# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC ,
SECURITIES LITIGATION

§
§
§
§
§
§

CIVIL ACTION NO  99-371-KAJ
(CONSOLIDATED)


## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## MOTION FOR CLASS CERTIFICATION


Jeffrey L  Moyer (#3309)
Alyssa M  Schwartz (#4351)
RICHARDS, LAYTON & FINGER, P.A
One Rodney Square
P.O  Box 551
Wilmington, Delaware  19899
jmoyer@rlf com
aschwartz@rlf com
(302) 658-6541

ATTORNEYS FOR DEFENDANTS
ADAMS GOLF, INC., B.H  ADAMS,
RICHARD H  MURTLAND, DARL P
HATFIELD, PAUL F  BROWN, JR ,
ROLAND E  CASATI, FINIS F.
CONNER,  AND STEPHEN R.
PATCHIN

OF COUNSEL
Paul R. Bessette
Jennifer R  Brannen
Christopher W. Ahart
Michelle A  Reed
AKIN GUMP STRAUSS HAUER &
FELD LLP
300 W. 6th Street, Suite 2100
Austin, Texas  78701
(512) 499-6200
(512) 499-6290

Dated:  March 14, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

I.    SUMMARY OF ARGUMENT ...................................................................... 1

II.   STATEMENT OF FACTS ............................................................................ 3

      A.    The Company ..................................................................................... 3

      B.    The Initial Public Offering .............................................................. 4

      C.    The Company's Performance After the IPO ................................... 7

      D.    Plaintiffs' Allegations ....................................................................... 9

      E.    Class Certification ........................................................................... 10

            1    The Proposed Classes ............................................................. 10

            2    The Proposed Class Representatives ..................................... 11

III.  ARGUMENT ............................................................................................... 13

      A.    Plaintiffs bear the strict burden of proving that the proposed class
            satisfies all the Rule 23 requirements for certification ............... 13

      B.    Any class, if certified, must be narrowly defined ......................... 14

            1    This Court's prior Order limits the section 12(a)(2) subclass to
                 a single day—July 10, 1998 .................................................. 15

            2    The section 11 class period must end, as a matter of law, no
                 later than October 22, 1998 .................................................. 15

      C.    Plaintiffs have failed to satisfy their burden of proof that the proposed
            class representatives are adequate—all have had little or no
            supervisory role in the litigation ................................................... 18

            1    The proposed class representatives do not have a basic
                 understanding of the litigation ............................................. 20

            2    The proposed class representatives do not understand their
                 roles as class representatives ................................................. 21

i

3     The proposed class representatives have failed to supervise
      class counsel ................................................................22

4     The proposed class representatives were solicited by and are
      beholden to their attorneys ...........................................23

D     Plaintiffs have failed to satisfy their burden of proof that the proposed
      class representatives are adequate—all have interests antagonistic to
      the class ......................................................................24

1     All the class representatives arguably knew about the alleged
      misrepresentation when they purchased Adams Golf stock ...........25

2     Craus, Tonore, and Morrash are inadequate because they
      testified that other factors may have contributed to the stock-
      price decline ................................................................27

3     Craus and Tonore are inadequate because they purchased
      Adams Golf stock after the alleged undisclosed risk was
      revealed .....................................................................28

4     Craus and Tonore are inadequate because they cannot trace
      certain stock purchases to the IPO ..................................29

E     The proposed class representatives and their counsel are inadequate for
      failure to comply with rules governing attorney's fee arrangements .......32

F     Craus is atypical because she is preoccupied with a unique theory of
      liability ......................................................................33

IV    CONCLUSION ...............................................................35

## TABLE OF AUTHORITIES

### CASES

*Abbey v. Computer Memories, Inc.*,
   634 F. Supp. 870 (N.D. Cal. 1986) ................................................................ 29

*In re Adams Golf, Inc. Sec. Litig.*,
   176 F. Supp. 2d 216 (D. Del. 2001) ........................................................ 15, 29

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004) ...................................................................... 9, 29

*In re Advanced Tissue Sci. Sec. Litig.*,
   184 F.R.D. 346 (S.D. Cal. 1998) ................................................................ 18

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988) ...................................................................................... 17

*Berger v. Compaq Computer Corp.*,
   257 F.3d 475 (5th Cir. 2001),
   *reh'g denied*, 279 F.3d 313 (5th Cir. 2002) ........................................ 13, 18

*Berwecky v. Bear, Stearns & Co.*,
   197 F.R.D. 65 (S.D.N.Y. 2000) .................................................................. 28

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ................................................................ 17

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ........................................................................ 24

*In re Cirrus Logic Sec. Litig.*,
   155 F.R.D. 654 (N.D. Cal. 1994) ................................................................ 19

*In re DaimlerChrysler AG Sec. Litig.*,
   216 F.R.D. 291 (D. Del. 2003) .................................................................... 18

*Dubin v. Miller*,
   132 F.R.D. 269 (D. Colo. 1990) ................................................................ 33

*Feiner v. SS&C Techs., Inc.*,
   47 F. Supp. 2d 250 (D. Conn. 1999) .......................................................... 15

*In re Frontier Ins. Group, Inc. Sec. Litig.*,
   172 F.R.D. 31 (E.D.N.Y. 1997) .................................................................. 23

iii

*General Tel. Co. of Southwest v. Falcon,*
   457 U.S. 147 (1982) .................................................................... 14

*In re Initial Pub. Offering Sec. Litig.,*
   2004 WL 2297401 (S.D.N.Y. Oct. 13, 2004) ....................... 18, 30, 31

*J.H. Cohn & Co. v. Am. Appraisal Assocs.,*
   628 F.2d 994 (7th Cir. 1980) ...................................................... 25
*Klein v. A.G. Becker Paribas, Inc.,*
   109 F.R.D. 646 (S.D.N.Y. 1986) ........................................... 16, 17

*Klein v. Henry S. Miller Residential Servs., Inc.,*
   82 F.R.D. 6 (N.D. Tex. 1978) ..................................................... 33

*Koenig v. Benson,*
   117 F.R.D. 330 (E.D.N.Y. 1987) ................................................ 29

*Kovaleff v. Piano,*
   142 F.R.D. 406 (S.D.N.Y. 1992) ................................................ 28

*Krim v. PcOrder,* 2005 WL 469618 (5th Cir. March 1, 2005) ........... 30, 31

*Kurczi v. Eli Lilly & Co.,*
   160 F.R.D. 667 (N.D. Ohio 1995) .............................................. 30

*Lerch v. Citizens First Bancorp, Inc.,*
   144 F.R.D. 247 (D.N.J. 1992) .......................................... 15, 16, 18, 24

*In re ML-Lee Acquisition Fund II, L.P. &*
   *ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Sec. Litig.,*
   848 F. Supp. 527 (D. Del. 1994) ................................................ 13

*Martin v. Dahlberg,*
   156 F.R.D. 207 (N.D. Cal. 1994) ............................................... 13

*McNichols v. Loeb Rhoades & Co.,*
   97 F.R.D. 331 (N.D. Ill. 1982) .............................................. 25, 27

*Navellier v. Sletten,*
   262 F.3d 923 (9th Cir. 2001) ..................................................... 14

*In re Network Assocs., Inc. Sec. Litig.,*
   76 F. Supp. 2d 1017 (N.D. Cal. 1999) ........................................ 19

iv

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) .............................................................. 34

*In re Quintus Sec. Litig.*,
201 F.R.D. 475 (N.D. Cal. 2001) ...................................................... 32

*In re Rent-Way Sec. Litig.*,
218 F.R.D. 101 (W.D. Pa. 2003) ................................................. 14, 26

*In re Safeguard Scientifics*,
216 F.R.D. 577 (E.D. Pa. 2003) ........................................................ 29

*Savino v. Computer Credit, Inc.*,
164 F.3d 81 (2d Cir. 1998) ................................................................ 23

*Szczubelek v. Cendant Mtg. Corp.*,
215 F.R.D. 107 (D.N.J. 2003) ........................................................... 14

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) .......................................................................... 17

*Weiss v. York Hospital*,
745 F.2d 786 (3d Cir. 1984) .............................................................. 33

*Wetzel v. Liberty Mutual Insur. Co.*,
508 F.2d 239 (3d Cir. 1974) .............................................................. 24

*Zenith Labs., Inc. v. Carter-Wallace, Inc.*,
530 F.2d 508 (3d Cir. 1975) ......................................................... 24, 25

## STATUTES AND OTHER AUTHORITIES

15 U.S.C. § 77 ........................................................... 15, 16, 25, 27

FED. R. CIV. P. 23 ................................................................... *passim*

DEL. R. PROF'L. CONDUCT 1.5(c) ................................................ 32

PA. R. OF PROF'L. CONDUCT 1.5(c) .............................................. 32

Joint Explanatory Statement of the Committee of Conference, H R CONF REP No 104-369, 104th Cong , 1st Sess (1995), *reprinted in* U S C A.A N 730 ............... 2, 18

Ken Van Kampen, "Why Are Club Sales Flat, And What Can Retailers Do About It?", GOLF PRO, Sept 1, 1998 ............... 32

7 C CHARLES A WRIGHT & ARTHUR R MILLER, FED PRAC & PROCED § 1763 (1972) ............... 33

RLF1-2851996-1

Defendants Adams Golf, Inc ("Adams Golf" or the "Company"), B  H  (Barney) Adams, Richard M  Murtland, Darl P  Hatfield, Paul F  Brown, Roland E  Casati, Finis F  Conner, and Stephen R  Patchin (the "Adams Golf Defendants") respectfully submit this brief in opposition to plaintiffs' motion for class certification and to appoint Patricia Craus, Todd Tonore, John Morrash, and F Kenneth Shockley as class representatives [1]

## I.    SUMMARY OF ARGUMENT

It is black-letter law that plaintiffs bear the factual burden of establishing all of the prerequisites of Federal Rule of Civil Procedure 23  Plaintiffs failed to meet this burden in their Motion for Class Certification (D I  117) and accompanying Memorandum of Law (Mot ) (D I 118) because they did not, and cannot, establish that. (1) the proposed class is appropriately defined; (2) the proposed representatives will fairly and adequately represent the interests of the class; and (3) the proposed class representatives' claims are typical of the claims of absent class members   None of the proposed class representatives has submitted a declaration, and the exhibits submitted by plaintiffs' counsel do nothing to address the qualifications of the proposed class representatives

First, plaintiffs fail to articulate an appropriate class period  Any class, if certified, must be narrowly defined  For example, this Court's prior order limits the section 12(a)(2) subclass to a single day—July 10, 1998  And the section 11 class must end, as a matter of law, no later than October 22, 1998, when Adams Golf specifically disclosed that the gray marketing of some of its clubs was affecting its sales results—which plaintiffs allege was misrepresented in or omitted from the prospectus

---

[1] Plaintiffs have withdrawn Federated National Insurance Company as a proposed class representative  (Decl of Alyssa M  Schwartz ("Schwartz Decl.") ¶ 2, Ex  1.)

1

In this case, however, no class should be certified at all because plaintiffs failed to establish that the proposed class representatives will adequately represent the absent class members. Plaintiffs' motion fails even to address—much less prove—that the proposed class representatives are supervising or controlling the litigation. It is now clear why: the deposition testimony reveals that the proposed representatives have wholly abdicated their duties to their counsel. This is particularly troublesome in light of one of the primary goals of the Private Securities Litigation Reform Act of 1995 ("PSLRA")—to stop "the manipulation by class action lawyers of the clients whom they purportedly represent" by assuring that class representatives "exercise supervision and control of the lawyers for the class."[2]  The proposed class representatives, who have ceded control of the lawsuit to their counsel, are precisely the kind of figurehead plaintiffs the PSLRA discourages and Rule 23 precludes as inadequate.

The proposed representatives also are inadequate because each is subject to various unique defenses that make their interests antagonistic to the class. All of them (or their agents) arguably knew about the alleged misrepresentation or omission when they purchased Adams Golf stock. Three of the four are inadequate because they testified that other factors likely contributed to the stock-price decline. Two of the four purchased Adams Golf stock after the disclosure of the allegedly misrepresented or omitted fact. And the same two cannot trace certain stock purchases to the IPO and thus are subject to unique defenses that make them antagonistic to the section 11 class. Additionally, all the proposed class representatives and class counsel are inadequate because they do not appear to have a written fee agreement with Berger &

---

[2] Joint Explanatory Statement of the Committee of Conference, H.R. CONF. REP. NO. 104-369, 104th Cong., 1st Sess. (1995), *reprinted in* U.S.C.A.A.N. 730, 730-31 ("Joint Explanatory Statement"). (Schwartz Decl. ¶ 15, Ex. 14.)

Montague—a requirement of both Delaware and Pennsylvania law—preventing the Court from evaluating one of the key components in determining adequacy

Finally, proposed class representative Craus is atypical because she is preoccupied with theories of liability uncommon to, and in fact in conflict with, the proposed class  For these reasons, and others more fully stated below, this Court should deny plaintiffs' motion, or at a minimum, narrowly define the class period

## II.    STATEMENT OF FACTS

### A.    The Company

Adams Golf was founded in 1987 to make premium performance golf clubs  Adams Golf's breakthrough product was a fairway wood, the Tight Lies, which was introduced in 1995 The Tight Lies introduced a low-profile design to fairway woods and a number of innovative features that are the subjects of various United States patents  (Schwartz Decl ¶ 3, Ex 2 at 17 )

Adams Golf's financial performance demonstrated that Tight Lies was a breathtakingly successful product  In 1996, the Company's net sales were $3 5 million  (Schwartz Decl ¶ 3, Ex 2 at 16 )  In 1997, sales shot up 942% to $36 7 million  (Schwartz Decl ¶ 3, Ex 2 at 16 ) Sales of the Tight Lies fairway woods accounted for 94.3% of these revenues  (Schwartz Decl ¶ 3, Ex 2 at 19 )  In the first quarter of 1998 alone (the last fiscal quarter before the IPO), net sales were $24 5 million—Tight Lies sales accounted for 97 3%  (Schwartz Decl ¶ 3, Ex 2 at 18 )

This huge sales increase did not immediately translate into profit, however, as the Registration Statement frankly disclosed.  Despite the nearly thousand-percent sales increase in 1997, Adams Golf still incurred a net loss of $4 6 million in fiscal 1997  (Schwartz Decl ¶ 3, Ex 2 at 16 )  But in the first quarter of fiscal 1998, Adams Golf reported net income of more than $5.6 million  (Schwartz Decl ¶ 3, Ex 2 at 16 )

3

### B.     The Initial Public Offering

Adams Golf's Registration Statement became effective after market close on July 9, 1998 (*i e*, all IPO purchases occurred on July 10, 1998 at $16 per share)  (Schwartz Decl. ¶ 3, Ex  2 ) Far from being misleading, the Registration Statement fully and fairly disclosed the risks associated with an investment in Adams Golf. The Registration Statement candidly disclosed the Company's limited history of profitability, history of operating losses, and the role that the Company's flagship product—the Tight Lies woods—played in the Company's recent and very rapid growth, as well as numerous other risks. In particular, the Registration Statement warned that a "decline in demand for, or average selling prices of, the Tight Lies line of products would have a material adverse effect on the Company's business, operating results and financial condition." (Schwartz Decl. ¶ 3, Ex. 2 at 6 )

The significance of this risk could not have escaped the eye of the reasonable investor, given the many warnings about the highly competitive nature of the golf-equipment business. The Registration Statement warned that "successful technologies, designs and product concepts are likely to be copied by competitors" (Schwartz Decl  ¶ 3, Ex  2 at 6 )  Moreover, Adams Golf's competitors included "a number of established companies, many of which have greater financial and other resources than the Company" (Schwartz Decl  ¶ 3, Ex  2 at 8 ) Adams Golf would compete with these well-armed competitors for discretionary consumer spending, which itself was influenced by a number of unpredictable factors  The Registration Statement warned that consumer purchasing decisions "are often the result of highly subjective preferences, which can be influenced by many factors, including, among others, advertising, media, promotions and product endorsements " (Schwartz Decl  ¶ 3, Ex  2 at 8 )

This competition for consumers' golf dollars "could result in significant price erosion which could have a material adverse effect on the Company's business, operating results and

4

financial condition." (Schwartz Decl. ¶ 3, Ex. 2 at 8-9.) Adams Golf warned that the highly competitive nature of the golf-equipment business, historical seasonality in golf spending (favoring the second and third quarters of the year), and the inherently unpredictable nature of consumer spending patterns meant that "period-to-period comparisons of its results of operations should not be relied upon as an indication of future performance." (Schwartz Decl. ¶ 3, Ex. 2 at 10.) The Company's future results were subject to the influence of many unpredictable factors, including "demand for and market acceptance of the Company's existing      products, new product introductions by the Company's competitors; competitive pressures resulting in lower than expected average selling prices; and the volume of orders that are received      in a quarter." (Schwartz Decl. ¶ 3, Ex. 2 at 10.)

To aggressive investors, Adams Golf represented an opportunity. After its introduction in 1995, the Tight Lies line of fairway woods had grown to be "the top-selling single fairway woods in the U.S. on a unit volume basis" during the first quarter of 1998, with "a 27% market share of the single fairway woods category" according to the Golf Market Research Institute (Schwartz Decl. ¶ 3, Ex. 2 at 3.) The Company achieved these results through, among other things, a selective retail-distribution policy, "limiting its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and expertise" (e.g., on-and-off course pro shops and sporting-goods stores), and to a lesser extent, by selling direct to consumers (e.g., television shopping channels and infomercials). (Schwartz Decl. ¶ 3, Ex. 2 at 3, 24, 17.)

The Company believed that its selective retail distribution helped its retailers maintain profitable margins and maximize sales of its products. (Schwartz Decl. ¶ 3, Ex. 2 at 3, 24.) During the last five years for which annual information was available, wholesale golf-club sales

had increased to $2.4 billion, at an estimated compound annual rate of approximately 13%
(Schwartz Decl. ¶ 3, Ex. 2 at 3.)  Broad social and demographic trends suggested further
increases in demand as well, given an increased interest in golf and an aging population, and as
reflected by increased golf-course construction  (Schwartz Decl. ¶ 3, Ex. 2 at 3-4.)

In this highly competitive and uncertain environment, Adams Golf's goal was to
"establish itself as a leading developer of technologically innovative, performance-oriented golf
clubs." (Schwartz Decl. ¶ 3, Ex. 2 at 4.)  To achieve this goal, the Company would attempt to
"build its share of the premium fairway woods market" and "leverage the success, performance
and reputation of the Tight Lies fairway woods" (Schwartz Decl. ¶ 3, Ex. 2 at 4.)  As
prominently disclosed, however, the golf-club business was marked by "the rapid evolution of
golf-club designs and materials," and competitors were likely to copy "successful technologies,
designs and product concepts" (Schwartz Decl. ¶ 3, Ex. 2 at 4-6.)  So, while Adams Golf sought
to build on its success with the Tight Lies, its future results would "depend, in large part, on its
ability to successfully develop and introduce new products accepted in the marketplace"
(Schwartz Decl. ¶ 3, Ex. 2 at 6.)  Whether consumers would accept these future products or
prefer products that might be offered by larger, well-established competitors, as well as the
uncertainty of future demand for Adams Golf's existing products, were all factors that the
Company warned could adversely affect its future operating results.  (Schwartz Decl. ¶ 3, Ex. 2
at 6.)

In the IPO, six million shares were sold at $16.00 per share.  As the Registration
Statement and Prospectus disclosed, the offering was conducted on a firm-commitment basis, in
which the shares are sold to the public, not by the Company or the selling shareholders, but by

6

the underwriters, who agreed in advance of the offering to purchase and re-sell the shares.[3] (Schwartz Decl. ¶ 3, Ex. 2.)

### C.     The Company's Performance After the IPO

Unfortunately for the Company's shareholders (which include all of the individual defendants), Adams Golf's stock did not perform as well as its clubs had.  When trading in Adams Golf began on NASDAQ on July 10, 1998, the stock traded as high as $18.825 and closed at $18.375.  (Schwartz Decl. ¶ 4, Ex. 3.)  The stock price held this ground briefly, but within days began a steady descent from which it has not recovered.

Notably, the decline persisted in spite of Adams Golf's report of its best quarter ever, and indeed, accelerated following that report.  On July 22, 1998, Adams Golf reported its results for the quarter ended June 30, 1998.  (Schwartz Decl. ¶ 5, Ex. 4.)  The Company posted record quarterly net sales of $33.8 million (an increase of 751% over the same quarter in 1997), with net income of $6.7 million.  (Schwartz Decl. ¶ 5, Ex. 4.)  For the first six months of 1998, Adams Golf posted net sales of $58.3 million, an increase of 970% over the first six months of 1997, with net income of $12.3 million (compared to net income of $41,000 for the first six months of 1997).  (Schwartz Decl. ¶ 5, Ex. 4.)  The Company's stock price nevertheless closed below the offering price that day, at $15.25 per share.  (Schwartz Decl. ¶ 4, Ex. 3.)  By the end of the following week, the stock price had dropped below $10.  Golf Pro magazine described the general decline aptly:  "Two words describe the golf club market so far this year: flat, and slow."[4]

---

[3] The underwriters for Adams Golf's IPO were Lehman Brothers Holdings, Inc., Banc of America Securities, LLC, and Ferris, Baker, Watts, Inc. (the "Underwriter Defendants").

[4] Ken Van Kampen, "Why Are Club Sales Flat, And What Can Retailers Do About It?", GOLF PRO, Sept. 1, 1998.  (Schwartz Decl. ¶ 15, Ex. 14.)

7

Between August 13 and September 25, 1998, the Company's stock price declined even more, dropping from $10 to $4.50 a share. (Schwartz Decl. ¶ 4, Ex. 3.) Then, on September 28, 1998, Adams Golf announced that it expected its third-quarter results to be between $22 and $23 million, slightly short of Wall Street analysts' estimates of about $25 million. (Schwartz Decl. ¶ 5, Ex. 5.) The Company believed the anticipated results were attributable to "new product introductions by the Company's competitors in the fairway wood category and, to a lesser degree, a general softening of golf equipment sales." (Schwartz Decl. ¶ 6, Ex. 5.) After this announcement, the Company's stock price declined about $0.62, closing at $4.00 a share on September 29, 1998. (Schwartz Decl. ¶ 4, Ex. 3.) For the next month, the Company's stock price traded in the $4 range. (Schwartz Decl. ¶ 4, Ex. 3.)

On October 22, 1998, Adams Golf announced its final operating results for the third quarter, ending September 30, 1998. (Schwartz Decl. ¶ 7, Ex. 6.) Net sales were just shy of $23 million, and net income was $4.3 million. (Schwartz Decl. ¶ 7, Ex. 6.) The Company also announced that "we anticipate our sales will be further impacted by the recent gray market distribution of our products to a membership warehouse club. While we are working diligently to identify and stop the unauthorized distribution of our products to this retailer, we anticipate this process will take at least through the end of the year." (Schwartz Decl. ¶ 7, Ex. 6.) Adams Golf had been aware, and publicly disclosed before the IPO, that Costco had improperly obtained a small number of clubs,[5] but it was only after the IPO that such the Company learned that gray marketing had a discernable impact on its overall sales. (Schwartz Decl. ¶ 7, Ex. 6.) Following

---

[5] On June 9, 1998, the Company announced it was filing a bill of discovery against Costco to determine whether Costco's claims that it had properly acquired Adams Golf's Tight Lies fairway woods for resale was accurate. (Schwartz Decl. ¶ 9, Ex. 8.) The Company was not aware of Costco possessing more than a few hundred clubs but still wanted to investigate because Costco was not an authorized distributor. (Schwartz Decl. ¶ 9, Ex. 8.)

8

the Company's October 22, 1998 announcement, the Company's stock continued to trade in the $4 range (Schwartz Decl ¶ 4, Ex 3 )

On January 7, 1999, the Company announced an anticipated net loss for the fourth quarter (Consolidated Am Compl ("CAC") (D I 28) ¶ 40 ) Plaintiffs contend that, in this announcement, "the Company finally disclosed a material fact that results had been, were currently, and would continue to be materially, adversely affected by gray market distribution to discount retailers " (CAC ¶ 40 ) But plaintiffs ignore both the Company's previous disclosure in its October 22 press release and the Company's statement in its January 7 announcement that fourth-quarter sales would be disappointing because of "continuing weakness in the golf equipment market " (Schwartz Decl ¶¶ 7-8, Exs 6-7 ) Nevertheless, the stock closed at $3 50, down only $0 125 the next day [6] (Schwartz Decl ¶ 4, Ex 3 ) The Company's 1998 Form 10K confirmed this announcement on March 29, 1999.

### D.   Plaintiffs' Allegations

Plaintiffs bring this lawsuit on behalf of all purchasers of Adams Golf stock in the IPO or traceable to the IPO (Mot at 1-2 ) Plaintiffs assert claims under sections 11, 12(a)(2) and 15 of the Securities Act (CAC ¶¶ 8-11 )

After remand, plaintiffs' only operative allegation is that Adams Golf's July 9, 1998 Registration Statement and Prospectus contained material misstatements and omissions

---

[6] The only other alleged curative disclosure that plaintiffs reference occurred on April 12, 1999, when the Company announced its final first-quarter 1999 results. According to plaintiffs, this announcement "disclosed that for at least 12 months—since well prior to the IPO—there had been an 'oversupply of inventory at the retail level' on an industry-wide basis." (CAC ¶ 49 ) Since dismissal of the industry over-supply allegations was affirmed by the Third Circuit Court of Appeals, this issue can no longer form the basis of any claim. *In re Adams Golf, Inc Sec Litig.*, 381 F 3d 267, 279 (3d Cir 2004)

concerning the alleged "gray market" distribution of the Company's golf clubs. *In re Adams Golf Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004). Plaintiffs contend that defendants should have foreseen in July 1998 that the Company's future sales would be materially affected because a relatively small number of its clubs had, without explanation or authorization, appeared in a few warehouses of the discount retailer, Costco. The CAC asserts that this gray-market distribution rendered certain statements in the Registration Statement concerning the Company's "selective retail distribution" false or misleading. (CAC ¶ 33.) Plaintiffs also contend that the gray-market distribution constituted a known adverse trend before the IPO that should have been disclosed in the Registration Statement pursuant to Item 303 of SEC Regulation S-K. (CAC ¶ 55.)

### E.    Class Certification

Plaintiffs provided no supporting declarations or other evidence—apart from the resumes of proposed class counsel—to meet their burden of proving the Rule 23 requirements. The record evidence submitted by the Adams Golf Defendants demonstrates that the proposed class representatives are inadequate and that a class should not be certified.

### 1.    The Proposed Classes

Plaintiffs seek to certify a section 11 class and a section 12(a)(2) subclass. The proposed section 11 class consists of "all persons who acquired the common stock of Adams Golf, Inc. . . . pursuant to, or traceable to, the Registration Statement issued in connection with the July 9, 1998 initial public offering." (Mot. at 1.) The proposed class representatives for the section 11 class are Patricia Craus, F. Kenneth Shockley, John Morrash, and Todd Tonore.

The proposed 12(a)(2) subclass consists of "all persons who purchased the common stock of Adams Golf, Inc., in the July 9, 1998 IPO and pursuant to the Registration Statement issued in connection with the IPO." (Mot. at 1.) The proposed class representatives for the 12(a)(2)

10

subclass are Patricia Craus, F. Kenneth Shockley, and John Morrash. Plaintiffs have not stated a class period for either proposed class.

### 2.    The Proposed Class Representatives

Although plaintiffs originally proposed five class representatives, they withdrew Federated National Insurance on February 9, 2005 because it was unwilling or unable to appear for a deposition. (Schwartz Decl. ¶ 2, Ex. 1.) The only remaining class representatives each testified to the same set of facts: they know nothing about the case and have completely ceded supervision and control of the litigation to lead counsel.

Patricia Craus is a Texas resident and personal acquaintance of B.H. Adams. (Craus 8.5, 73:18-74.9.)[7] She purchased stock in the IPO, but then she purchased five times as many shares after the October 22, 1998 disclosure. (Craus 82.23-83.12 at Dep. Ex. 13) (showing 1,000 shares purchased in IPO and 5,400 shares purchased in January 1999).) Although she represented to the Court in her investor certification that she never sold her shares, she in fact sold 100% of her IPO shares on November 9, 1998—Craus now claims that this was an "error." (Craus 45.11-21 at Dep. Ex. 4.) Her certification also fails to reflect her January 1999 purchases. (Craus 45.11-21 at Dep. Ex. 4.) Craus testified that her handwritten summary of trades reflected all of her trading in Adams Golf stock, but then later admitted that she bought more stock in the last few months. (Craus 83.10-12; 107.24-108.10.)

Todd Tonore, the only plaintiff who is not a member of the 12(a)(2) subclass, is also a Texas resident. (Tonore 8:3.)[8] He purchased 500 Adams Golf shares in the secondary market on

---

[7] Cited excerpts from Craus's deposition are attached as Exhibit 9 to the Schwartz Declaration. Exhibits introduced at the proposed class representatives' depositions are included in the same exhibit tab as their respective transcript excerpts and are called "Dep. Ex." hereinafter.

[8] Cited excerpts from Tonore's deposition are attached as Exhibit 10 to the Schwartz Declaration.

11

July 10, 1998 and purchased 5,700 additional shares from July to January 1999  (Tonore 80:20-81.12 at Dep. Ex. 27.)  Like Craus, Tonore continued to purchase stock after the October 22, 1998 disclosure.  (Tonore 80:20-81.12.)  And although Tonore testified he no longer holds any Adams Golf securities, his records reflect purchases of 6,200 shares but sales of only 2,040 shares.  (Tonore 84.4-19.)

John Morrash is a Pennsylvania resident.  (Morrash 12:2-5.)[9]  Morrash gave his broker complete discretion over his account, and on July 10, 1998, Morrash's broker purchased 4,000 shares in the IPO and then sold the shares at the end of 1998 for tax reasons.  (Morrash 22:13-24, 35.10-36.11, 159.7-13, Dep. Ex. 20 at JMM 11.)  Morrash did not learn of his stock purchase until after the IPO.  (Morash 22:21-23.3.)

Kenneth Shockley, a Florida and New Jersey resident, is a family friend of Morrash and in 1998 used the same broker.  (Shockley 7.22-8.4.)[10]  His sworn certification states that he bought 1,500 shares in the IPO and sold them at the end of 1998 for a loss.  (Shockley 85:23-86.10 at Dep. Ex. 23.)  His certification conceals, however, that he actually purchased 3,000 shares in the IPO and then sold 1,500 of those shares for a profit on July 17, 1998.  (Shockley 130.4-25 at Dep. Ex. 30.)  Shockley relied heavily on his broker's advice and provided no input on the decision to purchase Adams Golf stock.  (Shockley 159.18-160.17.)

---

[9] Cited excerpts from Morrash's deposition are attached as Exhibit 11 to the Schwartz Declaration.

[10] Cited excerpts from Shockley's deposition are attached as Exhibit 12 to the Schwartz Declaration.

## III.  ARGUMENT

### A.    Plaintiffs bear the strict burden of proving that the proposed class satisfies all the Rule 23 requirements for certification

Plaintiffs imply that class certification in a securities case should be quasi-automatic. (Mot at 4-6.) This is contrary to the law—"[p]laintiffs, as the proponents of class certification, have the burden of establishing a right to class certification." *In re ML-Lee Acquisition Fund II, L.P. & ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Sec. Litig.*, 848 F. Supp. 527, 557 (D. Del. 1994); *see also Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481-82 (5th Cir. 2001) (reversing class certification in a securities litigation case because the district court applied the incorrect legal standard by stating that "'[t]he adequacy of the putative representatives . . . is presumed in the absence of specific proof to the contrary'"), *reh'g denied*, 279 F.3d 313 (5th Cir. 2002) (clarifying that no new standard for adequacy was created).[11]

To qualify for class certification under Rule 23(a), the proposed class representatives must establish that: (1) the proposed class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately represent the interests of the class. FED. R. CIV. P. 23(a), *ML-Lee*, 848 F. Supp. at 557-58. The proposed class action must also satisfy at least one element of Rule 23(b). FED. R. CIV. P. 23(b), *ML-Lee*, 848 F. Supp. at 558. Here, plaintiffs rely on Rule 23(b)(3), which requires that the questions common to the class predominate over questions affecting individual members *and* that a class action be superior to

---

[11] *Accord Martin v. Dahlberg*, 156 F.R.D. 207, 213 (N.D. Cal. 1994) ("The burden of proving that a class is appropriate rests with the proponent of the class action. The party seeking to maintain the action as a class suit must, therefore, establish a *prima facie* showing of each of the four certification prerequisites . . .")

other available methods for the fair and efficient adjudication of the controversy. (Mot at 14-15.)

Plaintiffs must establish each of these factual and legal prerequisites for class certification. *In re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 111 (W.D. Pa. 2003). They "cannot simply reiterate conclusory allegations to satisfy the requirements but must instead allege sufficient facts demonstrating that all of the requirements for bringing a class action are fulfilled." *Id.*; *see, e.g., Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001) holding ("[b]ald assertions" that "there are no intra or interclass conflicts" or that "there are no unique defenses" are insufficient to justify class certification). Courts must thoroughly examine plaintiffs' factual and legal allegations, including, if necessary, "'prob[ing] behind the pleadings before coming to rest on the certification question.'" *Szczubelek v. Cendant Mtg. Corp.*, 215 F.R.D. 107, 114 (D.N.J. 2003) (quoting *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982)).

The Court should reject class certification in this case because plaintiffs have not met and cannot meet their burden of proof for at least three separate reasons: (1) they have failed to appropriately define a class period; (2) they have not established that the proposed representatives will fairly and adequately represent the interests of the class, and (3) proposed class representative Craus is atypical because she is preoccupied with unusual theories of liability.

**B.    Any class, if certified, must be narrowly defined**

Although it is ordinarily true that the Court should not decide the merits of the underlying claims when considering a motion for class certification, this certainly does not mean that the Court must ignore well-settled law when defining the scope of the purported class. The Supreme Court has instructed that courts must "probe behind the pleadings" in coming to rest on the class-certification decision. *Falcon*, 457 U.S. at 160. "While it is true that a finding that the class

14

period ends sooner than plaintiffs wish is, in one sense, a merits determination, such a determination is not necessarily improper at this stage of the litigation " *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 254 (D.N.J. 1992) (narrowing plaintiffs' proposed 10b-5 class period at the class-certification stage)

### 1.  This Court's prior Order limits the section 12(a)(2) subclass to a single day—July 10, 1998

In its Order on the motion to dismiss, this Court held that only those plaintiffs who purchased their Adams Golf shares in the IPO, at the IPO price, directly from the Underwriter Defendants, have standing to bring claims under section 12(a)(2).[12] *In re Adams Golf, Inc. Sec. Litig.*, 176 F. Supp. 2d 216, 224-25 (D. Del. 2001) (D.I. 70)  Accordingly, plaintiffs are estopped from including anyone in the section 12(a)(2) subclass who does not meet this criteria.[13]  Any section 12(a)(2) subclass therefore, by definition, must begin and end on July 10, 1998.[14]

### 2.  The section 11 class period must end, as a matter of law, no later than October 22, 1998

The section 11 class period should end no later than October 22, 1998.  Plaintiffs claim that Adams Golf's Registration Statement and Prospectus omitted and misrepresented the

---

[12] The lead plaintiffs who met this criterion were F. Kenneth Shockley and David Shockley, so the Court referred to them in the Order as the "Shockley plaintiffs." *Adams Golf*, 176 F. Supp. 2d at 218, 223.

[13] Plaintiffs failed to propose a class period in their motion, but the CAC alleges and the proposed class representatives testified that the class should be limited to individuals who purchased 25 days after the IPO.  (CAC ¶¶ 7, 18, 68; Craus 48:1-5; Tonore 47:4-7; 49:6-12; 53:19-22; 112:10-17; Morrash 128:8-16.)  Some courts have held that section 12(a)(2) liability is coextensive with the statutory and regulatory prospectus-delivery requirements (*i.e.*, 25 days), instead of limited to the initial distribution of shares. *E.g.*, *Feiner v. SS&C Techs., Inc.*, 47 F. Supp. 2d 250, 252-54 (D. Conn. 1999)  Presumably, plaintiffs and the proposed class representatives refer to this 25-day period in the CAC and their testimony, but this Court has already specifically rejected this contention. *Adams Golf*, 176 F. Supp. 2d at 225.

[14] In addition, there is no joint-and-several liability under section 12, so investors may only sue the immediate seller from whom they purchased.  15 U.S.C. 77l.  Accordingly, the Court should designate a separate 12(a)(2) subclass for each Underwriter Defendant.

15

material risk of gray-market distribution    (CAC ¶¶ 25-26.)    To prevail on their claim, "plaintiff[s] must be able to prove that [they] purchased stock issued and sold pursuant to a deficient registration statement, and that [they] did not have knowledge of that deficiency." *Klein v. A.G. Becker Paribas, Inc.*, 109 F.R.D. 646, 652 (S.D.N.Y. 1986). Plaintiffs' knowledge of the allegedly omitted or misrepresented information provides an absolute defense to a section 11 claim. 15 U.S.C. § 77k(a).

On October 22, 1998, Adams Golf announced that the gray marketing of its clubs had affected its third-quarter results, and thus overdisclosed and apprised the market of the risk that plaintiffs claim was missing from the Registration Statement and Prospectus.[15] (Schwartz Decl. ¶ 7, Ex. 6.) "[A] number of courts have held that 'liability under the securities acts is terminated when curative information is publicly announced or otherwise effectively disseminated.'" *Lerch*, 144 F.R.D. at 253 (quoting *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143 (D.N.J. 1984)). Consequently, any section 11 class should terminate no later than October 22, 1998, when Adams Golf again disclosed the existence of a gray market.[16] *See Klein*, 109 F.R.D. at 652 (certifying a section 11 and 12(a)(2) class of investors who purchased shares between the IPO date and the date when the allegedly omitted information was substantially disclosed). Each of

---

[15] Arguably, the class period should end much earlier than October 22, 1998, because the market for Adams Golf stock incorporated the June 9, 1998 press release concerning the gray market into the total mix of information when the market for the stock became efficient. *See infra* nn. 15-16. Defendants intend to raise this issue in an early summary-judgment motion to further limit any class period initially certified and to prove their negative-causation defense.

[16] Although the Company disclosed in its January 7, 1999 press release that results would continue to be affected by gray-market distribution, the risk that plaintiffs complain of had already occurred and been disclosed in October 1998. (Schwartz Decl. ¶ 8, Ex. 7.) Accordingly, plaintiffs cannot extend the section 11 class period by arguing that the October 1998 disclosure did not fully reveal the ultimate impact of gray marketing on the Company.

16

the proposed class representatives testified about his or her actual knowledge of the gray-market disclosure. (Craus 16.12-17.2, Tonore 22:19-23; Morrash 56:4-21; Shockley 25.25-26:13.)

This disclosure eliminates recovery beyond October 22, 1998 as a matter of law for two reasons. (1) individual issues regarding investors' knowledge will predominate after this date because the question whether investors had actual knowledge of the widely disseminated press release will overwhelm common issues, and (2) any alleged omission was rendered immaterial by the disclosure. On the first point, the October 22 disclosure of the allegedly omitted information was incorporated into the market price in an efficient market.[17] Thus, investors' knowledge of the gray market after the disclosure date will predominate because the market price reflected the disclosed information.[18]

On the second point, any alleged omission or misrepresentation is only actionable if it is material—that is, if a reasonable investor would have viewed its disclosure as significantly altering the "total mix of information" available about the stock. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Thus, once the Company announced *any* possibility of gray marketing, the alleged omission or misrepresentation was rendered immaterial as a matter of law by the disclosure, which would be incorporated into the market price. *Klein*, 109 F.R.D. at 652.

---

[17] Adams Golf's stock satisfies all of the most important efficient-market criteria: (1) it traded on NASDAQ; (2) it had high trading volumes, especially on days when there was news about the Company; (3) the stock price responded to Company-specific news; and (4) it had substantial analyst coverage. *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); (Schwartz Decl. ¶ 4, Ex. 3); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (adopting the fraud-on-the-market theory as the basis for a reliance presumption in section 10b-5 cases—the theory's underlying premise is that all available material information is incorporated into a stock's price if that stock trades in an efficient market).

[18] In addition to this Rule 23(b)(3) ground for truncating any class period, the Court also could find under Rule 23(a)(3) that investors' claims after October 22, 1998 would not be typical of the proposed class representatives' claims or other absent class members' claims who bought before that date because antagonism would exist between pre- and post-disclosure investors. *See Klein*, 109 F.R.D. at 652 (terminating class period on disclosure date because post-disclosure investors were atypical).

(narrowing the class period because the named plaintiffs' claim of an alleged material omission would conflict with and not be typical of claims made by investors who had access to the information); *see also Lerch*, 144 F R D. at 254-55

Finally, plaintiffs' inability to trace provides an alternative ground to truncate the class: any class period must end before shares issued pursuant to the December 1, 1998 SEC Form S-8 entered the market. If the class period were not so limited, then "the resulting inquiry would fragment the class action into myriad mini-trials on the subject of tracing." *In re Initial Pub. Offering Sec. Litig.*, 2004 WL 2297401, \*38-39 (S.D.N.Y. Oct. 13, 2004); *see infra* Part III D.4.

## C.    Plaintiffs have failed to satisfy their burden of proof that the proposed class representatives are adequate—all have had little or no supervisory role in the litigation

The adequacy analysis requires an inquiry into the willingness and ability of the proposed representatives to take an active role in and control the litigation and to protect the interests of absent class members.[19] In the Third Circuit, as this Court noted, "Courts have declined to certify a class where the proposed lead plaintiffs have little or no supervisory role in the litigation and little knowledge of the underlying facts of the law suit." *In re DaimlerChrysler AG Sec. Litig.*, 216 F R D. 291, 299 (D. Del. 2003). The post-PSLRA reality is that: "[B]ecause absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times."[20] *Berger*, 257 F 3d at 480

---

[19] *See* Joint Explanatory Statement, *supra* note 2, at 31-35

[20] *See also In re Advanced Tissue Sci Sec Litig*, 184 F R D. 346, 352 (S.D. Cal. 1998) ("The very purpose of the PSLRA was to curtail the influence of professional, figurehead plaintiffs by transferring primary control of the private securities litigation from lawyers to investors.") (internal

18

Even before the PSLRA's enactment, courts oftentimes denied class certification in securities cases where the proposed representatives failed to supervise their attorneys. *See, e.g., In re Cirrus Logic Sec. Litig.*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (denying class certification where plaintiff had performed no independent investigation, his attorneys had decided whom to name as defendants and what types of claims to bring, and he was unaware that his lawyers had filed an amended complaint). Although the PSLRA did not change the procedural requirements, it did raise the bar—one of its primary goals was to end the "manipulation by class action lawyers of their clients whom they purportedly represent" by assuring that class representatives "exercise supervision and control of the lawyers of the class."[21]

Here, plaintiffs have made no attempt to demonstrate the adequacy of the proposed class representatives. Instead, they claim falsely—and without any explanation, much less evidence—that the proposed representatives are adequate:

> Class Representatives are not antagonistic to the interests of the Class or Subclass. As discussed above, the claims and injuries of Class Representatives arise out of the same misrepresentations and omissions in the Registration Statement that injured the Class and Subclass Members. Since Sections 11 and 12 do not require

---

citations omitted). One court explained that lead plaintiffs owe absent class members specific fiduciary obligations:

> The PSLRA seeks to place the lead plaintiff in charge of conduct of the litigation on behalf of the class. The lead plaintiff owes a fiduciary duty to all members of the proposed class to provide fair and adequate representation and actively to work with class counsel.    [T]he lead plaintiff shall take affirmative steps to keep itself fully informed at all times on the progress and status of the case, the strengths and weaknesses of the case, the prospects for settlement, and the resources invested in the suit or proposed to be invested.    To minimize reduction from recovery for attorney's fees, the lead plaintiff shall consult with counsel in advance to determine whether major tasks proposed by counsel are likely to add more value to the case than would be incurred in time and expense. In this connection, the lead plaintiff shall review monthly time and expense records prepared by counsel.

*In re Network Assocs., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1032-33 (N.D. Cal. 1999).

[21] *See* Joint Explanatory Statement, *supra* note 2, at 730-31.

19

> reliance on the misrepresentation or omission, there can be no
> issue of differences in reliance between Class Representatives and
> the Classes  As a result, there can be no antagonism between the
> claims of Class Representatives and the other Class and Subclass
> Members

(*See* Mot  at 13 )  Such boilerplate does not demonstrate the proposed class representatives'

willingness and ability to control the litigation   Indeed, the relevant deposition testimony

demonstrates that the proposed representatives have ceded control of the litigation to lead

counsel in direct contravention of the PSLRA's mandate [22]

### 1.    The proposed class representatives do not have a basic understanding of the litigation

To supervise the litigation, the proposed class representatives must first understand it

None has demonstrated such an understanding

- Although Shockley was the first plaintiff to file a lawsuit, he did not know it
  When asked who filed the first lawsuit, Shockley stated, "I'd have to ask my
  attorney" (Shockley 78:13-20 )  When asked when the lawsuit was filed, he
  reiterated, "I'd have to ask my attorney" (Shockley 78.21-23 )

- Craus was unsure whether she had read the CAC before it was filed  (Craus 28:3-
  18 ) Tonore did not review it before it was filed  (Tonore 28.23-29:4 ) When
  asked about the complaint he originally filed, Shockley said, "What is it?  I don't
  really know  ." (Shockley 43.15-44.9 )  Shockley testified that he did not
  review the Consolidated Amended Complaint for accuracy: "I think something
  like this I would get an opinion on  If you can't trust your lawyer, then why are
  you hiring him?" (Shockley 48.4-7 )

- Craus could not name any defendants other than Adams Golf and Barney Adams
  (Craus 12:15-24 ) Tonore did not know how many defendants there were and
  could only identify the Company, Adams, and vague references to the
  underwriters  (Tonore 15:7-14 )  Morrash could not name any of the individual
  defendants other than Adams and could not name any of the underwriter
  defendants  (Morrash 16:7-14 ) Shockley could not name the defendants and did
  not even know how many defendants there were  (Shockley 17.2-18.5 )

---

[22] *Id*

- Tonore had no idea what claims, if any, were dismissed by the Court or the Third Circuit Court of Appeals  (Tonore 64:16-65:2; 65.24-66:3 )

- Although mediation has been scheduled for June 1, 2005, none of the class representatives had been asked to attend  (Craus 53.1-3; Tonore 58.22-24; Morrash 137.17-24; Shockley 94:24-95.7 )  In fact, Shockley thought he "might be in the Bahamas" for the scheduled mediation.  (Shockley 95.5-7 )

- Neither Shockley nor Craus knew that several complaints against Adams Golf were consolidated  (Craus 43.4-7; Shockley 78.24-79:6 )

- Craus had no understanding of the class she is seeking to represent.  (Craus 46.23-47.12 )  She did not even know that there are two proposed classes  (Craus 47.13-18 )  Neither Craus nor Tonore know when the proposed class period begins or ends  (Craus 48:16-19, Tonore 54.22-55.4 )  Shockley did not have any idea about the contours of the class he is seeking to represent—instead repeatedly saying "I would have to ask my attorney "  (Shockley 89:5-90.7 )

- Tonore thought the list of potential witnesses in the plaintiffs' initial disclosures was a list of class members  (Tonore 34.20-35.1 )

- Shockley never discussed the strengths and weaknesses of the case with his attorneys  (Shockley 101:9-16.)  He has not discussed the prospects of settlement and thought that he would know of a settlement offer once the parties had reached agreement  (Shockley 101.17-24 )

- Although her testimony was inconsistent, Craus did not appear to have reviewed any drafts of her interrogatory or document-request responses before they were submitted  (Craus 65.7-13, 70:2-7 )

- Until defendants showed the document to him, Tonore had never seen plaintiffs' motion for class certification  (Tonore 94:15-95.4 )

**2.    The proposed class representatives do not understand their roles as class representatives**

The proposed class representatives did not appear to have any understanding of what their role is in managing the litigation, and some did not even know that they were seeking to be appointed as a class representative

- When asked if he was appointed lead plaintiff, Shockley testified, "That's what they said  I didn't volunteer for that."  (Shockley 87.22-25 )  When asked why he would be an appropriate class representative, Shockley testified, "I don't think I'd be a perfect class representative.    I don't go through all this legal stuff and you don't want to know my opinion of lawyers "  (Shockley 93.7-14 )

- Although Craus and Tonore were appointed lead plaintiffs in this action, neither knew whether s/he was appointed lead plaintiff and neither could name any other lead plaintiffs  (Craus 46.9-19, Tonore 52.11-25.)

- Craus and Shockley did not know whether they were seeking to be a named class representative and had no idea how many proposed class representatives there are (Craus 46:20-22, 49.8-10, Shockley 88.5-8.)  None had ever met with or spoken to any of the other proposed class representatives, and none knew how many class representatives were proposed    (Craus 49.19-50:2, Tonore 56:3-11, Morrash 132:2-4, Shockley 90.23-91.3.)

Certainly a proposed class representative is not adequate where, as Shockley testified, he did not "volunteer" to be a representative and he does not think he would be an appropriate one.

### 3.    The proposed class representatives have failed to supervise class counsel

The deposition testimony of the proposed class representatives demonstrates that they have not and will not supervise class counsel.

- None had met personally with lead plaintiffs' counsel before the deposition preparation.  (Craus 11.6-8; Tonore 11.16-18, Morrash 9.10-15, Shockley 98.19-99.2.)

- The proposed class representatives have done nothing to control costs of the litigation.  (Craus 57.10-12; Tonore 63:14-16, Shockley 96.9-17.)  They do not have a fee agreement with counsel.  (Craus 54.1-3; Tonore 60:17-19, Shockley 98:7-12; Morrash 182:2-23 (no written agreement).)  They have no idea how much their attorneys bill per hour   (Craus 54:16-18, Tonore 61.5-7; Morrash 140.11-14; Shockley 98.13-15.)  They did not take any competitive bids from any other attorneys    (Craus 54:19-22, Morrash 141.12-16, Shockley 98:16-18.)  Neither Craus nor Tonore ever reviewed monthly time and expense reports. (Craus 57:13-15, Tonore 63:17-19.)  Morrash had no idea what the magnitude of costs are for the litigation:  "The magnitude of the costs is not a matter for my concern  I'm not responsible for it."  (Morrash 147:15-22; 149:16-18.)

- Shockley's lawyers represented that he was beginning jury duty on Tuesday, February 23, 2005 and that he could not commit to a date for a deposition because he was not sure if he would be selected for jury duty[23]  (Schwartz Decl. ¶ 2, Ex

---

[23] On multiple occasions when defense counsel sought alternate dates—e.g., asking whether Shockley could appear the week before (the week of February 14, 2005), appear on a Saturday, or even whether Shockley could seek an exemption from jury duty—plaintiffs' counsel represented that they could not confirm a date for Shockley until after the end of the day on Tuesday, February 22, when they

1 ) Shockley testified, however, that he was on jury duty several weeks before the deposition and that he flew up the week before the deposition because he was "coming up anyway" to his second home in New Jersey. (Shockley 8:3-4, 11:24-12:5, 103:24-104.1 ) Either Shockley is inadequate for misleading class counsel or class counsel is inadequate for misleading defendants.[24]

### 4.    The proposed class representatives were solicited by and are beholden to their attorneys

Proposed class representatives Craus and Tonore were solicited by plaintiffs' attorneys.

- Craus testified that she first heard about the lawsuit after the IPO from plaintiffs' lawyer Todd Collins by letter or conversation. (Craus 41:16-42.6.) After a break where she was able to talk to her lawyer, Craus changed her story and said "I don't know—I probably called that law firm." (Craus 92.22-93.4.)

- Tonore testified that he was contacted by Keller Rohrback. (Tonore 47.20-22 )

- Craus and Tonore did not know whose idea it was to file a lawsuit or whose idea it was to file a class action. (Craus 43:20-44.1; Tonore 49.17-22.)

The proposed class representatives have ceded control of the litigation to their attorneys.

- Craus and Shockley testified that the attorneys have the authority to settle the case. (Craus 53.4-5; Shockley 95:13-20)

- Craus, Tonore, and Shockley believe the attorneys make the strategy calls in the case. (Craus 55:10-13, Tonore 61.19-21; Shockley 100.11-13 )

- If Craus or Tonore disagreed with the attorney's decision in the case, they each would "defer to the attorney." (Craus 55:14-17, Tonore 62.2-5.)

- Craus and Tonore believe the attorneys were responsible for actively managing and controlling the litigation. (Craus 56:7-9, Tonore 62.19-21 )

---

would know whether Shockley had been selected, and if so, how long his trial likely would last. (Schwartz Decl. ¶ 2, Ex. 1 ("Dr. Shockley has jury duty in Florida. If he becomes free he will definitely appear for his deposition on the 24th. ... We will know that on the 23rd, and will reschedule for the next week if he is still held by the Florida subpoena."))

[24] Lack of candor is another reason to find proposed class representative Shockley inadequate. *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (finding that it is also appropriate to consider the "honesty and trustworthiness" of class representatives); *In re Frontier Ins. Group, Inc. Sec. Litig.*, 172 F.R.D. 31, 47 (E.D.N.Y. 1997) (denying class certification where proposed class representatives were "so lacking in credibility that they are likely to harm their case")

23

RLF1-2851996-1

- Tonore testified that he didn't know what his sworn certification was. "Only other than signing some documentation when I joined the class, but I'm not—to be honest with you, I don't know what that documentation said or really what it was." (Tonore 106:15-18, 107.16-19.)

- When shown the Registration Statement, Craus did not remember ever seeing it (Craus 18:20-22.) After pressured coaching from her attorney, Craus testified that she did read the Registration Statement. (Craus 18:23-20:5.)

Adequacy requires more than simply hiring experienced class counsel. And for good reason: the due process rights of thousands of unnamed plaintiffs, who never directly participate in the suit, must be safeguarded by vigilant class representatives. The proposed class representatives here—Craus, Tonore, Shockley, and Morrash—have ceded all control to their lawyers, with little to no supervision. This violates Third Circuit law. *In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001) (observing in the settlement-approval context that the PSLRA's goal is to have "an engaged lead plaintiff actively supervise[ing] the conduct of the litigation and the actions of class counsel" and holding that if this criteria is not met "such a movant does not satisfy the adequacy requirement").

**D.     Plaintiffs have failed to satisfy their burden of proof that the proposed class representatives are adequate—all have interests antagonistic to the class**

Under Rule 23(a)(4), the Court must find that the "representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). In the Third Circuit, plaintiffs must satisfy two factors to meet their burden: (1) the representatives must not have interests antagonistic to those of the class, and (2) plaintiffs' attorneys must be qualified and experienced. *Wetzel v. Liberty Mutual Insur. Co.*, 508 F.2d 239, 247 (3d Cir. 1974). "Antagonism between the representatives and the other class members may exist when a unique defense is asserted against the named plaintiff or against the other class members. . ." *Lerch*, 144 F.R.D. at 251 (citing *Zenith Labs., Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976)). The Third Circuit has affirmed denial of class certification when "unique defenses could

24

conceivably become the focus of the entire litigation and divert much of [the representative]'s attention from the suit as a whole," severely disadvantaging the rest of the class [25] *Zenith*, 530 F 2d at 512  To prevent certification, "it is not necessary that the defense asserted against the putative class representative ultimately succeed." *McNichols v. Loeb Rhoades & Co ,* 97 F R D 331, 334 (N.D. Ill. 1982)

### 1.  All the class representatives arguably knew about the alleged misrepresentation when they purchased Adams Golf stock

Any person who actually knew of the alleged misrepresentation or omission when they purchased their stock cannot recover under section 11   15 U S C  § 77k(a).  Craus, Tonore, Morrash, and the broker of Morrash and Shockley (who purchased their stock) arguably knew about alleged gray marketing at or before the IPO   (Craus 17.3-11, 18.1-14; Tonore 3:14-18, 17:17-21; 43.11-23, Morrash 18:4-9, 71.8-10 )  Although all proposed class representatives claim they did not know about the gray market pre-IPO, their inconsistent testimony raises a genuine questions about whether this is true.

Craus had actual knowledge of the gray market.  She knew about the IPO a couple months before the offering in July  (Craus 17.3-11 )  She testified that after learning about the IPO, she followed the company and saw "a press release stating there would be an IPO. Otherwise, it would have been related to the gray market information and that type thing " (Craus 18.1-14 )  The press release Craus saw announcing the IPO was issued May 4, 1998  If Craus followed the Company after the announcement, as she testified, she would have seen

---

[25] Other circuits refer to this as a typicality inquiry rather than an adequacy inquiry.  Ultimately, "the presence of even an arguable defense peculiar to the named plaintiff .    may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation " *J H. Cohn & Co. v. Am Appraisal Assocs.,* 628 F.2d 994, 999 (7th Cir. 1980).

Adams Golf's only other pre-IPO press release—the June 9, 1998 press release announcing the Bill of Discovery against Costco

Tonore testified that he had actual knowledge. He said that he reviewed the Company's press releases and followed it for a year before it went public. (Tonore 13.14-18, 17:17-21.) He then testified that he received emails that Costco was gray marketing Adams Golf clubs and that this information "was put out by the company via e-mail a couple of days before the IPO"[26]—in other words, Tonore knew about the June 9, 1998 press release before the IPO. (Tonore 43.11-23.)

Morrash and Shockley shared the same broker, and both testified that they relied on him to review all available materials before purchasing the stock on their behalf—those materials would have included the Company's press release on June 9, 1998, announcing that a Bill of Discovery had been filed against Costco to investigate reports of gray-market Adams Golf clubs in certain Costsco stores. (Morrash 35.4-9, 36.23-37:6, 167:19-168:5; Shockley 16.12-17:1, 126:16-127.13, 160.24-161.7.) Both Morrash and Shockley gave their broker virtually unfettered discretion to make investments for them—indeed, Morrash did not even know about his purchase of Adams Golf stock until after the fact. (Morrash 22.13-23.3. 35.10-36:11; Shockley 159.18-160.17.) Accordingly, as their agent, the broker's knowledge is imputed to Morrash and Shockley. *See, e.g., Rent-Way*, 218 F.R.D. at 109 (analyzing an investment adviser's standing to pursue litigation on behalf of its clients and concluding that "as decision-maker for its clients," the adviser "had an interest in its own right to receive full and fair disclosures concerning the true value of [the company's] stock"). Thus, for different reasons,

---

[26] Tonore testified that sometimes when he said "emails," he really meant he obtained the information from the Internet. (Schwartz Decl. Ex. 10 at 122:18-24.)

each proposed class representative is subject to the unique defense of actual knowledge of the risk that Adams Golf's clubs could appear in the gray market, and this defense likely will become an important focus of the litigation.

Additionally, Craus, Tonore, and Morrash all testified that gray marketing affects many industries, thus acknowledging the risk and implying that Adams Golf, like companies in other industries, could be affected by gray marketing   (Craus 72:10-11, Tonore 78.8-14; Morrash 54.6-15)   Their general knowledge of gray marketing further subjects them to the unique defense that they knew about the risk of gray marketing when they purchased Adams Golf stock, and they did not need a specific disclosure to explain the risk it posed to Adams Golf   Although plaintiffs certainly will point to testimony where each claims that he or she did not know about the gray market pre-purchase, this does not change the fact that their actual knowledge based on their inconsistent deposition testimony will become a unique defense that renders them inadequate. *See McNichols*, 97 F R D at 334 (To prevent certification, "it is not necessary that the defense asserted against the putative class representative ultimately succeed ")

### 2.    Craus, Tonore, and Morrash are inadequate because they testified that other factors may have contributed to the stock-price decline

Section 11 prevents or limits liability where all or part of the stock-price decline is due to factors other than the alleged misrepresentation or omission, the so-called "negative causation" defense   15 U S C  § 77k(e)   Craus, Tonore, and Morrash all testified that factors other than the alleged misrepresentation or omission likely contributed to stock-price declines   (Craus 87.7-9, 89.8-14, Tonore 87.13-88:18; Morrash 168.6-169:9.)   Because plaintiffs have testified that other factors may have affected stock prices, they are subject to the unique defense that their damages were not caused by the alleged misrepresentations or omissions   These proposed representatives'

admission that other factors could have contributed to the stock-price decline likely will become a focus of the litigation

### 3. Craus and Tonore are inadequate because they purchased Adams Golf stock after the alleged undisclosed risk was revealed

The stock purchases of Craus and Tonore after disclosure of the alleged omission preclude them from representing the proposed class[27] *See Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y. 1992) (denying class certification for section 11 and 12(2) claims where proposed class representative was atypical because he purchased post-disclosure)

Here, Adams Golf disclosed on October 22, 1998, that "we anticipate our sales will be further impacted by the recent gray market distribution of our products to a membership warehouse club  While we are working diligently to identify and stop the unauthorized distribution of our products to this retailer, we anticipate this process will take at least through the end of the year" (Schwartz Decl. ¶ 7, Ex. 6) Thus, as a matter of law, all investors knew about the allegedly undisclosed risk no later than October 22, 1998 *See Kovaleff*, 142 F.R.D. at 408

Despite this disclosure, Craus purchased five times as many shares *after* she learned of the alleged omission than she did *before* the alleged omission (Craus 82:23-83.12 at Dep Ex 13) Craus testified that one reason she purchased stock post-disclosure was because she believed the stock price would rise (Craus 99.7-13)

Tonore also purchased shares *after* the alleged omission was disclosed (Tonore 80.20-82.14 at Dep Ex 27) These post-disclosure purchases raise unique materiality issues that

---

[27] *Cf. Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69-70 (S.D.N.Y. 2000) (denying class certification in a 10b-5 case because, among other things, investors who increased their holdings after revelation of the alleged fraud could not serve as class representatives) (citing *Kovaleff*, 142 F.R.D. at 408)

render Craus and Tonore inadequate; that is, they are subject to the defense that the alleged omission was immaterial in that it did not affect their decision to invest. *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (named plaintiff who had increased purchases after public disclosure of alleged omission was inadequate representative on typicality grounds because post-disclosure purchases raised serious materiality questions); *Koenig v. Benson*, 117 F.R.D. 330, 336 (E.D.N.Y. 1987) (holding "since [plaintiff] nonetheless purchased more stock after [disclosure], his behavior raises doubts about the importance to him of the purported omissions") [28]

### 4.    Craus and Tonore are inadequate because they cannot trace certain stock purchases to the IPO

To have standing as a section 11 plaintiff, investors either must have purchased in the offering or otherwise be able to trace their secondary-market purchases to the offering. [29] *Adams Golf*, 176 F. Supp. 2d at 225-27, *see also Abbey v. Computer Memories, Inc.*, 634 F. Supp. 870, 875-76 (N.D. Cal. 1986) (plaintiff "clearly bears the ultimate burden of directly tracing his shares to the offering"). The tracing inquiry must be conducted in an individualized, fact-specific manner—*i.e.*, each plaintiff must offer *specific, individualized* proof that his shares were issued

---

[28] Plaintiffs likely will argue that these purchases are irrelevant because reliance is not an element under sections 11 and 12(a)(2). Though reliance is not at issue, materiality is—post-disclosure purchases suggest that the omitted information was not material to investors. In both *Koenig* and *Safeguard Scientifics*, the court held that materiality formed an independent unique defense because the post-disclosure purchases "rais[ed] serious doubt as to the materiality of the alleged . . . disclosures." *Safeguard*, 216 F.R.D. at 582.

[29] Under section 12, in contrast, this Court held that only plaintiffs who purchased directly in the IPO have standing to pursue a claim. 176 F. Supp. 2d at 225 (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995); *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682 (3d Cir. 1991)). Plaintiffs never appealed this ruling, and therefore the law of the case limits the section 12(a)(2) subclass to purchasers who purchased directly from the Underwriter Defendants on July 10, 1998 at $16 share. *Adams Golf*, 381 F.3d at 271 n.1.

pursuant to the Registration Statement [30]  *See, e.g., Krim v. PcOrder*, 2005 WL 469618, *4 (5th Cir. March 1, 2005) (holding that certain plaintiffs had no standing because they could not trace their shares, even where 99 85% of the shares outstanding were IPO shares)  Defendants then must have the opportunity to analyze and potentially challenge the tracing analysis.

Adams Golf filed two Forms S-8 on December 1, 1998 and May 28, 1999 before plaintiffs filed their lawsuits, meaning that non-IPO shares entered the market and mingled with IPO shares at least by December 1998  (Schwartz Decl. ¶ 14, Ex 13.)  Adams Golf insiders were also able to sell shares after the IPO pursuant to Rule 144 with the Underwriters Defendants' consent  (Schwartz Decl. ¶ 3, Ex 2 at 11.)  Given the manner in which shares are bought and sold through computerized clearinghouses, it is virtually impossible to trace shares to a registration statement when there are already shares trading in the open market.  *See Initial Pub. Offering*, 2004 WL 2297401, at *38 ("The modern practice of electronic delivery and clearing of securities trades, in which all deposited shares of the same issue are held together in fungible bulk, makes it virtually impossible trace shares to a registration statement once additional unregistered shares have entered the market ")

Here, the Court would be required to supervise the process and ultimately rule on *each class member's* standing to sue under section 11.  This entire process would need to be repeated for each of the hundreds of potential plaintiffs who purchased after the offering date.  Ultimately, this process would take months and likely would take significantly longer than the actual trial on the issues common to the class.  *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 678 (N.D. Ohio 1995) ("[E]ven if [named plaintiff] were to prevail in her claim, that decision would not provide any

---

[30] As discussed in section III.B.2., *supra*, this problem provides another ground for truncating any proposed class period.

other plaintiff with a basis for recovery. Each plaintiff would still have to prove [the elements of her claim].")

Even if the named plaintiffs were able to make some sort of showing through individualized proof, the very need for individualized proof from each class member to demonstrate standing precludes class certification. Courts have rejected attempts to establish standing through statistical probabilities that certain plaintiffs can trace their shares to the allegedly defective registration statement. *Krim*, 2005 WL 469618, at *4 ("To allow [plaintiffs] to satisfy the tracing requirement for aftermarket standing in this case with the proffered statistical methodology would contravene the language and intent of Section 11.")

Craus purchased 1,000 Adams Golf shares in the IPO and thus has standing to pursue a section 11 claim. However, she also purchased 5,400 shares in January 1999, and she failed to disclose these purchases in her investor certification and failed to make any effort to trace these shares to the offering. Thus, Craus will be unable to recover for these shares and will be subject to the unique defense that her shares are untraceable. (Craus 82.23-83:12 at Dep. Ex. 13.)

Tonore purchased all his shares in the secondary market from July 1998 to January 1999. He testified that he has no idea how to trace his shares back to the IPO. (Tonore 84:24-85:7.) Where, as here, the shares at issue are commingled in the market with shares registered pursuant to other non-defective registration statements, tracing can be virtually impossible. *Initial Pub. Offering*, 2004 WL 2297401, at *38 (holding "[p]laintiffs' proposed section 11 classes are suitable only for those periods in which class members' ability to trace their shares is susceptible to common proof" and noting "[s]uch generalized proof is possible if plaintiffs' section 11 class periods are limited to exclude all purchases made after untraceable securities entered the market") Plaintiffs have not made an affirmative showing that Tonore's shares are traceable to

31

the IPO, so Tonore is subject to the unique defense that he lacks standing for certain Adams Golf stock purchases

### E.    The proposed class representatives and their counsel are inadequate for failure to comply with rules governing attorney's fee arrangements

All proposed class representatives and lead counsel are inadequate representatives of the proposed class because they appear to have ignored Delaware law requiring that contingent-fee agreements be in writing   They also appear to have ignored Pennsylvania law—the state where lead counsel practices—regarding contingent-fee arrangements   Each lawyer who practices before this Court is bound by the Delaware Rules of Professional Conduct   Under both Delaware and Pennsylvania law, a contingent-fee arrangement must be in writing   DEL R PROF'L CONDUCT 1 5(c); PA R PROF'L CONDUCT 1 5(c)[31]   Despite this mandate, all proposed class representatives testified that they did not have a fee arrangement with Berger & Montague (Craus 54.1-3, Tonore 60.17-19; Shockley 98.7-12, Morrash 182:2-23 (no written agreement) )   Moreover, only Shockley and Tonore have fee agreements with other counsel—Shockley with Abrahams, Lowenstein, Bushman, and Kauffman and Tonore with Keller Rohrback, neither of which are lead plaintiffs' counsel [32]

---

[31] The rules governing lawyer conduct in Pennsylvania similarly require contingency-fee agreements to be in writing   See PA R OF PROF'L CONDUCT 1 5(c) ("A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated ")

[32] Plaintiffs only produced Shockley's and Tonore's fee agreements with other counsel (not lead counsel) after the issue was raised in the first two depositions (Craus's and Morrash's)   Plaintiffs' counsel produced Shockley's document just before his deposition began on February 25, 2005, and they produced Tonore's document after business hours on March 9, 2005, just three business days before defendants' Opposition due date   Nevertheless, both Shockley and Tonore testified that they did not have fee agreements with counsel, further demonstrating their lack of understanding of basic facts about the case

The lack of a fee agreement—in violation of the Delaware Rules governing attorney conduct—demonstrates the inadequacy of the proposed class representatives and their counsel. *See In re Quintus Sec. Litig.*, 201 F.R.D. 475, 482 (N.D. Cal. 2001) ("[a]lmost certainly, the best way for the court to assess a potential lead plaintiff's adequacy is to consider the manner in which he has retained counsel and negotiated an attorney's fee for the class"), *see also Klein v. Henry S. Miller Residential Servs., Inc.*, 82 F.R.D. 6, 8-9 (N.D. Tex. 1978) (noting that inquiry into plaintiffs' fee arrangement is necessary to determine adequacy). Here, there is no fee agreement between plaintiffs and lead counsel that the Court, or the defendants, can inquire into or scrutinize.

**F.    Craus is atypical because she is preoccupied with a unique theory of liability**

Rule 23(a)(3) requires that the Court find that "the claims or defenses of the representative parties are typical of the claims of the class." FED. R. CIV. P. 23(a)(3). "The rationale behind the requirement that the class representative's claims be typical of the class claims is recognition that a plaintiff with claims typical of the class will, in pursuing and defending his own self interest in the litigation, be concomitantly advancing or defending the interests of the class." *Dubin v. Miller*, 132 F.R.D. 269, 274 (D. Colo. 1990) (citing 1 H. NEWBERG, NEWBERG ON CLASS ACTIONS § 3.22, at 199 (2d ed. 1985)).

In the Third Circuit, courts examine whether "the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Weiss v. York Hospital*, 745 F.2d 786, 809 n.36 (3d Cir. 1984) (quoting and adopting analysis in 7 C. CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROCED. § 1763, at 614 (1972)). The CAC alleges that defendants are liable because they misrepresented or omitted disclosure of the risk of gray marketing. (CAC ¶ 42.) Plaintiffs cite these misrepresentations or omissions as the

33

questions common to the class members   (Mot at 9.)   Craus, however, is preoccupied with different, uncommon claims.

Craus testified that she believed she was to receive special treatment—a claim the rest of the class cannot make.  She testified that in addition to the class claims, she is suing Adams Golf because she believes she "was to be sold 2,000 shares of stock" for $2 per share   (Craus 22.13-15; 101.23-103.4 )[33]  She admits that she does not have or has not found any documentation to support this claim   (Craus 74.25-75.10.)  Craus also acknowledges that the documentation she produced does not support her claim    (Craus 80.25-81:12.)  Despite these drawbacks, her preoccupation with this claim conflicts with the class's interest   "The typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees."

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001)      (citation omitted)  Since this claim is unique to her, Craus should be deemed atypical

## IV.   CONCLUSION

For these reasons, the Court should deny plaintiffs' motion for class certification, or alternatively, at the very least, should narrowly define the class as requested above

Jeffrey L. Moyer (#3309)
Alyssa M. Schwartz (#4351)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware  19899
(302) 658-6541
jmoyer@rlf.com
aschwartz@rlf.com
ATTORNEYS FOR DEFENDANTS ADAMS
GOLF, INC., B.H. ADAMS, RICHARD H.
MURTLAND, DARL P. HATFIELD, PAUL F.
BROWN, JR., ROLAND E. CASATI, FINIS F.
CONNER, AND STEPHEN R. PATCHIN

Of Counsel:
Paul R. Bessette
Jennifer R. Brannen
Christopher W. Ahart
Michelle A. Reed
AKIN GUMP STRAUSS HAUER & FELD LLP
300 W. 6th Street, Suite 2100
Austin, Texas  78701
(512) 499-6200

Dated:  March 14, 2005

35

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2005, I electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered to the following:

Carmella P. Keener
Rosenthal, Monhait, Gross & Goddess
919 Market Street, Suite 1401
Wilmington, DE 19801

Robert K. Payson
John E. James
Potter Anderson & Corroon LLP
1313 North Market Street, Hercules Plaza
Wilmington, Delaware 19801

I hereby certify that on March 14, 2005, I have Federal Expressed the document(s) to the following non-registered participants:

Todd S. Collins
Jacob A. Goldberg
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA 19103

Michael J. Chepiga
Elaine M. Divelbliss
Theodore J. McEvoy
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Alyssa M. Schwartz (#4351)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
schwartz@rlf.com