**2**

of Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise (other than, in the case of the Company, the grant of options pursuant to option plans existing on the date hereof).

Until the distribution of the shares of Common Stock is completed, rules of the Commission may limit the ability of the Underwriters and certain selling group members to bid for and purchase shares of Common Stock. As an exception to these rules, the Underwriters are permitted to engage in certain transactions that stabilize the price of the Common Stock. Such transactions may consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of the Common Stock.

In addition, if the Underwriters over-allot (I.E., if they sell more shares of Common Stock than are set forth on the cover page of this Prospectus), and thereby create a short position in the Common Stock in connection with the Offering, the Underwriters may reduce that short position by purchasing Common Stock in the open market. The Underwriters also may elect to reduce any short position by exercising all or part of the over-allotment option described herein.

The Underwriters also may impose a penalty bid on certain dealers and certain selling group members. This means that if the Underwriters purchase shares of Common Stock in the open market to reduce the Underwriter short position to stabilize the price of the Common Stock, they may reclaim the amount of selling concession from such dealers and the selling group who sold shares as part of the Offering.

In general, purchases of a security for the purpose of stabilization or to reduce a syndicate short position could cause the price of the security to be higher than it might otherwise be in the absence of such purchases. The imposition of a penalty bid might have an effect on the price of a security, to the extent that it were to discourage resales of the security by purchasers in the Offering.

Neither the Company nor any of the Underwriters makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the Common Stock. In addition, neither the Company nor any of the Underwriters makes any representation that the Underwriters will engage in such transactions or that such transactions, once commenced, will not be discontinued without notice.

The Company and each of the Selling Stockholders have agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act, and to contribute to payments the Underwriters may be required to make in respect thereof.

Prior to the sale of shares in the Offering, there has been no active public market for the Common Stock of the Company. The initial public offering price of the shares of Common Stock will be determined by negotiation among the Company, the Selling Stockholders and the Underwriters. Among the factors that will be considered in determining the initial public offering price will be the prospects of the Company and its industry in general, the Company's past and present operations, the Company's position in the industry, an assessment of the Company's management, the general condition of securities markets at the time of the Offering and the demand for similar securities.

At the request of the Company, the Underwriters have reserved up to 575,000 shares of Common Stock offered hereby for sale to certain officers, directors, employees, business associates and related parties of the Company at the initial public offering price set forth on the cover page of this Prospectus. Such persons must commit to purchase no later than the close of business on the day following the date hereof. The number of shares available for sale to the general public will be reduced to the extent such persons purchase such reserved shares.

## LEGAL MATTERS

The validity of the shares of Common Stock offered hereby will be passed upon for the Company by Arter & Hadden LLP, Dallas, Texas. Certain legal matters in connection with the Offering will be passed upon for the Underwriters by Cooley Godward LLP, San Francisco, California.

## EXPERTS

The consolidated financial statements and financial statement schedule of the Company as of December 31, 1996 and 1997, and for each of the years in the three-year period ended December 31, 1997, have been included herein and elsewhere in the Registration Statement in reliance upon the report of KPMG Peat Marwick LLP, independent certified public accountants, appearing elsewhere herein and in the Registration Statement, and upon the authority of such firm as experts in accounting and auditing.

The statements in this Prospectus set forth under "Risk Factors--Patents and Protection of Proprietary Technology," "Business--Design and Development--Patent Review" and "Business--Patents," together with the last paragraph of the inside front cover of this Prospectus, have been reviewed and approved by Aquilino & Welsh, Arlington, Virginia, as experts in patent and trademark law, and are included herein in reliance upon that review and approval. A partner in Aquilino & Welsh owns 59,106 shares of Common Stock of the Company. Purchasers of the securities offered hereby should not rely on Aquilino & Welsh with respect to any matters other than as set forth above.

## ADDITIONAL INFORMATION

The Company has filed with the Commission a Registration Statement on Form S-1 under the Securities Act with respect to the Common Stock offered hereby. This Prospectus constitutes a part of the Registration Statement and does not contain all of the information set forth therein and in the exhibits thereto, certain portions of which have been omitted as permitted by the rules and regulations of the Commission. For further information with respect to the Company and the Common Stock offered hereby, reference is hereby made to such Registration Statement and exhibits. Statements contained in this Prospectus as to the contents of any document are not necessarily complete and in each instance are qualified in their entirety by reference to the copy of the appropriate document filed with the Commission. The Registration Statement, including the exhibits thereto, may be examined without charge at the Commission's public reference facility at Room 1024, Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C. 20549, and at the following regional offices of the Commission: 7 World Trade Center, New York, NY 10048, and Northwestern Atrium Center, 500 West Madison Street, Suite 1400, Chicago, IL 60601. Copies of such material may be obtained from the Public Reference Section of the Commission at its principal office at 450 Fifth Street, N.W., Washington, D.C. 20549, upon payment of the fees prescribed by the Commission. Copies of such material are also available through the Commission's website located at http:// www.sec.gov.

51

## INDEX TO FINANCIAL STATEMENTS

Independent Auditors' Report .................................................................................................................. F-2

Consolidated Balance Sheets as of December 31, 1996 and 1997 and March 31, 1998
(unaudited) ......................................................................................................................................... F-3

Consolidated Statements of Operations for the years ended December 31, 1995, 1996 and
1997 and the three months ended March 31, 1997 and 1998 (unaudited) ......................................... F-4

Consolidated Statements of Stockholders' Equity for the years ended December 31,
1995, 1996 and 1997 and the three months ended March 31, 1998 (unaudited) ............................... F-5

Consolidated Statements of Cash Flows for the years ended December 31, 1995, 1996 and
1997 and the three months ended March 31, 1997 and 1998 (unaudited) .......................................... F-6

Notes to Consolidated Financial Statements. ..................................................................................... F-7

Financial Statement Schedule:
II--Valuation and Qualifying Accounts for the years ended December 31, 1995, 1996
and 1997 and the three months ended March 31, 1998 (unaudited). ................................................. F-16

All other schedules are omitted since the required information is not present or is not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements and notes thereto.

## INDEPENDENT AUDITORS' REPORT

The Board of Directors and Stockholders Adams Golf, Inc. and subsidiaries:

We have audited the consolidated financial statements of Adams Golf, Inc. and subsidiaries as listed in the accompanying index. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in the accompanying index. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Adams Golf, Inc. and subsidiaries as of December 31, 1996 and 1997, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1997, in conformity with generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

### KPMG PEAT MARWICK LLP

Dallas, Texas
April 29, 1998

F-2

# ADAMS GOLF, INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

### ASSETS

| | DECEMBER 31, | | MARCH 31, |
| | 1996 | 1997 | 1998 |
|---|---|---|---|
| | | | (UNAUDITED) |
| **Current assets:** | | | |
| Cash and cash equivalents | $854,543 | $1,955,563 | $602,290 |
| Trade receivables net of allowance for doubtful accounts of $26,199, $698,341 and $1,126,831 (unaudited) in 1996, 1997 and 1998, respectively (note 7) | 497,787 | 7,670,960 | 14,708,636 |
| State income taxes refundable | -- | 221,637 | 221,637 |
| Inventories (notes 2 and 7) | 674,737 | 4,486,563 | 5,559,699 |
| Prepaid expenses | 28,007 | 509,350 | 1,106,635 |
| Deferred income tax assets (note 8) | -- | 390,164 | 650,626 |
| Other current assets | -- | 715,670 | 352,795 |
| Total current assets | 2,055,074 | 15,949,907 | 23,202,318 |
| Property and equipment, net (note 3) | 123,950 | 603,823 | 2,094,794 |
| Deferred income tax assets (note 8) | -- | 182,621 | 209,942 |
| Other assets, net (note 4) | 379,697 | 623,728 | 285,705 |
| Total assets | $2,558,721 | $17,360,079 | $25,792,759 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | 1996 | 1997 | 1998 |
|---|---|---|---|
| **Current liabilities:** | | | |
| Notes payable | $230,406 | $-- | $-- |
| Note payable to shareholder (note 7) | -- | -- | 912,642 |
| Accounts payable | 17,526 | 377,622 | 2,732,215 |
| Federal income taxes payable | -- | 1,020,980 | 2,940,390 |
| Accrued expenses (note 5) | 332,423 | 7,636,157 | 4,317,926 |
| Total current liabilities | 580,355 | 9,034,759 | 10,903,173 |
| Notes payable to shareholder, less current portion (note 7) | -- | -- | 222,399 |
| Total liabilities | 580,355 | 9,034,759 | 11,125,572 |
| **Stockholders' equity (note 9):** | | | |
| Common stock, $.001 par value. Authorized 50,000,000 shares; 11,873,234, 15,719,338 and 18,199,282 (unaudited) shares issued and outstanding at December 31, 1996 and 1997 and March 31, 1998, respectively | 11,873 | 15,719 | 18,199 |
| Additional paid-in capital | 3,126,073 | 14,123,398 | 16,031,896 |
| Common stock subscription | -- | -- | (230,459) |
| Deferred compensation | -- | -- | (981,000) |
| Accumulated deficit | (1,159,580) | (5,813,797) | (171,449) |
| Total stockholders' equity | 1,978,366 | 8,325,320 | 14,667,187 |
| Commitments (note 6) | | | |
| | $2,558,721 | $17,360,079 | $25,792,759 |

See accompanying notes to consolidated financial statements.

**ADAMS GOLF, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | YEARS ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | | | | (UNAUDITED) | |
| Net sales | $1,125,115 | $3,521,788 | $36,690,090 | $1,474,940 | $24,510,808 |
| Cost of goods sold | 756,400 | 1,589,696 | 9,991,132 | 586,538 | 5,862,255 |
| Gross profit | 368,715 | 1,932,092 | 26,698,958 | 888,402 | 18,648,553 |
| Operating expenses: | | | | | |
| Research and development expenses | 18,516 | 51,101 | 557,513 | -- | 196,997 |
| Selling and royalty expenses | 312,785 | 625,897 | 13,093,174 | 418,737 | 6,248,196 |
| General and administrative expenses: | | | | | |
| Stock compensation and bonus award (note 9) | -- | 213,760 | 14,841,711 | -- | -- |
| Provision for bad debts | 12,791 | 51,306 | 738,805 | 75,768 | 466,213 |
| Other | 268,518 | 981,219 | 1,436,995 | 328,727 | 2,865,198 |
| Total operating expenses | 612,610 | 1,923,283 | 30,668,198 | 823,232 | 9,776,604 |
| Operating income (loss) | (243,895) | 8,809 | (3,969,240) | 65,170 | 8,871,949 |
| Other income (expense): | | | | | |
| Interest income | 1,226 | 3,938 | 15,325 | 4,451 | 10,550 |
| Interest expense | -- | -- | (69,731) | (13,090) | (9,362) |
| Other | = | = | (47,808) | 4,350 | (100,621) |
| Income (loss) before income taxes | (242,669) | 12,747 | (4,071,454) | 60,881 | 8,772,516 |
| Income tax expense (note 8) | = | = | 582,763 | 15,586 | 3,130,168 |
| Net income (loss) | $(242,669) | $12,747 | $(4,654,217) | $45,295 | $5,642,348 |
| Income (loss) per common share: | | | | | |
| Basic | $(.05) | $.00 | $(.37) | $.00 | $.32 |
| Diluted | $(.05) | $.00 | $(.37) | $.00 | $.31 |

See accompanying notes to consolidated financial statements.

**ADAMS GOLF, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**YEARS ENDED DECEMBER 31, 1995, 1996 AND 1997 AND THE**
**THREE MONTHS ENDED MARCH 31, 1998 (UNAUDITED)**

| | SHARES OF PREFERRED STOCK | PREFERRED STOCK | SHARES OF COMMON STOCK | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | COMMON STOCK SUBSCRIPTION | DEFERRED COMPENSATION |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 1994 (unaudited) | 772,551 | $773 | 1,066,514 | $1,067 | $1,327,799 | $-- | $-- |
| Conversion of preferred stock to common stock (note 9) | (772,551) | (773) | 1,545,102 | 1,545 | (772) | -- | -- |
| Sale of stock | -- | -- | 4,168,988 | 4,169 | 453,507 | -- | -- |
| Stock distribution (note 9) | -- | -- | 4,282,304 | 4,282 | (4,282) | -- | -- |
| Net loss | = | = | = | = | = | = | = |
| Balance, December 31, 1995 | = | $-- | 11,062,908 | 11,063 | 1,776,252 | = | = |
| Sale of stock | | | 1,581,126 | 1,581 | 1,594,362 | -- | -- |
| Common stock repurchased and retired (note 9) | | | (770,800) | (771) | (244,541) | -- | -- |
| Net income | | | = | = | = | = | = |
| Balance, December 31, 1996 | | | 11,873,234 | 11,873 | 3,126,073 | -- | -- |
| Stock compensation award (note 9) | | | 2,000,000 | 2,000 | 9,998,000 | -- | -- |
| Exercise of stock options | | | 946,104 | 946 | 550,225 | -- | -- |
| Exchange of debt for common stock (note 9) | | | 900,000 | 900 | 449,100 | -- | -- |
| Net loss | | | = | = | = | = | = |
| Balance, December 31, 1997 | | | 15,719,338 | 15,719 | 14,123,398 | -- | -- |
| Issuance of stock options | | | -- | -- | 981,000 | -- | (981,000) |
| Exercise of stock options | | | 2,479,944 | 2,480 | 927,498 | (230,459) | -- |
| Net income | | | = | = | = | = | = |
| Balance, March 31, 1998 (unaudited) | | | 18,199,282 | $18,199 | $16,031,896 | $(230,459) | $(981,000) |

| | ACCUMULATED DEFICIT | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|
| Balance, December 31, 1994 (unaudited) | $(929,658) | $399,981 |
| Conversion of preferred stock to common stock (note 9) | -- | -- |
| Sale of stock | -- | 457,676 |
| Stock distribution (note 9) | -- | -- |
| Net loss | (242,669) | (242,669) |
| Balance, December 31, 1995 | (1,172,327) | 614,988 |
| Sale of stock | -- | 1,595,943 |
| Common stock repurchased and retired (note 9) | -- | (245,312) |
| Net income | 12,747 | 12,747 |
| Balance, December 31, 1996 | (1,159,580) | 1,978,366 |
| Stock compensation award (note 9) | -- | 10,000,000 |
| Exercise of stock options | -- | 551,171 |
| Exchange of debt for common stock (note 9) | -- | 450,000 |
| Net loss | (4,654,217) | (4,654,217) |
| Balance, December 31, 1997 | (5,813,797) | 8,325,320 |
| Issuance of stock options | -- | -- |
| Exercise of stock options | -- | 699,519 |
| Net income | 5,642,348 | 5,642,348 |

Balance, March 31, 1998
(unaudited) .............................................    $(171,449)    $14,667,187

See accompanying notes to consolidated financial statements

F-5

ADAMS GOLF, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | YEARS ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
| | 1995 | 1996 | 1997 | 1997 | 1998 |
|---|---|---|---|---|---|
| | | | | (UNAUDITED) | |
| **Cash flows from operating activities:** | | | | | |
| Net income (loss) | $(242,669) | $12,747 | $(4,654,217) | $45,295 | $5,642,348 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | 8,291 | 19,278 | 302,589 | 16,374 | 218,959 |
| Loss on retirement of fixed assets | -- | -- | 134,009 | -- | 100,617 |
| Stock compensation and bonus award | -- | -- | 10,000,000 | -- | -- |
| Deferred income taxes | -- | -- | (572,785) | -- | (137,657) |
| Allowance for doubtful accounts | -- | 26,199 | 672,142 | 71,207 | 1,126,831 |
| Changes in assets and liabilities: | | | | | |
| Trade and other receivables | (93,649) | (374,228) | (8,066,952) | (399,963) | (8,164,507) |
| Inventories | (81,470) | (476,467) | (3,811,826) | (103,962) | (1,073,136) |
| Prepaid assets | (27,589) | (418) | (481,343) | 406 | (597,285) |
| Other current assets | 2,860 | -- | (715,670) | (257,186) | 362,875 |
| Other assets | (4,873) | (361,916) | (390,442) | 67,478 | 248,822 |
| Accounts payable | 40,252 | (22,726) | 360,096 | 60,688 | 991,832 |
| Accrued expenses | 2,728 | 329,302 | 7,303,734 | 187,607 | (2,105,596) |
| Federal income taxes payable | -- | -- | 1,020,980 | 15,586 | 1,919,410 |
| Net cash provided by (used in) operating activities | (396,119) | (848,229) | 1,100,315 | (296,470) | (1,466,487) |
| **Cash flow from investing activities--purchase of equipment** | (9,287) | (121,444) | (770,060) | (46,277) | (1,721,347) |
| **Cash flows from financing activities:** | | | | | |
| Proceeds from notes payable and line of credit | -- | 230,406 | 1,050,000 | 250,000 | 4,635,041 |
| Repayment of line of credit borrowings | -- | -- | (800,000) | -- | (3,500,000) |
| Repayment of notes payable | -- | -- | (30,406) | (1,494) | -- |
| Issuance of common stock | 457,676 | 1,350,631 | 551,171 | -- | 699,520 |
| Net cash provided by financing activities | 457,676 | 1,581,037 | 770,765 | 248,506 | 1,834,561 |
| Net increase (decrease) in cash and cash equivalents | 52,270 | 611,364 | 1,101,020 | (94,241) | (1,353,273) |
| Cash and cash equivalents at beginning of period | 190,909 | 243,179 | 854,543 | 854,543 | 1,955,563 |
| Cash and cash equivalents at end of period | $243,179 | $854,543 | $1,955,563 | $760,302 | $602,290 |
| **Supplemental disclosure of cash flow information:** | | | | | |
| Interest paid | $-- | $-- | $69,731 | $13,090 | $9,362 |
| Income taxes paid | $-- | $-- | $356,204 | $-- | $1,293,820 |
| Supplemental disclosure of financing activity-- exchange of debt for common stock | $-- | $-- | $450,000 | $-- | $-- |

See accompanying notes to consolidated financial statements.

F-6

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

## (1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### (a) GENERAL

Adams Golf, Inc. (the "Company") was founded in 1987. The Company designs, manufactures, markets and distributes golf clubs and provides custom golf club fitting technology. The Company's primary products are fairway woods that are marketed under the trademark "Tight Lies."

The Company has both domestic and international sales. International sales were $647,325, $878,666, and $1,387,325 for the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998, respectively. There were no international sales in 1995.

The consolidated financial statements include the accounts of Adams Golf, Inc. and its wholly-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation.

The consolidated financial statements of the Company as of March 31, 1998 and for the three months ended March 31, 1997 and 1998 are unaudited, but in the opinion of management reflect all adjustments (consisting only of normal recurring accruals) which are necessary for a fair statement of the results of the interim periods presented. Results for interim periods are not necessarily indicative of the results to be expected for a full year due in part to the Company's growth.

### (b) INVENTORIES

Inventories are valued at the lower of cost or market and primarily consists of completed golf clubs and component parts. Cost is determined using the first-in, first-out method.

### (c) PROPERTY AND EQUIPMENT

Property and equipment are stated at cost. Depreciation is calculated using the straight-line method over the estimated useful lives of the respective assets, which range from three to seven years.

### (d) REVENUE RECOGNITION

The Company records revenue as earned, which occurs when the product is shipped.

### (e) OTHER ASSETS AND RELATED AMORTIZATION EXPENSE

Other assets consist primarily of the cost of obtaining patents, development costs of an infomercial and various deposits. Patent amortization is computed on the straight-line method over the estimated useful lives of the assets, which range from 5 to 15 years.

### (f) RESEARCH AND DEVELOPMENT

Research and development costs consist of all costs incurred in planning, designing and testing of golf equipment, including salary costs related to research and development, and are expensed as incurred.

### (g) ADVERTISING COSTS

Advertising media costs, other than infomercial costs, are expensed as incurred. Production costs are charged to expense ratably in relation to sales over the year in which incurred. Advertising costs other than infomercials were $35,300, $33,503 and $8,651,420 for the years ended December 31, 1995, 1996 and 1997, respectively, and $59,049 (unaudited) and $2,333,406 (unaudited) for the three months ended March 31, 1997 and 1998, respectively.

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED) Infomercial costs are amortized based on revenues generated compared to total estimated revenues expected to result from the airing of such infomercial generally over an 18 month period. Amortization expense for the years ended December 31, 1995, 1996 and 1997 was $3,161, $3,738 and $146,411, respectively, and $89,200 (unaudited) for the three months ended March 31, 1998.

(h) PRODUCT WARRANTY AND SALES RETURNS

The Company's golf equipment is sold under warranty against defects in material and workmanship for a period of two years. In addition, the Company has a 90 day "no questions asked" return policy. An allowance for estimated future warranty and sales return costs is recorded in the period products are sold. Such estimates have approximated actual costs incurred.

(i) INCOME TAXES

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforwards. Deferred tax assets and liabilities are measured using enacted rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

(j) INCOME (LOSS) PER SHARE

The weighted average common shares used for determining basic net income (loss) per common share was 4,423,146, 11,237,794 and 12,519,392, for the years ended December 31, 1995, 1996 and 1997, respectively, and 11,873,234 (unaudited) and 17,662,189 (unaudited) for the three months ended March 31, 1997 and 1998, respectively. The effect of dilutive stock options added 678,263 (unaudited) shares for the three months ended March 31, 1998 for the computation of diluted income (loss) per common share. Stock options outstanding for the years ended December 31, 1995, 1996 and 1997 and the three months ended March 31, 1997 were not considered in the computation of net income (loss) per common share since their effect is immaterial or antidilutive.

(k) USE OF ESTIMATES

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(l) FINANCIAL INSTRUMENTS

The carrying amount of cash and cash equivalents, accounts receivable, accounts payable, and accrued expenses and note payable to stockholder approximates fair value due to the short maturity of these instruments.

F-8

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED) (m) IMPAIRMENT OF LONG-LIVED ASSETS AND LONG-LIVED ASSETS TO BE DISPOSED OF

The Company adopted the provisions of Statement of Financial Accounting Standards (SFAS) No. 121, ACCOUNTING FOR THE IMPAIRMENT OF LONG-LIVED ASSETS AND FOR LONG-LIVED ASSETS TO BE DISPOSED OF, on January 1, 1996. This Statement requires that long-lived assets and certain identifiable intangibles be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceed the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell. Adoption of this Statement did not impact the Company's financial position, results of operations, or liquidity.

(n) STATEMENTS OF CASH FLOWS

The Company considers all short-term highly liquid instruments, with an original maturity of three months or less, to be cash equivalents

(o) NEWLY ADOPTED ACCOUNTING PRONOUNCEMENTS

The Company adopted the reporting and disclosure requirements of SFAS No. 130, REPORTING COMPREHENSIVE INCOME, on January 1, 1998. This Statement requires the display of comprehensive income and its components in a financial statement that is displayed in equal prominence with other financial statements. As the Company has not had any comprehensive income components, the reporting and disclosure requirements of this statement have not altered the consolidated financial statements presented herein.

Effective January 1, 1998, the Company adopted Statement of Position (SOP) 98-1, ACCOUNTING FOR THE COSTS OF COMPUTER SOFTWARE DEVELOPED OR OBTAINED FOR INTERNAL USE, which was issued in March 1998. The SOP requires that certain costs related to the development or purchase of internal-use software be capitalized and amortized over the estimated useful life of the software. The SOP also requires that costs related to the preliminary project stage and the post-implementation/operations stage of an internal-use computer software development project be expensed as incurred.

(2) INVENTORIES

Inventories consist of the following:

| | DECEMBER 31 | | |
| --- | --- | --- | --- |
| | 1996 | 1997 | MARCH 31, 1998 |
| | | | (UNAUDITED) |
| Finished goods | $41,323 | $2,063,803 | $2,526,767 |
| Component parts | 633,414 | 2,422,760 | 3,032,932 |
| | $674,737 | $4,486,563 | $5,559,699 |

F-9

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

## (3) PROPERTY AND EQUIPMENT, NET

Property and equipment consists of the following:

| | DECEMBER 31, | | |
|---|---|---|---|
| | 1996 | 1997 | MARCH 31, 1998 |
| | | | (UNAUDITED) |
| Manufacturing equipment | $70,728 | $142,137 | $151,979 |
| Office and computer equipment | 100,368 | 660,145 | 2,237,891 |
| Accumulated depreciation | (47,146) | (198,459) | (295,076) |
| | $123,950 | $603,823 | $2,094,794 |

## (4) OTHER ASSETS, NET

Other assets, net, consist of the following:

| | DECEMBER 31, | |
|---|---|---|
| | 1996 | 1997 |
| Deposits, including amounts for fixed assets purchased | $97,498 | $380,836 |
| Infomercial costs | 267,677 | 233,365 |
| Patents | 14,522 | 9,527 |
| | $379,697 | $623,728 |

## (5) ACCRUED EXPENSES

Accrued expenses consist of the following:

| | DECEMBER 31, | | |
|---|---|---|---|
| | 1996 | 1997 | MARCH 31, 1998 |
| | | | (UNAUDITED) |
| Payroll, bonuses and commissions (see note 9) | $277,810 | $5,576,134 | $1,115,699 |
| Sales, property and state income taxes | 4,604 | 271,225 | 204,501 |
| Royalties | -- | 392,541 | 477,163 |
| Advertising | -- | 470,500 | 795,260 |
| Product warranty and sales returns | -- | 449,200 | 732,100 |
| Professional services | 9,807 | 340,389 | 220,491 |
| Other | 40,202 | 136,168 | 772,712 |
| | $332,423 | $7,636,157 | $4,317,926 |

F-10

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(6) COMMITMENTS

The Company is obligated under certain noncancelable leases for office space. A summary of the minimum rental commitments under noncancellable leases is as follows:

YEARS ENDING
DECEMBER 31,

| | |
|---|---:|
| 1998 | $368,700 |
| 1999 | 456,000 |
| 2000 | 480,400 |
| 2001 | 488,500 |
| 2002 | 512,900 |
| Thereafter | 651,400 |

Rent expense was $32,540, $45,603, $104,480 $26,694 (unaudited) and $64,075 (unaudited) for the years ended December 31, 1995, 1996 and 1997, and the three months ended March 31, 1997 and 1998, respectively.

The Company had outstanding commitments (denominated in U.S. dollars ) on letters of credit of $459,167 at December 31, 1997, and $989,419 (unaudited) at March 31, 1998 for the purchase of inventory from foreign vendors.

(7) DEBT

The Company entered into a $1,500,000 revolving line of credit agreement with a bank on May 30, 1997. The line of credit is secured by trade receivables and inventories, matures on May 15, 1998 and bears interest, payable quarterly, at the bank's prime rate (8.5% at December 31, 1997). At December 31, 1997, there was no balance outstanding on this line of credit. The Company pays an annual commitment fee of 0.5% on the unused portion of the line of credit.

On February 27, 1998, the Company entered into a new $10,000,000 revolving credit facility with a bank which replaced the existing $1,500,000 line of credit. The facility is secured by eligible trade receivables, inventories and equipment, matures on December 31, 1998 and bears interest, payable monthly, at the bank's prime rate of interest minus 25 basis points (8.25% at March 31, 1998) or LIBOR rates plus 1.75% interest. At March 31, 1998, there was no balance outstanding on this credit facility. The Company pays an annual commitment fee of 0.25% on the unused portion of the credit facility.

During the first quarter of 1998, the Company borrowed $1,135,041 in the form of an unsecured note payable to the Chief Executive Officer. The principal balance is payable in three installments, matures on April 14, 1999, and bears interest at 5.39%.

F-11

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(8) INCOME TAXES

Income tax expense (benefit) for the year ended December 31, 1997 consists of the following:

| | YEAR ENDED DECEMBER 31, 1997 | | |
|---|---|---|---|
| | CURRENT | DEFERRED | TOTAL |
| Federal | $1,020,980 | $(572,785) | $448,195 |
| State | 134,568 | — | 134,568 |
| | $1,155,548 | $(572,785) | $582,763 |

Actual income tax expense differs from the "expected" income tax expense (benefit) (computed by applying the U.S. federal corporate tax rate of 34% to income (loss) before income taxes) for the years ended December 31, 1995, 1996 and 1997 as follows:

| | YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| Computed "expected" tax expense (benefit) | $(82,507) | $4,334 | $(1,384,294) |
| State income taxes, net of federal tax benefit | — | — | 88,815 |
| Stock compensation and bonus award | — | — | 2,159,000 |
| Change in valuation allowance for deferred tax assets | 81,352 | (4,334) | (337,558) |
| Other | 1,155 | — | 56,800 |
| | $— | $— | $582,763 |

The tax effects of temporary differences that give rise to deferred tax assets and deferred tax liabilities are presented below:

| | DECEMBER 31, | | |
|---|---|---|---|
| | 1996 | 1997 | MARCH 31, 1998 |
| | | | (UNAUDITED) |
| Deferred tax assets: | | | |
| Allowance for bad debts | $8,908 | $237,436 | $394,391 |
| Research and development costs | 7,563 | 974 | — |
| Bonus compensation | 72,678 | — | — |
| Product warranty and sales returns | — | 152,728 | 256,235 |
| Net operating tax loss carryforwards | 389,528 | 311,100 | 320,250 |
| Total gross deferred tax assets | 478,677 | 702,238 | 970,876 |
| Less valuation allowance | (387,667) | (50,109) | (59,259) |
| Net deferred tax assets | 91,010 | 652,129 | 911,617 |
| Deferred tax liabilities--infomercial costs | (91,010) | (79,344) | (51,049) |
| Net | $— | $572,785 | $860,568 |

In assessing the realizability of deferred income tax assets, management considers whether it is more likely than not that some portion or all of the deferred income tax assets will not be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during

F-12

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(8) INCOME TAXES (CONTINUED)

the periods in which those temporary differences become deductible. Based upon projections for future taxable income over the periods which the deferred tax assets are deductible, management believes it is more likely than not that the Company will realize the benefits of these deductible differences, net of the existing valuation allowance at December 31, 1997.

The valuation allowance for deferred tax assets at December 31, 1996 and 1997 was $387,667 and $50,109, respectively. The net change in the total valuation allowance for the years ended December 31, 1996 and 1997 were decreases of $4,334 and $337,558, respectively.

At December 31, 1997, the Company has net operating tax loss carryforwards for federal income tax purposes of approximately $915,000 which are available to offset future federal taxable income through 2010. The availability of the net operating loss carryforwards to reduce future taxable income is subject to certain limitations. As a result of a change in ownership, the Company believes utilization of its net operating tax loss carryforwards is limited to approximately $62,000 per year for the remaining life of the net operating losses.

(9) STOCKHOLDERS' EQUITY

(a) STOCK OPTION PLANS

In April 1996, the Company adopted the 1996 Stock Option Incentive Plan ("the Stock Option Plan"), pursuant to which stock options covering an aggregate of 800,000 shares of the Company's common stock may be granted. Options awarded under the Stock Option Plan (i) are generally granted at prices that equate to or are above fair market value on the date of the grant; (ii) generally become exercisable over a period of one to four years; and (iii) generally expire five years subsequent to award.

At December 31, 1997 and March 31, 1998, there were 140,310 shares available for grant under the Plan. The per share weighted-average fair value of stock options granted during 1995 and 1996 was $0.25 and $0.06, respectively, on the date of grant using the Black Scholes option-pricing model with the following weighted-average assumptions: Risk-free interest rate, 6%; expected life, two-five years and expected dividend yield, 0%.

In connection with an employment agreement entered into in September 1995 with the Company's chief executive officer and founder, the Company granted the chief executive officer options to acquire 1,520,766 shares of common stock at $.375 per share, the market price at date of grant. Vesting of the stock options was conditioned upon meeting certain revenue and earnings requirements, which were met during 1996 and 1997. Also, the agreement provided for a bonus to be paid to the officer in an amount equal to the exercise price of the options plus any related income tax due by the officer upon exercise of the options. The officer notified the Company of his intent to exercise the options in December 1997 and the shares were issued in January 1998. Compensation expense of $213,760 and $2,300,023 was charged to operations in 1996 and 1997, respectively, to recognize the bonus due to the officer.

In conjunction with a 1996 stock purchase agreement, the Company granted options to a shareholder to acquire an aggregate of 942,632 shares of common stock at option exercise prices ranging from $0.375, the market price at date of grant, to $0.625 per share. During 1997, the shareholder exercised the options for an aggregate exercise price of $549,869.

F-13

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(9) STOCKHOLDERS' EQUITY (CONTINUED) In February 1998, the Company adopted the 1998 Stock Incentive Plan ("the 1998 Stock Option Plan"), pursuant to which stock options covering an aggregate of 1,800,000 shares of the Company's common stock may be granted. The Company granted 218,000 options to employees on February 26, 1998 at $2.50 per share. For financial statement reporting purposes, the grant was deemed to have a fair market value of $7.00 per share at the date of grant. Accordingly, the Company has recorded deferred compensation of $981,000 at March 31, 1998.

The Company applies Accounting Principles Board Opinion 25 in accounting for its stock plans and, accordingly, no compensation cost has been recognized for its stock options in the financial statements. Had the Company determined compensation cost based on the fair value at the grant date for its stock options under SFAS No. 123, the Company's net income (loss) would have been adjusted to the pro forma amounts indicated below:

|  | YEARS ENDED DECEMBER 31 | | |
|  | 1995 | 1996 | 1997 |
| Net income (loss): |  |  |  |
| As reported | $(242,669) | $12,747 | $(4,654,217) |
| Pro forma | (242,669) | (13,361) | (4,743,744) |
| Diluted income (loss) per common share: |  |  |  |
| As reported | $(0.05) | $0.00 | $(0.37) |
| Pro forma | (0.05) | (0.00) | (0.38) |

Pro forma net loss reflects only options granted in 1995, 1996 and 1997. Therefore, the full impact of calculating compensation cost for stock options under SFAS No. 123 is not reflected in the pro forma net loss amounts presented above because compensation cost is reflected over the respective options vesting periods of up to four years.

A summary of stock option activity follows:

|  | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE |
| Options outstanding at December 31, 1994 | -- | $-- |
| Options granted | 1,520,766 | 0.375 |
| Options outstanding at December 31, 1995 | 1,520,766 | 0.375 |
| Options granted | 1,946,948 | 0.50 |
| Options outstanding at December 31, 1996 | 3,467,714 | 0.44 |
| Options exercised | (946,104) | 0.583 |
| Options outstanding at December 31, 1997 | 2,521,610 | 0.375 |
| Options granted | 272,000 | 2.50 |
| Options exercised | (2,479,944) | 0.375 |
| Options outstanding at March 31, 1998 (unaudited) | 313,666 | $2.22 |

At December 31, 1997, the exercise price and weighted-average remaining contractual life of outstanding options was $0.375 and 3.5 years, respectively.

At December 31, 1996 and 1997, the number of options exercisable was 467,970 and 2,114,492, respectively, and the weighted-average exercise price of those options was $0.375.

F-14

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

**(9) STOCKHOLDERS' EQUITY (CONTINUED)**

    (b) STOCK DISTRIBUTION

In connection with the acquisition of a related entity, the Company distributed 4,282,304 shares of common stock to its shareholders during the year ended December 31, 1995. As a result of the common control existing between the Company and the related entity, the transaction was accounted for in a manner similar to a pooling of interests. Accordingly, the transaction resulted in no increase to stockholders' equity since the recorded net asset value of the related entity was not material. The resulting subsidiary has been inactive during the three years ended December 31, 1997 and has no assets or liabilities.

    (c) STOCK COMPENSATION AWARD

In December 1997, the Board of Directors of the Company approved a stock compensation award of 2,000,000 shares of common stock to its chief executive officer and founder of the Company. In addition, the Company agreed to pay all income taxes payable by the officer relating to such stock award and related tax bonus. Aggregate compensation of $12,541,688 (including $2,541,688 for estimated taxes) was recorded by the Company during the year ended December 31, 1997 based on the fair market value of the stock.

    (d) NOTE WITH STOCKHOLDER CONVERTED TO STOCK

The Company borrowed $200,000 from a stockholder in October 1996 and an additional $250,000 from the same stockholder in 1997. The aggregate notes payable balance of $450,000 was converted into 900,000 shares of the Company's stock in September 1997.

    (e) STOCK CONVERSION

During 1995, the Company amended its Certificate of Incorporation to provide the authority to issue up to 25,000,000 shares of $.001 per share par value stock. All such shares were to be designated as common stock and, accordingly, all stockholders of preferred stock surrendered such shares for an equivalent number of shares of common stock.

    (f) STOCK SPLIT AND AUTHORIZED CLASSES OF STOCK

Effective April 29, 1998, the stockholders of the Company authorized a two-for-one stock split for holders of record on May 1, 1998. The stock split has been reflected in the accompanying consolidated financial statements and, accordingly, all applicable dollar, share and per share amounts have been restated to reflect the stock split. In addition, the stockholders of the Company also approved an increase in the number of authorized shares of Common Stock to 50,000,000 and established a class of preferred stock with a par value of $.01 per share and authorized shares of 5,000,000.

**(10) SUBSEQUENT EVENTS (UNAUDITED)**

Effective May 1, 1998, the Company entered into an agreement with Nicholas A. Faldo, a professional golfer (the "Agreement"). The Agreement with Faldo, provides the Company with Faldo's endorsement and use of Adams products, as well as the design, development and testing of new technologies and products. As consideration for such services, Faldo will receive 900,000 shares of the Company's common stock which will be recorded and amortized over the estimated period benefited. In addition, Mr. Faldo will receive royalty payments representing 5% of net sales outside the U.S., with a minimum annual amount of $1,500,000 beginning in 1999 and increasing ratably to $4,000,000 in 2004. Under certain conditions, including the failure by the Company to effect an initial public offering by December 31, 1998, Faldo has the right to require the Company to repurchase the shares for $5,000,000 at which point the Company would have the right to terminate the agreement.

**SCHEDULE II**

**ADAMS GOLF, INC. AND SUBSIDIARIES**
**YEARS ENDED DECEMBER 31, 1995, 1996**
**AND 1997 AND THREE MONTHS ENDED MARCH 31, 1998 (UNAUDITED)**
**VALUATION AND QUALIFYING ACCOUNTS**

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS CHARGED TO: | | | BALANCE AT END OF PERIOD |
| --- | --- | --- | --- | --- | --- |
| | | COSTS AND EXPENSES | OTHER | DEDUCTIONS(1) | |
| Allowance for doubtful accounts: | | | | | |
| Year ended December 31, 1995 | $— | $12,791 | $— | $12,791 | $— |
| Year ended December 31, 1996 | $— | $51,306 | $— | $25,107 | $26,199 |
| Year ended December 31, 1997 | $26,199 | $738,805 | $— | $66,663 | $698,341 |
| Three months ended March 31, 1998 (unaudited) | $698,341 | $466,213 | $— | $37,723 | $1,126,831 |
| Product Warranty and Sales Returns: | | | | | |
| Year ended December 31, 1995 | $— | $— | $— | $— | $— |
| Year ended December 31, 1996 | $— | $1,733 | $— | $1,733 | $— |
| Year ended December 31, 1997 | $— | $1,808,154 | $— | $1,358,954 | $449,200 |
| Three months ended March 31, 1998 (unaudited) | $449,200 | $1,078,407 | $— | $795,507 | $732,100 |

(1) Represents uncollectible accounts charged against the allowance for doubtful accounts and actual costs incurred for warranty repairs and sales returns.

[This Page Intentionally Left Blank]

[This Page Intentionally Left Blank]

NO DEALER, SALESPERSON OR OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED ON AS HAVING BEEN AUTHORIZED BY THE COMPANY, THE SELLING STOCKHOLDERS OR THE UNDERWRITERS. THIS PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OTHER THAN THE REGISTERED SECURITIES TO WHICH IT RELATES IN ANY STATE TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION IN SUCH STATE. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE.

## TABLE OF CONTENTS

| | Page |
|---|---|
| Prospectus Summary | 3 |
| Risk Factors | 6 |
| Disclosure Regarding Forward-Looking Statements | 12 |
| Use of Proceeds | 13 |
| Dividend Policy | 13 |
| Dilution | 14 |
| Capitalization | 15 |
| Selected Consolidated Financial Information | 16 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Business | 22 |
| Management | 33 |
| Certain Transactions | 42 |
| Principal and Selling Stockholders | 44 |
| Description of Capital Stock | 45 |
| Shares Eligible for Future Sale | 48 |
| Underwriting | 49 |
| Legal Matters | 51 |
| Experts | 51 |
| Additional Information | 51 |
| Index to Financial Statements | F-1 |

UNTIL            , 1998 (25 DAYS AFTER THE DATE OF THIS PROSPECTUS), ALL.

DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

5,750,000 SHARES

[LOGO]

COMMON STOCK

PROSPECTUS

July , 1998

LEHMAN BROTHERS

NATIONSBANC MONTGOMERY SECURITIES LLC

FERRIS, BAKER WATTS

INCORPORATED

**PART II**
**INFORMATION NOT REQUIRED IN PROSPECTUS**

## ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION.

Set forth below are the expenses in connection with the issuance and distribution of the securities being registered hereby other than the underwriting discounts and commissions. All amounts are estimated except the Securities and Exchange Commission, Nasdaq National Market and NASD fees

| | |
|---|---:|
| Securities and Exchange Commission registration fee. | $32,450 |
| Nasdaq National Market listing and application fee | 95,000 |
| NASD filing fee. | 11,500 |
| Legal fees and expenses (other than Blue Sky fees and expenses) | 350,000 |
| Blue Sky fees and expenses. | 5,000 |
| Printing and engraving expenses. | 240,000 |
| Accounting fees and expenses. | 140,000 |
| Transfer Agent and Registrar fees and expenses | 10,000 |
| Miscellaneous. | 180,000 |
| Total. | 1,063,950 |

The Company will bear all of the foregoing fees and expenses.

## ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS.

Article VII of the Registrant's Certificate of Incorporation provides that the Company shall indemnify its directors and officers to the fullest extent permitted by the DGCL.

Section 145 of the DGCL permits a corporation, under specified circumstances, to indemnify its directors, officers, employees or agents against expenses (including attorneys' fees), judgments, fines and amounts paid in settlements actually and reasonably incurred by them in connection with any action, suit or proceeding brought by third parties by reason of the fact that they were or are directors, officers, employees or agents of the corporation, if such directors, officers, employees or agents acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe their conduct was unlawful. In a derivative action (I.E., one by or in the right of the corporation), indemnification may be made only for expenses actually and reasonably incurred by directors, officers, employees or agents in connection with the defense or settlement of an action or suit, and only with respect to a matter as to which they shall have acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the corporation, except that no indemnification shall be made if such persons shall have been adjudged liable to the corporation, unless and only to the extent that the court in which the action or suit was brought shall determine upon application that the defendant directors, officers, employees or agents are fairly and reasonably entitled to indemnity for such expenses, despite such adjudication of liability.

Section 102(b)(7) of the DGCL permits a corporation organized under Delaware law to eliminate or limit the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director subject to certain limitations. Article IX of the Certificate of Incorporation includes the following provision:

A director of this corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section

II-1

174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit. If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article IX by the stockholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification.

The Company may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, fiduciary, or agent of the Company against any liability asserted against and incurred by such person in any such capacity or arising out of such person's position, whether or not the Company would have the power to indemnify against such liability under the provisions of the Certificate of Incorporation or Bylaws of the Company.

The Underwriting Agreement, the proposed form of which is filed herewith, contains provisions by which the Underwriters agree to indemnify the Registrant, each person who controls the Registrant within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, each director of the Registrant, and each officer of the Registrant who signs this Registration Statement which respect to information relating to such Underwriter furnished in writing by such Underwriter for use in the Registration Statement.

## ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES.

Since January 1, 1995, the Registrant has sold or issued the following securities:

1. From March 1995 through December 1995, the Registrant issued an aggregate of 266,478 shares of Common Stock to Faris McMullin, Richard Murtland and Hank Haney for services to the Company. The Board of Directors of the Company concluded that the value of such services to the Company exceeded the fair value of the shares, which was determined by the Board of Directors to be equal to approximately $.375 per share of Common Stock.

2. In September 1995, in connection with the Reorganization the Registrant issued an aggregate of 4,282,304 shares of Common Stock to the shareholders of Supershafts, Inc. ("Supershafts") in exchange for all of the then issued and outstanding shares of common stock of Supershafts. The Board of Directors of the Company concluded that the value of the consideration to the Company exceeded the fair value of the shares, which was determined by the Board of Directors to be equal to approximately $.375 per share of Common Stock.

3. In September 1995, in connection with the Reorganization the Registrant issued an aggregate of 1,545,102 shares of Common Stock to the holders of the Company's then outstanding Series A and Series B Preferred Stock in exchange therefor. The Board of Directors concluded that the value of the consideration to the Company exceeded the fair value of the shares, which was determined by the Board of Directors to be equal to approximately $.375 per share.

4. In September 1995, the Registrant sold an aggregate of 40,000 shares of Common Stock to Steve Adams for an aggregate purchase price of $15,000.

5. In September and October 1995, the Registrant sold an aggregate of 2,000,000 shares of Common Stock to Royal for an aggregate purchase price of $750,000.

6. In December 1995, the Registrant sold 2,000,000 shares of Common Stock to Roland Casati for $750,000.

7. In June, 1996, the Registrant sold an aggregate of 770,000 shares of Common Stock to Royal, Roland Casati and Clyde and Peggy Smith for an aggregate purchase price of $246,400.

8. In October, 1996, the Registrant sold 699,526 shares of Common Stock to Finis Conner for an aggregate purchase price of $349,763.

9. In September 1997, the Registrant issued 900,000 shares of Common Stock to Royal in cancellation of certain indebtedness of the Registrant to Royal in the aggregate principal amount of $450,000.

10. In September, 1997, the Registrant issued 942,632 shares of Common Stock to Finis Conner upon exercise of stock options for an aggregate exercise price of $549,869 and subsequently, the Registrant issued an additional 344,618 shares of Common Stock to Mr. Conner upon exercise of stock options for an aggregate exercise price of $129,232.

11. In December 1997, the Registrant issued 2,000,000 shares to Barney Adams for his services to the Company. The Board of Directors of the Company concluded that the value of such services to the Company exceeded the fair value of the shares, which was determined by the Board of Directors to be $10,000,000.

12. From April 1996 to the date of this Registration Statement, the Registrant has issued 2,138,798 shares of Common Stock to employees who exercised options for an aggregate exercise price of $802,049.

13. As of the date of this Registration Statement, the Company has granted options to purchase up to 423,666 shares of Common Stock at a weighted average exercise price of $2.70 that have not been exercised.

14. Pursuant to an agreement between the Registrant and Nick Faldo dated April 22, 1998, the Registrant issued 900,000 shares to Nick Faldo in consideration for, among other things, Mr. Faldo's endorsement of certain products of the Registrant and his license of certain intellectual property rights to the Registrant. The Board of Directors of the Company concluded that the value of the consideration to be received by the Company under the agreement with Mr. Faldo exceeded the fair value of the shares, which was determined by the Board of Directors to be $10,125,000.

All transactions described above were effected in reliance on the exemption from registration provided by Section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering. The recipients of securities in each such transaction represented their intentions to acquire the securities for investment only and not with a view to or for sale in connection with any distribution thereof and appropriate legends were affixed to the share certificates issued in such transactions. All recipients had adequate access, through their relationships with the Registrant, to information about the Registrant.

II-3

## ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

### (a) Exhibits

| | |
|---|---|
| 1.1 | Form of Underwriting Agreement* |
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant* |
| 3.2 | Amended and Restated Bylaws of the Registrant* |
| 4.1 | 1998 Stock Incentive Plan of the Registrant dated February 26, 1998* |
| 4.2 | 1996 Stock Option Plan dated April 10, 1996* |
| 4.3 | Registration Rights Agreement dated April 30, 1998, among the Registrant and certain stockholders of the Registrant* |
| 4.4 | Adams Golf, Ltd. 401(k) Retirement Plan* |
| 4.5 | Form of Common Stock Certificate for the Registrant* |
| 5.1 | Opinion of Arter & Hadden LLP as to legality of securities being offered |
| 10.1 | Agreement between the Registrant and Nick Faldo, dated April 22, 1998* |
| 10.2 | Revolving Credit Agreement dated February 27, 1998, between Adams Golf Direct Response, Ltd., Adams Golf, Ltd. and NationsBank of Texas, N.A.* |
| 10.3 | Commercial Lease Agreement dated December 5, 1997, between Jackson-Shaw Technology Center II, Ltd. and the Registrant* |
| 10.4 | Commercial Lease Agreement dated April 6, 1998 between Jackson-Shaw Technology Center II, Ltd. and the Registrant* |
| 10.5 | Letter Agreement dated April 13, 1998, between the Registrant and Darl P. Hatfield* |
| 11.1 | Computation of Income (Loss) Per Share* |
| 21.1 | Subsidiaries of the Registrant* |
| 23.1 | Consent of Arter & Hadden LLP (included in their opinion filed as Exhibit 5.1) |
| 23.2 | Consent of KPMG Peat Marwick LLP |
| 23.3 | Consent of Aquilino & Welsh |
| 24.1 | Power of Attorney (previously included on Page II-6)* |
| 27.1 | Financial Data Schedule* |

* Previously filed.

### (b) Financial Statement Schedules

Set forth below is a list of the financial statements included as part of this Registration Statement:

Schedule II--Valuation and Qualifying Accounts

All other schedules have been intentionally omitted because they are either not required or the information has been included in the Notes to the Consolidated Financial Statements included as part of this Registration Statement.

## ITEM 17. UNDERTAKINGS.

(F)  EQUITY OFFERINGS OF NONREPORTING REGISTRANTS  The undersigned registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreement certificates in such

denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

(H)  REQUEST FOR ACCELERATION OF EFFECTIVE DATE. Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered hereunder the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(I)  RULE 430A. The undersigned registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as a part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For purposes of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

II-5

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Amendment No. 3 to Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Plano, State of Texas, on July 9, 1998.

ADAMS GOLF, INC.

By:        /s/ RICHARD H. MURTLAND

Richard H. Murtland
SENIOR VICE PRESIDENT--RESEARCH AND
DEVELOPMENT, SECRETARY AND TREASURER

Pursuant to the requirements of the Securities Act of 1933, as amended, this Amendment No. 3 to Registration Statement has been signed on the 9th day of July, 1998, below by or on behalf of the following persons in the capacities indicated.

| SIGNATURE | TITLE |
|---|---|
| /s/ B.H. (BARNEY) ADAMS*<br>―――――――――――<br>B.H. (Barney) Adams | Chairman of the Board,<br>Chief Executive Officer,<br>and President (PRINCIPAL<br>EXECUTIVE OFFICER) |
| /s/ DARL P. HATFIELD*<br>―――――――――――<br>Darl P. Hatfield | Senior Vice<br>President--Finance and<br>Administration and Chief<br>Financial Officer<br>(PRINCIPAL FINANCIAL AND<br>ACCOUNTING OFFICER) |
| /s/ RICHARD H. MURTLAND<br>―――――――――――<br>Richard H. Murtland | Vice President--Research<br>and Development,<br>Secretary, Treasurer and<br>Director |
| /s/ PAUL F. BROWN, JR.*<br>―――――――――――<br>Paul F. Brown, Jr. | Director |
| /s/ ROLAND E. CASATI*<br>―――――――――――<br>Roland E. Casati | Director |
| /s/ FINIS F. CONNER*<br>―――――――――――<br>Finis F. Conner | Director |
| ―――――――――――<br>Mark R. Mulvoy | Director |
| /s/ STEPHEN R. PATCHIN*<br>―――――――――――<br>Stephen R. Patchin | Director |

*By:      /s/ RICHARD H. MURTLAND

Richard H. Murtland
ATTORNEY-IN-FACT

II-6
