9

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF DELAWARE

 3                                )

                                  )

 4    IN RE:                      )

                                  )   CIVIL ACTION NO. 99-371-KAJ

 5    ADAMS GOLF, INC.,           )   (CONSOLIDATED)

      SECURITIES LITIGATION       )

 6                                )

                                  )

 7                                )

 8

 9    * * * * * * * * * * * * * * * * * * * * * * * * * *

10                  ORAL DEPOSITION OF

11                   PATRICIA CRAUS

12                 FEBRUARY 18, 2005

13    * * * * * * * * * * * * * * * * * * * * * * * * * *

14

15       ORAL DEPOSITION OF PATRICIA CRAUS, produced as a

16    witness at the instance of the Defendants, and duly

17    sworn, was taken in the above-styled and numbered cause

18    on February 18, 2005, from 9:59 a.m. to 1:15 p.m.,

19    before DELLA M. SAWVEL, CSR in and for the State of

20    Texas, reported by machine shorthand, at the offices of

21    AKIN GUMP STRAUSS HAUER & FELD, LLP, 300 West 6th

22    Street, Suite 2100, Austin, Texas, pursuant to Federal

23    Rule of Civil Procedure 30(b)(1) and the District of

24    Delaware Federal Rules.

25
```

PATRICIA CRAUS                                2/18/2005   IN RE: ADAMS GOLF, INC , SECURITIES LITIGATION

---

**Page 2**

```
 1              A P P E A R A N C E S
 2
     FOR THE PLAINTIFFS:
 3
       Ms. Elizabeth W. Fox
 4     BERGER & MONTAGUE, P C
       1622 Locust Street
 5     Philadelphia, PA  19103-6305
 6
 7
     FOR THE DEFENDANTS ADAMS GOLF
 8   AND INDIVIDUAL DEFENDANTS:
 9     Ms  Michelle A  Reed
       Mr  Christopher W  Ahart
10     Ms. Jennifer R. Brannen
       AKIN GUMP STRAUSS HAUER & FELD, LLP
11     300 West 6th Street, Suite 2100
       Austin, Texas  78701
12
13
14   FOR THE DEFENDANT UNDERWRITERS:
15     Mr  Theodore J  McEvoy
       SIMPSON THACHER & BARTLETT, LLP
16     425 Lexington Avenue
       New York, New York  10017-3954
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1               INDEX
                                     PAGE
 2
     Appearances . . . . . . . . . . . . .  2
 3
 4   PATRICIA CRAUS
       Examination by Ms  Reed . . . . .  5
 5     Examination by Mr  McEvoy . . . .  95
       Examination by Ms. Reed . . . . . 110
 6
     Signature and Changes . . . . . . . 114
 7   Reporter's Certificate . . . . . . . 116
 8                EXHIBITS
 9   NO   DESCRIPTION                    PAGE
10    1 . . . . . . . . . . . . . . . . . 18
        Amendment No  3 to Form S-1 of Adams Golf, Inc
11
      2 . . . . . . . . . . . . . . . . . 25
12      Consolidated and Amended Class Action
        Complaint for Violation of Federal
13      Securities Laws
14    3 . . . . . . . . . . . . . . . . . 33
        Disclosures
15
      4 . . . . . . . . . . . . . . . . . 45
16      Certification
17    5 . . . . . . . . . . . . . . . . . 61
        Request for Production of Documents
18
      6 . . . . . . . . . . . . . . . . . 63
19      Responses and Objections of Patricia Craus to
        Defendant Adams Golf, Inc 's First Request For
20      Production of Documents and Things, From
        Proposed Class Representatives, Federated
21      National Insurance Company, John Morrash, Todd
        Tonore, F  Kenneth Shockley and Patricia Craus
22
      7 . . . . . . . . . . . . . . . . . 69
23      Defendant Adams Golf's First Set of
        Interrogatories to Proposed Class
24      Representatives, Federated National Insurance
        Company, John Morrash, Todd Tonore, F  Kenneth
25      Shockley, and Patricia Craus
```

---

**Page 4**

```
 1              EXHIBITS (CONTINUED)
 2   NO    DESCRIPTION                   PAGE
 3
 4    8 . . . . . . . . . . . . . . . . . 69
        Plaintiff Patricia Craus' Responses to
 5      Defendant Adams Golf's First Set of
        Interrogatory
 6
      9 . . . . . . . . . . . . . . . . . 74
 7      Letter dated June 12, 1998, from Lehman
        Brothers
 8
     10 . . . . . . . . . . . . . . . . . 75
 9      Fax Cover to Tim Gamso from Pat Craus dated
        6/26/98
10
     11 . . . . . . . . . . . . . . . . . 78
11      Letter dated July 9, 1998, from Lehman
        Brothers
12
13   12 . . . . . . . . . . . . . . . . . 93
        Memorandum of Law in Support of Plaintiffs'
14      Submission For Class Certification
15
     13 . . . . . . . . . . . . . . . . . 82
16      Account Information
17
     14 . . . . . . . . . . . . . . . . . 112
18      Patricia Craus' Background Information
19
     15 . . . . . . . . . . . . . . . . . 112
20      Article "Fore!  A Golf Equipment Giant is
        Headed Your Way" dated August 28, 1998
21
22
23
24
25
```

---

**Page 5**

```
 1              PATRICIA CRAUS,
 2   having been first duly sworn, testified as follows:
 3                EXAMINATION
 4   BY MS. REED:
 5     Q.  Good morning, Ms. Craus.  I am Michelle Reed
 6   and I represent the defendants, Adams Golf, and then the
 7   individual defendants in this action.
 8       MR. McEVOY:  My name is Ted McEvoy from
 9   Simpson, Thacher & Bartlett, and I represent the
10   underwriter defendants in this action.
11     Q.  (BY MS. REED)  Could you please state your full
12   name for the record.
13     A.  Patricia, P-A-T-R-I-C-I-A, Ann, A-N-N, Craus,
14   C-R-A-U-S.
15     Q.  And what is your date of birth?
16     A.  11/23/36.
17     Q.  Have you ever had your deposition taken before?
18     A.  Yes.
19     Q.  When did you have that taken?
20     A.  I can't remember the date.  Somewhere -- I
21   really don't remember the date.
22     Q.  Do you know about when or --
23     A.  Probably around 1995 maybe.
24     Q.  And have you only had it taken one other time?
25     A.  I have actually -- and this is just related to
```

---

PATRICIA CRAUS                    2/18/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 6

1  something that is not securities or anything, but
2  probably it was longer ago than that. I would just be
3  guessing to say around 1992 or something.
4      Q.  Okay. What types of cases have you had your
5  deposition taken in?
6      A.  I'm a land developer, and it would be like a
7  homeowner might file suit over something they felt
8  wasn't what it was supposed to be, and then I ended up
9  in a suit, a class action suit with American Airlines.
10  They just sent me papers and I don't have a clue what
11  they did.
12     Q.  So you weren't a named party?
13     A.  No, no, no.
14         MS. FOX:  But there was no deposition in
15  that.
16         THE WITNESS:  No deposition, no, I'm
17  sorry. I got, I think, three little tickets that if you
18  appeared in a chicken suit at 8:00, you got $15 off your
19  ticket, or something to that effect.
20     Q.  (BY MS. REED)  Were you a party in the land
21  developer suits?
22     A.  Yes.
23     Q.  And were you a defendant?
24     A.  Individually, no.  No, only as a company.
25     Q.  Okay. I just want to go over some basic ground

Page 7

1  rules.
2      A.  Sure.
3      Q.  Since you've had it taken before, you probably
4  know, you're under oath and so this is as if we were in
5  court. You're supposed to testify truthfully. And this
6  is probably the most important rule, is to answer
7  audibly, uh-huhs, or huh-uhs, are difficult for her to
8  type down, and it's best for us not to talk over one
9  another. I'm sometimes the worst at that. Because it's
10  hard for her to take down two people talking at the same
11  time.
12         Tell me if you don't understand a question
13  I ask. It's no problem. I can rephrase it. I'll try
14  to be clear, but if you answer, I will assume that you
15  understand the question. If you need a break, say so.
16  We can do it at any time. Try not to leave a question
17  pending. Just answer the question and we can take a
18  break. Don't guess in your answers to any of these
19  questions, but I'm still entitled to your best
20  recollection. So -- but there's no reason to guess. Is
21  there any reason you can't give your best testimony here
22  today?
23     A.  No.
24     Q.  And is there any mental or physical condition
25  or medications that would prevent you from testifying

Page 8

1  truthfully and accurately?
2      A.  No.
3      Q.  Could you give me your address?
4      A.  520 Lakeside, one word, L-A-K-E-S-I-D-E, Drive,
5  and it's in the town of Azle, A-Z-L-E, Texas, 76020.
6      Q.  And were you living at that address in 1998 to
7  '99?
8      A.  Yes.
9      Q.  And what is your business?
10     A.  Basically, it has been land development, but
11  also building shopping -- built a shopping center and
12  movie theatre and various investments.
13     Q.  What is the name of your business?
14     A.  I have several. The most active would be Star
15  Village, L.P.
16     Q.  Are you married?
17     A.  No.
18     Q.  I'd like to go over some of your educational
19  background starting with high school, going through any
20  potential graduate school you might have had.
21     A.  High school was in Beaumont, Texas, and then a
22  BA degree from Howard Payne University in Brownwood.
23     Q.  What was your degree that you received?
24     A.  Major in speech.
25     Q.  Sorry. I should have asked what your

Page 9

1  major/minor was, because your degree was a BA.
2      A.  It was a BA degree.
3      Q.  Did you have any financial business accounting
4  classes?
5      A.  I think I had one class that was business. I
6  minored in Bible.
7      Q.  In --
8      A.  Bible.
9      Q.  Okay. And do you have any graduate education?
10     A.  No.
11     Q.  Have you taken any seminars or trade courses
12  since -- since graduating from college?
13     A.  Well, I received a broker's license from the
14  State of Texas.
15     Q.  A real estate?
16     A.  Yes.
17     Q.  When did you receive that license?
18         MS. FOX:  Don't guess.
19         THE WITNESS:  A very long time ago.
20     Q.  (BY MS. REED)  Are you a member of any
21  professional societies?
22     A.  No.
23     Q.  Now, I'd like to turn to your employment
24  history. If you could, list your employers since you
25  graduated from college. Now, I know that might be a

3 (Pages 6 to 9)

PATRICIA CRAUS                              2/18/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 10

1   lot. So if you want to sort of group them, that's fine,
2   so that we can move it along.
3           MS. FOX: Do you have that -- off the
4   record just a second.
5           (Discussion off the record.)
6       Q.  (BY MS. REED) Does the CV cover your major
7   employers since you graduated?
8       A.  Yes.
9       Q.  Okay. Let's skip over this, and then we can
10  come back.
11          MS. FOX: That's fine.
12      Q.  (BY MS. REED) When did you learn that you were
13  going to have your deposition taken in this case?
14      A.  I don't remember the date, but in the past year
15  or so.
16      Q.  And who told you?
17      A.  The firm of -- that's represented by Ms. Fox,
18  Berger & Montague.
19      Q.  Did you meet with anyone to prepare for this
20  deposition?
21      A.  Yes.
22      Q.  Who did you meet with?
23      A.  Ms. Fox.
24      Q.  When did you meet with Ms. Fox?
25      A.  Last night.

Page 11

1       Q.  Did you meet with her at any other time?
2       A.  No.
3       Q.  How long did you meet?
4       A.  We had dinner, probably two hours at the
5   maximum.
6       Q.  Have you met personally with any of your
7   attorneys before today?
8       A.  No.
9       Q.  Or I guess I should say before last night?
10      A.  Yes. Okay.
11      Q.  And did you -- have you communicated with
12  anyone else in preparation for your deposition?
13      A.  Well, I have spoken with Todd Collins with the
14  firm of Berger & Montague, and I have spoken with
15  Ms. Fox.
16      Q.  Have you spoken with anyone else about your
17  deposition other than your attorneys?
18      A.  No.
19      Q.  And this includes phone or written
20  communications?
21      A.  Yes.
22      Q.  Did you review any documents to prepare for
23  your deposition?
24      A.  Yes.
25      Q.  What did you review?

Page 12

1       A.  The papers for copying. That would have been
2   generally most of them.
3       Q.  And when did you review those documents?
4       A.  In the past two weeks.
5       Q.  Did any of those documents refresh your memory
6   about the events connected with this lawsuit?
7       A.  Yes, it did some.
8       Q.  Which ones?
9       A.  The portfolio, the -- it was from Lehman
10  Brothers.
11      Q.  The one we saw that was bound?
12      A.  Yes, yes.
13      Q.  We can identify that later.
14      A.  Prospectus or whatever they call them.
15      Q.  Who are you suing in this action?
16      A.  Adams Golf and named parties, and I'm not sure
17  who else is involved in the suit.
18      Q.  Do you know any of those named parties? Can
19  you name any of those named parties?
20      A.  You mean like with Adams Golf or something?
21      Q.  Yes.
22      A.  Yes, Barney Adams.
23      Q.  Any others?
24      A.  No.
25      Q.  Why are you suing my clients?

Page 1.

1       A.  I purchased stock at the initial public
2   offering, and I feel I was misled as to various facts
3   provided to me, both before and after the purchase.
4       Q.  Which facts do you feel misled you?
5       A.  First, I was to be sold 2,000 shares of stock
6   at a price that preceded the $16 IPO rate. Then, I
7   realized that afterward that a great, great deal of
8   funds, you know, went to other people from the
9   IPO and that in the gray market area, they call it,
10  there were -- there was a real overload of product
11  existent, and because I had gone into great detail that
12  the product would be sold only through pro shops and --
13      Q.  Pro shops?
14      A.  Yes. Golf pro shops. I'm sorry. And that's
15  probably about it, I guess.
16      Q.  Are you suing on the basis of these two or
17  three, however you want to classify them,
18  representations, on all of these?
19      A.  Yes, in all of them, because I'm sure in some
20  way, each one has an involvement.
21      Q.  Now, you talked about a gray market overload.
22  What do you believe that my clients did wrong?
23      A.  I directly was told that, by Mr. Adams, that
24  one of the secrets to the success of the company would
25  be the marketing process. Having been in marketing

Page 14

1 through my companies, I know that that's very critical
2 to whether you succeed or fail. And supply and demand
3 creates value, and I felt that was a good approach,
4 because it would be sold through either golf
5 professional shops at the golf courses or places that
6 teach like Hank Haney school in Dallas and that the --
7 it would become a high line, not an inexpensive-type
8 golf club that you could purchase, you know, just about
9 anywhere. That was probably, I think, their most --
10 their intent there, was probably the right direction.
11 They just didn't do it.
12    Q. And what evidence do you have to support your
13 belief that they didn't do it?
14    A. Well, number one -- of course, I've read
15 articles regarding the gray market event. They called
16 it gray market. I don't know why that particular term,
17 but it meant sales that were -- that were done that were
18 a lot cheaper than if I went to the golf pro shop
19 to buy the clubs, I would pay a much higher price than
20 if you went to one of the retail-type stores that were
21 discounted heavily.
22      Also, during that same time, I cannot
23 remember whether I read it or I was told by Barney or
24 who, but I was told that because of the gray market
25 happening, that there were many golf professional shops

Page 15

1 that were very disenchanted and were returning their
2 clubs back to Adams Golf and getting -- or requesting
3 their monies back.
4    Q. Do you remember when you read these articles?
5    A. It would have been after the IPO, but not too
6 far after.
7    Q. Did you read any of these articles before the
8 IPO?
9    A. Oh, no, I did not read it before the IPO.
10    Q. Do you know how many defendants there are in
11 this action?
12    A. No, not totally. I know Adams Golf.
13    Q. In 1998, what sort of business was Adams Golf
14 in?
15    A. Barney -- I had toured the factory several
16 times or his plant.
17       THE REPORTER: You had?
18       THE WITNESS: I had toured his plant
19 several times and it was the Tight Lies that were, I
20 think, basically Fairway Woods, and he demonstrated, you
21 know, the -- how you put them together and the various
22 things  That would probably be it.
23    Q. (BY MS. REED) Do you know how -- I guess we've
24 already covered. You know how Adams markets its
25 products  Do you know in 1998 who Adams sold its clubs

Page 16

1 to?
2    A. I couldn't name who they sold it to. It was
3 supposed to be golf pro shops and I know Hank Haney
4 School of Golf had them.
5    Q. Have you ever seen any Adams Golf
6 advertisements?
7    A. Yes.
8    Q. Were these television advertisements?
9    A. I might have seen one television advertisement;
10 otherwise, it would have possibly been something out of
11 a golf magazine.
12    Q. In your interrogatories, you said that you saw
13 ads in the paper for clubs sold at discount or off-price
14 stores; is that right?
15    A. Yes.
16    Q. When did you see these advertisements?
17    A. It would have been after the IPO, but not too
18 much after.
19    Q. When you say not too much after --
20    A. Well, like in months, not years.
21    Q. Do you remember what stores were advertising?
22    A. Would you repeat that?
23    Q. Yeah, let me clarify. Do you remember what
24 stores were advertising the discount on Adams Golf
25 clubs?

Page 17

1    A. I think that Cosco was involved in the article.
2 I can't remember the others, no.
3    Q. When did you first learn about the IPO?
4    A. At least a month or two before the IPO.
5    Q. So the IPO is in July. So May time frame?
6 Does that sound right?
7       MS. FOX: I think there's some documents.
8       THE WITNESS: Dates on the documents would
9 have taken it back as far as I have written documents,
10 but I was aware several -- you know, as I say, a couple,
11 three months ago, before.
12    Q. (BY MS. REED) Were you aware before Lehman
13 Brothers sent you those documents?
14    A. Yes.
15    Q. And how were you made aware?
16    A. Barney Adams and Clyde Smith.
17    Q. And who's Clyde Smith?
18    A. A business -- well, a very close friend and a
19 business associate in one instance.
20    Q. And what is his relationship to Adams Golf?
21    A. He was a major backer of Barney Adams in the
22 beginning of his company.
23    Q. A financial backer or just --
24    A. Yes, a financial backer and they were friends,
25 I'm sure.

Page 18

1    Q.  After learning about the IPO, Adams Golf IPO,
2  did you follow the company?
3    A.  Yes.
4    Q.  How did you do that?
5    A.  Of course, the newspapers.  Possibly a
6  conversation with Barney Adams over the telephone and
7  discussions with Mr. and Mrs. Smith.
8    Q.  So you -- did you -- you said you saw news
9  articles about Adams Golf?
10   A.  Yes.
11   Q.  Did you see press releases about Adams Golf?
12   A.  There was a press release stating there would
13  be an IPO.  Otherwise, it would have been related to the
14  gray market information and that type thing.
15   Q.  What was your understanding of the -- withdraw.
16  Who is W.D.C. McKenzie?
17   A.  Who is who?
18   Q.  W.D.C. McKenzie?
19   A.  I don't know.
20   Q.  I'm now going to show you what's been marked as
21  Defendant's Exhibit 1.  Do you recognize this document?
22   A.  I don't know that I've ever seen this.
23   Q.  Well, let me represent to you -- just going to
24  identify it for the record.  Defendant's Exhibit 1 is
25  Amendment No. 3 to Form S-1 of Adams Golf, Inc., without

Page 19

1  amendments, and it's not Bates stamped.  This is the
2  prospectus that Adams Golf submitted to the ICC in
3  connection with this IPO.
4    MS. FOX:  It's a copy of the --
5    MS. REED:  Yeah, excuse me, it's a copy of
6  the prospectus.  In fact, everything I'm using today
7  will be copies.  None of them will be originals.
8    THE WITNESS:  I received something from
9  Lehman Brothers, but I don't remember anything this
10  thick.  I remember more clearly the booklet that's being
11  copied.
12   Q.  (BY MS. REED) Okay.
13   A.  To the best of my memory, I don't know.
14   MS. FOX:  This would have been a copy of
15  two-sided tissue paper.  So it probably wouldn't have
16  been this thick, is that right, the original?
17   MS. REED:  Probably not.
18   MS. FOX:  The original probably would have
19  been in a form of the one that you produced?
20   THE WITNESS:  That fits more to my memory,
21  is something around that other size.
22   MS. REED:  Okay.
23   MS. FOX:  Might have been a little larger
24  than the other one that I brought.
25   Q.  (BY MS. REED) Do you have any recollection of

Page 20

1  reading a prospectus?
2    A.  Yes.
3    Q.  Did you read the prospectus all the way
4  through?
5    A.  Yes.
6    Q.  What statements in the prospectus do you
7  believe were false or misleading?
8    A.  First, the marketing procedure was not
9  followed.  Secondly, I believe that most of the funds
10  from the IPO would remain in the company rather than
11  being distributed to partners.  And I think the pursuit
12  of quality and advancement of the clubs.  I'm sure some
13  was done, but I did not feel at all that it was as
14  timely and certainly not representative of what I felt
15  they were telling me in the prospectus.
16   Q.  Specifically looking at the prospectus, can you
17  identify any statement that you believe was false?  I
18  understand you've given me three different examples of
19  types of things you believe were false, but do you have
20  any specific statements that were contained -- can you
21  identify any specific statements contained in the
22  prospectus that were -- that you believe were false?
23   MS. FOX:  I would object to that.  This is
24  a half-inch document.  For her to go through to find the
25  statements that are actually in the complaint would be

Page 21

1  ridiculous.  I couldn't find them sitting here today.
2    THE WITNESS:  I was going to say, I would
3  have to take time to read the entire booklet.
4    Q.  (BY MS. REED) Okay.  Let's do a timesaver.  Do
5  you believe that anything other than what is alleged in
6  the complaint is false and misleading in this
7  prospectus?
8    MS. FOX:  Other than what she's already
9  said.
10   THE WITNESS:  Again, you know, I'd have to
11  read it.
12   Q.  (BY MS. REED) Okay.  Maybe on a break, I'd
13  like you to take a look at the prospectus so we can just
14  identify the statements that you believe my clients made
15  that were allegedly false.
16   A.  I'd be happy to.
17   Q.  Okay.  Do you understand the difference between
18  a misrepresentation and an omission?
19   A.  Legally, no.
20   Q.  Generally, what's your understanding of a
21  misrepresentation versus an omission?
22   A.  I would guess a misrepresentation would be to
23  hold forth something you were going to do knowing you
24  weren't going to do it, possibly.  And what was the
25  other one?

Page 22

1    Q   Omission.
2    A.  Omission would be the failure to include
3  something.
4    Q.  And in this case do you believe there were
5  misrepresentations or omissions?
6    A.  Misrepresentations, primarily. There probably
7  were some omissions as well, but --
8    Q.  What do you believe that the defendants should
9  have disclosed that they didn't?
10    A.  I feel that there should have been disclosure
11  of the fact that there were so many clubs that were
12  already on the market that were not revealed to me.
13  They should have revealed -- well, they -- I was told I
14  would be able to buy 2,000 shares of stock at I think it
15  was $2, because Barney had put me on his preferred list,
16  and that didn't happen. I definitely did not know that
17  the amount of the millions of dollars would go to these
18  named parties immediately at the IPO, or closely to
19  that.
20    Q.  So you're saying that millions of dollars from
21  the IPO were given directly to the named defendants?
22    A.  I think the named defendants were given the
23  stock at zero to something, but very low when they
24  joined Barney Adams, and then it was sold very -- not
25  too much thereafter, months probably, rather than years.

Page 23

1  at the $16 value, which would have been millions, yes,
2  to each party or I assume millions to each party. I
3  know so in some cases.
4    Q.  And this, what you think is an improper
5  distribution of millions of dollars, do you think -- do
6  you include the underwriters in that?
7    A.  I think the underwriters had to know it. If
8  they didn't know it, I don't think they did their due
9  diligence. Yes, I would think they had to know it.
10    Q.  Okay. So the underwriters knew about this
11  distribution, but you're not claiming that the
12  underwriters received money that they should not have?
13    A.  I have no idea what they received.
14    Q.  Okay. All right. Could you turn to Page 24 of
15  Exhibit 1. Now, the numbers are at the very bottom of
16  that, you know, sort of -- not the very bottom, but the
17  middle bottom.
18        Now, on this page, if you look at the
19  second block paragraph starting "Innovative marketing
20  model on strong retail" -- third line down, it says,
21  "to preserve the integrity of its image and reputation,
22  the company" --
23    A.  I'm lost here. Just a minute. Third line down
24  under innovative -- okay, now, I'm with you.
25    Q.  "To preserve" -- now, I'm lost. "To preserve

Page 24

1  the integrity of its image and reputation, the company
2  currently limits its distribution to retailers that
3  market premium quality golf equipment and provide a high
4  level of customer service and technical expertise." And
5  it continues, "The company currently sells its products
6  to on- and off-course golf shops and selective sporting
7  goods retailers. The company does not sell its products
8  through price sensitive general discount warehouses,
9  department stores or membership clubs." Do you -- do
10  you believe this is a true statement?
11    A.  No.
12    Q.  Why not?
13    A.  First of all, I know they didn't do it. I
14  purchased a set of the clubs for a relative of mine, and
15  took him to the Hank Haney school in Dallas, where they
16  measured, you know, it was supposed to be a custom-type
17  thing, and then I started realizing that -- and I
18  paid -- I don't know what I paid for them, but I know it
19  was a type of service, I think, that was supposed to be
20  existent. Then when all the clubs started showing up
21  everywhere, you know, you take away any type of
22  exclusiveness or this club is -- you know, Tight Lies is
23  the club that everybody would want, because once you can
24  buy it anywhere and at a fraction of the price that
25  you'd buy it, like at Hank Haney school or a pro shop, I

Page 25

1  think that removed a lot of the exclusiveness. And
2  someone in the company, in my opinion, I don't think
3  that could happen without knowledge.
4    Q.  So are you alleging that Adams Golf sold their
5  clubs to these discount warehouses?
6    A.  I have no way to know how it happened.
7    Q.  Okay. So you're just alleging that the clubs
8  ended up there?
9    A.  And again, I think somewhere, when you have a
10  company holding out these facts and they're particularly
11  being very proud of the marketing strategy, and there
12  has to somehow be a way that the company had some
13  awareness, in my opinion.
14    Q.  Do you know specifically who had that
15  understanding?
16    A.  I don't understand the question.
17    Q.  Let me clarify it. Do you know who at the
18  company knew that these clubs would end up at Cosco?
19    A.  I do not.
20    Q.  All right. Let me show you what has been
21  marked as Exhibit 2. Do you recognize this document?
22    A.  I believe I do.
23    Q.  What is it?
24    A.  It appears to be an amended class action
25  complaint. So I guess an amended portion of the suit.

PATRICIA CRAUS                    2/18/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 26

1    Q.  Okay  Let me identify it for the record  It's
2  the consolidated and amended class action complaint for
3  violation of federal securities laws  It's not Bates
4  stamped, but it's numbered Pages 1 through 25 with three
5  additional pages at the end  Have you -- have you seen
6  this document before?
7    A.  I believe I have.
8    Q.  When did you first see it?
9    A.  I really don't know.  It would have been after
10  the initial public offering, I believe, but it may not
11  have been.  I guess since the lawsuit.  It would have to
12  be after.
13    Q.  And I know you don't remember specifically, but
14  do you recall if you saw it years ago or just recently?
15    A.  I do not recall.  I really don't.
16    Q.  Other than today, have you seen this document
17  recently?
18    A.  Not in the last week, I would not think.  I
19  would have -- I would say it would have been in my past,
20  but I don't know when.
21    Q.  Okay.  Did you file this complaint against the
22  defendants?
23    A.  No.
24        MS. FOX:  I object.  That's a legal
25  conclusion

Page 27

1    Q.  (BY MS. REED)  Well, I'm just asking since
2  you're, you know, a proposed class representative and
3  you're involved in the litigation, is it your
4  understanding that you were part of filing this suit?
5    A.  I was willing to be part of the suit, yes.
6    Q.  What investigation did you undertake before you
7  filed the consolidated amended complaint, which I'll
8  refer to as the complaint?
9        MS. FOX:  I'll object to the form.  You
10  know perfectly well that lawyers file amended
11  complaints, plaintiffs don't.  She was in Texas.  It was
12  filed in Delaware.
13    Q.  (BY MS. REED)  Okay.  I'm not talking about the
14  physical act of filing the complaint, but since you
15  are -- you say that you are part of this.  What
16  investigation did you take before you had your lawyers
17  file this complaint?
18    A.  Well, I didn't have the lawyers, you know, file
19  the complaint.  I -- together, it was a class action
20  suit.  So I don't know how they did that, but my
21  investigation would have been knowledge of conversations
22  with Barney Adams and Mr. and Mrs. Smith, and the
23  articles I told you I read about and the consequences of
24  what happened to the stocks' value.
25    Q.  Did you help at all in preparing this

Page 28

1  complaint?
2    A.  No.
3    Q.  Did you read this complaint before it was
4  filed?
5    A.  Yes.  Well, before it was filed --
6        MS. FOX:  This is not the original
7  complaint, obviously, that her -- her certification is
8  attached to.
9        THE WITNESS:  Right, I read the --
10        MS. FOX:  This is a long, a later amended
11  complaint.
12    Q.  (BY MS. REED)  Which complaint is it your
13  understanding that your certification was attached to?
14    A.  The earlier one.
15    Q.  An earlier one?
16    A.  Yeah, right.
17    Q.  Do you know specifically which one?
18    A.  No.
19        MS. FOX:  It would have been the first
20  complaint that we filed, the first complaint that has
21  her name on it.
22    Q.  (BY MS. REED)  Okay.  Now, before this
23  complaint was filed, did you review it for accuracy?
24    A.  This one?
25    Q.  Uh-huh.

Page 29

1    A.  I might have read it, but I didn't spend time
2  studying it.
3    Q.  Do you consider yourself a careful person when
4  it comes to reviewing important documents?
5    A.  Yes.
6    Q.  And is it fair to say that accuracy is
7  important to you when you're reviewing important
8  documents?
9    A.  Yes.
10    Q.  Other than the three things you mentioned,
11  speaking to Barney Adams and the Smiths and reviewing
12  those articles, did you do anything to satisfy yourself
13  that these allegations were accurate?
14    A.  Well, I knew the allegations I just mentioned
15  to you were accurate.
16    Q.  But other than those three things, you didn't
17  do anything?
18    A.  I didn't go out and research anything, like
19  going to the plant or anything like that, no.
20    Q.  If it turned out that the allegations in the
21  complaint weren't accurate, would you be willing to
22  dismiss the complaint?
23    A.  I don't think individually I have the power to
24  dismiss the complaint.
25    Q.  Would you be willing to dismiss at least your

8 (Pages 26 to 29)

Page 42

1    Q. (BY MS. REED) So in response to the letter,
2  did you do anything?
3    A. I spoke with Mr. Collins.
4    Q. And after speaking with Mr. Collins, did you
5  decide to join the lawsuit?
6    A. Yes.
7    Q. What did you hear about the lawsuit?
8        MS. FOX: Well, I'm going to object. If
9  you heard it from anyone, any of the lawyers on the
10  case, you can't testify about it.
11       THE WITNESS: That would be true.
12   Q. (BY MS. REED) So other than the lawyers, did
13  you hear anything about the lawsuit?
14   A. No.
15   Q. Do you know who first filed the lawsuit against
16  Adams Golf?
17   A. No.
18   Q. Do you know the law firm that first filed the
19  lawsuit against Adams Golf?
20   A. I assume it was Berger & Montague.
21   Q. Do you know when the lawsuit was filed?
22   A. I couldn't give you the date of it, no. After
23  the IPO for sure, but I don't know the date, huh-uh.
24   Q. Was it like -- I'm just trying to get a general
25  idea. Six months? A year? Two years?

Page 43

1        MS. FOX: Don't guess.
2        THE WITNESS: I was going to say, I would
3  be totally guessing.
4    Q. (BY MS. REED) Are you aware that several suits
5  against Adams Golf were filed initially, and they were
6  later consolidated into one case?
7    A. Not particularly.
8    Q. Were you a named party in any of the initial
9  lawsuits?
10       MS. FOX: Well, that calls for a legal
11  conclusion. I don't think she knows what that means.
12   Q. (BY MS. REED) Okay. Was your name on any of
13  the initial lawsuits?
14   A. My name ultimately was on the lawsuit. I don't
15  know if that means the initial one or when my name
16  but -- where my name first appears on one of the law
17  suits, that's the first time.
18   Q. But you don't recall when that is?
19   A. I'm sorry. I don't.
20   Q. Do you know whose idea it was to file a
21  lawsuit?
22   A. A lot of other people must have felt somewhat
23  like I did. I don't know who started it.
24   Q. Do you know whose idea it was to file a class
25  action?

Page 44

1    A. No.
2    Q. Do you have any hesitation or concern about
3  filing the lawsuit?
4    A. Me filing a lawsuit?
5    Q. Yes.
6    A. Personally?
7    Q. Yes.
8    A. I would not have personally gone down and filed
9  a lawsuit, because the cost would have been exorbitant
10  compared to the recovery.
11   Q. Other than the costs, did you have any concern
12  about filing a lawsuit?
13   A. I would not have had, if I had wanted to.
14   Q. Do you believe that you have an obligation to
15  investigate the facts alleged in the complaint?
16   A. I don't know what you mean by "investigate."
17   Q. Well, what's your understanding of
18  investigation?
19   A. Well, to me, I would think you would, I guess,
20  try to go out and talk to employees at their company
21  possibly and stuff like that. I didn't do any of that.
22   Q. And you don't think you have any obligation to
23  do that?
24   A. I think I have an obligation of knowledge of
25  the instruments that I received in conversations by

Page 45

1  telephone that I had, and then, you know, gathering the
2  documents which I have provided for you.
3    Q. Do you know who investigated the facts that are
4  alleged in the complaints?
5    A. No.
6    Q. I'm going to show you what has been marked as
7  Defendant's Exhibit 4. It's Bates stamped PC 18. Do
8  you recognize this?
9    A. Yes, I do.
10   Q. What is it?
11   A. It's a certification that -- of course, as it
12  reads, you know, that I reviewed the complaint. I
13  didn't -- just exactly as it says. I do see an error on
14  it, however.
15   Q. And what's that error?
16   A. Well, where it says, "shares sold," I did sell
17  them, and in the documents you're reproducing, it shows
18  a copy of that sale.
19   Q. Okay.
20   A. I don't know why the three zeros are there. I
21  must not have understood that portion to begin with.
22   Q. Are there any other errors in this?
23   A. I don't see any.
24   Q. What is your understanding of what the term
25  "representative party" means?

12 (Pages 42 to 45)

PATRICIA CRAUS                    2/18/2005  IN RE: ADAMS GOLF, INC , SECURITIES LITIGATION

Page 46

1   A.  And where do you find that? I'm looking for
2  it.
3   Q.  I'm just asking you in general
4   A.  Oh, representative party?
5   Q  Uh-huh.
6   A.  That I'm willing to represent the class,
7  however large it is, and don't mind taking the time to
8  appear, like here today.
9   Q  Do you know whether you were appointed lead
10  plaintiff in this action?
11   A.  No.
12      MS. FOX: You don't know  Calls for a
13  legal conclusion.
14        THE WITNESS: No, I don't know.
15   Q.  (BY MS. REED) Do you know anyone who is a lead
16  plaintiff in this action?
17   A.  No, I do -- not to my knowledge.
18   Q.  Can you name any lead plaintiffs?
19   A.  No, I couldn't.
20   Q   Do you know whether you're seeking to be named
21  class representative by the court?
22   A.  No, I don't know that.
23   Q.  Could you describe in your own words the class
24  who you are -- who you are trying to represent?
25   A.  Basically, I would gather anyone who invested

Page 47

1  at the initial public offering that is in the lawsuit.
2   Q.  When you say, "that is in the lawsuit," what do
3  you mean?
4   A.  Named parties. And then those that are not
5  named, but did purchase.
6   Q.  Did you -- are there any geographic limitations
7  to the class?
8   A.  I don't know.
9   Q.  How many members are in the class?
10   A.  I don't know.
11   Q.  Have you investigated that at all?
12   A.  No.
13   Q.  Is there more than one class?
14   A.  More than one class?
15   Q.  Yes
16   A.  You mean more than one other person?
17   Q.  No  Is there more than one class?
18   A.  I don't know.
19   Q.  Do you know if any of the other class members
20  bought Adams Golf stock?
21      MS. FOX: She just defined the class as
22  people that bought Adams stock  So that's sort of a
23  trick question, and it's unnecessary.
24   Q.  (BY MS. REED) Well, I'm really not trying to
25  trick you, I promise.

Page 48

1         When did class members purchase their
2  stock?
3   A.  I think at the initial public offering or some
4  amount of days thereafter.  I don't recall how many
5  amount of days were involved.
6   Q.  And why do you think it's some days thereafter?
7   A.  Because I think I saw that in the lawsuit.
8   Q.  Why are you seeking to serve as a class
9  representative?
10   A.  Well, I began -- I was very poor when I grew
11  up, and as I went into business, it was, of course,
12  without being a very wealthy person by any means, and I
13  think there are a lot of people out there who lost money
14  that need to be represented by somebody for recovery, if
15  that's the way the court rules.
16   Q.  When did the proposed class period begin?
17   A.  I don't know.
18   Q.  When does it end?
19   A.  I assume -- I don't know.
20   Q.  Do you think your claims are typical of the
21  class of plaintiffs you represent?
22   A.  I believe so --
23      MS. FOX: Object to the --
24      THE WITNESS: Oh, excuse me
25   Q.  (BY MS. REED) Do you know how many proposed

Page 49

1  class representatives there are?
2   A.  No.
3      MS. FOX: She's asked and answered.
4      MS. REED: I asked about lead plaintiff.
5  I didn't ask about class reps.
6      MS. FOX: Number of members, not known,
7  why not.
8   Q.  (BY MS. REED) Right.  I'm asking about do you
9  know how many proposed class representatives there are?
10   A.  No.
11   Q.  Okay.  Did you know that Federated National
12  Insurance Company withdrew as a proposed class
13  representative?
14   A.  Yes.
15   Q.  Why did they withdraw?
16   A.  I don't know.
17   Q.  How do you know that they withdrew?
18   A.  Ms. Fox and I discussed it last night.
19   Q.  Have you ever met with any of the other
20  proposed class representatives?
21   A.  No.
22   Q.  Have you ever discussed the case with any of
23  them?
24   A.  No.
25   Q.  Have you ever communicated to them in any way

13 (Pages 46 to 49)

Page 50

1   whether orally or written?
2       A.  Only Mr. and Mrs. Smith and my two business
3   partners, as I've shared.
4       Q.  What do you understand your responsibilities
5   are as a proposed class representative?
6       A.  I guess to appear for a deposition like today
7   and at any other time I suppose that the court -- that
8   I'm called upon to do so.
9       Q.  Why do you think you will be an appropriate
10  class representative?
11          MS. FOX:  Well, first of all, that calls
12  for a legal conclusion.  I don't think she's -- can
13  answer.
14          MS. REED:  Right.  I mean, I'm not asking
15  for a legal conclusion.
16      Q.  (BY MS. REED)  I just want to know why you
17  think you will be an appropriate class rep?
18      A.  Probably because I have knowledge of the
19  misstatements and the misrepresentations that I believe
20  were made, and I'm willing to do it.
21      Q.  How much time have you spent fulfilling your
22  duties as lead plaintiff and proposed class rep?
23      A.  Reading all of the documents that were sent to
24  me and coming up here.
25      Q.  What documents have been sent to you?

Page 51

1       A.  I think most of them were provided in between
2   here and the documents you were copying.  There probably
3   were some other communications with my attorney.
4       Q.  But other than the -- I guess when you say
5   "documents," the complaint and these initial disclosures
6   and then the documents that you gave to me --
7       A.  Yeah.
8       Q.  -- have you received any other documents?
9       A.  Probably from my attorney.
10      Q.  What -- what type of documents?
11      A.  Correspondence.  And telephone conversation.
12      Q.  What would you call a document like Exhibit 3?
13      A.  Which one was 3?
14      Q.  It's the initial disclosures.  I think it's --
15      A.  This one?
16      Q.  That one.
17      A.  You asked me what?
18      Q.  Would you call that document correspondence?
19      A.  Kind of.
20      Q.  Okay.  Now, you said you -- the time you spent
21  has been reading the documents and driving down here for
22  this deposition, and doing the deposition.  Can you give
23  me a rough estimate of how much time you think that is?
24      A.  Gosh, I really couldn't.  I can tell you how
25  long it took me to drive here, you know.

Page 52

1       Q.  Right.
2       A.  But as to how much exact time reading, I
3   couldn't tell you.
4       Q.  Let me give you some gross.  Do you think you
5   spent weeks working on this case?
6       A.  No more than weeks.
7       Q.  Okay.  Do you have any other responsibilities
8   that might interfere with your ability to fulfill the
9   duties as a proposed class representative?
10      A.  Not as I sit here today.
11      Q.  Would future travel to Delaware impose a burden
12  on you?
13      A.  It would be more difficult, but I would
14  certainly do it.
15      Q.  What do you stand to gain as a class
16  representative?
17      A.  Whatever the court rules on a pro rata basis of
18  what everybody bought.  I don't know what that would be.
19      Q.  Now, what parts of the lawsuit do you intend to
20  directly participate in other than this deposition?
21      A.  I don't know.
22      Q.  Would you attend a class certification hearing?
23      A.  If I were asked to by my attorney.
24      Q.  Would you attend a mediation?
25      A.  If I were asked to do so by my attorney.

Page 53

1       Q.  Have you been asked by your attorney to attend
2   any mediation or alternative dispute resolution?
3       A.  Not yet.
4       Q.  Who has the authority to settle this case?
5       A.  The attorneys.
6       Q.  Do you plan on attending the entire trial?
7       A.  If my attorneys say I have to be there.
8       Q.  Do you have an agreement with your attorneys
9   concerning your costs in acting as a class
10  representative?  Let me give you an example.  If you had
11  to fly to Delaware, do you have an agreement with your
12  attorneys who would pay for that flight to Delaware?
13      A.  I don't have any signed agreement, but I
14  understand I would be reimbursed for expenses.
15      Q.  Other than Berger & Montague, do you have any
16  other attorneys who represent you in this litigation?
17      A.  Whoever is in their firm that might be
18  designated to do something, but I don't know of anybody.
19      Q.  How did you choose your attorneys?
20      A.  How did I choose them?
21      Q.  Yes.
22      A.  I was contacted by them.
23      Q.  Why did you choose Berger & Montague in
24  particular?
25      A.  That's who contacted me.

PATRICIA CRAUS                                    2/18/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 54

1    Q.  Do you have a fee agreement with your
2    attorneys?
3    A.  No.
4    Q.  Do you have any understanding of how your
5    attorneys will be paid?
6    A.  I would assume from the proceeds of any award
7    the court makes.
8    Q.  Now, you say you assume that. You don't know
9    for sure?
10   A.  Well, basically, as I would say, no one has
11   said I will get my money from this source, but I know
12   enough to know that, yes, attorneys are paid out of the
13   proceeds.
14   Q.  You don't think we work for free?
15   A.  Somehow, I don't -- the ones I have don't.
16   Q.  Do you know how much your attorneys bill per
17   hour?
18   A.  I do not.
19   Q.  And I'm going to assume based on your previous
20   answers that you didn't take competitive bids from any
21   other attorneys?
22   A.  No.
23   Q.  How often do you speak with the attorneys about
24   this lawsuit?
25   A.  I probably have had four or five conversations

Page 55

1    total.
2    Q.  How many of those conversations have been in
3    the past year?
4    A.  Well, probably all -- most all of them. Some
5    might have been, you know, nearer the time of the
6    filing, whenever that was.
7    Q.  Do you know how many motions your counsel have
8    filed in this case?
9    A.  No.
10   Q.  Who makes the strategy calls in the case?
11   A.  I would assume the attorneys.
12   Q.  But not you?
13   A.  No.
14   Q.  Now, if you disagreed with your attorney's
15   decision about how to handle some aspect of the case,
16   what would you do?
17   A.  I would defer to the attorney.
18   Q.  Have you discussed the strengths and the
19   weaknesses of your case with your attorneys?
20   A.  I don't know that we discussed it in that form,
21   no.
22   Q.  You say not in that form. Have you discussed
23   it in some other form?
24   A.  Just conversations about the lawsuit.
25   Q.  Have you discussed the prospects of settlement

Page 56

1    with your attorneys?
2    A.  The word settlement was mentioned, yes, in a
3    letter, I think.
4    Q.  Do you know whether a settlement offer has been
5    made?
6    A.  No.
7    Q.  Who do you believe is responsible for actively
8    managing and controlling the litigation?
9    A.  The attorneys.
10   Q.  Have you had, other than Berger & Montague,
11   have you had contact with other attorneys regarding
12   Adams Golf?
13   A.  No.
14       THE REPORTER: Are you shaking your head?
15       THE WITNESS: No. I'm just kind of going
16   from side to side.
17       THE REPORTER: I didn't hear an answer.
18       MS. REED: She said no.
19   Q.  (BY MS. REED) Now, you mentioned that you --
20   if you had to fly to Delaware that your attorneys would
21   reimburse you?
22   A.  That's my understanding.
23   Q.  Your understanding. Would they reimburse you
24   regardless of the outcome of the lawsuit?
25   A.  Yes, that's my understanding.

Page 57

1    Q.  What understanding do you have as to costs you
2    might have to pay?
3    A.  That I don't pay any costs.
4    Q.  Do you have any knowledge of what costs are
5    involved in the litigation?
6    A.  No.
7    Q.  Do you know the magnitude of costs of this
8    litigation?
9    A.  No.
10   Q.  What steps, if any, have you taken to manage
11   the costs incurred in this lawsuit?
12   A.  None.
13   Q.  Have you ever reviewed monthly time and expense
14   reports prepared by your counsel?
15   A.  No.
16       MS. FOX: Well, I'll object to the form.
17   Q.  (BY MS. REED) Do you know whether defendants
18   could seek to recover costs of the lawsuit from you
19   alone if they win?
20   A.  They don't --
21       MS. FOX: Wait. That calls for a legal
22   conclusion. That's not fair.
23       MS. REED: Well, I'm just asking for her
24   understanding of cost structure in a lawsuit. I'm not
25   asking for --

15 (Pages 54 to 57)

Page 58

1   Q.  (BY MS. REED) I'm not going to bind you to
2   whatever you say in terms of, "Well, she said she'd pay
3   us."
4   A.  No, I don't know.
5   Q.  If the plaintiffs lose in this case, would you
6   be able to pay plaintiffs' costs?
7        MS. FOX: I'll object to the form.  Under
8   the Delaware law, we're allowed to have a contract with
9   her that is completely contingent, and that's what we
10  have.
11  Q.  (BY MS. REED) If the plaintiffs lose, would
12  you be able to pay defendant's costs?
13  A.  No.
14  Q.  What financial resources do you have available
15  if you were ordered to pay costs?
16       MS. FOX: I object to the form.  You
17  haven't made any -- there's no possible law that says
18  that she would personally have to pay.
19  Q.  (BY MS. REED) Did you review the court's order
20  on the Defendant's Motion to Dismiss?
21  A.  I think I did.
22  Q.  Do you know what parts of plaintiffs' complaint
23  the court dismissed?
24  A.  The best I remember, there were two causes of
25  action possibly.  I think they kept the gray market.

Page 59

1   Q.  And when you say "they," meaning --
2   A.  The courts.  The courts.
3   Q.  Are you aware of any appeal from the district
4   court's order?
5   A.  Yes, there was an appeal.
6   Q.  Why did it take plaintiff so long to appeal
7   from the district court's order?
8        MS. FOX: Object. I don't know what
9   you're talking about.
10       MS. REED: Okay.
11       MS. FOX: I mean, how could she possibly
12  know that there's a 30-day --
13       MS. REED: No, no, okay.
14       MS. FOX: I mean, if you're going to
15  appeal, it's got to be in 30 days.  That's under the
16  rules, but that's not something she knows.
17       MS. REED: I'm just talking about from the
18  order.
19  Q.  (BY MS. REED) Are you aware of any -- of any
20  gap in time between the order on the motion to dismiss
21  and the final judgment?
22       MS. FOX: I object to it.  She doesn't
23  even know what a motion to dismiss is.  I mean, that's
24  just not part of what she has to know.
25  Q.  (BY MS. REED) Okay. All right. Well, you say

Page 60

1   your attorney sends you different things, right?  And
2   different papers, like the initial disclosures, and the
3   complaint.  Did they send you anything having to do with
4   a motion to dismiss?
5   A.  I can't recall that, specifically.
6   Q.  Okay.  We have been going for about an hour and
7   a half.  Do you want to take a break?
8   A.  No, we can move right along.
9   Q.  You want to keep going?
10  A.  Uh-huh.
11  Q.  All right. I think we'll be done -- just so
12  you know. I think we'll be done.
13       Let's look back at Exhibit 4, a
14  certification.  You mentioned that this was accurate as
15  to the shares purchased, but not as to the shares sold;
16  is that right?
17  A.  That's -- it's just omitted.
18  Q.  Right, right.  I actually need to take a break
19  so I can look at the documents.  Just so -- I think
20  it'll just go faster.
21       MS. FOX: Do we have those others back?
22       MS. REED: We do.  Actually I need a
23  break.
24       (Recess taken 11:26 a.m. - 11:47 a.m.)
25       MS. REED: Back on the record.

Page 6

1   Q.  (BY MS. REED) All right. I've reviewed the
2   documents that you gave to me. So thank you very much
3   And we'll get to those probably in a little bit  But
4   that's what took so long on the break.
5        Let me show you what we have marked as
6   Exhibit 5.  Have you ever seen this document before?
7   A.  Yes, I think I have.
8   Q.  What is it?
9   A.  Well, it's a request to produce documents, as
10  best I see.
11  Q.  And have you produced documents in response to
12  this?
13  A.  Yes.
14  Q.  And then you brought those additional
15  responsive documents with you today?
16  A.  Yes.
17  Q.  Do you have any other documents that are
18  responsive to this request?
19  A.  Not that I'm aware of, but as I say, I've moved
20  offices at least three times since this, and I'm
21  continuing to see if there's anything I can find.
22  Q.  What did you do to gather responsive documents?
23  A.  Went through files.
24  Q.  Did you do a complete search of all your files
25  to see if you had any documents?

Page 62

1    A.  As far as I know.  I have warehouses yet to --
2  you know, self-storage units that I might still glance
3  in, but I think I have them all here.
4    Q.  So you've searched your office files, but
5  haven't searched your self-storage unit files?
6    A.  The only place would be one of the storage
7  units.  I have searched everywhere else.
8    Q.  Did you search for any files on your computer?
9    A.  I don't know how to turn on my computer.  I
10  have a nice one, though.  I can't turn it on.
11    Q.  Then there's probably not files there.
12    A.  No.
13    Q.  Did you contact anyone about obtaining
14  responsive documents?  So, for example, did you contact
15  your broker to obtain responsive --
16    A.  No, I think I already had those, like when I
17  sold the stock and stuff.
18    Q.  Would anyone else have documents responsive to
19  this request, like a family member?
20    A.  No.
21    Q.  Do you keep a file of documents related to the
22  lawsuit?
23    A.  I have so far come upon three different little
24  files.  So -- that I put it in a folder and put Adams
25  Golf on it, there probably are two or three.

Page 63

1    Q.  And what documents do you keep in that file?
2    A.  Things like this, and the stock information as
3  well.
4    Q.  And when you say "like this," you were
5  referring to Exhibit 5?
6    A.  Yes, and the --
7    Q.  And I don't think I identified it for the
8  record  Exhibit 5 is defendant Adams Golf's first
9  request for the production of documents and things from
10  proposed class representatives, Federated National
11  Insurance Company, John Morrash, Todd Tonore, F  Kenneth
12  Shockley and Patricia Craus, there are Bates numbers for
13  that, I guess it's Pages 1 through 8, and an additional
14  page on the end with the style.
15        Let me show you what we have marked as
16  Exhibit 6  Do you recognize this document?
17    A.  Yes.
18    Q.  And what is that?
19    A.  It's Responses and Objections of Patricia Craus
20  to Defendant Adams Golf, Inc.'s First Request For
21  Production of Documents and Things, From Proposed Class
22  Representatives, Federated National Insurance Company,
23  John Morrash, Todd Tonore, F. Kenneth Shockley and
24  Patricia Craus.
25    Q.  Thank you.  When did you first see this

Page 64

1  document?
2    A.  I don't know when as far as date is concerned.
3  Let me see if it has a date on it.  I couldn't tell you
4  exactly when.
5    Q.  Okay.  Did you review this document before --
6        MS. FOX:  Wait a second. It's missing
7  page 8.
8        MS. REED:  Oh, it is?
9        THE WITNESS:  Yeah, mine is too.
10    Q.  (BY MS. REED) Page 8 is -- let me --
11        MS. FOX:  It's where the signature was
12        MS. REED:  Let me tear out my page 8 so
13  you have a complete set.
14        MS. FOX:  I thought there was a place that
15  says -- it shows a place for her to sign.
16        MS. REED:  I don't think so.  This is --
17  I'm pretty sure mine's complete, because that was page
18  8, and then Page 9.
19    Q.  (BY MS. REED) And so it's dated February 11th,
20  2005.  Did you see this document before --
21        MS. FOX:  No, wait.  This is page 8 of the
22  document --
23        THE WITNESS:  Yeah, she handed it to you.
24        MS. FOX:  Request for production.  And
25  we're looking at the interrogatories, aren't we?

Page 65

1        MS. REED:  No  We should be looking at
2  the request for production.
3        MS. FOX:  We were looking at the
4  responses -- oh, okay.  Okay  Sorry.
5        MS. REED:  That's okay.  I'm sorry that it
6  somehow didn't get copied.
7    Q.  (BY MS. REED) Did you see this document before
8  February 11th, 2005?
9    A.  No, I don't think so, since that's the date on
10  it, it would have had to have been mailed to me.
11    Q.  Did you see a draft of this document before
12  February 11th, 2005?
13    A.  No.
14    Q.  Have you ever seen drafts of documents filed by
15  your attorneys?
16    A.  Yes.
17    Q.  Which documents have you seen drafts of?
18    A.  The ones -- some of these that have been
19  produced today in the -- the ones we discussed earlier,
20  that -- something about the appeal and -- different
21  documents.  I don't have their names.
22    Q.  Okay.  Now, on Page 4 of Exhibit 5 -- or
23  Exhibit 6.  I apologize  Your responses, it says under
24  the heading, Objection to Relevant Time Period.  It says
25  "Documents" --

Page 70

1   A.  Yes.
2   Q.  What is it?
3   A.  It's my responses to the interrogatories.
4   Q   And when did you first see this document or a
5   draft of this document?
6   A.  It was dated February the 11th, 2005.  So
7   again, shortly thereafter.
8   Q.  Now, these documents -- these responses are
9   responses for you personally and not including anything
10  to do with your attorney; is that right?
11  A.  Yes, that's correct.
12  Q.  Okay.  Do you have any other information that's
13  responsive to these interrogatories that is not already
14  contained in your responses here?
15  A.  I provided you all the documents in everything
16  I found.
17  Q.  Okay.  But these interrogatories are --
18       MS. FOX:  Just take a look at them.
19  Q.  -- questions and not asking for documents.
20  A.  Okay.
21  Q.  In looking at these questions, is there
22  anything that you can add to these questions that you
23  haven't already told me?
24  A.  Well, under Interrogatory No. 2, I, as a named
25  plaintiff, I would be consulted by the attorney on, you

Page 71

1   know, if it got to settlement talks or things like that.
2   Q.  Okay
3   A.  Under Interrogatory No. 6, would that be where
4   I had discussions with the Smiths?  I don't know that it
5   would or not, but I have had discussions with --
6       MS. FOX:  Well, current or former
7   employees, customers, distributors --
8       MS. REED:  Or any third party.
9       MS. FOX:  -- or defendants.
10      THE WITNESS:  Okay.  It's probably
11  accurate.  I think that, yes, would be right.
12  Q.  (BY MS. REED) Okay  Let me ask you a
13  little -- this is sort of stepping back a little bit.
14  What is your understanding of what gray marketing is?
15  A.  That would be where it was not, I would say --
16  if I compared it to cars, it's where, you know, it's not
17  a legitimate dealer.  There -- you know, it's provided
18  for the public, but not through a legitimate dealer in
19  the United States.  So I guess it's very similar to
20  this, where people got, you know, attained golf clubs to
21  sell that were not through the methods of the marketing
22  program, which was the pro shops, and the various things
23  they mention.
24  Q.  What companies are affected by gray marketing?
25  And in this, I'm not limiting it just to the golf

Page 72

1   industry.  I'm just -- your personal knowledge of what
2   company  You gave me an example of -- or I guess maybe
3   a better question is, like what industries?  So you gave
4   me an example of cars  What other circumstances are
5   there where there could be gray marketing?
6   A.  Well, of course, in things like golf clubs
7   here, definitely would be.  I would assume where they
8   stand on the street in New York on the corner and sell
9   you Rolex watches for $25, that type of thing.
10  Q.  Is gray marketing limited to the golf industry?
11  A.  No, I don't think so.
12  Q.  In 1998, was any other golf company affected by
13  gray marketing?
14  A.  I don't know.
15  Q.  Do you know if Callaway was affected by gray
16  marketing?
17  A.  I really wouldn't know.  I really had my eyes
18  on Adams Golf since that's where my investment was.  So
19  I really don't know what they did.
20  Q.  I'm not sure we covered this.  How did you
21  first learn about Adams Golf  I know you talked to
22  Barney, but when was your -- when did you first learn
23  about Adams Golf?
24  A.  From the Smiths.  We were in Hawaii and Barney
25  Adams called Mr. Smith, and needed very desperately some

Page 73

1   money, I think it was $75,000 to pay the bills.  And I
2   went with Mr. Smith when -- I think I went with him when
3   he wired the money the next day or had it by telephone
4   wired.
5   Q.  And when was that?
6   A.  It was well before the IPO.  I try to relate
7   things to that, but I wouldn't know.
8   Q.  Like a couple of years before the IPO or --
9   A.  No, I would say -- well, I really don't know.
10      MS. FOX:  Don't guess.
11      THE ANSWER:  I really don't know.
12  Q.  (BY MS. REED) Okay  Was it months before the
13  IPO?
14  A.  Oh, yes, it would have been that, but I really
15  don't know.  If I knew a date, I really would tell you.
16  Q.  Yeah.  And how did you decide that you should
17  first invest in Adams Golf?
18  A.  Well, I had toured his plant two or three
19  times, and I had been to the Hank Haney school, and I
20  believe that I hit some of their clubs, and then
21  Mr. Smith, you know, had this close relation to Barney
22  Adams, and I had met him on several occasions.
23      MS. FOX:  "Met him" meaning?
24      THE WITNESS:  Mr. Adams.  Mr. Adams, and I
25  felt that he had a good product from what I saw, and I'm

19 (Pages 70 to 73)

Page 74

1  not a professional. And then I learned that there was
2  going to be the initial public offering on the stock. I
3  don't know before -- the early times with Mr. Smith, I
4  don't know anything about what stock existed, but it was
5  not much value. So I talked to Mr. Adams about what
6  stock I would get on a preferred treatment, and then
7  after the Lehman Brothers, I was told by Mr. Adams to
8  contact Lehman Brothers, as they would be handling the
9  sale.
10  Q. (BY MS. REED) Okay. I want to show you what
11  we've marked as Exhibit 9, and this was produced to you
12  or by you. I'm going to represent to you that I stapled
13  it. So you hadn't stapled it in a particular way. So
14  this is my stapling. It's Bates stamped PC 1 through PC
15  4. What is this document?
16  A. Well, it was from Lehman Brothers telling me
17  that Barney Adams had contacted them and that I would be
18  allowed to invest in a new issue of stock. It really
19  related somewhat to that special price on 200 shares,
20  but it -- it just says you can -- you know, it will be
21  limited -- let's see. Less shares. That I was reserved
22  those shares.
23  Q. Okay. Can you show me where you're reading
24  from?
25  A. Well, on the first page, the -- on the second

Page 75

1  paragraph, the attached is a package to be completed in
2  full for you to be eligible to invest in this new issue.
3  The maximum number of shares that you will be able to
4  buy has been indicated due to the supply and demand of
5  the issue, we kind of allocate additional shares. So
6  that was telling me I, through Barney, would get
7  preferential treatment on 2, but it doesn't mention that
8  it was 200 shares in this letter. It was told -- that
9  was either written in another letter, which I haven't
10  found, or by telephone with Mr. Gamso.
11  Q. Okay. All right. Now, I'm going to show you
12  what has been marked as Exhibit 10, and again, I'll
13  represent to you that I stapled it, but I think it goes
14  together. It is Bates stamped PC 5 to PC 12. What is
15  this?
16  A. Well, it's a -- a note I had my secretary send
17  after -- actually, it looks like, and my memory may have
18  been --
19  MS. FOX: Why don't you look at it, the
20  whole thing carefully, before you --
21  THE WITNESS: Okay. This is communication
22  between myself and Mr. Gamso with Lehman Brothers.
23  Q. (BY MS. REED) Okay. And is -- you can go
24  ahead. I'm sorry.
25  A. That's okay.

Page 76

1  Q. Is the information in this that you have filled
2  out; is this all true?
3  A. Yes.
4  Q. So let's walk through this. The note on the
5  front, is that your secretary's writing?
6  A. That is my secretary's writing, except for
7  "Adams Golf" at the top. I wrote that.
8  Q. Okay. And the note on it says "6/29/98. Tim
9  Gamso confirmed receipt by fax, also called back at
10  4:30. Agreed to sell PC" -- which I assume is Pat
11  Craus.
12  A. Yes.
13  Q. "1,000 shares"?
14  A. Uh-huh.
15  Q. Is that right?
16  A. That's correct. I will correct one thing on
17  myself, the -- the handwriting at the top is my
18  secretary's. This portion here is my --
19  Q. Oh, this is your handwriting?
20  A. Yes.
21  Q. Oh, okay. So here it looks like Tim Gamso said
22  that you would be able to purchase a thousand shares.
23  A. That's correct.
24  Q. Okay. Then as we continue through, you are
25  basically asking what looks like Lehman to open you an

Page 7

1  account so you can purchase an IPO.
2  A. Yes.
3  Q. And then you fill out this questionnaire, and
4  then on PC 11, which is form 2 --
5  A. Yes.
6  Q. -- you say under investment objections --
7  excuse me, objectives. Your number one objective is
8  growth, and then your next is current income, your next
9  is liquidity, and your next is tax deferral. Was that
10  true at the time?
11  A. Yes.
12  Q. Is that still true today?
13  A. Yes.
14  Q. And then it also says that your risk tolerance
15  is aggressive; is that correct?
16  A. Aggressive in the sense that I understood when
17  the stockbroker asked you, you know, when you're very --
18  what's the word, conservative or aggressive, I would
19  call myself aggressive.
20  Q. Okay. And then on the next page, which is PC
21  12, it gives you an estimated annual income of $100,000,
22  an estimated liquid net worth of a million, and a total
23  net worth of two million. Was that correct at the time?
24  A. Yes.
25  Q. Was -- would that still be correct?

PATRICIA CRAUS                    2/18/2005  IN RE: ADAMS GOLF, INC , SECURITIES LITIGATION

Page 82

1   A.  Oh, yes.  Yes.
2   Q.  So that's where it says that you're preferred
3   and then on the next page, PC 2, which is dated the
4   same, that's where it says that it would be a $14 to $16
5   per share; is that right?
6   A.  But I had telephone communications with
7   Mr. Gamso in which it was discussed that I would have a
8   limit as to how much I could buy at the lower price,
9   which I think was going to be $2 a share, and he said
10  that I would receive that price.  I didn't.
11  Q.  So other than the oral communication with
12  Mr. Gamso, you don't have anything that talks about that
13  price?
14  A.  Just the letter from Barney Adams that mentions
15  preferred and no one put in writing that it was to be $2
16  or whatever that number was.  I don't have it in
17  writing.
18  Q.  I think -- when you say the letter from Barney
19  Adams, do you mean the letter from Lehman Brothers
20  saying that Barney Adams has included --
21  A.  That's right.  Yes.  I'm sorry.
22  Q.  Okay.  That's okay.
23      Let me -- now, I'm showing you what's been
24  marked as Exhibit 13, at least your copy has been.  Now,
25  this is the document you provided to me today.  It's

Page 83

1   Bates stamped PC 21, and then it skips to PC 24 and goes
2   to PC 35.  Now, on the -- I think to speed it up, this
3   first page looks to be a handwritten summary of your
4   purchases of Adams Golf stock; is that right?
5   A.  Yes.
6   Q.  And in that -- based on my look over the break,
7   it looks like it summarizes those trades I've just shown
8   you, plus these trades on PC 24 to PC 35; is that right?
9   A.  Yes.
10  Q.  And other than the trades listed on this page,
11  PC 21, did you trade in Adams Golf stock?
12  A.  Not that I can remember.
13  Q.  Okay.  Now, starting at the bottom where you
14  have 1, you have Lehman, and I think that's 7/9/98; is
15  that right?
16  A.  Yes.
17  Q.  So that's your IPO purchase?
18  A.  Yes.
19  Q.  And then your sale with that is 11/9/98?
20  A.  Yes.
21  Q.  And then your second purchase was with Jack
22  White?
23  A.  Yes.
24  Q.  And then it was bought on 1/11/99?
25  A.  Yes.

Page 84

1   Q.  And then sold on 4/7/99?
2   A.  Yes.
3   Q.  And then your third purchase was bought on 1/27
4   and 1/28/99 and sold on April 7th, '99; is that right?
5   A.  Yes, that's correct.
6   Q.  Okay.  So we went over the reasons why you
7   bought in your IPO purchase.  So if we look at the
8   second purchase on January 11th, why did you buy Adams
9   Golf stock on January 11th?
10  A.  I was trying to leverage the loss and the
11  purchase price of the shares, you can see, were a great
12  deal less.
13  Q.  So what do you mean by trying to leverage?
14  A.  Well, to buy at a price that I felt it surely
15  might go higher on.  But it kept going down instead.  As
16  you see, I probably lost a little bit on the dollar.
17  Q.  Uh-huh.  And then later on in January, it --
18  why did you buy?
19  A.  The same reason.  I wanted to try to average
20  out from the $16 down to whatever it was, four and an
21  eighth or whatever, to try to, you know, reduce my
22  losses.
23  Q.  Okay.  Were you -- were you following the
24  company?  By the company, I mean, were you following
25  Adams Golf in the newspaper or the golf magazines or

Page 85

1   analyst reports throughout this time period?
2   A.  Probably those, in addition -- probably
3   conversation with Barney and the Smiths.
4   Q.  Okay.  Have you ever read an analyst's report
5   on the golf industry?
6   A.  I believe Lehman Brothers made a number of
7   analyses in the prospectus.
8   Q.  And have you ever read an analyst's report
9   about Adams Golf, specifically, other than Lehman
10  Brothers?
11  A.  I don't think so.
12  Q.  What percentage of your total securities
13  holdings did your Adams Golf purchases comprise?
14  A.  I don't recall how much stocks that I owned at
15  that time.  I just -- it's possible -- I really don't
16  remember how much stock, but it wasn't a whole lot.
17  Q.  It was less than 50 percent?
18  A.  It would be less than 50 percent.
19  Q.  Less than 25 percent?
20  A.  I really am not sure.
21  Q.  Do you know what stock exchange Adams Golf was
22  trading on during the class period?
23  A.  I know I always had to hunt for it in the Wall
24  Street Journal.  I think they were on the American Stock
25  Exchange.

22 (Pages 82 to 85)

PATRICIA CRAUS                    2/18/2005  IN RE: ADAMS GOLF, INC , SECURITIES LITIGATION

Page 90

1 settlement of the total.
2    Q. What do you hope to accomplish as a result of
3 the lawsuit for yourself?
4    A. Well, hopefully, some financial recovery. I
5 think additionally, my concerns for the general class
6 of -- because I think investments are made on all levels
7 and where it hurts people that couldn't have afforded to
8 be hurt.
9    Q. What do you claim are your individual damages?
10    A. Well, financially, it would be listed on that
11 Exhibit 13, you know, where I -- where I lined them up
12 there. That would -- if you figured them up, that would
13 show you the financial damage.
14    Q. Okay. So you're saying what you bought it at
15 minus what you sold it at?
16    A. Right.
17    Q. What do you claim are the total damages for the
18 class?
19    A. I don't know.
20    Q. Do you believe you're entitled to anything more
21 than other class members as a percentage basis?
22    A. No, I don't.
23    Q. And do you have any agreement in place that
24 would compensate you any additional amount?
25    A. No.

Page 91

1    Q. All right. We are so almost done. I'm going
2 to ask you a bunch of questions that I just have to.
3       Have you -- you mentioned earlier that
4 your company was a party to other civil litigation, land
5 development cases?
6    A. There were some lawsuits.
7    Q. Other than those, have you been a party to any
8 other civil litigation -- oh, and the American Airlines.
9 I'm sorry. So other than the land development and the
10 American Airlines, any other civil litigation?
11    A. No.
12    Q. Have you ever had a judgment levied against
13 you?
14    A. No.
15    Q. Have you ever been tried for a crime?
16    A. No.
17    Q. Have you ever been terminated from a job for
18 dishonesty or embezzlement?
19    A. No.
20    Q. Have you ever been a witness at a trial?
21    A. No, I don't think so. Witness?
22       MS. FOX: That would mean like there was a
23 judge or a jury and you went to the courthouse, and you
24 testified.
25       THE WITNESS: Related only to my

Page 92

1 businesses.
2    Q. (BY MS. REED) Okay. Have you ever been held
3 in contempt of court?
4    A. No.
5    Q. Have you ever filed for bankruptcy?
6    A. No.
7    Q. Have you ever become insolvent?
8    A. No.
9    Q. Do you have any personal family or business
10 relationship with your attorneys apart from your
11 relationship in this suit?
12    A. No.
13    Q. And do any of your friends have any personal
14 relationship with the attorneys other than your
15 relationship -- I guess -- wait. Let me withdraw that.
16       Do any of your friends have a personal
17 relationship with your attorneys?
18    A. Not that I'm aware of.
19    Q. Now, you mentioned when -- that you received a
20 letter from Todd Collins?
21    A. Yes.
22    Q. Was that your first communication with Berger &
23 Montague?
24    A. I don't -- I kind of think somehow I was made
25 aware of the class action, and I don't know -- I

Page 93

1 probably called that law firm. I think there was
2 several law firms in the article, and I don't know why I
3 selected that law firm, but that would be my -- I
4 probably called Mr. Collins, more than likely.
5    Q. I forgot one more exhibit. Exhibit 12. Have
6 you seen this before?
7    A. I'm not sure, but the latter part about the
8 Collins, Mr. Collins in that firm, I had learned.
9    Q. Okay. Let me -- sorry. Let me identify it for
10 the record. Exhibit 12 is the Memorandum of Law in
11 Support of Plaintiff's Submission For Class
12 Certification. Do you know when this was filed?
13    A. No, it's dated November the 12th, 2004, but I
14 wouldn't know.
15    Q. Did you review it before it was filed?
16    A. I probably did, I guess.
17    Q. Do you know if you did?
18    A. No, I don't know positively.
19    Q. Okay. And did you make any revisions to it?
20    A. No.
21    Q. All right. I think that's all I have for now.
22 The only thing, I forgot to remind you to check on your
23 break. I don't know if you did. Did you check on your
24 break?
25    A. What were the questions?

PATRICIA CRAUS                                  2/18/2005  IN RE: ADAMS GOLF, INC , SECURITIES LITIGATION

Page 98

1    Q.  Okay  So was there a -- what I'm trying to
2  just get at is was there a lag of time between the time
3  you saw these articles and the time you ultimately
4  decided to sell your shares in November?
5    A.  Well, there might have been some time, but not
6  a lot, I wouldn't think.  I really don't recall exactly
7  when I saw the articles.
8    Q.  Was there anything else that you saw in the
9  interim between seeing these articles and ultimately
10  selling your shares for the first time in November
11  of '98 that sort of tipped the scales for you to go
12  ahead and sell your shares?
13    A.  Well, yes.  I think I said earlier that I heard
14  or read, and I can't remember which, it would have been
15  either through Barney Adams or the Smiths, or something
16  I read, that the pro shops, a lot of the pro shops were
17  very unhappy with the company, and were returning their
18  golf clubs to get a -- well, to get a refund, I suppose
19  would be the word.
20    Q.  Okay.  Now, when you purchased additional
21  shares of Adams Golf in January of '99, was it your
22  understanding that there was no more gray marketing
23  going on of Adams Golf clubs?
24    A.  I really don't know.
25    Q.  Is it fair to say you weren't sure whether the

Page 99

1  problem they had been having was still going on at that
2  point?
3    A.  I was looking more at the price of the stock,
4  and thinking that, you know, when it dropped so
5  dramatically, that it would be safe to buy some and
6  maybe average out the loss.
7    Q.  So is it fair to say that when you bought the
8  stock in January, that you thought that it had potential
9  to go up?
10    A.  Oh, absolutely, yes.
11    Q.  And is the same true for your purchase in late
12  January, you thought the stock had potential?
13    A.  Each time I bought I had great hopes.
14    Q.  Okay.  I just want to circle back to your
15  conversations with Lehman Brothers, your communication
16  with them  Again, I'm going to try not to re-cover any
17  ground.  I just want to try to nail a few things down.
18  My understanding of your testimony earlier was that
19  Barney Adams suggested that you get in touch with Lehman
20  Brothers prior to the IPO; is that right?
21    A.  Yes.
22    Q.  Okay.  And you did call Lehman Brothers?
23    A.  Yes.
24    Q.  Or called somebody at Lehman Brothers?
25    A.  I just called Lehman Brothers, and I was put

Page 100

1  with Mr. Gamso.
2    Q.  Okay.
3    A.  I guess he was handling.
4    Q.  So you called up and said I'm interested in
5  this IPO  And was sent to talk to Mr Gamso?
6    A.  Yes.
7    Q.  When was that call, do you recall?
8    A.  Well, of course, it was before the IPO.
9    Q.  Sure.  Was it months before, weeks before?
10    A.  Wouldn't have been a whole lot before; maybe
11  weeks, could have been months.  I really -- I don't
12  really know.
13    Q.  And that was the first conversation you had
14  with Mr. Gamso?
15    A.  Yes.
16    Q.  And the first conversation that you had with
17  anybody at Lehman Brothers?
18    A.  Yes.
19    Q.  Okay.  You never bought stock with them prior
20  to that at any point?
21    A.  Not that I have any awareness of.
22    Q.  Okay.  After you made that first call to
23  Mr Gamso, about how many times did you speak with him
24  subsequent to that?
25    A.  We spoke a number of occasions.

Page 10

1    Q.  Uh-uh.
2    A.  I don't know.  Maybe eight or ten times, just a
3  guess.
4    Q.  And when was your last conversation with
5  Mr. Gamso?
6    A.  Probably when I told him to sell the stock.
7    Q.  Would that be in November of 1998?
8    A.  Whatever date the sale took place.
9    Q.  All right  Just to be clear, your purchases in
10  January of '99, stock were not done through Lehman; is
11  that correct?
12    A.  I beg your pardon.
13    Q.  The purchases of your stock -- purchases of
14  Adams Golf stock that were made in January of 1999 were
15  not done through Lehman; is that correct?
16    A.  That is correct.
17    Q.  Okay.  Other than the documents that you've
18  produced so far in the correspondence with Lehman, are
19  you aware of any other correspondence or documents that
20  reflect communications between you and Lehman Brothers
21  about the Adams Golf stock?
22    A.  Not other than what we've discussed today.
23    Q.  Okay.  And I believe you testified earlier,
24  again, counsel will correct me if I'm wrong, that
25  Mr. Adams suggested to you that there would be a certain

PATRICIA CRAUS                    2/18/2005  IN RE: ADAMS GOLF, INC , SECURITIES LITIGATION

Page 102

1  amount of stock available to you for $2 a share; is that
2  right?
3      A.  It was a very preferred amount.  It was a
4  special list, and I don't -- you know, as I say, I don't
5  have anything showing it was $2, but I think that's what
6  it was.
7      Q.  And was it Mr Adams that told you this,
8  initially?
9      A.  Yes.
10     Q.  Okay  Then when you called Mr Gamso, did you
11 speak to him about this preferred list?
12     A.  Yes.
13     Q.  Okay  And again, just to be sure, is it your
14 testimony that Mr Gamso told you during one of your
15 conversations that you would be able to purchase a
16 certain amount of stock at $2 a share?
17     A.  That's what he -- that's what we discussed by
18 telephone.  I don't have anything in correspondence that
19 way.
20     Q.  When you bought the stock initially in the IPO
21 for $16 a share -- let me back up.  I'm sorry  At some
22 point, did Mr Gamso tell you that there was not going
23 to be any stock available to you at $2 a share?
24     A.  Actually, no.  I went into the IPO expecting
25 that there would be this preferred amount, and as I

Page 103

1  recall, I talked to Mr. Gamso, and he said they -- they
2  didn't have enough to go around to that effect.
3      Q.  Okay
4      A.  And so I just dropped it.
5      Q.  So you decided to buy at the $16 a share price?
6      A.  Well, I didn't know that until after the IPO.
7      Q.  So just to be clear, you were intending to
8  invest a certain amount of money?
9      A.  Uh-huh.
10     Q.  And the number of shares was a surprise to you
11 when you got it back, because you actually paid $16
12 instead of 2; is that right?
13     A.  Yes, the price was a shock to me, not the
14 number of shares, because I had written on one of these
15 documents that, you know, I would buy up to $20,000
16 worth.
17     Q.  Right  I saw a sticky note to that effect, I
18 think, on one of these exhibits.
19     A.  But the price was a surprise to me.
20     Q.  Okay  When you learned that you had paid, in
21 fact, $16 a share for the Adams Golf stock, why is it --
22 did you consider selling it right away?
23     A.  Well, no, because it dropped almost
24 immediately.
25     Q.  Do you recall what the stock was trading at in

Page 104

1  the -- say the week after the IPO, what range it was
2  trading at?
3      A.  I really don't.
4      Q.  Okay  Can you tell me in general terms, if you
5  recall, how far it had dropped in the first month or so
6  after the IPO, from $16?
7      A.  Let's see.
8          MS. FOX:  Don't guess
9          THE WITNESS:  I was just going to say if
10 you'll refer to this list, the times I purchased showed
11 the prices that it dropped to.
12     Q.  (BY MR. MCEVOY)  Sure  This -- yeah, just
13 wanted to know if you had a recollection of after -- in
14 July of '98, that first month, IPO is -- comes out at
15 $16, if you had any -- any sense of how far it dropped
16 in that first month.  I know it ended up down at 4 80 in
17 November, but did you have a sense that it was dropping
18 precipitously, and then leveling out or something else?
19     A.  Well, my first sense was it wasn't sold to me
20 at the price that I was told it would be sold to me for.
21 That was a disappointment, which I mentioned to
22 Mr. Gamso, and probably to Barney as well.  Then I can't
23 give you the time, but not a whole lot after that it was
24 beginning to decline real rapidly, and that's when I
25 found out about the amount of funds that were taken out

Page 105

1  for company personnel, the top executives, and I felt
2  that also impacted the situation.
3      Q.  Okay  Can you just tell me if you have any
4  understanding, what exactly -- well, strike that.
5          Just to talk about this issue of funds
6  going to certain individuals.  Is it your understanding
7  that Barney Adams received a certain amount of money in
8  connection with the IPO?
9      A.  Oh, yes.
10     Q.  And do you have any idea how much money that
11 was?
12     A.  I think my guess -- and this is something I
13 believe I was told, was about $14 million, or more.
14     Q.  Okay  And were there other individuals who
15 received payments in connection with the IPO?
16     A.  Yes.
17     Q.  And do you know any of those other individuals?
18     A.  I don't know them, but they're listed.
19     Q.  And when you found out that these payments had
20 been made to these individuals, did that make you --
21 strike that.
22         When you found out the payments had been
23 made to the individuals, did you consider selling stock
24 at that time?
25     A.  It was probably beginning to pray on my mind at

27 (Pages 102 to 105)

PATRICIA CRAUS                    2/18/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 106

1  that time, because I know that, in my opinion, in
2  running my companies that would be a decision to be
3  made.
4      Q.  Now, other than Tim Gamso, did you have
5  conversations with anyone else at Lehman Brothers?
6      A.  I talked at some time to -- some point with
7  Steve McManus, I believe his name was, and with someone
8  named Dawn.
9      Q.  You don't recall Dawn's last name?
10     A.  No, I don't.
11     Q.  Do you recall when about your first
12 conversation with Steve McManus was?
13     A.  It would have been after the IPO.
14     Q.  After the IPO.  And do you recall when your
15 last conversation would have been?
16     A.  It would -- about -- well, after the IPO, so
17 within a short period of time.
18     Q.  Okay.  Did you only speak with him once or was
19 it more than once?
20     A.  I might have spoken to Steve twice, but
21 generally speaking, I think I worked with Mr. Gamso.
22     Q.  Did you ever discuss the issue of the preferred
23 list and the price of the stock that you were expecting
24 to get with Mr. McManus?
25     A.  I don't know that I did.  I think mostly with

Page 107

1  Mr. Gamso.
2      Q.  And again, in connection with your conversation
3  with Dawn, do you recall when your first conversation
4  with her was?
5      A.  I really don't even recall, except that I had
6  it in my notes that I spoke to Dawn.
7      Q.  Okay.  Was it a one-time conversation or did
8  you speak to her more than once, do you know?
9      A.  I think she was a secretary or something.
10     Q.  I think we're very close to the end here.  Let
11 me just flip through.
12         Do you know whether any of the other
13 potential class members bought Adams Golf stock
14 subsequent to the IPO like you did in January of the
15 following year?
16     A.  I don't know.
17     Q.  Okay.  Do you know of anyone connected with the
18 case, any of the named plaintiffs or the proposed class
19 representatives who subsequently bought Adams Golf stock
20 to leverage their positions as you did?
21     A.  I think probably Mr. and Mrs. Smith, but I
22 don't know for sure when they bought or what they
23 bought.
24     Q.  Okay.  And you don't still own any Adams Golf
25 stock?

Page 108

1      A.  Let's see.  I'm thinking that I bought some
2  real -- very small share, more recently, because it's so
3  far down, and I'm still trying to average out my losses.
4      Q.  So that would have been a purchase that's not
5  reflected on this Exhibit 13?
6      A.  No, it wouldn't be.  That paper was prepared
7  before.
8      Q.  Do you have a general recollection of when,
9  over the past year?
10     A.  Oh, it would be in the past months.
11     Q.  Within the past few months?
12     A.  Uh-huh.  And it would have been a very small
13 amount.
14     Q.  Talking hundreds of shares or --
15     A.  $2,000 maybe.
16     Q.  $2,000.  I don't know how much that gets,
17 but --
18     A.  I don't remember what it got me either.
19     Q.  Do you know whether your -- the Smiths or any
20 of the other potential class members still own any Adams
21 Golf stock?
22     A.  The Smiths, I feel confident do.
23     Q.  And I apologize if you've answered this
24 already, but did the Smiths receive their stock in the
25 IPO, initially?  Did they buy --

Page 10...

1      A.  They bought some in the IPO, I believe.  They
2  once had 25 percent of the company, but it got
3  immediately diluted to less than 5 percent.
4      Q.  And I just want to ask you  I know you've been
5  through the allegations of the complaint.  I don't want
6  to go back to the documents, but can you tell me in your
7  own words what it is that you believe that Lehman
8  Brothers did wrong in this situation?
9      A.  Well, in reading the prospectus that I brought
10 that was copied today, they gave incredibly glowing
11 reports of the industry, the market, why this was going
12 to be so great, and I think somebody had to be just less
13 than informed when these other matters existed, some of
14 them.  And they knew they -- they would have to know the
15 trends of the market.  And yet, I think they predicted
16 something like -- they expected it to be over $21 in a
17 very short period of time.  I think they just oversold
18 with better knowledge than to do so.
19     Q.  Okay.  When you say they should have had
20 knowledge of these matters, can you tell me specifically
21 what it was they should have known?  I don't want to put
22 words in your mouth, but I'll assume it's the gray
23 marketing problem.
24     A.  Well, the gray market is certainly one of the
25 reasons it happened to them, but it was various

28 (Pages 106 to 109)