10

Page 1

1                    UNITED STATES DISTRICT COURT

                         DISTRICT OF DELAWARE

2

3      IN RE:  ADAMS GOLF, INC., )

       SECURITIES LITIGATION      ) CIVIL ACTION NO. 99-371-KAJ

4                                 ) (CONSOLIDATED)

5

6

7      *********************************************

                        ORAL DEPOSITION OF

8                      TODD MICHAEL TONORE

                     FRIDAY, FEBRUARY 25, 2005

9      *********************************************

10

11

12               ORAL DEPOSITION OF TODD MICHAEL TONORE,

13     produced as a witness at the instance of the Defendants

14     and duly sworn, was taken in the above-styled and

15     numbered cause on the 25th day of February 2005, from

16     10:01 a.m. to 12:40 p.m., before RANDALL N. FINCH, CSR

17     in and for the State of Texas, reported by machine

18     shorthand, at the offices Akin Gump Strauss Hauer &

19     Feld, L.L.P., 300 West 6th Street, Suite 2100, Austin,

20     Texas 78701, pursuant to the Federal Rules of Civil

21     Procedure and the provisions stated on the record or

22     attached hereto.

23

24

25

Page 2

```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF CLASS:
 3     Ms. Elizabeth W. Fox
       BERGER & MONTAGUE, P.C.
 4     1622 Locust Street,
       Philadelphia, PA 19103  (215) 875-3000
 5              (215) 857-4604 Fax
 6   FOR THE ADAMS GOLF DEFENDANTS:
 7     Mr. Christopher W. Ahart
              -and-
 8     Ms. Michelle A. Reed
       AKIN GUMP STRAUSS HAUER & FELD, L.L.P.
 9     300 West 6th Street, Suite 2100
       Austin, Texas 78701  (512) 499-6200
10              (512) 499-6290 Fax
11   FOR THE UNDERWRITER DEFENDANTS:
12     Mr. Theodore J. McEvoy
       SIMPSON THACHER & BARTLETT, L.L.P.
13     425 Lexington Avenue
       New York, New York 10017  (212) 455-2831
14              (212) 455-2502 Fax
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                INDEX
 2   Appearances.............................. 2
 3   Stipulations.
 4   TODD MICHAEL TONORE
 5     Examination by Mr. Ahart.............. 4
       Further examination by Mr. McEvoy...  95
 6     Further examination by Ms. Fox.....  111
 7   Signature and Changes................  114
 8   Reporter's Certificate...............  116
 9
10         DEFENDANT'S EXHIBITS
11   1. Prospectus........................  19
12   2. Complaint.........................  27
13   3. List of members in the class......  34
14   4. Document.
15   5. Document.
16   6. Document.
17   7. Interrogatories...................  73
18   27. Adams Golf, Inc. certification pursuant to
       the Federal Securities Law..........  46
19
     28. Responses and objections of Todd Tonore to
20     Defendant Adams Golf, Inc.'s first request
       for the production of documents......  69
21
     29. Plaintiff Todd Tonore's responses to
22     Defendant Adamas Golf's first set of
       interrogatories.....................  75
23
24
25
```

Page 4

```
 1                TODD MICHAEL TONORE,
 2   having been first duly sworn, testified as follows:
 3               EXAMINATION
 4   BY MR. AHART:
 5     Q.  Good morning, Mr. Tonore.
 6     A.  Good morning.
 7     Q.  My name is Chris Ahart and I represent the
 8   Adams Golf defendants in this case, which is Adams
 9   Golf, Inc. and individual defendants.
10     A.  Right.
11         MR. McEVOY:  I'm Ted McEvoy from Simpson,
12   Thacher & Bartlett.  I represent the underwriter
13   defendants in this case.
14         THE WITNESS:  Okay.
15     Q.  (By Mr. Ahart)  Okay.  To start off, let's just
16   get a few preliminary things out of the way.
17     A.  Okay.
18     Q.  Could you please state and spell your full
19   name for the record.
20     A.  Okay.  It's Todd Michael Tonore.  T-o-d-d.
21   Michael, M-i-c-h-a-e-l.  Tonore, T-o-n-o-r-e
22     Q.  And what is your date of birth?
23     A.  11/6/61.
24     Q.  Okay.  Have you ever taken a deposition
25   before?
```

Page 5

```
 1     A.  No.
 2     Q.  Okay.
 3         MS. FOX:  Taken?  I thought only lawyers
 4   did that.
 5         MR. AHART:  Oh, I'm sorry.
 6     Q.  (By Mr. Ahart)  Have you ever given a
 7   deposition before --
 8     A.  Given, no.
 9     Q.  Okay.
10     A.  No.
11     Q.  Okay.  Well, let's go over some basic ground
12   rules for how this is going to take place.
13     A.  Okay.
14     Q.  Please remember that you are under oath.
15     A.  Okay.
16     Q.  This is the same oath that you would give if
17   you were in court.  You must testify truthfully.
18   Please remember to answer my questions audibly, so
19   avoid nodding or saying uh-huh or --
20     A.  All right.
21     Q.  -- something like that, because it's difficult
22   for the court reporter to record those answers.  Also,
23   for the sake of the court reporter, please wait until I
24   finish a question before you answer, just because he
25   can't record both of us speaking at the same time.
```

TODD TONORE                    2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 6

1    A.  Right.
2    Q.  Please don't hesitate to tell me if you don't
3  understand a question.  I will do my best to explain a
4  question as best I can.  I'll try to be clear, but feel
5  free to ask me --
6    A.  Okay.
7    Q.  -- if you don't understand something.  If you
8  do answer a question that I ask, then I'll assume that
9  you understood what I asked you.
10    A.  Okay.
11    Q.  If you need a break, just say so.  And we can
12  take a break anytime that you want to.  But please
13  don't leave a question pending.  If I've asked you a
14  question, please try to answer it as best you can
15  before you request a break.
16    A.  Okay.
17    Q.  When answering a question, don't guess.  Okay?
18  I am entitled to your best recollection of the events.
19  It's difficult to remember everything exactly.
20    A.  Right.
21    Q.  But please don't guess.
22    A.  Okay.
23    Q.  Okay.  And then just a final few questions.
24  Is there any reason that you can't give your best
25  testimony here today?

Page 7

1    A.  No.
2    Q.  Okay.  Are you under any mental or physical
3  condition or any medications that would prevent you
4  from testifying truthfully or accurately?
5    A.  No.
6    Q.  Okay.  Okay.  Let's talk about a few personal
7  details.  What is your current address?
8    A.  I'm with Bancroft Bag, Incorporated.  We're a
9  paper bag manufacturing company out of Monroe,
10  Louisiana, which is my hometown.  I have been with
11  Bancroft for 20 years.  I am the sales manager for
12  Bancroft.  I have sales people all over the country.
13  We manufacture any type of paper bag you would see when
14  you walk into a grocery store.  Old Roy pet food,
15  Kingsford, Royal Oak, Hall -- gift bags for Hallmark,
16  motion sickness bags for the airlines.
17          We're -- we're a -- what's -- what you
18  would call a multi-wall bag producer.  We have -- we're
19  about a hundred million dollar a year company,
20  privately held by one gentleman, Toby Bancroft.  And
21  like I said, I have been with Toby for more than 20
22  years.
23          MS. FOX:  Okay.  Could we go off the
24  record a second?
5          (Discussion off the record)

Page 8

1    Q.  (By Mr. Ahart)  Let's go back on the record.
2  What is your current home address right now?
3    A.  1024 Pebble Beach in Mansfield, Texas, which
4  is just south of Fort Worth.
5    Q.  Did you live at this address during 1998 and
6  1999?
7    A.  Yes, I did.
8    Q.  Okay.  And do you have a home telephone
9  number?
10    A.  (817) 453-5519.
11    Q.  Okay.  Are you married?
12    A.  Yes.  Married.
13    Q.  Okay.  How long have you been married?
14    A.  Been married 12 years.
15    Q.  And what's your wife's employment?
16    A.  Real estate agent.
17    Q.  Okay.  Okay.  Let's discuss your educational
18  background leading up to your career.
19    A.  Okay.
20    Q.  Where did you attend high school and when?
21    A.  Monroe, Louisiana, graduated in 1980.
22          MS. FOX:  That answers it.
23          THE WITNESS:  All right.  Sorry.
24    Q.  (By Mr. Ahart)  Did you go to college?
25    A.  Yes.

Page 9

1    Q.  Okay.  When did you go to college?
2    A.  '80 to '84.
3    Q.  Where did you go?
4    A.  Northeast Louisiana University in Monroe.
5    Q.  Okay.  What was your degree?
6    A.  Sales -- marketing.
7    Q.  Okay.
8    A.  Business.  Business marketing.
9    Q.  And that was your major?
10    A.  Right.
11    Q.  Did you have a minor?
12    A.  The minor was in marketing.  Major was in
13  business.
14    Q.  Okay.  So I take it that you had some classes
15  with financial business accounting or --
16    A.  Sure.
17    Q.  -- economics backgrounds and things of this
18  nature?  Okay.
19    A.  Correct.
20    Q.  Okay.  Did you go to graduate school?
21    A.  No.
22    Q.  Okay.  In connection with your job at Bancroft
23  or anything before, have you attended any seminars or
24  trade courses or company classes?
25    A.  Sure.

3 (Pages 6 to 9)

TODD TONORE                              2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 10

1    Q.  Okay.  What kind of topics have those courses
2  typically covered?
3    A.  Well, a lot of quality type classes, ISO
4  classes, some management classes from SMU business
5  school in Dallas.
6    Q.  Is that the Cox Business School?
7    A.  Right.
8    Q.  Correct?
9    A.  Right.
10    Q.  Okay.  Are you a member of any professional
11  societies?
12    A.  No.
13    Q.  Do you have any other education certifications
14  or professional licenses or anything of that sort?
15    A.  (Witness shakes head)  I'm sorry.  No.
16    Q.  And I think we have addressed this next
17  question already, but it sounds like you've worked for
18  Bancroft since you left college.  Has that been your
19  only job since you left college?
20    A.  I sold pharmaceuticals for one year right out
21  of college and then went to work for Bancroft.
22    Q.  And who did you sell pharmaceuticals for?
23    A.  Fisons, F-i-s-o-n-s, a Johnson & Johnson
24  company.
25    Q.  Okay.  Did you serve in the military at any

Page 11

1  time?
2    A.  No.
3    Q.  When did you first learn that you would have
4  to give a deposition in this case?
5    A.  About a month ago.
6    Q.  Okay.  Who told you?
7    A.  I was contacted by Elizabeth.
8    Q.  Okay.  Who have you met with personally to
9  prepare for this deposition?
10    A.  No one other than Elizabeth.
11    Q.  Okay.  How many times have y'all met with one
12  another?
13    A.  Just once, this morning.
14    Q.  Okay.  How long did you meet?
15    A.  Thirty minutes.
16    Q.  Okay.  And this was the first time that you
17  had personally met with your attorneys before today?
18    A.  Yes.
19    Q.  Okay.  Have you communicated with anyone else
20  at all in preparation for your deposition today?
21    A.  No.
22    Q.  Okay.  Did you review any documents to prepare
23  for this morning's deposition?
24    A.  No.
25    Q.  All right.  Let's move on and just talk about

Page 12

1  some of the basic issues in this lawsuit.  Who are you
2  suing in this case?
3    A.  Barney Adams, Adams Golf, and directors at the
4  time of the IPO, and the company that actually assisted
5  them in taking the company public.  And I assume that
6  would be his company.
7    Q.  And by company, you mean the underwriters
8  that --
9    A.  Underwriters, yes.
10    Q.  Okay.  Can you talk briefly about why you're
11  suing my clients?
12    A.  Basically because I've -- I lost a lot -- a
13  tremendous amount of money.  I feel like I was misled.
14  And I'm representing the class that also lost a lot of
15  money that I feel was misled.
16    Q.  And how do you believe they were misled?
17    A.  I think they were -- there was information
18  withheld at the time of the IPO that later -- shortly
19  afterward affected the stock price to do what it did in
20  a six-month period, go from a little over 18 all the
21  way down to three or wherever it is.  I don't even know
22  where it is today.
23    Q.  Okay.  And so you believe it was this withheld
24  information that caused the stock price -- conceivably,
25  this information that was withheld is what caused the

Page 13

1  stock price to decline after the offering?
2    A.  Yes.
3    Q.  What evidence do you have to support your
4  belief?
5    A.  Evidence?  There was a lot printed, lot of
6  press releases, once the -- once Adams Golf announced
7  why the stock price was declining.  I was -- I
8  purchased my stock through A. G. Edwards and I was
9  given information off of their Web sites and -- and off
10  of the Adams Golf Web site that basically stated the
11  reason for the decline in the stock.
12    Q.  Okay.
13    A.  Or their -- their -- their reason.
14    Q.  So you -- you reviewed the company's press
15  releases?  Adams Golf?  By company, I mean Adams Golf.
16    A.  Yes, through -- via the Internet, through
17  information that I could pull up basically off --
18  through my brokerage company.
19    Q.  Okay.  Did you also review any general
20  articles about the industry or other newsprint sources
21  that may have discussed Adams Golf, or just
22  primarily -- just releases by the company?
23    A.  I couldn't turn the TV on without seeing
24  Barney Adams.  I mean, there was a tremendous amount of
25  advertising being done by Adams Golf at that time.

4 (Pages 10 to 13)

TODD TONORE                          2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 14

1 There was no -- no indication at the time of the IPO
2 that there was any information being withheld. But
3 after -- after the fact, the stock dove and then the
4 information was revealed.
5    Q.  Okay.
6    A.  And I believe they called -- referred to it as
7 gray marketing.
8    Q.  Mm-hmm. What facts do you know to support
9 your belief that this information was withheld, other
10 than these press releases that you read or other
11 information you may have seen on the news?
12    A.  None.
13    Q.  None?
14    A.  Other than what I read.
15    Q.  Okay. You touched briefly on this, but can
16 you just for the record identify the defendants that
17 are in this lawsuit?
18    A.  Defendants. Again, I -- I don't know
19 directors' names. I -- Barney Adams being the owner of
20 the company, and I want to say it's Lehman or whoever
21 helped -- I'm trying to think of the term. His company
22 basically. The underwriters.
23    Q.  Okay.
24    A.  I can't think...
25    Q.  Can you name any of the individual director

Page 15

1 defendants --
2    A.  No.
3    Q.  -- at all?
4        Okay. And other than Lehman Brothers,
5 can you name any of the underwriter defendants?
6    A.  No.
7    Q.  Okay. Can you give me the names, titles or
8 responsibilities of the people that have been named as
9 defendants in this suit, particularly any of the
10 officers that used to be in the company?
11    A.  No. Only Barney Adams.
12    Q.  Okay. Do you know how many defendants there
13 are in total?
14    A.  No.
15    Q.  In 1998, which is the time of the IPO, can you
16 tell me what sort of business Adams Golf was in?
17    A.  The golf business. They manufactured a club
18 to -- to basically replace drivers and woods, a variety
19 of woods in the golf business.
20    Q.  Do you know the name of the particular product
21 that was so popular at that time?
22    A.  Tight Lies.
23    Q.  Tight Lies clubs?
24        Do you know how Adams Golf marketed its
5 products and sold its products at that time?

Page 16

1    A.  Yes. They -- I played with the product and I
2 was only able to purchase it through a -- the country
3 club which I'm a member of. And I was -- I was told
4 that it was marketed through specialty shops and not
5 discount houses.
6    Q.  Okay. Were the clubs available through any
7 other sources other than through specialty shops or
8 golf pro shops?
9    A.  At the -- at the time of the IPO, no.
10    Q.  Okay.
11    A.  Not to my knowledge.
12    Q.  You said at the time of the IPO you saw Barney
13 Adams' face all over the place, so --
14    A.  Oh, sure.
15    Q.  Did you see these advertisements for the
16 company or for Barney in television or on the radio or
17 both or --
18    A.  Everywhere.
19    Q.  -- in newsprint?
20    A.  Everywhere. Newsprint, infomercials,
21 television commercials, just about everywhere. Golf
22 publication magazines, anything that related to golf,
23 that -- you know, that was the hot item back then and
24 it was all -- it was stamped everywhere.
25    Q.  Mm-hmm. Do you know why the product was

Page 17

1 considered to be so hot, as you say, at that time?
2    A.  It was a very good product. It was -- I have
3 no -- you know, I've always said that it was a good
4 product. That was one of my reasons for buying the
5 product. It was a good product.
6    Q.  Do you remember when you first learned about
7 the IPO?
8    A.  When I first learned about the IPO? Maybe a
9 day or two before the IPO.
10    Q.  Okay. So it was shortly before the IPO --
11    A.  Right.
12    Q.  -- actually occurred?
13    A.  Right.
14    Q.  But I guess before the IPO occurred you had
15 already been following the company or --
16    A.  No, I had been --
17    Q.  -- you did you not start following the
18 company really until you heard about the IPO itself?
19    A.  No, I followed the company because I was
20 playing with their equipment for a year before they
21 took the company public.
22    Q.  So you think so -- you actually purchased a
23 Tight Lies club sometime in 1997?
24    A.  Sure.
25    Q.  Do you know who Barney Adams is personally or

512-320-0185                    RLS LEGAL SOLUTIONS                    512-391-0269

Page 22

1    Q.  Okay.  And what is your understanding of what
2  that means?
3    A.  To me, gray marketing could be -- I believe it
4  means the products were -- were put in the hands of
5  someone that sold the products to a discount -- or at a
6  discounted rate.  And they were -- and for that to
7  happen, I feel the products were sold at a discounted
8  rate so that that could happen.
9    Q.  Okay.  Who do you believe sold the clubs at a
10  discounted rate to these retailers?
11    A.  I believe Adams Golf manufactured the clubs
12  and sold the -- sold the clubs to someone or -- or some
13  company, I'm not sure, that wound up selling the clubs
14  into -- into a discounted market like a Costco or a
15  Wal-Mart.
16    Q.  Do you think Adams Golf actually sold clubs
17  directly to these discounters?
18    A.  No.
19    Q.  Okay.  And back to the gray market issue, do
20  you remember when Adams Golf first disclosed that there
21  were gray market problems?
22    A.  After the initial public offering when the
23  stock began to fall.
24    Q.  Okay.
25    A.  It was -- that was the first time I had heard

Page 23

1  the term "gray marketing" or read it anywhere.  I never
2  read it anywhere before that time.
3    Q.  Okay.  Let's turn to page 24 of the
4  prospectus.  And if you'll look at that second full
5  paragraph --
6    A.  Mm-hmm.
7    Q.  There's a sentence there on the third line, in
8  the middle of the third line that starts off with "To
9  preserve..."
10    A.  Right.
11    Q.  So I'm going to read it aloud.  "To preserve
12  the integrity of its image and reputation, the company
13  limits its distribution to retailers that market
14  premium quality golf equipment and provide a high level
15  of customer service and technical expertise.  The
16  company currently sells its products to on- and
17  off-course golf shops and selected supporting goods
18  retailers.  The company believes that selective retail
19  distribution helps its retailers to maintain profitable
20  margins and maximize sales of Adams products."
21          Do you believe this is a true statement?
22    MS. FOX:  Wait a second.  I don't think
23  you read the whole thing.
24    THE WITNESS:  No.
25    MS. FOX:  You read -- did you read, "The

Page 24

1  company does not sell its products through
2  price-sensitive general discount warehouses, department
3  stores or membership clubs?
4    THE WITNESS:  No.
5    MR. AHART:  I'm sorry, I must have been
6  paraphrasing it a little bit.
7    MS. FOX:  Just skipped it.
8    MR. AHART:  I apologize.
9    THE WITNESS:  Yes, I believe that -- I
10  believe the statement when that last sentence is
11  included.
12    MR. AHART:  Okay.  And --
13    MS. FOX:  I'm sorry.  What was that in
14  response to?
15    THE WITNESS:  The last sentence, "The
16  company does not sell its products through
17  price-sensitive general discount warehouses, department
18  stores or membership clubs."
19    MR. AHART:  But my question was whether
20  he believed that was a true statement.  Can we go off
21  the record for a second?
22    (Discussion off the record)
23    Q.  (By Mr. Ahart)  We'll go back on the record.
24  Okay, let me read this --
25    A.  Okay.

Page 25

1    Q.  -- section to you again, and my question to
2  you is:  Do you believe that the following statement
3  that I'm going to read which is in the prospectus is
4  true?
5    A.  Okay.
6    Q.  "To preserve the integrity of its image and
7  reputation, the company currently limits its
8  distribution to retailers that market premium quality
9  golf equipment and provide a high level of customer
10  service and technical expertise.  The company currently
11  sells its products to on- and off-course golf shops and
12  selected supporting goods retailers.  The company does
13  not sell its products through price-sensitive general
14  discount warehouses, department stores or membership
15  clubs.  The company believes its selective retail
16  distribution helps its retailers to maintain profitable
17  margins and maximize sales of Adams products."
18          Do you believe this statement is true?
19    A.  Yes, I do.
20    Q.  Let's turn to page 29.  And if you will see
21  down there the second full paragraph from the bottom
22  where it says "Sales to retailers," in capital print?
23    A.  Yes.
24    Q.  I'm going to read this excerpt to you as well,
25  and please tell me if you believe that this is a true

7 (Pages 22 to 25)

TODD TONORE                    2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 26

1  statement: "The company sells a significant majority
2  of its products to selected retailers. To maintain its
3  high quality reputation and generate retailer loyalty,
4  the company does not sell its products through
5  price-sensitive general discount warehouses, department
6  stores or membership clubs."
7          Do you believe that's a true statement?
8      A.  I believe that was their intention. That's
9  not what wound up happening.
10     Q.  But do you believe it was a true statement at
11 the time of the IPO?
12     A.  No.
13     Q.  And why do you not believe it was true at the
14 time of the IPO --
15     A.  Because I think they -- I think they knew
16 their products were in -- in discount warehouses,
17 department stores and membership clubs. I -- I know
18 they knew they were in membership clubs.
19     Q.  Well, why do you believe that the company knew
20 at the time of the IPO that they had clubs in those
21 stores?
22     A.  Well, they later admitted they knew that there
23 were clubs in Costco, because they sued Costco.
24     Q.  Did they admit that they knew at the time of
25 the IPO that there were clubs in those stores?

Page 27

1      A.  Yeah, they knew.
2      Q.  Okay. All right, let's move on to the next
3  Exhibit. And I'm going to hand you what has been
4  marked as Defendant's Exhibit 2.
5          (Defendant's Exhibit No. 2 marked)
6      A.  Are we through with this?
7      Q.  Just set it aside there.
8      A.  Okay.
9          MS. FOX: This is the complaint.
10     Q.  (By Mr. Ahart) Do you recognize this document?
11     A.  Yes.
12     Q.  Can you tell me what it is?
13     A.  That is a copy of the lawsuit.
14     Q.  When did you first see this?
15     A.  My best recollection, it's been -- I'm not
16 sure.
17     Q.  That's okay. When did you most recently see
18 it?
19     A.  When did I most recently see it? Maybe four
20 months ago, digging through my old files.
21         MS. FOX: You should include anything you
22 saw this morning talking to me.
23         THE WITNESS: Okay. Well, I mean,
24 she -- we didn't go through it. She showed me this --
25 a copy of this today, this morning when we met.

Page 28

1      Q.  (By Mr. Ahart) Mm-hmm.
2      A.  But I didn't go -- I haven't been through it.
3      Q.  So the most recent time that you saw it was
4  this morning?
5      A.  Yes.
6      Q.  Do you remember when you saw it last before
7  this morning?
8      A.  Maybe four months ago while going through my
9  files. I had a copy of it in my files. I believe I
10 received it six -- six to eight years ago, when -- once
11 the class was filed.
12     Q.  Okay. Can you talk about what investigation
13 that you may have performed before this consolidated
14 complaint was filed?
15     A.  The investigation -- what I did was contact a
16 family lawyer once I had lost a large sum of money
17 to -- I was personally going to pursue a lawsuit
18 against Barney Adams and Adams Golf. And I was advised
19 at that time to join the class. There was a class
20 formed and I was advised by him to join the class.
21     Q.  Did you help prepare the complaint at all?
22     A.  No.
23     Q.  Did you read the complaint before it was
24 filed?
25     A.  I'm -- I have no knowledge of that. It's been

Page 29

1  so long ago. I'm not sure. I don't -- if you would
2  show it -- are you talking about this?
3      Q.  This particular complaint.
4      A.  Not before it was filed, no.
5      Q.  Okay. And so you did not review the complaint
6  for accuracy or anything like that before it was filed?
7      A.  No. I -- the law firm that -- that took this
8  case, I joined the -- the class and then was asked
9  later to be whatever my title is today here. I'm
10 legal -- I don't know the legal term for what I am in
11 this lawsuit.
12         MS. FOX: Lead plaintiff.
13         THE WITNESS: I'm to be the lead
14 plaintiff.
15     Q.  (By Mr. Ahart) Okay. Do you consider yourself
16 a careful person when it comes to looking through and
17 reviewing documents?
18     A.  Not necessarily, not documents that -- no,
19 sir.
20     Q.  Okay. But is accuracy important to you when
21 you're reviewing important documents?
22     A.  Sure.
23     Q.  Did you do anything to satisfy yourself either
24 before or after this complaint was filed to make sure
25 that the statements in that complaint were accurate?

512-320-0185                    RLS LEGAL SOLUTIONS                    512-391-0269

TODD TONORE                          2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 34

1    Q.  When investigating matters in this complaint?
2    A.  No, sir.
3    Q.  Have your attorneys told you that they have
4  spoken to any third parties while investigating this
5  complaint?
6    A.  I have no knowledge, no.  I have no knowledge
7  who my attorneys have spoken to.
8    Q.  Okay.  Let's move on to Defendant's Exhibit 3.
9        (Defendant's Exhibit No. 3 marked)
10       MS. FOX:  Okay, Exhibit 3.
11   Q.  (By Mr. Ahart)  Have you seen this document
12  before?
13   A.  I do not recall.
14   Q.  Can you tell me --
15   A.  Other than this -- this morning, see a copy of
16  it.  I just --
17   Q.  Did you review a copy of it with your attorney
18  this morning?
19   A.  I saw the document.  We did not review it.
20   Q.  Okay.  Have you seen the document before this
21  morning when you reviewed it with your attorney?
22   A.  Not to my knowledge.
23   Q.  Can you tell me what it is?
24   A.  Not being a lawyer, it looks to me like
25  just -- it looks to me like names of people that are a

Page 35

1  member of the class.
2    Q.  Okay.
3        MS. FOX:  Don't guess.  If you don't
4  know --
5        THE WITNESS:  I don't know.
6        MS. FOX:  -- don't say.
7        THE WITNESS:  I mean, that's what I'm
8  saying.  I don't know.
9        MS. FOX:  If you want to read it back to
10  him, you can.  But that's not the point.
11       THE WITNESS:  Okay.  I don't know what it
12  is.
13   Q.  (By Mr. Ahart)  So you don't know what these
14  disclosures are about?
15   A.  No.
16   Q.  Let's look at page 4.  Have you spoken to
17  anyone that's listed in that response to No. 3?  And
18  take your time, it continues for a couple of pages.
19   A.  Okay.  (Brief pause)  No.
20   Q.  To your knowledge, do you know if your
21  attorneys have spoken to any of these people?
22   A.  Again, I'm not sure who my attorneys have
23  spoken to.
24   Q.  Okay.  Let's turn to page 10.  Can you tell me
25  on question 5, No. 5 there at the bottom of the page?

Page 36

1    A.  Mm-hmm.
2    Q.  Have you spoken with any of the people listed
3  under No. 5?
4    A.  No, sir.  Not on the -- I'm going to turn the
5  page.  No.
6    Q.  Okay.  Do you know if your attorneys have
7  spoken to anyone listed under five?
8    A.  Again, no knowledge.
9    Q.  Have you or to your knowledge have your
10  attorneys spoken to anyone from W. D. C. McKinzey?
11   A.  No knowledge.
12   Q.  Who have you talked to?
13       MS. FOX:  What do you mean, who have you
14  talked to?
15   Q.  (By Mr. Ahart)  In this -- I'm sorry.  Who have
16  you talked to in this case, in investigating this
17  claim?
18   A.  Other than information gained through the
19  Internet, the only other action that I took was I went
20  to the Adams Golf Web page and e-mailed their -- once
21  the stock was falling, and e-mailed someone in
22  their -- whoever receives that e-mail off of their Web
23  page did respond to me that sales were still strong
24  and -- and -- because my -- my basic question was, you
25  know, what's going on?  And even at that time there was

Page 37

1  nothing said about gray marketing, that sales were
2  still strong and -- and debt was very low and
3  everything that I had read via e-mail on the financials
4  of the company were correct.
5    Q.  Okay.  Let's go back to Defendant's Exhibit
6  No. 2, which is the complaint.
7    A.  Mm-hmm.
8    Q.  And if we could go to paragraph 26, which I
9  believe is on page 8?
10   A.  Okay.  Here.  Where are we at?
11   Q.  That's it.
12   A.  In here?  Okay.
13       MS. FOX:  Yeah.  Take some time just to
14  read the page before you answer the question.
15       THE WITNESS:  Page 28?
16   Q.  (By Mr. Ahart)  Page 8.  And it's paragraph 26
17  on page 8.
18   A.  Okay.  Okay.  Paragraph 26.
19       MS. FOX:  Take some time to read it
20  before he asks some questions.
21       THE WITNESS:  Okay.
22   Q.  (By Mr. Ahart)  Okay?  In paragraph 26, the
23  second sentence states that "Various sources have
24  informed plaintiffs that prior to the effective date
25  gray market distribution of Adams Golf's products was a

TODD TONORE                          2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 42

1 not privileged.
2        MS. FOX: I don't believe that's correct.
3 And he's not going to be -- he can ask me, but I'm not
4 going to give any response. And in fact, I don't know,
5 so if that makes you feel any better. It's the kind of
6 thing that needs to be in paper discovery, and we'll
7 deal with that. We have objected to it as you know.
8 There's no reason that you drag him through that.
9        Q. (By Mr. Ahart) Okay. So that just for the
10 sake of the record, are you refusing to reveal who your
11 confidential sources are for that statement?
12       THE WITNESS: I'm --
13       MS. FOX: I'm objecting to that. There's
14 no reason that he would know the confidential people.
15 He hasn't -- and he is not refusing, he's simply saying
16 he doesn't know.
17       MR. AHART: Okay. Are plaintiffs'
18 lawyers refusing to identify confidential sources?
19       MS. FOX: When -- when it's a question
20 addressed to a lay witness at a deposition, we
21 certainly are. Our witnesses, unless they know the
22 answers, are not going to tell.
23       MR. AHART: Okay. I'm asking you. Are
24 you going to refuse to --
25       MS. FOX: Well, you haven't deposed me.

Page 43

1 So I'm -- you know, when -- when I'm under deposition
2 you can -- you can get whatever answers I might have,
3 but I'm not now.
4        MR. AHART: Okay. Well, let's just move
5 on.
6        Q. (By Mr. Ahart) Paragraph 29, which is on the
7 next page, it's page 9. It says, "According to various
8 sources, prior to the effective date, Costco, an
9 unauthorized discount retailer, alone had over 5,000
10 Adams Golf clubs available for sale at its facilities."
11 Can you tell me how you know Costco had those clubs?
12       A. I did not know the number. I don't have proof
13 of the number. But I do -- the way I found out about
14 Costco personally was through -- via e-mail information
15 that was put out by various brokerage companies. When
16 the word "gray marketing" appeared, Costco seemed to
17 appear with it.
18       Q. (By Mr. Ahart) Okay. Do you know when you got
19 those e-mails?
20       A. Yes. At the time -- I followed the company
21 via -- not e-mails, but I followed the company's news
22 presses and -- and information that was put out by the
23 company via e-mail a couple of days before the IPO.
24       Q. Okay. Other than what you've told me so far,
25 is there any -- any other personal knowledge that would

Page 44

1 support the allegations in the complaint that you
2 haven't mentioned so far?
3        A. Repeat that.
4        Q. Do you have any other personal knowledge that
5 we haven't discussed so far in this deposition that
6 would support allegations in the complaint?
7        A. No.
8        Q. Okay. Other than the misstatements or the
9 omissions that we've already discussed, are there any
10 other misstatements or omissions that you believe were
11 made in connection with your purchase of the company's
12 securities?
13       A. No.
14       MS. FOX: I would object to that again.
15 As you know, there are other misstatements in the
16 complaint. If he can't remember them now, so be it.
17 The question is, do you remember others?
18       THE WITNESS: I do not remember.
19       Q. (By Mr. Ahart) Okay. When did you first
20 become aware that you may have possible claims against
21 Adams Golf and the other defendants in this case?
22       A. When the stock went from 18 to three in a
23 period of six months and -- and I was a $50,000 loser.
24       Q. Okay. So was it based on a share price
25 decline that you felt that you might have a claim

Page 45

1 against the company?
2        A. Yeah. After reading the news
3 about -- once -- once gray -- once I heard the term
4 gray marketing, that is a -- at the point I knew that
5 there may be a case against the company.
6        Q. And you --
7        A. I believe they withheld information.
8        Q. Okay. And this information is just what you
9 have learned through the company's own press releases?
10       A. Not just the company's press releases but also
11 through the brokerage release -- the brokerage house
12 releases that I was using at that time, A. G. Edwards.
13       Q. When did you first hear about this particular
14 lawsuit?
15       MS. FOX: You don't need to give a date.
16       THE WITNESS: It was after I sold the
17 stock -- after I had sold all the stock at three, so
18 it's -- it had to be in '99. '98, '99. It's -- I've
19 got that. Do you have that -- do you have a copy of
20 that, my -- my stock trades?
21       MS. FOX: Here. Are you going to make
22 that an exhibit?
23       MR. AHART: Yes.
24       THE WITNESS: You've got this?
25       Q. (By Mr. Ahart) Just so we make the record

12 (Pages 42 to 45)

Page 46

1   clear --
2       A.   It would have been -- okay.
3       Q.   What you're looking at is a -- is marked --
4   okay, well, I'll just introduce Exhibit 20. This is
5   Defendant's Exhibit 27. It's Bates stamped TT 1
6   through TT 2, and the title of the document is Adams
7   Golf, Inc. certification pursuant to the federal
8   securities laws. Okay, you can go ahead and discuss it
9   now.
10      A.   Okay. Repeat your question.
11      Q.   When did you first hear about this lawsuit?
12      A.   It would have been in late '99.
13           MS. FOX: Well, take a look at the first
14   page. No point in just guessing when -- when you've
15   got -- look at the -- read the first page.
16           THE WITNESS: This one here?
17           MS. FOX: Yeah.
18           THE WITNESS: (Brief pause) It would
19   have been -- I imagine -- it's been eight years or six
20   years ago, but now in order for me to join the class I
21   believe I had to -- to sign up 25 days after the IPO,
22   or after the class was -- I had to sign up 25 days
23   after the class.
24           MS. FOX: Well, don't -- don't try and do
25   that. Do you remember when you --

Page 47

1           MR. McEVOY: Could you let him finish his
2   answer? I know you would like to tell him what to
3   say --
4           THE WITNESS: I had to sign up -- I had
5   to sign the class. Once I was made aware, I had to
6   join the class within 25 days after the -- after I
7   was -- the class was filed. And I -- I believe I was
8   made aware of the class in '99. I last sold the stock
9   in July -- June of '99.
10      Q.   (By Mr. Ahart) Okay. And how did you learn
11   about the suit?
12      A.   Just following the company via e-mail. I was
13   a -- I read that Keller Ro -- R-o-h-r-b-a-c-k had taken
14   the class and I contacted them and joined.
15      Q.   Okay. What did you hear about the lawsuit
16   when you first heard about it?
17      A.   That there was a -- basically that there was a
18   class action lawsuit against Adams Golf for withholding
19   information about gray market distribution.
20      Q.   Do you know who first filed the lawsuit
21   against Adams Golf?
22      A.   I was contacted by Juli from Keller Rohrback.
23   I'm not sure who filed it.
24      Q.   And Juli is an attorney at Keller Rohrback?
25      A.   Yes.

Page 48

1       Q.   Did she contact you first?
2           MS. FOX: Object. He said that he --
3           THE WITNESS: Yeah, I contacted --
4           MS. FOX: -- contacted Keller Rohrback.
5   Don't try and trick him into that. It's not right.
6           MR. AHART: Just asking him a question.
7           MR. McEVOY: Liz, listen, nobody is
8   trying to trick him.
9           MS. FOX: Then you are trying to trick
10  him. You know he's confused and you're trying to
11  confuse him more.
12          MR. McEVOY: Nobody's trying to confuse
13  him.
14          MR. AHART: Off the record.
15          (Discussion off the record)
16          MR. AHART: Back on the record.
17      Q.   (By Mr. Ahart) Do you know when the lawsuit
18  was originally filed?
19          MS. FOX: He's answered that. He doesn't
20  know.
21          THE WITNESS: I don't know.
22          MS. FOX: It's ridiculous. You know, you
23  keep asking him when you know he doesn't know. It's
24  six years ago.
25          MR. AHART: Yeah. Let's go off the

Page 49

1   record for a second.
2           (Discussion off the record).
3       Q.   (By Mr. Ahart) Are you aware that several
4   individual suits have been filed against Adams Golf and
5   that they were later consolidated?
6       A.   My only knowledge is that there were -- I'm
7   only knowledgeable that there are two, that people that
8   bought the stock on the initial IPO, there's a suit.
9   And then I assume that the remainder of the people
10  that -- that bought the stock within a 30-day period or
11  so after the IPO, there's another suit. And that's the
12  one that I'm -- I'm a member of.
13          I did not buy the stock during the
14  initial public offering. I did buy it the day of the
15  initial public offering, but not -- I wasn't a part of
16  the IPO.
17      Q.   Okay. Do you know whose idea it was to
18  initially file the suit?
19      A.   No.
20      Q.   Do you know whose idea it was to file a class
21  action?
22      A.   No.
23      Q.   Did you personally have any hesitation or
24  concern about filing the suit or joining this suit?
25      A.   No.

TODD TONORE                        2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 50

1    Q.  Do you believe that you have any obligation to
2    investigate the facts that are alleged in the
3    complaint?
4    A.  Yes.
5    Q.  And what investigation exactly did you
6    perform?
7    A.  Only other than, again, just information
8    gathered via Internet that the company was publishing
9    and my brokers were publishing.
10    Q.  Do you know who else investigated facts that
11    are alleged in this complaint?
12    A.  I assume that the lawyers did, that filed the
13    suit.
14    Q.  Okay.  Let's move on to what we've already
15    introduced at this point but it's Defendant's
16    Exhibit 27.
17        MS. FOX:  That's your -- this is the
18    actual exhibit but this is the original.
19        MR. AHART:  Ted, do you have a copy?
20        MR. McEVOY:  Yeah, I do.  Thank you.
21        THE WITNESS:  Is that here?
22    Q.  (By Mr. Ahart)  Yeah, with the green sticker.
23    A.  Okay.  I've got you.
24    Q.  Can you tell me exactly what this document is
25    in terms of how you understand it to be?

Page 51

1    A.  It's just a document that -- that I
2    received -- that I received a copy of the suit.
3    Q.  In this document, let's say on No. 3?
4    A.  Mm-hmm.
5    Q.  Do you see there it refers to quote, unquote,
6    representative party.  Can you tell me what your
7    understanding of the term "representative party" means?
8        MS. FOX:  Object to the form.  It says
9    representative plaintiff.  And I object to the form
10    because it calls for a legal conclusion.  But --
11    Q.  (By Mr. Ahart)  I apologize.  It does not say
12    representative party.  It says representative plaintiff
13    and it's a misquote on my part.
14    A.  Okay.
15    Q.  Can you tell me what your understanding of the
16    term representative plaintiff is in terms of the
17    context of this case?
18    A.  I know my reason for serving.  Is -- is that
19    what you want?
20    Q.  Well, we could start with that.
21    A.  Are you asking -- well, my reason for serving
22    is the fact I lost a tremendous amount of money, felt
23    like I was misled, and I have an interest in
24    representing other people that lost a tremendous amount
25    of money that I'm sure in a lot of cases were not able

Page 52

1    to overcome it like I was.
2    Q.  Okay.  Well, what is it -- what do you think
3    it means for you to be a representative plaintiff on
4    behalf of the other plaintiffs?  And I'm not asking for
5    a legal definition.
6    A.  Right.
7    Q.  Just your understanding of what that means.
8    A.  That basically I would be willing to go in
9    front of a judge and tell him that I felt like I was
10    misled.
11    Q.  Okay.  Do you know whether you were appointed
12    as a lead plaintiff in this case?
13        MS. FOX:  Object.  Calls for a legal
14    conclusion.
15    Q.  (By Mr. Ahart)  You can answer the question.
16    A.  I do not.
17    Q.  Do you know who the other lead plaintiffs are
18    in this case?
19    A.  No knowledge.
20    Q.  Okay.  Do you know whether you're seeking to
21    be named as a class representative by the court?
22        MS. FOX:  Object.  It calls for a legal
23    conclusion.
24    Q.  (By Mr. Ahart)  You can still answer.
25    A.  I do not.

Page 53

1    Q.  Can you describe for me in your own words who
2    was in this plaintiff's class that you're trying to
3    represent?
4    A.  In my own words, I believe members of
5    other -- other stockholders that had bought Adams Golf
6    stock and suffered losses as I did.
7    Q.  Can you tell me why you're seeking to serve as
8    a class representative in this case?
9    A.  To possibly recoup some of the money that was
10    lost by me and others -- other class members.
11    Q.  Can you tell me how many class members are in the
12    class?
13    A.  I have no clue.
14    Q.  Do you know if there's more than one class?
15    A.  I know there's --
16        MS. FOX:  Object.  It calls for a legal
17    conclusion.  But I think he's described the --
18        THE WITNESS:  Yeah, I know of -- as I
19    said earlier, I know of two classes, and that's -- you
20    know, the ones that bought the stock on -- on the IPO
21    and then the ones that bought it within a 30-day period
22    after the IPO.
23    Q.  (By Mr. Ahart)  Okay.
24    A.  That's the only -- my only knowledge of the
25    two classes.

14 (Pages 50 to 53)

TODD TONORE                2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 54

1   Q.  Do you know if other class members bought
2   Adams Golf stock?
3   A.  I have no knowledge.
4   Q.  Do you know why --
5       MS. FOX:  I object.  He already defined
6   the class as people who bought Adams Golf stock.  And
7   you -- that's a clear case of your trying to confuse
8   him, asking the question backwards so he'll be
9   confused.
10      MR. AHART:  I'm just asking if he knows
11  that they bought stock.
12  Q.  (By Mr. Ahart)  And I understand what your
13  understanding is of the class, and I'm just asking if
14  you know whether or not they purchased stock.
15  A.  Do I know if they bought stock?  I have no
16  knowledge of that.
17  Q.  Okay.  Do you know when the alleged class
18  period begins?
19      MS. FOX:  Again, it calls for a legal
20  conclusion.  I think he has described that.
21  Q.  (By Mr. Ahart)  It's not a legal conclusion.
22  Can you just answer the question?  Do you know when the
23  class period begins?
24  A.  No.
25  Q.  Do you know when it ends?

Page 55

1   A.  I would assume at trial.
2   Q.  Do you know why the class begins on a certain
3   date and ends on another date?
4   A.  No.
5       MS. FOX:  Objection; calls for a legal
6   conclusion.
7       THE WITNESS:  I'm not a lawyer.
8   Q.  (By Mr. Ahart)  Do you know how the Section 11
9   subclass will trace your stock for the IPO?
10  A.  No, I don't.  I'm not a lawyer.
11      MS. FOX:  First off, do you know what the
12  Section 11 subclass is?
13      THE WITNESS:  I do not.  No.
14      MS. FOX:  Explain what it means, then, if
15  you -- maybe he can -- but it definitely calls for a
16  legal conclusion.  Not even the courts agree on it.
17  Q.  (By Mr. Ahart)  Can you tell me how you're
18  going to trace your stock back to the IPO?
19  A.  I have record of my buy and sells.
20  Q.  Okay.  Do you think your claims are typical of
21  the class of plaintiffs that you're purporting to
22  represent?
23  A.  I would think -- yes, I do.
24  Q.  Why do you think that?
5   A.  I believe the class would not have been

Page 56

1   written in the manner it was written by the lawyers
2   if -- if that wasn't the case.
3   Q.  Do you know how many other proposed class
4   representatives there are for this case?
5   A.  No.
6   Q.  Did you know that Federated National Insurance
7   Company withdrew as a proposed class representative?
8   A.  No.
9   Q.  Have you ever met with any of the other
10  proposed class representatives?
11  A.  No.
12  Q.  Can you generally discuss for me what you
13  understand to be your responsibilities to the class as
14  a class representative?
15  A.  I understand I -- I may have a responsibility
16  to agree or disagree with an offer and I may
17  have -- also have -- I will have a responsibility to
18  appear in court, if it goes that far.
19  Q.  Can you tell me why you think that you in
20  particular will be an appropriate class representative
21  for the plaintiffs in this case?
22  A.  Repeat that.
23  Q.  In terms of your own understanding.
24  A.  I think -- I think -- yes, I do understand the
25  question.  I think I bought the stock in good faith and

Page 57

1   I -- I lost a tremendous amount of money and I feel I
2   was misled.  And I think that is the general consensus
3   of the class.
4   Q.  Can you tell me how much time you spent
5   fulfilling your duties in this case as a lead plaintiff
6   and as a class representative so far?
7   A.  How much time?  I've reviewed documents over
8   the last six years that have been sent to me through
9   the -- through the attorneys.  Other than that, I have
10  spent no time.
11  Q.  Can you estimate for us about how long you've
12  probably spent reviewing these documents?
13  A.  Seven hours.  I don't know.
14  Q.  Do you have any other responsibilities that
15  might interfere with your ability to fulfill these
16  duties as a class representative and lead plaintiff?
17  A.  No.  I -- I'll -- nothing I can't work around.
18  Q.  Would future travel to Delaware, if that was
19  necessary, impose any kind of burden on you?
20  A.  Depending on the time, possibly.  But I will
21  work around -- I will work with you any way I can, via
22  phone or -- e-mail to give you whatever answers you
23  may need.
24  Q.  Okay.  In your mind, what do you stand to gain
25  as a class representative in this case?

TODD TONORE                    2/25/2005   IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 58

1   A.   At this point it's not about the money.
2   It's -- because I've overcome the money.  It's about
3   right and wrong.  And it's about the people that are a
4   member of this class that didn't overcome the money,
5   that were misled by -- by a company and a group of
6   gentlemen that made millions at the class' -- the class
7   members and the shareholders' expense.  It's criminal.
8   Q.   What parts of the lawsuit do you intend to
9   directly participate in beyond this deposition?  For
10  instance, let's say, the class certification hearing or
11  any hearings or motions for summary judgment or
12  anything of that sort?
13  A.   I will participate wherever needed.
14  Q.   Would you attend the mediation?
15  A.   It -- define the mediation.
16  Q.   Well, it's where the two parties come together
17  and try to resolve their disputes outside of the formal
18  court process is probably the easiest way to describe
19  it.
20  A.   If -- if the -- if the attorneys of the class
21  choose to do that, yes.
22  Q.   Have you been asked by your attorney to attend
23  the mediation?
24  A.   No.
25  Q.   Okay.  Would you attend the mediation that's

Page 59

1   currently scheduled for June 1st, 2005?
2   A.   June 1st.  June 1st.  I think I may be able
3   to.  Where is it at?
4   Q.   I think it's Delaware, I believe.
5          MS. FOX:  Delaware.  Yeah.
6          THE WITNESS:  If needed.  If -- if not,
7   again, by phone or -- or, you know, I will make myself
8   available in one form or another.
9   Q.   (By Mr. Ahart)  Can you tell me who has the
10  authority to settle this case?
11  A.   Who has the authority to settle the case?  I
12  do not know.
13  Q.   Do you plan on attending the entire trial, if
14  necessary?
15  A.   If necessary.
16  Q.   Did you fly down here today?
17  A.   Yes.
18  Q.   Who paid for your flight to attend this
19  deposition?
20  A.   I did.  But the -- I will be reimbursed by our
21  lawyers.
22  Q.   Do you have an agreement with your lawyers
23  concerning your costs in acting as a class
24  representative and lead plaintiff in this case?
25  A.   Strictly verbal.

Page 60

1   Q.   Okay.  Can you discuss the details of that
2   verbal agreement?
3   A.   Yeah.  I -- I am being paid nothing, zero.
4   And -- and whatever expenses I incur when
5   needed -- when they need me, they will pay for it.
6   Q.   Do you know who your attorneys are in this
7   case?
8   A.   I know Elizabeth.
9   Q.   Okay.  What firm is she with?
10  A.   She's with Todd Collins, and the name of
11  the -- I'm not familiar with the name of the firm.
12  Q.   And how did you choose your attorneys in this
13  case?
14  A.   They were -- they were already attorneys
15  on -- they were -- they already had the class action
16  when I -- when I joined them.
17  Q.   Do you have a fee arrangement with your
18  attorneys in this case?
19  A.   No.
20  Q.   Do you have any understanding that's -- your
21  attorneys will obtain some sort of contingency fee if
22  you win this lawsuit?
23  A.   Sure.
24  Q.   Do you know what that percentage will be?
25  A.   No.

Page 61

1          MS. FOX:  Object to the form.  Sorry.  He
2   hasn't testified -- you can't ask what percentage if
3   you didn't establish that there was a percentage.  He
4   doesn't know anyway, so...
5   Q.   (By Mr. Ahart)  Do you know how much your
6   attorneys bill per hour?
7   A.   No.
8   Q.   Can you tell me how many times that you've
9   physically met with your attorneys to date in this
10  case?
11  A.   This is it.
12  Q.   How often do you speak with your attorneys,
13  say, over the phone or by written communication about
14  the status of this lawsuit?
15  A.   Over the period of six years, maybe four times
16  with -- Elizabeth would be the third attorney that's
17  contacted me.  Juli being the first, Todd Collins and
18  now Juli.  Or Elizabeth, excuse me.
19  Q.   Who makes the strategy calls for pursuing this
20  case?
21  A.   The attorneys.
22  Q.   If you disagree with an attorney's decision
23  about how to handle a specific aspect of the case, what
24  would you do?
25  A.   I would contact Juli and -- and review it with

16 (Pages 58 to 61)

TODD TONORE                           2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

---

Page 62

1    her.
2        Q.   If push came to shove, would you defer to the
3    attorney's judgment or would you make the call on what
4    to do?
5        A.   I would defer to their judgment.
6        Q.   Have you discussed the strengths and
7    weaknesses of your case in this particular lawsuit with
8    any of your attorneys?
9        A.   Only this morning.  I --
10           MS. FOX:  Don't -- don't tell what you
11   discussed, just that you have discussed it.
12           THE WITNESS:  Yes, I have discussed it.
13       Q.   (By Mr. Ahart)  Do you know whether a
14   settlement offer has been made in this case?
15       A.   I'm not aware of one.
16       Q.   Have you discussed the prospects of a possible
17   settlement with your lawyers?
18       A.   No.
19       Q.   Who do you believe is responsible for actively
20   managing and controlling this litigation?
21       A.   The attorneys.
22       Q.   Have you had contact with any other attorneys
23   other than the ones that you discussed today regarding
24   this particular case?
25       A.   Only my family lawyer when I chose to join the

---

Page 63

1    case.  I was advised to join the case, the class.
2        Q.   Have you agreed to reimburse your attorneys
3    for any costs in this case, regardless of the outcome
4    of the lawsuit?
5        A.   No.
6        Q.   Do you have any knowledge of what costs are
7    involved in this case beyond what we've discussed such
8    as class notice costs or reporter costs or anything
9    like that?
10       A.   No.
11       Q.   Do you know what the magnitude of these costs
12   might be in thousands or tens of thousands of dollars?
13       A.   No idea.
14       Q.   Have you taken any steps to manage the costs
15   incurred in this lawsuit?
16       A.   No.
17       Q.   Have you reviewed any monthly time and expense
18   reports prepared by your lawyers?
19       A.   No.
20       Q.   Do you know whether defendants could seek to
21   recover these costs of a lawsuit from you alone if they
22   win?
23       A.   Repeat that again.
24       Q.   Do you know whether defendants could seek to
25   recover their costs in this lawsuit from you alone if

---

Page 64

1    they win this case?
2        A.   No.
3        Q.   If they could, would you be able to pay
4    defendants' costs?
5        A.   No.
6        Q.   Let's move on to a different aspect of the
7    case.  Did you review the court's order on the
8    defendants' motion to dismiss?
9        A.   Repeat that.
10       Q.   Did you review the court's order, which was
11   ruling on the defendants' motion to dismiss that was
12   filed a few years ago?
13           MS. FOX:  Again, it calls for
14   understanding of the legal terms here.
15           THE WITNESS:  No, I did not.
16       Q.   (By Mr. Ahart)  So do you have any idea about
17   which parts of the plaintiffs' complaint were dismissed
18   by the court when it ruled on the defendants' motion to
19   dismiss?
20           MS. FOX:  What court are you referring
21   to?
22           MR. AHART:  Well, the district court.
23           MS. FOX:  Again, it calls for a legal
24   conclusion.
25           THE WITNESS:  Yeah.  No knowledge.

---

Page 65

1        Q.   (By Mr. Ahart)  No knowledge?
2        A.   No knowledge.
3        Q.   Okay.  What about the third circuit, the
4    appeals court?
5        A.   Repeat the full question.  You've -- you've
6    confused me with terms, with legal terms.
7        Q.   Okay.  I'm sorry.  I'll try to explain it.
8        A.   Okay.
9        Q.   Defendants filed a motion to dismiss, which is
10   a basis to dismiss the complaint.
11       A.   The defendant being Adams Golf.
12       Q.   Adams Golf.
13       A.   Okay.
14       Q.   And the other defendants.
15       A.   Okay.
16       Q.   Because defendants claim that the complaint
17   was deficient for one reason or another.  And the
18   district court ruled on that.
19       A.   Right.
20       Q.   And then it was appealed.
21       A.   Right.
22       Q.   And then the third circuit ruled on that.
23       A.   Right.
24       Q.   Do you know what claims in your -- in the
25   plaintiffs' complaint, the consolidated complaint, were

---

17 (Pages 62 to 65)

TODD TONORE                                    2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 66

1  dismissed by either the district court or Third Circuit
2  Court of Appeals?
3  A.  No.
4  Q.  Okay.  Did you ever review the Third Circuit
5  Court of Appeals order in this case?
6  A.  No.
7  Q.  Okay.  Let's go back to Exhibit 27, which is
8  the documents that you -- or the document that you had
9  with you, and it's -- with the green sticker there at
10  the top.
11  A.  Okay.
12  Q.  And just so we know that the information in
13  here is correct and we don't need any further
14  clarification, can you confirm that all the information
15  in this document is in fact correct?
16  A.  Yes.
17  Q.  Okay.  Let's move on now to Defendant's
18  Exhibit 5.  I'll provide you with a copy, here we go.
19  Please take a moment or two to review the document.
20          (Defendant's Exhibit No. 5 marked)
21  A.  (Brief pause)  Okay.
22          MS. FOX:  Take a look all the way
23  through, at least through page 5.
24          THE WITNESS:  (Brief pause)
25          MS. FOX:  Just skip that and go to

Page 67

1  page 5.
2          THE WITNESS:  Go to page 5.  I'm sorry.
3  Okay.
4  Q.  (By Mr. Ahart)  Have you ever seen that
5  document before?
6  A.  Yes.  It was sent to me by Elizabeth a month
7  ago.
8  Q.  Okay.  Have you produced any documents in
9  response to this document?
10  A.  No, only -- I did not -- I did not have any
11  document remaining from eight years ago.  I had a house
12  fire, and what documentation I had I no longer have.
13  Q.  So the only copies you had were in the house?
14  A.  Right.
15  Q.  And they were destroyed in the fire?
16  A.  Right.
17  Q.  Can you tell us what kind of documents that
18  you did have that were destroyed?
19  A.  Only documents that would back up the document
20  that I gave you showing my buy and trade, my by/sell
21  documentation.
22  Q.  So it was just the stock transactions?
23  A.  Right.
24  Q.  You didn't have any newspaper articles or
25  clippings or a copy of the prospectus or anything like

Page 68

1  that?
2  A.  No, I didn't keep it.  Most all of that I've
3  accumulated through the Internet.
4  Q.  Did you bring any additional documents,
5  responsive documents with you today?
6  A.  No.
7  Q.  Can you talk about the process that you went
8  through to gather responsive documents for this
9  request?
10  A.  None, because I had none.
11  Q.  Okay.  But if your stock records were
12  destroyed, did you contact your broker?
13  A.  Yes.
14  Q.  And get a new record?
15  A.  Yes.  I contacted my broker, and he was going
16  to provide me with -- with records.  And then I
17  contacted Elizabeth and she already had them from back
18  when I submitted them back in -- in -- six years ago.
19  Q.  Okay.
20  A.  And that's what you have a copy of here.  So
21  he couldn't provide me with anything other than that.
22  Q.  Did you contact anyone else other than your
23  broker about trying to gather some responsive documents
24  for these requests?
25  A.  No.

Page 69

1  Q.  Did you turn over any other complaints of any
2  other lawsuits that you might have been a party to or
3  somehow a part of?
4  A.  No.
5  Q.  Have you ever been a part of any other
6  litigation?
7  A.  Only as a witness one -- one other time.
8  Q.  Can you talk about that case?
9  A.  Yeah.  When my house burnt down, I had bought
10  a golf cart -- a new golf cart, brought it home,
11  plugged it in to my garage, and a few minutes later my
12  house burnt down.  So I -- my insurance company State
13  Farm sued the golf cart manufacturer and I
14  was -- when they -- I was with State Farm as a witness
15  against the golf cart manufacturer.
16  Q.  Okay.  And you testified as a witness for
17  State Farm?
18  A.  Exactly.
19  Q.  Okay.
20  A.  So they could recoup the money that they had
21  paid me.
22  Q.  Were they successful?
23  A.  No.
24  Q.  Okay.  Let's move on to Defendant's
25  Exhibit 28.  This is a new exhibit.

18 (Pages 66 to 69)

TODD TONORE                    2/25/2005     IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 78

1   price of the product was driven down so fast that there
2   were a lot of -- the club I was a member of, I can
3   distinctly remember the head professional telling me
4   that they're selling the clubs at Costco for 30 percent
5   less than what I had to pay for them for Adams Golf.
6      Q.  Mm-hmm.
7      A.  So he would -- they -- he was stuck.
8      Q.  Do you know if gray marketing issues are
9   limited to the golf industry?
10     A.  No.  I know they're not limited to the golfing
11  industry.  I'm sure they're in -- in many other
12  industries.  You know, I've -- you know, you go to any
13  foreign country, which I do, you see products being
14  duplicated and -- and sold back into this country.
15     Q.  Okay.  Do you think that gray marketing also
16  encompasses, like you said, duplicate clubs or do you
17  think that's a different issue?
18     A.  It could.  It could mean duplication of clubs
19  or it -- it could mean maybe someone just getting ahold
20  of a large number of clubs and being able to get -- to
21  supply a major chain.
22     Q.  Do you know -- go ahead.  I'm sorry.
23     A.  I don't believe -- I don't believe -- you
24  know, honestly, I don't believe that as a manufacturer,
25  because I'm in the manufacturing business, I know where

Page 79

1   my products go.  I think they knew who bought the
2   products.  And when you -- when I sell a large volume
3   of products, not only do I know where they go, I know
4   where they're going to wind up.
5      Q.  How do you know that?
6      A.  Just from knowing my customers and knowing the
7   people I sell to.  It's just business 101.  I mean, you
8   know, you -- you know where you're -- you have
9   knowledge of -- if you don't know that, you shouldn't
10  sell them.  If you have no -- if you're going to lose
11  control of your product anywhere in the -- in the -- in
12  the chain from manufacture to customer, you shouldn't
13  sell it if you're going to lose complete control of
14  it.
15     Q.  Do you know at the time of the IPO in 1998 if
16  there were any other golf companies that were affected
17  by gray marketing?
18     A.  Not that I know of.
19     Q.  Have you ever experienced any gray marketing
20  in your own business?
21     A.  No.
22     Q.  So there are no retailers that get ahold of
23  the products that your company sells that shouldn't
24  have them?
25     A.  No.  We sell directly to manufacture -- to

Page 80

1   people that would actually field the products, so, no,
2   it's...
3      Q.  Is it possible that someone who is
4   unauthorized to get ahold of your products could get
5   them?
6      A.  Well, the products we make are all custom.
7   They're all printed with custom logos, so -- so, no,
8   we're not selling a brand.  We're not -- we don't have
9   our own brand that we're selling.  We're -- everything
10  we do is custom.
11     Q.  Okay.  Why did you first decide to invest in
12  Adams Golf during the IPO?
13     A.  I was playing with the product.  It -- it --
14  still today I believe that it's a great product.
15  People that I was surrounded around in the golf
16  industry swore by the product.  Everything I read was
17  positive.  The company had tremendous sales, very
18  little debt.  I had no reason not to buy the product or
19  the stock.
20     Q.  Okay.  Let's go back to Exhibit 27, which is
21  one of the first exhibits that we went through.  You
22  have it right there.
23     A.  Okay.
24     Q.  And let's look at the second page, which is
25  Bates labeled TT 2.

Page 81

1      A.  I don't know whether I have that.  Is that...
2   Okay, my -- yeah, my stock trades.  Okay.
3      Q.  Okay.  Could you take a minute to review the
4   information on this page and confirm for the record
5   that these in fact are your trading records in Adams
6   Golf stock at that time?
7      A.  That's correct.
8      Q.  The records indicate that you purchased 500
9   shares on July the 10th, 1998.  And then an additional
10  number of shares up through January the 8th, 1999.  I
11  could read them out for the record if you want to.
12     A.  That's okay.
13     Q.  But if you trust my math, it adds up to 5,700
14  shares?
15     A.  Sure.  Yeah.
16     Q.  Do you know how many shares you purchased
17  after the company first issued a press release about
18  the gray marketing problems?
19     A.  I'm not -- I'm not quite sure.  I know I did
20  purchase some as the stock began to fall at -- at the
21  advice of my broker in order to -- what -- the term
22  they use is dollar cost average.
23     Q.  Okay.  Can you describe for us what that means
24  exactly?
25     A.  Well, it means if you bought a thousand

TODD TONORE                    2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 82

1  at -- at 18, and then the stock fell to -- to 16, you
2  buy another thousand, your average cost is 17. You
3  just bring your average cost down so as the stock
4  falls, you can continue to buy it to get your average
5  cost down.
6    Q.  Okay. But you would do this despite the fact
7  the company had issued this negative information about
8  its results?
9    A.  Well, once -- once the negative information
10 was released, the company remained positive in the fact
11 that they continued to advertise, they continued
12 to -- they didn't admit necessarily that -- that their
13 business was going to suffer because of it. They
14 continued to do the things, business as normal.
15   Q.  Mm-hmm.
16   A.  And when I contacted the company direct,
17 that's basically the answer I received back. You know,
18 we're continuing to grow, we're -- we still have very
19 little debt. Our sales continue to be strong and...
20 And the -- and honestly, the people that I was -- when
21 I was using the product, people that I was playing golf
22 with, they continued to use it. It was a good product.
23 I didn't see the product going away and it still hasn't
24 gone away. It was a good product. It's a good
25 product.

Page 83

1    Q.  Okay. On June 10th, 1999, you sold 2,040
2  shares. Why did you sell those shares?
3          MS. FOX:  I think that's January. Am I
4  wrong?
5          MS. REED:  July 10th.
6          MS. FOX:  Oh, no. June. I'm sorry.
7          THE WITNESS:  Where are you looking at
8  there?
9    Q.  (By Mr. Ahart)  The last entry there.
10   A.  Right.
11   Q.  6/10/99, you sold 2,040 shares. Why did you
12 at that time decide to go ahead and sell at least a
13 portion of your holdings?
14   A.  Financial reasons. I had -- I don't know
15 if -- I had had some of these stocks on margin, and I
16 had margin calls that I was forced to pay. So I
17 had -- I reached a point where I just couldn't go any
18 further. I -- I cut my losses and went and borrowed
19 money and paid off my margin calls.
20   Q.  Do you still have shares in Adams Golf stock
21 at this time?
22   A.  No.
23   Q.  Okay. If we needed the records, could you
24 provide us with the records of the additional sales
25 until you finally exhausted your portfolio of Adams

Page 84

1  Golf stock?
2    A.  That's it right there. That's when I
3  exhausted it 6/10/99.
4    Q.  Well, but I could -- I mean, I may have made a
5  mistake, but I believe that there were 6,200 shares
6  purchased in total, and that last transaction only
7  shows two 2,040 shares being sold.
8    A.  I'm not aware. I mean, this was the only
9  report that I -- that I received.
10   Q.  Could you contact --
11   A.  I was buying -- as you can see, in a six-month
12 period I was buying it. I can contact them, I'm not
13 sure what success I would have getting documentation
14 from Edward Jones that dates back to '98 or '99.
15   Q.  Okay. But if we --
16   A.  I'll try, yeah.
17   Q.  If we asked you to, you could see if you could
18 get the records?
19   A.  I'll make the call, yes.
20   Q.  And for the purchases that did not occur
21 during the IPO, which would in this case be all of
22 them --
23   A.  Right.
24   Q.  Will you be able to trace these purchases back
25 to the IPO?

Page 85

1          MS. FOX:  Again, I object to the form.
2  It's a -- calls for a legal conclusion. And it
3  isn't -- it's an issue that's not settled by the
4  courts, so it's particularly confusing to him.
5    Q.  (By Mr. Ahart)  You can still answer the
6  question.
7    A.  I don't understand the question.
8    Q.  Okay.
9    A.  To be honest with you.
10   Q.  Okay. At any time before you actually
11 purchased the shares, did you ever review any of the
12 documents that were issued by Adams Golf such as any
13 SEC filings or press releases or the prospectus that we
14 reviewed earlier?
15   A.  Just press releases that were on the Internet
16 through my brokerage company and through the Adams Golf
17 Web site.
18         MS. FOX:  Well, now, this is before you
19 purchased the shares. Were you following it before?
20         THE WITNESS:  Before I actually -- yeah.
21 I mean, I went and looked at the financials before I
22 actually bought the first 500.
23   Q.  (By Mr. Ahart)  Mm-hmm. Okay.
24   A.  And everything looked in place. I mean, they
25 had very little debt and they had high sales and there

22 (Pages 82 to 85)

512-320-0185                    RLS LEGAL SOLUTIONS                    512-391-0269

TODD TONORE                              2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 86

1   was no mention where I was looking of any upcoming or
2   existing problems.
3       Q.   Okay.
4       A.   It seemed to me that I was dealing with a
5   company that couldn't fail. Everything was in place.
6       Q.   Did you ever read any analyst reports on the
7   golf industry?
8       A.   No.
9       Q.   Did you ever read any analyst reports that
10  were specifically discussing Adams Golf?
11      A.   Again, only what was provided to me through
12  Edward Jones, which I -- I would think would come from
13  their stock analysts.
14      Q.   Could you estimate for us roughly what
15  percentage of your total securities holdings comprised
16  the Adams Golf portion of your portfolio?
17      MS. FOX:   At what period of time?
18      Q.   (By Mr. Ahart) At 1998.
19      A.   In 1998, approximately 30 percent.
20      Q.   Okay. Do you know what stock exchange that
21  Adams Golf's shares were traded on at the time of the
22  IPO?
23      A.   Yeah, it's -- it's NASDAQ.
24      Q.   Okay. What is your understanding of how stock
25  prices are determined for a stock that's traded on this

Page 87

1   exchange?
2       A.   Based on -- at the time of IPO?
3       Q.   Just in general.
4       A.   At the time of IPO, in general I would -- I
5   think it's based on financials that had been submitted
6   to the -- whether that would be the SEC, and I don't
7   think you can present false information when you're
8   taking a company public. I've never been involved with
9   taking a company public, so I really don't -- I don't
10  know, to be honest with you. But I would think
11  whatever you submit would have to be truthful and to
12  the best of your knowledge.
13      Q.   But assuming that these financials are
14  truthful, do you think that these financial figures are
15  factored into the -- the eventual price of the stock
16  that it's traded on the exchange?
17      A.   I would -- I would imagine current financials
18  and projections and things of that nature would, yes,
19  affect the price of the -- of the stock at the time of
20  the initial public offering.
21      Q.   Do you believe that --
22      A.   Demand. Demand also.
23      Q.   Do you believe that the other information is
24  reflected in the company's stock price?
25      MS. FOX:   Well, I -- that's vague. I

Page 88

1   don't understand what you're --
2       THE WITNESS:   As a -- give me an example.
3       Q.   (By Mr. Ahart) I'm sorry. Other information
4   outside of just financial statement numbers.
5       MS. FOX:   And you're talking about the
6   stock price at the time of the IPO or later on?
7       Q.   (By Mr. Ahart) We could -- we could limit it
8   to the time of the IPO, but this would just be sort of
9   a general discussion of how you think the stock price
10  was --
11      A.   Oh, yeah, I think there are other things that
12  they look at. I mean, they look at ownership, they
13  look at directors. They look at past history of
14  those -- these guys, track records. Health. I mean, I
15  wouldn't have bought stock in Barney -- in Barney's
16  company if I felt like he was going to die next year.
17  I mean, so, yeah, I think there's other things that
18  people look at when they go to invest in a company.
19      Q.   If new information comes out on a company, how
20  quickly do you think that information is
21  assimilated into the stock price on the exchange?
22      MS. FOX:   Do you understand what that
23  means?
24      THE WITNESS:   I think very quickly.
25  Especially the larger the company. There's a -- well,

Page 89

1   you know, I watched -- during that period I watched
2   CNBC an awful lot and they -- and they -- you know,
3   when news -- they would break news.
4       Q.   Do you think this information would affect
5   your decision or influence your decision to invest in a
6   particular stock?
7       MS. FOX:   When you say this information,
8   what do you mean?
9       MR. AHART:   Well, the information that,
10  you know, is broken on CNBC or new information that's
11  released by a company.
12      MS. FOX:   That's so vague, I -- I just
13  think that --
14      THE WITNESS:   Yeah, I mean, it just
15  depends on, you know; what it is and who we're talking
16  about, really. I mean, it -- you know, they have
17  positive information all -- every day all day on that
18  show, and I don't buy all those stocks. So that's not
19  why I bought their stock.
20      Q.   (By Mr. Ahart) What if there was negative
21  information about a company, would that influence your
22  decision?
23      A.   Yes. Most definitely.
24      Q.   Do you think that market factors in general
25  affect a company's stock price like global or

23 (Pages 86 to 89)

TODD TONORE                                    2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 94

1    Q.   Basically you can't pay your debts.
2    A.   No.
3    Q.   Do you have any personal family or business
4    relationship with your attorneys apart from your
5    relationship in this suit?
6    A.   No.
7    Q.   Aside from being a shareholder, do you have
8    any relationship with the defendant Adams Golf?
9    A.   No.
10       MS. FOX:  Well, I think he has talked
11   about owning Tight Lies.
12       THE WITNESS:  Yeah, other than -- than
13   using the product, no, I don't -- I don't know anyone
14   there.  I thought that was...
15   Q.   (By Mr. Ahart)  Okay, here's our last exhibit
16   and I'm going to hand you what has been previously
17   marked as Defendant's Exhibit 12.  And this one is
18   fairly long, so please feel free to flip through it a
19   little bit if you'd like.
20   A.   What is this in layman's terms?
21       MS. FOX:  This is the motion we met -- we
22   made to form the class and it's the motion that you are
23   now giving evidence about.  This is the memorandum of
24   law in support of that motion, which is obviously a
25   legal document.

Page 95

1        THE WITNESS:  Right.  Okay.
2    This -- I've -- I've never seen this.
3    Q.   (By Mr. Ahart)  So you've never seen it before?
4    A.   No.
5    Q.   Can you tell us what it is, other than what
6    your attorney just told you?
7    A.   No.
8    Q.   Okay.  So you didn't help draft or write
9    anything in the document?
10   A.   No, sir.
11   Q.   You didn't make any revisions to it?
12   A.   No.
13   Q.   And I guess you didn't review it before it was
14   filed with the court or served on other parties?
15   A.   No.
16   Q.   Okay.  Well, at this time I'm going to kind of
17   review my notes and make sure that I don't have any
18   followup questions, but in the meantime I'm going to
19   let Mr. McEvoy here ask you a couple of questions.
20   A.   Okay.  Sure.
21       FURTHER EXAMINATION
22   BY MR. McEVOY:
23   Q.   Okay.  Good afternoon, Mr. Tonore.  Thank you
24   for your time so far, and I intend to be as brief as
25   possible.

Page 96

1    A.   Okay.
2    Q.   I don't mean to cover any ground that you've
3    already covered.
4    A.   Right.
5    Q.   But as I noted before, I'm from Simpson,
6    Thacher & Bartlett and I represent the underwriter
7    defendants in this case.  I just wanted to go through
8    briefly and touch on a couple of points.
9        Now, I believe you said earlier that
10   you understand that Lehman Brothers is an underwriter
11   defendant in this case.  Is that right?
12   A.   I've seen that name.  I don't know.  Is
13   that -- where have I seen that name?  I have just seen
14   it in some documentation, but I'm...
15   Q.   Have you ever had any communications with
16   anybody who works at Lehman Brothers?
17   A.   No.
18   Q.   Okay.  None whatsoever?
19   A.   None.
20   Q.   Going back to the time of the IPO?
21   A.   No.
22   Q.   Any communications with anyone at Bank of
23   America Securities, L.L.C?
24   A.   No.
25   Q.   Okay.  Any communications with anybody at

Page 97

1    Nations Bank Montgomery Securities, L.L.C.?
2    A.   No.
3    Q.   And any communications with anyone at Ferris,
4    Baker, Watts, Incorporated?
5    A.   No.
6    Q.   Okay.  Can you tell me briefly what your
7    understanding is of the role of an underwriter in
8    connection with an initial public offering?
9    A.   I've never done one myself, but I would -- I
10   would assume that your role would be as an underwriter
11   to take the information that's provided to you and
12   assist the company in taking their -- their company
13   public.
14   Q.   Can you tell me briefly in your own words what
15   it is that you allege the underwriters did wrong in
16   this case?
17   A.   Only if the underwriters -- repeat that again
18   now, what did the underwriters do wrong, basically?
19   Q.   Yeah.
20   A.   Okay, I'm --
21   Q.   I'm sorry.  Can you read the question back?
22   I'm sorry.
23       (The record was read as requested.)
24       THE WITNESS:  In my own words, the
25   underwriters may have done nothing wrong in this case

25 (Pages 94 to 97)

TODD TONORE                           2/25/2005   IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 106

1 Montague?
2          MS. FOX:  I think Juli Desper in that
3 firm.
4          THE WITNESS:  Yeah.  In regard to fees?
5 Is that what the question is in regard to?
6      Q.  (By Mr. McElvoy)  Well, I would like to -- I
7 would like to ask you if you signed a retention
8 agreement, but I'm not sure if that's -- do you
9 understand what a retention agreement is?
10     A.  I don't know what a retention agreement is.
11     Q.  Okay.  Have you signed any sort of piece of
12 paper which sets forth any of the terms of the
13 representation with any law firm in connection with
14 this case?
15     A.  Only other than signing some documentation
16 when I joined the class, but I'm not -- to be honest
17 with you, I don't know what that documentation said or
18 really what it was.
19     Q.  Okay.  Have you given a copy of -- well,
20 strike that.  The documentation that you signed when
21 you joined the class, is that this Exhibit 27 or is
22 that something else?
23     A.  No, this was -- I joined the class six years
24 ago.
25     Q.  Right.

Page 107

1      A.  I signed this a month ago.
2          MS. FOX:  No, no.
3          THE WITNESS:  Is this --
4          MS. FOX:  You signed that on the 8th day
5 of July.
6          THE WITNESS:  Oh, okay.  I've got you.
7 Of '99.  But didn't I sign something like this a month
8 ago?
9          MS. FOX:  You did.
10         THE WITNESS:  Okay, I signed something
11 very close to this a month ago.  Yes, I did sign this
12 back in '99.
13     Q.  (By Mr. McElvoy)  Okay.  So would you say --
14     A.  I didn't notice the date there, but she's
15 correct.
16     Q.  Okay.  So when you say the piece of paper that
17 you signed in connection with joining the class, that
18 would be this -- this document that's here, Exhibit 27?
19     A.  Right.
20         MS. FOX:  I'll object to the form.
21     Q.  (By Mr. McElvoy)  To the best of your
22 recollection?
23     A.  That's the best of my recollection.
24         MR. McEVOY:  And can I just ask counsel,
25 the document that he signed a month ago, is that

Page 108

1 something --
2          MS. FOX:  Yeah, he -- what he did was he
3 signed the answers to interrogatories and I do have his
4 signature there, but then as I explained to you
5 before -- can we go off the record?
6          (Discussion off the record)
7      Q.  (By Mr. McEvoy)  Mr. Tonore, have you had any
8 discussions -- and I apologize if this has been asked
9 before in some other form.  Have you had any
10 discussions with anyone other than your lawyers about
11 this lawsuit?
12     A.  Only discussions I've had is with my family
13 lawyer, and again he advised me that it would be too
14 costly for me personally to pursue a suit against
15 Barney Adams directly, that I should join the -- the
16 class that's already been established.  And that's the
17 only discussions I've had.
18     Q.  But other than lawyers, family lawyer
19 included, have you discussed the case with anyone else?
20     A.  No, not the case.
21     Q.  And again I apologize because I think this
22 was -- might have been touched on before, but is it
23 your understanding that today you don't own any stock
24 in Adams Golf?
25     A.  That's correct.

Page 109

1      Q.  Okay.  And I know this has been asked, but I
2 would request on behalf of the underwriters that you
3 and your counsel could secure the records that would
4 show the sales of the stock, because what we have here
5 on Exhibit 27 doesn't seem to account for all of the
6 shares.  And I'm just making that request on the
7 underwriter's behalf so that the record is clear.
8      A.  Mm-hmm.
9      Q.  I believe you said -- I believe you testified
10 earlier that the golf pro at the country club that you
11 are a member of said to you that golf clubs were being
12 sold at Costco at around 30 percent less than what he
13 was paying for them.  Was that correct?
14     A.  That's a correct statement.
15     Q.  Okay.  Do you know the name of the golf pro
16 that you were speaking to?
17     A.  Back at that time that would be -- what was
18 that guy's name?  We've had so many pros at our club.
19 Junior Salinas, I believe.
20     Q.  What's the name of the club?
21     A.  Walnut Creek Country Club.
22     Q.  And you would have had this conversation back
23 in what year?
24     A.  Back during the time -- back in what,
25 '90 -- sometime in '99.

28 (Pages 106 to 109)

TODD TONORE                    2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 110

1    Q.   Now, did you have an agreement with A. G.
2    Edwards whereby they were authorized to buy stock for
3    you?
4         MS. FOX:  I would object to the form.  I
5    don't think there's any evidence that A. G. Edwards was
6    involved at the early -- here, like A. G. Edwards
7    turned into Edward Jones.  Or Edward Jones turned into
8    A. G. Edwards.
9         THE WITNESS:  Yeah, Edward Jones.  Yeah,
10   when I -- if I've referred to A. G. Edwards, I meant
11   Edward Jones.
12   Q.   (By Mr. McElvoy)  I think that was my mistake.
13   A.   Okay.
14   Q.   Let me rephrase the question.  Strike the
15   earlier one.
16   A.   Yeah.
17   Q.   Now, did you have an agreement with Edward
18   Jones whereby they were authorized to buy stock on your
19   behalf?
20   A.   Only with my permission.
21   Q.   Okay.  So did Edward Jones or someone from
22   Edward Jones consult with you prior to the IPO and ask
23   you whether you wanted to invest in the stock?
24   A.   No.  I made that decision on my own.
25   Q.   Okay.  So you told Edward Jones to purchase

Page 111

1    the initial --
2    A.   Right.
3    Q.   -- stock on your behalf?
4    A.   Right.
5    Q.   Other than the e-mail that you sent to Adams
6    Golf that we discussed earlier, have you had any
7    communications with anyone at Adams Golf about this
8    stock offering?
9    A.   No, I have not.
10        MR. McEVOY:  Okay, that's all I have at
11   this time.  Thank you very much.
12        THE WITNESS:  All right.
13        MS. FOX:  Do you have more?
14        MR. AHART:  We don't have any further
15   questions.
16        MS. FOX:  Okay, I have a couple of
17   questions.
18        FURTHER EXAMINATION
19   BY MS. FOX:
20   Q.   Do you sometimes get confused by legal terms?
21   A.   No doubt.  I'm not a lawyer, so, yes.  I get
22   confused when you say plaintiffs and defendants, not
23   being a lawyer, not being -- using those terms on a
24   daily basis, yes.  I do get confused.
25   Q.   Do you know what the term "interrogatory"

Page 112

1    means?
2    A.   Not really.
3    Q.   Do you understand what's meant by the term
4    "class period"?
5    A.   No.
6    Q.   Do you have an understanding of which persons
7    would be part of this class, when they would have
8    bought their stock?  Think about it.
9    A.   Now, repeat that.  Do I have a --
10   Q.   Do you have an understanding of when the
11   persons who are members of this class, which would
12   include you --
13   A.   Right.
14   Q.   -- bought their stock?  What period of time?
15   A.   Including myself, yes, it would have been from
16   the time of the IPO to 20 something days afterward, are
17   a member of the class that I'm a member of.
18   Q.   When you use the term e-mail, do you mean
19   something slightly different?
20   A.   Yes, I mean -- when I refer to -- the only
21   time e-mail occurred was when I e-mailed Adams Golf
22   directly.  If I've used that term in -- in another
23   form, I meant going to -- just going to a Web page
24   or -- and basically just researching information.
25        MS. FOX:  That's all the questions I

Page 113

1    have.  Thanks.
2         THE WITNESS:  Okay.
3         MR. AHART:  Okay.  We have no further
4    questions.  Thank you for your time.
5         (Deposition closed at 12:40 p.m.)

29 (Pages 110 to 113)

## ADAMS GOLF, INC.
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAW

Todd Tonore ("Plaintiff"), duly swears and says, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint filed on behalf of Mark J. Lantz against Adams Golf, Inc. and its officers and directors, I approve of its contents, and I authorize a similar Compliant to be filed on my behalf.

2. I did not purchase the security that is the subject of this action at the direction of my counsel or in order to participate in this private action.

3. I am willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transactions in the securities of Adams Golf, Inc.

| Shares Purchased | Date of Purchase | Price Per Share |
|---|---|---|
| | *SEE ATTACHED* | |

| Shares Sold | Date of Sale | Price Per Share |
|---|---|---|
| | *SEE ATTACHED* | |

5. I have not sought to serve as a class representative in any other action filed under the United States federal securities laws in the past three (3) preceding the date on which this certification is signed, except as listed below.

6. I have not and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United states that the foregoing is true and correct. Executed this _18_ day of _JULY_, 1999, at _3:20 PM_ _CENTRAL DAYLIGHT TIME_.

By: _____

PRINT NAME: _TODD TONORE_

\\KELLER\SYS\CLIENTS\24450\1\CLASS\TR070899.DOC

KELLER ROHRBACK L L P
SUITE 3200
1201 THIRD AVENUE
SEATTLE, WASHINGTON 98101-3052
(206) 623-1900

TT 1

# Edward Jones

AUTOMATED BROKER'S BOOK
ACTIVITY FOR ACCOUNT SEQUENCED BY PRODUCT

07/07/99

| | |
|---|---|
| IR: 146906 | Acct: 145-03859    SINGLE |
| Name: TONORE, TODD M | Occupation: MANAGER/SUPERVISOR |
| Phone: HOME    - - | Acct Codes: H H H H H  Sweeper: OFF |
| WORK P 817-453-8400 | Inv Obj: GRW GRWI AGR |

Product

| Date | Activity | Qty In | Qty Out | Unit Price | Orig Cost | Y-T-M | Acc Int | Orig IR |
|---|---|---|---|---|---|---|---|---|
| ADAMS GOLF INC COM | | | | | Cusip=006228100 | | Symbol=ADGO | |
| 07/10/98 | BOUGHT | 500.0000 | | 18 5/8 | 9469.23 | | | |
| | Notes: P 70 | | | | | | | |
| 07/27/98 | BOUGHT | 750.0000 | | 12 1/2 | 9617.33 | | | |
| 08/07/98 | BOUGHT | 1000.0000 | | 9 7/8 | 10143.58 | | | |
| 08/18/98 | BOUGHT | 750.0000 | | 9 1/4 | 7102.70 | | | |
| | Notes: P 80 | | | | | | | |
| 08/24/98 | BOUGHT | 1000.0000 | | 7 1/8 | 7352.33 | | | |
| 08/28/98 | BOUGHT | 1000.0000 | | 6 1/4 | 6464.20 | | | |
| 09/11/98 | BOUGHT | 500.0000 | | 5.0000 | 2607.95 | | | |
| 01/08/99 | BOUGHT | 700.0000 | | 3 1/2 | 2571.95 | | | |
| 06/10/99 | SOLD | | 2040.0000 | 3 1/32 | 6180.59 | | | |
| AMPEX CORP DEL CL A | | | | | Cusip=032092108 | | Symbol=AXC | |
| 05/10/96 | BOUGHT | 1000.0000 | | 11 1/8 | 11409.51 | | | |
| 05/22/96 | BOUGHT | 200.0000 | | 11 5/8 | 2406.95 | | | |
| 05/28/96 | SOLD | | 1200.0000 | 13 1/8 | 15392.14 | | | |
| 06/10/96 | BOUGHT | 1000.0000 | | 12 1/8 | 12422.01 | | | |
| 06/19/96 | BOUGHT | 1000.0000 | | 9 13/16 | 10040.44 | | | |
| | Notes: P 85 | | | | | | | |
| 07/10/96 | BOUGHT | 1000.0000 | | 7 13/16 | 8026.67 | | | |
| | Notes: P 90 | | | | | | | |
| 07/11/96 | BOUGHT | 1000.0000 | | 7.0000 | 7225.45 | | | |
| 07/24/96 | BOUGHT | 1000.0000 | | 6 7/16 | 6654.51 | | | |
| 10/21/96 | BOUGHT | 1000.0000 | | 6 7/16 | 6590.29 | | | |
| | Notes: P 70 | | | | | | | |
| 11/21/96 | SOLD | | 6000.0000 | 8 1/2 | 50185.75 | | | |
| | Notes: P 80 | | | | | | | |
| ASTRA AB ADR (SPONSORED) REPR CL A ORD | | | | | Cusip=046298105 | | Symbol=A | |
| 11/13/97 | BOUGHT | 1000.0000 | | 16 1/2 | 16781.95 | | | |
| | Notes: P 80 | | | | | | | |
| 12/09/97 | SOLD | | 1000.0000 | 17 15/16 | 17567.23 | | | |
| BANC ONE CORP COM | | | | | Cusip=059438101 | | Symbol= | |
| (See Also BANK ONE CORP & FIRST BANC GROUP OHIO INC ) | | | | | | | | |
| 03/08/96 | SOLD | | 69.0000 | 35 1/2 | 2377.46 | | | |

PAGE 1

INTERNAL USE ONLY - DO NOT DISTRIBUTE TO THE PUBLIC
PROPERTY OF EDWARD JONES