11

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF DELAWARE

 2

 3

 4   IN RE:  ADAMS GOLF,        CIVIL ACTION NO. 99-371-KAJ

     INC., SECURITIES

 5   LITIGATION                 (CONSOLIDATED)

 6

 7

 8

 9

10            Oral deposition of JOHN

11   MICHAEL MORRASH, taken at the law

12   offices of BERGER & MONTAGUE, P.C., 1622

13   Locust Street, Philadelphia,

14   Pennsylvania, on Wednesday, February 23,

15   2005, at 10:12 a.m., before Rosemary

16   Locklear, Registered Professional

17   Reporter, Certified Shorthand Reporter

18   (NJ), Certified Realtime Reporter and

19   Notary Public, pursuant to notice.

20

21

22

23

24

25
```

JOHN MORRASH                2/23/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

## Page 2

```
 1  APPEARANCES:
 2  BERGER & MONTAGUE, P.C
       BY: ELIZABETH WILLIAMS FOX, ESQUIRE
 3     efox@bm.net
       1622 Locust Street
 4     Philadelphia, Pennsylvania 19103-6305
       (215) 875-3000
 5
       and
 6
    LAW OFFICE OF DONALD B. LEWIS
 7     BY: DONALD B LEWIS, ESQUIRE
       5 Cynwyd Road
 8     Bala Cynwyd, Pennsylvania 19004
       (610) 668-0331
 9     Appearing on behalf of the Plaintiffs
10  AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P
       BY: JENNIFER R. BRANNEN, ESQUIRE
11     jbrannen@akingump.com
       LAURA MORIATY, ESQUIRE
12     lmoriaty@akingump.com
       300 West 6th Street, Suite 2100
13     Austin, Texas 78701-2916
       (512) 499-6200
14     Appearing on behalf of the Defendants Adams Golf,
       Inc., B. H. Adams, Richard H. Murtland, Darl P
15     Hatfield, Paul F Brown, Jr , Roland E. Casati,
       Finis F Conner and Stephen R. Patchin
16
    SIMPSON THACHER & BARTLETT, L.L.P.
17     BY: THEODORE J McEVOY, ESQUIRE
       tmcevoy@stblaw.com
18     425 Lexington Avenue
       New York, New York 10017-3954
19     (212) 455-3382
       Appearing on behalf of the Defendants Lehman
20     Brothers Holdings, Inc ; Banc of America
       Securities, L.L.C ; and Ferris, Baker Watts,
21     Incorporated
22              EXAMINATION INDEX
23
    JOHN MICHAEL MORRASH
24  BY MS BRANNEN         4
    BY MR. McEVOY        176
25  BY MS. BRANNEN       183
    BY MS FOX            184
```

## Page 3

```
 1             EXHIBIT INDEX
 2
                MARKED
 3
    16  1-page copy of document entitled "John    14
 4      M Morrash." plus attachment, JMM
        59-JMM 60
 5
    17  9-page copy of document entitled         110
 6      "Responses and Objections of John M
        Morrash to Defendant Adams Golf, Inc 's
 7      First Request for the Production of
        Documents and Things from Proposed
 8      Class Representatives Federated
        National Insurance Co , John Morrash
 9      Todd Tonore, F Kenneth Sheckley, and
        Patricia Craus"
10
    18  7-page copy of document entitled         112
11      "Plaintiff John M Morrash's Responses
        to Defendant Adams Golf's First Set of
12      Interrogatories"
13  19  22-page copy of document entitled        122
        "Class Action Complaint for Violations
14      of Federal Securities Laws." plus
        attachments
15
    20  1-page copy of document entitled "Adam   156
16      Golf Litigation," plus attachments, JMM
        1, JMM 3-JMM 15
17
    21  Multi-page copy of document dated        163
18      8/12/98 entitled "Ferris Baker Watts"
        JMM 16-JMM 39
19
20
21
22
23
24
25
```

## Page 4

```
 1          JOHN MICHAEL MORRASH, having
 2  been duly sworn, was examined and
 3  testified as follows:
 4          EXAMINATION
 5  BY MS. BRANNEN:
 6  Q.  Good morning, Mr. Morrash.
 7          MS. FOX:  Before you start, I
 8  have something to put on the record.
 9       Mr. Morrash, when he was
10  considering all the stuff last night,
11  looked at his Interrogatory answers and
12  realized that one of his Interrogatory
13  answers was incomplete and he has
14  completed it and then signed an
15  Affidavit. So that's the completed
16  Affidavit
17          MS. BRANNEN:  Okay.  And I
18  was in and out at the last deposition,
19  but is this -- did you give us
20  signatures for all the Interrogatories
21  at the last one?  I vaguely recall
22  something.
23          MS. FOX:  Can we go off the
24  record?
25          (Discussion off the record.)
```

## Page 5

```
 1          MS. BRANNEN:  Well, let's go
 2  back on the record, then.
 3  BY MS. BRANNEN:
 4  Q.  Good morning, Mr. Morrash.  I'm
 5  Jenny Brannen and I represent the Adams
 6  Golf defendants.  I guess, let's see,
 7  you've already spelled your name for the
 8  court reporter
 9       Can you give us your date of
10  birth as well
11  A.  Sure. October 12th, 1954.
12  Q.  Okay.  Have you ever had your
13  deposition taken before?
14  A.  Yes.
15  Q.  When was that?
16  A.  I don't remember specifically, but
17  it was a few years ago.
18  Q.  Was that the only time you've ever
19  had it taken?
20  A.  Yes.
21  Q.  What kind of case was it?
22  A.  That was a wrongful dismissal
23  case.
24  Q.  What does that mean?
25  A.  That means that an employee is
```

2 (Pages 2 to 5)

JOHN MORRASH                                    2/23/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 6

1  claiming that his employer violated
2  employment law resulting in his or her
3  dismissal.
4  Q. We call it wrongful termination in
5  Texas.
6  A. Yes. Okay.
7  Q. There you go. I was confused.
8       Were you a party to the case?
9  A. I was a defendant, yes.
10  Q. Okay. And who was the company?
11  The employer?
12  A. The employer was a company that
13  did business as Medford Ice Rink, and
14  the name of the company was MARA, M-A --
15  all caps, M-A-R-A, L.L.C.
16  Q. So you're probably familiar then
17  or may vaguely recall the basic ground
18  rules of a deposition, that you're under
19  oath, it's just like being in court and
20  being -- your testimony is sworn.
21       Do you understand that?
22  A. I understand that my testimony is
23  under a oath, yes.
24  Q. And so you must testify
25  truthfully.

Page 7

1       For the court reporter's
2  sake, please answer audibly, try not to
3  nod or say uh-huh and, you know, wait
4  for me to finish my question so that
5  both of us aren't trying to talk at
6  once.
7       If you don't understand my
8  questions, please tell me. I'll try and
9  be as clear as possible, but feel free
10  to ask me if you don't understand one of
11  my questions; but if you answer, I'll
12  assume that you understood.
13       And if you need a break at
14  any point, just let me know, but try not
15  to do it while a question is pending.
16  You know, try and answer the question to
17  the best of your ability before we take
18  a break.
19       And in response to my
20  questions, don't guess, but I'm entitled
21  to whatever your best recollection is.
22       And then finally, is there
23  any reason that you can't give me your
24  best testimony here today? Is there any
5  kind of mental or physical condition or

Page 8

1  medication that would prevent you from
2  testifying truthfully and accurately?
3  A. There are none.
4  Q. Okay. When did you learn that you
5  would have to give a deposition in this
6  litigation?
7  A. I believe that would have been in
8  January of this year.
9  Q. And who told you?
10  A. Ms. Fox told me.
11  Q. And with whom have you met in
12  person to prepare for the deposition?
13  A. I had a meeting with Liz Fox, Don
14  Lewis, and Todd Collins.
15  Q. And when did you meet with them?
16  A. I met with them last night.
17  Q. Was that the only time that you
18  met with them to prepare for your
19  deposition?
20  A. Yes, that was the only time.
21       MS. FOX: Well, this morning,
22  obviously.
23       THE WITNESS: Oh  This
24  morning.
25  BY MS. BRANNEN:

Page 9

1  Q. So twice, last night and then this
2  morning?
3  A. Once last night.
4  Q. And then also this morning?
5  A. Yes.
6  Q. How long did you meet each time?
7  A. This morning, 15 or 20 minutes;
8  last night, perhaps two hours, two and a
9  half hours.
10  Q. And had you ever met personally
11  with any of your attorneys before
12  yesterday?
13  A. Personally, if that means face-to-
14  face, no. But by phone on a good number
15  of occasions.
16  Q. Were the phone calls in
17  preparation for your deposition?
18  A. No.
19  Q. So those were just other
20  communications with your attorneys by
21  phone?
22  A. Yes.
23  Q. And did you review any documents
24  to prepare for this deposition?
25  A. Yes.

3 (Pages 6 to 9)

Page 10

1   Q.   Do you recall which documents?
2   A.   I reviewed the documents that were
3   in my file, personal file that I kept
4   with respect to this investment. And I
5   also reviewed some information on the
6   Internet last night.
7   Q.   What sort of information was that?
8   A.   SEC filings by the company.
9   Q.   And when did you review the
10  documents in your file?
11  A.   I reviewed them intensely last
12  night.
13  Q.   And did reviewing those documents
14  refresh your memory about any of the
15  events connected with the lawsuit?
16  A.   Yes.
17  Q.   Which events?
18  A.   Primarily, it refreshed my memory
19  as to why I was so upset about this
20  situation.
21  Q.   And so which documents were the
22  ones primarily that refreshed your
23  memory?
24  A.   The ones in my file.
25  Q.   Yes. And we'll go through those

Page 11

1   documents --
2   A.   Yes.
3   Q.   -- in a little bit. I presume
4   those are probably the documents that
5   you turned over to your lawyers who then
6   produced them to us.
7   A.   Yes.
8   Q.   But, primarily, are you referring
9   to like your trading records in Adams
10  Golf?
11  A.   I'm referring to the Baker Watts
12  report that was written on the company
13  in August of 1998, and then I'm also
14  referring to financial results that I
15  saw on the Internet by way of my viewing
16  SEC filings.
17  Q.   And what time period were those
18  SEC filings for?
19  A.   I looked at the 10-K for 1998, the
20  10-K for 1999, the 10-Q for the period
21  ended September 30th, 1998, to the best
22  of my recollection.
23  Q.   Oh. And let's walk through a few
24  just personal details so that we have
25  them on the record.

Page 12

1   A.   Uh-huh.
2   Q.   Can you give us your current
3   address, please.
4   A.   Sure. It's 3565 Lexington Drive,
5   in Doylestown, Pennsylvania.
6   Q.   And your telephone number.
7   A.   My home phone number?
8   Q.   Yes.
9   A.   Is 215-345-4096.
10  Q.   And was that your same address
11  during 1998 to 1999 time frame?
12  A.   No, it wasn't.
13  Q.   What was your address then?
14  A.   My address then was 3901 Sherwood
15  Lane, Doylestown, Pennsylvania.
16  Q.   And what's your business address?
17  A.   My current business address is
18  Radnor Corporate Center in Radnor,
19  Pennsylvania.
20  Q.   Is there a street address or is
21  that --
22  A.   It's Building 3; it's fourth
23  floor.
24  Q.   Okay. So no ZIP Code, though?
25  Just, you know, for the record, we're

Page 13

1   just trying to get a good mailing
2   address.
3   A.   I don't recall what the ZIP Code
4   is. I don't use it.
5       MS. FOX:   Well, you know, I
6   would object. If you want to get ahold
7   of him, get ahold of us.
8   BY MS. BRANNEN:
9   Q.   So are you married, Mr. Morrash?
10  A.   I'm not married.
11  Q.   And then next I want to walk
12  through just your educational
13  background, your formal education. Did
14  you graduate from college?
15  A.   I did. And we've provided a brief
16  resume to you.
17  Q.   Right. Right. We will get to
18  that shortly.
19      What was your degree in, just
20  so that we can get it on the record?
21  A.   B.S. degree in accounting.
22  Q.   Okay. And do you belong to any
23  seminars? I'm sorry. Have you attended
24  a lot of accounting and financially-
25  related seminars then, I would guess, if

4 (Pages 10 to 13)

JOHN MORRASH                     2/23/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 14

1  your background is in accounting?
2  A.  From time to time, yes.
3  Q.  What about courses in investing
4  and that kind of thing?
5  A.  Formal courses, no.
6  Q.  Do you belong to any professional
7  societies?
8  A.  I belong to the Pennsylvania
9  Institute of Certified Public
10  Accountants and the American Institute
11  of Certified Public Accountants.
12  Q.  Okay.  And let me go ahead and
13  introduce your resume, which I'm going
14  to ask the court reporter to mark as
15  Exhibit 16.
16      (Exhibit 16 was marked for
17  identification.)
18      MS. BRANNEN:  And I've just
19  left the page that was behind it which
20  looks like just a file label page but
21  attached with this one.
22      MS. FOX:  Yes.  That is the
23  back of the folder.
24      MS. BRANNEN:  Of the folder.
25  Okay.  I just figured I'd leave it with

Page 15

1  this one so that it stayed with
2  something.
3  BY MS. BRANNEN:
4  Q.  So can you identify this document
5  for the record, please.
6  A.  Yes.  Appears to be the document
7  that I prepared in response to a request
8  by my attorneys.
9  Q.  And can you describe the document?
10  A.  Sure.  It's a --
11      MS. FOX:  Wait a second.
12      Could I have the -- or let
13  him look at the real document and let me
14  look at this one.  Good.  Thank you.
15      THE WITNESS:  It is a summary
16  of my college education, professional
17  certificates received, and employment by
18  employer with various detailed positions
19  indicating some -- in all cases for the
20  period beginning in 1996 to the present.
21  BY MS. BRANNEN:
22  Q.  Okay.  And this is a full and
23  accurate description of your employment
24  history and educational history?
25  A.  Yes, it is.

Page 16

1  Q.  Okay.  Then we don't need to walk
2  through the whole thing.
3      Mr. Morrash, do you know who
4  it is exactly that you're suing in this
5  litigation?
6  A.  Yes, I do.
7  Q.  Can you identify the defendants
8  for me?
9  A.  The defendants include Barney
10  Adams, other officers of the company
11  whose name I don't have memorized but
12  are clearly indicated in the Complaint.
13  We're also suing three underwriters, and
14  they are the -- that's who we're suing.
15  Q.  And do you know why you're suing
16  those defendants?
17  A.  I certainly do.
18  Q.  Can you explain to me what it is
19  that you believe they did wrong?
20  A.  Yes, I can.  I believe they did a
21  lot of things wrong, including excluding
22  material information with respect to
23  certain risks associated with this
24  investment from the prospectus and
25  registration statement.

Page 17

1  Q.  And can you tell me what
2  statements you think or risks you think
3  were omitted from the registration
4  statement?
5  A.  Yes, I can.  I think that what was
6  omitted was adequate disclosure with
7  respect to the company's product being
8  sold in gray markets.
9  Q.  And can you tell me what evidence
10  you have that supports that belief?
11  A.  Well, I've -- I relied on my
12  attorneys to articulate the claim and
13  the particulars of the claim and I think
14  that that stands on its own.
15  Q.  Can you tell me what facts you
16  know about, though, that support your
17  belief that the risk of gray marketing
18  was --
19  A.  Yes.
20  Q.  -- wrongfully omitted from the
21  prospectus?
22  A.  Yes.  Absolutely.
23      Can you repeat the question
24  again?
25  Q.  Yes.  Just can you tell me what

5 (Pages 14 to 17)

JOHN MORRASH                                    2/23/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 18

1  facts you personally know about or have
2  learned that support your belief about
3  what defendants you think did wrong?
4  A.  Well, I know that the -- I know
5  that the company sometime prior to going
6  public released to the public by way of
7  a press release the fact that it was
8  aware that its products were appearing
9  in the gray market.  I know that the
10 prospectus and registration says nothing
11 about it.
12      And I also know that in later
13 filings, that is filings subsequent to
14 the public offering, that the company
15 has disclosed the fact that its products
16 are being sold in the gray market.
17 Q.  Did you --
18 A.  And -- go ahead.
19 Q.  I'm sorry.  Go ahead.  I didn't
20 mean to cut you off if you weren't done.
21 A.  I'm done.
22 Q.  So you mentioned a press release
23 that was issued before the company went
24 public.  Did you see that press release?
25      MS. FOX:  You have to say

Page 19

1  what time frame you're talking about.
2      MS. BRANNEN:  Well, he --
3      MS. FOX:  Are you asking him
4  did he see it before the Complaint was
5  filed?
6      MS. BRANNEN:  Yes.
7  BY MS. BRANNEN:
8  Q.  Did you see that press release
9  actually at the time the press release
10 was issued?
11 A.  At the time it was issued?
12 Q.  Uh-huh.
13 A.  No, I didn't.
14 Q.  Did you see the press release
15 before the company went public?
16 A.  No, I didn't.
17 Q.  And had you seen it before you
18 purchased your Adams Golf stock?
19 A.  I didn't.
20 Q.  Going back on the parties that
21 have been sued in the lawsuit, do you
22 know off the top of your head how many
23 defendants there are?
24 A.  What do you mean, off the top of
25 my head?  Do you mean approximately?

Page 20

1  Q.  Well, I mean you kind of -- you
2  listed sort of a group of people --
3  A.  Yes.  Right.
4  Q.  -- and I just wondered if you knew
5  exactly how many people had been sued.
6  A.  It's a matter of public record.  I
7  didn't count them to refresh my memory.
8  Q.  And so in terms of the officers of
9  the company that, you know, you listed
10 sort of as a group, you said you hadn't
11 memorized their names, but do you know
12 at all generally, you know, what their
13 responsibility at the company was or
14 what they might have --
15 A.  I know that the chief financial
16 officer is one of those individuals.
17 Q.  And is he the only one whose title
18 you recall?
19 A.  Yes.  Although I have read the
20 Complaint a number of times and I've
21 read their names and titles a number of
22 times, I just haven't committed them to
23 memory.
24 Q.  So I just want to go through kind
25 of some of your understanding of what

Page 21

1  was going on with Adams Golf at the time
2  it went public.
3      So generally can you tell me
4  in 1998, you know, what sort of business
5  Adams Golf was in?
6  A.  They were in the specialty golf
7  club market.  Primarily fairway woods.
8  Q.  And in 1998 do you know which
9  products exactly they sold?
10 A.  I know that they had a fairway
11 wood called Tight Lies.  I don't
12 remember exactly what the degrees of
13 that club were, but I know that it was
14 intended to be a club that's easier to
15 hit a ball that appears in the fairway a
16 long distance because a lot of people
17 have trouble hitting long irons.
18 Q.  Yes, they do.
19      Do you know how Adams Golf
20 was marketing its products in 1998?
21 A.  I know -- can you repeat that
22 question, please?
23 Q.  Just whether or not you know how
24 Adams Golf was marketing its products in
25 1998.

JOHN MORRASH                          2/23/2005  IN RE: ADAMS GOLF, INC , SECURITIES LITIGATION

Page 22

1   A.  Today I do know how they're
2   marketing their products in 1998, yes.
3   They were selling their products through
4   two primary outlets.  One was a direct
5   outlet where I believe they indicated
6   they had about 200,000 direct customers,
7   and then they were selling through a
8   selected distribution channel, which
9   included approximately 7,000 golf shops.
10  Q.   And were you aware of that -- of
11  how they marketed their products in 1998
12  when you bought your stock?
13  A.  No.  Because I didn't make the
14  decision to buy my stock.  My broker
15  did.
16  Q.  Why did your broker recommend that
17  you buy Adams Golf?  Or he actually made
18  the decision to do it?
19  A.  My broker made the decision to buy
20  it, yes.
21  Q.  Did he tell you about that
22  decision before he bought it?
23  A.  No.  He has discretionary
24  authority with respect to the account.
25  Q.   And so at what point did you

Page 23

1   become aware that he had purchased Adams
2   Golf stock?
3   A.  Within several days of the IPO.
4   Q.  Okay.  And I'll probably come back
5   to that in a little bit.  But in 1998
6   had you ever seen any Adams Golf
7   advertisements?
8   A.  I don't recall if in 1998 I saw
9   any advertisements.
10  Q.  And did you know anything about
11  the IPO until your broker told you he
12  had purchased the stock in the IPO?
13  A.  To the best of my recollection, I
14  knew nothing about the IPO prior to it
15  occurring.
16  Q.  And once you learned about the
17  IPO, did you follow the company after
18  that?
19  A.  I did, yes.
20  Q.  How did you do that?  What kind of
21  information did you read to learn about
22  the company?
23  A.  I obtained information off of the
24  Internet.  I think at the time I was
5   using Yahoo! Finance, and then I have in

Page 24

1   my file a report from Baker Watts, an
2   analyst report, which was written in
3   August of 1998.
4   Q.  And so was that the only analyst
5   report that you recall reading about the
6   stock?
7   A.  That's the only one I recall
8   reading about it.  That was a long time
9   ago, so I don't have full recollection
10  of what I might read -- might have read.
11  Q.  It was the only one you kept in
12  your file, anyway.
13  A.  Yes.
14  Q.  And you mentioned Barney Adams as
15  one of the defendants before.  And do
16  you know who he is, what his position is
17  at the company?
18  A.  I believe he is CEO and chairman
19  of the board.
20  Q.  And --
21  A.  I believe he has been since
22  inception.
23  Q.  And so did you know him personally
24  at all?
25  A.  No.

Page 25

1   Q.  And what is it that you believe
2   Barney Adams in particular did wrong?
3   A.  I believe that he -- I believe he
4   initiated and carried out an effort to
5   oversell his product during the period
6   just prior to the IPO in order to
7   inflate the value of the company and
8   maximize the value of the public
9   offering.
10  Q.  So when you say "he carried out an
11  effort to oversell his product," what do
12  you mean by that?  How do you believe he
13  did that?
14  A.  I'm not going to speculate as to
15  how he did it, but I think if you look
16  at the financial statements, that you
17  can draw a very reasonable conclusion
18  that that's what happened.
19  Q.  And what is it in the financial
20  statements that would make you draw that
21  conclusion?
22  A.  The peak in sales during that
23  period of time when the company went
24  public.
25  Q.  Do you think there could be any

7 (Pages 22 to 25)

JOHN MORRASH                                    2/23/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 34

1   A.  I would have -- after my broker
2   buys shares, he sends the information to
3   me, so my broker would have had access
4   to this prior to his buying the shares
5   for my account.
6   Q.  So I guess I'm not 100 percent
7   clear.  So did you -- you received it
8   after your broker bought the shares or
9   no?
10  A.  I would assume so because I
11  received all proxy, all -- I'm sorry --
12  prospectus for other IPOs I was involved
13  in subsequent to my broker buying those
14  stocks.
15  Q.  And do you recall reading that
16  prospectus at the time?
17  A.  That was a long time ago.  I don't
18  recall the moment I read it, no.
19  Q.  But you have read it before?
20  A.  Subsequent to my learning that I
21  -- the account -- the shares were
22  purchased for my account, I read various
23  documents with respect to the company.
24  Most -- some of those were documents
25  prepared in compliance with securities

Page 35

1   and exchange laws, like 10-Ks and 10-Qs
2   and prospectus and registration
3   statements.
4   Q.  But you don't recall specifically
5   if you read this one?
6   A.  I don't have a specific
7   recollection, no, but my broker had
8   access to it prior to and he made the
9   decision to buy the shares.
10  Q.  Right.  And so how did you that
11  relationship work?  I know you said he
12  had discretion to invest for you.  If he
13  made an investment and then after the
14  fact you -- would you research it and
15  decide if you wanted to stay in it or
16  did he have discretion then to decide
17  when to sell as well?
18  A.  He had full discretion.  I would
19  give him my opinion sometimes, but at
20  the end of the day I let his judgment
21  prevail.
22  Q.  So if you guys had a difference of
23  opinion, he would make the final call on
24  whether to buy or to hold something?
25  A.  Depending on the magnitude of the

Page 36

1   difference of opinion.
2   Q.  Can you give me an example?
3   A.  Theoretically, if he bought
4   something that I just didn't like and
5   thought it was a bad idea, he would be
6   likely to sell it.  If I bought
7   something that I was somewhat unsure
8   about but he was more confident in
9   because he had done research and so on,
10  then I would be more inclined to allow
11  his decision to prevail.
12  Q.  So do you know whether Adams Golf
13  was one of those things that -- where
14  would you put it sort of on the scale of
15  you being less confident about or, you
16  know, being averse to holding?
17       MS. FOX:  At what point?
18  BY MS. BRANNEN:
19  Q.  Immediately, I guess, after it was
20  purchased and you learned about the
21  purchase.
22  A.  Oh, I was glad to have the shares.
23  Q.  And did you discuss with your
24  broker like how much research he had
25  done on it before he purchased it?

Page 37

1   A.  I had a discussion with him about
2   the company.  He was -- appeared to be
3   informed about it.  I don't recall
4   asking him if he had read the
5   registration statement, but he was -- he
6   was informed about the company.
7   Q.  Do you know where he had gotten
8   his information about the company from
9   other than possibly the registration
10  statement?
11  A.  Well, that's -- he's in that
12  business, so I don't -- and he works for
13  a firm.  I don't know where they get
14  their information.
15  Q.  Okay.  You didn't discuss it with
16  him.  You don't know.
17  A.  No.
18  Q.  Do you know which statements --
19  can you identify which statements in the
20  prospectus you believe were false and
21  misleading?  You can --
22  A.  I think that they're articulated
23  pretty well in the -- in the Complaints
24  and I believe that they're quoted in
25  there.

Page 54

1  definition, in my opinion, not as an
2  expert but as an investor, is material
3  information that is relevant to my
4  decision to hold these shares or sell
5  them or buy them in the beginning.
6  Q.  Do you know whether gray marketing
7  is something that's limited to the golf
8  industry?
9  A.  No. It's not limited to the golf
10  industry.
11  Q.  What other industries are affected
12  by it?
13  A.  Jewelry, watches, purses. You
14  know, a lot of retail products, I would
15  assume.
16  Q.  Do you know whether other golf
17  companies were affected by gray
18  marketing in 1998?
19  A.  I don't know. I don't know if
20  they were or not.
21  Q.  How familiar are you with the golf
22  industry sort of generally? Do you golf
23  or...
24  A.  I don't golf frequently now. I
25  have in the past. I've never been a

Page 55

1  serious golfer.
2  Q.  So you didn't keep up particularly
3  with any of the other golf companies in
4  the industry when you were investing in
5  Adams Golf?
6  A.  From the perspective of a consumer
7  or an investor?
8  Q.  Both, actually.
9  A.  Well, from the perspective of a
10  consumer, I would frequently walk
11  through golf shops and see what was
12  available. I've purchased clubs from
13  time to time.
14  Q.  When you purchased clubs, did you
15  purchase them at a specialty shop or at
16  a mass distribution outlet?
17  A.  At a specialty shop.
18  Q.  Do you know what other clubs were
19  available at mass distribution outlets
20  in that time frame?
21  A.  I've walked through mass
22  distribution outlets and see a whole
23  bunch of clubs sitting in a bin. I just
24  usually take a glance and keep walking.
25  Q.  So you don't know whether any

Page 56

1  other golf companies were affected by
2  gray marketing in '98?
3  A.  I don't know.
4  Q.  So do you know when Adams Golf
5  disclosed the information that you're
6  alleging it should have disclosed in the
7  prospectus?
8  A.  I saw it in the -- in the 1999
9  10-K, and my recollection, though not
10  specific, was that there was a
11  disclosure prior to that as well.
12  Q.  What kind of a disclosure?
13  A.  I don't have perfect recollection
14  on this matter, but it may have been a
15  press release. It may have been in a
16  10-Q. I'm not sure.
17  Q.  Do you recall the approximate time
18  frame when that disclosure was made?
19  A.  I don't want to guess. I believe
20  it was within a year of them being
21  public -- going public.
22  Q.  Were you still holding Adams Golf
23  at the time of that disclosure?
24  A.  I just don't recall. That was a
25  long time ago.

Page 57

1  Q.  If you were, would it have
2  affected your decision about whether to
3  hold onto the stock?
4  A.  Of course, it would.
5      MR. McEVOY: I'm sorry  I
6  just couldn't --
7      THE WITNESS: I said of
8  course it would.
9  BY MS. BRANNEN:
10  Q.  How would it have affected your
11  decision? In what way?
12  A.  What it would tell me was that
13  this is a company that is not selling a
14  product in which they're trying to
15  create a lot of value in the brand and
16  which is the underlying basis and theory
17  upon which this was -- this company was
18  founded, in my opinion, as an investor.
19      It wasn't founded as a
20  company to produce clubs in high volumes
21  for mass distribution. Those would be
22  more efficiently made overseas.
23  Q.  What's your understanding of the
24  disclosure that was made? Was it that
25  Adams Golf had decided to sell to mass

15 (Pages 54 to 57)

JOHN MORRASH                                    2/23/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 70

1    Because I don't -- I can't make -- I
2    can't do this myself.
3    Q.  I'm not trying --
4    A.  Okay?
5    Q.  I'm not trying to give you a
6    memory test.
7    A.  Okay.
8    Q.  All I'm trying to get at is your
9    personal understanding of the case.
10   A.  Yeah.  And I --
11   Q.  So if you -- that's why I'm just
12   asking you for your personal
13   recollection of the facts that support
14   your personal belief.  If you don't have
15   any, just say so.  That's fine.
16   A.  Give me the Complaint and I'll --
17        MS. FOX:  Wait.
18        Object to the form.
19        He has given you a number of
20   facts.
21        THE WITNESS:  Yeah.
22        MS. BRANNEN:  Okay.  Could
23   you read my last question back, please.
24        (The court reporter read back
25   the following:

Page 71

1        "QUESTION:  So if you --
2    that's why I'm just asking you for your
3    personal recollection of the facts that
4    support your personal belief.  If you
5    don't have any, just say so.  That's
6    fine.")
7        THE WITNESS:  There are
8    facts.  The company disclosed that its
9    products were ending up in gray markets
10   prior to it going public.  The company
11   disclosed that its products ended up in
12   gray markets subsequent to going
13   public.  The company disclosed that its
14   products ended up in mass distribution
15   in their, I believe, 1999 10-K.
16        As I also indicated earlier,
17   I believe sometime subsequent to going
18   public and prior to that 10-K there was
19   another disclosure of some form that
20   their -- that their products are sold --
21   are being sold in gray markets.  So
22   there are plenty of facts.
23   BY MS. BRANNEN:
24   Q.  Can you --
25   A.  In fact, I don't think Adams Golf

Page 72

1    is disputing the facts.
2    Q.  Can you take a look at Page 29 of
3    the prospectus, please.  In the next-to-
4    the-last paragraph where it says:  Sales
5    to retailers.  The prospectus states
6    that the company sells a significant
7    majority of its products to selected
8    retailers.  To maintain its high-quality
9    reputation and generate retailer
10   loyalty, the company does not sell its
11   products through price-sensitive general
12   discount warehouses, department stores
13   or membership clubs.
14        Do you believe that was a
15   true statement in 1998, at the time of
16   the prospectus?
17   A.  It may have been true, but, in my
18   opinion, it's incomplete with respect to
19   the substance of the point that's trying
20   to be made there.
21   Q.  And why is that?
22   A.  They may not sell directly to mass
23   production -- to mass distribution, but
24   their product may end up there, and if
25   they have knowledge of their product

Page 73

1    ending up there, then they ought to tell
2    investors about it because it's
3    important to investors for the reasons
4    that are articulated in their own
5    language.
6        It's pretty easy.  These guys
7    screwed up.  It's very easy.  This is
8    not rocket science.  It's not rocket
9    science.  It's easy.
10   Q.  I'm going to show you --
11   A.  I --
12   Q.  -- this document that's --
13   A.  I'd love to tell my story to a
14   jury.  That's what I would -- you know.
15   Okay?  Instead of you.  But we'll go
16   through this.
17   Q.  I'm going to show you this
18   document that's been previously marked
19   as Exhibit 2.
20        Do you recognize this
21   document?
22   A.  This appears to be the Amended
23   Complaint.
24   Q.  Do you recall when you first saw
25   this document?

Page 126

1   became an action of this nature, i.e., a
2   class action.
3   Q.  But you're not -- you don't know
4   specifically whose idea it was.
5   A.  Well, it was the attorneys, the
6   attorneys who are involved in the case,
7   including the attorneys who are
8   representing --
9   Q.  But no one specific one, or you
10  don't know for sure?
11  A.  I don't know for sure which
12  specific attorney, no.
13  Q.  And then I know you mentioned
14  Kenneth Schockley and David Schockley
15  were also lead plaintiffs.  What's
16  their -- who is Bill Schockley in
17  relation to them?
18  A.  Bill is Dr. Kenneth Schockley's
19  son, and David Schockley is Ken
20  Schockley's son as well.
21  Q.  And so is Bill Schockley a named
22  plaintiff?
23  A.  To my knowledge, he is not.
24  Q.  Do you know why not?
25  A.  I don't know why not.

Page 127

1   Q.  Do you know whether you're seeking
2   to be named a class representative by
3   the Court?
4   A.  I believe I am.  I'm willing to
5   be --
6       MS. FOX:  Object.  This --
7   it's really a legal question of --
8       THE WITNESS:  Yeah.
9       MS. BRANNEN:  I'm just asking
10  for his understanding of what he's
11  seeking to do in this lawsuit.
12      THE WITNESS:  Well, I can put
13  it in laymen's terms.
14  BY MS. BRANNEN:
15  Q.  That's great.
16  A.  And in laymen's terms, what I'm
17  willing to do is to -- is to represent
18  in whatever capacity it is -- is
19  necessary other individuals who have
20  suffered a loss that is of the same
21  nature and same genesis as my loss.
22  Q.  And so can you describe in your
23  own words kind of what the boundaries
24  are of that class that you're trying to
25  represent, who those people are that

Page 128

1   have suffered a similar loss?
2       MS. FOX:  Again, it calls for
3   a legal conclusion.
4       MS. BRANNEN:  I asked him to
5   describe it in his own words.
6   BY MS. BRANNEN:
7   Q.  You can answer the question.
8   A.  I'm sure I could give it to you in
9   laymen's terms.  I know that there is a
10  class and a subclass that is -- these --
11  both these classes -- one class includes
12  individuals who purchased the stock on
13  the IPO, the other includes individuals
14  who purchased the stock within a -- I
15  believe a 25-day window following the
16  IPO.
17      And can you repeat -- I think
18  there was more than one part of the
19  question, if you wouldn't mind repeating
20  it.
21  Q.  That was really it.
22  A.  Okay.
23  Q.  Just whether you could kind of
24  describe the boundaries of the class
25  that you're seeking to represent --

Page 129

1   A.  Okay.
2   Q.  -- in terms of who they are.
3   A.  Uh-huh.
4   Q.  Why do you want to be a class
5   representative?
6   A.  Because I think that there has
7   been a -- an injustice here.  There's
8   been a wrong here.  I think it's a wrong
9   that needs to be righted.  I think
10  there's been a -- I think this is a case
11  of thievery and theft.  I think Barney
12  Adams stole this money from people.
13  Okay?  In the -- in a broad sense of the
14  word.
15      He didn't come and take
16  his -- put his hands in our pockets, but
17  he sold us a stock that he said and that
18  the company said and that the
19  underwriters said was worth $16 a share
20  and he took our money.  And in a very
21  few months all that evaporated.  So I
22  think he ought to give that money back
23  to us.
24  Q.  Do you know how many members are
25  in the class that you're seeking to

33 (Pages 126 to 129)

JOHN MORRASH                           2/23/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 130

1  represent?
2  A.  I don't know.  I assume that there
3  are thousands.  I don't know
4  specifically how many.
5  Q.  And do you know when the other
6  class members bought their Adams Golf
7  stock?
8      MS. FOX:  I think he just
9  described that with some clarity.
10  BY MS. BRANNEN:
11  Q.  Can you just repeat the answer?
12  Sorry.
13  A.  I'll repeat it.  Yes.  Some of
14  them bought it on the IPO.  Some of them
15  bought it within a 25-day window of the
16  IPO.
17  Q.  And do you know why those class
18  members bought their stock?
19      MS. FOX:  How could he
20  possibly?
21      THE WITNESS:  I would not
22  have any possible knowledge of why they
23  bought their stock.
24  BY MS. BRANNEN:
25  Q.  Do you know when the alleged class

Page 131

1  period begins?
2  A.  Can you define what the class
3  period is?
4      MS. FOX:  Calls for a legal
5  conclusion again.
6  BY MS. BRANNEN:
7  Q.  Let me just move to another
8  question.
9      Do you think your claims are
10  similar to the class of plaintiffs you
11  purport to represent?
12  A.  Yes.
13  Q.  And I may have already asked you
14  this, but do you know how many other
15  proposed class representatives there
16  are?
17      MS. FOX:  It's been asked.
18  He said in the thousands.
19      THE WITNESS:  Yeah.
20      MS. BRANNEN:  No, I don't --
21  BY MS. BRANNEN:
22  Q.  Thousands of proposed class
23  representatives?
24  A.  Oh, class representatives?
25  Q.  Uh-huh.

Page 132

1  A.  Just a handful of us, I believe.
2  Q.  Have you ever met with any of the
3  other proposed class representatives?
4  A.  I have not.
5  Q.  Have you ever met Kenneth
6  Schockley or David Schockley?
7  A.  I have met them in the sense that
8  I know them, yes.  I've never met with
9  them to discuss this case.
10  Q.  Okay.  Did you know that Federated
11  National Insurance Company was a class
12  representative or proposed class
13  representative?
14  A.  Not -- I recall reading that name,
15  but really didn't focus on it.
16  Q.  Did you know that they withdrew
17  from consideration as a proposed class
18  representative?
19  A.  No.
20  Q.  And so I guess you don't know why
21  they withdrew, then.
22  A.  It's not relevant to me.
23  Q.  Do you have an agreement with your
24  attorneys concerning who pays the costs
25  for you to act as a class

Page 133

1  representative?
2  A.  I don't have an agreement with
3  them.
4  Q.  Who is paying -- I'm guessing it
5  sounded like you could drive here; you
6  didn't have travel expenses to get here
7  today; is that right?
8  A.  I've not been reimbursed for any
9  of my expenses, and I have not to date
10  asked for reimbursement of any of my
11  expenses.
12  Q.  Do you plan to ask for
13  reimbursement of any of your expenses?
14  A.  If they become significant,
15  whatever that means to me, perhaps, but
16  not necessarily.
17  Q.  What would that mean to you?  What
18  would be a significant cost to you?
19  A.  I don't know.  Like I said, it
20  would depend on how I feel at the time.
21  Q.  What do you understand your job to
22  be, sort of your role as a class
23  representative?
24  A.  My role, as I see it, is to see
25  this claim through a -- through a fair

JOHN MORRASH                    2/23/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 134

1    process, through a process which will
2    allow the claim to be heard, to be
3    presented in a professional manner, and
4    to be presented and defended in a manner
5    which will maximize the recovery of our
6    loss.
7    Q.  Can you tell me approximately how
8    much time you've spent fulfilling your
9    duties so far as lead plaintiff and a
10   proposed class representative?
11   A.  Over the course of the last few
12   years since this claim was filed, I
13   stayed in touch with the attorneys,
14   calling them from time to time,
15   inquiring as to the status, getting
16   briefings over the phone in terms of
17   what has happened, discussed strategy
18   with them, and came in here last night,
19   spoke to them about the claims, met with
20   them this morning.
21        I don't know how many hours
22   all that is.
23   Q.  You think it's, I don't know,
24   approximately eight hours' worth of work
25   or more than that?

Page 135

1        MS. FOX:  Well --
2        THE WITNESS:  It's more than
3    that.
4    BY MS. BRANNEN:
5    Q.  More than two days?
6    A.  I never really kept track of the
7    time.  It's the -- it's the quality of
8    the time that's important to me and
9    whether or not we're making progress and
10   whether or not this is a claim worth
11   pursuing.
12   Q.  What parts of the lawsuit do you
13   intend to directly participate in beyond
14   this deposition?  For example, will you
15   attend the class certification hearing?
16   A.  If required, I will.  If
17   required, I'll attend whatever hearings
18   my presence -- where my presence is
19   required in the opinion of my attorneys.
20   Q.  So would future travel to Delaware
21   impose any kind of burden on you?
22   A.  Not a burden that can't be
23   overcome.
24   Q.  And what do you stand to gain
25   personally as a class representative?

Page 136

1    A.  Justice and a return of our loss,
2    but, more importantly, justice.  I wish
3    this was a criminal case instead.  You
4    know, that's what I'd like to see, these
5    folks go to jail.
6    Q.  If you were to prevail in your
7    suit, what do you believe that you're
8    entitled to in terms of damages?
9    A.  I think I'm entitled to all the
10   money -- I think the class is entitled
11   to the money it lost and some return on
12   that money and reimbursement of all of
13   our expenses to pursue the return of
14   those -- that loss and anything else
15   that the law entitles me to be
16   recoverable.
17   Q.  What's your understanding of the
18   monetary recovery that you might receive
19   as a result of the lawsuit?
20   A.  Personally?
21   Q.  Yes.
22   A.  I haven't done a -- I haven't done
23   any calculations.  I -- my loss is
24   something like $49,000.
25   Q.  Do you know what you are claiming

Page 137

1    are the total damages to the class?
2    A.  It's many millions of dollars.  I
3    mean, I don't know what the exact number
4    is, but it's a big number.
5    Q.  Do you believe that you're
6    entitled to anything more than other
7    class members on a percentage basis?
8    A.  No.
9    Q.  Do you have any kind of agreement
10   in place that would compensate you by
11   any additional amount that's not
12   available to the other class members?
13   A.  Absolutely not.
14   Q.  Would you be willing to attend a
15   mediation in this case?
16   A.  Yes.
17   Q.  Did you know there is a mediation
18   set for June 1st, 2005?
19   A.  Yes.
20   Q.  Are you planning to attend that?
21   A.  That will be a strategic question
22   -- that's a strategic question that
23   needs to be asked and discussed between
24   myself and the attorneys, my attorneys.
25   Q.  Who has the authority to settle

JOHN MORRASH                    2/23/2005    IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 138

```
 1   the case?
 2   A.  The case will be settled based
 3   upon an agreement that is reached
 4   between -- well, I guess only the
 5   plaintiffs have the authority to settle
 6   the case.  The attorneys don't have the,
 7   to my knowledge, the authority to settle
 8   the case unless we give them the
 9   authority to settle it, and I haven't
10   given anyone the authority to settle
11   this case.
12   Q.  Do you plan on attending the
13   entire trial?
14   A.  If there's a trial, I'm sure I'll
15   be there for some portion of it.
16   Q.  But not the entire thing?
17   A.  Depends on what's required.
18   Q.  Can you identify -- who
19   specifically is your attorney
20   representing you?
21       MS. FOX:  Object to that.
22       How -- what do you mean by
23   who is his attorney?
24       MS BRANNEN:  I'm just asking
25   him who his --
```

Page 139

```
 1       MS. FOX:  People signed the
 2   Complaint.  All of whom represent him,
 3   obviously.
 4   BY MS. BRANNEN:
 5   Q.  Can you please answer the
 6   question?
 7   A.  Sure.  My attorneys Liz Fox and
 8   Don Lewis and Todd Collins and anyone
 9   else they need to get done what they
10   need to get done to pursue this case.
11   Q.  And do you have a Fee Agreement
12   with your attorneys?
13   A.  Yes.
14   Q.  Is it a written agreement?
15   A.  No.  The agreement is that if this
16   case is successful, they'll be paid
17   something that will be reviewed and
18   recommended by a judge.
19   Q.  Do you have any agreement with
20   them about what they will ask the judge
21   for?
22   A.  I haven't even discussed that.
23   Q.  So your agreement -- can you just
24   explain to me again then what the
25   agreement is?  I'm confused.
```

Page 140

```
 1   A.  My agreement is it's a contingent
 2   fee.  I don't pay them anything unless
 3   this case is successful, and then they
 4   get paid based upon their application
 5   for a fee and based upon -- and after a
 6   review by a Court.
 7   Q.  And do you know what percentage of
 8   the recovery the contingency fee would
 9   be?
10   A.  I don't know.
11   Q.  Do you know how much your
12   attorneys bill per hour?
13   A.  I don't know because I'm not
14   paying them by the hour.
15   Q.  I know you talked about how Bill
16   Schockley sort of took your discussions
17   about whether this might be a case to an
18   attorney; I forget the name.  Can you
19   tell me again?
20   A.  Abrahams Loewenstein, I believe.
21   Q.  That's right.
22       And that then from there it
23   kind of made its way to some of the
24   other attorneys that are representing
25   you now.  Were you involved in choosing
```

Page 141

```
 1   those attorneys?
 2   A.  No, I wasn't.
 3   Q.  Do you know how they were chosen?
 4   A.  They were chosen on the advice of
 5   counsel beginning with Abrahams
 6   Loewenstein and being passed on from
 7   that point.
 8   Q.  And why were they chosen?
 9   A.  They were chosen based upon their
10   competency and expertise to handle a
11   case of this nature.
12   Q.  Do you know whether competitive
13   bids were taken from different law
14   firms?
15   A.  To my nature, there were no
16   competitive bids.
17       I'm sorry.  To my knowledge,
18   not my nature.
19   Q.  And I think we may have gone over
20   this already and if so, I apologize.
21   Can you tell me again how many times you
22   physically met with your attorneys in
23   this case?
24   A.  I met with them by phone on many
25   occasions.  I met with them in person
```

Page 146

```
1    travel, filing fees with the Court,
2    sending out notices to the class, that
3    kind of thing?
4    A.  They pay it themselves.  If
5    they're successful, if the class is
6    successful, then they will be reimbursed
7    a fee and likely some amount of their
8    expenses as well.
9    Q.  So have you agreed to reimburse
10   the attorneys for all costs regardless
11   of the outcome of the lawsuit?
12   A.  I haven't agreed to --
13       MS. FOX:  Objection.
14   BY MS. BRANNEN:
15   Q.  You can still answer the question.
16   A.  I haven't -- I have not agreed to
17   anything in that respect.
18   Q.  What understanding do you have
19   about any costs that you might have to
20   pay?
21   A.  My understanding is that I'm
22   entitled to be reimbursed for out-of-
23   pocket expenses, but -- you know, like
24   for my travel here, for parking, but,
25   you know, I don't necessarily intend to
```

Page 147

```
1    pursue reimbursement for that.
2    Q.  Do you have any knowledge of what
3    costs are involved beyond the examples I
4    just gave you?
5    A.  I believe you've covered it.
6    Court fees, travel expenses, filing
7    fees.
8    Q.  Court reporter costs?
9    A.  Court reporter.
10   Q.  I didn't cover that one.
11   A.  Yeah.
12       MR. LEWIS:  She doesn't get
13   paid.
14   BY MS. BRANNEN:
15   Q.  Do you know what the magnitude of
16   all of these costs can be?
17   A.  No, I haven't attempted to
18   estimate it.
19   Q.  I mean, just thinking about it,
20   would you estimate it to be in the
21   thousands?
22   A.  It's not really relevant --
23       MS. FOX:  I'm going to object
24   to this whole line of questioning.
25       He's not responsible for
```

Page 148

```
1    costs.  He's explained that.  He's
2    explained how we get our costs, if we
3    get our costs, and otherwise it's simply
4    not part of this litigation.
5    BY MS. BRANNEN:
6    Q.  You can still answer my question.
7        MS. FOX:  There's no reason
8    for him to.  It's completely irrelevant.
9        MS. BRANNEN:  Are you making
10   a privilege objection?
11       MS. FOX:  No.  I'm making a
12   relevance objection.
13       MS. BRANNEN:  Well, you can't
14   instruct him not to answer the question
15   unless you have a privilege objection.
16       MS. FOX:  If he has some
17   knowledge on the subject, he can answer
18   it.  But I think we've gone on --
19       MS. BRANNEN:  And I'd
20   appreciate it if you'd stop making
21   speaking objections after this.
22       MS. FOX:  You've gone off at
23   length with your irrelevancies and I
24   think you can get -- be through with it.
25       MS. BRANNEN:  Okay.  Well,
```

Page 149

```
1    I'd appreciate it if you'd stop making
2    speaking objections, and I'd ask that
3    the witness please answer the question.
4        THE WITNESS:  Can you repeat
5    the question, please?
6        MS. BRANNEN:  Would you read
7    it back, please.
8        (The court reporter read back
9    the following:
10       "QUESTION:  I mean, just
11   thinking about it, would you estimate it
12   to be in the thousands?")
13   BY MS. BRANNEN:
14   Q.  And I was referring to the
15   magnitude of the costs.
16   A.  The magnitude of the costs is not
17   a matter for my concern.  I'm not
18   responsible for it.  They're --
19   Q.  Have you taken -- I'm sorry.
20   A.  They operate at risk here.
21   Q.  Have you taken any steps to manage
22   the costs incurred in the lawsuit?
23   A.  It's self-managing by way of
24   the -- by virtue of the fact that they
25   only get paid if they win, so it's self-
```

Page 158

1    know.
2        And so it's all discussions
3    after this lawsuit was filed, so then
4    they don't need to be -- I think we had
5    already confirmed that we don't need to
6    put that on a privilege log then.
7        MS. FOX: Well, we're going
8    to put it on just because we don't have
9    a --
10        MS. BRANNEN: Bates number
11    for it?
12        MS. FOX: -- a Bates number
13    for it.
14        MS. BRANNEN: That sounds
15    good.
16    BY MS. BRANNEN:
17    Q.  So have you had a minute to review
18    this?
19    A.  Yes.  Yes.  These are my trading
20    records.
21    Q.  And so let's take a look first at
22    JMM 7.  And so you bought 4,000 shares
23    of Adams Golf on July 10th is what this
24    reflects; is that correct?
25    A.  Uh-huh.

Page 159

1    Q.  And then if you'll look at JMM 3,
2    this document reflects a sale of 4,000
3    shares on December 30th, 1998?
4    A.  Yes.
5    Q.  Why did you decide to sell your
6    shares at this point?
7    A.  I don't recall specifically if I
8    made the decision to sell or whether or
9    not my broker made the decision to
10    sell.  But it was done at the end of the
11    year, I think I can safely assume, so
12    that the tax loss could be taken in
13    1998.
14    Q.  Would your broker ordinarily
15    confer with you before he sold something
16    at a loss, especially a substantial
17    loss?
18    A.  Yes.  But we had discussed this
19    stock.  He had my okay to sell it pretty
20    much, you know, at his discretion.
21    Q.  At what point did you give him
22    his -- your okay to sort of sell it at
23    any time?
24    A.  I don't really remember
25    specifically.  I remember being upset

Page 160

1    about the loss and probably wanting to
2    take the tax loss in end-year.  I don't
3    really remember the specifics.
4    Q.  At what point did you get
5    concerned about the amount of money that
6    the Adams Golf shares had lost?
7    A.  My recollection is that it dropped
8    -- it dropped pretty quickly, so...
9    Q.  Quickly after the IPO?
10    A.  Yes.  Certainly because this is
11    between June or July, whenever the
12    IPO -- the shares, let's see.  They were
13    purchased on -- traded July 10th, so
14    when -- in less than six months, it
15    dropped $12 and some change.
16        So -- and it dropped -- my
17    recollection is that it dropped pretty
18    steeply.  It's not like -- I don't
19    recall specifically.  I don't think it
20    sort of worked its way down.  I think it
21    dropped pretty quickly.
22    Q.  So I guess what I'm trying to get
23    at is how close you were tracking the
24    drop.  At what point would you have
25    instructed your broker that it was okay

Page 161

1    to sell it at any time?
2    A.  I don't really recall.  I would
3    just trying to be reconstructing history
4    based on the best of my guess, I guess.
5    I don't remember specifically.
6        MS. FOX: Don't guess.  If
7    you don't remember, you don't remember.
8        THE WITNESS: Yeah.  I don't
9    remember specifically.
10    BY MS. BRANNEN:
11    Q.  I guess my other question would
12    be, did you have some sort of standard
13    practice?  If something that he
14    purchased for you started losing money,
15    did you guys have some kind of standard
16    agreement about, you know, at what --
17    kind of what percentage loss or some
18    other way that you determined, you know,
19    that we should just get out of it?
20    A.  It wasn't that -- it was -- it
21    wasn't that formal because he's a friend
22    of mine.  He was, you know, doing very
23    well for me.  I don't expect, you know,
24    every one to be a winner, but he had
25    discretion.

JOHN MORRASH                      2/23/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 166

1  market makers like the NASDAQ are
2  supposed to do.
3  BY MS. BRANNEN:
4  Q.  And do you believe that
5  information about a company affects the
6  way the market values the stock?
7  A.  Yes.
8  Q.  What kind of information do you
9  think influences a company's stock
10  price?
11  A.  People have written books on
12  that. Anything. Again, I mean, it --
13  their relative strength to their
14  competitors, the outlook for new
15  products for the company, technological
16  advantages they might have, congruency
17  between their products and the specific
18  demands of a market, the total
19  consumption in the market, the growth in
20  the market, in this case, in terms of
21  number of golfers, number of new golf
22  courses, the ability of a company to
23  penetrate markets in foreign countries,
24  ability of companies to sell
25  aggressively.

Page 167

1       All that kind of information
2  is relevant and is information that's
3  considered by people who buy and sell
4  investments on a daily basis.
5  Q.  How fast do you think that such
6  information is assimilated by the
7  market, the stock market?
8  A.  Today?
9       MS. FOX: If you know.
10       THE WITNESS: In my --
11  BY MS. BRANNEN:
12  Q.  In your layman's opinion.
13  A.  In my layman's opinion? Faster
14  every day, with -- the world pretty much
15  operates in real time.
16  Q.  Does that kind of information
17  influence your investment decisions?
18  A.  Yes.
19  Q.  Or maybe, I guess, a better
20  question is, does it influence your
21  broker's investment decisions? Because
22  do you actually -- I think you were
23  saying earlier you don't really have
24  time to follow all the stocks that
25  you're invested in.

Page 168

1  A.  I can't speak for my brokers, but
2  my common-sense understanding is that
3  they're basing their decision about all
4  the sources of information that are
5  available.
6  Q.  And I know when you were listing
7  some of the information that you think
8  affects the company's stock price, one
9  of the things you talked about was sort
10  of industry conditions, market
11  conditions in the industry where a
12  corporation does business. How fast do
13  you believe that kind of information is
14  assimilated by the market?
15       MS. FOX: Again, it's way
16  beyond his expertise and --
17  BY MS. BRANNEN:
18  Q.  Just -- I'm just looking for your
19  layman's opinion.
20       MS. FOX: -- completely
21  irrelevant.
22       THE WITNESS: As a layman,
23  that is a longer-term issue because it
24  speaks -- it speaks to a trend in the
25  marketplace. You don't build golf

Page 169

1  courses overnight. You don't convince
2  more Americans they should be playing
3  golf overnight. It's a -- it's -- in my
4  layman's opinion, it's something that
5  happens over a period of time.
6  BY MS. BRANNEN:
7  Q.  Do you --
8  A.  But it's different for each --
9  it's different for each business.
10  Q.  Do you think that global or
11  macroeconomic forces in general affect a
12  company's stock price?
13  A.  Of course.
14  Q.  And do you think those kinds of
15  forces affected Adams Golf stock at any
16  time during the class period?
17  A.  No. Not in a negative way. No.
18  Q.  Have you ever met or known anyone
19  at Adams Golf, an employee or a former
20  employee of Adams Golf?
21  A.  I was at a golf show once and
22  stopped by the Adams Golf booth and told
23  a person there how upset I was about
24  losing almost $50,000 in their company.
25  I don't know her name. I just sort of

43 (Pages 166 to 169)

Page 182

1  A.  I would not.
2  Q.  I understand you testified earlier
3  about your agreement with your counsel
4  regarding fees ultimately to be
5  determined by the Court.
6  A.  Uh-huh.
7  Q.  Do you have a written retention
8  agreement with Berger & Montague?
9  A.  No.
10  Q.  Do you have a written retention
11  agreement with any of the attorneys
12  whose names are listed on this
13  Complaint, Exhibit 19, Mr. Lewis?
14  A.  No.
15  Q.  Abrahams Loewenstein & Bushman,
16  and the Olsen law firm, do you have any
17  there?
18  A.  I do not.
19  Q.  Is there any form of written
20  document that sets out the parameters of
21  your attorneys' representation of you in
22  this suit?
23  A.  There is not.
24  Q.  I believe you said earlier that
25  Mr. Bill Schockley works with a private

Page 183

1  equity firm; is that correct?
2  A.  Yes.
3  Q.  Can you tell me the name of that
4  firm?
5  A.  I mean, I don't know why that's
6  relevant.  That's his business, where he
7  works, not mine.
8  Q.  You're not going to answer the
9  question?
10  A.  No, I'm not going to answer the
11  question.
12  Q.  Is there a reason why you're not
13  going to answer the question?
14  A.  I just don't think it's relevant.
15  I'm not going to tell you where he works
16  or where he lives.  It's just -- it's
17  his right to privacy.
18        MR. McEVOY:  Okay.  That's
19  all I have.
20        EXAMINATION
21  BY MS. BRANNEN:
22  Q.  I just have one or two more
23  questions.  I just want to make sure
24  that I got clear for the record the --
25  when we looked at Exhibit 20, which was

Page 184

1  your -- the trading records that you
2  produced regarding your Adams Golf
3  transactions --
4  A.  Uh-huh.
5  Q.  -- that reflects all the -- the
6  only two transactions that you ever made
7  in Adams Golf stock; is that correct?
8  A.  That's correct.
9  Q.  Okay.  I just wanted to make sure
10  there weren't any other purchases or
11  sales at a different time period.
12  A.  No.
13        MS. BRANNEN:  Okay.  Can we
14  just take a quick five-minute break and
15  I just want to make sure I've covered
16  everything.
17        MS. FOX:  Sure.
18        MS. BRANNEN:  Off the record.
19        (Recess, 3:22-3:24 p.m.)
20        MS. BRANNEN:  I think I'm
21  done.
22        MS. FOX:  I have one
23  question.
24        MS. BRANNEN:  Okay.
25        EXAMINATION

Page 185

1  BY MS. FOX:
2  Q.  Is it your understanding that
3  Adams Golf itself is a defendant in this
4  litigation?
5  A.  Yes, the company.  Yes.
6  Q.  Did you know that at the time you
7  were asked to recite the defendants this
8  morning --
9  A.  I did --
10  Q.  -- the first or second question?
11  A.  I did know that, yes.
12  Q.  And you just forgot, you said?
13  A.  Yes.  I just --
14        MS. FOX:  Okay.  That's fine.
15  Thank you.
16        MS. BRANNEN:  Then I think
17  we're done.
18        (Whereupon the deposition
19  concluded at 3:24 p.m.)
20        TESTIMONY CLOSED
21
22
23
24
25

47 (Pages 182 to 185)

ADGODOB



EXHIBIT NO. 20
RC 2/23/05

Adam Golf Litigation

# Janney Montgomery Scott
INC.

PHILADELPHIA, PA 19103-1675
1801 MARKET STREET
(215) 665-6000

MT. LAUREL, N.J. 08054
1000 ATRIUM WAY (ATRIUM I BLDG.)

SEE REVERSE SIDE FOR IMPORTANT INFORMATION

JOHN M MORRASH &
SANDRA H MORRASH JT-TEN
3901 SHERWOOD LANE
DOYLESTOWN PA 18901

| | DESCRIPTION | PRICE | AMOUNT | INTEREST | S.E.C. FEE ADD'D OR HANDLING | COMMISSION OR CHARGE | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| B - YOU BOUGHT | | | | | | | |
| S - YOU SOLD | | | | | | | |
| S | ADAMS GOLF | | | | | | |
| 4000 | | 36339 | 1453560 | | 49 | 50375 | 1403136 |

| ACCOUNT NUMBER | TYPE OF ACCT. | TYPE OF TRANS. | TRADE DATE | SETTLEMENT DATE |
|---|---|---|---|---|
| G CH4860261B326 | 1 | 06 | 12/30/98 | 01/05/99 |

SYMBOL ADGO

CUSIP NO 006228-10-0

MEMBER
SIPC
SECURITIES INVESTOR
PROTECTION CORPORATION

JMM 3

## Terms and Conditions

This transaction is subject to the constitution, rules, regulations, customs and usages of the Exchange or Market (and its Clearing House if any) where executed and to the provisions of the Security Exchange Act of 1934 and the rules and regulations of the Securities and Exchange Commission, and of the Federal Reserve Board, and also in accordance with the requirements of the National Association of Securities Dealers, Inc.

Until settlement is made by you, these securities are or may be hypothecated and commingled with securities carried for other customers.

Securities shall not be deemed to be delivered to us until actually received by us. Title to securities delivered by us shall not pass until payment is actually received. A check shall not be considered payment until it has been collected. On collection, title to these securities shall pass to the buyer.

If we have acted as your agent, the name of the other party to the transaction, time of execution and remuneration will be furnished upon written request.

For holders of certain Zero Coupon Municipal Bonds, there are no periodic payments and; if applicable, may be callable below maturity value without notice by mail to Holder unless Registered.

If this transaction was executed on a Canadian exchange, the amount shown under interest or state tax on the face hereof represents the aggregate amount of the conversion differential between Canadian and American currency on the date of the transaction.

If the symbol (•) appears in the security description on the face hereof, the offering of the described security has been made solely by means of the prospectus relating thereto, a copy of which has been or will be delivered to you, receipt of which is acknowledged by payment hereof.

If the symbol (F) appears in the security description, it indicates that the security is "Foreign" and may be subject to interest equalization tax.

If the symbol (•) appears in the security description, it indicates that there is a 100% initial margin requirement on the purchase of the security.

If the symbol (•) appears in the price, it indicates that an add in differential has been added to the price on purchases or deducted on sales. On the New York Stock Exchange this amount is 12½¢ per share. In all other cases an explanation will be provided upon request.

On certain orders, we may receive remuneration for directing these orders to particular brokers/dealers or market centers for execution. If any compensation was received in connection with your transaction, the source and amount is available at your request.

Regarding CMO's and other asset- backed securities, the anticipated yield and average life of the security will fluctuate depending on actual prepayment experience and current interest rates. Further information available on request.

**Explanation**

Type of account
1. Cash
2. General
3. Withholding
4. When Issued
5. Other
6. Short

Type of transaction
This capacity in which we have acted in this transaction is indicated by the number appearing on the face hereof and described as follows:
01. As principal for our account.

As agent for your account on:
02. New York Stock Exchange
03. Chicago Stock Exchange
04. American Stock Exchange
05. Other
06. Over the counter

07. As agent for another account
08. Agent for both buyer and seller; the 'same' or like commission has been charged by the broker to the customer on the other side of the transaction.
14. American Stock Exchange-Options
15. Chicago Board Options Exchange
25. Pacific Stock Exchange
35. Philadelphia Stock Exchange

**Please retain this confirmation for income tax purposes**

JMM 4



# <u>INSTRUCTIONS</u>

### <u>FOR SECURITIES BOUGHT</u>
PLEASE RETURN THIS STUB WITH REMITTANCE
MAKE CHECKS PAYABLE TO JANNEY MONTGOMERY SCOTT INC . OR JMS

### <u>FOR SECURITIES SOLD</u>
PLEASE RETURN THIS STUB WITH CERTIFICATES

**JMM 6**

# Janney Montgomery Scott
INC.

PHILADELPHIA, PA 19103-1675
1801 MARKET STREET
(215) 665-6000

MT. LAUREL, N.J. 08054,
1000 ATRIUM WAY (ATRIUM I BLDG.)

SEE REVERSE SIDE FOR IMPORTANT INFORMATION

| B - YOU BOUGHT<br>S - YOU SOLD | DESCRIPTION | PRICE | AMOUNT | INTEREST | ACCOUNT NUMBER | TYPE OF ACCT. | S.E.C. FEE AND/OR HANDLING | TYPE OF TRANS. | COMMISSION OR CHARGE | TRADE DATE | NET AMOUNT | SETTLEMENT DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B | ADAMS GOLF | 160000 | 6400000 | | G CH4860268326 | 1 | | 01 | | 07/10/98 | 6400000 | 07/15/98 |
| 4000 | | | | | | | | | | | | |

BILLING 07/13/98

PROSPECTUS MAILED UNDER SEPARATE COVER

JOHN M MORRASH &
SANDRA M MORRASH JT-TEN
3901 SHERWOOD LANE
DOYLESTOWN PA 18901

SYMBOL ADG0    CUSIP NO 006228-10-0

MEMBER
SIPC
SECURITIES INVESTOR
PROTECTION CORPORATION

## Terms and Conditions

This transaction is subject to the constitution, rules, regulations, customs and usages of the Exchange or Market (and its Clearing House) if any where executed and to the provisions of the Security, Exchange Act of 1934 and the rules and regulations of the Securities and Exchange Commission, and of the Federal Reserve Board, and also in accordance with the requirements of the National Association of Securities Dealers, Inc.

Until settlement of this transaction the securities are or may be hypothecated and commingled with securities carried for other customers.

Securities shall not be deemed to be delivered to us until actually received by us. Title to securities delivered by us shall not pass until payment is actually received. A check shall not be considered payment until it has been collected. On collection, title to these securities shall pass to the buyer.

If we have acted as your agent, the name of the other party to the transaction, time of execution and remuneration will be furnished upon written request.

For holders of certain Zero Coupon Municipal Bonds, there are no periodic payments and, if applicable, may be callable below maturity value without notice by mail to Holder unless Registered.

If this transaction was executed on a Canadian exchange, the amount shown under interest or state tax on the face hereof represents the appropriate amount of the conversion differential between Canadian and American currency on the date of this transaction.

If the symbol (+) appears in the security description on the face hereof, the offering of the described security has been made solely by means of the prospectus relating thereto, a copy of which has been or will be delivered to you.

If the symbol (*) appears in the security description, it indicates that the security is "Foreign" and may be subject to interest equalization tax.

If the symbol (F) appears in the security description, it indicates that there is a 100% initial margin requirement on the purchase of the security.

If the symbol (+) appears in the security description, it indicates that an odd lot differential has been added to the price on purchases or deducted on sales. On the New York Stock Exchange this amount is 12½¢ per share. In all other cases, if the symbol (*) appears in the price, it indicates that an odd lot differential has been added to the price or deducted on sales.

On certain orders, we may receive remuneration for directing these orders to particular broker/dealers or market centers for execution. If any compensation was received in connection with your transaction, the source and amount of such an explanation will be provided upon request.

On certain orders, we may receive remuneration for directing these orders to particular broker/dealers or market centers for execution. Further information available on request.

Regarding CMO's and other asset-backed securities, the anticipated yield and average life of the security will fluctuate depending on actual prepayment experience and current interest rates.

Please retain this confirmation for income tax purposes

**Explanation**

Type of account:
1. Cash
2. General
3. Withholding
4. When issued
5. Other
6. Short

Type of transaction:
This capacity in which we have acted in this transaction is indicated by the number appearing on the face hereof and described as follows:
01. As principal for our account.
02. As agent for your account.
03. As agent for both buyer and seller.
04. As agent for another account.
05. Other
06. Over the counter

07. As agent for both buyer and seller: the "same broker in the transaction" on the other side of the transaction.
08. Agent for both buyer and seller or "like commission has been charged by the broker or the customer on the other side of the transaction.

14. American Stock Exchange-Options
15. Chicago Board Options Exchange
25. Pacific Stock Exchange
35. Philadelphia Stock Exchange

New York Stock Exchange
Chicago Stock Exchange
American Stock Exchange
Over the counter

JMM 8



Established 1832
**JMS** INC

**MEMBERS**
NEW YORK STOCK EXCHANGE
AMERICAN STOCK EXCHANGE
PHILADELPHIA STOCK EXCHANGE
NAT'L ASSN. SECURITIES DEALERS

SEE REVERSE SIDE FOR INSTRUCTIONS

| B - YOU BOUGHT S - YOU SOLD | DESCRIPTION | NET AMOUNT |
|---|---|---|
| B    4000 | ADAMS GOLF | 6400000 |
| | BILLING 07/13/98 | SETTLEMENT DATE |
| | | 07/15/98 |

JOHN M MORRASH &
SANDRA M MORRASH JT—TEN
3901 SHERWOOD LANE
DOYLESTOWN   PA   18901

| ACCOUNT NUMBER |
|---|
| CH4860268326  1 |

| CUSIP NUMBER |
|---|
| 006228—10—0 |

JMM 9

## <u>INSTRUCTIONS</u>

<u>FOR SECURITIES BOUGHT</u>
PLEASE RETURN THIS STUB WITH REMITTANCE
MAKE CHECKS PAYABLE TO JANNEY MONTGOMERY SCOTT INC . OR JMS

<u>FOR SECURITIES SOLD</u>
PLEASE RETURN THIS STUB WITH CERTIFICATES

## ADAMS GOLF, INC. SECURITIES LITIGATION
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

*John M. & Sand M. Morrish* ("Plaintiff") duly swears and says, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed the complaint and have authorized the filing of a substantially similar complaint on my behalf.

2.  The security that is the subject of this action was not purchased at the direction of plaintiff's counsel or in order to participate in this private action.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  The transactions in the security that is the subject of this action during the Initial Public Offering are as follows:

| Date | Number of Shares Purchased | Price Per Share |
|------|---------------------------|-----------------|
| 7-10-98 | 4000 | # 16.00 |

loss # 49,464

| Date | Number of Shares Sold | Price Per Share |
|------|----------------------|-----------------|
| 12-30-98 | 4000 | # 3.6339 |

JMM 11

07/03/1996  02:57  2153451570        MORRASH

5.    Plaintiff has not sought to serve as a class representative in any securities fraud class action in the last three (3) years, unless indicated below.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of United States that the foregoing is true and correct. Executed this _12_ day of _April_, 1999, at _Jenkintown, PA_ .

By: _John M. Morrash / Sandra M. Morrash_

Adams:Golf:Certform/213045.wp

P.01/01

JMM 12

5.     Plaintiff has not sought to serve as a class representative in any securities fraud class action in the last three (3) years, unless indicated below.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of United States that the foregoing is true and correct. Executed this _*12*_ day of *April*, 1999, at _*Jenkintown, PA*_.

By: _____
John M. Morreux / Sandra M. Morreux

STATEMENT OF ACCOUNT

**[JMS]** INC.

MEMBER NEW YORK STOCK EXCHANGE INC. AND OTHER PRINCIPAL EXCHANGES

Page 3 of 4

JOHN M MORRASH &
SANDRA M MORRASH JT-TEN

ACCOUNT NUMBER OH48 6026-5326
STATEMENT PERIOD 06/27/98 - 07/31/98

TAX ID # 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

2007528

## CURRENT ACTIVITY SECTION

### INCOME AND EXPENSE ACTIVITY

| Date | Transaction Type | Quantity | Description | Price | Debits | Credits | Acct Type |
|---|---|---|---|---|---|---|---|
| | DIVIDEND | | | | | | CASH |

TOTAL

### SECURITIES BOUGHT AND SOLD

| Date | Transaction Type | Quantity | Description | Price | Debits | Credits | Acct Type |
|---|---|---|---|---|---|---|---|
| 7/13 | PURCHASE | 4,000 | ADAMS GOLF AS OF 7/10/98 | 16.0000 | 64,000.00 | | CASH |

TOTAL

### OTHER ACTIVITY

| Date | Transaction Type | Quantity | Description | Price | Debits | Credits | Acct Type |
|---|---|---|---|---|---|---|---|
| 7/24 | JOURNAL | | | | | | |
| 7/24 | JOURNAL | | | | | | |
| 7/24 | JOURNAL | | | | | | |
| 7/24 | JOURNAL | | | | | | |
| 7/30 | RECEIVED | | | | | | |
| 7/30 | MARGIN INT | | | | | | |
| 7/30 | NET JOURNALS | | | | | | |
| 7/30 | NET JOURNALS | | | | | | |

TOTAL

### MONEY MARKET CHECKING ACTIVITY

| Date | Transaction Type | Description | Check#/Code | Debits | Credits | Acct Type |
|---|---|---|---|---|---|---|

### MONEY MARKET PURCHASE AND SALE ACTIVITY

| Date | Transaction Type | Description | Price | Debits | Credits | Acct Type |
|---|---|---|---|---|---|---|

**SIPC** YOUR SIPC COVERAGE IS SUPPLEMENTED BY ADDITIONAL PROTECTION OF $49,500,000 BY A MAJOR INSURANCE COMPANY.

FOR IMPORTANT INFORMATION PLEASE SEE REVERSE SIDE.

# STATEMENT OF ACCOUNT

## Janney Montgomery Scott
### INC.
MEMBER NEW YORK STOCK EXCHANGE INC. AND OTHER PRINCIPAL EXCHANGES

JOHN M MORRASH &
SANDRA M MORRASH JT-TEN

ACCOUNT NUMBER  OH48 6026-8326
STATEMENT PERIOD  11/28/98 - 12/31/98

TAX ID # 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

Page 3 of 4

3008702

### INCOME AND EXPENSE ACTIVITY

| Date | Transaction Type | Quantity | Description | Price | Debits | Credits | Acct Type |
|---|---|---|---|---|---|---|---|
| | | | | | | | CASH |

TOTAL

### SECURITIES BOUGHT AND SOLD

| Date | Transaction Type | Quantity | Description | Price | Debits | Credits | Acct Type |
|---|---|---|---|---|---|---|---|
| | PURCHASE | | | 3.6339 | | | CASH |
| 12/20 | SALE | 4,000 | ADAMS GOLF | | | 14,031.36 | CASH |

TOTAL

### OTHER ACTIVITY

| Date | Transaction Type | Quantity | Description | Price | Debits | Credits | Acct Type |
|---|---|---|---|---|---|---|---|

### MONEY MARKET CHECKING ACTIVITY

| Date | Transaction Type | Description | Check # / Code | Debits | Credits | Acct Type |
|---|---|---|---|---|---|---|

TOTAL

### MONEY MARKET PURCHASE AND SALE ACTIVITY

| Date | Transaction Type | Description | Price | Debits | Credits | Acct Type |
|---|---|---|---|---|---|---|