**12**

Page 1

1            IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF DELAWARE

2

3

4    IN RE:  ADAMS GOLF,        CIVIL ACTION NO. 99-371-KAJ

     INC.,

5

     SECURITIES   LITIGATION          (CONSOLIDATED)

6

7

8

9

10

11            Oral deposition of FLOYD

12   KENNETH SHOCKLEY, D.O., taken at the law

13   offices of BERGER & MONTAGUE, P.C., 1622

14   Locust Street, Philadelphia,

15   Pennsylvania, on Friday, February 25,

16   2005, at 10:42 a.m., before Rosemary

17   Locklear, Registered Professional

18   Reporter, Certified Shorthand Reporter

19   (NJ), Certified Realtime Reporter and

20   Notary Public, pursuant to notice.

21

22

23

24

25

KENNETH SHOCKLEY                    2/24/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

---

Page 2

```
1  APPEARANCES:
2  BERGER & MONTAGUE, P.C.
      BY: TODD S. COLLINS, ESQUIRE
3     tcollins@bm.net
      1622 Locust Street
4  Philadelphia, Pennsylvania 19103-6305
      (215) 875-3000
5
      and
6
   LAW OFFICE OF DONALD B. LEWIS
7     BY: DONALD B. LEWIS, ESQUIRE
      5 Cynwyd Road
8  Bala Cynwyd, Pennsylvania 19004
      (610) 668-0331
9
      and
10
   ABRAHAMS, LOEWENSTEIN & BUSHMAN
11    BY: ALAN A. SANDERS, ESQUIRE
      asanders@e-ALB.com
12    Three Parkway - Suite 1300
      16th and Cherry Streets
13 Philadelphia, Pennsylvania 19102-1321
      (215) 561-1030
14    Appearing on behalf of the Plaintiffs
15 AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
      BY: JENNIFER R. BRANNEN, ESQUIRE
16    jbrannen@akingump.com
      LAURA MORIATY, ESQUIRE
17    lmoriaty@akingump.com
      300 West 6th Street, Suite 2100
18 Austin, Texas 78701-2916
      (512) 499-6200
19    Appearing on behalf of the Defendants Adams Golf,
      Inc., B. H. Adams, Richard H. Murtland, Darl P.
20    Hatfield, Paul F. Brown, Jr., Roland E. Casati,
      Finis F. Conner and Stephen R. Patchin
21
22
23
24
25
```

---

Page 3

```
1  APPEARANCES: (CONTINUED)
2  SIMPSON THACHER & BARTLETT, L.L.P.
      BY: DAVID H. LaROCCA, ESQUIRE
3     dlarocca@stblaw.com
      425 Lexington Avenue
4  New York, New York 10017-3954
      (212) 455-3382
5     Appearing on behalf of the Defendants Lehman
      Brothers Holdings, Inc.; Banc of America
6     Securities, L.L.C.; and Ferris, Baker Watts,
      Incorporated
7
8         EXAMINATION INDEX
9
   FLOYD KENNETH SHOCKLEY, D.O.
10    BY MS. MORIATY              4
      BY MR. LaROCCA             155
11
12        EXHIBIT INDEX
13
                   MARKED
14
      22  Document              9
15
      23  Document             85
16
      24  Document            107
17
      25  Document            119
18
      26  Document            122
19
      30  Document            128
20
21
22
23
24
25
```

---

Page 4

```
1          FLOYD KENNETH SHOCKLEY, D.O.,
2  having been duly sworn, was examined and
3  testified as follows:
4          EXAMINATION
5  BY MS. MORIATY:
6  Q.  Good morning, Dr. Shockley. My
7  name is Laura Moriaty. I represent the
8  defendant company, Adams Golf, and the
9  individual defendants.
10         I just wanted to run through
11 the general deposition rules, first off,
12 so we understand, both, what's going on.
13         Have you ever had your
14 deposition taken before?
15 A.  For a security problem or for a
16 medical problem?
17 Q.  Just ever. Yes.
18 A.  Yeah. Medicine, I have.
19 Q.  Okay. When was that?
20 A.  I practiced medicine from 1969
21 until two years ago, three years ago.
22 Q.  Did it happen several times?
23 A.  I had two -- no. I had two or
24 three depositions probably in the '70s.
25 I don't know.
```

---

Page 5

```
1  Q.  Okay. And that was just two or
2  three, you think?
3  A.  I'm positive it was only two or
4  three.
5  Q.  What kinds of cases were they?
6  They were --
7  A.  Malpractice litigations.
8  Q.  Okay. And were you a party to
9  those cases?
10         MR. COLLINS: Let's go off
11 the record.
12         (Discussion off the record.)
13 BY MS. MORIATY:
14 Q.  Were you a party in those cases?
15 A.  Yes.
16         MS. MORIATY: Sorry. We're
17 back on the record.
18 BY MS. MORIATY:
19 Q.  Generally, you understand today
20 that you're under oath as if you were in
21 court; right?
22 A.  Yes.
23 Q.  And that you must therefore
24 testify truthfully.
25 A.  Yes.
```

---

2 (Pages 2 to 5)

KENNETH SCHOCKLEY                    2/24/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 6

1   Q.  And I need you to answer audibly
2   so that the court reporter can pick it
3   up, not just, you know, say uh-huh or
4   gesture unh-unh.  And the trickiest
5   part, at least for me right now, is to
6   not talk over each other.  So try not to
7   interrupt, because she has to get both
8   sides of the conversation.
9           Tell me if you don't
10  understand something I ask because, if
11  you go ahead and answer it, I'll just
12  assume that you understood the
13  question.  So just stop me and tell me
14  you didn't understand.
15          And if you need a break, just
16  say so and we can break at any point.
17  But I would ask that if we have a
18  question, if I've asked you a question
19  and it's still pending, that you just go
20  ahead and answer it rather than taking a
21  break sort of in midstream.
22          MR. COLLINS:  Which is
23  exactly right, Dr. Shockley.  However,
24  if you ever have a question in your mind
25  as to whether answering a question would

Page 7

1   violate some privilege, especially the
2   attorney-client privilege, then under
3   those circumstances you can consult with
4   your lawyer while a question is pending,
5   but not otherwise.
6           MS. MORIATY:  Thank you.
7   BY MS. MORIATY:
8   Q.  I guess the next thing is that we
9   ask you not to guess.  But to the extent
10  that you have a recollection, we'd like
11  your best recollection.  And finally, is
12  there any reason that you're not going
13  to be able to give your best testimony
14  here today?
15  A.  No.
16  Q.  Are you suffering from any mental
17  or physical conditions or medications?
18  A.  Not to my knowledge.
19  Q.  Okay.  All right.  Can you tell me
20  your address?
21  A.  My permanent address?
22  Q.  Your home address.
23  A.  Okay.  Well, I'm basically running
24  out of two places right now, so I don't
25  know which one you want.  848 Summerwood

Page 8

1   Drive, Jupiter, Florida.
2   Q.  Okay.  Sounds good.
3   A.  But I'm basically out of 40
4   Broadway, Somers Point, New Jersey.
5   Q.  And what is your telephone number
6   at the place you're most likely to be
7   able to be reached?
8   A.  609-926-7112.
9   Q.  Okay.  And did you live in the
10  Florida address from '98 to '99?
11  A.  No.
12  Q.  Where did you live then?
13  A.  I lived in Florida, but not at
14  that address.
15  Q.  Okay.  Do you remember what the
16  address was that you lived at then?
17  A.  '98, '99?  I've lived in four
18  different places in Florida in the last
19  several years.  I would say it was my
20  Taquesta address.
21  Q.  Okay.  And what is your business
22  currently?
23  A.  Retired.
24  Q.  Okay.  Are you married?
25  A.  Single.

Page 9

1   Q.  All right.  I'd like to
2   introduce -- let me get this marked
3   first.  This is your CV you gave us
4   today.  Is that, to your knowledge,
5   accurate and complete?
6   A.  I don't think that was updated
7   probably in the last five to seven
8   years.  But when I was in practice, that
9   was my CV.
10  Q.  Is there anything you'd like to
11  add that's happened in the last five to
12  seven years?
13  A.  No.
14          MR. COLLINS:  Are you going
15  to mark that as an exhibit?
16          MS. MORIATY:  I'm sorry.
17  It's going to be 22, I believe.
18          (Exhibit 22 was marked for
19  identification.)
20  BY MS. MORIATY:
21  Q.  Now, I'm showing you what's been
22  marked as Exhibit 22.
23          Does that look complete and
24  accurate to you?
25  A.  It's what I brought up from the

3 (Pages 6 to 9)

Page 10

1    shore with me this morning, yes.
2    Q. Okay. When you were in your
3    college education, did you take any sort
4    of finance, accounting, business
5    courses?
6    A. No.
7    Q. Did you take any postgraduate
8    courses or seminars -- I'm sorry,
9    postgraduating from college, courses or
10   seminars on business, accounting,
11   finance, that sort of thing?
12        MR. COLLINS: Vague and
13   ambiguous.
14        Go ahead.
15        THE WITNESS: The only thing
16   I did during the years that I was in
17   practice is I'd take courses in medical
18   business as far as running your office
19   practice.
20   BY MS. MORIATY:
21   Q. Did any of that cover investing --
22   A. No.
23   Q. -- or accounting?
24   A. No.
25        MR. COLLINS: Forgive me.

Page 11

1        You've got to let her finish
2    asking before you answer.
3    BY MS. MORIATY:
4    Q. I suppose your professional
5    societies are covered in the CV; is that
6    correct?
7    A. Yes.
8        MR. COLLINS: Obviously, as
9    of the time the CV was prepared.
10       MS. MORIATY: Right.
11   BY MS. MORIATY:
12   Q. Are there any additional
13   professional societies that you've
14   joined since the CV was prepared?
15   A. I have less of them now that I'm
16   retired.
17   Q. Okay. Let's see. All right. I'm
18   going to turn over to the preparation
19   you did for this deposition. When did
20   you learn you were going to have to give
21   this deposition in this litigation?
22       MR. COLLINS: Vague and
23   ambiguous.
24       THE WITNESS: Several weeks
25   ago, I guess. I was in Florida on jury

Page 12

1    duty and they were trying to pick a date
2    and I didn't know what I was going to be
3    required to do with the jury duty. So
4    they were waiting for me to get finished
5    that to make this date.
6    BY MS. MORIATY:
7    Q. And who told you that you were
8    going to give this deposition?
9        MR. COLLINS: I'm sorry.
10   Please answer the question, but never
11   say what a lawyer said to you or you
12   said to a lawyer, please. Go ahead.
13   BY MS. MORIATY:
14   Q. You can identify who told you.
15   A. Mr. Sanders.
16   Q. Thank you.
17       With whom did you meet to
18   personally prepare -- whom did you meet
19   with personally to prepare for the
20   deposition?
21   A. This morning I met with
22   Mr. Collins.
23   Q. Was it just this morning or were
24   there any other meetings?
25       MR. COLLINS: Vague and

Page 13

1    ambiguous.
2        Go ahead.
3        THE WITNESS: First meeting
4    I -- was this morning.
5    BY MS. MORIATY:
6    Q. Have you communicated with anyone
7    else other than your attorneys in
8    preparation for the deposition?
9    A. No.
10   Q. Did you review any documents in
11   preparation for the deposition?
12   A. This morning we went over
13   documents, some documents.
14   Q. Did any of those refresh your
15   recollection of any of the things that
16   were involved in this case?
17       MR. COLLINS: Overbroad.
18       THE WITNESS: Sort of all
19   Greek and Latin to me.
20   BY MS. MORIATY:
21   Q. Were there any specific documents
22   you recall that you viewed that
23   refreshed your recollection in any way?
24       MR. COLLINS: Overbroad.
25       THE WITNESS: I remember

4 (Pages 10 to 13)

Page 14

1   seeing the documents before. But when
2   does this go back to, 1998?
3   BY MS. MORIATY:
4   Q.   Right.
5   **A.   I have trouble remembering what I**
6   **did six months ago.**
7   Q.   So there weren't any -- are you
8   saying that there weren't any specific
9   documents that you --
10  **A.   No surprises.**
11  Q.   -- specifically recall?
12        MR. COLLINS: Excuse me.
13  Excuse me.
14        I think I object to your
15  question, but I didn't hear it all. But
16  go ahead.
17  BY MS. MORIATY:
18  Q.   Then there were not any specific
19  documents that you viewed that refreshed
20  your recollection specifically?
21        MR. COLLINS: Vague,
22  overbroad, ambiguous, asked and
23  answered.
24        THE WITNESS: Explain that to
25  me. I don't -- what do you mean that

Page 15

1   they were --
2        MS. MORIATY: We'll just move
3   on.
4   BY MS. MORIATY:
5   Q.   I'm just going to talk through
6   your sort of basic understanding of this
7   lawsuit, from your layperson's
8   perspective now.
9   **A.   Thank you.**
10  Q.   Who are you suing in this action?
11  **A.   I'm suing Adams Golf and**
12  **underwriters.**
13  Q.   Why are you suing those
14  defendants?
15  **A.   Because at the time I was angry.**
16  Q.   What do you believe they did
17  wrong?
18  **A.   I think the principals of the**
19  **company, the directors, officers,**
20  **whatever you want to call them, made**
21  **millions of dollars under false**
22  **pretenses, didn't give out all the facts**
23  **and the little guy like me and other**
24  **people got, excuse the expression,**
25  **screwed.**

Page 16

1   Q.   What evidence do you have to
2   support that belief?
3        MR. COLLINS: Excuse me.
4   Wait a minute.
5        Evidence is a legal term. To
6   avoid an objection, do you want to put
7   it into --
8   BY MS. MORIATY:
9   Q.   What facts can you as a layperson
10  point to to substantiate that belief?
11        MR. COLLINS: Go ahead.
12        THE WITNESS: At the time I
13  remember reading the prospectus, I was
14  told that it was an IPO, it was a well-
15  run company and that I ought to invest
16  in it. From my stockbroker, who was a
17  golf pro or semi golf pro. I don't know
18  a thing about golf. I thought it was a
19  good deal.
20  BY MS. MORIATY:
21  Q.   So you read the prospectus and you
22  talked to the golf pro? Were there any
23  other --
24  **A.   No. He was a stockbroker.**
25  Q.   Okay.

Page 17

1   **A.   He knew golf.**
2   Q.   Can you give me the name -- the
3   people who you have sued in this suit
4   that we went over earlier, can you name
5   the individual defendants in the
6   lawsuit?
7        MR. COLLINS: You mean give
8   their names as opposed to describing who
9   they are or what positions they held?
10        MS. MORIATY: Either way.
11        THE WITNESS: No. I'd have
12  to look at the document of who they
13  are. I referred that to my attorney
14  when I went to him.
15  BY MS. MORIATY:
16  Q.   Could you give me their sort of
17  titles and responsibilities?
18        MR. COLLINS: Vague and
19  ambiguous.
20        THE WITNESS: I thought they
21  were directors or officers of the
22  club -- of the club, of the business.
23  BY MS. MORIATY:
24  Q.   Do you know how many defendants
25  there are?

5 (Pages 14 to 17)

Page 18

1      MR. COLLINS:  You mean
2  individual defendants or total
3  defendants?
4      MS. MORIATY:  In total.
5      THE WITNESS:  No.
6  BY MS. MORIATY:
7  Q.  In 1998, do you know what sort of
8  business Adams Golf was in?
9  A.  Making golf clubs.
10  Q.  Do you know what sort of products
11  Adams Golf sold?
12      MR. COLLINS:  Asked and
13  answered.
14      THE WITNESS:  Golf products.
15  BY MS. MORIATY:
16  Q.  Do you know how Adams Golf markets
17  or marketed in 1998 its products?
18  A.  Well, if I remember correctly, in
19  the prospectus before the big shots sold
20  out, the marketing was a little
21  different than what it came out with the
22  bad report afterwards.
23  Q.  In what way?
24  A.  Costcos, selling their clubs
25  through Costcos instead of pro shops.

Page 19

1  Q.  Is it your belief that Adams Golf
2  was selling directly to Costco?
3  A.  I -- I -- I don't think that you
4  have a specialty item and they don't
5  mention that fact, I think that that's
6  misleading.
7  Q.  So --
8  A.  And for everybody to sell out
9  before the bad report came out, somebody
10  knew something.
11  Q.  So Adams Golf's marketing policy
12  involved selling directly to Costco.
13      MR. COLLINS:  Asked and
14  answered, mischaracterizes his
15  testimony.
16  BY MS. MORIATY:
17  Q.  Do you agree?
18      MR. COLLINS:  You mean
19  whether it mischaracterizes his
20  testimony?
21      It's asked and answered.  Go
22  ahead.
23      MS. MORIATY:  He can still
24  answer it, though.
25      THE WITNESS:  I agree that

Page 20

1  they -- they cheapened their product by
2  what they did.
3  BY MS. MORIATY:
4  Q.  Have you seen any Adams Golf --
5  well, let me ask a more specific
6  question.  In 1998, do you know who
7  Adams Golf was selling its clubs to
8  directly?
9  A.  I thought to pro shops.
10  Q.  Have you seen any Adams Golf
11  advertisements?
12  A.  Me?
13  Q.  Yes.
14  A.  I wouldn't know a golf magazine if
15  I saw one.
16  Q.  When did you first learn about the
17  IPO?
18  A.  Back then I guess the stockbroker
19  mentioned it to me and told me it was
20  good, this and that, we went into it.
21  Q.  So a couple of months before, a
22  week before?
23  A.  No, I don't remember.
24  Q.  Okay.  After learning about the
25  IPO, did you start following the

Page 21

1  company?
2  A.  Well, I read the prospectus at the
3  time, yeah.  After -- you get that right
4  afterwards or whatever.
5  Q.  Did you follow press releases from
6  the company?
7  A.  I don't think so.
8  Q.  Do you know who Barney Adams is?
9  A.  Must have something to do with
10  Adams Golf.
11  Q.  Do you have any --
12  A.  How much money did he make?
13  Q.  Do you have any assertion of what
14  you might believe Barney Adams did
15  wrong?
16      MR. COLLINS:  Asked and
17  answered.
18      You mean Barney Adams as
19  opposed to all the other defendants as
20  to which he's given full and complete
21  answers already?
22      MS. MORIATY:  Right.  Barney
23  Adams.
24      THE WITNESS:  No.  I didn't.
25  All I want to know is what he made.

KENNETH SCHOCKLEY                    2/24/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 22

1   BY MS. MORIATY:
2   Q.  Do you know who W.D.C. Mackenzie
3   is?
4   A.  No.
5   Q.  The prospectus, which has been
6   previously marked as Exhibit 1, is what
7   I'm showing you right now. Do you
8   recognize that document?
9        MR. COLLINS:  Wait a second.
10       You just mischaracterized
11  what this document is.
12       MS. MORIATY: I'm sorry. The
13  S-1 filing.
14  BY MS. MORIATY:
15  Q.  Do you recognize this document?
16  A.  No.
17  Q.  So you don't believe you've ever
18  seen it before?
19       MR. COLLINS:  That's -- that
20  is -- are you referring to any part of
21  it or are you referring to each page by
22  it?  Vague and ambiguous.
23  BY MS. MORIATY:
24  Q.  Do you believe you've ever seen
25  any part of this document before?

Page 23

1   A.  I might have. Jeez, I --
2   Q.  Do you know when that would be?
3        MR. COLLINS:  I'm sorry. Did
4   you finish, Dr. Shockley?  If you're
5   finished, that's fine. She didn't mean
6   to cut you off.
7        THE WITNESS:  I mean, do you
8   think that I could read this and
9   understand it?  I could ask you a
10  medical question. I bet you couldn't
11  understand it.
12  BY MS. MORIATY:
13  Q.  I'm just asking, you had been
14  discussing looking through the
15  prospectus with your broker earlier that
16  is included in here. I was --
17  A.  The broker was in 1990 something.
18  I haven't talked about Adams Golf since.
19  Q.  Did you look at a document similar
20  to this when working with your broker in
21  purchasing your Adams Golf stock?
22  A.  I can't recall.
23  Q.  What statements, when you did look
24  at the prospectus, what statements --
25  I'm sorry. You testified earlier that

Page 24

1   you did look at the prospectus; is that
2   correct?
3   A.  At one time I did.
4   Q.  So when you looked at the
5   prospectus, what statements in there did
6   you believe were false and misleading?
7        MR. COLLINS:  What do you
8   mean?
9   BY MS. MORIATY:
10  Q.  Do you now believe were false and
11  misleading?
12       MR. COLLINS:  You don't want
13  him to go through this and pick out
14  Paragraph 19 on Page 73, do you?  What
15  do you mean?
16       MS. MORIATY:  He can describe
17  what he believed from the assertions he
18  read in the prospectus generally.
19       THE WITNESS:  Can I give you
20  a general statement?
21       MS. MORIATY:  Sure.
22       THE WITNESS:  I practiced
23  medicine and surgery for 30 years. I
24  was always honest with my patients and
25  explained things to the best of my

Page 25

1   knowledge to them.
2        I think it was misleading,
3   they weren't honest and there was a bait
4   and switch operation and a lot of people
5   made a lot of money and a lot of little
6   people got screwed.
7   BY MS. MORIATY:
8   Q.  So you don't have any sense of any
9   specific statements that were made in
10  that prospectus you read that you felt
11  were mischaracterizations?
12       MR. COLLINS:
13  Mischaracterizes his testimony. The
14  question has been asked and answered
15  previously.
16       Go ahead.
17       THE WITNESS:  Right now I
18  don't. How many years has this been?
19       MS. MORIATY:  And one more
20  question.
21  BY MS. MORIATY:
22  Q.  Was there anything that you --
23  A.  How many years has this been?
24  Q.  Several.
25       The prospectus in 1998, do

KENNETH SCHOCKLEY                2/24/2005  IN RE: ADAMS GOLF, INC , SECURITIES LITIGATION

Page 26

1  you recall anything that you read
2  there -- I imagine the answer is going
3  to be no but just bear with me -- that
4  you read there that was not alleged in
5  your Complaint but you believe was a
6  false and misleading statement?
7  **A.  I remember generalities.  That it**
8  **was built up, it was going to be a well**
9  **run company and everything else.  And**
10 **then an IPO came out, the big shots sold**
11 **off, made all their money and a bad**
12 **report came out with underwriters or**
13 **somebody a month after that.**
14 Q.  Generally, what is your
15 understanding, not from a legal
16 perspective but just your understanding,
17 of the difference between
18 misrepresentations and omissions?
19      MR. COLLINS:  It calls for a
20 legal conclusion.
21      MS. MORIATY:  Just your
22 understanding, not a legal
23 understanding.  These two words in the
24 English language.
25      THE WITNESS:  I think they're

Page 27

1  very similar.
2  BY MS. MORIATY:
3  Q.  Is there any difference between a
4  misrepresentation in your mind than an
5  omission?
6      MR. COLLINS:  Same objection.
7      THE WITNESS:  I imagine there
8  is.  I --
9  BY MS. MORIATY:
10 Q.  Can you at all verbalize the
11 difference you see?
12      MR. COLLINS:  Excuse me.
13      Objection; legal conclusion.
14 I think also you may be asking for an
15 expert opinion on the English language.
16      Go ahead.
17 BY MS. MORIATY:
18 Q.  Your layman's understanding.
19 **A.  I can tell you I am not an English**
20 **major.**
21 Q.  With no expertise at all.  Your
22 regular-Joe opinion of the two words,
23 omission and misrepresentation, what do
24 they mean to you?
25      MR. COLLINS:  Asked and

Page 28

1  answered.
2      THE WITNESS:
3  Misrepresentation means that they say
4  something that isn't true.  Omission,
5  they just didn't bother saying
6      MS. MORIATY:  Thank you.
7  BY MS. MORIATY:
8  Q.  Did Adams Golf make
9  misrepresentations in your understanding
10 of the word?
11      MR. COLLINS:  Calls for a
12 legal conclusion, calls for an expert
13 opinion.
14 BY MS. MORIATY:
15 Q.  You can still answer it.
16 **A.  I'd rather go with him with that.**
17 **I don't know.**
18 Q.  Well, I'm not asking for your
19 expert opinion and I don't want a legal
20 conclusion.  I want what you as someone
21 who was investing in the stock knew.
22 That's it.
23      MR. COLLINS:  With all
24 respect, he said I don't know that, so
25 he answered the question.

Page 29

1      MS. MORIATY:  He has given me
2  a definition.  I mean, you were able to
3  articulate the difference between
4  misrepresentation and omission.  That's
5  all I'm asking for.  All I want to know
6  is do you believe Adams Golf in your
7  understanding of this word, no-big-yah
8  thing about it at all --
9  BY MS. MORIATY:
10 Q.  Do you think they made a
11 misrepresentation?
12      MR. COLLINS:  Asked and
13 answered.  Calls for a legal conclusion,
14 asks for an expert opinion
15      THE WITNESS:  Somebody did
16 something that wasn't right.
17 BY MS. MORIATY:
18 Q.  And you have no opinion --
19 **A.  They made a lot of money with it**
20 **and the little guy got messed up.**
21 Q.  But do you have an opinion over
22 whether that was a misrepresentation or
23 an omission?
24      MR. COLLINS:  Same
25 objections.

8 (Pages 26 to 29)

KENNETH SCHOCKLEY                2/24/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 42

1   that Adams Golf was selling to golf
2   shops, selected sporting goods retailers
3   at the time of the IPO?
4   A.  What time was that?
5   Q.  1998.
6   A.  I would have to look up to when
7   they started selling to Costcos, but
8   they did sell to Costcos.
9   Q.  Okay.  We're going to move to Page
10  29.
11        And we're looking for a
12  statement that starts, "The company
13  sells significant." Oh, there we go,
14  under Sales and Customer Support, we're
15  on the second paragraph, Sales To
16  Retailers.
17        "The company sells a
18  significant majority of its products to
19  selected retailers.  To maintain its
20  high-quality reputation and generate
21  retailer royalty, the company does not
22  sell its products through price
23  sensitive general discount warehouses,
24  department stores or membership clubs."
25        Is this, as far as your

Page 43

1   understanding goes at the time of the
2   IPO in 1998, a true statement?
3   A.  I think so.
4   Q.  Okay.  I'm going to show you
5   what's been marked as Exhibit 2.  This
6   is the -- actually, let's start with
7   Exhibit 19.  I'm showing you what's been
8   marked as Exhibit 19.
9        MS. BRANNEN:  Can we go off
10  the record just for a second.
11        (Discussion off the record.)
12        MS. MORIATY:  Back on the
13  record, please.
14  BY MS. MORIATY:
15  Q.  I'm showing you what's been marked
16  as Exhibit 19.
17        Do you recognize that
18  document?
19        MR. COLLINS:  Well, multi-
20  page document, so answer but take a look
21  at it.
22        THE WITNESS:  Yeah.  I've
23  seen this before.
24  BY MS. MORIATY:
25  Q.  What is it?

Page 44

1   A.  This document?  What is it?  I
2   don't really know, but I remember seeing
3   these pages with the stock purchases and
4   the sales.
5   Q.  Just for the record, this is the
6   original Complaint filed by Plaintiffs.
7   When did you first see this document?
8   A.  I guess shortly after the lawyers
9   filed the Complaint.
10  Q.  So did you see it before the
11  lawyers filed the Complaint?
12  A.  I don't remember that.  What date
13  was this?
14  Q.  Early '99.
15  A.  1999?
16  Q.  You have the only copy in the
17  room.
18  A.  1999 did I see this?
19  Q.  Yes.
20  A.  That's --
21        MR. COLLINS:  And just so
22  it's clear, you're handing him a
23  document that has a court filing number
24  on it, so obviously there's no way he
25  could have seen this until after it was

Page 45

1   filed.
2        Go ahead.
3   BY MS. MORIATY:
4   Q.  What additional investigation did
5   you undertake before this original
6   Complaint was filed?
7        MR. COLLINS:  Foundation,
8   vague and ambiguous.
9        THE WITNESS:  I don't
10  understand the question.
11  BY MS. MORIATY:
12  Q.  Did you undertake any
13  investigation prior to filing this
14  initial Complaint?  Investigation of
15  Adams Golf and this whole problem that
16  you were going to sue over.
17        MR. COLLINS:  Excuse me.
18  Apart from what he's already testified
19  to and apart from the investigation of
20  his attorneys?
21        MS. MORIATY:  Yes.
22        MR. COLLINS:  So any personal
23  investigation.  Off the record, please.
24        (Discussion off the record.)
25        MS. MORIATY:  Let's go back

12 (Pages 42 to 45)

Page 46

1  on the record and I will -- yeah.
2       Read me back the original
3  question, I'm sorry.
4       Actually, let me ask a new
5  one and we'll take that question second.
6  BY MS. MORIATY:
7  Q.  Did you see a final copy of this
8  prior to this Complaint, prior to it
9  being filed?
10       MR. COLLINS:  Vague and
11  ambiguous, maybe calls for a legal
12  conclusion.
13       THE WITNESS:  I saw a final
14  copy.  I don't know when.
15       MS. MORIATY:  Okay.
16       THE WITNESS:  It would be the
17  timing of the filing.  I don't know.
18  BY MS. MORIATY:
19  Q.  Did you personally undertake any
20  investigation of the issues on which
21  this -- the claims laid out in this suit
22  are based prior to filing this
23  Complaint?
24       MR. COLLINS:  Apart from
25  attorneys' investigation and apart from

Page 47

1  what he's testified to, I gather?
2       MS. MORIATY:  Yes.
3       THE WITNESS:  Yes.  I spoke
4  to the stockbroker, I spoke to my son, I
5  spoke to some other people about it.
6  BY MS. MORIATY:
7  Q.  Did you help prepare this
8  Complaint?
9  A.  I beg your pardon?
10       MR. COLLINS:  Vague and
11  ambiguous.
12       THE WITNESS:  What was --
13  BY MS. MORIATY:
14  Q.  Did you help prepare the
15  Complaint?  Did you --
16  A.  No.  I referred it to attorneys
17  and they prepared it.
18  Q.  Did you review the Complaint for
19  accuracy before it was filed?
20  A.  As far as I could tell, the legal
21  interpretation of things, it seemed
22  accurate to me.  I'm not a lawyer.  I
23  don't know.
24  Q.  Do you consider yourself a careful
25  person, generally, when it comes to

Page 48

1  reviewing important documents?
2       MR. COLLINS:  Oh, wait a
3  minute.
4       THE WITNESS:  No.  I think
5  something like this I would get an
6  opinion on.  If you can't trust your
7  lawyer, then why are you hiring him?
8  BY MS. MORIATY:
9  Q.  What did your stockbroker and son
10  tell you when you consulted with them
11  about the allegations in this Complaint?
12  A.  I think the word was something
13  smells.
14       MR. COLLINS:  With regard to
15  the underlying cause of action as
16  opposed to the Complaint, the smelling,
17  I presume?
18  BY MS. MORIATY:
19  Q.  Did they have any comment on the
20  Complaint itself?
21  A.  I imagine they did back at that
22  time.  That's why I was so angry.
23  Q.  But on the specific allegations of
24  the Complaint, they did not, as far as
25  you recall, have a specific comment?

Page 49

1  A.  I have no idea.
2  Q.  Is it fair to say that accuracy is
3  important to you when you're reviewing
4  important documents?
5       MR. COLLINS:  Overbroad.
6       THE WITNESS:  I would say
7  accuracy is very important, mostly if
8  you're a surgeon for 30 years.
9  BY MS. MORIATY:
10  Q.  And that would apply to documents
11  too, I presume?
12  A.  No.  Documents, if they're not in
13  my expertise, I'd have somebody that was
14  their expertise tell me if they were
15  okay.
16  Q.  Did you do anything to satisfy
17  yourself that the allegations in this
18  document were accurate?
19       MR. COLLINS:  Asked and
20  answered.
21       THE WITNESS:  I don't
22  understand what you mean.
23  BY MS. MORIATY:
24  Q.  Did you --
25  A.  Satisfy myself?

13 (Pages 46 to 49)

Page 78

1   you.
2   BY MS. MORIATY:
3   Q. Did you contact someone about
4   becoming involved in this lawsuit?
5   A. My attorney.
6        MR. COLLINS: No.
7   BY MS. MORIATY:
8   Q. You went to the attorney.
9   A. Yeah.
10  Q. They did not contact you
11  initially.
12  A. No.
13  Q. Okay. Do you know who first filed
14  a lawsuit against Adams Golf?
15       MR. COLLINS: Could you tease
16  that question out a little?
17  BY MS. MORIATY:
18  Q. Either a named plaintiff or a law
19  firm.
20  A. I'd have to ask my attorney.
21  Q. Do you know when the initial
22  lawsuit was filed?
23  A. I'd have to ask my attorney.
24  Q. Are you aware that several suits
25  against Adams Golf were filed initially

Page 79

1   and that they were later consolidated
2   into a single case?
3        MR. COLLINS: Foundation.
4        Go ahead.
5        THE WITNESS: I don't think I
6   know that.
7   BY MS. MORIATY:
8   Q. Was your name on any of those
9   initial lawsuits?
10       MR. COLLINS: Asked and
11  answered.
12       THE WITNESS: If I could see
13  the documents, I could answer it for
14  you.
15  BY MS. MORIATY:
16  Q. Do you know whose idea it was to
17  file the initial lawsuit?
18       MR. COLLINS: Asked and
19  answered.
20       THE WITNESS: I thought I
21  said that I discussed this with people
22  and with my attorney and they thought we
23  ought to file a suit.
24  BY MS. MORIATY:
25  Q. So it was your idea.

Page 80

1   A. I had a lot to do with it, yes. I
2   thought we established that I was angry
3   and that's what I wanted to do.
4   Q. Was it also your idea to file a
5   class action?
6   A. If that's the legal term for it,
7   yes.
8   Q. To involve everybody like you.
9   A. Well, I think the other small
10  peons deserve to get their money back if
11  the other guys made millions.
12  Q. Did you --
13  A. And part of those people were
14  people in my office that bought the
15  stock because I did.
16  Q. Did you believe that --
17  A. Made about $25,000 a year. That
18  was their salary.
19  Q. I'm sorry. I didn't mean to
20  interrupt.
21       Do you believe that you had
22  any obligation as the person initially
23  involved in this suit to investigate the
24  facts alleged in the Complaint?
25       MR. COLLINS: Wait a minute.

Page 81

1   Could we hear that one back.
2        (The court reporter read back
3   the following:
4        "QUESTION: I'm sorry. I
5   didn't mean to interrupt.
6        "Do you believe that you had
7   any obligation as the person initially
8   involved in this suit to investigate the
9   facts alleged in the Complaint?")
10       MR. COLLINS: Are you asking
11  whether apart from the investigation and
12  analysis he already described and apart
13  from the investigation of his attorneys,
14  is that your question?
15       MS. MORIATY: I'm asking how
16  he felt. Whether he felt he had an
17  obligation as a named person, as a
18  person whose name was on the suit, to
19  investigate the claims involved in the
20  suit.
21       MR. COLLINS: Well, it's
22  vague and ambiguous and apparently
23  counsel refuses to clear it up, which is
24  your choice. In addition to that, by
25  obligation I presume you are asking for

KENNETH SCHOCKLEY                2/24/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 82

1  a legal conclusion.
2        MS. MORIATY: I am not
3  asking --
4        MR. COLLINS: Excuse me. So
5  you can go ahead and answer the question
6  unless counsel determines she wants to
7  rephrase it.
8        MS. MORIATY: Let me
9  rephrase.
10  BY MS. MORIATY:
11  Q.  I don't want to know about any
12  investigations you did. I want to know
13  whether you felt in your understanding
14  of the word as a doctor, as a layman,
15  what -- whether you had any obligation
16  to investigate the facts underlying the
17  claims.
18  A.  I think --
19        MR. COLLINS: Excuse me.
20  Vague and ambiguous. Calls for a legal
21  conclusion.
22        You may answer.
23        THE WITNESS: I think my name
24  on a document that's a class-action suit
25  that I'm trying to represent the small

Page 83

1  investor, the other people that are
2  involved in it and I intend to follow
3  through with it.
4  BY MS. MORIATY:
5  Q.  And that would include doing
6  investigations?
7  A.  Going to Texas.
8  Q.  It would include attendance and it
9  would investigations?
10        MR. COLLINS: Asked and
11  answered.
12        THE WITNESS: I'd have the
13  attorneys do the investigations. I
14  don't have any idea how to do that.
15  BY MS. MORIATY:
16  Q.  Do you know who investigated the
17  facts that are alleged in this lawsuit?
18        MR. COLLINS: Wait a minute.
19  If you have an understanding, you may
20  answer.
21        I presume you'll agree that
22  if he answers this question, however he
23  answers it will not be a waiver;
24  correct?
25        MS. MORIATY: That's fine.

Page 84

1        MR. COLLINS: If you can
2  understand the question and if you have
3  an answer, provide it, please.
4        THE WITNESS: I'm so confused
5  now I have no idea.
6        MR. COLLINS: I'm sorry.
7  Could you ask it again, please?
8  BY MS. MORIATY:
9  Q.  Do you know who investigated the
10  facts that are alleged in this lawsuit?
11  A.  I would imagine my attorneys.
12  Q.  Who is Bill Shockley?
13  A.  That's my son.
14  Q.  Have you ever discussed this
15  lawsuit with him?
16        MR. COLLINS: Excuse me.
17        Off the record a second.
18        (Discussion off the record.)
19        MS. MORIATY: Back on the
20  record.
21        I'm sorry.
22  BY MS. MORIATY:
23  Q.  Just for my own clarification, how
24  many sons do you have and what are their
25  names?

Page 85

1  A.  Three that I know of.
2  Q.  And their names are?
3  A.  William, Kenneth and David.
4  Q.  Okay. And is William a plaintiff
5  in this lawsuit?
6  A.  I don't think so.
7  Q.  And why is his name, to your
8  knowledge, why is his name not on these
9  Complaints?
10  A.  He's probably too busy. He's
11  flying all over the country. He's a
12  chief executive officer of a company.
13  Q.  Okay.
14  A.  He tries to explain business to
15  me. It's a little hard.
16  Q.  Exhibit 22.
17        MS. MORIATY: I'm going to
18  have to ask you to mark it. This is 23
19  now because we've got the CV.
20        (Exhibit 23 was marked for
21  identification.)
22  BY MS. MORIATY:
23  Q.  There's the official marked one.
24  I'm showing you what's been marked as
25  Exhibit 23.

22 (Pages 82 to 85)

KENNETH SCHOCKLEY                    2/24/2005    IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 86

1    MR. COLLINS: You've got the
2  same thing over and over again.
3        Go ahead.
4    MS. MORIATY: Sorry.
5  BY MS. MORIATY:
6  Q.  Do you know what that is?
7  A.  Yes.
8  Q.  What is it?
9  A.  It's the stocks that I bought and
10 sold.
11 Q.  Is it accurate?
12 A.  I actually went and looked up the
13 slips the other day and sent them.  Yes.
14 Q.  For the record, this is the
15 Witness's Certification Of Investor.
16       What is your understanding of
17 what the term representative party
18 means?
19 A.  Representative party.
20       MR. COLLINS: Is --
21       THE WITNESS: Can you
22 elaborate on that a little bit?
23       MR. COLLINS: Are you
24 referring to the representative party as
25 used in Paragraph 3?

Page 87

1        MS. MORIATY: I'm just
2  referring to his understanding of the
3  words. He doesn't --
4        MR. COLLINS: Oh, come on.
5        MS. MORIATY: It doesn't have
6  to be used in any fashion.
7        THE WITNESS: Representative
8  party. I represent the class of
9  investors.
10       MS. MORIATY: Yes. As used
11 in Paragraph 3. But you do not have to
12 give me a legal --
13       MR. COLLINS: Excuse me. He
14 was answering.
15       Go ahead.
16       THE WITNESS: As a
17 representative party on behalf of the
18 class. By me doing this, I represent
19 the people who invested in this company
20 and lost money.
21 BY MS. MORIATY:
22 Q.  Do you know whether you were
23 appointed lead plaintiff in this case?
24 A.  That's what they said. I didn't
25 volunteer for that.

Page 88

1  Q.  Do you know who the other lead
2  plaintiffs are?
3  A.  I imagine I can read some document
4  of who they are.
5  Q.  Do you know whether you were
6  seeking to be named a class
7  representative by the Court?
8  A.  No, I don't.
9  Q.  Describe in your own words, if you
10 would, who the class is that you were
11 trying to represent.
12 A.  I guess you didn't understand what
13 I just said.  The investors who lost
14 money.
15 Q.  From the purchase of --
16 A.  The IPO.
17 Q.  Why are you seeking to serve as
18 class representative?
19 A.  In like 15 minutes. Because I
20 got -- excuse me. Because I got angry
21 that it was a bait and switch, it was a
22 scam that a lot of people made a lot of
23 money because of insider knowledge. And
24 I was tired of being pushed around.
25       I don't expect to make money

Page 89

1  on every deal I make, but I don't expect
2  people not to be honest. Now, I've said
3  that before. I'm not going to tell you
4  again. Okay?
5  Q.  How many members are in the class
6  that you seek to represent?
7  A.  I don't know. I can look it up,
8  though.
9  Q.  Is there more than one class?
10 A.  I'll look it up, if you want.
11 Q.  Do you know what geographic
12 regions are included in the class?
13       MR. COLLINS: Oh, come on.
14 Foundation.
15       THE WITNESS: I'll ask my
16 attorney.
17 BY MS. MORIATY:
18 Q.  Do you know if the other class
19 members bought Adams Golf stock?
20 A.  I would have to ask my attorney.
21 Q.  Do you know when they bought their
22 stock?
23 A.  Date and time?
24 Q.  Yes.
25 A.  No.

23 (Pages 86 to 89)

Page 90

1  Q. Do you know when the alleged class
2  period begins?
3  A. I guess I could review that with
4  my attorney.
5  Q. Do you know when it ends?
6  A. I'd have to review that with my
7  attorney.
8  Q. Do you know --
9  A. I know now it's in Delaware and
10  it's a lot easier for me to go to
11  Delaware than Texas.
12  Q. Do you think your claims are
13  similar to those of the other class
14  plaintiffs you're going to represent?
15        MR. COLLINS: Calls for a
16  legal conclusion.
17        THE WITNESS: I don't know
18  that. I do know that my one son and a
19  couple employees that had it, as long as
20  I do something, they'll be happy. I've
21  got a lot of time now.
22  BY MS. MORIATY:
23  Q. Do you know how many other
24  proposed class representatives there
25  are?

Page 91

1  A. Didn't you just ask that? I think
2  we just asked that and I think I told
3  you I'd have to ask my attorney.
4  Q. Do you know that Federated
5  National Insurance Company withdrew as a
6  proposed class representative?
7  A. No, I don't.
8  Q. So then I assume you wouldn't know
9  why they withdrew.
10  A. No. Did they lose money, too?
11  Q. You've got me.
12       Have you ever met with any of
13  the other class members?
14  A. Yes.
15  Q. If so, have you discussed the case
16  with them?
17  A. No.
18       MR. COLLINS: Well, wait a
19  minute. You two have a
20  misunderstanding.
21       THE WITNESS: Well, she asked
22  me if I ever met with my son, David. I
23  see him all the time. Do I discuss this
24  case with him? No.
25       MR. COLLINS: And we also

Page 92

1  have extensive testimony on the record
2  already about discussions with family
3  members and broker about this case.
4  BY MS. MORIATY:
5  Q. Did you meet with any other class
6  representatives?
7  A. No.
8  Q. What do you understand to be your
9  responsibilities as a representative?
10  A. Didn't I just answer that
11  question?
12  Q. I don't think so.
13  A. I think so.
14  Q. Your responsibilities?
15  A. Yes. My responsibilities is to
16  carry out this class-action suit to try
17  to get their money back for them being
18  scammed.
19  Q. Is there any degree of diligence
20  that is required to do that in your
21  mind?
22       MR. COLLINS: Because --
23       THE WITNESS: Be available.
24       MR. COLLINS: Excuse me.
25  Foundation, legal conclusion.

Page 93

1       Go ahead.
2       Did you finish your answer,
3  sir?
4       THE WITNESS: To be
5  available.
6  BY MS. MORIATY:
7  Q. Why do you think you would be an
8  appropriate class represent?
9  A. Why do I think? I don't think I'd
10  be a perfect class representative. It's
11  not my forte to sue people. I've never
12  sued anybody before. I don't go through
13  all this legal stuff and you don't want
14  to know my opinion of lawyers.
15  Q. How much time have you spent so
16  far fulfilling these duties as lead
17  plaintiff?
18  A. I don't keep track of it.
19  Q. Can you give me a ballpark?
20  A. Well, the mail comes, I open the
21  letters, I read them, I call the lawyer
22  up, I send him the stuff.
23  Q. You show up to this.
24  A. I met with a lawyer today for a
25  couple hours. If I have to go to

Page 94

1  Delaware, I'll go to Delaware. It's a
2  lot easier drive than coming to
3  Philadelphia.
4  Q.  Do you have any other
5  responsibilities that might interfere
6  with your ability to fulfill any of your
7  class rep duties?
8  A.  No.  Sort of looking for a career
9  change.  Maybe I'll do this.
10  Q.  What do you stand to gain as class
11  representative?
12  A.  I don't think I stand to -- maybe
13  get my money back that I lost, but that
14  would be about it I'd imagine.
15  Q.  What parts of the lawsuit do you
16  intend to directly participate in beyond
17  this deposition?  For example, will you
18  attend things like class certs or the
19  hearings for that?
20  A.  If my attorney wanted me to do
21  something and I thought it was
22  reasonable, I would do what he told me
23  to do.
24  Q.  Will you attend the mediation?
25  A.  What is that?

Page 95

1  Q.  It's a discussion between the two
2  parties but it's -- it's an event
3  occurring on June 1st, 2005.  Do you
4  currently have any plans to attend?
5  A.  I didn't know about it.  I might
6  be in the Bahamas but if I'm not, I'd
7  attend if he told me to.
8      MR. COLLINS:  We might move
9  the mediation to the Bahamas, too.
10      MS. MORIATY:  That would be
11  great.
12  BY MS. MORIATY:
13  Q.  Who has the authority to settle
14  this case?
15  A.  I think I have a lot to say about
16  it with the attorney.  I mean, the
17  attorney can tell me to jump out the
18  window, doesn't mean I'm going to do
19  it.  But yeah, I think that I take the
20  attorney's advice.
21  Q.  Do you plan on attending the
22  entire trial?
23  A.  What dates are they?
24  Q.  Hasn't been set yet.
25  A.  Well, then I don't know.

Page 96

1  Q.  Okay.  Who paid for your flight to
2  attend this deposition?
3      MR. COLLINS:  Excuse me.  Off
4  the record.
5      THE WITNESS:  My flight?  I
6  drove from the shore.  It's an hour and
7  a half drive.
8      MR. COLLINS:  Off the record.
9      (Discussion off the record.)
10      MS. MORIATY:  We're back on.
11  BY MS. MORIATY:
12  Q.  Do you have an agreement with your
13  attorneys concerning your costs in
14  acting as class representative?
15      MR. COLLINS:  Foundation,
16  vague and ambiguous.
17      THE WITNESS:  No, not really.
18      MS. MORIATY:  I'm sorry?
19      THE WITNESS:  Not really.
20      MS. MORIATY:  Off the record
21  for just a second.
22      (Recess, 11:59-12:09 p.m.)
23      MS. MORIATY:  Back on.
24  BY MS. MORIATY:
25  Q.  Who are your attorneys?

Page 97

1  A.  Who are my attorneys?  They're
2  sitting right here.
3  Q.  Can you --
4  A.  Mr. Collins, Don and Alan Sanders.
5  Q.  Thank you.
6      How did you choose your
7  attorneys?
8  A.  Alan Sanders has been my attorney
9  for probably 25 years, and he made
10  recommendations.
11  Q.  So why did you choose these
12  attorneys?  Just off his
13  recommendations?
14      MR. COLLINS:  Well, vague and
15  ambiguous.
16      You mean why did he choose
17  the attorneys apart from Mr. Sanders?
18      MS. MORIATY:  Right.
19      THE WITNESS:  Why did I
20  choose Mr. Sanders?
21  BY MS. MORIATY:
22  Q.  Why did you choose your attorneys?
23      MR. COLLINS:  Apart from
24  Mr. Sanders, apparently.
25  BY MS. MORIATY:

25 (Pages 94 to 97)

KENNETH SCHOCKLEY      2/24/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 98

```
 1   Q.  Why did you choose any --
 2   A.  I discussed this with Mr. Sanders.
 3   Q.  And you followed his
 4   recommendations?
 5   A.  And I followed his
 6   recommendations.
 7   Q.  Do you have an understanding that
 8   they will obtain some sort of
 9   contingency fee if the plaintiffs win
10   the lawsuit?
11   A.  I never really went over that with
12   them.
13   Q.  How much do your attorneys bill
14   per hour?
15   A.  No idea.
16   Q.  Did you take competitive bids from
17   other attorneys?
18   A.  No.
19   Q.  How many times have you physically
20   met with your attorneys to date about
21   this case?
22   A.  Well, I see Mr. Sanders on a
23   monthly basis and we discuss a lot of
24   topics, so I don't know how many of
25   those times we discussed this case.  I
```

Page 99

```
 1   talk to Mr. Collins on the phone and I
 2   met with him today.
 3   Q.  When did you talk with Mr. Collins
 4   on the phone?
 5   A.  Several days ago.
 6   Q.  But prior to that had you had any
 7   conversations with him?
 8   A.  Probably a year, two years ago or
 9   something.
10   Q.  How often do you speak with your
11   attorneys about the status of the
12   lawsuit?  Are you updated every time you
13   talk to your lawyer, monthly?
14       MR. COLLINS:  Okay.  Now, are
15   you asking about updates or are you
16   asking about oral conversations or both?
17   BY MS. MORIATY:
18   Q.  How often are you updated on the
19   status of this lawsuit?
20   A.  Periodically.
21   Q.  What kind of period?
22   A.  I don't know.  It's not set in
23   stone.  I mean, they send me things in
24   the mail.  They'll -- you know, if I
25   have questions, I call them.
```

Page 100

```
 1   Q.  Generally, monthly, you think?
 2   A.  It could be.
 3   Q.  Okay.
 4       MS. BRANNEN:  I'm sorry.  I
 5   couldn't hear your answer.
 6       THE WITNESS:  It could be.
 7   BY MS. MORIATY:
 8   Q.  Do you know how many motions your
 9   counsel have filed in this case?
10   A.  No.
11   Q.  Who makes the strategy calls in
12   this case?
13   A.  The lawyers.
14   Q.  If you disagreed with your
15   attorneys' decision about how to handle
16   some aspect of the case, what would you
17   do?
18       MR. COLLINS:  Hypothetical,
19   foundation.
20       THE WITNESS:  I would discuss
21   it with them and tell them my point of
22   view.
23   BY MS. MORIATY:
24   Q.  Have you discussed the strengths
25   and weaknesses of your case with your
```

Page 101

```
 1   attorneys?
 2       MR. COLLINS:  You can only
 3   answer whether that subject matter
 4   was --
 5       MS. MORIATY:  Just --
 6       MR. COLLINS:  -- was
 7   discussed without going into the details
 8   as to who said what.
 9       THE WITNESS:  Have I
10   discussed the subject matter with my
11   attorney?
12   BY MS. MORIATY:
13   Q.  The subject matter of the
14   strengths and weaknesses of your case
15   with your attorneys.
16   A.  I haven't to this -- at this time.
17   Q.  Okay.  Have you discussed the
18   prospects of settlement with your
19   attorneys?
20   A.  No.
21   Q.  Do you know whether or not a
22   settlement offer has been made?
23   A.  No.  I think if it was agreed
24   upon, I would then know that.
25   Q.  Who do you believe is responsible
```

26 (Pages 98 to 101)

Page 102

1  for actively managing and controlling
2  the litigation?
3      MR. COLLINS:  Vague and
4  ambiguous.
5      THE WITNESS:  Who do I
6  believe is actively --
7      MS. MORIARTY:  Is responsible
8  for actively managing and controlling
9  the litigation.
10     MR. COLLINS:  Vague and
11 ambiguous.
12     THE WITNESS:  The attorneys
13 with my input.
14 BY MS. MORIARTY:
15 Q.  Have you had contact with other
16 attorneys other than the ones that
17 you've already talked about?
18 A.  No.
19     MR. COLLINS:  Or our firms.
20     MS. MORIARTY:  Or your firms.
21 BY MS. MORIARTY:
22 Q.  What is your agreement with your
23 attorneys regarding costs, not the Fee
24 Agreement but the costs like traveling,
25 filing fees, notice fees, things like

Page 103

1  that?
2  A.  I think once it was moved to
3  Delaware I know I'm not going to pay for
4  anything.
5  Q.  So when you have costs, are they
6  advanced by your attorneys?
7      MR. COLLINS:  Foundation,
8  vague and ambiguous.
9      THE WITNESS:  I didn't do
10 this to make a lot of money.  I did this
11 to recover for people who listened to me
12 and bought into the IPO to recover that
13 money.  I don't expect to make what
14 Mr. Adams did.  Okay?  But, you know, if
15 attorneys set it up and they do
16 something and everybody is treated
17 fairly, that's fine with me.
18     MS. MORIARTY:  I'm sorry.  I
19 wasn't trying to suggest that you were
20 going to make money.  I was just trying
21 to find out if you were to fly in from
22 Florida, would you be reimbursed for
23 that flight?
24     THE WITNESS:  No. I flew up
25 Friday from Florida and I was coming up

Page 104

1  anyway.
2      MS. MORIARTY:  Okay.
3  BY MS. MORIARTY:
4  Q.  Have you agreed to reimburse your
5  attorneys for all costs regardless of
6  the outcome of the suit?
7      MR. COLLINS:  Excuse me.
8  Asked and answered, foundation,
9  mischaracterizes his testimony.
10     Go ahead.  Do you want to
11 hear it again?
12     THE WITNESS:  Yes.
13     MS. MORIARTY:  Can you read it
14 back
15     (The court reporter read back
16 the following:
17     "QUESTION:  Have you agreed
18 to reimburse your attorneys for all
19 costs regardless of the outcome of the
20 suit?")
21     THE WITNESS:  No.
22 BY MS. MORIARTY:
23 Q.  What is your understanding of what
24 costs you may have to pay?
25     MR. COLLINS:  Wait.

Page 105

1  Foundation.  Mischaracterizes the
2  testimony.
3      THE WITNESS:  Since it's now
4  in the state of Delaware, I don't think
5  I'm going to pay anything except drive
6  my car over the bridge, Atlantic City
7  Expressway tolls, parking my car today
8  and going home.
9      MS. MORIARTY:  Okay.
10     THE WITNESS:  And my time,
11 which is very valuable.
12 BY MS. MORIARTY:
13 Q.  Do you have knowledge of the costs
14 that are involved in a lawsuit?  Do you
15 have knowledge of -- specifically, do
16 you have knowledge of class notice
17 costs?
18 A.  No.  The way they have frivolous
19 lawsuits for doctors, it must be awful.
20 Q.  Do you have knowledge of reporter
21 costs, such as the court reporter today?
22 A.  No.
23 Q.  Do you have knowledge of court
24 costs?
25 A.  No.

KENNETH SCHOCKLEY                    2/24/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 126

1    MS. MORIATY: So back on the
2  record.
3  BY MS. MORIATY:
4    Q.  Other than what we've already
5  talked about, have you ever discussed
6  this lawsuit with anyone else that you
7  haven't already mentioned?
8    A.  No.
9        THE COURT REPORTER: Excuse
10  me. Could we go off the record?
11       MS. MORIATY: Yes.
12       (Discussion off the record.)
13  BY MS. MORIATY:
14    Q.  How did you first learn of Adams
15  Golf?
16    A.  My stockbroker called me up on the
17  phone and said an IPO was coming out in
18  Adams Golf and told me a little bit
19  about it.
20    Q.  What did he tell you?
21    A.  It was in 1998. I don't exactly
22  remember what he said.
23    Q.  Do you remember anything about
24  what he said?
25    A.  He got me into different IPOs

Page 127

1  before and we did pretty well with them,
2  so whatever he told me, and I didn't
3  know a thing about golf, he reassured me
4  that this was a quality company.
5    Q.  How did you first decide that you
6  should invest in Adams Golf?
7    A.  I took the advice of my
8  stockbroker.
9    Q.  What knowledge of Adams Golf did
10  you acquire before purchasing your Adams
11  Golf stock?
12    A.  I talked to my stockbroker. He
13  gave me information.
14    Q.  Did you purchase Adams Golf stock
15  after June 11th, 1999?
16    A.  I would have to look at the
17  purchasing sheets that I gave you.
18    Q.  Do you know if your broker
19  received a questionnaire at the time he
20  bought your stock?
21    A.  No. I don't know what my broker
22  did.
23       MS. MORIATY: Do we have the
24  trading records handy? Okay. Are we
25  skipping to Exhibit 30?

Page 128

1        (Exhibit 30 was marked for
2  identification.)
3  BY MS. MORIATY:
4    Q.  I'm showing you what's been marked
5  as Exhibit 30.
6        Do these appear to be your
7  trading records?
8    A.  They appear. I gave you my
9  trading, my actual trading records. I
10  don't know where they are now. It's in
11  one of those things. But they appear.
12       MR. COLLINS: And let the
13  record show that in answering that
14  question, you're only looking at the
15  first page of the exhibit.
16       MS. MORIATY: I'm sorry.
17  BY MS. MORIATY:
18    Q.  Look through all of it and let me
19  know if that, in fact, is your trading
20  records, please.
21    A.  Could I see the sheet that had the
22  actual photostated copies of the
23  transactions that I looked up the other
24  day? Like that.
25       MR. COLLINS: The witness is

Page 129

1  referring to the second page, FKS 5 and
2  6.
3        MS. MORIATY: I believe, yes,
4  the third page probably has --
5        MR. COLLINS: And 7?
6        THE WITNESS: The dates are
7  all different, but that's similar to it
8  I guess. Why does it say trade date,
9  7/10?
10       I don't know about these
11  because the dates don't appear. This
12  says seven --
13       MR. COLLINS: Do you want
14  this?
15       MS. MORIATY: Can we go off
16  the record for just a second.
17       (Discussion off the record.)
18       MS. MORIATY: So we're going
19  back on. I'm sorry.
20  BY MS. MORIATY:
21    Q.  So these are, in fact, your
22  trading records; is that correct?
23    A.  Page 5 and Page 6 are.
24    Q.  Okay.
25    A.  And 7.

33 (Pages 126 to 129)

Page 130

```
 1   Q.  And the first page reflects --
 2   A.  I have no idea where the first
 3   page came from or what it reflects.
 4   Q.  So these records show that you
 5   bought 3,000 shares of Adams Golf in the
 6   IPO on July 10th; is that correct?
 7       MR. COLLINS: These documents
 8   speak for themselves.
 9       Go ahead. You may answer.
10       THE WITNESS: Yes.
11   BY MS. MORIATY:
12   Q.  Why did you sell?
13       MR. COLLINS: Now --
14   BY MS. MORIATY:
15   Q.  I'm sorry. Let me split that
16   question up.
17       You sold 1,500 shares on our
18   next date is July 17th, 1998. Why did
19   you sell those shares at that time?
20   A.  In 1998?
21   Q.  Seven days after you bought them.
22   A.  Did the stock go down?
23   Q.  You seem to have made money.
24   A.  I made money?
25   Q.  That's what it looks like.
```

Page 131

```
 1   A.  Bad report came out, stock started
 2   going down, I sold half of the stock. I
 3   waited to see if it was going to come
 4   back. It didn't. I sold the rest. It
 5   went down after that.
 6   Q.  So you sold -- this is in response
 7   to a negative report?
 8   A.  I imagine so, ma'am. In 1998 I
 9   don't know what you were doing, but I
10   really don't remember exactly what
11   happened.
12   Q.  It's fine if you don't remember.
13   I'm just trying to get your best
14   recollection. So then you sell the
15   second 1,500 shares on December 30th,
16   1998. Why did you sell on that date?
17   A.  Because the stock was going down.
18   And I didn't like the report.
19   Q.  So there was no other particular
20   significance of December 30th?
21       MR. COLLINS: Vague.
22       You may answer.
23       THE WITNESS: Not that I know
24   of.
25       MS. MORIATY: Okay.
```

Page 132

```
 1   BY MS. MORIATY:
 2   Q.  Do you still hold any Adams Golf
 3   stock?
 4   A.  No.
 5   Q.  Would you consider buying Adams
 6   Golf stock?
 7   A.  No.
 8   Q.  Were these your only transactions
 9   in Adams Golf stock?
10   A.  I'm pretty sure of that.
11   Q.  Okay. At any time before your
12   purchase did you review any documents
13   issued by Adams Golf like the SEC
14   filings or the prospectus or press
15   releases?
16       MR. COLLINS: Asked and
17   answered.
18       Go ahead.
19       THE WITNESS: I think I
20   stated the fact that those days the
21   stockbroker would call me up, he'd
22   explain the stock, explain what it was
23   about and I would buy the stock.
24   Shortly after prospectus or something
25   would show up.
```

Page 133

```
 1   BY MS. MORIATY:
 2   Q.  Did you read any analyst's report
 3   about the golf industry?
 4   A.  I don't remember.
 5       MR. COLLINS: You need to let
 6   her get the question out.
 7   BY MS. MORIATY:
 8   Q.  Did you read any analyst's reports
 9   about the golf industry?
10   A.  I don't remember.
11   Q.  Have you ever read before or after
12   or since any analyst's reports about the
13   golf industry?
14   A.  Golf industry?
15   Q.  Yes.
16   A.  No, not really.
17   Q.  How about on Adams Golf?
18   A.  Not that I can recall.
19   Q.  Okay.
20       MR. COLLINS: Now, the last
21   question was, did he ever read an
22   analyst's report?
23       MS. MORIATY: On Adams Golf.
24       MR. COLLINS: At any time.
25       MS. MORIATY: At any time.
```

Page 158

1  BY MR. LaROCCA:
2  Q.  Do you know if your broker had any
3  communication with anyone at any of the
4  four companies I just named regarding
5  Adams Golf?
6        MR. COLLINS:  Same objection.
7        Four companies?
8        THE WITNESS:  I don't know.
9        MR. COLLINS:  Same objection.
10 BY MR. LaROCCA:
11 Q.  You don't know?
12 A.  I don't know whether he did or
13 didn't.
14 Q.  We talked before about or you
15 testified before about your broker with
16 respect to your purchase of Adams Golf
17 stock and that was Janney Montgomery
18 Scott; is that correct?
19 A.  That's who he worked for at that
20 time, yes.
21 Q.  And I apologize if I'm covering
22 ground we already covered, but was there
23 an individual at Janney Montgomery Scott
24 you dealt with regarding the purchase of
25 Adams Golf?

Page 159

1  A.  Leonard Fox.
2  Q.  Was there anyone else?
3  A.  No.
4  Q.  What kind of account did you have
5  with Janney Montgomery Scott when you
6  purchased the Adams Golf stock?
7        MR. COLLINS:  Vague and
8  ambiguous.
9        THE WITNESS:  Tell me the
10 different accounts and I'll tell you
11 what I had.  I'm trying to think of the
12 legal -- of the term for them.  But he
13 would make recommendations and I'd
14 either okay them or not okay them.  He
15 couldn't just carte blanche do something
16 without my input.
17 BY MR. LaROCCA:
18 Q.  So is it fair to say you had
19 control over your broker's investment
20 decisions for your account?
21 A.  Yeah.  He -- he would sometimes
22 buy an IPO and then tell me about it.
23 But, yes, normally I had investment
24 decisions.
25 Q.  When your broker purchased the

Page 160

1  Adams Golf stock for your account, did
2  you provide any input as to whether the
3  broker should make the purchase?
4        MR. COLLINS:  Asked and
5  answered.
6        THE WITNESS:  No.  I think
7  that's one that really bothered me a
8  little bit because I knew nothing about
9  golf and I didn't know what I was buying
10 in golf and they had to sell me on how
11 great this product was.
12 BY MR. LaROCCA:
13 Q.  Did you ever consider telling your
14 broker not to purchase the Adams Golf
15 stock?
16 A.  I don't remember.  I wasn't gung-
17 ho about that purchase of that stock.
18 Q.  So is it fair to say you just took
19 his advice on his word as to whether --
20 A.  No.  I think he read things about
21 it and, you know, press releases and
22 whatever.  That was all given to me to
23 scan.
24 Q.  Can you tell me in detail what
25 information the broker gave you to scan

Page 161

1  that you just referred to?
2  A.  I can't remember now back then,
3  but if it was a press release or
4  synopsis or whatever of the company.
5  Q.  And this was prior to your
6  purchase of the stock?
7  A.  Uh-huh.
8        MR. COLLINS:  That was a yes.
9        THE WITNESS:  Yeah.  I'm
10 sorry.  Yes.
11 BY MR. LaROCCA:
12 Q.  Do you remember what press release
13 your broker gave to you prior to the
14 purchase of the stock?
15 A.  No, I do not.
16 Q.  Do you remember what the content
17 of the press release was?
18 A.  Can't recall now.
19 Q.  Did the press release refer to
20 Costco?
21 A.  No.  I mean, the press release I
22 remember seeing was, you know, about the
23 driver or whatever it was.  There was
24 discussion.  Improved your game.
25 Q.  Did the press release refer to

41 (Pages 158 to 161)

## ADAMS GOLF, INC. SECURITIES LITIGATION

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

F. KENNETH SHOCKLEY, M.D. ("Plaintiff") duly swears and says, as to the claims asserted under the federal securities laws, that:

1.   I have reviewed the complaint and have authorized the filing of a substantially similar complaint on my behalf.

2.   The security that is the subject of this action was not purchased at the direction of plaintiff's counsel or in order to participate in this private action.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   The transactions in the security that is the subject of this action during the Initial Public Offering are as follows:

| Date | Number of Shares Purchased | Price Per Share |
|---|---|---|
| 7/10/98 | 1,500 | $16 |

| Date | Number of Shares Sold | Price Per Share |
|---|---|---|
| 12/30/98 | 1,500 | $3.6339 |



EXHIBIT NO. 23

FKS 2

5. Plaintiff has not sought to serve as a class representative in any securities fraud class action in the last three (3) years, unless indicated below.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of United States that the foregoing is true and correct. Executed this _29 th_ day of May, 1999, at Voorhees, New Jersey.

By _[signature]_

```
7605-0527     SHOCKLEY  F   ENNETH        CH48
                                        *INTERNAL USE ONLY*
             QUANTITY        PRX/SOURCE COST/PROCEEDS      DATE        REALIZED G/L
  B/S
1017-548     AT&T CORP
    B          500                        21,845.30    05/31/94
    S          500        58.0625        28,792.84-    09/14/98       6,947.54LG

1029-360     ACSYS INC
    B          4000         8.5000        34,000.00    02/06/98
    S          4000        10.4968       41,985.80-    02/06/98       7,985.80SG

1029-360     ACSYS INC
    B          2000         9.1250        18,250.00    11/02/98
    S          2000         3.7500        7,499.75-    12/30/98      10,750.25SL

1033-157     ADAMS GOLF
    B          1500        16.0000        24,000.00    07/10/98
    S          1500        16.5000       24,557.92-    07/17/98        557.92SG

1033-157     ADAMS GOLF
    B          1500        16.0000        24,000.00    07/10/98
    S          1500         3.6339        5,259.41-    12/30/98      18,740.59SL

1105-938     AMERN AIRCARRIERS SUPPRT
    B          300          6.0000         1,800.00    05/28/98
    S          300          6.0000         1,721.19-    07/21/98         78.81SL

1105-938     AMERN AIRCARRIERS SUPPRT
    B          4700         6.0000        28,200.00    05/28/98
    S          4700         6.0000        27,850.62-    07/22/98        349.38SL

1191-800     ANSOFT CORP
    B          4000        12.0000        48,000.00    02/25/98
    S          4000        12.5000       49,998.33-    03/19/98       1,998.33SG

1192-950     ANWORTH MTG ASSET CORP
    B          2500         9.0000        22,500.00    03/12/98
    S          2500         6.5000       16,031.26-    08/12/98       6,468.74SL

1309-503     BELL ATLANTIC CORP
    B          2000        EDP                          09/20/96
    S          2000        45.4375       90,400.31-    09/14/98

1366-900     BRANDYWINE RLTY TR NEW
    B          2000        24.0000        48,000.00    01/29/98
    S          2000        24.3125       48,244.62-    04/09/98        244.62SG

1714-860     CRUSADER HLDGS CORP
    B          100         15.0000         1,500.00    02/10/98
    S          100         15.0000         1,481.57-    02/24/98         18.43SL
```



file Adams Golf

FKS 4



**Janney Montgomery Scott** INC
PHILADELPHIA, PA 19103-1675
1801 MARKET STREET
(215) 665-6000

1000 ATRIUM WAY (ATRIUM I BLDG.)

SEE REVERSE SIDE FOR IMPORTANT INFORMATION

| YOU BOUGHT YOU SOLD | DESCRIPTION | PRICE | AMOUNT | INTEREST | S.E.C FEE AND/OR HANDLING | COMMISSION OR CHARGE | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| 3000 | ADAMS GOLF | 160000 | 4800000 | | | | 4800000 |

BILLING 07/13/98

| | ACCOUNT NUMBER | TYPE OF. ACCT. | TYPE OF TRANS. | TRADE DATE | SETTLEMENT DATE |
|---|---|---|---|---|---|
| G | CH4876050527 | 1 | 01 | 07/10/98 | 07/15/98 |

PROSPECTUS MAILED UNDER SEPARATE COVER

DR F KENNETH SHOCKLEY
25 GLEN DRIVE
VOORHEES NJ  08043

MEMBER
SIPC
SECURITIES INVESTOR
PROTECTION CORPORATION

SYMBOL ADGO          CUSIP NO 006228-10-0

Established 1832
JMS INC
MEMBERS
NEW YORK STOCK EXCHANGE
AMERICAN STOCK EXCHANGE
PHILADELPHIA STOCK EXCHANGE
NAT'L ASSN SECURITIES DEALERS

SEE REVERSE SIDE FOR INSTRUCTIONS

| B - YOU BOUGHT S - YOU SOLD | | DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| B | 3000 | ADAMS GOLF | 4800000 |

BILLING 07/13/98

SETTLEMENT DATE
07/15/98

DR F KENNETH SHOCKLEY
25 GLEN DRIVE
VOORHEES NJ  08043

ACCOUNT NUMBER
CH4876050527    1

CUSIP NUMBER
006228-10-0

# Janney Montgomery Scott
INC

1801 MARKET STREET
PHILADELPHIA, PA 19103-1675
(215) 665-6000

MT. HOLLY OFFICE
1000 ATRIUM WAY (ATRIUM I BLDG.)

SEE REVERSE SIDE FOR IMPORTANT INFORMATION

| · YOU BOUGHT<br>· YOU SOLD | DESCRIPTION | PRICE | AMOUNT | INTEREST | S.E.C. FEE<br>AND / OR<br>HANDLING | COMMISSION<br>OR<br>CHARGE | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| S  1500 | ADAMS GOLF | 165000 | 2475000 | | 83 | 19125 | 245579 |

PREFERRED RATE APPLIED

| | ACCOUNT NUMBER | TYPE<br>OF<br>ACCT. | TYPE<br>OF<br>TRANS. | TRADE DATE | SETTLEMENT<br>DATE |
|---|---|---|---|---|---|
| G | CH4876050527 | 1 | 06 | 07/17/98 | 07/22/9 |

DR F KENNETH SHOCKLEY
25 GLEN DRIVE
VOORHEES NJ    08043

MEMBER
SIPC
SECURITIES INVESTOR
PROTECTION CORPORATION

SYMBOL ADGO          CUSIP NO 006228-10-0



Established 1832
JMS
INC

MEMBERS
NEW YORK STOCK EXCHANGE
AMERICAN STOCK EXCHANGE
PHILADELPHIA STOCK EXCHANGE
NAT'L. ASSN. SECURITIES DEALERS

SEE REVERSE SIDE FOR INSTRUCTIONS

| B - YOU BOUGHT<br>S - YOU SOLD | | DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| S  1500 | | ADAMS GOLF | 2455792 |
| | | | SETTLEMENT<br>DATE<br>07/22/98 |

DR F KENNETH SHOCKLEY
25 GLEN DRIVE
VOORHEES NJ    08043

ACCOUNT NUMBER
CH4876050527
1
CUSIP NUMBER
006228-10-0

FKS 6

# Janney Montgomery Scott
INC

1000 ATRIUM WAY (ATRIUM I BLDG.)

| YOU BOUGHT YOU SOLD | DESCRIPTION |
|---|---|
| 1500 | ADAMS GOLF |

PREFERRED RATE APPLIED

SEE REVERSE SIDE FOR IMPORTANT INFORMATIC

| PRICE | AMOUNT | INTEREST | | COMMISSION OR CHARGE | NET AMOUNT |
|---|---|---|---|---|---|
| 36339 | 545085 | | 19 | 19125 | 52594 |

| ACCOUNT NUMBER | CODE OF ACCT | TYPE OF TRANS | TRADE DATE | SETTLEMENT DATE |
|---|---|---|---|---|
| G CH4876050527 | 1 | 06 | 12/30/98 | 01/05/9 |

DR F KENNETH SHOCKLEY
25 GLEN DRIVE
VOORHEES NJ 08043

SYMBOL ADGO        CUSIP NO 006228-10-0

| JMS | MEMBERS | | |
|---|---|---|---|

SEE REVERSE SIDE FOR INSTRUCTIONS

| YOU BOUGHT YOU SOLD | DESCRIPTION | NET AMOUNT |
|---|---|---|
| S 1500 | ADAMS GOLF | 525941 |
| | | SETTLEMENT DATE |
| | | 01/05/99 |

DR F KENNETH SHOCKLEY
25 GLEN DRIVE
VOORHEES NJ 08043

| ACCOUNT NUMBER |
|---|
| CH4876050527 |
| 1 |
| CUSIP NUMBER |
| 006228-10-0 |

FKS 7