**13**

*ADAMS*GOLF

# ADAMS GOLF INC (ADGO)

2801 EAST PLANO PARKWAY
PLANO, TX 75074
972. 673 9000
http://www.adamsgolf.com/

# S-8

**Filed on 12/01/1998**
File Number 333-68129



**GSI**

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

As filed with the Securities and Exchange Commission
on November 30, 1998

Registration No. 333-_____

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.  20549

FORM S-8
REGISTRATION STATEMENT
UNDER THE SECURITIES ACT OF 1933

ADAMS GOLF, INC.
(Exact name of Registrant as specified in its charter)

| Delaware | 75-2320087 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 300 Delaware Avenue, Suite 548 | |
| Wilmington, Delaware | 19801 |
| (Address of Principal Executive Offices) | (Zip Code) |

Adams Golf, Inc. 1998 Stock Incentive Plan
(Full title of the plan)

| B. H. (Barney) Adams | Copy to: |
| Chief Executive Officer | Joseph A. Hoffman |
| 300 Delaware Avenue, Suite 548 | Arter & Hadden LLP |
| Wilmington, Delaware 19801 | 1717 Main Street, Suite 4100 |
| (Name and address of agent for service | Dallas, Texas 75201 |
| | 214-761-2100 |

302-427-5892
(Telephone number, including
area code, of agent for service)

CALCULATION OF REGISTRATION FEE

| Title of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Share (1) | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock Par Value $.001 | 1,800,000 | $4.00 | $7,200,000 | $2,001.60 |

--------------
(1)  Based upon the average of the high and low sales prices of
the Common Stock on the Nasdaq Stock Market's National Market on
November 24, 1998; determined in accordance with Rules 457(c) and
(h) solely for the purpose of determining the amount of the
registration fee

PART II

INFORMATION REQUIRED IN THE REGISTRATION STATEMENT

Item 3    Incorporation of Documents by Reference

The following documents and reports filed by Adams Golf,
Inc. (the "Company") with the Securities and Exchange Commission
(the "Commission") are incorporated herein by reference:

(a)  The Company's prospectus filed with the Commission
pursuant to Rule 424(b) on July 13, 1998 in connection with the
Company's Registration Statements on Form S-1 (File Nos  333-
51715, 333-58917), including the exhibits thereto;

(b)  The Company's Quarterly Report on Form 10-Q for the
quarter ended June 30, 1998 (File No  0-24583);

(c)  The Company's Quarterly Report on Form 10-Q for the
quarter ended September 30, 1998 (File No  0-24583); and

(d)  The description of the Company's Common Stock contained
in the Company's Registration Statement on Form 8-A (file No  000-
24583), including any amendment or report filed for the purpose
of updating such description

All documents filed after the date of the filing of this
Registration Statement by the Company pursuant to Sections 11(a),
13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as
amended, prior to the filing of a post-effective amendment which
indicates that all securities offered have been sold or which
deregisters all securities then remaining unsold, shall be deemed
to be incorporated herein by reference and to be a part hereof
from the date of filing of such documents

Item 4    Description of Securities

Not applicable

Item 5    Interests of Named Experts and Counsel

Not applicable

Item 6    Indemnification of Directors and Officers

Article VII of the Company's Certificate of Incorporation
provides that the Company shall indemnify its directors and
officers to the fullest extent permitted by the Delaware General
Corporation Law ("DGCL")

Section 145 of the DGCL permits a corporation, under
specified circumstances, to indemnify its directors, officers,
employees or agents against expenses (including attorneys' fees),
judgments, fines and amounts paid in settlements actually and
reasonably incurred by them in connection with any action, suit
or proceeding brought by third parties by reason of the fact that
they were or are directors, officers, employees or agents of the
corporation, if such directors, officers, employees or agents
acted in good faith and in a manner they reasonably believed to
be in or not opposed to the best interests of the corporation,
and, with respect to any criminal action or proceeding, had no
reasonable cause to believe their conduct was unlawful   In a
derivative action (i.e., one by or in the right of the
corporation), indemnification may be made only for expenses
actually and reasonably incurred by directors, officers,
employees or agents in connection with the defense or settlement
of an action or suit, and only with respect to a matter as to
which they shall have acted in good faith and in a manner they
reasonably believed to be in or not opposed to the best interests
of the corporation, except that no indemnification shall be made
if such persons shall have been adjudged liable to the
corporation, unless and only to the extent that the court in
which the action or suit was brought shall determine upon
application that the defendant directors, officers, employees
or agents are fairly and reasonably entitled to indemnity for
such expenses, despite such adjudication of liability

-2-

Section 102(b)(7) of the DGCL permits a corporation organized under Delaware law to eliminate or limit the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director subject to certain limitations. Article IX of the Certificate of Incorporation includes the following provision:

A director of this corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit. If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended Any repeal or modification of the foregoing provisions of this Article IX by the stockholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification

Section 14 of the Plan provides for indemnification of the Board of Directors of the Company or the members of the committee appointed by the Board to administer the Plan as follows:

Each person who is or shall have been a member of the Committee or of the Board shall be indemnified and held harmless by the Corporation against and from any loss, cost, liability or expense that may be imposed upon or reasonably incurred by him in connection with or resulting from any claim, action, suit or proceeding to which he may be a party or in which he may be involved by reason of any action taken or failure to act under this Plan and against and from any and all amounts paid by him in settlement thereof, with the Corporation's approval, or paid by him in satisfaction of any judgment in any such action, suit or proceeding against him, provided he shall give the Corporation an opportunity, at its own expense, to handle and defend the same before he undertakes to handle and defend it on his own behalf The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled under the Corporation's Certificate of Incorporation or Code of Regulations, as a matter of law, or otherwise, or any power that the Corporation may have to indemnify them or hold them harmless

The Company has purchased directors and officers liability insurance that provides coverage for directors and officers with respect to certain liabilities

Item 7.    Exemption from Registration Claimed

Not applicable

Item 8.   Exhibits

4 1      Adams Golf, Inc. 1998 Stock Incentive Plan (filed as Exhibit 4.1 to the Company's Registration Statement on Form S-1 as filed on May 4, 1998. File No 333-51715), incorporated herein by reference

4 2      Forms of Stock Option Agreements to be used in connection with the Adams Golf, Inc 1998 Stock Incentive Plan (filed herewith)

5 1      Opinion of Arter & Hadden LLP

23 1     Consent of KPMG Peat Marwick LLP

23 2     Consent of Arter & Hadden LLP (included in Exhibit 5 1)

Item 9    Undertakings

-3-

A.    The undersigned Registrant hereby undertakes:

(1)    To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:  (i) to include any prospectus required by Section 10(a)(3) of the Securities Act of 1933; (ii) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement; (iii) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement; provided, however, that clauses (i) and (ii) do not apply if the information required to be included in a post-effective amendment by those clauses is contained in periodic reports filed by the Registrant pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement.

(2)    That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)    To remove from registration by means of a post-effective amendment any securities being registered which remain unsold at the termination of the offering.

B.    The undersigned Registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the Registrant's annual report pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

C.    Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable.  In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

-4-

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-8 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Plano, State of Texas on this 30th day of November, 1998.

ADAMS GOLF, INC

By: /s/ DARL P HATFIELD
--------------------------------
   Darl P Hatfield
   Senior Vice President-Finance
   and Administration and Chief
   Financial Officer

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed below by or on behalf of the following persons in the capacities indicated and on the dates indicated

| Signatures | Titles | Date |
| --- | --- | --- |
| /s/ B.H. (BARNEY) ADAMS<br>------------------------<br>B H (Barney) Adams | Chairman of the Board, Chief Executive Officer and President (principal executive officer) | November 30, 1998 |
| /s/ DARL P. HATFIELD<br>------------------------<br>Darl P Hatfield | Senior Vice President-Finance and Administration and Chief Financial Officer (principal financial and accounting officer) | November 30, 1998 |
| /s/ RICHARD H. MURTLAND<br>------------------------<br>Richard H Murtland | Vice President-Research and Development, Secretary, Treasurer and Director | November 30, 1998 |
| /s/ PAUL F BROWN, JR<br>------------------------<br>Paul F Brown, Jr | Director | November 17, 1998 |
| /s/ ROLAND E CASATI<br>------------------------<br>Roland E Casati | Director | November 30, 1998 |
| /s/ FINIS F. CONNER<br>------------------------<br>Finis F Conner | Director | November 30, 1998 |
| /s/ MARK R MULVOY<br>------------------------<br>Mark R Mulvoy | Director | November 30, 1998 |
| /s/ STEPHEN R. PATCHIN<br>------------------------<br>Stephen R Patchin | Director | November 19, 1998 |
| /s/ JOHN SIMPSON<br>------------------------<br>John Simpson | Director | November 30, 1998 |

-5-

EXHIBIT INDEX

Exhibit     Exhibit
Number
-------     -------

4.1     Adams Golf, Inc. 1998 Stock Incentive Plan (filed as
        Exhibit 4.1 to the Company's Registration Statement on
        Form S-1 as filed on May 4, 1998, File No. 333-51715),
        incorporated herein by reference.

4.2     Forms of Stock Option Agreements to be used in
        connection with the Adams Golf, Inc. 1998 Stock
        Incentive Plan (filed herewith).

5.1     Opinion of Arter & Hadden LLP

23.1    Consent of KPMG Peat Marwick LLP

23.2    Consent of Arter & Hadden LLP (included in Exhibit 5.1)

*ADAMS GOLF*

# ADAMS GOLF INC (ADGO)

2801 EAST PLANO PARKWAY
PLANO, TX 75074
972. 673 9000
http://www.adamsgolf.com/

# EX-4.2

**S-8 Filed on 12/01/1998**
File Number 333-68129



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

EXHIBIT 4 2

ADAMS GOLF, INC.
INCENTIVE STOCK OPTION AGREEMENT
UNDER
1998 STOCK INCENTIVE PLAN

NONTRANSFERABLE INCENTIVE STOCK OPTION AGREEMENT (this "Agreement") entered into this _____ day of _____ · _____, between ADAMS GOLF, INC . a Delaware corporation (the "Corporation"), and _____ (the "Optionee," which term as used herein shall be deemed to include any successor to the Optionee by will or by the laws of descent and distribution. unless the context shall otherwise require)

Pursuant to the Corporation's 1998 Stock Incentive Plan (the "Plan"), the Corporation, acting through its Compensation/Plan Committee of the Board of Directors (the "Committee"), approved the issuance to the Optionee, effective as of the date set forth above. of an incentive stock option to purchase up to an aggregate of _____ shares of common stock, par value $ ____, of the Corporation (the "Common Stock"). at the price of $ ____ per share (the "Option Price") which represents not less than 100% of the fair market value of a share of Common Stock determined in accordance with the Plan or 110% of the fair market value of a share of Common Stock determined in accordance with the Plan in the case of any stockholder of the Corporation who on the date of this Agreement owns stock representing more than 10% of the total combined voting powers of all classes of the stock of the Corporation or its parent or its Subsidiary (a "10% Stockholder") upon the terms and conditions hereinafter set forth  (Capitalized terms used herein but not defined herein shall have the meaning ascribed to them in the Plan )

NOW, THEREFORE, in consideration of the mutual premises and undertakings hereinafter set forth. the parties hereto agree as follows:

1    OPTION; OPTION PRICE  On behalf of the Corporation, the Committee hereby grants as of the date of this Agreement to the Optionee the option (the "Option") to purchase. subject to the terms and conditions of this Agreement and the provisions of the Plan (which is incorporated by reference herein and which in all cases shall control in the event of any conflict with the terms. definitions and provisions of this Agreement), _____ shares of Common Stock of the Corporation at an exercise price per share equal to the Option Price, which Option is intended to qualify for federal income tax purposes as an "incentive stock option" within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (the "Code")   A copy of the Plan as in effect on the date hereof has been supplied to the Optionee. and the Optionee by executing this Agreement hereby acknowledges receipt thereof

2    TERM  The term (the "Option Term") of the Option shall commence on the date of this Agreement and shall terminate on the fifth anniversary of the date of this Agreement, unless such Option shall theretofore have been terminated in accordance with the terms hereof or the provisions of the Plan

3    VESTING; CHANGE OF CONTROL; RESTRICTIONS ON EXERCISE

(a)  Subject to the provisions of Sections 5 and 8 hereof, and unless accelerated, as set forth in the Plan or as provided herein. the Option granted hereunder shall vest and become exercisable for the number of shares set forth opposite the dates noted below (the "Option Vesting Schedule")

| Date(s) | Cumulative Number of Vested Shares |
| ------- | ---------------------------------- |
|         |                                    |

(b)  Notwithstanding the provisions of Paragraph 3(a) above. upon a Change in Control (as hereinafter defined):

-1-

(i)  the Option shall become fully vested and shall become immediately exercisable with respect to all shares subject to the Option; and

(ii) upon exercise of the Option during the 60-day period from and after the date of a Change of Control, the Optionee may in lieu of the receipt of Common Stock upon the exercise of the Option, elect by written notice to the Corporation to receive an amount in cash equal to the excess of the aggregate Value (as defined below) of the shares of Common Stock covered by the Option or portion thereof surrendered determined on the date the Option is exercised, over the aggregate exercise price of the Option (such excess is referred to herein as the "Aggregate Spread"); provided, however, if the end of such 60-day period from and after the date of a Change of Control is within six months of the date of grant of the Option and the Optionee is an officer or director of the Corporation subject to the reporting requirements of Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Option shall be cancelled in exchange for a cash payment to the Optionee equal to the Aggregate Spread on the day which is six months and one day after the date of grant of such Option.  As used in this Section 3(b)(ii), the term "Value" means the higher of (1) the highest Fair Market Value (as defined below) during the 60-day period from and after the date of a Change of Control and (2) if the Change of Control is the result of a transaction or series of transactions described in paragraphs (i) or (iii) of the definition of Change of Control, the highest price per share of the Common Stock paid in such transaction or series of transactions (which in the case of paragraph (i) shall be the highest price per share of the Common Stock as reflected in a Schedule 13D filed by the person having made the acquisition) and the term "Fair Market Value" means the "Fair Market Value" of the Common Stock on any date of reference shall be the closing price on the business day immediately preceding such date.  For this purpose, the closing price of the Common Stock on any business day shall be (i) if the Common Stock is listed or admitted for trading on any United States national securities exchange, the last reported sale price of the Common Stock on such exchange, as reported in any newspaper of general circulation, (ii) if actual transactions in the Common Stock are included in the Nasdaq National Market or are reported on a consolidated transaction reporting system, the closing sales price of the Common Stock on such system, (iii) if the Common Stock is otherwise quoted on the Nasdaq system, or any similar system of automated dissemination of quotations of securities prices in common use, the mean between the closing high bid and low asked quotations for such day of the Common Stock on such system, (iv) if none of clause (i), (ii) or (iii) is applicable, the mean between the high bid and low asked quotations for the Common Stock as reported by the National Daily Quotation Service if at least two securities dealers have inserted both bid and asked quotations for the Common Stock on at least five (5) of the ten (10) preceding days and (v) if none of clause (i), (ii), (iii) or (iv) is applicable, the most recent valuation price for the Common Stock as adjusted by the Board in the exercise of its good faith discretion.

(c)  For purposes of this Agreement a Change in Control of the Corporation shall be deemed to have occurred upon the happening of any of the following events:

       (i)  the acquisition, other than from the Corporation, by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) other than Royal Holding Company, Inc. or B.H. Adams of beneficial ownership of thirty percent (30%) or more of either the then outstanding shares of Common Stock of the Corporation or the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors; provided, however, that any acquisition by the Corporation or any corporation or other entity, whether domestic or foreign, in which the Corporation has or obtains, directly or indirectly, a proprietary interest of more than fifty percent (50%) by reason of stock ownership or otherwise ("Subsidiary"), or any employee benefit plan (or related trust) of the Corporation or its Subsidiaries, or any corporation with respect to such acquisition, more than fifty percent (50%) of, respectively, the then outstanding shares of common stock of such corporation and the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors is then beneficially owned, directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Common Stock and voting securities of the Corporation immediately prior to such acquisition in substantially the same proportion as their ownership, immediately prior to such acquisition, of the then outstanding shares of Common Stock of the Corporation or the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors, as the case may be, shall not constitute a Change of Control;

-2-

(ii) individuals who constitute the Board of Directors of the Corporation as of January 1, 1998 (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors of the Corporation, provided that any individual becoming a director subsequent to such date whose election, or nomination for election by the Corporation's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the directors of the Corporation (as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act); or

(iii)    approval by the stockholders of the Corporation of a reorganization, merger or consolidation of the Corporation, in each case, with respect to which the individuals and entities who were the respective beneficial owners of the Common Stock and voting securities of the Corporation immediately prior to such reorganization, merger or consolidation do not, following such reorganization, merger or consolidation, beneficially own, directly or indirectly, more than sixty percent (60%) of, respectively, the then outstanding shares of Common Stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such reorganization, merger or consolidation, or a complete liquidation or dissolution of the Corporation or of the sale or other disposition of all or substantially all of the assets of the Corporation.

(d)  Subject to the provisions of Sections 5 and 8 hereof, shares as to which the Option becomes exercisable pursuant to the foregoing provisions may be purchased at any time thereafter prior to the expiration or termination of the Option. Anything contained in this Agreement to the contrary notwithstanding, the Option shall not be exercisable to the extent that the aggregate Fair Market Value on the date hereof of all stock with respect to which incentive stock options are exercisable for the first time by the Optionee during any calendar year (under the Plan and all other plans of the Corporation and its Subsidiaries, if any) exceeds $100,000.  Such prohibition on exercise shall be temporary and shall not effect subsequent exercises if the restriction set forth herein is not violated at such time.

4    TERMINATION OF OPTION

(a)  The unexercised portion of the Option shall automatically terminate and shall become null and void and be of no further force or effect upon the first to occur of the following:

(i)  The expiration of the Option Term.

(ii) The expiration of three months from the date that the Optionee retires from the Corporation and its Subsidiaries provided that the Optionee on the date of termination of employment has attained the age of 62 with 10 years of continuous employment with the Corporation or its Subsidiaries; provided, however, that if the Optionee shall die during such three month period, the expiration of the unexercised portion of the Option shall be determined in accordance with subparagraph (v) below.  The exercisability of the Option shall be accelerated and the Option shall become immediately exercisable without regard to the number of shares for which it could otherwise have been exercised on the date the Optionee retires.

(iii)    The expiration of one year from the date that the Optionee terminates employment with the Corporation and its Subsidiaries as a result of the Optionee's permanent and total disability (provided that the Optionee is eligible for benefits under the Corporation's disability plan or successor plan upon termination of employment); provided, however, that if the Optionee shall die during such one year period, the expiration of the unexercised portion of the Option shall be determined in accordance with subparagraph (v) below.  The exercisability of the Option shall be accelerated and the Option shall become immediately exercisable without regard to the number of shares for which it could otherwise have been exercised on the date of termination of employment.

(iv) The date that the Optionee terminates employment with the Corporation and its Subsidiaries if such termination is for reasons other than retirement, (at age 62 or older with 10 years of continuous employment with the Corporation or its Subsidiaries), permanent and total disability (provided

-3-

that the Optionee is eligible for benefits under the Corporation's disability plan or successor plan upon termination of employment) or death and further provided that the Option is exercisable only for the number of shares for which it could have been exercised at the time the Optionee terminated employment with the Corporation and its Subsidiaries.

(v)  The expiration of the Option Term in the event the Optionee dies while employed by the Corporation or a Subsidiary or during the three month period following retirement (at age 62 or older with 10 years of continuous employment with the Corporation or its Subsidiaries), or during the one year period following termination of employment due to permanent or total disability (provided that the Optionee is eligible for benefits under the Corporation's disability plan or successor plan upon termination of employment).  The exercisability of all options previously granted to a deceased Optionee shall be accelerated and the Option shall become immediately exercisable without regard to the number of shares for which it otherwise could have been exercised on the date of death of the Optionee.

(b)  Anything contained herein to the contrary notwithstanding, the Option shall not be affected by any change of duties or position of the Optionee (including a transfer to or from the Corporation or one of its Subsidiaries), so long as the Optionee continues to be an officer or employee of the Corporation or any of its Subsidiaries.

5.  PROCEDURE FOR EXERCISE

(a)  Subject to the requirements of Section 8, the Option may be exercised, from time to time, in whole or in part (but for the purchase of a whole number of shares only), by delivery of a written notice (the "Notice") from the Optionee to the Secretary of the Corporation, which Notice shall:

(i)  state that the Optionee elects to exercise the Option;

(ii)  state the number of shares with respect to which the Option is being exercised (the "Optioned Shares");

(iii)  state the date upon which the Optionee desires to consummate the purchase of the Optioned Shares (which date must be prior to the termination of such Option and no later than thirty (30) days after the date of receipt of such Notice);

(iv)  include any representations of the Optionee required under Section 8(c); and

(v)  if the Option shall be exercised pursuant to Section 10 by any person other than the Optionee, include evidence to the satisfaction of the Committee of the right of such person to exercise the Option.

(b)  Payment of the Option Price for the Optioned Shares shall be made in U.S. dollars by personal check, bank draft or money order payable to the order of the Corporation or by wire transfer.

(c)  The Corporation shall issue a stock certificate in the name of the Optionee (or such other person exercising the Option in accordance with the provisions of Section 10) for the Optioned Shares as soon as practicable after receipt of the Notice and payment of the aggregate Option Price for such shares.

6.  NO RIGHTS AS A STOCKHOLDER.  The Optionee shall have no rights as a stockholder of the Corporation with respect to any Optioned Shares until the date the Optionee or his nominee (which, for purposes of this Agreement, shall include any third party agent selected by the Committee to hold such Option Shares on behalf of the Optionee), guardian or legal representative is the holder of record of such Optioned Shares.

7.  ADJUSTMENTS.  The aggregate number of shares subject to the Option and the Option Price of the Option shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock of the Corporation resulting from a stock split, stock dividend, combination or exchange of shares, exchange for other

-4-

securities. reclassification, reorganization, redesignation, spin-off, split-off. merger. consolidation. recapitalization or other such change

8    ADDITIONAL PROVISIONS RELATED TO EXERCISE

(a)  The Option shall be exercisable only in accordance with this Agreement, including the provisions regarding the period when the Option may be exercised and the number of shares of Common Stock that may be acquired upon exercise

(b)  The Option may not be exercised as to less than one hundred (100) shares of Common Stock at any one time unless less than one hundred (100) shares of Common Stock remain to be purchased upon the exercise of the Option

(c)  To exercise the Option, the Optionee shall follow the provisions of Section 5 hereof   Upon the exercise of the Option at a time when there is not in effect a registration statement under the Securities Act of 1933, as amended (the "Securities Act") relating to the shares of Common Stock issuable upon exercise of the Option, the Committee in its discretion may. as a condition to the exercise of the Option, require the Optionee (i) to represent in writing that the shares of Common Stock received upon exercise of the Option are being acquired for investment and not with a view to distribution and (ii) to make such other representations and warranties as are deemed appropriate by counsel to the Corporation. No Option may be exercised and no shares of Common Stock shall be issued and delivered upon the exercise of the Option unless and until the Corporation and/or the Optionee shall have complied with all applicable federal or state registration. listing and/or qualification requirements and all other requirements of law or of any regulatory agencies having jurisdiction

(d)  Stock certificates representing shares of Common Stock acquired upon the exercise of the Option that have not been registered under the Securities Act shall, if required by the Committee. bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER THE ACT OR PURSUANT TO AN EXEMPTION FROM REGISTRATION OR AN OPINION OF COUNSEL SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED "

(e)  The exercise of each Option and the issuance of shares in connection with the exercise of an Option shall, in all cases, be subject to each of the following conditions:  (i) the declaration of effectiveness by the Securities and Exchange Commission ("SEC") of a registration statement relating to a primary offering of the Common Stock, filed by the Corporation with the SEC under the Securities Act, (ii) the satisfaction of withholding tax or other withholding liabilities. (iii) the listing, registration or qualification of any to-be-issued shares upon any securities exchange, any NASDAQ or other trading or quotation system or under any federal or state law, (iv) the consent or approval of any regulatory body, (v) the execution of a lock-up agreement with one or more prospective underwriters, or (vi) the execution of a buy-sell or shareholders agreement with other shareholders of the Corporation   The Committee shall in its sole discretion determine whether one or more of these conditions is necessary or desirable to be satisfied in connection with the exercise of an Option and prior to the delivery or purchase of shares pursuant to the exercise of an Option   The exercise of an Option shall not be effective unless and until such condition(s) shall have been satisfied or the Committee shall have waived such conditions. in its sole discretion

9    NO EVIDENCE OF EMPLOYMENT OR SERVICE   Nothing contained in the Plan or this Agreement shall confer upon the Optionee any right to be retained in the employ of or under contract with the Corporation or a Subsidiary or interfere in any way with the right of the Corporation or any Subsidiary (subject to the terms of any separate agreement to the contrary) to terminate the Optionee's employment or engagement or to increase or decrease the Optionee's compensation at any time

-5-

10   RESTRICTION ON TRANSFER   Except to the extent, if any, as may be permitted by the Code and rules promulgated under Section 16 of the Exchange Act, the Option may not be assigned or transferred except by will or by the laws of descent and distribution, and may be exercised during the lifetime of the Optionee only by the Optionee or the Optionee's guardian or legal representative   If the Optionee dies, the Option shall thereafter be exercisable, during the period specified in Section 4(a)(v), by his executors or administrators or by a person who acquired the right to exercise such option by bequest or inheritance to the full extent to which the Option was exercisable by the Optionee at the time of his death.   The Option shall not be subject to execution, attachment or similar process Any attempted assignment or transfer of the Option contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the Option, shall be null and void without effect

11   DISQUALIFYING DISPOSITIONS.   If the shares of Common Stock acquired upon the exercise of this Option are disposed of within two (2) years following the date of this Agreement or one (1) year following the issuance of shares of Common Stock upon exercise of the Option pursuant to the terms of this Agreement to the Optionee or the Optionee otherwise makes a disposition within the meaning of Section 424(c) of the Code and the regulations promulgated thereunder (a "Disqualifying Disposition"), the Optionee shall, within ten (10) days after a Disqualifying Disposition, notify the Corporation in writing of the date, sales price or other value ascribed to or used to measure the amount received upon disposition of the shares and the other terms of such Disqualifying Disposition and shall immediately deliver to the Corporation payment for any amount of federal income tax withholding required by law with respect to the Disqualifying Disposition

12   NOTICES   All notices or other communications which are required or permitted hereunder shall be in writing and sufficient if (i) personally delivered, (ii) sent by nationally-recognized overnight courier or (iii) sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

if to the Optionee, to the address set forth on the signature page hereto; and

if to the Corporation, to:

Adams Golf, Inc
300 Delaware Avenue, Suite 548
Wilmington, Delaware  19801
Attention: Secretary

with a copy to:

Adams Golf Management Corp
2801 E  Plano Parkway
Plano, Texas  75225
Attention: President

or to such other address as the party to whom notice is to be given may have furnished to each other party in writing in accordance herewith   Any such communication shall be deemed to have been given (i) when delivered, if personally delivered, (ii) on the first Business Day (as hereinafter defined) after dispatch, if sent by nationally-recognized overnight courier and (iii) on the third Business Day following the date on which the piece of mail containing such communication is posted, if sent by mail   As used herein, "Business Day" means a day that is not a Saturday, Sunday or a day on which banking institutions in the city to which the notice or communication is to be sent are not required to be open

13   NO WAIVER   No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature

14.   OPTIONEE UNDERTAKING   The Optionee hereby agrees to take whatever additional actions and execute whatever additional documents the Corporation or its counsel may in their reasonable judgment deem necessary or advisable in order to carry out or effect one or more of the obligations or restrictions imposed on the Optionee pursuant to the express provisions of this Agreement

-6-

15.  MODIFICATION OF RIGHTS.  The rights of the Optionee are subject to modification and termination in certain events as provided in this Agreement and the Plan.

16.  GOVERNING LAW.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be wholly performed therein.

17.  COUNTERPARTS.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

18.  ENTIRE AGREEMENT.  This Agreement and the Plan constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all previously written or oral negotiations, commitments, representations and agreements with respect thereto.

[Remainder of Page Intentionally Left Blank]

ADAMS GOLF, INC.

By:_____

Name:_____

Title:_____

OPTIONEE:

_____

Name:_____

Address:_____

-8-

Ladies/Gentlemen:

I hereby exercise my Incentive Stock Option to purchase _____ shares of Common Stock of ADAMS GOLF, INC. at the option price of $_____ per share as provided in the Incentive Stock Option Agreement dated the ___ day of _____.

I acknowledge that I previously received a copy of the 1998 Stock Incentive Plan and executed an Incentive Stock Option Agreement, and I have carefully reviewed both documents.

I have considered the federal tax implications of my option. I hereby tender my personal check, bank draft or money order payable to ADAMS GOLF, INC. in the amount of $_____ or, I have wire transferred $_____ to ADAMS GOLF, INC., which transfer shall be subject to confirmation of receipt of funds by the Corporation. [If payment is to be made by wire transfer, the Optionee should contact the Corporation's Chief Financial Officer or Controller in advance to obtain wiring instructions.]

_____
Employee

_____
Date

-9-

ADAMS GOLF, INC
NONQUALIFIED STOCK OPTION AGREEMENT
UNDER
1998 STOCK INCENTIVE PLAN

NONTRANSFERABLE NONQUALIFIED STOCK OPTION AGREEMENT
(this "Agreement") entered into this ____ day of _____,
____. between ADAMS GOLF, INC , a Delaware corporation (the
"Corporation"), and _____                          (the
"Optionee," which term as used herein shall be deemed to include
any successor to the Optionee by will or by the laws of descent
and distribution. unless the context shall otherwise require)

        Pursuant to the Corporation's 1998 Stock Incentive Plan
(the "Plan"), the Corporation, acting through its
Compensation/Plan Committee of the Board of Directors (the
"Committee"), approved the issuance to the Optionee, effective as
of the date set forth above, of a nonqualified stock option to
purchase up to an aggregate of _____ shares of common
stock, par value $ .001, of the Corporation (the "Common Stock").
at the price of $____ per share (the "Option Price") which
represents not less than 100% of the fair market value of a share
of Common Stock determined in accordance with the Plan, upon the
terms and conditions hereinafter set forth   (Capitalized terms
used herein but not defined herein shall have the meaning
ascribed to them in the Plan)

        NOW, THEREFORE, in consideration of the mutual premises
and undertakings hereinafter set forth, the parties hereto agree
as follows:

        1     OPTION; OPTION PRICE   On behalf of the
Corporation, the Committee hereby grants as of the date of this
Agreement to the Optionee the option (the "Option") to purchase,
subject to the terms and conditions of this Agreement and the
provisions of the Plan (which is incorporated by reference herein
and which in all cases shall control in the event of any conflict
with the terms. definitions and provisions of this Agreement),
_____ shares of Common Stock of the Corporation at an
exercise price per share equal to the Option Price   A copy of
the Plan as in effect on the date hereof has been supplied to the
Optionee, and the Optionee by executing this Agreement hereby
acknowledges receipt thereof

        2     TERM  The term (the "Option Term") of the Option
shall commence on the date of this Agreement and shall terminate
on the fifth anniversary of the date of this Agreement, unless
such Option shall theretofore have been terminated in accordance
with the terms hereof or the provisions of the Plan.

        3     VESTING; CHANGE OF CONTROL; RESTRICTIONS ON
              EXERCISE

        (a)  Subject to the provisions of Sections 5 and 8
hereof, and unless accelerated, as set forth in the Plan or as
provided herein, the Option granted hereunder shall vest and
become exercisable for the number of shares set forth opposite
the dates noted below (the "Option Vesting Schedule")

|  | Cumulative |
| Date(s) | Number of Vested Shares |
| ------- | ------------------------ |

        (b)  Notwithstanding the provisions of Paragraph 3(a)
above, upon a Change in Control (as hereinafter defined):

        (i)  the Option shall become fully vested and
shall become immediately exercisable with respect to all
shares subject to the Option; and

-1-

(ii) upon exercise of the Option during the 60-day period from and after the date of a Change of Control, the Optionee may in lieu of the receipt of Common Stock upon the exercise of the Option, elect by written notice to the Corporation to receive an amount in cash equal to the excess of the aggregate Value (as defined below) of the shares of Common Stock covered by the Option or portion thereof surrendered determined on the date the Option is exercised, over the aggregate exercise price of the Option (such excess is referred to herein as the "Aggregate Spread"); provided, however, if the end of such 60-day period from and after the date of a Change of Control is within six months of the date of grant of the Option and the Optionee is an officer or director of the Corporation subject to the reporting requirements of Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Option shall be cancelled in exchange for a cash payment to the Optionee equal to the Aggregate Spread on the day which is six months and one day after the date of grant of such Option. As used in this Section 3(b)(ii), the term "Value" means the higher of (1) the highest Fair Market Value (as defined below) during the 60-day period from and after the date of a Change of Control and (2) if the Change of Control is the result of a transaction or series of transactions described in paragraphs (i) or (iii) of the definition of Change of Control, the highest price per share of the Common Stock paid in such transaction or series of transactions (which in the case of paragraph (i) shall be the highest price per share of the Common Stock as reflected in a Schedule 13D filed by the person having made the acquisition) and the term "Fair Market Value" means the "Fair Market Value" of the Common Stock on any date of reference shall be the closing price on the business day immediately preceding such date. For this purpose, the closing price of the Common Stock on any business day shall be (i) if the Common Stock is listed or admitted for trading on any United States national securities exchange, the last reported sale price of the Common Stock on such exchange, as reported in any newspaper of general circulation, (ii) if actual transactions in the Common Stock are included in the Nasdaq National Market or are reported on a consolidated transaction reporting system, the closing sales price of the Common Stock on such system, (iii) if the Common Stock is otherwise quoted on the Nasdaq system, or any similar system of automated dissemination of quotations of securities prices in common use, the mean between the closing high bid and low asked quotations for such day of the Common Stock on such system, (iv) if none of clause (i), (ii) or (iii) is applicable, the mean between the high bid and low asked quotations for the Common Stock as reported by the National Daily Quotation Service if at least two securities dealers have inserted both bid and asked quotations for the Common Stock on at least five (5) of the ten (10) preceding days and (v) if none of clause (i), (ii), (iii) or (iv) is applicable, the most recent valuation price for the Common Stock as adjusted by the Board in the exercise of its good faith discretion.

(c) For purposes of this Agreement a Change in Control of the Corporation shall be deemed to have occurred upon the happening of any of the following events:

(i) the acquisition, other than from the Corporation, by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) other than Royal Holding Company, Inc. or B. H. Adams of beneficial ownership of thirty percent (30%) or more of

either the then outstanding shares of Common Stock of the
Corporation or the combined voting power of the then
outstanding voting securities of the Corporation entitled to
vote generally in the election of directors; provided,
however, that any acquisition by the Corporation or any
corporation or other entity, whether domestic or foreign, in
which the Corporation has or obtains, directly or
indirectly, a proprietary interest of more than fifty
percent (50%) by reason of stock ownership or otherwise
("Subsidiary"), or any employee benefit plan (or related
trust) of the Corporation or its Subsidiaries, or any
corporation with respect to which, following such
acquisition, more than fifty percent (50%) of, respectively,
the then outstanding shares of common stock of such
corporation and the combined voting power of the then
outstanding voting securities of such corporation entitled
to vote generally in the election of directors is then
beneficially owned, directly or indirectly, by all or
substantially all of the individuals and entities who were
the beneficial owners, respectively, of the Common Stock and
voting securities of the Corporation immediately prior to
such acquisition in substantially the same proportion as
their ownership, immediately prior to such acquisition, of
the then outstanding shares of Common Stock of the
Corporation or the combined voting power of the then
outstanding voting securities of the Corporation entitled to
vote generally in the election of directors, as the case may
be, shall not constitute a Change of Control;

   (ii) individuals who constitute the Board of
Directors of the Corporation as of January 1, 1998 (the
"Incumbent Board") cease for any reason to constitute at
least a majority of the Board of Directors of the
Corporation, provided that any individual becoming a
director subsequent to such date

-2-

whose election, or nomination for election by the
Corporation's stockholders, was approved by a vote of at
least a majority of the directors then comprising the
Incumbent Board shall be considered as though such
individual were a member of the Incumbent Board, but
excluding, for this purpose, any such individual whose
initial assumption of office is in connection with an actual
or threatened election contest relating to the election of
the directors of the Corporation (as such terms are used in
Rule 14a-11 of Regulation 14A promulgated under the Exchange
Act); or

        (iii)     approval by the stockholders of the
Corporation of a reorganization, merger or consolidation of
the Corporation, in each case, with respect to which the
individuals and entities who were the respective beneficial
owners of the Common Stock and voting securities of the
Corporation immediately prior to such reorganization, merger
or consolidation do not  following such reorganization,
merger or consolidation, beneficially own, directly or
indirectly, more than sixty percent (60%) of, respectively,
the then outstanding shares of Common Stock and the combined
voting power of the then outstanding voting securities
entitled to vote generally in the election of directors, as
the case may be, of the corporation resulting from such
reorganization, merger or consolidation, or a complete
liquidation or dissolution of the Corporation or of the sale
or other disposition of all or substantially all of the
assets of the Corporation

        (d)   Subject to the provisions of Sections 5 and 8
hereof, shares as to which the Option becomes exercisable
pursuant to the foregoing provisions may be purchased at any time
thereafter prior to the expiration or termination of the Option

        4    TERMINATION OF OPTION

            (a)   The unexercised portion of the Option shall
automatically terminate and shall become null and void and be of
no further force or effect upon the first to occur of the
following:

                (i)   The expiration of the Option Term

                (ii) The expiration of three months from the date
that the Optionee retires from the Corporation and its
Subsidiaries provided that the Optionee on the date of
termination of employment has attained the age of 62 with 10
years of continuous employment with the Corporation or its
Subsidiaries; provided, however, that if the Optionee shall
die during such three month period, the expiration of the
unexercised portion of the Option shall be determined in
accordance with subparagraph (v) below  The exercisability
of the Option shall be accelerated and the Option shall
become immediately exercisable without regard to the number
of shares for which it could otherwise have been exercised
on the date the Optionee retires

                (iii)     The expiration of one year from the date
that the Optionee terminates employment with the Corporation
and its Subsidiaries as a result of the Optionee's permanent
and total disability (provided that the Optionee is eligible
for benefits under the Corporation's disability plan or
successor plan upon termination of employment); provided,
however, that if the Optionee shall die during such one year
period, the expiration of the unexercised portion of the
Option shall be determined in accordance with subparagraph
(v) below.  The exercisability of the Option shall be
accelerated and the Option shall become immediately
exercisable without regard to the number of shares for which
it could otherwise have been exercised on the date of
termination of employment

                (iv)   The date that the Optionee terminates
employment with the Corporation and its Subsidiaries if such
termination is for reasons other than retirement. (at age 62
or older with 10 years of continuous employment with the
Corporation or its Subsidiaries), permanent and total
disability (provided that the Optionee is eligible for
benefits under the Corporation's disability plan or
successor plan upon termination of employment) or death and
further provided that the Option is exercisable only for the
number of shares for which it could have been exercised at
the time the Optionee terminated employment with the
Corporation and its Subsidiaries

                (v)   The expiration of the Option Term in the
event the Optionee dies while employed by the Corporation or
a Subsidiary or during the three month period following
retirement (at age

-3-

62 or older with 10 years of continuous employment with the Corporation or its Subsidiaries), or during the one year period following termination of employment due to permanent or total disability (provided that the Optionee is eligible for benefits under the Corporation's disability plan or successor plan upon termination of employment).  The exercisability of all options previously granted to a decreased Optionee shall be accelerated and the Option shall become immediately exercisable without regard to the number of shares for which it otherwise could have been exercised on the date of death of the Optionee

(b)  Anything contained herein to the contrary notwithstanding, the Option shall not be affected by any change of duties or position of the Optionee (including a transfer to or from the Corporation or one of its Subsidiaries), so long as the Optionee continues to be an officer or employee of the Corporation or any of its Subsidiaries

5    PROCEDURE FOR EXERCISE

(a)  Subject to the requirements of Section 8, the Option may be exercised, from time to time. in whole or in part (but for the purchase of a whole number of shares only), by delivery of a written notice (the "Notice") from the Optionee to the Secretary of the Corporation. which Notice shall:

(i)  state that the Optionee elects to exercise the Option;

(ii)  state the number of shares with respect to which the Option is being exercised (the "Optioned Shares");

(iii)  state the date upon which the Optionee desires to consummate the purchase of the Optioned Shares (which date must be prior to the termination of such Option and no later than thirty (30) days after the date of receipt of such Notice);

(iv)  include any representations of the Optionee required under Section 8(c); and

(v)  if the Option shall be exercised pursuant to Section 10 by any person other than the Optionee. include evidence to the satisfaction of the Committee of the right of such person to exercise the Option

(b)  Payment of the Option Price for the Optioned Shares shall be made in U S  dollars by personal check, bank draft or money order payable to the order of the Corporation or by wire transfer

(c)  The Corporation shall issue a stock certificate in the name of the Optionee (or such other person exercising the Option in accordance with the provisions of Section 10) for the Optioned Shares as soon as practicable after receipt of the Notice and payment of the aggregate Option Price for such shares

6    NO RIGHTS AS A STOCKHOLDER  The Optionee shall have no rights as a stockholder of the Corporation with respect to any Optioned Shares until the date the Optionee or his nominee (which, for purposes of this Agreement, shall include any third party agent selected by the Committee to hold such Option Shares on behalf of the Optionee), guardian or legal representative is the holder of record of such Optioned Shares

7    ADJUSTMENTS  The aggregate number of shares subject to the Option and the Option Price of the Option shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock of the Corporation resulting from a stock split. stock dividend, combination or exchange of shares, exchange for other securities, reclassification, reorganization, redesignation. spinoff, split-off, merger, consolidation. recapitalization or other such change

8    ADDITIONAL PROVISIONS RELATED TO EXERCISE

(a)  The Option shall be exercisable only in accordance with this Agreement. including the provisions regarding the period when the Option may be exercised and the number of shares of Common Stock that may be acquired upon exercise

-4-

(b)  The Option may not be exercised as to less than one hundred (100) shares of Common Stock at any one time unless less than one hundred (100) shares of Common Stock remain to be purchased upon the exercise of the Option

(c)  To exercise the Option, the Optionee shall follow the provisions of Section 5 hereof  Upon the exercise of the Option at a time when there is not in effect a registration statement under the Securities Act of 1933, as amended (the "Securities Act") relating to the shares of Common Stock issuable upon exercise of the Option, the Committee in its discretion may, as a condition to the exercise of the Option, require the Optionee (i) to represent in writing that the shares of Common Stock received upon exercise of the Option are being acquired for investment and not with a view to distribution and (ii) to make such other representations and warranties as are deemed appropriate by counsel to the Corporation  No Option may be exercised and no shares of Common Stock shall be issued and delivered upon the exercise of the Option unless and until the Corporation and/or the Optionee shall have complied with all applicable federal or state registration  listing and/or qualification requirements and all other requirements of law or of any regulatory agencies having jurisdiction

(d)  Stock certificates representing shares of Common Stock acquired upon the exercise of the Option that have not been registered under the Securities Act shall, if required by the Committee  bear the following legend:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT")   THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER THE ACT OR PURSUANT TO AN EXEMPTION FROM REGISTRATION OR AN OPINION OF COUNSEL SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED "

(e)  The exercise of each Option and the issuance of shares in connection with the exercise of an Option shall, in all cases, be subject to each of the following conditions: (i) the declaration of effectiveness by the Securities and Exchange Commission ("SEC") of a registration statement relating to a primary offering of the Common Stock, filed by the Corporation with the SEC under the Securities Act, (ii) the satisfaction of withholding tax or other withholding liabilities, (iii) the listing, registration or qualification of any to-be-issued shares upon any securities exchange, any NASDAQ or other trading or quotation system or under any federal or state law, (iv) the consent or approval of any regulatory body, (v) the execution of a lock-up agreement with one or more prospective underwriters, or (vi) the execution of a buy-sell or shareholders agreement with other shareholders of the Corporation  The Committee shall in its sole discretion determine whether one or more of these conditions is necessary or desirable to be satisfied in connection with the exercise of an Option and prior to the delivery or purchase of shares pursuant to the exercise of an Option.  The exercise of an Option shall not be effective unless and until such condition(s) shall have been satisfied or the Committee shall have waived such conditions  in its sole discretion

9.  NO EVIDENCE OF EMPLOYMENT OR SERVICE.  Nothing contained in the Plan or this Agreement shall confer upon the Optionee any right to be retained in the employ of or under contract with the Corporation or a Subsidiary or interfere in any way with the right of the Corporation or any Subsidiary (subject to the terms of any separate agreement to the contrary) to terminate the Optionee's employment or engagement or to increase or decrease the Optionee's compensation at any time

10.  RESTRICTION ON TRANSFER.  Except to the extent, if any, as may be permitted by the Code and rules promulgated under Section 16 of the Exchange Act, the Option may not be assigned or transferred except by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined in the Code, and may be exercised during the lifetime of the Optionee only by the Optionee or the Optionee's guardian or legal representative or assignee pursuant to a qualified domestic relations order.  If the Optionee dies, the Option shall thereafter be exercisable  during the period specified in Section 4(a)(v), by his executors or administrators or by a person who acquired the right to exercise such option by bequest or inheritance to the full extent to which the Option was exercisable by the Optionee at the time of his death.  The Option shall not be subject to execution, attachment or similar process  Any attempted assignment or transfer of the Option contrary to the provisions

-5-

hereof, and the levy of any execution, attachment or similar process upon the Option. shall be null and void and without effect

11  NOTICES  All notices or other communications which are required or permitted hereunder shall be in writing and sufficient if (i) personally delivered, (ii) sent by nationally-recognized overnight courier or (iii) sent by registered or certified mail, postage prepaid. return receipt requested. addressed as follows:

if to the Optionee. to the address set forth on the signature page hereto; and

if to the Corporation. to:

Adams Golf, Inc.
300 Delaware Avenue, Suite 548
Wilmington. Delaware  19801
Attention: Secretary

with a copy to:

Adams Golf, Ltd.
c/o Adams Golf GP Corp
2801 E  Plano Parkway
Plano, Texas  75225
Attention:  President

or to such other address as the party to whom notice is to be given may have furnished to each other party in writing in accordance herewith  Any such communication shall be deemed to have been given (i) when delivered, if personally delivered. (ii) on the first Business Day (as hereinafter defined) after dispatch. if sent by nationally-recognized overnight courier and (iii) on the third Business Day following the date on which the piece of mail containing such communication is posted, if sent by mail  As used herein. "Business Day" means a day that is not a Saturday. Sunday or a day on which banking institutions in the city to which the notice or communication is to be sent are not required to be open

12.  NO WAIVER  No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition. whether of like or different nature

13.  OPTIONEE UNDERTAKING  The Optionee hereby agrees to take whatever additional actions and execute whatever additional documents the Corporation or its counsel may in their reasonable judgment deem necessary or advisable in order to carry out or effect one or more of the obligations or restrictions imposed on the Optionee pursuant to the express provisions of this Agreement

14  MODIFICATION OF RIGHTS  The rights of the Optionee are subject to modification and termination in certain events as provided in this Agreement and the Plan

15.  GOVERNING LAW.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be wholly performed therein

16  COUNTERPARTS  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument

17.  ENTIRE AGREEMENT  This Agreement and the Plan constitute the entire agreement between the parties with respect to the subject matter hereof. and supersede all previously written or oral negotiations, commitments. representations and agreements with respect thereto

-6-

ADAMS GOLF, INC.

By:_____
Name:_____
Title:_____

OPTIONEE:

_____
Name:_____
Address:_____

-7-

Ladies/Gentlemen:

I hereby exercise my Nonqualified Stock Option to purchase _____ shares of Common Stock of ADAMS GOLF, INC. at the option price of $____ per share as provided in the Nonqualified Stock Option Agreement dated the ___ day of _____.

I acknowledge that I previously received a copy of the 1998 Stock Incentive Plan and executed a Nonqualified Stock Option Agreement, and I have carefully reviewed both documents.

I have considered the federal tax implications of my option. I hereby tender my personal check, bank draft or money order payable to ADAMS GOLF, INC. in the amount of $_____ or, I have wire transferred $_____ to ADAMS GOLF, INC., which transfer shall be subject to the confirmation of receipt of funds by the Corporation. [If payment is to be made by wire transfer, the Optionee should contact the Corporation's Chief Financial Officer or Controller in advance to obtain wiring instructions.]

_____
Employee

_____
Date

-8-

*ADAMS*GOLF*

# ADAMS GOLF INC (ADGO)

2801 EAST PLANO PARKWAY
PLANO, TX 75074
972 673 9000
http://www.adamsgolf.com/

# EX−5.1

**S−8 Filed on 12/01/1998**
File Number 333−68129



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

EXHIBIT 5 1

ARTER & HADDEN LLP
1717 Main Street, Suite 4100
Dallas, Texas 75201
Tel: 214 761 2100
Fax: 214 741 7139

November 30. 1998

Adams Golf, Inc.
300 Delaware Avenue, Suite 548
Wilmington. Delaware 19801

Re:   Adams Golf, Inc.
      Registration Statement on Form S-8
      Adams Golf. Inc  1998 Stock Incentive Plan

Gentlemen:

We have acted as counsel to Adams Golf. Inc., a Delaware
corporation (the "Company"), in connection with the preparation
of the Registration Statement on Form S-8 (the "Registration
Statement") to be filed with the Securities and Exchange
Commission on or about November 30, 1998. under the Securities
Act of 1933, as amended (the "Securities Act"), relating to
1,800,000 shares of the $0 001 par value common stock (the
"Common Stock") of the Company that will be issued on the
exercise of stock options (collectively, the "Options") granted
or that may be granted under the Adams Golf. Inc  1998 Stock
Incentive Plan (the "Plan")

You have requested the opinion of this firm with respect to
certain legal aspects of the Registration Statement    In
connection therewith, we have examined and relied upon the
original, or copies identified to our satisfaction. of (1) the
Certificate of Incorporation and the Bylaws of the Company, as
both have been amended; (2) minutes and records of the corporate
proceedings of the Company with respect to the establishment and
approval of the Plan, the granting of the Options under the Plan,
the issuance of shares of Common Stock pursuant to the Plan and
related matters; (3) the Registration Statement and exhibits
thereto, including the Plan and the Form of Stock Option
Agreement listed as exhibits to the Registration Statement; and
(4) such other documents and instruments as we have deemed
necessary for the expression of the opinions herein contained
In making the foregoing examinations, we have assumed the
genuineness of all signatures and the authenticity of all
documents submitted to us as originals, and the conformity to
original documents of all documents submitted to us as certified
or photostatic copies.  As to various questions of fact material
to this opinion, and as to the content and form of the
Certificate of Incorporation, the Bylaws, minutes, records.
resolutions and other documents or writings of the Company, we
have relied, to the extent we deem reasonably appropriate, upon
representations or certificates of officers or directors of the
Company and upon documents. records and instruments furnished to
us by the Company. without independent check or verification of
their accuracy.

Based upon our examination, consideration of, and reliance
on the documents and other matters described above. and subject
to the comments and exceptions noted below. we are of the opinion
that, assuming (i) the outstanding Options were duly granted and
the Options to be granted in the future will be duly granted in
accordance with the terms of the Plan. (ii) the Company maintains
an adequate number of authorized but unissued shares and/or
treasury shares of Common Stock available for issuance to those
persons who exercise Options granted under the Plan, (iii) the
exercise of Options is in accordance with the provisions thereof
and in accordance with the provisions of the Plan, and (iv) the
consideration for the shares of Common Stock issuable upon the
exercise of such Options is actually received by the Company as
provided in the Plan and the particular Option and such
consideration exceeds the par value of such shares, then the
shares of Common Stock issued pursuant to the exercise of the
Options will be validly issued. fully paid and nonassessable

We bring to your attention the fact that this legal opinion is an expression of professional judgment and not a guaranty of result. This opinion is rendered as of the date hereof, and we undertake no, and hereby disclaim any, obligation to advise you of any changes in or new developments that might affect any matters or opinions set forth herein.

This opinion is limited in all respects to the General Corporation Law of the State of Delaware as in effect on the date hereof; however, we are not members of the Bar of the State of Delaware and our knowledge of its General Corporation Law is derived from a reading of the most recent compilation of that statute available to us without consideration of any judicial or administrative interpretations thereof.

We hereby consent to the filing of this opinion as Exhibit 5.1 to the Registration Statement and to references to our firm included in or made a part of the Registration Statement. In giving this consent, we do not admit that we come within the category of person whose consent is required under Section 7 of the Securities Act or the Rules and Regulations of the Securities and Exchange Commission thereunder. This opinion may not be relied upon by any person other than the addressee identified above.

Very truly yours,

/s/  ARTER & HADDEN LLP

*ADAMSGOLF*

# ADAMS GOLF INC (ADGO)

2801 EAST PLANO PARKWAY
PLANO, TX 75074
972  673 9000
http://www.adamsgolf.com/

# EX−23.1

**S−8 Filed on 12/01/1998**
File Number 333−68129

GSI

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

EXHIBIT 23.1

CONSENT OF KPMG PEAT MARWICK LLP

The Board of Directors
Adams Golf, Inc.

We consent to the use of our report incorporated herein by
reference.


                        /s/  KPMG PEAT MARWICK LLP

Dallas, Texas
November 30, 1998

*ADAMS*GOLF

# ADAMS GOLF INC (ADGO)

2801 EAST PLANO PARKWAY
PLANO, TX 75074
972  673 9000
http://www.adamsgolf.com/

# S–8

**Filed on 05/28/1999**
File Number 333–79495



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

As filed with the Securities and Exchange
Commission on May 27, 1999

Registration No 333-_____

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D C   20549

FORM S-8
REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

ADAMS GOLF, INC.
(Exact name of Registrant as specified in its charter)

| Delaware | 75-2320087 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No ) |

| 300 Delaware Avenue, Suite 572 Wilmington, Delaware (Address of Principal Executive Offices) | 19801 (Zip Code) |
|---|---|

1999 NON-EMPLOYEE DIRECTOR PLAN
OF ADAMS GOLF, INC
(Full title of the plan)

| B H  (Barney) Adams Chief Executive Officer ADAMS GOLF, INC 300 Delaware Avenue, Suite 572 Wilmington, Delaware  19801 (Name and address of agent for service) | Copy to: J  David Washburn, Esq ARTER & HADDEN LLP 1717 Main St.,  Suite 4100 Dallas, Texas  75201-4605 (214)  761-2100 |
|---|---|

(302)  427-5892
(Telephone number,
including area code,
of agent for service)

CALCULATION OF REGISTRATION FEE

| Title of Securities to be Registered | Amount to be Registered(1) | Proposed Maximum Offering Price Per Share | Proposed Maximum Aggregate Offering Price(2) | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock $ 001 par value | 200 000 shares | (2) | $712 500 | $198 08 |

(1)  The securities to be registered represent shares of
Common Stock issued or reserved for issuance under the 1999 Non
Employee Director Plan of Adams Golf, Inc  (the "Plan").
Pursuant to Rule 416, shares of Common Stock of the Company
issuable pursuant to the exercise of options granted or to be
granted under the Plan in order to prevent dilution resulting
from any future stock split, stock dividend or similar transaction
are also being registered hereunder.

(2)  Estimated pursuant to Rule 457(h) solely for the
purpose of calculating the registration fee as follows:  (i) the
maximum proposed offering price at which outstanding options
under the Plan 110,000 shares of Common Stock) may be exercised
is $67,500 and (ii) the maximum proposed offering price at which
unissued options may be exercised under the Plan (190,000 shares
of Common Stock) is $645,000 calculated on the basis of the
closing sale price per share of Common Stock on the Nasdaq Stock
Market's National Market on May 26, 1999 ($3 50), in accordance
with Rule 457(c).

Part I

INFORMATION REQUIRED IN THE SECTION 10(a) PROSPECTUS

Item 1.    Plan Information.*

Item 2.    Registrant Information and Employee Plan Annual
           Information.*

* Information required by Part I to be contained in the Section
  10(a) Prospectus is omitted from the Registration Statement in
  accordance with Rule 428 under the Securities Act of 1933, as
  amended (the "Securities Act"), and the Note to Part I of Form
  S-8.

PART II

INFORMATION REQUIRED IN THE REGISTRATION STATEMENT

Item 3.    Incorporation of Documents by Reference.

     Adams Golf, Inc. (the "Company") hereby incorporates by
reference in this Registration Statement the following documents
previously filed or to be filed with the Securities and Exchange
Commission (the "Commission"):

     (a)   the Company's Annual Report on Form 10-K filed with the
           Commission for the fiscal year ended December 31, 1998;

     (b)   the Company's Quarterly Report filed with the
           Commission on Form 10-Q for the quarter ended March 31,
           1999;

     (c)   the description of the Company's common stock, par
           value $.001 per share (the "Common Stock"), contained
           in the Company's Registration Statement on Form 8-A
           (file no. 0-24583), including any amendment or report
           filed for the purpose of updating such description; and

     (d)   all documents filed by the Company with the Commission
           pursuant to Sections 13(a), 13(c), 14 and 15(d) of the
           Securities Exchange Act, of 1934, as amended,
           subsequent to the date of this Registration Statement
           shall be deemed to be incorporated herein by reference
           and to be a part hereof from the date of filing of such
           documents until such time as there shall have been
           filed a post-effective amendment that indicates that
           all securities offered under the Registration Statement
           have been sold or that deregisters all securities
           remaining unsold at the time of the amendment.

     Any statement contained herein or in a document incorporated
or deemed to be incorporated by reference herein shall be deemed
to be modified or superseded for purposes of this Registration
Statement to the extent that the statement contained herein or in
any subsequently filed document that also is or is deemed to be
incorporated by reference herein, or in any document forming any
part of the Section 10(a) Prospectus to be delivered to
participants in connection with, modifies or supersedes such
statement.  Any statement so modified or

-2-

superseded shall not be deemed, except as so modified or superseded. to constitute a part of this Registration Statement

Item 4    Description of Securities

   Not Applicable

Item 5    Interests of Named Experts and Counsel

   Not Applicable

Item 6    Indemnification of Directors and Officers

   Article VII of the Company's Certificate of Incorporation provides that the Company shall indemnify its directors and officers to the fullest extent permitted by the Delaware General Corporation Law ("DGCL")

   Section 145 of the DGCL permits a corporation, under specified circumstances, to indemnify its directors, officers, employees or agents against expenses (including attorneys' fees). judgments, fines and amounts paid in settlements actually and reasonably incurred by them in connection with any action, suit or proceeding brought by third parties by reason of the fact that they were or are directors, officers, employees or agents, acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe their conduct was unlawful   In a derivative action (i.e., one by or in the right of the corporation). indemnification may be made only for expenses actually and reasonably incurred by directors, officers, employees or agents in connection with the defense or settlement of an action or suit, and only with respect to a matter as to which they shall have acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the corporation, except that no indemnification shall be made if such persons have been adjudged liable to the corporation, unless and only to the extent that the court in which the action or suit was brought shall determine upon application that the defendant directors, officers, employees or agents are fairly and reasonably entitled to indemnity for such expenses, despite such adjudication of liability

   Section 102(b)(7) of the DGCL permits a corporation organized under Delaware law to eliminate or limit the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director subject to certain limitations.  Article IX of the Certificate of Incorporation includes the following provision:

      A director of this corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law. (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit  If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or

-3-

limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article IX by the stockholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification.

Article XI of the company's Bylaws further provides for the indemnification of, and advancement of expenses to, its officers and directors in certain circumstances.

The Company has purchased directors and officers liability insurance that provides coverage for directors and officers with respect to certain liabilities.

Item 7.    Exemption from Registration Claimed.

Not applicable.

Item 8.    Exhibits.

(a)    Exhibits.

| Exhibit | Description |
| ------- | ----------- |
| 4.1 | 1999 Non-Employee Director Plan of Adams Golf, Inc. (the "Plan") (filed herewith) |
| 4.2 | Form of Stock Option Agreement relating to options granted under the Plan (filed herewith) |
| 5.1 | Opinion of Arter & Hadden LLP (filed herewith) |
| 23.1 | Consent of Arter & Hadden LLP (included in their opinion filed as Exhibit 5.1) (filed herewith) |
| 23.2 | Consent of KPMG LLP (filed herewith) |

Item 9.    Undertakings.

A.    The undersigned Registrant hereby undertakes:

(1)    To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:  (i) to include any prospectus required by Section 10(a)(3) of the Securities Act of 1933; (ii) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement; (iii) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement; provided, however, that clauses (i) and (ii) do not apply if the information required to be included in a post-effective amendment by those clauses is contained in periodic reports filed by the Registrant pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement.

-4-

(2)  That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)  To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

B.  The undersigned Registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the Registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

C.  Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable.  In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

-5-

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant certifies that it has reasonable grounds to believe that it meets all the requirements for filing on Form S-8 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Plano, Texas, on May 26, 1999:

ADAMS GOLF, INC

By:/s/  DARL P  HATFIELD
-----------------------------------
Darl P. Hatfield
Senior Vice President - Finance
and Administration and Chief
Financial Officer

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons and in the capacities indicated on May  26, 1999.

| Signatures | Titles |
| ---------- | ------ |
| /s/  B.H.  ADAMS<br>--------------------------<br>B. H. (Barney) Adams | Chairman of the Board, Chief Executive Officer and President (Principal Executive Officer) |
| /s/  DARL P. HATFIELD<br>--------------------------<br>Darl P  Hatfield | Senior Vice President-Finance and Administration and Chief Financial Officer (Principal Financial and Accounting Officer) |
| /s/  RICHARD H. MURTLAND<br>--------------------------<br>Richard H. Murtland | Vice President-Research and Development, Secretary, Treasurer and Director |
| /s/  PAUL F. BROWN, JR.<br>--------------------------<br>Paul F. Brown, Jr | Director |
| /s/  ROLAND E. CASATI<br>--------------------------<br>Roland E. Casati | Director |
| /s/  ROBERT F. MACNALLY<br>--------------------------<br>Robert F. MacNally | Director |
| --------------------------<br>Mark R. Mulvoy | Director |
| /s/  STEPHEN R. PATCHIN<br>--------------------------<br>Stephen R. Patchin | Director |
| --------------------------<br>John S. Simpson | Director |

-6-

EXHIBIT INDEX

| Exhibit | Description |
| ------- | ----------- |
| 4.1 | 1999 Non-Employee Director Plan of Adams Golf, Inc. (the "Plan") (filed herewith) |
| 4.2 | Form of Stock Option Agreement relating to options granted under the Plan (filed herewith) |
| 5.1 | Opinion of Arter & Hadden LLP (filed herewith) |
| 23.1 | Consent of Arter & Hadden LLP (included in their opinion filed as Exhibit 5.1) (filed herewith) |
| 23.2 | Consent of KPMG LLP (filed herewith) |

*ADAMSGOLF*

# ADAMS GOLF INC (ADGO)

2801 EAST PLANO PARKWAY
PLANO, TX 75074
972. 673 9000
http://www.adamsgolf.com/

# EX−4.1

**S−8 Filed on 05/28/1999**
File Number 333−79495

**GSI** 

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

1999 NON-EMPLOYEE DIRECTOR PLAN OF
ADAMS GOLF, INC.

1.   PURPOSE.  The purpose of this Plan is to advance the
interests of Adams Golf, Inc., a Delaware corporation (the
"Company"), by providing an additional incentive to attract and
retain qualified and competent directors, upon whose efforts and
judgment the success of the Company is largely dependent, through
the encouragement of stock ownership in the Company by such
persons.

2.   DEFINITIONS. As used herein, the following terms shall
have the meaning indicated:

(a)  "Board" shall mean the Board of Directors of Adams
Golf, Inc.

(b)  "Committee" shall mean the committee, if any,
appointed by the Board pursuant to Section 12 hereof.

(c)  "Common Stock" shall mean the common stock, par
value one tenth of one cent ($0.001) of the Company.

(d)  "Date of Grant" shall mean the date on which an
Option is granted to an Eligible Person pursuant to this
Plan.

(e)  "Director" shall mean a member of the Board.

(f)  "Eligible Person(s)" shall mean those persons who
are Directors of the Company and who are not employees of
the Company or a Subsidiary.

(g)  "Exchange Act" shall mean the Securities Exchange
Act of 1934, as amended.

(h)  "Fair Market Value" of a Share on any date means
the closing price on the business day immediately preceding
such date.  For this purpose, the closing price of a Share
on any business day shall be (i) if the Common Stock is
listed or admitted for trading on any United States national
securities exchange, the last reported sale price of the
Common Stock on such exchange, as reported in any newspaper
of general circulation, (ii) if actual transactions in the
Common Stock are included in the Nasdaq National Market or
are reported on a consolidated transaction reporting system,
the closing sales price of the Common Stock on such system,
(iii) if the Common Stock is otherwise quoted on the Nasdaq
system, or any similar system of automated dissemination of
quotations of securities prices in common use, the mean
between the closing high bid and low asked quotations for
such day of the Common Stock on such system, (iv) if none of
clause (i), (ii) or (iii) is applicable, the mean between
the high bid and low asked quotations for the Common Stock
as reported by the National Daily Quotation Service if at
least two securities dealers have inserted both bid and
asked quotations for the Common Stock on at least five (5)
of the ten (10) preceding days and (v) if none of clause
(i), (ii), (iii) or (iv) is applicable, the price determined
by the Board in the exercise of its good faith discretion.

(i)   "Internal Revenue Code" or "Code" shall mean the Internal Revenue Code of 1986, as it now exists or may be amended from time to time.

(j)   "Non-Employee Director" shall have the meaning set forth in Rule 16b-3 of the Exchange Act or any successor provision thereof

(k)   "Nonqualified Stock Option" shall mean an option that is not an incentive stock option as defined in Section 422 of the Internal Revenue Code

(l)   "Option" (when capitalized) shall mean any option granted under Section 4 of this Plan

(m)   "Optionee" shall mean a person to whom an Option is granted under this Plan or any successor to the rights of such person under this Plan by reason of the death of such person.

(n)   "Plan" shall mean this 1999 Non-Employee Director Plan of Adams Golf, Inc.

(o)   "Share(s)" shall mean a share or shares of the Common Stock.

(p)   "Subsidiary" shall mean any corporation or other entity, whether domestic or foreign, in which the Company has or obtains, directly or indirectly, a proprietary interest of more than fifty percent (50%) by reason of stock ownership or otherwise.

Other terms shall have the meanings set forth elsewhere herein

3    SHARES AND OPTIONS.

(a)   The maximum number of Shares to be issued pursuant to Options under this Plan, shall be Two Hundred Thousand (200,000) Shares. Shares issued pursuant to Options granted under this Plan may be issued from Shares held in the Company's treasury or from authorized and unissued Shares. If any Option granted under this Plan shall terminate, expire, or be canceled or surrendered as to any Shares, new Options may thereafter be granted covering such Shares.

(b)   Each Option granted hereunder shall be evidenced by an option agreement (an "Option Agreement") and shall contain such terms as are not inconsistent with this Plan or any applicable law. Any person who files with the Committee, in a form satisfactory to the Committee, a written waiver of eligibility to receive any Option under this Plan shall not be eligible to receive any Option under this Plan for the duration of such waiver. Any Option granted hereunder shall be a Nonqualified Stock Option

(c)   Neither the Plan nor any Option granted under the Plan shall confer upon any person any right to continue to serve as a Director.

-2-

4.    DISCRETIONARY GRANTS OF OPTIONS

(a)  At any time and from time to time during the term of this Plan and subject to the provisions herein, Options may be granted by the Committee to any Eligible Person for such number of Shares as the Committee in its discretion shall deem to be in the best interest of the Company and which will serve to further the purposes of the Plan. Upon the grant of an Option, the Company shall promptly deliver to such Eligible Person an Option Agreement.  Options granted pursuant to this Section 4(a) shall vest according to the vesting schedule provided in the Option Agreement and shall be exercisable for the term provided in the Option Agreement.  In the event no term is provided in the Option Agreement, such term shall be ten (10) years.

(b)  The Options granted to Directors pursuant to Section 4(a) herein shall be in addition to any other benefits with respect to the Director's position with the Company or its Subsidiaries.

5.    OPTION PRICE.  The option price per Share of any Option granted pursuant to this Plan shall be one hundred percent (100%) of the Fair Market Value per Share on the Date of Grant.

6.    EXERCISE OF OPTIONS.  Options may be exercised at any time after the date on which the Options, or any portion thereof, are vested until the Option expires pursuant to Section 7; provided, however, that at least six months must elapse from the date of the acquisition of the Option to the date of disposition of the Option (other than upon exercise or conversion) or the underlying Shares.  An Option shall be deemed exercised when (i) the Company has received written notice of such exercise in accordance with the terms of the Option Agreement, (ii) full payment of the aggregate option price of the Shares as to which the Option is exercised has been made and (iii) arrangements that are satisfactory to the Committee in its sole discretion have been made for the Optionee's payment to the Company of the amount, if any, that the Committee determines to be necessary for the Company to withhold in accordance with applicable federal or state income tax withholding requirements.  Pursuant to procedures approved by the Committee, tax withholding requirements, at the option of an Optionee, may be met by withholding Shares otherwise deliverable to the Optionee upon the exercise of an Option.  Unless further limited by the Committee in any Option Agreement, the Option price of any Shares purchased shall be paid solely in cash, by certified or cashier's check, by money order, with Shares (but with Shares that have been owned by the Optionee for at least six months and only if permitted by the Option Agreement or otherwise permitted by the Committee in its sole discretion at the time of exercise) or by a combination of the above; provided, however, that the Committee in its sole discretion may accept a personal check in full or partial payment of any Shares.  If the exercise price is paid in whole or in part with Shares, the value of the Shares surrendered shall be their Fair Market Value on the date the Shares are received by the Company.  An Option shall not at any time be exercisable with respect to less than 100 Shares unless the remaining Shares covered by the Option are less than 100 Shares.

7.    TERMINATION OF OPTION PERIOD.  The unexercised portion of an Option shall automatically and without notice terminate and become null and void at the time of the earliest to occur of the following:

-3-

(a)  sixty (60) days after the date that an Optionee ceases to be a Director regardless of the reason therefor other than as a result of such termination by death of the Optionee;

(b)  one (1) year after the date that an Optionee ceases to be a Director by reason of death of the Optionee or six (6) months after the Optionee shall die if that shall occur during the sixty-day period described in Subsection 7(a) herein; or

(c)  the expiration date of the term of such Option.

8.  ADJUSTMENT OF PROVISIONS.

(a)  If at any time while this Plan is in effect or unexercised Options are outstanding, (1) there shall be any increase or decrease in the number of issued and outstanding Shares through the declaration of a stock dividend, stock split, combination of shares or through any recapitalization resulting in a stock split-up, spin-off, combination or exchange of Shares or (2) the value of the outstanding shares of Common Stock of the Company is reduced by reason of an extraordinary cash dividend, then and in each such event:

(i)  appropriate adjustment shall be made in the maximum number of Shares then subject to being optioned under this Plan, so that the same proportion of the Company's issued and outstanding Shares shall continue to be subject to being so optioned; and

(ii)  appropriate adjustment shall be made in the number of Shares and the exercise price per Share thereof then subject to any outstanding Option, so that the same proportion of the Company's issued and outstanding Shares shall remain subject to purchase at the same aggregate exercise price.

(b)  Except as otherwise expressly provided herein, the issuance by the Company of shares of its capital stock of any class, or securities convertible into shares of capital stock of any class, either in connection with a direct sale or upon the exercise of rights or warrants to subscribe therefor, or upon conversion of shares or obligations of the Company convertible into such shares or other securities, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number of or exercise price of Shares then subject to outstanding Options granted under this Plan.

(c)  Without limiting the generality of the foregoing, the existence of outstanding Options granted under this Plan shall not affect in any manner the right or power of the Company to make, authorize or consummate (i) any or all adjustments, recapitalizations, reorganizations or other changes in the Company's capital structure or its business; (ii) any merger or consolidation of the Company; (iii) any issue by the Company of debt securities, or preferred or preference stock that would rank above the Shares subject to outstanding Options; (iv) the dissolution or liquidation of the Company; (v) any sale, transfer or assignment of all or any part of the assets or business of the Company; or (vi) any other corporate act or proceeding, whether of a similar character or otherwise.

-4-

9.    REORGANIZATIONS

(a)  Notwithstanding anything contained in this Plan or
any Option Agreement to the contrary, in the event of a
Change of Control, as defined below, all or any of the
following may, in the sole discretion of the Committee,
occur with respect to any and all Options outstanding as of
such Change of Control:

(i)  automatic acceleration of the vesting of such
Options so that such Options may be immediately
exercised in full on or before the relevant date fixed
in the Option Agreement;

(ii)  upon exercise of an Option during the 60-day
period from and after the date of a Change of Control,
the Optionee exercising the Option may in lieu of the
receipt of Shares upon the exercise of the Option,
elect by written notice to the Company to receive an
amount in cash equal to the excess of the aggregate
Value (as defined below) of the Shares covered by the
Option or portion thereof surrendered determined on the
date the Option is exercised, over the aggregate
exercise price of the Option (such excess is referred
to herein as the "Aggregate Spread"); provided,
however, and notwithstanding any other provision of
this Plan, if the end of such 60-day period from and
after the date of a Change of Control is within six
months of the Date of Grant, such Option shall be
canceled in exchange for a cash payment to the Optionee
equal to the Aggregate Spread on the day which is six
months and one day after the Date of Grant of such
Option  As used in this Section 9(a), the term "Value"
means the higher of (i) the highest Fair Market Value
during the 60-day period from and after the date of a
Change of Control and (ii) if the Change of Control is
the result of a transaction or series of transactions
described in paragraphs (i) or (iii) of the definition
of Change of Control, the highest price per share of
the Common Stock paid in such transaction or series of
transactions (which in the case of paragraph (i) shall
be the highest price per Share as reflected in a
Schedule 13D filed by the person having made the
acquisition);

(iii)  if an Optionee ceases to be a Director
regardless of the reason therefor other than death
following a Change of Control, any Option held by such
Optionee may be exercised by such Optionee until the
earlier of sixty (60) days after the Optionee ceases to
be a Director or the expiration date of such Option;

(iv)  all Options become non-cancelable;

(v)  if the Option shall remain exercisable after
any such Change of Control, from and after such Change
of Control, any such Option shall be exercisable only
for the kind and amount of securities and/or other
property, or the cash equivalent thereof, receivable as
a result of such Change of Control by the holder of a
number of shares of stock for which such Option could
have been exercised immediately prior to such Change of
Control.

-5-

(b) "Change of Control" of the Company shall be deemed to have occurred upon the happening of any of the following events:

(i)  the acquisition, other than from the Company, by any individual, entity or group (within the meaning of Section 13(d)(3) of the Exchange Act) other than Royal Holding Company, Inc. or B. H. Adams of beneficial ownership of thirty percent (30%) or more of either the then outstanding shares of Common Stock of the Company or the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors;

(ii) individuals who, as of January 1, 1999, constitute the Board as of the date thereof (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board, provided that any individual becoming a Director subsequent to such date whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the Directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the Directors (as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act);

(iii)      approval by the stockholders of the Company of a reorganization, merger or consolidation of the Company, in each case, with respect to which the individuals and entities who were the respective beneficial owners of the Common Stock and voting securities of the Company immediately prior to such reorganization, merger or consolidation do not, following such reorganization, merger or consolidation, beneficially own, directly or indirectly, more than sixty percent (60%) of, respectively, the then outstanding shares of Common Stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the Company resulting from such reorganization, merger or consolidation;

(iv) consummation by the Company of the sale or other disposition by the Company of all or substantially all of the Company's assets; or

(v)  approval by the stockholders of the Company or any order by a court of competent jurisdiction of a plan of liquidation of the Company.

(c)  If the Company shall consummate any merger, consolidation or other reorganization not involving a Change of Control (a "Reorganization") in which holders of shares of Common Stock are entitled to receive in respect of such shares any securities, cash or other consideration (including, without limitation, a different number of shares of Common Stock), each Option outstanding under this Plan shall thereafter be exercisable, in accordance with this Plan, only for the kind and amount of securities, cash and/or other consideration receivable upon such Reorganization by a holder of the same

-6-

number of shares of Common Stock as are subject to that Option immediately prior to such Reorganization, and any adjustments will be made to the terms of the Option in the sole discretion of the Committee as it may deem appropriate to give effect to the Reorganization.

10    TRANSFERABILITY OF OPTIONS.  Each Option Agreement shall provide that such Option shall not be transferable by the Optionee otherwise than by will or the laws of descent and distribution or pursuant to a qualified domestic relations order and that so long as an Optionee lives, only such Optionee or his or her guardian or legal representative shall have the right to exercise the related Option.

11.    ISSUANCE OF SHARES.  No person shall be, or have any of the rights or privileges of, a stockholder of the Company with respect to any of the Shares subject to an Option unless and until certificates representing such Shares shall have been issued and delivered to such person.  As a condition of any transfer of the certificate for Shares, the Committee may obtain such agreements or undertakings, if any, as it may deem necessary or advisable to assure compliance with any provision of this Plan, any Option Agreement or any law or regulation, including, but not limited to, the following:

(i)  A representation, warranty or agreement by the Optionee to the Company, at the time any Option is exercised, that he or she is acquiring the Shares to be issued to him or her for investment and not with a view to, or for sale in connection with, the distribution of any such Shares; and

(ii) A representation, warranty or agreement to be bound by any legends that are, in the opinion of the Committee, necessary or appropriate to comply with the provisions of any securities law deemed by the Committee to be applicable to the issuance of the Shares and are endorsed upon the Share certificates.

Share certificates issued to an Optionee who is a party to any stockholder agreement or a similar agreement shall bear the legends contained in such agreements.

12.    ADMINISTRATION OF THE PLAN.

(a)  This Plan shall be administered by a stock option committee (the "Committee") consisting of not fewer than two (2) Non-Employee Directors; provided, however, that if no Committee is appointed, the full Board shall administer this Plan and in such case all references to the Committee shall be deemed to be references to the Board.  The Committee shall have all of the powers of the Board with respect to this Plan. Any member of the Committee may be removed at any time, with or without cause, by resolution of the Board, and any vacancy occurring in the membership of the Committee may be filled by appointment by the Board.

(b)  The Committee, from time to time, may adopt rules and regulations for carrying out the purposes of this Plan. The Committee may at any time terminate this Plan or make such modification or amendment thereof as it deems advisable. Termination or any modification or amendment of this Plan shall not, without consent of

-7-

the Optionee, affect his rights under an Option previously granted to him  The determinations and the interpretation and construction of any provision of this Plan by the Committee shall be final and conclusive.

(c)  Any and all decisions or determinations of the Committee shall be made either (i) by a majority vote of the members of the Committee at a meeting or (ii) without a meeting by the written approval of all of the members of the Committee.

13.  INTERPRETATION.

(a)  If any provision of this Plan is held invalid for any reason, such holding shall not affect the remaining provisions hereof, but instead this Plan shall be construed and enforced as if such provision had never been included in this Plan.

(b)  THIS PLAN SHALL BE GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO DELAWARE CONFLICT OF LAW PROVISIONS.

(c)  Headings contained in this Plan are for convenience only and shall in no manner be construed as part of this Plan.

(d)  Any reference to the masculine, feminine or neuter gender shall be a reference to such other gender as is appropriate.

14.  SECTION 83(b) ELECTION.  If as a result of exercising an Option an Optionee receives Shares that are subject to a "substantial risk of forfeiture" and are not "transferable" as those terms are defined for purposes of Section 83(a) of the Code, then such Optionee may elect under Section 83(b) of the Code to include in his gross income, for his taxable year in which the Shares are transferred to such Optionee, the excess of the Fair Market Value of such Shares at the time of transfer (determined without regard to any restriction other than one which by its terms will never lapse), over the amount paid for the Shares.  If the Optionee makes the Section 83(b) election described above, the Optionee shall (i) make such election in a manner that is satisfactory to the Committee, (ii) provide the Company with a copy of such election, (iii) agree to promptly notify the Company if any Internal Revenue Service or state tax agent, on audit or otherwise, questions the validity or correctness of such election or of the amount of income reportable on account of such election, and (iv) agree to such withholding as the Committee may reasonably require in its sole and absolute discretion.

15.  EFFECTIVE DATE AND TERMINATION DATE  The effective date of this Plan is February 3, 1999 and the effective date of any amendment to this Plan is the date on which the Board adopted such amendment; provided, however, if this Plan is not approved by the stockholders of the Company within twelve (12) months after the effective date, then, in such event, this Plan and all Options granted pursuant to this Plan shall be null and void. This Plan shall terminate on February 2, 2009, and any Option outstanding on such date will remain outstanding until it has either expired or has been exercised.

-8-

# ADAMS GOLF INC (ADGO)

2801 EAST PLANO PARKWAY
PLANO, TX 75074
972  673 9000
http://www.adamsgolf.com/

# EX–4.2

**S–8 Filed on 05/28/1999**
File Number 333–79495



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

STOCK OPTION AGREEMENT
UNDER
1999 NON-EMPLOYEE DIRECTOR PLAN
OF
ADAMS GOLF, INC.

STOCK OPTION AGREEMENT (this "Agreement") entered into this _____ day of _____, ____, between ADAMS GOLF, INC , a Delaware corporation (the "Corporation"), and _____, a member of the Board of Directors of the Corporation (the "Optionee," which term as used herein shall be deemed to include any successor to the Optionee by will or by the laws of descent and distribution, unless the context shall otherwise require).

Pursuant to the Corporation's 1999 Non-Employee Director Plan (the "Plan"), the Corporation, acting through its Compensation/Plan Committee of the Board of Directors (the "Committee"), approved the issuance to the Optionee, effective as of the date set forth above, of a nonqualified stock option to purchase up to an aggregate of _____ shares of common stock, par value $.001, of the Corporation (the "Common Stock"), at the price of $____ per share (the "Option Price") which represents not less than 100% of the fair market value of a share of Common Stock determined in accordance with the Plan, upon the terms and conditions hereinafter set forth  (Capitalized terms used herein but not defined herein shall have the meaning ascribed to them in the Plan)

NOW, THEREFORE, in consideration of the mutual premises and undertakings hereinafter set forth, the parties hereto agree as follows:

1.    OPTION; OPTION PRICE.  On behalf of the Corporation, the Committee hereby grants as of the date of this Agreement to the Optionee the option (the "Option") to purchase, subject to the terms and conditions of this Agreement and the provisions of the Plan (which is incorporated by reference herein and which in all cases shall control in the event of any conflict with the terms, definitions and provisions of this Agreement), _____ shares of Common Stock of the Corporation at an exercise price per share equal to the Option Price.  A copy of the Plan as in effect on the date hereof has been supplied to the Optionee, and the Optionee by executing this Agreement hereby acknowledges receipt thereof

2.    TERM. The term (the "Option Term") of the Option shall commence on the date of this Agreement and shall terminate on the fifth anniversary of the date of this Agreement, unless such Option shall theretofore have been terminated in accordance with the terms hereof or the provisions of the Plan.

3.    VESTING; CHANGE OF CONTROL; RESTRICTIONS ON EXERCISE.

(a)  Subject to the provisions of Sections 5 and 8 hereof, and unless accelerated, as set forth in the Plan or as provided herein, the Option granted hereunder shall vest and become exercisable for the number of shares set forth opposite the dates noted below (the "Option Vesting Schedule") .

|  | Cumulative |
| Date(s) | Number of Vested Shares |
| ------- | ----------------------- |

(b)  Notwithstanding the provisions of Paragraph 3(a) above.
upon a Change in Control (as hereinafter defined):

(i)  the Option shall become fully vested and shall
become immediately exercisable with respect to all shares
subject to the Option;

(ii) upon exercise of the Option during the 60-day
period from and after the date of a Change of Control, the
Optionee may in lieu of the receipt of Common Stock upon the
exercise of the Option. elect by written notice to the
Corporation to receive an amount in cash equal to the excess
of the aggregate Value (as defined below) of the shares of
Common Stock covered by the Option or portion thereof
surrendered determined on the date the Option is exercised,
over the aggregate exercise price of the Option (such excess
is referred to herein as the "Aggregate Spread"); provided,
however, if the end of such 60-day period from and after the
date of a Change of Control is within six months of the date
of grant of the Option, the Option shall be cancelled in
exchange for a cash payment to the Optionee equal to the
Aggregate Spread on the day which is six months and one day
after the date of grant of the Option  As used in this
Section 3(b)(ii). the term "Value" means the higher of (1)
the highest Fair Market Value (as defined below) during the
60-day period from and after the date of a Change of Control
and (2) if the Change of Control is the result of a
transaction or series of transactions described in
paragraphs (i) or (iii) of the definition of Change of
Control, the highest price per share of the Common Stock
paid in such transaction or series of transactions (which in
the case of paragraph (i) shall be the highest price per
share of the Common Stock as reflected in a Schedule 13D
filed by the person having made the acquisition) and the
term "Fair Market Value" means the "Fair Market Value" of
the Common Stock on any date of reference shall be the
closing price on the business day immediately preceding such
date   For this purpose, the closing price of the Common
Stock on any business day shall be (i) if the Common Stock
is listed or admitted for trading on any United States
national securities exchange, the last reported sale price
of the Common Stock on such exchange, as reported in any
newspaper of general circulation, (ii) if actual
transactions in the Common Stock are included in the Nasdaq
National Market or are reported on a consolidated
transaction reporting system, the closing sales price of the
Common Stock on such system, (iii) if the Common Stock is
otherwise quoted on the Nasdaq system, or any similar system
of automated dissemination of quotations of securities
prices in common use, the mean between the closing high bid
and low asked quotations for such day of the Common Stock on
such system, (iv) if none of clause (i), (ii) or (iii) is
applicable, the mean between the high bid and low asked
quotations for the Common Stock as reported by the National
Daily Quotation Service if at least two securities dealers
have inserted both bid and asked

-2-

quotations for the Common Stock on at least five (5) of the ten (10) preceding days and (v) if none of clause (i), (ii), (iii) or (iv) is applicable, the most recent valuation price for the Common Stock as adjusted by the Board in the exercise of its good faith discretion;

(iii)    if the Optionee ceases to be a Director regardless of the reason therefor other than death following a Change of Control, the Option may be exercised by the Optionee until the earlier of sixty (60) days after the Optionee ceases to be a Director or the expiration date of the Option;

(iv) the Option becomes non-cancelable; and

(v)  if the Option shall remain exercisable after any such Change of Control, from and after such Change of Control, the Option shall be exercisable only for the kind and amount of securities and/or other property, or the cash equivalent thereof. receivable as a result of such Change of Control by the holder of a number of shares of stock for which the Option could have been exercised immediately prior to such Change of Control

(c)  For purposes of this Agreement, a Change in Control of the Corporation shall be deemed to have occurred upon the happening of any of the following events:

(i)  the acquisition. other than from the Corporation, by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) other than Royal Holding Company, Inc  or B  H  Adams of beneficial ownership of thirty percent (30%) or more of either the then outstanding shares of Common Stock of the Corporation or the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors; provided, however, that any acquisition by the Corporation or any corporation or other entity, whether domestic or foreign. in which the Corporation has or obtains, directly or indirectly, a proprietary interest of more than fifty percent (50%) by reason of stock ownership or otherwise ("Subsidiary"), or any employee benefit plan (or related trust) of the Corporation or its Subsidiaries, or any corporation with respect to which, following such acquisition. more than fifty percent (50%) of, respectively, the then outstanding shares of common stock of such corporation and the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors is then beneficially owned, directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Common Stock and voting securities of the Corporation immediately prior to such acquisition in substantially the same proportion as their ownership. immediately prior to such acquisition, of the then outstanding shares of Common Stock of the Corporation or the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors, as the case may be, shall not constitute a Change of Control;

(ii) individuals who constitute the Board of Directors of the Corporation as of January 1. 1999 (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors of the Corporation, provided that any individual

-3-

becoming a director subsequent to such date whose election, or nomination for election by the Corporation's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the directors of the Corporation (as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"));

(iii)    approval by the stockholders of the Corporation of a reorganization, merger or consolidation of the Corporation, in each case, with respect to which the individuals and entities who were the respective beneficial owners of the Common Stock and voting securities of the Corporation immediately prior to such reorganization, merger or consolidation do not, following such reorganization, merger or consolidation, beneficially own, directly or indirectly, more than sixty percent (60%) of, respectively, the then outstanding shares of Common Stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such reorganization, merger or consolidation;

(iv) consummation by the Corporation of the sale or other disposition by the Corporation of all or substantially all of the Corporation's assets; or

(v)  approval by the stockholders of the Corporation or any order by a court of competent jurisdiction of a plan of liquidation of the Corporation.

(d)  If the Corporation shall consummate any merger, consolidation or other reorganization not involving a Change of Control (a "Reorganization") in which holders of shares of Common Stock are entitled to receive in respect of such shares any securities, cash or other consideration (including, without limitation, a different number of shares of Common Stock), the Option shall thereafter be exercisable, in accordance with the Plan and this Agreement, only for the kind and amount of securities, cash and/or other consideration receivable upon such Reorganization by a holder of the same number of shares of Common Stock as are subject to the Option immediately prior to such Reorganization, and any adjustments will be made to the terms of the Option in the sole discretion of the Committee as it may deem appropriate to give effect to the Reorganization.

(e)  Subject to the provisions of Sections 5 and 8 hereof, shares as to which the Option becomes exercisable pursuant to the foregoing provisions may be purchased at any time thereafter prior to the expiration or termination of the Option.

4.  TERMINATION OF OPTION.

(a)  The unexercised portion of the Option shall automatically and without notice terminate and become null and void at the time of the earliest to occur of:

-4-

(i)  sixty (60) days after the date that the Optionee ceases to be a Director regardless of the reason therefor other than as a result of such termination by death of the Optionee;

(ii) one (1) year after the date that the Optionee ceases to be a Director by reason of death of the Optionee or six (6) months after the Optionee shall die if that shall occur during the sixty-day period described in Section 4(a)(i); or

(iii)    the expiration date of the term of the Option.

5.   PROCEDURE FOR EXERCISE

(a)  Subject to the requirements of Section 8, the Option may be exercised, from time to time, in whole or in part (but for the purchase of a whole number of shares only), by delivery of a written notice (the "Notice") from the Optionee to the Secretary of the Corporation, which Notice shall:

(i)  state that the Optionee elects to exercise the Option;

(ii) state the number of shares with respect to which the Option is being exercised (the "Optioned Shares");

(iii)    state the date upon which the Optionee desires to consummate the purchase of the Optioned Shares (which date must be prior to the termination of such Option and no later than thirty (30) days after the date of receipt of such Notice);

(iv) include any representations of the Optionee required under Section 8(c); and

(v)  if the Option shall be exercised pursuant to Section 10 by any person other than the Optionee, include evidence to the satisfaction of the Committee of the right of such person to exercise the Option.

(b)  Payment of the Option Price for the Optioned Shares shall be made in U.S. dollars by personal check, bank draft or money order payable to the order of the Corporation or by wire transfer.

(c)  The Corporation shall issue a stock certificate in the name of the Optionee (or such other person exercising the Option in accordance with the provisions of Section 10) for the Optioned Shares as soon as practicable after receipt of the Notice and payment of the aggregate Option Price for such shares.

6.   NO RIGHTS AS A STOCKHOLDER.  The Optionee shall have no rights as a stockholder of the Corporation with respect to any Optioned Shares until the date the Optionee or his nominee (which, for purposes of this Agreement, shall include any third party agent selected by the Committee to hold such Option Shares on behalf of the Optionee), guardian or legal representative is the holder of record of such Optioned Shares.

-5-

7    ADJUSTMENTS

(a)  If at any time while the Option is outstanding. (1) there shall be any increase or decrease in the number of issued and outstanding shares of Common Stock through the declaration of a stock dividend, stock split, combination of shares or through any recapitalization resulting in a stock split-up, spin-off, combination or exchange of shares of Common Stock or (2) the value of the outstanding shares of Common Stock is reduced by reason of an extraordinary cash dividend, then and in each such event appropriate adjustment shall be made in the number of shares and the exercise price per share covered by the Option. so that the same proportion of the Corporation's issued and outstanding shares of Common Stock shall remain subject to purchase at the same aggregate exercise price

(b)  Except as otherwise expressly provided herein. the issuance by the Corporation of shares of its capital stock of any class, or securities convertible into shares of capital stock of any class. either in connection with a direct sale or upon the exercise of rights or warrants to subscribe therefor, or upon conversion of shares or obligations of the Corporation convertible into such shares or other securities, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number of or exercise price of shares of Common Stock covered by the Option

(c)  Without limiting the generality of the foregoing, the existence of the Option shall not affect in any manner the right or power of the Corporation to make, authorize or consummate (i) any or all adjustments, recapitalizations, reorganizations or other changes in the Corporation's capital structure or its business; (ii) any merger or consolidation of the Corporation; (iii) any issue by the Corporation of debt securities, or preferred or preference stock that would rank above the shares of Common Stock covered by the Option; (iv) the dissolution or liquidation of the Corporation; (v) any sale, transfer or assignment of all or any part of the assets or business of the Corporation; or (vi) any other corporate act or proceeding, whether of a similar character or otherwise

8    ADDITIONAL PROVISIONS RELATED TO EXERCISE

(a)  The Option shall be exercisable only in accordance with this Agreement, including the provisions regarding the period when the Option may be exercised and the number of shares of Common Stock that may be acquired upon exercise

(b)  The Option may not be exercised as to less than one hundred (100) shares of Common Stock at any one time unless less than one hundred (100) shares of Common Stock remain to be purchased upon the exercise of the Option

(c)  To exercise the Option, the Optionee shall follow the provisions of Section 5 hereof   Upon the exercise of the Option at a time when there is not in effect a registration statement under the Securities Act of 1933, as amended (the "Securities Act") relating to the shares of Common Stock issuable upon exercise of the Option, the Committee in its discretion may, as a condition to the exercise of the Option, require the Optionee (i) to represent in writing that the shares of Common Stock received upon exercise of the Option are being acquired for investment and not with a view to distribution and (ii) to make such other representations and warranties as are deemed appropriate by counsel to the Corporation.  No Option may be exercised and no shares of Common Stock shall be issued and delivered upon the exercise of the Option unless and until the Corporation and/or the

-6-

Optionee shall have complied with all applicable federal or state registration. listing and/or qualification requirements and all other requirements of law or of any regulatory agencies having jurisdiction

(d)  Stock certificates representing shares of Common Stock acquired upon the exercise of the Option that have not been registered under the Securities Act shall, if required by the Committee, bear the following legend:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT")   THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER THE ACT OR PURSUANT TO AN EXEMPTION FROM REGISTRATION OR AN OPINION OF COUNSEL SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED "

(e)  The exercise of each Option and the issuance of shares in connection with the exercise of an Option shall, in all cases, be subject to each of the following conditions:  (i) the declaration of effectiveness by the Securities and Exchange Commission ("SEC") of a registration statement relating to a primary offering of the Common Stock, filed by the Corporation with the SEC under the Securities Act, (ii) the satisfaction of withholding tax or other withholding liabilities, (iii) the listing, registration or qualification of any to-be-issued shares upon any securities exchange, any NASDAQ or other trading or quotation system or under any federal or state law, (iv) the consent or approval of any regulatory body, (v) the execution of a lock-up agreement with one or more prospective underwriters, or (vi) the execution of a buy-sell or shareholders agreement with other shareholders of the Corporation   The Committee shall in its sole discretion determine whether one or more of these conditions is necessary or desirable to be satisfied in connection with the exercise of an Option and prior to the delivery or purchase of shares pursuant to the exercise of an Option   The exercise of an Option shall not be effective unless and until such condition(s) shall have been satisfied or the Committee shall have waived such conditions, in its sole discretion

9    RESTRICTION ON TRANSFER   The Option may not be assigned or transferred except by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined in the Code, and may be exercised during the lifetime of the Optionee only by the Optionee or the Optionee's guardian or legal representative or assignee pursuant to a qualified domestic relations order   If the Optionee dies, the Option shall thereafter be exercisable, during the period specified in Section 4(a)(ii), by his executors or administrators or by a person who acquired the right to exercise such option by bequest or inheritance to the full extent to which the Option was exercisable by the Optionee at the time of his death.  The Option shall not be subject to execution, attachment or similar process Any attempted assignment or transfer of the Option contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the Option. shall be null and void and without effect

10.  NOTICES   All notices or other communications which are required or permitted hereunder shall be in writing and sufficient if (i) personally delivered, (ii) sent by nationally-

-7-

recognized overnight courier or (iii) sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

if to the Optionee, to the address set forth on the signature page hereto; and

if to the Corporation, to:

Adams Golf, Inc.
300 Delaware Avenue, Suite 572
Wilmington, Delaware  19801
Attention: Secretary

with a copy to:

Adams Golf, Ltd.
c/o Adams Golf GP Corp.
2801 E. Plano Parkway
Plano, Texas  75225
Attention: President

or to such other address as the party to whom notice is to be given may have furnished to each other party in writing in accordance herewith.  Any such communication shall be deemed to have been given (i) when delivered, if personally delivered, (ii) on the first Business Day (as hereinafter defined) after dispatch, if sent by nationally-recognized overnight courier and (iii) on the third Business Day following the date on which the piece of mail containing such communication is posted, if sent by mail.  As used herein, "Business Day" means a day that is not a Saturday, Sunday or a day on which banking institutions in the city to which the notice or communication is to be sent are not required to be open.

11.  NO WAIVER.  No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature.

12.  OPTIONEE UNDERTAKING.  The Optionee hereby agrees to take whatever additional actions and execute whatever additional documents the Corporation or its counsel may in their reasonable judgment deem necessary or advisable in order to carry out or effect one or more of the obligations or restrictions imposed on the Optionee pursuant to the express provisions of this Agreement.

13.  MODIFICATION OF RIGHTS.  The rights of the Optionee are subject to modification and termination in certain events as provided in this Agreement and the Plan.

14.  GOVERNING LAW.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be wholly performed therein.

-8-

15. COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

16. ENTIRE AGREEMENT. This Agreement and the Plan constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all previously written or oral negotiations, commitments, representations and agreements with respect thereto.

ADAMS GOLF, INC.

By:_____
Name:_____
Title:_____


OPTIONEE:


_____
Name:_____
Address: _____
        _____
        _____


-9-

Ladies/Gentlemen:

I hereby exercise my Stock Option to purchase _____ shares of Common Stock of ADAMS GOLF, INC. at the option price of $_____ per share as provided in the Stock Option Agreement dated the ___ day of _____.

I acknowledge that I previously received a copy of the 1999 Non-Employee Director Plan of Adams Golf, Inc. and executed a Stock Option Agreement, and I have carefully reviewed both documents.

I have considered the federal tax implications of my option. I hereby tender my personal check, bank draft or money order payable to ADAMS GOLF, INC. in the amount of $_____ or, I have wire transferred $_____ to ADAMS GOLF, INC., which transfer shall be subject to the confirmation of receipt of funds by the Corporation. [If payment is to be made by wire transfer, the Optionee should contact the Corporation's Chief Financial Officer or Controller in advance to obtain wiring instructions.]


_____
Optionee


_____
Date

*ADAMSGOLF*

# ADAMS GOLF INC (ADGO)

2801 EAST PLANO PARKWAY
PLANO, TX 75074
972. 673.9000
http://www.adamsgolf.com/

# EX−5.1

**S−8 Filed on 05/28/1999**
File Number 333−79495

GSI

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
**www.gsionline.com**

EXHIBIT 5.1
-----------

ARTER & HADDEN LLP
1717 Main Street, Suite 4100
Dallas, Texas  75201
Tel:  214.761.2100
Fax:  214.741.7139

May 27, 1999

Board of Directors
Adams Golf, Inc.
300 Delaware Avenue, Suite 572
Wilmington, Delaware  19801

Re:  Adams Golf, Inc.
     Registration Statement on Form S-8
     1999 Non-Employee Director Plan

Gentlemen:

We have acted as counsel to Adams Golf, Inc., a Delaware
corporation (the "Company"), in connection with the preparation
and filing of the Registration Statement on Form S-8 (the
"Registration Statement") to be filed with the Securities and
Exchange Commission on or about May 27, 1999, under the
Securities Act of 1933, as amended (the "Securities Act"),
relating to 200,000 shares of the $0.001 par value common stock
(the "Common Stock") of the Company that will be issued on the
exercise of stock options (collectively, the "Options") granted
or that may be granted under the Non-Employee Director Plan of
Adams Golf, Inc. (the "Plan").

You have requested the opinion of this firm with respect to
certain legal aspects of the Registration Statement. In
connection therewith, we have examined and relied upon the
original, or copies identified to our satisfaction, of (1) the
Certificate of Incorporation and the Bylaws of the Company, as
both have been amended; (2) minutes and records of the corporate
proceedings of the Company with respect to the establishment and
approval of the Plan, the granting of the Options under the Plan,
the issuance of shares of Common Stock pursuant to the Plan and
related matters; (3) the Registration Statement and exhibits
thereto, including the Plan and the Form of Stock Option
Agreement listed as exhibits to the Registration Statement; and
(4) such other documents and instruments as we have deemed
necessary for the expression of the opinions herein contained. In
making the foregoing examinations, we have assumed the
genuineness of all signatures and the authenticity of all
documents submitted to us as originals, and the conformity to
original documents of all documents submitted to us as certified
or photostatic copies. As to various questions of fact material
to this opinion, and as to the content and form of the
Certificate of Incorporation, the Bylaws, minutes, records,
resolutions and other documents or writings of

the Company, we have relied, to the extent we deem reasonably appropriate, upon representations or certificates of officers or directors of the Company and upon documents, records and instruments furnished to us by the Company, without independent check or verification of their accuracy.

Based upon our examination, consideration of, and reliance on the documents and other matters described above, and subject to the comments and exceptions noted below, we are of the opinion that, assuming (i) the outstanding Options were duly granted and the Options to be granted in the future will be duly granted in accordance with the terms of the Plan, (ii) the Company maintains an adequate number of authorized but unissued shares and/or treasury shares of Common Stock available for issuance to those persons who exercise Options granted under the Plan, (iii) the exercise of Options is in accordance with the provisions thereof and in accordance with the provisions of the Plan, and (iv) the consideration for the shares of Common Stock issuable upon the exercise of such Options is actually received by the Company as provided in the Plan and the particular Option and such consideration exceeds the par value of such shares, then the shares of Common Stock issued pursuant to the exercise of the Options will be validly issued, fully paid and nonassessable.

We bring to your attention the fact that this legal opinion is an expression of professional judgment and not a guaranty of result. This opinion is rendered as of the date hereof, and we undertake no, and hereby disclaim any, obligation to advise you of any changes in or new developments that might affect any matters or opinions set forth herein.

This opinion is limited in all respects to the General Corporation Law of the State of Delaware as in effect on the date hereof; however, we are not members of the Bar of the State of Delaware and our knowledge of its General Corporation Law is derived from a reading of the most recent compilation of that statute available to us without consideration of any judicial or administrative interpretations thereof.

We hereby consent to the filing of this opinion as Exhibit 5.1 to the Registration Statement and to references to our firm included in or made a part of the Registration Statement. In giving this consent, we do not admit that we come within the category of person whose consent is required under Section 7 of the Securities Act or the Rules and Regulations of the Securities and Exchange Commission thereunder. This opinion may not be relied upon by any person other than the addressee identified above.

Very truly yours,

/s/  ARTER & HADDEN LLP

ARTER & HADDEN LLP

*ADAMS*GOLF

# ADAMS GOLF INC (ADGO)

2801 EAST PLANO PARKWAY
PLANO, TX 75074
972 673 9000
http://www.adamsgolf.com/

# EX-23.2

**S-8 Filed on 05/28/1999**
File Number 333-79495



GSI

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

EXHIBIT 23.2
------------

Independent Auditors' Consent
-----------------------------

The Board of Directors
    Adams Golf, Inc. and subsidiaries


We consent to the use of our report incorporated herein by
reference.


/s/  KPMG LLP


Dallas, Texas
May 27, 1999