**14**

44

tion and must be of a nature that the factor or factors could actually affect whether the forward-looking statement is realized.

The Conference Committee expects that the cautionary statements identify important factors that could cause results to differ materially—but not all factors. Failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor. The Conference Committee specifies that the cautionary statements identify "important" factors to provide guidance to issuers and not to provide an opportunity for plaintiff counsel to conduct discovery on what factors were known to the issuer at the time the forward-looking statement was made.

The use of the words "meaningful" and "important factors" are intended to provide a standard for the types of cautionary statements upon which a court may, where appropriate, decide a motion to dismiss, without examining the state of mind of the defendant. The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.

Courts may continue to find a forward-looking statement immaterial—and thus not actionable under the 1933 Act and the 1934 Act—on other grounds. To clarify this point, the Conference Committee includes language in the safe harbor provision that no liability attaches to forward-looking statements that are "immaterial."

The safe harbor seeks to provide certainty that forward-looking statements will not be actionable by private parties under certain circumstances. Forward-looking statements will have safe harbor protection if they are accompanied by a meaningful cautionary statement. A cautionary statement that misstates historical facts is not covered by the Safe harbor, it is not sufficient, however, in a civil action to allege merely that a cautionary statement misstates historical facts. The plaintiff must plead with particularity all facts giving rise to a strong inference of a material misstatement in the cautionary statement to survive a motion to dismiss.

The second prong of the safe harbor provides an alternative analysis. This safe harbor also applies to both written and oral forward-looking statements. Instead of examining the forward-looking and cautionary statements, this prong of the safe harbor focuses on the state of mind of the person making the forward-looking statement. A person or business entity will not be liable in a private lawsuit for a forward-looking statement unless a plaintiff proves that person or business entity made a false or misleading forward-looking statement with actual knowledge that it was false or misleading. The Conference Committee intends for this alternative prong of the safe harbor to apply if the plaintiff fails to prove the forward-looking statement (1) if made by a natural person, was made with the actual knowledge by that person that the statement was false or misleading; or (2) if made by a business entity, was made by or with the approval of an executive officer of the entity with actual knowledge by that officer that the statement was false or misleading.

45

The Conference Committee recognizes that, under certain circumstances, it may be unwieldy to make oral forward-looking statements relying on the first prong of the safe harbor. Companies who want to make a brief announcement of earnings or a new product would first have to identify the statement as forward-looking and then provide cautionary statements identifying important factors that could cause results to differ materially from those projected in the statement. As a result, the Conference Committee has provided for an optional, more flexible rule for oral forward-looking statements that will facilitate these types of oral communications by an issuer while still providing to the public information it would have received if the forward-looking statement was written. The Conference Committee intends to limit this oral safe harbor to issuers or the officers, directors, or employees of the issuer acting on the issuer's behalf.

This legislation permits covered issuers, or persons acting on the issuer's behalf, to make oral forward-looking statements within the safe harbor. The person making the forward-looking statement must identify the statement as a forward-looking statement and state that results may differ materially from those projected in the statement. The person must also identify a "readily available" written document that contains factors that could cause results to differ materially. The written information identified by the person making the forward-looking statement must qualify as a "cautionary statement" under the first prong of the safe harbor (i.e., it must be a meaningful cautionary statement or statements that identify important factors that could cause actual results to differ materially from those projected in the forward-looking statement.) For purposes of this provision, "readily available" information refers to SEC filed documents, annual reports and other widely disseminated materials, such as press releases.

*Who and what receives safe harbor protection*

The safe harbor provision protects written and oral forward-looking statements made by issuers and certain persons retained or acting on behalf of the issuer. The Conference Committee intends the statutory safe harbor protection to make more information about a company's future plans available to investors and the public. The safe harbor covers underwriters, but only insofar as the underwriters provide forward looking information that is based on or "derived from" information provided by the issuer. Because underwriters have what is effectively an adversarial relationship with issuers in performing due diligence, the use of the term "derived from" affords underwriters some latitude so that they may disclose adverse information that the issuer did not necessarily "provide." The Conference Committee does not intend the safe harbor to cover forward-looking information made in connection with a broker's sales practices.

The Conference Committee adopts the SEC's present definition, as set forth in Rule 175, of forward-looking information, with certain additions and clarifying changes. The definition covers: (i) certain financial items, including projections of revenues, income and earnings, capital expenditures, dividends, and capital structure; (ii) management's statement of future business plans and ob-

46

jectives, including with respect to its products or services; and (iii) certain statements made in SEC required disclosures, including management's discussion and analysis and results of operations; and (iv) any statement disclosing the assumptions underlying the forward-looking statement.

The Conference Committee has determined that the statutory safe harbor should not apply to certain forward-looking statements. Thus, the statutory safe harbor does not protect forward-looking statements: (1) included in financial statements prepared in accordance with generally accepted accounting principles; (2) contained in an initial public offering registration statement; (3) made in connection with a tender offer; (4) made in connection with a partnership, limited liability company or direct participation program offering; or (5) made in beneficial ownership disclosure statements filed with the SEC under Section 13(d) of the 1934 Act.

At this time, the Conference Committee recognizes that certain types of transactions and issuers may not be suitable for inclusion in a statutory safe harbor absent some experience with the statute. Although this legislation restricts partnerships, limited liability companies and direct participation programs from safe harbor protection, the Conference Committee expects the SEC to consider expanding the safe harbor to cover these entities where appropriate. The legislation authorizes the SEC to adopt exemptive rules or grant exemptive orders to those entities for whom a safe harbor should be available. The SEC should consider granting exemptive orders for established and reputable entities who are excluded from the safe harbor.

Moreover, the Committee has determined to extend the statutory safe harbor only to forward-looking information of certain established issuers subject to the reporting requirements of section 13(a) or section 15(d) of the 1934 Act. Except as provided by SEC rule or regulation, the safe harbor does not extend to an issuer who: (a) during the three year period preceding the date on which the statement was first made, has been convicted of a felony or misdemeanor described in clauses (i) through (iv) of Section 15(b)(4) or is the subject of a decree or order involving a violation of the securities laws; (b) makes the statement in connection with a "blank check" securities offering, "rollup transaction," or "going private" transaction; or (c) issues penny stock.

The Committee intends for its statutory safe harbor provisions to serve as a starting point and fully expects the SEC to continue its rulemaking proceedings in this area. The SEC should, as appropriate, promulgate rules or regulations to expand the statutory safe harbor by providing additional exemptions from liability or extending its coverage to additional types of information.

This legislation also makes clear that nothing in the safe harbor provision imposes any duty to update forward-looking statements.

The Conference Committee does not intend for the safe harbor provisions to replace the judicial "bespeaks caution" doctrine or to foreclose further development of that doctrine by the courts.

47

*The safe harbor and stay of discovery*

The legislation provides that, on any motion to dismiss the compliant based on the application of the safe harbor, the court shall consider the statements cited in the complaint and statements identified by the defendant in its moving papers, including any cautionary statements accompanying the forward-looking statement that are not subject to material dispute. The applicability of the safe harbor provisions under subsection (c)(1)(B) shall be based on the "actual knowledge" of the defendant and does not depend on the use of cautionary language. The applicability of the safe harbor provisions under subsections (c)(1)(A)(I) and (c)(2) shall be based upon the sufficiency of the cautionary language under those provisions and does not depend on the state of mind of the defendant. In the case of a compliant based on an oral forward-looking statement in which information concerning factors that could cause actual results to differ materially is contained in a "readily available" written document, the court shall consider statements in the readily available written documents.

### INAPPLICABILITY OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) TO PRIVATE SECURITIES ACTIONS.

The SEC has supported removing securities fraud as a predicate offense in a civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). SEC Chairman Arthur Levitt testified: "Because the securities laws generally provide adequate remedies for those injured by securities fraud, it is both necessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO." [30]

The Conference Committee amends section 1964(c) of title 18 of the U.S. Code to remove any conduct that would have been actionable as fraud in the purchase or sale of securities as racketeering activity under civil RICO. The Committee intends this amendment to eliminate securities fraud as a predicate offense in a civil RICO action. In addition, the Conference Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.

### AUDITOR DISCLOSURE OF CORPORATE FRAUD

The Conference Report requires independent public accountants to adopt certain procedures in connection with their audits and to inform the SEC of illegal acts. These requirements would be carried out in accordance with generally accepted auditing standards for audits of SEC registrants—as modified from time to time by the Commission—on the detection of illegal acts, related party transactions and relationships, and evaluation of an issuer's ability to continue as a going concern.

The Conference Committee does not intend to affect the Commission's authority in areas not specifically addressed by this provision. The Conference Committee expects that the SEC will continue its longstanding practice of looking to the private sector to set

48

and to improve auditing standards. The SEC should not act to "modify" or "supplement" generally accepted auditing standards for SEC registrants until after it has determined that the private sector is unable or unwilling to do so on a timely basis. The Conference Committee intends for the SEC to have discretion, however, to determine the appropriateness and timeliness of the private sector response. The SEC should act promptly if required by the public interest or for the protection of investors.

FOOTNOTES

[1] This certification should not be construed to waive the attorney-client privilege.

[2] The notice provisions in this subsection do not replace or supersede other notice provisions provided in the Federal Rules of Civil Procedure.

[3] See Elliott J. Weiss and John S. Beckerman, "Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions," 104 Yale L.J. 2053 (1995).

[4] See testimony of Maryellen Anderson, Investor and Corporate Relations Director of the Connecticut Retirement & Trust Funds and Treasurer of the Council of Institutional Investors before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, July 21, 1993.

[5] See The Brancato Report on Institutional Investment, "Total Assets and Equity Holdings," Vol. 2, Ed. 1.

[6] See "Let the Money do the Monitoring," note 3, supra.

[7] See generally Majority Staff Report, May 17, 1994 at page 81 et seq.

[8] See testimony of Patricia Reilly before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, June 17, 1993.

[9] See NASCAT Analysis of Pending Legislation on Securities Fraud Litigation, Hearing on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995.

[10] See testimony of Patricia Reilly, note 8 supra.

[11] See testimony of former SEC Commissioner J. Carter Beese, Jr., Chairman of the Capital Markets Regulatory Reform Project Center for Strategic and International Studies, before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995 (citing testimony of Philip A. Lacavara before the Telecommunications and Finance Subcommittee of the House Committee on Energy and Commerce, hearing on H.R. 3185.)

[12] See testimony of Richard J. Egan, Chairman of the Board of EMC Corporation before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, June 17, 1993. See also testimony of Dennis Bakke, President and CEO, AES Corporation, before the Telecommunications and Finance Subcommittee of the House Committee on Commerce, January 19, 1995.

[13] See testimony of Hon. Richard Breeden, former Chairman, Securities and Exchange Commission, before the Subcommittee on Telecommunications and Finance, House Commerce Committee, February 10, 1995. See also testimony of Daniel Gelzer, id. at 274.

[14] See testimony of Hon. Arthur Levitt, Chairman, Securities and Exchange Commission, before the Subcommittee on Telecommunications and Finance of the House Commerce Committee, February 10, 1995, at 192. See also id. at 116, 126 (testimony of Dennis W. Bakke, Chairman and CEO, AES Corporation); id. at 137-8 (testimony of James Kimsey, Chairman, America Online).

[15] The Conference Report makes no change in the law with respect to Section 11 claims against other types of defendants. Section 11 expressly provides for a right of contribution, see Section 11(f), and this right has been construed to establish contribution and settlement standards like those set forth in the Conference Report. This section has no effect on the interpretation of Section 11(f) with respect to defendants other than outside directors.

[16] See Section 16(b) (short-swing transactions) and Section 18 (liability for misleading statements).

[17] See, e.g., testimony of Saul S. Cohen, Rosenman & Colin, before the Telecommunications and Finance Subcommittee of the House Committee on Commerce, February 10, 1995. ("In our experience, Rule 11 has been largely ineffective in deterring strike suits. As a general matter, courts rarely grant Rule 11 sanctions in all but the most egregious circumstances".)

[18] Rule 11(c)(2) limits sanctions to "what is sufficient to deter the repetition of such conduct or comparable conduct by others similarly situated".

[19] See testimony of John Olson, Chairman, American Bar Association Business Law Section, before the Subcommittee on Telecommunications and Finance, House Commerce Committee, February 10, 1995.

[20] See id.

[21] See, e.g., testimony of Saul S. Cohen, Rosenman & Colin, before the Telecommunications and Finance Subcommittee of the House Committee on Commerce at 234-35 (February 10, 1995).

[22] See id.

[23] For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.

49

[24] The percentages of damages as market losses in the analysis ranged from 7.9% to 100%. See Princeton Venture Research, Inc., "PVR Analysis, Securities Law Class Actions. Damages as a Percent of Market Losses," June 15, 1993

[25] See Lev and de Villiers, "Stock Price Crashes and 10b–5 Damages: A Legal, Economic and Policy Analysis," Standford Law Review, 7, 9–11 (1994)

[26] See testimony of Hon. Richard C. Breeden, former Chairman, SEC, before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs. April 6, 1995.

[27] See testimony of the National Venture Capital Association before the Securities Subcommittee on the Senate Committee on Banking, Housing, and Urban Affairs. March 2, 1995

[28] See testimony of Hon. J. Carter Beese, former SEC Commissioner, at *id.*

[29] The concept of a safe harbor for forward-looking statements made under certain conditions is not new. In 1979, the SEC promulgated Rule 175 to provide a safe harbor for certain forward looking statements made with a "reasonable basis" and in "good faith." This safe harbor has not provided companies meaningful protection from litigation. In a February 1995 letter to the SEC, a major pension fund stated: "A major failing of the existing safe harbor is that while it may provide theoretical protection to issuers from liability when disclosing projections, it fails to prevent the threat of frivolous lawsuits that arises every time a legitimate projection is not realized." See February 14, 1995 letter from the California Public Employees' Retirement System to the SEC. Courts have also crafted a safe harbor for forward-looking statements or projections accompanied by sufficient cautionary language. The First, Second, Third, Sixth and Ninth Circuits have adopted a version of the "bespeaks caution" doctrine. See, e.g., In re *Worlds of Wonder Securities Litigation*, 35 F. 3d 1407 (9th Cir. 1994); *Rubinstein v. Collins*, 20 F 3d 169 (5th Cir. 1994); *Kline v. First Western Government Securities, Inc.*, 24 F 3d 480 (3d Cir. 1994); *Sinay v. Lamson & Sessions Company*, 948 F.2d 1037 (6th Cir. 1991); *I. Meyer Pincus & Associates v. Oppenheimer & Co., Inc.*, 936 F 2d 759 (2d Cir. 1991); *Romani v. Shearson Lehman Hutton*, 929 F.2d 875 (1st Cir. 1991); *Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986); In re *Donald J. Trump Casino*, 7 F.3d 357 (3d Cir. 1993).

[30] See testimony of Hon. Arthur Levitt, Chairman, SEC. before the Telecommunications and Finance Subcommittee of the House Commerce Committee, February 10, 1995.

From the Committee on Commerce, for consideration of the House bill, and the Senate amendment, and modifications committed to conference:

THOMAS BLILEY,
BILLY TAUZIN,
JACK FIELDS,
CHRIS COX,
RICHARD F. WHITE,
ANNA G. ESHOO,

As additional conferees from the Committee on the Judiciary, for consideration of the House bill, and the Senate amendment, and modifications committed to conference:

BILL MCCOLLUM,
*Managers on the Part of the House.*

ALFONSE D'AMATO,
PHIL GRAMM,
ROBERT F. BENNETT,
ROD GRAMS,
PETE V. DOMENICI,
CHRISTOPHER DODD,
JOHN F. KERRY,
*Managers on the Part of the Senate.*

O


factiva™

Dow Jones & Reuters

**Uphill Climb**
2,274 words
1 September 1998
Golf Pro
10
ISSN: 1072-1274
English

Copyright 1998 Gale Group Inc. All rights reserved.

Why are club sales flat, and what can retailers do about it?

KEN VAN KAMPEN

Two words describe the golf club market so far this year: flat, and slow. Flatter than a Magic Johnson monologue. Slower than Ken Starr's agenda. After an extensive period of prosperity when retailers grew accustomed to reloading their registers with fresh rolls of tape, club sales have weakened. 'It's a struggle,' says Bill Neidlinger, owner of Pro Golf Discount of Atlanta. 'We're doing more right now to promote sales than we have in 40 years.'

Why the slowdown? Can we keep faulting El Nino? Not any more. Though it was easy and convenient and, in some regions, fair to blame weak sales early in the year on everybody's least favorite rogue weather pattern, its 15 minutes of fame are over.

Waiting For The Next Big Thing

One popular theory explaining the continued sluggishness contends that there simply hasn't been much new on the shelves, excepting Orlimar TriMetal and Adams Tight Lies fairway woods and Callaway X-12 irons, to pique consumer interest. 'It's been the strangest year since I got into the business in 1982,' says Zack Veasey, head pro and general manager at Hillandale GC, Durham, N.C. 'The oversize driver phenomena seems to be over, and there's been no new technology to spark sales.' Even Don Dye, president and CEO of Callaway, concurs: In the metalwood category, 'something new and different is needed to get people to buy again,' he says.

Are people spoiled out there in the land of disposable golf income? In some ways, yes. The life span of a club used to last from five to seven years, but now two years is a lot. That puts more pressure than ever on manufacturers to churn out fresh, innovative, higher-performing products.

'There's been such a flood of new product over the last six to eight years that consumers have come to expect it,' says John Wilson, general manager of Pro Golf, which maintains six stores in central Indiana. 'I think the current lull is partly due to golfers waiting for something new.' Ken Brugh, v.p. and general manager at Golfsmith, agrees. 'Definitely there is pressure on manufacturers to keep coming up with new, better-performing products. It's what consumers have come to expect.'

Expect, maybe. But have today's shorter product cycles jaded consumers toward golf equipment? Do they take improved performance claims less seriously now that they're made so frequently? It's a question that only time can answer.

Whatever consumers think of the usually steady stream of new products, genuine innovations don't necessarily grow on trees in Carlsbad, or anywhere else. Can vendors be expected to continually deliver so quickly?

'Legitimate paradigm shifts - true innovations - are tough to make,' acknowledges Leigh Bader of Joe & Leigh's Discount Golf Pro Shop, Southeaston, Mass. 'I like to see at least one new product that captures people's attention per season, something they'll want to come into the shop to take a look at. Once they're in, they'll usually start noticing and taking interest in some of the other merchandise.' For its part, the industry accepts the challenge without whining. 'No matter what the market is doing,' says Mike Whan, v.p. of marketing for Taylor Made, 'we're always trying to improve our products, to make something better.'

Those That Want It, Got It

Has the temporary lull in new product introductions allowed the public to satisfy its appetite for oversize drivers? Is there a chicken in every pot and a titanium driver in every bag? That's hard to quantify, but the consensus is, very probably. Titanium has been around long enough that prices have gone down, so that those who couldn't afford its original high cost now can. Plus, says Greg Hopkins, president and COO of **Cleveland Golf**, 'There is a certain percentage of consumers who have bought more than one ti driver; who have got one in their bag plus a couple more in the garage.'

Another potential saturation problem looms: Should, as expected, a flurry of new product introductions occur soon, the retail market may be deluged by manufacturers looking to unload inventories of last year's model, a move Goldwin Golf made recently in something of a preemptive strike. Readying to launch new woods and irons later in 1998, Goldwin sold off the remaining inventory of its current line in July at a 35 to 40 percent price reduction.

Should a gaggle of new intros descend upon the market, how should retailers handle the release of inventories? What retailer wants to be left holding bagfuls of last year's model when everyone's clamoring for the latest and greatest? 'If you have a good relationship and do a lot of business with a company, they'll usually take old product off your hands and liquidate it some other way,' says Jess Faulkner, president of Boston Links Golf Shop. 'But the retailer has to use his head, too. If a certain club's sales slow down, the retailer should recognize that the manufacturer is probably going to replace it.'

How Much Is Too Much?

Has premium-priced equipment been slow to move because the high price is keeping buyers at bay? Have consumers drawn a line in the sand, daring manufacturers and retailers not to cross? Maybe, but not necessarily.

'If the club will improve someone's game and they have the money to spend, they'll buy it,' according to Edwin Watts, co-owner and co-founder of Edwin Watts Golf Shops. Says Taylor Made's Whan, 'I think we have reached a ceiling with existing products, but if a new club comes along that offers significantly improved performance, people will pay for it.'

A line in the sand? Quite the contrary, contends Callaway's Dye, who believes that 'There is no price ceiling for a club that is demonstrably superior. We've proven that before. We can price a club higher than the Biggest Big Bertha if it's demonstrably superior.'

Earlier this year, of course, Callaway, following Taylor Made's lead, went in the opposite direction and reduced by $50 the wholesale price of both its Biggest Big Bertha and Great Big Bertha drivers, a move that, according to Dye, was an attempt to excite consumers in the softening wood market. Callaway and Taylor Made weren't the only companies appealing to the consumer's wallet - McHenry Metals, whose Tour Pure drivers and fairway woods carry an SRP of $586 (though according to Brad Wilhite, executive v.p., they generally retail for between $429 and $469), implemented a consumer rebate program between June 15 and August 31 of $50 on its TourPure woods.

Sales of titanium woods this year may also have been negatively impacted by a unique and unforeseen event: the USGA's inquiry into the so-called 'trampoline effect.' 'That caused a lot of people to refrain from making purchases during a time of year when buying is typically heavy,' says Watts. 'That whole situation couldn't have been timed worse. It cost the industry, in my opinion, several hundred million dollars.'

One could argue that outside the trade - to the consumer - the window of uncertainty was small. Even so, how much might the USGA's announcement cost the industry going forward? By giving titanium the okay, the USGA may have sent the message to consumers that titanium really doesn't offer an advantage, despite its exotic cache and high price, not to mention fueling consumer cynicism.

Economic problems in Asia, the so-called 'Asian Flu,' has also negatively affected global club sales - including the U.S., according to Dye. 'Asians take trips here, frequenting places like Hawaii and California, play golf and buy equipment. Or, Asian retailers send agents here to buy product. When Asia drops off, it affects the whole global market,' he says.

Print Results

There are no definitive answers to this year's sluggish club sales, and there probably won't be until the current, slow-selling product cycles are complete. Sales of the next big-company product introductions will also shed light on the current market – how well the next wave of products and their pricing are received by consumers will obviously help clarify whether saturation and price ceilings are the culprits keeping cashiers quiet. And, of course, that will depend on the new products themselves - whether the better mousetraps that everyone is waiting for are delivered. AS with a golf swing, where the takeaway affects the downswing, each aspect of the market is interrelated.

Putting Wind In The Sales

These are not times for retail slackers. Instead, a popular response to the lagging club market has been to emphasize sales and customer service. That often boils down to simply talking and interacting more with consumers on the sales floor. Bader, who reports that overall business is up despite sluggish clubs, attributes the success in part to a philosophy of building relationships with shoppers: 'We try to act more as advisors. That helps build trust, which cultivates a loyal clientele and repeat business.' Bader sees custom-fitting as a golden opportunity for spending quality time and building relationships, when a retailer can spend at least 30 minutes one-on-one with a consumer. In fact, his store is now building a 'fitting deck' to better accommodate interested golfers.

Golfsmith has gone so far as to post 'greeters' at the front door of its retail facilities to welcome customers as they enter and point them toward the products they're seeking. Store managers are required to spend a certain amount of hours per week greeting. But don't expect any hard-sell attitudes. 'We feel it's important to take the time to address and accommodate our customers as much as we can,' says Brugh. The emphasis isn't necessarily on selling, but on talking to people, informing and giving direction.

Then again, allotting additional manpower in order to increase customer attention is a luxury that many retailers are hard-pressed to provide. Gene McMasters, director of golf retail for Family Golf Centers, acknowledges that one of his challenges has been to find ways to free up staff from their normal workaday duties so they have more time to spend with people.

Beyond finding time to give customers more attention, there's also the matter of making sure that help is up to speed on the features and benefits and selling points of the many different clubs out there ' 'Consumers are smarter now, they know more about equipment and ask better questions,' observes Wilson of Pro Golf. 'Advertising might drive customers into the store, but print ads and TV commercials don't get enough information across about a club. It's up to us to pick up where the advertising left off. We work hard at keeping our sales help up to speed on the elements of today's more sophisticated clubs.'

An element of increased customer interaction includes offering more demo opportunities. During slow sales time, many retailers have done more to emphasize demo dubs, making them available early, often and in greater quantity. 'When we can, we're overwhelming customers with demo equipment,' says Neidlinger.

According to Tim Whalen, co-owner of Fiddlers Green GC, Eugene, Ore., 'We've got 240 sets of irons on display, and every one is considered a demo set. We'll let people try anything in the store at our driving range.' At Joe & Leigh's Discount interested parties can withdraw sets from the demo club 'bank' to try at either the on-site range or course, or even off the premises. However it's done, the premise is simple: Make it easy for a customer to try it, and hopefully they'll buy it.

Retail Failings

As rosy as all of the above sounds, some retailers still may in some degree be contributors to creeping clubs sales. 'Too many don't have a clue on how to sell and merchandise,' contends Faulkner. 'Instead, pricing is the only tactic they have to move product. And that screws up the market for everybody else.' And despite efforts to keep personnel educated on the fine points of different brands of equipment, too many salespeople convey disinformation to consumers, which leads to confusion that hurts sales. 'Today's golfer has access to a lot more information on clubs via sources like magazines and the Internet. Often, the customer knows more than the guy on the sales floor,' says Faulkner.

Faulkner also points out that there are a lot more places to buy equipment than 10 years ago, while noting that the number of golfers probably hasn't increased enough to support every dealer during a slow year like this one.

Is there light at the end of the tunnel? Again, much will depend on what types of new breakthrough products, if any, make their way to market and into the imaginations of the buying public. For now, retailers are working hard to make the best of a lethargic period. 'The golf business is so cyclical,' notes Johnson. 'Last year was great. My boss, the owner, said, 'It's just one year. You're going to have to work harder next year than you ever have.' And he was right.'

There's little doubt most retailers are doing the same, given this low point in the cycle when so many have needed to bear down and peddle hard to make it through what's so far been an uphill battle.

Document glfp000020010917du9100015

© 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva)  All rights reserved

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2297401 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,014
**(Cite as: 2004 WL 2297401 (S.D.N.Y.))**
< KeyCite History >

Motions, Pleadings and Filings

United States District Court,
S.D. New York.
In re: INITIAL PUBLIC OFFERING Securities
Litigation
In re CORVIS CORP. Initial Public Offering
Securities Litigation
In re ENGAGE TECHNOLOGIES, INC. Initial
Public Offering Securities Litigation
In re FIREPOND, INC. Initial Public Offering
Securities Litigation
In re IXL ENTERPRISES, INC. Initial Public
Offering Securities Litigation
In re SYCAMORE NETWORKS, INC. Initial
Public Offering Securities Litigation
In re VA LINUX CORP., formerly known as VA
Linux Systems, Inc. Initial Public
Offering Securities Litigation
No. 21 MC 92(SAS), 01 Civ. 3857(SAS), 01 Civ.
8408(SAS), 01 Civ. 7048(SAS), 01
Civ. 9417(SAS), 01 Civ. 6001(SAS), 01 Civ.
0242(SAS).

Oct. 13, 2004.

Melvyn I. Weiss, Robert A. Wallner, David A.P. Brower, Ariana J. Tadler, Milberg Weiss Bershad & Schulman LLP, New York, NY, Stanley Bernstein, Rebecca M. Katz, Bernstein Liebhard & Lifshitz, LLP, New York, NY, Liaison Counsel for Plaintiffs.

Gandolfo V. DiBlasi, Penny Shane, Sullivan & Cromwell, New York, NY, Liaison Counsel for Defendants (Underwriters).

Jack C. Auspitz, Morrison & Foerster LLP, New York, NY, Liaison Counsel for Defendants (Issuers).

*OPINION AND ORDER*

SCHEINDLIN, J.

*1 This Document Relates to:

I.   INTRODUCTION ................................................................ 1

II.  FACTS ........................................................................ 4
     A. The Alleged Scheme ...................................................... 4
     B. The Focus Cases ......................................................... 5
     C. The Parties' Submissions ................................................ 6
     D. The Proposed Class Periods .............................................. 9
     E. Focus Case-Specific Facts .............................................. 10
        1. Corvis .............................................................. 10
           a. The Corvis IPO .................................................. 10
           b. Corvis Class Representatives .................................... 13
        2. Engage .............................................................. 15
           a. The Engage IPO .................................................. 15

           b. Engage Class Representatives .................................... 18
        3. Firepond ............................................................ 21
           a. The Firepond IPO ................................................ 21
           b. Firepond Class Representatives .................................. 23
        4. iXL ................................................................. 25
           a. The iXL IPO ..................................................... 25
           b. iXL Class Representatives ....................................... 28
        5. Sycamore ............................................................ 29

a. The Sycamore IPO .................................................. 29
b. Sycamore Class Representatives ........................ 32
6. VA Linux ............................................................... 36
a. The VA Linux IPO .......................................... 36
b. VA Linux Class Representatives ..................... 39
F. Industry-Wide Events Affecting All Focus Cases During the Class
Period .................................................................... 41

III. LEGAL STANDARD ...................................................... 46
A. The Requirements of Rule 23 ................................... 46
1. Rule 23(a) ........................................................ 47
a. Numerosity ................................................ 47
b. Commonality .............................................. 48

c. Typicality .................................................. 49
d. Adequacy .................................................. 50
e. Ascertainability ......................................... 52
2. Rule 23(b) ....................................................... 53
a. Predominance ............................................ 54
b. Superiority ................................................ 55
3. Rule 23(g) ....................................................... 55
B. The Standard of Proof ........................................... 56

IV. DISCUSSION ................................................................ 66
A. Rule 23(a) ........................................................... 66
1. Commonality ................................................... 66
2. Typicality ........................................................ 70
3. Adequacy ........................................................ 76
a. Antagonistic Interests ................................ 76
b. Familiarity with the Action ......................... 78
c. Abdication of Control to Class Counsel ........ 80
d. Moral Character ......................................... 81
4. Ascertainability .............................................. 82
B. Rule 23(b): Predominance ..................................... 98
1. Transaction Causation ..................................... 99

a. The Affiliated Ute Presumption ................... 99
b. The Fraud on the Market Presumption ......... 101
(1) Market Efficiency ............................... 103
(2) Investment Strategies ......................... 107
(3) Knowledge of Fraudulent Scheme ........ 111
2. Loss Causation ................................................ 114
3. Damages ........................................................ 127
4. Section 11 Claims ............................................ 132
a. Tracing ..................................................... 132
b. Adequacy and Typicality of Section 11 Class
Representatives ..................................................... 140
C. Rule 23(b)(3): Superiority ..................................... 142

V. CONCLUSION .............................................................. 146

I. INTRODUCTION

*2 Between January 11 and December 6, 2001,

thousands of investors filed class action lawsuits, alleging that 55 underwriters, 310 issuers and hundreds of individuals associated with those issuers had engaged in a sophisticated scheme to defraud the investing public. In brief, the scheme consisted of a requirement, imposed by the underwriters, that IPO allocants purchase shares in the aftermarket, often at escalating prices, and pay undisclosed compensation. In addition, the underwriters prepared analyst reports that contained inaccurate information and recommendations because the analysts operated under a conflict of interest. As a result of the scheme, plaintiffs allege that they collectively lost billions of dollars. These actions were consolidated before this Court for pre-trial supervision. At the suggestion of the Court, the parties selected six cases to be used as test cases for determining whether these suits can proceed as class actions. Upon plaintiffs' motion, I now address whether these test cases can be certified as class actions.

Defendants have submitted thousands of pages of briefs, affidavits, exhibits and reports in opposition to the motion. Although they raise every conceivable argument, their major contention is that individual issues predominate over common issues with respect to almost every aspect of proof. In particular, defendants note that each plaintiff differs with respect to her knowledge of the alleged scheme when she invested (e.g., whether she was an allocant or an aftermarket purchaser or both and whether and to what extent she was exposed to press reports and other public disclosures); the nature of her investment (e.g., whether she was a long term investor, a short seller, a day trader, or a momentum trader); the timing of her investment (e.g., the purchase price of the stock and the effect of any artificial inflation at the time of purchase); the amount of her damages (e.g., the subsequent dissipation of any artificial inflation by the time of sale); and the traceability of her shares to a particular offering and registration statement. Because of these differences, defendants argue, common issues cannot predominate, and class certification must be denied. Defendants also contend that it would be impossible to ascertain which investors should be in the class and which must be excluded.

In their zeal to defeat the motion for class certification, defendants have launched such a broad attack that accepting their arguments would sound the death knell of securities class actions. Yet class-wide adjudication under Rule 23 of the Federal Rules of Civil Procedure is particularly well-suited to securities fraud cases. [FN1] In opposing certification, defendants do not truly seek separate adjudications of each individual claim. In reality, they seek no adjudication because the prospect of 310 million individual lawsuits (based on a hypothetical average class membership of one million investors), represents an impossible burden for all parties--the individual plaintiffs, the defendants and the courts. [FN2] Thus, if certification is denied, defendants will have essentially defeated the claims without ever having been compelled to defend the suits on the merits. Of course, if plaintiffs fail to satisfy the stringent requirements of Rule 23, then a class cannot be certified, even if that results in plaintiffs' inability to press their claims. [FN3]

> FN1. See Fed.R.Civ.P. 23(b)(3) Advisory Committee Note (acknowledging that class action is an appealing tool for adjudicating cases of "fraud perpetrated on numerous persons by the use of similar misrepresentations").

> FN2. See In re Worldcom, Inc. Sec. Litig., 219 F.R.D. 267, 304 (S.D.N.Y.2003) ("Few individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail.").

> FN3. See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 209 F.R.D. 323, 353 (S.D.N.Y.2002) (denying class certification).

*3 "The class action device was designed to promote judicial efficiency and to provide aggrieved persons a remedy when individual litigation is economically unrealistic, as well as to protect the interests of absentee class members." [FN4] This underlying purpose of Rule 23 provides much-needed guidance in focusing on the real issues. While highly competent counsel, with unlimited resources, have the capability to advance an almost unlimited array of complex arguments against certification, the Court must not lose sight of the ultimate question: whether class adjudication of the issues raised in these complaints is clearly superior to any other form of dispute resolution.

Although defendants' arguments have raised a number of thorny problems, forcing this Court to take a hard look at the pleadings and the many submissions made in support of and in opposition to this motion, the balance tips strongly in favor of certification. Trying these cases will be an arduous task, but that is no reason to close the courthouse door to the alleged victims of a sophisticated and widespread fraudulent scheme. Accordingly, for the reasons set forth below, class certification, to the extent noted, is granted in each of the six focus cases.

> FN4. 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.03 (3d ed. 2004).

## II. FACTS

### A. The Alleged Scheme

Plaintiffs seek recovery for securities fraud pursuant to the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs allege that defendants engaged in a comprehensive scheme to defraud investors by artificially inflating the prices of the issuers' stocks. The alleged scheme is described at length in my February 19, 2003 Opinion denying defendants' motion to dismiss. [FN5] Familiarity with that Opinion is assumed.

> FN5. See In re Initial Public Offering Sec. Litig. ("In re IPO"), 241 F.Supp.2d 281 (S.D.N.Y.2003).

### B. The Focus Cases

These proceedings sweep together for pre-trial management 310 consolidated class actions, each with a distinct group of defendants (many of whom are overlapping) but alleging the same scheme to defraud investors. Because the question of whether a class can be certified under the rigorous standard set forth by Rule 23 is common to *all* of these consolidated actions, judicial efficiency counsels in favor of a test case approach. Accordingly, the parties have presented for the Court's consideration six cases, involving the following issuers: Corvis Corp. ("Corvis"); Engage Technologies, Inc. ("Engage"); Firepond, Inc. ("Firepond"); iXL Enterprises, Inc. ("iXL"); Sycamore Networks, Inc. ("Sycamore"); and VA Software Corp, formerly known as VA Linux Systems, Inc. ("VA Linux")

(collectively, the "focus cases"). [FN6]

> FN6. Plaintiffs selected Corvis, Engage, Firepond, Sycamore and VA Linux. *See* 10/14/03 Letter to the Court from Melvyn I. Weiss, liaison counsel for plaintiffs. Defendants selected iXL. *See* 11/26/03 Letter to Weiss from Mark Holland, counsel for defendant Merrill Lynch.

The parties have agreed that "[t]he rulings on the class certification motions in the selected cases will govern those cases only." [FN7] However, most of the issues this Opinion addresses would undoubtedly be raised in a motion for class certification with respect to the remaining 304 consolidated actions. This Opinion is intended to provide strong guidance, if not dispositive effect, to all parties when considering class certification in the remaining actions. [FN8]

> FN7. 7/11/03 Case Management Term Sheet, Part II.D.

> FN8. *See* Transcript of 6/17/04 Hearing at 3:1-6 ("THE COURT: [O]nce there is a decision on these motions, ... we can talk about what common issues ... would only reappear in every other class certification motion, and what unique issues there may be in the remaining action.").

### C. The Parties' Submissions

*4 On September 2, 2003, plaintiffs moved for class certification and submitted Plaintiffs' Memorandum of Law in Support of Their Omnibus Motion for Class Certification ("Plaintiffs' Omnibus Mem."). Defendants responded with six opposition briefs: the Underwriter Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification in Corvis ("Corvis Mem."); the Memorandum in Opposition to Omnibus Motion for Class Certification, and to Certification of the Proposed Class in Engage Technologies, Inc. ("Engage Mem."); the Underwriter Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification in Firepond ("Firepond Mem."); the iXL Underwriter Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("iXL Mem."); the Underwriter Defendants' Opposition to Plaintiffs' Motion for Class Certification in

Sycamore ("Sycamore Mem."); and Credit Suisse First Boston ("CSFB") LLC's Memorandum in Opposition to Plaintiffs' Motion for Class Certification in VA Linux Mem. ("VA Linux Mem."). [FN9] Plaintiffs replied on April 19, 2004, with Plaintiffs' Corrected Reply Memorandum of Law in Support of Their Omnibus Motion for Class Certification ("Plaintiffs' Reply"). Defendants responded on May 10, 2004, with the Underwriter Defendants' Sur-Reply Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Defendants' Sur-Reply"), and plaintiffs submitted Plaintiffs' Response to Underwriter Defendants' Sur-Reply Memorandum in Opposition to Class Certification ("Plaintiffs' Response") on May 19, 2004.

> FN9. The iXL Mem. is dated February 23, 2004. The Corvis, Engage, Firepond and VA Linux memoranda are all dated February 24, 2003. The corrected Sycamore Mem. is dated April 7, 2004.

After oral argument on June 17, 2004, I directed plaintiffs to submit a letter brief refining their proposed class definition, which plaintiffs submitted on July 6, 2004 ("Class Def. Letter"). Defendants responded to the proposed definition on July 20, 2004, in a letter brief of their own ("Class Def. Opp."). Finally, on September 7, 2004, I ordered plaintiffs to submit a proposed trial plan, which plaintiffs submitted on September 15, 2004 ("Trial Plan"). Defendants opposed the Trial Plan in a letter brief dated September 22, 2004, and plaintiffs replied on September 28, 2004.

The parties have also submitted many expert reports regarding the hotly contested issues of loss causation and damages. Plaintiffs submitted an expert report by Professor Daniel Fischel on January 20, 2004 ("1/20/04 Fischel Report"). Defendants countered with reports by the following experts: Dr. Christopher B. Barry in support of iXL Mem. ("Barry Report"); Dr. Paul A. Gompers in support of Sycamore Mem. ("Gompers Report"); Dr. Allan W. Kleidon in support of Sycamore Mem. ("Kleidon Report"); Dr. Maureen O'Hara in support of Corvis Mem. and VA Linux Mem. ("2/23/04 O'Hara Report"); Dr. Erik R. Sirri in support of iXL Mem. ("Sirri Report"); and Dr. Rene M. Stultz in support of Firepond Mem. ("Stultz Report"). [FN10] Plaintiffs submitted a rebuttal report by Professor Fischel dated April 15, 2004 ("4/15/04 Fischel Report"). Defendants countered with a report by Dr.

Bradford Cornell, dated May 10, 2004 ("Cornell Report"). In my June 21, 2004 Order, I directed plaintiffs to "submit a supplemental report from [ ] Fischel in which he analyzes the causal link between the alleged tie-in agreements and their effect on stock price in light of *all* tie-in purchases in the six focus cases known to plaintiffs' counsel (both in the form of aftermarket trades and pre-opening bids-and-asks). [ ] Fischel is advised to pay particular attention to the duration of any inflationary effect caused by this activity." [FN11] Plaintiffs submitted a final Fischel report on July 12, 2004 ("7/12/04 Fischel Report"), and defendants countered with a report from Dr. O'Hara dated July 23, 2004 (the "7/23/04 O'Hara Report").

> FN10. The Barry Report, 2/23/04 O'Hara Report and Sirri Report are all dated February 23, 2004. The Gompers Report, Kleidon Report and Stultz Report are all dated February 24, 2004.

> FN11. *In re IPO*, No. 21 MC 92, 2004 WL 1635575, at *1 (S.D.N.Y. June 23, 2004) (emphasis in original).

D. The Proposed Class Periods

*5 For each of these consolidated actions, "[t]he Class consists of all persons and entities that purchased or otherwise acquired the securities of [Specific Issuer] during the Class Period and were damaged thereby," subject to various exclusions. [FN12] Plaintiffs propose class periods for each case that span the period between the initial public offering ("IPO") and December 6, 2000. [FN13] For the purposes of this Opinion, plaintiffs' proposed class periods are adopted for plaintiffs' Exchange Act claims; however, plaintiffs' proposed class periods must be shortened with respect to plaintiffs' claims pursuant to section 11 of the Securities Act in each of the six focus cases. [FN14]

> FN12. Class Def. Letter at 1. The exclusions from this class definition are discussed in detail in Part IV.A.4., *infra*.

> FN13. *See* 4/19/02 Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws for Corvis ¶ 58; 4/19/02 Consolidated Amended Class Action Complaint For Violations of the

Federal Securities Laws for Engage ¶ 55; 4/19/02 Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws for Firepond ¶ 53; 4/19/02 Amended Class Action Complaint For Violations of the Federal Securities Laws for iXL ¶ 64; 4/19/02 Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws for Sycamore ¶ 68; 4/19/02 Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws for VA Linux ¶ 52.

FN14. *See infra* Part IV.B.4.

E. Focus Case-Specific Facts

1. Corvis

a. The Corvis IPO

Corvis held its IPO on July 28, 2000, with CSFB serving as the lead underwriter, offering 31,625,000 shares at $36.00 per share.15 Defendants note that "[p]rior to the IPO, Corvis had issued a significant number of unregistered shares ... which would have been freely tradeable at the time of the IPO, provided that the shareholders satisfied SEC Rule 144." [FN16] Corvis reported a number of outstanding unregistered shares of stock that had been issued to other companies and to Corvis affiliates before the Corvis IPO. [FN17] On the first day of trading, the stock opened at $74.00, peaked at $98.00 and closed at $84.72, a 135% increase over the offering price. [FN18] By the end of the first day of trading, 28,137,100 shares had changed hands in 35,755 transactions. [FN19]

Plaintiffs allege that 195 of the institutional allocants in the Corvis IPO, to whom 12,193,450 shares were allocated, entered into tie-in agreements with the allocating underwriter. [FN20] Plaintiffs further allege that purchase orders from these allocants accounted for 1,469,600 of the 2,569,600 purchase orders placed during the pre-open bid session, during which the opening share price rose to more than twice the $36.00 offering price. [FN21] During the ten business days from July 28 through August 10, 2000, Corvis allocants purchased a total of 11,582,004 shares in the aftermarket. The same investors sold a total of 1,543,240 shares during that time. [FN22]

Following the IPO, Corvis's stock climbed to its highest price, $108.06 per share, on August 4, 2000, the same day Broadwing disclosed a $44,000,000 investment position in Corvis and announced that it would buy $200,000,000 in equipment. [FN23] By the end of September 2000, the stock had fallen to just over $60.00 per share. [FN24] On October 2, 2000, Corvis filed a prospectus for 2,446,074 newly registered shares acquired through the exercise of employee stock options. [FN25] Corvis explicitly incorporated the disclosures made in its IPO prospectus into its October 2, 2000 prospectus. [FN26] During November 2000, the stock slid from $64.00 to $28.81 per share. [FN27] Corvis experienced a slight rebound in December 2000, reaching $40.38 per share on December 6. [FN28] According to Professor Fischel, Corvis underperformed when compared to various market benchmarks by 27 to 64 percentage points from July 28 to December 6, 2000, and by 35 to 67 points thereafter. [FN29] On May 10, 2001, when the first Corvis case, *PRFT Partners v. Corvis Corp.*, No. 01 Civ. 3994, was filed, shares of Corvis closed at $7.380 per share. [FN30]

b. Corvis Class Representatives [FN31]

(1) Satswana Basu

*6 Satswana Basu, who also seeks to act as a class representative in six other IPO cases, purchased and sold 95,198 Corvis shares, and sold and covered short 20,000 Corvis shares between November 17 and December 6, 2000, resulting in a $736,869.20 loss during that time. Basu also purchased Corvis shares after December 6, 2000. [FN32]

(2) Michael Huff

Between August 24 and September 26, 2000, Michael Huff bought and sold 12,000 shares of Corvis stock for a $22,755.00 profit. On September 28 and 29, 2000, however, Huff purchased a total of 6,000 shares for $472,832.50, which he had not sold as of December 6, 2000. Had he sold the shares that day, when the stock closed at $40.38 per share, Huff would have suffered a total pre-December 6, 2000 loss of $207,797.50. [FN33]

(3) Sean Rooney

Sean Rooney purchased 1,000 shares of Corvis

stock on August 7, 2000 at $107.50 per share and another 500 shares on August 11, 2000 at $90.00 per share. Rooney sold 500 shares on December 5, 2000, at $39.00 per share, leaving him with 1,000 unsold shares on December 6, 2000. Had he sold his shares that day, when the stock closed at $40.38 per share, he would have suffered a total pre-December 6, 2000 loss of $92,620.00. [FN34] Rooney also received an allocation of 500 shares in the Priceline.com IPO. [FN35]

2. Engage

a. The Engage IPO

Engage held its IPO on July 20, 1999, with Goldman Sachs acting as lead underwriter, offering 6,938,000 shares at $15.00 per share. [FN36] The IPO prospectus for Engage notes that 1,225,324 shares of common stock were already outstanding well before the IPO, on April 30, 1999. [FN37] On the first day of trading, the stock opened at $28.00, peaked at $47.00 and closed at $41.00, a 173% increase over its offering price. By the end of the first day of trading, 14,887,200 shares had changed hands. [FN38]

Plaintiffs allege that forty-nine of the institutional allocants in the Engage IPO, to whom 786,900 shares were allocated, entered into tie-in agreements with the allocating underwriter. [FN39] Plaintiffs further allege that purchase orders from these allocants made up 693,000 of the 1,251,000 total purchase orders placed during the pre-open bidding session, during which the opening price for Engage was set at $28.00, $13.00 above the offering price. [FN40] During the ten business days from July 20, 1999 through August 2, 1999, Engage allocants purchased a total of 3,313,660 shares in the aftermarket. [FN41] The same investors sold a total of 135,850 shares during that time. [FN42]

Following the IPO, the price for Engage stock fell, but the stock traded consistently in the mid-twenties through the end of 1999. [FN43] On January 16, 2000, approximately 6,700,000 non-IPO shares associated with "employee stock options, corporate acquisitions, and other transactions became freely tradable in large numbers in the secondary market." [FN44] From January to February 2000, Engage prices climbed to all-time highs, peaking at over $180.00 per share. [FN45] The price declined rapidly in March and April of 2000, and the stock split two for one on April 4, 2000. [FN46] By

August 2000, the stock was trading around the offering price of $15.00 per share when adjusted to reflect the split. The price dropped below the offering price for the first time in October 2000, and continued to decline through December 6, 2000, when it was trading at a split-adjusted price of approximately $3.19 per share. [FN47] Fischel asserts that Engage underperformed when compared to various market benchmarks by 35 to 72 percentage points from July 20, 1999 to December 6, 2000, and by 34 to 68 points thereafter. [FN48] On September 7, 2001, when the first Engage case, *Chin v. Engage Tech., Inc.*, No. 01 Civ. 8404, was filed, Engage stock closed at $0.190 per share. [FN49]

b. Engage Class Representatives

(1) Stathis Pappas

*7 Stathis Pappas was an allocant in Engage's IPO, receiving 100 shares of Engage stock on July 20, 1999, at $15.00 per share. [FN50] Pappas made no aftermarket purchases in Engage. It does not appear from the facts before this Court that Pappas ever sold any of those shares, which were worth approximately $3.19 per share on December 6, 2000. [FN51] Had he sold his shares that day, he would have suffered a $1,181.26 loss on the transaction. According to defendants, Pappas is a member of more than fifteen potential classes in these consolidated actions. [FN52]

(2) Krikor Kasbarian

Between March 31 and August 29, 2000, Krikor Kasbarian purchased 20,000 shares of Engage stock for $1,008,687.50 and sold 30,000 post-split shares for $411,450.00, resulting in a total pre-December 6, 2000 loss of $597,237.50. [FN53] On his October 8, 2001 PSLRA certification, Kasbarian failed to disclose several transactions. [FN54] In October, 2000, Kasbarian destroyed records documenting his Engage trades. [FN55] He held no Engage stock on December 6, 2000. [FN56]

Kasbarian engaged in six transactions involving Engage after December 6, 2000. In July 2001, Kasbarian bought Engage twice and sold twice, each sale within a few days of the respective purchase. Kasbarian made a profit of $.06 per share on the first set of trades and broke even on the second set. [FN57] Kasbarian failed to disclose these trades on

his PSLRA certification. [FN58] Following submission of the certification, Kasbarian made a final pair of trades in Engage stock, purchasing 4,000 shares on October 25, 2001, and selling those shares for a $.03 profit per share on October 30, 2001. [FN59] According to defendants, Kasbarian is also a member of more than fifteen potential classes in these consolidated actions and seeks to serve as a class representative in the TheGlobe.com litigation. [FN60]

3. Firepond

a. The Firepond IPO

Firepond held its IPO on February 4, 2000, with Robertson Stephens acting as lead underwriter, offering approximately 5,000,000 shares at $22.00 per share.    [FN61] On that date, 27,751,713 unregistered shares were already outstanding. [FN62] On the first day of trading, Firepond's stock opened at $52.00, peaked at $102.31 and closed at $100.25, an increase of 356% over its offering price. By the end of the first day of trading, 9,284,900 shares had changed hands. [FN63]

Plaintiffs allege that 152 of the institutional allocants in the Firepond IPO, to whom 3,153,100 shares were allocated, entered into tie-in agreements with the allocating underwriter. [FN64] Plaintiffs further allege that purchase orders from these allocants made up 3,965,100 of the 4,125,100 million total purchase orders placed during the pre-open bidding session, during which the opening price for Firepond rose to $30.00 above the offering price. [FN65] During the ten business days from February 4 through February 17, 2000, Firepond allocants purchased a total of 13,970,988 shares in the aftermarket. The same investors sold a total of 12,611,116 shares during that time. [FN66]

*8 Following the IPO, Firepond's stock fell slightly, closing at $71.00 on February 17, 2000. The price then rebounded, reaching a high of $97.44 on February 29, only to rapidly decline to $15.88 by April 17. [FN67] Defendants claim that the number of outstanding shares increased by nearly 2,000,000 between the IPO and April 30, 2000. [FN68] The stock once again rebounded, peaking at $40.69 on June 29, 2000, but soon resumed its decline, trading in the upper teens again by August 1. [FN69] On August 2, 2000, Firepond's 180-day lock-up expired, and more than 26,000,000 shares became

tradeable. [FN70] The price of the stock began to fall dramatically in the fall of 2000, declining from over $17.00 a share on September 14 to a closing price of $6.69 on December 6, 2000. [FN71] Fischel asserts that Firepond underperformed when compared to various market benchmarks by 27 to 63 percentage points from February 4, 2000 to December 6, 2000, and 33 to 65 points thereafter. [FN72] On July 31, 2001, when the first Firepond case, *Barrett v. FirePond, Inc.,* No. 01 Civ. 7048, was filed, Firepond closed at $0.66. [FN73]

b. Firepond Class Representatives

(1) Zitto Investments

Zitto Investments ("Zitto") purchased 345 shares of Firepond stock between February and April of 2000. It sold 100 shares in February for a profit but sold 245 shares in August 2000 for less than $20.00 per share, resulting in a net loss of $7,258.75. [FN74]

(2) James and Diane Collins

James and Diane Collins ("the Collinses") made four purchases of Firepond stock between March 14 and May 1, 2000, totaling 500 shares for $24,300.00. The Collinses had not sold any shares of Firepond stock prior to December 6, 2000, when the stock closed at $6.69 per share. [FN75] Had the Collinses sold their shares that day, they would have suffered a $20,955.00 loss on the transaction.

(3) Joseph Zhen

Between February 11 and March 17, 2000, Joseph Zhen purchased 2,600 Firepond shares for $192,956.25 and sold 1,600 shares for $126,725.00, resulting in a gain of $7,982.69. Zhen still held 1,000 shares when the price dropped dramatically in late March. He sold his remaining shares on April 17, 2000 for $16,093.80, bringing his total pre-December 6, 2000 loss to $50,137.45. [FN76] Zhen omitted thirteen of his seventeen Firepond trades, some of which resulted in profits, from his September 20, 2001 PSLRA certification. [FN77] During discovery, Zhen failed to produce trading records for transactions in securities other than Firepond. [FN78]

4. iXL

a. The iXL IPO

iXL held its IPO on June 2, 1999, with Merrill Lynch serving as lead underwriter, offering close to 7,000,000 shares at $12.00 per share. [FN79] The iXL IPO Prospectus notes that "no restricted securities will be eligible for immediate sale on the date of this prospectus," and that "121,828 restricted securities issuable pursuant to stock options will be eligible for sale 90 days after the date of this prospectus [on August 31, 1999.]" [FN80] During the first day of trading, the stock opened at $15.13, peaked at $24.50 and closed at $17.88, an increase of 49% above the offering price. On the first day of trading, 14,008,117 shares changed hands. [FN81]

*9 Plaintiffs allege that thirty-seven of the institutional allocants in the iXL IPO, to whom 1,222,750 shares were allocated, entered into tie-in agreements with the allocating underwriter. [FN82] During the ten business days from June 3 through June 16, 1999, iXL allocants purchased a total of 3,080,089 shares in the aftermarket. The same investors sold a total of 2,956,325 shares during that time. [FN83]

In the weeks following the iXL IPO, the share price rose slightly, closing at $19.13 on June 28, 1999. [FN84] That day, 4,000,000 shares were registered with the SEC for use in future acquisitions. [FN85] A month later, on July 27, 1999, iXL issued a positive earnings announcement, [FN86] and Merrill Lynch upgraded the stock from near-term "accumulate/buy" to near-term "buy/buy." [FN87] The following day, shares closed at $29.13. In August 1999, the price dropped to $22.00. Shares rebounded to $37.00 in mid-November and, on January 20, 2000, the price reached $58.75, the stock's high-water mark. [FN88]

In February 2000, more than 50,000,000 shares became tradeable due to the expiration of a lock-up that had taken effect shortly after the IPO. [FN89] Between mid-February and late June, 2,400,000 shares that had been subject to lock-up agreements were sold. [FN90] On February 18, 2000, Merrill downgraded iXL to "accumulate" and warned of the risk of sales of unlocked shares. [FN91] Merrill re-classified its long-term rating to "buy" on March 20, 2000. [FN92] In September 2000, Merrill downgraded iXL first to "accumulate" [FN93] and then to "neutral." [FN94] The price of iXL shares closed at $1.25 on December 6, 2000. [FN95] Fischel asserts that iXL underperformed when compared to various market benchmarks by 63 to 99

percentage points from June 2, 1999 to December 6, 2000, and by 36 to 62 points thereafter. [FN96] On October 25, 2001, when the first iXL case, *Turner v. iXL Enterprises, Inc.*, No. 01 Civ. 9417, was filed, iXL closed at $0.32 per share. [FN97]

b. iXL Class Representatives

(1) John Miles

Between August 19, 1999 and November 2, 2000, John Miles purchased 16,400 iXL shares for $138,233.41. Miles sold 2,400 shares by August 16, 2000 for $53,452.04, but still held 14,000 shares as of December 6, 2000. [FN98] Had he sold his remaining shares that day, when the stock closed at $1.25 per share, he would have suffered a total pre-December 6, 2000 loss of $67,281.37.

(2) John Rowe

Between June 4 and August 31, 1999, John Rowe purchased 1,335 iXL shares for $25,685.23. He sold 335 shares between September 17 and November 22, 1999 for $12,029.82, at a profit, leaving him with 1,000 unsold shares as of December 6, 2000. [FN99] Had he sold his remaining shares that day, when the stock closed at $1.25 per share, Rowe would have suffered a total pre-December 6, 2000 loss of $12,405.41.

5. Sycamore

a. The Sycamore IPO

Sycamore held its IPO on October 21, 1999, with Morgan Stanley acting as the co-lead underwriter, offering 7,475,000 shares at $38.00 per share. [FN100] On the first day of trading, Sycamore shares opened at $270.88, the day's high price, and closed at $184.75, an increase of 386% above the offering price. Almost 10,000,000 shares changed hands on the first day of trading. [FN101]

*10 Plaintiffs allege that eighty-seven institutional allocants in the Sycamore IPO, to whom 1,077,625 shares were allocated, entered into tie-in agreements with the allocating underwriter. [FN102] Plaintiffs further allege that purchase orders from these allocants made up 561,900 of the 2,868,035 total purchase orders placed during the pre-open bidding session, during which the opening price for Sycamore rose to $232.88 above the offering price.

[FN103] During the first ten days following Sycamore's IPO, Sycamore allocants purchased a total of 2,297,115 shares. The same investors sold a total of 745,832 shares during that time. [FN104]

Defendants assert that on the first day of public trading, 5,734,183 previously issued non-IPO Sycamore shares were not subject to lock-up. [FN105] At least 368,587 of these shares became tradeable 90 days after the Sycamore IPO--*i.e.*, on January 19, 2000. [FN106] Following the IPO, the price of Sycamore stock climbed steadily, closing at $203.00 on October 26, 1999. [FN107] On January 19, 2000, millions of additional shares that had been issued prior to the Sycamore IPO were released from lock-up, [FN108] and by the end of that week, the stock price reached $280.00. [FN109] The stock split three for one on February 14, 2000. [FN110] On March 2, 2000, the stock soared to a price of $569.81 per share, [FN111] and the next day 8,985,186 more shares, issued one year earlier, were released from lock-up. [FN112] A secondary offering of 10,200,000 Sycamore shares occurred on March 14, 2000. [FN113] On April 18, 2000, 26,965,355 additional shares were released from lock-up. [FN114] After rising and falling several times, the stock price eventually declined, trading around $300.00 per share in October of 2000, and closing at a split-adjusted price of $169.31 per share on December 6, 2000. [FN115] Fischel asserts that Sycamore underperformed when compared to various market benchmarks by 32 to 68 percentage points from October 21, 1999 to December 6, 2000, and by 32 to 64 points thereafter. [FN116] On July 2, 2001, when the first Sycamore case, *Pond Equities v. Sycamore Networks, Inc.*, No. 01 Civ. 6001, was filed, Sycamore closed at $8.63 per share. [FN117]

b. Sycamore Class Representatives

(1) Barry Lemberg

Barry Lemberg purchased 100 Sycamore shares for $175.00 per share on March 3 and an additional 100 shares on April 13, 2000 for $71.13 per share. [FN118] Lemberg had not sold those shares as of December 6, 2000, when the stock closed at $56.44 per share. [FN119] Had Lemberg sold the shares that day, he would have suffered a $13,325.00 loss on the transaction. While Lemberg alleges that he is entitled to damages relating to 1,200 shares, he purchased only 200 shares before December 6, 2000. [FN120]

Lemberg's testimony and questionnaire responses conflict as to whether he received an IPO allocation, [FN121] and although Lemberg alleged that he had never personally bought and sold the same stock on the same day, the record reveals that he had conducted a same day transaction on at least one occasion. [FN122] He testified that he does not remember having any involvement in preparing the Complaint. [FN123] Moreover, defendants claim that he "does not understand financial markets well," and is "unable to describe the specific behavior of Morgan Stanley that was improper." [FN124]

(2) Vasanthakumar Gangaiah

*11 Vasanthakumar Gangaiah purchased and sold 11,600 shares of Sycamore stock between March 1 and December 6, 2000, resulting in a $69,276.21 loss. [FN125] Defendants assert that Gangaiah provided "conflicting and false" testimony about his investment accounts, [FN126] and "falsely claimed never to have received an IPO allocation." [FN127] Defendants also question Gangaiah's understanding of the litigation, noting that he does not know what kind of damages are being sought in the case or which people are members of the class. [FN128]

(3) Frederick Henderson

Frederick Henderson received an IPO allocation of 50 shares of Sycamore stock at $38.00 per share, which he flipped on October 22, 1999 for $200.00 per share. [FN129] Between May 2 and October 13, 2000, Henderson purchased an additional 14,000 shares for $1,550,081.25. He sold 4,000 shares on November 16, 2000 for $266,675.00, for a loss, leaving him with 10,000 unsold shares as of December 6, 2000. Had he sold them that day, when the stock closed at $56.44, Henderson would have suffered a total pre-December 6, 2000 loss of $710,906.25. [FN130]

Henderson does not recall seeing the Amended Complaint before it was filed. [FN131] He acknowledges that he "has no idea how or why December 6, 2000 was selected as the end of the class period, nor ... whether it should be the end of the class period." [FN132]

6. VA Linux

a. The VA Linux IPO

VA Linux held its IPO on December 9, 1999, with CSFB serving as its lead underwriter, offering 5,060,000 shares at $30.00 per share. [FN133] At that time, VA Linux had already issued 35,301,586 unregistered shares. [FN134] The VA Linux Prospectus notes that VA Linux's "directors and officers as well as other stockholders and optionholders" had agreed to subject themselves to a 180-day lock-up on their unregistered shares, but does not explicitly state whether each and every one of the 35,301,586 unregistered shares was subject to lock-up. [FN135] VA Linux registered 24,863,635 additional shares simultaneously with its IPO as part of its various stock option benefit plans. VA Linux's filings for these stock option benefit plans explicitly incorporate the contents of the VA Linux IPO Prospectus and set their prices at $30, the same as the IPO price. [FN136] On the first day of trading, VA Linux stock opened at $299.00 and peaked at $320.00, with a trading volume of 7,685,600 shares. Shares closed that day at $239.25, an increase of 698% over the offering price. [FN137]

Plaintiffs allege that 147 of the institutional allocants in the VA Linux IPO, to whom 2,174,850 shares were allocated, entered into tie-in agreements with the allocating underwriter. [FN138] Plaintiffs further allege that purchase orders from these allocants made up 294,230 of the 426,230 total purchase orders placed during the pre-open bid session, when the opening price was set at $299.00, $269.00 above the offering price. [FN139] During the first ten days following VA Linux's IPO, VA Linux allocants purchased a total of 1,572,138 shares in the aftermarket. The same investors sold a total of 165,473 shares during that time. [FN140]

*12 On February 3, 2000, VA Linux announced its acquisition of Andover.net, Inc. in a $913,300,000 stock deal. [FN141] In March and April 2000, VA Linux announced acquisitions, using stock and cash, of Trusolutions, Inc., NetAttach and Precision Insight, Inc. [FN142] On June 7, 2000, a total of 22,940,202 shares became tradeable at the end of a lock-up period. [FN143] On November 6, 2000, the company announced that it would miss its earnings estimates. [FN144] That day, four firms monitoring VA Linux issued analyst reports, and the stock plummeted from $30.00 to $17.38. [FN145] The stock closed at $7.94 on December 6, 2000. [FN146] Fischel asserts that VA Linux underperformed when compared to various market benchmarks by 30 to 66 percentage points from December 9, 1999 to December 6, 2000, and by 26 to 58 points thereafter. [FN147] On January 11, 2001, when the first VA Linux case, *Makaron v. VA Linux Sys., Inc.*, No. 01 Civ. 0242, was filed, VA Linux closed at $9.031 per share. [FN148]

b. VA Linux Class Representatives

(1) Harold Zagoda

On December 9, 1999, Harold Zagoda purchased 10,000 shares of VA Linux stock at $300.00 per share and received an allocation of 300 shares at $30.00 per share. He sold 800 shares on December 13, 1999 for $200.06 per share. On June 3, 2000, he purchased 1,000 shares at $61.50 per share; on July 31, he purchased 1,500 shares at $32.00 per share; and on October 27, he purchased 1,000 shares at $27.50 per share. He held 13,000 shares on December 6, 2000, when the stock closed at $7.94 per share. [FN149] Had he sold his remaining shares that day, Zagoda would have suffered a total pre-December 6, 2000 loss of $2,882,732.00. [FN150]

(2) Spiros and Mary Gianos

Spiros and Mary Gianos purchased 3,000 shares of VA Linux stock on December 10, 1999 for $764,180.00 and an additional 1,000 shares on December 13, 1999 for $200,000.00. Between December 13, 1999 and April 6, 2000, the Gianoses sold their 4,000 shares for $367,183.00, resulting in a loss of $596,997.00. [FN151]

(3) Anita Budich

Anita Budich purchased 13 shares of VA Linux stock on December 15, 1999, at $230.63 per share, which she still owned on December 6, 2000. [FN152] Had she sold them that day, when the stock closed at $7.94 per share, Budich would have suffered a $2,894.97 loss on the transaction.

F. Industry-Wide Events Affecting All Focus Cases During the Class Period

In opposition to these motions, defendants note that throughout the class period, various events affected the markets for each of the six focus cases, and indeed for all of these 310 consolidated actions. *First,* the market for Internet and technology stock underwent an unprecedented boom in the late 1990s,

ignited by the emergence and visibility of the Internet coupled with a streak of economic optimism and experimentation. [FN153] Stock prices soared. [FN154] Eventually, though, the "huge market bubble in Internet stocks burst, propelling prices of those stocks down 90% in a few months," [FN155] prompting a period of "market chaos." [FN156]

*13 *Second,* various reports were published describing the use of tie-in agreements by some allocating underwriters in IPOs. In mid-June of 1999, amidst a period of staggering decline in many Internet stock prices, MSNBC published an investigative report stating that underwriters had employed "a widely practiced marketing scheme known as a 'tie-in' " to artificially inflate the price of Internet IPO stock. [FN157] According to the MSNBC article, this practice extended to "the industry's leading, most prestigious firms." [FN158] The article described a scheme whereby "the opportunity to get in on IPO offerings at cheap, pre-market prices" was "conditioned on an unwritten, oral agreement" that the customer would "give back to the underwriters what amounts to a blank check to buy many more shares ... the minute the deal goes public." [FN159] The MSNBC article attained some notoriety within the investment industry. [FN160] Then, on July 14, 2000, the *Wall Street Journal* published a front page article reporting that Gary Tanaka, a partner in the growth-oriented mutual fund group Amerindo, had made an "agreement to buy shares [of an internet company] in the aftermarket" to increase his fund's allocation in the IPO and that "market experts" believed such agreements "raise regulatory questions." [FN161]

On August 25, 2000, the SEC's Division of Market Regulation issued Staff Legal Bulletin No. 10, warning securities distributors that "solicit[ing] their customers to make additional purchases of the offered security after trading in the security begins" violates Regulation M, promulgated pursuant to the Exchange Act. [FN162] The Bulletin called tie-in agreements "a particularly egregious form of solicited transaction" that "undermine the integrity of the market as an independent pricing mechanism for the offered security." The Bulletin explained that "[u]nderwriters have an incentive to artificially influence aftermarket activity because they have underwritten the risk of the offering, and a poor aftermarket performance could result in reputational and subsequent financial loss."

The release of the SEC Bulletin prompted *Barron's* to publish an article on September 11, 2000, stating that despite its "tame" tone, "[t]he bulletin targets one of the main grease guns now lubricating the IPO machine." [FN163] *The Wall Street Journal* followed suit on December 6, 2000, publishing an article detailing the "new IPO playbook on Wall Street," in which investors who agree to buy in the aftermarket are the ones who receive the largest allocations. [FN164] The article also acknowledged that while the SEC, in its August Bulletin, was "blowing the whistle" to quell the practice of using tie-in agreements, the understandings between investors and brokers were usually informal and unwritten, making them difficult to police. However, despite their "limited and implicit" nature, claimed some investors, "tie-ins ... have a significant market impact ... provid[ing] the rocket fuel that sometimes boosts IPO prices into orbit on the first trading day." [FN165] Prices for all six of the focus stocks remained depressed, and never returned to their offering levels. [FN166]

*14 *Finally,* defendants note that various press reports described apparent conflicts of interest among analysts and underwriters. [FN167] SEC Chairman Arthur Levitt acknowledged the problem on April 13, 1999, issuing an "early warning signal" that the high number of "rosy stock analyses appear to be shaped by the lucrative investment banking ties that analysts' firms have with the companies they're supposed to watch with a critical eye." [FN168] Following Levitt's warning, allegations of analyst conflicts continued to appear in the press. For example, the British *Sunday Times* reported on April 23, 2000, that "[t]he 'Chinese Walls' that once separated researchers and bankers have all but disappeared in today's banking world and researchers have often become blatant pitchmen for bank deals," [FN169] and an August 1, 2000 article in *The Philadelphia Inquirer* quoted a finance professor to the effect that the analyst conflict problem "seems to have gotten worse in recent years," with analysts issuing approximately fifty "buy" recommendations for every "sell" recommendation, a far cry from the six to one ratio that existed in the early 1990s. [FN170]

## III. LEGAL STANDARD

### A. The Requirements of Rule 23

Federal Rule of Civil Procedure 23 governs class certification. To be certified, a putative class must meet all four requirements of Rule 23(a) as well as the requirements of one of the three subsections of Rule 23(b). In this case, as in most cases seeking money damages, plaintiffs bear the burden of demonstrating that the class meets the requirements of Rule 23(a)-- referred to as numerosity, commonality, typicality, and adequacy [FN171]-- and that the action is "maintainable" under Rule 23(b)(3). [FN172] Under Rule 23(b)(3)--the only applicable subsection of Rule 23(b)--"common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be demonstrably "superior" to other methods of adjudication. [FN173]

1. Rule 23(a)

a. Numerosity

Rule 23 requires that the class be "so numerous that joinder of all members is impracticable." [FN174] "Impracticability does not mean impossibility of joinder, but refers to the difficulty or inconvenience of joinder." [FN175] Although precise calculation of the number of class members is not required, and it is permissible for the court to rely on reasonable inferences drawn from available facts, numbers in excess of forty generally satisfy the numerosity requirement. [FN176] The numerosity of plaintiffs' proposed classes, each of which includes thousands of investors, is undisputed.

b. Commonality

Commonality requires a showing that common issues of fact or law affect all class members. [FN177] A single common question may be sufficient to satisfy the commonality requirement. [FN178] "The critical inquiry is whether the common questions are at the core of the cause of action alleged." [FN179]

*15 The commonality requirement has been applied permissively in securities fraud litigation. [FN180] In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied. [FN181]

c. Typicality

The typicality requirement "is not demanding." [FN182] A named plaintiff's claims are "typical" pursuant to Rule 23(a)(3) where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove the defendants' liability. [FN183] "The rule is satisfied ... if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." [FN184]

In addition, a putative class representative's claims are not typical if that representative is subject to unique defenses. [FN185] The test is whether the defenses will become the focus of the litigation, overshadowing the primary claims and prejudicing other class members. [FN186] Accordingly, the commonality and typicality requirements " 'tend to merge' because '[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." ' [FN187]

d. Adequacy

Plaintiffs must also show that "the representative parties will fairly and adequately protect the interests of the class." [FN188] To do so, plaintiffs must demonstrate that the proposed class representatives have no "interests [that] are antagonistic to the interest of other members of the class." [FN189] Courts have also considered "whether the putative representative is familiar with the action, whether he has abdicated control of the litigation to class counsel, and whether he is of sufficient moral character to represent a class." [FN190]

Class representatives cannot satisfy Rule 23(a)(4)'s adequacy requirement if they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interest of the attorneys." [FN191] However, it is well established that "in complex litigations such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected." [FN192]

The requirements of adequacy and typicality tend to bleed into one another. But "[r]egardless of whether

the issue is framed in terms of the typicality of the representative's claims ... or the adequacy of [their] representation ... there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [her]." [FN193]

e. Ascertainability

Although " 'Rule 23(a) does not expressly require that a class be definite in order to be certified[,] a requirement that there be an identifiable class has been implied by the courts.' " [FN194] "This implied requirement is often referred to as 'ascertainability.' " [FN195]

*16 "An identifiable class exists if its members can be ascertained by reference to objective criteria." [FN196] "Class members need not be ascertained prior to certification, but 'the exact membership of the class must be ascertainable at some point in the case.' " [FN197] It must thus be "administratively feasible for a court to determine whether a particular individual is a member" of the class. [FN198] "The Court must be able to make this determination without having to answer numerous fact-intensive questions." [FN199]

2. Rule 23(b)

If plaintiffs can demonstrate that the proposed class satisfies the elements of Rule 23(a), they must then establish that the action is "maintainable" as defined by Rule 23(b). Rule 23(b) provides that "an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition" one of three alternative definitions of maintainability is met. Plaintiffs argue that these putative class actions are maintainable under subsection (b)(3), which requires "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [FN200] Rule 23(b)(3) thus has two elements: "predominance" and "superiority."

a. Predominance

"In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole ... predominate over those issues that are subject only to individualized proof." [FN201] "The 23(b)(3) predominance requirement is 'more stringent' and 'far more demanding than' the commonality requirement of Rule 23(a)." [FN202] Courts frequently have found that the requirement was not met where, notwithstanding the presence of common legal and factual issues that satisfy the commonality requirement, individualized inquiries predominate. [FN203] Nonetheless, the Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud...." [FN204]

b. Superiority

The superiority prong of Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication. [FN205] The court should consider, inter alia, "the interest of the members of the class in individually controlling the prosecution or defense of separate actions" and "the difficulties likely to be encountered in the management of a class action." [FN206]

3. Rule 23(g)

Rule 23(g) requires a court to assess the adequacy of proposed class counsel. To that end, the court must consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action, (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (3) counsel's knowledge of the applicable law, and (4) the resources counsel will commit to representing the class. [FN207] The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." [FN208]

*17 Defendants do not contest the qualifications of class counsel, who easily meet the requirements of Rule 23(g).

B. The Standard of Proof

All of these requirements are aimed at answering two questions: Can the claims be managed as class actions, and should they be managed as class actions? In this regard, the term "claims" encompasses not only plaintiffs' claims, but also any

affirmative defenses that defendants may assert.
[FN209]

Courts must therefore exercise their judgment to
further Rule 23's goals of promoting judicial
economy and providing aggrieved persons a remedy
when it is not economically feasible to obtain relief
through multiple individual actions. [FN210] The
Second Circuit requires a "liberal" construction of
Rule 23. [FN211] Thus, "to deny a class action
simply because all of the allegations of the class do
not fit together like pieces in a jigsaw puzzle [ ]
would destroy much of the utility of Rule 23."
[FN212] Accordingly, in securities cases, "when a
court is in doubt as to whether or not to certify a
class action, the court should err in favor of
allowing the class to go forward." [FN213]

Notwithstanding the general liberality in this circuit
towards class certification motions, the Supreme
Court unequivocally requires district courts to
undertake a "rigorous analysis" that the
requirements of Rule 23 have been satisfied.
[FN214] The burden rests on plaintiffs to make this
showing. [FN215]

The question remains, however, as to what
constitutes a rigorous analysis. Must plaintiffs prove
their case? Must a district court make factual and
legal findings that the proposed class satisfies the
Rule? Given that class certification decisions only
became appealable in 1998, [FN216] and that the
Supreme Court did not even articulate the "rigorous
analysis" standard until 1982, the guidance from
higher courts is scant.

In *Eisen v. Carlisle & Jacquelin,* a securities and
antitrust suit that originated in this district, the
Supreme Court made its first significant
pronouncement on class certification. In that case,
the district court, after conducting a hearing on the
merits of plaintiffs' claims, imposed 90 % of the cost
of the class notice on defendants. Finding fault in
the lower court's approach, the Supreme Court
explained that "nothing in either the language or
history of Rule 23 ... gives a court any authority to
conduct a preliminary inquiry into the merits of a
suit in order to determine whether it may be
maintained as a class action. Indeed, such a
procedure contravenes the Rule ...." [FN217]

Many lower courts have understood this passage in
*Eisen* to mean that on a Rule 23 motion, as on a
Rule 12(b)(6) motion, a court must assume the

allegations contained in the complaint to be true and
draw all inferences in plaintiffs' favor. In several
cases decided shortly after *Eisen,* for instance, the
Second Circuit held that on a Rule 23 motion, "the
facts will be taken as alleged in the complaint or as
they appear without dispute in the record before us."
[FN218]

*18 But such a view--if it was ever correct--is no
longer the prevailing view. As Judge Frank
Easterbrook recently stated, "[t]he proposition that a
district judge must accept all of the complaint's
allegations when deciding whether to certify a class
cannot be found in Rule 23 and has nothing to
recommend it." [FN219]

Just four years after *Eisen,* the Supreme Court
explained in *Coopers & Lybrand v. Livesay* that
although district courts should avoid weighing the
merits of a plaintiff's claims at class certification,
"class determination generally involves
considerations that are 'enmeshed in the factual and
legal issues comprising the plaintiff's cause of
action.' " [FN220] Four years later, the Court
imposed its "rigorous analysis" test. [FN221]
Repeating the just-quoted language from *Livesay,*
Justice Stevens wrote in *General Telephone
Company of the Southwest v. Falcon* that
"sometimes it may be necessary for the court to
probe behind the pleadings before coming to rest on
the certification question.... [A]ctual, not presumed,
conformance with Rule 23(a) remains ...
indispensable." [FN222] In light of this language, it
would be error to presume plaintiffs' allegations to
be true.

The tricky question that remains, however, is: If a
court may not take the allegations of the complaint
as true, what showing must plaintiffs make in
support of their class certification motion? On this
question, the Supreme Court has been silent.

At least two Courts of Appeal have implied that
plaintiffs' showing on a class certification motion
must satisfy the requirements of Rule 23 by a
*preponderance of the evidence* or a similar standard.
In *Szabo v. Bridgeport Machines, Inc.,* the Seventh
Circuit held that where it is necessary to make legal
or factual inquiries on a Rule 23 motion, the court
should "receive evidence (if only by affidavit) and
resolve the disputes before deciding whether to
certify the class," even if such a resolution requires
a "preliminary inquiry into the merits." [FN223]

*Szabo* likened a district court's finding under Rule 23 to the sorts of "inquiries routinely [undertaken] under Rule 12(b)(1) and 12(b)(2) before deciding whether [the courts] possess jurisdiction over the subject matter of the case and the persons of the defendants, the location of the proper venue, application of *forum non conveniens,* and other preliminary issues." [FN224] If such situations are truly analogous to class certification, then a district court would need to find that the proposed class satisfies each of the elements of Rule 23 by a preponderance of the evidence. [FN225]

Even more recently, the Fourth Circuit held--in a securities fraud case--that a district court must make "findings" in resolving a Rule 23 motion, even if such findings overlap with the merits. [FN226] The court explained:

> The ... concern that Rule 23 findings might prejudice later process on the merits need not lead to the conclusion that such findings cannot be made. The jury or factfinder can be given free hand to find all of the facts required to render a verdict on the merits, and if its finding on any fact differs from a finding made in connection with class action certification, the ultimate factfinder's finding on the merits will govern the judgment. A model for this process can be observed in the context of the preliminary injunction practice. Courts make factual findings in determining whether a preliminary injunction should issue, but those findings do not bind the jury adjudging the merits, and the jury's findings on the merits govern the judgment to be entered in the case. [FN227]

*19 The court's analogy to a preliminary injunction hearing suggests that on a class certification motion in the Fourth Circuit, a plaintiff must establish the elements of Rule 23 by evidence sufficient to establish a "likelihood of success on the merits"--a burden similar to the Seventh Circuit's apparent requirement that plaintiffs prove that they satisfy Rule 23 by a preponderance of the evidence. [FN228]

Both the Supreme Court and the Second Circuit, however, have suggested that requiring a plaintiff to establish the elements of Rule 23--especially with those elements are "enmeshed" in the merits--by a preponderance of the evidence would work an injustice. In *Eisen,* the Court noted that

> a preliminary determination of the merits may result in substantial prejudice to the defendant,

since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials. The court's tentative findings, made in the absence of established safeguards, may color the subsequent proceedings and place an unfair burden on the defendant. [FN229]

More recently, in *Caridad v. Metro-North Commuter Railroad,* the Second Circuit reminded district courts that they "must not consider or resolve the merits of the claims of the purported class." [FN230] Rather, a plaintiff is only required to make "some showing." [FN231] Differing from the Seventh and Fourth Circuits, the Second Circuit clearly held that "a weighing of the evidence is not appropriate at this stage in the litigation." [FN232] If a district court is forbidden to weigh the evidence on class certification, *a fortiori,* plaintiffs need not establish the elements of Rule 23 by a preponderance of the evidence.

Even more recently, in *In re VISA Check/Master Money Antitrust Litigation,* the Second Circuit reiterated the "some showing" standard. Juxtaposing the requirements of *Falcon* and *Caridad,* the court held that "[a]lthough a trial court must conduct a 'rigorous analysis' to ensure that the prerequisites of Rule 23 have been satisfied before certifying a class, 'a motion for class certification is not an occasion for examination of the merits of the case.' " [FN233] In the context of expert reports, for example, *VISA Check* teaches that a district court "may not weigh conflicting expert evidence or engage in 'statistical dueling' of experts." [FN234] Instead, the *sole* job of a district court in assessing expert evidence on a class certification motion is to "ensure that the basis of the [plaintiff's] expert opinion is not so flawed that it would be inadmissible as a matter of law." [FN235]

In sum, under the binding caselaw in this Circuit, a district court may not simply accept the allegations of plaintiffs' complaint as true. Rather, it must determine, after a "rigorous analysis," whether the proposed class comports with all of the elements of Rule 23. In order to pass muster, plaintiffs-- who have the burden of proof at class certification--must make *"some showing."* That showing may take the form of, for example, expert opinions, evidence (by document, affidavit, live testimony, or otherwise), or the uncontested allegations of the complaint.

IV. DISCUSSION

## A. Rule 23(a)

### 1. Commonality

**\*20** The common issues of liability presented in these six class actions are overwhelming. Any plaintiff seeking damages--whether proceeding individually or as a class member--will have to establish the following facts, all of which defendants vigorously dispute: [FN236]

. The participation of each defendant in the alleged scheme.

. The existence and terms of tie-in agreements, and the process by which defendants induced allocants to enter into tie-in agreements.

. Defendants' failure to disclose the existence, extent and purpose of the tie-in agreements, and the materiality of that omission.

. The existence and magnitude of excess compensation, and how such payments were induced. If excess compensation was paid in unusual forms, such as wash sales, that those actions amounted to payment of excess compensation.

. Defendants' failure to disclose excess compensation, and the materiality of defendants' omission.

. Where defendants conducted a secondary public offering ("SPO") (*e.g.*, Corvis, Sycamore and iXL), that the SPO offering price was derived from prices that were artificially inflated through market manipulation, that defendants failed to disclose the price inflation, and the materiality of that omission.

. That plaintiffs are entitled to a presumption of reliance.

. That plaintiffs bought their shares in an efficient market.

. That analysts reporting on the specific securities had conflicts of interest, that the analysts failed to disclose such conflicts, and that such omissions were material.

. That analyst coverage was used in the marketing of defendants' IPOs.

. That price-targets set in analyst reports were the product of manipulated prices.

. That tie-in agreements and analyst reports materially affected stock prices.

. That defendants acted with scienter in manipulating stock prices.

. That defendants' manipulation actually caused inflation of stock prices.

. That the artificial inflation of stock prices caused by the unlawful scheme dissipated over time.

. The true value and actual price of the stock at the time plaintiffs purchased and sold stock.

. That press reports and regulatory announcements were neither sufficiently clear nor specific to place plaintiffs on inquiry notice of the alleged scheme with respect to each issuer. [FN237]

Proof of these facts may require extensive discovery and expert testimony, and, if the three and one-half years that have elapsed since the filing of the first suit in these consolidated actions, *Makaron v. VA Linux,* are any indication, the disposition of *all* of the 310 consolidated class actions will take years.

By contrast, only a few authentically individualized issues remain. Most prominent is the need to calculate damages individually, but even that may be accomplished by applying a common formula to each individual claim. [FN238] Indeed, the quantum of damages is the *only* element *plaintiffs* must prove on an individual basis. All other individual questions (*e.g.,* actual knowledge and inquiry notice) will arise because of issues *defendants* choose to raise. In fact, many of defendants' anticipated defenses will require proof that is relevant to large groups within the class; for example, if defendants assert that a plaintiff's claim is barred because the June 16, 1999, MSNBC article placed that plaintiff on notice that the IPO market was tainted by fraud, the determination of that issue is relevant to all plaintiffs who purchased after the MSNBC article. Similarly, if defendants argue that a plaintiff's claim is barred because her trading history shows the payment of undisclosed compensation through "wash" sales, the questions of whether the wash sale constitutes undisclosed compensation and whether a particular pattern of trading activity constitutes a wash sale bear on all similarly situated class members.

**\*21** As a result, plaintiffs have satisfied the Rule 23(a) commonality requirement. Defendants' contention that individual issues will predominate at trial is addressed in the discussion of the Rule 23(b)(3) predominance requirement. [FN239]

### 2. Typicality

"When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual

claims." [FN240] "The factual background of each named plaintiff's claim need not be identical to that of all the class members as long as 'the disputed issue of law or fact occup[ies] essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class.'" [FN241] For example, where plaintiffs allege a market manipulation scheme, typicality may be satisfied despite fluctuations in the amount of inflation over time, even though such fluctuations create differences between class members and class representatives in terms of how much, if any, of their loss was caused by an alleged scheme. [FN242]

Plaintiffs' proposed class representatives allege that they were harmed in the same "unitary scheme" as the rest of the class. [FN243] All class members, including the proposed class representatives, bought shares allegedly inflated by defendants' wrongdoing, and each was damaged thereby. [FN244] The disputed issues are central to the claims of all proposed class representatives and the class members they seek to represent. [FN245]

However, even where a class representative's motivation to prove the underlying fraud is typical of all class members, she may nonetheless be excluded as atypical if she is "subject to unique defenses which threaten to become the focus of litigation." [FN246] Defendants contend that some of plaintiffs' proposed class representatives are subject to unique defenses, and thus atypical, because they: (1) were allocants, engaged in tie-in agreements, or were knowledgeable institutional investors, and thus can be charged with knowledge of the alleged scheme; [FN247] (2) purchased stock after publication of certain articles or after the SEC Bulletin, and thus were on inquiry notice of the alleged scheme; [FN248] (3) were short sellers, momentum traders or day traders, and therefore cannot avail themselves of a presumption of reliance on stock prices; [FN249] or (4) purchased stock after the close of the class period or after filing suit, and therefore cannot be said to have relied on the integrity of the market, because they were willing to buy after learning of the alleged scheme. [FN250]

Defendants' arguments are unavailing. The question of participation resulting in actual knowledge is adequately addressed by the revised class definition. [FN251] The question of whether any particular publication placed a class representative on inquiry notice of the alleged scheme early enough that her

claim would be barred under the section 10(b) statute of limitations is itself a question common to all class members. Defendants may also choose to challenge the rebuttable presumption of reliance with respect to any individual class representative on the grounds that some publication (*e.g.*, the MSNBC article or the SEC Bulletin) placed her on inquiry notice of the alleged scheme. This will not raise a unique defense. To the contrary, a determination that such publications were not sufficient to place the class representative on inquiry notice would inure to the benefit of all class members who, like the class representative, bought after the publication was issued. [FN252] Conversely, if defendants succeed in rebutting the presumption of reliance as to any class representative, then each similarly situated class member would be forced to prove reliance individually, thereby causing individual questions to predominate for those investors and mandating amendment of the class definition or decertification.

*22 Similarly, defendants' attacks on the proposed class representatives' reliance on the integrity of the market because of "unique" investment strategies do not defeat typicality. [FN253] The classes as pled include many investors with similar investment strategies, so any "unique defenses" based on those strategies are in fact common questions. [FN254] Finally, defendants' argument that class representatives who purchased after the close of the class period should be excluded because the "fact that [the] proposed plaintiff purchased shares both after learning of the fraud and after filing suit rebuts the fraud-on-the-market presumption" [FN255] makes no sense. Just because a stock is manipulated at one point in its trading history does not mean that the stock is forever tainted; a plaintiff may legitimately believe that, although his past losses were caused by market manipulation, the effect of that manipulation has dissipated and the stock price once again reflects all available information about its true value.

Plaintiffs' proposed class representatives' claims arise from the same course of events, and require the same legal arguments, as those of the class at large. Consequently, because defendants have not established that any proposed class representative in the six focus cases will assert atypical claims or be subject to unique defenses that "overshadow[ ] the primary claims and prejudic[e] other class members," plaintiffs have satisfied the Rule 23(a)

typicality requirement with respect to their Exchange Act claims. [FN256] However, certain proposed class representatives are atypical with respect to plaintiffs' section 11 classes because they are subject to the unique defense that they cannot trace their shares to an allegedly defective registration statement, as discussed in Part IV.B.4.b. below.

### 3. Adequacy

#### a. Antagonistic Interests

Defendants attack as inadequate any proposed class representative who is either a proposed class representative or a class member in another of these consolidated actions. [FN257] Defendants submit that this dual role creates a conflict of interest because plaintiffs with interests in multiple cases may seek to increase any settlement designation in favor of one action at the expense of another.

Defendants cite two cases in support of their theory, but both are inapposite. *First,* in *duPont v. Wyly,* the court found duPont to be an inadequate class representative because he was also the plaintiff in a personal action he brought against University Computing Company ("UCC"), a defendant in *Wyly.* [FN258] Given that recovery in either case could have rendered UCC judgment-proof, the court found that duPont could not represent the class as he would have an interest in ensuring his own recovery in his personal law suit. [FN259] *Second,* in *Boro Hall v. Metropolitan Tobacco Co.,* Jamaica Tobacco, a proposed class representative, had not only brought a personal antitrust action against Metro Tobacco, but was also a competitor of other class members. [FN260] Furthermore, Metro Tobacco counterclaimed against Jamaica Tobacco, giving Jamaica Tobacco an incentive to settle that other class members would not share. [FN261]

*23 It is overwhelmingly likely that the interests of the proposed class representatives, even in a settlement posture, will be in maximizing the possible recovery of all classes in which the class representative is a member. For a class representative to profit by reducing the recovery of the class she represents for the sake of another class, her monetary interest in the benefitted class would have to be many times greater than her interest in the class she represents, because the money sacrificed by one class is likely to be distributed among three hundred different classes, each with

thousands of class members. There is no evidence that any class representative has such a disproportionately small interest in the class that he, she, or it seeks to represent. Furthermore, this Court will review the fairness of any settlement to ensure that it is reasonable and adequate, and to prevent inequitable distribution. [FN262] For these reasons, membership in more than one of these consolidated classes does not result in an interest so antagonistic as to prevent the adequate representation of absent class members.

#### b. Familiarity with the Action

Defendants argue that the proposed Sycamore class representatives cannot fulfill their roles as fiduciaries to class members because they are unfamiliar both with their case and their duties as class representatives. [FN263] For example, defendants claim that Henderson, a Sycamore class representative, "does not understand the scheme alleged" in the Complaint. [FN264] However, at his deposition Henderson described the alleged laddering, biased analyst reporting, and the inflated commissions allegedly received by underwriter defendants. [FN265] Henderson also described his responsibilities as class representative to include retaining the best available counsel, remaining involved in the litigation, and ensuring that class members are kept informed about the litigation and that their interests are protected. [FN266] Given his familiarity with the case and his responsibilities, Henderson satisfies Rule 23(a)(4)'s adequacy requirement. Gangaiah's testimony demonstrates a similar level of familiarity with the case and an understanding of his responsibilities. [FN267] Lemberg, on the other hand, is clearly not a sophisticated investor and was unable to describe the operation of the alleged market manipulation. [FN268] "Regardless, 'it is unreasonable to expect an ordinary investor ... to have the requisite sophistication and legal background to assist counsel in assessing liabilities under the securities laws.' " [FN269] Even Lemberg, with his basic understanding of the case, satisfies Rule 23(a)(4)'s adequacy requirement. [FN270] No evidence suggests that any proposed class representative is so lacking in her understanding of and involvement in her case that she is inadequate.

#### c. Abdication of Control to Class Counsel

Defendants argue that the proposed class representatives have abdicated to class counsel their

roles as fiduciaries for the class and so are inadequate to serve as representatives. [FN271] Essentially, defendants raise the concern that by relinquishing responsibility for prosecuting the case to class counsel, the proposed representatives will be unable to protect the class members should a conflict of interest arise between class counsel and class members.

*24 Defendants' concern is unwarranted. To the extent that it relates to the representatives' purported lack of participation or control, this argument is merely an extension of the familiarity objection, which I have already rejected. Even if, as defendants claim, counsel and the class representatives have conflicting views of the case, "a great deal of reliance upon the expertise of counsel is to be expected." [FN272] For this reason, "[t]he ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court"--not the proposed class representatives. [FN273]

d. Moral Character

"Although credibility may warrant denying certification, 'it is generally inappropriate to deny certification based on questions going to the credibility of named plaintiffs.' " [FN274] Defendants assert that certain class representatives are inadequate because of their failure to disclose all transactions in the relevant security, inconsistencies in their sworn statements and testimony, and, in the case of Kasbarian, destruction of trading records after learning of the alleged fraud (but prior to filing suit). [FN275]

Defendants' argument has no merit. There is no evidence that any of the conduct here was the result of bad faith or an attempt to deceive defendants or the court. For example, Kasbarian's destruction of trading records occurred before he was aware of the possibility of a lawsuit; he had no reason to believe he would need those records. [FN276] Such conduct does not render Kasbarian inadequate to prosecute the interests of the class. Furthermore, none of the inconsistencies or omissions complained of by defendants, such as failing to disclose certain specific transactions, affect the merits of the class representatives' manipulation claims. Given the complexity of these actions, minor testimonial inconsistencies and omissions are likely to occur.

Only if "the problems alleged call the validity of the plaintiffs' entire case into question" do such credibility issues merit denial of class certification. [FN277] The temporary omission of certain transactions from class representatives' disclosures does not call into question the overall validity of their claim that they lost money because of defendants' manipulation of securities markets. Denial of certification on credibility grounds is not warranted. [FN278]

4. Ascertainability

Ascertainability, not ascertainment, is a prerequisite to class certification. [FN279] Accordingly, at this stage of the proceedings, plaintiffs need not present an airtight method of identifying every class member who may be entitled to a recovery. Rather, the goal at this stage is to define a class that excludes, with broad strokes, segments of the proposed class that are not so entitled. Precise identification of every class member may be accomplished at a later stage. [FN280]

*25 Defendants impliedly argue that because the Federal Rules of Civil Procedure were revised in 2003 to eliminate the availability of "conditional certification," perfect ascertainment of class members should be a prerequisite of class certification. [FN281] This is not so. The 2003 revisions to Rule 23 do not require identification of every class member prior to certification. Rather, to certify a class, a court must simply be "satisfied that the requirements of Rule 23 have been met." [FN282] The court may alter or amend the certification order, or even decertify the entire class, at any point before final judgment if the need arises. [FN283] To require the identification of all class members at the class certification stage would impermissibly require a determination, on the merits, of the validity of each proposed class member's claim. [FN284]

"[I]t is axiomatic that one cannot commit a fraud ... against oneself." [FN285] This truism takes on special importance when the participation of certain investors (*i.e.*, those who engaged in laddering and paid undisclosed compensation) is integral to the alleged scheme. It should be noted that this inquiry--which seeks to ascertain which investors *could not have been defrauded* because of their actual knowledge of the alleged scheme--is not the same as the question of which investors knew