**14**

enough that they *could not have relied* on the market price of securities as an accurate measure of their intrinsic value. [FN286] That question is one of predominance, not ascertainability [FN287] Plaintiffs concede that investors who knowingly participated in the alleged scheme have no right to recover. [FN288] Plaintiffs' revised class definition seeks to exclude these investors. [FN289]

The first and most important inquiry in determining which groups of investors to exclude on the basis of actual knowledge is the question of what the scheme entails. In this case, plaintiffs have alleged that defendants engaged in the following scheme to manipulate the market:

> 15. The Underwriter Defendants set about to ensure that there would be large gains in aftermarket trading on shares following initial public offerings by improperly creating artificial aftermarket demand. They accomplished this by conditioning share allocations in initial public offerings upon the requirement that customers agree to purchase, in the aftermarket, additional shares of stocks in which they received allocations, and, in some instances, to make those additional purchases at pre-arranged, escalating prices ("Tie-in Agreements").
>
> ...
>
> 16. By extracting agreements to purchase shares in the aftermarket, the Underwriter Defendants created artificial demand for aftermarket shares, thereby causing the price of the security to artificially escalate as soon as the shares were publicly issued.
>
> 17. Not content with record underwriting fees obtained in connection with new offerings, the Underwriter Defendants sought, as part of their manipulative scheme, to further enrich themselves by improperly sharing in the profits earned by their customers in connection with the purchase and sale of IPO securities. The Underwriter Defendants kept track of their customers' actual or imputed profits from the allocation of shares in the IPOs and then demanded that the customers share a material portion of the profits obtained from the sale of those allocated IPO shares through one or more of the following types of transactions: (a) paying inflated brokerage commissions; (b) entering into transactions in otherwise unrelated securities for the primary purpose of generating commissions; and/or (c) purchasing equity offerings underwritten by the Underwriter Defendants, including, but not limited to, secondary (or add-on) offerings that would not be purchased but for the Underwriter Defendants' unlawful scheme. (Transactions "(a)" through "(c)" above will be, at varying times, collectively referred to hereinafter as "Undisclosed Compensation"). [FN290]

*26 Clearly, the laddering scheme plaintiffs allege includes three necessary components: the tie-in agreements, the undisclosed compensation, and the escalation in share prices caused by artificial demand. Accordingly, an investor can only be said to have full knowledge of the alleged laddering scheme if she is aware of all three components.

Defendants complain that "[i]dentifying claimants with knowledge would be a massive undertaking in light of plaintiffs' assertion that thousands of [investors] participated in the alleged manipulation in hundreds of offerings." [FN291] Defendants base their assertion of widespread participation on plaintiffs' own allegations, which read in pertinent part:

> 30. Institutional and retail investors, who have received allocations in initial public offerings from various firms, have noted that it was common knowledge that the clients who were forced to pay Undisclosed Compensation to the underwriters, in the form of commissions or otherwise, and who agreed to purchase in the aftermarket received allocations in IPOs.
>
> 31. This industry-wide understanding was sometimes expressed by the Underwriter Defendants and other times implied, but nevertheless invariably communicated between those with the power to make allocations of shares in initial public offerings (the underwriters) and customers seeking the allocations. [FN292]

Defendants' concerns are unfounded. *First,* a close look at these paragraphs is absolutely necessary in view of defendants' argument. Paragraph 30 reveals that the allegation is only that "investors [who are allocants] have noted that...." Thus, the pleading is not that "everyone knew of the scheme" but rather that some allocants "noted" that certain information was common knowledge. This is not a judicial admission by plaintiffs that "everyone knew of the scheme." [FN293] In addition, one must look closely at what these investors say was common knowledge. They say that it was common knowledge that investors who paid undisclosed compensation and agreed to purchase in the aftermarket received allocations. This is not surprising. But they do not say that it was common knowledge that the price of

stock was artificially inflated through illegal tie-in arrangements that *required* a large percentage of allocants to pay undisclosed compensation and to agree to make a certain number of purchases in the aftermarket at escalating prices *in order to obtain* an allocation. That is the guts of the scheme now alleged and nothing in paragraph 30 pleads that such a scheme was commonly known by the investing public.

The same is true of paragraph 31. The paragraph begins with the words "this industry-wide understanding." This raises the question--to what does the word "this" refer? The natural reading is that it refers back to the immediate prior paragraph so that "this industry-wide understanding" is that investors who paid undisclosed compensation and agreed to purchase in the aftermarket received allocations. Paragraph 31 merely pleads that the underwriters made it known that those who paid undisclosed compensation and agreed to purchase stock in the aftermarket received allocations--not that such investors were aware of an illegal scheme to inflate stock prices.

*27 *Second,* even if plaintiffs' allegations are construed as broadly as possible, they do not suggest that many investors knew of the *entire scheme alleged.* Nowhere do plaintiffs allege that allocants were aware that such agreements were part of an industry-wide scheme to inflate share prices through the creation of artificial demand. Many allocants may have been defendants' unwitting tools, each performing certain acts (*i.e.,* paying undisclosed compensation and agreeing to purchase in the aftermarket) that only when aggregated constituted a cohesive scheme to defraud investors. Even to the extent that allocants might have suspected illegality, that wrongdoing could be ascribed a clear and direct goal--the enrichment of the Underwriter defendants through payment of excessive compensation and increased business ensured by tie-in agreements--*not* the indirect scheme to defraud investors by artificially driving up securities prices alleged here. As plaintiffs' counsel has noted, it is unlikely indeed that investors who had full knowledge of the alleged scheme would retain their shares for any length of time after the securities' immediate price gains if they knew that the heavy demand had *artificially* inflated the price, and that the artificial inflation would inevitably dissipate over time. [FN294]

*Finally,* plaintiffs' counsel has explained that,

contrary to defendants' assertions that the *scheme* was "common knowledge" and "invariably communicated" to allocation-seekers, only a limited population of allocants actually paid undisclosed compensation or consummated tie-in agreements:

> MR. WEISS: We're not saying that all allocants were subjected to this kind of requirement for laddering and kickbacks. There's a certain small universe, but we say that the universe was sufficient to be able to doctor this market and to create huge additional compensation that was undisclosed for these underwriters; a scheme, information that was never disclosed by ... the defendants throughout the class period. The population of those allocants who participated is a relatively small population.... [FN295]

This position is more consistent with information gleaned through the discovery process than is the notion that every customer who ever expressed an interest in an allocation somehow became privy to the alleged scheme. [FN296]

After reviewing plaintiffs' new proposed class definition, and considering the traits most likely to separate investors who knew of the alleged scheme from those who did not know, the following represents an ascertainable class: [FN297]

> The Class consists of all persons and entities that purchased or otherwise acquired the securities of [Specific Issuer] during the Class Period and were damaged thereby. Excluded from the Class are:
> (1) Defendants herein, each of their respective parents, subsidiaries, and successors, and each of their respective directors, officers and legal counsel during the Class Period, and each such person's legal representatives, heirs, and assigns, members of each such person's immediate family, and any entity in which such person had a controlling interest during the Class Period;
> *28 (2) all persons and entities that, with respect to [Specific Issuer's] initial public offering: (a) received an allocation, (b) placed orders to purchase shares of that issuer's securities in the aftermarket within four weeks of the effective date of the offering, (c) paid any undisclosed compensation to the allocating underwriter(s), and (d) made a net profit (exclusive of commissions and other transaction costs), realized or unrealized, in connection with all of such person's or entity's combined transactions in [Specific Issuer's] securities during the Class Period; and
> (3) all persons and entities who satisfy all of the requirements of subparagraph (2) with respect to

any of the 309 initial public offerings that are the subject of these coordinated actions, if that offering occurred prior to [Specific Issuer's] offering. [FN298]

As I have previously noted, the ascertainability inquiry does not demand ascertainment at the class certification stage. Certain investors not automatically stricken by the class definition may later prove to have actual knowledge of the alleged scheme. Any securities fraud class action runs the risk of including individual investors who may be ineligible for recovery for any number of reasons, including actual knowledge of the alleged fraud. [FN299] If the possibility that certain class members might eventually be excluded were sufficient to preclude class certification, there could *never* be a securities fraud class action. At trial, defendants may choose to bear the burden and the cost of proving that any particular investor had access to nonpublic information that gave that investor actual knowledge of the alleged scheme. [FN300]

The class definition broadly excludes those investors who exhibit the hallmarks of full participation in the alleged scheme. Defendants are alleged to have defrauded investors by manipulating the conduct of allocants, both in terms of the compensation they paid and their aftermarket activity, thereby creating a market where the aggregate demand caused by tie-in agreements artificially inflated the price of the stock. [FN301] The class excludes those who engaged in the acts alleged to have driven up securities prices, and who exhibited their knowledge of the overall scheme by selling their shares for a profit before the effects of the scheme dissipated. The class definition further excludes those who had knowledge of the scheme in one case from participating in the classes for *any* subsequent IPOs in these consolidated actions, because an investor who has knowledge of the alleged fraud in one offering cannot erase that knowledge thereafter.

Defendants assert that applying plaintiffs' proposed exclusions, which are similar (although not identical) to those just enumerated by the Court, will present serious manageability problems because the information to be gathered with respect to each allocant "would be scattered in multiple formats among many firms" and "would have to be repeated for each of the few thousand allocants in a single case, and for each of the thousands in 309 cases." [FN302] However, the requirement is

ascertainability--not ascertainability with ease. Plaintiffs in a class action meet their burden by pleading a class whose membership is ascertainable, even if actual ascertainment might prove "slow and burdensome." [FN303] Here, plaintiffs note that the class definition factors "are all mathematically certain and objectively determinable," and that the documentary evidence required to apply the proposed definition "is legally required to be retained by broker-dealers" and includes "customer monthly statements, trade confirmations, and order tickets." [FN304]

**\*29** Although defendants mount several attacks on whether the proposed class definition will successfully exclude those with actual knowledge of the alleged scheme, only three require comment. *First,* defendants complain that the class definition "is based only on investor conduct in the '309' IPOs and thus fails to account for knowledge acquired or shown through participation in [ ] the 87 follow-on offerings" conducted by 82 issuers in these consolidated actions. [FN305] Defendants make a good point. An investor who participated in an IPO or traded in its aftermarket in ignorance of the alleged scheme, but later exhibited knowledge of the alleged scheme in connection with a follow-on offering, should be charged with knowledge of the scheme only after her knowing participation. Consequently, the class exclusions apply to participants in follow-on offerings, but only exclude those participants with respect to trades executed *after* they satisfy the class exclusion criteria.

*Second,* defendants claim that the class definition does not adequately exclude investors who had knowledge of the fraudulent scheme through participation in "the 'more than 900' IPOs that plaintiffs allege were manipulated as part of this purported industry wide scheme," but 600 of which are not part of these consolidated actions. [FN306] I note, however, that defendants have vehemently opposed suggestions that they produce any discovery whatsoever with respect to any IPOs other than those consolidated here. [FN307] Defendants may not now have it both ways; if plaintiffs do not obtain full discovery in the IPOs that are not in suit, then defendants are barred from making this argument. On the other hand, if defendants now believe that it would be beneficial to alter the boundaries of this case to give plaintiffs access to discovery in the approximately 600 remaining IPOs, this issue can be revisited. Otherwise, defendants' argument is

without merit.

*Third,* defendants note that "the proposal would not exclude those participants who supposedly paid undisclosed compensation through 'churned' or 'wash' transactions or high volume trades [ ] or those who allegedly obtained allocations by purchasing shares in 'undesired add-on offerings.' " [FN308] Defendants are simply wrong. Allocants who paid undisclosed compensation--in whatever form--are excluded if they also purchased in the aftermarket and profited from their investments. The only question is whether such transactions amount to undisclosed compensation. That is a common question of law, not an ascertainability problem.

Accordingly, plaintiffs' class is ascertainable.

## B. Rule 23(b): Predominance

Defendants challenge plaintiffs' proposed class on the grounds that individualized questions will predominate at trial. Defendants' predominance arguments fall into four major categories: transaction causation, loss causation, damages, and section 11 liability. As discussed earlier, plaintiffs' cases offer a wealth of common issues. [FN309] With the exception of defendants' arguments regarding section 11 tracing (which are limited to the duration of the section 11 classes), none of defendants' arguments defeat plaintiffs' showing of predominance.

### 1. Transaction Causation

\*30 "Like reliance, transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities. It is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transactions." [FN310] Plaintiffs may avail themselves of a rebuttable presumption of reliance under the following theories.

### a. The *Affiliated Ute* Presumption

"In securities fraud claims, reliance is presumed when the claim rests on the omission of a material fact." [FN311] This presumption of reliance is not conclusive. [FN312] Rather, "once the plaintiff establishes the materiality of the omission ... the burden shifts to the defendant to establish ... that the

plaintiff did not rely on the omission in making the investment decision." [FN313] To satisfy this burden, a defendant must prove "that 'even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was.' " [FN314]

Defendants attempt to distinguish *Affiliated Ute* on the following grounds: "*Affiliated Ute* was not a class action, did not involve alleged market manipulation, was not deemed applicable to the manipulation and misrepresentation claims asserted in *Basic,* and would [still] require" that plaintiffs demonstrate the materiality of the omissions and their ignorance of the omitted facts. [FN315] While a court need not address every argument it rejects, a few observations are in order. The Second Circuit has applied *Affiliated Ute* in the class action context. [FN316] Moreover, while *Basic* adopted the "fraud on the market" presumption, it contains no language disfavoring *Affiliated Ute* where both market manipulation and material omissions are alleged. Rather, *Basic* approved the *Affiliated Ute* presumption and presented the "fraud on the market" presumption alongside it in the panoply of securities fraud-related presumptions. [FN317] Finally, the materiality of the alleged omissions here (*i.e.,* the total nondisclosure of the alleged scheme) has not been disputed. Plaintiffs are entitled to an *Affiliated Ute* presumption of reliance to the extent their 10b-5 claims derive from material omissions.

### b. The Fraud on the Market Presumption

Plaintiffs may also avail themselves of a presumption of reliance, under the "fraud on the market" theory, for claims arising from alleged misrepresentations and market manipulation.

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations. [FN318]

\*31 "The fraud-on-the-market doctrine, as described by the Supreme Court in *Basic v. Levinson,* creates a rebuttable presumption that (1)

misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." [FN319] A defendant, of course, may rebut the fraud on the market presumption by showing that it made no material misrepresentations because the alleged misrepresentations were already known to the market--a so-called "truth on the market" defense. [FN320]

### (1) Market Efficiency

The fraud on the market presumption only applies if the market for the security is open and developed enough that it quickly incorporates material information into the price of the security--in other words, the market must be an "efficient" one. [FN321] Defendants object that plaintiffs have not met their evidentiary burden of showing that the markets for the stocks in the focus cases were efficient. [FN322]

The Second Circuit has not adopted a test or method for determining whether the market for a security is efficient. [FN323] Nonetheless, the record in this case contains several strong indications that the market in which the focus stocks traded was efficient. Three facts stand out as particularly probative: *first,* all the focus stocks were traded on the NASDAQ National Market; [FN324] *second,* the focus stocks were traded actively at high volumes throughout the class period; and *third,* the focus stocks were the subjects of numerous analyst reports and extensive media coverage. Under any conceivable test for market efficiency, these three facts are sufficient to meet plaintiffs' Rule 23 burden to make "some showing" that the stocks in question traded on an efficient market.

Ultimately, whether the relevant markets were efficient is a question of fact to be resolved at trial. [FN325] The present finding--that plaintiffs have made "some showing" that the focus markets were efficient--is solely for the purposes of adjudicating the pending motion for class certification, and is not binding on the finder of fact. Based on the evidence presented at trial, the finder of fact may conclude that the relevant markets were efficient, in which case all class members will benefit from a presumption of reliance. On the other hand, the finder of fact may conclude that one or more of the relevant markets was inefficient, [FN326] in which

case those plaintiffs who traded in such markets would be required to make individual showings of reliance.

### (2) Investment Strategies

"[I]t has been noted that 'it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?' " [FN327] Defendants believe there are such investors. Indeed, they claim that so many reckless gamblers engaged in a 'crooked crap game,' and that exposing their folly would be such an arduous task, that any adjudication of their claims would require innumerable individual inquiries.

**\*32** Defendants assert that "thousands of day and momentum traders [ ] were not concerned about the integrity of a stock's market price," and argue that "[f]or both types of traders the integrity of the market price was irrelevant to the investor's decision to purchase." [FN328] According to defendants, "subjective inquiries" into whether these traders actually relied on market integrity would cause individual issues to predominate. [FN329] But day and momentum traders have the same incentives to prove defendants' liability as all other class members, and their presence in a securities class does not create intra-class conflicts. [FN330]

Similarly, defendants challenge plaintiffs' proposed classes on the grounds that they may contain short sellers, [FN331] and that, "[b]ecause short sellers do not rely on the market price, they do not enjoy a presumption of reliance." [FN332] Defendants cite the Third Circuit's decision in *Zlotnick v. TIE Communications* in support of this contention. [FN333] But *Zlotnick* does not control. Not only is *Zlotnick* a Third Circuit case (and therefore not binding on this Court), it pre-dates the Supreme Court's seminal opinion in *Basic*. Indeed, in cases like this one, courts in the Third Circuit and elsewhere have almost unanimously rejected the *Zlotnick* exception. [FN334] One such court noted that:

> Moreover, under defendants['] view of the case, any plaintiff seeking to represent a class of investors of a large, publicly traded corporation would be unable to satisfy reliance, and, hence, typicality, as a matter of law.... It can be stated without fear of gainsay that the shareholders of every large, publicly traded corporation includes

[sic] institutional investors, short-sellers, arbitragers etc. The fact that these traders have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof that price played *no* part whatsoever in their decision making. If defendants believe that this stretches the concept of reliance beyond the intent of the statute, their course of attack is to overrule *Basic,* not render its holding meaningless. [FN335]

This analysis is far more persuasive than defendants' application of the *Zlotnick* exception, and it comports with the policy and practice of certifying securities class actions in this Circuit. [FN336] Accordingly, the presence of short sellers does not undermine plaintiffs' showing of predominance.

(3) Knowledge of Fraudulent Scheme

A presumption of reliance may be rebutted by a showing that the plaintiff had knowledge of the omitted fact or fraudulent scheme. "[I]f the plaintiff has been furnished with the means of knowledge and he is not prevented from using them he cannot say that he has been deceived by the misrepresentations of the other party." [FN337]

Defendants note that "pervasive press reports mirrored the allegations in these cases," [FN338] pointing to several occasions exposing class members, through the national media or official releases, to information which, defendants claim, "would have made any reader aware of the allegations here and put them on notice to inquire further." [FN339] Defendants maintain that determining "which purchasers knew what, and when ... will require ... subjective inquiry into each claimant's state of mind." [FN340]

*33 However, the question of whether publicly available information "would have made any reader aware of the allegations here" [FN341] presents an important class-wide common issue. [FN342] If any of defendants' proffered publications is determined to have been so relevant, clear and widely disseminated that knowledge of the alleged scheme must be imputed to the universe of investors in the stock market, then reliance cannot be proven individually or collectively. [FN343] Furthermore, differences among class members in terms of access to publicly available information (*e.g.,* whether certain investors *actually* saw all publicized

materials, or whether they had access to sophisticated investment advice in interpreting the releases) are insufficient to defeat certification or rebut plaintiffs' presumed reliance. [FN344]

2. Loss Causation

In addition to transaction causation, plaintiffs must prove loss causation; that is, they must show a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." [FN345] Plaintiffs may submit an expert report suggesting a methodology for determining such a link. [FN346] "A district court must ensure that the basis of [such an] expert opinion is not so flawed that it would be inadmissible as a matter of law." [FN347] At the class certification stage, the question "is whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive;" a district court should therefore refrain from "weigh[ing] conflicting expert evidence or engag[ing] in 'statistical dueling' of experts." [FN348] Under Rule 23(b)(3), plaintiffs must present a methodology for determining loss causation that may be commonly applied to all members of the class. [FN349]

Unlike damages, which require a showing of the quantum of loss, loss causation requires only that there be a causal connection between the alleged wrongdoing and plaintiffs' loss. [FN350] In a market manipulation case, plaintiffs can satisfy their burden by presenting a means to determine that the scheme caused an increase in price that dissipated throughout the class period. [FN351] To satisfy Rule 23 in the context of loss causation, plaintiffs need not precisely quantify the proportion of each plaintiff's loss attributable to dissipation; they need only provide a mechanism showing that the alleged scheme actually caused *some* loss to all class members. [FN352] Plaintiffs must, however, provide a mechanism for proving that inflation dissipation occurred throughout the class period. Otherwise, investors who purchased after all artificial inflation created by the alleged scheme had dissipated would be differently situated (*i.e.,* they would be forced to prove loss causation individually using alternatives to the class method of proof), and individual questions would dominate the loss causation inquiry.

*34 Plaintiffs submit the expert opinion of Professor Fischel to provide a method of proving that the alleged scheme inflated stock prices as early as the beginning of trading, and that the inflation dissipated throughout the class period. [FN353] Fischel's methodology for proving loss causation depends on two separate analyses: *first,* an analysis of the initial inflation caused by alleged tie-in agreements; and *second,* an analysis of the dissipation of that inflation over time.

Fischel empirically demonstrates the effect of tie-in agreements on demand and price through an analysis of the pre-open bid sessions for five of the six focus cases. [FN354] During the pre-open bid session, in which a new issue takes dealer quotes before actual trading begins, the lead underwriter opens the bidding and investors may enter bids to purchase shares. The level of demand in the pre-open bid session affects bid prices. [FN355] Fischel describes and analyzes price changes in the "inside bid"--the highest bid at any given time--with respect to the bidding activity of the lead underwriter and investors alleged to have executed tie-in agreements. [FN356] Institutional investors with alleged tie-in agreements constituted much of the demand for shares in each pre-open bid session, and purchase orders executed after these sessions accounted for a substantial portion of all shares issued in the IPO. [FN357] Demand by investors with tie-in agreements remained strong throughout the pre-open bid session. [FN358] Fischel notes that, "consistent with the substantial purchase orders at the end of the pre-open bid session, the opening price for each of the focus case stocks was substantially higher than the offer price." [FN359]

Fischel also observes that the lead underwriter in each pre-open bid session set the initial bid substantially higher than the offering price, and that "[t]his is consistent with ... knowledge of the volume of pending purchase orders." [FN360] Fischel asserts that:

> The literature has documented that even before the opening of trading, significant price discovery takes place and that a large proportion of the change in price from the offer price to the opening price is captured in the first quote entered by the lead underwriter. This evidence supports the conclusion that the alleged tie-in agreements affected prices before trading began. [FN361]

Fischel also notes that "activity in the lead underwriter's bid during the pre-open bid session was [frequently] followed by an increase in the inside [best] bid." [FN362]

Trading activity of allocants with alleged tie-ins was not limited to purchase orders executed at the beginning of trading. Rather, Fischel notes that allocants "purchased substantial quantities of shares in each focus [stock's] aftermarket." [FN363] Fischel also undertakes a regression analysis to show that the size of each allocation correlates to the quantity of stock that allocant purchased in the aftermarket. [FN364] To explain how such purchases might inflate prices, Fischel notes that "Keim and Madhavan ... find that a buyer-initiated trade of only 0.16 percent of a company's outstanding stock is associated with a *permanent* price increase of 4.7 percent in the stock price." [FN365]

*35 Having thus established a mechanism for proving that the alleged scheme caused artificial inflation, Fischel turns to the problem of how to determine the duration of that inflation and its rate of dissipation. Fischel adopts the "Comparable Index Approach," in which the overall performance of an issue is compared to a benchmark index averaging the price movements of comparable stocks. [FN366] Defendants' expert asserts, and Fischel concedes, that the Comparable Index Approach is usually invoked to determine *damages,* not loss causation. [FN367] Specifically, "[t]he premise of the Comparable Index Approach is that all changes in the price of a company's stock not accounted for by movements in the comparable company stock prices and not accounted for by movements in the general market are attributed to the alleged fraud." [FN368] Thus, as generally applied, the Comparable Index Approach is used to calculate damages where loss causation has already been proven or is assumed; that is, it "*assumes loss causation rather than detects it.*" [FN369]

However, Fischel has already provided a method to show that the alleged scheme artificially inflated stock prices. Plaintiffs' loss causation calculation does not depend on the Comparable Index Approach. It is, however, a component of the analysis. Once artificial inflation has been established by the mechanisms discussed earlier (*i.e.,* by a lead underwriter making a high initial bid in the pre-open bid session and raising its own bid; by creation of artificial demand through tie-in agreements, which causes prices to rise; and by

permanent changes in beliefs caused by buyer-initiated trading), all that remains is detecting the dissipation of that inflation. Here, each of the focus stocks ultimately plummeted in value to levels far below their offering prices and not far above zero, the lowest possible value. Some loss causation may be inferred simply from the disappearance of the original inflation. [FN370] After all, when an artificially inflated stock tumbles to a fraction of its offering price, it is logical to assume that the artificial inflation has dissipated. The Comparable Index Approach need not carry the load of proving the *existence* of inflation or dissipation.

Fischel proposes only to use the Comparable Index Approach to determine the *duration* of dissipation. [FN371] Under this framework, Fischel finds that each of the focus stocks significantly overperformed on the first day of trading and underperformed in the long term when compared to various benchmark indices. [FN372] Fischel attributes the securities' initial overperformance to artificial inflation in the immediate aftermarket and their later underperformance, at least in part, to a gradual dissipation of that inflation. The rate of dissipation, and its existence, can be inferred from the fact that, in the long run, the focus stocks consistently declined further in price than comparable market benchmarks, which presumably reflected the same market-wide variables. Fischel notes that the markets for the six focus cases significantly underperformed market benchmarks even after December 6, 2000, implying that the stock price continued to shed inflation throughout and after the close of the class period. [FN373] As a result, Fischel has established a method by which a finder of fact could conclude both that stock prices were artificially inflated and that the inflation dissipated throughout the class period, continuing even after December 6, 2000. [FN374]

*36 Fischel's theory is not fatally flawed. Although defendants present a cadre of experts clamoring to apply alternative methods of determining loss causation, [FN375] now is not the time to "weigh conflicting evidence or engage in 'statistical dueling' of experts." [FN376] Defendants are free to attack Fischel's theory at trial or present alternative theories if they choose.

Plaintiffs have satisfied their burden at this stage to articulate a theory of loss causation that is not fatally flawed. Moreover, because plaintiffs' theory posits

protracted dissipation throughout the proposed class period, it presents common questions of liability--namely, whether tie-in agreements artificially inflated stock prices and the duration of any such inflation (*i.e.*, whether the inflation dissipated abruptly or over the course of the entire class period). Defendants' alternative theories of loss causation, which generally require intensive trade-by-trade analysis of transitory price effects, would, if adopted by the jury, answer that question in the negative. [FN377] Defendants provide various criticisms of Fischel's "methodology," but these attacks go to the weight of Fischel's conclusions and must be reserved for trial. [FN378] Defendants also point out that Fischel's analysis may not be able to quantify the amount of inflation or dissipation at any given time. [FN379] However, as I have already noted, loss causation only requires that plaintiffs establish *some* inflation and dissipation, not the precise size of the inflation or amount of the loss. That inquiry relates to damages, not loss causation, and is therefore addressed in the next section.

3. Damages

If plaintiffs are successful in proving liability, they will have to provide a methodology for calculating damages. In any publicly traded securities market, some investors own many shares and some own only a few; some maintain their portfolios for years, and some trade shares daily. Thus, the extent of the harm suffered by each class member as a result of the alleged misconduct is, by definition, an individualized inquiry. [FN380]

However, where common questions otherwise predominate, the need for individualized damages inquiries is not enough to scuttle the class action. [FN381] Rather, the Second Circuit has recognized several methods by which a court may address the problem of individual damages while securing the benefits of the class action device for common issues of liability:

> There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

[FN382]

*37 "Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." [FN383] Although there are extreme cases in which calculation of damages may present such an intolerable burden that it renders class certification inappropriate, [FN384] "such cases rarely, if ever, come along." [FN385]

"Before and after the enactment of the PSLRA, absent class members in securities fraud cases have been awarded a common fund of damages computed by the trier of the fact, based usually on expert testimony ...." [FN386] For example, a jury may be asked to compute the "true value" of a stock over time, including fluctuations due to various price-affecting events, and consequently determine by what degree the stock was inflated at any given time during the class period. [FN387] Thus, important common questions regarding damages, as well as loss causation, may be resolved by asking the jury to trace a "graph delineating the actual value of the stock throughout the class period. When compared with a comparable graph of the price the stock sold at, the determination of damage will be a mechanical task for each class member." [FN388]

Plaintiffs suggest just such an approach. [FN389] Plaintiffs have proposed using both the "Event Study Approach" and the "Comparable Index Approach" to determine the effect that any given event during the class period had on stock prices. [FN390] While assessing the effect of each salient event over hundreds of days in any given class period may be a laborious and time-consuming task, it nonetheless provides a common basis for calculating the damages of all class members. By contrast, an alternative approach that would force each class member to prove in individual proceedings how various events impacted the stock price when she purchased and sold stock would be staggeringly inefficient, would provide countless opportunities for juries to render inconsistent verdicts, and, if the cost were placed on individual class members seeking to prove damages, would likely present a formidable (if not complete) barrier to recovery. [FN391]

Accordingly, by suggesting a method by which a jury could determine the true value of securities over time, plaintiffs present the common question of magnitude of damages. At this stage of the proceedings, plaintiffs have met their burden to establish that common questions predominate. [FN392]

4. Section 11 Claims

a. Tracing

"Aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act." [FN393] A plaintiff successfully traces her shares if she demonstrates that her stock was actually "issued pursuant to a defective [registration] statement;" it is "insufficient that [her] stock 'might' have been issued pursuant to a defective [registration] statement." [FN394] This requirement has been strictly applied, even where its application draws arbitrary distinctions between plaintiffs based on the remote genesis of their shares. [FN395]

*38 Tracing may be established either through proof of a direct chain of title from the original offering to the ultimate owner (e.g., if the owner was an allocant in the IPO, or took actual physical possession of share certificates directly from an allocant), or through proof that the owner bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement. [FN396] The modern practice of electronic delivery and clearing of securities trades, in which all deposited shares of the same issue are held together in fungible bulk, makes it virtually impossible to trace shares to a registration statement once additional unregistered shares have entered the market. [FN397] Even where the open market is predominantly or overwhelmingly composed of registered shares, plaintiffs are not entitled to a presumption of traceability. [FN398]

Defendants assert that the actual tracing of each plaintiff's stock is "a necessarily individualized inquiry." [FN399] Furthermore, defendants proclaim that, insofar as each class member must individually prove that her shares were issued pursuant to the relevant registration statement, the necessity of trying individual issues should disqualify the class under the Rule 23(b)(3) predominance requirement. [FN400]

Defendants are correct. If the classes for each of the focus cases are to extend from the date of the

IPO to the last day of plaintiffs' proposed class period, December 6, 2000, then each class will include plaintiffs who purchased their shares after untraceable shares entered the market. While some individual class members who purchased after the end of the class period might be able to trace their shares successfully, the resulting inquiry would fragment the class action into myriad mini-trials on the subject of tracing. Plaintiffs' proposed section 11 classes are suitable only for those periods in which class members' ability to trace their shares is susceptible to common proof. [FN401] Such generalized proof is possible if plaintiffs' section 11 class periods are limited to exclude all purchases made after untraceable securities entered the market. As a result, the section 11 class periods for each of the focus cases must end at the time when unregistered shares became tradeable. [FN402]

For each focus case, the filed registration statement summarizes the number and status of outstanding shares, and tells investors when outstanding shares will qualify to enter the market, including information as to when lock-ups will expire and at what point previously issued shares become eligible for trading under Rule 144, promulgated pursuant to the Securities Act. [FN403] Rule 144 provides, in pertinent part, that affiliated holders of restricted securities who have satisfied the statutory holding period must wait until the issuer "has been subject to the reporting requirements of [either] section 13 ... or section 15(d) of the [Exchange Act] ... for a period of at least 90 days" and "has filed all the reports required to be filed thereunder during the 12 months preceding such sale...." [FN404] In either case, the issuer becomes subject to the filing requirements of the Exchange Act when its filed registration statement becomes effective. [FN405]

*39 In the Corvis and VA Linux cases, additional stock offerings were consummated before the 90-day Rule 144 holding period expired. [FN406] Where there are multiple public offerings of a security, a plaintiff is entitled to a presumption that she has satisfied the tracing requirement of section 11 only if every such offering was defective. [FN407] However, in both cases, the additional offerings explicitly incorporated the contents of the IPO prospectuses. [FN408] Thus, to the extent that the IPO registration statements are defective, so are the additional registration statements.

Under Rule 144(k), non-affiliates who hold unregistered shares may sell their shares without restriction after they have held the shares for a period of two years. [FN409] Defendants imply that some unregistered shares might have been tradeable at the time of the IPOs in Corvis, Firepond and Sycamore. No such inference is supported by the facts. In Corvis, all outstanding shares issued before 1999 (and therefore tradeable under Rule 144(k) before 2001) were issued to affiliates, and defendants have produced no evidence that such shares were ever transferred to non-affiliates. [FN410] In Firepond, all Rule 144(k) shares were subject to 180-day lock-up agreements. [FN411] In Sycamore, the company did not exist two years prior to the IPO, making it impossible for any non-affiliate to have held unregistered shares for the two years required by Rule 144(k). [FN412]

Shares issued in the context of stock-based acquisitions (like those in the VA Linux case) cannot circumvent the required holding periods of Rule 144. Before trading unregistered stock, a recipient must hold the stock for "[a] minimum of one year ...." [FN413] Thus, a recipient of stock in VA Linux's first acquisition--of Trusolutions, Inc., on March 28, 2000--would not have been able to sell that stock until March 28, 2001, well after the end of plaintiffs' proposed class period.

Accordingly, plaintiffs' section 11 class periods are appropriately limited to the periods between each IPO and the time when unregistered shares entered the market. In Corvis, Engage, Firepond, iXL and Sycamore, unregistered shares became tradeable 90 days after the IPO pursuant to Rule 144. In VA Linux, all outstanding shares appear to have been subject to 180-day lock-up agreements, [FN414] so the VA Linux section 11 class period extends for 180 days after the IPO. Thus, plaintiffs' section 11 class periods are limited to the following: Corvis, July 28, 2000 to October 26, 2000; Engage, July 20, 1999 to October 18, 1999; Firepond, February 4, 2000 to May 4, 2000; iXL, June 2, 1999 to August 31, 1999; Sycamore, October 21, 1999 to January 19, 2000; and VA Linux, December 9, 1999 to June 12, 2000.

b. Adequacy and Typicality of Section 11 Class Representatives

A class representative's lack of standing under section 11 qualifies as a "unique defense" sufficient to defeat the typicality of a proposed class representative. [FN415] Moreover, because section

11 grants a right of recovery only to plaintiffs who sold their securities below the offering price, and limits that recovery to the difference between the sale and offering prices (or the difference between the offering price and the value of shares still held at time of suit), plaintiffs who sold all their traceable stock at prices above the offering price have no right to recover under section 11. [FN416] Defendants posit that any proposed class representative who sold her shares at a price in excess of the offering price should be excluded because, absent any possibility of section 11 recovery, her claims are not typical of section 11 class members who have a right to recover damages. [FN417] Defendants are correct. Besides the fact that such a class representative would be subject to unique defenses with respect to her section 11 claims, the foreclosure of any hope for recovery calls into question her motivation to fairly and adequately protect the interests of the class. [FN418]

*40 Consequently, representatives of plaintiffs' proposed section 11 classes must (1) have purchased shares during the appropriate class period, and (2) have either sold the shares at a price below the offering price or held the shares until the time of suit.

Accordingly, the following class representatives are appropriate representatives for their section 11 classes: for Corvis, Huff and Rooney; for Engage, Pappas; for Firepond, the Collinses, Zhen and Zitto; and for VA Linux, Budich and Zagoda. Because plaintiffs have no suitable class representatives for their iXL and Sycamore section 11 classes, their motion to certify those classes must be denied.

C. Rule 23(b)(3): Superiority

Plaintiffs must show that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." [FN419] Rule 23 suggests a number of nonexclusive factors the trial judge can weigh to determine superiority, including "the interest of members of the class in individually controlling the prosecution." [FN420] In a case with thousands or millions of claimants, though, a class member's interest in *aggregating* the claims substantially outweighs her interest in individual control of the litigation. "The more claimants there are, the more likely a class action is to yield substantial economies in litigation." [FN421] "[I]n enacting Rule 23(b)(3), 'the Advisory Committee

had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.' " [FN422] In a securities class action where millions of shareholders are damaged by fraudulent conduct, none but the very largest individual investors have the capital to prosecute their claims individually. This is especially true in a case such as this one, where expert reports, voluminous briefing and vast discovery are par for the course. [FN423] However, when investors' claims are aggregated, even an investor who bought a single share has the chance to recover for defendants' alleged wrongdoing. This benefit of the class action form is not easily overcome. [FN424]

Any consideration of superiority must be framed in this context. Thus, the mere possibility of complexity or unmanageability does not defeat a class action. [FN425] Because a securities fraud class action offers the opportunity for redress of wrongs where victims would otherwise be unable to press their claims, "a class action has to be unwieldy indeed before it can be pronounced an inferior alternative--no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied--to no litigation at all." [FN426]

Moreover, the superiority of the class action form to alternative means of adjudication cannot--and should not--be considered in a vacuum. "In many respects, the predominance analysis ... has a tremendous impact on the superiority analysis ... for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." [FN427] Any consideration of superiority must therefore be subjective; it must weigh the benefits and costs of allowing the class action to proceed *versus* the benefits and costs of individual adjudication. [FN428]

*41 In this case, class adjudication is clearly superior to any other form of adjudication. Although preparation and trial of 310 class actions, each of which includes the multitude of common questions presented here, is daunting, preparation and trial of 310 *million* individual suits with virtually identical allegations would be impossible for all participants--plaintiffs, defendants and the courts. Rule 23 is intended to facilitate, *not prevent*, litigation of a multitude of claims with substantially

identical allegations. [FN429]

Defendants make little effort to propose alternative means of adjudication that might be superior to the class action form. The two alternative forms defendants suggest--individual prosecution of claims and NASD arbitration [FN430]--are both impractical for the reasons just described. Because of the costs arbitration or litigation impose on small-stakes securities fraud plaintiffs, neither could result in any recovery for the vast majority of investors included in the class definition, even if defendants' liability is ultimately proved. As neither the defendants nor the Court can suggest a means of adjudicating plaintiffs' claims that would be superior or even comparable to the efficiency and fairness of a class action, plaintiffs have satisfied the superiority requirement of Rule 23(b)(3).

## V. CONCLUSION

Accordingly, plaintiffs' motion for class certification is granted in part and denied in part for each of the six focus cases. Plaintiffs' Exchange Act classes are certified to the extent they include investors who acquired shares between the date of the IPO and December 6, 2000 and who satisfy the Court's revised class definition. Plaintiffs' section 11 classes for Corvis, Engage, Firepond and VA Linux are certified as to all investors that satisfy the revised class definition and acquired shares before unregistered shares entered the market, and sold those shares for a loss at prices below the offering price. All of plaintiffs' proposed class representatives except Pappas are suitable to prosecute the Exchange Act claims. Huff, Rooney, Pappas, the Collinses, Zhen, Zitto, Budich and Zagoda are appropriate class representatives for their respective section 11 classes. Because plaintiffs have proposed no suitable class representatives for their iXL or Sycamore section 11 classes, those classes cannot be certified.

SO ORDERED:

FN15. *See* Corvis Corp. IPO Facts, Ex. A to 2/24/04 Declaration of Fraser L. Hunter, Jr. in Support of Corvis Opposition ("Hunter Corvis Decl.").

FN16. Corvis Mem. at 20 n.19.

FN17. *See* 7/27/00 Form S-1/A filed by Corvis ("Corvis Form S-1/A"), Ex. N to Hunter Corvis Decl. at II-2-5.

FN18. *See id.*

FN19. *See* Corvis Corp. (CORV) Market-Wide Trading Data for Day One, Ex. D to Hunter Corvis Decl.

FN20. *See* Summary of Alleged Tie-In Agreements ("Fischel Tie-In Summary"), Ex. A to 7/12/04 Fischel Report.

FN21. *See* Purchase Orders for the Focus Case Stocks in the Pre-Open Bid Session ("Fischel Purchase Order Summary"), Ex. B to 7/12/04 Fischel Report.

FN22. *See* Aftermarket Trading in Corvis Corp. by CSFB Allocated Accounts, Ex. D-1 to 7/12/04 Fischel Report.

FN23. *See* Corvis Corp. Chronology of Events from July 28, 2000 to December 6, 2000 ("Corvis Chronology"), Ex. F to Hunter Corvis Decl., at 1.

FN24. *See id.* at 3.

FN25. *See* 10/2/00 Form S-8 for Corvis ("October 2, 2000 Prospectus"), Ex. N to Hunter Corvis Decl.

FN26. *See id.* at II-1.

FN27. *See* Corvis Chronology at 5-6.

FN28. *See id.* at 6.

FN29. *See* 1/20/04 Fischel Report ¶¶ 26, 29. "Underperformed" and "overperformed," as the terms are used by Fischel, mean that stock prices either declined or rose relative to the price movements of various benchmark indices. *See* 1/20/04 Fischel Report ¶¶ 23-26. For example, if the benchmark suggests that the market lost 50% of its value during the period, and a stock lost 80% of its value, then the stock is said to have "underperformed" the benchmark by 30 percentage points. Conversely, if another stock lost only 20% of its value over that period, it "overperformed" by 30 percentage points. As discussed in Part IV.B.2., *infra,* plaintiffs assert that price

2005 WL 469618                                                                  Page 2
--- F 3d ---
(Cite as: 2005 WL 469618 (5th Cir.(Tex.)))

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available

United States Court of Appeals,
Fifth Circuit
Jerry KRIM; et al , Plaintiffs,
David Petrick, Lead Plaintiff; Bret Beebe, Lead
Plaintiff; Gene Burke, Lead
Plaintiff, Plaintiffs-Appellants,
Dawn Rusing-Bell; Kishore Mehta; Dierdre
Humphrey, Appellants,
v
PCORDER COM, INC ; Ross A Cooley; Trilogy
Software, Inc ; Peter J Barris;
Joseph A Liemandt; Robert W Stearns; Linwood A
Lacy, Jr , Defendants-
Appellees
Jean Schwartz Burke, On Behalf of Herself and All
Others Similarly Situated;
Plaintiff-Appellant,
Dawn Rusing-Bell; Kishore Mehta; Dierdre
Humphrey, Appellants,
v
PCORDER COM, Inc ; Ross A Cooley; Cristina C
Jones; James J Luttenbacher;
Joseph A Liemandt; Peter J Barris; Linwood A
Lacy, Jr.; Robert W Stearns;
Trilogy Software, Inc ; Goldman, Sachs & Co ;
Credit Suisse First Boston; SG
Cowen & Co , Defendants-Appellees
Barry J Pinkowitz, On Behalf of Himself and All
Others Similarly Situated,
Plaintiff,
Dawn Rusing-Bell; Kishore Mehta; Dierdre
Humphrey, Appellants,
v
PCORDER COM, Inc ; Ross A Cooley; Cristina C
Jones; James J Luttenbacher;
Joseph A Liemandt; Peter J Barris; Linwood A
Lacy, Jr ; Robert W Stearns;
Trilogy Software, Inc ; Goldman, Sachs & Co ;
Credit Suisse First Boston; SG
Cowen & Co , Defendants-Appellees
No. 03-50737.

March 1, 2005

**Background:** Investors brought Securities Act suits against corporation, individual directors, controlling shareholder, and investment bankers, alleging false registration statement. The United States District Court for the Western District of Texas, Sparks, J , consolidated actions, denied investors' motion for class certification, 210 F.R.D. 581, and dismissed remaining claims, 2003 WL 21076787. Investors appealed dismissal of individual claims, and would-be intervenors appealed denial of their motion to intervene

**Holdings:** The Court of Appeals, Patrick E. Higginbotham, Circuit Judge, held that:
(1) aftermarket buyers' statistical evidence showing high probability that at least some of their stock was traceable back to public offering in question was insufficient, by itself, to confer standing under Act, and
(2) no right to intervene existed after District Court's dismissal of remaining individual claims
Affirmed.

**[1] Securities Regulation 25.19**

349Bk25.19 Most Cited Cases
Investor's Securities Act right of action against issuer of false registration statement is available not only to those who purchased their stock during relevant public offerings, but also to aftermarket purchasers, as long as stock is traceable back to relevant public offering Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**[2] Federal Courts 776**
170Bk776 Most Cited Cases

**[2] Federal Courts 850.1**
170Bk850.1 Most Cited Cases
Court of Appeals generally reviews de novo dismissal for lack of subject matter jurisdiction, and reviews jurisdictional findings of fact for clear error. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[3] Federal Courts 33**
170Bk33 Most Cited Cases
In considering challenge to subject matter jurisdiction, district court is free to weigh evidence and resolve factual disputes Fed.Rules

© 2005 Thomson/West No Claim to Orig. U.S Govt Works

2005 WL 469618
--- F 3d ---
(Cite as: 2005 WL 469618 (5th Cir.(Tex.)))

Civ.Proc.Rule 12(b)(1). 28 U.S.C.A

**[4] Federal Courts 817**
170Bk817 Most Cited Cases
Court of Appeals reviews de novo denial of motion to intervene as of right.

**[5] Federal Courts 817**
170Bk817 Most Cited Cases
Court of Appeals reviews for abuse of discretion denial of permissive motion to intervene.

**[6] Securities Regulation 25.19**
349Bk25.19 Most Cited Cases
In Securities Act suit alleging false registration statement, plaintiff aftermarket buyers' statistical evidence showing high probability that at least some of their stock was traceable back to public offering in question was insufficient, by itself, to satisfy Act's "any person acquiring such security" criterion, and thus insufficient to confer standing; statistical tracing went to whether number of shares held by given buyer, if drawn at random, would likely include at least one tainted share, rather than whether and in what amount buyer's particular shares were tainted, and thus would impermissibly expand traceability criterion, which by its terms conferred standing only on those who actually purchased tainted stock, not those who probably purchased it. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k

**[7] Federal Civil Procedure 331**
170Ak331 Most Cited Cases
Once district court had denied class certification in Securities Act suit, and dismissed as moot named investor's remaining claim on ground that defendant had made settlement offer equal to investor's full recovery under Act, other investors could not intervene, since no existing suit remained within court's jurisdiction; would-be intervenors did not seek to appeal denial of class certification, and fact that court had not awarded prejudgment interest to named investor did not preclude full satisfaction of named investor's claim, so as to keep named suit active despite involuntary settlement, since Act did not require prejudgment interest. Securities Act of 1933, § 11(e), 15 U.S.C.A. § 77k(e)

James D. Baskin, III (argued), The Baskin Law Firm, Austin, TX, Joe R. Whatley, Jr., Whatley Drake, Birmingham, AL, for Plaintiffs-Appellants and Appellants.

James Edward Maloney, Baker Botts, Houston, TX, for pcOrder com, Inc, Ross A Cooley, Christina C. Jones and James J. Luttenbacher

Noel M.B. Hensley (argued), P. Nicholas Even, Richard Thaddeus Behrens, Haynes & Boone, Dallas, TX, for Trilogy Software, Inc, Peter J Barris and Joseph A. Liemandt.

Robert W. Brownlie, Gray, Cary, Ware & Freidenrich, San Diego, CA, Alan D. Albright, Geoffrey Robert Unger, Gray, Cary, Ware & Freidenrich, Austin, TX, for Robert W. Stearns and Linwood A Lacy, Jr

Harry M. Reasoner, Karl S. Stern, Gary Ewell, Vinson & Elkins, Houston, TX, for Goldman Sachs & Co, Credit Suisse First Boston and SG Cowen & Co

Appeal from the United States District Court for the Western District of Texas

Before HIGGINBOTHAM, DAVIS and GARZA, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

*1 Investors who purchased stock in pcOrder com brought this consolidated securities action under Sections 11 and 15 of the Securities Act of 1933 against defendants pcOrder com, its directors, its controlling shareholder Trilogy Software, and its investment bankers (collectively "PCOrder"), alleging that the registration statements filed with the Securities and Exchange Commission were false and misleading The district court concluded that, with one exception, the investors lacked Section 11 standing because they could not trace their stock to the registration statements in question. Finding the remaining investor's claims moot, the court dismissed all of the claims and denied a third-party motion to intervene. We affirm.

I

PCOrder conducted an initial public offering of pcOrder.com stock on February 26, 1999, and a secondary public offering on December 7, 1999 In connection with each offering PCOrder filed a registration statement with the SEC

© 2005 Thomson/West No Claim to Orig U.S. Govt Works

2005 WL 469618
--- F 3d ---
(Cite as: 2005 WL 469618 (5th Cir.(Tex.)))

Several holders of pcOrder.com stock filed multiple lawsuits against PCOrder under Section 11 of the Securities Act of 1933, which provides a right of action to "any person acquiring" shares issued pursuant to an untrue registration statement [FN1] The plaintiffs alleged that the registration statements were false and misleading by indicating that pcOrder.com had a viable business plan, had an ability to generate and report accurate operating and financial information, and was not competing with Trilogy Software for revenue The district court consolidated the actions and appointed Lead Plaintiffs [FN2] The Lead Plaintiffs sought to have a class action certified and have themselves designated as class representatives

[1] In its October 21, 2002, order denying class certification, [FN3] the district court first found that none of the Lead Plaintiffs purchased their stock during the public offerings--that is, they were "aftermarket" purchasers [FN4] However, it held that Section 11 is available not only to those who purchased their stock during the relevant public offerings, but also to aftermarket purchasers as long as the stock is "traceable" back to the relevant public offering [FN5]

The district court then considered whether Lead Plaintiffs Beebe, Dr Burke, and Petrick could trace their stock back to either of the two public offerings. The district court found that the approximately 2 5 million shares issued in the pcOrder com IPO were registered in a stock certificate in the name of Cede & Co, the nominee of the Depository Trust Company. The court found that, on April 19, 1999, when Beebe purchased 1000 of these "street name" shares, the pool of street name stock still contained only the IPO stock Therefore, because all of his stock was *necessarily* IPO stock, Beebe was able to satisfy the traceability requirement and establish standing

In contrast, the court concluded that standing was lacking for Dr Burke and Petrick By the end of June 1999 when Dr Burke purchased 3000 shares, the court found that non-IPO shares--specifically, insider shares--had entered the street name certificate and intermingled with the IPO shares, but that IPO shares still comprised 99 85% of the pool. Subsequent to the December 7, 1999, secondary public offering, Dr Burke made additional purchases and Petrick also purchased a number of shares at a

time when IPO and SPO shares (collectively "PO stock") constituted 91% of the market Appellants' expert acknowledged that there is no way to track individual shares within a pool once it becomes contaminated with outside shares

*2 In light of the intermingling of PO and non-PO stock in the market at the time of their purchases--even though PO stock was the overwhelming majority--the district court held that Dr Burke and Petrick could not demonstrate that their shares were traceable to the public offering registration statements In reaching this conclusion, the court considered expert testimony indicating that, given the number of shares owned by each Lead Plaintiff and the percentage of PO stock in the market, the probability that each Lead Plaintiff owned at least one share of PO stock was very nearly 100% [FN6] However, the court held that this did not satisfy the traceability requirement because the "Lead Plaintiffs must demonstrate *all* stock for which they claim damages was actually issued pursuant to a defective statement, not just that it might have been, probably was, or most likely was, issued pursuant to a defective statement " [FN7] The district court noted that, "[o]therwise, 'all persons who held stock in street name on and after the offering date could claim a proportional interest in the shares' " [FN8]

Having found that Dr Burke and Petrick lacked Section 11 standing, the court concluded that they could not serve as class representatives and denied class certification [FN9] We rejected a request for an interlocutory appeal. [FN10]

On May 5, 2003, the district court granted PCOrder's motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) [FN11] The district court reiterated its conclusion that Beebe had standing to sue under Section 11, but that Dr Burke and Petrick did not. It concluded that the other plaintiffs, Barry Pinkowitz, Jerry Krim, and Jean Schwartz Burke, also lacked standing because they too could not trace their stock back to the public offerings [FN12] The court dismissed all of these claims without prejudice. The court then dismissed Beebe's claim as moot because PCOrder had offered Beebe a settlement equal to his full recovery under the statute. Having disposed of the suits, the district court denied a motion to intervene by three individuals ("Intervenors") [FN13] and entered final judgment

© 2005 Thomson/West No Claim to Orig U S Govt Works

2005 WL 469618
--- F.3d ---
(Cite as: 2005 WL 469618 (5th Cir.(Tex.)))

in favor of PCOrder. Appellants [FN14] challenge the district court's rulings regarding standing and the motion to intervene. The denial of class certification is not before us.

II

*3 [2][3][4][5] In general, we review a dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) de novo. [FN15] "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." [FN16] In considering a challenge to subject matter jurisdiction, the district court is "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." [FN17] We review the district court's jurisdictional findings of fact for clear error. [FN18] The denial of a motion to intervene as of right is reviewed de novo. [FN19] The denial of a permissive motion to intervene is reviewed for abuse of discretion. [FN20]

III
A

Appellants argue that Dr. Burke, Mrs. Burke, and Petrick can establish Section 11 standing by proffering nothing more than statistics indicating a high mathematical probability, based on the number of shares purchased by each individual and the number of PO shares in the market, that at least some of their shares were issued pursuant to the challenged registration statement. We disagree. [FN21]

1

[6] We turn first to the language of the statute. [FN22] In general, the Securities Act of 1933 ("Securities Act") [FN23] "is concerned with the initial distribution of securities." [FN24] Section 11 of the Securities Act, imposing civil liability for public offering of securities pursuant to a false registration statement, permits "any person acquiring such security" to sue. [FN25] While Section 11's liability provisions are expansive--creating "virtually absolute" liability for corporate issuers for even innocent material misstatements [FN26]--its standing provisions limit putative plaintiffs to the "narrow class of persons" consisting of "those who purchase securities that are the direct subject of the prospectus and registration statement." [FN27]

In Rosenzweig v. Azurix Corp., we recently held that

aftermarket purchasers do not inevitably lack standing. [FN28] The district court here foreshadowed this in holding that Section 11's "language suggests a much broader class of potential plaintiffs than those who literally purchased their shares in the challenged offering." [FN29] Indeed, the plain language of the statute confers standing on "any person acquiring such security," [FN30] and there is no reason to categorically exclude aftermarket purchasers, " 'so long as the security was indeed issued under that registration statement and not another.' " [FN31] As such, aftermarket purchasers seeking standing must demonstrate the ability to "trace" their shares to the faulty registration. [FN32] As one court explained:

[T]o be able to take advantage of the lower burden of proof and almost strict liability available under § 11, a plaintiff must meet higher procedural standards. The most significant of the procedural standards is the requirement that a plaintiff be able to trace the security for which damages are claimed to the specific registration statement at issue. [FN33]

In Rosenzweig, we further held that this traceability requirement is satisfied, as a matter of logic, when stock has only entered the market via a single offering. [FN34] We did not speculate on what other methods might be available to satisfy the traceability requirement for aftermarket purchases, but we were careful to note the Supreme Court's concern "that the Securities Act remain anchored to its original purpose of regulating only public offerings." [FN35]

*4 Appellants, as aftermarket purchasers, assert that they can also demonstrate standing by showing a very high probability that they each have at least one PO share. Appellants argue that their statistical determinations, being over 50%, demonstrate by a preponderance of the evidence, that it is "more likely than not," that their shares are traceable to the public offerings in question.

We are persuaded that accepting such "statistical tracing" would impermissibly expand the statute's standing requirement. Because any share of pcOrder.com stock chosen at random in the aftermarket has at least a 90% chance of being tainted, its holder, according to Appellants' view, would have Section 11 standing. [FN36] In other words, every aftermarket purchaser would have standing for every share, despite the language of

2005 WL 469618
--- F.3d ---
(Cite as: 2005 WL 469618 (5th Cir.(Tex.)))

Section 11, limiting suit to "any person acquiring *such* security." [FN37] As the district court found, it is "likely that any street name shareholder can make a similar claim with regard to *one* share." [FN38] This cannot be squared with the statutory language-- that is, with what Congress intended. We decline the invitation to reach further than the statute.

The fallacy of Appellants position is demonstrated with the following analogy. Taking a United States resident at random, there is a 99.83% chance that she will be from somewhere other than Wyoming. [FN39] Does this high statistical likelihood alone, assuming for whatever reason there is no other information available, mean that she can avail herself of diversity jurisdiction in a suit against a Wyoming resident? Surely not. [FN40]

In limiting those who can sue to "any person acquiring such security," Congress specifically conferred standing on a *subset* of security owners (unless of course, as in *Rosenzweig*, all shares in the market are PO shares). To allow Appellants to satisfy the tracing requirement for aftermarket standing in this case with the proffered statistical methodology would contravene the language and intent of Section 11.

2

Appellants urge this Court to not hew the statutory line, contending that to do so, in light of current market conditions, effectively precludes recovery under Section 11; that there is no reason to "express a preference for" the interests of defendants over plaintiffs. Appellants point out that, given the fungible nature of stocks within a street name certificate, it is virtually impossible to differentiate PO shares from non-PO shares.

However, as we have explained, Section 11 *is* available for anyone who purchased directly in the offering and any aftermarket purchasers who can demonstrate that their shares are traceable to the registration statement in question--*e.g.* when, as with Beebe, there had only been one offering at the time of purchase. [FN41] When Congress enacted the Securities Act of 1933 it was not confronted with the widespread practice of holding stock in street name that Appellants describe as an impediment, absent our acceptance of statistical tracing, to invoking Section 11. [FN42] That present market realities, given the fungibility of stock held in street name,

may render Section 11 ineffective as a practical matter in some aftermarket scenarios is an issue properly addressed by Congress. It is not within our purview to rewrite the statute to take account of changed conditions. In the words of one court, Appellants' arguments may "have the sound ring of economic reality but unfortunately they merely point up the problems involved in the present scheme of statutory regulation." [FN43]

*5 It is, therefore, perhaps not surprising that we failed to locate any court, nor did Appellants point to any, that found Section 11 standing based solely on the statistical tracing theory espoused today. Given that the statute has been in existence for over 70 years and such elementary statistical calculations have been around for centuries, it is difficult to conclude that this is a coincidence. We note that a handful of lower courts have rebuffed similar attempts by plaintiffs. [FN44] In one case, *Kirkwood v. Taylor*, the district court--later summarily affirmed by the Eighth Circuit--rejected the "fungible mass" method whereby every purchaser is deemed to own a pro rata portion of PO shares for the purpose of determining Section 11 standing. [FN45] Because "all persons who held stock in street name on and after the offering date could claim a proportional interest in the shares," the court held that "the logical extension of plaintiffs' fungible mass theory would ... effectively circumvent the tracing requirement." [FN46] Similar concerns persuade us to reject today's attempt at statistical tracing.

In *Barnes v. Osofsky*, [FN47] the Second Circuit confronted an intermingled stock pool not unlike the one we face today. In that case, two individuals challenged the settlement of a class action alleging Section 11 violations in a secondary public offering. The challengers, who purchased stock after the SPO, were unable to trace a portion of their shares to the SPO as opposed to the preexisting shares on the market. They objected to a provision of the settlement "limiting the benefits of the settlement to persons who could establish that they purchased securities issued" in the SPO. [FN48] The court was not deterred by the reality that this "eliminated those who purchased after the issuance of the allegedly incomplete prospectus but could not so trace their purchases," because Section 11 "extends only to purchases of the newly registered shares." [FN49] While not addressing the question before us today,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Barnes*is nonetheless instructive. Plaintiffs in that case urged a broad reading of Section 11 to cover anyone purchasing stock after the SPO-- whether or not it was traceable to the SPO. Not unlike the concerns expressed by Appellants in the instant case, the plaintiffs in *Barnes*argued as follows:

[O]nce it is agreed that § 11 is not limited to the original purchasers, to read that section as applying only to purchasers who can *trace the lineage* of their shares to the new offering makes the result turn on mere accident since most trading is done through brokers who neither know nor care whether they are getting [tainted] or [clean] shares. [I]t is often impossible to determine whether previously traded shares are [clean] or [tainted], and that tracing is further complicated when stock is held in margin accounts in street names since many brokerage houses do not identify specific shares with particular accounts but instead treat the account as having an undivided interest in the house's position. [FN50]

*6 The court rejected these arguments and rejected the plaintiffs' broad reading of Section 11's standing requirement as "inconsistent with the over-all statutory scheme" and "contrary to the legislative history." [FN51] The same is true of Appellants' view today.

3

Appellants' reliance upon the Fourth Circuit's opinion in *Friends of the Earth v. Gaston* [FN52] is misplaced. Rather, this case offers support to PCOrder. In *Gaston*, the Clean Water Act [FN53] specifically provided standing for persons "having an interest which is *or may be* adversely affected." [FN54] This language, chosen by Congress, "confers standing on a 'broad category of potential plaintiffs' who 'can claim some sort of injury,' be it actual or threatened, economic or noneconomic." [FN55] In fact, "Congress has indicated that this provision confers standing to enforce the Clean Water Act to the full extent allowed by the Constitution." [FN56] As such, *Gaston* illustrates Congress's ability to provide for standing based on risk, confined only by the strictures of Article III:

While Article III sets the minimum requirements for standing, Congress is entitled to impose more exacting standing requirements for the vindication of federal statutory rights if it wishes. Here the legislature chose to go to the full extent of Article III in conferring standing on any person with "an

interest which is or may be adversely affected." [FN57]

Here, by contrast, Congress conferred standing on those who *actually* purchased the tainted stock, not on the whole class of those who *possibly* purchased tainted shares--or, to put it another way, are at risk of having purchased tainted shares. Unlike the standing conferred by Congress in the Clean Water Act, Appellants here cannot meet the statutory standing requirement of Section 11 merely by showing that they jumped into a potentially polluted "pool" of stock. [FN58]

4

Appellants are surely correct in pointing out that, at some level, all evidence is "probabilistic." [FN59] As we have explained, however, this does not answer the question before us today. In concluding that Appellants' attempt to "statistically trace" is incompatible with the standing requirement of Section 11, we cast no shadow on the use of statistical evidence in general. We recognize, for example, the widely accepted use of DNA evidence in criminal matters--even in capital murder trials-- where proof must be beyond a reasonable doubt. [FN60] While both are rooted in statistical calculations, at least two distinctions between DNA evidence and the statistics presented by Appellants come to mind. First, in most trials, DNA evidence does not stand alone. [FN61] Here, Appellants have relied exclusively on a presentation of background statistics. Second, in any case, DNA evidence is more particularistic than the statistics here. DNA analysis seeks to establish a match between the DNA of a particular individual (*e.g.* a suspect) and a "mystery" sample (*e.g.* from a crime scene), essentially by quantifying and narrowing the universe of possible sources of the DNA. [FN62] In contrast, Appellants' evidence merely demonstrates the probability that *anyone* with $x$ number of shares will possess some tainted shares. It says nothing about the shares that one particular individual actually owns. The more particularized nature of DNA is further evident from the fact that "a nonmatch between any band of the suspect's DNA and the corresponding band of the questioned sample conclusively eliminates the suspect as the source of that sample." [FN63] There is no such analog in the general statistics before us today.

Unquestionably, principles of probability are

powerful tools, when deployed in appropriate tasks. Unquestionably, the statistics in this case indicate a high probability that a person purchasing a given number of shares will obtain at least one tainted share. However, these general statistics say nothing about the shares that a specific person *actually* owns and have no ability to separate those shares upon which standing can be based from those for which standing is improper. The task before the district court was to determine, by a preponderance of the evidence, whether and in what amount a plaintiff's shares are tainted, not whether the same number of shares drawn at random would likely include at least one tainted share. Understood in this light, statistical tracing is not up to the task at hand.

5

*7 In sum, aftermarket purchasers seeking Section 11 standing must demonstrate that their shares are traceable to the challenged registration statement. We are not persuaded that the statistical tracing method advanced today is sufficient to satisfy this traceability requirement.

B

[7] Appellants argue that the district court erred in denying the motion to intervene. We disagree.

As a preliminary matter, we note that this is not a case where intervention is sought for the purpose of appealing the denial of class certification. [FN64] Indeed, Appellants have chosen in this appeal not to challenge the class certification denial. [FN65] Thus, the "prerequisite of an intervention" that there be "an existing suit within the Court's jurisdiction" depends here on the individual claims. [FN66] That none of the individual claims remained viable on February 14, 2003, when the motion to intervene was filed, disposes of the attempt at intervention.

As we have explained, by October 21, 2002, the district court had correctly made clear that only Beebe had standing. Furthermore, the district court held that, as of January 15, 2003, Beebe's individual claims were rendered moot because PCOrder offered Beebe a settlement equal to the statutory limit on his damages. [FN67] Appellants do not dispute that a full settlement offer, even if refused, would dispose of Beebe's individual claims. [FN68] Instead, Appellants contend that Beebe's claims were not fully satisfied because the involuntary settlement imposed by the district court did not include

prejudgment interest. The statute, however, does not require prejudgment interest, and such an award of interest is up to the district court's discretion. [FN69] The district court concluded that it would deny any request from Beebe for prejudgment interest because the delay in the payment of his award was due to his "meritless motion for class certification." [FN70] We are not persuaded that the district court abused its discretion in denying prejudgment interest. Therefore, as we are not faced on appeal with a challenge to the denial of class certification, in the absence of viable individual claims, we are not persuaded that the district court erred in denying intervention. [FN71]

IV

*8 For the foregoing reasons the judgment of the district court is AFFIRMED.

FN1. 15 U.S.C. § 77k(a)

FN2. Bret Beebe, Dr. Gene Burke, and David Petrick were appointed Lead Plaintiffs, along with two other individuals who subsequently dropped out of the suit and are not part of this appeal.

FN3. *Krim v. pcOrder.com, Inc.,* 210 F.R.D. 581 (W.D.Tex.2002)

FN4. The "aftermarket," also termed the "secondary market," is the "securities market in which previously issued securities are traded among investors." BLACK'S LAW DICTIONARY 990 (8th ed 2004).

FN5. *Krim,* 210 F.R.D. at 585. We have since adopted the traceability test and allowed such aftermarket purchasers to establish standing in Section 11 cases. *See Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 873 (5th Cir.2003)

FN6. Appellants' expert arrived at the odds of getting at least one PO (or "tainted") share using elementary principles of binomial probability. *See generally* PAUL G. HOEL, INTRODUCTION TO MATHEMATICAL STATISTICS (4th ed 1971), *cited in Castaneda v. Partida,* 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *see also Vuyanich v.*

*Republic Nat'l Bank of Dallas,* 505 F.Supp. 224, 345-46 (N.D.Tex.1980), *vacated,* 723 F.2d 1195 (5th Cir.1984)
The expert treated the purchase of shares as a series of independent random draws from the stock pool (similar to flipping a weighted coin once for each share), and calculated the probability that at least one of the shares would be tainted according to the following formula: 1--(1--PO%)# shares, where PO% is the percentage of PO stock in the market and # *shares* is the number of shares owned. For example, at the end of June, when Dr. Burke had purchased 3000 shares, PO shares (specifically IPO shares) constituted 99.85% of the street name certificate. Therefore, the probability that he owned at least one PO share was 1--(1--0.9985) 3000, or very nearly 100%.

FN7. *Krim,* 210 F.R.D. at 586

FN8. *Id.* at 587 (quoting *Kirkwood v. Taylor,* 590 F.Supp. 1375, 1380 (D.Minn.1984), *aff'd* 760 F.2d 272 (8th Cir.1985) (table)).

FN9. The district court further concluded as an independent ground for not certifying the class or appointing the representatives that even if each of the Lead Plaintiffs had standing to sue under Section 11, they were each, including Beebe, unqualified to be class representatives because they were, for other reasons, not able to "fairly and adequately protect the interests of the class." *Id.* at 587-89.

FN10. *Krim v. pcOrder.com Inc.,* No. 03-00001 (5th Cir. Mar. 18, 2003) (order denying petition for leave to appeal under Fed.R.Civ.P. 23(f)).

FN11. *Krim v. pcOrder.com, Inc.,* No. A-00-CA-776-SS, 2003 WL 21076787 (W.D.Tex. May 5, 2003) (order dismissing for lack of subject matter jurisdiction and denying intervention).

FN12. PCOrder's motion to dismiss for lack of standing was unopposed with respect to the claims of Pinkowitz and Krim. *Id.* at *2

n. 1. Jean Burke purchased 200 shares at the end of June 1999 around the same time that her husband, Dr. Gene Burke, made his initial purchases.

FN13. The Intervenors were Dawn Rusing-Bell, Kishore Mehta, and Dierdre Humphrey.

FN14. Appellants include Beebe, Dr. Burke, Mrs. Burke, Petrick and the Intervenors. No argument is advanced on appeal on behalf of either Krim or Pinkowitz.

FN15. *John Corp. v. City of Houston,* 214 F.3d 573, 576 (5th Cir.2000); *Robinson v. TCI/US W. Communications Inc.,* 117 F.3d 900, 904 (5th Cir.1997).
We note that the motion before the district court was styled as a "Motion to Dismiss for Lack of Subject Matter Jurisdiction, or Alternatively, for Summary Judgment," but the district court chose to dispose of it as the former. Neither party has objected on appeal to that choice. In *Montez v. Department of Navy* we noted:
[W]here issues of fact are central both to subject matter jurisdiction and the claim on the merits, we have held that the trial court must assume jurisdiction and proceed to the merits. In circumstances where "the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court ... is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case" under either Rule 12(b)(6) or Rule 56."
392 F.3d 147, 150 (5th Cir.2004) (quoting *Williamson v. Tucker,* 645 F.2d 404, 415 (5th Cir.1981))

FN16. *Home Builders Ass'n of Miss., Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir.1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1187 (2d Cir.1996)) (internal quotation marks omitted).

FN17. *Montez,* 392 F.3d at 149 (citing *Land v. Dollar,* 330 U.S. 731, 735 & n. 4, 67

S.Ct. 1009, 91 L.Ed. 1209 (1947)); *see Robinson,* 117 F.3d at 904 ("A court may base its disposition of a motion to dismiss for lack of subject matter jurisdiction on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts ").

FN18. *Robinson,* 117 F.3d at 904; *see also Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 845 (5th Cir.2000).

FN19. *Doe v. Duncanville Indep. Sch. Dist.,* 994 F.2d 160, 167 (5th Cir.1993).

FN20. *Bush v. Viterna,* 740 F.2d 350, 359 (5th Cir.1984).

FN21. Appellants' related argument that the district court applied an inappropriately high burden of proof to the standing issue misses the mark. Appellants correctly point out that the correct burden of proof is a preponderance of the evidence. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (plaintiff's burden of proof on standing issue is same as for other elements of the claim); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (burden of proof in securities cases, in absence of contrary congressional expression, is preponderance of the evidence). While the district court did not make explicit the standard that it was applying, it is clear that it found Appellants could not, based solely on general mathematical probabilities, and in light of admissions about the nature of securities markets, demonstrate the ability to satisfy the tracing requirement under *any* of the proffered standards.

FN22. *See, e g., Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)

FN23. 15 U.S.C. § 77a *et seq.*

FN24. *Rosenzweig,* 332 F.3d at 861.

FN25. 15 U.S.C. § 77k(a) Section 11 provides, in relevant part:
In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, *any person acquiring such security* (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [various individuals]
*Id.* (emphasis added).

FN26. *Herman & MacLean,* 459 U.S. at 382, 103 S.Ct. 683 ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements " (footnote omitted)); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363, 369 (5th Cir.2001).

FN27. *Fischman v. Raytheon Mfg. Co.,* 188 F.2d 783, 786-87 (2d Cir.1951), *quoted in Barnes v. Osofsky,* 373 F.2d 269, 273 (2d Cir.1967).

FN28. 332 F.3d at 872; *accord DeMaria v. Andersen,* 318 F.3d 170, 175-78 (2d Cir.2003); *Lee v. Ernst & Young, LLP,* 294 F.3d 969, 974-78 (8th Cir.2002); *Joseph v. Wiles,* 223 F.3d 1155, 1158-61 (10th Cir.2000); *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1079-82 (9th Cir.1999).

FN29. *Krim,* 210 F.R.D. at 585.

FN30. 15 U.S.C. § 77k(a).

FN31. *DeMaria,* 318 F.3d at 176 (quoting *Lee,* 294 F.3d at 976-77).

FN32. *Rosenzweig,* 332 F.3d at 873.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN33. *Harden v. Raffensperger, Hughes & Co.,* 933 F.Supp. 763, 766 (S.D.Ind.1996) (citing *Kirkwood,* 590 F.Supp. at 1378).

FN34. *Rosenzweig,* 332 F.3d at 873 ("[B]ecause there was only *one* offering of Azurix stock, all the plaintiffs' stock is traceable to the challenged registration statement "); *accord Hertzberg,* 191 F.3d at 1080 (finding standing for aftermarket purchaser because "the only Dignity stock ever sold to the public was pursuant to the allegedly misleading registration statement at issue in this case"); *Joseph,* 223 F.3d at 1160 ("[B]ecause [the defendant] made only one debenture offering, the debentures [the plaintiff] purchased are directly traceable to the May offering and registration statement.")
In *Hertzberg v. Dignity Partners, Inc.,* the Ninth Circuit noted that "[i]f there is a mixture of pre-registration stock and stock sold under the misleading registration statement, a plaintiff must either show that he purchased his stock in the initial offering or trace his later-purchased stock back to the initial offering" but that "it might present a problem of proof in a case in which stock was issued under more than one registration statement." 191 F.3d at 1080 & n. 4.

FN35. 332 F.3d at 873 (citing *Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)).

FN36. Indeed, under Appellants' view, in any case where more than 50% of the available shares are issued pursuant to an allegedly false registration statement, all shareholders would have standing. Furthermore, even when the PO% is less than that, applying the "coin flip" methodology, *see supra* note 6, it would take relatively few shares to confer standing. For example, even if only 30% of the available shares are PO, or "tainted," shares, two shares will suffice to confer standing because there would be a 51% chance that at least one of the two shares is a PO share, *i.e.* $1-(1-0.30)2 = 51\%$ (Put another way, the chance that both shares will be "clean" is $(0.70)2$, or 49%. Therefore, the likelihood of this *not* being the case--*i.e.* that at least one share is tainted--is 51%.) When PO shares are 10% of the market, still only 7 shares are needed: $1-(1-0.10)7 = 52\%$. Even when PO shares are only 2% of the pool, 35 shares would confer standing: $1-(1-0.02)35 = 51\%$

FN37. 15 U.S.C. § 77k(a) (emphasis added).

FN38. *Krim v. PcOrder.com Inc.,* 212 F.R.D. 329, 332 n. 2 (W.D.Tex.2002) (order denying motion for reconsideration of refusal to certify class).

FN39. U.S. CENSUS BUREAU, U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES: 2004-2005, at 23 tbl 20 (124th ed 2004), *available at* http://www.census.gov/prod/www/statistical-abstract-04.html (last visited Mar. 1, 2005).

FN40. This is not unlike the well-known blue bus hypothetical to which Appellants refer in their Reply Brief. One commentator offers the following account of this hypothetical:
While driving late at night on a dark, two-lane road, a person confronts an oncoming bus speeding down the center line of the road in the opposite direction. In the glare of the headlights, the person sees that the vehicle is a bus, but he cannot otherwise identify it. He swerves to avoid a collision, and his car hits a tree. The bus speeds past without stopping. The injured person later sues the Blue Bus Company. He proves, in addition to the facts stated above, that the Blue Bus Company owns and operates 80% of the buses that run on the road where the accident occurred. Can he win?
In this case and others like it, the plaintiff will lose; in fact, the case is unlikely even to reach the jury. Although the defendant probably caused the plaintiff's injury ... [t]he factfinder can only conclude from the plaintiff's evidence that there was an 80% chance that he was injured by the Blue Bus

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Company and a 20% chance that he was not... [T]he factfinder cannot, and the public knows it cannot, make anything other than a bet on the evidence Because the judicial system strives to project an acceptable account about what happened, then, the plaintiff's evidence is insufficient, notwithstanding the high probability of its accuracy

Charles Nesson, *The Evidence or the Event? On Judicial Proof and the Acceptability of Verdicts,* 98 HARV. L.REV. 1357, 1378-79 (1985) (footnotes omitted); *see also* Laurence H Tribe, *Trial by Mathematics. Precision and Ritual in the Legal Process,* 84 HARV. L.REV. 1329, 1349 (1971) ("[E]ven assuming a [preponderance of the evidence] standard of proof ..., the plaintiff does not discharge that burden by showing simply that four-fifths, or indeed ninety-nine percent, of all blue buses belong to the defendant ")

This hypothetical is based on *Smith v. Rapid Transit, Inc.,* 317 Mass. 469, 58 N.E.2d 754 (1945) (affirming directed verdict for defendant bus company) In *Smith,* the court further noted that " 'the fact that colored automobiles made in the current year outnumber black ones would not warrant a finding that an undescribed automobile of the current year is colored and not black, nor would the fact that only a minority of men die of cancer warrant a finding that a particular man did not die of cancer ' " *Id.* at 755 (quoting *Sargent v. Mass. Accident Co.,* 307 Mass. 246, 29 N.E.2d 825, 827 (1940)); *cf Howard v. Wal-Mart Stores, Inc.,* 160 F.3d 358, 359-60 (7th Cir.1998) (Posner, C J.)

FN41. There might well be other acceptable methods of aftermarket tracing even where non-PO stock has entered the market For example, if a putative plaintiff possesses more shares than the number of non-PO shares on the market, our reasoning in *Rosenzweig* suggests that she must have standing for at least some of the shares. If, for example, there are 100 non-PO shares and 900 PO shares, a plaintiff with 101 shares would seem to have at least 1 PO share In any case, because Appellants have

not suggested that these conditions apply here, we need not resolve this issue. Nor need we consider at this time what effect, if any, the practice of "short selling" would have in such a situation

FN42. *See* J. Robert Brown, *The Shareholder Communication Rules and the Securities and Exchange Commission. An Exercise in Regulatory Utility or Futility?,* 13 J. CORP. L. 683, 693 (1988) (noting relatively infrequent use of street name and nominee accounts in 1930s) (citing LOUIS LOSS, SECURITIES REGULATION 42 n 226 (1951)); *see also Silber v. Mahon,* 957 F.2d 697, 700 (9th Cir.1992) ("The widespread practice of holding securities in street names grew out of a perceived 'paperwork crisis' in the securities industry in the 1960s. Using street names facilitated the prompt handling of a huge volume of transactions on the various exchanges in the buying and selling of securities by investors and speculators " (internal quotation marks and citation omitted))

FN43. *Colonial Realty Corp. v. Brunswick Corp.,* 257 F.Supp. 875, 881 (S.D.N.Y.1966), *cited approvingly, Barnes,* 373 F.2d at 273

FN44. *See, e g., In re Elscint, Ltd. Sec. Litig.,* 674 F.Supp. 374 (D.Mass.1987); *Abbey v. Computer Memories, Inc.,* 634 F.Supp. 870 (N.D.Cal.1986); *Kirkwood,* 590 F.Supp. at 1378-83 (discussing various tracing techniques and rejecting all but the "direct trace" method); *see also In re Quarterdeck Office Sys., Inc. Sec. Litig.,* No. CV 92-3970, 1993 WL 623310 (C.D.Cal. Sept.30, 1993)

FN45. 590 F.Supp. 1375, 1381 (D.Minn.1984), *aff'd* 760 F.2d 272 (8th Cir.1985) (table).

FN46. *Id.* at 1380-81.

FN47. 373 F.2d 269 (2d Cir.1967) (Friendly, J.)

FN48. *Id.* at 271.

© 2005 Thomson/West No Claim to Orig U S Govt Works

FN49. *Id*

FN50. *Id.* at 271-72 (emphasis added) (footnote omitted).

FN51. *Id.* at 272. Judge Friendly went on to note:
Without depreciating the force of appellants' criticisms that this construction gives § 11 a rather accidental impact as between one open-market purchaser of a stock already being traded and another, we are unpersuaded that, by departing from the more natural meaning of the words, a court could come up with anything better. What appellants' arguments does suggest is that the time may have come for Congress to reexamine these two remarkable pioneering statutes in the light of thirty years' experience.
*Id.* at 273.

FN52. 204 F.3d 149 (4th Cir.2000) (en banc)

FN53. 33 U.S.C. § 1251 *et seq*

FN54. 33 U.S.C. § 1365(g) (emphasis added)

FN55. *Gaston*, 204 F.3d at 155 (quoting *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 16-17, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)) In another CWA case, we held that "the *Constitution* does not require Sierra Club to produce an affiant who claims that Cedar Point's discharge *in particular* injured him in some way." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,* 73 F.3d 546, 558 (5th Cir.1996) (emphases added) Indeed, "[t]he Supreme Court has expressly held that a 'threatened injury' will satisfy the 'injury in fact' requirement for [constitutional] standing." *Id.* at 556 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

FN56. *Gaston*, 204 F.3d at 152.

FN57. *Id.* at 162 (quoting 33 U.S.C. § 1365(g)).

FN58. *Cf In re Ames Dep't Stores Inc. Stock Litig.,* 991 F.2d 953, 964 (2d Cir.1993) ("[I]t is not a bar to a 10b-5 action that the false and misleading statements in a Registration Statement are pertaining to an issue of a security ... which is not the security purchased ")

FN59. *See, e.g., Victor v. Nebraska,* 511 U.S. 1, 14, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) ("The beyond a reasonable doubt standard is itself probabilistic."); *Riordan v. Kempiners,* 831 F.2d 690, 698 (7th Cir.1987) (Posner, J.) ("All evidence is probabilistic--statistical evidence merely explicitly so "); *see also* Richard A. Posner, *An Economic Approach to the Law of Evidence,* 51 STAN. L. REV. 1477, 1508 (1999) ("It is now generally recognized, even by the judiciary, that since all evidence is probabilistic--there are no metaphysical certainties-- evidence should not be excluded merely because its accuracy can be expressed in explicitly probabilistic terms ")

FN60. *See, e.g., Prible v. State,* --- S.W.3d ----, No. AP-74487, 2005 WL 156555 (Tex.Crim.App. Jan.26, 2005) (affirming conviction in capital murder case, rejecting argument that evidence was insufficient, where evidence included DNA and several other factors).

FN61. *See, e.g., People v. Soto,* 21 Cal.4th 512, 88 Cal.Rptr.2d 34, 981 P.2d 958, 965 (1999) ("[The] probability that the suspect was indeed the source of the sample ... will usually depend, not on the DNA findings alone, but on a combination of those findings together with other, non-DNA incriminating evidence.").

FN62. *See* 3 DAVID L. FAIGMAN ET AL, MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY § 24-9 2 (2d ed. 2002) ("DNA typing is capable of exceedingly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

high discrimination, and in favorable circumstances it can be shown that only one person in several billion could have been the source of the evidence bloodstain "); *see also Commonwealth v. Gaynor,* 443 Mass. 245, 820 N.E.2d 233, 240 (2005) (noting that "one in 64 quadrillion (64 x 10 15) African-Americans would be expected to have the same DNA profile as the sperm fraction"); *Rayford v. State,* 125 S.W.3d 521, 526 (Tex.Crim.App.2003) ("The DNA expert testified that the probability of the DNA belonging to someone other than Hall was one in 116 billion "); *cf Miller v. Albright,* 523 U.S. 420, 484-85, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (Breyer, J , dissenting) (citing E Donald Shapiro et al , *The DNA Paternity Test: Legislating the Future Paternity Action,* 7 J.L. & HEALTH 1, 29 (1992-1993), for the proposition that "current testing methods can determine probability of paternity to 99 999999% accuracy").

FN63. *Soto,* 88 Cal.Rptr.2d 34, 981 P.2d at 965.

FN64. *Cf Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 332 n. 5, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) (noting that the district court may have "a responsibility, prior to approval of a settlement and dismissal of the class action, to provide an opportunity for intervention by a member of the putative class *for the purpose of appealing the denial of class certification* " (emphasis added)); *Nichols v. Mobile Bd. of Realtors, Inc.,* 675 F.2d 671, 675 (5th Cir.1982) (permitting putative class members to intervene "solely for the purpose of appealing the district court's decertification of the class action" even after settlement of named plaintiffs' claims); *see also United Airlines, Inc. v. McDonald,* 432 U.S. 385, 392, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977).

FN65. *Cf Roper,* 445 U.S. at 331-40, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) (holding that plaintiffs can appeal denial of class certification despite a tender to named plaintiffs in a class action of the amounts claimed in their individual capacities, followed by the entry of judgment in their favor on the basis of that tender, over their objection); *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 404, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (where denial of class certification is challenged on appeal, "an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification has been denied").

FN66. *Non Commissioned Officers Ass'n of the United States v. Army Times Publ'g Co.,* 637 F.2d 372, 373 (5th Cir.1981).

FN67. *See Krim,* 2003 WL 21076787, at *3 (citing 15 U.S.C. § 77k(e))

FN68. *See Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1045 (5th Cir.1981) ("[A] suit brought as a class action must as a general rule be dismissed for mootness when the personal claims of the named plaintiffs are satisfied and no class has properly been certified "). This, as the district court acknowledged, does not foreclose the right to appeal the denial of class certification. *See Krim,* 2003 WL 21076787, at *4 (citing *Roper,* 445 U.S. at 332-36, 100 S.Ct. 1166).

FN69. *See Whitfield v. Lindemann,* 853 F.2d 1298, 1306 (5th Cir.1988) ("Absent statutory mandate, the award of prejudgment interest generally is discretionary with the trial court ")

FN70. *Krim,* 2003 WL 21076787, at *3.

FN71. Appellants' argument that the defendants' "maneuver" (*i e* defeating class certification and then "picking off" the only remaining plaintiff with standing) deprived absent class members their day in court is without merit. It was the Appellants who chose not to pursue an appeal of the denial of class certification. In any case, the district court afforded the plaintiffs the opportunity to return in the event that they can establish standing and suggested that

2005 WL 469618                                                                    Page 15
 --- F.3d ---
**(Cite as: 2005 WL 469618 (5th Cir.(Tex.)))**

    Intervenors are free to initiate a suit of their          <u>top)</u>
own

2005 WL 469618 (5th Cir.(Tex.))                           <u>03-50737</u>          (Docket)
                                                          (Jun. 30, 2003)

                                                          END OF DOCUMENT

**Briefs and Other Related Documents** <u>(Back to</u>

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE


### CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2005, I electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered to the following:

Carmella P. Keener
Rosenthal, Monhait, Gross & Goddess
919 Market Street, Suite 1401
Wilmington, DE 19801

Robert K. Payson
John E. James
Potter Anderson & Corroon LLP
1313 North Market Street, Hercules Plaza
Wilmington, Delaware 19801


I hereby certify that on March 14, 2005, I have Federal Expressed the document(s) to the following non-registered participants:

Todd S. Collins
Jacob A. Goldberg
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA 19103

Michael J. Chepiga
Elaine M. Divelbliss
Theodore J. McEvoy
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Alyssa M. Schwartz (#4351)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
schwartz@rlf.com