IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.,          :      CONSOLIDATED
SECURITIES LITIGATION             :      CIVIL ACTION
                                  :      NO. 99-371-KAJ

---

**PLAINTIFFS' REPLY BRIEF IN SUPPORT
OF THEIR MOTION FOR CLASS ACTION CERTIFICATION**

---

**ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.**
Carmella P. Keener (DSBA No. 2810)
919 N. Market Street, Suite 1401
P. O. Box 1070
Wilmington, Delaware 19899
(302)656-4433

PLAINTIFFS' LIAISON COUNSEL

**OF COUNSEL:**

**BERGER & MONTAGUE, P.C.**
Todd S. Collins
Elizabeth W. Fox
1622 Locust Street
Philadelphia, PA 19103
(215)875-3000

DATED:  April 4, 2005

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.      The Section 11 Class Period Should End Not Earlier
                Than January 7, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                1.      Defendants Did Not Make Full Disclosure
                        Until January 7, 1999 at the Earliest . . . . . . . . . . . . . . . . . . . . . . 6
                2.      Defendants Cannot Limit the Duration of the
                        Section 11 Class Period By Speculating that
                        Additional Shares Might Have Entered the Market . . . . . . . . . . . . . 8

        B.      The Class Plaintiffs Satisfy Adequacy and
                Typicality Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                1.      Typicality Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                2.      Adequacy Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                3.      Plaintiffs Have Demonstrated Knowledge of Their
                        Claims and Commitment to the Class . . . . . . . . . . . . . . . . . . . . . . 12
                4.      Defendants Have Unjustifiably Attacked Plaintiffs . . . . . . . . . . . . . 12

                        a.      Defendants Distort Plaintiffs' Typicality . . . . . . . . . . . . . . 12
                        b.      The Court Should Ignore Personal Attacks
                                on Plaintiffs and Their Counsel . . . . . . . . . . . . . . . . . . . . 16
                        c.      Defendants' Tactics Have Unfairly Confused
                                The Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

*In re Adams Golf  Sec. Litig.,*
381 F.3d 267 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Cheney v. Cyberguard Corp.,*
213 F.R.D. 484 (S.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Currency Conversion Fee Antitrust Litig.,*
224 F.R.D. 555 (S.D. N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*DaimlerChrysler AG Sec. Litig.,*
216 F.R.D. 291 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

*In re Data Access System Sec. Litig.,*
103 F.R.D. 130 (D. N.J. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 19

*Friedman v. Lansdale Parking Authority,* Fed.Sec.L.Rep. (CCH)
P97, 801 (E.D. Pa. Aug. 30, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Greenfield v. Villager Indus., Inc.,*
483 F.2d 824 (3d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hoffman Electric Inc. v. Emerson Electric Co.,*
754 F.Supp. 1070 (W.D. Pa. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Honeywell International,*
211 F.R.D. 255 (D. N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hoxworth v. Blinder Robinson & Co., Inc.,*
980 F.2d 912 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re  Initial Public Offering Sec. Litig.,*
Fed.Sec.L.Rep. (CCH)
P93, 014 (S.D.N.Y. Oct. 13, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

*Lehocky v. Tidel Techs. Inc.,*
220 F.R.D. 491 (S. Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lewis v. Curtis,*
671 F.2d 779 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 15

*In re ML-Lee Acquisition Fund II,*
*L.P.*, 848 F.Supp. 527 (D. Del. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Newton v. Merrill Lynch, Pierce, Fenner & Smith,*
259 F.3d 154 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In Re Rent-Way Sec. Litig.,*
218 F.R.D. 101 (W.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Schwartz v. Celestial Seasonings,*
178 F.R.D. 545 (D. Colo. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Sley v. Jamaica Water & Utilities, Inc.,*
77 F.R.D. 391 (E.D. Pa. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Smith v. Dominion Bridge Corp.*, Fed.Sec.L.Rep. (CCH)
P90, 163 (E.D. Pa.. March 5, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 17

*Szczubelek v. Cendant Mort. Corp.,*
215 F.R.D. 107 (D. N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Weikel v. Tower Semiconductor, Ltd.*
183 F.R.D. 377 (D. N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wolgin v. Magic Marker Corp.,*
82 F.R.D. 168 (E.D. Pa. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Zenith Laboratories, Inc. v. Carter Wallace, Inc.,*
530 F.2d 508 (3d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Apart from questioning the exact length of the Class Period, defendants concede that this case satisfies most of the class certification elements. They challenge only the adequacy and typicality of the named plaintiffs. In these challenges, defendants ask the Court to disregard controlling Third Circuit precedent that class plaintiffs are not required either to micromanage the case or to exhibit special expertise with respect to legal complexities. Further, defendants seriously distort the deposition testimony of plaintiffs, often wrenching isolated words out of context to "support" untenable factual propositions.

## I.    THE FACTS

The four proposed Class plaintiffs, Patricia Craus, Dr. Kenneth Shockley, Todd Tonore and John Morrash, are exemplary class representatives. Each is a professional or businessperson. Each plaintiff knows about Adams Golf, the material falsity of the Registration Statement and Prospectus, and the principal claims and events of the litigation. Each believes that defendants violated the law, harming investors. Each is committed to securing a recovery on behalf of the Class. Each is independent of the attorneys, and exercises control over the litigation.

Patricia Craus, a land developer, is suing because the Registration Statement and Prospectus misled purchasers of Adams Golf stock in the July 1998 initial public offering (the "IPO"), including with respect to gray marketing. Craus deposition transcript ("Craus") at 8: 9-15, 13:4-15:3. (Attached as Exhibit A to Declaration of Elizabeth W. Fox, which is attached as Ex. I ("Fox Dec.")). According to Craus, the Prospectus, which she read all the way through, was misleading with respect to Adams Golf's marketing and the amount of clubs on the market. Craus at 20:3-15, 22:10-12. Its statements about the supposedly limited distribution of the clubs were false. Craus at 24:13-25:3. She knows that the Prospectus

falsely represented that the clubs "would be sold through either golf professional shops at the golf courses or places that teach . . . . it would become a high line, not an inexpensive-type golf club that you could purchase, you know, just about anywhere." Craus at 14:4-9.

Craus knows that defendants include Adams Golf and Barney Adams. Craus at 12:15-22. As for the underwriters for the IPO, either they knew about the falsity of the Registration Statement and Prospectus or else "I don't think they did their due diligence." Craus at 23:7-9. After the IPO, she "read articles regarding the gray marketing event." Craus at 14:14-16. Craus understands that, as a class representative, she represents "anyone who invested at the initial public offering that is in the lawsuit." That includes the "[n]amed parties. And then those that are not named, but did purchase." Craus at 46:23-47:5.

Craus has consulted with her attorneys on several occasions. *See* Craus at 54:23-55:6. She has reviewed numerous pleadings, Craus at 25:20-26:17, 32:25-33:5, 58:19-21, including drafts of pleadings. Craus at 65:14-21. Craus's attention to detail has been sufficient that she is aware that plaintiffs originally pled two causes of action, but the court sustained only the gray marketing claim. Craus at 58:22-59:2.

Dr. Kenneth Shockley, a retired physician and medical practice owner, knows whom he is suing -- "Adams Golf underwriters", Shockley deposition transcript ("Shockley") at 15:11-12 (attached as Exhibit B to Fox Dec.) -- and why:

> [T]he principals of the company, the directors, officers, whatever you want to call them, made millions of dollars under false pretenses, didn't give out all the facts and the little guy like me and other people got, excuse the expression, screwed.

Shockley at 15:18-25.

Shockley explains how the Registration Statement and Prospectus were misleading:

> [I]n the prospectus before the big shots sold out, the
> marketing was a little different than what it came out with the
> bad report afterwards.
>
> Q. In what way?
>
> A. Costcos, selling their clubs through Costcos instead of pro
> shops.

Shockley at 18:18-25.

Shockley understands that "I represent the people who invested in this company and lost money." Shockley at 87:18-20. Shockley is seeking to serve as class representative because "I got angry that it was a bait and switch, it was a scam." Shockley at 88:20-22.

Shockley has known one of the lawyers on plaintiffs' team, Alan Sanders, for "probably 25 years". Shockley at 97:9. Shockley receives periodic reports on the litigation from Sanders and lawyers at Berger & Montague. His lawyers send him materials with respect to the litigation, and Shockley asks questions. The updates he receives from his lawyers occur as frequently as monthly. Shockley at 99:10-100:2.[1]

Todd Tonore is a sales manager with a background in marketing. Tonore deposition transcript ("Tonore") at 7:11-12, 9:1-10:7 (attached as Exhibit C to Fox Dec.). He identified

---

[1] In this connection, defendants misstate the record to attempt to impugn the integrity and veracity of both Shockley and his lawyers. Shockley's deposition was scheduled for February 24. Fox Dec. at ¶ 16 and Ex. E. Plaintiffs' counsel did not inform defendants that Shockley had jury duty "beginning" on February 23, Def. Opp. at 22, but instead that, in light of Shockley's jury duty, counsel could not confirm the deposition before February 23rd. Fox Dec. at ¶ 17. Shockley did not testify that he was "on jury duty several weeks before the deposition", Def. Opp. at 23, but instead that he learned that he would be giving his deposition "[s]everal weeks ago". Shockley at 11:19-25. In fact, Shockley reported for jury duty on February 17, in Florida. He did not and could not know at that time how long his jury duty would continue. Declaration of Kenneth Shockley, which is attached as Ex. II, at ¶¶ 2 & 3. See also Shockley at 11:25-12:5.

In addition, on another subject, defendants flatly misread Shockley, Def. Opp. at 32, who stated that he did indeed enter into an agreement with his attorneys with regard to fees and other matters. Shockley at 108:13-22. Fox Dec. Ex. F.

defendants as Barney Adams, Adams Golf, "directors at the time of the IPO", and the underwriters. Tonore at 12:1-9. He is suing because "I lost a lot -- a tremendous amount of money. I feel like I was misled. And I'm representing the class that also lost a lot of money that I feel was misled." Tonore at 12:12-15.

Tonore testified that he and the other Class members were misled regarding "[t]he sale of their products through what they refer to as gray marketing." Tonore at 21:21-25. He described gray marketing and how it works: "someone . . . wound up selling the clubs into -- into a discounted market like a Costco or a Wal-Mart". Tonore at 22:12-15.
Tonore's goal is "[t]o possibly recoup some of the money that was lost by me and others -- other class members." Tonore at 53:9-10.

Tonore has spent hours reviewing documents in this case. Tonore at 57:4-13. He "will participate wherever needed" with respect to Court hearings. Tonore at 58:8-13. With respect to other responsibilities that might interfere with his duties as class representative, he testified that there is "nothing I can't work around." Tonore at 57:14-17. He has a firm understanding of why he is pursuing this case:

> At this point it's not about the money. It's -- because I've overcome the money. It's about right and wrong. And it's about the people that are a member of this class that didn't overcome the money, that were misled by -- by a company and a group of gentlemen that made millions at the class' -- the class members' and the shareholders' expense. It's criminal.

Tonore at 58:1-7.

Morrash, a C.P.A. and businessman, Morrash deposition transcript ("Morrash") at 12:16-14:11 (attached as Exhibit D to Fox Dec.), is of exactly the same mind:

> Q. Why do you want to be a class representative?

A. Because I think that there has been a -- an injustice here. There's been a wrong here. I think it's a wrong that needs to be righted. I think there's been a -- I think this is a case of thievery and theft. I think Barney Adams stole this money from people. Okay? In the -- in a broad sense of the word.

He didn't come and take his -- put his hands in our pockets, but he sold us a stock that he said and that the company said and that the underwriters said was worth $16 a share and he took our money. And in a very few months all that evaporated. So I think he ought to give that money back to us.

Morrash at 129:4-23.

Morrash also makes clear that this can hardly be characterized as lawyer-driven litigation:

A. This Complaint originated with me. Okay? This Complaint is a result of actions that I took. Okay? That's where this Complaint started. That's where this whole thing started. This whole thing started with me and Bill Shockley [the son of Kenneth Shockley]. The lawyers didn't find me, I found the attorneys.

Q. And so how did you get things started?

A. Bill Shockley and myself lost -- and his family members, we lost a lot of money on this transaction along with all the other class and subclass members. We were very upset about it.

We reviewed the financial statements, we reviewed other information that was -- that was available by way of the Internet, press releases, and we decided that there was enough suspicion here of something being wrong to take it to an attorney and to get their opinion as to whether or not our view that something was wrong here could be substantiated and was worth pursuing.

Morrash at 78:21-79:21.

Each of the four plaintiffs seeks to represent the Section 11 Class, and each but Tonore also seeks to represent the Section 12(a)(2) Subclass.

5

## II.  ARGUMENT

### A.    The Section 11 Class Period Should End Not Earlier Than January 7, 1999

Defendants argue that plaintiffs have not defined a Class Period.  However, plaintiffs assert a Section 12 claim on behalf of those persons who bought in the IPO, that is, on July 9-10, 1998, when the Registration Statement became effective and the IPO purchases occurred. See Def. Opp. at 4.

Plaintiffs' Section 11 claim is on behalf of all persons who purchased pursuant to the Registration Statement and Prospectus.  The Class Period thus begins on July 9, 1998. Although defendants suggest that October 22, 1998 is the last possible date for the Class Period, the Section 11 Class Period should end not earlier than January 7, 1999.  Since the October 22, 1998 press release was only a partial disclosure, it was insufficient to terminate the Class Period.  See Def. Ex. 6.  Defendants continued to mislead materially and to omit material facts until at least January 7, 1999.  In addition, defendants' contention that plaintiffs who bought their shares after the IPO cannot trace their shares back to the IPO -- limiting the Section 11 Class to a single day -- is incorrect.  On the record, tracing is possible for purchases at least through January 7, 1999.

### 1.    Defendants Did Not Make Full Disclosure Until January 7, 1999 at the Earliest

On October 22, 1998, defendants identified gray marketing as a secondary reason for Adams Golf's lowered expectations for the December 1998 quarter.  In this press release, defendants boasted of a 61.5% increase in net sales in the September 1998 quarter over the corresponding quarter of 1997.  Def. Ex. 6.

Defendants minimized the potential impact of gray marketing, citing "continuing

6

weakness in the golf equipment market" as the primary reason for the expectation that, in the December 1998 quarter, the Company's net income "will be at or slightly above a break even level." Defendants also said that gray marketing was limited to a single "membership warehouse club" and held out the possibility that by the end of 1998 Adams Golf would "stop the unauthorized distribution of our products to this retailer". Moreover, the October 22, 1998 press release emphasized that "[w]e remain optimistic . . . about our ability to increase our sales and earnings in 1999." Def. Ex. 6. The implication was that gray marketing might hurt results in the December 1998 quarter, but not beyond.

It was only later, on January 7, 1999, at the earliest, that Adams Golf began to provide anything approaching full disclosure with respect to the risk posed by gray marketing. In a January 7, 1999 press release, defendants disclosed that, in the December 1998 quarter, Adams Golf would not break even as projected in the October 22, 1998 release, but instead would lose $.17 - $.19 per share. See Def. Ex. 7. Not only was gray marketing targeted as one of the causes for this poor performance, but also the Company disclosed a material impact on results caused by credits issued to retailers "in connection with a new suggested retail pricing structure" that Adams Golf apparently found necessary as a result of the serious impact of gray marketing.

Moreover, the January 7, 1999 release expressed only mild enthusiasm for future prospects (claiming improvement to "our competitive posture . . . [and] benefit [to] our shareholders going forward") compared to much more glowing projections for 1999 performance in the October 22, 1998 release ("[w]e remain optimistic . . . about our ability to increase our sales and earnings in 1999"). Def. Ex. 6 & 7. In response, Adams Golf 's stock price dropped materially on January 7 and 8, 1999, from $4.31 (January 7th opening) to $3.50

7

(January 8th closing) or 18%. Def. Ex. 3.

When, if ever, defendants fully disclosed the matters they misrepresented and concealed in the Registration Statement and Prospectus is a factual issue on the merits, not appropriate for resolution at this stage. See, e.g., In re ML-Lee Acquisition Fund II, L.P., 848 F. Supp. 527, 559 (D. Del. 1994) (when an argument goes to the merits it is best left for later consideration). In any case, if the Court determines that there should be a specific end date for the Class Period, that end date should be not earlier than January 7, 1999.

> 2.    **Defendants Cannot Limit the Duration of the Section 11 Class Period By Speculating that Additional Shares Might Have Entered the Market**

Defendants allege that Tonore and members of the Class who bought after the date of the IPO have no standing to bring claims under Section 11. They speculate that Tonore and such Class members cannot trace their shares back to the IPO, on the basis that there may conceivably have been shares on the market, after the IPO, that could not be traced to the IPO.

There is no basis for defendants' argument. As defendants themselves admit, between the IPO and December 1, 1998, Adams Golf itself put no additional shares on the market. Def. Opp. at 30. Adams Golf also put no additional shares on the market before January 7, 1999. Although Adams Golf issued an S-8 on December 1, 1998, making more shares potentially available pursuant to stock options granted to employees, no shares actually entered the market pursuant to this S-8 before January 7, 1999.[2]

---

[2] The S-8, which incorporates by reference the July 1998 IPO Prospectus, states that Adams Golf must file "during any period in which offers or sales are being made, a post-effective amendment to this registration statement (I) to include any prospectus required by Section 10(a)(3) of the Securities Act of 1933; (ii) to reflect in the prospectus any facts or events arising after the effective date . . . ". See Def. Ex. 13 at p. 4, Section A.(1). Since no post-effective prospectus was filed until at least May 28, 1999, no new shares entered the

Defendants also argue that some insider who held Rule 144 stock could possibly have sold into the market at some point after the IPO, but defendants provide no evidence that any such Rule 144 sale actually occurred before January 7, 1999. Moreover, defendants acknowledge that the Underwriters had to approve any such sale by an insider within 180 days of the IPO (i.e., on or before January 10, 1999) (the "lock up"). See Def. Ex. 2 at p. 11.

This theoretical possibility of post IPO Rule 144 sales is insufficient to defeat or limit class certification. In re Data Access Systems Sec. Litig., 103 F.R.D. 130, 146 (D.N.J. 1984) (improper for court to deny class certification because of tracing which is a merits issue). It is impossible at this stage, before defendants have completed their document productions and before depositions, for plaintiffs to prove the negative -- that no insider obtained Underwriter permission and sold shares during the 180 day lock-up period. As Judge Schindler found in In re Initial Pub. Offering Sec. Litig., Fed. Sec. L. Rep. (CCH) P93, 014, P93, 090 n. 410 (S.D.N.Y. Oct. 13, 2004), where tracing involves proving a negative, defendants should shoulder that burden. ("It unjustifiably aggravates an already onerous burden to force plaintiffs to prove a negative").

Tonore bought his shares on the first trading day, July 10, 1998. Tonore at 81:8-12. Although he did not buy shares in the IPO, the Court should certify Tonore, along with Shockley, Craus and Morrash, as Class plaintiffs for the Section 11 Class.[3] Under Rule 23(c)(1)(C), the Court can adjust the parameters of the Section 11 Class if defendants produce evidence that insiders sold shares during the 180 day lock-up period, before January

---

market during the proposed Class Period.

[3] Tonore did not testify that he "has no idea how to trace his shares back to the IPO", as defendants claim. Def. Opp. at 31. Instead, he testified that he did not understand defendants' question about tracing. Tonore at 84:24-85:9. The question called for a legal conclusion, and plaintiffs' counsel properly objected.

9

7, 1999.[4]  See e.g., Schwartz v. Celestial Seasonings, 178 F.R.D. 545, 554-55 & n. 4.  (D. Colo. 1998) (tracing is a merits issue, not appropriate for consideration on the motion for class certification).

**B.    The Class Plaintiffs Satisfy Adequacy and Typicality Standards**

**1.    Typicality Standards**

Since typicality focuses on a class plaintiff's legal and factual theories, if the class representatives' claims arise from the same events or conduct and are based on the same legal theories as the class's claims, typicality is satisfied.  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001); Szczubelek v. Cendant Mortg. Corp., 215 F.R.D. 107, 117-18 (D.N.J. 2002) (low threshold for satisfying typicality).  The kind of "unique" defense required to defeat typicality would not apply to the claims of other class members, but would divert attention from the Class's case, thus disadvantaging absent class members.  Zenith Laboratories, Inc. v. Carter Wallace, Inc., 530 F.2d 508, 512 (3d Cir. 1979). See also, ML-Lee, 848 F. Supp. at 558-59 (a defense that applies to many class members as well as the class representative is not "unique").

**2.    Adequacy Standards**

Adequacy depends on just two factors:  (a) whether the plaintiff's attorney is qualified, experienced, and generally able to conduct the proposed litigation, and (b) whether the plaintiff has interests "antagonistic to" those of the class.  Hoxworth v. Blinder Robinson & Co., 980 F.2d 912, 923-24 (3d Cir. 1992); See Lewis v. Curtis, 671 F.2d 779, 788 (3d Cir. 1982) (burden is on the defendants to demonstrate that the proposed representation will be

---

[4]  Defendants argue that tracing must be determined individually for each plaintiff. Def. Opp. at 30.  This is untrue.  Once it is clear when non-IPO shares entered the market, the Court can make a class period decision.

inadequate).

Lewis further held that a class plaintiff may be adequate despite almost complete ignorance of the legal basis for his claim and the facts, so long as his interests parallel those of the class. 671 F.2d at 789. Courts in the Third Circuit continue to cite Lewis as controlling law on this point. See, e.g., Smith v. Dominion Bridge Corp., Fed. Sec. L. Rep. (CCH) P90, 163 (E.D. Pa. March 5, 1998); Friedman v. Lansdale Parking Authority, Fed. Sec. L. Rep. (CCH) P97801, P97, 946-47. (E.D. Pa. Aug. 30, 1993); Hoffman Elec. Inc. v. Emerson Elec. Co., 754 F. Supp. 1070, 1076-77 (W.D. Pa. 1991) (class plaintiffs' lack of knowledge not a reason to deny class certification).   Former Chief Judge Farnan recognized the standards of Lewis and certified  classes despite the same arguments made here, that plaintiffs were "ignorant of the facts" and were "rubber stamps" for their counsel. DaimlerChrysler AG Secs. Litig., 216 F.R.D. 291, 299-300 (D. Del. 2003) (in this Circuit, even post-PSLRA, "plaintiffs are held to a 'very minimal requirement of knowledge about the litigation and the facts upon which it is based'") citing ML-Lee, 843 F. Supp. at 559-60.[5]

Further, this Circuit has repeatedly found that in complex and abstract securities cases, counsel, not the class plaintiffs, must direct and manage the action. Defendants' arguments disregard the necessary and customary place of counsel in complex litigation. As Judge Aldisert has written: "Experience teaches that it is counsel for the class representatives and not the named parties, who direct and manage these actions." Greenfield v. Villager Indus., Inc., 483 F.2d 824, 832 n. 9 (3d Cir. 1973). See also, Dominion Bridge,

---

[5] Defendants have failed to cite or distinguish controlling Third Circuit law contrary to their position. Indeed, they have misrepresented the law, claiming that this Court in DaimlerChrysler AG found that "[i]n the Third Circuit" courts have applied the  standards that defendants advocate. (Def. Opp. at 18)  In fact, in Daimler Chrysler AG Judge Farnan referred to a handful of contrary cases in other Circuits, then cited to ML-Lee for the governing Third Circuit rule and certified the class.  216 F.R.D. at 299-300.

Fed. Sec. L. Rep. at P90, 168 ("the courts in this Circuit have consistently found that it is counsel, not the named plaintiff, who controls the class action").

### 3. Plaintiffs Have Demonstrated Knowledge of Their Claims and Commitment to the Class

As shown above, none of plaintiffs is a puppet of counsel, lacking an understanding of the proceeding they have brought or disinterested in its outcome. Each plaintiff has demonstrated knowledge of the claims and the nature of this litigation despite the lapse of six years since the litigation began and nearly seven years since the IPO. Each is committed to the interests of the Class.

As held in <u>Lewis v. Curtis</u> and its progeny, whether a class will receive adequate representation depends primarily on whether the lawyers for the class will pursue the interests of the class representatives and the Class in a professionally skillful manner. Here, the experienced and skilled counsel for the Class will continue to prosecute this action effectively and manage it efficiently. In a word, these proposed Class representatives and their counsel are entirely adequate. None of the so-called "unique defenses" argued by defendants renders any of the four inadequate.

### 4. Defendants Have Unjustifiably Attacked Plaintiffs

In their effort to defeat certification, defendants have stretched many facts and relied on others that are irrelevant.

#### a. Defendants Distort Plaintiffs' Typicality

Defendants claim that plaintiff Craus is atypical because she is "preoccupied" with a unique theory of liability, since she testified that she believes that Barney Adams misrepresented to her that she could acquire shares of Adams stock at a discount price. Def. Opp. at 33-34. This is sophistry; the subject came up only because defendants posed broad

and irrelevant questions about what Craus personally thought Adams should have disclosed. See Craus at 13:4-15. Craus has not asserted or tried to assert this personal claim in this case. Rather, by joining in the Consolidated Amended Complaint she has elected to be bound by the theory of the case pursued in it. Wolgin v. Magic Marker Corp., 82 F.R.D. 168, 172 (E.D. Pa. 1979) (no atypicality when proposed plaintiff has a separate personal contention, but alleges the same claim as the class). Her claimed "preoccupation" is simply irrelevant.

Defendants claim that all plaintiffs are atypical because they all "arguably" knew that Adams faced gray marketing problems before the IPO. Def. Opp. at 25. This argument is a red herring. Even if plaintiffs had in fact known about the golf clubs at Costco before the IPO, this knowledge would not provide any defense, since reliance is not an element of plaintiffs' claims. In re Adams Golf Sec. Litig.,381 F.3d 267, 274 n. 7. (3d Cir. 2004); Def. Opp. at 12. Further, materiality is a factual issue not ripe for resolution at this stage. See e.g., ML-Lee, 848 F. Supp. at 559.

Moreover, each plaintiff denied having such knowledge. Craus at 14:22-15:9 ("I did not read it before the IPO"); Shockley at 18:18-22 ("in the prospectus . . . the marketing was a little different than what it came out with . . . afterwards."); Tonore at 14:1-7 (with respect to gray marketing "no indication at the time of the IPO that there was any information being withheld. But after . . . then the information was revealed."); Morrash at 17:5-8 (prospectus did not disclose "the company's product being sold in gray markets"). Defendants argue that because two plaintiffs took an interest in Adams before the IPO, they could conceivably have run across the June 1998 press release (Def. Ex. 8) that announced that Adams had filed a Bill of Discovery to determine how some of its clubs came into Costco's possession. Def.

Opp. at 25-26. But, as noted, they did not. See Craus at 22:10-12 (gray marketing "not revealed to me"); Tonore at 22:19-23:2 ("I never read it anywhere" before IPO). Plaintiffs denied seeing the June press release.

As for the two plaintiffs who did not read about Adams before the IPO, defendants argue that they "would" have known of a gray marketing problem if their broker followed the Company. Def. Opp. at 26-27. Yet defendants have no evidence as to what any particular broker did or did not know. Their argument is based on nothing but speculation.

Defendants also argue that all plaintiffs knew of the undisclosed risks to Adams, because some plaintiffs testified that they are aware that in the world there exist some other companies, apart from Adams Golf, that are impacted by gray marketing. This argument fails for two reasons. First, the cited testimony offers no evidence that plaintiffs knew of the risks to Adams Golf in 1998. Second, knowledge of the general existence of gray marketing is not a "unique" defense, since this "defense" would be applicable to most if not all Class members, including all who followed the Company, all who bought from brokers and all who had any knowledge of gray marketing in any industry at any time. ML-Lee, 848 F. Supp. at 559.

Defendants claim that Tonore and Craus are atypical because they purchased after the October 22, 1998 announcement that touched on the existence of gray marketing. But in this 1933 Act case, where reliance is not an issue, such later purchases are irrelevant. Moreover, defendants' October 22, 1998 disclosure boasted of strong recent performance, projected improved results for 1999, and minimized the gray marketing risk. Def. Ex. 6. In addition, purchases after partial or even full disclosure are of no significance. Both Craus and Tonore testified that they bought when the stock was very low, in the hope that the stock

14

would go up and they could recoup their losses through "stock averaging." Craus 99:3-16; Tonore 101:9-102:3. Cost averaging is a common practice among investors and does not render them atypical. In re Rent-Way Sec. Litig., 218 F.R.D. 101, 114 (W.D. Pa. 2003) (purchases after defendant discloses truth are irrelevant); Cheney v. Cyberguard Corp., 213 F.R.D. 484, 493-4 (S.D. Fla. 2003) (buying securities at a low price to "cost average" does not make a class representative atypical).

Defendants further charge that plaintiffs are atypical because they "admitted" that factors unrelated to gray marketing caused Adams Golf's stock price drop. Defendants base this charge on nothing more than some plaintiffs' testimony that, generally speaking, many factors may affect a stock's price. Indeed, the testimony of Morrash cited by defendants shows exactly the opposite of what they claim: Morrash recognized that various factors may affect a stock's price, then denied that any factor other than the belated disclosure of gray marketing caused Adams Golf's stock price to go down. Morrash 169:10-17. Once again, because almost any stockholder would agree that many different issues can cause a stock to go down, everyone in the class would be subject to that "defense", making it anything but "unique".

Defendants also insinuate, unfairly, that Shockley admitted that he is not an adequate class representative. Shockley testified merely that he does not consider himself to be a "perfect" representative, Shockley, 93:7-14, even though his testimony established that he would be a far more adequate representative than, for example the plaintiff in Lewis v. Curtis. See pp. 11 above. In the Third Circuit, perfection is not required. See, e.g., DaimlerChrysler AG, 216 F.R.D. at 299-300.

15

      **b.**     **The Court Should Ignore Personal Attacks**
             **on Plaintiffs and Their Counsel**

As held in <u>Weikel v. Tower Semiconductor, Ltd.</u>, 183 F.R.D. 377, 397 (D.N.J. 1998),

at the class certification stage "attacks on credibility are not often given much weight."

(citations omitted). <u>See also</u> <u>In re IPO Litig.</u>, Fed. Sec. L. Rep. (CCH) P93, 014, at P93, 074.

There is good reason for this. Defendants who attack a proposed representative's credibility,

while feigning concern for the interests of the Class, "are realistically not concerned with the

'best' representation for the plaintiff class but rather their goal is to ensure 'no'

representation." <u>Sley v. Jamaica Water & Utilities, Inc.</u>, 77 F.R.D. 391, 394 (E.D. Pa. 1977).

Here, defendants' attacks fail to demonstrate why these plaintiffs cannot advance the

interests of the Class. For example, defendants seize upon claimed errors in some of

plaintiffs' Lead Plaintiff certifications. They even suggest that some plaintiffs intended to

mislead the Court by not including certain transactions in them, even though the errors are

inconsequential. None of these claimed errors affects plaintiffs' adequacy. For example,

Craus's form asked her to list purchases and sales "in the IPO," making it understandable

that she did not include the sales she made months after the IPO. Def. Ex. 9, Dep. Ex. 4. Dr.

Shockley's certification omitted the purchase and sale of an additional 1,500 shares, which

he sold shortly after purchase for a profit of just $557. Def. Ex. 12, Dep. Ex. 23, 30. Indeed,

this buy-and-sell was hardly material in light of the very large losses Shockley suffered on

the other IPO shares he purchased and held. Def. Ex. 12, Dep. Ex. 30. In any event, a

misinterpretation or even an error in Lead Plaintiff's certification does not call into question

his or her ability to represent the Class. <u>See</u> <u>e.g.</u>, <u>In re Honeywell Int'l., Inc.</u>, 211 F.R.D. 255,

262-63 (D.N.J. 2002).

Defendants distort plaintiffs' testimony in claiming that plaintiffs were "solicited" by plaintiffs' counsel. This charge is both unsupported and untrue. Defendants' only purported "support" was a confused statement, corrected by Craus, that one of plaintiffs' counsel had called her before she called him. See Craus at 92:24-93:4 ("somehow I was made aware of the class action, and I don't know -- I probably called that law firm.") Apart from ethical considerations, counsel could not have called Craus first, because they would have had no way to identify her as a class member. See Collins Dec., attached as Ex. III, at ¶¶ 7 & 8. It is likely that Craus saw the press release issued in connection with the filing of the suit, left a message, and counsel returned her call. See Ex. 1 to Collins Dec. (PSLRA press release issued by the Berger firm).

Likewise, defendants claim that counsel solicited Tonore. This contradicts Tonore's testimony that he went to his personal lawyer who recommended that he join the class that was announced in a press release from Keller Rohrback. Tonore testified, "I contacted them and joined." Tonore at 47:12-14. Further, defendants cite testimony by Shockley that, when he filed the suit, he did not "volunteer" to be a class representative. Defendants failed to follow up as to his meaning. Shockley 87:24-25. Had defendants done so, they would have learned that it was not counsel who initiated the case and urged Shockley to represent the Class, but instead it was Morrash and Shockley's son. Morrash at 78:21-81:22.

Defendants go so far as to suggest something amiss from the fact that Craus, having previously seen the Prospectus in its original double-sided form, at first testified that she did not recall seeing the Prospectus in the form defendants showed her at deposition, which was copied on one side of the page only, not both sides. What defendants showed her was twice as thick as what she had read previously. Craus at 18:20-20:5.

17

Defendants attack plaintiffs and their counsel for the absence of written retainer agreements. Two of the plaintiffs, Tonore and Shockley, had such agreements prepared by their counsel, who are counsel of record in this case. See Fox Dec. Ex. F and G.

As for the other two plaintiffs, any lack of retainer agreements has caused no harm. Indeed, their absence is irrelevant to these proceedings. In re Currency Conversion Fee Antitrust Litig., 224 F.R.D. 555, 563 (S.D.N.Y. 2004) (fee agreements unnecessary if plaintiffs understand their agreement); Lehocky v. Tidel Techs. Inc., 220 F.R.D. 491, 503 (S.D. Tex. 2004) ("the absence of a fee agreement lends no weight to Lead Plaintiffs' inadequacy."); Dominion Bridge Corp., Fed. Sec. L. Rep. (CCH) P90, 165 (lack of written fee agreement irrelevant where plaintiff understands terms of retention). Craus and Morrash testified that they understand the terms of their contingent fee agreement, including that the amount of attorney's fees, if any, would be decided by the Court.[6] See Craus at 54:4-7; Morrash 139:23-140:6.

### c.    Defendants' Tactics Have Unfairly Confused The Issues

Throughout the depositions of the four Class plaintiffs, defendants took the tack of asking broad, vague questions regarding plaintiffs' layman's understanding of details of a case which they brought almost six years ago. Given the passage of time since the case was filed, and the even longer amount of time since they invested in Adams Golf, it is not surprising that plaintiffs do not recall details regarding which documents they saw and did not see, the identity and number of defendants, particular motions filed years ago, and the like. Defendants have tried to exploit the lapse of time and inexperience of plaintiffs -- none

---

[6] In addition, it was Berger & Montague's regular procedure in the Adams Golf case, in responding to inquiries from persons wishing to participate as plaintiffs, to inform them in writing that the legal representation would be on a contingent fee and cost basis. See Collins Dec. ¶¶ 3 & 4.

18

of whom could be argued to be "professional plaintiffs" -- to attack them.

This tactic is particularly unfair here, where plaintiffs include a retired physician, a businessman with a CPA, a real estate developer and a sales manager with a strong knowledge of marketing. All four plaintiffs have come forth in hopes that with the help of counsel they can right a wrong and recover for less fortunate members of the Class. See, for example, Shockley at 80:9-15 ("the other small peons deserve to get their money back", including "people in my office that bought the stock because I did"); Craus at 48:13-14 ("there are a lot of people out there who lost money that need to be represented by somebody for recovery"); Tonore at 53:9-10 (seeking to serve as class representative to recover "money that was lost by me and others -- other class members."); Morrash at 129:7-9 ("There's been a wrong here. I think it's a wrong that needs to be righted.").

Plaintiffs have all consulted on numerous occasions with counsel, reviewed drafts of legal filings, provided documents and interrogatory answers, and submitted to depositions on a schedule made tight by defendants' delay in seeking discovery.[7] Fox Dec. at ¶¶ 13-16. Plaintiffs understand their claims and their role in this litigation. Even through appeal and remand, they remain committed to protecting the Class. If the Court examines the complete record of discovery, rather than the out-of-context snippets cobbled together by defendants, it will find that plaintiffs satisfy the well-developed law of this Circuit, and that defendants' attacks on them amount to "grasping at straws" to find some "alleged infirmities" in them. See Data Access, 103 F.R.D. at 141.

---

[7] After the filing of Rule 26 disclosures, defendants waited a month to serve document requests and interrogatories on plaintiffs and then demanded the depositions of all class plaintiffs in a single week, even though Craus had surgery planned for that week and Shockley had been called for jury duty, of indefinite duration, the preceding Thursday. [Fox Dec. at ¶¶ 13-16.] Lead Plaintiffs' determination is evidenced by their willingness to cancel appointments and travel to the deposition sites within the short period demanded by defendants.

### III.    **CONCLUSION**

For all the reasons stated above, as well in plaintiffs' opening brief, the Class

and the Subclass should be certified in all respects.

Dated:  April 4, 2005

<div style="margin-left: 40%">

Respectfully submitted,

ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.

   /s/ Carmella P. Keener
Carmella P. Keener (DSBA No.2810)
919 N. Market St., Suite 1401
P.O. Box 1070
Wilmington, DE 19899
(302) 656-4433
ckeener@rmgglaw.com

PLAINTIFFS' LIAISON COUNSEL

</div>

OF COUNSEL:

BERGER & MONTAGUE, P.C.
Todd S. Collins
Elizabeth W. Fox
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

LAW OFFICES OF DONALD B. LEWIS
Donald B. Lewis
Five Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

KELLER ROHRBACK, LLP
Lynn Lincoln Sarko
Elizabeth Leland
Julie Desper
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900

ABRAHAMS, LOWENSTEIN, BUSHMAN
 & KAUFFMAN, P.C.
Alan Sanders
Morton Simon
One Liberty Place, Suite 3100
1650 Market Street
Philadelphia, PA 19103-7392
(215) 561-1030

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 4th day of April, 2005, I electronically filed

**Plaintiffs' Reply Brief In Support Of Their Motion For Class Action Certification** with the

Clerk of Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Kevin G. Abrams, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Robert K. Payson, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

and a copy has been served by electronic mail upon the following:

Theodore J. McEvoy, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com

Michael J. Chepiga, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: mchepiga@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

_____ */s/ Carmella P. Keener* _____
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT, GROSS
  & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com