# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.,           :         CIVIL ACTION NO. 99-371
SECURITIES LITIGATION              :

## DECLARATION OF ELIZABETH W. FOX, ESQ.

I, ELIZABETH W. FOX, ESQUIRE, declare under penalty of perjury:

1.      I am an attorney at Berger & Montague, P.C. and was in charge of preparing discovery responses and scheduling the depositions of the Proposed Lead Plaintiffs.

2.      On receipt of the interrogatories and document requests, I sent each plaintiff the interrogatories and document requests directed to that plaintiff.

3.      I then called each plaintiff and obtained their responses. In addition, Dr. Shockley and Mr. Morrash sent drafts of their responses.

4.      I then had the responses typed and sent the finals back to plaintiffs for their approval.

5.      All plaintiffs confirmed that their typed responses were correct before the responses were served on defendants.

6.      Attached hereto as Exhibit A is a true and correct copy of the relevant sections of the deposition of Patricia Craus taken on February 18, 2005.

7.      Attached hereto as Exhibit B is a true and correct copy of the relevant sections of the deposition of Dr. Kenneth Shockley taken on February 25, 2005.

8.      Attached hereto as Exhibit C is a true and correct copy of the relevant sections of the deposition of Todd Tonore taken on February 25, 2005.

9.      Attached hereto as Exhibit D is a true and correct copy of the relevant sections of the deposition of John Morrash taken on February 23, 2005.

10.    Attached hereto as Exhibit E are true and correct copies of e-mail correspondence between Adams Golf's attorneys and Berger & Montague attorneys.

11.    Attached hereto as Exhibit F is a true and correct copy of Dr. Shockley's retainer agreement with counsel.

12.    Attached hereto as Exhibit G is a true and correct copy of Mr. Tonore's retainer agreement with counsel.

13.    Although defendants could have served interrogatories and document requests in mid-December under the Court's Scheduling Order of November 29, 2004, defendants delayed serving interrogatories and document requests until January 12, 2005 with answers due on February 11, 2005. See e-mail Brannen to Fox, February 1, 2005, in Ex. E.

14.    Defendants then demanded that all proposed lead plaintiffs appear for deposition during the week of February 21, 2005 (February 21 itself was President's Day) and proposed doing two depositions on one day. See Brannen to Fox, February 4, 2005, in Ex. E..

15.    Although Ms. Craus was scheduled for surgery during that week, she agreed to adjust her schedule so that she could be deposed on Friday, February 18. See e-mail Fox to Brannen , February 9, 2005, in Ex. E..

16.    Dr. Shockley was originally scheduled for deposition on February 24, 2005. See e-mail Brannen to Fox  February 8, 2005, in Ex. E.

17.    On inquiring of Dr. Shockley's personal counsel, Alan Sanders, Esq., if Dr. Shockley would be available on February 24th, Sanders told me that Dr. Shockley had jury duty in Florida. Dr. Shockley did not know how long the jury duty would last. Sanders told me he would know by February 23, 2005 if Dr. Shockley would be free for the 24th. See e-mail Fox to

Brannen, February 9, 2005, in Ex. E.

18.    It is my understanding that Mr. Sanders was out of his office on vacation over the Presidents' Day weekend from Friday, February 18 to Wednesday, February 23, 2005. Se e-mail Fox to Brannen, Feb. 10 in Ex. E. Mr. Sanders called me on Tuesday, February 22, to tell me that Dr. Shockley would be available on Friday, February 25th. See e-mail of February 10, 2005, Fox to Brannen, in Ex. E.

19.    On the 22nd, after speaking with Mr. Sanders, I sent a letter by e-mail (pdf) to Adams Golf's counsel Michelle Reed in response to her letter to me, confirming that Dr. Shockley would be available for Friday the 25th. See February 22, 2005 letter from Fox to Reed, and e-mails dated February 24, 2005 between Todd Collins, who defended Dr. Shockley and Jenny Brannen, representing Adams Golf, confirming the deposition for the 25th, in Ex. E.

20.    I declare under penalty of perjury that the foregoing is true and correct.


DATED: April 3, 2004                    _____
                                        Elizabeth W. Fox


392589.wpd

# EXHIBIT A

Page 1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF DELAWARE

3                              )

                               )

4    IN RE:                    )

                               )    CIVIL ACTION NO. 99-371-KAJ

5    ADAMS GOLF, INC.,         )    (CONSOLIDATED)

     SECURITIES LITIGATION     )

6                              )

                               )

7                              )

8

9    * * * * * * * * * * * * * * * * * * * * * * * * * *

10              ORAL DEPOSITION OF

11                PATRICIA CRAUS

12              FEBRUARY 18, 2005

13   * * * * * * * * * * * * * * * * * * * * * * * * * *

14

15       ORAL DEPOSITION OF PATRICIA CRAUS, produced as a

16   witness at the instance of the Defendants, and duly

17   sworn, was taken in the above-styled and numbered cause

18   on February 18, 2005, from 9:59 a.m. to 1:15 p.m.,

19   before DELLA M. SAWVEL, CSR in and for the State of

20   Texas, reported by machine shorthand, at the offices of

21   AKIN GUMP STRAUSS HAUER & FELD, LLP, 300 West 6th

22   Street, Suite 2100, Austin, Texas, pursuant to Federal

23   Rule of Civil Procedure 30(b)(1) and the District of

24   Delaware Federal Rules.

25

Page 6

1  something that is not securities or anything, but
2  probably it was longer ago than that. I would just be
3  guessing to say around 1992 or something.
4     Q.  Okay. What types of cases have you had your
5  deposition taken in?
6     A.  I'm a land developer, and it would be like a
7  homeowner might file suit over something they felt
8  wasn't what it was supposed to be, and then I ended up
9  in a suit, a class action suit with American Airlines.
10  They just sent me papers and I don't have a clue what
11  they did.
12     Q.  So you weren't a named party?
13     A.  No, no, no.
14        MS. FOX  But there was no deposition in
15  that.
16        THE WITNESS: No deposition, no, I'm
17  sorry. I got, I think, three little tickets that if you
18  appeared in a chicken suit at 8:00, you got $15 off your
19  ticket, or something to that effect.
20     Q.  (BY MS. REED)  Were you a party in the land
21  developer suits?
22     A.  Yes.
23     Q.  And were you a defendant?
24     A.  Individually, no. No, only as a company.
25     Q.  Okay. I just want to go over some basic ground

Page 7

1  rules.
2     A.  Sure.
3     Q.  Since you've had it taken before, you probably
4  know, you're under oath and so this is as if we were in
5  court. You're supposed to testify truthfully. And this
6  is probably the most important rule, is to answer
7  audibly, uh-huhs, uh-uhs, are difficult for her to
8  type down, and it's best for us not to talk over one
9  another. I'm sometimes the worst at that. Because it's
10  hard for her to take down two people talking at the same
11  time.
12        Tell me if you don't understand a question
13  I ask. It's no problem. I can rephrase it. I'll try
14  to be clear, but if you answer, I will assume that you
15  understand the question. If you need a break, say so.
16  We can do it at any time. Try not to leave a question
17  pending. Just answer the question and we can take a
18  break. Don't guess in your answers to any of these
19  questions, but I'm still entitled to your best
20  recollection. So -- but there's no reason to guess. Is
21  there any reason you can't give your best testimony here
22  today?
23     A.  No.
24     Q.  And is there any mental or physical condition
25  or medications that would prevent you from testifying

Page 8

1  truthfully and accurately?
2     A.  No.
3     Q.  Could you give me your address?
4     A.  520 Lakeside, one word, L-A-K-E-S-I-D-E, Drive,
5  and it's in the town of Azle, A-Z-L-E, Texas, 76020.
6     Q.  And were you living at that address in 1998 to
7  '99?
8     A.  Yes.
9     Q.  And what is your business?
10     A.  Basically, it has been land development, but
11  also building shopping -- built a shopping center and
12  movie theatre and various investments.
13     Q.  What is the name of your business?
14     A.  I have several. The most active would be Star
15  Village, L.P.
16     Q.  Are you married?
17     A.  No.
18     Q.  I'd like to go over some of your educational
19  background starting with high school, going through any
20  potential graduate school you might have had.
21     A.  High school was in Beaumont, Texas, and then a
22  BA degree from Howard Payne University in Brownwood.
23     Q.  What was your degree that you received?
24     A.  Major in speech.
25     Q.  Sorry. I should have asked what your

Page 9

1  major/minor was, because your degree was a BA.
2     A.  It was a BA degree.
3     Q.  Did you have any financial business accounting
4  classes?
5     A.  I think I had one class that was business. I
6  minored in Bible.
7     Q.  In --
8     A.  Bible.
9     Q.  Okay. And do you have any graduate education?
10     A.  No.
11     Q.  Have you taken any seminars or trade courses
12  since -- since graduating from college?
13     A.  Well, I received a broker's license from the
14  State of Texas.
15     Q.  A real estate?
16     A.  Yes.
17     Q.  When did you receive that license?
18        MS. FOX: Don't guess.
19        THE WITNESS: A very long time ago.
20     Q.  (BY MS. REED)  Are you a member of any
21  professional societies?
22     A.  No.
23     Q.  Now, I'd like to turn to your employment
24  history. If you could, list your employers since you
25  graduated from college. Now, I know that might be a

Page 10

1  lot. So if you want to sort of group them, that's fine,
2  so that we can move it along.
3         MS. FOX:  Do you have that -- off the
4  record just a second.
5         (Discussion off the record)
6     Q.  (BY MS. REED) Does the CV cover your major
7  employers since you graduated?
8     A.  Yes.
9     Q.  Okay. Let's skip over this, and then we can
10  come back.
11        MS. FOX:  That's fine.
12     Q.  (BY MS. REED) When did you learn that you were
13  going to have your deposition taken in this case?
14     A.  I don't remember the date, but in the past year
15  or so.
16     Q.  And who told you?
17     A.  The firm of -- that's represented by Ms. Fox,
18  Berger & Montague.
19     Q.  Did you meet with anyone to prepare for this
20  deposition?
21     A.  Yes.
22     Q.  Who did you meet with?
23     A.  Ms. Fox.
24     Q.  When did you meet with Ms. Fox?
25     A.  Last night.

Page 11

1     Q.  Did you meet with her at any other time?
2     A.  No.
3     Q.  How long did you meet?
4     A.  We had dinner, probably two hours at the
5  maximum.
6     Q.  Have you met personally with any of your
7  attorneys before today?
8     A.  No.
9     Q.  Or I guess I should say before last night?
10     A.  Yes. Okay.
11     Q.  And did you -- have you communicated with
12  anyone else in preparation for your deposition?
13     A.  Well, I have spoken with Todd Collins with the
14  firm of Berger & Montague, and I have spoken with
15  Ms. Fox.
16     Q.  Have you spoken with anyone else about your
17  deposition other than your attorneys?
18     A.  No.
19     Q.  And this includes phone or written
20  communications?
21     A.  Yes.
22     Q.  Did you review any documents to prepare for
23  your deposition?
24     A.  Yes.
25     Q.  What did you review?

Page 12

1     A.  The papers for copying. That would have been
2  generally most of them.
3     Q.  And when did you review those documents?
4     A.  In the past two weeks.
5     Q.  Did any of those documents refresh your memory
6  about the events connected with this lawsuit?
7     A.  Yes, it did some.
8     Q.  Which ones?
9     A.  The portfolio, the -- it was from Lehman
10  Brothers.
11     Q.  The one we saw that was bound?
12     A.  Yes, yes.
13     Q.  We can identify that later.
14     A.  Prospectus or whatever they call them.
15     Q.  Who are you suing in this action?
16     A.  Adams Golf and named parties, and I'm not sure
17  who else is involved in the suit.
18     Q.  Do you know any of those named parties? Can
19  you name any of those named parties?
20     A.  You mean like with Adams Golf or something?
21     Q.  Yes.
22     A.  Yes, Barney Adams.
23     Q.  Any others?
24     A.  No.
25     Q.  Why are you suing my clients?

Page 1.

1     A.  I purchased stock at the initial public
2  offering, and I feel I was misled as to various facts
3  provided to me, both before and after the purchase.
4     Q.  Which facts do you feel misled you?
5     A.  First, I was to be sold 2,000 shares of stock
6  at a price that preceded the $16 IPO rate. Then, I
7  realized that afterward that a great, great deal of
8  funds, you know, went directly to other people from the
9  IPO and that in the gray market area, they call it,
10  there were -- there was a real overload of product
11  existent, and because I had gone into great detail that
12  the product would be sold only through pro shops and --
13     Q.  Pro shops?
14     A.  Yes. Golf pro shops. I'm sorry. And that's
15  probably about it, I guess.
16     Q.  Are you suing on the basis of these two or
17  three, however you want to classify them,
18  representations, on all of those?
19     A.  Yes, in all of them, because I'm sure in some
20  way, each one has an involvement.
21     Q.  Now, you talked about a gray market overload.
22  What do you believe that my clients did wrong?
23     A.  I directly was told that, by Mr. Adams, that
24  one of the secrets to the success of the company would
25  be the marketing process. Having been in marketing

Page 14

1    through my companies, I know that that's very critical
2    to whether you succeed or fail. And supply and demand
3    creates value, and I felt that was a good approach,
4    because it would be sold through either golf
5    professional shops at the golf courses or places that
6    teach like Hank Haney school in Dallas and that the --
7    it would become a high line, not an inexpensive-type
8    golf club that you could purchase, you know, just about
9    anywhere. That was probably, I think, their most --
10   their intent there, was probably the right direction.
11   They just didn't do it.
12      Q.   And what evidence do you have to support your
13   belief that they didn't do it?
14      A.   Well, number one -- of course, I've read
15   articles regarding the gray market event. They called
16   it gray market. I don't know why that particular term,
17   it meant sales that were -- that were done that were
18   a lot cheaper than like if I went to the golf pro shop
19   to buy the clubs, I would pay a much higher price than
20   if you went to one of the retail-type stores that were
21   discounted heavily.
22      Also, during that same time, I cannot
23   remember whether I read it or I was told by Barney or
24   who, but I was told that because of the gray market
25   happening, that there were many golf professional shops

Page 15

1    that were very disenchanted and were returning their
2    clubs back to Adams Golf and getting -- or requesting
3    their monies back.
4       Q.   Do you remember when you read these articles?
5       A.   It would have been after the IPO, but not too
6    far after.
7       Q.   Did you read any of these articles before the
8    IPO?
9       A.   Oh, no, I did not read it before the IPO.
10      Q.   Do you know how many defendants there are in
11   this action?
12      A.   No, not totally. I know Adams Golf.
13      Q.   In 1998, what sort of business was Adams Golf
14   in?
15      A.   Barney -- I had toured the factory several
16   times or his plant.
17      THE REPORTER:   You had?
18      THE WITNESS:   I had toured his plant
19   several times and it was the Tight Lies that were, I
20   think, basically Fairway Woods, and he demonstrated, you
21   know, the -- how you put them together and the various
22   things. That would probably be it.
23      Q.   (BY MS. REED) Do you know how -- I guess we've
24   already covered. You know how Adams markets its
25   products. Do you know in 1998 who Adams sold its clubs

Page 16

1    to?
2       A.   I couldn't name who they sold it to. It was
3    supposed to be golf pro shops and I know Hank Haney
4    School of Golf had them.
5       Q.   Have you ever seen any Adams Golf
6    advertisements?
7       A.   Yes.
8       Q.   Were these television advertisements?
9       A.   I might have seen one television advertisement;
10   otherwise, it would have possibly been something out of
11   a golf magazine.
12      Q.   In your interrogatories, you said that you saw
13   ads in the paper for clubs sold at discount or off-price
14   stores; is that right?
15      A.   Yes.
16      Q.   When did you see these advertisements?
17      A.   It would have been after the IPO, but not too
18   much after.
19      Q.   When you say not too much after --
20      A.   Well, like in months, not years.
21      Q.   Do you remember what stores were advertising?
22      A.   Would you repeat that?
23      Q.   Yeah, let me clarify. Do you remember what
24   stores were advertising the discount on Adams Golf
25   clubs?

Page 17

1       A.   I think that Cosco was involved in the article.
2    I can't remember the others, no.
3       Q.   When did you first learn about the IPO?
4       A.   At least a month or two before the IPO.
5       Q.   So the IPO is in July. So May time frame?
6    Does that sound right?
7       MS. FOX:   I think there's some documents.
8       THE WITNESS:   Dates on the documents would
9    have taken it back as far as I have written documents,
10   but I was aware several -- you know, as I say, a couple,
11   three months ago, before.
12      Q.   (BY MS. REED) Were you aware before Lehman
13   Brothers sent you those documents?
14      A.   Yes.
15      Q.   And how were you made aware?
16      A.   Barney Adams and Clyde Smith.
17      Q.   And who's Clyde Smith?
18      A.   A business -- well, a very close friend and a
19   business associate in one instance.
20      Q.   And what is his relationship to Adams Golf?
21      A.   He was a major backer of Barney Adams in the
22   beginning of his company.
23      Q.   A financial backer or just --
24      A.   Yes, a financial backer and they were friends,
25   I'm sure.

PATRICIA CRAUS                    2/18/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 18

```
 1     Q.  After learning about the IPO, Adams Golf IPO,
 2  did you follow the company?
 3     A.  Yes.
 4     Q.  How did you do that?
 5     A.  Of course, the newspapers. Possibly a
 6  conversation with Barney Adams over the telephone and
 7  discussions with Mr. and Mrs. Smith.
 8     Q.  So you -- did you -- you said you saw news
 9  articles about Adams Golf?
10     A.  Yes.
11     Q.  Did you see press releases about Adams Golf?
12     A.  There was a press release stating there would
13  be an IPO. Otherwise, it would have been related to the
14  gray market information and that type thing.
15     Q.  What was your understanding of the -- withdraw.
16  Who is W.D.C. McKenzie?
17     A.  Who is who?
18     Q.  W.D.C. McKenzie?
19     A.  I don't know.
20     Q.  I'm now going to show you what's been marked as
21  Defendant's Exhibit 1. Do you recognize this document?
22     A.  I don't know that I've ever seen this.
23     Q.  Well, let me represent to you -- just going to
24  identify it for the record. Defendant's Exhibit 1 is
25  Amendment No. 3 to Form S-1 of Adams Golf, Inc., without
```

Page 19

```
 1  amendments, and it's not Bates stamped. This is the
 2  prospectus that Adams Golf submitted to the ICC in
 3  connection with this IPO.
 4     MS. FOX:  It's a copy of the --
 5     MS. REED:  Yeah, excuse me, it's a copy of
 6  the prospectus. In fact, everything I'm using today
 7  will be copies. None of them will be originals.
 8     THE WITNESS:  I received something from
 9  Lehman Brothers, but I don't remember anything this
10  thick. I remember more clearly the booklet that's being
11  copied.
12     Q.  (BY MS. REED) Okay.
13     A.  To the best of my memory, I don't know.
14     MS. FOX:  This would have been a copy of
15  two-sided tissue paper. So it probably wouldn't have
16  been this thick, is that right, the original?
17     MS. REED:  Probably not.
18     MS. FOX:  The original probably would have
19  been in a form of the one that you produced?
20     THE WITNESS:  That fits more to my memory,
21  is something around that other size.
22     MS. REED:  Okay.
23     MS. FOX:  Might have been a little larger
24  than the other one that I brought.
25     Q.  (BY MS. REED) Do you have any recollection of
```

Page 20

```
 1  reading a prospectus?
 2     A.  Yes.
 3     Q.  Did you read the prospectus all the way
 4  through?
 5     A.  Yes.
 6     Q.  What statements in the prospectus do you
 7  believe were false or misleading?
 8     A.  First, the marketing procedure was not
 9  followed. Secondly, I believe that most of the funds
10  from the IPO would remain in the company rather than
11  being distributed to partners. And I think the pursuit
12  of quality and advancement of the clubs. I'm sure some
13  was done, but I did not feel at all that it was as
14  timely and certainly not representative of what I felt
15  they were telling me in the prospectus.
16     Q.  Specifically looking at the prospectus, can you
17  identify any statement that you believe was false? I
18  understand you've given me three different examples of
19  types of things you believe were false, but do you have
20  any specific statements that were contained -- can you
21  identify any specific statements contained in the
22  prospectus that were -- that you believe were false?
23     MS. FOX:  I would object to that. This is
24  a half-inch document. For her to go through to find the
25  statements that are actually in the complaint would be
```

Page 21

```
 1  ridiculous. I couldn't find them sitting here today.
 2     THE WITNESS:  I was going to say, I would
 3  have to take time to read the entire booklet.
 4     Q.  (BY MS. REED) Okay. Let's do a timesaver. Do
 5  you believe that anything other than what is alleged in
 6  the complaint is false and misleading in this
 7  prospectus?
 8     MS. FOX:  Other than what she's already
 9  said.
10     THE WITNESS:  Again, you know, I'd have to
11  read it.
12     Q.  (BY MS. REED) Okay. Maybe on a break, I'd
13  like you to take a look at the prospectus so we can just
14  identify the statements that you believe my clients made
15  that were allegedly false.
16     A.  I'd be happy to.
17     Q.  Okay. Do you understand the difference between
18  a misrepresentation and an omission?
19     A.  Legally, no.
20     Q.  Generally, what's your understanding of a
21  misrepresentation versus an omission?
22     A.  I would guess a misrepresentation would be to
23  hold forth something you were going to do knowing you
24  weren't going to do it, possibly. And what was the
25  other one?
```

6 (Pages 18 to 21)

PATRICIA CRAUS                    2/18/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 22

1    Q.  Omission.
2    A.  Omission would be the failure to include
3    something.
4    Q.  And in this case do you believe there were
5    misrepresentations or omissions?
6    A.  Misrepresentations, primarily.  There probably
7    were some omissions as well, but --
8    Q.  What do you believe that the defendants should
9    have disclosed that they didn't?
10   A.  I feel that there should have been disclosure
11   of the fact that there were so many clubs that were
12   already on the market that were not revealed to me.
13   They should have revealed -- well, they -- I was told I
14   would be able to buy 2,000 shares of stock at I think it
15   was $2, because Barney had put me on his preferred list,
16   and that didn't happen.  I definitely did not know that
17   the amount of the millions of dollars owing to these
18   named parties immediately at the IPO, or closely to
19   that.
20   Q.  So you're saying that millions of dollars from
21   the IPO were given directly to the named defendants?
22   A.  I think the named defendants were given the
23   stock at zero to something, and then it was sold very -- not
24   joined Barney Adams, and then it was sold very -- not
25   too much thereafter, months probably, rather than years,

Page 23

1    at the $16 value, which would have been millions, yes,
2    to each party or I assume millions to each party.  I
3    know so in some cases.
4    Q.  And this, what you think is an improper
5    distribution of millions of dollars, do you think -- do
6    you include the underwriters in that?
7    A.  I think the underwriters had to know it.  If
8    they didn't know it, I don't think they did their due
9    diligence.  Yes, I would think they had to know it.
10   Q.  Okay.  So the underwriters knew about this
11   distribution, but you're not claiming that the
12   underwriters received money that they should not have?
13   A.  I have no idea what they received.
14   Q.  Okay.  All right.  Could you turn to Page 24 of
15   Exhibit 1.  Now, the numbers are at the very bottom of
16   that, you know, sort of -- not the very bottom, but the
17   middle bottom.
18        Now, on this page, if you look at the
19   second block paragraph starting "Innovative marketing
20   model on strong retail" -- third line down, it says,
21   "to preserve the integrity of its image and reputation,
22   the company" --
23   A.  I'm lost here.  Just a minute.  Third line down
24   under innovative -- okay, now, I'm with you.
25   Q.  "To preserve" -- now, I'm lost.  "To preserve

Page 24

1    the integrity of its image and reputation, the company
2    currently limits its distribution to retailers that
3    market premium quality golf equipment and provide a high
4    level of customer service and technical expertise."  And
5    it continues, "The company currently sells its products
6    to on- and off-course golf shops and selective sporting
7    goods retailers.  The company does not sell its products
8    through price sensitive general discount warehouses,
9    department stores or membership clubs."  Do you -- do
10   you believe this is a true statement?
11   A.  No.
12   Q.  Why not?
13   A.  First of all, I know they didn't do it.  I
14   purchased a set of the clubs for a relative of mine, and
15   took him to the Hank Haney school in Dallas, where they
16   measured, you know, it was supposed to be a custom-type
17   thing, and then I started realizing that -- and I
18   paid -- I don't know what I paid for them, but I know it
19   was a type of service, I think, that was supposed to be
20   existent.  Then when all the clubs started showing up
21   everywhere, you know, you take away any type of
22   exclusiveness or this club is -- you know, Tight Lies is
23   the club that everybody would want, because once you can
24   buy it anywhere and at a fraction of the price that
25   you'd buy it, like at Hank Haney school or a pro shop, I

Page 25

1    think that removed a lot of the exclusiveness.  And
2    someone in the company, in my opinion, I don't think
3    that could happen without knowledge.
4    Q.  So are you alleging that Adams Golf sold their
5    clubs to these discount warehouses?
6    A.  I have no way to know how it happened.
7    Q.  Okay.  So you're just alleging that the clubs
8    ended up there?
9    A.  And again, I think somewhere, when you have a
10   company holding out these facts and they're particularly
11   being very proud of the marketing strategy, and there
12   has to somehow be a way that the company had some
13   awareness, in my opinion.
14   Q.  Do you know specifically who had that
15   understanding?
16   A.  I don't understand the question.
17   Q.  Let me clarify it.  Do you know who at the
18   company knew that these clubs would end up at Cosco?
19   A.  I do not.
20   Q.  All right.  Let me show you what has been
21   marked as Exhibit 2.  Do you recognize this document?
22   A.  I believe I do.
23   Q.  What is it?
24   A.  It appears to be an amended class action
25   complaint.  So I guess an amended portion of the suit.

Page 26

1    Q.  Okay.  Let me identify it for the record.  It's
2  the consolidated and amended class action complaint for
3  violation of federal securities laws.  It's not Bates
4  stamped, but it's numbered Pages 1 through 25 with three
5  additional pages at the end.  Have you -- have you seen
6  this document before?
7    A.  I believe I have.
8    Q   When did you first see it?
9    A.  I really don't know.  It would have been after
10  the initial public offering, I believe, but it may not
11  have been.  I guess since the lawsuit.  It would have to
12  be after.
13    Q.  And I know you don't remember specifically, but
14  do you recall if you saw it years ago or just recently?
15    A.  I do not recall.  I really don't.
16    Q.  Other than today, have you seen this document
17  recently?
18    A.  Not in the last week, I would not think.  I
19  would have -- I would say it would have been in my past,
20  but I don't know when.
21    Q.  Okay.  Did you file this complaint against the
22  defendants?
23    A.  No.
24         MS. FOX:  I object.  That's a legal
25  conclusion.

Page 27

1    Q.  (BY MS. REED)  Well, I'm just asking since
2  you're, you know, a proposed class representative and
3  you're involved in the litigation, is it your
4  understanding that you were part of filing this suit?
5    A.  I was willing to be part of the suit, yes.
6    Q.  What investigation did you undertake before you
7  filed the consolidated amended complaint, which I'll
8  refer to as the complaint?
9         MS. FOX:  I'll object to the form.  You
10  know perfectly well that lawyers file amended
11  complaints, plaintiffs don't.  She was in Texas.  It was
12  filed in Delaware.
13    Q.  (BY MS. REED)  Okay.  I'm not talking about the
14  physical act of filing the complaint, but since you
15  are -- you say that you are part of this.  What
16  investigation did you take before you had your lawyers
17  file this complaint?
18    A.  Well, I didn't have the lawyers, you know, file
19  the complaint.  I -- together, it was a class action
20  suit.  So I don't know how they did that, but my
21  investigation would have been knowledge of conversations
22  with Barney Adams and Mr. and Mrs. Smith, and the
23  articles I told you I read about and the consequences of
24  what happened to the stocks' value.
25    Q.  Did you help at all in preparing this

Page 28

1  complaint?
2    A.  No.
3    Q.  Did you read this complaint before it was
4  filed?
5    A.  Yes.  Well, before it was filed --
6         MS. FOX:  This is not the original
7  complaint, obviously, that her -- her certification is
8  attached to.
9         THE WITNESS:  Right, I read the --
10         MS. FOX:  This is a long, a later amended
11  complaint.
12    Q.  (BY MS. REED)  Which complaint is it your
13  understanding that your certification was attached to?
14    A.  The earlier one.
15    Q.  An earlier one?
16    A.  Yeah, right.
17    Q.  Do you know specifically which one?
18    A.  No.
19         MS. FOX:  It would have been the first
20  complaint that we filed, the first complaint that has
21  her name on it.
22    Q.  (BY MS. REED)  Okay.  Now, before this
23  complaint was filed, did you review it for accuracy?
24    A.  This one?
25    Q.  Uh-huh.

Page 29

1    A.  I might have read it, but I didn't spend time
2  studying it.
3    Q.  Do you consider yourself a careful person when
4  it comes to reviewing important documents?
5    A.  Yes.
6    Q.  And is it fair to say that accuracy is
7  important to you when you're reviewing important
8  documents?
9    A.  Yes.
10    Q.  Other than the three things you mentioned,
11  speaking to Barney Adams and the Smiths and reviewing
12  those articles, did you do anything to satisfy yourself
13  that these allegations were accurate?
14    A.  Well, I knew the allegations I just mentioned
15  to you were accurate.
16    Q.  But other than those three things, you didn't
17  do anything?
18    A.  I didn't go out and research anything, like
19  going to the plant or anything like that, no.
20    Q.  If it turned out that the allegations in the
21  complaint weren't accurate, would you be willing to
22  dismiss the complaint?
23    A.  I don't think individually I have the power to
24  dismiss the complaint.
25    Q.  Would you be willing to dismiss at least your

PATRICIA CRAUS                    2/18/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 30

```
 1   participation in this suit?
 2       A.  Well, since I believe they're accurate, I doubt
 3   that I would, but if it was ruled against or something,
 4   obviously, it would not be within my power.  Did that
 5   answer --
 6       Q.  Uh-huh.  You did.  Is there anything inaccurate
 7   to your knowledge in the complaint?
 8       A.  This particular one or the original filing?
 9       Q.  Well, let's start with this one and then we'll
10   ask about the original one.
11       A.  All right.  I need to read it.
12       Q.  Okay.  What about the original filing?  Is
13   there anything inaccurate in the original filing?
14       A.  I don't think that I caught anything that was
15   inaccurate to my knowledge.
16       Q.  Okay.  And when I refer to the original filing,
17   we're talking about the first complaint that was filed
18   in this action; is that right, or is --
19           MS. FOX:  I think that her name was on the
20   first one, but it was the first one that her name was on
21   that she would have reviewed.
22           MS. REED:  Okay.
23           MS. FOX:  There may have been -- I think
24   there were several complaints filed.  I'm not sure which
25   one was --
```

Page 31

```
 1       Q.  (BY MS. REED)  Okay.  Did you review -- I
 2   guess -- let me ask it is this way:  Did you review a
 3   complaint before you reviewed this complaint?
 4       A.  Well, I reviewed the original lawsuit that was
 5   filed and my name was on it, yes.
 6       Q.  Okay.  Now, we've talked about what you believe
 7   the defendants did wrong.  What is your understanding of
 8   what the complaint says the individuals did wrong?
 9       A.  Well, I think the -- as I recall, best recall
10   in the complaint, I think they mentioned the gray
11   market -- the overabundance or supply of clubs on the
12   market.  I think they mentioned that.  They didn't
13   mention the part about the company spending -- taking
14   out of the IPO such a large amount of monies
15   individually, and I think that's part of the problem,
16   but that's about it.
17       Q.  Okay.  Have you spoken to any -- since the
18   filing of this lawsuit, have you spoken to anyone about
19   Adams Golf?
20       A.  Yes.
21       Q.  Who have you spoken to?
22           MS. FOX:  Wait a second.  You've got to
23   be -- you can't say what you said to any lawyer.  Okay?
24   But you can certainly name who you spoke to, if you
25   remember.
```

Page 32

```
 1           THE WITNESS:  Well, of course, I spoke to
 2   the attorneys.  And I spoke to Mr. and Mrs. Smith.
 3       Q.  (BY MS. REED)  Have you spoken to anyone else?
 4       A.  Probably one of my business partners.
 5       Q.  Who are your business partners?
 6       A.  Well, it depends on what project, but
 7   primarily, it would have been Ruth Hanks, H-A-N-K-S, or
 8   Jeanette, J-E-A-N-E-T-T-E, Baker.
 9       Q.  Did Ruth Hanks invest in Adams Golf?
10       A.  No.
11       Q.  Did Jeanette Baker invest in Adams Golf?
12       A.  To my knowledge, no.
13       Q.  Have your attorneys spoken to anyone, any third
14   parties -- let me explain what I mean by third parties.
15   Have your attorneys spoken to anyone in investigating
16   this complaint?
17           MS. FOX:  I'll object.  There's no way she
18   can know who her attorneys spoke to.
19           THE WITNESS:  That's right.
20       Q.  (BY MS. REED)  Have your attorneys told you
21   that they've spoken to third parties in connection with
22   this complaint or in connection with this lawsuit?
23       A.  I'm sure they did, but I don't know that they
24   told me, no, they didn't.
25       Q.  I'm going to show you what's been marked
```

Page 33

```
 1   Defendant's Exhibit 3.
 2       A.  A shorter one.
 3       Q.  Have you seen this document before?
 4       A.  I don't recall right off if I have or not.
 5   Probably I have seen it, yes.
 6       Q.  What is it?
 7           MS. FOX:  Well, that calls for a legal
 8   conclusion.
 9       Q.  (BY MS. REED)  I'm not asking for a legal
10   conclusion.  I'm just asking for your understanding of
11   what this is.
12       A.  Basically, I would go by what the title says,
13   disclosures.
14       Q.  And what are --
15       A.  Disclosures.
16       Q.  What are these disclosures about?
17       A.  Glance on through it.  Is it just a group of
18   names?  No.
19           MS. FOX:  If you're going to answer
20   questions about it, look at it carefully.
21           THE WITNESS:  All right.  Now, what was
22   the question?
23           MS. REED:  Could you read that back?
24           (Requested portion read by reporter)
25           THE WITNESS:  I don't know.
```

PATRICIA CRAUS                    2/18/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 46

1    A.  And where do you find that?  I'm looking for
2  it.
3    Q.  I'm just asking you in general.
4    A.  Oh, representative party?
5    Q.  Uh-huh.
6    A.  That I'm willing to represent the class,
7  however large it is, and don't mind taking the time to
8  appear, like here today.
9    Q.  Do you know whether you were appointed lead
10 plaintiff in this action?
11   A.  No.
12        MS. FOX:  You don't know.  Calls for a
13 legal conclusion.
14        THE WITNESS:  No, I don't know.
15   Q.  (BY MS. REED)  Do you know anyone who is a lead
16 plaintiff in this action?
17   A.  No, I do -- not to my knowledge.
18   Q.  Can you name any lead plaintiffs?
19   A.  No, I couldn't.
20   Q.  Do you know whether you're seeking to be named
21 class representative by the court?
22   A.  No, I don't know that.
23   Q.  Could you describe in your own words the class
24 who you are -- who you are trying to represent?
25   A.  Basically, I would gather anyone who invested

Page 47

1  at the initial public offering that is in the lawsuit.
2    Q.  When you say, "that is in the lawsuit," what do
3  you mean?
4    A.  Named parties.  And then those that are not
5  named, but did purchase.
6    Q.  Did you -- are there any geographic limitations
7  to the class?
8    A.  I don't know.
9    Q.  How many members are in the class?
10   A.  I don't know.
11   Q.  Have you investigated that at all?
12   A.  No.
13   Q.  Is there more than one class?
14   A.  More than one class?
15   Q.  Yes.
16   A.  You mean more than one other person?
17   Q.  No.  Is there more than one class?
18   A.  I don't know.
19   Q.  Do you know if any of the other class members
20 bought Adams Golf stock?
21        MS. FOX:  She just defined the class as
22 people that bought Adams stock.  So that's sort of a
23 trick question, and it's unnecessary.
24   Q.  (BY MS. REED)  Well, I'm really not trying to
25 trick you, I promise.

Page 48

1        When did class members purchase their
2  stock?
3    A.  I think at the initial public offering or some
4  amount of days thereafter.  I don't recall how many
5  amount of days were involved.
6    Q.  And why do you think it's some days thereafter?
7    A.  Because I think I saw that in the lawsuit.
8    Q.  Why are you seeking to serve as a class
9  representative?
10   A.  Well, I began -- I was very poor when I grew
11 up, and as I went into business, it was, of course,
12 without being a very wealthy person by any means, and I
13 think there are a lot of people out there who lost money
14 that need to be represented by somebody for recovery, if
15 that's the way the court rules.
16   Q.  When did the proposed class period begin?
17   A.  I don't know.
18   Q.  When does it end?
19   A.  I assume -- I don't know.
20   Q.  Do you think your claims are typical of the
21 class of plaintiffs you represent?
22   A.  I believe so --
23        MS. FOX:  Object to the --
24        THE WITNESS:  Oh, excuse me.
25   Q.  (BY MS. REED)  Do you know how many proposed

Page 49

1  class representatives there are?
2    A.  No.
3        MS. FOX:  She's asked and answered.
4        MS. REED:  I asked about lead plaintiff.
5  I didn't ask about class reps.
6        MS. FOX:  Number of members, not known,
7  why not.
8    Q.  (BY MS. REED)  Right.  I'm asking about do you
9  know how many proposed class representatives there are?
10   A.  No.
11   Q.  Okay.  Did you know that Federated National
12 Insurance Company withdrew as a proposed class
13 representative?
14   A.  Yes.
15   Q.  Why did they withdraw?
16   A.  I don't know.
17   Q.  How do you know that they withdrew?
18   A.  Ms. Fox and I discussed it last night.
19   Q.  Have you ever met with any of the other
20 proposed class representatives?
21   A.  No.
22   Q.  Have you ever discussed the case with any of
23 them?
24   A.  No.
25   Q.  Have you ever communicated to them in any way

PATRICIA CRAUS                              2/18/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 54

1    Q.  Do you have a fee agreement with your
2  attorneys?
3    A.  No.
4    Q.  Do you have any understanding of how your
5  attorneys will be paid?
6    A.  I would assume from the proceeds of any award
7  the court makes.
8    Q.  Now, you say you assume that.  You don't know
9  for sure?
10    A.  Well, basically, as I would say, no one has
11  said I will get my money from this source, but I know
12  enough to know that, yes, attorneys are paid out of the
13  proceeds.
14    Q.  You don't think we work for free?
15    A.  Somehow, I don't -- the ones I have don't.
16    Q.  Do you know how much your attorneys bill per
17  hour?
18    A.  I do not.
19    Q.  And I'm going to assume based on your previous
20  answers that you didn't take competitive bids from any
21  other attorneys?
22    A.  No.
23    Q.  How often do you speak with the attorneys about
24  this lawsuit?
25    A.  I probably have had four or five conversations

Page 55

1  total.
2    Q.  How many of those conversations have been in
3  the past year?
4    A.  Well, probably all -- most all of them.  Some
5  might have been, you know, nearer the time of the
6  filing, whenever that was.
7    Q.  Do you know how many motions your counsel have
8  filed in this case?
9    A.  No.
10    Q.  Who makes the strategy calls in the case?
11    A.  I would assume the attorneys.
12    Q.  But not you?
13    A.  No.
14    Q.  Now, if you disagreed with your attorney's
15  decision about how to handle some aspect of the case,
16  what would you do?
17    A.  I would defer to the attorney.
18    Q.  Have you discussed the strengths and the
19  weaknesses of your case with your attorneys?
20    A.  I don't know that we discussed it in that form,
21  no.
22    Q.  You say not in that form.  Have you discussed
23  it in some other form?
24    A.  Just conversations about the lawsuit.
25    Q.  Have you discussed the prospects of settlement

Page 56

1  with your attorneys?
2    A.  The word settlement was mentioned, yes, in a
3  letter, I think.
4    Q.  Do you know whether a settlement offer has been
5  made?
6    A.  No.
7    Q.  Who do you believe is responsible for actively
8  managing and controlling the litigation?
9    A.  The attorneys.
10    Q.  Have you had, other than Berger & Montague,
11  have you had contact with other attorneys regarding
12  Adams Golf?
13    A.  No.
14       THE REPORTER:  Are you shaking your head?
15       THE WITNESS:  No.  I'm just kind of going
16  from side to side.
17       THE REPORTER:  I didn't hear an answer.
18       MS. REED:  She said no.
19    Q.  (BY MS. REED)  Now, you mentioned that you --
20  if you had to fly to Delaware that your attorneys would
21  reimburse you?
22    A.  That's my understanding.
23    Q.  Your understanding.  Would they reimburse you
24  regardless of the outcome of the lawsuit?
25    A.  Yes, that's my understanding.

Page 57

1    Q.  What understanding do you have as to costs you
2  might have to pay?
3    A.  That I don't pay any costs.
4    Q.  Do you have any knowledge of what costs are
5  involved in the litigation?
6    A.  No.
7    Q.  Do you know the magnitude of costs of this
8  litigation?
9    A.  No.
10    Q.  What steps, if any, have you taken to manage
11  the costs incurred in this lawsuit?
12    A.  None.
13    Q.  Have you ever reviewed monthly time and expense
14  reports prepared by your counsel?
15    A.  No.
16       MS. FOX:  Well, I'll object to the form.
17    Q.  (BY MS. REED)  Do you know whether defendants
18  could seek to recover costs of the lawsuit from you
19  alone if they win?
20    A.  They don't --
21       MS. FOX:  Wait.  That calls for a legal
22  conclusion.  That's not fair.
23       MS. REED:  Well, I'm just asking for her
24  understanding of cost structure in a lawsuit.  I'm not
25  asking for --

PATRICIA CRAUS                2/18/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 58

1    Q.  (BY MS. REED) I'm not going to bind you to
2  whatever you say in terms of, "Well, she said she'd pay
3  us."
4    A.  No, I don't know.
5    Q.  If the plaintiffs lose in this case, would you
6  be able to pay plaintiffs' costs?
7        MS. FOX: I'll object to the form. Under
8  the Delaware law, we're allowed to have a contract with
9  her that is completely contingent, and that's what we
10  have.
11    Q.  (BY MS. REED) If the plaintiffs lose, would
12  you be able to pay defendant's costs?
13    A.  No.
14    Q.  What financial resources do you have available
15  if you were ordered to pay costs?
16        MS. FOX: I object to the form. You
17  haven't made any -- there's no possible law that says
18  that she would personally have to pay.
19    Q.  (BY MS. REED) Did you review the court's order
20  on the Defendant's Motion to Dismiss?
21    A.  I think I did.
22    Q.  Do you know what parts of plaintiffs' complaint
23  the court dismissed?
24    A.  The best I remember, there were two causes of
25  action possibly. I think they kept the gray market.

Page 59

1    Q.  And when you say "they," meaning --
2    A.  The courts. The courts.
3    Q.  Are you aware of any appeal from the district
4  court's order?
5    A.  Yes, there was an appeal.
6    Q.  Why did it take plaintiff so long to appeal
7  from the district court's order?
8        MS. FOX: Object. I don't know what
9  you're talking about.
10        MS. REED: Okay.
11        MS. FOX: I mean, how could she possibly
12  know that there's a 30-day --
13        MS. REED: No, no, okay.
14        MS. FOX: I mean, if you're going to
15  appeal, it's got to be in 30 days. That's under the
16  rules, but that's not something she knows.
17        MS. REED: I'm just talking about the
18  order.
19    Q.  (BY MS. REED) Are you aware of any -- of any
20  gap in time between the order on the motion to dismiss
21  and the final judgment?
22        MS. FOX: I object to it. She doesn't
23  even know what a motion to dismiss is. I mean, that's
24  just not part of what she has to know.
25    Q.  (BY MS. REED) Okay. All right. Well, you say

Page 60

1  your attorney sends you different things, right? And
2  different papers, like the initial disclosures, and the
3  complaint. Did they send you anything having to do with
4  a motion to dismiss?
5    A.  I can't recall that, specifically.
6    Q.  Okay. We have been going for about an hour and
7  a half. Do you want to take a break?
8    A.  No, we can move right along.
9    Q.  You want to keep going?
10    A.  Uh-huh.
11    Q.  All right. I think we'll be done -- just so
12  you know. I think we'll be done.
13        Let's look back at Exhibit 4, a
14  certification. You mentioned that this was accurate as
15  to the shares purchased, but not as to the shares sold;
16  is that right?
17    A.  That's -- it's just omitted.
18    Q.  Right, right. I actually need to take a break
19  so I can look at the documents. Just so -- I think
20  it'll just go faster.
21        MS. FOX: Do we have those others back?
22        MS. REED: We do. Actually I need a
23  break.
24        (Recess taken 11:26 a.m. - 11:47 a.m.)
25        MS. REED: Back on the record.

Page 61

1    Q.  (BY MS. REED) All right. I've reviewed the
2  documents that you gave to me. So thank you very much.
3  And we'll get to those probably in a little bit. But
4  that's what took so long on the break.
5        Let me show you what we have marked as
6  Exhibit 5. Have you ever seen this document before?
7    A.  Yes, I think I have.
8    Q.  What is it?
9    A.  Well, it's a request to produce documents, as
10  best I see.
11    Q.  And have you produced documents in response to
12  this?
13    A.  Yes.
14    Q.  And then you brought those additional
15  responsive documents with you today?
16    A.  Yes.
17    Q.  Do you have any other documents that are
18  responsive to this request?
19    A.  Not that I'm aware of, but as I say, I've moved
20  offices at least three times since this, and I'm
21  continuing to see if there's anything I can find.
22    Q.  What did you do to gather responsive documents?
23    A.  Went through files.
24    Q.  Did you do a complete search of all your files
25  to see if you had any documents?

16 (Pages 58 to 61)

Page 62

1    A.  As far as I know.  I have warehouses yet to --
2    you know, self-storage units that I might still glance
3    in, but I think I have them all here.
4    Q.  So you've searched your office files, but
5    haven't searched your self-storage unit files?
6    A.  The only place would be one of the storage
7    units.  I have searched everywhere else.
8    Q.  Did you search for any files on your computer?
9    A.  I don't know how to turn on my computer.  I
10    have a nice one, though.  I can't turn it on.
11    Q.  Then there's probably not files there.
12    A.  No.
13    Q.  Did you contact anyone about obtaining
14    responsive documents?  So, for example, did you contact
15    your broker to obtain responsive --
16    A.  No, I think I already had those, like when I
17    sold the stock and stuff.
18    Q.  Would anyone else have documents responsive to
19    this request, like a family member?
20    A.  No.
21    Q.  Do you keep a file of documents related to the
22    lawsuit?
23    A.  I have so far come upon three different little
24    files.  So -- that I put it in a folder and put Adams
25    Golf on it, there probably are two or three.

Page 63

1    Q.  And what documents do you keep in that file?
2    A.  Things like this, and the stock information as
3    well.
4    Q.  And when you say "like this," you were
5    referring to Exhibit 5?
6    A.  Yes, and the --
7    Q.  And I don't think I identified it for the
8    record.  Exhibit 5 is defendant Adams Golf's first
9    request for the production of documents and things from
10    proposed class representatives, Federated National
11    Insurance Company, John Morrash, Todd Tonore, F. Kenneth
12    Shockley and Patricia Craus, there are Bates numbers for
13    that.  I guess it's Pages 1 through 8, and an additional
14    page on the end with the style.
15            Let me show you what we have marked as
16    Exhibit 6.  Do you recognize this document?
17    A.  Yes.
18    Q.  And what is that?
19    A.  It's Responses and Objections of Patricia Craus
20    to Defendant Adams Golf, Inc.'s First Request For
21    Production of Documents and Things, From Proposed Class
22    Representatives, Federated National Insurance Company,
23    John Morrash, Todd Tonore, F. Kenneth Shockley and
24    Patricia Craus.
25    Q.  Thank you.  When did you first see this

Page 64

1    document?
2    A.  I don't know when as far as date is concerned.
3    Let me see if it has a date on it.  I couldn't tell you
4    exactly when.
5    Q.  Okay.  Did you review this document before --
6        MS. FOX:  Wait a second.  It's missing
7    page 8.
8        MS. REED:  Oh, it is?
9        THE WITNESS:  Yeah, mine is too.
10    Q.  (BY MS. REED)  Page 8 is -- let me --
11        MS. FOX:  It's where the signature was.
12        MS. REED:  Let me tear out my page 8 so
13    you have a complete set.
14        MS. FOX:  I thought there was a place that
15    says -- it shows a place for her to sign.
16        MS. REED:  I don't think so.  This is --
17    I'm pretty sure mine's complete, because that was page
18    8, and then Page 9.
19    Q.  (BY MS. REED)  And so it's dated February 11th,
20    2005.  Did you see this document before --
21        MS. FOX:  No, wait.  This is page 8 of the
22    document --
23        THE WITNESS:  Yeah, she handed it to you.
24        MS. FOX:  Request for production.  And
25    we're looking at the interrogatories, aren't we?

Page 65

1        MS. REED:  No.  We should be looking at
2    the request for production.
3        MS. FOX:  We were looking at the
4    responses -- oh, okay.  Okay.  Sorry.
5        MS. REED:  That's okay.  I'm sorry that it
6    somehow didn't get copied.
7    Q.  (BY MS. REED)  Did you see this document before
8    February 11th, 2005?
9    A.  No, I don't think so, since that's the date on
10    it, it would have had to have been mailed to me.
11    Q.  Did you see a draft of this document before
12    February 11th, 2005?
13    A.  No.
14    Q.  Have you ever seen drafts of documents filed by
15    your attorneys?
16    A.  Yes.
17    Q.  Which documents have you seen drafts of?
18    A.  The ones -- some of these that have been
19    produced today in the -- the ones we discussed earlier,
20    that -- something about the appeal and -- different
21    documents.  I don't know their names.
22    Q.  Okay.  Now, on Page 4 of Exhibit 5 -- or
23    Exhibit 6.  I apologize.  Your responses, it says under
24    the heading, Objection to Relevant Time Period.  It says
25    "Documents" --

Page 90

1  settlement of the total.
2      Q.  What do you hope to accomplish as a result of
3  the lawsuit for yourself?
4      A.  Well, hopefully, some financial recovery.  I
5  think additionally, my concerns for the general class
6  of -- because I think investments are made on all levels
7  and where it hurts people that couldn't have afforded to
8  be hurt.
9      Q.  What do you claim are your individual damages?
10     A.  Well, financially, it would be listed on that
11  Exhibit 13, you know, where I -- where I lined them up
12  there.  That would -- if you figured them up, that would
13  show you the financial damage.
14     Q.  Okay.  So you're saying what you bought it at
15  minus what you sold it at?
16     A.  Right.
17     Q.  What do you claim are the total damages for the
18  class?
19     A.  I don't know.
20     Q.  Do you believe you're entitled to anything more
21  than other class members as a percentage basis?
22     A.  No, I don't.
23     Q.  And do you have any agreement in place that
24  would compensate you any additional amount?
25     A.  No.

Page 91

1      Q.  All right.  We are so almost done.  I'm going
2  to ask you a bunch of questions that I just have to.
3          Have you -- you mentioned earlier that
4  your company was a party to other civil litigation, land
5  development cases?
6      A.  There were some lawsuits.
7      Q.  Other than those, have you been a party to any
8  other civil litigation -- oh, and the American Airlines.
9  I'm sorry.  So other than the land development and the
10  American Airlines, any other civil litigation?
11     A.  No.
12     Q.  Have you ever had a judgment levied against
13  you?
14     A.  No.
15     Q.  Have you ever been tried for a crime?
16     A.  No.
17     Q.  Have you ever been terminated from a job for
18  dishonesty or embezzlement?
19     A.  No.
20     Q.  Have you ever been a witness at a trial?
21     A.  No, I don't think so.  Witness?
22         MS. FOX:  That would mean like there was a
23  judge or a jury and you went to the courthouse, and you
24  testified.
25         THE WITNESS:  Related only to my

Page 92

1  businesses.
2      Q.  (BY MS. REED)  Okay.  Have you ever been hel
3  in contempt of court?
4      A.  No.
5      Q.  Have you ever filed for bankruptcy?
6      A.  No.
7      Q.  Have you ever become insolvent?
8      A.  No.
9      Q.  Do you have any personal family or business
10  relationship with your attorneys apart from your
11  relationship in this suit?
12     A.  No.
13     Q.  And do any of your friends have any personal
14  relationship with the attorneys other than your
15  relationship -- I guess -- wait.  Let me withdraw that.
16         Do any of your friends have a personal
17  relationship with your attorneys?
18     A.  Not that I'm aware of.
19     Q.  Now, you mentioned when -- that you received a
20  letter from Todd Collins?
21     A.  Yes.
22     Q.  Was that your first communication with Berger &
23  Montague?
24     A.  I don't -- I kind of think somehow I was made
25  aware of the class action, and I don't know -- I

Page 9_

1  probably called that law firm.  I think there was
2  several law firms in the article, and I don't know why
3  selected that law firm, but that would be my -- I
4  probably called Mr. Collins, more than likely.
5      Q.  I forgot one more exhibit.  Exhibit 12.  Have
6  you seen this before?
7      A.  I'm not sure, but the latter part about the
8  Collins, Mr. Collins in that firm, I had learned.
9      Q.  Okay.  Let me -- sorry.  Let me identify it for
10  the record.  Exhibit 12 is the Memorandum of Law in
11  Support of Plaintiffs' Submission For Class
12  Certification.  Do you know when this was filed?
13     A.  No, it's dated November the 12th, 2004, but I
14  wouldn't know.
15     Q.  Did you review it before it was filed?
16     A.  I probably did, I guess.
17     Q.  Do you know if you did?
18     A.  No, I don't know positively.
19     Q.  Okay.  And did you make any revisions to it?
20     A.  No.
21     Q.  All right.  I think that's all I have for now.
22  The only thing, I forgot to remind you to check on your
23  break.  I don't know if you did.  Did you check on your
24  break?
25     A.  What were the questions?

24 (Pages 90 to 93)

# EXHIBIT B

Page 1

1                IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF DELAWARE

2

3

4     IN RE:  ADAMS GOLF,         CIVIL ACTION NO. 99-371-KAJ

       INC.,

5

       SECURITIES  LITIGATION              (CONSOLIDATED)

6

7

8

9

10

11             Oral deposition of FLOYD

12     KENNETH SHOCKLEY, D.O., taken at the law

13     offices of BERGER & MONTAGUE, P.C., 1622

14     Locust Street, Philadelphia,

15     Pennsylvania, on Friday, February 25,

16     2005, at 10:42 a.m., before Rosemary

17     Locklear, Registered Professional

18     Reporter, Certified Shorthand Reporter

19     (NJ), Certified Realtime Reporter and

20     Notary Public, pursuant to notice.

21

22

23

24

25

KENNETH SCHOCKLEY                    2/24/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 10

1  shore with me this morning, yes.
2  Q.  Okay.  When you were in your
3  college education, did you take any sort
4  of finance, accounting, business
5  courses?
6  A.  No.
7  Q.  Did you take any postgraduate
8  courses or seminars -- I'm sorry,
9  postgraduating from college, courses or
10  seminars on business, accounting,
11  finance, that sort of thing?
12      MR. COLLINS:  Vague and
13  ambiguous.
14      Go ahead.
15      THE WITNESS:  The only thing
16  I did during the years that I was in
17  practice is I'd take courses in medical
18  business as far as running your office
19  practice.
20  BY MS. MORIATY:
21  Q.  Did any of that cover investing --
22  A.  No.
23  Q.  -- or accounting?
24  A.  No.
25      MR. COLLINS:  Forgive me.

Page 11

1      You've got to let her finish
2  asking before you answer.
3  BY MS. MORIATY:
4  Q.  I suppose your professional
5  societies are covered in the CV; is that
6  correct?
7  A.  Yes.
8      MR. COLLINS:  Obviously, as
9  of the time the CV was prepared.
10      MS. MORIATY:  Right.
11  BY MS. MORIATY:
12  Q.  Are there any additional
13  professional societies that you've
14  joined since the CV was prepared?
15  A.  I have less of them now that I'm
16  retired.
17  Q.  Okay.  Let's see.  All right.  I'm
18  going to turn over to the preparation
19  you did for this deposition.  When did
20  you learn you were going to have to give
21  this deposition in this litigation?
22      MR. COLLINS:  Vague and
23  ambiguous.
24      THE WITNESS:  Several weeks
25  ago, I guess.  I was in Florida on jury

Page 12

1  duty and they were trying to pick a date
2  and I didn't know what I was going to be
3  required to do with the jury duty.  So
4  they were waiting for me to get finished
5  that to make this date.
6  BY MS. MORIATY:
7  Q.  And who told you that you were
8  going to give this deposition?
9      MR. COLLINS:  I'm sorry.
10  Please answer the question, but never
11  say what a lawyer said to you or you
12  said to a lawyer, please.  Go ahead.
13  BY MS. MORIATY:
14  Q.  You can identify who told you.
15  A.  Mr. Sanders.
16  Q.  Thank you.
17      With whom did you meet to
18  personally prepare -- whom did you meet
19  with personally to prepare for the
20  deposition?
21  A.  This morning I met with
22  Mr. Collins.
23  Q.  Was it just this morning or were
24  there any other meetings?
25      MR. COLLINS:  Vague and

Page 13

1  ambiguous.
2      Go ahead.
3      THE WITNESS:  First meeting
4  I -- was this morning.
5  BY MS. MORIATY:
6  Q.  Have you communicated with anyone
7  else other than your attorneys in
8  preparation for the deposition?
9  A.  No.
10  Q.  Did you review any documents in
11  preparation for the deposition?
12  A.  This morning we went over
13  documents, some documents.
14  Q.  Did any of those refresh your
15  recollection of any of the things that
16  were involved in this case?
17      MR. COLLINS:  Overbroad.
18      THE WITNESS:  Sort of all
19  Greek and Latin to me.
20  BY MS. MORIATY:
21  Q.  Were there any specific documents
22  you recall that you viewed that
23  refreshed your recollection in any way?
24      MR. COLLINS:  Overbroad.
25      THE WITNESS:  I remember

4 (Pages 10 to 13)

KENNETH SCHOCKLEY          2/24/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 14

1  seeing the documents before. But when
2  does this go back to, 1998?
3  BY MS. MORIATY:
4  Q. Right.
5  A. I have trouble remembering what I
6  did six months ago.
7  Q. So there weren't any -- are you
8  saying that there weren't any specific
9  documents that you --
10  A. No surprises.
11  Q. -- specifically recall?
12      MR. COLLINS: Excuse me.
13  Excuse me.
14      I think I object to your
15  question, but I didn't hear it all. But
16  go ahead.
17  BY MS. MORIATY:
18  Q. Then there were not any specific
19  documents that you viewed that refreshed
20  your recollection specifically?
21      MR. COLLINS: Vague,
22  overbroad, ambiguous, asked and
23  answered.
24      THE WITNESS: Explain that to
25  me. I don't -- what do you mean that

Page 15

1  they were --
2      MS. MORIATY: We'll just move
3  on.
4  BY MS. MORIATY:
5  Q. I'm just going to talk through
6  your sort of basic understanding of this
7  lawsuit, from your layperson's
8  perspective now.
9  A. Thank you.
10  Q. Who are you suing in this action?
11  A. I'm suing Adams Golf and
12  underwriters.
13  Q. Why are you suing those
14  defendants?
15  A. Because at the time I was angry.
16  Q. What do you believe they did
17  wrong?
18  A. I think the principals of the
19  company, the directors, officers,
20  whatever you want to call them, made
21  millions of dollars under false
22  pretenses, didn't give out all the facts
23  and the little guy like me and other
24  people got, excuse the expression,
25  screwed.

Page 16

1  Q. What evidence do you have to
2  support that belief?
3      MR. COLLINS: Excuse me.
4  Wait a minute.
5      Evidence is a legal term. To
6  avoid an objection, do you want to put
7  it into --
8  BY MS. MORIATY:
9  Q. What facts can you as a layperson
10  point to substantiate that belief?
11      MR. COLLINS: Go ahead.
12      THE WITNESS: At the time I
13  remember reading the prospectus, I was
14  told that it was an IPO, it was a well-
15  run company and that I ought to invest
16  in it. From my stockbroker, who was a
17  golf pro or semi golf pro. I don't know
18  a thing about golf. I thought it was a
19  good deal.
20  BY MS. MORIATY:
21  Q. So you read the prospectus and you
22  talked to the golf pro? Were there any
23  other --
24  A. No. He was a stockbroker.
25  Q. Okay.

Page 17

1  A. He knew golf.
2  Q. Can you give me the name -- the
3  people who you have sued in this suit
4  that we went over earlier, can you name
5  the individual defendants in the
6  lawsuit?
7      MR. COLLINS: You mean give
8  their names as opposed to describing who
9  they are or what positions they held?
10      MS. MORIATY: Either way.
11      THE WITNESS: No. I'd have
12  to look at the document of who they
13  are. I referred that to my attorney
14  when I went to him.
15  BY MS. MORIATY:
16  Q. Could you give me their sort of
17  titles and responsibilities?
18      MR. COLLINS: Vague and
19  ambiguous.
20      THE WITNESS: I thought they
21  were directors or officers of the
22  club -- of the club, of the business.
23  BY MS. MORIATY:
24  Q. Do you know how many defendants
25  there are?

KENNETH SCHOCKLEY                    2/24/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

**Page 18**

1   MR. COLLINS:  You mean
2   individual defendants or total
3   defendants?
4        MS. MORIATY:  In total.
5        THE WITNESS:  No.
6   BY MS. MORIATY:
7   Q.  In 1998, do you know what sort of
8   business Adams Golf was in?
9   **A.  Making golf clubs.**
10  Q.  Do you know what sort of products
11  Adams Golf sold?
12       MR. COLLINS:  Asked and
13  answered.
14       THE WITNESS:  Golf products.
15  BY MS. MORIATY:
16  Q.  Do you know how Adams Golf markets
17  or marketed in 1998 its products?
18  **A.  Well, if I remember correctly, in**
19  **the prospectus before the big shots sold**
20  **out, the marketing was a little**
21  **different than what it came out with the**
22  **bad report afterwards.**
23  Q.  In what way?
24  **A.  Costcos, selling their clubs**
25  **through Costcos instead of pro shops.**

**Page 19**

1   Q.  Is it your belief that Adams Golf
2   was selling directly to Costco?
3   **A.  I -- I -- I don't think that you**
4   **have a specialty item and they don't**
5   **mention that fact, I think that that's**
6   **misleading.**
7   Q.  So --
8   **A.  And for everybody to sell out**
9   **before the bad report came out, somebody**
10  **knew something.**
11  Q.  So Adams Golf's marketing policy
12  involved selling directly to Costco.
13       MR. COLLINS:  Asked and
14  answered, mischaracterizes his
15  testimony.
16  BY MS. MORIATY:
17  Q.  Do you agree?
18       MR. COLLINS:  You mean
19  whether it mischaracterizes his
20  testimony?
21       It's asked and answered. Go
22  ahead.
23       MS. MORIATY:  He can still
24  answer it, though.
25       THE WITNESS:  I agree that

**Page 20**

1   they -- they cheapened their product by
2   what they did.
3   BY MS. MORIATY:
4   Q.  Have you seen any Adams Golf --
5   well, let me ask a more specific
6   question.  In 1998, do you know who
7   Adams Golf was selling its clubs to
8   directly?
9   **A.  I thought to pro shops.**
10  Q.  Have you seen any Adams Golf
11  advertisements?
12  **A.  Me?**
13  Q.  Yes.
14  **A.  I wouldn't know a golf magazine if**
15  **I saw one.**
16  Q.  When did you first learn about the
17  IPO?
18  **A.  Back then I guess the stockbroker**
19  **mentioned it to me and told me it was**
20  **good, this and that, we went into it.**
21  Q.  So a couple of months before, a
22  week before?
23  **A.  No, I don't remember.**
24  Q.  Okay.  After learning about the
25  IPO, did you start following the

**Page 21**

1   company?
2   **A.  Well, I read the prospectus at the**
3   **time, yeah.  After -- you get that right**
4   **afterwards or whatever.**
5   Q.  Did you follow press releases from
6   the company?
7   **A.  I don't think so.**
8   Q.  Do you know who Barney Adams is?
9   **A.  Must have something to do with**
10  **Adams Golf.**
11  Q.  Do you have any --
12  **A.  How much money did he make?**
13  Q.  Do you have any assertion of what
14  you might believe Barney Adams did
15  wrong?
16       MR. COLLINS:  Asked and
17  answered.
18       You mean Barney Adams as
19  opposed to all the other defendants as
20  to which he's given full and complete
21  answers already?
22       MS. MORIATY:  Right.  Barney
23  Adams.
24       THE WITNESS:  No.  I didn't.
25  All I want to know is what he made.

6 (Pages 18 to 21)

KENNETH SCHOCKLEY                    2/24/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 78

1  you.
2  BY MS. MORIATY:
3  Q.  Did you contact someone about
4  becoming involved in this lawsuit?
5  A.  My attorney.
6      MR. COLLINS:  No.
7  BY MS. MORIATY:
8  Q.  You went to the attorney.
9  A.  Yeah.
10 Q.  They did not contact you
11 initially.
12 A.  No.
13 Q.  Okay.  Do you know who first filed
14 a lawsuit against Adams Golf?
15     MR. COLLINS:  Could you tease
16 that question out a little?
17 BY MS. MORIATY:
18 Q.  Either a named plaintiff or a law
19 firm.
20 A.  I'd have to ask my attorney.
21 Q.  Do you know when the initial
22 lawsuit was filed?
23 A.  I'd have to ask my attorney.
24 Q.  Are you aware that several suits
25 against Adams Golf were filed initially

Page 79

1  and that they were later consolidated
2  into a single case?
3      MR. COLLINS:  Foundation.
4  Go ahead.
5      THE WITNESS:  I don't think I
6  know that.
7  BY MS. MORIATY:
8  Q.  Was your name on any of those
9  initial lawsuits?
10     MR. COLLINS:  Asked and
11 answered.
12     THE WITNESS:  If I could see
13 the documents, I could answer it for
14 you.
15 BY MS. MORIATY:
16 Q.  Do you know whose idea it was to
17 file the initial lawsuit?
18     MR. COLLINS:  Asked and
19 answered.
20     THE WITNESS:  I thought I
21 said that I discussed this with people
22 and with my attorney and they thought we
23 ought to file a suit.
24 BY MS. MORIATY:
25 Q.  So it was your idea.

Page 80

1  A.  I had a lot to do with it, yes.  I
2  thought we established that I was angry
3  and that's what I wanted to do.
4  Q.  Was it also your idea to file a
5  class action?
6  A.  If that's the legal term for it,
7  yes.
8  Q.  To involve everybody like you.
9  A.  Well, I think the other small
10 peons deserve to get their money back if
11 the other guys made millions.
12 Q.  Did you --
13 A.  And part of those people were
14 people in my office that bought the
15 stock because I did.
16 Q.  Did you believe that --
17 A.  Made about $25,000 a year.  That
18 was their salary.
19 Q.  I'm sorry.  I didn't mean to
20 interrupt.
21     Do you believe that you had
22 any obligation as the person initially
23 involved in this suit to investigate the
24 facts alleged in the Complaint?
25     MR. COLLINS:  Wait a minute.

Page 81

1  Could we hear that one back.
2      (The court reporter read back
3  the following:
4      "QUESTION: I'm sorry.  I
5  didn't mean to interrupt.
6      "Do you believe that you had
7  any obligation as the person initially
8  involved in this suit to investigate the
9  facts alleged in the Complaint?")
10     MR. COLLINS:  Are you asking
11 whether apart from the investigation and
12 analysis he already described and apart
13 from the investigation of his attorneys,
14 is that your question?
15     MS. MORIATY:  I'm asking how
16 he felt.  Whether he felt he had an
17 obligation as a named person, as a
18 person whose name was on the suit, to
19 investigate the claims involved in the
20 suit.
21     MR. COLLINS:  Well, it's
22 vague and ambiguous and apparently
23 counsel refuses to clear it up, which is
24 your choice.  In addition to that, by
25 obligation I presume you are asking for

KENNETH SCHOCKLEY                    2/24/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 86

1    MR. COLLINS: You've got the
2  same thing over and over again.
3    Go ahead.
4    MS. MORIATY.  Sorry.
5  BY MS. MORIATY:
6  Q.  Do you know what that is?
7  A.  Yes.
8  Q.  What is it?
9  A.  It's the stocks that I bought and
10  sold.
11  Q.  Is it accurate?
12  A.  I actually went and looked up the
13  slips the other day and sent them.  Yes.
14  Q.  For the record, this is the
15  Witness's Certification Of Investor.
16    What is your understanding of
17  what the term representative party
18  means?
19  A.  Representative party.
20    MR. COLLINS:  Is --
21    THE WITNESS:  Can you
22  elaborate on that a little bit?
23    MR. COLLINS:  Are you
24  referring to the representative party as
25  used in Paragraph 3?

Page 87

1    MS. MORIATY:  I'm just
2  referring to his understanding of the
3  words.  He doesn't --
4    MR. COLLINS:  Oh, come on.
5    MS. MORIATY:  It doesn't have
6  to be used in any fashion.
7    THE WITNESS:  Representative
8  party.  I represent the class of
9  investors.
10    MS. MORIATY:  Yes.  As used
11  in Paragraph 3.  But you do not have to
12  give me a legal --
13    MR. COLLINS:  Excuse me.  He
14  was answering.
15    Go ahead.
16    THE WITNESS:  As a
17  representative party on behalf of the
18  class.  By me doing this, I represent
19  the people who invested in this company
20  and lost money.
21  BY MS. MORIATY:
22  Q.  Do you know whether you were
23  appointed lead plaintiff in this case?
24  A.  That's what they said.  I didn't
25  volunteer for that.

Page 88

1  Q.  Do you know who the other lead
2  plaintiffs are?
3  A.  I imagine I can read some document
4  of who they are.
5  Q.  Do you know whether you were
6  seeking to be named a class
7  representative by the Court?
8  A.  No, I don't.
9  Q.  Describe in your own words, if you
10  would, who the class is that you were
11  trying to represent.
12  A.  I guess you didn't understand what
13  I just said.  The investors who lost
14  money.
15  Q.  From the purchase of --
16  A.  The IPO.
17  Q.  Why are you seeking to serve as
18  class representative?
19  A.  In like 15 minutes.  Because I
20  got -- excuse me.  Because I got angry
21  that it was a bait and switch, it was a
22  scam that a lot of people made a lot of
23  money because of insider knowledge.  And
24  I was tired of being pushed around.
25    I don't expect to make money

Page 89

1  on every deal I make, but I don't expect
2  people not to be honest.  Now, I've said
3  that before.  I'm not going to tell you
4  again.  Okay?
5  Q.  How many members are in the class
6  that you seek to represent?
7  A.  I don't know.  I can look it up,
8  though.
9  Q.  Is there more than one class?
10  A.  I'll look it up, if you want.
11  Q.  Do you know what geographic
12  regions are included in the class?
13    MR. COLLINS:  Oh, come on.
14  Foundation.
15    THE WITNESS:  I'll ask my
16  attorney.
17  BY MS. MORIATY:
18  Q.  Do you know if the other class
19  members bought Adams Golf stock?
20  A.  I would have to ask my attorney.
21  Q.  Do you know when they bought their
22  stock?
23  A.  Date and time?
24  Q.  Yes.
25  A.  No.

KENNETH SCHOCKLEY     2/24/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

**Page 90**

```
1   Q.  Do you know when the alleged class
2   period begins?
3   A.  I guess I could review that with
4   my attorney.
5   Q.  Do you know when it ends?
6   A.  I'd have to review that with my
7   attorney.
8   Q.  Do you know --
9   A.  I know now it's in Delaware and
10  it's a lot easier for me to go to
11  Delaware than Texas.
12  Q.  Do you think your claims are
13  similar to those of the other class
14  plaintiffs you're going to represent?
15      MR. COLLINS:  Calls for a
16  legal conclusion.
17      THE WITNESS:  I don't know
18  that.  I do know that my one son and a
19  couple employees that had it, as long as
20  I do something, they'll be happy.  I've
21  got a lot of time now.
22  BY MS. MORIATY:
23  Q.  Do you know how many other
24  proposed class representatives there
25  are?
```

**Page 91**

```
1   A.  Didn't you just ask that?  I think
2   we just asked that and I think I told
3   you I'd have to ask my attorney.
4   Q.  Do you know that Federated
5   National Insurance Company withdrew as a
6   proposed class representative?
7   A.  No, I don't.
8   Q.  So then I assume you wouldn't know
9   why they withdrew.
10  A.  No.  Did they lose money, too?
11  Q.  You've got me.
12      Have you ever met with any of
13  the other class members?
14  A.  Yes.
15  Q.  If so, have you discussed the case
16  with them?
17  A.  No.
18      MR. COLLINS:  Well, wait a
19  minute.  You two have a
20  misunderstanding.
21      THE WITNESS:  Well, she asked
22  me if I ever met with my son, David.  I
23  see him all the time.  Do I discuss this
24  case with him?  No.
25      MR. COLLINS:  And we also
```

**Page 92**

```
1   have extensive testimony on the record
2   already about discussions with family
3   members and broker about this case.
4   BY MS. MORIATY:
5   Q.  Did you meet with any other class
6   representatives?
7   A.  No.
8   Q.  What do you understand to be your
9   responsibilities as a representative?
10  A.  Didn't I just answer that
11  question?
12  Q.  I don't think so.
13  A.  I think so.
14  Q.  Your responsibilities?
15  A.  Yes.  My responsibilities is to
16  carry out this class-action suit to try
17  to get their money back for them being
18  scammed.
19  Q.  Is there any degree of diligence
20  that is required to do that in your
21  mind?
22      MR. COLLINS:  Because --
23      THE WITNESS:  Be available.
24      MR. COLLINS:  Excuse me.
25  Foundation, legal conclusion.
```

**Page 93**

```
1       Go ahead.
2       Did you finish your answer,
3   sir?
4       THE WITNESS:  To be
5   available.
6   BY MS. MORIATY:
7   Q.  Why do you think you would be an
8   appropriate class represent?
9   A.  Why do I think?  I don't think I'd
10  be a perfect class representative.  It's
11  not my forte to sue people.  I've never
12  sued anybody before.  I don't go through
13  all this legal stuff and you don't want
14  to know my opinion of lawyers.
15  Q.  How much time have you spent so
16  far fulfilling these duties as lead
17  plaintiff?
18  A.  I don't keep track of it.
19  Q.  Can you give me a ballpark?
20  A.  Well, the mail comes, I open the
21  letters, I read them, I call the lawyer
22  up, I send him the stuff.
23  Q.  You show up to this.
24  A.  I met with a lawyer today for a
25  couple hours.  If I have to go to
```

24 (Pages 90 to 93)

KENNETH SCHOCKLEY                    2/24/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 94

1  Delaware, I'll go to Delaware. It's a
2  lot easier drive than coming to
3  Philadelphia.
4  Q.  Do you have any other
5  responsibilities that might interfere
6  with your ability to fulfill any of your
7  class rep duties?
8  A.  No.  Sort of looking for a career
9  change.  Maybe I'll do this.
10  Q.  What do you stand to gain as class
11  representative?
12  A.  I don't think I stand to -- maybe
13  get my money back that I lost, but that
14  would be about it I'd imagine.
15  Q.  What parts of the lawsuit do you
16  intend to directly participate in beyond
17  this deposition?  For example, will you
18  attend things like class certs or the
19  hearings for that?
20  A.  If my attorney wanted me to do
21  something and I thought it was
22  reasonable, I would do what he told me
23  to do.
24  Q.  Will you attend the mediation?
25  A.  What is that?

Page 95

1  Q.  It's a discussion between the two
2  parties but it's -- it's an event
3  occurring on June 1st, 2005.  Do you
4  currently have any plans to attend?
5  A.  I didn't know about it.  I might
6  be in the Bahamas but if I'm not, I'd
7  attend if he told me to.
8      MR. COLLINS:  We might move
9  the mediation to the Bahamas, too.
10     MS. MORIATY:  That would be
11  great.
12  BY MS. MORIATY:
13  Q.  Who has the authority to settle
14  this case?
15  A.  I think I have a lot to say about
16  it with the attorney.  I mean, the
17  attorney can tell me to jump out the
18  window, doesn't mean I'm going to do
19  it.  But yeah, I think that I take the
20  attorney's advice.
21  Q.  Do you plan on attending the
22  entire trial?
23  A.  What dates are they?
24  Q.  Hasn't been set yet.
25  A.  Well, then I don't know.

Page 96

1  Q.  Okay.  Who paid for your flight to
2  attend this deposition?
3      MR. COLLINS:  Excuse me.  Off
4  the record.
5      THE WITNESS:  My flight?  I
6  drove from the shore.  It's an hour and
7  a half drive.
8      MR. COLLINS:  Off the record.
9      (Discussion off the record.)
10     MS. MORIATY:  We're back on.
11  BY MS. MORIATY:
12  Q.  Do you have an agreement with your
13  attorneys concerning your costs in
14  acting as class representative?
15     MR. COLLINS:  Foundation,
16  vague and ambiguous.
17     THE WITNESS:  No, not really.
18     MS. MORIATY:  I'm sorry?
19     THE WITNESS:  Not really.
20     MS. MORIATY:  Off the record
21  for just a second.
22     (Recess, 11:59-12:09 p.m.)
23     MS. MORIATY:  Back on.
24  BY MS. MORIATY:
25  Q.  Who are your attorneys?

Page 97

1  A.  Who are my attorneys?  They're
2  sitting right here.
3  Q.  Can you --
4  A.  Mr. Collins, Don and Alan Sanders.
5  Q.  Thank you.
6      How did you choose your
7  attorneys?
8  A.  Alan Sanders has been my attorney
9  for probably 25 years, and he made
10  recommendations.
11  Q.  So why did you choose these
12  attorneys?  Just off his
13  recommendations?
14     MR. COLLINS:  Well, vague and
15  ambiguous.
16     You mean why did he choose
17  the attorneys apart from Mr. Sanders?
18     MS. MORIATY:  Right.
19     THE WITNESS:  Why did I
20  choose Mr. Sanders?
21  BY MS. MORIATY:
22  Q.  Why did you choose your attorneys?
23     MR. COLLINS:  Apart from
24  Mr. Sanders, apparently.
25  BY MS. MORIATY:

KENNETH SCHOCKLEY                    2/24/2005  IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 98

1   Q.  Why did you choose any --
2   A.  I discussed this with Mr. Sanders.
3   Q.  And you followed his
4   recommendations?
5   A.  And I followed his
6   recommendations.
7   Q.  Do you have an understanding that
8   they will obtain some sort of
9   contingency fee if the plaintiffs win
10  the lawsuit?
11  A.  I never really went over that with
12  them.
13  Q.  How much do your attorneys bill
14  per hour?
15  A.  No idea.
16  Q.  Did you take competitive bids from
17  other attorneys?
18  A.  No.
19  Q.  How many times have you physically
20  met with your attorneys to date about
21  this case?
22  A.  Well, I see Mr. Sanders on a
23  monthly basis and we discuss a lot of
24  topics, so I don't know how many of
25  those times we discussed this case.  I

Page 99

1   talk to Mr. Collins on the phone and I
2   met with him today.
3   Q.  When did you talk with Mr. Collins
4   on the phone?
5   A.  Several days ago.
6   Q.  But prior to that had you had any
7   conversations with him?
8   A.  Probably a year, two years ago or
9   something.
10  Q.  How often do you speak with your
11  attorneys about the status of the
12  lawsuit?  Are you updated every time you
13  talk to your lawyer, monthly?
14      MR. COLLINS:  Okay.  Now, are
15  you asking about updates or are you
16  asking about oral conversations or both?
17  BY MS. MORIATY:
18  Q.  How often are you updated on the
19  status of this lawsuit?
20  A.  Periodically.
21  Q.  What kind of period?
22  A.  I don't know.  It's not set in
23  stone.  I mean, they send me things in
24  the mail.  They'll -- you know, if I
25  have questions, I call them.

Page 100

1   Q.  Generally, monthly, you think?
2   A.  It could be.
3   Q.  Okay.
4      MS. BRANNEN:  I'm sorry.  I
5   couldn't hear your answer.
6      THE WITNESS:  It could be.
7   BY MS. MORIATY:
8   Q.  Do you know how many motions your
9   counsel have filed in this case?
10  A.  No.
11  Q.  Who makes the strategy calls in
12  this case?
13  A.  The lawyers.
14  Q.  If you disagreed with your
15  attorneys' decision about how to handle
16  some aspect of the case, what would you
17  do?
18      MR. COLLINS:  Hypothetical,
19  foundation.
20      THE WITNESS:  I would discuss
21  it with them and tell them my point of
22  view.
23  BY MS. MORIATY:
24  Q.  Have you discussed the strengths
25  and weaknesses of your case with your

Page 101

1   attorneys?
2      MR. COLLINS:  You can only
3   answer whether that subject matter
4   was --
5      MS. MORIATY:  Just --
6      MR. COLLINS:  -- was
7   discussed without going into the details
8   as to who said what.
9      THE WITNESS:  Have I
10  discussed the subject matter with my
11  attorney?
12  BY MS. MORIATY:
13  Q.  The subject matter of the
14  strengths and weaknesses of your case
15  with your attorneys.
16  A.  I haven't to this -- at this time.
17  Q.  Okay.  Have you discussed the
18  prospects of settlement with your
19  attorneys?
20  A.  No.
21  Q.  Do you know whether or not a
22  settlement offer has been made?
23  A.  No.  I think if it was agreed
24  upon, I would then know that.
25  Q.  Who do you believe is responsible

26 (Pages 98 to 101)

KENNETH SHOCKLEY                    2/24/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 106

1   Q.  Do you have any concept of the
2   magnitude of those costs at all?
3         MR. COLLINS:  Well, vague and
4   ambiguous, asked and answered.
5         THE WITNESS:  I imagine it's
6   very lucrative or there wouldn't be so
7   many attorneys in the United States.
8   BY MS. MORIATY:
9   Q.  Have you taken any steps to manage
10  the costs in this lawsuit?
11        MR. COLLINS:  To what?
12        THE WITNESS:  Manage the
13  costs.
14  BY MS. MORIATY:
15  Q.  Control, constrain.
16  **A.  No.  I'm not really, you know,**
17  **into the legalities of it.**
18  Q.  So have you reviewed any monthly
19  time and expense reports prepared by
20  your lawyers?
21  **A.  No.**
22  Q.  Do you know if these costs are
23  going to come out of any recovery your
24  class might get as a result of this
25  suit?

Page 107

1   **A.  No.  But I mean, I've had class-**
2   **action suits go across my desk for**
3   **years.  I don't think the little person**
4   **ever gets anything.  It's always the**
5   **attorneys.  But I think what we're**
6   **trying to do here is establish the fact**
7   **that these people were crooks.**
8   Q.  Do you know whether defendants can
9   seek to recover the costs of a lawsuit
10  from you alone if they win?
11        MR. COLLINS:  Wait a minute,
12  please.
13        THE WITNESS:  No, I don't.
14        MR. COLLINS:  I'm sorry.  You
15  need to let me object when it's a
16  particularly outrageous question.
17        THE WITNESS:  Okay.  Okay.
18        MR. COLLINS:  That question
19  was objectionable on a number of grounds
20  which I'd be glad to describe,
21  otherwise, you can go ahead.
22        MS. MORIATY:  I would now
23  like to introduce what we're going to
24  have to mark as Exhibit 24.
25        (Exhibit 24 was marked for

Page 108

1   identification.)
2   BY MS. MORIATY:
3   Q.  I'm showing you what's been marked
4   as Exhibit 24.  Take a moment to look at
5   it and let me know what it is.
6         MR. COLLINS:  I'm sorry.
7   There's a question?
8   BY MS. MORIATY:
9   Q.  Please tell me what that is after
10  you've reviewed it.
11        Have you reviewed it?  Can
12  you tell me what it is?
13  **A.  What I would call an Employment**
14  **Agreement.  I don't think that's the**
15  **legal term for this.**
16  Q.  Would you agree that it's an
17  agreement about attorneys' fees and the
18  arrangement between you and the
19  attorneys?
20        MR. COLLINS:  Well --
21        THE WITNESS:  And other
22  things, yes.
23        MR. COLLINS:  Thank you.
24  BY MS. MORIATY:
25  Q.  And it looks accurate to you?

Page 109

1         MR. COLLINS:  Now, wait a
2   minute.
3         Please explain accurate.  You
4   mean is that his signature?
5         MS. MORIATY:  Have you seen
6   this document before?
7         THE WITNESS:  I signed it.
8   BY MS. MORIATY:
9   Q.  Does it appear to be the document
10  you signed?
11  **A.  Yes.**
12  Q.  Thank you.  That's all we're doing
13  with that.
14        MR. COLLINS:  Okay.
15        It's a long time.
16  BY MS. MORIATY:
17  Q.  Okay.  Are you aware of a Motion
18  to Dismiss being filed in this case?
19  **A.  Yes.**
20  Q.  Do you know the outcome of that
21  Motion?
22  **A.  I don't know if I can tell you in**
23  **legal terms of that, but I think it was**
24  **and then it was brought back.**
25  Q.  Okay.

28 (Pages 106 to 109)

KENNETH SCHOCKLEY                    2/24/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 130

1   Q.  And the first page reflects --
2   A.  I have no idea where the first
3   page came from or what it reflects.
4   Q.  So these records show that you
5   bought 3,000 shares of Adams Golf in the
6   IPO on July 10th; is that correct?
7       MR. COLLINS: These documents
8   speak for themselves.
9       Go ahead.  You may answer.
10      THE WITNESS:  Yes.
11  BY MS. MORIATY:
12  Q.  Why did you sell?
13      MR. COLLINS:  Now --
14  BY MS. MORIATY:
15  Q.  I'm sorry.  Let me split that
16  question up.
17      You sold 1,500 shares on our
18  next date is July 17th, 1998.  Why did
19  you sell those shares at that time?
20  A.  In 1998?
21  Q.  Seven days after you bought them.
22  A.  Did the stock go down?
23  Q.  You seem to have made money.
24  A.  I made money?
25  Q.  That's what it looks like.

Page 131

1   A.  Bad report came out, stock started
2   going down, I sold half of the stock.  I
3   waited to see if it was going to come
4   back.  It didn't.  I sold the rest.  It
5   went down after that.
6   Q.  So you sold -- this is in response
7   to a negative report?
8   A.  I imagine so, ma'am.  In 1998 I
9   don't know what you were doing, but I
10  really don't remember exactly what
11  happened.
12  Q.  It's fine if you don't remember.
13  I'm just trying to get your best
14  recollection.  So then you sell the
15  second 1,500 shares on December 30th,
16  1998.  Why did you sell on that date?
17  A.  Because the stock was going down.
18  And I didn't like the report.
19  Q.  So there was no other particular
20  significance of December 30th?
21      MR. COLLINS:  Vague.
22      You may answer.
23      THE WITNESS:  Not that I know
24  of.
25      MS. MORIATY:  Okay.

Page 132

1   BY MS. MORIATY:
2   Q.  Do you still hold any Adams Golf
3   stock?
4   A.  No.
5   Q.  Would you consider buying Adams
6   Golf stock?
7   A.  No.
8   Q.  Were these your only transactions
9   in Adams Golf stock?
10  A.  I'm pretty sure of that.
11  Q.  Okay.  At any time before your
12  purchase did you review any documents
13  issued by Adams Golf like the SEC
14  filings or the prospectus or press
15  releases?
16      MR. COLLINS:  Asked and
17  answered.
18      Go ahead.
19      THE WITNESS:  I think I
20  stated the fact that those days the
21  stockbroker would call me up, he'd
22  explain the stock, explain what it was
23  about and I would buy the stock.
24  Shortly after prospectus or something
25  would show up.

Page 133

1   BY MS. MORIATY:
2   Q.  Did you read any analyst's report
3   about the golf industry?
4   A.  I don't remember.
5       MR. COLLINS:  You need to let
6   her get the question out.
7   BY MS. MORIATY:
8   Q.  Did you read any analyst's reports
9   about the golf industry?
10  A.  I don't remember.
11  Q.  Have you ever read before or after
12  or since any analyst's reports about the
13  golf industry?
14  A.  Golf industry?
15  Q.  Yes.
16  A.  No, not really.
17  Q.  How about on Adams Golf?
18  A.  Not that I can recall.
19  Q.  Okay.
20      MR. COLLINS:  Now, the last
21  question was, did he ever read an
22  analyst's report?
23      MS. MORIATY:  On Adams Golf.
24      MR. COLLINS:  At any time.
25      MS. MORIATY:  At any time.

34 (Pages 130 to 133)