# EXHIBIT C

Page 1

1                    UNITED STATES DISTRICT COURT

                        DISTRICT OF DELAWARE

2

3       IN RE:  ADAMS GOLF, INC., )

        SECURITIES LITIGATION     ) CIVIL ACTION NO. 99-371-KAJ

4                                 ) (CONSOLIDATED)

5

6

7        * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

                        ORAL DEPOSITION OF

8                      TODD MICHAEL TONORE

                    FRIDAY, FEBRUARY 25, 2005

9        * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

10

11

12                    ORAL DEPOSITION OF TODD MICHAEL TONORE,

13       produced as a witness at the instance of the Defendants

14       and duly sworn, was taken in the above-styled and

15       numbered cause on the 25th day of February 2005, from

16       10:01 a.m. to 12:40 p.m., before RANDALL N. FINCH, CSR

17       in and for the State of Texas, reported by machine

18       shorthand, at the offices Akin Gump Strauss Hauer &

19       Feld, L.L.P., 300 West 6th Street, Suite 2100, Austin,

20       Texas 78701, pursuant to the Federal Rules of Civil

21       Procedure and the provisions stated on the record or

22       attached hereto.

23

24

25

Page 6

```
1      A.   Right.
2      Q.   Please don't hesitate to tell me if you don't
3  understand a question.  I will do my best to explain a
4  question as best I can.  I'll try to be clear, but feel
5  free to ask me ---
6      A.   Okay.
7      Q.   -- if you don't understand something.  If you
8  do answer a question that I ask, then I'll assume that
9  you understood what I asked you.
10     A.   Okay.
11     Q.   If you need a break, just say so.  And we can
12 take a break anytime that you want to.  But please
13 don't leave a question pending.  If I've asked you a
14 question, please try to answer it as best you can
15 before you request a break.
16     A.   Okay.
17     Q.   When answering a question, don't guess.  Okay?
18 I am entitled to your best recollection of the events.
19 It's difficult to remember everything exactly.
20     A.   Right.
21     Q.   But please don't guess.
22     A.   Okay.
23     Q.   Okay.  And then just a final few questions.
24 Is there any reason that you can't give your best
25 testimony here today?
```

Page 7

```
1      A.   No.
2      Q.   Okay.  Are you under any mental or physical
3  condition or any medications that would prevent you
4  from testifying truthfully or accurately?
5      A.   No.
6      Q.   Okay.  Okay.  Let's talk about a few personal
7  details.  What is your current address?
8      A.   I'm with Bancroft Bag, Incorporated.  We're a
9  paper bag manufacturing company out of Monroe,
10 Louisiana, which is my hometown.  I have been with
11 Bancroft for 20 years.  I am the sales manager for
12 Bancroft.  I have sales people all over the country.
13 We manufacture any type of paper bag you would see when
14 you walk into a grocery store.  Old Roy pet food,
15 Kingsford, Royal Oak, Hall -- gift bags for Hallmark,
16 motion sickness bags for the airlines.
17           We're a -- we're a -- what's -- what you
18 would call a multi-wall bag producer.  We have -- we're
19 about a hundred million dollar a year company,
20 privately held by one gentleman, Toby Bancroft.  And
21 like I said, I have been with Toby for more than 20
22 years.
23           MS. FOX:  Okay.  Could we go off the
24 record a second?
'5            (Discussion off the record)
```

Page 8

```
1      Q.   (By Mr. Ahart)  Let's go back on the record.
2  What is your current home address right now?
3      A.   1024 Pebble Beach in Mansfield, Texas, which
4  is just south of Fort Worth.
5      Q.   Did you live at this address during 1998 and
6  1999?
7      A.   Yes, I did.
8      Q.   Okay.  And do you have a home telephone
9  number?
10     A.   (817) 453-5519.
11     Q.   Okay.  Are you married?
12     A.   Yes.  Married.
13     Q.   Okay.  How long have you been married?
14     A.   Been married 12 years.
15     Q.   And what's your wife's employment?
16     A.   Real estate agent.
17     Q.   Okay.  Okay.  Let's discuss your educational
18 background leading up to your career.
19     A.   Okay.
20     Q.   Where did you attend high school and when?
21     A.   Monroe, Louisiana, graduated in 1980.
22           MS. FOX:  That answers it.
23           THE WITNESS:  All right.  Sorry.
24     Q.   (By Mr. Ahart)  Did you go to college?
25     A.   Yes.
```

Page 9

```
1      Q.   Okay.  When did you go to college?
2      A.   '80 to '84.
3      Q.   Where did you go?
4      A.   Northeast Louisiana University in Monroe.
5      Q.   Okay.  What was your degree?
6      A.   Sales -- marketing.
7      Q.   Okay.
8      A.   Business.  Business marketing.
9      Q.   And that was your major?
10     A.   Right.
11     Q.   Did you have a minor?
12     A.   The minor was in marketing.  Major was in
13 business.
14     Q.   Okay.  So I take it that you had some classes
15 with financial business accounting or --
16     A.   Sure.
17     Q.   -- economics backgrounds and things of this
18 nature?  Okay.
19     A.   Correct.
20     Q.   Okay.  Did you go to graduate school?
21     A.   No.
22     Q.   Okay.  In connection with your job at Bancroft
23 or anything before, have you attended any seminars or
24 trade courses or company classes?
25     A.   Sure.
```

TODD TONORE                2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 10

1  Q.  Okay.  What kind of topics have those courses
2  typically covered?
3  A.  Well, a lot of quality type classes, ISO
4  classes, some management classes from SMU business
5  school in Dallas.
6  Q.  Is that the Cox Business School?
7  A.  Right.
8  Q.  Correct?
9  A.  Right.
10  Q.  Okay.  Are you a member of any professional
11  societies?
12  A.  No.
13  Q.  Do you have any other education certifications
14  or professional licenses or anything of that sort?
15  A.  (Witness shakes head)  I'm sorry.  No.
16  Q.  And I think we have addressed this next
17  question already, but it sounds like you've worked for
18  Bancroft since you left college.  Has that been your
19  only job since you left college?
20  A.  I sold pharmaceuticals for one year right out
21  of college and then went to work for Bancroft.
22  Q.  And who did you sell pharmaceuticals for?
23  A.  Fisons, F-i-s-o-n-s, a Johnson & Johnson
24  company.
25  Q.  Okay.  Did you serve in the military at any

Page 11

1  time?
2  A.  No.
3  Q.  When did you first learn that you would have
4  to give a deposition in this case?
5  A.  About a month ago.
6  Q.  Okay.  Who told you?
7  A.  I was contacted by Elizabeth.
8  Q.  Okay.  Who have you met with personally to
9  prepare for this deposition?
10  A.  No one other than Elizabeth.
11  Q.  Okay.  How many times have y'all met with one
12  another?
13  A.  Just once, this morning.
14  Q.  Okay.  How long did you meet?
15  A.  Thirty minutes.
16  Q.  Okay.  And this was the first time that you
17  had personally met with your attorneys before today?
18  A.  Yes.
19  Q.  Okay.  Have you communicated with anyone else
20  at all in preparation for your deposition today?
21  A.  No.
22  Q.  Okay.  Did you review any documents to prepare
23  for this morning's deposition?
24  A.  No.
25  Q.  All right.  Let's move on and just talk about

Page 12

1  some of the basic issues in this lawsuit.  Who are you
2  suing in this case?
3  A.  Barney Adams, Adams Golf, and directors at the
4  time of the IPO, and the company that actually assisted
5  them in taking the company public.  And I assume that
6  would be his company.
7  Q.  And by company, you mean the underwriters
8  that --
9  A.  Underwriters, yes.
10  Q.  Okay.  Can you talk briefly about why you're
11  suing my clients?
12  A.  Basically because I've -- I lost a lot -- a
13  tremendous amount of money.  I feel like I was misled.
14  And I'm representing the class that also lost a lot of
15  money that I feel was misled.
16  Q.  And how do you believe they were misled?
17  A.  I think they were -- there was information
18  withheld at the time of the IPO that later -- shortly
19  afterward affected the stock price to do what it did in
20  a six-month period, go from a little over 18 all the
21  way down to three or wherever it is.  I don't even know
22  where it is today.
23  Q.  Okay.  And so you believe it was this withheld
24  information that caused the stock price -- conceivably,
25  this information that was withheld is what caused the

Page 13

1  stock price to decline after the offering?
2  A.  Yes.
3  Q.  What evidence do you have to support your
4  belief?
5  A.  Evidence?  There was a lot printed, lot of
6  press releases, once the -- once Adams Golf announced
7  why the stock price was declining.  I was -- I
8  purchased my stock through A. G. Edwards and I was
9  given information off of their Web sites and -- and off
10  of the Adams Golf Web site that basically stated the
11  reason for the decline in the stock.
12  Q.  Okay.
13  A.  Or their -- their -- their reason.
14  Q.  So you -- you reviewed the company's press
15  releases?  Adams Golf?  By company, I mean Adams Golf.
16  A.  Yes, through -- via the Internet, through
17  information that I could pull up basically off --
18  through my brokerage company.
19  Q.  Okay.  Did you also review any general
20  articles about the industry or other newsprint sources
21  that may have discussed Adams Golf, or just
22  primarily -- just releases by the company?
23  A.  I couldn't turn the TV on without seeing
24  Barney Adams.  I mean, there was a tremendous amount of
25  advertising being done by Adams Golf at that time.

4 (Pages 10 to 13)

Page 14

1  There was no -- no indication at the time of the IPO
2  that there was any information being withheld. But
3  after -- after the fact, the stock dove and then the
4  information was revealed.
5       Q.  Okay.
6       A.  And I believe they called -- referred to it as
7  gray marketing.
8       Q.  Mm-hmm.  What facts do you know to support
9  your belief that this information was withheld, other
10 than these press releases that you read or other
11 information you may have seen on the news?
12      A.  None.
13      Q.  None?
14      A.  Other than what I read.
15      Q.  Okay.  You touched briefly on this, but can
16 you just for the record identify the defendants that
17 are in this lawsuit?
18      A.  Defendants.  Again, I -- I don't know
19 directors' names.  I -- Barney Adams being the owner of
20 the company, and I want to say it's Lehman or whoever
21 helped -- I'm trying to think of the term.  His company
22 basically.  The underwriters.
23      Q.  Okay.
24      A.  I can't think...
25      Q.  Can you name any of the individual director

Page 15

1  defendants --
2       A.  No.
3       Q.  -- at all?
4       Okay.  And other than Lehman Brothers,
5  can you name any of the underwriter defendants?
6       A.  No.
7       Q.  Okay.  Can you give me the names, titles or
8  responsibilities of the people that have been named as
9  defendants in this suit, particularly any of the
10 officers that used to be in the company?
11      A.  No.  Only Barney Adams.
12      Q.  Okay.  Do you know how many defendants there
13 are in total?
14      A.  No.
15      Q.  In 1998, which is the time of the IPO, can you
16 tell me what sort of business Adams Golf was in?
17      A.  The golf business.  They manufactured a club
18 to -- to basically replace drivers and woods, a variety
19 of woods in the golf business.
20      Q.  Do you know the name of the particular product
21 that was so popular at that time?
22      A.  Tight Lies.
23      Q.  Tight Lies clubs?
24      Do you know how Adams Golf marketed its
:5 products and sold its products at that time?

Page 16

1       A.  Yes.  They -- I played with the product and I
2  was only able to purchase it through a -- the country
3  club which I'm a member of.  And I was -- I was told
4  that it was marketed through specialty shops and not
5  discount houses.
6       Q.  Okay.  Were the clubs available through any
7  other sources other than through specialty shops or
8  golf pro shops?
9       A.  At the -- at the time of the IPO, no.
10      Q.  Okay.
11      A.  Not to my knowledge.
12      Q.  You said at the time of the IPO you saw Barney
13 Adams' face all over the place, so --
14      A.  Oh, sure.
15      Q.  Did you see these advertisements for the
16 company or for Barney in television or on the radio or
17 both or --
18      A.  Everywhere.
19      Q.  -- in newsprint?
20      A.  Everywhere.  Newsprint, infomercials,
21 television commercials, just about everywhere.  Golf
22 publication magazines, anything that related to golf,
23 that -- you know, that was the hot item back then and
24 it was all -- it was stamped everywhere.
25      Q.  Mm-hmm.  Do you know why the product was

Page 17

1  considered to be so hot, as you say, at that time?
2       A.  It was a very good product.  It was -- I have
3  no -- you know, I've always said that it was a good
4  product.  That was one of my reasons for buying the
5  product.  It was a good product.
6       Q.  Do you remember when you first learned about
7  the IPO?
8       A.  When I first learned about the IPO?  Maybe a
9  day or two before the IPO.
10      Q.  Okay.  So it was shortly before the IPO --
11      A.  Right.
12      Q.  -- actually occurred?
13      A.  Right.
14      Q.  But I guess before the IPO occurred you had
15 already been following the company or --
16      A.  No, I had been --
17      Q.  -- you did you not start following the
18 company really until you heard about the IPO itself?
19      A.  No, I followed the company because I was
20 playing with their equipment for a year before they
21 took the company public.
22      Q.  So you think you -- you actually purchased a
23 Tight Lies club sometime in 1997?
24      A.  Sure.
25      Q.  Do you know who Barney Adams is personally or

TODD TONORE                          2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 18

1  do you just know him in connection with the
2  advertisements?
3     A.  Just connection with the advertisement.
4     Q.  What do you believe that Mr. Adams did wrong
5  in this case?
6     A.  From a business standpoint, I think he was
7  aware of the threat of what they later called gray
8  marketing and -- and he knew it was going to affect his
9  sales in the future, in the near future and failed to
10 disclose that at the time of the IPO.
11    Q.  And by affecting sales, what do you mean by he
12 knew it would affect sales in the future?
13    A.  I just -- re -- say that again.
14    Q.  Well, you say that you knew -- well, in your
15 opinion, that Barney Adams knew that this gray market
16 issue would affect sales in the future.  In what way do
17 you mean it would affect sales?
18    A.  He knew it existed.  And he knew it -- it
19 would affect him in the fact that the arrangement that
20 he had with the way he chose to sell his products
21 through specialized shops, once these products surfaced
22 in discount -- in the discount arena, he knew that the
23 loyalty and the price would be -- would go away.
24    Q.  Okay.  Can you tell me who is W. D. C.
25 McKinzey?

Page 19

1     A.  No idea.
2     Q.  Okay.  I'm going to hand you what has been
3  marked as Defendant's Exhibit 1.
4     A.  Okay.
5         (Defendant's Exhibit No. 1 marked)
6     Q.  Do you recognize this document?  And please
7  take your time to look through it before you answer the
8  question.
9     A.  I believe that at one point I may have seen
10 this document, but it's been eight years ago.  So for
11 me to say that I remember it, no, sir, I do not.
12    Q.  This is the company's prospectus that they
13 released --
14    A.  Correct.
15    Q.  -- at the time of the offering.  If you were
16 to have seen this document, do you remember when you
17 did in fact first see it?
18    A.  It would have been after I had purchased the
19 stock from my -- it would have come to me from
20 my -- from the A. G. Edwards --
21    Q.  Okay.
22    A.  -- stockholder must -- my -- my broker would
23 have sent it to me.
24    Q.  Okay.  Do you recall or do you know at this
25 time what statements in the prospectus that you believe

Page 20

1  are false or misleading?
2     A.  Again, I mean, I've -- I haven't had time to
3  read it, but --
4     Q.  Well, if you would like, at a break you can
5  look through it if you want.
6     A.  Okay.
7     Q.  We can always revisit these questions.
8     A.  Yeah.
9     Q.  Let's try and move on a little bit.  Do you
10 believe that the company or any of the defendants
11 misrepresented anything or made any misstatements
12 specifically in this prospectus that you're alleging is
13 wrong?
14    A.  In this particular prospectus, I don't believe
15 that there was any misrepresentation.  I believe there
16 may have been some things left out.
17    Q.  Okay.  So do you know the differences between
18 a misrepresentation and what we'll call an omission?
19       MS. FOX:  I'm going to object because it
20 calls for a legal conclusion.  But you'd want to elicit
21 his lay interpretation of those -- of those terms.
22       MR. AHART:  That's fine.
23       MS. FOX:  You can't assume that he has
24 the legal interpretation --
25       THE WITNESS:  Right.

Page 21

1         MS. FOX:  -- because he knows the words.
2     Q.  (By Mr. Ahart)  Okay.  So in your lay
3  understanding of what a misrepresentation is versus an
4  omission or, you know, as you said, "didn't say
5  something."
6     A.  An omission to me is when you leave -- when
7  you -- when you have knowledge of something and -- and
8  don't admit it.
9     Q.  Okay.  And so Adams Golf did not make my
10 misrepresentations?  Is that correct?
11    A.  They may have not made any -- rephrase that
12 now.
13    Q.  I guess my question -- we were just trying to
14 figure out what it is that you're alleging has
15 occurred.  So you are saying that it wasn't that Adams
16 Golf made any misrepresentations.  Is that correct?
17 It's that Adams Golf omitted or did not state something
18 that they were supposed to state.  Is that correct?
19    A.  Correct.
20    Q.  Okay.  And again, although we've touched upon
21 this briefly in another question, can you just discuss
22 again what it is that you believe that Adams Golf did
23 not disclose that they should have disclosed?
24    A.  The sale of their products through what they
25 refer to as gray marketing.

6 (Pages 18 to 21)

512-320-0185                     RLS LEGAL SOLUTIONS                     512-391-0269

Page 22

1    Q.  Okay.  And what is your understanding of what
2  that means?
3    A.  To me, gray marketing could be -- I believe it
4  means the products were -- were put in the hands of
5  someone that sold the products to a discount -- or at a
6  discounted rate.  And they were -- and for that to
7  happen, I feel the products were sold at a discounted
8  rate so that that could happen.
9    Q.  Okay.  Who do you believe sold the clubs at a
10  discounted rate to these retailers?
11    A.  I believe Adams Golf manufactured the clubs
12  and sold the -- sold the clubs to someone or -- or some
13  company, I'm not sure, that wound up selling the clubs
14  into -- into a discounted market like a Costco or a
15  Wal-Mart.
16    Q.  Do you think Adams Golf actually sold clubs
17  directly to these discounters?
18    A.  No.
19    Q.  Okay.  And back to the gray market issue, do
20  you remember when Adams Golf first disclosed that there
21  were gray market problems?
22    A.  After the initial public offering when the
23  stock began to fall.
24    Q.  Okay.
25    A.  It was -- that was the first time I had heard

Page 23

1  the term "gray marketing" or read it anywhere.  I never
2  read it anywhere before that time.
3    Q.  Okay.  Let's turn to page 24 of the
4  prospectus.  And if you'll look at that second full
5  paragraph --
6    A.  Mm-hmm.
7    Q.  There's a sentence there on the third line, in
8  the middle of the third line that starts off with "To
9  preserve..."
10    A.  Right.
11    Q.  So I'm going to read it aloud.  "To preserve
12  the integrity of its image and reputation, the company
13  limits its distribution to retailers that market
14  premium quality golf equipment and provide a high level
15  of customer service and technical expertise.  The
16  company currently sells its products to on- and
17  off-course golf shops and selected supporting goods
18  retailers.  The company believes that selective retail
19  distribution helps its retailers to maintain profitable
20  margins and maximize sales of Adams products."
21         Do you believe this is a true statement?
22         MS. FOX:  Wait a second.  I don't think
23  you read the whole thing.
24         THE WITNESS:  No.
25         MS. FOX:  You read -- did you read, "The

Page 24

1  company does not sell its products through
2  price-sensitive general discount warehouses, department
3  stores or membership clubs?
4         THE WITNESS:  No.
5         MR. AHART:  I'm sorry, I must have been
6  paraphrasing it a little bit.
7         MS. FOX:  Just skipped it.
8         MR. AHART:  I apologize.
9         THE WITNESS:  Yes, I believe that -- I
10  believe the statement when that last sentence is
11  included.
12         MR. AHART:  Okay.  And --
13         MS. FOX:  I'm sorry.  What was that in
14  response to?
15         THE WITNESS:  The last sentence, "The
16  company does not sell its products through
17  price-sensitive general discount warehouses, department
18  stores or membership clubs."
19         MR. AHART:  But my question was whether
20  he believed that was a true statement.  Can we go off
21  the record for a second?
22         (Discussion off the record)
23    Q.  (By Mr. Ahart)  We'll go back on the record.
24  Okay, let me read this --
25    A.  Okay.

Page 25

1    Q.  -- section to you again, and my question to
2  you is:  Do you believe that the following statement
3  that I'm going to read which is in the prospectus is
4  true?
5    A.  Okay.
6    Q.  "To preserve the integrity of its image and
7  reputation, the company currently limits its
8  distribution to retailers that market premium quality
9  golf equipment and provide a high level of customer
10  service and technical expertise.  The company currently
11  sells its products to on- and off-course golf shops and
12  selected supporting goods retailers.  The company does
13  not sell its products through price-sensitive general
14  discount warehouses, department stores or membership
15  clubs.  The company believes its selective retail
16  distribution helps its retailers to maintain profitable
17  margins and maximize sales of Adams products."
18         Do you believe this statement is true?
19    A.  Yes, I do.
20    Q.  Let's turn to page 29.  And if you will see
21  down there the second full paragraph from the bottom
22  where it says "Sales to retailers," in capital print?
23    A.  Yes.
24    Q.  I'm going to read this excerpt to you as well,
25  and please tell me if you believe that this is a true

TODD TONORE                    2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 46

1   clear --
2       A.   It would have been -- okay.
3       Q.   What you're looking at is a -- is marked --
4   okay, well, I'll just introduce Exhibit 20. This is
5   Defendant's Exhibit 27. It's Bates stamped TT 1
6   through TT 2, and the title of the document is Adams
7   Golf, Inc. certification pursuant to the federal
8   securities laws. Okay, you can go ahead and discuss it
9   now.
10      A.   Okay. Repeat your question.
11      Q.   When did you first hear about this lawsuit?
12      A.   It would have been in late '99.
13           MS. FOX: Well, take a look at the first
14   page. No point in just guessing when -- when you've
15   got -- look at the -- read the first page.
16           THE WITNESS: This one here?
17           MS. FOX: Yeah.
18           THE WITNESS: (Brief pause) It would
19   have been -- I imagine -- it's been eight years or six
20   years ago, but now in order for me to join the class I
21   believe I had to -- to sign up 25 days after the IPO,
22   or after the class was -- I had to sign up 25 days
23   after the class.
24           MS. FOX: Well, don't -- don't try and do
25   that. Do you remember when you --

Page 47

1           MR. McEVOY: Could you let him finish his
2   answer? I know you would like to tell him what to
3   say --
4           THE WITNESS: I had to sign up -- I had
5   to sign the class. Once I was made aware, I had to
6   join the class within 25 days after the -- after I
7   was -- the class was filed. And I -- I believe I was
8   made aware of the class in '99. I last sold the stock
9   in July -- June of '99.
10      Q.   (By Mr. Ahart) Okay. And how did you learn
11  about the suit?
12      A.   Just following the company via e-mail. I was
13  a -- I read that Keller Ro -- R-o-h-r-b-a-c-k had taken
14  the class and I contacted them and joined.
15      Q.   Okay. What did you hear about the lawsuit
16  when you first heard about it?
17      A.   That there was a -- basically that there was a
18  class action lawsuit against Adams Golf for withholding
19  information about gray market distribution.
20      Q.   Do you know who first filed the lawsuit
21  against Adams Golf?
22      A.   I was contacted by Juli from Keller Rohrback.
23  I'm not sure who filed it.
24      Q.   And Juli is an attorney at Keller Rohrback?
'5      A.   Yes.

Page 48

1       Q.   Did she contact you first?
2           MS. FOX: Object. He said that he --
3           THE WITNESS: Yeah, I contacted --
4           MS. FOX: -- contacted Keller Rohrback.
5   Don't try and trick him into that. It's not right.
6           MR. AHART: Just asking him a question.
7           MR. McEVOY: Liz, listen, nobody is
8   trying to trick him.
9           MS. FOX: Then you are trying to trick
10  him. You know he's confused and you're trying to
11  confuse him more.
12           MR. McEVOY: Nobody's trying to confuse
13  him.
14           MR. AHART: Off the record.
15           (Discussion off the record)
16           MR. AHART: Back on the record.
17      Q.   (By Mr. Ahart) Do you know when the lawsuit
18  was originally filed?
19           MS. FOX: He's answered that. He doesn't
20  know.
21           THE WITNESS: I don't know.
22           MS. FOX: It's ridiculous. You know, you
23  keep asking him when you know he doesn't know. It's
24  six years ago.
25           MR. AHART: Yeah. Let's go off the

Page 49

1   record for a second.
2           (Discussion off the record).
3       Q.   (By Mr. Ahart) Are you aware that several
4   individual suits have been filed against Adams Golf and
5   that they were later consolidated?
6       A.   My only knowledge is that there were -- I'm
7   only knowledgeable that there are two, that people that
8   bought the stock on the initial IPO, there's a suit.
9   And then I assume that the remainder of the people
10  that -- that bought the stock within a 30-day period or
11  so after the IPO, there's another suit. And that's the
12  one that I'm -- I'm a member of.
13           I did not buy the stock during the
14  initial public offering. I did buy it the day of the
15  initial public offering, but not -- I wasn't a part of
16  the IPO.
17      Q.   Okay. Do you know whose idea it was to
18  initially file the suit?
19      A.   No.
20      Q.   Do you know whose idea it was to file a class
21  action?
22      A.   No.
23      Q.   Did you personally have any hesitation or
24  concern about filing the suit or joining this suit?
25      A.   No.

TODD TONORE                    2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 50

1    Q.  Do you believe that you have any obligation to
2 investigate the facts that are alleged in the
3 complaint?
4    A.  Yes.
5    Q.  And what investigation exactly did you
6 perform?
7    A.  Only other than, again, just information
8 gathered via Internet that the company was publishing
9 and my brokers were publishing.
10    Q.  Do you know who else investigated facts that
11 are alleged in this complaint?
12    A.  I assume that the lawyers did, that filed the
13 suit.
14    Q.  Okay.  Let's move on to what we've already
15 introduced at this point but it's Defendant's
16 Exhibit 27.
17        MS. FOX:  That's your -- this is the
18 actual exhibit but this is the original.
19        MR. AHART:  Ted, do you have a copy?
20        MR. McEVOY:  Yeah, I do.  Thank you.
21        THE WITNESS:  Is that here?
22    Q.  (By Mr. Ahart)  Yeah, with the green sticker.
23    A.  Okay.  I've got you.
24    Q.  Can you tell me exactly what this document is
25 in terms of how you understand it to be?

Page 51

1    A.  It's just a document that -- that I
2 received -- that I received a copy of the suit.
3    Q.  In this document, let's say on No. 3?
4    A.  Mm-hmm.
5    Q.  Do you see there it refers to quote, unquote,
6 representative party.  Can you tell me what your
7 understanding of the term "representative party" means?
8        MS. FOX:  Object to the form.  It says
9 representative plaintiff.  And I object to the form
10 because it calls for a legal conclusion.  But --
11    Q.  (By Mr. Ahart)  I apologize.  It does not say
12 representative party.  It says representative plaintiff
13 and it's a misquote on my part.
14    A.  Okay.
15    Q.  Can you tell me what your understanding of the
16 term representative plaintiff is in terms of the
17 context of this case?
18    A.  I know my reason for serving.  Is -- is that
19 what you want?
20    Q.  Well, we could start with that.
21    A.  Are you asking -- well, my reason for serving
22 is the fact I lost a tremendous amount of money, felt
23 like I was misled, and I have an interest in
24 representing other people that lost a tremendous amount
25 of money that I'm sure in a lot of cases were not able

Page 52

1 to overcome it like I was.
2    Q.  Okay.  Well, what is it -- what do you think
3 it means for you to be a representative plaintiff on
4 behalf of the other plaintiffs?  And I'm not asking for
5 a legal definition.
6    A.  Right.
7    Q.  Just your understanding of what that means.
8    A.  That basically I would be willing to go in
9 front of a judge and tell him that I felt like I was
10 misled.
11    Q.  Okay.  Do you know whether you were appointed
12 as a lead plaintiff in this case?
13        MS. FOX:  Object.  Calls for a legal
14 conclusion.
15    Q.  (By Mr. Ahart)  You can answer the question.
16    A.  I do not.
17    Q.  Do you know who the other lead plaintiffs are
18 in this case?
19    A.  No knowledge.
20    Q.  Okay.  Do you know whether you're seeking to
21 be named as a class representative by the court?
22        MS. FOX:  Object.  It calls for a legal
23 conclusion.
24    Q.  (By Mr. Ahart)  You can still answer.
25    A.  I do not.

Page 53

1    Q.  Can you describe for me in your own words who
2 was in this plaintiff's class that you're trying to
3 represent?
4    A.  In my own words, I believe members of
5 other -- other stockholders that had bought Adams Golf
6 stock and suffered losses as I did.
7    Q.  Can you tell me why you're seeking to serve as
8 a class representative in this case?
9    A.  To possibly recoup some of the money that was
10 lost by me and others -- other class members.
11    Q.  Can you tell me how many members are in the
12 class?
13    A.  I have no clue.
14    Q.  Do you know if there's more than one class?
15    A.  I know there's --
16        MS. FOX:  Object.  It calls for a legal
17 conclusion.  But I think he's described the --
18        THE WITNESS:  Yeah, I know of -- as I
19 said earlier, I know of two classes, and that's -- you
20 know, the ones that bought the stock on -- on the IPO
21 and then the ones that bought it within a 30-day period
22 after the IPO.
23    Q.  (By Mr. Ahart)  Okay.
24    A.  That's the only -- my only knowledge of the
25 two classes.

14 (Pages 50 to 53)

TODD TONORE                           2/25/2005     IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 54

1    Q.  Do you know if other class members bought
2   Adams Golf stock?
3    A.  I have no knowledge.
4    Q.  Do you know why --
5        MS. FOX:  I object.  He already defined
6   the class as people who bought Adams Golf stock.  And
7   you -- that's a clear case of your trying to confuse
8   him, asking the question backwards so he'll be
9   confused.
10       MR. AHART:  I'm just asking if he knows
11  that they bought stock.
12   Q.  (By Mr. Ahart)  And I understand what your
13  understanding of the class, and I'm just asking if
14  you know whether or not they purchased stock.
15   A.  Do I know if they bought stock?  I have no
16  knowledge of that.
17   Q.  Okay.  Do you know when the alleged class
18  period begins?
19       MS. FOX:  Again, it calls for a legal
20  conclusion.  I think he has described that.
21   Q.  (By Mr. Ahart)  It's not a legal conclusion.
22  Can you just answer the question?  Do you know when the
23  class period begins?
24   A.  No.
25   Q.  Do you know when it ends?

Page 55

1    A.  I would assume at trial.
2    Q.  Do you know why the class begins on a certain
3   date and ends on another date?
4    A.  No.
5        MS. FOX:  Objection; calls for a legal
6   conclusion.
7        THE WITNESS:  I'm not a lawyer.
8    Q.  (By Mr. Ahart)  Do you know how the Section 11
9   subclass will trace your stock for the IPO?
10   A   No, I don't.  I'm not a lawyer.
11       MS. FOX:  First off, do you know what the
12  Section 11 subclass is?
13       THE WITNESS:  I do not.  No.
14       MS. FOX:  Explain what it means, then, if
15  you -- maybe he can -- but it definitely calls for a
16  legal conclusion.  Not even the courts agree on it.
17   Q.  (By Mr. Ahart)  Can you tell me how you're
18  going to trace your stock back to the IPO?
19   A.  I have record of my buy and sells.
20   Q.  Okay.  Do you think your claims are typical of
21  the class of plaintiffs that you're purporting to
22  represent?
23   A.  I would think -- yes, I do.
24   Q   Why do you think that?
5    A.  I believe the class would not have been

Page 56

1   written in the manner it was written by the lawyers
2   if -- if that wasn't the case.
3    Q.  Do you know how many other proposed class
4   representatives there are for this case?
5    A.  No.
6    Q.  Did you know that Federated National Insurance
7   Company withdrew as a proposed class representative?
8    A.  No.
9    Q.  Have you ever met with any of the other
10  proposed class representatives?
11   A.  No.
12   Q.  Can you generally discuss for me what you
13  understand to be your responsibilities to the class as
14  a class representative?
15   A.  I understand I -- I may have a responsibility
16  to agree or disagree with an offer and I may
17  have -- also have -- I will have a responsibility to
18  appear in court, if it goes that far.
19   Q.  Can you tell me why you think that you in
20  particular will be an appropriate class representative
21  for the plaintiffs in this case?
22   A.  Repeat that.
23   Q.  In terms of your own understanding.
24   A.  I think -- I think -- yes, I do understand the
25  question.  I think I bought the stock in good faith and

Page 57

1   I -- I lost a tremendous amount of money and I feel I
2   was misled.  And I think that is the general consensus
3   of the class.
4    Q.  Can you tell me how much time you spent
5   fulfilling your duties in this case as a lead plaintiff
6   and as a class representative so far?
7    A.  How much time?  I've reviewed documents over
8   the last six years that have been sent to me through
9   the -- through the attorneys.  Other than that, I have
10  spent no time.
11   Q.  Can you estimate for us about how long you've
12  probably spent reviewing these documents?
13   A.  Seven hours.  I don't know.
14   Q.  Do you have any other responsibilities that
15  might interfere with your ability to fulfill these
16  duties as a class representative and lead plaintiff?
17   A.  No.  I -- I'll -- nothing I can't work around.
18   Q.  Would future travel to Delaware, if that was
19  necessary, impose any kind of burden on you?
20   A.  Depending on the time, possibly.  But I will
21  work around -- I will work with you any way I can, via
22  phone or -- or e-mail to give you whatever answers you
23  may need.
24   Q.  Okay.  In your mind, what do you stand to gain
25  as a class representative in this case?

Page 58

1    A.  At this point it's not about the money.
2  It's -- because I've overcome the money.  It's about
3  right and wrong.  And it's about the people that are a
4  member of this class that didn't overcome the money,
5  that were misled by -- by a company and a group of
6  gentlemen that made millions at the class' -- the class
7  members and the shareholders' expense.  It's criminal.
8    Q.  What parts of the lawsuit do you intend to
9  directly participate in beyond this deposition?  For
10 instance, let's say, the class certification hearing or
11 any hearings or motions for summary judgment or
12 anything of that sort?
13   A.  I will participate wherever needed.
14   Q.  Would you attend the mediation?
15   A.  It -- define the mediation.
16   Q.  Well, it's where the two parties come together
17 and try to resolve their disputes outside of the formal
18 court process is probably the easiest way to describe
19 it.
20   A.  If -- if the -- if the attorneys of the class
21 choose to do that, yes.
22   Q.  Have you been asked by your attorney to attend
23 the mediation?
24   A.  No.
25   Q.  Okay.  Would you attend the mediation that's

Page 59

1  currently scheduled for June 1st, 2005?
2    A.  June 1st.  June 1st.  I think I may be able
3  to.  Where is it at?
4    Q.  I think it's Delaware, I believe.
5        MS. FOX:  Delaware.  Yeah.
6        THE WITNESS:  If needed.  If -- if not,
7  again, by phone or -- or, you know, I will make myself
8  available in one form or another.
9    Q.  (By Mr. Ahart)  Can you tell me who has the
10 authority to settle this case?
11   A.  Who has the authority to settle the case?  I
12 do not know.
13   Q.  Do you plan on attending the entire trial, if
14 necessary?
15   A.  If necessary.
16   Q.  Did you fly down here today?
17   A.  Yes.
18   Q.  Who paid for your flight to attend this
19 deposition?
20   A.  I did.  But the -- I will be reimbursed by our
21 lawyers.
22   Q.  Do you have an agreement with your lawyers
23 concerning your costs in acting as a class
24 representative and lead plaintiff in this case?
25   A.  Strictly verbal.

Page 60

1    Q.  Okay.  Can you discuss the details of that
2  verbal agreement?
3    A.  Yeah.  I -- I am being paid nothing, zero.
4  And -- and whatever expenses I incur when
5  needed -- when they need me, they will pay for it.
6    Q.  Do you know who your attorneys are in this
7  case?
8    A.  I know Elizabeth.
9    Q.  Okay.  What firm is she with?
10   A.  She's with Todd Collins, and the name of
11 the -- I'm not familiar with the name of the firm.
12   Q.  And how did you choose your attorneys in this
13 case?
14   A.  They were -- they were already attorneys
15 on -- they were -- they already had the class action
16 when I -- when I joined them.
17   Q.  Do you have a fee arrangement with your
18 attorneys in this case?
19   A.  No.
20   Q.  Do you have any understanding that's -- your
21 attorneys will obtain some sort of contingency fee if
22 you win this lawsuit?
23   A.  Sure.
24   Q.  Do you know what that percentage will be?
25   A.  No.

Page 61

1        MS. FOX:  Object to the form.  Sorry.  He
2  hasn't testified -- you can't ask what percentage if
3  you didn't establish that there was a percentage.  He
4  doesn't know anyway, so...
5    Q.  (By Mr. Ahart)  Do you know how much your
6  attorneys bill per hour?
7    A.  No.
8    Q.  Can you tell me how many times that you've
9  physically met with your attorneys to date in this
10 case?
11   A.  This is it.
12   Q.  How often do you speak with your attorneys,
13 say, over the phone or by written communication about
14 the status of this lawsuit?
15   A.  Over the period of six years, maybe four times
16 with -- Elizabeth would be the third attorney that's
17 contacted me.  Juli being the first, Todd Collins and
18 now Juli.  Or Elizabeth, excuse me.
19   Q.  Who makes the strategy calls for pursuing this
20 case?
21   A.  The attorneys.
22   Q.  If you disagree with an attorney's decision
23 about how to handle a specific aspect of the case, what
24 would you do?
25   A.  I would contact Juli and -- and review it with

16 (Pages 58 to 61)

TODD TONORE                     2/25/2005     IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 78

1  price of the product was driven down so fast that there
2  were a lot of -- the club I was a member of, I can
3  distinctly remember the head professional telling me
4  that they're selling the clubs at Costco for 30 percent
5  less than what I had to pay for them for Adams Golf.
6      Q.  Mm-hmm.
7      A.  So he would -- they -- he was stuck.
8      Q.  Do you know if gray marketing issues are
9  limited to the golf industry?
10     A.  No. I know they're not limited to the golfing
11 industry. I'm sure they're in -- in many other
12 industries. You know, I've -- you know, you go to any
13 foreign country, which I do, you see products being
14 duplicated and -- and sold back into this country.
15     Q.  Okay. Do you think that gray marketing also
16 encompasses, like you said, duplicate clubs or do you
17 think that's a different issue?
18     A.  It could. It could mean duplication of clubs
19 or it -- it could mean maybe someone just getting ahold
20 of a large number of clubs and being able to get -- to
21 supply a major chain.
22     Q.  Do you know -- go ahead. I'm sorry.
23     A.  I don't believe -- I don't believe -- you
24 know, honestly, I don't believe that as a manufacturer,
25 because I'm in the manufacturing business, I know where

Page 79

1  my products go. I think they knew who bought the
2  products. And when you -- when I sell a large volume
3  of products, not only do I know where they go, I know
4  where they're going to wind up.
5      Q.  How do you know that?
6      A.  Just from knowing my customers and knowing the
7  people I sell to. It's just business 101. I mean, you
8  know, you -- you know where you're -- you have
9  knowledge of -- if you don't know that, you shouldn't
10 sell them. If you have no -- if you're going to lose
11 control of your product anywhere in the -- in the -- in
12 the chain from manufacture to customer, you shouldn't
13 sell it if you're going to lose complete control of
14 it.
15     Q.  Do you know at the time of the IPO in 1998 if
16 there were any other golf companies that were affected
17 by gray marketing?
18     A.  Not that I know of.
19     Q.  Have you ever experienced any gray marketing
20 in your own business?
21     A.  No.
22     Q.  So there are no retailers that get ahold of
23 the products that your company sells that shouldn't
24 have them?
'5      A  No. We sell directly to manufacture -- to

Page 80

1  people that would actually field the products, so, no,
2  it's...
3      Q.  Is it possible that someone who is
4  unauthorized to get ahold of your products could get
5  them?
6      A.  Well, the products we make are all custom.
7  They're all printed with custom logos, so -- so, no,
8  we're not selling a brand. We're not -- we don't have
9  our own brand that we're selling. We're -- everything
10 we do is custom.
11     Q.  Okay. Why did you first decide to invest in
12 Adams Golf during the IPO?
13     A.  I was playing with the product. It -- it --
14 still today I believe that it's a great product.
15 People that I was surrounded around in the golf
16 industry swore by the product. Everything I read was
17 positive. The company had tremendous sales, very
18 little debt. I had no reason not to buy the product or
19 the stock.
20     Q.  Okay. Let's go back to Exhibit 27, which is
21 one of the first exhibits that we went through. You
22 have it right there.
23     A.  Okay.
24     Q.  And let's look at the second page, which is
25 Bates labeled TT 2.

Page 81

1      A.  I don't know whether I have that. Is that...
2  Okay, my -- yeah, my stock trades. Okay.
3      Q.  Okay. Could you take a minute to review the
4  information on this page and confirm for the record
5  that these in fact are your trading records in Adams
6  Golf stock at that time?
7      A.  That's correct.
8      Q.  The records indicate that you purchased 500
9  shares on July the 10th, 1998. And then an additional
10 number of shares up through January the 8th, 1999. I
11 could read them out for the record if you want to.
12     A.  That's okay.
13     Q.  But if you trust my math, it adds up to 5,700
14 shares?
15     A.  Sure. Yeah.
16     Q.  Do you know how many shares you purchased
17 after the company first issued a press release about
18 the gray marketing problems?
19     A.  I'm not -- I'm not quite sure. I know I did
20 purchase some as the stock began to fall at -- at the
21 advice of my broker in order to -- what -- the term
22 they use is dollar cost average.
23     Q.  Okay. Can you describe for us what that means
24 exactly?
25     A.  Well, it means if you bought a thousand

512-320-0185                     RLS LEGAL SOLUTIONS                     512-391-0269

TODD TONORE                              2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 82

1   at -- at 18, and then the stock fell to -- 16, you
2   buy another thousand, your average cost is 17. You
3   just bring your average cost down so as the stock
4   falls, you can continue to buy it to get your average
5   cost down.
6       Q.   Okay. But you would do this despite the fact
7   the company had issued this negative information about
8   its results?
9       A.   Well, once -- once the negative information
10  was released, the company remained positive in the fact
11  that they continued to advertise, they continued
12  to -- they didn't admit necessarily that -- that their
13  business was going to suffer because of it. They
14  continued to do the things, business as normal.
15      Q.   Mm-hmm.
16      A.   And when I contacted the company direct,
17  that's basically the answer I received back. You know,
18  we're continuing to grow, we're -- we still have very
19  little debt. Our sales continue to be strong and...
20  And the -- and honestly, the people that I was -- when
21  I was using the product, people that I was playing golf
22  with, they continued to use it. It was a good product.
23  I didn't see the product going away and it still hasn't
24  gone away. It was a good product. It's a good
25  product.

Page 83

1       Q.   Okay. On June 10th, 1999, you sold 2,040
2   shares. Why did you sell those shares?
3            MS. FOX: I think that's January. Am I
4   wrong?
5            MS. REED: July 10th.
6            MS. FOX: Oh, no. June. I'm sorry.
7            THE WITNESS: Where are you looking at
8   there?
9       Q.   (By Mr. Ahart) The last entry there.
10      A.   Right.
11      Q.   6/10/99, you sold 2,040 shares. Why did you
12  at that time decide to go ahead and sell at least a
13  portion of your holdings?
14      A.   Financial reasons. I had -- I don't know
15  if -- I had had some of these stocks on margin, and I
16  had margin calls that I was forced to pay. So I
17  had -- I reached a point where I just couldn't go any
18  further. I -- I cut my losses and went and borrowed
19  money and paid off my margin calls.
20      Q.   Do you still have shares in Adams Golf stock
21  at this time?
22      A.   No.
23      Q.   Okay. If we needed the records, could you
24  provide us with the records of the additional sales
25  until you finally exhausted your portfolio of Adams

Page 84

1   Golf stock?
2       A.   That's it right there. That's when I
3   exhausted it 6/10/99.
4       Q.   Well, but I could -- I mean, I may have made a
5   mistake, but I believe that there were 6,200 shares
6   purchased in total, and that last transaction only
7   shows two 2,040 shares being sold.
8       A.   I'm not aware. I mean, this was the only
9   report that I -- that I received.
10      Q.   Could you contact --
11      A.   I was buying -- as you can see, in a six-month
12  period I was buying it. I can contact them, I'm not
13  sure what success I would have getting documentation
14  from Edward Jones that dates back to '98 or '99.
15      Q.   Okay. But if we --
16      A.   I'll try, yeah.
17      Q.   If we asked you to, you could see if you could
18  get the records?
19      A.   I'll make the call, yes.
20      Q.   And for the purchases that did not occur
21  during the IPO, which would in this case be all of
22  them --
23      A.   Right.
24      Q.   Will you be able to trace these purchases back
25  to the IPO?

Page 85

1            MS. FOX: Again, I object to the form.
2   It's a -- calls for a legal conclusion. And it
3   isn't -- it's an issue that's not settled by the
4   courts, so it's particularly confusing to him.
5       Q.   (By Mr. Ahart) You can still answer the
6   question.
7       A.   I don't understand the question.
8       Q.   Okay.
9       A.   To be honest with you.
10      Q.   Okay. At any time before you actually
11  purchased the shares, did you ever review any of the
12  documents that were issued by Adams Golf such as any
13  SEC filings or press releases or the prospectus that we
14  reviewed earlier?
15      A.   Just press releases that were on the Internet
16  through my brokerage company and through the Adams Golf
17  Web site.
18           MS. FOX: Well, now, this is before you
19  purchased the shares. Were you following it before?
20           THE WITNESS: Before I actually -- yeah.
21  I mean, I went and looked at the financials before I
22  actually bought the first 500.
23      Q.   (By Mr. Ahart) Mm-hmm. Okay.
24      A.   And everything looked in place. I mean, they
25  had very little debt and they had high sales and there

22 (Pages 82 to 85)

Page 98

1  if they were not provided the information from
2  the -- from Adams Golf that they -- they knew about.
3    Q. (By Mr. McElvoy) Do you understand that
4  the -- the complaint in this case alleges that the
5  underwriter defendants had information including
6  information about gray marketing prior to the IPO?
7    A. Yes, but I have -- yes, I understand you're
8  named in this case, but I didn't -- again, I joined the
9  case after it was already filed.
10    Q. Okay. So is it fair to say that you have no
11  personal knowledge --
12    A. Exactly.
13    Q. -- or information -- I'm sorry, let me just --
14    A. Excuse me.
15    Q. Let me just get it out -- let me just get it
16  out so we can get it clear. So it would be fair to say
17  that you have no personal knowledge or information to
18  support the allegations in the complaint as to what the
19  underwriters might have known prior to the IPO?
20    A. That's a correct statement.
21    Q. Okay. Thank you. I know you spoke briefly
22  about damages just a minute ago, and I don't mean to
23  cover old ground, but can you tell me in dollar terms
24  what damages you are seeking personally?
25    A. Just a -- just my fair share of the money

Page 99

1  that's left in the class. I -- I have come to the
2  acceptance that I will not get all my money back, okay?
3  I don't expect it back. And, you know, again, I've
4  said before, this is not a -- that's not why I'm here.
5  It's not about the money. It's -- it's -- it's more
6  about if -- if -- what I expect is to get a percentage,
7  the same percentage as anyone else in the class. Now,
8  I may wind up getting more because I had more shares
9  than most. But, again, I think I'm smart enough to
10  know that once you -- that I won't recoup all my money.
11  That's not my intention.
12    Q. Do you have any sort of a ballpark figure for
13  the amount of money that you have lost as a result of
14  buying Adams Golf stock?
15    A. A little over 50,000.
16    Q. Okay. Now, I understand you first bought the
17  stock -- and you can look at Exhibit 27 just for
18  reference. It --
19    A. Okay.
20    Q. I understand you first bought the stock at
21  around 18 and five-eighths. Is that correct?
22    A. Yes, sir the day of the IPO, that was what I
23  purchased the stock at, 18 and five-eighths.
24    Q. And would it be fair to say that your
25  allegation is that you were overcharged for the stock

Page 100

1  at that price?
2    A. Based on what the stock -- at the -- that day,
3  with the information that was available, no, I don't
4  think I was overcharged.
5    Q. Okay.
6    A. I think I paid a fair price.
7    Q. Okay.
8    MS. FOX: But --
9    THE WITNESS: But based on infor -- based
10  on what happened --
11    MR. McELVOY: One second. Liz, can you
12  please -- can you please refrain from coaching the
13  witness in the middle of an answer? I mean, I don't
14  mind if you want to take a break, but --
15    MS. FOX: The witness was answering and I
16  was afraid you were going to cut him off.
17    MR. McELVOY: I would never dream of
18  cutting him off.
19    Q. (By Mr. Ahart) Please go ahead, sir.
20    A. But I do feel that I paid too much for the
21  stock if the information that I feel they withheld
22  would have been available at that time.
23    Q. Okay. So is it fair to say that if the
24  information that you later learned was known on the
25  10th of July of 1998, the stock should have been

Page 101

1  selling at a lower price than 18?
2    A. I never -- I never would have bought the
3  stock.
4    Q. Okay.
5    A. Wouldn't have bought it at all.
6    Q. Okay. So that's fair enough. Now, you say
7  the subsequent -- pardon me. I understand your
8  testimony to be -- and your counsel will correct me if
9  I'm misstating it -- that you bought the stock on
10  subsequent occasions through to January 8th of '99, to
11  engage in dollar cost averaging. Is that right?
12    A. Correct.
13    Q. Okay. And -- and the point of the dollar cost
14  averaging was to mitigate the amount of money that you
15  lost buying the stock. Is that correct?
16    A. It was -- even once the -- the news about gray
17  marketing came out, the company still remained very
18  positive in the sense that they thought they could turn
19  it around. So it made a lot of sense to me to -- as
20  the stock fell, to continue to buy it and try to get my
21  average cost down so when it did turn I wouldn't have
22  to -- the stock -- you know, I don't know what my
23  average cost wound up being. We could do the math and
24  see. But, you know, from 18 to three, I had a better
25  chance of buying -- when I bought it at three, I was

TODD TONORE                    2/25/2005    IN RE: ADAMS GOLF INC., SECURITIES LITIGATION

Page 102

1  hoping it would get to -- if my average was eight, I
2  felt like I had a better chance of getting it to eight
3  than I did back to 18.
4      Q.  I became a lawyer so I could avoid doing math
5  as much as possible.
6      A.  Right.
7      Q.  So we're not going to do the math, but --
8      A.  Right.
9      Q.  Now, can you tell me at what point if
10  you -- if we're just looking at this list -- and again,
11  I'm looking at Exhibit 27. And basically, Exhibit 27
12  has the first purchase on July 10th of 1998 and your
13  last purchase on January 8th of 1999. Can you tell me
14  roughly at what point during this period you learned
15  about the gray marketing problem that you've been
16  talking about?
17          MS. FOX:  Don't guess.
18          THE WITNESS:  It would strictly be a
19  guess.
20      Q.  (By Mr. McElvoy)  Okay. I don't want you to
21  guess.
22      A.  It would be a guess. I mean, it...
23      Q.  You had spoken with -- I believe you testified
24  earlier, and again counsel will correct me if I'm
25  wrong, that you sent an e-mail to Adams Golf at some

Page 103

1  point?
2      A.  Yes.
3      Q.  Do you recall roughly when you sent that
4  e-mail to Adams Golf?
5      A.  Roughly, I like that term. Then it would have
6  been once the stock began to decline and looking at
7  my -- my transactions, it would have been around July
8  of '98.
9      Q.  Okay. So -- so would it be fair to say that
10  you did buy some stock after learning about the gray
11  market problem?
12      A.  No doubt.
13      Q.  Okay. We just don't know exactly when that
14  point was when you learned. Is that right?
15      A.  That's correct.
16      Q.  Okay. I understand -- I believe earlier you
17  testified that you have not spoken with any of the
18  other lead plaintiffs in this case or met any of the
19  lead plaintiffs. Is that right?
20      A.  That's correct.
21          MS. FOX:  I object to the form, because
22  he has already testified he doesn't know what the word
23  lead plaintiff means.
24      Q.  (By Mr. McElvoy)  Okay. That's fine. Have you
'5  ever met with or spoken with anyone else who's involved

Page 104

1  in this lawsuit as a plaintiff? And by that, I mean
2  anybody who might be a lead plaintiff or any proposed
3  member of the class?
4      A.  I haven't.
5      Q.  Okay. Now, we've -- I think your testimony
6  earlier again was that you do not know whether other
7  proposed members of the class might have purchased
8  Adams Golf stock or when they purchased it?
9      A.  No, I'm not.
10      Q.  You have no understanding about that. Right?
11      A.  It would be strictly --
12          MS. FOX:  Object to form, because he
13  defined class earlier as people who bought.
14          THE WITNESS:  Right. I mean, it would --
15          MS. FOX:  That's really an unfair
16  question. You know it was.
17          THE WITNESS:  It would be strictly an
18  assumption. I would assume they bought it.
19      Q.  (By Mr. McElvoy)  Okay.
20      A.  Or they wouldn't be a member of the class.
21  But I don't know that they bought it.
22      Q.  Okay.
23      A.  Because I don't know them.
24      Q.  I apologize for misstating that. I just
25  wanted to start off with a baseline.

Page 105

1      A.  Okay.
2      Q.  Because the question that I wanted to ask you
3  was then:  You wouldn't know whether any other members
4  of the proposed class engaged in the dollar cost
5  averaging kind of activity that you were doing through
6  the end of -- of '98?
7      A.  That's correct.
8      Q.  Is that correct? Okay. Now, I understand
9  again that you testified that you've got a verbal
10  agreement with your attorneys regarding fees and costs.
11  Right?
12      A.  Mm-hmm.
13      Q.  Is that correct?
14      A.  Not involving -- the only verbal agreement I
15  have with our -- my attorneys are that they would
16  compensate me for any expenses that I incur during this
17  case.
18      Q.  Okay. Have you signed anything at all, any
19  piece of paper regarding the terms under which you
20  are -- your attorneys are representing you in this
21  case?
22      A.  Not to my knowledge.
23      Q.  Okay. Did you sign anything at all in
24  connection with representation by the attorneys that
25  you spoke to prior to being represented by Berger &

# EXHIBIT D

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
2

3

4    IN RE:  ADAMS GOLF,          CIVIL ACTION NO. 99-371-KAJ
     INC., SECURITIES
5    LITIGATION                   (CONSOLIDATED)

6

7

8

9

10             Oral deposition of JOHN

11   MICHAEL MORRASH, taken at the law

12   offices of BERGER & MONTAGUE, P.C., 1622

13   Locust Street, Philadelphia,

14   Pennsylvania, on Wednesday, February 23,

15   2005, at 10:12 a.m., before Rosemary

16   Locklear, Registered Professional

17   Reporter, Certified Shorthand Reporter

18   (NJ), Certified Realtime Reporter and

19   Notary Public, pursuant to notice.

20

21

22

23

24

25
```

JOHN MORRASH                                    2/23/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 10

1  Q.  Do you recall which documents?
2  A.  I reviewed the documents that were
3  in my file, personal file that I kept
4  with respect to this investment. And I
5  also reviewed some information on the
6  Internet last night.
7  Q.  What sort of information was that?
8  A.  SEC filings by the company.
9  Q.  And when did you review the
10 documents in your file?
11 A.  I reviewed them intensely last
12 night.
13 Q.  And did reviewing those documents
14 refresh your memory about any of the
15 events connected with the lawsuit?
16 A.  Yes.
17 Q.  Which events?
18 A.  Primarily, it refreshed my memory
19 as to why I was so upset about this
20 situation.
21 Q.  And so which documents were the
22 ones primarily that refreshed your
23 memory?
24 A.  The ones in my file.
25 Q.  Yes. And we'll go through those

Page 11

1  documents --
2  A.  Yes.
3  Q.  -- in a little bit. I presume
4  those are probably the documents that
5  you turned over to your lawyers who then
6  produced them to us.
7  A.  Yes.
8  Q.  But, primarily, are you referring
9  to like your trading records in Adams
10 Golf?
11 A.  I'm referring to the Baker Watts
12 report that was written on the company
13 in August of 1998, and then I'm also
14 referring to financial results that I
15 saw on the Internet by way of my viewing
16 SEC filings.
17 Q.  And what time period were those
18 SEC filings for?
19 A.  I looked at the 10-K for 1998, the
20 10-K for 1999, the 10-Q for the period
21 ended September 30th, 1998, to the best
22 of my recollection.
23 Q.  Oh. And let's walk through a few
24 just personal details so that we have
25 them on the record.

Page 12

1  A.  Uh-huh.
2  Q.  Can you give us your current
3  address, please.
4  A.  Sure. It's 3565 Lexington Drive,
5  in Doylestown, Pennsylvania.
6  Q.  And your telephone number.
7  A.  My home phone number?
8  Q.  Yes.
9  A.  Is 215-345-4096.
10 Q.  And was that your same address
11 during 1998 to 1999 time frame?
12 A.  No, it wasn't.
13 Q.  What was your address then?
14 A.  My address then was 3901 Sherwood
15 Lane, Doylestown, Pennsylvania.
16 Q.  And what's your business address?
17 A.  My current business address is
18 Radnor Corporate Center in Radnor,
19 Pennsylvania.
20 Q.  Is there a street address or is
21 that --
22 A.  It's Building 3; it's fourth
23 floor.
24 Q.  Okay. So no ZIP Code, though?
25 Just, you know, for the record, we're

Page 13

1  just trying to get a good mailing
2  address.
3  A.  I don't recall what the ZIP Code
4  is. I don't use it.
5       MS. FOX: Well, you know, I
6  would object. If you want to get ahold
7  of him, get ahold of us.
8  BY MS. BRANNEN:
9  Q.  So are you married, Mr. Morrash?
10 A.  I'm not married.
11 Q.  And then next I want to walk
12 through just your educational
13 background, your formal education. Did
14 you graduate from college?
15 A.  I did. And we've provided a brief
16 resume to you.
17 Q.  Right. Right. We will get to
18 that shortly.
19      What was your degree in, just
20 so that we can get it on the record?
21 A.  B.S. degree in accounting.
22 Q.  Okay. And do you belong to any
23 seminars? I'm sorry. Have you attended
24 a lot of accounting and financially-
25 related seminars then, I would guess, if

4 (Pages 10 to 13)

Page 14

1  your background is in accounting?
2  A.  From time to time, yes.
3  Q.  What about courses in investing
4  and that kind of thing?
5  A.  Formal courses, no.
6  Q.  Do you belong to any professional
7  societies?
8  A.  I belong to the Pennsylvania
9  Institute of Certified Public
10  Accountants and the American Institute
11  of Certified Public Accountants.
12  Q.  Okay.  And let me go ahead and
13  introduce your resume, which I'm going
14  to ask the court reporter to mark as
15  Exhibit 16.
16        (Exhibit 16 was marked for
17  identification.)
18        MS. BRANNEN:  And I've just
19  left the page that was behind it which
20  looks like just a file label page but
21  attached with this one.
22        MS. FOX:  Yes.  That is the
23  back of the folder.
24        MS. BRANNEN:  Of the folder.
25  Okay.  I just figured I'd leave it with

Page 15

1  this one so that it stayed with
2  something.
3  BY MS. BRANNEN:
4  Q.  So can you identify this document
5  for the record, please.
6  A.  Yes.  Appears to be the document
7  that I prepared in response to a request
8  by my attorneys.
9  Q.  And can you describe the document?
10  A.  Sure.  It's a --
11        MS. FOX:  Wait a second.
12        Could I have the -- or let
13  him look at the real document and let me
14  look at this one.  Good.  Thank you.
15        THE WITNESS:  It is a summary
16  of my college education, professional
17  certificates received, and employment by
18  employer with various detailed positions
19  indicating some -- in all cases for the
20  period beginning in 1996 to the present.
21  BY MS. BRANNEN:
22  Q.  Okay.  And this is a full and
23  accurate description of your employment
24  history and educational history?
25  A.  Yes, it is.

Page 16

1  Q.  Okay.  Then we don't need to walk
2  through the whole thing.
3        Mr. Morrash, do you know who
4  it is exactly that you're suing in this
5  litigation?
6  A.  Yes, I do.
7  Q.  Can you identify the defendants
8  for me?
9  A.  The defendants include Barney
10  Adams, other officers of the company
11  whose name I don't have memorized but
12  are clearly indicated in the Complaint.
13  We're also suing three underwriters, and
14  they are the -- that's who we're suing.
15  Q.  And do you know why you're suing
16  those defendants?
17  A.  I certainly do.
18  Q.  Can you explain to me what it is
19  that you believe they did wrong?
20  A.  Yes, I can.  I believe they did a
21  lot of things wrong, including excluding
22  material information with respect to
23  certain risks associated with this
24  investment from the prospectus and
25  registration statement.

Page 17

1  Q.  And can you tell me what
2  statements you think or risks you think
3  were omitted from the registration
4  statement?
5  A.  Yes, I can.  I think that what was
6  omitted was adequate disclosure with
7  respect to the company's product being
8  sold in gray markets.
9  Q.  And can you tell me what evidence
10  you have that supports that belief?
11  A.  Well, I've -- I relied on my
12  attorneys to articulate the claim and
13  the particulars of the claim and I think
14  that that stands on its own.
15  Q.  Can you tell me what facts you
16  know about, though, that support your
17  belief that the risk of gray marketing
18  was --
19  A.  Yes.
20  Q.  -- wrongfully omitted from the
21  prospectus?
22  A.  Yes.  Absolutely.
23        Can you repeat the question
24  again?
25  Q.  Yes.  Just can you tell me what

Page 78

1    Q.  But if it turned out that the
2    allegations were wrong, would you be
3    willing to dismiss the Complaint?
4        MS. FOX.  Object to the form.
5    BY MS. BRANNEN:
6    Q.  You can still answer the question.
7        MS. FOX:  In fact, that's up
8    to the Court to answer, not up to him.
9        THE WITNESS:  I'm an honest
10   person.  I'm not intending to bring a
11   false claim against the company.  If I
12   was to learn that, you know -- I would
13   not be a part of any claim brought
14   against any company that is false and
15   frivolous.  This is not of that nature.
16   BY MS. BRANNEN:
17   Q.  Do you have personal knowledge
18   about any of the allegations in the
19   Complaint outside of what you've learned
20   through your attorneys?
21   A.  **This Complaint originated with**
22   **me.  Okay?  This Complaint is a result**
23   **of actions that I took.  Okay?  That's**
24   **where this Complaint started.  That's**
25   **where this whole thing started.  This**

Page 79

1    **whole thing started with me and Bill**
2    **Schockley.  The lawyers didn't find me,**
3    **I found the attorneys.**
4    Q.  And so how did you get things
5    started?
6    A.  **Bill Schockley and myself lost --**
7    **and his family members, we lost a lot of**
8    **money on this transaction along with all**
9    **the other class and subclass members.**
10   **We were very upset about it.**
11       **We reviewed the financial**
12   **statements, we reviewed other**
13   **information that was -- that was**
14   **available by way of the Internet, press**
15   **releases, and we decided that there was**
16   **enough suspicion here of something being**
17   **wrong to take it to an attorney and to**
18   **get their opinion as to whether or not**
19   **our view that something was wrong here**
20   **could be substantiated and was worth**
21   **pursuing.**
22   Q.  So how did you first become aware
23   that you might have these claims?
24   A.  **I lost $49,000.  What the hell**
25   **kind of question is that?**

Page 80

1    Q.  Well, I'm just saying --
2    A.  **I lost $49,000.  How much do you**
3    **think the Shockleys lost and how much**
4    **did the rest of the people who I'm**
5    **trying to represent here as well lose?**
6        **This is a theft.  This is a**
7    **theft.  Somebody stole our money.**
8    **Somebody stole our money.  Barney Adams**
9    **and everyone else who signed off on this**
10   **thing stole our money.  That's how I got**
11   **aware of it.  And I'm not going to just**
12   **sit here and let those guys steal my**
13   **money.**
14       **He ought to be in prison is**
15   **where he ought to be because he violated**
16   **the law.  He broke the law.**
17   Q.  It was your idea personally to
18   bring the lawsuit or was it
19   Mr. Schockley's idea or was it both of
20   you together?
21   A.  **Mr. Schockley and I had the**
22   **conversation and he took it to his**
23   **attorney.**
24   Q.  So was it your idea first?  I'm
25   just trying to understand.

Page 81

1    A.  **It came out of a conversation that**
2    **the two of us had.  We worked together.**
3    **We had mutual investment in this**
4    **company.  We'd lost a lot of money.  We**
5    **were upset by having lost a lot of**
6    **money.**
7        **The financial results, as I**
8    **described in detail before, looked**
9    **suspicious, the fact that the company**
10   **was having record performance during the**
11   **time when its product was being taken --**
12   **when the company was being taken public,**
13   **the fact that the company had all kind**
14   **of great plans to grow, the fact that**
15   **the company dropped to single digits**
16   **from $16 a share less than a year after**
17   **it went public.**
18       **Yeah, we were upset about**
19   **that.  Okay?  And we wanted to see if**
20   **our concerns were legitimate enough to**
21   **be pursued legally.  And that's when we**
22   **sought legal advice.**
23   Q.  You said it was Bill Schockley.
24   Is that -- what's his full name?
25   A.  **William M. Schockley.**

JOHN MORRASH                                    2/23/2005   IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

---

Page 126

1  became an action of this nature, i.e., a
2  class action.
3  Q.  But you're not -- you don't know
4  specifically whose idea it was.
5  A.  Well, it was the attorneys, the
6  attorneys who are involved in the case,
7  including the attorneys who are
8  representing --
9  Q.  But no one specific one, or you
10  don't know for sure?
11  A.  I don't know for sure which
12  specific attorney, no.
13  Q.  And then I know you mentioned
14  Kenneth Schockley and David Schockley
15  were also lead plaintiffs.  What's
16  their -- who is Bill Schockley in
17  relation to them?
18  A.  Bill is Dr. Kenneth Schockley's
19  son, and David Schockley is Ken
20  Schockley's son as well.
21  Q.  And so is Bill Schockley a named
22  plaintiff?
23  A.  To my knowledge, he is not.
24  Q.  Do you know why not?
25  A.  I don't know why not.

---

Page 127

1  Q.  Do you know whether you're seeking
2  to be named a class representative by
3  the Court?
4  A.  I believe I am.  I'm willing to
5  be --
6      MS. FOX:  Object.  This --
7  it's really a legal question of --
8      THE WITNESS:  Yeah.
9      MS. BRANNEN:  I'm just asking
10  for his understanding of what he's
11  seeking to do in this lawsuit.
12      THE WITNESS:  Well, I can put
13  it in laymen's terms.
14  BY MS. BRANNEN:
15  Q.  That's great
16  A.  And in laymen's terms, what I'm
17  willing to do is to -- is to represent
18  in whatever capacity it is -- is
19  necessary other individuals who have
20  suffered a loss that is of the same
21  nature and same genesis as my loss.
22  Q.  And so can you describe in your
23  own words kind of what the boundaries
24  are of that class that you're trying to
25  represent, who those people are that

---

Page 128

1  have suffered a similar loss?
2      MS. FOX:  Again, it calls for
3  a legal conclusion.
4      MS. BRANNEN:  I asked him to
5  describe it in his own words.
6  BY MS. BRANNEN:
7  Q.  You can answer the question.
8  A.  I'm sure I could give it to you in
9  laymen's terms.  I know that there is a
10  class and a subclass that is -- these --
11  both these classes -- one class includes
12  individuals who purchased the stock on
13  the IPO, the other includes individuals
14  who purchased the stock within a -- I
15  believe a 25-day window following the
16  IPO.
17      And can you repeat -- I think
18  there was more than one part of the
19  question, if you wouldn't mind repeating
20  it.
21  Q.  That was really it.
22  A.  Okay.
23  Q.  Just whether you could kind of
24  describe the boundaries of the class
25  that you're seeking to represent --

---

Page 129

1  A.  Okay.
2  Q.  -- in terms of who they are.
3  A.  Uh-huh.
4  Q.  Why do you want to be a class
5  representative?
6  A.  Because I think that there has
7  been a -- an injustice here.  There's
8  been a wrong here.  I think it's a wrong
9  that needs to be righted.  I think
10  there's been a -- I think this is a case
11  of thievery and theft.  I think Barney
12  Adams stole this money from people.
13  Okay?  In the -- in a broad sense of the
14  word.
15      He didn't come and take
16  his -- put his hands in our pockets, but
17  he sold us a stock that he said and that
18  the company said and that the
19  underwriters said was worth $16 a share
20  and he took our money.  And in a very
21  few months all that evaporated.  So I
22  think he ought to give that money back
23  to us.
24  Q.  Do you know how many members are
25  in the class that you're seeking to

---

JOHN MORRASH                    2/23/2005    IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION

Page 130

1  represent?
2  A.  I don't know.  I assume that there
3  are thousands.  I don't know
4  specifically how many.
5  Q.  And do you know when the other
6  class members bought their Adams Golf
7  stock?
8       MS. FOX:  I think he just
9  described that with some clarity.
10  BY MS. BRANNEN:
11  Q.  Can you just repeat the answer?
12  Sorry.
13  A.  I'll repeat it.  Yes.  Some of
14  them bought it on the IPO.  Some of them
15  bought it within a 25-day window of the
16  IPO.
17  Q.  And do you know why those class
18  members bought their stock?
19       MS. FOX:  How could he
20  possibly?
21       THE WITNESS:  I would not
22  have any possible knowledge of why they
23  bought their stock.
24  BY MS. BRANNEN:
25  Q.  Do you know when the alleged class

Page 131

1  period begins?
2  A.  Can you define what the class
3  period is?
4       MS. FOX:  Calls for a legal
5  conclusion again.
6  BY MS. BRANNEN:
7  Q.  Let me just move to another
8  question.
9       Do you think your claims are
10  similar to the class of plaintiffs you
11  purport to represent?
12  A.  Yes.
13  Q.  And I may have already asked you
14  this, but do you know how many other
15  proposed class representatives there
16  are?
17       MS. FOX:  It's been asked.
18  He said in the thousands.
19       THE WITNESS:  Yeah.
20       MS. BRANNEN:  No, I don't --
21  BY MS. BRANNEN:
22  Q.  Thousands of proposed class
23  representatives?
24  A.  Oh, class representatives?
25  Q.  Uh-huh.

Page 132

1  A.  Just a handful of us, I believe.
2  Q.  Have you ever met with any of the
3  other proposed class representatives?
4  A.  I have not.
5  Q.  Have you ever met Kenneth
6  Schockley or David Schockley?
7  A.  I have met them in the sense that
8  I know them, yes.  I've never met with
9  them to discuss this case.
10  Q.  Okay.  Did you know that Federated
11  National Insurance Company was a class
12  representative or proposed class
13  representative?
14  A.  Not -- I recall reading that name,
15  but really didn't focus on it.
16  Q.  Did you know that they withdrew
17  from consideration as a proposed class
18  representative?
19  A.  No.
20  Q.  And so I guess you don't know why
21  they withdrew, then.
22  A.  It's not relevant to me.
23  Q.  Do you have an agreement with your
24  attorneys concerning who pays the costs
25  for you to act as a class

Page 133

1  representative?
2  A.  I don't have an agreement with
3  them.
4  Q.  Who is paying -- I'm guessing it
5  sounded like you could drive here; you
6  didn't have travel expenses to get here
7  today; is that right?
8  A.  I've not been reimbursed for any
9  of my expenses, and I have not to date
10  asked for reimbursement of any of my
11  expenses.
12  Q.  Do you plan to ask for
13  reimbursement of any of your expenses?
14  A.  If they become significant,
15  whatever that means to me, perhaps, but
16  not necessarily.
17  Q.  What would that mean to you?  What
18  would be a significant cost to you?
19  A.  I don't know.  Like I said, it
20  would depend on how I feel at the time.
21  Q.  What do you understand your job to
22  be, sort of your role as a class
23  representative?
24  A.  My role, as I see it, is to see
25  this claim through a -- through a fair

34 (Pages 130 to 133)

Page 138

1  the case?
2  A.  The case will be settled based
3  upon an agreement that is reached
4  between -- well, I guess only the
5  plaintiffs have the authority to settle
6  the case.  The attorneys don't have the,
7  to my knowledge, the authority to settle
8  the case unless we give them the
9  authority to settle it, and I haven't
10  given anyone the authority to settle
11  this case.
12  Q.  Do you plan on attending the
13  entire trial?
14  A.  If there's a trial, I'm sure I'll
15  be there for some portion of it.
16  Q.  But not the entire thing?
17  A.  Depends on what's required.
18  Q.  Can you identify -- who
19  specifically is your attorney
20  representing you?
21      MS. FOX:  Object to that.
22      How -- what do you mean by
23  who is his attorney?
24      MS. BRANNEN:  I'm just asking
25  him who his --

Page 139

1      MS. FOX:  People signed the
2  Complaint.  All of whom represent him,
3  obviously.
4  BY MS. BRANNEN:
5  Q.  Can you please answer the
6  question?
7  A.  Sure.  My attorneys Liz Fox and
8  Don Lewis and Todd Collins and anyone
9  else they need to get done what they
10  need to get done to pursue this case.
11  Q.  And do you have a Fee Agreement
12  with your attorneys?
13  A.  Yes.
14  Q.  Is it a written agreement?
15  A.  No.  The agreement is that if this
16  case is successful, they'll be paid
17  something that will be reviewed and
18  recommended by a judge.
19  Q.  Do you have any agreement with
20  them about what they will ask the judge
21  for?
22  A.  I haven't even discussed that.
23  Q.  So your agreement -- can you just
24  explain to me again then what the
25  agreement is?  I'm confused.

Page 140

1  A.  My agreement is it's a contingent
2  fee.  I don't pay them anything unless
3  this case is successful, and then they
4  get paid based upon their application
5  for a fee and based upon -- and after a
6  review by a Court.
7  Q.  And do you know what percentage of
8  the recovery the contingency fee would
9  be?
10  A.  I don't know.
11  Q.  Do you know how much your
12  attorneys bill per hour?
13  A.  I don't know because I'm not
14  paying them by the hour.
15  Q.  I know you talked about that Bill
16  Schockley sort of took your discussions
17  about whether this might be a case to an
18  attorney; I forget the name.  Can you
19  tell me again?
20  A.  Abrahams Loewenstein, I believe.
21  Q.  That's right.
22      And that then from there it
23  kind of made its way to some of the
24  other attorneys that are representing
25  you now.  Were you involved in choosing

Page 141

1  those attorneys?
2  A.  No, I wasn't.
3  Q.  Do you know how they were chosen?
4  A.  They were chosen on the advice of
5  counsel beginning with Abrahams
6  Loewenstein and being passed on from
7  that point.
8  Q.  And why were they chosen?
9  A.  They were chosen based upon their
10  competency and expertise to handle a
11  case of this nature.
12  Q.  Do you know whether competitive
13  bids were taken from different law
14  firms?
15  A.  To my nature, there were no
16  competitive bids.
17      I'm sorry.  To my knowledge,
18  not my nature.
19  Q.  And I think we may have gone over
20  this already and if so, I apologize.
21  Can you tell me again how many times you
22  physically met with your attorneys in
23  this case?
24  A.  I met with them by phone on many
25  occasions.  I met with them in person

Page 166

1 market makers like the NASDAQ are
2 supposed to do.
3 BY MS. BRANNEN:
4 Q. And do you believe that
5 information about a company affects the
6 way the market values the stock?
7 A. Yes.
8 Q. What kind of information do you
9 think influences a company's stock
10 price?
11 A. People have written books on
12 that. Anything. Again, I mean, it --
13 their relative strength to their
14 competitors, the outlook for new
15 products for the company, technological
16 advantages they might have, congruency
17 between their products and the specific
18 demands of a market, the total
19 consumption in the market, the growth in
20 the market, in this case, in terms of
21 number of golfers, number of new golf
22 courses, the ability of a company to
23 penetrate markets in foreign countries,
24 ability of companies to sell
25 aggressively.

Page 167

1     All that kind of information
2 is relevant and is information that's
3 considered by people who buy and sell
4 investments on a daily basis.
5 Q. How fast do you think that such
6 information is assimilated by the
7 market, the stock market?
8 A. Today?
9     MS. FOX. If you know.
10    THE WITNESS: In my --
11 BY MS. BRANNEN:
12 Q. In your layman's opinion.
13 A. In my layman's opinion? Faster
14 every day, with -- the world pretty much
15 operates in real time.
16 Q. Does that kind of information
17 influence your investment decisions?
18 A. Yes.
19 Q. Or maybe, I guess, a better
20 question is, does it influence your
21 broker's investment decisions? Because
22 do you actually -- I think you were
23 saying earlier you don't really have
24 time to follow all the stocks that
25 you're invested in.

Page 168

1 A. I can't speak for my brokers, but
2 my common-sense understanding is that
3 they're basing their decision about all
4 the sources of information that are
5 available.
6 Q. And I know when you were listing
7 some of the information that you think
8 affects the company's stock price, one
9 of the things you talked about was sort
10 of industry conditions, market
11 conditions in the industry where a
12 corporation does business. How fast do
13 you believe that kind of information is
14 assimilated by the market?
15     MS. FOX: Again, it's way
16 beyond his expertise and --
17 BY MS. BRANNEN:
18 Q. Just -- I'm just looking for your
19 layman's opinion.
20     MS. FOX: -- completely
21 irrelevant.
22     THE WITNESS: As a layman,
23 that is a longer-term issue because it
24 speaks -- it speaks to a trend in the
25 marketplace. You don't build golf

Page 169

1 courses overnight. You don't convince
2 more Americans they should be playing
3 golf overnight. It's a -- it's -- in my
4 layman's opinion, it's something that
5 happens over a period of time.
6 BY MS. BRANNEN:
7 Q. Do you --
8 A. But it's different for each --
9 it's different for each business.
10 Q. Do you think that global or
11 macroeconomic forces in general affect a
12 company's stock price?
13 A. Of course.
14 Q. And do you think those kinds of
15 forces affected Adams Golf stock at any
16 time during the class period?
17 A. No. Not in a negative way. No.
18 Q. Have you ever met or known anyone
19 at Adams Golf, an employee or a former
20 employee of Adams Golf?
21 A. I was at a golf show once and
22 stopped by the Adams Golf booth and told
23 a person there how upset I was about
24 losing almost $50,000 in their company.
25 I don't know her name. I just sort of

# EXHIBIT E

## Elizabeth Fox

| | |
|---|---|
| **From:** | Elizabeth Fox |
| **Sent:** | Thursday, February 10, 2005 2:46 PM |
| **To:** | 'Brannen, Jenny' |
| **Cc:** | 'Don Lewis'; Todd Collins; 'Carmella Keener' |

**Subject:** RE: Proposed class representatives depositions and documents

Jenny—Here is the schedule--Craus in Austin on the 18th.  Morrash in Philadelphia on the 23rd.  Schockley in Phila on the 24th  if he is through jury duty.Tonnore in Austin on the 25th.  One trip to phila for you, two trips to Austin for me. My understanding is that  Shockley starts jury duty at the beginning of the week.  His counsel is not available on the 21st, 22nd or 23rd. The 24th  is the best chance to do him.  If that fails it will have to go to the next week.
I will fed Ex The documents to you as soon as I get them.
Liz

-----Original Message-----
**From:** Brannen, Jenny [mailto:jbrannen@AkinGump.com]
**Sent:** Thursday, February 10, 2005 1:03 PM
**To:** Elizabeth Fox
**Cc:** Todd Collins; morris lewislaw; Carmella Keener
**Subject:** RE: Proposed class representatives depositions and documents

Liz,

Let's set Craus in Austin on Feb. 18th then.  Will you be sending us her documents for delivery tomorrow or Saturday morning?  Will we be getting all your documents at the same time?

Also, we've agreed on Tonore in Austin for Feb. 25.

We would prefer to make only one trip to Philadelphia if possible.  When is Shockley supposed to appear for jury duty?  Could he appear for his deposition on Feb. 21, 22, or 23?

Thanks,
Jenny

-----Original Message-----
**From:** Elizabeth Fox [mailto:efox@bm.net]
**Sent:** Wednesday, February 09, 2005 11:53 AM
**To:** Brannen, Jenny
**Cc:** Todd Collins; morris lewislaw; Carmella Keener
**Subject:** RE: Proposed class representatives depositions and documents

Jenny—Craus could make herself available in Austin on the 17 or 18th of Feb.  Otherwise, she will be able to do the 16th or 17th of  March.  She will produce some but not a large volume of documents (less than an inch I think). Let me know, Liz

-----Original Message-----
**From:** Brannen, Jenny [mailto:jbrannen@AkinGump.com]
**Sent:** Tuesday, February 08, 2005 8:08 PM
**To:** Elizabeth Fox
**Cc:** Todd Collins; morris lewislaw; Carmella Keener
**Subject:** RE: Proposed class representatives depositions and documents

3/29/2005

Liz:

Thanks for sending us dates for 2 of the 5 proposed class representatives. We plan to depose all five proposed class representatives. If we make the determination at some point that any of the five depositions are unnecessary, we will let you know as far in advance of the scheduled deposition date(s) as possible.

We originally proposed taking all 5 depositions within the same week at your office for your convenience and to minimize travel expenses. Obviously, it will be most cost effective for us to take all the depositions that will be in Philadelphia over a span of consecutive days in the same week if at all possible. Please confirm whether Dr. Shockley will be available on Feb. 24 as soon as you can, so that we can figure out what schedule makes the most sense.

Finally, please provide us with dates for the other 3 proposed class representatives by the close of business this Friday, February 11. If you are unable to provide us with dates, we will be forced to subpoena these proposed class representatives to appear for deposition in Delaware.

Thanks,
Jenny

-----Original Message-----
**From:** Elizabeth Fox [mailto:efox@bm.net]
**Sent:** Tuesday, February 08, 2005 1:40 PM
**To:** Brannen, Jenny
**Cc:** Todd Collins; Don Lewis; Carmella Keener
**Subject:** RE: Proposed class representatives depositions and documents

Jenny—With regard to your request for depositions, we do not believe you  need to depose all the class representatives. There is no reason that you cannot find out all you need to know with the depositions of 2 or possibly 3 of them.
In keeping with your rushed schedule, we have scheduled the deposition of John Morrash at our offices on Wed. Feb. 23. Todd Tonore is available on Fri. Feb. 25 at your offices in Austin. Dr. Shockley has jury duty in Florida. We hope he will be available on Feb. 24 at our offices or possibly during the week of Feb. 28, but we can make no promises yet. Liz

-----Original Message-----
**From:** Brannen, Jenny [mailto:jbrannen@AkinGump.com]
**Sent:** Friday, February 04, 2005 7:15 PM
**To:** Elizabeth Fox
**Subject:** RE: Proposed class representatives depositions and documents

No problem --- that sounds good. How soon after the 11th do you think you can get us all of the class reps' documents since we will need those in advance of the depos?

We were planning to take 2 at the same time, so that we could get them all done in that week (and that Monday is a holiday, so we figured it would be better to avoid scheduling any that day, if possible). Our office is in Austin, so we would be glad to do Craus and Tonore here --- how about Craus on the 22nd and Tonore on the 23rd? Then we could still have someone fly up to take Shockley on the 22nd, Morrash on the 23rd, and Federated National on the 24th.

Let me know when you know about everyone's schedule.

Thanks, and have a good weekend,

Jenny

-----Original Message-----
**From:** Elizabeth Fox [mailto:efox@bm.net]
**Sent:** Friday, February 04, 2005 4:25 PM
**To:** Brannen, Jenny
**Cc:** Elizabeth Fox
**Subject:** RE: Proposed class representatives depositions and documents

Jenny—sorry—I miscounted. We will have answers and some of the documents to you by Feb. 11.
  We just received the dep. Notice. Both Shockley and Craus are listed for tues Feb. 22nd at 10 am. Is that a mistake ? Further, both Craus and Tonnore live in Texas. Would you be willing to do their deps in texas, and if so where, if that is more convenient for them? Thanks for agreeing to do the others at our offices.
   Let me know, thanks, Liz

**From:** Brannen, Jenny [mailto:jbrannen@AkinGump.com]
**Sent:** Tuesday, February 01, 2005 12:18 PM
**To:** Elizabeth Fox
**Subject:** RE: Proposed class representatives depositions and documents

Liz, I think you may have miscalculated the deadline --- we hand delivered the discovery requests on January 12, so 30 days is February 11. Again, we would appreciate getting whatever documents you have already collected via overnight mail on the 11th for Saturday delivery. Do you have a feel for when we will have all the documents?

We're proposing to do the depositions in Philadelphia rather than Delaware for your convenience. We'll be happy to do them in your office, as long as you can provide us with two main rooms and a breakout room. Regarding the dates, we would like to schedule them for the week of February 21.

Thanks,
Jenny

-----Original Message-----
**From:** Elizabeth Fox [mailto:efox@bm.net]
**Sent:** Tuesday, February 01, 2005 9:42 AM
**To:** Brannen, Jenny
**Cc:** Todd Collins; Don Lewis; julie desper; Carmella Keener
**Subject:** RE: Proposed class representatives depositions and documents

Hi Jenny
—By my calculation our answers are not due until the 14th. We have to Bates stamp the documents after that. We will copy them here and fed Ex them to you as quickly as we can. I do not anticipate that the volume of documents will be large.
 If we do the depositions in Philadelphia, we would

prefer to do them at this office.  I will call you as soon
as I find out when  our clients are available.

-----Original Message-----
**From:** Brannen, Jenny
[mailto:jbrannen@AkinGump.com]
**Sent:** Monday, January 31, 2005 8:14 PM
**To:** Elizabeth Fox
**Subject:** Proposed class representatives
depositions and documents

Hi, Liz.

I just wanted to give you the heads up that we
will be sending out deposition notices for the
proposed class representatives in the next
day or so.  We're planning to send them out
with place-holder dates, but we will work with
you as much as possible on scheduling.
We're planning to conduct the depos at our
office in Philadelphia.  Please let me know
once you have had a chance to check with
your clients about dates.  Also, we would like
to make arrangements for you to overnight us
copies of their documents on the 11th for
Saturday delivery, so let me know who I
should send our account numbers to.

Please give me a call if you'd like to discuss.

Thanks,
Jenny

Jennifer R. Brannen
Akin Gump Strauss Hauer & Feld LLP
300 W. 6th St., Suite 2100
Austin, TX 78701
512.499.6258
512.499.6290 (fax)

The information contained in this e-mail message
is intended only for the personal and confidential
use of the recipient(s) named above. This
message may be an attorney-client
communication and/or work product and as such
is privileged and confidential. If the reader of this
message is not the intended recipient or an agent
responsible for delivering it to the intended
recipient, you are hereby notified that you have
received this document in error and that any
review, dissemination, distribution, or copying of
this message is strictly prohibited. If you have
received this communication in error, please

notify us immediately by e-mail, and delete the
original message.

The information contained in this e-mail message is intended
only for the personal and confidential use of the recipient(s)
named above. This message may be an attorney-client
communication and/or work product and as such is privileged
and confidential. If the reader of this message is not the
intended recipient or an agent responsible for delivering it to
the intended recipient, you are hereby notified that you have
received this document in error and that any review,
dissemination, distribution, or copying of this message is
strictly prohibited. If you have received this communication in
error, please notify us immediately by e-mail, and delete the
original message.

The information contained in this e-mail message is intended only for the
personal and confidential use of the recipient(s) named above. This message
may be an attorney-client communication and/or work product and as such is
privileged and confidential. If the reader of this message is not the intended
recipient or an agent responsible for delivering it to the intended recipient,
you are hereby notified that you have received this document in error and
that any review, dissemination, distribution, or copying of this message is
strictly prohibited. If you have received this communication in error, please
notify us immediately by e-mail, and delete the original message.

The information contained in this e-mail message is intended only for the personal and
confidential use of the recipient(s) named above. This message may be an attorney-client
communication and/or work product and as such is privileged and confidential. If the
reader of this message is not the intended recipient or an agent responsible for delivering it
to the intended recipient, you are hereby notified that you have received this document in
error and that any review, dissemination, distribution, or copying of this message is strictly
prohibited. If you have received this communication in error, please notify us immediately
by e-mail, and delete the original message.

The information contained in this e-mail message is intended only for the personal and confidential use
of the recipient(s) named above. This message may be an attorney-client communication and/or work
product and as such is privileged and confidential. If the reader of this message is not the intended
recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that
you have received this document in error and that any review, dissemination, distribution, or copying of
this message is strictly prohibited. If you have received this communication in error, please notify us
immediately by e-mail, and delete the original message.

## Elizabeth Fox

| | |
|---|---|
| **From:** | Todd Collins |
| **Sent:** | Thursday, February 24, 2005 1:58 PM |
| **To:** | 'Brannen, Jenny' |
| **Cc:** | Elizabeth Fox; tmcevoy@stblaw.com; Larocca, David H; Moriaty, Laura; Donna Giovanetti; Elizabeth Fox; morris lewislaw |

**Subject:** RE: Shockley deposition

It would be our pleasure to start, or try to start, at 10:30. Please be here then, and inform the court reporter. We may end up being a few minutes late in starting, but we will try to start as promptly as possible. I have strong feelings about people making the last plane in time to get home to their families, and our side will do everything we can. I am defending tomorrow, and I tend to object on occasion, but I will strive, as I am sure you will, to keep down the colloquy.

You might have noticed the snow. In case transportation difficulties arise, it would be wise for you and I to exchange cell numbers. Mine is 267 979 0003.

Regarding the extra copies of the documents, I will ask Donna Giovanetti of my office to look after that right away. We will also have extra copies available at the dep.

Finally, if you are interested, the phone number of the Barnes Foundation is 610 667 0290. Very cumbersome to get tickets, and you cannot just show up and get in. Maybe you can check with your concierge. Note that Barnes may not be open today, just tomorrow and over the weekend.

    -----Original Message-----
    **From:** Brannen, Jenny [mailto:jbrannen@AkinGump.com]
    **Sent:** Thursday, February 24, 2005 1:24 PM
    **To:** Todd Collins
    **Cc:** Elizabeth Fox; tmcevoy@stblaw.com; Larocca, David H; Moriaty, Laura
    **Subject:** Shockley deposition

    Todd:

    I just wanted to confirm that we are still on for tomorrow. I know you wanted to push the start time back to 11:00 so that you would have some prep time in the morning, but as a compromise, could we please start at 10:30? The latest flight out tomorrow night is at 5:30, and we would really like to make it if possible. For that reason, we would also like to propose that we take a very short lunch break, if a break is necessary. (If you insist on starting at 11:00, we would prefer to go straight through.)

    Please let me know so that I can confirm the time with the court reporter.

    Thank you for producing Mr. Shockley's documents. I had asked Liz to have 4 copies made since there were only 7 pages, so that we would be able to have our exhibits ready to go, but I only received one copy at the hotel. Will you please have the other copies delivered here this afternoon so that we don't have to spend time organizing them in the morning? Also, I would appreciate it if you could fax or pdf a set to Ted and his colleague, David Larocca, so that they have a chance to review them before tomorrow.

    Thanks.
    Jenny

1622 LOCUST STREET · PHILADELPHIA PA 19103-6305 | *phone* 215/875-3000 | *fax* 215/875-4604 | *www.bergermontague.com*

# Berger&Montague,P.C.
### ATTORNEYS AT LAW

| | |
|---|---|
| WRITER'S DIRECT DIAL | (215) 875-5806 |
| WRITER'S DIRECT FAX | (215) 875-4604 |
| WRITER'S DIRECT E-MAIL | efox@bm.net |

**ELIZABETH W. FOX**

February 22, 2005

Michelle A. Reed, Esquire
**Akin, Gump, Strauss, Hauer & Feld, LLP**
300 West 6th Street, Suite 2100
Austin, TX  78701

> **Re:**    **IN RE ADAMS GOLF, INC. SECURITIES LITIGATION**
> **Consolidated Civil Action No. 99-371-KAJ**

Dear Michelle:

We will produce the documents identified in our Rule 26 disclosures to you on a disc or copy them for you, at your expense.  None of these documents is privileged.

We request that you produce immediately those documents identified in your clients' Rule 26 disclosures.

As to your questions which appear to be about the objections we interposed to your initial interrogatories, we will look at the cases you cite and get back to you.

Dr. Shockley is available for deposition at this office at 11:00 a.m. on Friday, February 25, 2005.  I will give his documents (2 or 3 pages) to Jenny tomorrow.

Finally, we note that although plaintiffs' document requests were served on you before you sent us discovery requests, we have not received anything from you or the investment bank defendants.  We see no reason why you have delayed so long in producing the documents, and request that you produce them by the first of March, which is five weeks after your responses were due.

Sincerely,

*Liz Fox*

Elizabeth W. Fox

EWF/sw

cc:    Theodore McEvoy, Esq.
Juli Desper, Esq.
Donald B. Lewis, Esq.
Todd S. Collins, Esq.
Carmella Keener, Esq.

# EXHIBIT F

LAW OFFICES

# ABRAHAMS, LOEWENSTEIN, BUSHMAN & KAUFFMAN
### A PROFESSIONAL CORPORATION



**AL B&K**

FOUNDED 1910

ONE LIBERTY PLACE
1650 MARKET STREET, SUITE 3100
PHILADELPHIA, PENNSYLVANIA 19103-7392

(215) 561-1030
FAX (215) 587-0888
E-mail: albk@albk.com
http://albk.com

NEW JERSEY OFFICE

20 BRACE ROAD, SUITE 112
CHERRY HILL, NJ 08034

(609) 795-5860
FAX (609) 616-7887

DIRECT DIAL NUMBER
215-587-0814
DIRECT EMAIL
Rlouis@albk.com

March 10, 1999

Dr. F. Kenneth Shockley
25 Glen Drive
Voorhees, NJ 08043

    Re: **Adams Golf Securities Litigation**

Dear Dr. Shockley:

    At your request, we have pursued an investigation of the circumstances concerning your losses in the stock of Adams Golf, Inc. ("Adams Golf"). I enclose a working draft of a complaint that we intended to file against Adams Golf, certain of its officers and directors, and the underwriters for Adams Golf's July 1998 initial public offering, namely Lehman Brothers, Nationsbanc Montgomery Securities LLC and Ferris, Baker Watts Incorporated. We are conducting further investigation and making certain revisions to the complaint, which we hope to file shortly after you execute and return to me the certification sent to you with the complaint. However, I ask that you return the certification as soon as possible, so that we will be in a position to file without delay if that proves necessary or advantageous. In the event that we determine that it makes sense to await the filing of Adams Golf's 1998 Report on Form 10-K before filing suit, we may ask you to sign a revised certification later this month or in early April, following release of the 10-K.

    We will represent you in this proposed class action litigation on the following basis:

    1.  The suit will be brought as a class action in federal court in Dallas, Texas.

FKS 8

ABRAHAMS    EWENSTEIN, BUSHMAN & KAUFFMAN

Dr. F. Kenneth Shockley
March 10, 1999
Page 2

We will work as co-counsel with Berger & Montague, P.C. and the Law Offices of Donald B. Lewis. We will also need to retain local counsel in Texas.

2.    You will serve as a class representative, to attempt to obtain a recovery for all persons, including yourself, who have been injured by similar conduct and practices of the defendants. Your responsibilities as a class representative will include producing documents and information, and possibly testifying at deposition or trial, as well as monitoring the litigation generally and insuring that we provide the class with appropriate notice of the action.

3.    If the case is certified as a class action, the Court may award attorneys' fees to us and to our co-counsel at the conclusion of the case. Any such award would come out of the recovery or from the defendant, and you will not in any event be personally responsible to pay any attorneys' fees to any of us.

4.    The case will be brought as a class action, because otherwise it would not be economically feasible. Unless the court refuses to certify the class, it will not be possible to settle the case on your individual behalf. Many federal court judges have awarded payments to successful class representatives to recognize their efforts on behalf of a class, although I can give you no assurances payment would under current law be limited to items such as reasonable costs and expenses, including lost wages.

5.    We will advance all costs and other disbursements, including filing fees, travel costs, transcript costs, the costs of notifying the class, copying costs and any other costs necessary to the proper handling of the matter. In the event the case is successful, the court may reimburse these costs to us at the conclusion of the litigation from any fund that may be obtained from a settlement or a judgment. In the event the litigation is unsuccessful, your responsibility to us will be limited to being responsible for an appropriate share of the costs of the litigation, not including any attorneys' fees.

When you have reviewed the draft complaint and this letter, please complete the enclosed certification and return it to us at your earliest opportunity. If the foregoing is acceptable to you, I would appreciate it if you would sign in the space below, retaining a copy for your files. Naturally, do not hesitate to call if you have suggestions concerning the draft or questions concerning this letter or the enclosures.

FKS 9

MAR 10 '99 10:33 FROM ABRAHAMS LOEWENSTEIN          ID:12155070808          PAGE    5/1

ABRAHAMS ᴸ OEWENSTEIN, BUSHMAN & KAUFFMAN

Dr. F. Kenneth Shockley
March 10, 1999
Page 3

We all look forward to representing you.

Very truly yours,

ROBERT H. LOUIS

RHL/lb
Enclosures
cc:    Todd S. Collins, Esquire
       Donald B. Lewis, Esquire

AGREED TO AND ACCEPTED:

F. Kenneth Shockley

FKS 10

# EXHIBIT G

## ADAMS GOLF CLASS ACTION
## SHAREHOLDER QUESTIONNAIRE

This form is to be filled out in order to join the shareholder class action being brought against Adams Golf, Inc.

First Name: _TODO_

Middle Initial: _M_

Last Name: _TONORE_

E-Mail Address: _TODOTONORE @ AOL . COM_

Mailing Address: _1024 PEBBLE BEACH_

City: _MANSFIELD_

State: _TX_

Zip Code: _76063_

Phone Numbers: _( 817 ) 453 - 8400_ (Home)
_( 817 ) 371 - 8645_ (Work)

Fax Number: _( 817 ) 453 - 8601_

Number of Shares of Adams Golf Common Stock
(attach trade confirmations and/or acquisition documents): _6200 SHARES_

As explained in the cover letter, we will represent you on a contingent fee basis and will apply to the Court for reimbursement of costs and payment of fees out of any recovery. You will **not** be individually responsible for payment to the attorneys. Pursuant to applicable bar rules you may sever this attorney/client relationship at your discretion.

Signed this _18_ date of _July_, 1999.

_____
Signature

KELLER ROHRBACK L.L.P.
SUITE 3200
1201 THIRD AVENUE
SEATTLE, WASHINGTON 98101-3052
(206) 623-1900

# EXHIBIT II

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.,      :      CIVIL ACTION NO. 99-371
SECURITIES LITIGATION     :

## DECLARATION OF KENNETH SHOCKLEY, D.O.

I, KENNETH SHOCKLEY, D.O. declare under penalty of perjury:

1.     In early February, I received a call from my personal attorney, Alan Sanders asking if I would be available for deposition in this case on February 24, 2005.

2.     I told Alan that I had been subpoenaed for jury duty in Florida, and I did not know how long it would last. I told him I could not be sure to be available on February 24, but I would come if I could.

3.     I reported for jury duty on February 17, 2005. I was not chosen for a jury and was dismissed at the end of that day.

4.     Sanders called me on February 22, to confirm that I would be available to do the deposition. I confirmed that I was available.

5.     My deposition was taken on February 25, 2005.

6.     I declare under penalty of perjury that the foregoing is true and correct.


DATED: _____             _____
                                     Kenneth Shockley, D.O.

392596_01.wpd

# EXHIBIT III

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.,          :          CIVIL ACTION NO. 99-371
SECURITIES LITIGATION             :

## DECLARATION OF TODD S. COLLINS

I, TODD S. COLLINS, declare under penalty of perjury:

1.      I am a Shareholder at Berger & Montague, P.C.

2.      I have been in charge of the Adams Golf litigation at the Berger firm from the inception of the case in 1999.

3.      At my direction, and pursuant to the PSLRA, the Berger firm issued a press release with respect to the filing of the initial complaint in the litigation.  The press release was issued on June 14, 1999.  (See Exhibit 1.)

4.      Our practice in the case, when we received calls and emails, in response to the press release, was to send the prospective lead plaintiffs who contacted us a form letter, a form of Certification, and the Complaint, along with other materials.

5.      In this form letter, we informed prospective plaintiffs that, should they choose to retain the Berger firm, attorney's fees and cost would be on a contingent basis.  By returning the Certification, the prospective plaintiff would agree to this contingent fee and expense arrangement.

6.      I understand that Ms. Craus, along with other prospective plaintiffs who contacted us, received a copy of this form letter.

7.      In the Adams Golf case, as in all other cases, I did not telephone prospective plaintiffs unless such persons first contacted the Berger firm.  This practice was consistent with my instructions to all attorneys and paralegals at the Berger firm who communicated with

prospective plaintiffs and others responding to the Berger firm's press release.

8.     Of course, I would be constrained by ethical considerations from initiating contact by telephone with prospective plaintiffs. In addition, and as an entirely separate matter, we would have had no way of knowing the identity of any non-controlling shareholders at Adams Golf unless such persons contacted us.

9.     I declare under penalty of perjury that the foregoing is true and correct.


DATED: _____            _____

                                  **TODD S. COLLINS**


392947.wpd

# EXHIBIT 1

Jones Interactive Publications Library                    http://nrstg1s.djnr.com/cgi-bin/DJInteractive_S

**Adams Golf, Inc. (Nasdaq: ADGO ) and Its Top Officers and Directors Are Sued by the Shareholders as Per the Class Action Lawsuit Filed by Berger & Montague, P.C.**
06/14/1999
PR Newswire
(Copyright (c) 1999, PR Newswire)

PHILADELPHIA, June 14 /PRNewswire/ -- Investors have filed a **class action** alleging Adams Golf, Inc. (Nasdaq: **ADGO** ) and certain of its officers and directors violated the federal securities laws. According to the lawsuit, defendants omitted or misrepresented information from the Registration Statement they filed with the SEC and the Prospectus they disseminated to investors who purchased Adams Golf (Nasdaq: **ADGO** ) common stock in the initial public offering in July 1998 (the "IPO").

The lawsuit charges that the Registration Statement and the Prospectus failed to disclose material risks arising from two important conditions existing at the time of the IPO, namely that at the time of the IPO, gray market distribution of Adams Golf products and an oversupply of golf club inventory at the retail level were negatively affecting Adams Golf's earnings.

According to the complaint, the price of Adams Golf stock has declined dramatically in the period following the IPO as investors have learned the truth.

The complaint also alleges that, in the IPO, individual defendants sold more than two million shares of the Company's stock for more than $36 million in proceeds.

The complaint was filed Friday in the United States District Court for the District of Delaware, and the case number is 99-371. The class consists generally of persons who purchased in the IPO.

The law firm of Berger & Montague, P.C. has extensive experience in securities **class action** cases. The Berger firm has played lead roles in major cases over the past 25 years resulting in recoveries in the billions of dollars to investors. Courts widely recognize Berger & Montague, P.C. for the high quality of its legal representation on behalf of defrauded investors.

If you purchased Adams Golf common stock in the IPO, you may, not later than 60 days from today, move the Court to serve as lead plaintiff of the class.

If you wish to discuss this action or have any questions concerning the notice or your rights or interests with respect to these matters, please contact Berger & Montague, P.C. (Todd S. Collins, Esq. or Jacob Goldberg, Esq.) at 1622 Locust Street, Phila., PA 19103, Law Offices of Donald B. Lewis (Donald B. Lewis, Esq.) at 5 Cynwyd Rd., Bala Cynwyd, PA 19004, Abrahams, Loewenstein, Bushman & Kaufman, P.C. (Robert H. Louis, Esq. or Jeffrey P. Bates) at One Liberty Place, Suite 3100, 1650 Market Street, Philadelphia, PA 19103 or The Olsen Law Firm (Kurt B. Olsen, Esq.) at 212 K St., N.W., Suite 800, Washington, D.C. 20037.

Contact:
Berger & Montague, P.C.
Todd S. Collins, Esq.
Jacob Goldberg, Esq.
1622 Locust Street
Philadelphia, PA 19103
888-891-2289 or 215-875-3000
fax: 215-875-4673
e-mail: InvestorProtect@bm.net
website: www.bm.net/home
or