# EXHIBIT A
# REDACTED VERSION OF EXHIBIT A FILED ON September 1, 2005 at D.I. 180

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ———————————————x | : | CONSOLIDATED |
| IN RE ADAMS GOLF, INC. | : | C.A. No. 99-371 KAJ |
| SECURITIES LITIGATION | : | |
| | : | CLASS ACTION |
| ———————————————x | | JURY TRIAL DEMANDED |

## SECOND CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

### NATURE OF THE ACTION

Plaintiffs, on behalf of the Class and Subclass as defined below ("Plaintiffs"), for their Second Consolidated and Amended Class Action Complaint ("Complaint"), allege as follows:

1.    Plaintiffs base the allegations of this Complaint, except the averments with respect to themselves and their transactions in the stock of defendant Adams Golf, Inc. ("Adams Golf" or the "Company"), upon the investigation of their counsel. Counsel's investigation included, inter alia, review and analysis of the public filings of Adams Golf with the Securities and Exchange Commission (the "SEC"); Adams Golf's public statements; media and securities analysts' reports; documents produced by defendants; documents produced from Andrews & Kurth and Costco pursuant to subpoena; and information provided by knowledgeable sources, including Class Members and former Adams Golf employees.

2.    This is a federal securities law class action. The Court has certified a class consisting of all persons (the "Class") who purchased shares of Adams Golf in, or traceable to, Adams Golf's initial public offering (the "IPO") between July 10, 1998 and October 22, 1998 (the "Class Period"). The Court has also certified a subclass consisting of all persons (the "Subclass") who bought Adams

Golf shares in the IPO, on July 10, from defendant Lehman Brothers Holdings, Inc. ("Lehman") for $16 per share. Defendants conducted the IPO pursuant to a registration statement on Form S-1 (the "Registration Statement"), which became effective July 9, 1998 (the "Effective Date"), and the prospectus (the "Prospectus") included as an exhibit to the Registration Statement. Both the Registration Statement and the Prospectus were materially misleading and omitted material facts.

3.      The claims asserted herein arise under §§11, 12(a)(2) and 15 of the Securities Act of 1933, as amended (the "Act"), 15 U.S.C. §§77k, 77l(a)(2) and 77o.

4.      This Court has jurisdiction pursuant to §22 of the Act, 15 U.S.C. §77v and 28 U.S.C. §1331.

5.      Venue is proper in this District pursuant to §22 of the Act. Defendant Adams Golf has its principal executive offices in this District; substantial acts in furtherance of the IPO occurred within this District; and many of the acts, transactions and conduct alleged herein occurred in substantial part within this District.

6.      In connection with wrongful conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

<u>PARTIES</u>

7.      By Orders dated June 27, 2005, and August 3, 2005, the Court appointed Plaintiffs, Todd Tonore, F. Kenneth Shockley, John Morrash, and Patricia Craus, as "Class Representatives" in this action as to all defendants. As described in their sworn Certifications, which they previously filed with the Court, Class Representatives purchased shares of Adams Golf in, or traceable to, the

2

IPO and were damaged thereby. Plaintiff Craus was also appointed as "Lehman Subclass Representative" by Orders dated June 27, 2005, and August 3, 2005. She bought Adams Golf common stock in the IPO from Lehman on July 10, 1998, at $16.00 per share.

8.      Defendant Adams Golf is a corporation organized under the laws of the State of Delaware with its principal executive offices located at 300 Delaware Avenue, Suite 572, Wilmington, Delaware 19801. Adams Golf common stock trades on the "NASDAQ." According to press releases issued by the Company, Adams Golf is a leading seller of golf clubs.

9.      During the Class Period the Company conducted its operations through several direct and indirect wholly-owned subsidiaries, including: (i) Adams Golf Holding Corp., a Delaware corporation, which holds limited partnership interests of certain indirect subsidiaries of the Company; (ii) Adams Golf GP Corp., a Delaware corporation, which holds capital stock or limited partnership interests, as applicable, of certain indirect subsidiaries of the Company; (iii) Adams Golf Direct Response, Ltd., a Texas limited partnership, which operates the call-center and advertising activities; (iv) Adams Golf, Ltd., a Texas limited partnership, which operates the golf club design, assembly and sales business; (v) Adams Golf IP, L.P., a Delaware limited partnership, which holds the intellectual property rights of the Company; and (vi) Adams Golf Management Corp., a Delaware corporation, which provides management and consulting services to certain of the Company's indirect subsidiaries.

10.      The following "Individual Defendants" each signed the Registration Statement. Because of their management positions and/or membership on the Company's Board of Directors, the Individual Defendants had the power and influence, which they exercised, to cause Adams Golf to issue the Registration Statement and Prospectus as alleged in this Complaint. The Individual

Defendants were, therefore, "control persons" of Adams Golf within the meaning of Section 15 of the Act.

(a)    Defendant B.H. (Barney) Adams ("Barney Adams") founded Adams Golf and was at all relevant times Chairman of the Board of Directors, Chief Executive Officer and President of the Company.

(b)    Defendant Darl P. Hatfield ("Hatfield") was at all relevant times Senior Vice President-Finance and Administration and Chief Financial Officer of the Company. He had joined the Company in May, 1998;

(c)    Defendant Richard H. Murtland ("Murtland") was at all relevant times Senior Vice President-Research and Development, Secretary and Treasurer of the Company;

(d)    Defendant Paul F. Brown, Jr. ("Brown") was at all relevant times a director of the Company;

(e)    Defendant Roland E. Casati ("Casati") was at all relevant times a director of the Company;

(f)    Defendant Finis F. Conner ("Conner") was at all relevant times a director of the Company; and

(g)    Defendant Stephen R. Patchin ("Patchin") was at all relevant times a director of the Company.

11.    Defendants Lehman, Banc of America Securities LLC (at the time of the IPO, named Nationsbanc Montgomery Securities LLC) ("Bank of America"), and Ferris, Baker Watts, Incorporated ("Ferris, Baker") (collectively, the "Underwriter Defendants") were the lead underwriters for the IPO. Each of the Underwriter Defendants participated in due diligence meetings

4

and in road shows, actively soliciting the sale of the Company's common stock. Each of the Underwriter Defendants obtained a major share of the fees paid to the underwriters in connection with the IPO.

## CLASS ALLEGATIONS

12.    Class and Subclass Representatives bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) with respect to liability asserted under Sections 11 and 12 of the Act. Class Representatives bring this action on behalf of the Class, consisting of all persons who purchased Adams Golf common stock during the Class Period, issued in or traceable to the IPO, under Section 11 of the Act. In addition, with respect liability asserted under Section 12 of the Act, Subclass Representative Craus brings this action on behalf of the Subclass, consisting of all persons who purchased Adams Golf common stock in the IPO from Lehman. Excluded from the Class and the Subclass are the defendants and members of their immediate families, any entity in which a defendant has a controlling interest and the heirs, successors and assigns of any such excluded party.

13.    This Court ruled on June 27, 2005, and August 3, 2005, that the Class and Subclass meet the prerequisites of Federal Rule of Civil Procedure 23(a) and (b)(3), and certified the Class and Subclass as described above.

14.    Class Representatives assert claims on behalf of the Class against all Defendants. Subclass Representative asserts claims on behalf of the Subclass against Lehman.

15.    Questions of law and fact common to the Class and Subclass are:

(a)    Whether the Registration Statement and the Prospectus contained material untrue statements or omitted and/or misrepresented material risks and facts;

(b)    Whether Defendants violated the Act;

5

(c)     Whether the Class Representatives and the members of the Class and the Subclass have sustained damages, and, if so, the proper measure of such damages; and

(d)     Whether the Individual Defendants were control persons within the meaning of Section 15 of the Act, 15 U.S.C. § 77(o).

16.     The names and addresses of the record owners of Adams Golf common stock purchased in, or traceable to, the IPO, between July 10, 1998 and October 22, 1998, are available from Adams Golf's transfer agent.  Plaintiffs expect to send notice to Class and Subclass members by first class mail and publication, using techniques similar to those employed in other class actions arising under the federal securities laws.

SUBSTANTIVE ALLEGATIONS

17.     Adams Golf designs, manufactures and markets what it contends are premium quality, technologically innovative golf clubs.  Claiming to be the leading seller of fairway woods, Adams Golf touted its golf clubs as employing technology and design that provide golfers with the ability to hit the ball from virtually any lie while maximizing distance.

18.     Founded by Adams in 1987, the Company operated initially as a components supplier and contract manufacturer.  Thereafter, the Company established its custom fitting operation, which serviced a network of certified custom fitting accounts.

19.     In the fall of 1995, the Company introduced the original "Tight Lies" fairway wood. The Company extended the Tight Lies to include the Tight Lies Strong 3, Strong 5 and Strong 7 in December, 1996, and the Tight Lies Strong 9 in January 1998.

6

20.    According to the Company, sales of the Tight Lies line of products increased significantly after the second quarter of 1997, when the Company launched an infomercial relating to the original Tight Lies fairway wood.

21.    According to the Company, it derived net sales primarily from sales to on- and off-course golf shops and selected sporting goods retailers and, to a much lesser extent, from direct sales to consumers, international distributors and the Company's custom fitting accounts.

## The Materially False and Misleading Registration Statement and Prospectus

22.    The Registration Statement, and the Prospectus were materially false and misleading in that: (1) the Registration Statement and the Prospectus failed to disclose and misrepresented the material risk and fact that Adams Golf's reported profits and revenues had been distorted by, and that its future profits and revenues were being and would continue to be severely threatened by, "gray market" distribution of Adams Golf's products; (2) the Registration Statement and the Prospectus failed to disclose and misrepresented the material risk and fact that the Company's post-IPO results would be materially, adversely impacted because of practices that included "double shipping", shipments with liberal or unlimited rights of return, and underreserving for returns, all of which practices were occurring before and at the time of the IPO; (3) the Registration Statement and the Prospectus failed to disclose and misrepresented the Company's failure to take reasonable actions to protect its supposedly "selective retail distribution", such as written contracts binding Adams Golf's authorized retailers and distributors ("Dealers") to refrain from resale or transshipment to other retailers, discounters, or other buyers who were not end-users; and (4) the Registration Statement and the Prospectus failed to disclose and misrepresented the material risk and fact that Adams Golf's results would be adversely affected by a decline in retailers' margins.

7

A.    **The Registration Statement and the Prospectus Omitted and Misrepresented Material Risks Arising from Gray Market Distribution.**

23.    The Registration Statement, and the Prospectus were materially false and misleading, because the Registration Statement and the Prospectus failed to disclose and misrepresented the material risk and fact that Adams Golf's reported profits and revenues had been distorted by, and that its future profits and revenues were severely threatened by, extensive "gray market" distribution of Adams Golf's products.

24.    Gray market distribution is the unauthorized distribution of the Company's products to discount retailers. Sales in the gray market are made at a substantial discount to the suggested retail prices at which the Company's authorized retailers sell. Consumers' purchases from unauthorized discounters at lower prices have a material adverse impact on authorized retailers' sales at higher prices, reducing the Company's profit margins. The gray market also tends to skew the Company's revenues, causing higher sales in earlier periods (as products filter to discounters through gray market channels) and lower sales in later periods (as the Company's authorized retailers, losing sales to discounters, order fewer clubs from the Company). The Company will also be adversely affected if it tries to ward off the gray marketers by giving rebates to its authorized retailers or attempts to buy back all of its products which are available at the discount stores.

1.    **Previous Gray Market Allegations**

25.    At the time of the IPO, not only did gray market distribution pose a material risk to the Company's future results, but it was and had been ongoing. Various sources have informed plaintiffs that, before the Effective Date, gray market distribution of Adams Golf products was a routine topic of conversation among Company personnel.

8

26.    Any sales, even sales to the gray market, boosted Adams Golf's short-term sales results, results that were critical to the success of the IPO.

27.    Prior to the Effective Date, review of the Company's sales records would have indicated strong evidence of both the existence of the gray market sales problem and the identity of Dealers responsible for unauthorized distribution to discount retailers. For one thing, many Dealers had the capacity to store and then sell only relatively small quantities of golf clubs at one time. Certain of these Dealers purchased golf clubs from the Company in quantities that far exceeded their sales and storage capabilities.

28.    According to various sources, prior to the Effective Date, Costco, an unauthorized discount retailer, alone had over 5,000 Adams Golf clubs available for sale at its facilities. Costco's gray market sales were in addition to such sales by other unauthorized discount retailers and international gray market distributors.

29.    According to a Company press release issued June 9, 1998, only one month before the Effective Date, the Company filed a Bill of Discovery against Costco "to determine whether Costco's claims that they had properly acquired Adams' Tight Lies fairway woods for resale were accurate." According to the press release:

> Adams Golf became concerned when it learned that Costco was selling their Tight Lies fairway woods because Costco is not an authorized distributor.

30.    Nowhere in its lengthy discussion of risks did the Registration Statement and the Prospectus disclose that, as a result of the gray market sales, the Company faced the risk of severe margin pressure as well as the loss of important retail outlets. The Registration Statement and the

Prospectus also failed to disclose the material fact that material amounts of gray market sales had already occurred.

31.   Contrary to the adverse trend represented by material amounts of gray market sales, the Registration Statement and the Prospectus were materially false and misleading by portraying positively the distribution of Adams Golf products, stating:

> To preserve the integrity of its image and reputation, the Company <u>limits its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and technical expertise</u>. The Company <u>currently sells its products to on-and off-course golf shops and selected sporting goods retailers</u>. The Company believes its <u>selective retail distribution helps its retailers to maintain profitable margins</u> and maximize sales of Adams' products.

(Emphasis added).

32.   By the foregoing statement, the Registration Statement and the Prospectus were materially false and misleading to investors in at least the following three respects: (1) they stated that "the Company limits its distribution" to certain retailers, when in fact at the time of the IPO Costco was already receiving and selling at discounted prices significant number of Tight Lies clubs; (2) they stated that the Company "currently sells its products" to golf shops and selected retailers, when in fact, at the time of the IPO, Costco was obtaining and selling at discounted prices significant number of Tight Lies; and (3) they stated that "selective retail distribution" helped retailers to maintain profitable margins and maximize the Company's sales, when in fact, at the time of the IPO, distribution of the Company's products was not "selective."

10

33.     At the time of the IPO, the Company faced the grave risk - undisclosed in the Registration Statement and the Prospectus - that retailers' "profitable margins" and the Company's sales would decline as a result of the sale of material amounts of Tight Lies at discounted prices by gray marketers. The Registration Statement and the Prospectus failed to disclose the material fact that, increasingly, the Company's retail distribution was not "selective," but was instead characterized by discounting, and that the Company's margins and future sales were in jeopardy as a result.

34.     According to the Registration Statement and the Prospectus:

> The Company sells a significant majority of its products to selected retailers. To maintain its high quality reputation and generate retailer loyalty, the Company does not sell its products through price sensitive general discount warehouses, department stores or membership clubs.

(Emphasis added).

35.     As quoted above, the Registration Statement and the Prospectus were materially false because, contrary to the statement that "the Company does not sell its products through price sensitive general discount warehouses, department stores or membership clubs," in fact, at the time of the IPO, Costco was obtaining and selling to the golfing public significant numbers of Tight Lies clubs.

36.     The short-term income generated by sales to the gray market also skewed the Company's overall financial appearance, creating the false impression of heightened sales and profitability at the time of the IPO, according to the historical financial statements contained in the Registration Statement and the Prospectus.

37.    The increased sales resulting from gray market distribution were unsustainable, and created the material risk that authorized retailers would be expected to, and in fact did, stop purchasing golf equipment from Adams Golf unless the Company restricted or curtailed the sales to the gray market.

38.    On January 7, 1999, as it projected disappointing fourth quarter and 1998 results, the Company finally disclosed a material fact that results had been, were currently, and would continue to be materially, adversely affected by gray market distribution to discount retailers. Results were disappointing, according to the press release, in part because of "the gray market distribution of its products to a membership warehouse club."

39.    The gray market sales, as described above eventually resulted in reduced sales and the eventual need to offer substantial concessions to its retailers. On February 3, 1999, the Company announced that its fourth quarter 1998 sales had been reduced by a $4.3 million credit given to its retailers in connection with a new pricing structure.

40.    In the Company's 1998 Form 10-K Report, filed with the SEC in March 1999, the Company disclosed that:

> Despite the Company's efforts to limit its distribution to selected retailers, Adams Golf products have been found in a certain membership warehouse club, which the Company believes has obtained the products though the use of unauthorized distribution channels. Adams Golf has taken steps to limit this unauthorized distribution through the serialization of all Adams Golf club heads but <u>does not believe the gray marketing of its products can be totally eliminated</u>.

(Emphasis added).

12

41.    The Company thus disclosed the following two material facts that the Registration Statement and the Prospectus misrepresented and failed to disclose: (1) that gray marketing represented a material risk to the Company in that it posed a threat to the Company's earnings; and (2) that gray marketing represented a material problem that could not be "totally eliminated" by the Company's corporate controls.

### 2.    Additional Gray Market Allegations

42.    At the time of the IPO, not only did gray market distribution to Costco pose a material risk to the Company's future results, but also gray marketing was ongoing and significantly affecting Adams Golf and its Dealers.

43.    Mark Gonsalves was Adams Golf's Vice President of Sales and Marketing in the period before and shortly after the IPO.

44.    According to former inside sales persons who directed the Company's sales to Dealers in specific territories, inside sales persons received complaints from Dealers that Costco was selling Adams Golf clubs in their areas.  These inside sales persons informed Gonsalves that gray market distribution of Adams Golf clubs in the United States was a serious problem at least in Washington State and Florida as early as 1997.  In addition, before the IPO Costco was selling Adams Golf clubs in California.

45.    By early 1998, before the IPO, the Company believed that one or more of its Dealers had "transshipped" clubs to Costco or other discount retailers.

46.    The Company's sales records show that before the IPO some Dealers, such as Manatee in Florida and King Par in Michigan, ordered more clubs than they could have sold to end-users in their own territories.

47.    On March 27, 1998, Gonsalves wrote a memo to defendant Murtland, stating that King Par had been "called to task" for transshipping clubs to a retailer that sold to the public at a discount price, which the retailer advertised in newspapers.

48.    On April 15, 1998, Chris Beebe, Adams Golf's newly installed Director of International Sales, sent a memo to Gonsalves, stating that "the transshipment of tight lies has been detected recently, both in the United States and in Canada." The memo pointed out that "these gray market operations hurt Adams Golf no matter where they occur," and stated that to combat Costco gray marketing other golf equipment companies had purchased the entire inventory of their clubs on sale at Costco or else issued credits so that they golf shops or pro shops could match Costco prices.

49.    Barney Adams personally wrote to Costco on May 18, 1998 and again on June 1, 1998. He asked Costco to identify Costco's source for Adams Golf clubs. In a May 26, 1998 internal memorandum, Barney Adams referred to Costco as "the 800# gorilla and they've done this 1,000 times."

50.    After the IPO, some Dealers' shipments from Adams Golf were materially lower than they had been before the IPO, suggesting that their pre-IPO sales had increased because they had been transshipping to Costco or other discounters.

51.    In an October 8, 1998 memo, Barney Adams acknowledged that gray marketing at Costco, on the scale that occurred prior to the IPO, was sufficient to cause material harm to Adams Golf. Barney Adams wrote as follows:

> One thing that is hurting us badly is Costco. It was a problem before, but has greatly escalated in the last two weeks and will be very difficult in Q4 (Christmas)

\* \* \*

14

> We estimate a negative sales effect in Q4 of 20% - 25% based on a market survey (customers who refuse to buy). . ..
>
> Except for a lesser amount in the pipeline we'll have this under control by Q1 '99, but it's a problem that has become a major issue in the last two weeks.

52.     This October 8, 1998 memo represents an implicit admission that pre-IPO Costco sales materially impacted Adams Golf, at the time of the IPO. This is because Costco's pre-IPO gray market purchases of Adams Golf clubs exceeded Costco's purchases at the time of Barney Adams' October 8, 1998 memo. During the period March-June 1998, Costco obtained for a sale a total of 8,478 Adams Golf clubs, whereas Costco bought 6,718 Adams Golf clubs in the period from July-October 1998. In other words, whatever the negative impact of Costco gray marketing at the time of Barney Adams' memorandum in October, the negative impact could only have been worse at the time of the IPO in July.

### (a)     Pre-IPO Gray Marketing in Canada

53.     Before the IPO, gray marketing was especially serious in Canada, the Company's largest foreign market at the time.

54.     Adams Golf clubs were first found in Canadian Costco stores in March 1998, four months before the IPO.

55.     WDC Mackenzie ("WDC") was the Company's exclusive distributor in Canada prior to the IPO. Vance MacKenzie, the Vice President in charge of wholesale at WDC, concluded that Costco obtained the clubs it sold in its Canadian stores from United States Dealers, especially King Par in Michigan.

56.     According to Mackenzie, Costco provided King Par enough funds to buy 4400 Adams Golf clubs. Of those clubs, Costco sold 3900 in Canadian Costco stores and paid King Par by giving it the remaining 500 clubs.

57.     WDC wrote to Costco on March 31, 1998, complaining that WDC had exclusive rights to sell Adams Golf clubs in Canada, and had not sold to Costco, but Costco was selling the clubs at discount prices to the public. Costco subsequently admitted to WDC that it had bought Adams Golf clubs on the gray market.

58.     On April 13, 1998, WDC informed Chris Beebe, Adams Golf's new Director of International Sales, that the presence of Adams Golf clubs in Costco stores in Canada "has the potential to have great impact on the Canadian market for Adams . . ." WDC informed Beebe that WDC was receiving 10 to 25 calls a day from retail golf shops complaining about the Adams Golf clubs at Costco. Costco was selling Adams Golf Tight Lies at $249.99 Canadian. WDC's wholesale price was $235 Canadian, and the retail price charged by WDC's customers was $299-$349 Canadian.

59.     WDC also informed Adams Golf that, regardless of the number of clubs Costco had obtained to date, the gray marketing had affected the perception of Adams Golf in the market.

60.     By April 15, Dealers located in Canada had returned 108 clubs to WDC because of Costco competition. Soon after he was hired, Beebe traveled to Canada in late April. In a fax, he listed the topics he wanted to discuss. Four of the eight involved what he called "the Costco problem."

61.     On May 6, 1998, Beebe wrote to all authorized distributors of Adams Golf products that gray marketing had occurred in the United States as well as overseas. He warned that any

distributors found transshipping clubs or selling them "outside their designated territories will be terminated." He told all distributors to be careful not to sell too many clubs to a single customer at one time, since such large orders could facilitate gray marketing.

62.    On May 29, 1998, Barney Adams authorized Beebe to take whatever action was necessary to protect the Company's market.

63.    On June 8, 1998, Beebe again addressed what he described as the "Costco problem." Beebe proposed "a price matching policy" whereby authorized retailers affected by Costco's gray marketing could match Costco's price and receive a credit from Adams Golf for the difference between the Costco price and the suggested retail price. This reflected the material risk, undisclosed in the IPO documents, that Adams Golf would incur material expense in trying to counter gray marketing, which would have a material adverse impact on post-IPO financial results.

64.    This policy, implemented in the month before the IPO but not disclosed in the Registration Statement or the Prospectus, was a material departure from Adams Golf's marketing strategy. Such "price matching" policies, necessitated by gray marketing, represented a material risk to post-IPO financial results. This risk resulted in a $4.3 million charge, described above, at year end 1998.

65.    In August 1998, after the IPO, WDC informed Adams Golf that at least three shipments of Adams Golf clubs had been sent to Costco in the spring of 1998 (before the IPO). WDC stated that, "the negative impact in the marketplace was immediate. . . Costco was carrying larger stock levels than many of WDC's key accounts."

17

**(b)     Other Golf Club Manufacturers Suffered from Gray Marketing Prior to the IPO**

66.     Further indicating the seriousness of the gray marketing risk was the fact that by the time of the IPO, gray marketing sales had posed significant problems to certain of Adams Golf's competitors who sold unique or specialized equipment.

67.     Adams' Golf's largest competitor, Callaway, warned in its 1997 Report on Form 10K, filed with the SEC, that its "efforts to address gray market issues could have an adverse impact on the Company's sales and financial performance."

68.     Likewise, WDC informed Adams Golf before the IPO that Adams Golf's competitors Taylor Made and Ping had experienced severe problems when their clubs were sold at discount prices by Costco.  Likewise, Beebe sent a memo to Barney Adams and Mark Gonsalves, informing them that Callaway, Ping and Taylor Made had all encountered problems with Costco.

69.     News reports from May 25, 1998, show that Titleist had been forced to implement a redistribution program to stop its customers from selling to "non-authorized retail locations."

70.     Exacerbating Adams Golf's risk from gray marketing, in March 1998 the United States Supreme Court issued a decision in <u>Quality King Distributors v. L'Anza Research International</u>, 523 U.S. 135 (1998), in which Costco had filed an amicus brief.  The Supreme Court held that copyright holders lose control of a product once it enters the stream of commerce.

**B.     The Registration Statement and the Prospectus Failed to Disclose Material Risks Posed by Pre-IPO Sales Practices and Underreserving.**

71.     Before the IPO, Adams Golf engaged in various questionable practices, including double shipping, selling on consignment or with unlimited rights of return, and inadequate reserving

for returns. These questionable practices created a material risk of adversely affecting Adams Golf's post-IPO results.

72.    Double shipping was the Company's pre-IPO practice of shipping twice as many clubs as a customer ordered, as former Adams Golf sales persons have informed plaintiffs. Former Adams Golf sales persons identified Jay Greanay, a friend of Gonsalves, as an inside sales person at Adams Golf heavily involved in double shipping during the period before the IPO.

73.    Because the Company recognized sales on shipment of the goods, double shipping had the effect of including in revenue twice the sales value of these transactions.

74.    In addition, many or most of the clubs double-shipped in the months before the IPO, when the Company was recording record sales, were returned after the IPO, a period in which the Company's reported sales lagged behind Company forecasts and the market's expectations. For example, former Adams Golf sales persons have informed plaintiffs that numerous pallets of clubs were shipped to Hawaii pre-IPO and then returned several months later, adversely impacting subsequent period results.

75.    However, even if a Dealer who received double shipments did not return the excess clubs, that Dealer was so over-supplied that the Dealer would likely reduce future orders of Adams Golf clubs.

76.    Barely one month after the IPO, on August 14, 1998, Barney Adams wrote a memo to Gonsalves stating that following "an in depth evaluation of [the] Inside Sales" area at Adams Golf, Barney Adams had discovered that inside sales persons "know cheating (at least in the form of double shipments) occurs . . ."

19

77.    Adams stated further in this memo:

> Apparently we've made a lot of sales that have been falsely reported (as sales) and are little more than consignments. Check July returns and tell me what they'll be during the rest of the year.

78.    In fact, as suggested by Barney Adams, returns soared in July 1998, as clubs with a value of $1,011,000 were returned. The value of unexpected returns was $371,000. Adams thus underreserved for returns in July 1998, experiencing almost 43 percent more returns than it had reserved for.

79.    Barney Adams further stated in his August 14, 1998 memo:

> I don't think I need to write any more; the issue is squarely on the table and I'll clarify what is making me sick. Are we living the big lie? Did we present Road Show numbers for '98, '99 that we have no idea we can attain? Is the big lie catching up with us and the reason people are upset is that they know it?

80.    Adams Golf soon thereafter terminated or forced the resignation of Greanay, Gonsalves and Jim Farrell, Vice President of Finance, and reorganized the entire sales department.

C.    **The Registration Statement and the Prospectus Failed to Disclose and Misrepresented the Company's Failure to Take Customary and Reasonable Actions to Protect the Supposedly "Selective Retail Distribution".**

81.    Even though the Registration Statement and the Prospectus extolled Adams Golf's "selective retail distribution", they failed to disclose and misrepresented the Company's failure to take customary and reasonable actions to limit or prevent transshipment to other retailers, distributors or even discounters.

82.    On May 26, 1998, Barney Adams asked Gonsalves in a memo: "Is there any language in our purchase orders that precludes [a Dealer from] selling to other retailers?" The answer was no.

83.    At the time of the IPO, Adams Golf imposed no written contractual obligation on its Dealers to refrain from transshipment of Adams Golf clubs. Moreover, as of the time of the IPO, Adams Golf failed to place identifying marks, numbers or tracking information on its golf clubs, which would have permitted Adams Golf to discern which of its Dealers was transshipping clubs.

84.    As a result, undisclosed in and misrepresented by the Registration Statement and the Prospectus, the Company faced a material risk to its "selective retail distribution", because Dealers were free to transship Adams Golf clubs, uncontrolled and undetected by Adams Golf.

**D.    The Registration Statement and the Prospectus Failed to Disclose and Misrepresented Material Risks Concerning Authorized Retailers' Margins.**

85.    The Registration Statement and the Prospectus stated: "The Company believes its selective retail distribution helps its retailers maintain profitable margins and maximize sales of Adams' products." Likewise, the "Growth Strategy" section of the Prospectus stated:

> The Company believes it can increase its market share by . . . (ii) assisting existing retailers to increase their sales of the Tight Lies fairway woods by maintaining the relative high margins currently enjoyed by such retailers; and (iii) increasing the number of on-and-off course golf shops and selected sporting goods retailers that distribute the Tight Lies fairway woods.

86.    The Registration Statement and the Prospectus, however, omitted any discussion of Adams Golf's material risk that authorized retailers' margins might decline. This material risk to

21

the Company was acknowledged by defendants among themselves, pre-IPO, but concealed from investors in the Registration Statement and the Prospectus.

87.     According to a Bank of America internal document summarizing the IPO, which was prepared soon before the IPO, the second of three Risk Factors was as follows:

88.     In addition, a similar, pre-IPO internal document prepared by Lehman included the following sentence in the first of the Risk Factors (or "Cons") listed:

## E.     Violations of SEC Regulations and Generally Accepted Accounting Principles ("GAAP").

89.     By failing to disclose and misrepresenting the material risks and facts described above, the Registration Statement and the Prospectus were materially false and misleading, because they and the financial statements contained therein failed to conform to SEC regulations and GAAP, as follows:

(a)     Item 303 of SEC Regulation S-K (Sec. 229.303(a)(3)(ii)) requires a description of any known trends or uncertainties that have had or that the registrant (i.e., the Company) reasonably expects will have a materially favorable or unfavorable impact on net sales or revenues or income from continuing operations. The Registration Statement and the Prospectus violated Regulation S-K, in that they failed to disclose that certain matters - - gray market

distribution; practices such as double shipping, shipments with rights of return amounting to consignments, and underreserving; failure to take customary steps to limit or prevent transshipments; and material risks concerning authorized retailers' margins - - all constituted "known trends or uncertainties" that the Company reasonably expected would have a materially adverse impact on sales and income from continuing operations.

      (b)     Financial Accounting Standards Board Statement No. 5, Accounting for Contingencies ("FAS 5"), requires that an estimated loss from a loss contingency must be recorded if the following conditions are met: (1) "Information available prior to the issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss" and (2) "The amount of the loss can be reasonably estimated."

      (c)     FAS 5 further states:

> If no accrual is made for loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

      (d)     Footnote 6 to this paragraph states the following example:

> For example, disclosure shall be made of any loss contingency that meets the condition in paragraph 8(a) but that is not accrued because the amount of loss cannot be reasonably estimated (paragraph 8(b)). Disclosure is also required of some loss contingencies that do not meet the condition in paragraph 8(a) - namely, those contingencies for

23

which there is a *reasonable possibility that* a loss may have been incurred even though information may not indicate that it is *probable* that an asset had been impaired or a liability had been incurred at the date of the financial statements.

90.    The financial statements contained in the Registration Statement and the Prospectus (including the financial statements for the 12-month period ended December 1997 and the three-month period ended March 1998) violated FAS 5 in that it was probable that the Company would incur loss by providing discounts and credits to authorized retailers in light of their declining margins as a result of the gray marketing and transshipment issues, and in that it was probable that the Company would incur loss by double shipping, entering into what amounted to consignment arrangements, and underreserving for returns. (Indeed, the Company took at least a $4.3 million charge in connection with credits given retailers, lowering the suggested retail prices for the inventory the retailers had on hand.) As noted above, FAS 5 requires, *at a minimum*, disclosure of the contingency thought to be probable and material, but not estimable. If it is also estimable, FAS 5 requires the recording of an accrual and related expense.

91.    Financial Accounting Standards Board Statement No. 48 ("FAS 48"), requires that revenue from sales where there is a right of return should not be recognized unless the amount of future returns can be reasonably estimated. Revenue should not be recognized if sales are contingent upon resale of the merchandise. Under FAS 48, since the amount of returns where there was double-shipping and an unconditional right of return could not be estimated, the sales subject to the contingencies should not have been recognized in the financial statements contained in the Registration Statement and the Prospectus.

24

**The Class of Purchasers Suffered Loss.**

92.    As the market gradually learned the truth, the price of Adams Golf stock collapsed from a high of $18.875 to $3.375 -- a drop of 80%.

93.    On October 22, 1998, the Company announced its results for the September 1998 quarter and cited gray marketing as a reason for lowered expectations in the December 1998 quarter. The Company said results "will be _further_ impacted by the recent gray market distribution of our products to a membership warehouse club." (Emphasis added.) The stock price dropped 27%, from a high of $4.625 on October 22, 1998 to a low of $3.375 on October 23, 1998. At the time this suit was brought, the market value of the security was less than $3.00 per share. Plaintiffs suffered damages as a result.

## COUNT I

### (Against all Defendants for Violations of Section 11 of the Act)

94.    Plaintiffs repeat and reallege each and every allegation contained above.

95.    This Count is brought by plaintiffs pursuant to Section 11 of the Act against all defendants, on behalf of all persons who purchased or otherwise acquired Adams Golf's common stock in the IPO or traceable to the IPO between July 10, 1998 and October 22, 1998.

96.    The Registration Statement prepared by the defendants and distributed in connection with the IPO was inaccurate and misleading, contained misleading statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and failed adequately to disclose material facts as described above.

25

97.     The Company is the registrant of the securities issued. The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

98.     As issuer of the securities, Adams Golf is strictly liable to plaintiffs and the Class for the misstatements and omissions in the Registration Statement. The Individual Defendants are all liable as signatories of the Registration Statement. The Underwriter Defendants are liable as underwriters of the stock issued pursuant to the Registration Statement.

99.     None of the Individual Defendants or Underwriter Defendants named herein made a reasonable investigation or had reasonable grounds for the belief that the statements in the Registration Statement and the Prospectus were true and without omissions of any material facts. Each of the defendants (except for the Company, which is strictly liable) acted negligently.

100.    Plaintiffs and the Class have sustained damages. The value of Adams Golf shares declined substantially after the IPO, trading well below the IPO price.

101.    At the time they purchased Adams Golf securities, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein. Less than one year elapsed from the time that plaintiffs discovered, or reasonably could have discovered, the facts upon which this complaint is based until the time that plaintiffs commenced this action. Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public until the time plaintiffs commenced this action.

102.    This Count is not grounded in fraud.

26

## COUNT II

### (Against Lehman For Violations of Section 12(a)(2) of the Act)

103.    Plaintiffs repeat and reallege each and every allegation contained above.

104.    This Count is brought by Subclass Representative Craus, who bought shares of Adams Golf common stock from Lehman in the IPO at $16 per share, pursuant to Section 12(a)(2) of the Act against Lehman on behalf of the Subclass.

105.    Lehman was a seller, offeror and/or solicitor of the shares of Adams Golf common stock offered by the Prospectus or by other communications.

106.    The Prospectus and such other communications contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts.

107.    Lehman's actions as seller, offeror and/or solicitor included participating in the preparation of the false and misleading Prospectus and urging Craus and Subclass members to buy the shares and selling the shares to members of the Subclass.

108.    Lehman owed to the purchasers of Adams Golf securities, including Craus and the Subclass, the duty to make a reasonable and diligent investigation of the statements contained in the IPO materials, including the Prospectus contained therein, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Lehman knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

27

109.    Lehman was a seller of Adams Golf common stock within the meaning of §12 in that it held title to the stock and offered and/or sold the stock for financial gain. Lehman was well-positioned to control, and did control, the flow of information to potential purchasers of Adams Golf common stock and/or supplied or authorized the dissemination of the information contained in the IPO materials, including the Prospectus, that was provided to purchasers of the common stock.

110.    Craus and other members of the Subclass bought Adams Golf common stock pursuant to the defective IPO materials, including the Prospectus. Craus and Subclass members did not know of the untruths and omissions contained in the IPO materials, including the Prospectus.

111.    By reason of the conduct alleged herein, Lehman violated §12(a)(2) of the Act. Accordingly, those members of the Subclass who hold Adams Golf common shares acquired in the IPO have the right to rescind and recover the consideration paid for their Adams Golf shares, with interest thereon, less the amount of any income received thereon, upon tender, and hereby elect to rescind and tender their Adams Golf shares to Lehman. Craus and those Subclass members who have sold their Adams Golf shares are entitled to damages plus interest.

112.    At the time this action was filed, less than three years had elapsed from the time that the securities upon which this Count is brought were sold to the public. Less than one year had elapsed from the time when Subclass members discovered or reasonably could have discovered the facts upon which this Count is based.

113.    This Count is not grounded in fraud.

## COUNT III

### (Against the Individual Defendants for Violations of Section 15 of the Act)

114.    Plaintiffs repeat and reallege each and every allegation contained above.

115.    This Count is brought pursuant to Section 15 of the Act against the Individual Defendants on behalf of the Class of persons who purchased or otherwise acquired Adams Golf's common stock in the IPO or traceable to the IPO between June 10, 1998 and October 22, 1998.

116.    Each of the Individual Defendants was a control person of Adams Golf by virtue of his position(s) as a director and/or as senior officer of Adams Golf. In addition, the Individual Defendants each had direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Adams Golf.

117.    Each of the Individual Defendants was a culpable participant in the violations of Section 11 of the Act alleged in Count I above, based on their having signed the Registration Statement.

118.    This Count is not grounded in fraud.

**WHEREFORE,** plaintiffs pray for relief and judgment, as follows:

A.    Continuing to determine that this action is a proper class action, and continuing to certify plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Lead Counsel;

B.    Awarding Class members the difference between the amount they paid for the security (not exceeding $16.00) and (1) the value of the shares on June 14, 1999, the day plaintiffs brought suit or (2) the price at which Class members sold their shares before June 14, 1999,

or (3) the amount at which they sold before judgment if such amount is less than the amount calculated through provision (1), plus interest.

C.      Awarding Craus and Subclass members the consideration paid for their Adams Golf shares, with interest thereon, less the amount of any income received thereon, upon tender to Lehman (and election to make such rescission and tender is hereby made) or, in the alternative, awarding in favor of Subclass members against Lehman damages sustained as a result of Lehman's wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding plaintiffs and the Class and Subclass their reasonable fees and expenses incurred in this action, including counsel and expert fees and expenses; and

E.      Granting such further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand trial by jury.

DATED:

ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.

_____/s/ Carmella P. Keener_____
Carmella P, Keener (DSBA No. 2810)
Suite 1401, Citizens Bank Center
P.O. Box 1070
Wilmington, DE 19801
(302) 656-4433

**Plaintiffs' Liaison Counsel**

BERGER & MONTAGUE, P.C.
Todd S. Collins
Elizabeth W. Fox
Neil Mara
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000

**Plaintiffs' Lead Counsel**

LAW OFFICES OF DONALD B. LEWIS
Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, Pennsylvania 19004
(610) 668-0331

KELLER ROHRBACK L.L.P.
Lynn Lincoln Sarko
Juli F. Desper
Elizabeth Leland
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900

31

ABRAHAMS, LOWENSTEIN, BUSHMAN
& KAUFMAN, P.C.
Jeffrey P. Bates
One Liberty Place, Suite 3100
1650 Market Street
Philadelphia, Pennsylvania  19103-7392
(215) 561-1030

KLAFTER & OLSEN, LLP
Kurt Olsen
Suite 800
2121 K Street N.W.
Washington, D.C.  20037
(202) 261-3553


Attorneys for Plaintiffs


SECOND CONSOLIDATED AC.wpd

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 1st day of September, 2005, I caused the foregoing document to be hand delivered to the following:

Jeffrey L. Moyer, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Robert K. Payson, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

and a copy has been served by electronic mail upon the following:

Theodore J. McEvoy, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com

Michael J. Chepiga, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: mchepiga@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2004 DEC 14  PM 1:45

IN RE: ADAMS GOLF, INC.,
SECURITIES LITIGATION

§
§
§
§
§

CIVIL ACTION NO. 99-371-KAJ
(CONSOLIDATED)

## PROTECTIVE ORDER

To facilitate discovery in this matter, and upon motion of all the parties for a Protective Order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure and Local Rule 26.2, IT IS HEREBY ORDERED that:

1.      "Confidential Information," as used herein, means information of any type, kind or character that is designated "Confidential" in the manner set forth in paragraphs 3 and 4 of this Order by any of the parties to the action or other person(s) producing the information (including nonparties), whether it be a document, information contained in a document, information revealed during a deposition, information revealed in an interrogatory answer, or otherwise.  In designating information as "Confidential," the designating person will make such designation only as to that information that it in good faith believes contains nonpublic, confidential, proprietary, commercially sensitive, or trade secret information.  Information or material which is available to the public, including catalogues, advertising materials, and the like shall not be classified as Confidential.

2.      Unless otherwise agreed to in writing by the person or entity that produces or discloses Confidential Information, or until the Court orders otherwise, any party, person, or entity receiving Confidential Information shall use it solely for the purpose of litigating this case and shall not disclose it to any person except in accordance with this Order. All persons to whom

RLF1-2819089-1

Confidential Information is disclosed shall be informed of and shown a copy of this Protective Order.

3.    Documents produced in this action may be designated as "Confidential" by marking each page of the document(s) so designated with a stamp stating "Confidential." The "Confidential" designation shall be stamped in a size and location which makes the designation readily apparent and in a manner which does not conceal or affect the legibility or content of the document.    The "Confidential" designation shall be affixed to any document produced or generated in the course of this litigation that mentions, discusses, or comments upon any Confidential Information.  In lieu of marking the original of a document, if the original is not produced, the designating person may mark the copies that are produced or exchanged. Originals shall be preserved for inspection.

Any Confidential Information produced on magnetic disks or other computer-related media may be designated as such by labeling each disk "Confidential" before production.  In the event that anyone other than the producer generates a hard-copy document or printout from any disk so designated, each page of the hard-copy document or printout must be immediately stamped as "Confidential" and treated as such pursuant to the terms of this Protective Order.  If not all the documents on a disk contain Confidential Information, then it is the designating party's responsibility to inform the other party which documents are designated "Confidential."

Any Confidential Information that is not reduced to documentary, tangible, or physical form, and that is otherwise not readily designated as "Confidential" pursuant to the preceding two paragraphs, may be designated "Confidential" by informing counsel for the parties in writing that it is Confidential.

4.     Information disclosed at: (i) the deposition of a party or one of its present or former officers, directors, employees, agents, or independent experts retained by counsel for the purpose of this litigation; or (ii) the deposition of a nonparty (which information pertains to a party) may be designated by any party as "Confidential" information by indicating on the record at the deposition, through counsel, that the relevant portions of the testimony are Confidential and are subject to the provisions of this Order.

Any party may also designate information disclosed at such deposition as "Confidential" by notifying the reporter, all counsel of record, and any other affected person in writing within twenty-one (21) days of receipt of the transcript of the relevant portions of the transcript that should be treated as Confidential thereafter.  All deposition transcripts shall be treated as Confidential for a period of twenty-one (21) days after the receipt of the transcript.

If a "Confidential" designation is made, the court reporter shall be directed to affix the appropriate legend on the cover page and on all pages of the transcript, and to each copy thereof. The parties may modify this procedure for any particular deposition through agreement on the record at such deposition, without further order of the Court.  If filed with the Court, a deposition containing Confidential Information, either in testimony or exhibits, shall be filed with the Clerk of the Court under seal in the manner provided in paragraph 13.

5.     (a)  Information designated as "Confidential" shall not be disclosed or made available by the receiving party or parties to persons other than Qualified Persons, as defined in paragraph 6.  Confidential Information may be used or disclosed only as specified in this Protective Order.

(b) Any documents produced in this litigation, regardless of classification, which are provided to Qualified Persons as defined in paragraph 6, shall be maintained only at the

office of such Qualified Person and only working copies shall be made of any such documents. Copies of documents produced under this Protective Order may be made, or exhibits prepared by independent copy services, printers or illustrators for the purpose of this litigation.

6.    "Qualified Persons," as used herein, means:

(a) Counsel representing the named parties in the litigation, including in-house counsel and co-counsel, paralegals, clerks, secretaries, and other persons employed or retained by the named parties' counsel to assist counsel in the preparation of this litigation (collectively referred to as a party's "legal team");

(b)    Counsel representing any insurer or indemnitor of any defendant, including any insurer's or indemnitor's legal team;

(c)    The named parties to this action;

(d)    Actual or potential independent experts or consultants;

(e)    Any person who authored, or has previously received or otherwise been provided access to the material in the ordinary course of his or her business;

(f)    Any actual or potential deponent or witness, including former employees, officers, or agents of a party (and clerical employees associated with the deponent or witness), provided that there is a reasonable basis to believe that such person is already familiar with the Confidential Information and will possess relevant information or knowledge regarding such material or will give relevant testimony regarding the material;

(g)    Any court reporter or other person involved in recording deposition testimony in this litigation by any means and acting in that capacity;

(h)   The Court (and any appellate court) and any persons employed by the Court whose duties require access to the Confidential Information, including court personnel, jurors and alternate jurors; and

(i)   The person(s) (including third parties) who produced the particular Confidential Information in question, and any officer, employee, or agent of such producer.

7.   Any party desiring to reveal Confidential Information to any of the persons referred to in paragraphs 6(d) and (f), provided that such person is no longer an employee of the designating party, shall first secure from each such person a signed certificate in the form attached hereto as Exhibit A before disclosing any information subject to the restrictions of this Protective Order.  If a witness refuses to sign Exhibit A, the party that wants to show the Confidential Information may seek an order from the court that has jurisdiction over the witness to compel the witness to sign.  No Confidential Information shall be disclosed to the objecting witness until Exhibit A is signed.  Counsel for the party who provided the Confidential Information to the persons listed in paragraphs 6(d) and (f), shall retain all original signed certificates obtained from any person pursuant to this paragraph.  Executed Exhibits A shall not be discoverable except as required to enforce this Order or as otherwise allowed under the Federal Rules of Civil Procedure and federal case law interpreting those rules.  However, upon request by any party, counsel representing the named parties in the litigation shall exchange copies of all signed certificates obtained from any person pursuant to this paragraph, except those signed by undisclosed consulting experts, within thirty (30) days after the termination of the litigation.

8.   Documents previously produced may be retroactively designated as Confidential by notice in writing of each document by Bates number within thirty (30) days of the entry of

this order. Documents unintentionally produced without designation as "Confidential" may be retroactively designated in the same manner and shall be treated appropriately from the date that written notice of the designation is provided to the receiving party.

The producer shall be obligated to provide replacement copies of any redesignated documents or materials labeled "Confidential" to the receiving party within ten (10) days of the date of the written notice of the redesignation, unless otherwise agreed. Upon receipt of a copy of the redesignated documents or materials, the receiving person(s) shall use their best efforts to destroy, cause to be destroyed, or return all copies of the documents or materials in their possession or reasonably retrievable that do not bear the new designation, unless otherwise agreed.

In the event that two copies of a document or information are produced and one copy is designated "Confidential" and the other is not, the "Confidential" designation shall apply, but it will not be a violation of this Order should the receiving party inadvertently use the undesignated copy of the document, as long as the document is labeled and treated as Confidential when the producing party notifies the receiving party of the mistake. Should the receiving party notice any such discrepancy, it shall promptly bring it to the producing party's attention.

9.    Nothing herein shall prevent disclosure beyond the terms of this Order if the party designating the information as "Confidential" has authority to and does consent to such disclosure or, if the Court, after notice to all affected parties, orders such disclosure. Nor shall anything herein prevent any counsel of record from utilizing Confidential Information in the examination or cross-examination of any person who is indicated on the document as being an author, source, or recipient of the Confidential Information, irrespective of which party produced such information.

RLF1-2819089-1

6

Neither the provisions of this Protective Order nor the lodging or filing of any material under seal shall prevent use in the litigation of any Confidential Information, either in open court, at any hearing, or at trial, provided that the party desiring to use the material gives the relevant producer reasonable advance notice that the disclosing party is substantially likely to use the Confidential Information in open court. There is no obligation to disclose the exact Confidential documents likely to be used. Inclusion of any Confidential documents or other information in any filing with the Court is a prima facie indication that it is substantially likely that Confidential Information will be used in open court. As to these documents, no other notice is required. Upon motion or request by any party or designating party and for good cause shown, the Court may exclude from a hearing or the trial, or any portion thereof, any person who is not authorized by the terms of this Protective Order to see or receive Confidential Information, on the grounds that Confidential Information may be disclosed. In addition, the Court may order that the transcript of any hearing or portion of the trial that reflects the disclosure of Confidential Information be sealed as provided in paragraph 13.

10.     A party shall not be obligated to challenge the propriety of a designation as "Confidential" at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. Failure to object to a designation of confidentiality shall not constitute or be construed as an admission nor raise an inference that the documents designated as "Confidential" constitute or contain confidential, proprietary information or any trade secret. A failure to challenge the propriety of any designation by any party or nonparty does not constitute a waiver or in any way preclude a subsequent challenge in this or any other action to the propriety of such designation.

11.     To properly object to the propriety of a "Confidential" designation under this Protective Order by a producing person of any document (or part thereof), the objecting party

must submit to the producing person a signed writing that specifically identifies the document by Bates number, specifically identifies the language or information (whether in whole or in part) that the objecting party contends is not Confidential, and provides the reason(s) why the objecting party reasonably believes that such language or information is not Confidential under the terms of this Protective Order. The objecting party shall also simultaneously provide a copy of this signed writing to each party in this litigation. When challenging the designation of any document (or part thereof), the objecting party must object in good faith and in accordance with the terms of this Protective Order.

In the event that a party objects to the "Confidential" designation in accordance with the terms of this Protective Order, the objecting party shall consult with the producing person and any other interested person or party to attempt to resolve their differences. If the parties are unable to reach an accord regarding the proper designation of the material, the objecting party may move the Court for a ruling on whether the information or material should be designated "Confidential." The producing person has the burden of establishing that the "Confidential" designation is proper. Unless and until the Court rules that the material is not properly designated as "Confidential" under the terms of this Order, the information shall continue to be treated as Confidential.

The parties may, by stipulation, provide for exceptions to this Protective Order and any party may seek an order of this Court modifying this Protective Order. Unless and until otherwise ordered by the Court, or agreed to in writing by the parties, all Confidential Information shall be treated as Confidential and shall not be disclosed except under the terms of this Protective Order.

12.   Nothing shall be regarded as Confidential Information if it is information that either:

(a)   is in the public domain at the time of disclosure, as evidenced by a written document;

(b)   becomes part of the public domain, as evidenced by a written document, through no fault of the receiving party;

(c)   the receiving party can show by written document that the information was in its rightful and lawful possession at the time of disclosure; or

(d)   the receiving party lawfully receives such information at a later date from a third party without restriction as to disclosure, provided such third party has the right to make the disclosure to the receiving party.

13.   In the event that a party wishes to use any Confidential Information in any affidavits, briefs, memoranda of law, or other papers filed in Court in this litigation, such Confidential Information used therein shall be filed under seal with the Court. For applications, motions, or other papers submitted to the Court including, *inter alia*, transcripts of depositions, exhibits, physical evidence, answers to interrogatories or requests for admissions, briefs, and memoranda in which a party submits or refers to Confidential Information, all documents containing Confidential Information that are submitted to the Court shall be lodged or filed with the Court in a sealed envelope or other appropriate sealed container, on which shall be attached: (i) the caption and title page of the document enclosed within the sealed envelope or other container; and (ii) the designation "Confidential – Filed Under Seal."

14.   For the convenience of the parties and the Court, a party that files a paper containing both Confidential Information and nonconfidential information may file the entire

paper under seal, although the document must clearly indicate which portions are designated "Confidential." If any person fails to file protected information under seal, the producing party or any party claiming confidentiality for the documents or information may request that the Court place the filed documents or information under seal. Nothing in this Paragraph or this Protective Order shall be deemed to restrict or waive the right of any party to apply to the Court on any appropriate ground to remove the seal from any documents lodged or filed under seal.

If Confidential Information must be provided to answer an interrogatory or request for admission, counsel for the responding party should, at the time the response is served, designate that portion of the response that shall be deemed Confidential Information for purposes of this Protective Order. All answers to interrogatories or requests for admission designated as "Confidential" shall be covered by the terms of this Protective Order, shall be designated as "Confidential" as set forth herein, and shall only be disclosed as provided by this Protective Order.

15.    Nothing herein shall restrict or preclude any party from responding to a subpoena issued by a court of law or on behalf of a governmental agency. However, upon receipt of a subpoena or other request for Confidential Information, the party shall forward a copy of the subpoena or request to the producing party within three (3) business days of service and afford the producing party a reasonable time after the receipt of such notice to contest the production of Confidential Information sought by the subpoena or other request. If the producing party fails to seek or obtain an appropriate order, the party responding to the subpoena or other request will not be deemed in breach of this Protective Order by producing Confidential Information sought by the subpoena or other request.

16.    The Clerk of this Court is directed to maintain under seal all documents and transcripts of deposition testimony and answers to interrogatories, admissions and other pleadings filed under seal with the Court in this litigation which have been designated, in whole or in part, as "Confidential" information by a party to this action.

17.    By entering this Protective Order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that the same information may be relevant and subject to disclosure in another case. Any person or party subject to this Protective Order who becomes subject to a motion to disclose another party's information designated "Confidential" pursuant to this Order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

18.    Within one hundred twenty (120) days after conclusion of this litigation and any appeal thereof, any Confidential document and all derivative materials, including all copies of those documents produced by any party (including third parties), in the possession of any of the persons qualified under paragraphs 6(a) through (d) shall, without demand, either (a) be destroyed, or (b) be returned to the producing person, except as this Court may otherwise order or to the extent such information was used as evidence at the trial.  Notwithstanding the foregoing, each party's outside counsel may retain copies of pleadings, briefs, motions and the like actually filed in the court that include Confidential Information. As far as the provisions of any protective orders entered in this action restrict the communication and use of the documents produced thereunder, such orders shall continue to be binding after the conclusion of this litigation, except that: (i) there shall be no restriction on documents that are used as exhibits in Court unless such exhibits were filed under seal; and (ii) a party may seek the written permission

of the producing person or order of the Court with respect to dissolution or modification of such protective orders.

19.    Upon the final conclusion of this litigation:

(a)    any Confidential Information produced hereunder that has been submitted for identification or into evidence at any hearing or trial in this litigation may be withdrawn by counsel for the person who offered such Confidential Information into evidence;

(b)    the Clerk is authorized to deliver said Confidential Information to said counsel;

(c)    any such Confidential Information not returned to counsel shall be destroyed.

20.    This Order shall not bar or otherwise restrict any attorney for the parties from rendering advice to his client with respect to this litigation. For this purpose, the attorney may convey to any client his evaluation in a general way of Confidential Information; provided, however, that in rendering such advice and otherwise communicating with his client, the attorney shall not disclose the specific contents of any Confidential Information produced by another party herein, which disclosure would be contrary to the terms of this Protective Order.

21.    This Protective Order shall survive the final conclusion of this litigation and continue in full force and effect and the Court shall retain jurisdiction to enforce this Protective Order.

SIGNED AND ENTERED this 14th day of Dec, 2004.

_____
UNITED STATES DISTRICT JUDGE

**Exhibit A**

I hereby acknowledge that I will be receiving Confidential Information pursuant to the terms of a Protective Order entered in the action entitled *In re Adams Golf, Inc. Securities Litigation*. I have been given a copy of, and have read and understand the Protective Order and I agree to be bound by the terms and conditions of that Order. I understand that: (i) I am to make no copies of any such Confidential Information except as is necessary for use in the above-referenced action; and (ii) such Confidential Information and any copies thereof are Confidential Information to remain in my personal custody until I have completed my assigned duties, whereupon they are to be returned to counsel who provided me with such Confidential Information. I agree not to disseminate any information derived from such Confidential Information to anyone, or make disclosure of any such information, except for the purposes of the above-referenced proceedings or as permitted by the Protective Order or by further Order of the Court.

Signature _____        Date _____

Print Name _____