## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.,
SECURITIES LITIGATION

§
§
§
§
§

CIVIL ACTION NO. 99-371-KAJ
(CONSOLIDATED)

## THE ADAMS GOLF DEFENDANTS' OPENING BRIEF IN
## SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS'
## SECOND CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger
One Rodney Square
Wilmington, Delaware 19899
(302) 651-7700

OF COUNSEL:

Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 W. 6th Street, Suite 2100
Austin, Texas 78701
(512) 499-6200

Attorneys for Defendants Adams Golf, Inc.,
B.H. Adams, Richard H. Murtland, Darl P.
Hatfield, Paul F. Brown, Jr., Roland E. Casati,
Finis F. Conner, and Stephen R. Patchin

Dated: February 8, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.....................1

II.   SUMMARY OF ARGUMENT...........................................................................2

III.  STATEMENT OF FACTS ................................................................................2

IV.   ARGUMENT...............................................................................................4

      A.    Plaintiffs' SAC Sounds in Fraud and Therefore Must Meet the Rigors of
            Rule 9(b) ........................................................................................4

      B.    Plaintiffs Fail to State a Claim Under Section 11 ....................................7

            1.    Plaintiffs' Gray Market Claim Fails as a Matter of Law.............................8

                  a)    This Court can and should test the legal validity of the gray
                        market claim in light of the new allegations....................................8

                  b)    The gray market as pled in the SAC was an industry-wide
                        phenomenon that did not require disclosure in the
                        Registration Statement ...................................................................9

            2.    Adams Golf Did Not Misstate or Omit the Risk that Its Results
                  Could Be Adversely Affected by a Decline in Retailers' Margins.............10

            3.    Plaintiffs' New Claim, that the Company Failed to Take
                  Reasonable Steps to Protect Its "Selective Retail Distribution
                  Policy," Is Not Actionable and Is Demonstrably False.............................11

            4.    Plaintiffs' New Accounting Allegations Fail to State a Claim...................13

                  a)    Plaintiffs have not alleged how the questionable sales
                        practices rendered the financial statements in the
                        Prospectus false or misleading.........................................................14

                        (1)    Post-IPO effects are not actionable under section 11.........14

                        (2)    Plaintiffs have not linked any of the alleged
                               questionable sales practices to the financial
                               statements...................................................................14

                               (a)    Double Shipping.........................................................15

                               (b)    Rights of Return .......................................................15

(c)    Inadequate Reserves ................................................16

(3)    Adams Golf had no duty to disclose these alleged
questionable sales practices ............................................18

b)    There are no facts suggesting that alleged overshipments or
excess returns were material to the IPO financial statements........19

C.    The Claim Against the Individual Defendants for Control-Person Liability
Must Be Dismissed ...........................................................................................20

V.    CONCLUSION.............................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899 (8th Cir. 2005) .......................................17, 18

*In re Adams Golf Sec. Litig.*, 176 F. Supp.2d 216 (D. Del. 2001) ...............................................1, 9

*In re Adams Golf Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004)..................................................... *passim*

*In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004)........................................................21

*Bender v. Suburban Hosp., Inc.*, 159 F.3d 186 (4th Cir. 1998)........................................................8

*Cal. Pub. Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) ..........5, 6, 14

*Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*, 68 F. Supp.2d 480 (D.N.J. 1999)..................7

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp.2d 316 (D.N.J. 2000)................14

*In re Convergent Tech. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991) ....................................................9

*In re Craftmatic Sec. Litig.*, 890 F.2d 628 (3d Cir. 1990) .......................................................12, 13

*In re Digital Island Sec. Litig.*, 223 F. Supp.2d 546 (D. Del. 2002).......................................21, 22

*In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993) .............................................7

*In re F&M Distrib., Inc. Sec. Litig.*, 937 F. Supp. 647 (E.D. Mich. 1996)......................................9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp.2d 249 (S.D.N.Y. 2004)..................17

*Hemenway v. Peabody Coal Co.*, 159 F.3d 255 (7th Cir. 1998) .....................................................8

*In re Ikon Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002).......................................................17

*Johnson v. Nyfix*, 399 F. Supp.2d 105 (D. Conn. 2005) ..................................................................6

*Klein v. Gen. Nutrition Co.*, 186 F.3d 338 (3d Cir. 1999) ..........................................................9, 13

*Laker v. Freid*, 854 F. Supp. 923 (D. Mass. 1994) .........................................................................7

*In re Livent, Inc. Sec. Litig.*, 78 F. Supp.2d 194 (S.D.N.Y. 1999)................................................22

*In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005)....................................................8

*Messinger v. Anderson*, 225 U.S. 436 (1912).................................................................................5

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ........................................................................11, 18

*Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002) ..........................................18

*Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997)...........................................................20

*Quern v. Jordan*, 440 U.S. 332 (1979) .............................................................................................5

*In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493 (W.D. Pa. 2002) ..................................................21

*In re Rockefeller Center Properties, Inc. Sec. Litig.*, 311 F.3d 198 (3d Cir. 2002)......................21

*Romine v. Acxiom Corp.*, 296 F.3d 701 (8th Cir. 2002) ..................................................................19

*Scibelli v. Roth*, 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000) .........................................................17

*In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161 (D. Mass. 2000) ................................16

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) ........................................................5, 7, 21

*Siegel v. Lyons*, 1996 WL 438793 (N.D. Cal. Apr. 26, 1996).........................................................17

*Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522 (1979).................................17

*Tracinda Corp. v. DaimlerChrysler*, 197 F. Supp. 2d 42 (D. Del. 2002)......................................21

*Tracinda Corp. v. DaimlerChrysler*, 364 F. Supp. 2d 362 (D. Del. 2005)..............................12, 13

*United States v. Colgate*, 250 U.S. 300 (1919)..............................................................................11

*United States v. Gen. Motors*, 384 U.S. 127 (1966) .......................................................................11

*In re Wall Data Sec. Litig.*, 1996 WL 585596 (W.D. Wash. June 25, 1996) .................................15

*Walsh v. McGee*, 918 F. Supp. 107 (S.D.N.Y. 1996) ........................................................................5

*In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996).............................................................2

*Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605 (7th Cir. 1995) ........................................9

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) .................................................16

*Zucker v. Quasha*, 891 F. Supp. 1010 (D.N.J. 1995) , *aff'd* 82 F.3d 408 (3d Cir. 1996)..............7, 8

RLF1-2979014-1

## STATUTES & OTHER AUTHORITIES

15 U.S.C. § 77k(a) ................................................................................................................7, 14

15 U.S.C. § 77*l*(a)(2)...............................................................................................................14

17 C.F.R. § 229.303(a)(3)(ii) ..............................................................................................10, 18

Management's Discussion & Analysis of Fin. Condition & Results of Operations,
　　Exchange Act Rel. No. 34-26831, 54 Fed. Reg. 22427 (May 24, 1989)..................................19

Restatement (First) of Torts § 757, Comment b (2005) ................................................................12

RLF1-2979014-1

## I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On June 11, 1999, plaintiffs filed their initial complaint against Adams Golf and others

alleging claims under sections 11 and 12(a)(2) of the Securities Act. (D.I. 1.)  Six additional

complaints followed, and on May 17, 2000, plaintiffs filed their consolidated amended complaint

("CAC"). (D.I. 28.)  In July 2000, defendants moved to dismiss the CAC. (D.I. 49.)  On

December 10, 2001, the Court granted the motions and dismissed the case. (D.I. 70); *In re*

*Adams Golf Sec. Litig.*, 176 F. Supp. 2d 216; (D. Del. 2001).  Plaintiffs appealed and in 2004 the

Third Circuit affirmed in part, holding that the alleged omission about an industry-wide

oversupply of golf equipment was inactionable, but remanding the claim concerning the alleged

omission of the gray-market risk.  (D.I. 99, 104); *In re Adams Golf Sec. Litig.*, 381 F.3d 267 (3d

Cir. 2004).  On August 3, 2005, this Court certified a class of section 11 claimants, but shortened

the proposed class period to end on October 22, 1998, and declined to certify a section 12(a)(2)

class against the Adams Golf defendants.[1]

On September 1, 2005, plaintiffs sought leave to file a Second Amended Complaint

("SAC") alleging that the Prospectus issued on July 9, 1998 contained the following additional

misrepresentations or omissions: (1) failure to disclose the risk that the gray market could cause

retailers' profit margins to erode; (2) failure to disclose that the Company made no reasonable

attempts to enforce its selective retail distribution policy; and (3) misstating the Company's

---

[1] D.I. 178.  The district court shortened the class period because liability under the Securities Act cannot extend past the date of a curative disclosure (*i.e.,* Adams Golf's October 22, 1998 press release announcing fourth quarter results and the potential impact of gray marketing).    The district court refused to certify a 12(a)(2) class against the Adams Golf Defendants because they were not "sellers"—Adams Golf sold its stock to the Underwriter Defendants in a firm commitment underwriting; it did not sell or actively participate in the sale of stock to plaintiffs. Furthermore, the Court declined to certify 12(a)(2) classes against two of the three Underwriter Defendants because plaintiffs could not identify appropriate class representatives.

financial statements due to "double shipping" of clubs, consignment sales and underreserving for returns. (SAC ¶ 22.) On January 24, 2006, the Court granted leave to file the SAC. (D.I. 215) The Adams Golf Defendants now file this Motion to Dismiss.

## II.    SUMMARY OF ARGUMENT

Plaintiffs have now filed a third complaint in this case that reveals, after more than six years of litigation, that they cannot state a claim. The SAC purports to supplement plaintiffs' "gray market claim" (*i.e.*, that Adams Golf did not disclose in its offering documents that unauthorized retailers improperly obtained and sold some unknown number of golf clubs before Adams Golf's IPO), but what it actually does is clarify that the gray market was an industry-wide phenomenon that did *not* require disclosure under the federal securities laws. To compound their problem, plaintiffs litter the SAC with fraud allegations—such as defendants concealed and misrepresented known facts—thus subjecting the SAC to Rule 9(b) scrutiny.

Plaintiffs also introduce, for the first time, some new accounting allegations in an apparent attempt to save the SAC from dismissal. But the allegations are hopelessly non-specific and utterly fail to demonstrate a false or misleading statement of material fact in the Registration Statement and Prospectus. In short, the SAC exposes plaintiffs' case as one of management second-guessing rather than a violation of the securities laws.

## III.    STATEMENT OF FACTS[2]

In 1995, Adams Golf, Inc. ("Adams Golf" or the "Company") revolutionized the golf industry by introducing a new fairway wood called Tight Lies, which featured a redesigned,

---

[2] These facts are derived from plaintiffs' complaints, documents referenced therein, and from publicly available matters of which the Court may take judicial notice. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 707 (3d Cir. 1996). For a more detailed factual background, see Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint, D.I. 49, and Defendants' Opposition to Class Certification, D.I. 144.

2

inverted head that created a larger sweet spot and thereby instantly improved handicaps, even for mediocre and amateur golfers. (A027.) Before this breakthrough, Adams Golf had been a small and barely profitable company. After the advent of Tight Lies, Adams Golf experienced a nearly ten-fold increase in sales revenue in a single year, 94% of which was attributable to Tight Lies sales. (A006.)

Adams Golf sold its clubs only through a selective retail distribution network made up of on- and off-course pro shops, sporting-goods stores, and through television infomercials. (A029-30.) Adams Golf did not sell to discounters or warehouse stores like Costco. (A025.) In early 1998, the Company began to receive isolated reports that Tight Lies were appearing in several Costco stores. (SAC ¶ 44.) Adams Golf did not hide this information from investors; indeed, it issued a press release in June 1998 (just weeks before its IPO) disclosing that it had filed a Bill of Discovery against Costco to determine how Costco, an unauthorized distributor, had obtained the clubs. (SAC ¶ 29.)

Adams Golf went public on July 9, 1998 at $16 per share. (SAC ¶ 7.) In its Registration Statement and Prospectus, the Company disclosed to potential investors information about the Company, its business practices, and the variety of potential risks it faced. The Company explained that to protect its price point and brand image, it sold only to a selective retail distribution network. (A030.) It also described its 90-day, "no questions asked" return policy and explained that "an allowance for estimated future warranty and sales return costs is recorded in the period products are sold." (A061.) Additionally, Adams Golf cautioned potential investors that its retailers could see their profit margins decrease, and shareholders could see their stock value drop, because "competition could result in significant price erosion or increased promotional expenditures, either of which could have a material adverse effect on the Company's

3

business, operating results and financial condition." (A009-10.)  Adams Golf also warned that "competitive pressures resulting in lower than expected average selling prices . . . could result in the Company failing to achieve its expectations as to future sales or net income." (A011.)

Although the Company and its investors both hoped that the share price would follow the same exponential trajectory as Tight Lies sales, it did not.  Adams Golf stock gradually declined over the next several months, from an opening-day high of $18.875 on July 10, 1998 to $4.625 on October 22, 1998, (SAC ¶ 92-93), despite the fact that Adams Golf reported record Tight Lies sales and posted its best quarterly result ever in the quarter ended June 30, 1998.  (D.I. 45 at A080.)

What the record second quarter sales numbers did not reflect, but which golf industry observers and investors already knew, was that the golf industry was encountering a general slowdown in equipment sales.  (D.I. 45 at A080, A083-84.)  In the second half of 1998, Adams Golf's competition began catching up by mimicking the inverted head design that made Tight Lies so innovative, a risk about which Adams Golf had warned investors.  (A033.)  For example, both Callaway and Orlimar were offering golf clubs patterned after the Tight Lies but priced significantly less.  (D.I. 45 at A083-84.)  On October 22, 1998, Adams Golf announced its third quarter earnings, reporting substantial increases in net sales and income but lower revenues than analysts had expected.  (D.I. 45 at A083-84.)  The Company also warned that its fourth quarter revenues might be lower than expected due in part to recent gray marketing.

## IV.  ARGUMENT

### A.  Plaintiffs' SAC Sounds in Fraud and Therefore Must Meet the Rigors of Rule 9(b)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) should be granted where, accepting well-pleaded allegations as true, plaintiffs can prove no set of facts that

4

would warrant relief. *Cal. Pub. Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126, 143

(3d Cir. 2004). "In making this determination, [the court] need not credit a complaint's 'bald

assertions' or 'legal conclusions.'" *Id.* (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902,

906 (3d Cir. 1997)). And where the complaint sounds in fraud, the circumstances constituting

the fraud or mistake shall be stated with particularity: "plaintiffs asserting securities fraud claims

must specify "the who, what, when, where, and how." *Id.* at 144.

Plaintiffs must plead their claims with the specificity demanded under Rule 9(b) because

their section 11 claim sounds in fraud. *Id.* at 142; *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288

(3d Cir. 1992). Although this Court held that Rule 9(b) did not apply to the allegations in

plaintiffs' CAC, the allegations in the SAC unequivocally sound in fraud.[3] Plaintiffs need not

use the word "fraud" to trigger Rule 9(b). A claim will sound in fraud when the factual

allegations show or imply that defendants knowingly and intentionally made false or misleading

statements. *Id.* This is the case even where, as here, plaintiffs specifically disavow any fraud or

artfully avoid using the word "fraud." *Chubb,* 394 F.3d at 161.

The SAC alleges that the defendants knowingly and intentionally omitted information

from the Prospectus about the gray market, double shipping, and the potential for a decline in

retailers' margins. Courts must look behind plaintiffs' boilerplate disavowings and evaluate

whether the allegations sound in fraud. The SAC outlines a storybook case of fraud and

---

[3] The law of the case doctrine does not prohibit reconsideration of this issue, as it has not been decided in
light of plaintiffs' new allegations. The law of the case doctrine, which holds that courts generally should refuse to
reopen questions that already have been decided in a case, does not prevent reconsideration of plaintiffs' newly-
supplemented complaint. *Messinger v. Anderson*, 225 U.S. 436, 444 (1912). The Supreme Court has declared, "The
law of the case comes into play only with respect to issues previously determined." *Quern v. Jordan*, 440 U.S. 332,
348 n.18 (1979). Since the issue of whether the SAC sounds in fraud has not been decided previously, the law of the
case does not apply. *Walsh v. McGee*, 918 F. Supp. 107, 111 (S.D.N.Y. 1996).

5

conspiracy (albeit with woefully insufficient particularity):[4]

> This material risk to the Company was ***acknowledged by
> defendants among themselves***, pre-IPO, but ***concealed from
> investors*** in the Registration Statement and the Prospectus.

(SAC ¶ 86.)

The SAC is peppered throughout with fraud inferences: the registration statement was

"materially *false* and *misleading*"; "reported profits and revenues had been *distorted* by . . . gray

market"; "the Registration Statement and the Prospectus . . . *misrepresented* the material risk . . .

[of] 'double shipping,' shipments with liberal or unlimited rights of return, and underreserving

for returns"; "the Registration Statement and the Prospectus . . . *misrepresented* the Company's

failure to take reasonable actions to protect its supposedly 'selective retail distribution'"; "the

Registration Statement and the Prospectus . . . *misrepresented* the material risk and fact that

Adams Golf's results would be adversely affected by a decline in retailers' margins." (SAC ¶¶

22, 23, 81.)

In *California Public Employees' Retirement System v. Chubb Corp.*, the Third Circuit

found that Rule 9(b) applied to section 11 claims because "a core theory of fraud permeates the

entire Second Amended Complaint and underlies all of Plaintiffs' claims." *Chubb,* 394 F.3d at

160. The same is true here. Plaintiffs' tale in the SAC of Adams Golf's decline depicts a

conspiracy of managers who knew that gray marketing and double shipping were material

---

[4] *Chubb*, 394 F.3d at 160-61 (holding a claim sounded in fraud because plaintiffs alleged that the
Registration Statement was "false and misleading," the stock was "artifical[ly] inflat[ed]," and defendants
"conceal[ed] facts); *Johnson v. Nyfix*, 399 F. Supp. 2d 105, 120 (D. Conn. 2005) (holding a claim sounded in fraud
because plaintiffs alleged a registration statement was "inaccurate *and* misleading," contained "*untrue* statements of
material facts" and that defendants issued "materially *false* and *misleading* written statements").

6

concerns but refused to mention these risks in the Prospectus.[5] These are classic fraud allegations.

Accordingly, Rule 9(b) requires plaintiffs to plead "(1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *Shapiro,* 964 F.2d at 284. Under this standard, or even under Rule 8's minimal pleading standard, plaintiffs' SAC fails to state a claim.

### B.      Plaintiffs Fail to State a Claim Under Section 11

To allege a proper section 11 claim, plaintiffs must plead facts demonstrating: (1) the offering documents contained a material misstatement or omission; (2) defendants had a duty to disclose the omitted information (if based on an omission); and (3) that such information ***existed at the time*** the prospectus became effective.[6] Plaintiffs must allege material misrepresentations or omissions under the facts as they existed at the offering. *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 (3d Cir. 1993). Hindsight is not sufficient. Federal courts have long rejected plaintiffs' attempts to plead fraud by hindsight, such as alleging that disclosures in later

---

[5] *See* SAC ¶¶ 44-49, 50-66, 68 (Mark Gonsalves, former head of sales, and Barney Adams, the Company's CEO, received detailed information pre-IPO regarding gray marketing but concealed it from investors); SAC ¶¶ 72, 76 (Mark Gonsalves turned a blind eye to alleged double shipping by his friend, Jay Greaney); SAC ¶¶ 50, 73-74 (Adams Golf managers were motivated to conceal these facts because it allowed the Company to post record pre-IPO sales).

[6] 15 U.S.C. § 77k(a). To underscore this last principle, courts have held that "omissions that create a misleading impression—particularly one that is misleading only in hindsight—are not sufficient to constitute the basis of a securities action under section 11 or section 12(2)." *Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*, 68 F. Supp. 2d 480, 488 (D.N.J. 1999). Thus, plaintiffs must allege specific facts showing that a statement was materially misleading at the time of the IPO. *Laker v. Freid*, 854 F. Supp. 923, 931 (D. Mass. 1994). Section 11 "does not impose liability for the omission of material information which was unknown to, and not reasonably discoverable by, the defendants." *Zucker v. Quasha*, 891 F. Supp. 1010, 1017 (D.N.J. 1995) (quoting *In re Keegan Mgmt. Co. Sec. Litig.*, 794 F. Supp. 939, 946 (N.D. Cal. 1992)), *aff'd* 82 F.3d 408 (3d Cir. 1996). "[W]here an event is contingent or speculative in nature, it is difficult to ascertain whether the reasonable investor would have considered the omitted information significant at the time." *Shapiro*, 964 F.2d at 283.

reports should have been made earlier.[7]  Finally, materiality requires a "substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Adams Golf*, 381 F.3d at 275 n.8; *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 273-74 (3d Cir. 2005) (holding that materiality standard is the same under section 10(b) and section 11).

### 1.  Plaintiffs' Gray Market Claim Fails as a Matter of Law

#### a)  This Court can and should test the legal validity of the gray market claim in light of the new allegations

Plaintiffs have chosen to supplement their gray market claim with new facts.  For example, in a new section of the SAC labeled "Additional Gray Market Allegations," plaintiffs assert that the gray market posed a material risk to the Company because many other golf club manufacturers had suffered from the same problem previously, (SAC ¶¶ 66-69), and they refer to various documentary sources suggesting that gray marketing was a common risk in the golf industry.  *Id.*  This Court is entitled, even required, to test the legal validity of the gray market claim in light of these new facts.  Simply because some of the allegations that appeared in the CAC also appear in the SAC does not change the Court's duty to test the newly-alleged claim. Plaintiffs may protest that providing more detail about their gray market claim cannot make it inactionable, but the law says otherwise: "[W]hile notice pleading does not demand that a complaint expound the facts, a plaintiff who does so is bound by such exposition." *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 192 (4th Cir. 1998).  As shown below, plaintiffs have "pleaded themselves out of court." *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 261 (7th Cir. 1998).

---

[7] *Zucker*, 891 F. Supp. at 1014 (holding bankruptcy filing four months after offering could not support inference that company was in a "precarious" financial position at the time of the offering).

8

### b) The gray market as pled in the SAC was an industry-wide phenomenon that did not require disclosure in the Registration Statement

Adams Golf had no duty to disclose the existence of a gray market because, as the SAC asserts, it was an industry-wide phenomenon that affected virtually all golf-equipment manufacturers. (SAC ¶¶ 66-70.) An industry-wide phenomenon cannot support a securities claim because it is "public information and, therefore, by definition is available to any and all who take the time to discover it."[8]

The law of the case mandates dismissal of plaintiffs' gray-market claim. In the CAC, plaintiffs alleged that Adams Golf was affected by an oversupply of golf equipment on the same industry-wide level that they now claim existed for the gray market. (CAC ¶¶ 43-54.) This Court has held that "to be actionable, the challenged statements must mislead a reasonable investor as to the prospects of Adams Golf—not to the golf industry, generally." *Adams Golf*, 176 F. Supp. 2d at 236. This Court then held that the industry-wide oversupply claim was not actionable. *Id.* at 237. On appeal, the Third Circuit affirmed this aspect of the dismissal:

> We agree with the District Court that neither of these statements were materially misleading by the omission of these industry-wide conditions . . . [w]hatever financial problems other manufacturers and retailers may have struggled with, the securities laws obligated Adams Golf to disclose material information concerning its own business and not necessarily the details relating to its competitors.[9]

---

[8] *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608-09 (7th Cir. 1995); *Adams Golf*, 381 F.3d at 278-79 (holding "Adams Golf was not duty-bound to disclose general industry-wide trends easily discernable from information already available in the public domain"); *Klein v. Gen. Nutrition Co.*, 186 F.3d 338, 343 (3d Cir. 1999); *In re F&M Distrib., Inc. Sec. Litig.*, 937 F. Supp. 647, 653 (E.D. Mich. 1996); *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991).

[9] *Adams Golf*, 381 F.3d at 278 (citing *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 375 (3d Cir. 1993) (holding that "the issuer of a security [need not] compare itself in myriad ways to its competitors, whether favorably or unfavorably. . .")).

9

In the SAC, plaintiffs likewise allege that Adams Golf failed to disclose in its Prospectus an industry-wide gray market condition and that it failed to compare itself to its competitors. (SAC ¶¶ 66-70 (noting Calloway, Taylor Made, Ping, and Titleist all experienced publicly reported gray marketing).) That the industry-wide condition plaintiffs complain about now is gray marketing rather than equipment oversupply makes no difference to the legal standard articulated by this Court and affirmed by the Third Circuit. Both courts have held that the failure to disclose an industry-wide condition does not make the Company's Prospectus false or misleading.[10]

### 2. Adams Golf Did Not Misstate or Omit the Risk that Its Results Could Be Adversely Affected by a Decline in Retailers' Margins

Plaintiffs contend that the Prospectus "omitted any discussion of Adams Golf's material risk that authorized retailers' profit margins might decline." (SAC ¶ 86.) This new claim is a non-starter because the Prospectus specifically disclosed this very risk. (*See* A009-11 (noting potential for "significant price erosion" and "competitive pressures resulting in lower than expected average selling prices").) Adams Golf's many warnings of the risks attendant to retail margins clearly bespoke caution: the company warned of the risks posed by decreased selling prices. *Adams Golf*, 381 F.3d at 279.

The claim also fails because Adams Golf's financial results, as reported in the Prospectus, were not—and could not possibly be—affected by some future margin decline. The securities

---

[10] The alleged omission concerning the gray market is the only potentially actionable claim in the SAC, as the Third Circuit previously held that there were no false statements in the Prospectus. *See Adams Golf*, 381 F.3d at 277-78.

10

laws generally, and section 11 in particular, do not require companies to disclose hypothetical events that may adversely impact future results.[11]

### 3. Plaintiffs' New Claim, that the Company Failed to Take Reasonable Steps to Protect Its "Selective Retail Distribution Policy," Is Not Actionable and Is Demonstrably False

Plaintiffs stretch the securities laws to their breaking point when they try to state a claim by second-guessing management's response to the alleged gray marketing of the Tight Lies clubs. Adams Golf cannot be liable merely because plaintiffs feel that the Company could have protected its distribution network more effectively by using written contracts with its retailers. (SAC ¶ 83.) Adams Golf did what it could, within the confines of anti-trust law, to protect its selective distribution network. Under federal law, a manufacturer cannot create a "resale price maintenance scheme" by agreeing with its retailers and distributors to resell the manufacturer's product only at a certain set price. *United States v. Gen. Motors*, 384 U.S. 127 (1966). Such agreements would constitute unlawful conspiracies whether or not they were in the form of written contracts. The securities laws, of course, cannot mandate a violation of the antitrust laws.

The only means available to a manufacturer to control its product's resale price is to announce a recommended retail price and then refuse to deal further with any retailer or distributor that sells at a lower price. *United States v. Colgate*, 250 U.S. 300, 306-307 (1919). Adams Golf had such an arrangement in place: the Company announced to its retailers that its suggested minimum retail price for Tight Lies was $149 for steel shafts and $199 for graphite, and made clear through letters and discussions that any retailer caught selling Tight Lies at a

---

[11] Companies need only disclose " known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii); *see also Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000).

11

lower price may be cut off from receiving further shipments. (*See, e.g.*, SAC ¶ 47.) This arrangement would not have been any more effective if it had been memorialized in a written contract.

Moreover, the lack of a written contract with distributors does not render any statement in the Prospectus false or misleading. The Prospectus stated that "the Company limits its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and technical expertise." (SAC ¶ 31.) The means though which the Company chose to enforce this limited distribution policy are not relevant to this statement, and therefore cannot render it false or misleading.

Plaintiffs also contend that Adams Golf violated section 11 because the Company failed to disclose that it did not have a club tracking system that would defeat gray marketing.[12] This claim is patently specious—the securities laws do not require a company to speculate about all the different systems it could use to protect its business. Moreover, Adams Golf's system for tracking clubs in the distribution chain is a trade secret,[13] which, of course, also is not required to be disclosed in the Prospectus.

---

[12] SAC ¶ 83. Adams Golf had no obligation to speculate about what better methods might exist or soon become available to protect its distribution network. No company is required to speculate in its Prospectus, as this would be uninformative and immaterial to shareholders. *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 640 (3d Cir. 1990); *Tracinda Corp. v. DaimlerChrysler,* 364 F. Supp. 2d 362, 413 (D. Del. 2005).

[13] Under federal law, a trade secret is "any formula, pattern, device or compilation of information which is used in ones business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." RESTATEMENT (FIRST) OF TORTS § 757, comment b (2005). Under this definition, the means through which a company attempts to identify its product to stop counterfeiting or gray marketing is a trade secret. A trade secret is destroyed if it is revealed, because when such information becomes common knowledge, it no longer allows for a possible advantage over competitors.

12

Finally, the Company had no duty to disclose matters of business judgment, such as how it chose to enforce its distribution network or track its clubs in the distribution chain.[14]  The Third Circuit has held that companies are not required to disclose such details, "where the incremental value of the disclosure is solely to place potential investors on notice that management is capable of . . . incompetence." *Craftmatic,* 890 F.2d at 640.  Management's alleged failure to ensure the reliability and sustainability of an aspect of the company's business by using insufficient controls may be a sign of questionable business judgment, but it certainly is not a material fact that requires disclosure under the securities laws. *Id.* (finding that the company had no obligation to disclose that the company's management had implemented inadequate and ineffective controls on costs, financial reporting, accounting and information systems).  Plaintiffs cannot use hindsight to criticize management, particularly where—as here— there is no dispute that the Company aggressively protected its distribution network by filing a legal action against Costco.  (SAC ¶ 29.)

### 4.  Plaintiffs' New Accounting Allegations Fail to State a Claim

Plaintiffs, apparently seeking to bolster their chances for survival, are trying to manufacture an accounting fraud claim.  They allege that Adams Golf failed to disclose alleged practices such as double shipping, selling on consignment or with unlimited rights of return, and setting inadequate reserves, but all of these claims fail as a matter of law.  (SAC ¶ 71.)

---

[14] The level of detail that plaintiffs allege Adams Golf should have provided in its Prospectus is plainly unreasonable, and if required would defeat the purpose of the federal securities laws: to provide shareholders with information sufficient to allow them to determine the level of risk inherent in the offered stock, but not so much information that shareholders become confused or misled.  As this Court stated in *Tracinda,* "corporations are not required to address their stockholders as if they were children in kindergarten. . . . It is thus sufficient if the company provides information as to material facts in a format from which a reasonable investor could reach his own conclusions as to the risks of the transaction." 364 F. Supp.2d at 413.  Requiring, as plaintiffs suggest, that a company describe not only its distribution policy but also the minute intricacies of the means of monitoring distribution currently used by the company and those hypothetically possible, would yield a prospectus clogged with confusing, immaterial detail and distraction.

13

Section 11 does not impose liability for the mere omission of a fact unless that fact is either required by law to be included in the Prospectus (*e.g.,* due to its materiality) or must be included to make other facts in the Prospectus not misleading. *See Chubb*, 394 F.3d at 167; *Klein*, 186 F.3d at 342; 15 U.S.C. §§ 77k(a), 77*l*(a)(2). Each alleged omission then must be linked in a logical nexus to an affirmative statement that was thereby rendered misleading. *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323-24 (D.N.J. 2000). Plaintiffs have not alleged any such duty to disclose or otherwise linked the alleged omission of "questionable [sales] practices" to any affirmative misstatement in the Prospectus. Moreover, the financial statements "bespoke caution" in warning that the forward-looking estimates of return reserves in the Prospectus could differ from financial results. (A061); *Adams Golf*, 381 F.3d at 279.

### a) Plaintiffs have not alleged how the questionable sales practices rendered the financial statements in the Prospectus false or misleading

#### (1) Post-IPO effects are not actionable under section 11

By plaintiffs' own admission, these "questionable [sales] practices" did not affect the financial statements in the Prospectus—they allegedly only affected "Adams Golf's post-IPO results." (SAC ¶ 71.) This is simply not actionable under section 11.

#### (2) Plaintiffs have not linked any of the alleged questionable sales practices to the financial statements

Plaintiffs fail to identify a single statement in the Prospectus that was rendered false or misleading by the supposed omission of "questionable [sales] practices." (SAC ¶¶ 71-80.)

14

### (a)    Double Shipping

Allegations of accounting irregularities must identify what was misstated and by how much—plaintiffs have alleged neither one.[15]  They do not identify a single customer or a single amount that was double shipped.  They simply fail to allege how any purported double shipments were material to the IPO financial statements.  Plaintiffs claim that one sales person (who was later terminated) double shipped, and "numerous pallets of clubs were shipped to Hawaii pre-IPO and then returned several months later."  (SAC ¶ 72 (referencing Jay Greaney).)[16]  They do not, and cannot, say whether these clubs were double shipped or merely returned, and thus do not demonstrate that Adams Golf's IPO financial statements were false.[17]

### (b)    Rights of Return

Adams Golf stated in the Prospectus that it had a 90-day no questions asked returns policy, which its auditors had approved.  (A061.)  Plaintiffs do not allege in the SAC that the "questionable [sales] practices" involved anything more than adhering to this publicly disclosed policy.[18]  To the extent plaintiffs claim that more liberal return rights were granted, the federal securities laws do not require Adams Golf to disclose such exceptions:

---

[15] *In re Wall Data Sec. Litig.*, 1996 WL 585596, at *1 (W.D. Wash. June 25, 1996) ("The plaintiff must at a minimum identify particular customers and transactions and explain why those transactions were improperly recorded.").

[16] SAC ¶ 74.  To the extent plaintiffs' claims are based on Mr. Adams's post-IPO speculation about one sales representative, they are inactionable because they do not allege that such alleged double shipping (1) was material, or (2) occurred prior to the IPO.  SAC ¶ 76 (inside sales persons "know cheating (at least in the form of double shipments) occurs").

[17] If any overshipments occurred inadvertently in the ordinary course of business, then such shipping errors would be accounted for in the return reserve (and likely were never recognized as revenue if they were shipped and returned in the same quarter).  Most of Adams Golf's retailers were very small pro shops and would have to return any erroneously shipped product immediately because of a lack of inventory space.  (A025.)

[18] Again, plaintiffs reference Mr. Adams's post-IPO management concerns.  SAC ¶ 77.  A CEO's post-IPO speculations about returns do not demonstrate that IPO Financial Statements were materially false, particularly where there was no way for Mr. Adams to know of such returns before the IPO.

15

> Just because some of [the Company's] customers were allowed a
> refund does not mean that . . . [the Company] had a practice of
> offering guaranteed sales to all its customers. Giving an
> unsatisfied customer a refund is a normal business method of
> dealing with an unsatisfied customer. It is not a violation of
> securities laws for [the Company] to fail to disclose such an
> obvious practice to potential investors.

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) (granting summary judgment on

1933 Act and 1934 Act claims).

Plaintiffs also claim that Adams Golf improperly engaged in consignment sales, but they

fail to allege a single one. The SAC does not allege that any supposed consignment sale was

material to the IPO financial statements. Moreover, GAAP, and Financial Accounting Standards

Board Statement No. 48 ("FAS 48") in particular, allow revenue recognition where a right of

return exists so long as future returns can be reasonably estimated:

> FAS 48 does not prohibit a seller from recognizing contingent sales
> income so long as certain conditions are met, the most important of
> which requires a reasonable estimate of expected returns and the
> set-aside of a sufficient reserve to absorb any resulting reversal of
> revenue. Estimating returns, as the rule makers recognize, entails a
> degree of unavoidable guesswork.

*Cf. In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 169 (D. Mass. 2000).

As demonstrated below, there are no credible allegations demonstrating that Adams Golf

lacked a reasonable basis to estimate and reserve for future returns.

### (c)    Inadequate Reserves

Plaintiffs summarily allege that the Company failed to adequately reserve for returns and

thus violated GAAP. (SAC ¶ 90.) But they provide no detail, and they fail to allege how Adams

Golf could have estimated its reserves any better. There is no bright-line test for setting reserves,

and GAAP leave such allowances to management's business judgment. *Cf. Segue*, 106 F. Supp.

2d at 169. GAAP are not a "canonical" set of rules requiring identical treatment of identical

16

transactions; rather, they "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544 (1979). Notably, plaintiffs do not allege what Adams Golf's reserves should have been—even after over six years of hindsight.

FAS 5 provides the applicable standard for setting return reserves. It states that companies should accrue for reserves only where (1) "it is *probable* that an asset had been impaired or a liability had been incurred," and (2) the "amount of loss can be reasonably estimated." (FAS 5 ¶ 10 (emphasis added).) Courts recognize that "setting" reserves for doubtful accounts is a "highly imperfect undertaking."[19]

Plaintiffs fail to state a claim because they have not pleaded facts to indicate that Adams Golf's return reserves were false or misleading on the effective date of the Prospectus.

> [Plaintiffs] argue that numerous statements made by the [defendants] after the registration statement was issued show that [the Company's] reserves were inadequate at the time of issuance. However, this type of retrospective analysis of awareness cannot be the basis for a claim. *See, e.g., Scibelli v. Roth*, 2000 WL 122193, *3 (S.D.N.Y. 2000) (noting that it is "not a reasonable inference" to assume prior knowledge based upon actual knowledge at a later date). Under both FAS-5 and Section 11, information is required to be included only if it is available prior to the issuance of a financial statement.

*In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899 (8th Cir. 2005) (dismissing section 11 claim); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 255-56 (S.D.N.Y. 2004).

---

[19] *Cf. In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 675 (3d Cir. 2002) (dismissing section 10(b) claim of inadequate reserves); *Siegel v. Lyons*, 1996 WL 438793, at *5 (N.D. Cal. Apr. 26, 1996) (dismissing section 10(b) claim of accounting fraud).

17

Adams Golf set its return reserve based on an analysis of historical returns. The return reserve set forth in the Prospectus was higher than any previous return reserve, a fact that flatly undermines plaintiffs' claim that it was somehow false as of the effective date. (A063.) Plaintiffs only allegations of falsity are a hindsight assessment based on actual returns, citing the actual number of clubs that were returned as evidence that the return reserve was inadequate. (SAC ¶ 78.) But these facts existed *after* the Prospectus was issued, and thus cannot form the basis for a claim under section 11. *Acceptance*, 423 F.3d 899. Indeed, all of plaintiffs' allegations of accounting impropriety reference post-IPO facts. (*See, e.g.*, SAC ¶¶ 76-79.)

Despite the tale alleged in the SAC, the real story on returns was told in the CAC: the golf industry was oversupplied and when the seasonality of golf set in, sales decreased and returns increased. (CAC ¶¶ 43-54.) Adams Golf could not predict the industry oversupply that resulted in increased returns in 3Q and 4Q 1998. (*Compare* SAC ¶ 90 *with* CAC ¶¶ 49, 56.)

### (3) Adams Golf had no duty to disclose these alleged questionable sales practices

Adams Golf had no duty to disclose these alleged "questionable [sales] practices" under the securities laws, assuming they ever existed. First, Item 303 of Regulation S-K does not impose a duty to disclose because plaintiffs have not alleged facts demonstrating that these "questionable [sales] practices" were a *known* trend that the Company reasonably expected to have a material impact on sales.[20] Although section 11 does not have a scienter requirement, Item 303 requires that these trends or uncertainties be "known to management." 17 C.F.R. § 229.303(a)(3)(ii). Plaintiffs have not alleged a single fact to support their allegation that any

---

[20] *Oran*, 226 F.3d at 287. Item 303 requires a company to include in its SEC filings a discussion of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).

18

defendant knew of these questionable sales practices pre-IPO.  Moreover, Item 303 requires that the Company be able to quantitatively assess the risk to the Company.[21]  The SAC does not allege any particular quantitative impact, other than a hindsight recitation of what actual returns were in July 1998, something unquestionably unknown to the defendants before the IPO.  Second, plaintiffs nowhere allege what particular statement in the Prospectus was rendered false or misleading by the alleged omission.  And curiously, they seem to admit they have no claim when they allege that these practices affected only "post-IPO results."  (SAC ¶ 71.)

### b) There are no facts suggesting that alleged overshipments or excess returns were material to the IPO financial statements

Plaintiffs do not plead materiality, an essential element of their section 11 claim.  Although materiality is often a question of fact, where the "alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality," the court may determine the alleged misrepresentation is immaterial as a matter of law.[22]

The purported deficiency in return reserves is immaterial.  Plaintiffs allege, in hindsight, that actual returns were about $371,000 more than Adams Golf had estimated pre-IPO.  (SAC ¶ 78.)  No company is clairvoyant in estimating returns, and GAAP does not require such precision.  A $371,000 variance in reserves is plainly immaterial.  *Romine*, 296 F.3d at 707

---

[21] The SEC has interpreted these disclosure obligations to require some quantitative assessment of impact on financial results.  Management's Discussion & Analysis of Fin. Condition & Results of Operations, Exchange Act Rel. No. 34-26831, 54 Fed. Reg. 22427, 22430 (May 24, 1989); *see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1190-92 (11th Cir. 2002) (requiring "an observed pattern [that] accurately reflects *persistent* conditions of the particular registrant's business environment").

[22] *Adams Golf*, 381 F.3d at 274-75 (specifically noting example where information is immaterial as a matter of law); *see also Romine v. Acxiom Corp.*, 296 F.3d 701, 706-07 (8th Cir. 2002) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997)) (dismissing section 11 accounting claim as immaterial as a matter of law).

19

(holding net reserve change of $400,000 immaterial and fails to state a section 11 claim);
*Gateway 2000*, 122 F.3d at 546.

The alleged double shipping is also immaterial. The only specific allegation of double shipping is that "numerous pallets of clubs" were shipped to Hawaii pre-IPO and returned several months later. (SAC ¶ 74.) Plaintiffs candidly admit that this return "adversely impact[ed] subsequent period results," an effect not actionable under section 11. And to the extent plaintiffs claim the shipment was falsely reported as income, they have plead no facts to support their theory that a few pallets of returned clubs were material where $58 million worth of clubs were shipped pre-IPO. (D.I. 45 at A080.)

In sum, plaintiffs have failed to plead facts demonstrating that the Prospectus was false or misleading, that Adams Golf had any duty to disclose these alleged "questionable [sales] practices," and that any of these supposed false or misleading statements were material to financial statements disclosed in the Prospectus.

### C.    The Claim Against the Individual Defendants for Control-Person Liability Must Be Dismissed

Plaintiffs allege that all of the individual defendants are liable under section 15 of the Securities Act as "control persons" because each signed the Registration Statement and had either a management position in the Company or served on the Company's Board of Directors. (SAC ¶ 10.) This Court has previously found that to state a claim for control person liability under section 15, "the plaintiff must allege (1) a primary violation of the federal securities laws by a controlled person; (2) control of the primary violator by the defendant; and (3) that the

20

controlling person was in some meaningful way a culpable participant."[23]  By failing to plead

section 11 liability, plaintiffs also have failed to allege sufficiently the individual defendants'

section 15 liability. [24]

Moreover, officer and director status is insufficient, standing alone, to support an

allegation of control-person liability.  Even if this Court finds that plaintiffs have adequately

plead a section 11 violation, plaintiffs have not sufficiently alleged that each of the individual

defendants had control over the Company, particularly those who served as outside directors.  To

survive a motion to dismiss, "the plaintiffs' legal conclusions that the individual defendants

qualify as 'controlling persons' . . . may not be accepted as true absent factual support." *In re*

*Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002).

To allege that a purported "control person" truly controlled a company, plaintiffs must

state enough facts to "support a reasonable inference that [defendants] had the potential to

influence and direct the activities of the primary violator." *Tracinda*, 197 F. Supp. 2d at 72.

More specifically, the plaintiffs must plead sufficient facts to show that "each of the individual

defendants had direct and supervisory involvement in the day-to-day operations of [the

Company] by virtue of their positions, ownership rights and contractual rights, and consequently

that they had the power to influence and control the particular transactions giving rise to the

alleged securities violations." *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 524 (W.D. Pa.

---

[23] *Tracinda Corp. v. DaimlerChrysler,* 197 F. Supp. 2d 42, 55 (D. Del. 2002).  This standard is the same as
the standard for control person liability under section 20 of the Exchange Act of 1934, and therefore cases analyzing
control person liability under either act are equally applicable to the other.  *Id.* at 55.

[24] *In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 153 (3d Cir. 2004); *In re Rockefeller Center Properties,
Inc. Sec. Litig.,* 311 F.3d 198, 211 (3d Cir. 2002) ("[I]t is well-settled that controlling person liability is premised on
an independent violation of the federal securities laws."); *Shapiro,* 964 F.2d at 279 ("'[C]ontrolling person' liability
can exist only if primary liability has been established as to another defendant . . . . Here, the dismissal of the § 10(b)
claims against UJB made it impossible to hold the individual defendants liable under § 20(a).").

21

2002). Merely citing the individual defendant's title is not sufficient to allege control; "it is well-settled that '[t]he mere fact that an individual is a director of a firm is not sufficient to show he is a control[ling] person of the firm.'"[25] When plaintiffs have neglected to offer any further description of an individual defendant's duties beyond simply citing his position as a member of the board of directors, this court has refused to find that these individuals qualified as "control persons."[26]

Four of the individual defendants, Paul F. Brown, Jr., Roland E. Casati, Finis F. Conner, and Stephen R. Patchin, ("Outside Directors") were outside directors with little knowledge of the Company's day-to-day operations. Plaintiffs do not allege otherwise, stating simply that "[b]ecause of their . . . membership on the Company's Board of Directors, the individual defendants had power and influence." (SAC ¶ 10.) Plaintiffs do not include any additional facts about the Outside Directors, beyond their titles, that might suggest how they would be control persons. Plaintiffs do not suggest that any of the Outside Directors were involved in any special committee that might have had decision-making control over the content of the sections of the Company's Prospectus that plaintiffs claim are false and misleading. Nor do plaintiffs allege that the Outside Directors were heavily invested in the Company. Because they allege the Outside Directors' control over the Company only by invoking their status as board members, plaintiffs have not sufficiently alleged the second prong of the standard for control person

---

[25] *Digital Island*, 223 F. Supp. 2d at 561 (citing *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *16 (N.D. Cal. Sept. 29, 2000); *see also, In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999) ("[o]fficer or director status alone does not constitute control").

[26] *Digital Island*, 223 F. Supp 2d at 561 ("[N]one of the individual defendants are identified as having any responsibilities within [the company], other than serving as directors . . . . Such allegations alone clearly cannot support a finding of control.").

22

liability under section 15. For this reason, the section 15 claims against the Outside Directors must be dismissed.

Similarly, plaintiffs make no allegations that defendants Richard Murtland and Darl Hatfield exercised control over the day-to-day operations of Adams Golf. In plaintiffs' only references to Murtland and Hatfield in the SAC, they merely state their titles, with no description of what they did or what role they had with the allegations at issue. (SAC ¶ 10(b)-(c).) The allegation that "[e]ach of the Individual Defendants was a control person of Adams Golf by virtue of his position(s) as a director and/or as [a] senior officer of Adams Golf" fails to allege control person liability, and the mere assertion that each defendant "had direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Adams Golf" is plainly insufficient to state a claim. (SAC ¶ 116.) Accordingly, the section 15 claims should be dismissed against the defendants Murtland and Hatfield as well.

## V.    CONCLUSION

After *six years* of litigation and *three attempts* at pleading a claim, plaintiffs have finally managed to plead themselves out of court. The SAC should be dismissed with prejudice in its entirety, as any further amendment would be futile.

OF COUNSEL:

Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 W. 6th Street, Suite 2100
Austin, Texas 78701
(512) 499-6200


Dated: February 8, 2006

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger
One Rodney Square
Wilmington, Delaware 19899
(302) 651-7700

Attorneys for Defendants Adams Golf, Inc.,
B.H. Adams, Richard H. Murtland, Darl P.
Hatfield, Paul F. Brown, Jr., Roland E. Casati,
Finis F. Conner, and Stephen R. Patchin

23

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

### CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2006, I electronically filed the foregoing with the

Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered

to the following:

Carmella P. Keener                    Robert K. Payson
Rosenthal, Monhait, Gross & Goddess   John E. James
919 Market Street, Suite 1401         Potter Anderson & Corroon LLP
Wilmington, DE 19801                  1313 North Market Street, Hercules Plaza
                                      Wilmington, Delaware 19801


I hereby certify that on February 8, 2006, I have Federal Expressed the foregoing

document(s) to the following non-registered participants:

Todd S. Collins                       Michael J. Chepiga
Berger & Montague, PC                 Theodore J. McEvoy
1622 Locust Street                    Simpson Thacher & Bartlett
Philadelphia, PA 19103                425 Lexington Avenue
                                      New York, NY 10017

                                      Alyssa M. Schwartz (#4351)
                                      Richards, Layton & Finger, P.A.
                                      One Rodney Square
                                      P.O. Box 551
                                      Wilmington, Delaware 19899
                                      (302) 651-7700
                                      schwartz@rlf.com