## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE ADAMS GOLF, INC.<br>SECURITIES LITIGATION | CONSOLIDATED<br>C.A. NO. 99-371 KAJ |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

BERGER & MONTAGUE, P.C.
Todd S. Collins
Elizabeth W. Fox
Neil Mara
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000

*Plaintiffs' Lead Counsel*

OF COUNSEL:

LAW OFFICES OF DONALD B. LEWIS
Donald B. Lewis
5 Bala Cynwyd Road
Bala Cynwyd, Pennsylvania 19004
(610) 668-0331

KELLER ROHRBACK L.L.P.
Lynn Lincoln Sarko
Juli F. Desper
Elizabeth Leland
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900

Dated: February 27, 2006

ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.
Carmella P. Keener (DSBA No. 2810)
Suite 1401, Citizens Bank Center
P. O. Box 1070
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com

***Plaintiffs' Delaware Liaison Counsel***

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

A.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . 1

B.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

C.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    1.  Gray Market Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    2.  Risks Arising from Pre-IPO Sales Practices . . . . . . . . . . . . . . . . . . . . . . . . 5

    3.  Risks Posed by Failure to Take Precautions Against Gray Marketing . . . . . . . . . 6

    4.  Risks Posed by the Danger of Falling Retailer Margins . . . . . . . . . . . . . . . . . . 7

D.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    1.  The Complaint Sounds in Negligence and Strict Liability, Not Fraud . . . . . . . . . 8

        a.  The District Court Has Already Found That The Gray
           Market Allegations Set Forth in the CAC, and Repeated
           Here, Do Not Sound in Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        b.  The Rest of The Complaint Does Not Sound in Fraud . . . . . . . . . . . . . . 11

    2.  Each of Plaintiffs' Allegations States a Claim Under the 1933 Act . . . . . . . . . . 14

        a.  The Gray Market Allegations Continue to State a Claim . . . . . . . . . . . . 15

        b.  Gray Marketing Was an Individual Problem at Various
           Times for Adams Golf and for Some of its Competitors,
           not an Industry-wide Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        c.  The Prospectus Omitted the Material Threat to Retailers'
           Margins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

        d.     The Prospectus Should Have Warned that the Company
              Had No Way to Protect its Selective Distribution Policy
              from Gray Marketing ........................................ 18

        e.     The SEC Regulations and GAAP Provisions Required
              Defendants to Disclose Known Trends and Uncertainties
              and Loss Contingencies ...................................... 19

        f.      Materiality is Not an Issue on a Motion to Dismiss ................. 21

    3.    Plaintiffs Have Sufficiently Pled Control Person Liability
        Under Section 15 .............................................. 22

E.    CONCLUSION ...................................................... 26

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Adams Golf, Inc. Secs. Litig.,* 176 F. Supp. 2d 216 (D. Del. 2001) ........................... 8, 9, 16

*In re Adams Golf, Inc. Secs. Litig.,* 381 F.3d 267 (3d Cir. 2004) ........................................ *passim*

*In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137 (3d Cir. 2004) ....................................... 23

*Bender v. Suburban Hospital, Inc.,* 159 F.3d 186 (4th Cir. 2004) ............................... 15

*Cal. Public Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126 (3d Cir. 2004) ....................... 13

*In re Chambers Dev. Sec. Litig.,* 848 F. Supp. 602 (W.D. Pa. 1994) ........................................ 25

*In re City of Philadelphia Litig.,* 158 F.3d 711 (3d Cir. 1998) ......................................... 9, 10, 16

*In re Cont'l Airlines, Inc.,* 279 F.3d 226 (3d Cir. 2002) ............................................... 9

*In re Digital Island Sec. Litig.,* 223 F. Supp. 2d 546 (D. Del 2002) ........................................... 24

*Evancho v. Fisher,* 423 F.3d 347 (3d Cir. 2005) ..................................................... 8, 11

*Hemenway v. Peabody Coal Co.,* 159 F.3d 255 (7th Cir. 1998) ................................... 15

*Johnson v. NYFIX, Inc.,* 399 F. Supp. 2d 105 (D. Conn. 2005) .................................. 14

*In re Merck & Co. Sec. Litig.,* 432 F.3d 261 (3d Cir. 2005) .................................. 15, 21

*Messenger v. Anderson,* 225 U.S. 436 (1912) ............................................. 10

*In re MobileMedia Sec. Litig.,* 28 F. Supp. 2d 901 (D.N.J. 1998) ............................... 25

*Oran v. Stafford,* 226 F.3d 275 (3d Cir. 2000) ........................................... 19

*Quern v. Jordan,* 440 U.S. 332 (1979) ............................................... 10, 16

*In re Reliance Sec. Litig.,* 91 F. Supp. 2d 706 (D. Del. 2000) .................................. 25

*In re Rent-Way Sec. Litig.,* 209 F. Supp. 2d 493 (W.D. Pa. 2002) .............................. 24

*In re Rockefeller Ctr. Properties, Inc. Sec. Litig.,* 311 F.3d 198 (3d Cir. 2002) ....................... 23

*Shapiro v. UJB Finance Corp.,* 964 F.2d 272 (3d Cir. 1992) ................................. 13, 14

*Sheehan v. Little Switzerlan*d, 136 F. Supp. 2d 301 (D. Del. 2001) ........................................... 24

*In re Storage Tech. Corp. Sec. Litig.,* 147 F.R.D. 232 (D. Colo. 1993) ...................................... 24

*In Re Suprema Specialties, Inc. Sec. Litig.,* 2006 U.S.App. LEXIS 4307 (3d Cir. 2006) ...... 2, 10

*Tracinda Corp. v. DaimlerChrysler*, 197 F. Supp. 2d 42 (D. Del. 2002) ....................... 22, 23, 24

*Walsh v. McGee*, 918 F. Supp. 107 (S.D.N.Y. 1996) ................................................................ 10

## FEDERAL STATUTES

17 C.F.R. §229, 303 (a)(3) ............................................................................................................ 19

A.    **STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS**

Plaintiffs began this class action litigation, alleging violations of Sections 11 and 12(a)(2) of the

Securities Act of 1933 (the "1933 Act"), in June 1999. D.I. 1. The Court chose plaintiffs as Lead

Plaintiffs, in April 2000, D.I. 27, and plaintiffs filed an amended consolidated complaint the ("CAC") the

next month. D.I. 28. After the parties completed the motion to dismiss briefing in October 2000, D.I. 59,

Judge McKelvie issued his opinion dismissing the case in December 2001. D.I. 69. That same month,

plaintiffs moved to alter or amend. Judge McKelvie left the Court without ruling on the motion, D.I. 80,

and the case was ultimately assigned to Judge Jordan in January 2003. D.I. 87. In August 2003, this

Court denied the motion to alter or amend. D.I. 94.

Plaintiffs filed their notice of appeal in September 2003. D.I. 99. In August 2004, the Third

Circuit overruled the dismissal order in part, ruling that the gray marketing claims in the CAC state a valid

cause of action. *In re Adams Golf, Inc. Secs. Litig.*, 381 F.3d 267 (3d Cir. 2004) ("*Adams II*"). D.I.

104.

Following remand, the parties negotiated and agreed on a Scheduling Order, which the Court

approved. D.I. 120. Plaintiffs moved to certify the class in November 2004. D.I. 117. Defendants took

discovery on class issues and, in March 2005, filed their opposition. D.I. 144. The Court certified a class

of Section 11 claimants and a subclass of Section 12(a)(2) claimants in June 2005. D.I. 159. Meanwhile,

defendants had started producing documents, D.I. 131, not completing their initial production until June

2005.

The Scheduling Order provided an opportunity for filing an amended complaint during discovery.

D.I. 120 and D.I. 170. After further interviews with potential witnesses, and review and analysis of

1

defendants' documents and documents received pursuant to subpoenas, D.I. 141, 142, plaintiffs moved for leave to file this amended complaint (the "Complaint") on September 1, 2005, D.I. 180, which the Court granted on January 24, 2006. D.I. 215.

The Complaint contains the precise allegations in the CAC that the Third Circuit sustained, along with additional allegations. Plaintiffs filed the Complaint because they had learned new facts through discovery that strengthened their original gray marketing claim and informed them of additional claims.[1] In addition, plaintiffs did not want to be precluded from introducing the newly-discovered evidence and new claims at trial.

## B.    SUMMARY OF ARGUMENT

1.    The Complaint does not sound in fraud. Judge McKelvie found the CAC did not sound in fraud. That ruling is governed by the law of the case doctrine. The new parts of the Complaint were carefully pled to avoid any suggestion of fraud. The Complaint states what material facts the Registration Statement and Prospectus (the "Prospectus")[2] omitted and how the Prospectus misstated material facts, without pleading scienter, intent, fraud or deceit. Since the Complaint pleads only negligence and strict liability, it is governed by Rule 8 of the Federal Rules of Civil Procedure. *See In re Suprema Specialties, Inc, Sec. Litig.*, 2006 U.S. App. LEXIS 4307 (3d 2. Cir. Feb. 23, 2006) (attached as Exhibit A).

---

[1]Defendants assert that "after more than six years of litigation [plaintiffs] cannot state a claim," Opening Brief of Defendants ("O.B.") at 2, and make reference to "*six years* of litigation and *three attempts* at pleading a claim ..." O.B. 23 (emphasis in original). Defendants' comments are inappropriate. As the record shows, plaintiffs have been diligent in prosecuting their claims. Moreover, the principal claim (gray marketing) in the only complaint that has been tested on a motion to dismiss has been sustained on appeal. Accordingly, plaintiffs to date have not just attempted but succeeded at pleading a claim.

[2]The Registration Statement and Prospectus are reproduced in defendants' Appendix, A1 to A72.

Contrary to defendants' argument, the new gray marketing claims do not allege industry-wide problems, but focus on the failure of the Prospectus to warn of the significant risk of harm to Adams Golf, Inc. ("Adams" or the "Company") itself caused by gray marketing. Accordingly, the new gray market allegations should be sustained.

2.    With respect to other claims in the Complaint, the undisclosed risks to Adams posed by any serious decline in Adams's retailers' margins were mentioned in two pre-IPO memos from the underwriters, but not mentioned in the Prospectus. The Prospectus warned that competition might cause Adams's prices to go down, and cause Adams to spend more money on promotion, as defendants point out. However, this is not a warning about the risk to Adams of declining retailer margins, which could threaten the high-end retail network touted in the Prospectus.

3.    The Prospectus failed to warn of the risk that gray marketing could go on unchecked, because Adams did not have any marking system to identify clubs sold to distributors and retailers and no written contracts with distributors and retailers. The lack of those precautions exacerbated the already serious gray marketing problem, making it harder to control.

4.    The SEC regulations and GAAP provisions section of the Complaint does not state an accounting fraud case, but merely sets forth the relevant standards. These standards require the Prospectus to disclose the risks of gray marketing, double-shipping and diminishing retailer margins. Contrary to defendants' assertions, none of plaintiffs' claims stems from post-IPO facts. The risks of each claim were knowable at the time of the IPO. The August 14, 1998 memo from Barney Adams quoted in the Complaint, though written just after the IPO, references facts and problems occurring before the IPO.

3

5.     Defendants' argument that there was no duty to disclose the risks of double-shipping is also incorrect. Double-shipping that occurred pre-IPO posed a material threat to post-IPO results and in addition was a "known trend" that the securities regulations required to be disclosed. Likewise, this Court cannot properly consider the fact-intensive issue of materiality on a motion to dismiss.

6.     Finally, plaintiffs have properly pled control person liability, in most cases using the same allegations that the District of Delaware and the Third Circuit have found adequate under notice pleading. Moreover, control person liability is another factually intensive issue best left to the merits.

## C.     **STATEMENT OF FACTS**

Defendant Adams, a manufacturer of golf clubs, launched its IPO on July 10, 1998. Adams Golf's Registration Statement and Prospectus (the "Prospectus") misstated or omitted four sets of material facts in violation of Sections 11 and 12(a)(2) of the 1933 Act:

- the Prospectus omitted and misrepresented the material risks arising from gray market distribution. Complaint ¶¶ 23-70.

- the Prospectus failed to disclose material risks posed by improper pre-IPO sales practices, including double-shipping and underreserving for returns. Complaint ¶¶ 71-80.

- the Prospectus failed to disclose that the Company had failed to take reasonable and customary precautions to protect its selective retail distribution. Complaint ¶¶ 81-84.

- the Prospectus failed to disclose the material risks to Adams in the event of a decline in the margins of Adams's authorized retailers. Complaint ¶¶ 85-88.

4

1.    **Gray Market Risks**.

Adams sold most of its clubs to exclusive sporting goods retailers, including golf course pro shops,

who sold the clubs to the public at premium prices. A025. In 1997 and during the spring of 1998, before

the IPO, the discounter Costco began obtaining Adams Golf "Tight Lies" golf clubs through gray market

channels and selling those clubs in the U.S. and Canada at retail prices barely above Adams's wholesale

price. Adams lacked any means to trace its clubs to find out which of its authorized customers were

transshipping clubs to Costco, rather than selling them to end users. In addition, Adams's authorized

customers had not signed contracts that obligated them to refrain from transshipping. In an effort to find

out how Costco had obtained the Tight Lies, Adams filed a legal proceeding called a bill of discovery in

Texas state court. Adams issued a press release in connection with this filing in June 1998, a month before

the IPO.[3]

In July 1998, although gray marketing continued unabated, the Prospectus said nothing about the

threat and risks of gray marketing to Adams Golf, while, at the same time, touting Adams's exclusive retail

network.

2.    **Risks Arising from Pre-IPO Sales Practices**.

In the quarter before the IPO, at the same time that sales to retailers who transshipped clubs to

Costco were boosting Adams's reported sales, Adams was further improving sales by shipping twice as

---

[3]Defendants state that Adams "did not hide the Costco information from investors."  In *Adams II*, the Third Circuit ruled that, because there was no efficient market in Adams stock before the IPO, the pre-IPO press release was not sufficient to inform the investing public of the gray marketing risk. *Adams II*, 381 F.3d at 277. Moreover, anyone who had seen the June 1998 press release could only assume that, since the gray market risk was not addressed in the Prospectus, the risk had disappeared through Adams's bill of discovery and other efforts.

many clubs as customers ordered. Ultimately, Adams allowed those customers to return the unsold extras.[4]

Since sales were recorded on shipment, these double shipments had the effect of increasing sales numbers just before the IPO. Complaint ¶¶ 73.

Both the practice of double-shipping and the existence of gray market sales posed the material risk that, after the IPO, clubs would be returned or new clubs would not be ordered, causing a post-IPO decrease in net sales. Complaint ¶¶ 74 and 75. This risk existed in the case of double-shipping because the retailer had too many clubs, and would have to return clubs or at least not reorder. Complaint ¶¶ 74 and 75. The risk existed where there was gray marketing, since the exclusive Adams retailers could not sell their Tight Lies, because the same clubs were available at Costco at a substantially lower price. This material risk of a post-IPO decrease in sales as a result of these factors is not addressed in the Prospectus.[5]

### 3.    Risks Posed by Failure to Take Precautions Against Gray Marketing.

At the time of the IPO, Adams lacked effective weapons to address gray marketing. First, Adams had no written sales contracts with its customers, the retail shops who were supposed to sell Tight Lies directly to golfers. Accordingly, Adams could not contractually prevent its customers from selling well below suggested retail prices to discounters, rather than selling directly to golfers at premium prices. Second, once the clubs appeared at Costco or some other discount outlet, Adams had no means to determine who had transshipped them. Had the clubs borne distinguishing numbers or marks, Adams could

---

[4]Plaintiffs do not allege that any of the defendants knew about or were reckless in failing to uncover the double-shipping. Plaintiffs alleged that defendants were negligent in not discovering double-shipping and other sales practices until after the IPO. Complaint ¶ 99.

[5]Defendants claim this is an accounting claim. It is not. It is merely a claim that since gray market sales and double-shipping pumped up sales pre-IPO, a material risk existed that post-IPO sales would decrease and returns increase.

have traced them and stopped selling to the customer who had transshipped them.

In the face of the serious problems with Costco, the Prospectus should also have disclosed the risk that Adams was unable to trace the clubs that Costco was selling and unable to police its own customers to keep them from transhipping Tight Lies. The lack of ordinary precautions materially increased the risk of gray marketing, yet was not included in the risk section of the Prospectus. A007-13.

### 4. Risks Posed by the Danger of Falling Retailer Margins.

Another material risk not addressed in the Prospectus was the risk that Adams would lose its exclusive retail network if retailers' margins decreased. Retailers' margins reflect the amount in excess of the wholesale price that a retailer can charge for the clubs. Defendants observe that the Prospectus addressed the possibility that competition might force the price of Adams clubs down, A009-10, or that Adams could be faced with "increased promotion expenditures." A009-10. However, the Prospectus did not mention the material risk that when retailers could not sell their Adams clubs at high margins, they would stop ordering Adams clubs, return the clubs they had in stock, and ultimately no longer participate in selling Adams clubs, a situation which was already very serious in Canada at the time of the IPO. Complaint ¶¶ 53-65. Since the Prospectus extolled the benefit of Adams's large retail network of allegedly satisfied customers, A004, it should have warned of the risks that retailers would abandon the Adams brand if retailers' margins decreased.

7

**D.    ARGUMENT**

When considering a motion to dismiss, the court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005). A case should not be dismissed for failure to state a claim unless it appears certain that no relief can be granted under any set of facts that could be proved consistent with plaintiffs' allegations. *Id.* at 351.

**1.    The Complaint Sounds in Negligence and Strict Liability, Not Fraud.**

Defendants claim that the Complaint "alleges that the defendants knowingly and intentionally omitted information from the prospectus . . .," and therefore the entire Complaint should be dismissed because it sounds in fraud. O.B. 5-6. But defendants cannot identify a single statement in the entire Complaint which alleges fraudulent, deceitful or intentional behavior by defendants. What the Complaint alleges is that the Prospectus contained untrue statements of material fact and omitted material facts necessary to make the statements in the Prospectus not misleading. That is what plaintiffs must prove under Section 11. Whether defendants intended the omissions or made representations deliberately or deceitfully is simply not at issue under the statute, and it is not addressed or alleged in the Complaint.

**a.    The District Court Has Already Found That The Gray Market Allegations Set Forth in the CAC, and Repeated Here, Do Not Sound in Fraud.**

The Complaint contains two sets of gray market allegations. First, the allegations in ¶¶ 25 to 41 are repeated from the CAC. The District Court has already held that these allegations do not sound in fraud. *In re Adams Golf, Inc. Secs. Litig.*, 176 F. Supp. 2d 216, 229 (D. Del. 2001) ("*Adams I*"), *rev'd in part*, 381 F. 3d 267 (3d Cir. 2004). Second, the Complaint sets forth new gray market allegations,

8

gleaned from newly uncovered facts, that support and amplify the original allegations. Complaint ¶¶ 42-70. The first set of gray market allegations cannot be questioned, since they have already been found not to sound in fraud, a finding not appealed by defendants. *Adams II*, 381 F.3d at 274 n. 5. The second set pleads facts that show the seriousness of the gray marketing problem by the time of the IPO but does not accuse any defendants of deceit, intentional conduct, or fraud.

In his 2001 decision on defendants' motion to dismiss the CAC, Judge McKelvie found:

> Reviewing the complaint, the court finds that the plaintiffs merely allege that the IPO offering materials included materially false and misleading statements and omitted to disclose material facts relating to the gray market distribution of Adams Golf products and the oversupply of golf club inventory at the retail level. Nowhere in the complaint do plaintiffs' allegations focus on or even refer to the defendants' state of mind.

*Adams I*, 176 F. Supp. 2d at 229. Judge McKelvie ruled that "the heightened pleading standard of Rule 9(b) is not applicable to plaintiffs' claims in this case." *Id.* On appeal, the Third Circuit remarked that defendants failed to cross appeal this ruling, and agreed that the claims would be subject to notice pleading. *Adams II*, 381 F.3d at 274 n.5.

Defendants argue that the "law of the case" doctrine is not binding on this Court. The law of the case doctrine "limits relitigation of an issue once it has been decided," in an earlier stage of the same litigation. *In re Cont'l Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002); *In re City of Philadelphia Litig.*, 158 F.3d 711, 717-18 (3d Cir. 1998). Reconsideration is appropriate only if new evidence differs materially from the evidence of record when the issue was first decided. If the evidence is substantially similar at the later stage, the doctrine will apply. *Id.* Here, the evidence of record, the first set of gray market pleadings found in the CAC, is identical, so the doctrine should apply as to the original gray

9

marketing claims.

In none of the cases defendants cite did a court overrule the court's own decision on the same issue in the same case, without an intervening change in evidence.[6] Moreover, application of the doctrine is even more appropriate here, where defendants had an opportunity to cross appeal on the issue and declined to do so. Accordingly, this Court should follow the decision of Judge McKelvie and find that ¶¶ 25-41 of the Complaint do not sound in fraud.

Judge McKelvie's reasoning should also be applied to the additional gray market allegations. ¶¶ 42-70. These allegations merely elucidate the first set of gray market allegations. ¶¶ 25-41. Any fair reading of the new set of allegations is that they simply state additional facts to support the claims that the gray marketing problem was widespread before and at the time of the IPO, and that the risk was material. As Judge McKelvie found, with regard to the allegations in the CAC, the allegations do not focus on or even refer to the defendants' state of mind. They are negligence allegations. Accordingly, this Court should not dismiss the gray market allegations in the Complaint, ¶¶ 25-70, on Rule 9 grounds. *See Suprema*

---

[6]*Messenger v. Anderson*, 225 U.S. 436 (1912), which involved the interpretation of a will, went to the circuit court of appeals three times. Before the third decision, the Supreme Court of Ohio ruled differently than the circuit court on the same issue. In its third decision, the circuit court followed its own prior ruling, thinking it was bound by law of the case. The Supreme Court stated, in *dicta*, that the law of the case doctrine does not limit a court's power to change its mind, but expresses the practice of courts to refuse to reopen decided issues. The Supreme Court then made its own decision. *Messenger* is different from this case because of the intervening ruling by a state supreme court on a state law issue.

In *Quern v. Jordan*, 440 U.S. 332, 338, 348 n. 18 (1979) the Court found that law of the case applies, only, as in the present case, "to issues previously determined."

Finally, in *Walsh v. McGee,* 918 F. Supp. 107, 111 (S.D.N.Y. 1996), the court held the law of the case doctrine did not apply where there were two separate issues on successive motions to dismiss. The court denied the first motion to dismiss and sustained the sufficiency of a procedural due process claim. The court granted the second motion to dismiss and dismissed the case for lack of subject matter jurisdiction.

Here, unlike the cases cited, defendants are asking the Court to reconsider the same issue previously determined in the same litigation, which the defendants chose not to appeal. Thus, the law of the case doctrine applies. *City of Philadelphia*, 158 F.3d at 117-18.

*Specialties* 2006 U.S. App. LEXIS 4307 * 32 ("Securities Act claims do not sound in fraud if ordinary

negligence is expressly pled in connection with those claims.")

        **b.**      **The Rest of The Complaint Does Not Sound in Fraud.**

In the rest of the Complaint, as with the gray market claims, plaintiffs have alleged negligence, not

fraud.  None of their allegations sound in fraud.

The sales practices section of the Complaint, ¶¶ 71-80, alleges that the Prospectus failed to

disclose the pre-IPO practice of shipping more clubs than had been ordered by the customer, or shipping

clubs with unlimited rights of return.  Nothing in the section says or implies that any defendant knew about

this practice before the IPO.  Indeed, the post-IPO memo from Barney Adams, Adams's President and

CEO, quoted in ¶¶ 76-79, makes clear that Barney Adams learned of the issue only after the IPO.  Thus,

although defendants were negligent in not discovering this problem and warning in the IPO of the risks it

posed, the Complaint does not allege or even hint that the omission of these risks was deliberate or

fraudulent.[7]

The preventive measures section of the Complaint, at ¶¶ 81-84, simply alleges that the Prospectus

does not disclose that Adams Golf had failed to take reasonable and ordinary measures to limit or prevent

gray marketing.  Once again, the allegations focus on the absence of adequate disclosure in the Prospectus,

making no reference to any fraudulent intent or dishonesty.

The retailer margins section of the Complaint, ¶¶ 85-88, focuses on the omission in the Prospectus

---

[7]To the extent defendants attempt to manufacture an inference that the particular persons named as defendants knew of the questionable sales practices and deliberately refused to disclose them as a risk in the Prospectus, this Court must make reasonable inferences in favor of plaintiffs, not defendants. *Evancho*, 423 F.3d at 350.

of the material risk that Adams would suffer from any decline in Adams's retailers' margins. In pre-IPO memos, the underwriters had flagged the risks posed by declining retailers' margins, yet these risks were omitted from the Prospectus. This section of the Complaint contains no discussion of any intent or recklessness, but alleges only negligence. There is no allegation that any of the individual defendants even knew that this risk existed or knew that it was omitted from the Prospectus.

The regulations section of the Complaint, ¶¶ 89-91, likewise has no allegation of fraudulent behavior. This section is simply a recitation of SEC and accounting rules that relate to some of the material omissions in the Prospectus. There is no allegation that defendants meant to falsify accounting records or deliberately tried to mislead investors. Rather, the section simply points out that, because the Prospectus did not disclose the risks of gray marketing and sales practices such as double-shipping, the Prospectus failed to conform to SEC regulations and Generally Accepted Accounting Principles ("GAAP"). This section does not list any further or additional material omissions in the Prospectus. It simply gives additional reasons why the Prospectus should not have omitted the risks caused by the existence of gray marketing and the pre-IPO sales practices. No fraud is involved, just negligence.

Defendants cite certain isolated words in the Complaint that they contend show that the Complaint sounds in fraud. O.B. at 6.[8] The statute itself requires that plaintiffs establish that the registration statement

---

[8]In footnote 5, defendants mischaracterize a number of allegations to make it sound as if plaintiffs alleged fraudulent behavior. For instance, in ¶¶ 44-49, 50-66, and 68, the Complaint states merely that something was omitted from the Prospectus, with no allegation of deliberate or intentional concealment. Nor did plaintiffs aver that defendants fudged facts to make pre-IPO sales look larger. As defendants point out, O.B. 15 and 19, the Complaint alleges Barney Adams did not even discover the double-shipping until after the IPO. Finally, the Complaint lacks any discussion of the reason why the Prospectus makes no mention of the risk of gray marketing. Defendants are imputing fraud where none is alleged. The only inference that this Court can make is that the misstatements and omissions claimed were caused by negligence, as plaintiffs here specifically alleged.

is "false" and "misleading" and that it "contains material misrepresentations" or omissions. A false and misleading registration statement, containing material misrepresentations, is not necessarily the result of fraud. In this case, since there is no discussion or allegation that any defendant did anything fraudulently, with deceitful intent or even intentionally,[9] the Complaint does not sound in fraud and need not be pleaded under the standards of Rule 9 of the Federal Rules of Civil Procedure.

The cases defendants cite, all of which involve fraud claims, are inapposite. They are all egregious instances where plaintiffs explicitly alleged intentional, deceitful, or fraudulent behavior by defendants. *Cal. Pub. Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004), was primarily a Section 10(b) securities fraud claim. Plaintiffs incorporated all their fraud claims, including a section called "scienter and scheme allegations," into their Section 11 claims. *Id.* at 161. The court found that the Section 11 claims were "immersed in unparticularized allegations of fraud." *Id.* at 160. Plaintiffs alleged that "defendants knowingly and intentionally committed accounting violations . . ." and made intentional misrepresentations. *Id.* Moreover, plaintiffs never claimed that defendants had acted negligently. *Id.* at 160-61. *Chubb* is distinguishable from this case, where plaintiffs have alleged negligence only and made no allegations of intentional or fraudulent actions.

Likewise, in *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992), plaintiffs incorporated fraud claims, including claims of defendants' intentional behavior, into their Section 11 claims. *Id.* at 287. They "repeatedly aver that defendants 'intentionally,' 'knowingly,' or 'recklessly' misrepresented and

---

[9]Defendants point out, O.B. 6, that in ¶ 86 of the Complaint, plaintiffs allege that a risk was "concealed" from investors. The single use of this word, which may be used in the absence of fraud, and does not necessarily involve or suggest fraud, does not cause this section, let alone the entire 30-page Complaint, to sound in fraud.

13

omitted to represent certain material information." *Id.* And plaintiffs never alleged negligence. For these reasons *Shapiro* is easily distinguishable from this case, as Judge McKelvie found. *Adams I*, 176 F. Supp. 2d at 229.

Finally, defendants cite *Johnson v. NYFIX*, 399 F. Supp. 2d 105 (D. Conn. 2005), in which plaintiffs alleged both securities fraud and Section 11 claims. O.B. 6 n.4. In *NYFIX*, plaintiffs based their Section 11 claims on the same facts as recited in their fraud claims, including facts pled in the fraud claims to allege scienter. *Id.* at 122. The court noted that certain words that are associated with fraud in the 10(b) context, such as "untrue statements" and "materially false and misleading," are part of the requirement in pleading a Section 11 case. *Id.* Thus, in the Section 11 context, the mere recitation of such words, without more, cannot be found to sound in fraud. The court gave plaintiffs leave to amend their Section 11 claims, giving plaintiffs a chance either to plead their Section 11 claims with the particularity required by Rule 9, or allowing plaintiffs to remove or rewrite the Section 11 claims so that they would not allege deceitful or fraudulent intent. *Id.* at 123.

In a word, defendants' cases are all in the context of Section 10(b) fraud cases, and their Section 11 allegations directly accuse defendants of fraud. The Complaint in the present case avoids these pitfalls, pleading only negligence. Accordingly, this Court should find that the claims are properly pled in negligence and strict liability under Rule 8. *See Suprema Specialties* at * 32. ("Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims."),

## 2.    <u>Each of Plaintiffs' Allegations States a Claim Under the 1933 Act.</u>

Plaintiffs supplemented their gray market claim and brought several related claims, even though the gray market claim had been upheld by the Third Circuit, to strengthen and broaden their claims in light of

14

their continuing investigation and review of documents, and because they did not want to be restricted to their former pleadings in view of the new facts uncovered. Each of the new claims concerns material misrepresentations or omissions in the Prospectus; the information about each existed as of July 10, 1998, the date of IPO; and each alleges misrepresentations and omissions that were material, although "[m]ateriality is ordinarily an issue left to the fact finder and is therefore not typically a matter for Rule 12(b)(6) dismissal." *Adams II*, 381 F.3d at 274. *See also In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005) (stating that the stock price decline following disclosure in *Adams II* was material).

### a.    The Gray Market Allegations Continue to State a Claim.

Without legal support, defendants claim that this Court should dismiss the gray market claim because of newly added facts, even though the claim has been upheld by the Third Circuit. The cases they cite for this proposition, none of which are from this Circuit, are distinguishable. In *Bender v. Suburban Hospital, Inc.*, 159 F.3d 186 (4th Cir. 1998), plaintiff asserted that she was an "employee" but then in the same complaint alleged facts to establish that she was not an employee, in effect pleading herself out of court. No court had ever ruled on an initial pleading upholding her assertion that she was an employee. Here, unlike the *Bender* case, nothing in the facts added to the Complaint establishes that statements in the original pleadings were not accurate.

Likewise, in *Hemenway v. Peabody Coal Co.*, 159 F.3d 255 (7th Cir. 1998), plaintiffs' fraud claim was defective because the alleged omissions were in fact not omitted, by plaintiffs' own admission. There was no initial complaint that a court had ruled stated a claim, which was then dismissed because of additions in an amended complaint. The *Hemenway* situation is a far cry from this case, where nothing in the new gray market claims negates the original, sustained claim from the CAC.

15

**b.**    **Gray Marketing Was an Individual Problem at Various Times for Adams Golf and for Some of its Competitors, not an Industry-wide Problem.**

Defendants claim that, because plaintiffs alleged that Callaway warned of the risks of gray marketing in its SEC filing in a period before Adams had had any gray market problems, and because other golf manufacturers had had gray market problems at different times, this relieved Adams Golf from the responsibility to warn its shareholders of the risks of gray marketing specific to Adams Golf. The problem with this argument is that gray marketing was not an "industry-wide" problem, and it affected each manufacturer mentioned in the Complaint individually, in different ways, and at different times. The four manufacturers mentioned in the Complaint were far from the entire golf club industry. Their plight is of importance only because it shows, at the time of the IPO, that some of Adams Golf's competitors considered gray marketing a material reportable risk.

Defendants even argue without support that the "law of the case" doctrine mandates dismissal of plaintiffs' gray market claim. O.B. 9.[10] Judge McKelvie found that "to be actionable, the challenged statements must mislead reasonable investors to the prospects of Adams Golf – not to the golf industry, generally." *Adams I*, 176 F. Supp. 2d at 236. Quoted at O.B. 9. The entire gray market section of the Complaint avers that the omission of gray market risks would "mislead  reasonable investors to the prospects of Adams Golf," itself, in Judge McKelvie's words. Likewise, defendants quote from the Third

---

[10]As noted above, the law of the case doctrine limits relitigation of an issue once it has been decided in the same litigation. The doctrine holds that a court should not later change a ruling about the same issue, without new evidence. *City of Philadelphia*, 158 F.3d at 717-18. Here, defendants have asked the Court to apply a prior ruling with respect to one claim (retailer over-supply on an industry-wide basis) to an entirely separate claim (gray marketing at Adams). Since there are two different issues, the doctrine does not apply. *See Quern*, 440 U.S. at 348 n. 18.

Circuit's opinion: "the securities laws obligated Adams to disclose material information concerning its <u>own</u> business. . ." O.B. 9 (emphasis added). That, of course, is exactly what Adams failed to do with respect to gray marketing, as *Adams II* found, and as this Complaint alleges in ¶¶ 22-70. In a word, the Complaint makes no allegations about the golf industry – its allegations are about what the Prospectus omitted about Adams itself, and Adams's "own business."

In footnotes 8 and 9, O.B. 9, defendants cite several irrelevant cases. These cases are irrelevant because the Complaint does not allege that Adams should have revealed the risks of gray marketing as an industry-wide trend, or that Adams should have revealed the problems of its competitors. The Prospectus should have revealed the threat and risks of gray marketing, not to the industry as a whole but to Adams, because gray marketing was a material threat and risk to Adams in particular.[11]

### c.    The Prospectus Omitted the Material Threat to Retailers' Margins.

Defendants incorrectly claim that the threat to Adams presented by retailer margins was revealed in the Prospectus. Defendants appear to misapprehend what retailer margins are. Retailer margins refer to the difference between Adams's wholesale price, or what a retailer pays for a club, and the price at which the retailer can sell the club. According to the Prospectus, A025, because Adams Golf distributed only to exclusive retailers who sold the clubs at premium prices, the retailers made a nice profit and were eager to sell Adams clubs. The Prospectus should also have warned that there was a risk to Adams arising

---

[11]In a misleading footnote, O.B. 10 n. 10, defendants claim incorrectly that, in *Adams II*, the Third Circuit "held that there were no false statements in the Prospectus." The cited pages of *Adams II* encompass the end of the Circuit Court's analysis of the gray market claim and the beginning of its analysis of the oversupply claim. There are no holdings on those pages about the claims that have been added to the Complaint, which the Third Circuit obviously could not have anticipated. *Adams II*, 381 F.3d at 277-78.

from the danger that retailer margins would erode or plunge, which could cause Adams to lose the retailer

network which it touted in the Prospectus. A004 and A025.

Defendants claim that the Prospectus did reveal the risk to retailers' margins in A009-11.

However, the Prospectus on those pages warned about the risks posed by Adams's competition -- the risk

that competition would cause Adams's prices to decline and its promotional expenditures to increase --

but nowhere did the Prospectus mention the concept or the words "retailer margins," even though two of

the underwriters had noted the retailer margin risk in internal memos prepared before the IPO. Complaint

¶¶ 87, 88. Further, because the Prospectus boasted about the strong retailer network, A004 and A025,

the threat to that network, as noted by the underwriters in their internal memos, should have been included

to make the statements in the Prospectus not misleading.

### d.    The Prospectus Should Have Warned that the Company Had No Way to Protect its Selective Distribution Policy from Gray Marketing.

Defendants argue that there was no need for the Prospectus to warn about the risks to its selective

distribution policy. However, at the time of the IPO, the lack of a tracing mechanism and the absence of

written contracts with Adams's retailers and distributors made it impossible for Adams Golf to control the

transshipping of its clubs. Complaint ¶¶ 81-84. The Prospectus should have informed investors that

Adams was at gray marketers' mercy, because Adams had no enforceable agreement with its customers

preventing them from transshipping,[12] and no way to tell which customers were supplying Costco. Plaintiffs

---

[12]Attempting improperly to argue the merits on a motion to dismiss, defendants claim that Adams had an oral agreement with its retailers concerning transshipments and suggested retail price. O.B. 11-12. However, defendants provide no factual support for this statement, and, in any event, some of Adams's customers ignored this alleged agreement and transshipped clubs to Costco at low prices. Complaint ¶¶ 45-47, 61. Defendants also claim anti-trust law problems with written contracts. O.B. 11. This is another issue of fact, inappropriate in this motion.

do not claim, as defendants suggest, that the Prospectus should have announced *how* the Company would enforce its selective distribution policy. O.B. 12. Rather, the Prospectus should have warned investors of the risk that Adams lacked the means to do so.

Defendants cite no applicable case law. This is not a speculation, business judgment, or trade secret issue. Gray market selling was a known trend and uncertainty that Adams reasonably expected would have a material unfavorable impact. 17 C.F.R. §229, 303 (a)(3)(ii); *Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000); Complaint ¶¶ 42-52 (Barney Adams was aware of the problem, saw it increasing and unsuccessfully attempted to correct it). Investors had a right to know this before they bought the stock.

### e.    The SEC Regulations and GAAP Provisions Required Defendants to Disclose Known Trends and Uncertainties and Loss Contingencies.

In their eagerness to find fraud allegations where none were made, defendants have misread the SEC and GAAP section of the Complaint, ¶¶ 89 to 91. This section does not plead accounting fraud. It simply sets forth applicable regulations and explains why those regulations required the Prospectus to state the risk of gray marketing and the lack of a mechanism to stop it, and the risks of double-shipping and similar practices and their probable effect on post IPO sales. Section 11 renders an omission actionable if the material fact omitted is "required to be stated therein" or, alternatively, if it is "necessary to make the statements therein not misleading." This section of the Complaint simply explains why certain disclosures were "required." Thus, virtually all of defendants' arguments about this section are irrelevant.

Defendants first argue that plaintiffs have not alleged how the double-shipping and sales with unlimited return rights rendered the financial statements false or misleading. O.B. 14-19. Again, defendants miss the point. False financial reporting with respect to historical results is not what the

Complaint alleges. Instead, the Complaint alleges that, given the questionable sales practices, the Prospectus should have *warned*, in the risk section, that such practices could lead to post-IPO problems, such as increased returns and decreased sales. Complaint ¶¶ 71-80. Thus, the risk section of the Prospectus was false and misleading.

Defendants appear to argue that neither double-shipping nor unlimited rights of return are "accounting irregularities." O.B. 15-16. Once again, the Complaint does not allege accounting irregularities, but instead alleges that the risks presented by these practices should have been disclosed.

Defendants assert that the allegations of accounting improprieties are based on post-IPO facts. O.B. 18-20. That is not accurate. Inside sales staff members, whom plaintiffs have interviewed, knew about the double-shipping and unlimited returns practices before the IPO. Complaint ¶¶ 72-79. Sales by Costco and the lack of means to track sales and control distributors were known before the IPO. Complaint ¶¶ 44-49, 82-84. The Barney Adams memo, though written a month after the IPO, clearly references the questionable sales practices occurring before the IPO. Complaint ¶¶ 76-79.

Defendants argue that the product warranty and sales returns reserves at the time of the IPO were adequately estimated and larger than they had ever been before. O.B. 18. Once again, defendants' arguments are irrelevant. Plaintiffs claim that the Prospectus should have revealed the risk existing at the time of the IPO that post-IPO returns would increase, and sales decrease. Plaintiffs have made no claims about the falsity of the March 31, 1998 reserves shown in the Prospectus at A063.

Defendants claim that, under the securities laws, Adams Golf had no duty to disclose the double-shipping and unlimited rights of return. They claim that such sales practices did not constitute a known trend that the Company expected would materially impact sales. O.B.18-19. The Complaint alleges that

20

double-shipping was "a pre-IPO practice," ¶ 72, and that "practices such as double-shipping, shipments

with rights of return amounting to consignments, and underreserving . . . constituted 'known trends or

uncertainties' that the Company reasonably expected would have a materially adverse impact on sales and

income from continuing operations." Complaint ¶ 89(a). These allegations must be accepted as true by

the Court on a motion to dismiss.

Defendants claim that the Company did not know about the double-shipping, so it could not have

considered it a trend. This is an issue of fact that cannot be decided in this motion. In any event, the

Complaint alleges that inside salespersons knew about double-shipping before the IPO, and that inside

salesperson Jay Greanay was involved in the practice. Complaint ¶ 72. Accordingly, pursuant to Item 303

of SEC Regulation SK, the Complaint properly alleged that the Prospectus should have disclosed the

double-shipping and shipments with unlimited rights of return.

### f.    Materiality is Not an Issue on a Motion to Dismiss

Undaunted by the Third Circuit's direct ruling in this case that "[m]ateriality is ordinarily an issue

left to the fact-finder and is therefore not typically a matter for Rule 12(b)(6) dismissal," *Adams II,* 381

F.3d at 274, and the Third Circuit's conclusion that the price decline in *Adams II* was material, *Merck,*

432 F.3d at 275, defendants once more try to attack plaintiffs' claims on grounds of materiality. The

Complaint alleges that the Prospectus should have warned that, because of the improper sales practices,

Adams faced the material risk of higher returns and lower sales post-IPO. Complaint ¶¶ 71-80. At the

end of the class period, Barney Adams announced that net sales would be lower in the future, and the stock

went down 27%. Complaint ¶¶ 92, 93. According to *Merck*, the test of materiality in a publicly traded

stock is whether the corrective announcement causes a stock price correction. *Merck*, 432 F.3d at 273-

21

74. Since there was a correction in this case, materiality is adequately pled.

Defendants claim that even though the Complaint alleges that Adams was 43% underreserved for returns in July 1998, the allegations about sales practices are immaterial. See Complaint ¶ 78. However, returns are only half of the question. Over-shipping, as explained in the Complaint ¶¶ 71-80, presents the risk, post-IPO, of both lower sales and higher returns, because some customers kept the excess clubs but did not reorder, affecting future sales. Complaint ¶ 75. Further, as can be seen from Barney Adams's reaction to discovering the sales improprieties, Complaint ¶¶ 76-80, double shipping was plainly material to Barney Adams. Indeed it was making him "sick." He asked "Are we living the big lie? Did we present Road Show numbers for '98, '99 that we have no idea we can attain? Is the big lie catching up with us …?" Complaint ¶79. It is clear that "the big lie" would have been a matter of extreme interest to virtually any investor in the Adams IPO. These allegations of materiality are sufficient to leave the issue to the fact finders, as *Adams II* suggests.

### 3.    Plaintiffs Have Sufficiently Pled Control Person Liability Under Section 15.

Defendants argue that they cannot be held liable as "control persons" under Section 15 of the 1933 Act, because plaintiffs have failed to allege an underlying violation, and failed to allege that each defendant had control over the Company. O.B. 20-21. To the contrary, plaintiffs have established that the defendants were, throughout the class period, controlling persons of Adams within the meaning of Section 15. Plaintiffs have sufficiently alleged: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. *Tracinda Corp. v. DaimlerChrysler*, 197 F. Supp. 2d 42,

55 (D. Del. 2002).[13]

In this regard, contrary to the defendants' allegations, the Complaint sufficiently alleges primary underlying violations of Sections 11 and 12(a)(2) of the Act by defendant Adams, as the Third Circuit has held. *Adams II*, 381 F.3d at 277-78; Complaint ¶¶ 94-113.[14] Further, the Complaint alleges that the individuals among the defendants – Barney Adams, Hatfield, Murtland, Brown, Casati, Conner, and Patchin – are all liable as control persons of Adams by virtue of their positions as directors and/or senior officers of Adams. The Complaint pleads that because of their management positions and/or membership on the board of directors, they had the power and influence to control Adams. The Complaint alleges they were responsible for the contents and dissemination of the Prospectus. Complaint ¶¶ 97, 106. By signing the Registration Statement and failing to conduct a reasonable and diligent investigation of the statements contained in the Prospectus, the individuals among the defendants authorized the dissemination of the false and misleading information given to plaintiffs who purchased Adams stock. In addition, the Complaint alleges that the individual defendants each had a series of business and/or personal relationships with other directors and/or major shareholders of Adams. Complaint ¶ 116.

---

[13]The Court in *Tracinda* stated, "[t]he elements of controlling persons claims under Section 20 of the Exchange Act and Section 15 of the Securities Act are identical." *Id.* at 55. Therefore, cases analyzing control person liability under either Act are equally applicable.

[14]Cases defendants cite in support of the proposition that controlling persons' liability can exist only if an underlying securities violation has been established, are easily distinguishable. Defendants cite *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004), where, because plaintiffs failed to state a Rule 10b-5 claim, the court held its control person liability claim failed; and *In re Rockefeller Center Properties, Inc. Sec. Litig.*, 311 F.3d 198, 211 (3d Cir. 2002), where the court found no control person liability because there were no securities law violations. Here, the Third Circuit has concluded that plaintiffs have adequately alleged underlying securities violations on which control person liability can be premised. *Adams II*, 381 F.3d at 277-78.

Defendants erroneously assert that plaintiffs have failed to allege "facts to 'support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator.'" *Tracinda*, 197 F. Supp. 2d at 72; O.B. 21. Unfortunately, defendants fail to quote the remainder of the sentence, that "[a]llegations that a director signed a fraudulent SEC filing and was in a position to exercise control over the primary violator are sufficient to withstand a motion to dismiss." *Id.* Defendants also claim that plaintiffs rely solely on the defendants' corporate titles to allege control over the Company. O.B. at 21-22.[15] To the contrary, plaintiffs' control person allegations are detailed and tailored to the individuals, going beyond simply a statement of the individuals' corporate offices. Complaint ¶¶ 97, 106, 116.

Claims of control liability need not be stated with the particularity of Rule 9(b) but, rather, are subject to the ordinary notice pleading requirements of Rule 8(a). *See, e.g., In re Storage Tech. Corp. Sec. Litig.*, 147 F.R.D. 232, 236 (D. Colo. 1993). It is sufficient to explain how the "defendants generally

---

[15]Defendants rely on several cases to support the proposition that allegations of defendants' status alone are insufficient to establish control over the Company for purposes of Section 15. In citing *Tracinda*, defendants do not take into account that *Tracinda's* control person allegations that defendants signed a false SEC filing and were in a position to control the Company, which the District of Delaware Court found passed muster, were very similar to those in the Complaint. Defendants also cite *In re Rent-Way Secs. Litig.*, 209 F. Supp. 2d 493, 524 (W.D. Pa. 2002), which held plaintiffs properly pleaded control person liability where they made allegations that "support a reasonable inference that [all of the defendants] had the potential to influence and direct the activities of the primary violator." *Id.* The court further stated, "[e]ach of these defendants is also alleged to have signed one or more statements filed with the SEC . . . and to have had the ability to control the contents of these various statements." *Id.* Here, as in *Tracinda*, plaintiffs allege that the individual defendants signed a false and misleading SEC filing, the Registration Statement, and were in a position to control the Company.

Defendants also rely on *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002). O.B. at 21-22. In *Digital Island,* the court held control person liability failed because plaintiffs failed to allege directors played a role in the alleged non-disclosures in connection with a tender offer. Here, plaintiffs allege defendants had supervisory control and that they had control over the specific transaction, signing the registration statement. Furthermore, *Digital Island* states "the court is mindful that at least one District Court has found allegations that the defendant directors 'participated in the drafting, preparation, and/or approval' of the alleged misleading statements sufficient to state a . . .[control person liability] claim." *Id.* at 562 (citing *Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 308-309, 314-315 (D. Del. 2001)).

exercised control over the accused operations, but need not demonstrate that defendants actually exercised their authority to control the specific transaction or activity that is alleged to give rise to liability." *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 731, (D. Del. 2000). Here, the Complaint adequately set forth not only how defendants controlled Adams's affairs generally, but also that defendants signed the false and misleading Registration Statement, and failed to discharge their duties of investigation of whether those documents contained any material misstatements or omissions. ¶¶ 94-99, 103-111.

Moreover, allegations of control liability are intensely factual questions that cannot typically be decided on the pleadings. "Whether a defendant is a 'controlling person' within the meaning of federal securities law presents a question of fact which cannot ordinarily be resolved at the pleading stage." *In re Chambers Dev. Sec. Litig.*, 848 F. Supp. 602, 618 (W.D. Pa. 1994) ("[T]he Court observes that many, perhaps a majority, of defendants' numerous arguments for dismissal of the Amended Complaint are premature as they involve factual questions and raise disputes as to facts or inferences to be drawn from facts which, under the well-known standards for determining the adequacy of the complaint, cannot be resolved at this stage of the proceedings."); *see also Reliance*, 91 F. Supp. 2d at 731; *In re MobileMedia Secs. Litig.*, 28 F. Supp. 2d 901, 940 (D.N.J. 1998).

25

## E.    CONCLUSION

For the reasons detailed herein, this Court should deny defendants' motion to dismiss. Should the

Court grant any part of defendants' motion, plaintiffs respectfully request that they be given an opportunity

to amend.

Dated: February 27, 2006


BERGER & MONTAGUE, P.C.
Todd S. Collins
Elizabeth W. Fox
Neil Mara
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000

***Plaintiffs' Lead Counsel***


OF COUNSEL:

LAW OFFICES OF DONALD B. LEWIS
Donald B. Lewis
5 Bala Cynwyd Road
Bala Cynwyd, Pennsylvania 19004
(610) 668-0331

KELLER ROHRBACK L.L.P.
Lynn Lincoln Sarko
Juli F. Desper
Elizabeth Leland
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900

Dated: February 27, 2006


ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.

   /s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
Suite 1401, Citizens Bank Center
P. O. Box 1070
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com

***Plaintiffs' Delaware Liaison Counsel***


26

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 27th day of February, 2006, I electronically filed

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** with the Clerk of

Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

and a copy has been served by electronic mail upon the following:

Theodore J. McEvoy, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com

Michael J. Chepiga, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: mchepiga@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

Michelle Reed, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: mreed@akingump.com

s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT, GROSS
 & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com