# EXHIBIT A

1 of 1 DOCUMENT

**IN RE: SUPREMA SPECIALTIES, INC. SECURITIES LITIGATION; Teachers'
Retirement System of Louisiana, Appellant in 04-3716; Special Situations Fund, III,
L.P.; Special Situations Cayman Fund, L.P., Appellants in 04-3755**

**Nos. 04-3716 & 04-3755**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2006 U.S. App. LEXIS 4307*

**September 14, 2005, Argued
February 23, 2006, Filed**

**PRIOR HISTORY:** [\*1] On Appeal from the United States District Court for the District of New Jersey. (D.C. Nos. 02-cv-00168, 02-cv-03099). District Judge: Honorable William H. Walls. *Special Situations Fund, III, L.P. v. Cocciola (In re Suprema Specialties, Inc. Sec. Litig.), 334 F. Supp. 2d 637, 2004 U.S. Dist. LEXIS 16932 (D.N.J., 2004)*

**COUNSEL:** Daniel L. Berger (Argued), J. Erik Sandstedt, Bernstein, Litowitz, Berger & Grossman, LLP, New York, NY, Attorneys for Appellant, Teachers' Retirement System of Louisiana.

Lawrence M. Rolnick (Argued), Lowenstein Sandler P.C., Roseland, NJ; Marc B. Kramer (Argued), Short Hills, NJ, Attorneys for Appellants, Special Situations Fund, III, L.P. and Special Situations Cayman Fund, L.P.

Phillip A. Geraci (Argued), Frederic W. Yerman, Kaye Scholer, New York, NY; Diane J. O'Neil, Mendes & Mount, Newark, NJ; Michael T. Conway, Lazare, Potter, Giacovas & Kranjac, New York, NY, Attorneys for Appellees, Mark Cocchiola and Marco Cocchiola.

Nancy E. Delaney (Argued), T. Barry Kingham, Dora Straus, Curtis, Mallet-Prevost, Colt & Mosle, LLP, New York, NY, Attorneys for Appellee, Steven Venechanos.

William J. Snipes (Argued), Sullivan & Cromwell, LLP, New York, NY; Charles J. Benjamin, Jr., McCarter & English, LLP, Newark, NJ, Attorneys for Appellees, Rudolph Acosta, Paul DeSocia, and Barry Rutcofsky.

Ira G. Greenberg [\*2] (Argued), Edwards, Angell, Palmer & Dodge, New York, NY, Attorney for Appellee, BDO Seidman, LLP.

Robert L. Hickok (Argued), Pepper Hamilton LLP, Philadelphia, PA, Attorney for Appellees, Roth Capital Partners, LLC, Janney Montgomery Scott, LLC, and Pacific Growth Equities, Inc.

Thomas B. Lewis, Stark & Stark, Princeton, NJ, Attorneys for Appellee, Oberweis.net.

Anthony P. La Rocco, Kirkpatrick & Lockhart Nicholson Graham LLP, Newark, NJ; Keith A. Ketterling, Stoll Stoll Berne Lokting & Shlachter PC, Portland, OR, Attorneys for Appellee, Paulson Investment Company, Inc.

Robert A. Assuncao, DLA Piper Rudnick Gray Cary US LLP, Edison, NJ, Attorneys for Appellee, Westminster Securities Corp.

Nooshin Namazi (Argued), Kevin J. O'Malley, Nicoletti Hornig Campise & Sweeney, New York, NY, Attorneys for Appellee, Westport Resources Investment Services, Inc.

**JUDGES:** Before: SLOVITER, BARRY, and SMITH, Circuit Judges.

2006 U.S. App. LEXIS 4307, *

**OPINIONBY:** SLOVITER

**OPINION:**

OPINION OF THE COURT

SLOVITER, Circuit Judge

Table of Contents

I. A. The Rise and Fall of Suprema

B. The Secondary Offerings

C. Procedural History

II. A. Section 11 and Section 12(a)(2) Claims

B. Section 10(b) Claims [*3]

1. The Officers

a) Motive and Opportunity

b) Circumstantial Evidence of Misconduct

2. The Auditor

3. The Outside Directors

4. The 2000 and 2001 Underwriters

C. Section 18 Claims

D. Section 15 and Section 20(a) Claims

E. Pendent State law claims

III. Conclusion

At the center of this securities fraud action is Suprema Specialties, Inc. ("Suprema"), a now-defunct company that presented itself as a producer and distributor of all natural gourmet Italian cheeses. Over a two-year period, Suprema reported wildly successful growth in its sales and receivables, thereby enticing lenders to increase its credit line and luring investors to the purchase of its stock. In truth, Suprema had fabricated millions of dollars in cheese sales and engaged in other fraudulent schemes that ultimately led to the company's dissolution in bankruptcy. Government investigations resulted in four individuals connected to Suprema's schemes pleading guilty to federal charges of, inter alia, conspiracy to commit securities fraud. Those individuals have admitted that a number of Suprema's public statements regarding its finances and the nature of its business were untrue.

The plaintiffs-appellants [*4] here are two institutional investors, Special Situations Fund, III, L.P., and Special Situations Fund Cayman, L.P. (collectively, the "SSF Plaintiffs"), and the Teachers' Retirement System of Louisiana (referred to as "Lead Class Plaintiff" because it held that status in the consolidated class actions before the District Court). SSF Plaintiffs and Lead Class Plaintiff brought separate actions for damages against Suprema's former officers and directors, its auditor, and several investment firms that served as underwriters in two public stock offerings through which plaintiffs claim to have acquired Suprema stock. Plaintiffs asserted claims for relief under *Sections 11, 12(a)(2),* and *15* of the Securities Act of 1933 (the "Securities Act"), and *Sections 10(b), 18,* and *20* of the Securities and Exchange Act of 1934 (the "Exchange Act"), along with fraud and misrepresentation claims under state law. On defendants' motions, the United States District Court for the District of New Jersey dismissed all claims pursuant to *Rules 9(b)* and *12(b)(6)* of the Federal Rules of Civil Procedure, as well as provisions of the Private Securities Litigation Reform Act [*5] ("PSLRA"). Among the important issues presented on appeal is whether the District Court properly ap-

plied the "sounds in fraud" doctrine in dismissing the claims asserted under *Section 11* and *Section 12(a)(2)* despite plaintiffs' efforts to ground their Securities Act claims in negligence and to plead them separately in the complaints from their fraud-based claims. We will reverse the District Court's orders dismissing the claims under *Sections 11*, *12(a)(2)*, and *15* of the Securities Act and *Section 10(b)* of the Exchange Act as to some of the defendants, and we will affirm as to the dismissal of the remaining counts. We will remand as to the state law claims.

**I.**

In setting forth the underlying facts, we accept as true the well-pleaded allegations in plaintiffs' second amended complaints and consider the documents incorporated by reference therein. See *Cal. Pub. Employees Ret. Sys. v. Chubb Corp., 394 F.3d 126, 134 (3d Cir. 2004)* (hereinafter "CALPERS").

A. The Rise and Fall of Suprema

Suprema was founded as a New York non-public corporation in 1983. It became a publicly traded company in 1991 and was listed on the NASDAQ (trading under the symbol [*6] "CHEZ") in 1993. Suprema had its corporate headquarters, along with a processing plant, in Paterson, New Jersey, and it operated three wholly-owned subsidiaries, at which it manufactured and processed cheese, in Manteca, California; Ogdensburg, New York; and Blackfoot, Idaho. Suprema's business was divided between two product lines: "hard cheese," which included imported and domestically produced parmesan and romano, and "soft-cheese," which included domestically produced mozzarella, ricotta, and provolone.

Defendant-Appellee Mark Cocchiola was a founder of Suprema and acted as the company's Executive Vice-President, CEO, and Chairman of the Board of Directors. Defendant-Appellee Steven Venechanos was the company's CFO and Secretary, and also a member of the Board of Directors during the Class Period. (Cocchiola and Venechanos will be referred to collectively as the "Officers.") Defendants-Appellees Marco Cocchiola (Mark Cocchiola's father), Rudolph Acosta, Jr., Paul DeSocio, and Barry Rutcofsky (collectively, the "Outside Directors") were members of the Board of Directors. (We will refer to Mark Cocchiola simply as "Cocchiola" and to Marco Cocchiola by his full name.) Marco Cocchiola [*7] was also Suprema's Operations Manager. Acosta, DeSocio, and Rutcofsky were members of the Board's Audit Committee. Defendant-Appellee BDO Seidman, LLP ("BDO") was Suprema's auditor throughout the class period.

In 2000 and 2001, Suprema reported dramatic growth in sales and receivables, which it attributed primarily to growth in sales of its domestically manufactured hard cheeses. Suprema's net sales for fiscal year 2000 increased to $ 278.4 million, reflecting a 58% increase over fiscal year 1999, and for fiscal year 2001, increased to $ 420.3 million, or 51% over fiscal year 2000. In its hard cheese business alone, Suprema reported 400% growth in revenue between fiscal year 1999 and the end of fiscal year 2001. Its receivables were reported to have grown from $ 36 million at the end of fiscal year 1999 to $ 101.8 million by the end of fiscal year 2001. During this same period, industry-wide growth in sales was only approximately 9% per year. In September 2001, FORTUNE MAGAZINE named Suprema the twenty-third fastest growing small company in the United States, and shortly thereafter FORBES MAGAZINE ranked it as the twenty-second best small company. Between the fourth quarter of 1998 [*8] and the fourth quarter of 2000, the company's average share price more than doubled.

State and federal investigations subsequently revealed that Suprema's explosive growth was an illusion-- the product of a fraudulent scheme involving so-called round-trip sales or circular transactions associated with the hard cheese side of its business. The round-trip sales scheme was one in which Suprema purportedly sold hard cheese products to entities posing as customers, which then sold the fictitious products to entities posing as suppliers. The "suppliers," in turn, sold the products back to Suprema. In most cases, the customer and the supplier in these sales shared a common owner who would reap commissions on the fictitious transactions. According to a civil complaint filed by the Securities and Exchange Commission ("SEC") in 2004, fictitious sales accounted for approximately 30%, 65%, 85% and 87% of Suprema's accounts receivable for fiscal years 1998, 1999, 2000, and 2001.

Millions of dollars in company checks-- some signed by Cocchiola, some by Venechanos, and some by both-- were issued to ostensible "suppliers" during 2001. The apparent increase in net sales and accounts receivable brought [*9] increases in the company's line of credit. Suprema's credit line increased from $ 35 million in 1998 to $ 140 million in 2001. The increased credit line led to an expansion in the volume and value of fictitious round-trip sales, which in turn led to further increases in accounts receivable, thereby fueling the increased line of credit. The ever-widening cycle produced the appearance, on paper, of phenomenal growth.

2006 U.S. App. LEXIS 4307, *

The invoices issued in connection with the circular scheme generally did not correspond to any actual shipments. Some of the "ship to" locations identified in invoices for huge quantities of cheese were nothing more than postal boxes, storefronts, or single-family residences. The shipments that were actually made contained mislabeled or adulterated cheese products that were generally unfit for human consumption. Suprema purchased imitation cheeses and other non-cheese products and relabeled them as higher-priced premium cheeses, and it adulterated its "all natural" cheeses with fillers to reduce costs and increase sales. Inventory impounded by the government in connection with its investigations turned out to have been grossly overvalued and was actually worth less than [*10] $ 2 million, though Suprema had represented it in December 2001 as worth more than $ 60 million.

On December 21, 2001, just six weeks after Suprema conducted a substantial public stock offering (discussed below), Venechanos and Suprema's controller, Arthur Christensen, resigned, and the company announced that it had initiated an internal investigation into its previously reported financial results. In response to this announcement, NASDAQ suspended trading of Suprema's stock. On January 25, 2002, the company announced that it had engaged Deloitte & Touche, LLP to continue the investigation.

From that point, Suprema and the fraudulent scheme upon which its apparent success had been founded unraveled quickly. On February 4, 2002, federal authorities executed a search warrant at Suprema's headquarters and seized financial and manufacturing records. Thereafter, Suprema revealed that it was being criminally investigated by the FBI, the FDA, the SEC, and the New Jersey Department of Agriculture. On February 18, 2002, BDO resigned as Suprema's auditor, citing, among other reasons, an inability to determine whether the company had adequate internal controls necessary to develop reliable [*11] financial statements, whether Suprema's prior financial statements contained material inaccuracies, and whether it could rely on management's representations.

On February 24, 2002, Suprema filed for Chapter 11 bankruptcy protection. On the same day, it announced that Cocchiola had resigned as CEO and that NASDAQ would be de-listing its stock as of March 1, 2002. On March 20, 2002, the company's Chapter 11 reorganization was converted into a Chapter 7 liquidation, and a liquidation trustee was appointed.

On January 7, 2004, four individuals associated with the company-- the former Operations Manager of the Paterson plant, John Van Sickell, n1 and the principals of three companies that had been Suprema's ostensible customers or suppliers, Lawrence Fransen, George Vieira, and Robert Quattrone-- pled guilty to federal charges of, inter alia, conspiracy to commit securities fraud, bank fraud, and mail fraud in connection with the round-trip sales scheme. In their plea allocutions, all four individuals admitted that their criminal actions, including participation in the invoicing scheme and adulteration of products, were undertaken at the direction and under the supervision of, or with [*12] the knowledge of and in conjunction with, Suprema's management. The criminal informations filed by the United States Attorney in the case alleged that $ 700 million of Suprema's $ 1.2 billion in net sales between 1996 and 2002 (87% of all sales made to the companies controlled by Fransen, Vieira, and Quattrone) were entirely fictitious. n2

n1 Van Sickell had worked as an assistant to the company's former Executive Vice-President, Paul Lauriero, who died in August 2001. Following Lauriero's death, Cocchiola assumed his responsibilities, which included overseeing the company's general operations and its procurement of raw materials for production.

n2 At the time the District Court decided the motions to dismiss, neither Cocchiola nor Venechanos was under indictment. Pursuant to a motion to expand the record on appeal, which we granted, SSF Plaintiffs submitted a Supplemental Appendix containing a 38-count grand jury indictment of those individuals in connection with their activities at Suprema. The indictment, which was brought in the United States District Court for the District of New Jersey, charges Cocchiola and Venechanos with, inter alia, conspiracy, mail fraud, wire fraud, bank fraud, and making false statements to the SEC. Because the indictments of Cocchiola and Venechanos were not part of the record below, we do not consider them for purposes of this appeal.

[*13]

B. The Secondary Offerings

Suprema conducted two public stock offerings relevant to this action: the first was in August 2000 (the "2000 Offering"), and the second was in November 2001 (the "2001 Offering"). The 2000 Offering was for 1.2 million shares of common stock. It was underwritten by, inter alia, defendants-appellees Oberweis.net; Paulson Investment Co.; West-

minster Securities Corp.; and Westport Resources (collectively, the "2000 Underwriters"). n3 On May 10, 2000, Suprema filed a registration statement and prospectus on Form S-2 with the SEC announcing the offering. Cocchiola, Venechanos, Marco Cocchiola, Acosta, and DeSocio signed the Form S-2. The Form S-2 incorporated by reference Suprema's annual report on Form 10-K filed on June 30, 1999, its quarterly reports on Form 10-Q filed on September 30 and December 31, 1999, and its proxy statement filed on October 22, 1999.

> n3 The 2000 Offering was also underwritten by Hobbs Melville Securities Corp.; Auerbach, Pollak & Richardson, Inc.; Girard Securities, Inc.; and Mercer Partners, Inc. These four companies were named as defendants by the SSF Plaintiffs but never entered appearances in the action. There is no indication on the district court docket that the SSF Plaintiffs served process upon them. Counsel for SSF Plaintiffs suggested at oral argument before this court that "some" of these defendants "are being represented by Oberweis.net," but we find no indication that this is the case. Tr. Oral Arg. at 55. Given the SSF Plaintiffs' failure to brief any issue concerning the non-appearance of these underwriters, we conclude that any claims against them are not properly before us.

[*14]

The 2001 Offering was for 4.05 million shares of common stock. It was underwritten by defendants-appellees Janney Montgomery Scott, LLC; Pacific Growth Equities, Inc.; and Roth Capital Partners, LLC (collectively, the "2001 Underwriters"). Cocchiola, Venechanos, Marco Cocchiola, Acosta, DeSocio, and Rutcofsky signed the Form S-2 filed with the SEC in connection with the offering. The Form S-2 incorporated by reference Suprema's annual report on Form 10-K filed on September 28, 2001. By the close of the 2001 Offering, Suprema had sold 3.5 million shares for proceeds of $ 41.5 million.

BDO issued unqualified audit opinions in August 1999 and August 2001 regarding Suprema's consolidated financial statements for fiscal years 1999, 2000, and 2001. The audit opinions were incorporated into the Form S-2s that Suprema filed for the 2000 and 2001 Offerings. BDO stated that it had performed its audits in accordance with Generally Accepted Auditing Standards ("GAAS") n4 and that, in its opinion,

> the consolidated financial statements ... present fairly, in all material respects, the financial position of [Suprema and its wholly owned subsidiaries] as of June 30, 2000 and 2001, and [*15] the results of their operations and their cash flows for each of the three years in the period ended June 30, 2001, in conformity with generally accepted accounting principles.

App. at 195, 903.

> n4 GAAS are the standards established by the Auditing Standards Board of the American Institute of Certified Public Accountants for the conduct of auditors performing an examination. See *In re IKON Office Solutions, Inc. Sec. Litig., 277 F.3d 658, 664 n.5 (3d Cir. 2002)*.

SSF Plaintiffs allege that they purchased 250,000 shares of Suprema common stock in the 2000 Offering at a price of $ 8.00 per share, reflecting a total investment of $ 2,000,000. SSF Plaintiffs allegedly made additional purchases of Suprema stock at various prices throughout 2000 and 2001. SSF Plaintiffs then allegedly purchased 13,000 shares, at $ 12.75 per share, from underwriter Pacific Growth Equities, and averred in the complaint that the shares were "traceable to" the 2001 Offering. App. at 268. Lead Class Plaintiff, a [*16] public pension fund organized for the benefit of current and retired public school teachers of the State of Louisiana, alleges that it purchased 47,000 shares of Suprema stock, at $ 12.75 per share, from underwriter Janney Montgomery Scott, LLC, on the date of the 2001 Offering. Lead Class Plaintiff makes no claim in this action based on the 2000 Offering.

C. Procedural History

Following the revelation in December 2001 that Suprema was conducting an internal investigation, numerous putative class action suits were filed, including Lead Class Plaintiff's suit on January 14, 2002. The District Court consoli-

dated the cases, pursuant to provisions of the PSLRA, and appointed Lead Class Plaintiff to represent the class on July 1, 2002. See *Smith v. Suprema Specialties, Inc., 206 F. Supp. 2d 627 (D.N.J. 2002).* SSF Plaintiffs filed a separate, non-class complaint on June 27, 2002, raising similar claims against most of the same parties.

Following its appointment, Lead Class Plaintiff filed an amended class complaint on September 11, 2002. SSF Plaintiffs filed an amended complaint on September 17, 2002. The District Court consolidated the two cases for pre-trial [*17] proceedings. Thereafter, the District Court granted defendants' motions to dismiss all claims in the amended complaints, concluding that "the complaints lack the factual specificity demanded by the PSLRA and may not be so maintained." App. at 474. In its order, the District Court afforded plaintiffs leave to file a motion to amend the complaints to cure, if possible, what it identified as the defects in plaintiffs' pleading of the claims. Plaintiffs so moved, and defendants opposed the motion.

On the day scheduled for oral argument on the motion to amend, January 8, 2004, counsel for Lead Class Plaintiff informed the District Court that Van Sickell, Fransen, Vieira, and Quattrone had entered their guilty pleas on the previous day. In view of this new information, the parties agreed that plaintiffs should be granted leave to file second amended complaints in which they could incorporate newly discovered facts arising out of the criminal informations and guilty pleas. Accordingly, plaintiffs filed their respective second amended complaints on January 30, 2004.

Lead Class Plaintiff's second amended complaint asserted violations of *Section 11* of the Securities Act by all defendants; [*18] *Section 12(a)(2)* of the Securities Act by the Officers and 2001 Underwriters; *Section 15* of the Securities Act by the Officers; *Section 10(b)* of the Exchange Act by the Officers and BDO; and *Section 20* of the Exchange Act by the Officers. Lead Class Plaintiff brought suit on its own behalf and on behalf of all those who acquired Suprema common stock in the 2001 Offering pursuant to the registration statement, or acquired Suprema common stock during the class period of September 27, 2000 through December 21, 2001, and sustained a loss as a result.

SSF Plaintiffs' second amended complaint asserted violations of the following provisions: *Section 11* by all defendants; *Section 12(a)(2)* by the Officers and (non-appearing defendant) Hobbs Melville; *Section 15* by the Officers and the Outside Directors; *Section 18* of the Exchange Act by the Officers, the Outside Directors, and BDO; *Section 10(b)* by all defendants; *Section 20* by the Officers and the Outside Directors; and common law fraud and negligent misrepresentation by all defendants.

Although plaintiffs added a host of new allegations arising out of the Suprema criminal investigations and indictments, all defendants again moved to dismiss [*19] for failure to state a claim. The District Court granted the motions and dismissed the second amended complaints in their entirety. See *Special Situations Fund, III, L.P. v. Cocciola (In re Suprema Specialties, Inc. Sec. Litig.), 334 F. Supp. 2d 637 (D.N.J. 2004).* The District Court dismissed plaintiffs' *Section 11* and *12(a)(2)* claims on the ground that those claims "sounded in fraud" and failed to satisfy the heightened pleading requirement of *Federal Rule of Civil Procedure 9(b)* for averments of fraud. The District Court dismissed plaintiffs' *Section 10(b)* claims for failure adequately to plead scienter; it dismissed SSF Plaintiffs' Section 18 claims for failure adequately to plead actual reliance on alleged material misstatements; and it dismissed plaintiffs' *Section 15* and *Section 20(a)* control-person claims for failure adequately to plead underlying violations by the Officers. The District Court declined to exercise supplemental jurisdiction over the SSF Plaintiffs' state law claims.

Plaintiffs each timely filed a notice of appeal from the dismissal of their respective second amended complaints. This court consolidated the appeals for disposition. We have jurisdiction under *28 U.S.C. § 1291.* [*20] Our review of the grant of a motion to dismiss is de novo. *In re NAHC Sec. Litig., 306 F.3d 1314, 1322-23 (3d Cir. 2002).* We must accept as true the factual allegations in the second amended complaints and may affirm the dismissals only if it appears certain that plaintiffs can prove no set of facts that would entitle them to relief. See *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).*

II.

A. Section 11 and Section 12(a)(2) Claims

The District Court dismissed plaintiffs' Section 11 and Section 12(a)(2) claims because it found, upon review of the allegations in the second amended complaints, that the claims "sound in fraud." As a result, the District Court required plaintiffs to meet the heightened pleading requirements of *Rule 9(b)* and held that plaintiffs failed to do so. We exercise plenary review over the legal question whether the Section 11 or Section 12(a)(2) claims sound in fraud and are therefore subject to *Rule 9(b).* See *CALPERS, 394 F.3d at 160.*

"The primary innovation of the [Securities] Act was the creation of federal duties -- for the most part, registration and disclosure obligations -- in connection [*21] with public offerings." *Gustafson v. Alloyd Co., 513 U.S. 561, 571, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995)*; see also *In re Adams Golf, Inc. Secs. Litig., 381 F.3d 267, 273 (3d Cir. 2004)*. As relevant here, *Section 11* concerns material misstatements or omissions in registration statements, while *section 12(a)(2)* concerns material misrepresentations in prospectuses and other solicitation materials. *Adams, 381 F.3d at 273*.

Under *Section 11*, "a private action for damages may be brought 'by any person acquiring such security' if a registration statement, as of its effective date: (1) 'contained an untrue statement of material fact'; (2) 'omitted to state a material fact required to be stated therein'; or (3) omitted to state a material fact 'necessary to make the statements therein not misleading.'" *CALPERS, 394 F.3d at 167* (quoting *15 U.S.C. § 77k(a)*). As the Supreme Court has explained, *Section 11* "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983)* [*22] (footnote omitted). A Section 11 claim may be brought against the issuer of securities, its directors or partners, underwriters, and accountants who prepared or certified the registration statement. *Id. at 382 n.13* (citing *§ 77k(a)*). *Section 11* is a "virtually absolute liability provision[], which do[es] not require plaintiffs to allege that defendants possessed any scienter." *In re Adams Golf, 381 F.3d at 274 n.7*. "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Herman & MacLean, 459 U.S. at 382*.

*Section 12(a)(2)* provides for civil liability for anyone who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading. . . ." *15 U.S.C. § 77l(a)(2)*. Like *Section 11*, *Section 12(a)(2)* is a "virtually absolute" liability provision that does not require an allegation that defendants [*23] possessed scienter. *In re Adams Golf, 381 F.3d at 274 n.7*. To state a prima facie claim under *Section 12(a)(2)*, the plaintiff must allege the purchase of securities pursuant to a materially false or misleading prospectus or oral communication. *Id. at 273*.

Fraud, as noted above, is not a necessary element to establish a prima facie claim under *Section 11* or *Section 12(a)(2)*. See *Shapiro, 964 F.2d at 288*. But claims under those provisions can be, and often are, predicated on allegations of fraud. See, e.g., *CALPERS, 394 F.3d at 160*. We have held that where the plaintiff grounds these Securities Act claims in allegations of fraud -- and the claims thus "sound in fraud"-- the heightened pleading requirements of *Rule 9(b)* apply. *Id. at 161-63*; *Shapiro, 964 F.2d at 288-89*. n5 SSF Plaintiffs urge us "to do away with the 'sounds in fraud' doctrine altogether," SSF Br. at 19, but this panel is bound by prior precedential decisions of this court. See 3d Cir. IOP Ch. 9.1.

     n5 Plaintiffs argue that applying *Rule 9(b)* to Section 11 and Section 12(a)(2) claims impermissibly "create[s] new elements for these statutory causes of action." LP Br. at 24; accord SSF Br. at 26. We have previously rejected this argument:

     It does not logically flow from the fact that fraud is not a necessary element of a section 11 claim that a section 11 claim cannot hinge on an allegation of fraud. . . . Recognizing that neither fraud nor mistake is a necessary element of a cause of action under *section 11*, we nonetheless held in Shapiro that 'when § 11 and § 12[(a)](2) claims are grounded in fraud rather than negligence, *Rule 9(b)* applies.'

     *CALPERS, 394 F.3d at 161*.

[*24]

*Rule 9(b)* provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Rule 9(b)* serves to give defendants "notice of the claims against them, provide[] an increased measure of protection for their reputations, and reduce[] the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)*. "*Rule 9(b)* requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity;

(3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage." *Shapiro, 964 F.2d at 284*. Where a plaintiff's Section 11 or Section 12(a)(2) claims are not grounded in allegations of fraud, the liberal notice pleading requirements of *Rule 8* apply. See *In re Adams Golf, 381 F.3d at 273 n.5* ("Claims under the 1933 Act that do not sound in fraud are not held to the heightened pleading requirements of [*Rule] 9(b).*"). *Rule 8* [*25] pleading merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. Whether a Securities Act claim is subject to *Rule 9(b)* requires an assessment of the particular claim to determine whether acts of fraud on the part of the defendants form the basis for the claim against them. See *Shapiro, 964 F.2d at 288* ("*Rule 9(b)* refers to 'averments' of fraud, and thus requires us to examine the factual allegations that support a particular legal claim."); see also *CALPERS, 394 F.3d at 160* ("[A]n examination of the factual allegations that support Plaintiffs' section 11 claims establishes that the claims are indisputably immersed in unparticularized allegations of fraud.").

Although, in its second amended complaint, Lead Class Plaintiff described its suit as arising out of a "massive fraud" at Suprema, stemming in particular from the allegedly material misrepresentations in the registration statements that Suprema filed in connection with the 2001 Offering, App. at 82, it prefaced its *Section 11* and *Section 12(a)(2)* counts with an explicit disclaimer-- [*26] "this claim is not based on and does not sound in fraud"-- prior to setting forth the factual allegations that support each claim for relief. App. at 93, 125. Lead Class Plaintiff made it clear that its particular claims for relief under the Securities Act

> are not based on any knowing or reckless misconduct on the part of the defendants-- i.e., they do not allege, and do not sound in fraud. Rather, they are premised on the fact that there were material misrepresentations and omissions in the Registration Statement, and the defendants' negligence in failing to recognize this fact.

App. at 82. It expressly stated its cause of action as sounding in negligence, claiming that "had they exercised reasonable care, these defendants could have known of the material misstatements and omissions alleged herein." App. at 123.

In similar fashion, SSF Plaintiffs asserted at the outset that their suit arises out of "one of New Jersey's most scandalous accounting frauds," App. at 260, but also stated clearly that "this action seeks to advance negligence claims against the underwriters, auditor, and signatories of Suprema's publicly-filed documents." App. at 261. SSF Plaintiffs prefaced [*27] the *Section 11* and *Section 12(a)(2)* counts of the second amended complaint with the disclaimer that "this claim is not based on and does not sound in fraud, and Plaintiffs expressly disclaim and exclude any allegation that could be construed as alleging fraud or intentional or reckless misconduct." App. at 324. The preface to the *Section 11* count further states that "this claim is based . . . solely on claims of strict liability and/or negligence under the Securities Act." App. at 324. At the heart of the claims was the allegation that the named defendants were negligent in their failure to uncover the fraud at Suprema.

The District Court held that both complaints sound in fraud, mainly because "'the wording and imputations of the complaint[s] are classically associated with fraud.'" App. at 14 (quoting *Rombach, 355 F.3d at 172*). Among other things, the District Court noted that Lead Class Plaintiff alleged that the action arose from a "massive fraud" and that SSF Plaintiffs had identified several specific false representations of material fact in the 2000 and 2001 Registration Statements upon which they claimed to have relied. Thus, although the District Court [*28] acknowledged that plaintiffs pleaded their claims as negligence-based, it held that the *Section 11* and *Section 12(a)(2)* claims sound in fraud as to all defendants. Applying the heightened pleading standard of *Rule 9(b)*, the District Court determined that the claims must fail because plaintiffs did not allege that any of the defendants knew of the falsity of their statements and intended for the statements to be acted upon.

Lead Class Plaintiff argues that the District Court erred because (1) the second amended complaint set forth no allegations of fraud with regard to the 2001 Underwriters and Directors, and (2) it was careful to separately plead the fraudulent conduct of the Officers and BDO in connection with the Section 10(b) claims from the conduct that supported the Section 11 and Section 12(a)(2) claims. On that basis, and on the basis that the Section 11 and Section 12(a)(2) claims were expressly pled as negligence claims, Lead Class Plaintiff contends that its Section 11 and Section 12(a)(2) claims should not have been held to sound in fraud. SSF Plaintiffs likewise contend that their claims were based solely on the defendants' negligent failure to carry out their respective [*29] responsibilities and not fraud on their part.

For their part, defendants principally rely upon our decision in CALPERS, where we held that the heightened pleading of *Rule 9(b)* applied to a Section 11 claim despite the plaintiffs' express disavowal of fraud because "the claims [were] indisputably immersed in unparticularized allegations of fraud," and "a core theory of fraud permeate[d] the entire Second Amended Complaint." *CALPERS, 394 F.3d at 160*. We concluded that "the one-sentence disavowment of fraud contained within Plaintiffs' *section 11* Count . . . does not require us to infer that the claims are strict liability or negligence claims, and in this case is insufficient to divorce the claims from their fraudulent underpinnings." Id.

Although defendants are correct to observe that this case resembles CALPERS inasmuch as a core theory of fraud permeates the action, we find this case easily distinguishable from *CALPERS* with respect to the manner in which plaintiffs have pled their Section 11 and Section 12(a)(2) claims. Unlike the plaintiffs in CALPERS, plaintiffs in this case do not merely disavow already-pled allegations of fraud in connection [*30] with their Section 11 and Section 12(a)(2) claims, leaving the court to "sift through [those] allegations . . . in search of some 'lesser included' claim of strict liability." *CALPERS, 394 F.3d at 162* (quoting *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc., 238 F.3d 363 (5th Cir. 2001))*. Rather, both plaintiffs have expressly pled negligence in connection with their Section 11 and 12(a)(2) claims. We regard this difference in pleading as dispositive.

In CALPERS, we subjected the plaintiff's pleading to the strictures of *Rule 9(b)* because the complaint was "completely devoid of any allegations that Defendants acted negligently." *CALPERS, 394 F.3d at 161*. Similarly, in Shapiro, we held that *Rule 9(b)* applied to Section 11 and Section 12(a)(2) claims because there was "not a hint in the allegations that defendants were negligent in violating *§ § 11* and *12[(a)](2)*." *Shapiro, 964 F.2d at 287-88*. Both CALPERS and Shapiro thus presented complaints containing allegations of fraud exclusively; no allegations of negligence were pled in support of the Securities Act claims. See, e.g., *Shapiro, 964 F.2d at 288* [*31] ("We are not presented with a mixture of allegations of negligence [and] fraud.") (citation and quotation marks omitted). We observed in Shapiro that "it would be unreasonable to infer a negligence cause of action from [nothing more than a] fleeting and obscure reference [in the complaint] to 'gross negligence.'" *Id. at 288 n.18*.

Other courts of appeals presented with Section 11 or 12(a)(2) claims premised *exclusively* on allegations of fraud have followed our approach in Shapiro and declined to infer negligence where it has not been expressly pled. See, e.g., *In re Daou Sys., 411 F.3d 1006, 1028 (9th Cir. 2005)*; *Rombach, 355 F.3d at 172*; *Melder v. Morris, 27 F.3d 1097, 1100 n. 6 (5th Cir. 1994)*. Conversely, where the claims are expressly premised on negligence rather than fraud, *Rule 9(b)* has been held inapplicable. See *Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1251-52 (10th Cir. 1997)* (assuming arguendo that the approach in Shapiro is correct and holding that Section 11 claim not premised on fraud did not trigger *Rule 9(b)* scrutiny).

We now hold that where, [*32] as here, individual defendants are accused in separate claims of the same complaint of having violated *Section 11*, *Section 12(a)(2)*, and *Section 10(b)*, the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims. In such a case, the fraud allegations cannot be said to "contaminate" the Section 11 and Section 12(a)(2) claims if the allegations are pled separately. We applied *Rule 9(b)* to the Section 11 and Section 12(a)(2) claims in Shapiro because "plaintiffs did not allege ordinary negligence" and we could "see no way to construct a negligence cause of action." *Shapiro, 964 F.2d at 288*. Here, ordinary negligence is alleged in the Section 11 and Section 12(a)(2) claims, and those claims are pled separately from the *Section 10(b)* fraud claims against the same defendants. That is enough to avoid triggering *Rule 9(b)*. A contrary result would effectively preclude plaintiffs from filing suit under *Section 11* and *Section 12(a)(2)* as well as *Section 10(b)(5)*. There is no suggestion that Congress intended such an incongruous approach.

To be sure, the "sounds in fraud" determination for Securities Act claims [*33] will not always be clear cut in cases where the plaintiff simultaneously raises claims against the same defendants under a provision that requires a showing of scienter, like *Section 10(b)*. But where the plaintiff has exercised care in differentiating asserted negligence claims from fraud claims and in delineating the allegations that support the negligence cause of action as distinct from the fraud, the determination is straightforward.

Lead Class Plaintiff carefully segregated its allegations of negligence against the Officers and BDO from its allegations of fraud against those defendants. It did so by pleading its Section 11 and Section 12(a)(2) claims in negligence before-- and wholly apart from-- pleading its fraud-based Section 10(b) claims. This manner of pleading makes for a clear conceptual separation in the complaint between claims sounding in negligence and those sounding in fraud. And while Lead Class Plaintiff prefaced its complaint with a general statement that its suit "arises out of the massive fraud that was perpetrated at Suprema," App. at 82, it was careful in that introductory discussion not to accuse any particular defendant of acting with fraudulent intent. As [*34] to its claims against the Outside Directors and Underwriters in par-

ticular, there are no allegations of fraud or reckless misconduct whatsoever in any count of Lead Class Plaintiff's second amended complaint; ordinary negligence is all that is pled.

SSF Plaintiffs were less artful in their pleading, with the result that allegations of negligence and allegations of fraud against the defendants are somewhat commingled in the second amended complaint. Although we view this lapse in pleading as inexpert, we do not regard it as fatal under the circumstances. The Section 11 and Section 12(a)(2) claims were expressly pled in, and limited to, negligence, with preceding allegations of fraud expressly disavowed in the context of those claims. n6 While not as "clean" as the pleading style adopted by Lead Class Plaintiff, the SSF Plaintiffs' allegations as set forth were sufficient to give notice to the defendants of the claims against them.

> n6 See, e.g., App. at 324:

>> Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein...[but] Plaintiffs expressly disclaim and exclude any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based on solely on [sic] claims of strict liability and/or negligence under the Securities Act.

> Although we frowned upon this style of pleading in *CALPERS, 394 F.3d at 162*, SSF Plaintiffs, unlike the plaintiff in CALPERS, expressly pled negligence in their complaint, so the burden on a court to "sift through" allegations of fraud to identify the facts that support the Section 11 and Section 12 claims is lessened substantially.

[*35]

In holding that *Rule 9(b)* does not apply to Section 11 or Section 12(a)(2) claims that are expressly pled in negligence even when Section 10(b) claims against some of the same defendants are pled separately in the same complaint, we adopt a position that is consistent with our holdings in Shapiro and CALPERS, and one that has already been adopted by a number of district courts within our circuit. See, e.g., *In re Ravisent Techs., Inc. Sec. Litig., 2004 U.S. Dist. LEXIS 13255, No. CIV.A. 00-CV-1014, 2004 WL 1563024, at *13 (E.D. Pa. July 13, 2004)* ("It appears that Plaintiffs' counsel were aware of Shapiro when drafting the complaint, and were careful to plead negligence sufficiently to avoid the heightened pleading requirements."); *In re Cendant Corp. Litig., 60 F. Supp. 2d 354, 364 (D.N.J. 1999)* ("Unlike the complaint in Shapiro, this complaint does not incorporate allegations of scienter and fraud into the § 11 claim. Rather, here the § 11 claim is [pled] before any of the other claims. Although the plaintiffs have [pled] that certain defendants acted fraudulently in violation of § 10(b), the § 11 claim is limited to negligence."); *Resolution Trust Corp. v. Castellett, 1993 U.S. Dist. LEXIS 21267, No. CIV.A.92-4635(AMW), 1993 WL 719764, at *2 (D.N.J. Sept. 7, 1993)* [*36] (holding that *Rule 9(b)* did not apply to plaintiff's *Section 11* count because that count sounded in negligence and did not incorporate allegations of fraud from a *Section 10(b)* count).

In short, the reputational concerns that animate *Rule 9(b)* with respect to a defendant accused of fraud are not implicated when a defendant stands accused of nothing more than negligence. Cf. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)* (discussing the limited applicability of *Rule 9(b)*). Because the Section 11 and Section 12(a)(2) claims of the plaintiffs here were expressly negligence-based and pled distinctly in the complaint from the fraud-based claims, it was error for the District Court to hold that they sound in fraud. Accordingly, we will vacate the dismissal of these claims. n7

> n7 The 2001 Underwriters and the Cocchiolas argue in the alternative that plaintiffs' Section 11 and Section 12(a)(2) claims should have been dismissed for lack of standing because plaintiffs did not allege that their "purchases of Suprema stock were part of or, in the case of § 11, were directly traceable to, public offerings under the challenged registration statements." Cocchiola Br. at 14. According to these appellees, standing for Section 11 and Section 12(a)(2) claims "applies only to purchasers in initial stock offerings, not to open or secondary market purchases." *Id. at 24.* The District Court held that plaintiffs adequately alleged standing: "Because Plaintiffs have alleged that they have purchased 'in' or 'traceable to' the 2000 and 2001 secondary offerings, Plaintiffs have pled standing sufficiently at this motion to dismiss stage." App. at 13.

"For the purposes of determining standing, the court must accept as true all material allegations set forth in plaintiffs' complaint and must construe those facts in favor of the plaintiffs." *Mariana v. Fisher, 338 F.3d 189, 205 (3d Cir. 2003)* (citation omitted). SSF Plaintiffs alleged in their second amended complaint that on August 25, 2000, they purchased 250,000 shares of "newly-issued Suprema common stock *in* the 2000 Offering." App. at 265 (emphasis added). They also alleged that on November 14, 2001, which was the last day of the 2001 Offering, they "purchased 13,000 shares of Suprema stock which are *traceable to* the shares newly-issued in the [2001 Offering]." App. at 266 (emphasis added). Lead Class Plaintiff alleged that on November 8, 2001, it purchased 47,000 shares of Suprema common stock "*in*" the 2001 Offering, making the purchase from underwriter Janney Montgomery. App. at 84 (emphasis added). As noted, Lead Class Plaintiff asserts Section 11 violations by all defendants and Section 12(a)(2) violations by the Officers and the 2001 Underwriters. SSF Plaintiffs assert Section 11 violations by all defendants and Section 12(a)(2) violations by the Officers and Hobbs Melville (one of the non-appearing underwriters, see supra note 3).

We agree with the District Court that plaintiffs' allegations regarding the purchases were sufficient to survive the motions to dismiss. By its terms, *Section 11* provides that "*any* person acquiring" a security issued pursuant to a materially false registration statement may sue (unless the purchaser knew about the false statement). *15 U.S.C. § 77k(a)* (emphasis added). As the Court of Appeals for the Second Circuit has observed, "we can find no reason why 'any' as used in *§ 11* should not be read as the equivalent of 'every' such that every person who acquires a security issued pursuant to an allegedly defective registration statement has standing to sue under *§ 11*." *DeMaria v. Andersen, 318 F.3d 170, 176 (2d Cir. 2003);* accord *Lee v. Ernst & Young, LLP, 294 F.3d 969, 976-77 (8th Cir. 2002); Joseph v. Wiles, 223 F.3d 1155, 1159 (10th Cir. 2000)*. We agree with this view and hold that plaintiffs' assertions of purchases "in" and "traceable to" the Suprema stock offerings were sufficient at the pleading stage. Indeed, we recognized as much in Shapiro, where plaintiffs alleged that they purchased stock "pursuant to" a registration statement. This court concluded that while "plaintiffs need not prove their shares are traceable to a false or misleading registration statement at this early stage of the litigation, they must allege it." *Shapiro, 964 F.2d at 286*. We found that plaintiffs had sufficiently alleged their Section 11 standing, adding that "before discovery takes place [] it is impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market." Id. The question here is likewise a factual one, to be resolved through discovery, as to whether plaintiffs can demonstrate that the shares they allegedly purchased are in fact traceable to the registration statement alleged to be false and misleading. See *Lee, 294 F.3d at 978; Joseph, 223 F.3d at 1159-60*. If, as appellees suggest, plaintiffs have misrepresented the circumstances of their stock purchases and do not in fact have standing, appellees can raise that matter at the summary judgment stage after discovery.

Similarly, Section 12(a)(2) claims concern the purchase of securities pursuant to a materially false or misleading prospectus or oral communication. We have recognized that the language of *Section 12(a)(2)* "should not be expanded to aftermarket trading." *Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 689 (3d Cir. 1991)*. At the pleading stage, however, we accept as true plaintiffs' allegations that they made their stock purchases in or traceable to the Suprema public offerings. "If defendants were eventually to prove that the shares came from the secondary market, *§ 12[(a)](2)* would not apply, and judgment would be entered for them." *Shapiro, 964 F.2d at 287 n.16* (citation omitted).

[*37]

## B. Section 10(b) Claims

*Section 10(b)* of the Exchange Act prohibits the "'use or employ, in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . .'" *In re IKON, 277 F.3d at 666* (quoting *15 U.S.C. § 78j(b)*). Pursuant to this statutory authority, the Commission promulgated Rule 10b-5, which creates a private cause of action for investors harmed by materially false or misleading statements. *In re Advanta, 180 F.3d 525, 535 (3d Cir. 1999)*. Rule 10b-5 "makes it unlawful for any person 'to make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made[,] in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.'" *17 C.F.R. § 240.10b-5(b)*; see *In re IKON, 277 F.3d at 666*.

The Supreme Court has recently set forth the elements of a Section 10(b) claim. See *Dura Pharm., Inc. v. Broudo, 161 L. Ed. 2d 577,* [*38] __ U.S. __, *125 S. Ct. 1627, 1631 (2005)*. They are

(1) *a material misrepresentation (or omission)*; (2) *scienter, i.e.,* a wrongful state of mind; (3) *a connection with the purchase or sale of a security*; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;" (5) *economic loss;* and (6) *"loss causation," i.e.,* a causal connection between the material misrepresentation and the loss.

Id. (citations omitted). The PSLRA provides that a Section 10(b) claim must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)(B)*. n8

n8 The purpose of the heightened pleading requirements contained in the PSLRA is "to restrict abuses in securities'class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys." *In re Advanta, 180 F.3d at 531* (citing H.R. Conf. Rep. No. 104-369, at 28 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 748).

[*39]

The PSLRA also requires that plaintiffs plead the required state of mind with particularity. *GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004); In re Advanta, 180 F.3d at 530.* Specifically, the PSLRA states in relevant part:

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*15 U.S.C. § 78u-4(b)(2).*

"'The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Burlington Coat Factory, 114 F.3d at 1418* (citations omitted). We have defined "recklessness" to include

"highly unreasonable (conduct), involving not merely [*40] simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

*SEC v. Infinity Group Co., 212 F.3d 180, 192 (3d Cir. 2000)* (quoting *McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979)).*

In addition to the PSLRA requirements, plaintiffs alleging fraud under the Exchange Act must also comply with the heightened pleading requirement of *Rule 9(b). GSC, 368 F.3d at 236.* As applied to Section 10(b) claims, "*Rule 9(b)* requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *In re Rockefeller Center Prop. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002)* (internal quotation marks and citation omitted). Moreover, "*Rule 9(b)* requires plain-

tiffs to identify [*41] the source of the allegedly fraudulent misrepresentation or omission." Id. (citation omitted). In sum, "*Rule 9(b)* requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' -- that is, the 'who, what, when, where and how' of the events at issue." *Id. at 217* (quoting *In re Burlington Coat Factory, 114 F.3d at 1422*). To the extent that *Rule 9(b)*'s allowance of general pleading with respect to mental state conflicts with the PSLRA's requirement that plaintiffs state with particularity facts giving rise to a strong inference that the defendant acted with scienter, *15 U.S.C. § 78u-4(b)(2)*, the PSLRA "supersedes *Rule 9(b)* as it relates to Rule 10b-5 actions." *In re Advanta, 180 F.3d at 531 n.5*.

1. The Officers

Plaintiffs pled the required scienter on the part of Cocchiola and Venechanos (the "Officers") by alleging both motive and opportunity (with respect to insider stock sales) and strong circumstantial evidence of conscious misbehavior or recklessness (with respect [*42] to the round-trip sales scheme). The District Court held that the alleged facts did not give rise to a strong inference of the Officers' scienter and dismissed the Section 10(b) claims. We conclude that plaintiffs' allegations were sufficient to survive a motion to dismiss.

a) Motive and Opportunity

Plaintiffs allege that Cocchiola and Venechanos sold substantial portions of their stock in the 2001 Offering and therefore had the motive and opportunity to inflate the price of their stock. Although we have stated that "we will not infer fraudulent intent from the mere fact that some officers sold stock," we also stated that sales of company stock by insiders that are "unusual in scope or timing . . . may support an inference of scienter." *In re Advanta, 180 F.3d at 540* (citations and quotation marks omitted). Whether a sale is "unusual in scope" depends on factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *Wilson v. Bernstock, 195 F. Supp. 2d 619, 635 (D.N.J. 2002)* (citation omitted). Other factors relevant to scope and timing are whether the sales were [*43] "normal and routine," and whether the profits were substantial relative to the seller's ordinary compensation. *In re Burlington Coat Factory, 114 F.3d at 1423*.

The second amended complaints differ as to precisely how many shares Cocchiola sold in the 2001 Offering. Lead Class Plaintiff alleges that Cocchiola sold 31% of his total holdings (193,423 shares) for proceeds of just over $ 2 million, and that he sold another 81,577 shares in the over-allotment, for nearly $ 1 million in further proceeds. n9 SSF Plaintiffs allege that Cocchiola sold 347,809 shares for proceeds of over $ 4 million. They further allege that Cocchiola pledged another 200,000 shares as collateral for a $ 600,000 personal loan. Both plaintiffs agree that Venechanos sold 38% of his total holdings (52,937 shares) in the 2001 Offering for proceeds of nearly $ 628,000.

> n9 According to Lead Class Plaintiff, Cocchiola was the largest holder of Suprema common stock when Suprema filed its 2001 Form 10-K statement, exercising ownership or control over 1.1 million shares representing approximately 17.4 of the stock issued and outstanding. Venechanos at that time allegedly exercised ownership or control over 138,000 shares, or approximately 2.4 of the common stock.

[*44]

Plaintiffs claim that these insider sales were suspicious in timing because they came at a time when the price of Suprema's stock was artificially inflated as a result of the round-trip sales scheme, just six weeks before Venechanos and Christensen resigned. Furthermore, they allege that the sales were suspicious in scope because Cocchiola had sold only 50,000 shares before the 2001 Offering and Venechanos had sold none. Cocchiola sold over five times the number of shares in the 2001 Offering than he had sold prior to that time. With respect to the ratio of profits to compensation, SSF Plaintiffs allege that Cocchiola's profits from the stock sale nearly doubled in one day the total amount of money that he had made over the previous three years combined. The sales Venechanos made netted him over four times his annual salary.

Citing our decision in *In re Advanta, 180 F.3d 525*, the District Court held that the sales made in the 2001 Offering were not unusual because "both Cocchiola and Venechanos retained large stock holdings after the sales, 49% and 62%, respectively." App. at 27-28. We conclude, however, that the stock sales here differ substantially from the sales [*45] in In re Advanta. In that case, the defendants traded only small percentages of their holdings, with two of the defendants selling seven and five percent, respectively. *In re Advanta, 180 F.3d at 540*. Here, each Officer is alleged to have sold

over 30 percent of his holdings. Plaintiffs have plausibly alleged that the sales were not normal or routine for these Officers, and that the profits from the trades were substantial in comparison to their overall compensation. Indeed, Lead Class Plaintiff alleges that Cocchiola realized over $ 2.3 million in profit from the sale of his shares, and Venechanos $ 627,832. The timing of the sales was also suspect in that they occurred just six weeks before Venechanos and Christensen resigned. We conclude that plaintiffs' allegations regarding the stock sales are sufficient at this stage to support a strong inference that Cocchiola and Venechanos had a motive and opportunity to inflate the value of their stock artificially by reporting fictitious sales and by falsely inflating the value of their inventory in public statements.

b) Circumstantial Evidence of Misconduct

Plaintiffs alleged numerous facts that they argue constitute [*46] strong circumstantial evidence that the Officers knew of or recklessly disregarded the falsity of Suprema's registration statements and prospectuses with respect to reported financial performance. Among other things, plaintiffs cite the following: Cocchiola and Venechanos were the leaders of a very small senior management team at Suprema which boasted a "hands-on" relationship with key accounts and customers, App. at 128; three of these key customers pled guilty to fraud charges in connection with the round-trip sales scheme and admitted in their plea allocutions that they had created false invoices, falsely labeled cheese, and adulterated cheese "at the direction and with the participation of Suprema's management," App. at 133; n10 fictitious transactions with these customers constituted "more than two-thirds of the company's revenue and nearly all of its growth" during the class period, App. at 187; Cocchiola and Venechanos signed millions of dollars in company checks during the class period, payable in large part to entities controlled by these customers; Venechanos controlled all of the bookkeeping connected with these accounts and he and Cocchiola prevented Suprema's accounting [*47] staff from having any contact with the accounts or with BDO concerning the accounts; Cocchiola and Venechanos instructed Suprema employees not to be involved in the hard cheese portion of the business; and Cocchiola prevented Suprema employees from having contact with BDO concerning the accounts.

> n10 Lead Class Plaintiff specifically alleged that "Cocchiola, Venechanos, and Lauriero (when he was alive) . . . collectively constituted the 'management' of Suprema throughout the Class Period[.]" App. at 135. Further, as counsel for Lead Class Plaintiff emphasized at argument before this court, Suprema "was a small company, this was not IBM[.]" Tr. of Oral Argument at 13.

We thus conclude that plaintiffs' allegations against the Officers are detailed as to each and are sufficient to give rise to the requisite strong inference that these defendants knew that the statements they made in connection with the 2000 and 2001 Offerings were materially false and misleading. We reject defendants' contention that plaintiffs [*48] have merely pled "fraud by title." On the contrary, plaintiffs have attributed to each of the Officers specific knowledge and conduct. Moreover, even if plaintiffs' allegations with respect to the Officers' insider stock sales were insufficient to support a strong inference that they acted with scienter, the allegations concerning the Officers' respective roles in the round-trip sales scheme would be enough to survive a motion to dismiss. On this record, we will vacate the District Court's dismissal of plaintiffs' 10(b) claims against the Officers.

2. The Auditor

The District Court dismissed plaintiffs' claims against BDO for failure adequately to allege scienter. The court rejected plaintiffs' allegations that BDO acted recklessly by failing to take numerous steps required by GAAS, and that BDO failed to heed "red flags" indicating that something was grossly amiss with Suprema's accounting. The District Court found that the "purported 'red flags' were normal aspects of a healthy business," and it credited BDO's argument that it had a good faith belief that its audits were accurate. App. at 32. The District Court added that BDO "was in effect a victim of the fraud" and had done [*49] all it was required to do. Id. Ultimately, the District Court concluded that "given the information available to BDO at the time of the audit it can not be said that BDO did not have an honest belief that the statements made by it were true." Id.

When a professional opinion is issued to the investing public by those in a position to know more than the public, there is an obligation to disclose data indicating that the opinion may be doubtful. *Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir. 1985)*. When that opinion is

> based on underlying materials which on their face or under the circumstances suggest that they cannot be relied on without further inquiry, then the failure to investigate further may "support[] an inference that when [the defendant] expressed the opinion it had no genuine belief that it had the information on which it could predicate that opinion."

Id. (quoting *McLean v. Alexander, 599 F.2d 1190, 1198 (3d Cir. 1979)).* A showing that an auditor either lacked a genuine belief that its representations were supported by adequate information or engaged in auditing practices so shoddy that they amounted at best [*50] to a "pretended audit" has traditionally supported a finding of liability, even in the face of assertions of good faith. *McLean, 599 F.2d at 1198.* But as our case law makes clear,

> the mere second-guessing of calculations will not suffice; appellants must show that [the auditor]'s judgment-- at the moment exercised-- was sufficiently egregious such that a reasonable accountant reviewing the facts and figures should have concluded that [the company]'s financial statements were misstated and that as a result the public was likely to be misled.

*In re IKON, 277 F.3d at 673.*

At the pleading stage, courts have recognized that allegations of GAAS violations, coupled with allegations that significant "red flags" were ignored, can suffice to withstand a motion to dismiss. See, e.g., *In re Daou, 411 F.3d at 1016; Greebel v. FTP Software, Inc., 194 F.3d 185, 203 (1st Cir. 1999); Malone v. Microdyne Corp., 26 F.3d 471, 479 (4th Cir. 1994).* Such allegations, of course, must be pled with particularity. *In re Daou, 411 F.3d at 1016.* It is insufficient, for example, for a plaintiff [*51] to cite GAAS standards without an explanation of how the defendant knowingly or recklessly violated those standards. *In re Westinghouse Sec. Litig., 90 F.3d 696, 712 (3d Cir. 1996).*

Plaintiffs here have alleged that BDO failed to comply with specific GAAS standards, including, among others, the requirement to exercise due care and professional skepticism in the conduct of an audit; the requirement adequately to plan, staff, and supervise an audit; the requirement adequately to assess the nature of the audited business; and the requirement to recognize enumerated risk factors or red flags that may have alerted the auditor to the existence of fraud. Moreover, plaintiffs explain in detail in the second amended complaints how BDO's alleged GAAS violations led it to overlook numerous red flags. Thirty such red flags are cited as having been present in this case, including the following: (1) Suprema's 2001 Form 10-K made no mention that Suprema was engaged in the purchase and resale of bulk cheese from domestic suppliers when even a cursory review of the company's check register, vendor invoices, and purchasing records would have revealed that fully two-thirds of company [*52] revenue for that year was derived from such sales; (2) Suprema's cash flows from operations were negative and grew dramatically worse over time, even though Suprema was reporting astronomical growth in net sales, gross margin, and net earnings, including a 400% increase in hard-cheese revenue during just a two-year period; (3) Suprema posted growth that was radically disproportionate with growth in the cheese industry as a whole; (4) although Suprema was reporting rapid growth in production, it did not report corresponding increases in its labor force and the utilization of its production facilities; (5) Suprema restricted BDO's access to key accounting personnel, including the accounts receivable and accounts payable supervisors, which represented a material limitation of the scope of the audit; (6) all of Suprema's significant hard-cheese customers had accounts that were well past due; and (7) Suprema had weak internal controls, a fact that BDO essentially admitted in its letter of resignation, and one that should have led BDO to investigate further before issuing unqualified audit opinions.

BDO argues some of the proffered red flags, such as late or missing invoices, delayed compliance [*53] with document requests, and payment of stock options and large bonuses to management, are not obvious or strong indicators of fraud. However, even if we discount these weaker indicators, the much stronger indicators noted above remain, and those factors are sufficient to raise serious questions about the integrity of the audits.

Indeed, accepting plaintiffs' allegations as true, the evidence of Suprema's financial foul play was hiding in plain sight. Suprema management was a small group, and the company had only five "customers" that accounted for more than 80% of its business in 2001. Its largest customer that year, Tricon, and its largest supplier, Noram, were both owned and controlled by one individual, Paul Zambas. Even a cursory inquiry would have disclosed that the address for Tricon in Suprema's business records was not the same as Tricon's address available in public records; the address to which Suprema sent checks to Noram was a gift shop in a mall; and, most tellingly, checks from Tricon to Suprema

came from the same bank account into which Suprema's checks to Noram were deposited. Similarly, the tens of millions of dollars in checks that Suprema wrote to another supplier, [*54] CMM, were also deposited into the same account from which a purported customer, WCC, wrote checks back to Suprema. The checks were an obvious and readily available indicator of fraud. Moreover, plaintiffs have offered a detailed set of allegations as to how BDO violated specific GAAS standards in its audit of Suprema, and they have identified numerous substantive indicators of fraud that were allegedly ignored altogether in the auditing process. "In many cases the most plausible means to prevail on a section 10(b) claim against an auditor-- without that ever-elusive 'smoking gun' document or admission-- will be to show how specific and not insignificant accounting violations collectively raise an inference of scienter." *In re IKON, 277 F.3d at 677 n.26*; see also *PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 694, 91 Fed. Appx. 418 (6th Cir. 2004)* ("When the alleged accounting errors are sufficiently basic and large, their existence, in combination with other factors, may support the requisite scienter inference.") (citation omitted). The accounting violations set forth here surpass an inference of ordinary negligence; they reasonably suggest that BDO either knew of, or [*55] willfully turned a blind eye to, the fraud at Suprema.

We have not overlooked BDO's protestations that it, too, was a victim of the fraud at Suprema, that the fraud conspirators hid information from and lied to BDO about Suprema's finances, and that BDO performed its audits in good faith under the circumstances. We are not suggesting that plaintiffs' Section 10(b) claim will necessarily survive a properly supported summary judgment motion after BDO marshals its evidence. At the pleading stage, however, plaintiffs are entitled to the benefit of all reasonable inferences based on the detailed and specific allegations in their complaints. In the face of the numerous and not insignificant alleged accounting violations, we cannot rule out, as a matter of law, a strong and reasonable inference of BDO's scienter. Consequently, we will vacate the District Court's dismissal of the Section 10(b) claims against BDO.

### 3. The Outside Directors

The District Court dismissed SSF Plaintiffs' Section 10(b) claim against the Outside Directors, holding that the allegations supporting the claim were conclusory and lacking in detail. n11 SSF Plaintiffs premise their allegations of recklessness against [*56] the Outside Directors essentially on the following facts: (1) revenue was wrongfully recognized; (2) the Outside Directors had access to Suprema's business records; and (3) the Outside Directors were charged, as members of the audit committee, with reviewing and monitoring the company's financial reporting, external audits, internal control functions, and compliance with applicable rules and regulations.

n11 As noted, Lead Class Plaintiff did not file a Section 10(b) claim against the Outside Directors, nor did it file such a claim against the Underwriters.

Significantly, while the SSF Plaintiffs alleged specifically what the audit committee's duties were, they did not allege which duties were violated, by whom they were violated, or how they were violated. Indeed, whereas the allegations concerning BDO's recklessness span more than forty pages of the SSF Plaintiffs' second amended complaint, the corresponding allegations against the four Outside Directors are scant, comprising fewer than two pages. Recklessness [*57] is pled against the Outside Directors as a group, based on their position, without any attempt to link specific individuals to specific instances of reckless conduct. We have held that such "catch-all" or "blanket" assertions do not satisfy the particularity requirements of *Rule 9(b)* and the PSLRA, and must be disregarded. *CALPERS, 394 F.3d at 145*.

A pleading of scienter sufficient to satisfy *Rule 9(b)* "may not rest on a bare inference that a defendant 'must have had' knowledge of the facts" or "must have known" of the fraud given his or her position in the company. *In re Advanta, 180 F.3d at 539* (citations omitted). As we have stated, "generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." Id. (citation omitted). The allegation that the Outside Directors, *qua* directors and members of the audit committee, had access to unspecified business records and a duty to review them does not give rise to a strong inference that the Outside Directors individually knew of or recklessly disregarded particular wrongful recognitions of revenue. We will, therefore, affirm the District Court's dismissal [*58] of SSF Plaintiffs' Section 10(b) claims against the Outside Directors.

### 4. The 2000 and 2001 Underwriters

The District Court also dismissed SSF Plaintiffs' Section 10(b) claim against the Underwriters, holding that the allegations suggested negligence only and did not reach the threshold for scienter. In the second amended complaint, SSF

Plaintiffs alleged that the Underwriters collectively "failed to adequately review Suprema's internal financial forecasts, contracts, and other documents, make a physical inspection of Suprema's major facilities, employ analysts having expertise in the cheese business, conduct interviews with Suprema's senior and middle management, or interview Suprema's major customers, outside quality consultants, auditors, and legal counsel." App. at 381-82. SSF Plaintiffs also alleged that the Underwriters earned significant fees for services rendered in connection with the public offerings.

"A securities professional has an obligation to investigate the securities he or she offers to customers." *SEC v. GLT Dain Rauscher, Inc., 254 F.3d 852, 857 (9th Cir. 2001)*. The investigation must be adequate to provide the professional "with a reasonable [*59] basis for a belief that the key representations in the statements provided to . . . investors are truthful and complete." *Id. at 858* (citations omitted). Whereas a reckless failure to investigate an issuer of securities can give rise to liability under *Section 10(b)*, simple negligence, even inexcusable negligence, is not enough. *Infinity, 212 F.3d at 192*. Nor is an allegation that an underwriter had a motive to commit fraud simply because it stood to collect underwriting fees. *GSC, 368 F.3d at 238*.

Our review of the SSF Plaintiffs' allegations confirms the District Court's conclusion that they failed adequately to allege scienter. The breaches alleged are, at best, negligent breaches of the duty to investigate. The fact that the Underwriters earned fees for their services does not establish that they acted with any culpable intent. Moreover, plaintiffs' manner of pleading their claim collectively, through blanket allegations against numerous different defendants, runs afoul of the particularity requirements of the PSLRA and *Rule 9(b)*. See *CALPERS, 394 F.3d at 145*. Plaintiffs accuse all of the Underwriters of having [*60] breached various aspects of the duty to investigate, but they fail to allege any specific derogation of duty on the part of any specific defendant. Given the lack of particularity in their pleading, and given that they have alleged a mental state amounting to no more than negligence, SSF Plaintiffs have failed to state a Section 10(b) claim. We will affirm the dismissal of the Section 10(b) claim against the Underwriters.

C. Section 18 Claims

SSF Plaintiffs asserted a claim for relief under *Section 18* of the Exchange Act against the Officers, Outside Directors, and BDO for their alleged negligence in connection with the false statements purportedly made in documents that Suprema filed with the *SEC*. *Section 18* creates a private remedy for damages resulting from the purchase or sale of a security in reliance upon a false or misleading statement contained in any document or report filed with the SEC pursuant to the Exchange Act. *15 U.S.C. § 78r(a)*. n12 SSF Plaintiffs concede that to state their claim under *Section 18*, they were required to plead actual, as opposed to presumed, reliance upon a false or misleading statement. See SSF Br. at 44 (citing [*61] *Heit v. Weitzen, 402 F.2d 909, 916 (2d Cir. 1968))*; see also *Howard v. Everex Sys., 228 F.3d 1057, 1063 (9th Cir. 2000)* (noting that "courts have required a purchaser's actual reliance on the fraudulent statement under § 18(a)*, as opposed to the constructive reliance, or fraud-on-the-market, theory available under § 10(b)*") (citation omitted). A Section 18 plaintiff, however, bears no burden of proving that the defendant acted with scienter or any particular state of mind. *Brody v. Stone & Webster, Inc. (In re Stone & Webster, Inc., Sec. Litig.), 414 F.3d 187, 193 (1st Cir. 2005)*; see *Magna Inv. Corp. v. John Does One Through Two Hundred, 931 F.2d 38, 39-40 (11th Cir. 1991)*. Thus, unlike a Section 10(b) claim, liability under *Section 18* requires proof of reliance but does not require proof of scienter. See *McGann v. Ernst & Young, 102 F.3d 390, 395 (9th Cir. 1996)*. n13

n12 *Section 78r(a)* provides in relevant part:

Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading.

*15 U.S.C. § 78r(a)*.

[*62]

> n13 This court has yet to determine when or if the heightened pleading requirements of *Rule 9(b)* apply to a Section 18 claim, but we see no need to reach that question on this appeal.

SSF Plaintiffs contend that they sufficiently pled actual reliance under *Section 18* because they alleged that they read and relied upon each "document" that contained a misstatement or omission. The District Court determined that, although SSF Plaintiffs stated for each document at issue that they "relied upon" the document, they "merely allege[d] that they relied [on the] documents that contained misstatements. They did not allege actual reliance on the specific misrepresentations themselves." App. at 35. The District Court held that, absent allegations of reliance on specific statements, the claims were inadequately pled.

We agree that plaintiffs were required to plead actual reliance on specific statements contained in the SEC filings at issue. *Section 18* plainly refers to reliance upon any materially false "statement." See *15 U.S.C. § 78r(a)* ("Any person who shall make . . . [*63] any statement in any application, report, or document[,] . . . which statement was [materially false,] . . . shall be liable to any person . . . who, *in reliance upon such statement*, shall have purchased or sold a security at a price which was affected by such statement.") (emphasis added). In *Cramer v. General Tel. & Electronics Corp., 582 F.2d 259 (3d Cir. 1978)*, this court, applying this natural reading of the statutory language, stated that a plaintiff seeking to bring a claim under *Section 18* must allege a causal nexus between the sale of a security and "reliance upon a false *statement*" in a report filed with the SEC. *Id. at 269* (emphasis added).

SSF Plaintiffs alleged cursorily that they "received, reviewed, actually read, and relied upon" various Form 10-Q filings and the 2000 and 2001 Form 10-K filings. For example, regarding the September 28, 2001, Form 10-K, they allege that they "obtained this document at or about the it [sic] was publicly filed with the SEC, and actually read and relied upon it in making their decisions to invest in Suprema common stock." App. at 367. SSF Plaintiffs failed, however, to plead facts probative [*64] of their actual reliance on any specific false statements contained in those filings. Given the lack of allegations to show the requisite causal nexus between their purchase of securities and specific statements contained in the SEC filings, we will affirm the District Court's dismissal of SSF Plaintiffs' Section 18 claims.

## D. Section 15 and Section 20(a) Claims

*Section 15* of the Securities Act provides for joint and several liability on the part of one who controls a violator of *Section 11* or *Section 12*. *15 U.S.C. § 77o*; see *In re Adams Golf, 381 F.3d at 273 n. 3*. n14 *Section 20(a)* of the Exchange Act imposes joint and several liability upon one who controls a violator of *Section 10(b)*. *15 U.S.C. § 78t(a)*; see *In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004)*; *Sharp v. Coopers & Lybrand, 649 F.2d 175, 185 (3d Cir. 1981)*. n15 Under both provisions, the plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws. See *Klein v. Gen. Nutrition Companies, 186 F.3d 338, 344 (3d Cir. 1999)* [*65] (*Section 15*); *In re Alpharma, 372 F.3d at 153 (Section 20(a))*. n16

> n14 *Section 15* provides:
>
>> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under *sections 77k* or *77l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
>
> *15 U.S.C. § 77o.*
>
> n15 *Section 20(a)* provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. § 78t(a).*

[*66]

n16 We also have held that "secondary liability cannot be found under *Section 20(a)* unless it can be shown that the defendant was a culpable participant in the fraud." *Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 890 (3d Cir. 1975)*; see also *Sharp, 649 F.2d at 185* ("One element of any case imposing liability under *§ 20(a)* is 'culpable participation' in the securities violation.").

Both plaintiffs asserted Section 15 and Section 20(a) claims against the Officers, i.e., Cocchiola and Venechanos. The District Court dismissed these claims on the ground that the Officers' underlying violations of the securities laws were inadequately pled, and thus the control-person claims must fail, as well. We have concluded, however, that plaintiffs did adequately plead their Section 11, Section 12(a)(2), and Section 10(b) claims against the Officers.

Plaintiffs contend, moreover, that the District Court misconstrued the nature of their control-person claims. They note that their *Section 15* and *Section 20(a)* counts were premised upon underlying violations by Suprema itself, [*67] even though Suprema is not named as a defendant because it is bankrupt. Plaintiffs contend that while the Officers were alleged to have committed primary violations in other counts of the second amended complaints, Suprema was the alleged primary violator for purposes of the control-person claims.

The record reveals that plaintiffs did expressly name the corporation itself as the primary violator in their *Section 15* and *Section 20(a)* counts. Both plaintiffs also asserted that they would have named Suprema as a defendant to the suits were it not for its status as a bankrupt. Essentially, plaintiffs argue that Suprema's controlling persons should not escape liability under *Section 15* and *Section 20(a)* merely because Suprema's underlying liability cannot be formally adjudicated due to its insolvency. We agree.

As noted, *Section 15* imposes joint and several liability for any person who controls a person liable under the Securities Act, while *Section 20(a)* imposes similar control liability for an underlying violator of the Exchange Act. With regard to *Section 20(a)*, we have observed that "the text of the statute plainly requires the plaintiff to prove not only that one person controlled [*68] another person, but also that the 'controlled person' is liable under the Act. If no controlled person is liable, there can be no controlling person liability." *Shapiro, 964 F.2d at 279* (citation omitted). The same holds true for claims brought under *Section 15*. See, e.g., *Cooperman v. Individual, Inc., 171 F.3d 43, 52 (1st Cir. 1999)*. Thus, establishing the liability of the controlled person or entity is plainly an element of a claim for relief under both *Section 15* and *Section 20(a)*.

But there is no requirement in the language of either statute that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling individual defendants. A plaintiff need only establish the controlled person's liability. See *In re Hayes Lemmerz Intern., Inc., 271 F. Supp. 2d 1007, 1022 n. 11 (E.D. Mich. 2003)* ("If the complaint states a primary violation by the Company, even if the Company is not named in the complaint as a defendant, then a § 20 claim can stand if the individuals were controlling persons."); *In re CitiSource, Inc. Sec. Litig., 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988)* [*69] (holding that "liability of the primary violator is simply an element of proof of a section 20(a) claim," and that "liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong"). As one district court has cogently observed, "it would be inconsistent with the broad remedial purposes of the securities laws to permit senior executives of a bankrupt corporation-- whose actions allegedly contributed to the bankruptcy-- to avoid liability by relying on the corporation's bankruptcy." *Porter v. Conseco Inc, 2005 U.S. Dist. LEXIS 15466, No. 1:02CV1332DFHTAB, 2005 WL 1656871, at *6 (S.D. Ind. July 14, 2005).*

Plaintiffs here adequately alleged primary violations of the Securities Act and the Exchange Act by Suprema. Lead Class Plaintiff set forth in detail the specific allegations of Suprema's misstatements and omissions in its Registration Statement and Prospectus, and it expressly asserted that Suprema should be primarily liable as a result under *Section 15*. Lead Class Plaintiff also detailed the allegations of materially false and misleading statements and omissions in SEC filings and asserted that Suprema should be held [*70] primarily liable under *Section 20(a)*. SSF Plaintiffs set forth similar and equally sufficient allegations. The complaints also detailed the manner in which Cocchiola and Venechanos are alleged to have tightly controlled Suprema's business and operations and acted as culpable participants in the fraud, as discussed in connection with plaintiffs' Section 10(b) claims against those defendants. For these reasons, we will vacate the dismissal of plaintiffs' Section 15 and Section 20(a) claims against the Officers. n17

n17 SSF Plaintiffs also asserted Section 15 and Section 20(a) claims against the Outside Directors. In their opening brief, however, SSF Plaintiffs devote a mere one paragraph to their control-person claims, and that paragraph makes no mention of the Outside Directors per se and provides no substantive discussion of the claims against those defendants. Although SSF Plaintiffs argue the claim at length in their reply brief, it is well-settled in this court that "an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal." *United States v. Pelullo, 399 F.3d 197, 222 (3d Cir. 2005)*. Consequently, we deem SSF Plaintiffs' control-person claims against the Outside Directors waived.

[*71]

E. Pendent State law claims

After dismissing all claims brought under federal law, the District Court declined to exercise supplemental jurisdiction under *28 U.S.C. § 1367(c)(3)* over the SSF Plaintiffs' state-law claims based on common law fraud and negligent misrepresentation. The District Court did not address the merits of the state law claims. Given our conclusion that many of the federal claims were improperly dismissed at this preliminary stage, and that the District Court therefore retains jurisdiction over the federal claims, we will vacate the dismissal of the state-law claims for reconsideration by the District Court.

**III.**

We will affirm the District Court's dismissal of both plaintiffs' Section 10(b) claims against the Outside Directors and the Underwriters, as well as the dismissal of the Section 18 claims in their entirety. We will reverse the dismissal of plaintiffs' Section 11 and 12(a)(2) claims against all defendants, the Section 10(b) claims against the Officers and BDO, the Section 15 and 20(a) claims as to the Officers, and the dismissal of the SSF Plaintiffs' claims under state law. We will remand the matter to the District [*72] Court for further proceedings on the remaining claims in accordance with this opinion.