## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: ADAMS GOLF, INC.<br>SECURITIES LITIGATION | §<br>§<br>§<br>§ | CIVIL ACTION NO. 99-371-KAJ<br>(CONSOLIDATED) |

## THE ADAMS GOLF DEFENDANTS' REPLY BRIEF
## IN SUPPORT OF THEIR MOTION TO DISMISS

OF COUNSEL:

Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas 78701
(512) 499-6200

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger
920 North King Street
Wilmington, Delaware 19899
(302) 651-7700

Attorneys for Defendants Adams Golf, Inc.,
B.H. Adams, Richard H. Murtland, Darl P.
Hatfield, Paul F. Brown, Jr., Roland E. Casati,
Finis F. Conner, and Stephen R. Patchin

Dated: March 9, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

I.    INTRODUCTION ......................................................................................... 1

II.   ARGUMENT ................................................................................................ 2

      A.   Plaintiffs' Allegations Must Be Considered in Their Totality and Rule 9(b)
           Applies ................................................................................................. 2

      B.   Plaintiffs' Gray-Market Claim Fails as a Matter of Law ......................... 5

           1.   This Amended Claim Is Subject to Review ..................................... 5

           2.   Plaintiffs Allege Gray Marketing Was an Industry-Wide
                Phenomenon ................................................................................. 6

      C.   The Risk of Retail Margins Was Disclosed ............................................ 8

      D.   Plaintiffs Have Not Pled an Actionable Omission Related to Adams Golf's
           Selective Retail Distribution Network .................................................. 9

      E.   Adams Golf Had No Duty to Disclose Risks Related to Alleged
           Questionable Sales Practices ............................................................... 10

           1.   Item 303 of Regulation S-K Mandates Disclosure Only of Known
                Trends and Requires Allegations of Actual Knowledge .............. 11

           2.   Plaintiffs Expressly Disclaim Actual Knowledge, So the
                Accounting-Related Claims Must Be Dismissed .......................... 12

           3.   Plaintiffs Have Failed to Allege the "Questionable [Sales]
                Practices" Were Known Trends or Uncertainties ........................ 13

                a.   Double Shipping ................................................................ 14

                b.   Returns .............................................................................. 14

           4.   The "Questionable [Sales] Practices" Are Immaterial ................. 15

      F.   Section 11 Requires Plaintiffs to Plead Materiality at the Motion-to-
           Dismiss Stage ...................................................................................... 16

      G.   Plaintiffs Do Not Provide a Single Reference to the Outside Directors or
           Messrs. Murtland and Hatfield in Their Control-Person Analysis and
           Therefore These Claims Must Be Dismissed ........................................ 17

III.  CONCLUSION ........................................................................................... 20

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (D. Del. 2004) ..................................................................................6, 7

*In re Alpharma Inc. Sec. Litig.*,
372 F.3d 137 (3d Cir. 2004) ......................................................................................17

*In re Anchor Gaming Sec. Litig.*,
33 F. Supp. 2d 889 (D. Nev. 1999) ........................................................................2, 4

*Bender v. Suburban Hospital, Inc.*,
159 F.3d 186 (4th Cir. 1998) ........................................................................................5

*Butler v. Snyder*,
106 F. Supp. 2d 589 (D. Del. 2000) ............................................................................5

*In re City of Philadelphia*,
158 F.3d 711 (3d Cir. 1998) ....................................................................................3, 7

*Cline v. Indus. Maint. Eng'g & Contracting Co.*,
200 F.3d 1223 (9th Cir. 2000) ....................................................................................5

*In re Computervision Corp. Sec. Litig.*,
869 F. Supp. 56 (D. Mass. 1994) ................................................................................4

*In re Continental Airlines, Inc.*,
279 F.3d 226 (3d Cir. 2002) ........................................................................................3

*In re Craftmatic Sec. Litig.*,
890 F.2d 628 (3d Cir. 1989) ......................................................................................10

*In re Digital Island Sec. Litig.*,
223 F. Supp. 2d 546 (D. Del. 2002) ....................................................................18, 19

*In re Donald J. Trump Casino Sec. Litig.*,
793 F. Supp. 543 (D.N.J. 1992) ................................................................................10

*In re Gander Mountain Co. Sec. Litig.*,
2006 WL 140670 (D. Minn. Jan. 17, 2006) ..............................................................13

*Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*,
263 F.3d 296 (3d Cir. 2001) ......................................................................................13

RLF1-2989958-1

*Hemenway v. Peabody Coal Co.*,
    159 F.3d 255 (7th Cir. 1998) ...........................................................................5, 6

*Keane v. Fox Television Stations, Inc.*,
    297 F. Supp. 2d 921 (S.D. Tex. 2004) ....................................................................5

*McIntyre v. United States*,
    336 F. Supp. 2d 87 (D. Mass. 2004) .......................................................................5

*In re Merck & Co. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ...........................................................................9, 16

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) ................................................................................16

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) .........................................................................11, 16

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002) .............................................................................15

*In re Reliance Sec. Litig.*,
    91 F. Supp. 2d 706, 731 (D. Del. 2000) ................................................................18

*In re Rent-Way Securities Litigation*,
    209 F. Supp. 2d 493 (W.D. Pa. 2002) .............................................................18, 19

*In re Rockefeller Ctr. Props. Inc. Sec. Litig.*,
    311 F.3d 198 (3d. Cir. 2002) ................................................................................17

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992) ..................................................................................4

*Sheehan v. Little Switzerland, Inc.*,
    136 F. Supp. 2d 301 (D. Del. 2001) .....................................................................20

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) .........................................................................13, 14

*In re Suprema Specialities, Inc.*,
    2006 U.S. App. LEXIS 4307 (3d Cir. Feb. 23, 2006) .............................................3

*Thelen v. Massachusetts Mut. Life Ins. Co.*,
   111 F. Supp. 2d 688 (D. Md. 2000).............................................................................5

*Thomas v. Farley*,
   31 F.3d 557 (7th Cir. 1994) .......................................................................................5

*Tracinda Corp. v. DaimlerChrysler AG*,
   197 F. Supp. 2d 42 (D. Del. 2002)..................................................................8, 17, 18

*Treadway v. Gateway Chevrolet Oldsmobile Inc.*,
   362 F.3d 971 (7th Cir. 2004)......................................................................................5

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994)...................................................................................14

## OTHER AUTHORITIES

Management's Discussion & Analysis of Fin. Condition & Results of Operations,
   Securities Act Release No. 33-6835, 1989 WL 1092885 (May 24, 1989)..............................12

17 C.F.R. § 229.303(a)(3)(ii) ...........................................................................10, 11

## I.    INTRODUCTION

The Second Amended Complaint ("SAC") must be dismissed because plaintiffs have pled themselves out of court. In addition to two new claims, plaintiffs add detail about their gray-market claim (that Adams Golf failed to disclose the risk of gray marketing and the risk of inadequate protective measures). Although the gray-market claim was sustained in the Consolidated Amended Complaint ("CAC") (D.I. 28), the claim has been amended in the SAC and must be reviewed in light of the new allegations. There is no doubt that plaintiffs now allege the gray market was an industry-wide phenomenon. The law in the Third Circuit (and the law of the case) is that a company has no duty to disclose general industry-wide trends "easily discernable from information already available in the public domain." Thus, this Court must dismiss the gray-market claim.

Plaintiffs' two new claims are also not actionable. They allege that Adams Golf failed to disclose the risk of retail-margin decline and the risk of questionable sales practices, but the Company disclosed the first risk and had no duty to disclose the second. Adams Golf disclosed the risk of retail-margin decline in the Prospectus when it disclosed the risk that retail prices could decline—plaintiffs cannot state a claim by insisting that Adams Golf should have described the risk in terms of retail margins rather than retail prices. And the questionable sales practices were not required to be disclosed under Item 303 because plaintiffs do not and cannot allege that they were known, quantifiable pre-IPO trends that the Company reasonably expected to have a material impact on net sales or revenues. Accordingly, the Court should dismiss the SAC with prejudice.

## II.    ARGUMENT

### A.    Plaintiffs' Allegations Must Be Considered in Their Totality and Rule 9(b) Applies

Plaintiffs argue that the SAC's allegations sound in negligence, not fraud, because (1) "[t]he new parts of the Complaint were *carefully pled* to avoid any suggestion of fraud" and (2) Judge McKelvie held that the CAC's original gray-market allegations did not sound in fraud. (Opp. at 2 (emphasis added), D.I. 223.)  Neither argument carries the day.

First, plaintiffs may have been careful, but they also knew that they had to plead actual knowledge to state a claim under Regulation S-K.  And that is what they tried to do.  Plaintiffs tell the story of management that *knew* about gray marketing and other problems and conspired to conceal the risks they posed from investors.  (SAC ¶¶ 42-52, D.I. 180; Opp. at 19 ("Barney Adams was aware of the problem, saw it increasing and unsuccessfully attempted to correct it"); SAC ¶¶ 62-64, 68 (alleging management's knowledge and concealment of various aspects of gray marketing); SAC ¶¶ 82-84 (alleging management's knowledge and concealment of the lack of protection for the Company's selective-distribution network); SAC ¶¶ 86-88 (alleging that defendants acknowledged the risk among themselves pre-IPO that retail margins could decline but concealed it from investors).)  Plaintiffs cannot change the nature of their allegations simply by avoiding the word "fraud" or by disclaiming any fraud.  *In re Anchor Gaming Sec. Litig.*, 33 F. Supp. 2d 889, 892-93 (D. Nev. 1999) ("Plaintiffs' Complaint *could* have been drafted to simply allege, without embellishment, that the Prospectus contained materially false or misleading statements or omissions.  However, Plaintiffs chose to do more.  By including allegations of fraudulent misconduct, Plaintiffs brought the burden of Rule 9(b) upon themselves.").

2

Second, plaintiffs' argument that Judge McKelvie's decision on the CAC's original gray-market allegations protects these same allegations in the SAC, under the law-of-the-case doctrine, is creative but not supported by the case law. For example, *In re Continental Airlines, Inc.*, 279 F.3d 226 (3d Cir. 2002), is not similar to our case and does not involve the introduction of new allegations. In *In re City of Philadelphia Litigation*, the Third Circuit concluded that the "new evidence" presented did not warrant a departure from the law-of-the-case doctrine because it acted only to support the prior panel's conclusion and did not undermine that conclusion. 158 F.3d 711, 718-20 (3d Cir. 1998). The opposite is true here. Plaintiffs pled "new evidence" in the form of a host of new allegations about industry-wide gray marketing and management's purported effort to conceal it. These allegations certainly undermine the prior decision.[1] (SAC ¶¶ 42-70.) The SAC and these new allegations have not yet been tested on a motion to dismiss. Thus, the law-of-the-case doctrine does not apply. *City of Philadelphia*, 158 F.3d at 718. (recognizing that the doctrine does not preclude reconsideration of previously decided issues when new evidence is available).

The only case plaintiffs cite to support their argument that the SAC pleads negligence, not fraud, *In re Suprema Specialties, Inc. Sec. Litig.*, is also inapposite. 2006 U.S. App. LEXIS 4307 (3d Cir. Feb. 23, 2006). In that case, the Third Circuit held that where plaintiffs allege both section 11 and section 10(b) claims, the court will look to see whether ordinary negligence is expressly pled for the section 11 claim. *Id.* at *32. The *Suprema* plaintiffs segregated their allegations of negligence from those of fraud (*id.* at *33), and they carefully articulated their negligence theory in the complaint. *Id.* at *26 ("had they exercised reasonable care, these

---

[1] Plaintiffs themselves recognize that the Third Circuit "obviously could not have anticipated" the SAC and its new detail about management's alleged pre-IPO knowledge and concealment of gray-market risks. (Opp. at 17 n.11.)

3

defendants could have known of the material misstatements and omissions alleged" against them). Plaintiffs here did neither.

The SAC more closely resembles those complaints that only alleged a section 11 claim but also sounded in fraud. *See In re Anchor Gaming*, 33 F. Supp. 2d at 892-93; *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56, 63-64 (D. Mass. 1994). Those complaints, like the SAC, were "rife with *insinuations and suggestions* that Defendants purposefully omitted and misstated material information. . . ." *Anchor Gaming*, 33 F. Supp. at 893 (emphasis added). The *Computervision* court held that one phrase, exactly like the one plaintiffs used here, was indicative of fraud: "None of the Individual Defendants . . . made a reasonable investigation or possessed reasonable grounds for the belief" that the statements contained in the Prospectus were true and without omission of any material facts. *Compare Computervision*, 869 F. Supp. at 64 *with* SAC ¶ 99. And contrary to plaintiffs' representation (Opp. at 8), defendants identified several statements in the SAC that allege defendants' fraudulent, deceitful, or intentional behavior. (O.B. at 6, D.I. 219; *see also* SAC ¶¶ 42-52, 62-64, 68, 82-84, 86-88.)

Neither the law-of-the-case doctrine nor plaintiffs' "it's negligence because we say so" argument can save the SAC from Rule 9(b) scrutiny. Plaintiffs allege throughout the SAC that defendants knowingly omitted material information from the Prospectus (as they must to allege claims under Regulation S-K), but they fail to do so with the specificity required by Rule 9(b).[2] Therefore, the Court may dismiss the SAC on Rule 9(b) grounds alone. The Court also may, and should, dismiss the SAC for all the reasons stated below.

---

[2] *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir. 1992) (stating that Rule 9(b) requires plaintiffs to plead "(1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage").

4

**B.    Plaintiffs' Gray-Market Claim Fails as a Matter of Law**

**1.    This Amended Claim Is Subject to Review**

Plaintiffs have pled a gray-market claim in the SAC that is new and different from the one they pled in the CAC.  (SAC ¶¶ 66-70.)  The Court must review this new claim and determine whether, in light of the newly pled facts, the SAC states a viable claim.  *Bender v. Suburban Hospital, Inc.*, 159 F.3d 186, 192 (4th Cir. 1998) (noting that "although notice pleading does not require a plaintiff to plead particulars, 'if a plaintiff chooses to do so, and they show that he has no claim, then he is out of luck'").[3]  The law did not require plaintiffs to add these new facts, but they chose to include them and they are now bound by them.  *Id.*

Plaintiffs' half-hearted attempt to distinguish *Bender* and *Hemenway v. Peabody Coal Co.*, 159 F.3d 255 (7th Cir. 1998), completely misses the point of these cases.  (Opp. at 15.)  Both examine the sufficiency of plaintiffs' pleadings under the rubric of Rule 12(b)(6), and that is all that matters in this inquiry.  *Hemenway*, 159 F.3d at 261-62; *Bender*, 159 F.3d at 192.  The factual context of that examination is irrelevant.  Plaintiffs again get creative when they, in effect, ask this Court to hold that if a complaint is amended after surviving a motion to dismiss, then defendants are only entitled to test the sufficiency of new allegations related to new claims—not any new allegations related to old claims.  That is not the law.  Rule 12(b)(6) permits the testing of the legal sufficiency of a claim.  If plaintiffs choose to amend a claim, then the legal

---

[3]    *See also Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 983 n.10 (7th Cir. 2004) (same).  This legal doctrine has been embraced by courts in other federal circuits.  *See, e.g., Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1232 (9th Cir. 2000) (citing an earlier Seventh Circuit case, *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994), for the same proposition); *McIntyre v. United States*, 336 F. Supp. 2d 87, 129 n.44 (D. Mass. 2004) (citing *Treadway*, 362 F.3d at 983 n.10); *Thelen v. Massachusetts Mut. Life Ins. Co.*, 111 F. Supp. 2d 688, 691 (D. Md. 2000) (noting that "a party 'can plead himself out of court by unnecessarily alleging facts which demonstrate that he has no legal claim'" (citing *Northern Trust Co. v. Peters*, 69 F.3d 123, 129 (7th Cir. 1995)); *Keane v. Fox Television Stations, Inc.*, 297 F. Supp. 2d 921, 932-33 (S.D. Tex. 2004) (citing *Farley*, 31 F.3d at 558-59).  This legal doctrine has also been observed by a Delaware federal court and should be adopted by this Court.  *See Butler v. Snyder*, 106 F. Supp. 2d 589, 593 (D. Del. 2000) (citing *Farley*, 31 F.3d at 558-59, and concluding that plaintiff's allegation was insufficient where its characterization was inconsistent with the facts alleged in the complaint).

5

sufficiency of that *claim* can be tested. Here, plaintiffs' newly alleged facts render their gray-market claim insufficient as a matter of law. Plaintiffs have, as the *Hemenway* court recognized, "pleaded themselves out of court." 159 F.3d at 261.

### 2.    Plaintiffs Allege Gray Marketing Was an Industry-Wide Phenomenon

Plaintiffs are betrayed by their own pleadings. The newly alleged facts (SAC ¶¶ 66-70) characterize gray marketing as an industry-wide phenomenon, and such a condition cannot support a securities claim. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 278-79 (D. Del. 2004). Indeed, the new gray-marketing allegations parallel the retail-oversupply allegations pled in the CAC, which this Court dismissed as an industry-wide trend and then the Third Circuit affirmed.[4] For example, the largest players in the golf industry, Callaway (Adams Golf's largest competitor), Taylor Made, Ping, and Titleist, all allegedly suffered from gray marketing, and all but one was listed as a key competitor in the Company's Registration Statement. (A032.) This is the relevant golf industry, and gray marketing was allegedly common to the industry.

---

[4] Plaintiffs alleged the following in the SAC: (1) by the time of the IPO, "gray marketing sales had posed significant problems to certain of Adams Golf's competitors . . ." (SAC ¶ 66); (2) "Adams Golf's largest competitor, Callaway, warned . . . that its 'efforts to address gray market issues could have an adverse impact on [its] sales and financial performance" (SAC ¶ 67); (3) "Adams Golf's competitors Taylor Made and Ping had experienced severe problems when their clubs were sold . . . by Costco" (SAC ¶ 68); "Callaway, Ping and Taylor Made had all encountered problems with Costco" (SAC ¶ 68); "*News reports* from May 25, 1998, show that Titleist had been forced to implement a redistribution program to stop its customers from selling to 'non-authorized retail locations'" (SAC ¶ 69) (emphasis added).

These new facts effectively mirror the defective retail-oversupply allegations in the CAC: (1) Adams Golf disclosed that "the oversupply of inventory at the retail level . . . has weakened club sales industry wide over the last 12 months . . . ." (CAC ¶ 43); (2) the Registration Statement and Prospectus "failed to disclose that the Company's own retailers were suffering from, and would likely continue to suffer from, an industry-wide over-supply of golf equipment inventory" (CAC ¶ 47); (3) the Registration Statement and Prospectus "failed to indicate that Adams Golf retailers were carrying excess inventory" (CAC ¶ 48); (4) Adams Golf disclosed "it would offer extraordinary credits to its own retailers . . to alleviate problems arising from those retailers' excess inventory" (CAC ¶ 49); and (5) prior to the IPO, "*competitors of Adams Golf* had begun to take corrective action to address the industry-wide oversupply of equipment" (CAC ¶ 50) (emphasis added).

6

The only difference between the SAC's gray-market allegations and the CAC's retail-oversupply allegations is that plaintiffs cleverly omitted the word "industry" in the SAC.[5] Plaintiffs alleged before that retail oversupply was an industry-wide problem that affected different manufacturers in different ways at different times, just as they now allege about the gray market. (*Compare* Opp. at 16 *with supra* note 4.) But the problem itself was easily discernable from information already in the public domain, and thus Adams Golf was not required to disclose it, despite plaintiffs' allegations regarding its specific effect on the Company. *Adams Golf*, 381 F.3d at 278-79. Form should not prevail over substance—plaintiffs alleged that gray marketing was an industry-wide problem, and thus it is not required to be disclosed under the securities laws and the law-of-the-case doctrine.

Plaintiffs apparently misunderstand the law-of-the-case doctrine when they contend it does not apply here because the retail-oversupply allegation and the gray-market allegation are two different claims. (Opp. at 16 & n.10.) *City of Philadelphia* and *Quern* make clear that the doctrine applies to preclude review of previously decided *legal issues*. 158 F.3d at 718; 440 U.S. at 348 n.18. There is only one legal issue before this Court: whether the failure to disclose an industry-wide phenomenon, in any context, can support a securities claim. In *Adams Golf*, the Third Circuit made it clear that the answer is "no." What matters is that the Third Circuit expressly rejected *any* securities claim based on the failure to disclose industry-wide phenomena. *Adams Golf*, 381 F.3d at 278-79 (holding that "Adams Golf was not duty-bound to disclose

---

[5] Plaintiffs claim that the Adams Golf Defendants cite several irrelevant cases (including *Adams Golf*) because gray marketing was not an industry-wide phenomenon. (Opp. at 16.) As demonstrated above, however, these cases are right on point—plaintiffs' newly pled facts regarding the golf industry's gray-market woes do not substantively differ from the dismissed retail-oversupply allegations.

In a similar vein, plaintiffs challenge the argument that the Third Circuit found in *Adams Golf* that there were no false statements in the Prospectus. (Opp. at 17 n.11.) Plaintiffs provide no basis for this challenge, however, and a plain reading of the opinion shows that the Third Circuit did not find any false statements. *Adams Golf*, 381 F.3d at 277-78. Indeed, to the extent that plaintiffs' gray-market claim survived, the only issue is an alleged omission. Furthermore, plaintiffs do not appear to allege anything other than omissions in the SAC.

general industry-wide trends easily discernable from information already available in the public domain").

### C.    The Risk of Retail Margins Was Disclosed

Plaintiffs do not dispute that Adams Golf disclosed in the Prospectus that retail prices for its clubs could decline, and they do not cite any section of the Prospectus where the Company guaranteed its resellers specific profit margins. That alone justifies dismissal of this claim. What plaintiffs quibble with is that the Prospectus did not mention "retailer margins," which they explain is the amount a retailer stands to profit from selling an Adams Golf club—the difference between the club's sales price and the retailer's cost. (Opp. at 17-18.) What plaintiffs have to acknowledge, however, and what any reasonable investor knows, is that if the sales price declines (a risk disclosed in the Prospectus), then retail margins necessarily also decline (a risk impliedly disclosed in the Prospectus).

The federal securities laws do not require companies to disclose information that is obvious or easily inferred from other disclosures. As this Court stated in *Tracinda Corp. v. DaimlerChrysler AG*, "corporations are not required to address their stockholders as if they were children in kindergarten . . . It is thus sufficient if the company provides information as to material facts in a format from which a reasonable investor could reach his own conclusions as to the risks of the transaction." 364 F. Supp. 2d 362, 413 (D. Del. 2005). Plaintiff's argument is that they would prefer the Company to have chosen the phrase "retailer margins" to describe the potential decline in retailer profits, rather than the language of "significant price erosion" and "lower than expected average sales prices" that the Company chose instead. (A009-11.) This does not state a viable claim.

Plaintiffs next contend that "because the Prospectus boasted about the strong retailer network," Adams Golf had a duty to disclose that the retailers may become disgruntled because

8

of declining retail margins. (Opp. at 18.) Once again, the Prospectus did disclose that retailers' prices could decline and simple math enables investors to calculate that their margins also could decline. An additional disclosure is thus unnecessary. *See Merck*, 432 F.3d at 270 (quoting *Ash v. LFE Corp.*, 525 F.2d 215, 219 (3d Cir. 1975) ("We decline to hold that those responsible for the preparation of proxy solicitations must assume that stockholders cannot perform simple subtraction.")). Adams Golf's prospectus bespoke caution and investors were on notice of potential price erosion and its attendant implied effects on retailers.

### D. Plaintiffs Have Not Pled an Actionable Omission Related to Adams Golf's Selective Retail Distribution Network

Plaintiffs allege that Adams Golf should have disclosed that it did not have contracts with its retailers and that it did not serialize its clubs. (SAC ¶¶ 81-84.) This claim must be dismissed because (1) it merely repackages the inactionable gray-market claim, and (2) Adams Golf had no duty to disclose these alleged omissions. First, plaintiffs admit they are not raising a new claim: the alleged omission is simply a risk associated with the gray market. (Opp. at 19 (stating selective retail distribution network claim required disclosure because "[g]ray market selling was a known trend and uncertainty that Adams reasonably expected would have a material unfavorable impact.") As discussed in Part II.B above, because gray marketing was an industry-wide phenomenon, Adams Golf had no duty to disclose it in the Prospectus.

Second, Adams Golf had no duty to disclose these alleged omissions. Notably, plaintiffs do not identify what statements were made misleading or how they were made misleading. (SAC ¶¶ 81-84.) They simply allege that Adams Golf "should have informed investors that Adams was at gray marketers' mercy . . ." (Opp. at 18.) That is nonsense. "Certainly management is not required to offer investments pursuant to a prospectus which disparages the

9

very viability of that investment." *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 556 (D.N.J. 1992).

This claim amounts to nothing more than questioning business judgment in hindsight: plaintiffs believe that Adams Golf should have had written contracts rather than oral contracts[6] with its retailers and that Adams Golf should have serialized its clubs sooner than it did. (SAC ¶¶ 82-83.) Federal securities laws do not require disclosure of claims like this that are nothing more than alleged mismanagement.[7] *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 637 (3d Cir. 1989). Finally, plaintiffs do not and cannot allege with a straight face that the lack of written contracts or the lack of club serialization were "known trends" required to be disclosed under Regulation S-K. *See also infra* Part II.E.1.

### E.    Adams Golf Had No Duty to Disclose Risks Related to Alleged Questionable Sales Practices

Plaintiffs seek to hold defendants liable for three questionable sales practices—alleged double shipping, unlimited rights of returns, and inadequate return reserves (the "accounting-related claims"). These claims must fail because plaintiffs do not properly allege a duty to disclose under Item 303 and fail to allege facts to demonstrate materiality.

Plaintiffs now concede there is no historical false impact of the accounting-related claims, that is, no impact on the IPO financial statements. (Opp. at 19-20.) Instead, they assert that Adams Golf materially omitted the "risk" that these practices would impact future results. (SAC

---

[6] Plaintiffs themselves essentially alleged that the Company employed this enforcement mechanism by citing a March 27, 1998 memo from Mark Gonsalves, in which he explained that he had threatened to implement the Company's enforcement policy against retailer King Par in response to evidence that this retailer might have engaged in transshipping. (SAC ¶ 47.)

[7] As explained in defendants' opening brief, federal antitrust laws limit plaintiffs' proposed written price-fixing structure, and trade-secret laws limit disclosure of serialization (or non-serialization) of clubs. (O.B. 11-13.)

10

¶ 71.)  The *only* possible basis for a duty to disclose this alleged risk is if it constituted a "known trend" under Regulation S-K.  It plainly did not.

To plead an actionable Item 303 omission, plaintiffs must allege that (1) a known trend or uncertainty exists; (2) the trend is *known* to management pre-IPO; (3) the company reasonably expects that trend to have a material impact on net sales or revenues; and (4) the trend is persistent and quantifiable.  17 C.F.R. § 229.303(a)(3)(ii) & Instructions 3 & 7 (emphasis added).  The two pages of the SAC devoted to these claims fail to allege any of these required elements.  (SAC ¶¶ 71-80.)

### 1.    Item 303 of Regulation S-K Mandates Disclosure Only of Known Trends and Requires Allegations of Actual Knowledge

Item 303 of Regulation S-K only requires disclosure of material "*known* trends or uncertainties" that the Company "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues . . ."  17 C.F.R. § 229.303(a)(3)(ii) (emphasis added); *see Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000).  The instructions to Item 303 state:

> [MD&A] shall focus specifically on material events and uncertainties *known to management* that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

17 C.F.R. § 229.303, Instruction 3 (emphasis added).  Item 303 distinguishes known trends (*e.g.*, known increase in raw material prices) from forward-looking information (*e.g.*, predictions or projections).  Forward-looking information need not be disclosed under Item 303.  *Id.*,

11

Instruction 7. Finally, only those persistent risks where the Company is able to quantitatively assess impact are deemed trends under Item 303.[8]

### 2. Plaintiffs Expressly Disclaim Actual Knowledge, So the Accounting-Related Claims Must Be Dismissed

Plaintiffs have failed to allege contemporaneous actual knowledge of the "questionable [sales] practices" by management.[9]  Plaintiffs allege that sales persons informed *plaintiffs*, not management, about the alleged actions of a lone salesperson—Jay Greanay—who is indisputably not a member of management.  (SAC ¶ 72.)  The closest plaintiffs come to connecting management to these alleged sales practices pre-IPO is to allege that Greanay was "a friend of Gonsalves"—but plaintiffs do not allege that Mark Gonsalves had any knowledge of the alleged double shipping.  (SAC ¶ 74.)  Similarly, plaintiffs allege that salespersons informed *plaintiffs*, not management, about the clubs returned from Hawaii.  All other allegations of knowledge are post-IPO.  (SAC ¶¶ 76-80.)

Not only do plaintiffs fail to allege actual knowledge, they expressly ***disclaim*** actual knowledge in their Opposition:

> The sales practices section of the Complaint, ¶¶ 71-80, alleges that the Prospectus failed to disclose the pre-IPO practice of shipping more clubs than had been ordered by the customer, or shipping clubs with unlimited rights of return.  *Nothing in the section says or implies that any defendant knew about this practice before the IPO.*  Indeed, the post-IPO memo from Barney Adams, Adams's President and CEO, quoted in ¶¶ 76-79, makes clear that Barney Adams learned of the issue *only after the IPO.*

---

[8] Management's Discussion & Analysis of Fin. Condition & Results of Operations, Securities Act Release No. 33-6835, 1989 WL 1092885, *6 (May 24, 1989) (the "SEC's 1989 Release").

[9] Management is defined in the prospectus as Barney Adams, Darl Hatfield, Richard Murtland, James Farrell, Mark Gonsalves, Steve Sanazaro, Paul Brown, Roland Casati, Finis Conner, Mark Mulvoy, and Stephen Patchin. (A034.)

(Opp. at 11 (emphasis added).)  Plaintiffs' own allegations demonstrate that the SAC does not meet Item 303's actual-knowledge requirement.

Finally, Adams Golf could not have "reasonably expect[ed]" that these questionable sales practices would "have a material impact on net sales or revenues." 17 C.F.R. § 229.303(a)(3)(ii). As disclosed in the Prospectus, Adams Golf had experienced a ten-fold increase in sales revenue in a single year.  (A006, D.I. 220.)  Even if Adams Golf management somehow knew of these potential problems (which is not alleged), they could not reasonably expect the problems to materially impact sales and revenues:

> Based on such positive factual data, the allegations failed to raise a factual question of whether management knew that there was a trend *and* unreasonably failed to predict that there was a likelihood that the company's future earnings and profits would be materially affected.

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1297-98 (9th Cir. 1998).

### 3. Plaintiffs Have Failed to Allege the "Questionable [Sales] Practices" Were Known Trends or Uncertainties

Plaintiffs have not alleged that a known trend existed.  At the motion-to-dismiss stage, legal conclusions masquerading as facts should not be accepted as true.  *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001).  Plaintiffs assert that because they include the magic words "***known trends or uncertainties***," the Court must therefore conclude for purposes of the motion that these were in fact known trends.  (Opp. at 21 (emphasis added).) This misstates the legal standard and contradicts federal precedent.  *See, e.g., Steckman*, 143 F.3d at 1297-98 (requiring evaluation of facts alleged to determine whether omission was a "known trend"); *In re Gander Mountain Co. Sec. Litig.*, 2006 WL 140670, *15 (D. Minn. Jan. 17, 2006) (same).  Plaintiffs have not alleged any facts demonstrating that these alleged practices were known trends.

13

### a.    Double Shipping

Plaintiffs assert that one salesperson—Greanay—was "heavily involved in double shipping during the period before the IPO" and that other salespeople knew (at some unspecified time) of his actions. (SAC ¶ 74.) Without identifying a single customer or a single amount that was double shipped, plaintiffs do not allege facts giving rise to a known trend. The actions of a single salesperson cannot constitute a "known trend." *Steckman*, 143 F.3d at 1298.

### b.    Returns

Plaintiffs raise two issues with respect to returns: alleged unlimited return rights and inadequate reserves. Neither is sufficiently pled, and Adams Golf made appropriate disclosures related to both. First, plaintiffs assert that "many" clubs were returned after the IPO and "numerous pallets of clubs were shipped to Hawaii pre-IPO and then returned several months later," without detailing the number of clubs, why they were returned, or whether they were returned before the IPO. (SAC ¶ 74.) Plaintiffs have not stated to whether these were unlimited returns or simply returns that fall under the 90-day no-questions-asked return policy that was disclosed in the Prospectus. (A061.) In the end, plaintiffs have only alleged that *some* customers returned *some* unspecified number of clubs. This does not constitute a known trend of *increasing* returns. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1418 (9th Cir. 1994) (noting that it is a normal business practice to accept returns and that it is unnecessary to disclose such an obvious practice).

The return-reserves risk claim is also inactionable. The only detail in the SAC related to return reserves is the statement that in July 1998 returns were higher than predicted. (SAC ¶ 78.) But Adams Golf's reserve disclosure cautioned investors that some clubs would be returned and then provided an estimate. (A063.) Adams Golf further warned that actual results may differ

14

from this estimate. (A061.) This is full disclosure. One post-IPO datapoint (*i.e.*, July 1998 returns) cannot possibly constitute a known trend pre-IPO that reserves were inadequate.

### 4.    The "Questionable [Sales] Practices" Are Immaterial

Plaintiffs admit that they do not sufficiently allege a material false statement with respect to the accounting-related claims. (Opp. at 20.) Instead, they claim "the Prospectus should have *warned*, in the risk section, that such practices could lead to post-IPO problems, such as increased returns and decreased sales." (Opp. at 19-20.) But the only risk associated with these "questionable practices" is accounting related—that these "questionable practices" somehow materially affected net sales and revenue in later financial statements.[10] (SAC ¶ 71 ("material risk of adversely affecting Adams Golf's post-IPO results"); ¶ 74 (returns "adversely impact[ed] subsequent period results").) Plaintiffs have not pled facts linking the alleged "questionable practices" to some financial-statement impact nor have they pled any material impact; indeed, plaintiffs do not even detail a single transaction or amount of alleged double shipping or improper returns. The SAC does not come close to alleging that the trend was persistent and material as required. *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1190-92 (11th Cir. 2002) (holding that Item 303 requires facts raising "an observed pattern [that] accurately reflects

---

[10] If the accounting-related allegations never impacted a future financial statement, then, by definition, they were immaterial and plaintiffs cannot allege to have suffered damages from the alleged omission.

persistent conditions"). Mere conclusory statements about some vague future impact are insufficient to state a claim.[11]

### F. Section 11 Requires Plaintiffs to Plead Materiality at the Motion-to-Dismiss Stage

Plaintiffs contend that this Court may not consider the issue of materiality on a motion to dismiss. (Opp. at 21-22.) While ordinarily this is an issue left to the fact-finder, because plaintiffs fail to plead any facts suggesting materiality, the SAC fails as a matter of law.[12] (O.B. at 11-13); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (dismissing claim based on materiality at motion-to-dismiss stage); *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005) (same).

Plaintiffs have failed to allege materiality for any of the new claims. They fail to plead specific facts and instead argue that materiality is properly alleged for all claims because Adams Golf's stock price declined. (Opp. at 21-22.) The stock-price decline analyzed in *Merck*, however, was related to Adams Golf's January 7, 1999 press release, a disclosure that is now outside of the class period and irrelevant to this case. *Merck*, 432 F.3d at 274-75 (citing *Adams Golf*, 381 F.3d at 276 and discussing decline in Adams Golf stock price on January 7, 1999). Plaintiffs cannot allege materiality based on this post-class-period stock-price decline. And

---

[11] SEC's 1989 Release, 1989 WL 1092885, *4 ("[r]equired disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product process; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract").

Barney Adams's post-IPO complaints do not allege pre-IPO materiality as required by Item 303. They do not show a known trend with material impact on net sales and revenues (*i.e.*, Adams Golf's financial statements). The general *TSC Industries v. Northway* test for materiality is inapplicable to the accounting-related claims because plaintiffs do not allege an omission necessary to make some other statement in the Prospectus not misleading. *Oran*, 226 F.3d at 288. Thus, the Item 303 materiality test is the only applicable standard.

[12] Although the facts in discovery demonstrate otherwise, for purposes of the motion to dismiss, defendants concede that the law of the case prevents them from challenging the materiality of the gray-market claim at the motion-to-dismiss stage. This claim is inactionable, however, because it is now pled as an industry-wide phenomenon that need not have been disclosed. *See supra* Part II.B.

plaintiffs cannot use a class-period stock-price decline because they have not alleged *any* curative disclosure in the period related to the new claims (*i.e.,* omissions regarding retail margins, failure to protect the selective-distribution network, double shipping, unlimited rights of return, and inadequate reserves). Thus, plaintiffs have failed to plead the required element of materiality.

### G. Plaintiffs Do Not Provide a Single Reference to the Outside Directors or Messrs. Murtland and Hatfield in Their Control-Person Analysis and Therefore These Claims Must Be Dismissed

Contrary to plaintiffs' protestations, the law of the case does not sustain the SAC's control-person claims. To establish control-person liability, plaintiffs must first and foremost establish an underlying securities-law violation. *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 55 (D. Del. 2002). The SAC is defective and should be dismissed in its entirety. To that end, the SAC is no different than the hundreds of other dismissed securities cases where plaintiffs have failed to state an underlying securities claim.[13]

Plaintiffs also misconstrue federal case law by arguing that they need only plead that the individual defendant held the title of a director or officer and signed an SEC filing. (Opp. at 24 & n.15.) This is false. The *Tracinda* standard requires that they plead three things to successfully assert control-person liability: (1) that the individual held the title of officer or director of the company, (2) that the individual was "in some meaningful way a culpable participant in the primary violation," and (3) that the individual was "in a position to exercise control over the primary violator." 197 F. Supp. 2d at 55, 72. Plaintiffs attempt to conflate the

---

[13] *See, e.g., In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) (when plaintiffs failed to state a securities violation, the control-person liability claim failed as well); *In re Rockefeller Ctr. Props. Inc. Sec. Litig.*, 311 F.3d 198, 211 (3d. Cir. 2002) (no underlying securities violation yields no control-person liability). Plaintiffs' attempt to distinguish these cases based on the Third Circuit's prior holding fails because the live complaint here, the SAC, fails to state a claim.

first and third elements, but they are distinct. Many federal courts have held that simply citing a director or officer's job title is insufficient to show that the individual was in a position to exercise control over the primary violator, and that such a showing requires factual support rather than mere conclusory allegations. *See, e.g., In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002).

An examination of *Tracinda* reveals that the plaintiffs pled not only that the individual defendant, Mr. Gentz, was an officer at Daimler-Benz, but also that he had personally met with two other defendants, who were alleged to be the masterminds of the fraud, and acted in concert to mislead the Chrysler shareholders about Daimler-Benz's intentions toward Chrysler. 197 F. Supp. 2d at 50. It was these detailed factual allegations that led the *Tracinda* court to conclude that Mr. Gentz was a control person "by virtue of his position in and activities at Daimler-Benz," not the mere citation of his title. *Id.* at 72. Plaintiffs have made no attempt to plead facts that connect the outside directors or Messrs. Murtland or Hatfield personally with the decision-making process that led to the alleged securities violation, and thus have not alleged that these individuals were in positions to exercise control over the challenged activities.[14]

Plaintiffs' reading of *In re Rent-Way Securities Litigation,* 209 F. Supp. 2d 493, 524 (W.D. Pa. 2002), similarly mischaracterizes the holding and glosses over the detailed facts in that case. Plaintiffs make it appear that the *Rent-Way* court found that merely pleading an individual defendant's title and signature on an SEC filing was sufficient (Opp. at 24 n.15), but the court

---

[14] Although plaintiffs argue that they need not demonstrate that defendants exercised their authority to control the specific challenged activity (Opp. at 25), Delaware courts are divided on this issue. *Compare Digital Island*, 223 F. Supp. 2d at 561 *with In re Reliance Sec. Litig*, 91 F. Supp. 2d 706, 731 (D. Del. 2000). The better-reasoned cases hold that control-person liability is not adequately pled by unsupported allegations regarding general management responsibilities. *See, e.g., Digital Island*, 223 F. Supp. 2d at 561 (citing *Paracor Fin. Inc. v. GE Capital Corp.*, 96 F. 3d 1151, 1163 (9th Cir. 1996)). Regardless, plaintiffs have not pled any facts showing that defendants generally exercised over the Company's operations. (SAC ¶¶ 94-99, 103-111, 116.)

18

instead looked to a litany of specific facts that linked each defendant to the decision-making process that led to the securities-law violations.  209 F. Supp. 2d at 513-515, 524.[15]

In contrast, the court dismissed the control-person claim in *In re Digital Island Securities Litigation*, because it contained vague and conclusory allegations that cited little more than the individual defendant's job titles and the fact that their duties should have included exerting control over the company.  223 F. Supp. 2d at 561.  The same is true in the SAC.  Plaintiffs have failed to plead any facts of the sort required in *Rent-Way* and *Tracinda* to show that individual defendants other than Barney Adams personally had the power to influence and control the Company's actions that led to the alleged securities-law violations.  (Opp. at 24 n.15.)

The paragraphs of the SAC that the plaintiffs cite as containing fact allegations "detailed and tailored to the individuals" in fact contain broad, vague and conclusory assertions.[16]  (Opp. at 24.)  The SAC asserts essentially what the *Digital Island* court found lacking and insufficient to state a claim for control-person liability: "that, due to their Board or managerial positions, the defendants actively participated in the alleged fraud and that the defendants knew of the

---

[15] For example, the *Rent-Way* plaintiffs pled that the individual defendants had personally "directed Rent-Way's accounting and finance personnel to make artificial journal entries so that the books would balance," that one had "requested that Rent-Way's accounting firm alter dates on advertising invoices," that some had been personally informed of the incorrect and fraudulent journal entries in a personal meeting with the company's auditor, and that others had been close personal friends and involved in a housing development project together.  209 F. Supp. 2d at 513-15.

[16] Far from being "detailed and tailored to the individuals" as plaintiffs claim, the facts in SAC paragraph 116 are absurdly broad and non-specific: the Individual Defendants were each "a director and/or senior officer of Adams Golf," and "the Individual Defendants each had direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Adams Golf."  In paragraph 97, plaintiffs assert merely, "The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus," a statement of non-specific group pleading that does not include facts explaining why or how the defendants were responsible and is not even limited to the individual defendants but seems to include the Company as well.  Thus, it is anything but "detailed and tailored to the individuals."  In paragraph 106, plaintiffs allege that "The Prospectus and other communications contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts," a pleading that fails to mention the individual defendants, much less show detailed and tailored facts about them.

allegedly undisclosed facts." 223 F. Supp.2d at 562. Such pleading failed in *Digital Island* and should fail here too.[17]

## III.    CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice.

OF COUNSEL:

Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas  78701
(512) 499-6200

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger
920 North King Street
Wilmington, Delaware  19899
(302) 651-7700

Attorneys for Defendants Adams Golf, Inc.,
B.H. Adams, Richard H. Murtland, Darl P.
Hatfield, Paul F. Brown, Jr., Roland E. Casati,
Finis F. Conner, and Stephen R. Patchin

Dated:  March 9, 2006

---

[17] Plaintiffs also imply that the facts they have pled are similar to those in *Sheehan v. Little Switzerland, Inc*, 136 F. Supp. 2d 301 (D. Del. 2001). (Opp. at 24 n.16.) This is wrong—the *Sheehan* court held that plaintiffs adequately pled control-person liability for the former CEO, Chairman of the Board, and CFO based on plaintiffs' allegations of scienter for each individual defendant and their involvement in the transaction at issue—allegations that are absent here. 136 F. Supp. 2d at 313, 315 (finding that plaintiffs had alleged power and control to influence the publicity surrounding a merger by alleging the various individuals had signed filings related to the merger and a letter to the shareholders advising them of the merger agreement). Like the plaintiffs in *Digital Island*, the plaintiffs in this case "do not allege facts even arguably similar to those in *Sheehan*," and thus have failed to plead control-person liability. 223 F. Supp. 2d at 562.

20

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2006, I electronically filed the foregoing with the Clerk

of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered to the

following:

Carmella P. Keener
Rosenthal, Monhait, Gross & Goddess
919 Market Street, Suite 1401
Wilmington, DE  19801

Robert K. Payson
John E. James
Potter Anderson & Corroon LLP
1313 North Market Street, Hercules Plaza
Wilmington, Delaware  19801

I hereby certify that on March 9, 2006, I have Federal Expressed the foregoing

document(s) to the following non-registered participants:

Todd S. Collins
Jacob A. Goldberg
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA  19103

Michael J. Chepiga
Elaine M. Divelbliss
Theodore J. McEvoy
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY  10017

Alyssa M. Schwartz (#4351)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
schwartz@rlf.com