# ADAMS GOLF SECURITIES LITIGATION

## EXPERT REPORT OF CHRISTIANA OCHOA

INDIANA UNIVERSITY SCHOOL OF LAW, 211 SOUTH INDIANA AVENUE, BLOOMINGTON, IN 47405
PHONE: (812) 856-1516/ FAX (812) 855-0555/ EMAIL: cochoa@indiana.edu

ADAMS GOLF SECURITIES LITIGATION

EXPERT REPORT OF CHRISTIANA OCHOA

I.    INTRODUCTION

1.    I have been asked by plaintiff's counsel in this matter for my opinion as to:

A.    The characteristics of gray marketing and the effects it can have on brand name products and the trademark owners or manufacturers thereof.

B.    Given the business strengths and strategies of Adams Golf (hereinafter "Adams" or "the Company"), whether at the time of and subsequent to its initial public offering, gray market distribution was an important risk faced by investors in the Company and whether the gray market distribution and sale of Adams golf clubs was of such a nature as to be a material consideration to persons considering investing in the Company's securities.

II.    BACKGROUND AND QUALIFICATIONS

2.    I am an Associate Professor of Law at Indiana University School of Law. This report summarizes my opinion regarding the above question.

3.    My curriculum vitae, which is attached as Exhibit A hereto, summarizes my educational and professional experiences, as well as my areas of expertise. This is the first time I have provided an expert opinion in connection with litigation.

4.    I am providing this opinion independent of my relationship with Indiana University, including Indiana University School of Law. The opinion expressed herein is entirely my own and does not represent the opinions of these institutions.

1

5.    Indiana University School of Law is a top-tier law school, devoted to the

education and training of attorneys. My courses include International Business

Transactions, which includes materials on gray market activity in the golf industry. I also

teach Corporate Finance, Contracts and two courses in Human Rights. My research

includes topics related to corporate social responsibility, human rights and international

law.

6.    I graduated with a dual B.A. degree in History and American Culture from

the University of Michigan in 1993. I also received a J.D. from Harvard Law School in

1998. I have attended many continuing legal education sessions on topics related to

corporate law and corporate finance transactions.

7.    I have worked as a transactional attorney and professor. My work

experience includes:

- Indiana University School of Law - Bloomington, 2003-present. As an Associate
Professor my duties are divided into three categories: research, teaching and
service. My research currently is concerned with theoretical aspects of customary
international law. It has previously been focused on the intersection of cross-
border business activity and human rights. As discussed above, my courses
include International Business Transactions, including a section devoted to
counterfeit and gray market activity, especially in the golf industry, Corporate
Finance, Contracts and two courses in Human Rights. My teaching responsibilities
also include mentoring and guiding students through law school and into their first
years as practicing attorneys. The service aspect of my duties is primarily fulfilled
via membership on various law school committees, including as an elected
representative on the law school's policy committee. I have also acted as the
faculty supervisor to the Public Interest Law Foundation and the Indiana
University Journal of Global Legal Studies.

- Clifford Chance, an international law firm, summer 1997 (summer associate) and
from 1999-2001 (attorney). I represented investment banks and institutional
investors in all aspects of various loan transactions, corporate restructurings,
securities transactions and aircraft purchases. I drafted and negotiated loan
agreements and collateral agreements and other transactional documentation,
prepared offering circulars and performed due diligence in connection with
securities offerings.

2

- Universidad de los Andes, a premier law school in Bogotá, Colombia, 1998-1999. As a visiting professor of law, I developed and taught a law school course entitled "Economic Globalization, Labor and Migration. I also prepared the first runner-up student team for the Organization of American States Human Rights Moot Court Competition.

- Colombian Commission of Jurists, a prominent human rights and humanitarian law organization in Bogotá, Colombia, 1999. I researched Colombia's constitutional mechanisms for human rights protections, in particular the constitution's applicability in addressing violations of such rights by private actors.

8.    I am being compensated for the time I spend on this matter at my current

hourly rate of $425.00 per hour. Secretarial assistance and research assistance, when

utilized, is being compensated at a nominal hourly rate of between $15 and $20 per hour.

Indiana University School of Law and Indiana University are not being compensated in

this matter.

9.    I am familiar with the causes and effects of gray market activity. In

connection with this matter, I have reviewed the following articles related to the gray

market generally:

- Assmus, Gert, & Wiese, Carsten, Sloan Management Review, "How to Address the Gray Market Threat Using Price Coordination", Spring 1995, vol. 36 no. 3, p.31.
- Berman, Barry, Business Horizons, "Strategies to Combat the Sale of Gray Market Goods", July-August 2004, vol. 47 no.4, p. 51.
- Cespedes, Frank, et. al., "Gray Markets: Causes and Cures", Harvard Business Review, July-August, 1988, p. 75.
- Eagle, Lynne, et. al., "Brand Equity and Brand Vulnerability: The Impact of Gray Marketing/Parallel Importing on Brand Equity and Values", European Journal of Marketing, 2003, vol.37 no.10, p. 1332.
- Maskulka, James, Gulas, Charles, "The Long-term Dangers of Gray-Market Sales", Business, Jan-Mar 1987, vol. 37, p. 25.
- Myers, Mathew, "Incidents of Gray Market Activity Among US Exporters: Occurrences, Characteristics and Consequences", Journal of International Business Studies, 1st Qtr., 1999, vol. 30 no. 1, p. 105.

3

- Myers, Matthew B., Griffith, David A, Business Horizons, "Strategies for Combating Gray Market Activity", Nov. 1999, vol.42 i.6, p2.
- Myers, Mathew, Griffith, David A., "Organizational- and Product – Related Influences of Gray Market Channel Activity", Journal of Marketing Channels, 2000, vol.7 no.4, p. 45.

10.    I have familiarized myself with the gray market activity Adams was experiencing at the time of and following its initial public offering and have developed insights and opinions regarding the causes of gray market distribution of Adams golf clubs as well as the nature of the risk such activity posed to investors in the Company's securities at the time of the initial public offering. I have reviewed and/or relied on the following documents, among others, in arriving at these opinions:

- Depositions and transcripts and exhibits of all deponents except plaintiffs
- Declarations of Mark Woodrich and Ryan Magnussen
- Costco Wholesale's sales history inquiries by item by region for fiscal years 1998-2001.
- 1997 Callaway Golf 10-K
- Opinion of R. Allan Miler

III.    ANALYSIS AND OPINION

11.    Gray market goods, also referred to as "parallel imports", are genuine goods, produced lawfully and with the permission of the manufacturer or trademark holder (in this case, Adams). Unlike the black market, which serves as the distribution channel for counterfeit and other illegal goods, the gray market is not necessarily illegal. What distinguishes gray market goods is that they are sold through distribution channels that the trademark owner did not authorize or plan, often without valid licenses or in violation of trade regulations. (Myers &Griffith, 1999, p. 2)

12.    Gray market activity creates intra-brand competition and can provide a larger selection of goods or goods at lower prices than authorized retailers would

4

normally provide. However, gray market goods may be sold without valid warranties and the customer service the manufacturer and/or authorized retailers would normally provide. This report is concerned with the short and long term effects of the gray market on the manufacturer or trademark holder, this case, Adams.

13.    The gray market can be beneficial to the trademark owner, in that it may allow for increased sales. However, as this report will discuss, these are generally short term benefits. In the long term, the gray market is often detrimental to trademark holders. Problems can arise in the form of "ineffective pricing policies, deteriorated distributor relationships, low sales force morale" (Meyers, 1999, p. 106, citing Cespedes, 1988) and decreased prestige associated with a trademark or brand name. (Meyers, 1999, p. 106)

14.    Goods sold through gray market distribution channels can be manufactured within or outside of the country in which they are sold to consumers. In the case of Adams, all golf clubs were manufactured in the United States and were sold both in the United States and internationally.

15.    Adams golf clubs were being sold though gray market distribution channels at the time of the initial public offering. The gray market distribution occurred both in the United States and in Canada, when the Company's golf clubs appeared in Costco stores throughout both countries and in other unauthorized stores. While the absolute number of Adams golf clubs sold through Costco stores may seem relatively small when compared to total sales, there are a number of reasons even these sales posed a significant risk to investors. These include: 1) the Company's business model and the desirability of the Adams brand, if unchanged, would continue to make Adams golf clubs particularly attractive to gray marketers; 2)   the Company's business model and the

5

desirability of the Adams brand were particularly susceptible to damage from gray market activity; 3) gray market Adams clubs were available in Costco stores throughout the United States and Canada and required the attention of Adams' distributors, sales personnel and retailers throughout this large geographic region; 4) Costco records indicate that, at the time of Adams' initial public offering, Costco had purchased over 8,400 golf clubs, indicating that gray market sales were likely to continue or intensify; 5) Once there is an established gray market distribution channel for a given product, the volume of sales made through discount retailers can increase rapidly; and 6) reducing gray market activity requires manufacturers to exercise constant vigilance and expend resources on an ongoing basis These reasons and others will be discussed herein.

A.    Adams' experience with gray marketing illustrates how quickly a gray market problem can arise and spread for a manufacturer or trademark owner. The apparent "first lead" on Adams golf clubs being sold through Costco was on March 23, 1998. This information was passed on to the Company soon thereafter. (Exs. 6, 7, 258) On April 16, 1998, the Company received a letter from WDC Mackenzie Distributors, Ltd. (hereinafter "Mackenzie"), its only authorized distributor in Canada, indicating that it had received 108 returned clubs in the weeks since Adams golf clubs appeared in Costco stores. (Ex. 9) In a fax to Barney Adams, Mark Gonsalves and Marc Puglielli dated May 29, 1998, Chris Beebe, Adams' head of international sales, conveys that the first shipment of Adams clubs to Costco "caused a great deal of trouble" for Adams' Canadian distributor and for authorized Canadian retailers. Mr. Beebe also expresses his concern that the Company "stands to lose most of the goodwill we [Adams] have built in Canada, and see the 15,000 clubs that McKenzie is forecasting for sales through the end

6

of the year disappear." (Ex. 85, ADAMS 001497) By May 6, 1998, the Company had

heard of several cases of gray marketing occurring in the United States and

internationally. (Ex 51 MCK00081)

        B.     Discount retail chains such as Costco have the capacity to ensure

that a given gray market product will be sold in numerous geographic regions. A study

on the long term effects of the gray market which was available at the time of the

Company's initial public offering states:

> Once established, the gray market tends to exhibit a
> "snowball effect," forcing traditional marketing channel
> members to participate in order to compete. Even those
> firms that would normally be geographically removed from
> the center of gray-market activity are drawn into direct
> competition with the gray market...Thus, gray marketing
> can reach all markets. The disturbing consequence for
> domestic marketers is that all domestic channels are subject
> to pressure from the gray market. (Maskulka & Gulas,
> 1987, p. 26)

Costco records show that prior to the initial public offering, at least 3915 golf clubs were

sold in Costco stores. Of these, 3200 (82%) were sold in the United States and 715 (18%)

were sold in Canada. During the period of March 15 to July 5, 1998, Costco stores in

every region of the United States and in Canada had purchased and were selling Adams

golf clubs. (Cost 0009-52)

        C.     Gray market sales of Adams golf clubs grew in the period leading

up to the initial public offering and were highest in the time immediately surrounding the

initial public offering. (Cost 0024) Costco sales of Adams golf clubs grew from 223 clubs

in the United States and Canada combined during the period such sales were first

discovered (March 15 – April 11, 1998) to 2,008 golf clubs during the period of July 5 to

August 1, 1998. (Cost 0024, 0051 and Cost 0052).

7

16.    As described in paragraph 15.A and 15.B above, gray market sales were occurring at the time of the initial public offering. There is ample contemporaneous evidence the Company believed this was a serious problem. In a fax to Mark Gonsalves dated April 15, 1998, Chris Beebe explains that gray market operations detected recently in the United States and Canada could "hurt Adams Golf no matter where they occur, for the outlets that receive these goods 1) have not been approved as an Adams outlet for a variety of reasons, 2) are not required to standby our pricing policies, which can impact our good accounts and 3) can cost Adams Golf a *great deal* of money and/or sales." (emphasis added, Ex. 258, ADAMS 005045) Mark Gonsalves, Adams' vice president for sales, viewed gray market sales of Adams clubs as a "serious situation" (Ex. 257, ADAMS 002472) which required Adams to "take all necessary action to help prevent this from happening again." (Ex.63 ADAMS 002470) After the initial public offering, the Company's Board of Directors also seems to have requested that it meet "when serious issues such as Costco come up." (Ex. 151 ADAMS 002241)

17.    Before the initial public offering Adams developed a plan to deal with gray market sales that would affect the Company's profit margins. As discussed in paragraph 15.A above, gray market sales had the capacity to negatively impact its relationship with authorized retailers, to decrease profit margins (Ex. 258, ADAMS 005045) and to affect the perception of Adams golf clubs in the market. (Ex. 6 MCK00094) In reaction to the Costco sales, by June 8, 1998, the Company had established a plan to deter the sale of its clubs to and through Costco stores in Canada. This plan was to "remain in effect until the stock of Costco products is too low to realistically impact the *Tight Lies* selling price." (Ex. 10) In addition, by the end of July

8

1998 Adams had installed its "Thank-you America buy two Tight Lies©, get a free stand bag" program, which was utilized, at least in part, to deal with the appearance of Adams clubs in Costco stores. (Ex. 80 ADAMS036832 and Exhibit 56, ADAMS036843)

18.    The Company had a gray market problem at the time of the initial public offering which had already begun to threaten its relationships with retailers, its profit margins and its perception in the market place. Numerous articles written on gray market activity discuss methods companies can employ in attempting to eradicate gray market activity once it has begun. These strategies can be very complex and costly. To my knowledge there is no significant evidence that any approach will ensure eradication of a company's gray market problem. The Company's experience with the gray market indicates the difficulty in stopping gray market activity once it has begun. In an email written just over a year after Adams first discovered its clubs were being sold in Costco stores, Patty Walsh expressed the Company's belief that the gray market distribution of its clubs could "never be eradicated altogether." (Ex. 109, ADAMS 003825)

19.    The Company's business model made it particularly vulnerable to gray marketers. It also made it particularly susceptible to the types of damage the gray market can bring to a manufacturer or trademark holder. In the long term, the gray market is known to be potentially detrimental to consumers and trademark holders alike. Problems can arise in the form of "ineffective pricing policies, deteriorated distributor relationships, low sales force morale, poor customer service" (Meyers, 1999, p. 106, citing Cespedes, 1988) and decreased prestige associated with a trademark or brand name. (Meyers, 1999, p. 106)

9

20.    Adams' business strengths, as stated in the Prospectus filed with the SEC and in its Roadshow Presentation, were strongly reliant on three aspects of the Company's business on which the gray market can readily prey and on which it can have significant detrimental effects: a) a prestigious brand image of the clubs b) high profit margins and c) strong and exclusive relationships with its distributors and authorized retailers. (Ex. 167 UND 00016, 00017, 00028, 00029 and Ex.72, p 24)

21.    The prestigious image enjoyed by Adams golf clubs made Adams an attractive gray market target. At the same time, the gray market had the potential of degrading this prestigious image.

A.    When a good is in high demand, its suppliers or manufacturers may discourage competition among authorized retailers, as Adams sought to do through supposedly strong relationships with its retailers. This creates a price umbrella likely to draw unauthorized dealers into the market. (Cespedes, et.al., p78) In addition, gray marketers gain a "free ride" on the market demand and brand image created by authorized distributors and retailers, without having to incur the costs of promoting the product which have helped build the brand's image. "Brand images are a fragile asset and can easily be tarnished by gray market activities. Since gray marketers have no investment in the brand name they have no incentive to protect it." (Maskulka & Gulas, 1987, p.27) The built-in cost differential created by this "free ride" makes gray marketing in prestigious brand name products attractive. The gray market literature suggests that high profile brands are attractive gray market targets. (Eagle, et. al., 2003, p. 1344) When combined with opportunities for arbitrage created by high profit margins, currency fluctuation or price differentials, a prestigious brand name becomes highly attractive to

10

retailers such as Costco, which can provide such products at reduced prices to price-sensitive consumers.

B.     Two aspects of a prestigious trademark or brand name can be damaged as a result of the gray market: First, the goodwill established or being established by the trademark owner is threatened when gray market consumers do not receive the full "extended product" in the form of pre- and post-sale service that buyers from authorized retailers receive. Second, a prestigious trademark or brand name can lose its esteemed status when it appears at reduced prices through unauthorized distributors. (Meyers and Grifith, 2000 p. 47) It should be noted that the marketing activity of a gray market retailer, such as Costco, is not coordinated by the manufacturer. As a result, a brand name such as *Tight Lies*, which Adams marketed by emphasizing its quality can be damaged when a gray market retailer instead focuses on discount prices. (Eagle, et.al., 2003, p, 1337) In a recent study of the effects of gray marketing on brand image, each of fifteen brand owners "believed that parallel import activity of their products into discount retail stores was negatively impacting, or had the potential to impact on their brand's perceptions. Their major concerns related to the lowering of prestige images by the brands' placement in what the brand controllers perceived to be an incompatible retail environment."(Eagle, et. al., 2003, p. 1342.) This same study concludes that in at least some situations, "a decline in brand valuation could presage a fall in shareholder value and thus investor attractiveness." (Eagle, et. al., 2003, p. 1347)

C.     By extension, when a brand name is strongly identified with its manufacturer, as it was in the case of Adams golf clubs, the manufacturer's own image in the marketplace may be eroded together with the market image of its products. "[T]he

11

manufacturer and its legitimate dealers are left with a tarnished reputation that may require a substantial investment of time and money to correct." (Maskulka & Gulas, 1987, p. 30) This is likely to be particularly true for relatively new brand names and manufacturers, like *Tight Lies* and Adams for at least three reasons. First, consumers unfamiliar with the brand may first see and learn of the brand on the floor of a discount retail shop, rather than in an authorized golf shop, giving the impression that this new brand is not prestigious. Second, the name "ADAMS" appeared on each club (Ex. 167 UND00014) , together with the trademark *Tight Lies*. In addition, *Tight Lies* made up over 95% of the Company's sales prior to its initial public offering. This ensured that the Company name and the *Tight Lies* trademark were closely associated and any damage to the value of the *Tight Lies* trademark would likely redound to the Company as well.

D.    In Adams' case, the availability of its clubs in Costco stores and retail sales of its clubs through Costco stores grew steadily prior to the initial public offering and then rose sharply immediately after its initial public offering. (Cost 0024) The Magnussen declaration states that sales by Mackenzie "plummeted during July, particularly after the IPO." (Ex. 50, p.3)  An issue of Golf Pro magazine which was apparently available in the middle of July discussed the availability of Adams golf clubs in Costco stores. (Ex. 233, p. 3) In an industry in which "word gets around quickly" (Ex. 50, p.4) the availability of a high-prestige product in a discount retailer is likely to be known and the negative effects of that knowledge are likely to be felt quickly. The close correlation between increasing gray market sales and decreasing authorized sales, therefore, strongly suggests that the damage to Adams name and the *Tight Lies* brand

resulting from the gray market was great immediately after the Company's initial public offering.

      E.    Consumer and investor knowledge of gray marketing likely increased in tandem with the increase of Adams golf clubs available and/or sold through gray market channels. On June 9, 1998, the Company issued a press release that it had filed a Bill of Discovery against Costco on June 9, 1998. (Ex. 20 MCK 01358) This was not effective notice to potential investors about gray market sales of Adams clubs, nor did it adequately explain the risks associated with investing in Adams. The press release did not clearly state that Adams was experiencing gray market sales. Also, even the potential investor who knew of this press release could reasonably believe that the absence of any mention of gray market sales in the Company's Prospectus indicated that either 1) Costco had not obtained the Company's clubs or 2) the gray market was no longer posing a problem for Adams.

      22.    The Company boasted higher retailer profit margins than any of its competitors as of the time of its Roadshow. (Ex. 167, UND00029) The high retailer profit margins built in to the Adams business strategy made its golf clubs especially attractive to gray marketers. Once established, the availability of Adams clubs through gray market distributors had the potential of eroding such high margins.

      A.    Gray marketing is often described as a form of arbitrage. Gray marketing takes advantage of price differentials created by currency fluctuation and differences in pricing in different markets. It also becomes possible as a result of high profit margins, such as those which were at the center of the Adams business model. Adams boasted retail margins of 31% (significantly higher than its competitors, such as

Callaway, Taylor Made or Cobra, which offered margins of 15%, 26% and 25%, respectively) (Ex. 167, UND00029). This allowed authorized retailers to purchase quantities of Adams clubs which they did not sell through their stores, but instead sold to Costco at a price that presumably fell somewhere between the wholesale price of $138.00 and Costco's retail price. High profit margins allow for each party in a gray market distribution chain to earn a profit even after the accounting for the additional shipping, storage and other costs associated with diverted sales. (See, Berman, 2004, p.55; Myers and Griffith, 1999, p. 3, Figure 1)

      B.     The Company's own Director of Investor Relations described the effects of the gray market on profit margins as follows: "While it may seem advantageous at first glance, the truth is this type of distribution can erode our retailers' profit margins, i.e. the on- and off-course golf shops which make up our customer base." (Ex.127, ADAMS 003672)

      C.     Gray market sales also resulted in less effective pricing policies. Authorized retailers sold Adams clubs for an average price of $199.00. Costco stores sold the same clubs at a significantly lower price. This price difference threatened sales at authorized retailers. Sales of Adams clubs through gray market channels resulted the Company's "retailers in the affected markets [being] reluctant to sell Adams equipment for little or no margin and therefore orders in these areas have been soft." (Ex. 112, ADAMS 003648) As a result, the Company implemented short term plans which cut into its own profits. These have been discussed previously herein at paragraph 17. In the long term, the Company overhauled its pricing policy in reaction to unauthorized sales of its products, reducing its suggested retail and minimum advertised pricing levels to $199.95

and $149.95, respectively, thereby eroding authorized retailers' profit margins – one of the Company's business strengths. In fact, by November 25, 1998, Eddie Tate, one of Adams' Regional Account Coordinators, stated that "once our pricing dropped to $179.00 in many of our markets, our once favorable margin was lost forever." (Ex. 299, TATE 0002) This new pricing policy is illustrative of the significant damage a Company can suffer from gray market activity.

23.     The Company relied on strong and exclusive relationships with on and off-course golf shops and selected sporting good retailers. Gray market sales are known to have a negative impact on a manufacturer's relationship with its distributors and authorized retailers.

A.     "When a distributor loses a sale to a gray marketer, the manufacturer hears about it in seven different languages." (Cespedes, et.al., p.75) Authorized retailers see sales decrease and/or their profit margins eroded from gray market sales, which they believe the manufacturer has a duty to control. As a result, even when a manufacturer is able to profit from gray market sales, its relationship with its authorized retailers is typically strained. (Myers and Griffith, 2000, p.47; Berman, 2004, p. 54; Assmus & Weise, 1995). The displeasure Adams' authorized retailers felt with gray market sales is well documented and described in part in paragraph 15.A above. (See, e.g. Ex. 85, ADAMS 001497)

24.     The Company's strategy for growth included internationalization. (ex.167 UND 00033 and Ex. 72, p. 25) The gray market can increase in at least three ways when products are sold internationally. First, if a product is priced lower in its country of manufacture than it is in a foreign country and the additional costs of shipping, storage,

15

etc. are lower than the price difference, parallel importing is economically viable.
Second, if a product in a foreign market is cheaper than in the country of manufacture
(due to currency differences or due to lower pricing in a softer market) and the additional
costs of gray marketing are lower than the price difference, there is economic incentive to
reimport the goods for gray market distribution. Finally, if there are price differences
between two countries, neither of which is the country of distribution, the product can be
sold through what is referred to as "lateral importation." (See Assmus and Wiese, p. 32
and Cespedes article, p. 77). A significant amount of the literature on gray marketing
discusses it in an international context, given the increased opportunities for arbitrage
once largely undifferentiated products are sold internationally.

  25. Also, at the time of the initial public offering, the Company used a
network of thirty-three distributors such as Mackenzie in its international operations (Ex.
72, p. 25) and intended to continue to build its international operations. The gray market
literature indicates that firms, such as Adams, which outsource the distribution functions
in their export operations through the use of commission agents and merchant distributors
(as opposed to directing in-house employees to perform these functions), suffer most
from gray market sales. (Meyers, 1999, p. 117) Thus, the international distribution model
Adams employed made it particularly vulnerable to gray marketing.

  26. Given the fact that gray marketing was already occurring at the time of the
initial public offering, the Company's plans to expand international sales would likely
create additional opportunities for gray market activity. This report has discussed above
how the Company's business strengths could be damaged by gray market activity. These
factors should reasonably have argued in favor of disclosure to investors, even if the total

16

volume of gray market sales was small relative to total sales at the time of the initial public offering.

27.     Low sales force morale is another common effect of gray market activity. (Meyers, 1999, p. 106) On August 14, 1998, Barney Adams' sent a memo to Marc Gonsalves and Ric Jerrett in which he provided a very negative assessment of the Company's sales department. Among other similar comments, he stated that the "staff [had] very low morale", including having "no faith in their management." (Ex. 57, ADAMS 028451)

28.     While the Company's business model was endangered by gray market activity in the long term, it is also important to note that Adams may have been enjoying the benefits of gray market sales in the short term. It is well established that the availability of goods in a greater number of retail outlets, especially at reduced prices, can have the effect of increasing sales volumes as price-sensitive consumers who lie outside of a manufacturer's target consumer base gain access to lower-priced goods. Anecdotally, one sales manager has stated, "[s]hort term, the gray market gives us good incremental business and it moves product. But longer term, we wind up competing with ourselves at a lower price."(Cespedes, et.al., 1988, p.76) This appears to have been Adams' experience as well.

A.      During the time preceding the initial public offering, Adams golf clubs were a high-prestige brand. By the Company's design they had traditionally been sold primarily through high-end on and off-course golf shops and selected sporting good retailers. This report has previously established that a "hot" brand name characteristic

17

together with the large profit margin built into the retail sales price made Adams golf
clubs attractive to gray marketers and to gray market distribution outlets such as Costco.

        B.     The addition of Costco as a buyer from the Company's authorized
distributors or retailers had the effect of driving sales volumes upward during the time
sales volume figures were being scrutinized by investors prior to the initial public
offering. In all, Costco purchased in excess of 8,400 Adams golf clubs in the second
quarter of 1998, prior to the initial public offering. The Company repeatedly stated before
and after the initial public offering that it did not intend to sell its golf clubs through the
"big box" retailers. Nonetheless, these unauthorized and unplanned sales to Costco were
included in the Company's sales volume figures thereby skewing these same figures. In
other words, if the Company could have prevented all sales to Costco, it may have sold in
excess of 8,400 fewer golf clubs during the pre-initial public offering period. These 8,400
plus sales were nonetheless included in the Company's total sales volume figures as
presented to potential investors.

        C.     The Company's future sales might also be at risk as a result of gray
market activity for at least two reasons.

        1.     First, there was substantial risk and likelihood that the
initial Costco shipments were just the beginning of a long term gray market problem for
the Company. This could have and should have been predicted given the nature of the
gray market and the amenability of the Company's business model to the gray market.
Given the gray market activity it was experiencing, if the Company intended to stamp out
gray market activity, it would lose at least a portion of whatever sales were being made to
Costco and other gray market retail outlets. Thus, while the projected sales figures

18

presented to potential investors may have been accurate, they included gray market

distribution of the Company's golf clubs, which the Company claimed to prohibit and

appears to have wanted to eliminate.

              2.     In addition, the sales in Costco stores had the effect of

diminishing the prestige and desirability of its clubs among high-end consumers thus

reducing sales though the high-end retailers. On October 8, 1998, Barney Adams

recognized this problem when he estimated that the gray market had a "negative sales

effect in Q4 of 20%-25% based on a market survey (customers who refuse to buy)."(Ex.

80, ADAMS 036832) This is consistent with the experience of other brand owners

suffering from gray market sales. Many trademark holders have "noted substantial losses

in sales (up to 30%) as the direct result of parallel import activity." (Eagle, et.al., 2003, p.

1342)

29.     A company can suffer the negative effects of gray marketing even if only

a relatively small percentage of their products are being diverted to discount retailers.

This is especially true when sales are occurring in a broad geographic area, as they were

in the case of Adams golf clubs which were sold at Costco stores throughout the United

States and Canada.

              A.     As described above, there are specific business strategies that make

particular products or companies vulnerable to gray market activity. In Adams' case,

there was a strong congruence between the Company's business strengths and the

characteristics that lead to gray market activity.  In addition, the Company's intentions to

further internationalize, especially using independent distributors, ensured that unless the

Company devoted significant resources to deterring gray marketing, the Company would

19

continue to be an attractive target for gray marketers before and after its initial public offering.

          B.     Once there is an established gray market distribution channel for a given product, the volume of sales made through discount retailers can increase rapidly if a manufacturer does not counter quickly and effectively. This appears to have been the case for Adams which was "slow to react when unauthorized resellers, such as Costco, hurt retail margins" (Ex.17, MCK00026; Ex. 299, TATE 0002) despite the fact that gray market sales were growing each month leading up to the initial public offering. When Adams did respond, they appear not to have responded effectively, as the Company was later surprised that the plan they had established "in case Q4 turned sour" did not adequately counter the Costco sales (Ex. 56, ADAMS036843).

          C.     Finally, gray market activity can cause enduring harm as a manufacturer must exercise constant vigilance and expend resources on an ongoing basis to keep gray market distribution of its products at bay. In Adams' case, manpower, profits and capital resources were all affected by its attempts to stem gray market activity. The Company dedicated a four person "Costco Buster" team (Ex. 64, ADAMS 001524) charged with studying and stemming gray market sales. The Company implemented the plans described at 17.A and 22.C above which cut into the Company's profits and/or retailer profit margins. The Company also purchased equipment to place serial numbers on each of its clubs in an effort to deter gray marketing by allowing each club to be traceable through its distribution channel (Ex. 61). It is worth noting that at the time of the initial public offering this technique of addressing gray marketing had been criticized

as "administratively time consuming and costly" and was "not recommended as a long-

term solution." (Maskulka & Gulas, 1987, p. 29)

30.    At the time of its initial public offering, Callaway had disclosed its gray

market problem to investors through its 1997 Annual Report. In this report Callaway

informed investors that:

> Some quantities of the Company's products find their way
> to unapproved outlets or distribution channels. This "gray
> market" in the Company's products can undermine
> authorized retailers and distributors who promote and
> support the Company's products, and can injure the
> Company's image in the minds of its customers and
> consumers. On the other hand, stopping such commerce
> could result in a potential decrease in sales to those
> customers who are selling Callaway Golf products to
> unauthorized distributors and/or an increase in sales returns
> over historical levels. While the Company has taken some
> lawful steps to limit commerce in its products in the "gray
> market" in both domestic and international markets, it has
> not stopped such commerce. The Company's efforts to
> address gray market issues could have an adverse impact
> on the Company's sales and financial performance.

This is notable because in determining whether a given disclosure is necessary it

is common to consult the risk factors described by others in a given market segment

when drafting disclosure documents such as the Company's Prospectus. Despite its on-

going gray market problem and likelihood that such activity would continue or increase,

Adams chose not to disclose its gray market problem or describe the risks its gray market

problem posed to investors.

31.    On October 13, 1998, Barney Adams stated that Costco sales had a greater

negative impact on the Company's fourth quarter sales than competition. (Ex. 56,

ADAMS 036843) In his deposition he also stated that the gray market activity Adams

was experiencing in October was no worse than it had been at the time of the initial

21

public offering. Nonetheless, Adams chose not to disclose the gray market distribution of its goods. Thus, under the Company's own admission, at the time of its initial public offering the gray market was a greater problem than competition (which was described to potential investors as a risk factor). Still, despite strong indications that the characteristics of the gray market posed considerable risk to the Company's business strategy, Adams chose not to disclose its gray market problem to potential investors.

32. I have prepared this report before the final completion of fact discovery and before reviewing defendant's expert report(s), which may cause me to modify or amplify views expressed herein.

July 14, 2006
Date

Christiana Ochoa
Associate Professor of Law

22

# EXHIBIT A

# CHRISTIANA OCHOA
Indiana University School of Law,
211 South Indiana Avenue, Bloomington, IN 47405
Phone: (812) 856-1516
email: cochoa@indiana.edu

## TEACHING EXPERIENCE

**INDIANA UNIVERSITY,** BLOOMINGTON, INDIANA                                  JUNE 2003 - PRESENT
*Associate Professor of Law, School of Law*: Courses include Contracts, Human Rights,  International
Business Transactions and Corporate Finance.  Research interests include the intersection of human rights
and international economic activity as well as, more generally, international law, finance and globalization.

*Adjunct Professor, Latino Studies Program*

*Faculty Reference, Center for Latin American and Caribbean Studies*

**UNIVERSIDAD DE LOS ANDES,** BOGOTÁ, COLOMBIA                        SEPTEMBER 1998 - JULY 1999
*Visiting Professor and Researcher*: Developed and taught a law school course entitled "Economic
Globalization, Labor and Migration." Prepared first runner-up student team for the Inter-American Human
Rights Moot Court Competition.

## OTHER WORK EXPERIENCE

**INDIANA UNIVERSITY,** BLOOMINGTON, INDIANA
*Faculty Colloquium for Excellence in Teaching (FACET)* – One of five Bloomington campus faculty
representatives engaged in a university wide Leadership Institute exploring issues related to developing
civic and moral responsibility in a global context.

**CLIFFORD CHANCE,** LONDON AND NEW YORK                    SUMMER  1997,  SEPTEMBER  1999 -
APRIL 2001
Attorney in corporate department of law firm specializing in cross-border transactions.  Represented
investment banks and institutional investors in all aspects of various loan transactions, corporate
restructurings, securities transactions and aircraft purchases.  Served as elected associate representative to
Personnel                                                                                         Committee.

**COLOMBIAN COMMISSION OF JURISTS,** BOGOTÁ, COLOMBIA                        APRIL - JULY 1999
*Visiting Researcher*: Researched Colombia's constitutional mechanisms for human rights protections, in
particular, the constitution's applicability in addressing violations of human rights by private actors.

**HUMAN RIGHTS WATCH/AMERICAS AND CEJIL,** RIO DE JANEIRO, BRAZIL     SUMMER 1996, JANUARY 1997
Conducted research for and wrote petitions for submission to the Inter-American Commission on Human
Rights -- one concerning systemic police violence in Rio de Janeiro and the other on the massacre of a
community of Yanomami Indians.

**UNITED NATIONS,** GENEVA, SWITZERLAND                                           AUGUST 1996
Participated in successful lobby of the Sub-Commission on the Prevention of Discrimination and Protection
of Minorities to investigate the relationship between human rights and the activities of transnational
corporations. Prepared an intervention for presentation to the Sub-Commission and participated in a panel
discussion organized by Japanese non-governmental organizations attending the annual meeting of the Sub-
Commission.

**WITHERAL SCHOOL,** ST. JOSEPH, MICHIGAN                               JANUARY - AUGUST 1995

*Head Teacher:* Planned and taught academic and cultural activities for thirty children aged four to eight, many of them with learning or emotional disabilities.

**FUNDECI,** MANAGUA, NICARAGUA                                                                SUMMER 1994
Prepared development loan applications for community development non-governmental organization. Translated human rights petitions. Organized and served as translator to medical delegations. Coordinated summer volunteers.

**WORLD TEACH,** LA CRUZ, COSTA RICA                                                          SPRING 1994
*Head Teacher:* Taught English and environmental education to rural Costa Rican elementary school children.

**OFFICE OF COMMUNITY SERVICE AND LEARNING,** UNIVERSITY OF MICHIGAN       JUNE 1992 - JUNE 1993
*Adrian High School Project, Coordinator:* Prepared and conducted weekly seminars for undergraduate students regarding the educational experience of Latinos in the United States. Organized volunteer tutors for Latino high school students.
*Migrant Labor Project:* Taught English as a Second Language to Latino migrant laborers in Michigan.

## PUBLICATIONS

Book review, *Companies, International Trade and Human Rights* 28 HUM. RTS. Q. 289 (2006).

*Towards a Cosmopolitan Vision of Customary International Law: Identifying and Defining CIL Post SOSA V. ALVAREZ-MACHAIN,* 74 U. CIN. L. REV. 105 *(2006).*

*Access to U.S. Federal Courts as a Forum for Human Rights Disputes: Pluralism and the Alien Tort Claims Act,* 12 IND. J. GLOBAL LEGAL STUD. 631 (2005).

*Advancing the Language of Human Rights in a Global Economic Order: An Analysis of a Discourse,* 23 B.C. THIRD WORLD L.J. 57 (2003).

*Comparación de negociaciones de paz en conflictos políticos y étnicos: los casos de Irelanda del Norte y de España [Comparison of Peace Negotiations in Ethnic and Political Conflicts: The Cases of Northern Ireland and Spain], in* LA OTRA GUERRA: EL DERECHO COMO CONTINUACIÓN DEL CONFLICTO Y LENGUAJE DE LA PAZ 271 (Rivera et al. eds., 1998).

*SALSA...Latino to Latino...A Tutoring/Mentoring Project, in* PRAXIS II: SERVICE LEARNING RESOURCES FOR UNIVERSITY STUDENTS, STAFF AND FACULTY 301, 313-14 (Galura et al. eds., 1993).

## INVITED PRESENTATIONS

*Refugees and Human Rights,* Panel Discussant at Conference entitled The History of Human Rights, Indiana University, Center for History and Memory and the Department of History, Bloomington, IN (March 8, 2006).

*Fair Trade: Definitions and Developments,* Paper presentation at Indiana University conference entitled The University and Fair Trade, Bloomington, IN (September 29, 2005).

*Can Legal Pluralism Inform the Inclusion of International Law in Judicial Decision Making?,* Paper presentation at the Law and Society 2005 Annual Meeting, Las Vegas, NV (June 5, 2005).

*Disparate Impact, Disparate Treatment: Discrimination in American Society,* Panel Discussant at the Law and Society 2005 Annual Meeting, Las Vegas, NV (June 5, 2005).

*Disjunctures in International Law: The role of the individual under customary international law treaties.* Paper presentation at Indiana University Institute for Advanced Study, Bloomington, IN (April 28, 2005).

*Identification and Definition of Customary International Law for Purposes of ATCA Litigation Post Sosa v. Alvarez-Machain: Towards a Cosmopolitan Theory,* Paper presentation at University of Cincinnati School of Law symposium entitled Corporate Social Responsibility in the International Context, Cincinnati, Ohio (February 18, 2005).

*Globalization and the New Politics of Labor and Law & Society Workshop,* discussant for panel entitled: *Human Trafficking and the Politics of Labor Migration,* Indiana University School of Law, Bloomington, IN (February 11, 2005)

*Liability of Union Carbide Under the Alien Tort Claims Act,* presentation to Association for India's Development, Bloomington, IN (December 3, 2004).

*Access to U.S. Courts as a Forum for Human Rights Disputes: The Alien Tort Claims Act Under Scrutiny,* Paper presentation at University of Trento Law Faculty conference entitled Back to Government? The Pluralistic Deficit in Decision-Making Processes and Before the Courts, Trento, Italy (June 11-12, 2004).

*The role of International Law and Institutions in Relation to Hardt and Negri's Empire,* Presentation at the Indiana University, Bloomington American Studies/Cultural Studies conference entitled Empire, Bloomington, IN (April 10, 2004).

*Human Rights and the Formation of Corporate Duties Under International Law.* Presentation to the International Law Society, Indiana University School of Law (March 10, 2004).

*Advancing Corporate Responsibility in the Global Economy: The Global Compact and Other Business-based Initiatives.* Presentation at California Western School of Law conference entitled The Rule of Law: Creating an Effective Legal Environment for the Global Economy, San Diego, California (November 16, 2002).

*Peace Negotiations: The Examples of Northern Ireland and Spain.* Panel Presentation at Javeriana University conference entitled Rights and Peace: Possibilities for Interaction, Bogotá, Colombia (October 1998).

*The Responsibility of Transnational Corporations for Violations of Human Rights.* Panel Presentation before Japanese non-governmental organizations attending annual meeting of the United Nations Sub-Commission on the Prevention of Discrimination and Protection of Minorities. Geneva, Switzerland (August 1996).

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., JUNE 1998

Activities: *Harvard Human Rights Journal,* EDITOR IN CHIEF; Harvard International Human Rights Project; Dean's Ad-Hoc Public Interest Committee, Student Representative; Student Public Interest Network, Chairperson; Public Interest Auction, Co-Chairperson

Honors: Harvard Human Rights Fellowship; Reginald F. Lewis Traveling Fellowship; Irving R. Kaufman Public Interest Fellowship; Deborah K. Hauger Memorial Fellowship

**UNIVERSITY OF MICHIGAN**, B.A. HISTORY, B.A. AMERICAN CULTURE, JUNE 1993

Honors/Activities: *cum laude*; Honors Program; Michigan Student Assembly-Women's Issues Commission

## PROFESSIONAL ASSOCIATIONS

- Admitted to the New York Bar

- American Society of International Law
- New York Bar Association
- The Association of the Bar of the City of New York, Member of the International Security Affairs Committee (2000-2002).
- American Society of International Law

## LANGUAGES

Native English; Native Spanish; Proficient Portuguese

27

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 14th day of July, 2006, I caused the

**EXPERT REPORT OF CHRISTIANA OCHOA** to be electronically filed the  with the Clerk

of Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

and a copy has been served by electronic mail upon the following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email:  pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com