# EXHIBIT C
# PART 1

# Expert Report of H. Stephen Grace, Jr., Ph.D.

---

## Adams Golf, Inc. Securities Litigation

Civil Action No. 99-371-KAJ

United States District Court, District of Delaware

July 14, 2006

Houston: 4615 Southwest Freeway, Suite 625   Houston, TX 77027
(713) 572-6800   Fax (713)572-6806   Email: HSGRACE@HSGRACECO COM

New York: 300 East 57th Street, #18A   New York, NY 10022
(212) 644-8620   Fax (212) 813-1779   Email: HSGRACE@HSGRACECO COM

# TABLE OF CONTENTS

Chapter One: Scope of Assignment and Summary of Conclusions ...............................................5

Chapter Two:  H. S. Grace & Company, Inc. Personnel .............................................7

Chapter Three: Conclusions & Findings ......................................................9

Conclusions ..................................................................9

Overview ..................................................................9

Discussion ..................................................................10

    1.   Background ..................................................................10

        a.   Due Diligence Responsibilities of Officers and Directors in Initial Public Offerings ..................................................10

        b.   Business Investment Decisions Involve Risks ..................... 10

        c.   The Golf Industry and New Technology .................... 11

        d.   Adams Golf Offered New Technology ..................... 12

    2.   Pre-IPO Due Diligence and Events ................................ 13

        a.   The Adams Golf Pre-IPO Due Diligence Process ...............13

        b.   Adams Golf's Continuing Operations During Pre-IPO Period ..................................................13

        c.   Gray Market Develops for "Tight Lies" ...................16

        d.   Double Shipping and Underreserving for Returns in Pre-IPO Period ..................................................20

    3.   Post-IPO Events and Disclosures ................................ 21

        a.   Adams Golf's Continuing Operations During the Post-IPO Period ..................................................21

        b.   Adams Golf's Financial Results, Press Releases, and Internal Memos ..................................................23

        c.   Adams Golf's Continued Product Research and Development ..................................................24

Summary of Findings .................................................................................24

# Chapter One
## <u>Scope of Assignment and Summary of Conclusions</u>

# Chapter One
# <u>Scope of Assignment and Summary of Conclusions</u>

I am the President and Chief Executive Officer of H.S. Grace & Company, Inc. and Grace & Co. Consultancy, Inc. H.S. Grace & Company, Inc. provides specialized financial and operational advisory services, assists on complex commercial litigation, and advises on issues of corporate governance, oversight and control. My resume is attached including a list of addresses and publications on Exhibit I. The Board of Advisors of Grace & Co. Consultancy is shown on Exhibit II.

I am being compensated at the rate of $550 per hour. Other individuals assisting me have billing rates from $90 per hour to $550 per hour. My compensation is not dependent on the outcome of this matter. A list of cases in which I have testified as an expert at trial or by deposition is attached as part of Exhibit I.

I have been retained by counsel for Adams Golf, Inc., to provide an opinion regarding the nature of the roles, responsibilities and actions taken or omitted by the individual defendants in connection with the allegations in the complaint in the litigation styled *In re Adams Golf, Inc. Securities Litigation*. The individual defendants, B.H. Adams, Darl P. Hatfield, Richard H. Murtland, Paul F. Brown, Jr., Roland E. Casati, Finis F. Conner, and Stephen R. Patchin are referred to as "Individual Defendants."

Based on the documents I have reviewed, including internal Company documents, depositions, deposition exhibits, and documents produced by other parties, and analyses and evaluations undertaken based on my industry and business experience, I have obtained a sufficient understanding of the issues in the matter and the background relating to these issues in order to formulate my opinions and conclusions.

As is set out in detail in Chapter Three, my conclusion is that the company, its officers and its directors satisfactorily addressed and fulfilled their responsibilities and conducted a reasonable investigation during the period immediately preceding and following the initial public offering of Adams Golf's stock in connection with the operation of Adams Golf and the issuance of the Registration Statement and the related Prospectus. The officers and directors exercised proper due diligence, followed customary and normal business practices in addressing and fulfilling their responsibilities, and after their reasonable investigation, had reasonable grounds to believe and did believe at the time the Registration Statement became effective that it did not contain any material misstatements or omit any material facts.

My work on this matter is ongoing. I reserve the right to amend or update this report as new materials come to my attention.

# Chapter Two

# H. S. Grace & Company, Inc.
## Personnel

# Chapter Two
# H. S. Grace & Company, Inc.
## Personnel

I and other individuals associated with H.S. Grace & Company, Inc , in our roles as CEOs, CFOs, Treasurers, senior banking officers, and as other members of senior management, have extensive experience with the customary and ordinary roles and responsibilities of officers and directors in publicly held corporations  We are equally experienced in the roles and responsibilities of the various parties with respect to Initial Public Offerings ("IPOs") of a corporation's stock

The team that worked on this project consists of Martin G. Mand, James F. Ott, Ronald H Wilcomes and myself  Their resumes are attached as Exhibits III through V.

The H S  Grace & Company, Inc. ("H S  Grace & Company") team is familiar with the investment in and the operation of complex business organizations  I have over thirty five years of Senior Management and Consulting experience involving public and private firms active in acquiring firms, and in the establishment, financing and operation of a broad range of business structures - limited partnerships, general partnerships, joint ventures, and parent-subsidiaries - including business structures in which there are majority and minority owners

Mr  Mand is the retired Executive Vice President and Chief Financial Officer of Nortel Networks and previously served as Vice President and Treasurer of The DuPont Company and has over thirty-five years of experience  In his roles as CFO and Treasurer, he is familiar with the roles and responsibilities of the various parties in the operation and financing of business organizations

Mr  Ott, Director of Operations of H S  Grace & Company, has over forty years of experience including the performance of financial due diligence on acquisition candidates.  Mr  Ott has served as a member of senior management of public corporations

Mr  Wilcomes is the retired Vice President and Investment Counsel for the Metropolitan Life Insurance Company, and has over thirty years experience in dealing with the operation and financing of various forms of business organizations

7

# Chapter Three

## Conclusions & Findings

# Chapter Three
# Conclusions & Findings

## Conclusions

My conclusion is that there were no misleading statements or omissions connected with the Registration Statement and the Prospectus. But even if there were, at the time of the IPO, the Individual Defendants made a reasonable investigation, which provided them with reasonable grounds to believe, and they did believe, that the Registration Statement and Prospectus, including the risk disclosures, were complete and true. Furthermore, they reasonably relied on their auditors and other professionals in connection with the Registration Statement and the Prospectus and had no reasonable ground to believe and did not believe at the time that it contained any misstatements or omissions. My findings, set out below, support my conclusions.

## Overview

### *Plaintiffs' Allegations*

Plaintiffs allege that the Registration Statement and the Prospectus were materially false and misleading because: "(1) the Registration Statement and the Prospectus failed to disclose and misrepresented the material risk and fact that Adams Golf's reported profits and revenues had been distorted by, and that its future profits and revenues were being and would continue to be severely threatened by, 'gray market' distribution of Adams Golf's products; (2) the Registration Statement and the Prospectus failed to disclose and misrepresented the material risk and fact that the Company's post-IPO results would be materially, adversely impacted because of practices that included 'double shipping', shipments with liberal or unlimited rights of return, and underreserving for returns, all of which practices were occurring before and at the time of the IPO."[1]

I have examined publicly available financial and operational information regarding Adams Golf and have been provided other documents related to internal communications within Adams Golf and between Adams Golf and certain of its distributors. My review of this information raises serious questions regarding the accuracy of the Plaintiffs' allegations (1) and (2) set out above. Gray market issues had faced golf club manufacturers for many years, and the industry-wide issues concerning gray marketing were known to both investors and analysts. When the Company first received reports of purported Adams Golf clubs appearing in certain Costco stores in Canada, the Individual Defendants appropriately investigated and addressed the issue. Both Adams Golf and the professionals assisting Adams Golf with the IPO were aware of the Costco issue, and all determined that it was not necessary to be disclosed in the Registration Statement or Prospectus. Moreover, the SEC did not require any discussion of gray marketing in the Registration Statement or Prospectus. The Individual Defendants conducted a reasonable investigation of the issues facing the Company and made a reasonable business judgment in

---

[1] Second Amended Complaint ¶ 22

9

determining that gray marketing was not a material risk that needed to be disclosed in the Registration Statement and Prospectus

Regarding the issues of double shipping, rights of return, and reserves for returns, my analysis has indicated a lack of evidence supporting the Plaintiffs' allegations, and the immateriality of any of these problems which may have existed  The actions of Adams Golf and its officers and directors were both appropriate and within customary and normal procedures for addressing its operations, its issuance of financial reports related to those operations, and its issuance of the Registration Statement and the Prospectus in connection with the July 1998 IPO. No evidence indicates any practices of double shipping, consignment sales or underreserving, let alone that such practices posed a material risk that needed to be disclosed in the Registration Statement and Prospectus  Accordingly, the officers' and directors' investigation was reasonable and the lack of inclusion of "questionable sales practices" as a risk disclosure represents a proper business judgment.

### Discussion

      1.     **Background**

            a.     **Due Diligence Responsibilities of Officers and Directors in Initial Public Offerings**

Officers are responsible for the management of the firm  They direct the firm's personnel on a day-to-day basis and have responsibility for all of the activities of the firm, including planning, financing, marketing, operations and otherwise. The board has a primary responsibility for the evaluation and direction of the CEO, including the hiring and termination of the CEO  The board's responsibilities include the oversight of firm operations, and the exercise of certain controls. A board committee, normally the audit committee, reviews the firm's financial statements prior to each filing. In the case of the 10K Report for the year filed by the company, all of the board members are asked to sign. Board committees, such as the audit committee, may conduct an ongoing dialogue with external service providers such as the external auditor, throughout the year.

Management normally hires and directs the external professionals providing assistance – lawyers, consultants, and CPAs (although if the CPAs are to serve as the firm's external auditors, many years after 1998 corporate governance has evolved to the point that the hiring of the external auditors is normally handled by the audit committee with the input of certain members of management). Officers recommend corporate strategy to the board and they recommend operating budgets, capital budgets, R&D budgets, and other such requirements which they believe face the firm.

The officers and directors are expected to exercise reasonable business judgment in addressing their responsibilities  This does not mean that the decisions of officers and directors are expected to be error free  The accuracy of the officers' and directors' decisions is not subject to being judged in hindsight  There is no guarantee in the world of business that things will always turn out well. There is the recognition that there can be errors  Officers and directors may rely on others such as lawyers, accountants, and bankers/investment bankers in conjunction

with addressing their responsibilities. Officers and directors will normally follow customary and ordinary accepted business practices, but there may be exceptions where other approaches are acceptable, as they attempt to diligently address their responsibilities

An IPO normally has as its objective the providing of certain equity financing to the firm It is an element of fundraising that the officers would recommend for the review and approval of the board. The officers would normally lead the IPO efforts, including the hiring of the various external advisors – accountants, underwriters, special legal counsel, as may be required, and others. The IPO is a particular form of financing and, as with all financings, requires certain types of expertise. These are normally seen as knowledge of the legal requirements, knowledge of the financial markets, and knowledge of the accuracy of the financial statements of the firm being brought to the IPO market, and perhaps, others. Officers and directors do not (normally) and are not expected to possess these expertises. Officers and directors hire professionals who possess the required expertise and are permitted to rely on these professionals. At times, the officers may be assisted by a director or directors highly experienced in the particular type of financing being undertaken.

An IPO is part of a firm's ongoing operations, whatever its financing objectives may be As such, the board is required to be involved in the oversight of the IPO process. Included in this is the requirement that all of the members of the board sign the relevant documents in connection with the IPO

As set out, directors and officers bear distinct responsibilities in regard to the required due diligence for an IPO. The officers, in driving the day-to-day affairs of the Company, hire the external professionals required to complete the IPO, and interact with them on multiple fronts including providing the required information. The directors, in the oversight role, monitor the progress being made by management. The directors meet with management, as well as the external professionals, to gain an understanding of the contents of the Registration Statement and the Prospectus, and to examine the risk factors which have been included in the filing(s). Certain directors, as members of the pricing committee, interact with the underwriters regarding the value of the Company, the conditions in the IPO marketplace, and other matters as they move toward finalizing the offering price and the number of shares to be offered. Directors may properly exercise due diligence without involvement in the day-to-day affairs of the Company

### b.     Business Investment Decisions Involve Risks

Business investment decisions take many forms, and many of these investments fail. Of all the business investment decisions involving risks, none hold more allure than those involved in the development of new or improved products. At the same time, the risks involved in this area of business investment are quite high. This is an area where investors believe that the sky is the limit relative to the returns which can be earned, but it is also an area of business investment where one's entire investment, and perhaps even more, can be lost in a relatively short period of time. New product development is the area into which Adams Golf entered with the development of its "Tight Lies" club, and it is the area in which Adams Golf continues to operate today

### c.     The Golf Industry and New Technology

Golf is a sport where participants are continually in search of new technology. Participants pay a great deal of attention to the golf products being utilized by the leading players. While endorsements on baseball bats and baseball gloves have some (limited) value, endorsements of particular lines of golf clubs by leading players can have a significant impact on sales.

Further, participants are always paying attention to what is new in equipment design. Putters offer an excellent example of this, with popular putter designs differing widely over the years. This is similarly true with regard to wedges and the development of various specialty clubs.

It is important to recognize that major breakthroughs in equipment technology had occurred in the two decades prior to Adams Golf's IPO in July 1998. One of the most significant was Ping's development of perimeter-weighted irons. Another was Callaway's development of the Big Bertha club. Adams Golf introduced a club that was considered revolutionary and ultimately created a new category subdivision.

### d.     Adams Golf Offered New Technology

Adams Golf was a fledgling golf club manufacturer, having begun business in the second half of the 1980s. Reincorporated in Delaware in 1990, Adams Golf remained quite small until past the mid-90s, relying on custom club design and other areas for its sales.

From its formation, Adams Golf worked on technical design issues. This research led to Adams Golf developing its "Tight Lies" club. Adams Golf's "Tight Lies" club was seen as a breakthrough product in the marketplace.

Adams Golf developed an innovative infomercial marketing the "Tight Lies" club, and the infomercial ran on TV in the latter part of the first half of 1997. Sales exploded, as the golf equipment market became aware of Adams Golf's "Tight Lies" club. The club stood alone; there was an absence of competition. The deposition of Greg Pratt is illuminating in capturing the appeal of the "Tight Lies" golf club. Discussing the trade shows in Canada for the Canadian Professional Golf Association, Pratt stated that during ". . . our shows in October, November of '97, we literally had customers running into our booth saying, 'There's the club, I have to have it.' It was something that I had never experienced before, and it was - - people were buying products like I had never seen the quantities before."[2]

The reception Adams Golf received in the marketplace with its "Tight Lies" club put it in a class with the marketplace reception given to Ping's perimeter-weighted irons and the market reception of Callaway's Big Bertha. Adams Golf had a very limited history with regard to the manufacture of golf clubs. Its public offering in July 1998 was not the offering of an established club manufacturer with a long history of positive sales trends. Adams Golf offered new, breakthrough technology. This technology offered Adams Golf the chance to move into the

---

[2] Pratt Dep. at 14

ranks of leading golf club manufacturers and perhaps even beyond, given the marketplace's reception of the Tight Lies clubs.

### 2. Pre-IPO Due Diligence and Events

Adams Golf continued its commitment to ongoing research while simultaneously facing what has been referred to as explosive growth in the demand for its clubs. Adams Golf had expanded from the original "Tight Lies" fairway wood to include a Strong 3, a Strong 5 and a Strong 7, and subsequently brought a Strong 9 to market in January 1998. Research was continuing on a new titanium driver, which was introduced on schedule in January 1999, and research was underway regarding Nick Faldo wedges, which were also introduced in January 1999. Adams Golf had signed a contract with Faldo where he would represent their clubs on the ProTour. This was not a small accomplishment, as Faldo was one of the most highly regarded players on the Pro Tour at that time.

At the same time, Adams Golf, previously a small manufacturer that mostly made custom clubs, was addressing the business challenges of production, shipping, marketing, and distribution associated with the growing demand for their existing line of clubs and the Company's transition to a position as a leading golf manufacturer. The type of "explosive" sales being experienced by Adams Golf presented significant challenges in each of these areas.

### a. The Adams Golf Pre-IPO Due Diligence Process

In late 1997 and early 1998, Adams Golf assembled a highly experienced and professional team to join with management and the Board of Directors in preparing for an IPO. These professionals included KPMG (the Company's auditors), Arter & Hadden (the Company's lawyers), Cooley Godward (the Underwriters' lawyers), and major underwriting firms who were knowledgeable in the golf industry, including Lehman Brothers, Inc., who previously participated in the IPO of Cobra, another golf club manufacturer. Two other underwriters rounded out the lead underwriters: NationsBanc Montgomery Securities (now known as Banc of America Securities) and Ferris Baker Watts (collectively with Lehman, the "Underwriters").

The officers and directors of Adams Golf worked closely with the professional team they had assembled in preparing for the IPO. The Board of Directors of Adams Golf was closely involved with the officers in the IPO process. They met as a Board to approve the initiation of the IPO process, passed Board resolutions making various corporate governance improvements, established committees to ensure proper evaluation (including the pricing committee, compensation committee, and audit committee), reviewed Company performance, and had frequent additional informal meetings and conversations.[3]

The intensive due diligence process was spearheaded by management, along with its key advisors at the underwriters and securities attorneys. Barney Adams was joined at the various due diligence meetings by other senior management including Darl Hatfield, Mark Gonsalves,

---

[3] Ex. 76, 280, 283

13

Jim Farrell, Richard Murtland, and Patty Walsh.[4] Management and employees provided and exchanged with the underwriters and lawyers extensive information about the Company's operations, its financial statements, and all issues requested by its advisors.[5]

Outside directors Paul Brown, Finis Conner, Stephen Patchin, and Roland Casati also participated in the due diligence process. The role of the outside directors was described very well by Finis Conner at his deposition. He explained that the directors reviewed the Registration Statement and the Prospectus before they were submitted to the SEC.[6] The directors believed that these statements were complete and accurate when submitted based upon discussions the directors had with management.[7] These discussions included a review of the contents in the documents, a review of the market and a comparison of thoughts of the board members as they worked to get a complete and accurate understanding of what was contained in the documents.[8] Conner further sets out the importance of risk factors to him, and the benefits of having leading bankers who have done multiple public offerings (Conner had been involved in at least two public offerings himself).[9] He discussed the board's, management's and the external advisors' focus on risk factors to ensure that these were being fully disclosed in the Registration Statement and the Prospectus.[10]

The Board of Directors reviewed drafts of the Registration Statement and Prospectus and asked questions of management. Each independently reviewed the Registration Statement and Prospectus, including the risk factors, and made a determination that the disclosures were honest, true, and correct.[11] Each of the directors continues to believe that the Registration Statement and Prospectus were fully candid and complete, disclosing all material risks and containing no material misstatements or omissions. In the depositions of the directors, they discuss the value to them of the external advisors who were certifying and authenticating information – attorneys, auditors, and bankers.[12] The directors felt comfortable that the information and the accuracy of the numbers presented by the auditors were accurate. The experience of the Underwriters and the benefit of the resources they could supply to undertake the required due diligence, the required research, and the competitive analysis were recognized and valued by the directors.

The depositions of the directors indicated a sensitivity to the importance of understanding the risk factors and properly disclosing the risk factors. The directors were familiar with the gray market, and Conner's description of the gray market issue in his deposition is interesting: "I have found that the gray market issue is mostly done to accommodate some retail house who is trying

---

[4] Exs 90, 92, 165, 198, 200-202, 261, 278-279; Adams Dep at 104; Hatfield Dep at 22-24; Walsh Dep at 48-49; Gonsalves Dep at 14; Farrell Dep at 40-47

[5] Exs 155-162, 193-199, 260, 262

[6] Conner Dep at 15-17

[7] Conner Dep at 16-17

[8] Conner Dep at 16-17

[9] Conner Dep at 32 and 52

[10] Conner Dep at 52-53

[11] Conner Dep at 16; P Brown Dep at 17; Patchin Dep at 18-19; conversations with Messrs Murtland and Casati

[12] Conner Dep at 52; P Brown; Dep at 67; Patchin Dep at 19

to use a loss leader, and so they go buy excess inventory from people and low ball the price to get people in the store. That was never an issue as far as I was concerned relative to Adams. It's my belief that all the risk factors that were outlined covered every known possible scenario that we had, and basically alerted the buyer of the stock to be careful because we don't know all things."[13]

The pricing committee of Conner and Brown considered a broad range of factors in the course of their work.[14] They had a fair market valuation done of the company and worked closely with the underwriters to determine supply and demand conditions for the Adams Golf common stock.[15]

The Company's lawyers, Arter & Hadden, had extensive contact with the SEC to ensure complete compliance with the federal securities laws and full disclosure of any risks to the Company.[16]

Another important process taking place as part of the preparations for the IPO was the internal review undertaken by the Underwriters regarding the risks associated with the proposed Adams Golf IPO. As mentioned earlier, acting independently, and consistent with management's position that the gray market was immaterial, the Underwriters determined that a discussion of gray marketing did not need to be set out in either the Registration Statement or the Prospectus. A review of the memos developed by the Underwriters is interesting in terms of the range of individuals within each firm that were involved in their respective evaluations, and the number of factors each firm considered before making the decision to proceed with the IPO. This thoroughness is impressive, even more so given the relatively small size of the Adams Golf IPO.[17]

### b.    Adams Golf's Continuing Operations During Pre-IPO Period

The officers and directors of Adams Golf exercised further good faith and due diligence by continuing to focus on ongoing operations during the pre-IPO period. The officers were faced with the positive challenge of the rapidly growing demand for Adams Golf's clubs. While certainly a positive development, it is important to keep in mind that Adams Golf had been a very small manufacturer of golf clubs less than a year before. Adams Golf was faced with the production issues of acquiring the components, the assembly of the clubs, the testing of the finished products and, quite importantly, growing their labor force to handle this significant increase in volume, and also growing the manufacturing space and equipment required to accommodate this increased production. What had been a small shipping department less than a year before, was also forced to grow in literally every respect to accommodate this rapid increase

---

[13] Conner Dep. at 53

[14] Ex. 75

[15] Exs. 75, 225, 229, 277

[16] Ex. 204; Adams 043441-043449; Adams 043450-043452; Adams 043453-043482; Adams 043701-043702; Adams 043703-043708

[17] Ex. 152, 198

in demand  Adams Golf's sales grew from $1 1 million in 1995 to $3 5 million in 1996 to $36 7 million in 1997 and to $84 6 million in 1998

Marketing was another area of operational challenge  Even with the growth in demand, marketing issues had to continue to be addressed  In fact, the "coming of age" of Adams Golf could be expected to present simultaneously new marketing opportunities and challenges

Finally, Adams Golf continued to pay close attention throughout this period to issues affecting their distribution process  Adams Golf was building relationships with authorized retailers and was committed to protecting and further growing those relationships. As with any "hot product," this popularity resulted in unauthorized parties seeking to obtain Adams Golf clubs. The problem which faced Adams Golf was not new  Gray marketing has characterized the golf equipment industry—and other retail industries—for many years.

---

c.    **Gray Market Develops for "Tight Lies"**

The rapid growth and popularity of the Adams Golf "Tight Lies" club, not unexpectedly, caused gray market issues to arise. The gray market issues primarily center around authorized distributors and/or retailers who transship clubs that they have ordered to other non-authorized retailers, who in turn sell them to the public. Another closely related area is the presence of "knock-offs" (where golf clubs are manufactured by third parties to resemble well-known golf clubs) and counterfeits  Counterfeits are essentially the same product, but made with illegally obtained components and illegally stamped with the name of the well-known club  It can be extremely difficult to identify whether a product is counterfeit

When fraudulent reproductions are identified by the manufacturer, they move directly to eradicate these products from the marketplace and are supported by the legal system in doing so The true gray market issue is one where the manufacturer's actual clubs are being sold, but through an unauthorized distributor or retailer  It is important to recognize that these problems frequently occur on a localized basis, when an unauthorized retailer who is able to obtain these clubs from authorized distributors or retailers then markets these clubs in their own local marketplace  But it is not unusual for those lines of equipment that attain a high degree of popularity to attract the attention of unauthorized retailers with a wider distribution network.

Gray markets have always been part of the golf equipment industry. Very importantly, the Supreme Court has ruled that manufacturers cannot control their distributors. That is, once a distributor purchases the clubs from the manufacturer, the distributor is able to sell the products that they have obtained to whatever buyers they may choose. Plaintiffs cite the *Quality King vs L'Anza* litigation as further proof of manufacturers' limited ability to control their distributors  Manufacturers do attempt to identify those authorized distributors who are shipping the manufacturers' products to unauthorized distributors, and take action against those distributors to the extent that is legally permitted

The Plaintiffs allege that these gray market issues were significant in the case of Adams Golf and that Adams Golf's failure to disclose this material risk in their Registration Statement and their Prospectus resulted in these documents being materially false and misleading  My conclusion is that Adams Golf, its officers and its directors acted appropriately in investigating

16

and addressing the gray market issues which arose.[18]  Adams Golf management was concerned about any gray market problems that did arise  Adams Golf management moved to address these problems in an in-depth, timely manner even though the primary source of customer complaints about Costco was the Company's Canadian distributor and the Canadian market represented, in total, less than 3% of Adams Golf's sales [19]

Adams Golf acted in a clear, straightforward manner in addressing the Costco problem which was first identified in Canada by Adams Golf's Canadian distributor, WDC Mackenzie  Chris Beebe, Adams Golf's international sales director, traveled to Canada, met with WDC MacKenzie, and visited with golf retailers [20]  After this visit, the agreed consensus was that no action was needed because most Costcos were out of the purported Tight Lies  When the Costcos received a second shipment,[21] however, Adams Golf immediately and within the time frame requested by WDC MacKenzie introduced a price matching program for authorized retailers [22]  At the time of the IPO, there were only nine instances of price matching in Canada [23]

A second key step was monitoring orders from retailers and distributors  Beebe testified and others confirmed that after learning of Costco's acquisition of clubs Beebe carefully monitored all large orders [24]  Beebe even stopped a large order to one distributor.[25]  Barney Adams sent warning letters to suspected transshippers, and the Company began reviewing its sales policy to ensure tightest possible redistribution restrictions while still complying with antitrust laws.[26]

Barney Adams himself wrote to Costco demanding to know the sources from which Costco had obtained the purported Adams Golf clubs [27]  Barney Adams led the effort by Adams Golf to further persuade Costco to reveal their sources by filing a Bill of Discovery in June 1998.[28]  Adams Golf took this action even though Costco was selling a limited number of purported Adams Golf clubs in a marketplace, Canada, which accounted for less than 3% of Adams Golf's total sales, and only a few isolated locations in the United States  Vice President of Sales, Mark Gonsalves, personally investigated the Costco issue [29]  He visited the ProGolf

---

[18] Report Ex  VII

[19] D  Brown Dep  at 70; Pratt Dep  at 148-149

[20] Ex  19

[21] Ex  85

[22] Exs  10-11

[23] Ex  31

[24] Beebe Dep  at 29; Pratt Dep  at 95

[25] Ex  255

[26] Exs  291-292, 294

[27] ADAMS 1505

[28] Ex  20  The Company was later forced to voluntarily dismiss the bill of discovery because of lack of personal jurisdiction over Costco in Texas

[29] Ex  256; Gonsalves Dep  at 51-62

location in Boise, Idaho from whom he had received complaints, and even visited the local Costco, seeing very few clubs for sale in an non-prominent location.[30]

Finally, Adams Golf investigated marking clubs to enable identification of the alleged transshipper. Around the time of the IPO, Adams Golf marked certain clubs with paint under the grips and investigated obtaining a laser engraver that would serialize the clubs.[31] Within months, Adams Golf had obtained the engraver and began serializing clubs by the end of 1998.

To the extent the gray market was also a local issue for Adams Golf, various documents including internal memos indicate that Adams Golf attempted to address these unauthorized distributors wherever and whenever the issue arose.[32]

Since Adams Golf was unable to find out from Costco the number of clubs acquired or to be acquired by Costco at the time of the IPO (and indeed, not until this year), another method for judging the magnitude of the problem pre-IPO is the breadth and significance of complaints raised. The only complaints raised before the IPO were by the Canadian distributor and eight U.S. retailers (out of 7,000+ retailers to whom Adams Golf sold clubs). When compared to thousands of calls from retailers that were received pre-IPO, the nine complaints raised by U.S. retailers demonstrate the immateriality of the Costco issue.[33]

Documents produced by Costco more than eight years later in this litigation underscore the immateriality of the gray marketing issue. Costco records demonstrate that only 3,860 clubs were sold in Costco pre-IPO, 3,200 in the U.S. and 660 in Canada.[34] Adams Golf sold more than 457,000 clubs pre-IPO in 1998.[35] Based on my thirty-five years experience in business, it is my opinion that the Individual Defendants properly exercised their due diligence in determining the extent of gray marketing and its impact on the Company. What we know now—that the amount of gray-marketed clubs in 1998 amounted to less than 2% of total sales and the units sold were less than 1% of total units—confirms that the Company's and the Individual Defendants' business judgment at the time was correct. The small amount of clubs being gray marketed could not be deemed a material risk to the overall performance of the Company.

Plaintiffs point to no quantitative evidence that demonstrates the gray market was material. For example, assume Costco's activities actually resulted in a 25% decrease in Adams Golf's Canadian sales. Given that Canada accounted for 3% of Adams Golf's total sales, this 25% drop in Canada would result in a ¾ of 1% decline in Adams Golf's total sales (i.e., the 25% decline would result in Canada's sales falling from 3% of Adams Golf's total sales to 2.25% of Adams Golf's total sales, a drop of ¾ of 1%).

---

[30] Gonsalves Dep. at 55

[31] ADAMS 9071; ADAMS 9090

[32] Hatfield Dep. at 29 and 37

[33] ADAMS 041074, 041242, 041296, 041334, 041435, 041441, 041443, 041454, 041514

[34] Report Ex. VI

[35] ADAMS 28669

It is important to address the Plaintiffs' reference to Callaway's remarks in their 1997 10K Report, which was published in early 1998. The Plaintiffs attempt to imply that other golf manufacturers suffered from gray marketing problems and that the gray markets constituted a major risk to Adams Golf. Plaintiffs take Callaway's words out of context, and a careful reading of the Callaway 10K makes clear that Callaway recognized the existence of gray market problems; Callaway recognized the difficulties manufacturers have in addressing gray market problems; and Callaway went on to say that should they move aggressively to end all gray market problems, such actions could be detrimental to the financial results achieved by Callaway. Further, Callaway's Press Releases for the second and the third quarters of 1998 do not even mention gray market issues.

Plaintiffs further state, in the Complaint section entitled "Other Golf Club Manufacturers Suffered From Gray Marketing Prior to the IPO," that Taylor Made and Ping had suffered severe problems and Titleist was forced to implement a redistribution program to address such issues, citing a May 25, 1998 news report involving Titleist. As part of my analysis, I examined the 10Qs and 10Ks of certain equipment manufacturers. Fortune Brands, which owns both Titleist and Cobra, did not mention the gray market in their 10Q for the second quarter of 1998, nor did they mention the gray market in the 10Q for the third quarter of 1998. In both of these reports, there were extensive discussions of what was happening in terms of sales and profits for Titleist and for Cobra equipment. Also, there was considerable discussion of the decline in demand that was facing the golf industry in total. The press releases for both the second quarter and the third quarter of 1998 provide in-depth discussions of equipment sales of both the Titleist and the Cobra brands, but make no mention of the gray market. The Golden Bear 10Q for the second quarter of 1998 and the third quarter of 1998 made no mention of the gray market, although these reports did mention lawsuits which had been filed and the existence of an SEC investigation. Further, the 10K for Golden Bear for 1998 made no mention of the gray market. Amer Sports, which owns the Wilson equipment brand, spoke in their 1998 annual report about the global golf equipment market decline that was underway and which they expected to exist during 1999, but made no mention of the gray market.

The gray market also has a potential positive impact on increased name recognition and consumer base. Indeed, plaintiffs have not considered the positive impact of broad based distribution when the product involved is one that would be termed a "hot product." The ability to build a customer base as large as possible during the time period in which a manufacturer's product occupies a highly, attractive position in the marketplace, can be a positive force in the maintenance of the manufacturer's long-term viability.

In summary, Adams Golf, its officers and its directors addressed the gray market issues appropriately. They responded in a strong, unequivocal manner to support their authorized distributors whenever and wherever these problems came to Adams Golf's attention. The officers and directors of Adams Golf understood that gray market issues had always been part of the golf equipment industry. They also recognized the limited nature of the gray market problem. The issue of the gray market was known pre-IPO by the Individual Defendants, the

Underwriters, the Underwriters' lawyers, and the Company's lawyers—no one deemed it material for inclusion in the Registration Statement and Prospectus [36]

### d.    Double Shipping and Underreserving for Returns in Pre-IPO Period

The demand for Adams Golf "Tight Lies" club began to explode in the fourth quarter of 1997 and continued into 1998. As discussed above, the extraordinary growth in demand, while potentially beneficial, created a number of operating challenges for Adams Golf

The evidence reviewed does not indicate any particular shipping discrepancies. Even if such discrepancies had occurred, however, it is not uncommon in shipping departments to have shipments misdirected, shipments not being delivered on time or at all, quantities shipped being different from the quantities ordered, and related problems. These problems arise in the operation of the shipping department of a "stabilized" company. It would be expected that these problems could sharply increase in the face of the growing demand that Adams Golf faced, and these problems would be further amplified by the need for Adams Golf to hire additional people, and procure additional space and equipment to accommodate the increased shipping activity. There is no evidence whatsoever of any intentional double shipping, consignment sales, or unlimited rights of return as alleged by plaintiffs.

In the normal course of business, the objective of most firms is to ship the quantity of products ordered by the customer. In spite of this, endless occasions arise where the amount of products shipped is either below the requested amount or above the requested amount. WDC Mackenzie personnel acknowledged that at times they were under-shipped and at times they were over-shipped products [37] These types of errors happened in the normal course of business

No evidence has been presented by the Plaintiffs to support either the double shipping issue or the underreserving during the pre-IPO period. The comment by Greg Pratt in his deposition regarding the demand for the Adams Golf club evidenced at the trade shows in Canada for the Canadian Professional Golf Association held in October and November of 1997 is worth reviewing. He said, "It was something that I had never experienced before, and it was – people were buying products like I had never seen the quantities before."[38] This explosive demand combined with the fact that Adams Golf was moving from shipping a very low volume to a very significant volume added to the difficultly and complexity of forecasting returns. Further, the Individual Defendants exercised their due diligence in speaking with management and relying on Adams Golf's auditors. KPMG approved all of Adams Golf's 1998 financial statements and has never required a restatement. In fact, during the 1998 audit, KPMG indicated that Adams Golf should reduce its reserve for returns by almost $200,000 [39] This underscores

---

[36] Adams Dep 121; Gonsalves Dep 143; Hatfield Dep 40-41; Walsh Dep 35; Farrell Dep 59; Pulido-Crowe Dep 25 & 47

[37] D Brown Dep at 15-16 and 51

[38] Pratt Dep at 14, lines 6 & 7

[39] KPMG 502-504; KPMG 2057-2058

the conclusion that everyone involved appropriately investigated and concluded that no additional risk factors were required to be disclosed

As stated, there is no evidence presented as to double shipping or consignment sales Both Eddie Tate (a terminated former regional account coordinator) and Sandra Brooks (an inside salesperson) made statements alluding to the possibility of this, but neither had personal knowledge or could specify any particular double shipping. Plaintiffs have not produced any supporting data. The allegations related to Jay Greaney were denied by Greaney and were not verified by any empirical evidence. The single letter in Greaney's HR file was explained as a system error and, in any event, was not material. Double shipping can happen and does happen in companies with growing, stable or declining sales. Under-shipping also happens in the same types of companies under similar conditions. The fact that certain employees might discuss a situation of either over-shipping or under-shipping is not evidence of an underlying problem involving purposeful over-shipping with the intended objective of increasing reported sales and impacting financial results

Adams Golf, its Officers, and its Directors acted appropriately in the following of customary normal guidelines and practices in dealing with and addressing the various issues which arose in the course of Adams Golf's operations and the implication of the same on Adams Golf's Registration Statement and Prospectus. These officers and directors appropriately interacted and relied on KPMG's expertise in preparing the financial statements, and on their experienced team of external professionals in the preparation of the Registration Statement and Prospectus. As stated above, there was no evidence of any questionable sales practices in the pre-IPO period

In the end, the Individual Defendants exercised their due diligence with respect to these allegedly questionable sales practices by having discussions with management over these areas and relying on their independent auditors. The Company had established procedures and no evidence suggests that these procedures were not adhered to [40]. Given that the evidence does not indicate questionable sales practices, let alone any material risk posed by such practices, the Individual Defendants exercised due care and reasonable diligence in not including such allegedly questionable sales practices as a risk factor

3.    **Post-IPO Events and Disclosures**

a.    **Adams Golf's Continuing Operations During the Post-IPO Period**

Adams Golf's IPO had the allure in the marketplace of breakthrough technology. This breakthrough technology had been proven by the significant demand that had been evidenced for the "Tight Lies" clubs in the fourth quarter of 1997 and the first two quarters of 1998. The pre-IPO demand for Adams Golf's stock was such that the number of shares being offered was increased

---

[40] Ex. 87, 255

21

Shortly after the Adams Golf IPO, a serious decline in the demand for golf equipment was identified  Manufacturers began to see the impact of the decline on their sales  Perhaps even more telling was the July 1998 Press Release from Callaway, given the position of status held by Callaway in the golf industry at that time. Callaway's press release discussed " softening of U S demand" and stated that it expected "no significant improvement in sales in the near term."[41] Fortune Brands in their 10Q for the second quarter of 1998 stated, "The golf club market has been adversely affected this year by lower consumer demand resulting in a volume decline in the US market      and extensive price discounting " These same points are mentioned in the 10Q for Fortune Brands third quarter of 1998  Compounding the problem was the fact that competition for "Tight Lies" clubs was emerging  The Orlimar line of "TriMetal" clubs was receiving considerable attention and were selling well. Callaway had announced that new metal woods would be forthcoming in the near future  These developments were realizations of the risks set out in Adams Golf's Registration Statement and Prospectus in preparation for the IPO.[42]

Adams Golf also faced the issue of "market saturation" for its "Tight Lies" club  The number of golfers is not unlimited, and the number of golfers able to afford equipment priced similar to that of Adams' "Tight Lies" club is further limited, a risk warned of by Adams Golf.[43] One way equipment manufacturers attempt to deal with this "market saturation" phenomenon is to design improved versions of the popular club  Another approach to addressing the "market saturation" issue is the design of new products which offer advantages beyond the previous models. Neither of those was forthcoming for Adams Golf at that point in time  Adams Golf had a driver scheduled for release in January 1999 and also planned to begin delivery of its Faldo wedges at the same time. Given the benefit of hindsight, Adams Golf faced an issue of "market saturation" for its "Tight Lies" club in the second half of 1998 [44]

The result was that Adams Golf sales slowed and its stock price declined  Adams Golf was not alone  The same slowing of sales and stock price declines were happening at other golf equipment manufacturers  While different manufacturers may have had particular products that were continuing to do well, a general decline was underway which was affecting all of these golf club manufacturers

Interestingly, one further development that appears to have taken place shortly after Adams Golf's IPO was a decline in the small cap market  This was discussed in a conference call in late July that involved individuals from Lehman Brothers and Adams Golf. The objective of the phone call was to analyze a sharp decline in price of Adams Golf's stock subsequent to the

---

[41] Ex 41

[42] Ex 72 at 6-12  Plaintiffs give no consideration to the fact that Adams Golf had a very narrow line of products  Its initial Tight Lies club had been supplemented by three other clubs, and then a fourth (as the Plaintiffs set out in paragraphs 17-21)  It is well understood in the golf industry that certain clubs become "hot products' or "fads " It is not unusual, in a relatively short period of time, for the demand for these clubs to decline sharply after a certain saturation is achieved  As Adams Golf warned in its Registration Statement and Prospectus, new products and improved versions of existing products are needed to continue to spur equipment sales  This is well understood in the industry and is also set out by the other manufacturers such as Callaway in their discussion of their 1998 results

[43] Ex 72 at 6-12

[44] Brewer Dep at 71-72

IPO earlier in the month [45] Gray marketing was not included in the list of possible factors contributing to the decline in the stock price

          **b.**    **Adams Golf's Financial Results, Press Releases, and Internal Memos**

     Adams Golf reported its third quarter operating results in a press release dated Thursday, October 22, 1998. (The third quarter ended September 30, 1998 ) The Press Release indicated the significant increases in sales that had been achieved by Adams Golf in the first quarter of 1998, the second quarter of 1998, and the third quarter of 1998 when compared to their respective quarters in 1997  For example, net income for the nine months ending September 30, 1998, was reported to be $16,645,897 versus $3,184,807 for the first nine months of 1997

~~The increase was obviously significant; however, the market and the analysts thought that~~ Adams Golf would be doing better than the reported numbers  Barney Adams, in the Press Release, discussed the impact of the continuing weakness in the golf equipment market. As set out earlier, this decline was impacting all manufacturers both in absolute and relative terms  He stated that Adams Golf anticipated their sales would be further impacted by the recent gray market distribution of their products to a membership warehouse club. Later in the Press Release, Adams stated that Adams Golf remained optimistic about the ability to increase sales and earnings in 1999 as a result of the introduction of new products and continued expansion of the Company's marketing efforts

     On top of these factors, there was the presence of the Orlimar's "TriMetal" clubs and the "market saturation" effect occurring with regards to Adams "Tight Lies." In hindsight, both of these contributed to the decline in Adams Golf's sales  The impact of the gray market on Adams Golf's sales at this time was likely exacerbated by these factors and the general market downturn [46]

     Pratt's memo of August 19, 1998 to Barney Adams is a good example of the "potential" and the "problems" Adams Golf and its distributors were facing [47]  The increase in WDC MacKenzie unit sales in Canada from 335 units in 1996 to 5,000 in 1997, and to an originally estimated 26,000 units in 1998 shows the remarkable growth in the sales of Adams Golf's clubs  Pratt points out what WDC Mackenzie has done to drive the sales  He also points out in Section IV of his memo, that even with significant sales growth there had been obstacles. One of these had been the Costco situation, one had been the falling Canadian dollar, and one had been Orlimar product line, and one had been Callaway's new fairway woods

     As stated earlier, the gray market issue regarding Costco arose in certain locations, at a certain point in time and was addressed by management (as is normally the case on these

---

[45] Ex  78
[46] Adams Dep  at 215
[47] Ex  14

matters)  Interestingly  at this same time in the fourth quarter  Orlimar wrote to its retail accounts regarding unauthorized redistribution of TriMetal fairway woods by Costco[48]

### c.    Adams Golf's Continued Product Research and Development

Adams Golf has succeeded in a highly competitive marketplace  Its research and development efforts have produced a series of clubs building on the original  Tight Lies  club which propelled Adams Golf into the golf equipment market spotlight  Competitors such as Orlimar are gone  as are other recent competitors such as Lynx  Old line manufacturers such as Spalding are also out of the golf club manufacturing market

New hybrid clubs are gaining acceptance in the golf equipment market  Adams Golf is a leader in this area  Adams Golf s hybrid clubs are understood to be a top seller in certain categories of equipment

---

### Summary of Findings

Adams Golf  its officers and its directors have focused on the development and the operations of a company which emerged from relative obscurity to the position of a major player in the golf equipment industry  joining Callaway  Taylor Made  Ping and others  Adams Golf's  Tight Lies  club moved Adams Golf into the equipment spotlight  and Adams Golf successfully built off of that platform

The officers and the directors of Adams Golf assembled an experienced  professional team to assist in their IPO  The parties interacted appropriately regarding the issues which require attention in preparing for an IPO  There were diligent efforts made to investigate  assess and respond to the gray market distribution issue involving Costco  and the Individual Defendants properly exercised their due diligence and business judgment in concluding that the Registration Statement or Prospectus was complete without inclusion of a separate disclosure regarding gray marketing  Similarly  there is no evidence that the alleged questionable sales practices even existed and therefore the Individual Defendants properly exercised their due diligence and business judgment in not including such alleged practices in the Registration Statement and Prospectus

July 14  2006

H  Stephen Grace  Jr  Ph D

[48]  Ex  42

Exhibit I

# H. Stephen Grace, Jr., Ph.D.

## Background, Addresses, and Publications

Dr. Grace is the President of H.S. Grace & Company, Inc. The firm's services represent a combination of business and academic experience, draw on Dr. Grace's more than 30 years of Senior Management, Faculty, and Consultant experience, and incorporate work reflected in his broad range of publications.

- **Education:** B.S. - Industrial Engineering, Lamar University (1964); M.B.A. - University of Chicago (1966); Ph.D. – Economics, University of Houston (1970).

**H.S. Grace & Company, Inc.:** Incorporated in 1985. Dr. Grace is President and CEO. The firm was reactivated in May 1993 after Dr. Grace left Deloitte & Touche. The company provides specialized financial and operational advisory services to healthy and troubled companies, assists in complex commercial litigation, and advises on issues of corporate governance, oversight and control.

**Touche Ross & Co./Deloitte & Touche** (1988-1993): Served as National Director at Large with responsibilities in the areas of real estate, finance and litigation consulting for the New York region and nationally serving a variety of high profile clients.

**Dane Development Corporation:** (1981-1988): Served as President & Chief Executive Officer of Dane Development and related companies owned equally by Dr. Grace and Richard A. Meyers. Mr. Meyers died in May 1985 and his stock was acquired by Dr. Grace. Dane and its sister firms performed finance, project management, and related work for developers, lenders and for the account of Mr. Meyers and Dr. Grace in connection with over $100 million of projects.

**Century Corporation/Century Development Corporation** (1976-1981): Served as Vice President of Finance & Chief Financial Officer of Century Corporation, parent holding company, with direct responsibility for the financial activities and oversight of over sixty subsidiaries, joint ventures, and affiliated companies with activities including auto and equipment leasing, cable TV, architectural services, and sports franchises (NBA, hockey, soccer).

Simultaneously served as Senior Vice President & Chief Financial Officer of Century Development Corporation with direct responsibility for day-to-day financial and operational activities of over 10 million square feet of commercial space in addition to retail space, hotels, high-rise condominiums, city clubs and a major arena.

**Other Activities:** Consultant - Communicators Federal Credit Union (1973-1993); Consultant - Marathon Manufacturing Company (NYSE) (1974-75, and 1987-88); Consultant/Assistant Treasurer - Zapata Corporation (NYSE) (1973-74); Consultant - Hydrotech Corporation (1975-76); Assistant/Associate Prof. Of Finance - Texas Southern University (1970-76); Financial Assistant to the President - Ennis Business Forms (NYSE) (1969-70), Instructor of Economics and Statistics - University of Houston (1966-69); McKinsey & Co. (1965-66).

**Professional Affiliations:** Financial Executives International – National Chairman 2003-2004, Member of The Office of the Chairman, formerly President of the New York City Chapter and of the Houston Chapter, Area Director, Area Vice President, and Trustee of The Financial Executives Research Foundation. Member since 1970

1

Forbes CFO Forum Advisory Board - Member since 1997.

The CPA Journal - Editorial Board

New York State Society of CPAs (NYSSCPA) - Quality Enhancement Policy Committee

Lamar University College of Engineering - Advisory Council - Founding member
Lamar University College of Business - Advisory Council

Jesse H. Jones School of Business, Texas Southern University - Advisory Council

Calvert House, University of Chicago – Advisory Council

Accredited Instructor for Continuing Legal Education (CLE) - States of Michigan, New York, Pennsylvania and Texas

Accredited Instructor for Continuing Education (CE) for Property and Liability Insurance License Holders - States of North Carolina and Texas

---

## Addresses:

"Corporate Fiduciary Duties in the Magic Kingdom and Elsewhere " Speaker, Fulbright & Jaworski L.L.P., The Houstonian Hotel, Houston, TX, December 7, 2005

Effective Governance in Ethic-less Organizations. SmartPros Financial Management Network. DVD. September 2005

"Building Ethical Behavior Into An Organization " Speaker at the Ethics Week Forum "Maintaining Ethics in Profit Driven Enterprises", Baruch College CUNY - Robert Zicklin Center For Corporate Integrity, April 13, 2005.

"Ethics And The Evolution Of Corporate Governance: An External And Internal Opportunity And Challenge . " Keynote Speaker, Zurich Insurance Management Solutions Group, The Portifino Bay Hotel, Orlando, Florida, February 16, 2005.

"The SEC's coming, what do you do?" Forbes CFO Forum, February 1-2, 2005, New York, NY, Plaza Hotel, Panel Member - Audience taken through anatomy of a corporate investigation

"Ethics, The Evolution of Corporate Governance and the Challenges of Measurement " Keynote Speaker, C.T. Bauer College of Business - "Bridging the GAAP" Seminar, *Stanford Financial Speaker Series*, University of Houston, April 30, 2004.

"Ethics and the Evolution of Corporate Governance " Keynote Speaker, Jesse H. Jones School of Business – Annual Awards Banquet, Texas Southern University, April 23, 2004.

"Current Developments in Corporate Governance." Speaker, Institute of Management Accountants, Long Island, NY Chapter, April 20, 2004

"Ethics and the Evolution of Corporate Governance." Keynote Speaker, Financial Executives International – Houston Chapter, The Houston Country Club, Houston, Texas, February 17, 2004.

"The Evolution and Future Direction of Corporate Governance: Implications for Audit Committees " Speaker, American Law Institute-American Bar Association's Second Annual Advanced Sarbanes-Oxley Institute Conference, Westin Embassy Row, Washington, DC, September 4, 2003.

Tone at the Top: Necessary But Not Sufficient. SmartPros. Financial Management Network. Video. July 2003.

2

"The Evolution and Future Direction of Corporate Governance." Speaker, Institute of Internal Auditors International Conference, MGM Grand Hotel and Casino, Las Vegas, Nevada, June 24, 2003.

"Stress-Testing Your Governance: How Does Your Company Stack Up?" Speaker, FORBES CFO Forum 2003, The Plaza Hotel, New York, New York, June 23, 2003.

"Audit Committee Composition and Responsibilities." Panelist, New York CityBar: Sarbanes/Oxley Act Financial and Accounting Implementation Strategies – A Look Back – A Look Ahead, CityBar Center for CLE, New York, New York, June 2, 2003

"From Tone at the Top to Checks and Balances." Speaker, The Institute of Internal Auditors' 2003 General Audit Management Conference: A Golden Opportunity for Chief Audit Executives, Disney's *Yacht* and *Beach Club* resorts, Orlando, Florida, March 10, 2003.

"When the (Litigation) Bell Tolls: A Good Offense Is Still The Best Defense." Moderator, FORBES CFO Forum 2002, Ritz Carlton (Battery Park City), New York, New York, September 19, 2002

"Corporate Governance and Corporate Management." Panelist, Foundation for Accounting Education (FAE): The Future of SEC Practice After Enron, New York Helmsley Hotel, New York, New York, August 19, 2002.

"The Evolution and Future Direction of Corporate Governance." Speaker, Chubb/McGriff Seibels & Williams, Inc.: The Executive Protection and Enterprise Risk Management Seminar, Pinehurst, North Carolina, May 9, 2002

"On Certain Fundamentals of Managing Our Lives and Our Work." Commencement Speaker, Lamar University, Beaumont, Texas, May 12, 2001

"On The Ethics of Management: Responsibility, Accountability and Service." Keynote Speaker, Institute of Industrial Engineering Region IX Technical Paper Competition, Beaumont, Texas, March 2, 2001.

"The Evolution of Audit Committee Responsibilities Within the Context of Personal, Political, and Corporate Governance." Invited by the Stan Ross Department of Accountancy in the Zicklin School of Business at Baruch College to give the Emanuel Saxe Distinguished Lecture in Accounting, New York, November 8, 2000

"The Mock Deposition of an Audit Committee Chair." Moderated mock deposition and spoke regarding the evolving responsibilities of audit committees. Presented to the Financial Executives International – Pittsburgh Chapter, May 1, 2001; the Financial Executives International – Detroit Chapter, April 30, 2001; the Financial Executives International – Dallas Chapter, January 9, 2001; Forbes CFO Forum, May 17, 2000; the Financial Executives Institute- New York City Chapter, February 1, 2000; and the Financial Executives Institute- Houston Chapter, January 25, 2000.

"Corporate Governance and International Economic Opportunity." Address to the Instituto Mexicano De Ejecutivos De Finanzas A.C., Ciudad Juarez, Mexico, October 14, 1999.

"Cash Forecasting & Control: Beyond the Fundamentals." Address to Forbes Special CFO Forum, Charleston, May 1999.

"Gaining From Giving: The Benefits of Corporate Volunteerism." Address to CFO Rising 1999, Orlando, March 1999.

"Profits and Pitfalls of Troubled Company Buyouts." Address to IBF Buyouts Conference, New York, November 1998.

"The Role of the CFO in Public Policy - Wanted: A Few Good CFOs." Address to Forbes Special CFO Forum, Puerto Rico, February 1997

"Maximizing Business Viability and Value." Address to the Financial Executives Institute Seminar for Private and Closely-Held Companies, Chicago, January 1997

"Pension Investing – Fighting for Better Terms." Address to Pensions & Investments Investment Management '97 Conference, Washington, D.C., May 1997

"Pension Funds and Private Investments – Risk Control Issues." Address to the New York Chapter of the Financial Executives Institute, May 1997 (jointly with William W. Weisner of Patterson, Belknap, Webb & Tyler LLP)

3

"Addressing Downside Risk: An Opportunity For GP/LP Cooperation." Address to Venture Investing 1997 Conference, San Francisco, June 1997

"CFO's Leading Change – The Performance Improvement Loop." Address to CFO's Leading Change: An FEI Member to Member Forum, New York City, April 1997

"The Role of the Financial/Managerial Expert in Complex Business Litigation." "Corporate Volunteerism: A Powerful Platform for Improving Corporate Productivity." Addresses to National Law Network meetings, Palm Springs, October/November 1997

"Maximizing Pension Funds Returns on Private/Alternative Investments." Address given to the Financial Executives Institute's Committee on the Investment of Employee Benefit Assets, Washington, D.C., September 1995

"Pension Fund Private Investments – A Time to Rewrite the Rules." Address given to the New York Chapter of the Financial Executives Institute, May 1995

"Interest Rates and Breakeven Economics." Address to the Texas Telephone Credit Union Conference, Houston, Texas, October 23, 1981

"CLMS - Computerized Lease Management Systems." Presented at the semi-annual meeting of National Association of Corporate Real Estate Officers, Nashville, Tennessee, October 1979

"Cash Flow vs. P&L Controls in Real Estate." Presented at the National Association of Corporate Real Estate Officers annual meetings, Atlanta, Georgia, March 1979

"Interest Rates and Alternative Financial Instruments." Address to the Board of Directors of the Houston Telephone Credit Union, October 1977

"The Mechanics of Money Management and Cash Control." Presented at the annual meeting of the Financial Management Association, Kansas City, Kansas, October 9-11, 1975

"An Elementary Application of Dynamic Programming to the Funds Procurement Decisions of a Financial Intermediary." Presented at the annual meeting of the Southwestern Finance Association, Dallas, Texas, March 28-30, 1974

"Employment Opportunities at Minority Universities." Address given to the National meeting of Financial Management Association, San Antonio, Texas, October 1973

"Management Information Systems, Organizational Analysis and Long-Range Planning -- A Review of Current Practices and Research." Address given to the Houston Chapter of Planning Executive Institute, September 1972

---

## Publications:

"The Search for Qualified Governance Consultants," co-authored with John E. Haupert. THE CORPORATE BOARD, May/June 2006, pp. 15-19

"How to Make an Ethics Program Work," co-authored with John E. Haupert. The CPA Journal, April 2006, pp. 66-67

"Reflections Of A Non-Executive Chair," THE CORPORATE BOARD, May/June 2005, pp. 11-13.

"Effective Governance in an Ethicless Organization," The CPA Journal, May 2005, pp. 6, 8

"Our Past, Present and Future: The Ethical Evolution of Corporate Governance," Corporate Governor, Vol 2, No. 3, published by Grant Thornton, Summer 2004, pp. 2-4.

"Ethics and the Evolution of Corporate Governance," Directors Monthly, published by National Association of Corporate Directors (NACD), June, 2004, pp. 6-8.

4

"Billings Discipline Builds Good Business," co-authored with John E. Haupert   The CPA Journal, February, 2004, p. 60

"Running An Audit Committee Today," co-authored with John E. Haupert   The Corporate Board, September/October 2003, pp. 10 – 15

"Financial Literacy," co-authored with John E. Haupert. The CPA Journal, June 2003, pp. 8.

"Financial Officers' Code of Ethics: Help or Hindrance," co-authored with John E. Haupert   The CPA Journal, March 2003, pp. 65 – 66.

"Corporate Boards and Business Oversight," Guest Editorial   The CPA Journal, September 2002, pp. 80

"A Prescription For Company Health," co-authored with George Cox, John E. Haupert, Peter Howell and Ronald H. Wilcomes   The CPA Journal, July 2002, pp. 62 – 63.

"Have You Got It Right? The Times Call For An Immediate Review of Oversight and Control," co-authored with John E. Haupert, Peter Howell and Ronald H. Wilcomes   Controllers Update (Controllers Council of the Institute of Management Accountants), May 2002.

"Compatibility of Non-Audit Services With the Traditional Independent Audit Role," co-authored with Steven B. Lilien, Ph.D. and John E. Haupert   The Financial Management Network Online/SmartPros.com (www.smartpros.com), April 2002

"From 'Tone at the Top' To 'Checks and Balances'," co-authored with James N. Clark, R. Hartwell Gardner, John E. Haupert and Robert S. Roath. The CPA Journal, March 2002, p. 63

"Enron and Andersen: Auditors Under the Microscope," The CPA Journal, January 2002. *The CPA Journal presents the thoughtful perspectives of four people worth listening to on the subject - a contribution to the comprehensive dialogue on the unfolding events* H. Stephen Grace, Jr., Ph.D., Gary Illiano, Robert J. Sack and Lynn Turner.

"Have You Got It Right? The Times Call for An Immediate Review Of Oversight and Control," co-authored with John E. Haupert, Peter Howell and Ronald H. Wilcomes   The Financial Management Network Online (www.fmnonline.com), November 26, 2001

"Note Taking – A Foil Or Foible," co-authored with Richard W. Simmons and John E. Haupert   The Financial Management Network Online (www.fmnonline.com), October 17, 2001.

"Sailing In Troubled Waters," co-authored with John E. Haupert, Peter Howell and Ronald H. Wilcomes. The Financial Management Network Online (www.fmnonline.com), February 11, 2001

"Audit Committee Oversight: A Forgotten Issue?" co-authored with John E. Haupert   The Financial Management Network Online (www.fmnonline.com), December 4, 2000

"It Pays to Keep Your House in Order: Plaintiff's Case Undone By Poor Internal Controls," co-authored with John E. Haupert   The Financial Management Network Online (www.fmnonline.com), June 26, 2000

"Audit Committee Alert," co-authored with Dennis R. Beresford, John E. Haupert, Robert S. Roath and Hon. William M. Schultz   The Financial Management Network Online (www.fmnonline.com), January 2000.

"Who's Watching the Store?" co-authored with John E. Haupert and Robert S. Roath   Pensions & Investments, November 29, 1999, p. 14.

"Senior Executives and Lawyers Jointly Ponder Audit Committee Liabilities," co-authored with Hon. William M. Schultz and Richard W. Simmons   The Financial Management Network Online (www.fmnonline.com), November 23, 1999

"Keys to Effective Corporate Governance," co-authored with John E. Haupert and Robert S. Roath   The Financial Management Network Online (www.fmnonline.com), October 27, 1999.

"Do Audit Committees Face New Legal Challenges in the Future?" co-authored with John E. Haupert and Robert S. Roath. The Financial Management Network Online (www.fmnonline.com), August 1999.

"Who's Minding the Store?" co-authored with John E. Haupert and Robert S. Roath. Financial Executive, March/April 1999, pp. 46-47.

"United We Stand - By Forming an Advisory Board, Limited Partners can Enhance their Decision Making and Monetary Position," co-authored with Stephen F. Cooper. Venture Capital Journal, January 1997, pp. 39-41.

"The CFO and Public Policy," The Corporate Report, Second Quarter, 1997.

"Changing partnership rules - Effective private investing requires a new approach," co-authored with Stephen F. Cooper. Pensions & Investments, September 2, 1996, p. 32.

"The Case of the Missing Management Model," co-authored with John E. Haupert. Financial Executive, January/February 1996 pp. 44-48.

"How Productive Are Your People." Financial Executive, November-December 1995, pp. 18-23. Served as Moderator of the roundtable discussion.

"Cash Management: An Optimal Control Approach." The Journal of Economics and Business, Volume 27, No. 3 (Spring 1975), pp. 254-60.

"On Optimal Financing of Cyclical Cash Needs: Comment." The Journal of Finance, September 1975, pp. 1135-36.

"Proper Specification of the Cost Function: A Comment on Baumol's and on Morris Transaction Demand for Cash." The Quarterly Journal of Economics November 1975, pp. 658-59.

"Professor Samuelson on Free Enterprise and Economic Inefficiency: A Comment." Quarterly Journal of Economics, May 1970, pp. 337-40. Published along with the following reply by Professor Samuelson, "Optimality in Discrete Spatial Programming: a Reply."

"Organizational Analysis: An Integral Component of Long-Range Planning." Managerial Planning, May/June 1973, pp. 17-20.

"Attaching a Rate of Return to Present-Value Calculations." Distributed at the Financial Executive International Conference, October 1971.

"The Effect of Growth Potential on Corporate Stock Prices: A Method of Estimation." Distributed at the Financial Executives Institute International Conference, October 1971.

Managerial Long-Range Planning. A privately circulated study of the long-range planning practices of corporations headquartered in the Southwest. (Published January 1972)

"Clarification of the Re-Investment Assumptions: A Comment." Proceedings, Southwest Finance Association, March 1972. pp. 78-80.

"Optimal Control Theory and Cash Management." Proceedings, Southwest Finance Association, March 1973, pp. 243-252.

# H.S. Grace & Company, Inc.

*H. Stephen Grace, Jr., Ph.D.*
*Deposition/Trial Testimony*

- Larry F. Robb vs. Stericycle, Inc., et al.
  Number: 467704-A
  Houston, Texas
  **DEPOSED**

- U.S. Bank National Association, Plaintiff vs. John R. Stanley, et al., Defendants
  Cause No. 2003-54145
  Houston, Texas
  **DEPOSED**

- Wells Fargo Bank N.A., Plaintiff vs. G.W. Manufacturing Company Inc., Defendants
  Case No. RCV 071120
  Los Angeles, California
  **TESTIFIED**

- Crystal Power Company, Plaintiff vs. Coastal Salvadoran Power, Ltd., Coastal Nejapa, Ltd., El
  Paso CGP Company, and El Paso Corporation, Defendants
  Cause No. 21815*BH02
  Houston, Texas
  **DEPOSED**

- E*TRADE Securities LLC, Plaintiff vs. Deutche Bank AG, et al. Defendants
  Civil No. 02-3711 (RHK/AJB)
  New York, New York
  **DEPOSED**

- SPJST et al. vs. JPMorgan Chase Bank
  Cause No. 2003-24238
  Dallas, Texas
  **DEPOSED**

- The Hartford/Cambridge Food Group, Inc., vs. Brown
  Client Matter No. 008561.003
  Arbitration
  New York, New York
  **TESTIFIED**

**Deposition/Trial Testimony**
*H. Stephen Grace, Jr., Ph.D.*

- Costa Brava Partners III, L.P., et al., vs. JPMorgan Chase Bank,
  Index No. 603218/03
  New York, New York
  **DEPOSED**

- Fiber Systems International, Inc., et al. vs. Michael Roehrs
  Case No. 401-02417-01
  Dallas, Texas
  **DEPOSED**

- Ernest E. Bartimmo, M.D. vs. Richard J. Pohil, M.D.
  Case No. 2000-62947
  Houston, Texas
  **DEPOSED**

- Goodrich Petroleum Corporation, Goodrich Petroleum Company, L.L.C., and Goodrich
  Petroleum Company-Lafitte, L.L.C. vs. Stone Energy Corporation
  Case No. 2000-06437
  Houston, Texas
  **DEPOSED**

- David T. Allen vs. Sidney J. Taylor, et al.
  Civil Action No. 99-146-RRM
  District of Delaware
  **DEPOSED**

- Dallas Hockey Club, Inc. vs. Comerica Bank–Texas, N.A. and Joseph Lynch
  Case No. DV 9806889
  Dallas, Texas
  **DEPOSED**

- Cornelius Ryan and Carl Ryan, et al. vs. Joseph Ryan and Yolanda Ryan, et al.
  Case No. 70 Y 168 00179 00
  Arbitration
  Houston, Texas
  **TESTIFIED**

- Susan Camille Lee et al. (Plaintiff) vs. Ronald C. Lee, Jr. (Defendant)
  Case No. 137,506
  Probate Court No. 2, Harris County, Texas
  **TESTIFIED**

8

**Deposition/Trial Testimony**
*H. Stephen Grace, Jr., Ph.D*

- Donna Kline vs. Susan Camille Lee
  Houston, Texas
  **TESTIFIED**

- ALG, Inc. et al. vs. NationsBank, N.A. Midwest
  Case No. 97C15260
  Johnson County, Kansas
  **TESTIFIED**

- Andover Togs, Inc. et al. vs. Mid City Associates
  Bankruptcy Court
  New York, New York
  **TESTIFIED**

- Wellington Funding vs. Continental Grain
  New York, New York
  **DEPOSED**

H
G
S

Exhibit II

# Grace & Co. Consultancy, Inc.
## Board of Advisors

**C. J. Christie**
Consultant on Audit Committees and Risk Management
Senior Vice President & Treasurer (Ret.), Sedgwick James
Former Chairman, Financial Executives International

**James N. Clark**
Board of Directors, The Western & Southern Life Insurance Company
Executive Vice President and CFO (Ret.), Western & Southern
Former Chairman, Financial Executives International

**George Cox**
Consultant on Construction and Real Estate Development
Managing General Partner (Ret.), Park Central Ltd.

**R. Hartwell Gardner**
Board of Directors, Pioneer Natural Resources
Treasurer (Ret.), Mobil Corporation
Former Chairman, Financial Executives International

**Edward A. Grun**
Director, Gensler Worldwide

**John E. Haupert**
Consultant on Corporate Organization and Financing
Treasurer (Ret.), The Port Authority of New York and New Jersey

**Peter Howell**
Consultant on Banking, Bankruptcy and Reorganization
Direktor, Credit Risk Management (Ret.), DeutscheBank

**Steven B. Lilien**
Consultant on Accounting and Business Operations
Weinstein Professor of Accounting and Former Chairman of the Stan Ross Department of
Accounting at Zicklin School of Business, Baruch College
Director of Center for Financial Integrity, Baruch College

**Martin G. Mand**
Executive Vice President & CFO (Ret.), Nortel Networks
Vice President & Treasurer (Ret.), DuPont Company
Former Chairman, Financial Executives Research Foundation, Inc.
Director on several Boards

**S. Khalid Masood**
Finance Director, The Hub Power Company Limited, Karachi, Pakistan

**Thomas C. McGill**
Member of the Defense Science Research Council;
Chairman of Board 61 Systems, Inc.
Professor, California Institute of Technology

**S. Lawrence Prendergast**
Executive Vice President of Finance & Director, LaBranche & Co. Inc.
Chairman & CEO (Ret.) and Director, AT&T Investment Management Corp.

**Francis C. Regnier**
Consultant on International Retailing
Former Chief Executive Officer, Montaigne Diffusion (LACOSTE), Paris, France

**Robert S. Roath**
Board of Directors and Audit Committee Chair, InterDigital Communications Corporation
Chairman of Advisory Board, L.E.K. Consulting
Former Chief Financial Officer, RJR Nabisco

**The Honorable William M. Schultz**
Consultant and Lecturer on Legal and Governance Issues
Former United States Bankruptcy Judge, Southern District of Texas

**Ronald H. Wilcomes**
Consultant on Finance and Investments
Vice President and Investment Counsel (Ret.), Metropolitan Life Insurance Co.

**Alfred L. Williams**
Consultant on Corporate Organizations, Finance and Reorganizations
Former Senior Vice President and CFO, Global Industrial Technologies, Inc.

**Walter C. Wilson**
Consultant on Complex Corporate Structures, Turnarounds and Reorganizations
Former Senior Vice President and CFO, EOG Resources, Inc.
Former Director, Encal Energy, Ltd.
Former Trustee, Financial Executives Research Foundation, Inc.

*Houston Office*: H. Stephen Grace, Jr. Ph D ♦ James F. Ott
4615 Southwest Freeway, Suite 625, Houston. TX 77027
(713) 572-6800 ♦ Fax (713) 572-6806    www.hsgraceco.com

*New York Office*:
300 East 57th Street #18A, New York, NY 10022
(212) 644-8620 ♦ Fax (212) 396-4215    www.hsgraceco.com

Exhibit III

# Martin G. Mand

Martin G. Mand is Chairman and Chief Executive Officer of Mand Associates, Limited, a consulting, speaking, and writing firm, based in Wilmington, Delaware. In addition, he is an arbitrator for the American Arbitration Association, and serves as a Delaware Chancery Court-appointed company custodian.

Prior to starting his own firm, Mr. Mand was Executive Vice President and Chief Financial Officer of Nortel Networks and a member of its four-person Chairman's Office. Before joining Nortel, he was Vice President and Treasurer of the DuPont Company, having previously served as DuPont's Vice President and Comptroller and Vice President – Taxes and Financial Services.

Mr. Mand currently serves on the Boards of Directors of the Mizuho Corporate Bank (U.S.A.), New York, New York; Townsends, Inc., Wilmington, Delaware; and Factory Card and Party Outlet, Naperville, Illinois. He also serves on the Advisory Board of Global IP Sound, AB, Stockholm, Sweden. He previously served as a director of CAI Wireless, Albany, New York, and Sun Healthcare Group, Inc., Albuquerque, New Mexico.

He was Chairman of the Advisory Board of the McIntire School of Commerce of the University of Virginia and president and director of various Delaware nonprofit organizations. Mr. Mand was active and held positions in many national professional associations, including the American Management Association (Chairman, Finance Council and Board of Directors), Financial Executives Research Foundation (President and Trustee), Financial Executives International (Executive Committee and Board of Directors) and the Manufacturers' Alliance for Productivity and Innovation (Vice Chairman, Finance Council).

He co-authored a book entitled *Partnering for Performance: Unleashing the Power of Finance in the 21st - Century Organization*, and has also written articles for *Financial Executive, Treasury & Risk Management, Business Finance* and *Strategy & Leadership* magazines.

Mr. Mand holds a B.S. degree in commerce from the University of Virginia and an M.B.A. degree from the University of Delaware.

Exhibit IV

# James F. Ott

## Finance and Accounting Professional

Member of Senior Management with more than thirty-five years of business experience in the following areas:

* SEC Reporting
* Budgeting
* Accounting Controls
* Financial Statements
* Accounting Software Selection
* Foreign and U.S. Tax Filings
* Foreign and U.S. Tax Planning
* Litigation Support
* Due Diligence Studies

* Cash Management and Reporting
* Financial Controls
* Inventory Management and Control
* Accounting for Lease Transactions
* Hardware and Software Conversions
* Payroll
* Cost Accounting
* Acquisition and Divestiture Studies
* Oil and Gas Accounting Controls

## Employers

Director of Operations                                1998- Present
H.S. Grace & Company, Inc.

- H.S. Grace & Company, Inc. consults on complex commercial litigation, provides specialized financial and operational advisory services to healthy and troubled companies, and advises on corporate governance issues.

Controller                                            1997-1998
Hydrocarbon Processing, Inc., Houston, TX.

- Determine financial status and viability of troubled business enterprise.
- Make cost cutting and operational improvements.
- Recommendations to management in order to preserve the viability of the company.

Financial Consultant                                  1995-1997

- Review of the financial position and operations of a large group of Doctors (Ob-gyn) in order to prepare the association for public offering.
- Analyzed financial commitments of a law firm and advised them of ways to improve cash flow and reduce debt.
- Prepared Corporate, Partnership, Individual and Not For Profit tax returns.

Controller                                              1989-1995
Owen Healthcare, Inc., Houston, TX.

- Responsibility: Internal and external financial reporting, including quarterly, annual, stockholder, and management.
- Profit Planning (budgeting).  Maintain and update current monthly, quarterly, annual and five year forecasts.
- General Accounting.  Publish financial statements for 500 + locations and departments.
- Billing.  Prepare accurate and comprehensive invoices for approximately 300 customers.
- Accounts Payable.  Process approximately thirty thousand invoices per month and maintain a processing rate of two thousand invoices per employee per month.
- Special Projects.  Perform as requested.  Projects ranged from analysis of potential acquisitions to establishing internal billing rates for departments.

W.R. Grace & Co. and Subsidiaries                      1977-1989
   Controller
   Homco International, Inc.                        1980-1989

- Financial and operational integration of acquisitions.
- Responsible for all internal and external financial reporting, including SEC quarterly and annual, and management.
- Foreign tax planning, preparation and compliance for operations in six foreign countries, and work papers for the ultimate consolidation of forty-four state and ten federal tax returns.
- General Accounting.  Publish financial statements for 250 locations and departments.

   Auditor
   Natural Resources Group, Dallas, TX                1977-1980

- Responsible for financial review performed in due diligence of approximately ten acquisition candidates.
- Review findings of W.R. Grace corporate auditors for items that required implementation.

Audit Manager                                           1970-1977
Amerada Hess Corporation

- Audits of exploration, production, refining and marketing functions of major oil and gas corporation.

In - Charge Semi-Senior                                 1966-1970
Arthur Andersen & Co., New York, NY

- Small business audit staff.

## Education

B.B.A. Accounting, Pace University, New York

## Professional

Pro Bono Chief Financial Officer of Houston Drug Free Business Initiative Inc., a not-for-profit organization – 1989-1997

Financial Executives International – Various committee positions

Institute of Internal Auditors – Various positions including Chair of Committee for Revision of COPAS Accounting Standards

National Association of Accountants – President, Brunswick Area Chapter

National Association of Corporate Directors (NACD) – Member

Accredited Instructor for Continuing Legal Education (CLE) – MI, NY, PA and TX

Accredited Instructor for Continuing Education (CE) for Property and Liability Insurance License Holders – NC and TX

Served as a Fact Witness four times.

## Addresses and Articles

"The Mock Deposition of an Audit Committee Chair" – played role of Audit Committee Chairman in the mock deposition and spoke regarding the evolving responsibilities of audit committees. Presented to the:

> Financial Executives International – Pittsburgh Chapter, May 1, 2001;
> Financial Executives International – Detroit Chapter, April 30, 2001;
> Financial Executives International – Dallas Chapter, January 9, 2001;
> Forbes CFO Forum                – New York, May 17, 2000;
> Financial Executives International – New York City Chapter, February 1, 2000;
> Financial Executives International – Houston Chapter, January 25, 2000.

A major contributing author to above Mock deposition.

Assisted in the editing of articles published in *The CPA Journal* and articles authored by members of H.S. Grace & Company, Inc.

Exhibit V

# RONALD H. WILCOMES
**9 Lyncrest Drive**
**Paramus, NJ 07652**
**201-652-1541**

## WORK EXPERIENCE

**Grace and Co. Consultancy, Inc.**
4615 Southwest Freeway, Suite 800
Houston, Texas 77027-7106

*Member – Board of Advisors - Currently*

**Metropolitan Life Insurance Company**
New York, New York

*Vice-President & Investment Counsel - 1988-1996*

- Officer-in-charge of the Law Department Real Estate Investments Section comprised of 34 attorneys in 6 offices in the United States

- Structured, negotiated, closed and supervised real estate acquisition, sale, lease, joint venture and loan transactions, including enforcement of contracts through negotiation and litigation

*Associate General Counsel - 1978-1988*

- Officer-in-charge of the Law Department Real Estate Investments Northeast Region

- Responsible for the legal aspects of major real estate acquisitions such as the Pan Am Building and 85 Broad Street in New York City and for major leases in connection therewith

- Officer and Director of Cross & Brown Company, a major New York leasing and management company owned by Metropolitan Life Insurance Company

*Assistant General Counsel - 1973-1978*

*Attorney - 1965-1973*

## TEACHING EXPERIENCE

### Baruch College
New York, New York
*Adjunct Associate Professor – 2002*
- Course Subject: Real Estate Transactions

### Washington and Lee University School of Law
Lexington, Virginia
*Adjunct Professor of Law - 1997-1999*
- Course Subject: Commercial Real Estate Transactions

### Fordham University School of Law
New York, New York
*Adjunct Associate Professor of Law - 1989-1992*
- Course Subject: Commercial Real Estate Leases

### American Law Institute - American Bar Association
### Committee on Continuing Professional Education
Philadelphia, Pennsylvania
*Faculty Member*
- Course Title: "Modern Real Estate Transactions"
1987, 1990-1996

### Practicing Law Institute
New York, New York
*Faculty Member*
- Course Titles: "Realty Joint Ventures" - 1982-1983, 1985-1987
"Negotiating the Realty Joint Venture Agreement Workshop" -1985
"Drafting and Negotiating Commercial Leases" - 1989-1990
"The Real Estate Partnership in Default" - 1990
"Real Estate Workouts and Bankruptcies" - 1991
"The Best Entity for Doing the Deal - Issues & Answers" - 1996

### Banking Law Institute
Washington, DC
*Faculty Member*
- Course Title: "Commercial Real Estate Lending" - 1985

### Law Journal Seminars-Press
New York, New York
*Faculty Member*
- Course Title: "Joint Ventures in Real Estate" - 1982 – 1983

## PROFESSIONAL ASSOCIATIONS

### American College of Real Estate Lawyers (ACREL)
- *Co-chairperson*, Partnership, Limited Liability Companies and
Taxation Committee - 1991-1996
- *Acrel Advisor*, National Conference of Commissioners on Uniform
State Laws Drafting Committee on the Uniform Partnership Act
- *Acrel Observer*, National Conference of Commissioners on Uniform
State Laws Drafting Committee on Limited Liability Partnership Amendments

### Association of Life Insurance Counsel

### American Land Title Association Lender's Counsel Group

### American Bar Association

## EDUCATION

### Columbia University School of Law
New York, New York
LL.B., 1965

### Rutgers University – Rutgers College
New Brunswick, New Jersey
BA, 1962, Magna Cum Laude, Political Science
- Henry Rutgers Scholar
- Phi Beta Kappa

## BAR ADMISSIONS

**New York – 1966**
**New Jersey – 1972**
**US District Court for the District of New Jersey - 1972**