# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ADAMS GOLF, INC., | § | CIVIL ACTION NO. 99-371-KAJ |
| SECURITIES LITIGATION | § | (CONSOLIDATED) |
| | § | |
| | § | |

## OPENING BRIEF IN SUPPORT OF ADAMS GOLF DEFENDANTS' ##
## <u>MOTION FOR SUMMARY JUDGMENT</u> ##

Of Counsel:

Paul R. Bessette

Jennifer R. Brannen

Michelle A. Reed

Laura Moriaty

Akin Gump Strauss Hauer & Feld LLP

300 West 6th Street, Suite 2100

Austin, Texas 78701

Jeffrey L. Moyer (#3309)

moyer@rlf.com

Alyssa M. Schwartz (#4351)

schwartz@rlf.com

Richards, Layton & Finger, P.A.

One Rodney Square, P.O. Box 551

Wilmington, Delaware 19899

(302) 651-7700

Attorneys for Defendants Adams Golf, Inc.,
B.H. Adams, Richard H. Murtland, Darl P.
Hatfield, Paul F. Brown, Jr., Roland E. Casati,
Finis F. Conner, and Stephen R. Patchin

Dated: September 11, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iv

I.      STATEMENT AND NATURE OF THE PROCEEDING ....................................... 1

II.     SUMMARY OF ARGUMENT ............................................................................... 2

III.    STATEMENT OF THE FACTS .............................................................................. 5

      A.    Barney Adams revolutionized the golf-club industry ...................................... 5

      B.    After the Tight Lies was introduced, Adams Golf experienced
           extraordinary growth in a very short time ....................................................... 5

      C.    Adams Golf established sales and return practices to keep up with the
           exponential growth in demand ........................................................................ 6

      D.    Tight Lies appeared in the gray market ........................................................... 9

      E.    Adams Golf went public .................................................................................. 11

      F.    Adams Golf's stock price dropped in the weeks following the IPO for
           reasons unrelated to the gray market ............................................................... 12

           1.    Many factors affected the stock price in July 1998 ............................ 12

           2.    Class-period disclosures about the gray market did not affect
                  Adams Golf's stock price because neither analysts nor investors
                  thought gray marketing was a significant issue ................................... 14

      G.    Adams Golf's sales department suffered from low morale as demand
           dropped off ....................................................................................................... 15

      H.    Management perceived Costco as becoming a significant issue in the
           fourth quarter of 1998 ...................................................................................... 17

ARGUMENT ...................................................................................................................... 19

IV.     LEGAL STANDARDS ............................................................................................ 19

      A.    Summary-judgment standard ............................................................................ 19

      B.    Section 11 elements ......................................................................................... 19

V.      THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE
      ADAMS GOLF'S STOCK PRICE DECLINED FOR REASONS UNRELATED
      TO PLAINTIFFS' CLAIMS ................................................................................... 21

      A.    Adams Golf's stock price did not decline in response to class-period
           disclosures about gray marketing and this alone meets defendants'
           negative-causation burden ............................................................................... 21

           1.    The alleged risk of gray marketing was incorporated into the
                  offering price ....................................................................................... 22

i

2.      The gray-marketing risk was nevertheless reflected in the stock price on the first day of trading and the price did not decline .........23

3.      Class-period disclosures about the gray market did not cause stock-price declines .........................................................................24

4.      The stock-price reaction following Adams Golf's October 22, 1998 earnings warning was not caused by information allegedly omitted from the Prospectus........................................................................26

5.      Plaintiffs do not dispute that market participants knew about the gray-market risks at least by mid-July and therefore no price decline after this time can be attributable to its alleged omission from the Prospectus......................................................................27

B.      There were no class-period disclosures about alleged questionable sales practices, and therefore no causally related stock-price declines or losses .........27

C.      Adams Golf's stock price declined because of market-share loss and an industry-wide decline in demand .........................................................28

1.      There are no statistically significant stock-price reactions on any class-period day associated with plaintiffs' claims and therefore no section 11 losses ...................................................................28

2.      The undisputed industry-wide decline in demand caused Adams Golf's stock price to decline ...............................................29

3.      Adams Golf's market-share loss to Orlimar caused Adams Golf's stock price to decline ...............................................................30

D.      Plaintiffs' speculation that information about the gray market may have "leaked" out and may have been "associated with" Adams Golf's stock-price decline has no basis in financial economics and is not supported by the factual record.........................................................................31

VI.     THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE PLAINTIFFS HAVE FAILED TO PROVE THAT THE PROSPECTUS CONTAINED ANY MATERIAL MISSTATEMENTS OR OMISSIONS RELATED TO THE RISK OF GRAY MARKETING.........................................33

A.      The Prospectus contained no false statements .........................................33

B.      The Prospectus did not omit any material facts related to the risk of gray marketing ................................................................................34

1.      The duty to disclose information in a Prospectus is governed by Item 303 of Regulation S-K.............................................................34

2.      Adams Golf did not have a duty to disclose gray marketing under Regulation S-K.........................................................................35

3.      There is no actionable omission because the absence of a specific gray-marketing risk factor did not render misleading any other statements in the Prospectus ...............................................................38

ii

|   |   | 4. | There is no actionable omission about the gray market because Adams Golf disclosed its potential harms—the risk of eroding profit margins and the risk of harm to brand image | 39 |

|   | C. | | Gray-marketing risks were not material as a matter of law | 40 |
|   |   | 1. | Adams Golf's stock price did not decline in response to class-period disclosures about gray marketing | 41 |
|   |   | 2. | Gray marketing was an industry-wide phenomenon and thus was already public knowledge | 42 |
|   |   | 3. | Adams Golf disclosed a month before the IPO that Costco had golf clubs purporting to be Tight Lies | 44 |
|   |   | 4. | Actual post-IPO numbers confirm that gray marketing was not material at the time of the IPO and never had a material effect on the Company's results | 45 |

| VII. | | | THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE THAT ANY ALLEGED "QUESTIONABLE SALES PRACTICES" EXISTED, LET ALONE WERE MATERIAL | 48 |
|   | A. | | There is no evidence of double shipping | 48 |
|   | B. | | There is no evidence of consignment sales or sales with unlimited rights of return | 51 |
|   | C. | | There is no evidence that Adams Golf's reserve was inadequate | 52 |

| VIII. | | | PLAINTIFFS' CLAIM AGAINST THE INDIVIDUAL ADAMS GOLF DEFENDANTS MUST BE DISMISSED BECAUSE THEY PERFORMED A REASONABLE INVESTIGATION IN THEIR IPO DUE DILIGENCE AND REASONABLY BELIEVED THAT THE PROSPECTUS WAS COMPLETE AND ACCURATE | 54 |
|   | A. | | Reasonable investigation and belief provide an absolute defense for the individual defendants | 54 |
|   | B. | | The outside directors conducted a reasonable investigation under the circumstances and had reasonable grounds for their belief that the Prospectus was true and complete | 55 |
|   | C. | | The officers conducted a reasonable investigation and had reasonable ground to believe, and did believe, that the Prospectus contained no material misstatements or omissions | 57 |
|   |   | 1. | Adams, Murtland, and Hatfield conducted a reasonable investigation based on their respective positions at the Company | 57 |
|   |   | 2. | Based on their reasonable investigation, Adams, Murtland, and Hatfield had reasonable grounds for their belief that the Prospectus was true and complete | 59 |

| IX. | | | CONCLUSION | 61 |

# TABLE OF AUTHORITIES

## CASES

*In re Adams Golf, Inc. Sec. Litig.*,
  176 F. Supp. 2d 216 (D. Del. 2001) ................................................................43

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ............................................................... *passim*

*In re Adams Golf, Inc. Sec. Litig.*,
  No. 99-371 (D. Del. April 11, 2006) ..............................................................33

*Akerman v. Oryx Communications, Inc.*,
  810 F.2d 336 (2d Cir. 1987) ...............................................................21, 28

*In re Alamosa Holdings, Inc.*,
  382 F. Supp. 2d 832, 865-66 (N.D. Tex. 2005) ...............................................22, 28

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..............................................................................19

*Basic v. Levinson*,
  485 U.S. 224 (1988) ..............................................................................40

*Bell v. Ascendant Solutions, Inc.*,
  422 F.3d 307 (5th Cir. 2005) ....................................................................25

*Boyle v. County of Allegheny, Pa.*,
  139 F.3d 386 (3d Cir. 1998) .....................................................................19

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...............................................................40, 41

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) .....................................................................20

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) .................................................................23

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*,
  68 F. Supp. 2d 480 (D.N.J. 1999) ................................................................20

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*,
  114 F. Supp. 2d 316 (D.N.J. 2000) ...............................................................20

iv

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................19

*Cooke v. Manufactured Homes, Inc.*,
    998 F.2d 1256 (4th Cir. 1993) .......................................................44, 45

*Donohoe v. Consolidated Oper. & Prod. Corp.*,
    982 F.2d 1130 (7th Cir. 1992) ................................................................54

*Escott v. BarChris Construction Corp.*,
    283 F. Supp. 643 (S.D.N.Y. 1968) .................................................55, 60

*Feit v. Leasco Data Processing Equip. Corp.*,
    332 F. Supp. 544 (E.D.N.Y. 1971) ................................................55, 60

*In re Fortune Systems Sec. Litig.*,
    680 F. Supp. 1360 (N.D. Cal. 1987) ......................................................32

*Goldstein v. Alodex Corp.*,
    409 F. Supp. 1201 (E.D. Pa. 1976) ........................................................57

*Hillson Partners Ltd. P'ship. v. Adage, Inc.*,
    42 F.3d 204 (4th Cir. 1994) ...................................................................44

*Klein v. Gen. Nutrition Cos., Inc.*,
    186 F.3d 338 (3d Cir. 1999)..............................................20, 40, 42, 43

*Laker v. Freid*,
    854 F. Supp. 923 (D. Mass. 1994) .........................................................20

*Laven v. Flanagan*,
    695 F. Supp. 800 (D.C.N.J. 1988) .........................................................57

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...............................................................................19

*McKowan Lowe & Co. v. Jasmine, Ltd.*,
    No. Civ. 94-5522, 2005 WL 1541062 (D.N.J. June 30, 2005)..............28

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
    65 F.3d 1044 (2d Cir. 1995)...................................................................21

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)..............................................23, 28, 40, 42

v

*Metge v. Baehler*,
    762 F.2d 621 (8th Cir. 1985) .............................................................................. 54

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) .............................................................................. 42

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ................................................................... 28, 40, 42

*S.E.C. v. J.W. Barclay & Co., Inc.*,
    442 F.3d 834 (3d Cir. 2006) ................................................................................ 19

*In re Segue Software, Inc. Sec. Litig.*,
    106 F. Supp. 2d 161 (D. Mass. 2000) .................................................................. 50

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d cir. 1997) ................................................................................. 40

*Smith v. Circuit City Stores, Inc.*,
    286 F. Supp. 2d 707 (E.D. Va. 2003) ................................................................... 45

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ................................................................................ 20

*Tracinda Corp. v. DaimlerChrysler*,
    197 F. Supp. 2d 42 (D. Del. 2002) ...................................................................... 54

*Tracinda Corp. v. DaimlerChrysler*,
    364 F. Supp. 2d 362 (D. Del. 2005.) .................................................................... 40

*In re Donald J. Trump Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993) .................................................................................... 40

*Weilgos v. Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) ......................................................................... 41, 44

*Weinberger v. Jackson*,
    1990 U.S. Dist. LEXIS 18394 (N.D. Cal. Oct. 11, 1990) .............................. 55, 56

*Whirlpool Fin. Corp. v. GN Holdings, Inc.*,
    67 F.3d 605 (7th Cir. 1995) .......................................................................... 43, 44

*In re Worldcom Sec. Litig.*,
    No. 02 Civ. 3288DLC, 2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) ................... 60

*Zucker v. Quasha*,
    891 F. Supp. 1010 (D.N.J. 1995) ............................................................20

## STATUTES AND OTHER AUTHORITIES

15 U.S.C. § 77k(a) ............................................................................................20

15 U.S.C. § 77k(b) ............................................................................................54

15 U.S.C. § 77k(c) ............................................................................................54

15 U.S.C. § 77l(a)(2) ........................................................................................20

15 U.S.C. § 77k(e) ............................................................................................21

15 U.S.C. § 77l(b) .............................................................................................21

17 C.F.R. § 229.303 ....................................................................................34, 48

17 C.F.R. § 230.176 ..........................................................................55, 56, 57

Fed. R. Civ. P. 56(c) ........................................................................................19

Brealey & Myers, Principles of Corporate Finance
    (7th Ed. 2003) ............................................................................................26

Mgmt's Discussion & Analysis of Fin. Condition & Results
    of Operations, Securities Act Release No. 33-6835,
    1989 WL 1092885 (May 24, 1989) ..........................................................35

## I.    STATEMENT AND NATURE OF THE PROCEEDING

In June 1999, plaintiffs filed complaints against Adams Golf, Inc., B.H. Adams, Richard H. Murtland, Darl P. Hatfield, Paul F. Brown, Jr., Roland E. Casati, Finis F. Conner, Stephen R. Patchin (the "Adams Golf Defendants") and the three underwriters of Adams Golf's initial public offering ("IPO") in this Court, alleging violations of sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as amended, in connection with the IPO. Plaintiffs alleged that the offering prospectus and registration statement ("Prospectus") failed to disclose that unauthorized distribution of Adams Golf's products (*i.e.*, gray-market sales) threatened its long-term profits. Plaintiffs also alleged that the Prospectus failed to disclose that the golf-equipment industry suffered from an oversupply of inventory at the retail level, which had an adverse impact on our sales. After this Court dismissed the consolidated, amended complaint, plaintiffs appealed. On August 25, 2004, the Third Circuit affirmed the dismissal of plaintiffs' claim related to oversupply of retail inventory and reversed the dismissal of the gray-market claim.

On August 3, 2005, this Court certified a class of section 11 claimants, but shortened the proposed class period to end on October 22, 1998 and declined to certify a section 12(a)(2) class against the Adams Golf Defendants. On September 1, 2005, plaintiffs filed a motion for leave to amend their complaint, which was granted on January 24, 2006. Defendants filed a motion to dismiss the second amended complaint ("SAC"), which this Court granted in part and denied in part on April 10, 2006. Now, in addition to the gray-market claim, the SAC alleges that the Prospectus failed to disclose that Adams Golf engaged in "questionable sales practices" (*i.e.*, double shipping, consignment sales, unlimited rights of return, and underreserving for returns), which threatened post-IPO financial results. The parties have completed fact and expert discovery, and the Adams Golf Defendants now move for summary judgment on all claims asserted against them. This is the Adams Golf Defendants' Opening Brief in support thereof.

## II.    SUMMARY OF ARGUMENT

This case remains the paradox it started as 7 years ago—how can plaintiffs maintain a section 11 case, based on an alleged omission of a gray-marketing risk from the Prospectus, when Adams Golf told the public in a press release one month before the IPO that Costco was gray marketing its clubs, and two subsequent class-period disclosures about the gray marketing did *not* result in *any* discernible stock-price drop? The answer, now that the evidence is in, is that there is no case. Yes, plaintiffs may have suffered losses as the stock price dropped in the weeks following the IPO, but they suffered no section 11 damages because the gray-marketing risk at the IPO was immaterial, the two public class-period disclosures about gray-market concerns resulted in no stock-price drops, and risks that were disclosed—competition and a drastic downturn in the golf market—actually caused plaintiffs' losses.

Plaintiffs have turned over every stone looking for evidence. There have been 3 complaints, 26 fact-witness depositions, 14 expert reports, and 8 expert depositions. What has become abundantly clear from all that litigation, however, is that aside from conjecture and attenuated inferences, plaintiffs have no genuine issue of material fact to take to a jury on their claim that Adams Golf omitted the then-existing material risks of gray marketing and "questionable sales practices."

This is a case about alleged omissions. No misstatements of fact are at issue. Plaintiffs' central claim is that Adams Golf should have disclosed in its Prospectus that the unauthorized distribution of its golf clubs to Costco (*i.e.*, "gray marketing") presented a material risk to its business. The uncontroverted evidence shows the opposite: (1) Adams Golf received very few complaints about its clubs being at Costco; (2) Costco sold a very small number of clubs relative to the Company's total sales; (3) Adams Golf took appropriate steps to manage the issue and reasonably believed that it was under control; and (4) the number of clubs Costco sold was too

2

small to materially hurt Adams Golf's business, and it actually was beneficial. With respect to plaintiffs' claim that Adams Golf failed to warn that "questionable sales practices" posed a material risk to its future financial results, the summary-judgment argument is simple: there is absolutely no evidence that these practices existed at the time of the IPO, let alone posed any risk to Adams Golf.

There are several grounds that support summary judgment. Most important is **negative causation**—Adams Golf's stock-price decline was caused by factors other than plaintiffs' allegations. The gray-marketing risk also was already incorporated into the offering price because, one month before the IPO, the Company issued a press release disclosing that Costco had improperly obtained some clubs and the Company had sued Costco. Moreover, Adams Golf stock traded in an efficient market and thus the previously disclosed gray-market risk was incorporated into the price on the first day of trading. The evidence also shows that Adams Golf's stock price did not decline in response to class-period disclosures about gray-market concerns, which *alone* proves the negative-causation defense.

The Court also should grant summary judgment because plaintiffs cannot prove that Adams Golf had a duty to disclose gray marketing in the Prospectus. Under section 11, plaintiffs must show that defendants failed to disclose material facts that were either (1) required to be disclosed, or (2) necessary to make other statements in the prospectus not misleading. Plaintiffs fail on both counts.

First, there was **no duty to disclose**. The evidence shows that at the IPO gray marketing was not a known trend or uncertainty that was likely to have a material impact on the Company's future results. Thus, there was no duty to disclose under Regulation S-K. Adams Golf did

disclose the very risks that are alleged to be the potential harms from gray marketing—declining profit margins and a tarnished brand image—so there is simply no actionable omission.

Plaintiffs cannot show that the alleged omission rendered any other statements misleading. The Company's disclosure about its selective distribution network was not rendered misleading by the nondisclosure because Costco's scant sales could not and did not undermine the selective distribution network. Indeed, the fact that Costco obtained its clubs in the gray market demonstrates that the selective distribution network was working—Costco could not legitimately obtain the clubs from Adams Golf.

**Lack of materiality** is another basis upon which the Court could and should grant summary judgment. The evidence demonstrates that any gray-market risks were not material under the reasonable-investor standard, which takes into account both the size of the risk and the probability that it will adversely impact the business. Investors obviously did not consider the gray-marketing risk to be material—as two class-period disclosures about it did not cause Adams Golf's stock price to decline. No wonder, as gray marketing is a well-known industry-wide phenomenon. Plaintiffs simply cannot raise a genuine fact issue on materiality.

The same applies to plaintiffs' claim about questionable sales practices. With no evidence that these practices actually occurred, plaintiffs cannot demonstrate any duty to disclose under Regulation S-K nor can they prove materiality under the reasonable-investor standard.

Finally, the individual defendants should be dismissed from the case on the basis of their **due-diligence defense**. The evidence shows that each of them conducted a reasonable investigation and had reasonable ground to believe and did believe at the time the Prospectus became effective that it contained no material misstatements or omissions.

For all these reasons, the Court should grant this Motion for Summary Judgment.

4

III.    **STATEMENT OF THE FACTS**

A.    **Barney Adams revolutionized the golf-club industry.**

In the early 1990s, Barney Adams founded Adams Golf, then a small, custom-fitting operation that made clubs to complement or improve the unique swing and style of individual customers. (Ex. 72 at 23.)[1] While trying to imagine how to alter a fairway wood to improve the accuracy and distance of mediocre or aging golfers, Adams had a revelation: an average golfer would hit better with a fairway wood that had its head turned upside down, so that its center of gravity was lower. (Ex. 72 at 23; Magnussen Dep. Tr. 59:21-60:9.)

In 1996, Adams Golf started manufacturing a fairway wood with an inverted metal head, called the Tight Lies. (Ex. 72 at 23; Magnussen Dep. Tr. 59:21-60:9.) The Company advertised the club through an infomercial starring golf guru Hank Haney demonstrating the improvement in accuracy and distance that most golfers experienced using the Tight Lies. (Ex. 72 at 23; Pratt Dep. Tr. 52:3-53:12.) As Greg Pratt, the buyer for Adams Golf's Canadian distributor WDC Mackenzie, recalled, "Barney . . . had come up with this Tight Lies Fairway Wood that . . in many ways, changed a part of the game. . . and he had not only. . . invented this product, but just the way he also marketed the product through infomercials, in many ways changed a lot of the way golf was marketed." (Pratt Dep. Tr. 51:25-52:7.)

B.    **After the Tight Lies was introduced, Adams Golf experienced extraordinary growth in a very short time.**

As soon as the infomercial began to air, Tight Lies sales exploded. Greg Pratt had never seen a product as hot as the Tight Lies in his time as a retail buyer: "in October, November of '97, we literally had customers running into our booth, saying, 'There's the club, I have to have

---

[1] All exhibits and deposition transcripts are attached to the Declaration of Jennifer R. Brannen submitted with the Adams Golf Defendants' Motion for Summary Judgment

it.' It was something that I had never experienced before. . . people were buying product like I had never seen the quantities before." (Pratt Dep. Tr. 13:9-14:7.) As golfers used the clubs and determined that the improvements in distance and accuracy touted in the infomercial were real, Tight Lies sales grew exponentially in 1997 and 1998. (Ex. 72 at 16, 18-19.) The Company's sales grew from $1.1 million in 1994 to $3.5 million in 1996 to $36.6 million in 1997 and to $84.6 million in 1998. (Ex. 72 at 16, 18-19; Ex. 421 at 9.)

### C.    Adams Golf established sales and return practices to keep up with the exponential growth in demand.

Adams Golf sold its Tight Lies through a combination of direct sales to customers who called into a hotline number from the infomercial and wholesale sales to an exclusive network of on-and off-golf-course pro shops and international distributors. (Ex. 72 at 29-30.) By the time of the IPO, Adams Golf had over 7,000 authorized retailers in the U.S. and 33 international distributors, who were responsible for handling the marketing of Tight Lies within their respective countries and dealing directly with the individual retailers in those countries. (Ex. 72 at 29-30.) International sales accounted for about 12% of Adams Golf's total sales for January–June 1998, and Canada was approximately 3% of total sales. (Ex. 401 at ADAMS 001894; Exs. 402-403.)

During 1998, the Company's domestic sales department consisted of two divisions: wholesale and direct response. The wholesale division, also called inside sales, was responsible for selling Tight Lies to authorized retailers at wholesale prices, while the direct-response division sold the clubs directly to consumers that called from the infomercials. (Gonsalves Dep. Tr. 8:18-9:4; Adams Dep. Tr. 228:10-228:14.) When the call volume became too great to handle internally, the Company outsourced the call center to a series of outside vendors. (Gonsalves Dep. Tr. 141:5-12; Adams Dep. Tr. 228:12-20.) Around the time of the IPO, Adams Golf used

Telegolf as its outside vendor. (Gonsalves Dep. Tr. 141:5-12; Rainwater Dep. Tr. 55:1-8 (citing to Ex. 364).)

The inside salespeople were assigned to specific regions of the United States, and they took orders from authorized retailers in those regions. (Gonsalves Dep. Tr. 8:12-9:4.) Orders were predominantly taken over the phone and confirmed verbally, although some were confirmed in writing. (Brewer Dep. Tr. 29:14-18; Greaney Dep. Tr. 12:18-15:3.)

One of the key challenges the Company was facing in the spring of 1998 was keeping up with the incredible demand for the Tight Lies. (Adams Dep. Tr. 101:13-18; Pratt Dep. Tr. 13:9-14:7.) Jay Greaney recalled that in late 1997 and early 1998, "the customer would just call . . . [and] say, 'Send me as many as you can.'" (Greaney Dep. Tr. 17:15-17.) To keep retailers satisfied, the salespeople would consult with some of the large or consistent retailers in their territories to schedule club shipments months in advance. (Greaney Dep. Tr. 68:14-69:10; Blevins Dep. Tr. 176:24-177:12.) This method also ensured fewer backorders during times of high product demand because it caused the manufacturing department to ramp up production in advance to meet these pre-scheduled orders. (Greaney Dep. Tr. 68:14-68:24.) Adams Golf did not recognize revenue on these, or indeed on any, orders until shipment. (Ex. 72 at F-7; Hatfield Dep. Tr. 65:15-16.)

The Company's auditors were KPMG, and they assisted the Company by, among other things, reviewing its reserve for returns. The Company set its return reserve based on historical analysis (Exs. 362-365; Ex. 302 at 4; Rainwater Dep. Tr. 17:1-18:6), and wanted to err on the side of conservatism due to the exponential growth it was experiencing. (Rainwater Dep. Tr. 78:20-81:7; Hatfield Dep. Tr. 106:22-107:22.) In 1998, the Company never experienced returns in excess of reserves, but in one month (July) returns increased and the Company adjusted its

7

reserve consistent with generally accepted accounting principles ("GAAP").[2]  (Ex. 302 at 2, 7.)

In fact, the uncontroverted evidence shows that at the end of 1998, KPMG informed the

Company that it was over-reserved for returns.  (Ex. 302 at 8; *see also* Exs. 365, 404.)  In other

words, the Company's accounting for its return reserve was very conservative.  (Rainwater Dep.

Tr. 79:3-79:11.)

This does not mean that retailers never returned product.  Most commonly, clubs were

returned because they were damaged or because the wrong product had been shipped.  (Murtland

Aff. ¶ 8.)  Retailers frequently anticipated and placed future orders, but then they would

occasionally refuse these scheduled orders for various reasons.[3]  Infrequently, simple mistakes

happened in the process of booking retailers' orders that caused shipments to arrive early or late,

or to be shipped twice.  (Greaney Dep. Tr. 73:14-73:18.)  In all of these scenarios, the retailer

might complain that it had received a double shipment and return the extra, unwanted clubs.

(Greaney Dep. Tr. 74:19-76:10; Blevins Dep. Tr. 176:11-178:19.)  There was no motivation for a

salesperson to intentionally overship clubs because the Company's return policy allowed

retailers to return overshipments, and all returned sales were deducted from the responsible

salesperson's commission.  (Hatfield Dep. Tr. 63:20-64:15; Greaney Dep. Tr. 24:4-24:9; Ex.

405.)

---

[2] The Company found that the source of the increased returns in July 1998 was Telegolf, the third-party call-center operator to which the Company had outsourced a portion of its direct sales.  (Ex. 302 at 7; Rainwater Dep. Tr. 55:1-8.)  Shortly thereafter, Adams Golf fired Telegolf for unsatisfactory performance because the Telegolf employees had not been trained sufficiently on golf in general and Adams Golf's product line in particular.  (Ex. 302 at 7; Rainwater Dep. Tr. 55:13-55:17; Gonsalves Dep. Tr. 141:4-20.)

[3] For example, pre-confirmed orders—although firm and requested—were sometimes refused by retailers if they had a high inventory, or if the retailer was low on cash and did not want to pay for the order at that time (Blevins Dep. Tr. 176:11-178:19; Greaney Dep. Tr. 74:14-75:7.)  And occasionally a sales representative would schedule an initial order from a retailer as a recurring order, to reduce back orders in anticipation of high demand (Brewer Dep. Tr. 28:4-29:18; Greaney Dep. Tr. 68:2-69:10.)  In this case, the ordering retailer might refuse the scheduled order when it arrived, claiming that it had never been ordered  (Greaney Dep. Tr. 75:3-7.)

Richard Murtland, the Company's Vice President of Operations at the time of the IPO, was kept apprised of any returns that either were unusually large (i e., more than 20 clubs) or were based on something other than an administrative error. (Murtland Aff. ¶ 8.) There is no evidence that any returns for reasons other than an administrative error were material to Adams Golf's financial results in 1998 (Murtland Aff. ¶ 8.)

### D. Tight Lies appeared in the gray market.

On March 23, 1998, Adams Golf received the first indication that its Tight Lies clubs were being gray marketed—WDC Mackenzie, the Company's Canadian distributor, complained that Tight Lies had appeared in a Costco store in Canada. (Ex. 7.) Adams Golf's management began monitoring Tight Lies orders for signs of gray marketing, looking for a disproportionately large number of clubs going to a retailer who lacked sufficient floor space to display and sell the clubs. (Ex. 255; Pratt Dep. Tr. 74:22-75:12, 93:13-94:8; Beebe Dep. Tr. 20:25-21:16, 23:14-20.) Within a week after the first report, Mark Gonsalves, head of sales and marketing, announced that the Company had stopped a suspiciously large club order to King Par, an authorized Adams Golf retailer in Flint, Michigan. (Ex. 255; Pratt Dep. Tr. 74:22-75:12, 93:13-94:8; Beebe Dep. Tr. 20:25-21:16; Gonsalves Dep. Tr. 26:17-27:6.) When Chris Beebe, the newly hired head of international sales, met with WDC Mackenzie in Canada in late April 1998, they told him that most of the Canadian Costcos were out of Tight Lies. (Ex. 19.) As Greg Pratt pointed out, "With gray market, you never know if there will be a next shipment," so all involved believed that this could be the end of Costco's Tight Lies inventory. (Pratt Dep. Tr. 21:5-21:6.)

Adams Golf wanted to send a message to its authorized retailers and support its exclusive retail distribution policy. On May 6, 1998, Chris Beebe sent a letter to all of the Company's international distributors reminding them of their obligation to refrain from gray marketing under the Company's distribution agreement. (Ex. 51.)

9

That same day, Adams Golf received its first report of Tight Lies appearing in an American Costco store from Pro Golf, the Company's authorized retailer in Fairfax, Virginia. (Ex. 406 at ADAMS 041074.) Barney Adams thereafter wrote a series of letters to Costco asking that it disclose its supplier. (Ex. 407-409.) Costco adamantly and repeatedly refused. (Exs. 408, 410.) Adams Golf then took legal action, filing a Bill of Discovery in Texas state court seeking an order requiring Costco to reveal its Tight Lies supplier. (Ex. 411.)

On June 9, 1998, Adams Golf issued a press release saying that it was experiencing gray marketing and that it had taken legal action against Costco. (Ex. 77.) For Adams Golf, the Bill of Discovery served two purposes: to identify the source of the gray marketing, and to strengthen the Company's relationship with its retailers, distributors and customers by proactively reassuring them that, as Barney Adams put it, "We don't sell to Costco. And not only do we not sell to them, we sue them." (Adams Dep. Tr. 69:5-6; *see also* Gonsalves Dep. Tr. 90:4-91:3.)

Rather than waiting for the litigation process to run its course, Adams Golf took other steps to discover the supplying retailer or distributor. On June 26, 1998, Barney Adams wrote letters to the owners of Manatee Golf and King Par Golf—two authorized retailers the Company suspected of gray marketing based on their sales figures (out of the more than 7,000 retailers)—reminding them of their retailer agreements to sell only to end-users and asking them to confirm their commitment to the distribution policy by signing and returning a copy of the policy. (Exs. 412, 413.)

On May 29, 1998, WDC Mackenzie reported that another shipment of Tight Lies had arrived in Canadian Costcos. (Ex. 85.) Adams Golf then implemented a price-matching policy similar to that used by other golf manufacturers that had previously encountered gray marketing. (Exs. 6, 10, 258.) The policy allowed Adams Golf's Canadian retailers to match Costco's price

without giving up their profit margin for any customer that mentioned that he or she had seen a Tight Lies in Costco.(Exs. 6, 10, 258.)

In the United States, between the first report of Tight Lies in an American Costco on May 6, 1998 and the July 9, 1998 date of Adams Golf's IPO, Adams Golf received only 9 recorded complaints of gray-marketed Tight Lies in Costco, out of more than 12,885 total retailer calls (for various reasons) from among the 7,000 authorized retailers. (Ex. 406, Adams Dep. Tr. 63:19-22.)

### E.    Adams Golf went public.

Adams Golf went public on July 9, 1998, marking the culmination of months of research, discussion, and drafting by Adams Golf's board of directors and management, the Company's lawyers (Arter & Hadden) and its underwriters (Lehman Brothers, Nationsbanc Montgomery, and Ferris Baker Watts). During the process of vetting all the business issues that could potentially impact Adams Golf's future results, Adams Golf's Board of Directors, management, lawyers and underwriters all were aware that Adams Golf was experiencing some gray marketing of its Tight Lies clubs in Costco stores and knew that Adams Golf had sued Costco. (Patchin Dep. Tr. 23:13-23:22; Adams Dep. Tr. 68:16-69:6; Murtland Aff. ¶ 11; Hatfield Aff. ¶¶ 5-6; Casati Aff. ¶¶ 3, 5-6; Conner Dep. Tr. 37:7-21; P. Brown Dep. Tr. 23:11-24:13; Pulido-Crowe Dep. Tr. 27:12-18.) No one believed that gray marketing was a significant issue to the Company or that it would pose a material threat to the Company's future. For these reasons, no one believed it was necessary to include a specific risk factor about gray marketing in the Prospectus. (Adams Dep. Tr. 103:22-104:11; Conner Dep. Tr. 31:5-32:19; Pulido-Crowe Dep. Tr. 22:14-25:15, 27:12-28:10, 29:15-30:12, 45:1-46:15, 69:5-72:1.)

As part of the process of allowing an IPO registration statement to become effective, the Securities and Exchange Commission ("SEC") routinely examines drafts of the Prospectus and

11

makes comments requesting further information or suggesting changes to the Prospectus. (Ex. 330 at 4; Sjoquist Dep. Tr. 10:12-11:13.) The SEC staff made several comments to Adams Golf's draft Prospectus, including requesting that the Company "consider whether disclosure of the Costco matter was necessary." (Ex. 164.) The Company's lawyers drafted a response that was circulated to the underwriters, their counsel, and KPMG, which described the legal action Adams Golf had taken against Costco and explained that "[t]he Company does not believe that this proceeding is material." (Ex. 90 at AH 000008.) This comment was resolved orally with the SEC, and the staff did not request further comment or revisions to the Prospectus regarding Costco or gray marketing. (Ex. 165; Ex. 330 at 5; Washburn Dep. Tr. 51:1-52:8; Sjoquist Dep. Tr. 55:3-56:5.)

### F.    Adams Golf's stock price dropped in the weeks following the IPO for reasons unrelated to the gray market.

#### 1.    Many factors affected the stock price in July 1998.

Adams Golf stock, unfortunately, did not turn out to be as hot a seller as the Tight Lies club. The stock price gradually and steadily fell from an opening-day high of $18.875 on July 10, 1998 to $4.625 on October 22, 1998. (D.I. 180 Ex. A ¶¶ 92-93.)

On July 28, 1998, members of Adams Golf's management and pricing committee met with Lehman Brothers representatives to discuss the potential reasons for the stock-price drop and the need to have a conference call with investors and analysts. (Ex. 78.) The factors discussed included the general downturn in the golf market and the decline in small-cap stocks generally. (Ex. 78.) On July 22, 1998, Callaway, the largest and most successful golf manufacturer, had issued an earnings release and disclosed that its sales had fallen and were likely to continue to fall due to "what appears to be a softening of demand [for golf equipment] in the United States." (Ex. 41.) The attendees at the July 28 meeting noted that many other golf

12

manufacturers were also experiencing declining sales and poor stock performance; as Gonsalves explained, "as goes Callaway, the perception was, so goes the industry." (Ex. 78; Gonsalves Dep. Tr. 96:15-96:17; *see also* Pulido-Crowe Dep. Tr. 129:10-129:19, Picchi Dep. Tr. 148:12-149:4.)    As former Lehman analyst Brian Lantier said in retrospect, "[The large golf manufacturers] were clearly canaries in the coal mine for what was coming for Adams." (Lantier Dep. Tr. 182:10-11.)

Additionally, golf sales were declining in their usual cyclical seasonal pattern as the summer was ending and the North American golf season drew to a close. (Ex. 72 at 10; Adams Dep. Tr. 189:15-16; Hatfield Dep. Tr. 43:11-15; Pratt Dep. Tr. 83:13-84:5.) Compounding these factors was competition, which was significant and increasing since other golf manufacturers such as Orlimar and Callaway had introduced competitors to the Tight Lies in 1998. (Exs. 414-415; Brewer Dep. Tr. 71:16-71:21; P. Brown Dep. Tr. 83:19-84:13; Pratt Dep. Tr. 108:19-109:3, 111:2-111:9; Ex. 180 at 28.)    Orlimar presented particularly tough competition because its TriMetal club featured the same inverted head as the Tight Lies, but its head was made of a mix of metals rather than the basic steel of the Tight Lies. (Blevins Dep. Tr. 166:17-167:4; Adams Dep. Tr. 218:22-24; Greaney Dep. Tr. 19:11-22; Pratt Dep. Tr. 62:21-63:25, 107:21-108:18; Puglielli Dep. Tr. 41:20-42:20, 43:4-43:9; Tate Dep. Tr. 88:2-18; Ex. 180 at 10, 27.) Orlimar also marketed its club via an infomercial, like the Tight Lies, but added to this a new marketing technique that Adams Golf had not yet discovered: it offered sales people at retail golf shops direct incentive payments, called "spiffs," for every TriMetal they sold. (Blevins Dep. Tr. 167:5-167:16; P. Brown Dep. Tr. 74:22-75:9; Tate Dep. Tr. 88:19-89:7.)

Adams Golf began to suffer from its inability to bring out new, successful, innovative products quickly following the Tight Lies introduction. At the time of the IPO, the Tight Lies

had already been on the market for two years and was approaching the end of its product lifecycle. (Brewer Dep. Tr. 71:22-72:4; Puglielli Dep. Tr. 43:1-3; Tate Dep. Tr. 88:2-88:3; Pratt Dep. Tr. 104:21-104:24.) Although the Company introduced a wedge and a driver after the IPO, neither product was particularly innovative or successful, and the Company failed to improve or update the Tight Lies to refresh that product line. (Picchi Dep. Tr. 148:12-22, 154:9-12.) Analysts were beginning to realize that Adams Golf was in danger of becoming a "one hit wonder." (Ex. 233 at 3; Picchi Dep. Tr. 154:9-12.)

> **2.    Class-period disclosures about the gray market did not affect Adams Golf's stock price because neither analysts nor investors thought gray marketing was a significant issue.**

An August 1, 1998 article in *Golf Pro* highlighted some concerns facing the Company as it went public in the summer of 1998. (Ex. 233.) The article described Adams Golf as an up-and-coming golf manufacturer, attempting to join the ranks of the major players. (Ex. 233.) The article noted that in one way, Adams Golf had already "joined the ignominious ranks of the big boys" by having its products gray marketed to Costco. (Ex. 233 at 3.) This disclosure had *no effect* on Adams Golf's stock price. (Ex. 336 at 4 ¶ 6(c) and 57.)

Soon after, on August 6, 1998, Adams Golf hosted its first conference call with investors and analysts as a publicly traded company to discuss its second-quarter earnings. (Ex. 99.) Lehman Brothers prepared a memorandum in advance for the Company regarding topics that might be raised during the conference call, including competition from Orlimar and Callaway, Adams Golf's recent sales, new products, and gray marketing. (Ex. 177.) In the end, although investors and analysts on the call inquired about competition, market share, the slow-down in U.S. demand for golf equipment, and how soon the Company might release a new product—*no one* asked about gray marketing. (Ex. 99.)

On August 28, 1998, Lehman Brothers published its first analyst report on Adams Golf with a "1-Buy" rating. (Ex. 180.) In the body of the report Lehman Brothers listed a series of uncertainties that it thought could, but were unlikely to, affect the stock price. The analysts mentioned that Adams Golf was experiencing gray marketing of its clubs to Costcos, but pointed out in the same paragraph that the Company had taken legal action and was "working hard to correct" the issue, and that Adams Golf's competitors, including Callaway and Taylor Made, also were seeing their clubs gray marketed through Costco at that time. (Ex. 180 at 27.) This disclosure about the gray market, like the *Golf Pro* article, had *no discernible effect* on Adams Golf's stock price. (Ex. 336 at 4 ¶ 6(c), 59 ¶ 59.)

### G. Adams Golf's sales department suffered from low morale as demand dropped off.

During the peak demand for the Tight Lies, many of Adams Golf's inside salespeople earned substantial commissions. (Greaney Dep. Tr. 11:19-12:1.) The commission-based compensation structure, which was revised several times to actually lower commission levels, caused significant "finger-pointing" and "bickering" among the salespeople (Adams Dep. Tr. 141:3-7; *see also* Gonsalves Dep. Tr. 123:16-124:4, 125:4-8.) Adams Golf's top salesperson in 1998 was Jay Greaney, who was known to be an aggressive salesperson and was eventually terminated for, among other things, accosting a customer at a PGA show. (Brewer Dep. Tr. 23:19-24:23; 24:12-18; 29:19-30:14; Gonsalves Dep. Tr. 125:23-126:9; Greaney Dep. Tr. 79:2-5.) Greaney's aggressive style and outstanding sales numbers were the subject of "watercooler talk" and speculation among the salespeople about the tactics he used, including suggestions that he shipped more product to customers than they had ordered so as to recoup extra commissions. (Brooks Dep. Tr. 77:16-81:21.) There was no evidence that substantiated the accusations against

Greaney. (Adams Dep. Tr. 142:23-143:5, 246:19-247:1; Gonsalves Dep. Tr. 125:9-19, 127:20-128:19, 129:14-130:2.)

After the IPO, morale in the inside sales department deteriorated rapidly as competition (especially from Orlimar), the general market downturn, and the end of the product lifecycle combined to make it more difficult to put up sales numbers at the prior rate. During a personal visit to the sales department, Barney Adams observed this deterioration, and in his typical off-the-cuff style, dashed off a memo to Mark Gonsalves and Ric Jarrett that reflected his concern that the environment was unprofessional, with "disarray, bickering, finger-pointing, [and] childish stuff going on" ("August 14, 1998 Memo" or "Memo"). (Adams Dep. Tr. 139:9-19, 141:4-5; Ex. 57.) The Memo reports a number of accusations that Adams heard from the inside salespeople, and he understandably was upset, even though he had no personal knowledge of whether the accusations were true. (Ex. 57; Adams Dep. Tr. 142: 20-143:11, 149:8-22, 246:19-247:1.) He was upset that the accusations were even made. (Adams Dep. Tr. 247:1-248:10.)

Adams testified that his Memo was "a classic case of [his] volatility," an example of his "guilty-until-proven-innocent approach," and sometimes going "over the top;" Gonsalves said that he took the Memo with a grain of salt "in context with the person who sent it to me" because "Barney is at times able to allow his emotions to distort his thinking on certain topics." (Adams Dep. Tr. 138:23-139:2, 139:6-19, 145:1-145:2; Gonsalves Dep. Tr. 122:23-123:6.) When Adams and Gonsalves talked about the issues, Gonsalves verified what Adams "knew when I wrote this, that all these allegations were . . . the result of backbiting and bickering and low morale and that . . . I had overstated my case." (Adams Dep. Tr. 245:6-18.) Adams learned that the allegations were only "the office cooler gossip-type stuff and there was no records, no evidence, no proof, no nothing." (Adams Dep. Tr. 246:21-247:1.)

16

In this same timeframe, however, Adams became disappointed that Gonsalves did not have a plan to make changes and improve morale in the sales department, but more importantly, they had differing views about how to reorganize the department to meet the changing marketplace. (Adams Dep. Tr. 246:1-18.) Gonsalves ultimately resigned on good terms to pursue another opportunity, and he was replaced by Chip Brewer. (Adams Dep. Tr. 184:14-24, 185:20-186:16; Gonsalves Dep. Tr. 132:7-16; 133:15-19; Brewer Dep. Tr. 11:8-12:17.)

## H. Management perceived Costco as becoming a significant issue in the fourth quarter of 1998.

On September 28, 1998, Adams Golf announced that its third-quarter earnings would fall slightly short of analysts' estimates, and it attributed this shortcoming to "new product introductions by the Company's competitors in the fairway wood category, and, to a lesser degree, a general softening of golf equipment sales." (Ex. 102.) Third-quarter sales were *not* affected by gray marketing or by Costco.

By the time the fourth quarter rolled around, competition and the drastic downturn in demand had begun to take their toll. In this sales environment, which was vastly different from the pre-IPO sales environment, Adams Golf began to form the view that gray marketing might impact its fourth-quarter results. In an October 8, 1998 memo to the Board of Directors, Barney Adams wrote "One thing that is hurting us badly is Costco . . . . We estimate a negative sales effect in Q4 of 20%-25% based on a market survey." (Ex. 80.) Adams informed the Board that Costco had only "become a major issue in the last two weeks." (Ex. 80.)

Adams explained that the Costco issue "took on new significance" in the context of an increasingly severe general market decline, the bleak golf sales market typical of the fourth quarter, and the serious competition from Orlimar. (Adams Dep. Tr. 190:8-17; 193:5-193:16; 194:23-195:10.) When asked why these factors did not appear in the memo, Adams replied, "I

17

was embarrassed . . . [Orlimar was] beating us up." (Adams Dep. Tr. 195:8-195:10.) Adams added that the fact that Costco was the single subject of this memo "doesn't mean it's the most important [issue facing the Company];" in fact, Adams had written other memos addressing other key issues, including the general market decline and competition. (Adams Dep. Tr. 256:3-17; *see also, e.g.,* Exs. 56, 65.) Adams felt that gray marketing had, for the first time, the *potential* to have a material effect on the Company's future financial performance. (Adams Dep. Tr. 190:8-191:1.)

Adams's prediction of a 20%-25% impact on fourth-quarter sales proved to be wildly exaggerated, as Costco's Tight Lies sales equated to only 5.3% of the Company's sales in the fourth quarter (which notably was always the Company's slowest quarter of the year due to seasonality of the golf market).[4] (Ex. 310 at Ex. VII; Adams Dep. Tr. 189:12-189:18.)

Now, with hindsight, it is clear that Costco's pre-IPO sales of Tight Lies were immaterial and insignificant. According to the sales data Costco produced under subpoena in this litigation, American Costcos sold only 3,200 Tight Lies clubs between January 1, 1998 and the date of Adams Golf's IPO—which is 0.7% of the Company's total club sales in the same period. (Ex. 310 at Ex. VII.) Similarly, Canadian Costcos sold only 715 clubs during this time, which is basically 0.2% of Adams Golf's total club sales. Thus, Costco's total North American pre-IPO sales of Tight Lies represented less than 1% (0.86%) of Adams Golf's total club sales for the same period.

---

[4] Costco's Tight Lies sales did not directly affect Adams Golf's earnings. Costco had to obtain the clubs in the first place from an Adams Golf retailer or distributor, who of course had already purchased the clubs from Adams Golf.

## ARGUMENT

## IV.    LEGAL STANDARDS

### A.    Summary-judgment standard.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also S.E.C. v. J.W. Barclay & Co., Inc.*, 442 F.3d 834, 840 (3d Cir. 2006).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial* '" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Barclay,* 442 F.3d at 840. The mere existence of some evidence in support of the nonmovant, however, is not sufficient; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Boyle v. County of Allegheny, Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Barclay,* 442 F.3d at 840.

### B.    Section 11 elements.

Plaintiffs must prove that the offering documents contained a material misstatement or omission, and that the true or omitted information existed and was known or reasonably

discoverable at the time the Prospectus became effective. 15 U.S.C. § 77k(a); *see also Zucker v.*

*Quasha*, 891 F. Supp. 1010, 1017 (D.N.J. 1995), *aff'd* 82 F.3d 408 (3d Cir. 1996).

Section 11 straightforwardly defines a misstatement as a misrepresentation of material

fact in the registration statement. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269

(3d Cir. 2006). The definition of an omission is a bit more complex: a material fact not disclosed

in the prospectus only becomes an actionable omission if (1) it is required by law to be included

(*i.e.*, a duty to disclose exists), or (2) otherwise must be disclosed so other statements are not

rendered misleading by its omission. 15 U.S.C. §§ 77k(a), 77l(a)(2); *see Suprema*, 438 F.3d at

269; *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 167 (3d Cir. 2004); *Klein v.*

*Gen. Nutrition Cos., Inc.*, 186 F.3d 338, 342 (3d Cir. 1999). If a material fact is not legally

required to be disclosed, then plaintiffs must prove it is linked in a logical nexus to an affirmative

statement that was rendered misleading by the fact's omission. *Castlerock Mgmt. Ltd. v.*

*Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323-24 (D.N.J. 2000).

Misstatements and omissions cannot be determined in hindsight, but instead must be

examined in light of the facts existing at the offering. *Castlerock Mgmt. Ltd. v. Ultralife*

*Batteries, Inc.*, 68 F. Supp. 2d 480, 488 (D.N.J. 1999) (holding that "omissions that create a

misleading impression—particularly one that is misleading *only in hindsight*—are not sufficient

to constitute the basis of a securities action under section 11 or section 12(2)."). Thus, plaintiffs

must allege specific facts showing that a statement was materially misleading *at the time of the*

*IPO*. *Laker v. Freid*, 854 F. Supp. 923, 931 (D. Mass. 1994) (emphasis added). Section 11

"does not impose liability for the omission of material information which was unknown to, and

*not reasonably discoverable* by, the defendants." *Zucker*, 891 F. Supp. 1010 at 1017 (quoting *In*

20

*re Keegan Mgmt. Co. Sec. Litig.*, 794 F. Supp. 939, 946 (N.D. Cal. 1992)), *aff'd* 82 F.3d 408 (3d

Cir. 1996) (emphasis added).

## V.    THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE ADAMS GOLF'S STOCK PRICE DECLINED FOR REASONS UNRELATED TO PLAINTIFFS' CLAIMS

Plaintiffs cannot recover damages under either section 11 or 12 of the Securities Act to

the extent that defendants can show that something *other than the alleged omission* caused the

stock-price decline.  *See* 15 U.S.C. § 77k(e) (section 11); *see also* 15 U.S.C. § 77l(b) (section

12).    Defendants bear the burden of proof on this affirmative defense, which has been

characterized as a "negative causation" defense.[5]  In his expert report, Dr. Chris James examines

the various causes of Adams Golf's stock-price decline during the class period using a

scientifically accepted event-study analysis.[6]  He concludes that no damages may be attributed to

the alleged omissions because plaintiffs' losses were caused by other factors.  (*See* Ex. 336 at 3-6

¶ 6.)

### A.    Adams Golf's stock price did not decline in response to class-period disclosures about gray marketing and this alone meets defendants' negative-causation burden.

This is really a single omission case.  Although plaintiffs claim that Adams Golf omitted

risks associated with both the gray market and "questionable sales practices," the alleged "gray

---

[5]*See Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 338-43 (2d Cir. 1987) (granting defendants' motion for summary judgment "because defendants had established that the prospectus error did not actually result in any part of the stock price decline"); *see also McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1049 (2d Cir. 1995) ("[A]s a general rule price decline before disclosure [of the truth] may not be charged to defendants.")

[6] As explained in Defendants' Motion to Exclude the Expert Testimony of Alan Miller, an event study is the generally accepted method for analyzing stock-price returns.  An event study controls for industry and market factors and generates residual stock-price change.  (Ex. 336 at 10-11 ¶¶ 17-19.)  This stock-price change is then tested to determine whether it is statistically significant.  (Ex. 336 at 11 ¶ 19.)  That is, it is tested to determine whether the change in stock price is simply normal volatility attributed to nothing more than the randomness of stock-price changes or whether the change is large enough to be abnormal and therefore likely caused by something else.  (Ex. 336 at 11 ¶ 21.)  For an in-depth discussion of the importance of statistical significance, see Defendants' Motion to Exclude the Expert Testimony of Alan Miller.

21

market" omission is the only one that possibly could have caused a stock-price decline.[7]  Thus,

by definition, if an expert can isolate the stock-price decline caused by the public disclosure of

this alleged omission, then all other declines must have been caused by "something other than"

the alleged omission.  (Ex. 336 at 11 ¶ 22.)  Dr. James isolated this decline—or, in this case, the

lack thereof—through three alternative scenarios.

### 1. The alleged risk of gray marketing was incorporated into the offering price.

On June 9, 1998, Adams Golf publicly announced over the widely distributed *PR*

*Newswire* that it had filed a Bill of Discovery against Costco after learning that Costco was

selling Tight Lies.  (Ex. 77.)  This press release—nearly contemporaneous with the Adams Golf

IPO road show and published after Adams Golf had filed its Prospectus—was publicly available

to market participants.  (Ex. 166.)  Adams Golf's underwriters were aware of the gray market as

an industry-wide issue, and they were aware specifically of the press release and the fact that

Costco was selling clubs.  (Ex. 336 at 12-14 ¶¶ 26-29; Ex. 90; Pulido-Crowe Tr. 22:14-23:23,

26:1-9, 27:12-28:10, 29:15-30:12, 78:18-79:1; Teklits Dep. Tr. 16:7-18.)  This information was

discussed as part of the due-diligence process and considered before the pricing of the IPO.

(Walsh Dep. Tr. 148:5-149:9; Adams Dep. Tr. 252:11-253:4; Pulido-Crowe Dep. Tr. 27:12-22.)

The underwriters were aware of the gray-market issue when they discussed the proposed offering

with prospective buyers, obtained indications of interest, and priced the offering.  (Pulido-Crowe

Tr. 27:12-22, 76:18-80:12, 82:8-84:24; Walravens Dep. Tr. 69:12-20; Lantier Dep. Tr. 42:1-

---

[7]That is because the alleged omission related to "questionable sales practices" has no curative disclosure associated with it—as there is no evidence these practices even existed or were material—and thus could *not* have resulted in any losses.  *See* Part V.B. at 27, *infra* ; *see also In re Alamosa Holdings. Inc* , 382 F. Supp. 2d 832, 865-66 (N.D. Tex. 2005) (holding that where there are no curative disclosures related to a particular claim, the negative causation defense is absolute)  Indeed, plaintiffs' damages expert does not address the impact any alleged questionable sales practices may have had on Adams Golf's stock price, thus implicitly agreeing with Dr. James' conclusion that this alleged omission did not cause any stock-price declines.  (Ex. 336 at 5 ¶ 6(e).)

43:16.)  The supply-and-demand conditions of the IPO price-setting process reflected this gray-market/Costco information.  (Ex. 336 at 14 ¶ 29.)  Accordingly, defendants cannot be liable for any post-IPO stock-price decline.

### 2. The gray-marketing risk was nevertheless reflected in the stock price on the first day of trading and the price did not decline.

#### a) Adams Golf traded in an efficient market.

The Third Circuit "as compared to the other courts of appeals, has one of the 'clearest commitments' to the efficient market hypothesis." *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005).  The undisputed facts demonstrate that Adams Golf's stock traded in an efficient market throughout the class period.  (*See* Ex. 336 at 15 ¶ 31.)

The following factors determine whether the market for a particular stock is efficient: (1) weekly trading volume; (2) analyst report coverage; (3) number of market makers; (4) S-3 eligibility; (5) immediate stock-price reaction to new information.  *Cammer v. Bloom*,  711 F. Supp. 1264, 1286-87 (D.N.J. 1989).  As demonstrated by Dr. James, and conceded by plaintiffs, Adams Golf more than meets these criteria—(1) it had a weekly trading volume of 8.8% (substantially higher than *Cammer's* 2% benchmark); (2) it was covered by six analysts; (3)  it had an average of 18 market makers; and, most importantly, (4) its stock price responded immediately to new, material information.  (Ex. 336 at 19-23 ¶¶ 43-55.)  The only criterion that Adams Golf did not satisfy at the time was eligibility to file an S-3, a factor that financial economics gives little weight.  (Ex. 336 at 20 ¶ 46.)  The essence of an efficient market— whether the stock price responds to new, material information—was conclusively established through Dr. James's event study and conceded by plaintiffs.  (Ex. 336 at 20-23 ¶¶ 48-54 & James Exs. 7-8.)

23

> **b)    The information about Costco and the gray market in the June 9 press release was reflected in the stock price on the first trading day, and the price did not decline.**

The Adams Golf press release disclosing the Costco/gray-market issue became part of the total mix of information available to investors when the stock began trading publicly. (*See* Ex. 336 at 3 ¶ 6(b).)    Dr. James concluded that the market itself would have reflected this information as soon as shares began trading on July 10, 1998. (Ex. 336 at 14 ¶ 30.)    In an efficient market (which Dr. James concludes, and plaintiffs concede, existed for Adams Golf), all publicly available information—even information released *before* an IPO—is reflected in the stock price. (Ex. 336 at 14 ¶ 30.)    During the first day of trading, Adams Golf's stock price opened at $16 and closed at $18.38—more than $2 *higher* than the IPO price. (Ex. 336 at 14 ¶ 30.)    Therefore, no damages could possibly be attributed to the alleged gray-market omission. (Ex. 336 at 14 ¶ 30.)

> **3.    Class-period disclosures about the gray market did not cause stock-price declines.**

There were two class-period disclosures discussing the fact that Costco, an unauthorized distributor, had obtained and was selling Adams Golf's clubs.    Neither of these disclosures is associated with a statistically significant stock-price decline.    This proves that any alleged omission in the Prospectus about the gray market did not cause plaintiffs' losses.

> **a)    August 1, 1998 *Golf Pro* article**

The first class-period disclosure occurred when a *Golf Pro* article was published on Saturday, August 1, 1998.[8]  (Ex. 233.)  The article stated:

---

[8] Plaintiffs' experts, Alan Miller and Christiana Ochoa, speculate that this article might have been distributed in the weeks before August 1, but there is no evidence to support this guess.  For example, when asked about the basis for his speculation, Mr. Miller simply said that plaintiffs' counsel told him it might have been published earlier.  (Miller Dep. Tr. 125:12-127:13.)  The only empirical evidence about when the article was publicly available, however, demonstrates that it was on August 1, 1998: (1) that is the cover date; and (2) a *Factiva*

> The company joined the ignominious ranks of the big boys in
> another way this year: Tight Lies started showing up in Costco,
> prompting a lawsuit from Adams with two different aims. The
> first is to find out how the discount giant is getting the clubs. The
> second is to prove to its traditional retailers that Adams Golf will
> not sit around and take it, even if it's an "800-pound gorilla" that's
> dishing it out. "We have to show we're making the effort," Adams
> says.

On the first trading day following its publication (August 3, 1998), there was no
statistically significant price reaction. (*See* Ex. 336 at 4 ¶ 6(c), 24 ¶ 57.) Although there was a
small price decline in terms of raw dollars, none of this decline can be attributed to plaintiffs'
allegations because the decline was within the normal volatility of the stock price, reflecting
randomness of stock prices (*i.e.*, the decline was not statistically significant). This proves that
the information about Tight Lies clubs in Costco was either not new (*i.e.*, it was priced into the
IPO or otherwise reflected on the first day of trading), or it was not material (*i.e.*, did not cause a
stock-price decline) *Cf. Bell v. Ascendant Solutions, Inc*, 422 F.3d 307, 316 (5th Cir. 2005).

### b)    August 28, 1998 Lehman Brothers report

On August 28, 1998, Lehman Brothers published an analyst report expressing concern
about Costco:

> Margins/Pricing:
>
> One concern that we should report is that Adams Tight Lies are
> appearing in Costco Wholesale stores with increasing regularity.
> Adams has filed a suit of discovery against Costco to determine
> how Costco—an unauthorized retailer—has secured this inventory.
> One retailer in particular indicated that "Costco is flooding the
> market with Adams clubs at $149" (versus an average wholesale
> price of $144)—a trend that we have seen in a few markets.

---

search for references to *Golf Pro* magazine demonstrates that all references occurred on or *after* the publication date,
not before, suggesting that the cover date was indeed the date it became publicly available (James Dep Tr 254:22-
257:7) Despite Miller's arguments to the contrary, in an efficient market once information is public, it does not
matter what the period is over which other people receive the publication through distribution (Ex 336 at 15-16 ¶
34)

> Although, this is an extremely serious issue that Adams is working
> hard to correct, we think investors should note that Costco is also
> selling popular clubs from Callaway and Taylor Made.

(Ex. 180 at 27.)[9]

On this day and the next day, there was no statistically significant price reaction to the information. (*See* Ex. 336 at 4 ¶¶ 6(c), 25 ¶ 59.) Again, this proves that the information was not new and/or not material—and it certainly proves that Adams Golf's stock-price decline is not attributable to disclosures about gray-market risk.

### 4. The stock-price reaction following Adams Golf's October 22, 1998 earnings warning was not caused by information allegedly omitted from the Prospectus.

On October 22, 1998, after market close, Adams Golf announced Q3 results and warned of a revenue shortfall for Q4 due in part to the continuing weakness in the golf market and the anticipated effect of the gray market. The following day, there was a statistically significant stock-price decline. This decline, however, was *not* caused by material information allegedly omitted from the Prospectus. Two prior class-period disclosures about the gray-market concerns did *not* cause any stock-price declines. Thus, merely repeating stale, immaterial information about the gray market would not and did not cause a price decline. In an efficient market, only the public disclosure of new, material information will move stock prices. (Ex. 337 at 2 ¶ 3.) The October 22 press release contained such new, material information about the gray market—that it was expected to impact Q4 results in combination with the sharp drop in demand. This, of

---

[9] Plaintiffs seek to minimize the impact of this information by saying it appeared on page 27 of a 28-page analyst report. That is irrelevant—efficient markets digest the entirety of public information released through analyst reports, regardless of what page it is on. (Ex. 336 at 15 ¶ 33; *see also* BREALEY & MYERS, PRINCIPLES OF CORPORATE FINANCE at 351 (7th ed. 2003). And although Miller suggests this negative information was offset by positive information, he does not identify any new, positive information contained in the Lehman report and admits that he does not recall comparing it to previous reports, which contained entirely duplicative positive information (Miller Dep. Tr. 209:23-210:23.)

course, was not information that existed at the July 9 IPO and therefore could *not* have been "omitted" from the Prospectus. *See infra* Part VI.

There was additional new, material information conveyed in the press release: lowered future earnings prospects (Adams Golf anticipated net income for the fourth quarter to be at or slightly above a break-even level) and analyst revisions to their fourth-quarter consensus earnings estimates (from $0.11 per share to $0.05 per share). (*See* Ex. 336 at 5 ¶¶ 6(d), 25-26 ¶¶ 60-61.) These were significant drivers of the stock-price decline, and they underscore the fact that the price reacted to the new, material information about the expected Q4 earnings shortfall and *not* the stale, immaterial news about a gray-market risk. (Ex. 336 at 25-26 ¶¶ 61-62; Ex. 337 at 19-22 ¶¶ 55-59.)

> **5.    Plaintiffs do not dispute that market participants knew about the gray-market risks at least by mid-July and therefore no price decline after this time can be attributable to its alleged omission from the Prospectus.**

In an efficient market, public information is incorporated into stock prices quickly, if not immediately. (Ex. 336 at 9 ¶¶ 15, 15-16 ¶¶ 33-34.) Even if that same information is repeated to the market, the stock price will not change because the current price already reflects that information. (Ex. 336 at 11-12 ¶¶ 23, 17 ¶ 37.) Plaintiffs admit that investors knew about the gray market as early as mid-July 1998. (Ex. 334 at 9 ¶ 16.) Thus, any stock-price decline that occurs more than a day after the information was publicly available cannot be attributed to that omission. (Ex. 336 at 11-12 ¶ 23.) By plaintiffs' own admission then, to the extent they suffered damages at all, such damages ended in mid-July 1998.

> **B.    There were no class-period disclosures about alleged questionable sales practices, and therefore no causally related stock-price declines or losses.**

Plaintiffs have failed to identify *any* disclosure of the alleged questionable sales practices during the class period. Since "the price decline before disclosure may not be charged to

27

defendants," none of Adams Golf's stock-price decline can be attributed to the questionable sales practices allegation. *See Akerman*, 810 F.2d at 342; *see also Alamosa*, 382 F. Supp. 2d at 865-66 (N.D. Tex. 2005). Adams Golf's stock-price decline therefore must have been caused by something other than this alleged omission. *Id.; see also* Ex. 336 at 5 ¶ 6(e).

### C. Adams Golf's stock price declined because of market-share loss and an industry-wide decline in demand.

The undisputed facts demonstrate that Adams Golf's stock price declined due to factors other than the alleged omissions, including competition, a downturn in the golf market, seasonal slow sales, the end of the Tight Lies product lifecycle, and the Company's failure to refresh and expand its product line. (*See* Pratt Dep. Tr. 62:13-64:3, 83:13-84:11, 104:14-105:19, 107:23-109:14; Adams Dep. Tr. 176:2-177:1; Brewer Dep. Tr. 71:7-72:9; Puglielli Dep. Tr. 21:9-23:15, 28:22-29:15, 41:19-43:19; Walsh Dep. Tr. 93:3-97:15; P. Brown Dep. Tr. 71:13-75:9, 83:19-84:13; Greaney Dep. Tr. 19:11-22; Picchi Dep. Tr. 148:8-150:24 (all detailing causes *other than* gray market that caused the stock-price decline).) Since these risks were all disclosed in the Prospectus, defendants as a matter of law cannot be liable for the investment losses that were caused by these factors. (Ex. 72 at 6-12.) Plaintiffs cannot manufacture a fact issue with speculation and suppositions. *Akerman*, 810 F.2d at 343 (explaining that "[s]tatistical analyses must control for relevant variables to permit reliable inferences").

### 1. There are no statistically significant stock-price reactions on any class-period day associated with plaintiffs' claims and therefore no section 11 losses.

To attribute a stock-price decline to an alleged omission, there must be a statistically significant price movement in response to new, material information about the alleged omission. *Merck*, 432 F.3d at 269 (citing *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). Dr. Chris James analyzed Adams Golf's stock price on each class-period day. (*See* Ex. 336 at James Exs.

28

5-6.) He found that, apart from October 23, 1998, there were no trading days with statistically significant negative stock returns that could be linked to plaintiffs' allegations. (*See* Ex. 336 at 6 ¶ 6(g), 26-27 ¶¶ 63-64.) Hence, the decline over the class period was caused by factors other than the alleged omissions. (Ex. 336 at 27 ¶ 64.) The law does not require that defendants *prove* what caused the stock decline—it requires only that defendants prove the decline was something "other than" the alleged omissions. *McKowan Lowe & Co. v. Jasmine, Ltd.*, 2005 WL 1541062, at *11-12 & nn.12-13 (D.N.J. 2005).

### 2. The undisputed industry-wide decline in demand caused Adams Golf's stock price to decline.

Beginning in July 1998, the entire golf industry suffered from an unexpected and dramatic slowdown. Plaintiffs acknowledged this slowdown in their Consolidated Amended Complaint and must concede that this caused some portion of Adams Golf's stock-price decline. (D.I. 28 ¶¶ 44, 47.) The golf industry was peppered with sobering news:

- On July 24, 1998: "Callaway is facing an over-supplied, increasingly competitive, and flattening market for golf clubs that offers little comfort in sales going forward." (Ex. 336 at 29 ¶ 66.)

- On July 29, 1998: "The industry has been adversely affected by lower consumer demand this year, resulting in a domestic volume decline in golf clubs in the range of 5-10%." (Ex. 336 at 29 ¶ 66.)

- On September 4, 1998: "Given the recent problems affecting golf club OEMs, we had been anticipating the need to reduce our estimates. . . . As Callaway has been hit hard by the Asian flu and competitive domestic pricing pressures, it was only a matter of time before their impact reached Coastcast." (Ex. 336 at 29 ¶ 66.)

- On October 8, 1998: "From the big industry hitters such as Callaway Golf to lesser-known companies such as Englewood, Colo.'s Black Rock Golf Co., golf stocks have tanked—taking hits even harder than the stricken stock market." (Ex. 336 at 30 ¶ 66.)

- On October 22, 1998: "The slowing demand for premium golf equipment combined with a significant downturn in Asian economies continues to put downward pressure on sales [at Callaway]." (Ex. 336 at 30 ¶ 66.)

29

(*See also* Ex. 336 at James Ex. 9.)

Dr. James tested the relationship between the golf-industry decline and the decline in Adams Golf's stock price. He found that his model explained 38.9% of the stock-price decline—a highly statistically significant correlation suggesting that the industry decline was responsible for much of Adams Golf's stock-price decline. (Ex. 336 at 30 ¶ 67 & James Ex. 10.) In other words, industry-wide factors explained approximately 40% of the Company's stock-price decline during the class period. Indeed, during late July 1998 when plaintiffs claim that Adams Golf's stock was declining because of "leaked" gray market information—Adams Golf's stock price virtually tracked the stock price of its competitors identified by plaintiffs' expert, Alan Miller. (Exs. 339-340.) This suggests that it was not unique Company-specific news related to gray marketing that caused Adams Golf's stock price to decline, but rather Adams Golf was mirroring the decline of its competitors who also were struggling from the industry-wide slowdown.

### 3. Adams Golf's market-share loss to Orlimar caused Adams Golf's stock price to decline.

Before the IPO, Adams Golf sold its Tight Lies club in a market virtually free of competition—no other manufacturer had a shallow-faced fairway wood that could compete with Adams Golf. In February 1998, Orlimar, a non-publicly-traded golf manufacturer, introduced a shallow-faced fairway wood that was remarkably similar to the Tight Lies and that provided Adams Golf with its first competition. Then, in July 1998, Callaway introduced its Big Bertha steel-head fairway club, another competitor product to the Tight Lies fairway wood. Adams Golf lost significant market share to its competitors starting in the spring of 1998. (Ex. 336 at James Ex. 11.)

Dr. Chris James modeled the relationship between Adams Golf's loss of market share to Orlimar and Adams Golf's stock price. Because there was a lag time of 25-33 days before the Golf Datatech market-share data were released to the market, Dr. James used a regression that analyzed monthly data. (Ex. 338.) His analysis demonstrates that more than 60% of Adams Golf's stock-price decline can be attributed to loss of market share to Orlimar—also a highly statistically significant correlation suggesting that Adams Golf's loss of market share was responsible for much of its stock price decline. (*See* Ex. 336 at 6 ¶ 6(f), 31 ¶ 69 & James Ex. 12 (regression results) and James Ex. 13 (graphical relationship).)

### D. Plaintiffs' speculation that information about the gray market may have "leaked" out and may have been "associated with" Adams Golf's stock-price decline has no basis in financial economics and is not supported by the factual record.

Through the report of Alan Miller, plaintiffs speculate that information about gray marketing "leaked" into the market in mid-July and caused a gradual decline in Adams Golf stock. As explained in detail in Defendants' Motion to Exclude the Expert Testimony of Alan Miller, this approach has no basis in financial economics and is not empirically supported by the undisputed facts.

First, other than the October 22, 1998 press release, no *public* information related to gray market was associated with a statistically significant price decline during the class period. Plaintiffs cannot identify *any* information about the gray market that was released on any particular day.[10] Instead, they speculate that the information "leaked" into the market over time in unspecified, nonpublic ways. (Ex. 334 at 9-11 ¶¶ 14, 16.) There is no evidence whatsoever

---

[10] Notably, Miller concedes that "[o]ne cannot determine ... statistical significance ... without being able to identify a disclosure date." (Ex. 335 at 18 ¶ 19(B).) This suggests that his great speculation about "rumors" and "anecdotal" sightings of Tight Lies in various Costco stores cannot be shown to have caused a statistically significant price decline on any given day.

31

supporting this theory: plaintiffs admit they have no Internet chat-room evidence or any other evidence of "leakage," and they cannot point to any non-public information that somehow became public. (*See* Ex. 416 at Admission No. 52.) Plaintiffs merely *guess* that individual Costco warehouse employees or others *might* have traded stock based on Costco purchase orders—this borders on the frivolous. The Costco purchase orders were ***nonpublic*** and could not have caused the price decline in an efficient market. (Ex. 335 at 20 ¶ 22(A); Ex. 337 at 11 ¶ 33; *see also supra* note 8.) The Costco purchase orders were not only nonpublic, they were only discovered recently by subpoena in this litigation.

Second, even if some "information" about the gray market somehow "leaked" into the public market in mid-July, it was nevertheless *not* associated with *any* statistically significant negative price changes. (*See* Ex. 336 at 26-27 ¶¶ 63-64.) Dr. James analyzed the stock-price change on each class-period day, and (other than October 23, 1998) there were only three trading days associated with a statistically significant price change—and they were all positive. (Ex. 336 at 26-27 ¶¶ 63-64.) Thus, even if some "information" about gray marketing was "leaking" out— a theory no economist has ever accepted in this context—it did *not* affect the stock price and could *not* cause any damage.

As the court held in *In re Fortune Systems Sec. Litig.*, 680 F. Supp. 1360, 1368 (N.D. Cal. 1987), plaintiffs' rebuttal of negative causation may not be based on unsupported speculation:

> The Court refuses to allow speculation, unfounded opinions, and misleading comparisons to create a genuine issue of material fact for trial on the issue of loss causation. Plaintiffs have failed to rebut defendants' evidence concerning the decline from March 4 through May 11. Thus, defendants have met their burden under § 11, and have shown that "other forces" caused the decline in the Fortune stock from March 4 through the close of the stock exchange on May 11.

32

Accordingly, summary judgment should be granted since Adams Golf's stock price declined due to factors other than the alleged omissions.

## VI. THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE PLAINTIFFS HAVE FAILED TO PROVE THAT THE PROSPECTUS CONTAINED ANY MATERIAL MISSTATEMENTS OR OMISSIONS RELATED TO THE RISK OF GRAY MARKETING

Plaintiffs cannot prove that the Prospectus contained any material misstatements or omissions. First, plaintiffs do not allege and certainly cannot prove that there are any false statements in the Prospectus. Second, they cannot demonstrate that there was an actionable omission—the Company had no duty to disclose a specific risk factor about gray marketing, and plaintiffs cannot show that its omission rendered any other statement in the Prospectus misleading. Finally, the information reasonably discoverable by the Company shows that gray marketing was not material to a reasonable investor.

### A.    The Prospectus contained no false statements.

The Third Circuit has previously held in this case that there were no false statements in the Prospectus related to gray marketing. *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277-78 (3d Cir. 2004) (holding that the district court properly held there were no false statements). Plaintiffs later amended their complaint to include new claims, but still did not allege any false statements. (*See* D.I. 180 Ex. A.) Plaintiffs have admitted that the Company's financial statements published in the Prospectus were not false or misleading and that their allegations do not implicate the Company's accounting methods. (Ex. 416 at Admission No. 35; Ex. 422 (D.I. 229 at 36, 40.).) Furthermore, this Court has dismissed plaintiffs' claims regarding misstatements of retailer margins or inadequate controls on the Company's distribution network. *In re Adams Golf, Inc. Sec. Litig.*, No. 99-371 (D. Del. April 11, 2006) (order partially granting

motion to dismiss). The SAC contained no new allegations of false statements related to gray marketing.

In the course of written discovery, however, plaintiffs have refused to either admit there are no false statements or to specifically identify any false statements in the Prospectus. They suggest that Adams Golf's description of its selective retail distribution network was a misstatement, but their real claim is that these statements were rendered misleading by the gray-marketing omission. (D.I. 180 Ex. A ¶¶ 31-37; D.I. 223 at 5-6; Ex. 417 at Response No. 1; Ex. 416 at Admission No. 1.) Thus, this is an omissions case, not a misstatement case. There are no alleged misstatements.

**B.     The Prospectus did not omit any material facts related to the risk of gray marketing.**

**1.     The duty to disclose information in a Prospectus is governed by Item 303 of Regulation S-K.**

Item 303 of Regulation S-K dictates the items that a company going public must disclose in its prospectus. Regulation S-K limits disclosure to those issues management knows at the time of the IPO: (1) are material, or (2) have the reasonable potential to become material after the IPO. The instructions to Item 303 state, "[MD&A] shall focus specifically on *material events and uncertainties known to management* that would cause reported financial information not to be necessarily indicative of future operating results or future financial condition." 17 C.F.R. § 229.303, Instruction 3 (emphasis added). Item 303 also states that the registrant must "[d]escribe any trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues . . . " 17 C.F.R. § 229.303(a)(3)(ii).

34

Hence, if an event, uncertainty or trend is not known to the company's management, then there is no duty to disclose it.[11]  Also, if the event, trend or uncertainty is unlikely to have any future impact that the company knows of at the time of the IPO, then there is no duty to disclose it.  Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations, Securities Act Release No. 33-6835, 1989 WL 1092885, at *6 (May 24, 1989).  Finally, even if the company knows that the event, trend or uncertainty is likely to have a future impact, but determines that it is not reasonably likely that this impact will be material to the company's future operating results or financial condition, there is still no duty to disclose it.  *Id.*

### 2.    Adams Golf did not have a duty to disclose gray marketing under Regulation S-K.

Adams Golf's management did not know and could not have known at the time of the IPO that gray marketing had or could have a material impact on the Company's operating results or financial condition.  All of the information the Company had indicated that the gray marketing was minor and manageable, and the Company received no information suggesting that gray marketing was likely to increase in the future.

---

[11] This standard is different from the scienter requirement of section 10 because Item 303 is focused on the information known by the Company at the time of the IPO, rather than the culpable mindset of the Company's management.  *In re Adams Golf*, 381 F.3d at 274 n.7.  The SEC interprets Item 303 of Regulation S-K as follows: "Where a trend, demand, commitment, event or uncertainty is *known*, management must make two assessments:  (1) Is the *known* trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.  (2) If management cannot make that determination, it must evaluate objectively the consequences of the *known* trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.  Each final determination resulting from the assessments made by management must be objectively reasonable, viewed as of the time the determination is made."  Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations, Securities Act Release No. 33-6835, 1989 WL 1092885, at *6 (May 24, 1989) (emphasis added).

35

a)    **Reports of gray marketing before the IPO indicated it was and would remain immaterial.**

The Company received very few reports or complaints from its retailers and distributors about Adams Golf Tight Lies in Costco. Before the IPO, Adams Golf gauged the number of clubs Costco had by relying on reports from WDC Mackenzie and the affected U.S. retailers, on its price-matching program in Canada, and on its associates' sightings of clubs in Costco stores.[12] By the time Adams Golf went public, only one distributor and nine retailers had complained of clubs in Costco.[13]  (Ex. 310 at Ex. VII.)  The Adams Golf affiliates who observed Tight Lies in Costcos reported that there were no more than thirty clubs in any Costco, and many had run out. (Murtland Aff. ¶ 4; Exs. 85-86, 418.)

The only affected distributor, the Canadian distributor WDC Mackenzie, was the most vocal about the Costco issue.  (Ex. 310 at Ex. VII.)  But the entire Canadian market represented only about 2.5% of Adams Golf's total sales in 1998.  (Exs. 402-403.)  Furthermore, in its reports to the Company regarding Costco, WDC Mackenzie expressed concern but was also optimistic that the problem in its market could be controlled by a price-matching program.  (Exs. 6, 258.)  After a second shipment of Tight Lies arrived at Canadian Costcos in late May 1998, Adams Golf implemented a price-matching program that allowed authorized Canadian retailers to match Costco's price on Tight Lies without eroding their profit margin.  (Exs. 10, 258.)  By

---

[12] There was no accurate way for Adams Golf to determine Costco's inventory of Tight Lies. After the IPO, in early October 1998, Adams Golf began sending its Regional Account Coordinators to the Costcos in their particular assigned geographic territories to try to estimate Costco's inventory by telling the Costco clerks that they needed a large number of clubs for a tournament. (Ex. 64; Blevins Dep. Tr. 48:9-49:5.) When the Costco employee told the Adams Golf employee the number of clubs that store had in stock or could get, the Adams Golf employee would report his or her findings back to the Company. (Blevins Dep. Tr. 52:17-53:1.) This effort, however, only provided snapshots of Costco's inventory, and therefore did not show the rate of inventory turn-over or allow the Company to determine how many clubs Costco had received or sold in total. (Blevins Dep. Tr. 55:24-56:14; see, e.g. Exs. 68, 70, 71.)

[13] These complaints were minute in the overall picture of Adams Golf's business: These nine retailers represented only 0.13% of Adams Golf's more than 7,000 authorized retailers and only 0.07% of the 12,885 logged calls that Adams Golf received between January 1, 1998 and July 9, 1998 from retailers complaining about various business issues. (Ex. 406.)

the time Adams Golf went public, the Canadian retailers under this program had price matched only *nine* clubs—a completely de minimis amount. (Ex. 31.)

By all accounts, it appeared that Costco had not purchased or sold very many clubs, particularly compared to the 457,496 total clubs Adams Golf sold in the first half of 1998. Management correctly perceived that gray marketing was not material to the Company's results at the time of the IPO, and they had no basis whatsoever to believe that it would become material after the IPO. (Ex. 402.)

Indeed, the Costco sales had no demonstrable effect on Adams Golf's financial results. Costco obtained its clubs from Adams Golf retailers or distributors who had purchased the clubs from Adams Golf. Those sales were real sales made to Adams Golf retailers or distributors at the standard wholesale price. There is no evidence that any Adams Golf retailer or distributor stopped carrying Adams Golf clubs before the IPO because Costco was selling Tight Lies. (Frazier Dep. Tr. 228:17-229:10.) Adams Golf thus had no duty to disclose gray marketing as a risk factor in its Prospectus under Item 303 of Regulation S-K.

### b)    Adams Golf implemented methods to control gray marketing.

Adams Golf took steps to control gray marketing so it would not increase in the future. The sales department monitored retailer orders, watching for any that seemed disproportionately large given the retailer's history. (Ex. 255; Pratt Dep. Tr. 75:9-12, 93:13-94:8; Beebe Dep. Tr. 20:25-21:16, 23:14-20.) Adams Golf refused to ship at least one large and potentially lucrative order to an authorized retailer because the risk the clubs could end up in the gray market was too high. (Ex. 255; Pratt Dep. Tr. 75:9-12, 93:13-94:8; Beebe Dep. Tr. 20:25-21:16; Gonsalves Dep. Tr. 26:17-27:2.) Adams Golf also reminded its retailers and distributors of the terms of its distribution agreements and threatened to cut off anyone found to be gray marketing. (Exs. 51,

37

412, 413.)    Additionally, as discussed above, Adams Golf implemented a price-matching program in Canada to protect retailers from being affected by the gray market at all.  (Ex. 31.)

In seeking a solution to gray marketing, Adams Golf also approached Costco directly.  In late May 1998, Barney Adams wrote a series of letters to Costco management, demanding that Costco cease and desist from selling Adams Golf clubs, reveal whether the clubs it was selling were authentic Tight Lies, and identify its supplier.  (Exs. 407, 409.)  Costco responded that the clubs it possessed were authentic, that it intended to continue to sell Tight Lies, and that it refused to reveal the supplier's name.  (Exs. 410, 408.)  Adams Golf thereafter filed a Bill of Discovery seeking a court order forcing Costco to reveal the supplier's identity.  (Ex. 411.)

According to marketing expert Dr. Gary Frazier, a company can effectively control gray marketing and prevent it from becoming a material issue by implementing exactly these kinds of preventative measures.  (Ex. 331 at 7-9.)  Dr. Frazier also found that Adams Golf's methods of controlling gray marketing were reasonable in light of the small, immaterial number of clubs Costco sold before the IPO.  (Ex. 331 at 14-15.)  Having implemented these preventative measures to limit future gray marketing, Adams Golf reasonably believed that they were handling the gray-market issue effectively.  They had no reason to believe that gray marketing might become material to the Company in the future, and therefore had no duty under Item 303 to disclose it in the Company's Prospectus.

Without a duty to disclose gray marketing, there can be no actionable omission under section 11, and the Court should grant summary judgment on that basis.

> **3.    There is no actionable omission because the absence of a specific gray-marketing risk factor did not render misleading any other statements in the Prospectus.**

The developed factual record shows that the minimal gray marketing that Adams Golf experienced pre-IPO did not render misleading the Company's description of its selective retail

distribution network. While the Third Circuit noted in its ruling on the Motion to Dismiss that the description could have been misleading if "unauthorized retailers were . . . selling significant quantities of . . . Adams Golf merchandise," the evidence shows that Costco sold only a small number of clubs both before and after the IPO—indeed, before the IPO Costco's sales represented less than 1% of Adams Golf's total sales for the same period. *In re Adams Golf*, 381 F.3d at 277-278, 275; (Exs. 402, 419). According to Dr. Gary Frazier, this de minimis amount of gray marketing is commonly found when a company uses a selective distribution network and is selling a hot product such as the Tight Lies; the gray marketing did not suggest that Adams Golf's distribution system was not functioning properly. (Ex. 331 at 3-4, 11-14.) Indeed, a functioning, healthy selective distribution system is a prerequisite for gray marketing—if a product can be acquired easily by any retailer wishing to sell it, then the gray market loses its value and ceases to exist. (Ex. 331 at 3-4.) For these reasons, plaintiffs cannot prove that the lack of a specific gray-marketing risk factor in the Prospectus rendered the description of Adams Golf's selective retail distribution network misleading, and thus, there is no actionable omission on this basis. This is another independent ground supporting a grant of summary judgment dismissing the gray-marketing claim.

>    **4.    There is no actionable omission about the gray market because Adams Golf disclosed its potential harms—the risk of eroding profit margins and the risk of harm to brand image.**

The Prospectus disclosed the very risks that plaintiffs contend gray marketing posed to the Company—the risk of eroding profit margins and the risk of harm to the Company's brand image. (D.I. 180 Ex. A ¶¶ 23-70; Ex. 303 at 10-15 ¶¶ 21-22(c); *see also* Ex. 180 at 27.) The Prospectus noted the potential for "significant price erosion" and "competitive pressures resulting in lower than expected average selling prices" and the potential for "material deterioration of customer loyalty and the Company's image." (Ex. 72 at 8-9, 20, 32.) That is

39

essentially what plaintiffs assert—that gray marketing is dangerous because it creates intra-brand competition, forcing the Company's authorized retailers to compete against Costco for the same customers, and that it hurts the brand image to be seen in a discount warehouse. (*See* Frazier Dep. Tr. 140:6-143:7.) The Prospectus warned of these risks, even though it did not, and need not, envision the exact mechanism that might give rise to the risks it discloses. *Tracinda Corp. v. DaimlerChrysler*, 364 F.Supp. 2d 362, 413 (D. Del. 2005.) Thus, there is no actionable omission.

### C. Gray-marketing risks were not material as a matter of law.

To establish their section 11 claim, plaintiffs must prove, among other things, that the alleged omission was material.[14] Although materiality is usually an issue for the trier of fact, a court can rule on it as a matter of law if the "omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Klein*, 186 F.3d at 342; *In re Donald J. Trump Sec. Litig.*, 7 F.3d 357, 369 (3d Cir. 1993) (citing *Shapiro v. UJB Fin Corp.*, 964 F.2d. 272, 280 n.11 (3d Cir. 1992)); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix' of information made available."[15] *Basic v Levinson*, 485 U.S. 224, 231-32 (1988); *Adams Golf*, 381 F.3d at 275.

The materiality of an alleged omission is determined by both the magnitude of an effect and the probability that the event will occur. "The *anticipated* magnitude (the size if the worst

---

[14] Even if this Court finds that Adams Golf had a duty to disclose gray marketing as a potential trend under Item 303 of Regulation S-K, it can and should still hold that the gray-marketing risks were not material at the time of the IPO under the reasonable-investor standard. *Oran v. Stafford*, 226 F. 3d at 288 (holding that a violation of SK-303's reporting requirements does not automatically give rise to a material omission under the *Basic* standard)

[15] *See also Merck*, 432 F. 3d at 273-74 (holding that the materiality standard is the same under section 10(b) and section 11)

happens, multiplied by the probability that it will happen) may be small even when the total effect could be whopping. Reasonable investors do not want to know everything that could go wrong, without regard to probabilities; that would clutter registration documents and obscure important information. Issuers must winnow things to produce manageable, informative filings." *Weilgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989).

The same evidence that shows Adams Golf had no duty under Regulation S-K to disclose the de minimis gray-marketing risk also proves that gray marketing was not material at the time of the IPO—*e g ,* scant reports from the Company's retailers, the low numbers of clubs Costco obtained and sold relative to the Company's sales, and the controls established to keep gray marketing from increasing. Furthermore, the summary-judgment evidence establishes several other reasons that the alleged gray-marketing omission was not material: (1) the stock price did not decline in response to class-period disclosures, (2) gray marketing affected the whole industry, (3) the Company disclosed the information in a press release before the IPO, and (4) the information that has now become available as a result of this litigation demonstrates that gray marketing was not material. All of this evidence proves as a matter of law that no reasonable investor in Adams Golf's IPO could have thought that gray marketing was a significant risk to the Company's future performance based on the information that existed at the time of the IPO, meaning that this Court should grant summary judgment on the gray-marketing claim.

### 1. Adams Golf's stock price did not decline in response to class-period disclosures about gray marketing.

In an efficient market, the stock price responds to new, material information, which by definition "alters the price of the firm's stock." *Burlington*, 114 F.3d at 1425. The Third Circuit specifically holds that "the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the

41

firm's stock."[16] *Merck*, 432 F.3d at 269 (citing *Oran*, 225 F.3d at 283) (holding information was immaterial because the stock price did not decline in response to the disclosure)); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (holding information immaterial as a matter of law because the court discerned "no negative effect" on the company's stock price "immediately following" the date of disclosure).

As explained in Part V.A. above, Adams Golf's stock price did not decline in a statistically significant way in response to either of the two widely distributed public disclosures about gray-market concerns during the class period.[17] Therefore, under established Third Circuit precedent, the information is immaterial as a matter of law.

### 2.    Gray marketing was an industry-wide phenomenon and thus was already public knowledge.

Plaintiffs claim that regardless of Adams Golf's internal assessment, the Company should have disclosed the risk of gray marketing because its competitors had been affected by it to varying degrees and had disclosed the risk. (D.I. 180 Ex. A ¶¶ 66-70 (noting that the Company's competitors—Callaway, Taylor Made, Ping, and Titleist—all had experienced and publicly reported gray marketing).) But this logic is faulty and disregards both the law of this Circuit and the law of this case. Although information contained in the public domain is not *per se* immaterial, courts rarely hold that such information should be deemed material. *See, e.g., Klein*, 186 F.3d at 343 (holding that alleged disclosures were immaterial as a matter of law where the information was public knowledge); *Adams Golf*, 381 F.3d at 279 (holding general industry-wide

---

[16] The *Merck* court's dicta regarding the Third Circuit's opinion in *Adams Golf* is inapplicable: the well-developed factual record shows no price reaction to class-period disclosures, and the October 22, 1998 press release is inapplicable because the information contained therein did not exist at the time of the IPO.

[17] For the reasons stated above, the decline following the October 22, 1998 press release (Ex. 245) was unrelated to the gray-market information that existed at the time of the IPO.

trends immaterial and not subject to mandatory disclosure because such information is easily discernable from available public information).

This Court has stated that "to be actionable, the challenged statements [or omissions] must mislead a reasonable investor as to the prospects of Adams Golf—not the golf industry, generally." *In re Adams Golf, Inc. Sec. Litig.*, 176 F. Supp. 2d 216, 236 (D.Del. 2001). An industry-wide phenomenon, such as gray marketing, cannot support a securities claim because it is "public information and, therefore, by definition is available to any and all who take the time to discover it." *See, e.g., Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995); *Klein*, 186 F.3d at 342. Plaintiffs cannot use the fact that other companies experienced gray-market issues particular to them to impose a general duty on Adams Golf to disclose a generic gray-market risk.

Plaintiffs admit and the evidence shows that gray marketing is an industry-wide phenomenon in golf manufacturing that all companies experience to varying degrees.[18] (D.I. 180 Ex. A ¶¶ 66-70; *see also* Ex. 303 at 4-5 ¶¶ 11-13, 9 ¶¶ 18-19, 15 ¶ 23(a), 15-16 ¶ 24, 17 ¶ 28, 21 ¶ 30; Ex. 331 ¶ 31; Exs. 6, 42, 258; Ex. 416 at Response No. 39 ("[B]etween 1992 and the autumn of 1998, Callaway, Taylor Made, Ping, and Orlimar experienced some amount of gray marketing[ ]"); Magnussen Dep. Tr. 61:23-62:12; Pulido-Crowe Dep. Tr. 26:1-9, 78:18-79:1; Teklits Dep. Tr. 16:7-16:18; Adams Dep. Tr. 14:12-15:20, 217:11-219:3, 252:11-254:14.) Plaintiffs' depiction of gray marketing as an industry-wide phenomenon underscores that this information could not have been material to a reasonable investor in Adams Golf's IPO. This provides another independent ground upon which the Court can base a grant of summary judgment.

---

[18] The Company's competitors appear to have employed similar methods to manage gray marketing. (*See* Ex. 416 at Response Nos. 8-11.)

43

### 3. Adams Golf disclosed a month before the IPO that Costco had golf clubs purporting to be Tight Lies.

The Company disclosed that Costco had purported Tight Lies a month before the IPO, thereby placing the information in the public domain. (Ex. 77.) The securities laws "require disclosure of information *that is not otherwise* in the public domain, not information that has already been publicly—indeed, officially—disclosed . . . ." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir. 1994); *Whirlpool*, 67 F.3d at 608-09. "A reasonable investor is presumed to have information available in the public domain" and constructive knowledge can be imputed accordingly. *Whirlpool*, 67 F.3d at 610 ("In today's society, with the advent of the 'information superhighway,' federal and state legislation and regulations, as well as information regarding industry trends, are easily accessed.").

Although information contained in the public domain is not per se immaterial, courts rarely hold that such information rises to the level of being deemed material. *Klein*, 186 F.3d at 342 (holding that the alleged nondisclosure, which was public information, was immaterial as a matter of law and stating that a materiality determination takes into account the availability of the information in the public domain); *cf. Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262-63 (4th Cir. 1993) (holding summary judgment of securities claims properly granted for the defendants and finding no genuine issue of material fact as to defendants' declining financial status where they issued multiple public press releases); *see also Weilgos*, 892 F.2d at 517 (holding that "[i]t is pointless and costly to compel firms to reprint information already in the public domain").

Here, the Company informed the public that its clubs might be appearing in the gray market approximately one month before the IPO. (Ex. 77.) Courts have held that when information about a company was made publicly available, such as in a press release or by

44

newspaper articles, a failure to disclose such information by the company is immaterial and cures any omissions by the company. *Cf. Cooke*, 998 F.2d at 1263; *see also Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 721 (E.D. Va. 2003). And the fact that the golf industry was discussing the appearance of Adams Golf clubs in Costco before the IPO is further evidence that the information was in the public domain. (See D. Brown Dep. Tr. 30:1-11; Magnussen Dep. Tr. 6:13-10:15, 20:22-22:8, 104:4-106:17; Pratt Dep. Tr. 49:25-50:14.) Thus, the information about Costco was immaterial because it was already known, and the Court should grant summary judgment because defendants are not liable for its omission.

### 4. Actual post-IPO numbers confirm that gray marketing was not material at the time of the IPO and never had a material effect on the Company's results.

Costco has produced documents under subpoena in this litigation that show the actual numbers of Tight Lies it acquired and sold during the class period. (Ex. 419 at COST 1-8, 24, 41, 50-52.) This information was not available to Adams Golf during the class period despite several written requests from Barney Adams and a lawsuit against Costco. (Exs. 407-408, 410.)

The parties have now obtained this information, and it confirms that gray marketing was not material to the Company before the IPO and did not have the potential to become material after the IPO. Before the IPO, Costco had purchased 8,369 Tight Lies clubs through the gray market, representing only 1.83% of Adams Golf's total units sold for the same period. (Ex. 419 at COST 1-8; *see also* Ex. 310 at Ex. VII.) Costco sold only 3,200 Tight Lies in the United States and another 715 clubs in Canada before the IPO—a miniscule 0.86% of Adams Golf's total unit sales during the first half of 1998. (Exs. 402, 419 at COST 24, 41, 50-52; *see also* Ex. 310 at Ex. VII.)

The evidence now available shows that Adams Golf successfully contained and controlled the gray marketing of its clubs after the IPO. Between July 9, 1998, when Adams

45

Golf went public, and December 31, 1998, Costco acquired fewer Adams Golf clubs than it had before the IPO—only 7,190 clubs in the United States and no more clubs for its Canadian stores. In total during 1998, Costco sold 12,169 Tight Lies, a mere 1.68% of Adams Golf's total sales of 724,990 Tight Lies for the same period. (Exs. 402, 419 at COST 24, 41, 50-52; *see also* Ex. 310 at Ex. VII.) Again, the Costco sales did not directly impact Adams Golf's results—the clubs acquired by Costco had originally been sold to an authorized retailer or distributor.

Adams Golf did not have the benefit of this information when it forecasted its fourth-quarter earnings. What the Company knew at the time was that increased competition from Orlimar and Callaway combined with a general slow-down in the U.S. golf equipment market to shrink Adams Golf's expected sales. (Adams Dep. Tr. 189:7-18; 194:23-195:10; 249:6-250:19.) In that environment, the Company first became concerned that gray marketing might impact its financial results—*not* because of an increase in gray-marketing activity, but because its effect would be greater when overall demand was down so sharply. (Adams Dep. Tr. 190:8-191:1.) Adams Golf thus disclosed that it was concerned gray marketing would impact the Company's 4Q financial results. (Ex. 245.) In the end, Adams Golf's concern was exaggerated: Costco's fourth-quarter 1998 sales were only 5% of Adams Golf's total sales for the same quarter. (Ex. 310 at Ex. VII.)

In their pleadings and expert report, plaintiffs have attempted to twist and misconstrue the Company's 4Q disclosure, suggesting that Adams Golf believed gray marketing was material in 4Q98 and drawing the false inference that since the number of Adams Golf clubs Costco acquired post-IPO was similar to the number it acquired pre-IPO, management should have known that gray marketing was material before the IPO. (D.I. 180 Ex. A ¶ 52; Ex. 303 at 21-

22 )[19]  This argument contains several fallacies.  Adams Golf did *not* report that Costco was materially harming the Company's fourth-quarter financial performance, only that the Company anticipated that Costco might affect the Company's 4Q98 earnings.  (Ex. 245.)  Since the Company never determined that Costco's gray marketing was material to its financial performance after the IPO, it is impossible to say that the Company should have predicted it would be material before the IPO.  (Exs. 420-421) (no mention of gray marketing as a material risk to the Company or having had a material effect on its financial results.)

According to Dr. Gary Frazier, an expert in marketing (including gray marketing), these de minimis gray-market sales could not have represented a material risk to the accuracy of Adams Golf's financial statements or its future financial performance and could not have significantly hurt Adams Golf's relationships with its retailers or distributors or harmed its brand image.  (Ex. 331 at 11-14.)  In fact, Dr. Frazier believes that low-level gray-market sales such as these actually can enhance a company's sales and brand image, by allowing the company to reach market segments that would otherwise be left unserved.  (Ex. 331 at 5-6.)  Thus, with the benefit of hindsight, accurate data, and expert opinion, it is evident that management correctly assessed the immateriality of the gray-marketing risk at the time of the IPO, providing further support for the Court to grant summary judgment.

---

[19] This is an example of just one of several instances (more fully described in Defendants' Motion to Exclude the Expert Testimony of Christiana Ochoa) in which Christiana Ochoa, who plaintiffs have put forward as a gray-marketing expert, improperly relies on and mischaracterizes information that was not available to the Company before the IPO. In addition, and as we discuss further in the Motion to Exclude, Ms. Ochoa's theories are all explanations of what she determined from reading several articles is the "typical" experience of a company that encounters gray marketing, and she neglects to explain how the facts in this case indicate that Adams Golf fit at all with her "typical" model. Indeed, for many of her assertions, Ms. Ochoa fails to cite any facts from this case at all (*See* Ex. 331 at 10-11.)

## VII.    THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE THAT ANY ALLEGED "QUESTIONABLE SALES PRACTICES" EXISTED, LET ALONE WERE MATERIAL

Plaintiffs' allegations that the Company had a duty to disclose the alleged "questionable sales practices" are based solely on Item 303 of Regulation S-K.[20]  (D.I. 180 Ex. A ¶ 89 ("[t]he Registration Statement and the Prospectus violated Regulation S-K, in that they failed to disclose that certain . . . practices such as double shipping, shipments with rights of return amounting to consignments, and underreserving . . . all constituted 'known trends or uncertainties . . .' ").) There is *no evidence* that anyone at Adams Golf engaged in the alleged questionable sales practices at all, that management knew of any trend or pattern of questionable sales practices at the time of the IPO, or that any of this was material.  Accordingly, summary judgment is proper.

### A.    There is no evidence of double shipping.

Plaintiffs focus on a single salesperson, Jay Greaney, as being "heavily involved in double shipping during the period before the IPO" and that other salespeople knew of his actions. (D.I. 180 Ex. A ¶ 72.)  Plaintiffs have failed, however, to produce any actual evidence to substantiate their claims.  The following highlights their shortcomings:

- Plaintiffs fail to identify a single customer or amount that was overshipped.

- Plaintiffs do not identify when, if ever, anyone at Adams Golf learned or knew of Greaney's alleged double-shipping practices, nor do they explain, because they cannot, how one salesperson's purported activities could have a significant effect on the Company's results as a whole.

- In particular, despite their allegation that Gonsalves knew about Greaney's alleged double shipping (Ex. 422 at 38:18-40:4; *see also* D.I. 180 Ex. A ¶ 72;), no evidence supports this claim.  Indeed, Greaney testified that he

---

[20] As explained above, under Item 303, plaintiffs must prove that (1) a known trend or uncertainty exists; (2) the trend is *known* to management before to the IPO; and (3) the company reasonably expects that trend to have a material impact on net sales or revenues.  17 C.F.R. § 229.303 (a)(3)(ii) & Instructions 3 & 7 (emphasis added).

does not ever recall being accused of even padding his orders. (Greaney Dep. Tr. 82:6-12.)

- Gonsalves says that he talked to Greaney about whether he was overshipping, and Greaney said he was not (Gonsalves Dep. Tr. 127:3-128:11), and Gonsalves saw *no evidence* of any overshipping. (Gonsalves Dep. Tr. 127:3-128:11, 129:18-130:2.)

- Plaintiffs allege no facts pertaining to double shipping that would constitute a known trend.

The evidence actually refutes any claim of questionable sales practices. For example, individuals within the sales department have testified that what plaintiffs refer to as "double shipping" could occur as a result of unintentional administrative error, 'pre-booking' *with customer consent*, or customer indecision. (Blevins Dep. Tr. 176:24-177:12; Greaney Dep. Tr. 68:17-24, 70:12-16, 98:14-17 (pre-booking was the standard practice in the sales industry at the time of the IPO).) Pre-IPO customers were requesting as many clubs as the Company could ship. (Greaney Dep. Tr. 74:19-75:7.) Approximately 10% to 20% of retailers simultaneously pre-booked second, identical orders to guard against delayed shipments. (Greaney Dep. Tr. 68:17-24, 71:2-5; Blevins Dep. Tr. 176:11-178:19.) As demand began to wane, however, customers occasionally denied having ordered products after the shipment had already arrived. (Greaney Dep. Tr. 68:2-69:10; Brewer Dep. Tr. 29:2-18.)

Plaintiffs turn a blind eye to this undisputed evidence, instead relying on the August 14, 1998 Memo from Barney Adams stating that he had learned that salespersons "know cheating (at least in the form of double shipments) occurs . . ." (D.I. 180 Ex. A ¶¶ 76-80; Ex. 57.) But plaintiffs completely ignore the context of the memo and what Adams testified under oath he knew and meant when he wrote it. Adams testified that he wrote the memo as a motivational tool to spawn change within the sales department, not as an informational memorandum. (Adams Dep. Tr. 246-249.) He testified that he had no personal knowledge about the accuracy

49

of the allegations on the memo and wrote it with the intent that the sales department's management would "prove [him] wrong." (Adams Dep. Tr. 149:18-22 ("I wanted Mark and Ric to go come back to me and—and absolutely embarrass me by putting this thing to bed and show me how squared away they were.").)

In fact, Mark Gonsalves did "prove [Adams] wrong" and demonstrated that all of the issues raised in the Memo were resolved well before the IPO. Specifically, Gonsalves verified Adams' original belief that "all these allegations were . . . the result of backbiting and bickering and low morale and so on and so forth. . . ." (Adams Dep. Tr. 246:11-18 ("I had overstated my case."); Adams Dep. Tr. 186:19-24, 185:22-187:6 (Mark "nicely explained to me that I'd gone over the top here and these things were easily explained . . .").)  In sum, the August 14, 1998 Memo was intended strictly to inspire change in the sales department, nothing more.  (*See* Adams Dep. Tr. 246:9-247:12, 248:14-249:10; Ex. 302 ¶¶ 43-45.)

Moreover, plaintiffs cannot prove that overshipments, to the extent they occurred, were intentional, were material, or constituted a known trend that presented a material risk to future financial results.  Plaintiffs argue that double shipping created such a material risk "*[b]ecause* the Company recognized sales on shipment of the goods. . . ." (D.I. 180 Ex. A ¶¶ 71, 73.)  But this would be true only if Adams Golf had an inadequate return reserve, which as shown in Part VII.C. below, was plainly not the case.[21]

Plaintiffs' other arguments about the risks posed by double shipping strain all logic.  They claim there was a risk because if a retailer received more clubs than it ordered and subsequently returned the excess product in a later period, the overshipment "had the effect of

---

[21] *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 169 (D. Mass. 2000) ("FAS 48 does not prohibit a seller from recognizing contingent sales income so long as certain conditions are met, the most important of which require a reasonable estimate of expected returns and the set-aside of a sufficient reserve to absorb any resulting reversal of revenue.")

including in revenue twice the sales value of these transactions." This, according to plaintiffs, adversely affects later period results. (D.I. 180 Ex. A ¶¶ 73-75.) (Of course, it would not be true for shipments returned in the same quarter.) But plaintiffs' claim becomes convoluted when they go on to allege that double shipping creates a risk "even if a Dealer who received double shipments did not return the excess clubs" because the Dealer would "*likely*" reduce subsequent orders with the Company to compensate for the excess product. (D.I. 180 Ex. A ¶ 75.) This logic is contradictory (presumably the retailer only keeps the clubs if he believes he can sell them and will order more when he believes he can sell more), and it is based on nothing more than speculation about what an unidentified retailer might or might not do after allegedly receiving and subsequently keeping some unknown amount of extra product. (D.I. 180 Ex. A ¶ 75.)

*No* evidence exists in the record to support the double-shipping allegations, much less enough to create a genuine issue of material fact.

### B. There is no evidence of consignment sales or sales with unlimited rights of return.

Plaintiffs also claim that Adams Golf engaged in consignment sales or sales with unlimited rights of return.[22] (D.I. 180 Ex. A ¶ 71.) Again, there is *no evidence* that anyone ever sold Adams Golf products on consignment. (Greaney Dep. Tr. 97:12-15; Brewer Dep. Tr. 85:5-16; Hatfield Dep. Tr. 67:6-22.) Similarly, the undisputed evidence illustrates that Adams Golf did not sell to customers with unlimited rights of return. (Ex. 302 at 5-11; Lynch Dep. Tr. 14:11-16, 14:21-15:8; Hatfield Dep. Tr. 67:18-68:23.)

---

[22] Plaintiffs once again rely solely on the August 14, 1998 Memorandum to support this claim (D.I. 180 Ex. A ¶¶ 77-80 ("[a]pparently we've made a lot of sales that    are little more than consignments") Again, Barney Adams put the Memorandum in context, clarifying, "I think I used the word 'consignments ' I don't know if [the sales department] ever used the word 'consignments '" (Adams Dep. Tr. 148:16-22, 149:8-11 ("[ T ]he word consignment, is my word, my interpretation"); Hatfield Dep. Tr. 67:6-22 )

Members and management of the Company's sales department provided undisputed testimony that consignment sales did not occur at Adams Golf anywhere close to the time of the IPO. (Greaney Dep. Tr. 97:12-15 ("I never sold clubs on consignment."); Brewer Dep. Tr. 85:5-16 (attesting that consignment sales were not a problem for the Company); Hatfield Dep. Tr. 67:6-22.) For example, Greaney testified that any practice of consignment sales predated the IPO and stated that a form of consignment sales may have occurred "really early on in the company, when there was really not enough demand for anyone to even accept the product in their store." (Greaney Dep. Tr. 92:4-93:7.)

Similarly, there is *no evidence* that the Company offered sales with unlimited returns. Adams Golf disclosed that it had a 90-day "no-questions asked" return policy; however, the policy only applied to direct-response sales (which represented a very small percentage of the Company's total sales). (Lynch Dep. Tr. 22:1-24:8; Hatfield Dep. Tr. 70:17-21.) All other sales had no right of return, and returns were only accepted on a case-by-case basis to maintain customer relationships. (Lynch Dep. Tr. 18:2-19:7, 28:2-8, 39:3-8, 40:10-22 (Lynch testified that only 3% to 5% of commercial sales were accepted as returns); Ex. 302 at 5-6 & Lynch Ex. 4; Hatfield Dep. Tr. 67:10-15.) Plaintiffs have no evidence that anyone at the Company engaged in consignment sales or offered unlimited rights of return with purchases during the relevant time period.

### C. There is no evidence that Adams Golf's reserve was inadequate.

Plaintiffs allege that Adams Golf violated GAAP by failing to maintain an adequate return reserve. (D.I. 180 Ex. A ¶¶ 71, 78, 90.) Their sole evidence is that the Company's returns were higher than predicted in July of 1998. (D.I. 180 Ex. A ¶¶ 71, 78, 90.) But this evidence proves nothing.

52

Adams Golf did not set inadequate reserves. (*See* Rainwater Dep. Tr. 79:4-81:7; Exs. 362-365.)  First, it is important to keep in mind that "sales return estimates are always an estimate. They're never going to be accurate.  They can only be reasonable or unreasonable estimates based on what happens[.]"  (Lynch Dep. Tr. 54:19-22.)  Adams Golf maintained a conservative return reserve and actually overaccrued for commercial-sales returns during the class period.  (Ex. 302 at 2 ¶ 5, 8 ¶ 41.)

Adams Golf recorded sales in the period in which they were sold and shipped, and simultaneously recorded a provision for returns in accordance with GAAP.  (Ex. 72 at F-8; Ex. 302 at 4; Hatfield Dep. Tr. 65:15-19.)  The Company's return-reserve system for estimating reserves based on historical analysis was created by Adams Golf's financial controller and subsequently approved by Adams Golf's auditors. (Rainwater Dep. Tr. 29:5-11, 42:2-10; Lynch Dep. Tr. 75:18-76:23; Hatfield Dep. Tr. 64:7-11.)  As discussed below, under FAS 48, Adams Golf made a "reasonable estimate of sales returns during the class period," and indeed, ended up with too large a reserve at the end of 1998.  (Ex. 302 at 6.)

The Company does not dispute the fact that its returns increased in the third quarter of 1998.  The increase was minimal and was attributable to issues with Telegolf, the third-party vendor to which Adams Golf outsourced its direct-response calls.  (Rainwater Dep. Tr. 55:1-19.)  Telegolf's sales representatives' lack of knowledge of the sport and the Company's product led to an increase in returns of direct-response sales[23] and subsequently caused the Company's returns to increase slightly.  (Lynch Dep. Tr. 71:6-73:18; Gonsalves Dep. Tr. 141:4-13.)  The amount of returned clubs in the third quarter of 1998 increased less than ten percent from the

---

[23] Direct response was a completely separate division of the Company from inside sales  (Rainwater Dep Tr 82:3-10.)

prior quarter. (Lynch Dep. Tr. 72:13-17, 72:24-73:7; ("[The returns are] less than $100,000 increase from one quarter [the third quarter in 1998] to the other.").)

Finally, the Company fully disclosed its return-reserve policy to investors in its Prospectus. (Ex. 72 at F-8; Ex. 302 at 5.) The disclosure provided an estimate of the returns the Company expected and warned investors that "actual returns could differ from those estimates." (Ex. 72 at F-8.) The summary-judgment evidence confirms that the Company did in fact maintain an adequate return reserve and fully disclosed its return-reserve policy to investors.

## VIII. PLAINTIFFS' CLAIM AGAINST THE INDIVIDUAL ADAMS GOLF DEFENDANTS MUST BE DISMISSED BECAUSE THEY PERFORMED A REASONABLE INVESTIGATION IN THEIR IPO DUE DILIGENCE AND REASONABLY BELIEVED THAT THE PROSPECTUS WAS COMPLETE AND ACCURATE

The individual Adams Golf Defendants are not liable under section 11 in any event if they can demonstrate that after a reasonable investigation, they had reasonable grounds to believe, and did believe, that the non-expertised portions of the Prospectus contained no material omissions. 15 U.S.C. § 77k(b)(3)(A). The pre-IPO conduct of all of the individual defendants satisfied this standard.[24]

### A. Reasonable investigation and belief provide an absolute defense for the individual defendants.

The standard of reasonableness (of both investigation and grounds for belief) is "that required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c). Rule 176 provides additional factors to be considered when determining whether a defendant's conduct constituted a reasonable investigation or offered a reasonable basis for belief, including,

---

[24] Furthermore, good faith is a defense to control-person liability. *Donohoe v. Consolidated Oper. & Prod. Corp.*, 982 F.2d 1130, 1139 (7th Cir. 1992); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985); *see also Tracinda Corp. v. DaimlerChrysler*, 197 F. Supp. 2d 42, 55 (D.Del. 2002) (stating that the standard for control-person liability is the same under section 15 of the Securities Act of 1933 as it is under section 20(a) of the Exchange Act of 1934). The reasonable investigation performed by the individual defendants before the Prospectus became effective is proof that they acted in good faith and are not liable as control persons.

among others: the office held; the directors' other relationship to the issuer, if any; and reasonable reliance on officers, employees, and others whose duties should have given them knowledge of the particular facts (in light of the functions and responsibilities of the particular person with respect to the issuer and the filing). 17 C.F.R. § 230.176 (2006).

As the Rule 176 factors indicate, reasonable investigation is different for outside directors than for inside directors and officers. Outside directors are not obligated to conduct an independent investigation into the accuracy of all the statements contained in the registration statement. They can "rely upon the reasonable representations of management, if [their] own conduct and level of inquiry were reasonable under the circumstances." *Weinberger v. Jackson*, 1990 U.S. Dist. LEXIS 18394, at *10 (N.D. Cal. Oct. 11, 1990). A reasonable investigation by an inside director requires the independent verification of the registration statement, which is more than the mere questioning of management and reliance on their representations. *Escott v. BarChris Construction Corp.*, 283 F. Supp. 643, 683-84 (S.D.N.Y. 1968). Inside directors possess the most intimate knowledge of the corporation and its daily operations, so they are "expected to make a more complete investigation . . . than outside directors." *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 578 (E.D.N.Y. 1971).

> **B.    The outside directors conducted a reasonable investigation under the circumstances and had reasonable grounds for their belief that the Prospectus was true and complete.**

The outside directors satisfy the reasonable-investigation standard because their conduct and level of inquiry were reasonable under the circumstances. *See Weinberger*, 1990 U.S. Dist. LEXIS 18394, at *10. They were reasonably familiar with the company's business and operations. *See Weinberger*, 1990 U.S. Dist. LEXIS 18394, at *10; (Exs. 75-76, 81, 283, 423-425; Ex. 310 at 24). They regularly attended board meetings and reviewed the company's financial statements. *See Weinberger*, 1990 U.S. Dist. LEXIS 18394, at *10; (Exs. 75-76, 81,

283, 423-425). They reviewed the draft Prospectus and discussed it at length with management, asking questions to satisfy themselves of its accuracy, although they had no duty to do so as long as the disclosures were consistent with their knowledge of the issuer. *See Weinberger*, 1990 U.S. Dist. LEXIS 18394, at *11; (P. Brown Dep. Tr. 13:11-15:19; Casati Aff. ¶ 5; Conner Dep. Tr. 14:8-15, 16:2-18:5, 30:22-32:19; Patchin Dep. Tr. 18:16-19:20; 32:8-33:13, 35:11-14; Hatfield Aff. ¶ 4; Murtland Aff. ¶ 10). Some board members discussed the offering and other Company issues with each other and with Barney Adams outside of board meetings. (P. Brown Dep. Tr. 63:15-23, 76:18-77:10; Patchin Dep. Tr. 16:7-14, 32:23-33:13, 60:18-61:6; Conner Dep. Tr. 16:18-17:22.) As members of the pricing committee, Brown and Conner met with management and the underwriters. (P. Brown Dep. Tr. 67:9-69:11; Conner Dep. Tr. 12:19-13:2, 18:23-19:3, 26:15-29:22.)

The outside directors were aware of the Costco issue before the IPO and reasonably relied on management's representations that they were addressing the issue and that it did not pose a material risk to the Company. *See Weinberger*, 1990 U.S. Dist. LEXIS 18394, at *10; 17 C.F.R. § 230.176 (2006); (P. Brown Dep. Tr. 19:10-20:13, 22:9-25:23, 31:12-33:22, 54:2-56:8, 63:15-23; Casati Aff. ¶¶ 3, 5-7; Conner Dep. Tr. 30:22-31:24, 32:5-33:16, 35:24-36:18, 37:7-21, 45:17-46:17; Patchin Dep. Tr. 23:2-24:20, 26:18-28:4, 42:13-18, 43:15-44:3; Ex. 310 at 14-15, 19-20). Likewise, there was no evidence of any pattern of double shipping, consignment sales, or unlimited rights of return, and it was reasonable for the outside directors to rely on management to alert them to any potential issues of this sort. *See Weinberger*, 1990 U.S. Dist. LEXIS 18394, at *10; (*see also* Ex. 310 at 20-21). Furthermore, like the outside director in *Weinberger*, they were "also given comfort by the fact that the prospectus and the information in it were reviewed by underwriters, counsel and accountants." *Weinberger*, 1990 U.S. Dist.

56

LEXIS 18394, at *11-12; (Conner Dep. Tr. 18:6-15, 51:24-52:24; Casati Aff. ¶ 5; Ex. 310 at 13-14, 19-20). The statements in the Prospectus were consistent with the outside directors' knowledge of the Company. Thus, they were not required to conduct an independent investigation of either gray marketing or the alleged questionable sales practices. *See Weinberger*, 1990 U.S. Dist. LEXIS 18394, at *11-12; *see also Laven v. Flanagan*, 695 F. Supp. 800, 812 (D.C.N.J. 1988); *Goldstein v. Alodex Corp.*, 409 F. Supp. 1201, 1203 n.1 (E.D. Pa. 1976).

The outside directors' conduct and level of inquiry was reasonable under the circumstances, and they were entitled to rely on management's representations. Based on their reasonable investigation, the outside directors had reasonable grounds to believe and did believe that the Prospectus was true and complete and contained no material misstatements and omissions. (P. Brown Dep. Tr. 13:7-15:19; Casati Aff. ¶ 7; Conner Dep. Tr. 16:2-20:23, 51:19-53:21; Patchin Dep. Tr 16:7-14, 18:16-19:20, 83:14-84:24; Ex. 310 at 24.)

### C. The officers conducted a reasonable investigation and had reasonable ground to believe, and did believe, that the Prospectus contained no material misstatements or omissions.

#### 1. Adams, Murtland, and Hatfield conducted a reasonable investigation based on their respective positions at the Company.

The inside directors (Adams and Murtland) and Hatfield acted reasonably, given their respective positions at the Company. 17 C.F.R. § 230.176 (2006) (listing the office a particular officer held as a factor to consider when assessing reasonableness of investigation and belief). As CEO, Adams worked in connection with Gonsalves and Beebe to investigate and address the gray-marketing issue. (Ex. 310 at 16-18; Ex 331 at 14-15.) Similarly, Murtland and Hatfield, as Vice President of Operations and CFO, respectively, stayed apprised of issues related to returns and would have known if there were any significant issues with regard to double shipping or

consignment sales. (Murtland Aff. ¶¶ 3, 8; Hatfield Dep. Tr. 60:18-22, 65:9-19, 68:1-23, 86:17-87:10, 106:9-108:3.)

As explained in detail in Part III above, Adams Golf's management, led by Barney Adams, took steps to investigate and manage the Costco issue, as soon as they became aware that purported Adams Golf clubs had been seen in Costcos in Canada. (*See also* Ex. 310 at 16-18.) Those steps included obtaining estimates from WDC Mackenzie of the numbers of clubs involved, monitoring large orders, stopping at least one suspiciously large order, marking some clubs, demanding in writing that Costco reveal its source of clubs, instituting a price-matching program in Canada, writing to suspected gray marketers to reaffirm their distribution agreement, and taking legal action against Costco. (Ex. 310 at 16-18.) Barney Adams and others in management reasonably believed that by taking these steps, they were appropriately managing the nuisance of gray marketing. (Adams Dep. Tr. 19:17-26:7, 31:19-33:10, 40:1-21, 44:1-46:12, 61:23-77:23; Hatfield Aff. ¶¶ 4-5; Murtland Aff. ¶¶ 4-7; *see also* Ex. 331 at 14-15; Frazier Dep. Tr. 300:9-301:12.)

All of the business issues facing the Company, including gray marketing, were thoroughly vetted by the professionals and Company management who were involved in the IPO process. (Pulido-Crowe Dep. Tr. 22:16-25:15, 77:4-80:12, 81:6-13; Walsh Dep. Tr. 35:4-13, 39:7-40:19; Adams Dep. Tr. 103:22-104:21, 251:11-253:14; Hatfield Aff. ¶ 5; Murtland Aff. ¶ 11.) All were aware of the Costco Bill of Discovery and discussed the gray-marketing issue, including its limited nature and the steps the Company was taking to address it. (Adams Dep. Tr. 68:16-69:6; Pulido-Crowe Dep. Tr. 27:12-27:18, 29:15-30:6, 47:21-51:2; Hatfield Aff. ¶ 5; Murtland Aff. ¶ 11.) No one believed it was necessary to include a risk factor regarding gray marketing. (Adams Dep. Tr. 105:12-21, 251:11-253:14; Pulido-Crowe Dep. Tr. 45:1-46:15,

69:5-72:1, 77:4-80:12, 81:22-82:6, 82:22-84:24, 88:13-19; Hatfield Aff. ¶¶ 3, 5; Murtland Aff. ¶¶ 11, 12.) The SEC asked the Company to consider disclosing the Costco litigation but after oral resolution of this comment, it let the Prospectus go effective without any disclosure. (Ex. 165; Ex. 330 at 5; Washburn Dep. Tr. 51:1-52:8.)

As discussed in Part VII above, there is no evidence of double shipping, consignment sales, or unlimited rights of return. By virtue of their positions, Hatfield and Murtland were the ones whose day-to-day responsibilities gave them a familiarity with these issues. Hatfield testified that after the only time he heard a rumor of an instance of overshipping, he went immediately to Mark Gonsalves. (Hatfield Dep. Tr. 60:18-22, 62:11-16.) Gonsalves seemed very surprised (Hatfield Dep. Tr. 63:3-6), and he agreed that Hatfield should attend the next weekly sales meeting to make a presentation to the sales department regarding SEC requirements and what constitutes a sale. (Hatfield Dep. Tr. 65:9-12.) Hatfield had no concerns about the issues raised in Barney Adams's August 14, 1998 Memo regarding double shipping or returns because they were "very insignificant to the financial statements." (Hatfield Dep. Tr. 86:17-87:10; *see also* Hatfield Dep. Tr. 67:6-70:24.) In his position as Vice President of Operations, Murtland was aware of the returns coming in, and his staff alerted him any time there was a return that was out of the ordinary. (Murtland Aff. ¶ 8; Ex. 255.) Murtland never saw any evidence of significant returns that were purported to be coming back because a salesperson had overshipped on a retailer's order. (Murtland Aff. ¶ 8.) Both Hatfield and Murtland reasonably investigated these issues.

> **2.    Based on their reasonable investigation, Adams, Murtland, and Hatfield had reasonable grounds for their belief that the Prospectus was true and complete.**

Although insiders' more detailed knowledge of corporate affairs means that they must satisfy a higher standard of reasonable investigation, and indeed, that "liability will lie in

practically all cases of misrepresentation," *Feit*, 332 F. Supp. at 578, where there are only alleged omissions, the Court should apply a standard akin to the business-judgment rule. No reported cases appear to deal with the reasonable-investigation defense in the context of an omissions-only case. In this type of case, as opposed to the body of reported cases in which plaintiffs allege affirmative misrepresentations (usually signaled with multiple red flags),[25] management and inside directors should not be held to a standard approaching strict liability. If they have performed a reasonable investigation of the contested issue and made a good-faith business judgment that the issue was not material, there is no legitimate rationale for holding them to a strict liability standard. To hold otherwise eliminates any reason for a due-diligence defense to exist at all for insiders.

As demonstrated above, Adams Golf's management reasonably believed that they had gray marketing under control, and thus they had reasonable grounds to believe that the Prospectus omitted nothing material. Likewise, they were reasonable in their belief that there was no practice of double shipping, consignment sales or unlimited rights of return, so they had reasonable grounds to believe there was no material omission related to practices that did not exist. Adams, Murtland and Hatfield reasonably believed at the time of the IPO that the Prospectus was true and complete. (Adams Dep. Tr. 105:12-21, 251:11-253:14; Murtland Aff. ¶ 12; Hatfield Aff. ¶ 6.)

---

[25] *See. e.g., Escott*, 283 F. Supp. at 679, 684-87 (involving a number of misrepresentations known to management); *Feit*, 332 F. Supp. at 550; *In re Worldcom Sec. Litig.*, No. 02 Civ. 3288DLC, 2005 WL 638268, at *1, *12 (S.D.N.Y. Mar. 21, 2005) (denying reasonable-investigation defense to former chairman of WorldCom board when undisputed facts showed that executives engaged in a secretive scheme to misrepresent the company's financial condition in SEC filings and ultimately announced a massive restatement and filed for bankruptcy) In *Feit*, for example, plaintiffs alleged that the defendant acquiring company failed to disclose the approximate amount of "surplus surplus" cash held by target insurance company and misrepresented its true intentions to reorganize the insurance company to access the cash 332 F. Supp. at 550 The court found that the defendant actively misrepresented its ability to accurately estimate the surplus surplus and that the CEO of the target company was more concerned with advancing his own personal fortune than with his fiduciary duty to the shareholders *Id.* at 558, 560-61, 565.

60

## IX.    CONCLUSION

For all these reasons, the Court should grant summary judgment in favor of defendants.

Jeffrey L. Moyer (#3309)
moyer@rlf.com

Of Counsel:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas  78701

Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware  19899
(302) 651-7700

Attorneys for Defendants Adams Golf, Inc.,
B.H. Adams, Richard H. Murtland, Darl P.
Hatfield, Paul F. Brown, Jr., Roland E. Casati,
Finis F. Conner, and Stephen R. Patchin

Dated:  September 11, 2006

## UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2006, I have caused the foregoing to be served by Hand Delivery and Electronic Mail which has also been filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Carmella P. Keener
Rosenthal, Monhait & Goddess
919 Market Street, Suite 1401
Wilmington, DE 19801

Robert K. Payson
John E. James
Potter Anderson & Corroon LLP
1313 North Market Street, Hercules Plaza
Wilmington, DE 19801

I hereby certify that on September 11, 2006, I have sent by Federal Express and Electronic Mail the foregoing document(s) to the following non-registered participants:

Neil Mara
Todd S. Collins
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA 19103

Michael J. Chepiga
Theodore J. McEvoy
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Alyssa M. Schwartz (#4351)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
schwartz@rlf.com