**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: ADAMS GOLF, INC., | § § § § | CIVIL ACTION NO. 99-371-KAJ |
| SECURITIES LITIGATION | | (CONSOLIDATED) |

**ADAMS GOLF DEFENDANTS' OPENING MEMORANDUM
IN SUPPORT OF THEIR MOTION TO EXCLUDE THE
EXPERT TESTIMONY OF R. ALAN MILLER**

Of Counsel:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas  78701

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware  19899
(302) 651-7700

Attorneys for Defendants Adams Golf, Inc.,
B.H. Adams, Richard H. Murtland, Darl P.
Hatfield, Paul F. Brown, Jr., Roland E. Casati,
Finis F. Conner, and Stephen R. Patchin

Dated:  September 11, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. ii

I.     INTRODUCTION ....................................................................................................1

II.    MILLER'S EXPERT REPORT FAILS TO MEET THE REQUIREMENTS
     MANDATED BY THE FEDERAL RULES OF EVIDENCE. ..................................1

     A.    Miller has no background in financial economics, other than as a hired
         litigation consultant for plaintiffs ...................................................................3

     B.    Miller's opinions are based upon anecdotal speculation that has no basis in
         any recognized discipline ................................................................................3

         1.    Miller's definition of market efficiency is inconsistent with that
             employed in the financial economics field .........................................4

             a.    Information must be new and material to affect stock price .......4

             b.    Rumors or non-public information are not reflected in a
                 stock price until it is actually public .........................................5

             c.    Miller uses incorrect event windows .......................................6

         2.    Miller adopts unscientific standards in assessing materiality and
             damages...............................................................................................7

             a.    Miller performs no event study and uses no statistical tests ...........7

              b.    Miller ignores the academically accepted and judicially
                 endorsed requirement of statistical significance ........................9

          3.    Miller's proportional trading model is not generally accepted ..................11

     C.    Miller's opinion is not based on verifiable facts and is so fundamentally
         flawed as to be inadmissible ..........................................................................12

     D.    Miller's report fails to meet the requirements of both the Federal Rules of
         Civil Procedure and Evidence........................................................................12

         1.    Miller's report is not based on sufficient facts or data .......................13

         2.    Miller's undisclosed opinion on due diligence of the Adams Golf
             officers and directors must be excluded because of insufficient
             disclosures and untimeliness..............................................................14

III.    CONCLUSION.....................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Allen v. Pa. Eng'g Corp.*,
102 F.3d 194 (5th Cir. 1996) ................................................................. 11

*Bell v. Ascendant Solutions, Inc.*,
2004 WL 1490009 (N.D. Tex. July 1, 2004) ..................................... 6

*Bell v. Fore Sys, Inc.*,
2002 WL 32097540 (W.D. Pa. Aug. 2, 2002) ................................... 11

*Bonesmo v. The Nemours Found.*,
253 F. Supp. 2d 801 (D. Del. 2003)..................................................... 12

*Calhoun v. Yamaha Motor Corp., USA*,
350 F.3d 316 (3d Cir. 2003)................................................................... 9

*Cavallo v. Star Enter.*,
892 F. Supp. 756 (E.D. Va. 1995 ......................................................... 9

*Clark v. Takata Corp.*,
192 F.3d 750 (7th Cir. 1999) ................................................................. 2

*Coleman v. Exxon Chem. Corp.*,
162 F. Supp. 2d 593 (S.D. Tex. 2001) ............................................... 10

*Cuffari v. S-B Power Tool Co.*,
80 Fed. Appx. 749 (3d Cir. 2003)......................................................... 9

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ............................................................... 12

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)................................................................... *passim*

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)................................................................... 2

*Goldkrantz v. Griffin*,
1999 U.S. Dist. LEXIS 4445 (S.D.N.Y. April 5, 1999) ................. 10

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
131 F. Supp. 2d 680 (E.D. Pa. 2001) ................................................... 8

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005)................................................................... 5

RLF1-3056531-1

*Kaufman v. Motorola*,
    2000 WL 1506892 (N.D. Ill. Sept. 21, 2000) .......................................................... 11

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ................................................................... 4, 6

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................ 2, 3, 15

*Magistrini v. One Hour Martinizing Dry Cleaning*,
    180 F. Supp. 2d 584 (D.N.J. 2002) .................................................................. 10

*Minasian v. Standard Chartered Bank PLC*,
    109 F.3d 1212 (7th Cir. 1997) ......................................................................... 2

*Ortiz-Lopez v. Sociedad Expanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*,
    248 F.3d 29 (1st Cir. 2001) .......................................................................... 15

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) ........................................................................ 11

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*,
    73 F.3d 546 (5th Cir. 1996) ......................................................................... 12

*Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470 (D.N.J. 2002) ..................................... 2

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ....................................................................... 15

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 26(a)(2)(B) ........................................................................ 14, 15

FED. R. CIV. P. 37(c)(1) .......................................................................... 13, 15

FED. R. EVID. 104(a) ............................................................................... 2, 3

Fed. R. Evid. 702 ................................................................................ 1, 3, 15

FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 124 (2d ed. 2000) .................................................................................................. 10

RLF1-3056531-1

Defendants Adams Golf, Inc., B.H. Adams, Richard H. Murtland, Darl P. Hatfield, Paul

F. Brown, Jr., Roland E. Casati, Finis F. Conner, and Stephen R. Patchin (the "Adams Golf

Defendants") move to exclude the expert testimony of R. Alan Miller under Federal Rule of

Evidence 702.

## I.   INTRODUCTION

The principles and methodology employed by plaintiffs' materiality and damages expert,

R. Alan Miller, lack empirical or theoretical support and are inconsistent with accepted finance

theory. Miller uses an ad hoc analysis ***never before*** used in academic literature of financial

economics and provides no justification for this aberrant approach.

Miller's opinions do not represent respectable financial analysis and are not based on

sufficient data or accepted methodologies in the fields of finance and economics. As a

consequence, his opinions are unreliable and his purported "expert" testimony should be

excluded.

## II.   MILLER'S EXPERT REPORT FAILS TO MEET THE REQUIREMENTS
MANDATED BY THE FEDERAL RULES OF EVIDENCE.

Federal Rule of Evidence 702 provides the requirements for admissibility of expert

testimony:

> a witness . . . may testify . . . in the form of an opinion or
> otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case.

The party who proffers an expert's testimony bears the burden of establishing each of

these requirements by a preponderance of proof. *See Daubert v. Merrell Dow Pharms., Inc.*, 509

U.S. 579, 593 n.10 (1993). Where an expert's "testimony's factual basis, data, principles,

methods, or their application are called sufficiently into question, . . . the trial judge must

determine whether the testimony has 'a reliable basis in the knowledge and experience of [the

relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). The Court must act as a gatekeeper and evaluate the proffered expert opinions to determine if they are admissible. *See Daubert*, 509 U.S. at 597; *see also* FED. R. EVID. 104(a).

In the Third Circuit, it is the district court's responsibility to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Elcock v. Kmart Corp.*, 233 F.3d 734, 746 (3d Cir. 2000). In doing so, the Court may consider: "(1) whether [the] method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Id.* at 745-46. This list is non-exclusive and each factor need not be applied in every case. *Id.* at 746. Nonetheless, the Court "should consider the specific factors . . . where they are reasonable measures of the reliability" of the expert. *Id.* This means that, for each conclusion contained in the expert's proposed testimony, the Court must determine if the methodology leading to that conclusion is sound and the expert's opinion is based on "good grounds." *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 495 (D.N.J. 2002).

Qualifications alone do not suffice. Even a supremely qualified expert cannot "waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant . . . ." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *see also Minasian v. Standard Chartered Bank PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) (warning that "judges [should] not be deceived by the assertions of experts who

2

offer credentials rather than analysis"). Thus, the Court must act as a gatekeeper and evaluate the proffered expert opinions to determine if such opinions are admissible. *See Daubert*, 509 U.S. at 597; *see also* FED. R. EVID. 104(a).

### A.   Miller has no background in financial economics, other than as a hired litigation consultant for plaintiffs.

Miller is an accountant, not an economist. He received a Masters of Business Administration (MBA) degree with a major in financial accounting. (Ex. 334 at 4 ¶ 6.) He has never published a paper related to financial economics in a peer-reviewed journal and has no professional designations in the finance or economic fields. (Miller Dep. Tr. 9:6-13, 22:17-23:2.) Instead, he claims that his real world experience from more than 26 years ago is sufficient to qualify him as an expert on determining materiality and damages. (Miller Dep. Tr. 14:12-16.) For the reasons stated below, this purported qualification as an expert should be rejected.

### B.   Miller's opinions are based upon anecdotal speculation that has no basis in any recognized discipline.

Under Rule 702, the proponent of the expert testimony bears the burden of proving that the evidence is reliable. *See Daubert*, 509 U.S. at 593 n.10; *see also Kumho Tire Co.*, 526 U.S. at 149 (stating that when an expert's "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline'"). At least three critical aspects of Miller's report are flawed and not generally accepted in the field of finance and economics: (1) he incorrectly defines market efficiency; (2) he improperly uses an ad hoc personal assessment to determine materiality; and (3) he erroneously calculates damages by using a proportional trading model.

3

1.    **Miller's definition of market efficiency is inconsistent with that employed in the financial economics field.**

Miller ignores the application of efficient market theory, instead adopting his own standards for market efficiency.  He suggests that (1) stale information released in multiple places at multiple times affects stock price, ignoring the accepted definition that only *new* and *material* information impacts stock prices; (2) non-public rumors or conversations affect stock price; and (3) event windows may be extended over long periods of time.[1]  None of this is supported by any financial economics literature and, not surprisingly, his aberrant approach has been criticized as "inconsistent with the concept of market efficiency."  *Krogman v. Sterritt*, 202 F.R.D. 467, 477 n.14 (N.D. Tex. 2001).

Miller ignores the vast body of peer-reviewed, empirical work that finds that market efficiency results in immediate incorporation into stock price.  Miller's failure to acknowledge these important principles in determining and applying market efficiency demonstrates that his analysis is not based upon reliable principles and methods.

a.    **Information must be new and material to affect stock price**

"In an efficient stock market, a stock's price reflects the total mix of information available in the marketplace about the company's future earnings prospects and only *new material* information about a company's earnings prospects leads to a significant change its stock price." (Ex. 337 at 2 ¶ 3.)[2]  Although he acknowledged this basic principle of market efficiency at his deposition, in his report, Miller makes no attempt to analyze whether public information is new, material, and related to plaintiffs' specific allegations. (Ex. 337 at 3 ¶ 7; Miller Dep. Tr. 102:10-12.)  For example, Miller suggests that knowledge about the gray market for Adams

---

[1] The only article Miller uses to support his unorthodox view is an unpublished paper that analyzes *complex* events, such as mergers and acquisitions—something completely different from the measurement of discrete information concerning a gray market risk on Adams Golf's stock price. Ex. 335 at 15 n.1. Even then, Miller gets it wrong. The paper confirms that small event windows should be used for discrete events.

4

Golf's clubs "leaked" into the market over time.  (Ex. 334 at 9-10 ¶ 16.)  Yet he provides *no* economic or statistical support for this conjecture.  (Ex. 337 at 25 ¶ 66.)  Indeed, the very concept of leakage is at odds with efficient market theory, a theory strongly endorsed by the Third Circuit.  (Ex. 337 at 25 ¶ 66); *see In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005) (noting that the Third Circuit "as compared to the other courts of appeals, has one of the 'clearest commitments' to the efficient market hypothesis").  Once new, material information enters the public domain, it becomes—and remains—part of the total mix until new information arrives.  (Ex. 337 at 25 ¶ 67.)  Miller's unsupported theory that information arbitrarily and slowly "leaks" into the market and thereby affects stock prices must be rejected as untested and unreliable.

**b.    Rumors or non-public information are not reflected in a stock price until it is actually public.**

Miller uses rumors or non-public information to explain Adams Golf's stock-price decline.  He points to the following non-public information items as support:

- An internal Adams Golf memo from Barney Adams to the Board of Directors dated October 8, 1998.  (Ex. 334 at 8 ¶ 13B.)

- Costco national purchase orders and sales.  (Ex. 334 at 9 ¶ 16(A); Ex. 335 at 20-21 ¶ 22(A) and 22(C), which information Miller admits was not available to the Company or the underwriters at the time of the IPO.)  (Miller Dep. Tr. 162:6-10.)

- Knowledge of gray marketing possessed by the sales and marketing personnel at Adams.  (Ex. 334 at 10 ¶ 16(B); Ex. 335 at 20 ¶ 22(B).)

- Documents reflecting the underwriters' and their customers' trading activity in Adams Golf stock in the aftermarket, implying that the underwriters' knowledge would have been reflected in the stock price.  (Ex. 334 at 10 ¶ 16(E).)

- Information such as "rumors, employee 'leaks,' and information possessed or disseminated by participants in the gray marketing process itself."  (Ex. 335 at 11 ¶¶ 12, 22(A).)  Miller also refers to this as "oral information transmitted among

---

[2] All exhibits and deposition transcripts are attached to the Declaration of Jennifer R. Brannen submitted with the Adams Golf Defendants' Motion for Summary Judgment.

members of a particular community such as golfers, brokerage customers, retailers, gray market participants, etc." (Ex. 335 at 14-15 ¶ 14.)

- An internal, non-publicly distributed Lehman Brothers memo dated July 29, 1998 regarding an upcoming investor conference call. (Ex. 335 at 21 ¶ 22(F).) Notably, Miller did not even review the actual transcript of what investors actually asked at this conference call—a conveniently overlooked fact that *no investors* inquired about Costco or gray-market concerns amid the stock-price decline. (Miller Dep. Tr. 160:19-161:2.)

Miller cannot prove that *any* of this non-public information affected Adams Golf's stock price. (Ex. 337 at 11 ¶ 33; Ex. 337 at 15-16 ¶¶ 46-47; Ex. 337 at 16 ¶ 49.) His theory is based on an unscientific, and absurd, assumption—that Costco warehouse workers purchased and then short-sold Adams Golf stock in sufficient quantifies to affect the general market price. He has absolutely no evidence of this, nor could he. The financial economics literature rejects the premise that private or nonpublic information affects stock prices. (Ex. 337 at 11 ¶ 33.) One court already has criticized Miller for this same approach, specifically rejecting his use of "news events that were not publicly available." *Krogman*, 202 F.R.D. 467, 477 n.14 (N.D. Tex. 2001); *see also Bell v. Ascendant Solutions, Inc.*, 2004 WL 1490009, at *3 n.3 (N.D. Tex. July 1, 2004) (excluding an expert's opinion and noting "while Internet rumors may one day be an acceptable basis for expert opinion in a court, use of them is not at present a reliable methodology").

### c. Miller uses incorrect event windows.

Although Miller agrees that stock prices typically respond immediately to new information released to the market, to contrive large stock-price changes, Miller uses multiple-day windows (some as large as five or six days) to evaluate stock price. (Ex. 335 at 20 ¶ 22(A).) Financial economic theory demonstrates that information, once public, is incorporated very rapidly into the stock price. (Ex. 337 at 26 ¶ 68.)

As Professor James explains, Miller's techniques (1) have not been tested, (2) have not been subject to peer review and publication, and (3) do not enjoy general acceptance within a

relevant scientific community. (Ex. 337 at 2-3 ¶¶ 4-8; Ex. 337 at 4-18 ¶¶ 11-52); *Daubert*, 509 U.S. at 592-94. Financial economists generally use single-day intervals to measure stock-price reaction in an efficient market. (Ex. 336 at 15-16 ¶ 34.) Since the basis of Miller's analysis is improper, this Court should reject it entirely.

## 2. Miller adopts unscientific standards in assessing materiality and damages.

Since the market for Adams Golf stock was efficient, which plaintiffs concede, only the release of new, material information can lead to a statistically significant stock-price change. (Ex. 337 at 2 ¶ 3.) None of the class period disclosures about gray marketing resulted in a statistically significant stock-price change.[3] That alone, as the Adams Golf Defendants explain in their motion for summary judgment, proves their negative causation defense. Nonetheless, Miller asserts—with no evidence other than his personal speculation—that the gray market was a material risk. (Ex. 337 at 8 ¶ 24.) He concedes, however, that "I can't say I believe it affected the price on certain days in certain amounts or anything like that." (Miller Dep. Tr. 135:4-6.) If the Court accepts the undisputed fact that the market for Adams Golf stock was efficient, then, as shown below, it must reject Miller's speculation that the alleged gray market risk was material at the IPO.

### a. Miller performs no event study and uses no statistical tests.

Miller does not perform an event study to assess materiality and instead attributes the entire decline to the alleged gray market omission in assessing damages. An event study is the generally accepted method for analyzing stock price returns. (Ex. 337 at 5 ¶ 14.) An event study controls for industry and market factors and generates residual stock-price changes. (Ex. 336 at

---

[3] As explained in the Adams Golf Defendants' Motion for Summary Judgment, to the extent the October 22, 1998 press release related to gray marketing, the information contained in that press release did not exist at the time of the IPO and the stock-price decline was likely caused by other negative information contained in the release (Ex. 337 at 17-18 ¶¶ 50-52; Ex. 337 at 20-22 ¶¶ 56-59.)

7

10-11, ¶¶ 17-19; Ex. 337 at 5 ¶ 15.)  This stock-price change is then tested to determine whether it is statistically significant, since no damages result from firm-specific price movements that are not statistically significant.  (Ex. 336 at 11, ¶ 19; Ex. 337 at 6 ¶¶ 16, 18.)  That is, it is tested to determine whether the change in stock price is simply normal volatility attributed to nothing more than the randomness of stock price changes or whether the change is large enough to be abnormal and therefore likely caused by something else.   (Ex. 336 at 11, ¶ 21; Ex. 337 at 6 ¶ 17.)   The event study also enables financial economists to deduct stock-price declines due to other factors in assessing damages.  (Ex. 337 at 7 ¶ 21.)

Miller performed no statistical test to determine materiality.  (Ex. 337 at 2-3 ¶¶ 5-6, at 5 ¶ 13.)  Similarly, despite Professor James's report that shows other factors caused the decline in Adams Golf's stock, Miller attributes the *entire* stock-price decline to the gray-market risk.  (Ex. 337 at 2-3 ¶¶ 4, 7-8.)  He does this despite the fact that plaintiffs tacitly admit that Orlimar's Trimetal club took market share away from Adams Golf in the spring and summer of 1998.  (Ex. 416 at Admission No. 54.)  Miller acknowledges that market and industry forces may have affected Adams Golf's stock price, but he fails altogether to account for these forces.  (Miller Dep. Tr. 77:3-17, 78:13-23, 85:21-86:2; Ex. 337 at 7 ¶ 21; Ex. 337 at 23 ¶ 61.)  Miller claims that his approach is "implicit[ly]" accepted in academic literature, but he can identify no peer-reviewed academic literature that supports it.  (Miller Dep. Tr. 100:10.)  The reason is clear—this approach has no basis in academic literature and has been rejected by various courts.  The Eastern District of Pennsylvania specifically rejected Miller's approach of assuming that the entire stock-price decline is attributed to the alleged nondisclosure.  *In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 690 n.9 (E.D. Pa. 2001).

8

                **b.**     **Miller ignores the academically accepted and judicially**
                           **endorsed requirement of statistical significance.**

Miller asserts that "[t]here can be no question that the risk and impact of gray marketing were material to investors or potential investors in Adams Golf." (Ex. 334 at 7 ¶ 13.) To reach this conclusion, he rejects rigorous statistical analysis as "academic" and then claims that the entire stock-price decline can be attributed to this alleged non-disclosure. (Miller Dep. Tr. 48:16-22.) This opinion has no factual or scientific foundation and should be excluded. *See Calhoun v. Yamaha Motor Corp., USA,* 350 F.3d 316, 321 (3d Cir. 2003) (noting that "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'") (citing *Daubert*, 509 U.S. at 590); *Cuffari v. S-B Power Tool Co.*, 80 Fed. Appx. 749, 750-51 (3d Cir. 2003).

Miller's methodology for assessing materiality is fundamentally flawed: he averages raw dollar price changes in Adams Golf's stock price to analyze materiality––this is improper and has no basis in finance literature. (Ex. 335 at Exs. A-B; Miller Dep. Tr. 82:23-83:10.) Without controlling for market and industry effects and analyzing returns in the context of Adams Golf's high stock price volatility, these numbers are meaningless, amounting to mere anecdotal evidence. *See Cavallo v. Star Enter.*, 892 F. Supp. 756, 763-69 (E.D. Va. 1995), *aff'd in relevant part*, 100 F.3d 1150, 1149 (4th Cir. 1996) (excluding expert testimony based on anecdotal evidence). His subjective evaluation of Adams Golf's stock price in connection with "various index and comparable company movements," without performing any statistical tests whatsoever, must be rejected as unscientific and untestable. (Miller Dep. Tr. 82:25-83:2; Ex. 337 at 4-18 ¶¶ 11-52.)

Where the stock price does not move in response to an alleged misstatement, sound financial economic theory finds that no inflation (and accordingly, no damages) may be

attributed to that statement. *Cf. Goldkrantz v. Griffin*, 1999 U.S. Dist. LEXIS 4445, at *9 (S.D.N.Y. April 5, 1999), *aff'd,* 201 F.3d 431 (2d Cir. 1999) (finding no genuine issue of material fact as to loss causation where event study showed no statistically significant stock price movement at the 95% confidence interval on the release of the allegedly misleading information). That is exactly the case here. (*See* Opening Brief in Support of Adams Golf Defendants' Motion for Summary Judgment at Part V.)

Miller, however, attributes damages on all trading days in the class period (except the eight days where the stock traded higher than the IPO price), even though *only* three of the event days he studied resulted in statistically significant stock price movement. (Ex. 336 at 27 ¶¶ 63-64.) No one disagrees on the applicable standard in the field—even Miller agreed that the generally accepted level of significance in the field and in peer-reviewed journals was the 90-95% confidence interval (*i.e.*, the 5-10% level of statistical significance). (Miller Dep. Tr.49:15-19.); *cf. Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F. Supp. 2d 584, 605 & n.27 (D.N.J. 2002) (excluding expert testimony that did not use 5% (*i.e.,* 0.05) level of statistical significance); *Coleman v. Exxon Chem. Corp.*, 162 F. Supp. 2d 593, 616 (S.D. Tex. 2001) (endorsing the generally accepted 5% level for determining statistical significance in a Title VII action); *see also* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 124 & n.138 (2d ed. 2000) (noting that "[i]n practice, statistical analysts often use certain preset significance levels—typically .05 or .01. The .05 level is the most common in social science" and observing that the Supreme Court has referred to any result less than that as "suspect to a social scientist").

Miller completely abandons the requirement of statistical significance and instead uses junk science. He speculates that some price movements "came very close to reaching his statistically significant threshold line," but he does not identify what these movements are or

whether any information about gray market was released on these days.  (Ex. 335 at 14.)  He acknowledges that he does not recall any peer-reviewed journals applying his approach.  (Miller Dep. Tr. 59:15-60:6.)  The Federal Rules of Evidence require that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).  Miller cannot simply ignore statistical significance in this litigation when it is required in peer reviewed journals.

In evaluating the testimony of an expert who admitted that his finding lacked the statistical significance applied in his field, one court cautioned, "Courts should particularly pay close attention when expert witnesses depart from generally accepted scientific methodologies. . . 'A judge or jury is not equipped to evaluate scientific innovations.'" *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 197 n.4 (5th Cir. 1996).  This Court should similarly reject Miller's departure from the rigors of financial economics and exclude his unfounded testimony.

### 3.    Miller's proportional trading model is not generally accepted.

In calculating section 11 and section 12 damages, Miller uses a proportional trading model.  Professor James explains that "[s]uch models have not been generally accepted or tested in the economics profession, and error rates for such models are not known." (Ex. 337 at 27 ¶ 71.)  Proportional trading models have been rejected by courts as not satisfying the rigors of *Daubert. See Kaufman v. Motorola*, 2000 WL 1506892, at *1 (N.D. Ill. Sept. 21, 2000); *Bell v. Fore Sys, Inc.*, 2002 WL 32097540, at *3 (W.D. Pa. Aug. 2, 2002).  Miller's model overstates trading volume, overestimates the number of shares, uses unsupported model subperiods, and applies an assumed "decline curve" based on an arbitrary non-peer-reviewed methodology  (Ex. 337 at 29-31 ¶ 76.)

11

**C.  Miller's opinion is not based on verifiable facts and is so fundamentally flawed as to be inadmissible.**

Miller's analysis does not reliably apply the principles and methods on which it is ostensibly based. In the few instances where he purports to examine causes of Adams Golf's stock-price decline, Miller misstates the undisputed facts from discovery. For example, Miller asserts that the October 22, 1998 press release is the "first Company press release admitting the existence of a major impact of gray marketing." (Ex. 335 at 8 ¶ 10.) He ignores the fact that the purported "major impact of gray marketing" as disclosed in this press release was a fourth-quarter event and such information did not exist at the time of the IPO. (Ex. 337 at 15 ¶¶ 45-46.)

**D.  Miller's report fails to meet the requirements of both the Federal Rules of Civil Procedure and Evidence.**

To be admissible, an expert must disclose the factual bases underlying his opinions: "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" FED. R. EVID. 702 advisory committee's notes to the 2000 Amendments ¶ 13; *see also Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough."). Moreover, Federal Rule of Civil Procedure 26(a)(2)(B) governs the content of expert reports and provides:

> The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; [and] the data or other information considered by the witness in forming the opinions . . . .

An expert's report must be "detailed and complete" in order to "avoid the disclosure of sketchy and vague expert information." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996); *see also Bonesmo v. Nemours Found.*, 253 F. Supp. 2d 801, 810 (D. Del. 2003). As a sanction for failing to comply with Rule 26 requirements for expert reports, the Court may prohibit the use of the subject testimony. *See* FED. R. CIV. P. 37(c)(1).

12

1.    **Miller's report is not based on sufficient facts or data.**

Miller's report fails to disclose the facts and data on which his opinion rests. He recites

mere conclusions without the required factual basis:

- "Gray marketing reduces profit margins by causing a company to take costly steps to protect authorized retailers' margins. . . . Earnings are therefore reduced directly by the existence of gray marketing." (Ex. 334 at 7 ¶ 13.) But other than vague speculation, he could not identify what particular steps were taken before the IPO or what impact (if any) they had on Adams Golf's financial results. (Miller Dep. Tr. 175:25-179:17.)

- "It would be surprising if there were not some significant overlap between [Costco personnel and customers and Adams distributors] and investors in Adams Golf stock." (Ex. 334 at 10 ¶ 16(A).) Nowhere, however, does Miller identify anything other than speculation about whether these individuals invested in or sold Adams Golf stock. (Ex. 337 at 26 ¶ 69.) Furthermore, if these investors did know about the gray market then that would be part of the total mix of information and would result in no damages since it was not new information. (Ex. 337 at 26-27 ¶ 70.)

- The *Golf Pro* article "was apparently available in the middle of July." (Ex. 334 at 10 ¶ 16(C).) Miller testified that he thinks plaintiffs' counsel may have spoken with someone who thought it might possibly have been published in July, but someone else said it was published in August—he didn't know who spoke to whom or exactly what they said. (Miller Dep. Tr. 125:15-126:19.) Although he claims "the text itself strongly suggests that it may well have been distributed in the middle of July," he could not identify any such text in his deposition. (Ex. 335 at 6 ¶ 9.) And he ignores the published cover date of the article and the fact that the only references to *Golf Pro* articles in other publications occur after the publication date, suggesting it was released on the cover date. (Ex. 337 at 12 ¶ 36; James Dep. Tr. 256:6-257:7.) Even his own chronology of information events places the *Golf Pro* article as published on August 1, 1998. (Ex. 335 at Ex. B at 61.; Miller Dep. Tr. 136:3-13.)

These mere conclusions, masquerading as "expert" opinions, are not supported by an appropriate

factual basis and, therefore, cannot be tested adequately by cross-examination or rebuttal.

*Daubert*, 509 U.S. at 593 n.10. Accordingly, these opinions must be rejected.

13

2.     **Miller's undisclosed opinion on due diligence of the Adams Golf officers and directors must be excluded because of insufficient disclosures and untimeliness.**

Although neither of Miller's expert reports disclose ***anything*** about the due diligence of the officers and directors, he purportedly intends to opine about this topic at trial. After plaintiffs' counsel shut down Mr. Miller's deposition and after the Adams Golf Defendants' counsel had left (in order to catch the last flight out to Texas to arrive home in time for the premature birth of his wife's new baby), plaintiffs counsel asked the following:

> Q:     Mr. Miller, aside from the opinions that have been expressed in your various reports about underwriters' due diligence, are there any other opinions that you have formed and believe you may express in the litigation on the subject of due diligence?
>
> A:     If asked about the topic of due diligence with respect to other parties besides the underwriters, I would offer the same sort of opinion with respect to the conduct of due diligence by other parties being signatories or defendants in this matter as well.

(Miller Dep. Tr. 308:24-309:10.) Miller then opined that he has evaluated the due diligence of the Adams Golf officers and directors and believes it to be inadequate. (Miller Dep. Tr. 309:22-310:10.) This testimony should be excluded because he never disclosed such opinions in his initial report or his rebuttal report, nor did he disclose that he even considered opining about the topic. *See* Fed. R. Civ. P. 26(a)(2)(B) ("The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; [and] the data or other information considered by the witness in forming the opinions . . . ."). Plaintiffs' counsel knew that this recent "opinion" was unexpected by defense counsel because of Miller's insufficient (in fact empty) prior disclosures on the issue, as he commented, "I have one question, possibly the famous one question, for Mr. Miller to get on the record before we terminate." (Miller Dep. Tr. 307:7-9.) Since none of Miller's opinions or bases for these opinions have been disclosed, and because of the underhanded way this issue was handled by plaintiffs' counsel, Miller's purported

14

opinions on the due diligence of the Adams Golf officers and directors must be excluded pursuant to the Federal Rules of Civil Procedure.

Rule 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by . . . Rule 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), *is not*, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." *See also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001) (exclusion an appropriate remedy for failing to meet the disclosure requirements of Rule 26(a)).[4] This Court should exercise its power under Rule 37(c)(1) and strike plaintiffs' purported expert testimony on the due diligence of Adams Golf's officers and directors.

## III.   CONCLUSION

The objective of *Daubert's* gatekeeping requirement is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. As demonstrated above and emphasized in Professor James's rebuttal report, Miller employs an analysis not generally accepted in the field and abandons the intellectual rigor mandated by financial economics. Since nothing in *Daubert* or the Federal Rules of Evidence requires a trial judge to admit opinion evidence that is connected to the underlying data only by the *ipse dixit* of the expert, this Court should exclude Miller's opinions. *Id.* at 157.

---

[4] *See also Ortiz-Lopez v. Sociedad Expanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 248 F.3d 29 (1st Cir. 2001) (although exclusion of an expert would prevent plaintiff from making out a case, it was "nevertheless within the wide latitude" of Rule 37(c)(1))

Jeffrey L. Moyer (#3309)

Of Counsel:                                 moyer@rlf.com
Paul R. Bessette                            Alyssa M. Schwartz (#4351)
Jennifer R. Brannen                         schwartz@rlf.com
Michelle A. Reed                            Richards, Layton & Finger, P.A.
Laura Moriaty                               One Rodney Square, P.O. Box 551
Akin Gump Strauss Hauer & Feld LLP          Wilmington, Delaware  19899
300 West 6th Street, Suite 2100             (302) 651-7700
Austin, Texas  78701


                                            Attorneys for Defendants Adams Golf, Inc.,
                                            B.H. Adams, Richard H. Murtland, Darl P.
                                            Hatfield, Paul F. Brown, Jr., Roland E. Casati,
                                            Finis F. Conner, and Stephen R. Patchin


Dated:  September 11, 2006

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2006, I have caused the foregoing to be served by

Hand Delivery and Electronic Mail which has also been filed with the Clerk of Court using

CM/ECF which will send notification of such filing(s) to the following:

Carmella P. Keener
Rosenthal, Monhait & Goddess
919 Market Street, Suite 1401
Wilmington, DE 19801

Robert K. Payson
John E. James
Potter Anderson & Corroon LLP
1313 North Market Street, Hercules Plaza
Wilmington, DE 19801

I hereby certify that on September 11, 2006, I have sent by Federal Express and

Electronic Mail the foregoing document(s) to the following non-registered participants:

Neil Mara
Todd S. Collins
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA 19103

Michael J. Chepiga
Theodore J. McEvoy
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Alyssa M. Schwartz (#4351)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
schwartz@rlf.com