IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: ADAMS GOLF, INC. | ) |
| SECURITIES LITIGATION | ) Civil Action No. 99-371-KAJ |
|  | ) (CONSOLIDATED) |
|  | ) |

**OPENING BRIEF IN SUPPORT OF UNDERWRITER
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*Of Counsel*:

Michael J. Chepiga
Paul C. Gluckow
Theodore J. McEvoy
Ryan A. Kane
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017-3954
Telephone: (212) 455-2831
Facsimile: (212) 455-2502

Robert K. Payson (No. 274)
John E. James (No. 996)
POTTER ANDERSON & CORROON LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
E-Mail: rpayson@potteranderson.com
E-Mail: jjames@potteranderson.com

*Attorneys for Underwriter Defendants*

Dated: September 11, 2006
749468/23310

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................iv

NATURE AND STAGE OF THE PROCEEDINGS ...................................................1

SUMMARY OF ARGUMENT................................................................................1

    The Underwriters Conducted a Reasonable Investigation....................................................2

    The Underwriters Reasonably Believed Costco Sales Were Not Material ........................4

STATEMENT OF FACTS ....................................................................................5

    I.    The Underwriters Conducted A Thorough, Knowledgeable And Reasonable Investigation Of Adams Golf.......................................................................5

    Adams Golf: A Rapidly Growing Company With One Major Product .................5

    The Underwriters Formed An Experienced Due Diligence Team Of 15 Professionals ...............................................................................................6

    March 24: Due Diligence Begins ............................................................8

    April 1 To April 24: Documents Are Reviewed, Management Interviewed, And Calls Begin To Adams' Largest Retail Customers ...........................................8

    Continuing Discussions With Adams Management ...............................................10

    Due Diligence Of Manufacturing, Including Interviews With Suppliers ..............11

    Review And Analysis Of Internal Business Plans And Financial Forecasts ........11

    Research Analysts Provided An Independent Analysis Of Adams Golf And The Golf Club Industry, Including An Analysis Of Growth And Competition .............................................................................................12

    The Due Diligence Team Interviewed Adams' Independent Outside Auditors .......................................................................................................12

    The Adams IPO Was Approved By The Underwriters' Commitment Committees ..................................................................................................13

    May 1998: Lehman And Nationsbanc Prepared Financial Projections for Adams ...........................................................................................................13

    May-June 1998: The Preliminary Prospectus Was Submitted To The SEC For Review......................................................................................................14

July 9: Bringdown Due Diligence Before The Registration Statement Became Effective ...................................................................................14

Adams Golf's 2nd And 3rd Quarter Earnings Were Consistent With Pre-IPO Estimates ........................................................................................14

II.    The Underwriters' Conducted A Thorough, Knowledgeable And Reasonable Investigation Of The Costco Sales .......................................................15

The Underwriters Knew That Gray Market Sales Were Common In The Golf Club Industry.............................................................................16

The Due Diligence Team Was Aware Of The Costco Issue ................................16

No One Said During Due Diligence That Costco Was A Significant Issue ..........17

Customer Calls................................................................................17

The Underwriters Reasonably Concluded And Believed That Costco Was A Minor Issue, Not Material To Adams Golf's Prospects ...................................18

The Underwriters Were Aware Of Adams' Legal Action Against Costco ...........19

The Underwriters Knew About Communications With The SEC.........................20

The Underwriters Discovered And Considered The Issue And, Based On The Evidence Available At The Time Of The IPO, Reasonably Concluded That The Few, Isolated Costco Sales Were Not Material .....................................20

For Almost Four Months After The IPO, Costco Was Still Not A Significant Issue ..............................................................................21

III.   Based On Their Reasonable Investigation, The Underwriters Reasonably Believed That Costco Sales Were Not Material....................................................22

ARGUMENT.................................................................................................22

I.    The Underwriters' Investigation of Adams Golf And Of The Costco Sales Was Reasonable; That Is All The Law Requires .....................................................23

       A.    The Law Requires A Reasonable Investigation, Not A Perfect Investigation ...............................................................................23

       B.    The Investigation Of Adams Golf As A Whole Was Reasonable .............................................................................................24

       C.    The Due Diligence On The Costco Sales Was Thorough; Indeed, Plaintiffs Have Not Identified Any Material Facts The Underwriters *Should* Have Discovered .........................................27

Page

D.    Plaintiffs May Not Rely On Documents Created *After* The IPO In An Effort To Show That The Underwriters' Pre-IPO Investigation Was Flawed..............................................................28

E.    The "Double-Shipping" Claim Relates Solely To The Financial Statements; There Is No Evidence That The Underwriters' Belief In The Accuracy Of Those Statements Was Unreasonable ......................................................................28

II.    The Underwriters Reasonably Believed — Based Upon Their Reasonable Investigation — That The Costco Sales Were Not Material................................30

CONCLUSION..............................................................................................................35

# TABLE OF AUTHORITIES

## CASES

Page

*Coates v. Heartland Wireless Communications, Inc.*,
  55 F. Supp. 2d 628 (N.D. Tex. 1999) ..............................................................31, 34

*Competitive Assocs., Inc. v. International Health Sciences, Inc.*,
  72 Civ. 1848-CLB, 1975 WL 349  (S.D.N.Y. Jan. 22, 1975) ...........................25, 26

*Escott v. BarChris Construction Corp*,.
  283 F. Supp. 643 (S.D.N.Y. 1968) .........................................................................32

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ......................................................................30, 31, 33

*In re Donald J. Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir. 1993) .......................................................................................30

*In re International Rectifier Sec. Litig.*,
  No. CV91-3357-RMT (BQRX), 1997 WL 529600 (C.D. Cal. Mar. 31, 1997) ....23, 25, 26, 28

*In re Mobile Media Sec. Litig.*,
  28 F. Supp. 2d 901 (D.N.J. 1998) ...........................................................................24

*In re Software Toolworks Inc. Sec. Litig.*,
  50 F.3d 615 (9th Cir. 1994) ...............................................................................29, 32

*In re World of Wonders Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ..................................................................................29

*In re Worldcom, Inc. Sec. Litig.*,
  346 F. Supp. 2d 628 (S.D.N.Y. 2004) ...............................................................29, 34

*Klein v. General Nutrition Companies, Inc.*,
  186 F.3d 338 (3d Cir. 1999) ...................................................................................30

*Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & ERISA Litig.)*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) ....................................................................29

*Phillips v. Kidder, Peabody & Co.*,
  933 F. Supp. 303 (S.D.N.Y 1996), *aff'd,* 108 F.3d 1370 (2d Cir. 1977) ...................25, 26, 33

*Picard Chemical Inc. v. Perrigo Co.*,
  No. 1:95-CV-141, 1:95-CV-290, 1998 WL 513091 (W.D. Mich. June 15, 1998) ..........passim

Page

*Weilgos v. Commonwealth Edison Co.*,
   892 F.2d 509 (7th Cir. 1989)..................................................................................34

*Weinberger v. Jackson*,Co
   No. C-89-2301-CAL, 1990 WL 260676 (N.D. Cal. Oct. 11, 1990) ...........................23, 25, 26

## **<u>STATUTE</u>**

15 U.S.C. §77k(b)(3)(c) ........................................................................................29, 31

## NATURE AND STAGE OF THE PROCEEDINGS

The Underwriter Defendants refer to and incorporate herein the statement of the Nature and Stage of the Proceedings in the Adams Golf Defendants' Motion for Summary Judgment, and add that on August 3, 2005 the Court also certified a Section 12(a)(2) class against Lehman Brothers. The Underwriter Defendants likewise move for summary judgment in their favor on all claims asserted against them. This is the Underwriter Defendants' Opening Brief in support thereof.

## SUMMARY OF ARGUMENT

Plaintiffs' case against the Adams Golf Underwriters rests on a single omission: the absence of a reference to unauthorized sales of Adams clubs by the Costco Warehouse chain. Plaintiffs do not say that any words in the Prospectus are *explicitly misleading*. They effectively admit the accuracy of (i) the historical financial results and financial statements, (ii) the written description of Adams Golf's business, and (iii) the written description of the "risk factors." Indeed, Plaintiffs concede that the entire Prospectus would be completely accurate if only it said something about the Costco sales.

Plaintiffs must, of course, first prove that this omission was actually material.[1] But even if they do, that does not mean the Underwriters are liable. Sections 11 and 12(a)(2) of the Securities Act state that — even if there *is* a material omission — the Underwriters are not liable if they prove they had, "after reasonable investigation, reasonable ground to believe and did believe . . . that there was no omission to state a material fact . . . ."

---

[1]     As set out in the Adams Golf Defendants' Motion for Summary Judgment, the Costco issue was *not* material. The Underwriters join and incorporate herein the arguments asserted in the Adams Golf Defendants' Motion for Summary Judgment.

The undisputed facts show that — based on the results of their reasonable investigation — the Underwriters "reasonably believed" that the Costco sales were not material to Adams Golf.

### The Underwriters Conducted a Reasonable Investigation

Beginning in March 1998, Lehman Brothers, Nationsbanc Montgomery, and Ferris Baker Watts formed a due diligence team of at least 15 experienced financial professionals. The team included experienced investment bankers, financial analysts, research analysts, and attorneys. Day-to-day supervision was provided by Olga Pulido-Crowe, an experienced Lehman Senior Vice President, with extensive knowledge of the golf club market.

This diligence team reviewed Adams' internal files. They went over legal files, corporate structure, and business plans. They went over financial statements and projections. They met with internal accountants and outside auditors.

The due diligence team also met with and interviewed Adams management. As part of those discussions, Adams management informed them about the Costco sales. Management said these were a small fraction of Adams' sales and were not material. They said that Adams was taking steps to stop the sales, including filing a suit against Costco to obtain information.

The Underwriters did not simply accept the statements made by Adams management about Adams' business. The due diligence team interviewed 7 of Adams' largest retail customers and an international distributor. Not one of these customers even mentioned gray markets or the Costco purchases, much less expressed any concern about that issue.

- 2 -

Pulido-Crowe checked some Costco stores, including a Costco in the San Francisco area, a major market for high-end golf clubs.  None of those Costco stores had Adams Golf clubs, confirming that the sale of Adams golf clubs was not a chain-wide practice, but was limited to individual stores.  This further confirmed management's belief that the Costco sales were not material to Adams' overall revenues.

The Underwriters' research analysts were also a significant part of the due diligence team. These were specialists in analyzing companies.  Their normal occupation was providing clients with reports on companies.  The research analysts who were part of the due diligence team already had an extensive background in the golf club industry. They reviewed marketing information, market share information, and information about Adams' competitors.  They spoke to Adams management.  Not one of these analysts stated that Costco sales were material.

The Underwriters also knew that — in response to a comment from the SEC — Adams Golf had stated that it did not believe the Costco issue was material.  The Prospectus contained no reference to Costco sales, and the SEC allowed the offering to go effective.

This case is unlike most due diligence cases, because the Underwriters learned of the Costco sales, discussed those sales with management, and independently verified management's statements.  In fact, Plaintiffs cannot point to a single piece of pre-IPO evidence that the Underwriters could have discovered showing that the Costco sales were material.  Plaintiffs are thus left to point to documents created *after* the IPO.  This does not cast doubt on the pre-IPO due diligence, because no amount of pre-IPO investigation could have discovered documents that did not exist.

***The Underwriters Reasonably Believed Costco Sales Were Not Material***

Section 11 states that:

> In determining . . . reasonable ground for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property.

The Underwriters believed the Costco sales were not material.  It is undisputed that there is nothing about gray market sales in general that made this belief unreasonable.  In fact, the Plaintiffs *admit* there is nothing inherently material about gray markets.  They have stated that, although many golf club manufacturers faced gray marketing, "*such gray marketing impacted each company in different ways, at different times, and triggered different responses.*"  A1122 (Response No. 39) (emphasis added).[2]

There is no question about the reasonableness of the Underwriters' process for deciding the materiality of the Costco sales.  They knew about the Costco sales, knew that those sales were limited to individual Costco stores, and knew that the sales were a very small percentage of Adams Golf's overall sales.  They analyzed the Costco sales in light of the specific facts, and believed the sales were not material.  They also believed that Adams Golf was taking appropriate steps to deal with the sales.

These beliefs were based on the best information available.  They were reached after due deliberation.  And these beliefs were shared by everyone involved in the Adams Golf IPO.  They were clearly reasonable in light of the Underwriters' extensive investigation.

---

[2]     The record evidence cited by the Underwriters in their Opening Brief is included in an Appendix filed contemporaneously herewith and referenced by an "A" prefix.

Plaintiffs' argument thus boils down to a claim that even though the Underwriters reasonably believed that the Costco sales were not material to Adams Golf's earnings, the Prospectus should nevertheless have said that it was *possible* that Costco sales might — in the future under a different set of circumstances — materially affect Adams' earnings. If that were the disclosure standard, every prospectus would be the size of a telephone book. Stuffing a prospectus full of immaterial information makes it *less* meaningful, not more.

The Underwriters have met their burden of proof. [3] Plaintiffs are unable to deny those facts. Summary judgment should be granted dismissing the claims against the Underwriters.

## STATEMENT OF FACTS

Section 11 requires a reasonable investigation and a reasonable belief. The undisputed facts show that the investigation — of Adams as a whole and of the specific issue of Costco sales — was reasonable, as was the Underwriters' belief that Costco sales were not material.

### I. THE UNDERWRITERS CONDUCTED A THOROUGH, KNOWLEDGEABLE AND REASONABLE INVESTIGATION OF ADAMS GOLF

### Adams Golf: A Rapidly Growing Company With One Major Product

Adams Golf began selling golf clubs in 1995. A586; A65. These clubs were designed to help amateur golfers achieve lower scores by giving them more distance on shots from the fairway, rather than just off of the tee. A592. The clubs were a hit, and sales began to increase rapidly. A626; A54-55; A86-89. Given that its market was

---

[3]    The due diligence defenses under §§11 and 12 are effectively the same. Thus, these arguments also require dismissal of the §12(a)(2) claim against Lehman.

golfers with some experience, who were willing to buy specialized clubs, Adams

concluded that it could sell its clubs to this market at a relatively high price.  A493.

Adams Golf sold its clubs through direct marketing, including television

infomercials, and through the retail channel.  A598; A255.  The main retailers were golf

course pro shops and specialty golf shops.  A586.  Adams Golf did not have any

problems with gray markets or unauthorized sales in 1995, 1996, or 1997.

By 1998 Adams Golf had grown large enough to issue publicly traded stock.

A62; A1040-1041.  It retained three underwriters for its Initial Public Offering: Lehman

Brothers, Nationsbanc Montgomery, and Ferris Baker Watts.  A644-680.  Lehman was

the lead underwriter.  *Id.*; A325.

### *The Underwriters Formed An Experienced Due Diligence Team Of 15 Professionals*

As lead underwriter, Lehman had overall responsibility for due diligence.  A972-

975; A136.  But all three Underwriters contributed personnel to conduct due diligence.

A549-A562.

| Lehman Brothers (7) | Nationsbanc (5) | Ferris Baker Watts (3) |
|---|---|---|
| Stuart Francis<br>*Managing Director* | John Berg<br>*Senior Managing Director* | Steven Shea<br>*Senior Vice President* |
| Olga Pulido-Crowe<br>*Senior Vice President* | Jeff Mills<br>*Associate* | Charles Place<br>*Vice President* |
| Patrick Walravens<br>*Associate* | John Weiss<br>*Senior Managing Director* | Joe Teklits<br>*Equity Analyst* |
| Sameet Mehta<br>*Financial Analyst* | Courtney Tuttle<br>*Associate* | |
| Bradley Smith<br>*Vice President* | David Chanley<br>*Analyst* | |
| Bernard Picchi<br>*Managing Director: Equity Research* | | |
| Brian Lantier<br>*Equity Research Analyst* | | |

This team of investment bankers, financial analysts, and research analysts was joined by experienced lawyers from Cooley Godward, LLP, counsel to the Underwriters. A560; A324. Adams Golf retained Arter & Hadden as counsel. A559; A1103.

The head of Lehman's team was Stuart Francis, a managing director. The day-to-day leader was Olga Pulido-Crowe. A942-943. She joined Lehman in 1986 after receiving her M.B.A. from Harvard. A936. At the time of the Adams Golf IPO, she was a Senior Vice President, and in charge of Lehman's West Coast consumer industrial banking group. A937. In addition to her 12 years of experience at Lehman, and her general experience with consumer products, she had handled the IPO of Cobra, a golf club manufacturer. A939-940. During that IPO she became familiar with the golf club industry in general, and with the high-end golf club markets. A940-941.

Her direct assistant was Patrick Walravens, a J.D./M.B.A. who was experienced in due diligence. A958-960. Sameet Mehta was a financial analyst who reviewed all financial matters and projections. He helped generate Lehman's internal financial analysis of Adams Golf. A961.

All three Underwriters contributed members of their equity research departments. A549-A562. These analysts normally provided independent research on companies in this industry. A1022-1025; A1035-1037. They used their experience and research skills to provide an independent analysis of Adams Golf for the Underwriters. A962-965; A1032-1033. The Lehman and Nationsbanc analysts were Managing Directors, who were assisted by associates. Ferris Baker Watts also provided a research analyst from its research group. A549-A562.

Plaintiffs try to focus the due diligence issue entirely on sales to Costco Warehouse Club.  But the investigation of those sales was only a small part of the overall due diligence effort.  A947; A949; A965-966.  The overall scope of their due diligence demonstrates the depth and sophistication of the Underwriters' efforts.  Accordingly, this Statement of Facts will describe the overall due diligence effort, dealing with the smaller issue of the Costco sales in the proper context.

### March 24: Due Diligence Begins

The Underwriters held a "kick-off" meeting on March 24, 1998.  A104. Representatives of all three Underwriters met with senior management from Adams Golf to discuss the IPO process and begin due diligence.  A105-132.  Adams management was given a 7-page Due Diligence Outline/Request that listed detailed areas of due diligence, including documents that would need to be provided and a due diligence schedule. A123-130.  Due diligence began at that meeting with several presentations by Adams management.  A106.

### April 1 To April 24: Documents Are Reviewed, Management Interviewed, And Calls Begin To Adams' Largest Retail Customers

*Background Checks*

Within a week, Lehman had conducted background checks on Adams senior management and reported the results in an April 1 memorandum.  A215-248. This research included reading a variety of news articles and magazine articles about Adams Golf.  *Id.*  The articles were then attached to a memorandum reporting the results of the investigation.  *Id.*  None of the articles mentioned any gray market issues for Adams Golf.  *Id.*

*Document Review*

On April 8, the due diligence team received two shipments of Adams Golf documents.  A259-268.  These documents included financial projections, organization charts, Auditor's management letters, and sales data for 1995 to 1997, broken down by product and geographical area.  *Id.*  The documents also included revenue recognition policies and an inventory analysis.  A266.

On April 22 through 24 another three shipments of documents came from Adams Golf.  A312-319.  They were all reviewed by the due diligence team.  A976-978.  The attorneys reviewed all major contracts and legal documents.  A714.  None of the documents received from April 8 to April 24 identified gray marketing or Costco as a material issue for Adams Golf.

*Customer Calls*

On April 1 the Underwriters received a list of Adams' top 10 retail customers. A249-251; A1018-1019.  The due diligence team reviewed that list, and randomly divided those customers among the Underwriters.  A269.  The Underwriters interviewed the customers by telephone.  A981.  A substantial questionnaire was provided to each Underwriter to guide their conversations.  A269-274.  The calls were meant to confirm information given to the Underwriters by Adams management, and to find out if the customers were experiencing any other problems.  A981-984.

For example, on April 9, 1998, Lehman conducted a phone interview with the Vice President of Merchandising for Golfsmith International.  A292-296.  He confirmed that Golfsmith was satisfied with Adams clubs, and stated that Golfsmith was anticipating increases in its sale of Adams clubs over the next two years.  *Id.*  He also said

that Golfsmith expected to continue doing business with Adams Golf, and that there were no issues on knock-offs, clones or copies. *Id.* When asked if there were any other issues about Adams Golf that were important, he said: "No." *Id.* He did not identify gray marketing or Costco as an issue. *Id.*; A983-984.

From April 9 to May 16, the Underwriters called 6 more of the top 10 retail customers, and the distributor for Korea, which is in one Adams' most important international markets—Asia. A297-311; A436-443; A447-454. In every call, the customers stated that they were happy with Adams clubs, that they anticipated increasing sales of Adams clubs over the next two years, that they expected to continue doing business with Adams Golf, and that there were no issues with knock-offs, clones or copies. *Id.* They all stated that they had no other issues, except for one customer who wanted to buy Adams stock. *Id.* Not one of them identified gray marketing or sales to Costco as an issue. A983-984.

Indeed, in their Responses to Adams Golf's Request for Admissions, Plaintiffs stated — after discovery was closed — that they could not deny that:

> None of the Adams Golf retailer or distributors contacted by the Underwriters in the pre-IPO due-diligence process expressed concern about the presence of Tight Lies clubs appearing in certain Costco stores during the spring through July 1998.

A1123 (Response No. 42).

### Continuing Discussions With Adams Management

The Underwriters attended a number of formal meetings and conference calls with Adams management, including a meeting on April 13 (on historical financial performance, financial projections, and product introduction plans), a meeting on April 21 (on financial and accounting issues) and a teleconference on April 27 (on financial

projections). A325; A275-276. They conducted formal interviews of members of Adams management, including Barney Adams (CEO), Dick Murtland (VP, Operation), Jim Farrell (VP, Finance), Walt Devault (Director, Direct Sales) and Mark Gonsalves (VP, Sales). A713.

A member of Lehman's equity research group had a separate interview with Mark Gonsalves. A446. In addition to these meetings and interviews, the Underwriters had frequent contact with management on issues as they came up. A984; A989. One of those issues was sales by Costco of Adams clubs. A947-952. Plaintiffs have stated that they cannot deny this fact. A1121 (Response No. 38).

### Due Diligence Of Manufacturing, Including Interviews With Suppliers

Members of the Underwriters' due diligence team reviewed Adams' manufacturing capacity. A944-945; A967. They contacted major Adams suppliers. A713. They interviewed Mark Berry, a custom club fitter for Adams who traveled throughout Adams' markets offering advice on fitting clubs to individual purchasers. A714. None of these interviews raised any concerns about Adams Golf in general, or gray marketing in particular.

### Review And Analysis Of Internal Business Plans And Financial Forecasts

The Underwriters received copies of Adams' business plans and forecasts. A56-85; A277-289. Financial analysts, including Sameet Mehta from Lehman, reviewed those plans and forecasts. A961. Lehman prepared an independent analysis of Adams' prospects, including a valuation of the company and an income model for Adams for 1995-2002. A455-457. None of this analysis raised any questions about Adams and its internal forecasting capacity.

***Research Analysts Provided An Independent Analysis Of Adams Golf And The Golf
Club Industry, Including An Analysis Of Growth And Competition***

In addition to the investigation by the investment bankers, the research analysts
from the Underwriters conducted their own separate and independent review of the
company.  A1002-1003; A1027; A1032-1033; A962-965.  Each of the three Underwriters
had research analysts that analyzed Adams Golf.  A720-743; A764-787.  They also
analyzed the golf club industry, including Adams' primary competitor, Callaway.  A722-
723; A732-734; A774-779.

The research analysts considered risks for Adams based on their detailed
knowledge of the industry and their research of Adams, and analyzed the potential
growth for Adams and for the golf club market as a whole.  A1032-1033; A1004-1005;
A1007-1008.  The analysts reviewed trade journals, industry publications, general market
information and information about specific competitors.  A1011-1012; A1038; A1033.

Not one of these analysts identified any significant problems with Adams, or any
significant risks that were not in the Prospectus.  A1028-1029.  They did not say that any
gray market or Costco issue was material to Adams Golf.  A1006-1007; A1030-1031.  As
Olga Pulido-Crowe stated, the IPO would not have gone forward if the research analysts
had identified any serious issues.  A998.1-998.2.

***The Due Diligence Team Interviewed Adams' Independent Outside Auditors***

The due diligence team interviewed KPMG, the independent outside auditors for
Adams Golf.  A714.  They reviewed the financial statements for Adams.  *Id.*; A90-103;
A390-407.  KPMG represented to the Underwriters that it audited the 1996 and 1997
financial statements attached to the Prospectus and those financial statements "compl[ied]

as to form in all material respects with the applicable accounting requirements of the Act
and the related published rules and regulations adopted by the SEC."  A684.

### The Adams IPO Was Approved By The Underwriters' Commitment Committees

The Adams IPO was a "firm commitment" underwriting; the Underwriters
committed to purchase the Adams Golf shares and then resell them.  A654-655.  Not only
were they committing their own funds, they were committing their reputations.
Transactions such as the Adams Golf IPO thus had to be approved by the most senior
bankers at each Underwriter.  A997-998.

For example, the Lehman Equity Commitment Committee, comprising Lehman's
most senior and experienced bankers, was provided with a 14-page memorandum with
attachments.  A320-429; A939-940; A956-957; A997-998. The memorandum included a
forecast of Adams' market share, prepared by Lehman Equity Research, and over two
pages of risk factors.  A327-333.  As Olga Pulido-Crowe testified, the Committee
discussed the transaction in detail:

> Every word gets examined by our commitment committee. . . . they
> are very thorough meetings; they are not brief.  You are on the line
> at these meetings.

A998.

### May 1998: Lehman And Nationsbanc Prepared Financial Projections for Adams

In May 1998 Lehman and Nationsbanc analysts each prepared an analysis of
Adams Golf that included projected income statements.  A455-457; A469.  Lehman's
financial analysis was based on information provided by Lehman's equity research group.
A455-457; A333.  Interestingly, although these forecasts did not account for any gray
market effect, they nevertheless wound up accurately predicting Adams' actual results for
the 2nd and 3rd quarters of 1998.  *Compare* A455-457; A469 *with* A719; A804.

### *May-June 1998: The Preliminary Prospectus Was Submitted To The SEC For Review*

The preliminary prospectus was submitted to the SEC for review in May 1998. A444-445. After receiving and responding to written comments on the prospectus from the SEC, Adams Golf received further oral comments on June 25 and responded to these comments in a letter dated July 6. A510-548; A563-566. The SEC allowed the S-1 to become effective on July 9. A681.

### *July 9: Bringdown Due Diligence Before The Registration Statement Became Effective*

The Underwriters' due diligence continued to the very day that the Registration Statement became effective. On July 9, the Underwriters held a "bringdown due diligence" session. A567-568; A979-980. Adams Golf gave representations that there had not been any material changes in the company, and that Adams Golf and its management were not aware of any material misstatements or omissions in the Prospectus. A716-717. The outside auditors, KPMG, issued a comfort letter confirming that they were not aware of any misrepresentations or omissions in the audited financial statements. A682-711; A718.

### *Adams Golf's 2nd And 3rd Quarter Earnings Were Consistent With Pre-IPO Estimates*

The due diligence investigation ended on July 9. And Plaintiffs have stated that "the relevant time is before the IPO <u>not</u> during the Class Periods." A1112 (Response No. 13). But Plaintiffs have nevertheless used post-IPO documents to try to support their claims. In fact, pre- *and* post-IPO documents show that the Costco sales did not have a material effect on Adams Golf's earnings.

Plaintiffs concede that the historical financial results in the Prospectus were accurate.  A1120 (Response No. 35).  And those financials showed no effect from Costco sales.  The post-IPO results for the 2nd and 3rd quarters showed no effect of Costco sales. Both quarters met or exceeded the pre-IPO revenue projections of Lehman and Nationsbanc.  *Compare* A455-457; A469 *with* A719; A804.

Plaintiffs point to an October 22 press release — issued nearly four months after the IPO — in which Adams offered preliminary guidance on its earnings for the 4th quarter.  A804-806.  That preliminary guidance stated that Adams' estimate of 4th quarter net earnings would be at or slightly above break-even.  A804.  The press release stated that this estimate was based on the anticipated effect of several factors, including sales by Costco.  *Id.*

The press release was the first time Adams Golf stated that Costco sales would have any effect on Adams Golf's earnings.  Indeed, Barney Adams stated in memoranda written in October 1998 that the Costco issue had "greatly escalated in the last two weeks" and was a "surprise."  A788-789.

The Adams Golf 10K for 1998 does contain a reference to sales by a "certain membership warehouse club."  A831.  But the 10K does *not* say those sales materially affected 1998 earnings.  *Id.*

## II.    THE UNDERWRITERS' CONDUCTED A THOROUGH, KNOWLEDGEABLE AND REASONABLE INVESTIGATION OF THE COSTCO SALES

The Underwriters' overall due diligence was clearly reasonable.  The investigation of the Costco sales was equally thorough.

***The Underwriters Knew That Gray Market Sales Were Common In The Golf Club Industry***

Gray markets in golf clubs were not a surprise to the Underwriters. A949-950. Pulido-Crowe previously had taken Cobra, a golf club maker, public. A940. She testified that gray markets had been discussed in that deal, but they were not a significant issue. A950-951; A1000. As head of the consumer group for Lehman's West Coast office, she was generally aware of gray markets in consumer goods. A949-950; A986-987. Even Plaintiffs have admitted that "at differing times between 1992 and the autumn of 1998, Callaway, Taylor Made, Ping, and Orlimar experienced some amount of gray marketing." A1122 (Response No. 39).

In addition to Cobra, the Underwriters reviewed the IPO materials for Callaway. A999. Although it is undisputed that Callaway had experienced gray marketing, there was no mention of gray markets in Callaway's IPO prospectus. A1122 (Response No. 39); A1-53.

The research analysts from all three Underwriters were familiar with gray markets for golf clubs, including the leading club maker Callaway. A1026; A1009-1010. And they knew that gray markets were not necessarily significant for a consumer products company. A1029.1-1030; A1008.

***The Due Diligence Team Was Aware Of The Costco Issue***

Plaintiffs do not deny that:

In the due diligence process, Adams Golf management and the Underwriters discussed the presence of Tight Lies golf clubs in certain Costco stores in spring of 1998.

A1121 (Response No. 38). As Plaintiffs admit, the Underwriters learned about the Costco issue during due diligence. A946-952; A1006; A1129. They discussed it with

Adams management.  A1129; A946-954; A968-969; A985-988; A1020; A1042-1044; A932-934.  They knew Adams was dealing with that issue.  A968-970.  They knew that Adams management did not think it was significant.  A953-954; A968-969; A987-988; A1020; A1042-1044.  They reached their own view that it was not material.  A968-971; A987-988; A1006.

### No One Said During Due Diligence That Costco Was A Significant Issue

Plaintiffs cite complaints from Canadian distributor WDC Mackenzie as "notice" of the Costco issue that the Underwriters did not review.  But the Underwriters were aware that Costco was selling clubs in Canada.  A1129.

There was no evidence that anyone believed or said at any point pre-IPO that the Costco sales were material.  A946-954; A968-969; A985-988.  To place the issue in perspective, even Plaintiffs admit that Adams' total sales to Mackenzie were only approximately 3% of Adams' sales in 1998.  A1113 (Response No. 15).  And the sales of Adams Golf clubs through Canadian Costco warehouses were a small fraction of this 3%. A930.

### Customer Calls

The first Mackenzie complaints to Adams Golf regarding Costco sales were made on March 23, 1998.  A290.  On April 28, Lehman interviewed the owner of Pete Carlson's Golf & Tennis, one of Adams Golf's most important U.S. retailers.  A436-439; A163.  As with all the other customers who were called, Carlson expected business to increase, planned on continuing to do business with Adams Golf, and had no other concerns.  A436-439.  Costco was never mentioned.  *Id.*; A983-984.

On April 29, Lehman interviewed the buyer for Dick's Sporting Goods, which has 62 stores.  A440-443.  As with the others, he expected sales to rise, expected to continue

to do business with Adams Golf, and did not mention any problems with gray marketing or Costco. *Id.*; A983-984.

And as late as May 21, Lehman interviewed the Vice President for sales of Somerton Springs. A451-454. Somerton was one of Adams Golf's leading retail customers, with 24 locations. *Id.* The Somerton representative was happy with Adams, expected sales to increase, expected to keep doing business with Adams Golf, and had no problems with knock-offs or clones. *Id.* The only other issue he identified was that he would like to buy some shares of Adams stock. A454.

Indeed, Plaintiffs have stated — after the close of discovery — that they *do not deny* the fact that none of the major retailers and distributors contacted by the Underwriters expressed any concern about Costco sales of Adams clubs. A1123 (Response No. 42).

### *The Underwriters Reasonably Concluded And Believed That Costco Was A Minor Issue, Not Material To Adams Golf's Prospects*

The Underwriters knew that the Canadian market, as a whole, was only a small fraction of Adams Golf's sales. A1129; A955. The Underwriters also understood that the Canadian market was less important for Adams Golf than other foreign markets, such as Asia. A1129. The financial materials provided to the Underwriters during due diligence confirmed that Canada accounted for a very small percentage of Adams' overall sales. A154; A157. Given that the Costco sales in Canada were a small fraction of Canadian sales, which totaled only approximately 3% Adams' overall sales for 1998, the Underwriters reasonably believed that the issue was not material. Moreover, the Underwriters knew — since Costco had purchased those clubs from an Adams distributor

— that the sale of those clubs by Costco had not affected Adams' income.  A1015-1016; A968-969; A992.

After learning that some Adams Golf clubs had appeared in some Costco stores in Canada, Pulido-Crowe even checked for Adams Golf clubs at Costco stores, including stores in the San Francisco Bay area, a major market for high-end golf clubs.  A1130; A971-972.  She also visited Costco stores in other areas, including Southern California.  *Id.*  None of those Costco stores had Adams Golf clubs, confirming that the sale of Adams Golf clubs was not a chain-wide practice, but was limited to individual stores.  *Id.*

Plaintiffs have admitted that gray market issues must be judged according to the facts of each individual company, and, therefore, the mere existence of gray markets was not inherently material.  A1122 (Response No. 39).  The Underwriters analyzed the Costco sales in terms of the facts about Adams Golf pre-IPO.  A947; A949; A966-967.  They knew that the only impact on Adams' income from Costco sales could be if the sales grew so large and wide-spread that it reduced Adams' sales to retail customers.  A1030-1031; A1015-1016. There was no evidence that anyone pre-IPO believed that Costco sales would ever approach that level, and there is no evidence even today that Costco sales ever approached that level.

### The Underwriters Were Aware Of Adams' Legal Action Against Costco

The Underwriters were aware of Adams' letter to its distributors, informing them that they were not allowed to sell to discount stores.  A1129.  The Underwriters knew that Adams had contacted Costco asking for information.  A969-971; A987-988.  They also knew that Costco refused to provide any information about where it obtained its clubs.  A987-988; A1013-1014.

Plaintiffs have admitted that "there is evidence that Costco refused to identify its sources of Adams Golf clubs in response to questions from Adams Golf and Mackenzie." A1109 (Response No. 2). And they *do not deny* that (i) "Costco refused to identify the source of their Adams Golf clubs", and (ii) "Costco refused to provide Adams Golf with information about the number of Adams Golf clubs that it had obtained." A1108-1109 (Response Nos. 2-3).

The Underwriters were also aware that Adams had filed suit against Costco on June 9, seeking the information Costco had refused to provide. A985-988. The Underwriters carefully considered that lawsuit, discussed it with counsel and Adams management, and concluded that the Costco issue was not significant. *Id.*

### The Underwriters Knew About Communications With The SEC

On June 25, the SEC gave oral comments on the draft S-1 to counsel for Adams. A563. Included in those comments was a question about the filing of the suit against Costco, and whether some statement about Costco should be included in the S-1. *Id.*

Adams concluded that there was no reason to put any statements about Costco in the S-1 since it was not a significant issue. A1042-1044; A1104-1106. This position was discussed with the Underwriters, who agreed with that position. A990-993. Adams Golf's counsel spoke with the SEC, and on July 6 Adams Golf responded to the SEC with a letter that did not address the Costco issue. A564-566. The SEC allowed the registration statement to become effective. A681.

### The Underwriters Discovered And Considered The Issue And, Based On The Evidence Available At The Time Of The IPO, Reasonably Concluded That The Few, Isolated Costco Sales Were Not Material

The Underwriters' investigation was thorough. They did not find any evidence that Costco's minimal sales of Adams clubs was or would be material, and there was

- 20 -

none.  As of July 9, the Underwriters were abreast of the Costco issue.  They knew it was a minor issue in Canada.  A1129.  They concluded that it would have no demonstrable effect on Adams' financial results:  Sales by Costco would not harm Adams Golf because those sales came from an Adams' distributor, and there was no evidence as of July 9 that Costco's sales would grow so large that they would reduce Adams' sales.

Plaintiffs do not deny that Adams "had no pre-IPO documents [that] reflect the number of Adams Golf clubs in Costco stores."  A1110 (Response No. 5).  Further, in an April 20 memorandum, Chris Beebe, who was in charge of international sales, stated that Mackenzie had told Beebe in late April 1998 that Costco had about 600 clubs in Canada.  A431.  Beebe's notes from his meeting with Mackenzie stated that Beebe believed the Costco sales in Canada would have a "limited impact" in that country.  A297.  Indeed, it is undisputed that in an April 28 memorandum, Beebe stated that it was Mackenzie's feeling "that most Costco's are out of most Tight Lies, so there is no reason to do anything in terms of price support."  A1123 (Response No. 41).  In late May 1998, Beebe stated in another memorandum that Adams Golf's Costco sales could be managed just as other club manufacturers, such as Taylor Made, Ping and Callaway, managed the sale of their clubs by Canadian Costco stores. A1131.

Thus, there can be no dispute that the Underwriters' investigation was adequate.  Indeed, no matter how intensive the Underwriters' investigation was, they could not have found any Adams documents stating any opinion that the Costco sales were material to Adams Golf's prospects for the future — because there were none.

### *For Almost Four Months After The IPO, Costco Was Still Not A Significant Issue*

Plaintiffs admit that only pre-IPO documents are relevant.  A1112 (Response No. 13).  They then contradict themselves by relying on post-IPO documents.

- 21 -

But even if post-IPO documents were relevant to Plaintiffs' claims against the Underwriters, all of those documents support the Underwriters' position. No document issued for nearly 4 months after the IPO contains any indication that the Costco sales had any discernible effect on Adams' earnings as of the IPO or during the 2nd and 3rd quarters. In fact, Adams met or exceeded the Lehman and Nationsbanc pre-IPO earnings estimates for the 2nd and 3rd quarters. *Compare* A455-457; A469 *with* A719; A804.

### III.    BASED ON THEIR REASONABLE INVESTIGATION, THE UNDERWRITERS REASONABLY BELIEVED THAT COSTCO SALES WERE NOT MATERIAL

Plaintiffs have *admitted* that:

[A]t differing times between 1992 and the autumn of 1998, Callaway, Taylor Made, Ping, and Orlimar experienced some amount of gray marketing, but that such *gray marketing impacted each company in different ways, at different times, and triggered different responses*.

A1122 (Response No. 39) (emphasis added). It is undisputed that gray markets are *not* always important. Each company must consider its own situation, recognizing that gray marketing may affect each company in different ways, at different times, and trigger different responses. And these are the issues that the Underwriters considered for Adams Golf. After reasonable investigation, they determined that Costco sales had not materially affected Adams Golf; even Plaintiffs admit that the Costco sales did not affect Adams' historical financial statements. A1120 (Response No. 35).

The Underwriters believed — based upon their investigation — that Adams management was correct in concluding that the Costco sales were not material. That belief was reasonable.

### ARGUMENT

Summary judgment is appropriate when undisputed facts show that defendants are not liable. Courts have awarded summary judgment when it is undisputed that the

underwriters are entitled to the reasonable belief defense in §§11 and 12. *Picard Chemical Inc. v. Perrigo Co.*, No. 1:95-CV-141, 1:95-CV-290, 1998 WL 513091, *16 (W.D. Mich. June 15, 1998) ("*Picard Chemical*");[4] *In re International Rectifier Sec. Litig.*, No. CV91-3357-RMT (BQRX), 1997 WL 529600, *11 (C.D. Cal. Mar. 31, 1997) ("*International Rectifier Sec. Litig.*"); *Weinberger v. Jackson*, No. C-89-2301-CAL, 1990 WL 260676 (N.D. Cal. Oct. 11, 1990) ("*Weinberger*").

The undisputed evidence establishes that the Underwriters conducted a *reasonable* investigation, and had a *reasonable* belief. Thus, even if Plaintiffs could find a mistake in the investigation, or someone who could disagree with the Underwriters' belief, that would not defeat summary judgment.

## I.  THE UNDERWRITERS' INVESTIGATION OF ADAMS GOLF AND OF THE COSTCO SALES WAS REASONABLE; THAT IS ALL THE LAW REQUIRES

Section 11 only requires a reasonable investigation. The Underwriters' investigation of Adams Golf met that standard. Summary judgment is thus appropriate as to the reasonableness of the Underwriters' investigation of Adams Golf as to that prong of the due diligence defense.

## A.  The Law Requires A Reasonable Investigation, Not A Perfect Investigation

Plaintiffs essentially seek to impose a strict liability standard for the Underwriters, requiring a flawless investigation. But that is not the law.

In fact, as the Court said in *International Rectifier Sec. Litig.*, "the diligence conducted must be reasonable, not perfect." 1997 WL 529600 at *7. The plaintiffs in *International Rectifier* claimed that the underwriters erred by interviewing the largest customers, rather than a random selection. *Id.* at *11. The Court noted that, even if that

---

[4]    Unreported cases are attached to the Appendix at A1132-1184.

was a mistake, "one judgmental error on the part of the Underwriters, in light of the otherwise thorough due diligence investigation performed, should not, alone, negative the reasonableness of their investigation." *Id*.

This was confirmed by the Court in *Picard Chemical*, stating that "the ultimate question is whether the defendant performed a reasonable investigation and had a reasonable belief that the information regarding the offering was true and accurate." 1998 WL 513091 at *15; s*ee also In re Mobile Media Sec. Litig.*, 28 F. Supp. 2d 901, 933 (D.N.J. 1998) ("*Mobile Media Sec. Litig."*).

Thus, the first issue for this Court to decide is whether the investigation was reasonable, not whether it was flawless. It was reasonable. Indeed, the actual investigation far exceeded the requirements of §11.

**B.     The Investigation Of Adams Golf As A Whole Was Reasonable**

Contrary to Plaintiffs' fixation with the limited issue of the Costco sales, the Underwriters were required to conduct a reasonable investigation of *all* of Adams Golf. And the scope and competence of that investigation refutes any claim that this sophisticated and thorough investigation somehow inexplicably broke down as to the Costco sales.

Despite off-hand comments by Plaintiffs' purported experts Alan Miller and Christiana Ochoa — both of whom are being challenged by defendants as proper experts — the Plaintiffs do not say that the Underwriters' overall due diligence was flawed. In fact, Edward Necarsulmer, the only expert in this litigation with actual experience — over thirty years — in conducting, supervising and reviewing due diligence in IPOs stated:

> [T]he underwriters of this offering performed due diligence in line with normal industry standards and practice. Their actions were consistent with a standard of reasonableness as I understand it, and were more than sufficient to satisfy me as to their adequacy and completeness.

A1048. Mr. Necarsulmer's opinion is entirely consistent with the standards adopted by various Courts over the years.

Those courts listed various factors that go into proper due diligence. *See Picard Chemical*, 1998 WL 513091 at *15; *International Rectifier Sec. Lit.,* 1997 WL 529600 at *7-8; *Phillips v. Kidder, Peabody & Co.,* 933 F. Supp. 303, 318-319 (S.D.N.Y 1996), *aff'd,* 108 F.3d 1370 (2d Cir. 1997) ("*Phillips*"); *Weinberger*, 1990 WL 260676 at *3; *Competitive Assocs., Inc. v. International Health Sciences, Inc.,* 72 Civ. 1848-CLB, 1975 WL 349 at *17-18 (S.D.N.Y. Jan. 22, 1975) ("*Competitive Assocs., Inc.*).

Combining these lists shows that the Underwriters met every requirement:

| Due Diligence Areas Identified by the Courts | This Case? |
|---|---|
| Begin with knowledge of industry | YES |
| Hold initial meeting with company to review diligence questions and begin process | YES |
| Obtain and review company documents, including important legal documents, documents relating to company structure, management and operations | YES |
| Have counsel review all important legal documents and contracts | YES |
| Have underwriters' counsel review all litigation | YES |
| Become familiar with company finances, management and operations | YES |
| Interview company management | YES |
| Review company forecasts and business plans | YES |
| Prepare independent forecasts of company revenues | YES |
| Interview major customers and suppliers | YES |

- 25 -

| Due Diligence Areas Identified by the Courts | This Case? |
|---|---|
| Interview outside auditors | YES |
| Work on drafting and reviewing prospectus | YES |
| Inspect manufacturing facilities | YES |
| Retain and use research analysts knowledgeable about the industry | YES |
| Gain knowledge of industry through publications, industry data, and journals | YES |
| Continue diligence until effective date, with bring-down due diligence session | YES |
| Obtain oral and written confirmation from management of lack of material misstatements or omissions | YES |
| Obtain "cold comfort" letter from independent outside auditors | YES |

There is *one* factor that distinguishes this case from other cases that have discussed due diligence. In each of those cases the claim is that the underwriters' due diligence *did not find* a key document or fact. Nevertheless, the Courts concluded that because the due diligence process included all necessary steps, summary judgment was appropriate even though the due diligence process had failed to uncover certain facts. *See Picard Chemical*, 1998 WL 513091 at *16; *International Rectifier Sec. Lit.,* 1997 WL 529600 at *13; *Phillips,* 933 F. Supp. at 325; *Weinberger,* 1990 WL 260676 at *3; *Competitive Assocs., Inc.,* 1975 WL 349 at *20.

Here, by contrast, the due diligence investigation uncovered the facts relating to the Costco sales. This is not surprising given the sophistication and thoroughness of the Underwriters' investigation. The Underwriters' due diligence involved weeks of investigation by 15 experienced investigators assisted by Underwriters' counsel. They covered every aspect of Adams' operations, checked with customers and suppliers,

interviewed management, and reviewed a large number of documents. That investigation *was* reasonable.

**C.    The Due Diligence On The Costco Sales Was Thorough; Indeed, Plaintiffs Have Not Identified Any Material Facts The Underwriters *Should* Have Discovered**

Plaintiffs do not challenge the general scope of the due diligence effort. Instead, they claim that — on the very limited issue of pre-IPO Costco sales — the Underwriters should have done even more due diligence. But the only actual flaw that Plaintiffs allege is the fact that the Underwriters did not interview Mackenzie, a Canadian distributor that accounted for approximately 3% of Adams' sales in 1998. But Plaintiffs do not state what additional facts the Underwriters would have learned if they had called Mackenzie.

The Underwriters had spoken to Adams management about the Costco issue. A1129; A946-954; A968-969; A985-988; A1020; A1042-1044; A932-934. They knew the Costco sales primarily involved Canada. A1129. They knew Adams was dealing with that issue. A968-970.

If the Underwriters had crawled through even more files, they still would not have found a document stating that Costco sales were *material*. No such documents ever existed.

In fact, they would only have found even more documents confirming that the Costco sales were not material. For example, the head of international sales, Chris Beebe, stated in his notes in late April that Costco sales would have a "limited impact" on Canadian sales. A297. And in late May, Beebe stated in a memorandum that Adams Golf's Costco sales could be managed just as other club manufacturers, such as Taylor Made, Ping and Callaway, managed the sale of their clubs by Canadian Costco stores. A1131.

**D.    Plaintiffs May Not Rely On Documents Created *After* The IPO In An Effort To Show That The Underwriters' Pre-IPO Investigation Was Flawed**

Plaintiffs have conceded that only pre-IPO evidence is relevant.  A1112 (Response No. 13).  But, unable to find pre-IPO evidence, they contradict themselves and rely upon *post*-IPO documents.  They cite analyst's reports in August — a month after the IPO went effective — stating that Adams clubs were starting to show up in Costco. But, as the Court stated in *International Rectifier Sec. Lit.*, underwriters cannot be faulted "for failing to examine data which were simply unavailable" at the time.  1997 WL 529600 at *10.

Looking at the undisputed pre-IPO evidence, it is clear that the Underwriters conducted a complete and reasonable investigation into Adams Golf.  The Underwriters have thus established their burden as to the reasonableness of their investigation.

**E.    The "Double-Shipping" Claim Relates Solely To The Financial Statements; There Is No Evidence That The Underwriters' Belief In The Accuracy Of Those Statements Was Unreasonable**

Plaintiffs added a claim to their second amended complaint alleging that some salesmen at Adams Golf engaged in improper revenue recognition activities, shipping golf clubs that had not been ordered.  But those claims related only to revenue recognition issues, which relate only to Adams Golf's financial statements.  That is, Plaintiffs are alleging that Adams Golf's financial statements were misleading because they included shipments that should not have been recognized as income.

But those statements are clearly the province of Adams Golf's independent outside auditors, KPMG.  Section 11 exempts a party from liability that:

> as regards any part of the registration statement purporting to be made on the authority of an expert (other than himself) or purporting to be a copy of or extract from a report or valuation of an expert (other than

himself), he had no reasonable ground to believe and did not believe,
. . . that the statements therein were untrue.

15 U.S.C. §77k(b)(3)(c).  It is black letter law that audited financials, such as those

attached to Adams' Prospectus, are considered "expertised" documents.  *See, e.g., In re*

*Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 664 (S.D.N.Y. 2004) ("*Worldcom, Inc.*

*Sec. Litig."); Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & ERISA Litig.*),

235 F. Supp. 2d 549, 613 (S.D. Tex. 2002) ("*Newby v. Enron"*); *In re Software*

*Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 623 (9th Cir. 1994) ("*Software Toolworks Inc.*

*Sec. Litig.*").  Underwriters may rely on statements made on the authority of an expert

unless there are reasonable grounds to believe the statements are untrue.  *See In re World*

*of Wonders Sec. Litig.*, 35 F.3d 1407, 1421 (9th Cir. 1994) ("*World of Wonders Sec.*

*Litig.*") (holding that underwriter defendant was entitled to rely on accountant's expert

decision to permit revenue recognition for sales); *Software Toolworks,* 50 F.3d at 623

("An underwriter need not conduct due diligence into the 'expertised' parts of a

prospectus, such as certified financial statements.  Rather, the underwriter need only

show that it 'had no reasonable ground to believe, and did not believe that the . . .

statements therein were untrue'") (citing 15 U.S.C. §77k(b)(3)(c)).

Here, Plaintiffs do not claim that the Underwriters had any reason to believe that

there were any revenue recognition issues.  There is no evidence that the Underwriters

believed there were any revenue recognition issues.  Accordingly, the Underwriters are

entitled to summary judgment.

## II.    THE UNDERWRITERS REASONABLY BELIEVED — BASED UPON THEIR REASONABLE INVESTIGATION — THAT THE COSTCO SALES WERE NOT MATERIAL

The Underwriters had no reason to believe that the Costco issue was significant. Not one member of Adams management said — or believed — that Costco was a material issue. Not one member of the 15 member due diligence team believed Costco sales were material to Adams Golf's earnings, then or in the future.

Even if a jury were to find that the Costco sales were material — which they were not — , that would not decide the issue of the Underwriters' due diligence defense. As set out in the Adams Golf Defendants' Motion for Summary Judgment and incorporated herein, the Underwriters' belief was not just reasonable — it was correct: the Costco issue was *not* material. *See* Adams Golf Defendants' Motion for Summary Judgment.

Indeed, the statute assumes that a jury has found the omission or misstatement material before the due diligence defense is even considered. Thus, although the Underwriters completely agree with Adams Golf that the Costco issues were not material at the time of the IPO, that decision would only begin the evidence that would have to be introduced and considered in order to decide the Underwriters' due diligence defense.

*A fortiori*, it is quite possible for the jury to find that the Costco sales were material, and find that the Underwriters had a reasonable belief that they were *not* material. Even the benchmarks to be considered are different. Materiality is based upon whether a reasonable investor would find that the mix of information was changed. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004) ("*Adams Golf, Inc. Sec. Litig.*"); *Klein v. General Nutrition Companies, Inc.*, 186 F.3d 338, 342 (3d Cir. 1999)*; In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 (3d Cir. 1993) (internal citations omitted). But the statute states that as to the due diligence defense, the governing

standard for "what constitutes reasonable investigation and reasonable ground for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property." 15 U.S.C. §77k(b)(3)(c).

This benchmark requires looking at the reasonableness of the decision at the time, rather than with the perspective of hindsight. *Coates v. Heartland Wireless Communications, Inc*., 55 F. Supp. 2d 628, 635 (N.D. Tex. 1999) ("*Coates*") (federal courts have long rejected attempts by plaintiffs to assert claims based on hindsight, "that is, to seize upon disclosures in later reports and allege that they should have been made in earlier ones").

Plaintiffs may attempt to rely on the Third Circuit decision in this case, claiming that the Court determined that the Costco issue was material. *Adams Golf, Inc. Sec. Litig,* 381 F.3d 267. Any such argument would be meritless for two reasons. First, the Third Circuit clearly stated that it was *not* determining materiality. It was *only* deciding whether sufficient facts were alleged to survive a motion to dismiss:

> Mindful of this Court's dismissal standard for immateriality, and our obligation to draw reasonable inferences in the plaintiffs' favor, we cannot agree with the District Court's conclusion that the gray market issue was obviously unimportant to a reasonable investor. Of course, ultimately, Costco's inventory of Tight Lies golf clubs *may be found to be immaterial, but that is for a factfinder to determine in light of a developed record. Id.* at 277 (emphasis added).

Second, mere materiality does not decide the issue of whether the Underwriters' belief was reasonable at the time of the IPO.

Unlike a motion to dismiss, the Plaintiffs bear the burden of proof on materiality. Now that this Court is presented with "a developed record," it is clear that there is no evidence to support Plaintiffs' claims. There is no evidence in the record showing that the Underwriters failed to discern any pertinent facts, and there is no evidence that

required them to conclude that Costco sales were material to Adams Golf. To the contrary, the record shows that, based on their diligent investigation, the Underwriters believed that the Costco sales were not material.

This is not a case, such as *Software Toolworks Inc.*, 50 F.3d 615, 626 (9th Cir. 1994), or *Escott v. BarChris Construction Corp*, 283 F. Supp. 643, 696 (S.D.N.Y. 1968), where the Underwriters accepted management's statement at face value without any verification. Here, the Underwriters conducted multiple interviews with a variety of third parties, including phone interviews with 7 major customers of Adams and one major foreign distributor. A292-311; A436-443; A447-454. Not one of those customers even hinted at a gray market problem, a Costco problem, or any problem that would affect their relationships with Adams in the future. *Id.*; A983-984.

The Underwriters also relied on their own knowledge of the golf club industry, independent of what Adams management might be saying. Pulido-Crowe had taken Cobra public and became familiar with the golf club industry in general, and with the high-end golf club markets. A939-941.

Plaintiffs concede that several golf club makers had faced gray markets from 1992 through 1998. A1122 (Response No. 39). The Underwriters reviewed IPO materials of Callaway. A999. They knew that the Cobra and Callaway IPO's confirmed that gray markets — although always present to some degree — were *not* always material. And not one of the research analysts, who were experienced in the golf club market and monitored it closely, said that Adams was facing a material gray market issue. A1006-1007; A1004-1005.

Accordingly, the only remaining issue is whether it was reasonable for the Underwriters to believe that Costco was not material, based on the information available to them.  Gray markets had affected all of the major golf club makers.  A1122 (Response No. 39).  And those golf club manufacturers did not discuss this in their IPO materials.  *See Phillips*, 933 F. Supp. at 321 (defendants have "no duty to report readily available industry trends" in prospectus); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d at 279 (same).

Reasonable business people could have believed that the Costco issue was not material.  In fact, Adams management believed it was not material.  The investment bankers who worked on the transaction believed it was not material.  The only expert with experience conducting due diligence as an underwriter in IPO's stated: "Again based on my long industry experience . . . it is further my opinion that the due diligence . . . resulted in a registration statement that the underwriters reasonably believed was complete and accurate."  A1048.

Even the SEC allowed the Registration Statement to go effective without any discussion of Costco.  A681.  Of course, the SEC does not approve securities documents.  But the fact that the SEC did not insist on such disclosure offered further assurance that the Costco issue was not material.

The Underwriters clearly met the standard of §11: a reasonable belief, based on the standard used by a prudent businessman in the conduct of his affairs.  *See Picard Chemical*, 1998 WL 513091 at *15 ("the ultimate question is whether the defendant performed a reasonable investigation and had a reasonable belief that the information regarding the offering was true and accurate").  As Olga Pulido-Crowe testified, the

Costco sales were "fully discussed and vetted with the company and with the underwriters, and we felt it wasn't a significant issue."  A988.

As with the reasonableness of an investigation, it is not enough to show that someone else might believe differently.  It is not enough to show that, in retrospect, the belief turned out to be wrong.  *See Coates*, 55 F. Supp. 2d at 635.  The issue is whether — at the time of the IPO — it was *unreasonable* for the Underwriters, based upon an extensive investigation that turned up nothing to the contrary, to agree with everyone who looked at this issue.

Finally, Plaintiffs appear to argue that a discussion of Costco should have been included in the Prospectus because it was easy to do so.  But the purpose of a prospectus is to provide disclosure about *material* facts.  Putting in every fact that the Underwriters reviewed in their due diligence without consideration of materiality would turn the Prospectus into a massively unreadable document, with material facts buried under a mound of immaterial facts.  That is not the goal of the securities laws.   *Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d at 658 ("A prospectus violates Section 11 if it . . . buries [material] matters beneath other information . . . .") (internal quotes omitted).  As the Seventh Circuit stated in *Weilgos v. Commonwealth Edison Co.*:

> [T]he *anticipated* magnitude (the size if the worst happens, multiplied by the probability that it will happen) may be small even when the total effect could be whopping.  Reasonable investors do not want to know everything that could go wrong, without regard to probabilities; that would clutter registration documents and obscure important information.  Issuers must winnow things to produce manageable, informative filings.

892 F.2d 509, 517 (7th Cir. 1989).

**CONCLUSION**

Section 11 states that if the Underwriters can show that they conducted a

reasonable investigation, and based upon that reasonable investigation they reasonably

believed that the Prospectus was not misleading, they are *not* liable under §11.  The same

standard applies to §12(a)(2).  The undisputed evidence shows that the Underwriters (i)

conducted a reasonable investigation, (ii) did not believe Costco's sales were material,

and (iii) that belief was reasonable.  Accordingly, the Underwriters are entitled to

summary judgment dismissing the complaints against them, with prejudice.


*Of Counsel:*                                    POTTER ANDERSON & CORROON LLP

Michael J. Chepiga
Paul C. Gluckow                                  By:___*/s/ John E. James*_____
Theodore J. McEvoy                                   Robert K. Payson (No. 274)
Ryan A. Kane                                         John E. James (No. 996)
SIMPSON THACHER & BARTLETT LLP                       Hercules Plaza – Sixth Floor
425 Lexington Avenue                                 1313 N. Market Street
New York, NY 10017-3954                              Wilmington, DE  19801
Telephone: (212) 455-2831                            Telephone:  (302) 984-6000
Facsimile:  (212) 455-2502                           Facsimile:    (302) 658-1192

                                                 *Attorneys for Underwriter Defendants*


Dated:  September 11, 2006
749468/23310

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, John E. James, hereby certify that on September 11, 2006, the within document was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following attorneys of record stating that the document is available for viewing and downloading from CM/ECF:

Carmella P. Keener, Esquire
Rosenthal Monhait Gross & Goddess, P.A.
919 Market Street, Suite 1401
Wilmington, DE  19801

Alyssa Schwartz, Esquire
Richards Layton & Finger
One Rodney Square
Wilmington, DE  19801

_/s/ John E. James_
John E. James (No. 996)
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North  Market Street
Wilmington, DE  19801
Telephone:  (302) 984-6000
E-mail:  jjames@potteranderson.com

749468/23310