# Appendix
# A1-A50

Filed pursuant to Rule 424(b)(1).
Registration No. 33-44556



**PROSPECTUS**



2,600,000 Shares

# Callaway GOLF Co.

**Common Stock**

RECD S.E.C.
MAR 2 - 1992
37

Of the 2,600,000 shares of Common Stock being offered, 800,000 shares are being offered by Callaway Golf Company (the "Company") and 1,800,000 shares are being offered by the Selling Shareholders. The Company will not receive any of the proceeds from the sale of the shares by the Selling Shareholders. See "Principal and Selling Shareholders."

Prior to this offering, there has been no public market for the Common Stock. See "Underwriting" for information relating to the factors considered in determining the initial public offering price.

The Common Stock has been approved for listing on the New York Stock Exchange under the symbol "ELY" subject to official notice of issuance.

See "Risk Factors" for a discussion of certain factors which should be considered by prospective purchasers of the securities offered hereby.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

| | Price to Public | Underwriting Discount(1) | Proceeds to Company(2) | Proceeds to Selling Shareholders |
|---|---|---|---|---|
| Per Share .................... | $20.00 | $1.40 | $18.60 | $18.60 |
| Total(3) ..................... | $52,000,000 | $3,640,000 | $14,880,000 | $33,480,000 |

(1) The Company and the Selling Shareholders have agreed to indemnify the several Underwriters against certain liabilities, including certain liabilities under the Securities Act of 1933, as amended. See "Underwriting."

(2) Before deducting expenses payable by the Company estimated to be $604,270.

(3) The Company and the Selling Shareholders have granted to the several Underwriters an option, exercisable within 30 days after the date of this Prospectus, to purchase up to an additional 126,469 and 263,531 shares of Common Stock, respectively, on the same terms as set forth above, to cover over-allotments, if any. If all such additional shares are purchased, the total Price to Public, Underwriting Discount, Proceeds to Company and Proceeds to Selling Shareholders will be $59,800,000, $4,186,000, $17,232,323 and $38,381,677, respectively. See "Underwriting."

The shares of Common Stock are offered by the Underwriters, subject to prior sale, when, as and if delivered to and accepted by them, and subject to the approval of certain legal matters by counsel for the Underwriters and certain other conditions. The Underwriters reserve the right to withdraw, cancel or modify such offer and to reject orders in whole or in part. It is expected that delivery of the shares of Common Stock will be made in New York, New York on or about March 5, 1992.

## Merrill Lynch & Co.

PROCESSED BY
MAR 6 1992

The date of this Prospectus is February 27, 1992.

DISCLOSURE
INCORPORATED

A 1

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE COMMON STOCK OFFERED HEREBY AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH TRANSACTIONS MAY BE EFFECTED ON THE NEW YORK STOCK EXCHANGE OR OTHERWISE. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.



No dealer, salesman or other person has been authorized to give any information or to make any representations other than those contained in this Prospectus in connection with the offering covered by this Prospectus. If given or made, such information or representations must not be relied upon as having been authorized by the Company, the Selling Shareholders or any of the Underwriters. This Prospectus does not constitute an offer to sell, or a solicitation of an offer to buy, the Common Stock in any jurisdiction where, or to any person to whom, it is unlawful to make such offer or solicitation. Neither the delivery of this Prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has not been any change in the facts set forth in this Prospectus or in the affairs of the Company since the date hereof.

Until March 23, 1992, all dealers effecting transactions in the Common Stock, whether or not participating in this distribution, may be required to deliver a Prospectus. This delivery requirement is in addition to the obligation of dealers to deliver a Prospectus when acting as Underwriters and with respect to their unsold allotments or subscriptions.

Unless otherwise noted, all Common Stock share amounts and per share data set forth in this Prospectus have been adjusted, effective December 12, 1991, to give effect to (i) a 2 for 1 stock split of the Common Stock and (ii) the establishment of a $.01 par value per share for the Common Stock and Preferred Stock. In addition, except for the financial statements and the notes thereto and unless otherwise noted, all Common Stock share amounts and per share data have also been adjusted to give effect to the conversion of all outstanding Preferred Stock into Common Stock, which will be effective as of immediately prior to the consummation of this offering.

A table of contents may be found on the last page of this Prospectus.

A 2

# PROSPECTUS SUMMARY

*The following summary is qualified in its entirety by the more detailed information and financial statements (including the notes thereto) appearing elsewhere in this Prospectus. Unless otherwise indicated, the information in this Prospectus does not give effect to the exercise of the over-allotment option granted to the Underwriters.*

## The Company

Callaway Golf Company ("Callaway" or the "Company") designs, develops, manufactures and markets high-quality, innovative golf clubs. The Company's golf clubs are sold at premium prices to both average and skilled golfers on the basis of performance, ease of use and appearance. Callaway's primary products, most of which incorporate the Company's S2H2® design concept, currently include oversized Big Bertha® metal woods, conventional-sized S2H2® metal woods, S2H2® irons and Callaway Hickory Stick® wedges and putters.

The Company's Big Bertha® golf clubs are a full line of metal woods with clubheads that are significantly larger than conventional metal woods. The Company believes that these oversized clubheads have a larger "sweet spot" and are more resistant to deflection on off-center hits. Since Callaway introduced its Big Bertha® metal woods in the first quarter of 1991, they have gained rapid market acceptance. In 1991, substantially all of the Company's sales increase was attributable to sales of metal woods, a substantial majority of which consisted of sales of Big Bertha® metal woods. The S2H2® irons have also been successful products of the Company. These irons, which are cavity-backed and perimeter-weighted, were largely responsible for the growth in the Company's sales in 1990.

The golf club industry has been dramatically influenced by the development and introduction of new golf club designs, including the introduction of cavity-backed, perimeter-weighted irons in the late 1960's and conventional-sized, stainless steel metal woods in the late 1970's. In 1988, Callaway introduced its S2H2® golf club design, which involves significantly reducing or eliminating the hosel (neck), extending the shaft through the entire clubhead and moving the saved weight into more effective regions of the clubhead. Callaway believes that the S2H2® design of its irons and metal woods, and its incorporation into oversized Big Bertha® metal woods, are significant golf club innovations. The market for premium-quality golf clubs is highly competitive and typically experiences widespread imitation of popular club designs. In late 1991 and early 1992, several other golf club manufacturers introduced oversized metal woods to compete with the Company's Big Bertha® metal woods.

Callaway has advanced product development capabilities involving computer aided design and modeling software and equipment. In addition, Callaway's innovative designs and emphasis on quality require specialized manufacturing processes which make the Company's golf clubs more costly to manufacture than conventional golf clubs. As the Company develops specialized manufacturing techniques for existing products, it is often able to utilize these techniques to facilitate the development and production of new product designs. The Company seeks to protect the design and manufacture of S2H2® clubs, including Big Bertha® metal woods, and its other products by obtaining and enforcing patents, trademarks, trade secrets, trade dress and other proprietary rights.

Callaway focuses its sales and marketing efforts on developing a well-recognized, premium brand franchise that reflects the quality and innovation of its products. The Company's marketing activities include advertising in golf magazines and on television, as well as endorsements by tour professionals. Prices for Callaway clubs are at the high end of the U.S. market, consistent with the Company's premium brand image. The Company primarily sells its products for distribution in the United States to off-course golf shops and on-course pro shops. Callaway intends to expand the international distribution of its products. During 1991, approximately 18% of the Company's sales were to international distributors of its products, including approximately 10% for resale in Japan. Through its exclusive distributor in Japan, the Company recently introduced Big Bertha® metal woods in Japan on a limited basis and plans to formally introduce these clubs and commence a promotional campaign in Japan in mid-1992.

3

A 3

## The Offering

Common Stock offered by:
The Company ............................ 800,000 shares
The Selling Shareholders ................... 1,800,000 shares

Common Stock to be outstanding after this offering .. 6,969,180 shares(1)

Common Stock to be outstanding after this offering,
including shares underlying 8% Convertible
Subordinated Bonds due 2000 .................. 7,878,271 shares(1)(2)

Use of proceeds .................................. Working capital and general corporate purposes.

New York Stock Exchange symbol................. ELY

(1) Excludes 685,000 shares issuable upon exercise of outstanding stock options.
(2) The Company's 8% Convertible Subordinated Bonds due 2000, with $3.5 million in aggregate principal amount outstanding at December 31, 1991, had a conversion price of $3.85 per share of Common Stock at such date.

### Summary Financial Information

#### (in thousands, except per share amounts)

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1987 | 1988 | 1989 | 1990 | 1991 |
| **Statement of Operations Information:** | | | | | |
| Net sales ................... | $3,219 | $4,815 | $10,380 | $21,518 | $54,753 |
| Gross profit ................... | 1,121 | 1,767 | 4,660 | 9,698 | 28,578 |
| Income (loss) from operations ................... | (1,049) | (511) | 329 | 1,943 | 10,769 |
| Net income (loss) ................... | (875) | (509) | 329 | 1,842 | 6,416 |
| Earnings (loss) per common share: | | | | | |
| Primary ................... | $(0.31) | $(0.16) | $.05 | $.29 | $.95 |
| Fully diluted ................... | $(0.31) | $(0.16) | $.05 | $.28 | $.86 |
| Common equivalent shares: | | | | | |
| Primary ................... | 2,795 | 3,200 | 6,284 | 6,420 | 6,722 |
| Fully diluted ................... | 2,795 | 3,200 | 6,284 | 6,485 | 7,674 |

| | At December 31, 1991 | |
|---|---|---|
| | Actual | As Adjusted (1) |
| **Balance Sheet Information:** | | |
| Cash and cash equivalents ................... | $5,878 | $19,454 |
| Working capital ................... | 16,212 | 30,508 |
| Total assets ................... | 28,824 | 43,100 |
| Long-term debt ................... | 4,450 | 3,500 |
| Total shareholders' equity ................... | 15,227 | 30,453 |

| | Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 31, | | June 30, | | September 30, | | December 31, | |
| | 1990 | 1991 | 1990 | 1991 | 1990 | 1991 | 1990 | 1991 |
| **Quarterly Financial Information:** | | | | | | | | |
| Net sales ................... | $4,494 | $8,006 | $5,899 | $14,226 | $6,501 | $16,986 | $4,624 | $15,535 |
| Gross profit ................... | 2,212 | 3,868 | 2,567 | 7,413 | 2,936 | 8,987 | 1,903 | 8,310 |
| Income from operations ................... | 570 | 782 | 622 | 3,346 | 683 | 3,820 | 68 | 2,821 |
| Net income ................... | 548 | 461 | 587 | 2,003 | 638 | 2,327 | 69 | 1,625 |
| Earnings per common share: | | | | | | | | |
| Primary ................... | $.09 | $.07 | $.09 | $.30 | $.10 | $.35 | $.01 | $.23 |
| Fully diluted ................... | $.08 | $.07 | $.09 | $.27 | $.10 | $.31 | $.01 | $.21 |

(1) Adjusted to give effect to (a) the receipt by the Company of the estimated net proceeds from the sale of 800,000 shares offered hereby by the Company and (b) the cancellation of an obligation of the Company to repurchase 100,000 shares of Common Stock. See Note 4 of Notes to Financial Statements.

4

A 4

## THE COMPANY

The Company designs, develops, manufactures and markets high-quality, innovative golf clubs. The Company's golf clubs are sold at premium prices to both average and skilled golfers on the basis of performance, ease of use and appearance. Callaway's primary products currently include oversized Big Bertha® metal woods, conventional-sized S2H2® metal woods, S2H2® irons and Callaway Hickory Stick® wedges and putters. Callaway Golf Company was incorporated on September 15, 1982 in the State of California. The Company's principal executive offices are located at 2345 Camino Vida Roble, Carlsbad, California 92009 (Telephone: 619-931-1771). Commencing April 1992, the Company's principal executive offices will be located at 2285 Rutherford Road, Carlsbad, California 92008.

The Company intends to furnish its shareholders with annual reports containing financial statements audited and reported upon with an opinion expressed by its independent accountants and with quarterly reports containing unaudited financial statements for each of the first three quarters of each fiscal year.

## RISK FACTORS

In addition to the other information in this Prospectus, the following factors should be considered carefully before purchasing the Common Stock offered by this Prospectus.

### Rapid Growth in Sales; Dependence on Sales of Big Bertha® Metal Woods

During the past three years, the Company has experienced rapid and substantial growth in sales. There can be no assurance that such growth will continue or that the Company will be able to sustain the level of sales that has been achieved. The Big Bertha® line of metal woods, introduced in the first quarter of 1991, has become the Company's most successful line of golf clubs. Substantially all of the Company's sales growth in 1991 was attributable to sales of metal woods, a substantial majority of which consisted of sales of Big Bertha® metal woods. In late 1991 and early 1992, several other golf club manufacturers introduced oversized metal woods to compete with the Company's Big Bertha® metal woods. There can be no assurance that the rate of sales growth attributable to Big Bertha® metal woods will continue. Any significant decline in demand for Big Bertha® metal woods, or any significant delay in production of these clubs, would have a material adverse effect on the Company's business.

### Future Sales by Principal Shareholders

General Electric Pension Trust ("GEPT") and Ely Callaway have indicated to the Company that they intend to sell all or at least a substantial portion of their shareholdings within the next year, depending on market conditions and applicable legal restrictions. After this offering, GEPT and Ely Callaway will beneficially own approximately 41.1% and 12.0%, respectively, of the outstanding Common Stock. In addition, GEPT, Ely Callaway and other significant shareholders may determine to sell shares of Common Stock from time to time to take advantage of favorable market conditions or for any other reason. Sales of substantial amounts of Common Stock in the public market, or the perception that such sales may occur, could have a material adverse effect on the market price of the Common Stock. See "Shares Eligible for Future Sale."

### Competition

The market for premium-quality golf clubs is highly competitive and is served by a number of well-established, well-financed companies with recognized brand names. In addition, there are several golf club manufacturers with substantial resources that, although they do not currently manufacture premium-quality golf clubs, could pose significant competition to the Company if they were to enter the market for premium-quality golf clubs. The golf club industry, in general, has been characterized by widespread imitation of popular club designs. A manufacturer's ability to compete is in part dependent upon its ability to satisfy various subjective requirements of golfers, including the golf club's look and "feel" and the level of acceptance that the golf club has among professional and other golfers. The subjective preferences of golf club purchasers may also be subject to rapid and unanticipated changes. There can be no assurances as to how long the Company's golf clubs will maintain market acceptance. A decline in the size of the golf club market, whether from a decrease in the popularity of golf or otherwise, could have a material adverse effect on the Company's business.

In late 1991 and early 1992, several other golf club manufacturers introduced oversized metal woods to compete with the Company's Big Bertha® metal woods. There can be no assurance that the introduction of these competing clubs will not have an adverse impact on demand for the Company's Big Bertha® golf clubs.

5

### New Product Introduction

The Company believes that the introduction of new, innovative golf clubs will be crucial to its future success. New models and basic design changes are frequently introduced into the golf club market but are often met with consumer rejection. Although the Company has achieved certain successes in the introduction of its golf clubs, no assurances can be given that the Company will be able to continue to design and manufacture golf clubs that meet with market acceptance. In addition, prior successful designs may be rendered obsolete within a relatively short period of time as new products are introduced into the market. The design of new golf clubs is also greatly influenced by rules and interpretations of the United States Golf Association ("USGA"). Although the golf equipment standards established by the USGA generally apply only to competitive events sanctioned by that organization, it has become critical for designers of new clubs to assure compliance with USGA standards. Although the Company believes that all its clubs comply with USGA standards, no assurance can be given that any new products will receive USGA approval or that existing USGA standards will not be altered in ways that adversely affect the sales of the Company's products.

### Product Breakage

Since the Company does not rely upon traditional designs in the development of its golf clubs, its products are more likely to develop unanticipated problems than those of many of its competitors that use traditional designs. For example, the process of attaching the shaft to the clubhead on S2H2® irons was improved to minimize the incidence of twisting clubheads. Similarly, the Company has experienced a level of breakage of graphite-shafted Big Bertha® metal woods which caused it to work closely with its graphite shaft supplier to achieve design improvements in this area. In addition, some users of Big Bertha® metal woods have reported that the sound made when the clubhead strikes the golf ball changes over time, and certain Big Bertha® metal woods have been returned with cracked clubheads. Although the incidence of clubs returned as a result of these and other product problems has not to date been material in relation to the volume of Callaway clubs which have been sold, the Company monitors the level and nature of any product breakage carefully and, where appropriate, incorporates design and production changes to assure its customers of the highest quality available on the market. If the Company's golf clubs were to experience a significant increase in the incidence of breakage or other product problems, the Company's sales and image with golfers could be materially adversely affected. See "Business—Product Warranties."

### Dependence on Key Personnel

The Company is dependent upon the management and leadership skills of Ely Callaway, the Company's founder and Chief Executive Officer, and the other members of the Company's senior management team. Mr. Callaway, who is 72 years old, has an employment agreement with the Company that runs through 1993, and he has informed the Company that he may begin to limit his involvement in the Company shortly thereafter. The Company's innovative golf clubs are the result of the Company's product development department, which is headed by Richard Helmstetter and Glenn Schmidt. There is intense competition for qualified personnel in the golf club industry, and the loss of key personnel or an inability to attract, retain and motivate key personnel could adversely affect the Company's business. There is no assurance that the Company will be able to retain its existing senior management personnel or to attract additional qualified personnel.

### Dependence on Certain Suppliers

Pursuant to a contract with Cast Alloys, Inc. ("Cast Alloys"), a casting house, the Company is obligated to purchase all of its metal wood clubheads from Cast Alloys through September 30, 1992. The Company purchases graphite club shafts from Aldila Corp. ("Aldila"), which has made modifications in its standard products to accommodate the Company's golf club designs. Any significant delay or disruption in the supply of clubheads from Cast Alloys or graphite shafts from Aldila would have a material adverse effect on the Company's business. In such event, the Company believes that suitable clubheads and graphite shafts could be obtained from other manufacturers, although the transition to another supplier could result in production delays of several months, especially in the case of Big Bertha® metal woods.

The Company and Cast Alloys have worked closely to develop techniques for the manufacture of Big Bertha® metal wood clubheads based in part on processes which are proprietary to Callaway. However, Cast Alloys is not precluded from manufacturing oversized metal wood clubheads for competitors of Callaway. It is the Company's understanding that Cast Alloys is currently manufacturing prototype oversized metal wood clubheads for at least one competitor of the Company.

6

A 6

### Control by Principal Shareholder

Following the completion of the offering, GEPT will own approximately 41.1% of the outstanding Common Stock (39.0% if the Underwriters' over-allotment option is exercised in full) and will, therefore, be in a position to exercise significant influence on the election of directors and the affairs of the Company. Two members of the Company's current four-member board of directors are representatives of GEPT. See "Principal and Selling Shareholders" and "Management."

### Shares Eligible for Future Sale

Future sales of shares of Common Stock by the Company and its shareholders could adversely affect the prevailing market price of the Common Stock. The Company and certain of its shareholders have entered into lock-up agreements with Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representative of the Underwriters (the "Representative"), whereby the Company and such shareholders have agreed not to sell any Common Stock or securities convertible into or exchangeable or exercisable for Common Stock for 180 days following the date of this Prospectus without the consent of the Representative. After such time, approximately 5,278,271 shares of Common Stock (including shares issuable upon conversion of the Company's 8% Convertible Subordinated Bonds due 2000) will be eligible for sale pursuant to Rule 144 promulgated under the Securities Act of 1933, as amended (the "Securities Act"). In addition, the holders of most of such shares of Common Stock will have rights to demand or participate in future registrations under the Securities Act. See "Description of Capital Stock—Registration Rights of Certain Holders." Sales of substantial amounts of Common Stock in the public market, or the perception that such sales may occur, could have a material adverse effect on the market price of the Common Stock. See "Shares Eligible for Future Sale."

### Absence of Public Market and Possible Volatility of Stock Prices

Prior to this offering there has been no public market for the Common Stock and there can be no assurance that an active trading market will develop or be sustained. The initial public offering price of the Common Stock offered hereby has been determined by negotiations among the Company, the Selling Shareholders and the Representative and may not be indicative of the market price for the Common Stock after the offering. The market price for shares of the Common Stock may be highly volatile depending on a number of factors, including news announcements or changes in general market conditions. See "Underwriting."

### Dilution

The initial public offering price is substantially higher than the book value per share of Common Stock. Investors purchasing shares of Common Stock in this offering will therefore incur immediate and substantial dilution. See "Dilution."

## USE OF PROCEEDS

The net proceeds to the Company from the sale of the 800,000 shares of Common Stock offered by the Company hereby are estimated to be $14,275,730. The principal purposes of this offering are to increase the Company's working capital and equity base, to provide a public market for its Common Stock and to provide liquidity for its shareholders. The Company intends to use the net proceeds for working capital and general corporate purposes, including capital expenditures, expansion of the Company's product development efforts, additional advertising and expansion of the Company's international sales efforts.

The Company will not receive any proceeds from the sale of shares of Common Stock offered by the Selling Shareholders hereby. See "Principal and Selling Shareholders."

## DIVIDEND POLICY

The Company has never declared or paid any cash dividends on the Common Stock and does not currently intend to do so. Any future determination to pay cash dividends will be at the discretion of the Company's Board of Directors and will be dependent upon the Company's results of operations, financial condition, contractual restrictions and other factors deemed relevant by the Board of Directors.

A 7

## CAPITALIZATION

The following table sets forth the capitalization of the Company at December 31, 1991 and as adjusted to give effect to (1) the sale of the shares of Common Stock offered by the Company and (2) the conversion of the Company's outstanding Series A Convertible Preferred Stock and Series C Convertible Preferred Stock to shares of Common Stock. This table should be read in conjunction with the historical financial statements of the Company and the notes related thereto.

| | December 31, 1991 | |
|---|---|---|
| | Actual | As Adjusted(1) |
| | (in thousands) | |
| **Long-term debt:** | | |
| 8% Convertible Subordinated Bonds due 2000(2) | $ 3,500 | $ 3,500 |
| Other | 950 | — |
| | 4,450 | 3,500 |
| **Shareholders' equity(3):** | | |
| Preferred Stock, $.01 par value, 4,389,031 shares authorized, 2,241,397 shares issued and outstanding; 3,000,000 shares authorized, no shares issued and outstanding, as adjusted | 23 | — |
| Common Stock, $.01 par value, 10,000,000 shares authorized, 1,686,386 shares issued and outstanding; 30,000,000 shares authorized, 6,969,180 shares issued and outstanding, as adjusted(4) | 16 | 70 |
| Paid-in-capital | 11,738 | 26,933 |
| Retained earnings | 3,450 | 3,450 |
| Total shareholders' equity | 15,227 | 30,453 |
| Total capitalization | $19,677 | $33,953 |

(1) Reflects receipt of estimated net proceeds from the sale of shares of Common Stock by the Company in this offering and the cancellation of an obligation of the Company to repurchase 100,000 shares of Common Stock. See Note 4 of Notes to Financial Statements.

(2) Convertible into an aggregate of 909,091 shares of Common Stock.

(3) Effective as of immediately prior to the consummation of this offering, the number of authorized shares of Common Stock and Preferred Stock will be changed to 30,000,000 and 3,000,000 shares, respectively.

(4) Excludes (i) 685,000 shares issuable upon exercise of outstanding stock options and (ii) 950,000 shares available for future issuance pursuant to the Company's 1991 Stock Incentive Plan. See "Management— Executive Compensation."

8

A 8

## DILUTION

The net tangible book value of the Company as of December 31, 1991 was $14,821,000, or $2.40 per share of Common Stock, based on 6,169,180 shares of Common Stock outstanding. "Net tangible book value" per share represents the amount of total tangible assets of the Company reduced by the amount of its total liabilities and divided by the number of shares of Common Stock outstanding. After giving effect to the sale of the 800,000 shares of Common Stock offered by the Company hereby and after deducting the underwriting discount and estimated offering expenses and the cancellation of an obligation of the Company to repurchase 100,000 shares of Common Stock, the pro forma net tangible book value of the Company as of December 31, 1991 would have been $30,047,000, or $4.31 per share of Common Stock. This represents an immediate increase in net tangible book value of $1.91 per share to the existing shareholders and an immediate dilution of $15.69 per share to new investors. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Initial public offering price per share(1)........................................ | | $20.00 |
| Net tangible book value per share before this offering(2)............... | $2.40 | |
| Increase in net tangible book value per share attributable to new investors.. | 1.91 | |
| Pro forma net tangible book value per share after this offering............... | | 4.31 |
| Net tangible book value per share dilution to new investors(3)............... | | $15.69 |

(1) Before deduction of underwriting discount and estimated expenses of the offering.

(2) Excludes 909,091 shares issuable upon conversion of the Convertible Bonds and 685,000 shares issuable upon exercise of outstanding stock options.

(3) Dilution determined by subtracting net tangible book value per share after the offering from the amount of cash paid by the new investors for a share of Common Stock.

The following table summarizes, at December 31, 1991, after giving effect to the sale of the shares of Common Stock offered by the Company and the Selling Shareholders, (i) the number of shares of Common Stock purchased by existing shareholders from the Company and the total consideration and the average price per share paid to the Company for such shares, (ii) the number of shares of Common Stock purchased by new investors in this offering from the Company and the total consideration and the average price per share paid by them for such shares and (iii) the percentage of shares purchased from the Company by existing shareholders and new investors and the percentages of the consideration paid to the Company for such shares by existing shareholders and new investors.

| | Shares Purchased from the Company | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Existing shareholders ................. | 6,169,180 | 89 | $12,727,018 | 44 | $ 2.06 |
| New investors........................ | 800,000 | 11 | $16,000,000 | 56 | $20.00 |
| Total ........................... | 6,969,180 | 100 | $28,727,018 | 100 | |

9

A 9

## SELECTED FINANCIAL DATA

The selected financial data set forth below with respect to the Company's Statement of Operations for the three years ended December 31, 1991 and with respect to the Balance Sheets at December 31, 1990 and 1991 are derived from financial statements audited by Price Waterhouse, independent accountants, which are included elsewhere in this Prospectus, and are qualified by reference to such financial statements. The Statement of Operations Data for the year ended December 31, 1988 and the Balance Sheet Data at December 31, 1988 and 1989 were derived from financial statements audited by Price Waterhouse which are not included in this Prospectus. The Statement of Operations Data and Balance Sheet Data for the year ended December 31, 1987 were derived from financial statements audited by other independent accountants which are not included in this Prospectus. The data presented below should be read in conjunction with the financial statements and the related notes included herein.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1987 | 1988 | 1989 | 1990 | 1991 |
| | (in thousands, except per share amounts) | | | | |
| **Statement of Operations Data:** | | | | | |
| Net sales | $ 3,219 | $4,815 | $10,380 | $21,518 | $54,753 |
| Cost of goods sold | 2,098 | 3,048 | 5,720 | 11,820 | 26,175 |
| Gross profit | 1,121 | 1,767 | 4,660 | 9,698 | 28,578 |
| Selling, general and administrative expenses | 1,978 | 2,198 | 4,537 | 7,292 | 16,964 |
| Research and development costs | 192 | 80 | 206 | 463 | 845 |
| Income (loss) from operations | (1,049) | (511) | (83) | 1,943 | 10,769 |
| Interest income (expense), net | (8) | (71) | 225 | 122 | (163) |
| Royalty income, net | 182 | 133 | 187 | 148 | 180 |
| Loss on asset disposal | — | (60) | — | (28) | (15) |
| Income (loss) before income taxes | (875) | (509) | 329 | 2,185 | 10,771 |
| Provision for income taxes | — | — | — | 343 | 4,355 |
| Net income (loss) | $ (875) | $ (509) | $ 329 | $ 1,842 | $ 6,316 |
| Earnings (loss) per common share: | | | | | |
| Primary | $ (0.31) | $(0.16) | $ 0.05 | $ 0.29 | $ 0.95 |
| Fully diluted | $ (0.31) | $(0.16) | $ 0.05 | $ 0.28 | $ 0.86 |
| Common equivalent shares: | | | | | |
| Primary | 2,795 | 3,200 | 6,284 | 6,420 | 6,722 |
| Fully diluted | 2,795 | 3,200 | 6,284 | 6,485 | 7,674 |

| | At December 31, | | | | |
|---|---|---|---|---|---|
| | 1987 | 1988 | 1989 | 1990 | 1991 |
| | (in thousands) | | | | |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 310 | $3,741 | $ 2,827 | $ 1,322 | $ 5,178 |
| Working capital | 758 | 5,002 | 5,451 | 8,733 | 16,232 |
| Total assets | 2,114 | 6,242 | 8,007 | 14,715 | 28,824 |
| Long-term debt | — | — | — | 2,084 | 4,450 |
| Total shareholders' equity | 1,323 | 5,645 | 6,424 | 8,718 | 15,227 |

A 10

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Results of Operations

*Years ended December 31, 1991 and 1990*

Net sales increased 154% to $54.8 million for the year ended December 31, 1991 compared to $21.5 million for the prior year. Substantially all of this increase was attributable to sales of metal woods, a substantial majority of which consisted of sales of Big Bertha® metal woods, which were introduced in January 1991. Unit sales increased to 577,000 golf clubs in 1991 from 337,000 golf clubs in 1990.

During 1991, gross profit increased to $28.6 million from $9.7 million in 1990, representing an increase in gross margin to 52% from 45%. The increase in gross profit and gross margin was primarily the result of the introduction of Big Bertha® metal woods, which have a higher gross margin than other clubs offered by the Company due to their higher price. Certain production efficiencies achieved by greater manufacturing volume in 1991 compared to 1990 also contributed to the increase in gross profit and gross margin. The increase in gross profit and gross margin was partially offset by increases in the provisions for inventory obsolescence and warranty expense. The provision for inventory obsolescence increased in 1991 in anticipation of the expected obsolescence of certain clubs due to the introduction of new clubs by the Company. Inventory obsolescence provisions are based in part on the Company's expectations of the effect of new product introductions and market conditions on the demand for its product as well as the Company's level of net sales. In 1991, the provision for inventory obsolescence increased to $1.3 million from $115,000 in 1990. Based upon the Company's current assessment of these factors, the Company expects that during 1992 the provision for inventory obsolescence as a percent of net sales will be comparable to 1991. The provision for warranty expense increased to $1.6 million (2.9% of net sales) in 1991 from $553,000 (2.6% of net sales) in 1990, attributable primarily to increased net sales volume.

Income from operations increased 454% to $10.8 million for 1991 compared to $1.9 million for 1990. Selling expenses increased to $11.3 million for 1991 from $4.8 million in 1990, primarily due to the increase in net sales. As a percentage of net sales, selling expenses declined to 21% for 1991 from 22% for 1990. Selling expenses, as a percentage of net sales, declined primarily due to certain sales people surpassing the maximum sales base on which commissions are payable. General and administrative expenses for 1991 totalled $5.6 million, an increase of 127% from the $2.5 million incurred in 1990. As a percentage of net sales, general and administrative expenses decreased to 10% in 1991 from 12% in 1990. The increase in general and administrative expenditures is primarily attributable to hiring additional personnel and incurring higher occupancy costs.

Net interest expense amounted to $163,000 for 1991 compared to net interest income of $122,000 for 1990. Interest expense was primarily related to the Company's $3,500,000 in principal amount of 8% Convertible Subordinated Bonds due 2000 (the "Convertible Bonds") which were issued in December 1990 and January 1991. Interest income was generated primarily by investing excess operating cash in money market investments. For 1991, interest expense was $328,000, partially offset by interest income of $165,000. In 1990, interest expense was $28,000 and interest income amounted to $150,000.

*Years ended December 31, 1990 and 1989*

Net sales for the years ended December 31, 1990 and 1989 were $21.5 million and $10.4 million, respectively. Substantially all of the growth in sales during this period was attributable to increases in sales of S2H2® irons, introduced in 1988, and S2H2® metal woods, introduced in 1989. Unit sales increased to 337,000 golf clubs in 1990 from 161,000 golf clubs in 1989.

Gross profit for the years ended December 31, 1990 and 1989 were $9.7 million and $4.7 million, respectively. Gross margin was 45% in 1990 and 1989, however, the primary components of cost of goods sold changed. Material and labor costs decreased by 1.3% and 1.0% of net sales, respectively, as a result of

11

A 11

vertical integration of certain production processes which had previously been performed by outside suppliers. These efficiencies were principally offset by an increase in the provision for warranty expense amounting to 1.6% of net sales. See "Business—Product Warranties."

Income from operations was $1.9 million in 1990 compared to a loss of $83,000 in 1989. Profitable operations were achieved during 1990 primarily as a result of fixed charges being allocated over a substantially increased sales level. Selling expenses aggregated $4.8 million and $2.6 million in 1990 and 1989, respectively. As a percentage of net sales, selling expenses declined from 25% in 1989 to 22% in 1990 principally because net sales increased at a higher rate than advertising expenditures. General and administrative expenses totalled $2.5 million for 1990, compared to $1.9 million in 1989. As a percentage of net sales, general and administrative expenses decreased to 12% in 1990 from 18% in 1989 due to higher sales volume and the fixed cost nature of many general and administrative expenses. In 1989 and the first half of 1990, the Company's compensation practice included the issuance of compensatory stock options with exercise prices below fair market value at the time of grant. The Board of Directors has no present intention to grant additional compensatory stock options, but may do so in the future as it deems appropriate. In 1989 the amount of such expense was $451,000 compared to $95,000 in 1990.

### Seasonality

Set forth below are certain unaudited quarterly financial information:

| | Year Ended December 31, 1990 | | | | Year Ended December 31, 1991 | | | |
|---|---|---|---|---|---|---|---|---|
| | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
| | (In thousands) | | | | | | | |
| Net Sales | $4,494 | $5,899 | $6,501 | $4,624 | $8,006 | $14,226 | $16,986 | $15,535 |
| Income from operations | 570 | 622 | 683 | 68 | 782 | 3,346 | 3,820 | 2,821 |
| Net income | 548 | 587 | 638 | 69 | 461 | 2,003 | 2,327 | 1,625 |
| Inventory (at end of period) | 3,868 | 4,945 | 6,264 | 8,528 | 8,573 | 7,692 | 7,316 | 11,188 |

Historically, the Company's operating results have been affected by seasonal demand for golf clubs which generally results in higher sales in the second and third quarters. As a result, income from operations is typically lower in the first and fourth quarters as fixed operating costs are spread over generally lower sales volume. In anticipation of seasonal increases in demand the Company typically builds inventories in the fourth quarter. Although the Company's business generally follows this seasonal trend, the success of the Company's new products has tended to mitigate the impact of seasonality in recent years. No assurances can be given, however, that the Company will be able to continue to successfully introduce new products to offset the impact of seasonality.

Net sales have historically been lower in the fourth quarter. However, due to unsatisfied demand for Big Bertha® metal woods during the second and third quarters of 1991, demand for Big Bertha® metal woods continued into the fourth quarter. Net sales of Big Bertha® metal woods was also influenced in the fourth quarter by an exceptionally high level of favorable publicity relating to Big Bertha® metal woods. The results in the fourth quarter of 1991 may not be indicative of future fourth quarter operating results.

During the fourth quarter of 1990, the Company incurred certain nonrecurring charges totalling $336,000 that contributed to lower operating income and net income during that period.

### Liquidity and Capital Resources

The Company has financed its operations principally through the sale of equity and debt securities and through internally generated funds. The Company has also utilized, on a short-term basis, credit facilities offered by its lender under a line of credit agreement and by the Company's founder, Ely Callaway. At December 31, 1990 and 1991, the Company held cash and cash equivalents of $1.3 million and $5.2 million, respectively. This increase in cash during 1991 was attributable to the issuance of $1.4 million of the Convertible Bonds in January 1991 and cash flow from operations of $5.0 million, offset by $1.0 million

repayment of the Company's line of credit and $1.5 million in capital expenditures. The Company's net accounts receivable increased to $6.1 million at December 31, 1991 from $2.1 million at December 31, 1990, primarily as a result of the increase in net sales.

The Company's historical requirements for capital have been directly related to supporting its sales increases. Cash provided by operating activities in 1991 was $5.0 million and cash used for operating activities in 1990 and 1989 was $3.6 million and $502,000, respectively. The majority of cash used for operating activities has been invested in inventories and accounts receivable. Capital expenditures were $1.5 million, $1.3 million and $411,000 in 1991, 1990 and 1989, respectively.

At December 31, 1991, the Company had outstanding $3.5 million in principal amount of its Convertible Bonds. The Convertible Bonds are subordinated to the line of credit, are secured by all of the assets of the Company and limit the amount of indebtedness senior to the Convertible Bonds to $10.0 million. In December 1991, the Company entered into a $5.0 million line of credit agreement with a bank. The credit agreement expires November 30, 1992 and carries an interest rate of prime plus 1/4%. The line is secured by all assets of the Company. Amounts available under the line are subject to limitations based on current receivables and inventory.

The Company anticipates that its existing capital resources, including the net proceeds of this offering, will enable it to maintain its current level of operations and its planned operations for the foreseeable future. The Company's capital requirements will be affected by several factors, including working capital required to finance sales, the addition of approximately $4 million of leasehold improvements and machinery and equipment to the Company's new leased facility and continued research and development.

13

A 13

# BUSINESS

Callaway designs, develops, manufactures and markets high-quality, innovative golf clubs. The Company's golf clubs are sold at premium prices to both average and skilled golfers on the basis of performance, ease of use and appearance. Callaway's primary products currently include oversized Big Bertha® metal woods, conventional-sized S2H2® metal woods, S2H2® irons and Callaway Hickory Stick® wedges and putters.

## Industry Background and Company History

The development and introduction of new golf club designs and technological advances have dramatically influenced the golf club industry. In the late 1960's cavity-backed, perimeter-weighted irons were successfully introduced. The "sweet spot" on these irons was significantly increased, making the club more forgiving to off-center hits and providing the opportunity for many golfers to make better golf shots. The golf club market was further advanced in the late 1970's with the introduction of metal woods, which increased the distance golfers could achieve with drivers or fairway woods. In 1988, Callaway introduced the "short straight hollow hosel" (S2H2®) golf club design concept and in January 1991 introduced its Big Bertha® oversized metal woods, which incorporated the S2H2® concept. This concept involves significantly reducing the size of the hosel (neck), extending the shaft through the entire clubhead and moving the saved weight into the clubhead. The ability to redistribute weight from the hosel to the clubhead led to the Company's development of the Big Bertha® oversized metal woods. The Company believes that its S2H2® and Big Bertha® clubs provide greater "feel" and, for many golfers, increase the opportunity for longer, straighter golf shots, especially on off-center hits.

Ely Callaway founded the Company in 1982 to acquire all the assets of a company which produced a small line of specialized golf clubs made with hickory wood shafts containing a steel core. Until 1988, substantially all of the Company's sales were derived from its hickory stick product line. In January 1988, after approximately two years of research and development, the Company developed its S2H2® concept and introduced a broad line of irons based on this concept. In January 1989, Callaway extended the S2H2® concept to metal woods. The Company's sales increase in 1990 was attributable primarily to the success of the Company's S2H2® irons. Further sales growth in 1991 was largely attributable to the evolution of the S2H2® concept into Big Bertha® metal woods.

## Business Strategy

Several important elements of Callaway's business strategy are intended to enhance the Company's business prospects, its competitive position and its reputation for quality and innovation.

*Active Product Development.* Callaway's strategy is to develop new golf clubs that appeal to both average and skilled golfers on the basis of performance, ease of use and appearance. In order to develop such products, the Company continues to invest in its product development capability. S2H2® irons, S2H2® conventional-sized metal woods and oversized Big Bertha® metal woods, represent successful product developments by the Company.

*Manufacturing Differentiation.* The Company strives to differentiate its products in part on the basis of the specialized manufacturing processes required by the unique design of its products. For example, enlarging the clubhead on a Big Bertha® metal wood without increasing overall club weight requires several specialized manufacturing techniques which make Callaway golf clubs more costly to manufacture than conventional golf clubs. Callaway intends to continue to utilize its specialized manufacturing capabilities to facilitate the development and production of new products which excel in performance, ease of use and appearance.

*Premium Brand Franchise.* Callaway intends to continue to build a premium brand franchise to reflect the innovation, performance and quality of its products. As a part of this strategy, Callaway supports all of its products with extensive customer service. Consistent with the premium quality image that the Company seeks to convey, prices for Callaway's products are at the high end of the U.S. market. The

14

A 14

Company seeks to enhance this image by actively advertising and promoting its products, including entering into endorsement arrangements with leading professional golfers.

*Quality.*  Callaway believes that product quality and responsiveness to customers are critical factors for success in the market for premium golf clubs. The Company has adopted a number of quality improvement and measurement techniques to monitor and improve several aspects of its business. To achieve excellence in product quality, Callaway emphasizes inspection throughout the production process, devotes significant resources to its manufacturing systems and maintains close relations with key suppliers. The Company's extensive customer service efforts also serve to enhance its reputation for producing high quality golf clubs.

*International Expansion.*  Callaway intends to expand the international distribution of its products. In 1991, the Company derived approximately 18% of its sales from customers that distribute the Company's products in foreign countries.

*Protection of Intellectual Property.*  Callaway believes that its golf club designs, manufacturing processes and name recognition are valuable intellectual property rights. The Company aggressively seeks to protect these rights by obtaining and enforcing patents, trademarks, trade secrets, trade dress and other intellectual property rights.

## Products

Callaway offers a broad line of golf clubs including oversized metal woods, conventional-sized metal woods, irons, wedges and putters. Most of the Company's golf clubs incorporate its S2H2® concept, which involves the elimination of or the use of a significantly shorter, hollow hosel and the extension of the shaft through the entire clubhead. The weight saved by eliminating the hosel or by using a short, hollow hosel is redistributed to more effective areas of the clubhead. The extension of the shaft completely through the sole of the clubhead places the shaft tip as much as 1½ inches closer to the center of the ball at impact. The Company believes that the combination of this bore-through shaft and redistributed weight in the clubhead provides greater "feel" and, for many golfers, increases the opportunity for longer, straighter golf shots, especially on off-center hits.

The following table sets forth the contribution to net sales (dollars in thousands and as a percentage of net sales) attributable to the product groups and for the periods indicated.

|  | Year Ended December 31, | | | | | |
|  | 1989 | | 1990 | | 1991 | |
| Metal woods | $ 3,302 | 32% | $ 6,669 | 31% | $37,028 | 68% |
| Irons | 4,756 | 46 | 11,568 | 54 | 13,901 | 25 |
| Putters, wedges and other | 2,322 | 22 | 3,281 | 15 | 3,824 | 7 |
| Net sales | $10,380 | 100% | $21,518 | 100% | $54,753 | 100% |

A 15



THE S2H2 CONCEPT

S2H2®
SHORT STRAIGHT HOLLOW HOSEL

CONVENTIONAL CLUBHEAD
END OF SHAFT

CENTER OF BALL

CENTER OF BALL

S2H2® CLUBHEAD
END OF SHAFT

16

A 16

*Big Bertha® Metal Woods.* The Company believes that its Big Bertha® drivers, introduced in January 1991, were the world's first oversized stainless steel drivers to be produced and merchandised in large quantities. The Company offers Big Bertha® drivers, which have become its best selling golf club, in lofts ranging from 8 to 11 degrees and with graphite, steel or titanium shafts. The Company also offers Big Bertha® fairway woods (numbers 2, 3, 4, 5 and 7). All Big Bertha® metal woods incorporate the Company's S2H2® concept. The Company believes that by incorporating the S2H2® concept into an oversized stainless steel metal wood clubhead it has developed a perimeter-weighted clubhead with a larger "sweet spot" and an increased resistance to deflection on off-center hits. These clubs also feature a distinctive sole plate design which the Company believes will help golfers get the ball airborne faster and easier from a wide variety of lies.

*S2H2® Metal Woods.* Callaway's S2H2® metal woods are similar in design to the Big Bertha® metal woods, including the distinctive sole plate feature, while utilizing conventional-sized metal wood clubheads. The Company offers S2H2® metal wood drivers in lofts ranging from 8.5 degrees to 12 degrees and with graphite, steel or titanium shafts. The Company also offers S2H2® fairway woods (numbers 3, 4, 5 and 7). Although the Company intends to continue to offer S2H2® metal woods for golfers who prefer conventional-sized metal woods, it is expected that sales of these clubs will decline over the next year.

*S2H2® Irons.* The Company's S2H2® irons are cavity-backed, perimeter-weighted and slightly offset. In addition to the customary set, including 3 through 9 irons and a pitching wedge, the Company offers S2H2® 1 and 2 irons and three S2H2® wedges (for approach, sand and lob shots). The significant sales growth experienced by the Company in 1989 and 1990 was attributable in large part to the successful introduction and marketing of S2H2® irons, which have continued to represent a significant portion of the Company's total sales.

*Bobby Jones™ Irons.* In January 1992, Callaway introduced a line of irons under the Bobby Jones™ name to address that segment of golfers who prefer the look and feel of the more traditional "player's blade" over the newer, cavity-backed irons. Bobby Jones™ irons incorporate the S2H2® concept and compete at the high-quality, premium end of the U.S. market.

*Wedges and Putters.* Since 1982, the Company has produced a unique line of wedges and putters using specially designed shafts of hickory wood with a steel core. The Company believes that these clubs, marketed under the Callaway Hickory Stick® tradename, have a special appeal for golfers who desire the look and feel of highly polished hickory with the performance of steel. The Company also makes a line of putters, some of which incorporate the S2H2® concept.

*Other.* In addition to its golf clubs, Callaway offers golf-related equipment and supplies manufactured by other companies bearing the Callaway logo, including golf balls, golf bags, travel bags, head covers and other accessories. Through a licensing arrangement with Jonesheirs, Inc., Callaway obtained the exclusive, worldwide rights to the use of the Bobby Jones™ name on golf clubs and golf-related accessories through 2010. The Company also receives a royalty on sales of Bobby Jones® Sportswear and certain other products by the Hickey-Freeman Company.

**Product Development**

The Company has not limited itself in its research efforts by trying to duplicate designs that are traditional or conventional and believes it has created an environment in which new ideas are valued and explored. Product development at Callaway is a result of the integrated efforts of its manufacturing, sales and product development departments, all of which work together to generate new ideas for golf equipment. The Company's product development department then refines these ideas and creates prototypes, masters and the necessary tooling. Callaway's 10-person product development department is led by Richard Helmstetter, President—New Products, and Glenn Schmidt, Vice President—Research and Development. Mr. Helmstetter joined the Company in 1986, when the Company was only manufacturing hickory stick wedges and putters, and had previously been involved in design of sports equipment. The Company believes

17

A 17

that Mr. Schmidt is one of the leading toolmakers in the golf equipment industry. The Company's research and development expenses were $845,000, $463,000 and $206,000 during 1991, 1990 and 1989, respectively.

In 1987, Callaway expanded its line of Callaway Hickory Stick® wedges and putters to a full line of hickory stick woods and irons. In the process of developing a full set of hickory stick irons, Callaway enhanced its ability to build and modify clubheads by using computer aided design/computer aided manufacturing ("CAD/CAM") software and complete numerical control ("CNC") milling equipment. CAD/CAM software enables designers to develop computer models of new club designs. CNC milling equipment converts the digital output from CAD/CAM computer models into physical metal models produced by an electronically-controlled milling machine. Callaway uses this software and equipment to facilitate the rapid design and production of physical models of clubheads, as well as casting tools for producing prototype clubheads for testing.

The Company's hickory stick Billet Series® wedges and putters were produced with CAD/CAM software and CNC milling equipment. In order to enhance the performance of the Billet Series® wedge, the Company frequently modified the design of the clubhead by shortening the hosel, which eventually led to the development of the S2H2® concept. In 1988, Callaway extended the S2H2® concept from the Billet Series® wedge to a full line of irons built with graphite, steel and titanium shafts.

The design of new golf clubs is also greatly influenced by rules and interpretations of the United States Golf Association ("USGA"). Although the golf equipment standards established by the USGA generally apply only to competitive events sanctioned by that organization, it has become critical for designers of new clubs to assure compliance with USGA standards. The Company's new product design and development process involves coordination with the USGA staff regarding such compliance.

## Sales and Marketing

### Sales for Distribution in the United States

The Company targets those golf retailers who sell pro-line clubs (professional quality golf clubs) and provide the level of customer service appropriate for the sale of premium golf clubs. In 1991, approximately 70% of the Company's revenue in the U.S. market was derived from sales to approximately 1,000 off-course golf shops, 25% from sales to approximately 3,400 on-course pro shops and the remainder from sales to various specialty and department stores and for corporate gift programs. No one customer that distributes golf clubs in the United States accounted for more than 4% of the Company's revenues in 1991.

The Company employs 21 full-time regional field representatives and seven in-house telephone salespersons. Each geographic region is covered by both a field representative and a telephone salesperson who work together to initiate and maintain relationships with customers through frequent telephone calls and in-person visits. Each field representative is paid a commission for each sale made in the field representative's region, and each telephone salesperson receives both a salary and a sales commission. The Company believes that this tandem approach of utilizing field representatives and telephone salespersons provides the Company a competitive advantage over other golf club manufacturers that distribute their golf clubs solely through independent sales representatives rather than employees.

### Sales for Distribution Outside of the United States

Generally, the Company does not directly sell golf clubs to customers outside of the United States. Instead, international sales are made through distributors in specific countries or regions around the world. Approximately 18% of the Company's net sales were derived from sales for distribution outside of the United States in 1991. The Company currently has 18 distributorship arrangements covering sales of the Company's

18

A 18

products in over 20 foreign countries, including Japan, Canada, Singapore, Korea, Hong Kong, the United Kingdom, Australia, Germany and South Africa. In addition, the Company is working to develop additional distributorship arrangements in Europe and currently sells golf clubs to various nonexclusive distributors for resale in South America.

Sales to Sumitomo Corporation of America ("Sumitomo"), the exporter of the Company's golf clubs to Japan, represented approximately 10%, 22% and 21% of the Company's net sales in 1991, 1990 and 1989, respectively. Through an affiliate of Sumitomo, the Company has introduced Big Bertha® metal woods in Japan on a limited basis and plans to formally introduce these clubs and commence a promotional campaign in Japan in mid-1992. Prices of golf clubs for sales outside of the United States receive an export pricing discount to compensate international distributors for selling, advertising and distribution costs. See Note 10 of Notes to Financial Statements.

### Advertising and Promotion

Within the United States, the Company focuses its advertising efforts on a combination of television commercials and printed advertisements in national magazines, such as *Golf Digest*, *Golf Magazine*, *Golf World* and *Golf Week*, and in trade publications, such as *Golf Pro Merchandiser* and *Golf Shop Operations*. The Company spent approximately $2.2 million, $757,000 and $661,000 on print and television advertising in 1991, 1990 and 1989, respectively. Advertising of the Company's golf clubs outside of the United States is typically handled by distributors and resellers of products in a particular country.

The Company also establishes relationships with professional golfers in order to promote the Callaway brand among both professional and amateur golfers. The Company has entered into endorsement arrangements with four members of the Senior Professional Golf Association Tour—Jim Dent, Orville Moody, Charles Coody and Bob Charles; two members of the PGA's regular tour—Fulton Allem and Olin Browne; and one member of the LPGA—Valerie Skinner. In addition, in September 1991, the Company entered into a five-year player-endorsement agreement with Chi Chi Rodriguez, which provides that he will use and endorse Callaway golf clubs in Japan and other Far East countries. The Company also has an endorsement and consulting arrangement with Mike Dunaway, a professional "long-drive" champion, which extends through July 1993. The Company's aggregate endorsement and related expenses (including the compensation element of stock awarded to professional golfers) were $1.8 million and $219,000 in 1991 and 1990, respectively.

### Manufacturing

The manufacturing of Callaway golf clubs involves a number of specialized processes required by the unique design of the products. The Company's metal woods and irons are produced by the Company's manufacturing personnel at its Carlsbad, California facilities using clubheads, shafts and grips supplied by independent vendors with whom the Company has established long-term relationships. The Company also manufactures the shafts used in the production of its Callaway Hickory Stick® wedges and putters.

All of the clubheads used in the production of S2H2® and Big Bertha® metal woods are manufactured to Callaway's precise specifications by Cast Alloys, based in part on processes which are proprietary to Callaway. The Company works closely with Cast Alloys, which enables the Company to monitor the quality and reliability of clubhead production. Cast Alloys is not precluded from manufacturing oversized metal wood clubheads for others and it is the Company's understanding that Cast Alloys is currently manufacturing prototype oversized metal wood clubheads for at least one competitor of the Company. The Company also works closely with Aldila, its supplier of graphite shafts, to develop specialized shafts suited to the S2H2® design and specifically Big Bertha® metal woods. Any significant delay or disruption in the supply of clubheads by Cast Alloys or graphite shafts by Aldila would have a material adverse effect on Callaway's business. In such event, the Company believes that suitable heads and shafts could be obtained from other manufacturers, although the transition to another supplier could result in production delays of several months, especially in the case of Big Bertha® metal woods.

19

A 19

Callaway's own production processes entail rigorous and continual quality control inspection and require the application of significant resources to the manufacturing process. The Company's executive offices, product development, manufacturing and distribution facilities are currently housed in a cluster of 9 buildings aggregating approximately 65,000 square feet in Carlsbad, California. By April 1992, the Company plans to consolidate most of its operations into a new 133,000 square foot facility leased by the Company in Carlsbad, California. This new facility will provide significantly expanded manufacturing capability, which the Company believes will be sufficient for its production needs in the foreseeable future.

In the ordinary course of its manufacturing process, the Company uses paints and chemical solvents which are stored on-site. The waste created by use of these materials is transported off-site on a regular basis by registered waste haulers. To date, the Company has not experienced any significant environmental compliance problems, although there can be no assurance that such problems will not arise in the future.

## Competition

The golf club manufacturing business is highly competitive. The industry has been characterized by widespread imitation of popular club designs. The preferences of golf club purchasers may also be subject to rapid and unanticipated changes. According to *Golf Pro Merchandiser* magazine, a trade publication, in 1990 forty-one companies manufactured golf clubs for sale in the United States, with the top ten companies representing approximately 66% of the total wholesale value of 1990 golf club shipments. The Company believes that its principal competitors include Karsten Manufacturing Corporation (Ping) and Tommy Armour Golf Company, with respect to irons, and Taylor Made Golf Company and Yonex, with respect to metal woods. In addition, there are several golf club manufacturers that, although they do not currently manufacture premium-quality golf clubs, could, in light of their substantial resources, pose significant competition to the Company if they were to enter the market for premium-quality golf clubs.

In late 1991 and early 1992, several other golf club manufacturers introduced oversized metal woods to compete with the Company's Big Bertha® metal woods.

## Intellectual Property

The Company aggressively seeks to protect its intellectual property, such as product designs, manufacturing processes, new product research and concepts and trademarks. These rights are protected through the acquisition of utility and design patents and trademark registrations, the maintenance of trade secrets, the development of trade dress, and, when necessary and appropriate, litigation against those who are, in the Company's opinion, unfairly competing.

The Company has applied for or been granted patents for certain features of its S2H2® irons and metal woods, Big Bertha® metal woods and Callaway Hickory Stick® shafts. Additionally, it has been granted trademark registration for Callaway®, Big Bertha®, S2H2®, Callaway Hickory Stick®, and has applied for or been granted trademark registration for several other product names and descriptions. The Company's patents relating to the S2H2® concept extend at least through 2005. While there is no assurance that, prior to a court of competent jurisdiction validating them, any of these patents or trademarks are enforceable, the Company intends to assert them against any infringer and believes them to be enforceable. There can be no assurance that other golf club manufacturers will not be able to produce successful golf clubs which imitate the Company's designs without infringing any of the Company's intellectual property rights.

The Company has stringent procedures to maintain the secrecy of its confidential business information, which it believes gives it a distinct competitive advantage. These procedures include a "need to know" criteria for dissemination of information and written confidentiality agreements from visitors and employees. Suppliers, when engaged in joint research projects, are required to enter into additional confidentiality agreements.

## Seasonality

Golf is generally regarded as a warm weather sport. Sales of golf equipment have historically been strongest during the second and third quarters. In order to minimize the disruption caused by these

20

A 20

anticipated sales fluctuations, the Company has historically increased its product inventories during the fourth quarter. Although the Company's business generally follows this seasonal trend, the success of the Company's new products has tended to mitigate the impact of seasonality in recent years. No assurances can be given, however, that the Company will be able to successfully introduce new products to offset the impact of seasonality. See "Management's Discussion and Analysis of Financial Condition and Results of Operations Seasonality."

## Product Warranties

The Company supports all of its golf clubs with a two-year written warranty. Since the Company does not rely upon traditional designs in the development of its golf clubs, its products are more likely to develop unanticipated problems than those of many of its competitors that use traditional designs. For example, the process of attaching the shaft to the clubhead on S2H2® irons was improved to minimize the incidence of twisting clubheads. Similarly, the Company has experienced a level of breakage of graphite-shafted Big Bertha® metal woods which caused it to work closely with its graphite shaft supplier to achieve design improvements in this area. In addition, some users of Big Bertha® metal woods have reported that the sound made when the clubhead strikes the golf ball changes over time, and certain Big Bertha® metal woods have been returned with cracked clubheads. Although the incidence of clubs returned as a result of these and other product problems has not to date been material in relation to the volume of Callaway clubs which have been sold, the Company monitors the level and nature of any product breakage carefully and, where appropriate, incorporates design and production changes to assure its customers of the highest quality available on the market. If Callaway clubs were to experience a significant increase in the incidence of breakage or other product problems, the Company's sales and image with golfers could be materially adversely affected. At December 31, 1991, the Company's reserves for warranty claims were approximately $1.3 million. This represents an increase of $1.1 million from December 31, 1990 to provide for anticipated warranty claims. During 1990 and 1991 the Company incurred warranty charges aggregating $446,000 and $521,000, respectively. The Company believes that it has sufficient reserves for warranty claims, however, there can be no assurance that these reserves will be sufficient if the Company were to experience an unusually high incidence of breakage or other product problems.

## Employees

As of December 31, 1991, the Company had 376 full-time employees, including 48 employed in sales and marketing, 14 employed in research and development and product engineering and 272 employed in production. The remaining full-time employees are administrative and support staff. The Company considers its employee relations to be good. None of the Company's employees are represented by unions.

## Legal Proceedings

There are no material pending legal proceedings to which the Company is a party or to which any of its property is subject.



*Sir Isaac Newton for Callaway Golf*

21

# MANAGEMENT

## Directors and Executive Officers

The directors and executive officers of the Company and ages as of the date of this Prospectus are set forth below.

| Name | Age | Position(s) Held |
|------|-----|------------------|
| Ely Callaway | 72 | Chairman of the Board, Chief Executive Officer and Director of Public Relations |
| Donald H. Dye | 49 | Vice Chairman of the Board, Chief Operating Officer, General Counsel and Secretary |
| Richard C. Helmstetter | 49 | President—New Products—Tour Relations—Japan Relations |
| Bruce Parker | 35 | Executive Vice President—Chief Merchant |
| John P. Duffy | 51 | Executive Vice President—Chief of Manufacturing |
| Carol A. Kerley | 34 | Senior Vice President, Chief Financial Officer and Controller |
| Glenn H. Schmidt | 47 | Vice President—Research and Development |
| Dale F. Frey(1)(2) | 59 | Director |
| John H. Myers(1)(2) | 46 | Director |

(1) Member of the Compensation Committee

(2) Member of the Audit Committee

Ely Callaway has served as Chairman of the Board and Chief Executive Officer of the Company since the Company's formation in 1982. From 1974 to 1981, Mr. Callaway founded and operated Callaway Vineyard and Winery in Temecula, California, until it was sold. From 1946 to 1973, Mr. Callaway worked in the textile industry, where he served as a Divisional President of several major divisions of Burlington Industries, Inc., and in 1968 was elected Corporate President and Director of Burlington, at the time the world's largest textile company. Prior to 1945, Mr. Callaway served a five-year tour of duty in the U.S. Army Quartermaster Corps.

Donald H. Dye has served as Vice Chairman, Chief Operating Officer, General Counsel and Secretary of the Company since October 1991 and as a Director, Secretary, and outside counsel of the Company since its formation in 1982. From 1982 to 1991, Mr. Dye was also Managing Partner and founder of Dye, Thomas, Luebs and Mort, a law firm in Riverside, California, which has provided services to the Company. Prior to 1973, Mr. Dye served five years in the U.S. Air Force as a member of the Judge Advocates General Corps.

Richard C. Helmstetter has served the Company as Executive Vice President since 1986 and became President in 1990. From 1967 to 1986, Mr. Helmstetter served as President of Adam Ltd., a pool cue manufacturing and merchandising company which he founded and operated in Japan. During 1982 and 1983, Mr. Helmstetter also consulted extensively for several Japanese, European and American companies, including Bridgestone Corporation's strategic planning group.

Bruce Parker has served the Company in various vice presidential positions since 1984 and became Executive Vice President—Chief Merchant in October 1991. Prior to 1984, Mr. Parker worked as a sales manager for various golf club manufacturers throughout California.

John P. Duffy has served the Company in various vice presidential positions since 1989 and became Executive Vice President—Manufacturing in March 1990. From 1988 to 1989, Mr. Duffy served as Vice President—Product Line Management of Taylor Made Golf Company. From 1984 to 1988, Mr. Duffy served as Vice President—Manufacturing of Taylor Made. From 1982 to 1984, Mr. Duffy served as General Manager—Western Division of Taylor Made. Prior to 1982, Mr. Duffy owned and operated golf retail outlets in Florida and California under the name "House of Golf."

Carol A. Kerley has served the Company as Controller since 1988 and became Senior Vice President and Chief Financial Officer in October 1991. From 1987 to 1988, Ms. Kerley served as controller of the San Diego office of the real estate firm of Trammell Crow. Prior to 1987, she was a manager for the accounting firm of Price Waterhouse, and served a total of eight years in public accounting.

Glenn H. Schmidt has served as Vice President—Research and Development of the Company since December 1990. Prior to 1990, Mr. Schmidt was the owner and operator of XYZ Design, Ltd. Mr. Schmidt served as one of the Company's independent toolmakers through XYZ Design, Ltd. since the Company's formation in 1982.

Dale F. Frey has served as a director of the Company since January 1989. Mr. Frey is President and Chairman of General Electric Investment Corporation. Mr. Frey is also Vice President and Treasurer of General Electric Company and has served as an officer for General Electric and its affiliated companies for over five years. Mr. Frey serves as a Trustee of GEPT. Mr. Frey also serves on the Board of Directors of GE Financial Services, Inc., USF&G Corporation, the Damon Runyon-Walter Winchell Cancer Research Fund and is a Trustee of Franklin and Marshall College.

John H. Myers has served as a director of the Company since May 1990. Mr. Myers has served as an officer of General Electric Investment Corporation for over five years and currently is its Executive Vice President. Mr. Myers is a Trustee of GEPT and also serves on the Board of Directors of Butler Capital Advisory Board and the Investors Advisory Committee of Excelsior Capital Corporation, a unit of the New York State Department of Economic Development.

All directors of the Company hold office until the next annual meeting of shareholders and until their successors have been elected and qualified. Officers serve at the pleasure of the Board of Directors, except where the Company has entered into an employment agreement with such officer.

The Board of Directors has a Compensation Committee, which makes recommendations concerning salaries and incentive compensation for officers and employees of the Company, and an Audit Committee, which reviews the results and scope of the audit and other services provided by the Company's independent accountants.

The Company intends to appoint two additional directors not affiliated with the Company within one year following the sale of shares pursuant to this offering. Such persons have not yet been identified.

23

A 23

**Executive Compensation**

*Cash Compensation.* The following table sets forth the cash compensation, consisting of salaries and annual incentive bonuses that Callaway paid to its five highest compensated executive officers and to all of its executive officers as a group, for services in all capacities to the Company during the year ended December 31, 1991.

| Name of Individual | Capacities in Which Served | Cash Compensation |
|---|---|---|
| Ely Callaway...................... | Chairman, Chief Executive Officer and Director of Public Relations | $ 535,000(1) |
| Richard C. Helmstetter ............. | President—New Products— Tour Relations—Japan Relations | $ 287,000 |
| Bruce Parker...................... | Executive Vice President—Chief Merchant | $ 241,000 |
| Glenn H. Schmidt ................ | Vice President—Research and Development | $ 200,000 |
| John P. Duffy ..................... | Executive Vice President— Chief of Manufacturing | $ 183,000 |
| All executive officers as a group, consisting of 7 persons (including those named) ....................................... | | $1,721,000(2) |

(1) Includes $50,000 paid to Mr. Callaway in 1991 for expense allowances in 1990 and 1991.

(2) Does not include $139,000 paid to the law firm of Dye, Thomas, Loebs & Mort for legal services rendered during the year. Donald H. Dye's professional corporation was a partner of this law firm through July 1, 1991.

*Director Compensation.* Directors who are not employees of the Company do not receive any compensation for their services as directors.

*Employment Agreements.* The Company has entered into an employment agreement with Mr. Ely Callaway for an initial term commencing January 1, 1992 and ending December 31, 1993, requiring Mr. Callaway to devote his full productive time and best efforts to the Company during the term of the agreement and to serve thereafter as a consultant to the Company for a period of five years. The agreement provides for: the payment of an annual base salary in 1992 and 1993 of $225,000; the payment of an annual commission beginning January 1, 1994 or at such time as his full time employment with the Company terminates, whichever occurs last, and continuing for a period of five years based on a percentage of Company net sales, not to exceed $400,000 per year; an annual non-discretionary bonus through the Company's Executive Bonus Pool; the payment of a special expense allowance of $25,000 per year; and the grant of an option to purchase 75,000 shares of Common Stock at the initial public offering price, subject to 50% vesting on December 31, 1992 and 100% on December 31, 1993.

The Company has also entered into employment agreements with Richard C. Helmstetter, Bruce Parker, Glenn H. Schmidt, John P. Duffy, Donald H. Dye and Carol A. Kerley for an initial term commencing January 1, 1992 and ending December 31, 1994. The agreements provide for: the payment of an annual base salary of $175,000 for Messrs. Helmstetter and Parker, $150,000 for Messrs. Schmidt, Duffy and Dye, and $90,000 for Ms. Kerley; an annual non-discretionary bonus through the Company's Executive Bonus Pool; certain restrictions on the transfer of Common Stock owned by such individuals; and the grant of an option to purchase shares of Common Stock at the initial public offering price, subject to 10% vesting on January 1, 1994, 30% on January 1, 1995, 60% on January 1, 1996 and 100% on January 1, 1997. The options granted to Messrs. Helmstetter, Parker, Schmidt, Duffy and Dye and Ms. Kerley cover 75,000, 75,000, 60,000, 60,000, 75,000 and 60,000 shares of Common Stock, respectively.

24

A 24

Pursuant to the employment agreements described above, the named officers have agreed (i) to devote their full productive time and efforts exclusively to the Company and (ii) to refrain from competing, directly or indirectly, with the business of the Company. In addition, each of the employment agreements includes customary terms and provisions of employment agreements, including provisions governing expense reimbursement, vacations, medical insurance plan coverage, term life insurance coverage, disability benefits, termination, rights to proprietary information and rights to inventions and innovations.

*Executive Bonus Pool.* In December 1991, the Company established an Executive Bonus Pool (the "Bonus Pool"), the purpose of which will be to provide incentive compensation to officers selected to participate therein by the Board (or the Compensation Committee). The aggregate amount available for bonuses to participating officers under the Bonus Pool will be determined annually based on the achievement by the Company of certain levels of operating performance, including net sales growth and pretax income. For 1992, up to an aggregate of approximately $2.2 million could be available for bonuses to the seven officers currently eligible to participate. Pursuant to the terms of the Bonus Pool and the employment agreements of participating officers, 50% of the amount available to the officers participating in the Bonus Pool is required to be paid to the participating officers in proportion to their base salaries. The remaining 50% may be paid to the participating officers at the discretion of the Company's Chief Executive Officer.

*1991 Stock Incentive Plan.* In the fourth quarter of 1991, the Company's Board of Directors adopted a Stock Incentive Plan for its officers, directors and key employees (the "Incentive Plan"). The Incentive Plan will be administered by the Board of Directors, or, in the discretion of the Board, a committee of two or more directors (the "Committee"). All directors, officers and key employees of the Company are eligible for awards under the Incentive Plan except that no director of the Company who is not also an employee of the Company is eligible to receive any award under the Incentive Plan. The Incentive Plan provides for stock-based incentive awards, including stock options, restricted stock, sales of securities, stock bonuses, performance shares, performance units, stock appreciation rights, phantom stock, dividend equivalents and other stock-based benefits. An award may consist of one such arrangement or benefit or two or more of them in tandem or in the alternative. The Incentive Plan permits the Board, or the Committee, to select eligible persons to receive awards and generally to determine the terms and conditions of the award. Under the Incentive Plan, options to purchase Common Stock may be granted with an option exercise price that is less than the then current market value of such stock. A total of 1,000,000 shares have been reserved for issuance under the Incentive Plan. Options to purchase 50,000 shares of Common Stock at an exercise price of $5.00 were granted to Mr. Callaway in the fourth quarter of 1991 under the Incentive Plan. Concurrently with the consummation of this offering, the Company plans to grant to certain officers and key employees options to purchase an aggregate of approximately 675,000 shares of Common Stock under the Incentive Plan at the initial public offering price. The options to be granted to executive officers will be made pursuant to their employment agreements as described above.

The terms of the Incentive Plan provide that the Board of Directors, or the Committee, may amend, suspend or terminate the Incentive Plan at any time. However, the Board may not increase the maximum number of shares that may be sold or issued under the Incentive Plan or alter the class of persons eligible to participate in the Incentive Plan, without the approval of the Company's shareholders. With respect to any other amendments to the Incentive Plan, the Board may, in its discretion, determine that such amendment shall only become effective upon approval by the shareholders of the Company if the Board determines that such shareholder approval may be advisable, such as for the purpose of obtaining or retaining any statutory or regulatory benefits under federal or state securities law, federal or state tax laws or any other laws or for the purpose of satisfying applicable stock exchange listing requirements.

*401(k) Plan.* The Company has adopted, effective as of January 1, 1991, a voluntary deferred compensation plan under Section 401(k) of the Internal Revenue Code (the "401(k) Plan") for all employees who satisfy the age and service requirements under the 401(k) Plan. Each participant in the 401(k) Plan may

25

elect to contribute up to a maximum of 10% of the participant's annual compensation (subject to the maximum permitted under federal law). Under the 401(k) Plan, the Company is obligated to contribute annually an amount equal to 50% of the participant's contribution up to 6% of that participant's annual compensation. Additionally, the Company can make discretionary contributions based on the profitability of the Company.

A participant's contributions and the related investment earnings thereon are immediately vested. The Company's matching and discretionary contributions and the related investment earnings thereon vest at the rate of 25% per year. For the purpose of determining this vesting period, all current employees shall be credited their prior employment time. Vested amounts allocated to each participating employee are distributed in the event of retirement, death, disability or other termination of employment.

All plan contributions are deposited in a trust fund established in connection with the 401(k) Plan and are invested at the employee's discretion in one of four investment alternatives including Common Stock. Each participant's account receives its pro rata share of the earnings and losses of the 401(k) Plan.

## Certain Transactions

In December 1988, the Company issued 292,149 shares of its Series A Convertible Preferred Stock to Mr. Ely Callaway in exchange for the cancellation of $900,000 of promissory notes owed by the Company to Mr. Callaway. In April 1989, Mr. Callaway sold an aggregate of 113,613 shares of Series A Convertible Preferred Stock to U.S. Venture Partners, III (96,571 shares), Second Ventures, L.P. (15,906 shares) and U.S.V. Entrepreneur Partners (1,136 shares) for an aggregate purchase price of $350,000. Each share of Series A Convertible Preferred Stock is convertible into two shares of Common Stock and will be converted into Common Stock immediately prior to the consummation of this offering.

In December 1988, the Company sold 1,298,441 shares of its Series B Convertible Preferred Stock to GEPT for $4,000,000. In connection with this investment in the Company, Mr. Frey was elected to the Company's Board of Directors. In April 1989, GEPT sold an aggregate of 210,996 shares of Series B Convertible Preferred Stock to U.S. Venture Partners, III (179,347 shares), Second Ventures, L.P. (29,539 shares) and U.S.V. Entrepreneur Partners (2,110 shares) for an aggregate purchase price of $650,000. Pursuant to the Company's Amended and Restated Articles of Incorporation, each share of Series B Convertible Preferred Stock was converted on December 15, 1990 into an equal number of shares of Series A Convertible Preferred Stock. Each share of Series A Convertible Preferred Stock is convertible into two shares of Common Stock and will be converted into Common Stock immediately prior to the consummation of this offering.

In May 1990, the Company sold 660,000 shares of its Series C Convertible Preferred Stock to GEPT for $4,620,000. Each share of Series C Convertible Preferred Stock is convertible into two shares of Common Stock and will be converted into Common Stock immediately prior to the consummation of this offering.

In December 1990 and January 1991, the Company sold an aggregate of $3,500,000 of its Convertible Bonds. Under the terms of the Indenture pursuant to which the Convertible Bonds were issued (the "Bond Indenture"), the Convertible Bonds are convertible at any time prior to November 1, 2000 into shares of Common Stock. The conversion price is $3.85 per share, as a result of the 2-to-1 stock split of the Common Stock and is subject to downward adjustment if the Company issues any Common Stock at a price less than the conversion price or less than the fair market value and in certain other instances. In addition, on or after November 1, 1993, the Company may redeem the Convertible Bonds for the principal amount plus accrued interest. Upon the sale of all or substantially all of the assets of the Company or a merger or reorganization which results in the shareholders of the Company immediately prior to such transaction owning less than 50% of the surviving entity, the Company may redeem the Convertible Bonds and the holder of a Convertible Bond may require redemption in each case at a redemption price equal to the principal and interest due, if

26

any, on the Convertible Bonds. The Convertible Bonds are secured by all of the assets of the Company, and limit the amount of indebtedness senior to the Convertible Bonds to $10.0 million. GEPT is the holder of $3,089,001 of Convertible Bonds and Richard Helmstetter is the holder of $77,000 of Convertible Bonds.

In November 1990, the Company acquired substantially all of the assets of XYZ Design, Ltd., a design and toolmaking contractor in the golf club industry owned by Mr. Glenn Schmidt, for $480,000. In connection with this transaction, the Company also entered into a five-year exclusive employment agreement with Mr. Schmidt, which was terminated and replaced with a new employment agreement which commenced January 1, 1992. See "Management—Executive Compensation—Employment Agreements."

In October 1991, the Company made a loan of $150,000 to Mr. Bruce Parker which is secured by a second trust deed on his personal residence and a pledge of his options to acquire Common Stock. The interest rate on the loan is fixed at 9% and, for the first five years, only the payment of interest is required. Thereafter, the loan payments adjust to repay the loan on a fully-amortized basis over 10 years. The loan provides that, while Mr. Parker is employed by the Company and the loan secured by the first trust deed on his personal residence remains unpaid, annual interest payments shall not exceed the amount by which Mr. Parker's compensation exceeds $140,000. Any accrued but unpaid interest shall be converted into principal. In the event Mr. Parker ceases to be employed by the Company, the loan becomes payable on a fully-amortized basis over 10 years.

Dye, Thomas, Luebs & Mort ("Dye, Thomas"), a law firm in which Donald H. Dye's professional corporation was a partner until July 1, 1991, has rendered legal services to the Company since its formation in 1982. The amounts paid to Dye, Thomas for legal services during 1991, 1990 and 1989 were $139,000, $213,000 and $22,000, respectively. Mr. Dye is currently an officer and director of the Company.

In June 1990, the Company agreed to issue to Mr. Richard Helmstetter, the Company's President, 10,000 shares of Common Stock in exchange for Mr. Helmstetter's one-third interest in Callaway Pacific, Inc., a Japanese corporation, two-thirds of which is owned by the Company.

The Company has agreed to make a loan to Mr. John Duffy, the Company's Executive Vice President—Chief of Manufacturing, of approximately $80,000, which amount is approximately equal to his estimated tax liability arising out of the receipt in December of 1991 of 20,000 shares of Common Stock pursuant to the terms of his prior employment agreement. Such loan, if made, may be on an unsecured basis, at an interest rate equal to the Company's borrowing rate and with a maturity date not to exceed five years.

27

## PRINCIPAL AND SELLING SHAREHOLDERS

At December 31, 1991, the Company had approximately 33 holders of its shares of Common Stock. The following table sets forth certain information regarding the beneficial ownership of the Common Stock as of the date of this Prospectus, after giving effect to the sale of Common Stock offered by the Company and the Selling Shareholders hereby: (i) by each person who is known by the Company to own beneficially more than 5% of the Company's Common Stock; (ii) by each director; (iii) by all officers and directors of the Company as a group; and (iv) by all other Selling Shareholders.

| Directors, Officers and 5% Shareholders | Shares Beneficially Owned Prior to Offering(1) | | Shares to be sold in Offering | Shares Beneficially Owned After Offering (1) | |
|---|---|---|---|---|---|
| | Number | Percent | | Number | Percent |
| General Electric Pension Trust(2)........... 3003 Summer Street Stamford, Connecticut 06905 | 4,297,228 | 61.6% | 1,102,044 | 3,195,184 | 41.1% |
| Ely Callaway(3) ......................... c/o Callaway Golf Company 2345 Camino Vida Roble Carlsbad, California 92009 | 1,142,796 | 18.2% | 293,075 | 849,721 | 12.0% |
| Donald H. Dye(4)........................ c/o Callaway Golf Company 2345 Camino Vida Roble Carlsbad, California 92009 | 1,089,344 | 17.6% | 293,075 | 796,269 | 11.4% |
| Entities affiliated with U.S. Venture Partners(5)........................... 2180 Sand Hill Road, Suite 300 Menlo Park, California 94025 | 649,218 | 10.5% | 166,494 | 482,724 | 6.9% |
| Dale F. Frey(6)........................... | 4,297,228 | 61.6% | 1,102,044 | 3,195,184 | 41.1% |
| John H. Myers(6) ........................ | 4,297,228 | 61.6% | 1,102,044 | 3,195,184 | 41.1% |
| All directors and officers as a group (9 persons)(7) ......................... | 5,846,572 | 78.6% | 1,395,119 | 4,451,453 | 54.0% |
| **Other Selling Shareholders** | | | | | |
| BancOne Capital Partners Corporation(8)... | 265,668 | 4.3% | 68,132 | 197,536 | 2.8% |
| Thomas B. O'Grady(9) ................... | 141,038 | 2.3% | 36,170 | 104,868 | 1.5% |
| National City Capital Corporation ......... | 110,800 | 1.8% | 28,416 | 82,384 | 1.2% |
| P. Michael McCart, M.D., Inc. Pension Plan . | 92,614 | 1.5% | 20,000 | 72,614 | 1.0% |
| Juan A. "Chi Chi" Rodriguez(10) ......... | 75,000 | 1.2% | 19,234 | 55,766 | * |
| Jack R. Crosby .......................... | 40,000 | * | 10,258 | 29,742 | * |
| Boyd L. and Sharon K. Jefferies ........... | 40,000 | * | 10,258 | 29,742 | * |
| Tony Manzoni............................ | 40,000 | * | 10,000 | 30,000 | * |
| Eddie Elias ............................. | 25,000 | * | 6,412 | 18,588 | * |
| William E. Ayer ......................... | 25,000 | * | 5,000 | 20,000 | * |
| Laurence E. Carpenter(11) ................ | 23,116 | * | 5,928 | 17,188 | * |
| Harriet S. Hass ......................... | 20,000 | * | 3,695 | 16,305 | * |
| William E. Thomas....................... | 13,790 | * | 3,536 | 10,254 | * |
| Roger A. Luebs........................... | 12,058 | * | 3,092 | 8,966 | * |
| Shepard M. Holcombe .................... | 10,000 | * | 2,564 | 7,436 | * |
| Kenneth D. Roberts ...................... | 10,000 | * | 2,564 | 7,436 | * |
| Paul Scott Runyan ....................... | 10,000 | * | 2,000 | 8,000 | * |
| Peter J. Mort ........................... | 2,400 | * | 616 | 1,784 | * |
| Albert J. Henry........................... | 2,000 | * | 512 | 1,488 | * |

28

A 28

---

*Less than 1%

(1)  Gives effect to the conversion of the Series A Convertible Preferred Stock and Series C Convertible Preferred Stock into an aggregate of 4,482,794 shares of Common Stock. Unless otherwise indicated in the footnotes to this table, and subject to community property laws where applicable, each of the shareholders named in this table have sole voting and investment power with respect to the shares shown as beneficially owned by it.

(2)  Includes 802,338 shares which are issuable upon conversion of Convertible Bonds.

(3)  Includes 1,042,796 shares held by the Ely R. Callaway, Jr. Trust (the "Callaway Trust") for which Ely Callaway and Donald H. Dye are co-trustees, each with voting and dispositive powers over such shares. The Callaway Trust will sell 293,075 shares in this offering. Also includes 100,000 shares which are issuable upon the exercise of options held by Mr. Callaway which are exercisable within 60 days of the date of this Prospectus. Mr. Callaway is an officer and director of the Company.

(4)  Includes 1,042,796 shares held by the Callaway Trust for which Ely Callaway and Donald H. Dye are co-trustees, each with voting and dispositive powers over such shares. The Callaway Trust will sell 293,075 shares in this offering. Also includes 30,000 shares which are issuable upon the exercise of options held by Mr. Dye which are exercisable within 60 days of the date of this Prospectus. Mr. Dye is an officer and director of the Company.

(5)  Includes 551,836 shares held by U.S. Venture Partners III, A California Limited Partnership, of which 141,520 shares will be sold in this offering, 90,890 shares held by Second Ventures Limited Partnership, of which 23,310 shares will be sold in this offering, and 6,492 shares held by U.S.V. Entrepreneur Partners, A California Limited Partnership, of which 1,664 shares will be sold in this offering.

(6)  Includes 4,297,228 shares held by GEPT. Messrs. Frey and Myers are trustees of GEPT but disclaim beneficial ownership over the shares held by GEPT. Messrs. Frey and Myers are directors of the Company.

(7)  Includes 450,000 shares which may be purchased pursuant to management stock options exercisable within 60 days of the date of this Prospectus and 822,338 shares which are issuable upon conversion of the Convertible Bonds.

(8)  Includes 34,806 shares which are issuable upon conversion of Convertible Bonds.

(9)  Includes 41,038 shares which are issuable upon conversion of Convertible Bonds.

(10) Mr. Rodriguez is a professional golfer with whom the Company has entered into a player-endorsement agreement. See "Business—Sales and Marketing."

(11) Includes 3,116 shares which are issuable upon conversion of Convertible Bonds.

## SHARES ELIGIBLE FOR FUTURE SALE

GEPT and Mr. Callaway have indicated to the Company that they intend to sell all or at least a substantial portion of their shareholdings within the next year, depending on market conditions and applicable legal restrictions. After this offering, GEPT and Mr. Callaway will beneficially own approximately 41.1% and 12.0%, respectively, of the outstanding Common Stock. In addition, GEPT, Mr. Callaway and other significant shareholders may determine to sell shares of Common Stock from time to time to take advantage of favorable market conditions or for any other reason. Sales of substantial amounts of Common Stock in the public market, or the perception that such sales may occur, could have a material adverse effect on the market price of the Common Stock.

Upon consummation of this offering, the Company will have outstanding 6,969,180 shares of Common Stock, without taking into account shares of Common Stock issuable upon exercise of outstanding options or conversion of the Convertible Bonds. Of these shares, the 2,600,000 shares of Common Stock sold in this offering will be freely transferable without restriction under the Securities Act, unless held by an "affiliate" of the Company (as that term is defined below). Any such affiliate will be subject to the resale limitations of Rule 144 adopted under the Securities Act. The remaining 4,369,180 outstanding shares of Common Stock were issued by the Company in private transactions not involving a public offering, and are "restricted securities" for purposes of Rule 144. The 909,091 shares of Common Stock issuable upon conversion of the Convertible Bonds will, upon such conversion, also be restricted securities. Restricted securities may not be resold in a public distribution except in compliance with the registration requirements of the Securities Act or pursuant to an exemption therefrom, including that provided by Rule 144.

In general, under Rule 144 as currently in effect, a person (or persons whose shares are aggregated), including an "affiliate," who has beneficially owned shares that are "restricted securities" for at least two years, is entitled to sell, within any three-month period, that number of shares that does not exceed the greater of 1% of the then outstanding shares or the average weekly trading volume of the then outstanding shares during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain provisions regarding the manner of sale, notice requirements and the availability of current public information. A person (or persons whose shares are aggregated) who is not an "affiliate" of the Company for at least 90 days prior to a proposed transaction, and who has beneficially owned "restricted securities" for at least three years, is entitled to sell such shares under Rule 144 without regard to the volume limitations described above. As defined in Rule 144, an "affiliate" of an issuer is a person that directly or indirectly controls, or is controlled by, or is under common control with such issuer.

The Company and certain of its shareholders have agreed not to offer, sell, contract to sell or otherwise dispose of any Common Stock or any securities convertible into or exchangeable or exercisable for Common Stock, including any sale pursuant to Rule 144 or Rule 144A promulgated under the Securities Act, for a period of 180 days after the date of this Prospectus without the prior written consent of the Representative.

Certain holders of Common Stock have registration rights with respect to such shares. See "Description of Capital Stock—Registration Rights of Certain Holders."

Prior to the date of this Prospectus, there has been no public market for the Common Stock. Trading of the Common Stock is expected to commence following the consummation of this offering. No prediction can be made as to the effect, if any, that future sales of Common Stock, or the availability of shares for future sale, will have on the market price prevailing from time to time. Sales of substantial amounts of Common Stock, or the perception that such sales could occur, could have a material adverse effect on the market price of the Common Stock.

## DESCRIPTION OF CAPITAL STOCK

### Common Stock

The Company is authorized to issue up to 30,000,000 shares of Common Stock, $.01 par value. The holders of Common Stock are entitled to one vote per share on all matters submitted to a vote of shareholders and are entitled to receive ratably those dividends declared by the Board of Directors out of legally available funds. In the event of a liquidation, dissolution, or winding up of the Company, the holders of Common Stock are entitled to share ratably all assets remaining after all liabilities have been paid, subject to the rights of the holders of Preferred Stock, if any. The holders of Common Stock have no preemptive rights and no rights to convert their Common Stock into any other securities. All outstanding shares of Common Stock are fully paid and nonassessable.

### Preferred Stock

The Company is authorized to issue up to 3,000,000 shares of Preferred Stock, $.01 par value. The Company's Board of Directors may issue the Preferred Stock in one or more series and fix the voting rights, liquidation preferences, dividend rights, conversion rights, redemption rights and terms, and certain other rights and preferences of the Preferred Stock, which could adversely affect the voting power and other rights of the holders of Common Stock. Such an issuance of Preferred Stock could be used as a defensive measure in connection with a takeover which might be deemed desirable by then-current shareholders or in which then-current shareholders might receive a substantial premium for their stock. If issued, the Preferred Stock will most likely have priority over the Common Stock with respect to dividends and distributions upon liquidation. The Company currently has no plans to issue any of the Preferred Stock.

### Certain Charter Provisions

The California General Corporation Law provides that California corporations may include provisions in their articles of incorporation relieving directors of monetary liability for breach of their fiduciary duty as directors, except for the liability of a director resulting from (i) any transaction from which the director derives an improper personal benefit, (ii) acts or omissions involving intentional misconduct or the absence of good faith, (iii) acts or omissions constituting an unexcused pattern of inattention to the director's duty,

A 30

(iv) acts or omissions showing a reckless disregard for the director's duty or (v) the making of an illegal distribution to shareholders or an illegal loan or guaranty. The Company's Amended and Restated Articles of Incorporation provide that the Company's directors are not liable to the Company or its shareholders for monetary damages for breach of their fiduciary duties to the fullest extent permitted by California law.

The Company's Bylaws provide that the Company may indemnify its directors and officers as to those liabilities and on those terms and conditions as are specified by the California General Corporation Law. In addition, the Bylaws provide for cumulation of votes in respect of the election of directors if the candidates' names have been placed in nomination prior to commencement of the voting and the shareholder has given notice prior to the commencement of the voting of the shareholder's intention to cumulate votes. A majority of the voting shares must be present either in person or by proxy to constitute a valid shareholders meeting, and a majority vote of shareholders present at any such meeting is required for actions by shareholders unless otherwise required by the California General Corporation Law or by the Amended and Restated Articles of Incorporation.

The Company believes the foregoing provisions are necessary to attract and retain qualified persons as directors and officers.

## Registration Rights of Certain Holders

The holders of Convertible Bonds have certain rights to require registration under the Securities Act of the Common Stock issuable upon conversion of their Convertible Bonds. If (i) the Company receives written request from holder(s) of 50% of the Common Stock issuable upon conversion of the Convertible Bonds requesting that the Company effect registration of at least 50% of the Common Stock issuable upon conversion of the Convertible Bonds, (ii) the Company has previously filed a registration statement with the Securities and Exchange Commission pursuant to the Securities Act which has been declared effective, and (iii) the Company has not received such a registration request within the previous twelve months, the Company is required to use its best efforts to effect such a registration. The Company is not required to effect more than three such registrations and all registration rights terminate upon the effective registration of 75% of all Common Stock issuable upon conversion of the Convertible Bonds.

In addition, if the Company proposes to register any of its securities, whether or not for its own account, the Company is required to notify the holders of Convertible Bonds and, subject to limitations which may be imposed by the managing underwriter of the offering, to include in such registration all of the shares of Common Stock issuable upon conversion of the Convertible Bonds requested to be included by such holders.

Holders of shares of Common Stock issued upon conversion of the Company's Series A Convertible Preferred Stock and Series C Convertible Preferred Stock and of shares of Common Stock issued to officers of the Company (collectively, the "Registrable Securities"), that are subject to restrictions on resale pursuant to Rule 144 promulgated under the Securities Act, also have certain rights to require registration under the Securities Act of such shares of Common Stock. If the Company receives written request from holder(s) of 40% of such shares of Common Stock requesting that the Company effect registration of at least $2.5 million of such shares, and the Company has not received such a registration request within the previous twelve months, the Company is required to use its best efforts to effect such a registration. The Company is not required to effect more than three such registrations.

In addition, if the Company proposes to register any of its securities, whether or not for its own account, the Company is required to notify holders of Registrable Securities and, subject to limitations which may be imposed by the managing underwriter of the offering, to include in such registration all Registrable Shares requested to be included by such holders.

## Transfer Agent and Registrar

The Company has appointed Manufacturers Hanover Trust Company of California as the transfer agent and registrar for its Common Stock.

## UNDERWRITING

Subject to the terms and conditions set forth in a purchase agreement (the "Purchase Agreement"), the Company and the Selling Shareholders have agreed to sell to each of the underwriters named below (the "Underwriters"), and each of the Underwriters, for whom Merrill Lynch, Pierce, Fenner & Smith Incorporated is acting as representative (the "Representative"), has severally agreed to purchase, the number of shares of Common Stock set forth opposite its name below. The Underwriters are committed to purchase all of such shares if any are purchased. Under certain circumstances, the commitments of non-defaulting Underwriters may be increased as set forth in the Purchase Agreement.

| Underwriter | Number of Shares |
|---|---:|
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 1,216,000 |
| Dillon, Read & Co. Inc. | 50,000 |
| The First Boston Corporation | 50,000 |
| Donaldson, Lufkin & Jenrette Securities Corporation | 50,000 |
| A.G. Edwards & Sons, Inc. | 50,000 |
| Goldman, Sachs & Co. | 50,000 |
| Invemed Associates, Inc. | 50,000 |
| Lazard Frères & Co. | 50,000 |
| Montgomery Securities | 50,000 |
| J.P. Morgan Securities Inc. | 50,000 |
| Morgan Stanley & Co. Incorporated | 50,000 |
| PaineWebber Incorporated | 50,000 |
| Prudential Securities Incorporated | 50,000 |
| The Robinson-Humphrey Company, Inc. | 50,000 |
| Salomon Brothers Inc | 50,000 |
| Shearson Lehman Brothers Inc. | 50,000 |
| Smith Barney, Harris Upham & Co. Incorporated | 50,000 |
| Dean Witter Reynolds Inc. | 50,000 |
| Advest, Inc. | 18,000 |
| Robert W. Baird & Co. Incorporated | 18,000 |
| William Blair & Company | 18,000 |
| J.C. Bradford & Co. | 18,000 |
| Cowen & Company | 18,000 |
| Dain Bosworth Incorporated | 18,000 |
| First Albany Corporation | 18,000 |
| First of Michigan Corporation | 18,000 |
| Furman Selz Incorporated | 18,000 |
| Gruntal & Co., Incorporated | 18,000 |
| Interstate/Johnson Lane Corporation | 18,000 |
| Kemper Securities Group, Inc. | 18,000 |
| Ladenburg, Thalmann & Co. Inc. | 18,000 |
| Legg Mason Wood Walker, Incorporated | 18,000 |
| Neuberger & Berman | 18,000 |
| Piper, Jaffray & Hopwood Incorporated | 18,000 |
| The Principal/Eppler, Guerin & Turner, Inc. | 18,000 |
| Ragen MacKenzie Incorporated | 18,000 |
| Rauscher Pierce Refsnes, Inc. | 18,000 |
| Raymond James & Associates, Inc. | 18,000 |
| Stephens Inc. | 18,000 |
| Stifel, Nicolaus & Company, Incorporated | 18,000 |
| Sutro & Co. Incorporated | 18,000 |
| Tucker Anthony Incorporated | 18,000 |
| Wheat, First Securities, Inc. | 18,000 |
| The Buckingham Research Group Incorporated | 12,000 |
| Crowell, Weedon & Co. | 12,000 |
| D. A. Davidson & Co. Incorporated | 12,000 |
| Fahnestock & Co. Inc. | 12,000 |
| Gabelli & Company, Inc. | 12,000 |
| Pennsylvania Merchant Group Ltd. | 12,000 |
| Seidler Amdec Securities Inc. | 12,000 |
| Total | 2,600,000 |

The Representative has advised the Company and the Selling Shareholders that the Underwriters propose to offer the shares of Common Stock offered hereby to the public initially at the public offering price set forth on the cover page of this Prospectus and to certain dealers at such price less a concession not in excess of $.84 per share of Common Stock. The Underwriters may allow, and such dealers may reallow, a discount not in excess of $.10 per share of Common Stock on sales to certain other dealers. After the initial public offering, the public offering price, concession and discount may be changed.

The Company and the Selling Shareholders have granted the Underwriters an option to purchase up to an additional 390,000 shares of Common Stock, at the initial public offering price less the underwriting discount. Such option, which expires 30 days from the date of this Prospectus, may be exercised solely to cover over-allotments. To the extent that the Underwriters exercise such option, each of the Underwriters will have a firm commitment, subject to certain conditions, to purchase approximately the same percentage of the option shares that the number of shares to be purchased initially by that Underwriter bears to the total number of shares to be purchased initially by the Underwriters.

The Company and the Selling Shareholders have agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act.

The Company, certain Selling Shareholders, and certain other holders of Common Stock prior to this offering, have agreed not to sell or otherwise dispose of any shares of Common Stock or securities convertible into or exchangeable or exercisable for shares of Common Stock, except the shares sold to the Underwriters pursuant to the Purchase Agreement, without the prior written consent of the Representative, for a period of 180 days after the date of this Prospectus. See "Shares Eligible for Future Sale."

The Underwriters do not intend to confirm sales to any accounts over which they exercise discretionary authority.

Prior to this offering, there has been no public market for the Common Stock of the Company. The initial public offering price was determined through negotiations among the Company, the Selling Shareholders, and the Representative. Among the factors considered in such negotiations were an assessment of the Company's recent results of operations, the future prospects of the Company and its industry in general, the price earnings ratio and market prices of securities of similar companies and prevailing conditions in the equity securities market. There can be no assurance that an active trading market will develop for the Common Stock or that the Common Stock will trade in the public market subsequent to this offering at or above the initial offering price.

The shares of Common Stock offered hereby have been approved for listing on the New York Stock Exchange subject to official notice of issuance.

## LEGAL MATTERS

Certain legal matters with respect to the legality of the Common Stock offered hereby will be passed upon for the Company by Gibson, Dunn & Crutcher, Orange County, California. Certain legal matters relating to this offering will be passed upon for the Underwriters by Skadden, Arps, Slate, Meagher & Flom, Los Angeles, California.

## EXPERTS

The financial statements as of December 31, 1991 and 1990 and for each of the three years in the period ended December 31, 1991 included in this Prospectus and the financial statement schedules included in the Registration Statement have been so included in reliance on the report of Price Waterhouse, independent accountants, given on the authority of said firm as experts in auditing and accounting.

## ADDITIONAL INFORMATION

The Company has filed with the Securities and Exchange Commission (the "Commission") a Registration Statement on Form S-1 under the Securities Act with respect to the securities offered hereby. This Prospectus does not contain all of the information set forth in the Registration Statement, certain portions of which are omitted as permitted by the rules and regulations of the Commission. Such additional information may be obtained from the Commission's principal office in Washington, D.C. Statements contained in this Registration Statement by reference as to the contents of any contract or other document referred to herein or therein are not necessarily complete, and in each instance reference is made to the copy of such contract or other document filed as an exhibit to the Registration Statement or such other document, each such statement being qualified in all respects by such reference.

33

A 33

[THIS PAGE INTENTIONALLY LEFT BLANK]

A 34

## INDEX TO FINANCIAL STATEMENTS

Financial Statements of Callaway Golf Company

Report of Independent Accountants ...................................................... F-2

Balance Sheet at December 31, 1990 and 1991........................................... F-3

Statement of Income for the years ended December 31, 1989, 1990 and 1991 ................. F-4

Statement of Cash Flows for the years ended December 31, 1989, 1990 and 1991.............. F-5

Statement of Shareholders' Equity for the years ended December 31, 1989, 1990 and 1991 ...... F-6

Notes to Financial Statements ........................................................... F-7

F-1

A 35

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors
and Shareholders of Callaway Golf Company

In our opinion, the accompanying balance sheets and the related statements of income, of cash flows and of shareholders' equity present fairly, in all material respects, the financial position of Callaway Golf Company at December 31, 1991 and 1990, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 1991, in conformity with generally accepted accounting principles. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with generally accepted auditing standards which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for the opinion expressed above.

PRICE WATERHOUSE

San Diego, California
January 30, 1992

F-2

A 36

## CALLAWAY GOLF COMPANY
## BALANCE SHEET

| | December 31, | |
|---|---|---|
| | 1990 | 1991 |
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 1,322,000 | $ 5,178,000 |
| Accounts receivable, net | 2,124,000 | 6,113,000 |
| Inventories | 8,528,000 | 11,188,000 |
| Prepaid taxes | 103,000 | 20,000 |
| Deferred taxes | 465,000 | 2,273,000 |
| Other current assets | 104,000 | 607,000 |
| Total current assets | 12,646,000 | 25,379,000 |
| Property and equipment, net | 1,859,000 | 2,762,000 |
| Patents and trademarks, net | 187,000 | 406,000 |
| Other assets | 23,000 | 277,000 |
| | $14,715,000 | $28,824,000 |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 2,627,000 | $ 7,027,000 |
| Accrued employee compensation and benefits | 286,000 | 957,000 |
| Note payable | 1,000,000 | |
| Income taxes payable | | 1,163,000 |
| Total current liabilities | 3,913,000 | 9,147,000 |
| Long-term debt | 2,084,000 | 4,450,000 |
| | | |
| Commitments (Note 9) | | |
| | | |
| Shareholders' equity: | | |
| Series A Convertible Preferred Stock, $.01 par value, 1,590,590 shares authorized, 1,581,397 shares issued and outstanding at December 31, 1990 and 1991 (to be converted into Common Stock immediately preceding the closing of the offering contemplated by this Prospectus) | 16,000 | 16,000 |
| Series C Convertible Preferred Stock, $.01 par value, 1,500,000 shares authorized, 660,000 shares issued and outstanding at December 31, 1990 and 1991 (to be converted into Common Stock immediately preceding the closing of the offering contemplated by this Prospectus) | 7,000 | 7,000 |
| Common Stock, $.01 par value, 10,000,000 shares authorized, 1,566,386 and 1,686,386 issued and outstanding at December 31, 1990 and 1991, respectively | 16,000 | 16,000 |
| Paid-in-capital | 11,629,000 | 11,738,000 |
| Retained earnings (accumulated deficit) | (2,950,000) | 3,450,000 |
| Total shareholders' equity | 8,718,000 | 15,227,000 |
| | $14,715,000 | $28,824,000 |

See accompanying notes to financial statements

F-3

A 37

# CALLAWAY GOLF COMPANY

## STATEMENT OF INCOME

| | Year Ended December 31, | | |
|---|---|---|---|
| | 1989 | 1990 | 1991 |
| Net sales | $10,380,000 | $21,518,000 | $54,753,000 |
| Cost of goods sold | 5,720,000 | 11,820,000 | 26,175,000 |
| Gross profit | 4,660,000 | 9,698,000 | 28,578,000 |
| | | | |
| Selling expenses | 2,621,000 | 4,811,000 | 11,342,000 |
| General and administrative expenses | 1,916,000 | 2,481,000 | 5,622,000 |
| Research and development costs | 206,000 | 463,000 | 845,000 |
| Income (loss) from operations | (83,000) | 1,943,000 | 10,769,000 |
| | | | |
| Other income (expenses) | | | |
| Interest income (expense), net | 225,000 | 122,000 | (163,000) |
| Royalty income, net | 187,000 | 148,000 | 180,000 |
| Loss on asset disposal | | (28,000) | (15,000) |
| Income before income taxes | 329,000 | 2,185,000 | 10,771,000 |
| Provision for income taxes | | 343,000 | 4,355,000 |
| Net income | $ 329,000 | $ 1,842,000 | $ 6,416,000 |
| | | | |
| | | | |
| Earnings per common share | | | |
| Primary | $0.05 | $0.29 | $0.95 |
| Fully diluted | $0.05 | $0.28 | $0.86 |
| Common equivalent shares | | | |
| Primary | 6,284,000 | 6,420,000 | 6,722,000 |
| Fully diluted | 6,284,000 | 6,485,000 | 7,674,000 |

See accompanying notes to financial statements

F-4

A 38

## CALLAWAY GOLF COMPANY
## STATEMENT OF CASH FLOWS

| | Year ended December 31, | | |
|---|---|---|---|
| | 1989 | 1990 | 1991 |
| **Cash flows from operating activities:** | | | |
| Net income | $ 329,000 | $ 1,842,000 | $ 6,416,000 |
| Adjustments to reconcile net income to net cash provided by (used for) operating activities: | | | |
| Depreciation and amortization | 136,000 | 258,000 | 618,000 |
| Loss on disposal of assets | | 28,000 | 15,000 |
| Compensatory stock options and rights expense | 451,000 | 95,000 | 125,000 |
| Compensatory stock expense | | | 950,000 |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (1,068,000) | (643,000) | (3,989,000) |
| Inventories | (1,177,000) | (6,020,000) | (2,660,000) |
| Prepaid taxes | (6,000) | (97,000) | 83,000 |
| Deferred taxes | | (465,000) | (1,808,000) |
| Other current assets | (100,000) | 108,000 | (503,000) |
| Intangible and other assets | (53,000) | (65,000) | (473,000) |
| Accounts payable and accrued expenses | 810,000 | 1,292,000 | 4,400,000 |
| Accrued employee compensation and benefits | 176,000 | 38,000 | 671,000 |
| Income taxes payable | | | 1,163,000 |
| | (502,000) | (3,629,000) | 5,008,000 |
| **Cash flows from investing activities:** | | | |
| Capital expenditures | (411,000) | (1,329,000) | (1,540,000) |
| Sale of fixed assets | | 12,000 | 4,000 |
| | (411,000) | (1,317,000) | (1,536,000) |
| **Cash flows from financing activities:** | | | |
| Proceeds from note payable | | 1,000,000 | |
| Repayments on note payable | | | (1,000,000) |
| Issuance of long-term debt | | 2,084,000 | 1,416,000 |
| Issuance of Preferred Stock | (1,000) | 4,520,000 | |
| Issuance of Common Stock | | 100,000 | |
| Retirement of Preferred Stock | | (64,000) | |
| Retirement of Common Stock | | (4,199,000) | |
| Retirement of stock options | | | (32,000) |
| | (1,000) | 3,441,000 | 384,000 |
| Net increase (decrease) in cash and cash equivalents | (914,000) | (1,505,000) | 3,856,000 |
| Cash and cash equivalents at beginning of year | 3,741,000 | 2,827,000 | 1,322,000 |
| Cash and cash equivalents at end of year | $ 2,827,000 | $ 1,322,000 | $ 5,178,000 |

See accompanying notes to financial statements

F-5

A 39

# CALLAWAY GOLF COMPANY

## STATEMENT OF SHAREHOLDERS' EQUITY

| | Preferred Stock, $.01 Par Value | | | | | | Common Stock $.01 Par Value | | Paid-in Capital | Retained Earnings (Accumulated Deficit) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Series A Convertible | | Series B Convertible | | Series C Convertible | | | | | | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | | | |
| Balance December 31, 1988. | 292,000 | $ 3,000 | 1,298,000 | $ 13,000 | | | 2,676,000 | $ 27,000 | $ 9,613,000 | $(4,012,000) | $ 5,644,000 |
| Compensatory stock options and rights ...... | | | | | | | | | 451,000 | | 451,000 |
| Net income............... | | | | | | | | | | 329,000 | 329,000 |
| Balance December 31, 1989. | 292,000 | 3,000 | 1,298,000 | 13,000 | | | 2,676,000 | 27,000 | 10,064,000 | (3,683,000) | 6,424,000 |
| Stock issuance ........... | | | | | 660,000 | $7,000 | 40,000 | | 4,613,000 | | 4,620,000 |
| Stock retired ............ | (9,000) | | | | | | (1,150,000) | (11,000) | (3,143,000) | (1,109,000) | (4,263,000) |
| Stock conversion ......... | 1,298,000 | 13,000 | (1,298,000) | (13,000) | | | | | | | |
| Compensatory stock options and rights ...... | | | | | | | | | 95,000 | | 95,000 |
| Net income............... | | | | | | | | | | 1,842,000 | 1,842,000 |
| Balance December 31, 1990. | 1,581,000 | 16,000 | | | 660,000 | 7,000 | 1,566,000 | 16,000 | 11,629,000 | (2,950,000) | 8,718,000 |
| Mandatorily redeemable Common Stock issuance ............... | | | | | | | 120,000 | | | | |
| Stock repurchased ........ | | | | | | | | | (16,000) | (16,000) | (32,000) |
| Compensatory stock options ............... | | | | | | | | | 125,000 | | 125,000 |
| Net income............... | | | | | | | | | | 6,416,000 | 6,416,000 |
| Balance December 31, 1991. | 1,581,000 | $16,000 | | | 660,000 | $7,000 | 1,686,000 | $ 16,000 | $11,738,000 | $ 3,450,000 | $15,227,000 |

See accompanying notes to financial statements

F-6

A 40

## CALLAWAY GOLF COMPANY

## NOTES TO FINANCIAL STATEMENTS

**Note 1—Summary of Significant Accounting Policies:**

*Description of business*

Callaway Golf Company (Callaway or the Company) is a California corporation formed in 1982. The Company designs, develops, manufactures and markets high-quality, innovative golf clubs. Callaway's primary products currently include Big Bertha® metal woods, S2H2® irons and metal woods and Callaway Hickory Stick® wedges and putters.

*Revenue recognition*

Sales are recognized at the time goods are shipped.

*Earnings per common share*

Primary earnings per common share are calculated by dividing net income by the weighted average number of common shares outstanding during the period increased by dilutive common stock equivalents using the treasury stock method. The calculation of fully diluted earnings per common share includes the effect of the assumed conversion of the convertible subordinated bonds at the beginning of the year.

Pursuant to the requirements of the Securities and Exchange Commission (SEC), common shares issued and stock options granted subsequent to December 31, 1990 by the Company at prices below the anticipated public offering price have been included in the calculation of the shares used in computing both primary and fully diluted earnings per common share as if they were outstanding for all periods presented (using the treasury stock method and the estimated public offering price). In addition, the calculation of the shares used in computing primary and fully diluted earnings per common share also includes the convertible preferred shares which will convert into 4,482,794 common shares immediately prior to the consummation of a public offering of common stock as if they were converted to common shares on their respective effective original dates of issuance.

*Cash equivalents*

Cash equivalents are highly liquid investments purchased with an original maturity of three months or less. Cash equivalents consist of investments in money market accounts, U.S. Treasury bills and/or investment grade commercial paper.

*Inventories*

Inventories are valued at the lower of cost or market. Cost is determined using the first-in, first-out (FIFO) method.

*Property and equipment*

Property and equipment are stated at cost less accumulated depreciation. Depreciation is computed using the straight-line method over estimated useful lives of five to fifteen years. Repairs and maintenance to property and equipment are charged to expense when incurred.

**CALLAWAY GOLF COMPANY**

**NOTES TO FINANCIAL STATEMENTS—(Continued)**

*Patents and trademarks*

Patents and trademarks are amortized over the shorter of the estimated economic lives or seventeen and ten years, respectively. Amortization commences on the date the patents and trademarks are issued.

*Income taxes*

Income taxes are computed under the provisions of Statement of Financial Accounting Standards No. 96 "Accounting for Income Taxes" (SFAS 96). Current income tax expense is the amount of income taxes expected to be payable for the current year. A deferred income tax liability or asset is established for the expected future consequences resulting from the differences in the financial reporting and tax basis of assets and liabilities. Deferred income tax expense is the net change during the year in the deferred income tax liability or asset (Note 8).

The Financial Accounting Standards Board (FASB) has recently issued an Exposure Draft of Statement of Financial Accounting Standards No. 109, to supersede SFAS 96. Both SFAS 96 and the Exposure Draft require use of the liability method for computing income taxes. The effect on these financial statements upon adoption of the Exposure Draft is not considered to be significant.

*Reclassifications*

Certain 1989 and 1990 balances have been reclassified to conform to the 1991 presentation.

**Note 2—Selected Financial Statement Information:**

| | December 31, | |
| --- | --- | --- |
| | 1990 | 1991 |
| Cash and cash equivalents: | | |
| Cash—non interest bearing | $ 281,000 | $ 17,000 |
| Cash—interest bearing | 339,000 | 2,665,000 |
| Treasury bills and commercial paper | 702,000 | 2,496,000 |
| | $1,322,000 | $ 5,178,000 |
| Accounts receivable: | | |
| Trade accounts receivable | $2,295,000 | $ 6,553,000 |
| Other receivables | 29,000 | 16,000 |
| | 2,324,000 | 6,569,000 |
| Allowance for doubtful accounts | (200,000) | (456,000) |
| | $2,124,000 | $ 6,113,000 |
| Inventories: | | |
| Raw materials | $5,537,000 | $ 5,909,000 |
| Work-in-process | 333,000 | 359,000 |
| Finished goods | 2,658,000 | 4,920,000 |
| | $8,528,000 | $11,188,000 |

F-8

A 42

**CALLAWAY GOLF COMPANY**

**NOTES TO FINANCIAL STATEMENTS—(Continued)**

|  | December 31, | |
|---|---|---|
|  | **1990** | **1991** |
| Property and equipment: | | |
| Machinery and equipment | $1,084,000 | $1,486,000 |
| Production molds | 422,000 | 672,000 |
| Furniture, computers and equipment | 573,000 | 873,000 |
| Leasehold improvements | 186,000 | 240,000 |
| Construction in process | 196,000 | 703,000 |
|  | 2,461,000 | 3,974,000 |
| Accumulated depreciation | (602,000) | (1,212,000) |
|  | $1,859,000 | $2,762,000 |
| | | |
| Patents and trademarks: | | |
| Patents | $ 148,000 | $ 241,000 |
| Trademarks | 59,000 | 193,000 |
|  | 207,000 | 434,000 |
| Accumulated amortization | (20,000) | (28,000) |
|  | $ 187,000 | $ 406,000 |
| | | |
| Accounts payable and accrued expenses: | | |
| Accounts payable | $1,810,000 | $3,807,000 |
| Accrued expenses | 503,000 | 1,597,000 |
| Customer advances | 66,000 | 300,000 |
| Royalties payable | 21,000 | 22,000 |
| Warranty reserve | 227,000 | 1,301,000 |
|  | $2,627,000 | $7,027,000 |
| | | |
| Accrued employee compensation and benefits: | | |
| Accrued commissions | $ 14,000 | $ 177,000 |
| Accrued vacation and sick pay | 152,000 | 283,000 |
| Accrued payroll and taxes | 120,000 | 497,000 |
|  | $ 286,000 | $ 957,000 |

Inventory includes an allowance for obsolescence of approximately $280,000 and $1,465,000 at December 31, 1990 and 1991, respectively.

**Note 3—Bank Line of Credit:**

In December 1991, the Company renegotiated its bank line of credit. The credit line was increased from $3,500,000 to $5,000,000 and the interest rate was reduced from the bank's prime rate plus ½% to the bank's prime rate plus ¼%. The interest rate at December 31, 1991 was 6.75%. At December 31, 1991, there were no borrowings under the line of credit. The line is secured by all assets of the Company and is subject to renewal on November 30, 1992. During 1991, the Company repaid $1,000,000 outstanding under the line of credit. Average borrowings for the period from January 1, 1991 through December 31, 1991 were $518,000. At December 31, 1991, availability under the Company's line of credit was $3,173,000, after reduction for outstanding letters of credit in the amount of $1,827,000.

F-9

A 43

## CALLAWAY GOLF COMPANY

### NOTES TO FINANCIAL STATEMENTS—(Continued)

The line of credit is periodically utilized to provide working capital and to support the issuance of letters of credit. The line of credit requires Callaway to maintain certain financial ratios, including current and debt to equity ratios. The Company is also subject to other restrictive covenants under the terms of the credit agreement.

**Note 4—Long-term debt:**

In December 1990 and January 1991, Callaway issued an aggregate of $3,500,000 of 8% Convertible Subordinated Bonds due 2000. Interest to bondholders is due and payable quarterly. The bonds allow the deferral of up to four quarterly interest payments. Deferred interest, if any, will be capitalized and added to bond principal. As of December 31, 1991, the Company had made all scheduled quarterly interest payments.

The bonds are convertible by the holders at any time up to November 1, 2000 into Common Stock of the Company at $3.85 per share. The conversion price is subject to downward adjustment if the Company issues any Common Stock at a price less than the conversion price or less than fair market value. The bonds are secured by all the assets of the Company and limit the amount of senior indebtedness to $10,000,000. In addition to requiring the Company not to default on the line of credit, the bonds require the maintenance of a specified interest coverage ratio.

The bonds are subject to optional redemption at any time after November 1, 1993, and are mandatorily redeemable on a ratable basis over three years beginning on November 1, 1998. The bonds may be redeemed in whole or in part, at the option of the Company and/or the holders, upon the sale of all or substantially all of the assets of the Company or a merger or reorganization which results in the shareholders of the Company immediately prior to such transaction owning less than 50% of the surviving entity at an amount equal to the amount of principal and interest due on the bond.

In September 1991, the Company entered into a five-year tour endorsement contract with a professional golfer. As consideration for specified services to be rendered by the professional golfer, the professional golfer was to receive $50,000 in cash and 20,000 shares of Common Stock during each of the five years. The professional golfer had the right to put 20,000 shares to the Company each year during a specified 60-day period at the then fair market value, but in no event less than $5.00 per share. The Company issued the first 20,000 shares in September 1991 and reflected as long-term debt a $150,000 liability for the mandatory redemption of these shares.

In December 1991, the Company renegotiated the contract with the professional golfer. As consideration for the renegotiated contract, the professional golfer was immediately issued an additional 80,000 shares of Common Stock and the Company will be relieved of the put feature of the contract upon the Company's completion of a public offering. The additional Common Stock was issued in December 1991 at the then current market value of $10.00 per share. Until the consummation of a public offering, the $950,000 value of all shares issued to the professional golfer will be reflected as long-term debt due to the mandatory redemption feature of these shares. All other terms of the contract remained unchanged.

**Note 5—Common and Preferred Stock:**

In December 1988, the Company issued 1,298,441 shares of Series B Convertible Preferred Stock (Series B Stock) for $4,000,000. On December 15, 1990, the Series B Stock was converted into an equal number of shares of Series A Convertible Preferred Stock (Series A Stock).

Also, in December 1988, the Company issued 292,149 shares of Series A Stock in exchange for the cancellation of $900,000 of debt. Each share of Series A Stock is convertible into two shares of Common Stock and is subject to mandatory conversion immediately prior to the consummation of a public offering of Common Stock.

F-10

A 44

CALLAWAY GOLF COMPANY

NOTES TO FINANCIAL STATEMENTS—(Continued)

In June 1990, the Company issued 660,000 shares of Series C Convertible Preferred Stock (Series C Stock) for $4,620,000. The proceeds were used to purchase and retire shares of Common Stock and Series A Stock in transactions totalling $4,263,000. Each share of Series C Stock is convertible into two shares of Common Stock and is subject to mandatory conversion upon the consummation of a public offering of Common Stock.

In the event of any liquidation, dissolution or winding up of the Company, the holders of outstanding shares of Series A Stock and Series C Stock shall be entitled, as if members of a single class of securities, to be paid an amount equal to $3.08 per share for the Series A Stock and $4.82 per share for the Series C Stock, subject to certain adjustments.

Effective December 12, 1991, the Company's Board of Directors authorized a two for one Common Stock split and established a post-split par value of all Preferred and Common Stock of $.01 per share. All information in the financial statements has been retroactively adjusted for the Common Stock split and the establishment of par value.

Note 6—Stock Options and Rights:

Pursuant to the Company's non-qualified stock option plan, the Company may grant officers, key employees and consultants options to purchase an aggregate of not more than 375,000 shares of Common Stock. At December 31, 1991, options to purchase 335,000 shares have been granted at exercise prices ranging from $2.50 to $3.50 per share, 100,000 of which were exercisable at December 31, 1991.

The Company has also issued 306,000 options to officers, key employees and consultants to purchase 306,000 shares of Common Stock at prices ranging from $0.50 to $2.50 per share. Options for 30,000 and 16,000 shares of Common Stock were exercised in 1990 and 1991, respectively. No shares were issued upon exercise as the Company elected to pay the option holders the difference between the option exercise price and the then fair market value of the underlying Common Stock. The aggregate net payment for the exercised options was $70,000 and $32,000 for 1990 and 1991, respectively. As of December 31, 1991, options for 260,000 shares of Common Stock were exercisable.

In October 1991, the Company adopted the 1991 Stock Incentive Plan (the Incentive Plan) for its officers, directors and key employees. All directors, officers and key employees of the Company are eligible for awards under the Incentive Plan except that no director of the Company who is not also an employee of the Company is eligible to receive any award under the Incentive Plan. Under the Incentive Plan, options to purchase Common Stock may be granted with an option price less than the then current market value of such stock. A total of 1,000,000 shares have been reserved for issuance under the Incentive Plan. Options to purchase 50,000 shares of Common Stock at an exercise price of $5.00 per share were granted in October 1991.

For the years 1989, 1990 and 1991, the Company recorded $451,000, $95,000 and $125,000, respectively, in compensation expense as the value of options and rights to purchase shares of Common Stock granted to employees of and consultants to the Company. The valuation of the options and rights is based on the difference between the exercise price and the market value of the stock on the date of the grant. The following summarizes stock option transactions for the years ended December 31, 1989, 1990 and 1991.

| | Year ended December 31, | | |
|---|---|---|---|
| | 1989 | 1990 | 1991 |
| Outstanding at beginning of period | 226,000 | 376,000 | 601,000 |
| Granted | 160,000 | 255,000 | 50,000 |
| Cancelled | (10,000) | — | — |
| Exercised | — | (30,000) | (16,000) |
| Outstanding at end of period | 376,000 | 601,000 | 635,000 |
| Price range of outstanding options | $0.50-2.50 | $0.50-3.50 | $0.50-5.00 |

F-11

A 45

## CALLAWAY GOLF COMPANY

### NOTES TO FINANCIAL STATEMENTS—(Continued)

In addition, in 1989 and 1990, officers, consultants and an employee of the Company were granted rights to receive an aggregate of 100,000 shares of Common Stock for services or other consideration. In 1990, rights to receive 30,000 shares of Common Stock were surrendered to the Company for consideration of $105,000. In 1991, an officer of the Company exercised his right to receive 20,000 shares of Common Stock. At December 31, 1991, rights to receive 50,000 shares of Common Stock remain outstanding.

#### Note 7—Benefit Plan

The Company adopted on December 12, 1991, effective January 1, 1991, a voluntary deferred compensation plan under Section 401(k) of the Internal Revenue Code (the "401(k) Plan") for all employees who satisfy the age and service requirements under the 401(k) Plan. Each participant may elect to contribute up to the maximum permitted under federal law and the Company is obligated to contribute annually an amount equal to 50% of the participant's contribution up to 6% of that participant's annual compensation. Additionally, the Company can make discretionary contributions based on the profitability of the Company. For the year ended December 31, 1991 the Company has accrued contributions of $374,000 to the 401(k) Plan and there were no employee contributions.

#### Note 8—Income Taxes

Effective December 31, 1989, the Company adopted, retroactive to January 1, 1989, SFAS 96. The primary effect of applying SFAS 96 in fiscal year 1989 is to recognize the utilization of net operating loss (NOL) carryforwards as a benefit in the income tax provision rather than as an extraordinary credit. Implementation of SFAS 96 did not have a material effect on the results of operations or financial position.

The provision for income taxes is as follows:

| | Year ended December 31, | |
|---|---|---|
| | 1990 | 1991 |
| Current tax provision: | | |
| Federal | $553,000 | $4,815,000 |
| State | 255,000 | 1,348,000 |
| Deferred tax benefit: | | |
| Federal | (465,000) | (1,808,000) |
| | $343,000 | $4,355,000 |

Deferred income taxes are summarized as follows:

| | December 31, | |
|---|---|---|
| | 1990 | 1991 |
| Reserves and allowances | $ (53,000) | $ (869,000) |
| Effect of inventory overhead adjustment | (181,000) | (395,000) |
| State income taxes | (84,000) | (376,000) |
| Net operating loss utilization | (169,000) | (176,000) |
| Compensatory stock options and rights | (115,000) | (37,000) |
| Research and development costs | 50,000 | 37,000 |
| Depreciation and amortization | 25,000 | 27,000 |
| Other | 62,000 | (19,000) |
| | $(465,000) | $(1,808,000) |

F-12

A 46

**CALLAWAY GOLF COMPANY**

**NOTES TO FINANCIAL STATEMENTS—(Continued)**

A reconciliation of the provision for income taxes to the amount computed by applying the statutory federal income tax rate to income before income taxes follows:

| | Year ended December 31, | | |
|---|---|---|---|
| | 1989 | 1990 | 1991 |
| Amounts computed at statutory Federal rate of 34% | $ 112,000 | $ 743,000 | $3,662,000 |
| State income taxes, net of Federal benefit | 37,000 | 168,000 | 890,000 |
| Effect of NOL utilization | (240,000) | (598,000) | (176,000) |
| Other | 91,000 | 30,000 | (21,000) |
| Provision for income tax | $ — | $ 343,000 | $4,355,000 |

**Note 9—Commitments:**

At December 31, 1991, the Company leased manufacturing and operations facilities under operating leases which expire at various times through the year 2002. In September 1991, the Company entered into a ten and one-half year lease for an approximately 133,000 square foot facility for $68,000 a month beginning April 1992, subject to annual increases based on the Consumer Price Index and including six months of free rent. The rental agreement contains a purchase option for $9,000,000 exercisable from date of lease through December 31, 1992. The agreement also contains purchase options in the fourth or seventh year at fair market value, but not less than $9,000,000. The lease can be extended for two five-year periods. The Company also leases various equipment under month-to-month operating leases. At December 31, 1991, future minimum lease payments under these facility and equipment leases were:

| | |
|---|---|
| 1992 | $   848,000 |
| 1993 | 972,000 |
| 1994 | 918,000 |
| 1995 | 918,000 |
| 1996 | 908,000 |
| Thereafter | 6,005,000 |
| | $10,569,000 |

Total rent expense was $273,000 and $462,000 in 1990 and 1991, respectively.

**Note 10—Sales Information:**

The Company is engaged in domestic sales and in international sales through distributors located within the following geographic areas:

| | Year ended December 31, | | |
|---|---|---|---|
| | 1989 | 1990 | 1991 |
| United States | $ 7,443,000 | $14,576,000 | $44,896,000 |
| Japan | 2,199,000 | 4,828,000 | 5,451,000 |
| Other | 738,000 | 2,114,000 | 4,406,000 |
| | $10,380,000 | $21,518,000 | $54,753,000 |

In 1989, 1990 and 1991, sales to Sumitomo Corporation of America (Sumitomo) accounted for 21%, 22% and 10%, respectively, of the Company's net sales. The Company and Sumitomo entered into a second exclusive distribution agreement on January 1, 1991 for an initial term of three years. The Company, through this distribution agreement, has appointed Sumitomo as the sole supplier of Callaway clubs in Japan. The distribution agreement requires Sumitomo to purchase specified minimum quantities during each of the three years.

**Note 11—Supplemental Statement of Cash Flows Information:**

Cash paid for interest during 1989, 1990 and 1991 was $1,000, $18,000 and $302,000, respectively.

Income taxes paid in 1989, 1990 and 1991 amounted to $1,000, $903,000 and $4,918,000, respectively.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

| | Page |
|---|---|
| Prospectus Summary | 3 |
| The Company | 5 |
| Risk Factors | 5 |
| Use of Proceeds | 7 |
| Dividend Policy | 7 |
| Capitalization | 8 |
| Dilution | 9 |
| Selected Financial Data | 10 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 11 |
| Business | 14 |
| Management | 22 |
| Principal and Selling Shareholders | 28 |
| Shares Eligible for Future Sale | 29 |
| Description of Capital Stock | 30 |
| Underwriting | 32 |
| Legal Matters | 33 |
| Experts | 33 |
| Additional Information | 33 |
| Index to Financial Statements | F-1 |

[THIS PAGE INTENTIONALLY LEFT BLANK]