# Appendix
# A51-A130



**PGA TOUR PROFESSIONALS FOR CALLAWAY GOLF**

Jim Dent

Orville Moody

Charles Coody

Bob Charles

Chi Chi Rodriguez
(Japan and Far East only)

Olin Browne

Fulton Allem

Callaway GOLF

# THE BOBBY JONES® S2H2 "BLADE" IRONS
## Introduced January, 1992



Bobby Jones®

Callaway GOLF



# STRICTLY

Reprinted from August 30, 1997

# BUSINESS

## GOLFWEEK'S BIWEEKLY INDUSTRY REPORT

# Infomercial sends Tight Lies sales soaring



*Tight Lies Air Assault*

**By LYNN HENNING**

With each passing month, it ranks as one of golf's most interesting — and surprising — equipment stories of the year.

Adams Golf, the same company that two years ago racked up $1 million in sales for its entire year, is now selling its Tight Lies line of fairway woods at a startling clip.

Company founder/president Barney Adams projects 1997 sales of more than $20 million, with the past month's orders landing somewhere in the $5 million range.

Not bad for a company that in 1995 got by with a staff of about 18. Adams now employs 135 workers, many of them involved in three-shifts-a-day production of the Tight Lies clubs,

all of which are made at Adams' headquarters in Plano, Texas.

Office, manufacturing and warehouse space is yet another measure of the company's boom times. Adams Golf has grown out of the 8,000 square feet in which it resided in the pre-Tight Lies era and now dwells within a 25,000-square-foot expanse. But already, 10,000 square feet of additional rented space has been required, which puts Adams at the amount of square footage that had been anticipated five years from now.

It's what happens, apparently, when a hot golf club hooks up with that staple of 1990s marketing and advertising, the . . . infomercial?

Those who watched past a rain delay during CBS' telecast of the third round of the PGA Championship got a 30-minute dose of Adams' infomercial. The nationally broadcast video cast included TV golf commentator Jack Whitaker, noteworthy golf instructors Hank Haney and Carol Mann, and players Gibby Gilbert and Bill Rogers. For half an hour, the Tight Lies infomercial pelted viewers with compelling reasons why its 16-degree fairway wood — shallow, with a low center of gravity — would enable them to get their shots airborne out of all forms of terrain and travel ample distances toward the green.

It also reminded viewers that a phalanx of sales people were waiting by the phones ready to take orders. The club costs about $160 (steel, $239 graphite) and is backed by a three-month, money-back guarantee.

Together, the recipe combines a popular club with a convincing on-screen sales presentation. It has thus managed to do what Barney Adams had been trying to do for the

previous 12 years: find a product and an audience that would provide lusty sales numbers and make his small company a success.

"It's turned into somewhat of a minor phenomenon," acknowledged Adams, who, before he founded Adams Golf in 1985, had at various



*Adams*

times been a field engineer for Dow Corning and an analyst who helped Silicon Valley investors solve their management problems.

"We've caught a small wave, let's put it that way," he continued. "But under no circumstances do we consider ourselves a successful company. We are making wonderful progress. But those are two different things. That's how we look at it here, anyhow."

Tom Stine, co-founder of Golf Datatech of Orlando, Fla., which tracks golf equipment sales nationally, agrees Adams has had a huge 1997, but he says the company's growth is still a relative figure.

"They are in the shops, and they are selling product," Stine said, "but not yet to a significant degree of market share, according to our reports."

Adams, however, estimates that 50 percent of his sales (almost all of which are domestic) are generated by the infomercials and are handled by his 12-person telesales staff.

Nick Berklich, PGA head professional at Warwick Hills Country Club in Grand Blanc, Mich., site of the Buick Open, could not quantify his Tight Lies sales, but said: "We've had great success with it. The sell-through has been fine, mainly because if one person in

UND 05317

the foursome gets it, the rest have got to have it. It's quite a multi-purpose club. Along with the Berthas (Callaway's Big Bertha family of metalwoods), they've been our two biggest metalwoods sellers."

The way in which Adams has looked at the golf business — and his company's place in it — explains the Tight Lies technology, as well as the infomercial campaign.

Adams, in essence, was desperate.

He started his company in the mid-'80s as a component supplier for do-it-yourself clubmakers — another version of Golfsmith. That went nowhere when most of his customers asked for knockoff clubheads.

**MARKETING**

He then got into custom-made, custom-fit golf clubs. But the market was too small, his exposure too miniscule, to make that anything but a limited venture.

Then came his brainstorm for Tight Lies. Adams believed companies that extended the oversize driver concept to oversize fairway woods were missing the boat. He went home and sketched a model for his new fairway wood on a yellow legal pad, an anecdote reminiscent of Ping founder and engineer Karsten Solheim's early work.

The shallow-faced, low-center-of-gravity Tight Lies fairway head was born. Two months later, Tight Lies was introduced as a custom-fitted fairway wood featuring Adams' new, homespun technology, suitable for hitting the ball off the fairway, out of deep rough, fairway bunkers, etc.

"Pretty soon, we started getting phone calls," Adams said. "We had never had phone calls before. But it was one guy playing with another, noticing that his partner had hit a shot over the water on No. 14 — that kind of thing.

"So, we had a meeting. We decided we might have a product that had stand-alone capability. We were now selling a product, rather than just selling a service. We didn't know it, actually, but we guessed it."

It led to a critical mission for Mark Gonsalves, the company's vice president of sales and marketing.

"I said to Mark that we may have a real product here," Adams recalls. "I told him, 'See if you can figure out a way to sell it. I've tried all the traditional methods, and they haven't worked.'"

Gonsalves sifted ideas from all industries. At least in his mind, there was one strategy.

"You're going to have to sell them over the telephone," Gonsalves said. To which Adams replied:

"You're kidding... You mean the same people who are calling me at home when I'm half

asleep, trying to sell me a cell phone?"

Gonsalves nodded. He also told Adams that telemarketing — "telesales" as they refer to it — could be done tastefully. The company added four telesales people to recruit distributors (primarily on-course golf shops) and in 1996 saw sales jump to $3.5 million from the previous year's $1 million.

It led to another in-house meeting midway through 1996.

"We said, 'OK, we're onto something — this is working. But what can we do now, when in this world around us, people are spending $40 million on advertising?'" Adams recalled.

The decision: infomercials. Presentations on a club's features and benefits.

Adams and his strategists decided to essentially spend everything on select spots — 15 seconds to a half-hour — that would run on cable and network television outlets ranging from The Golf Channel to full-length rollouts such as the one that appeared during the PGA Championship.

"We basically took all of our chips and put them on the line," Adams said, although he won't reveal figures except to say last month's infomercial expenditures surpassed $1 million.

"It was a huge, frightening gamble, in that the downside was that the results could be zero."

Initial response to fragmented media buys — Adams' version of test-marketing — were strong. Heavier spending and longer infomercials rolled out in mid-June. Sales began to surge — far beyond the $8.5 million Adams and his generals projected for 1997.

"I will tell you that we projected $8 million with great trepidation," he said, explaining that the company took another gamble in stocking up on two years of inventory in anticipation of heavy sales — inventory that, Adams said, was gone 2½ months after the year's first infomercials hit.

"The objective was to sell enough on TV to keep the show on the air, which we would use as retail advertising."

Another strategy was to advertise only the 16-degree club (3-wood), although a 4-wood, 5-wood and 7-wood are available, and a 9-wood will be introduced at September's PGA International Golf Show in Las Vegas.

"We know that a majority of golfers who buy one will buy the others," said Adams, who estimates that his company will spend $7 million this year in advertising, some of which appears in *USA TODAY* and *The Wall Street Journal.*

"We use the original club to stimulate interest, which provides retailers the rest of the line to sell. You take the 50-75 percent of people who will never buy anything off the television end, through the infomercial, drive them into the retail shops. You're thereby driving customers who won't buy on TV, and those who have bought from TV, into the shops.

"That's our program on retail."

One of the happy results, Adams said, is that "for the first time, (off-course) retailers are receptive to us. It's not a knock on retailers, but before they didn't want anything to do with us. They're not in the pioneer business."

Infomercials are, not surprisingly, viewed differently by companies of different sizes.

Mike Spacciapolli, president of Carbite Golf of San Diego, which has used infomercials in selling its Viper Bite wedges, says of Adams' success: "I love it. Barney's proven, and we've proven, that there are more ways than the traditional means for marketing golf clubs and building a successful company. It allows us to compete with the major companies . . . He's done a beautiful job."

Dick De La Cruz, chief executive officer at Goldwin Golf of Carlsbad, Calif., has a different read on infomercials. Although Goldwin's challenge to sell golf clubs against the Callaway-Cobra-Taylor Made juggernauts was formidable when it started up three years ago, Goldwin this year signed on with a San Francisco marketing agency that has opted for conventional television and print advertising.

"We looked at infomercials," De La Cruz said, "but we're not interested in them. For the long run, and to be substantial in this business, I think people look at infomercials as an option for a company that can't get rid of product through regular channels.

"I don't mean to be derogatory," De La Cruz said, "because I understand he (Adams) makes a heck of a nice product. Maybe it's a good way to get it going, and then switch to conventional sales methods."

Adams isn't sure that anything is going to change, at least soon. The company clearly intends to exploit the recognition that Tight Lies, increasingly, is gaining. Bob Bush, formerly of shaft company True Temper, has joined Adams Golf as head of research and development, and Tight Lies irons are a good bet to appear down the road. But not soon.

"The dumbest thing we can do is come out with new products now," Adams said. "We're very focused. We understand who we are, and maybe more important, we understand who we are not."                                         o

UND 05318

# ADAMS GOLF

*We make golf clubs.*

December 1997

ADAMS GOLF

2901 Summit Avenue
Suite 100
Plano, TX 75074

Telephone 972-422-7060
Facsimile  972-424-0721

CONFIDENTIAL

UND 05615

A 56

CONFIDENTIAL

UND 05616

A 57

**ADAMS GOLF**                                                    *Confidentiality*

This Confidential Overview (the "Document") has been prepared by Adams Golf, Inc. (the "Company") solely for informational purposes. Although the Company believes the information contained in this Document is true, the Company has not independently verified any of the information contained herein; nor does the Company make any representation or warranty as to the accuracy or completeness of this Document and shall have no liability for any representations (expressed or implied) contained in, or for any omissions from this Document or any other written information or communications transmitted to the recipient ("Additional Documents") in the course of its evaluation of the Company. This Document includes certain statements and estimates provided by the Company with respect to the anticipated future performance of the Company. Such statements and estimates reflect various assumptions by the Company which may or may not prove correct. No representations are made as to the accuracy or completeness of such statements or estimates.

By accepting this Document, the recipient acknowledges and agrees that:

1) All of the information contained herein is of a highly confidential nature and the recipient will keep all of such information - and all other information contained in the Additional Documents - permanently confidential.

2) None of such information will be used by the recipient or any of its directors, officers, employees, agents or representatives (including accountants and attorneys) ("Representatives") in any manner whatsoever, other than in connection with its evaluation of the Company for the purpose of investment.

3) The recipient will not (i) reproduce this Document or any Additional Document, in whole or in part, (ii) distribute all or any portion of this Document or any Additional Document, or (iii) disclose any information contained in this Document or any Additional Document to any person other than a limited number of recipient's Representatives who have a clear need to know such information for the purpose set forth above in 2) above and who are informed by the recipient of the confidential nature of such information and the recipient will cause such Representatives to keep such information permanently confidential and not to ever use such information other than in evaluating the Company for the recipient.

4) Upon written request of the Company, the recipient will return this Document and all Additional Documents to the Company as soon as practicable and destroy all written documentation prepared by the recipient or its Representatives based on any of the information contained in this Document or any Additional Document.

5) Any proposed actions by the recipient which are inconsistent in any manner with the foregoing agreements will require the prior written consent of this the Company.

6) If the undersigned or any of its Representatives are requested to disclose any information contained in this Document or any Additional Document pursuant to any legal process, the undersigned will promptly notify the Company in writing to permit the Company to seek a protective order or to take other appropriate action. If, in the absence of a protective order, the undersigned or any of its Representatives are compelled as a matter of law to disclose such information, the undersigned may disclose to the party compelling disclosure only the part of such information as is required by law to be disclosed.

CONFIDENTIAL                                              UND 05617

A 58

ADAMS GOLF                                              *Table of Contents*

EXECUTIVE SUMMARY ..................................................................... 2

    FINANCIAL SUCCESS ..................................................................... 2
    WHY ADAMS GOLF IS CONSIDERING OUTSIDE CAPITAL ............................ 3
        *Development of Infrastructure* ..................................................... 3
        *Research & Development* ............................................................ 4
        *New Product Introduction* .......................................................... 4
        *Tour Support* .......................................................................... 4

OVERVIEW & HISTORY .................................................................. 6

MARKETING MODEL & OBJECTIVES ................................................ 7

    PRODUCTS ................................................................................... 7
    OVERVIEW ................................................................................... 7
    DIRECT RESPONSE MARKETING ....................................................... 9
        *Direct Marketing Infomercial* ...................................................... 9
        *Other Direct Marketing Mediums* ............................................... 10
        *The Economics of Advertising* ................................................... 10
    CONTROLLED RETAIL DISTRIBUTION .............................................. 10
    GEOGRAPHIC EXPANSION ............................................................. 11

INDUSTRY OVERVIEW ................................................................. 13

    THE GOLF MARKET ..................................................................... 13
    OVERVIEW ................................................................................. 13
        *Woods* ................................................................................. 13
        *Irons* .................................................................................. 14
        *Putters* ............................................................................... 14
    COMPETITION ............................................................................ 14
        *Callaway Golf* ...................................................................... 14
        *Taylor Made* ........................................................................ 15
        *Cobra & Titleist (Fortune Brands)* ............................................. 15
        *Ping* ................................................................................... 15
        *Tommy Armour* ..................................................................... 16

FINANCIAL .............................................................................. 17

    GROWTH .................................................................................. 17
    FINANCIAL STATEMENTS ............................................................. 18
        *Income Statement* ................................................................. 18
        *Balance Sheet* ...................................................................... 19
    ADAMS GOLF V. CALLAWAY & COBRA .............................................. 19
    BASIC ECONOMICS OF THE BUSINESS ............................................ 20

OPERATIONS ........................................................................... 21

    PRODUCTION PROCESS ................................................................ 21
    FULFILLMENT ........................................................................... 21
    PLANT & FACILITY ..................................................................... 21

STAFFING & MANAGEMENT .......................................................... 22

CONFIDENTIAL

UND 05618

A 59



# KEY INVESTMENT CONSIDERATIONS

The Company has a proven operating model which uses direct response marketing to create demand and draw products through the retail distribution channels at the highest margin levels in the premium area.

The Company is one of the top four manufacturers in its segment and is rapidly increasing its marketshare.

The fairway wood segment of the golf industry is the fastest growing area with 20% annual growth.

Five unique new clubs are currently under development with patent protection in place or under way, and all five are applicable to the operating model.

By the third quarter of 1998 there will be one million Tight Lies™ customers, all strong candidates for any new Adams products.

The Company plans its next new product introduction in the third quarter of 1998, in line with its policy of dominant market share in one area before line extension in another.

The Company has invested significantly in its infrastructure of people and systems.

CONFIDENTIAL

UND 05619

A 60

# EXECUTIVE SUMMARY

Adams Golf is considering outside capital to continue building on its current success and becoming a dominant force in the golf equipment industry. The Company has grown from $3.5 Million in revenue in 1996 to $35 Million in 1997 and is projecting $101 Million in revenue for 1998.

Started as a components supplier, the Company developed several patents which led to the success of the Tight Lies™ fairway woods. Adams Golf has developed a successful operating model which uses direct response marketing to build demand and draw products through the traditional retail golf distribution channels. Success in the golf club business is a result of the right exposure for a good product.

Using its own inside sales force, the Company has built a significant marketshare in fairway woods competing head to head with larger and more established competition. It has done this by using infomercials and other forms of advertising to build sell-thru support for retailers. In using direct response advertising, the Company is able to produce market awareness that it otherwise couldn't afford. By being selective in its distribution, Adams has been able to provide retailers with gross margins of 30 to 40 percent, compared to 18 to 25 percent for their competitors.

The goal of the Company's marketing programs is to realize specific milestones for marketshare and then leverage that success for follow on products. It is this overall integrated business model that has generated the Company's current success and will enable it to become a premier player in the industry.

## FINANCIAL SUCCESS

Adam's Golf has achieved tremendous financial success growing to over $35 Million in revenue for 1997. Because of the nature of its business, and strong gross margins, the Company has realized substantial profits and high operating income as a percentage of sales on a relatively small base of assets. In achieving this, *Adams Golf has evaded the typical barriers to entry, and enacted what most industry experts and market analysts said "can't be done" – compete effectively with Callaway, Taylor Made and Cobra.* Table 1 summarizes the Company's current operating success and projected profitability.

CONFIDENTIAL                                                      UND 05620

A 61

ADAMS GOLF                                                    *Executive Summary*

Table 1

# Summary Financial Information

| (\$ in 000's) | Actual | Projected | |
| --- | --- | --- | --- |
| | 11/30/97 | 12/31/97 | 12/31/98 |
| **Operating Performance** | | | |
| Sales | \$ 31,367 | \$ 35,888 | \$ 101,500 |
| Gross Profit | 22,127 | 25,300 | 71,555 |
| EBITDA | 9,361 | 9,953 | 26,749 |
| Depreciation & Amortization | 224 | 507 | 1,130 |
| EBIT | \$ 9,137 | \$ 9,446 | \$ 25,619 |
| **Sales Growth and Margin Analysis** | | | |
| Sales Growth | N/A | N/A | 182.8% |
| Gross Margin | 70.5% | 70.5% | 70.5% |
| EBITDA Margin | 29.8% | 27.7% | 26.4% |
| EBIT Margin | 29.1% | 26.3% | 25.2% |
| **Balance Sheet** | | | |
| Accounts Receivable | \$ 8,419 | \$ 8,500 | \$ 12,180 |
| Inventory | 3,139 | 3,800 | 8,000 |
| Total Assets | 14,658 | 15,384 | 34,829 |
| Total Current Liabilities | 5,425 | 5,951 | 7,000 |
| Total Liabilities | 5,425 | 5,951 | 2,000 |
| Net Working Capital | 6,133 | 6,349 | 13,180 |

## WHY ADAMS IS CONSIDERING OUTSIDE CAPITAL

The Company is considering outside capital to continue building on its current success and becoming a dominate force in the golf equipment market. As such, in competing with larger companies like Callaway, Adams will have to develop a secure infrastructure to drive and fulfill retail sales, develop new and innovative products that can be marketed using its current successful operating model, and providing endorsement monies for more visible clubs such as drivers or putters.

### Development of Infrastructure

**October of 1997 saw the Company realize over \$6.6 million in revenue for a single month.** As can be expected, this dramatic growth has forced the Company to take great leaps and strides in most every area to fulfill its success. In the last quarter of 1997 alone, the Company will spend over \$1 million on information and telecommunication systems. The future will require an infrastructure that can effectively develop, maintain and

CONFIDENTIAL                                                  UND 05621

A 62

apply the Company's successful business model to other areas of golf equipment.

### Research & Development

The starting point of success in any club category whether woods, irons or putters is research & development ("R&D"). Management believes that the key to the future of Adams Golf is its ability to design and produce new products that have the technical standards and impact of Tight Lies™ which can flow through its proven marketing and business models.

Historically, R&D was performed by Barney Adams with testing of products at borrowed space and on a variety of driving ranges. While the Company has been fortunate with its results, a cost effective test facility needs to be developed to support an ongoing and more formal R&D program.

Building on its current success, Adams Golf has retained the expertise of Bob Bush by making him a partner of Research & Development. Bob brings an impressive history of product innovation to the Company and will assist a department staffed with at least two additional people. Between Mr. Bush and the Company's current efforts, five new products are at various stages of development.

### New Product Introduction

Tight Lies™ was launched after extensive test marketing and pre-selling over the telephone long before the successful infomercial. By using "Word of Mouth" and inside sales efforts, there was already a proclivity to accept the product in the market when the infomercial generated greater demand.

As the Company sees opportunity in the market, and after pre-determined milestones are reached with antecedent clubs, Adams intends to launch new marketing and club campaigns. While these programs would not follow the exact same path, a systematic process proven by Tight Lies™ will be applied to grow market share in the chosen equipment area.

Currently, the Company has at least one product introduction planned for the third quarter of 1998 after market penetration for Tight Lies™ has been more fully realized.

### Tour Support

Adams Golf has achieved great success to date without paying professional players to use their clubs. The "We don't pay Tour Players" policy has worked to the Company's advantage by creating a marketing situation of being able to point to strong tour acceptance and support of the Tight

CONFIDENTIAL

UND 05622

A 63

Lies™ clubs without compensation. Thus, the "I use Tight Lies™ because it helps my game" message is more emphatically delivered.

The nature of Tour contracts is that companies typically pay for professional players to use the most visible clubs that show up on television, i.e. drivers, irons, and putters. Adams has achieved strong Tour support in spite of these contracts because most players have the option to add two or three non-contract clubs and fairway woods is a logical area for these substitutions.

In the future, Adams will probably need to provide compensation to Tour professionals for exposure of highly visible clubs, such as a driver line (the most logical segment). Should a Tour program become a necessity, the Company would devise some form of pool concept designed to attract a number of professional players. Management believes that the message to the public should be "Quantity of Tour Players" versus just marquee endorsements.



CONFIDENTIAL                                                          UND 05623

A 64

# OVERVIEW
# & HISTORY

## OVERVIEW

Adams Golf is a golf club company, which, as a result of its history in custom golf club fitting, has positioned itself as a scientific club manufacturer offering solutions to common problems golfers face. In short the Company conveys to the market the theme of "We Are Golf People."

## HISTORY

**Founded in 1987** when Barney Adams purchased the assets of Dave Pelz Golf, Adams Golf began its operation as a components supplier. By 1991, Mr. Adams recognized the need to be in a larger market in order to grow the Company, and thus moved the headquarters to Richardson, Texas. In 1992, Adams Golf formed a **custom fitting relationship with Hank Haney** which resulted in increased club sales and subsequent years of steady growth. In 1994 Adams Golf had its first patent issued for the **VMI Technology** method of making balanced clubs, and in late 1995 followed with the Air Assault Driver patents for design and utility. This product would eventually become the fairway wood **Tight Lies™**. The dramatic success of the Tight Lies™ club over the first part of 1996 resulted in an extremely successful ½ **hour TV infomercial.** 1997 saw the Company begin to realize its potential by **drawing retail sales of its entire line of fairway woods through the established golf distribution channels.** By August 1997, Adams Golf had achieved its first **$5 million dollar month.**

## ▲ SIGNIFICANT MILESTONES



CONFIDENTIAL

UND 05624

A 65

# MARKETING MODEL & OBJECTIVES

## PRODUCTS

Adams Golf is a full line manufacturer of golf clubs. Approximately 98 percent of its revenue comes from the sale of fairway woods. The Company markets its #4 fairway wood through direct response marketing, building demand for its #3, #5, #7, and #9 woods which are sold exclusively through retail channels. The Company's irons are sold through teaching professionals who are certified Adams Golf club fitters.

## OVERVIEW

The key to Adams Golf's operating model is establishing market penetration through direct response marketing, which builds demand and draws products through the retail distribution channel. This integration of distribution channels has a powerful effect and delicately balances such marketing programs as infomercials, television and radio advertising, and print ads with the Company's support of its wholesalers and green grass and non-green grass retailers. Adams Golf enacts the balance by providing wholesalers and retailers with substantially higher margins than other club providers, making the retail segment the exclusive distribution channel for the #3, #5, #7, and #9 woods, and providing strong "sell-thru" support via direct response marketing and advertising.

Adams Golf's marketing strategy is to gain marketshare through targeted penetration of a category of golf equipment, and then introduce new products which are thoroughly tested into its distribution channels. By pursuing this strategy, and building on the success of the Tight Lies™ fairway woods, the Company can develop and realize individual market goals and objectives for other products. Its current stated objective is to establish a 20% marketshare in the fairway woods category. The Company has begun to realize this objective by establishing a strong marketshare in little over six months.

CONFIDENTIAL

UND 05625

A 66

ADAMS GOLF                                          *Marketing Model & Objectives*





CONFIDENTIAL

UND 05626

A 67

ADAMS GOLF                                          *Marketing Model & Objectives*



## DIRECT RESPONSE MARKETING

The objective of direct response marketing is not to be a major selling function, but rather to convey the message of the product to the marketplace, building awareness and retail demand. Thus, direct response is a vehicle to generate sales, primarily to pay for advertising, which creates sell-thru in the retail segment. A secondary benefit of direct response is the resulting database of end-use customers, which can be used for marketing and test marketing subsequent product innovations.

### *Direct Marketing Infomercial*

Adams Golf's most successful medium of advertisement has been its ½ hour infomercial which generates sales for its Tight Lies™ #4 fairway wood. Hosted by veteran announcer Jack Whitaker and featuring former PGA Teacher of the Year Hank Haney, former British Open champion Bill Rogers and LPGA Hall of Famer Carol Mann, the infomercial demonstrates the patented technological advances which allow the club to provide the ultimate in playability with maximum distance.

The infomercial shows three amateur golfers, of various levels of ability, hitting their own fairway woods and long irons from a variety of lies and on-course situations. The results are then compared to the shots hit with the

CONFIDENTIAL

UND 05627

A 68

Tight Lies™ club. The result is a convincing depiction that the Tight Lies™ club is easier to hit with more accuracy and distance.

The Adams infomercial was produced by Script To Screen, of Santa Ana, California, the recognized leaders in direct response television with credits including NordicTrack, Taylor Made and Alien. The creative objective of the production was to capture on film the uniqueness of the club and how it can benefit every golfer.

### Other Direct Marketing Mediums

The company has begun building on its success in television and is applying shorter direct response programs to radio. The next method of penetration will be newspaper and magazine advertisements, which will continue to stress Tight Lies™ as a solution to a problem.

### The Economics of Advertising

In deploying direct response marketing programs, the measure of success is the MER, or ratio of revenue to cost of advertising. Thus, if an infomercial run in a certain region generated $200,000 in revenue and cost $100,000 for airtime, the MER would be 2.0. The MER response to Adams programs, television and print advertising are unprecedented in success. The Company policy is to build on this success with broader exposure always aimed at driving retail sell-thru.

## CONTROLLED RETAIL DISTRIBUTION

While direct marketing is highly profitable, **only by having a strong wholesale and retail distribution channel can the Company realize its objectives.** Adams Golf has established a selective, yet expansive, retail presence through its **16 inside sales representatives,** which exclusively serve this segment and drive the retail sales channel. The Company uses six company-employed outside sales representatives to support the inside telemarketing sales.

Approximately three out of every ten television viewers will consider purchasing the Adams Tight Lie club through the direct marketing program. This club is a #4 wood. The Company has proven that of these purchases, **eight out of every ten will purchase a second club** (#3, #5, #7, or #9). The key to Adams' success in the retail segment has been creating demand for the #3, #5, #7, and #9 woods at the retail level and **granting channel exclusivity for those clubs.** Secondarily, Adams controls its distribution just enough to allow retailers to command a **margin of 30 to 40 percentage points.** This can be contrasted against an **18 to 25 percentage point margin for Callaway.**

CONFIDENTIAL

UND 05628

A 69

As can be seen in the below chart, the Company has no significant customer concentration.



By maintaining strong advertising through direct marketing, creating demand for the #3, #5, #7, and #9 woods for the retail segment, controlling distribution enough to allow retailers to hold margin and continuing to provide innovative products, Adams' marketing model should continue to fuel its growth.

## GEOGRAPHIC EXPANSION

Approximately 48 percent of golf equipment purchases worldwide take place outside of the United States. The majority of these sales take place in western Europe and Asia, which are more accustomed to the more traditional model of golf equipment distribution and promotion. Adams Golf is aggressively pursuing international expansion and has established 21 distributors in these markets. An infomercial campaign is slated to begin in Japan the first quarter of 1998.

The United States still has significant room for geographic expansion. As can be seen in the below chart, Adams can realize incremental sales by targeting other states it has chosen not to focus on to date.

CONFIDENTIAL                                                              UND 05629

A 70

ADAMS GOLF                                    *Marketing Model & Objectives*



CONFIDENTIAL

UND 05630

A 71

# INDUSTRY OVERVIEW

## THE GOLF MARKET

Each year, 24.6 million Americans play golf. Of these, "Avid golfers" – diehard golf enthusiasts – were responsible for 72% of all rounds played, yet only represent 23% of total golfers. Baby Boomers which outnumber any previous population wave, accounts for 45% of the U.S. golfer population and are expected to drive industry growth as their level of play increases.

Since every golfer's ultimate goal is to lower his/her score, innovations in golf equipment, design, and materials that are perceived to enhance performance create the need for new products, making current clubs obsolete. Where people are looking for hope, Adams Golf is selling solutions.

As a result of these factors, the market for golf equipment is expected to grow in the double digits for the next several years. This growth will be fueled by (1) an accelerated interest in the sport among new players fueled by The Tiger Woods Factor and the fact that even before Tiger, every year two million Americans play golf for the first time; (2) the conversion to premium and oversized titanium clubs; and (3) new product innovations which lower scores. The latter of which play to Adams Golf's strength.

## OVERVIEW

Primarily on the strength of two companies, Callaway and Taylor Made, and the conversion from steel to high priced titanium heads, wholesale sales of golf clubs grew 13% in the first six months of 1997 to $937 million.

### Woods

The estimated market in the United States for fairway woods in 1997 is approximately $478 million and growing at approximately 20% per year. The U.S. market for drivers is approximately $528 million for 1997. The woods segment represents 55% of all golf equipment sales, up from 49% in 1993, as growth in woods has outpaced irons over the last few years.

The unit sales of woods while decreasing 13% to 13.3 million has increased in absolute dollars due to a 32% increase in the average wholesale sales price

CONFIDENTIAL

UND 05631

A 72

to $117. This price increase is driven from the successful adoption of higher-priced titanium clubs and consumer upgrades to such clubs. This trend is expected to continue the increase in woods growth of the total market.

### Irons

This segment, dominated by Ping in the 1980's, is more fragmented in the 1990's than the woods segment primarily due to lack of innovation. As a result, there is no runaway leader with a dominant market share. Callaway and Cobra have posted impressive growth rates in iron sales and now hold the number one and two slots respectively with Taylor Made, Lynx, and Ping vying for the number three spot.

Total domestic wholesales of irons in the first half of 1997 increased 11% to $420 million from $379 million in the same period a year ago. The increase over the last few years is due primarily to a higher percentage of graphite shafted irons sold versus steel and the continuing trading up to premium priced irons.

### Putters

The putter market is the smallest area of golf clubs and represents less than five percent of total sales. This area is dominated by Odyssey Putters and Ping.

## COMPETITION

Though it is likely that new companies will emerge and some will even prosper, it is also probable there will be a shrinking "middle class" with a handful of companies dominating the premium markets and a few niche players holding a share of specialty categories. The largest competitors in the market are Callaway Golf, Taylor Made, and Fortune Brands.

### Callaway Golf

Callaway is the dominant market leader in the golf equipment industry and is the standard by which all other golf equipment products and companies are judged. Consistently maintaining a 36% market share in fairway woods, Callaway's 1997 projected worldwide fairway woods sales are $265 million of which $172 million are domestic.

In August 1997 Callaway purchased Odyssey Putters for $130 Million in cash, roughly two times estimated 1997 revenues. The Odyssey purchase is a strong strategic fit as it rounds out the company's product offering giving Callaway a leadership position in all club categories. Callaway's share in

CONFIDENTIAL                                                           UND 05632

A 73

the fragmented iron market jumped to 26% in the first half of 1997 from 24% for the same period a year ago

Evidence of Callaway's strength in the golf industry is the migration of impact players from both competitors and suppliers to the Callaway team, some of whom "sit on the bench" until a position is found. Callaway has amassed what many believe is the most talented executive pool in the industry.

### Taylor Made

Taylor Made had benefited immensely from the introduction of its *Bubble Burner* in 1994 and the follow-on products that uses its Bubble Shaft.

Continuing its strong 1996 performance when Taylor Made's sales in the United States increased 81%, Taylor Made's sales in the U.S. increased 26%, while total sales in the first six months of 1997 worldwide increased 23% to 1,181 million French francs (or approximately $205 million).

### Cobra & Titleist (Fortune Brands)

Cobra Golf is a full line golf equipment manufacturer which is particularly strong in the green grass segment of the market. In January 1996, Cobra was sold to Fortune Brands for approximately $700 million, or four times trailing 12 months revenues, 21 times 12 months earning, and 13 times EBIT at the height of its growth. Cobra is trying to regain marketshare it lost in 1996 when the company ran into a number of manufacturing and "integration" challenges which resulted in disappointing results.

Another Fortune brands company, Titleist has a strong brand name, primarily from golf balls, and its successful DCI irons. Sales for 1996 were approximately $58 million with 25% coming from woods. Titleist introduced the 975D and 976R titanium drivers which are designed to create shots which fly with a harder, more penetrating ball flight. Titleist's premium wood sales are projected to decrease from $10 million in 1996 to $9 million in 1997.

### Ping

Ping is a very well established brand and is well entrenched in the green grass retail outlets. Ping sold approximately $100 million in 1996 with irons and putters providing the vast majority of revenues. Ping sales of woods are estimated to shrink 20% to $9 million in 1997. To combat their weakness in woods, Ping introduced the ISI Tour fairway woods this year. The ISI is a compact club with a light urethane insert in the center which Ping claims will make it more forgiving.

CONFIDENTIAL

UND 05633

A 74

*Tommy Armour*

Tommy Armour was sold by U.S. Industries to TearDrop Golf Company for $24.8 million in November 1997. The Company sold $17.3 million of woods in 1996 and is estimated to see those sales decline to $15 million in 1997. Due to the cost of launching their 100% titanium irons and the lack of expected sales of those irons, Tommy Armour will lose money in 1997.

CONFIDENTIAL

UND 05634

A 75

ADAMS GOLF                                                        *Financial*

# FINANCIAL

## GROWTH

The explosion in popularity of the Tight Lies™ line of fairway woods has
caused Adams' sales to increase tenfold from $3.5 million in 1996 to a
projected $35.9 million in 1997. Sales in 1998 are forecast to increase
182.8% to $101.5 million. Sales growth is being driven by effective execution
of the business model, which is creating demand to draw the Tight Lies™
through retail distribution channels.



The Company relies on subcontractors for many of its key cost components
such as telemarketing, fulfillment and the major sub-components of the
Tight Lies™. These subcontractors allow the company to quickly scale its
operations without significant additional fixed costs, management time or
capital outlays. This cost structure allows the Company to grow to higher
plateaus without the traditional stair stepping of fixed cost structures and
large increases in deployed capital. The Company can grow significantly and
maintain operating margins over 25%.

CONFIDENTIAL                                              UND 05635

A 76

ADAMS GOLF                                                    *Financial*

FINANCIAL STATEMENTS

*Income Statement*

For the eleven months ended November 30, 1997, the Company recorded operating earnings of $9.1 million on $31.4 million in sales for an operating margin of 29.1%. The Company has high gross profit margins of 70.5%. As a result of the advertising costs inherent in the operating model selling expenses were $10.9 million or 34.9% of sales.

Table 2

## Actual & Projected Income Statements

| ($ in 000's) | Actual | | | | Projected | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 11/30/97 | % | 12/31/97 | % | 12/31/98 | % | 12/31/99 | % |
| **Revenue & Expenses** | | | | | | | | |
| Sales | $ 31,387 | 100.0% | $ 35,888 | 100.0% | $ 101,500 | 100.0% | $ 150,000 | 100.0% |
| Cost of Sales | 9,260 | 29.5% | 10,588 | 29.5% | 29,945 | 29.5% | 49,500 | 33.0% |
| Gross Profit | $ 22,127 | 70.5% | $ 25,300 | 70.5% | $ 71,555 | 70.5% | $ 100,500 | 67.0% |
| Research & Development | 475 | 1.5% | 500 | 1.4% | 1,600 | 1.6% | 2,500 | 1.7% |
| Selling Expense | 10,949 | 34.9% | 12,519 | 34.9% | 35,407 | 34.9% | 46,500 | 31.0% |
| General & Administrative | 1,566 | 5.0% | 2,835 | 7.9% | 8,929 | 8.8% | 13,125 | 8.8% |
| Income from Operations | $ 9,137 | 29.1% | $ 9,446 | 26.3% | $ 25,619 | 25.2% | $ 38,375 | 25.6% |

Table 3

## Projected 1998 Quarterly Income Statements

| ($ in 000's) | Q1 | % | Q2 | % | Q3 | % | Q4 | % |
|---|---|---|---|---|---|---|---|---|
| **Revenue & Expenses** | | | | | | | | |
| Sales | $ 21,475 | 100.0% | $ 29,275 | 100.0% | $ 26,875 | 100.0% | $ 23,875 | 100.0% |
| Cost of Sales | 6,336 | 29.5% | 8,637 | 29.5% | 7,929 | 29.5% | 7,044 | 29.5% |
| Gross Profit | $ 15,139 | 70.5% | $ 20,638 | 70.5% | $ 18,946 | 70.5% | $ 16,831 | 70.5% |
| Research & Development | 325 | 1.5% | 375 | 1.3% | 450 | 1.7% | 450 | 1.9% |
| Selling Expense | 7,491 | 34.9% | 10,212 | 34.9% | 9,375 | 34.9% | 8,329 | 34.9% |
| General & Administrative | 1,889 | 8.8% | 2,575 | 8.8% | 2,364 | 8.8% | 2,100 | 8.8% |
| Income from Operations | $ 5,434 | 25.3% | $ 7,476 | 25.5% | $ 6,757 | 25.1% | $ 5,952 | 24.9% |
| Income Tax | 1,956 | 36.0% | 2,691 | 36.0% | 2,433 | 36.0% | 2,143 | 36.0% |
| Net Income | $ 3,478 | 16.2% | $ 4,785 | 16.3% | $ 4,324 | 16.1% | $ 3,809 | 16.0% |

CONFIDENTIAL                                        UND 05636

A 77

**ADAMS GOLF**                                                        *Financial*

*Balance Sheet*

The large operating margins have allowed the Company to grow sales ten
fold and still have $1.3 million in cash from internally generated funds as of
November 30, 1997. The Company also has a $10.0 Million senior credit
facility. The Company has almost fifty days of sales in accounts receivable as
a result of personnel shortages that kept the credit department behind in
billings and collections. The credit department staff is currently being
increased.

Table 4

## Actual & Projected Balance Sheets

|  | Actual | Projected | |
| --- | ---: | ---: | ---: |
| [$ in 000's] | 11/30/97 | 12/31/97 | 12/31/98 |
| **Current Assets** | | | |
| Cash | $ 1,345 | $ 1,239 | $ 5,796 |
| Accounts Receivable | 8,419 | 8,500 | 12,180 |
| Prepaid Expense | 95 | 79 | 3,113 |
| Deposit | 798 | 421 | 887 |
| Inventory | 3,139 | 3,800 | 8,000 |
| Total Current Assets | $ 13,796 | $ 14,039 | $ 29,976 |
| Fixed Assets | 482 | 625 | 2,491 |
| Other Assets | 380 | 720 | 2,362 |
| Total Assets | $ 14,658 | $ 15,384 | $ 34,829 |
| **Current Liabilities** | | | |
| Accounts Payable | $ 2,324 | $ 2,551 | $ 1,500 |
| Accrued Expenses | 2,301 | 2,160 | 5,500 |
| Notes Payable | 800 | 1,240 | |
| Total Current Liabilities | $ 5,425 | $ 5,951 | $ 7,000 |
| Non-Current Liabilities | | | 2,000 |
| Stockholders' Equity | 9,233 | 9,433 | 25,829 |
| Total Liabilities & Equity | $ 14,658 | $ 15,384 | $ 34,829 |

## ADAMS GOLF V. CALLAWAY & COBRA

Table 5 compares Adams projected 1998 income statement to Callaway and
Cobra in 1992, their breakout year. The most significant differences are in
gross profit and selling expense. Adams expects to make a larger gross profit

CONFIDENTIAL

UND 05637

A 78

ADAMS GOLF                                                        *Financial*

due to the higher margin direct response sales and by reducing downward pricing pressure by limiting their retail outlets. Selling expenses are much higher due to greater advertising efficiencies afforded by the Adams business model. Adams' projected research and development dollars will be greater than Callaway and Cobra in their breakout years, which should allow Adams to develop more products to push through its retail distribution channel.

Table 5

## Adams Golf v. Callaway & Cobra

| (% in 000's) | Adams Proj. | | Callaway | | Cobra | |
|---|---|---|---|---|---|---|
| | 1998 | % | 1992 | % | 1992 | % |
| *Income Statement* | | | | | | |
| Sales | $ 101,500 | 100.0% | $ 132,058 | 100.0% | $ 35,307 | 100.0% |
| Cost of Sales | 29,945 | 29.5% | 62,970 | 47.7% | 18,284 | 51.8% |
| Gross Profit | $ 71,555 | 70.5% | $ 69,088 | 52.3% | $ 17,023 | 48.2% |
| Research & Development | 1,600 | 1.6% | 1,585 | 1.2% | 1,256 | 3.6% |
| Selling Expense | 35,407 | 34.9% | 19,140 | 14.5% | 7,863 | 22.3% |
| General & Administrative | 8,929 | 8.8% | 15,660 | 11.9% | 2,799 | 7.9% |
| Income from Operations | $ 25,619 | 25.2% | $ 32,703 | 24.8% | $ 5,105 | 14.5% |

## BASIC ECONOMICS OF THE BUSINESS

The assembly process for the Tight Lies™ involves assembling subcomponents that are produced to the Company's specifications by subcontractors. The simplicity of the process makes determining and controlling product costs relatively easy. A graphite shafted club has direct and burdened costs of approximately $40 and a steel shafted club costs about $32.00 to produce. Of these costs only $2.50 is the Company's labor component. The average wholesale selling price is about $130 and the average direct response price is $190. This structure enabled the company to realize gross margins of 70.5% in 1997. Selling expenses are the next greatest category for economic impact.

CONFIDENTIAL                                              UND 05638

A 79

# OPERATIONS

### PRODUCTION PROCESS

Adams relies on numerous sub-contractors to produce the major sub-components to their specifications. Adams then assembles the sub-components using a custom club manufacturing process to reduce the variability among clubs. The key to the Adams custom method is twofold: a patented manufacturing process called Variable Moment of Inertia, which uses complex mathematical calculations to match swing characteristics to the proper shaft-flex; and a precise shaft-flex manufacturing process. The Company has multiple suppliers for each sub-component, so as to increase negotiating leverage and reduce risks associated with production problems.

### FULFILLMENT

The Company currently uses **third-party fulfillment** operations to execute orders for its direct response marketing campaigns. Within this process, a call center will handle the inbound telemarketing call and relay order information to a fulfillment company. The fulfillment company processes payment including credit cards, checks or money orders; assembles the order; ships the product to the customer; and handles the physical aspect of returns. Adams Golf's **returns on direct response marketing is less than ten percent**, which is substantially lower than industry averages.

The Company plans to implement its own fulfillment program towards the latter part of 1998 after its facility constraints have been addressed.

### PLANT & FACILITY

Adams Golf operates out of two facilities totaling **37,520 square feet** in Dallas, Texas. Approximately two thirds of the Company's space is utilized for warehousing and one third for production and administration. The Company has contracted to lease **a new facility** which will enable them to have over **65,000 square feet** in a single location.

CONFIDENTIAL                                         UND 05639

A 80

# STAFFING & MANAGEMENT

## OVERVIEW

The Company's management team consists of highly competent and talented personnel with extensive experience at their functional positions. Adams Golf's top managers have been and will be invaluable in the growth and success of the Company.

## PERSONNEL

The Company's current staffing levels are ever changing as the hyper growth continues to be realized. By mid 1998 the Company's staffing levels should begin to stabilize at approximately 225 individuals split roughly even between production/warehousing and administration.



**Current & Projected Staffing Levels**

| | Current | Projected |
|---|---|---|
| Executive | 3 | 6 |
| Accounting | 16 | 21 |
| Customer Service | 10 | 25 |
| Sales | 15 | 37 |
| Custom Fit | 6 | 12 |
| Information Systems | 4 | 12 |
| Purchasing | 1 | 3 |
| Production | 80 | 109 |
| Total | 135 | 225 |

CONFIDENTIAL

UND 05640

A 81

### ORGANIZATION CHART



### RESUMES OF MANAGEMENT



## Byron H. (Barney) Adams

### Chief Executive Officer and Founder

Barney Adams offers more than 20 years of experience to the Company, specializing in the areas of developing start-up companies and turning around troubled firms. Prior to starting Adams Golf in 1987 and growing the Company, Mr. Adams gained financial expertise in a variety of industries. He served as CEO for Intertest, a manufacturer of Semiconductor Testing Equipment, as Sr. Vice President of Margaux Controls, Inc., a manufacturer of energy control systems which completed a $22 million IPO, and as Executive Vice President of Maytec Manufacturing. In each of these situations, Mr. Adams increased sales and reduced indebtedness, resulting in profitable companies. Mr. Adams holds a Bachelor of Business Administration (Business and Engineering) from Clarkson College in New York, and he has participated in Advanced Studies at Penn State, Stanford and Harvard. He is considered an industry equipment expert, has authored several magazine articles and is a frequent PGA sectional speaker.

CONFIDENTIAL

UND 05641

A 82



# James E. Farrell

### Chief Financial Officer

Jim Farrell brings a strong background in financial operations, marketing and management to Adams Golf. Before joining the company, Mr. Farrell served in Director and Manager level positions for The Pittson Company, Brink's Home Security, ADT Security Systems and Hunt Energy Corporation. At ADT he implemented a marketing plan to increase customer retention, created alternative product distribution channels, and re-organized customer service in a call center environment that increased efficiency and addressed business growth. At the Pittson Company (Fortune 500 holding company for Brink's Home Security, Brink's Armored Car, Burlington Air Express and Pittson Minerals), he re-engineered financial reviews of product distribution, as well as implemented customer-based retention strategies and information technology redesign. Mr. Farrell, a Certified Public Accountant, is a 1981 graduate of The State University of New York where he received a Bachelor of Science Degree in Accounting.



# Bob Bush

### Research & Development

Bob Bush comes to Adams Golf with over 30 years of experience in the golf industry. He served as the Director of Technical Services for True Temper from 1966 to 1993, where he was responsible for designing and testing all shafts, including Dynamic Gold, Dynalite, and Wilson Counter Torque. In the development process of these clubs, Mr. Bush worked with and developed personal friendships with several PGA Tour players. He was also instrumental in the development of "Iron Byron" during this time. Before joining Adams Golf, Mr. Bush served as a consultant to Unifiber Shaft Co., and currently is a member of the Technical Advisory Panel for *Golf Digest*. Mr. Bush holds a B.S. in Chemical Engineering from Cleveland State.

CONFIDENTIAL                                    UND 05642

A 83

 **Mark D. Gonsalves**

### Vice President, Sales & Marketing

Mark Gonsalves began his career in Data Processing Recruitment (review of clients, company development and in-depth knowledge of company sales cycles). He eventually founded his own recruitment organization in 1987, Integrity Software Resources, Inc., which was profitable each year (annual sales of over $1 million). Mr. Gonsalves then spent 2 years as a professional golfer in the U.S., Europe and South America, after which he founded In-Sync Sport International, Inc., a sports psychology firm which used *Hemi-Sync* sound technology to improve performance. He gained further industry experience by studying clubfitting and club making. As V.P. of Sales & Marketing for Adams Golf, Mr. Gonsalves is responsible for overall budgeting and planning for sales. He has been instrumental in the development of the company's inside sales function, which has accounted for significant growth in sales for 1996 and 1997. Mr. Gonsalves is a graduate of the University of Massachusetts with a B.S. in Accounting.

 **Richard H. Murtland**

### Vice President, Operations

Before joining Adams Golf in 1994, Richard Murtland acquired close to 30 years experience in operations & engineering. Beginning his career with General Motors in 1963, he served on various plant engineering and production assignments. Mr. Murtland next served as a U.S. Army Officer in Viet Nam, after which he worked on international projects and operations management with Air America, Inc. and The Bechtel Corporation. He joined ARCO in 1976, subsequently spending almost 20 years in major project management on domestic & international assignments. Mr. Murtland also served in ARCO's Finance, Planning and Control Group, leading their effective cost management program in Alaska. Currently, Mr. Murtland is responsible for day-to-day manufacturing operations, as well as product technical improvements and cost optimizations. He holds a BSID from Clarkson College and participated in the Construction Executive Program at Stanford University.

CONFIDENTIAL

UND 05643

A 84

*Staffing and Management*



## Cindy A. Herington

### Director, Special Projects

Ms. Herington graduated from State University at Buffalo with a B.S. in Business Management and joined Home Front as Merchandising Coordinator. She subsequently took a position with Neiman Marcus, where she spent 10 years in a variety of sales management positions. Cindy's past expertise in merchandising and sales has been of great benefit, as she currently heads the team for direct response television, print and radio advertising, in addition to direct response fulfillment.

CONFIDENTIAL

UND 05644

A 85

As Seen In The 1997 Inc. 500

# Changing Course

If your market seems impossible to break into, consider turning your back on it altogether. It worked for the founder of Ad Golf Inc. (#211). When he couldn't sell the golf clubs he manufactured, Barney Adams decided to sell a service instead. C

when he had resigned himself to that did the clubs themselves actually take off. "Some guy would call and say that he never saw his friend hit the ball so good," Adams says, "and how could he get one of our clubs?"

Adams knew he had good clubs back when he started the business, in 1987. But, like everyone else's, the clubs had to conform to strict design limits, meaning that "you never get in a position where your product is two or three times better



BARNEY ADAMS

than someone else's," he notes. With product-performance levels nearly indistinguishable, image sells. As an unknown making cold calls to distributors, Adams found himself on the receiving end of lots of clicks. "Nobody would take a chance on a company that nobody's ever heard of," he says.

Adams was trying to drive into the roughest part of his market: 85% of golf

PHOTOGRAPH: DAR BRYANT

clubs and other accessories are sold "off-course," in specialty golf and sporting-goods stores and other retail outlets. That's also where the big competitors roam, spending up to $50 million a year on advertising and celebrity endorsements. With sales of less than $100,000 in those early years, Adams could hardly compete.

So he didn't. He carried his clubs to the golf course, where a mere 15% of all clubs and accessories are sold through pro shops. He followed the lead of one or two small club manufacturers, offering custom-fitted clubs to clients. Adams traveled the country, setting up fitting sessions on driving ranges and courses. After analyzing a client's swing, he'd fly back to Plano, Tex., where his inhouse manufacturing team—early on, it consisted of himself—could crank out a set of custom clubs in two to four days. After a year, he started teaching pro shops how to fit the clubs, and by 1992, annual sales had climbed to almost $300,000.

Although Adams had always had the means to sell clubs "off-the-shelf," or individually, "I couldn't give them away," he says. Then, five years after he had retreated into custom fitting, Adams started getting phone calls. "Within a few months we went from zero calls to 20 to 30 a week for our Tight Lies club," he says. "We had never had calls for a club in our entire existence." The patented fairway wood is designed to help golfers get balls airborne more easily, whether from the rough or from a poor fairway position.

Adams called managers into an emergency meeting. "I think we have a st alone product," he said. "How do we it?" Mark Gonsalves, vice-president of and marketing, recommended hi telemarketers to call retail accounts. those are the people who call me at h at night and try to sell me things I d want," argued Adams. Gonsalves won explaining that independent sales wouldn't devote enough time to the tively unknown product.

From 1995 to 1996, sales explo from $1 million to $3.5 million. At same time, the custom-fitting busi tripled, although it accounted for 10% of revenues instead of 90%. Ad has landed more than 6,000 n accounts, and the dozen telemark don't get as many hang-ups.

This past spring, Adams debuted a minute infomercial chock-full of celel endorsements. "Carol Mann, in Ladies Professional Golf Association of Fame, asked us if she could be in show," says Adams. Sales are projecte hit $30 million by the end of 1997. Fin Adams Golf is driving with the big t

—Phaedra

## ADAMS

Reprinted with permission of Inc. magazine. Copyright © 1997, Goldhirsh Group, Inc., 38 Commercial Wharf, Boston, MA, (617) 248-8432

# STRICTLY

Reprinted from February 21, 1998.

# BUSINESS

## GOLFWEEK'S BIWEEKLY INDUSTRY REPORT

## A QUICK ROUND WITH

# Barney Adams:
# Keeping his focus on the future

It has been 11 years since Barney Adams left his job as an applications engineer at **Corning Glass** to embark on the golf business. And every inch of the way, for the next eight years, Adams Golf struggled despite having one of the best custom-clubfitting systems in golf.

It all began to change — dramatically — a little more than two years ago, when Tight Lies fairway woods were released. The clubs were novel, a Barney Adams brainstorm all the way. They went against the grain with their Air Assault technology, utilizing a low-center of gravity design that produced a clubhead wider at the bottom than at the top.

They became an instant hit, and through infomercial marketing, the clubs became one of 1997's biggest stories, producing 10 times the sales revenue Adams had enjoyed in 1996.

Adams Golf has gone from fewer than 10 employees two years ago to 180 in February of this year. Next month, there will be a move to new quarters, covering 67,000 square feet. Two years ago, the company got by on 7,000 square feet.

Adams talked about his real-life Horatio Alger equipment story, and he discussed future plans with *Strictly Business'* Lynn Henning.

**Strictly Business:** *What kind of PGA Show did a company as hot as yours have?*

**Barney Adams:** Outstanding. The bottom line is, we sold considerably more product at the Show than our sales were in 1996.

**SB:** *You took more orders in Orlando than you did in all of 1996?*

**BA:** That's correct. You know, it's hard for us, this is all new ground. What do we have to compare anything to? We're kind of learning as we go. The best way to say it is, with other companies, when you ask, "How was the Show"? — by definition that requires a comparative answer. Hell, we can throw out history. Our history is being made every time we're there. I can only say that, based upon internal goals going into the Show, we thought we had a very aggressive sales goal. We beat that by Friday afternoon at 2 o'clock. Either we don't know how to forecast, or it was better than we thought.

**SB:** *What kind of numbers did you end up with for 1997?*

**BA:** That $35 million number I mentioned last summer — we will end up within a half-million dollars of that.

**SB:** *You did $1 million three years ago, $3.5 million two years ago. Is any of this making sense to you?*

**BA:** That's a great question. When I was in college back in the Dark Ages, one of the courses I took





**PRODUCT DEVELOPMENT**

was the study of Machiavelli, his strategy for war and battles and so forth. And, basically, when you have a huge entity, what you do is break it down to microentities, then you can manage it. So what we try and do is, rather than marvel at, or get caught in, or whatever you want to call it — The Grand Scheme — we break it down into a series of smaller, more manageable ideas. For example: Relationships with major

retailers would be one. Relationships with green-grass pro shops would be one. Getting messages out to the consumer would be one. Internal shipping schedules, quality, — I could go on and give six or seven more — but that's how I look at it.

**SB:** *So you've attacked some of these microentities in what way?*

**BA:** We have done something that I think is very unique. Starting

UND 05276

in September, we put six people into the field. Now you're gonna say, "What's the big deal?" What's unique about this is that none of them carries an order pad. See, we feel that our customer — our wholesaler for lack of a better word — whether a retailer or the pro shops, gets so inundated with people coming in to see him with order pads, that some of the effective things you can do get distracted, so to speak. So, our people aren't sales people. They are not there to take orders. They are there to help. They are there to do demo days. They are there to straighten up the display. Take inventory. Straighten up someone else's display, if that's what's needed. They are there to train sales people. Or, to have a Product Selling Day so that our people are in the store so others can watch them sell product, which we already have done. So, because we are still new in this, we are trying to establish relationships with our customers. We felt one way to do this was to take away the stigma of the order pad and provide service organization. It's not so unusual in other industries, but I think it's unusual in golf. It divides the whole into parts, and then you manage the parts.

**SB:** *A little bit of history here. You had the idea for this pared-down, low-center-of-gravity metalwood that went against the oversized trend. You sketched it out on a yellow legal pad . . .*

**BA:** I was sitting in my office one night, and that's where there was this actual culmination of the idea, drawing this sketch.

**SB:** *It was just a one-night epiphany kind of thing?*

**BA:** The idea of lowering the center of gravity had been with me for years. When I write things, I'll first think about it and think about it and think about it, and when I sit down to write it out, it just kind of comes out. That's the way the design worked. The sketch came in 10 minutes, with about 10 years of thought input.

**SB:** *So, when did you actually put together the sketch?*

**BA:** I'll say that it was early in '95 that I might have been fooling with it. But I know we never started selling product until the fall of '95, and then we were just sampling with it. It was all designed to be in our (custom) fitting system, and we put it in during the fall of '95. It was never intended to be a product like it is today.

**SB:** *Did you do the first castings?*

**BA:** I sent a sketch to my supplier, who is Taiwanese, and who was very well-educated in engineering in the U.S. We have a good relationship. It was really funny. He sent me back a fax and said, "You can't do this." I sent a fax back and said, "I'm paying for it, so we'll do it anyway." He thought the shape was too thin. He didn't like what we were doing.

**SB:** *What were the originals like?*

**BA:** He got me those first samples, and I fooled around with them, and they were very, very close to the final product. We made a couple of minor changes in the sole plate, and a top-line change. The top line was too square, too blocky-looking. I wanted it relieved. The toe was too square, I wanted that relieved. The angle of the sole plate wasn't quite right, and I made a change there.

**SB:** *The club, though, was effective when you first tested it?*

**BA:** Yes. From Day 1.

**SB:** *So, now it was just a matter of getting the message out?*

**BA:** Not really. It didn't happen quite that way. What I know was, I had a terrific club for my fitting kit. I never had any plans beyond that. Then what happened is, within a week or two, people who had purchased the club from our custom-fitting system would be out playing with friends, and it'd be, "Hey, pal, let me hit that club." Next thing, his pal's calling back. But you have to put this in perspective. At that moment in our life, getting calls was a very, very unusual occurrence. No one had ever called us. We didn't have a switchboard. In those days, when you ranked companies within categories, we looked up at "other." We were nobody. All of a sudden people are taking the time and effort to call us. We recognized that as a very significant situation, 'cause we didn't get one call — we were getting 8, 10, 12 calls a week. We knew it was powerful. That's when we made the decision to market this club by itself.

**SB:** *And that's when you turned loose Mark Gonsalves (vice president of sales and marketing) and eventually decided to go with telemarketing and infomercials?*

**BA:** I first went out and found a guy named Rick Jarrett, the old president of Tiger Shark, and hired him as a marketing specialist, and they (Jarrett and Gonsalves) talked me into doing telemarketing, which I hated. I'm one of the old fogies when it comes to that kind of stuff,

but they said this was the way business was done these days and Tight Lies would be a great club to market this way. So, in December of 1995 — and I give them all the credit, because I was prepared to say, "I told you so" — they hired four people and put them through extensive telemarketing training and started selling Tight Lies on the telephone. It was a few retailers, mainly, but face it, retailers don't want to be pioneers. But with pro shops, where we could get them to try the club, we had some success. So they were right and I was wrong. Telemarketing worked.

**SB:** *Telemarketing and infomercials aside, didn't the club have to do the selling?*

**BA:** You're exactly right. Without the fact that the club worked, all the rest of this would never have mattered. You could have telemarketed till your eyes fall out. If the product isn't a good product, all the marketing in the world isn't going to work. But conversely, as good as the club is, if you keep it a secret, you're going to die with it.

**SB:** *Isn't this creating something of a problem for other companies that think infomercials are their path to fortune?*

**BA:** Sure. You know, it's very difficult. I've had conversations with guys, and I don't want to sit here and sound like some arrogant horse's behind, that's not me, but I've got to ask the question of them: "What are you selling?" We were certainly not the first company that tried an infomercial. Most people don't understand is that there are dozens of these infomercials, and we don't always know about them or their product because it doesn't work. They never made it past the test market. They died on the air before anything really happened. I was told going in that a golf infomercial stood no better than one chance in 10 of being successful. And those are industry statistics.

**SB:** *And yet you did some things that clearly helped here. You got Hank Haney, Bill Rogers and Carol Mann, and you had Jack Whitaker lend some narrative.*

**BA:** Well, they were part of a master plan to produce a show that treated the consumer with respect. We wanted more of an educational premise than we wanted a bunch of guys standing around giving each other high-fives. Those people were, and are, effective. With the exception of Jack, who was a hired gun, Hank and Bill Rogers and Carol Mann all used the club, anyway. Everyone in the show was a

consumer. All of them volunteered to be on the show.

**SB:** *You saw it as giving a sound product some legitimate backing?*

**BA:** Two interesting stories there. One of the guys on the show, early on, was Dan Dunn, who is just a Joe Consumer guy. He talks about the club very earnestly and comes across very well. Danny has one arm. Hits the hell out of the golf ball. Well, we refused to show him as a one-armed golfer. You never know from watching that he has only one arm. We thought that would be the kind of thing we didn't want to do. That, to me, falls into game-show territory: "This club is so good even a one-armed golfer can . . ."

**SB:** *Hope Danny appreciates the humor. What's the other tale?*

**BA:** There are three guys on the show, three amateurs, "the story," so to speak. To this day, I don't know them. And that was on purpose. They volunteered to be on the show. I did meet them during the shooting, but I can't remember their names to this day, and that's all on purpose. I didn't want one of those deals where, you now, "Hey, that was a nice job your brother-in-law did on that ad." The three guys, they were as arm's-length as they could be.

**SB:** *How much did you spend on that infomercial?*

**BA:** Producing the show — and that includes to me the test marketing — it was close to $600,000 before it was all paid for. It might as well have been $60 million, because that was all the money we had.

**SB:** *So, this was genuinely make-it-or-break-it for Adams Golf?*

**BA:** I can tell you without question that there were about six weeks of my life where I could not sleep for more than an hour at a time. I had the nightmares, the whole nine yards: "Barney's going to be stacking bags again at the club." Now, you can say, "Just go raise more money." Well, how's this for a scenario: "Hi, I'm Barney Adams. We've got this little golf-club company. So far, we've failed miserably, but I'd like to raise some more cash."

**SB:** *How did your staffers react knowing that this was fourth-and-long with the clock running out?*

**BA:** Honest to God, I can remember telling the guys here, "Hey, you're 35 years old, you're 42 years old, I'm pushing 60. Ain't nobody going to want to talk to me, so if we fall on our face, you're the ones who'll be all right. You'll always be able to get a job, you'll

always be able to sell yourselves. You're good, you're hirable, you're sharp, you've got a lot of experience, and you've learned a lot since you've been here. I'm the guy heading for the toilet." So, they hung on.

**SB:** *How were you able to ramp up so rapidly to meet demand that was so unbelievably heavy?*

**BA:** That was the rest of the money. We took the long lead-time items and stocked up on them. Either we were going to be able to meet demand, or we would have the lowest turnover of inventory ratio known to man for the next few years.

**SB:** *You doubled up on a bet that was already threatening to sink you?*

**BA:** Big time.

**SB:** *You had a thousand-percent increase in sales last year. Not many in the industry would have believed that one heading into '97.*

**BA:** Sometimes neither can I. I'm blessed. I've got wonderful people here. And it's not just manufacturing, it's the whole infrastructure; billing, paper flow, everything. Oh, we had some monumental screwups, but in the grand scheme of things, it's worked.

**SB:** *What sort of things happened?*

**BA:** It's now February, so I'll put it in perspective. Last March, our accounting system ran on Quick Books. Of course, that's an accounting package designed for very, very small operations. We had a bookkeeper. And that's all.

**SB:** *What are the chances we'll see new products with the Tight Lies name, or new and improved Tight Lies metalwoods?*

**BA:** I feel a tremendous need to come out with new products, but I feel a tremendous need to come out at the right time. The difficulty of our growth is that we've got to get our system intact, our internal support, so that when we do come out with other products, we can do a good job supporting those. It would have been impossible to have had this kind of growth with four or five products. With irons, or with another line of woods, it would have been impossible.

**SB:** *You're thinking prudent and conservative as far as any new lines?*

**BA:** I hope. I hope. Unless I can make it better, I'm not going to do something just for the sake of introducing a new club. If I could figure out a way to improve the Tight Lies, I would. For instance, we're currently making a Tour 3-wood. We have some specific requests to fill, so we'll put together a 3-wood, but that's a minor change, not a full revision.

**SB:** *You have something of a genre of plus in Tight Lies. Does that preclude any need to update the line soon?*

**BA:** We're looking at new technologies. If they can be applied to Tight Lies down the road, sure. For instance, I could come out with a titanium Tight Lies. I've got one. It won't go any further, won't play any better, but it will cost more. I've got sole plates made out of tungsten. I've got all those metal mixes that some companies say are unique. There's nothing new there. When we go test them, they don't perform any better. So why do it?

**SB:** *What kind of sales projections are you making for '98?*

**BA:** We're continuing to grow. I don't think we've peaked in what we can do. Otherwise, I can't say anything.

**SB:** *Who's been trying to buy you?*

**BA:** That's really funny. Everyone thinks it's an awkward question. I'll tell you the god's honest truth — nobody. I've never had a substantive conversation with anybody trying to buy us. Absolutely nobody.

**SB:** *You're sitting here with a successful operation, lots of black ink, and significant potential, and you're not a partner for someone out there?*

**BA:** I don't know what to tell you in that regard. Really, if you stop and think about it, the big buyer is Callaway. We have a hosel, they don't. They're an oversize company, we're not. I don't see that as being a good fit. That's just an analysis as

an outsider. Who else? I don't know. I sure don't have a For Sale sign out front, I can tell you that. Nobody approached me at the Show. Nobody approached one at the Show asking, "Can we get together?" I think I've got it figured out. I think I've been in the business long enough that most of these guys know what an obnoxious pain in the butt I am. They can't figure out how to get around it.

**SB:** *What about the other question that comes up with respect to you — going public?*

**BA:** That one has some potential. Some potential.

**SB:** *What can you tell us?*

**BA:** I have investors, and I owe my investors the potential to maximize their stake in the company. They didn't get in it for my good looks. I say this is the game of capitalization, and when you're in the game of capitalization, there are things you take a look at. I don't know what's going to happen to us. My theory is, if we continue to grow the company, and do it in an intelligent fashion, then the capitalism side of the equation will take care of itself.

**SB:** *That would seemingly be a sound exit strategy for a man 59 years old.*

**BA:** Yeah. But in any discussion I'm going to be part of the picture for some time. No. 1, I love the business. And I love the people in this business. That's one of the great attractions of golf — I'm very happy in the business. I'm a workaholic, anyway. Where am I going to go? I can see the time coming when I'll be less hands-on, day to day. But that's normal attrition.

**SB:** *What have people, even your competitors, said to you as the good times have come during the past year?*

**BA:** Two answers: I've had a wonderful number of people come up to me — competitors, customers — and say, "Congratulations, we know you've been doing this for a long time, we're really happy for you, it's good to see one of the good guys win." All that kind of stuff.

One of them said it at the Show, in the presence of my wife, and under her breath I could hear her say: "If they only knew. . ." And then, a major competitor announced to one of our customers that they were going to buy us.

**SB:** *Might that have been Callaway?*

**BA:** High probability. I know who it is, I just don't want to name their name.

**SB:** *We understand, of course, that Callaway has a new line of woods coming to replace War Bird and that, by extension, Tight Lies is in its sights.*

**BA:** I never heard that they were going to bury us before. But that's their mentality. It's kind of a bully-on-the-block thing. Those are just words.

**SB:** *Can this party of yours last?*

**BA:** Sure. I've said this before, we are not a success here. I use a formula: Success equals progress over time. We're doing very well with the progress part of the equation. And if we continue the progress part, the time will take care of itself. But I can guarantee you we do not sit around here congratulating ourselves on how brilliant we are.

**SB:** *A little humility is a good investment in your mind.*

**BA:** I certainly hope so, because it's not false humility. I've been around a long time. I've seen places come and go. I think that comes back to what I said earlier: If we continue to communicate with our customers, and we understand their needs, and dedicate ourselves to fulfilling their needs, I don't think we're going to go away.

**SB:** *Have you had time to indulge yourself a little, now that you're making some money?*

**BA:** Nah, I'm too old for that stuff. Virtually nothing will change for me. The other day an estate planner called me. I said, "Wait a minute, don't you first have to have an estate? I have about $143 in the bank." Maybe down the road . . .     o

Y-B Financial Review

CONFIDENTIAL

UND 04988

A 90

ADAMS GOLF, INC.

**DRAFT**

Balance Sheets

December 31, 1997 and 1996

| Assets | 1997 | 1996 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 1,955,563 | 854,543 |
| Trade receivables net of allowance for doubtful accounts of $698,341 and $26,199 in 1997 and 1996, respectively (note 7) | 7,670,960 | 497,787 |
| Income taxes refundable | 221,637 | — |
| Inventories (notes 2 and 7) | 4,486,563 | 674,737 |
| Prepaid expenses | 509,350 | 28,007 |
| Deferred income tax assets (note 8) | 390,164 | — |
| Other current assets | 715,670 | — |
| Total current assets | 15,949,907 | 2,055,074 |
| Property and equipment, net (note 3) | 603,823 | 123,950 |
| Deferred income tax assets (note 8) | 182,621 | — |
| Other assets, net (note 4) | 623,728 | 379,697 |
| Total assets | $ 17,360,079 | 2,558,721 |

| Liabilities and Stockholders' Equity | | |
|---|---|---|
| Current liabilities: | | |
| Notes payable | $ — | 230,406 |
| Accounts payable | 377,622 | 17,526 |
| Federal income taxes payable | 1,020,980 | — |
| Accrued expenses (note 5) | 7,636,157 | 332,423 |
| Total current liabilities | 9,034,759 | 580,355 |
| Stockholders' equity (note 9): | | |
| Common stock, $.001 par value. Authorized 25,000,000 shares; 7,859,669 and 5,936,617 shares issued and outstanding in 1997 and 1996, respectively | 7,860 | 5,937 |
| Additional paid-in capital | 7,781,257 | 3,132,009 |
| Retained earnings (accumulated deficit) | 536,203 | (1,159,580) |
| Total stockholders' equity | 8,325,320 | 1,978,366 |
| Commitments (note 6) | | |
| | $ 17,360,079 | 2,558,721 |

See accompanying notes to financial statements.

I-I-Legal

CONFIDENTIAL

UND 04989

A 91

DRAFT

## ADAMS GOLF, INC.

### Statements of Operations

#### Years ended December 31, 1997, 1996 and 1995

| | 1997 | 1996 | 1995 |
|---|---|---|---|
| Net sales | $ 36,690,090 | 3,521,788 | 1,125,115 |
| Cost of goods sold | 9,991,132 | 1,589,696 | 756,400 |
| Gross profit | 26,698,958 | 1,932,092 | 368,715 |
| **Operating expenses:** | | | |
| Research and development expenses | 557,513 | 51,101 | 18,516 |
| Selling and royalty expenses | 13,093,174 | 625,897 | 312,785 |
| General and administrative expenses: | | | |
| Stock compensation and bonus award (note 9) | 8,491,711 | 213,760 | — |
| Provision for bad debts | 738,805 | 51,306 | 12,791 |
| Other | 1,436,995 | 981,219 | 268,518 |
| Total operating expenses | 24,318,198 | 1,923,283 | 612,610 |
| Operating profit (loss) | 2,380,760 | 8,809 | (243,895) |
| **Other income (expense):** | | | |
| Interest income | 15,325 | 3,938 | 1,226 |
| Interest expense | (69,731) | — | — |
| Other | (47,808) | — | — |
| Income (loss) before income taxes | 2,278,546 | 12,747 | (242,669) |
| Income tax expense (note 8) | 582,763 | — | — |
| Net income (loss) | $ 1,695,783 | 12,747 | (242,669) |
| **Income (loss) per common share:** | | | |
| Basic | $ .27 | .00 | (.11) |
| Diluted | $ .26 | .00 | (.11) |

See accompanying notes to financial statements.

CONFIDENTIAL

UND 04990

A 92

DRAFT

## ADAMS GOLF, INC.

### Statements of Stockholders' Equity

Years ended December 31, 1997, 1996 and 1995

| | Shares of preferred stock | Preferred stock | Shares of common stock | Common stock | Additional paid-in capital | Retained earnings (deficit) | Total stockholders' equity |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 1994 | 772,551 | $773 | 533,257 | $ 533 | 1,328,333 | (929,658) | 399,981 |
| Conversion of preferred stock to common stock (note 9) | (772,551) | (773) | 772,551 | 773 | — | — | — |
| Sale of stock | — | — | 2,140,294 | 2,141 | 455,536 | — | 457,677 |
| Stock distribution (note 9) | — | — | 2,085,352 | 2,085 | (2,085) | — | — |
| Net loss | — | — | — | — | — | (242,669) | (242,669) |
| Balance, December 31, 1995 | — | $ — | 5,531,454 | 5,394 | 1,781,784 | (1,172,327) | 614,989 |
| Sale of stock | | | 405,163 | 405 | 1,350,225 | — | 1,350,630 |
| Net income | | | | | — | 12,247 | 12,247 |
| Balance, December 31, 1996 | | | 5,936,617 | 5,937 | 3,132,009 | (1,159,580) | 1,978,366 |
| Stock compensation award (note 9) | | | 1,000,000 | 1,000 | 3,649,000 | — | 3,650,000 |
| Exercise of stock options | | | 473,052 | 473 | 550,698 | — | 551,171 |
| Exchange of debt for common stock (note 9) | | | 450,000 | 450 | 449,550 | — | 450,000 |
| Net income | | | | | — | 1,695,783 | 1,695,783 |
| Balance, December 31, 1997 | | $ — | 7,859,669 | $ 7,860 | 7,781,257 | 536,203 | 8,325,320 |

See accompanying notes to financial statements.

CONFIDENTIAL

UND 04991

A 93

02/18/98  WED 16:57 FAX 214 754 2264     KPMG DALLAS

ADAMS GOLF, INC.

DRAFT

Statements of Cash Flows

Years ended December 31, 1997, 1996 and 1995

|  | 1997 | 1996 | 1995 |
|---|---|---|---|
| Cash flows from operating activities: |  |  |  |
| Net income (loss) | $ 1,695,783 | 12,747 | (242,669) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: |  |  |  |
| Depreciation and amortization | 302,589 | 19,278 | 8,291 |
| Loss on retirement of fixed assets | 134,009 | — | — |
| Stock bonus award | 3,650,000 | — | — |
| Deferred income taxes | (572,785) | — | — |
| Allowance for doubtful accounts | 672,142 | 26,199 | — |
| Changes in assets and liabilities: |  |  |  |
| Trade and other receivables | (8,066,952) | (374,228) | (93,649) |
| Inventories | (3,811,826) | (476,467) | (81,470) |
| Prepaid assets | (481,343) | (418) | (27,589) |
| Other current assets | (715,670) | — | 2,860 |
| Other assets | (390,442) | (361,916) | (4,873) |
| Accounts payable | 360,096 | (22,726) | 40,252 |
| Accrued expenses | 7,303,734 | 329,303 | 2,727 |
| Federal income taxes payable | 1,020,980 | — | — |
| Net cash provided by (used in) operating activities | 1,100,315 | (848,228) | (396,120) |
| Cash flow from investing activities - purchase of equipment | (770,060) | (121,444) | (9,287) |
| Cash flows from financing activities: |  |  |  |
| Proceeds from notes payable and line of credit | 1,050,000 | 230,406 | — |
| Repayment of line of credit borrowings | (800,000) | — | — |
| Repayment of notes payable | (30,406) | — | — |
| Issuance of common stock | 551,171 | 1,350,630 | 457,677 |
| Net cash provided by financing activities | 770,765 | 1,581,036 | 457,677 |
| Net increase in cash and cash equivalents | 1,101,020 | 611,364 | 52,270 |
| Cash and cash equivalents at beginning of year | 854,543 | 243,179 | 190,909 |
| Cash and cash equivalents at end of year | $ 1,955,563 | 854,543 | 243,179 |
| Supplemental disclosure of cash flow information: |  |  |  |
| Interest paid | $ 69,731 |  |  |
| Income taxes paid | $ 356,204 |  |  |
| Supplemental disclosure of financing activity - exchange of debt for common stock | $ 450,000 |  |  |

See accompanying notes to financial statements.

CONFIDENTIAL

UND 04992

A 94

ADAMS GOLF, INC.

Notes to Financial Statements

December 31, 1997 and 1996

DRAFT

(1) Summary of Significant Accounting Policies

(a) General

Adams Golf, Inc. (the Company) was founded in 1987. The Company designs, manufactures, markets and distributes golf clubs and provides custom golf club fitting technology. The Company's primary products are fairway woods that are marketed under the trademark "Tight Lies."

(b) Inventories

Inventories are valued at the lower of cost or market and primarily consists of completed golf clubs and component parts. Cost is determined using the first-in, first-out method.

(c) Property and Equipment

Property and equipment are stated at cost. Depreciation is calculated using the straight-line method over the estimated useful lives of the respective assets, which range from three to seven years.

(d) Revenue Recognition

The Company records revenue as earned, which generally occurs when the product is shipped.

(e) Other Assets and Related Amortization Expense

Other assets consist primarily of the cost of obtaining patents, development costs of an infomercial and various deposits. Patent amortization is computed on the straight-line method over the estimated useful lives of the assets, which range from 5 to 15 years. Infomercial costs are amortized over a 24 month period based on revenues generated compared to total estimated revenues resulting from the airing of such infomercial. Amortization expense for the years ended December 31, 1997, 1996 and 1995 was $146,411, $3,738 and $3,161, respectively.

(f) Research and Development

Research and development costs consist of all costs incurred in planning, design and testing of golf equipment, including salary costs related to research and development, and are expensed as incurred.

(Continued)

CONFIDENTIAL

UND 04993

A 95

2

DRAFT

ADAMS GOLF, INC.

Notes to Financial Statements

(g)  Advertising Costs

Advertising costs, other than direct response (infomercial) costs, are expensed as incurred. Non-direct response advertising costs were $8,649,920, $33,503 and $35,300 in 1997, 1996 and 1995, respectively.

(h)  Product Warranty

The Company's golf equipment is sold under warranty against defects in material and workmanship for a period of two years. In addition, the Company has a 90 day "no questions asked" return policy. An allowance for estimated future warranty and sales return costs is recorded in the period products are sold.

(i)  Income Taxes

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforwards. Deferred tax assets and liabilities are measured using enacted rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

(j)  Income (Loss) Per Share

The weighted average common shares used for basic net income (loss) per common share was 6,259,696, 5,618,897 and 2,211,573 for 1997, 1996 and 1995, respectively. The effect of dilutive stock options added 229,573 shares for 1997 for the computation of diluted income (loss) per common share. Stock options outstanding in 1996 and 1995 were not considered in the computation of net income (loss) per common share since their effect is immaterial and antidilutive, respectively.

(k)  Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(Continued)

CONFIDENTIAL

3

ADAMS GOLF, INC.

Notes to Financial Statements

DRAFT

(l)  Financial Instruments

The carrying amount of cash and cash equivalents, accounts receivable, accounts payable and accrued expenses approximates fair value due to the short maturity of these instruments.

(m)  Impairment of Long-Lived Assets and Long-Lived Assets to Be Disposed Of

The Company adopted the provisions of Statement of Financial Accounting Standards (SFAS) No. 121, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of*, on January 1, 1996. This Statement requires that long-lived assets and certain identifiable intangibles be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceed the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell. Adoption of this Statement did not impact the Company's financial position, results of operations, or liquidity.

(n)  Statements of Cash Flows

The Company considers all short-term highly liquid instruments, with an original maturity of three months or less, to be cash equivalents.

(2)  Inventories

Inventories consist of the following at December 31, 1997 and 1996:

|                  | 1997        | 1996    |
|------------------|-------------|---------|
| Finished goods   | $ 2,063,803 | 41,323  |
| Component parts  | 2,422,760   | 633,414 |
|                  | $ 4,486,563 | 674,737 |

(Continued)

CONFIDENTIAL

UND 04995

A 97

02/18/98   WED 16:55   FAX 214 754 ----         -- -- ------

4

ADAMS GOLF, INC.

DRAFT

Notes to Financial Statements

(3) Property and Equipment, Net

Property and equipment consists of the following at December 31, 1997 and 1996:

|  | 1997 | 1996 |
|---|---|---|
| Manufacturing equipment | $ 142,137 | 70,728 |
| Office equipment | 660,145 | 100,368 |
| Accumulated depreciation | (198,459) | (47,146) |
|  | $ 603,823 | 123,950 |

(4) Other Assets, Net

Other assets, net, consist of the following at December 31, 1997 and 1996:

|  | 1997 | 1996 |
|---|---|---|
| Deposits, including amounts for fixed assets purchased | $ 380,836 | 97,498 |
| Infomercial costs | 233,365 | 267,677 |
| Patents | 9,527 | 14,522 |
|  | $ 623,728 | 379,697 |

(5) Accrued Expenses

Accrued expenses consist of the following at December 31, 1997 and 1996:

|  | 1997 | 1996 |
|---|---|---|
| Payroll, bonuses and commissions (see note 9) | $ 5,576,134 | 277,810 |
| Sales, property and state income taxes | 271,225 | 4,604 |
| Royalties | 392,541 | -- |
| Advertising | 470,500 | -- |
| Product warranty expense | 449,200 | -- |
| Professional services | 340,389 | 9,807 |
| Other | 136,168 | 40,202 |
|  | $ 7,636,157 | 332,423 |

(Continued)

CONFIDENTIAL

UND 04996

A 98

02/18/98  WED 16:58 FAX 214 754 2264      KPMG DALLAS                        ☒ 003

5

## DRAFT

### ADAMS GOLF, INC.

Notes to Financial Statements

(6)  Commitments

The Company is obligated under certain noncancelable leases for office space. A summary of the minimum rental commitments under noncancellable leases is as follows:

Years ending
December 31,

| | |
|---|---|
| 1998 | $ 368,700 |
| 1999 | 456,000 |
| 2000 | 480,400 |
| 2001 | 488,500 |
| 2002 | 512,900 |
| Thereafter | 651,400 |

Rent expense was $104,480, $45,603 and $32,540 for the years ended December 31, 1997, 1996 and 1995, respectively.

The Company had outstanding commitments on letters of credit of $459,167 at December 31, 1997, for the purchase of inventory from foreign vendors.

(7)  Line of Credit

The Company entered into a $1,500,000 revolving line of credit agreement with a bank on May 30, 1997. The line of credit is secured by trade receivables and inventories, matures on May 15, 1998 and bears interest, payable quarterly, at the bank's prime rate (8.5% at December 31, 1997). At December 31, 1997, there was no balance outstanding on this line of credit.

(8)  Income Taxes

Income tax expense (benefit) for the year ended December 31, 1997 consists of the following:

| | Current | Deferred | Total |
|---|---|---|---|
| Federal | $ 1,020,980 | (572,785) | 448,195 |
| State | 134,568 | — | 134,568 |
| | $ 1,155,548 | (572,785) | 582,763 |

(Continued)

CONFIDENTIAL

UND 04997

A 99

6

DRAFT

ADAMS GOLF, INC.

Notes to Financial Statements

Actual income tax expense (benefit) differs from the "expected" income tax expense (benefit) (computed by applying the U.S. federal corporate tax rate of 34% to income (loss) before income taxes) for the years ended December 31 as follows:

|  | 1997 | 1996 | 1995 |
|---|---|---|---|
| Computed "expected" tax expense (benefit) | $ 774,706 | 4,334 | (82,507) |
| State income taxes, net of federal tax benefit | 88,815 | — | — |
| Change in valuation allowance for deferred tax assets | (337,558) | (4,334) | 81,352 |
| Other | 56,800 | — | 1,155 |
|  | $ 582,763 | — | — |

The tax effects of temporary differences that give rise to deferred tax assets and deferred tax liabilities at December 31 are presented below:

|  | 1997 | 1996 |
|---|---|---|
| Deferred tax assets: |  |  |
| Allowance for bad debts | $ 237,436 | 8,908 |
| Research and development costs | 974 | 7,563 |
| Bonus compensation | — | 72,678 |
| Warranty reserve | 152,728 | — |
| Net operating loss carryforwards | 311,100 | 389,528 |
| Total gross deferred tax assets | 702,238 | 478,667 |
| Less valuation allowance | (50,109) | (387,667) |
| Net deferred tax assets | 652,129 | 91,010 |
| Deferred tax liabilities - infomercial costs | 79,344 | 91,010 |
| Net | $ 572,785 | — |

In assessing the realizability of deferred income tax assets, management considers whether it is more likely than not that some portion or all of the deferred income tax assets will not be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible.

The valuation allowance for deferred tax assets at December 31, 1997 and 1996 was $50,109 and $387,667, respectively. The net change in the total valuation allowance for the years ended December 31, 1997 and 1996 were decreases of $337,558 and $4,334, respectively.

At December 31, 1997, the Company has net operating loss carryforwards for federal income tax purposes of approximately $915,000 which are available to offset future federal taxable income through 2010. The availability of the net operating loss carryforwards to reduce future taxable income is subject to certain limitations. As a result of a change in ownership, the Company believes utilization of its net operating loss carryforwards is limited to approximately $63,000 per year for the remaining life of the net operating losses.

(Continued)

CONFIDENTIAL

02/18/98  WED 16:59 FAX 214 754 2264    KPMG DALLAS

7

DRAFT

ADAMS GOLF, INC.

Notes to Financial Statements

(9)  Stockholders' Equity

(a)  Stock Option Plans

In April 1996, the Company adopted the 1996 Stock Option Incentive Plan ("the Stock Option Plan"), pursuant to which stock options covering an aggregate of 400,000 shares of the Company's common stock may be granted. Options awarded under the Stock Option Plan (i) are generally granted at prices that equate to or are above fair market value on the date of the grant; (ii) generally become exercisable over a period of one to four years; and (iii) generally expire five years subsequent to award. At December 31, 1997, there were 70,155 shares available for grant under the Plan.

In connection with an employment agreement entered into in September 1995 with the Company's chief executive officer and founder, the Company granted options to acquire 760,383 shares of common stock at $.75 per share. Vesting of the stock options was conditioned upon meeting certain revenue and earnings requirements, which were met during 1996 and 1997. Also, the agreement provided for a bonus to be paid to the officer in an amount equal to the exercise price of the options plus any related income tax due by the officer upon exercise of the options. The officer notified the Company of his intent to exercise the options in December 1997 with the shares issued in January 1998. Compensation expense of $2,300,023 and $213,760 was charged to operations in 1997 and 1996, respectively, to recognize the bonus due to the officer.

In conjunction with a 1996 stock purchase agreement, the Company granted options to a shareholder to acquire an aggregate of 471,316 shares of common stock at option exercise prices ranging from $.75 to $1.25 per share. During 1997, the shareholder exercised the options for an aggregate exercise price of $549,419.

A summary of stock option activity follows:

|  | Number of Shares | Weighted average exercise price |
|---|---|---|
| Options outstanding at December 31, 1994 | — | $ — |
| Options granted | 760,383 | 0.75 |
| Options outstanding at December 31, 1995 | 760,383 | 0.75 |
|  |  |  |
| Options granted | 801,163 | 1.00 |
| Options outstanding at December 31, 1996 | 1,561,546 | 0.88 |
|  |  |  |
| Options exercised | (473,052) | 1.17 |
| Options outstanding at December 31, 1997 | 1,088,494 | $ 0.75 |

(Continued)

CONFIDENTIAL

02/18/98  WED 16:59 FAX 214 754 2264      KPMG DALLAS                                ☒014

8

ADAMS GOLF, INC.

Notes to Financial Statements

DRAFT

(Continued)

CONFIDENTIAL

UND 05000

A 102

02/18/98   WED 16:59 FAX 214 754 2264       KPMG DALLAS                        Ø013

9

DRAFT

ADAMS GOLF, INC.

Notes to Financial Statements

At December 31, 1997, the exercise prices and weighted-average remaining contractual life of outstanding options was $0.75 and 3.5 years, respectively.

At December 31, 1997 and 1996, the number of options exercisable was 1,057,246 and 233,985, respectively, and the weighted-average exercise price of those options was $0.75.

(b) Stock Distribution

In connection with the acquisition of a related entity, the Company distributed 2,085,352 shares of common stock to its shareholders during the year ended December 31, 1995. As a result of the common control existing between the Company and the related entity, the transaction was accounted for in a manner similar to a pooling of interest. Accordingly, the transaction resulted in no increase to stockholders' equity since the recorded net asset value of the related entity was not material. The resulting subsidiary has been inactive during the three years ended December 31, 1997 and has no assets or liabilities.

(c) Stock Compensation Award

In December 1997, the Board of Directors of the Company approved a stock compensation award of 1,000,000 shares of common stock to its chief executive officer and founder of the Company. In addition, the Company agreed to pay all income taxes due by the officer relating to such stock award and related tax bonus. The fair market value of the common shares awarded was determined to be $3.65 per share and taxes were estimated to be a $2,541,688 for an aggregate award of $6,191,688. The expense associated with the award has been included in the accompanying statements of operations for the year ended December 31, 1997.

(d) Note with Shareholder Converted to Stock

The Company borrowed $200,000 from a shareholder in October 1996 and an additional $250,000 from the same shareholder in 1997. The aggregate notes payable balance of $450,000 was converted into 450,000 shares of the Company's stock in September 1997.

(e) Stock Conversion

During 1995, the Company amended its Certificate of Incorporation to provide the authority to issue up to 25,000,000 shares of $.001 per share par value stock. All such shares were to be designated as common stock and, accordingly, all shareholders of preferred stock surrendered such shares for an equivalent number of shares of common stock. As a result of the amendment, no preferred stock is authorized by the Company subsequent to 1995.

CONFIDENTIAL

UND 05001

A 103

# LEHMAN BROTHERS

---

### FACSIMILE

---

**DATE:**    March 19, 1998                    **PAGES (INCLUDING COVER): 1**

---

**TO:**    Ann Neff
Adams Golf, Inc.
(972) 422-7060 (Direct Phone Number)
(972) 424-0721 (Fax Number)

---

**FROM:**    Sameet Mehta
Investment Banking
(415) 274-5389 (Direct Phone Number)
(415) 274-5381 (Fax Number)

---

**MESSAGE:**    **Details for Adams Golf Meeting**

Time and Date:      10:00 a.m. Tuesday, March 24, 1998

Place:              Arter & Hadden LLP
                    1717 Main Street, Suite 4100
                    Dallas, Texas 75201    . Tel: (214) 761-2400

Agenda:
| | |
|---|---|
| 10:00 a.m. – 10:15 a.m. | Introductions |
| 10:15 a.m. – 12:00 p.m. | Review of the offering |
| | – Time schedule |
| | – Proposed offering |
| | – Financial and accounting matters |
| | – Publicity issues |
| | – Legal and other issues |
| 12:00 p.m. – 12:30 p.m. | Working Lunch |
| 12:30 p.m. – 4:00 p.m. | Due diligence / Company Presentations |

---

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

---

LEHMAN BROTHERS
333 CALIFORNIA STREET 39TH FLOOR SAN FRANCISCO, CALIFORNIA 94104 TELEPHONE (415) 274-5389 FACSIMILE (415) 274-5381

CONFIDENTIAL                                        UND 08889

A 104

rsmbna02\groups\santran\wxtraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:51:43 PM - Page 1 of 27

# ADAMS GOLF, INC.



## INITIAL PUBLIC OFFERING

## ORGANIZATIONAL MEETING

### MARCH 24, 1998

# LEHMAN BROTHERS

UND 08722

A 105

rambrot2\groups\bankan\wakravenicSenis\aziame\ipo\orgmig\org2.doc - Carol Madrid - 9/17/2005 2:51:43 PM - Page 1 of 27

## *Table Of Contents*

I.    AGENDA

II.   INITIAL PUBLIC OFFERING ("IPO") DISCUSSION ITEMS

III.  WORKING GROUP LIST

IV.   SUMMARY AND DETAILED IPO TIME TIMETABLES

V.    DUE DILIGENCE OUTLINE/REQUEST LIST

1

UND 08723

A105.1

rambna02\groups\earthan\watraven\clients\acams\ipo\cramb\orp2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 2 of 27

## Agenda

Tuesday, March 24

| Time | Activity |
|------|----------|
| 10:00 a.m. - 10:15 a.m. | Introductions |
| 10:15 a.m. - 12:00 p.m. | Review of the offering |
| | − Time schedule |
| | − Proposed offering |
| | − Financial and accounting matters |
| | − Publicity issues |
| | − Legal and other issues |
| 12:00 p.m. - 12:30 p.m. | Lunch |
| 12:30 p.m. - 4:00 p.m. | Due diligence |
| | Company presentations: |

Barney Adams
*Chief Executive Officer*

Jim Farrell
*Chief Financial Officer*

Walt DeVault
*Director of Sales, Call Center*

Mark Gonsalves
*Vice President, Sales & Marketing*

Steve Sanozaro
*Vice President, Information Technology*

Dick Murtland
*Vice President, Operations*

2

UND 08724

A 106

r:\mbne02\groups\cert\enwa\raverrx\items\ezens\ipo\org.mig\erp2.doc - Carol Madkid - 2/17/2006 2:31:43 PM - Page 3 of 27

## *IPO Discussion Items*

---

I.     Review Working Group List

II.    Time Schedule

    (A)   Drafting/due diligence sessions
    (B)   Availability of Q1 financials and projections
    (C)   Status of Representation Agreements
    (D)   Lead times for prospectus photographs, charts, graphics
    (E)   Filing date/filing press release
    (F)   SEC review period
    (G)   Roadshow/Internal management presentations
    (H)   Institutional meetings/roadshow meetings
    (I)   Pricing and offering
    (J)   Closing

III.   Proposed Offering

    (A)   Size of offering
    (B)   Primary/secondary shares
    (C)   Review existing shareholder list
        (1) Registration rights
        (2) Rule 144 stock
    (E)   Lock-up agreements with principal shareholders
        (1) Amount of time
        (2) Cut off (% ownership)
    (F)   Stock split/shares outstanding
    (G)   Use of proceeds
    (H)   Syndicate structure
    (I)   Green shoe option
    (J)   Distribution objectives
    (K)   Directed shares
    (L)   Inclusion in National Market System (NMS)
    (M)   Proposed Ticker Symbol "_____"

3

UND 08725

A 107

cambna02\groups\centrai\valravenc\clients\adams\ipo\org\mtglorg2.doc - Carol Madrid - 2/17/2006 2:31:33 PM - Page 6 of 27

*IPO Discussion Items*

IV.    Review Legal Issues

    (A)   Outstanding claims
    (B)   Intellectual property issues/patent enforcement
    (C)   Environmental Review
    (D)   Blue Sky issues
        (1) Shareholder notes
        (2) Cheap stock
        (3) Stock options
    (E)   Board meetings
        (1) Appropriate board authorizations
        (2) Filing registration statement
        (3) Other
    (F)   Third-party consents
        (1) Bank agreements
        (2) Landlord
        (3) Waiver of registration rights, if applicable
    (G)   Related party, certain transactions and confidential document disclosure
    (H)   Other legal issues

V.    Financial and Accounting Matters

    (A)   Availability of unaudited and audited financials
    (B)   Presentation in prospectus
    (C)   Comfort letter
    (D)   Tax/FASB
    (E)   Cheap stock issues/compensation charges
        (1) Employees
        (2) Representation Agreements
        (3) Other
    (F)   Management letters/responses
    (G)   Historical audited financials, pro forma financials
    (H)   Historical and projected EPS calculations
        (1) Shares, options, warrants outstanding
        (2) Weighted average shares outstanding
    (I)   Review of accounting principles/changes
    (J)   Review of projections

VI.   Publicity Issues

    (A)   Pre-filing, post-filing/pre-effective periods
    (B)   Internal communication with employees
    (C)   Press releases
    (D)   Meetings with securities analysts

4

UND 08726

A 108

rembna02\groups\sanfran\wallreven\clients\adams\ipo\orgmtg\orp2.doc - Carol Madrid - 2/17/2006 2:21:43 PM - Page 5 of 27

*IPO Discussion Items*

VII.    Printing of Documents

    (A)   Selection of printer and bank note company

    (B)   Use of color, pictures

VIII.   Legal Due Diligence/Review of Corporate Records

    (A)   Information request list

5

UND 08727

A 109

ram\rna02\groups\sanlran\wakaven\clients\adams\pc\orgmtg\org2.doc - Carol Madrid - 2/17/2005 2:31:43 PM - Page 6 of 27

## Working Group List

ADAMS GOLF, INC.
2901 Summit Avenue
Suite 100
Plano, TX 75074
Tel:    (972) 546-9600
Fax:    (972) 546-0682

| Name/Title | Office | | Home |
|---|---|---|---|
| Barney H. Adams<br>*Chief Executive Officer* | Tel: | (972) 422-7060 Ext. 105 | |
| | Alt: | (800) 622-0609 | |
| | Fax: | (972) 424-0721 | |
| James E. Farrell<br>*Chief Financial Officer* | Tel: | (972) 422-7060 Ext. 153 | Cellular:   (972) 365-7060 |
| | Alt: | (800) 622-0609 | |
| | Fax: | (972) 424-0721 | |

6

UND 08728

A 110

*Working Group List*

---

LEHMAN BROTHERS
555 California Street, 30th Floor
San Francisco, CA  94104
Tel:    *(415) 274-5200*

---

| Name/Title | Office | Home |
|---|---|---|
| **INVESTMENT BANKING,**<br>**SAN FRANCISCO:** | | |
| J. Stuart Francis<br>*Managing Director* | Tel:    (415) 274-5220<br>Fax:    (415) 274-5269<br>E-mail:  *Smart_Francis@usccmail.lehman.com* | 242 Clark Drive<br>San Mateo, CA 94402<br>Tel:        (650) 343-8090<br>Car:        (415) 279-3150<br>Cellular:  (415) 608-6667<br>Fax:        (650) 347-1100 |
| *Assistant:    Rachel Rodriguez* | Tel:    (415) 274-5298 | |
| Olga A. Pulido-Crowe<br>*Senior Vice President* | Tel:    (415) 274-5227<br>Fax:    (415) 274-5381<br>E-mail:  *Olga_Pulido@usccmail.lehman.com* | 3137 Gough Street<br>San Francisco, CA 94123<br>Tel:        (415) 929-0354<br>Cellular:  (415) 602-0868<br>Fax:        (415) 922-3933<br>Pager:     (800) 225-0256<br>         Pin #: 598-3801 |
| *Assistant:    Eileen Maldonado* | Tel:    (415) 274-5274 | |
| Patrick Walravens<br>*Associate* | Tel:    (415) 274-5285<br>Fax:    (415) 274-5381<br>E-mail:  *pwalrave@lehman.com* | 151 Stanyan Street<br>San Francisco, CA 94118<br>Tel:        (415) 752-3359<br>Cellular:  (415) 609-4268 |
| *Assistant:    Louis Banks* | Tel    (415) 274-5346 | |
| Sameet S. Mehta<br>*Analyst* | Tel:    (415) 274-5389<br>Tel:    (415) 837-5679<br>E-mail:  *Sameet_Mehta@usccmail.lehman.com* | 401 El Cerrito Avenue<br>Hillsborough, CA 94010<br>Tel:        (650) 348-2716 |
| *Assistant: Eileen Maldonado* | Tel:    (415) 274-5274 | |

UND 08729

A 111

## *Working Group List*

LEHMAN BROTHERS
3 World Financial Center
200 Vesey Street
New York, NY 10285
Tel:    *(212) 526-7000*
Fax:    *(212) 526-3738*

| Name/Title | Office | Home |
|---|---|---|
| **EQUITY CAPITAL MARKETS:** | | |
| Marc Paley[e] *Managing Director and Global Group Head* | Tel:    (212) 526-9420 Fax:    (212) 528-6301 E-Mail: mpaley@lehman.com | 47 Cayuga Way Short Hills, NJ 07078 Tel:    (201) 379-2069 Fax:    (201) 379-5707 |
| M. Bradley Smith *Vice President* | Tel:    (212) 526-0115 Fax:    (212) 528-6973 E-mail: *Brad_Smith@usccmail.lehman.com* | 277 West 10th Street Apt. 9C New York, NY 10014 Tel:    (212) 242-0684 |
| *Assistant:*   Cynthia Minter | Tel:    (212) 526-8828 | |
| **EQUITY RESEARCH:** | | |
| Bernard J. Picchi[e] *Managing Director* | Tel:    (212) 526-5344 Fax:    (212) 526-5399 E-mail: *Bernard_Picchi@usccmail.lehman.com* | 151 Mine Mount Road Bernardsville, NJ 07924 Tel:    (908) 221-9186 Fax:    (908) 221-9082 |
| Brian J. Lantier *Research Analyst* | Tel:    (212) 526-5977 Fax:    (212) 526-5399 E-mail: *Brian_Lantier@usccmail.lehman.com* | 5126 Washington Boulevard Jersey City, NJ 07310 Tel:    (201) 610-9650 |
| **ROADSHOW SERVICES:** | | |
| Unni Mahany[9] *Vice President* | Tel:    (212) 526-7860 E-Mail: *Unni_Mahany@usccmail.lehman.com* | 8 Essex Drive Little Silver, NJ 07739 Tel:    (908) 933-4789 |
| **LEGAL:** | | |
| Steven L. Berkenfeld[e] *Managing Director* | Tel:    (212) 526-2557 Fax:    (212) 526-2198 E-Mail: *Steven_Berkenfeld@usccmail.lehman.com* | 8 Norman Court Dix Hills, NY 11746 Tel:    (516) 547-8048 Fax:    (516) 385-7918 |
| Kevin R. Genirs[e] *Vice President* | Tel:    (212) 526-2614 Fax:    (212) 526-2198 E-Mail: *Kevin_Genirs@usccmail.lehman.com* | 411 West End Avenue Apt. 7A New York, NY 10024 Tel:    (212) 875-1729 |
| **REGISTRATION:** | | |
| Arlene Salmonson[e] *Vice President* | Tel:    (212) 526-6140 E-Mail: *Arlene_Salmonson@usccmail.lehman.com* | |

[e]No Documents

8

UND 08730

A 112

rambnab2\groups\santrankara\venicflents\adams\tpolcorpmtg\crg2.doc - Caro: Madrid - 2/17/2006 2:31:43 PM - Page 9 of 27

## Working Group List

NATIONSBANK MONTGOMERY SECURITIES LLC
600 Montgomery Street
San Francisco, CA 94111
Tel: *(415) 627-2000*

| Name/Title | | Office | Home |
|---|---|---|---|
| **INVESTMENT BANKING:** | | | |
| John Berg<br>*Senior Managing Director* | Tel:<br>Fax:<br>E-Mail: | (415) 627-2111<br>(415) 913-5802<br>*jberg@montgomery.com* | 2642 Broadway<br>San Francisco, CA 94115<br>Tel:    (415) 922-2374<br>Cellular:  (415) 279-3991 |
| *Assistant: Bibi Green* | Tel: | (415 ) 627-2523 | |
| Jeff Mills<br>*Associate* | Tel:<br>Fax:<br>E-Mail: | (415) 913-6213<br>(415) 913-5802<br>*jmills@montgomery.com* | 3219 Gough Street<br>San Francisco, CA 94123<br>Tel:    (415) 440-5886<br>Cellular:  (415) 606-1214 |
| *Assistant: Lauren G'Neil* | Tel: | (415) 913-5915 | |
| **RESEARCH**<br>John Weiss*<br>*Senior Managing Director* | Tel: | (415) 627-2240 | |
| Richard L. Leza*<br>*Associate* | Tel: | (415) 913-5734 | |
| **SYNDICATE**<br>Dick Smith*<br>*Senior Managing Director* | Tel: | (415) 627-2264 | |
| Mark Saltzgaber<br>*Principal* | Tel: | (415) 627-2788 | |
| **LEGAL**<br>David Baylor*<br>*Associate Counsel* | Tel: | (415) 627-2384 | |

*No Documents

UND 08731

A 113

## *Working Group List*

NATIONSBANK MONTGOMERY SECURITIES LLC
9 West 57th Street
New York, NY 10019
Tel: *(212) 583-8000*

| Name/Title | Office | | Home |
|---|---|---|---|
| **INVESTMENT BANKING:** | | | |
| Courtney Tuttle | Tel: | (212) 583-8079 | 257 West 86th Street , Apt.7C |
| *Associate* | Fax: | (212) 583-8589 | New York, NY 10024 |
| | E-Mail: | *ctuttle@montgomery.com* | Tel:     (212) 721-7117 |
| | | | Cellular:   (917) 865-0525 |
| *Assistant: Laurie Velluzzi* | Tel: | (212) 583-8085 | |
| David Chanley | Tel: | (212) 583-8073 | 300 East 34th Street, Apt.8C |
| *Analyst* | Fax: | (212) 583-8273 | New York, NY 10016, |
| | E-Mail: | *dchanley@montgomery.com* | Tel:     (212) 545-7252 |
| | | | Cellular:   (917) 769-5243 |
| *Assistant: Juliana Chen* | Tel: | (212) 583-8541 | |

UND 08732

A 114

rambna02\groups\sanfran\walnave\clients\adams\ipo\orgmis\org2.doc - Carol Madrid - 2/17/2005 2:21:43 PM - Page 11 of 27

## Working Group List

FERRIS, BAKER WATTS, INC.
100 Light Street
Baltimore, MD 21202
Tel: *(410) 685-2600*

| Name/Title | Office | Home |
|---|---|---|
| **INVESTMENT BANKING** | | |
| Steven L. Shea<br>*Senior Vice President* | Tel:  (410) 659-4639<br>Fax:  (410) 659-4632<br>E-mail: *sshea@fbw.com* | 101 Pleasant Hill Road<br>Owings Mills, MD 21117<br>Tel:   (410) 363-4058<br>Cellular: (410) 371-3536 |
| Charles W. Place<br>*Vice President* | Tel:  (410) 659-4657<br>Fax:  (410) 659-4632<br>E-mail: *cplace@fbw.com* | 127 W. Montgomery<br>Baltimore, MD 21230<br>Tel:   (410) 752-2429<br>Cellular: (410) 375-0575 |
| **RESEARCH**<br>Joe Teklits*<br>*Equity Analyst* | Tel:  (410) 659-4605<br>(410) 382-4347<br>(410) 659-4395<br>E-Mail: *jteklits@fbw.com* | 3736 College Avenue<br>Ellicot City, MD 21043<br>Tel:   (410) 480-1604 |
| **SYNDICATE**<br>Kim Clendenin*<br>*Senior Vice President* | Tel:  (202) 429-3608<br>Fax:  (202) 429-3606 | |

\*No Documents

11

UND 08733

A 115

rambnat2group\sanfran\w\traversclients\adams\polorgml\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 12 of 27

*Working Group List*

---

ARTER & HADDEN
1717 Main Street
Suite 4100
Dallas, Texas 75201-4505
Tel:    *(214) 761-2100*
Fax:    *(214) 741-7139*

---

| Name/Title | Office | | Home |
|---|---|---|---|
| Joseph A. Hoffman | Tel: | (214) 761-4779 | 5420 Pebblebrook |
| | Fax: | (214) 741-7139 | Dallas, TX 75229 |
| | E-mail: *jhoffma2@arterhadden.com* | | Tel:    (214) 265-8953 |
| Robin Bradford | Tel: | (214) 761-4328 | 5520 Surrey Circle |
| | Fax: | (214) 741-7139 | Dallas, TX 75209 |
| | E-Mail: *rbradfor@arterhadden.com* | | Tel:    (214) 956-9919 |
| J. David Washburn | Tel: | (214) 761-4309 | 2107 Meadowview |
| | Fax: | (214) 741-7139 | Corinth, TX 76205 |
| | E-Mail: *dwashbur@arterhadden.com* | | Tel:    (817) 497-2348 |

12

UND 08734

A 116

## *Working Group List*

COOLEY GODWARD LLP
One Maritime Plaza
20th Floor
San Francisco, CA 94111
Tel:    *(415) 693-2000*
Fax:    *(415) 951-3699*

| Name/Title | Office | Home |
|---|---|---|
| Kenneth L. Guernsey<br>*Partner* | Tel:    (415) 693-2091<br>Fax:    (415) 951-3699<br>E-mail:  *guernseykl@cooley.com* | 1506 Forestview Avenue<br>Burlingame, CA 94010<br>Tel:          (650) 347-1021<br>Fax:          (650) 347-3843<br>Cell:         (415) 860-4582<br>Pager:       (415) 207-9647<br><br>Second Home:<br>570 Beale Street<br>Suite 202<br>San Francisco, CA 94105<br>Tel:          (415) 512-1595<br>Fax:          (415) 512-1972 |
| *Assistant: Gloria Taylor* | Tel:   (415) 693-2421 | |
| Karyn R. Smith<br>*Associate* | Tel:   (415) 693-2033<br>Fax:   (415) 951-3699<br>E-mail:  smithkr@cooley.com | 2516 Franklin Street<br>San Francisco, CA 94123<br>Tel:          (415) 923-1507<br>Fax:          (415) 923-1508<br>Cell:         (415) 722-4166 |
| *Assistant: Cathy Diaz* | Tel:   (415) 693-2316 | |
| Richard S. Jasen<br>*Associate* | Tel:   (415) 693-2013<br>Fax:   (415) 951-3699<br>E-mail:  jasenrs@cooley.com | 1855 Pine Street<br>San Francisco, CA 94109<br>Tel/Fax:   (415) 441-5451 |

13

UND 08735

A 117

rsmbns02\groups\santran\wakavert\clients\adams\pol\orgmg\orp2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 14 of 27

*Working Group List*

KPMG PEAT MARWICK
200 Crescent Court
Suite 300
Dallas, TX 75201-1885
Tel:   (214) 754-2000
Fax:   (214) 754-2297

| Name/Title | Office | | Home |
|---|---|---|---|
| Darl P. Hatfield, Jr.<br>*Partner* | Tel:<br>Fax:<br>E-mail: | (214) 754-2480<br>(214) 754-2264<br>*dhatfield@kpmg.com* | 601 Liechty Court<br>Heath, TX 75087 |
| *Assistant:* Ruselyn Howard | Tel: | (214) 754-2531 | |
| Rick Ehrman<br>*Senior Manager* | Tel:<br>Fax:<br>E-mail: | (214) 754-2145<br>(214) 754-2485<br>*rehrman@kpmg.com* | 3523 Whitehall<br>Dallas, TX 75229 |

14

UND 08736

A 118

*Summary Timetable (Filing with Q1 1998 Financials)*

| March 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| April 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| May 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| Date | Activity |
|---|---|
| March 24 | Organizational and Preliminary Due Diligence meeting |
| April 7 to April 21 | Due diligence meetings; Preparation of S-1 Registration Statement and underwriting documents |
| April 21 | Financial due diligence meeting |
| April 27 and 28 | Meetings at Printer to complete S-1 Registration Statement |
| April 29 | File S-1 Registration statement with SEC; Silent filing |
| Week of June 1 | Receive SEC Comments on S-1 Registration Statement; Respond to SEC Comments; Print and circulate red herring; management presentations at Underwriters |
| Week of June 8 and June 15 | Roadshow meetings in selected cities with investors |
| June 22 to June 29 | Price offering; closing |

15

UND 08737

A 119

*Detailed IPO Timetable (Filing with Q1 1998 Financials)*

| March 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| April 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| May 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| Participants | Legend |
|---|---|
| Adams Golf, Inc. (Company) | C |
| Lehman Brothers, Nationsbank Montgomery Securities and Ferris Bakers Watts (Underwriters) | UW |
| Arter & Hadden (Company Counsel) | CC |
| Cooley Godward LLP (Underwriters' Counsel) | UC |
| KPMG Peat Marwick (Accountants) | A |

| Time Period | Activity | |
|---|---|---|
| March 24 | (a) Organizational meeting to discuss:<br>(1) Time schedule<br>(2) Offering<br>(3) Document preparation responsibilities | All Parties |
| | (b) Commence review of all corporate records, materials, contracts, financial statements and documentation with regard to outstanding securities | C, UW, CC, UC |
| | (c) Preparation of Officers' and Directors' Questionnaire and Lock-up Agreements | CC, UC |
| | (d) Commence preparation of the Underwriting Agreement, Agreement Among Underwriters, Underwriters' Questionnaire, Underwriters' Power of Attorney and Preliminary Blue Sky Memorandum | CC, UC |
| March 30 to April 24 | (a) Discuss Comfort Letter procedures | A, UW |
| | (b) Officers' and Directors' Questionnaires mailed | CC |
| | (c) Lock-up Agreement finalized | CC, UW |
| | (d) Discussion of syndicate composition and desired distribution | C, UW |
| | (e) Contact bank note company to arrange for preparation of certificates | C |
| April 3 | Distribute first draft of S-1 Registration Statement | CC |
| April 7 | Drafting session; due diligence | All Parties |
| April 10 | Distribute second draft of S-1 Registration Statement | CC |
| April 14 | Second drafting session; due diligence | All Parties |
| April 17 | Distribute third draft of S-1 Registration Statement | CC |

16

UND 08738

A 120

*Detailed IPO Timetable (Filing with Q1 1998 Financials)*

| March 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| April 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| May 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| Time Period | Activity | |
|---|---|---|
| April 21 | Third drafting session | All Parties |
| | Financial due diligence session | All Parties |
| April 23 | S-1 Registration Statement sent to Printer | CC |
| April 24 | Printer proofs of all documents distributed to all parties | Printer |
| April 27 and 28 | Meetings at printer to review all documents and prepare filing package | Printer |
| April 29 | S-1 Registration Statement filed with SEC - Silent filing | CC, UC |
| April 29 to May 29 | (a) Roadshow presentation preparation and practice sessions with Company | C, UW |
| | (b) Dates and locations of roadshow meetings finalized | UW |
| Week of June 1 | (a) Comments received from SEC | C, UW |
| | (b) Review SEC comments and prepare responses | All Parties |
| | (c) Preliminary Prospectus sent to offices of Lehman Brothers and other managers | UW, Printer |
| | (d) Copies of S-1 Registration Statement and Preliminary Prospectus, proofs of Underwriting Agreement and Agreement Among Underwriters, Underwriters' Power of Attorney, Underwriters' Questionnaire and Preliminary Blue Sky Memorandum distributed to proposed syndicate members | UW |
| | (e) Mailing to institutional investors and financial publications | UW |
| | (f) Prepare press release regarding Offering | C, CC |
| | (g) Review draft tombstone advertisement | LB |
| | (h) Supplemental Blue Sky Memorandum prepaid | UW |
| June 4 and 5 | Company presentation to Underwriters' sales forces | C, UW |
| June 8 to June 19 | Roadshow meetings in selected domestic and European (to be determined) cities | C, UW |

17

UND 08739

A 121

### *Detailed IPO Timetable (Filing with Q1 1998 Financials)*

| March 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |
| | | | | | | |

| April 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |
| | | | | | | |

| May 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |
| | | | | | | |

| Time Period | Activity | |
|---|---|---|
| June 23 | (a) Meeting between the Company and Underwriters to determine offering terms | C, UW |
| | (b) Final Prospectus filing package prepared | All parties |
| | (c) Agreement Among Underwriters signed | UW |
| | (d) Underwriting Agreement signed | C, UW |
| | (e) Comfort Letter delivered | A |
| | (f) Pricing. S-1 Registration Statement declared effective | C, UW |
| | (g) Press release regarding Offering issued | C, CC |
| Week of June 29 | Closing | C, UW, CC, UC |

18

UND 08740

A 122

ramona02\groups\santrank\xstraven\client\adams\lpc\org\mig\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 19 of 27

### *Due Diligence Outline/Request List*

I.     General Document Requests

    A.  Historical and Current Data
        – Three Year Historical Financial and Operating Data

                (a) Audited Annual and Quarterly Financials (for FY 1995, 1996 and 1997) for Adams Golf, including income statements, balance sheets and cash flow statements
                (b) Breakdown of components of revenues and expenses by product
                (c) Revenue breakdown by sales channel/geography
                (d) List of major customers showing total sales in FY 1995, 1996 and 1997
                (e) Backlog data

        – Auditor's Management Letters
        – Tax Audit Status Reports
        – Updated Shareholder Holdings Profile
        – Articles of Incorporation and Bylaws
        – Bank Loan Agreements
        – Organization Chart and Departmental Headcounts
        – Key Management Resumes
        – Labor Contracts and Employee Agreements with Key Officers
        – Benefit Plan Summaries
        – Product Brochures and/or Marketing Material
        – Facilities Layouts, Descriptions and Photographs

    B.  Business or Strategic Plan

    C.  Financial Projections
        – Financial projections (quarterly for FY 1998 and 1999 and annually for 1998 to 2002, including income statements, balance sheets and cash flow statements

                (a) Breakdown by major product areas of revenues and margins
                (b) All product introduction, key milestones, market penetration, pricing, capital expenditures and other assumptions involved in projections
                (c) Breakdown of revenue by distribution channel
                (d) Revenue breakdown by geographic area

UND 08741

A 123

rambna02\groups\san\markat\raven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 20 of 27

## *Due Diligence Outline/Request List*

C. Financial Projections (cont'd)

      (e) Projected major capital expenditures and R&D expenses
      (f) Major customers projected each year from 1998-2000, key customer wins

- Five Year Capital Budget
- Review of stockholders and equity ownership
- History of equity ownership
- History of options grants

II. Business Review

A. Products
- Review of Major Product Lines
- Comparative Product Analysis
    (Advantages and Disadvantages)

B. Markets and Market Position
- Market Size and Share by Product
- Industry Capacity
- Principle Competitors by Product
    (Estimated Market Shares)
- Comparative Pricing Strategy
- Top 15 Customers
    (Penetration by Customers and Major Product Line)
- List of Companies which Represent 80% of Total Business
- Revenue Composition Analysis
    Direct response, International, Custom Fitting, Inside Sales, etc.
    Proportion of Renewal Business (Recurring Revenues)
    Customer Attrition Record
    Long-Term Core Business vs Transitional Business

C. Major Strategic Issues Facing the Company
- Technological Change
- Supply/Demand for Product
- Size and Market Share of Competitors
- Competitors' New Product Introductions
- Dependence Cyclical Markets
- Other Short- and Long-Term Risks
- Age/Health of Management or Other Key Personnel
- Regulatory Issues

UND 08742

A 124

rambna\02\groups\sanfran\walraven\clients\adams\po\organi\org2.doc - Carol Madrid - 2/17/2003 2:31:43 PM - Page 21 of 27

*Due Diligence Outline/Request List*

III.     Research and New Product Development

    A.  Product Development Strategy
- Summary of R&D Activity Over Past Three Years
- Product Life Cycle
- Project Origination, Planning and Control Process
- Products Under Development
- Product Acquisition Opportunities
- Remarketing Arrangements
- Quality Assurance and Testing
- Technical Service and Support
- Sourcing of Next Generation of Products
- Requirements For Additional Facilities
- Comparison with Competitors' R&D Efforts

IV.     Marketing and Sales

    A.  Sales Organization
- Description of the Sales Process
- Organization of Selling Effort
    Product vs Geographic
    Vertical Markets (Government, International, Other)
- Sales Channels
    Percent of Sales Through Sales Force vs Reps. and Distributors
    Number and Names of Distributors and Billings per Distributors
    Distributors Contract Terms
        (Copy of a Representative Distribution Contract)
- Sales Terms and Conditions
    Pricing Terms
    Discount and Allowance Policy

    B.  Sales Force
- Number and Location of Sales Offices and Sales Force
- Strengths and Weakness of Sales Force
- Productivity Statistics
    (i.e. Revenues per Salesperson)
- Compensation Structure
- Account Coverage
- Experience and Training Profile
- Support Requirements

UND 08743

A 125

rambnad2\groups\saniranlwalraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2005 2:21:43 PM - Page 22 of 27

*Due Diligence Outline/Request List*

---

    C.  Advertising and Promotion
        –  Advertising Philosophy
        –  Expenditures By Channel


V.  Finance

    A.  Reporting Cycles
        –  Financial Controls and MIS Systems Review
        –  Monthly Financial Reports

    B.  Financial Review (Historical and Projected)
            Income Statement
            Identify Non-Recurring Items
            Identify Discontinued Businesses
        –  Balance Sheet
        –  Statement of Changes in Financial Position
        –  Capital Expenditures
        –  Goodwill Amortization, and Other

    C.  Revenue Review
        –  Revenue Recognition Policies
        –  Revenue Trends
        –  Unit Sales Volume and Pricing Data
        –  Sales Breakdown by Product

    D.  Cost Analysis
        –  Direct vs Indirect Costs
        –  Variable vs Fixed costs
        –  Standalone Costs (if applicable)
        –  Product-Specific costs

    E.  Inventory Analysis
        –  Raw Materials by Type
        –  Work in Process and Finished Goods
        –  Allowance for Obsolescence
        –  Policies

UND 08744

A 126

rambna12\groups\santnan\wsxtravsn\clients\scomsl\polorgmlg\crp2.doc - Carol Madrid - 2/17/2006 2:21:43 PM - Page 23 of 27

*Due Diligence Outline/Request List*

F.  Receivables Analysis
    - Account Concentration
    - Aging Analysis
    - Receivables Policy
    - List of Overdue Accounts, Reserves and Write-Offs
    - Adequacy of Allowances
    - Collection Periods (Turns Assumptions)

G.  Fixed Assets Analysis
    - Investment and Accumulated Depreciation By:
        Asset Type
        Location
        Date or Month of Acquisition
    - Replacement Cost
    - Amortization and Depreciation Policies

H.  Other Balance Sheet Issues
    - All Short and Long-Term Debt Agreements and Conditions
    - Deferred Income Taxes
    - R&D Tax Credits
    - ITC Tax Credits
    - Foreign Tax Status
    - Detail of Prepaid and Accrued Accounts
    - Deferred Liabilities
    - Tax vs GAAP Book Value of Assets
    - Pension Plan Funding Status

I.  Cash Flow Issues
    - Depreciation
    - Capital Expenditures
    - Physical Plant Capacity Issues
    - Net Working Capital Issues
    - Invested Capital/Reserve Issues
    - Other Major External Sources/Uses of Cash

J.  Other Financial Issues
    - Pension Funds Structure and Rules
    - Implicit Tax Rate and Tax Liability Exposure Assumptions
    - Foreign Currency Translation Policies/Exposure
    - Upcoming Extraordinary/Non-Recurring Items
    - Patents/Licenses/Trademarks/Royalties/Etc...
    - Associated/Affiliated Companies

23

UND 08745

A 127

*Due Diligence Outline/Request List*

VI.   Production

   A.  Description of Facilities and Future Facilities Needs
       −  Owned vs Leased vs Contracting
       −  Domestic vs Offshore
       −  Lease Terms, Depreciation Policy
       −  Significant Production Equipment

   B.  Description of Production Process
       −  Steps in Production Process
       −  Major Material and Labor Components
       −  List of Key Suppliers and any Material Supply Agreements
       −  List of Second or Alternative Vendors
       −  Potential Supply Bottlenecks
       −  Review of Capacity and Capacity Utilization

   C.  Environmental Review
       −  Current Status
       −  EPA Review
       −  Outstanding Violations
       −  Other Potential Contingencies


VII.  Administration and Management

   A.  Organization Structure
       −  Reporting Relationships
       −  Geographic vs Product vs Market Management Responsibilities
       −  Corporate Support

   B.  Management
       −  Description of Responsibilities
       −  Management Quality Assessments
       −  Bonuses Plans, Stock Options, Etc...

   C.  Systems
       −  Major EDP Systems
       −  EDP Systems Plan
       −  Telecommunications/Call Center Plans


24

UND 08746

A 128

rambna0Ergroups\santranlwalravenclients\adams\lpo\orgmit\org2.doc - Carol Madrid - 2/17/2006 2:31:45 PM - Page 25 of 27

*Due Diligence Outline/Request List*

VIII.  Workforce

    A.  Hourly and Salaried Employees
- Headcounts By Department, Location and Facility
- Productivity Measurements
- Turnover Statistics
- Compensation and Incentive Plans
- Health Care and Retirement Plans
- Other Fringe Benefits

    B.  Labor Relations
- Union Representation
- Strike History
- Industry Norms
- Labor Contract Review

    C.  Regulatory Issues
- EEOC Compliance
- OSHA Compliance
- Other Potential Regulatory Issues

IX.  International

- Subsidiary Structure
- Products Sold Internationally
- International Sales Force and Marketing Arrangement
- Distributor Arrangements
- Nature of Foreign Competition
- International Development Facilities
- Foreign Currency Exposure and Accounting Treatment
- Foreign Tax Position

UND 08747

A 129

rambna02\gcups\sanfran\wa\ravenisclients\adams\pct\orgrsig\xrp2.doc - Carol Madrid - 2/17/2006 2:51:43 PM - Page 26 of 27

*Due Diligence Outline/Request List*

XI.    Other

- Other Significant Contractual Relationships
- Acquisition and Divestiture Summary
- All Stock Purchase Agreements, Voting Trust Agreements, Buy/Sell Agreements
- Copies of All Stock Option Plans
- Press Releases since January 1, 1997
- Joint Venture, Partnership and Distribution Agreements
- List of Patents and Patent Applications
- Marketing and Product Literature
- List of any Outstanding Legal Claims/Issues Regarding Intellectual Property and Environmental (not listed above)
- Any Appropriate Industry Articles, Market Research, Industry Newsletters and Competitive Analyses etc.
- Any External or Internal Analysis Regarding Competitors' Products, Pricing Trends
- Review of Federal, State and Local Tax Status
- Professional Relationships
    - Attorney
    - Accounting Firm
    - Public Relations Firm
    - Advertising Firm
    - Other

26

UND 08748

A 130