# Appendix
# A231-A330

And, for the same reasons Arbuckle listed, he found that market tough to crack.

Adams had developed a custom club-fitting system, and he turned to it to sell his clubs. First, he sold the fitting system to golf pros and golf equipment retailers. In turn, they'd use the system to fit players for a set of custom clubs, and Adams would make the clubs. Adams concentrated on developing that fitting system, and on building a staff that could keep the company moving forward.

* The fitting system is still the core of Adams Golf's business, and that's where the Tight Lies club originated. But when the club started making it onto courses, demand for it far exceeded that for any previous Adams club.

Adams said the club's unique design makes it easier to play than most woods.

"We designed the club upside down," he said.

He explained that, looking at the toe of most woods, you basically see an upside-down triangle. That means most of the club head's weight is at the top, making for a higher center of gravity. Adams said today's oversized woods – with taller faces and broader tops – have even higher centers of gravity than older clubs.

The Tight Lies, on the other hand, uprights the triangle, putting most of the weight across the bottom of the club head and lowering the center of gravity.

"When the weight is lower, it's easier to get the ball into the air," Adams said.

Rinker said Adams' new club is a unique design, and that he's heard good things about it. But even if that product takes off, the company won't be able to rest on its laurels.

"You look at those companies," Rinker said of the industry kingpins, "and they're working to come out with new and innovative products."

It's the same way in the software industry, according to Driver. One product won't sell forever.

"Your customers are waiting for the next one," she said.

No matter the product, it's got to prove its worth. Adams' new club has the credentials to show it isn't just a gimmick: it has U.S. Golf Association approval and is in use among tour members.

Adams doesn't pay players to carry his clubs. He supplies clubs for PGA, Senior PGA and Ladies PGA tour players, and sells them to other pros at special rates. Anything beyond that would be a financial burden for the company, he said.

If demand for the Tight Lies club keeps growing, Adams may be able to change that approach. The company is working on a full line
* of woods using the unique design, and if that makes Adams Golf a household name, sales of Adams' other clubs should take off as well.

"Will we be the next Cobra or Callaway? Who knows?" Adams said. "Do we have a chance? Definitely."

I0607  * End of document.

    DOCUMENT  61 OF 102
    DLBJ8001390639
    Golf club maker bets on excellence
    749 Words
    4628 Characters
    05/13/94
    Dallas Business Journal
    (Copyright 1994)
        By JAMES C. ALLEN  Staff writer of the Dallas Business Journal
    RICHARDSON _ Barney Adams said when he speaks to people
considering buying or starting their own business, he gives them

# CONFIDENTIAL

UND 01923

A 231

some blunt advice.

"You better go into something you like because the hours you will work are going to be twice as long as you figured," he said.

Fortunately for Adams, he found such a business. In 1988 he bought the assets of Dave Pelz Golf in Abilene, gave his own name to the company and moved it to Richardson three years later. During these six years, Adams Golf Inc.'s harmonious fitting process has produced hundreds of clubs and dozens of satisfied customers.

But limited budgets have forced the company to rely on word-of-mouth marketing, and Adams' strategy has been to turn this limitation into part of the firm's marketing strategy.

"We are not a big success," Adams said. "We're embryonic. But I have a lot of customers who ask why we're not a big success."

The answer he offers, Adams said, is that the company decided on a strategy of investing its precious capital on its product not promotions. The company departs with industry convention by sponsoring no professional tour players. Neither does its spend millions on television and magazine advertising.

Instead, Adams said, his company directs all its energies at making a product that will help his customers enjoy the game more by helping them play better.

But can this strategy work against the deep pockets of the multinational giants, whose lavish gifts to professional golfers and high-profile ad campaigns blanket the golf world?

"It's difficult to be a word-of-mouth business when you're going against millions and millions of advertising and promotion," Adams said.

Nonetheless, his word-of-mouth supporters say that recommendations from happy customers were enough to attract them and that Adams' service deserves those recommendations.

One such supporter is John Roote, an eight handicap accountant. Three weeks ago, Roote said he paid $700 for a set of Adams' fitted clubs. Already, he said he has improved his struggling game because the clubs are easier to use than his old set.

While part of the improvement Roote attributes to the lessons he received from the professionals at the Hank Haney Golf Ranch in McKinney _ a golf school that sells Adams' clubs _ he said the clubs themselves have to receive some credit. That is because the new set of clubs was tailored to match his swing.

Adams said the tailoring process is designed to fit the individual to the clubs that work for them. Among the factors he uses to determine which clubs work include things like the length and stiffness of the club shaft, the placement of the head relative to the shaft and the club's weight distribution.

"We call it harmonic club fitting," Adams said.

To achieve this harmony, Adams starts by measuring each customer to determine shaft length as well as head placement. The remaining information comes from having the customer hit 10 different club setups. One of these clubs will work best, Adams said, and the remainder of the fitting process is taken from that club.

Despite the expertise Adams has developed over the last six years in the field of golf club manufacturing and fitting, his professional background is in turnaround management. Before to buying the golf club company, he was helping troubled firms get back on their feet. During this period, he said he spent a lot of time working with high-technology companies in Silicon Valley.

But the lure of actually owning a company, while at the same time working with the game he has played for 40 years, led Adams to induce six investors to front the money to buy the company.

# CONFIDENTIAL

UND 01924

A 232

So far _ despite its word-of-mouth campaign _ the company remains small. Adams estimates the company will generate about $500,000 in revenue this year. He has hopes that the company will eventually sell between 2,000 and 2,500 clubs through as many as 125 golf outlets.

But for the time being, Adams is content to serve a limited clientele and patiently grow the company. And despite the lack of sponsorships, some 30 to 40 tour pros either have used or are using his clubs _ after paying full price. Some of Adams' customers believe more tour players will follow.

"He's got a really wonderful product," said Roote. "As a consumer, he seems to be way ahead of what other people in the industry are doing."

10607   *   End of document.

CONFIDENTIAL

UND 01925

A 233

```
People on the Move
ACCOUNTING
648 Words
4504 Characters
06/24/94
Dallas Business Journal
(Copyright 1994)
 MANUFACTURING
   *   Adams Golf named Richard Murtland as vice president of operations.
I0607  *   End of document.
```

CONFIDENTIAL

UND 01926

A 234

FEATURES ACCENT & ENTERTAINMENT
THE SHAPE OF THINGS TO COME
NEW PRODUCTS CAN INSPIRE HIBERNATORS TO GET MOVING AGAIN
Julia Osborne   For The Dispatch
775 Words
5295 Characters
03/27/95
The Columbus Dispatch
Home Final
01D
(Copyright 1995)
    Mind games
    Better golf and tennis games are in the mind, according to
* the Virginia company In-Sync Sport.
    Each of a series of compact discs to improve athletic
performance ($49.95 each) plays for an hour - say, before a game -
to help the listener relax, concentrate and visualize a good
competition.
    The CDs - for golf, tennis, putting and skiing - use
technology, developed by the Monroe Institute in Virginia, that
coaxes both sides of the brain to work together.
*    For more information, write In-Sync Sport, 32 Black Walnut
Dr., Nellysford, Va. 22958; or call 804-361-1900.

I0607   *   End of document.

    DOCUMENT   2 OF 4
    BWR9000157958
   * Corporate Profile for In-Sync Sport International, dated Friday,
July 29
    180 Words
    2543 Characters
    07/29/94
    Business Wire
    (Copyright (c) 1994, Business Wire)

    --(BUSINESS WIRE)--The following Corporate Profile is available
for inclusion in your files.  News releases from this client are
distributed by Business Wire and also are stored in many popular
databases.
Published date:   July 29, 1994
Company name:     In-Sync Sports International Inc.
Address:          32 Black Walnut Dr.
                  Nellysford, Va. 22958
Telephone No.:    804/361-1900
Chief Executive
   Officer:       Mark D. Gonsalves
Industry:         Sports/Sports Psychology
* Company description: In-Sync Sport International Inc. produces audio
                  compact discs (CDs) that utilize an advanced,
                  patented sound technology and visualization
                  exercises to enhance athletic performance.
                  Now in its third year, the company has programs
                  for golf putting, tennis and skiing.  To date,
                  sales exceed 38,000 copies/worldwide.  The CDs
                  have been endorsed by Peter Kostis, PGA Tour
                  Instructor Bruce Crampton, Senior PGA Tour
                  player, Franz Klammer, Olympic Downhill

# CONFIDENTIAL

UND 01927

A 235

Champion and Tennis Magazine.  Through a
patented high-tech process called "Hemi-Sync",
pioneered and developed by The Monroe Institute
in Virginia, In-Sync Sport programs bring both
hemispheres of the brain in sync with eachother
resulting in an integrating "whole-brain" state
that studies conclude is associated with peak
performance.

07:39 ET    JUL 29, 1994

CONFIDENTIAL

UND 01928

A 236

```
        *IN DATE*              Statement Date: DEC 31 1997


     DUNS: 10-247-1737         DATE PRINTED          SUMMARY
ADAMS GOLF, INC.               APR 01 1998    RATING    3A1

2901 SUMMIT AVE, STE 100       MFG FULL LINE OF  STARTED  1987
AND BRANCH(ES) OR DIVISION(S)  GOLF CLUES        SALES  $60,000,000
PLANO TX 75074                 SIC NO.                    (PROJ)
    TEL: 972 422-7060          39 49             WORTH F $8,325,320
                                                 EMPLOYS  180(180 EERE)
                                                 HISTORY  CLEAR
```

CHIEF EXECUTIVE: B H ADAMS, PRES

SPECIAL EVENTS/UPDATES/CHANGES

SPECIAL
EVENTS
03/18/98      On Mar 18 1998 Jim Farrell, cfo, stated that the company is
       moving to 2801 E Plano Pkwy, Plano, TX 75074 in Apr 1998.


Copyright 1998 Mill Hollow Corporation
DM News

February 23, 1998

SECTION: SUPPLEMENT; DRTV NEWS; DRTVProfile; Pg. 8

LENGTH: 1244 words

HEADLINE: Infomercial Is Driving Factor in Golf Club Success

BYLINE: By Denise Duclaux

BODY:
   Barney Adams, president of Adams Golf, Plano, TX, stood 30 feet from his
1,500-square-foot booth at Orlando's PGA Merchandise Show this month, observed
its bustling activity and thought: "This can't be me."

   Adams, 59, had attended the PGA show countless times during his rocky career
as a golf-club designer.  He often manned the smallest exhibition booth of the
show, his lonely vigil interrupted only by friends who stopped by for a quick
"hello."

   "It's just a different world now," Adams said as he watched more than 30
employees staff his latest booth and welcome a swarm of golfers eager to
test-swing his clubs.  "Part of you is extraordinarily grateful and the other
part of you recognizes the challenge that is inherent in that situation -- like
don't let this be a one-shot deal.  Show everybody you're going to be here for a
while."

   Adams, who has been a golf fan since his caddie days at the age of 12, began

CONFIDENTIAL

UND 01929

A 237

designing golf clubs about three decades ago, originally as a hobby and later for a living.

But success eluded him until he aired an infomercial last spring to promote his Tight Lies wood.  The 30-minute commercial transformed him from a long shot to a big shot.

His company earned $ 37 million in 1997, 10 times what it earned the previous year.  Stories of his arrival ran in publications such as The New York Times, Sports Illustrated, Golf World and Inc. magazine.  And his winning formula was imitated by rivals such as Top-Flite Golf, Ray Cook, Cubic Balance, Orlimar and Competence Golf.

"I had people from the industry saying, 'My God, Barney, they ought to be sending you a commission check; people are doing infomercials left and right'," Adams said.  "At the risk of sounding arrogant, and I don't by any stretch of the imagination mean to sound that way, doing an infomercial is one thing, but unless you've got the product, you're wasting your money."

Before designing golf clubs full-time, Adams worked as a field engineer at Dow Corning and as a low-level consultant to small Silicon Valley firms.  His stint as a consultant led him to the troubled Feather-Lite golf shaft company in the 1970s, which was eventually snuffed out by a Texas economic drought.  Adams purchased its fixtures and equipment and founded Adams Golf in Abilene, TX.

CONFIDENTIAL

UND 01930

A 238

DM News, February 23, 1998

PAGE    2

FOCUS

**'Scared to Death'**

He began selling component parts to club makers, but was often asked to supply knockoffs of well-known brands. Deciding that a life of imitation wasn't for him, Adams moved to Dallas to custom fit golf clubs and hoped that the metropolitan area would provide him with enough customers to keep his career afloat. But his phone seldom rang.

"I can't say that I ever regretted giving up my day job, but I can say that I was scared to death most of the time," Adams said. "But, you know, I either have a lot of resolve or I'm dumb, one of the two."

The latter option seems unlikely in light of Adams' track record, which peaked with his creation of Tight Lies. Traditionally, manufacturers had attempted to resolve golfers' difficulty in using long irons by designing larger, deep-faced fairway woods. Adams, however, designed a shallow-faced fairway wood with a low center of gravity. Clients were thrilled with the new club, and word-of-mouth spread.

"When we started making Tight Lies, we would get phone calls from friends of people who had one," Adams said. "That woke us up to the fact that maybe there was a product here that had a life of its own."

After huddling with Mark Gonsalves, vice president of sales and marketing, Adams hired a team of four telemarketers to sell Tight Lies to golf pro shops and retailers. Sales jumped from $ 1 million in 1995 to $ 3.5 million in 1996.

The company needed a more aggressive effort but lacked the capital for more conventional marketing programs. When Gonsalves suggested an infomercial, his boss was leery of the idea.

"I thought [infomercials] didn't tell the truth, that they sold junk, that they made promises that were ridiculous, that they were an embarrassment," Adams said. "But I didn't have a hell of a lot of choice, that was the big thing."

Alien Success Inspiring

Adams overcame his trepidation. He was heartened by the success and quality of the Alien Ultimate Wedge golf infomercial, although Alien eventually declared bankruptcy.

Just as Adams was calling Script to Screen, the Santa Ana, CA-based firm that produced Alien's infomercial, Script to Screen's president was placing a call to Adams Golf.

"It was sort of like ships in the night contacting each other. It was an interesting coincidence," said Tony Kerry, vice president of marketing at Script to Screen. "We really felt that their product would be great for an infomercial. Our president had bought one of Adams' products and was just a huge fan of the club. At the same time they were interested in having us produce the infomercial."

**CONFIDENTIAL**

UND 01931

A 239

DM News, February 23, 1998                           PAGE    3

                                                      FOCUS

Adams came up with more than $ 600,000, all his company could afford, to produce and test the infomercial. He then crossed his fingers and waited.

"I spent about six weeks of my life when I didn't sleep more than an hour at a time," Adams said.

Hosted by veteran announcer Jack Whitaker and featuring former PGA Teacher of the Year Hank Haney, former British Open champion Bill Rogers and LPGA Hall of Famer Carol Mann, the infomercial demonstrates the patented technologies that allow Adams' club to maneuver golf balls out of nightmare situations or "tight lies." Viewers are advised to call a toll-free number to order the 16-degree club, which costs $ 159.80 in steel and $ 219.80 in graphite.

"A lot of people have told us that the infomercial kind of reeks of honesty and integrity while many infomercials are full of hype and over promise," Kerry said.

Last year Adams Golf hired a dozen more outbound telemarketers. Now it plans to move to a 67,000-square-foot facility 25 yards from its current 25,000-square-foot building. The company, which had just 18 employees in 1995, now tops 180.

Although only the original 16-degree club is advertised in the infomercials, a line of related clubs are now available. Adams estimates that 80 percent of those who buy the 16-degree club buy another club from his line.

Driving Retail

Adams, who doesn't play much golf these days, will release a new line of products this fall and doesn't rule out the possibility of another infomercial. He will continue airing the original as well as using a series of direct-response print ads and radio spots. But he warns that his company's focus on direct marketing may be misleading.

"Our whole intention from day one is to drive retail; we are not intending to be a direct response company," Adams said. "We have taken the whole direct response world so to speak and we have pushed it as far as we can to drive retail. The game plan hasn't changed."

Although Adams is breathing easier now, he refuses to regard his company as a success.

"We have a formula here that success equals progress over time," Adams said. "We are performing at the progress level, and as we continue, the time level will take care of itself.

"The analogy I use is restaurants. How many new restaurants have you gone to where you can't get near the place? It's the world's greatest this, the world's greatest that. You go back six months later, and it's a bowling alley. We recognize that we are very fortunate, but we also recognize that we have to keep it going."

GRAPHIC: Picture 1, Barney Adams scored a hole-in-one with an infomercial for his golf club, Tight Lies; Picture 2, Script to Screen produced the 30-minute

CONFIDENTIAL

UND 01932

A 240

DM News, February 23, 1998

PAGE    4

FOCUS

show, which features veteran announcer Jack Whitaker.

LANGUAGE: ENGLISH

LOAD-DATE: March 3, 1998

CONFIDENTIAL

UND 01933

A 241

PAGE    5

FOCUS – 15 OF 104 STORIES

Copyright 1998 Goldhirsh Group, Inc.
Inc.

February, 1998

SECTION: FEATURES; Special Report: How To Finance Anything; Pg. 46

LENGTH: 2624 words

HEADLINE: THE TROUBLE WITH Angels

BYLINE: BY STEPHANIE GRUNER; Stephanie Gruner (stephanie.gruner@inc.com) is a
staff writer at Inc.

HIGHLIGHT:
What's the difference between a venture capitalist and an angel investor? Not
much anymore. Just try finding an old-fashioned angel

BODY:
   WHAT WILL IT TAKE TO PERSUADE HANS Severiens to invest in your start-up? Ask
him, and he'll issue a litany of demands -- a business plan, well-defined
milestones, a significant equity stake, and usually a board seat -- rigid enough
to make any entrepreneur want to leap into the arms of the nearest angel
investor. Except that Severiens is an angel investor. Or what passes for one
these days, when it's harder and harder to separate the angels from the venture
capitalists. "There really isn't much difference," confesses Severiens, who
belongs to the Band of Angels, one of Silicon Valley's better-known
angel-investor groups. "We're all trying to make sensible investments, and we're
exercising some due caution."

   Nonchalant as he sounds, Severiens is emblematic of a surprising turnabout:
not long ago angel investors were viewed as start-up saviors, quietly stepping
in to fill the gap where venture capitalists feared to tread. Angels were
defined by how distinct they were from the venture types: eager to make smaller
investments, they were willing to wait longer for a payback and were fully
expecting to play an active mentoring role along the way. Largely consisting of
retired entrepreneurs looking to invest their accumulated wisdom and wealth --
in that order -- the angels clung to their discreet and inefficient operating
style. You found angels less by trying than by hoping: through a chance meeting
or a remote contact or plain happenstance. They wanted it that way.

   Not anymore. In the wake of a raging bull market, many venture-capital funds
have grown too big to even consider any investment below $ 1 million, leaving a
much wider field for the angels. Meanwhile, a sizzling market for cashing out
has enabled a broader range of wanna-bes to act on their angelic impulses. At
least 10% of CEOs on this year's Inc. 500, a ranking of the country's
fastest-growing companies, actually consider themselves to be angels. "There's a
lot of money in the hands of young people who are technically competent and not
afraid to invest," observes Severiens. Investing their cash also lends them
cachet. Calling yourself an angel puts you in the orbit of such celebrated
winged ones as Microsoft cofounder Paul Allen. It conjures images of the
heavenly returns earned by the angels who backed Amazon.com, the on-line book
retailer that was one of last year's hottest initial public offerings.

CONFIDENTIAL

UND 01934

A 242

Inc., February, 1998

PAGE    6

FOCUS

The angel community's newfound notoriety has come as a by-product of its growth: it's estimated that in 1996, 250,000 angels invested upwards of $ 20 billion annually; in comparison, roughly 600 venture firms put in half that amount. These days angel investors are about as publicity shy as the average Geraldo guest. Competing for the best deals, some resort to making cold calls. "They're hard to say no to," says Dale Van Aken, chief executive of Syncro Technology Corp., a $ 5.8-million software developer based in Langhorne, Pa. "They're saying, 'Here's my name, and I want to give you money.'"

Not that angels are all working their way through the yellow pages. Still, chances are that if your accountant doesn't know an angel, your lawyer will. If neither pans out, flip open the Wall Street Journal -- where you'll find ads for matchmakers who specialize in linking entrepreneurs with angels -- or do a search on the Internet, where even the government maintains a site, ACE-Net, aimed at pairing fund-loving entrepreneurs with well-heeled angels.

Dave Berkus, former CEO of an Inc. 500 company, says that the angel network he created, Los Angeles-based Berkus Technology Ventures, sees more and more deals that have been sent by venture capitalists. "I consider myself a seed venture capitalist," says Berkus. "But angel is a good description, too."

That very overlap makes angel a less-than-helpful label for those seeking to raise money. Like the budding venture capitalists of the 1960s, angels have discovered that pooling resources and sharing due diligence make for greater efficiency. Brand-name groups like the Band of Angels have helped legitimize angels as a breed. And harden them. "Nine times out of 10, entrepreneurs are too greedy," says Thomas Barr, who has invested in seven ventures while serving as CEO of HydroLogic Inc., a fast-growing environmental-services business in Asheville, N.C. "They want to keep too much. That turns off an investor more than anything else."

It's that sort of attitude that earned venture capitalists their unaffectionate nickname: vulture capitalists. Angels aren't there yet, but they are bringing new sophistication to every aspect of the deals they do, meaning that the wisest entrepreneurs are learning to perform some serious due diligence of their own. "We think of the classic angel as patient money," says Jeffrey Sohl, director of the Center for Venture Research at the University of New Hampshire, "but some of these investors are looking for a quick turn-around and will destroy the business to get the money out." With so much at stake, it's worth learning the new realities of angel investing.

Angels Who Fall from the Sky May Crush You

CEO DALE VAN AKEN WOULD BE HAPPY not to hear from an angel again anytime soon. "I'm busy," he tells the angels who call him out of the blue. "I'm trying to grow a company. This is a distraction. Go away."

His response -- however bluntly expressed -- is more appropriate than ever. The attention surrounding angel financing has attracted some less-than-reputable figures. Some of them aren't angels at all, as Barney Adams knows. Adams, founder and CEO of Adams Golf, a $ 35-million maker of golf clubs in Plano, Tex., says that he's taken regular calls from would-be investors claiming to represent foreign angels and wealthy-but-reticent families. Asking for cash up front to cover fees, they'll offer to raise angel money for Adams, should his

CONFIDENTIAL

UND 01935

A 243

Inc., February, 1998                                    PAGE    7

                                                                FOCUS

company meet certain requirements. Curious, Adams once played along with some
"angels" who requested $ 50,000 up front, but he held off on sending the check.
Suspicious of the forms the angels asked him to fill out, he played along by
making a counteroffer: I'll double your fee, he said, if you send me the
investors' check first. Not surprisingly, the investors refused, but they
offered to reduce the $ 50,000 to $ 5,000. It was the last time he heard from
them.

   Adams also hears from investors who like to think of themselves as angels.
One such big shot offered to advance Adams a considerable sum just as he was
headed to an important trade show. The local businessman, whom Adams knew only
slightly, encouraged the founder to go, relax, and call him to hash out the
details when he returned. Counting on the money, Adams charged the trip on a
credit card, only to discover when he got back that his would-be benefactor
wouldn't return his calls. The lesson: perfect angels rarely fall from the sky.
They materialize through long-standing relationships.

   In fact, 90 days after that fiasco, Adams hooked up with a former coworker
and fellow entrepreneur who wanted to invest more than $ 250,000, an offer he
felt confident accepting. Sure, a shared history helps. But not everyone is
lucky enough to have sat behind a future angel in grade school. The key is to
recruit investors who understand your industry well, so they won't panic during
a seasonal slump.

   When Dennis Harmon, CEO of Synchronicity Inc., a Marlborough, Mass., company
that builds software for the semiconductor industry, launched a private
placement in early 1996, he and his three cofounders listed 124 people they
believed would make ideal angels. They stuck to former coworkers who had money;
industry executives and salespeople who knew the founders' work history and
could presumably meet the net-asset requirements; past customers; and members of
their network who would bring additional resources, such as advisers and more
investors. Then they called each candidate. Those who didn't flinch at the $
25,000 minimum got a 12-page executive summary and a letter outlining the
investment process. Of the 24 new investors, more than half have their roots in
the semiconductor industry, giving the company lots of helpful connections. One,
a former boss of Harmon's who is now a senior vice-president at a large software
company, has introduced Synchronicity to a customer with whom Harmon hopes to
forge a strategic alliance. "He has a vested interest in hooking us up with the
right people," says Harmon. Another angel introduced the founders to bankers and
venture capitalists.

What Looks Like a Halo at First Could Be a Noose -- Intended for You

   UNDERSTANDABLY, JOSEPH FREEDMAN jumped at the opportunity to accept funding
from three local entrepreneurs for Amicus Legal Staffing Inc., the company he
had founded in 1991. "I was hoping for coaching and mentoring," says Freedman,
who was looking for money to expand in 1993. Active company builders, as opposed
to retired CEOs, could better relate to his problems. As it turned out, they
were far too busy. "Their business took off when mine did," he says.

   Working angels are a relatively new phenomenon, partly spawned by a
proliferation of IPO-enriched CEOs. Pressed for time, such angels are often
inexperienced investors with less tolerance for risk than even they realize.

CONFIDENTIAL

UND 01936

A 244

Inc., February, 1998

Freedman, a law student who probably should have known better, forked over a 65% equity stake in exchange for $ 150,000. For the angels, it turned out to be "a hell of an investment," as Freedman points out. Last year, when the $ 11-million company was scooped up by AccuStaff, a $ 2-billion staffing company, their stake was valued at about $ 13 million, according to Freedman. He doesn't begrudge his angels their hefty return. He actually learned more by doing things himself, he says. But back then, their lack of involvement irked him. "It was frustrating," he says. "I really needed more then money."

Of course, more-experienced entrepreneurs might yearn for an angel who exudes aloofness. What's crucial is to surmise ahead of time whether the kind of angel you've attracted is going to be gratified by providing the help you need. Van Aken was working with three partners to launch his second software venture when there appeared before him an angel offering wisdom (she professed industry knowledge), riches (she invested an amount he would have expected from three angels), and discretion (she promised to forswear second-guessing). But before long, Van Aken says, "her advisory role shifted from a silent investor to a day-to-day role. And that included creating mini-alliances with other partners." Her meddling was not the sole reason Van Aken ultimately hightailed it out of the venture, but he says it did set into motion a series of "political problems" that put him on that course.

Van Aken advises entrepreneurs to contact other companies in which their prospective angels have invested. He also suggests that entrepreneurs and angels set guidelines that clarify each other's roles. "People have needs that aren't necessarily financial," he says. "She wanted a place to play and mess around and have a social setting."

For the most part, angels don't suddenly "turn into devils," as entrepreneur Mike Watts claims. But their motivation for investing needs to be scouted out ahead of time. If it's not, it will likely reveal itself just when it can do the most damage. When Watts and his father, Gerald, founded Professional Resources, a software-programming company in Merriam, Kans., they made a deal with the only investor who would give them money: the certified public accountant of the younger Watts's former secretary. But the terms should have signaled a clue about the angel's reason for participating. Not that the younger Watts was looking that carefully. "I always had this image of an angel with a halo," he admits.

The angel put in $ 20,000 and guaranteed a line of credit of up to $ 75,000, using himself as the bank, according to Watts. He received a 35% stake in the company and was paid a consulting fee, although he didn't provide any additional services, Watts says. The interest on the credit line -- 2 1/2% over prime -- sounded reasonable. But the angel also got 20% interest on every draw against the credit line. The entrepreneurs understood the terms, but what they didn't expect was that the company would grow so quickly. As it did, Watts habitually tapped the expensive line of credit to make payroll, tossing the company into a "death spiral." Eventually, the pair turned to employees and friends, who pitched in $ 30,000 to buy out the angel's equity stake. They then took out a loan of $ 225,000 to pay off the line of credit. "We were trying to expand; he wanted to make sure we weren't spending too much money. We needed to hire; his goal was to make a lot of money," says Watts. Looking back, he issues a single cautionary sentence: "Make sure you have common goals."

CONFIDENTIAL

UND 01937

[error] -- \temp\golf.doc - Jim Holderman - 04/22/96 10:40 AM - Page 31 of 38

Inc., February, 1998                                   PAGE    9

                                                       FOCUS

It's Up to You to Harness Your Angel's Special Powers

   WHEN ROBERT ROGERS JR. SET OUT LAST fall to scare up money for Chesapeake
Center Inc., the health-care service provider he cofounded in 1985, he
interviewed a dozen venture capitalists and angels. His first angel had been an
almost-retired entrepreneur who offered $ 370,000 and plenty of advice. For his
second round of financing, he chose an angel who not only offered $ 3.5 million
but also signed a written commitment to help Rogers meet specific milestones.

   It's tricky placing restraints on someone who is offering to give you money.
But Rogers's contract spells out exactly how and when the angel will help him
with such tasks as negotiating bank loans, checking out candidates for
acquisition, and recruiting senior managers.

   It's incumbent upon entrepreneurs to institute a formal communication system,
especially given the average angel's bulging portfolio. David Spitzman, an angel
investor based in Newport, R.I., wants to receive financial statements on at
least a quarterly basis, supplemented by a phone conversation every couple of
months. He's most irritated, he says, when he suspects he's being placated.
"Inconsistency makes me nervous," he says. Pearl Holforty, CEO of Liberty BIDCO
Investment Corp., an investment firm based in Farmington Hills, Mich., goes a
step further in making life easier for her angels: three times a year, she
invites them to a get-together where they can mingle with representatives of a
company she thinks might interest them.

   Such care and feeding can pay off in unexpected ways, as Joe Boldan knows.
Boldan, CEO of Ex Officio, a $ 12-million travel-apparel company in Seattle,
came to a sobering awareness late on Christmas Eve of 1996: sales weren't
picking up fast enough to enable him to make payroll. The call went out: chief
financial officer Bob Carroll got on the horn with Varro Smith, an angel with
whom the company had a long-standing relationship. Smith, confident that he was
hearing the truth -- he'd always been kept in the loop -- wrote a check for $
125,000 to cover the pay of Ex Officio's 30 employees.

   That kind of 11th-hour rescue could come from only one type of investor.
Distinctions may blur, but one fundamental difference remains: because they are
investing someone else's money, venture capitalists aren't much equipped for
decisive, much less heroic, measures. Angels, no matter how much they've
evolved, are still free to act on their feelings. "It's a great company," says
Smith. "They have integrity." That's about as far as he goes -- or needs to go
-- in explaining his decision to bail Ex Officio out. "He understood what we
were going through, and he agreed to do it on the spot," says Boldan. "That's a
real angel."

GRAPHIC: Illustration, no caption, CYNTHIA VON BUHLER

LANGUAGE: ENGLISH

LOAD-DATE: February 12, 1998

# CONFIDENTIAL

UND 01938

A 246

PAGE    10

FOCUS - 41 OF 104 STORIES

Copyright 1997 Goldhirsh Group, Inc.
Inc.

October, 1997

SECTION: SPECIAL ISSUE: INC. 500; Origins; Pg. 114

LENGTH: 615 words

HEADLINE: Changing Course

BYLINE: Phaedra Hise

BODY:
If your market seems impossible to break into, consider turning your back on
it altogether. It worked for the founder of Adams Golf Inc. (#211). When he
couldn't sell the golf clubs he manufactured, Barney Adams decided to sell a
service instead. Only when he had resigned himself to that did the clubs
themselves actually take off. "Some guy would call and say that he never saw his
friend hit the ball so good," Adams says, "and how could he get one of our
clubs?"

Adams knew he had good clubs back when he started the business, in 1987. But,
like everyone else's, the clubs had to conform to strict design limits, meaning
that "you never get in a position where your product is two or three times
better than someone else's," he notes. With product-performance levels nearly
indistinguishable, image sells. As an unknown making cold calls to distributors,
Adams found himself on the receiving end of lots of clicks. "Nobody would take a
chance on a company that nobody's ever heard of," he says.

Adams was trying to drive into the roughest part of his market: 85% of golf
clubs and other accessories are sold "off-course," in specialty golf and
sportinggoods stores and other retail outlets. That's also where the big
competitors roam, spending up to $ 50 million a year on advertising and
celebrity endorsements. With sales of less than $ 100,000 in those early years,
Adams could hardly compete.

So he didn't. He carried his clubs to the golf course, where a mere 15% of
all clubs and accessories are sold through pro shops. He followed the lead of
one or two small club manufacturers, offering custom-fitted clubs to clients.
Adams traveled the country, setting up fitting sessions on driving ranges and
courses. After analyzing a client's swing, he'd fly back to Plano, Tex., where
his in-house manufacturing team -- early on, it consisted of himself -- could
crank out a set of custom clubs in two to four days. After a year, he started
teaching pro shops how to fit the clubs, and by 1992, annual sales had climbed
to almost $ 300,000.

Although Adams had always had the means to sell his clubs "off-the-shelf," or
individually, "I couldn't give them away," he says. Then, five years after he
had retreated into custom fitting, Adams started getting phone calls. "Within a
few months we went from zero calls to 20 to 30 a week for our Tight Lies club,"
he says. "We had never had calls for a club in our entire existence." The
patented fairway wood is designed to help golfers get balls airborne more
easily, whether from the rough or from a poor fairway position.

CONFIDENTIAL

UND 01939

A 247

Inc., October, 1997

Adams called his managers into an emergency meeting. "I think we have a stand-alone product," he said. "How do we sell it?" Mark Gonsalves, vice-president of sales and marketing, recommended hiring telemarketers to call retail accounts. "But those are the people who call me at home at night and try to sell me things I don't want," argued Adams. Gonsalves won out, explaining that independent sales reps wouldn't devote enough time to the relatively unknown product.

From 1995 to 1996, sales exploded from $ 1 million to $ 3.5 million. At the same time, the custom-fitting business tripled, although it accounted for just 10% of revenues instead of 90%. Adams has landed more than 6,000 retail accounts, and the dozen telemarketers don't get as many hang-ups.

This past spring, Adams debuted a 30-minute infomercial chock-full of celebrity endorsements. "Carol Mann, in the Ladies Professional Golf Association Hall of Fame, asked us if she could be in the show," says Adams. Sales are projected to hit $ 30 million by the end of 1997. Finally, Adams Golf is driving with the big boys.

GRAPHIC: Photograph, BARNEY ADAMS, DAN BRYANT

LANGUAGE: ENGLISH

LOAD-DATE: October 28, 1997

CONFIDENTIAL

UND 01940

A 248

Received:  4/ 1/98  1:20PM;                972 424 0721  -> LEHMAN BROTHERS;  Page 1
APR-01-1998  15:04          ADAMS GOLF                    972 424 0721   P.01/23

2901 Summit Avenue, Suite 100
Plano, Texas 75074 USA
Phone: 572-422-7050 Fax: 572-424-0721





| To: | Sameet Mehta | From: | Mark D. Gonsalves |
|-----|--------------|-------|-------------------|
| Fax: | 415-274-5381 | Pages: | 3, including this one. |
| Phone: | 415-274-5389 | Date: | 04/01/98 |
| Re: | Top 10 Account List | CC: | Jim Farrell |

As Requested.

Dear Sameet,

Enclosed, please find the listing of our top accounts. I have not talked with each one directly, but have left voice mail for the individuals I did not reach prefacing your call. They should all provide you what you need.

Let me know if I can be of further help.

Best regards,

Mark D. Gonsalves
Vice President
Sales & Marketing

EXHIBIT
260

CONFIDENTIAL

UND 05262

A 249

Received:  4/ 1/98  1:20PM;              972 424 0721 -> LEHMAN BROTHERS;  Page 2
APR-01-1998  15:04        ADAMS GOLF                        972 424 0721   P.02/03

Top 10 Customer List for Lehman Bros.

1.  Edwin Watts- President & Owner
    Edwin Watts Golf Shops
    20 Hill Avenue
    Fort Walton Beach, FL 32548
    800-874-0146 x103

2.  Craig Johnson- VP of Merchandising
    Golfsmith International
    11000 N. IH-35
    Austin, TX 78753
    512-837-8810

3.  John McGregor- VP of Golf Merchandising
    Golf Day
    135 American Legion Hwy
    Revere, MA 02131
    781-853-0900 x2318

4.  Gene McMasters- Director of Retail Sales
    Family Golf Centers, Inc.
    225 Broadhollow Rd., Ste. # 106E
    Melville, NY 11747
    516-694-1666 x31

5.  Butch Marman- VP of Sales
    Golf Discount of St. Peters
    4100 Mid Rivers Mall Drive
    St. Peters, MO 63376
    314-939-4283

6.  Craig McCallister- Owner
    World Wide Golf Enterprises
    26382 Carmel Rancho Lane
    Carmel, CA 93923
    408-624-3160 x101

7.  Jack London- Chairman of the Board
    Pro Golf of America
    Home Office: 2342 Vallecitos
    La Jolla, CA 90237
    619-459-0241

CONFIDENTIAL

UND 05263

A 250

8.    Henry Lange- VP of Sales
      Somerton Springs, Inc.
      48 Vincent Circle, Unit D
      Ivyland, PA 18974
      215-956-2460 x

9.    Joe Beauseigneur- Merchandising Manager
      Dick's Sporting Goods
      400 Fairway Drive
      Coraopolis, PA 15108
      412-269-4516 x3137

10.   Pete Carlson- Owner
      Pete Carlson's Golf & Tennis
      73-741 Hwy 111
      Palm Desert, CA 92260
      760-568-3263

CONFIDENTIAL

UND 05264

A 251

I-A(e) Revenue breakdown by
sales channel/geography

CONFIDENTIAL

UND 04389

A 252

I-A(c)-Business

**ADAMS GOLF, INC.**
Sales by Department
For the Year Ended December 31, 1995

| | Sales Dollars | |
|---|---|---|
| | Sales Dollars | % of Total |
| Wholesale | $ - | 0.0% |
| Custom Filling | 1,125,115 | 100.0% |
| International | - | 0.0% |
| | $ 1,125,115 | 100.0% |

Due Diligence Package-Complete/Sales by Dept 1995   4/5/98   1:10 PM

CONFIDENTIAL

UND 04390

A 253

**ADAMS GOLF, INC.**
Sales by Department
For the Year Ended December 31, 1996

|  | Sales Dollars | |
| --- | --- | --- |
|  | Sales Dollars | % of Total |
| Wholesale | $ 2,778,198 | 78.8% |
| Custom Fitting | 97,452 | 2.8% |
| International | 647,873 | 18.4% |
|  | $ 3,523,523 | 100.0% |

CONFIDENTIAL

I-A(c)-Business

Due Diligence Package-Complete/Sales by Dept 1996    4/5/98    2:57 PM

UND 04391

A 254

**ADAMS GOLF, INC.**
Sales by Department
For the Periods Indicated

| | Sales Dollars | | | | Units | | | |
| | YTD 1997 | | YTD Thru 2/28 | | YTD 1997 | | YTD Thru 2/28 | |
| | Sales Dollars | % of Total | Sales Dollars | % of Total | Units | Avg Price Per Unit | Units | Avg Price Per Unit |
|---|---|---|---|---|---|---|---|---|
| Wholesale | $ 25,352,838 | 65.9% | $ 10,763,432 | 77.3% | 208,728 | 121 | 84,544 | $127 |
| Direct Response | 10,707,359 | 27.8% | 2,189,188 | 15.7% | 61,363 | 174 | 12,256 | 179 |
| Custom Fitting | 1,559,375 | 4.1% | 385,974 | 2.6% | 12,707 | 123 | 3,141 | 117 |
| International | 878,666 | 2.3% | 613,277 | 4.4% | 7,611 | 115 | 6,579 | 93 |
| | $ 38,498,238 | 100.0% | $ 13,931,871 | 100.0% | 290,409 | 133 | 106,519 | $131 |

Due Diligence Package-Complete\Sales by Dept 1997 & 1998    4/3/98    12:56 PM

I-A(c)-Business

CONFIDENTIAL

UND 04392

A 255

**ADAMS GOLF, INC.**
Sales By Geographic Area
Year Ended December 31, 1995

| State | Gross Sales | % of Total Sales |
|---|---|---|
| California | 171,550 | 15.2% |
| Florida | 136,689 | 12.1% |
| Texas | 85,162 | 7.6% |
| New York | 67,651 | 6.0% |
| Pennsylvania | 50,560 | 4.5% |
| North Carolina | 49,104 | 4.4% |
| Georgia | 41,378 | 3.7% |
| New Jersey | 41,359 | 3.7% |
| Michigan | 39,400 | 3.5% |
| Ohio | 38,555 | 3.4% |
| All Other States | 403,708 | 35.9% |
| Subtotal | 1,125,115 | 100.0% |
| Foreign Sales | — | 0.0% |
| Total | 1,125,115 | 100.0% |

I-A(c)-Business

Due Dilligence Package-Complete/1995 by State.    4/5/98    3:07 PM

CONFIDENTIAL

UND 04393

A 256

**ADAMS GOLF, INC.**
Sales By Geographic Area
Year Ended December 31, 1996

| State | Gross Sales | % of Total Sales |
|---|---|---|
| California | 438,458 | 12.4% |
| Florida | 349,360 | 9.9% |
| Texas | 217,663 | 6.2% |
| New York | 172,907 | 4.9% |
| Pennsylvania | 129,224 | 3.7% |
| North Carolina | 125,503 | 3.6% |
| Georgia | 105,757 | 3.0% |
| New Jersey | 105,709 | 3.0% |
| Michigan | 100,700 | 2.9% |
| Ohio | 98,541 | 2.8% |
| All Other States | 1,031,827 | 29.3% |
| Subtotal | 2,875,650 | 81.6% |
| Foreign Sales | 647,873 | 18.4% |
| Total | 3,523,523 | 100.0% |

I-A(e) Business

Due Diligence Package-Complete/1996 by State    4/5/08    3:05 PM

CONFIDENTIAL

UND 04394

A 257

**ADAMS GOLF, INC.**
Sales By Geographic Area
Year Ended December 31, 1997

| State | Gross Sales | % of Total Sales |
|-------|------------:|------:|
| California | 5,735,965 | 14.9% |
| Florida | 4,570,374 | 11.9% |
| Texas | 2,847,491 | 7.4% |
| New York | 2,261,992 | 5.9% |
| Pennsylvania | 1,690,518 | 4.4% |
| North Carolina | 1,641,843 | 4.3% |
| Georgia | 1,383,527 | 3.6% |
| New Jersey | 1,382,894 | 3.6% |
| Michigan | 1,317,375 | 3.4% |
| Ohio | 1,289,132 | 3.3% |
| All Other States | 13,498,460 | 35.1% |
| Subtotal | 37,619,572 | 97.7% |
| Foreign Sales | 878,666 | 2.3% |
| Total | 38,498,238 | 100.0% |

Due Dilligence Package-Complete/1997 by State   4/5/98   3:12 PM

I-A(c)-Business

CONFIDENTIAL

UND 04395

A 258

# Cooley Godward LLP

ATTORNEYS AT LAW

One Maritime Plaza
20th Floor
San Francisco, CA
94111-3580
Main    415 693-2000
Fax    415 951-3699

www.cooley.com

STEVEN R. HARMON
415 693-2141
harmonsr@cooley.com

Palo Alto, CA
650 843-5000

Menlo Park, CA
650 843-5000

San Diego, CA
619 550-6000

Boulder, CO
303 546-4000

Denver, CO
303 606-4800

April 8, 1998

VIA HAND DELIVERY/OVERNIGHT COURIER.

Sameet S. Mehta
Lehman Brothers
555 California Street,
30th Floor
San Francisco, CA
94104

Jeff Mills
NationsBanc Montgomery
Securities LLC
600 Montgomery Street
San Francisco, CA  94111

Courtney Tuttle
NationsBanc
Montgomery Securities
LLC
9 West 57th Street
New York, NY  10019

Steven L. Shea
Ferris, Baker Watts, Inc.
100 Light Street
Baltimore, MD  21202

Re:    Adams Golf, Inc.

Ladies/Gentlemen:

Enclosed for your review please find copies of certain due diligence materials with respect to Adams Golf, Inc. provided by Arter & Hadden LLP. In addition, I have enclosed the itemized list of such materials, which has been prepared by Arter & Hadden. As we receive additional materials, we will forward them to you.

If you have any questions or comments, please feel free to contact me at the number referenced above.

Very truly yours,

Steven R. Harmon

Steven R. Harmon

Enclosures

cc:    Richard S. Jasen (w/o encl.)

211987 v1/SF
4JX01!.DOC


Δπ EXHIBIT  155
Deponent _____
Date 5/17/06 Rptr. dp

UND 06283

A 259

## DUE DILIGENCE LISTS

Business Due Diligence

Item No.                    Item

I-A          (Articles of Incorporation and Bylaws)

- Certificate of Incorporation of Adams Golf, Inc., together with amendments thereto

- Certificate of Incorporation of Adams Golf IP Corp., together with amendments thereto

- Certificate of Incorporation of Adams Golf Holding Corp.

- Certificate of Incorporation of Adams Golf GP Corp.

- Certificate of Limited Partnership of Adams Golf IP, L.P.

- Certificate of Limited Partnership of Adams Golf Direct Response, Ltd.

- Certificate of Limited Partnership of Adams Golf IP, Ltd.

- Certificate of Limited Partnership of Adams Golf, Ltd.

- Bylaws of Adams Golf, Inc.

- Bylaws of Adams Golf GP Corp.

- Bylaws of Adams Golf Holding Corp.

- Bylaws of Adams Golf Management Corp.

- Bylaws of Adams Golf IP Corp.

- Bylaws of Adams Golf Holding Corp.

(Updated Shareholder Holdings Profile)

- Adams Golf, Inc. Capitalization as of 1/31/98

- Adams Golf, Inc. Capitalization as of 12/31/97

(Organizational Chart)

- Organizational Chart

PE274.1
691651181294

UND 06284

A 260

(Benefit Plan Summaries)

- Employee Benefit Plans

(Bank Loan Agreements)

- Revolving Credit Agreement

- Continuing and Unconditional Guaranty

- Security Agreement and Financing Statements executed by Adams Golf, Ltd.

- Security Agreement and Financing Statements executed by Adams Golf Direct Response, Ltd.

- Security Agreement and Financing Statements executed by Adams Golf, Inc.

- Security Agreement and Financing Statements executed by Adams Golf Holding Corp.

- Security Agreement and Financing Statements executed by Adams Golf Management Corp.

- Security Agreement and Financing Statements executed by Adams Golf GP Corp.

- Security Agreement and Financing Statements executed by Adams Golf IP, LP

I-C    (Financial Projections)

- Adams Golf, Ltd., Schedule of Assets and Liabilities Received from Adams Golf, Inc., 12/31/97

- Adams Golf Direct Response, Ltd., Schedule of Assets and Liabilities Received from Adams Golf, Inc., 12/31/97

- Adams Golf IP, L.P., Schedule of Assets and Liabilities Received from Adams Golf, Inc., 12/31/97

- Adams Golf, Inc., Schedule of Assets and Equity Remaining on Books, 12/31/97

2.

UND 06285

A 261

V-J    (Patents/Trademarks)

- Adams Golf Patents, Trademarks and Logos

- Assignment of Marks (4)

- Assignment of Patents (2)

X    (Stock Option Plans)

- Stock Option Summary

- Adams Golf, Inc. 1998 Stock Incentive Plan

- 1996 Stock Option Plan of Adams Golf, Inc.

(Stock Purchase Agreements, Buy/Sell Agreements)

- Stock Purchase Agreements by and between Adams Golf, Inc. and the following persons:

  Clyde Smith And Peggy Smith, together with Amendment to Stock Purchase Agreement

  Finis Conner

  Royal Holding Company, Inc.

  Ronald E. Casati

  B. H. Adams, Supershafts, Inc. and Royal Producing Corp.

  Supershafts, Inc. and Royal Producing Corp.

  Finis Conner

  Kim Calhoun

- Termination of Shareholders Agreement with respect to Adams Golf, Inc. Shareholders' Agreement

- Shareholders' Agreement with respect to Adams Golf, Inc.

- Waiver of Preemptive Rights (2)

3.

UND 06286

A 262

- Waiver of Rights of First Refusal (2)

(Partnership Agreements)

- Capital Contribution Agreement, by and among Adams Golf, Inc., Adams Golf GP Corp., Adams Golf Holding Corp., and Adams Golf IP, Ltd.

- Capital Contribution Agreement, by and among Adams Golf, Inc., Adams Golf GP Corp., Adams Golf Holding Corp., and Adams Golf Direct Response, Ltd.

- Capital Contribution Agreement, by and among Adams Golf, Inc., Adams Golf GP Corp., Adams Golf Holding Corp. and Adams Golf, Ltd.

- Agreement of Limited Partnership of Adams Golf, Ltd.

- Agreement of Limited Partnership of Adams Golf Direct Response, Ltd.

- Agreement of Limited Partnership of Adams Golf IP, L.P.

- Agreement of Limited Partnership of Adams Golf IP, Ltd.

(Other Significant Contractual Relationships)

- Commercial Lease Agreement

- Management Agreement, by and between Adams Golf Direct Response, Ltd. and Adams Golf Management Corp.

- Management Agreement, by and between Adams Golf, Ltd. and Adams Golf Management Corp.

4.

UND 06287

A 263

# Cooley Godward LLP

ATTORNEYS AT LAW

One Maritime Plaza
20th Floor
San Francisco, CA
94111-3580
Main    415 693-2000
Fax      415 951-3699

www.cooley.com

STEVEN R. HARMON
415 693-2141
harmonsr@cooley.com

Palo Alto, CA
650 843-5000

Menlo Park, CA
650 843-5000

San Diego, CA
619 550-6000

Boulder, CO
303 546-4000

Denver, CO
303 606-4800

April 8, 1998

VIA HAND DELIVERY/OVERNIGHT COURIER

Sameet S. Mehta
Lehman Brothers
555 California Street,
30th Floor
San Francisco, CA
94104

Jeff Mills
NationsBanc Montgomery
Securities LLC
600 Montgomery Street
San Francisco, CA  94111

Courtney Tuttle
NationsBanc
Montgomery Securities
LLC
9 West 57th Street
New York, NY 10019

Steven L. Shea
Ferris, Baker Watts, Inc.
100 Light Street
Baltimore, MD  21202

Re:    Adams Golf, Inc.

Ladies/Gentlemen:

Enclosed for your review please find a second shipment of certain due diligence materials with respect to Adams Golf, Inc. provided by Arter & Hadden LLP. In addition, I have enclosed the itemized list of such materials, which has been prepared by Arter & Hadden. As we receive additional materials, we will forward them to you.

If you have any questions or comments, please feel free to contact me at the number referenced above.

Very truly yours,

Steve Harmon

Steven R. Harmon

Enclosures

cc:    Richard S. Jasen (w/o encl.)

216502 v1/SF
4nly01!.DOC

EXHIBIT 156

Deponent
Date 5/11/06 Rptr.

CONFIDENTIAL

UND 04380

A 264

# DUE DILIGENCE LISTS

## Business Due Diligence

| Item No. | Item |
| --- | --- |
| I-A(b) | • Sales breakdown by product for years ended December 31, 1995 - 1997 |
| I-A(c) | • Sale by geographical area for the years ended December 31, 1995 - 1997 |
| | • Sales by department for the years ended December 31, 1995 - 1997 and for the period ended February 28, 1998 |
| I-A(e) | • Backorders as of April 2, 1998 |
| I-A | (Auditor's Management Letters) |

* Letter, dated February 9, 1998, from KPMG Peat Marwick LLP to Board of Directors of Adams Golf, Inc. regarding internal control.

(Facilities Layouts, Descriptions and Photographs)

* Adams Golf Seating Plan

* Photographs of the Facilities.

(Organizational Chart and Departmental Headcounts)

* Adams Golf, Inc. Departmental Organizational Chart

* Adams Golf, Inc. Functional Organization Chart

(Product Brochures and/or Marketing Material)

* Previously provided to underwriters

(Key Management Resumes)

* Adams Golf, Inc. staff biographies for the following persons:

Byron H. Adams

Richard H. Murtland

Mark D. Gonsalves

James E. Farrell

397251.1
69160032234

CONFIDENTIAL

UND 04381

A 265

Cindy A. Herrington

Stephen P. Sanazaro

Walter G. DeVault

Bob Bush

Mary Beth Lacy

Michael M. Carroll

(Labor Contracts and Employee Agreements with key officers)

- Consulting terms of Michael M. Carroll
- B.H. Adams Employment Agreement

(Bank Loan Agreements)

- Closing Binder containing loan documents with respect to a $10,000,000 Revolving Credit Loan from NationsBank of Texas, N.A.

I-C    (Financial Projections)

- Financial projections for 1998 quarters
- Financial projections (conservative) for years ended December 31, 1998 - 2002

II-B    (Top 15 Customers)

- Top 10 customers by sales

V-B    (Financial Review)

- Adams Golf, Inc. Balance Sheets December 31, 1997 and 1996

V-C    (Revenue Recognition Policy)

- Revenue Recognition Policy

V-E    (Inventory Analysis)

- Inventory trend as of February 28, 1998

V-F    (Receivables Analysis)

94751.1
69168\80294

2.

CONFIDENTIAL

UND 04382

A 266

- Summary of aged accounts receivable from September 1997 through February 1998

- Receivables management

- Receivables allowance policy and analysis as of March 31, 1998

V-G   (Fixed Asset Analysis)

- Fixed Asset Analysis for the month ended December 1997

VI-A   (Significant Production Equipment)

- Significant Production Equipment for the month ended February 28, 1998

VI-B   (List of Key Suppliers)

- Major suppliers, distributors and manufacturers for the month ended February 28, 1998

VII-B   (Management Quality Assessments)

- Management Quality Assessments for the month ended February 28, 1998

VIII-A   (Other Fringe Benefits)

- Hourly and salarized employees fringe benefits for the month ended February 28, 1998

X   (Professional Relationships)

- Professional Relationships as of March 31, 1998

(List of any Outstanding Legal Claims/Issues Regarding Intellectual Property)

- Settlement documents with regard to *Adams Golf, Inc. v. Tad Moore Golf, Inc.*

(Press Releases Since January 1, 1997)

- Press Releases dated: 02/20/98, 12/22/97, 4/16/97, 4/14/97, undated, 11/3/97, 10/6/97, 9/26/97, 12/19/97, 10/16/97, 2/20/98, 3/3/98, and 3/23/98

(Other Significant Contractual Relationships)

557551.3
091614432294

3.

CONFIDENTIAL

UND 04383

A 267

- Agreement, dated October 21, 1996, by and between Adams Golf, Inc. and Bill Rodgers

- Agreement, dated October 24, 1996, by and between Adams Golf, Inc. and Jack Whitiker Enterprises F/S/O

- Agreement, dated November 15, 1996, by and between Adams Golf, Inc. and Gibby Gilbert

- Infommercial Agreement, dated October 1, 1996, by and between Adams Golf, Inc. and Carol Mann, Inc.

- Infommerical Agreement, dated October 1, 1996, by and between Adams Golf, Inc. and Hank Haney

- Campaign Management Agreement, dated September 26, 1996, by and between Script To Screen, Inc. and Adams Golf

- Production Agreement, dated September 26, 1996, by and between Script To Screen, Inc. and Adams Golf

- Policy with Chubb Group of Insurance Companies for Adams Golf, Inc.

- Life Insurance policies for D. H. Adams with the Old Line Life Insurance Company of America (2)

5775L3
6716N3252N

4.

CONFIDENTIAL

UND 04384

A 268

# LEHMAN BROTHERS

### FACSIMILE

| | |
|---|---|
| **DATE:** April 8, 1998 | **PAGES (INCLUDING COVER):** 7 |

**TO:**    Charles Place
Vice President
Ferris, Baker Watts, Inc.
(410) 659-4657 (Direct Phone Number)
(410) 659-4632 (Fax Number)

**FROM:**    Sameet Mehta
Investment Banking
(415) 274-5389 (Direct Phone Number)
(415) 274-5381 (Fax Number)

**MESSAGE:**

Charles,

Attached are the materials needed to make the customer due diligence calls for Adams Golf. We plan to split up the list as follows: Lehman will call customers 1-4, Montgomery calls customers 5-7 and Ferris, Baker calls customers 8-10.

After the calls are made, we can consolidate our notes and have for each customer a completed questionnaire. Feel free to call me if you have any questions.

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

LEHMAN BROTHERS
555 CALIFORNIA STREET  30TH FLOOR  SAN FRANCISCO, CALIFORNIA 94104  TELEPHONE (415) 274-5700  FACSIMILE (415) 274-5701

## CONFIDENTIAL



UND 00292

A 269

Received:   4/ 1/99  1:20PM;              972 424 8721 -> LEHMAN BROTHERS;  Page 2;
APR-01-1999  15:04         ADAMS GOLF                      972 424 8721    P.02/03

Top 10 Customer List for Lehman Bros.

1. Edwin Watts- President & Owner
   Edwin Watts Golf Shops
   20 Hill Avenue
   Fort Walton Beach, FL 32548
   800-874-0146 x103

2. Craig Johnson- VP of Merchandising
   Golfsmith International
   11000 N. IH-35
   Austin, TX 78753
   512-837-8810

3. John McGregor- VP of Golf Merchandising
   Golf Day
   135 American Legion Hwy
   Revere, MA 02131
   781-853-0900 x2318

4. Gene McMasters- Director of Retail Sales
   Family Golf Centers, Inc.
   225 Broadhollow Rd., Ste. # 106E
   Melville, NY 11747
   516-694-1666 x31

5. Butch Marman- VP of Sales
   Golf Discount of St. Peters
   4100 Mid Rivers Mall Drive
   St. Peters, MO 63376
   314-939-4283

6. Craig McCallister- Owner
   World Wide Golf Enterprises
   26362 Carmel Rancho Lane
   Carmel, CA 93923
   408-624-3160 x101

7. Jack London- Chairman of the Board
   Pro Golf of America
   Home Office: 2342 Vallecitos
   La Jolla, CA 90237
   619-459-0241



# CONFIDENTIAL

UND 00293

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

| Customer Name | Contact Name | Interviewer Name | Date |
|---|---|---|---|

1) For how long have you been doing business with Adams Golf?

2) What is your role and title at your company?

3) Which golf clubs does your company purchase from Adams Golf?  At what price do you sell them?

| | Price |
|---|---|
| ☐ Tight Lies | _____ |
| ☐ Tight Lies #3 | _____ |
| ☐ Tight Lies #5 | _____ |
| ☐ Tight Lies #7 | _____ |
| ☐ Air Assault Drivers | _____ |
| ☐ Assault$^{VMI}$ Irons | _____ |
| ☐ Assault$^{VMI}$ Putters | _____ |

## CONFIDENTIAL   - 1 -

UND 00294

## *Adams Golf, Inc.*
### *Customer Due Diligence Questionnaire*

4) Approximate your annual dollar volume of Adams Golf club sales. Do you expect business to increase during the next one and two years?

5) Based on your industry knowledge, how does the growth of Adams Golf compare to that of other golf companies you've seen?

6) Are customers pre-disposed to purchasing the Adams Golf clubs or do you find yourself having to introduce and describe the club to customers?

CONFIDENTIAL   -2-

### *Adams Golf, Inc.*
### *Customer Due Diligence Questionnaire*

7) Are fairway woods a growing part of your business?  Is Adams Golf selling the most units of fairway woods?

8) Do you think Adams Golf will have the ability to develop new products which customers will be pre-disposed to consider buying?

9) What are your impressions of Adams Golf's direct response channel (1-800-number)? Do you see the 1-800-number as a source of competition?

CONFIDENTIAL          - 3 -

UND 00296

A 273

### Adams Golf, Inc.
### Customer Due Diligence Questionnaire

10) How do you rank the Adams Golf clubs versus its competitors – better, worse or the same?

11) Are you satisfied with the service Adams Golf provides to you? How might it improve?

12) Do you expect to continue doing business with Adams Golf?

13) Are there any other issues (legal, contractual or otherwise) which you feel are important?

CONFIDENTIAL      - 4 -

UND 00297

A 274



# *MEETING AGENDA*

**Time:**      *Monday, April 13, 1998 at 11:30 am*
**Location:**   *2801 East Plano Parkway, Plano, Texas*
**Subject:**    *Meeting with Equity Research Analysts*
**Attendees:**

| **Adams Golf** | **Lehman Brothers** | **Nationsbank Montgomery** | **Ferris, Baker Watts** |
|---|---|---|---|
| Barney Adams | Bernie Picchi | John Weiss | Joe Teklits |
| Darl Hatfield | Brian Lantier | Richard Leza | |
| Jim Farrell | Patrick Walravens | | |

**Discussion Topics:**

Financial Review:

- Three Year Historical Financial and Operating Data
  - — Breakdown of components of revenues and expenses by product
  - — Revenue breakdown by sales channel/geography
    - Green Grass/Off Course/Telemarketing

- Product Introduction Plans
  - — Timing, Types of Clubs, Differentiated?

- Financial projections (quarterly for FY 1998 and 1999 and annually for 1998 to 2002, including income statements, balance sheets and cash flow statements)
  - — Revenue breakdown by club type or shaft type
  - — Distribution channel (current structure and trends)
  - — Gross Margin and Pricing Trends
  - — Expansion of Overhead (staff, etc)
  - — Advertising – Infomercials, Print
  - — Distribution channel
  - — R&D expenses

---

**LEHMAN BROTHERS**                    1

CONFIDENTIAL

UND 010409

A 275

Business Review

- Comparative Product Analysis
  - (Advantages and Disadvantages)
- Fairway wood market size and Adams' share
- Industry Capacity (in terms of clubs)    Our estimate ▪
- Position versus competitors
- Pricing Strategy
- Customers
- Revenue Analysis
  - Direct response, Traditional, Other
  - Do you have repeat end-customers? (Recurring Revenues)
    - Repeat wholesale customers
- Other
  - Supply Chain Management
  - Competitors' New Products/Knock-offs
  - Weather, Foreign currency impacts
  - Products Under Development
  - Product Acquisition Opportunities
  - Description of the Sales Process
  - Sales Channels
    - Pricing Terms (Steel $105/Graphite $144)
    - Discount and Allowance Policy
  - Advertising Philosophy
  - Revenue Recognition Policies
  - Major Accounting/HR/Telecom Systems
- Staff
  - Hourly and Salaried Employees
  - Productivity Measurements
  - Turnover Statistics
  - Post-Offering: Threat of union

---

LEHMAN BROTHERS                    2

CONFIDENTIAL

UND 010410

A 276

Projections

CONFIDENTIAL

UND 05443

A 277

**ADAMS GOLF, INC.**
April 13, 1998

Schedule

1.   3 Year Statement of Operations for the Years Ended December 31, 1997, 1996, 1995

2.   1997 Revenues by Department by Quarter

3.   5 Year Annual Financial Projections

4.   1998 Financial Projections by Quarter

5.   1999 Financial Projections by Quarter

6.   1998 Revenue Forecast by Department by Quarter

7.   1999 Revenue Forecast by Department by Quarter

8.   1998 Headcount

CONFIDENTIAL

UND 05444

A 278

2

## ADAMS GOLF, INC.

TOO @

Statements of Operations

Years ended December 31, 1997, 1996 and 1995

|  | 1997 | 1996 | 1995 |
|---|---|---|---|
| Net sales | $ 36,690,090 | 3,521,788 | 1,125,115 |
| Cost of goods sold | 9,991,132 | 1,589,696 | 756,400 |
| Gross profit | 26,698,958 | 1,932,092 | 368,715 |
| **Operating expenses:** |  |  |  |
| Research and development expenses | 557,513 | 51,101 | 18,516 |
| Selling and royalty expenses | 13,095,174 | 625,897 | 312,785 |
| General and administrative expenses: |  |  |  |
| Stock compensation and bonus award (note 9) | 8,491,711 | 213,760 | — |
| Provision for bad debts | 738,805 | 51,306 | 12,791 |
| Other | 1,436,995 | 981,219 | 268,518 |
| Total operating expenses | 24,318,198 | 1,923,283 | 612,610 |
| Operating profit (loss) | 2,380,760 | 8,809 | (243,895) |
| **Other income (expense):** |  |  |  |
| Interest income | 15,525 | 3,938 | 1,226 |
| Interest expense | (69,731) | — | — |
| Other | (47,808) | — | — |
| Income (loss) before income taxes | 2,278,546 | 12,747 | (242,669) |
| Income tax expense (note 8) | 582,763 | — | — |
| Net income (loss) | $ 1,695,783 | 12,747 | (242,669) |
| Income (loss) per common share: |  |  |  |
| Basic | $ .27 | .00 | (.11) |
| Diluted | $ .26 | .00 | (.11) |

See accompanying notes to financial statements.

CONFIDENTIAL

UND 05445

A 279

4/13/06 10:43 AM

③

**Revenue By Department**
**1997 Actual**
**($ in millions)**

| Net Sales | 1 Qtr. 1997 | % of Total | 2 Qtr. 1997 | % of Total | 3 Qtr. 1997 | % of Total | 4 Qtr. 1997 | % of Total | Total 1997 | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Inside Sales | $1.2 | 80.0% | $2.1 | 51.2% | $9.0 | 62.5% | $12.5 | 74.9% | $24.8 | 67.6% |
| Direct Response/Call Center/Customer Service | 0.0 | 0.0% | 1.3 | 31.7% | 4.8 | 33.3% | 3.4 | 20.4% | 9.3 | 25.9% |
| Custom Fitting | 0.2 | 13.3% | 0.5 | 12.2% | 0.5 | 3.5% | 0.4 | 2.4% | 1.6 | 4.4% |
| International | 0.1 | 6.7% | 0.2 | 4.9% | 0.1 | 0.7% | 0.4 | 2.4% | 0.8 | 2.2% |
| Total | $1.5 | 100.0% | $4.1 | 100.0% | $14.4 | 100.0% | $16.7 | 100.0% | $36.7 | 100.0% |

Rev Show A

Handout

CONFIDENTIAL

UND 05446

A 280

ADAMS GOLF, INC.
Financial Projections
Years Ended December 31, 1998, 1999, 2000, 2001 and 2002
($ in millions)

| | 1998 | % of Sales | 1999 | % of Sales | 2000 | % of Sales | 2001 | % of Sales | 2002 | % of Sales |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales - Domestic | $94.8 | 94.8% | $150.0 | 90.9% | $225.0 | 86.9% | $285.0 | 83.8% | $375.0 | 81.5% |
| Net Sales - Foreign | 5.2 | 5.2% | 15.0 | 9.1% | 34.0 | 13.1% | 55.0 | 16.2% | 85.0 | 18.5% |
| **Total Net Sales** | 100.0 | 100.0% | 165.0 | 100.0% | 259.0 | 100.0% | 340.0 | 100.0% | 460.0 | 100.0% |
| Cost of Goods Sold | 29.0 | 29.0% | 47.8 | 29.0% | 75.1 | 29.0% | 98.6 | 29.0% | 133.4 | 29.0% |
| Gross Margin | 71.0 | 71.0% | 117.2 | 71.0% | 183.9 | 71.0% | 241.4 | 71.0% | 326.6 | 71.0% |
| Selling Expenses | 28.5 | 28.5% | 46.1 | 27.9% | 72.3 | 27.9% | 94.9 | 27.9% | 128.4 | 27.9% |
| General and Administrative Expenses | 15.2 | 15.2% | 22.3 | 13.5% | 35.0 | 13.5% | 45.9 | 13.5% | 62.0 | 13.5% |
| Research and Development Expenses | 1.3 | 1.3% | 2.6 | 1.6% | 4.1 | 1.6% | 5.4 | 1.6% | 7.4 | 1.6% |
| Total Expenses | 43.0 | 43.0% | 71.0 | 43.0% | 111.4 | 43.0% | 146.2 | 43.0% | 197.8 | 43.0% |
| Operating Margin | 28.0 | 28.0% | 46.2 | 28.0% | 72.5 | 28.0% | 95.2 | 28.0% | 128.8 | 28.0% |
| Taxes, Effective Tax Rate 36% | 10.1 | 10.1% | 16.5 | 10.0% | 26.1 | 10.1% | 34.3 | 10.1% | 46.4 | 10.1% |
| Net Income | $17.9 | 17.9% | $29.7 | 18.0% | $46.4 | 17.9% | $60.9 | 17.9% | $82.4 | 17.9% |
| Revenue Growth Percentage | | 172% | | 65.0% | | 57.0% | | 31.3% | | 35.3% |

Rev Shaw

Handout

(4)

CONFIDENTIAL

UND 05447

A 281

**ADAMS GOLF, INC.**
1998 Financial Projections
For the periods indicated
($ In millions)

| | Actual 1 Qtr. 1998 | % of Sales | Budget 2 Qtr. 1998 | % of Sales | Budget 3 Qtr. 1998 | % of Sales | Budget 4 Qtr. 1998 | % of Sales | Total 1998 | % of Sales |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales - Domestic | $23.3 | 95.1% | $26.6 | 85.7% | $24.2 | 94.9% | $20.9 | 94.1% | $95.0 | 95.0% |
| Net Sales - Foreign | 1.2 | 4.9% | 1.2 | 4.3% | 1.3 | 5.1% | 1.3 | 5.9% | 5.0 | 5.0% |
| Total Net Sales | 24.5 | 100.0% | 27.8 | 100.0% | 25.5 | 100.0% | 22.2 | 100.0% | 100.0 | 100.0% |
| Cost of Goods Sold | 5.9 | 24.1% | 8.8 | 31.7% | 7.9 | 31.0% | 6.4 | 28.8% | 29.0 | 29.0% |
| Gross Margin | 18.6 | 75.9% | 19.0 | 68.3% | 17.6 | 69.0% | 15.8 | 71.2% | 71.0 | 71.0% |
| | | | | | | | | | | |
| Selling Expenses | 6.2 | 25.3% | 7.3 | 26.3% | 7.9 | 31.0% | 5.1 | 23.0% | 26.5 | 26.5% |
| General and Administrative Expenses | 3.6 | 14.7% | 4.1 | 14.7% | 3.8 | 14.9% | 3.7 | 16.7% | 15.2 | 15.2% |
| Research and Development Expenses | 0.1 | 0.4% | 0.5 | 1.8% | 0.4 | 1.6% | 0.3 | 1.4% | 1.3 | 1.3% |
| Total Expenses | 9.9 | 40.4% | 11.9 | 42.8% | 12.1 | 47.5% | 8.1 | 41.0% | 43.0 | 43.0% |
| | | | | | | | | | | |
| Operating Margin | 8.7 | 35.5% | 7.1 | 25.5% | 5.5 | 21.6% | 6.7 | 30.2% | 28.0 | 28.0% |
| | | | | | | | | | | |
| Taxes, Effective Rate 36% | 3.1 | 12.8% | 2.6 | 9.2% | 2.0 | 7.8% | 2.4 | 10.9% | 10.1 | 10.1% |
| | | | | | | | | | | |
| Net Income | $5.6 | 22.7% | $4.5 | 16.3% | $3.5 | 13.8% | $4.3 | 19.3% | $17.9 | 17.9% |
| | | | | | | | | | | |
| Percent Revenue Growth vs. Same Period Prior Year | 1650.0% | | 561.9% | | 77.1% | | 32.9% | | 172.5% | |
| | | | | | | | | | | |
| **Unit Sales** | | | | | | | | | | |
| Net Sales - Domestic | 179,230 | | 204,615 | | 186,154 | | 160,769 | | 730,768 | |
| Net Sales - Foreign | 11,429 | | 11,430 | | 12,382 | | 12,382 | | 47,023 | |
| Total Net Sales | 190,659 | | 216,045 | | 198,536 | | 173,151 | | 778,391 | |

98 99 Bgt Due Diff Format

Handout

(5)

CONFIDENTIAL

UND 05448

A 282

(6)

**ADAMS GOLF, INC.**
1999 Financial Projections
For the periods indicated
($ in millions)

| | 1 Qtr. 1999 | % of Sales | 2 Qtr. 1999 | % of Sales | 3 Qtr. 1999 | % of Sales | 4 Qtr. 1999 | % of Sales | Total 1999 | % of Sales |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales – Domestic | $31.6 | 90.9% | $44.5 | 90.9% | $40.6 | 90.9% | $33.3 | 90.9% | $150.0 | 90.9% |
| Net Sales – Foreign | 3.2 | 9.1% | 4.4 | 9.1% | 4.1 | 9.1% | 3.3 | 9.1% | 15.0 | 9.1% |
| Total Net Sales | 34.8 | 100.0% | 48.9 | 100.0% | 44.7 | 100.0% | 36.6 | 100.0% | 165.0 | 100.0% |
| Cost of Goods Sold | 10.1 | 29.0% | 14.2 | 29.0% | 13.0 | 29.0% | 10.6 | 29.0% | 47.8 | 29.0% |
| Gross Margin | 24.7 | 71.0% | 34.8 | 71.0% | 31.7 | 71.0% | 26.0 | 71.0% | 117.2 | 71.0% |
| Selling Expenses | 9.7 | 27.9% | 13.7 | 27.9% | 12.5 | 27.9% | 10.2 | 27.9% | 46.1 | 27.9% |
| General and Administrative Expenses | 4.7 | 13.5% | 6.6 | 13.5% | 6.0 | 13.5% | 4.9 | 13.5% | 22.3 | 13.5% |
| Research and Development Expenses | 0.5 | 1.6% | 0.8 | 1.6% | 0.7 | 1.6% | 0.8 | 1.6% | 2.6 | 1.6% |
| Total Expenses | 15.0 | 43.0% | 21.1 | 43.0% | 19.2 | 43.0% | 15.8 | 43.0% | 71.0 | 43.0% |
| Operating Margin | 9.7 | 28.0% | 13.7 | 28.0% | 12.5 | 28.0% | 10.2 | 28.0% | 46.2 | 28.0% |
| Taxes, Effective Tax Rate 35% | 3.5 | 10.0% | 4.9 | 10.0% | 4.5 | 10.0% | 3.7 | 10.0% | 16.5 | 10.0% |
| Net Income | $6.2 | 18.0% | $8.8 | 18.0% | $8.0 | 18.0% | $6.6 | 18.0% | $29.7 | 18.0% |

* Percent Revenue Growth vs. Prior Year is 64.8%

98 99 Bgt Due Dil Format

Handout

CONFIDENTIAL

UND 05449

A 283

4/13/08 10:45 AM

**Revenue By Department**
**1998 Forecast**
**($ in millions)**

| Net Sales | 1 Qtr. 1998 | % of Total | 2 Qtr. 1998 | % of Total | 3 Qtr. 1998 | % of Total | 4 Qtr. 1998 | % of Total | Total 1998 | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Inside Sales | $19.0 | 81.2% | $21.8 | 78.44% | $19.7 | 77.3% | $17.7 | 70.7% | $78.1 | 79.1% |
| Direct Response/Call Center/ Customer Service | $2.6 | 11.4% | $4.2 | 15.1% | $3.9 | 15.3% | $2.0 | 11.7% | $13.5 | 13.5% |
| Custom Fitting | $0.6 | 2.4% | $0.6 | 2.2% | $0.8 | 2.4% | $0.6 | 2.7% | $2.4 | 2.4% |
| International | $1.2 | 4.9% | $1.2 | 4.3% | $1.3 | 5.1% | $1.3 | 5.8% | $5.0 | 5.0% |
| Total | $24.5 | 100.0% | $27.8 | 100.0% | $25.5 | 100.0% | $22.2 | 100.0% | $100.0 | 100.0% |

Rev Show A

Handout

CONFIDENTIAL

UND 05450

A 284

ADAMS GOLF, INC.
Revenues By Department
1999 Forecast
($ in millions)

| Net Sales | 1 Qtr. 1999 | % of Total | 2 Qtr. 1999 | % of Total | 3 Qtr. 1999 | % of Total | 4 Qtr. 1999 | % of Total | Total 1999 | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Inside Sales | $27.2 | 78.2% | $38.8 | 79.3% | $35.2 | 78.7% | $29.5 | 80.0% | $130.7 | 79.2% |
| Direct Response/Call Center/ Customer Service | 3.5 | 10.1% | 5.3 | 10.8% | 5.6 | 12.3% | 3.8 | 10.4% | 18.1 | 11.0% |
| Custom Fitting | 0.5 | 1.4% | 0.6 | 1.2% | 0.6 | 1.3% | 0.6 | 1.5% | 2.3 | 1.4% |
| International | 3.6 | 10.3% | 4.3 | 8.6% | 3.4 | 7.6% | 2.8 | 7.7% | 14.1 | 8.5% |
| Total | $34.8 | 100.0% | $48.9 | 100.0% | $44.7 | 100.0% | $36.6 | 100.0% | $165.0 | 100.0% |

4/13/8610:46 AM

6

Rev/Show A

Handout

CONFIDENTIAL

UND 05451

A 285

**ADAMS GOLF, INC.**
Headcount

|  | 3/31/98 | 12/31/98 |
|---|---|---|
| Hourly | 108 | 114 |
| Salary | 90 | 128 |
| Total | 198 | 242 |

- 1997 Turnover was less than 10%.

- Forecast Revenue per Employee

| Revenue | $ 100,000,000 |
|---|---|
| Average Number of Employees | 220 |
| Revenue per Employee | $    454,545 |

Rev Show A

Handout

CONFIDENTIAL

UND 05452

A 286

**ADAMS GOLF, INC.**
**1999 Financial Projections**
**For the periods indicated**
($ in millions)

| | Actual 1 Qtr. 1999 | % of Sales | Budget 2 Qtr. 1999 | % of Sales | Budget 3 Qtr. 1999 | % of Sales | Budget 4 Qtr. 1999 | % of Sales | Budget Total 1999 | % of Sales |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales – Domestic | 31.6 | 90.9% | 44.5 | 90.9% | 40.6 | 90.9% | 33.3 | 90.9% | 150.0 | 90.9% |
| Net Sales – Foreign | 3.2 | 9.1% | 4.4 | 9.1% | 4.1 | 9.1% | 3.3 | 9.1% | 15.0 | 9.1% |
| Total Net Sales | 34.8 | 100.0% | 48.9 | 100.0% | 44.7 | 100.0% | 36.6 | 100.0% | 165.0 | 100.0% |
| Cost of Goods Sold | – | 0.0% | – | 0.0% | – | 0.0% | – | 0.0% | – | 0.0% |
| Gross Margin | 34.8 | 100.0% | 48.9 | 100.0% | 44.7 | 100.0% | 36.6 | 100.0% | 165.0 | 100.0% |
| | | | | | | | | | | |
| Selling Expenses | 9.7 | 27.9% | 13.7 | 27.9% | 12.5 | 27.9% | 10.2 | 27.9% | 46.1 | 27.9% |
| General and Administrative Expenses | 4.7 | 13.5% | 6.6 | 13.5% | 6.0 | 13.5% | 4.9 | 13.5% | 22.3 | 13.5% |
| Research and Development Expenses | 0.5 | 1.6% | 0.8 | 1.6% | 0.7 | 1.6% | 0.6 | 1.6% | 2.6 | 1.6% |
| Total Expenses | 15.0 | 43.0% | 21.1 | 43.0% | 19.2 | 43.0% | 15.8 | 43.0% | 71.0 | 43.0% |
| | | | | | | | | | | |
| Operating Margin | 19.8 | 57.0% | 27.9 | 57.0% | 25.5 | 57.0% | 20.8 | 57.0% | 94.0 | 57.0% |
| | | | | | | | | | | |
| Taxes | 3.5 | 10.0% | 4.9 | 10.0% | 4.5 | 10.0% | 3.7 | 10.0% | 16.5 | 10.0% |
| | | | | | | | | | | |
| Net Income (Loss) | 16.3 | 47.0% | 23.0 | 47.0% | 21.0 | 47.0% | 17.2 | 47.0% | 77.5 | 47.0% |
| | | | | | | | | | | |
| Percent Revenue Growth | 56.6% | | 40.8% | | -8.7% | | -18.0% | | 59.8% | |
| | | | | | | | | | | |
| **Unit Sales** | | | | | | | | | | |
| Net Sales – Domestic | – | | – | | – | | – | | – | |
| Net Sales – Foreign | – | | – | | – | | – | | – | |
| Total Net Sales | | | | | | | | | | |

CONFIDENTIAL

UND 05453

A 287

Received: 4/10/98 8:58AM; 972 424 0721 -> LEHMAN BROTHERS; Page 3
APR-10-1998 13:02    ADAMS GOLF    972 424 0721    P.03/04

**ADAMS GOLF, INC.**
1998 Financial Projections
For the periods indicated
($ in millions)

| | Actual 1 Qtr. 1998 | % of Sales | Budget 2 Qtr. 1998 | % of Sales | Budget 3 Qtr. 1998 | % of Sales | Budget 4 Qtr. 1998 | % of Sales | Budget Total 1998 | % of Sales |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales - Domestic | 23.1 | 94.3% | 28.4 | 95.8% | 25.8 | 95.3% | 20.8 | 94.3% | 98.3 | 95.0% |
| Net Sales - Foreign | 1.4 | 5.7% | 1.3 | 4.2% | 1.3 | 4.7% | 1.3 | 5.7% | 5.2 | 5.0% |
| Total Net Sales | 24.5 | 100.0% | 29.7 | 100.0% | 27.1 | 100.0% | 22.2 | 100.0% | 103.4 | 100.0% |
| Cost of Goods Sold | 5.9 | 23.9% | 8.6 | 29.0% | 7.9 | 29.0% | 6.4 | 29.0% | 28.8 | 27.8% |
| Gross Margin | 18.6 | 76.1% | 21.1 | 71.0% | 19.2 | 71.0% | 15.8 | 71.0% | 74.7 | 72.2% |
| Selling Expenses | 6.2 | 25.5% | 7.0 | 23.6% | 7.8 | 28.8% | 5.6 | 25.4% | 26.7 | 25.8% |
| General and Administrative Expenses | 3.5 | 14.4% | 4.3 | 14.4% | 4.0 | 14.8% | 3.8 | 17.0% | 15.6 | 15.1% |
| Research and Development Expenses | 0.1 | 0.4% | 0.5 | 1.7% | 0.4 | 1.4% | 0.4 | 1.7% | 1.3 | 1.3% |
| Total Expenses | 9.9 | 40.3% | 11.8 | 39.7% | 12.2 | 45.0% | 9.8 | 44.1% | 43.6 | 42.2% |
| Operating Margin | 8.8 | 35.8% | 9.3 | 31.3% | 7.0 | 26.0% | 6.0 | 26.9% | 31.1 | 30.1% |
| Taxes | 3.3 | 13.3% | 3.3 | 11.3% | 2.5 | 9.3% | 2.1 | 9.5% | 11.3 | 10.9% |
| Net Income (Loss) | 5.5 | 22.5% | 5.9 | 20.0% | 4.5 | 16.7% | 3.9 | 17.4% | 19.8 | 19.2% |
| Percent Revenue Growth | 47.7% | | 21.0% | | -8.7% | | -18.0% | | 181.9% | |
| **Unit Sales** | | | | | | | | | | |
| Net Sales - Domestic | 156,190 | | 219,335 | | 186,623 | | 162,807 | | 736,755 | |
| Net Sales - Foreign | 10,294 | | 11,875 | | 11,875 | | 11,875 | | 45,919 | |
| Total Net Sales | 166,484 | | 231,210 | | 210,498 | | 174,482 | | 782,674 | |

1C-Business

08 99 Bgt Doc Dt Format/1998 Show Units   4/10/98   11:43 AM

**ADAMS GOLF, INC.**
Financial Projections – Conservative
Years Ended December 31, 1998, 1999, 2000, 2001 and 2002
($ in millions)

| | 1998 | % of Sales | 1999 | % of Sales | 2000 | % of Sales | 2001 | % of Sales | 2002 | % of Sales |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales – Domestic | 85.0 | 94.6% | 160.0 | 90.9% | 225.0 | 86.9% | 285.0 | 83.3% | 375.0 | 81.5% |
| Net Sales – Foreign | 6.0 | 6.6% | 15.0 | 9.1% | 34.0 | 13.1% | 55.0 | 16.2% | 85.0 | 18.5% |
| **Total Net Sales** | 91.0 | 100.0% | 185.0 | 100.0% | 268.0 | 100.0% | 340.0 | 100.0% | 460.0 | 100.0% |
| Cost of Goods Sold | 26.4 | 29.0% | 47.9 | 29.0% | 76.1 | 29.0% | 98.6 | 29.0% | 133.4 | 29.0% |
| Gross Margin | 64.8 | 71.0% | 117.2 | 71.0% | 183.9 | 71.0% | 241.4 | 71.0% | 326.6 | 71.0% |
| Selling Expenses | 25.4 | 27.9% | 46.1 | 27.9% | 72.3 | 27.9% | 94.9 | 27.9% | 128.4 | 27.9% |
| General and Administrative Expenses | 12.2 | 13.4% | 22.3 | 13.5% | 35.0 | 13.5% | 45.9 | 13.5% | 62.0 | 13.5% |
| Research and Development Expenses | 1.5 | 1.6% | 2.6 | 1.6% | 4.1 | 1.6% | 5.4 | 1.6% | 7.4 | 1.6% |
| **Total Expenses** | 39.1 | 43.0% | 71.0 | 43.0% | 111.4 | 43.0% | 146.2 | 43.0% | 197.8 | 43.0% |
| **Operating Margin** | 25.8 | 28.0% | 46.2 | 28.0% | 72.5 | 28.0% | 95.2 | 28.0% | 128.8 | 28.0% |
| Taxes | 9.2 | 10.1% | 16.5 | 10.0% | 26.1 | 10.1% | 34.3 | 10.1% | 46.4 | 10.1% |
| **Net Income (Loss)** | 16.3 | 17.9% | 29.6 | 18.0% | 46.4 | 17.9% | 60.9 | 17.9% | 82.4 | 17.9% |
| Revenue Growth Percentage | | 59.7% | | 44.8% | | 36.3% | | 28.1% | | |

CONFIDENTIAL

UND 05455

A 289

W.D.C.MacKenzie       TEL:14032432457         Apr 14 98   16:03 No.021 P.01

# WDC MACKENZIE DISTRIBUTORS LTD
**1140 B 44TH AVENUE S.E.**
**CALGARY, ALBERTA**
**T2G 4W6**
**PHONE# (403) 243-4005**
**FAX# (403) 243-2457**
**E-MAIL: WDCMACKG@CADVISION.COM**

## FACSIMILE TRANSMISSION SHEET

TO: _Adams Golf_    ATTN: _Chris Beebe_

FAX #: _____    DATE: _April 14th_

FROM: _Paul Holford_    TIME: _____

TOTAL NUMBER OF PAGES INCLUDING COVER: _2.5_

COMMENTS: _No per discussion — FYI_
_Our first lead on Adams/Costco_
_was Mar. 23rd (Kelowna BC._
_We passed on the info. to you_
_folks shortly thereafter._

_JHX_
_Paul_

ADAMS 009325

April 14, 1998

CHRIS BEEBE
*Adams Golf*
2801 East Plano Parkway
Plano, Texas
75074

Re : Costco Wholesale

Dear Chris,

As per our discussion, here is the related information.

1.) Acushent Canada Inc. : *Transshipment/ Redistribution Policy*

2.) Golf Connections : Orem, Utah (801) 467-4499 Contact : *Borger Lamont*
Parallel exportus of Adams, Callaway, Taylor Made, etc. Possible source for Costco, but confirmed as presenting these products to Retail and Green Grass facilities.

Hope this information proves useful in our common plight. I would like to thank you for your efforts on behalf of all of us here at WDC Mackenzie Distributors Ltd.

Sincerely,

Paul Holford
Manager
Customed Service

ADAMS 009326

A 291

# LEHMAN BROTHERS

### FACSIMILE

---

| | |
|---|---|
| **DATE:** | April 16, 1998 |

**PAGES (INCLUDING COVER):** 5

**TO:** Charles Place
Vice President
Ferris, Baker Watts, Inc.
(410) 659-4657 (Direct Phone Number)
(410) 659-4632 (Fax Number)

---

**FROM:** Sameet Mehta
Investment Banking
(415) 274-5389 (Direct Phone Number)
(415) 274-5381 (Fax Number)

---

**MESSAGE:**

Hi Charlie,

I've attached our notes from the customer due diligence call to Golfsmith, and I'll send you the notes for the other calls as we complete them. Could you please send the notes to the customer calls, as you finish them, to me and to Jeff Mills at Montgomery? Thanks.

# CONFIDENTIAL

---

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

LEHMAN BROTHERS
555 CALIFORNIA STREET 30TH FLOOR SAN FRANCISCO, CALIFORNIA 94104 TELEPHONE (415) 274-5360 FACSIMILE (415) 274-5381

UND 00299

A 292

## Adams Golf, Inc.
## Customer Due Diligence Questionnaire

| Customer Name | Contact Name | Interviewer Name | Date |
|---|---|---|---|
| Golfsmith International | Craig Johnson, VP of Merchandising | Patrick Walravens and Sameet Mehta | April 9, 1998 |

1. For how long have you been doing business with Adams Golf?

Business of any substance since Oct-Nov of 1997. Golfsmith sells Adams clubs through retail and catalogue channels. Sales of Adams clubs are equally balanced between these channels.

2. What is your role and title at your company?

VP of Merchandising, responsible for product selection, acquisition and inventory management.

3. Which golf clubs does your company purchase from Adams Golf? At what price do you sell them?

|  | Price | |
|---|---|---|
|  | Steel Shaft | Graphite Shaft |
| √ Tight Lies | $149.95 | $199.95 |
| √ Tight Lies #3 | $149.95 | $199.95 |
| √ Tight Lies #5 | $149.95 | $199.95 |
| √ Tight Lies #7 | $149.95 | $199.95 |
| √ Tight Lies #9 | $149.95 | $199.95 |
| ☐ Air Assault Drivers | _____ | _____ |
| ☐ Assault$^{VMI}$ Irons | _____ | _____ |
| ☐ Assault$^{VMI}$ Putters | _____ | _____ |

The wholesale price is $102 for Steel Shaft and $135 for Graphite Shaft

CONFIDENTIAL        - 1 -

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

4. Approximate your annual dollar volume of Adams Golf club sales. Do you expect business to increase during the next one and two years?

For the first 15% of 1998, Golfsmith has sold $502,000 between its retail and catalogue operations, and they are still in the growth stage of the curve. Craig conservatively estimates total 1998 sales of Adams clubs to be $3.5 to $4.0 million. Business should increase over the next one and two years because 1) Craig expects same-store sales to increase and 2) Golfsmith is undergoing a retail expansion, adding 6 or 7 stores by the end of the year.

What percent of your equipment sales in a given month are Adams clubs?

For the first 15% of 1998, Adams clubs represented $0.5 million of $15.0 million in total woods and irons sales, or about 3.3%. Craig expects this percentage to increase based on consumers' enthusiasm for Adams clubs.

5. Based on your industry knowledge, how does the growth of Adams Golf compare to that of other golf companies you've seen?

The growth from no sales to $0.5 million in sales in three months, not in the prime golf season, is phenomenal from Golfsmith's standpoint. The comparable story is that of Callaway.

6. Are customers pre-disposed to purchasing the Adams Golf clubs or do you find yourself having to introduce and describe the club to customers?

Customers are pre-disposed to purchasing the Adams clubs. In fact Golfsmith has received calls from customers about the Adams clubs prior to having carried these clubs in the store.

Do Adams clubs increase customer traffic in your store?

Yes.

CONFIDENTIAL                     - 2 -

UND 00301

A 294

## Adams Golf, Inc.
## Customer Due Diligence Questionnaire

7. Are Fairway Woods a growing part of your business? Is Adams Golf selling the most units of Fairway Woods?

Yes, and Adams is selling the most units of Fairway Woods.

What percent of your equipment sales are Fairway Woods today vs. 5 years ago?
Today, Fairway Woods represent 10-15% of equipment sales, versus 0% 5 years ago. Fairway Woods represent about 33% of all woods sales.

Who else are the major players in this space?

Callaway, Taylor Made and Cobra. Demand in this space is expanding the market, and Craig would not take competition, especially from Callaway, lightly.

8. Do you think Adams Golf will have the ability to develop new products which customers will be pre-disposed to consider buying?

Doesn't know – from his experience with working with Adams, he is impressed with their new product advertising. The sales staff responds and executes very well, and Craig believes that the can sell whatever new product Adams comes up with.

Would you consider carrying new product lines from Adams?

Yes. Although Golfsmith is careful about choosing its relationships, once a vendor is established, like Adams Golf, Golfsmith will go deep into its vendor's product lines.

What would your preference be for a new club?

Unless an entirely new category develops, a driver would be a good choice.

9. What are your impressions of Adams Golf's direct response channel (1-800-number)?
Do you see the 1-800-number as a source of competition?

It is a source of competition, but the advertising builds the customer base which more than offsets any negative competitive effect.

## CONFIDENTIAL

- 3 -

UND 00302

A 295

### *Adams Golf, Inc.*
### *Customer Due Diligence Questionnaire*

10. How do you rank the Adams Golf clubs versus its competitors – better, worse or the same?

From a sales perspective, it is much easier to sell Adams clubs, and the product is driving customers into the stores. Therefore he would rate them highly relative to competitors.

11. Are you satisfied with the service Adams Golf provides to you? How might it improve?

Yes. There are no negatives at all with Adams' service level. They never create demand which they can't back-up.

12. Do you expect to continue doing business with Adams Golf?

Yes.

13. Are there any other issues (legal, contractual or otherwise) which you feel are important?

No.

14. What are your thoughts on knock-offs/clones/copies?

Craig doesn't see this as much of a threat; he feels that Adams does a good job of policing it.

CONFIDENTIAL        - 4 -

UND 00303

A 296

4/20   Gregg Platt

$\qquad$ 24 __ 33
Steel   229 - 259
$\qquad$ 30    48

$ 8,000

Roles of CS + Sales person
— Communication
Ys
# of accounts they sell to

$ Member to get into Costco — # truly offered
— limited impact

Masters back from JV ⟩ TBS
                        ⟩ Mitsubishi
7 days                  ⟩ Kanematsu
                        ⟩ Sumidomo
1400                    ⟩ Fuji Seki

Kindal + with light stuff          Martin Lee
   rapport — not good kindal      — Vidality Gulf

ADAMS 009329

A 297

4/15   Grey Pratt

Whole sale   $235

retail   $ 289 - 349   GGrass

Costco   $ 245 75 retail

1 month already

a letter Important

$ → 36 clubs — okay   Graphite   Score   Demo Tour
200 demo days   by major Golf Publication

4/15   Another lead in // market
will fax info to us

800 726
6449

ADAMS 009330

A 298

[cambria02\groups] - \cardramware\reverteclients\adams\ppd\due diligence\customerngeliday.doc - Carol Madrid - -AUTODATE -AUTODATE.

EXHIBIT
*156*

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

| Customer Name | Contact Name | Interviewer Name | Date |
|---|---|---|---|
| Golf Day | John McGregor | Patrick Walravens | 4/20/98 |
| | VP Golf Merchand. | | |
| | (781) 853-0900x2318 | | |

1) For how long have you been doing business with Adams Golf? *6 month.*

2) What is your role and title at your company? *Vice President.  Golf Day is a division of Trends Lines Incorporated. I do mail order, overseas stuff and some merchandising for our 80 stores.*

3) Which golf clubs does your company purchase from Adams Golf?

*Sell steel for $149 & graphite for Tight Lives $199. Don't want to tell you our cost. No problem getting product delivered. Turnaround no worse than anyone else. In top half in terms of delivery.*

4) Approximate your annual dollar volume of Adams Golf club sales. Do you expect business to increase during the next one and two years?

*Mail order – item not in catalog at Adams request. So no sales occurring there.*

*In store. I really can't say.*

- What percent of your equipment sales in a given month are Adams clubs?

*Over 50% of our pro line fairway woods are Adams clubs. Fairway woods represent less than 10% of total sales.*

- 1 -

CONFIDENTIAL

UND 010443

A 299

# *Adams Golf, Inc.*
## Customer Due Diligence Questionnaire

5) Based on your industry knowledge, how does the growth of Adams Golf compare to that of other golf companies you've seen?

*The big issues is will they be able to sustain their growth? This is unclear especially for an infomercial driven company. Golf is very cyclical. Look at the Ginty (Stan Thompson) fairway woods company that went out of business. The rapid growth will level and then dip unless they come up with new products. No dip so far however. Thinks 1998 will be a big year for Adams Golf. More sales in 98 than 97 expected. Good word of mouth. People come in the store asking for it. The issue will be sales in 1999.*

6) Are customers pre-disposed to purchasing the Adams Golf clubs or do you find yourself having to introduce and describe the club to customers?

*They are predisposed to buying it.*

- Do Adams clubs increase customer traffic in your store?

*Yes. Some people come in because they see our flyers which we mail to 750,000 people and which will have Tight Lies in them. This helps get people to come in the store and look at the product. Tight Lies create some traffic. They are a hot item.*

- 2 -

CONFIDENTIAL

UND 010444

A 300

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

7) Are Fairway Woods a growing part of your business?  Is Adams Golf selling the most units of Fairway Woods?

*Yes it's definitely a growing part of our business.  And it will continue to be as the population gets older.  Older people use fairway woods more often.  Adams dominates the pro line fairway woods.*

- What percent of your equipment sales are Fairway Woods today vs. 5 years ago?

*Less than 10% on dollar basis, today.*

- Who else are the major players in this space?

*Isn't any niche player like Adams. Cobra is reintroducing the Baffler with a steel head. Callaway has the Heaven 7 and Divine 9 – but these are more more expensive. We are talking to Orlimar but not carrying them yet. We want to wait and see if customers ask for Orlimar.*

8) Do you think Adams Golf will have the ability to develop new products which customers will be pre-disposed to consider buying?

*Don't know them well enough to say.  Only met Mark Gonsalves for about ten minutes. Don't know the rest of the management team.*

- Would you consider carrying new product lines from Adams?

*Would be receptive to putting new products in stores  - start in small amounts and see how they do.*

- What would your preference be for a new club?

*Hard to say.  I would try to stay away from big guys.  Why go head to head with Callaway by coming out with a driver?  Maybe  a wedge.  But then again the driver is where the money is.  Tough question. The issue for Adams is how do you transition to different niche.  That's the challenge.*

CONFIDENTIAL

UND 010445

A 301

[rambns0Zigroups] – \sanfran\watraven\clients\adams\ipoldue diligence\customerga\fday.doc - Carol Madrid - –AUTODATE –AUTODATE- Page 4 of 5

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

9) What are your impressions of Adams Golf's direct response channel (1-800-number)? Do you see the 1-800-number as a source of competition?

No. Doesn't bother him. Lot of people won't buy over the phone or on tv. Thinks of direct response as additional advertising. Would like Adams to tag commercials to say that Tight Lies are available at Golf Day. Working with Adams about doing just that.

10) How do you rank the Adams Golf clubs versus its competitors - better, worse or the same?

*Can't say. I haven't hit the club.*

Are you satisfied with the service Adams Golf provides to you? How might it improve?

*Thinks Adams is making a lot of profit on its clubs now. Compared to Callaway and Taylor Made, Adams provides better margins to Golf Day and does a better job of controlling distribution. Three ways to sell clubs: media advertising, word of mouth and making people in retail stores want to sell the product. Adams have decent displays and have brand recognition from advertising. GolfDay sales people don't steer customers towards Adams though. Adams people aren't calling on the stores and training the sales people. Adams should come in and give the assistant managers a hat or a t-shirt or something to get them on the Adams team. Also Adams isn't spiffing. Some other mfg do SPIFF and that provides an incentive to steer customers toward products.*

11) Do you expect to continue doing business with Adams Golf? *Yes.*

12) Are there any other issues (legal, contractual or otherwise) which you feel are important? *No.*

14) What are your thoughts on knock-offs/clones/copies?

*Knock offs are coming. Companies with look-a-like clubs want to be in the catalogs. Adams won't let us sell Tight Lies in catalogs so we'll put the clones in. These are not patent infringers. Also, we get better margins off the knock offs. Can buy a club similar to a Tight Lies for $29 and sell it for $69.*

- 4 -

CONFIDENTIAL

UND 010446

A 302

[rambna02\groups] – \samlran\walraven\clients\adams\ipo\due diligence\customer\familyge.doc - Carol Madrid - ~AUTODATE ~AUTODATE- Page 1 of 8

# *Adams Golf, Inc.*
# *Customer Due Diligence Questionnaire*

| Customer Name | Contact Name | Interviewer Name | Date |
|---|---|---|---|
| Family Golf Center | Gene McMasters | Patrick Walravens | 4/20/98 |
| | Director of Retail | | |
| | Sales | | |
| | (516) 694-1666x31 | | |

1) For how long have you been doing business with Adams Golf?

*2 & ½ years*

2) What is your role and title at your company?

*Director of Retail Sales. I negotiate w/ vendors, develop new programs and handle our retail efforts. We have retail in each of our practice facilities*

3) Which golf clubs does your company purchase from Adams Golf? At what price do you sell them? *We buy the Tight Lies line.*

- *Buy steel at $___ and sell it at $149, sometimes $139. Steel doesn't sell well.*

- *Buy graphite at $120 and sell it at $199, sometimes $189.*

*Don't sell the drivers. They don't sell well.*

- 1 -

CONFIDENTIAL

UND 010638

A 303

[rambns02\groups] — \sanfran\wal:raven\clients\adams\lpo\due diligence\customer\familyc.doc - Carol Madrid - ~AUTODATE ~AUTODATE- Page 2 of 6

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

*4)* Approximate your annual dollar volume of Adams Golf club sales.  Do you expect business to increase during the next one and two years?

- *Don't know.  Yes I do expect it to increase for a while.  But eventually everyone has one and they need to introduce new products.*

- What percent of your equipment sales in a given month are Adams clubs?

- *Don't know.*

5) Based on your industry knowledge, how does the growth of Adams Golf compare to that of other golf companies you've seen?

- *Faster.  Not too many stories like Adams.  Question is can they introduce another product and keep it going.  Adams is benefiting from the downward spiral of Callaway and Taylor Made.*

6) Are customers pre-disposed to purchasing the Adams Golf clubs or do you find yourself having to introduce and describe the club to customers?

- *Adams is a hot item.  People definitely come into the store looking for Tight Lies.  The strong brand is "Tight Lies" not Adams Golf.*

- Do Adams clubs increase customer traffic in your store?

*Yes.  Telemarketing definitely helps a lot.*

*Customers are looking for Tight lies products.*

- 2 -

CONFIDENTIAL

UND 010639

A 304

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

7) Are Fairway Woods a growing part of your business?  Is Adams Golf selling the most units of Fairway Woods?

*Biggest growth factor in the golf business has been unit woods, then unit wedges and unit putters.*

- What percent of your equipment sales are Fairway Woods today vs. 5 years ago?

*Don't know.  Loose woods have dramatically dominated sales.  Never sell sets of woods anymore.*

- Who else are the major players in this space?

*Orlimar is coming along.  Particularly in the Pacific Northwest.   Orlimar also gives better margins to retailers than Adams.*

8) Do you think Adams Golf will have the ability to develop new products which customers will be pre-disposed to consider buying?

*Open issue.  Its like the  Star Thompson "Ginty" seven wood with a four wood length.  It was historic.  After a couple years of success, Sam Thompson came out with a 1, 3, 5. People couldn't hit the driver.  Adams needs to come out with another good product. Simply using Tight Lies design to make a driver won't work.  People don't want their drivers to fly that high.  Better players won't use it.*

- Would you consider carrying new product lines from Adams?

*Sure if it works.  In fact, FG is thinking about doing custom fitting with Adams irons.  Our customer are looking for more customized products, so it might be a nice fit.*

- 3 -

CONFIDENTIAL

UND 010640

A 305

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

- What would your preference be for a new club?

*Need a driver pretty soon. Orlimar has a club on the senior tour that people are doing pretty well with. Adams should also consider coming out with a mid- or low level brand.*

9) What are your impressions of Adams Golf's direct response channel (1-800-number)? Do you see the 1-800-number as a source of competition?

*We like it and don't view it as a source of competition. In fact, we are working with Barney to tag Family Golf's name on to 1-800 calls. The way it would work is that when Adams introduces new product, it will be announced on the air but will not be available for direct sales for a couple of weeks. FG will have it available before AG direct sales. When people call, Adams will give location of nearest Family Golf Center that has the product immediately. We are excited about this concept.*

*We think the future of golf will be like apparel where companies like Ralph Lauren control vertical markets with their own stores.*

CONFIDENTIAL

UND 010641

A 306

[rambns07\groups] — \ssnfranh\satraven\clients\adams\ipo\due diligence\customer\familyga.doc - Carol Madrid - ~AUTODATE ~AUTODATE- Page 5 of 6

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

10) How do you rank the Adams Golf clubs versus its competitors - better, worse or the same?

*Likes the TL 4 and 5 wood. Not thrilled with the 3 wood. Can't make the ball tumble with that club. Wants a 3 wood he can get 225 yards with.*

11) Are you satisfied with the service Adams Golf provides to you? How might it improve?

*Good job. Debbie is their sales contact. Gene trusts Adams in a way he doesn't trust other golf companies (especially Taylor Made). Have confidence that Adams won't dump its products and kill the retailers margins. Maintaining the retailers margins is the most important thing. Adams seems to be aware of it. Family Golf centers will bend over backwards to help Adams succeed.*

*Need to keep retailers margin strong. Doing a pretty good job so far. As long as they are serious about keeping strong retailer margins we should be fine. If Adams products end up in Price Club this will be a problem and its likely to happen soon. The entire industry is moving toward big-box sales.*

12) Do you expect to continue doing business with Adams Golf?

*Right now yes. Hope they come up with another good idea. Will work hard to help them succeed. Have confidence in Barney Adams. This retailer confidence gives Adams another year to come up with another product. By next Orlando show Adams will need something new.*

13) Are there any other issues (legal, contractual or otherwise) which you feel are important?

*Need to do good, better, best product lines. That way, when prices come down, Adams can sell retailers products with a lower price that maintain retailer margins.*

-5-

CONFIDENTIAL

UND 010642

A 307

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

*Need to identify a source of better shafts with good availability. Adams stock graphite shaft is not very good –only adequate. With a better 60 gram shaft, or tour weight shafts, you can hit better balls and not as high. Stock shaft doesn't have enough feel, not tight enough in torque. Torque is the most critical factor. 2.8 to 3 degrees of radial torque is good.*

*Locker room talk is most critical thing for this company. It's still good for Adams. Once it dies you're in trouble because selling and advertising costs go way up.*

14) What are your thoughts on knock-offs/clones/copies?

*Family Golf tries to find products that have similar concept at lower price points. There are other companies out there marketing lower end products like Tight Lies: Nickent (has a law suit with Adams) and Confidence Golf – manufacturer of mid-priced clubs.*

*Family Golf wouldn't carry products that infringe the Adams patents.*

- 6 -

CONFIDENTIAL

UND 010643

A 308

ram\na02\groups\sanlram\walraven\clients\adams\ipo\due diligence\customer questionnaire.doc - Eileen Maldonado - ~AUTODATE ~AUTODATE- Page 1 of 3

## *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

| EXHIBIT |
| --- |
| *192* |

| Customer Name | Contact Name | Interviewer Name | Date |
| --- | --- | --- | --- |
| Edwin Watts | Edwin Watts<br>President<br>(800) 874-0146x103 | Patrick Walravens | 4/21/98 |

1) For how long have you been doing business with Adams Golf? *Over the last 4 years. Lots in the last 2 years since the Tight Lies came out.*

2) What is your role and title at your company? *CEO. We have 40 stores in 8 or 9 states.*

3) Which golf clubs does your company purchase from Adams Golf? At what price do you sell them? *We sell all models of Tight Lies. Including left handed versions. $199 graphite and $149 steel. We hold prices and don't discount. Don't know the cost. But margins are good.*

4) Approximate your annual dollar volume of Adams Golf club sales. Do you expect business to increase during the next one and two years? *Yes at least during 1998*

• What percent of your equipment sales in a given month are Adams clubs? *Hard to say. Less than 5% of our total woods sales.*

5) Based on your industry knowledge, how does the growth of Adams Golf compare to that of other golf companies you've seen? *Growth is in the 5 or 6 all time fastest.*

6) Are customers pre-disposed to purchasing the Adams Golf clubs or do you find yourself having to introduce and describe the club to customers? *Customers are pre-disposed. We also push the product because margins are better than other brands like Callaway.*

• Do Adams clubs increase customer traffic in your store? *Probably. But they are also becoming competition for us with their direct sales.*

- 1 -

CONFIDENTIAL

UND 010644

A 309

rambbm02\group\xaed\ranbeo\rawen\clients\adams\ipoldoe diligence\customer questionnaire.doc - Eileen Maldenado - ~AUTODATE ~AUTODATE - Page 2 of 3

## *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

7) Are Fairway Woods a growing part of your business? Is Adams Golf selling the most units of Fairway Woods? *Definitely a growing part. Not sure who sells the most.*

- What percent of your equipment sales are Fairway Woods today vs. 5 years ago? *Not sure.*

- Who else are the major players in this space? *Callaway and Orlimar.*

8) Do you think Adams Golf will have the ability to develop new products which customers will be pre-disposed to consider buying? *That's a difficult question. I don't know. You have to realize that they are a niche product. Also, the smaller size head works perfect for fairway woods and it was something Callaway and others had trouble selling because of their focus on oversized products. This was a void, a good space for Adams to fill. I'm not sure they'll be able to find another space this good.*

- Would you consider carrying new product lines from Adams? *Sure. We'll carry anything that helps out golfers. Adams has become a good brand that people are familiar with.*

- What would your preference be for a new club? *I'd keep going after the fairway woods market for a while. Add clubs specifically for seniors and ladies. Although I guess they kind of do that now. My next thing would be irons.*

9) What are your impressions of Adams Golf's direct response channel (1-800-number)? Do you see the 1-800-number as a source of competition? *Yes it is competition. It's a major hurdle. Adams can't afford to make its retailers mad. Adams needs to move away from direct sales. I feel Adams is overdoing their infomercials and print ads in areas where we have stores. Adams is stealing customers away from our stores. Also, customers think they might get a better deal direct because the ads tout the steel at the lower price and don't make it clear that that price is for steel only. It's bait and switch.*

- 2 -

CONFIDENTIAL

UND 010645

A 310

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

*10)* How do you rank the Adams Golf clubs versus its competitors - better, worse or the same? *Adams is pretty good. Some of the larger players are over-distributed. As a result, their margins are low. Adams has higher margins, which makes our stores want to push their products. Adams has succeeded because they have a niche product, good marketing and good retailer margins. I worry that if they go public they will feel pressure to increase their sales and will overdistribute.*

*11)* Are you satisfied with the service Adams Golf provides to you? How might it improve? *Adams service is good. Callaway is the best. The delivery that Adams get us is fine. We think we may get better service because we are a large customer. Adams has inside sales and a face to face person for each store. Inside sales work fine. Overall, customer service is not a problem.*

12) Do you expect to continue doing business with Adams Golf? *Yes. But they need to be careful about overdistributing and eroding margins. If the margins erode, we'll get off the bandwagon and start pushing other products with higher margins.*

13) Are there any other issues (legal, contractual or otherwise) which you feel are important?

*14)* What are your thoughts on knock-offs/clones/copies? *Not really an issue. We don't sell knock-offs. In fact, we market against such products. Don't think it's a big problem because most people want the real thing.*

– 3 –

CONFIDENTIAL

UND 010646

A 311

# Cooley Godward LLP

ATTORNEYS AT LAW

One Maritime Plaza
20th Floor
San Francisco, CA
94111-3580
Main    415 693-2000
Fax     415 951-3699

www.cooley.com

STEVEN R. HARMON
415 693-2141
harmonsr@cooley.com

Palo Alto, CA
650 843-5000

Menlo Park, CA
650 843-5000

San Diego, CA
619 550-6000

Boulder, CO
303 546-4000

Denver, CO
303 606-4800

April 22, 1998

VIA HAND DELIVERY/OVERNIGHT COURIER

Sameet S. Mehta
Lehman Brothers
555 California Street,
30th Floor
San Francisco, CA
94104

Jeff Mills
NationsBanc Montgomery
Securities LLC
600 Montgomery Street
San Francisco, CA  94111

Courtney Tuttle
NationsBanc
Montgomery Securities
LLC
9 West 57th Street
New York, NY  10019

Steven L. Shea
Ferris, Baker Watts, Inc.
100 Light Street
Baltimore, MD  21202

Re:   Adams Golf, Inc.

Ladies/Gentlemen:

Enclosed for your review please find a third shipment of certain due diligence materials with
respect to Adams Golf, Inc. provided by Arter & Hadden LLP.  In addition, I have enclosed the
itemized list of such materials, which has been prepared by Arter & Hadden.  As we receive
additional materials, we will forward them to you.

If you have any questions or comments, please feel free to contact me at the number referenced
above.

Very truly yours,

Steve Harmon

Steven R. Harmon

Enclosures

cc:   Richard S. Jasen (w/o encl.)

216502 v1/SF
4nly011.DOC

Δπ EXHIBIT 157
Deponent _____
Date 5/17/06 Rpt. ML
WWW.DEPOBOOK.COM

UND 06946

A 312

DUE DILIGENCE LIST

**Business Due Diligence**

Item No.      Item

I-A      (Employee Labor Contracts and Employee Agreements with key officers)

- Adams Golf, Inc. And Its Subsidiaries Pronouncement of Policies and Procedures (Employee Confidentiality Agreement)

- Consulting Agreement, dated 4/1/98, by and between Adams Golf, Ltd. and Michael M. Carroll.

- Letter, dated 7/23/97, with respect to Bob Bush's employment terms

- Contract Agreement, dated 11/10/97, by and between Protus Technologies and Adams Golf

(Tax Audit Status Reports)

- Not applicable

VIII-A      • The Century Plan (401K)

X      • Commercial Lease Agreement

- Addendum to Commercial Lease Agreement

- Distribution Agreement, by and between Colony Group, Inc. and Adams Golf

- Technology Transfer Agreement, dated 1/23/98, by and between Evolution Golf, Inc. and Adams Golf

- Pleadings regarding intellectual property legal claims/issues

- Adams Golf, Inc. Monthly Management Summary February 1998

- Prosecution histories for the eight Adams' patent applications

59095.1
69163\60254

UND 06947

A 313

**Additional Due Diligence Items (2 sets are enclosed - Legal and Business)**

- Adams Golf, Inc. - Super Shaft, Inc. Subscription Agreement (Nick Aquilino)

- Adams Golf, Inc. - Super Shaft, Inc. Subscription Agreement (Clyde Smith and Peggy Smith)

- Adams Golf, Inc. - Super Shaft, Inc. Subscription Agreement (Royal Producing Corp.)

- Adams Golf, Inc. - Super Shaft, Inc. Subscription Agreement (Don Hall)

- Stock Purchase Agreement, dated 10/19/93, by and among Adams Golf, Inc., Super Shafts, Inc. and Royal Producing Corp. - Texas

- Endorsement Agreement, dated 11/1/92, by and between Adams Golf, Inc. and Hank Haney

- Stock Purchase Agreement, dated 8/21/95, by and among Adams Golf, Inc., Super Shafts, Inc., Royal Producing Corp. - Texas and B.H. Adams

- Consent in Lieu of Special Joint Meeting of the Board of Directors and Shareholders of Adams Golf, Inc. and Super Shafts, Inc., dated 8/21/95

- Adams Golf, Inc. Subscription Agreement (Steven B. Adams)

- Stock Purchase Agreement, dated 11/95, by and among Adams Golf, Inc. and Roland E. Casati

- Security Agreement, dated 10/1/95, by and between Adams Golf, Inc. and Royal Holding Company, Inc.

- Promissory Note, dated 10/1/95, executed by Royal Holding Company, Inc. in favor of Adams Golf, Inc., in the original principal amount of $300,000

- Affidavit of Facts Regarding Lost Securities, dated 1/10/96

- Stock Option Agreements for: Beard, Gonsalves, Murtland, Mark Puglielli, Max Puglielli and Patty Walsh

- Adams Golf, Inc. Series A Preferred Stock Purchase Agreement, dated 2/12/90 together with Post Sale Agreement, Employment Agreement, Stockholder Vesting Agreement and Stock Certificates

- Stock Purchase Agreement, dated 10/24/96, by and between Adams Golf, Inc. and Finis Conner

UND 06948

A 314

- Stock Purchase Agreement, dated 1/15/91, by and between Adams Golf, Inc. and Roy Kitamura

- Stock Purchase Agreement, dated 5/15/91, by and between Adams Golf, Inc. and Jim Sieber

- Certificate of Merger of Adams Golf IP, Ltd. into Adams Golf IP, L.P.

- Inventory Services and Sublease Agreement, dated 1/1/98, by and between Adams Golf, Ltd. and Adams Golf Direct Response, Ltd.

## Additional Legal Due Diligence Items

- Signature pages to Shareholders Agreement

- Articles of Incorporation of B.H. Golf Corporation

- Copies of Stock Certificates

- UCC Searches Texas Secretary of State

- UCC Searches Texas Secretary of State and Collin County, Texas

99085.1
0916034G294

UND 06949

A 315

# Cooley Godward LLP

ATTORNEYS AT LAW

One Maritime Plaza
20th Floor
San Francisco, CA
94111-3580
Main    415 693-2000
Fax    415 951-3699

www.cooley.com

Palo Alto, CA
650 843-5000

Menlo Park, CA
650 843-5000

San Diego, CA
619 550-6000

Boulder, CO
303 546-4000

Denver, CO
303 606-4800

April 23, 1998

STEVEN R. HARMON
415 693;2141
harmonsr@cooley.com

VIA HAND DELIVERY/OVERNIGHT COURIER

Sameet S. Mehta
Lehman Brothers
555 California Street,
30th Floor
San Francisco, CA
94104

Jeff Mills
NationsBanc Montgomery
Securities LLC
600 Montgomery Street
San Francisco, CA  94111

Courtney Tuttle
NationsBanc
Montgomery Securities
LLC
9 West 57th Street
New York, NY  10019

Steven L. Shea
Ferris, Baker Watts, Inc.
100 Light Street
Baltimore, MD  21202

Re:    Adams Golf, Inc.

Ladies/Gentlemen:

Enclosed for your review please find a fourth shipment of certain due diligence materials with respect to Adams Golf, Inc. (the "Company"), received by fax from Arter & Hadden LLP.  The materials are as follows:

1.    Letter Agreement between the Company and Darl P. Hatfield, dated April 13, 1998

2.    Additional pages of Commercial Lease Agreement between Jackson-Shaw Technology Center II, Ltd. and the Company, dated April 6, 1998 (to complete previously transmitted document from which pages were omitted)

3.    Memoranda from Fu Sheng Industrial Co. Ltd. to the Company, dated February 11, 1997 and February 23, 1997

4.    License Agreement between Mizuno Corporation and the Company, dated July 1, 1997

5.    List of salaries of Officers of the Company

As we receive additional materials, we will forward them to you.

UND 08076

# Cooley Godward LLP

Sameet S. Mehta
Jeff Mills
Courtney Tuttle
Steven L. Shea
April 23, 1998
Page Two

If you have any questions or comments, please feel free to contact me at the number referenced above.

Very truly yours,

Steven R. Harmon

Enclosures

cc:    Richard S. Jasen (w/o encl.)

216502 v2/SF
4nly021.DOC

UND 08077

A 317

# Cooley Godward LLP

ATTORNEYS AT LAW

One Maritime Plaza
20th Floor
San Francisco, CA
94111-3580
Main    415 693-2000
Fax     415 951-3699

www.cooley.com

STEVEN R. HARMON
415 693-2141
harmonsr@cooley.com

Palo Alto, CA
650 843-5000

Menlo Park, CA
650 843-5000

San Diego, CA
619 550-6000

Boulder, CO
303 546-4000

Denver, CO
303 606-4800

April 24, 1998

Via Hand Delivery/Federal Express

Sameet S. Mehta
Lehman Brothers
555 California Street,
30th Floor
San Francisco, CA
94104

Jeff Mills
NationsBanc Montgomery
Securities LLC
600 Montgomery Street
San Francisco, CA 94111

Courtney Tuttle
NationsBanc
Montgomery Securities
LLC
9 West 57th Street
New York, NY 10019

Steven L. Shea
Ferris, Baker Watts, Inc.
100 Light Street
Baltimore, MD 21202

Re:    Adams Golf, Inc.

Ladies/Gentlemen:

Enclosed for your review please find a _fifth_ shipment of certain due diligence materials with respect to Adams Golf, Inc. (the "Company"), received by fax from Arter & Hadden LLP. The materials are as follows:

1.    Consent Statement

2.    Notice of Registration

3.    Neopost Lease Agreement

4.    Panasonic Lease Agreement

5.    Caterpillar Financial Services Corporation Lease Agreement (2)

6.    Nissan/Infiniti Lease

As we receive additional materials, we will forward them to you.

# Cooley Godward LLP

Sameet S. Mehta
Jeff Mills
Courtney Tuttle
Steven L. Shea
April 24, 1998
Page Two

If you have any questions or comments, please feel free to contact me at the number referenced above.

Very truly yours,

Steven R. Harmon

Enclosures

cc:    Richard S. Jasen (w/o encl.)

216502 v3/SF
4n1y03l.DOC

UND 07961

A 319



Commitment Committee

Δ π EXHIBIT 152

Deponent_____

Date 5/17/06 Rptr. AL

WWW.DOCKDOCK.COM

UND 06023

A 320

CONFIDENTIAL

# LEHMAN BROTHERS

MEMORANDUM

To:    *Investment Banking Equity Commitment Committee*    As of 9/13/98

**Committee Members**                          **Counsel** *(full book)*

Frederick Frank (17)                    Steven L. Berkenfeld (18)
Eliot M. Fried (17)                     Kevin R. Genirs (18)
Allen S. Kaplan *(Chairman)* (17)       Randolph A. Stuzin (18)
Thomas J. Nestor (20)
Alan H. Washkowitz (18) *(memo only)*
Evette A. Saldana (17) 2 Copies
(Committee Secretary)    NOTE: DISTRIBUTION LISTS ARE AVAILABLE ON COMMITTEE COVER PAGE & NOT MEMO ONLY

cc:    *(cover page by cc-mail)*                cc:    *(memo only by cc-mail)*
Thomas A. Russo (10)                    Richard S. Fuld, Jr. (10)
Joseph M. Gregory, Jr. (6)              Bradley H. Jack (18)
Stephen M. Lessing (6)                  Michael F. McKeever (18)
Gregory E. Sacco, Jr. (6)              Peter R. Sherratt (London/5)
Ludovico del Balzo (London/4)          Marc Silverman (24)
Bruce Lakefield (London/3)             *Maureen Miskovic (10) (full book)*
C. Daniel Tysoe (Hong Kong)
Kiyoshi Tsugawa (Tokyo)
Edmond Papantonio (Tokyo/Legal)
Wai Kwong Seck (Singapore)

FROM:   *INVESTMENT BANKING*          *EQUITY CAPITAL*        *RESEARCH*
        Stu Francis                    Marc Paley             Bernie Picchi
        Olga Pulido-Crowe-Crowe        Brad Smith             Brian Lanier
        Patrick Walravens
        Sameet Mehta

MEETING DATE:  Tuesday, April 28

LOCATION:      Allan Kaplan's Office, 17th Floor

TIME:          2:30 PM EST

CONFIDENTIAL                                          UND 06024

A 321

SUBJECT:    Adams Golf, Inc. - $86.3 million Initial Public Offering

*Please call Patrick Walravens (415) 274-5285 or Sameet Mehta (415) 274-5389 for additional information.*

CONFIDENTIAL

UND 06025

A 322

## Table Of Contents

I.    Introduction And Recommendation
      A.   The Transaction
      B.   Timing
      C.   Lehman Brothers' Relationship
      D.   Due Diligence
      E.   Research Opinion
      F    Company Summary
      G.   Issue(s) Before The Committee - Pros And Cons
      H.   Recommendation

II.   Business Of The Company

III.  Financial Results

IV    Valuation Analysis

V.    Management, Directors, Owners And Employees

VI.   Litigation And Other Contingent Liabilities

VII.  Appendices
      A.   Draft of Registration Statement on Form S-1
      B.   Comparable Company Analysis
      C.   Comparable Shareholder Analysis

-1-

CONFIDENTIAL                                          UND 06026

A 323

## I.    INTRODUCTION AND RECOMMENDATION

### A. THE TRANSACTION

Adams Golf, Inc. ("Adams" or the "Company") has asked Lehman Brothers to lead manage its proposed initial public offering of Common Stock (the "Offering"). The purpose of the Offering is to raise proceeds for working capital and general corporate purposes. The Company will be traded on NASDAQ under the symbol "ADGO." The terms of the Offering are listed below in Table 1:

| TABLE 1: SUMMARY OF ANTICIPATED TERMS OF THE OFFERING | |
| --- | --- |
| Managing Underwriters | Lehman Brothers (Books)<br>NationsBank Montgomery Securities<br>Ferris, Baker Watts |
| Expected Filing Date | May 4, 1998 |
| Expected Pricing Date | On or about June 28th |
| Expected Filing Range | $14.00-$16.00 |
| Expected Shares Offered [a]: | 5,750,000 (3,750,000 primary / 2,000,000 secondary). |
| Estimated Fully Diluted Shares Outstanding<br>After the Offering [b]: | 22,980,946 |
| Estimated Gross Proceeds [a) (b)]: | $ 86.3 million |
| Estimated Net Proceeds to the Company [a) (b) (c)]: | $ 51.3 million |
| Over-Allotment Option | 15.0%/862,500 – shares (all secondary) |
| Pre-Offering Market Value [a) (b)] | $288.5 million |
| Post-Offering Market Value [a) (b)] | $344.7 million |
| Fully Distributed Valuation: [d] | |
|     CY 1998E P/E | 20.6x |
|     CY 1999E P/E | 14.4x |
| Gross Spread | 7.0% |
| Pot Split | 40% fixed (45/45/10). 60% jump ball. No cap |
| Lock-up | 180 Days |
| Dividends | None |
| Use of Proceeds: | For working capital and general corporate purposes |
| Expected Roadshow Dates: | Weeks of June 15 and 22 |

(a)  Does not assume exercise of underwriters' over-allotment option.
(b)  Assumes the mid-point of the filing range.
(c)  Assumes a gross spread of 7.0% and miscellaneous expenses of $500,000 payable by the Company.
(d)  Based on Lehman Brothers equity research 1998 and 1999 estimated EPS of $0.85 and $1.23

Company counsel is Arter & Hadden (Dallas, TX). Underwriters' counsel is Cooley Godward LLP (San Francisco, CA). Cooley Godward was selected based on that firm's relationships with the investment banking team, presence in the Bay Area and experience with high-growth firms such as the Company. The Company's auditors are KPMG Peat Marwick, LLP (Dallas, TX) ("KPMG"). The Company's most recent audited financials are for the year ended December 31,

-2-

CONFIDENTIAL

UND 06027

A 324

1997. Unaudited numbers for the quarter ended March 31, 1998 will be included in the prospectus.

**B. TIMING**

The Company plans to file the Registration Statement on Form S-1 on May 4, 1998 simultaneously with a press conference announcing that it has signed an endorsement agreement with Nick Faldo. Assuming SEC comments are received and responded to by the week of June 8, we expect primary marketing for the Offering will occur the weeks of June 15 and 22. Pricing is expected the week of June 29.

**C. LEHMAN BROTHERS' RELATIONSHIP.**

Stu Francis was introduced to the Company by fellow members of his golf club in mid 1997. In November, 1997, Finis Connor, a member of the Company's board of directors, contacted Stu and Olga Pulido-Crowe about the Company. Stu and Olga called upon the Company in December 1997 at which time Bernie Picchi was introduced to the Company and its senior management team. Because of its strong investment banking experience in the golf industry (e.g., Cobra Golf) and Bernie's strong research capabilities, Lehman Brothers' was asked to lead manage this offering.

Given the strong growth prospects of Adams Golf, the prospects for a follow-on offering and other future financing activity are very good.

**D. DUE DILIGENCE**

A due diligence review regarding the Company's operational strategy, financial history and projections was conducted with the Company's senior management on March 24, 1998. Senior management present included Barney Adams (CEO), Jim Farrell (VP, Finance), Richard Murtland (VP, Operations), Mark Gonsalves (VP, Marketing) and Walt DeVault (Director, Direct Sales). Attendees from Lehman Brothers included Stu Francis, Olga Pulido-Crowe, Brad Smith, Patrick Walravens and Sameet Mehta. Other attendees included representatives from Montgomery Securities, Ferris Baker Watts, KPMG, Company counsel and Underwriters' counsel. On April 13, equity research analysts from Lehman Brothers (Bernie Picchi and Brian Lantier) and from the other underwriters held a meeting with the Company's senior management. Lehman Brothers conducted additional financial due diligence on April 21, 1998 (focusing on accounting issues) and via teleconference on April 27 (focusing on projections). Attendees from Lehman Brothers included Olga Pulido-Crowe and Patrick Walravens. Other attendees included representatives from the other underwriters, Company counsel and underwriters' counsel. Lehman Brothers also performed background checks on Barney Adams (President and CEO), Mark Gonsalves (VP, Marketing), Jim Farrell (VP, Finance) and Darl Hatfield (SVP, Finance). No issues were discovered. Lehman Brothers has spoken with the Company's largest retail customers and calls to the Company's international distributors are in progress. Lehman Brothers also held a due diligence teleconference on April 27th with Nick Faldo, who recently signed an endorsement agreement with Adams Golf.

**E. RESEARCH OPINION**

Lehman Brothers' Emerging Growth Stock research analyst, Bernie Picchi, with assistance from Brian Lantier, expects to initiate coverage on the Company after the Offering.

-3-

CONFIDENTIAL

UND 06028

A 325

## F. COMPANY SUMMARY

Adams designs, manufactures and markets premium quality, technologically innovative golf clubs. Adams' design philosophy is to make golf clubs that deliver demonstrable performance benefits and that inspire confidence in the golfer when he or she addresses the ball. The Company believes that its most successful product line to date, the Tight Lies fairway woods, meets this objective by providing golfers with the ability to hit the ball from virtually any lie, without compromising distance. Adams has developed an innovative marketing model that integrates direct-to-consumer marketing, inside sales and traditional forms of advertising. Adams believes that the success of its product development capabilities and marketing strategy are evidenced by its dramatic increase in net sales over the past two years. Net sales have increased from $3.5 million in 1996 to $36.7 million in 1997 and from $1.5 million in the three months ended March 31, 1997 to $24.5 million in the three months ended March 31, 1998.

Adams Golf was founded in 1986 and now employs 210 people. The Company is a Delaware Corporation with its manufacturing facilities and corporate headquarters located in Plano, Texas.

## G. ISSUES BEFORE THE COMMITTEE: PROS AND CONS

### PROS

- *"Best of Class" Products.* Adams' line of Tight Lies fairway woods provide golfers with superior playability and maximum distance. The Tight Lies fairway woods patented design outperforms long irons and other fairway woods. Tight Lies fairway woods have won a number of industry awards including 1996 Breakthrough Product of the Year and 1997/1998 Certificate of Excellence.

- *Effective Marketing Model.* Adams Golf has developed an innovative marketing model that generates brand awareness through direct response (e.g., 1-800 infomercial and print ads) advertising in order to drive retail sales at on-course pro shops and other golf specialty stores. Under this model, the direct response revenues more than offset advertising expenses and allow for a much greater frequency of advertising. The increased advertising results in greater brand awareness that in turn drives retail sales. For example, although demand for the Tight Lies was built primarily using direct response advertising, over 78% of net sales in the three months ended March 31, 1998 occurred at the retail level.

- *Strong Financial Performance.* Adams believes that the success of its product development capabilities and marketing strategy are evidenced by its dramatic increase in net sales and earnings over the past two years. Net sales have increased from $3.5 million in 1996 to $36.7 million in 1997 and from $1.5 million in the three months ended March 31, 1997 to $24.5 million in the three months ended March 31, 1998. Operating income has increased from $8,809 in 1996 to $2.4 million in 1997 and from $0.1 million in the three months ended March 31, 1997 to $8.9 million in the three months ended March 31, 1998.

- *Strong Platform for Growth.* Adams believes that it is well-positioned to become the next major brand in golf equipment. It believes it has a number of assets in place that will make this possible including: (i) an innovative marketing strategy, (ii) acceptance of the Adams and

-4-

CONFIDENTIAL

UND 06029

A 326

Tight Lies brands by retailers and golfers, (iii) a strong customer service organization and (iv) an R&D pipeline of potential new products.

- *Lifetime Relationship with Nick Faldo.* Adams has recently entered into a lifetime agreement with Nick Faldo, who uses the Tight Lies fairway woods. Mr. Faldo will be inducted into the World Golf Hall of Fame in May 1998 and has won more major championships in the 1990s than any other golfer. The Company intends to leverage Mr. Faldo's international reputation for technical excellence to expand Adams' international sales. The Company also expects to work closely with Mr. Faldo to develop new products and technologies.

## CONS

- *Dependence on New Products Introductions; Uncertain Consumer Acceptance.* Over 95.3% of the Company's 1997 revenues were derived from sales of the Tight Lies fairway woods. Golf clubs tend to have a limited life cycle and at some point the Company can expect that sales of its clubs will diminish and that average selling prices will decline. Accordingly, the Company's continued growth and success depend on its ability to successfully develop and introduce new products that meet with consumer and retailer acceptance. With respect to retailers, the Company must ensure its products continue to offer retailers high margins and are not discounted. The Company plans to introduce new technologies in the design of future golf clubs. In particular, the Company is currently developing a new energy transfer technology, which, if it proves to be commercially viable, will form the basis for a new line of drivers, and, further in the future, a second generation of Tight Lies fairway woods. There can be no assurance that such technologies will not be rejected by consumers or that the Company will be able to complete its product development activities in a timely manner. Moreover, successful technologies and designs created by the Company, including the Tight Lies fairway woods, are likely to be copied by competitors. For example, the Company is already aware of several companies that have produced clubs designed in a manner very similar to the Tight Lies ("knock-offs"). The design of new golf clubs is also greatly affected by the rules and interpretations of the United States Golf Association ("USGA"). No assurances can be given that new products will receive USGA approval.

- *Ability to Manage Growth.* The Company has recently experienced a period of extraordinary growth that has resulted in new and increased responsibilities for management and continues to place a strain on the Company's management, operating and financial systems and resources. To accommodate this recent growth and to manage future growth, the Company will need to improve its operational, financial and management information systems and controls on a timely basis and recruit and train employees, including members of management. The failure to do so would adversely impact the Company.

- *Highly Competitive Industry.* The market for golf clubs is highly competitive. The Company's primary competition comes from Callaway Golf Company, Taylor-Made Golf Company, Titleist (Cobra) and Karsten Manufacturing Corporation (Ping). Callaway is the dominant player in the industry with a 42% market share as a result of strength in both irons

-5-

CONFIDENTIAL

UND 06030

A 327

and woods. Many of the Company's competitors have much larger financial, marketing and other resources than the Company. The golf club industry is increasingly dominated by a few brands, and has been characterized by consolidation such has Callaway's July 1997 purchase of Odyssey and Fortune Brands' acquisition of Cobra Golf. The industry therefore carries a high cost of entry, based on the advertising, endorsement and development expenses necessary to create a strong brand. The Company also faces competition from smaller companies, some of whom are imitating the Company's marketing strategy. Orlimar Golf Company, for example, has introduced it own fairway woods with a direct response driven strategy. There can be no assurance that the Company will be able to compete effectively and any failure to do so would adversely affect it business results.

- *Limited History of Profitability.* The Company was founded in 1986 and generated a positive operating income for the first time during fiscal year 1996.

- *Dependence on Key Personnel and Nick Faldo.* The Company's success depends in large part upon the performance of its senior management team and, in particular, Barney Adams, who directs day-to-day affairs of the Company as well as product development efforts. The loss or unavailability of Mr. Adams would negatively impact the Company. The Company has recently entered into an endorsement agreement with Nick Faldo. The Company believes the future of its marketing strategy, particularly internationally, depends in large part upon Mr. Faldo. The loss, unavailability or poor performance of Mr. Faldo could adversely affect the Company. Additionally, there is significant competition for experienced personnel in the golf industry and the inability to attract or retain other key personnel could also adversely impact the Company.

- *Patents and Protection of Proprietary Technology.* The Company's ability to compete effectively in the golf club market will depend in part upon its ability to maintain the proprietary nature of its technologies and products. The Company has been awarded a number of U.S. patents with respect to its products and technologies. There can be no assurance however as to the commercial value, breadth or degree of protection afforded by these patents. There can be no assurance that competitors will not apply for and obtain patents that prevent, limit or interfere with the Company's ability to make and sell its products. The Company is aware of numerous patents held by competitors that relate to products that compete with the Company's products, including the Tight Lies fairway woods. The defense and prosecution of patents is costly and time-consuming, even if the outcome is favorable. There can be no assurance that the Company will have the resources or ability to aggressively enforce its intellectual property rights or defend itself against claims by others. An adverse outcome in a defense of a patent suit could subject the Company to significant liabilities or require the Company to cease selling its products.

- *Limited Sources of Supply.* The Company relies on a limited number of suppliers for the components for its golf clubs. In the event the Company lost these sources of supply or experienced a price increase from them, it could sustain shortages of components or periods of margin compression. The Company has at times experienced shortages of quality components in the past which have caused the Company to fail to meet its own internal expectations regarding product delivery. Price pressure or the recurrence of such shortages could adversely affect the Company.

-6-

CONFIDENTIAL

UND 06031

A 328

- *Risks of Conducting Business Abroad.* The Company imports a significant portion of its component parts from companies in Taiwan, China and Mexico. In addition, the Company is ramping up its international sales efforts. As a result, the Company could be adversely affected by foreign regulations, political unrest abroad and economic conditions in other countries.

- *Broad Management Discretion in Use of Proceeds.* The Company intends to use the net proceeds of this offering primarily for working capital and general corporate purposes, including capital expenditures, product development, advertising, and expansion of international sales. Accordingly, management will have broad discretion over the use of proceeds and stockholders must depend upon management's judgement in the expenditures of funds.

- *Seasonality.* Golf is primarily a warm weather sport. Golf equipment sales have historically been strongest during the second and third quarters. The success of the Tight Lies have mitigated this seasonality in recent years, however, there can be no assurance that the success of the Tight Lies will continue or that the Company will be able to introduce new products to offset the impact of seasonality. Such seasonality could lead to variability in the Company's quarterly performance and thereby negatively impact the Company's stock price.

> *The preceding discussion of the "issues" with respect to this transaction is preliminary. We have not yet completed our due diligence investigation or our analysis of the Company. Upon further investigation, we may, with the advice of counsel, conclude that certain of these considerations are not relevant or material and therefore should not be included in the prospectus. For a final assessment of the risks associated with this transaction, please see the copy of the preliminary prospectus distributed to prospective investors.*

## H. RECOMMENDATION

Based on the strong growth prospects and financial performance of Adams, as well as its experienced management team, positive feedback from retailers and proven success in developing the Tight Lies fairway woods, we recommend that the Committee approve Lehman Brothers' role as lead-manager of the Offering.

-7-

CONFIDENTIAL

UND 06032

A 329

## BUSINESS OF THE COMPANY

### Principal Products

Adams designs, manufactures and markets premium quality, technologically innovative golf clubs. The Company's principal products are a line of fairway woods consisting of the Original Tight Lies Fairway Wood and the Strong 3, Strong 5, Strong 7 and Strong 9 Tight Lies fairway woods. The Tight Lies fairway woods incorporate an upright trapezoidal head, a shallow face and a lower center of gravity as compared to conventional fairway woods. The Company believes the design of these clubs provide golfers with the ability to hit the ball from virtually any lie, without compromising distance. The design of the Tight Lies fairway woods has been awarded a U.S. patent. In addition, the Tight Lies fairway woods have won two significant golf industry awards, the 1996 Breakthrough Product of the Year Award from the International Network of Golf and the 1997/98 Golf Industry Award of Excellence. Over 50 professional golfers have used the Tight Lies fairway woods in competition, without being paid to do so, since the introduction of the Tight Lies.

The Company also has two other lines of golf clubs including a driver and irons. These other clubs preceded the Tight Lies fairway woods and sales of these other clubs represented less than 3% of sales in the three months ended March 31, 1998.

### Marketing Model

Adams has developed an innovative marketing model that integrates direct to consumer marketing, inside sales and traditional forms of advertising. An important element of this strategy is to generate brand awareness through a variety of direct response media in order to drive retail sales at on-course and off-course golf shops and selected sporting goods retailers. The Company built brand and product awareness for the Tight Lies fairway woods by selling the original 16° Tight Lies through its direct response advertising, including infomercials and print advertising in publications such as Golf Digest and the Wall Street Journal. Although demand for the Tight Lies was build using direct response marketing, over 78% of net sales in the three months ended March 31, 1998 occurred at the retail level, where the Company sells its entire line of Tight Lies fairway woods including the original 16°, Strong 3, Strong 5, Strong 7 and Strong 9.

### Sales Force

Rather than relying on independent sales representatives, as do many other golf companies, Adams Golf has its own inside sales force consisting of 25 persons who maintain direct contact with the Company's retail accounts. The Company believes that using and carefully managing its own sales force enables it to reduce selling expenses and to pass such savings on to its retailers. Adams also has a 25-seat call center and 6 Regional Account Co-ordinators who provide complete customer service to the Company's retail and direct sales clients. These professionals are, to a large extent, experienced golfers, including former collegiate and NIKE tour players. These employees are encouraged to assist customers with the full range of golf-related questions, regardless of whether such contact results in the sale of Adams products. Adams believes its knowledgeable representatives reinforce customers' positive impressions of its products and help build the Adams Golf brand image.

CONFIDENTIAL

UND 06033

A 330