# Appendix
# A331-A390

## Business Trends

Trends in the Company's business since the introduction of the Tight Lies fairway woods in 1996 have been very favorable:

- Sales have increased from $1.1 million in 1995, to $3.5 million in 1996, to $36.7 million in 1997;
- Gross margins have increased from 33% in 1995 to 76% in the first three months of 1998;
- Prices for the Company's products have remained steady to date, both at the wholesale and retail level. In fact, the Company successfully increased wholesale prices of its Tight Lies fairway woods by 5% in January 1998;
- Operating margins have increased from an operating loss in 1995 to 36% for the first three months of 1998;
- Net income has increased from a negative figure in 1995 to $5.5 million (a 22% margin) for the first three months of 1998.

| TABLE 2: BUSINESS TRENDS 1995-1998 YTD ($MM) | | | | | |
|---|---|---|---|---|---|
| | Year Ended December 31, | | | 3 Months Ended | |
| | 1995 | 1996 | 1997 [b] | 3/31/97 [b] | 3/31/98 |
| Net Sales | $    1.1 | $    3.5 | $   36.7 | $   1.5 | $    24.5 |
| *Growth* | *NA* | *213.0%* | *941.8%* | *NA* | *1,561.7%* |
| Cost of Goods Sold | 0.8 | 1.6 | 10.0 | 0.6 | 5.9 |
| Gross Profit | 0.4 | 1.9 | 26.7 | 0.9 | 18.6 |
| *Gross Margin* | *32.8%* | *54.9%* | *72.8%* | *60.2%* | *76.1%* |
| SG&A | 0.6 | 1.9 | 23.8 | 0.8 | 9.7 |
| R&D | 0.0 | 0.1 | 0.6 | 0.0 | 0.1 |
| Operating Income | (0.2) | 0.0 | 2.4 | 0.1 | 8.9 |
| *Operating Margin* | *(21.7%)* | *0.3%* | *6.5%* | *4.7%* | *36.2%* |
| Net Other/Interest Income | 0.0 | 0.0 | (0.1) | 0.0 | (0.1) |
| Pretax Income | (0.2) | 0.0 | 2.3 | 0.1 | 8.8 |
| Taxes | | | 0.6 | (0.0) | 3.3 |
| Net Income | $   (0.2) | $    0.0 | $    1.7 | $   0.1 | $     5.5 |
| *Net Income Margin* | *(21.6%)* | *0.4%* | *4.6%* | *4.9%* | *22.5%* |

*(a) 1997 SG&A includes a one-time $8.3 million compensation expense associated with a stock compensation award to the Company's CEO and the exercise by the Company's CEO of a non-statutory stock option.
(b) SG&A and R&D for the 3 months ended 3/31/97 are assumed to be the same proportion of operating expenses as in the year ended 12/31/97. Net Other/Interest Income assumed to be zero.*

## Industry Trends

The Company believes that a number of trends in the golf industry are likely to further increase the demand for its products. These trends include: (i) growth in wholesale sales of golf clubs, (ii) increasing use of fairway woods by amateur and professional golfers, (iii) spending patterns that are driven largely by avid golfers who are early adopters of new products, (iv) increasing interest in golf from women, juniors and minority golfers, (v) increasing availability of golf courses and practice ranges and (vi) golfers' willingness to accept new products and technologies.

-9-

CONFIDENTIAL

UND 06034

A 331

## Competitive Position

The Company faces intense competition from established golf companies with significantly greater resources than the Company. These competitors include Callaway Golf Company, Taylor Made Golf (a subsidiary of Adidas-Salomon AG), and Cobra Golf and Titleist (subsidiaries of Fortune Brands). In addition, the Company faces competition from other small companies, some of whom are successfully imitating the Company's marketing strategy. The Company's success to date can be largely attributed to three factors: (i) its focus on a niche (fairway woods) which the larger competitors had largely ignored in the past, (ii) its innovative marketing model and (iii) its ability to deliver high margin quality products to golf retailers. Each of these sources of competitive advantage could be eroded by competition. The larger companies have noted Adams Golf's success in the fairway woods niche and are expected to introduce new lines of fairway woods in the future. Other companies, such as Orlimar Golf Company, have begun to imitate the Adams direct response driven marketing model. Although the Company's products have not experienced material amounts of discounting to date, such discounting may become more prevalent as the Company continues to increase its sales.

## III. FINANCIAL RESULTS

### TABLE 3: SUMMARY INCOME STATEMENT ($MM except per share data)

|  | Year Ended December 31, | | | 3 Months Ended, | |
|  | 1995 | 1996 | 1997 [a] | 3/31/97 [b] | 3/31/98 |
|---|---|---|---|---|---|
| Net Sales | $ 1.1 | $ 3.5 | $ 36.7 | $ 1.5 | $ 24.5 |
| *Year/Year Growth* | *NA* | *213.0%* | *941.8%* | *NA* | *1,561.7%* |
| Cost of Goods Sold | 0.8 | 1.6 | 10.0 | 0.6 | 5.9 |
| Gross Profit | 0.4 | 1.9 | 26.7 | 0.9 | 18.6 |
| *Gross Margin* | *32.8%* | *54.9%* | *72.8%* | *60.2%* | *76.1%* |
| SG&A | 0.6 | 1.9 | 23.8 | 0.8 | 9.7 |
| R&D | 0.0 | 0.1 | 0.6 | 0.0 | 0.1 |
| Total Operating Expenses | 0.6 | 1.9 | 24.3 | 0.8 | 9.8 |
| Operating Income | (0.2) | 0.0 | 2.4 | 0.1 | 8.9 |
| *Operating Margin* | *(21.7%)* | *0.3%* | *6.5%* | *4.7%* | *36.2%* |
| Net Other/Interest Income | 0.0 | 0.0 | (0.1) | 0.0 | (0.1) |
| Pretax Income | (0.2) | 0.0 | 2.3 | 0.1 | 8.8 |
| Taxes | | | 0.6 | (0.0) | 3.3 |
| Net Income | $ (0.2) | $ 0.0 | $ 1.7 | $ 0.1 | $ 5.5 |
| *Net Income Margin* | *(21.6%)* | *0.4%* | *4.6%* | *4.9%* | *22.5%* |
| Post Split W/A Shares | 4.4 | 11.2 | 13.0 | 12.5 | 17.8 |
| EPS | $ (0.05) | $ 0.00 | $ 0.13 | $ 0.01 | $ 0.31 |

(a) 1997 SG&A includes a one-time $8.5 million compensation expense associated with a stock compensation award to the Company's CEO and the exercise by the Company's CEO of a non-statutory stock option.
(b) SG&A and R&D for the 3 months ended 3/31/97 are assumed to be the same proportion of operating expenses as in the year ended 12/31/97. Net Other/Interest Income assumed to be zero. Weighted average shares in the 3 months ended 3/31/97 extrapolated based on the figures for 1996 and 1997.

## OPERATING RESULTS

*Revenues.* Net revenues in 1997 were $36.7 million compared to $3.5 million in 1996, an increase of $31.2 million. The increase in revenue was attributable to the market's acceptance of the Tight Lies product, which represented 95.3% of 1997 sales. Revenues, driven by the Tight

CONFIDENTIAL

UND 06035

A 332

Lies sales, increased in the March 31, 1998 quarter to $24.5 million, from $1.5 million in the March 31, 1997 quarter. Tight Lies sales represented 97.3% of sales in Q1 1998.

*Gross Profit.* Gross profit increased to $26.7 million in 1997, versus $1.9 million in 1996. Gross profit increased to $18.6 million in Q1 1998 quarter, from $0.9 million in Q1 1997. The gross profit margin increase, both in 1997 (72.8%) over 1996 (54.9%) and in Q1 1998 (76.1%) over Q1 1997 (60.2%), resulted from an increased percentage of sales attributable to the higher margin Tight Lies golf club, and inherent cost savings associated with larger volume operations.

*Operating expenses.* Total operating expenses in 1997 of $24.3 million represented a $22.4 million increase over 1996 operating expenses of $1.9 million. Of this expense, $8.5 million, or 34.9%, was a result of stock-based compensation in connection with an employment agreement with Barney Adams. Operating expenses increased to $9.8 million in Q1 1998 from $0.8 million in Q1 1997. The increases in operating expenses arose from the higher levels of selling and advertising costs associated with the promotion of the Tight Lies product line, and increased administrative costs from the hiring of additional employees. Operating expenses decreased as a percent of sales, from 55.8% in Q1 1997 to 39.9% in Q1 1998.

*Operating income.* Operating income increased from $8,809 in 1996 to $2.4 million in 1997. Operating income increased to $8.9 million in Q1 1998 from $65,000 in Q1 1997. The rise in both 1997 and Q1 1998 operating income were due to increased sales.

## PROJECTED OPERATING RESULTS

Upon completion of the initial public offering, Bernie Picchi, Lehman Brothers' head of emerging growth equity research, and Brian Lantier will be covering the Company. The Company is expected to experience top-line growth of over 30% through the year 2002. Lehman Brothers' quarterly income statement projections for 1998 and 1999 and annual projections through 2002 are set forth below in Table 4.

### TABLE 4: QUARTERLY AND ANNUAL PROJECTED INCOME STATEMENT
($MM except per share data)

| | 3/31A | 6/97E | 9/97E | 12/97E | 1997E | 3/98E | 6/98E | 9/98E | 12/98E | 1998E | 1999E | 2000E | 2001E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | $ 7.3 | $ 28.2 | $ 25.4 | $ 25.8 | $ 101.1 | $ 20.1 | $ 58.0 | $ 43.4 | $ 24.3 | $ 197.7 | $ 121.1 | $ 329.6 | $ 430.3 |
| Sequential Growth | NA | 143% | (9.3%) | 1/1.1% | 243.4% | 52.4% | 28.7% | (17.7%) | (15.7%) | 52.1% | 43.4% | 24.7% | 30.6% |
| Cost of Goods Sold | 3.9 | 1.3 | 7.9 | 6.7 | 29.4 | 10.4 | 14.5 | 12.2 | 11.2 | 49.2 | 76.3 | 102.3 | 134.6 |
| Gross Profit | 12.1 | 17.3 | 17.3 | 16.1 | 71.7 | 23.8 | 33.4 | 31.2 | 17.2 | 122.2 | 115.3 | 227.4 | 295.7 |
| Gross Margin | 74.1% | 66.4% | 68.8% | 70.8% | 77.0% | 78.4% | 70.9% | 78.7% | 71.0% | 74.9% | 69.8% | 63.8% | 68.2% |
| SG&A | 5.7 | 11.3 | 11.3 | 9.0 | 41.1 | 11.0 | 10.7 | 11.3 | 16.0 | 50.3 | 104.9 | 171.1 | 175.0 |
| R&D | 0.1 | 0.3 | 0.4 | 0.3 | 1.3 | 0.7 | 1.0 | 0.9 | 0.4 | 3.4 | 5.5 | 7.3 | 9.5 |
| Total Operating Expenses | 9.8 | 11.0 | 12.1 | 9.4 | 43.3 | 13.3 | 11.9 | 19.3 | 18.3 | 72.9 | 110.4 | 144.4 | 183.5 |
| Operating Income | 8.9 | 1.3 | 3.3 | 6.8 | 28.3 | 9.8 | 13.7 | 11.4 | 10.6 | 45.5 | 41.4 | 82.1 | 108.3 |
| Operating Margin | 36.1% | 22.3% | 21.5% | 29.7% | 28.0% | 17.3% | 27.4% | 21.4% | 27.5% | 27.4% | 28.6% | 23.2% | 24.3% |
| Net Other/Interest Income | (0.1) | | | | | | | | | | | | |
| Pretax Income | 8.8 | 1.3 | 3.3 | 6.8 | 24.3 | 9.9 | 13.7 | 11.4 | 12.8 | 45.3 | 42.4 | 83.1 | 102.3 |
| Taxes | 3.3 | 2.6 | 2.0 | 2.4 | 10.2 | 3.1 | 4.9 | 4.3 | 3.8 | 16.2 | 21.4 | 34.9 | 37.9 |
| Net Income | $ 5.5 | $ 4.5 | $ 3.3 | $ 4.3 | $ 14.1 | $ 6.5 | $ 8.8 | $ 5.9 | $ 6.8 | $ 23.8 | $ 41.9 | $ 53.2 | $ 67.4 |
| Net Income Margin | 22.7% | 14.6% | 12.6% | 15.9% | 13.9% | 32.3% | 17.2% | 11.5% | 11.4% | 12.5% | 14.6% | 13.2% | 13.7% |
| Post Split WA Shares | 17.2 | 19.6 | 23.3 | 23.4 | 31.3 | 33.8 | 34.1 | 34.4 | 35.7 | 34.5 | 35.2 | 35.3 | 38.1 |
| EPS | $ 0.31 | $ 0.24 | $ 0.11 | $ 0.19 | $ 0.61 | $ 0.21 | $ 0.36 | $ 0.23 | $ 0.77 | $ 1.22 | $ 1.64 | $ 1.99 | $ 2.60 |

-11-

CONFIDENTIAL

UND 06036

A 333

The Company's balance sheet as of March 31, 1998 is set forth below in Table 5.

### TABLE 5:  BALANCE SHEET

| (in thousands) | As of 3/31/98 |
|---|---|
| **ASSETS** | |
| Cash and cash equivalents | $      602 |
| Accounts receivable | 14,709 |
| Income taxes refundable | 222 |
| Inventories | 5,560 |
| Prepaid expenses | 1,107 |
| Deferred income tax assets | 390 |
| Other current assets | 353 |
| Total current assets | 22,942 |
| Property and equipment, net | 2,095 |
| Deferred income tax assets | 183 |
| Other assets | 286 |
| Total assets | $ 25,505 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | |
| Notes payable | $ |
| Notes payable to stockholder | 1,135 |
| Accounts payable | 1,766 |
| Federal income taxes payable | 2,940 |
| Accrued expenses | 4,985 |
| Total current liabilities | 10,826 |
| Stockholders' equity | |
| Common stock | 18 |
| Additional paid-in capital | 8,851 |
| Common stock subscription | (231) |
| Retained earnings | 6,041 |
| Total shareholders' equity | 14,679 |
| Total liabilities and shareholders' equity | $ 25,505 |

-12-

CONFIDENTIAL

UND 06037

A 334

## PRO FORMA CAPITALIZATION

Table 6 sets forth the actual and adjusted capitalization of the Company at March 31, 1998 to give effect to the Offering and the application of the estimated net proceeds therefrom.

### TABLE 6: CAPITALIZATION TABLE

| | As of March 31, 1998 | |
|---|---|---|
| | Actual | As Adjusted[(a)] |
| Cash & Cash Equivalents | $ 602 | $ 51,280 |
| Total Debt and Notes Payable to Stockholders | $ 1,135 | $ — |
| Stockholders' Equity | 14,679 | 66,492 |
| Total Capitalization | $ 15,814 | $ 66,492 |

(a) Adjusted to reflect the sale of 3,750,000 primary shares of common stock assuming an initial public offering price of $15 per share less the 7.0% underwriting discount and $300,000 estimated offering expenses.

## CORPORATE STRUCTURE

To avoid paying the 4.5% Texas Franchise tax, the Company has been structured as a holding company. The parent company, Adams Golf, Inc., is a Delaware corporation. All of the Company's assets are held in various limited partnerships, which have the parent company as the general partner. Company counsel informs us that this structure is common in Texas and that other publicly-traded Texas-based companies utilize this structure, including Dell Computer.

## AUDIT INFORMATION

The Company received a clean audit opinion from KPMG Peat Marwick. Audited financials for the years ended December 31, 1995, 1996 and 1997 will be included in the Prospectus. The Company had de minimis revenues and earnings in fiscal 1993 and 1994. The Company has obtained a waiver from the SEC with respect to financial data for these years and consequently information regarding 1993 and 1994 will not be included in the Prospectus.

The KPMG management letter dated February 9, 1998 raised four issues: (i) need to segregate cash disbursement duties, (ii) need to computerize fixed asset records, (iii) need to develop a systematic approach for determining appropriate allowances for uncollectible amounts and (iv) recommendation that the Company remove a provision of its stock option plan that could potentially allow pyramiding, an alternative that can cause a Company to forfeit favorable accounting treatment of its plan. The Company has taken actions to correct each of these issues.

-13-

CONFIDENTIAL

UND 06038

A 335

## IV. VALUATION ANALYSIS

The following consumer products companies were used in our comparable company analysis:

*Large Cap Companies With Major Golf Businesses*

- Callaway Golf Company (NYSE: ELY): Callaway is a leading maker of high quality, premium-priced golf clubs.

- Adidas-Salomon AG (NYSE-ADR: ADDDY): Adidas-Salomon AG manufactures and markets "Adidas" brand sports shoes, sportswear and a variety of other sports merchandise worldwide. The Company owns Taylor Made Golf.

- Fortune Brands Inc. (NYSE: FO): Fortune Brands is a holding company for a diversified group of businesses. Products include distilled spirits, golf equipment (Titleist, Cobra and Footjoy) and other products.

*Selected Premium Hard and Soft Goods Makers*

- NIKE, Inc. (NYSE: NKE): Nike, Inc. designs, develops and markets high quality footwear, apparel, equipment, and accessory products.

- K2 Design. Inc. (NYSE: KTO): K2, Inc. is a diversified manufacturer and distributor of brand name sporting goods and other recreational products such as skis, snowboards, in-line skates and mountain bikes. KTO also manufactures and distributes industrial products.

- Ashworth Inc. (NASDAQ: ASHW): Ashworth, Inc. designs, markets, and distributes a full line of sports apparel, headwear and shoes under the Ashworth label, retailed in golf pro shops, resorts and department and specialty retail stores.

- Cutter & Buck, Inc. (NASDAQ: CBUK): Cutter & Buck, Inc. designs, sources and markets its brand sportswear and outerwear through golf pro shops and resorts, upscale men's specialty stores and corporate sales accounts.

-14-

CONFIDENTIAL

UND 06039

A 336

## IV.    VALUATION ANALYSIS (CONT'D)

The comparable company valuation is summarized below in table 7.

### TABLE 7: SUMMARY OF COMPARABLE COMPANY ANALYSIS

| Company | Market Value | Firm Value [1] | 5-Year Est. LTG Growth [2] | CY98 P/E / 5-Year Growth | CY99 P/E / 5-Year Growth | LTM P/E | CY1998 P/E | CY1999 P/E | Market Value / Book Val. | Firm Value / LTM EBIT | Firm Value / LTM EBIT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ashworth Golf, Inc. [x] | $ 405.5 | $ 342.1 | 57.3% | 34.1% | 26.2% | NM | 30.6 x | 16.4 x | 43.7 x | 3.2 x | 124.3 x |
| *Primary Comparable Company* | | | | | | | | | | | |
| Callaway Golf Company [3] | 3,444.4 | 2,358.2 | 17.5% | 73.4% | 64.1% | 14.8 x | 23.8 x | 11.9 x | 4.2 x | 2.4 x | 3.1 x |
| *Large Cap Companies with Major Golf Businesses* | | | | | | | | | | | |
| Adidas-Salomon AG (b) [5] | $ 7,216.3 | $ 8,571.8 | 21.0% | 47.2% | 30.2% | 23.3 x | 9.9 x | 7.5 x | 14.9 x | 2.1 x | 7.2 x |
| Fortune Brands, Inc. [6] | 6,472.3 | 7,568.8 | 13.0% | 130.3% | 108.3% | 31.3 x | 22.1 x | 17.5 x | 1.1 x | 1.8 x | 15.2 x |
| | | | **Mean** | 17.0% | 88.8% | 73.3% | 28.3 x | 16.0 x | 12.5 x | 8.3 x | 1.9 x | 11.2 x |
| | | | **Median** | 17.0% | 88.8% | 73.3% | 28.3 x | 16.0 x | 12.5 x | 8.3 x | 1.9 x | 11.2 x |
| *Selected Premium Hard and Soft Good Makers* | | | | | | | | | | | |
| Nike, Inc. [6] | $ 13,541.2 | $ 14,403.8 | 13.0% | 113.8% | 149.8% | 32.4 x | 27.8 x | 22.3 x | 4.9 x | 2.5 x | 17.9 x |
| K2 Inc. [7] | 242.3 | 378.6 | 17.0% | 37.8% | 35.9% | 13.6 x | 15.5 x | 13.4 x | 1.5 x | 0.3 x | 11.3 x |
| Ashworth, Inc. | 232.9 | 250.3 | 37.3% | 91.3% | 43.4% | 39.3 x | 33.3 x | 14.0 x | 2.5 x | 22.6 x |
| Coach A Buck Inc. | 151.3 | 174.8 | 22.5% | 79.5% | 33.7% | 31.3 x | 31.4 x | 16.1 x | 3.9 x | 2.1 x | 19.6 x |
| | | | **Mean** | 31.8% | 111.1% | 88.9% | 37.3 x | 32.4 x | 11.3 x | 3.4 x | 1.9 x | 16.6 x |
| | | | **Median** | 22.5% | 91.5% | 73.2% | 34.9 x | 12.2 x | 17.3 x | 2.2 x | 1.9 x | 16.3 x |

[1] Firm Value is defined as Market Value plus Debt minus Cash.

[2] EPS estimates are the median of the estimates reported in IBES; Projected 5-Year EPS Growth is the median of the growth rate reported in IBES.

[3] Data taken from latest press release. Shares Outstanding figure is of one quarter behind that reported in the latest press release.

[x] Figures are Post Future IPO. Assumes an offering of $125.00 million based on midpoint of filing range, i.e. $17.43 after reconverting the 15% IPO discount, with 3,236 primary and 2,036 secondary shares.

[b] K2's EBIT and Net Income figures include $12.04 and $3.04 after tax, respectively, in litigation charges.

[c] ADIDDY's reported figures taken from press release. Income taken figures as of 12/04.

[d] FO's figures include $205,134 in extraordinary charges. Gross Profit excludes the effect of $89,134 in extraordinary charges and EBIT excludes the effect of $229,134 in extraordinary charges. The non-Control amount excluded from Net Income is $228,284.

[e] NKE's EPS figures include dividends declared.

[f] KTO's EBIT and Net Income figures include $2.04 and $1.04 after tax, respectively, in restructuring charges.

Preliminary valuation suggests that the Company will be priced at a fully distributed 14.4x CY 1999E P/E, implying a 20.9% premium to Callaway Golf, the primary comparable company (CY 1999E P/E of 11.9x). After taking into account the 15% IPO discount, the Company is initially priced at a 1999E P/E of 12.2x.

-15-

CONFIDENTIAL

UND 06040

A 337

## V.  MANAGEMENT, DIRECTORS, OWNERS AND EMPLOYEES

### DIRECTORS AND MANAGEMENT.

Lehman Brothers conducted background checks on management and did not discover any negative records. Dari Hatfield, the Company's new CFO, will not officially begin with the Company until May 1, 1998. Prior to that, Mr. Hatfield has been partner in charge of the Company's account with KPMG Peat Marwick. The Company's former CFO, Jim Farrell, will stay on as the VP, Finance and report to Mr. Hatfield.

Table 8 below sets forth certain information with respect to the directors and executive officers of the Company:

**TABLE 8: MANAGEMENT AND DIRECTORS.**

| Name | Age | Position with the Company |
|------|-----|---------------------------|
| B.H. (Barney) Adams | 59 | Chairman of the Board, Chief Executive Officer and President |
| Dari P. Hatfield | 51 | Senior Vice President – Finance and Administration |
| Richard H. Murtland | 57 | Vice President – Research and Development, Secretary, Treasurer and a Director |
| James E. Farrell | 39 | Vice President – Finance |
| Mark D. Gonsalves | 38 | Vice President – Sales and Marketing |
| Steven P. Sanazaro | 49 | Vice President – Information Technology |
| Walter G. DeVault | 47 | Director of Consumer Sales |
| Cindy A. Herington | 36 | Director of Special Projects |
| Paul F. Brown, Jr. | 51 | Director |
| Roland E. Casati | 67 | Director |
| Finis F. Conner | 54 | Director |
| Mark Mulvoy | NA | Director |
| Steven R. Patchin | 39 | Director |

*B.H. (Barney) Adams.* Mr. Adams founded the Company in 1986 and has served as Chairman of the Board, Chief Executive Officer and President since that time. Prior to founding the Company, Mr. Adams served as Chief Executive Officer of Interest, Inc. (a manufacturer of semiconductor testing equipment), as Senior Vice President of Margaux Controls, Inc. (a manufacturer of energy control systems) and Executive Vice President of Maytex Manufacturing. Mr. Adams is widely considered an industry equipment expert, has authored several magazine articles concerning the technical aspects of golf equipment and is a frequent PGA section speaker.

-16-

CONFIDENTIAL

UND 06041

A 338

## V.  MANAGEMENT, DIRECTORS, OWNERS AND EMPLOYEES (CONT'D)

*Darl P. Hatfield.* Mr. Hatfield joined the Company as Senior Vice President – Finance and Administration in May 1998. Prior to joining the Company, Mr. Hatfield was a partner with KPMG Peat Marwick LLP. Mr. Hatfield has 30 years of experience in accounting and auditing and is a Certified Public Accountant.

*Richard H. Murtland.* Mr. Murtland joined the Company in 1994 as Vice President – Operations. He became Vice President – Research and Development in April, 1998. Mr. Murtland has approximately 30 years of experience in operations and engineering, most recently as Project Manager with Atlantic Richfield Co. (an international oil exploration company).

*James E. Farrell.* Mr. Farrell joined the Company as Vice President – Finance in September 1997. Prior to joining the Company, Mr. Farrell served as a Manager for The Pittson Company. From April 1994 to June 1995, Mr. Farrell worked in Finance/Marketing for Brinks Home Security (a monitored home security company). Prior thereto, he was employed for ADT Security Systems. Mr. Farrell is a Certified Public Accountant.

*Mark D. Gonsalves.* Mr. Gonsalves joined the Company in July 1995 as Vice President – Sales and Marketing. Prior to joining the Company, Mr. Gonsalves founded and was President and Chief Executive Officer of In-Sync Sport International, Inc. (a sports psychology company founded by Mr. Gonsalves). He was a professional golfer from 1990 to 1992. Mr. Gonsalves has 16 years sales and marketing experience.

*Steven P. Sanazaro.* Mr. Sanazaro joined the Company as Vice President – Information Technology in January 1998. Prior to joining Adams, Mr. Sanazaro served as Vice President, Information Technology for PepsiCo, Inc. and as Vice President, Research and Development for Harbinger Corporation (a supplier of electronic commerce software and network services) from 1993 to 1996. Mr. Sanazaro has approximately 30 years of business technology experience.

*Walter G. DeVault.* Mr. DeVault joined the Company as Director of Consumer Sales in February 1998. He has worked in the home security industry for the last eight years and was most recently the National Sales Director for Brink's Home Security, Inc. Mr. DeVault has over 25 years of sales and sales management experience.

*Cindy A. Herington.* Ms. Herington joined the Company as Director of Special Projects in May 1997. She currently manages the daily advertising and marketing needs for the Company. Prior to joining the Company, Ms. Herington had been employed for ten years by Neiman Marcus. Ms. Herington is the daughter of Barney Adams, the Company's Chief Executive Officer and President.

*Paul F. Brown, Jr.* Mr. Brown became a director in 1995. Mr. Brown has been Vice President – Finance and Chief Financial Officer of Royal (a holding company with diversified interests since 1990).

-17-

CONFIDENTIAL

UND 06042

A 339

## V. MANAGEMENT, DIRECTORS, OWNERS AND EMPLOYEES (CONT'D)

*Roland Casati.* Mr. Casati became a director in 1995. He has been engaged in the development of residential and commercial real estate and diversified personal investments for over 30 years. Mr. Casati's investments have involved original investments in communications, retail and manufacturing, including two previous investments in sports manufacturers. Mr. Casati is a director of Ziegler Coal Holding Co. (one of the largest coal producers in the U.S.)

*Finis F. Conner.* Mr. Conner was elected a director of the Company in October 1996. Until 1996, Mr. Conner was Chairman of the Board and Chief Executive Officer of Conner Peripherals, Inc., (a leading publicly traded manufacturer of disk drives for personal computers founded by Mr. Conner in 1986) which merged with Seagate Technology, Inc. (a publicly traded manufacturer of computer components co-founded by Mr. Conner) in February 1996. Mr. Conner served as Vice-Chairman of Seagate from 1979 to 1985. From 1996 to the present, Mr. Conner has been Chairman of the Board of Virtual Visits, Inc., a company engaged in the design of Internet web sites for the promotion of golf products, and since February 1996, Mr. Conner has been a principal of the Conner Group, an independent consulting operation.

*Steven R. Patchin.* Mr. Patchin became a director in 1990. He has been President and Chief Executive Officer of Royal Oil and Gas Corp., an oil and gas exploration company and wholly owned subsidiary of Royal, since 1985 and President and Chief Executive Officer of Royal since 1990.

*Mark Mulvoy.* Mr. Mulvoy became a director in April 1998.

### Shareholders

The top shareholders of the Company on a post-split basis are set forth in Table 9 below:

| | TABLE 9: TOP FIVE SHAREHOLDERS OF THE COMPANY | | | |
|---|---|---|---|---|
| Shareholder | Shares Held[a] Pre-Offering | % of Total Shares[b] | Shares Sold in Offering | Pro Forma Ownership Post Offering[c] |
| Royal Holding Company, Inc. | 7,405,438 | 38.5% | 370,272 | 30.6% |
| B.H. Adams | 4,640,768 | 24.1% | 1,160,192 | 15.1% |
| Roland Casati | 2,138,600 | 11.1% | None | 9.3% |
| Finis Conner | 1,986,776 | 10.3% | 397,355 | 6.9% |
| Nick Faldo | 900,000 | 4.7% | None | 3.9% |
| Total | 17,071,582 | 88.8% | 1,927,819 | 65.9% |

(a) Includes stock options
(b) Based on 19,230,946 fully diluted share
(c) Does not include over-allotment option; Based on offering of 3,750,000 primary shares

### Employees

The Company employs approximately 210 persons of which 95 are engaged in manufacturing and assembly, 17 in research and development and quality control, 66 in sales support and 32 in management and administration. Adams' employees are not unionized and management believes that its relations with employees are good.

-18-

CONFIDENTIAL

UND 06043

A 340

## VI.   LITIGATION AND OTHER CONTINGENT LIABILITIES

The Company is not engaged in any material legal proceedings.

-19-

CONFIDENTIAL

UND 06044

A 341

A

CONFIDENTIAL

UND 06045

A 342

## Comparable Company Analysis

LEHMAN BROTHERS

CONFIDENTIAL



## Comparable Company Analysis

CONFIDENTIAL

UND 06047

A 344

B

CONFIDENTIAL

UND 06048

A 345

*...tilon they ..* 1
..ny not shall

*...ilies ......tlitsalm..hibitim...* 
effective. This Prospectus shall not constitute an offer to sell or the solicitation of an of.
....tries under the securities laws of any such State.

.....it.......filed i......In fih.......In the .......Iles is ......registation ..............
....the ..... in....In fih.......In the ..... Prospectus shall not constitute an offer to sell or the solicitation of an of.

in flu.....In the ..... .....In fih.....In the ..... Prospectus shall not .....hibitim...
....effective. This Prospectus shall not constitute an offer to sell or the solicitation of an of.
..fore........tfiled I.......In flu.....In .......ries under the securities laws of any such State.
effective. This Prospectus shall not .....

.... ...u.t......In......... Registration Statement is .....th....n Sta...
...t be ..... .....and/or....m Stat..
a sold nor may offers to buy be accepted prior to the time the Registration Statement is
....effective. This Prospectus shall not constitute an offer to sell or the solicitation of an
....ures to buy sale of these securities in any Suc in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such State.

....claim...nation......In the....tion....and...... .....tation to ...
a sold nor may offers to buy be accepted prior to the time the Registration Statement is
....ures to be any sale of these securities in any Suc in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such State.

**SUBJECT TO COMPLETION, DATED MAY 4, 1998**

PROSPECTUS

## Shares

## [ADAMS GOLF LOGO]

## Common Stock

Of the ____ shares of common stock, par value $.001 per share (the "Common Stock"), being offered hereby ____ are being offered by Adams Golf, Inc. (the "Company") and ____ are being offered by certain stockholders of the Company (the "Selling Stockholders"). The Company will not receive any of the proceeds from the sale of shares by the Selling Stockholders. See "Principal and Selling Stockholders."

Prior to the offering made hereby (the "Offering"), there has been no public market for the Common Stock of the Company. It is currently estimated that the initial public offering price of the Common Stock will be between $____ and $____ per share. See "Underwriting" for a discussion of the factors considered in determining the initial public offering price of the Common Stock. Application has been made to have the Common Stock listed on The Nasdaq Stock Market's National Market under the symbol "ADGO."

See "Risk Factors" beginning on page 6 for a discussion of certain factors that should be considered by prospective purchasers of the Common Stock offered hereby.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

| | Price to Public | Underwriting Discounts and Commissions(1) | Proceeds to Company(2) | Proceeds to Selling Stockholders |
|---|---|---|---|---|
| Per Share | $ | $ | $ | $ |
| Total(3) | $ | $ | $ | $ |

(1) The Company and the Selling Stockholders have agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended. See "Underwriting."

(2) Before deducting expenses of the Offering payable by the Company of approximately $____.

(3) [The Company and] the Selling Stockholders have granted the Underwriters a 30-day option to purchase up to and aggregate of ____ additional shares of Common Stock on the same terms and conditions as set forth above, solely to cover over-allotments, if any. If such option is exercised in full, the total Price to Public, Underwriting Discounts and Commissions, Proceeds to Company and Proceeds to Selling Stockholders will be $____, $____, $____ and $____, respectively. See "Underwriting."

The shares of Common Stock offered by this Prospectus are offered severally by the Underwriters, subject to prior sale, to withdrawal, cancellation or modification of the offer without notice, to delivery to and acceptance by the Underwriters and to certain further conditions. It is expected that delivery of the certificates for the shares of Common Stock will be made at the offices of Lehman Brothers Inc., New York, New York or through the facilities of the Depository Trust Company, on or about June ____, 1998.

## Lehman Brothers

## NationsBanc Montgomery Securities

### Ferris, Baker Watts
Incorporated

____, 1998

95701A
DRAFT: 4/24/98

A 346

As Filed with the Securities and Exchange Commission on May 4, 1998.          Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM S-1
### REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

## ADAMS GOLF, INC.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **3949** | **75-2320087** |
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

300 Delaware Avenue, Suite 545
Wilmington, Delaware 19801
(302) 427-5892
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

B.H. (Barney) Adams
Chief Executive Officer
300 Delaware Avenue, Suite 545
Wilmington, Delaware 19801
(302) 427-5892
(Name, address, including zip code, and telephone number,
including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| JOSEPH A. HOFFMAN, ESQ. | KENNETH L. GUERNSEY, ESQ. |
| J. DAVID WASHBURN, ESQ. | KARYN R. SMITH, ESQ. |
| Arter & Hadden LLP | Cooley Godward LLP |
| 1717 Main Street, Suite 4100 | One Maritime Plaza |
| Dallas, Texas 75201 | 20th Floor |
| (214) 761-2100 | San Francisco, California 94111 |
| | (415) 693-2000 |

**Approximate date of commencement of proposed sale to the public:**
As soon as practicable after the effective date of this Registration Statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box: ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective Registration Statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. ☐

### Calculation of Registration Fee

| Title of Each Class of Securities to be Registered | Amount to be Registered (1) | Proposed Maximum Offering Price Per Share(2) | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock, $.001 par value | shares | $ | $ | $ |

(1)   Includes      shares of Common Stock which the Underwriters have the option to purchase to cover over-allotments, if any.
(2)   Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457 under the Securities Act of 1933, as amended.

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933, AS AMENDED, OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.

96702.4
DRAFT: 4/24/98

CONFIDENTIAL

UND 06050

A 347

[ON THIS PAGE APPEAR (1) A PHOTOGRAPH OF _____
AND (2) A _____ ]

The Company intends to furnish to its stockholders annual reports containing audited consolidated financial statements and quarterly reports containing unaudited consolidated financial information for each of the first three quarters of each fiscal year.

CERTAIN PERSONS PARTICIPATING IN THE OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK. SUCH TRANSACTIONS MAY INCLUDE THE PURCHASE OF SHARES OF COMMON STOCK FOLLOWING THE PRICING OF THE OFFERING TO COVER A SYNDICATE SHORT POSITION IN THE COMMON STOCK OR FOR THE PURPOSE OF MAINTAINING THE PRICE OF THE COMMON STOCK AND THE IMPOSITION OF PENALTY BIDS. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."

The Company has registered the trademarks Tight Lies®, Assault®, SuperShafts®, Nightstick®, Adams® (with triangle design), and currently has pending applications for registration of the trademarks The Upside Down Woods, a configuration of the heel portion of a golf club head, and an overall configuration of a golf club head. This Prospectus also includes trademarks of companies other than the Company.

95702.4

CONFIDENTIAL

UND 06051

A 348

## PROSPECTUS SUMMARY

*The following summary information is qualified in its entirety by and should be read in conjunction with the more detailed information and the Company's Financial Statements (including the Notes thereto) appearing elsewhere in this Prospectus. Unless otherwise indicated, all share amounts, per share amounts and other information in this Prospectus have been adjusted to give effect to a 2-for-1 stock split of the Common Stock and assume that the Underwriters' over-allotment option has not been exercised. References in this Prospectus to the "Company" or "Adams" are, unless the context otherwise requires, to Adams Golf, Inc., a Delaware corporation, and the Company's subsidiaries. See "Underwriting."*

### The Company

Adams Golf, Inc. designs, manufactures and markets premium quality, technologically innovative golf clubs. The Company's design objective is to produce golf clubs that deliver meaningful performance benefits and inspire player confidence at address. The Company believes that its most successful product line to date, the Tight Lies fairway woods, meets this objective by providing golfers with the ability to hit the ball from virtually any lie while maximizing distance. The patented Tight Lies fairway woods feature an upright trapezoidal head, a shallow face and a lower center of gravity as compared to conventional fairway woods.

Adams has developed a comprehensive marketing model that integrates direct to consumer marketing, inside sales and more traditional forms of advertising. An important element of this strategy is to generate brand awareness in order to drive retail sales at on- and off-course golf shops and selected sporting goods retailers through a variety of media. Using this strategy, the Company built brand and product awareness for Adams and its Tight Lies fairway woods by selling the original Tight Lies fairway wood through direct response advertising, including an infomercial and print advertising in publications such as *Golf Digest*, *USA Today* and the *Wall Street Journal*. Although demand for the Tight Lies was initially built using direct response marketing, currently a majority of sales occur at the retail level, where the Company sells its Tight Lies, Strong 3, Strong 5, Strong 7 and Strong 9 fairway woods.

Another important element of the Company's success to date has been its sales and customer service infrastructure. Rather than relying on independent sales representatives, as do many other golf companies, Adams has a 25-person inside sales department which is in frequent, direct contact with the Company's over 16,000] retailers. These sales representatives are supported by 16] Regional Account Coordinators who maintain personal, face-to-face contact with the Company's retailers. The Company believes that using and carefully managing its own sales force enables it to significantly reduce selling expenses. Adams also has a separate 25-seat customer call center that provides complete customer service. Many of the Company's sales and customer service personnel are accomplished golfers, including a number of former collegiate and professional golfers. These employees are encouraged to assist customers with a full range of golf-related questions, regardless of whether such contact results in the immediate sale of Adams products. The Company believes its knowledgeable representatives reinforce customers' positive impressions of the Company and its products and help build the Adams brand image.

Adams believes that the success of its product development capabilities and comprehensive marketing philosophy are evidenced by its dramatic increase in net sales over the past two years. Net sales have increased from $1.1 million in 1995 to $36.7 million in 1997 and from $1.5 million in the three months ended March 31, 1997 to $24.5 million in the three months ended March 31, 1998.

The Company believes that a number of trends in the golf industry are likely to further increase the demand for its products. These trends include: (i) [unprecedented] growth in the number of golf courses and practice ranges, (ii) increasing interest in golf from women, juniors and minority golfers, (iii) the large numbers of golfers entering their 40s, the age when most golfers begin to play more often and increase their spending on the sport and (iv) golfers' willingness to accept new product designs and technologies.

Adams' goal is to leverage its strengths to become the leading manufacturer of premium quality, technologically innovative golf clubs. To achieve this goal the Company has implemented a four-part growth strategy. First, the Company intends to increase sales of the Tight Lies fairway woods both domestically and overseas.

96702.4                                     3

CONFIDENTIAL

UND 06052

A 349

Domestically, the Company intends to increase sales to meet existing demand and to expand its base of high-quality retailers. Overseas, the Company expects to expand its network of 31 international distributors in 38 countries. Second, Adams intends to leverage its recently established relationship with professional golfer Nick Faldo, who currently uses the Tight Lies fairway woods. Mr. Faldo will be inducted into the World Golf Hall of Fame in May 1998 and has won more major championships in the 1990s than any other golfer. Third, the Company intends to develop proprietary new technologies and designs that provide golfers with meaningful performance benefits. The Company expects to work closely with Mr. Faldo during the product development process. Finally, the Company intends to leverage existing retailer and consumer acceptance of the Tight Lies brand to introduce new products into its retail distribution channels. The Company believes that its retail accounts are eager to carry additional Adams products and that current Tight Lies owners are pre-disposed to visit retailers to purchase such products.

The address of the Company's principal executive office is 300 Delaware Avenue, Suite 548, Wilmington, Delaware 19801. The Company's telephone number is (302) _____. The Company's principal manufacturing and corporate headquarters are located at 2801 East Plano Parkway, Plano, Texas 75074 and its telephone number at this location is (972) 673-9000. The Company's World Wide Web site is located at www.adamsgolf.com.

96702.4

CONFIDENTIAL

UND 06053

A 350

## The Offering

Common Stock offered:
By the Company ................................................................ shares
By the Selling Stockholders ............................................. shares

Total ................................................................................. shares

Common Stock to be outstanding after the Offering .............. shares(1)

Use of net proceeds to the Company ..................................... Working capital and general corporate purposes.

Proposed Nasdaq National Market Symbol .......................... ADGO

(1)    Excludes _____ shares of Common Stock issuable upon the exercise of outstanding stock options.

### Summary Consolidated Financial Information
### (In thousands, except per share data)

The following table sets forth summary financial data and other operating financial information of the Company and should be read in conjunction with the Consolidated Financial Statements, related Notes thereto and other financial information included herein.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| Consolidated Statement of Operations Data(1): | | | | | |
| Net sales | $ 1,125 | $ 3,522 | $ 36,690 | $ 1,475 | $ 24,511 |
| Gross profit (loss) | | | | | |
| Operating profit (loss) | (244) | 9 | 2,281 | 69 | 8,863 |
| Net income (loss) | (242) | 13 | 1,696 | 73 | 5,642 |
| Income (loss) per common share(2): | | | | | |
| Basic | $ (.11) | — | $ .27 | $ | $ .62 |
| Diluted | $ (.11) | — | $ .26 | $ | $ .62 |
| Weighted average common shares(2): | | | | | |
| Basic | 2,212 | 5,619 | 6,260 | | 8,831 |
| Diluted | 2,212 | 5,619 | 6,449 | | 8,893 |

| | At March 31, 1998 | |
|---|---|---|
| | Actual | As Adjusted(3) |
| Consolidated Balance Sheet Data: | | |
| Cash and cash equivalents | $ 602 | $ |
| Working capital | 12,176 | |
| Total assets | 25,643 | |
| Total liabilities (including current portion) | 10,826 | |
| Stockholders' equity | 14,817 | |

(1)    This table excludes summary financial information for the fiscal years ended December 31, 1993 and 1994 because operations of the Company in those years were not comparable in size or scope to current operations and certain financial records applicable to those years cannot be prepared in accordance with generally accepted accounting principles ("GAAP") applied on a basis consistent with the other periods presented.

(2)    See Note 1 of the Consolidated Financial Statements concerning the calculation of income (loss) per common share.

(3)    Gives effect to the sale of _____ shares offered hereby and the anticipated application of the estimated net proceeds therefrom (based on an assumed offering price of $_____ per share). See "Use of Proceeds" and "Capitalization."

96702.4                                     5

CONFIDENTIAL                                                    UND 06054

A 351

## RISK FACTORS

*An investment in the Common Stock offered hereby involves a high degree of risk. Prospective purchasers of Common Stock offered hereby should consider carefully the following factors in addition to other information in this Prospectus. This Prospectus contains forward-looking statements which involve risks and uncertainties. The Company's actual results and the timing of certain events could differ materially from those anticipated by such forward-looking statements as a result of certain factors discussed in this Prospectus, including the factors set forth below and in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business."*

### Dependence on New Product Introductions; Uncertain Consumer Acceptance

During the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998, approximately 47.2%, 94.4% and 97.3%, respectively, of the Company's gross revenues were derived from the sale of Tight Lies fairway woods. Sales of this product line are expected to account for a substantial portion of the Company's revenues for some time. A decline in demand for, or average selling prices of, the Tight Lies lines of products would have a material adverse effect on the Company's business, operating results and financial condition. Accordingly, the Company's continued growth and success depend, in large part, on its ability to successfully develop and introduce new products accepted in the marketplace. Failure by the Company to identify and develop innovative new products could adversely affect the Company's future growth and profitability. Consequently, the Company intends to introduce new technologies and product designs. Historically, a large portion of new golf club technologies are met with consumer rejection. No assurance can be given that the Company will be able to continue to design, manufacture and introduce golf clubs that meet with market acceptance. Additionally, successful technologies, designs and product concepts are likely to be copied by competitors. Accordingly, the Company's operating results could fluctuate as a result of the amount, timing and market acceptance of new product introductions by the Company or its competitors. The design of new golf clubs is greatly influenced by the rules and interpretations of the U.S. Golf Association ("USGA"). Although the golf equipment standards established by the USGA generally apply only to competitive events sanctioned by that organization, the Company believes that it is critical for its future success that new clubs introduced by the Company comply with USGA standards. No assurance can be given that any new products will receive USGA approval or that existing USGA standards will not be altered in ways that adversely affect the sales of the Company's products.

### Limited History of Profitability

The Company has a limited history of profitability. The Company generated net income for the first time during the year ended December 31, 1996. There can be no assurance that the Company will be able to sustain profitability on a quarterly or annual basis in the future. The Company's prospects must be considered in light of the significant risks, challenges and difficulties frequently encountered by companies experiencing rapid growth. To address these risks, the Company must, among other things, successfully increase the scope of its operations, respond to competitive and technological developments, continue to attract, retain and motivate qualified personnel and continue to develop and obtain market acceptance of performance enhancing golf equipment. There can be no assurance that the Company will be successful in addressing these risks and challenges. See "-Dependence on new Product Introductions, Uncertain Consumer Acceptance," "-Ability to Manage Growth," "-Highly Competitive Industry," and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### Patents and Protection of Proprietary Technology

The Company's ability to compete effectively in the golf club market will depend, in large part, on the ability of the Company to maintain the proprietary nature of its technologies and products. The Company has previously been awarded [six] U.S. patents relating to certain of its products and proprietary technologies and has filed [three] patent applications. There can be no assurance, however, as to the degree of protection afforded by these patents or as to the likelihood that patents will be issued from the pending patent applications. Moreover, these patents may have limited commercial value or may lack sufficient breadth to protect adequately the aspects of the Company's products to which the patents relate. The Company does not hold any foreign patents and no foreign patent applications are pending. The

6

CONFIDENTIAL

UND 06055

A 352

U.S. patents held by the Company do not preclude foreign competitors from developing products similar to the Company's products.

There can be no assurance that competitors, in the U.S. and in foreign countries, many of which have substantially greater resources than the Company and have made substantial investments in competing products, will not apply for and obtain patents that will prevent, limit or interfere with the Company's ability to make and sell its products. The Company is aware of numerous patents held by third parties that relate to products competitive with the Company's, including products competitive with the Tight Lies fairway woods. There is no assurance that these patents would not be used as a basis to challenge the validity of the Company's patent rights, to limit the scope of the Company's patent rights or to limit the Company's ability to obtain additional or broader patent rights. A successful challenge to the validity of the Company's patents may adversely affect the Company's competitive position. Moreover, there can be no assurance that such patent holders or other third parties will not claim infringement by the Company with respect to current and future products. Because U.S. patent applications are held and examined in secrecy, it is also possible that presently pending U.S. applications will eventually issue with claims that will be infringed by the Company's products or technologies. The defense and prosecution of patent suits is costly and time-consuming, even if the outcome is favorable. This is particularly true in foreign countries where the expenses associated with such proceedings can be prohibitive. An adverse outcome in the defense of a patent suit could subject the Company to significant liabilities to third parties, require the Company and others to cease selling products or require disputed rights to be licensed from third parties. Such licenses may not be available on satisfactory terms, or at all. See "Business - Patents."

The Company also relies on unpatented proprietary technology. Third parties could develop the same or similar technology or otherwise obtain access to the Company's proprietary technology. To protect its rights in these areas, the Company often requires [key] employees and outside consultants, advisors and collaborators to enter into confidentiality agreements. There can be no assurance, however, that these agreements will provide meaningful protection for the Company's trade secrets, know-how or other proprietary information in the event of any unauthorized use, misappropriation or disclosure of such trade secrets, know-how or other proprietary information. Moreover, the Company does not require all outside consultants, advisors and collaborators to execute confidentiality agreements.

Ability to Manage Growth

The Company has recently experienced a period of rapid growth that has resulted in new and increased responsibilities for existing management personnel. Further, the Company has recently employed a number of additional senior management personnel. The Company's growth continues to place a significant strain on the Company's management, operating and financial systems and resources. To accommodate this recent growth and to compete effectively and manage future growth, if any, the Company will be required to continue to implement and improve its operational, financial and management information systems, procedures and controls on a timely basis and to expand, train, motivate and manage its workforce. There can be no assurance that the Company's personnel, systems, procedures and controls will be adequate to support the Company's existing or future operations. Any failure to implement and improve the Company's operational, financial and management systems or to expand, train, motivate or manage employees could have a material adverse effect on the Company's business, operating results and financial condition. See "Business - Information Technology" and "Management."

Dependence on Key Personnel and Endorsements

The Company's success depends to a significant extent upon the performance of its senior management team, particularly the Company's founder, Chief Executive Officer and President, B. H. (Barney) Adams. In addition to his direction and supervision of the day-to-day affairs of the Company, Mr. Adams spearheads the Company's product development efforts. The loss or unavailability of Mr. Adams would adversely affect the Company's business and prospects. None of the Company's officers or employees, including Mr. Adams, is bound by an employment agreement and the relationships of such officers and employees are, therefore, at will. The Company has a $2.0 million key man life insurance policy on the life of Mr. Adams; however, there can be no assurance that the proceeds of such policy could adequately compensate the Company for the loss of his services. In addition, there is strong competition for

7

CONFIDENTIAL                                               UND 06056

A 353

qualified personnel in the golf-club industry, and the inability to continue to attract, retain and motivate other key personnel could adversely affect the Company's business.

The Company has recently entered into an agreement with Nick Faldo, an internationally recognized golf professional and winner of numerous U.S. and international championships. This agreement requires the Company to make certain significant payments to Mr. Faldo, whether or not his endorsement results in increased sales of the Company's products. The Company believes that the future success of its marketing strategy will depend, to a significant degree, on the continued professional success of Mr. Faldo. The inability of the Company to maintain its relationship with Mr. Faldo or the inability of Mr. Faldo to maintain an acceptable level of professional success, could have a material adverse effect on the Company's operating results. See "Business - Growth Strategy" and "Business - Advertising."

## Highly Competitive Industry

The market for golf clubs is highly competitive. The Company's competitors include a number of established companies, many of which have greater financial and other resources than the Company. The purchasing decisions of many purchasers of golf clubs are often the result of highly subjective preferences, which can be influenced by many factors, including, among others, advertising, media, promotions and product endorsements. The Company could therefore face substantial competition from existing or new competitors that introduce and successfully promote golf clubs perceived as more desirable to consumers. Further, there can be no assurance that the marketing strategy historically used by the Company will not be emulated by others, thereby diluting the Company's message or forcing the Company to adopt a new marketing strategy. Such competition could result in significant price erosion or increased promotional expenditures, either of which could have a material adverse effect on the Company's business, operating results and financial condition. There can be no assurance that Adams will be able to compete successfully against current and future sources of competition or that its business will not be adversely affected by increased competition in the markets in which it operates. See "Business - Competition."

## Sources of Supply

The Company relies on a limited number of suppliers for a significant portion of the component parts used in the manufacture of its golf clubs, including the manufacture of its Tight Lies line of fairway woods. While management believes that alternative sources of supply either exist or could be developed in the event that it should lose its present sources of supply for these components, experience delays in receiving delivery from such sources, or experience a significant price increase from such suppliers, the Company could sustain at least temporary shortages of component or periods of increased price pressures, which could temporarily have a material adverse effect on the Company's operating results. The Company has, at times, experienced shortages of quality component parts during periods of significantly increased purchasing from certain of its vendors, which have caused the Company to fail to meet its own internal expectations regarding product delivery. Although management of the Company has installed procedures to minimize the reoccurrence of such shortages, failure to obtain adequate supplies or fulfill customer orders on a timely basis could have a material adverse effect on the Company's business, financial condition and results of operations in the future. See "Business - Manufacturing and Assembly."

## Broad Management Discretion in Use of Proceeds

The Company intends to use the net proceeds of this Offering for working capital and general corporate purposes, including capital expenditures, expansion of the Company's product development efforts, additional advertising and expansion of the Company's international sales efforts. Accordingly, management will have broad discretion with respect to the expenditure of such proceeds. Purchasers of shares of Common Stock offered hereby will be entrusting their funds to the Company's management, upon whose judgment they must depend, with limited information concerning the specific working capital requirements and general corporate purposes to which the funds will ultimately be applied. See "Use of Proceeds."

CONFIDENTIAL

UND 06057

A 354

**Seasonality and Quarterly Fluctuations; Discretionary Consumer Spending**

Golf generally is regarded as a warm weather sport and sales of golf equipment historically have been strongest during the second and third quarters, with the weakest sales occurring during the fourth quarter. In addition, sales of golf clubs are dependent on discretionary consumer spending, which may be affected by general economic conditions. A decrease in consumer spending generally could result in decreased spending on golf equipment, which could have a material adverse effect on the Company's business, operating results and financial condition. In addition, the Company's future results of operations could be affected by a number of other factors, such as unseasonal weather patterns; demand for and market acceptance of the Company's existing and future products; new product introductions by the Company's competitors; competitive pressures resulting in lower than expected average selling prices; and the volume of orders that are received and that can be fulfilled in a quarter. Any one or more of these factors could result in the Company failing to achieve its expectations as to future sales or net income.

Because most operating expenses are relatively fixed in the short term, the Company may be unable to adjust spending sufficiently in a timely manner to compensate for any unexpected sales shortfall, which could materially adversely affect quarterly results of operations. If technological advances by competitors or other competitive factors require the Company to invest significantly greater resources than anticipated in research and development or sales and marketing efforts, the Company's business, operating results or financial condition could be materially adversely affected. Accordingly, the Company believes that period-to-period comparisons of its results of operations should not be relied upon as an indication of future performance. In addition, the results of any quarter are not indicative of results to be expected for a full fiscal year. As a result of fluctuating operating results or other factors discussed above and below, in certain future quarters the Company's results of operations may be below the expectations of public market analysts or investors. In such event, the market price of the Company's Common Stock would be materially adversely affected. See "- Absence of Public Market for Common Stock and Volatility" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Certain Risks of Conducting Business Abroad**

The Company imports a significant portion of its component parts, including heads, shafts, headcovers and grips, from companies in Taiwan, China and Mexico. In addition, the Company is rapidly increasing its international sales efforts. As a result, the Company's business is subject to the risks generally associated with doing business abroad, such as foreign government regulations, foreign consumer preferences, political unrest, disruptions or delays in shipments and changes in economic conditions and exchange rates in countries in which the Company manufactures or sells its products.

**Control by Principal Stockholders**

Following the closing of the Offering, the Company's existing stockholders, certain of whom are directors, officers or employees of the Company, will own approximately ___% of the outstanding Common Stock (approximately ___% if the Underwriters' over-allotment option is exercised in full), without giving effect to any purchases of Common Stock in the Offering by such persons. See "Underwriting." The Company's founder, Chief Executive Officer and President, Barney Adams, and Royal Holding Company, Inc. ("Royal"), the Company's largest single stockholder, will own approximately ___% and ___%, respectively (___% and ___%, respectively, if the Underwriters' over-allotment option is exercised in full), of the outstanding Common Stock immediately following the Offering. As a result of such Common Stock ownership, the existing stockholders will be in a position to exercise control with respect to the affairs of the Company and the election of directors. See "Principal and Selling Stockholders" and "Management."

**Shares Eligible for Future Sale; Issuance of Additional Shares**

Future sales of shares of Common Stock by the Company and its stockholders could adversely affect the prevailing market price of the Common Stock. The Company's directors, officers and [certain] stockholders, including the Selling Stockholders, have agreed not to sell, offer, contract to sell, grant any option or right for the sale of or otherwise dispose of any Common Stock or any securities convertible, exercisable or exchangeable into shares of

9

UND 06058

A 355

Common Stock, nor any options or right to acquire any shares of Common Stock, including any sale pursuant to Rule 144 or Rule 144A promulgated under the Securities Act of 1933, as amended (the "Securities Act"), for a period of 180 days after the date of this Prospectus without the prior written consent of Lehman Brothers Inc. (the "Lock-up Agreement"). After such time, approximately _____ shares of Common Stock will be eligible for sale pursuant to Rule 144 promulgated under the Securities Act.

In addition, the Company has granted registration rights to stockholders holding an aggregate of _____ shares of Common Stock. These stockholders have the right, subject to certain conditions, to demand that their stock be registered under the Securities Act on any three occasions commencing generally one year after the date of this Prospectus. The stockholders also have certain additional piggyback registration rights, and subject to certain conditions, may participate in future registrations by the Company of shares of Common Stock under the Securities Act. See "Description of Capital Stock - Registration Rights."

Sales of substantial amounts of Common Stock in the public market, or the perception that such sales may occur, could have a material adverse effect on the market price of the Common Stock. See "Shares Eligible for Future Sale" and "Underwriting." Pursuant to its Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation"), the Company has the authority to issue additional shares of Common Stock. The issuance of such shares could result in the dilution of the voting power of Common Stock purchased in the Offering. See "Description of Capital Stock."

## Anti-Takeover Provisions

The Company's Certificate of Incorporation and Amended and Restated Bylaws (the "Bylaws") contain, among other things, provisions establishing a classified Board of Directors, authorizing shares of preferred stock with respect to which the Board of Directors of the Company has the power to fix the rights, preferences, privileges and restrictions without any further vote or action by the stockholders, requiring that all stockholder action be taken at a stockholders' meeting and establishing certain advance notice requirements in order for stockholder proposals or director nominations to be considered at such meetings. In addition, the Company is subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law (the "DGCL"). In general, this statute prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner. Such provisions could delay, deter or prevent a merger, consolidation, tender offer, or other business combination or change of control involving the Company that some or a majority of the Company's stockholders might consider to be in its best interest, including offers or attempted takeovers that might otherwise result in such stockholders receiving a premium over the market price for the Common Stock. The potential issuance of preferred stock may have the effect of delaying, deferring or preventing a change of control of the Company, may discourage bids for the Common Stock at a premium over the market price of the Common Stock and may adversely affect the market price of and the voting and other rights of the holders of the Common Stock. The Company has not issued, and currently has no plans to issue, shares of preferred stock. See "Description of Capital Stock - Preferred Stock" and "Description of Capital Stock - Delaware Law and Certain Charter and Bylaw Provisions."

## Absence of Public Market for Common Stock and Volatility

Prior to the Offering there has been no public market for the Common Stock, and there can be no assurance that an active trading market will develop or be sustained after the Offering. The initial public offering price of the Common Stock offered hereby will be determined through negotiations among the Company, the Selling Stockholders and the Underwriters, and may not be indicative of the market price for the Common Stock after the Offering. The market price for shares of the Common Stock may be volatile depending on a number of factors, including business performance, industry dynamics, news announcements or changes in general market conditions. See "Underwriting."

## Dilution

The initial public offering price is substantially higher than the book value per share of Common Stock. Investors purchasing shares of Common Stock in the Offering will therefore incur immediate and substantial dilution in

10

CONFIDENTIAL

UND 06059

A 356

net tangible book value per share of $_____. To the extent outstanding options to purchase the Company's Common Stock are exercised, there will be further dilution. See "Dilution."

## USE OF PROCEEDS

The net proceeds to the Company from the sale of the _____ shares of Common Stock offered by the Company hereby, after deducting estimated Offering expenses payable by the Company and the underwriting discounts and commissions, are estimated to be approximately $_____ million [($____ million if the Underwriters' over-allotment option is exercised in full)]. The principal purposes of this Offering are to increase the Company's working capital and equity base, to provide a public market for its Common Stock and to provide liquidity for its stockholders. The Company intends to use the net proceeds for working capital and general corporate purposes, including capital expenditures, expansion of the Company's product development efforts, additional advertising and expansion of the Company's international sales efforts. The Company will not receive any of the proceeds from the sale of Common Stock by the Selling Stockholders. See "Principal and Selling Stockholders."

## DIVIDEND POLICY

The Company has no present intention of declaring or paying any dividends in the foreseeable future. The Company anticipates that any earnings will be retained for the foreseeable future for use in the operations of the business. Any future determinations as to the payment of dividends will be at the discretion of the Company's Board of Directors and will depend on the Company's results of operations, financial condition, contractual restrictions and other factors deemed relevant by the Board of Directors. The Company's ability to pay dividends is restricted by certain covenants set forth in its Revolving Credit Agreement with NationsBank of Texas, N.A. See "Management's Discussion and Analysis of Financial Condition and Results of Operations - Liquidity and Capital Resources."

11

CONFIDENTIAL

UND 06060

A 357

## DILUTION

As of March 31, 1998, the Company's net tangible book value was $14,667,000 or $1.61 per share. Net tangible book value per share represents the amount of the Company's total tangible assets less the Company's total liabilities, divided by the number of shares of Common Stock outstanding. Without taking into account any other changes in such net tangible book value after March 31, 1998, other than to give effect to the sale of _____ shares of Common Stock offered by the Company hereby (after deduction of estimated underwriting discounts and commissions and Offering expenses), the net tangible book value of the Company on March 31, 1998 would have been $_____ or $_____ per share. This represents an immediate increase in net tangible book value of approximately $_____ per share to the existing stockholders and an immediate dilution in net tangible book value of $_____ per share to purchasers of the Common Stock in the Offering. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Assumed public offering price per share | | $ |
| Net tangible book value per share before the Offering | $ 1.61 | |
| Increase in net tangible book value per share attributable to new investors | | |
| Net tangible book value per share after the Offering | | |
| Dilution per share to new investors | | $ |

The following table sets forth, at March 31, 1998, the difference between existing stockholders and the new investors in the Offering with respect to the number of shares purchased from the Company, the total consideration paid and the average price per share paid. [split?]

| | Shares Purchased from the Company | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Existing Stockholders | 9,099,641 | % | $ 8,618,924 | % | $ 0.95 |
| New Investors | | | | | $ |
| Total | | 100.0% | | 100.0% | |

The above computations exclude _____ shares of Common Stock issuable upon exercise of outstanding stock options. An additional _____ shares of Common Stock are reserved for issuance under the Company's 1998 Incentive Stock Option Plan (the "Incentive Plan"). To the extent that any outstanding options are exercised, or additional shares are issued, there will be further dilution to investors in the Offering. See "Management – Benefit Plans," "Description of Capital Stock," "Shares Eligible for Future Sale" and "Underwriting."

12

CONFIDENTIAL

UND 06061

A 358

## CAPITALIZATION

The following table sets forth the capitalization of the Company at March 31, 1998 and as adjusted as of that date to give effect to the sale of _____ shares of Common Stock by the Company in the Offering and the application of the estimated net proceeds therefrom. See "Use of Proceeds." This table should be read in conjunction with the Company's Consolidated Financial Statements (including the Notes thereto) appearing elsewhere in this Prospectus.

| | At March 31, 1998 | |
|---|---|---|
| | Actual | As Adjusted |
| | (in thousands) | |
| Total short-term debt: | | |
| Notes Payable | $ 913 | $ |
| Long-term debt | | |
| Notes Payable | 222 | |
| Stockholders' equity: | | |
| Preferred stock, $.01 par value, 5,000,000 shares authorized; none outstanding | — | — |
| Common stock, $.001 par value, 50,000,000 shares authorized; 9,099,642[2] shares (actual) and 18,199,284[4] shares (as adjusted) issued(1)(2) | 9 | |
| Additional paid-in capital(2) | 8,554 | |
| Retained earnings | 6,041 | |
| Treasury stock, at cost; _____ shares (actual) and no shares (as adjusted)(2) | | |
| Total stockholders' equity | 14,604 | |
| Total capitalization | 15,739 | |

(1) Excludes _____ shares subject to outstanding options.
(2) Issued shares, treasury shares and related amounts have been adjusted to give effect to a 2-for-1 stock split effected May __, 1998.

13

CONFIDENTIAL

UND 06062

A 359

## SELECTED CONSOLIDATED FINANCIAL INFORMATION

The following selected financial data as of and for the fiscal years ended December 31, 1995, 1996 and 1997 are derived from the Consolidated Financial Statements of the Company, which have been audited by KPMG Peat Marwick LLP, independent certified public accountants. The selected financial information for the three months ended March 31, 1997 and 1998 are derived from unaudited Consolidated Financial Statements of the Company. In the opinion of management, all adjustments consisting only of normal recurring adjustments, necessary for a fair presentation of the financial position and results of operations have been included in such unaudited Consolidated Financial Statements. Results for the three months ended March 31, 1998 may not be indicative of the results expected for the year ended December 31, 1998. The Consolidated Financial Statements as of December 31, 1996 and 1997 and for each of the years in the three-year period ended December 31, 1997, and the independent auditors' report are included elsewhere in this Prospectus. The selected financial data should be read in conjunction with the Consolidated Financial Statements, the related Notes thereto, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the other financial information included elsewhere herein.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | (in thousands, except per share data) | | | | |
| **Consolidated Statement of Operations Data(1):** | | | | | |
| Net sales | $ 1,125 | $ 3,522 | $ 36,690 | $ 1,475 | $24,511 |
| Cost of goods sold | 756 | 1,590 | 9,991 | 587 | 5,862 |
| Gross profit (loss) | | | | | |
| Operating expenses | | | | | |
| Operating profit (loss) | 613 | 1,923 | 24,318 | 820 | 9,786 |
| Income before taxes | (244) | 9 | 2,381 | 69 | 8,863 |
| Net income (loss) | | | | | |
| Income (loss) per common share: | (243) | 13 | 1,696 | 73 | 5,642 |
| Basic | | | | | |
| Diluted | (.11) | — | .27 | | .62 |
| Weighted average common shares(2): | (.11) | — | .26 | | .62 |
| Basic | | | | | |
| Diluted | 2,212 | 5,619 | 6,260 | | 8,831 |
| | 2,212 | 5,619 | 6,489 | | 8,893 |

| | At December 31, | | | At March 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | (in thousands) | | | | |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $   243 | $   855 | $ 1,956 | $   760 | $   602 |
| Working capital | 575 | 1,475 | 6,915 | 1,785 | 12,176 |
| Total assets | 658 | 2,559 | 17,360 | 3,116 | 25,505 |
| Total liabilities (including current portion) | | | | | |
| Stockholders' equity | 43 | 580 | 9,035 | 847 | 10,826 |
| | 615 | 1,978 | 8,325 | 2,269 | 14,679 |

(1)    This table excludes summary financial information for the fiscal years ended December 31, 1993 and 1994 because operations of the Company in those years were not comparable in size or scope to current operations and certain financial records applicable to those years cannot be prepared in accordance with GAAP applied on a basis consistent with the other periods presented.

(2)    See Note 1 of the Consolidated Financial Statements concerning the calculation of income (loss) per common share.

(3)    Gives effect to the sale of _____ shares offered hereby and the anticipated application of the estimated net proceeds therefrom (based on an assumed offering price of $_____ per share). See "Use of Proceeds" and "Capitalization."

14

CONFIDENTIAL

UND 06063

A 360

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
### FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following management's discussion and analysis of financial condition and results of operations addresses the performance of the Company for the three months ended March 31, 1997 and 1998, and the years ended December 31, 1995, 1996 and 1997, and should be read in conjunction with the Company's Consolidated Financial Statements (including the Notes thereto) appearing elsewhere in this Prospectus.

### Overview

Adams designs, manufactures and markets premium quality, technologically innovative golf clubs. Founded in 1986, the Company operated initially as a component supplier and contract manufacturer. Thereafter, the Company established its custom fitting operation which currently services a network of over 100 certified custom fitting accounts. In the fall of 1995, the Company introduced the original Tight Lies fairway wood and, in December 1996, the Company extended the Tight Lies line to include the Tight Lies Strong 3, Strong 5 and Strong 7, with the Tight Lies Strong 9 being introduced in January 1998. Sales of the Tight Lies line of products increased significantly subsequent to the second quarter of 1997, when the Company launched an infomercial relating to the original Tight Lies fairway wood for the purpose of building brand recognition and driving retail sell through. The Company's net sales have increased from $1.1 million in 1995 to $36.7 million in 1997 and from $1.5 million in the three months ended March 31, 1997 to $24.5 million in the three months ended March 31, 1998.

The Company does not currently manufacture the components required to assemble its golf clubs, relying instead on component suppliers. Costs of the Company's Tight Lies fairway woods consist primarily of component parts including the head, shaft and grip. To a lesser degree, the Company incurs labor to assemble the components and overhead associated primarily with occupancy costs.

Operating expenses are composed primarily of selling and royalty expenses and general and administrative expenses. To a lesser degree, the Company also incurs expenses for research and development activities. Expenses associated with research and development efforts include salaries and independent consulting fees.

Selling and royalty expenses include advertising, marketing, salaries and commissions, royalties related to the Company's infomercial and independent consulting fees. Royalties approximate 6% of sales of the Company's original Tight Lies fairway wood for direct response and wholesale net sales. The Company defines net sales as gross sales less returns. An allowance for returns is estimated at the time sales are recognized.

General and administrative expense includes salaries and benefits for corporate management, accounting, administrative support staff, bad debts, independent consulting and professional services, and office rent and utilities.

### Results of Operations

The following table sets forth operating results expressed as a percentage of net sales for the periods indicated. Results for any one or more periods are not necessarily indicative of annual results or continuing trends. See "- Quarterly Results and Seasonality," below.

15

CONFIDENTIAL    UND 06064

A 361

| Consolidated Statement of Operations Data | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| Net Sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 67.2 | 45.1 | 27.2 | 39.8 | 23.9 |
| Gross profit | 32.8 | 54.9 | 72.8 | 60.2 | 76.1 |
| Operating expenses | 54.5 | 54.6 | 66.3 | 55.8 | 39.9 |
| Operating profit (loss) | (21.7) | 0.3 | 6.5 | 4.4 | 36.2 |
| Interest expense | — | — | 0.2 | — | — |
| Other income (expense) | 0.1 | 0.1 | 0.1 | 0.6 | (0.4) |
| Income (loss) before income taxes | (21.6) | 0.4 | 6.2 | 5.0 | 35.8 |
| Income tax expense | — | — | — | — | — |
| Net income (loss) | % | % | % | % | % |

**Three Months Ended March 31, 1997 compared to Three Months Ended March 31, 1998**

Net sales increased to $24.5 million for the three months ended March 31, 1998, from $1.5 million for the comparable period of 1997, primarily due to the continued market acceptance of the Company's Tight Lies line of golf clubs, and, to a lesser extent, a price increase effective January 1, 1998. Net sales of the Tight Lies line of fairway woods totaled $23.8 million for the three months ended March 31, 1998, or 97.3% of net sales, as compared to $1.1 million, or 75.8% of net sales for the comparable period of 1997. Sales of the Tight Lies fairway woods increased subsequent to the Company's introduction of an infomercial marketing its fairway woods in the second quarter of 1997. Net sales of other product lines for the three months ended March 31, 1998 increased to $0.7 million from $0.4 million for the comparable period of 1997, but decreased as a percentage of net sales to 2.7% from 24.2%. Net sales of the Company's products outside the U.S. constituted $1.4 million for the three months ended March 31, 1998, as compared to $0.2 million for the three months ended March 31, 1997, but increased as a percentage of net sales from [5.7%] to [11.9%]. The increase in international sales is due to increased market acceptance of the Tight Lies fairway woods and expanded international marketing efforts in the last half of 1997.

The Company's gross profit for the three months ended March 31, 1998 increased to $18.6 million from $0.9 million for the comparable period of 1997, and increased as a percentage of net sales, to 76.1% from 60.2%. The gross profit margin for the three months ended March 31, 1998 was favorably affected by an increased percentage of sales attributable to the higher margin Tight Lies golf clubs and the inherent cost savings associated with buying components in large volumes and assembling them on a substantially increased scale.

Operating income increased to $8.9 million for the three months ended March 31, 1998, from $65,000 for the comparable period of 1997 due to the increased level of sales. Total operating expenses increased to $9.8 million for the three months ended March 31, 1998, from $0.8 million for the comparable period of 1997, principally as a result of relatively higher levels of selling and advertising costs related to the promotion of the Tight Lies fairway woods and increased administrative costs resulting primarily from the hiring of additional employees and incurring slightly higher occupancy costs. As a percentage of net sales, operating expenses decreased for the three months ended March 31, 1998 to 39.9% from 55.8% for the comparable period of 1997.

**Year Ended December 31, 1996 compared to Year Ended December 31, 1997**

Net sales increased to $36.7 million for the year ended December 31, 1997 from $3.5 million for 1996 primarily due to increased market acceptance of its Tight Lies fairway woods. Net sales of the Tight Lies fairway woods for 1997 were $34.5 million, compared to $1.7 million in 1996, and represented 94.3% of net sales in 1997 compared to 47.2% of net sales in 1996. Net sales of other product lines in 1997 increased to $2.1 million compared to $1.8 million in 1996, but decreased as a percentage of sales to 5.7% in 1997 from 52.8% in 1996.

16

CONFIDENTIAL

UND 06065

A 362

The Company's gross profit for 1997 increased to $26.7 million from $1.9 million in 1996, and increased as a percentage of net sales to 72.8% from 54.9%. The increase in gross profit was primarily due to the sales of higher margin Tight Lies fairway woods and the inherent cost savings associated with buying components in large volume and assembling them on a substantially increased scale through a higher volume of sales of the Tight Lies fairway woods.

Operating income increased to $2.4 million in 1997 from $9,000 in 1996, and increased as a percentage of net sales to 66.3% in 1997 to 54.6% in 1996. Total operating expenses increased to $24.3 million from $1.9 million in 1996. Of the $24.3 million of operating expenses in 1997, $8.5 million, or 34.9%, of expenses related to stock compensation and bonus awards to the Company's chief executive officer and founder. See "Certain Transactions." The expense recognized in 1996 in conjunction with these awards was $0.2 million, or 11.1% of operating expenses. In 1997, the Company also incurred higher expenses for selling and royalties, research and development, and provision for bad debts in each case due principally to the increased sales of the Tight Lies fairway woods. General and administrative expenses also increased due to the hiring of additional employees.

Year Ended December 31, 1995 Compared to Year Ended December 31, 1996

Net sales increased to $35 million for the year ended December 31, 1996 from $7.1 million for 1995, primarily due to the introduction of the original Tight Lies fairway wood in the fall of 1995. Net sales of the original Tight Lies fairway wood increased to $1.7 million in 1996, from $0.1 million in 1995, and increased as a percentage of net sales from 47.2% in 1996 to 9.6% in 1995. Net sales of other products in 1996 increased to $1.8 million from $1.0 million in 1995, but decreased as a percentage of net sales to 52.8% in 1996 from 90.4% in 1995. The increase in sales of other products in absolute dollars is due to sales of custom fitted golf clubs resulting from increased number of teaching professionals who became certified Adams Golf club fitters in 1996.

The Company's gross profit increased to $1.9 million in 1996 from $0.4 million in 1995, and increased as a percentage of net sales to 54.9% in 1996 from 32.8% in 1995. The increase in gross profit was due to higher sales of the Company's products, specifically the higher margin original Tight Lies fairway wood.

Operating income increased to $9,000 in 1996 from an operating loss of $0.2 million in 1995. Total operating expenses increased to $1.9 million in 1996 from $0.6 million in 1995 and remained relatively flat as a percentage of net sales. Of the $1.9 million of operating expenses in 1996, $0.2 million or 11.1% of expenses were related to a bonus award to the Company's chief executive officer and founder. The Company also incurred additional selling and general and administrative expenses in 1996 as a result of increased sales and hiring additional employees.

Quarterly Results and Seasonality

The following table sets forth certain unaudited quarterly financial operational data for the five most recent quarters.

|  | Quarter Ended | | | | |
|---|---|---|---|---|---|
|  | March 31, 1997 | June 30, 1997 | Sept. 30, 1997 | Dec. 31, 1997 | March 31, 1998 |
|  | $ | $ | $ | $ | $ |
| Net sales | | | | | |
| Gross profit | | | | | |
| Operating income (loss) | | | | | |
| Net income | | | | | |

The Company's business is seasonal in nature, and therefore results for any one or more quarters are not necessarily indicative of annual results or continuing trends. In addition, quarterly results may vary from year to year due to the timing of new product introductions, advertising expenditures, and promotional periods. The Company historically has received a substantial percentage of its initial preseason orders between [September 1 and January 31], and those orders are generally filled, depending on customer preference, between [February 1 and June 30]. In 1997 and 1996, approximately ____% and ____%, respectively, of the Company's net sales for

17

CONFIDENTIAL

UND 06066

A 363

each year occurred during the [six] months ended [June 30]. See "Risk Factors - Seasonality and Quarterly Fluctuations; Discretionary Consumer Spending."

## Year 2000 Compliance

Many existing computer systems and applications and other control devices use only two digits to identify a year in the date field, without considering the impact of the upcoming change in the century. As a result, as year 2000 approaches, computer systems and applications used by many companies may need to be upgraded to comply with "Year 2000" requirements. The Company relies on its systems in operating and monitoring many significant aspects of its business, including financial systems (such as general ledger, accounts payable, accounts receivable, inventory and order management), customer service, infrastructure and network and telecommunications equipment. The Company also relies directly and indirectly on the systems of external business enterprises such as customers, suppliers, creditors, financial organizations and domestic and international governments. The Company currently estimates that its costs associated with Year 2000 compliance, including any costs associated with the consequences of incomplete or untimely resolution of Year 2000 compliance issues, will not have a material adverse effect on the Company's business, financial condition or results of operations. However, the Company has not extensively investigated and does not believe it has fully identified the impact of Year 2000 compliance and has not concluded that it can resolve any issues that may arise in complying with Year 2000 without disruption of its business or without incurring significant expense. In addition, even if the Company's internal systems are not materially affected by Year 2000 compliance issues, the Company could be affected through disruption in the operation of the enterprises with which the Company interacts.

## Liquidity and Capital Resources

The Company historically has financed its operations principally through internally generated funds and funds from the private placement of equity securities. Such funds have been supplemented from time to time with short-term borrowings under the Company borrowing facilities. Net cash provided (used) by operating activities was ($0.6) million for the three months ended March 31, 1998 and $1.1 million for the year ended December 31, 1997.

Working capital totaled $12.1 million at March 31, 1998 compared to $6.9 million at December 31, 1997. Net trade accounts receivable amounted to $14.7 million at March 31, 1998 compared to $7.7 million at December 31, 1997. The increase is primarily due to the increase in net sales experienced in the first three months of 1998. Inventory totaled $5.3 million at March 31, 1998 and $4.5 million at December 31, 1997.

Effective February 27, 1998, the Company established a $10 million revolving credit facility, which expires on December 31, 1998. At March 31, 1998, the Company had no outstanding borrowings under its revolving credit facility. Borrowings under the revolving credit facility agreement are at an interest rate that is .25% under the bank's Reference Rate (as defined in such agreement) with borrowings limited to the lesser of $10 million or a stated percentage of eligible accounts receivable and inventories. Obligations under the revolving credit facility loan agreement are collateralized by substantially all the assets of the Company. Also effective in the first quarter 1998, the Company borrowed $1.1 million in the form of a note payable to the Chief Executive Officer and Founder. The remaining principal amount of the note ($534,899 at April 30, 1998) is payable in two installments on December 15, 1998 and April 14, 1999 at an interest rate of 5.39%.

The Company's capital expenditures amounted to $1.1 million, $0.8 million and $0.1 million for the three months ended March 31, 1998 and the years ended December 31, 1997 and 1996, respectively. The Company anticipates making capital expenditures in the ordinary course of business and is currently implementing a customer management information system at an estimated cost of $1.7 million for the year ending December 31, 1998.

The Company believes that the cash flow from operations, the net proceeds of the Offering and the Company's $10 million credit facility will be sufficient to meet operating needs and capital expenditures for at least the next 12 months.

18

CONFIDENTIAL

UND 06067

A 364

# BUSINESS

## General

Adams designs, manufactures and markets premium quality, technologically innovative golf clubs. The Company's design objective is to produce golf clubs that deliver meaningful performance benefits and inspire confidence at address. The Company believes that its most successful product line to date, the Tight Lies fairway woods, meets this objective by providing golfers with the ability to hit the ball from virtually any lie, while maximizing distance. The patented Tight Lies fairway woods feature an upright trapezoidal head, a shallow face and a lower center of gravity as compared to conventional fairway woods. To gain brand awareness and stimulate retail sell-through, Adams has developed a comprehensive marketing model that integrates direct to consumer advertising, inside sales and more traditional forms of advertising. The Company believes that this marketing philosophy has been, and will continue to be, vital to its success. The Company believes that the success of its product development capabilities and comprehensive marketing philosophy is evidenced by its dramatic increase from net sales $1.1 million in 1995 to $36.7 million in 1997 and from $1.5 million in the first three months of 1997 to $24.5 million in the comparable period of 1998.

The Company's growth strategy is to continue to increase its share of the fairway woods market, develop new technologies and products and introduce these technologies and products through Adams' sophisticated marketing model.

## Golf Industry Overview

According to the National Golf Foundation, there are approximately 49 million golfers worldwide, including approximately 26 million in the U.S. In 1997, golfers in the U.S. played an estimated 547 million rounds of golf and spent over $6.0 billion on golf equipment, apparel and accessories. Of the 26 million U.S. golfers, about 5.6 million, characterized by the National Golf Foundation as "avid golfers," played over 25 rounds of golf per year and made more than one-half of the total annual U.S. equipment purchases. The Company believes that avid golfers are the first to seek out performance oriented golf equipment and thereby generally drive golf club product trends. In 1997, wholesale sales of golf clubs in the U.S. reached approximately $2.4 billion. This figure represents a compound annual growth rate of approximately 7% over the ten year period from 1987 to 1997.

The Company believes that sales of golf clubs will continue to grow in the future due to a number of factors including:

*Increasing Availability of Golf Facilities.*  Approximately 350 new golf courses are expected to open in the U.S. each year until the year 2000, the vast majority of which will be available to the public. Moreover, the number of short courses (courses having less than 18 holes) and practice ranges is also expected to increase. The Company believes that these additional facilities will make golf more accessible and convenient, leading to a further increase in golf participation rates.

*Increasing Interest from Non-Traditional Golfers.*  The game of golf has become increasingly attractive to segments of the population that have not historically been well-represented among golfers. Most notably, Tiger Woods has made golf more appealing to juniors, young adults and minority golfers. According to the National Golf Foundation, the total number of beginning and junior golfers increased by approximately 30% in 1997 compared to the previous year. In addition, the success of the Ladies Professional Golf Association (the "LPGA") Tour and such female golfers as Annika Sörenstam of Sweden have increased the appeal of the sport for women.

*Favorable Population Trends.*  The Company believes that two population trends are likely to benefit the golf industry over the next several years: (i) the aging of the Baby Boomers and (ii) the emergence of the Echo Boom generation. According to the National Golf Foundation, as golfers pass the age of 40, they tend to play golf more often and spend more money on the sport. The Baby Boomers (those born between 1946 and 1964) are entering their 40s and 50s and are therefore likely to spend more time playing golf and more money on golf equipment. The "Echo Boom" generation (those born between 1977 and 1995) actually constitutes a larger population group than the Baby Boomers.

19

CONFIDENTIAL

UND 06068

A 365

Echo Boomers will grow up in an era where golf is more visible and popular and will be predisposed to participate in the sport.

*New Product Innovations.* In recent years, the golf equipment industry has made significant advances in product designs and technologies to enhance golfers' performance and overall enjoyment of the game. The Company believes that this rapid evolution of golf clubs has accelerated the rate at which golfers have purchased new or additional clubs.

According to _____, fairway woods have been the fastest growing segment of the golf club market in recent years, growing at a rate of approximately 20% per year over the last three years. U.S. unit sales of fairway woods reached approximately _____ million in 1997 and are expected to surpass _____ million in 1998. The Company believes sales of fairway woods will continue to grow because:

- fairway woods have proven to be more versatile than the long irons (specifically, the #1-#4 irons) because they can be hit from the rough with greater distance and more accuracy;
- an increasing number of professional golfers on each of the Professional Golf Association ("PGA"), LPGA, Senior PGA and Nike Tours are carrying multiple fairway woods in their bags, thereby validating the use of fairway woods as an accepted substitute for long irons; and
- changes in course architecture and turf maintenance techniques are placing a premium on shots that fly higher and land softer (i.e., the types of shots typically produced by fairway woods).

Company History

Barney Adams founded the Company in 1986. After an initial period of supplying components and performing contract manufacturing, the Company established a custom fitting operation at the Hank Haney Golf Ranch in McKinney, Texas, a state-of-the-art practice and teaching facility. As a result of the knowledge and experience gained through custom-fitting, Mr. Adams concluded that the greatest difference in skill between a professional golfer and an amateur golfer is the ability to successfully hit the long second shot to the green. A similar conclusion had previously been reached by Alastar Cochran and John Stobbs in their book *"Search for the Perfect Swing".* After a period of further research, development and testing, the Company introduced a patented club head design to assist golfers with this shot. The resulting product, the original Tight Lies fairway wood, incorporates an upright trapezoidal head, a shallow face, a low center of gravity and 16° of loft to assist the golfer in getting the ball airborne quickly and efficiently from a variety of lies, while maximizing distance.

In an effort to generate maximum exposure and retail sell through of the original Tight Lies fairway wood, the Company debuted its professionally produced infomercial in April 1997. This 30 minute informational commercial is hosted by veteran golf announcer Jack Whitaker and features former PGA Teacher of the Year Hank Haney, former British Open Champion Bill Rogers and LPGA Hall of Famer Carol Mann. To meet retail demand, the Company simultaneously increased its distribution capacity by expanding its network of on- and off-course golf shops and selected sporting goods retailers. In late 1996, Adams extended the Tight Lies line of fairway woods to include the Strong 3, Strong 5 and Strong 7 and, one year later, the Tight Lies Strong 9.

In 1996 the International Network of Golf, an 800-member organization of leading media and golf industry executives, named the Tight Lies fairway wood as the "Breakthrough Product of the Year." In addition, the Tight Lies fairway wood has received the 1997/98 Certificate of Excellence by the Golf Industry Association. In the three months ended March 31, 1998, more than _____ professionals on the PGA, LPGA, Senior PGA and Nike Tours carried the Tight Lies fairway wood in competition, none of whom were then under contract with or paid by the Company.

20

CONFIDENTIAL

UND 06069

A 366

**Business Strengths**

The Company has developed the following business strengths which it believes provides it with a competitive advantage over many other golf club manufacturers:

*Strength of the Tight Lies Brand.* The Company believes that it has established a significant presence in the premium quality fairway woods market category. As reported in the March 1998 issue of *Golf Shop Operations* ("GSO"), a widely recognized industry trade publication, the Adams Tight Lies fairway wood is one of the top-selling golf equipment items among those retailers polled from GSO's list of "America's 100 Best Golf Shops." The Company believes that the strength of its brand is demonstrated by the rapid acceptance of the expanded line of Tight Lies fairway woods (3, 5, 7 and 9). Although the Company has not yet specifically advertised these clubs, their sales have grown to represent approximately ___% of total sales during the three months ended March 31, 1998.

*Innovative Marketing Model.* To gain brand awareness and stimulate retail sell-through, Adams has developed an innovative marketing model that combines direct-to consumer marketing, inside sales and more traditional forms of advertising. This model generates brand awareness in order to drive retail sales at on- and off-course golf shops and selected sporting goods retailers. The Company believes that its approach to marketing permits it to successfully compete with the larger, more established manufacturers of golf clubs like Callaway and Taylor Made. The Company further believes it is well-positioned to utilize its marketing model for future products.

*Relationship with Nick Faldo.* The Company has recently entered into a relationship with Nick Faldo. Mr. Faldo will be inducted into the World Golf Hall of Fame in May 1998 and has won more major championships in the 1990s than any other golfer. In total, Mr. Faldo won the Masters three times (1989, 1990 and 1996) and the British Open three times (1987, 1990 and 1992). Mr. Faldo uses Adams' Tight Lies fairway woods in competition and has agreed to work closely with the Company to assist in the design and testing of future golf clubs and other equipment. The Company believes that Mr. Faldo's comprehensive knowledge of the game of golf and reputation for technical excellence complements the Company's capabilities and strong brand identity.

*Customer Service Infrastructure.* Adams has committed significant resources in developing its customer service infrastructure. The Company's call center is given the responsibility of (i) providing technical assistance to the Company's customers and (ii) taking inbound direct response calls. The Company also maintains Regional Account Coordinators charged solely with providing complete, face to face customer service to retailers nationwide. Further, each of the Company's new employees attends an 8-hour, in-house seminar which provides training on club specifications, performance design and manufacturing.

*Emphasis on Quality.* Due in large part to its heritage in custom club fitting, Adams emphasizes quality control and precise adherence to design specifications. The Company has established a quality assurance program at those manufacturing facilities located in Taiwan and China that are collectively responsible for producing substantially all of the Company's performance club heads. Those component manufacturers who have demonstrated an acceptable level of internal quality control are not subject to the Company's quality assurance program. Upon arrival at the Company's manufacturing facilities in Plano, Texas, each component used in the Company's clubs is again checked to ensure consistency with strict design parameters. Components are then sorted to identify minor variations in characteristics, such as weight and flexibility, that, although within the specified range, may cause club performance to vary. The Company uses its VMI formula to combine compatible components to produce a consistent swing feel not only among clubs of the same loft but also across an entire set of clubs.

21

    UND 06070

A 367

## Growth Strategy

The Company's growth strategy is to further strengthen the Adams brand and establish itself as a leading developer of technologically innovative, performance oriented golf clubs. Important elements of that strategy include:

*Building Market Share in Fairway Woods.* The Company's first priority is to build its share of the premium fairway woods market by increasing sales of its Tight Lies line of fairway woods. Although industry sources have not traditionally separated out sales of premium fairway woods from sales of the larger category woods (including drivers), based on available data, the Company believes that in 1997 it achieved a market share in this category of at least 10%. The Company believes it can further increase this market share in 1998 by continuing to build demand using the Company's innovative marketing model and increasing retail distribution of the Tight Lies line.

*Leveraging Consumer Acceptance of Tight Lies Brand.* The Company intends to leverage acceptance of the Tight Lies brand to develop and sell additional products; a strategy that has proven effective in marketing the Company's expanded line of Tight Lies fairway woods. For the three months ended March 31, 1998, sales of the expanded line of Tight Lies fairway woods exceeded sales of the original Tight Lies. Adams believes that the success and performance of its Tight Lies fairway woods have earned the Company the reputation as a manufacturer of technologically innovative, performance oriented golf clubs among its customers and avid golfers generally. The Company further believes that it will be able to efficiently introduce new products to this customer base through its recent investments in infrastructure, thereby generating sales and receiving valuable product feedback.

*Expanding International Sales.* Until recently, the Company has focused on developing sales domestically. Accordingly, the Company's sales to date have been achieved without significant contribution from international markets. Beginning in late 1997, the Company began leveraging its domestic strength to attract qualified international distributors. The Company currently has a network of [31] distributors located in [38] countries including Canada, Japan and the United Kingdom. The Company expects to continue to build its international distribution. The Company has recently hired a Director of International Sales who has significant international golf equipment sales experience. Additionally, the Company believes that Nick Faldo's worldwide reputation will play a significant role in its international expansion strategy.[For the year ended December 31, 1997, international sales represented less than 5% of total sales.]

*Developing New Technologies and Product Designs.* The Company engages continuously in the process of developing new technologies and product designs that, when incorporated into golf clubs, are expected to provide golfers with meaningful performance benefits. To the extent that any new technology can be developed to the point of commercial viability, the Company intends to introduce such technology into a single club category and, if the product is well received by consumers, develop a broader product line around the core technology. The Company believes that the affiliation, endorsement and support of Nick Faldo will provide important credibility in the development and marketing of new products.

The Company's continued growth and success depend, in large part, on its ability to successfully develop and introduce new products that are perceived by golfers to represent an improvement in performance compared to products otherwise available in the marketplace. Failure by the Company to identify and develop innovative new products could adversely affect the Company's future growth and profitability. Historically, a large portion of new golf club technologies are met with consumer rejection. There can be no assurance that the Company will be able to continue to design, manufacture and market golf clubs that meet with market acceptance. See "Risk Factors - Dependence on New Product Introductions; Uncertain Consumer Acceptance."

## Products

The Company currently offers the following products:

*Original Tight Lies Fairway Wood.* The original Tight Lies fairway wood has an innovative upright trapezoidal or "upside down" head shape that incorporates 16° of loft, a distinctive shallow face and a lower center of gravity as compared to conventional fairway woods. The Company believes that this club is ideal for getting the ball

22

CONFIDENTIAL

UND 06071

A 368

airborne quickly and efficiently with optimum spin to maximize distance from the critical scoring area of 185 to 225 yards from the green. The Company further believes that the Tight Lies fairway woods are particularly effective from virtually any unfortunate lie on the course including the rough, hard pan, cart path, fairway bunkers or divots.

*Expanded Line of Tight Lies Fairway Woods.* In late 1996, based on initial consumer acceptance of the original Tight Lies fairway wood, the Company expanded its line to include the Tight Lies Strong 3 (13° loft), the Tight Lies Strong 5 (19° loft) and the Tight Lies Strong 7 (24° loft). In January 1998, the Company expanded the line again to include the Tight Lies Strong 9 (28° loft). The expanded line of Tight Lies fairway woods incorporates the same design innovations as the original club. These additional lofts provide golfers with increased flexibility by enabling them to play the Tight Lies fairway woods from different distances on the course. For the three months ended March 31, 1998, sales of the expanded line of Tight Lies fairway woods exceeded sales of the original Tight Lies.

*Other Club Lines.* The Company's other clubs include the Air Assault Driver and the Assault – VMI irons. The Air Assault Driver was the Company's first product to incorporate the patented upright trapezoidal head. The Company's Assault-VMI irons are perimeter-weighted, cavity-backed, slightly offset irons which incorporate the Company's patented variable moment of inertia (VMI) design formula which produces consistent swing feel throughout a golfer's set of clubs. The Company markets the Assault-VMI irons to professional and avid golfers exclusively through its network of over 100 certified custom fitting accounts. The Company has manufactured in excess of 5,000 sets of custom-fitted Assault-VMI irons. The Company believes that its custom fitting activities provide Adams a thorough understanding of golf club design and credibility in the golf industry.

Each golf club manufactured by the Company is available in a variety of shaft length and flexes to accommodate both men and women golfers of all ages and ability levels. In addition, once a club has received a certain degree of market acceptance, the Company has historically introduced a left-handed model. Currently, the Company offers each of its golf clubs in a left-handed model, except the recently introduced Tight Lies Strong 9.

The following table indicates the percentage of gross sales in each major product group for the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998. Historical percentages may not be indicative of the Company's future product mix.

Percentage of [Net] Sales by Product Group

| Product Group | Year Ended December 31, | | Three Months Ended March 31, 1998 |
|---|---|---|---|
| | 1996 | 1997 | |
| Original Tight Lies® | 45.6% | 55.9% | 48.5% |
| 3, 5, 7 and 9 Tight Lies® | 1.6 | 38.5 | 48.8 |
| Other Club Lines | 52.8 | 5.6 | 2.7 |
| TOTAL | 100.0% | 100.0% | 100.0% |

The Company supports each of its products with a two-year warranty. The warranty provides for repair or replacement of the golf club, except in the case of abuse. The Company has not experienced material amounts of breakage with respect to its golf clubs.

### Design and Development

The Company's design and development team is responsible for developing, testing and introducing new technologies and product designs. Product design and development is currently spearheaded by Barney Adams, Chairman of the Board, Chief Executive Officer and President; Richard Murtland, Vice President – Research and Development, and independent consultants, Robert ___. Bush and Dr. Michael M. Carroll. Mr. Bush has over 30 years in golf club development, most recently, as Director of Technical Services for True Temper Sports, a leading shaft manufacturer, where from 1966 to 1993, he was responsible for testing all golf club shafts. Mr. Bush was instrumental in the development of "Iron Byron," the industry standard for the mechanical testing of golf clubs and balls. Mr. Bush is currently a member of the Technical Advisory Panel for *Golf Digest*. Dr. Michael M. Carroll is

23

J

CONFIDENTIAL                    UND 06072

A 369

Dean of the George R. Brown School of Engineering at Rice University in Houston, Texas. Dr. Carroll holds doctorate degrees in both physics and mathematics and is an avid golfer. Dr. Carroll works closely with the Adams design team and is responsible for the scientific analysis of each new product developed by the Company. See "Management - Directors and Executive Officers."

The Company's research and development expenses were $_____, $_____ and $_____ during 1995, 1996 and 1997, respectively.

The design and development team engages in a five step process for designing and developing new products.

*Concept Development.* During concept development, Adams' design and development team identifies specific ball flight objectives. In addition, the Company considers new ideas from distributors, inventors, professional golfers and others. The Company expects that Nick Faldo will play a significant role in future concept development.

*Design Parameters.* The Company's product development team determines design parameters for the club, including shaft length, flex and weight, head design, loft and overall club weight. The product development team also determines the optimal materials to use in the club. The Company will not use higher cost materials, such as titanium or other alloys, unless such expensive materials provide meaningful performance benefits.

*Patent Review.* The Company considers patent protection for its designs and technologies to be an important part of its design strategy. The Company and its patent attorneys conduct a search of prior art and existing products to determine whether a new product idea may be covered by an existing patent.

*Product Design and Engineering Review.* If a product concept continues past the patent review stage, the Company translates design parameters into working designs. When appropriate, these designs are modeled and developed using computer aided design technologies and subjected to rigorous engineering review to validate the effectiveness of the design or technology. Dr. Carroll plays a key role in this stage of product design.

*Testing and USGA Approval.* Once a specific design has been decided upon, the Company creates and tests one or more prototypes. [NEW TEST FACILITY] The Company has a testing facility at the Hank Haney Golf Ranch in McKinney, Texas. As part of the testing process, the Company records, analyzes and interprets data associated with each prototype including distance, flight, spin and accuracy. Using feedback from these tests, the Company modifies its designs to achieve its performance objective. Prior to approving a design, the Company provides prototypes of the clubs to employees, consultants, custom fitters and others to obtain additional feedback. During the testing phase, the Company applies for USGA approval of the club. Although the golf equipment standards set by the USGA only apply to competitive events sanctioned by that organization, the Company believes it is critical for new clubs to comply with these standards. Upon approval of a new product from the USGA, it becomes considered for commercial release.

Marketing

The goals of the Company's marketing efforts are to drive sales through its retail distribution channel and build its brand identity. To accomplish these goals, Adams intends to (i) carry out direct response and traditional advertising, (ii) engage in promotional activities and (iii) capitalize on its relationship with Nick Faldo and other well known golf figures.

*Advertising.* In order to build brand awareness and stimulate retail demand for its products, the Company uses a combination of direct response and traditional image-based advertising.

*Direct Response Advertising.* The Company intends to continue to build brand awareness and stimulate product demand through its direct response advertising, which includes a variety of mediums including television, radio, print and direct mail. Direct response advertising, in which

24

CONFIDENTIAL

UND 06073

A 370

consumers may order products directly from the Company by calling a toll-free telephone number, provides a cost-effective vehicle enabling Adams to tell a compelling product story and build brand recognition while generating consumer sales revenue. In April 1997, Adams debuted a 30-minute Tight Lies infomercial, which has contributed significantly to the Company's recent growth. This infomercial received the "Best Product Information Award" from _____ in _____. The Tight Lies infomercial routinely runs on The Golf Channel, regional sports stations, national networks and local, market-specific broadcast stations. In addition, the Company utilizes 30- and 60-second direct response television commercials to supplement the infomercial airings, as well as radio advertising. The Company advertises regularly in major golf and industry publications, general consumer magazines and local newspapers nationwide. These include *Golf Digest*, *Golf Magazine*, *Sports Illustrated*, *The Wall Street Journal* and *USA Today*. Finally, direct mail advertising enhances the Company's direct to consumer marketing efforts with regularly scheduled campaigns. The direct response sales revenue has enabled Adams to broaden its advertising efforts to include image-based, brand advertising.

- *Image-Based Advertising.* The Company also uses traditional advertising to generate retail demand and build its brand identity. Traditional advertising includes: (i) a series of 30-second commercials which run during major golf tournaments and golf related programs, (ii) newspaper, magazine and radio ad campaigns and (iii) a professionally redesigned world wide web site that is located at www.adamsgolf.com.

The Company has received extensive editorial coverage in golf, consumer and trade publications as well as general consumer magazines and newspapers worldwide.

*Promotional Activities.* The Company engages in a variety of promotional activities to sell and market its products. Such activities include (i) consumer sweepstakes like the Company's "Ramble in the Bramble" where one golfer will receive an all expense paid, luxury tour of Scotland's most legendary golf courses, (ii) promotional giveaways with certain purchases including items such as instructional videos or books and (iii) promotional campaigns like the "90-day challenge" in which the Company is advertising its 90-day return policy.

*Relationship with Nick Faldo and Others.* The Company has recently formed a relationship with Nick Faldo, an internationally recognized golf professional and winner of numerous U.S. and international championships, including three Masters (1989, 1990 and 1996) and three British Opens (1987, 1990 and 1992). Mr. Faldo led the Official World Golf Ranking for 81 weeks during 1993 and 1994. Mr. Faldo also has the most Ryder Cup appearances in the history of golf. Adams intends that Nick Faldo will be actively and directly involved in the design, testing and development of new technologies and new products. Mr. Faldo is noted for his precise play as a golfer and his reputation as a perfectionist. The Company believes that by aligning itself with Mr. Faldo, it can further promote the Adams brand, while at the same time demonstrating the Company's ability to deliver game enhancing golf equipment that satisfies the specific and demanding requirements of successful tour professionals. See "Management - Consulting Agreement."

The Company has also obtained endorsements from Hank Haney and Bill Rogers. Mr. Haney was named the 1993 PGA Teacher of the Year and is a five-time recipient of the Northern Texas Section PGA Teacher of the Year Award. Mr. Haney has instructed over 100 touring professionals from the PGA, LPGA, European, Japanese and Asian Tours along with several top rated junior golfers. Mr. Haney is a member of the advisory staff for *Golf Digest*. Bill Rogers won the British Open championship in 1981 and was the 1991 PGA Player of the Year.

Sales and Customer Support

The Company sells its products through on- and off-course golf shops and selected sporting goods stores, direct sales to consumers, international distributors, and the Company's custom fitting accounts.

*Sales to Retailers.* The Company sells a significant majority of its products to selected retailers. To maintain its high quality reputation and generate retailer loyalty, the Company does not sell its products through price sensitive

25

CONFIDENTIAL

UND 06074

A 371

general discount warehouses, department stores or membership clubs. The Company believes its selective retail distribution strategy helps its retailers to maintain profitable margins and maximize sales of Adams products. In the three months ended March 31, 1998, sales to retailers accounted for 78.9% of the Company's total sales.

Adams maintains a 25-person inside sales department which is in frequent, direct contact with the Company's over 6,000 retailers. These sales representatives are supported by [6] Regional Account Coordinators who maintain personal, face-to-face contact with the Company's retailers. The Company has been successful in generally delivering product to its retailers within one week of the order being received. The Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than they may be required to for other golf equipment manufacturers.

*Direct Response Sales and Support.* Adams engages in direct response sales and support for the purpose of accelerating retail demand. The Company maintains an in-house customer service call center whose representatives field calls resulting from the Company's direct response advertising and provide technical assistance to Adams' customers. The Company also outsources a portion of its call center activities. Each of the Company's customer service representatives can direct callers to their nearest Adams retailer.

*International Sales.* International sales are made in over 38 countries (primarily Japan, Canada and the United Kingdom) through approximately 31 independent distributors. The international distributors sell to retailers for end sale to the consumer. International sales have increased from $_____ in 1995 and $_____ in 1996 to $_____ in 1997 and $_____ in the first three months of 1998. The Company recently expanded its international sales division to include a Director of International Sales to identify, develop, engage and support the Company's worldwide distributor base.

*Custom Fitting Sales.* The Company employs 6 sales representatives who manage the Company's custom fitting sales and support division and who administer Adams' custom fitting training program for golf professionals. Adams' custom fitting training program has received PGA certification and provides continuing education credits for PGA Member Professionals. Since 1995, the Company has certified in excess of 350 golf professionals to custom fit its Assault-VMI irons, which are sold exclusively through its approximately 110 custom fitting locations. Custom fitters measure data relating to swing and ball flight characteristics. Based on this analysis, a set of clubs is manufactured that is specifically tailored to that golfer.

Many of the Company's sales and customer service personnel are accomplished golfers, including a number of former collegiate and professional golfers. These employees are encouraged to assist customers with a full range of golf-related questions, regardless of whether such contact results in the immediate sale of Adams products. Adams believes its knowledgeable representatives reinforce the customers' positive impressions of the Company and its products and helps build the Adams brand image.

Manufacturing and Assembly

The Company manages all stages of manufacturing, from sourcing to assembly, in order to maintain a level of quality and consistency. The Company establishes product specifications, selects the materials used to produce the components and tests the specifications of all components received by the Company. In this regard, the Company has established a quality assurance program at those manufacturing facilities located in Taiwan and China that are collectively responsible for producing substantially all of the Company's performance club heads. Those component manufacturers who have demonstrated an acceptable level of internal quality control are not subject to the Company's quality assurance program. Upon arrival at the Company's manufacturing facilities in Plano, Texas, each component used in the Company's clubs is again checked to ensure consistency with strict design parameters. Components are then sorted to identify minor variations in characteristics, such as weight and flexibility, that, although within the specified range, may cause club performance to vary.

The Company believes that its facilities have the capacity to meet manufacturing and assembly needs for the foreseeable future. The Company relies on a limited number of suppliers for a significant portion of the component parts used in the manufacture of its golf clubs, including the manufacture of its Tight Lies fairway woods. While

26

A 372

management believes that alternative sources of supply either exist or could be developed in the event that it should lose its present sources of supply for these components, experience delays in receiving delivery from such sources, or experience a significant price increase from such suppliers, the Company could sustain at least temporary shortages of components or periods of increased price pressures, which could temporarily have a material adverse effect on the Company's operating results. The Company has, at times, experienced shortages of quality component parts during periods of significantly increased purchasing from certain of its vendors, which have caused the Company to fail to meet its own internal expectations regarding product delivery. Although management of the Company has installed procedures to minimize the reoccurrence of such shortages, failure to obtain adequate supplies or fulfill customer orders on a timely basis could have a material adverse effect on the Company's business, financial condition and results of operations in the future. See "Risk Factors - Sources of Supply."

Patents

The Company's ability to compete effectively in the golf club market will depend, in large part, on the ability of the Company to maintain the proprietary nature of its technologies and products. The Company has previously been awarded [six] U.S. patents relating to certain of its products and proprietary technologies and has filed [three] patent applications. The Company has been awarded a patent with respect to the design of the Tight Lies fairway wood as well as the VMI design formula. There can be no assurance, however, as to the degree of protection afforded by these or any other patents held by the Company or as to the likelihood that patents will be issued from the pending patent applications. Moreover, these patents may have limited commercial value, or may lack sufficient breadth to protect adequately the aspects of the Company's products to which the patents relate. The Company does not hold any foreign patents and no foreign patent applications are pending.

There can be no assurance that competitors, in the U.S. and in foreign countries, many of which have substantially greater resources than the Company and have made substantial investments in competing products, will not apply for and obtain patents that will prevent, limit or interfere with the Company's ability to make and sell its products. The Company is aware of numerous patents held by third parties that relate to products competitive to the Company's, including products competitive with the Tight Lies fairway woods. There is no assurance that these patents would not be used as a basis to challenge the validity of the Company's patent rights, to limit the scope of the Company's patent rights or to limit the Company's ability to obtain additional or broader patent rights. A successful challenge to the validity of the Company's patents may adversely affect the Company's competitive position. Moreover, there can be no assurance that such patent holders or other third parties will not claim infringement by the Company with respect to current and future products. Because U.S. patent applications are held and examined in secrecy, it is also possible that presently pending U.S. applications will eventually issue with claims that will be infringed by the Company's products or technologies. The defense and prosecution of patent suits is costly and time-consuming, even if the outcome is favorable. This is particularly true in foreign countries where the expenses associated with such proceedings can be prohibitive. An adverse outcome in the defense of a patent suit could subject the Company to significant liabilities to third parties, require the Company and others to cease selling products or require disputed rights to be licensed from third parties. Such licenses may not be available on satisfactory terms, or at all. See "Risk Factors - Patents and Protection of Proprietary Technology."

Information Systems

The Company believes that a comprehensive and integrated infrastructure of computer technology, systems and services is a significant factor in maintaining and improving its competitive position. Systems in place, including order fulfillment and distribution, financials and decision support and operational planning, have supported the past growth of the Company. The Company is aggressively enhancing its current capabilities and expects to complete this work to meet the demands of the Company's growth. Special emphasis is being placed on systems for customer management, supply chain management and business analysis and planning. The Company believes that its current and enhanced computer systems, along with normal upgrades and extensions, will be sufficient to accommodate the Company's anticipated growth of sales and planned expansion for the foreseeable future. There can be no assurance that any upgrades of its information systems will be completed in a timely

27

CONFIDENTIAL

UND 06076

A 373

manner, that any such upgrades will be adequate to meet the needs of the Company or that these upgrades will not strain the Company's financial resources.

## Competition

Adams faces intense competition in the performance oriented golf club business. The Company competes with a number of established manufacturers, many of which have greater financial and other resources than the Company. Adams' competitors include Callaway Golf Company adidas-Salomon AG (Taylor Made) and Fortune Brands (Titleist and Cobra). The Company competes primarily on the basis of performance, brand name recognition, quality and price. The Company believes that its ability to market its products through multiple distribution channels, including on- and off-course golf shops, selected sporting goods retailers and through direct response advertising, is important to its ability to compete.

The golf club industry is generally characterized by rapid and widespread imitation of popular technologies, designs and product concepts introduced by new or existing competitors. Due to the success of the Tight Lies fairway woods, the Company expects that one or more competitors may introduce products similar to the Tight Lies fairway woods. The Company has generally not emphasized the product innovations of its competitors and, has elected instead, to market its own innovative designs in golf clubs. However, the purchasing decisions of many purchasers of golf clubs are often the result of highly subjective preferences which can be influenced by many factors, including, among others; advertising media, promotions and product endorsements. The Company may face competition from manufacturers which may introduce other new or innovative products into the market and/or successfully promote golf clubs perceived to offer performance advantages. The failure to compete successfully in the future could result in a material deterioration of customer loyalty and the Company's image and could have a material adverse effect on the Company's business. See "Risk Factors - Dependence on New Product Introductions; Uncertain Consumer Acceptance" and "- Highly Competitive Industry."

## Employees

At March 31, 1998, the Company had 210 full-time employees, including 95 engaged in manufacturing and assembly, 17 in research and development and quality control, 66 in sales support and 32 in management and administration. Adams' employees are not unionized. Management believes its relations with its employees are good.

## Properties

The Company's administrative offices and manufacturing and assembly, research and development and warehouse and distribution facilities currently occupy approximately 65,000 square feet of space in Plano, Texas. This facility is leased by the Company pursuant to a lease agreement expiring in 2004 and may be extended for an additional five years. The Company maintains the right to terminate the lease if it moves to a larger facility owned by the current lessor. The Company has also leased an additional 33,000 square feet of space to be used for the expansion of the Company's in-house call center. The Company expects to take possession of the additional space in June 1998 pursuant to the terms of a lease also expiring in 2004. The Company believes that these facilities will be sufficient through at least the end of 199___.

## Legal Proceedings

The Company is not involved in any material legal proceedings.

21

CONFIDENTIAL

UND 06077

A 374

## MANAGEMENT

### Directors and Executive Officers

The following table sets forth certain information with respect to the directors and executive officers of the Company:

| Name | Age | Position(s) Held |
|------|-----|------------------|
| B. H. (Barney) Adams | 59 | Chairman of the Board, Chief Executive Officer and President |
| Darl P. Hatfield | 51 | Senior Vice President – Finance and Administration and Chief Financial Officer |
| Richard H. Murtland | 57 | Vice President – Research and Development, Secretary, Treasurer and Director |
| James E. Farrell | 39 | Vice President – Finance |
| Mark D. Gonsalves | 38 | Vice President – Sales and Marketing, Retail |
| Steven P. Sanazaro | 49 | Vice President – Information Technology |
| Walter G. DeVault | 47 | Director, Customer Service and Consumer Sales |
| Cindy A. Herington | 36 | Director, Advertising and Direct Response Marketing |
| Paul F. Brown, Jr. | 51 | Director |
| Roland E. Casati | 67 | Director |
| Finis F. Conner | 54 | Director |
| Mark Mulvoy | | Director |
| Stephen R. Patchin | 39 | Director |

The Company's Certificate of Incorporation was amended and restated effective May 14, 1998 to provide, among other things, that the Board of Directors be divided into three classes, each of whose members serve for staggered three-year terms. Commencing with the 1999 Annual Meeting of Stockholders, one class of directors will be elected each year for a three-year term. Messrs. Conner and Patchin are members of Class I, the term of which expires at the 1999 Annual Meeting of Stockholders, Messrs. Murtland and Casati are members of Class II, the term of which expires at the 2000 Annual Meeting of Stockholders and Messrs. Adams and Brown are members of Class III, the term of which expires at the 2001 Annual Meeting of Stockholders. See "Description of Capital Stock – Delaware Law and Certain Charter and Bylaw Provisions."

The number of members of the Board of Directors of the Company is currently fixed at nine and, as a result, the Board presently has two vacancies. The Company intends to fill these vacancies as soon as practicable after the completion of the Offering. Under the terms of the agreement between the Company and Nick Faldo, Mr. Faldo has the right to designate one person to serve on the Company's Board of Directors. The Company has agreed that, for so long as royalties remain payable to Mr. Faldo under the terms of such agreement, it will use commercially reasonable efforts to cause Mr. Faldo's designee to be nominated for, and elected to, the Board. As of the date of this Prospectus, Mr. Faldo has not notified the Company of his designee to the Board.

Certain additional information concerning the directors and executive officers is set forth below.

*B. H. (Barney) Adams.* Mr. Adams founded the Company in [1986] and has served as Chairman of the Board, Chief Executive Officer and President since that time. Mr. Adams is the inventor of the Tight Lies fairway wood. Prior to founding the Company, Mr. Adams served as President of Intertest, Inc. (a manufacturer of semiconductor testing equipment), Senior Vice President of Margaux Controls, Inc. (a manufacturer of energy control systems) and Executive Vice President of Maytex Manufacturing (a manufacturer of store fixtures). Mr. Adams is widely considered a golf equipment expert, has authored several magazine articles concerning the technical aspects of golf equipment and is a frequent PGA section speaker.

*Darl P. Hatfield.* Mr. Hatfield joined the Company as Senior Vice President – Finance and Administration and Chief Financial Officer in May 1998. Prior to joining the Company, Mr. Hatfield was a partner with KPMG Peat Marwick LLP. Mr. Hatfield has 30 years of experience in accounting and auditing and is a Certified Public Accountant.

29

CONFIDENTIAL

A 375

*Richard H. Murtland.* Mr. Murtland joined the Company in 1994 as Vice President - Operations and has been a director of the Company since _____, 1995. He became Vice President - Research and Development in April 1998. Mr. Murtland has approximately 30 years of experience in operations and engineering, most recently as Project Manager with ARCO International Oil and Gas Company (an international oil exploration and production company).

*James E. Farrell.* Mr. Farrell joined the Company as Vice President - Finance in September 1997. Prior to joining the Company, Mr. Farrell served as a Manager for The Pinson Company (a _____), where he was responsible for _____. From April 1994 to June 1995, Mr. Farrell was Manager - Finance/Marketing for Brinks Home Security (a monitored home security company). Prior thereto, he was _____ for ADT Security Systems a (_____). Mr. Farrell is a Certified Public Accountant.

*Mark D. Gonsalves.* Mr. Gonsalves joined the Company in July 1995 as Vice President - Sales and Marketing and now serves as Vice President - Sales and Marketing, Retail. Prior to joining the Company, Mr. Gonsalves was President and Chief Executive Officer of In-Sync Sport International, Inc. (a sports psychology company founded by Mr. Gonsalves). He was a professional golfer from 1990 to 1992. Mr. Gonsalves has 16 years sales and marketing experience.

*Steven P. Sanazaro.* Mr. Sanazaro joined the Company as Vice President - Information Technology in January 1998. Prior to joining Adams, Mr. Sanazaro served as Vice President, Information Technology for Pepsico, Inc. from May 1996 to January 1998 and as Vice President, Research and Development and Chief Technology Officer for Harbinger Corporation (a supplier of electronic commerce software and network services) from August 1993 to May 1996. Mr. Sanazaro has approximately 30 years of business technology experience.

*Paul F. Brown, Jr.* Mr. Brown became a director in _____ 1995. Mr. Brown has been Vice President - Finance and Chief Financial Officer of Royal (a holding company with diversified interests) since 1990.

*Roland E. Casati.* Mr. Casati became a director in _____ 1995. He has been engaged in the development of residential and commercial real estate and diversified personal investments for over 30 years. Mr. Casati's investments have involved original investments in communications, retail and manufacturing, including two previous investments in sports equipment manufacturers. Mr. Casati is a director of Ziegler Coal Holding Co. (one of the largest coal producers in the U.S.).

*Finis F. Conner.* Mr. Conner was elected a director of the Company in October 1996. From 1986 to 1996, Mr. Conner was Chairman of the Board and Chief Executive Officer of Conner Peripherals, Inc. (a leading publicly traded manufacturer of disk drives for personal computers founded by Mr. Conner in 1986) which, in February 1996, merged with Seagate Technology, Inc. (a publicly traded manufacturer of computer components co-founded by Mr. Conner in 1979). Mr. Conner served as Vice-Chairman of Seagate from 1979 to 1985. Since February 1996, Mr. Conner has been a principal of the Conner Group, an independent consulting organization and Chairman of the Board of Virtual Visits, Inc., a company engaged in the design of Internet web sites for the promotion of golf products. Mr. Conner is a director of Box Hill Systems Corp., a manufacturer of high performance data storage systems.

*Mark Mulvoy.* Mr. Mulvoy became a director of Adams in April 1998.

*Stephen R. Patchin.* Mr. Patchin became a director in _____ 1993. He has been President and Chief Executive Officer of Royal Oil and Gas Corp., an oil and gas exploration and production company and wholly owned subsidiary of Royal, since _____ 1985 and President and Chief Executive Officer of Royal since _____ 1990.

Executive officers of the Company are elected by and serve at the discretion of the Board of Directors.

30

CONFIDENTIAL

UND 06079

A 376

**Key Management Employees**

The following table sets forth certain information with respect to certain additional key management employees of the Company.

| Name | Age | Position(s) Held |
|------|-----|------------------|
| Walter G. DeVault | 47 | Director, Customer Service and Consumer Sales |
| Cindy A. Herington | 36 | Director, Advertising and Direct Response Marketing |

Certain additional information concerning these individuals is set forth below.

*Walter G. DeVault.* Mr. DeVault joined the Company as Director of Customer Service and Consumer Sales in February 1998. He has worked in the home security industry for the last eight years and was most recently the National Sales Director for Brink's Home Security, Inc. Mr. DeVault has over 25 years sales and sales management experience.

*Cindy A. Herington.* Ms. Herington joined the Company as Director of Special Projects in May 1997. Ms. Herington became Director of Advertising and Direct Response Marketing in April 1998. She currently manages all of the daily advertising and marketing needs for the Company. Prior to joining the Company, Ms. Herington had been employed for ten years by Neiman Marcus in a variety of management positions with increasing responsibilities, most recently as _____. Ms. Herington is the daughter of Barney Adams, the Company's Chief Executive Officer and President.

**Committees**

Upon completion of the Offering, the Board of Directors will have two standing committees: the Compensation/Plan Committee and the Audit Committee. The Compensation/Plan Committee will be responsible for the recommendation to the Board of Directors of annual salaries for senior management as well as the administration and grant of awards under the Company's Incentive Plan and the Company's Bonus Plan (the "Bonus Plan"). The Compensation/Plan Committee will be comprised of Messrs. _____, _____ and _____.

The Audit Committee will be responsible for meeting periodically with representatives of the Company's independent public accountants to review the general scope of audit coverage, including consideration of the Company's accounting practices and procedures and system of internal accounting controls, and to report to the Board of Directors with respect thereto. The Audit Committee will also make recommendations to the Board of Directors with respect to appointment of the Committee's independent auditors. The Audit Committee will be comprised of Messrs. _____ and _____.

31

CONFIDENTIAL

UND 06080

A 377

## Executive Compensation

The following table discloses compensation received by the Company's Chief Executive Officer and the executive officers whose individual salary and bonus exceeded $100,000 during the fiscal year ended December 31, 1997 (collectively, the "Named Executive Officers").

### Summary Compensation Table

| Name and Principal Position | Year | Annual Compensation | | | |
|---|---|---|---|---|---|
| | | Salary | Bonus | Other Annual Compensation | All Other Compensation |
| B. H. Adams Chairman of the Board, Chief Executive Officer and President | 1997 | $162,940 | $3,615,800(1) | $____(2) | $____(3) |
| Richard H. Morthend Vice President-Research and Development, Secretary and Treasurer | 1997 | 72,548 | 40,000 | | |
| Mark D. Gonzalves Vice President - Sales and Marketing, Retail | 1997 | 62,400 | 352,144 | | |

(1)  Comprised of (a) $15,000 cash bonus and (b) grant of 2,000,000 shares of Common Stock on December 31, 1997 having a fair market value, as determined by an independent valuation, of $1.83 per share on the date of grant.

(2)  Comprised of (a) $2,541,688 for reimbursement of tax associated with the grant of certain restricted shares of Common Stock and (b) $_____ of initiation fees and monthly dues paid on a golf and country club membership.

(3)  Comprised of premiums for life insurance policy for which members of Mr. Adams' family are the beneficiaries.

### Fiscal Year-End Option/SAR Values

| Name | Number of Securities Underlying Unexercised Options/SARs at Fiscal Year-End (#) | | Value of Unexercised In-The-Money Options/SARs at Fiscal Year End(1)(1) | |
|---|---|---|---|---|
| | Exercisable | Unexercisable | Exercisable | Unexercisable |
| B. H. Adams | 1,520,768 | 0 | $2,205,114 | - |
| Richard H. Morthend | 222,214 | 0 | 322,311 | - |
| Mark D. Gonzalves | 333,320 | 0 | 482,314 | - |

(1)  Based on the fair market value of the Common Stock at December 31, 1997 ($1.83 per share), as determined by an independent valuation. Each of the options referred to herein was exercised by the respective option holder during January 1998.

## Benefit Plans

*1998 Stock Incentive Plan.* The Company adopted the 1998 Stock Incentive Plan effective as of February 26, 1998. The purpose of the Incentive Plan is to provide incentives and rewards for participating employees and consultants of the Company (i) to support the execution of the Company's business strategies and the achievement of its goals and (ii) to associate the interests of such persons with those of the Company's stockholders. In furtherance of this purpose, the Incentive Plan authorizes the granting of stock options, including incentive stock options (within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended) (the "Code"), stock appreciation rights, restricted and performance shares, restricted and performance share units, performance stock awards, dividend or equivalent rights, or other awards that are valued in whole or in part by reference to, or otherwise based on, the Common Stock of the Company (each, an "Award"). A total of 1,800,000 shares of Common Stock have been reserved for issuance upon the exercise of Awards granted under the Incentive Plan, subject to adjustment in accordance with the terms of the Incentive Plan.

32

CONFIDENTIAL

UND 06081

A 378

Upon consummation of the Offering, the Incentive Plan will be administered by the Compensation/Plan Committee comprised of Messrs. _____, _____ and _____. The Compensation/Plan Committee has discretion to select the persons to whom Awards will be granted (each, a "Participant"), to determine the type, size and terms and conditions applicable to each Award and the authority to interpret, construe and implement the provisions of the Incentive Plan. Each Award under the Incentive Plan shall be evidenced by an Award Agreement. It is presently anticipated that _____ individuals will initially participate in the Incentive Plan.

Under the Incentive Plan, the Company may grant, in addition to other Awards, incentive or nonqualified stock options. The exercise price of any option granted under the Incentive Plan must be at least equal to the fair market value of the Common Stock on the date of the grant, and in the case of a grant of an incentive stock option to any Participant who owns stock representing more than 10% of the Common Stock, the exercise price shall at least equal 110% of the fair market value of the shares at the time the incentive stock option is granted. In addition, no incentive stock option is exercisable more than 10 years from the date of grant (5 years if such option is granted to a Participant who owns in excess of 10% of the Common Stock) and the aggregate fair market value, determined on the date of grant, of the Common Stock as to which such incentive stock options are exercisable for the first time by any Participant in the Incentive Plan shall be limited to $100,000 per calendar year. The Incentive Plan also permits the grant of stock appreciation rights (rights to receive the excess of the fair market value of a share of Common Stock on the date the Award is exercised over the fair market value of a share of Common Stock on the date of grant for such period as the Compensation/Plan Committee may determine); restricted and performance shares (a transfer of shares of Common Stock to a Participant, subject to such restrictions on transfer or other incidents of ownership, or subject to specified performance standards as the Compensation/Plan Committee may determine; restricted or performance share units (fixed or variable share or dollar-denominated units subject to conditions of vesting, performance and time of payment as the Compensation/Plan Committee may determine, which may be paid in shares of Common Stock, cash or a combination of both); dividend or equivalent rights (rights to receive dividends or their equivalent in value in shares of Common Stock, cash or in a combination of both with respect to any new or previously existing Award); performance stock awards (rights to receive restricted shares that will not be issued until after the end of the applicable performance period, subject to the satisfaction of specified performance goals); and other Common Stock-based Awards, in each case, as set forth in the Incentive Plan.

As of April 30, 1998, the Company had granted Awards consisting only of options to purchase an aggregate of _____ shares of Common Stock under the Incentive Plan.

If a Participant terminates his or her service for reasons other than retirement, permanent and total disability or death, the Participant may exercise, no later than the date of termination, only those stock options vested as of the date of termination. Upon retirement, a Participant's options immediately vest and such Participant may exercise nonqualified stock options within one year of retirement and incentive stock options within three months of such retirement. In order to retire under the Incentive Plan, a Participant must have attained the age of 62 and have had 10 years of continuous employment with the Company. In the case of termination as a result of permanent and total disability, a Participant's options will immediately vest and such Participant will have one year from termination to exercise any outstanding options. If a Participant who was granted stock options dies while employed by the Company, or during the period which options may be exercised following termination of employment due to retirement or permanent and total disability, all stock options granted under the Incentive Plan immediately vest and must be exercised by the Participant's estate no later than the termination date of such option. Except to the extent permitted by the Code and the rules and regulations promulgated under Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (i) no Award under the Incentive Plan is assignable or transferable except by will, by the laws of descent and distribution or pursuant to a qualified domestic relations order and (ii) during the lifetime of a Participant, the Award will be exercisable only by such Participant or such Participant's guardian, legal representative or assignee pursuant to a qualified domestic relations order.

The Incentive Plan provides that, in the event of a "change of control" (as defined below), the following may, in the sole discretion of the Compensation/Plan Committee, occur with respect to any and all Awards outstanding as of such change of control:

33

CONFIDENTIAL

UND 06082

A 379

(i)     automatic maximization of performance standards, lapse of all restrictions and acceleration of any time periods relating to the exercise, realization or vesting of such Awards so that such Awards may be immediately exercised, realized or vested in full on or before the relevant date fixed in the applicable Award Agreement;

(ii)     performance shares or performance units shall be paid entirely in cash;

(iii)     upon the exercise of a stock option during the 60-day period from and after the date of the change of control, the Participant exercising the option may in lieu of the receipt of Common Stock upon exercise, elect by written notice to the Company to receive an amount in cash equal to the excess of the aggregate Value (as hereinafter defined) of the shares of Common Stock covered by the option or portion thereof surrendered, determined on the date the option is exercised, over the aggregate exercise price of the option (the "Aggregate Spread"). However, if the end of such 60 day period is within six months of the date of grant of the option held by a Participant subject to the reporting requirements of Section 16 of the Exchange Act, such option shall be cancelled in exchange for a cash payment to the participant equal to the Aggregate Spread on the day which is six months and one day after the date of grant of such option. "Value," as more fully defined in the Incentive Plan, means the higher of (i) the highest fair market value during the 60-day period after the date of a change of control and (ii) if the change of control is the result of a transaction described in paragraphs (i) or (iii) under the definition of a change of control, the highest price per share of the Common Stock paid in such transaction.

(iv)     if a Participant's employment or engagement terminates for any reason other than retirement or death following a change of control, any options held by such Participant may be exercised by such Participant until the earlier of three months after the termination of employment or engagement or the expiration date of such options; and

(v)     all Awards become non-cancellable.

For purposes of the Incentive Plan, "change of control" is defined, in general, to mean the occurrence of any of the following events: (i) the acquisition, other than from the Company, by an individual, entity or group (other than Royal or B. H. Adams) of beneficial ownership of thirty percent (30%) or more of either the then outstanding shares of Common Stock or the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in election of directors, (ii) the ceasing, for any reason, of individuals who, as of January 1, 1998, constitute the Board of Directors to constitute at least a majority of the Board, provided that any individual becoming a director subsequent to such date whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the incumbent Board shall be considered as though such individual were a member of the incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the directors of the Company; (iii) approval by the stockholders of the Company of a reorganization, merger or consolidation of the Company, in each case, whereby the individuals who were the respective beneficial owners of the Common Stock and voting securities of the Company immediately prior to such reorganization, merger or consolidation do not, following such reorganization, merger or consolidation, beneficially own, directly or indirectly, more than sixty percent (60%) of the then outstanding shares of Common Stock and the combined voting power of the then outstanding voting securities entitled to vote generally in election of directors, as the case may be, of the Company resulting from such reorganization, merger or consolidation, or complete liquidation or dissolution of the Company or the sale or other disposition of all or substantially all of the assets of the Company. The Incentive Plan terminates on April ___, 2008.

*1996 Stock Option Plan.* In April 1996, the Company adopted a stock option plan (the "1996 Plan") providing for the issuance to certain officers, directors, employees and advisors of the Company of incentive stock options within the meaning of Section 422 of the Code and stock options that are nonqualified for Federal income tax purposes. A total of 800,000 shares of Common Stock have been reserved for issuance upon the exercise of options granted under such plan. As of April ___, 1998, the Company had issued nonqualified stock options to purchase an aggregate of _____ shares of Common Stock with a weighted-average exercise price of $_____ per share under the 1996 Plan. All such stock options were granted at an exercise price that was, at the time of grant, equal to the fair market value of a share of Common Stock, as determined by the Board of Directors. The Company currently does not anticipate making additional grants under the 1996 Plan.

34

CONFIDENTIAL

UND 06083

A 380

*401(k) Plan.* [RB]

*Company Bonus Plan.* The Company adopted the Bonus Plan on February 26, 1998 to become effective for the fiscal quarter commencing April 1, 1998. The Bonus Plan is administered by the Compensation/Plan Committee. Participation is based upon individual selection by the Compensation/Plan Committee from among key employees who, in the judgment of the Compensation/Plan Committee, make significant contributions to the performance of the Company and whose decisions and actions most significantly affect the growth, profitability and efficient operations of the Company. It is anticipated that approximately _____ individuals will initially participate in the Bonus Plan. The aggregate amount of any awards paid with respect to any calendar year to any participant under the Bonus Plan shall not exceed $_____.

Awards are based upon the extent to which the Company's financial performance (measured in terms of financial goals or objectives as may be determined by the Compensation/Plan Committee) during the appropriate measurement period for each award (e.g., the calendar year, calendar quarter, etc.) has met or exceeded certain performance goals specified by the Compensation/Plan Committee. Some performance goals applicable to participants in the Bonus Plan may include elements which specify individual achievement objectives directly related to such individual's area of responsibility. The Compensation/Plan Committee may, in its discretion, decrease, but not increase, the amount of any award granted under the Bonus Plan. Additionally, the Compensation/Plan Committee may alternatively grant discretionary bonuses.

Because the performance goals under the Bonus Plan are determined by the Compensation/Plan Committee in its discretion, it is not possible to determine the benefits and amounts that will be received by any individual participant or group of participants in the future. The Board of Directors may terminate, modify or suspend the Bonus Plan, in whole or in part, at any time; provided that no such termination or modification may impair any rights which may have accrued under such Bonus Plan.

Compensation of Directors

Prior to the Offering, directors did not receive compensation to serve as directors of the Company but did receive reimbursement for expenses traveling to and from Directors meetings. The Company intends to continue to reimburse the directors for their reasonable expenses associated with attending Board meetings.

Indemnification of Officers and Directors

The Company's Certificate of Incorporation and Bylaws provide that the Company will indemnify, to the fullest extent permitted by applicable law as from time to time may be in effect, any person against all liability and expense (including attorneys' fees and settlement costs) incurred by reason of the fact that he is or was a director or officer of the Company, or, while serving as a director or officer of the Company, he is or was serving at the request of the Company as a director, officer, partner or trustee of, or in any similar managerial or fiduciary position of another corporation, partnership, joint venture, trust, association, or other entity, or by reason of any action alleged to have taken or omitted in such capacity. Expenses (including reasonable attorneys' fees) incurred in defending any proceeding or prosecution will be paid by the Company in advance of the final disposition of such proceeding or suit upon receipt of a written affirmation by the director or officer of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification and a written undertaking by such person to repay such amount if it is ultimately determined that he or she is not entitled to indemnification. [The Company may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, fiduciary, or agent of the Company against any liability asserted against and incurred by such person in any such capacity or arising out of such person's position, whether or not the Company would have the power to indemnify against such liability under the provisions of the Certificate of Incorporation or Bylaws of the Company.]

The indemnification provided by the Certificate of Incorporation is not deemed to be exclusive of any other rights to which those indemnified may be entitled under any Bylaw, agreement or vote of stockholders or disinterested directors, or otherwise, and inures to the benefit of their heirs, executors and administrators. Further, such indemnification shall continue as to a person who has ceased to be a director or officer. The provisions of the Bylaws

25

CONFIDENTIAL

UND 06084

A 381

specifically permit the Company to indemnify other persons from similar or other expenses and liabilities as the Board of Directors may determine. Insofar as indemnification for liabilities under the Securities Act may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, the Company has been informed that, in the opinion of the Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

The foregoing description of certain provisions of the Company's Certificate of Incorporation and Bylaws is qualified in its entirety by the actual Certificate of Incorporation and Amended and Restated Bylaws of the Company filed as exhibits to the Registration Statement of which this Prospectus is a part.

Compensation Committee Interlocks and Insider Participation

Prior to April ___, 1998, the Company did not have a Compensation Committee or other committee of the Board of Directors performing similar functions. Decisions concerning compensation of executive officers have generally been made by Mr. Adams in consultation with the other members of the Board of Directors. None of the executive officers of the Company currently serves on the Compensation Committee of another entity or on any other committee of the Board of Directors of another entity performing similar functions.

CERTAIN TRANSACTIONS

In November 1996, the Company borrowed $450,000 from Royal to finance the production of the Company's infomercial. This loan was evidenced by a promissory note (the "Royal Note") bearing interest at __ % per annum and was unsecured. Accrued and unpaid interest was due _____, and the entire principal amount was due _____. In September 1997, the Company issued 900,000 shares of Common Stock (at a rate of $.50 per share) to Royal in cancellation of the Royal Note.

Effective December 31, 1997, the Board of Directors of the Company granted to Mr. Adams, the Company's President and Chief Executive Officer, 2,000,000 shares of Common Stock as a bonus for services rendered. The Board also provided Mr. Adams with a cash payment of $2,541,688, an amount equal to the Federal Income tax liability associated with such grant. In the first quarter of 1998, Mr. Adams loaned $1.1 million of such funds back to the Company pursuant to an unsecured promissory note. The remaining principal amount of the note ($534,899 at April 30, 1998) is payable in two installments on December 15, 1998 and April 14, 1999 at an interest rate of 5.39%.

KPMG Peat Marwick LLP ("KPMG"), a public accounting firm in which Darl P. Hatfield was a partner until April 30, 1998, has provided accounting and auditing services to the Company during 1997 and 1998. The amounts paid to KPMG for services rendered during 1997 and 1998 were $95,000 and $_____, respectively. Mr. Hatfield is currently Senior Vice President - Finance and Administration and Chief Executive Officer for the Company.

In January 1998, the Company made loans of $83,330 and $125,000 to Richard H. Murtland and Mark D. Gonzalves, respectively, to finance the aggregate exercise price of stock options then exercised by such executive officers. The loans bear interest at the rate of 5% per annum and are due January 14, 2001. Messrs. Murtland and Gonsalves are each executive officers of the Company.

During the year ended December 31, 1997, the Company paid Virtual Visits, Inc., a company engaged in the design of Internet Web sites for the promotion of golf products, $_____ for services rendered. Since January 1, 1998, the Company has paid Virtual Visits, Inc. a total of $_____. Finis F. Conner, a director of the Company, is Chairman of the Board of Virtual Visits, Inc. [Does Mr. Conner own in excess of 10% of VVI?]

The Company has granted options to purchase the Company's Common Stock to certain of its officers, directors and consultants. See "Management - Benefit Plans" and "Principal and Selling Stockholders."

The Company believes that all of the transactions set forth above were made on terms no less favorable to the Company than could have been obtained from unaffiliated third parties. All future transactions will be approved by a

36

CONFIDENTIAL

UND 06085

A 382

majority of the Board of Directors, including a majority of the independent and disinterested outside directors of the Board of Directors.

## PRINCIPAL AND SELLING STOCKHOLDERS

The following table and the notes thereto set forth information, as of the date of this Prospectus, relating to beneficial ownership of the Common Stock by (i) each person known by the Company to own beneficially more than 5% of the outstanding shares of the Common Stock, (ii) each director of the Company, (iii) each Named Executive Officer, (iv) all directors and executive officers of the Company as a group, and (v) each Selling Stockholder.

| Name of Beneficial Owners | Beneficial Ownership of Common Stock Prior to the Offering(1) | | Number of Shares of Common Stock to be Sold(2) | Beneficial Ownership of Common Stock After the Offering(1)(2) | |
|---|---|---|---|---|---|
| | Number | Percent | Number | Number | Percent |
| Directors and Named Executive Officers | | | | | |
| B. H. Adams | 4,640,768 | 25.5 | | | |
| Richard H. Marsland | 333,952 | 1.8 | — | 333,952 | * |
| Mark D. Gonsalves | 333,200 | 1.8 | — | 333,200 | * |
| Paul F. Brown, Jr.(3)(4) | 7,405,438 | 40.7 | | | |
| Roland E. Casati | 2,138,600 | 11.8 | | | |
| Finis F. Conner | 1,986,776 | 10.9 | | | |
| [Mark Mulvey] | | | | | |
| Stephen R. Patchin(3)(4) | 7,405,438 | 40.7 | | | |
| All Executive Officers and Directors as a Group (10 persons) | | | | | |
| Beneficial Owners of 5% or More of the Company's Common Stock | | | | | |
| Royal Holding Company, Inc.(4) 300 Delaware Avenue, Suite 306 Wilmington, Delaware 19301 | 7,405,438 | 40.7 | | | |
| Other Selling Stockholders | | | | | |

* Less than one percent.
(1) Applicable percentage of ownership is based on 18,199,282 shares of Common Stock outstanding on April __, 1998, together with the applicable number of shares of Common Stock acquirable upon exercise of outstanding stock options for such stockholder, if any. Common Stock is the only class of equity securities outstanding. Beneficial ownership is determined in accordance with the rules of the Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options that are presently exercisable or exercisable within 60 days are deemed to be beneficially owned by the person holding such options for the purpose of computing the percentage of ownership of such person but are not treated as outstanding for the purpose of computing the percentage of any other person.
(2) Does not give effect to the exercise of the Underwriters' over-allotment option or to purchases in the Offering, if any. See "Underwriting."
(3) The address for Messrs. Patchin and Brown is c/o Royal Holding Company, Inc., 300 Delaware Avenue, Suite 306, Wilmington, Delaware 19801.
(4) Represents 7,405,438 shares of Common Stock owned directly by Royal. Messrs. Patchin and Brown, directors of the Company, are the (i) Chief Executive Officer and President and (ii) Chief Financial Officer and Vice President – Finance, respectively, of Royal and, by virtue of their positions with Royal, may be deemed to share the power to vote or direct the vote of, and to share the power to dispose or direct the disposition of, these shares of Common Stock.

37

UND 06086

A 383

## DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company consists of 50,000,000 shares of Common Stock, $.001 par value per share, and 5,000,000 shares of Preferred Stock, $.01 par value per share (the "Preferred Stock"), which are subject to future issuance as determined by the Board of Directors of the Company.

### Common Stock

The holders of Common Stock are entitled to share pro rata in dividends and distributions, if any, with respect to the Common Stock when, as and if declared by the Board of Directors, from funds legally available therefor. Holders of Common Stock are entitled to one vote per share, are not entitled to cumulative voting in the election of directors and have no preemptive, subscription, redemption or conversion rights. Upon the liquidation, dissolution or winding up of the Company, the assets of the Company remaining after payment of or provision for liabilities and payment to the holders of Preferred Stock of such preferential amounts that they are entitled to receive will be distributed pro rata on a share-for-share basis among the holders of Common Stock. All outstanding shares of Common Stock are, and the shares to be issued and sold in the Offering will be, duly authorized, validly issued, fully paid and non-assessable. The rights, preferences and privileges of holders of Common Stock are subject to any series of Preferred Stock that the Company may issue in the future.

### Preferred Stock

The Company's Board of Directors is authorized to divide the Preferred Stock into series and, with respect to each series, to determine the preferences and rights and the qualifications, limitations or restrictions thereof, including the dividend rights, conversion rights, voting rights, redemption rights and terms, liquidation preferences, sinking fund provisions, the number of shares constituting the series and the designation of such series. The Board of Directors could, without stockholder approval, issue Preferred Stock with voting and other rights that could adversely affect the voting power of the holders of Common Stock and could have certain anti-takeover effects. The Company has no present plans to issue any shares of Preferred Stock.

The authority possessed by the Board of Directors to issue Preferred Stock could potentially be used to discourage attempts by others to obtain control of the Company through merger, tender offer, proxy contest or otherwise by making such attempts more costly or difficult to achieve.

### Registration Rights

Pursuant to the terms of that Registration Rights Agreement dated April ___ 1998 (the "Registration Rights Agreement") by and among the Company and certain stockholders of the Company holding an aggregate of shares of Common Stock, the Company has granted certain registration rights to such stockholders. Specifically, under the terms of the Registration Rights Agreement, the stockholders holding in excess of 40% of the Common Stock covered by such agreement have a right commencing at any time not earlier than the latter of (i) the expiration of any of the "lock-up" period prescribed by the Lock-up Agreement and (ii) the date on which the Company shall become eligible to use the Form S-3 Registration Statement (or any successor to such form) for the purpose of registering outstanding securities for the account of any person other than the Company, to demand that the shares of the Common Stock held by them be registered under the Securities Act. However, if the Board of Directors determines, in its good faith, that such registration would be detrimental to the Company and, as a result, that it is necessary to defer the filing of such registration statement at such time, the Company may defer such registration for a period not to exceed 180 days. The Company has agreed to pay all costs and expenses necessary to effect the registration of the shares of Common Stock to be sold by the stockholders in this first registration statement (other than underwriting and brokerage commissions, if any, and legal fees incurred by the selling holders). If, after the Company has effected the first such registration statement, it shall receive a request for registration from the stockholders holding a majority of the shares of Common Stock subject to the Registration Rights Agreement not previously registered, the Company shall file a second or third registration statement for the purpose of registering such shares under the Securities Act however, the Company and such stockholders have agreed to defer the filing of such registration statements in the same manner and on the same basis as the first registration. The stockholders having shares registered in such subsequent registration

38

CONFIDENTIAL

UND 06087

A 384

statements have agreed to pay all costs and expenses related thereto including the Company's fees and expenses relating to counsel, accountants and filing under the Securities Act.

The Registration Rights Agreement also grants certain piggy-back registration rights to the stockholders. Accordingly, whenever the Company proposes to register any shares of Common Stock under the Securities Act (other than registrations on Form S-4 or S-8), certain of the stockholders have the right to include the shares of Common Stock held by them in any such registration. However, if the managing underwriter of such registration advises the Company in writing that, in its opinion, the total number or dollar amounts of securities requested to be included in such registration exceeds the number or dollar amount of shares of Common Stock that can be sold in such offering, the Company may exclude certain shares from the offering. In such a case, the order of priority in which shares are to be included in the proposed offering will be as follows: first, all shares of Common Stock that the Company proposes to sell; and second, up to the full number or dollar amount of shares of Common Stock requested by the stockholders to be included in such registration in excess of the number or dollar amount of shares of the Common Stock the Company proposes to sell which, in the opinion of such underwriter, can be sold, allocated pro rata among the participating stockholders on the basis of the number of shares of Common Stock requested to be included therein by each. The Company generally is obligated to bear the expenses, other than underwriting discounts and sales commissions, of the registration of such shares. Any exercise by the holders of such incidental registration rights may hinder efforts by the Company to arrange future financings and may have an adverse impact on the market price of the Common Stock.

### Delaware Law and Certain Charter and Bylaw Provisions

Following the consummation of the Offering, the Company will be subject to Section 203 of the DGCL, the "business combinations" statute. In general, such statute prohibits a publicly held Delaware corporation from engaging in various "business combinations" with any "interested stockholder" for a period of three years after the time that such stockholder became an "interested stockholder," unless (i) the business combination or the transaction by which such stockholder became an "interested stockholder" was approved by the Board of Directors prior to such time, (ii) upon consummation of the transaction which resulted in the stockholder becoming an "interested stockholder," the "interested stockholder" owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced (excluding for purposes of determining the number of shares outstanding those shares owned by (a) persons who are directors and also officers and (b) certain employee stock ownership plans) or (iii) on or subsequent to such time the "business combination" is approved by the Board of Directors and authorized at an annual or special meeting of stockholders by the affirmative vote of at least 66⅔% of the outstanding voting stock which is not owned by the "interested stockholder." A "business combination" includes mergers, asset sales and other transactions resulting in financial benefit to a stockholder. In general, an "interested stockholder" is a person who, together with affiliates and associates, owns (or within three years, did own) 15% or more of a corporation's outstanding voting stock. The statute could prohibit or delay mergers or other takeover or change in control attempts with respect to the Company and, accordingly, may discourage attempts to acquire the Company.

In addition, certain provisions of the Company's Certificate of Incorporation and Bylaws summarized in the following paragraphs may be deemed to have an anti-takeover effect and may delay, defer or prevent an attempt to obtain control of the Company by means of a proxy contest, tender offer, merger or other transaction that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares held by stockholders.

*Classified Board of Directors.* The Company's Certificate of Incorporation provides for the Board of Directors to be divided into three classes of directors serving staggered three-year terms. As a result, approximately one-third of the Board of Directors will be elected each year. Moreover, under the DGCL, in the case of a corporation having a classified board, stockholders may remove a director only for cause. This provision, when coupled with the provision of the Bylaws authorizing the Board of Directors to fill vacant directorships, may preclude a stockholder from removing incumbent directors without cause and simultaneously gaining control of the Board of Directors by filling the vacancies created by such removal with its own nominees.

*Special Meeting of Stockholders.* The Company's Bylaws provide that special meetings of stockholders of the Company may be called only by the Board of Directors, or the Executive Committee of the Board of Directors, if any,

39

CONFIDENTIAL

UND 06088

A 385

or the President. This provision will make it more difficult for stockholders to take actions opposed by the Board of Directors.

*Stockholder Action by Written Consent.* The Company's Certificate of Incorporation provides that no action required or permitted to be taken at any annual or special meeting of the stockholders of the Company may be taken without a meeting, and the power of stockholders of the Company to consent in writing, without a meeting, for the taking of any action is specifically denied.

*Advance Notice Requirements for Stockholder Proposals and Director Nominations.* The Bylaws provide that stockholders seeking to bring business before an annual meeting of stockholders, or to nominate candidates for election as directors at an annual or special meeting of stockholders, must provide timely notice thereof in writing. In order to be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Company no later than 90 days prior to the meeting; provided, however, that in the event that less than 100 days notice or prior public disclosure of the date of the meeting is given and made to stockholders, notice by the stockholder must be received no later than the close of business on the tenth day following the day on which such notice of the date of the meeting was mailed or such public disclosure was made in order to be timely. The Bylaws specify certain requirements for a stockholder's notice to be in proper form. These provisions may preclude some stockholders from bringing matters before the stockholders at an annual or special meeting or from making nominations for directors at an annual or special meeting.

The Company believes the foregoing provisions are necessary to attract and retain qualified persons as directors and officers.

Market Information

Prior to the Offering, there has been no established public trading market for the Common Stock. The Company has made application to list the Common Stock on The Nasdaq Stock Market's National Market under the symbol "ADGO."

Transfer Agent and Registrar

The Company has appointed _____ as the transfer agent and registrar for the Common Stock.

## SHARES ELIGIBLE FOR FUTURE SALE

Upon the closing of the Offering, the Company will have _____ shares of Common Stock outstanding, [assuming no exercise of the Underwriters' over-allotment option.] Of these shares, the _____ shares sold by the Company and the _____ shares sold by the Selling Stockholders in the Offering will be freely tradeable without restriction or further registration under the Securities Act unless held by an "affiliate" of the Company (as that term is defined below). Any such affiliate will be subject to the resale limitations of Rule 144 adopted under the Securities Act. The remaining _____ shares of Common Stock currently outstanding are "restricted securities" for purposes of Rule 144, of which _____ shares are held by affiliates of the Company within the meaning of Rule 144 under the Securities Act, and _____ shares are held by non-affiliates of the Company. Restricted securities may not be resold in a public distribution except in compliance with the registration requirements of the Securities Act or pursuant to an exemption therefrom, including that provided by Rule 144.

In general under Rule 144 as currently in effect, a person (or persons whose shares are aggregated), including a person who may be deemed to be an "affiliate" of the Company as that term is defined under the Securities Act, is entitled to sell within any three-month period a number of shares beneficially owned for at least one year that does not exceed the greater of (i) 1% of the then outstanding shares of Common Stock or (ii) the average weekly trading volume of the outstanding shares of Common Stock during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and the availability of current public information about the Company. However, a person (or persons whose shares are aggregated) who is not an "affiliate" of the

40

CONFIDENTIAL

A 386

Company during the 90 days preceding a proposed sale by such person and who has beneficially owned "restricted securities" for at least two years is entitled to sell such shares under Rule 144 without regard to the volume, manner of sale or notice requirements. As defined in Rule 144, an "affiliate" of an issuer is a person that directly or indirectly controls, or is controlled by, or is under common control with such issuer.

The directors, officers and [certain] stockholders holding an aggregate of _____ shares of Common Stock of the Company have agreed not to sell, offer, contract to sell, grant any option or right for the sale, of or otherwise dispose of any Common Stock or any securities convertible, exercisable or exchangeable into shares of Common Stock nor any options or right to acquire any shares of Common Stock, including any sale pursuant to Rule 144 or Rule 144A promulgated under the Securities Act, for a period of 180 days after the date of this Prospectus without the prior written consent of Lehman Brothers Inc.

After such 180-day period, the Company may file a Registration Statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance to its employees, officers, directors and consultants under its employee benefit plans. Upon the effective date of such Registration Statement, shares of Common Stock issued upon exercise of options granted under the plans generally will be available for sale in the open market. As of the date of this Prospectus, the Company [as granted options to purchase up to _____ shares of Common Stock including options exercisable for _____ shares of Common Stock granted to certain employees, officers; directors and consultants under the 1996 Plan and Incentive Plan.

No predictions can be made of the effect, if any, that future sales of shares of Common Stock, and options to acquire shares of Common Stock, or the availability of shares for future sale, will have on the market price prevailing from time to time. Sales of substantial amounts of Common Stock in the public market, or the perception that such sales could occur, could adversely affect prevailing market prices of the Common Stock.

## UNDERWRITING

The underwriters of the Offering of the Common Stock (the "Underwriters"), for whom Lehman Brothers Inc., NationsBanc Montgomery Securities and Ferris, Baker Watts, Incorporated are acting as representatives (the "Representatives"), have severally agreed, subject to the terms and conditions of the Underwriting Agreement, the form of which is filed as an exhibit to the Registration Statement, of which this Prospectus forms a part (the "Registration Statement"), to purchase from the Company and the Selling Stockholders, and the Company and the Selling Stockholders have agreed to sell to the Underwriters, the aggregate number of shares of Common Stock set forth opposite their respective names below:

| Underwriter | Number of Shares |
|---|---|
| Lehman Brothers Inc. | |
| NationsBanc Montgomery Securities | |
| Ferris, Baker Watts, Incorporated | |
| | |
| Total | |

41

CONFIDENTIAL

UND 06090

A 387

The Underwriting Agreement provides that the obligations of the several Underwriters to purchase shares of Common Stock are subject to the certain conditions contained therein, and that if any of the foregoing shares of Common Stock are purchased by the Underwriters pursuant to the Underwriting Agreement, all the shares of Common Stock agreed to be purchased by the Underwriters pursuant to the Underwriting Agreement must be so purchased.

The Company and the Selling Stockholders have been advised that the Underwriters propose to offer the shares of Common Stock directly to the public at the initial public offering price set forth on the cover page of this Prospectus, and to certain selected dealers (who may include the Underwriters) at such public offering price less a selling concession not in excess of $0.___ per share. The selected dealers may reallow a concession not in excess of $0.___ per share to certain brokers and dealers. After the initial public offering, the public offering price, the concession to selected dealers and the reallowance may be changed by the Representatives.

Prior to the sale of shares in the Offering, there has been no active public market for the Common Stock of the Company. The initial public offering price of the shares of Common Stock will be determined by negotiation among the Company, the Selling Stockholders and the Representatives. Among the factors that will be considered in determining the initial public offering price will be the prospects of the Company and its industry in general, the Company's past and present operations, the Company's position in the industry, an assessment of the Company's management, the general condition of securities markets at the time of the Offering and the demand for similar securities.

The distribution of this Prospectus and the offering or sale of the shares of Common Stock in certain jurisdictions may be restricted by law. Accordingly, the shares of Common Stock may not be offered or sold, directly or indirectly, and neither this Prospectus nor any other offering material or advertisements in connection with the shares of Common Stock may be distributed or published, in or from any jurisdiction, except under circumstances that will result in compliance with applicable rules and regulations of any such jurisdiction. Such restrictions may be set out in applicable Prospectus Supplements. Persons into whose possession this Prospectus comes are required by the Company, the Selling Stockholders and the Underwriters to inform themselves about and to observe any applicable restrictions. This Prospectus does not constitute an offer of, or an invitation to subscribe for purchase, any shares of Common Stock and may not be used for the purpose of an offer to, or solicitation by, anyone in any jurisdiction or in any circumstances in which such offer or solicitation is not authorized or is unlawful.

[The Company and] the Selling Stockholders have granted to the Underwriters an option to purchase up to an additional _____ shares of Common Stock at the initial public offering price less the aggregate underwriting discount, solely to cover over-allotments, if any (the "Over-allotment Option"). [Of the _____ shares of Common Stock available under the Over-allotment Option, the Company will provide _____ shares and the Selling Stockholders will provide _____ shares.] The option may be exercised at any time up to 30 days after the date of this Prospectus. To the extent that the Underwriters exercise such option, each of the Underwriters will be committed, subject to certain conditions, to purchase a number of option shares proportionate to such Underwriter's initial commitment.

The directors, officers and certain stockholders of the Company holding an aggregate of ___ shares of Common Stock have agreed not to sell, offer, contract to sell, grant any option or right for the sale of or otherwise dispose of any shares of Common Stock or any securities convertible, exercisable or exchangeable into shares of Common Stock, including any sale pursuant to Rule 144 or Rule 144A promulgated under the Securities Act, for a period of 180 days after the date of this Prospectus without prior written consent of Lehman Brothers Inc.

The Underwriting Agreement contains indemnity provisions between the Underwriters, the Selling Stockholders and the Company and the controlling persons thereof against certain liabilities, including liabilities under the Securities Act.

At the request of the Company, the Representatives have reserved up to _____ shares of Common Stock offered hereby for sale to certain officers, directors, employees, business associates and related parties of the Company at the initial public offering price set forth on the cover page of this Prospectus. Such persons must commit to purchase

42

CONFIDENTIAL

UND 06091

A 388

no later than the close of business on the day following the date hereof. The number of shares available for sale to the general public will be reduced to the extent such persons purchase such reserved shares.

## LEGAL MATTERS

The validity of the shares of Common Stock offered hereby will be passed upon for the Company by Arter & Hadden LLP, Dallas, Texas. Certain legal matters in connection with the Offering will be passed upon for the Underwriters by Cooley Godward LLP, San Francisco, California.

## EXPERTS

The financial statements and financial statement schedules of the Company as of December 31, 1996 and 1997, and for each of the years in the three-year period ended December 31, 1997, included herein and elsewhere in the Registration Statement have been included herein and elsewhere in the Registration Statement in reliance upon the reports of KPMG Peat Marwick LLP, independent certified public accountants, appearing elsewhere herein and in the Registration Statement, and upon the authority of such firm as experts in accounting and auditing.

[D'arl, Item 509]

## ADDITIONAL INFORMATION

The Company has filed with the Commission a Registration Statement on Form S-1 (the "Registration Statement") under the Securities Act with respect to the Common Stock offered hereby. This Prospectus does not contain all of the information set forth in the Registration Statement and the exhibits and schedules thereto. For further information with respect to the Company or such Common Stock, reference is made to the Registration Statement and the schedules and exhibits filed as a part thereof. Statements contained in this Prospectus regarding the contents of any contract or any other document are not necessarily complete and, in each instance, reference is hereby made to the copy of such contract or other document filed as an exhibit to such Registration Statement. The Registration Statement, including exhibits thereto, may be inspected without charge at the Commission's principal office in Washington, D.C., and copies of all or any part thereof may be obtained from the Public Reference Section, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549 upon payment of the prescribed fees. The Commission maintains a Web site that contains reports, proxy and information statements and other information regarding registrants that file electronically with the Commission. The address of the Commission's Web site is http://www.sec.gov.

## DISCLOSURE REGARDING FORWARD LOOKING STATEMENTS

This Prospectus includes "forward-looking statements" including statements containing the words "believes," "anticipates," "expects" and words of similar import. All statements other than statements of historical fact included in this Prospectus, including without limitation, such statements under "Prospectus Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business" and located elsewhere herein, regarding the Company or any of the transactions described herein, including the timing, financing, strategies and effects of such transactions, are forward-looking statements. Although the Company believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from expectations are disclosed in this Prospectus, including, without limitation, in conjunction with the forward-looking statements in this Prospectus and/or under "Risk Factors." The Company does not intend to update these forward-looking statements.

43

CONFIDENTIAL

UND 06092

A 389

## INDEX TO FINANCIAL STATEMENTS

Independent Auditors' Report ................................................................. F-1

Consolidated Balance Sheets as of December 31, 1996 and 1997
and March 31, 1998 (unaudited) ......................................................... F-2

Consolidated Statements of Operations for the years ended December 31, 1995, 1996
and 1997 and the three months ended March 31, 1997 and 1998 (unaudited) ......... F-3

Consolidated Statements of Stockholders' Equity for the years ended December 31, 1995,
1996 and 1997 and the three months ended March 31, 1998 (unaudited) ............... F-4

Consolidated Statements of Cash Flows for the years ended December 31, 1995, 1996
and 1997 and the three months ended March 31, 1997 and 1998 (unaudited) ......... F-5

Notes to Consolidated Financial Statements ................................................. F-6

CONFIDENTIAL

UND 06093

A 390