# Appendix
# A461-A550

NationsBanc Montgomery Securities

## TYPICAL RETAIL PRICES FOR FAIRWAY WOODS

| | Previous | Current |
|---|---|---|
| **Callaway** | | |
| War Bird[1] | $199-229 | $199 |
| Great Big Bertha[1] | $349-379 | $329 |
| **Taylor-Made** | | |
| Stainless Steel[1] | | $199 |
| Titanium[1] | | $299 |
| **Adams** | | |
| Infomercial[1] | | $219 |
| Retail[1] | | $199 |
| **Orlimar** | | |
| Infomercial[1] | | $280 |
| Retail[1] | | $265 |

[1] With graphite shaft.

*prices competitive* (handwritten)

8. We also believe it is likely that Callaway will introduce a new line of metalwoods in August 1998, although we would expect such a line to be priced above Adams' clubs.

9. Callaway's management seems to believe that large oversized fairway wood heads are best for most golfers. Adams has a different positioning.

10. If Callaway did introduce a shallow-faced fairway wood, this could validate the Adams design in the minds of consumers.

## Tour Usage

1. Even though Adams does not pay any professional other than Nick Faldo to use its clubs and has no club modification support staff on the tours, the Tight Lies fairway woods have recently been the fourth most frequently used fairway wood on the senior tour.

### RECENT TYPICAL SENIOR PGA TOUR USAGE

| | Fairway Wood Shares |
|---|---|
| Callaway | 30% |
| Orlimar | 30% |
| Taylor-Made | 7-10% |
| Adams | 7-8% |
| Top-Flite | 6-8% |

2. Interestingly, many of the professionals using Callaway fairway woods use the traditional-sized -S2H2 metalwood. As a result, about 50% of the fairway woods used on the Senior PGA Tour are not oversized.

3. About 50 professionals use a Tight Lies fairway wood. We expect this number to increase. In 1992, in its early growth phase and when its annual sales of metalwoods were $103 million, about 140 professionals used Callaway drivers compared to approximately 300 in the U.S. currently.

# CONFIDENTIAL

UND 00690

A 461

NationsBanc Montgomery Securities

## Involvement of Nick Faldo

1. Nick Faldo, one of the greatest golfers in the history of golf, has a long-term cooperative agreement with Adams Golf. Mr. Faldo has won the prestigious British Open three times and Masters three times. He was ranked number one in the Official World Golf Ranking in 1993 and 1994, and has played in more Ryder Cub tournaments (Europe versus U.S. by qualification or invitation only) than any other golfer in history.

2. Importantly, Mr. Faldo is generally considered one of the best ball strikers in history and is viewed by all as a consummate perfectionist in terms of his golf swing and equipment. Furthermore, Mr. Faldo is well known outside the U.S. where Adams has significant untapped potential.

3. Mr. Faldo cannot sign a contract with any other golf club company, and he currently uses the Adams 3-wood. Mr. Faldo will be actively involved in developing and testing new products. In addition, Mr. Faldo has an arrangement with Marriott Golf Centers which will now be named Faldo-Adams Golf Schools. There is currently one such golf school, and there could eventually be twenty. Adams can test clubs at these schools, and R&D expenses in effect will be leveraged into advertising.

4. Mr. Faldo is heavily incented to assist the company perform well. He has been granted 900,00 common shares and receives 5% of foreign sales.

## Marketing

Adams Golf has combined an innovative and differentiated product with extremely effective marketing.

1. Adams ran its first 30-minute infomercial on television in April 1997. The infomercial shows three amateurs of varying ability hitting their own fairway woods and long irons and the Original Tight Lies (4-wood) from a variety of lies. The infomercial is hosted and narrated by Jack Whitaker, the well-known golf announcer, Hank Haney, one of the most respected teaching professionals in golf, Bill Rogers, a former British Open Champion and Carol Mann, one of the greatest lady professionals of all-time.

2. The infomercial was named Best Infomercial Demonstration Show in 1997 by the National Infomercial Marketer Association.

3. The infomercial is viewed positively and not as a competitor by retailers as it builds awareness and generates retail store traffic. In the first quarter of 1998, retail sales accounted for 79% of Adams' sales. The 4-wood is the only club marketed on the infomercial. In addition, the infomercial price of $219 provides a pricing umbrella for retailers. Retailers can offer the club at $199 and make a value statement versus the infomercial price and still achieve an attractive gross margin.

4. We believe the attractive gross margin of the Adams Tight Lies line has strong appeal to retailers, some of whom indicate their sales of Adams fairway woods already equal or exceed those of Callaway.

CONFIDENTIAL

UND 00691

A 462

NationsBanc Montgomery Securities

## GROSS MARGINS TO RETAILERS[1]
Per Club

| | Adams | Callaway Warbird | |
| --- | --- | --- | --- |
| | | Before Price Cut | After Price Cut |
| Retail Price | $199 | $199-229 | $199 |
| Wholesale Price | $144 | $170 | $150 |
| Gross Profit | $55 | $29-49 | $49 |
| Gross Margin | 28% | 15-21% | 25% |

[1] On clubs with graphite shafts.

5.  Note the sales ramp following the introduction of the infomercial in the second quarter of 1997.

### ADAMS GOLF SALES
($ millions)

| | 1997 | 1998 |
| --- | --- | --- |
| First Quarter | $1.5 | $24.5 |
| Second Quarter | $4.0 | |
| Third Quarter | $14.2 | |
| Fourth Quarter | $17.0 | |

6.  Returns of products purchased directly (i.e. over the telephone) are only 11% including clubs that are returned to be replaced with a different shaft.

7.  The direct sales model has allowed Adams to collect names, addresses and telephone numbers of golfers to whom a new product, when introduced, could be directly marketed.

8.  Adams also employs traditional television ads, radio ads and print ads in the *Wall Street Journal* and *USA Today*.

9.  Adams has just recently begun selling to most major golf club retailers. Many of these retailers do not yet carry all of Adam's SKUs.

## Foreign Potential

1.  Sales outside the U.S. accounted for only 6% of Adams sales in the first quarter of 1998. As noted, industry sales of golf equipment outside the U.S. approximate sales in the U.S. In addition, Callaway's foreign sales represented 35% of its sales (or an estimated 45% including product transshipped from the U.S. to foreign markets) in 1997.

2.  Adams has already named 33 distributors in 39 countries. Most of these distributors have experience marketing other golf club lines.

## The Callaway Analogy

1.  Callaway represents a precedent for the rapid growth we project for Adams Golf.

2.  In addition, our projected levels of selling, G&A and R&D expense for Adams are similar to the levels employed by Callaway at a similar stage of development.

CONFIDENTIAL          5

UND 00692

A 463

NationsBanc Montgomery Securities

8. Of course, an objective assessment requires noting that Callaway did not face as formidable a competitor as do those now competing with Callaway.

**DOLLAR SALES**
($ millions)

| Callaway (Metalwoods Only) | | Adams | |
|---|---|---|---|
| 1991 | $37 | 1997 | $37 |
| 1992 | $103 | 1998E | $100 |
| 1993 | $209 | 1999E | $165 |
| 1994 | $329 | | |

**UNIT SALES**
(000s)

| | Callaway (Metalwoods Only) | | | | Adams Golf | | |
|---|---|---|---|---|---|---|---|
| | U.S. | Foreign | Total | | U.S. | Foreign | Total |
| 1991 | 233 | 9 | 242 | 1997 | 248 | 8 | 256 |
| 1992 | 625 | 197 | 822 | 1998E | 661 | 48 | 709 |
| 1993 | 1,114 | 477 | 1,591 | 1999E | 888 | 340 | 1,228 |
| 1994 | 1,645 | 709 | 2,354 | | | | |

slower than CW

**BUILDING OF INFRASTRUCTURE**
($ millions)

| | Callaway | | | | Adams | | |
|---|---|---|---|---|---|---|---|
| | Selling Expense | G&A | R&D | | Selling Expense | G&A | R&D |
| 1991 | $11.3 | $5.6 | $0.8 | 1997 | $13.1 | $10.6 | $0.6 |
| 1992 | 19.8 | 15.6 | 1.6 | 1998E | 27.0 | 15.0 | 1.3 |
| 1993 | 38.5 | 28.6 | 3.7 | 1999E | 43.7 | 19.0 | 3.2 |
| Percentage of Sales | 18% | 14% | 2% | Percentage of Sales | 26% | 12% | 2% |

higher, intensel

**Management**

| Individual | Position | Age | Years with Adams Golf |
|---|---|---|---|
| Barney Adams | Chairman, CEO and President | 50 | 11 |
| Darl Hatfield | SVP-Finance & Administration, CFO | 51 | Less than one |
| Richard Murtland | VP-Research & Development | 57 | 4 |
| James Farrell | VP-Finance | 39 | 1 |
| Mark Gonsalves | VP-Sales & Retail | 38 | 3 |
| Steven Sanazzaro | VP-Information Technology | 49 | Less than one |
| Walter DeVault | Director of Customer Service and Consumer Sales | | Less than one |
| Cindy Herington | Director of Advertising and Direct Response Marketing | | |

Outside directors include Finis Conner, the founder, chairman and CEO of Conner Peripherals, a manufacturer of disk drives. Under Mr. Conner's leadership, Conner Peripherals achieved one of the

**CONFIDENTIAL**    6

UND 00693

A 464

most rapid growth ramps in the history of American business, with sales rising from $0 in 1993 to $1.3 billion in 1990.

## The Offering

The company is selling 3.75 million shares and existing shareholders are selling 2 million shares, plus an additional potential 862,500 shares in the green shoe.

### SALES BY EXISTING SHAREHOLDERS

| Individual | Shares Owned | Shares Offered | Percentage of Shares Owned | Shares Owned After Offering |
|---|---|---|---|---|
| Royal Holdings | 7,405,438 | 454,745 | 6.1% | 6,970,693 |
| B.H. Adams | 4,640,768 | 928,000 | 20.0% | 3,712,768 |
| Finis Connor | 1,942,776 | 388,555 | 20.0% | 1,554,221 |
| Richard Murtland | 333,952 | 66,750 | 20.0% | 267,202 |
| Lincoln Trust Company | 116,592 | | 20.0% | |
| Ferris McMullin | 111,738 | 77,000 | 66.0% | 39,592 |
| Peter Cassady | 8,400 | 73,750 | 66.0% | 37,988 |
| Richard Urdahl | 2,800 | 8,400 | 100.0% | 0 |
| | | 2,800 | 100.0% | 0 |

Adams is expected to be self-financing in terms of existing operations. Some portion of the offering proceeds could be used for acquisitions.

## Key Assumptions

### 1998

1. No sales of possible new driver.

2. Sales decline slightly sequentially in the third and fourth quarter due to normal industry seasonality. Callaway did not experience such seasonality during its rapid-growth phase. In fact, Callaway did not experience meaningful seasonality until its annual sales exceeded $400 million.

### 1999

1. Sales of fairway woods in the U.S. increase 14%. Dollar market share is projected at 16%.

2. Sales of fairway woods outside U.S. approximate $30 million, or only 22% of Adams' total fairway wood sales.

3. Sales of a new driver approximate $27 million, representing a market share of only 4% in the U.S.

4. The gross margin declines as a result of the increased importance of foreign sales and assumed lower gross margin on a driver.

### EPS SENSITIVITY—1999E

1. A five percentage-point change in the U.S. market share of fairway woods = $0.60.

2. A five percentage-point change in the U.S. market share of drivers = $0.55.

CONFIDENTIAL

7

UND 00694

A 465

NationsBanc Montgomery Securities

# Hypothetical Potential Earnings Power

## ASSUMPTIONS

1. Sales of fairway woods in the U.S. = 1999E level

2. Sales of drivers in the U.S. = 1999E sales of fairway woods in the U.S.

3. Foreign Sales = 30% of total sales.

   Hypothetical potential EPS = $2.00

## Financial Considerations

1. Adams is expected to generate excess cash.

2. Cash is projected at $67 million ($2.89 per share) at the end of 1998, and at $78 million ($3.36 per share) at the end of 1999.

## Risk Factors

1. Callaway is expected to introduce one to two new metalwood lines by January 1999. As noted, it seems likely that Callaway will continue to focus on oversized clubheads, leaving Adams with a different positioning. If Callaway introduces a shallow-faced clubhead, it could validate Adams' design.

2. As Adams expands its retail distribution, retailers' prices and gross margins could decline and reduce their enthusiasm for selling Adams' clubs. However, such retail price declines would likely stimulate consumer demand.

3. The success of a new driver is not assured. Our 1999 EPS estimate assumes a per share contribution of $0.25-0.30 from a driver. In the 1992-1996 period, when Callaway's stock increased 1100%, there was never much "visibility" into the next year in terms of new products or EPS.

USGA - Titanium - thin face
- wed

CONFIDENTIAL

UND 00695

A 466

05/26/98

**ADAMS GOLF, INC.**
**Annual Sales and Earnings Model**
($ millions, except per share data)

| FY ends 12/31 | 1997(1) | 1998E | 1999E |
|---|---|---|---|
| **Sales** | | | |
| Fairway Woods | $36.7 | $100.0 | $138.4 |
| United States | 35.9 | 95.0 | 108.1 |
| Wholesale | 26.4 | 83.4 | 95.1 |
| Direct Response | 9.5 | 11.6 | 13.0 |
| Foreign (Wholesale) | 0.8 | 5.0 | 30.3 |
| **Drivers** | | | 26.6 |
| United States | | | 21.6 |
| Wholesale | | | 9.6 |
| Direct Response | | | 12.0 |
| Foreign (Wholesale) | — | — | 5.0 |
| Total Sales | 36.7 | 100.0 | 165.0 |
| | | | |
| **Gross Profits** | | | |
| Fairway Woods | 26.7 | 72.2 | 92.1 |
| United States | 26.4 | 70.2 | 80.0 |
| Wholesale | 19.0 | 61.2 | 69.9 |
| as % of Wholesale Sales | 72.0% | 73.4% | 73.5% |
| Direct Response | 7.4 | 9.0 | 10.1 |
| as % of Direct Response Sales | 78.0% | 77.6% | 77.7% |
| Foreign (Wholesale) | 0.3 | 2.0 | 12.1 |
| as % of Foreign Sales | 40.0% | 40.0% | 40.0% |
| Drivers | 0.0 | 0.0 | 17.4 |
| United States | | | 15.4 |
| Wholesale | | | 6.5 |
| as % of Wholesale Sales | | | 68.0% |
| Direct Response | | | 8.9 |
| as % of Direct Response Sales | | | 74.0% |
| Foreign (Wholesale) | | | 2.0 |
| as % of Foreign Sales | | | 40.0% |
| Total Gross Profits | 26.7 | 72.2 | 109.5 |
| | 72.7% | 72.2% | 66.4% |
| | | | |
| Selling Expense | 13.1 | 27.0 | 43.7 |
| as % of Sales | 35.7% | 27.0% | 26.5% |
| | | | |
| G&A Expense | 2.1 | 15.0 | 19.0 |
| as % of Sales | 5.7% | 15.0% | 11.5% |
| | | | |
| R&D Expense | 0.6 | 1.3 | 3.2 |
| as % of Sales | 1.6% | 1.3% | 1.9% |
| | | | |
| Operating Income | 10.9 | 28.9 | 43.6 |
| as % of Sales | 29.7% | 28.9% | 26.4% |
| | | | |
| Interest Income (Expense) | (0.1) | 1.3 | 2.6 |
| | | | |
| Pretax Income | 10.8 | 30.2 | 46.2 |
| Tax Rate | 34.0% | 37.0% | 37.0% |
| Net Income | 7.1 | 19.0 | 29.1 |
| | | | |
| EPS | $0.57 | $0.90 | $1.25 |
| | | | |
| Average Shares Outstanding | 12.5 | 21.0 | 23.2 |

(1) Excludes special non-cash charge for stock compensation and assumes a tax rate of 34%.

CONFIDENTIAL

UND 00696

A 467

05/26/98

## ADAMS GOLF, INC.
### Condensed Quarterly Sales and Earnings Model
($ millions, except per-share data)

|  | 1997 | | | |
|---|---|---|---|---|
| FY ends 12/31 | 1Q | 2Q | 3Q | 4Q [1] |
| Sales | $1.5 | $4.0 | $14.2 | $17.0 |
| Gross Profits | 0.9 | 2.4 | 10.6 | 12.8 |
| as a % of Sales | 60.2% | 60.8% | 74.7% | 75.0% |
| Operating Expenses | 0.8 | 2.4 | 6.4 | 6.2 |
| Operating Income | 0.1 | 0.0 | 4.2 | 6.6 |
| Net Income | $0.04 | $0.0 | $3.1 | $4.0 |
| EPS | $0.00 | $0.00 | $0.24 | $0.31 |

[1] Excludes stock compensation and bonus award.

FOR PR... DISTRIBUTION ONLY

CONFIDENTIAL

UND 00697

A 468

05/26/98

# ADAMS GOLF, INC.
## Quarterly Sales and Earnings Model
### ($ millions, except per share data)

| FY ends 12/31 | 1Q | 1998 2QE | 3QE | 4QE |
|---|---|---|---|---|
| **Sales** | | | | |
| Fairway Woods | $24.5 | $27.8 | $25.5 | $22.2 |
| United States | 23.3 | 26.6 | 24.2 | 20.9 |
| Wholesale | 20.5 | 23.6 | 21.0 | 18.3 |
| Direct Response | 2.8 | 3.0 | 3.2 | 2.6 |
| Foreign (Wholesale) | 1.2 | 1.2 | 1.3 | 1.3 |
| **Driver** | | | | |
| United States | | | | |
| Wholesale | | | | |
| Direct Response | | | | |
| Foreign (Wholesale) | | 33.8 | — | — |
| Total Sales | 24.5 | 27.8 | 25.5 | 22.2 |
| | | | | |
| **Gross Profits** | | | | |
| Fairway Woods | 18.6 | 19.5 | 18.4 | 15.7 |
| United States | 18.1 | 19.0 | 17.9 | 15.2 |
| Wholesale | 15.9 | 15.7 | 15.4 | 13.2 |
| as % of Wholesale Sales | 77.6% | 70.8% | 73.3% | 72.1% |
| Direct Response | 2.2 | 2.3 | 2.5 | 2.0 |
| as % of Direct Response Sales | 78.6% | 77.0% | 77.0% | 77.0% |
| Foreign (Wholesale) | 0.5 | 0.5 | 0.5 | 0.5 |
| as % of Foreign Sales | 40.0% | 40.0% | 40.0% | 40.0% |
| **Driver** | | | | |
| United States | | | | |
| Wholesale | | | | |
| as % of Wholesale Sales | | | | |
| Direct Response | | | | |
| as % of Direct Response Sales | | | | |
| Foreign (Wholesale) | | | | |
| as % of Foreign Sales | | | — | — |
| **Total Gross Profits** | 18.6 | 19.5 | 18.4 | 15.7 |
| | 75.9% | 70.2% | 72.0% | 70.7% |
| | | | | |
| Selling Expense | 6.2 | 7.3 | 7.9 | 5.1 |
| as % of Sales | 25.3% | 26.3% | 31.0% | 23.0% |
| | | | | |
| G&A Expense | 3.6 | 4.1 | 3.8 | 3.5 |
| as % of Sales | 14.7% | 14.7% | 14.9% | 15.8% |
| | | | | |
| R&D Expense | 0.1 | 0.3 | 0.4 | 0.5 |
| as % of Sales | 0.4% | 1.1% | 1.6% | 2.3% |
| | | | | |
| Operating Income | 8.7 | 7.8 | 6.3 | 6.6 |
| as % of Sales | 35.5% | 28.1% | 24.6% | 29.7% |
| | | | | |
| Interest Income (Expense) | 0.0 | 0.0 | 0.4 | 0.0 |
| | | | | |
| Pretax Income | 8.7 | 7.8 | 6.7 | 7.0 |
| Tax Rate | 36.0% | 38.5% | 37.0% | 37.0% |
| Net Income | 5.6 | 4.8 | 4.2 | 4.4 |
| **EPS** | $0.31 | $0.25 | $0.18 | $0.19 |
| | | | | |
| Average Shares Outstanding | 18.3 | 19.2 | 23.2 | 23.2 |

.35

CONFIDENTIAL

A 469

05/26/98

## ADAMS GOLF, INC.
## Sources and Uses of Funds
($ millions)

| FY ends 12/31 | 1997 | 1998E | 1999E |
|---|---|---|---|
| **Sources** | | | |
| Net Income | $7.1 | $19.0 | $29.1 |
| Depreciation | | 0.2 | 0.3 |
| Total From Operations | 7.1 | 19.2 | 29.4 |
| Common Stock | 0.0 | 56.2 | 0.0 |
| Debt | 0.0 | 0.0 | 0.0 |
| Other | 0.0 | 0.0 | 0.0 |
| Total Sources | 7.1 | 75.4 | 29.4 |
| **Uses** | | | |
| Capital Expenditures | 0.8 | 1.7 | 4.0 |
| Debt Reductions | 0.0 | 0.0 | 0.0 |
| Other | 0.0 | 0.0 | 0.0 |
| Total Uses | 0.8 | 1.7 | 4.0 |
| Change in Working Capital | 6.3 | 73.7 | 25.4 |
| Less: Increase in Inventories | 0.0 | (8.0) | (8.0) |
| Less: Increase in Receivables | 0.0 | (4.0) | (8.0) |
| Plus: Increase in Current Liabilities | 0.0 | 3.0 | 2.0 |
| Change in Cash | 6.3 | 64.7 | 11.4 |
| **Year-End Figures** | | | |
| Current Assets | $15.9 | $92.6 | $118.8 |
| Current Liabilities | $9.0 | $12.0 | $14.0 |
| Current Ratio | 1.8 to 1 | 7.7 to 1 | 8.5 to 1 |
| Cash | $2.0 | $66.7 | $78.1 |
| Debt | $0.0 | $0.0 | $0.0 |
| Shareholders' Equity | $8.3 | $83.5 | $112.6 |

FOR ... DISTRIBUTION ONLY

CONFIDENTIAL

UND 00699

A 470

ROADSHOW PRESENTATION

EXHIBIT
170
5/17/06

UND 05200

A 471



LEHMAN BROTHERS

Adams Golf, Inc.

UND 05201

A 472

# Offering Summary

- **Issuer**            Adams Golf, Inc. (ADGO – NASDAQ)

- **Offering Size**     3,750,000    Primary shares
                        2,000,000    Secondary shares
                        5,750,000    Total shares

- **Filing Range**      $14.00 – $16.00

- **Timing**            Pricing July 9

- **Use of Proceeds**   Working capital and general corporate purposes

- **Underwriters**      Lehman Brothers
                        NationsBanc Montgomery Securities LLC
                        Ferris, Baker Watts Incorporated

◢ *ADAMS*

UND 05202

A 473

# Barney Adams
## Chairman, Chief Executive Officer and President

**ADAMS**

UND 05203

A 474

# Investment Highlights

- Tight Lies: dominate fairway wood category
- Highly effective marketing model
- Existing infrastructure for growth
- Experienced management team
- Strong financial performance

ADAMS

UND 05204

A 475



UND 05205

A 476



U.S. Wholesale Golf Club Sales

$2.1 Billion in 1998

Drivers
26%

Fairway Woods
23%

Putters
6%

Specialty Wedges
10%

Irons
35%

Source: National Golf Foundation; Company estimates

ADAMS

UND 05206

A 477

## Company Milestones

1987    Adams Golf founded

1990    Adams begins custom fitting golf clubs

1995    Adams introduces original Tight Lies
        fairway wood

1996    Strong 3, 5 and 7 introduced

1997    Infomercial airs
        Strong 9 introduced

1998    Nick Faldo partners with Adams Golf

**ADAMS**

UND 05207

A 478



Tight Lies®: Superior By Design

Patented Head Shape

Shallow Face

Lower Center of Gravity

Tri-level Sole Plate

ADAMS

UND 05208

A 479

# Tight Lies®: Lower Center of Gravity



Tight Lies Fairway Woods





Traditional Club

ADAMS

UND 05209

A 480



Tight Lies® Family of Fairway Woods

Original (16°)
Strong 3 (13°)
Strong 5 (19°)
Strong 7 (24°)
Strong 9 (28°)

ADAMS

UND 05210

A 481

# Tight Lies® Awards and Press




Golf Shop Operations 1998 Top Selling Product

International Network of Golf 1995 Breakthrough Product of the Year

*The right place at the right time*
*Tight Lies' founder, Barney Adams has hit it big*

Pro's say Tight Lies solves its name

Adams Comes Up Big with Small 'Tight Lies' Woods

TIGHT LIES: We can't keep them on shelves

Word is good on Tight Lies' Fairway Woods

**Adams Golf provides a perfect hit**

◢ ADAMS

UND 05211

A 482



UND 05212

A 483



UND 05213

A 484

# New Products

## Full Pipeline of New Products

| Products | Stage of Development | Target Introduction |
|---|---|---|
| Strong 2 Fairway Wood | Field Testing | Q4 1998 |
| Strong 11 Fairway Wood | Field Testing | Q4 1998 |
| New Driver | Prototype | Early 1999 |
| Irons | Computer Modeling | 1999–2000 |
| Putter | | |

**ADAMS**

UND 05214

A 485

# Manufacturing Facilities

## Capacity for Growth



- 98,000 sq. ft. (including adjacent building)
- Capacity: 3 – 4 million units per year
- 113 manufacturing employees
- Built in 1998

*ADAMS*

UND 05215

A 486



Experienced Management Team

UND 05216

A 487

# Mark Gonsalves
# Vice President —
# Sales & Marketing, Retail

ADAMS

UND 05217

A 488



UND 05218

A 489

Direct Response Marketing

Television

Print

THE WALL STREET JOURNAL

USA TODAY

FORTUNE

GOLF DIGEST

GOLF MAGAZINE

ADAMS

UND 05219

A 490

# Retail vs. Direct Sales

## 1997

Direct Sales
28%

Retail
72%

## Q1 1998

Direct Sales
13%

Retail
87%

**ADAMS**

UND 05220

A 491

# Strong Retail Distribution

- ⊠ Over 7,000 accounts

- ⊠ Increasing penetration of U.S. golf retailers

- ⊠ Selective distribution to
  - ◦ On and off course golf shops
  - ◦ Selected sporting goods retailers
  - • No discount warehouses

ADAMS

UND 05221

A 492

# Pricing Strategy

## High Retailer Margins

| | Average Wholesale Price | Average Retail Price | Average Retailer Margin |
|---|---|---|---|
| Adams | $138 | $199 | 31% |
| Callaway | 170 | 189 | 15 |
| Taylor Made | 150 | 189 | 26 |
| Cobra | 120 | 159 | 25 |

* Based on graphite shafts, stainless steel heads

ADAMS

UND 05222

A 493



# Strong Sales and Customer Service

Adams Sales and Customer Service

- Inside Sales (25)
- Regional Account Coordinators (14)
- Direct Sales Customer Service (30)
- Custom Fitting Sales (6)
- International Sales (13 Distributors)

**ADAMS**

UND 05223

A 494



## Growth Strategy

### Build U.S. Market Share

U.S. On-Off Course Shops Metal Woods Market Share

27.8%

22.3%

10.8%

7.1%

%
50
40
30
20
10
0

8/97    10/97    12/97    2/98    4/98

Source: Golf Datatech

ADAMS

UND 05224

A 495

# Single Fairway Woods Market Share

## Q1 1998 – Unit Volume Basis



Adams
27%

Callaway
13%

Spalding
12%

All Others
35%

Cobra
6%

Taylor Made
7%

Source: Golf Market Research Institute

ADAMS

UND 05225

A 496

# Growth Strategy

## Increase International Sales



- Leverage Nick Faldo
  - World Golf Hall of Fame
  - Masters Champion (1989, 1990, 1996)
  - British Open Champion (1987, 1990, 1992)

- Penetrate 3.9 million unit fairway woods market overseas

◢ADAMS

UND 05226

A 497



# Growth Strategy

## Introduce New Products Through Multiple Channels

New Products:
Hippo Wood,
Driver
Tight Lies
Woods
Putters

Custom Fitting → Direct Response → Retail → International

ADAMS

UND 05227

A 498

Darl Hatfield
Senior Vice President —
Finance and Administration and
Chief Financial Officer

◢◤ ADAMS

UND 05228



Financial Summary

Increasing Net Sales Growth

($ in Millions)

$40
$30
$20
$10
$0

$1.1    1995
$3.5    1996
$36.7   1997
$1.5    Q1 1997
$24.5   Q1 1998

ADAMS

UND 05229

A 500



Financial Summary

Quarterly Net Sales Growth

($ in Millions)

$30
$20
$10
$0

$1.5   $4.0   $14.2   $17.0   $24.5

Q1 1997   Q2 1997   Q3 1997   Q4 1997   Q1 1998

ADAMS

UND 05230

A 501

# Financial Summary

## Product Mix

| | 1996 | 1997 | Q1 1998 |
|---|---|---|---|
| Original | 45% | 56% | 48% |
| 3, 5, 7 and 9 | 2% | 38% | 49% |
| Other Clubs | 53% | 6% | 3% |
| | 100% | 100% | 100% |

**ADAMS**

UND 05231

A 502



Financial Summary

Operating Income Growth

($ in Millions)

* Excludes stock compensation and bonus expense of $14.8 million

ADAMS

UND 05232

A 503

# Financial Summary

## Quarterly Operating Income
($ in Millions)



| | Q1 1997 | Q2 1997 | Q3 1997 | Q4 1997 | Q1 1998 |
|---|---|---|---|---|---|
| | $0.1 | $0.0 | $4.2 | $6.6* | $8.9 |

* Excludes stock, compensation and bonus expense

**ADAMS**

UND 05233

A 504

# Financial Summary

## Operating Expense Analysis
(% of Net Sales)

| | 1997 | Q1 1998 |
|---|---|---|
| Research and development | 1.5% | 0.8% |
| Selling and royalty | 35.7 | 25.5 |
| Stock compensation and bonus | 40.5 | 0.0 |
| Provision for bad debt | 2.0 | 1.9 |
| Other general and administration | 3.9 | 11.7 |
| Total operating expenses | 43.1%* | 39.9% |

*Excludes stock compensation and bonus expense

**ADAMS**

UND 05234

A 505

## Financial Summary

### Operating Model
(% of Net Sales)

|  | 1997 | Q1 1998 |
|---|---|---|
| Gross Margin | 72.8% | 76.1% |
| Operating Margin | 29.6* | 36.2 |
| Net Margin | 19.4* | 23.0 |

* Excludes stock compensation and bonus award expense; net margin is net of income taxes

▲ ADAMS

UND 05235

A 506

# Financial Summary

## Capitalization

($ in Millions)

| | March 31, 1998 | |
| --- | --- | --- |
| | Actual | As Adjusted[a] |
| Cash and cash equivalents | $0.6 | $51.9 |
| Long-term debt | $0.2 | $0.2 |
| Stockholders' equity | 14.7 | 66.0 |
| Total capitalization | $14.9 | $66.2 |

◢ ADAMS

(a) As adjusted to reflect an offering of 3.75M primary shares at $15.00; assumes gross spread of 7.0% and offering expenses of $1.0M

UND 05236

A 507

## Closing Remarks

- Tight Lies: dominate fairway wood category
- Highly effective marketing model
- Existing infrastructure for growth
- Experienced management team
- Strong financial performance

**ADAMS**

UND 05237

A 508



LEHMAN BROTHERS

Q & A

UND 05238

A 509

06.05.96  FRI 13:57 FAX 202 942 9527    SEC OFFICE *

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
450 Fifth Street, N.W.
Washington, D.C. 20549



*COMMENTS*
*TO CRIG*
*FILING*

### TELEFACSIMILE TRANSMITTAL

PLEASE DELIVER THE FOLLOWING PAGES TO:

**Name:** J. David Washburn, Esg.

**Organization:** Arter & Hadden LLP

**Telecopier Number:** 214 741 7139

**Total Number of Pages, Including Cover Sheet:** 9

**Comments:**

**FROM:** Carolyn Kurr, Esg.

Telephone Number:    (202) 942-1850  x2915
Telecopier Number:    (202) 942-9527

*If you do not receive all pages, please telephone the above number for assistance.*

**NOTE:**    THIS DOCUMENT MAY CONTAIN PRIVILEGED AND NONPUBLIC INFORMATION. IT
IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE,
AND OTHERS WHO SPECIFICALLY HAVE BEEN AUTHORIZED TO RECEIVE IT. If you
are not the intended recipient of this facsimile, or the agent responsible for delivering
it to the intended recipient, you hereby are notified that any review, dissemination,
distribution, or copying of this communication strictly is prohibited. If you have
received this communication in error, please notify us immediately by telephone and
return the original to the above address by regular postal service without making a
copy. Thank you for your cooperation.

ADAMS 007325

A 510



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

DIVISION OF
CORPORATION FINANCE

Mail Stop 3-5

June 5, 1998

J. H. Adams
Chief Executive Officer
Adams Golf, Inc.
300 Delaware Avenue, Suite 548
Wilmington, Delaware   19801

Re:     **Adams Golf, Inc.**
       **Registration Statement on Form S-1 Filed May 4, 1998**
       **File Number 333-51715**

Dear Mr Adams:

The staff has reviewed the above-mentioned registration statement and has the following comments

## Form S-1

#### Inside Front Cover Page of the Prospectus

1.    Prior to printing and distribution of the preliminary prospectus, please supplementally provide us mock-ups of any pages that include any pictures or graphics to be presented. Accompanying captions, if any, should also be provided. We may have comments after reviewing the materials.

#### Prospectus Summary
#### The Company, pages 1-4

2.    In order to provide balance to the summary, discuss the Company's net operating losses in fiscal year 1997.

3.    Disclose the names of all the Company's sales and customer service personnel that are former professional golfers. Describe the specific positions of any such employees, if particularly significant.

4.    Summarize the main terms of the agreement with Mr. Faldo, including: (1) the length of the agreement; (2) specific responsibilities of Mr. Faldo; and (3) compensation to Mr. Faldo.

5.    Specify the Company's stage of development with respect to its new driver, and estimate when such a product may reach the market.

ADAMS 007326

A 511

Mr. B. H. Adams
June 5, 1998
Page 2

Risk Factors

Dependence on New Product Introductions: Uncertain Consumer Acceptance, page 6

6. Discuss the extent to which the Company believes that its rapid expansion to date has been dependent on its 1997 infomercial, and discuss any risks associated with the potentially "limited life" of such a marketing strategy.

Patents and Protection of Propriety Information, pages 6-7

7. Press reports indicate that, in February 1998, the Company sent several warnings of patent infringements to competitors that may have copied its designs. Discuss the status and potential negative effects of all such occurrences.

Ability to Manage Growth, page 7

8. You note that the Company's rapid growth has placed, and is expected to continue to place, a significant strain on the Company's operating and financial systems and resources. Discuss with greater specificity any financial difficulties resulting from the Company's rapid growth, including any problems related to cash flow. In particular, explain why the Company's net cash from operating activities during the most recent quarter was (1,466,487) rather than a surplus.

9. Discuss any material problems that the Company has had in filling customer orders on a timely basis during the past fiscal year.

Dependence on Key Personnel and Endorsements, pages 7-8

10. Disclose the certain significant payments that the Company must pay Mr. Faldo, whether or not his endorsement results in increased product sales.

11. Clarify why you believe that Mr. Faldo's continued professional success may have a more profound effect upon success of the Company's international, as opposed to domestic, marketing strategy.

12. Several press reports describe the relationship between Mr Faldo and the Company as a "lifetime deal." Disclose the length of the agreement with Mr. Faldo, as well as any material conditions that would trigger the termination of this agreement.

Highly Competitive Market, page 8

13. You note that there can be no assurance that the Company's marketing strategy will not be emulated by others, thereby diluting the Company's message or forcing the Company to adopt a new marketing

ADAMS 007327

Mr. B. H. Adams
June 5, 1998
Page 3

strategy. Press reports reveal that at least 24 golf infomercials aired in 1997, indicating that many golf companies already are utilizing Adams' major marketing strategy. Many of these also feature only one performance-oriented club, just as Adams's infomercial features its original True Lies fairway wood. Discuss the increased competition from other golf infomercials in this section.

Sources of Supply, page 8

14.   Disclose, if material, the lead time it would take the Company to locate alternative sources of supply.

Broad Management Discretion in Use of Proceeds, page 8

15.   Estimate the amount of proceeds that the Company intends to delegate to specific capital expenditures, product development, additional advertising, international sales efforts, and any acquisitions, and include such disclosure in the "Use of Proceeds" section. See Item 504 of Regulation S-K. In the alternative, if the Company cannot reasonably provide such information, retitle this section "Lack of Business Plan for Use of Proceeds" and specifically disclose that the Company has not yet decided how it will use the proceeds of the offering.

Certain Risks of Conducting Business Abroad, page 9

16.   Disclose the Company's current major international market(s), and, if applicable, discuss any material risks associated with conducting business in a particular region. In particular, disclose any material negative impact that the recent fiscal crisis in Southeast Asia has had upon the Company's business.

17.   Disclose the geographic regions in which the Company plans to increase its international sales efforts.

Control by Principal Stockholders, page 10

18.   Disclose whether CEO Barney Adams and/or Royal will have a controlling interest in the Company following the closing of the Offering.

Use of Proceeds, page 12

19.   We note that the Company has not developed a business plan for the use of proceeds of the offering. Disclose, therefore, the particular reasons that the Company has decided to raise such proceeds at this time.

20.   We note that the Company's operations for the quarter ended March 31, 1998 resulted in net cash of (1,466,487). Estimate the amount of proceeds, if any, that the Company anticipates using to finance its current operations in the upcoming year.

ADAMS 007328

1r. B. H. Adams
me 5, 1998
age 4

_apitalization, page 14_

1. Reflect the change in authorized shares of common stock as disclosed in Note 9 (f) on page F-15. Similarly revise the stockholders' equity section of the balance sheet.

_Aanagement's Discussion and Analysis_
_)verview, pages 16-17_

!2. Estimate the percentage of net sales by which the Company expects royalties to increase as a result of its agreement with Mr. Faldo. Alternatively, compare the Company's royalty expenses in fiscal year 1996 with its estimated royalty expenses in fiscal year 1997.

_Year Ended December 31, 1996 Compared to Year Ended December 31, 1997, page 18_

23. We note that the Company's net losses in fiscal year 1997 resulted primarily from the $14.8 in expenses related to stock compensation and bonus awards to Mr. Adams  Discuss the Board's reasons for approving such compensation in fiscal year 1997, and indicate whether such compensation may be indicative of future levels of compensation to Mr. Adams or other executives of the Company.

24. In particular, disclose the relevant terms of any material agreements regarding future compensation between the Company and Mr. Adams or other executives.

_Liquidity and Capital Resources, page 20_

25. Disclose any restrictions on the Company's credit facility, or cross reference to appropriate information in the notes to the financial statements.

26. You note that the Company borrowed $1.1 million in the form of a note payable to Mr. Adams during the first quarter of 1998.  Disclose the purposes for which the Company used, or plans to use, this money.

_Golf Industry Overview, page 21_

27. Supplementally provide copies of relevant materials which support statements throughout the prospectus regarding industry data and  the Company's  competitive position within the industry, for example: the March 1998 issue of GOLF SHOP OPERATIONS.

_Company History, page 22_

28. Revise the prospectus to describe the activities and responsibilities of the Company's eight subsidiaries listed in Exhibit 21.1 to the registration statement.  A supplemental organizational chart may be of help.

ADAMS 007329

A 514

Mr. B. H. Adams
June 5, 1998
Page 5

## Growth Strategy, page 24

29.  Estimate the Company's current market share within the premium fairway wood market.

## Expanding International Sales, page 24

30.  Provide the percentage of the Company's current revenues dependent upon international sales

## Design and Development, pages 25-26

31.  Provide information regarding the average duration of each of the five stages of product development.
    Again, as mentioned above, specify where in the process is the development of the Company's new driver
    and any other new products.  Discuss any potential marketing strategies tied to the introduction of this
    new product.

## Direct Response Advertising, page 27

32:  Although the Company has focused its marketing strategy on direct-response advertising, such as its
    Tight Lies infomercial, you note that the Company's net sales are primarily derived from sales to on- and
    off-course golf shops and selected sporting goods retailers, and to a much lesser extent, direct sales to
    consumers  Supplementally advise the staff and/or reconcile these statements in the registration
    statement.  In particular, is the direct-response advertising geared towards golf shops and retailers as well
    as consumers?

## Patents, page 29

33.  Provide the expiration dates of the six patents that have been issued to the Company.

## Directors and Executive Officers, page 32

34.  Provide the name(s) of Roland Casati's principal employer(s), and the principal business of such
    employer(s), during the past five years.

## 1998 Stock Benefit Plan, pages 34-35

35.  Provide an estimate of the number of employees who the Company believes will participate in the next
    fiscal year in the Company's 1998 stock benefit plan, if the Company can reasonably make such a
    determination.

ADAMS 007330

A 515

Mr. B. H. Adams
June 5, 1998
Page 6

Certain Transactions, page 40

36. State the complete name of Royal in the first paragraph.

37. Revise the third paragraph to provide the dollar value of the services rendered by Mr. Adams and the parties determining the value.

38. With reference to the fourth and fifth paragraphs on page 40, supplementally advise the staff how you determined that Mr. Hatfield's prior affiliation with KPMG and his current position with the Company did not impair KPMG's independence as your certified public accountants. We may have further comments after we review your response.

39. File as an exhibit to the registration statement a copy of the Company's April 1998 management agreement with Mr. Hatfield.

40. It is not clear if the Company has a written agreement with Virtual Visits; if so, describe the material terms of the agreement and file it as an exhibit in the next amendment.

Selling Shareholders, page 41

41. The table needs to identify, by name, the "Other Selling Shareholders". See Regulation S-K Item 507

42. It is not clear why Nick Faldo is not a 5% shareholder in view of the disclosure on page II-3, paragraph 14, which state that 900,000 shares were issued to Mr. Faldo on April 22, 1998 prior to the May 1 two-for-one stock split. Please revise or advise.

Independent Auditors' Report, page F-2

43. Revise the report to include the city and State where the report was issued. See Rule 2-02(a)(3) of Regulation S-X.

Note 1(d) - Summary of Significant Accounting Policies, Revenue Recognition, page F-7

44. The staff notes that revenue is "generally" recognized when the product is shipped. In this connection, supplementally advise the staff when you recognize revenues in cases other than when the product is shipped and quantify the related revenues for the periods presented. We may have further comment after we review your response.

ADAMS 007331

A 516



Mr. B. H. Adams
June 5, 1998
Page 7

**Note 1(h) - Summary of Significant Accounting Policies.  Product Warranty and Sales Returns, page F-8**

45.    Disclose that actual product warranty costs have not differed materially from accrued estimated amounts or detail the amounts and reason for significant variations.

**Note (1) -  Summary of Significant Accounting Policies.  General, pages F-5 through F-9**

46.    Disclose export sales in accordance with paragraph 36 of SFAS 14.

**Note (9) - Stockholders' Equity, page F-14**
**Note (9)(c) - Stockholders' Equity, Stock Compensation Award, page F-15**

47.    In connection with the issuance of stock options and common stock granted and issued, respectively, supplementally advise the staff how you determined the fair market value of your common stock on February 26, 1998 and during December 1997.  We may have further comments after we review your response.

**Item 15 Recent Sales of Securities, page II-2**

48.    Provide the nature and amount of consideration received by the Company for the transactions described in paragraphs 1,2,3,9,11 and 14.  Your attention is directed to Regulation S-K Item 701(c).

**General Accounting Comments**

49.    Please provide Exhibit 11 - Computation of Per Share Earnings including detailed application of Staff Accounting Bulletin Topic 4:D.

50.    Consider the requirement to update your financial statements and related disclosures in accordance with Rule 3-12 of Regulation S-X.

51.    In amendments, include currently-dated consents of the independent accountants in accordance with Rule 302 of Regulation S-T.

**Closing Comments**

File a pre-effective amendment to the registration statement in response to these comments.  Furnish a cover letter which keys your responses to these comments and provides any supplemental information we requested.  If you believe that compliance with any of the above comments is inappropriate, tell us why.  Provide adequate time for our review of your submissions prior to any request for acceleration.

ADAMS 007332

A 517

Mr. B. H. Adams
June 5, 1998
Page 8

Amendments should contain a currently dated consent of the independent auditors. The financial statements should be updated, as necessary, to comply with Rule 3-12 of Regulation S-X at the effective date. The staff will submit comments on incomplete information (for example, dilution and capitalization) when such information is furnished in the amendment.

Upon resolution of all outstanding comments, furnish your request for acceleration at least two business days prior to the requested effective date. Your attention is directed to Rules 460 and 461 promulgated under the Securities Act of 1933 and Rule 15c2-8 promulgated under the Securities Exchange Act of 1934 regarding the distribution of preliminary prospectuses and requests for acceleration.

To the extent that the above-referenced filing states that it includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, please be advised that the staff is not making any determination as to whether the disclosures (including, e.g., cautionary language or the placement of disclosures) satisfy the requirements of the Reform Act.

Please see Staff Legal Bulletin No. 5 (CF/IM). In this bulletin, we explain what public companies should disclose about Year 2000 issues in their filings. Please insure that you will disclose all required information about Year 2000 issues.

Any questions regarding the account comments may be directed to Kathy Mathis at (202) 942-1994 or Joe Hock, Assistant Chief Accountant at (202) 942-1901. Questions on other disclosure issues may be directed to Carolyn Kurr at (202) 942-2915, or, in her absence, the undersigned at (202) 942-2879 or William Tolbert, Assistant Director at (202) 942-1850.

Sincerely,

Letty Lynn
Reviewer

cc:     Via Facsimile
        J. David Washburn, Esq.

ADAMS 007333

*SEC Response*

ARTER & HADDEN LLP
1717 Main Street, Suite 4100
Dallas, Texas 75201-7366
214/761-2100 telephone
214/741-7139 facsimile

June 10, 1998

VIA EDGAR TRANSMISSION

SECURITIES AND EXCHANGE COMMISSION
Division of Corporation Finance
Judiciary Plaza
450 Fifth Street, N.W.
Mail Stop 3-5
Washington, D.C. 20549

Re: ADAMS GOLF, INC.
    Amendment No. 1 to Registration Statement on Form S-1
    File No. 333-51715
    ----------------------------------------------------

Ladies and Gentlemen:

On behalf of Adams Golf, Inc. (the "Company"), we have electronically transmitted herewith Amendment No. 1 to the above-referenced Registration Statement, which has been marked to indicate the changes effected by the Amendment. In addition, we have today forwarded, by way of overnight delivery, five (5) marked copies of Amendment No. 1 to the Registration Statement, c/o Ms. Letty Lynn, for the convenience of the Staff.

This letter responds to the Staff's letter of comment, dated June 5, 1998, on behalf of the Company. The numbering below corresponds to the numbering used in the comment letter.

INSIDE FRONT COVER PAGE OF THE PROSPECTUS

1. COMMENT:

Prior to printing and distribution of the preliminary prospectus, please supplementally provide us mock-ups of any pages that include any pictures or graphics to be presented. Accompanying captions, if any, should also be provided. We may have comments after reviewing the materials.

RESPONSE:

As requested, we have previously delivered to the Staff, c/o Ms. Letty Lynn, a mock-up of the inside front and inside back cover pages to the prospectus. The Staff advised in our

ADAMS 002836

A 519

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 2

telephone call on June 9, 1998 that it would not object to the use of
the pictures and/or captions contained therein. We have ensured the
inclusion of the appropriate legends as requested.

PROSPECTUS SUMMARY

THE COMPANY, PAGES 1-4

2.   COMMENT:

In order to provide balance to the summary, discuss the Company's net
operating losses in fiscal year 1997.

RESPONSE:

Based on the Staff's concerns regarding balance, the Company has deleted
all financial information from the Prospectus Summary. However, the
following disclosure has been added to this section:

"According to the Golf Market Research Institute, the Tight Lies fairway
woods were the top-selling single fairway woods in the U.S. on a unit
volume basis during the three months ended March 31, 1998. During this
period, the Company achieved a 27% market share of the single fairway
woods category."

3.   COMMENT:

Disclose the names of all the Company's sales and customer service
personnel that are former professional golfers. Describe the specific
positions of any such employees, if particularly significant.

RESPONSE:

The Company supplementally advises that it currently employs five persons
that are former professional golfers (golfers that have played on one or
more professional tours). Specifically, the Company employs Mike Love,
Russell Williams, Mark Gonsalves,

ADAMS 002837

A 520

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 3

Vance Gilley and Marc Puglielli. In addition, the Company employs six additional individuals who have been golf professionals (each was a teaching professional at one or more golf courses). Accordingly, the Company believes that the statement previously made in the prospectus is accurate. However, in light of the Staff's comment and the fact that no current employees participated in the other professional tours mentioned in the Prospectus, the Company has elected to delete the reference to professional golfers. The Company has disclosed Mr. Gonsalves' prior professional status under "Management - Directors and Executive Officers."

4.   COMMENT:

Summarize the main terms of the agreement with Mr. Faldo, including: (1) the length of the agreement; (2) specific responsibilities of Mr. Faldo; and (3) compensation to Mr. Faldo.

RESPONSE:

A summary of certain principal terms of the agreement with Nick Faldo has been included in the fifth paragraph under "Prospectus Summary - The Company." Specifically, the following sentences have been added in replacement of the previous third sentence to such paragraph:

"Pursuant to the terms of the agreement, Mr. Faldo has agreed to, among other things, (i) exclusively endorse the Company's golf clubs and undertake certain other promotional activities on behalf of the Company and (ii) assist in the design and field testing of a new line of golf clubs. In exchange for his services, Mr. Faldo was granted 900,000 shares of Common Stock and is entitled to receive certain minimum royalties. Absent an early termination event, the agreement with Mr. Faldo continues throughout his lifetime."

In addition, a more complete description of the agreement with Mr. Faldo has been included under "Certain Transactions." Accordingly, a cross reference to this section has also been added.

5.   COMMENT:

Specify the Company's state of development with respect to its new driver, and estimate when such a product may reach the market.

RESPONSE:

The Company has modified its disclosure to indicate that it is currently testing prototypes of the proposed new driver.

ADAMS 002838

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 4

Additionally, with respect to market introduction, the Company has added the following as the fourth sentence of such paragraph:

"The Company currently expects the new driver to be introduced after the end of fiscal year 1998."

RISK FACTORS

DEPENDENCE ON NEW PRODUCT INTRODUCTIONS; UNCERTAIN CONSUMER ACCEPTANCE, PAGE 6

6.   COMMENT:

Discuss the extent to which the Company believes that its rapid expansion to date has been dependent on its 1997 infomercial, and discuss any risks associated with the potentially "limited life" of such a marketing strategy.

RESPONSE:

ADAMS 002839

A 522

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 5

In response to the concerns raised by the Staff, the Company has added a
new risk factor entitled 'Historical Dependence on Television Advertising'
which reads, in its entirety, as follows:

"HISTORICAL DEPENDENCE ON TELEVISION ADVERTISING

In April 1997 the Company debuted a 30-minute infomercial
concerning the original Tight Lies fairway wood, and, immediately
thereafter, sales of this product grew significantly. Although,
consistent with the Company's marketing model, the Company has
subsequently increased its use of traditional image-based
advertising, sales of the Company's products at both the retail
and direct response levels have been, and may continue to be,
highly dependent on the success of the Company's infomercial.
The Company believes that its current television advertising
strategy, like other advertising campaigns, will reach a point of
diminishing return and will therefore need to be replaced or
abandoned. No assurance can be given that an alternative
infomercial or other equally effective advertising strategy can be
timely developed or that, if developed, such infomercial or
alternative strategy will achieve the same level of success as that
previously enjoyed by the Company's original infomercial. Further,
certain companies have attempted to emulate the Company's
marketing strategy. To the extent the Company believes that these
additional infomercials may have the effect of diluting the Company's
message, the Company may be forced to adopt a new marketing
strategy. A decline in effectiveness of the Company's marketing
strategy could have a material adverse effect on the Company's
business, operating results or financial condition."

ADAMS 002840

A 523

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 6

PATENTS AND PROTECTION OF PROPRIETARY INFORMATION, PAGES 6-7

7.   COMMENT:

Press reports indicate that, in February 1998, the Company sent several
warnings of patent infringements to competitors that may have copied its
designs. Discuss the status and potential negative effects of all such
occurrences.

RESPONSE:

The following paragraph as been added as the third paragraph under the
referenced risk factor:

"Despite the Company's efforts to protect its patent and other
intellectual property rights, unauthorized parties have attempted and
are expected to continue to attempt to copy all, or certain aspects
of, the Company's products.  Policing unauthorized use of the
Company's intellectual property rights can be difficult and expensive,
and while the Company takes appropriate action whenever it discovers
any of its products or designs have been copied, knock-offs and
counterfeit products are a persistent problem in the
performance-oriented golf club industry.  There can be no assurance
that the Company's means of protecting its patent and other
intellectual property rights will be adequate.  See
"Business--Patents."

Because the Company is continually involved in routine litigation and/or patent
enforcement proceedings, all of which, individually and collectively, are deemed
immaterial to the operations of the Company, the Company has elected not to
disclose the status of such proceedings in the Prospectus.

ABILITY TO MANAGE GROWTH, PAGE 7

8.   COMMENT:

You note that the Company's rapid growth has placed, and is expected to
continue to place, a significant strain on the Company's operating and
financial systems and resources.  Discuss with greater specificity any
financial difficulties resulting from the Company's rapid growth, including
any problems related to cash flow.  In particular, explain why the
Company's net cash from operating activities during the most recent quarter
was (1,466,487) rather than a surplus.

ADAMS 002841

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 7

RESPONSE:

The Company has not experienced any significant financial difficulties in connection with its rapid growth. At May 31, 1998, the Company had a cash balance of $1,466,216 and no amounts borrowed under its $10.0 million line of credit. The deficit in net cash from operating activities in the first quarter was due to tax reimbursement bonuses to the Company's founder, Chief Executive Officer and President in connection with a stock grant of 2,000,000 shares of Common Stock in December 1997 and such person's exercise of a stock option for 1,520,766 shares of the Company's Common Stock in January 1998. The Company anticipates positive cash flow from operations for the balance of 1998. The risk factor has been revised accordingly.

9.  COMMENT:

Discuss any material problems that the Company has had in filling customer orders on a timely basis during the past fiscal year.

RESPONSE:

The Company advises that it has not had any material problems in filling customer orders on a timely basis during the past fiscal year. Accordingly, the Company believes no modification of the referenced disclosure is necessary.

DEPENDENCE ON KEY PERSONNEL AND ENDORSEMENTS, PAGES 7-8

10.  COMMENT:

Disclose the certain significant payments that the Company must pay Mr. Faldo, whether or not his endorsement results in increased product sales.

RESPONSE:

The following disclosure has been added after the referenced sentence concerning the significant payments to Mr. Faldo:

"Specifically, Mr. Faldo is entitled to receive a royalty of 5% of the net sales price of all Adams golf clubs (other than certain specialty items for which the royalty equals 10% of the net sales price) sold outside of the U.S. throughout the term of the agreement. The agreement provides for a minimum royalty of $1.5 million in 1999 escalating to $4.0 million for the years 2004 through 2008. From 2009 through 2014, the minimum royalty is $1.5 million, as adjusted for changes in the consumer price index. After 2014, the agreement does not provide for a minimum royalty. Commencing with 2009, however, the agreement provides for maximum royalty of $4.0 million, as adjusted for changes in the consumer price index. Absent an early termination event, the agreement with Mr. Faldo continues throughout his lifetime."

A cross-reference to "Certain Transactions" has also been added.

ADAMS 002842

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 8

11. COMMENT:

Clarify why you believe that Mr. Faldo's continued professional success may
have a more profound effect upon the success of the Company's
international, as opposed to domestic, marketing strategy.

RESPONSE:

Although Mr. Faldo is expected to play a significant role in the expansion
of the Company's international marketing efforts, the Company recognizes
that Mr. Faldo's professional success will effect the Company's marketing
strategy generally.  Accordingly, the noted disclosure has been modified to
delete the word "international."

12. COMMENT:

Several press reports describe the relationship between Mr. Faldo and the
Company as a "lifetime deal." Disclose the length of the agreement with
Mr. Faldo, as well as any material conditions that would trigger the
termination of this agreement.

RESPONSE:

Reference is made to the last sentence of the disclosure added by the
Response to Comment No. 10.  In addition, the agreement between Nick
Faldo and the Company has been described in greater detail under
"Certain Transactions," which disclosure includes a description of the
specific conditions that would trigger the early termination of the
agreement.  Appropriate cross-references to this section are contained
in the prospectus.

HIGHLY COMPETITIVE MARKET, PAGE 8

13. COMMENT:

You note that there can be no assurance that the Company's marketing
strategy will not be emulated by others, thereby diluting the Company's
message or forcing the Company to adopt a new marketing strategy.  Press
reports reveal that at least 24 golf infomercials aired in 1997, indicating
that many golf companies are already utilizing Adams' major marketing
strategy.  Many of these also feature only one performance-oriented club,
just as Adams's infomercial features its original True Lies fairway wood.
Discuss the increased competition from other golf infomercials in this
section.

RESPONSE:

Please refer to the Response to Comment No. 6.

SOURCES OF SUPPLY, PAGE 8

ADAMS 002843

A 526

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 9

14.  COMMENT:

Disclose, if material, the lead time it would take the Company to locate
alternative sources of supply.

RESPONSE:

Because the Company currently maintains between 4 and 6 suppliers for each
of its major component parts (most of which have expressed a desire to
increase production for the Company), the Company believes that locating
alternative sources of supply would not prove problematic or time consuming
should the need arise.  Accordingly, the Company does not believe
additional disclosure concerning alternative sources of supply is material
or, therefore, necessary.

BROAD MANAGEMENT DISCRETION IN USE OF PROCEEDS, PAGE 8

15.  COMMENT:

Estimate the amount of proceeds that the Company intends to delegate to
specific capital expenditures, product development, additional advertising,
international sales efforts, and any acquisitions, and include such
disclosures in the "Use of Proceeds" section.  See Item 504 of Regulation
S-K.  In the alternative, if the Company cannot reasonably provide such
information, retitle this section "Lack of Business Plan for Use of
Proceeds" and specifically disclose that the Company has not yet decided
how it will use the proceeds of the offering.

RESPONSE:

Based on the Staff's comment, the Company has elected to retitle this risk
factor "Unspecified Use of Proceeds."  In addition, the Company has
modified the first sentence of this subsection to read:

"Although the Company intends to use the net proceeds of this
Offering for working capital and general corporate purposes,
including capital expenditures, expansion of the Company's
product development efforts, additional advertising and expansion
of the Company's international sales efforts, the Company
currently has no definite plan for the use of the net proceeds."

CERTAIN RISKS OF CONDUCTING BUSINESS ABROAD, PAGE 9

16.  COMMENT:

Disclose the Company's current major international market(s), and, if
applicable, discuss any material risks associated with conducting business
in a particular region.  In

ADAMS 002844

A 527

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 10

particular, disclose any material negative impact that the recent fiscal crisis in Southeast Asia has had upon the Company's business.

RESPONSE:

The following sentence will be added as a replacement for the third sentence of the risk factor:

"The Company's international business is currently centered in Canada, Japan and the United Kingdom. The Company intends to focus its international expansion efforts in Japan and the United Kingdom and, to a lesser extent, in South Africa and Australia."

The Company does not perceive any specific material risks associated with conducting business in these or other regions. The recent fiscal crisis in Southeast Asia has had virtually no impact on the Company's business due to the fact that the Company has had only an immaterial amount of sales in this region.

17. COMMENT:

Disclose the geographic regions in which the Company plans to increase its international sales efforts.

RESPONSE:

Please refer to the Response to Comment No. 16.

CONTROL BY PRINCIPAL STOCKHOLDERS, PAGE 10

18. COMMENT:

Disclose whether CEO Barney Adams and/or Royal will have a controlling interest in the Company following the closing of the Offering.

RESPONSE:

The following sentence has been added to the referenced risk factor:

"The Company's founder, Chief Executive Officer and President, B. H. (Barney) Adams, and Royal Holding Company, Inc. ('Royal'), the Company's largest single stockholder, will own approximately 15.6% and 30.4%, respectively, of the outstanding Common Stock immediately following the Offering and through their respective stock ownership and positions or representations on the Board of Directors may be able to exercise a controlling influence over the Company."

ADAMS 002845

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 11

USE OF PROCEEDS, PAGE 12

19.  COMMENT:

We note that the Company has not developed a business plan for the use of
proceeds of the offering.  Disclose, therefore, the particular reasons that
the Company has decided to raise such proceeds at this time.

RESPONSE:

The second sentence of the section "Use of Proceeds" has been modified to
read:

"The principal purposes of the Offering are to provide working
capital to fund the Company's long-term growth strategy, to
facilitate future access by the Company to the public equity markets,
to enhance the Company's ability to use the Common Stock as a means
of attracting, retaining and motivating senior managers and
professionals and to provide liquidity to its stockholders."

20.  COMMENT:

We note that the Company's operations for the quarter ended March 31, 1998
resulted in net cash of (1,466,487).  Estimate the amount of proceeds, if
any, that the Company anticipates using to finance its current operations
in the upcoming year.

RESPONSE:

The Company's negative cash flow in the first quarter of 1998 was primarily
due to an aggregate of approximately $4,400,000 of tax reimbursement
bonuses paid to the Company's founder, Chief Executive Officer and
President in connection with a stock grant of 2,000,000 shares of Common
Stock in December 1997 and such person's exercise of a stock option for
1,520,766 shares of the Company's Common Stock in January 1998.
The Company anticipates positive cash flow from operations for the balance
of 1998 and does not estimate using any of the proceeds of the Offering to
finance its current operations in the upcoming year.  Accordingly, the
Company has not revised the disclosure in the Prospectus.

CAPITALIZATION, PAGE 14

21.  COMMENT:

Reflect the change in authorized shares of common stock as disclosed in
Note 9(f) on page F-15.  Similarly revise the stockholders' equity section
of the balance sheet.

RESPONSE:

The number of authorized shares of Common Stock has been updated in the
Capitalization chart and the Balance Sheet to reflect the May 1, 1998
increase.

ADAMS 002846

A 529

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 12

MANAGEMENT'S DISCUSSION AND ANALYSIS OVERVIEW, PAGES 16-17

22.  COMMENT:

Estimate the percentage of net sales by which the Company expects royalties
to increase as a result of its agreement with Mr. Faldo. Alternatively,
compare the Company's royalty expenses in fiscal year 1996 with its
estimated royalty expenses in fiscal year 1997.

RESPONSE:

The Company is unable to estimate the amount by which royalties will
increase as a percentage of net sales. However, the following sentence has
been added as the fifth sentence of the fifth paragraph of the referenced
section:

"The Company's royalty expenses were $0 and $944,451 for 1996 and
1997, respectively.  Beginning May 1, 1998, Mr. Faldo is entitled
to receive a royalty equal to 5% of the Company's net sales of golf
clubs (other than certain specialty items for which the royalty is
10%) sold outside the U.S.  Although, there is no minimum royalty
for 1998, Mr. Faldo will be entitled to a minimum royalty in
subsequent years.  See "Certain Transactions."

YEAR ENDED DECEMBER 31, 1996 COMPARED TO YEAR ENDED DECEMBER 31, 1997, PAGE 18

23.  COMMENT:

We note that the Company's net losses in fiscal year 1997 resulted
primarily from the $14.8 in expenses related to stock compensation and
bonus awards to Mr. Adams.  Discuss the Board's reasons for approving such
compensation in fiscal year 1997, and indicate whether such compensation
may be indicative of future levels of compensation to Mr. Adams or other
executives of the Company.

RESPONSE:

The Company has added disclosure to the "Certain Transactions" section of
the prospectus which discloses the Boards reasons for approving the 1997
bonus to Mr. Adams and that such compensation is not expected to be
indicative of future levels of compensation to Mr. Adams or other
executives.

ADAMS 002847

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 13

24.  COMMENT:

In particular, disclose the relevant terms of any material agreements
regarding future compensation between the Company and Mr. Adams or other
executives.

RESPONSE:

The Company advises supplementally that no agreements exist between it and
any other executives, including B. H. Adams, concerning future
compensation. This fact is also stated in the Prospectus under "Prospectus
Summary - Dependence on Key Personnel and Executives."

LIQUIDITY AND CAPITAL RESOURCES, PAGE 20

25.  COMMENT:

Disclose any restrictions on the Company's credit facility, or cross
reference to appropriate information in the notes to the financial
statements.

RESPONSE:

A cross reference to Note 7 of the financial statements has been added to
the noted disclosure.

26.  COMMENT:

You note that the Company borrowed $1.1 million in the form of a note
payable to Mr. Adams during the first quarter of 1998. Disclose the
purposes for which the Company used, or plans to use, this money.

RESPONSE:

Disclosure has been made in the third paragraph to the subsection
"Liquidity and Capital Resources" to clarify that the $1.1 million borrowed
from Mr. Adams in the first quarter of 1998 was for purposes of working
capital.

GOLF INDUSTRY OVERVIEW, PAGE 21

27.  COMMENT:

Supplementally provide copies of all relevant materials which support
statements throughout the prospectus regarding industry data and the
Company's competitive position within the industry, for example:  the March
1998 issue of GOLF SHOP OPERATIONS.

ADAMS 002848

A 531

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 14

RESPONSE:

Attached as ANNEX A to the copies of this letter sent separately to the
Staff are excerpts of relevant materials which support statements made
throughout the prospectus regarding industry data and the Company's
competitive position within the industry.

COMPANY HISTORY, PAGE 22

28. COMMENT:

Revise the prospectus to describe the activities and responsibilities of
the Company's eight subsidiaries listed in Exhibit 21.1 to the registration
statement.  A supplemental organizational chart may be of help.

RESPONSE:

Please refer to the sixth paragraph under "Management's Discussion and
Analysis of Financial Condition and Results of Operations" which describes
the functions of the Company's subsidiaries.  An organizational chart has
been included as ANNEX B to the copies of this letter sent separately to
the Staff.

GROWTH STRATEGY, PAGE 24

29. COMMENT:

Estimate the Company's current market share within the premium fairway
wood market.

RESPONSE:

The Company has recently obtained the Golf Market Research Institutes
report entitled "A 7-year Trendline of Annual and Q1 Market Size: Focus
on Single Golf Clubs and Market Share Data - A Special Projects Report
(June 1998)" which indicates that the Company's Tight Lies fairway woods
were the top selling product in the single fairway woods category (on a
unit volume basis) during the three months ended March 31, 1998.  This
disclosure has been added to "Prospectus Summary" and "Business - General"
and "Business Strengths."  A copy of the report has been added to the
information provided to the Staff supplementally pursuant to our Response
to Comment No. 27.

EXPANDING INTERNATIONAL SALES, PAGE 24

30. COMMENT:

ADAMS 002849

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 15

Provide the percentage of the Company's current revenues dependent upon international sales.

RESPONSE:

The following sentence has been added as a new second sentence to the referenced section:

"For the year ended December 31, 1997 and the three months ended March 31, 1998, approximately 2% and 6%, respectively, of the Company's net sales were derived from international sales."

DESIGN AND DEVELOPMENT, PAGES 25-26

31.  COMMENT:

Provide information regarding the average duration of each of the five stages of product development. Again, as mentioned above, specify where in the process is the development of the Company's new driver and any other new products. Discuss any potential marketing strategies tied to the introduction of this new product.

RESPONSE:

The Company has added disclosure to "Design and Development" to reflect the average duration for the last four stages of product development. However, because concept development is an ongoing and fluid process without a specific beginning or ending point, the Company is unable to indicate an average duration for this stage. With respect to the new driver, please refer to the Company's Response to Comment No. 5. Additionally, the Company notes that it has not yet determined any potential marketing strategies related to the introduction of the new driver.

DIRECT RESPONSE ADVERTISING, PAGE 27

32.  COMMENT:

Although the Company has focused its marketing strategy on direct-response advertising, such as its Tight Lies infomercial, you note that the Company's net sales are primarily derived from sales to on- and off-course golf shops and selected sporting goods retailers, and to a much lesser extent, direct sales to consumers. Supplementally advise the Staff and/or reconcile these statements in the registration statement. In particular, is the direct-response advertising geared towards golf shops and retailers as well as consumers?

RESPONSE:

The Company supplementally advises the Staff that the goals of its marketing efforts are to use all advertising mediums (including infomercials and other forms of direct-response advertising) to build brand identity and drive sales through its retail distribution channel.

ADAMS 002850

A 533

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 16

For instance, management believes that although infomercials can be a cost effective and powerful method of demonstrating the performance potential of its products, many viewers of the program will not call and order the product directly. Rather, management believes that after being introduced to the Adams clubs and their technology via the infomercial, consumers are significantly more likely to purchase a product when subsequently made available at on- and off-course golf shops and selected sporting goods retailers. Accordingly, the Company has added the following disclosure to "--Marketing--Advertising":

"The Company's direct response advertising serves to introduce the Company's products to consumers, many of whom will subsequently purchase Adams clubs directly from the Company's retailers."

PATENTS, PAGE 29

33. COMMENT:

Provide the expiration dates of the six patents that have been issued to the Company.

RESPONSE:

The following sentence has been added as a new third sentence to the subsection entitled " - Patents":

"Assuming timely payment of maintenance fees, if any, the Company expects that the six currently issued patents will expire on various dates between 2009 and 2013."

Identical disclosure has been added to the "Risk Factors" section.

DIRECTORS AND EXECUTIVE OFFICERS, PAGE 32

34. COMMENT:

Provide the name(s) of Roland Casati's principal employer(s), and the principal business of such employer(s), during the past five years.

RESPONSE:

The requested information has been added to Mr. Casati's biography.

1998 STOCK BENEFIT PLAN, PAGES 34-35

35. COMMENT:

Provide an estimate of the number of employees who the Company believes will participate in the next fiscal year in the Company's 1998 stock benefit plan, if the Company can reasonably make such a determination.

RESPONSE:

The Company advises that it currently expects all of its employees to participate in the next fiscal year in its 1998 Stock Incentive Plan. A statement to this effect has been added to the fourth paragraph under the subsection entitled "- Benefit Plans." However,

ADAMS 002851

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 17

because the Company expects to add a number of new employees before the
end of such fiscal year, it is not possible or, in the opinion of the
Company, meaningful to add a precise number to this statement.

CERTAIN TRANSACTIONS, PAGE 40

36.  COMMENT:

State the complete name of Royal in the first paragraph.

RESPONSE:

The requested change has been made.

37.  COMMENT:

Revise the third paragraph to provide the dollar value of the services
rendered by Mr. Adams and the parties determining the value.

RESPONSE:

The third paragraph under "Certain Transactions" has been modified to
reflect the factors considered by the Board of Directors in concluding
to grant Mr. Adams the referenced bonus together with an indication of
the value of the services previously rendered to the Company by him.

38.  COMMENT:

With reference to the fourth and fifth paragraphs on page 40,
supplementally advise the Staff how you determined that Mr. Hatfield's
prior affiliation with KPMG and his current position with the Company did
not impair KPMG's independence as your certified public accountants.  We
may have further comments after we review your response.

RESPONSE:

The Company advises the Staff that it has received a letter from KPMG Peat
Marwick LLP ("KPMG") dated June 8, 1998 which states that,
notwithstanding Mr. Hatfield's prior affiliation with KPMG, KPMG has
remained independent with respect to the Company.  A copy of the KPMG
correspondence has been attached as ANNEX C to the copies of this letter
sent separately to the Staff.

39.  COMMENT:

File as an exhibit to the registration statement a copy of the Company's
April 1998 management agreement with Mr. Hatfield.

RESPONSE:

The agreement under which Mr. Hatfield joined the Company on May 1, 1998
has been filed as Exhibit 10.6 to Amendment No. 1 as requested.

ADAMS 002852

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 18

40.  COMMENT:

It is not clear if the Company has a written agreement with Virtual Visits;
if so, describe the material terms of the agreement and file it as an
exhibit in the next amendment.

RESPONSE:

The Company does not have a written agreement with Virtual Visits; however,
the Company notes supplementally that, based on intended changes to its
website, it will pay Virtual Visits at least an additional $10,000 by the
end of fiscal 1998.

SELLING SHAREHOLDERS, PAGE 41

41.  COMMENT:

The table needs to identify, by name, the "Other Selling Shareholders."
See Regulation S-K Item 507.

RESPONSE:

The table under "Principal and Selling Stockholders" has been completed to
add, among other things, the names of the Other Selling Stockholders.

42.  COMMENT:

It is not clear why Nick Faldo is not a 5% shareholder in view of the
disclosure on page II-3, paragraph 14, which state that 900,000 shares were
issued to Mr. Faldo on April 22, 1998 prior to the May 1 two-for-one stock
split.  Please revise or advise.

RESPONSE:

Mr. Faldo was issued 450,000 shares of Common Stock on April 22, 1998
which, after the May 1, 1998 two-for-one stock split represented 900,000
shares of Common Stock, or 4.7% of the 19,099,282 shares of Common Stock
outstanding on the date of the prospectus.

INDEPENDENT AUDITORS' REPORT, PAGE F-2

43.  COMMENT:

Revise the report to include the city and State where the report was
issued.  See Rule 2-02(a)(3) of Regulation S-X.

RESPONSE:

The Independent Auditors' Report has been modified to reflect the city and
State where the report was issued.

NOTE 1(d) - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES, REVENUE RECOGNITION,
PAGE F-7

ADAMS 002853

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 19

44. COMMENT:

The Staff notes that revenue is "generally" recognized when the product is
shipped. In this connection, supplementally advise the Staff when you
recognize revenues in cases other than when the product is shipped and
quantify the related revenues for the periods presented. We may have
further comment after we review your response.

RESPONSE:

The Company has reconsidered the statement referenced by the Staff and has
determined to delete the qualifier "generally." The Company supplementally
advises that there are no instances when it recognizes revenues in cases
other than when the product is shipped.

NOTE 1(h) - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES, PRODUCT WARRANTY AND
SALES RETURNS, PAGE F-8

45. COMMENT:

Disclose that actual product warranty costs may not have differed
materially from accrued estimated amounts or detail the amounts and reason
for significant variations.

RESPONSE:

The following sentence has been added to Note 1(h) to disclose that actual
warranty costs have not differed materially from accrued estimated amounts:

"Such estimates have approximated actual costs incurred."

NOTE (1) - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES, GENERAL, PAGES F-5
THROUGH F-9

46. COMMENT:

Disclose the export sales in accordance with paragraph 36 of SFAS 14.

RESPONSE:

The following has been added as a new second paragraph to Note 1(a) to
disclose export sales in accordance with paragraph 36 of SFAS 14:

"The Company has both domestic and international sales. International
sales were $647,325, $878,666, and $1,387,325 for the years ended
December 31, 1996 and 1997 and the three months ended March 31, 1998,
respectively. There were no international sales in 1995.

NOTE (9) - STOCKHOLDERS' EQUITY, PAGE F-14
NOTE (9)(c) - STOCKHOLDERS' EQUITY, STOCK COMPENSATION AWARD, PAGE F-15

ADAMS 002854

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 20

47.  COMMENT:

In connection with the issuance of stock options and common stock granted
and issued, respectively, supplementally advise the Staff how you
determined the fair market value of your common stock on February 26, 1998
and during December 1997.  We may have further comments after we review
your response.

RESPONSE:

The Company has been aware of its responsibility to perform necessary
diligence in arriving at a good faith determination of the fair value of
shares of its Common Stock in granting stock awards and stock options.
Recognizing the complexity of valuing the securities of a privately held
Company, the Board of Directors independently determined the fair value of
the Common Stock for each stock award and option grant only after due
consideration.  The compensation expense associated with stock awards and
stock options reflects the fair value of the Common Stock as determined in
good faith by the Board of Directors at the time of such awards or grants
in light of the information then available.  In determining the fair value
of the Common Stock, the Board of Directors considered factors such as
independent valuations, the magnitude of and trends in sales, the level of
commercial acceptance of the Company's products, the status and
significance of product development efforts, the likelihood and timing of
an initial public offering ("IPO") and certain other events that affect the
fair value of the Common Stock.  Certain of these factors are described in
the discussion set forth below.

The Company believes compensation expense relating to the December
1997 and February 1998 stock compensation transactions (the "stock
transactions") included in the results of operations for the year ended
December 31, 1997 and the three months ended March 31, 1998 valued at $5.00
per share and $7.00 per share, respectively, was recorded at the fair value
of its Common Stock at those respective points in time.

ANNEX D to this letter sets forth detailed information regarding the
Company's stock awards and stock options since January 1, 1997.  The
following paragraphs summarize the Company's stock awards and option grants
since January 1, 1997, describe the factors the Board of Directors
considered in determining the fair value of the Common Stock at the date of
the award or grant and, if different, the deemed fair value of the Common
Stock and summarize the deferred compensation expense, if any, that the
Company has recorded in connection with such stock awards or option grants.

-    In December 1997, an award of 2,000,000 shares of Common Stock
     was issued to the Company's founder, Chief Executive Officer and
     President as a bonus for long time and exemplary service.  These
     shares were valued at $5.00 per share for financial accounting
     purposes.

-    In late February 1998, options to purchase an aggregate of
     218,000 shares having an exercise price of $2.50 per share were
     granted to Company employees. These

ADAMS 002855

A 538

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 21

shares were valued at $7.00 per share for financial accounting purposes, and the Company recorded deferred compensation in the amount of $981,000 in connection with these grants.

The fair value utilized at each of the valuation dates (December 31, 1997 and February 26, 1998) was based primarily on valuations performed by independent valuation consultants as well as pricing models similar to those used by the Company and the Underwriters in determining the estimated initial public offering price of the Common Stock. Presented below is the methodology and basis for conclusion as of each valuation date.

DETERMINATION OF FAIR VALUE

The Company determined the fair value of the above stock transactions through consideration of two widely accepted valuation methods: (a) the income approach and (b) the market approach.

INCOME APPROACH. The income approach valuation was completed by Business Valuation Services, Inc., independent valuation consultants, as of December 31, 1997 and January 31, 1998. A copy of each of the December valuation and the January valuation has been attached as ANNEX E and ANNEX F, respectively, to the copies of this letter provided supplementally to the Staff. The following factors were considered:

- The market approach was considered inappropriate due to the Company's extremely limited history of meaningful sales and profitability and the considerable uncertainty surrounding its future financial prospects.

- Revenues of the Company were relatively insignificant prior to the debut of its infomercial in April 1997, which propelled the sales of its Tight Lies fairway wood.

- The uncertainty concerning the long-term acceptance of this product and lack of other products made it difficult to project the financial stability of the Company at the previously mentioned valuation dates.

- The Company is closely held and there were no contemporaneous sales of Common Stock during these time periods that could be used as a basis for determining the fair value of the Common Stock.

- The limited availability of comparable firms that had operations similar to those of the Company or market transactions involving firms comparable to the Company.

ADAMS 002856

A 539

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 22

As a result of the foregoing factors, the income approach was utilized, and this methodology provided a fair value per share of $1.83 and $1.95 at December 31, 1997 and January 31, 1998, respectively.

MARKET APPROACH. Subsequent to the completion of the independent valuation reports discussed above and concurrent with the Company's decision in late March to initiate the process for an IPO and the later filing of its Registration Statement on Form S-1 with the Commission on May 4, 1998, the Company determined that consideration of the market approach was appropriate under the circumstances. The market approach valuation was determined using a pricing model similar to that used by the Company and the Underwriters in determining the estimated initial public offering price of the Common Stock. The market approach utilized the same input data and projections used by the independent valuation consultants for the income approach valuations. The market approach valuations provided fair values per share at December 31, 1997 and January 31, 1998 as follows:

<Table>

|  | DECEMBER 31, 1997 | JANUARY 31, 1998 |
|---|---|---|
| Projected Earnings (1) | $ 11,496,000 | $ 12,527,000 |
| Price Earnings Multiple (2) | 11.0x | 11.0x |
| Full Capitalization | $126,456,000 | $137,797,000 |
| IPO Market Discount Factor 15% (3) | $107,488,000 | $117,127,000 |
| Diluted Shares | 18,374,000 | 18,374,000 |
| Market Approach Value Per Share | $    5.85 | $    6.37 |

</Table>

----------------------------
(1)  Represents forward-looking 12-month projections.
(2)  Represents industry average for publicly traded companies.
(3)  Represents discount used by the Company and the Underwriters in determining the estimated initial public offering price of the Common Stock.

FINAL DETERMINATION OF FAIR VALUE. Because of the Company's short history of profitability, the Company's limited product offering (fairway woods) and other factors, a certain level of risk associated with an IPO not occurring existed on the relevant valuation dates. To account for this risk and consistent with an April 30, 1998 valuation performed by the independent valuation consultants (a copy of which has been attached as ANNEX G to the copies of this letter provided supplementally to the Staff), the Company used a weighting of 25% for the income approach and 75% for the market approach in determining fair value for the December and February stock transactions. This approach resulted in a fair value per share of $4.85 and $5.27 at December 31, 1997 and January 31, 1998, respectively, and the Company used $5.00 and $7.00 per share for financial

ADAMS 002857

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 23

reporting purposes. The January 31, 1998 valuation was adjusted upward in recognition of February 1998 sales, which exceeded the previously expected level.

FAIR VALUE AT DECEMBER 1997 AND FEBRUARY 1998 AS COMPARED TO THE ASSUMED IPO PRICE

The Company believes that the above approach for valuing and determining the fair value of its stock at the dates of the stock transactions is appropriate and that the difference between this valuation and the assumed IPO price range of $14.00 to $16.00 per share (anticipating an early July pricing), is a result of the following facts and events not known or having not yet occurred at the time of the previous valuations:

- As shown in the table below, the revenue and profit projections used at the time of the December and January sales projections were significantly lower than those being utilized by the Company and the Underwriters to determine the estimated initial public offering price of the Common Stock.

<Table>

| | December Valuation(a) | | January Valuation(b) | | Current IPO Pricing Model | |
|---|---|---|---|---|---|---|
| | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 |
| | ---- | ---- | ---- | ---- | ------ | ------ |
| Sales | $73.4 | $55.0 | $80.2 | $60.1 | $100.0 | $165.0 |
| Net Income | $11.5 | $ 5.8 | $12.5 | $ 6.3 | $ 18.6 | $ 29.1 |

</Table>

(a) Source: Exhibit II-1 of the December Valuation.
(b) Source: Exhibit II-1 of the January Valuation.

This disparity in the projections accounts for the primary difference between the fair value determined at December 1997 and February 1998 versus the estimated initial public offering price of the Common Stock. The projections increased because the Company's monthly sales reached new levels after the December and January valuations. Specifically, sales in March, April and May exceeded $11.0 million monthly. In contrast, sales in December and January averaged approximately $5.6 million monthly.

- In March 1998, the Company began developing and making a prototype driver that it plans to introduce after the end of fiscal year 1998. The introduction of new products leveraging the Company's now well recognized brand name to supplement potentially declining sales of existing products (fairway woods) increased the Company's future revenue and earnings potential, which favorably affected the Company's valuation. The projections used in the December and January valuations did not give effect to any new product introductions that would supplement the expected normal product life cycle downturn in sales.

- In May 1998, the Company entered into a lifetime agreement with Mr. Nicholas Faldo, an internationally known professional golfer. Mr. Faldo is expected to provide the Company with creative efforts and support in developing new technologies and products. Under the agreement, Mr. Faldo will be the Company's principal professional representative and a user of its products (current and future). This alliance with Mr. Faldo provides immediate name recognition, association and credibility for the Adams Golf products. In addition, the Faldo alliance is expected to increase the exposure and points of sale for Adams' products outside the United States, which represented less that 6% of the Company's sales in the first three months of 1998. The Company views its

ADAMS 002858

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 24

        partnership with Mr. Faldo as a watershed event that represents
        the entrance of the Company into the top level of golf equipment
        suppliers.

- Prior to the second quarter of 1998, the Company's ability to
  grow was limited by the lack of certain key managers, including
  senior sales personnel and a chief financial officer. The
  Company did not fill these positions until April and May 1998,
  when a director of service and customer sales, a director of
  international sales and a chief financial officer joined the
  Company's management team. The Company believes that its ability
  to meet its current operating goals and initiatives has increased
  significantly with these recent additions to the Company's
  management team.

SUBSEQUENT STOCK TRANSACTIONS

Additional stock transactions occurred in May 1998 (primarily shares
granted to Mr. Faldo). As noted above, the Company received a valuation
report from its independent valuation consultants as of April 30, 1998,
which utilizes both the market and income approaches. The fair value
determined as a result of the market and income valuations, utilizing a
75/25 weighting towards the market approach, was $11.25 per common share.

For all of the foregoing reasons, the Company respectfully submits
that the fair values determined for the Company's Common Stock, and the
compensation recorded as a result, accurately reflects the compensation
element in the stock awarded and options granted during all periods
presented.

ITEM 15 RECENT SALES OF SECURITIES, PAGE II-2

48. COMMENT:

Provide the nature and amount of consideration received by the Company for
the transactions described in paragraphs 1, 2, 3, 9, 11 and 14. Your
attention is directed to Regulation S-K Item 701(c).

RESPONSE:

The Company believes that the response to Item 15, as modified by the
Amendment, complies with Item 701(c) of Regulation S-K.

GENERAL ACCOUNTING COMMENTS

49. COMMENT:
Please provide Exhibit 11 - Computation of Per Share Earnings including
detailed application of Staff Accounting Bulletin topic 4:D.

ADAMS 002859

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 25

RESPONSE:

Exhibit 11 - Computation of Per Share Earnings, has been added to Amendment
No. 1. Additionally, the Company applied Staff Accounting Bulletin Topic
D:4 including the use of the estimated IPO price for the calculation of
the repurchase of common stock under the treasury stock method.

50.  COMMENT:

Consider the requirement to update your financial statements and related
disclosures in accordance with Rule 3-12 of Regulation S-X.

RESPONSE:

The Company is aware of its disclosure obligations pursuant to Rule 3-12 of
Regulation S-X.

51.  COMMENT:

In amendments, include currently-dated consents of the independent
accountants in accordance with Rule 302 of Regulation S-T.

RESPONSE:

Updated consents have been included in the amended Registration Statement.

Please do not hesitate to call me at 214/761-4779 or J. David Washburn of
this office at 214/761-4309 if we can be of any further assistance in reviewing
the above responses.

                              Very truly yours,


                              Joseph A. Hoffman


ANNEX A  -    Industry Support (supplied separately)
ANNEX B  -    Organizational Chart (supplied separately)
ANNEX C  -    KPMG correspondence, dated June 8, 1998 (supplied separately)
ANNEX D  -    Information Concerning Response to Comment 47
ANNEX E  -    December 1997 Valuation (supplied separately)
ANNEX F  -    January 1998 Valuation (supplied separately)
ANNEX G  -    April 1998 Valuation (supplied separately)

ADAMS 002860

A 543

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 26

J20/pw
cc: Mr. Darl P. Hatfield
    Mr. James E. Farrell
    Kenneth L. Guernsey, Esq.
    J. David Washburn, Esq.

ADAMS 002861

A 544

SECURITIES AND EXCHANGE COMMISSION
June 10, 1998
Page 27

ANNEX D

The following table sets forth the date, amount and status of stock awards/exercise price of employee stock awards and options grants made since January 1, 1997, the deemed fair market value of such shares based on information available at the time the Company's Registration Statement was filed with the Commission. Unless otherwise noted, all stock awards and option grants have been made to employees and all options vest over four years.

<Table>

| DATE OF AWARD/ GRANT | NO. OF SHARES | STATUS AS STOCK AWARD/ EXERCISE PRICE | DEEMED FAIR MARKET VALUE OF COMMON STOCK | TOTAL FAIR VALUE OF COMMON STOCK |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| 12/31/97 | 2,000,000(1) | Stock Award | $ 5.00 | $10,000,000 |
| 2/26/98 | 218,000 | $ 2.50 | 7.00 | 1,526,000 |
| 2/26/98 | 54,000(2) | 2.50 | 7.00 | 378,000 |
| 4/29/98 | 20,000 | 11.25 | 11.25 | 225,000 |
| 5/1/98 | 90,000(3) | 2.50 | 11.25 | 1,012,500 |
| 5/1/98 | 900,000 | Stock Award | 11.25 | 10,125,000 |
| TOTAL | 3,282,000 | | | $23,266,500 |

</Table>

-----------------

(1) Vested on date of grant
(2) Granted to certain consultants; vest over three and four year periods
(3) 45,000 shares vest upon the sooner of one (1) year or the successful completion of an IPO with the remaining 45,000 shares vesting over the subsequent three year period.

ADAMS 002862

ANNEX A

ADAMS 002863

# ADAMS GOLF, INC.

Annex A

| Statement | Location in Amendment No. 1 | Support | Support Source |
|---|---|---|---|
| According to Golf Market Research Institute...Tight Lies fairway woods were the top selling fairway woods in the U.S....the Company achieved a 27% market share of the single fairway woods category. | Business – General, Paragraph 1 | Golf Market Research Institutes U.S. MARKETRAC® Program: A 7-year Trendline of Annual & Q1 Market Size: Focus on Single Golf Clubs & Market Share Data, a Special Projects Report (June 1998), Pg. 41. | A |
| According to the National Golf Foundation ("NGF"), there are approximately 49 million golfers worldwide... | Business – Golf Industry Overview, paragraph 1 | Golf.com Publications, "Global Estimates of Golf Participation," www.golf.com/business/rrc/perspectives97/33.htm | B |
| ...including approximately 25 million in the U.S. In 1997, golfers in the U.S. played an estimated 547 million rounds of golf... | Business – Golf Industry Overview, paragraph 1 | Golfweb.com , "NGF announced 1997 was a good year for golf," Pp. 1-2 table insert, www.golfweb.com/news/ngf980331.html. | C |
| ...and, according to the National Sporting Goods Association, are estimated to have spent $5.8 billion on golf equipment, apparel and accessories. | Business – Golf Industry Overview, paragraph 1 | Golf.com Publications, "Total Golf Equipment, Apparel and Shoe Sales Reached Over $5 Billion Dollars in 1996," www.golf.com/business/rrc/perspectives97/6.htm. | D |
| Of the 25 million U.S. golfers, about 5.6 million, characterized by the NGF as "avid golfer," played over 25 rounds of golf per year... | Business – Golf Industry Overview, paragraph 1 | Golfweb.com, "NGF announced 1997 was a good year for golf," Pp. 1-2 table insert, www.golfweb.com/news/ngf980331.html. | C |
| In 1997, wholesale sales of golf equipment in the U.S. reached approximately $2.4 billion. This figure represents a compound annual growth rate of approximately 13% over the 5-year period from 1992 to 1997. | Business – Golf Industry Overview, paragraph 2 | Press Release, The Sporting Goods Manufacturers Association, "1998 State of the Industry Report", April 16, 1998, Pg. 1, paragraph 1, www.sportlink.com. | E |
| According to the NGF, approximately 900 new golf courses, the vast majority of which will be available to the public, are expected to open in the U.S. by the year 2000. | Business – Golf Industry Overview – Increasing Availability of Golf Facilities | National Golf Foundation, "1998 Looming As Banner Year For Golf Course Construction", Pg. 1, paragraph 3-4, Pg. 3, paragraph 2, Pp. 3-6 table inserts. | F |

ADAMS 002864

A 547

| Statement | Location in Amendment No. 1 | Support | Support Source |
|---|---|---|---|
| According to the NGF, the total number of beginning and junior golfers increased by over 40% in 1997 compared to the previous year. | Business – Golf Industry Overview – Increasing Interest from Non-Traditional Golfers | Golfweb.com, "NGF announced 1997 was a good year for golf," Pp. 1-2 table insert, www.golfweb.com/news/ngf98033 1.html. | C |
| As golfers age, they tend to play golf more often... | Business – Golf Industry Overview – Favorable Population Trends | Golf.com Publications, "Golfers' Demographic Profile," www.golf.com/business/rrc/per-spectives97/2.htm, www.golf.com/business/rrc/per-spectives97/3.htm. | G |
| ...and spend more money on the sport, particularly in the over-50 age group. | Business – Golf Industry Overview – Favorable Population Trends | National Sporting Goods Association, "Golf Equipment Purchases by Age & Gender," Pg. 1 table insert, www.nsga.org/research/golf.html. | G |
| ...Echo Boomers are beginning to enter their 20s, the age most golfers begin to play the sport ... | Business – Golf Industry Overview – Favorable Population Trends | National Golf Foundation, "NGF President Updates International Conference on State of the Game in America," Pg. 3, paragraph 2. | H |
| Similarly, Alastair Cochran and John Stobbs previously concluded ... that the long approach shot affects a players score more than any other. | Business – Company History, paragraph 1 | "The Search for the Perfect Swing" by Alastair Cochran and John Stobbs, Chpt. 31, Pg. 198, paragraph 1 and 4, Pg. 200, paragraph 3. | I |
| The International Network of Golf, an 800-member organization of leading media and golf industry executives, named the original Tight Lies fairway wood the "Breakthrough Product of the Year" in 1996. | Business – Company History, paragraph 3 | See attached photograph. | J |
| In addition, the Tight Lies fairway wood has received the 1997/1998 Certificate of Excellence by the Golf Industry Association. | Business – Company History, paragraph 3 | See attached photograph. | K |

ADAMS 002865

A 548

rambas02\groups\sanfran\walraven\clients\adams\lpo\orgmig\working group list.doc - Eileen Maldonado - ~AUTODATE ~AUTODATE~
Page 1 of 14

# ADAMS GOLF, INC.



# WORKING GROUP LIST

## JUNE 12, 1998

CONFIDENTIAL

UND 010616

A 549

rambna02\groups\sanframval\raven\clients\adams\lpo\orgmtg\working group list.doc - Eileen Maldonado -~AUTODATE ~AUTODATE-
Page 1 of 14

## ADAMS GOLF, INC.
## WORKING GROUP LIST

| | | |
|---|---|---|
| **R.H. (Barney) Adams** | Tel: | |
| *Chief Executive Officer* | Fax: | |
| | E-mail: *adamsbh@adamsgolf.com* | |
| *Assistant: Ann Neff* | Tel:    (972) 673-9601 *neff@adamsgolf.com* | |

**James E. Farrell**
*Chief Financial Officer*
Tel:    (972) 673-9299
Fax:    (972) 398-8818
E-mail: *farrelljim@aol.com*
4213 New Forest Drive
Plano, TX 75093
Tel:    (972) 596-1159
Cellular: (972) 365-7060

**Mark D. Gonsalves**
*Vice President Sales & Marketing*
Tel:    (972) 673-9099
Fax:    (972) 398-8818
Cell: (972) 679-6122
505 Palm Desert Drive
Garland, TX 75044
Tel:    (972) 414-9488

**Darl Hatfield**
*Senior Vice President Finance & Administration*
Tel:    (972) 673-9899
Fax:    (972) 398-8818
*Darl@adamsgolf.com*
601 Liechty Court
Heath, TX 75087
Tel:    (972) 772-0261

**Steve Sanazaro**
*Vice President, Information Technology*
Tel:    (972) 673-9399
Fax:    (972) 398-8818
603 Fallen Branch Drive
McKinney, TX 75070
Tel:    (972) 529-2110
Fax:    (972) 529-2101

**Walt DeVault**
*Director of Sales, Call Center*
Tel:    (972) 673-9199
Fax:    (972) 398-8818
213 River Road
Coppell, TX 75019
Tel:    (972) 304-5400
Cell:    (972) 849-4006

**Dick Murtland**
*Vice President, Operations*
Tel:    (972) 673-9674
Fax:    (972) 398-8818
801 Legacy Drive, #1627
Plano, TX 75023
Tel:    (972) 517-4060

**Patty Walsh**
*Project Manager*
Tel:    (972) 673-9595
Fax:    (972) 398-8818
*Pattywalsh@adamsgolf.com*
1713 Sheffield Drive
Garland, TX 75040
Tel:    (972) 495-5341
Fax:    (972) 496-3936

**Dallas Rainwater**
*Assistant Controller*
Tel:    (972) 673-9297
Fax:    (972) 398-8818
2133 Arbor Creek
Carrollton, TX 75010
Tel:    (972) 395-9711

**Nick Faldo**
Tel: 011 44 181 879 1111
Fax: 011 44 181 879 0111
*Assistant Nadine*
*Nadine's Cell:*

-1-

**ADAMS**

CONFIDENTIAL

UND 010617

A 550