# Appendix
# A611-A670

## CERTAIN TRANSACTIONS

In September 1995, the Company effected a reorganization (the "Reorganization") pursuant to which it (i) distributed to its stockholders the shares of common stock of Supershafts, Inc., a Texas corporation ("Supershafts"), held by the Company and constituting a minority interest in ~~shafts, (ii) issued four shares of Common Stock in exchange for each share of Supershafts common stock then outstanding and (iii) .ified, on a 1 for 1 basis, all of the outstanding Series A Preferred Stock and Series B Preferred Stock of the Company as Common Stock. .result of the Reorganization, the Company issued an aggregate of 5,827,406 shares of Common Stock, Supershafts became a wholly-owned subsidiary of the Company and the Common Stock became the only class of capital stock of the Company outstanding. Mr. Adams and Royal Holding Company, Inc. received 820,000 and 3,706,382 shares of Common Stock, respectively, in the Reorganization.

In 1996 and 1997, the Company borrowed an aggregate of $450,000 from Royal of which $250,000 was advanced in 1997, to finance the production of the Company's infomercial. Such advances bore interest at the prime rate. In September 1997, the Company paid accrued interest of $29,233 on this debt and issued 900,000 shares of Common Stock (at a rate of $.50 of principal indebtedness per share) to Royal in cancellation of the principal amount.

In December 1997, the Board of Directors of the Company granted to Mr. Adams, the Company's Chairman of the Board, Chief Executive Officer and President, 2,000,000 shares of Common Stock. The Board of Directors also provided Mr. Adams with a cash payment of $2,541,688, an amount equal to the federal income tax and Medicare tax liability associated with such grant and bonus. In the first quarter of 1998, Mr. Adams loaned $1.1 million of such funds back to the Company pursuant to an unsecured promissory note at an interest rate of 5.39% per annum. The Company repaid $600,142 of the note on April 14, 1998 and the remaining principal amount of the note ($534,899) is payable in installments of $312,500 and $222,399 on December 15, 1998 and April 14, 1999, respectively. In determining that the stock grant and bonus to Mr. Adams were appropriate and in the best interests of the Company and its stockholders, the Board of Directors considered, among other factors, the Company's revenue and operating income growth and improved competitive position under Mr. Adams' leadership, Mr. Adams' historical cash compensation and the Board of Directors' desire to increase Mr. Adams' equity interest in the Company to a level commensurate with his contributions to and role with the Company. The Board of Directors determined that the value of Mr. Adams' services to the Company exceeded the fair market value of the stock ($10,000,000) and bonus. The Company does not consider these payments to be indicative of future levels of compensation to Mr. Adams or other executives of the Company.

The agreement between the Company and Nick Faldo (the "Faldo Agreement") became effective May 1, 1998 and provides that Mr. Faldo will exclusively endorse the Company's clubs and undertake certain other promotional activities on behalf of the Company. Pursuant to the Faldo Agreement, the Company and Mr. Faldo will design a line of clubs to be used by Mr. Faldo in tournaments and other events, provided such clubs are suitable for Mr. Faldo's use. Under the Faldo Agreement, the Company has licensed the worldwide rights to the Nick Faldo trademark f^ ~ in connection with the distribution of its golf clubs, head covers, golf bags, travel covers, golf towels and umbrellas which it designs or ctures.

As compensation for the licensing and endorsement arrangement set forth in the Faldo Agreement, the Company has granted 900,000 shares of Common Stock to Mr. Faldo. Subject to certain exceptions including transfers to Mr. Faldo's agent, Mr. Faldo may not transfer, dispose of or otherwise assign any rights in more than 100,000 shares of Common Stock in any calendar year prior to 2002. In addition, Mr. Faldo is entitled to receive a royalty of 5% of the net sales price of all Adams golf clubs (other than certain specialty items for which the royalty equals 10% of the net sales price) sold outside the U.S. throughout the term of the Faldo Agreement. The Faldo Agreement provides for a minimum royalty of $1.5 million in 1999 escalating to $4.0 million for years 2004 through 2008. From 2009 through 2014, the minimum royalty is $1.5 million, as adjusted for changes in the consumer price index. After 2014, the Faldo

42

A 611

Agreement does not provide for a minimum royalty. Commencing with 2009, however, the Faldo Agreement provides for a maximum royalty of $4.0 million, as adjusted for changes in the consumer price index. In the event Mr. Faldo does not compete in a minimum number of worldwide golf events each year, such royalty payments shall be reduced on a pro-rata basis, unless such events are missed as a result of illness or injury. The Company has also agreed that through the year 2008, it will support the "Faldo Junior Series" in the United Kingdom by making annual contribution to the sponsoring organization of not less than $45,000 for each year the tournament is played under that name. The Agreement further provides that, so long as royalties remain payable thereunder, the Company will use commercially reasonable efforts to use a designee of Mr. Faldo to be nominated for, and elected to, the Board of Directors of the Company. As of the date of this Prospectus, Mr. Faldo has not notified the Company of his designation to the Board.

The Faldo Agreement extends through Mr. Faldo's lifetime; however, the Company has the right to terminate the Faldo Agreement earlier if Mr. Faldo (a) is unable to perform the duties required by the Faldo Agreement for a period of 12 consecutive months, (b) retires or becomes officially ineligible to compete on the PGA and/or Senior PGA tour, or (c) has engaged in illegal or immoral conduct resulting in a felony conviction, or has otherwise conducted himself in a manner not in keeping with the standards of professional conduct set forth in the Faldo Agreement. In the event of the death of Mr. Faldo prior to May 1, 2030, the Company may, at its option, continue the terms of the Faldo Agreement until May 1, 2030, in which case, Mr. Faldo's heirs or estate shall be entitled to any royalties due.

KPMG, a public accounting firm in which Mr. Hatfield was a partner until April 30, 1998, has provided accounting and auditing services to the Company during 1997 and 1998. The amounts paid to KPMG for services rendered during 1997 and 1998 were $112,887 and $403,520, respectively. Mr. Hatfield is currently Senior Vice President—Finance and Administration and Chief Financial Officer of the Company. The Company has an agreement with Mr. Hatfield providing that, upon Mr. Hatfield's termination without cause following certain change of control events, Mr. Hatfield's stock options will become fully vested and Mr. Hatfield will be paid an amount equal to one year of his base salary.

From January 1, 1998 through May 31, 1998, the Company paid Virtual Visits, Inc. ("Virtual Visits"), a company engaged in the design of Internet Web sites for the promotion of golf products, approximately $60,000. The Company expects to pay at least an additional $10,000 to Virtual Visits during 1998. Mr. Conner and Mr. Casati, directors of the Company, are also directors and significant stockholders of Virtual Visits.

In January 1998, the Company made loans of $83,330 and $125,000 to Mr. Murtland and Mr. Gonsalves, respectively, to finance the aggregate exercise price of stock options then exercised by such individuals. The loans bore interest at the rate of 5% per annum and were due January 14, 2001. The loan to Mr. Murtland was repaid in April 1998. Messrs. Murtland and Gonsalves are each executive officers of the Company.

The Company has granted options to purchase the Company's Common Stock to certain of its officers and directors. See "Management—Plans" and "Principal and Selling Stockholders."

The Company believes that all of the transactions set forth above were made on terms no less favorable to the Company than could have been obtained from unaffiliated third parties. All future transactions between the Company and its officers, directors, principal stockholders and their affiliates will be approved by a majority of the Board of Directors, including a majority of the independent and disinterested outside directors.

43

A 612

## PRINCIPAL AND SELLING STOCKHOLDERS

The following table and the notes thereto set forth certain information regarding the beneficial ownership of the Common Stock as of May 31, 1998, by

(i) each person known by the Company to own beneficially more than 5% of the outstanding shares of the Common Stock, (ii) each director of the Company, (iii) each Named Executive Officer, (iv) all directors and executive officers of the Company as a group, and (v) each Selling Stockholder. Unless otherwise noted in the notes to the table, the Company believes the executive officers and directors can be contacted at the principal offices of the Company.

| NAME OF BENEFICIAL OWNERS | BENEFICIAL OWNERSHIP OF COMMON STOCK PRIOR TO THE OFFERING(1) | | NUMBER OF SHARES OF COMMON STOCK TO BE SOLD(2) | BENEFICIAL OWNERSHIP OF COMMON STOCK AFTER THE OFFERING(1)(2) | |
| --- | --- | --- | --- | --- | --- |
| | NUMBER | PERCENT | NUMBER | NUMBER | PERCENT |
| DIRECTORS AND NAMED EXECUTIVE OFFICERS | | | | | |
| B. H. Adams................................ | 4,482,321 | 23.5% | 928,000 | 3,554,321 | 15.4% |
| Richard H. Murtland........................ | 333,952 | 1.7 | 66,750 | 267,202 | 1.2 |
| Mark D. Gonsalves.......................... | 333,320 | 1.7 | 0 | 333,320 | 1.4 |
| Paul F. Brown, Jr.(3)(4)................... | 7,405,438 | 38.8 | 454,745(5) | 6,950,693 | 30.1 |
| Roland E. Casati........................... | 2,838,600 | 9.6 | 0 | 1,838,600 | 8.0 |
| Finis F. Conner........................... | 1,942,776 | 10.2 | 388,555 | 1,554,221 | 6.7 |
| Mark R. Mulvoy............................. | 0 | 0.0 | 0 | 0 | 0.0 |
| Stephen R. Patchin(3)(4)................... | 7,405,438 | 38.8 | 454,745(5) | 6,950,963 | 30.1 |
| ALL EXECUTIVE OFFICERS AND DIRECTORS AS A GROUP | | | | | |
| (11 PERSONS)(4)(6)........................ | 16,381,407 | 85.6 | 1,838,050 | 14,543,537 | 62.8 |
| BENEFICIAL OWNERS OF 5% OR MORE OF THE COMPANY'S COMMON STOCK | | | | | |
| Royal Holding Company, Inc.(3)(4)........ | 7,405,438 | 38.8 | 454,745 | 6,950,693 | 30.1 |
| OTHER SELLING STOCKHOLDERS | | | | | |
| Lincoln Trust Company | | | | | |
| Custodian f/b/o Richard Urdahl.......... | 116,592 | * | 77,000 | 39,592 | * |
| Richard Urdahl(7)......................... | 119,392 | * | 79,800(8) | 39,592 | * |
| Faris McMullin............................ | 111,738 | * | 73,750 | 37,988 | * |
| Peter Cassady............................. | 8,400 | * | 8,400 | 0 | 0.0 |

—————————

,than one percent.

(1) Applicable percentage of ownership is based on 19,099,282 shares of Common Stock outstanding on May 31, 1998, and 23,099,282 shares of Common Stock to be outstanding upon completion of the Offering. Common Stock is the only class of equity securities outstanding. Beneficial ownership is determined in accordance with the rules of the Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options that are presently exercisable or exercisable within 60 days of May 31, 1998 are deemed to be beneficially owned by the person holding such options for the purpose of computing the beneficial ownership of such person, but are not treated as outstanding for the purpose of computing the beneficial ownership of any other person.

(2) Does not give effect to the exercise of the Underwriters' over-allotment option or to purchases in the Offering, if any. If the Underwriters over-allotment option is exercised in full, Messrs. Adams, Murtland, Gonsalves, Conner, Urdahl, McMullin and Cassady would beneficially own 3,362,321 (14.6%), 250,464 (1.1%), 303,320 (1.3%), 1,554,221 (6.7%), 30,000 (less than 1%) (representing 30,000 shares held of record by Lincoln Trust Company as custodian for Mr. Urdahl), -0- and -0- shares of Common Stock, respectively, and Royal Holding Company, Inc. and Lincoln Trust Company would own 6,374,511 (27.6%) and 30,000 (less than 1%) shares, respectively, after the Offering. See "Underwriting."

(3) The address for Messrs. Patchin and Brown and for Royal is c/o Royal Holding Company, Inc., 300 Delaware Avenue, Suite 306, Wilmington, Delaware 19801.

(4) Includes 7,405,438 shares of Common Stock owned directly by Royal. Messrs. Patchin and Brown, directors of the Company, are the (i) Chief Executive Officer and President and (ii) Chief Financial Officer and Vice President— Finance, respectively, of Royal and, by virtue of their positions with Royal, may be deemed to share the power to vote or direct the vote of, and to share the power to dispose or direct the disposition of, these shares of Common Stock. Each of Messrs. Patchin and Brown disclaim beneficial ownership of the shares of Common Stock held by Royal.

(5) Represents shares sold for the account of Royal Holding Company, Inc.

(6) ...udes 45,000 shares of Common Stock subject to options exercisable by Darl P. Hatfield, an executive officer of the Company, within 60 da,, of May 31, 1998.

(7) Includes 116,592 shares of Common Stock held of record by Lincoln Trust Company as custodian for Mr. Urdahl and 2,800 shares of Common Stock held of record by Mr. Urdahl.

(8) Represents 77,000 shares sold for the account of Lincoln Trust Company as custodian for Mr. Urdahl and 2,800 shares sold for the account of Mr. Urdahl.

44

## DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company consists of 50,000,000 shares of Common Stock, $.001 par value per share, and 5,000,000 shares of Preferred Stock, $.01 par value per share (the "Preferred Stock"). The following description of certain characteristics of the capital stock of ·mpany does not purport to be complete and is subject to, and qualified in its entirety by, the provisions of the Certificate of ,oration, Bylaws and the Registration Rights Agreement, as defined below, each of which is included as an exhibit to the Registration Statement of which this Prospectus is a part, and by the provisions of applicable law.

### COMMON STOCK

As of May 31, 1998, there were 19,099,282 shares of Common Stock outstanding held of record by 101 stockholders. The holders of Common Stock are entitled to share pro rata in dividends and distributions, if any, with respect to the Common Stock when, as and if declared by the Board of Directors, from funds legally available therefor. See "Dividend Policy". Holders of Common Stock are entitled to one vote per share, are not entitled to cumulative voting in the election of directors and have no preemptive, subscription, redemption or conversion rights. Upon the liquidation, dissolution or winding up of the Company, the assets of the Company remaining after payment of or provision for liabilities and payment to the holders of Preferred Stock of such preferential amounts that they are entitled to receive will be distributed pro rata on a share-for-share basis among the holders of Common Stock. All outstanding shares of Common Stock are, and the shares to be issued and sold in the Offering will be, duly authorized, validly issued, fully paid and non-assessable. The rights, preferences and privileges of holders of Common Stock are subject to any series of Preferred Stock that the Company may issue in the future.

The Company effected a two-for-one stock split on May 1, 1998 in contemplation of this Offering. The Company had 9,549,641 shares of Common Stock issued and outstanding immediately prior to the stock split.

### PREFERRED STOCK

The Company's Board of Directors is authorized, without further action by the stockholders, to divide the Preferred Stock into series and, with respect to each series, to determine the preferences and rights, and the qualifications, limitations or restrictions thereof, including the dividend rights, conversion rights, voting rights, redemption rights and terms, liquidation preferences, sinking fund provisions, the number of shares constituting the series and the designation of such series. The Board of Directors could, without stockholder approval, issue Preferred Stock with voting and other rights that could adversely affect the voting power of the holders of Common Stock and could have certain anti-takeover effects. The Company has no present plans to issue any shares of Preferred Stock.

·thority possessed by the Board of Directors to issue Preferred Stock could potentially be used to discourage attempts by others to obtain control of the Company through merger, tender offer, proxy contest or otherwise by making such attempts more costly or difficult to achieve.

### REGISTRATION RIGHTS

Pursuant to the terms of that Registration Rights Agreement dated April 30, 1998 (the "Registration Rights Agreement") by and among the Company and certain stockholders of the Company holding an aggregate of 17,797,087 shares of Common Stock as of May 31, 1998, the Company has granted certain registration rights to such stockholders. Specifically, under the terms of the Registration Rights Agreement, the stockholders holding in excess of 40% of the Common Stock covered by such agreement have a right commencing at any time not earlier than the latter of (i) the expiration of any of the "lock-up" period prescribed by the Lock-up Agreement and (ii) the date on which the Company shall become eligible to use the Form S-3 Registration Statement (or any successor to such form) for the purpose of registering outstanding securities for the account of any person other than the Company, to demand that the shares of the Common Stock held by them be registered under the Securities Act. However, if the Board of Directors determines, in its good faith, that such registration would be detrimental to the Company and, as a result, that it is necessary to defer the filing of such registration statement at such time, the Company may defer such registration for a period not to exceed 180 days. The Company has agreed to pay all costs and expenses necessary to effect the registration of the shares of Common Stock to be sold by the stockholders in this first registration statement (other than underwriting and brokerage commissions, if

A 615

any, and legal fees incurred by the selling holders). If, after the Company has effected the first such registration statement, it shall receive a request for registration from the stockholders holding a majority of the shares of Common Stock subject to the Registration Rights Agreement not previously registered, the Company shall file a second or third registration statement for the purpose of registering such shares under the Securities Act; however, the Company and such stockholders have agreed to defer the filing of such registration statements in the same manner ~ 'n the same basis as the first registration. The stockholders having shares registered in such subsequent registration statements have agreed all costs and expenses related thereto including the Company's fees and expenses relating to counsel, accountants and filing under the .ities Act.

The Registration Rights Agreement also grants certain piggy-back registration rights to the stockholders. Accordingly, whenever the Company proposes to register any shares of Common Stock under the Securities Act (other than registrations on Form S-4 or S-8), certain of the stockholders have the right to include the shares of Common Stock held by them in any such registration. However, if the managing underwriter of such registration advises the Company in writing that, in its opinion, the total number or dollar amounts of securities requested to be included in such registration exceeds the number or dollar amount of shares of Common Stock that can be sold in such offering, the Company may exclude certain shares from the offering. In such a case, the order of priority in which shares are to be included in the proposed offering will be as follows: first, all shares of Common Stock that the Company proposes to sell; and second, up to the full number or dollar amount of shares of Common Stock requested by the stockholders to be included in such registration in excess of the number or dollar amount of shares of the Common Stock the Company proposes to sell which, in the opinion of such underwriter, can be sold, allocated pro rata among the participating stockholders on the basis of the number of shares of Common Stock requested to be included therein by each. The Company generally is obligated to bear the expenses, other than underwriting discounts and sales commissions, of the registration of such shares. Any exercise by the holders of such incidental registration rights may hinder efforts by the Company to arrange future financings and may have an adverse impact on the market price of the Common Stock.

DELAWARE LAW AND CERTAIN CHARTER AND BYLAW PROVISIONS

Following the consummation of the Offering, the Company will be subject to
Section 203 of the DGCL, the "business combinations" statute. In general, such statute prohibits a publicly held Delaware corporation from engaging in various "business combinations" with any "interested stockholder" for a period of three years after the time that such stockholder became an "interested stockholder," unless (i) the business combination or the transaction by which such stockholder became an "interested stockholder" was approved by the Board of Directors prior to such time, (ii) upon consummation of the transaction which resulted in the stockholder becoming an "interested stockholder," the "interested stockholder" owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced (excluding for purposes of determining the number of shares outstanding those shares owned by (a) persons who are directors and also officers and (b) certain employee stock ownership plans) or (iii) on or subsequent to such time r' "business combination" is approved by the Board of Directors and authorized at an annual or special meeting of stockholders by the ative vote of at least 66 2/3% of the outstanding voting stock which is not owned by the "interested stockholder." A "business ..nation" includes mergers, asset sales and other transactions resulting in financial benefit to a stockholder. In general, an "interested stockholder" is a person who, together with affiliates and associates, owns (or within three years, did own) 15% or more of a corporation's outstanding voting stock. The statute could prohibit or delay mergers or other takeover or change in control attempts with respect to the Company and, accordingly, may discourage attempts to acquire the Company.

In addition, certain provisions of the Company's Certificate of Incorporation and Bylaws summarized in the following paragraphs may be deemed to have an anti-takeover effect and may delay, defer or prevent an attempt to obtain control of the Company by means of a proxy contest, tender offer, merger or other transaction that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares held by stockholders.

CLASSIFIED BOARD OF DIRECTORS. The Company's Certificate of Incorporation provides for the Board of Directors to be divided into three classes of directors serving staggered three-year terms. As a result, approximately one-third of the Board of Directors will be elected each year. Moreover, under the DGCL, in the case of a corporation having a classified board, stockholders may remove a director only for cause.

A 616

This provision, when coupled with the provision of the Bylaws authorizing the Board of Directors to fill vacant directorships, may preclude a stockholder from removing incumbent directors without cause and simultaneously gaining control of the Board of Directors by filling the vacancies created by such removal with its own nominees.

·    'IAL MEETING OF STOCKHOLDERS. The Company's Bylaws provide that special meetings of stockholders of the Company may be
        only by the Board of Directors, or the Executive Committee of the Board of Directors, if any, or the President. This provision will make
    n ..ore difficult for stockholders to take actions opposed by the Board of Directors.

STOCKHOLDER ACTION BY WRITTEN CONSENT. The Company's Certificate of Incorporation provides that no action required or permitted to be taken at any annual or special meeting of the stockholders of the Company may be taken without a meeting, and the power of stockholders of the Company's to consent in writing, without a meeting, for the taking of any action is specifically denied.

ADVANCE NOTICE REQUIREMENTS FOR STOCKHOLDER PROPOSALS AND DIRECTOR NOMINATIONS. The Bylaws provide that stockholders seeking to bring business before an annual meeting of stockholders, or to nominate candidates for election as directors at an annual or special meeting of stockholders, must provide timely notice thereof in writing. In order to be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Company no later than 90 days prior to the meeting; provided, however, that in the event that less than 100 days notice or prior public disclosure of the date of the meeting is given and made to stockholders, notice by the stockholder must be received no later than the close of business on the tenth day following the earlier of the day on which such notice of the date of the meeting was mailed or such public disclosure was made in order to be timely. The Bylaws specify certain requirements for a stockholder's notice to be in proper form. These provisions may preclude some stockholders from bringing matters before the stockholders at an annual or special meeting or from making nominations for directors at an annual or special meeting.

The Company believes the foregoing provisions are necessary to attract and retain qualified persons as directors and officers.

MARKET INFORMATION

Prior to the Offering, there has been no established public trading market for the Common Stock. The Common Stock has been approved for listing on the Nasdaq National Market under the symbol "ADGO."

TRANSFER AGENT AND REGISTRAR

·    'ompany has appointed The Bank of New York as the transfer agent and registrar for the Common Stock.

A 617

## SHARES ELIGIBLE FOR FUTURE SALE

Upon the closing of the Offering, the Company will have 23,099,282 shares of Common Stock outstanding. Of these shares, the 4,000,000 shares sold by the Company and the 2,000,000 shares sold by the Selling Stockholders in the Offering will be freely tradeable without ∙∙∙tion or further registration under the Securities Act unless held by an "affiliate" of the Company (as that term is defined below). Any such ∙e will be subject to the resale limitations of Rule 144 adopted under the Securities Act. The remaining 17,099,282 shares of Common ∙∙∙∙x currently outstanding are "restricted securities" for purposes of Rule 144 ("Restricted Shares"). Restricted Shares may be sold in the public market only if registered or if they qualify for an exemption from registration under Rule 144 or Rule 701 promulgated under the Securities Act. As a result of contractual restrictions and the provisions of Rule 144 and Rule 701, additional shares will be available for sale in the public market as follows: (i) no Restricted Shares will be eligible for immediate sale on the date of this Prospectus; (ii) no additional Restricted Shares will be eligible for sale 90 days after the date of this Prospectus; and
(iii) an additional 16,184,282 Restricted Shares will be eligible for sale upon expiration of the Lock-up Agreements, 180 days after the date of this Prospectus.

After the expiration of the Lock-up Agreements, the Company may file a Registration Statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance to its employees, officers, directors and consultants under its employee benefit plans. Upon the effective date of such Registration Statement, shares of Common Stock issued upon exercise of options granted under the plans generally will be available for sale in the open market. As of the date of this Prospectus, the Company has granted outstanding options to purchase up to 423,666 shares of Common Stock to certain employees, officers, directors and consultants under the 1996 Plan and the Incentive Plan, none of which were then exercisable. In addition, Mr. Faldo has been granted 900,000 shares of Common Stock pursuant to the terms of the Incentive Plan, however, subject to certain exceptions including transfers to Mr. Faldo's agent, he may not transfer, dispose of or otherwise assign any rights in any more than 100,000 shares of Common Stock in any calendar year prior to 2002.

In general under Rule 144 as currently in effect, a person (or persons whose shares are aggregated), including a person who may be deemed to be an "affiliate" of the Company as that term is defined under the Securities Act, is entitled to sell within any three-month period a number of shares beneficially owned for at least one year that does not exceed the greater of (i) 1% of the then outstanding shares of Common Stock (approximately 230,993 shares immediately after the Offering) or (ii) the average weekly trading volume of the outstanding shares of Common Stock during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and the availability of current public information about the Company. A person (or persons whose shares are aggregated) who is not an "affiliate" of the Company during the 90 days immediately preceding a proposed sale by such person and who has beneficially owned "restricted securities" for at least two years is entitled to sell such shares under Rule 144(k) without regard to the volume, manner of sale, public information or notice requirements. As defined in Rule 144, an "affiliate" of an issuer is a person that directly or indirectly controls, or is c  ∙lled by, or is under common control with such issuer. In general, under Rule 701 under the Securities Act as currently in effect, any ∙∙ ∙ee, consultant or advisor of the Company who purchases shares from the Company in connection with a compensatory stock or option p∙ ∙r other written agreement related to compensation is eligible to resell such shares 90 days after the effective date of the offering in reliance on Rule 144, but without compliance with certain restrictions contained in Rule 144.

Prior to this Offering, there has been no public market for the Common Stock of the Company and no predictions can be made of the effect, if any, that future sales of shares of Common Stock, and options to acquire shares of Common Stock, or the availability of shares for future sale, will have on the market price prevailing from time to time. Sales of substantial amounts of Common Stock in the public market, or the perception that such sales could occur, could adversely affect prevailing market prices of the Common Stock.

48

A 618

# UNDERWRITING

Subject to certain terms and conditions contained in the Underwriting Agreement, Lehman Brothers Inc., NationsBanc Montgomery Securities LLC and Ferris, Baker Watts, Incorporated (the "Underwriters") have severally agreed to purchase from the Company and the Selling holders, and the Company and the Selling Stockholders have agreed to sell to each of the Underwriters, the number of shares of Common set forth opposite their respective names below:

| UNDERWRITER | NUMBER OF SHARES |
| --- | --- |
| Lehman Brothers Inc. | 1,602,000 |
| NationsBanc Montgomery Securities LLC. | 1,601,000 |
| Ferris, Baker Watts, Incorporated | 1,601,000 |
| CIBC Oppenheimer Corp. | 104,000 |
| Donaldson, Lufkin & Jenrette Securities Corporation. | 104,000 |
| A.G. Edwards & Sons, Inc. | 104,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 104,000 |
| Morgan Stanley & Co. Incorporated | 104,000 |
| PaineWebber Incorporated | 104,000 |
| Prudential Securities Incorporated | 104,000 |
| Wheat First Securities, Inc. | 104,000 |
| First Southwest Company | 52,000 |
| Hoak Breedlove Wesneski & Co. | 52,000 |
| Janney Montgomery Scott Inc. | 52,000 |
| Ragen MacKenzie Incorporated | 52,000 |
| Raymond James & Associates, Inc. | 52,000 |
| Sands Brothers & Co., Ltd. | 52,000 |
| J.E. Sheehan & Co., Inc. | 52,000 |
| Total | 6,000,000 |

The Underwriting Agreement provides that the obligations of the Underwriters thereunder are subject to various conditions. The nature of the Underwriters' obligations are such that they are committed to take and pay for all of the shares offered hereby if any are purchased.

Company and the Selling Stockholders have been advised by the Underwriters that they propose to offer the shares of Common Stock to blic at the public offering price set forth on the cover page hereof and to certain selected dealers (who may include the Underwriters) at price less a concession not in excess of $.65 per share. The Underwriters may allow, and such dealers may reallow, a concession not in excess of $.10 per share to certain other dealers. After the initial offering, the public offering price, the concession to selected dealers and the reallowance to other dealers may be changed by the Underwriters.

The Company and certain of the Selling Stockholders have granted to the Underwriters an option to purchase up to an additional 900,000 shares of Common Stock, at the public offering price less the underwriting discounts and commissions shown on the cover page of this Prospectus, solely to cover over-allotments, if any. Such option may be exercised at any time up to 30 days after the date of this Prospectus. To the extent that the Underwriters exercise such option, each of the Underwriters will be committed, subject to certain conditions, to purchase a number of additional shares that is proportional to such Underwriter's initial commitment.

The Company's directors, officers and certain stockholders of the Company including the Selling Stockholders have agreed that they will not, without the prior written consent of Lehman Brothers Inc., during the 180 days following the date of this Prospectus, directly or indirectly, (1) offer for sale, sell, pledge or otherwise dispose of (or enter into any transaction or device which is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any shares of Common Stock (including, without limitation, in the case of Selling Stockholders, shares of Common Stock that may

49

A 619

be deemed to be beneficially owned in accordance with the rules and regulations of the Securities and Exchange Commission and shares of Common Stock that may be issued upon exercise of any option or warrant) or securities convertible into or exchangeable for Common Stock (other than the shares of Common Stock to be sold in the Offering), or (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of such shares of Common Stock, whether any such transaction ibed in clause (1) or (2) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise (other than, in the f the Company, the grant of options pursuant to option plans existing on the date hereof).

Until the distribution of the shares of Common Stock is completed, rules of the Commission may limit the ability of the Underwriters and certain selling group members to bid for and purchase shares of Common Stock. As an exception to these rules, the Underwriters are permitted to engage in certain transactions that stabilize the price of the Common Stock. Such transactions may consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of the Common Stock.

In addition, if the Underwriters over-allot (I.E., if they sell more shares of Common Stock than are set forth on the cover page of this Prospectus), and thereby create a short position in the Common Stock in connection with the Offering, the Underwriters may reduce that short position by purchasing Common Stock in the open market. The Underwriters also may elect to reduce any short position by exercising all or part of the over-allotment option described herein.

The Underwriters also may impose a penalty bid on certain dealers and certain selling group members. This means that if the Underwriters purchase shares of Common Stock in the open market to reduce the Underwriter short position to stabilize the price of the Common Stock, they may reclaim the amount of selling concession from such dealers and the selling group who sold shares as part of the Offering.

In general, purchases of a security for the purpose of stabilization or to reduce a syndicate short position could cause the price of the security to be higher than it might otherwise be in the absence of such purchases. The imposition of a penalty bid might have an effect on the price of a security, to the extent that it were to discourage resales of the security by purchasers in the Offering.

Neither the Company nor any of the Underwriters makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the Common Stock. In addition, neither the Company nor any of the Underwriters makes any representation that the Underwriters will engage in such transactions or that such transactions, once commenced, will not be discontinued without notice.

The Company and each of the Selling Stockholders have agreed to indemnify the Underwriters against certain liabilities, including liabilities r  · the Securities Act, and to contribute to payments the Underwriters may be required to make in respect thereof.

P.... to the sale of shares in the Offering, there has been no active public market for the Common Stock of the Company. The initial public offering price of the shares of Common Stock will be determined by negotiation among the Company, the Selling Stockholders and the Underwriters. Among the factors that will be considered in determining the initial public offering price will be the prospects of the Company and its industry in general, the Company's past and present operations, the Company's position in the industry, an assessment of the Company's management, the general condition of securities markets at the time of the Offering and the demand for similar securities.

At the request of the Company, the Underwriters have reserved up to 575,000 shares of Common Stock offered hereby for sale to certain officers, directors, employees, business associates and related parties of the Company at the initial public offering price set forth on the cover page of this Prospectus. Such persons must commit to purchase no later than the close of business on the day following the date hereof. The number of shares available for sale to the general public will be reduced to the extent such persons purchase such reserved shares.

50

A 620

## LEGAL MATTERS

The validity of the shares of Common Stock offered hereby will be passed upon for the Company by Arter & Hadden LLP, Dallas, Texas. Certain legal matters in connection with the Offering will be passed upon for the Underwriters by Cooley Godward LLP, San Francisco, mia.

## EXPERTS

The consolidated financial statements and financial statement schedule of the Company as of December 31, 1996 and 1997, and for each of the years in the three-year period ended December 31, 1997, have been included herein and elsewhere in the Registration Statement in reliance upon the report of KPMG Peat Marwick LLP, independent certified public accountants, appearing elsewhere herein and in the Registration Statement, and upon the authority of such firm as experts in accounting and auditing.

The statements in this Prospectus set forth under "Risk Factors—Patents and Protection of Proprietary Technology," "Business—Design and Development—Patent Review" and "Business—Patents," together with the last paragraph of the inside front cover of this Prospectus, have been reviewed and approved by Aquilino & Welsh, Arlington, Virginia, as experts in patent and trademark law, and are included herein in reliance upon that review and approval. A partner in Aquilino & Welsh owns 59,106 shares of Common Stock of the Company. Purchasers of the securities offered hereby should not rely on Aquilino & Welsh with respect to any matters other than as set forth above.

## ADDITIONAL INFORMATION

The Company has filed with the Commission a Registration Statement on Form S-1 under the Securities Act with respect to the Common Stock offered hereby. This Prospectus constitutes a part of the Registration Statement and does not contain all of the information set forth therein and in the exhibits thereto, certain portions of which have been omitted as permitted by the rules and regulations of the Commission. For further information with respect to the Company and the Common Stock offered hereby, reference is hereby made to such Registration Statement and exhibits. Statements contained in this Prospectus as to the contents of any document are not necessarily complete and in each instance are qualified in their entirety by reference to the copy of the appropriate document filed with the Commission. The Registration Statement, including the exhibits thereto, may be examined without charge at the Commission's public reference facility at Room 1024, Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C. 20549, and at the following regional offices of the Commission: 7 World Trade Center, New York, NY 10048, and Northwestern Atrium Center, 500 West Madison Street, Suite 1400, Chicago, IL 60601. Copies of such material may be obtained from the Public Reference Section of the Commission at its principal office at 450 Fifth Street, N.W., Washington, D.C. 20549, upon payment of the fees prescribed by the Commission. Copies of such material are also available through the Commission's website located at www.sec.gov.

51

A 621

[This Page Intentionally Left Blank]

# INDEX TO FINANCIAL STATEMENTS

Independent Auditors' Report.................................................... F-2

Consolidated Balance Sheets as of December 31, 1996 and 1997 and March 31, 1998
  (unaudited)................................................................ F-3

Consolidated Statements of Operations for the years ended December 31, 1995, 1996 and
  1997 and the three months ended March 31, 1997 and 1998 (unaudited)............... F-4

Consolidated Statements of Stockholders' Equity for the years ended December 31,
  1995, 1996 and 1997 and the three months ended March 31, 1998 (unaudited)......... F-5

Consolidated Statements of Cash Flows for the years ended December 31, 1995, 1996 and
  1997 and the three months ended March 31, 1997 and 1998 (unaudited)............... F-6

Notes to Consolidated Financial Statements....................................... F-7

Financial Statement Schedule:
  II--Valuation and Qualifying Accounts for the years ended December 31, 1995, 1996
    and 1997 and the three months ended March 31, 1998 (unaudited).................. F-16

All other schedules are omitted since the required information is not present or is not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements and notes thereto.

F-1

INDEPENDENT AUDITORS' REPORT

The Board of Directors and Stockholders
Adams Golf, Inc. and subsidiaries:

.ve audited the consolidated financial statements of Adams Golf, Inc. and subsidiaries as listed in the accompanying index. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in the accompanying index. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Adams Golf, Inc. and subsidiaries as of December 31, 1996 and 1997, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1997, in conformity with generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

KPMG PEAT MARWICK LLP

Dallas, Texas
April 29, 1998

F-2

A 624

ADAMS GOLF, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

## ASSETS

| | DECEMBER 31, | | MARCH 31, |
| | 1996 | 1997 | 1998 |
| | | | (UNAUDITED) |
|---|---|---|---|
| Current assets: | | | |
| Cash and cash equivalents............................................. | $    854,543 | $  1,955,563 | $    602,290 |
| Trade receivables net of allowance for doubtful accounts of $26,199, $698,341 and $1,126,831 (unaudited) in 1996, 1997 and 1998, respectively (note 7)................................... | 497,787 | 7,670,960 | 14,708,636 |
| State income taxes refundable........................................ | -- | 221,637 | 221,637 |
| Inventories (notes 2 and 7).......................................... | 674,737 | 4,446,563 | 5,559,699 |
| Prepaid expenses..................................................... | 28,007 | 509,350 | 1,106,635 |
| Deferred income tax assets (note 8)................................. | -- | 390,164 | 650,626 |
| Other current assets................................................ | -- | 715,670 | 352,795 |
| Total current assets........................................... | 2,055,074 | 15,949,907 | 23,202,318 |
| Property and equipment, net (note 3)................................ | 323,950 | 603,823 | 2,094,734 |
| Deferred income tax assets (note 8)................................. | -- | 182,621 | 209,942 |
| Other assets, net (note 4).......................................... | 379,697 | 623,728 | 285,705 |
| Total assets.................................................. | $  2,558,721 | $ 17,360,079 | $ 25,792,759 |

## LIABILITIES AND STOCKHOLDERS' EQUITY

| | DECEMBER 31, | | MARCH 31, |
| | 1996 | 1997 | 1998 |
|---|---|---|---|
| Current liabilities: | | | |
| Notes payable....................................................... | $    230,406 | $      -- | $      -- |
| Note payable to shareholder (note 7)................................ | -- | -- | 912,642 |
| Accounts payable.................................................... | 17,526 | 377,622 | 2,732,215 |
| Federal income taxes payable........................................ | -- | 1,020,960 | 2,940,390 |
| Accrued expenses (note 5)........................................... | 332,423 | 7,636,157 | 4,317,926 |
| Total current liabilities..................................... | 580,355 | 9,034,759 | 10,903,173 |
| ...es payable to shareholder, less current portion (note 7)......... | -- | -- | 222,399 |
| Total liabilities............................................. | 580,355 | 9,034,759 | 11,125,572 |
| Stockholders' equity (note 9): | | | |
| Common stock, $.001 par value. Authorized 50,000,000 shares; 11,873,234, 15,719,338 and 18,199,282 (unaudited) shares issued and outstanding at December 31, 1996 and 1997 and March 31, 1998, respectively................................................ | 11,873 | 15,719 | 18,199 |
| Additional paid-in capital.......................................... | 3,126,073 | 14,123,398 | 16,031,896 |
| Common stock subscription........................................... | -- | -- | (230,459) |
| Deferred compensation............................................... | -- | -- | (981,000) |
| Accumulated deficit................................................. | (1,159,580) | (5,813,797) | (171,449) |
| Total stockholders' equity.................................... | 1,978,366 | 8,325,320 | 14,667,187 |
| Commitments (note 6)................................................ | | | |
| | $  2,558,721 | $ 17,360,079 | $ 25,792,759 |

See accompanying notes to consolidated financial statements.

F-3

A 625

ADAMS GOLF, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS

| | YEARS ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | | | | (UNAUDITED) | |
| Net sales................................. | $ 1,125,115 | $ 3,521,788 | $ 36,690,090 | $ 1,474,940 | $ 24,510,808 |
| Cost of goods sold........................ | 756,400 | 1,589,696 | 9,991,132 | 586,538 | 5,862,255 |
| Gross profit.......................... | 368,715 | 1,932,092 | 26,698,958 | 888,402 | 18,648,553 |
| Operating expenses: | | | | | |
| Research and development expenses......... | 18,516 | 51,101 | 557,513 | -- | 196,997 |
| Selling and royalty expenses.............. | 312,785 | 625,857 | 13,093,174 | 418,737 | 6,248,196 |
| General and administrative expenses: | | | | | |
| Stock compensation and bonus award (note 9)... | -- | 213,760 | 14,842,711 | -- | -- |
| Provision for bad debts................... | 12,791 | 51,306 | 738,805 | 75,768 | 466,213 |
| Other..................................... | 268,518 | 981,219 | 1,436,995 | 328,727 | 2,865,198 |
| Total operating expenses.............. | 612,610 | 1,923,283 | 30,668,198 | 823,232 | 9,776,604 |
| Operating income (loss)................ | (243,895) | 8,809 | (3,969,240) | 65,170 | 8,871,949 |
| Other income (expense): | | | | | |
| Interest income.......................... | 1,226 | 3,938 | 15,325 | 4,451 | 10,550 |
| Interest expense.......................... | -- | -- | (69,731) | (13,090) | (9,362) |
| Other..................................... | -- | -- | (47,808) | 4,350 | (100,621) |
| Income (loss) before income taxes..... | (242,669) | 12,747 | (4,071,454) | 60,881 | 8,772,516 |
| Income tax expense (note 8)................ | -- | -- | 582,763 | 15,586 | 3,130,168 |
| Net income (loss)..................... | $ (242,669) | $ 12,747 | $ (4,654,217) | $ 45,295 | $ 5,642,348 |
| Income (loss) per common share: | | | | | |
| Basic..................................... | $ (.05) | $ .00 | $ (.37) | $ .00 | $ .32 |
| Diluted................................... | $ (.05) | $ .00 | $ (.37) | $ .00 | $ .31 |

See accompanying notes to consolidated financial statements.

F-4

A 626

**ADAMS GOLF, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**YEARS ENDED DECEMBER 31, 1995, 1996 AND 1997 AND THE**
**THREE MONTHS ENDED MARCH 31, 1998 (UNAUDITED)**

| | SHARES OF PREFERRED STOCK | PREFERRED STOCK | SHARES OF COMMON STOCK | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | COMMON STOCK SUBSCRIPTION | DEFERRED COMPENSATION |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 1994 (unaudited) | 772,551 | $ 773 | 1,066,514 | $ 1,067 | $ 1,327,799 | $ -- | $ -- |
| Conversion of preferred stock to common stock (note 9) | (772,551) | (773) | 1,545,102 | 1,545 | (772) | -- | -- |
| Sale of stock | -- | -- | 4,168,988 | 4,169 | 453,507 | -- | -- |
| Stock distribution (note 9) | -- | -- | 4,282,304 | 4,282 | (4,282) | -- | -- |
| Net loss | -- | -- | -- | -- | -- | -- | -- |
| Balance, December 31, 1995 | -- | $ -- | 11,062,908 | 11,063 | 1,776,252 | -- | -- |
| Sale of stock | | | 1,581,126 | 1,581 | 1,594,362 | -- | -- |
| Common stock repurchased and retired (note 9) | | | (770,800) | (772) | (244,541) | -- | -- |
| Net income | | | -- | -- | -- | -- | -- |
| Balance, December 31, 1996 | | | 11,873,234 | 11,873 | 3,126,073 | -- | -- |
| Stock compensation award (note 9) | | | 2,000,000 | 2,000 | 9,998,000 | -- | -- |
| Exercise of stock options | | | 946,104 | 946 | 550,225 | -- | -- |
| Exchange of debt for common stock (note 9) | | | 900,000 | 900 | 449,100 | -- | -- |
| Net loss | | | -- | -- | -- | -- | -- |
| Balance, December 31, 1997 | | | 15,719,338 | 15,719 | 14,123,398 | -- | -- |
| Issuance of stock options | | | -- | -- | 981,000 | -- | (981,000) |
| Exercise of stock options | | | 2,479,944 | 2,480 | 927,498 | (230,459) | -- |
| Net income | | | -- | -- | -- | -- | -- |
| Balance, March 31, 1998 (unaudited) | | | 18,199,282 | $ 18,199 | $ 16,031,896 | $ (230,459) | $ (981,000) |

| | ACCUMULATED DEFICIT | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|
| Balance, December 31, 1994 (unaudited) | $ (929,658) | $ 399,981 |
| Conversion of preferred stock to common stock (note 9) | -- | -- |
| Sale of stock | -- | 457,676 |
| Stock distribution (note 9) | -- | -- |
| Net loss | (242,669) | (242,669) |
| Balance, December 31, 1995 | (1,172,327) | 614,588 |
| Sale of stock | -- | 1,595,943 |
| Common stock repurchased and retired (note 9) | -- | (245,312) |
| Net income | 12,747 | 12,747 |
| Balance, December 31, 1996 | (1,159,580) | 1,970,366 |
| Stock compensation award (note 9) | -- | 10,000,000 |
| Exercise of stock options | -- | 551,171 |
| Exchange of debt for common stock (note 9) | -- | 450,000 |
| Net loss | (4,654,217) | (4,654,217) |
| Balance, December 31, 1997 | (5,813,797) | 8,325,320 |
| Issuance of stock options | -- | -- |
| Exercise of stock options | -- | 639,519 |
| Net income | 5,642,348 | 5,642,348 |

```
                                    --------------    --------------
Balance, March 31, 1998
    (unaudited)..............    $  (171,449)    $ 34,667,187
                                    --------------    --------------
                                    --------------    --------------
```

·companying notes to consolidated financial statements.

F-5

ADAMS GOLF, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | YEARS ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | | | | (UNAUDITED) | |
| **Cash flows from operating activities:** | | | | | |
| Net income (loss) .......................... | $ (242,669) | $  12,747 | $(4,654,217) | $  45,295 | $ 5,642,348 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization................ | 8,291 | 19,278 | 302,589 | 16,374 | 218,959 |
| Loss on retirement of fixed assets........... | -- | -- | 134,009 | -- | 100,617 |
| Stock compensation and bonus award........... | -- | -- | 10,000,000 | -- | -- |
| Deferred income taxes........................ | -- | -- | (572,785) | -- | (137,657) |
| Allowance for doubtful accounts.............. | -- | 26,199 | 672,142 | 71,207 | 1,126,831 |
| Changes in assets and liabilities: | | | | | |
| Trade and other receivables.............. | (93,649) | (374,228) | (8,066,952) | (399,963) | (8,164,507) |
| Inventories............................. | (81,470) | (476,467) | (3,811,826) | (103,962) | (1,073,136) |
| Prepaid assets.......................... | (27,589) | (418) | (481,343) | 406 | (597,285) |
| Other current assets.................... | 2,860 | -- | (715,670) | (257,186) | 362,875 |
| Other assets............................ | (4,873) | (361,916) | (350,442) | 67,478 | 248,822 |
| Accounts payable........................ | 40,252 | (22,726) | 360,096 | 60,688 | 991,832 |
| Accrued expenses........................ | 2,728 | 329,302 | 7,303,734 | 187,607 | (2,105,596) |
| Federal income taxes payable............ | -- | -- | 1,020,980 | 15,586 | 1,919,410 |
| Net cash provided by (used in) operating activities............................ | (396,219) | (848,229) | 1,100,315 | (296,470) | (1,466,487) |
| **Cash flow from investing activities--purchase of equipment.................................** | (9,287) | (121,444) | (770,060) | (46,277) | (1,721,347) |
| **Cash flows from financing activities:** | | | | | |
| Proceeds from notes payable and line of credit................................... | -- | 230,406 | 1,050,000 | 250,000 | 4,635,041 |
| Repayment of line of credit borrowings....... | -- | -- | (800,000) | -- | (3,500,000) |
| Repayment of notes payable................... | -- | -- | (30,406) | (2,494) | -- |
| Issuance of common stock..................... | 457,676 | 1,350,631 | 551,171 | -- | 699,520 |
| Net cash provided by financing activities............................ | 457,676 | 1,581,037 | 770,765 | 248,506 | 1,834,561 |
| Net increase (decrease) in cash and cash equivalents................................ | 52,270 | 611,364 | 1,101,020 | (94,241) | (1,353,273) |
| Cash and cash equivalents at beginning of period..................................... | 190,909 | 243,179 | 854,543 | 854,543 | 1,955,563 |
| Cash and cash equivalents at end of period...... | $ 243,179 | $  854,543 | $ 1,955,563 | $ 760,302 | $  602,290 |
| **Supplemental disclosure of cash flow information:** | | | | | |
| Interest paid................................. | $ -- | $ -- | $  69,731 | $ 13,090 | $  9,362 |
| Income taxes paid............................ | $ -- | $ -- | $ 356,204 | $ -- | $ 1,293,820 |
| **Supplemental disclosure of financing activity-- exchange of debt for common stock.............** | $ -- | $ -- | $ 450,000 | $ -- | $ -- |

See accompanying notes to consolidated financial statements.

F-6

A 629

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(a) GENERAL

Adams Golf, Inc. (the "Company") was founded in 1987. The Company designs, manufactures, markets and distributes golf clubs and provides custom golf club fitting technology. The Company's primary products are fairway woods that are marketed under the trademark "Tight Lies."

The Company has both domestic and international sales. International sales were $647,325, $878,666, and $1,387,325 for the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998, respectively. There were no international sales in 1995.

The consolidated financial statements include the accounts of Adams Golf, Inc. and its wholly-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation.

The consolidated financial statements of the Company as of March 31, 1998 and for the three months ended March 31, 1997 and 1998 are unaudited, but in the opinion of management reflect all adjustments (consisting only of normal recurring accruals) which are necessary for a fair statement of the results of the interim periods presented. Results for interim periods are not necessarily indicative of the results to be expected for a full year due in part to the Company's growth.

(b) INVENTORIES

Inventories are valued at the lower of cost or market and primarily consists of completed golf clubs and component parts. Cost is determined using the first-in, first-out method.

(c) PROPERTY AND EQUIPMENT

Property and equipment are stated at cost. Depreciation is calculated using the straight-line method over the estimated useful lives of the respective assets, which range from three to seven years.

(d) REVENUE RECOGNITION

The Company records revenue as earned, which occurs when the product is shipped.

(e) OTHER ASSETS AND RELATED AMORTIZATION EXPENSE

Other assets consist primarily of the cost of obtaining patents, development costs of an infomercial and various deposits. Patent amortization is computed on the straight-line method over the estimated useful lives of the assets, which range from 5 to 15 years.

(f) RESEARCH AND DEVELOPMENT

Research and development costs consist of all costs incurred in planning, designing and testing of golf equipment, including salary costs related to research and development, and are expensed as incurred.

(g) ADVERTISING COSTS

Advertising media costs, other than infomercial costs, are expensed as incurred. Production costs are charged to expense ratably in relation to sales over the year in which incurred. Advertising costs other than infomercials were $35,300, $33,503 and $8,651,420 for the years ended December 31, 1995, 1996 and 1997, respectively, and $59,049 (unaudited) and $2,333,406 (unaudited) for the three months ended March 31, 1997 and 1998, respectively.

F-7

A 630

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED) Infomercial costs are amortized based on revenues generated compared to total estimated revenues expected to result from the airing of such infomercial generally over an 18 month period. Amortization expense for the years ended December 31, 1995, 1996 and 1997 was $3,161, $3,738 and $146,411, respectively, and $89,200 (unaudited) for the three months ended March 31, 1998.

(h) PRODUCT WARRANTY AND SALES RETURNS

The Company's golf equipment is sold under warranty against defects in material and workmanship for a period of two years. In addition, the Company has a 90 day "no questions asked" return policy. An allowance for estimated future warranty and sales return costs is recorded in the period products are sold. Such estimates have approximated actual costs incurred.

(i) INCOME TAXES

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforwards. Deferred tax assets and liabilities are measured using enacted rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

(j) INCOME (LOSS) PER SHARE

The weighted average common shares used for determining basic net income
(loss) per common share was 4,423,146, 11,237,794 and 12,519,392, for the years ended December 31, 1995, 1996 and 1997, respectively, and 11,873,234 (unaudited) and 17,662,189 (unaudited) for the three months ended March 31, 1997 and 1998, respectively. The effect of dilutive st   options added 678,263 (unaudited) shares for the three months ended March 31, 1998 for the computation of diluted income (loss) per      n share. Stock options outstanding for the years ended December 31, 1995, 1996 and 1997 and the three months ended March 31, 1997 \,       ot considered in the computation of net income (loss) per common share since their effect is immaterial or antidilutive.

(k) USE OF ESTIMATES

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

(l) FINANCIAL INSTRUMENTS

The carrying amount of cash and cash equivalents, accounts receivable, accounts payable, and accrued expenses and note payable to stockholder approximates fair value due to the short maturity of these instruments.

F-8

A 631

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
(m) IMPAIRMENT OF LONG-LIVED ASSETS AND LONG-LIVED ASSETS TO BE DISPOSED OF

The Company adopted the provisions of Statement of Financial Accounting Standards (SFAS) No. 121, ACCOUNTING FOR THE IMPAIRMENT OF LONG-LIVED ASSETS AND FOR LONG-LIVED ASSETS TO BE DISPOSED OF, on January 1, 1996. This Statement requires that long-lived assets and certain identifiable intangibles be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceed the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell. Adoption of this Statement did not impact the Company's financial position, results of operations, or liquidity.

(n) STATEMENTS OF CASH FLOWS

The Company considers all short-term highly liquid instruments, with an original maturity of three months or less, to be cash equivalents.

(o) NEWLY ADOPTED ACCOUNTING PRONOUNCEMENTS

The Company adopted the reporting and disclosure requirements of SFAS No. 130, REPORTING COMPREHENSIVE INCOME, on January 1, 1998. This Statement requires the display of comprehensive income and its components in a financial statement that is displayed in equal prominence with other financial statements. As the Company has not had any comprehensive income components, the reporting and disclosure requirements of this statement have not altered the consolidated financial statements presented herein.

Effective January 1, 1998, the Company adopted Statement of Position (SOP) 98-1, ACCOUNTING FOR THE COSTS OF COMPUTER SOFTWARE DEVELOPED OR OBTAINED FOR INTERNAL USE, which was issued in March 1998. The SOP requires that certain costs. related to the development or purchase of internal-use software be capitalized and amortized over the estimated useful life of the software. The SOP also requires that costs related to the preliminary project stage and the post-implementation/operations stage of an internal-use computer software development project be expensed as incurred.

(2) INVENTORIES

Inventories consist of the following:

|  | DECEMBER 31 | | MARCH 31, 1998 |
|  | 1996 | 1997 | (UNAUDITED) |
| --- | --- | --- | --- |
| Finished goods | $ 41,323 | $ 2,063,803 | $ 2,526,767 |
| Component parts | 633,414 | 2,422,760 | 3,032,932 |
|  | $ 674,737 | $ 4,486,563 | $ 5,559,699 |

F-9

A 632

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

### (3) PROPERTY AND EQUIPMENT, NET

Property and equipment consists of the following:

| | DECEMBER 31, | | MARCH 31, 1998 |
|---|---|---|---|
| | 1996 | 1997 | (UNAUDITED) |
| Manufacturing equipment | $ 70,728 | $ 142,137 | $ 151,979 |
| Office and computer equipment | 100,368 | 660,145 | 2,237,891 |
| Accumulated depreciation | (47,146) | (198,459) | (295,076) |
| | $ 123,950 | $ 603,823 | $ 2,094,794 |

### (4) OTHER ASSETS, NET

Other assets, net, consist of the following:

| | DECEMBER 31, | |
|---|---|---|
| | 1996 | 1997 |
| Deposits, including amounts for fixed assets purchased | $ 97,498 | $ 380,836 |
| Infomercial costs | 267,677 | 233,365 |
| Patents | 14,522 | 9,527 |
| | $ 379,697 | $ 623,728 |

### (5) ACCRUED EXPENSES

Accrued expenses consist of the following:

| | DECEMBER 31, | | MARCH 31, 1998 |
|---|---|---|---|
| | 1996 | 1997 | (UNAUDITED) |
| Payroll, bonuses and commissions (see note 9) | $ 277,810 | $ 5,576,134 | $ 1,125,699 |
| Sales, property and state income taxes | 4,604 | 271,225 | 204,501 |
| Royalties | -- | 392,541 | 477,163 |
| Advertising | -- | 470,500 | 795,260 |
| Product warranty and sales returns | -- | 445,200 | 732,100 |
| Professional services | 9,807 | 340,389 | 220,491 |
| Other | 40,202 | 136,168 | 772,712 |
| | $ 332,423 | $ 7,636,157 | $ 4,327,926 |

F-10

A 633

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(6) COMMITMENTS

The Company is obligated under certain noncancelable leases for office space. A summary of the minimum rental commitments under noncancelable leases is as follows:

| YEARS ENDING DECEMBER 31, | |
|---|---|
| 1998 | $ 368,700 |
| 1999 | 456,000 |
| 2000 | 480,400 |
| 2001 | 488,500 |
| 2002 | 512,900 |
| Thereafter | 651,400 |

Rent expense was $32,540, $45,603, $104,480 $26,694 (unaudited) and $64,075 (unaudited) for the years ended December 31, 1995, 1996 and 1997, and the three months ended March 31, 1997 and 1998, respectively.

The Company had outstanding commitments (denominated in U.S. dollars ) on letters of credit of $459,167 at December 31, 1997, and $989,419 (unaudited) at March 31, 1998 for the purchase of inventory from foreign vendors.

(7) DEBT

The Company entered into a $1,500,000 revolving line of credit agreement with a bank on May 30, 1997. The line of credit is secured by trade receivables and inventories, matures on May 15, 1998 and bears interest, payable quarterly, at the bank's prime rate (8.5% at December 31, 1997). At December 31, 1997, there was no balance outstanding on this line of credit. The Company pays an annual commitment fee of 0.5% unused portion of the line of credit.

On February 27, 1998, the Company entered into a new $10,000,000 revolving credit facility with a bank which replaced the existing $1,500,000 line of credit. The facility is secured by eligible receivables, inventories and equipment, matures on December 31, 1998 and bears interest, payable monthly, at the bank's prime rate of interest minus 25 basis points (8.25% at March 31, 1998) or LIBOR rates plus 1.75% interest. At March 31, 1998, there was no balance outstanding on this credit facility. The Company pays an annual commitment fee of 0.25% on the unused portion of the credit facility.

During the first quarter of 1998, the Company borrowed $1,135,041 in the form of an unsecured note payable to the Chief Executive Officer. The principal balance is payable in three installments, matures on April 14, 1999, and bears interest at 5.39%.

F-11

A 634

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(8) INCOME TAXES

Income tax expense (benefit) for the year ended December 31, 1997 consists of the following:

| | YEAR ENDED DECEMBER 31, 1997 | | |
|---|---|---|---|
| | CURRENT | DEFERRED | TOTAL |
| Federal.......................................... | $ 1,020,980 | $ (572,785) | $ 448,195 |
| State............................................ | 234,568 | -- | 134,568 |
| | $ 1,255,548 | $ (572,785) | $ 582,763 |

Actual income tax expense differs from the "expected" income tax expense (benefit) (computed by applying the U.S. federal corporate tax rate of 34% to income (loss) before income taxes) for the years ended December 31, 1995, 1996 and 1997 as follows:

| | YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| Computed "expected" tax expense (benefit)...................... | $ (82,507) | $ 4,334 | $ (1,384,294) |
| State income taxes, net of federal tax benefit................. | -- | -- | 88,815 |
| Stock compensation and bonus award............................ | -- | -- | 2,159,000 |
| Change in valuation allowance for deferred tax assets.......... | 81,352 | (4,334) | (337,558) |
| Other.......................................................... | 1,155 | -- | 56,800 |
| | $ -- | $ -- | $ 582,763 |

The tax effects of temporary differences that give rise to deferred tax assets and deferred tax liabilities are presented below:

| | DECEMBER 31, | | |
|---|---|---|---|
| | 1996 | 1997 | MARCH 31, 1998 |
| | | | (UNAUDITED) |
| Deferred tax assets: | | | |
| Allowance for bad debts........................................ | $ 8,908 | $ 237,436 | $ 394,391 |
| Research and development costs................................. | 7,563 | 974 | -- |
| Bonus compensation............................................. | 72,678 | -- | -- |
| Product warranty and sales returns............................ | -- | 152,728 | 256,235 |
| Net operating tax loss carryforwards.......................... | 389,528 | 311,100 | 320,250 |
| Total gross deferred tax assets............................... | 478,677 | 702,238 | 970,876 |
| Less valuation allowance...................................... | (387,667) | (50,109) | (59,259) |
| Net deferred tax assets....................................... | 91,010 | 652,129 | 911,617 |
| Deferred tax liabilities--infomercial costs................... | (91,010) | (79,344) | (51,049) |
| Net............................................................ | $ -- | $ 572,785 | $ 860,568 |

In assessing the realizability of deferred income tax assets, management considers whether it is more likely than not that some portion or all of the deferred income tax assets will not be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of fu   taxable income during

F-12

A 635

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(8) INCOME TAXES (CONTINUED) the periods in which those temporary differences become deductible. Based upon projections for future taxable income over the periods which the deferred tax assets are deductible, management believes it is more likely than not that the Company will realize the benefits of these deductible differences, net of the existing valuation allowance at December 31, 1997.

The valuation allowance for deferred tax assets at December 31, 1996 and 1997 was $387,667 and $50,109, respectively. The net change in the total valuation allowance for the years ended December 31, 1996 and 1997 were decreases of $4,334 and $337,558, respectively.

At December 31, 1997, the Company has net operating tax loss carryforwards for federal income tax purposes of approximately $915,000 which are available to offset future federal taxable income through 2010. The availability of the net operating loss carryforwards to reduce future taxable income is subject to certain limitations. As a result of a change in ownership, the Company believes utilization of its net operating tax loss carryforwards is limited to approximately $62,000 per year for the remaining life of the net operating losses.

(9) STOCKHOLDERS' EQUITY

(a) STOCK OPTION PLANS

In April 1996, the Company adopted the 1996 Stock Option Incentive Plan ("the Stock Option Plan"), pursuant to which stock options covering an aggregate of 800,000 shares of the Company's common stock may be granted. Options are granted at prices that equate to or are above fair market value on the date of the grant; (ii) generally become exercisable over a period of one to four years; and (iii) generally expire five years subsequent to award.

At December 31, 1997 and March 31, 1998, there were 140,310 shares available for grant under the Plan. The per share weighted-average fair value of stock options granted during 1995 and 1996 was $0.25 and $0.06, respectively, on the date of grant using the Black Scholes option-pricing model with the following weighted-average assumptions: Risk-free interest rate, 6%; expected life, two-five years and expected dividend yield, 0%.

1.    ..nection with an employment agreement entered into in September 1995 with the Company's chief executive officer and founder, the Company granted the chief executive officer options to acquire 1,520,766 shares of common stock at $.375 per share, the market price at date of grant. Vesting of the stock options was conditioned upon meeting certain revenue and earnings requirements, which were met during 1996 and 1997. Also, the agreement provided for a bonus to be paid to the officer in an amount equal to the exercise price of the options plus any related income tax due by the officer upon exercise of the options. The officer notified the Company of his intent to exercise the options in December 1997 and the shares were issued in January 1998. Compensation expense of $213,760 and $2,300,023 was charged to operations in 1996 and 1997, respectively, to recognize the bonus due to the officer.

In conjunction with a 1996 stock purchase agreement, the Company granted options to a shareholder to acquire an aggregate of 942,632 shares of common stock at option exercise prices ranging from $0.375, the market price at date of grant, to $0.625 per share. During 1997, the shareholder exercised the options for an aggregate exercise price of $549,869:

A 636

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(9) STOCKHOLDERS' EQUITY (CONTINUED) In February 1998, the Company adopted the 1998 Stock Incentive Plan ("the 1998 Stock Option Plan"), pursuant to which stock options covering an aggregate of 1,800,000 shares of the Company's common stock may be granted. The Company granted 218,000 options to employees on February 26, 1998 at $2.50 per share. For financial statement reporting purposes, the grant was deemed to have a fair market value of $7.00 per share at the date of grant. Accordingly, the Company has recorded deferred compensation of $981,000 at March 31, 1998.

The Company applies Accounting Principles Board Opinion 25 in accounting for its stock plans and, accordingly, no compensation cost has been recognized for its stock options in the financial statements. Had the Company determined compensation cost based on the fair value at the grant date for its stock options under SFAS No. 123, the Company's net income (loss) would have been adjusted to the pro forma amounts indicated below:

|  | YEARS ENDED DECEMBER 31 | | |
|  | 1995 | 1996 | 1997 |
| Net income (loss): | | | |
| As reported.......................................... | $ (242,669) | $ 32,747 | $ (4,654,217) |
| Pro forma............................................ | (242,669) | (13,362) | (4,743,744) |
| Diluted income (loss) per common share: | | | |
| As reported.......................................... | $ (0.05) | $ 0.00 | $ (0.37) |
| Pro forma............................................ | (0.05) | (0.00) | (0.38) |

Pro forma net loss reflects only options granted in 1995, 1996 and 1997. Therefore, the full impact of calculating compensation cost for stock options under SFAS No. 123 is not reflected in the pro forma net loss amounts presented above because compensation cost is reflected over the respective options vesting periods of up to four years.

A summary of stock option activity follows:

|  | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE |
| Options outstanding at December 31, 1994........................ | -- | $ -- |
| Options granted................................................. | 1,520,766 | 0.375 |
| Options outstanding at December 31, 1995........................ | 1,520,766 | 0.375 |
| Options granted................................................. | 1,946,948 | 0.50 |
| Options outstanding at December 31, 1996........................ | 3,467,714 | 0.44 |
| Options exercised.............................................. | (946,104) | 0.583 |
| Options outstanding at December 31, 1997........................ | 2,521,610 | 0.375 |
| Options granted................................................. | 272,000 | 2.50 |
| Options exercised.............................................. | (2,475,944) | 0.375 |
| Options outstanding at March 31, 1998 (unaudited)............... | 313,666 | $ 2.22 |

At December 31, 1997, the exercise price and weighted-average remaining contractual life of outstanding options was $0.375 and 3.5 years, respectively.

At December 31, 1996 and 1997, the number of options exercisable was 467,970 and 2,114,492, respectively, and the weighted-average exercise price of those options was $0.375.

F-14

A 637

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(9) STOCKHOLDERS' EQUITY (CONTINUED)
(b) STOCK DISTRIBUTION

In connection with the acquisition of a related entity, the Company distributed 4,282,304 shares of common stock to its shareholders during the year ended December 31, 1995. As a result of the common control existing between the Company and the related entity, the transaction was accounted for in a manner similar to a pooling of interests. Accordingly, the transaction resulted in no increase to stockholders' equity since the recorded net asset value of the related entity was not material. The resulting subsidiary has been inactive during the three years ended December 31, 1997 and has no assets or liabilities.

(c) STOCK COMPENSATION AWARD

In December 1997, the Board of Directors of the Company approved a stock compensation award of 2,000,000 shares of common stock to its chief executive officer and founder of the Company. In addition, the Company agreed to pay all income taxes payable by the officer relating to such stock award and related tax bonus. Aggregate compensation of $12,541,688 (including $2,541,688 for estimated taxes) was recorded by the Company during the year ended December 31, 1997 based on the fair market value of the stock.

(d) NOTE WITH STOCKHOLDER CONVERTED TO STOCK

The Company borrowed $200,000 from a stockholder in October 1996 and an additional $250,000 from the same stockholder in 1997. The aggregate notes payable balance of $450,000 was converted into 900,000 shares of the Company's stock in September 1997.

(e) STOCK CONVERSION

During 1995, the Company amended its Certificate of Incorporation to provide the authority to issue up to 25,000,000 shares of $.001 per share value stock. All such shares were to be designated as common stock and, accordingly, all stockholders of preferred stock surrendered such for an equivalent number of shares of common stock.

(f) STOCK SPLIT AND AUTHORIZED CLASSES OF STOCK

Effective April 29, 1998, the stockholders of the Company authorized a two-for-one stock split for holders of record on May 1, 1998. The stock split has been reflected in the accompanying consolidated financial statements and, accordingly, all applicable dollar, share and per share amounts have been restated to reflect the stock split. In addition, the stockholders of the Company also approved an increase in the number of authorized shares of Common Stock to 50,000,000 and established a class of preferred stock with a par value of $.01 per share and authorized shares of 5,000,000.

(10) SUBSEQUENT EVENTS (UNAUDITED)

Effective May 1, 1998, the Company entered into an agreement with Nicholas A. Faldo, a professional golfer (the "Agreement"). The Agreement with Faldo, provides the Company with Faldo's endorsement and use of Adams products, as well as the design, development and testing of new technologies and products. As consideration for such services, Faldo will receive 900,000 shares of the Company's common stock which will be recorded and amortized over the estimated period benefited. In addition, Mr. Faldo will receive royalty payments representing 5% of net sales outside the U.S., with a minimum annual amount of $1,500,000 beginning in 1999 and increasing ratably to $4,000,000 in 2004. Under certain conditions, including the failure by the Company to effect an initial public offering by December 31, 1998, Faldo has the right to require the Company to repurchase the shares for $5,000,000 at which point the Company would have the right to terminate the agreement.

F-15

A 638

SCHEDULE II

ADAMS GOLF, INC. AND SUBSIDIARIES
YEARS ENDED DECEMBER 31, 1995, 1996
AND 1997 AND THREE MONTHS ENDED MARCH 31, 1998 (UNAUDITED)
VALUATION AND QUALIFYING ACCOUNTS

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS CHARGED TO: | | DEDUCTIONS (1) | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| | | COSTS AND EXPENSES | OTHER | | |
| Allowance for doubtful accounts: | | | | | |
| Year ended December 31, 1995............. | $  -- | $   12,791 | $  -- | $   12,791 | $  -- |
| Year ended December 31, 1996............. | $  -- | $   51,306 | $  -- | $   25,107 | $   26,199 |
| Year ended December 31, 1997............. | $  26,199 | $  738,805 | $  -- | $   66,663 | $  698,341 |
| Three months ended March 31, 1998 (unaudited)............................. | $  698,341 | $  466,223 | $  -- | $   37,723 | $ 1,126,831 |
| Product Warranty and Sales Returns: | | | | | |
| Year ended December 31, 1995............. | $  -- | $  -- | $  -- | $  -- | $  -- |
| Year ended December 31, 1996............. | $  -- | $   1,733 | $  -- | $   1,733 | $  -- |
| Year ended December 31, 1997............. | $  -- | $ 1,808,154 | $  -- | $ 1,358,954 | $  449,200 |
| Three months ended March 31, 1998 (unaudited)............................. | $  449,200 | $ 1,078,407 | $  -- | $  795,507 | $  732,100 |

(1) Represents uncollectible accounts charged against the allowance for doubtful accounts and actual costs incurred for warranty repairs and sales returns.

F-16

A 639

[This Page Intentionally Left Blank]

[This Page Intentionally Left Blank]

NO DEALER, SALESPERSON OR OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED ON AS HAVING BEEN AUTHORIZED BY THE COMPANY, THE SELLING STOCKHOLDERS OR THE UNDERWRITERS. THIS PROSPECTUS DOES NOT STITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OTHER THAN THE ITERED SECURITIES TO WHICH IT RELATES IN ANY STATE TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE OFFER OR SOLICITATION IN SUCH STATE. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE.

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Prospectus Summary | 3 |
| Risk Factors | 6 |
| Disclosure Regarding Forward-Looking Statements | 12 |
| Use of Proceeds | 13 |
| Dividend Policy | 13 |
| Dilution | 14 |
| Capitalization | 15 |
| Selected Consolidated Financial Information | 16 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Business | 22 |
| Management | 33 |
| Certain Transactions | 42 |
| Principal and Selling Stockholders | 44 |
| Description of Capital Stock | 45 |
| Shares Eligible for Future Sale | 48 |
| Underwriting | 48 |
| Legal Matters | 49 |
| Experts | 51 |
| Additional Information | 51 |
| Index to Financial Statements | F-1 |

UNTIL AUGUST 4, 1998 (25 DAYS AFTER THE DATE OF THIS PROSPECTUS), ALL DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

6,000,000 SHARES

[LOGO]

COMMON STOCK

PROSPECTUS

July 9, 1998

LEHMAN BROTHERS

NATIONSBANC MONTGOMERY SECURITIES LLC

FERRIS, BAKER WATTS

INCORPORATED

A 642

of Filing

Powered by EDGAR

© 2005 | EDGAR Online, Inc.

A 643

H.1. Executed Underwriting Agreement



UND 02875

A 644

6,000,000 Shares

ADAMS GOLF, INC.

Common Stock

<u>UNDERWRITING AGREEMENT</u>

July 9, 1998

LEHMAN BROTHERS INC.
NATIONSBANC MONTGOMERY SECURITIES LLC
FERRIS, BAKER WATTS INCORPORATED
As Representatives of the several
  Underwriters named in Schedule 1,
c/o Lehman Brothers Inc.
Three World Financial Center
New York, New York 10285

Dear Sirs:

ADAMS GOLF, INC., a Delaware corporation (the "Company"), and certain stockholders of the Company named in Schedule 2 hereto (the "Selling Stockholders"), propose to sell an aggregate of 6,000,000 shares (the "Firm Stock") of the Company's Common Stock, par value $0.001 per share (the "Common Stock"). Of the 6,000,000 shares of the Firm Stock, 4,000,000 shares are being sold by the Company and 2,000,000 shares are being sold by the Selling Stockholders. In addition, the Selling Stockholders propose to grant to the Underwriters named in Schedule 1 hereto (the "Underwriters") an option to purchase up to an additional 900,000 shares of the Common Stock on the terms and for the purposes set forth in Section 3 (the "Option Stock"). The Firm Stock and the Option Stock, if purchased, are hereinafter collectively called the "Stock." This is to confirm the agreement concerning the purchase of the Stock from the Company and the Selling Stockholders by the Underwriters.

1.    *Representations, Warranties and Agreements of the Company and Certain Selling Stockholders.*  Each of the Company and B.H. Adams and Richard H. Murtland (the "Management Stockholders") severally represents, warrants and agrees that:

(a)    A registration statement on Form S-1 (File No. 333-51715) with respect to the Stock has (i) been prepared by the Company in conformity with the requirements of the Securities Act of 1933, as amended (the "Securities Act"), and the rules and regulations (the "Rules and Regulations") of the United States Securities and Exchange Commission (the "Commission") thereunder, (ii) been filed with the Commission under the Securities Act and (iii) become effective under the Securities Act. Copies of such registration statement have been delivered by the Company to you as the representatives (the "Representatives") of the Underwriters. As used in this Agreement, "Effective Time" means the date and the time as of which such registration statement, or the most recent post-effective amendment thereto, if any, was declared effective by the Commission; "Effective Date" means the date of the Effective Time; "Preliminary Prospectus" means each prospectus included in such registration statement, or amendments thereof, before it became effective under the Securities Act and any

UND 02876

A 645

prospectus filed with the Commission by the Company pursuant to Rule 424(a) of the Rules and Regulations; "Registration Statement" means such registration statement, as amended at the Effective Time, including all information contained in the final prospectus filed with the Commission pursuant to Rule 424(b) of the Rules and Regulations in accordance with Section 6(a) hereof and deemed to be a part of the registration statement as of the Effective Time pursuant to paragraph (b) of Rule 430A of the Rules and Regulations and, in the event of any amendment thereto or the filing of any abbreviated registration statement pursuant to Rule 462(b) of the Rules and Regulations relating thereto after the Effective Date, shall also mean (from and after the effectiveness of such amendment or the filing of such abbreviated registration statement) such registration statement as so amended, together with any such abbreviated registration statement; and "Prospectus" means such final prospectus, as first filed with the Commission pursuant to paragraph (1) or (4) of Rule 424(b) of the Rules and Regulations. The Commission has not issued any order preventing or suspending the use of any Preliminary Prospectus or instituted proceedings for that purpose.

(b)    (i) The Registration Statement conforms, and the Prospectus and any further amendments or supplements to the Registration Statement or the Prospectus will, when they become effective or are filed with the Commission, as the case may be and at all times subsequent thereto up to and including the First Delivery Date (as defined in Section 5) and the Second Delivery Date (as defined in Section 5), conform in all material respects to the requirements of the Securities Act and the Rules and Regulations; (ii) the Registration Statement, and any amendments and supplements thereto, did not and will not, as the applicable effective date, contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and (iii) the Prospectus, and any amendments or supplements thereto, did not and will not, as of the date thereof, contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made; *provided that* no representation or warranty is made as to information contained in or omitted from the Registration Statement or the Prospectus in reliance upon and in conformity with written information furnished to the Company through the Representatives by or on behalf of any Underwriter specifically for inclusion therein.

(c)    The Company and each of its subsidiaries (as defined in Section 17) which is a corporation have been duly incorporated and are validly existing as corporations in good standing under the laws of their respective jurisdictions of incorporation, are duly qualified to do business and are in good standing as foreign corporations in each jurisdiction in which their respective ownership or lease of property or the conduct of their respective businesses requires such qualification, except where the failure to so qualify would not have a material adverse effect on the consolidated financial position, stockholders' equity, results of operations, business or prospects of the Company and its subsidiaries, taken as a whole ("Material Adverse Effect"), and have all power and authority necessary to own or hold their respective properties and to conduct the businesses in which they are engaged; each of the Company's subsidiaries which is a limited partnership is duly formed, validly existing and in good standing under the laws

UND 02877

A 646

of its respective jurisdiction and each such subsidiary has all requisite partnership power and authority under its certificate of limited partnership and agreement of limited partnership to hold its properties and to conduct the businesses in which it is engaged; and none of the subsidiaries of the Company is a "significant subsidiary", as such term is defined in Rule 405 of the Rules and Regulations, other than Adams Golf Holding Corp., Adams Golf GP Corp., Adams Golf Management Corp., Adams Golf Direct Response, Ltd., Adams Golf, Ltd. and Adams Golf IP, L.P. The Company does not have any subsidiaries other than those set forth on Exhibit 21.1 to the Registration Statement.

(d)    The Company has an authorized capitalization as set forth in the Prospectus, and all of the issued and outstanding shares of capital stock of the Company have been duly and validly authorized and issued, are fully paid and non-assessable and conform in all material respects to the description thereof contained in the Prospectus; and all of the issued shares of capital stock of each subsidiary of the Company have been duly and validly authorized and issued and are fully paid and non-assessable and are owned directly or indirectly by the Company, free and clear of all liens, encumbrances, equities or claims.

(e)    The unissued shares of the Stock to be issued and sold by the Company to the Underwriters hereunder have been duly and validly authorized and, when issued and delivered against payment therefor as provided herein, will be duly and validly issued, fully paid and non-assessable; and the Stock will conform in all material respects to the descriptions thereof contained in the Prospectus.

(f)    This Agreement has been duly authorized, executed and delivered by the Company.

(g)    The execution, delivery and performance of this Agreement by the Company and the consummation of the transactions contemplated hereby will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound or to which any of the property or assets of the Company or any of its subsidiaries is subject, except where such conflict, breach, violation or default would not have a Material Adverse Effect, nor will such actions result in any violation of the provisions of the charter, bylaws, certificate of limited partnership or agreement of limited partnership, as applicable, of the Company or any of its subsidiaries or any statute, rule or regulation or any order known to the Company of any court or governmental agency or body having jurisdiction over the Company or any of its subsidiaries or any of their properties or assets, except where such violation would not have a Material Adverse Effect; and except for the registration of the Stock under the Securities Act and such consents, approvals, authorizations, registrations or qualifications as may be required under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and applicable state securities laws in connection with the purchase and distribution of the Stock by the Underwriters, no consent, approval, authorization or order of, or filing or registration with, any such court or governmental

UND 02878

A 647

agency or body is required for the execution, delivery and performance of this Agreement by the Company and the consummation of the transactions contemplated hereby.

(h)     Except as described or referred to in the Prospectus, there are no contracts, agreements or understandings between the Company and any person granting such person the right (other than rights which have been waived or satisfied) to require the Company to file a registration statement under the Securities Act with respect to any securities of the Company owned or to be owned by such person or to require the Company to include such securities in the securities registered pursuant to the Registration Statement or in any securities being registered pursuant to any other registration statement filed by the Company under the Securities Act.

(i)     Except as described or referred to in the Registration Statement, the Company has not sold or issued any shares of Common Stock during the six-month period preceding the date of the Prospectus, including any sales pursuant to Rule 144A or Regulations D or S under the Securities Act, other than shares issued to employee benefit plans, qualified stock options plans or other employee compensation plans or pursuant to outstanding options, rights or warrants.

(j)     Neither the Company nor any of its subsidiaries has sustained, since the date of the latest financial statements included in the Prospectus, any loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Prospectus, in each case except for such loss or interference as would not have a Material Adverse Effect; and, since such date, there has not been any change in the capital stock or long-term debt of the Company or any of its subsidiaries or any material adverse change, or any development known to the Company involving a prospective material adverse change, in or affecting the general affairs, management, financial position, stockholders' equity or results of operations of the Company and its subsidiaries, otherwise than as set forth or contemplated in the Prospectus.

(k)     The financial statements (including the related notes and supporting schedules) filed as part of the Registration Statement or included in the Prospectus present fairly the consolidated financial condition and results of operations of the entities purported to be shown thereby, at the dates and for the periods indicated, and have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods involved, except as otherwise stated therein.

(l)     KPMG Peat Marwick LLP ("KPMG"), who have certified certain financial statements of the Company, whose report appears in the Prospectus and who have delivered the initial letter referred to in Section 9(g) hereof, have advised the Company that they are independent public accountants as required by the Securities Act and the Rules and Regulations.

(m)     Neither the Company nor any of its subsidiaries owns any real property; the Company and each of its subsidiaries have good and defensible title to all personal property owned by them, in each case free and clear of all liens, encumbrances and

196239 v7/SF
43yn07L.DOC
071398

4.

UND 02879

A 648

defects except (i) such as are described or referred to in the Prospectus or (ii) such as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and its subsidiaries; and all real property and buildings held under lease by the Company and its subsidiaries are held by them under valid and subsisting leases enforceable against the Company, with such exceptions as are not material and do not interfere in any material respect with the use made and proposed to be made of such property and buildings by the Company and its subsidiaries.

(n)    The Company and each of its subsidiaries carry, or are covered by, insurance in such amounts and covering such risks as in the reasonable good faith judgment of the Company, is adequate for the conduct of their respective businesses and the value of their respective properties.

(o)    Except as described in the Prospectus, the Company and each of its subsidiaries own or possess adequate rights to use all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights and licenses necessary for the conduct of their respective businesses and have no reason to believe that the conduct of their respective businesses will conflict with, and have not received any notice of any claim of conflict with, any such rights of others.

(p)    There are no legal or governmental proceedings pending to which the Company or any of its subsidiaries is a party or of which any property or assets of the Company or any of its subsidiaries is the subject which, if determined adversely to the Company or any of its subsidiaries, would reasonably be expected to have a Material Adverse Effect and, to the actual knowledge of the Company, no such proceedings are threatened by governmental authorities or others.

(q)    There are no contracts or other documents that are required to be described in the Prospectus or filed as exhibits to the Registration Statement by the Securities Act or by the Rules and Regulations that have not been described in the Prospectus or filed as exhibits to the Registration Statement or incorporated therein by reference as permitted by the Rules and Regulations.

(r)    No relationship, direct or indirect, exists between or among the Company on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company on the other hand, that is required to be described in the Prospectus that is not so described.

(s)    No labor disturbance by the employees of the Company exists or, to the actual knowledge of the Company, is imminent that would reasonably be expected to have a Material Adverse Effect.

(t)    The Company and its subsidiaries have filed all federal, state and local income and franchise tax returns required to be filed through the date hereof and have paid all taxes due thereon, and no tax deficiency has been determined adversely to the Company or any of its subsidiaries which has had (nor does the Company have any actual

UND 02880

A 649

knowledge of any tax deficiency which, if determined adversely to the Company or any of its subsidiaries, would reasonably be expected to have) a Material Adverse Effect. The Company and its subsidiaries have paid all sales and use taxes owed through the date hereof in each jurisdiction in which any such taxes are owed, except where the failure to pay would not have a Material Adverse Effect. All tax liabilities are adequately provided for on the books of the Company and its subsidiaries.

(u)     Since the date as of which information is given in the Prospectus through the date hereof, and except as may otherwise be disclosed in the Prospectus, the Company has not (i) issued or granted any securities, (ii) incurred any material liability or obligation, direct or contingent, other than those incurred in the ordinary course of business, (iii) entered into any material transaction not in the ordinary course of business or (iv) declared or paid any dividend on its capital stock.

(v)     The Company (i) makes and keeps accurate books and records and (ii) maintains internal accounting controls that provide reasonable assurance that (A) transactions are executed in accordance with management's authorization, (B) transactions are recorded as necessary to permit preparation of its financial statements and to maintain accountability for its assets, (C) access to its assets is permitted only in accordance with management's authorization and (D) the reported accountability for its assets is compared with existing assets at reasonable intervals.

(w)     Neither the Company nor any of its subsidiaries (i) is in violation of its charter, bylaws, certificate of limited partnership or agreement of limited partnership, as applicable, (ii) is in default, and no event has occurred which, with notice or lapse of time or both, would constitute a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which it is a party or by which it is bound or to which any of its properties or assets is subject, in each case except for any default that would not reasonably be expected to have a Material Adverse Effect, or (iii) is in violation of any law, ordinance, governmental rule, regulation or court decree known to the Company to which it or its property or assets may be subject or has failed to obtain any license, permit, certificate, franchise or other governmental authorization or permit necessary to the ownership of its property or to the conduct of its business, in each case except where such violation or failure to obtain, as the case may be, would not reasonably be expected to have a Material Adverse Effect.

(x)     Neither the Company nor any of its subsidiaries, nor, to the Company's actual knowledge, any director, officer, agent, employee or other person associated with or acting on behalf of the Company or any of its subsidiaries, has used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or made any bribe, illegal rebate, payoff, influence payment, kickback or other unlawful payment.

(y)     Except as set forth in the Registration Statement and Prospectus, (i) each of the Company and its subsidiaries is in material compliance with all rules, laws and

196239-v7/SF
4Bys07!.DOC
071398

6.

UND 02881

A 650

regulations relating to the use, treatment, storage and disposal of toxic substances and protection of health or the environment ("Environmental Laws") which are applicable to its business, (ii) neither the Company nor any of its subsidiaries has received any notice from any governmental authority or third party of an asserted claim under Environmental Laws, which claim is required to be disclosed in the Registration Statement and the Prospectus, (iii) to its actual knowledge, neither the Company nor any of its subsidiaries will be required to make future material capital expenditures to comply with Environmental Laws and (iv) no property that is owned, leased or occupied by the Company or any of its subsidiaries has been designated as a Superfund site pursuant to the Comprehensive Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601, *et seq.*), or otherwise designated as a contaminated site under applicable state or local law.

(z)     The Company has not distributed and will not distribute prior to the later of (i) the First Delivery Date, or the Second Delivery Date, as the case may be, and (ii) completion of the distribution of the Firm Stock, any offering material in connection with the offering and sale of the Stock other than any Preliminary Prospectus, the Prospectus, the Registration Statement and other materials, if any, permitted by the Securities Act.

(aa)     The Company has not taken and will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Stock.

(bb)     The Common Stock has been approved for quotation on the Nasdaq National Market, subject to official notice of issuance.

(cc)     The Company is not, and upon completion of the transactions contemplated hereby will not be, subject to registration as an Investment Company Act of 1940, as amended (the "1940 Act"), and the rules and regulations thereunder.

(dd)     Other than the Representatives, since its inception, the Company has not granted any individual or entity any rights to underwrite any public or private offering of any of the Company's securities.

2.     *Representations, Warranties and Agreements of the Selling Stockholders.* Each Selling Stockholder (including the Management Stockholders) severally represents, warrants and agrees, solely with respect to such Selling Stockholder that:

(a)     The Selling Stockholder has, and immediately prior to the First Delivery Date (as defined in Section 5 hereof) the Selling Stockholder will have, good and valid title to the shares of Stock to be sold by the Selling Stockholder hereunder on such date, free and clear of all liens, encumbrances, equities or claims; and upon delivery of such shares and payment therefor pursuant hereto, good and valid title to such shares, free and clear of all liens, encumbrances, equities or claims, will pass to the several Underwriters.

UND 02882

A 651

(b)    The Selling Stockholder has placed in custody under a custody agreement (the "Custody Agreement" and, together with all other similar agreements executed by the other Selling Stockholders, the "Custody Agreements") with The Bank of New York, as custodian (the "Custodian"), for delivery under this Agreement, certificates in negotiable form endorsed in blank or accompanied by blank stock powers duly executed (with signature guaranteed by an "eligible guarantor institution" as defined in Rule 17Ad-15 under the Exchange Act), representing the shares of Stock to be sold by the Selling Stockholder hereunder.

(c)    The Selling Stockholder has duly and irrevocably executed and delivered a power of attorney (the "Power of Attorney" and, together with all other similar agreements executed by the other Selling Stockholders, the "Powers of Attorney") appointing B.H. Adams and Richard H. Murtland as attorneys-in-fact (the "Attorneys-in-Fact"), with full power of substitution, and with full authority (exercisable by either or both of them) to execute and deliver this Agreement and to take such other action as may be necessary or desirable to carry out the provisions hereof on behalf of the Selling Stockholder.

(d)    If the Selling Stockholder is a corporate entity, such Selling Stockholder has the corporate power and authority to enter into this Agreement, the Power of Attorney and the Custody Agreement; the execution, delivery and performance of this Agreement, the Power of Attorney and the Custody Agreement by the Selling Stockholder and the consummation by the Selling Stockholder of the transactions contemplated hereby and thereby will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any material indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Selling Stockholder is a party or by which the Selling Stockholder is bound or to which any of the property or assets of the Selling Stockholder is subject, nor will such actions result in any violation of the provisions of the charter or bylaws of the Selling Stockholder, if applicable, the articles or certificate of partnership of the Selling Stockholder, the deed of trust of the Selling Stockholder or any statute, rule or regulation or any known order of any court or governmental agency or body having jurisdiction over the Selling Stockholder or the property or assets of the Selling Stockholder; and, except for the registration of the Stock under the Securities Act and such consents, approvals, authorizations, registrations or qualifications as may be required under the Exchange Act and applicable state securities laws in connection with the purchase and distribution of the Stock by the Underwriters, no consent, approval, authorization or order of, or filing or registration with, any such court or governmental agency or body is required for the execution, delivery and performance of this Agreement, the Power of Attorney or the Custody Agreement by the Selling Stockholder and the consummation by the Selling Stockholder of the transactions contemplated hereby and thereby.

(e)    The Registration Statement, and any amendments or supplements thereto, did not and will not, as of the applicable effective date, contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, and the Prospectus, and any amendments or supplements thereto, did not and will not, as of the date thereof, contain an untrue

198239 v7/SF
48ym071.DOC
671398

8.

UND 02883

A 652

statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made; *provided that*, with respect to those Selling Stockholders that are not Management Stockholders, the foregoing shall apply in each case only insofar as such statements relate to the Selling Stockholder; *provided further* that no representation or warranty is made as to information contained in or omitted from the Registration Statement or the Prospectus in reliance upon and in conformity with written information furnished to the Company through the Representatives by or on behalf of any Underwriter specifically for inclusion therein.

(f)     The Selling Stockholder has no reason to believe (without having conducted any investigation or inquiry) that the representations and warranties of the Company contained in Section 1 hereof are not materially true and correct, is familiar with the Registration Statement and the Prospectus (as amended or supplemented) and has no actual knowledge of any material fact, condition or information not disclosed in the Registration Statement, as of the effective date, or the Prospectus (or any amendment or supplement thereto), as of the applicable filing date, which has had or would reasonably be expected to have a Material Adverse Effect and is not prompted to sell shares of Common Stock by any information concerning the Company which is not set forth in the Registration Statement and the Prospectus; *provided, however*, with respect to those Selling Stockholders that are not Management Stockholders, nothing in this Section 2(f) shall be deemed to constitute a guarantee of the representations and warranties made by the Company in Section 1 hereof.

(g)     The Selling Stockholder has not taken and will not take, directly or indirectly, any action which is designed to or that would reasonably be expected to cause or result in the stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the shares of the Stock.

(h)     The Selling Stockholder has not distributed and will not distribute any prospectus or other offering material in connection with the offering and sale of the Stock.

(i)     All information furnished by or on behalf of the Selling Stockholder relating to the Selling Stockholder and the Stock to be sold by the Selling Stockholder that is contained in the representations and warranties of the Selling Stockholder in the Selling Stockholder's Power of Attorney or set forth in the Registration Statement or the Prospectus is, and at the time the Registration Statement became or becomes, as the case may be, effective and at all times subsequent thereto up to and on the First Delivery Date, and on the Second Delivery Date, was or will be, true, correct and complete in all material respects, and does not, and at the time the Registration Statement became or becomes, as the case may be, effective and at all times subsequent thereto up to and on the First Delivery Date, and on the Second Delivery Date, will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make such information not misleading.

(j)     The Selling Stockholder does not have, or has waived prior to the date hereof, any preemptive right, co-sale right or right of first refusal or other similar right to

19K239-v1/SF
48ya071.DOC
071398

9.

UND 02884

A 653

purchase any of the Stock that is to be sold by the Company or any of the other Selling Stockholders to the Underwriters pursuant to this Agreement; the Selling Stockholder does not have, or has waived prior to the date hereof, any registration right or other similar right to participate in the offering made by the Prospectus, other than such rights of participation as have been satisfied by the participation of the Selling Stockholder in the transactions to which this Agreement relates in accordance with the terms of this Agreement; and the Selling Stockholder does not own any warrants, options or similar rights to acquire, and does not have any right or arrangement to acquire, any capital stock, rights, warrants, options or other securities from the Company, other than those described or referred to in the Registration Statement and the Prospectus.

3.    *Purchase of the Stock by the Underwriters.*  On the basis of the representations and warranties contained in, and subject to the terms and conditions of, this Agreement, the Company agrees to sell 4,000,000 shares of the Firm Stock and each Selling Stockholder hereby agrees to sell the number of shares of the Firm Stock set opposite its/his/her name in Schedule 2 hereto, severally and not jointly, to the several Underwriters and each of the Underwriters, severally and not jointly, agrees to purchase the number of shares of the Firm Stock set opposite that Underwriter's name in Schedule 1 hereto. Each Underwriter shall be obligated to purchase from the Company, and from each Selling Stockholder, that number of shares of the Firm Stock that represents the same proportion of the number of shares of the Firm Stock to be sold by the Company, and by each Selling Stockholder, as the number of shares of the Firm Stock set forth opposite the name of such Underwriter in Schedule 1 represents of the total number of shares of the Firm Stock to be purchased by all of the Underwriters pursuant to this Agreement. The respective purchase obligations of the Underwriters with respect to the Firm Stock shall be rounded among the Underwriters to avoid fractional shares, as the Representatives may determine.

In addition, the Company and the Selling Stockholders collectively grant to the Underwriters an option to purchase up to 900,000 shares of Option Stock. Such option is granted for the purpose of covering over-allotments in the sale of Firm Stock and is exercisable as provided in Section 5 hereof. If less than all of the shares of Option Stock are purchased by the Underwriters, then all purchases of shares of Option Stock from the Selling Stockholders shall be made in proportion to, but not greater than, the number of shares of Option Stock set forth opposite the name of Company and the names of such Selling Stockholders in Schedule 2 hereto. Shares of Option Stock shall be purchased severally for the account of the Underwriters in proportion to the number of shares of Firm Stock set forth opposite the names of such Underwriters in Schedule 1 hereto. The respective purchase obligations of each Underwriter with respect to the Option Stock shall be adjusted by the Representatives so that no Underwriter shall be obligated to purchase Option Stock other than in 100 share amounts. Upon exercise of the option by the Underwriters, each of the Company and the Selling Stockholders agrees to sell to the Underwriters the number of shares of Option Stock set forth in the notice delivered pursuant to Section 5 hereof. The price of both the Firm Stock and any Option Stock shall be $14.88 per share.

The Selling Stockholders shall not be obligated to deliver any of the Stock to be delivered on the First Delivery Date or the Second Delivery Date, as the case may be, except upon payment for all the Stock to be purchased on such Delivery Date as provided herein.

198239 v7/SF
48jn07!LDOC
071398

UND 02885

A 654

4.     *Offering of Stock by the Underwriters.*

Upon authorization by the Representatives of the release of the Firm Stock, the several Underwriters shall offer the Firm Stock for sale upon the terms and conditions set forth in the Prospectus. The Firm Stock initially is to be offered to the public at the initial public offering price provided for in Section 3. After the initial public offering, the Representatives may from time to time increase or decrease the public offering price, in their sole discretion, by reason of changes in general market conditions or otherwise.

It is understood that 575,000 shares of the Firm Stock will initially be reserved by the several Underwriters for offer and sale upon the terms and conditions set forth in the Prospectus and in accordance with the rules and regulations of the National Association of Securities Dealers, Inc. to employees and persons having business relationships with the Company and its subsidiaries who have heretofore delivered to the Representatives offers or indications of interest to purchase shares of Firm Stock in form satisfactory to the Representatives, and that any allocation of such Firm Stock among such persons will be made in accordance with timely directions received by the Representatives from the Company; *provided that,* under no circumstances will the Representatives or any Underwriter be liable to the Company or to any such person for any action taken or omitted in good faith in connection with such offering to employees and persons having business relationships with the Company and its subsidiaries. It is further understood that any shares of such Firm Stock that are not purchased by such persons will be offered by the Underwriters to the public upon the terms and conditions set forth in the Prospectus.

5.     *Delivery of and Payment for the Stock.*  Delivery of and payment for the Firm Stock shall be made at the office of Arter & Hadden LLP, 1717 Main Street, Suite 4100, Dallas, Texas, at 10:00 A.M., New York City time, on (a) the third full business day following the date of this Agreement, (b) if this Agreement is executed and delivered after 4:30 p.m. Eastern time, the fourth full business day following the date of this Agreement, or (c) at such other date or place as shall be determined by agreement between the Representatives and the Company. This date and time are sometimes referred to as the "First Delivery Date." On the First Delivery Date, the Company and the Selling Stockholders shall deliver or cause to be delivered certificates representing the Firm Stock to the Representatives for the account of each Underwriter against payment to or upon the order of the Company and the Selling Stockholders of the purchase price by wire transfer in immediately available funds. Time shall be of the essence, and delivery at the time and place specified pursuant to this Agreement is a further condition of the obligation of each Underwriter hereunder. Upon delivery, the Firm Stock shall be registered in such names and in such denominations as the Representatives shall request in writing not less than two full business days prior to the First Delivery Date. For the purpose of expediting the checking and packaging of the certificates for the Firm Stock, the Company and the Selling Stockholders shall make the certificates representing the Firm Stock available for inspection by the Representatives in New York, New York, not later than 2:00 P.M., New York City time, on the business day prior to the First Delivery Date.

At any time on or before the thirtieth day after the date of this Agreement, the option granted in Section 3 may be exercised by written notice being given to the Company and the Attorneys-in-Fact on behalf of the Selling Stockholders by the Representatives. Such notice shall set forth the aggregate number of shares of Option Stock as to which the option is being exercised, the names in

UND 02886

which the shares of Option Stock are to be registered, the denominations in which the shares of Option Stock are to be issued and the date and time, as determined by the Representatives, when the shares of Option Stock are to be delivered; *provided, however*, that this date and time shall not be earlier than the First Delivery Date nor earlier than the third business day after the date on which the option shall have been exercised nor later than the fifth business day after the date on which the option shall have been exercised. The date and time the shares of Option Stock are delivered are sometimes referred to as the "Second Delivery Date" and the First Delivery Date and the Second Delivery Date are sometimes each referred to as a "Delivery Date").

Delivery of and payment for the Option Stock shall be made at the place specified in the first sentence of the first paragraph of this Section 5 (or at such other place as shall be determined by agreement between the Representatives and the Company) at 10:00 A.M., New York City time, on the Second Delivery Date. On the Second Delivery Date, the Company and the Selling Stockholders shall deliver or cause to be delivered the certificates representing the Option Stock to the Representatives for the account of each Underwriter against payment to or upon the order of the Company and the Selling Stockholders of the purchase price by wire transfer in immediately available funds. Time shall be of the essence, and delivery at the time and place specified pursuant to this Agreement is a further condition of the obligation of each Underwriter hereunder. Upon delivery, the Option Stock shall be registered in such names and in such denominations as the Representatives shall request in the aforesaid written notice. For the purpose of expediting the checking and packaging of the certificates for the Option Stock, the Company and the Selling Stockholders shall make the certificates representing the Option Stock available for inspection by the Representatives in New York, New York, not later than 2:00 P.M., New York City time, on the business day prior to the Second Delivery Date.

6.    *Further Agreements of the Company.* The Company agrees:

(a)    To prepare the Prospectus in a form approved by the Representatives and to file such Prospectus pursuant to Rule 424(b) under the Securities Act not later than the Commission's close of business on the second business day following the execution and delivery of this Agreement or, if applicable, such earlier time as may be required by Rule 430A(a)(3) under the Securities Act; to make no further amendment or any supplement to the Registration Statement or to the Prospectus except as permitted herein; to advise the Representatives, promptly after it receives notice thereof, of the time when any amendment to the Registration Statement has been filed or becomes effective or any supplement to the Prospectus or any amended Prospectus has been filed and to furnish the Representatives with copies thereof; to advise the Representatives, promptly after it receives notice thereof, of the issuance by the Commission of any stop order or of any order preventing or suspending the use of any Preliminary Prospectus or the Prospectus, of the suspension of the qualification of the Stock for offering or sale in any jurisdiction, of the initiation or threatening of any proceeding for any such purpose, or of any request by the Commission for the amending or supplementing of the Registration Statement or the Prospectus or for additional information; and, in the event of the issuance of any stop order or of any order preventing or suspending the use of any Preliminary Prospectus or the Prospectus or suspending any such qualification, to use promptly its best efforts to obtain its withdrawal;

19E239-v7/SF
4B3n07LDOC
071398

12.

UND 02887

A 656

(b)    To furnish promptly to each of the Representatives and to counsel for the Underwriters a copy of the Registration Statement as originally filed with the Commission, and each amendment thereto filed with the Commission, including all consents and exhibits filed therewith;

(c)    To deliver promptly to the Representatives such number of the following documents as the Representatives shall reasonably request: (i) conformed copies of the Registration Statement as originally filed with the Commission and each amendment thereto (in each case excluding exhibits other than this Agreement and the computation of per share earnings) and (ii) each Preliminary Prospectus, the Prospectus and any amended or supplemented Prospectus; and, if the delivery of a prospectus is required at any time after the Effective Time in connection with the offering or sale of the Stock or any other securities relating thereto and if at such time any events shall have occurred as a result of which the Prospectus as then amended or supplemented would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made when such Prospectus is delivered, not misleading, or, if for any other reason it shall be necessary to amend or supplement the Prospectus in order to comply with the Securities Act, to notify the Representatives and to file such document and to prepare and furnish without charge to each Underwriter and to any dealer in securities as many copies as the Representatives may from time to time reasonably request of an amended or supplemented Prospectus that will correct such statement or omission or effect such compliance;

(d)    To file promptly with the Commission any amendment to the Registration Statement or the Prospectus or any supplement to the Prospectus that may, in the judgment of the Company or the Representatives, be required by the Securities Act or requested by the Commission, including any abbreviated registration statement pursuant to Rule 462(b) of the Rules and Regulations;

(e)    Prior to filing with the Commission any amendment to the Registration Statement or supplement to the Prospectus or any Prospectus pursuant to Rule 424 of the Rules and Regulations, to furnish a copy thereof to the Representatives and counsel for the Underwriters and not to make any such filing to which the Representatives object in writing, subject to compliance with the Securities Act and the Rules and Regulations and the provisions of this Agreement;

(f)    As soon as practicable after the Effective Date (it being understood that the Company shall have until at least 410 or, if the fourth quarter following the fiscal quarter that includes the Effective Date is the last fiscal quarter of the Company's fiscal year, 455 days after the end of the Company's current fiscal quarter), to make generally available to the Company's security holders and to deliver to the Representatives an earnings statement of the Company and its subsidiaries (which need not be audited) complying with Section 11(a) of the Securities Act and the Rules and Regulations (including, at the option of the Company, Rule 158);

(g)    For a period of five years following the Effective Date, to furnish to the Representatives copies of all materials furnished by the Company to its stockholders and

198229·V7/SF
48yn07I.DOC
071358

13.

UND 02888

A 657

all public reports and all reports and financial statements furnished by the Company to the principal national securities exchange upon which the Common Stock may be listed pursuant to requirements of or agreements with such exchange or to the Commission pursuant to the Exchange Act or any rule or regulation of the Commission thereunder;

(h)    Promptly from time to time to take such action as the Representatives may reasonably request to qualify the Stock for offering and sale under the securities laws of such jurisdictions within the United States as the Representatives may request and to comply with such laws so as to permit the continuance of sales and dealings therein in such jurisdictions for as long as may be necessary to complete the distribution of the Stock; *provided* that in connection therewith the Company shall not be required to qualify as a foreign corporation or to file a general consent to service of process in any jurisdiction;

(i)    For a period of 180 days from the date of the Prospectus, not to, directly or indirectly, (1) offer for sale, sell, pledge or otherwise dispose of (or enter into any transaction or device which is designed to, or would reasonably be expected to, result in the disposition by any person at any time in the future of) any shares of Common Stock or securities convertible into or exchangeable for Common Stock (other than the Stock and shares issued pursuant to employee benefit plans, qualified stock option plans or other incentive plans existing on the date hereof or pursuant to currently outstanding options, warrants or rights), or sell or grant options, rights or warrants with respect to any shares of Common Stock or securities convertible into or exchangeable for Common Stock (other than the grant of options or other awards pursuant to incentive plans existing on the date hereof), or (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of such shares of Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise, in each case without the prior written consent of Lehman Brothers Inc.; and to use reasonable efforts to cause each officer, director and stockholder of the Company to furnish to the Representatives, prior to the First Delivery Date, a letter or letters, in form and substance satisfactory to counsel for the Underwriters, pursuant to which each such person shall agree not to, directly or indirectly, (1) offer for sale, sell, pledge or otherwise dispose of (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any shares of Common Stock or securities convertible into or exchangeable for Common Stock or (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of such shares of Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise, in each case for a period of 180 days from the date of the Prospectus, without the prior written consent of Lehman Brothers Inc.;

(j)    Prior to filing with the Commission any reports on Forms 1Q-Q or 10-K containing information required pursuant to Rule 463 of the Rules and Regulations, to furnish a copy of such information to the counsel for the Underwriters and receive and consider its comments thereon;

198239 v7/SF
43yn07l.DOC
071398

14.

UND 02889

A 658

(k)    To apply the net proceeds from the sale of the Stock being sold by the Company as set forth in the Prospectus; and

(l)    To maintain a transfer agent and, if necessary under the jurisdiction of incorporation of the Company, a registrar (which may be the same entity as the transfer agent) for its Common Stock.

7.    Each Selling Stockholder agrees:

(a)    For a period of 180 days from the date of the Prospectus, not to, directly or indirectly, (1) offer for sale, sell, pledge or otherwise dispose of (or enter into any transaction or device which is designed to, or would reasonably be expected to, result in the disposition by any person at any time in the future of) any shares of Common Stock or securities convertible into or exchangeable for Common Stock (other than the Stock), or (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of such shares of Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise, in each case without the prior written consent of Lehman Brothers Inc.

(b)    That the Stock to be sold by the Selling Stockholder hereunder that is represented by the certificates held in custody by the Custodian for the Selling Stockholder, is subject to the interest of the Underwriters and the other Selling Stockholders thereunder that the arrangements made by the Selling Stockholder for such custody are to that extent irrevocable, and that the obligations of the Selling Stockholder hereunder shall not be terminated by any act of the Selling Stockholder, by operation of law, by the death or incapacity of any individual Selling Stockholder or, in the case of a trust, by the death or incapacity of any executor or trustee or the termination of such trust, or the occurrence of any other event.

(c)    To deliver to the Representatives prior to the First Delivery Date a properly completed and executed United States Treasury Department Form W-8 (if the Selling Stockholder is a non-United States person) or Form W-9 (if the Selling Stockholder is a United States person.)

8.    *Expenses.* The Company agrees to pay (a) the costs incident to the authorization, issuance, sale and delivery of the Stock and any taxes payable in that connection; (b) the costs incident to the preparation, printing and filing under the Securities Act of the Registration Statement and any amendments and exhibits thereto; (c) the costs of distributing the Registration Statement as originally filed and each amendment thereto and any post-effective amendments thereof (including, in each case, exhibits), any Preliminary Prospectus, the Prospectus and any amendment or supplement to the Prospectus, all as provided in this Agreement; (d) the costs of producing and distributing this Agreement and any other related documents in connection with the offering, purchase, sale and delivery of the Stock; (e) the costs of delivering and distributing the Custody Agreements and the Powers of Attorney; (f) the filing fees incident to securing any required review by the National Association of Securities Dealers, Inc. of the terms of sale of the Stock; (g) any applicable listing or other fees; (h) the fees and expenses (not in excess, in the aggregate, of $5,000) of qualifying the Stock under the securities laws of the several jurisdictions

195239 v7/SF
48yn07LDOC
071398

15.

UND 02890

A 659

as provided in Section 6 (h) and of preparing, printing and distributing a Blue Sky Memorandum; (i) all costs and expenses (not in excess, in the aggregate, of $10,000) of the Underwriters, including the fees and disbursements of counsel for the Underwriters, incident to the offer and sale of shares of the Stock by the Underwriters to employees and persons having business relationships with the Company and its subsidiaries, as described in Section 4 (not in excess, in the aggregate of $10,000); (j) the fees and expenses of one counsel for the Selling Stockholders as a group; and (k) all other costs and expenses incident to the performance of the obligations of the Company and the Selling Stockholders under this Agreement; *provided* that, except as provided in this Section 8 and in Section 13, the Underwriters shall pay their own costs and expenses, including the costs and expenses of their counsel, any transfer taxes on the Stock which they may sell, the fees and expenses of qualifying the Stock under the securities laws of the several jurisdictions and of preparing, printing and distributing a Blue Sky Memorandum to the extent such fees and expenses exceed the amount to be paid by the Company pursuant to Section 8(h) above, the expenses of advertising any offering of the Stock made by the Underwriters and stabilization costs, if any, and each Selling Stockholder shall pay any transfer taxes payable in connection with such stockholder's sale of Stock to the Underwriters.

9.    *Conditions of Underwriters' Obligations.*  The respective obligations of the Underwriters hereunder are subject to the accuracy, when made and on each Delivery Date, of the representations and warranties of the Company and the Selling Stockholders contained herein, to the performance by the Company and the Selling Stockholders of their respective obligations hereunder, and to each of the following additional terms and conditions:

(a)    The Prospectus shall have been timely filed with the Commission in accordance with Section 6(a); no stop order suspending the effectiveness of the Registration Statement or any part thereof shall have been issued and no proceeding for that purpose shall have been initiated or threatened by the Commission; and any request of the Commission for inclusion of additional information in the Registration Statement or the Prospectus or otherwise shall have been complied with.

(b)    No Underwriter shall have discovered after the Effective Time and disclosed to the Company on or prior to such Delivery Date that (i) the Registration Statement or any amendment or supplement thereto contains an untrue statement of a fact which, in the opinion of Cooley Godward LLP, counsel for the Underwriters, is material or omits to state a fact which, in the opinion of such counsel, is material and is required to be stated therein or is necessary to make the statements therein not misleading or (ii) the Prospectus or any amendment or supplement thereto contains an untrue statement of a fact which, in the opinion of Cooley Godward LLP, is material or omits to state a fact, which in the opinion of such counsel, is material and is required to be stated therein or is necessary to make the statements therein not misleading, in light of the circumstances under which they were made.

(c)    All corporate proceedings and other legal matters incident to the authorization, form and validity of this Agreement, the Custody Agreements, the Powers of Attorney, the Stock, the Registration Statement and the Prospectus, and all other legal matters relating to this Agreement and the transactions contemplated hereby shall be reasonably satisfactory in all material respects to counsel for the Underwriters, and the

198139 v7/SF
48ym07!.DOC
071391

16.

UND 02891

A 660

Company and the Selling Stockholders shall have furnished to such counsel all documents and information that they may reasonably request to enable them to pass upon such matters.

(d)     Arter & Hadden LLP shall have furnished to the Representatives its written opinion, as counsel to the Company and as counsel for the Selling Stockholders, addressed to the Underwriters and dated such Delivery Date, in substantially the form set forth in *Exhibit A* hereto.

(e)     The Representatives shall have received from Cooley Godward LLP, counsel for the Underwriters, such opinion or opinions, dated such Delivery Date, with respect to the issuance and sale of the Stock, the Registration Statement, the Prospectus and other related matters as the Representatives may reasonably require, and the Company shall have furnished to such counsel such documents as they reasonably request for the purpose of enabling them to pass upon such matters.

(f)     On the first business day following the date of this Agreement, the Representatives shall have received from KPMG a letter, in form and substance satisfactory to the Representatives, addressed to the Underwriters and dated such date (the "Initial Letter"), confirming that they are independent public accountants within the meaning of the Securities Act and are in compliance with the applicable requirements relating to the qualification of accountants under Rule 2-01 of Regulation S-X of the Commission. The Initial Letter also shall (i) set forth the opinion of KPMG with respect to its examination of the consolidated balance sheet of the Company as of December 31, 1997 and related consolidated statements of operations, stockholders' equity and cash flows for the twelve (12) months ended December 31, 1997, (ii) state that KPMG has performed the procedures set out in Statement on Auditing Standards No. 71 ("SAS 71") for a review of interim financial information and providing the report of KPMG as described in SAS 71 on the financial statements for each of the quarters ended March 31, 1997 and March 31, 1998 (the "Quarterly Financial Statements"), (iii) state that in the course of such review, nothing came to its attention that leads it to believe that any material modifications need to be made to any of the Quarterly Financial Statements in order for them to be in compliance with generally accepted accounting principles consistently applied across the periods presented and (iv) address other matters agreed upon by KPMG and the Representatives. In addition, the Representatives shall have received from KPMG a letter addressed to the Company and made available to the Representatives for the use of the Underwriters stating that its review of the Company's system of internal accounting controls, to the extent it deemed necessary in establishing the scope of its examination of the Company's consolidated financial statements as of December 31, 1997, did not disclose any weaknesses in internal controls that it considered to be material weaknesses.

(g)     On such Delivery Date, the Company shall have furnished to the Representatives a letter of KPMG addressed to the Underwriters and dated such Delivery Date (the "Bring-Down Letter") (i) confirming that they are independent public accountants within the meaning of the Securities Act and are in compliance with the applicable requirements relating to the qualification of accountants under Rule 2-01 of

UND 02892

A 661

Regulation S-X of the Commission and (ii) based upon the procedures described in the Initial Letter, but carried out to a date not more than five (5) business days prior to such Delivery Date, confirming, to the extent true, that the statements and conclusions set forth in the Initial Letter are accurate as of such Delivery Date and setting forth any revisions and additions to the statements and conclusions set forth in the Initial Letter that are necessary to reflect any changes in the facts described in the Initial Letter since the date of such letter, or to reflect the availability of more recent financial statements, data or information. The Bring-Down Letter shall not disclose any change in the condition (financial or otherwise), earnings, operations, business or business prospects of the Company and its subsidiaries considered as one enterprise from that set forth in the Registration Statement or Prospectus, which, in the Representatives' sole judgment, is material and adverse and that makes it, in the Representatives' sole judgment, impracticable or inadvisable to proceed with the public offering of the Stock as contemplated by the Prospectus.

(h)    Aquilino & Welsh shall have furnished to the Representatives its written opinion, as patent counsel to the Company, addressed to the Underwriters and dated such Delivery Date, in form and substance reasonably satisfactory to the Representatives, to the effect that such counsel is familiar with the technology used by the Company in its business and the manner of its use thereof and has read the Registration Statement and the Prospectus, including particularly the portions of the Registration Statement and the Prospectus referring to patents, trade secrets, trademarks, service marks or other proprietary information or materials and:

(i)    The statements in the Registration Statement and the Prospectus under the captions "Risk Factors – Patents and Protection of Proprietary Technology," "Business – Design and Development – Patent Review" and "– Patents," to the best of such counsel's knowledge and belief, are accurate and complete statements or summaries of the legal matters therein set forth and nothing has come to such counsel's attention that causes such counsel to believe that the above-described portions of the Registration Statement, as of the Effective Date, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading or that, as of the date thereof and as of such Delivery Date, the above-described portions of the Prospectus contained or contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(ii)    to the best of such counsel's knowledge, there are no legal or governmental proceedings pending relating to patent rights, trade secrets, trademarks, service marks or other proprietary information or materials of the Company or any of its subsidiaries and, to the best of such counsel's knowledge, no such proceedings are threatened or contemplated by governmental authorities or others;

UND 02893

A 662

(iii)    such counsel do not know of any contracts or other documents, relating to governmental regulation affecting the Company or any of its subsidiaries or the patents, trade secrets, trademarks, service marks or other proprietary information or materials of the Company or any of its subsidiaries, of a character required to be filed as an exhibit to the Registration Statement or required to be described in the Registration Statement or the Prospectus that are not filed or described as required;

(iv)    to the best of such counsel's knowledge, neither the Company nor any of its subsidiaries is infringing or otherwise violating any patents, trade secrets, trademarks, service marks or other proprietary information or materials, of others and, to the best of such counsel's knowledge, there are no infringements by others of any of the patents, trade secrets, trademarks, service marks or other proprietary information or materials of the Company or any of its subsidiaries which, in the judgment of such counsel, could affect materially the use thereof by the Company or any such subsidiary; and

(v)    to the best of such counsel's knowledge, the Company and its subsidiaries own or possess sufficient licenses or other rights to use all patents, trade secrets, trademarks, service marks or other proprietary information or materials necessary to conduct the business now being or proposed to be conducted by the Company and its subsidiaries as described in the Prospectus.

(i)    The Company shall have furnished to the Representatives a certificate, dated such Delivery Date, of its Chief Executive Officer and its Chief Financial Officer stating that:

(i)    The representations, warranties and agreements of the Company in Section 1 are true and correct as of such Delivery Date; the Company has complied with all its agreements contained herein; and the conditions set forth in Sections 9(a) through 9(n) have been fulfilled; and

(ii)    They have carefully examined the Registration Statement and the Prospectus and, to their knowledge, since the Effective Date, no event has occurred that should have been set forth in a supplement or amendment to the Registration Statement or the Prospectus.

(j)    Each Selling Stockholder (or the Custodian or one or more Attorneys-in-Fact on behalf of the Selling Stockholders) shall have furnished to the Representatives on such Delivery Date a certificate, dated such Delivery Date, signed by, or on behalf of, such Selling Stockholder (or the Custodian or one or more Attorneys-in-Fact) stating that the representations, warranties and agreements of such Selling Stockholder contained herein are true and correct as of such Delivery Date and that such Selling Stockholder has complied with all agreements contained herein to be performed by such Selling Stockholder at or prior to such Delivery Date.

(k)    (i) Neither the Company nor any of its subsidiaries shall have sustained since the date of the latest financial statements included in the Prospectus any loss or

19239 v2/SF
43yc07!.DOC
07l39$

19.

UND 02894

A 663

interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Prospectus or (ii) since such date there shall not have been any change in the capital stock or long-term debt of the Company or any of its subsidiaries or any change, or any development involving a prospective change, in or affecting the general affairs, management, financial position, stockholders' equity or results of operations of the Company and its subsidiaries, otherwise than as set forth or contemplated in the Prospectus, the effect of which, in any such case described in clause (i) or (ii), is, in the reasonable judgment of the Representatives, so material and adverse as to make it impracticable or inadvisable to proceed with the public offering or the delivery of the Stock being delivered on such Delivery Date on the terms and in the manner contemplated in the Prospectus.

(l)     Subsequent to the execution and delivery of this Agreement there shall not have occurred any of the following: (i) trading in securities generally on the New York Stock Exchange or the American Stock Exchange or in the over-the-counter market shall have been suspended or minimum prices shall have been established on any such exchange or such market by the Commission, by such exchange or by any other regulatory body or governmental authority having jurisdiction, (ii) a banking moratorium shall have been declared by federal or state authorities, (iii) the United States shall have become engaged in hostilities, there shall have been an escalation in hostilities involving the United States or there shall have been a declaration of a national emergency or war by the United States or (iv) there shall have occurred such a material adverse change in general economic, political or financial conditions (or the effect of international conditions on the financial markets in the United States shall be such) as to make it, in the judgment of a majority in interest of the several Underwriters, impracticable or inadvisable to proceed with the public offering or delivery of the Stock being delivered on such Delivery Date on the terms and in the manner contemplated in the Prospectus.

(m)     The Nasdaq National Market shall have approved the Stock for quotation, subject only to official notice of issuance and evidence of satisfactory distribution.

All opinions, letters, evidence and certificates mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof only if they are in form and substance reasonably satisfactory to counsel for the Underwriters.

10.     *Indemnification and Contribution.*

(a)     The Company shall indemnify and hold harmless each Underwriter, its officers and employees and each person, if any, who controls any Underwriter within the meaning of the Securities Act, from and against any loss, claim, damage or liability, joint or several, or any action in respect thereof (including, but not limited to, any loss, claim, damage, liability or action relating to purchases and sales of Stock), to which that Underwriter, officer, employee or controlling person may become subject, under the Securities Act or otherwise, insofar as such loss, claim, damage, liability or action arises out of, or is based upon (i) any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or any amendment or supplement thereto or the omission or alleged omission to state therein any material fact required to be stated therein or necessary to make the statements therein

195239 v2/SF
48yn07L.DOC
071398

20.

UND 02895

A 664

not misleading, (ii) any untrue statement or alleged untrue statement of a material fact contained in the Prospectus or any amendment or supplement thereto or the omission or alleged omission to state therein any material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made, (iii) any untrue statement or alleged untrue statement contained in any blue sky application or other document prepared or executed by the Company (or based upon any written information furnished by the Company) specifically for the purpose of qualifying any or all of the Stock under the securities laws of any state or other jurisdiction (any such application, document or information being hereinafter called a "Blue Sky Application") or (iv) any act or failure to act or any alleged act or failure to act by any Underwriter in connection with, or relating in any manner to, the Stock or the offering contemplated hereby, and which is included as part of or referred to in any loss, claim, damage, liability or action arising out of or based upon matters covered by clause (i), (ii) or (iii) above (provided that the Company shall not be liable under this clause (iv) to the extent that it is determined in a final judgment by a court of competent jurisdiction that such loss, claim, damage, liability or action resulted directly from any such acts or failures to act undertaken or omitted to be taken by such Underwriter through its gross negligence or willful misconduct), and shall reimburse each Underwriter and each such officer, employee or controlling person promptly upon demand for any legal or other expenses reasonably incurred by that Underwriter, officer, employee or controlling person in connection with investigating or defending or preparing to defend against any such loss, claim, damage, liability or action as such expenses are incurred; *provided, however*, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability or action arises out of, or is based upon, any untrue statement or alleged untrue statement or omission or alleged omission made in any Preliminary Prospectus, the Registration Statement or the Prospectus, or in any such amendment or supplement, or in any Blue Sky Application, in reliance upon and in conformity with written information furnished to the Company through the Representatives by or on behalf of any Underwriter specifically for inclusion therein; *provided, further*, that the indemnity agreement contained in this Section 10(a) with respect to any Prospectus shall not inure to the benefit of any Underwriter (or any persons controlling such Underwriter) on account of any losses, claims, damages, liabilities or litigation arising from the sale of Stock to any person, if such Underwriter fails to send or give a copy of the Prospectus, as the same may be then supplemented or amended, to such person, within the time required by the Securities Act and the untrue statement or alleged untrue statement or omission or alleged omission of a material fact contained in such Prospectus was corrected therein. The foregoing indemnity agreement is in addition to any liability that the Company may otherwise have to any Underwriter or to any officer, employee or controlling person of that Underwriter.

(b)     The Management Stockholders, severally and not jointly, shall indemnify and hold harmless each Underwriter, its officers and employees, and each person, if any, who controls any Underwriter within the meaning of the Securities Act, from and against any loss, claim, damage or liability, joint or several, or any action in respect thereof (including, but not limited to, any loss, claim, damage, liability or action relating to purchases and sales of Stock), to which that Underwriter, officer, employee or controlling person may become subject, under the Securities Act or otherwise, insofar as such loss, claim, damage, liability or action arises out of, or is based upon, (i) any untrue statement or alleged untrue statement of a material fact contained in any Preliminary Prospectus, the Registration Statement or the Prospectus or in any amendment or supplement thereto or (ii) the omission or alleged omission to state in any Preliminary

198239 v7/SF
48yn071.DOC
071398

21.

UND 02896

A 665

Prospectus, Registration Statement or the Prospectus, or in any amendment or supplement thereto, any material fact required to be stated therein or necessary to make the statements therein not misleading, and shall reimburse each Underwriter, its officers and employees and each such controlling person for any legal or other expenses reasonably incurred by that Underwriter, its officers and employees or controlling person in connection with investigating or defending or preparing to defend against any such loss, claim, damage, liability or action as such expenses are incurred; *provided, however,* that the Management Stockholders shall not be liable in any such case to the extent that any such loss, claim, damage, liability or action arises out of, or is based upon, any untrue statement or alleged untrue statement or omission or alleged omission made in any Preliminary Prospectus, the Registration Statement or the Prospectus or in any such amendment or supplement in reliance upon and in conformity with written information furnished to the Company through the Representatives by or on behalf of any Underwriter specifically for inclusion therein; *provided, further,* that the indemnity agreement contained in this Section 10(b) with respect to any Prospectus shall not inure to the benefit of any Underwriter (or any persons controlling such Underwriter) on account of any losses, claims, damages, liabilities or litigation arising from the sale of Stock to any person, if such Underwriter fails to send or give a copy of the Prospectus, as the same may be then supplemented or amended, to such person, within the time required by the Securities Act and the untrue statement or alleged untrue statement or omission or alleged omission of a material fact contained in such Prospectus was subsequently corrected. The foregoing indemnity agreement is in addition to any liability that the Management Stockholders may otherwise have to any Underwriter or any officer, employee or controlling person of that Underwriter.

(c)    The Selling Stockholders who are not Management Stockholders, severally and not jointly, shall indemnify and hold harmless each Underwriter, its officers and employees, and each person, if any, who controls any Underwriter within the meaning of the Securities Act, from and against any loss, claim, damage or liability, joint or several, or any action in respect thereof (including, but not limited to, any loss, claim, damage, liability or action relating to purchases and sales of Stock), to which that Underwriter, officer, employee or controlling person may become subject, under the Securities Act or otherwise, insofar as such loss, claim, damage, liability or action arises out of, or is based upon, (i) any untrue statement or alleged untrue statement of a material fact concerning such Selling Stockholder contained in any Preliminary Prospectus, the Registration Statement or the Prospectus or in any amendment or supplement thereto or (ii) the omission or alleged omission to state in any Preliminary Prospectus, Registration Statement or the Prospectus, or in any amendment or supplement thereto, any material fact required to be stated therein or necessary to make the statements therein not misleading, and shall reimburse each Underwriter, its officers and employees and each such controlling person for any legal or other expenses reasonably incurred by that Underwriter, its officers and employees or controlling person in connection with investigating or defending against any such loss, claim, damage, liability or action as such expenses are incurred; *provided, however,* that the Selling Stockholders shall not be liable in any such case to the extent that any such loss, claim, damage, liability or action arises out of, or is based upon, any untrue statement or alleged untrue statement or omission or alleged omission made in any Preliminary Prospectus, the Registration Statement or the Prospectus or in any such amendment or supplement in reliance upon and in conformity with written information furnished to the Company through the Representatives by or on behalf of any Underwriter specifically for inclusion therein; *provided, further,* that the indemnity agreement contained in this Section 10(c)

198239 v7/SF
48y0071.DOC
071398

22.

UND 02897

with respect to any Prospectus shall not inure to the benefit of any Underwriter (or any persons controlling such Underwriter) on account of any losses, claims, damages, liabilities or litigation arising from the sale of Stock to any person, if such Underwriter fails to send or give a copy of the Prospectus, as the same may be then supplemented or amended, to such person, within the time required by the Securities Act and the untrue statement or alleged untrue statement or omission or alleged omission of a material fact contained in such Prospectus was subsequently corrected. The foregoing indemnity agreement is in addition to any liability that the Selling Stockholders may otherwise have to any Underwriter or any officer, employee or controlling person of that Underwriter.

(d)     Each Underwriter, severally and not jointly, shall indemnify and hold harmless the Company, its officers and employees, each of its directors (including any person who, with his or her consent, is named in the Registration Statement as about to become a director of the Company), each person, if any, who controls the Company within the meaning of the Securities Act and each Selling Stockholder (including each Management Stockholder), from and against any loss, claim, damage or liability, joint or several, or any action in respect thereof, to which the Company or any such director, officer or controlling person may become subject, under the Securities Act or otherwise, insofar as such loss, claim, damage, liability or action arises out of, or is based upon, (i) any untrue statement or alleged untrue statement of a material fact contained (A) in any Preliminary Prospectus, the Registration Statement or the Prospectus or in any amendment or supplement thereto; or (B) in any Blue Sky Application or (ii) the omission or alleged omission to state in any Preliminary Prospectus, the Registration Statement or the Prospectus, or in any amendment or supplement thereto, or in any Blue Sky Application any material fact required to be stated therein or necessary to make the statements therein not misleading, but in each case only to the extent that the untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company through the Representatives by or on behalf of that Underwriter specifically for inclusion therein, and shall reimburse the Company and any such director, officer or controlling person for any legal or other expenses reasonably incurred by the Company or any such director, officer or controlling person in connection with investigating or defending or preparing to defend against any such loss, claim, damage, liability or action as such expenses are incurred. The foregoing indemnity agreement is in addition to any liability that any Underwriter may otherwise have to the Company or any such director, officer, employee or controlling person.

(e)     Promptly after receipt by an indemnified party under this Section 10 of notice of any claim or the commencement of any action, the indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under this Section 10, notify the indemnifying party in writing of the claim or the commencement of that action; *provided, however,* that the failure to notify the indemnifying party shall not relieve it from any liability that it may have under this Section 10 except to the extent it has been materially prejudiced by such failure and, *provided further,* that the failure to notify the indemnifying party shall not relieve it from any liability that it may have to an indemnified party otherwise than under this Section 10. If any such claim or action shall be brought against an indemnified party, and it shall notify the indemnifying party thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it wishes, jointly with any other similarly notified indemnifying party, to assume the defense thereof with counsel reasonably satisfactory to the indemnified

198239-v2/SF
43yn07l.DOC
071398

23.

UND 02898

A 667

party. After notice from the indemnifying party to the indemnified party of its election to assume the defense of such claim or action, the indemnifying party shall not be liable to the indemnified party under this Section 10 for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof other than reasonable costs of investigation; *provided, however*, that the Representatives shall have the right to employ counsel to represent jointly the Representatives and those other Underwriters and its respective officers, employees and controlling persons who may be subject to liability arising out of any claim in respect of which indemnity may be sought by the Underwriters against the Company or any Selling Stockholder under this Section 10 if, in the reasonable judgment of the Representatives, it is advisable for the Representatives and those Underwriters, officers, employees and controlling persons to be jointly represented by counsel separate from counsel to the Company or any Selling Stockholder, and in that event the fees and expenses of such separate counsel shall be paid by the Company or the Selling Stockholders. In no event shall the indemnifying parties be liable for fees and expenses of more than one counsel (in addition to local counsel) for all indemnified parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same set of allegations or circumstances. The counsel with respect to which fees and expenses shall be so reimbursed shall be designated in writing by Lehman Brothers Inc. in the case of parties indemnified pursuant to Sections 10(a), 10(b) and 10(c) and by the Company in the case of parties indemnified pursuant to Section 10(d). No indemnifying party shall (i) without the prior written consent of the indemnified parties (which consent shall not be unreasonably withheld), settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding, or (ii) be liable for any settlement of any such action effected without its written consent (which consent shall not be unreasonably withheld), but if settled with the consent of the indemnifying party or if there be a final judgment of the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment.

(f)     If the indemnification provided for in this Section 10 shall for any reason be unavailable to or insufficient to hold harmless an indemnified party under Section 10(a), 10(b) or 10(c) in respect of any loss, claim, damage or liability, or any action in respect thereof, referred to therein, then each indemnifying party shall, in lieu of indemnifying such indemnified party, contribute to the amount paid or payable by such indemnified party as a result of such loss, claim, damage or, liability, or action in respect thereof, (i) in such proportion as shall be appropriate to reflect the relative benefits received by the Company and the Selling Stockholders, on the one hand, and the Underwriters, on the other hand, from the offering of the Stock or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault ·of the Company and the Selling Stockholders, on the other hand, with respect to the statements or omissions that resulted in such loss, claim, damage or liability, or action in respect thereof, as well as any other relevant equitable considerations. The relative benefits received by the Company and the Selling Stockholders, on the one hand, and the Underwriters, on the other hand, with respect to such

198239 v7/SF
43yn07LDOC
071398

24.

UND 02899

A 668

offering shall be deemed to be in the same proportion as the total net proceeds from the offering of the Stock purchased under this Agreement (before deducting expenses) received by the Company and the Selling Stockholders, on the one hand, and the total underwriting discounts and commissions received by the Underwriters with respect to the shares of the Stock purchased under this Agreement, on the other hand, bear to the total gross proceeds from the offering of the shares of the Stock under this Agreement, in each case as set forth in the table on the cover page of the Prospectus. The relative fault shall be determined by reference to whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the Company, the Selling Stockholders or the Underwriters, the intent of the parties and their relative knowledge, access to information and opportunity to correct or prevent such statement or omission. The Company, the Selling Stockholders and the Underwriters agree that it would not be just and equitable if contributions pursuant to this Section 10(e) were to be determined by pro rata allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation that does not take into account the equitable considerations referred to herein. The amount paid or payable by an indemnified party as a result of the loss, claim, damage or liability, or action in respect thereof, referred to above in this Section 10 shall be deemed to include, for purposes of this Section 10(e), any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 10(e), no Underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Stock underwritten by it and distributed to the public was offered to the public exceeds the amount of any damages that such Underwriter has otherwise paid or become liable to pay by reason of any untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Underwriters' obligations to contribute as provided in this Section 10(e) are several in proportion to its respective underwriting obligations and not joint.

(g)     The Underwriters severally confirm and the Company acknowledges that the statements with respect to the public offering of the Stock by the Underwriters set forth on the cover page of, the legend concerning over-allotments and other stabilizing activities on the inside front cover page of, and the information appearing in the third paragraph under the caption "Underwriting" in the Prospectus is correct and constitutes the only information furnished in writing to the Company by or on behalf of the Underwriters specifically for inclusion in the Registration Statement and the Prospectus.

(h)     Notwithstanding any other provision of this Agreement, no Selling Stockholder (including each Management Stockholder) against whom a claim for indemnity is made on the basis of the provisions of Section 10(b) or 10(c), against whom contribution is sought on the basis of Section 10(f), or against whom any claim is otherwise pursued under this Agreement after the First Delivery Date shall be required to indemnify, hold harmless, reimburse or otherwise be liable to the Company or Underwriters in an aggregate amount in excess of the proceeds received by the Selling Stockholder in connection herewith.

11.     *Defaulting Underwriters*. If, on either Delivery Date, any Underwriter defaults in the performance of its obligations under this Agreement, the remaining non-defaulting

198239 v7/SF
48jm07!.DOC
071358

25.

UND 02900

A 669

Underwriters shall be obligated to purchase the Stock that the defaulting Underwriter agreed but failed to purchase on such Delivery Date in the respective proportions that the number of shares of the Firm Stock set opposite the name of each remaining non-defaulting Underwriter in Schedule 1 hereto bears to the total number of shares of the Firm Stock set opposite the names of all the remaining non-defaulting Underwriters in Schedule 1 hereto; *provided, however*, that the remaining non-defaulting Underwriters shall not be obligated to purchase any of the Stock on such Delivery Date if the total number of shares of the Stock which the defaulting Underwriter or Underwriters agreed but failed to purchase on such date exceeds 9.09% of the total number of shares of the Stock to be purchased on such Delivery Date, and any remaining non-defaulting Underwriter shall not be obligated to purchase more than 110% of the number of shares of the Stock which it agreed to purchase on such Delivery Date pursuant to the terms of Section 3. If the foregoing maximums are exceeded, the remaining non-defaulting Underwriters, or those other underwriters satisfactory to the Representatives who so agree, shall have the right, but shall not be obligated, to purchase, in such proportion as may be agreed upon among them, all the Stock to be purchased on such Delivery Date. If the remaining Underwriters or other underwriters satisfactory to the Representatives do not elect to purchase the shares that the defaulting Underwriter or Underwriters agreed but failed to purchase on such Delivery Date, this Agreement (or, with respect to the Second Delivery Date, the obligation of the Underwriters to purchase, and of the Company to sell, the Option Stock) shall terminate without liability on the part of any non-defaulting Underwriter or the Company or the Selling Stockholders, except that the Company and the Underwriters will continue to be liable for the payment of expenses to the extent set forth in Sections 8 and 13. As used in this Agreement, the term "Underwriter" includes, for all purposes of this Agreement unless the context requires otherwise, any party not listed in Schedule 1 hereto who, pursuant to this Section 11, purchases Firm Stock that a defaulting Underwriter agreed but failed to purchase.

Nothing contained herein shall relieve a defaulting Underwriter of any liability it may have to the Company and the Selling Stockholders for damages caused by its default. If other Underwriters are obligated or agree to purchase the Stock of a defaulting or withdrawing Underwriter, either the Representatives or the Company may postpone the Delivery Date for up to seven full business days in order to effect any changes that in the opinion of counsel for the Company or counsel for the Underwriters may be necessary in the Registration Statement, the Prospectus or in any other document or arrangement.

12.     *Termination.* The obligations of the Underwriters hereunder may be terminated by the Representatives by notice given to and received by the Company and the Selling Stockholders prior to delivery of and payment for the Firm Stock if, prior to that time, any of the events described in Sections 9(l) or 9(m), shall have occurred or if the Underwriters shall decline to purchase the Stock for any reason permitted under this Agreement.

13.     *Reimbursement of Underwriters' Expenses.* If the Company or any Selling Stockholder shall fail to tender the Stock for delivery to the Underwriters by reason of any failure, refusal or inability on the part of the Company or the Selling Stockholder(s) to perform any agreement on its part to be performed, or because any other condition of the Underwriters' obligations hereunder required to be fulfilled by the Company or the Selling Stockholder(s) is not fulfilled, the Company and the Selling Stockholder(s) will reimburse the Underwriters for all reasonable out-of-pocket expenses (including fees and disbursements of counsel) incurred by the

198239 v7/SF
48yn07LDOC
071395

26.

UND 02901

A 670