# Appendix
# A671-A720

Underwriters in connection with this Agreement and the proposed purchase of the Stock, and upon demand the Company and the Selling Stockholders shall pay the full amount thereof to the Representative(s). If this Agreement is terminated pursuant to Section 11 by reason of the default of one or more Underwriters, neither the Company nor any Selling Stockholder shall be obligated to reimburse any defaulting Underwriter on account of those expenses.

14.    *Notices, etc.* All statements, requests, notices and agreements hereunder shall be in writing, and:

(a)    if to the Underwriters, shall be delivered or sent by mail, telex or facsimile transmission to Lehman Brothers Inc., Three World Financial Center, New York, New York 10285, Attention: Syndicate Department (Fax: 212-526-6588), with a copy, in the case of any notice pursuant to Section 10(d), to the Director of Litigation, Office of the General Counsel, Lehman Brothers Inc., 3 World Financial Center, 10th Floor, New York, NY 10285;

(b)    if to the Company, shall be delivered or sent by mail, telex or facsimile transmission to the address of the Company set forth in the Registration Statement, Attention: Darl Hatfield (Fax:  972-398-8818), with a copy to Joseph A. Hoffman, Arter & Hadden LLP, 1717 Main Street, Suite 4100, Dallas, TX 75201 (Fax: 214-741-7139);

(c)    if to any Selling Stockholders, shall be delivered or sent by mail, telex or facsimile transmission to such Selling Stockholder at the address set forth on Schedule 2 hereto, with copies to B.H. Adams and Richard H. Murtland as Attorneys-In-Fact c/o the Company as set forth in Section 14(b) above and to Joseph A. Hoffman, also as set forth in Section 14(b) above;

*provided, however,* that any notice to an Underwriter pursuant to Section 10(d) shall be delivered or sent by mail, telex or facsimile transmission to such Underwriter at its address set forth in its acceptance telex to the Representatives, which address will be supplied to any other party hereto by the Representatives upon request. Any such statements, requests, notices or agreements shall take effect at the time of receipt thereof. The Company and the Selling Stockholders shall be entitled to act and rely upon any request, consent, notice or agreement given or made on behalf of the Underwriters by Lehman Brothers Inc. on behalf of the Representatives and the Company and the Underwriters shall be entitled to act and rely upon any request, consent, notice or agreement given or made on behalf of the Selling Stockholders by the Custodian.

15.    *Persons Entitled to Benefit of Agreement.* This Agreement shall inure to the benefit of and be binding upon the Underwriters, the Company, the Selling Stockholders and their respective personal representatives, if applicable, and successors. This Agreement and the terms and provisions hereof are for the sole benefit of only those persons, except that (A) the representations, warranties, indemnities and agreements of the Company and the Selling Stockholders contained in this Agreement shall also be deemed to be for the benefit of the person or persons, if any, who control any Underwriter within the meaning of Section 15 of the Securities Act and (B) the indemnity agreement of the Underwriters contained in Section 10(c) of this Agreement shall be deemed to be for the benefit of directors of the Company, officers of the Company who have signed the Registration Statement, any person controlling the Company within the meaning of Section 15 of the Securities Act and any affiliate of a Selling Stockholder.

UND 02902

A 671

Nothing in this Agreement is intended or shall be construed to give any person, other than the persons referred to in this Section 15, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein. No purchaser of stock from any Underwriter shall be deemed a successor of such Underwriter merely by reason of such purchase.

16.   *Survival.* The respective indemnities, representations, warranties and agreements of the Company, the Selling Stockholders and the Underwriters contained in this Agreement or made by or on behalf on them, respectively, pursuant to this Agreement, shall survive the delivery of and payment for the Stock and shall remain in full force and effect, regardless of any investigation made by or on behalf of any of them or any person controlling any of them.

17.   *Definition of the Terms "Business Day" and "Subsidiary".* For purposes of this Agreement, (a) "business day" means any day on which the New York Stock Exchange, Inc. is open for trading and (b) "subsidiary" has the meaning set forth in Rule 405 of the Rules and Regulations.

18.   *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of New York, without giving effect to the conflict of law provisions thereof.

19.   *Counterparts.* This Agreement may be executed by facsimile in one or more counterparts and, if executed in more than one counterpart, the executed counterparts shall each be deemed to be an original but all such counterparts shall together constitute one and the same instrument.

20.   *Headings.* The headings herein are inserted for convenience of reference only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement.

UND 02903

A 672

## SCHEDULE 1

| UNDERWRITERS | NUMBER OF SHARES OF FIRM STOCK |
|---|---|
| Lehman Brothers Inc. | 1,602,000 |
| NationsBanc Montgomery Securities LLC | 1,601,000 |
| Ferris, Baker Watts, Incorporated | 1,601,000 |
| CIBC Oppenheimer Corp. | 104,000 |
| Donaldson, Lufkin & Jenrette Securities Corporation | 104,000 |
| A.G. Edwards & Sons, Inc. | 104,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 104,000 |
| Morgan Stanley & Co. Incorporation | 104,000 |
| Paine Webber Incorporated | 104,000 |
| Prudential Securities Incorporation | 104,000 |
| Wheat First Securities, Inc. | 104,000 |
| First Southwest Company | 52,000 |
| Hoak Breedlove Wesneski & Co. | 52,000 |
| Janney Montgomery Scott Inc. | 52,000 |
| Ragen MacKenzie Incorporated | 52,000 |
| Raymond James & Associates, Inc. | 52,000 |
| Sands Brothers & Co., Ltd. | 52,000 |
| J.E. Sheehan & Co. Inc. | 52,000 |
| **TOTAL** | **6,000,000** |

198239 v2/SF
43y:071.DOC
071398

UND 02904

A 673

## SCHEDULE 2

| | NUMBER OF SHARES OF FIRM STOCK | NUMBER OF SHARES OF OPTION STOCK |
|---|---|---|
| Adams Golf, Inc. | | 37,500 |
| NAME AND ADDRESS OF SELLING STOCKHOLDER | | |
| Royal Holding Company, Inc. c/o Paul Brown 1 Indian Springs Road Indiana, PA 15701 | 454,745 | 576,182 |
| B. H. Adams 2801 East Plano Parkway Plano, Texas 75074 | 928,000 | 192,000 |
| Finis Conner The Conner Group San Carlos & 4th Street #2 Carmel, CA 93921 | 388,555 | — |
| Richard H. Murtland 2801 East Plano Parkway Plano, Texas 75074 | 66,750 | 16,738 |
| Lincoln Trust Company, f/b/o Richard Urdahl Custodian FBO Richard Urdahl Fiddler's Green Circle, Suite 400E Englewood, CO 890111 | 77,000 | 9,592 |
| Faris McMullin 7510 Mossy Cup Rd. Boise, ID 83709 | 73,750 | 37,988 |
| Marc Gonsalves 2801 East Plano Parkway Plano, TX 75074 | — | 30,000 |
| Peter Cassady 11935 Barranca Road Camarilla, CA 93012 | 8,400 | — |
| Richard Urdahl 3 Rollingwood Lane Sandy, UT 84092 | 2,800 | — |
| TOTAL | 2,000,000 | 900,000 |

198239 v7/SF
4Bya07L.DOC
071398

UND 02905

A 674

EXHIBIT A

FORM OF OPINION OF COMPANY COUNSEL

(i)     The Company is incorporated and is validly existing as a corporation under the laws of Delaware. Each of Holding Corp., GP Corp and Management Corp. (the "Corporate Subsidiaries" and, together with the Corporate Subsidiaries, the "Subsidiaries") has been duly incorporated and is validly existing as a corporation in good standing under the laws of Delaware. Each of GP Corp. and Management Corp. is duly qualified to do business and is in good standing as a foreign corporation in Texas. Each of the Company and each Corporate Subsidiary has all corporate power and authority necessary to own or hold its properties and conduct the business described in the Prospectus. Each of AGL, DRL and IPL (the "Partnership Subsidiaries" and, together with the Corporate Subsidiaries, the "Subsidiaries") is a limited partnership duly formed, validly existing and in good standing under the laws of its respective jurisdiction of organization and each such Partnership Subsidiary has all requisite partnership power and authority under its certificate of limited partnership and agreement of limited partnership to hold its properties and to conduct the business. Each Selling Stockholder that is a corporation has the corporate power and authority to enter into this Agreement, the Power of Attorney and the Custody Agreement;

(ii)     The issue and sale of the shares of Stock being delivered on such Delivery Date by the Company and the compliance by the Company with all of the provisions of this Agreement and the consummation of the transactions contemplated hereby (other than the indemnification and contribution obligations of the Company hereunder, as to which such counsel need express no opinion) will not result in a breach or violation of any of the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument known to such counsel to which the Company or any of the Subsidiaries is a party or by which the Company or any of the Subsidiaries is bound or to which any of the property or assets of the Company or any of its subsidiaries is subject, in each case which is filed as an exhibit to the Registration Statement (except, in each case, where such breach, violation or default would not have a Material Adverse Effect), nor will such breach, violation or default result in any violation of the provisions of the charter, bylaws, certificate of limited partnership or agreement of limited partnership, as applicable, of the Company or any of the Subsidiaries or any statute or any order, rule or regulation known to such counsel of any court or governmental agency or body having jurisdiction over the Company or any of the Subsidiaries or any of their properties or assets (except, in each case, where such violations would not have a Material Adverse Effect). The execution, delivery and performance of this Agreement (other than the indemnification and contribution obligations of this Agreement, as to which such counsel need express no opinion), the Power of Attorney and the custody Agreement by such Selling Stockholder and the consummation by such Selling Stockholder of the transactions contemplated hereby and thereby will not result in any violation of the provisions of the charter, bylaws or custody agreement of such Selling Stockholder, if applicable, or any statute, regulation or rule or any order known to such counsel of any court or governmental agency or body having jurisdiction over such Selling Stockholder or the property or assets of such Selling Stockholder known to such counsel;

198239 v1/SF
48ya071.DOC
071398

1.

UND 02906

A 675

(iii)    Except for the registration of the Stock under the Securities Act and such consents, approvals, authorizations, registrations or qualifications as may be required under the Exchange Act and applicable state securities laws in connection with the purchase and distribution of the Stock by the Underwriters, no consent, approval, authorization or order of, or filing or registration with, any such court or governmental agency or body is required for (a) the execution, delivery and performance of this Agreement by the Company and the consummation of the transactions contemplated hereby or (b) the execution, delivery and performance of this Agreement, the Power of Attorney or the Custody Agreement by each Selling Stockholder and the consummation by each Selling Stockholder of the transactions contemplated hereby and thereby;

(iv)    The Company has an authorized capitalization as set forth in the Prospectus under the caption "Capitalization", and all of the issued shares of capital stock of the Company (including the shares of Stock being delivered on such Delivery Date) have been duly and validly authorized and issued, are fully paid and non-assessable and conform in all material respects to the description thereof contained in the Prospectus. All of the issued shares of capital stock and partnership interests, as applicable, of each Subsidiary have been duly and validly authorized and issued and are fully paid, non-assessable and are owned directly or indirectly by the Company of record and, to such counsel's knowledge, free and clear of all liens, encumbrances, equities or claims;

(v)    Except as set forth in the Prospectus, there are no preemptive or other rights to subscribe for or to purchase, nor any restriction upon the voting or transfer of, any shares of the Stock pursuant to the Company's charter or bylaws or any agreement or other instrument known to such counsel;

(vi)    To such counsel's knowledge, there are no legal or governmental proceedings pending to which the Company or any of the Subsidiaries is a party or of which any property or assets of the Company or any of the Subsidiaries is the subject which are required to be described in the Prospectus and which are not so described, and, to such counsel's knowledge, no such proceedings are threatened by governmental authorities or others;

(vii)    The Registration Statement was declared effective under the Securities Act as of the date and time specified in such opinion, the Prospectus was filed with the Commission pursuant to the subparagraph of Rule 424(b) of the Rules and Regulations specified in such opinion on the date specified therein and, to the knowledge of such counsel, no stop order suspending the effectiveness of the Registration Statement has been issued nor, to the knowledge of such counsel, is any proceeding for that purpose pending before or threatened by the Commission;

(viii)    The Registration Statement and the Prospectus and any further amendments or supplements thereto made by the Company prior to such Delivery Date (other than the financial statements, the notes thereto and related schedules and other financial and accounting data included in the Registration Statement and Prospectus, as to which such counsel need express no opinion) comply as to form in all material respects with the requirements of the Securities Act and the Rules and Regulations;

UND 02907

A 676

(ix)    To such counsel's knowledge, there are no contracts or other documents that are required to be described in the Prospectus or filed as exhibits to the Registration Statement by the Securities Act or by the Rules and Regulations that have not been described or filed as exhibits to the Registration Statement or incorporated therein by reference as permitted by the Rules and Regulations;

(x)    This Agreement has been duly authorized, executed and delivered by the Company and assuming due authorization, execution and delivery by the Underwriters, will constitute a valid and binding agreement of the Company enforceable against the Company in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or at law) or an implied covenant of good faith and fair dealing. This Agreement, a Power of Attorney and a Custody Agreement have been duly authorized (if necessary), executed and delivered by or on behalf of each Selling Stockholder and constitute valid and binding agreements of each Selling Stockholder, enforceable in accordance with their respective terms (assuming with respect to this Agreement, due authorization, execution and delivery by the Underwriters), subject in each case to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or at law or an implied covenant of good faith and fair dealing);

(xi)    To such counsel's knowledge, except as described or referred to in the Prospectus, there are no contracts, agreements or understandings between the Company and any person granting such person the right (other than rights that have been waived or satisfied) to require the Company to file a registration statement under the Securities Act with respect to any securities of the Company owned or to be owned by such person or to require the Company to include such securities in the securities registered pursuant to the Registration Statement or in any securities being registered pursuant to any other registration statement filed by the Company under the Securities Act;

(xii)    The descriptions in the Registration Statement and the Prospectus of the charter and bylaws of the Company as set forth under the captions "Risk Factors – Anti-Takeover Provisions" and "Description of Capital Stock," in each case insofar as such description constitute summaries of legal matters, fairly present the information required to be presented by the Securities Act and the applicable Rules and Regulations;

(xiii)    The certificates evidencing the Stock being delivered on such Delivery Date are in proper form under Delaware law;

(xiv)    Immediately prior to the first Delivery Date, each Selling Stockholder had record title to the shares of Stock to be sold by such Selling Stockholder under this Agreement, free and clear of all liens, encumbrances, equities or claims known to such counsel, and each Selling Stockholder had the power and authority (as applicable) to sell, assign, transfer and deliver such shares to be sold by such Selling Stockholder hereunder; and

198239 v2/SF
48yn07l.DOC
071398

3.

UND 02908

A 677

(xv)   Record title to the shares of Stock to be sold by each Selling Stockholder under this Agreement has been transferred to each of the several Underwriters, free and clear of any adverse claims within the meaning of the Uniform Commercial Code provisions that govern the Selling Stockholders' sale of the stock to the Underwriters, assuming at such time that the Underwriters acquire the stock in good faith without notice of any adverse claim.

In rendering such opinion, such counsel may (i) state that its opinion is limited to matters governed by the federal laws of the United States of America, the laws of the State of Texas and the General Corporation Law of the State of Delaware and that such counsel is not admitted in the State of Delaware and (ii) expressly exclude from its opinion all matters involving the application of patent law, *provided that* Aquilino & Welsh, patent counsel to the Company, furnishes to the Representatives the opinion set forth in Section 9(h) of this Agreement. Such counsel shall also have furnished to the Representatives a written statement, addressed to the Underwriters and dated such Delivery Date, in form and substance satisfactory to the Representatives, to the effect that (x) such counsel has acted as counsel to the Company and to each Selling Stockholder in connection with the preparation of the Registration Statement, (y) such counsel has participated in conferences with officers and other representatives of the Company, the independent accountants for the Company and counsel for and other representative of the Underwriters in connection with the preparation of the Registration Statement and the Prospectus and has considered the matters required to be stated therein and the statements contained therein, (z) based on the foregoing, no facts have come to the attention of such counsel that lead it to believe that the Registration Statement, as of the Effective Date, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading, or that, as of the date thereof and as of such Delivery Date, the Prospectus contained or contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided, however*, such counsel need express no comment as to financial statements, the notes thereto and related schedules and other financial and accounting data included in the Registration Statement or the Prospectus.

In rendering such opinion, counsel for the Company may rely (i) as to matters of fact, to the extent it deems proper, on certificates of responsible officers of the Company and the Subsidiaries; (ii) to the extent it deems proper, upon written statements or certificates of officers of departments of various jurisdictions having custody of documents respecting the corporate existence or good standing of the Company and its subsidiaries, *provided that* copies of any such statements or certificates shall be delivered to counsel for the Underwriters; and (iii) in rendering the opinion in Sections (xiv) and (xv) above, rely solely upon a certificate of each Selling Stockholder in respect of matters of fact as to ownership of and liens, encumbrances, equities or claims on the shares of Stock sold by such Selling Stockholder, *provided that* such counsel shall furnish copies thereof to the Representatives and state that it believes that both the Underwriters and it are justified in relying upon such certificate.

195239 v7/SF
48m07L.DOC
071352

4.

UND 02909

A 678

If the foregoing correctly sets forth the agreement, the Selling Stockholders and the Underwriters, please indicate your acceptance in the space provided for that purpose below. Upon such acceptance this letter shall constitute a binding agreement among each of the Underwriters, the Company and each of the Selling Stockholders. It is understood that your acceptance of this letter on behalf of each of the Underwriters is pursuant to the authority set forth in a form of Agreement Among Underwriters.

Very truly yours,

ADAMS GOLF, INC.

By _____
Richard H. Murtland, Vice President-Research
and Development, Secretary, Treasurer

THE SELLING STOCKHOLDERS NAMED IN SCHEDULE 2
TO THIS AGREEMENT

By _____
Richard H. Murtland, Attorney-In-Fact

Accepted:

Lehman Brothers Inc.
NationsBanc Montgomery Securities LLC
Ferris, Baker Watts Incorporated

For themselves and as Representatives
of the several Underwriters named
in Schedule 1 hereto

By LEHMAN BROTHERS INC.

By _____
Authorized Representative

UND 02910

A 679

If the foregoing correctly sets forth the agreement, the Selling Stockholders and the Underwriters, please indicate your acceptance in the space provided for that purpose below. Upon such acceptance this letter shall constitute a binding agreement among each of the Underwriters, the Company and each of the Selling Stockholders. It is understood that your acceptance of this letter on behalf of each of the Underwriters is pursuant to the authority set forth in a form of Agreement Among Underwriters.

Very truly yours,

ADAMS GOLF, INC.

By _____
Richard H. Murtland, Vice President-Research and Development, Secretary, Treasurer

THE SELLING STOCKHOLDERS NAMED IN SCHEDULE 2 TO THIS AGREEMENT

By _____
Richard H. Murtland, Attorney-in-Fact

Accepted:

Lehman Brothers Inc.
NationsBanc Montgomery Securities LLC
Ferris, Baker Watts Incorporated

For themselves and as Representatives
of the several Underwriters named
in Schedule 1 hereto

By LEHMAN BROTHERS INC.

By _____
Authorized Representative

UND 02911

A 680

UNITED STATES OF AMERICA
BEFORE THE
SECURITIES AND EXCHANGE COMMISSION

July 9, 1998

| | |
|---|---|
| In the Matter of Issuer(s) <br> ADAMS GOLF, INC. <br> 300 DELAWARE AVENUE, SUITE 548 <br> WILMINGTON, DELAWARE   19801 | ORDER DECLARING THE REGISTRATION STATEMENT EFFECTIVE PURSUANT TO SECTION 8(a) OF THE SECURITIES ACT OF 1933, AS AMENDED |
| File No(s)   333-51715 | |

Request having been made that registration statement referred to in the caption  hereof be made effective pursuant  to Section 8(a) of the Securities Act of 1933.

IT IS ORDERED that the said statement is hereby declared effective at   7-9-98      4:30 pm

For the Commission, by the Division of Corporation Finance, pursuant to delegated authority.

Jonathan G. Katz
Secretary

ADAMS 001752

A 681

C.1. KPMG Letter (7/10/98) to Reps

UND 02782

A 682



**KPMG**

ADAMS GOLF, INC.

· Letter to Underwriters

July 10, 1998

UND 02783

A 683

**KPMG** Peat Marwick LLP

200 Crescent Court
Suite 300
Dallas, TX 75201-1885

July 10, 1998

The Board of Directors
Adams Golf, Inc.

Lehman Brothers Inc.
NationsBanc Montgomery Securities LLC
Ferris, Baker Watts, Incorporated
(as the representatives of the several Underwriters)

Ladies and Gentlemen:

We have audited the consolidated balance sheets of Adams Golf, Inc. and subsidiaries ("Adams" or the "Company") as of December 31, 1996 and 1997, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 1997, and the related financial statement schedule, all included in the Registration Statement (No. 333-51715) on Form S-1 (the "Initial Registration Statement") and incorporated by reference in the Registration Statement (No. 333-58917) on Form S-1 (the "Additional Registration Statement") filed by the Company under the Securities Act of 1933, as amended (the "Act"); our report with respect thereto is also included in the Initial Registration Statement and incorporated by reference in the Additional Registration Statement. The Initial Registration Statement, as amended on July 9, 1998, the Additional Registration Statement, as filed on July 10, 1998, and the related final prospectus dated July 9, 1998 are collectively herein referred to as the "Registration Statement".

In connection with the Registration Statement:

1.    We are independent certified public accountants with respect to the Company within the meaning of the Act and the applicable rules and regulations thereunder adopted by the Securities and Exchange Commission (the "SEC").

2.    In our opinion, the consolidated financial statements and financial statement schedule audited by us and included in the Registration Statement comply as to form in all material respects with the applicable accounting requirements of the Act and the related published rules and regulations adopted by the SEC.

Member Firm of KPMG International

UND 02784

A 684

2

3.  We have not audited any financial statements of Adams as of any date or for any period subsequent to December 31, 1997; although we have conducted an audit for the year ended December 31, 1997, the purpose (and therefore the scope) of the audit was to enable us to express our opinion on the consolidated financial statements of Adams as of December 31, 1997, and for the year then ended, but not on the financial statements for any interim period within that year. Therefore, we are unable to and do not express any opinion on the unaudited consolidated balance sheet as of March 31, 1998, and the unaudited consolidated statements of operations and cash flows for the three-month periods ended March 31, 1997 and 1998 and unaudited consolidated statement of stockholders' equity for the three-month period ended March 31, 1998, included in the Registration Statement, or on the financial position, results of operations, or cash flows as of any date or for any period subsequent to December 31, 1997.

4.  For purposes of this letter, we have read the 1998 minutes of the meetings of the board of directors of Adams as set forth in the minutes books at July 6, 1998, officials of the Company having advised us that the minutes of all such meetings through that date were set forth therein; we have carried out other procedures to July 6, 1998, as follows (our work did not extend to the period from July 7, 1998 to July 9, 1998):

    a)  With respect to the three-month periods ended March 31, 1997 and 1998, we have:

        (i)   Performed the procedures specified by the American Institute of Certified Public Accountants for a review of interim financial information as described in SAS No. 71, *Interim Financial Information*, on the unaudited consolidated balance sheet as of March 31, 1998, and the unaudited consolidated statements of operations and cash flows for the three-month periods ended March 31, 1997 and 1998 and unaudited consolidated statement of stockholders' equity for the three-month period ended March 31, 1998, included in the Registration Statement.

        (ii)  Inquired of certain officials of the Company who have responsibility for financial and accounting matters whether the unaudited consolidated financial statements referred to in a(i) comply as to form in all material respects with the applicable accounting requirements of the Act and the related rules and regulations adopted by the SEC.

    b)  With respect to the period from April 1, 1998 to May 31, 1998, we have:

        (i)   Read the unaudited consolidated financial statements of the Company for April and May of both 1997 and 1998 furnished to us by the Company, officials of the Company having advised us that no such financial statements as of any date or for any period subsequent to May 31, 1998 were available. The financial information for April and May of both 1997 and 1998 is incomplete in that it omits the statement of cash flows and footnote disclosures required under generally accepted accounting principles.

        (ii)  Inquired of certain officials of the Company who have responsibility for financial and accounting matters whether the incomplete unaudited consolidated financial statements referred to in b(i) are stated on a basis substantially consistent with that of the audited consolidated financial statements included in the Registration Statement.

UND 02785

A 685

3

The foregoing procedures do not constitute an audit conducted in accordance with generally accepted auditing standards. Also, they would not necessarily reveal matters of significance with respect to the comments in the following paragraph. Accordingly, we make no representations regarding the sufficiency of the foregoing procedures for your purposes.

5. Nothing came to our attention as a result of the foregoing procedures, however, that caused us to believe that:

   a) (i) Any material modifications should be made to the unaudited consolidated financial statements described in 4a(i), included in the Registration Statement, for them to be in conformity with generally accepted accounting principles.

      (ii) The unaudited consolidated financial statements described in 4a(i) do not comply as to form in all material respects with the applicable accounting requirements of the Act and the related rules and regulations adopted by the SEC.

   b) (i) At May 31, 1998, there was any change in the common stock, increase in long-term debt, or decreases in consolidated net current assets or stockholders' equity of Adams as compared with amounts shown in the March 31, 1998 unaudited consolidated balance sheet included in the Registration Statement, or (ii) for the period from April 1, 1998 to May 31, 1998, there were any decreases, as compared to the corresponding period in the preceding year, in consolidated net sales or in the total or per-share amounts of net income, except in all instances for changes, increases, or decreases that the Registration Statement discloses have occurred or may occur and except that the unaudited balance sheet as of May 31, 1998, which we were furnished by the Company, showed common stock outstanding has increased by 900,000 shares as compared to the common stock outstanding at March 31, 1998.

6. As mentioned in 4b(i), Company officials have advised us that no consolidated financial statements as of any date or for any period subsequent to May 31, 1998 are available; accordingly, the procedures carried out by us with respect to changes in financial statement items after May 31, 1998 have, of necessity, been even more limited than those with respect to the periods referred to in 4. We have inquired of certain officials of the Company who have responsibility for financial and accounting matters whether (a) at July 6, 1998, there was any change in common stock, increase in long-term debt or any decreases in consolidated net current assets or stockholders' equity of Adams as compared with amounts shown on the March 31, 1998 unaudited consolidated balance sheet included in the Registration Statement, or (b) for the period from April 1, 1998 to July 6, 1998, there were any decreases, as compared with the corresponding period in the preceding year, in consolidated net sales or in total or per-share amounts of net income. On the basis of these inquiries and our reading of the minutes described in 4, nothing came to our attention that caused us to believe that there was any such change, increase, or decrease, except in all instances for changes, increases, or decreases that the Registration Statement discloses have occurred or may occur and except as described in the following sentence. We have been informed by officials of the Company that common stock outstanding has increased by 900,000 shares as compared to the common stock outstanding at March 31, 1998.

UND 02786

A 686

4

7.  For purposes of this letter, we have also read the items identified by you on the attached copies of certain pages from the Registration Statement, and have performed the following procedures, which were applied as indicated with respect to the symbols explained below. For purposes of reporting our findings, in those items in which one or both of the compared amounts or percentages stated were rounded to some degree and the amounts or percentages were in agreement, except that they were not rounded to the same degree, we have nevertheless stated that we found the compared amounts to be in agreement. Additionally, all "schedules prepared by Adams" are derived from the Company's accounting records.

(A)  Compared or recomputed the amount or percentage with the corresponding amount or percentage in the Adams' audited consolidated financial statements included in the Registration Statement and found them to be in agreement.

(B)  Compared or recomputed the amount or percentage with the corresponding amount or percentage in the Adams' unaudited consolidated financial statements as of March 31, 1998 and for the three-month periods ended March 31, 1997 and 1998, included in the Registration Statement, and found them to be in agreement.

(C)  Compared to a schedule prepared by Adams that revealed net sales of the expanded line of Tight Lies fairway woods of $11,968,025 and net sales of the original Tight Lies fairway woods of $11,885,572, for the three months ended March 31, 1998.

(D)  Compared the amount or percentage to a schedule prepared by Adams and found them to be in agreement or recomputed the amount or percentage based on amounts appearing in the schedule and found them to be in agreement.

(E)  Compared the amount to the Company's payroll records for the period indicated and found them to be in agreement.

(F)  Compared the information to the respective Promissory Notes and found them to be in agreement.

ʌ  Verified the mathematical accuracy of the column or table.

8.  Our audits of the consolidated financial statements for the periods referred to in the introductory paragraph of this letter were comprised of audit tests and procedures deemed necessary for the purpose of expressing an opinion on such financial statements taken as a whole. For none of the periods referred to therein, or any other period, did we perform audit tests for the purpose of expressing an opinion on individual amounts, balances of accounts, percentages, or summaries of selected transactions such as those included on the attached copies of certain pages from the Registration Statement and, accordingly, we express no opinion thereon.

UND 02787

A 687

5

9. It should be understood that we make no representations regarding questions of legal interpretation or regarding the sufficiency for your purposes of the procedures enumerated in the preceding paragraphs; also, such procedures would not necessarily reveal any material misstatements of the amounts or percentages included on the attached copies of certain pages from the Registration Statement. Further, we have addressed ourselves solely to the foregoing data as set forth in the Registration Statement and make no representations regarding the adequacy of disclosures or regarding whether any material facts have been omitted.

10. This letter is solely for the information of the addressees and to assist the Underwriters in conducting and documenting their investigation of the affairs of Adams in connection with the offering of the securities covered by the Registration Statement, and it is not to be used, circulated, quoted, or otherwise referred to within or without the underwriting group for any purpose, including but not limited to the registration, purchase or sale of the securities, nor is it to be filed with or referred to in whole or in part in the Registration Statement or any other document, except that reference may be made to it in the underwriting agreement or in any list of closing documents pertaining to the offering of the securities covered by the Registration Statement.

Very truly yours,

KPMG Peat Marwick LLP

UND 02788

A 688

## PROSPECTUS SUMMARY

*The following summary information is qualified in its entirety by and should be read in conjunction with the more detailed information and the Company's Consolidated Financial Statements (including the Notes thereto) appearing elsewhere in this Prospectus. Unless otherwise indicated, all share amounts, per share amounts and other information in this Prospectus have been adjusted to give retroactive effect to a 2-for-1 stock split of the Common Stock and assume no exercise of the Underwriters' over-allotment option. References in this Prospectus to the "Company" or "Adams" are, unless the context otherwise requires, to Adams Golf, Inc., a Delaware corporation, and its subsidiaries.*

### The Company

Adams designs, manufactures and markets premium quality, technologically innovative golf clubs. The Company's design objective is to produce golf clubs that deliver meaningful performance benefits and inspire player confidence. The Company believes that its most successful product line to date, the Tight Lies fairway woods, meets this objective by providing golfers with the ability to hit the ball from virtually any lie while maximizing distance. The patented Tight Lies fairway woods feature an upright trapezoidal head, a shallow face and a lower center of gravity as compared to conventional fairway woods. The complete Tight Lies line of products includes the original, Strong 3, Strong 5, Strong 7 and Strong 9 fairway woods. According to the Golf Market Research Institute, the Tight Lies fairway woods were the top-selling single fairway woods in the U.S. on a unit volume basis during the three months ended March 31, 1998. During this period, the Company achieved a 27% market share of the single fairway woods category.

Adams has developed a marketing model that integrates direct response and traditional image-based advertising to generate brand awareness and drive retail sales. The Company's advertising includes a 30-minute informative television commercial ("infomercial") and print advertising in publications such as *Golf Digest, USA Today* and *The Wall Street Journal.* For the three months ended March 31, 1998, approximately 79% of the Company's sales occurred at the retail level. To preserve the integrity of its image and reputation, the Company currently limits its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and technical expertise. The Company currently sells its products to on- and off-course golf shops and selected sporting goods retailers. The Company believes its selective retail distribution helps its retailers to maintain profitable margins and maximize sales of Adams' products.

Another important element of the Company's success to date has been its sales and customer service infrastructure. Rather than relying on independent sales representatives, as do many other golf equipment companies, Adams maintains an inside sales department that currently consists of 25 employees who are in regular telephone contact with the Company's over 7,000 retailers. These sales representatives are supported by 13 field-based Regional Account Coordinators who maintain personal contact with the Company's retailers nationwide. The Company believes that using and carefully managing its own sales force enables it to significantly reduce selling expenses. Adams also has a separate 30-seat customer call center that provides customer service to retailers and consumers. The majority of the Company's sales and customer service personnel are experienced golfers. The Company believes interaction with its knowledgeable representatives promotes customer satisfaction and helps to strengthen the Adams brand.

In 1997, wholesale sales of golf equipment in the U.S. reached an estimated $2.4 billion. Wholesale sales of golf clubs increased at an estimated compound annual growth rate of approximately 13% over the 5-year period from 1992 to 1997. The Company believes that a number of trends are likely to further increase the demand for Adams' products. These trends include: (i) significant growth in the number of golf courses; (ii) increasing interest in golf from women, junior and minority golfers; (iii) the large numbers of golfers entering their 40s and 50s, the age when most golfers begin to play more often and increase their spending on the sport; (iv) the correspondingly large population of "Echo Boomers," who are beginning to

3

UND 02789

A 689

enter their 20s, the age when golfers generally take up the sport; and (v) the rapid evolution of golf club designs and materials.

The Company recently established a relationship with internationally recognized, professional golfer Nicholas A. Faldo, who currently uses the Tight Lies fairway woods. Mr. Faldo was inducted into the World Golf Hall of Fame in May 1998 and has won more major championships in the 1990s than any other golfer. Pursuant to the terms of the agreement, Mr. Faldo has agreed to, among other things, (i) exclusively endorse the Company's golf clubs and undertake certain other promotional activities on behalf of the Company and (ii) assist in the design and field testing of a new line of golf clubs. In exchange for his services, Mr. Faldo was granted 900,000 shares of Common Stock and is entitled to receive certain minimum royalties. Absent an early termination event, the agreement with Mr. Faldo continues through-out his lifetime. The Company believes that Mr. Faldo's comprehensive knowledge of the game of golf and reputation for technical excellence complement the Company's capabilities and strong brand identity. See "Certain Transactions."

The Company intends to develop proprietary new technologies and product designs that provide golfers with meaningful performance benefits. Capitalizing on the technical knowledge and expertise gained through the Tight Lies fairway woods, the Company is currently testing prototypes of a potential new driver. This new product is expected to combine the distance of a driver with the playability of a fairway wood. The Company currently expects the new driver to be introduced after the end of fiscal year 1998. The Company is working with Mr. Faldo to design and test this new driver as well as other potential new products.

The Company's goal is to establish itself as a leading developer of technologically innovative, performance-oriented golf clubs. To achieve this goal the Company intends to (i) build its share of the premium fairway woods market; (ii) leverage the success, performance and reputation of the Tight Lies fairway woods; (iii) expand international sales; and (iv) develop new technologies and product designs.

The address of the Company's principal executive office is 300 Delaware Avenue, Suite 548, Wilmington, Delaware 19801. The Company's telephone number at this address is (302) 427-5892. Adams' principal manufacturing and management headquarters are located at 2801 East Plano Parkway, Plano, Texas 75074 and its telephone number at this location is (972) 673-9000. The Company's World Wide Web site is located at www.adamsgolf.com. The contents of the Company's Web site shall not be deemed to be part of this Prospectus.

## The Offering

Common Stock offered by:

| | |
|---|---|
| The Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,000,000 shares |
| The Selling Stockholders . . . . . . . . . . . . . . . . . . . . . . . | 2,000,000 shares |
| · Total Common Stock Offered . . . . . . . . . . . . . . . . . . . | 6,000,000 shares |
| Common Stock to be outstanding after the Offering(1) . . . . . | 23,099,282 shares |
| Use of net proceeds to the Company . . . . . . . . . . . . . . . . . | Working capital and general corporate purposes |
| Nasdaq National Market Symbol . . . . . . . . . . . . . . . . . . . | ADGO |

(1) Excludes 423,666 shares of Common Stock issuable upon the exercise of outstanding stock options at May 31, 1998.

4

UND 02790

A 690

## RISK FACTORS

*An investment in the Common Stock offered hereby involves a high degree of risk. Prospective purchasers of Common Stock offered hereby should consider carefully the following factors in addition to other information in this Prospectus. This Prospectus contains forward-looking statements which involve risks and uncertainties. The Company's actual results and the timing of certain events could differ materially from those anticipated by such forward-looking statements as a result of certain factors discussed in this Prospectus, including the factors set forth below and in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business." See "Disclosure Regarding Forward-Looking Statements."*

### Dependence on New Product Introductions; Uncertain Consumer Acceptance

During the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998, approximately 47.2%, 94.3% and 97.3%, respectively, of the Company's net sales were derived from the sale of Tight Lies fairway woods. Sales of this product line are expected to account for a substantial portion of the Company's net sales for some time. A decline in demand for, or average selling prices of, the Tight Lies line of products would have a material adverse effect on the Company's business, operating results and financial condition. Accordingly, the Company's continued growth and success depend, in large part, on its ability to successfully develop and introduce new products accepted in the marketplace. Historically, a large portion of new golf club technologies and product designs have been met with consumer rejection. No assurance can be given that the new driver currently under development will meet with market acceptance or that the Company will be able to continue to design, manufacture and introduce new products that will meet with market acceptance. Failure by the Company to identify and develop innovative new products that achieve widespread market acceptance would adversely affect the Company's future growth and profitability. Additionally, successful technologies, designs and product concepts are likely to be copied by competitors. Accordingly, the Company's operating results could fluctuate as a result of the amount, timing and market acceptance of new product introductions by the Company or its competitors. The design of new golf clubs is also greatly influenced by the rules and interpretations of the U.S. Golf Association ("USGA"). Although the golf equipment standards established by the USGA generally apply only to competitive events sanctioned by that organization, the Company believes that it is critical for its future success that new clubs introduced by the Company comply with USGA standards. In an effort to anticipate emerging technology while maintaining the fundamental challenge of the game of golf, the USGA has recently announced that it will create a new standard for golf equipment by the year 2000. While this new standard would be set at a level that makes all currently approved clubs legal under the Rules of Golf, the testing methods being used to establish the standard are uncertain, therefore, it may take considerable time to define and promote the standard, which could delay research and development and the subsequent introduction of new products by the Company. No assurance can be given that any new products will receive USGA approval or that existing USGA standards will not be altered in ways that adversely affect the sales of the Company's products. See "—Historical Dependence on Television Advertising."

### Limited History of Profitability

The Company has a limited history of profitability. Although the Company generated net income during the year ended December 31, 1996 and the three months ended March 31, 1998, it has historically experienced net losses from operations. There can be no assurance that the Company will be able to sustain profitability on a quarterly or annual basis in the future. The Company's prospects must be considered in light of the significant risks, challenges and difficulties frequently encountered by companies experiencing rapid growth. To address these risks, the Company must, among other things, successfully increase the scope of its operations, respond to competitive and technological developments, continue to attract, retain and motivate qualified personnel and continue to develop and obtain market acceptance of its products. There can be no assurance that the Company will be successful in addressing these risks and challenges. See "—Dependence on New Product Introductions; Uncertain Consumer Acceptance,"

6

UND 02791

A 691

Stock and may adversely affect the market price of and the voting and other rights of the holders of the Common Stock. The Company has not issued, and currently has no plans to issue, shares of preferred stock. See "Description of Capital Stock—Preferred Stock" and "—Delaware Law and Certain Charter and Bylaw Provisions."

### Absence of Public Market for Common Stock and Volatility

Prior to the Offering there has been no public market for the Common Stock, and there can be no assurance that an active trading market will develop or be sustained after the Offering. The initial public offering price of the Common Stock offered hereby will be determined through negotiations among the Company, the Selling Stockholders and the Underwriters, and may not be indicative of the market price for the Common Stock after the Offering. The market price for shares of the Common Stock may be volatile depending on a number of factors, including business performance, industry dynamics, news announcements or changes in general market conditions. See "Underwriting."

### Dilution

The initial public offering price is substantially higher than the book value per share of Common Stock. Investors purchasing shares of Common Stock in the Offering will therefore incur immediate and substantial dilution in net tangible book value per share of $12.71. To the extent outstanding options to purchase the Company's Common Stock are exercised, there will be further dilution. See "Dilution."

### DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Prospectus includes "forward-looking statements" including statements containing the words "believes," "anticipates," "expects" and words of similar import. All statements other than statements of historical fact included in this Prospectus, including without limitation, such statements under "Prospectus Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business" and located elsewhere herein, regarding the Company or any of the transactions described herein, including the timing, financing, strategies and effects of such transactions, are forward-looking statements. Although the Company believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from expectations are disclosed in this Prospectus, including, without limitation, in conjunction with the forward-looking statements in this Prospectus and/or under "Risk Factors." The Company does not intend to update these forward-looking statements.

12

UND 02792

A 692

# DILUTION

At March 31, 1998, the Company's net tangible book value was $14,659,000 or $0.81 per share. Net tangible book value per share represents the amount of the Company's total tangible assets less the Company's total liabilities, divided by the number of shares of Common Stock outstanding. Without taking into account any other changes in such net tangible book value after March 31, 1998, other than to give effect to the sale of 4,000,000 shares of Common Stock offered by the Company hereby (after deduction of estimated expenses payable by the Company and underwriting discounts and commissions), the net tangible book value of the Company on March 31, 1998 would have been $72,929,000 or $3.29 per share. This represents an immediate increase in net tangible book value of approximately $2.48 per share to the Company's existing stockholders and an immediate dilution in net tangible book value of $12.71 per share to new investors in the Offering. The following table illustrates this per share dilution:

| | | |
|---|---:|---:|
| Initial public offering price per share .......................................... | | $16.00 |
|    Net tangible book value per share before the Offering ..................... | $0.81 | |
|    Increase in net tangible book value per share attributable to new investors ....... | 2.48 | |
| Net tangible book value per share after the Offering ......................... | | 3.29 |
| Dilution per share to new investors ........................................... | | $12.71 |

The following table sets forth, at May 31, 1998, the difference between existing stockholders and the new investors in the Offering with respect to the number of shares purchased from the Company, the total consideration paid and the average price per share paid.

| | Shares Purchased from the Company | | Total Consideration | | Average Price Per Share |
|---|---:|---:|---:|---:|---:|
| | Number | Percent | Amount | Percent | |
| Existing stockholders ................... | 19,099,282 | 82.7% | $ 4,838,636 | 7.0% | $ 0.25 |
| New investors ........................ | 4,000,000 | 17.3 | 64,000,000 | 93.0 | $ 16.00 |
| Total .............................. | 23,099,282 | 100.0% | 68,838,636 | 100.0% | |

The above computations exclude 423,666 shares of Common Stock issuable upon exercise of stock options outstanding at May 31, 1998. At May 31, 1998, an additional 518,000 shares of Common Stock are reserved for issuance under the Company's 1998 Stock Incentive Plan (the "Incentive Plan"). To the extent that any outstanding options are exercised, or additional options are issued, there will be further dilution to new investors in the Offering. See "Management—Benefit Plans," "Description of Capital Stock," "Shares Eligible for Future Sale" and "Underwriting."

14

UND 02793

A 693

## SELECTED CONSOLIDATED FINANCIAL INFORMATION

The following selected financial data at and for the fiscal years ended December 31, 1995, 1996 and 1997 are derived from the Consolidated Financial Statements of the Company, which have been audited by KPMG Peat Marwick LLP, independent certified public accountants. The selected financial information for the three months ended March 31, 1997 and 1998 are derived from unaudited Consolidated Financial Statements of the Company. In the opinion of management, all adjustments consisting only of normal recurring adjustments, necessary for a fair presentation of the financial position and results of operations, have been included in such unaudited Consolidated Financial Statements. Results for the three months ended March 31, 1998 may not be indicative of the results expected for the year ended December 31, 1998. The Consolidated Financial Statements at December 31, 1996 and 1997 and for each of the years in the three-year period ended December 31, 1997, and the independent auditors' report are included elsewhere in this Prospectus. The selected financial data should be read in conjunction with the Consolidated Financial Statements, the related Notes thereto, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the other financial information included elsewhere herein.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | (in thousands, except per share data) | | | | |
| **Consolidated Statements of Operations Data(1):** | | | | | |
| Net sales | $1,125 | $ 3,522 | $36,690 | $ 1,475 | $24,511 |
| Cost of goods sold | 756 | 1,590 | 9,991 | 587 | 5,862 |
| Gross profit | 369 | 1,932 | 26,699 | 888 | 18,649 |
| Operating expenses (excluding stock compensation and bonus award) | 613 | 1,709 | 15,826 | 823 | 9,777 |
| Stock compensation and bonus award(2) | — | 214 | 14,842 | — | — |
| Operating income (loss) | (244) | 9 | (3,969) | 65 | 8,872 |
| Income (loss) before taxes | (243) | 13 | (4,071) | 61 | 8,773 |
| Net income (loss) | $ (243) | $ 13 | $(4,654) | $ 45 | $ 5,642 |
| Income (loss) per common share(3): | | | | | |
| Basic | $ (.05) | $ — | $ (.37) | $ — | $ .32 |
| Diluted | $ (.05) | $ — | $ (.37) | $ — | $ .31 |
| Weighted average common shares(3): | | | | | |
| Basic | 4,423 | 11,238 | 12,519 | 11,873 | 17,662 |
| Diluted | 4,423 | 11,238 | 12,519 | 11,873 | 18,340 |

| | At December 31, | | | At March 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | (in thousands) | | | | |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 243 | $ 855 | $ 1,956 | $ 760 | $ 602 |
| Working capital | 575 | 1,475 | 6,915 | 1,558 | 12,299 |
| Total assets | 658 | 2,559 | 17,360 | 3,116 | 25,793 |
| Total debt (including current maturities) | — | 230 | — | 479 | 1,135 |
| Stockholders' equity | 615 | 1,978 | 8,325 | 2,024 | 14,667 |

(1) This table excludes financial information for the fiscal years ended December 31, 1993 and 1994 because operations in those years were not comparable in size or scope to current operations.

(2) Consists primarily of a stock award to the Company's founder, Chief Executive Officer and President. See "Certain Transactions" and Note 9 of Notes to Consolidated Financial Statements.

(3) See Note 1 of Notes to Consolidated Financial Statements for information concerning the calculation of income (loss) per common share and weighted average common shares outstanding.

16

UND 02794

A 694

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following management's discussion and analysis of financial condition and results of operations addresses the performance of the Company for the three months ended March 31, 1997 and 1998, and the years ended December 31, 1995, 1996 and 1997, and should be read in conjunction with the Company's Consolidated Financial Statements and Notes thereto appearing elsewhere in this Prospectus.

### Overview

Adams designs, manufactures and markets premium quality, technologically innovative golf clubs. Founded in 1987, the Company operated initially as a components supplier and contract manufacturer. Thereafter, the Company established its custom fitting operation which currently services a network of over 100 certified custom fitting accounts. In the fall of 1995, the Company introduced the original Tight Lies fairway wood, and, in December 1996, the Company extended the Tight Lies line to include the Tight Lies Strong 3, Strong 5 and Strong 7, with the Tight Lies Strong 9 being introduced in January 1998. Sales of the Tight Lies line of products increased significantly subsequent to the second quarter of 1997 when the Company launched an infomercial relating to the original Tight Lies fairway wood.

The Company's net sales are primarily derived from sales to on- and off-course golf shops and selected sporting goods retailers and, to a much lesser extent, direct sales to consumers, international distributors and the Company's custom fitting accounts. The Company defines net sales as gross sales less returns. The Company recognizes sales and an allowance for returns is estimated at the time products are shipped. The Company's net sales increased to $36.7 million for 1997 from $1.1 million for 1995 and to $24.5 million for the three months ended March 31, 1998 from $1.5 million for the three months ended March 31, 1997. The Company's net sales are based on orders for immediate delivery and backlog is not, therefore, necessarily indicative of future net sales.

The Company does not currently manufacture the components required to assemble its golf clubs, relying instead on component suppliers. Costs of the Company's Tight Lies fairway woods consist primarily of component parts, including the head, shaft and grip. To a lesser extent, the Company's cost of goods sold includes labor and occupancy costs in connection with the inspection, testing and assembly of component parts at its facility in Plano, Texas.

Operating expenses are composed primarily of selling and royalty expenses, general and administrative expenses, and to a lesser extent, research and development expenses. Selling and royalty expenses include advertising and marketing expenses, salaries and commissions, royalties related to the Company's infomercial and independent consulting fees. During the year ended December 31, 1997 and the first three months of 1998, royalties were approximately 6% of net sales of the Company's original Tight Lies fairway wood, excluding international and custom fitting sales. The Company expects royalties to increase as a percentage of net sales as a result of the agreement reached with Nick Faldo. The Company's royalty expenses were $0 and $944,451 for 1996 and 1997, respectively. Beginning May 1, 1998, Mr. Faldo is entitled to receive a royalty equal to 5% of the Company's net sales of golf clubs (other than certain specialty items for which the royalty is 10%) sold outside the U.S. Although, there is no minimum royalty for 1998, Mr. Faldo will be entitled to a minimum royalty in subsequent years. See "Certain Transactions." General and administrative expense includes salaries and benefits for corporate management, accounting, administrative support staff, bad debts, independent consulting and professional services, and office rent and utilities. Expenses associated with research and development efforts include salaries and independent consulting fees.

The Company was incorporated in Texas in 1987 and reincorporated in Delaware in 1990. The Company completed an internal reorganization in 1997 and now conducts its operations through several direct and indirect wholly-owned subsidiaries, including (i) Adams Golf Holding Corp., a Delaware corporation, which holds limited partnership interests of certain indirect subsidiaries of the Company; (ii) Adams Golf GP Corp., a Delaware corporation, which holds capital stock or limited partnership

17

UND 02795

A 695

interests, as applicable, of certain indirect subsidiaries of the Company; (iii) Adams Golf Direct Response, Ltd., a Texas limited partnership, which operates the call-center and advertising activities; (iv) Adams Golf, Ltd., a Texas limited partnership, which operates the golf club design, assembly and sales business; (v) Adams Golf IP, L.P., a Delaware limited partnership, which holds the intellectual property rights of the Company; and (vi) Adams Golf Management Corp., a Delaware corporation, which provides management and consulting services to certain of the Company's indirect subsidiaries.

## Results of Operations

The following table sets forth operating results expressed as a percentage of net sales for the periods indicated. Results for any one or more periods are not necessarily indicative of annual results or continuing trends. See "—Quarterly Results and Seasonality," below.

| Consolidated Statements of Operations Data | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 67.2 | 45.1 | 27.2 | 39.8 | 23.9 |
| Gross profit | 32.8 | 54.9 | 72.8 | 60.2 | 76.1 |
| Operating expenses | 54.5 | 54.6 | 83.6 | 55.8 | 39.9 |
| Operating income (loss) | (21.7) | 0.3 | (10.8) | 4.4 | 36.2 |
| Interest expense | — | — | 0.2 | 0.9 | — |
| Other income (expense) | 0.1 | 0.1 | (0.1) | 0.6 | (0.4) |
| Income (loss) before income taxes | (21.6) | 0.4 | (11.1) | 4.1 | 35.8 |
| Income tax expense | — | — | 1.6 | 1.1 | 12.8 |
| Net income (loss) | (21.6)% | 0.4% | (12.7)% | 3.0% | 23.0% |

### Three Months Ended March 31, 1997 Compared to Three Months Ended March 31, 1998

Net sales increased to $24.5 million for the three months ended March 31, 1998 from $1.5 million for the comparable period of 1997, primarily due to the continued market acceptance of the Company's Tight Lies line of fairway woods, and, to a lesser extent, a price increase effective January 1, 1998. Net sales of the Tight Lies line of fairway woods increased to $23.8 million from $1.1 million for the comparable period of 1997, and increased as a percentage of net sales to 97.3% from 75.8%, respectively. Sales of the Tight Lies fairway woods increased subsequent to the Company's introduction of an infomercial marketing its original Tight Lies fairway wood in the second quarter of 1997. Net sales of other product lines for the three months ended March 31, 1998 increased to $0.7 million from $0.4 million for the comparable period of 1997, but decreased as a percentage of net sales to 2.7% from 24.2%, respectively. Net sales of the Company's products outside the U.S. increased to $1.4 million for the three months ended March 31, 1998 from $0.2 million for the three months ended March 31, 1997, but decreased as a percentage of net sales to 5.7% from 11.0%, respectively. The increase in international sales in absolute dollars was due to increased market acceptance of the Tight Lies fairway woods and expanded international marketing efforts in the last half of 1997.

Gross profit increased to $18.6 million for the three months ended March 31, 1998 from $0.9 million for the comparable period of 1997, and increased as a percentage of net sales to 76.1% from 60.2%, respectively. Gross profit for the three months ended March 31, 1998 was favorably affected by an increased percentage of sales attributable to the higher margin Tight Lies fairway woods and the inherent cost savings associated with buying components in large volumes and assembling them on a substantially increased scale.

18

UND 02796

A 696

Operating income increased to $8.9 million for the three months ended March 31, 1998 from $65,000 for the comparable period of 1997 due to increased sales. Total operating expenses increased to $9.8 million for the three months ended March 31, 1998 from $0.8 million for the comparable period of 1997, principally as a result of increased selling and advertising costs related to the promotion of the Tight Lies fairway woods and increased administrative costs resulting primarily from the hiring of additional employees and slightly higher occupancy costs. As a percentage of net sales, operating expenses decreased for the three months ended March 31, 1998 to 39.9% from 55.8% for the comparable period of 1997.

**Year Ended December 31, 1996 Compared to Year Ended December 31, 1997**

Net sales increased to $36.7 million for 1997 from $3.5 million for 1996, primarily due to increased market acceptance of the Company's Tight Lies fairway woods. Net sales of the Tight Lies fairway woods increased to $34.6 million for 1997, from $1.7 million for 1996, and increased as a percentage of net sales to 94.3% from 47.2%, respectively. Net sales of other product lines increased to $2.1 million for 1997 compared to $1.8 million for 1996, but decreased as a percentage of net sales to 5.7% for 1997 from 52.8% for 1996.

Gross profit increased to $26.7 million for 1997 from $1.9 million for 1996, and increased as a percentage of net sales to 72.8% from 54.9%, respectively. Gross profit for 1997 was favorably affected by an increased percentage of sales attributable to the higher margin Tight Lies fairway woods and the inherent cost savings associated with buying components in large volumes and assembling them on a substantially increased scale.

The Company experienced operating loss of $4.0 million for 1997 as compared to operating income of $9,000 for 1996. Total operating expenses increased to $30.7 million for 1997 from $1.9 million for 1996. Of the $30.7 million of operating expenses for 1997, $14.8 million, or 48.4%, of expenses related to stock compensation and bonus awards to the Company's founder, Chief Executive Officer and President. See "Certain Transactions" and Note 9 of Notes to Consolidated Financial Statements. The expense recognized in 1996 in conjunction with these awards was $0.2 million, or 11.1% of operating expenses. In 1997, the Company also incurred higher expenses for selling and royalties and provision for bad debts, in each case due principally to increased sales of the Tight Lies fairway woods. General and administrative expenses also increased in 1997 due to the hiring of additional employees, and research and development expenses.

**Year Ended December 31, 1995 Compared to Year Ended December 31, 1996**

Net sales increased to $3.5 million for 1996 from $1.1 million for 1995, primarily due to the introduction of the original Tight Lies fairway wood in the fall of 1995. Net sales of the original Tight Lies fairway wood increased to $1.7 million for 1996 from $0.1 million for 1995, and increased as a percentage of net sales to 47.2% from 9.6%, respectively. Net sales of other products increased to $1.8 million for 1996 from $1.0 million for 1995, but decreased as a percentage of net sales to 52.8% from 90.4%, respectively. The increase in sales of other products in absolute dollars was due to increased sales of custom fitted golf clubs resulting from an increased number of teaching professionals who became certified Adams Golf club fitters during 1996.

Gross profit increased to $1.9 million for 1996 from $0.4 million for 1995, and increased as a percentage of net sales to 54.9% from 32.8%, respectively. The increase in gross profit was due to higher sales of the Company's products in 1996, specifically the higher margin original Tight Lies fairway wood.

Operating income was $9,000 for 1996 compared to an operating loss of $0.2 million for 1995. Total operating expenses increased to $1.9 million for 1996 from $0.6 million for 1995, and remained relatively flat as a percentage of net sales. Of the $1.9 million of operating expenses in 1996, $0.2 million, or 11.1%, of expenses were related to a bonus award to the Company's founder, Chief Executive Officer and President. The Company also incurred additional selling and general and administrative expenses in 1996 as a result of increased sales and hiring additional employees.

19

UND 02797

A 697

## Quarterly Results and Seasonality

The following table sets forth certain unaudited quarterly financial operational data for the five most recent quarters. A review in accordance with Statement on Auditing Standards No. 71 has not been performed by the Company's independent certified public accountants on the unaudited information in the table below.

| | March 31, 1997 | June 30, 1997 | Quarter Ended Sept. 30, 1997 | Dec. 31, 1997 | March 31, 1998 |
|---|---|---|---|---|---|
| Net sales | $1,475 B | $3,974 D | $14,236 D | $17,005 D | $24,511 B |
| Gross profit | 888 | 2,418 | 10,633 | 12,759 | 18,649 |
| Operating income (loss) | 65 | 4 | 4,212 | (8,250) | 8,872 |
| Net income (loss) | 45 | (4) | 3,144 | (7,839) | 5,642 |

Golf generally is regarded as a warm weather sport and sales of golf equipment historically have been strongest during the second and third quarters, with the weakest sales occurring during the fourth quarter. Although the Company's rapid growth has offset this trend in recent periods, no assurances can be given that the Company's growth will continue to offset the impact of seasonality, and therefore results for any one or more quarters are not necessarily indicative of annual results or continuing trends. In addition, sales of golf clubs are dependent on discretionary consumer spending, which may be affected by general economic conditions. A decrease in consumer spending generally could result in decreased spending on golf equipment, which could have a material adverse effect on the Company's business, operating results and financial condition. In addition, the Company's future results of operations could be affected by a number of other factors, such as unseasonal weather patterns; demand for and market acceptance of the Company's existing and future products; new product introductions by the Company's competitors; competitive pressures resulting in lower than expected average selling prices; and the volume of orders that are received and that can be fulfilled in a quarter. Any one or more of these factors could result in the Company failing to achieve its expectations as to future sales or net income.

Because most operating expenses are relatively fixed in the short term, the Company may be unable to adjust spending sufficiently in a timely manner to compensate for any unexpected sales shortfall, which could materially adversely affect quarterly results of operations. If technological advances by competitors or other competitive factors require the Company to invest significantly greater resources than anticipated in research and development or sales and marketing efforts, the Company's business, operating results or financial condition could be materially adversely affected. Accordingly, the Company believes that period-to-period comparisons of its results of operations should not be relied upon as an indication of future performance. In addition, the results of any quarter are not indicative of results to be expected for a full fiscal year. As a result of fluctuating operating results or other factors discussed above and below, in certain future quarters the Company's results of operations may be below the expectations of public market analysts or investors. In such event, the market price of the Company's Common Stock would be materially adversely affected.

## Stock-Based Compensation

In December 1997, the Board of Directors of the Company approved a stock compensation award of 2,000,000 shares of Common Stock to the Company's founder, Chief Executive Officer and President. The Company agreed to pay all income taxes due by the officer relating to such stock award and related tax bonus. As a result, compensation expense of approximately $12.5 million was charged to operations in 1997. In addition, this officer notified the Company of his intent to exercise stock options and an additional compensation expense of approximately $2.3 million was recorded in 1997. With respect to certain stock options granted to employees, the Company recorded deferred compensation of $981,000 and $788,000, respectively, in the first and second quarters of 1998. The Company will begin amortizing deferred compensation in the second quarter of 1998 over the vesting period, generally four years. In addition, in connection with its stock grant to Nick Faldo, the Company recorded deferred compensation of $10.1 million in the second quarter of 1998. This amount will be amortized to expense ratably over 10 years

20

UND 02798

A 698

beginning in the second quarter of 1998. See "Certain Transactions" and Note 9 of Notes to Consolidated Financial Statements.

## Year 2000 Compliance

Many existing computer systems and applications and other control devices use only two digits to identify a year in the date field, without considering the impact of the upcoming change in the century. As a result, as year 2000 approaches, computer systems and applications used by many companies may need to be upgraded to comply with "Year 2000" requirements. The Company relies on its systems in operating and monitoring many significant aspects of its business, including financial systems (such as general ledger, accounts payable, accounts receivable, inventory and order management), customer services, infrastructure and network and telecommunications equipment. The Company also relies directly and indirectly on the systems of external business enterprises such as customers, suppliers, creditors, financial organizations and domestic and international governments. The Company currently estimates that its costs associated with Year 2000 compliance, including any costs associated with the consequences of incomplete or untimely resolution of Year 2000 compliance issues, will not have a material adverse effect on the Company's business, financial condition or results of operations. However, the Company has not exhaustively investigated and does not believe it has fully identified the impact of Year 2000 compliance and has not concluded that it can resolve any issues that may arise in complying with Year 2000 without disruption of its business or without incurring significant expense. In addition, even if the Company's internal systems are not materially affected by Year 2000 compliance issues, the Company could be affected through disruption in the operation of the enterprises with which the Company interacts.

## Liquidity and Capital Resources

The Company historically has financed its operations principally through internally generated funds and funds from the private placement of equity securities. Such funds have been supplemented from time to time with short-term borrowings under the Company borrowing facilities. Primarily as a result of tax payments made by the Company in the first quarter of 1998, for the three months ended March 31, 1998 net cash used in operating activities was $1.5 million. Net cash provided by operating activities was $1.1 million for the year ended December 31, 1997.

Working capital totaled $12.3 million at March 31, 1998 compared to $6.9 million at December 31, 1997. Net trade accounts receivable amounted to $14.7 million at March 31, 1998 compared to $7.7 million at December 31, 1997. The increase was primarily due to increased net sales in the first three months of 1998. Inventory totaled $5.6 million at March 31, 1998 and $4.5 million at December 31, 1997.

The Company has a $10.0 million revolving credit facility, which expires on December 31, 1998. At May 31, 1998, the Company had no outstanding borrowings under this facility. Borrowings under the Company's revolving credit facility agreement are at interest rates based on the lending bank's general refinance rate of interest or certain LIBOR rates of interest. Obligations under the revolving credit facility loan agreement are collateralized by substantially all of the accounts receivable, inventory and equipment of the Company. See Note 7 of Notes to Consolidated Financial Statements. During the first quarter of 1998, the Company borrowed approximately $1.1 million in the form of a note payable to the Company's founder, Chief Executive Officer and President to be used for working capital purposes. The remaining principal amount of the note ($534,899 at April 30, 1998) is payable in two installments on December 15, 1998 and April 14, 1999 at an interest rate of 5.39%.

The Company's capital expenditures amounted to $1.7 million, $0.8 million and $0.1 million for the three months ended March 31, 1998 and the years ended December 31, 1997 and 1996, respectively. The Company anticipates making capital expenditures in the ordinary course of business of approximately $6.0 million in the balance of 1998, which includes implementing a customer management information system at an estimated cost of $1.9 million.

The Company believes that the cash flow from operations, the net proceeds of the Offering and the Company's $10.0 million credit facility will be sufficient to meet operating needs and capital expenditures for at least the next 12 months.

UND 02799

A 699

**Business Strengths**

The Company has developed the following business strengths that it believes provide it with a competitive advantage over many other golf club manufacturers:

*Strength of the Tight Lies Brand.* The Company believes that it has established a significant presence in the fairway woods market category. According to the Golf Market Research Institute, the Tight Lies fairway woods were the top selling single fairway woods in the U.S. on a unit volume basis during the three months ended March 31, 1998. During this period, the Company achieved a 27% market share of the single fairway woods category. The Company believes that the strength of its brand is further demonstrated by the rapid acceptance of the expanded line of Tight Lies fairway woods. Although at the time the Company only advertised the original Tight Lies fairway wood, sales of the expanded line represented 48.8% of net sales for the three months ended March 31, 1998.

*Innovative Marketing Model and Strong Retail Distribution.* Adams has developed a marketing model that integrates direct response and traditional image-based advertising to generate brand awareness and drive retail sales. For the three months ended March 31, 1998, approximately 79% of the Company's sales occurred at the retail level. To preserve the integrity of its image and reputation, the Company currently limits its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and technical expertise. The Company currently sells its products to on- and off-course golf shops and selected sporting goods retailers. The Company does not sell its products through price sensitive general discount warehouses, department stores or membership clubs. The Company believes its selective retail distribution helps its retailers maintain profitable margins and maximize sales of Adams products. The Company further believes it is well-positioned to utilize its marketing model and retail distribution for future products.

*Relationship with Nick Faldo.* The Company has recently entered into a relationship with Nick Faldo. Mr. Faldo was inducted into the World Golf Hall of Fame in May 1998 and has won more major championships in his career than any other golfer. In addition to numerous other domestic and international championships, Mr. Faldo has won the Masters three times (1989, 1990 and 1996) and the British Open three times (1987, 1990 and 1992). Mr. Faldo uses the Tight Lies fairway woods in competition and has agreed to work closely with the Company to assist in the design and testing of future golf clubs and other equipment. The Company believes that Mr. Faldo's comprehensive knowledge of the game of golf and reputation for technical excellence complements the Company's capabilities and strong brand identity.

*Sales and Customer Service Infrastructure.* Adams has committed significant resources to developing its sales and customer service infrastructure. Rather than relying on independent sales representatives, as do many other golf equipment companies, Adams maintains an inside sales department that currently consists of 25 employees who are in regular telephone contact with the Company's over 7,000 retailers. These sales representatives are supported by 13 field-based Regional Account Coordinators who maintain personal contact with the Company's retailers nationwide. The Company believes that using and carefully managing its own sales force enables it to significantly reduce selling expenses. Adams also has a separate 30-seat customer call center that provides customer service to retailers and consumers. The majority of the Company's sales and customer service personnel are experienced golfers. The Company believes interaction with its knowledgeable representatives promotes customer satisfaction and helps to strengthen the Adams brand.

*Emphasis on Quality.* Due in large part to its heritage in custom club fitting, Adams emphasizes quality control and precise adherence to design specifications. The Company has redundant sources of supply for each of the component parts used in the manufacture of its golf clubs and has established a quality assurance program at those manufacturing facilities located in Taiwan and China that are collectively responsible for producing substantially all of the Company's performance club heads. Upon arrival at the Company's manufacturing facilities in Plano, Texas, each component used in the Company's clubs is

24

UND 02800

A 700

again checked to ensure consistency with strict design specifications. Components are then sorted to identify variations in characteristics, such as head weight and shaft flexibility, that, although within the specified manufacturing tolerances, may affect club performance. The Company uses its patented variable moment of inertia ("VMI") formula to combine compatible components to produce a consistent swing feel across an entire set of clubs.

## Growth Strategy

The Company's goal is to establish itself as a leading developer of technologically innovative, performance-oriented golf clubs. The Company's strategy to achieve this goal includes the following elements:

*Building Market Share in Fairway Woods.* The Company's first priority is to build its share of the premium fairway woods market. The Company believes it can increase its market share by (i) continuing to build demand using the Company's marketing model; (ii) assisting existing retailers to increase their sales of the Tight Lies fairway woods by maintaining the relatively high margins currently enjoyed by such retailers; and (iii) increasing the number of on- and off-course golf shops and selected sporting goods retailers that distribute the Tight Lies fairway woods.

*Leveraging Consumer Acceptance of Tight Lies Brand.* The Company intends to leverage acceptance of the Tight Lies brand to develop and sell additional products, a strategy that has proven effective in marketing the Company's expanded line of Tight Lies fairway woods. For the three months ended March 31, 1998, sales of the expanded line of Tight Lies fairway woods exceeded sales of the original club. The Company believes that the success and performance of its Tight Lies fairway woods have earned Adams a reputation as a manufacturer of technologically innovative, performance-oriented golf clubs among its customers and avid golfers. The Company further believes that it will be able to efficiently introduce new products to this customer base through its recent investments in infrastructure, thereby generating sales and receiving valuable product feedback.

*Expanding International Sales.* Until recently, the Company has focused on developing sales domestically. For the year ended December 31, 1997 and the three months ended March 31, 1998, approximately 2% and 6%, respectively, of the Company's net sales were derived from international sales. Accordingly, the Company's sales to date have been achieved without significant contribution from international markets. Beginning in late 1997, the Company began leveraging its domestic strength to attract qualified international distributors. The Company currently has a network of 33 distributors located in 39 countries including Canada, Japan and the United Kingdom and expects to continue to build its international distribution. Toward this end, the Company has recently hired a Director of International Sales who has significant international golf equipment sales experience. Additionally, the Company believes that Nick Faldo's worldwide reputation will help drive international demand for the Company's products.

*Developing New Technologies and Product Designs.* The Company engages continuously in the process of developing new technologies and product designs that, when incorporated into golf clubs, are expected to provide golfers with meaningful performance benefits. Capitalizing on the technical knowledge and expertise gained through the Tight Lies fairway woods, the Company is currently testing prototypes of a potential new driver. This new product is expected to combine the distance of a driver with the playability of a fairway wood. The Company currently expects the new driver to be introduced after the end of fiscal year 1998. The Company is working with Mr. Faldo to design and test this new driver as well as other potential new products. To the extent that any new technology or product design can be developed to the point of commercial viability, the Company intends to introduce such technology or design into a single product and, if the product is well received by consumers, develop a broader product line around the core club category. The Company believes that the affiliation, endorsement and support of Nick Faldo will provide important credibility in the development and marketing of new technologies and product designs.

25

UND 02801

A 701

The Company's continued growth and success depend, in large part, on its ability to successfully develop and introduce new products that achieve widespread market acceptance. Failure by the Company to identify and develop innovative new technologies and product designs could adversely affect the Company's future growth and profitability. See "Risk Factors—Dependence on New Product Introductions; Uncertain Consumer Acceptance."

**Products**

The Company currently offers the following products:

*Original Tight Lies Fairway Wood.*  The original Tight Lies fairway wood has an innovative upright trapezoidal or "upside down" head shape that incorporates a distinctive shallow face, a low center of gravity and 16° of loft. The Company believes that this club is ideal for getting the ball airborne quickly and efficiently with optimum spin to maximize distance from the critical scoring area of 185 to 225 yards from the green. The Company further believes that the Tight Lies fairway woods are particularly effective from virtually any lie on the course including the rough, hard pan, fairway bunkers and divots.

*Expanded Line of Tight Lies Fairway Woods.*  In late 1996, based on initial consumer acceptance of the original Tight Lies fairway wood, the Company expanded its line to include the Tight Lies Strong 3 (13° loft), the Tight Lies Strong 5 (19° loft) and the Tight Lies Strong 7 (24° loft). In January 1998, the Company expanded the line again to include the Tight Lies Strong 9 (28° loft). The expanded line of Tight Lies fairway woods incorporates the same design innovations as the original club while providing golfers with increased flexibility to play these clubs from different distances on the course. For the three months ended March 31, 1998, sales of the expanded line of Tight Lies fairway woods exceeded sales of the original club.

*Other Club Lines.*  The Company's other clubs include the Air Assault Driver and the Assault-VMI irons. The Air Assault Driver was the Company's first product to incorporate the patented upright trapezoidal head. The Company's Assault-VMI irons are perimeter-weighted, cavity-backed, slightly offset irons which incorporate the Company's patented VMI design formula producing consistent swing feel across an entire set of clubs. The Company markets the Assault-VMI irons to professional and avid golfers exclusively through its network of over 100 certified custom fitting accounts. The Company believes that its custom fitting activities provide Adams with an in-depth understanding of golf club design and credibility in the golf industry.

Each golf club manufactured by the Company is available in a variety of shaft lengths and flexes to accommodate both men and women golfers of all ages and ability levels. In addition, once a club has received a certain degree of market acceptance, the Company has historically introduced a left-handed model. Currently, the Company offers each of its golf clubs in a left-handed model, with the exception of the recently introduced Tight Lies Strong 9.

26

UND 02802

A 702

The following table indicates the percentage of net sales in each major product group for the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998. Historical percentages may not be indicative of the Company's future product mix.

## Percentage of Net Sales by Product Group

| Product Group | Year Ended December 31, | | Three Months Ended March 31, 1998 |
| --- | --- | --- | --- |
| | 1996 | 1997 | |
| Original Tight Lies .................... | 45.6% D | 55.9% D | 48.5% D |
| 3, 5, 7 and 9 Tight Lies ................... | 1.6 | 38.4 | 48.8 |
| Other Club Lines ...................... | 52.8 | 5.7 | 2.7 |
| Total ............................. | 100.0% | 100.0% | 100.0% |

The Company supports each of its products with a two-year warranty. The warranty provides for repair or replacement of the golf club, except in the case of abuse. The Company has not experienced material amounts of breakage with respect to its golf clubs.

## Design and Development

The Company's design and development team is responsible for developing, testing and introducing new technologies and product designs. This team is currently spearheaded by Barney Adams, the founder of the Company and inventor of the Tight Lies fairway wood; Richard H. Murtland, Vice President—Research and Development; Mr. Nick Faldo and, independent consultants, Robert R. Bush and Dr. Michael M. Carroll. Mr. Bush has over 30 years of experience in golf club development, most notably, as Director of Technical Services for True Temper Sports, a leading shaft manufacturer, where from 1966 to 1993, he was responsible for testing all golf club shafts. Mr. Bush was instrumental in the development of "Iron Byron," the industry standard for the mechanical testing of golf clubs and balls. Mr. Bush is currently a member of the Technical Advisory Panel for *Golf Digest*. Dr. Michael M. Carroll is Dean of the George R. Brown School of Engineering at Rice University in Houston, Texas. Dr. Carroll holds doctorate degrees in both physics and mathematics and is an avid golfer. Dr. Carroll has worked with the Adams design and development team since April 1, 1998 and is responsible for the scientific analysis of each new product under development by the Company.

The design and development team engages in a five-step process to create new products.

*Concept Development.* During concept development, Adams' design and development team identifies specific desirable ball flight objectives. In addition, the Company considers new ideas from professional golfers, inventors, distributors and others. The Company expects that Nick Faldo will play a significant role in future concept development.

*Design Specifications.* The Company's product design and development team determines design specifications for the club, including shaft length, flex and weight, head design, loft and overall club weight. Throughout the design specifications process, the Company refers to and incorporates the golf equipment standards developed by the USGA. Although the standards set by the USGA only apply to competitive events sanctioned by that organization, the Company believes it is critical for new clubs to comply with these standards. At this time, the product design and development team also determines the optimal materials to use in the club. The Company will not use higher cost materials, such as titanium or other alloys, unless such expensive materials provide meaningful performance benefits. This stage of product development typically takes 6 to 8 weeks after a concept has been clearly identified.

*Patent Review.* The Company considers patent protection for its technologies and product designs to be an important part of its development strategy. The Company and its patent attorneys conduct a search

27

UND 02803

A 703

of prior art and existing products to determine whether a new product idea may be covered by an existing patent. Patent review, depending upon the complexity and novelty of the design involved, generally requires between 3 to 18 months to complete, however, this stage of product development typically occurs in conjunction with one or more of the other steps.

*Product Design and Engineering Review.*    If a product concept continues past the patent review stage, the Company translates design parameters into working designs. When appropriate, these designs are modeled and developed using computer aided design technologies and subjected to rigorous engineering review to validate the effectiveness of the technology or design. Dr. Carroll is expected to play a key role in this stage of product development. The Company estimates that it will take between 4 to 6 months to successfully complete product design and engineering review.

*Testing.*    Once a specific design has been decided upon, the Company creates and tests one or more prototypes. The Company has a testing facility at the Hank Haney Golf Ranch in McKinney, Texas. As part of the testing process, the Company records, analyzes and interprets data associated with each prototype including ball flight, distance, spin and accuracy. Using feedback from these tests, the Company modifies its designs to achieve its performance objective. Additionally, the Company applies for official USGA approval of the resulting club at this time. Upon approval of a new product from the USGA, it becomes considered for commercial release. The Company believes that in order to properly field test a new product, it must expect·between 4 to 6 months of additional development time.

The Company's research and development expenses were $18,516, $51,101 and $557,513 during 1995, 1996 and 1997, respectively.

Marketing

The goals of the Company's marketing efforts are to build its brand identity and drive sales through its retail distribution channel. To accomplish these goals, Adams utilizes direct response and traditional image-based advertising, engages in promotional activities and capitalizes on its relationship with Nick Faldo and other well known golf figures.

*Advertising.*    The Company uses a combination of direct response and traditional image-based advertising.

- *Direct Response Advertising.*    The Company intends to continue to build brand awareness and stimulate product demand through its direct response advertising, which includes a variety of mediums including television, radio, print and direct mail. Direct response advertising, in which consumers may order products directly from the Company by calling a toll-free telephone number, provides a cost-effective vehicle enabling Adams to communicate a compelling product story and build brand recognition. The Company's direct response advertising serves to introduce the Company's products to consumers, many of whom will subsequently purchase Adams clubs directly from the Company's retailers. In April 1997, Adams debuted a 30-minute Tight Lies infomercial, which has contributed significantly to the Company's recent growth. This infomercial received the award for "Best Infomercial Demonstration Show" from the National Infomercial Marketing Association in September 1997. The Tight Lies infomercial routinely runs on The Golf Channel, regional sports stations, national networks and local, market-specific broadcast stations. In addition, the Company utilizes 30- and 60-second direct response television commercials as well as radio advertising. The Company advertises regularly in major golf and industry publications, general consumer magazines and local newspapers nationwide. These include *Golf Digest, Golf Magazine, Sports Illustrated, The Wall Street Journal* and *USA Today.* Finally, the Company engages in regularly scheduled direct mail advertising campaigns.

- *Traditional Image-Based Advertising.*    The Company's direct response sales revenue has enabled Adams to broaden its advertising efforts to include traditional image-based advertising. This

28

UND 02804

A 704

advertising includes a series of 30-second commercials which run during major golf tournaments and golf related programs; newspaper, magazine and radio ad campaigns; sponsorship of selected golf tournaments; exclusive sponsorship of The Golf Channel's weekly instructional program, "*Living Room Lessons*" and a recently updated and professionally redesigned web site located at www.adamsgolf.com.

The Company has received extensive editorial coverage in golf, consumer and trade publications as well as general consumer magazines and newspapers worldwide.

*Promotional Activities.* The Company engages in a variety of promotional activities to sell and market its products. Such activities include (i) consumer sweepstakes like the Company's "Ramble in the Bramble," where the winner will receive an all expense paid, luxury tour for two of Scotland's most legendary golf courses; (ii) promotional giveaways with certain purchases, including items such as instructional videos and audio tapes; and (iii) promotional campaigns like the "90-Day Challenge," in which the Company advertises its 90-day return policy.

·*Relationship with Nick Faldo and Others.* The Company has recently formed a lifetime relationship with Nick Faldo, an internationally recognized professional golfer and winner of numerous U.S. and international championships, including three Masters (1989, 1990 and 1996) and three British Opens (1987, 1990 and 1992). Mr. Faldo led the Official World Golf Ranking for 81 weeks during 1993 and 1994. Mr. Faldo also has made the most Ryder Cup appearances in the history of golf. Adams expects Nick Faldo to be actively and directly involved in the design, testing and development of new technologies and products. Mr. Faldo is noted for his precise play as a golfer and his reputation as a perfectionist. The Company believes that by aligning itself with Mr. Faldo, it can further promote the Adams brand, while at the same time demonstrating the Company's ability to deliver golf clubs that satisfy the specific and demanding requirements of tour professionals.

The Company has also obtained endorsements from Hank Haney, Bill Rogers and Carol Mann. Mr. Haney was named the 1993 PGA Teacher of the Year and is a five-time recipient of the Northern Texas Section PGA Teacher of the Year Award. Mr. Haney has instructed over 100 touring professionals from the PGA, LPGA, European, Japanese and Asian Tours along with several top rated junior golfers. Mr. Haney is a member of the advisory staff for *Golf Digest.* Mr. Rogers won the British Open championship in 1981 and was the 1981 PGA Player of the Year. Ms. Mann is a member of the LPGA Hall of Fame.

## Sales and Customer Support

The Company sells its products through on- and off-course golf shops and selected sporting goods retailers, direct sales to consumers, international distributors and the Company's custom fitting accounts.

*Sales to Retailers.* The Company sells a significant majority of its products to selected retailers. To maintain its high quality reputation and generate retailer loyalty, the Company does not sell its products through price sensitive general discount warehouses, department stores or membership clubs. The Company believes its selective retail distribution strategy helps its retailers to maintain profitable margins and maximize sales of Adams products. In the three months ended March 31, 1998, sales to retailers accounted for approximately 79% of the Company's total sales.

Adams maintains an inside sales department that currently consists of 25 employees who are in regular contact with the Company's over 7,000 retailers. These sales representatives are supported by 13 field-based Regional Account Coordinators who maintain personal contact with the Company's retailers nationwide. The Company generally has been successful in delivering product to its retailers within one week of a placed order. The Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers.

UND 02805

A 705

*Customer Support and Direct Sales.* Adams believes that superior customer service can significantly enhance its marketing efforts. Accordingly, the Company maintains an in-house customer call center whose representatives provide technical assistance to Adams' customers and field calls resulting from the Company's direct response advertising. The Company also outsources a portion of its call center activities. The Company provides its staff with computerized access to its retailer database enabling call center representatives to guide consumers to their nearest Adams retailer.

*International Sales.* International sales are made in 39 countries (including Japan, Canada and the United Kingdom) through approximately 33 independent distributors. The international distributors sell to retailers for end sale to the consumer. International sales have increased from $0.6 million for 1996 to $0.9 million for 1997 and $0.2 million for the first three months of 1997 to $1.4 million for the first three months of 1998. The Company recently expanded its international sales staff to include a Director of International Sales to identify, develop, engage and support the Company's worldwide distributor base.

*Custom Fitting Sales.* The Company employs six sales representatives who manage the Company's custom fitting sales and support division and administer Adams' custom fitting training program for golf professionals. Adams' custom fitting training program has received PGA certification and provides continuing education credits for PGA Member Professionals. Since 1992, the Company has certified in excess of 300 golf professionals to custom fit its Assault-VMI irons, which are sold exclusively through its over 100 custom fitting accounts. Custom fitters measure data relating to swing and ball flight characteristics. Based on the interpretation of the data, a set of clubs is manufactured that is specifically tailored to that golfer.

The majority of the Company's sales and customer service personnel are experienced golfers, including a number of former collegiate and professional golfers. Further, each of the Company's new employees attends an 8-hour, in-house seminar which provides training on club specifications, performance, design and manufacturing. Adams believes interaction with its knowledgeable representatives promotes customer satisfaction and helps to strengthen the Adams brand image.

### Manufacturing and Assembly

The Company manages all stages of manufacturing, from sourcing to assembly, in order to maintain a high level of product quality and consistency. The Company establishes product specifications, selects the materials used to produce the components and tests the specifications of all components received by the Company. In addition, the Company has redundant sources of supply for each of the component parts used in the manufacture of its golf clubs and has established a quality assurance program at those manufacturing facilities located in Taiwan and China that are collectively responsible for producing substantially all of the Company's performance club heads. Upon arrival at the Company's manufacturing facilities in Plano, Texas, each component used in the Company's clubs is again checked to ensure consistency with strict design specifications. Components are then sorted to identify variations in characteristics, such as head weight and shaft flexibility, that, although within the specified range, may affect club performance. Golf clubs are then built by the Company's manufacturing personnel using the appropriate component parts and the Company's patented VMI technology. See "Risk Factors—Sources of Supply."

### Patents

The Company's ability to compete effectively in the golf club market will depend, in large part, on the ability of the Company to maintain the proprietary nature of its technologies and products. The Company currently holds six U.S. patents relating to certain of its products and proprietary technologies and has two patent applications pending. Assuming timely payment of maintenance fees, if any, the Company expects that the six currently issued patents will expire on various dates between 2009 and 2013. The Company has been awarded patents with respect to the design of the Tight Lies fairway wood and the VMI design formula. There can be no assurance, however, as to the degree of protection afforded by these or any other

30



**Executive Compensation**

The following table sets forth all compensation received by the Company's Chief Executive Officer and the executive officers whose total annual salary and bonus exceeded $100,000 during the fiscal year ended December 31, 1997 (collectively, the "Named Executive Officers").

**Summary Compensation Table**

| Name and Principal Position | Year | Annual Compensation | | Other Annual Compensation | All Other Compensation |
| | | Salary | Bonus | | |
| --- | --- | --- | --- | --- | --- |
| B. H. Adams | | | | | |
| Chairman of the Board, Chief Executive Officer and President .............. | 1997 | $162,940 | $10,015,000(1) | $2,541,688(2) | $4,185(3) |
| Richard H. Murtland | | | | | |
| Vice President–Research and Development, Secretary and Treasurer .. | 1997 | 72,548 | 40,000 | — | — |
| Mark D. Gonsalves | | | | | |
| Vice President—Sales and Marketing, Retail ......................... | 1997 | 62,400 | 352,144(4) | — | — |

(1) Represents (a) $15,000 cash bonus and (b) value of 2,000,000 shares of Common Stock granted on December 31, 1997 having a fair market value, as determined by the Board of Directors, of $5.00 per share on the date of grant. See "Certain Transactions."

(2) Represents reimbursement of federal income taxes and Medicare tax liability associated with the grant of certain restricted shares of Common Stock. See "Certain Transactions."

(3) Comprised of premiums for a life insurance policy for which members of Mr. Adams' family are the beneficiaries.

(4) Represents bonus earned in 1997 pursuant to the terms of a sales commission agreement which expired by its terms on December 31, 1997.

**Fiscal Year-End Option Values**

| Name | Number of Securities Underlying Unexercised Options at Fiscal Year-End(#) | | Value of Unexercised In-The-Money Options at Fiscal Year End($)(1) | |
| | Exercisable | Unexercisable | Exercisable | Unexercisable |
| --- | --- | --- | --- | --- |
| B. H. Adams ........................ | 1,520,766 | 0 | $7,033,552 | — |
| Richard H. Murtland ................ | 222,214 | 0 | 1,027,739 | — |
| Mark D. Gonsalves ................. | 333,320 | 0 | 1,541,605 | — |

(1) Calculated by determining the difference between the fair market value of the Common Stock underlying the options at December 31, 1997 ($5.00 per share), as determined by the Board of Directors, and the exercise price of such options. See "Certain Transactions." Each of the options referred to herein was exercised by the respective option holder during January 1998.

**Benefit Plans**

*1998 Stock Incentive Plan.*  In February 1998, the Company adopted the 1998 Stock Incentive Plan. The purpose of the Incentive Plan is to provide incentives and rewards for participating employees and consultants of the Company (i) to support the execution of the Company's business strategies and the achievement of its goals and (ii) to associate the interests of such persons with those of the Company's stockholders. In furtherance of this purpose, the Incentive Plan authorizes the granting of stock options, including incentive stock options (within the meaning of Section 422 of the Internal Revenue Code of

36

UND 02807

A 707

reorganization, merger or consolidation of the Company, in each case, whereby the individuals who were the respective beneficial owners of the Common Stock and voting securities of the Company immediately prior to such reorganization, merger or consolidation do not, following such reorganization, merger or consolidation, beneficially own, directly or indirectly, more than sixty percent (60%) of the then outstanding shares of Common Stock and the combined voting power of the then outstanding voting securities entitled to vote generally in election of directors, as the case may be, of the corporation resulting from such reorganization, merger or consolidation, or complete liquidation or dissolution of the Company or the sale or other disposition of all or substantially all of the assets of the Company. The Incentive Plan terminates on February 25, 2008.

*1996 Stock Option Plan.* In April 1996, the Company adopted a stock option plan (the "1996 Plan") providing for the issuance to certain officers, directors, employees and advisors of the Company of incentive stock options within the meaning of Section 422 of the Code and stock options that are nonqualified for federal income tax purposes. A total of 800,000 shares of Common Stock have been reserved for issuance upon the exercise of options granted under the 1996 Plan, subject to adjustment in accordance with such plan. At May 31, 1998, options to purchase an aggregate of 659,694 shares of Common Stock had been granted under the 1996 Plan, of which 618,030 had been exercised. All such stock options were granted at an exercise price that was, at the time of grant, equal to the fair market value of a share of Common Stock, as determined by the Board of Directors. The Company currently does not anticipate making additional grants under the 1996 Plan.

*401(k) Plan.* In February 1998, the Company adopted its 401(k) Retirement Plan (the "Retirement Plan"). Generally, all employees who are 18 years of age and who have completed a three-month consecutive period of service are eligible for participation in the Retirement Plan.

The Retirement Plan is a defined contribution plan intended to qualify under Section 401 of the Code, such that participants generally may elect to contribute to the Retirement Plan, on a pretax basis, up to 15% of their compensation per pay period in the form of voluntary payroll deductions (for which the statutorily prescribed annual limit in 1998 is $10,000 per participant) ("Voluntary Contributions"). The Company makes matching contributions equal to 50% of the first 6% of a participant's compensation contributed to the Retirement Plan during such pay period ("Mandatory Matching Contributions"). From time to time, the Company may make additional discretionary contributions to the Retirement Plan ("Discretionary Contributions," and together with Mandatory Matching Contributions, "Company Contributions").

Participants who were employed by the Company at May 1, 1998 are immediately vested in all Company Contributions. Participants who were not employed by the Company on May 1, 1998 are gradually vested in all Company Contributions over a period of three years of credited service, vesting 33⅓% a year for each full year of service beginning with the participant's first anniversary, and becoming fully vested after three years of service or upon death, total and permanent disability, retirement under the Retirement Plan or Retirement Plan termination. Participants are always fully vested in their Voluntary Contributions.

*Company Bonus Plan.* In February 1998, the Company adopted the Bonus Plan to become effective for the fiscal quarter commencing January 1, 1998. The Bonus Plan is administered by the Compensation/Plan Committee. Participation is based upon individual selection by the Compensation/Plan Committee from among key employees who, in the judgment of the Compensation/Plan Committee, make significant contributions to the performance of the Company and whose decisions and actions most significantly affect the growth, profitability and efficient operations of the Company. It is anticipated that approximately 22 individuals will initially participate in the Bonus Plan. The aggregate amount of any awards paid with respect to calendar year 1998 to any participant under the Bonus Plan shall not exceed 8% of the Company's net pre-tax operating profits.

UND 02808

A 708

## CERTAIN TRANSACTIONS

In September 1995, the Company effected a reorganization (the "Reorganization") pursuant to which it (i) distributed to its stockholders the shares of common stock of Supershafts, Inc., a Texas corporation ("Supershafts"), held by the Company and constituting a minority interest in Supershafts, (ii) issued four shares of Common Stock in exchange for each share of Supershafts common stock then outstanding and (iii) reclassified, on a 1 for 1 basis, all of the outstanding Series A Preferred Stock and Series B Preferred Stock of the Company as Common Stock. As a result of the Reorganization, the Company issued an aggregate of 5,827,406 shares of Common Stock, Supershafts became a wholly-owned subsidiary of the Company and the Common Stock became the only class of capital stock of the Company outstanding. Mr. Adams and Royal Holding Company, Inc. received 820,000 and 3,706,382 shares of Common Stock, respectively, in the Reorganization.

In 1996 and 1997, the Company borrowed an aggregate of $450,000 from Royal of which $250,000 was advanced in 1997, to finance the production of the Company's infomercial. Such advances bore interest at the prime rate. In September 1997, the Company paid accrued interest of $29,233 on this debt and issued 900,000 shares of Common Stock (at a rate of $.50 of principal indebtedness per share) to Royal in cancellation of the principal amount.

In December 1997, the Board of Directors of the Company granted to Mr. Adams, the Company's Chairman of the Board, Chief Executive Officer and President, 2,000,000 shares of Common Stock. The Board of Directors also provided Mr. Adams with a cash payment of $2,541,688, an amount equal to the federal income tax and Medicare tax liability associated with such grant and bonus. In the first quarter of 1998, Mr. Adams loaned $1.1 million of such funds back to the Company pursuant to an unsecured promissory note at an interest rate of 5.39% per annum. The Company repaid $600,142 of the note on April 14, 1998 and the remaining principal amount of the note ($534,899) is payable in installments of $312,500 and $222,399 on December 15, 1998 and April 14, 1999, respectively. In determining that the stock grant and bonus to Mr. Adams were appropriate and in the best interests of the Company and its stockholders, the Board of Directors considered, among other factors, the Company's revenue and operating income growth and improved competitive position under Mr. Adams' leadership, Mr. Adams' historical cash compensation and the Board of Directors' desire to increase Mr. Adams' equity interest in the Company to a level commensurate with his contributions to and role with the Company. The Board of Directors determined that the value of Mr. Adams' services to the Company exceeded the fair market value of the stock ($10,000,000) and bonus. The Company does not consider these payments to be indicative of future levels of compensation to Mr. Adams or other executives of the Company.

The agreement between the Company and Nick Faldo (the "Faldo Agreement") became effective May 1, 1998 and provides that Mr. Faldo will exclusively endorse the Company's clubs and undertake certain other promotional activities on behalf of the Company. Pursuant to the Faldo Agreement, the Company and Mr. Faldo will design a line of clubs to be used by Mr. Faldo in tournaments and other events, provided such clubs are suitable for Mr. Faldo's use. Under the Faldo Agreement, the Company has licensed the worldwide rights to the Nick Faldo trademark for use in connection with the distribution of its golf clubs, head covers, golf bags, travel covers, golf towels and umbrellas which it designs or manufactures.

As compensation for the licensing and endorsement arrangement set forth in the Faldo Agreement, the Company has granted 900,000 shares of Common Stock to Mr. Faldo. Subject to certain exceptions including transfers to Mr. Faldo's agent, Mr. Faldo may not transfer, dispose of or otherwise assign any rights in more than 100,000 shares of Common Stock in any calendar year prior to 2002. In addition, Mr. Faldo is entitled to receive a royalty of 5% of the net sales price of all Adams golf clubs (other than certain specialty items for which the royalty equals 10% of the net sales price) sold outside the U.S. throughout the term of the Faldo Agreement. The Faldo Agreement provides for a minimum royalty of $1.5 million in 1999 escalating to $4.0 million for years 2004 through 2008. From 2009 through 2014, the minimum royalty is $1.5 million, as adjusted for changes in the consumer price index. After 2014, the Faldo

42

UND 02809

A 709

Agreement does not provide for a minimum royalty. Commencing with 2009, however, the Faldo Agreement provides for a maximum royalty of $4.0 million, as adjusted for changes in the consumer price index. In the event Mr. Faldo does not compete in a minimum number of worldwide golf events each year, such royalty payments shall be reduced on a pro-rata basis, unless such events are missed as a result of illness or injury. The Company has also agreed that through the year 2008, it will support the "Faldo Junior Series" in the United Kingdom by making an annual contribution to the sponsoring organization of not less than $45,000 for each year the tournament is played under that name. The Faldo Agreement further provides that, so long as royalties remain payable thereunder, the Company will use commercially reasonable efforts to cause a designee of Mr. Faldo to be nominated for, and elected to, the Board of Directors of the Company. As of the date of this Prospectus, Mr. Faldo has not notified the Company of his designation to the Board.

The Faldo Agreement extends through Mr. Faldo's lifetime; however, the Company has the right to terminate the Faldo Agreement earlier if Mr. Faldo (a) is unable to perform the duties required by the Faldo Agreement for a period of 12 consecutive months, (b) retires or becomes officially ineligible to compete on the PGA and/or Senior PGA tour, or (c) has engaged in illegal or immoral conduct resulting in a felony conviction, or has otherwise conducted himself in a manner not in keeping with the standards of professional conduct set forth in the Faldo Agreement. In the event of the death of Mr. Faldo prior to May 1, 2030, the Company may, at its option, continue the terms of the Faldo Agreement until May 1, 2030, in which case, Mr. Faldo's heirs or estate shall be entitled to any royalties due.

KPMG, a public accounting firm in which Mr. Hatfield was a partner until April 30, 1998, has provided accounting and auditing services to the Company during 1997 and 1998. The amounts paid to KPMG for services rendered during 1997 and 1998 were $112,887 and $403,520, respectively. Mr. Hatfield is currently Senior Vice President—Finance and Administration and Chief Financial Officer of the Company. The Company has an agreement with Mr. Hatfield providing that, upon Mr. Hatfield's termination without cause following certain change of control events, Mr. Hatfield's stock options will become fully vested and Mr. Hatfield will be paid an amount equal to one year of his base salary.

From January 1, 1998 through May 31, 1998, the Company paid Virtual Visits, Inc. ("Virtual Visits"), a company engaged in the design of Internet Web sites for the promotion of golf products, approximately $60,000. The Company expects to pay at least an additional $10,000 to Virtual Visits during 1998. Mr. Conner and Mr. Casati, directors of the Company, are also directors and significant stockholders of Virtual Visits.

In January 1998, the Company made loans of $83,330 and $125,000 to Mr. Murtland and Mr. Gonsalves, respectively, to finance the aggregate exercise price of stock options then exercised by such individuals. The loans bore interest at the rate of 5% per annum and were due January 14, 2001. The loan to Mr. Murtland was repaid in April 1998. Messrs. Murtland and Gonsalves are each executive officers of the Company.

The Company has granted options to purchase the Company's Common Stock to certain of its officers and directors. See "Management—Benefit Plans" and "Principal and Selling Stockholders."

The Company believes that all of the transactions set forth above were made on terms no less favorable to the Company than could have been obtained from unaffiliated third parties. All future transactions between the Company and its officers, directors, principal stockholders and their affiliates will be approved by a majority of the Board of Directors, including a majority of the independent and disinterested outside directors.

43

UND 02810

A 710

## DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company consists of 50,000,000 shares of Common Stock, $.001 par value per share, and 5,000,000 shares of Preferred Stock, $.01 par value per share (the "Preferred Stock"). The following description of certain characteristics of the capital stock of the Company does not purport to be complete and is subject to, and qualified in its entirety by, the provisions of the Certificate of Incorporation, Bylaws and the Registration Rights Agreement, as defined below, each of which is included as an exhibit to the Registration Statement of which this Prospectus is a part, and by the provisions of applicable law.

### Common Stock

As of May 31, 1998, there were 19,099,282 shares of Common Stock outstanding held of record by 101 stockholders. The holders of Common Stock are entitled to share pro rata in dividends and distributions, if any, with respect to the Common Stock when, as and if declared by the Board of Directors, from funds legally available therefor. See "Dividend Policy". Holders of Common Stock are entitled to one vote per share, are not entitled to cumulative voting in the election of directors and have no preemptive, subscription, redemption or conversion rights. Upon the liquidation, dissolution or winding up of the Company, the assets of the Company remaining after payment of or provision for liabilities and payment to the holders of Preferred Stock of such preferential amounts that they are entitled to receive will be distributed pro rata on a share-for-share basis among the holders of Common Stock. All outstanding shares of Common Stock are, and the shares to be issued and sold in the Offering will be, duly authorized, validly issued, fully paid and non-assessable. The rights, preferences and privileges of holders of Common Stock are subject to any series of Preferred Stock that the Company may issue in the future.

The Company effected a two-for-one stock split on May 1, 1998 in contemplation of this Offering. The Company had 9,549,641 shares of Common Stock issued and outstanding immediately prior to the stock split.

### Preferred Stock

The Company's Board of Directors is authorized, without further action by the stockholders, to divide the Preferred Stock into series and, with respect to each series, to determine the preferences and rights, and the qualifications, limitations or restrictions thereof, including the dividend rights, conversion rights, voting rights, redemption rights and terms, liquidation preferences, sinking fund provisions, the number of shares constituting the series and the designation of such series. The Board of Directors could, without stockholder approval, issue Preferred Stock with voting and other rights that could adversely affect the voting power of the holders of Common Stock and could have certain anti-takeover effects. The Company has no present plans to issue any shares of Preferred Stock.

The authority possessed by the Board of Directors to issue Preferred Stock could potentially be used to discourage attempts by others to obtain control of the Company through merger, tender-offer, proxy contest or otherwise by making such attempts more costly or difficult to achieve.

### Registration Rights

Pursuant to the terms of that Registration Rights Agreement dated April 30, 1998 (the "Registration Rights Agreement") by and among the Company and certain stockholders of the Company holding an aggregate of 17,797,087 shares of Common Stock as of May 31, 1998, the Company has granted certain registration rights to such stockholders. Specifically, under the terms of the Registration Rights Agreement, the stockholders holding in excess of 40% of the Common Stock covered by such agreement have a right commencing at any time not earlier than the latter of (i) the expiration of any of the "lock-up" period prescribed by the Lock-up Agreement and (ii) the date on which the Company shall become eligible to use the Form S-3 Registration Statement (or any successor to such form) for the purpose of registering outstanding securities for the account of any person other than the Company, to demand that the shares of

45

UND 02811

A 711

Due Diligence Memo



CONFIDENTIAL

UND 06019

A 712

[lambda17\groups] – \\santiam\walraven\clients\adams\ipo\closing\ddmemo.doc – Patrick Walravens – 07/13/98 5:29 PM – Page 1 of 3

# LEHMAN BROTHERS

### MEMORANDUM

| | |
|---|---|
| To: | File |
| From: | Lehman Brothers Adams Golf Team |
| Date: | July 14, 1998 |
| Subject: | Summary of Due Diligence |

Selected highlights of the due diligence process included the following:

Management Interviews:

1. Barney Adams – CEO

2. Dick Murtand – VP, Operations

3. Jim Farrell – VP, Finance

4. Walt Devault – Director, Direct Sales

5. Mark Gonsalves – VP, Sales

Customer Calls – Summaries circulated to underwriters by caller

1. Golfsmith International – Craig Johnson (LEH)
2. Edwin Watts – Edwin Watts (LEH)
3. Golf Day – John McGregor (LEH)
4. Family Golf Center – Gene McMasters (LEH)
5. Dick's Sporting Goods – Joe Beauseigneur (Ferris, Baker, Watts)
6. Pete Carlson's Golf & Tennis – Pete Carlson (Ferris, Baker, Watts)
7. Somerton Springs – Harry Lange (Ferris, Baker Watts)
8. Chun Sin Corporation – Jung Ha ( Ferris, Baker, Watts

Supplier Calls
1. True Temper – Jim Felty (LEH)
2. Lamkin Grips – Mark Snopkowski (LEH)
3. Fu Sheng – Patrick Tai (Montgomery)

CONFIDENTIAL

UND 06020

A 713

Materials Reviewed

1. See due diligence items in file

2. See legal due diligence by underwriters counsel

3. Golf DataTech Market Surveys

4. Golf Market Research Institute Surveys

5. Other golf industry data sources

Background Checks

6. Barney Adams - CEO

7. Dick Murtand — VP, Operations

8. Jim Farrell — VP, Finance

9. Walt Devault — Director, Direct Sales

10. Mark Gonsalves — VP, Sales

Financial Due Diligence

1. Reviewed historical audited financials for 1994 –1997 and Q1 1998

2. Reviewed monthly sales results and projections for 1998

3. Company projections (4/29/98)

4. Interviewed Manny Fernandez and Rick Erhman, KPMG audit partner and senior manager

Legal Issues

1. Interviewed Adams outside patent counsel, Nick Acquillino

2. Interviewed Jacquie Valenzuela, Arter & Hadden's patent litigator

Other

1. Interviewed Nickolaus A. Faldo, professional golfer

2. Visited Hank Haney Golf Ranch and interviewed Mark Berry, professional Adams custom club fitter

3. Conducted other standard due diligence

CONFIDENTIAL

UND 06021

A 714

[ramboa17\groups] — \ssdiran\araraven\clients\adamslibo\dosing\ddmemo.doc - Patrick Walravens - 07/13/98 5:29 PM - Page 3 of 3
- 3 -

CONFIDENTIAL

UND 06022

A 715

A.5. Certificate of CEO & CFO of Adams

UND 02766

# ADAMS GOLF, INC.

## CERTIFICATE OF THE CHIEF EXECUTIVE OFFICER
## AND CHIEF FINANCIAL OFFICER

B. H. (Barney) Adams, President and Chief Executive Officer, and Darl P. Hatfield, Senior Vice President, Finance and Administration and Chief Financial Officer, respectively, of Adams Golf, Inc., a Delaware corporation (the "Company"), hereby certify the following on behalf of the Company pursuant to Section 9(f) of the Underwriting Agreement dated July 9, 1998 among the Company, the selling stockholders named therein, and Lehman Brothers Inc., NationsBanc Montgomery Securities LLC, and Ferris, Baker Watts Incorporated, as representatives (the "Representatives") of the several underwriters named in Schedule 1 thereto (the "Underwriting Agreement"). Capitalized terms used but not defined herein have the meanings given them in the Underwriting Agreement.

(i)     The representations, warranties and agreements of the Company in the Underwriting Agreement are true and correct as of the date hereof; the Company has complied with all the agreements contained therein; and the conditions set forth in Sections 9(a) through 9(n) thereof have been fulfilled.

(ii)     Each of the undersigned has carefully examined the Registration Statement and the Prospectus and, to the knowledge of each of the undersigned, since the effective date of the Registration Statement, there has occurred no event that should have been set forth in an amended or supplemented Registration Statement or Prospectus which has not been so set forth.

IN WITNESS WHEREOF, the undersigned have signed their names this 15th day of July, 1998.

ADAMS GOLF, INC.

_____

B. H. (Barney) Adams
Chief Executive Officer and President

_____

Darl P. Hatfield
Senior Vice President -- Finance and
Administration and Chief Financial Officer

254382 v3/SF
5g@6031.DOC
071398

UND 02767

A 717

 **Peat Marwick** LLP

200 Crescent Court
Suite 300
Dallas, TX 75201-1885

July 15, 1998

The Board of Directors
Adams Golf, Inc.

Lehman Brothers Inc.
NationsBanc Montgomery Securities LLC
Ferris, Baker Watts, Incorporated
(as the representatives of the several Underwriters)

Ladies and Gentlemen:

We refer to our letter of July 10, 1998, relating to the Registration Statement (as such term is defined in our letter of July 10, 1998) of Adams Golf, Inc. (the "Company"). We reaffirm as of the date hereof, and as though made on the date thereof, all statements made in that letter except that, for the purposes of this letter:

a.  The reading of minutes described in item 4 of that letter has been carried out through July 13, 1998.

b.  The procedures and inquiries covered in item 4 of that letter were carried out to July 13, 1998 (our work did not extend to the period from July 14, 1998 to July 15, 1998, inclusive).

c.  The references to July 6, 1998 in item 6 of that letter are changed to July 13, 1998.

This letter is solely for the information of the addressees and to assist the Underwriters in conducting and documenting their investigation of the affairs of the Company in connection with the offering of securities covered by the Registration Statement, and it is not to be used, circulated, quoted, or otherwise referred to for any purpose, including but not limited to the registration, purchase or sale of securities, nor is it to be filed with or referred to in whole or in part in the Registration Statement or any other document, except that reference may be made to it in the underwriting agreement or any list of closing documents pertaining to the offering of securities covered by the Registration Statement.

Very truly yours,

*KPMG Peat Marwick LLP*

CONFIDENTIAL

Member Firm of KPMG International

PGA TOUR PROS · PGA CLARK · MATERIAL DUR LINE · CRAFTSMANSHIP · PRESS RELEASES · CONTACT US

· HOME

## ADAMS IN THE NEWS

### Adams Golf Reports Record Second Quarter Sales and Earnings

--7/22/98

PLANO, Texas, July 22, 1998 -- Adams Golf (Nasdaq:ADGO) today announced record sales and earnings for the second quarter ended June 30, 1998. Net sales increased 751 percent to $33,817,000 as compared to net sales of $3,974,000 during the second quarter of 1997. Net income increased to $6,657,000, or $0.35 per share on a diluted basis, for the three month period ended June 30, 1998 from a loss of $4,000, or $0.00 per share, for the comparable period in 1997.

For the six month period ended June 30, 1998, net sales were $58,328,000, an increase of 970 percent from $5,449,000 for the comparable period in 1997. Net income for the six month period ended June 30, 1998 was $12,299,000 or $0.66 per share on a diluted basis, versus $41,000 or $0.00 per share for the first six months of 1997.

B.H. (Barney) Adams, Chairman, CEO and President of Adams Golf, stated, "The Company has enjoyed tremendous growth because of the demand by golfers for our innovative clubs. We are pleased to report such outstanding results in our first earnings report as a publicly held company."

The Company designs, manufactures and markets premium quality, technologically innovative golf clubs including the Tight Lies® fairway woods. The Company's Common Stock began trading on the Nasdaq Stock Market's National Market on Friday, July 10, 1998. Further information on the Company can be found on its Internet site, www.adamsgolf.com.

[Note: The original copy of this news release included a second page, consisting of the Company's Consolidated Statements of Operations. If you would like to receive a copy of the full 2-page news release, please call (972) 673-9850 and leave your fax telephone number. A copy of the release will be faxed to you as soon as possible.

To view Adams financial news releases, click here


EXHIBIT
174
5/17/06

-116-

A 719

RAMFAX0519          8/4/98     2:16:  PAGE  1/7    LEHMAN BROTHERS

*Foxer oure to Serur in DR on 8-4.*

# LEHMAN BROTHERS

### FACSIMILE

DATE: Tuesday, August 04, 1998 9:54:10 AM  PAGES (INCLUDING COVER): 07

To:              Name:  Mr. Steve Patchin
            Company:
        Fax Number:  9-1-5128888886
        Voice Phone:

FROM:     Timothy Gamso 214-720-9458

MESSAGE:

No part of this report may be reproduced in any manner without the written permission of Lehman Brothers Inc. The information herein has been obtained from sources which we believe to be reliable, but we do not guarantee its accuracy or completeness. All opinions expressed herein are subject to change without notice. Lehman Brothers Inc., its affiliated companies, or their respective shareholders, directors, officers and/or employees, may have a position in the securities discussed herein. The securities mentioned in this document may or may not be eligible for sale in some states or countries, nor suitable for all types of investors, their value and the income they produce may fluctuate and/or be adversely affected by exchange rates. ©1997 Lehman Brothers Inc. All rights reserved. Member SIPC. Member of the Securities and Futures Authority. The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

ADAMS 008264

A 720