# Appendix
# A841-A900

The Company expects to meet future liquidity requirements primarily through cash flows generated from operations. In 1999, cash flows from operations will be affected by the impact of the Company's net-down program implemented in the fourth quarter of 1998, which reduced accounts receivable by approximately $4.3 million. It is anticipated that operating cash flows and current cash reserves will adequately fund capital expenditure programs which will include continued upgrade of the newly integrated information systems. These capital expenditure programs can be suspended or delayed at any time with minimal disruption to the Company's operations if cash is needed in other areas of the Company's operations. In addition, cash flows from operations will be utilized to support purchasing of more expensive components associated with the SC Series Titanium drivers. The expected net positive cash flows, current cash reserves and flexibility regarding the Company's revolving credit facility allow the Company to meet working capital requirements during periods of low cash flows resulting from the seasonality of the industry.

Capital expenditures for the three years ended December 31, 1996, 1997 and 1998 were approximately $0.1 million, $0.8 million and $4.3 million, respectively. The expenditures made were primarily associated with development of information systems and reporting technologies to adequately monitor business operations. Capital expenditures in the future are not expected to include expenditures outside the ordinary course of business.

The Company is not aware of any event or trend that would potentially affect its liquidity. In the event such a trend should develop, the Company believes that the cash flow from operations, current cash reserves and the revolving credit facility would be sufficient to meet operating needs and capital expenditures for at least the next 12 months.

## SEASONALITY AND QUARTERLY FLUCTUATIONS

Golf generally is regarded as a warm weather sport and sales of golf equipment historically have been strongest during the second and third quarters, with the weakest sales occurring during the fourth quarter. In addition, sales of golf clubs are dependent on discretionary consumer spending, which may be affected by general economic conditions. A decrease in consumer spending generally could result in decreased spending on golf equipment, which could have a material adverse effect on the Company's business, operating results and financial condition. In addition, the Company's future results of operations could be affected by a number of other factors, such as unseasonal weather patterns; demand for and market acceptance of the Company's existing and future products; new product introductions by the Company's competitors; competitive pressures resulting in lower than expected average selling prices; reliance on third parties including suppliers; and the volume of orders that are received and that can be fulfilled in a quarter. Any one or more of these factors could result in the Company failing to achieve its expectations as to future sales or net income.

## YEAR 2000 READINESS DISCLOSURE

The year 2000 will have a broad impact on the business environment in which the Company operates due to the possibility that many computerized systems across all industries will be unable to process information containing the dates beginning in the year 2000. The Company relies on its internal information technology systems in operating and monitoring many significant aspects of its business, including financial systems, customer services, infrastructure and network and telecommunications equipment. The Company also relies directly and indirectly on the systems of external business enterprises such as suppliers, customers, creditors, financial organizations and domestic and international governments. The Company has established an enterprise-wide program to prepare its computer systems and applications for the year 2000 and is utilizing both internal and external resources to identify, correct and test the systems for Year 2000 compliance. The Company's legacy information system, as well as the information system currently being implemented, are certified as Year 2000 compliant. The Company has substantially completed an inventory of all information technology and non-information technology equipment as of December 31, 1998 and anticipates that the majority of its remediation plan will be completed by April 30, 1999. The Company expects that all systems critical to the conduct of the Company's operations will be Year 2000 compliant prior to the end of the 1999 calendar year.

13

A 841

The nature of the Company's business is such that the business risks associated with the Year 2000 can be reduced by closely assessing the vendors supplying the components used in assembling the Company's products. Because third party failures could have a material impact on the Company's ability to conduct business, questionnaires have been sent to the Company's significant vendors to obtain reasonable assurance that plans are being developed to address the Year 2000 issue. The returned questionnaires are currently being assessed by the Company, and are being categorized based upon readiness for the Year 2000 issues and prioritized in order of significance to the business of the Company. To the extent that vendors do not provide the Company with satisfactory evidence of their readiness to handle Year 2000 issues, contingency plans will be developed by July 31, 1999.

The Company does not believe the costs related to the Year 2000 compliance project will be material to its financial position or results of operations. However, the cost of the project and the date on which the Company plans to complete the Year 2000 modifications are based on management's best estimates, which were derived utilizing numerous assumptions of future events including the continued availability of certain resources, third party modification plans, and other factors. Unanticipated failures by critical vendors, as well as failure by the Company to execute its own remediation efforts, could have a material adverse effect on the cost of the project, its completion date, and the Company's results of operations and financial position. As a result, there can be no assurance that these forward-looking estimates will be achieved and the actual cost and vendor compliance could differ materially from those plans, resulting in material financial risk.

## NEW ACCOUNTING PRONOUNCEMENTS

In April 1998, the American Institute of Certified Public Accountants issued Statement of Position 98-5 ("SOP 98-5"), REPORTING OF THE COSTS OF START-UP ACTIVITIES, which is effective for financial statements issued for periods beginning after December 15, 1998. SOP 98-5 requires costs of start-up activities and organization costs to be expensed as incurred. The Company believes SOP 98-5 will not have a material impact on its financial statements or accounting policies. The Company will adopt the provisions of SOP 98-5 in the first quarter of 1999.

The Company is also assessing the reporting and disclosure requirements of SFAS No. 133, ACCOUNTING FOR DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES. This statement establishes accounting and reporting standards for derivative instruments and hedging activities. The statement is effective for financial statements for fiscal years beginning after June 15, 1999. The Company believes SFAS No. 133 will not have a material impact on its financial statements or accounting policies. The Company will adopt the provisions of SFAS No. 133 in the first quarter of 2000.

## FORWARD-LOOKING STATEMENTS

This Annual Report contains "forward-looking statements" made under the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on the beliefs of the Company's management as well as assumptions made by and information currently available to the Company's management. When used in this report, the words "anticipate," "believe," "expect" and words or phrases of similar import, as they relate to the Company or Company management, are intended to identify forward-looking statements. Such statements reflect the current view of the Company with respect to future events and are subject to certain risks, uncertainties and assumptions related to certain factors including, without limitation, product development; product introductions; market demand and acceptance of products; the impact of changing economic conditions; business conditions in the golf industry; reliance on third parties including suppliers; the impact of market peers and their products; the actions of competitors, including pricing; risks concerning future technology; and one-time events and other factors detailed in the Company's prospectus and other Securities and Exchange Commission filings. Although the Company believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will prove to have been correct. Based upon changing conditions, should any one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, actual results may vary materially from those described herein. The Company does not intend to update these forward-looking statements. All subsequent written and oral forward-looking statements attributable to the Company or persons acting on its behalf are expressly qualified in their entirety by the applicable cautionary statements.

A 842

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The Company, in the normal course of doing business, is exposed to market risk through changes in interest rates with respect to its cash equivalents and available-for-sale marketable securities. All of the Company's cash equivalents and available-for-sale marketable securities are fixed rate state government, municipal or corporate bonds. At December 31, 1998, the cost and market value of such cash equivalents and marketable securities was approximately $58,629,000 and $58,862,000, respectively. A significant increase in interest rates would result in a decrease in the bond prices. The Company's investment policy sets minimum standards related to the quality, maturity and liquidity of such investments.

The table below presents principal amounts and related weighted-average interest rates by year of maturity for the Company's investment portfolio (in thousands, except percentages).

|  | 1999 | 2000 | 2001 | TOTAL | FAIR VALUE |
|---|---|---|---|---|---|
| Cash equivalents: | | | | | |
| Fixed rate | $24,484 | $     - | $     - | $24,484 | $24,487 |
| Average interest rate (1) | 4.3% | - | - | 4.3% | |
| Marketable securities: | | | | | |
| Fixed rate | $13,019 | $15,206 | $5,920 | $34,145 | $34,375 |
| Average interest rate (1) | 3.5% | 3.9% | 3.8% | 3.7% | |

(1) The majority of cash equivalents and marketable securities are tax-exempt, resulting in a lower average interest rate than taxable investments.

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The financial statements are set forth herein under Item 14 commencing on page F-1. Schedule II to the financial statement is set forth herein under Item 14 on page S-1. In addition, quarterly financial data is not required as the Company has not met the requirements of net income after taxes, but before extraordinary items and cumulative effect of any change in accounting of $250,000, for each year in the three year period ended December 31, 1998, or total assets at December 31, 1998 of $200 million.

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

Not Applicable

15

A 843

PART III

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The information required by this Item is incorporated by reference from pages 3 through 7, inclusive, of the Company's Proxy Statement dated April 7, 1999 for the annual meeting of shareholders on May 5, 1999 (the "1999 Proxy Statement") under the respective captions, "Election of Directors", "Section
16(a) Beneficial Ownership Reporting Compliance" and "Executive Officers".

## ITEM 11. EXECUTIVE COMPENSATION

The information required by this Item is incorporated by reference from pages 8 through 10, inclusive, of the Company's 1999 Proxy Statement under the caption "Compensation of Executive Officers".

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The information required by this Item is incorporated by reference from page 6 of the Company's 1999 Proxy Statement under the caption "Beneficial Ownership of Certain Stockholders, Directors and Executive Officers".

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The information required by this Item is incorporated by reference from pages 10 through 12, inclusive, of the Company's 1999 Proxy Statement under the captions "Employment Contracts and Change in Control Agreements" and "Compensation Committee Interlocks and Insider Participation".

16

A 844

PART IV

## ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K.

(a) The following documents are filed as a part of this report:

(1) CONSOLIDATED FINANCIAL STATEMENTS

| ITEM | PAGE |
|------|------|
| Index to Consolidated Financial Statements and Related Financial Statement Schedule | F-1 |
| Independent Auditors' Report | F-2 |
| Consolidated Balance Sheets as of December 31, 1997 and 1998 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 1996, 1997, and 1998 | F-4 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 1996, 1997, and 1998 | F-5 - F-6 |
| Consolidated Statements of Cash Flows for the years ended December 31, 1996, 1997, and 1998 | F-7 |
| Notes to Consolidated Financial Statements | F-8 - F-20 |

(2) FINANCIAL STATEMENT SCHEDULE

The following financial statement schedule of the Company for the years
ended December 31, 1996, 1997, and 1998 is filed as part of this Annual
Report and should be read in conjunction with the Consolidated Financial
Statements of the Company. All other schedules have been omitted because
said schedules are not required under the related instructions or are not
applicable or because the information required is included in the Company's
consolidated financial statements or the notes thereto.

| | |
|---|---|
| Schedule II - Valuation and Qualifying Accounts | S-1 |

17

A 845

(3) EXHIBITS

The exhibits listed below are filed as a part of or incorporated by reference in this Annual Report. Where such filing is made by incorporation by reference to a previously filed document, such document is identified in parenthesis. See the Index of Exhibits included with the exhibits filed as part of this Annual Report.

| EXHIBIT | DESCRIPTION | LOCATION |
|---------|-------------|----------|
| Exhibit 3.1 | Amended and Restated Certificate of Incorporation | Incorporated by reference to Form S-1 (Exhibit 3.1) |
| Exhibit 3.2 | Amended and Restated By-laws | Incorporated by reference to Form S-1 (Exhibit 3.2) |
| Exhibit 4.1 | 1998 Stock Incentive Plan of the Company dated February 26, 1998 | Incorporated by reference to Form S-1 (Exhibit 4.1) |
| Exhibit 10.1 | Agreement between the Registrant and Nick Faldo, dated April 22, 1998 | Incorporated by reference to Form S-1 (Exhibit 10.1) |
| Exhibit 10.2 | Amended and Restated Revolving credit dated dated February 26, 1999, between Adams Golf Direct Response, Ltd., Adams Golf, Ltd. and NationsBank of Texas N.A. and related promissory note and guaranty. | Included in this filing |
| Exhibit 10.3 | Commercial Lease Agreement dated December 5, 1997, between Jackson-Shaw Technology Center II, Ltd. and the Company | Incorporated by reference to Form S-1 (Exhibit 10.3) |
| Exhibit 10.4 | Commercial Lease Agreement dated April 6, 1998, between Jackson-Shaw Technology Center II, Ltd. and the Company | Incorporated by reference to Form S-1 (Exhibit 10.4) |
| Exhibit 10.5 | Letter agreement dated April 13, 1998, between the Company and Darl P. Hatfield | Incorporated by reference to Form S-1 (Exhibit 10.5) |
| Exhibit 21.1 | Subsidiaries of the Registrant | Included in this filing |
| Exhibit 23.1 | Consent of KPMG LLP | Included in this filing |
| Exhibit 27.1 | Financial Data Schedule | Included in this filing |
| Exhibit 99.1 | Proxy Statement of Registrant dated April 7, 1999 | Incorporated by reference to the 1999 Proxy Statement |

(b) REPORTS ON FORM 8-K

None

18

A 846

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ADAMS GOLF, INC, a Delaware corporation

```
Date:   March 29, 1999        By: /s/ B. H. (Barney) Adams
                                  ------------------------------------------
                                  B. H. (Barney) Adams,
                                  Chairman of the Board, Chief Executive
                                  Officer and President

Date:   March 29, 1999        By: /s/ Darl P. Hatfield
                                  ------------------------------------------
                                  Darl P. Hatfield,
                                  Senior Vice President - Finance and
                                  Administration and Chief Financial
                                  Officer
```

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicate.

```
Date:   March 29, 1999            /s/ B. H. (Barney) Adams
                                  ------------------------------------------
                                  B. H. (Barney) Adams, Chairman of the
                                  Board, Chief Executive Officer and
                                  President (Principal Executive Officer)

Date:   March 29, 1999            /s/ Paul F. Brown, Jr.
                                  ------------------------------------------
                                  Paul F. Brown, Jr.,
                                  Director

Date:   March 29, 1999            /s/ Roland E. Casati
                                  ------------------------------------------
                                  Roland E. Casati,
                                  Director

Date:   March 29, 1999            /s/ Mark R. Mulvoy
                                  ------------------------------------------
                                  Mark R. Mulvoy
                                  Director

Date:   March 29, 1999            /s/ Richard H. Murtland
                                  ------------------------------------------
                                  Richard H. Murtland,
                                  Vice President - Research and
                                  Development Secretary, Treasurer and
                                  Director

Date:   March 29, 1999            /s/ Stephen R. Patchin
                                  ------------------------------------------
                                  Stephen R. Patchin
                                  Director

Date:   March 29, 1999            /s/ John S. Simpson
                                  ------------------------------------------
                                  John S. Simpson
                                  Director
```

19

A 847

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS
## AND RELATED FINANCIAL STATEMENT SCHEDULE

CONSOLIDATED FINANCIAL STATEMENTS                                                                              PAGE
--------------------------------
    Independent Auditors' Report                                                           F-2

    Consolidated Balance Sheets as of December 31, 1997 and 1998                            F-3

    Consolidated Statements of Operations for the years ended December 31, 1996, 1997 and 1998   F-4

    Consolidated Statements of Stockholders' Equity for the years ended December 31, 1996, 1997 and 1998   F-5 - F-6

    Consolidated Statements of Cash Flows for the years ended December 31, 1996, 1997 and 1998   F-7

    Notes to Consolidated Financial Statements                                             F-8 - F20

FINANCIAL STATEMENT SCHEDULE
----------------------------

    The following financial statement schedule of the Company for the years
ended December 31, 1996, 1997, and 1998 is filed as part of this Report
and should be read in conjunction with the Consolidated Financial
Statements of the Company.

    Schedule II - Valuation and Qualifying Accounts                                        S-1

    All other schedules are omitted since the required information is not
present, or is not present in amounts sufficient to require submission
of the schedule, or because the information required is included in the
consolidated financial statements and notes thereto.

A 848

### INDEPENDENT AUDITORS' REPORT

The Board of Directors and Stockholders
Adams Golf, Inc. and subsidiaries:

We have audited the consolidated financial statements of Adams Golf, Inc. and subsidiaries as listed in the accompanying index. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in the accompanying index. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Adams Golf, Inc. and its subsidiaries as of December 31, 1997 and 1998, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1998 in conformity with generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

**KPMG LLP**

Dallas, Texas
January 25, 1999

F-2

A 849

ADAMS GOLF, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

ASSETS

| | DECEMBER 31, | |
| --- | --- | --- |
| | 1997 | 1998 |
| Current assets: | | |
| Cash and cash equivalents................................... | $1,956 | $23,688 |
| Marketable securities (note 2)............................. | - | 13,084 |
| Trade receivables, net (note 3)........................... | 7,671 | 2,022 |
| Inventories (note 4)....................................... | 4,487 | 13,312 |
| Prepaid expenses........................................... | 509 | 885 |
| Income tax receivable...................................... | - | 2,088 |
| Deferred income tax assets (note 12)...................... | 390 | 2,386 |
| Other current assets...................................... | 937 | 1,287 |
| Total current assets................................... | 15,950 | 58,752 |
| Property and equipment, net (note 5)...................... | 604 | 3,468 |
| Marketable securities (note 2)............................ | - | 21,291 |
| Deferred income tax assets (note 12)..................... | 183 | - |
| Professional services agreement (note 6) .................. | - | 9,450 |
| Other assets, net (note 7)................................ | 623 | 3,945 |
| | $17,360 | $96,906 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
| --- | --- | --- |
| Current liabilities: | | |
| Note payable to shareholder (note 11)..................... | $ - | $ 175 |
| Accounts payable.......................................... | 378 | 1,152 |
| Income taxes payable...................................... | 1,021 | - |
| Accrued expenses (note 8)................................. | 7,636 | 4,418 |
| Total current liabilities............................. | 9,035 | 5,745 |
| Deferred income tax liabilities (note 12)................. | - | 2,971 |
| Total liabilities..................................... | 9,035 | 8,716 |
| Stockholders' equity (note 13): | | |
| Preferred stock, $0.01 par value; authorized 5,000,000 shares; none issued and outstanding................... | - | - |
| Common stock, $.001 par value; authorized 50,000,000 shares; 15,719,338 shares issued and outstanding at December 31, 1997 and 23,136,782 shares issued and 22,479,282 shares outstanding at December 31, 1998.................................... | 16 | 23 |
| Additional paid-in capital................................ | 14,123 | 85,183 |
| Common stock subscription................................. | - | (22) |
| Deferred compensation..................................... | - | (704) |
| Accumulated other comprehensive income.................... | - | 150 |
| Retained earnings (accumulated deficit) .................. | (5,814) | 6,696 |
| Treasury stock, 657,500 shares at cost................... | - | (3,136) |
| Total stockholders' equity............................. | 8,325 | 88,190 |
| Commitments and contingencies (notes 6 and 9) | | |
| | $17,360 | $96,906 |

See accompanying notes to consolidated financial statements.

F-3

A 850

ADAMS GOLF, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF OPERATIONS
### (IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

|  | YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 1996 | 1997 | 1998 |
| Net sales (note 3) ............... | $3,522 | $36,690 | $84,611 |
| Cost of goods sold................ | 1,590 | 9,991 | 21,441 |
| Gross profit............... | 1,932 | 26,699 | 63,170 |
| Operating expenses: |  |  |  |
| Research and development expenses.................... | 51 | 557 | 1,532 |
| Selling and royalty expenses.... | 626 | 13,093 | 31,239 |
| General and administrative expenses: |  |  |  |
| Stock compensation and bonus award (note 13)............ | 214 | 14,842 | – |
| Provision for bad debts...... | 51 | 739 | 1,464 |
| Other....................... | 981 | 1,437 | 10,435 |
| Total operating expenses... | 1,923 | 30,668 | 44,670 |
| Operating income (loss).... | 9 | (3,969) | 18,500 |
| Other income (expense): |  |  |  |
| Interest income................ | 4 | 15 | 1,367 |
| Interest expense............... | – | (70) | (71) |
| Other.......................... | – | (48) | (103) |
| Income (loss) before income taxes............ | 13 | (4,072) | 19,693 |
| Income tax expense (note 12)....... | – | 582 | 7,183 |
| Net income (loss).......... | $ 13 | $(4,654) | $12,510 |
| Income (loss) per common share: |  |  |  |
| Basic........................... | $ – | $ (0.37) | $ 0.61 |
| Diluted........................ | $ – | $ (0.37) | $ 0.61 |

See accompanying notes to consolidated financial statements.

F-4

ADAMS GOLF, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

YEARS ENDED DECEMBER 31, 1996, 1997 AND 1998

| | SHARES OF COMMON STOCK | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | COMMON STOCK SUBSCRIPTION | DEFERRED COMPENSATION | ACCUMULATED OTHER COMPREHENSIVE INCOME |
|---|---|---|---|---|---|---|
| Balance, December 31, 1995............ | 11,062,908 | $ 11 | $ 1,776 | $ - | $ - | $ - |
| Net income............ | - | - | - | - | - | - |
| Sale of stock.......... | 1,581,126 | 2 | 1,594 | - | | - |
| Common stock repurchased and retired (note 13)......... | (770,800) | (1) | (244) | - | - | - |
| Balance, December 31, 1996............. | 11,873,234 | 12 | 3,126 | - | - | - |
| Net loss............... | - | - | - | - | - | - |
| Stock compensation award (note 13)..... | 2,000,000 | 2 | 9,998 | - | - | - |
| Exercise of stock options............ | 946,104 | 1 | 550 | - | - | - |
| Exchange of debt for common common stock (note 13)........... | 900,000 | 1 | 449 | - | - | - |
| Balance, December 31, 1997............... | 15,719,338 | $16 | $14,123 | $ - | $ - | $ - |

| | RETAINED EARNINGS (ACCUMULATED DEFICIT) | COMPREHENSIVE INCOME | COST OF TREASURY STOCK | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|---|---|
| Balance, December 31, 1995............. | $(1,173) | | $ - | $ 614 |
| Net income............ | 13 | $ 13 | - | 13 |
| Sale of stock.......... | - | | - | 1,596 |
| Common stock repurchased and retired (note 13)......... | - | | - | (245) |
| Balance, December 31, 1996............. | (1,160) | | - | 1,978 |
| Net loss............... | (4,654) | $(4,654) | - | (4,654) |
| Stock compensation award (note 13)..... | - | | - | 10,000 |
| Exercise of stock options............ | - | | - | 551 |
| Exchange of debt for common common stock (note 13)........... | - | | - | 450 |
| Balance, December 31, 1997............... | $(5,814) | | $ - | $ 8,325 |

F-5 (continued)

A 852

ADAMS GOLF, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (CONTINUED)
(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

YEARS ENDED DECEMBER 31, 1996, 1997 AND 1998

| | SHARES OF COMMON STOCK | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | COMMON STOCK SUBSCRIPTION | DEFERRED COMPENSATION | ACCUMULATED OTHER COMPREHENSIVE INCOME |
|---|---|---|---|---|---|---|
| Balance, December 31, 1997 | 15,719,338 | $ 16 | $14,123 | $ - | $ - | $ - |
| Comprehensive income: | | | | | | |
| Net income | - | - | - | - | - | - |
| Other comprehensive income, net of tax – unrealized gains on marketable securities | - | - | - | - | - | 150 |
| Comprehensive income | - | - | - | - | - | - |
| Issuance of common stock | 4,037,500 | 4 | 58,468 | - | - | - |
| Issuance of stock options | - | - | 2,027 | - | (2,027) | - |
| Stock option forfeiture | - | - | (487) | - | 487 | - |
| Exercise of stock options | 2,479,944 | 2 | 928 | (230) | - | - |
| Payment of stock subscription | - | - | - | 208 | - | - |
| Grant of stock (note 6) | 900,000 | 1 | 10,124 | - | - | - |
| Treasury stock purchases (657,500 shares) | - | - | - | - | - | - |
| Amortization of deferred compensation | - | - | - | - | 836 | - |
| Balance, December 31, 1998 | 23,136,782 | $23 | $85,183 | $ (22) | $ (704) | $150 |

| | RETAINED EARNINGS (ACCUMULATED DEFICIT) | COMPREHENSIVE INCOME | COST OF TREASURY STOCK | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|---|---|
| Balance, December 31, 1997 | $(5,814) | | $ - | $ 8,325 |
| Comprehensive income: | | | | |
| Net income | 12,510 | $12,510 | - | 12,510 |
| Other comprehensive income, net of tax – unrealized gains on income, net of tax – unrealized gains on marketable securities | | 150 | - | 150 |
| Comprehensive income | - | $12,660 | - | - |
| Issuance of common stock | - | | - | 58,472 |
| Issuance of stock options | - | | - | - |
| Stock option forfeiture | - | | - | - |
| Exercise of stock options | - | | - | 700 |
| Payment of stock subscription | - | | - | 208 |
| Grant of stock (note 6) | - | | - | 10,125 |
| Treasury stock purchases (657,500 shares) | - | | (3,136) | (3,136) |
| Amortization of deferred compensation | - | | - | 836 |

A 853

| Balance, December 31, | | | |
|---|---|---|---|
| 1998................. | $ 6,696 | $(3,136) | $88,190 |
| | ======= | ======= | ======= |

See accompanying notes to consolidated financial statements.

F-6

ADAMS GOLF, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(IN THOUSANDS)

| | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| | 1996 | 1997 | 1998 |
| Cash flows from operating activities: | | | |
| Net income (loss)............................. | $13 | $(4,654) | $12,510 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization of property and equipment and intangible assets.............. | 19 | 302 | 2,204 |
| Loss on retirement of fixed assets........... | - | 134 | 111 |
| Stock compensation and bonus award............ | - | 10,000 | - |
| Amortization of deferred compensation.......... | - | - | 836 |
| Deferred income taxes......................... | - | (573) | 1,077 |
| Allowance for doubtful accounts............... | 26 | 672 | 596 |
| Changes in assets and liabilities: | | | |
| Trade receivables............................ | (374) | (8,067) | 5,053 |
| Inventories................................. | (476) | (3,812) | (8,825) |
| Prepaid expenses............................. | - | (481) | (376) |
| Income tax receivable........................ | - | - | (2,088) |
| Other current assets........................ | - | (716) | (350) |
| Other assets................................. | (362) | (390) | (3,567) |
| Accounts payable............................. | (23) | 360 | 774 |
| Income taxes payable......................... | - | 1,021 | (1,021) |
| Accrued expenses............................. | 329 | 7,304 | (3,218) |
| Net cash provided by (used in) operating activities................................. | (848) | 1,100 | 3,716 |
| Cash flows from investing activities: | | | |
| Purchases of marketable securities............. | - | - | (34,145) |
| Purchase of equipment........................ | (121) | (770) | (4,258) |
| Net cash used in investing activities....... | (121) | (770) | (38,403) |
| Cash flows from financing activities: | | | |
| Proceeds from initial public offering........... | - | - | 60,078 |
| Initial public offering costs................. | - | - | (1,606) |
| Purchase of treasury stock.................... | - | - | (3,136) |
| Proceeds from notes payable and line of credit..... | 230 | 1,050 | 7,135 |
| Repayment of line of credit borrowings.......... | - | (800) | (6,000) |
| Repayment of notes payable.................... | - | (30) | (960) |
| Issuance of common stock...................... | 1,351 | 551 | 908 |
| Net cash provided by financing activities.... | 1,581 | 771 | 56,419 |
| Net increase in cash and cash equivalents............ | 612 | 1,101 | 21,732 |
| Cash and cash equivalents at beginning of year........ | 243 | 855 | 1,956 |
| Cash and cash equivalents at end of year.............. | $ 855 | $ 1,956 | $ 23,688 |
| Supplemental disclosure of cash flow information: | | | |
| Interest paid................................. | $ - | $ 70 | $ 27 |
| Income taxes paid................................. | $ - | $ 356 | $ 9,298 |
| Supplemental disclosure of non-cash financing activity-stock issued for professional services agreement (note 6)................................. | $ - | $ - | $ 10,125 |
| Exchange of debt for common stock................. | $ - | $ 450 | $ - |

See accompanying notes to consolidated financial statements.

F-7

A 855

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(A) GENERAL

Adams Golf, Inc. (the "Company") was founded in 1987. The Company designs, manufactures, markets and distributes premium quality, technologically innovative golf clubs and provides custom golf club fitting technology. The Company's primary products are fairway woods and drivers that are marketed under the trademarks "Tight Lies" and "SC Series," respectively. The SC Series was introduced in January 1999 and, accordingly, had no sales for the three-year period ended December 31, 1998.

The consolidated financial statements include the accounts of Adams Golf, Inc. and its subsidiaries, all of which are wholly owned. All significant intercompany accounts and transactions have been eliminated in consolidation.

(B) MARKETABLE SECURITIES

Marketable securities, primarily consisting of governmental and corporate bonds, are managed under agreements with investment managers. The agreements provide terms related to the quality, diversification and maturities of the investments in the managed portfolios. The investments are classified as available-for-sale and are carried at fair value, with unrealized gains and losses, net of the related tax effect, reported as other comprehensive income in the consolidated statement of stockholders' equity. The balance sheet classification of the Company's marketable securities is based upon the contractual maturity date of such securities.

(C) INVENTORIES

Inventories are valued at the lower of cost or market and primarily consist of completed golf clubs and component parts. Cost is determined using the first-in, first-out method.

(D) PROPERTY AND EQUIPMENT

Property and equipment are stated at cost. Depreciation and amortization are calculated using the straight-line method over the estimated useful lives of the respective assets, which range from three to seven years.

(E) REVENUE RECOGNITION

The Company records revenue as earned, which generally occurs when the product is shipped.

F-8

A 856

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(F) OTHER ASSETS AND RELATED AMORTIZATION EXPENSE

Other assets consist primarily of the cost of implementing an enterprise resource planning (ERP) software system, obtaining patents, development costs of an infomercial and various deposits. The ERP software system costs have been capitalized in accordance with AICPA Statement of Position 98-1, ACCOUNTING FOR THE COSTS OF COMPUTER SOFTWARE DEVELOPED OR OBTAINED FOR INTERNAL USE, which was adopted by the Company on January 1, 1998. These costs are being amortized using the straight-line method over five years. Patent amortization is computed using the straight-line method over the estimated useful lives of the assets, which range from 5 to 15 years. Infomercial costs are amortized over a 6 to 24 month period based on the estimated useful life and on revenues generated compared to total estimated revenues resulting from the airing of such infomercials.

(G) RESEARCH AND DEVELOPMENT

Research and development costs consist of all costs incurred in planning, designing and testing of golf equipment, including salary costs related to research and development, and are expensed as incurred.

(H) ADVERTISING COSTS

Advertising costs, other than direct response (infomercial) costs, are expensed as incurred and aggregated approximately $34,000, $8,651,000 and $17,083,000 in 1996, 1997 and 1998, respectively.

(I) PRODUCT WARRANTY

The Company's golf equipment is sold under warranty against defects in material and workmanship for a period of two years. In addition, the Company has a 90 day "no questions asked" return policy applicable to direct response sales. An allowance for estimated future warranty and sales return costs is recorded in the period products are sold.

(J) INCOME TAXES

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforwards. Deferred tax assets and liabilities are measured using enacted rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

F-9

A 857

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(K) INCOME (LOSS) PER SHARE

The weighted average common shares used for basic net income
(loss) per common share were 11,237,794, 12,519,392, and 20,434,775 for 1996, 1997 and 1998, respectively. The effect of dilutive stock
options added 241,520 shares for 1998 for the computation of diluted income per common share. Options to purchase 100,000 shares of
common stock which were outstanding during 1998 were not included in the computation of diluted earnings per share as their effect would
have been antidilutive. Stock options outstanding in 1996 and 1997 were not considered in the computation of net income (loss) per common
share since their effect is either immaterial or antidilutive.

(L) FINANCIAL INSTRUMENTS

The carrying amounts of cash and cash equivalents, accounts receivable, accounts payable, accrued expenses and note payable to shareholder
approximate fair value, due to the short maturity of these instruments. The carrying amount of marketable securities is based upon quoted
market prices.

(M) IMPAIRMENT OF LONG-LIVED ASSETS AND LONG-LIVED ASSETS TO BE
DISPOSED OF

The Company reviews long-lived assets and certain identifiable intangibles for impairment whenever events or changes in circumstances
indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison
of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired,
the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceed the fair value of the assets.
Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell.

(N) COMPREHENSIVE INCOME

In 1998, the Company adopted Statement of Financial Accounting Standards (SFAS) No. 130, REPORTING COMPREHENSIVE INCOME.
This statement establishes rules for the reporting of comprehensive income and its components. Comprehensive income consists of net income
and unrealized gains and losses, net of related tax effect, on marketable securities classified as available-for-sale and is presented in the
consolidated statement of shareholders' equity.

F-10

A 858

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(O) STATEMENTS OF CASH FLOWS

The Company considers all short-term highly liquid instruments, with an original maturity of three months or less, to be cash equivalents.

(P) USE OF ESTIMATES

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(2) MARKETABLE SECURITIES

Marketable securities consist of the following at December 31, 1998:

|  | COST | UNREALIZED GAINS | FAIR VALUE |
|---|---|---|---|
| Governmental bonds | $ 32,342 | $229 | $ 32,571 |
| Corporate bonds | 1,803 | 1 | 1,804 |
|  | 34,145 | 230 | 34,375 |
| Less current amounts | (13,019) | (65) | (13,084) |
| Long-term marketable securities | $ 21,126 | $165 | $ 21,291 |

During the year ended December 31, 1998, there were no proceeds from the sale of available-for-sale securities. All marketable securities mature within three years.

F-11

A 859

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(3) TRADE RECEIVABLES

Trade receivables consist of the following at December 31, 1997 and 1998:

|  | 1997 | 1998 |
|---|---|---|
| Trade receivables | $8,369 | $ 3,316 |
| Allowance for doubtful accounts | (698) | (1,294) |
|  | $7,671 | $ 2,022 |

During the fourth quarter of 1998, the Company provided retailers an unconditional credit ("Net-down Credit") in connection with the Company's new suggested retail pricing structure. The Net-down Credit, which aggregated approximately $4,300,000, has been reflected as a reduction in net sales and accounts receivable in the Company's consolidated financial statements as of and for the year ended December 31, 1998.

(4) INVENTORIES

Inventories consist of the following at December 31, 1997 and 1998:

|  | 1997 | 1998 |
|---|---|---|
| Finished goods | $2,064 | $ 2,880 |
| Component parts | 2,423 | 10,432 |
|  | $4,487 | $13,312 |

(5) PROPERTY AND EQUIPMENT, NET

Property and equipment consists of the following at December 31, 1997 and 1998:

|  | 1997 | 1998 |
|---|---|---|
| Manufacturing equipment | $ 142 | $ 244 |
| Office equipment | 660 | 4,112 |
| Accumulated depreciation and amortization | (198) | (888) |
|  | $ 604 | $3,468 |

F-12

A 860

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(6) PROFESSIONAL SERVICES AGREEMENT

The professional services agreement consists of a contract entered into by the Company and Nicholas A. Faldo ("Faldo"), a professional golfer, which provides, among other things, for Faldo's endorsement and use of the Company's products, as well as the design, development and testing of new technologies and products. As consideration for such services, Faldo received 900,000 shares of the Company's common stock, which were valued at the fair market value of the stock ($11.25 per share) as of May 1, 1998, the effective date of the agreement. The value of the stock is being amortized over ten years, which represents the estimated period during which the Company will realize benefits under the agreement.

In addition, Faldo will receive royalty payments representing 5% of net sales outside the U.S., with a minimum annual amount of $1,500,000 beginning in 1999 and increasing ratably to $4,000,000 in 2004.

(7) OTHER ASSETS, NET

Other assets, net, consist of the following at December 31, 1997 and 1998:

|  | 1997 | 1998 |
|---|---|---|
| Enterprise resource planning software | $    - | $3,618 |
| Deposits, including amounts for fixed assets purchased | 381 | 274 |
| Infomercial costs | 233 | - |
| Patents | 9 | 7 |
| Other | - | 46 |
|  | $   623 | $3,945 |

(8) ACCRUED EXPENSES

Accrued expenses consist of the following at December 31, 1997 and 1998:

|  | 1997 | 1998 |
|---|---|---|
| Payroll, bonuses and commissions (see note 13) | $5,576 | $  476 |
| Royalties | 393 | 506 |
| Advertising | 471 | 1,661 |
| Product warranty expense and sales return | 449 | 736 |
| Professional services | 340 | 605 |
| Other | 407 | 434 |
|  | $7,636 | $4,418 |

F-13

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(9) COMMITMENTS AND CONTINGENCIES

The Company is obligated under certain noncancelable operating leases for manufacturing, warehouse and office space. A summary of the minimum rental commitments under noncancellable leases is as follows:

| YEARS ENDING DECEMBER 31, | |
| --- | --- |
| 1999 | $687 |
| 2000 | 717 |
| 2001 | 732 |
| 2002 | 767 |
| 2003 | 785 |
| Thereafter | 262 |

Rent expense was approximately $46,000 $104,000 and $472,000 for the years ended December 31, 1996, 1997 and 1998, respectively.

The Company had outstanding commitments on letters of credit of approximately $144,000 at December 31, 1998, for the purchase of inventory from foreign vendors.

From time to time, the Company is a party to various legal proceedings arising from the ordinary course of business. While any proceeding has an element of uncertainty, management believes that the final outcome of all matters currently pending will not have a materially adverse effect on the Company's financial position, results of operations or liquidity.

(10) RETIREMENT PLAN

In February 1998, the Company adopted the Adams Golf, Ltd. 401(k) Retirement Plan (the "Plan"), which covers substantially all employees. The Company matches 50% of employee contributions up to a maximum of 6% of the employee's compensation. For the year ended December 31, 1998, the Company contributed approximately $74,000 to the Plan.

F-14

A 862

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(11) DEBT

On February 27, 1998, the Company entered into a $10,000,000 revolving credit facility (the "Facility") bearing interest payable monthly at the bank's prime rate minus 25 basis points (7.50% at December 31, 1998) or LIBOR plus 1.75%, which expired December 31, 1998. Subsequent to December 31, 1998, the Company amended the Facility's maturity date to May 31, 2000 and the interest rate to the bank's prime rate of interest minus 50 basis points or LIBOR plus 1.00%. At December 31, 1998, there were no amounts outstanding under the Facility. The Company pays a commitment fee on the unused portion of the Facility of one-eighth of one percent per annum.

During the first quarter of 1998, the Company borrowed $1,135,000 in the form of an unsecured note payable to the Chief Executive Officer. The remaining principal balance of the note of $175,000, which bears interest at 5.39%, is due on April 14, 1999.

(12) INCOME TAXES

Income tax expense (benefit) for the years ended December 31, 1997 and 1998 consists of the following:

|  | 1997 | 1998 |
|---|---|---|
| Federal - current | $1,021 | $5,486 |
| Federal - deferred | (573) | 1,077 |
| State - current | 134 | 620 |
|  | $ 582 | $7,183 |

Actual income tax expense differs from the "expected" income tax expense (benefit) (computed by applying the U.S. federal corporate tax rate of 34% for 1996 and 1997 and 35% for 1998 to income (loss) before income taxes) for the years ended December 31, 1996, 1997 and 1998 as follows:

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Computed "expected" tax expense (benefit) | $ 4 | $(1,384) | $6,892 |
| State income taxes, net of federal tax benefit | - | 89 | 403 |
| Non-taxable interest income | - | - | (286) |
| Stock compensation and bonus award | - | 2,159 | - |
| Change in valuation allowance for deferred tax assets | (4) | (338) | (50) |
| Other | - | 56 | (224) |
|  | $ - | $ 582 | $7,183 |

F-15

A 863

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

The tax effects of temporary differences that give rise to deferred tax assets and deferred tax liabilities at December 31 are presented below:

|  | 1997 | 1998 |
|---|---|---|
| Deferred tax assets: | | |
| Allowance for bad debts | $ 237 | $ 453 |
| Research and development costs | 1 | 160 |
| Net-down credit | - | 1,505 |
| Product warranty and sales returns | 153 | 258 |
| Obsolete inventory reserve | - | 77 |
| Other reserves | - | 93 |
| Net operating loss carryforwards | 311 | 275 |
| Total gross deferred tax assets | 702 | 2,821 |
| Less valuation allowance | (50) | - |
| Net deferred tax assets | 652 | 2,821 |
| Deferred tax liabilities: | | |
| Infomercial costs | 79 | - |
| Prepaid professional services | - | 3,308 |
| Tax/book depreciation difference | - | 17 |
| Unrealized gain on marketable securities | - | 81 |
| Total gross deferred tax liabilities | 79 | 3,406 |
| Net deferred tax assets (liabilities) | $ 573 | $ (585) |

In assessing the realizability of deferred income tax assets, management considers whether it is more likely than not that some portion or all of the deferred income tax assets will not be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible.

The valuation allowance for deferred tax assets at December 31, 1997 was $50,000. The net change in the total valuation allowance for the years ended December 31, 1997 and 1998 was a decrease of $338,000 and $50,000, respectively.

At December 31, 1998, the Company has net operating loss carryforwards for federal income tax purposes of approximately $786,000 which are available to offset future federal taxable income through 2010. The availability of the net operating loss carryforwards to reduce future taxable income is subject to certain limitations. As a result of a change in ownership, utilization of its net operating loss carryforwards is limited to approximately $71,000 per year for the remaining life of the net operating losses.

F-16

A 864

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(13) STOCKHOLDERS' EQUITY

(A) INITIAL PUBLIC OFFERING

The Company completed the sale of 4,000,000 shares of common stock through an initial public offering (the "Offering") on July 15, 1998. The Offering resulted in net proceeds to the Company of approximately $58,000,000 after deducting offering expenses, discounts and commissions. On July 20, 1998, the Company completed the sale of an additional 37,500 shares of common stock in connection with the underwriters' exercise of their option to cover over-allotments, resulting in net proceeds of $500,000.

(B) STOCK OPTION PLANS

In April 1996, the Company adopted the 1996 Stock Option Incentive Plan (the 1996 Stock Option Plan), pursuant to which stock options covering an aggregate of 800,000 shares of the Company's common stock may be granted. Options awarded under the 1996 Stock Option Plan (i) are generally granted at prices that equate to or are above fair market value on the date of the grant; (ii) generally become exercisable over a period of one to four years; and (iii) generally expire five years subsequent to award.

At December 31, 1998, there were 140,310 shares available for grant under the 1996 Stock Option Plan. The per share weighted-average fair value of stock options granted during 1996 was $0.06, on the date of grant using the Black Scholes option-pricing model with the following weighted-average assumptions: Risk-free interest rate, 6%; expected life, two – five years and expected dividend yield, 0%. For the years ended December 31, 1997 and 1998, there were no stock options granted, nor does the Company intend to make future grants, under the 1996 Stock Option Plan.

In connection with an employment agreement entered into in September 1995 with the Company's Chief Executive Officer, the Company granted options to acquire 1,520,766 shares of common stock at $0.375 per share. Vesting of the stock options was conditioned upon meeting certain revenue and earnings requirements, which were met during 1996 and 1997. Also, the agreement provided for a bonus to be paid to the Chief Executive Officer in an amount equal to the exercise price of the options plus any related income tax due by the Chief Executive Officer upon exercise of the options. The Chief Executive Officer notified the Company of his intent to exercise the options in December 1997 with the shares issued in January 1998. Compensation expense of approximately $214,000 and $2,300,000 was charged to operations in 1996 and 1997, respectively, to recognize the bonus due to the Chief Executive Officer.

F-17

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

In conjunction with a 1996 stock purchase agreement, the Company granted options to a shareholder to acquire an aggregate of 942,632 shares of common stock at option exercise prices ranging from $0.375 to $0.625 per share. During 1997, the shareholder exercised the options for an aggregate exercise price of approximately $550,000.

In February 1998, the Company adopted the 1998 Stock Incentive Plan ("the 1998 Stock Option Plan"), pursuant to which stock options covering an aggregate of 1,800,000 shares (of which 900,000 were utilized as a direct stock grant to Faldo (see note 6)) of the Company's common stock may be granted. The Company granted 467,700 options, which generally vest over four years, to employees during 1998 at a weighted average price of $3.39 per share. At December 31, 1998, 541,940 shares remain available for grant, including forfeitures. For financial statement reporting purposes, the 1998 grants were deemed to have fair market values ranging from $3.75 to $11.25 per share at the date of grant. Accordingly, the Company has recorded deferred compensation of approximately $704,000, net of amounts amortized and forfeited, at December 31, 1998. The deferred compensation is being amortized to expense over the vesting period of the options.

The Company applies Accounting Principles Board Opinion 25 in accounting for its stock plans, and no compensation cost is recognized for its stock options in the consolidated financial statements for those stock options granted at fair market value. Had the Company determined compensation cost based on the fair value at the grant date for its stock options under SFAS No. 123, the Company's net income (loss) would have been the pro forma amounts indicated below:

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Net income (loss): |  |  |  |
| As reported | $   13 | $(4,654) | $12,510 |
| Pro forma | (13) | (4,744) | 12,445 |
| Diluted income (loss) per common share: |  |  |  |
| As reported | $    - | $ (0.37) | $  0.61 |
| Pro forma | - | (0.38) | 0.60 |

The per share weighted-averages fair value of stock options granted during 1998 under the 1998 Stock Option Plan was $5.22 on the date of grant using the Black Scholes option-pricing model with the following weighted-average assumptions: Risk-free interest rate, 6%; expected life, 5 years; and expected dividend yield, 0%.

F-18

A 866

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

Pro forma net income (loss) reflects only options granted in 1996, 1997 and 1998. Therefore, the full impact of calculating compensation cost for stock options under SFAS No. 123 is not reflected in the pro forma net income (loss) amounts presented above because compensation cost is reflected over the respective options vesting periods of up to four years.

A summary of stock option activity follows:

|  | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|
| Options outstanding at December 31, 1995 | 1,520,766 | $0.375 |
| Options granted | 1,946,948 | 1.00 |
| Options outstanding at December 31, 1996 | 3,467,714 | 0.44 |
| Options exercised | (946,104) | 0.583 |
| Options outstanding at December 31, 1997 | 2,521,610 | 0.375 |
| Options granted | 467,700 | 3.39 |
| Options exercised | (2,479,944) | 0.375 |
| Options forfeited | (151,304) | 1.91 |
| Options outstanding at December 31, 1998 | 358,062 | $3.67 |

At December 31, 1998, the exercise prices ranged from $2.50 to $11.25 per share, and the weighted-average remaining contractual life of outstanding options is approximately 4.37 years.

At December 31, 1997 and 1998, the number of options exercisable was 2,114,492 and 45,000, respectively, and the per share weighted-average exercise price of those options was $0.375 and $2.50, respectively. At December 31, 1998, the remaining contractual life of options exercisable was 4.5 years.

(C) STOCK COMPENSATION AWARD

In December 1997, the Board of Directors of the Company approved a stock compensation award of 2,000,000 shares of common stock to the Chief Executive Officer of the Company. In addition, the Company agreed to pay all income taxes due by the Chief Executive Officer relating to such stock award and related tax bonus. Aggregate compensation of $12,542,000 (including $2,542,000 for estimated taxes) was recorded by the Company during the year ended December 31, 1997 based on the fair market value of the stock.

F-19

A 867

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(D) NOTE WITH SHAREHOLDER CONVERTED TO STOCK

The Company borrowed $200,000 from a shareholder in October 1996 and an additional $250,000 from the same shareholder in 1997. The aggregate notes payable balance of $450,000 was converted into 450,000 shares of the Company's stock in September 1997.

(E) STOCK SPLIT AND AUTHORIZED CLASSES OF STOCK

Effective April 29, 1998, the stockholders of the Company authorized a two-for-one stock split for holders of record on May 1, 1998. The stock split has been reflected in the accompanying consolidated financial statements and, accordingly, all applicable dollar, share and per share amounts have been restated to reflect the stock split. In addition, the stockholders of the Company also approved an increase in the number of authorized shares of Common Stock to 50,000,000 and established a class of preferred stock with a par value of $.01 per share and authorized shares of 5,000,000.

(F) COMMON STOCK REPURCHASE PROGRAM

In October 1998, the Board of Directors approved a plan whereby the Company is authorized to repurchase from time to time on the open market up to 2,000,000 shares of its common stock. At December 31, 1998, the Company had repurchased 657,500 shares of common stock at an average price per share of $4.77 for a total cost of approximately $3,136,000 and the repurchased shares are held in treasury.

(14) GEOGRAPHIC SEGMENT AND DATA

In 1998, the Company adopted SFAS No. 131, DISCLOSURES ABOUT SEGMENTS OF AN ENTERPRISE AND RELATED INFORMATION. This statement establishes standards for reporting information about operating segments and related disclosures about products and services, geographic areas and major customers.

The Company generates substantially all revenues from the design, manufacturing, marketing and distribution of premium quality, technologically innovative golf clubs. The Company's products are distributed in both domestic and international markets. Net sales for these markets consisted of the following for the years ended December 31, 1996, 1997 and 1998:

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| United States | $2,922 | $35,808 | $73,580 |
| Rest of World | 600 | 882 | 11,031 |
|  | $3,522 | $36,690 | $84,611 |

At December 31, 1998, the Company has no assets outside of the United States.

(15) SUBSEQUENT EVENT

In February 1999, the Company signed a letter of intent to acquire certain assets of its exclusive distributor for the United Kingdom, which is majority owned by Faldo. Consideration will include approximately $200,000 in cash and a contingent cash payment of $200,000 due at the end of 1999 based upon the achievement of certain minimum levels of operating results.

F-20

A 868

SCHEDULE II

**ADAMS GOLF, INC.**
**VALUATION AND QUALIFYING ACCOUNTS**
**FOR THE YEARS ENDED DECEMBER 31, 1996, 1997, AND 1998**

(DOLLARS IN THOUSANDS)

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS | | DEDUCTIONS(1) | BALANCE AT END OF PERIOD |
| --- | --- | --- | --- | --- | --- |
| | | CHARGED TO COSTS AND EXPENSES | CHARGED TO OTHER ACCOUNTS | | |
| Allowance for doubtful accounts: | | | | | |
| Year ended December 31, 1996 | $   - | 51 | - | 25 | $   26 |
| Year ended December 31, 1997 | 26 | 739 | - | 67 | 698 |
| Year ended December 31, 1998 | 698 | 1,464 | - | 868 | 1,294 |
| Product Warranty and Sales Returns: | | | | | |
| Year ended December 31, 1996 | - | 2 | - | 2 | - |
| Year ended December 31, 1997 | - | 1,808 | - | 1,359 | 449 |
| Year ended December 31, 1998 | $449 | 5,476 | - | 5,189 | $  736 |

(1) Represents uncollectable accounts charged against the allowance for doubtful accounts and actual costs incurred for warranty repairs and sales returns.

S-1

A 869

## AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT

THIS AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT (this "AGREEMENT") is entered into as of February 26, 1999 by and between ADAMS GOLF DIRECT RESPONSE, LTD., a Texas limited partnership, and ADAMS GOLF, LTD., a Texas limited partnership (each a "BORROWER" and collectively, "BORROWERS"), and NATIONSBANK, N.A., a national banking association, successor in interest by merger to NationsBank of Texas, N.A., a national banking association ("LENDER").

### WITNESSETH:

1. Borrowers and Lender entered into that certain Revolving Credit Agreement dated as of February 27, 1998 (as modified, amended, renewed, extended, and restated from time to time, the "ORIGINAL LOAN AGREEMENT"), pursuant to which Lender provided to Borrowers a revolving credit facility upon the terms and subject to the conditions set forth in the Original Loan Agreement.

2. Borrowers and Lender desire and have agreed, subject to the terms and conditions set forth herein, to amend and restate the Original Loan Agreement in its entirety as and pursuant to this Agreement.

NOW, THEREFORE, in consideration of the mutual promises herein contained and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1

### DEFINITION OF TERMS

1.1 DEFINITIONS. As used in this Agreement, all exhibits and schedules hereto and in any note, certificate, report, or other Loan Documents made or delivered pursuant to this Agreement, the following terms have the respective meanings assigned to them in this SECTION 1 or in the SECTION or recital referred to below:

"ADJUSTED EURODOLLAR RATE" means, with respect to any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16th of 1%) equal to the quotient of (a) the Eurodollar Rate with respect to such Interest Period, DIVIDED BY (b) the remainder of 1.00 MINUS the Eurodollar Reserve Requirement in effect on such date.

"ADVANCE" means (a) the disbursement by Lender of a sum or sums lent to any Borrower pursuant to this Agreement, (b) the conversion of a Borrowing from one type of Borrowing to another type of Borrowing pursuant to SECTION 2.14, and (c) the continuation of a Eurodollar Borrowing to a new Interest Period pursuant to SECTION 2.14.

"ADVANCE DATE" has the meaning set forth in SECTION 2.2(a).

"AFFILIATE" of any Person means any other Person directly or indirectly, controlling, controlled by, or under common control with, such Person.

"AFTER-ACQUIRED SUBSIDIARY" has the meaning set forth in SECTION 6.13.

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

A 870

"AGI" means Adams Golf, Inc., a Delaware corporation.

"AGREEMENT" means this Revolving Credit Agreement, including the SCHEDULES and EXHIBITS hereto, as the same may be renewed, extended, amended, or modified from time-to-time.

"APPLICABLE MARGIN" means, at the time of determination thereof, the interest margin over the Base Rate or the Adjusted Eurodollar Rate, as the case may be, as follows:

| APPLICABLE MARGIN BASE RATE BORROWINGS | APPLICABLE MARGIN EURODOLLAR BORROWINGS |
|---|---|
| - 0.50% | 1.00% |

"BASE RATE" means the variable rate of interest established from time-to-time by Lender as its general reference rate of interest (which rate of interest may not be the lowest rate charged by Lender on similar loans). Each change in the Base Rate shall become effective without prior notice to Borrowers automatically as of the opening of business on the date of such change in the Base Rate.

"BASE RATE BORROWING" means any portion of the Principal Debt with respect to which the interest rate is calculated by reference to the Base Rate.

"BORROWING" means a Eurodollar Borrowing or a Base Rate Borrowing.

"BUSINESS DAY" means (a) for all purposes, any day OTHER THAN a Saturday, Sunday, or day on which national banks are authorized to be closed under the laws of the State of Texas, and (b) for purposes of any Eurodollar Borrowing, a day that satisfies the requirements of CLAUSE (A) and is a day when commercial banks are open for domestic or international business in London.

"CAPITAL LEASE" means, for any Person, any capital lease or sublease that has been (or under GAAP should be) capitalized on a balance sheet of such Person.

"CASH INTEREST EXPENSE" means (without duplication), for the Companies for any period, total interest expense in respect of Indebtedness actually paid or that is payable during such period, including, without limitation, all commissions, discounts, and other fees and charges with respect to letters of credit, but excluding interest expense not payable in cash, all as determined in accordance with GAAP.

"CHANGE IN CONTROL" means (a) AGI shall cease to own, directly or indirectly, one hundred percent (100%) of all of the issued and outstanding capital Stock of each other material Company, or (b) any Person or group of related Persons (other than B. H. Adams or Royal Holding Company, Inc. or their respective Affiliates) shall have acquired beneficial ownership of more than thirty-five percent (35%) of the outstanding Stock of AGI, or (c) at any time during any period of twelve (12) consecutive calendar months commencing on or after the date of this Agreement, a majority of the Board of Directors of AGI shall no longer be comprised of individuals (i) who were members of such Board of Directors on the first (1st) day of such period, (ii) whose election or nomination to such Board of Directors was approved by individuals referred to in CLAUSE (I) above constituting at the time of such election or nomination at least a majority of such Board of Directors, or (iii) whose election or nomination to such

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

Board of Directors was approved by individuals referred to in CLAUSES (I) and
(II) above constituting at the time of such election or nomination at least a majority of such Board of Directors.

"CODE" means the INTERNAL REVENUE CODE OF 1986, as amended, and all regulations promulgated and rulings issued thereunder.

"COMMITMENT USAGE" means, as of any date, THE SUM OF (a) the Principal Debt PLUS (b) the LC Exposure.

"COMPANIES" means Borrowers and Guarantors, and "COMPANY" means any one of the Companies.

"COMPLIANCE CERTIFICATE" means a certificate substantially in the form of EXHIBIT A, executed by an authorized officer of each Borrower, stating that a review of the activities of the Companies during the subject period has been made under such Person's supervision and that the Companies have performed each and every obligation and covenant contained herein and the other Loan Documents and are not in default under any of the same or, if any such default shall have occurred, then specifying the nature and status thereof, and setting forth a computation in reasonable detail as of the end of the period covered by such statements, of compliance with SECTIONS 7.14 and 7.15.

"CONSOLIDATED ADJUSTED NET INCOME" means, for the Companies for any period, consolidated net earnings (after income taxes) determined in accordance with GAAP, but excluding (a) extraordinary gains, (b) gains due to sales or write-up of assets, (c) earnings of any Person newly acquired, if earned prior to acquisition, or (d) gains due to acquisitions of any Stock of any Company.

"CONSTITUENT DOCUMENTS" means, with respect to any Person, its articles or certificate of incorporation, bylaws, partnership agreements, organizational documents, limited liability company agreements, trust agreement, or such other document as may govern such Person's formation, organization, and management.

"CONTRACT RATE" means (a) with respect to a Base Rate Borrowing, the Base Rate PLUS the Applicable Margin, and (b) with respect to a Eurodollar Borrowing, the Adjusted Eurodollar Rate PLUS the Applicable Margin.

"DEBTOR LAWS" means all applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, receivership, insolvency, reorganization, or similar laws from time-to-time in effect affecting the rights of creditors generally.

"DIVIDENDS" means, with respect to any Stock issued by any Person, (a) the retirement, redemption, purchase, or other acquisition for value of such Stock by such Person, (b) the declaration or payment of any dividend or distribution on or with respect to such Stock by such Person, and (c) any other payment by such Person with respect to such Stock.

"EBITDA" means, for the Companies for any period, THE SUM OF (a) Consolidated Adjusted Net Income, PLUS (b) depreciation and amortization expense, PLUS (c) Cash Interest Expense, PLUS (d) federal,

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

state, local, and foreign income taxes deducted from Consolidated Adjusted Net Income in accordance with GAAP.

"ENVIRONMENTAL LAWS" means any Legal Requirements pertaining to air, emissions, water discharge, noise emissions, solid or liquid waste disposal, hazardous waste or materials, industrial hygiene, or other environmental, health, or safety matters or conditions on, under or about real property or any portion thereof, and similar laws of any Governmental Authority having jurisdiction over real property as such Legal Requirements may be amended or supplemented from time-to-time, and regulations promulgated and rulings issued pursuant to such laws.

"ERISA" means the EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, as

amended, and the regulations and published interpretations thereunder.

"ERISA AFFILIATE" means any Subsidiary or trade or business (whether or not incorporated) which is a member of a group of which any Company is a member and which is under common control with any Company within the meaning of SECTION 414 of the Code.

"EURODOLLAR BORROWING" means any portion of the Principal Debt with respect to which the interest rate is calculated by reference to the Adjusted Eurodollar Rate for a particular Interest Period.

"EURODOLLAR RATE" means, for any Eurodollar Borrowing for any Interest Period therefor, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of one percent) equal to the rate appearing on the Dow Jones Markets Page 3750 (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two
(2) Business Days prior to the first (1st) day of such Interest Period for a term comparable to such Interest Period. If for any reason such rate is not available, then such rate shall be the rate appearing on the Reuters Screen LIBO Page as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first (1st) day of the such Interest Period for a term comparable to such Interest Period; PROVIDED, HOWEVER, if more than one rate is specified on the Reuters Screen LIBO Page, then the applicable rate shall be the arithmetic mean of all such rates. If neither of such rates are available, then such rate shall be determined on the basis of the rates at which deposits in United States dollars are offered by Lender at approximately 11:00 a.m. (London time) on the day that is two (2) Business Days preceding the first
(1st) day of the relevant Interest Period to prime banks in the London interbank market and for a period equal to such Interest Period commencing on the first (1st) day of such Interest Period.

"EURODOLLAR RESERVE REQUIREMENT" means, on any day, that percentage (expressed as a decimal fraction) that is in effect on such day, as provided by the Board of Governors of the Federal Reserve System (or any successor governmental body) applied for determining the maximum reserve requirements (including, without limitation, basic, supplemental, marginal and emergency reserves) under REGULATION D with respect to "EUROCURRENCY LIABILITIES" as currently defined in REGULATION D, or under any similar or successor regulation with respect to Eurocurrency liabilities or Eurocurrency funding. Each determination by Lender of the Eurodollar Reserve Requirement shall, in the absence of manifest error, be conclusive and binding.

"EVENT OF DEFAULT" has the meaning set forth in SECTION 8.1.

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

A 873

"FIXED CHARGES" means, for the Companies, for any period, the sum of
(a) Cash Interest Expense, (b) operating lease expenses, and (c) rent expenses.

"FUNDING LOSS" has the meaning set forth in SECTION 2.16(e).

"GAAP" means those generally accepted accounting principles and practices, applied on a consistent basis, which are recognized as such by the American Institute of Certified Public Accountants acting through its Accounting Principles Board and the Financial Accounting Standards Board and/or their respective successors and which are applicable in the circumstances as of the date in question.

"GOVERNMENTAL AUTHORITY" means, with respect to any Person, any government (or any political subdivision or jurisdiction thereof), court, bureau, agency, or other governmental authority having jurisdiction over such Person or any of its business, operations, or properties.

"GOVERNMENTAL AUTHORIZATION" means any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"GUARANTORS" means AGI, Adams Golf Holding Corp., a Delaware corporation, Adams Golf GP Corp., a Delaware corporation, Adams Golf Management Corp., a Delaware corporation, Adams Golf IP, L.P., a Delaware limited partnership, and each other After-Acquired Subsidiary of AGI.

"GUARANTY" of any Person means any contract or understanding of such Person pursuant to which such Person guarantees, or in effect guarantees, any Indebtedness of any other Person (the "PRIMARY OBLIGOR") in any manner, whether directly or indirectly, including agreements to assure the holder of the Indebtedness of the Primary Obligor against loss in respect thereof; PROVIDED THAT "GUARANTY" shall not include endorsements, in the ordinary course of business, of negotiable instruments or documents for deposit or collection.

"HAZARDOUS MATERIAL" means any hazardous, toxic, or dangerous waste, substance, or material defined as such in or for the purpose of any Environmental Law.

"INDEBTEDNESS" means, for any Person, all Liabilities of such Person, excluding accounts payable, deferred taxes, deferred liabilities, and accrued expenses in each case incurred in the ordinary course of business and the payment of which is not past-due (unless payment is being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained in accordance with GAAP).

"INTANGIBLE RIGHTS" means, for any Person, any permits, franchises, licenses, patents, trademarks, trade names, intellectual property rights, technology, know-how, and processes of such Person.

"INTEREST PERIOD" means, with respect to a Eurodollar Borrowing, a period commencing:

(a) on the Advance Date thereof; or

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

(b) on the conversion date pertaining to such Eurodollar Borrowing, if such Eurodollar Borrowing is made pursuant to a conversion as described in SECTION 2.13; or

(c) on the last day of the preceding Interest Period in the case of a rollover to a successive Interest Period;

and ending one (1) month or three (3) or six (6) months thereafter, as Borrowers shall elect in accordance with SECTION 2.13 or SECTION 2.14, PROVIDED THAT:

(i) any Interest Period that would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day, UNLESS such Business Day falls in another calendar month in which case such Interest Period shall end on the next preceding Business Day;

(ii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month or at the end of such Interest Period) shall, subject to CLAUSE (I) above, end on the last Business Day of a calendar month; and

(iii) if the Interest Period for any Eurodollar Borrowing would otherwise end after the final maturity date of the Note, then such Interest Period shall end on the final maturity date of the Note.

"INVESTMENT" in any Person means any investment, whether by means of Stock purchase, loan, advance, extension of credit, capital contribution, or otherwise, in or to such Person, the Guaranty of any Indebtedness of such Person, or the subordination of any claim against such Person to other Indebtedness of such Person.

"LC" means a documentary or standby letter of credit issued for the account of Borrowers by Lender under this Agreement and under an LC Agreement.

"LC AGREEMENT" means a letter of credit application and agreement (in form and substance satisfactory to Lender) executed by Borrowers and submitted to Lender for an LC for the account of Borrowers.

"LC EXPOSURE" means, without duplication, the SUM of (a) the total face amount of all undrawn and uncancelled LCs PLUS (b) the total unpaid reimbursement obligations of Borrowers under drawings under any LC.

"LC REQUEST" means a request substantially in the form of EXHIBIT B executed by a responsible officer of each Borrower.

"LC SUB-FACILITY" means a sub-facility of the Revolving Credit Commitment for the issuance of LCs, as described in SECTION 2.3, under which the LC Exposure (a) may never collectively exceed $5,000,000, and (b) TOGETHER WITH the Principal Debt may never exceed the Revolving Credit Commitment.

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

"LEGAL REQUIREMENT" means any federal, state, local, municipal, foreign, international, multi-national, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty as in effect on the date in question.

"LIABILITIES" means (without duplication), with respect to any Person, all indebtedness, obligations, and liabilities of such Person, including without limitation (a) all "LIABILITIES" which would be reflected on a balance sheet of such Person, (b) all obligations of such Person in respect of any Guaranty, letter of credit, or bankers' acceptance, (c) all obligations of such Person in respect of any Capital Lease, (d) all obligations, indebtedness, and liabilities secured by any lien or any security interest on any property or assets of such Person, and (e) any obligation to redeem or repurchase any of such Person's Stock.

"LIEN" means any lien, mortgage, security interest, tax lien, pledge, encumbrance, conditional sale or title retention arrangement, or any other interest in property designed to secure the repayment of Indebtedness, whether arising by agreement or under any statute or law, or otherwise.

"LOAN DOCUMENTS" means this Agreement, the Note, and any agreements, documents (and with respect to this Agreement, and such other agreements and documents, any renewals, extensions, amendments, or supplements thereto), or certificates at any time executed or delivered pursuant to the terms of this Agreement.

"MATERIAL ADVERSE EFFECT" means any material adverse changes in, or effect upon, (a) the validity, performance or enforceability of any Loan Documents, (b) the financial condition or business operations of any Company, or (c) the ability of any Company to fulfill its obligations under the Loan Documents.

"MAXIMUM RATE" means the highest non-usurious rate of interest (if any) permitted from day to day by applicable law. Lender hereby notifies and discloses to Borrowers that, for purposes of Tex. Rev. Civ. Stat. Ann. art. 5069-1D.001 (codified in the TEXAS FINANCE CODE Section 303.001), as it may from time to time be amended, the "APPLICABLE CEILING" shall be the "WEEKLY CEILING" from time to time in effect as limited by article 5069-1D.009 (codified in the TEXAS FINANCE CODE Section 303.305); PROVIDED, HOWEVER, that to the extent permitted by applicable law, Lender reserves the right to change the "APPLICABLE CEILING" from time to time by further notice and disclosure to Borrowers.

"MULTI-EMPLOYER PLAN" means a multi-employer plan as defined in SECTIONS 3(37) or 4001(A)(3) of ERISA or SECTION 414 of the Code to which any Company or any ERISA Affiliate is making, or has made, or is accruing, or has accrued, an obligation to make contributions.

"NOTE" means the Amended and Restated Promissory Note executed by Borrowers and delivered pursuant to the terms of this Agreement, together with any renewals, extensions, modifications, or restatements thereof.

"NOTICE OF BORROWING" means a notice in the form of EXHIBIT C attached hereto.

"OBLIGATION" means all present and future Indebtedness, obligations, and Liabilities and all

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

renewals and extensions thereof, or any part thereof, now or hereafter owed to Lender by Borrowers, whether arising pursuant to any of the Loan Documents, or otherwise, and all modifications, amendments, renewals, extensions, and restatements thereof, together with all interest accruing thereon and costs, expenses, and attorneys' fees incurred in the enforcement or collection thereof.

"OTHER TAXES" has the meaning set forth in SECTION 2.17.

"PBGC" means the Pension Benefit Guaranty Corporation, and any successor to all or any of the Pension Benefit Guaranty Corporation's functions under ERISA.

"PERSON" shall include an individual, corporation, joint venture, general or limited partnership, limited liability company, trust, unincorporated organization, or government, or any agency or political subdivision thereof.

"PERMITTED LIENS" means (a) Liens in favor of Lender to secure the Obligation, (b) pledges or deposits made to secure payment of worker's compensation (or to participate in any fund in connection with worker's compensation), unemployment insurance, pensions, or social security programs,
(c) Liens imposed by mandatory provisions of law such as for materialmen's, mechanic's, warehousemen's, and other like Liens arising in the ordinary course of a Company's business, securing Indebtedness whose payment is not yet due, (d) Liens for taxes imposed upon a Person or upon such Person's income, profits, or property, if the same are not yet due and payable or if the same are being contested in good faith and for which adequate reserves are maintained in accordance with GAAP, (e) good faith deposits in connection with leases, real estate bids or contracts (OTHER THAN contracts involving the borrowing of money), pledges or deposits to secure (or in lieu of) surety, stay, appeal, or customs bonds and deposits to secure the payment of taxes, assessments, customs, duties, or other similar charges, (f) encumbrances consisting of zoning restrictions, easements, or other restrictions on the use of real property, PROVIDED THAT such encumbrances do not impair the use of such property for the uses intended, and none of which is violated by existing or proposed structures or land use, and (g) Liens described on EXHIBIT F, and Liens resulting from the refinancing of the related Indebtedness secured thereby, PROVIDED THAT the Indebtedness secured thereby shall not be increased and the Liens shall not cover additional assets of any Company.

"PLAN" means an employee benefit plan or other plan maintained by any Company or any ERISA Affiliate and which is covered by TITLE IV of ERISA or subject to the minimum funding standards under SECTION 412 of the Code, as amended.

"PLANO FACILITY" means the Companies new facility located at 2801 East Plano Parkway, Plano, Texas.

"POTENTIAL DEFAULT" means the occurrence of any event which with passage of time or giving of notice or both would become an Event of Default.

"PRINCIPAL DEBT" means, as of any date, the sum of the outstanding principal balance of all outstanding Borrowings hereunder as of such date.

"REPORTABLE EVENT" has the meaning assigned to that term in TITLE IV of ERISA, but shall not

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

include an event with respect to which the PBGC has waived the reporting requirement by regulation.

"REPRESENTATIVES" means representatives, officers, directors, employees, attorneys, and agents.

"REVOLVING CREDIT COMMITMENT" means $10,000,000.00, as the same may be decreased by Borrowers pursuant to SECTION 2.1 or terminated by Lender pursuant to SECTION 8.2.

"SOLVENT" means, as to a Person, that (a) the aggregate fair market value of its assets exceeds its Liabilities, (b) such Person is able to pay and is paying its Liabilities as they mature, and (c) it does not have unreasonably small capital to conduct its businesses.

"STOCK" means all shares, options, warrants, general or limited partnership interests, membership interests, or other ownership interests (regardless of how designated) of or in a corporation, partnership, limited liability company, trust, or other entity, whether voting or nonvoting, including common stock, preferred stock, or any other "EQUITY SECURITY" (as such term is defined in RULE 3A11-1 of the GENERAL RULES AND REGULATIONS promulgated by the Securities and Exchange Commission under the SECURITIES EXCHANGE ACT OF 1934, as amended).

"SUBSIDIARY" means any corporation of which more than fifty percent (50%) (in number of votes) of the issued and outstanding Stock having ordinary voting power for the election of at least a majority of the directors is owned or controlled, directly or indirectly, by AGI, any Subsidiary of AGI, or any combination thereof.

"TAXES" has the meaning set forth in SECTION 2.17.

"TEMPORARY CASH INVESTMENT" means any Investment (a) in direct obligations of the United States of America or any agency thereof, or obligations fully guaranteed by the United States of America or any agency thereof, PROVIDED THAT such obligations mature within one (1) year of the date of acquisition thereof, (b) commercial paper rated in the highest grade by two (2) or more national credit rating agencies and maturing not more than 180 days from the date of creation thereof, and (c) time deposits with, and certificates of deposit and bankers' acceptances issued by, Lender or any United States bank having capital surplus and undivided profits aggregating at least $1,000,000,000.00.

"TERMINATION DATE" means the earlier of (a) May 31, 2000, (b) the date Lender's commitment to fund Advances hereunder is terminated pursuant to SECTION 8.2, or (c) the date that Lender's commitment to fund Advances hereunder is reduced to zero pursuant to SECTION 2.1.

"UNUSED COMMITMENT" means, as of any date, (a) the Revolving Credit Commitment, MINUS (b) the Commitment Usage.

1.2 ACCOUNTING TERMS. As used in this Agreement, and in any certificate, report, or other document made or delivered pursuant to this Agreement, accounting terms not defined in SECTION 1.1, and accounting terms partly defined in SECTION 1.1 to the extent not defined, have, as of any date, the respective meanings given to them under GAAP and all references to balance sheets or other financial statements means such statements, prepared in accordance with GAAP as of such date.

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

1.3 RULES OF CONSTRUCTION. When used in this Agreement: (a) "OR" is not exclusive; (b) a reference to a law includes any amendment or modification to such law; (c) a reference to a Person includes its permitted successors and permitted assigns; (d) except as provided otherwise, all references to the singular shall include the plural and VICE VERSA; (e) except as provided in this Agreement, a reference to an agreement, instrument, or document shall include such agreement, instrument, or document as the same may be amended, modified, renewed, extended, restated, or supplemented from time to time in accordance with its terms and as permitted by the Loan Documents; (f) all references to SECTIONS, SCHEDULES, or EXHIBITS shall be to Sections, Schedules, or Exhibits of this Agreement, unless otherwise indicated; (g) all EXHIBITS to this Agreement shall be incorporated into this Agreement; (h) the words "INCLUDE," "INCLUDES," and "INCLUDING" shall be deemed to be followed by the phrase "WITHOUT LIMITATION;" and (i) except as otherwise provided herein, in the computation of time from a specified date to a later specified date, the word "FROM" means "FROM AND INCLUDING" and words "TO" and "UNTIL" each mean "to but excluding."

1.4 JOINT AND SEVERAL.

(a) All representations contained herein shall be deemed individually made by each Borrower, and each of the covenants, agreements, and obligations set forth herein shall be deemed to be the joint and several covenants, agreements, and obligations of each Borrower. Any notice, request, consent, report, or other information or agreement delivered to Lender by any Borrower shall be deemed to be ratified by, consented to, and also delivered by each other Borrower. Each Borrower recognizes and agrees that each covenant and agreement of a "BORROWER" and "BORROWERS" in this Agreement and in any other Loan Document shall create a joint and several obligation of such entities, which may be enforced against such entities jointly or against each entity separately.

(b) Each Borrower hereby irrevocably and unconditionally agrees: (i) that it is jointly and severally liable to Lender for the full and prompt payment of the Obligation and the performance by each other Borrower of its obligations hereunder in accordance with the terms hereof; (ii) to fully and promptly perform all of its obligations hereunder with respect to the Obligation; and (iii) as a primary obligation to indemnify Lender on demand for and against any loss incurred by Lender as a result of any of the obligations of any one or more of Borrowers being or becoming void, voidable, unenforceable, or ineffective for any reason whatsoever, whether or not known to Lender or any Person, the amount of such loss being the amount which Lender would otherwise have been entitled to recover from any one or more Borrowers.

SECTION 2

### THE REVOLVING CREDIT LOAN

2.1 THE REVOLVING CREDIT COMMITMENT. Subject to the terms and conditions of this Agreement, Lender agrees to extend to Borrowers, from the date hereof through the Termination Date, a revolving line of credit which shall not exceed at any one time outstanding the then-current Revolving Credit Commitment. Within the limits of this SECTION 2.1, during such period, Borrowers may borrow, repay, and reborrow the Unused Commitment in accordance with this Agreement. Borrowers shall have

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

the right, upon three (3) Business Days' prior written notice to Lender, to permanently reduce the unutilized portion of the Revolving Credit Commitment; PROVIDED THAT if any such reduction does not reduce the Revolving Credit Commitment to $0.00, then any partial reduction shall be in the minimum amount of $1,000,000.00 or a greater integral multiple of $500,000.00.

## 2.2 MANNER OF BORROWING.

(a) NOTICE OF BORROWING. Borrowers may request an Advance by submitting to Lender a Notice of Borrowing (in writing or by telephone followed by written notice within one (1) Business Day), which is irrevocable and binding on Borrowers. Each Notice of Borrowing must be received by Lender no later than 10:00 a.m. (Dallas, Texas time) on the third (3rd) Business Day before the date on which funds are requested (the "ADVANCE DATE") for any Advance that will be a Eurodollar Borrowing or no later than 10:00 a.m. (Dallas, Texas time) on the Advance Date for any Advance that will be a Base Rate Borrowing.

(b) MINIMUM ADVANCES. Each Advance under the Revolving Credit Commitment shall be in an amount of $100,000.00 or a greater integral multiple of $50,000.00.

(c) FUNDING. Subject to the terms and conditions in this Agreement, by not later than 2:00 p.m., Dallas, Texas time, on the date specified, Lender shall make available to Borrowers, at Lender's offices in Dallas, Texas, the amount of a requested Advance under the Revolving Credit Commitment in immediately available funds.

## 2.3 LETTERS OF CREDIT.

(a) CONDITIONS. Subject to the terms and conditions of this Agreement, Lender agrees, if requested by Borrowers, to issue LCs upon Borrowers' making or delivering an LC Request and delivering an LC Agreement, both of which must be received by Lender no later than the third (3rd) Business Day before the Business Day on which the requested LC is to be issued, PROVIDED THAT (i) no LC may expire after a date that is one (1) month before the Termination Date, (ii) the LC Exposure may not exceed the limitations set forth in the definition of LC Sub-facility, and (iii) each LC must expire no later than one (1) year following the date of its issuance.

(b) REIMBURSEMENT OBLIGATION. To induce Lender to issue and maintain LCs, Borrowers agree, jointly and severally, to pay or reimburse Lender (i) on the first (1st) Business Day after Lender notifies Borrowers that Lender has made payment under an LC, the amount paid by Lender, and (ii) within three (3) Business Days after demand, the amount of any additional fees Lender customarily charges for amending LCs Agreements, for honoring drafts under LCs, and for taking similar action in connection with letters of credit. If Borrowers have not reimbursed Lender for any drafts paid by the date on which reimbursement is required under this SECTION, then Lender is irrevocably authorized to fund Borrowers' reimbursement obligations as a Base Rate Borrowing if the conditions in this Agreement for such a Borrowing (OTHER THAN any notice requirements or minimum funding amounts) have been satisfied. The proceeds of such Borrowing shall be advanced directly to Lender to pay Borrowers' unpaid reimbursement obligations. If funds cannot be advanced as a result of Borrowers' failure to satisfy any condition precedent set forth in SECTION 4, then Borrowers' reimbursement obligation shall constitute a

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

demand obligation. Borrowers' obligations under this SECTION are absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim, or defense to payment that any Borrower may have at any time against Lender or any other Person. From the date that Lender pays a draft under a LC until Borrowers either reimburse or are obligated to reimburse Lender for such draft under this SECTION, the amount of such draft bears interest payable to Lender at the rate then applicable to Base Rate Borrowings. From the due date of the respective amounts due under this SECTION, to the date paid (including any payment from proceeds of a Base Rate Borrowing), unpaid reimbursement amounts accrue interest that is payable on demand at the default rate set forth in SECTION 2.10.

(c) GENERAL. Lender shall promptly notify Borrowers of the date and amount of any draft presented for honor under any LC (but failure to give notice will not affect Borrowers' obligations under this Agreement). Lender shall pay the requested amount upon presentment of a draft unless presentment on its face does not comply with the terms of the applicable LC. When making payment, Lender may disregard (i) any default or potential default that exists under any other agreement, and (ii) obligations under any other agreement that have or have not been performed by the beneficiary or any other Person (and Lender is not liable for any of those obligations). Borrowers' reimbursement obligations to Lender under this SECTION are absolute and unconditional irrespective of, and Lender is not responsible for, (i) the validity, enforceability, sufficiency, accuracy, or genuineness of documents or endorsements (even if they are in any respect invalid, unenforceable, insufficient, inaccurate, fraudulent, or forged), (ii) any dispute by any Company with or any Company's claims, setoffs, defenses, counterclaims, or other rights against Lender or any other Person, or (iii) the occurrence of any Potential Default or Event of Default. However, nothing in this Agreement constitutes a waiver of Borrowers' rights to assert any claim or defense based upon the gross negligence or willful misconduct of Lender or its Representatives.

(d) DUTIES OF LENDER. Lender and each Borrower agree that, in paying any draft under any LC, Lender has no responsibility to obtain any document (OTHER THAN any documents expressly required by the respective LC) or to ascertain or inquire as to any document's validity, enforceability, sufficiency, accuracy, or genuineness or the authority of any Person delivering it. Neither Lender nor its Representatives will be liable to any Company for any LC's use or for any beneficiary's acts or omissions (INCLUDING, WITHOUT LIMITATION, ANY ACTS OR OMISSIONS CONSTITUTING ORDINARY NEGLIGENCE). Any action, inaction, error, delay, or omission taken or suffered by Lender or any of its Representatives in connection with any LC, applicable drafts or documents, or the transmission, dispatch, or delivery of any related message or advice, if in good faith and in conformity with applicable Legal Requirements and in accordance with the standards of care specified in the UNIFORM CUSTOMS AND PRACTICES FOR DOCUMENTARY CREDITS (1993 REVISION), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 500 (as amended or modified), is binding upon the Companies and Lender and, except as provided in SECTION 2.3(d), does not place Lender or any of its Representatives under any resulting liability to any Company. Lender is not liable to any Company for any action taken or omitted, in the absence of gross negligence or willful misconduct, by Lender or its Representative in connection with any LC.

(e) CASH COLLATERAL. On the Termination Date and if requested by Lender while a Potential Default or Event of Default exists, then Borrowers shall provide Lender cash collateral in an amount to equal the then-existing LC Exposure.

(f) INDEMNIFICATION. EACH BORROWER SHALL PROTECT, INDEMNIFY, PAY, AND SAVE LENDER

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

AND ITS REPRESENTATIVES, HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, DAMAGES, COSTS, CHARGES, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) WHICH ANY OF THEM MAY INCUR OR BE SUBJECT TO AS A CONSEQUENCE OF THE ISSUANCE OF ANY LC, ANY DISPUTE ABOUT IT, OR THE FAILURE OF LENDER TO HONOR A DRAW REQUEST UNDER ANY LC AS A RESULT OF ANY ACT OR OMISSION (WHETHER RIGHT OR WRONG) OF ANY PRESENT OR FUTURE GOVERNMENTAL AUTHORITY. ALTHOUGH LENDER AND ITS REPRESENTATIVES HAVE THE RIGHT TO BE INDEMNIFIED UNDER THIS AGREEMENT FOR ITS OR THEIR OWN ORDINARY NEGLIGENCE, NO PERSON IS ENTITLED TO INDEMNITY UNDER THE FOREGOING FOR ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(g) LC AGREEMENTS. Although referenced in any LC, terms of any particular agreement or other obligation to the beneficiary are not incorporated into this Agreement in any manner. The fees and other amounts payable with respect to each LC are as provided in this Agreement, drafts under each LC are part of the Obligation, only the events specified in this Agreement as a Default shall constitute a default under any LC or LC Agreement, and the terms of this Agreement control any conflict between the terms of this Agreement and any LC Agreement.

2.4 COMMITMENT FEES.

(a) UNUSED FEE. Borrowers agree to pay to Lender a commitment fee equal to one-eighth of one percent (0.125%) per annum on the daily Unused Commitment. Such commitment fee shall be payable quarterly in arrears on the last day of each March, June, September, and December during the term hereof, commencing on March 31, 1999, and continuing regularly thereafter so long as the Revolving Credit Commitment is in effect, and on the Termination Date.

(b) LC FEES. Borrowers agree to pay to Lender, as a condition precedent to the issuance (including the extension) of each LC, an issuance fee payable on the date of issuance equal to (i) two percent (2%) per annum of the face amount of such LC on the date of issuance for a standby LC, and (ii) the greater of (A) $125.00, and (B) one-quarter of one percent (0.25%) per annum of the face amount of such LC on the date of issuance, for a documentary LC.

(c) GENERALLY. Borrowers acknowledge that the commitment fees payable hereunder are bona fide commitment fees and are intended as reasonable compensation to Lender for committing to make funds available to Borrowers as described herein and for no other purposes.

2.5 NOTE. The Principal Debt shall be evidenced by the Note in form and substance satisfactory to Lender executed by Borrowers, which Note shall be (a) dated the date hereof, (b) in the amount of $10,000,000.00, and (c) payable to the order of Lender.

2.6 INTEREST AND PRINCIPAL PAYMENTS.

(a) INTEREST PAYMENTS. Accrued interest on each Eurodollar Borrowing shall be due and payable on the last day of its respective Interest Period. If any Interest Period is a period greater than three (3) months, then accrued interest shall also be due and payable on the date ending each three
(3) month period after the commencement of the Interest Period. Accrued interest on each Base Rate Borrowing shall be due and payable on the last day of each March, June, September, and December during the term hereof, commencing on March 31, 1999, with a final scheduled interest payment on all

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

Borrowings on the Termination Date; PROVIDED, HOWEVER, that accrued interest on each Base Rate Borrowing shall also be due and payable upon conversion of such Base Rate Borrowing to a Eurodollar Borrowing pursuant to SECTION 2.14.

(b) PRINCIPAL PAYMENTS. The unpaid Principal Debt shall be due and payable on the Termination Date.

(c) OPTIONAL PREPAYMENTS. Borrowers shall have the right, from time-to-time, to prepay the unpaid Principal Debt, in whole or in part, without premium or penalty (EXCEPT FOR any Funding Loss), upon the payment of accrued interest on the amount prepaid to and including the date of payment; PROVIDED, HOWEVER, that partial prepayments of principal shall be in an amount equal to $100,000.00 or a greater integral multiple of $50,000.00 (or, if less, the unpaid Principal Debt).

2.7 MANNER AND APPLICATION OF PAYMENTS. All payments and prepayments by Borrowers on account of principal, interest, and fees hereunder shall be made in immediately available funds. All such payments shall be made to Lender at its principal office in Dallas, Texas, not later than 12:00 noon, Dallas, Texas time, on the date due and funds received after that hour shall be deemed to have been received by Lender on the next following Business Day. If any payment is scheduled to become due and payable on a day which is not a Business Day, then such payment shall instead become due and payable on the immediately following Business Day and interest on the principal portion of such payment shall be payable at the then applicable rate during such extension. All payments made on the Note shall be applied first to accrued interest and then to principal (in the inverse order of maturity in the case of prepayments).

2.8 INTEREST OPTIONS. Except where specifically otherwise provided, Borrowings bear interest at an annual rate equal to the lesser of EITHER (a) THE SUM OF (i) the Base Rate or the Adjusted Eurodollar Rate (in each case as designated or deemed designated by Borrowers), as the case may be, PLUS (ii) the Applicable Margin, OR (b) the Maximum Rate. Each change in the Base Rate and the Maximum Rate is effective, without notice to Borrowers or any other Person, upon the effective date of change.

2.9 QUOTATION OF RATES. A responsible officer of Borrowers may call Lender before delivering a Notice of Borrowing to receive an indication of the interest rates then in effect, but the indicated rates do not bind Lender or affect the interest rate that is actually in effect when Borrowers deliver a Notice of Borrowing.

2.10 DEFAULT RATE. If permitted by law, all past-due principal of and accrued interest on the Note bears interest from maturity (stated or by acceleration) at the Maximum Rate, or if there is no Maximum Rate in effect, then fourteen percent (14%) per annum, until paid, regardless whether payment is made before or after entry of a judgment.

2.11 INTEREST RECAPTURE. If the Contract Rate applicable to any Borrowing exceeds the Maximum Rate, then the interest rate on that Borrowing is limited to the Maximum Rate, but any subsequent reductions in the Contract Rate shall not reduce the interest rate thereon below the Maximum Rate until the total amount of accrued interest equals the amount of interest that would have accrued if Contract Rate had always been in effect. If at maturity (stated or by acceleration) the total interest paid or

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

accrued is less than the interest that would have accrued if the Contract Rates had always been in effect, then, at that time and to the extent permitted by law, Borrowers shall pay an amount equal to the difference between (a) the lesser of the amount of interest that would have accrued if the Contract Rates had always been in effect and the amount of interest that would have accrued if the Maximum Rate had always been in effect, and (b) the amount of interest actually paid or accrued on the Note.

2.12 INTEREST CALCULATIONS.

(a) Interest shall be calculated on the basis of actual number of days (including the first day but excluding the last day) elapsed but computed as if each calendar year consisted of 360 days (unless the calculation would result in an interest rate greater than the Maximum Rate, in which event interest will be calculated on the basis of a year of 365 or 366 days, as the case may be). All interest rate determinations and calculations by Lender are conclusive and binding absent manifest error.

(b) The provisions of this Agreement relating to calculation of the Base Rate and the Eurodollar Rate are included only for the purpose of determining the rate of interest or other amounts to be paid under this Agreement that are based upon those rates. Lender may fund and maintain its funding of all or any part of each Borrowing as it selects.

2.13 SELECTION OF INTEREST OPTION. On making a Notice of Borrowing under SECTION 2.2(a), Borrowers shall advise Lender as to whether the Advance shall be (a) a Eurodollar Borrowing, in which case Borrowers shall specify the applicable Interest Period therefor, or (b) a Base Rate Borrowing. Notwithstanding anything to the contrary contained herein, (a) no more than three (3) Interest Periods shall be in effect at any one time with respect to Eurodollar Borrowings, (b) Borrowers shall have no right to request a Eurodollar Borrowing if the interest rate applicable thereto would exceed the Maximum Rate in effect on the first day of the Interest Period applicable to such Borrowing, and (c) each Eurodollar Borrowing shall be in the amount of $250,000.00 or a greater integral multiple of $50,000.00.

2.14 ROLLOVERS AND CONVERSIONS. Borrowers may (a) convert a Eurodollar Borrowing on the last day of the applicable Interest Period to a Base Rate Borrowing, (b) convert a Base Rate Borrowing at any time to a Eurodollar Borrowing, and (c) elect a new Interest Period for a Eurodollar Borrowing, by giving a Notice of Borrowing to Lender no later than 12:00 noon on the third (3rd) Business Day before the conversion date or the last day of the Interest Period, as the case may be (for conversion to a Eurodollar Borrowing or election of a new Interest Period), and no later than 12:00 noon one (1) Business Day before the last day of the Interest Period (for conversion to an Base Rate Borrowing); PROVIDED THAT each Eurodollar Borrowing shall be in the amount of $250,000.00 or a greater integral multiple of $50,000.00. Absent Borrowers' Notice of Borrowing, a Eurodollar Borrowing shall be deemed converted to a Base Rate Borrowing effective when the applicable Interest Period expires.

2.15 BOOKING BORROWINGS. To the extent permitted by law, Lender may make, carry, or transfer its Borrowings at, to, or for the account of any of its branch offices or the office of any of its Affiliates. However, no Affiliate is entitled to receive any greater payment under SECTION 2.16(b) than Lender would have been entitled to receive with respect to those Borrowings. Lender agrees that it will use its reasonable efforts (consistent with its internal policies and applicable law) to make, carry, maintain, or transfer its Borrowings with its Affiliates or branch offices in an effort to eliminate or reduce to the extent possible the aggregate amounts due to it under SECTIONS 2.16(b) and 2.16(c) if, in its

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

reasonable judgment, such efforts will not be disadvantageous to it.

2.16 SPECIAL PROVISIONS FOR EURODOLLAR BORROWINGS.

(a) BASIS UNAVAILABLE OR INADEQUACY OF EURODOLLAR LOAN PRICING. If with respect to an Interest Period for any Eurodollar Borrowing, (a) Lender determines that, by reason of circumstances affecting the interbank eurodollar market generally, deposits in Dollars (in the applicable amounts) are not being offered to or by Lender in the interbank eurodollar market for such Interest Period, or (b) Lender determines that the Eurodollar Rate as determined by Lender will not adequately and fairly reflect the cost to Lender of maintaining or funding the Eurodollar Borrowing for such Interest Period, then Lender shall forthwith give notice thereof to Borrowers, whereupon until Lender notifies Borrowers that the circumstances giving rise to such suspension no longer exist, (i) the obligation of Lender to make Eurodollar Borrowings shall be suspended, and (ii) Borrowers shall either (A) repay in full the then-outstanding principal amount of the Eurodollar Borrowings, together with accrued interest thereon on the last day of the then current Interest Period applicable to such Eurodollar Borrowings, or (B) convert such Eurodollar Borrowings to Base Rate Borrowings in accordance with
SECTION 2.14 on the last day of the then-current Interest Period applicable to each such Eurodollar Borrowing.

(b) ILLEGALITY. If, after the date of this Agreement, the adoption of any applicable law, rule, or regulation, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank, or comparable agency charged with the interpretation or administration thereof, or compliance by Lender with any request or directive (whether or not having the force of law) of any such authority, central bank, or comparable agency shall make it unlawful or impossible for Lender to make, maintain or fund Eurodollar Borrowings, then Lender shall so notify Borrowers. Before giving any notice pursuant to this SECTION, Lender shall designate a different Eurodollar lending office if such designation will avoid the need for giving such notice and will not be otherwise disadvantageous to any non-trivial extent to Lender (as determined in good faith by Lender). Upon receipt of such notice, Borrowers shall either (i) repay in full the then outstanding principal amount of all Eurodollar Borrowings, together with accrued interest thereon, or (ii) convert each Eurodollar Borrowing to a Base Rate Borrowing, on either (A) the last day of the then-current Interest Period applicable to such Eurodollar Borrowing if Lender may lawfully continue to maintain and fund such Eurodollar Borrowing to such day or (B) immediately if Lender may not lawfully continue to fund and maintain such Eurodollar Borrowing to such day, PROVIDED THAT Borrowers shall be liable for any Funding Loss arising pursuant to such conversion.

(c) INCREASED COSTS FOR EURODOLLAR BORROWINGS. If any Governmental Authority, central bank, or other comparable authority, shall at any time impose, modify, or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the Federal Reserve System but excluding any reserve requirement included in the Eurodollar Reserve Requirement), special deposit, or similar requirement against assets of, deposits with, or for the account of, or credit extended by, Lender, or shall impose on Lender (or its Eurodollar lending office) or the interbank eurodollar market any other condition affecting its Eurodollar Borrowings, the Note, or its obligation to make Eurodollar Borrowings; and the result of any of the foregoing is to increase the cost to Lender of making or maintaining Eurodollar Borrowings, or to reduce the amount of any sum received or receivable by Lender under this Agreement, or under the Note, by an amount deemed by Lender to be material, then, within five (5) days after demand by Lender, Borrowers shall pay to Lender such additional amount or amounts as will

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

compensate Lender for such increased cost or reduction. Lender will promptly notify Borrowers of any event of which it has knowledge, occurring after the date hereof, which will entitle Lender to compensation pursuant to this SECTION. No failure by Lender to immediately demand payment of any additional amounts payable hereunder shall constitute a waiver of Lender's right to demand payment of such amounts at any subsequent time. A certificate of Lender claiming compensation under this SECTION and setting forth the additional amount or amounts to be paid to it hereunder, together with a description in reasonable detail of the manner in which such amounts have been calculated, shall be delivered by Lender to Borrower within one hundred eighty (180) days after the incurrence thereof and shall be conclusive in the absence of manifest error. If Lender demands compensation under this SECTION, then Borrowers may at any time, upon at least five (5) Business Days' prior notice to such Lender, either convert such Eurodollar Borrowings to Base Rate Borrowings in accordance with the provisions of this Agreement; PROVIDED, HOWEVER, that Borrowers shall be liable for any Funding Loss arising pursuant to such actions.

(d) EFFECT ON BASE RATE BORROWINGS. If notice has been given pursuant to SECTION 2.16(a) or SECTION 2.16(b) requiring that Eurodollar Borrowings to be repaid or converted, then unless and until Lender notifies Borrowers that the circumstances giving rise to such repayment no longer apply, all Borrowings shall be Base Rate Borrowings. If Lender notifies Borrowers that the circumstances giving rise to such repayment no longer apply, then Borrowers may thereafter select Borrowings to be Eurodollar Borrowings in accordance with SECTION 2.13 and SECTION 2.14.

(e) FUNDING LOSSES. Borrowers shall jointly and severally indemnify Lender against any loss or reasonable expense (such loss or expense is referred to herein as a "FUNDING LOSS," such term including, but not limited to, any loss or reasonable expense sustained or incurred or to be sustained or incurred in liquidating or reemploying deposits from third parties acquired to effect or maintain such Borrowing or any part thereof as a Eurodollar Borrowing) with respect to Eurodollar Borrowings which Lender may sustain or incur as a consequence of (i) any failure by Borrowers to fulfill on the date of any Borrowing hereunder the applicable conditions set forth in SECTION 4, (ii) any failure by Borrowers to borrow hereunder or to convert Borrowings hereunder after a Conversion Notice has been given, (iii) any payment, prepayment, or conversion of a Eurodollar Borrowing required or permitted by any other provisions of this Agreement, including, without limitation, payments made due to the acceleration of the maturity of the Borrowings pursuant to SECTION 8.2, or otherwise made on a date OTHER THAN the last day of the applicable Interest Period, (iv) any default in the payment or prepayment of the principal amount of any Eurodollar Borrowing or any part thereof or interest accrued thereon, as and when due and payable (at the due date thereof, by notice of prepayment or otherwise), or (v) the occurrence of a Potential Default or an Event of Default. The term "FUNDING LOSS" includes, without limitation, an amount equal to the excess, if any, as determined by Lender of (A) its cost of obtaining the funds for the Borrowing being paid, prepaid, or converted or not borrowed or converted (based on the Adjusted Eurodollar Rate applicable thereto) for the period from the date of such payment, prepayment, or conversion or failure to borrow or convert to the last day of the Interest Period for such Borrowing (or, in the case of a failure to borrow or convert, the Interest Period for the Borrowing which would have commenced on the date of such failure to borrow or convert) over (B) the amount of interest (as estimated by Lender) that would be realized by Lender in reemploying the funds so paid, prepaid or converted or not borrowed or converted for such period or Interest Period, as the case may be. A certificate of Lender setting forth any amount or amounts which Lender is entitled to receive pursuant to this SECTION 2.16(e), together with a description in reasonable detail of the manner in which such amounts have been calculated, shall be delivered to

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

Borrowers and shall be conclusive, absent manifest error. Borrowers shall pay to Lender the amount shown as due on any certificate within five (5) days after its receipt of the same. Notwithstanding the foregoing, in no event shall Lender be permitted to receive any compensation hereunder constituting interest in excess of the Maximum Rate. Without prejudice to the survival of any other obligations of Borrowers hereunder, the obligations of Borrowers under this SECTION 2.16(e) shall survive the termination of this Agreement and/or the payment or assignment of the Note.

2.17 TAXES.

(a) Any and all payments by Borrowers hereunder or under the Note shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, or withholdings, and all liabilities with respect thereto (hereinafter referred to as "TAXES"), excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender, by the jurisdiction under the laws of which Lender is organized or is or should be qualified to do business or any political subdivision thereof and, taxes imposed on Lender's income, and franchise taxes imposed on Lender by the jurisdiction of Lender's lending office or any political subdivision thereof. If Borrowers shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Note to Lender, then (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this SECTION 2.17) Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrowers shall make such deductions, and (iii) Borrowers shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b) In addition, Borrowers agree to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, or similar levies which arise from any payment made hereunder or under the Loan Documents or from the execution, delivery, or registration of, or otherwise with respect to, this Agreement or the other Loan Documents (hereinafter referred to as "OTHER TAXES").

(c) Borrowers shall indemnify Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this SECTION 2.17) paid by Lender or any liability (including penalties and interest) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within five
(5) days from the date Lender makes written demand therefor.

(d) Within thirty (30) days after the date of any payment of Taxes, Borrowers shall furnish to Lender, at its address referred to in SECTION 9.4, the original or a certified copy of a receipt evidencing payment thereof.

(e) Without prejudice to the survival of any other agreement of Borrowers hereunder, the agreements and obligations of Borrowers contained in this SECTION 2.17 shall survive the payment in full of principal and interest hereunder and under the other Loan Documents.

SECTION 3

## GUARANTIES

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

3.1 GUARANTIES. Payment of the Obligation shall be unconditionally guaranteed by Guarantors.

SECTION 4

## CONDITIONS PRECEDENT

4.1 INITIAL ADVANCE. The obligation of Lender to make the initial Advance or issue the initial LC hereunder is subject to the conditions precedent that, on or before the date of such Advance or issuance of such LC,
(a) Borrowers shall have paid to Lender all fees to be received by Lender pursuant to this Agreement or any other Loan Document, and (b) Lender shall have received duly executed copies of each of the documents listed on EXHIBIT E, each dated as of the date of such Advance, and each in form and substance satisfactory to Lender.

4.2 ALL ADVANCES. The obligation of Lender to make any Advance and issue each LC under this Agreement (including the initial Advance or LC) shall be subject to the conditions precedent that, as of the date of such Advance or issuance of such LC and after giving effect thereto: (a) there exists no Potential Default or Event of Default; (b) no change that would cause a Material Adverse Effect has occurred since the date of the financial statements referenced in SECTION 5.6; (c) Lender shall have received from Borrowers a Notice of Borrowing or LC Request, as appropriate, dated as of the date of such Advance or issuance of such LC, as appropriate, and all of the statements contained in such Notice of Borrowing or LC Request, as the case may be, shall be true and correct; (d) the representations and warranties contained in each of the Loan Documents shall be true in all respects as though made on the date of such Advance or issuance of such LC; and (e) the Maximum Rate exceeds the Contract Rate.

SECTION 5

## REPRESENTATIONS AND WARRANTIES

To induce Lender to make Advances and issue LCs hereunder, Borrowers represent and warrant to Lender that:

5.1 ORGANIZATION AND GOOD STANDING. Each Company is duly organized, validly existing, and in good standing under the laws of the state of its incorporation or formation, is duly qualified and is in good standing in all states in which it is doing business (except where the failure to be so qualified and maintain good standing could not have a Material Adverse Effect), has the power and authority to own its properties and assets and to transact the business in which it is engaged in each jurisdiction in which it operates, and is or will be qualified in those states wherein it proposes to transact business in the future (except where the failure to be so qualified could not have a Material Adverse Effect).

5.2 AUTHORIZATION AND POWER. Each Company has full power and authority to execute, deliver, and perform the Loan Documents to be executed by such Person, all of which has been duly authorized by all proper and necessary action.

5.3 NO CONFLICTS OR CONSENTS. Neither the execution and delivery of the Loan Documents, nor the consummation of any of the transactions therein contemplated, nor compliance with the terms and

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

provisions thereof, will contravene or materially conflict with any Legal Requirement to which any Company is subject, any Governmental Authorization applicable to any Company, any indenture, loan agreement, mortgage, deed of trust, or other agreement or instrument binding on any Company, or any provision of the Constituent Documents of any Company. No consent, approval, authorization, or order of any court, Governmental Authority, stockholder, or third party is required in connection with the execution, delivery, or performance by any Company of any of the Loan Documents.

5.4 ENFORCEABLE OBLIGATIONS. The Loan Documents have been duly executed and delivered by each Company, as appropriate, and are the legal and binding obligations of each Company, as appropriate, enforceable in accordance with their respective terms, except as limited by Debtor Laws.

5.5 NO LIENS. Except for the Permitted Liens, all of the properties and assets of each Company are free and clear of all Liens and other adverse claims of any nature, and each Company has good and marketable title to such properties and assets.

5.6 FINANCIAL CONDITION. Borrowers have delivered to Lender copies of the financial statements of the Companies, as of September 30, 1998; such financial statements are true and correct, fairly represent the financial condition of the Companies as of such date, and have been prepared in accordance with GAAP; as of the date hereof, there are no obligations, Liabilities, or Indebtedness (including contingent and indirect Liabilities) of the Companies which are material and are not reflected in such financial statements; no Material Adverse Effect has occurred since the date of such financial statements.

5.7 FULL DISCLOSURE. There is no fact known to any Borrower that such Borrower has not disclosed to Lender which could have a Material Adverse Effect. No certificate or statement delivered by any Borrower to Lender in connection with this Agreement contains any untrue statement of a material fact or omits to state any material fact necessary to keep the statements contained herein or therein from being misleading.

5.8 NO POTENTIAL DEFAULT. No event has occurred and is continuing which constitutes a Potential Default or an Event of Default.

5.9 MATERIAL AGREEMENTS. No Company is in default in any material respect under any contract or agreement to which it is a party or by which any of its properties is bound, except where such default could not have a Material Adverse Effect.

5.10 NO LITIGATION. Except as disclosed on SCHEDULE 5.10, there are no actions, suits, or legal, equitable, arbitration, or administrative proceedings pending, or to the knowledge of any Borrower threatened, against any Company that could, if adversely determined, have a Material Adverse Effect.

5.11 USE OF PROCEEDS; MARGIN STOCK. The proceeds of each Advance will be used by each Borrower solely for the purposes specified in the preamble. None of such proceeds will be used for the purpose of purchasing or carrying any "MARGIN STOCK" as defined in REGULATIONS T, U, or X of the Board of Governors of the Federal Reserve System or for any other purpose which might constitute this transaction a "PURPOSE CREDIT" within the meaning of such Regulations. If requested by Lender, then Borrowers shall furnish to Lender a statement in conformity with the requirements of the Federal Reserve

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

Form U-1 referred to in said REGULATION U to the foregoing effect. No part of the proceeds of any Advance will be used for any purpose which violates, or is inconsistent with, the provisions of REGULATION X.

5.12 TAXES. All tax returns required to be filed by each Company in any jurisdiction have been filed and all taxes (including mortgage recording taxes), assessments, fees, and other governmental charges upon each Company or upon any of its properties, income, or franchises have been paid EXCEPT FOR taxes being contested in good faith by appropriate proceedings diligently projected and for which adequate reserves are maintained in accordance with GAAP. To the best of each Borrower's knowledge, there is no proposed tax assessment against any Company, and all tax Liabilities of each Company are adequately provided for. No income tax liability of any Company has been asserted by the Internal Revenue Service for taxes in excess of those already paid.

5.13 PRINCIPAL OFFICE, ETC. The principal office, chief executive office, and principal place of business of each Company are set forth on EXHIBIT D. Each Company maintains its principal records and books at such address.

5.14 COMPLIANCE WITH LAW.

(a) Except as disclosed on SCHEDULE 5.14-1: (i) each Company is in compliance with its respective Constituent Documents and all Legal Requirements which are applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets, except where such non-compliance could not have a Material Adverse Effect; and (ii) no Company has received any notice or other communication from any Governmental Authority or other Person of any event or circumstance that could constitute a violation of, or failure to comply with, any Legal Requirement.

(b) Except as disclosed on SCHEDULE 5.14-1: (i) each Company is in compliance with all of the terms and requirements of each Governmental Authorization held by such Person, except where such non-compliance could not have a Material Adverse Effect; (ii) no Company has received any notice or other communication from any Governmental Authority or other Person of any event or circumstance which could constitute a violation of, or failure to comply with, any term or requirement of any Governmental Authorization, or of any actual or potential revocation, withdrawal, cancellation, or termination of, or material modification to, any Governmental Authorization; (iii) all applications required to have been filed for the renewal of any required Governmental Authorizations have been duly filed on a timely basis with the appropriate Governmental Authorities, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authorities; (iv) upon consummation of the transactions contemplated hereby, each Company will lawfully hold all such Governmental Authorizations; and (v) none of the Governmental Authorizations of any Company will terminate upon consummation of the transactions contemplated hereby.

(c) Set forth on SCHEDULE 5.14-2 is a list of each of the Governmental Authorizations of each Company: (i) necessary to permit each such Person to lawfully conduct and operate its respective business in the manner it currently conducts and operates such business and to permit such Person to own and use its assets in the manner in which it currently owns and uses such assets; and (ii) necessary to permit each such Person, upon a consummation of the transactions contemplated hereby, to lawfully

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

conduct and operate its business and to permit each such Person to own and use its assets.

5.15 SUBSIDIARIES. Set forth on EXHIBIT D hereto is a complete and accurate list of all Subsidiaries as of the date hereof, showing as of such date (as to each such Subsidiary) the jurisdiction of its incorporation, the owner of the outstanding Stock of such Subsidiary, and the jurisdictions in which such Subsidiary is qualified to do business as a foreign corporation. To the extent applicable, all of the outstanding Stock of all Subsidiaries has been validly issued, is fully paid and nonassessable, and is owned by AGI or a Subsidiary free and clear of all Liens.

5.16 CASUALTIES. Neither the business nor the properties of any Company are affected by any environmental hazard, fire, explosion, accident, strike, lockout, or other labor dispute, drought, storm, hail, earthquake, embargo, act of God, or other casualty (whether or not covered by insurance), which could have a Material Adverse Effect.

5.17 SUFFICIENCY OF CAPITAL. Each Company is, and after consummation of this Agreement and after giving effect to all Indebtedness incurred and Liens created by the Companies in connection herewith will be, Solvent.

5.18 LOCATION OF ASSETS. All tangible assets of the Companies are located at the addresses listed on EXHIBIT D hereto except for inventory that is, in the ordinary course of the Companies' business, in transit. No asset of any Company will be kept at any other address.

5.19 CORPORATE NAME. No Company has, during the preceding five (5) years, (a) used any other corporate name or tradename, or (b) been the surviving corporation of a merger or consolidation or acquired all or substantially all of the assets of any Person.

5.20 LEASES. Except as set forth on SCHEDULE 5.20, no Company is the lessee of any real or personal property.

5.21 ERISA. Each Company and each ERISA Affiliate has fulfilled its obligations under the minimum funding standards of ERISA and the Code with respect to each Plan and is in compliance in all material respects with the presently applicable provisions of ERISA and the Code, and has not incurred any liability to the PBGC or a Plan under TITLE IV of ERISA.

5.22 LABOR MATTERS. There are no controversies pending between any Company and any of their employees which could have a Material Adverse Effect.

5.23 BURDENSOME CONTRACTS. No Company is a party to any contract, the breach, violation, or termination of which could result in a Material Adverse Effect.

5.24 PERMITS, FRANCHISES, INTELLECTUAL PROPERTY, AND OTHER INTANGIBLE RIGHTS. Each Company owns, holds, and has the lawful right to use, all material Intangible Rights used in or necessary for the conduct of its business as currently conducted or proposed to be conducted.

5.25 FULL DISCLOSURE OF RIGHTS AND CLAIMS. Except as disclosed on SCHEDULE 5.10, no claims are pending, or, to the best of any Borrower's knowledge, threatened, that any Company is infringing or

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

otherwise adversely affecting the Intangible Rights of any other Person. The consummation of the transactions contemplated by the Loan Documents will not impair the ownership of, or rights with respect to, any material Intangible Rights of any Company.

5.26 YEAR 2000 COMPLIANCE. Each Company has (a) initiated a review and assessment of all areas within its business and operations (including those affected by suppliers and vendors) that could be adversely affected by the "YEAR 2000 PROBLEM" (that is, the risk that computer applications used by the Companies (or its suppliers and vendors) may be unable to recognize and perform properly date-sensitive functions involving certain dates prior to and any date after December 31, 1999), (b) developed a plan and timeline for addressing the Year 2000 Problem on a timely basis, and (c) to date, implemented that plan in accordance with that timetable. Borrowers reasonably believe that all computer applications (including those of suppliers and vendors) that are material to the Companies' respective business and operations will on a timely basis be able to perform properly date-sensitive functions for all dates before and after January 1, 2000 (that is, be "YEAR 2000 COMPLIANT"), except to the extent that a failure to do so could not reasonably be expected to have Material Adverse Effect.

5.27 REPRESENTATIONS AND WARRANTIES. Each Notice of Borrowing shall constitute, without the necessity of specifically containing a written statement, a representation and warranty by Borrowers that no Potential Default or Event of Default exists and that all representations and warranties contained in this SECTION 5 or in any other Loan Document are true and correct on and as of the date the requested Advance is to be made.

5.28 SURVIVAL OF REPRESENTATIONS AND WARRANTIES. All representations and warranties by Borrowers herein shall survive delivery of the Note and the making of each Advance, and any investigation at any time made by or on behalf of Lender shall not diminish Lender's right to rely thereon.

SECTION 6

## AFFIRMATIVE COVENANTS

So long as Lender has any commitment to make Advances or issue LCs hereunder, and until payment in full of the Obligation and termination of all LCs, Borrowers agree that (unless Lender shall otherwise consent in writing):

6.1 FINANCIAL STATEMENTS, REPORTS, AND DOCUMENTS. Borrowers shall deliver to Lender each of the following:

(a) PERIODIC STATEMENTS. As soon as available, and in any event within forty-five (45) days after the last day of each fiscal quarter of each fiscal year of the Companies, copies of the consolidated balance sheet of the Companies as of the end of such fiscal quarter, and statements of income, retained earnings, and changes in cash flow of the Companies for that fiscal period and for the portion of the fiscal year ending with such period, all in reasonable detail, and certified by the chief financial officer of AGI as being true and correct and as having been prepared in accordance with GAAP, subject to year-end audit adjustments;

(b) ANNUAL STATEMENTS. As soon as available and in any event within one hundred and

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

twenty (120) days after the last day of each fiscal year of the Companies, copies of the consolidated balance sheet of AGI as of the close of such fiscal year and statements of income, retained earnings, and changes in cash flow of AGI for such fiscal year, in each case setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail and accompanied by an opinion thereon (which shall not be qualified by reason of any limitation imposed by any Company) of independent public accountants of recognized national standing selected by AGI and satisfactory to Lender, to the effect that (i) such consolidated financial statements have been prepared in accordance with GAAP (EXCEPT FOR changes in which such accountants concur), (ii) the examination of such accountants in connection with such financial statements has been made in accordance with generally accepted auditing standards and, accordingly, includes such tests of the accounting records and such other auditing procedures as were considered necessary under the circumstances, and (iii) in making their audit, such accountants have not become aware of any condition or event which would constitute a Potential Default or an Event of Default under any of the terms or provisions of this Agreement (insofar as any such terms or provisions pertain to accounting matters) and, if any such condition or event then exists, specifying the nature and period of existence thereof;

(c) COMPLIANCE CERTIFICATE. Contemporaneously with the delivery of the financial statements required by SECTION 6.1(a), a compliance Certificate and an accounts receivable aging report; and

(d) OTHER INFORMATION. Such other information concerning the business, properties or financial condition of any Company as Lender shall reasonably request including audit reports, registration statements, or other reports or notices provided to shareholders of AGI and, if applicable, filed with the Securities and Exchange Commission.

6.2 PAYMENT OF TAXES AND OTHER INDEBTEDNESS. Borrowers shall, and shall cause each of the other Companies to, pay and discharge (a) all taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits, or upon any property belonging to it, before delinquent,
(b) all lawful claims (including claims for labor, materials, and supplies), which, if unpaid, might give rise to a Lien upon any of its property, and (c) all of its other Indebtedness, except as prohibited under the Loan Documents; PROVIDED, HOWEVER, that the Companies shall not be required to pay any such tax, assessment, charge, or levy if and so long as the amount, applicability, or validity thereof shall currently be contested in good faith by appropriate proceedings and appropriate accruals and appropriate reserves have been established in accordance with GAAP.

6.3 MAINTENANCE OF EXISTENCE AND RIGHTS; CONDUCT OF BUSINESS. Borrowers shall, and shall cause each of the other Companies to, preserve and maintain its existence and all of its rights, privileges, and franchises (including Intangible Rights) necessary or desirable in the normal conduct of its business, and conduct its business in an orderly and efficient manner consistent with good business practices and in accordance with all Legal Requirements of any Governmental Authority, except where the failure to so preserve or maintain could not have a Material Adverse Effect.

6.4 NOTICE OF DEFAULT. Borrowers shall furnish to Lender, immediately upon becoming aware of the existence of any condition or event which constitutes a Potential Default or an Event of Default, written notice specifying the nature and period of existence thereof and the action which Borrowers are taking or proposes to take with respect thereto.

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

6.5 OTHER NOTICES. Borrowers shall, and shall cause each of the other Companies to, promptly notify Lender of (a) any material adverse change in its financial condition or its business, (b) any default under any material agreement, contract, or other instrument to which it is a party or by which any of its properties are bound, or any acceleration of the maturity of any Indebtedness owing by any Company, (c) any material adverse claim against or affecting any Company or any of its properties, and (d) the commencement of, and any material determination in, any litigation with any third party or any proceeding before any Governmental Authority affecting any Company.

6.6 OPERATIONS AND PROPERTIES. Borrowers shall, and shall cause each of the other Companies to, (a) act prudently and in accordance with customary industry standards in managing and operating its assets and properties, and
(b) keep in good working order and condition, ordinary wear and tear excepted, all of its assets and properties which are necessary to the conduct of its business.

6.7 BOOKS AND RECORDS; ACCESS. Borrowers shall, and shall cause each of the other Companies to, give any representative of Lender access upon reasonable notice and during all business hours to, and permit such representative to examine, copy, or make excerpts from, any and all books, records, and documents in the possession of any Company and relating to its affairs, and to inspect any of the properties of any Company. Borrowers shall, and shall cause each of the other Companies to, maintain complete and accurate books and records of its transactions in accordance with good accounting practices.

6.8 COMPLIANCE WITH LAW. Borrowers shall, and shall cause each of the other Companies to, comply with all applicable Legal Requirements of any Governmental Authority, a breach of which could have a Material Adverse Effect.

6.9 INSURANCE. Borrowers shall, and shall cause each of the other Companies to, keep all insurable property, real and personal, adequately insured at all times in such amounts and against such risks as are customary for Persons in similar businesses operating in the same vicinity, specifically to include a policy of hazard, casualty, fire, and extended coverage insurance covering all assets, business interruption insurance (where feasible), liability insurance, and worker's compensation insurance, in every case under a policy with a financially sound and reputable insurance company and with only such deductibles as are customary, and all to contain a mortgagee or loss payee clause naming Lender as its interest may appear.

6.10 AUTHORIZATIONS AND APPROVALS. Borrowers shall, and shall cause each of the other Companies to, promptly obtain, from time to time at its own expense, all Governmental Authorizations as may be required to enable it to comply with its obligations hereunder and under the other Loan Documents.

6.11 FURTHER ASSURANCES. Borrowers shall, and shall cause each of the other Companies to, make, execute, and deliver or file or cause the same to be done, all such notices, additional agreements, mortgages, assignments, financing statements, or other assurances, and take any and all such other action, as Lender may, from time to time, deem reasonably necessary or proper in connection with any of the Loan Documents, the obligations of any Company thereunder.

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

6.12 INDEMNITY BY BORROWERS. Borrowers shall indemnify, defend, and hold harmless Lender and its Representatives (individually, an "INDEMNITEE" and collectively, the "INDEMNITEES") from and against any and all loss, liability, obligation, damage, penalty, judgment, claim, deficiency, and expense (including interest, penalties, attorneys' fees, and amounts paid in settlement) to which any Indemnitee may become subject arising out of this Agreement and the other Loan Documents OTHER THAN those which arise by reason of the gross negligence or willful misconduct of Lender, BUT SPECIFICALLY INCLUDING ANY LOSS, LIABILITY, OBLIGATION, DAMAGE, PENALTY, JUDGMENT, CLAIM, DEFICIENCY, OR EXPENSE ARISING OUT OF THE SOLE OR CONCURRENT NEGLIGENCE OF LENDER OR ANY OF ITS REPRESENTATIVES. Borrowers shall also indemnify, protect, and hold each Indemnitee harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, proceedings, costs, expenses (including without limitation all reasonable attorneys' fees and legal expenses whether or not suit is brought), and disbursements of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against such Indemnitee, with respect to or as a direct or indirect result of the violation by any Company of any Environmental Law; or with respect to or as a direct or indirect result of any Company's use, generation, manufacture, production, storage, release, threatened release, discharge, disposal, or presence of a Hazardous Material on, under, from, or about real property. The provisions of and undertakings and indemnifications set forth in this SECTION 6.12 shall survive (a) the satisfaction and payment of the Obligation and termination of this Agreement, and (b) the release of any Liens held by Lender on real property or the extinguishment of such Liens by foreclosure or action in lieu thereof; PROVIDED, HOWEVER, that the indemnification set forth herein shall not extend to any act or omission by Lender with respect to any property subsequent to Lender becoming the owner of such property and with respect to which property such claim, loss, damage, liability, fine, penalty, charge, proceeding, order, judgment, action, or requirement arises subsequent to the acquisition of title thereto by Lender.

6.13 AFTER-ACQUIRED SUBSIDIARIES. Concurrently upon the formation or acquisition by any Company of any Subsidiary after the date hereof (an "AFTER-ACQUIRED SUBSIDIARY"), Borrowers shall, and shall cause each of the other Companies to, deliver Constituent Documents for such After-Acquired Subsidiary and such opinions as Lender shall require and shall cause the After-Acquired Subsidiary to execute a guaranty in favor of Lender.

6.14 ERISA COMPLIANCE. Borrowers shall, and shall cause each of the other Companies and each ERISA Affiliate to: (a) at all times, make prompt payment of all contributions required under all Plans and required to meet the minimum funding standards set forth in ERISA with respect to its Plan;
(b) within thirty (30) days after the filing thereof, furnish to Lender copies of each annual report/return (FORM 5500 series), as well as all schedules and attachments required to be filed with the Department of Labor and/or the Internal Revenue Service pursuant to ERISA, and the regulations promulgated thereunder, in connection with each of its Plans for each Plan year; (c) notify Lender immediately of any fact including but not limited to, any Reportable Event arising in connection with any of its Plans, which might constitute grounds for termination thereof by the PBGC or for the appointment by the appropriate United States District Court of a trustee to administer such Plan, together with a statement, if requested by Lender, as to the reason therefor and the action, if any, proposed to be taken with respect thereto; and (d) furnish to Lender upon its request, such additional information concerning any of its Plans as may be reasonably requested.

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

6.15 INTANGIBLE RIGHTS LITIGATION. If any Person files an action, suit, or legal, equitable, arbitration, or administrative proceeding against any Company asserting that such Company is infringing or otherwise adversely affecting the rights of such Person with respect to any Intangible Rights, then Borrowers shall, within sixty (60) days after the filing of such action, suit, or proceeding, provide to Lender evidence reasonably satisfactory to Lender (including, without limitation, opinions of counsel) that such Company is not infringing upon the Intangible Rights of any Person.

6.16 YEAR 2000 COMPLIANCE. Each Borrower shall promptly notify Lender in the event such Borrower discovers or determines that any computer application (including those of suppliers and vendors) that is material to its or any Company's business and operations will not be Year 2000 Compliant on a timely basis, except to the extent that such failure to be Year 2000 Compliant could not reasonably be expected to have a Material Adverse Effect.

SECTION 7

## NEGATIVE COVENANTS

So long as Lender has any commitment to make Advances or issue LCs hereunder, and until payment in full of the Obligation and termination of all LCs, Borrowers agree that (unless Lender shall otherwise consent in writing):

7.1 LIMITATION ON INDEBTEDNESS. Borrowers shall not, and shall not permit any of the other Companies to, incur, guarantee, or otherwise be or become, directly or indirectly, liable in respect of any Indebtedness, except
(a) Indebtedness arising out of this Agreement, (b) Indebtedness secured by the Permitted Liens (EXCEPT FOR Indebtedness incurred, borrowed, or guaranteed after the date hereof), and any renewals and extensions (but not increases) thereof, (c) Indebtedness not to exceed $750,000.00 in the aggregate at any time outstanding to finance the purchase or lease of telecommunications equipment and furnishings and fixtures to be used in the Plano Facility, (d) Indebtedness payable by Adams Golf, Ltd. to Barney Adams in the aggregate principal amount of approximately $1,100,000.00, (e) Indebtedness of any Company owed to any other Company, and (f) other Indebtedness not to exceed $1,000,000.00 in the aggregate at any time outstanding; PROVIDED THAT the Indebtedness permitted under (C) and (F) shall not exceed $1,500,000.00 in the aggregate at any time outstanding.

7.2 NEGATIVE PLEDGE. Borrowers shall not, and shall not permit any of the other Companies to, create, incur, permit, or suffer to exist any Lien upon any of its property or assets, now owned or hereafter acquired, EXCEPT FOR (a) Permitted Liens and (b) Liens securing the Indebtedness described in
SECTION 7.1(c) and (f).

7.3 NEGATIVE PLEDGE AGREEMENTS. Borrowers shall not, and shall not permit any of the other Companies to, enter into any agreement (excluding this Agreement or any other Loan Documents) prohibiting the creation or assumption of any Lien upon any of its property, revenues, or assets, whether now owned or hereafter acquired, or the ability of any Subsidiary to make any payments, directly or indirectly, to AGI by way of Dividends, advances, repayments of loans, repayments of expenses, accruals, or otherwise.

7.4 RESTRICTIONS ON DIVIDENDS. AGI shall not, if an Event of Default exists, declare or

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

make, or incur any liability to make, any Dividend. Borrower shall not, and shall permit any of the other Companies to, declare or make, or incur any liability to make, any Dividend except to another Company.

7.5 LIMITATION ON INVESTMENTS. Borrowers shall not, and shall not permit any of the other Companies to, make or have outstanding any Investments in any Person, EXCEPT FOR (a) the Companies' ownership of Stock of Subsidiaries, (b) Temporary Cash Investments and such other "CASH EQUIVALENT" investments as Lender may from time to time approve in writing,
(c) advances to employees and third parties not to exceed $250,000.00 in the aggregate at any time outstanding, (d) acquisitions of stock or other assets in the sports equipment and accessories business from any Person PROVIDED THAT the aggregate purchase price of such acquisitions do not exceed $2,000,000.00 in any calendar year, and (e) advances by any Company to another Company.

7.6 CERTAIN TRANSACTIONS. Borrowers shall not, and shall not permit any of the other Companies to, enter into any transaction with, or pay any management fees to, any Affiliate; PROVIDED, HOWEVER, that the Companies may enter into transactions with (a) any other Company, and (b) with Affiliates (other than the Companies) upon terms not less favorable to the Companies than would be obtainable at the time in comparable, arms-length transactions with Persons OTHER THAN Affiliates.

7.7 EXECUTIVE PERSONNEL. Borrowers shall not, and shall not permit any of the other Companies (other than Adams Golf Holding Corp.) to, permit Barney Adams to cease to be involved in its present executive management.

7.8 LIMITATION ON SALE OF PROPERTIES. Borrowers shall not, and shall not permit any of the other Companies to (a) sell, assign, exchange, lease, or otherwise dispose of any of its properties, rights, assets, or business, whether now owned or hereafter acquired, except in the ordinary course of its business and for a fair consideration, or (b) sell, assign, or discount any accounts receivable.

7.9 ACQUISITIONS; SUBSIDIARIES. Borrowers shall not, and shall not permit any of the other Companies to, (a) form, incorporate, acquire, or make any Investment in any Subsidiary, except the Subsidiaries listed on EXHIBIT D and wholly-owned After-Acquired Subsidiaries formed in accordance with
SECTION 6.13, or (b) acquire all or substantially all of the assets or Stock of any class of any other Person, except for Investments permitted under
SECTION 7.5.

7.10 LIQUIDATION, MERGERS, CONSOLIDATIONS, AND DISPOSITIONS OF SUBSTANTIAL ASSETS. Borrowers shall not, and shall not permit any of the other Companies to, dissolve or liquidate, or become a party to any merger or consolidation, or acquire by purchase, lease, or otherwise all or substantially all of the assets or Stock of any Person, or sell, transfer, lease, or otherwise dispose of all or any substantial part of its property or assets or business; PROVIDED, HOWEVER, that any Company may merge with any other Company.

7.11 LINES OF BUSINESS; RECEIVABLES POLICY. Borrowers shall not, and shall not permit any of the other Companies to, directly or indirectly, engage in any business OTHER THAN the sports equipment and accessories business, or discontinue any of its material existing lines of business. Borrowers shall not, and shall not permit any of the other Companies to, make any material change in its credit and collection policy, which change would materially impair the collectibility of its receivables, or rescind, cancel, or modify any receivable, except in the ordinary course of business.

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

7.12 GUARANTIES. Borrowers shall not, and shall not permit any of the other Companies to, become or be liable in respect of any Guaranty.

7.13 SALE AND LEASEBACK. Borrowers shall not, and shall not permit any of the other Companies to, enter into any arrangement with any Person pursuant to which any Company will lease, as lessee, any property which it owned as of the date hereof and which it sold, transferred, or otherwise disposed of to such other Person.

7.14 FIXED CHARGES COVERAGE. Borrowers shall not, as of the last day of any fiscal quarter, permit the ratio of (a) the sum of Consolidated Adjusted Net Income, PLUS federal, state, local, and foreign income taxes deducted from Consolidated Adjusted Net Income in accordance with GAAP, PLUS Fixed Charges, to (b) Fixed Charges, in each case for the four (4) fiscal quarters ending on the date of determination, to be less than 3.0 to 1.0.

7.15 DEBT TO EBITDA. Borrowers shall not permit, as of the last day of any fiscal quarter, the ratio of (a) all Indebtedness of the Companies as of such date, to (b) EBITDA for the four (4) fiscal quarters ending on the date of determination, to be greater than 2.0 to 1.0.

7.16 FISCAL YEAR. Borrowers shall not, and shall not permit any of the other Companies to, change its fiscal year or method of accounting.

SECTION 8

## EVENTS OF DEFAULT

8.1 EVENTS OF DEFAULT. An "EVENT OF DEFAULT" shall exist if any one or more of the following events (herein collectively called "EVENTS OF DEFAULT") shall occur and be continuing:

(a) any Company shall fail to pay when due the Obligation or any part thereof; or

(b) any representation or warranty made under this Agreement, or any of the other Loan Documents, shall prove to be untrue or inaccurate in any material respect as of the date on which such representation or warranty is made or deemed to have been made; or

(c) default shall occur in the performance of (i) any of the covenants or agreements of any Company contained in SECTION 6.1 and SECTION 7, or (ii) any other covenants or agreements of any Company contained herein or in any of the other Loan Documents and, in the case of (II), such failure shall continue for thirty (30) days after written notice thereof from Lender to Borrower; or

(d) default shall occur in the payment of any material Indebtedness (OTHER THAN the Obligation) of any Company or default shall occur in respect of any note or credit agreement relating to any such Indebtedness and such default shall continue for more than the period of grace, if any, specified therein; or

(e) any of the Loan Documents shall cease to be legal, valid, and binding agreements enforceable against the Person executing the same in accordance with its terms, shall be terminated,

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

become or be declared ineffective or inoperative or cease to provide the respective liens, security interests, rights, titles, interests, remedies, powers, or privileges intended to be provided thereby; or any Company shall deny that such Company has any further liability or obligation under any of the Loan Documents; or

(f) any Company shall (i) apply for or consent to the appointment of a receiver, trustee, custodian, intervenor, or liquidator of itself or of all or a substantial part of such Person's assets, (ii) file a voluntary petition in bankruptcy, admit in writing that such Person is unable to pay such Person's debts as they become due, or generally not pay such Person's debts as they become due, (iii) make a general assignment for the benefit of creditors, (iv) file a petition or answer seeking reorganization of an arrangement with creditors or to take advantage of any bankruptcy or insolvency laws, (v) file an answer admitting the material allegations of, or consent to, or default in answering, a petition filed against such Person in any bankruptcy, reorganization, or insolvency proceeding, or (vi) take corporate or partnership action for the purpose of effecting any of the foregoing; or

(g) an involuntary proceeding shall be commenced against any Company seeking bankruptcy or reorganization of such Person or the appointment of a receiver, custodian, trustee, liquidator, or other similar official of such Person, or all or substantially all of such Person's assets, and such proceeding shall not have been dismissed within sixty (60) days of the filing thereof; or an order, order for relief, judgment, or decree shall be entered by any court of competent jurisdiction or other competent authority approving a petition or complaint seeking reorganization of any Company or appointing a receiver, custodian, trustee, liquidator, or other similar official of such Person, or of all or substantially all of such Person's assets; or

(h) any final judgment(s) for the payment of money in excess of the sum of $100,000.00 in the aggregate shall be rendered against any Company and such judgment(s) shall not be satisfied or discharged at least ten (10) days prior to the date on which any of such Person's assets could be lawfully sold to satisfy such judgment; or

(i) a Change in Control shall occur.

8.2 REMEDIES UPON EVENT OF DEFAULT. If any Event of Default shall occur and be continuing, then Lender may, without notice, exercise any one or more of the following rights and remedies, and any other remedies provided in any of the Loan Documents, as Lender in its sole discretion may deem necessary or appropriate: (a) terminate Lender's commitment to lend hereunder, (b) declare the Obligation or any part thereof to be forthwith due and payable, whereupon the same shall forthwith become due and payable without presentment, demand, protest, notice of default, notice of acceleration or of intention to accelerate, or other notice of any kind, all of which Borrowers hereby expressly waive, anything contained herein or in the Note to the contrary notwithstanding, (c) reduce any claim to judgment, or (d) without notice of default or demand, pursue and enforce any of Lender's rights and remedies under the Loan Documents, or otherwise provided under or pursuant to any applicable law or agreement; PROVIDED, HOWEVER, if any Event of Default specified in SECTIONS 8.1(f) or (g) shall occur, then the Obligation shall thereupon become due and payable concurrently therewith, and Lender's obligation to lend shall immediately terminate hereunder, without any further action by Lender and without presentment, demand, protest, notice of default, notice of acceleration or of intention to accelerate, or

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

A 899

other notice of any kind, all of which Borrowers hereby expressly waive.

8.3 PERFORMANCE BY LENDER. If any Company fails to perform any covenant, duty, or agreement contained in any of the Loan Documents, then Lender may perform or attempt to perform such covenant, duty, or agreement on behalf of such Company. In such event, Borrowers shall, at the request of Lender, promptly pay any amount expended by Lender in such performance or attempted performance to Lender at its principal office in Dallas, Texas together with interest thereon at the Maximum Rate from the date of such expenditure until paid. Notwithstanding the foregoing, it is expressly understood that Lender shall not assume any liability or responsibility for the performance of any duties of any Company hereunder or under any of the Loan Documents and none of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Lender the right or power to exercise control over the management and affairs of any Company.

8.4 ORDER OF APPLICATION.

(a) NO DEFAULT. If no Event of Default exists, then except as specifically provided in the Loan Documents, any payments shall be applied to the Obligation in the order and manner as Borrowers direct.

(b) DEFAULT. If an Event of Default exists, then any payment (including proceeds from the exercise of any rights and remedies in any collateral, if any) shall be applied in the following order:

(i) to all fees and expenses which Lender has not been paid or reimbursed in accordance with the Loan Documents;

(ii) to accrued interest on the Principal Debt;

(iii) to the remaining Obligation in the order and manner as Lender deems appropriate; and

(iv) as a deposit with Lender as security for the payment of any LC Exposure.

SECTION 9

MISCELLANEOUS

9.1 ACCOUNTING REPORTS. All financial reports or projections furnished by any Person to Lender pursuant to this Agreement shall be prepared in such form and such detail as shall be satisfactory to Lender, shall be prepared on the same basis as those prepared by such Person in prior years, and, where applicable, shall be the same financial reports and projections as those furnished to such Person's officers and directors.

9.2 WAIVER. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender under the Loan Documents shall be in addition to all other rights provided by law. No modification or waiver of

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**