# Appendix
# A901-A960

any provision of any Loan Document, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar, or other instances without such notice or demand.

9.3 PAYMENT OF EXPENSES. Borrowers agree to pay Lender on demand all out-of-pocket costs and expenses of Lender (including, without limitation, the reasonable attorneys' fees of Lender's counsel) incurred in connection with the preservation and enforcement of Lender's rights under the Loan Documents, and all reasonable costs and expenses of Lender (including without limitation the reasonable fees and expenses of Lender's counsel) in connection with the negotiation, preparation, execution, delivery, and administration of the Loan Documents (except for the costs and expenses related to the negotiation, preparation, execution, and delivery of this Agreement and the Loan Documents executed on or prior to the date hereof).

9.4 NOTICES. Any communications required or permitted to be given by any of the Loan Documents must be (a) in writing and personally delivered or mailed by prepaid certified or registered mail, or (b) made by facsimile transmission delivered or transmitted, to the party to whom such notice of communication is directed, to the address of such party shown opposite its name on the signature pages hereof. Any such communication shall be deemed to have been given (whether actually received or not) on the day it is personally delivered or, if transmitted by facsimile transmission, on the day that such communication is transmitted as aforesaid subject to telephone confirmation of receipt; PROVIDED, HOWEVER, that any notice received by Lender after 10:00 a.m. Dallas, Texas time on any day from Borrowers pursuant to SECTION 2.2 (with respect to a Notice of Borrowing) or SECTION 2.3 (with respect to an LC Request) shall be deemed for the purposes of such SECTION to have been given by Borrowers on the next succeeding day, or if mailed, on the third (3rd) day after it is marked as aforesaid. Any party may change its address for purposes of this Agreement by giving notice of such change to the other parties pursuant to this SECTION 9.4.

9.5 GOVERNING LAW. THIS AGREEMENT HAS BEEN PREPARED, IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED IN THE STATE OF TEXAS AND THE SUBSTANTIVE LAWS OF SUCH STATE AND THE APPLICABLE FEDERAL LAWS OF THE UNITED STATES OF AMERICA SHALL GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THIS AGREEMENT AND ALL OF THE OTHER LOAN DOCUMENTS.

9.6 CHOICE OF FORUM; CONSENT TO SERVICE OF PROCESS AND JURISDICTION. Any suit, action, or proceeding against Borrowers with respect to this Agreement, the Note, or other Loan Documents, or any judgment entered by any court in respect thereof, may be brought in the courts of the State of Texas, County of Dallas, or in the United States courts located in the State of Texas as Lender in its sole discretion may elect and Borrowers hereby irrevocably submit to the nonexclusive jurisdiction of such courts for the purpose of any such suit, action, or proceeding. Borrowers hereby irrevocably consent to the service of process in any suit, action, or proceeding in said court by the mailing thereof by Lender by registered or certified mail, postage prepaid, to each Borrower's address shown opposite its name on the signature pages hereof. Nothing herein or in any of the other Loan Documents shall affect the right of Lender to serve process in any other manner permitted by law or shall limit the right of Lender to bring any action or proceeding against Borrowers or with respect to any of its property in courts in other jurisdiction. Borrowers hereby irrevocably waive any objections which it may now or hereafter have to

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

the laying of venue of any suit, action, or proceeding arising out of or relating to this Agreement, the Note, or any other Loan Documents brought in the courts located in the State of Texas, County of Dallas, and hereby further irrevocably waive any claim that any such suit, action, or proceeding brought in any such court has been brought in any inconvenient forum. Any action or proceeding by any Borrower against Lender shall be brought only in a court located in Dallas County, Texas.

9.7 INVALID PROVISIONS. Any provision of any Loan Document held by a court of competent jurisdiction to be illegal, invalid or unenforceable and shall not invalidate the remaining provisions of such Loan Document which shall remain in full force and the effect thereof shall be confined to the provision held invalid or illegal.

9.8 MAXIMUM INTEREST RATE. Regardless of any provision contained in any of the Loan Documents, Lender shall never be entitled to receive, collect, or apply as interest (whether termed interest herein or deemed to be interest by operation of law or judicial determination) on the Note any amount in excess of interest calculated at the Maximum Rate, and, in the event that any Lender ever receives, collects, or applies as interest any such excess, then the amount which would be excessive interest shall be deemed to be a partial prepayment of principal and treated hereunder as such; and, if the principal amount of the Obligation is paid in full, then any remaining excess shall forthwith be paid to Borrowers. In determining whether or not the interest paid or payable under any specific contingency exceeds interest calculated at the Maximum Rate, Borrowers and Lender shall, to the maximum extent permitted under applicable law: (a) characterize any non-principal payment as an expense, fee, or premium rather than as interest;
(b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate, and spread, in equal parts, the total amount of interest throughout the entire contemplated term of the Note; PROVIDED THAT, if the Note is paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds interest calculated at the Maximum Rate, then Lender shall refund to Borrowers the amount of such excess or credit the amount of such excess against the principal amount of the Note and, in such event, Lender shall not be subject to any penalties provided by any laws for contracting for, charging, taking, reserving, or receiving interest in excess of interest calculated at the Maximum Rate.

9.9 NON-LIABILITY OF LENDER. The relationship between the Companies and Lender is, and shall at all times remain, solely that of borrower and lender and Lender has no fiduciary or other special relationship with any Company.

9.10 OFFSET. Borrowers hereby grant to Lender the right of offset, to secure repayment of the Obligation, upon any and all moneys, securities, or other property of Borrowers and the proceeds therefrom, now or hereafter held or received by or in transit to Lender or its agents, from or for the account of Borrowers or any Guarantor, whether for safe keeping, custody, pledge, transmission, collection, or otherwise, and also upon any and all deposits (general or special) and credits of each Borrower, and any and all claims of Borrowers against Lender at any time existing.

9.11 SUCCESSORS AND ASSIGNS. The Loan Documents shall be binding upon and inure to the benefit of Borrowers and Lender and their respective successors, assigns, and legal representatives; PROVIDED, HOWEVER, that Borrowers may not, without the prior written consent of Lender, assign any rights, powers, duties, or obligations thereunder. Lender reserves the right to sell all or a portion of its interest in the Loan Documents, and Lender shall have the right to disclose any information in its

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

A 902

possession regarding any Company, or any assets pledged to Lender in connection herewith to any potential transferee of the Note or any part thereof.

9.12 TEXAS FINANCE CODE. Borrowers and Lender hereby agree that the provisions of CHAPTER 346 of the TEXAS FINANCE CODE, as amended (regulating certain revolving credit loans and revolving tri-party accounts), shall not apply to the Loan Documents.

9.13 HEADINGS. SECTION headings are for convenience of reference only and shall in no way affect the interpretation of this Agreement.

9.14 SURVIVAL. All representations and warranties made by Borrowers herein shall survive delivery of the Note and the making of the Loan.

9.15 PARTICIPATIONS. Lender shall have the right to enter into participation agreements with other banks with respect to the Note, and grant participations in the rate of other loan documents but such participation shall not affect the rights and duties of such Lender hereunder vis-a-vis Borrowers. Each actual or proposed participant shall be entitled to receive all information received by Lender regarding the creditworthiness of Borrowers, including, without limitation, information required to be disclosed to a participant pursuant to BANKING CIRCULAR 181 (REV., AUGUST 2, 1984), issued by the Comptroller of the Currency (whether the actual or proposed participant is subject to the circular or not).

9.16 NO THIRD PARTY BENEFICIARY. The parties do not intend the benefits of this Agreement to inure to any third party, nor shall any Loan Document or any course of conduct by any party hereto be construed to make or render Lender or any of its officers, directors, agents, or employees liable
(a) to any materialman, supplier, contractor, subcontractor, purchaser, or lessee of any property owned by any Borrower, or (b) for debts or claims accruing to any such Persons against any Borrower.

9.17 WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWERS HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY OR THE ACTIONS OF LENDER IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT THEREOF.

9.18 CAPITAL ADEQUACY. If, after the date hereof, Lender shall have determined that either (a) the adoption of any applicable law, rule, regulation, or guideline regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank, or comparable agency charged with the interpretation or administration thereof, or (b) compliance by Lender (or any lending office of Lender) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank, or comparable agency, has or would have the effect of reducing the rate of return on Lender's capital as a consequence of its or Borrowers' obligations hereunder to a level below that which Lender could have achieved but for such adoption, change, or compliance (taking into consideration Lender's policies with respect to capital adequacy) by an amount deemed by Lender to be material, then from time-to-time, within ten (10) days after demand by Lender, Borrowers shall pay to Lender such additional amount or amounts as will adequately compensate Lender for such reduction. Lender will promptly notify Borrowers of any event of which it has actual knowledge, occurring after the date thereof, which will

**AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3**

entitle Lender to compensation pursuant to this SECTION 9.18. A certificate of Lender claiming compensation under this SECTION 9.18 and setting forth the additional amount or amounts to be paid to it hereunder, together with the description of the manner in which such amounts have been calculated, shall be conclusive in the absence of manifest error. In determining such amount, Lender may use any reasonable averaging and attribution methods.

9.19 MULTIPLE COUNTERPARTS. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.

9.20 ARBITRATION. ANY CONTROVERSY OR CLAIM BETWEEN OR AMONG THE PARTIES HERETO INCLUDING BUT NOT LIMITED TO THOSE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR INSTRUMENTS, INCLUDING ANY CLAIM BASED ON OR ARISING FROM AN ALLEGED TORT, SHALL BE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (OR IF NOT APPLICABLE, THE APPLICABLE STATE LAW), THE RULES OF PRACTICE AND PROCEDURE FOR THE ARBITRATION OF COMMERCIAL DISPUTES OF J.A.M.S./ENDISPUTE OR ANY SUCCESSOR THEREOF (J.A.M.S.), AND THE "SPECIAL RULES" SET FORTH BELOW. IN THE EVENT OF ANY INCONSISTENCY, THE SPECIAL RULES SHALL CONTROL. JUDGMENT UPON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. ANY PARTY TO THIS AGREEMENT MAY BRING AN ACTION, INCLUDING A SUMMARY OR EXPEDITED PROCEEDING, TO COMPEL ARBITRATION OF ANY CONTROVERSY OR CLAIM TO WHICH THIS AGREEMENT APPLIES IN ANY COURT HAVING JURISDICTION OVER SUCH ACTION.

(a) SPECIAL RULES. THE ARBITRATION SHALL BE CONDUCTED IN THE CITY OF BORROWERS' DOMICILE AT THE TIME OF THIS AGREEMENT'S EXECUTION AND ADMINISTERED BY J.A.M.S. WHO WILL APPOINT AN ARBITRATOR; IF J.A.M.S. IS UNABLE OR LEGALLY PRECLUDED FROM ADMINISTERING THE ARBITRATION, THEN THE AMERICAN ARBITRATION ASSOCIATION WILL SERVE. ALL ARBITRATION HEARINGS WILL BE COMMENCED WITHIN 90 DAYS OF THE DEMAND FOR ARBITRATION; FURTHER, THE ARBITRATOR SHALL ONLY, UPON A SHOWING OF CAUSE, BE PERMITTED TO EXTEND THE COMMENCEMENT OF SUCH HEARING FOR UP TO AN ADDITIONAL 60 DAYS. THE PARTIES SHALL REQUEST THAT THE ARBITRATOR SHALL MAKE FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH SUCH ARBITRATION PROCEEDING, PROVIDED THAT SUCH FINDINGS OF FACT AND CONCLUSIONS OF LAW SHALL NOT AFFECT THE FINALITY OF THE ARBITRATOR'S DECISION.

(b) RESERVATION OF RIGHTS. NOTHING IN THIS AGREEMENT SHALL BE DEEMED TO (I) LIMIT THE APPLICABILITY OF ANY OTHERWISE APPLICABLE STATUTES OF LIMITATION OR REPOSE AND ANY WAIVERS CONTAINED IN THIS AGREEMENT; OR (II) BE A WAIVER BY LENDER OF THE PROTECTION AFFORDED TO IT BY 12 U.S.C. SS. 91 OR ANY SUBSTANTIALLY EQUIVALENT STATE LAW; OR (III) LIMIT THE RIGHT OF LENDER HERETO (A) TO EXERCISE SELF HELP REMEDIES SUCH AS (BUT NOT LIMITED TO) SET-OFF, OR (B) TO FORECLOSE AGAINST ANY REAL OR PERSONAL PROPERTY COLLATERAL, OR (C) TO OBTAIN FROM A COURT PROVISIONAL OR ANCILLARY REMEDIES SUCH AS (BUT NOT LIMITED TO) INJUNCTIVE RELIEF OR THE APPOINTMENT OF A RECEIVER. LENDER MAY EXERCISE SUCH SELF HELP RIGHTS, FORECLOSE UPON SUCH PROPERTY, OR OBTAIN SUCH PROVISIONAL OR ANCILLARY REMEDIES BEFORE, DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING BROUGHT PURSUANT TO THIS AGREEMENT. AT LENDER'S OPTION, FORECLOSURE UNDER A DEED OF TRUST OR MORTGAGE MAY BE ACCOMPLISHED BY ANY OF THE FOLLOWING: THE EXERCISE OF A POWER OF SALE UNDER THE DEED OF TRUST OR MORTGAGE, OR BY JUDICIAL SALE UNDER THE DEED OF TRUST OR MORTGAGE, OR BY JUDICIAL FORECLOSURE. NEITHER THIS EXERCISE OF SELF HELP REMEDIES NOR THE INSTITUTION OR MAINTENANCE OF AN ACTION FOR FORECLOSURE OR PROVISIONAL OR ANCILLARY

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

REMEDIES SHALL CONSTITUTE A WAIVER OF THE RIGHT OF ANY PARTY, INCLUDING THE CLAIMANT IN ANY SUCH ACTION TO ARBITRATE THE MERITS OF THE CONTROVERSY OR CLAIM OCCASIONING RESORT TO SUCH REMEDIES.

(c) CONFIDENTIALITY. ANY ARBITRATION PROCEEDING, AWARD, FINDINGS OF FACT, CONCLUSIONS OF LAW, OR OTHER INFORMATION CONCERNING SUCH ARBITRATION MATTERS SHALL BE HELD IN CONFIDENCE BY THE PARTIES AND SHALL NOT BE DISCLOSED EXCEPT TO EACH PARTIES EMPLOYEES OR AGENTS AS SHALL BE REASONABLY NECESSARY FOR SUCH PARTY TO CONDUCT ITS BUSINESS; PROVIDED, HOWEVER, THAT EITHER PARTY MAY DISCLOSE SUCH INFORMATION FOR AUDITING PURPOSES BY INDEPENDENT CERTIFIED ACCOUNTANTS, FOR COMPLYING WITH APPLICABLE GOVERNMENTAL LAWS, REGULATIONS OR COURT ORDERS, OR THAT IS OR BECOMES PART OF THE PUBLIC DOMAIN THROUGH NO BREACH OF THIS AGREEMENT.

9.21 ENTIRETY. THIS AGREEMENT, THE NOTE, AND THE OTHER LOAN DOCUMENTS REFERRED TO HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO. THE PROVISIONS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH ANY BORROWER IS A PARTY MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE PARTIES HERETO.

9.22 CONFIDENTIALITY. Lender agrees to keep confidential any information furnished or made available to it by any Company pursuant to this Agreement that is marked confidential; PROVIDED THAT nothing herein shall prevent Lender from disclosing such information (a) to any Affiliate of Lender, or any officer, director, employee, agent, or advisor of Lender or any Affiliate of Lender, (b) to any other Person if reasonably incidental to the administration of the credit facility provided herein, (c) as required by any Legal Requirement, (d) upon the order of any court or administrative agency, (e) upon the request or demand of any Governmental Authority, (f) that is or becomes available to the public or that otherwise becomes available to Lender other than as a result of a disclosure by Lender prohibited by this Agreement, (g) in connection with any litigation to which Lender or any of its Affiliates may be a party, (h) to the extent necessary in connection with the exercise of any remedy under this Agreement or any other Loan Document, and (i) subject to provisions substantially similar to those contained in this SECTION, to any actual or proposed participant or assignee.

9.23 AMENDMENT AND RESTATEMENT. This Agreement is in renewal, extension, modification, amendment, and restatement of the Original Loan Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES TO FOLLOW]

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT D-0601350.3

A 905

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written.

Address for Notice:                     BORROWERS:

c/o Adams Golf, Inc.                     ADAMS GOLF DIRECT RESPONSE, LTD.,
2801 East Plano Parkway
Plano, Texas 75074                       By: ADAMS GOLF GP CORP., a Delaware
Attention: Darl P. Hatfield                  corporation, General Partner
Telecopy No: 972-424-0721
                                             By:
                                             Name:
                                             Title:


Address for Notice:                     ADAMS GOLF, LTD., a Texas limited
                                        partnership
c/o Adams Golf, Inc.
2801 East Plano Parkway                  By: ADAMS GOLF GP CORP., a Delaware
Plano, Texas 75074                           corporation, General Partner
Attention: Darl P. Hatfield
Telecopy No: 972-424-0721                    By:
                                             Name:
                                             Title:


Address for Notice:                     LENDER:

901 Main Street, 7th Floor              NATIONSBANK, N.A., a national
P.O. Box 831000                         banking association (successor in
Dallas, Texas 75202                     interest by merger to NationsBank
Attention: Mr. Russell P. Hartsfield    of Texas, N.A.)
Telecopy No.: (214) 508-3139
                                             By:
                                                Russell P. Hartsfield
                                                Senior Vice President

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

[logo]

## NationsBank, N.A. AMENDED AND RESTATED PROMISSORY NOTE
Date February 26, 1999 Amount $ 10,000,000.00

FOR VALUE RECEIVED, the undersigned (jointly and severally, "Borrowers") unconditionally promise to pay to the order of NationsBank, N.A., successor in interest by merger to NationsBank of Texas, N.A. ("Bank"), Dallas (Banking Center) without setoff, at its offices at 901 MAIN STREET, DALLAS, Texas, or at such other place as may be designated by Bank, the principal amount of TEN MILLION AND NO/100 Dollars ($10,000,000.00), or so much thereof as may be advanced from time to time in immediately available funds, together with interest computed daily on the outstanding principal balance hereunder, at an annual interest rate, and in accordance with the payment schedule, indicated below. [This Note contains some provisions preceded by boxes. Mark only those boxes beside provisions which will be applicable to this transaction. A box which is not marked means that the provision beside it is not applicable to this transaction.]

## RATE

/ / PRIME RATE. The rate shall be the Prime Rate, plus _____ percent, per annum. The "Prime Rate" is the fluctuating rate of interest established by Bank from time to time, at its discretion, whether or not such rate shall be otherwise published. The Prime Rate is established by Bank as an index or base rate and may or may not at any time be the best or lowest rate charged by Bank on any loan.

/ / FIXED RATE. The Rate shall be fixed at _____ percent, per annum.

/ / TREASURY SECURITIES RATE. The Rate shall be the Treasury Securities Rate, plus _____ percent, per annum. The "Treasury Securities Rate" is a fluctuating rate of interest applied by Bank from time to time, based on the most recent monthly average of daily yields on all outstanding United States Treasury Securities adjusted to a constant maturity of _____ years, as made available by the Federal Reserve Board, rounded upwards to the nearest one-eighth of one percentage point (0.125%).

/X/ OTHER. THE RATE SHALL BE THE BASE RATE PLUS THE APPLICABLE MARGIN OR
THE ADJUSTED EURODOLLAR RATE PLUS THE APPLICABLE MARGIN (AS SUCH TERMS ARE DEFINED BELOW), AS SELECTED BY BORROWERS PURSUANT TO THE AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT DATED OF EVEN DATE HEREWITH, EXECUTED BY BORROWERS AND BANK (AS MODIFIED, AMENDED, RENEWED, EXTENDED, AND RESTATED FROM TIME TO TIME, THE "CREDIT AGREEMENT").

Notwithstanding any other provision contained in this Note, Bank does not intend to charge and Borrowers shall not be required to pay any amount of interest or other fees or charges that is in excess of the maximum permitted by applicable law. Borrowers agree that during the full term hereof, the maximum lawful interest rate for this Note as determined under Texas law shall be the monthly ceiling as specified in Article 5069-1.D. of the V.A.T.S. Further, to the extent that any other lawful rate ceiling exceeds the rate ceiling so determined, then the higher rate ceiling shall apply. Any payment in excess of such maximum shall be refunded to Borrowers or credited against principal, at the option of Bank.

## ACCRUAL METHOD

Interest at the Rate set forth above, unless otherwise indicated, will be calculated on the basis of the 365/360 method, which computes a daily amount of interest for a hypothetical year of 360 days, then multiplies such amount by the actual number of days elapsed in an interest calculation period.

## RATE CHANGE DATE

Any Rate based on a fluctuating index or base rate will change, unless otherwise provided, each time and as of the date that the index or base rate changes. In the event any index is discontinued, Bank shall substitute an index determined by Bank to be comparable, in its sole discretion.

## PAYMENT SCHEDULE

All payments received hereunder shall be applied first to the payment of any expense or charges payable hereunder or under any other documents executed in connection with this Note ("Loan Documents"), then to interest due and payable, with the balance being applied to principal, or in such other order as Bank shall determine at its option.

/ / PRINCIPAL Principal shall be paid in _____ (_____) equal: / / monthly, / / quarterly or / / PLUS installments of $_____ each, commencing on _____, 19__.

INTEREST together with accrued interest thereon and continuing on the same day of each successive month/quarter/or other period (as applicable) thereafter, with a final payment of all unpaid principal and interest thereon on _____, 19__.

/ / PRINCIPAL Principal and interest shall be paid in _____ (_____) equal: / / monthly, (_____) equal: / / monthly, / / quarterly or / /

A 907

AND installments of $_____ each, commencing on _____, 19__,

INTEREST and continuing on the same day of each successive month/quarter/or other period (as applicable) thereafter, with a final payment of all unpaid principal and interest thereon on _____, 19__; provided that, if accrued interest on any payment exceeds the installment amount set forth above, Borrowers will pay an additional amount equal to such excess interest.

/X/ SINGLE Principal shall be paid in full in a single payment on May 31, 2000. Interest thereon shall be payable as provided in the Credit Agreement.

/ / DEMAND. NOTWITHSTANDING ANY PROVISIONS CONTAINED HEREIN WHICH MAY BE INCONSISTENT WITH A DEMAND NOTE, INCLUDING BUT NOT LIMITED TO ANY REFERENCES TO INSTALLMENTS, A MATURITY DATE, ACCELERATION OR EVENTS OF DEFAULT, BORROWERS ACKNOWLEDGE THAT BANK MAY DEMAND PAYMENT AT ANY TIME, IN ITS SOLE DISCRETION.

/ / **OTHER**

**REVOLVING FEATURE**

/X/ Borrowers may borrow, repay and reborrow hereunder at any time, up to a maximum aggregate amount outstanding at any one time equal to the principal amount of this Note; provided, however, that Borrowers are not in default under any provision of the Credit Agreement, this Note, any Loan Document, or any other obligation of Borrowers to Bank, and provided that the borrowings hereunder do not exceed any limitations on borrowings by Borrowers set forth in the Credit Agreement. Bank shall have no liability for its

AMENDED AND RESTATED PROMISSORY

refusal to advance funds based upon its determination that any conditions of such further advances have not been met. Bank records of the amounts borrowed from time to time shall be conclusive proof thereof.

## AUTOMATIC PAYMENT

/ / Borrowers have elected to authorize Bank to effect payment of sums due under this Note by means of debiting Borrowers' account number _____. This authorization shall not affect the obligation of Borrowers to pay such sums when due, without notice, if there are insufficient funds in such account to make such payment in full on the due date thereof, or if Bank fails to debit the account.

BORROWERS REPRESENT TO BANK THAT THE PROCEEDS OF THIS LOAN ARE TO BE USED PRIMARILY FOR BUSINESS, COMMERCIAL OR AGRICULTURAL PURPOSES. BORROWERS ACKNOWLEDGE HAVING READ AND UNDERSTOOD, AND AGREE TO BE BOUND BY, ALL TERMS AND CONDITIONS OF THIS NOTE.

## ADDITIONAL TERMS AND CONDITIONS

1. WAIVERS, CONSENTS AND COVENANTS. Borrowers, any indorser, or guarantor hereof or any other party hereto (collectively "Obligors") and each of them jointly and severally (a) waive presentment, demand, notice of demand, notice of intent to accelerate, and notice of acceleration of maturity, protest, notice of protest, notice of nonpayment, notice of dishonor, and any other notice required to be given under the law to any of Obligors, in connection with the delivery, acceptance, performance, default or enforcement of this Note, of any indorsement or guaranty of this Note of any Loan Documents; (b) consent to any and all delays, extensions, renewals or other modifications of this Note or the Loan Documents, or waivers of any term hereof or of the Loan Documents, or releases or discharge by Bank of any of Obligors or release, substitution, or exchange of any security for the payment hereof, or the failure to act on the part of Bank or any indulgence shown by Bank, from time to time and in one or more instances (without notice to or further assent from any Obligors) and agree that no such action, failure to act or failure to exercise any right or remedy on the part of Bank shall in any way affect or impair the obligations of any Obligors or be construed as a waiver by Bank of, or otherwise affect, any of Bank's rights under this Note, under any indorsement or guaranty of this Note or under any of the Loan Documents; and
(c) agree to pay, on demand, all out-of-pocket costs and expenses of collection of this Note or of any indorsement or guaranty hereof and/or the enforcement of Bank's rights with respect to, or the administration, preservation, protection of, or realization upon, any property securing payment hereof, including, without limitation, reasonable attorney's fees, including fees related to any trial, arbitration, bankruptcy, appeal or other proceeding.

2. INDEMNIFICATION. Obligors agree to promptly pay, indemnify and hold Bank harmless from all state and federal taxes of any kind and other liabilities with respect to or resulting from advances made pursuant to this Note. If this Note has a revolving feature and is secured by a mortgage, Obligors expressly consent to the deduction of any applicable taxes from each taxable advance extended by Bank.

3. PREPAYMENTS. Subject to the terms and conditions set forth in the Credit Agreement, prepayments may be made in whole or in part at any time on any loan for which the Rate is based on the Prime Rate. All prepayments of principal shall be applied in the inverse order of maturity, or in such other order as Bank shall determine in its sole discretion. Except as set forth in the Credit Agreement, no prepayment of any other loan shall be permitted without the prior written consent of Bank.

4. EVENTS OF DEFAULT. A "default" or an "event of default" shall exist if an Event of Default (as defined in the Credit Agreement) shall occur and be continuing.

5. REMEDIES UPON DEFAULT. Whenever there is a default under this Note (a) the entire balance outstanding and all other obligations of Obligor to Bank (however acquired or evidenced) shall, at the option of Bank, become immediately due and payable, and/or (b) to the extent permitted by law, the Rate of interest on the unpaid principal shall, at the option of the Bank, be increased at Bank's discretion up to the maximum rate allowed by law, or if none, 14% per annum, (the "Default Rate"). The provisions herein for a Default Rate or a delinquency charge shall not be deemed to extend the time for any payment hereunder or to constitute a "grace period" giving the Obligors a right to cure any default. At Bank's option, any accrued and unpaid interest, fees or charges may, for purposes of computing and accruing interest on a daily basis after the due date of the Note or any installment thereof, be deemed to be a part of the principal balance, and interest shall accrue on a daily compounded basis after such date at the rate provided in this Note until the entire outstanding balance of principal and interest is paid in full. Bank is hereby authorized at any time to set off and charge against any deposit accounts of any Obligor, as well as any other property of such party at or under the control of Bank, without notice or demand, any and all obligations due hereunder.

6. NON-WAIVER. The failure at any time of Bank to exercise any of its options or any other rights hereunder shall not constitute a waiver thereof, nor shall it be a bar to the exercise of any of its options or rights at a later date. All rights and remedies of Bank shall be cumulative and may be pursued singly, successively or together, at the option of Bank. The acceptance by Bank of any partial payment shall not constitute a waiver of any default or of any Bank's rights under this Note. No waiver of nay of its rights hereunder, and no modification or amendment of this Note, shall be deemed to be made by Bank unless the same shall be in writing, duly signed on behalf of Bank; and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Bank or the obligations of Obligor to Bank in any other respect at any other time.

7. APPLICABLE LAW. This Note is delivered in and shall be construed under the internal laws and judicial decisions of the State of Texas, and the laws of the United States as the same may be applicable.

8. PARTIAL INVALIDITY. The unenforceability or invalidity of any provision of this Note shall not affect the enforceability or the validity of any other provision herein and the invalidity or unenforceability of any provision of this Note or of the Loan Documents to any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

9. JURISDICTION AND VENUE. In any litigation in connection with or to enforce this Note or any indorsement or guaranty of this Note or any Loan Documents, Obligors, and each of them, irrevocably consent to and confer personal jurisdiction on the courts of the State of Texas or the United States courts located within the State of Texas, and expressly waive any objections as to venue in any such courts, and agree that service of process may be made on Obligors by mailing a copy of the summons and complaint by registered or certified mail, return receipt requested, to their respective addresses. Nothing contained herein shall, however, prevent Bank from bringing any action or exercising any rights within any other state or jurisdiction or from obtaining personal jurisdiction by any other means available by applicable law.

10. INTEREST DEFINITIONS AND TERMS.

(a) DEFINITIONS.

"ADJUSTED EURODOLLAR RATE" means an interest rate per annum (rounded upwards, if necessary, to the next 1/16th of 1%) equal to the sum of the quotient of (a) the Eurodollar Rate with respect to such Interest Period, divided by (b) the remainder of 1.00 MINUS the Eurodollar Reserve Requirement in effect on such date.

AMENDED AND RESTATED PROMISSORY NOTE d-601455.1

"APPLICABLE MARGIN" means, at the time of determination thereof, the interest margin over the Base Rate or the Adjusted Eurodollar Rate, as the case may be, as follows:

| APPLICABLE MARGIN BASE RATE BORROWINGS | APPLICABLE MARGIN EURODOLLAR BORROWINGS |
|---|---|
| -0.50% | 1.00% |

"BASE RATE" means the sum of the variable rate of interest established from time-to-time by Bank as its general reference rate of interest (which rate of interest may not be the lowest rate charged by Bank on similar loans). Each change in the Base Rate shall become effective without prior notice to Borrowers automatically as of the opening of business on the date of such change in the Base Rate.

"EURODOLLAR RATE" means the rate per annum (rounded upwards, if necessary, to the nearest 1/16th of one percent) equal to the rate appearing on the Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first (1st) day of such Interest Period for a term comparable to such Interest Period. If for any reason the Dow Jones Markets Page 3750 rate is not available, then the "EURODOLLAR RATE" shall be the rate appearing on the Reuters Screen LIBO Page as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first
(1st) day of the such Interest Period for a term comparable to such Interest Period; PROVIDED, HOWEVER, if more than one rate is specified on the Reuters Screen LIBO Page, then the applicable rate shall be the arithmetic mean of all such rates.

"EURODOLLAR RESERVE REQUIREMENT" means, on any day, that percentage (expressed as a decimal fraction) that is in effect on such day, as provided by the Board of Governors of the Federal Reserve System (or any successor governmental body), applied for determining the maximum reserve requirements (including, without limitation, basic, supplemental, marginal, and emergency reserves) under Regulation D, with respect to "EUROCURRENCY LIABILITIES" as currently defined in Regulation D, or under any similar or successor regulation with respect to Eurocurrency liabilities or Eurocurrency funding. Each determination by Bank of the Eurodollar Reserve Requirement shall, in the absence of manifest error, be conclusive and binding.

(b) INTEREST PERIODS, TERMS, ETC. Reference is hereby made to the Credit Agreement for certain provisions relating the determination of the Base Rate and the Eurodollar Rate and Borrowers' rights, limitations, and restrictions to select such rates.

11. ARBITRATION. ANY CONTROVERSY OR CLAIM BETWEEN OR AMONG THE PARTIES HERETO INCLUDING BUT NOT LIMITED TO THOSE ARISING OUT OF OR RELATING TO THIS NOTE OR ANY RELATED NOTES OR INSTRUMENTS, INCLUDING ANY CLAIM BASED ON OR ARISING FROM AN ALLEGED TORT, SHALL BE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (OR IF NOT APPLICABLE, THE APPLICABLE STATE LAW), THE RULES OF PRACTICE AND PROCEDURE FOR THE ARBITRATION OF COMMERCIAL DISPUTES OF J.A.M.S. D/B/A ENDISPUTE, INC. ("J.A.M.S.") AND THE "SPECIAL RULES" SET FORTH BELOW. IN THE EVENT OF ANY INCONSISTENCY, THE SPECIAL RULES SHALL CONTROL JUDGMENT UPON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. ANY PARTY TO THE NOTE MAY BRING AN ACTION, INCLUDING A SUMMARY OR EXPEDITED PROCEEDING, TO COMPEL ARBITRATION OF ANY CONTROVERSY OR CLAIM TO WHICH THIS NOTE APPLIES IN ANY COURT HAVING JURISDICTION OVER SUCH ACTION.

(A) SPECIAL RULES. THE ARBITRATION SHALL BE CONDUCTED IN THE CITY OF BORROWERS' DOMICILE AT THE TIME OF THE NOTE'S EXECUTION AND ADMINISTERED BY J.A.M.S. WHO WILL APPOINT AN ARBITRATOR,; IF J.A.M.S. IS UNABLE OR LEGALLY PRECLUDED FROM ADMINISTERING THE ARBITRATION, THEN THE AMERICAN ARBITRATION ASSOCIATION WILL SERVE. ALL ARBITRATION HEARINGS WILL BE COMMENCED WITHIN 90 DAYS OF THE DEMAND FOR ARBITRATION; FURTHER, THE ARBITRATOR SHALL ONLY, UPON A SHOWING OF CAUSE, BE PERMITTED TO EXTEND THE COMMENCEMENT OF SUCH HEARING FOR AN ADDITIONAL 60 DAYS.

(B) RESERVATION OF RIGHTS. NOTHING IN THIS NOTE SHALL BE DEEMED TO (I) LIMIT THE APPLICABILITY OF ANY OTHERWISE APPLICABLE STATUTES OF LIMITATION OR REPOSE AND ANY WAIVERS CONTAINED IN THIS NOTE; OR (II) BE A WAIVER BY THE BANK OF THE PROTECTION AFFORDED TO IT BY 12 U.S.C. SS.91 OR ANY SUBSTANTIALLY EQUIVALENT STATE LAW; OR (III) LIMIT THE RIGHT OF THE BANK HERETO (A) TO EXERCISE SELF HELP REMEDIES SUCH AS (BUT NOT LIMITED TO) SETOFF, OR (B) TO FORECLOSURE AGAINST ANY REAL OR PERSONAL PROPERTY COLLATERAL, OR (C) TO OBTAIN FROM A COURT PROVISIONAL OR ANCILLARY REMEDIES SUCH AS (BUT NOT LIMITED TO) INJUNCTIVE RELIEF, WRIT OF POSSESSION OR THE APPOINTMENT OF A RECEIVER. THE BANK MAY EXERCISE SUCH SELF HELP RIGHTS, FORECLOSURE UPON SUCH PROPERTY, OR OBTAIN SUCH PROVISIONAL OR ANCILLARY REMEDIES BEFORE, DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING BROUGHT PURSUANT TO THIS NOTE. NEITHER THE EXERCISE OR SELF HELP REMEDIES NOR THE INSTITUTION OR MAINTENANCE OF AN ACTION FOR FORECLOSURE OR PROVISIONAL OR ANCILLARY REMEDIES SHALL CONSTITUTE A WAIVER OF THE RIGHT OF ANY PARTY, INCLUDING THE CLAIMANT IN SUCH ACTION, TO ARBITRATE THE MERITS OF THE CONTROVERSY OR CLAIM OCCASIONING RESORT TO SUCH REMEDIES.

12. BINDING EFFECT. This note shall be binding upon and inure to the benefit of Borrowers, Obligors and Bank and their respective

A 911

successor, assigns, heirs and personal representatives, provided, however, that no obligations of the Borrowers or the Obligors hereunder can be assigned without prior written consent of Bank.

13. NOTICE OF FINAL AGREEMENT. THIS WRITTEN PROMISSORY NOTE AND ANY OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

14. RENEWAL NOTE. This note is in modification, amendment, renewal, extension, and restatement, but not extinguishment, of that certain Promissory Note dated as of February 27, 1998, executed by Borrowers and payable to the order of Bank in the original principal amount of $10,000,000.00.

BORROWERS:

AMENDED AND RESTATED PROMISSORY NOTE d-601455.1

ADAMS GOLF DIRECT RESPONSE, LTD., a Texas
limited partnership

By: ADAMS GOLF GP CORP., a Delaware corporation,
General Partner

By:
Name:
Title:

ADAMS GOLF, LTD., a Texas limited partnership

By: ADAMS GOLF GP CORP., a Delaware corporation,
General Partner

By:
Name:
Title:

**AMENDED AND RESTATED PROMISSORY NOTE d-601455.1**

A 913

[Logo]

## NationsBank, N.A. AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY

1. GUARANTY. FOR VALUE RECEIVED, and to induce NationsBank, N.A., DALLAS COMMERCIAL BANKING
Banking Center

**901 MAIN STREET, 7TH FLOOR, DALLAS, TEXAS, 75202**
Bank Street Address City State Zip Code

(Attn: MR. RUSSELL P. HARTSFIELD) (herein called "Bank"), to make loans or advances or to extend credit or other financial
accommodations or benefits, with or without security, to or for the account of

**ADAMS GOLF DIRECT RESPONSE, LTD. AND/OR ADAMS GOLF, LTD.**

Borrower's Name

2801 EAST PLANO PARKWAY, PLANO, TEXAS, 75074
Street Address City State Zip Code

(herein collectively called "Borrowers"), the undersigned (jointly and severally called "Guarantors"), jointly and severally, hereby become surety for and irrevocably and unconditionally guarantee to Bank the full and prompt payment when due, whether by acceleration or otherwise, of any and all Liabilities (as hereinafter defined) of Borrowers to Bank, together with reasonable attorneys' fees, costs and expenses incurred by Bank in enforcing any and all of such indebtedness. This Guaranty is continuing and unlimited as to the amount.

Guarantors further unconditionally guarantee the faithful, prompt and complete compliance by Borrowers with all terms, conditions, covenants, agreements and undertakings of Borrowers (herein collectively referred to as the "Obligations") under all notes and other documents evidencing the Liabilities, as hereinafter defined, and under all deeds to secure debt, deeds of trust, mortgages, security agreements and other agreements, documents and instruments executed in connection with the Liabilities or related thereto (all such deeds to secure debt, deeds of trust, mortgages, security agreements and other documents securing payment of the Liabilities and all notes and other agreements, documents, and instruments evidencing or relating to the Liabilities and Obligations being herein collectively called the "Loan Documents"). The undertakings of Guarantors hereunder are independent of the Liabilities and Obligations of Borrowers and a separate action or actions for payment, damages or performance may be brought or prosecuted against Guarantors, whether or not an action is brought against Borrowers or to realize upon the security for the Liabilities and/or Obligations and whether or not Borrowers are joined in any such action or actions, and whether or not notice is given or demand is made upon the Borrowers.

Bank shall not be required to proceed first against any Borrower, or any other person, firm or corporation, whether primarily or secondarily liable, or against any Collateral held by it, before resorting to Guarantors for payment, and Guarantors shall not be entitled to assert as a defense to the enforceability of the Guaranty any defense of any Borrower with respect to any Liabilities or Obligations.

2. PARAGRAPH HEADINGS AND GOVERNING LAW. Guarantors agree that the paragraph headings in this Guaranty are for convenience only and that they will not limit any of the provisions of this Guaranty. Guarantors further agree that this Guaranty shall be governed by and construed in accordance with the laws of the State of Texas and applicable United States federal law. Guarantors further agree that this Guaranty shall be deemed to have been made in the State of Texas at Bank's address indicated herein, and shall be governed by, and construed in accordance with, the laws of the State of Texas, or the United States courts located within the State of Texas, and is performable in Dallas, Dallas County, Texas.

3. DEFINITIONS.

A. "Liability" or "Liabilities" as used herein shall include without limitation, all liabilities, overdrafts, indebtedness, and obligations of Borrowers to Bank, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, contractual or tortious, liquidated or unliquidated, arising by operation of law or otherwise, now or hereafter existing, or held or to be held by the Bank for its own account or as agent for another or others, whether created directly, indirectly, or acquired by assignment or otherwise, including but not limited to all extensions or renewals thereof, and all sums payable under or by virtue thereof, including without limitation, all amounts of principal and interest, all expenses (including attorney's fees and cost of collection as specified) incurred in the collection thereof or the enforcement of rights thereunder or in enforcing this Guaranty (including without limitation, any liability arising from failure to comply with state or federal laws, rules and regulations concerning the control of hazardous wastes or substances at or with respect to any real estate securing any loan guaranteed hereby), whether arising in the ordinary course of business or otherwise, and whether held or to be held by Bank for its own account or as agent for another or others. If Borrowers are a partnership, corporation or other entity the term "Liability" or "Liabilities" as used herein shall include all Liabilities to Bank of any successor entity or entities.

B. "Guarantor" as used herein shall mean Guarantors or any one or more of them. Anyone executing this Guaranty shall be bound by the terms hereof without regard to execution by anyone else. This Guaranty is binding upon Guarantors, their executors, administrators, successors or

A 914

assigns, and shall inure to the benefit of Bank, its successors, endorsees or assigns.

"Guarantors" as used in this instrument shall be construed as singular or plural to correspond with the number of persons executing this instrument as a Guarantor. The pronouns used in this Agreement are in the masculine gender but shall be construed as female or neuter as an occasion may require.

C. "Collateral" means the property subject to a security interest, and includes accounts and chattel paper which have been sold, including but not limited to all additions and accessions thereto, all replacements or substitutes therefor, and all immediate and remote proceeds of the sale or other disposition thereof.

## AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY

4. WAIVERS BY GUARANTORS. Each Guarantor waives notice of acceptance of this Guaranty, notice of any Liability or Obligations to which it may apply, and waives presentment, demand for payment, protest, notice of dishonor or nonpayment of any Liabilities, waiver of notice of intent to accelerate, waiver of notice of acceleration and notice of any suit or the taking of other action by Bank against any Borrower, any Guarantor, or any other person and any other notice to any party liable thereon (including such Guarantor) and any applicable statute of limitations.

Until the indefeasible payment of all Liabilities and Obligations, each Guarantor also hereby waives any claim, right or remedy which such Guarantor may now have or hereafter acquire against each Borrower that arises hereunder and/or from the performance by any Guarantor hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of the Bank against any Borrower or any security which the Bank now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

Each Guarantor hereby agrees to waive the benefits of any provision of law requiring that the Bank exhaust any right or remedy, or take any action, against any Borrower, any Guarantor, any other person and/or property including but not limited to the provisions of the Texas Civil Practice and Remedies Code ss. 17.001, Texas Rules of Civil Procedure Rule 31 and the Texas Business and Commerce Code ss. 34.03, as amended, or otherwise.

Bank may at any time and from time to time (whether before or after revocation or termination of this Guaranty) without notice to any Guarantor (except as required by law), without incurring responsibility to any Guarantor, without impairing, releasing, or otherwise affecting the obligations of any Guarantor, in whole or in part, and without the endorsement or execution by any Guarantor of any additional consent, waiver or guaranty: (a) change the manner, place or terms of payment; (b) change or extend the time of or renew or alter, any Liability or Obligation or installment thereof, or any security therefor; (c) loan additional monies or extend additional credit to any Borrower, with or without security, thereby creating new Liabilities or Obligations the payment or performance of which shall be guaranteed hereunder, and the Guaranty herein made shall apply to the Liabilities and Obligations as so changed, extended, surrendered, realized upon or otherwise altered; (d) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property at any time pledged or mortgaged to secure the Liabilities or Obligations and any offset there against; (e) exercise or refrain from exercising any rights against any Borrower or others (including any Guarantor) or act or refrain from acting in any other manner; (f) settle or compromise any Liability or Obligation or any security therefor and subordinate the payment of all or any part thereof to the payment of any Liability or Obligation of any other parties primarily or secondarily liable on any of the Liabilities or Obligations; (g) release or compromise any liability of any Guarantor hereunder or any Liability or Obligation of any other parties primarily or secondarily liable on any of the Liabilities or Obligations; or (h) apply any sums from any sources to any Liability without regard to any Liabilities remaining unpaid.

5. CREDIT AGREEMENT. Each Guarantor agrees that certain representations set forth in the Credit Agreement (defined below) are applicable to it and that certain covenants set forth in the Credit Agreement are binding upon it.

6. WAIVERS BY BANK. No delay on the part of Bank in exercising any of its options, powers or rights, or any partial or single exercise thereof, shall constitute a waiver thereof. No waiver of any of its rights hereunder, and no modification or amendment of this Guaranty, shall be deemed to be made by Bank unless the same shall be in writing, duly signed on behalf of Bank; and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Bank or the obligations of Guarantors to Bank in any other respect at any other time.

7. TERMINATION. This Guaranty shall continue until written notice of revocation signed by each respective Guarantor or until written notice of the death of such Guarantor shall actually have been received by Bank, notwithstanding change in name, location, composition or structure of, or the dissolution, termination or increase, decrease or change in personnel, owners or partners of any Borrower, or any one or more of Guarantors, provided, however, that no notice of revocation or termination hereof shall affect in any manner rights arising under this Guaranty with respect to Liabilities or Obligations that shall have been created, contracted, assumed or incurred prior to receipt of such written notice pursuant to any agreement entered into by Bank prior to receipt of such notice, and the sole effect of such notice of revocation or termination hereof shall be to exclude from this Guaranty, Liabilities or Obligations thereafter arising that are unconnected with Liabilities or Obligations theretofore arising or transactions entered into theretofore.

8. PARTIAL INVALIDITY AND/OR ENFORCEABILITY OF GUARANTY. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision herein and the invalidity or unenforceability of any provision of any Loan Document as it may apply to any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

In the event Bank is required to relinquish or return the payments, the Collateral or the proceeds thereof, in whole or in part, which had been previously applied to or retained for application against any Liability, by reason of a proceeding arising under the Bankruptcy Code, or for any other reason, this Guaranty shall automatically continue to be effective notwithstanding any previous cancellation or release effected by the Bank.

9. OBLIGATIONS OF GUARANTORS. In the event that any Borrower fails to perform any of the Obligations or pay any of the Liabilities, Guarantors shall upon demand by Bank, promptly and with due diligence pay all Liabilities and perform and satisfy for the benefit of Bank all Obligations.

10. FINANCIAL AND OTHER INFORMATION. Each Guarantor has made an independent investigation of the financial condition and affairs

of Borrowers prior to entering into this Guaranty, and such Guarantor has made and will continue to make an independent appraisal of the creditworthiness of Borrowers; and in entering into this Guaranty such Guarantor has not relied upon any representation of the Bank as to the financial condition, operation or creditworthiness of Borrowers. Each Guarantor further agrees that the Bank shall have no duty or responsibility now or hereafter to make any investigation or appraisal of any Borrower on behalf of such Guarantor or to provide such Guarantor with any credit or other information which may come to its attention now or hereafter.

11. NOTICES. All notices required or permitted to be given to Bank herein shall be sent by registered or certified mail, return receipt requested to the Bank at the address shown in the preamble to this agreement. Each Guarantor agrees that all notices required or permitted to be given to such Guarantor shall be sent by first class mail, postage prepaid United States mail. The parties agree that the notice shall be considered received by a Guarantor five (5) days after being placed in the United States mail.

12. EVENTS OF DEFAULT. An "event of default" shall exist if an Event of Default (as defined in the Amended and Restated Revolving Credit Agreement (as modified, amended, renewed, extended, and restated from time to time, the "CREDIT AGREEMENT") dated of even date herewith, executed by Borrowers and

AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY d-601468.2

Bank, and all modifications, amendments, and restatements thereof) shall occur and be continuing.

13. REMEDIES. Upon the occurrence of any event of default hereunder, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law, and without limiting the generality of the foregoing, Bank may, at its option and without notice of demand: (a) declare any Liability accelerated and due and payable at once; and (b) take possession of any Collateral wherever located, and sell, resell, assign, transfer and deliver all or any part of said Collateral of any Borrower or any Guarantor at any public or private sale or otherwise dispose of any or all of the Collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of said Collateral to be sold, free from and discharged of all trusts, claims, rights or redemption and equities of Borrowers or Guarantors whatsoever; each Guarantor acknowledges and agrees that the sale of any Collateral through any nationally recognized broker-dealer, investment banker or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and (c) set-off against any or all liabilities of any Guarantor all money owed by Bank in any capacity to such Guarantor whether or not due, and also set-off against all other Liabilities of any Borrower or any Guarantor to Bank all money owed by Bank in any capacity to any Borrower or any Guarantor, and if exercised by Bank, Bank shall be deemed to have exercised such right of set-off and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

14. ATTORNEY FEES, COST AND EXPENSES. Guarantors shall pay all costs of collection and reasonable attorneys' fees, including reasonable attorney's fees in connection with any suit, mediation or arbitration proceeding, out of court payment agreement, trial, appeal, bankruptcy proceedings or otherwise, incurred or paid by Bank in enforcing the payment of any Liability or enforcing or preserving any right or interest of Bank hereunder, including the collection, preservation, sale or delivery of any Collateral from time to time pledged to Bank, and after deducting such fees, costs and expenses from the proceeds of sale or collection, Bank may apply any residue to pay any of the Liabilities and Guarantors shall continue to be liable for any deficiency with interest at the rate specified in any instrument evidencing the Liability or, at the Bank's option, equal to the highest lawful rate, which shall remain a liability.

15. PRESERVATION OF PROPERTY. Bank shall not be bound to take any steps necessary to preserve any rights in any of the property of any Guarantor pledged to Bank to secure any Guarantor's obligations against prior parties who may be liable in connection therewith, and each Guarantor hereby agrees to take any such steps. Bank, nevertheless, at any time, may (a) take any action it deems appropriate for the care or preservation of such property or of any rights of Guarantors or Bank therein, (b) demand, sue for, collect or receive any money or property at any time due, payable or receivable on account of or in exchange for any property of any Guarantor, (c) compromise and settle with any person liable on such property, or (d) extend the time of payment or otherwise change the terms of the Loan Documents as to any party liable on the Loan Documents, all without notice to, without incurring responsibility to, and without affecting any of the obligations or liabilities of any Guarantor.

16. COLLATERAL. Bank shall have a properly perfected security interest in all of Guarantor's funds on deposit with Bank to secure the balance of any liabilities and/or obligations that Guarantors may now or in the future owe the Bank. Bank is granted a contractual right of set-off and will not be liable for dishonoring checks or withdrawals where the exercise of Bank's contractual right of set-off or security interest results in insufficient funds in Guarantors' accounts. As authorized by law, Guarantors grant to Bank this contractual right of set-off and security interest in all property of Guarantors now or at anytime hereafter in the possession of Bank, including but not limited to any joint account, special account, account by the entireties, tenancy in common, and all dividends and distributions now or hereafter in the possession or control of Bank.

17. ARBITRATION. ANY CONTROVERSY OR CLAIM BETWEEN OR AMONG THE PARTIES HERETO INCLUDING BUT NOT LIMITED TO THOSE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR INSTRUMENTS, INCLUDING ANY CLAIM BASED ON OR ARISING FROM AN ALLEGED TORT, SHALL BE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (OR IF NOT APPLICABLE, THE APPLICABLE STATE LAW), THE RULES OF PRACTICE AND PROCEDURE FOR THE ARBITRATION OF COMMERCIAL DISPUTES OF J.A.M.S. D/B/A ENDISPUTE, INC. ("J.A.M.S."), AND THE "SPECIAL RULES" SET FORTH BELOW. IN THE EVENT OF ANY INCONSISTENCY, THE SPECIAL RULES SHALL CONTROL. JUDGMENT UPON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. ANY PARTY TO THIS AGREEMENT MAY BRING AN ACTION, INCLUDING A SUMMARY OR EXPEDITED PROCEEDING, TO COMPEL ARBITRATION OF ANY CONTROVERSY OR CLAIM TO WHICH THIS AGREEMENT APPLIES IN ANY COURT HAVING JURISDICTION OVER SUCH ACTION.

A. SPECIAL RULES. THE ARBITRATION SHALL BE CONDUCTED IN THE CITY OF THE BORROWERS' DOMICILE AT THE TIME OF THIS AGREEMENT'S EXECUTION AND ADMINISTERED BY J.A.M.S. WHO WILL APPOINT AN ARBITRATOR; IF J.A.M.S. IS UNABLE OR LEGALLY PRECLUDED FROM ADMINISTERING THE ARBITRATION, THEN THE AMERICAN ARBITRATION ASSOCIATION WILL SERVE. ALL ARBITRATION HEARINGS WILL BE COMMENCED WITHIN 90 DAYS OF THE DEMAND FOR ARBITRATION; FURTHER, THE ARBITRATOR SHALL ONLY, UPON A SHOWING OF CAUSE, BE PERMITTED TO EXTEND THE COMMENCEMENT OF SUCH HEARING FOR UP TO AN ADDITIONAL 60 DAYS.

B. RESERVATION OF RIGHTS. NOTHING IN THIS AGREEMENT SHALL BE DEEMED TO (I) LIMIT THE APPLICABILITY OF ANY OTHERWISE APPLICABLE STATUTES OF LIMITATION OR REPOSE AND ANY WAIVERS CONTAINED IN THIS AGREEMENT; OR (II) BE A WAIVER BY THE BANK OF THE PROTECTION AFFORDED TO IT BY 12 U.S.C. SEC. 91 OR ANY SUBSTANTIALLY EQUIVALENT STATE LAW; OR (III) LIMIT THE RIGHT OF THE BANK HERETO (A) TO EXERCISE SELF HELP REMEDIES SUCH AS (BUT NOT LIMITED TO) SET-OFF, OR (B) TO FORECLOSURE AGAINST

ANY REAL OR PERSONAL PROPERTY COLLATERAL, OR (C) TO OBTAIN FROM A COURT PROVISIONAL OR ANCILLARY REMEDIES SUCH AS (BUT NOT LIMITED TO) INJUNCTIVE RELIEF, WRIT OF POSSESSION OR THE APPOINTMENT OF A RECEIVER. THE BANK MAY EXERCISE SUCH SELF HELP RIGHTS, FORECLOSE UPON SUCH PROPERTY, OR OBTAIN SUCH PROVISIONAL OR ANCILLARY REMEDIES BEFORE, DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING BROUGHT PURSUANT TO THIS AGREEMENT. AT BANK'S OPTION, FORECLOSURE UNDER A DEED OF TRUST OR MORTGAGE MAY BE ACCOMPLISHED BY ANY OF THE FOLLOWING: THE EXERCISE OF A POWER OF SALE UNDER THE DEED OF TRUST OR MORTGAGE, OR BY JUDICIAL SALE UNDER THE DEED OF

**AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY d-601468.2**

TRUST OR MORTGAGE, OR BY JUDICIAL FORECLOSURE. NEITHER THIS EXERCISE OF SELF HELP REMEDIES NOR THE INSTITUTION OR MAINTENANCE OF AN ACTION FOR FORECLOSURE OR PROVISIONAL OR ANCILLARY REMEDIES SHALL CONSTITUTE A WAIVER OF THE RIGHT OF ANY PARTY, INCLUDING THE CLAIMANT IN ANY SUCH ACTION, TO ARBITRATE THE MERITS OF THE CONTROVERSY OR CLAIM OCCASIONING RESORT TO SUCH REMEDIES.

18. NOTICE OF FINAL AGREEMENT. THIS WRITTEN CONTINUING AND UNCONDITIONAL GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

19. AMENDMENT AND RESTATEMENT. This Guaranty is in amendment and restatement of that certain Continuing and Unconditional Guaranty dated February 27, 1998, executed by Guarantors in favor of Bank.

Dated: February _____, 1999

NATIONSBANK, N.A., a national banking association

By:

**RUSSELL P. HARTSFIELD, SENIOR VICE PRESIDENT**
**Print Name and Title**

**GUARANTORS:**

ADAMS GOLF, INC., a Delaware corporation

By:
Name:
Title:

ADAMS GOLF HOLDING CORP., a Delaware corporation

By:
Name:
Title:

ADAMS GOLF GP CORP., a Delaware corporation

By:
Name:
Title:

ADAMS GOLF MANAGEMENT CORP., a Delaware corporation

By:
Name:
Title:

ADAMS GOLF IP, L.P., a Delaware limited partnership

By: ADAMS GOLF GP CORP., a Delaware corporation,
General Partner

By:
Name:
Title:

**AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY d-601468.2**

A 920

ADAMS GOLF FOREIGN SALES CORPORATION, a
Barbados corporation

By:

                    Name:
                    Title:

ADAMS GOLF RAC CORP., a Delaware corporation

By:
        Name:
        Title:

State of Texas      )
                    )
County of Dallas    )

This instrument was acknowledged before me on February ____, 1999 by _____, _____ of ADAMS GOLF, INC., a Delaware corporation, on behalf of said corporation.

{Seal}                    Notary Public
                            in and for the State of Texas

My Commission Expires        Print Name of Notary

State of Texas      )
                    )
County of Dallas    )

This instrument was acknowledged before me on February ____, 1999 by _____, _____ of ADAMS GOLF HOLDING CORP., a Delaware corporation, on behalf of said corporation.

{Seal}                    Notary Public
                            in and for the State of Texas

My Commission Expires        Print Name of Notary

State of Texas      )
                    )
County of Dallas    )

This instrument was acknowledged before me on February ____, 1999 by _____, _____ of ADAMS GOLF MANAGEMENT CORP., a Delaware corporation, on behalf of said corporation.

{Seal}                    Notary Public
                            in and for the State of Texas

AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY d-601468.2

My Commission Expires          Print Name of Notary

State of Texas     )
                   )
County of Dallas    )

This instrument was acknowledged before me on February ___, 1999 by _____, _____ of ADAMS
GOLF GP CORP., a Delaware corporation, General Partner of ADAMS GOLF IP, L.P., a Delaware limited partnership, on behalf of said
partnership.

(Seal)                  Notary Public
                       in and for the State of Texas

My Commission Expires          Print Name of Notary

State of Texas     )
                   )
County of Dallas    )

This instrument was acknowledged before me on February ___, 1999 by _____, _____ of ADAMS
GOLF FOREIGN SALES CORPORATION., a Barbados corporation, on behalf of said corporation.

(Seal)                  Notary Public
                       in and for the State of Texas

My Commission Expires          Print Name of Notary

State of Texas     )
                   )
County of Dallas    )

This instrument was acknowledged before me on February ___, 1999 by _____, _____ of ADAMS
GOLF RAC CORP., a Delaware corporation, on behalf of said corporation.

(Seal)                  Notary Public
                       in and for the State of Texas

My Commission Expires          Print Name of Notary

A 922

## EXHIBIT 21.1

## ADAMS GOLF, INC., A DELAWARE CORPORATION

### SUBSIDIARIES

The Company conducts its operations through several direct and indirect wholly-owned subsidiaries, including (i) Adams Golf Holding Corp., which holds limited partnership interests of certain indirect subsidiaries of the Company; (ii) Adams Golf GP Corp., which holds capital stock or general partnership interests, as applicable, of certain indirect subsidiaries of the Company; (iii) Adams Golf Direct Response, Ltd., which operates direct-to-consumer sales and advertising activities; (iv) Adams Golf, Ltd., which operates the golf club design, assembly and retail sales business; (v) Adams Golf IP, L.P., which holds the intellectual property rights of the Company, and (vi) Adams Golf Management Corp., which provides management and consulting services to certain of the Company's indirect subsidiaries. A complete list of the Company's subsidiaries at March 15, 1999 is as follows:

Adams Golf, Ltd., a Texas limited partnership Adams Golf Direct Response, Ltd., a Texas limited partnership Adams Golf Holding Corp., a Delaware corporation Adams Golf GP Corp., a Delaware corporation Adams Golf Management Corp., a Delaware corporation Adams Golf RAC Corp., a Delaware corporation Adams Golf IP, L.P., a Delaware limited partnership Adams Golf Foreign Sales Corporation, a Barbados, W.I. corporation Adams Golf U.K., Ltd., a United Kingdom private limited company

**EXHIBIT 23.1**

**INDEPENDENT AUDITORS' CONSENT**

The Board of Directors
Adams Golf, Inc and Subsidiaries.:

We consent to incorporation by reference in Registration Statement 333-58917 on Form S-8 of Adams Golf, Inc. of our report dated January 25, 1999 relating to the consolidated balance sheets of Adams Golf, Inc. and subsidiaries as of December 31, 1997 and 1998 and the related consolidated statements of operations, stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 1998, and the related financial statement schedule, which report is included in the December 31, 1998 Annual Report on Form 10-K of Adams Golf, Inc.

**KPMG LLP**

Dallas, Texas

March 29, 1999

A 924

ARTICLE 5

THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM THE CONSOLIDATED FINANCIAL STATEMENTS FOR ADAMS GOLF, INC. AND ITS SUBSIDIAIRIES FOR THE YEAR ENDED DECEMBER 31, 1998 AND IS QUALIFIED IN ITS ENTIRETY TO SUCH CONSOLIDATED FINANCIAL STATEMENTS.

MULTIPLIER: 1,000

| | |
|---|---|
| PERIOD TYPE | YEAR |
| FISCAL YEAR END | DEC 31 1998 |
| PERIOD END | DEC 31 1998 |
| CASH | 23,688 |
| SECURITIES | 13,084 |
| RECEIVABLES | 3,316 |
| ALLOWANCES | 1,294 |
| INVENTORY | 13,312 |
| CURRENT ASSETS | 58,752 |
| PP&E | 4,356 |
| DEPRECIATION | 888 |
| TOTAL ASSETS | 96,906 |
| CURRENT LIABILITIES | 5,745 |
| BONDS | 0 |
| PREFERRED MANDATORY | 0 |
| PREFERRED | 0 |
| COMMON | 23 |
| OTHER SE | 88,167 |
| TOTAL LIABILITY AND EQUITY | 96,906 |
| SALES | 84,611 |
| TOTAL REVENUES | 84,611 |
| CGS | 21,441 |
| TOTAL COSTS | 31,239 |
| OTHER EXPENSES | 11,967 |
| LOSS PROVISION | 1,464 |
| INTEREST EXPENSE | 71 |
| INCOME PRETAX | 19,693 |
| INCOME TAX | 7,183 |
| INCOME CONTINUING | 12,510 |
| DISCONTINUED | 0 |
| EXTRAORDINARY | 0 |
| CHANGES | 0 |
| NET INCOME | 12,510 |
| EPS PRIMARY | .61 |
| EPS DILUTED | .61 |

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

A 925

07/18/05  16:06 FAX 4160784015                    BERGER & MONTAGUE                    @003/010

JUL 14 '05 09:27 FR COSTCO          425 313 8114 TO 92066233384          P.01/05


**COSTCO**
**WHOLESALE**

999 Lake Drive
Issaquah, WA 98027

DATE: _Apr 28/06_ EXHIBIT NO. _55_
EXAM. OF _Rena Magnusson_
Donna _Gerbrandt CSR(A)_
_Amicus Reporting Group_

DATE:  July 14, 2005 (9:02am)

**NO. OF PAGES BEING SENT:5**
(Including this cover sheet)

TO:          Juli Farris Desper
AT:          Keller Rohrback LLP
PHONE:
FAX:         (206) 623-3384

FROM:        Nina R. Barson
PHONE        (425) 313-6465
FAX:         (425) 313-2053

If problems in transmission, call:
Nina Barson
(425) 313-6465

RE:      In re: Adams Golf, Inc., Securities Litigation - Non-Party Subpoena

COMMENTS: Revised document showing P.O. dates. As discussed, the dates of the
Costco Pos is included in the PO number...positions 4, 5, 6, & 7 provide
the month and day. The year is the same as the Nat'l P.O. Date. Canada
info also attached.

___   NO HARD COPY WILL BE SENT, FAX TRANSMISSION ONLY.

XX    ORIGINAL TO BE SENT BY: U.S. Mail XX
                              Overnight Delivery ___
                              Interoffice Mail ___

The information contained in this facsimile transmission is privileged and confidential, intended only for use of the
person(s) so identified above or its agent. If the reader of this cover page is not the intended recipient or its agent,
you are hereby notified that any dissemination, distribution or copying of this communication or the information
contained herein is strictly prohibited. If you have received this communication in error, please immediately notify
us by telephone, and return this facsimile to us at the address above via the U.S. Postal Service. Thank you.

**COST 0001**

A 926

JUL 14 '05 09:27 FR COSTCO          425 313 8114 TO 92056233384       P.02/05



Writer's Direct Line: (425) 427-7015
FAX: (425) 313-2053

July 14, 2005

VIA FACSIMILE @ (206) 623-3384 & MAIL

Juli Farris Desper
Keller Rohrback LLP
1201 Third Avenue
Suite 3200
Seattle, WA   98101

    Re:  In re Adams Golf, Inc., Securities Litigation - Non-
         Party Subpoena

Dear Juli:

    Pursuant to our telephone conversations, enclosed please
find the spreadsheet entitled "Adams Golf Recap - 1/1/98 thru
4/30/99", which has been revised to include the column "Date
Nat'l PO was Cut." Also enclosed is the Adams Golf Recap 1/1/98
thru 4/30/99 Canada.  All documents are marked "Confidential."

    If you have any questions, please give me a call.

                         Sincerely,

                         Nina R. Barson

                         Nina R. Barson
                         Paralegal

:nb

Enclosures

A 927

ADAMS GOLF RECAP
11/68 THRU 43059

7/13/2005

CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| 1100 | 25326 GRAPHITE SHAFT-FIRM | ADAMS GOLF | 6500612219 | 05/26/98 | 181944 |
| 900 | 25326 GRAPHITE SHAFT-FIRM | ADAMS GOLF | 1750608283 | 05/26/98 | 181945 |
| 40 | 234155 18" CLUB | ADAMS GOLF CLUBS | 1950621003 | 08/19/98 | 183444 |
| 200 | 234157 18" CLUB | ADAMS GOLF CLUBS | 1950821003 | 08/19/98 | 183444 |
| 20 | 234157 19" CLUB | ADAMS GOLF CLUBS | 1950521003 | 08/19/98 | 183444 |
| 60 | 234158 18" CLUB | ADAMS GOLF CLUBS | 1950821003 | 08/19/98 | 183444 |
| 20 | 234156 18" CLUB | ADAMS GOLF CLUBS | 1950821003 | 08/19/98 | 183444 |
| 60 | 235734 13" CLUB | ADAMS GOLF CLUBS | 1950621003 | 08/19/98 | 183444 |
| 2 | 234155 FAIRWAY WOOD-GRAPHITE SHAFT REG. | ADAMS GOLF CLUBS | 9101215039 | 11/20/98 | 185250 |
| 10 | 234155 FAIRWAY WOOD-GRAPHITE SHAFT REG. | ADAMS GOLF CLUBS | 9101215039 | 11/20/98 | 185250 |
| 12 | 234155 FAIRWAY WOOD-GRAPHITE FIRM | ADAMS GOLF CLUBS | 9101215039 | 11/20/98 | 185250 |
| 19 | 234157 FAIRWAY WOOD-GRAPHITE SHAFT REG. | ADAMS GOLF CLUBS | 9101215039 | 11/20/98 | 185250 |
| 6 | 234156 FAIRWAY WOOD-GRAPHITE SHAFT | ADAMS GOLF CLUBS | 9101215039 | 11/20/98 | 185250 |
| 6 | 234166 FAIRWAY WOOD-GRAPHITE SHAFT REG. | ADAMS GOLF CLUBS | 9101215039 | 11/20/98 | 185250 |
| 6 | 234166 FAIRWAY WOOD-GRAPHITE SHAFT REG. | ADAMS GOLF CLUBS | 9101215039 | 11/20/98 | 185250 |
| 41 | 234116 FAIRWAY WOOD-GRAPHITE FIRM | ADAMS GOLF CLUBS | 8101215039 | 11/20/98 | 185250 |
| 7 | 234116 FAIRWAY WOOD-GRAPHITE FIRM | ADAMS GOLF CLUBS | 8101215039 | 11/20/98 | 185250 |
| 10 | 251255 FAIRWAY WOOD-GRAPHITE SHAFT REG. | ADAMS GOLF CLUBS | 9101215039 | 11/20/98 | 185250 |
| 7 | 235151 FAIRWAY WOOD-GRAPHITE SHAFT REG. | ADAMS GOLF CLUBS | 9101215039 | 11/20/98 | 185250 |
| 44 | 234152 FAIRWAY WOOD-GRAPHITE SHAFT REG. | ADAMS GOLF CLUBS | 1961216003 | 11/20/98 | 185251 |
| 7 | 234156 FAIRWAY WOOD-GRAPHITE FIRM | ADAMS GOLF CLUBS | 1961216003 | 11/20/98 | 185251 |
| 7 | 234157 FAIRWAY WOOD-GRAPHITE SHAFT REG. | ADAMS GOLF CLUBS | 1961216003 | 11/20/98 | 185251 |
| 18 | 234156 FAIRWAY WOOD-GRAPHITE SHAFT REG. | ADAMS GOLF CLUBS | 1961216003 | 11/20/98 | 185251 |
| 13 | 234116 FAIRWAY WOOD-GRAPHITE REG. | ADAMS GOLF CLUBS | 1961216003 | 11/20/98 | 185251 |
| 13 | 235224 FAIRWAY WOOD-GRAPHITE FIRM | ADAMS GOLF CLUBS | 1961216003 | 11/20/98 | 185251 |
| 2531 | | | | | |
| 450 | 25926 ADAMS FARWAY WOOD GRAPHITE | ADAMS FARWAY WOOD GRAPHITE | 1750408242 | 3/17/98 | 180265 |
| 300 | 25327 ADAMS FARWAY WOOD STEEL | ADAMS FARWAY WOOD GRAPHITE | 1750408241 | 3/17/98 | 180267 |
| 1195 | 15927 ADAMS FARWAY WOOD STEEL | ADAMS FARWAY WOOD GRAPHITE | 9600408424 | 3/17/98 | 180267 |
| 1297 | 25926 ADAMS FARWAY WOOD GRAPHITE | ADAMS FARWAY WOOD GRAPHITE | 9600408424 | 3/17/98 | 180297 |
| 200 | 25326 ADAMS FARWAY WOOD GRAPHITE | ADAMS FARWAY WOOD GRAPHITE | 9500612226 | 5/1/98 | 181526 |
| 3005 | 25326 ADAMS FARWAY WOOD GRAPHITE | ADAMS FARWAY WOOD GRAPHITE | 1750429142 | 5/1/98 | 181529 |
| 505 | 25326 ADAMS FARWAY WOOD GRAPHITE | ADAMS FARWAY WOOD GRAPHITE | 1750608263 | 6/14/98 | 181702 |
| 500 | 25926 ADAMS FARWAY WOOD GRAPHITE | ADAMS FARWAY WOOD GRAPHITE | 1750608263 | 6/14/98 | 181702 |
| 1100 | 25325 FAIRWAY WOOD GRAPHITE-FIRM | ADAMS FARWAY WOOD W/COVER | 9600625033 | 8/19/98 | 185091 |
| 80 | 234155 GRAPHITE SHAFT-REG. | ADAMS | 1960731004 | 7/21/98 | 182891 |
| 257 | 234157 GRAPHITE SHAFT-FIRM | ADAMS | 1960731004 | 7/21/98 | 182891 |
| 75 | 234157 GRAPHITE SHAFT-REG. | ADAMS | 1960731004 | 7/21/98 | 182891 |
| 197 | 234156 GRAPHITE SHAFT-REG. | ADAMS | 1960731004 | 7/21/98 | 182891 |
| 50 | 234224 GRAPHITE SHAFT-FIRM | ADAMS | 1960731004 | 7/21/98 | 182891 |
| 95 | 234155 GRAPHITE SHAFT-REG. | ADAMS GOLF CLUBS | 1960731005 | 7/21/98 | 182908 |
| 255 | 234156 GRAPHITE SHAFT-FIRM | ADAMS GOLF CLUBS | 1960731005 | 7/21/98 | 182908 |
| 15 | 234157 FAIRWAY WOOD-REG. | ADAMS GOLF CLUBS | 1960731005 | 7/21/98 | 182908 |
| 180 | 234156 GRAPHITE SHAFT-FIRM | ADAMS GOLF CLUBS | 1960731005 | 7/21/98 | 182908 |
| 75 | 234156 GRAPHITE SHAFT-REG. | ADAMS GOLF CLUBS | 1960731005 | 7/21/98 | 182908 |
| 20 | 235224 FAIRWAY WOOD-FIRM | ADAMS GOLF CLUBS | 1960731005 | 7/21/98 | 182908 |
| 1097 | 234155 GRAPHITE SHAFT-FIRM | ADAMS | 9100805903 | 7/22/98 | 182926 |
| 640 | 234156 GRAPHITE SHAFT-FIRM | ADAMS | 9100805903 | 7/22/98 | 182926 |
| 905 | 25G716 GRAPHITE SHAFT-REG. | ADAMS | 9100805903 | 7/22/98 | 182926 |
| 298 | 234156 REGULAR 19" | ADAMS GOLF CLUBS | 9100809005 | 8/1/98 | 183446 |
| 700 | 234155 FIRM 19" | ADAMS GOLF CLUBS | 9100809005 | 8/1/98 | 183446 |
| 59 | 234157 REGULAR 19" | ADAMS GOLF CLUBS | 9100809005 | 8/1/98 | 183446 |
| 523 | 234156 FIRM 19" | ADAMS GOLF CLUBS | 9100809005 | 8/1/98 | 183446 |
| 190 | 234159 REGULAR 19" | ADAMS GOLF CLUBS | 9100809005 | 8/1/98 | 183446 |
| 90 | 2417 19" FIRM 13" | ADAMS GOLF CLUBS | 9100809005 | 8/1/98 | 183446 |
| 395 | 234155 GRAPHITE SHAFT-REG. | ADAMS GOLF CLUBS | 1960914005 | 8/19/98 | 183452 |
| 304 | 234156 GRAPHITE SHAFT-FIRM | ADAMS GOLF CLUBS | 1960914005 | 8/19/98 | 183452 |
| 18 | 234157 FAIRWAY WOOD-REG. SHAFT | ADAMS GOLF CLUBS | 1960914005 | 8/19/98 | 183452 |
| 191 | 234168 GRAPHITE SHAFT-FIRM | ADAMS GOLF CLUBS | 1960914005 | 8/19/98 | 183452 |
| 7 | 234166 GRAPHITE SHAFT-REG | ADAMS GOLF CLUBS | 1960914005 | 8/19/98 | 183452 |
| 35 | 235224 FAIRWAY WOOD-FIRM SHAFT | ADAMS GOLF CLUBS | 1960914005 | 8/19/98 | 183452 |
| 11052 | | | | | |

2000

053

8053

A 928

JUL 14 '05 09:28 FR COSTCO        425 313 8114 TO 92066233384        P.04/05

ADAMS GOLF RECAP
1/1/98 THRU 4/30/99                                                7/13/2001

| | | | | | | |
|---|---|---|---|---|---|---|
| 100 | 25926 | ADAMS TIGHT LIES GRAPHITE | ADAMS TIGHT LIES GRAPHITE | 1760323275 | 3/3/98 | 179968 |
| 100 | 25927 | ADAMS TIGHT LIES STEEL | ADAMS TIGHT LIES GRAPHITE | 1750323275 | 3/3/98 | 179968 |
| 225 | 25928 | ADAMS FAIRWAY WOOD-GRAPHITE | ADAMS FAIRWAY WOOD-GRAPHITE | 9500619200 | 5/20/98 | 181737 |
| 25 | 25925 | TIGHT LIES GRAPHITE SHAFT-FIRM | ADAMS | 1760714158 | 7/8/98 | 182591 |
| 15 | 25929 | TIGHT LIES GRAPHITE SHAFT-FIRM | ADAMS | 1760714156 | 7/8/98 | 182591 |
| 100 | 234153 | GRAPHITE SHAFT-REG | ADAMS | 1960731003 | 7/29/98 | 183068 |
| 100 | 234155 | GRAPHITE SHAFT-FIRM | ADAMS | 1360731003 | 7/29/98 | 183068 |
| 50 | 234157 | GRAPHITE SHAFT-REG | ADAMS | 1950731003 | 7/29/98 | 183068 |
| 100 | 234155 | GRAPHITE SHAFT-REG | ADAMS | 1960731002 | 7/29/98 | 183068 |
| 100 | 234156 | GRAPHITE SHAFT-FIRM | ADAMS | 1360731002 | 7/29/98 | 183068 |
| 25 | 234155 | GRAPHITE SHAFT-REG | ADAMS | 1960731002 | 7/29/98 | 183068 |
| 100 | 234155 | TIGHT LIES GRAPHITE-REG | ADAMS GOLF CLUBS | 1960914006 | 9/10/98 | 183852 |
| 100 | 234156 | TIGHT LIES GRAPHITE-FIRM | ADAMS GOLF CLUBS | 1860914006 | 9/10/98 | 183852 |
| 50 | 234157 | TIGHT LIES GRAPHITE-REG | ADAMS GOLF CLUBS | 1960914006 | 9/10/98 | 183852 |

EX 144
15597

CONFIDENTIAL

COST 0004

A 929

JUL 14 '05.09:28 FR COSTCO          425 313 8114 TO 52065233384          P.05/05

**ADAMS GOLF RECAP**
**1/1/98 THRU 4/30/99**
**CANADA**

| | | | | | |
|---|---|---|---|---|---|
| 60 | 383729 | 3 (13 DEGREE) MEN'S RIGHT - REGULAR FLEX | ADAMS TIGHT LIES | 2560303008 | 186933 |
| 440 | 385729 | 3 (13 DEGREE) MEN'S RIGHT - REGULAR FLEX | ADAMS TIGHT LIES | 0760216158 | 186533 |
| 188 | 299409 | | ADAMS TIGHT LIES (men's & ladies') | 0760326149 | 180552 |
| 304 | 287679 | MEN'S    35 LEFTS, 40 RIGHTS | ADAMS TIGHT LIES (men's & ladies') | 0760326149 | 180552 |
| 992 | | | | | |



COST 0005

** TOTAL PAGE.05 **

A 930

PATTY WALSH

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3

4    IN RE: ADAMS GOLF, INC.  :    CONSOLIDATED

5    SECURITIES LITIGATION     :    C.A. NO. 99-371 KAJ

6    _____X

7

8            ORAL DEPOSITION OF PATTY WALSH

9                 Thursday, May 11, 2006

10

11          The oral deposition of Patty Walsh was

12   held at the law offices of Akin Gump Strauss Hauer

13   & Feld, LLP, 1700 Pacific Avenue, Suite 4100,

14   Dallas, Texas, from 9:41 a.m. to 4:18 p.m., before

15   Jamie K. Israelow, a Certified Shorthand Reporter

16   in and for the State of Texas, Registered

17   Professional Reporter, Certified Realtime Reporter

18   and Certified LiveNote Reporter.

19

20

21          RSA/VERITEXT COURT REPORTING COMPANY

22              1845 Walnut Street, 15th Floor

23                Philadelphia, PA  19103

24          (215)241-1000    (888)777-6690

A 931

Page 148

1                          MS. BRANNEN:  Yes.  Just a few

2    questions.

3                          EXAMINATION

4    BY MS. BRANNEN:

5         Q       Patty, earlier I believe you

6    testified that Patrick Walravens would have known

7    about gray marketing and the Costco issue because

8    it was discussed before the IPO.

9         A       Yes.

10        Q       Is that right?

11        A       Yes.

12        Q       What do you remember about any

13   discussion that Mr. Walravens or anybody else

14   would have been involved in that -- that you know

15   about?

16        A       I remember in at least one instance

17   at a drafting session discussing that -- the whole

18   group of attendees discussed the gray-market

19   issue, you know, in a fact-finding way.

20        Q       Do you recall who attended that

21   drafting session?

22        A       There were quite a few people from

23   Adams.  I guess, Mark Gonsalves, Dallas Rainwater,

24   Darl Hatfield.  Then the underwriters, it was

A 932

Page 149

1    Patrick.  I don't remember if Olga was there or

2    not that day.  I believe she was.  And

3    representatives from both of the other two firms.

4    I just can't remember their names.

5         Q    By firms, you mean the law firms?

6         A    I'm sorry.  Ferris, Baker Watts and

7    NationsBanc Montgomery, as well as legal counsel

8    for one or both of -- or all three of those.  It

9    was a full room.

10        Q    Okay.  Do you remember the substance

11   of those discussions or that discussion, I guess?

12        A    No, not -- I don't remember the

13   specifics.  Just --

14        Q    Do you remember when this drafting

15   session occurred?

16        A    There were quite a number of drafting

17   sessions, so I -- I'm not sure about the timing.

18        Q    Were the company's lawyers at this

19   drafting session?

20        A    Yes.

21        Q    Why would gray marketing have come

22   up?  Why would it have been discussed?

23        A    Everything else did.  We talked about

24   everything with respect to the company, large and

A 933

PATTY WALSH

Page 150

1    small, so it was just a part of the whole process.

2         Q       Okay.

3                        MS. BRANNEN:  That's all the

4    questions I have at this time.

5                        MS. FOX:  Just to clarify.

6                   FURTHER EXAMINATION

7    BY MS. FOX:

8         Q       This is a drafting session for the

9    prospectus?

10        A       Correct.

11        Q       You didn't know the exact date, but

12   can you give me a month?  Was it early, like in

13   April or May, or was it later, in June?

14        A       I would say it was somewhere in the

15   middle.  I would.  I --

16        Q       Why do you happen to remember that?

17        A       Because I can -- I can just pic -- I

18   can picture that room -- those people in

19   attendance.  It may have been the first one I was

20   in.  It may have been the second.  That's --

21   that's why I'm a little conflicted about the

22   timing.

23        Q       Who was Dallas Rainwater?

24        A       He was -- I believe his title was

A 934

OLGA A. PULIDO-CROWE

Page 1

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF DELAWARE

3

4

5    In Re Adams Golf, Inc.        )

6    Securities Litigation         )   No. 99-37 KAJ

7                                   )

8    _____)

9

10

11

12

13

14          DEPOSITION OF OLGA A. PULIDO-CROWE

15              WEDNESDAY, MAY 17, 2006

16

17

18

19

20

21

22          RSA/VERITEXT COURT REPORTING COMPANY
            1845 Walnut Street, 15th Floor
            Philadelphia, PA 19103
23          (888) 777-6690  (215) 241-1000

24

25

A 935

OLGA A. PULIDO-CROWE

Page 7

```
 1      A.   Okay.
 2      Q.   Is there any reason why you can't give your
 3  best testimony today?
 4      A.   No.
 5      Q.   You're not under any physical condition or
 6  taking any medication that would prevent you from
 7  answering my questions truthfully and accurately?
 8      A.   No, I'm not.
 9      Q.   Can you give me your date of birth?
10      A.   8/9/60.
11      Q.   Starting with college, can you give me a
12  brief rundown of your educational background?
13      A.   Graduated from Cal State Stanislaus with a
14  B.A. in business administration, graduated from
15  Harvard Business School in '86, and then started at
16  Lehman Brothers.  I was a summer associate at
17  Lehman Brothers as well during my two -- between my
18  years at business school.
19      Q.   When you were at Lehman Brothers, did you
20  have any sort of ongoing or continuing training or
21  education?
22      A.   Yes.
23      Q.   Can you explain that for me?
24      A.   Ongoing or continuing education?
25      Q.   Any sort of classes that you took.  Just
```

A 936

OLGA A. PULIDO-CROWE

Page 9

1    I believe it was June of '86, working in the mortgage

2    capital area, mortgage -- I'm sorry -- focused on

3    mortgage banks, savings and loans, and thrifts.  And I

4    did that from June until August.

5         Then I went back to business school and

6    started at Lehman Brothers full-time -- I think it was

7    September 1, 1986, and was in the financial

8    institutions group.  I'm not sure if that was called

9    that at the time, but that's -- it focused on banks,

10   savings and loans, financial institutions and

11   insurance companies, that type of thing.

12        I was in that group until 199 -- 1990 or '91.

13   I can't recall.  And at that time, I became a consumer

14   industrial banker out here in San Francisco and

15   focused on large-cap and growth clients based on the

16   West Coast.

17        Q.  And when you started in 1986 at

18   Lehman Brothers, were you not in San Francisco?

19        A.  In New York.

20        Q.  New York.  Okay.

21        As of 1998, what position did you hold with

22   Lehman Brothers?

23        A.  I was a senior vice president, and I was the

24   head of West Coast consumer industrial banking.

25        Q.  And as head of West Coast consumer industrial

OLGA A. PULIDO-CROWE

```
 1    in the sports arena.

 2            In 1997, I believe, we were -- we'd been

 3    talking to Adams Golf.  I don't remember how exactly

 4    it started other than there was a board member that

 5    knew Lehman Brothers well and we had talked to before.

 6    And we knew that Adams Golf was looking at potentially

 7    doing an IPO.

 8        Q.  Do you remember the name of the board member?

 9        A.  Finis Conner.

10        Q.  Okay.

11            (Exhibit No. 152 marked for identification.)

12    BY MS. LELAND:

13            Take a look at this document.  Take your

14    time.

15            Do you recognize this document?

16        A.  Yep.

17        Q.  Could you tell me for the record what this

18    document is?

19        A.  Yes.  It's Lehman Brothers' commitment

20    committee memo.

21        Q.  Who prepared this document?

22        A.  The team working on the Adams Golf IPO.  That

23    would be myself, Patrick Walravens, Sameet Mehta --

24    and I'm reading the names here, the names that are on

25    the "From" comment here.  It's Stu Francis.
```

Page 12

1      Q.  And this is a document from Lehman Brothers'

2  file; is that correct?

3      A.  Yes.  We prepare these.  It's an extensive

4  study of the deal that we're working on, the product

5  that we're working on or that we intend to bring to

6  market.  And this is the approval process, the

7  commitment committee.

8      Q.  So this document was prepared in the ordinary

9  course of business?

10     A.  Yes.

11     Q.  It was kept in your files?

12     A.  Yes.

13     Q.  Could you take a look at Page -- you'll

14 notice there are Bates down at the bottom --

15 Page No. 6028.  And under Section C, about the top

16 half of the page, "Lehman Brothers relationship," can

17 you just go ahead and read that quickly to yourself.

18         (Witness examines document.)

19     A.  Okay.

20     Q.  This paragraph purports to describe how

21 Adams Golf and Lehman Brothers came together.  Is this

22 accurate?

23     A.  Yes.

24     Q.  Okay.  This paragraph mentions, and you also

25 mentioned, that Lehman had done work for Cobra in the

OLGA A. PULIDO-CROWE

Page 13

1   past.

2        Can you describe the work that was done by

3   Lehman Brothers for Cobra?

4        A.   We were the lead underwriting on Cobra Golf's

5   IPO.

6        Q.   And when did that occur?

7        A.   I believe 1993, 1992.  I'm sorry, I don't

8   remember the exact date.

9        Q.   That's perfectly fine.  It was a while ago.

10       What was your role in the Cobra underwriting?

11       A.   Let's see.  I was a member of the team, and

12  actually the lead person had another colleague from

13  the New York office as well.  We were the lead team

14  members on the due diligence and drafting of the

15  document.  We had two managing directors, I think,

16  above us at the time.

17       Q.   And when you say "due diligence," what do you

18  mean by "due diligence," or what was your actual role

19  in the due diligence process?

20       A.   Well, it was -- the due diligence process is

21  a very broad process, and anytime that we consider

22  working with a company, we need to do a lot of work

23  with the company, background checks and delve into the

24  business models and the business strategy of the

25  company.

A 940

OLGA A. PULIDO-CROWE

Page 14

1          So, as a team member on a potential IPO for

2     Cobra Golf, I would be getting to know the company in

3     depth in terms of their products and their strategic

4     plans and their operating policies and procedures,

5     and then I would help draft -- help the company in

6     drafting a prospectus and from the prospective of what

7     does a wall street investor need and want to see.

8          Q.  And as part of your research, you looked at

9     the industry they were involved in as well as the

10    company itself?

11         A.  That's right.

12         Q.  You also mentioned Callaway.

13             What was Lehman's role with Callaway?

14         A.  We did not have a specific role with

15    Callaway.  It was a competitor in the market.  So

16    we -- to my knowledge, none of us banked or covered

17    them in the traditional form of banking.

18         Q.  Okay.  So, no role with Callaway?

19         A.  Right.

20         Q.  Put this aside for right now.

21             MR. CHEPIGA:  Could I just see the documents

22    I gave you?  I just want to make sure -- I can't find

23    something.  I want to make sure it's not here.

24             MS. LELAND:  Oh, sure.

25             MR. CHEPIGA:  Okay.  Thank you.

A 941

OLGA A. PULIDO-CROWE

Page 16

1       Q.   Sorry, I don't mean to be confusing.

2            Were you -- do you know whose file this came

3    from?

4       A.   No, I don't know whose -- whose exact file.

5    It would have been -- we have -- we have a deal file,

6    so I assume it's from a deal file.

7       Q.   I just wasn't sure, because it had the e-mail

8    on the front cover.

9       A.   Oh, okay.  And we -- when we receive notice

10   and they ask for all of our materials, we hand

11   whatever we have over.  And we search.

12      Q.   What were your specific duties in the Adams

13   IPO?

14      A.   My specific duties in the Adams IPO.  Well,

15   I was the senior vice president on the account, and

16   that means it was my responsibility to lead the team.

17   And -- on the entire process of getting to know the

18   company and preparing a commitment committee memo and

19   presenting it to our commitment committee in New York,

20   and do everything that would be needed to do in the

21   execution of a potential IPO and carry that through

22   once we made the decision to go forward with it, carry

23   that through.

24           And I have a team of bankers working with me,

25   and of course I have my senior managing director that

Page 17

1    was part of the team, Stu Francis.

2        Q.   How many people did you supervise as part of

3    the IPO?

4        A.   How many people did I supervise?  I'll say

5    directly supervise.

6        Q.   Okay.

7        A.   And I directly supervised Patrick Walravens

8    and Sameet Mehta, my team.

9        Q.   As far as your role in leading the team, were

10   you involved in the actual research that was being

11   done of Adams in the market?

12       A.   Research that was being done of Adams in the

13   market?

14       Q.   I'm sorry.  I don't want to be vague.

15       A.   Okay.

16       Q.   I'm just trying to get an idea, sort of on a

17   day-to-day basis, of where your role came in.

18            Were you out pounding the pavement?  Were you

19   issuing directives from your office?  Were you on the

20   front lines in communication with people?

21       A.   I was very involved, I believe, in all those

22   things that you mentioned in terms of getting to know

23   the company, canvassing the market in terms of what

24   their positioning was, getting opinions from numerous

25   third-party sources on Adams Golf, on the business and

OLGA A. PULIDO-CROWE

Page 19

1    every line item on this list.

2        Q.  And you approved the list.

3        A.  Yes.

4        Q.  Would that be accurate?

5            At Page 8742, which is 20 of the memo, if --

6    I don't know which is easier.

7        A.  Okay.

8        Q.  Under the topic "Business review," Section C

9    identifies major strategic issues facing the company.

10       A.  Mm-hmm.

11       Q.  Were you involved in compiling the list of

12   strategic issues facing the company?

13       A.  Yes.

14       Q.  What is meant by -- and just briefly, what's

15   meant by "technological change"?

16       A.  Factors that occur in the market that --

17   in this particular case, we would be talking about,

18   are there new materials that are introduced?  Are

19   there new manufacturing processes that are introduced?

20   That kind of thing.

21       Q.  And "supply and demand for product," what is

22   meant by that?

23       A.  Supply and demand for product, can the

24   manufacturer -- in this case, Adams -- get everything

25   that it needs to make the product?  I include that in

A 944

OLGA A. PULIDO-CROWE

Page 20

1    it.  And can it make the product in substantial

2    numbers to meet demand?  Is it creating demand for the

3    product?  Is it meeting that demand?

4        Q.  "Size of market share of competitors."  Seems

5    self-explanatory, but could you go through it quickly?

6        A.  We looked at who else is out there in the

7    golf club market, what are their size, what are

8    their -- in terms of how large are they, how much

9    product do they supply, what's their market share,

10   what types of products, that kind of thing.

11       Q.  And from where did you gather this

12   information?

13       A.  From numerous sources.  Publicly available

14   information.  The major competitors that were publicly

15   traded at the time were Callaway Golf -- and I don't

16   recall if Cobra was still publicly traded or not.  But

17   they also have information on market share

18   information.

19           And then we look at, you know, others that

20   are in the market, survey lots of different sources in

21   terms of an extensive research capacity to who's out

22   there making golf clubs and other sports equipment,

23   that kind of thing.

24           So we would survey that and deem who are the

25   most closely competitive to the company and who's out

A 945

OLGA A. PULIDO-CROWE

Page 22

1      A.   Under this category specifically, I --
2   I don't recall.  I believe most of them are
3   all-encompassing under the major strategic issues.
4   But we would have looked at, you know, can they get
5   enough employees?  You know, what does the market look
6   like here in terms of people that they might be able
7   to hire if their demand was increasing?  Could they
8   get the labor, the workforce to do so?  Would the
9   workforce be trained efficiently enough?  Because to
10  handle the call centers, to handle the custom-made
11  golf-type things, what do they have?
12          That would be some of the things that we
13  would look at.
14      Q.   Do you recall if the topic of gray marketing
15  came up under this category or in any other context?
16      A.   Gray marketing came -- the topic of gray
17  marketing did come up during our discussions.  It
18  wasn't a primary term, you know, that we use.  But the
19  issues of gray marketing did come up and was looked at
20  under these categories.
21      Q.   Who looked at them?
22      A.   Our -- myself and our team.  It's all part
23  of, you know, what is out there in terms of the --
24  what the company is facing and what's material.
25          And I think, for Adams, the primary risk was

OLGA A. PULIDO-CROWE

Page 23

1    new product introduction and competition from

2    competitors, competitive lines of golf clubs.  That

3    was one of the primary risks and most material.

4        Q.  When you say that you and your team looked at

5    gray marketing, what exactly did you do in looking at

6    gray marketing?

7        A.  Well, we did a number of things.  Gray

8    marketing was not -- we weren't saying, "Let's look at

9    gray marketing."  We were saying, "Let's look at the

10   issues surrounding the market for the clubs and how

11   Adams distributes them."

12           And so we did numerous things.  We spoke, of

13   course, to the company and their sales force and their

14   salespeople.  We did due diligence with their

15   customers, their dealers.  We talked to, you know,

16   other -- I guess I have a lot of anecdotal evidence

17   that I would do personally as well and when we look at

18   all of these issues facing Adams.

19           So besides looking at information provided by

20   the company and talking to the company and talking to

21   third parties and verifying what we were learning,

22   there was other anecdotal evidence, I guess you might

23   say, that I know I personally did.

24       Q.  Okay.  Let me go back to a couple of things.

25       A.  Okay.

OLGA A. PULIDO-CROWE

Page 24

1      Q.  You said you spoke with the company and their

2   sales force.

3      A.  Mm-hmm.

4      Q.  Who did you speak with?

5      A.  Well, as part of the due diligence process,

6   you know, we speak with management of the company.

7   And that would have been, I think -- well, I was going

8   to refer to one of the documents we have here, a list

9   of names.

10     Q.  Feel free to refer back.

11     A.  Okay.  Well, if we look at the agenda --

12     Q.  Are you looking at Exhibit 143?

13     A.  Yeah, Page -- is this 153?  Yes.  Page 8724.

14     Q.  Okay.

15     A.  So we spoke with Barney Adams, Jim Farrell,

16  Walt DeVault, Mark Gonsalves -- and I'm just reading

17  from this list -- Dick Murtland, Steve Sanozaro.  And

18  those were the formal discussions.

19         We would also speak to people when we --

20  when we were present at the site.  You know, as you're

21  there, you would talk to people that you would run

22  into, basically, and ask them, "How do you like" --

23  "What do you think?"  "What's going on?"  There were

24  random discussions that we would have that were off

25  the official list of people.

OLGA A. PULIDO-CROWE

Page 25

1    Q.   When you spoke with the folks on the official

2    list, did the topic of gray marketing ever come up?

3    A.   In the -- in the context of what are the

4    risks facing the company and in the context of what --

5    looking at the dealers and the sales process.

6        Again, it wasn't -- gray marketing itself,

7    we didn't -- it's not something that -- it was part of

8    it.  We definitely talked about it, but it wasn't a

9    significant, material issue.  There were a lot of

10   other terms used for that in looking at that issue.

11   I -- my term is "stuffing the channels," that kind of

12   thing.  What are we doing -- that was one of the ways

13   that we would look at that.  And a lot of that would

14   be explored also when we spoke to the -- the retailers

15   and did our due diligence of customers.

16       Am I answering that?

17   Q.   I think so, and I -- I know you're trying,

18   and you're doing a great job.

19   A.   Okay.

20   Q.   When you spoke with the people listed on

21   Page 2 of the memo, 8724, did any of them tell you

22   that gray marketing was affecting Adams Golf or that

23   it wasn't affecting Adams Golf?  Just trying to get

24   the idea of the nature of the communications.

25   A.   Was affecting?  I mean, I wouldn't use that

A 949

OLGA A. PULIDO-CROWE

Page 26

1    term, "affecting." Gray marketing is a factor in --

2    in manufacturing and retailing. It's something that

3    everybody faces. How do the products get to

4    unauthorized markets? It's in the newspapers every

5    day. We see it with videos and CDs and, you know,

6    rip-offs here and there of -- how did that movie

7    get -- you know, DVD get out there on a movie that

8    hasn't been released yet? It's an issue that just

9    about everybody faces.

10            So, yes, it was discussed and mentioned in

11   that respect.

12       Q.  When you were doing your work with Cobra,

13   was gray market an issue back then?

14       A.  It's not -- I don't like the term "issue."

15   It's a -- something that's present definitely in the

16   market.

17            So I would say, for Cobra, you know, where

18   the clubs were showing up, yes, that was discussed and

19   how would people get them. It was more in the context

20   of, Are these knockoffs? You know, what is it that's

21   out there? And are there knockoffs being made or

22   fakes? You know, that kind of thing, that -- and

23   who's doing it, and is that a huge problem? How do

24   you protect your name, your brand from these rip-offs,

25   like the Gucci bags that are not real Gucci bags, that

A 950

OLGA A. PULIDO-CROWE

Page 27

1    kind of thing?

2            You know, that was a lot of the context that

3    was -- that we discussed that kind of thing.

4        Q.  And at the time that you were working with

5    Cobra, did they actually have product in the gray

6    market?

7        A.  I don't -- I don't recall.  I would --

8    I guess I don't recall.  I would assume, because

9    almost everybody has that issue.

10       Q.  Okay.  At the time of the Adams IPO -- let me

11   rephrase that.

12           At the time you were working with Adams to do

13   the underwriting, were you aware of any Adams product

14   in the gray market?

15       A.  We were -- we discussed the Costco issue,

16   that clubs had appeared at a Costco.  I don't remember

17   the location, but someone had seen some -- what were

18   purported to be Adams Golf clubs at a Costco.

19       Q.  Do you recall when this discussion occurred?

20       A.  I don't recall exactly, but it was during

21   our -- probably one of our drafting sessions or one of

22   our due diligence calls.

23       Q.  And these drafting sessions occurred in April

24   of 1998; is that correct?

25       A.  I would have to refer back to the schedule to

OLGA A. PULIDO-CROWE

Page 28

1    confirm that it was April 19 --

2        Q.   And I think I've got some documents in here

3    somewhere.

4        A.   Okay.

5        Q.   Do you recall who it was from Adams who

6    advised you that the clubs were at Costco?

7        A.   My recollection of exactly whom it was is

8    unclear.  I can't say if it was Barney, if it was

9    Mark, if it was Jim.  I don't remember who exactly it

10   was, but I do remember discussing the issue.

11       Q.   Can you take a quick look back at

12   Exhibit 152 --

13       A.   Okay.

14       Q.   -- at Page 3 of the memo, which is

15   Bates-number Page 6028.

16       A.   Okay.

17       Q.   Paragraph D, "Due diligence."

18       A.   Okay.

19       Q.   Could you go ahead and read that.

20            (Witness examines document.)

21       A.   March 24th.  Okay.

22            (Witness examines document.)

23            Okay.

24       Q.   Does that paragraph refresh your

25   recollection --

Page 29

```
 1      A.  Yes.

 2      Q.  -- concerning --

 3          MR. CHEPIGA:  Let her finish the question.

 4          THE WITNESS:  Oh.

 5   BY MS. LELAND:

 6      Q.  In looking at this, can you now pinpoint a

 7   date when the discussion of gray marketing that you

 8   just mentioned occurred?

 9      A.  I can't pinpoint an exact date other than to

10   say it might have been March 24th, April 21st,

11   April 27th.

12      Q.  Do you believe it was at one of these

13   meetings identified here?

14      A.  Yes.

15      Q.  Okay.  And what exactly, to the best of your

16   recollection, was discussed concerning the gray

17   marketing?

18      A.  There was -- the focus was Costco, that the

19   clubs found at -- believed to have been found at

20   Costco.  And we asked, "How did they get to Costco?

21   Do you know how they got to Costco?"

22          And the company thought they -- thought they

23   might know how they got there, but they weren't sure

24   and they were going to look into it.  It wasn't a

25   large number of clubs.  They thought they knew who --
```

OLGA A. PULIDO-CROWE

Page 30

1    how they got there, and they were going to put a stop

2    to that, that dealer/distributor.  And we talked about

3    filing some type of motion or suit -- and I apologize

4    I don't know the correct term -- with Costco to -- to

5    stop that or find out where they got it, that kind of

6    thing.

7         Q.  Do you recall what dealer/distributor the

8    Adams Golf people thought was selling the clubs to the

9    gray market?

10        A.  No, I don't.  I don't recall.  But it seemed

11   like they suspected it might be one, but I don't

12   remember.

13        Q.  Does King Par ring a bell?

14        A.  No, I'm sorry.  I don't know who.

15        Q.  That's perfectly fine.  I want you to answer

16   to the best that you can.  Don't try to guess.

17        A.  Okay.

18        Q.  Do you recall what customers were interviewed

19   concerning Adams gray marketing?

20        A.  I recall what customers we interviewed when

21   we did -- as part of our due diligence process and

22   discussing with them their entire relationship with

23   Adams Golf.

24        Q.  Which -- can you give me the names of any of

25   those customers?

A 954

OLGA A. PULIDO-CROWE

Page 31

1       A.   I would have to refer to --

2       Q.   That's fine.

3       A.   -- actually, our -- actually, I'm not sure

4    where they would be listed here -- other than our

5    notes.  But I remember Golfsmith being one, because

6    that was another client that we were -- potential

7    client we were talking to.  And there were numerous

8    others, but I have to refer to a list --

9       Q.   Okay.

10      A.   -- to remember names other than Golfsmith.

11      Q.   Okay.  That's fine.  I'm sure somewhere in

12   here, I've got a list.

13           Quickly, off the top of your head, do you

14   recall ever speaking with anyone at WDC Mackenzie?

15      A.   I don't think so.

16      Q.   Okay.  They were the Canadian distributors of

17   the Adams Golf product.

18      A.   Yes.  I do not remember talking to them.

19      Q.   Okay.

20      A.   Canada wasn't a big market.  We were looking

21   at Europe and Asia.

22      Q.   When you were talking with folks at

23   Adams Golf, did you ever talk with Chris Beebe?

24      A.   Chris Beebe?  I have to look at the list of

25   names.

OLGA A. PULIDO-CROWE

Page 34

1    is this a complete list of who was in the working

2    group?

3            MR. CHEPIGA:  As of the date of this

4    document?

5            MS. LELAND:  Sure.

6            THE WITNESS:  I would say as of the date of

7    this document, because we sometimes add names and

8    change information as it gets updated as we go along.

9    BY MS. LELAND:

10       Q.  And that will be my next question, is if you

11   know if this has changed in any way during the IPO

12   process.

13       A.  I -- during the IPO process, I'm sure it was

14   probably updated.  I mean, I don't have them in front

15   of me, but we would always update it.  We start off

16   with has anything changed in the working group, phone

17   numbers, addresses, people being added, that type of

18   thing.

19       Q.  Looking at Page 7, which is Bates-numbered

20   8729, the first person on the list is J. Stuart

21   Francis.  His title here is managing director.

22            What was his role in the IPO?

23       A.  He is the head of the office -- and the

24   contact for Finis Conner, also.  He also knew

25   Finis Conner.  And so he is the most senior person on

OLGA A. PULIDO-CROWE

Page 35

1    the team.

2        Q.   What was his role in the IPO?  What specific

3    duties did he have?

4        A.   Well, he would review the information, was

5    available for advice and guidance on this.  And he

6    also happened to be a scratch golfer, almost scratch

7    golfer.

8        Q.   Was he involved on a day-to-day basis or a

9    little bit more removed from the whole process?

10       A.   A little bit more removed, you know.  I think

11   he met in the initial meeting of the company and the

12   initial pitch for the company, certainly on the

13   commitment committee process and being prepared for

14   the commitment committee, which is an important

15   internal process.  He was very involved with that.

16       Q.   As part of the commitment committee process,

17   in what ways was he involved, to the extent you can

18   recall the details?

19       A.   Well, we have to have a managing director at

20   the -- you know, in charge of -- not in charge, but

21   there needs to be a managing director on the team.

22   I wasn't a managing director yet.  And so he's there.

23            And he had the board -- I guess the

24   board-level contact, if you will.  I did, too, but he

25   knew -- much longer relationship with Finis, and also

OLGA A. PULIDO-CROWE

Page 36

1    knew Barney from this process.

2        Q.  So did he attend meetings?

3        A.  Yes, he would attend some meetings, not all.

4        Q.  Not all?

5        A.  Mm-hmm.

6        Q.  Would it be fair to say he attended the

7    higher-level meetings, not the lower-level meetings?

8        A.  Higher-level meetings?

9        Q.  Just trying to get an idea.

10       A.  He -- that might be a fair characterization.

11       Q.  Did he draft documents?  Was he involved in

12   the drafting and preparation of any of the IPO

13   materials?

14       A.  I don't recall if he was actually at the

15   drafting sessions, but, you know, I would -- he would

16   receive copies and I would ask him to check something

17   or read over something if I felt uncomfortable.  He

18   made a practice -- he reads everything he gets.

19       Q.  Okay.  And you're listed next on this page,

20   followed by Patrick Walravens, who is described as an

21   associate.

22       A.  Mm-hmm.

23       Q.  Was that his position throughout the IPO?

24       A.  I can't recall.  I believe so.  I don't think

25   he was VP yet.

OLGA A. PULIDO-CROWE

Page 37

1      Q.  Okay.  What was his role in the IPO?

2      A.  He was my right arm, if you will, working on

3  the transaction.

4      Q.  Okay.  And I have to ask, can you give me

5  some details?  What do you mean by "right arm"?

6      A.  Well, he was the person I would look to,

7  to make sure, you know, these types of -- help me make

8  sure these types of things were executed, "these type

9  of things" meaning, you know, the drafting sessions

10  and the due diligence request list.  He was part of

11  the team.  It was my primary responsibility, and he

12  would prepare first drafts.  And then I would take it

13  from there or he would -- then he would spell-check

14  and that kind of thing.

15      Q.  And did he ever go out to Adams Golf and meet

16  with the salespeople?

17      A.  He went to Adams Golf, yes.  He was at

18  Adams Golf as part of the due diligence process.

19      Q.  And you were there as well; correct?

20      A.  Yes.

21      Q.  Was he involved in communicating with Adams

22  customers?

23      A.  Yes, as part of our due diligence process.

24      Q.  And you mentioned you spoke with customers as

25  well?

A 959

OLGA A. PULIDO-CROWE

Page 38

```
 1      A.  Yes.
 2      Q.  When he was performing these duties, he was
 3  performing them at your direction; correct?
 4      A.  Yes.
 5      Q.  Okay.
 6      A.  I believe.  I'm not sure what you mean.
 7      Q.  Just, again, trying to figure out who did
 8  what and where the pieces all fit together.
 9      A.  Yeah.
10      Q.  And I'm sorry if I'm being a little confusing
11  with that.  There is really no hidden agenda on this.
12      A.  Okay.  Yep.
13      Q.  Can you think of anything else that his
14  duties in the IPO entailed?
15      A.  Anything else that his duties --
16      Q.  Any memory of anything you had him working on
17  in the IPO.
18      A.  He was involved in the whole process, very
19  much so.  He's a J.D., M.B.A.  Excellent credentials.
20  He was very good.  I knew he was very thorough.
21      Q.  And how often did the two of you communicate
22  concerning the IPO?
23      A.  I don't recall, you know.  If you have
24  records on that -- but I would say daily.
25      Q.  Okay.  How did you communicate?  By phone?
```

A 960