# Appendix
# A961-A1040

OLGA A. PULIDO-CROWE

Page 40

1        A.   I don't recall.  You should have everything.

2   Everything we have, you have.

3        Q.   Okay.  Going back to the working group list,

4   the next person -- forgive me if I don't pronounce his

5   name right.  Sameet Mehta?

6        A.   Mehta.

7        Q.   Mehta.

8             What was his role in the IPO?

9        A.   He was a financial analyst.  So he was in

10  charge of running the numbers, putting books together,

11  also attend meetings, also help out on due diligence.

12       Q.   And he was in the San Francisco office?

13       A.   Yes.

14       Q.   How often did you communicate with him?

15       A.   Quite often as well.

16       Q.   How did you communicate?  By phone?  By

17  e-mail?

18       A.   By phone.  In meetings.  He sat -- I could

19  see him from where I sat, so -- in the office.  So

20  there's a lot of communication in the team.  A team in

21  a deal like this are always talking.

22       Q.   What was Marc Paley's role in the IPO?  The

23  top of the next page.

24       A.   He was a head of equity capital markets.

25       Q.   What does that mean?

Page 41

1       A.   So he -- we have a group that interfaces

2   between banking and the equity markets, the

3   salespeople in the -- that sell stock for Lehman

4   Brothers.  And he was the head of that equity capital

5   group.  It's kind of the interface between the sales

6   force and the banking side.

7       Q.   And M. Bradley Smith, what was his role on

8   the IPO?

9       A.   He was the VP from that same group and more

10  of the day-to-day person involved on the IPO.

11      Q.   Do you know if he ever met with the

12  Adams Golf people?

13      A.   Yes, I believe he did.

14      Q.   Okay.  Do you know if he ever traveled,

15  actually, to Adams Golf?

16      A.   I -- I believe he did, but correct me if I'm

17  wrong.  I believe he did.  Because they are very

18  involved --

19      Q.   Okay.

20      A.   -- the equity capital market people.

21      Q.   What was Bernard Picchi's role?

22      A.   Bernard Picchi.  He was the equity research

23  analyst.

24      Q.   What did that entail?

25      A.   Well, he was an independent research analyst,

OLGA A. PULIDO-CROWE

Page 42

1   which would decide -- again, independently -- whether

2   or not he would support the stock.  And he would be

3   issuing a research report, potentially, on the stock

4   after the IPO.

5       Q.  So what were the differences between the

6   New York and San Francisco analysts' duties with

7   respect to the Adams IPO, the differences between

8   Mr. Picchi and Mr. Mehta?

9       A.  Oh, significantly different.  Bernie Picchi's

10  job is to educate investors, institutional investors,

11  and provide an independent look at the company based

12  on his models, his knowledge of the market.

13          So Mehta -- Sameet Mehta was a financial

14  analyst, a junior person that did financial analysis

15  in terms of company comparables and lower-level work

16  than what Bernie Picchi would do.

17      Q.  Lower-level and more internal?  Is that what

18  you're --

19      A.  Let's see.  Sameet Mehta's job is more as a

20  support role for the banking team.

21      Q.  Okay.  That's helpful.  Still trying to

22  figure out how it all works.

23      A.  And the banking team is separate from the

24  equity research team.

25      Q.  And what was Brian Lantier's role?

OLGA A. PULIDO-CROWE

Page 43

1    A.  He was kind of like the -- the support for

2   Bernie Picchi.  An equity research analyst in

3   training.

4    Q.  Okay.

5    A.  He would eventually hope to have his own

6   accounts under coverage.

7    Q.  And how often did you communicate with either

8   Mr. Picchi or Mr. Lantier in the IPO process?

9    A.  Well, we were -- you know, we would --

10  I don't recall if we had -- we had to -- you know,

11  because they are a separate type of group and there is

12  a wall between us, we had to introduce the company to

13  them and they had to do their own analysis and their

14  own independent study.  And we could give them what we

15  had, but they made their own judgments on it.

16         But we would talk to them whenever they asked

17  us questions.  And I don't remember if at the time,

18  if we had a go-between.  We may have, in the form of

19  Brad and Mark.  I don't remember.

20   Q.  So even though they are on the working group,

21  there was something of a wall between the two groups,

22  with separate and defined roles?

23   A.  (Nods head up and down.)

24   Q.  Do you recall whether there was ever a

25  discussion with Mr. Picchi or Mr. Lantier about gray

OLGA A. PULIDO-CROWE

Page 44

1    marketing?

2        A.   I don't recall about whether or not we used

3    the term "gray marketing."  But we would certainly

4    talk to them -- him about any of our concerns or

5    anything like that.  And so most of our focus was on

6    the competition, you know, and what the next product

7    was that was going to be and how the company was doing

8    in that regard.

9            So that's -- that's what I recall.

10            And then he had a separate meeting with the

11    company, which bankers could attend, and then he would

12    explore whatever issues he felt were very relevant.

13    And so I'm sure it was all discussed in the terms of

14    what's important right now to the company in making an

15    assessment of what the most relevant risk factors

16    were.

17        Q.   Okay.  Just to be clear, when I use the term

18    "gray marketing," I know it's referred to by a variety

19    of terms, and "gray marketing" seems to be what we've

20    just started using in this case.

21        A.   Okay.

22        Q.   I think "parallel importing," I believe, is a

23    similar term, referring to any unauthorized

24    distribution, distribution to unauthorized retailers.

25        A.   Okay.

A 965

Page 45

1    Q.  And, going back, do you specifically recall

2  having any discussions of gray marketing, under any

3  term, with Mr. Picchi or Mr. Lantier before the Adams

4  IPO?

5    A.  Again, I'm getting very literal.  I know we

6  discussed it in general.  I can't tell you exactly

7  when or how, but I know we discussed any of the issues

8  that we would have.

9         So, again, I would go back to the

10  competition, what it would look like, where the clubs

11  are going, dealers.  But the gray marketing was --

12  that wasn't a big issue at all.  It happens, you know,

13  that clubs get to be -- you can get a club somewhere,

14  anywhere, no matter what the company does.  They could

15  have the strictest contractual things and somebody

16  somewhere can get a club.

17         And so it wasn't -- that wasn't an issue.

18  We were focused on, Are there dealers?  Are they

19  getting what they need from the company?  Are they

20  happy?  Are they upset with the company?  Is there

21  anything that they don't like about what the company

22  is doing?  And that was our primary focus, because if

23  those dealers no longer wanted to carry Adams Golf,

24  you know, then we would be -- there might be -- that

25  could be an issue.

1      Q.   Oh, sure.

2      A.   So we definitely focused on what -- did the

3   third-party checks.  We asked them, we probed them

4   very much.  So is there anything at all?

5           And the club was being pulled.  Everybody

6   wanted that club.  It was more an issue, could Barney

7   get the clubs to the dealers, you know, in the

8   quantity that they wanted, you know, and in a timely

9   manner?  And then also, how much Barney was going to

10  keep providing the pull, you know, with the brand

11  awareness and brand recognition out there.  Because

12  that all helped the dealers when the name was out

13  there, everybody knew it.  It sold the club for them.

14          So that's the kind of thing that we focused

15  on.

16     Q.   Okay.  So is it fair to say you don't recall

17  having any specific conversations concerning gray

18  market with Mr. Picchi or Mr. Lantier?

19          MR. CHEPIGA:  Are you referring -- using the

20  word "gray marketing," conversations in which they

21  used the word, the phrase "gray marketing"?

22          MS. LELAND:  Or any -- any sale of products

23  or finding products at an unauthorized retailer.

24          THE WITNESS:  Okay.  Now, that kind of thing,

25  we would have had.  I guess I just -- I have a problem

OLGA A. PULIDO-CROWE

Page 47

1    with the "gray marketing" concept.

2    BY MS. LELAND:

3         Q.  And we can refer to it as whatever you would

4    like to refer to it.  But in our complaint and

5    throughout this litigation, "gray marketing" has

6    referred to the unauthorized sale.

7         A.  So, unauthorized.  Yes, we would have

8    discussed that.  And it wasn't -- it wasn't a big

9    issue.  It just -- yes, we knew it was there, we

10   discussed it, and it wasn't material, whatever, a

11   relevant issue that was important to this.

12        Q.  How were you able to determine whether it was

13   relevant or not?

14        A.  Whether --

15        Q.  Whether the gray marketing --

16            MR. CHEPIGA:  One at a time.

17            THE WITNESS:  Okay.

18            MS. LELAND:  Sorry.

19        Q.  How did you determine whether the gray

20   marketing was material or not?

21        A.  We of course first spoke to the company,

22   talked about the distribution channels.  The issue

23   of -- the discussion of Costco came up because of

24   discount warehouses.  And we asked, was it much of a

25   problem?  They said no, there was -- it was an

OLGA A. PULIDO-CROWE

Page 48

 1    isolated incident -- I recall something to that

 2    effect.  My interpretation was it was an isolated

 3    incident and that that person or distributor, whoever

 4    it was that got those clubs there, they were going to

 5    pursue that and put an end to that.

 6         Q.  Do you recall who you spoke with at

 7    Adams Golf about this issue?

 8         A.  It would have been Barney or Mark or --

 9    I don't recall exactly who, but it was a group of many

10    people that were -- that would have been present.

11         Q.  Okay.

12             MR. CHEPIGA:  You were asking her what she

13    did to determine it was material.  Can we let her

14    finish her answer?

15             MS. LELAND:  Sure.

16             THE WITNESS:  Then we -- we interviewed third

17    parties, or their customers and retailers, to look --

18    to look at that.

19             Also, you know, I do a lot of anecdotal-type

20    thing.  Costco was a client of mine, so I was -- I

21    offered the company, like, "Well, do you want me to

22    talk to Costco about this?  I don't know if Costco

23    will tell me, but I can ask them about this."  And it

24    wasn't a big issue.  They said, "No, we'll take care

25    of it," through their -- their process, which was the

A 969

OLGA A. PULIDO-CROWE

Page 49

```
 1    potential litigation of the filing in Texas.  And so
 2    we said, okay, we don't have to do that.
 3            It wasn't a big issue.  Plus, there was
 4    discussion, would people actually buy the clubs at
 5    Costco?  Because if you -- when I was checking with
 6    people, they don't buy clubs at Costco, not at that
 7    price point.  It was a pretty expensive club to buy.
 8    If It's suspect, whether it's a second-quality one or
 9    rip-off in general.
10            Most people, they won't buy basketballs
11    because they think they bounce funny.  They won't buy
12    golf balls because they think they are second-quality.
13    That's the impression in general of some of the sports
14    equipment products.  And when this is such -- it's a
15    high-ticket item, and someone who's a golfer looking
16    to improve their golf swing and invest in this,
17    they're going to make sure that is the product that
18    has the little technology aspects to it that they
19    believe the product has.
20            So -- so it wasn't -- it wasn't going to be
21    an issue.  So many people said, "What?  I wouldn't buy
22    it there.  How do I know that's it, that that's the
23    right product?"
24            So I wasn't -- you know, if it was showing up
25    there, I didn't think it was -- I thought it would
```

A 970

OLGA A. PULIDO-CROWE

Page 50

```
 1    stop, you know, they would put an end to that.
 2    I didn't think there was going to be an issue.  It
 3    wasn't a great number of clubs that were showing up
 4    there.  This was a specialty club.
 5    BY MS. LELAND:
 6        Q.  How did you learn how -- the number of clubs
 7    that were in Costco?
 8        A.  I don't recall knowing the exact number, but
 9    I remember asking about, you know, where it was.  And
10    I just recall it being an isolated incident.
11        Q.  Did anybody from Lehman actually go to a
12    Costco and see the clubs in the store?
13        A.  We did not see them.  I looked.  I was,
14    "Where are they?  Okay, it must be some store."
15    I actually thought maybe it was up in Seattle or
16    something.  Because I didn't see them, so...
17        Q.  So you actually went out to Costco and looked
18    to see?
19        A.  Oh, yeah.
20        Q.  Which Costco did you go to?
21        A.  Let's see.  I would have gone to the
22    San Francisco one.  I -- whenever I was in
23    Los Angeles, I would find -- because Costco and we
24    were -- Lehman Brothers worked on the IPO of Costco --
25    don't quote me; I might be wrong.  But, yes, I'm a
```

Page 51

1    card-carrying member of Costco.  And my husband will

2    not buy any sports equipment there.

3        Q.  Let me finish going through this list and

4    then maybe, depending on how you feel, it would be a

5    good time to take a break.

6        A.  Okay.

7        Q.  What was the role of John Weiss in the IPO?

8            I'm sorry, I skipped ahead.  Page 9.  He

9    appears to be with NationsBank Montgomery.

10       A.  Oh.  He -- I don't recall, but from his title

11   here, he would have been like the Bernie Picchi of

12   NationsBank.

13       Q.  And what was the role of Joe Teklits, if I'm

14   pronouncing that correctly?

15       A.  He's an equity research analyst from

16   Ferris Baker.  The same as Bernie Picchi, similar role

17   as Bernie Picchi.

18       Q.  Okay.  And Dave Turner?

19       A.  I don't know that name.  I don't recall that

20   name, I should say.

21       Q.  Okay.  He was also at Ferris Baker, I

22   believe, and may have been later in the period.

23       A.  Okay.

24       Q.  What kind of communications did Lehman and

25   the other writers -- other underwriters have during

OLGA A. PULIDO-CROWE

Page 52

1    the IPO process?

2        A.  Well, they were our co-managers, so they

3    needed to be present at the drafting sessions and at

4    the due diligence sessions.  And we would include them

5    in -- they were part of the team.  We all worked

6    together.

7        Q.  Was there an exchange of the research that

8    was done by the individual underwriters?

9        A.  I --

10           MR. CHEPIGA:  Object to the form of the

11   question.

12           If you understand it, go ahead.  I don't.

13           MS. LELAND:  Let me try to rephrase it.

14       Q.  You did research at Lehman?

15       A.  Okay.  Equity research?  Because there's

16   equity research, which is the Bernie Picchi,

17   Joe Teklits, that kind of thing.  And that's

18   proprietary; they write their own and they are

19   competing with each other.  So -- you know, so we have

20   the same source in terms of the companies meetings for

21   equity research, but they write their own reports.

22       Q.  Okay.

23       A.  They do so independently.  They come up with

24   their own models, their own everything, if you're

25   talking about equity research.

OLGA A. PULIDO-CROWE

Page 53

1      Q.  And as far as the type of research you were

2  doing, is there a term for that?

3      A.  Well, if you're talking about the due

4  diligence.

5           MR. CHEPIGA:  Due diligence?

6           MS. LELAND:  Yes, just the due diligence in

7  general.

8           THE WITNESS:  Yes, we all do that together.

9  BY MS. LELAND:

10     Q.  And the information was exchanged between --

11     A.  Mm-hmm.  Mm-hmm.

12     Q.  Okay.

13     A.  Oh, I needed to say "yes."

14          MR. CHEPIGA:  Just making sure she got the

15  "yes."

16          Do you want to take a break?  We've been

17  going over an hour.

18          MS. LELAND:  Sure.

19          (Recess taken.)

20          (Exhibit No. 154 marked for identification.)

21  BY MS. LELAND:

22     Q.  Marked as Exhibit 154 is a document Bates UND

23  00134 through -43.  Can you take a look at the

24  document and then let me know if you recognize it.

25          (Witness examines document.)

OLGA A. PULIDO-CROWE

Page 56

1      Q.   Oh, sure.

2           To the best of your recollection,

3    approximately how many drafting sessions were there?

4    Five?  Ten?  Fifty?  Just trying to get a general

5    feel.

6      A.   I -- other than to say several, I don't --

7    I don't know.

8      Q.   "Several" is fine.

9           Can you flip ahead to Page 137.

10     A.   Okay.

11     Q.   About halfway down, right above management

12   presentations, it says:  "Olga is point person on due

13   diligence info for underwritings. "

14     A.   Okay.

15     Q.   Do you recall that topic being discussed at

16   any of the meetings that --

17     A.   "Olga is point person" -- I don't recall it,

18   but I would have said I'm the person collecting -- I'm

19   the lead underwriter there.  So I'm the person that

20   collects things.

21     Q.   So that statement is correct?

22     A.   Yeah.  Myself.  And I would delegate that

23   potentially to Patrick, but -- if I'm not there.

24   Either way, we're one and the same, kind of.

25           (Exhibit No. 155 through 158 marked for

A 975

OLGA A. PULIDO-CROWE

Page 57

1    identification.)

2           MS. LELAND:   Marked as Exhibit 155 is

3    Document UND 6283 through 6287; marked as Exhibit 156

4    is the document Bates-numbered UND 4380 through -84;

5    as Exhibit 157 is the document Bates-numbered

6    UND 06946 through -49; and as Exhibit 158 is the

7    document UND 8076 through -77.

8           Q.   Do you recognize these documents?

9           A.   Yes.

10          Q.   Will you tell me what these documents are?

11          A.   These are the cover letters of information

12   being sent from the company or from Arter, Hadden --

13   I'm not sure how it came, from the company or from

14   Arter, Hadden, but to our attorneys, who then

15   delivered them to us.

16          Q.   And these were prepared in the ordinary

17   course of the underwriting?

18          A.   Mm-hmm, yes.

19          Q.   And these were all part of the due diligence

20   process?

21          A.   Yes.

22          Q.   With respect to Exhibit 155, probably a good

23   place to start, do you recall receiving the documents

24   listed on Page 6284 through -87?

25          A.   Yes.

Page 58

1    Q.  Did you read all of the documents that were

2  provided by the attorneys?

3    A.  Did I read all of the documents?  I would say

4  a substantial portion of them.

5    Q.  Okay.  And did others on the team read the

6  remaining documents?

7    A.  Yes.

8    Q.  What was done with the documents once you

9  received them?

10    A.  They were reviewed, read by team members, and

11  used for reference and retained.

12    Q.  And looking at Exhibit 156, do you recall

13  receiving the documents listed here on Pages 4381

14  through -84?

15    A.  Yes.

16    Q.  Did you review them?

17    A.  Yes.

18    Q.  And what was done with them in addition to

19  reviewing them?

20    A.  If we were -- needed them for reference or we

21  would pull materials out of them, and then they would

22  be retained in the files.

23    Q.  Okay.  Same questions for Exhibit 157.

24    Do you recall receiving the documents listed

25  on Pages UND 6947 through -49?

A 977

OLGA A. PULIDO-CROWE

Page 59

1    A.  157, yes.

2    Q.  And did you read these documents?

3    A.  Yes.  We looked -- we looked through

4  everything.

5    Q.  And were any memos created summarizing the

6  information?

7    A.  I -- I don't recall.  If there was anything

8  of concern, it would be noted and we would pursue that

9  further.

10    Q.  Sitting here now, does any specific item of

11  concern come to mind?

12    A.  I would have to review each -- each line.

13    Q.  Okay.  Let's take a look at Exhibit 158.

14    A.  Okay.

15    Q.  Did you receive the documents listed on

16  Page 8076?

17    A.  Yes.

18    Q.  And do you recall reviewing those documents?

19    A.  Yes.

20    Q.  And what was done with these documents

21  following the review?

22    A.  They would be, again, reviewed, anything

23  noted, and then they would be retained.

24    Q.  Will you go ahead and take some time and go

25  through the list --

OLGA A. PULIDO-CROWE

Page 67

1   if there were others.  Objection.

2          THE WITNESS:  Yeah, I don't know.  It's

3   whatever you guys have in the files.

4          MS. LELAND:  She also said they keep very

5   good records and if it happened, it should be here.

6          MR. CHEPIGA:  If you pulled everything that's

7   relevant to show her.

8          (Exhibit No. 159 marked for identification.)

9          MS. LELAND:  Marked as Exhibit 159 is the

10  document Bates-numbered UND 00283 to -84.

11         THE WITNESS:  Okay.

12  BY MS. LELAND:

13     Q.  Do you recognize this document?

14     A.  No.

15     Q.  Do you recognize the handwriting in this

16  document?

17     A.  No.  Curious, whose is it?  Sorry.

18     Q.  The document purports to reflect a meeting

19  dated July 9th of 1998 with Daryl and Mark from the

20  company.  I'm looking at the top of Page 284.  It

21  says:  "Bring down due diligence."

22         Do you recall any such meeting occurring?

23     A.  "Bring down due diligence."  Yes.

24     Q.  Was this some -- did you participate in this

25  meeting?

OLGA A. PULIDO-CROWE

Page 68

1      A.  I believe so, but I can't recall

2  definitively.

3      Q.  Okay.  And by "Daryl and Mark from the

4  company," is that Daryl Hatfield and Mark Gonsalves?

5      A.  Yes.

6      Q.  Do you recall where the meeting was held?

7      A.  July 9th.  No, I do not.

8      Q.  Toward the bottom of Page 284, there is a

9  heading "Litigation front."

10         Do you see that?

11     A.  Mm-hmm.

12     Q.  It says:  "File lawsuit against British

13  distributor to void relationship.  They had declined

14  to sign agreement."

15         Do you see that language?

16     A.  Yes.

17     Q.  Do you know what that refers to?

18     A.  I don't recall.

19     Q.  Okay.  Do you recall whether, during this

20  meeting, any other litigation was discussed?

21     A.  Repeat the question.

22     Q.  Do you recall -- let me rephrase the

23  question.

24         Do you recall whether during this meeting on

25  July 9th, whether the company's litigation with Costco

OLGA A. PULIDO-CROWE

1    was discussed?

2         A.   I don't recall specifically.

3              (Exhibit No. 160 marked for identification.)

4    BY MS. LELAND:

5         Q.   Marked as Exhibit 160 is Bates UND 06019

6    through -22.

7              Do you recognize this document?

8         A.   Yes.

9         Q.   What is this document?

10        A.   It is a summary -- very brief summary of the

11   due diligence that we performed for the Adams Golf

12   IPO.

13        Q.   By "we," do you mean the working team?

14        A.   Yes.

15        Q.   The second item on Page 6020, second heading,

16   is "Customer Calls - summaries circulated to

17   underwriters by caller."

18             Do you recall customer calls?

19        A.   Yes.

20        Q.   Will you explain to me how that worked?

21        A.   We would call the Adams Golf contact at the

22   customer location and speak to them about their

23   relationships with Adams Golf.  And we split up the

24   calls amongst the underwriters.

25        Q.   Which underwriters were the calls divided

OLGA A. PULIDO-CROWE

Page 70

1    among?

2        A.   Well, by -- amongst ourselves and

3    Ferris Baker.

4        Q.   Okay.  And do you know who provided the names

5    of the customers?

6        A.   The names of the -- well, we asked for a list

7    of the top customers from the company.  So they

8    provided the list from which to select the -- the

9    customers, and we randomly selected from the list of

10   customers, focusing on the largest.

11       Q.   To your knowledge, during these customer

12   calls, was the issue of gray marketing ever discussed?

13       A.   Was the issue of gray marketing ever

14   discussed?  It was discussed in the context of the

15   customer's satisfaction with their overall

16   relationship with Adams Golf.  So, to clarify, we

17   would talk about if they had any problems or issues

18   with Adams Golf that we should be made aware of.

19            And so we gave them very open-ended,

20   broad questions so that they could tell us anything

21   and everything and gave them pretty much every

22   opportunity to do that.  And so, in that way, it was

23   discussed.

24       Q.   Okay.  Do you have any specific recollection

25   of a customer call during which gray marketing was

A 982

OLGA A. PULIDO-CROWE

Page 71

1  discussed?

2      A.  In terms of, like, if I go through each one

3  of these -- I would say -- well, with each of the

4  accounts that Lehman Brothers handled directly, I know

5  I was involved on those calls.  And it would -- we

6  would discuss any types of issues, again, they would

7  have with Adams, with any -- you know, what they saw

8  in competition.

9          So again, your definition -- your term of

10  "gray marketing," from the broadest sense, using that

11  definition -- in the broadest sense, sure, it was

12  discussed with each of these clients.

13      Q.  Were these --

14      A.  With each of these customers.  Excuse me.

15  Because we're talking about -- "You get your supply

16  from Adams Golf."  You know, "Are you" -- "what are

17  they doing with you?"  "How happy are you with

18  Adams Golf?"  What are they doing from their

19  perspective for protecting the brand and getting the

20  product to them and servicing them?

21          So that would cover a broad range of issues,

22  including the gray marketing issue.  If they had a

23  problem, they would have said something to us.

24      Q.  And do you recall anyone expressing concern

25  over the sale of clubs in Costco during these calls?

OLGA A. PULIDO-CROWE

Page 72

1      A.  Not at all.

2          (Exhibit No. 161 marked for identification.)

3   BY MS. LELAND:

4      Q.  Exhibit 161 is Bates UND 00287 through -315.

5   Go ahead and take a look at this and let me know if

6   you recognize it.

7      A.  Yes.  This is a compilation of customer due

8   diligence questionnaires, answers from -- that we

9   received from the company -- from the customers,

10 · pardon me -- that we receive from the customers when

11  performing due diligence.

12     Q.  Great.

13          Were you involved in preparing the

14  questionnaire?

15     A.  Yes.

16     Q.  Do you recall who else was involved in

17  preparing the questionnaire?

18     A.  Generally speaking, the team would be

19  involved.

20     Q.  And do these questionnaires correspond to the

21  customer calls listed on the prior exhibit, No. 160?

22          MR. CHEPIGA:  Do you actually want her to go

23  back and compare them?

24          MS. LELAND:  Please.

25          MR. CHEPIGA:  It's a matter of whatever is in

OLGA A. PULIDO-CROWE

Page 77

1      Q.  Do you recall whether you saw it prior to the

2   IPO?

3      A.  Yes.

4      Q.  You mentioned earlier that you were aware

5   that Adams Golf was commencing litigation against

6   Costco.  Is that correct?

7      A.  "Commencing litigation," I'm not sure if

8   that's the correct term, again, just because I don't

9   have the legal background.  But there was something

10  that was going to be done in a legal manner.  That's

11  what I knew.

12     Q.  By Adams against Costco?

13     A.  Yes.

14     Q.  Did you discuss the litigation with anyone at

15  Adams prior to them filing the suit?

16     A.  I believe it was prior, yes.

17     Q.  Who did you discuss this with?

18     A.  I don't recall exactly, but it would have --

19  it was a group of senior management at the company

20  and/or our -- our counsel, underwriters' counsel or

21  their counsel.  It was discussed.

22     Q.  Did you follow the litigation after it was

23  filed?

24     A.  What do you mean by "follow"?

25     Q.  Adams Golf filed a bill of discovery against

A 985

OLGA A. PULIDO-CROWE

Page 78

1    Costco in June of '98.

2        A.   Okay.

3        Q.   Did you have any discussions with anyone at

4    Adams concerning the litigation between June 9th

5    of '98 and July 9th of '98?

6        A.   I believe I did.

7        Q.   Who did you have discussions with?

8        A.   I don't recall.  I can recall conversations.

9    I don't remember who was actually there, but I recall

10   conversations.

11       Q.   And what was said in these conversations?

12       A.   My recollection was discussions to determine

13   whether or not this was a significant issue and

14   whether or not it was -- it was a significant issue.

15   And I remember concluding that it wasn't.

16       Q.   On what basis did you conclude that this was

17   not a significant issue?

18       A.   This type of thing happens all the time with

19   companies.  Costco was not -- it wasn't a big problem.

20   There weren't lots of clubs at Costco's; it was an

21   isolated incident, and it was protection that is done

22   in the normal course of business for -- that

23   Adams Golf would do.  So other golf clubs

24   manufacturers have -- do the same, protecting their

25   patent, that type of thing.  It's not anything

A 986

Page 79

1   different that -- so -- it's not anything different.

2       Q.  Do you know how the suit turned out?

3       A.  Not specifically.  I would have to be

4   prompted.  I believe it was a nonissue.

5       Q.  Would you be surprised to hear the suit was

6   dismissed?

7           MR. CHEPIGA:  Object to the form of the

8   question.

9           THE WITNESS:  What does that mean?

10          MR. CHEPIGA:  It means answer the question,

11  but I think it's a defective question.

12          THE WITNESS:  Would I be surprised to find

13  out that --

14          MS. LELAND:  -- the suit was dismissed.

15          THE WITNESS:  I don't know.

16  BY MS. LELAND:

17      Q.  Have you ever heard that the suit was

18  dismissed?

19      A.  I don't recall.  I just remember it not being

20  a significant issue.

21      Q.  Were people at Adams taking the position that

22  this was not a significant issue?

23      A.  We discussed it thoroughly.  We -- so it

24  was -- it was something that was discussed.  Anytime I

25  hear "legal action," it has to be discussed and

A 987

OLGA A. PULIDO-CROWE

Page 80

1    vetted.  And so the issue was taken seriously; it

2    wasn't, you know, just dismissed.  It was -- but it

3    was fully discussed and vetted with the company and

4    with the underwriters, and we felt it wasn't a

5    significant issue.  I do recall that.

6         I -- I mean, when there is a legal issue,

7    I want to know, you know, what's going on?  Is it

8    something that could impact the company significantly?

9    And we pursue that.  You know, typically they're

10   around patent issues, and this one was not one that

11   was significant.  There were other -- many other

12   factors that were significant, or material.

13        Q.  And those factors being the ones you

14   identified previously that appear in those first

15   couple of exhibits we talked about?

16        A.  Yes, to talk about competition.

17        Q.  Exactly.

18        A.  What's happening there.

19        Q.  Do you recall how you received a copy of that

20   press release?

21        A.  No, I don't.  No, I don't.  But I do remember

22   talking about it and discussing it.

23        Q.  Could you have received it directly from

24   Adams Golf?

25             MR. CHEPIGA:  Object to the form.

A 988

OLGA A. PULIDO-CROWE

Page 81

1           THE WITNESS:  Could I have?

2           MR. CHEPIGA:  That's what I'm objecting to.

3   BY MS. LELAND:

4      Q.  Just trying to find out if it came through

5   your in-house research or if Barney sent it to you.

6           Do you recall seeing a draft of the press

7   release?

8      A.  I don't know if I saw it.  I don't know if I

9   saw a draft.  But Barney contacted us frequently.  You

10  know, he was discussing -- he was one of the most --

11  he talked to us a lot.  We had lots of calls from

12  Barney.  And so I know we discussed a lot of these

13  issues.

14     Q.  What, to your knowledge, was the Adams-Costco

15  litigation intended to accomplish?

16     A.  What was it intended to accomplish?  Repeat

17  that question again.

18     Q.  What was the litigation intended to

19  accomplish?

20     A.  To stop the distribution of clubs wherever

21  they might be at Costco.

22     Q.  In going through the due diligence process,

23  who had the final say on whether or not the presence

24  of clubs in Costco was material?

25     A.  Who had the final say?

A 989

OLGA A. PULIDO-CROWE

Page 82

1      Q.   (Nods head up and down.)

2      A.   It would be a collaborative effort amongst

3   the underwriters and the company, and we would all

4   give our opinion on that.  And then I'm unsure as to

5   who would say it, but if we wanted -- if we felt that

6   it was material, we would put it in there.

7           (Exhibit No. 164 marked for identification.)

8           MS. LELAND:  Marked as Exhibit 164 is

9   Document No. UND 02708.

10          THE WITNESS:  Okay.

11   BY MS. LELAND:

12     Q.   Have you seen this document before?

13     A.   Yes.

14     Q.   What is this document?

15     A.   A summary of the SEC's comments on the

16   prospectus.

17     Q.   Who is Joe Hoffman?

18     A.   I have to look at the working group list.

19   I believe an attorney.

20     Q.   Okay.  Do you recall the approximate date

21   when you saw this memo?

22     A.   No, I don't recall the approximate date, but

23   as a matter of practice, we see the SEC's comments.

24     Q.   Okay.  So, as a matter of practice, you would

25   have seen it around the time the memo was issued;

A 990

OLGA A. PULIDO-CROWE

Page 83

```
1    is that correct?
2        A.  Yes.
3        Q.  Okay.  Take a look, and if you could read on
4    the record Item No. 4.
5        A.  Okay.
6            (Witness examines document.)
7            Okay.
8        Q.  "The staff wanted the company to consider
9    whether disclosure of the Costco matter was
10   necessary."
11       A.  Okay.
12       Q.  What happened when you saw this memo?
13       A.  When I saw that statement, "The staff wanted
14   the company to consider whether disclosure of the
15   Costco matter was necessary"?  Well, your question is,
16   like -- I know -- I don't know what happened when I
17   saw it, but I know what happened with considering
18   whether disclosure of the Costco matter was necessary.
19       Q.  What happened in the consideration?
20       A.  We discussed whether it was necessary and
21   concluded that it was not a material and relevant
22   factor.
23       Q.  Who all was involved in the discussions?
24       A.  I can't recall specific names, but I can
25   recall it was underwriters and -- and senior
```

A 991

OLGA A. PULIDO-CROWE

Page 84

```
 1    management and counsel.

 2        Q.  Okay.  By June 25, 1998, the clubs were in

 3    Costco; correct?

 4        A.  Well, in limited -- what we knew was a

 5    limited basis.

 6        Q.  And Adams had filed their suit against

 7    Costco; correct?

 8        A.  Correct, based on -- yes, okay.  June 9th,

 9    yes.

10        Q.  And nevertheless, everyone decided that it

11    wasn't a material issue?

12        A.  That's right, because Costco -- it was --

13    you could file suit against every person that you

14    found had a club.  You know, people get them in all

15    different manners and different ways.  And, you know,

16    this source was -- it was, you know, going to be shut

17    down.  It wasn't a significant one, a small number of

18    clubs, isolated incident.

19            And it just wasn't a -- it was not a relevant

20    factor to bring it out and highlight it as a separate

21    risk factor.  This was all covered under the risk

22    factors that are in the prospectus, those general

23    terms, competition and what happens, that kind of

24    thing.

25        Q.  Once you learned that the litigation had been
```

OLGA A. PULIDO-CROWE

Page 88

1    big issue.  It was an isolated incident.  So, you

2    know, there weren't huge, long -- there were long

3    discussions that I can tell you in detail about other

4    things, but in this one, it was not material by any

5    means.

6         Q.  Did anyone at Adams attempt to assure you

7    that this was not a big deal?

8         A.  Did anyone attempt to assure me?

9             MR. CHEPIGA:  Object to the form.

10            THE WITNESS:  Okay.

11            MR. CHEPIGA:  Go ahead and answer it.

12            MS. LELAND:  Let me try to rephrase it.

13        Q.  Did anyone at Adams tell you that the

14   presence of clubs in Costco was immaterial?

15        A.  I don't know if they would have used those

16   words.  I know that we talked about it as a group and

17   came to that conclusion.  But no one was forcing that

18   opinion on us, that kind of thing.  I wasn't forcing

19   it on anybody else.

20            (Exhibit No. 165 marked for identification.)

21            (Discussion off the record.)

22            (Recess taken.)

23   BY MS. LELAND:

24        Q.  Marked as Exhibit 165 is a Document UND 02701

25   through -03.

A 993

OLGA A. PULIDO-CROWE

Page 93

1    BY MS. LELAND:

2        Q.  Are you aware of any --

3            MR. CHEPIGA:  I'm just trying to hear the

4    question.

5            Go ahead.

6    BY MS. LELAND:

7        Q.  Are you aware of any other communications

8    between Adams and the SEC on these issues?

9        A.  The phone calls.

10       Q.  Okay.  Can you identify for me the phone

11   calls?

12       A.  No.

13       Q.  Okay.  How do you know the phone calls took

14   place?

15       A.  Well, it's typical in an IPO that there's

16   communication between the counsel and the SEC, so --

17   then she refers to them -- I mean he refers to

18   Carolyn Kurr calling.

19           MR. CHEPIGA:  In 164?

20           THE WITNESS:  In 164.

21   BY MS. LELAND:

22       Q.  And 164 is dated June 25th --

23       A.  Mm-hmm.

24       Q.  -- and 165, the response to the SEC, is dated

25   July 6th.

A 994

OLGA A. PULIDO-CROWE

Page 94

1      A.  Mm-hmm.

2      Q.  Are you aware of any specific calls between

3   the SEC and Adams after the call referred to in the

4   June 25th memo?

5      A.  Am I aware of any specific?

6      Q.  Yes.

7      A.  I can't recall specifically.

8      Q.  Okay.  Did you or anyone else at Lehman ever

9   communicate directly with Carolyn Kurr?

10     A.  Not to my recollection.

11     Q.  Did you or anyone else at Lehman ever

12  communicate directly with anyone at the SEC?

13     A.  Anyone else at Lehman?

14         MR. CHEPIGA:  About Adams Golf?

15         MS. LELAND:  About Adams Golf.

16         THE WITNESS:  I don't recall.

17         (Exhibit No. 166 marked for identification.)

18         MS. LELAND:  Exhibit 166 is a document

19  Bates-numbered UND 5135 through 5184.

20         THE WITNESS:  Okay.

21  BY MS. LELAND:

22     Q.  Do you recognize this document?

23     A.  Yeah.  Yes, it's the summary road show

24  schedule.

25     Q.  Who prepared this document?

OLGA A. PULIDO-CROWE

Page 123

1      Q.  When the underwriting was presented to

2   Lehman's commitment committee for approval, did anyone

3   raise the issue of gray marketing or the Costco issue?

4      A.  Repeat the question.

5      Q.  When the underwriting was presented to the

6   commitment committee meeting at the meeting we just

7   discussed, did anyone raise the issue of -- the Costco

8   or gray marketing issue?

9          (Witness examines document.)

10     A.  In the general sense, we talked about

11  distribution channels and many things regarding

12  distribution channels.

13     Q.  In the more specific sense, was the fact that

14  Adams clubs had turned up at Costco ever mentioned

15  during this meeting?

16     A.  I don't recall.

17     Q.  Was the fact that Adams had filed suit

18  against Costco ever mentioned at this meeting?

19     A.  I don't recall.  I don't recall.

20         MR. CHEPIGA:  Counsel, by -- the meeting was

21  April 28th.

22         MS. LELAND:  Oh, okay.

23     Q.  So as of April 28th -- and I apologize for

24  any confusion -- Costco may not even have been sued by

25  that time.

OLGA A. PULIDO-CROWE

Page 124

1    A.  Oh, okay.  The meeting was on April 28th.

2         MR. CHEPIGA:  If that's accurate.

3         MS. LELAND:  If that's accurate.

4         THE WITNESS:  Okay.  If that date is

5    accurate, then the specific Costco suit was not --

6    would not have been discussed because it didn't

7    happen.

8    BY MS. LELAND:

9    Q.  Are you aware of any reason why the meeting

10   did not happen on April 28th of 1998?

11   A.  No.

12   Q.  Okay.  At Page 6030, going over to Page 6032,

13   under the heading "Issues before the committee, pros

14   and cons," there is a list of cons.

15        Do you recall discussing these issues at the

16   meeting?

17   A.  Yes.

18   Q.  Do you recall any other issues that would

19   fall under the category of cons as used herein that

20   were discussed at that meeting?

21   A.  No, I do not.  We had to be very thorough in

22   this, and we discussed everything that was important

23   and material and negative and we vetted those out.

24   It's important to Lehman to make sure we have

25   everything material, and these are not taken lightly

Page 125

1    by any means.  Every one of these, almost every

2    word -- every word gets examined by our commitment

3    committee.  These are the negatives.

4        Q.  Do you recall how long the meeting lasted?

5        A.  No, I don't exactly recall.  But they are

6    very thorough meetings; they are not brief.  You are

7    on the line at these meetings.

8            Our commitment committee is a very good

9    committee, I'm proud to say.

10       Q.  At Page 10 of the memo, Page 6035, under the

11   heading "Competitive position" --

12       A.  6035.  Okay.

13       Q.  -- about halfway down the paragraph under

14   sub (iii), the memo states that the company's success

15   today can be largely attributed to three factors,

16   Factor 3 being "its ability to deliver high margin

17   quality products to golf retailers."

18           What is meant by that statement?

19       A.  "Its ability to deliver high margin quality

20   products to golf retailers."  It has -- the company

21   has a quality product, which a golfer is looking for,

22   and the company needs to be able to deliver that.  The

23   "high-margin" part is that there is a demand for that

24   product and it's a quality product.  And its -- let's

25   see.

OLGA A. PULIDO-CROWE

Page 146

1    because they don't tell us.  They don't share with us

2    their exact things; they share with us their concerns.

3         Q.  Okay.  Was the concern expressed regarding

4    Tight Lies' appearance in Costco expressed to you by

5    the analysts at any time prior to August 28th?

6         A.  No, I do not believe so.

7         Q.  And were Mr. Lantier and Mr. Picchi on the

8    working group team?

9         A.  They are research analysts for Lehman and

10   part of the -- part of the -- it's separate, banking

11   and research.  So they're there, but they have their

12   own independent reviews.

13        Q.  Okay.  So as of August 28th, they know the

14   Costco issue is a problem in their research report;

15   correct?

16             MR. CHEPIGA:  Object to the form.

17             THE WITNESS:  Correct.

18   BY MS. LELAND:

19        Q.  And this -- the Costco issue is based upon

20   what the memo says here, something they learned of

21   after speaking with golf shops over three months?

22        A.  Correct.

23             MR. CHEPIGA:  Objection.  The document speaks

24   for itself.

25             MS. LELAND:  I'm just trying to figure out --

A 998.1

OLGA A. PULIDO-CROWE

Page 147

1              MR. CHEPIGA:  This is a document she's not

2     involved in the creation of.  I don't know -- I don't

3     know what you're trying to establish through her with

4     this document.

5     BY MS. LELAND:

6         Q.  So although the equity -- the equity analysts

7     were aware of certain information, it wouldn't

8     necessarily flow to the investment banking side?

9         A.  If it were a major concern, it would.

10        Q.  Okay.

11        A.  If it were a major concern, we wouldn't have

12    done the deal.

13        Q.  And at any time prior to doing the deal, did

14    you discuss with either Mr. Lantier or Mr. Picchi the

15    issue of clubs in Costco?

16        A.  I don't recall the clubs in Costco, exactly,

17    but we discussed margins and pricing.

18        Q.  Okay.  How frequently did you communicate

19    with the Lehman analysts?

20             MR. CHEPIGA:  At what period of time?

21             MS. LELAND:  Prior to the IPO.  Let's start

22    there.

23             THE WITNESS:  How frequently?  It's hard to

24    say how frequently.  It's when -- when necessary.

25    But -- that's how I can answer it.  It's when

A 998.2

OLGA A. PULIDO-CROWE

Page 161

```
 1      A.  Yes.

 2      Q.  Did you review the IPO documents for the

 3  prospect -- the prospectuses for other Adams Golf

 4  competitors, like Callaway, specifically?

 5      A.  Yes.

 6      Q.  When you were reviewing those prospectuses,

 7  did you look specifically at their risk factors?

 8      A.  Definitely.

 9      Q.  And was gray marketing mentioned as a risk

10  factor in either of those prospectuses?

11      A.  No.

12      Q.  Do you remember reviewing any other potential

13  competitors to Adams Golf prospectuses or --

14          MR. CHEPIGA:  At the time?

15          MS. MORIATY:  I'm sorry.  At the time of the

16  IPO.

17      Q.  When you were planning for the IPO, did you

18  review any other similar --

19      A.  Yes.

20      Q.  -- companies' prospectuses?

21          MR. CHEPIGA:  Now it's your turn.

22          THE WITNESS:  Yes.

23  BY MS. MORIATY:

24      Q.  And did any of those similar companies'

25  prospectuses include gray marketing as a risk factor?
```

OLGA A. PULIDO-CROWE

Page 166

1    identified related to double shipping?

2          MS. LELAND:  No, in relation to the IPO

3    prospectuses that she looked at.

4          MR. CHEPIGA:  Looked at.  All right.  But she

5    didn't work on all of those; she just consulted

6    various IPOs.

7    BY MS. LELAND:

8      Q.  For the ones that you worked on, at the time

9    of the IPO, were any of those companies faced with the

10   unauthorized distribution of their product through the

11   gray market at locations such as Costco?

12     A.  I can't say for certain specifically, but the

13   issue is certainly there.  Everybody has -- every

14   company I worked with has gray market issues.

15     Q.  Okay.  But you don't recall whether Cobra,

16   for example, had a gray market problem at the time of

17   its IPO?

18     A.  Well, that's really reaching back, but I know

19   we discussed the issue.  Because, again, you wanted to

20   know where they were -- where they were and who was

21   getting ahold of the clubs where and whether or not

22   they were actual Cobra clubs or some knockoff, that

23   kind of thing.

24     Q.  So at the time of Cobra's IPO, were there

25   instances of unauthorized distribution of Cobra clubs?

A 1000

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4      -------------------------------------------

5

6   IN RE:  ADAMS GOLF, INC.    :      CONSOLIDATED

7

8   SECURITIES LITIGATION       :    C.A. NO. 99-371-KAJ

9

10

11     -----------------------------------------

12

13

14          ORAL DEPOSITION OF BRIAN LANTIER

15

16               Monday, June 5, 2006

17

18           The oral deposition of BRIAN LANTIER

19       was held at the Wyndham Syracuse Hotel,

20       6301 Route 298, East Syracuse, New York,

21       from 12:00 noon to 4:59 p.m., before

22       Cynthia A. Sanders, a Certified Shorthand

23       Reporter in and for the State of New York

24       and Registered Professional Reporter.

25

A 1001

Page 16

1    Q    Let's just focus on the phrase after-market

2                                                          16

3    support.

4            In what ways did, to your knowledge, Lehman

5    Brothers provide after-market support to its IPO

6    clients?

7    A    I'm not sure.  I would not have been in a

8    research capacity, so I'm not sure in which regard

9    they were offering -- we were offering support.

10   Q    Now, let me try to get a preview to scope

11   things down at the beginning.

12   A    Um-hmm.

13   Q    Would it be accurate to say that up until

14   the time that the IPO became effective in July of

15   1998, that your primary work was in the area of

16   valuation?

17   A    It's a function of the research analyst

18   role, yes; but not necessarily in valuations as they

19   are assigning value to an IPO price, it was valuations

20   versus the existing market trading price.

21           So there weren't a lot of --  It was not

22   here is 50 IPOs, let's talk about what their prices

23   valuation should be, that would be more of a banking

24   role.  My role was more:  There is a stock trading at

25   $15, should it be trading at 12 or 18, in your

A 1002

1    opinion.

2                                                              17

3         Q    Okay.  During the phase of Lehman's work

4    for Adams Golf, up to the time the offering became

5    effective, what other areas of work did you do other

6    than the type of valuation work that you just

7    described with respect to Adams Golf?

8         A    With respect to Adams Golf; there would

9    have been due diligence.  We did some preliminary due

10   diligence on our side, which was separate, but going

11   on at the same time as investment banking due

12   diligence.

13        Q    Okay.  While you were working on the Adams

14   Golf offering, what was the general nature of your

15   personal interaction, if any, with the investment

16   banking team?

17        A    We spoke fairly regularly about the

18   marketplace; what due diligence I had done, various

19   things that were going on with the company.

20        Q    And all of those people were generally in

21   San Francisco at the time?

22        A    Yes.

23        Q    And where was your office located?

24        A    Manhattan.

25        Q    How did you communicate with the investment

Page 33

```
 1      A      Myself, I was following probably --
 2                                                         33
 3   Actually, working with the estimates and the models,
 4   probably six or eight; in that range.
 5      Q      And were they concentrated in any
 6   particular industry?
 7      A      No, they were across industries; software,
 8   pharmaceutical manufacturing, it was pretty broad.
 9      Q      Did you follow any golf stocks, other than
10   Adams?
11      A      No.
12      Q      Do you have any knowledge as to how many
13   companies Mr. Picchi was following in those days?
14      A      I don't recall; it fluctuated, it probably
15   was within, you know, 10 to 16 or 17.
16      Q      And do you know whether he followed any
17   golf stocks, other than Adams in those days?
18      A      No, there was really only one other golf
19   stock, per se.
20      Q      You're referring to Callaway?
21      A      Callaway.
22      Q      And how did your role differ, if at all,
23   from Mr. Picchi's with respect to following Adams?
24      A      Bernie was our --  The head of our group,
25   the growth stock group, and I was a --  I don't even
```

A 1004

1    recall what my title was at the time, but it would

2                                                         34

3    have been a junior position to Bernie, all the

4    analysts within the group were juniors.  And my role

5    was to become as indepthly aware of the golf industry

6    as I could, to be the best analyst we could on a golf

7    stock, given the limited amount of information that

8    there was.

9        Q    When you drafted research reports --

10   Strike that.

11            When Lehman created research reports or

12   comments regarding Adams, was there a process by which

13   those reports were generated; did you do the first

14   draft, did Mr. Picchi do the first draft?

15                MR. McEVOY:  I'm just going object as

16                to vague; you can answer.

17       A    Depending upon the report, I would write

18   something and then have Bernie take a look at it,

19   offer feedback, comments, strike this, add this; that

20   type of thing.

21       Q    When price targets were set, which of the

22   two of you set the target?

23                MR. McEVOY:  Just wait for him to

24                finish the question.

25       A    It would have been a collective effort

Page 42

```
 1      Q      By the time you sent this document to
```

42

```
 2
 3   Mr. Picchi at the end of April of 1998, had you heard
 4   the term gray marketing in connection with Adams Golf?
 5      A      April of '98?  I'm not sure when I first
 6   heard the term the gray market.  I've seen that in a
 7   lot of documents, the term gray marketing, and I'm not
 8   sure that's an actual true definition, but it might be
 9   some terminology that I can correct at some point.
10      Q      Well, I would like to get to some
11   terminology that might save us some time.
12      A      Um-hmm.
13      Q      By the time the commitment committee at
14   Lehman had approved going forward with the Adams
15   offering, do you remember having heard of alleged
16   illegal distribution of Adams products?
17      A      I believe it may have come up --  I don't
18   know when it came up.  I remember hearing about it
19   prior to the IPO, and the determination was it was
20   such a small insignificant number of clubs, at the
21   time limited to one retailer, that it wasn't a --
22   going to have a material financial impact.
23      Q      How did you hear of this illegal
24   distribution issue, as best you can recall?
25      A      I can't recall whether it was -- how it
```

A 1006

Page 43

1    came up; I don't know whether it was through pro shop

2                                                            43

3    calls --  We had heard from conversations with pro

4    shops that there were some clubs showing up in big box

5    retailers, but if that was post-IPO or pre-IPO, I

6    can't recall.

7         Q    From what pro shops did you hear that from?

8         A    I can't recall.  I mean, we spoke to

9    dozens, I don't know which pro shop that was.

10        Q    Is it --  Just so we're on solid ground to

11   start with at least:  Is it your recollection that the

12   first way that you heard of an illegal distribution

13   issue was through a pro shop rather than some other

14   source?

15        A    I don't know how we -- how it may have come

16   up first.

17        Q    Do you remember ever discussing the issue

18   of illegal distribution of Adams clubs with the

19   investment banking team prior to the IPO?

20        A    I'm sure we may have discussed it at some

21   point, but I can't recall the --  It was not a high

22   priority, again because of the size.  It was not --

23   There were far more pressing issues.

24        Q    What were they?

25        A    The potential outlook for competition, new

A 1007

Page 44

1    clubs being buzzed by Callaway or Title Lies and

2                                                    44

3    Orlimar's filing; all those were things which we

4    focused a lot more attention on.

5        Q    What did you learn about the number of

6    clubs that made --  Strike that.

7             You said that a determination was made that

8    the number of clubs was small and insignificant.  Who

9    made the determination that the number of clubs was

10   small and insignificant?

11       A    I don't recall who may have made that

12   specific determination, but I remember calling around

13   to Costco's when the issue first came up, and I

14   couldn't find the clubs on the east coast; so we had

15   some understanding that they were not in the east

16   coast.  And as, you know, we went along, we could not

17   locate any of these clubs.  So we assumed that if it

18   was going on, it was not, you know --  In a company

19   that was selling 600,000 clubs a year, a few thousand

20   clubs wasn't going to make or break their year.

21       Q    And was it your conclusion, prior to the

22   IPO, that there were a few thousand clubs out there

23   that had gotten into Costco's?

24       A    No, we didn't have a firm number.  The

25   first time I ever saw a number was in your complaint,

A 1008

1    banking side about whether there had been a discussion

2                                                                    49

3    of disclosure of the Costco distribution issue?

4         A    I don't recall hearing that from them, no.

5         Q    Prior to hearing through the pro shop

6    survey that some Adams clubs had ended up in some

7    Costco stores, had you heard of the concept of gray

8    marketing before?

9         A    I have heard of a gray market, that a gray

10   market exists.  I think gray marketing implies that a

11   company is doing it on purpose, that the company is

12   marketing the products through a gray market, and I

13   think that's a fault in terminology; but that gray

14   market exists, certainly.  I would walk in my local

15   Sam's Clubs and there was racks of Callaway clubs and

16   racks of other clubs.  The retailers are exceptionally

17   skilled at obtaining clubs through the gray market.

18        Q    Had you ever studied unauthorized

19   distribution of products, whether in the gray market

20   or any terminology, in the course of your education

21   and learning of the gray market?

22        A    Not to try and track the products down.  We

23   understood that it happened, but to follow the product

24   through the chain as to how it got there,

25   understandably Costco and Sam's Club are pretty

A 1009

1    tight-lipped on how products get there.

2                                                                50

3        Q    Prior to the IPO, did you discuss, with

4    anyone, whether unauthorized distribution of Adams

5    products could have increased Adams sales?

6                MR. McEVOY:  I'm going to object to

7                the form.  You can answer it, if you can.

8        A    I'm not sure if we discussed it to that --

9    I don't recall discussing it that way.

10       Q    Do you recall, prior to the IPO, discussing

11   with anyone, that unauthorized distribution of Adams

12   products could have an impact on Adams margins?

13       A    I can recall that being an issue that

14   somebody had raised, be it an investor or someone had

15   said:  If Adams clubs end up in Costco like Callaway's

16   Warbird is, what is that going to do?  And we

17   discussed it; that if 3,000 clubs end up in Costco, it

18   might be an issue, but right now it's not an issue.

19   And it happens to everyone.

20       Q    Now, was that a conversation in which

21   Mr. Picchi participated?

22       A    I can't recall.

23       Q    Okay.

24       A    We had different offices, I don't recall

25   whether that was an investor conversation or who

Page 52

```
 1      Q      Were there any prohibitions in those days,
                                                            52
 2

 3   to your knowledge, on you're talking to investors?

 4      A      Post-IPO?

 5      Q      Post-IPO.

 6      A      No.

 7      Q      Pre-IPO?

 8      A      Pre-IPO you're not covering the stock, so

 9   all you're referring to are actual market trends.  You

10   can comment on the industry, but you would not comment

11   on a specific stock without covering it.

12      Q      In the process of researching the company,

13   prior to the IPO and then following it after the IPO,

14   did you, as part of your job, collect articles from

15   the golf industry about the various competitors of

16   Adams and Adams, itself?

17      A      Yes.

18      Q      And did you do anything to make sure that

19   you were all-inclusive in collecting that data --

20   Strike that.  Let me put it another way.

21             What did you do about the way of collecting

22   articles regarding Adams and its competitors?

23      A      There were --  There is three or four trade

24   magazines, we would monitor their web sites, kept

25   track of information that was coming out in industry
```

Page 53

1    publications.  There was also a --  There was a

2                                                    53

3    subscription service that we paid for, I can't

4    remember or recall what the name of it was, but they

5    tracked actual sell-through data of clubs on a monthly

6    basis.

7         Q    I'm sorry, what data?

8         A    Data of clubs being sold through the pro

9    shops.  And I can't remember the name of the company,

10   but we paid for that as well.  And that gave us good

11   indication of where each of the competitors would lie

12   in the competitive market.

13        Q    That was Golf Data Tech?

14        A    Yes, it is.

15        Q    When --  Strike that.

16             Did you do any computer searches to follow

17   the company?

18        A    I assume so, yes.  I would assume we were

19   working on the internet by then.

20        Q    Which were the golfing periodicals that you

21   actually saw in those days?

22        A    I can't recall.  Golf Digest, obviously,

23   and I'm sure there were others; I can't recall.

24             MR. McEVOY:  Don, is this a good time

25             for a quick break, just five minutes?

A 1012

1    that investors had raised the question of seeing Adams

2                                                                    99

3    clubs in Costco stores?

4         A    Um-hmm.

5         Q    And I would like to focus on that.

6              What is your best recollection about who

7    those investors were?

8         A    I can't recall who the specific investors

9    were.  It would not have been --  For the most part

10   when I refer to investors, people who call and spoke

11   to the analysts were typically referred by the

12   institutional salespeople.  So it would have been a

13   fund manager most likely who saw a club somewhere on

14   the west coast and called to say:  Is this an issue?

15   And, you know, it was a factor, but it was a minor

16   factor in my opinion.

17        Q    You mentioned the west coast.  Was that, in

18   fact, a place where you discovered that Costco was

19   acquiring Adams clubs?

20        A    I can't remember.  I can't recall where or

21   how --  We never --  To the best of my --  The most

22   information I know about Costco's relationship with

23   Adams came from reading the information you presented.

24   I never saw --  Costco was extremely tight-lipped.  I

25   could not get any information out of Costco, no matter

1    how many calls I made, as to where they were getting

2                                                              100

3    the clubs.

4        Q    And when you called Costco, what level of

5    the operation did you call?

6        A    I called the individual retailers, I called

7    their investor relations department and didn't get an

8    answer and they denied everything.  Then you would

9    call the individual retail stores, and I hoped to get

10   a hold of someone who would have some information to

11   pass along, and we were not successful in tracking

12   down from where it came from.

13       Q    Was there anyone that was part of the

14   original team that we looked at at the beginning of

15   this deposition who had, as part of his or her

16   responsibilities, helped to identify investor concerns

17   about Adams?

18       A    I don't know if anyone's specific role

19   would have been that job.  Anyone who spoke with an

20   investor, who received feedback, would always --  I

21   mean, we would all have that role to the same degree.

22   If I spoke with someone and someone mentioned:  I'm

23   playing an Orlimar, now I'm playing with an Adams;

24   that's an investor concern, I'm going to pass that

25   along.  But it was not any one specific task, I don't

Page 141

1    serious issue, that Adams is working hard to correct,

2                                                          141

3    we think investors should note that Costco is also

4    selling popular clubs from Callaway and TaylorMade.

5            First of all, what happened by August that

6    caused you to conclude that Adams was working hard to

7    correct the issue?

8        A    I think the assumption that the lawsuit was

9    still pending, which clearly was not correct, but --

10   and the assumption that they were working --  I can't

11   remember if we had already talked at this point about

12   their doing some sort of serial numbering on the

13   shafts, as well as working through their retail system

14   trying to find out how the clubs were getting into

15   Costco.  So I deem that to be working hard to fix

16   it -- fix whatever the problem was.

17       Q    Okay.  And that final sentence:  Callaway

18   and TaylorMade are already in there and has materially

19   altered their outlooks.

20           Why did you put the discussion, that

21   appears under the heading of margins and pricing,

22   under that particular caption?

23       A    The --  The pricing of the clubs at the

24   retail level had historically been at $199 or so.  For

25   Costco to sell them at $149, clearly could have

Page 142

1    impacted --  And this is where it's a little unclear.

2                                                        142

3    By the margins I'm referring to the retailers margins,

4    they're the pro shops margins.  Despite the fact that

5    it creates an unlevel playing field in the retail

6    market, it actually doesn't impact Adams margin

7    because it's already sold at $140 and Adams realizes

8    the revenue.  It really doesn't --  I mean, it does

9    matter, because they want to have one level playing

10   field for all their retailers.  But to Adams, the

11   revenue back to Adams, whether it sells at Costco for

12   $149 or a top level pro shop at $199, at this time it

13   was not -- you know, didn't change their margins at

14   all, it just changed the margins for the underlying

15   retailers.  It could apply margin pressure to them if

16   they had to start lowering their prices, because they

17   were used to making $40, $50 a club, and Costco was

18   willing to give it away, basically, at cost.

19        Q    It was your understanding, was it not, that

20   the level of retailer margins that had been described

21   in the Rocher document made Adams an attractive club

22   for its retailers to sell?

23        A    Yes.

24        Q    So that cutting the retailer margin made

25   Adams, to some greater or lesser degree, less

A 1016

Page 1

| | | |
|---|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT | |
| 2 | FOR THE DISTRICT OF DELAWARE INDEX NO. 99-371-KAJ | |
| 3 | _____x | 09:38:48 AM |
| 4 | IN RE:  ADAMS GOLF, INC. | 09:38:48 AM |
| 5 | CONSOLIDATED SECURITIES LITIGATION | 09:38:48 AM |
| 6 | _____x | 09:38:48 AM |
| 7 | | 09:38:48 AM |
| 8 | DEPOSITION OF MARK GONSALVES | 09:38:48 AM |
| 9 | (Taken by Plaintiff) | 09:38:48 AM |
| 10 | June 6, 2006 | 09:38:48 AM |
| 11 | 9:30 AM | 09:38:48 AM |
| 12 | | 09:38:48 AM |
| 13 | | 09:38:48 AM |
| 14 | | 09:38:48 AM |
| 15 | | 09:38:48 AM |
| 16 | | 09:38:48 AM |
| 17 | | 09:38:48 AM |
| 18 | | 09:38:48 AM |
| 19 | | 09:38:48 AM |
| 20 | | 09:38:48 AM |
| 21 | | 09:38:48 AM |
| 22 | | 09:38:48 AM |
| 23 | | 09:38:48 AM |
| 24 | | 09:38:48 AM |
| 25 | Reported by:  Arne' Davis, CCR-Huseby No: 7299 | 09:38:48 AM |

A 1017

Page 98

```
 1   if you can identify this document, please.          01:49:42 PM

 2       A.   Uh-huh (affirmative) Yes, I recognize      01:49:55 PM

 3   this.                                               01:50:07 PM

 4       Q.   This is the document that you authored     01:50:08 PM

 5   on or about August 26th, 1998, in the normal        01:50:10 PM

 6   course of your duties?                              01:50:14 PM

 7       A.   That's correct.                            01:50:16 PM

 8       Q.   Why was it relevant to point out to        01:50:16 PM

 9   Barney Adams that the Orlimar tri-metal had made    01:50:19 PM

10   an appearance in Costco?                            01:50:25 PM

11       A.   That's a good question.  (Pause) That's    01:50:29 PM

12   a good question.  I don't know what importance we   01:51:02 PM

13   placed on this information.                         01:51:05 PM

14       Q.   Did it potentially help your              01:51:07 PM

15   competitive position vis-a-vis the Orlimar club?    01:51:10 PM

16       A.   I don't think I would go there.   I        01:51:22 PM

17   don't think I would say that.                       01:51:27 PM

18       Q.   Exhibit 260, is Bate stamped UND at        01:51:33 PM

19   5262 through 64.                                    01:51:39 PM

20            (Whereupon Plaintiff's Exhibit Number      01:52:08 PM

21        260 were marked for identification.)           01:52:08 PM

22       Q.   (By Mr. Collins) Have you seen these       01:52:10 PM

23   pages before?                                       01:52:11 PM

24       A.   I recall these pages.                      01:52:45 PM

25       Q.   This is a fax that you sent to Sameet      01:52:47 PM
```

A 1018

Page 99

| | | |
|---|---|---|
| 1 | Mehta? | 01:52:50 PM |
| 2 | A.  Yes. | 01:52:50 PM |
| 3 | Q.  Who was that, Sameet Mehta, Lehman? | 01:53:02 PM |
| 4 | A.  That's correct. | 01:53:05 PM |
| 5 | Q.  And you supplied this information as | 01:53:07 PM |
| 6 | part of Lehman's due diligence for the IPO; is | 01:53:09 PM |
| 7 | that right? | 01:53:18 PM |
| 8 | A.  That would have been my understanding. | 01:53:19 PM |
| 9 | Q.  And you sent this fax on or about April | 01:53:23 PM |
| 10 | 1, 1998, in the normal course of your duties, I | 01:53:26 PM |
| 11 | presume? | 01:53:30 PM |
| 12 | A.  Yes. | 01:53:31 PM |
| 13 | Q.  I noticed the top the ten customers | 01:53:33 PM |
| 14 | don't include WDC MacKenzie, the Canadian | 01:53:36 PM |
| 15 | distributor? | 01:53:44 PM |
| 16 | A.  Yes. | 01:53:51 PM |
| 17 | Q.  Wasn't that one of your top ten | 01:53:51 PM |
| 18 | customers in early 1998? | 01:53:53 PM |
| 19 | A.  As far as volume, I'm not sure where | 01:53:58 PM |
| 20 | they would have ranked.  If they were in the top | 01:54:01 PM |
| 21 | ten, I think the reason why they were not | 01:54:04 PM |
| 22 | included in this list is because they were a | 01:54:07 PM |
| 23 | distributor and not a retailer.  These would be | 01:54:09 PM |
| 24 | the retail accounts.  That might be the | 01:54:13 PM |
| 25 | difference. | 01:54:15 PM |

A 1019

Page 102

| | |
|---|---|
| 1 | during that time. | 01:57:19 PM |
| 2 | Q. Did you discuss with the underwriters | 01:57:20 PM |
| 3 | grey marketing or the Costco issue? | 01:57:26 PM |
| 4 | A. I know that grey marketing in specific | 01:57:31 PM |
| 5 | to the Costco issue was discussed. Who exactly | 01:57:36 PM |
| 6 | the individuals were in the room or rooms during | 01:57:43 PM |
| 7 | those discussions about Costco, that would be | 01:57:46 PM |
| 8 | very hard for me to recall. I think at the end | 01:57:51 PM |
| 9 | of the day we all viewed it for what it was, felt | 01:57:55 PM |
| 10 | that it was like I said earlier, in the scheme of | 01:58:01 PM |
| 11 | where we were, an issue that wasn't, I guess, | 01:58:08 PM |
| 12 | material, is probably the best way for me to say | 01:58:14 PM |
| 13 | it, material to the conversations. | 01:58:17 PM |
| 14 | Q. In your last answer, when you said it | 01:58:25 PM |
| 15 | was discussed, do you mean that it was discussed | 01:58:27 PM |
| 16 | with the underwriters during due diligence | 01:58:31 PM |
| 17 | discussions with respect to the IPO? | 01:58:39 PM |
| 18 | A. I would suspect it was. | 01:58:46 PM |
| 19 | Q. Were there particular -- Do you -- Were | 01:58:53 PM |
| 20 | you interviewed by representatives of the | 01:58:57 PM |
| 21 | underwriters in connection with their due | 01:59:01 PM |
| 22 | diligence? | 01:59:04 PM |
| 23 | A. I don't recall it being an interview, | 01:59:05 PM |
| 24 | per se, but I'm sure there were discussions in | 01:59:07 PM |
| 25 | regard to our company and our products and sales | 01:59:10 PM |

A 1020

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
 2                         -  -  -

 3
    IN RE ADAMS GOLF, INC.  : CONSOLIDATED
 4                          :
    SECURITIES LITIGATION   : C.A. No. 99-371 KAJ
 5
                    ------------------------
 6                  Wednesday, June 7, 2006
 7                  ------------------------

 8

 9         Oral deposition of JOSEPH D. TEKLITS, taken

10    pursuant to notice, was held at the offices of

11    SIMPSON, THACHER, AND BARTLETT, LLP, 425 Lexington

12    Avenue, 28th Floor, New York, New York 10017,

13    commencing at 10:07 a.m. on the above date, before

14    Beth A. Barkocy, Certified Shorthand Reporter and

15    Notary Public.

16

17

18

19

20                         -  -  -

21          RSA/VERITEXT COURT REPORTING COMPANY
                 1845 Walnut Street, 15th Floor
22                  Philadelphia, PA   19103
                 (215)241-1000     (888)777-6690
23

24

25
```

JOSEPH D. TEKLITS

Page 6

```
 1          Q.        First of all, what degree?

 2          A.        Master's of finance.  US Government

 3   after that.

 4          Q.        Doing what?

 5          A.        Finance work for the CIA.  After

 6   that, Ladenburg Thalmann in New York.

 7          Q.        What's that?

 8          A.        Investment banking firm, doing

 9   research.  After that, research at Ferris Baker Watts.

10   After that, research at First Union Securities.

11          Q.        Okay, you've gone far enough.

12                    What kind of research were you doing

13   at the investment banking firm in New York?

14          A.        Equity research.

15          Q.        Just generally, any specific field?

16          A.        Consumer companies.

17          Q.        How long were you there?

18          A.        Eighteen months.

19          Q.        Did you have anything to do with any

20   golf companies during that period?

21          A.        Yes.

22          Q.        Which ones?

23          A.        Ashworth, golf apparel; Family Golf

24   Centers; Cutter and Buck.  That's all I can remember.

25          Q.        What years were those?
```

A 1022

JOSEPH D. TEKLITS

Page 13

```
 1          Q.      Yes.

 2          A.      I can't recall.

 3          Q.      You don't know?

 4          A.      I can't recall.

 5          Q.      Looking in the back at the working

 6   group list on Page 11, of these people, Steven Shea,

 7   senior vice president, Charles Place, vice president,

 8   and Kim Clandenen (ph), senior vice president, who of

 9   them do you think would have been at that meeting, if

10   anyone?

11                  MR. McEVOY:  I'm going to object

12          because it calls for speculation because he

13          doesn't recall being at it.

14                  You can answer if you know.

15                  THE WITNESS:  Of the four people on

16          this page, the two that would have been

17          invited would have been Steven Shea and

18          Charles Place.  I don't know who attended.

19   BY MS. FOX:

20          Q.      While you were at Ferris Baker Watts

21   in the period from sometime in 1997 through until

22   March of '98, were you an analyst of other golf

23   companies, golf-related companies?

24          A.      Yes.

25          Q.      Which ones were those, that you can
```

A 1023

JOSEPH D. TEKLITS

1   remember?

2          A.        During that time, I don't remember

3   specifically.

4          Q.        You don't remember any of them?

5          A.        During those specific years --

6          Q.        '97 and '98.

7          A.        During those specific years, I don't

8   recall exactly what stocks I was covering at that

9   time.

10         Q.        How long were you at Ferris Baker

11  Watts?

12         A.        Four years.

13         Q.        If you take the whole four years, do

14  you remember any other golf companies other than Adams

15  Golf?

16         A.        Yes.

17         Q.        Which ones?

18         A.        Callaway Golf, Ashworth, Cutter and

19  Buck, Family Golf Centers, Lesco, L-e-s-c-o.  That's

20  all I recall.

21         Q.        Some of those you had been analyst

22  for in your job before Ferris Baker; is that right?

23         A.        Yes.

24         Q.        Did you, so to speak, bring those

25  with you?

JOSEPH D. TEKLITS

Page 15

```
 1                   MR. McEVOY:  I'll object to the

 2          form.

 3                   You can answer.

 4                   THE WITNESS:  I'm not clear what

 5          that means.

 6    BY MS. FOX:

 7          Q.       Why was it that if you were an

 8    analyst at one company, that you then became an

 9    analyst for the same public company when you moved?

10          A.       My expertise.  One of the areas that

11    I focused on was the golf industry as an analyst at my

12    previous firm, Ladenburg Thalmann, so when hired at

13    Ferris Baker Watts, one of my duties was to also

14    continue coverage of the golf industry.

15          Q.       At your previous firm, had you had

16    any contact with Adams Golf?

17          A.       I can't recall.

18          Q.       Who is David Turner?

19          A.       My associate at Ferris Baker Watts.

20          Q.       What was his role in this IPO?

21          A.       He worked for me as an associate

22    research analyst, so he supported me.

23          Q.       Doing research?

24          A.       Yes.

25          Q.       Did he do drafting as well?
```

A 1025

JOSEPH D. TEKLITS

Page 16

```
1        A.      Drafting of what?

2        Q.      Drafting of the reports that you

3   did.

4        A.      The research reports?

5        Q.      Yes.

6        A.      Yes.

7        Q.      By 1998, were you familiar with the

8   term gray marketing?

9        A.      Yes.

10        Q.      What was your understanding of that?

11        A.      I can't recall at the time what my

12   understanding of it was.

13        Q.      Why were you familiar with it at

14   that point?

15        A.       It's pretty common in covering

16   consumer brands, covered apparel brands, covered golf

17   brands.  It's pretty common for that term to be part

18   of any discussion of a company's fundamentals.

19        Q.      Did you know of Costco at that

20   point, beginning of 1998?

21        A.      Yes.

22        Q.      Did you associate Costco with gray

23   marketing?

24        A.      I don't recall exactly.

25        Q.      Is it your understanding of gray
```

A 1026

JOSEPH D. TEKLITS

Page 22

```
 1                    THE WITNESS:  No.
 2     BY MS. FOX:
 3          Q.      Were you at those drafting sessions
 4     but didn't participate?  I think it was --
 5          A.      As an analyst, I wouldn't be at
 6     drafting sessions.
 7          Q.      You weren't involved?
 8          A.      I was not.
 9          Q.      Did you participate at all in any of
10     the due diligence that was done for the IPO on behalf
11     of Ferris Baker?
12          A.      On behalf of the Ferris Baker
13     research department, yes; on behalf of the Ferris
14     Baker investment banking department, no.
15          Q.      In other words, you didn't do
16     research for the underwriting?
17                    MR. McEVOY:  Object to form.
18                    THE WITNESS:  For the underwriting
19          team, no.
20     BY MS. FOX:
21          Q.      Was there a strict, like, steel
22     curtain between those two departments at Ferris Baker?
23                    MR. McEVOY:  Object to steel
24          curtain.
25                    MS. FOX:  Whatever we want to call
```

A 1027

JOSEPH D. TEKLITS

Page 23

1           it.

2                     THE WITNESS:  Definition of the word

3           strict is what I'm -- your definition and my

4           definition might be different.

5    BY MS. FOX:

6           Q.      Just explain how it worked, as best

7    you can.

8           A.       There was certainly dialogue between

9    research and investment banking at that time, but

10   there was a true separation of responsibilities when

11   it came to an IPO.  When it came to doing the due

12   diligence and more of the legal due diligence of

13   whether or not we want to be involved in an IPO or in

14   any underwriting, that was up to the investment

15   bankers.

16                    When it came to due diligence of

17   what the company was worth in the public markets at

18   the time that it entered the public markets and what

19   the fundamentals of the company were that we were

20   going to portray to investors was my responsibilities.

21          Q.       If you discovered something that was

22   disturbing about a company before the IPO, would it

23   have been your duty to tell the underwriters?

24                    MR. McEVOY:  Object to form.

25                    THE WITNESS:  Yes.

A 1028

JOSEPH D. TEKLITS

Page 24

```
 1   BY MS. FOX:

 2           Q.      In the underwriting of Adams Golf,

 3   do you remember any such discussions with the

 4   underwriters about anything about Adams Golf?

 5           A.      No.

 6                   MR. McEVOY:  I'm sorry, when you say

 7           "underwriters," you're talking about

 8           underwriters other than Ferris Baker?

 9                   MS. FOX:  I'm talking about the

10           underwriters at Ferris Baker.

11                   MR. McEVOY:  You mean the investment

12           banking side underwriters?

13                   MS. FOX:  Yes.

14                   THE WITNESS:  I don't recall.

15   BY MS. FOX:

16           Q.      Do you consider yourself an

17   underwriter?

18           A.      No.

19           Q.      What would you call yourself,

20   research analyst?

21           A.      Research analyst.

22                   MS. FOX:  Off the record.

23                   (Discussion held off the record.)

24                   (Document Bates Stamped

25           UND 09303-UND 09440 was marked Exhibit-261
```

A 1029

JOSEPH D. TEKLITS

1          Q.      Do you remember doing it at all?

2          A.      I know that -- yes, I do remember

3    that eventually, I did cut the rating, yes; I think I

4    recall that.  No specifics, but yes.

5          Q.      You don't remember why?

6          A.      No.

7                  MS. FOX:  That's all the questions I

8          have.  Thank you.

9                  MR. McEVOY:  I have nothing at this

10         point.

11                 MS. MORIATY:  I need to take a

12         break.  I'll have a few, but I'm not quite

13         ready yet.

14                 (Recess.)

15    BY MS. MORIATY:

16         Q.      I have a few questions for you to

17    follow up.

18                 With a product appearing in Costco,

19    does that invariably mean retailers are less willing

20    to carry that product?

21         A.      No.

22         Q.      Why would retailers still be willing

23    to carry a product that appeared in Costco?

24         A.      If there is continuing to be

25    consumer demand, they're going to continue to cater to

JOSEPH D. TEKLITS

Page 94

1    their customers.  Because it shows up in Costco, very

2    often, is a good sign.  It can be a bad sign; it can

3    mean there's a flood of product in the marketplace and

4    it's going there.  It could be a good sign because

5    Costco wants the best brands; they don't want to carry

6    a brand that consumers don't want, they want to carry

7    a brand that consumers are craving, so quantities

8    differ significantly.  If it's the latter, it's

9    because there's not a flood of product in the

10   marketplace but because consumers are craving or

11   demanding the product.  They'll still find a way to

12   get it one way or another, but it doesn't mean that

13   the retailers are going to suffer.

14          Q.      Before the IPO, what impact did you

15   think Costco selling Adams clubs would have on Adams

16   Golf's brand image?

17          A.      I don't know if I even knew Costco

18   was selling the clubs before the IPO, so I can't

19   recall.

20          Q.      Whenever you found out that Costco

21   was selling Adams Golf clubs, what impact did you

22   think those sales would have on Adams Golf's brand

23   image?

24          A.      Limited.

25          Q.      Why was that?

A 1030

Page 95

1          A.          Partly because I thought it could be

2     a very different customer than would shop in a core

3     golf shop or certainly green grass shop which is at a

4     golf course; secondly, I didn't think the quantities

5     would create any disruption for the brand and I

6     thought that the company could fix the problem

7     quickly.

8          Q.          When you found out that Costco was

9     carrying Adams clubs, what did you think about -- what

10    did you think the potential -- let me rephrase this

11    question.

12                     When you found out that Adams clubs

13    were appearing in Costco, what did you think the

14    likelihood was the appearance of Adams clubs in Costco

15    would have an impact on Adams sales and revenue?

16         A.          First of all, I don't recall.  I

17    don't know what I thought at this point, so it's hard

18    to say.

19         Q.          I'm going to ask the same question

20    in a different way.  Before the IPO, what did you

21    think about whether gray marketing was an issue for

22    Adams Golf?

23         A.          I just don't recall.

24         Q.          Did you have any reason to think

25    that it would become an issue or that it was an issue?

JOSEPH D. TEKLITS

Page 96

```
1         A.        No recollection.
2         Q.        I'll turn you to Exhibit-264.
3                   MS. FOX:  Tell us what it is,
4         please.
5                   MS. MORIATY:  It's the equity
6         research report after the first announcement.
7    BY MS. MORIATY:
8         Q.        Previously, we looked on Page 3,
9    which is Bates stamped Adams 4116.  We looked at the
10   paragraph labeled current issues.  There are three
11   issues that you mention in this paragraph.  In the
12   first sentence you mention industry softness and
13   competitive pressures in the fairway woods market,
14   then later on at the bottom of the paragraph you
15   mention that Tight Lies are being diverted into
16   Costco.  My question is how would you rank these three
17   issues in terms of their comparative importance as far
18   as Adams Golf sales and revenue?
19        A.        How would I or how did I?
20        Q.        Let's start with how did you.
21        A.        As far as I recall, competitive
22   issues were my focus of my due diligence in terms of
23   looking, searching for risks preIPO, postIPO.  I knew
24   of Orlimar; I knew the name of the team that ran it.
25   Just like I sought out Barney Adams, I sought out that
```

A 1032

Page 97

1    management team to get to know them, what they were

2    doing.  Everybody knew that was following the golf

3    industry; you couldn't not know that product.  I knew

4    of them, I knew they were making a similar product,

5    fairway wood, infomercials, so same channel, getting a

6    lot of buzz.

7                    I also knew there were knock-offs,

8    something -- not Tight Lies but something very

9    similar, even sounding like Tight Lies, that was

10   showing up cheap in the marketplace.  I knew Callaway

11   Golf was coming out with a new line of woods.  They

12   were the No. 1 market share company and biggest brand

13   in the industry, so I thought that could be

14   competition.

15        Q.       What did you know about industry

16   softness, overall industry softness?

17        A.       I don't recall exactly.  I know I

18   tracked that pretty closely, very closely.  I now

19   recall from today that Callaway Golf had news of

20   weakness in their business, and Callaway, being the

21   leading brand, it certainly would create that kind of

22   line of thinking, industry softness.

23        Q.       You testified earlier that part of

24   that Callaway drop was due to competition from Adams

25   Golf.  From what you're saying in this report here,

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2                        -  -  -

 3    IN RE ADAMS GOLF, INC.  : CONSOLIDATED
                             :
 4    SECURITIES LITIGATION   : C.A. No. 99-371 KAJ

 5

 6                 -----------------------
                    Friday, June 9, 2006
 7                 -----------------------

 8         Oral deposition of BERNARD PICCHI, taken

 9    pursuant to notice, was held at the offices of

10    SIMPSON, THACHER, AND BARTLETT, LLP, 425 Lexington

11    Avenue, 29th Floor, New York, New York 10017,

12    commencing at 10:04 a.m., on the above date, before

13    Beth A. Barkocy, Certified Shorthand Reporter and

14    Notary Public.

15

16

17

18

19                     -  -  -

20         RSA/VERITEXT COURT REPORTING COMPANY
                1845 Walnut Street, 15th Floor
21                 Philadelphia, PA   19103
                (215)241-1000     (888)777-6690
22

23

24

25
```

A 1034

Page 11

1    thing I can think of that you refer to as a physical

2    advantage or a competitive advantage.

3                    I think, though, maybe this is --

4    and correct me here, but I think that every analyst's

5    reputation ultimately resides not on the team but

6    really on the basis of what that single analyst can do

7    in terms of his client contacts and his reputation.

8         Q.        When you say "client contacts," what

9    client contacts did you have at that point in time?

10        A.        Just in the process of having been a

11   securities analyst on Wall Street for so many years, I

12   probably knew a great many portfolio managers and

13   analysts and trained in many institutions as a result

14   of that long history of experience and contact with

15   those individuals.

16        Q.        In Exhibit-187, the first one that

17   was in front of you, it is written on Page I hyphen

18   one, Lehman's head of emerging growth equity research,

19   Bernie Picchi, has thorough knowledge of emerging

20   growth companies through his coverage of 11 companies

21   in numerous industries.

22                    What is emerging growth equity as

23   you understood it?

24        A.        Emerging growth equity as

25   distinguished from emerging countries or emerging

BERNARD PICCHI

Page 12

1    markets, these are companies, almost all of which were

2    based in the United States, that represented, in many

3    cases, new business models, new companies with new

4    products and services, so we were really focused on

5    many companies that really hadn't had established

6    track records and developed an expertise over a period

7    of time of being able to sort of distinguish between

8    the companies that we thought were capable of

9    succeeding and delivering value for stockholders and

10   maybe those that weren't.

11          Q.      The document refers to your coverage

12   of 11 companies.  Would that have been the approximate

13   number of companies in total --

14          A.      (Indicating.)

15          Q.      -- that you were following in 1997,

16   1998?

17               MR. McEVOY:  Just wait for him to

18          finish the question.

19               THE WITNESS:  Right.  The answer is

20          yes, that was approximately the correct

21          number of companies which I was publishing

22          research at that time.

23   BY MR. LEWIS:

24          Q.      Did you cover companies on which you

25   weren't publishing research?

A 1036

Page 13

1          A.          Yes, I did.  I'd say that's very

2     common, actually, among analysts.  You typically tend

3     to focus on and publish on companies that represent

4     just a subset, really, of the total number of

5     companies within an industry or sector that you're

6     familiar with.

7          Q.          Were you following any companies in

8     the golf industry prior to your work for Adams Golf?

9          A.          I was aware of different publicly

10    traded golf companies.  I would say it would probably

11    be a little bit of an exaggeration to say I was

12    following them.  I'm certainly aware of them.  There

13    are really not that many publicly traded sports goods

14    companies.

15         Q.          Were you publishing on any sports

16    companies before the Adams Golf representation?

17         A.          No.

18         Q.          Had you ever followed Cobra?

19         A.          I had followed Cobra in the sense of

20    reading about the company, becoming familiar with some

21    of the company's products and all its financial

22    parameters and so forth.

23         Q.          Prior to your work for Adams Golf,

24    had you heard of any -- of whether there were any

25    problems at Cobra with respect to unauthorized

A 1037

BERNARD PICCHI

Page 40

```
 1          most knowledgeable analyst, certainly one of

 2          the most knowledgeable, yeah.

 3   BY MR. LEWIS:

 4      Q.        Prior to the initial public

 5   offering, did you do anything to familiarize yourself

 6   with the golf industry in the expectation of being one

 7   of the leading analysts in Adams once the offering was

 8   completed?

 9      A.        In truth, sir, I don't really recall

10   what degree of preparation.  Again, it's been so long,

11   I just don't remember what I did at that time.

12      Q.        Do you recall reading any literature

13   about the golf industry in that period to familiarize

14   yourself with the industry to a greater degree?

15      A.        Yes, I think that's true; I think

16   that's true, yeah.

17      Q.        What, in general, did you do, as

18   best you recall?

19      A.        Just reading various publications

20   about golf and about different golf equipment,

21   different fairway woods and drivers and putters and

22   all the different kind of golf equipment and new

23   trends.

24      Q.        In those days, did you do that by

25   going online at all?
```

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4   IN RE:  ADAMS GOLF, INC.  :     CONSOLIDATED

5   SECURITIES LITIGATION    :     C.A. NO. 99-371 KAJ

6   _____X

7

8            ORAL AND VIDEOTAPED DEPOSITION

9                    OF BARNEY ADAMS

10              Thursday, June 22, 2006

11

12          The oral deposition of BARNEY ADAMS was

13   held at the law offices of Akin Gump Strauss Hauer

14   & Feld, LLP, 1700 Pacific Avenue, Suite 4100,

15   Dallas, Texas, from 9:32 a.m. to 4:53 p.m., before

16   Jamie K. Israelow, a Certified Shorthand Reporter

17   in and for the State of Texas, Registered

18   Professional Reporter, Certified Realtime Reporter

19   and Certified LiveNote Reporter.

20

21          RSA/VERITEXT COURT REPORTING COMPANY

22              1845 Walnut Street, 15th Floor

23                Philadelphia, PA  19103

24              (215)241-1000    (888)777-6690

A 1039

Page 91

1    conducted an IPO in 1998, correct?

2        A    Yes, we did.

3        Q    Why did you do so, please?

4        A    Why did we do so?  As a source of

5    funding to -- equity funding to roll the company,

6    go forward.

7        Q    And the IPO was a success?

8        A    Yes.

9                MR. BESSETTE:  It depends what

10   you mean.

11       A    Yes, I'd say it was.

12               MR. COLLINS:  I would say that

13   Mr. Adams is in a position to answer that

14   question.

15       Q    (By Mr. Collins)  The stock was sold,

16   correct, and the underwriters' allotment was

17   exercised, correct?

18       A    Yes, it was.

19       Q    Now, this document, 212 in front of

20   you, you will -- this is a document produced by

21   the underwriters.  Do you know whether you've seen

22   it before?  On the first page, it's entitled:

23   Institutional Sales Memorandum.

24       A    I don't remember.