# Appendix
# A1041-A1120

1        Q       Did you see the materials -- now,

2    there was a prospectus -- a registration statement

3    containing a prospectus as an exhibit which you

4    signed in connection with the IPO, correct?

5        A       Yes, there was.

6        Q       And the material contained in the

7    prospectus was accurate and complete to the best

8    of your understanding?

9        A       To the best of my knowledge, yes.

10       Q       Now, this -- this Institutional Sales

11   Memorandum, I think you just said you don't recall

12   seeing this before?

13       A       No.   What is an institutional sales

14   memorandum?

15       Q       We could let Ted talk about this, but

16   I believe this was a selling document used by the

17   underwriters in connection --

18       A       Okay.   Their document.   Okay.

19       Q       Let me ask you a couple of questions

20   about this document, and then in a minute we'll

21   get to the prospectus for the IPO.

22                       Recognizing again that you

23   didn't sign this document, this Exhibit 212, let

24   me turn you to the page marked 146 at the bottom.

```
 1    what we shipped in the fourth quarter, but it
 2    wasn't very many.  So it was a percentage.  It
 3    just becomes a much more serious issue, and a much
 4    more visible issue.
 5        Q      Is that the reason you wrote the
 6    memo?
 7        A      Yeah.  You couldn't hide from it.  I
 8    had to show the board that I was aware of the
 9    situation and that, you know, we were going to do
10    something about it.
11        Q      Okay.  In the last subject area, you
12    talked a little bit about the due diligence
13    process in connection with the initial public
14    offering.  And I think you made it clear that you
15    and other management members of Adams Golf were
16    aware, pre-IPO, of certain -- certain number of
17    clubs purporting to be Adams Golf clubs in certain
18    Costco stores.
19                         Do I understand that right?
20                         MR. COLLINS:  Vague and
21    ambiguous.
22                         THE WITNESS:  Boy.  Thanks.
23        A      Pre-IPO, when we discussed this with
24    all of the people, that was the situation in
```

Page 252

1    Canada, no matter how small it was, it was still

2    the situation in Canada, and the fact that there

3    were always going to be some golf clubs in the

4    gray market because that's the way life was.  I

5    thought I was clear about that, but I may not --

6    it was just fully discussed.

7         Q    (By Mr. Bessette)  That's what I want

8    to explore.  You say it was fully discussed.  Who

9    discussed it and among -- among who was it

10   discussed, I should say?

11        A    I mean, I can't speak for other

12   people.  I can only speak for myself, you know,

13   when I had conversations, but I mean, with Lehman

14   Brothers, with any of the analysts or

15   representatives of the bankers that we talked to,

16   the lawyers, the financial people.  There were

17   just a myriad of -- of discussions with a myriad

18   of -- of, I guess, experts in their particular

19   fields, and that along with many other things was

20   discussed.

21        Q    And did any of those people, whether

22   they be underwriters, lawyers, financial people,

23   or anyone else involved in the due diligence

24   process, ever express the view to you that there

A 1043

Page 253

1    should be a separate stand-alone risk factor in

2    the prospectus concerning the gray market or

3    Costco?

4         A    No, they did not.

5         Q    Did you think that there should be a

6    separate risk-factor disclosure in the prospectus

7    about gray marketing or Costco?

8         A    No, I did not.

9         Q    Why?

10        A    It wasn't significant.  I mean, you

11   brought it up because -- I guess I'm anticipating

12   a question here, but -- because I brought up

13   everything I could think of, but it just wasn't

14   significant.

15             MR. BESSETTE:  That's all I

16   have.  Thank you very much.

17             MR. COLLINS:  Well, let me

18   follow up just a little bit.

19             FURTHER EXAMINATION

20   BY MR. COLLINS:

21        Q    Exhibit 80, the October 8th, '98

22   memo.  If I'm really hearing you correctly,

23   Mr. Adams, you're saying that the real issue as of

24   October 8th, '98, the real issue was A, industry

A 1044

## ADAMS GOLF INC. SECURITIES LITIGATION

### Expert Report of Edward Necarsulmer III

1.  **Assignment**:  I have been retained by counsel for the underwriter defendants in this action to opine as to the adequacy of the due diligence conducted by the underwriters in connection with initial public offering of Adams Golf, Inc.  I am being compensated at an hourly rate of $600 per hour.

2.  **Qualifications**:  I have more than 33 years of experience in the investment banking and securities businesses.  I have run the capital markets area as well as the North American Equities business for a major global investment bank.  I have also been in charge of all equity underwriting, sales, research, and trading for two U.S. firms.

I have been involved in all areas of due diligence from practitioner to supervisor over my career and additionally have had overall responsibility for the execution of numerous public offerings.  I have also been a member of and/or chaired commitment committees who serve as the "first consumer" of the firm's due diligence efforts and are ultimately responsible for the determination of its adequacy before the firm agrees to go forward with the underwriting of the securities.  In the underwriting business, this function is the firm's primary mechanism for the protection of its capital and most importantly its reputation.

My Resume is attached as Exhibit A.

3.  **Prior Testimony**.  I have been retained as an expert in two other similar matters which have been settled prior to trial.  I have written an expert report and have given a deposition in the AMF Bowling securities litigation.  I am also currently retained as an expert in a matter before the United States District Court in the Northern District of Texas.

4.  **Publications**.  I have not authored any publication in the past 10 years.

5.  **Materials Reviewed**.  I have reviewed an extensive number of documents including depositions, exhibits, SEC filings, the Complaint, as well as the document production of the underwriters.  A complete list of these documents is provided as Exhibit B.

6.  **Summary of Opinions**.

    A.  In my experience in the process of adequate due diligence, the underwriters should gather and review the following types of information. The contents and scope of this review may vary greatly depending on the issuer, but in general, these are the categories that should be considered.

- 1 -

A 1045

1. Complete review of the issuer's operations including business plans and strategy. Details as to distribution, manufacturing, products, and geographic scope. This should include analysis of any technological or other proprietary issues that significantly affect the company.

2. Investigation of industry trends and the competitive environment. Utilizing outside experts for confirmation when possible.

3. A complete and thorough review of financial performance - current and historical. Including thorough study of the income statement, balance sheet, and capital structure.

4. Personal interviews with key executive, financial and operating managers.

5. Physical visits to important and/or representative facilities.

6. Meeting with the issuer's counsel and public accountants.

7. Understanding of material outstanding litigation, regulatory or environmental issues.

8. Consideration of any other risk factors. These could include geopolitical, governmental issues, for example.

B. The generally accepted practice, in my judgement is that the collection, review and analysis of the foregoing is an ongoing process shared by members of the investment banking team and its counsel during the preparation of the registration statement and prior to the pricing. Although the registration statement is the issuer's, the underwriting team-including its counsel is also responsible for the completeness, materiality, and veracity of this information. Independent and industry sources can be particularly useful in this pursuit. While the process requires co-operation between issuer and underwriters; it is essential for due diligence efforts to be thorough and their conclusions factually supportable.

C. Based on the documentation that I have reviewed, it is my conclusion that the underwriters conducted a thorough and complete due diligence process with regard to this offering. Specifically:

- 2 -

A 1046

1. The offering process was staffed by a team of sufficient size, experience, and seniority to be appropriate for the project.

2. An extensive due diligence outline and materials request list was prepared and presented to company management at the organizational meeting.

3. The underwriters appear to have had an adequate amount of interaction with members of Adams's management including sales and marketing. These meetings were well organized, with management being provided proper outlines of topics to be discussed. Company facilities were visited by the team in accordance with industry practice.

4. The underwriters did extensive independent market research on selected Adams's customers. Thorough customers' due diligence questionnaires were prepared. Responses to these inquiries appear to reflect the views of the company's customers. Suppliers were also contacted.

5. The underwriters prepared lists of potential investor questions - in my experience this was always an effective mechanism for raising and responding to additional relevant issues.

6. The process was enhanced by the book-running firm's commitment process. A complete memo was prepared and presented to a group of senior firm members. This group further reviewed and validated the deal team's due diligence efforts.

7. As was permissible at the time, the underwriters utilized the experience of their securities analysts to provide perspective and insight into the company and the industry. In my career this was often a useful way to identify issues which might require further investigation.

8. Background checks on key Adams's managers were prepared and reviewed.

- 3 -

A 1047

9.    Golf industry data including GolfDataTech Market Surveys and Golf Market Research Institute Surveys was obtained and reviewed.

10.    Interviews were conducted with independent experts on golf including Nick Faldo and Mark Berry.

11.    Legal and accounting issues appear to have been given standard review in line with industry practice. Including interviews with the KPMG audit partner and Adams patent counsel.

7.    **Summary**:  Based on my long industry experience and the information presented to me, it is my opinion that, the underwriters of this offering performed due diligence in line with normal industry standards and practice.  Their actions were consistent with a standard of reasonableness as I understand it, and were more than sufficient to satisfy me as to their adequacy and completeness.  Responsibilities undertaken by the various underwriting firms and their counsel were also consistent with normal procedure. Again, based on my long industry experience and the information presented to me, it is further my opinion that the due diligence process described in the foregoing resulted in a registration statement that the underwriters reasonably believed was complete and accurate. Note that my work on this matter is ongoing and my opinions are subject to modification based on additional reports, depositions, or testimony that I might receive in the future.

July 12, 2006                                      Edward Necarsulmer III

- 4 -

A 1048

**Edward Necarsulmer III**
**Box 1173 21 Leaward Lane**
**Quogue NY 11959**
**Telephone: 631-653-9035**
**Fax: 631-653-7934**
**ENIII@AOL.COM**

**5/02 – Present Independent** Consultant to the financial service industry. Worked with global investment banks and domestic securities firms on issues related to research, sales, and investment banking businesses. Established expert witness practice. Member of the advisory board, Soleil Securities

**3/01-5/02**    Dresdner Kleinwort Wasserstein    Vice Chairman – Global Equities. Responsible for daily management of Domestic Equity business. Member commitment committee. Provide strategic advice to Global Heads of Equities. Member of North American Equity Management Committee. Represent the firm with key institutional and corporate clients.

**5/00-3/01**    Wasserstein Perella Securities    Chief Executive Officer – Equities Division. Managing Director. Responsible for sales, research, trading and equity capital markets activities. Principal liaison between Equities and Investment Banking activities of the firm. Member commitment committee.

**3/98-5/00**    Independent Consultant to the financial services industry.

**3/95-3/98**    Deutsche Morgan Grenfell    Head of Equities, North America. Member of Global Equities Management Committee and DBNA Management Committee. Responsible for all equities activities in North America and for North American products globally. Areas supervised included: sales, research, trading, equity capital markets, proprietary trading, derivative and international equities. Maintained DMG relationships with regulators, NYSE, NASD, etc. Member global commitment committee.

**10/92-3/95**    C.J. Lawrence/Deutsche Bank Securities    Executive Vice President and Chief Operating Officer to C.J. Lawrence. Ran equity business for the firm. Helped lead transition from CLJ to DBSC. Head of equity capital markets – led major primary market transactions resulting from Deutsche Bank relationships. Chair, domestic commitment committee. Supervised due diligence.

**3/74-10/92**    C.J. Lawrence, Inc.    Executive Vice President and Director. Began in institutional sales. Established equity capital markets efforts for the firm in the mid-1970's. Ran that business and became responsible for trading and other equity businesses. Member of firm's Executive Committee and Board of Directors. Chaired firm commitment committee. Supervised due diligence on any managed/co-managed offering.

A 1049

8/67-1/74    Hallgarten & Co.    General Partner. Roles in research, sales, and corporate finance. Performed due diligence in approximately 10 equity offerings from trainee to supervisory roles.

Education

B.A. Denison University, Granville Ohio

New York Institute of Finance-Professional Courses.

Securities Industry Association-Harvard Management Workshops

Certification & Registrations

While affiliated with member firms, I was a Registered Principal, NASD and NYSE, and was an Allied Member of the NYSE, and held a Series 63 Registration.

Regulatory Experience

Served on the NY District Business Conduct Committee (Board) of the NASD. Ran or participated in numerous hearing panels related to various aspects of firm and individual practices.

A 1050

## EXHIBIT B

### MATERIALS CONSIDERED

**Pleadings**

Second Consolidated and Amended Class Action Complaint

Transcript of Hearing on April 10, 2006

Order, dated April 11, 2006

Answer of Underwriter Defendants to the Second Consolidated and Amended Class Action Complaint

The Adams Golf Defendants' Answer to Plaintiffs' Second Consolidated and Amended Complaint

Underwriter Defendants' Responses and Objections to Plaintiffs' Sixth Set of Interrogatories Directed to Underwriter Defendants

Plaintiffs' Responses and Objections to Underwriter Defendants' First Set of Interrogatories to Class Representatives

Adams Golf Defendants' Objections and Responses to Plaintiffs' Fifth Set of Interrogatories

**Produced Documents**

Underwriter Defendants' Document Production (UND 00001-011636)

**Deposition Transcripts**

Barney Adams, 6/22/06 (with exhibits)

Chris Beebe, 5/23/06

Scott Blevens, 5/3/06 (with exhibits)

Chip Brewer, 5/2/06 (with exhibits)

Sandra Brooks, 6/30/06

Dave Brown, 4/27/06 (with exhibits)

Paul Brown, Jr., 5/16/06 (with exhibits)

A 1051

2

Finnis Connor, 5/9/06 (with exhibits)

Patricia Craus, 2/18/05

James Farrell, 6/12/06 (with exhibits)

Marc Gonsalves, 6/6/06 (with exhibits)

Jay Greanay, 5/18/06 (with exhibits)

Darl Hatfield, 6/8/06 (with exhibits)

Brian Lantier, 6/5/06 (with exhibits)

Ryan Magnussen, 4/28/06 (with exhibits)

John Morrash, 2/23/05 (with exhibits)

Stephen Patchin, 6/13/06 (with exhibits)

Bernard Picchi, 6/9/06 (with exhibits)

Gregg Pratt, 4/27/06 (with exhibits)

Marco Puglielli, 5/10/06 (with exhibits)

Olga Pulido-Crowe, 5/17/06 (with exhibits)

Kenneth Shockley, 2/25/05

M. Bradley Smith, 6/13/06 (with exhibits)

Eddie Tate, III, 6/27/06 (with exhibits)

Joseph Teklits, 6/7/06 (with exhibits)

Todd Tonore, 2/25/05 (with exhibits)

Patrick Walravens, 5/26/06 (with exhibits)

Patty Walsh, 5/11/06 (with exhibits)

## REBUTTAL EXPERT REPORT OF DR. GARY L. FRAZIER

I.    **Qualifications**

1.    I am the Richard and Jarda Hurd Professor of Distribution Management in the
Department of Marketing within the Marshall School of Business at the
University of Southern California. I have focused my research, teaching, and
consulting on marketing and distribution management over the past thirty years. I
have frequently published in the top marketing journals. I am one of the top
contributors in the history of the *Journal of Marketing*, a leading academic
marketing journal started in the 1930s. I have frequently consulted for companies
on marketing issues, beginning with General Motors in 1977 and including such
leading companies since as Coca-Cola, Honeywell, IBM, Intel, and Texas
Instruments. I also have been qualified as an expert witness in the areas of
marketing and distribution management on a number of occasions. In my role as
an expert witness, I have been retained by counsel for companies of various sizes
and in various industries. I have testified on behalf of both plaintiffs and
defendants. In 1995, I served as an expert for the Justice Department on the
question of whether it was unfair for Microsoft to use Windows95 as the
distribution channel for the Microsoft Network.

2.    Marketing as an academic discipline is concerned with how to gain and keep
customers. Within the marketing discipline, distribution management is
concerned with how firms organize and manage inter-firm relationships involving
manufacturers, wholesalers, retailers, and other organizations, to serve end-
consumers. Gray market issues frequently arise when marketing and distributing
products. I have dealt with gray market issues in my research, teaching,
consulting, and expert witnessing for over twenty years.

3.    A copy of my curriculum vitae is provided in Exhibit A, which lists all the
publications I have authored in the past ten years and all cases in which I have
testified as an expert at trial or by deposition in the past four years. My billing
rate for this engagement is $500 per hour.

1

A 1053

## II.     Assignment

4.     I have been retained by Akin Gump Strauss Hauer & Feld LLP, attorneys for Adams Golf, Inc. ("Adams Golf" or the "Company") and the Individual Defendants, and Simpson Thacher & Bartlett LLP, attorneys for the Underwriter Defendants, in In re: Adams Golf, Inc. Securities Litigation to review and comment on the Expert Report of Christiana Ochoa submitted July 14, 2006. In particular, I was asked to discuss the nature of gray markets, potential strategies for dealing with gray market activities, and their impact on Adams Golf.

5.     In conducting my analysis, I have reviewed the complaint and other legal filings in the case, documents produced by the parties in this litigation, depositions, declarations, expert reports, academic literature, trade and public press, and analyst reports. See Exhibit B for a list of documents specifically considered. I reserve the right to supplement or amend my opinions should additional information be produced that is relevant to them.

## III.     Summary of Opinions

6.     Ms. Ochoa presents an inaccurate and incomplete picture of how gray markets function, their potential impact on companies in general, and in particular their impact on Adams Golf.

- Contrary to Ms. Ochoa's statements in her expert report, gray markets are not always negative for manufacturers in the long run. In fact, gray markets can be beneficial in both the short and long run to companies like Adams Golf that are attempting to compete with more established brand names.

- Contrary to Ms. Ochoa's statements in her expert report, gray markets can be managed effectively.

- Contrary to Ms. Ochoa's statements in her expert report, Adams Golf's business model did not make it particularly vulnerable to gray marketers.

2

A 1054

- Contrary to Ms. Ochoa's statements in her expert report, at the time of the IPO, the gray market posed minimal, if any, risk to Adams Golf's business for several reasons:

    i.   gray market sales were potentially beneficial to the Company;

    ii.  the magnitude of gray market sales was extremely small;

    iii. gray market sales had not degraded the brand image of Adams Golf's clubs with end consumers;

    iv.  gray market sales had not degraded Adams Golf's relationships with channel partners; and

    v.   Adams Golf was taking reasonable steps to deal with gray market activity.

## IV.     Definition of Gray Markets

7.    Gray marketing is the sale of authorized branded products through unauthorized distribution channels – usually bargain or discount outlets that provide less customer service than do authorized channels.[1]  A wide range of products are sold through gray markets across a variety of firms and industries.  Well-established brands with high sales and consumer demand are highly sought after by members of unauthorized channels.  Firms building their reputations in industries with products that become "hot" in the marketplace also may find their products in the gray market.

8.    Manufacturers use authorized channels when they decide that significant quality control and intermediary value-added is desirable in their channels of distribution. Examples of firms using authorized channels include Baume & Mercier, a Swiss manufacturer of watches, Honeywell, a manufacturer of temperature controls and air treatment products, Intel, a manufacturer of semi-conductors, Joico, a

---

[1] Coughlan, Anderson, Stern, and El-Ansary, Marketing Channels, 2005, Prentice Hall, p. 260

3

A 1055

manufacturer of hair treatment products, and Lehmann Gross Bahn (LGB), a German manufacturer of toy trains and equipment.

9.  Gray markets represent a form of arbitrage. They are driven by product demand and price differentials which may be the result of exchange rates, volume price discounts, or other factors. Gray market suppliers may include international importers, authorized distributors or retailers selling to discount chains, or diverters specializing in acquiring products for sale to unauthorized channel members.

10.  Gray marketing comes in a variety of forms. Parallel importation occurs when products from the home market are priced lower than in the export market, and the gray marketer exports from the home market to the export market.[2] Reimportation occurs when products from the export market are cheaper than products in the home market, and the gray marketer exports from the foreign market to the home market.[3] Lateral importation occurs when there are price differences between two export markets, and the gray marketer exports from one to the other.[4] Trans-shipments concern gray marketing within a single country, and occur when distributors can acquire products at low prices and resell them to unauthorized channel members.

11.  Gray market activities are commonplace in a wide variety of industries, from expensive consumer durables like cars to inexpensive household products like cosmetics. They even exist in markets for life-saving pharmaceuticals and intangibles such as broadcast signals. Surveys confirm increasing incidence and scope of gray market activities and estimates are that such activities account for many billions of dollars worldwide.[5]

---

[2] Assmus, Gert, & Wiese, Carsten, Sloan Management Review, "How to Address the Gray Market Threat Using Price Coordination," Spring 1995, Volume 36, Number 3, p 32
[3] *Ibid.*
[4] *Ibid.*
[5] Antia, Kersi D , Bergen, Mark, and Dutta, Shantanu, "Competing with Gray Markets," MIT Sloan Management Review, Fall 2004, Volume 46, Number 1, p 63

A 1056

### V.    Gray Market Activities Can Be Beneficial

12.    The existence of gray markets has potential benefits for the manufacturer. Market
coverage is normally enhanced, leading to increased sales and increased market
share for the firm. In fact, "unauthorized distributors can aid a manufacturing
firm by serving price-sensitive consumers and other buyers who lie outside the
reach of traditional channels."[6] Moreover, consumers who are focused on getting
an excellent price and require less service are often attracted to gray market goods
sold in discount outlets. Ultimately, "a certain level of gray market activity ... is
acceptable if it leads to incremental profits without damaging relationships with
the trade or customers' perception of the product in the high-priced segment."[7]

13.    There are distinct segments of consumers in the golf industry. The professional or
highly skilled segment contains the most competent and committed golfers.
"Average golfers" play a minimum of 10 rounds a year, generally have handicaps
above 18, and buy new equipment every two to three years.[8] "Occasional
golfers" play one to seven rounds per year. "Beginning golfers" play their first
round in a given year and are highly price sensitive.[9] Beginners represent the
segment most likely to shop in unauthorized channels due to relatively low prices
found there.

14.    There are always delicate trade-offs to be made in any company's pricing,
distribution, brand image, and other marketing strategies. In the effort to optimize
a company's business strategy, there are trade-offs between short and long run
interests, as well as the relative interests of all agents involved. Manufacturers'
interests, distributors' interests, retailers' interests, and consumers' interests must
be carefully balanced, as all participants attempt to extract as much value as

---

[6] Myers, Matthew B., Griffith, David A., Business Horizons, "Strategies for Combating Gray Market
Activity," November 1999, Volume 42i6, p. 3; Myers, Matthew, "Incidents of Gray Market Activity among
U S Exporters: Occurrences, Characteristics and Consequences," Journal of International Business
Studies, March 22, 1999, Volume 30, Number 1, p. 106.
[7] Assmus, op cit, p.33.
[8] Callaway Golf Company, Harvard Business School Case, 9-501-019, August 11, 2000, p 5
[9] Ibid, p. 6

5

A 1057

possible in the process, while maintaining the overall health of the distribution chain.

15.  Ms. Ochoa admits that benefits from gray market sales exist at least in the short term, saying "It is well established that the availability of goods in a greater number of retail outlets, especially at reduced prices, can have the effect of increasing sales volumes as price-sensitive consumers who lie outside of a manufacturer's target consumer base gain access to lower-priced goods."[10]

16.  The benefits to the manufacturer of having its products sold in gray markets can also be long-term in nature,[11] contrary to what Ms. Ochoa claims.[12]  Gray markets can provide many benefits to manufacturers, including:

   • increased sales volumes to price-sensitive customers who would not otherwise be reached;

   • validation that a brand or product is desirable—gray marketers typically only target products that are highly sought after in the marketplace and do not require any marketing effort on their part (*i.e.*, established brands or "hot" products);

   • increased exposure of the brand;

   • a larger customer base for future sales and service.[13]

17.  If not properly managed, gray markets can have detrimental effects for the firm if the magnitude of gray market sales is high and intra-brand competition (*i.e.*, competition among all resellers of a given brand like Adams Golf) becomes extreme.  However, as discussed below, gray market activities can be effectively managed to avoid these negative effects.

---

[10] Expert Report of Christiana Ochoa, July 14, 2006, ¶ 28. (Hereafter, "Ochoa")
[11] Coughlan, *op cit*, p 66
[12] Ochoa, ¶ 13
[13] Antia, *op cit*, p 66

A 1058

**VI.    Gray Market Activities Can Be Effectively Managed**

18.    The key imperative for manufacturers is to adequately manage gray market activities. If the magnitude of gray market sales to the firm's overall sales is relatively low and intra-brand competition is also relatively low, the firm can gain some of the benefits of gray market activity while still managing any potential negative impact.

19.    In her expert report, Ms. Ochoa seems to imply that gray market activity is akin to finding termites in a house; that is, once you find them, you cannot effectively combat them except at great cost. She states "Once there is an established gray market distribution channel for a given product, the volume of sales made through discount retailers can increase rapidly if a manufacturer does not counter quickly and effectively."[14] She also says that "there is no significant evidence that any approach will ensure eradication of a company's gray market problem."[15]

20.    Ms. Ochoa misses the point that the goal is not to completely eradicate gray markets (which have some beneficial characteristics, especially for a firm like Adams Golf) but to manage gray market activities. The evidence clearly shows that this can be and is done by firms in many industries every day.

21.    The literature (including that cited by Ms. Ochoa) is replete with examples of strategies available to firms wishing to mitigate the prevalence of gray market sales of their products. These strategies fall into several broad categories: restricting the supply of products to the gray market; exerting more control over the distribution channel; changing pricing strategies; reducing consumer demand for gray market goods; and taking legal action against gray marketers after the fact. Some of the many ways to manage gray market activities are discussed below.

22.    <u>Restricting the supply of products to the gray market:</u> A company can track the sale of its products using serial numbers and punish offending distributors by

---

[14] Ochoa, ¶ 29B

[15] Ochoa, ¶ 18.

A 1059

restricting future shipments of its products.[16]  A company may also reduce gray
market activity by offering to repurchase excess stocks of its products before
distributors divert them to unauthorized channels.[17]  A company which operates
internationally and licenses its brand to third parties in its export markets can
often reduce gray marketing by tightening its licensing policies.[18]

23.    Exerting more control over the distribution channel:  A company may also reduce
the gray marketing of its products by exerting increased control over its
distribution network. Improved contact and information sharing between a
company and its channel members "can enhance the overall relationship and help
combat gray markets."[19]  A company can also discourage gray marketing by
carefully examining new distributors before forming relationships with them, and
then by closely monitoring distribution channels thereafter.[20]  A firm can
sometimes reduce gray marketing by ensuring that its popular products are being
equally and equitably allocated among its distributors.[21]  Finally, a company may
improve its control of its distribution channels by choosing to integrate parts of its
network, often by acquiring its distributors, or by altering its distribution model to
make increased use of in-house sales agents.[22]

24.    Changing pricing strategies:  A company can also reduce gray market activity by
implementing pricing policies which reduce arbitrage opportunities across (or
within) markets.  A firm may control prices through a variety of actions, including
adjusting transfer prices, rationing the supply of a product, and centralizing
control of pricing decisions.[23]  One pricing strategy involves implementing a one-
price policy for all markets, a tactic which "can eliminate an important source of

[16] Berman, Barry, Business Horizons, "Strategies to Combat the Sale of Gray Market Goods," July-August
2004, Volume 47, Number 4, p 57
[17] Maskulka, Innes, Gulas, Charles, "The Long-term Dangers of Gray-Market Sales," Business, January-
March 1987, Volume 37, p 30
[18] Ibid.
[19] Myers & Griffith, op cit , pp. 7-8.
[20] Berman, op cit , pp. 56-7; Maskulka, op cit , p 30
[21] Cespedes, Frank, et al , "Gray Markets: Causes and Cures," Harvard Business Review, July-August,
1998, p. 79; Maskulka, op cit , p 30
[22] Myers (Incidents), op cit , p. 108
[23] Myers (Incidents), op cit , p. 107; Assmus, op. cit , p 34

A 1060

arbitrage and allow the supplier to reassert a measure of channel control."[24] Alternatively, a firm may lower the price of sales to more expensive markets, thereby reducing price differentials and the consequent incentive to divert its products.[25] One form of this strategy involves offering rebates to consumers who purchase the company's products through authorized channels, thus lowering demand for gray market versions of its products.[26]

25.   <u>Reducing consumer demand for gray market goods:</u> A firm may also choose to combat gray marketing by communicating to consumers the benefits of purchasing its products through authorized channels (and the risks of purchasing its products elsewhere), in this way reducing consumer demand for gray market goods.[27] A manufacturer can also differentiate the products it sells to different markets, reducing the ability of distributors to divert goods.[28]

26.   <u>Taking legal action against gray marketers:</u> Finally, a company may combat gray marketing by taking legal action against offending distributors.[29] Even if the legal action is not ultimately successful, it will often signify support to a company's authorized retailers.

**VII.   Ms. Ochoa's Conclusion That Adams Golf Was "Particularly Vulnerable" to Damage From Gray Market Activities Is Unfounded**

27.   In her expert report, Ms. Ochoa states "The Company's business model made it particularly vulnerable to gray marketers. It also made it particularly susceptible to the types of damage the gray market can bring to a manufacturer or trademark holder. In the long term, the gray market is known to be potentially detrimental to consumers and trademark holders alike."[30]

---

[24] Cespedes, *op cit*, p 79; Maskulka, *op cit*, p 29
[25] Eagle, Lynne, et al, "Brand Equity and Brand Vulnerability: the Impact of Gray Marketing/Parallel Importing on Brand Equity and Values," European Journal of Marketing, 2003, Volume 37, Number 10, p. 1338
[26] Berman, *op cit*, p. 56.
[27] Berman, *op. cit*, p. 56; Maskulka, *op. cit*, p 30
[28] Berman, *op cit*, p 56
[29] Berman, *op cit*, p 58; Maskulka, *op cit*, p 28.
[30] Ochoa, ¶¶ 19, 28C

A 1061

28.   Ms. Ochoa provides little or no evidence to support her contention that Adams
      Golf's business model made it particularly vulnerable to gray marketers. The
      same is true for her contention that Adams Golf was particularly susceptible to the
      types of damage the gray market can bring to a manufacturer or trademark
      holder.[31]

29.   The literature cited by Ms. Ochoa demonstrates that a large number of
      characteristics impact the degree to which gray market activity is likely to occur
      and/or affect different firms. Environmental influences leading to greater gray
      market activity include increased export activity, heightened competitive
      pressures, foreign currency fluctuations, and restrictive import taxes.
      Technological influences on gray market activity include improved information
      flows that allow distributors to more effectively identify arbitrage opportunities
      across markets.

30.   Firm-specific influences on gray market activity include a firm's commitment to a
      particular market or channel, communication between the manufacturer and its
      distributors, and the existence of multiple pricing policies across markets. The
      companies who are most susceptible to damage from gray market sales are large
      firms with global brands that are indistinguishable across markets and those that
      license to a large number of competing distributors. This was not the position of
      Adams Golf, which was a relative newcomer with a hot product.

31.   If anything, given the highly competitive golf equipment industry in the late
      1990s, gray market sales were potentially more of an issue for the many well-
      established and well-financed companies with popular brand names.[32] Callaway
      Golf, (with 28.8% of total 1997 U.S. supply), Taylor Made Golf (13.2%), Fortune
      Brands' Titleist and Cobra (10.5%), and Ping Golf were among the top firms in
      the industry.[33]

---

[31] *Ibid*
[32] Callaway (HBS), *op. cit*, p. 10
[33] "Golf Equipment/Accessories – Golf Clubs Mkt Trends," MarkIntel, The Investext Group, October 1, 1998, p 8

10

A 1062

32.  Ms. Ochoa provides no direct evidence that any of the factors she identified as
     making Adams Golf supposedly more vulnerable to gray market sales actually led
     to any impact on Adams Golf. Moreover, Ms. Ochoa improperly relies on and
     mischaracterizes information that was not known at the time of the IPO. As noted
     by Prof. Chris James in his expert report, many factors other than gray marketing
     impacted Adams after the IPO,[34] yet Ms. Ochoa ignores these factors.

VIII.  **The Gray Market Posed Minimal, if Any, Business Risk to Adams Golf at the
       Time of the IPO**

       **A. Gray Market Sales Were Potentially Beneficial to Adams Golf**

33.  As discussed earlier in paragraphs 12-17, the existence of gray markets has
     potential benefits for a manufacturer such as Adams Golf, particularly in that
     market coverage may be enhanced, leading to increased sales and increased
     market share for the firm.

       **B. The Magnitude of Gray Market Sales Was Extremely Small**

34.  The number of gray market sales of Adams Golf clubs prior to the IPO was
     extremely small. According to Stephen Grace's expert report, Costco records
     indicate that prior to the IPO, only 3,200 clubs were sold in the U.S. and 660 in
     Canada.[35] This number of Adams Golf clubs sold through Costco was extremely
     low relative to Adams Golf's total sales of 457,000 clubs in 1998 prior to the
     IPO.[36] Thus, Costco sales represented less than 0.84% of 1998 pre-IPO sales.

35.  Damage from gray market activity typically occurs only once that activity has
     become severe. Left unchecked, gray marketing can eventually jeopardize
     relationships with authorized channel members and damage a product's brand
     image. The gray marketing that Adams Golf was experiencing, however, did not
     rise to this level of severity.

---

[34] Expert Report of Christopher M. James, July 14, 2006, p 6 and Exhibit 9; KPMG 2100-2107.
[35] Expert Report of H. Stephen Grace, July 14, 2006, p 18
[36] *Ibid*

A 1063

### C. Gray Market Sales Had Not Degraded Adams Golf's Brand Image with Consumers

36.  Ms. Ochoa states that two aspects of a prestigious brand name can be damaged as a result of the gray market. First, she states that the goodwill being established by the trademark owner is threatened when gray market consumers do not receive the full "extended product" in the form of pre- and post-sales service that buyers from authorized retailers receive. Second, she says a prestigious brand name can lose its esteemed status when it appears at reduced prices through unauthorized distributors.[37]

37.  Ms. Ochoa provides no evidence to support the contention that Adams Golf's goodwill with consumers was damaged by the low number of gray market sales prior to the IPO. If anything, the consumers shopping at Costco were likely those who cared more about low prices and did not value the pre- and post-sales service as much as consumers who typically shop in specialty stores or pro shops.[38] There is no evidence that consumers complained to authorized distributors about low prices at Costco (other than to attempt to get the same bargain themselves) and no evidence that consumers stopped wanting Adams Golf's clubs due to a tarnishing of brand image from the clubs being available at some Costco stores.

38.  Ms. Ochoa provides no evidence that Adams Golf's brand name lost status with consumers as a result of the low magnitude of gray market sales experienced by Adams Golf. Consumers gaining an authentic product with high brand prestige at a great price are often very satisfied with their purchases and still hold the brand in high esteem. If the magnitude of gray market sales is not that high, customers who typically buy through authorized channels are unlikely to be impacted in any way.

---

[37] Ochoa, ¶ 21B
[38] Coughlan, *op cit*, p 262

A 1064

**D. Gray Market Sales Had Not Degraded Adams Golf's Relationships with Authorized Retailers**

39.    Ms Ochoa states that the "displeasure Adams Golf's authorized retailers felt with gray market sales is well documented . . ."[39] In support of this statement, Ms. Ochoa cites one internal Adams Golf document that reports one complaint by one distributor. In my opinion, this is not indicative of a gray marketing problem of any significance.

40.    In total, only eight of Adams Golf's more than 7,000 retailers ever complained of gray marketing activities prior to the IPO.[40] This is an incredibly low number of complaints and in no way indicates the existence of degraded relationships with Adams Golf's authorized retail network.

41.    Further, some authorized channel partners will always complain about any level of gray market sales; however, a few isolated complaints do not demonstrate widespread damage to these relationships.

42.    Ms. Ochoa overreaches hugely, generalizing from the experience of a single distributor (citing declining sales reported by WDC Mackenzie, its Canadian distributor, during July at the time of a magazine article regarding availability of Adams Golf's clubs at Costco) to state that "The close correlation between increasing gray market sales and decreasing authorized sales, therefore, strongly suggests that the damage to Adams name and the *Tight Lies* brand resulting from the gray market was great immediately after the Company's initial public offering."[41] A decline in sales at a single distributor, whose sales of Adams Golf's products represented less than 3% of Adams Golf's total sales,[42] even if it did occur at the same time as the possible appearance of an article on gray market sales, hardly constitutes proof of a causal relationship for even that one distributor, let alone throughout Adams Golf's network of authorized channel partners.

---

[39] Ochoa, ¶ 23A
[40] Grace report, *op cit*, p. 18
[41] Ochoa, ¶ 21D.
[42] Grace report, *op cit*, pp. 17-18

A 1065

43. Ms. Ochoa states that Adams Golf's management apparently believed that even the small number of sales at Costco prior to the IPO was a serious issue.[43] She misconstrues Adams Golf's quick response to WDC Mackenzie's concerns as meaning that Adams Golf's management viewed the small number of gray market sales as a serious problem for the entire Company at the time of the IPO. In addition, evidence from WDC Mackenzie indicates that they felt Adams was responding to its concerns.[44]

### E. Adams Golf Took Reasonable Steps to Deal with Gray Market Sales

44. Further, Adams Golf took steps to manage the gray market activities. Prior to the IPO, Adams Golf took at least the following steps to address the small number of gray market sales:[45]

- Adams Golf let its authorized channel members know that it did not sell to Costco;[46]

- Adams Golf brought a bill of discovery against Costco to discover its supplier;[47]

- The Company discussed and addressed the gray market concerns of its channel partners;[48]

- Adams Golf's personnel were open to information on gray market activity and actively sought to determine how unauthorized intermediaries were acquiring its products;[49]

- Adams Golf punished authorized channel members who were found to be diverting product.[50]

---

[43] Ochoa, ¶ 16.
[44] Exhibit 6 (MCK 00093); Exhibit 85 (ADAMS 001497).
[45] Grace report, *op cit*, Ex VII.
[46] Deposition of Mark Gonsalves, June 6, 2006, p. 90
[47] Adams Golf, Inc., Press Release, June 9, 1998.
[48] Gonsalves deposition, *op cit*, pp. 59-62; Exhibit 63
[49] Gonsalves deposition, *op cit*, pp. 68-69; Exhibit 9
[50] Gonsalves deposition, *op. cit*, pp. 24-25.

A 1066

45.  In my opinion, the steps taken by Adams Golf were appropriate given the nature and magnitude of gray market sales prior to the IPO. Ms. Ochoa admits that Adams Golf took actions prior to the IPO to deal with gray market sales, but questions the timeliness of these actions and asserts (without proof) that Adams Golf's efforts to manage gray market sales were damaging to the Company.[51] On the contrary, Adams Golf's efforts to manage its relationships with authorized channel partners were fully appropriate, and the Company responded in a timely manner.

46.  Based on its status in the industry, the low magnitude of gray market sales, the low incidence of channel partner complaints, and the steps the Company was taking to manage gray market sales, it is my opinion that the gray market posed minimal, if any, risk to Adams Golf's business at the time of the IPO.

**IX.  Conclusions**

47.  Based on my review of the record in this case and my experience as an expert in marketing and distribution, it is my opinion that:

- Ms. Ochoa presents an inaccurate and incomplete description of how gray markets function, including their potential impact on companies in general and on Adams Golf in particular.

- Gray markets are a well-known aspect of markets in many industries, have both costs and benefits, and can be managed through a variety of strategies.

- At the time of the IPO, gray market sales posed minimal, if any, risk to Adams Golf's business. Gray market sales were potentially beneficial to the Company, the magnitude of such sales was insignificant, complaints from channel partners were rare, and the Company was taking reasonable steps to address gray market activity.

Gary L. Frazier

7-28-06

July 28, 2006

---

[51] Ochoa, ¶¶ 17, 22C, 29B, 29C.

A 1067

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PERSONAL DATA:**

Address:
Office:  University of Southern California          Home:  27 Buggy Whip Drive
         Marshall School of Business                        Rolling Hills, CA 90274-5008
         Department of Marketing                            (310) 377-6311
         Accounting 215E
         Los Angeles, CA 90089-0443
         (213) 740-5032

Date of Birth:   September 28, 1951

Family Status:   Married to Kyoung with a daughter, Jean (12 years), and a son, Ryan (6 years)

Citizenship:     U S A

**EDUCATION:**

D B A.:  Indiana University, Bloomington, 1979
         Major Field:     Marketing
         Minor Field:     Physical Distribution
         Minor Field:     Quantitative Analysis
         Dissertation:    An Empirical Examination of the Power-Influence Process in a
                          Channel of Distribution

M B A : Indiana University, Bloomington, 1977

B S  in Business Administration and B.A. in History and Social Studies, magna cum laude:
       Bemidji State University, Bemidji, Minnesota, 1975

**PROFESSIONAL POSITIONS:**

September 1993        The Richard and Jarda Hurd Professor of Distribution Management, Marshall
   to                School of  Business, University of Southern California, Los Angeles
Present

September 1992        Academic Director of the Program in Distribution Management, Marshall
   to                School of  Business, University of Southern California, Los Angeles
May 2000

November 1990         The Jerry and Nancy Neely Professor of Marketing, Marshall School of
   to                Business, University of Southern California, Los Angeles
August 1993

September 1990        Full Professor of Marketing, Marshall School of Business, University of
   to                Southern California, Los Angeles; notified of promotion to Full Professor in
Present              November 1989

July 1990             Chairperson of the Department of Marketing, Marshall School of Business,
   to                University of Southern California, Los Angeles
September 1995

A 1068

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PROFESSIONAL POSITIONS (continued):**

| | |
|---|---|
| June 1984<br>to<br>August 1990 | Associate Professor of Marketing, Marshall School of Business,<br>University of Southern California, Los Angeles; tenured since September 1,<br>1986 |
| April 1984 | Notified of promotion to Associate Professor of Business Administration<br>(Marketing) with tenure, College of Commerce and Business Administration,<br>University of Illinois, Urbana-Champaign; effective August 21, 1984 |
| August 1979<br>through<br>May 1984 | Assistant Professor of Business Administration (Marketing), College of<br>Commerce and Business Administration, University of Illinois, Urbana-<br>Champaign |
| August 1975<br>through<br>May 1979 | Associate Instructor of Marketing, Graduate School of Business, Indiana<br>University, Bloomington |

**PROFESSIONAL HONORS:**

Among the finalists for the Editor of the Journal of Marketing, 2002 to 2005 and 2005 to 2008

Golden Apple Award from the undergraduate program in the Marshall School of Business,
USC, for outstanding teaching, Spring, 1997

Outstanding Educator Award from the MBA Association, University of Illinois, Spring, 1984

Distinguished Teaching Award from the Graduate College, Indiana University, Spring, 1978

Honorable mention in the MBA Golden Apple award competition for outstanding teaching of an
elective course, Marshall School of Business, USC, 2000-2001 academic year

Among the finalists for the 1988 William O'Dell Award given by the <u>Journal of Marketing
Research</u> based on a 1983 sole-authored article entitled "On the Measurement of
Interfirm Power in Channels of Distribution"; the award is given to the article that has
made the most significant long-run contribution to marketing theory, methodology, or
practice

Participated in Arizona State University's "Distinguished Visiting Professor Program," May,
1986

Faculty member at the 1999 AMA Ph.D. Consortium at the University of Southern California,
August 3 through August 7

Faculty member at the 1996 AMA Ph.D. Consortium at the University of Colorado, July 31
through August 2

Faculty Member at the 1992 AMA Ph.D. Consortium at Michigan State University, August 4
through August 8

Dean's Fellow in the School of Business Administration at USC, Fall 1986 through Summer,
1990

A 1069

**EXHBIT A**
**CURRICULUM VITAE OF GARY L. FRAZIER**

**PROFESSIONAL HONORS (continued):**

Nominated for the University Associates Award for "creativity in research and scholarship" at USC during Fall semester, 1989 and 1990

On list of "excellent professors," University of Illinois, each semester, Spring, 1980 through Spring, 1984

Named outstanding graduate business student (all DBAs and MBAs considered), Indiana University, 1977-78

Passed major and minor D B A comprehensive examinations with distinction, Indiana University, Summer, 1978

Elected to Beta Gamma Sigma, 1978

Honorary Membership in Alpha Kappa Psi, 1981

Investors in Business Education general research grants, University of Illinois, Summers, 1980 and 1982

General research grant from Caterpillar Tractor Company, Summer, 1983

Internship with Famous Barr Department Stores, St Louis, July, 1983; examined buyer-vendor relations

Research grant from the Research Board at the University of Illinois, Fall, 1983, for a study of industrial distributorships

Research grant from Procter and Gamble, Fall, 1983, for a study of industrial distributorships

Research grant from Beltone Electronics Corporation, Spring, 1987, for a study of hearing aid dealers

Research Grants from the Marketing Science Institute and the Institute for the Study of Business Markets, Summer, 1990, for a study on channel structure

Chaired dissertation of Kirti Shawney Celli, who won a grant from the Institute for the Study of Business Markets at Penn State in 1990 for her dissertation

**PROFESSIONAL SERVICE:**

Member of the Editorial Review Board of the Journal of Marketing since December of 1984

Member of the Editorial Review Board of the Journal of International Business Studies since June of 2005

Member of the Editorial Review Board of the Journal of Marketing Research from July of 1985 through December of 2003

Served as a "Guest Editor" on a paper for Wagner Kamakura, Editor of the Journal of Marketing Research, Summer, 2002

A 1070

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

PROFESSIONAL SERVICE (continued):

Member of the Board of Consulting Editors of the International Journal of Research in Marketing since January of 2001

Leader of the "Inter-organizational Marketing" Special Interest Group (SIG), May 1, 2001 through September 1, 2003

Member of the Selection Committee for the 1989 William O'Dell Award at the Journal of Marketing Research

Member of the Selection Committee for the 1992 William O'Dell Award at the Journal of Marketing Research

Represented the Editor of the Journal of Marketing Research, Russ Winer, at a "Meet the Editors' session at the Academy of Marketing Science Annual Conference, Norfolk, Virginia, May 28, 1998

Member of Advisory Board of the Review of Marketing from Fall of 1987 to Fall of 1993

Member of the Advisory Board of South-Western Publishing Company during 1989

Member of the Editorial Review Board of the Journal of Retailing from December of 1986 until July of 1994

Member of the Editorial Review Board of the Journal of Business-to-Business Marketing from September of 1990 to September of 1995

Reviewer for the Journal of Marketing Research from June of 1983 to June of 1985

Reviewer for the Journal of Marketing from April of 1983 to November of 1984

Reviewer for Marketing Science in 1996

Reviewer for the Administrative Science Quarterly from 1982 to 1990

Reviewer for the The Academy of Management Review from 1988 to 1992

Reviewer for Management Science from 1987 to 1992

Reviewer for Research in Marketing from 1982 to 1993

Reviewer for Psychology and Marketing from 1987 to 1990

Reviewer for Sloan Management Review from 1988 to 1992

Reviewer for Advances in International Marketing Research in 1989

Reviewer for International Journal of Research in Marketing in 1989

Member of MSI's Business-to-Business Steering Committee, summer 1991 - summer 1995

Co-chair of the 1988 AMA Educators' Conference held in San Francisco

page 4

A 1071

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

PROFESSIONAL SERVICE (continued):

Co-chair of the 1991 AMA Ph D Consortium held at USC, August 13 through August 17

Chair of the Marketing Management and Institutions Track of the 1987 AMA Educators' Conference

Chair of the Marketing Strategy, Planning, and Control Track of the 1985 AMA Educators' Conference

Chair of the Exchange Theory Track of the 1989 AMA Winter Theory Conference

Chair of a special session at the 1988 AMA Winter Theory Conference entitled "The Interface of Macro and Micro Channel Issues," February 9

Chair of a competitive paper session at the 1990 AMA Winter Theory Conference entitled, "Interfunctional Aspects of Marketing Management," February 26

Chair of a competitive paper session at the 1990 AMA Summer Educators' Conference entitled, "Channel Management and Physical Distribution Management," August 7

Chair of a competitive paper session at the 1991 AMA Summer Educators' Conference entitled, "Channels and Strategy," August 18

Member of a panel on "The American Marketing Association's Doctoral Consortium: 25 Years Later" at the 1991 AMA Summer Educators' Conference, August 18

Served on "Blue Ribbon Panel" to select best paper for the 1989 AMA Educators' Conference

Co-organizer (along with Jagdish Sheth) of the Stellner Symposium on Theories of Marketing Practice, Champaign, Illinois, May 23 to May 25, 1985

Reviewer for the Marketing Management Track of the 1986 AMA Educators' Conference

Reviewer for the Marketing Mix and Marketing Institutions Track of the 1983 AMA Educators' Conference

Reviewer for the Marketing Management Track of the 1987 AMA Winter Theory Conference

Reviewer for the Marketing Research Track of the 1989 AMA Educators' Conference

Reviewer for the Marketing Theory Track and the Marketing Implementation Track of the 1990 Winter Educators' Conference

Reviewer for the Marketing Planning and Strategy Track and the Marketing Management and Institutions Track of the 1990 AMA Educators' Conference

Reviewer for the Marketing Theory Track of the 1991 Winter Educators' Conference

Reviewer for the Marketing Planning and Strategy Track of the 1991 AMA Educators' Conference

Discussant of papers in a session on "Channel Relationships" at the 1987 AMA Winter Theory Conference

A 1072

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PROFESSIONAL SERVICE (continued):**

Discussant of papers in a session on "Scaling and Measurement Issues in Marketing Research" at the 1989 AMA Educators' Conference

Judge for the annual AMA Doctoral Dissertation Competition since 1984

Judge of Research Proposals for Faculty Summer Fellowships at the University of Cincinnati during spring semester of 1985

Reviewer for the University of Pennsylvania Press during 1985

Reviewer for Random House during 1983

Appeared on ESPN's "Business Times" cable television program, speaking on the use of sales incentives to motivate salespeople, April 8, 1985

Appeared on CNN discussing the marketing strategy of non-profit and for-profit organizations, January 7, 1987

**PROFESSIONAL ORGANIZATIONS:**

American Marketing Association
Beta Gamma Sigma

**RESEARCH AND TEACHING INTERESTS:**

Distribution channel organization and management, and marketing strategy

**PUBLICATIONS:**

**Book Contributions**

Gary L. Frazier, Organizing and Managing Channels of Distribution, Thousand Oaks, CA: Sage Publications, Inc., forthcoming

Gary L. Frazier, Strategies of Distribution, New York: Oxford University Press, forthcoming

Gil P. Harrell and Gary L. Frazier (1999), Principles of Marketing, Upper Saddle River, NJ: Prentice-Hall.

Jagdish N. Sheth and Gary L. Frazier (1993), Advances in Telecommunications Management, Volume 4, Ruby Dholakia, (volume editor), "Strategic Perspective on the Marketing of Information Technologies", Greenwich, CT: JAI Press.

Gary L. Frazier (ed.) (1992), Advances in Distribution Channels Research, Volume 1, Greenwich, CT: JAI Press.

Jagdish N. Sheth and Gary L. Frazier (eds.) (1990), Advances in Telecommunications Management, Volume 1, Massoud Saghafi and Ashok Gupta (volume editors), "Managing the R&D - Marketing Interface," Greenwich, CT: JAI Press

A 1073

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

PUBLICATIONS (continued):

Book Contributions:

Jagdish N Sheth and Gary L. Frazier (eds ) (1990), Advances in Telecommunications Management, Volume 2, Wesley Johnston (volume editor), "Purchasing in the 1990s," Greenwich, CT: JAI Press.

Jagdish N Sheth and Gary L Frazier (1990), Advances in Telecommunications Management, Volume 3, Thomas Housel (volume editor), "Information Technology and Crisis Management," Greenwich, CT: JAI Press.

Richard P Bagozzi, J Paul Peter, Terry L Childers, A Fuat Firat, Gary L Frazier, Erdogan Kumcu, Michael L. Rothschild, Alan Sawyer, Edward C. Strong, and Alladi Venkatesh (eds ) (1989), Proceedings, American Marketing Associations' Winter Theory Conference, Chicago: American Marketing Association, February

Gary L Frazier, Charles Ingene, David Auker, Avijit Ghosh, Tom Kinnear, Sidney Levy, Rick Staelin, and John Summers (eds ) (1988), Proceedings, American Marketing Association's National Educators' Conference, Chicago: American Marketing Association, August

Gary L Frazier and Jagdish N. Sheth (eds.) (1987), Contemporary Views on Marketing Practice, Lexington, MA: Lexington Books

Susan Douglas, Michael Solomon, Mark Alpert, James Anderson, Peter Doyle, Gary Ford, Gary L. Frazier, Vijay Mahajan, and William Pride (eds ) (1987), Proceedings, American Marketing Association's National Educators' Conference, Chicago: American Marketing Association, August

Robert F Lusch, Gary T Ford, Gary L Frazier, Roy D Howell, Charles A. Ingene, Michael Reilly and Ronald W Stampfl (eds.) (1985), Proceedings, American Marketing Association's National Educators' Conference, Chicago: August.

Articles

Tassu Shervani, Gary L. Frazier, and Goutam Challagalla, "The Moderating Influence of Firm Market Power on the Transaction Cost Economics Model: An Empirical Test in a Forward Channel Integration Context," Strategic Management Journal, forthcoming

Gary L Frazier, "International Channels of Distribution: An Assessment", International Journal of Research in Marketing, forthcoming.

Kersi Antia and Gary L. Frazier (2001), "The Severity of Contract Enforcement in Inter-firm Channel Relationships," Journal of Marketing, 65 (October), 67-81

Gary L Frazier (1999), "Organizing and Managing Channels of Distribution", Journal of the Academy of Marketing Science, 27 (Spring), 226-240.

Keysuk Kim and Gary L Frazier (1997), "On the Measurement of Distributor Commitment in Industrial Channels of Distribution," Journal of Business Research, 40 (October), 139-154

page 7

A 1074

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

PUBLICATIONS (continued):

### Articles

Keysuk Kim and Gary L Frazier (1997), "On Distributor Commitment in Industrial Channels of
Distribution: A Multi-component Approach," Psychology and Marketing, 14
(December), 847-877.

Gary L Frazier and Walfried M Lassar (1996), "Determinants of Distribution Intensity,"
Journal of Marketing, 60 (October), 39-51

Kirti Celly and Gary L Frazier (1996), "Outcome-based and Behavior-based Coordination
Efforts in Channel Relationships," Journal of Marketing Research, 33 (May), 200-210.

Keysuk Kim and Gary L Frazier (1996), "A Typology of Distribution Channel Systems: A
Contextual Approach," International Marketing Review, 13 (1), 19-32

Gary L Frazier and Kersi Antia (1995), "Exchange Relationships and Inter-firm Power in
Channels of Distribution," Journal of the Academy of Marketing Science, 23 (Fall),
321-326.

Gary L Frazier, Bernard J. Jaworski, Ajay K. Kohli, and Barton A. Weitz (1994), "Buyer-
Supplier Relational Characteristics and Joint Decison Making," Marketing Letters,
5 (July), 259-270

Gary L. Frazier (1994), "A Perspective on Interorganizational Exchange in Channels of
Distribution," in Research Traditions in Marketing, Gilles Laurent, Gary Lilien,
and Bernard Pras, editors, New York: Kluwer Academic Publishers, 378-382

David W Stewart, Gary L Frazier, and Ingrid Martin (1993), "Integrated Channel Management:
Merging the Communications and Distribution Functions of the Firm," in The
Psychology of Integrated Communication, Ester Thorson and Jeri Moore, eds Hillsdale,
NJ: Lawrence Erlbaum

Gary L Frazier and Jagdish N Sheth (1993), "The Vertical Integration Issure in Channels of
Distribution," in Strategic Perspectives on the Marketing of Information Technologies,
Rudy Dholakia, ed , Greenwich, CT: JAI Press

Gary L Frazier and Tassu Shervani (1992), "Multiple Channels of Distribution and Their Impact
on Retailing," in The Future of U.S. Retailing: An Agenda for the 21st Century
Robert Peterson, ed., New York: Quorum Books, 217-237.

Gary L Frazier and Raymond C. Rody (1991), "The Use of Influence Strategies in Interfirm
Relationships in Industrial Product Channels," Journal of Marketing, 55 (January),
52-69

Gary L. Frazier, Kirti Sawhney, and Tassu Shervani (1990), "Intensity, Functions, and
Integration in Channels of Distribution," Review of Marketing, Volume 4, 263-298

Gary L. Frazier (1990), "The Design and Management of Channels of Distribution: A State-of-
the-Art Perspective," in The Interface of Marketing and Strategy, George Day, Barton
Weitz, and Robin Wensley, eds , Greenwich, CT: JAI Press, 255-304

A 1075

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PUBLICATIONS (continued):**

<u>Articles</u>

Saul Klein, Gary L. Frazier, and Victor J Roth (1990), "A Transaction Cost Analysis Model of Channel Integration in International Markets," <u>Journal of Marketing Research</u>, 27 (May), 196-208

Gary L Frazier and David W. Stewart (1990), "Channel Member Response to Trade Programs," <u>Research in Marketing</u>, Volume 10, 15-59

Gary L. Frazier, James D Gill, and Sudhir H Kale (1989), "Dealer Dependence Levels and Reciprocal Actions in a Channel of Distribution in a Developing Country," <u>Journal of Marketing</u>, 53 (January), 50-69

Gary L Frazier and Sudhir H. Kale (1989), "Distribution Channel Relationships: A Sellers' versus Buyers' Market Perspective," <u>International Marketing Review</u>, 6 (6), 7-26

Gary L. Frazier, Robert E. Spekman, and Charles R O'Neal (1988), "Just-In-Time Exchange Relationships in Industrial Markets," <u>Journal of Marketing</u>, 52 (October), 52-67.

One of the articles in the eighth edition of <u>Marketing Classics</u>.

Prem N. Shamdasani and Gary L. Frazier (1988), "Intrachannel Complaining Behavior and Conflict," <u>Journal of Consumer Satisfaction, Dissatisfaction, and Complaining Behavior</u>, Volume 1, 97-103

Gary L. Frazier and John O. Summers (1987), "Push and Pull Strategies in Industrial Markets: a Normative Framework," in <u>Contemporary Views on Marketing Practice</u>, Gary Frazier and Jagdish Sheth, eds , Lexington, MA: Lexington Books, 217-235

Gary L Frazier and John O. Summers (1986), "Perceptions of Interfirm Power and Its Use within a Franchise Channel of Distribution," <u>Journal of Marketing Research</u>, 23 (May), 169-176

Gary L Frazier and Jagdish N. Sheth (1985), "An Attitude-Behavior Framework for Distribution Channel Management," <u>Journal of Marketing</u>, 49 (Summer), 38-48.

Gary L Frazier and Roy D Howell (1985)," The Data Aggregation Issue in Empirical Analysis for Strategic Market Planning," in <u>Strategic Marketing and Management</u>, Howard Thomas and David Gardner, eds , London: John Wiley Limited, 167-180

Gary L Frazier (1984), "The Interfirm Power-Influence Process within a Marketing Channel," <u>Research in Marketing</u>, Volume 7, 63-91

Gary L Frazier and John O Summers (1984), "Interfirm Influence Strategies and Their Application within Distribution channels," <u>Journal of Marketing</u>, 48 (Summer), 43-55

Gary L. Frazier (1983),"Interorganizational Exchange Behavior in Marketing Channels: A Broadened Perspective," <u>Journal of Marketing</u>, 47 (Fall), 68-78

Reprinted in <u>Marketing Theory: Classic and Contemporary Readings</u>, Jagdish N Sheth and Dennis Garrett, eds , Cincinnati, OH: Southwestern Publishing Company, 1986, 702-721.

A 1076

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PUBLICATIONS (continued):**

Articles:

Gary L. Frazier (1983), "On the Measurement of Interfirm Power in Channels of Distribution," Journal of Marketing Research, 20 (May), 158-166.

Finalist for the 1988 Journal of Marketing Research William O'Dell Award for making a "significant long-run contribution to marketing theory, methodology, or practice."

Gary L. Frazier and Roy D. Howell (1983), "Business Definition and Performance," Journal of Marketing, 47 (Spring), 59-67.

Jagdish N. Sheth and Gary L. Frazier (1983), "A Margin-Return Model for Strategic Market Planning," Journal of Marketing, 47 (Spring), 100-109

Request made to the Journal of Marketing in 1984 for translation and reprinting of the article in an Italian quarterly journal; request made to Journal of Marketing in 1985 for reprinting of the article in a marketing management readings book.

One of the articles in the eighth edition of Marketing Classics

Gary L. Frazier and Roy D. Howell (1982), "Intraindustry Marketing Strategy Effects on the Analysis of Firm Performance," Journal of Business Research, 10 (December), 431-443

Roy D. Howell, Gary L. Frazier, and P. Ronald Stephenson (1982), "Using Industry Data in Small Business Decision Making: Potential Problems," Journal of Small Business Management, 20 (April), 45-56

Jagdish N. Sheth and Gary L. Frazier (1982), "A Model of Strategy Mix Choice for Planned Social Change," Journal of Marketing, 46 (Winter), 15-26

Request made to Journal of Marketing in 1985 for reprinting of the article in a marketing management readings book

P. Ronald Stephenson, William L. Cron, and Gary L. Frazier (1979), "Delegating Pricing Authority to the Sales Force: The Effects on Sales and Profit Performance," Journal of Marketing, 43 (Spring), 21-28.

Dictionary

Contributed conceptual definitions in the channels of distribution area for Peter Bennett (ed.) (1994), Dictionary of Marketing Terms, Chicago: American Marketing Association.

Published Proceedings

Gary L. Frazier (1987), "On the Theory of Distribution Channel Structure," Proceedings, 12th Paul D. Converse Symposium, Devanathan Sudharshan and Frederick Winter, eds., Chicago: American Marketing Association, 138-160

James R. Brown and Gary L. Frazier (1978), "The Application of Channel Power: Its Effects and Connotations," Proceedings, Marketing Educators' Conference, Chicago: American Marketing Association

page 1D

A 1077

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PUBLICATIONS (continued):**

**Published Proceedings**

Gary L. Frazier (1978), "An Indirect Approach to Measuring Power in Distribution Channels," <u>Proceedings</u>, Midwest AIDS, May.

Gary L. Frazier and James R. Brown (1978), "Use of Power in the Interfirm Influence Process," <u>Proceedings</u>, Albert Haring Doctoral Symposium, Indiana University, May.

Donald Granbois, John O. Summers, and Gary L. Frazier (1977), "Correlates of Consumer Expectations and Complaining Behavior," <u>Consumer Satisfaction, Dissatisfaction, and Complaining Behavior</u>, Ralph Day, ed., Division of Research: Indiana University, August.

**SUBMISSIONS:**

Gary L. Frazier, Elliot Maltz, Arnold Maltz, and Kersi Antia, "The Sharing of Strategic Information in Distribution Channel Relationships," under first revision for the <u>Journal of Marketing</u>

Elliot Maltz, Kersi Antia, and Gary L. Frazier, "Exploring the Impact of Traditional Media and Web-Based Media on Sales in Indirect Channels of Distribution," under third revision for the <u>Journal of Marketing</u>.

**WORK IN PROCESS:**

Gary L. Frazier, Xavier Dreze, and Matthew Thomson, "The Adoption of New Channels of Distribution," intended for the <u>Journal of Marketing</u>

Gary L. Frazier and David W. Stewart, "Relational Exchange in Channels of Distribution: A Multi-Level Conceptual Framework," intended for the <u>Journal of Marketing</u>.

Kersi Antia and Gary L. Frazier, "Attributed Opportunism in Distribution Channel Relationships," intended for the <u>Journal of Marketing</u>.

Gary L. Frazier, Key-Suk Kim, and David W. Stewart, "Resource Allocations to Push and Pull Strategies," intended for the <u>Journal of Marketing</u>

**PRESENTATIONS:**

AMA Summer Educators' Conference, July 29, 2005, 5th Annual Doctoral Student SIG Pre-Conference Symposium, "Navigating the Publishing Process," (with Greg Gundlach)

AMS Summer Eductors' Conference, July 29, 2005, 5th Annual Doctoral Student SIG Pre-Conference Symposium, Member of a Round Table on Research and Teaching in the Marketing Discipline

AMA Summer Educators' Conference, August 17, 2003, "Innovative Channels Research."

AMA Ph.D. Consortium, Emory University, June 8, 2002, "Problem-Driven Theory Development."

A 1078

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PRESENTATIONS (continued):**

Research seminar, Department of Marketing, University of Southern California, April 20, 2001, "The Adoption of New Channels of Distribution "

AMA Ph.D Consortium, University of Southern California, August 4, 1999, "The Boundaries of Relationship Marketing in Channels of Distribution."

AMA Summer Educators' Conference, August 15, 1998, "Power and Relationship Marketing"; a special session held in honor of Louis Stern

Research Conference of the Journal of Marketing and the Marketing Science Institute, Boston, June 5, 1998, "The Boundaries of Relationship Marketing in Channels of Distribution", with Dave Stewart

Research Seminar, University of Georgia, April 26, 1997, "Channel Research: Challenges and Opportunities "

Research Seminar, University of Georgia, April 25, 1997, "Distributor Information Sharing in Channels of Distribution "

AMA Ph D Consortium, University of Colorado, July 31, 1996, "Channel Systems: A Macro Perspective."

AMA Faculty Consortium on Strategic Marketing, Arizona State University, June 12, 1996, "Interorganizational Perspectives: Redrawing Boundaries and Managing Strategic Interdependencies "

Research Seminar, University of Houston, October 27, 1995, "Outcome-based and behavior-based Coordination Efforts in Channel Relationships "

Research Seminar, University of Florida, April 8, 1995, "Outcome-based and Behavior-based Channel Coordination Efforts."

Doctoral Internationalization Consortium, University of Texas, Austin, March 25, 1995, "International Channels Research."

AMA Winter Educators' Conference, February 13, 1995, "Close Channel Relationships: To Be or Not to Be "

Research Seminar, University of Colorado Boulder, March 20, 1994, "Distribution Intensity."

AMA Summer Educators' Conference, August 10, 1993, "Channel Systems in the Global Arena: A Typology" (with Keysuk Kim)

MSI Charleston Conference on Understanding Competitive Decision-Making, June 15, 1993, "Buyer-Seller Relational Characteristics and Joint Decision-Making" (with Bernie Jaworski, Ajay Kohli, and Bert Weitz)

Research Seminar, Penn State University, September 23, 1992, "Behavioral Channels Research: Future Challenges "

AMA Ph.D. Consortium, Michigan State University, August 5, 1992, "Behavioral Channels Research: Progress and Problems."

A 1079

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PRESENTATIONS** (continued):

USC/UCLA Marketing Colloquium, May 15, 1991, "Behavioral Channel Research: Present Knowledge and Needed Research."

Research Seminar, University of Pittsburgh, April 19, 1991, "Behavioral Channel Research: Present Knowledge and Needed Research "

Retailing in the Year 2000 Symposium, University of Texas, Austin, November 16th 1990, "Multiple Channels of Distribution and Their Impact on Retailing."

Research Seminar, University of California-Irvine, March 9, 1990, "The Use of Influence Strategies in Interfirm Relationships in Industrial Product Channels."

Research Seminar, University of Alabama, February 16, 1989, "The Use of Influence Strategies in Channel Relationships in Industrial Product Channels "

Special Session on Behavioral Channels Research at the AMA Winter Theory Conference, February 13, 1989, "Future Challenges in Distribution Channel's Research "

Center for Telecommunications Management Conference on Marketing Strategies for Information Technologies, November 18, 1988, "The Vertical Integration Issue in Channels of Distribution "

AMA Faculty Consortium on Marketing Channels and Distribution, July 27, 1988, "Marketing Channel Behavior "

Research Seminar, University of Minnesota, May 6, 1988, "Dealer Dependence Levels and Reciprocal Actions in a Channel of Distribution in a Developing Country "

Academy of Marketing Science Conference, April 28, 1988, Montreal, Canada, "The Status of Distribution Channel Research;" this was an invited presentation in a special session on channels research

Research Seminar, University of California-Irvine, February 17, 1988, "Strategic Implications of Channels Research "

Marketing Theory Conference, February 9, 1988, "The Interface of Macro and Micro Channel Issues "

Research Seminar, University of Washington-Seattle, March, 1987, "Challenges in Conducting Distribution Channel Research "

Research Seminar, University of California-Irvine, January, 1987, "Challenges in Conducting Distribution Channel Research."

USC/UCLA Marketing Colloquium, May 30, 1986, "Push and Pull Marketing Strategy for Industrial Markets: A Normative Framework "

Twelfth Ph.D Converse Symposium, American Marketing Association, University of Illinois-Urbana, May 19, 1986, "On the Theory of Distribution Channel Structure."

Research Seminar, Distinguished Professor Program, Arizona State University, May 2, 1986, "Push and Pull Marketing Strategy for Industrial Markets: A Normative Framework."

A 1080

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PRESENTATIONS (continued):**

Research Seminar, Distinguished Professor Program, Arizona State University, May 1, 1986, "Problems and Challenges in Distribution Channel Research."

Stellner Symposium on Theories of Marketing Practice, University of Illinois, May, 1985, "Push and Pull Marketing Strategy for Industrial Markets: A Normative Framework."

Research Seminar, University of Cincinnati, March, 1985, "Push and Pull Marketing Strategy for Industrial Markets "

Research Seminar, Southern Methodist University, February, 1985, "Interfirm Power and Its Use within a Channel of Distribution."

Strategic Marketing Seminar, American Marketing Association, Urbana, Illinois, April, 1983, "The Data Aggregation Issue in Empirical Analysis for Strategic Market Planning "

Research Seminar, University of Minnesota, June, 1982, "A Model of Interorganizational Exchange Behavior in Marketing Channels "

Guest Lecture Series, Ohio State University, June, 1981, "Marketing Management and Distribution Channels."

Logistics and Marketing Management Seminar, American Marketing Association, Mobile, Alabama, May, 1981, "Problems and Prospects for Increased Vertical and Horizontal Coordination of a Channel's Logistics Responsibilities."

Marketing Educators' Conference, American Marketing Association, Chicago, August, 1978, "The Application of Channel Power: Its Effects and Connotations "

Midwest AIDS, Cincinnati, May, 1978, "An Indirect Approach to Measuring Power in Distribution Channels."

Albert Haring Doctoral Symposium, Indiana University, April, 1978, "Use of Power in the Interfirm Influence Process."

**DOCTORAL DISSERTATION COMMITTEES:**

Kersi Antia, University of Southern California, 1994 to 1997 (chair)

Keysuk Kim, University of Southern California, 1990 to 1992 (chair)

Walfried Lassar, University of Southern California, 1990 to 1992 (chair)

Kirti Sawhney Celli, University of Southern California, 1989 to 1992 (chair)

Raymond C Rody, University of Southern California, 1989 to 1992 (chair)

Tassu Shervani, University of Southern California, 1988 to 1991 (chair)

Scott Koslow, University of Southern California, 1989 to 1991

Kerri Acheson, University of Southern California, 1986 to 1989 (chair)

A 1081

**EXHBIT A**
**CURRICULUM VITAE OF GARY L. FRAZIER**

DOCTORAL DISSERTATION COMMITTEES (continued):

Robert Allerheiligen, University of Southern California, 1984 to 1985

Dennis Garrett, University of Illinois, 1984 to 1985

Sudhir Kale, University of Illinois, 1983 to 1984

CONSULTING EXPERIENCE:

| Year | Company | Areas |
|------|---------|-------|
| 1977 | General Motors | Distribution and promotion management |
| 1978 | Paul Harris Company (retailer of women's fashion products) | Market segmentation and promotion management |
| 1978 | Olympia Brewing Company | Market expansion and distribution management |
| 1979 | Wholesalers in the medical supply and equipment channel | Sales force and distribution management |
| 1980 | Hewlett-Packard | Personal selling and sales force management |
| 1981 | Richard Newman Associates, Inc. (advertising agency) | Personal selling and channel design |
| 1982 and 1983 | Pullman Trailmobile (manufacturer of truck trailers) | Personal selling, sales force management, and distribution management |
| 1983 | Famous Barr Department Stores (member of the May Department Stores Company) | Buyer-vendor relations and negotiating strategy |
| 1983 | Western Electric (now AT&T Technologies) | Marketing strategy and sales force management |
| 1984 | Christie Clinic (health care provider) | Branch location and promotional strategy |
| 1984 | Therapy Selection Services (health care provider) | Strategic marketing and marketing strategy |
| 1985 | Northrop Corporation (manufacturer of aerospace products) | Distribution channel design and management, sales force management, and countertrading |
| 1985 | Foot Leveler, Inc. (manufacturer of medical equipment) | Expert witness on marketing and distribution |

page 15

A 1082

**EXHBIT A**
**CURRICULUM VITAE OF GARY L. FRAZIER**

CONSULTING EXPERIENCE (continued):

| Year | Company | Areas |
|------|---------|-------|
| 1985 | Deluca Wine and Spirits Corporation (distributor of wine and liquor) | Expert witness on marketing and distribution |
| 1985 and 1986 | Carnation | New product development and marketing strategy |
| 1986 | Standard Abrasives, Inc (manufacturer of industrial abrasive products) | Supplier distributor relationships, marketing research, and new product development |
| 1986 | Photo-Graphix Systems, Inc. (manufacturer of photographic business cards) | Supplier-distributor relationships and distributor sales training programs |
| 1987 and 1988 | C & C Wholesale (distributor of beverages and food products) | Expert witness on marketing and distribution |
| 1987 | Maury Abrams Co., Inc (real estate developer and shopping center owner) | Expert witness on marketing and distribution |
| 1988 | 3M | The management of distribution channel relationships |
| 1988 | Valcom, Inc (franchisor of computer products) | Expert witness on marketing and distribution |
| 1988 | TRW | The design and management of channels of distribution, and market segmentation |
| 1989 | Merck Pharmaceutical | The building and maintenance of business partnerships |
| 1990 | Southern California Edison | Expert witness on marketing strategy |
| 1990 | Pedo-Seed (producer of hybrid vegetable and fruit seeds) | The design and management of channels and distribution |
| 1990 | Omaha Vaccine Corporation (manufacturer of vaccines for livestock) | Expert witness on marketing and distribution |
| 1990 | Comac (marketing services provider) | Personal selling and sales force management |
| 1991 | Holmes-Hally Industries (manufacturer of garage doors) | Building a market-focused organization |

page 16

A 1083

**EXHBIT A**
## CURRICULUM VITAE OF GARY L. FRAZIER

CONSULTING EXPERIENCE (continued):

| Year | Company | Areas |
|------|---------|-------|
| 1991 and 1992 | Adrays (retailer of appliances and home entertainment products) | Expert witness on trademarks, marketing, and distribution |
| 1992 | Arthur Andersen | Building a market-focused organization |
| 1992 | Sunrider International (direct selling organization) | Building a market-focused organization |
| 1992 | Navistar (manufacturer of farm equipment) | Expert witness on marketing and distribution |
| 1993 | All-West (distributor of pet food) | Expert witness on marketing and distribution |
| 1993 | Shipley's (fashion retailer) | Expert witness on marketing and distribution |
| 1993 and 1994 | Several former distributors of Mac Tools, Inc | Expert witness on marketing and distribution |
| 1994 | Joico (manufacturer of hair care products) | Expert witness on marketing and distribution |
| 1995 | U S. Justice Department | Distribution expert in evaluating Microsoft's inclusion of MSN in Windows' '95' software |
| 1995 | Honeywell, Perfect Climate Division | Distribution practices |
| 1995 | Letro, Inc (manufacturer of automatic pool cleaning equipment) | Expert witness on trade dress, marketing, and distribution |
| 1995 | Hewlett-Packard | The productivity of marketing and sales tactics with distributors |
| 1996 | Vanstar (distributor of computer products) | Expert witness on marketing and distribution |
| 1996 | AirTouch Cellular (cellular telephone service provider) | Expert witness on marketing and distribution |
| 1996 | Santa Monica Honda (motorcycle dealer) | Expert witness on marketing and distribution |
| 1996 | LGB (German manufacturer of model trains) | Expert witness on trademarks, marketing, and distribution |

page 17

A 1084

**EXHBIT A**
**CURRICULUM VITAE OF GARY L. FRAZIER**

CONSULTING EXPERIENCE (continued):

| Year | Company | Arena |
|------|---------|-------|
| 1996 | Telesphere Liquidating Trust (telephone services) | Expert witness on marketing and distribution |
| 1997 | Bergen-Brunswig (distributor of pharmaceuticals) | Expert witness on marketing and distribution |
| 1997 | AirTouch Cellular | Expert witness on marketing and distribution |
| 1997 | Playtex (sun care products division) | Expert witness on marketing and distribution |
| 1997 | Micron Electronics (manufacturer of computer products) | Expert witness on marketing and distribution |
| 1997 | Hasbro, Inc. | Expert witness on marketing and distribution on the Internet |
| 1997 | LGB | Expert witness on marketing and distribution |
| 1997 | Oakland Raiders | Expert witness on licensing, marketing, and distribution |
| 1997 | Super Sports, Inc (retailer of sporting goods) | Expert witness on trademarks and their effects |
| 1998 | Michael Taylor (former owner of Andesite, a manufacturer of spill clean-up products) | Expert witness on marketing and distribution |
| 1998 | Anheuser-Busch | Expert witness on marketing and distribution |
| 1998 | Cambro (manufacturer of food service products) | Expert witness on distribution |
| 1998 | Dynamic (manufacturer of car alarms) | Expert witness on marketing and distribution |
| 1998 | Honeywell | Marketing and distribution |

page 18

A 1085

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**CONSULTING EXPERIENCE (continued):**

| Year | Company | Areas |
|------|---------|-------|
| 1998 | SPARC International | Expert witness on marketing and distribution |
| 1998 | Snap-On | Expert witness on distribution |
| 1998 | Bilstein (manufacturer of shock absorbers) | Expert witness on distribution |
| 1998 | Atwood-Richards (distributor of consumer products) | Expert witness on marketing and distribution |
| 1998 and 1999 | Coca-Cola | Re-design of channels in China |
| 1998 and 1999 | Lipton | Expert witness on marketing and distribution |
| 1998 and 1999 | AirTouch Cellular | Expert witness on marketing and distribution |
| 1999 | C & L Distribution (distributor of auto parts) | Expert witness on distribution |
| 1999 | Dacor (Manufacturer of kitchen appliances) | Expert witness on distribution |
| 1999 | 3M | Channel organization and management |
| 2000 | Tarkett (manufacturer of flooring products) | Expert witness on marketing and distribution |
| 2000 | Sky One (retailer of electronics) | Expert witness on marketing and distribution |
| 2000 | Dallo and Company (operator of supermarkets) | Expert witness on marketing and distribution |
| 2000 | Taco Bell | Expert witness on marketing and distribution |
| 2000 and 2001 | American Booksellers' Association | Expert witness on marketing and distribution |

A 1086

**EXHBIT A**
**CURRICULUM VITAE OF GARY L. FRAZIER**

CONSULTING EXPERIENCE (continued):

| Year | Company | Areas |
|------|---------|-------|
| 2000 and 2001 | Wal-Mart | Expert witness on marketing and distribution |
| 2001 | Pensoil | Expert witness on marketing and distribution |
| 2001 | Medibuy (an internet-based supplier of medical supplies) | Expert witness on marketing and distribution |
| 2001 | Arctic Cat (manufacturer of snowmobiles and ATVs) | Channel organization and management |
| 2001 | Australia Vision (manufacturer of sunglasses) | Expert witness on marketing and distribution |
| 2001 and 2002 | Former distributors of Sara Lee | Expert witness on marketing and distribution |
| 2002 and 2004 | Gillette | Expert witness on marketing and distribution |
| 2002 | Wal-Mart (USA and Mexico) | Expert witness on marketing and distribution |
| 2002 | Edwards Cinemas | Expert witness on marketing and distribution |
| 2002 | Scotts' (lawn and garden products) | Expert witness on marketing and distribution |
| 2002 | Mobil Oil Corporation | Expert witness on marketing and distribution |
| 2002 | Pacific Bell | Expert witness on marketing and distribution |
| 2002 | Pegasus (distributor of satellite television service) | Expert witness on marketing and distribution |
| 2002 and 2003 | Microsoft | Expert witness on distribution |
| 2002 and 2003 | Pelican Products (manufacturer of carrying cases) | Expert witness on marketing and distribution |

A 1087

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**CONSULTING EXPERIENCE (continued):**

| Year | Company | Areas |
|------|---------|-------|
| 2003 | Oakland Raiders | Expert witness on marketing and distribution |
| 2003 and 2004 | Nitgen (manufacturer of biometric products) | Expert witness on marketing and distribution |
| 2004 | Cyclone USA (manufacturer of automotive after-market products) | Expert witness on marketing and distribution |
| 2004 | EPI (distributor of automotive after-market products) | Expert witness on marketing and distribution |
| 2004 and 2005 | Mastercard International | Expert witness on marketing and distribution |
| 2004 and 2005 | Tong Yang (manufacturer) and Keystone (distributor) of automotive after-market products | Expert witness on marketing and distribution |
| 2004 and 2005 | C &L (former distributor of automotive after-market products) | Expert witness on marketing and distribution |
| 2005 | City of New York (vs gun manufacturers and distributors) | Expert witness on marketing and distribution |

**GRADUATE AND UNDERGRADUATE TEACHING EXPERIENCE:**

Marketing Channels, undergraduate, MBA, and Ph.D.
Marketing Strategy and Implementation, Ph D
Sales Force Management, MBA and undergraduate
Promotion Management, MBA and undergraduate
Marketing Management, MBA and undergraduate

**EXECUTIVE EDUCATION EXPERIENCE:**

| Year | Program | Areas |
|------|---------|-------|
| 1980-1984 | Faculty member, Industrial Marketing Management Seminar, University of Illinois | Distribution, sales force, and promotion management; sales forecasting; political processes within organizations; industrial buyer behavior |
| 1982 | Faculty member, Automotive Services Industry Association | New product development |

page 21

A 1088

**EXHBIT A**
**CURRICULUM VITAE OF GARY L. FRAZIER**

EXECUTIVE EDUCATION EXPERIENCE (continued):

| Year | Program | Areas |
|------|---------|-------|
| 1983 | Faculty member, Western Electric (now AT&T Technologies) Seminar, Chicago, Illinois | Marketing strategy, personal selling, and negotiating Strategy |
| 1984 and 1985 | Marketing of Professional Health Care Services, California Marketing Associates, Los Angeles | Strategic marketing and negotiating strategy |
| 1986 | General Electric, Management Development Institute, Crotonville, New York | Marketing strategy and management |
| 1988 and 1989 | Weyerhaeuser Corporation, Sales Leadership Seminar | The interface of marketing and sales management |
| 1991 | IBM Corporation, Business Partner Seminar | Channel management and building of partnerships in the channel |
| 1991 | USC Advanced Manager Program | Building a market-focused organization and channel management |
| 1992 | USC Advanced Manager Program | Creating value for customers |
| 1992 | Intel Foreign Manager Program | The structure and management of channels of distribution |
| 1992 and 1993 | Intel Marketing Program | The structure and management of channels of distribution, push and pull strategy, and retailing management |
| 1992 to 1995 | Honeywell Leadership Program | The structure and management of channels of distribution |
| 1994 to 1997 | USC Marketing Seminar | The structure and management of channels of distribution |
| 1994 | Hotai Marketing Program | The structure and management of channels of distribution |
| 1995 to 1997 | Texas Instruments | The structure and management of channels of distribution |
| 1996 and 1997 | Samsung | The structure and management of channels of distribution |

page 22

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

SERVICE, UNIVERSITY OF SOUTHERN CALIFORNIA, 1984 to present:

**University Level**

> Member of the University Committee on Appointment, Promotion, and Tenure,
> beginning Fall, 2002 to Spring, 2007

> USC Ambassador, beginning Fall of 2001 to the present

> Member of the Committee on Faculty Tenure and Privileges Appeals,
> beginning Spring, 2001

> Member of the University Research Committee, 1986-1987, 1987-1988, 1988-1989

> ♦ Chaired a sub-committee on "Research Support for Faculty in the Arts,
>   Humanities, and Social Science" during 1987-1988

> ♦ Chaired a sub-committee on "The Development Effort and Research Support"
>   during 1988-1989

**School of Business Administration Level**

> Member of the MBA Curriculum and Over-site Committee, beginning Fall, 2002

> Chair of the MBA Curriculum and Over-site Committee, Spring, 2001 through Summer, 2002

> Chair of the Committee on Chaired Appointments, Fall, 2002

> Member of an MBA teaching awards committee, Spring, 2000

> Member of a committee evaluating the merits of Ananth Madaven's record for a
>   distinguished chaired position, Spring, 2000

> Member of the School's Personnel Committee, September 1, 1995 to May 1, 1999

> Chaired Ph D Committee on identifying cross-departmental Ph.D Courses, Fall, 1998

> Head of School's Personnel Committee, September 1, 1995 to May 1, 1997

> Director of Research Conferences at the Center for Telecommunications Management
>   from Fall, 1987 to Summer, 1990

> Member of the Ph.D. Quest Committee, School of Business Administration 1984-1985

> Member of the Ph D. Committee, School of Business Administration, Spring semester,
>   1985 to 1989

> Member of the Strategic Planning Committee since July of 1989

> Member of the MBA Task Force, November of 1989 to present

> Member of the Dean's Fellows Committee from January of 1988 to May of 1990

A 1090

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

<u>School of Business Adminstration Level (continued):</u>

Member of the Distance Teaching Committee, Fall of 1989

Panelist at the doctoral workshops held at the Los Angeles MBA Forums,
November 9th and 10th, 1990

Presentation at Ph D Recruitment Program, December 1989 and 1990

Presentation at Undergraduate Recruitment Program, November 20, 1988

Organized FBE and Marketing Research Seminars with Tom Gilligan, 1987-1988

Member of the Research Committee, School of Business Administration, 1984 to 1987

Attended Directors of Doctoral Programs in Business Administration meeting in Seattle,
September 13-15, 1985

Project research advisor for students in the IBEAR program, School of Business Administration,
1984-1987

<u>Marketing Department Level</u>

Chair of Allen Weiss' Peer Evaluation Group, Fall, 2002

Member of Shantanu Dutta's Peer Evaluation Group, Fall, 2002

Chaired recruiting committee for an Assistant Clinical Professor position, Spring, 2002

Chair of Debbie MacInnis' Peer Evaluation Group, Fall, 2000

Served on the guidance committees of Youngshuan Bao, Matthew Thomson, and Shoming Qu
during the summer of 2000

Chaired recruiting committee for an Assistant Clinical Professor position, Spring, 2000

Chaired committee evaluating the status of the Ph D program in Marketing, Spring, 2000

Chaired committee evaluating annual faculty performance, Spring, 1999

Coordinated faculty recruiting effort, Summer, 1998
Chaired staff evaluation committee, Spring, 1998

Chairman of Robert Spekman's PEG Committee during the Spring of 1990

Served on two PEG Committees during the Fall of 1989

Served on three PEG Committees during the Fall of 1988; chairman of Wesley Johnston's
committee

Served on four PEG Committees during the Fall of 1987; chairman of Valerie Folkes'
committee

Coordinator of recruiting efforts in the Department, 1985 through 1988

page 24

A 1091

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

<u>Marketing Department Level (continued):</u>

Member of the "Chairman's Advisory Committee," 1987 to 1989

Member of the "Ph.D. Committee," 1985 to 1990

Coordinator of the Ph.D. Program in Marketing, 1985 to 1987

Served on committee to develop a "mission statement" for the department, Fall semester, 1986

Served on committee to evaluate a proposal for a revised M.B.A. Program, April 1986
Co-coordinator (along with John Graham) of the "Guest Speaker Series," Spring semester, 1985

Represented the Department at the Forum for University Admissions Staff, August 24, 1988 and
    August 16, 1989

Developed Ph.D. courses on "Marketing Strategy and Implementation" and "Implementation of
    Marketing Programs"

Course Section Coordinator for the undergraduate Sales Force Management (MKT 415) class
    from Fall of 1987 through Spring of 1990

SERVICE, UNIVERSITY OF ILLINOIS, 1979-1984:

Developed a Ph.D. course on "Interorganizational Marketing Systems," an MBA course on
    "Sales Force Management," and an undergraduate course on "Industrial Marketing"

Dealt with members of the Central States Industrial Distributors Association in funding and
    developing an education program in Industrial Distribution

Served on Committee to develop a "mission statement" for the Department, Fall semester, 1983

Served on the Graduate Admissions, Library, and Capricious Grading Committees

Coordinated faculty recruiting efforts at the American Marketing Association's Educators'
    Conference, 1980 and 1982

Faculty advisor to Alpha Kappa Psi, 1981 through 1984

Faculty advisor for students in the Individualized Plan of Study Program

SERVICE, INDIANA UNIVERSITY, 1975-1979:

President of DBA Association, 1978-1979

Member of the DBA Association's Policy Committee, 1977-1978 and 1978-1979

Athletic chairman of DBA Association, 1977-1978

Assisted Ralph L. Day in editing <u>Consumer Satisfaction, Dissatisfaction, and Complaining
    Behavior</u>, (Division of Research: Indiana University), Summer 1977

Coordinator of Albert Haring Doctoral Symposium, Spring 1977

page 25

A 1092

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

Second Consolidated and Amended Class Action Complaint

Transcript of April 10, 2006 Hearing

Court Order, April 11, 2006

Answer of Underwriter Defendants to the Second Consolidated and Amended Class Action Complaint

The Adams Golf Defendants' Answer to Plaintiffs' Second Consolidated and Amended Complaint

Underwriter Defendants' Responses and Objections to Plaintiffs' Sixth Set of Interrogatories Directed to Underwriter Defendants, June 30, 2006

Plaintiffs' Responses and Objections to Underwriter Defendants' First Set of Interrogatories to Class Representatives, June 5, 2006

Plaintiffs' Amended Response to Defendant Adams Golf's Second Set of Interrogatories to Proposed Class Representatives, May 17, 2000

Adams Golf Defendants' Objections and Responses to Plaintiffs' Fifth Set of Interrogatories, June 30, 2006

Notice of Filing and Service of the Defendants' Expert Disclosure, July 14, 2006

Deposition of Barney Adams with Exhibits, June 22, 2006

Deposition of Scott Blevins with Exhibits, May 3, 2006

Deposition of Chip Brewer with Exhibits, May 2, 2006

Deposition of David Brown with Exhibits, April 27, 2006

Deposition of Paul Brown, Jr. with Exhibits, May 16, 2006

Deposition of Finnis Conner, Jr. with Exhibits, May 9, 2006

Deposition of James Farrell with Exhibits, June 12, 2006

Deposition of Mark Gonsalves with Exhibits, June 6, 2006

Deposition of Jay Greaney with Exhibits, May 18, 2006

page 1

A 1093

# Exhibit B
## Documents Considered by Gary L. Frazier

Document Title, Date, Bates No (if available):

Deposition of Darl Hatfield with Exhibits, June 8, 2006

Deposition of Brian Lantier with Exhibits, June 5, 2006

Deposition of Ryan Magnussen with Exhibits, April 28, 2006

Deposition of Stephen R. Patchin with Exhibits, June 13, 2006

Deposition of Bernard Picchi with Exhibits, June 9, 2006

Deposition of Greg Pratt with Exhibits, April 27, 2006

Deposition of Marco Puglielli with Exhibits, May 10, 2006

Deposition of Olga A. Pulido-Crowe with Exhibits, May 17, 2006

Deposition of Michael Bradley Smith with Exhibits, June 13, 2006

Deposition of Eddie Tate III with Exhibits, June 27, 2006

Deposition of Joseph D. Teklits with Exhibits, June 7, 2006

Deposition of Patrick D. Walravens with Exhibits, May 26, 2006

Deposition of Patty Walsh with Exhibits, May 11, 2006

Deposition of Lehman Brothers, Inc. Taken Through Its Representative James G. Holderman, with Exhibits, February 28, 2006

Declaration of Ryan Magnussen, February 25, 2006

Declaration of Mark Woodrich (unsigned), June, 2006

Costco Document Production
*COST 0001-0052*

KPMG Document Production
*KPMG 2100-2107*

Expert Report of Christiana Ochoa, July 14, 2006

Expert Report of H. Stephen Grace, July 14, 2006 (including documents cited in Exhibit VII)

page 2

A 1094

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

Expert Report of Christopher M. James, July 14, 2006

Expert Report of Charles A. Sjolquist, July 14, 2006

Expert Report of Ed J. Lynch, July 14, 2006

Expert Report of R. Alan Miller, July 12, 2006

Expert Report of Edward Necarsulmer III, July 12, 2006

Lantier, B. and B. Picchi, CFA. "Adams Golf Inc: Initiating Coverage with a 1-Buy - Target $23 Pt. 1." Lehman Brothers (August 4, 1998)
*ADAMS 008264-71*

Weiss, John W., and Bracken J. White. "Adams Golf, Inc." NationsBanc Montgomery Securities LLC 29 (August 4, 1998)
*ADAMS 004249-64*

Lantier, B. and B. Picchi, CFA. "Adams Golf, Inc: Product Line Extensions Announced on Q2 Conference Ca..." Lehman Brothers (August 7, 1998)
*ADAMS 008260-63*

Teklits, Joseph and David Turner. "Adams Golf, Inc. - New Recommendation: Buy." Ferris Baker Watts (August 12, 1998)
*ADAMS 004175-98*

Lantier, Brian and Bernard J. Picchi, CFA. "Adams Golf, Inc. - Fore! A Golf Equipment Giant is Headed Your Way." Lehman Brothers (August 28, 1998)
*ADAMS 004302-33*

Weiss, John W. and Anne-Marie Lillestrand. "Adams Golf, Inc. - EPS Estimates Reduced Due to Competitive Environment; New Estimates Exclude Possible Share Repurchase Which Could Add $0.35 to EPS; Stock Price Approximates Net Working Capital Per Share." NationsBanc Montgomery Securities (September 25, 1998)
*ADAMS 004465-71*

Lantier, B. and B. Picchi, CFA. "Adams Golf, Inc: Pre-Announces Q3 Results: EPS and Target Lowered." Lehman Brothers (September 29, 1998)
*ADAMS 007976-9*

Teklits, Joseph and David Turner. "Revising Estimates for 4Q:98; Sales And Earnings Projected Lower." Ferris Baker Watts, Equity Research (October 9, 1998)

page 3

A 1095

# Exhibit B
## Documents Considered by Gary L. Frazier

<u>Document Title, Date, Bates No (if available):</u>

Lantier, B. and B. Picchi, CFA. "Adams Golf, Inc: Reports 3Q98 $0.19/sh Outlook Weakens."
Lehman Brothers (October 23, 1998)
*ADAMS 7952-53*

Teklits, Joseph and David Turner. "ADGO: Q3:98 In-Line with Pre-Announced Guidance -
Lowering Q4:98, 1999 EST's." Ferris Baker Watts (October 26, 1998)

Teklits, Joseph and David Turner. "ADGO: Lowering 1999 EPS to Low End of Potential
Range." Ferris Baker Watts (October 28, 1998)

Lantier, B. and B. Picchi, CFA. "Adams Golf, Inc: Lowering 1999 Estimates." Lehman
Brothers (November 6, 1998)
*ADAMS 4199-202*

Lantier, B. and B. Picchi, CFA. "Adams Golf, Inc: Lowering 1999 Estimates." Lehman
Brothers (November 6, 1998)
*ADAMS 4450-8*

Proxy Analysis of Adams Golf, Prepared by The Investext Group (March 31, 1999)

Proxy Analysis of Adams Golf, Inc., Prepared by Suzy Keady, Thomson Financial (April 22,
2000)

Company Report on Adams Golf Inc, Prepared by Mergent FIS

Ryan, Thomas M. and David Hone. "Callaway Golf Company - Estimates Reduced--'Market
Perform' Rating Reiterated." BT Alex Brown Research (July 13, 1998)

Eisenberg, Steven. "Coastcast Corporation - Reports Q2 Slightly Ahead of Out Forecast;
Lowering '98,'99 EPS Estimates." CIBC Oppenheimer (July 15, 1998)

Eisenberg, Steven. "Callaway Golf - Dramatically Lowering Expectations; Rating Cut to Hold
from Buy." CIBC Oppenheimer (July 23, 1998)

Rose, David L. and James S. Pott. "Callaway Golf Company - Missing the Ball." Jefferies &
Company, Inc. (July 24, 1998)

Ryan, Thomas M. and David Hone. "Callaway Golf Company - 2Q 1998 Results Reported--
Estimates Lowered Again --'Market Perform' Rating Reiterated." BT Alex.Brown Research
(July 27, 1998)

"Golf Equipment/Accessories - Golf Clubs Mkt Trends." MarkIntel (October 1, 1998)

page 4

A 1096

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

"Golf Equipment/Accessories - Distribution Channels." MarkIntel (October 1, 1998)

Teklits, Joseph and David Turner. "ELY: 3Q:98 Below Our Estimate - No Positive Trends Visible." Ferris Baker Watts (October 22, 1998)
*ADAMS 4138-45*

Eisenberg, Steven and Todd Denker. "Fortune Brands - Initiating Coverage with a Buy Rating " CIBC Oppenheimer, Equity Research (November 24, 1998)

Van Kampen, Ken. "Uphill Climb." Golf Pro (September 1, 1998)

Ramsey, Tom. "Golf's Retail Slump Puts Bite on Tiger." Daily Telegraph (September 19, 1998)

McNulty, Mike and the Plastic News Staff. "Spalding Looking to Expand Products." Rubber & Plastics News (September 21, 1998)

"3, Sports." The Financial Post (September 29, 1998)

"Adams Golf Reports Record Third Quarter Operating Results." Adams Golf Inc., Press Release (October 22, 1998)

"Adams Golf Reports Record Second Quarter Sales and Earnings." Adams Golf Inc., Press Release (July 22, 1998)

"Fortune Brands Inc 3rd Quarter & 9 Mths Results." Regulatory News Service (October 23, 1998)

"Callaway Golf Earnings - 3: Sees Improved Margins In '99> ELY." Dow Jones News Service (July 22, 1998)

"Callaway Golf Reports Second Quarter Sales and Earnings" Callaway Golf Press Release (July 22, 1998)

"Adams Golf/Costco - 2: Says Costco Not Authorized Reseller." Dow Jones News Service (June 9, 1998)

Rajiv, Lal and Edith D. Prescott. "Calloway Golf Company." Harvard Business School, Case Study No. 9-501-019 (2000, Revised September 26, 2005)

Antia, Kersi D., Mark Bergen, and Shantanu Dutta. "Competing with Gray Markets." MIT Sloan Management Review 46, no. 1 (Fall 2004): 63-69

page 5

A 1097

# Exhibit B
## Documents Considered by Gary L. Frazier

Document Title, Date, Bates No (if available):

Assmus, Gert and Carsten Wiese. "How to Address the Gray Market Threat Using Price Coordination." MIT Sloan Management Review 36, no. 3 (Spring 1995)

Cespedes, Frank V., Assistant Professor. "Peripheral Products Company: The 'Gray Market' for Disk Drives." Harvard Business School, Case Study No. 9-586-124 (1986, Revised September 7, 1988): 1-22

Chen, Hsiu-Li. "Gray Marketing and Unfair Competition." Atlantic Economic Journal 30, no. 2 (June 2002)

Hilke, John C. "Free Trading or Free Riding: An Examination of Theories and Available Empirical Evidence on Gray Market Imports." Chapter 12 in The Economics of Intellectual Property IV, Competition and International Trade, edited by Ruth Towse and Rudi Holzhauer

Mullen, Michael R., C.M. Sashi, and Patricia M. Doney. "Gray Markets: Threat or Opportunity? The Case of Herman Miller v. ASAL GmbH." in Advances in International Marketing, Reviving Traditions in Research on International Market Entry (2003): 77-105

Gaffney, Andrew. "Fore Scores." Sporting Good Business 28, no. 6 (June 1995): 50-51

Stogel, Chuck. "Maxfli Takes Aim at Unmet Needs; Hot Gray Market Prompts Responses." Brandweek 41, no. 7 (February 14, 2000): 14

Murray, Kathleen. "Shades of Gray Goods Again, European Consumers Find Themselves on the Losing Side of the Battle Over Who Sets Prices." Time International 152, no. 19 (November 9, 1998)

Johnson, Greg. "Gray Wail Several Southern California Companies Are Among The Many Upscale Manufacturers Voicing Their Displeasure About Middlemen Delivering Their Goods Into The Hands of Unauthorized Discount Retailers." Los Angeles Times (March 30, 1997)

Jacoby, Jacob and Maureen Morrin. "'Not Manufactured or Authorized by...': Recent Federal Cass Involving Trademark Disclaimers." Journal of Public Policy & Marketing 17, no. 1 (April 1, 1998)

"Germany - Golf Equipment Market (1) (4115)." Industry Sector Analysis (May 28, 1998)

"Adams Golf Reports Third Quarter Operating Results." PR Newswire (October 22, 1998)

"FFBN Research: Adams Golf At Bargain Valuations (Cont.)." Federal Filings Newswires (November 2, 1998)

"Adams Golf Comments on Fourth Quarter Outlook." PR Newswire (January 7, 1999)

page 6

A 1098

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

"Adams Golf Comments on Earnings Outlook." Adams Golf Investor Relations (September 28, 1998)

"Adams Golf Estimate - 3: Sets Ups New Price Structure>." PR Newswire (January 7, 1999)

"Adams Golf Reports 1998 Operating Results." PR Newswire (February 4, 1999)

"Adams Golf Identifies Source of Gray Market Supply." PR Newswire (March 18, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers And Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (June 14, 1999)

"Seattle's Keller Rohrback L.L.P. Investigates Adams Golf, Inc. and Its Top Officers and Directors." Business Wire (June 15, 1999)

"Seattle's Keller Rohrback L.L.P. Investigates Adams Golf, Inc. and Its Top Officers and Directors." Business Wire (June 16, 1999)

"Adams Golf, Inc. and Top Officers and Directors Are Sued by The Shareholders in Class Actions Lawsuits Filed by Keller Rohrback LLP." Business Wire (June 23, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." Business Wire (August 5, 1999)

"Wechsler Harwood Files Class Action Against Adams Golf, Inc." Business Wire (August 6, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." Business Wire (August 7, 1999)

Branch, Shelly. "Inside The Cult of Costco Diamonds and Tires and Bras, Oh, My!" Fortune 140, no. 5 (September 6, 1999)

"Titleist Selects GenuOne for Brand Security Solution; Leading Golf Manufacturer Taps Innovative Company for Strategic Approach To Product Diversion and Proactive Brand Management." Business Wire (October 12, 2000)

Greenwald, Judy. "Losses of Intangible Assets Can Be Costly: Brand Risk Require Careful Management." Business Insurance 35, no. 47 (November 19, 2001)

page 7

A 1099

# Exhibit B
## Documents Considered by Gary L. Frazier

Document Title, Date, Bates No (if available):

"Callaway Golf Company - SWOT Analysis." Datamonitor Company Profiles (June 17, 2004)

Sporting Good Business, May 17, 2005

"Wolf Haldenstain Announces Filing of Class Actions Against Adams Golf, Inc." Business Wire (July 6, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by the Shareholders As Per the Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (July 7, 1999)

"Keller Rohrback L.L.P. Announces Updated Procedures on Suit Against Adams Golf, Inc. and Top Officers and Directors." Business Wire (July 8, 1999)

"Adams Golf, Inc. and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." Business Wire (July 10, 1999)

"Adams Golf, Inc. and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." Business Wire (July 14, 1999)

"Law Suits Against Adams Golf, Inc. Assigned to Judge Roderick R. McKelvis in The U.S. District Court in Delaware Announces Keller Rohrback L.L.P." Business Wire (July 16, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholder As Per The Class Action Lawsuit Filed by Berger & Montague." Business Wire (July 17, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholder As Per The Class Action Lawsuit Filed by Berger & Montague." Business Wire (July 20, 1999)

"Stull, Stull & Brody Announces Class Action Against Adams Golf Inc." Business Wire (July 22, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by the Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (July 24, 1999)

"Keller Rohrback L.L.P. Announces New Class Action Against Adams Golf Inc." Business Wire (July 29, 1999)

page 8

A 1100

**Exhibit B**

Documents Considered by Gary L. Frazier

<u>Document Title, Date, Bates No (if available):</u>

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholder As Per The Class Action Lawsuit Filed by Berger & Montague." PR Newswire (July 17, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (July 20, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (August 4, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (August 5, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (August 7, 1999)

"How To Fit Your Game from Head to Toe." Golf Digest (December 1998)

Rob Sauerhaft's Review of Adam's Strong 3, Tight Lies, Strong. Golf Magazine 40, no. 3 (March 1998)

Rob Sauerhaft's Review of Fairway Woods and Drivers from Daiwa. Golf Magazine 40, no. 3 (March 1998)

Rob Sauerhaft's Review of Super Megasize Grooveless Drives and Megasize Offset Fairway Wood from Cubic Balance. Golf Magazine 40, no. 3 (March 1998)

Cespedes, Frank V., E. Raymond Corey, and V. Kasturi Rangan. "Gray Markets: Causes and Cures." Harvard Business Review (July-August 1988)

Mitchell, Alan, "Customer Rights a Gray Area in Distribution Ban," Marketing Week 21, no. 21 (July 23, 1998)

Coughlan, Anderson, Stern, and El-Ansary, <u>Marketing Channels</u>, 2005, Prentice Hall

page 9

A 1101

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4   IN RE:  ADAMS GOLF, INC.  :    CONSOLIDATED

5   SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

6   _____X

7

8          ORAL DEPOSITION OF J. DAVID WASHBURN

9                Tuesday, August 16, 2006

10

11          The oral deposition of J. DAVID WASHBURN

12   was held at the law offices of Akin Gump Strauss

13   Hauer & Feld, LLP, 1700 Pacific Avenue, Suite

14   4100, Dallas, Texas, from 10:03 a.m. to

15   12:28 p.m., before Jamie K. Israelow, a Certified

16   Shorthand Reporter in and for the State of Texas,

17   Registered Professional Reporter, Certified

18   Realtime Reporter and Certified LiveNote Reporter.

19

20

21          RSA/VERITEXT COURT REPORTING COMPANY

22            1845 Walnut Street, 15th Floor

23                Philadelphia, PA  19103

24            (215)241-1000    (888)777-6690

Page 5

```
 1        Q       And you have to answer -- you just

 2   nodded your head.  You can't do that.  The court

 3   reporter has to take it down, so you have to

 4   answer orally.  You have to say "yes" or "no."

 5        A       Okay.

 6        Q       If you know, when did Arter & Hadden

 7   start representing Adams Golf?

 8        A       Sometime prior to the IPO.

 9        Q       Do you know if their first

10   representation was the IPO, or had they been

11   representing them for other matters before that?

12        A       Our first significant representation

13   was to ready the company for the initial public

14   offering.

15        Q       Who was the billing partner or the

16   main partner on that?

17        A       Joe Hoffman.

18        Q       Who was the Robin somebody on the --

19   some of the papers?

20        A       Robin Bradford?

21        Q       Yes.

22        A       Robin was a partner at Arter &

23   Hadden.

24        Q       And what was his part in the
```

1                    MS. BRANNEN:  Objection, form.

2                    MR. RYAN:  Objection, form.

3        A     I -- I don't know what the SEC saw.

4        Q     (By Ms. Fox)  Do you remember your --

5   yourself personally or someone at Arter & Hadden

6   notifying the SEC about this bill of discovery?

7        A      I don't recall.  I don't recall.

8        Q      Before you heard from the SEC, and I

9   think we can stipulate that was June 25th that you

10  heard from the SEC.

11                   MS. BRANNEN:  Objection.

12                   MS. FOX:  You don't agree?

13                   MS. BRANNEN:  I think they

14  heard from the SEC probably more than once.

15                   MS. FOX:  Well, about this

16  issue.

17                   MS. BRANNEN:  If that's what

18  you're going to say, let's --

19       Q     (By Ms. Fox)  Okay.  You obviously

20  heard from the SEC many times, but before you

21  heard from the SEC with respect to this particular

22  press release or bill of discovery, did you have

23  any discussions about whether or not it should be

24  in the litigation section of the -- of the

Page 27

1    prospectus?

2                        MS. BRANNEN:  Objection, form.

3                        MR. RYAN:  Objection, form.

4        A      I'm confident that we did, yes.

5        Q      (By Ms. Fox)  And your decision was

6    that it did not need to be?

7                        MS. BRANNEN:  Objection, form.

8        A      Other than as it is otherwise

9    described in the registration statement.

10                       You need to understand that

11   any litigation, whether functioning as a plaintiff

12   or a defendant, that is on file at the time that a

13   company files a registration statement will

14   automatically be discussed in these drafting

15   sessions.

16                       Our role as counsel is to

17   ensure that the company understands the construct

18   of materiality and applies the facts as they

19   understand them to that construct and makes its

20   own determination as to whether or not it needs to

21   be disclosed in the registration statement.

22                       So when you ask, you know, was

23   it discussed, yes, I'm confident it was discussed.

24       Q      (By Ms. Fox)  That is, whether or not

A 1105

Page 46

1    what went on with you and the SEC?

2                    MR. RYAN:  Objection, form.

3                    MS. BRANNEN:  Objection, form.

4        Q      (By Ms. Fox)  Is that right?

5        A      Yeah.  I don't know what you're left

6    with.

7        Q      Do you remember any discussions with

8    the company during that period between July 25th

9    and -- I'm sorry -- June 25th, when they called,

10   and July 6th, when apparently the letter was --

11   was -- and the August file -- and Amendment 2 was

12   filed with the SEC?

13       A      I don't have any specific

14   recollection of any such conversations.  I'm

15   confident that we had more than one such

16   conversation in order to evaluate and consider the

17   SEC's comments and decide how best to respond.

18       Q      Who would you have spoken with at the

19   company?

20       A      The company representatives.  There

21   were a number of them, so I can't tell you with --

22   I can't tell you who those conversations would

23   have been with.

24       Q      This was during the road show, so

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

IN RE ADAMS GOLF, INC.                    CONSOLIDATED
SECURITIES LITIGATION                     C.A. No. 99-371 KAJ

---

**PLAINTIFFS' AMENDED AND SUPPLEMENTED RESPONSES TO ADAMS GOLF
DEFENDANTS FIRST REQUEST FOR ADMISSIONS TO PLAINTIFFS**

Plaintiffs hereby respond to Defendants' Adams Golf, Inc., Barney Adams, Darl Hatfield,

Richard Murtland, Paul Brown, Jr., Roland Casati, Finis Conner and Stephen Patchin

(collectively, "Adams Golf Defendants") requests for admissions (the "Requests") as follows:

## GENERAL OBJECTIONS

1.      Plaintiffs object to Adams Golf Defendants' definitions and instructions to the

extent that they are inconsistent with or would impose obligations upon plaintiffs in excess of

those set forth in the Federal Rules of Civil Procedure, including Rule 36 which permits a party

to state that after reasonable inquiry "the information known or readily obtainable by the party is

insufficient to enable the party to admit or deny", and permits, after an objection, that the

"answer . . . set forth in detail the reasons why the answering party cannot truthfully admit or

deny the matter."

2.      Plaintiffs object to Adams Golf Defendants' definitions and instructions to the

extent that they are unduly burdensome.

3.      Plaintiffs object to Adams Golf Defendants' definitions and instructions to the

extent that they are vague and overbroad.

408156

4.    Plaintiffs reserve the right to amend these admissions on the discovery of new

information.

### SPECIFIC OBJECTIONS AND RESPONSES

### REQUEST FOR ADMISSION NO. 1

The only statements in Adams Golf's Registration Statement that you contend in the
Complaint are false and misleading are the following:

> To preserve the integrity of its image and reputation, the Company
> currently limits its distribution to retailers that market premium
> quality golf equipment and provide a high level of customer service
> and technical expertise. The Company currently sells its products to
> on-and-off-course golf shops and selected sporting goods retailers.
> The Company believes its selective retail distribution helps its
> retailers to maintain profitable margins and maximum sales of
> Adams' products.

> The Company sells a significant majority of its products to selected
> retailers. To maintain its high quality reputation and generate retailer
> loyalty, the Company does not sell its product through price sensitive
> general discount warehouses, department stores or membership clubs.

### RESPONSE:

Objection. This discovery is duplicative of other discovery and motions. Plaintiffs admit

that both statements quoted are false and misleading, but deny that they are the only false or

misleading statements. The false and misleading statements as well as material omissions are set

forth in the Second Amended Complaint, and explained in detail in plaintiffs' responses to

defendants' motions to dismiss, as well as in Plaintiffs' Responses and Objections to the Adams

Golf Defendants' Third Set of Interrogatories to Plaintiffs and the Underwriter Defendants'

Interrogatories to Plaintiffs.

### REQUEST FOR ADMISSION NO. 2:

Costco refused to identify the source of their Adams Golf clubs.

408156                                                    2

**RESPONSE:**

After reasonable inquiry, plaintiffs have insufficient knowledge to admit or deny this request, since Plaintiffs do not know what oral communications went on between Costco and Adams Golf personnel. Plaintiffs admit that there is evidence that Costco refused to identify its sources of Adams Golf clubs in response to questions from Adams Golf and Mackenzie.

**REQUEST FOR ADMISSION NO. 3:**

Costco refused to provide Adams Golf with information about the number of Adams Golf clubs that it had obtained.

**RESPONSE:**

After reasonable inquiry, Plaintiffs do not have sufficient information to admit or deny this request. Plaintiffs are not aware of any documentary evidence that Adams asked Costco about the number of Adams clubs Costco had obtained, nor of any letter from Costco refusing to supply such number.

**REQUEST FOR ADMISSION NO. 4:**

The document Bates-labeled COST 0001 - COST 0005 represents the number of Adams Golf clubs in Costco distribution warehouses.

**RESPONSE:**

Plaintiffs object that the term "distribution warehouses" is vague and ambiguous. Notwithstanding this objection, Plaintiffs deny that COST 0001-0005 represents the number of Adams Golf clubs in Costco distribution warehouses. Plaintiffs understand that COST 001-005 is a compilation prepared by Costco and believe COST 0001-0005 sets forth clubs purchased by Costco or for Costco's account as shown by records currently available to Costco. See Declaration of Mark Woodrich and exhibits.

408156                                    3

A 1109

**REQUEST FOR ADMISSION NO. 5:**

No pre-IPO documents reflect the number of Adams Golf clubs in Costco stores.

**RESPONSE:**

Plaintiffs object to the term "pre-IPO documents," since it is vague and ambiguous. After a reasonable inquiry, plaintiffs have insufficient information to admit or deny the existence of pre-IPO documents reflecting the number of Adams clubs in Costco stores, since plaintiffs do not know what documents existed at Costco before the IPO. However, on the basis of documents produced by Costco in 2005 and 2006, it appears that before the IPO, Costco did have documents reflecting the number of Adams Golf clubs in Costco stores.

**REQUEST FOR ADMISSION NO. 6:**

No Costco distribution warehouse in Canada received a shipment of Adams Golf clubs between March 27, 1998 and December 31, 1998.

**RESPONSE:**

Plaintiffs object that the term "distribution warehouses" is ambiguous as Costco uses the term "warehouse" to mean store. Denied. After a reasonable inquiry, and study of the Declaration of Woodrich and COST 0005, apparently National placed orders for clubs for Canada on February 6, March 3, and March 26, 1998 as shown by records currently available at Costco. COST 0005 does not say when those clubs were shipped to Costco "distribution warehouses" in Canada. Mackenzie officers and Chris Beebe stated that almost 600 Adams clubs were in Costco stores in Canada starting in late March, 1998 and that a new shipment of Adams clubs arrived at Canadian Costcos at the end of May, 1998. Ex. 83, 84, 85. In MCK 00373, Pratt states that Costco received at least three shipments by August 1998.

408156                                                        4

A 1110

**REQUEST FOR ADMISSION NO. 7:**

On June 8, 1998, Adams Golf implemented a price-matching program in Canada.

**RESPONSE:**

Plaintiffs object that the term "price-matching program" which is not defined, is vague and ambiguous. Notwithstanding this objection, plaintiffs admit that Adams Golf implemented the plan reflected in deposition Exhibits 10 and 11 and the deposition testimony of Pratt, Brown and Magnussen.

**REQUEST FOR ADMISSION NO. 8:**

Before April 1998, Callaway employed a price-matching program to combat the gray marketing of its products.

**RESPONSE:**

Plaintiffs object that the term "price-matching program" is undefined and the date and details of Callaway's alleged plan are not included. After a reasonable inquiry, plaintiffs have insufficient knowledge to admit or deny whether Callaway had such a program, but admit that Pratt wrote that "Callaway, Taylor Made and Ping either match the pricing of Costco to its accounts or go to Costco and purchase all of the product." MCK 00093. See also ADAMS 009406.

**REQUEST FOR ADMISSION NO. 9:**

Before April 1998, Titleist employed a price-matching program to combat the gray marketing of its product.

**RESPONSE:**

Plaintiffs incorporate by reference objections to Request No.8, as to Titleist. After reasonable investigation, plaintiffs are without information on whether Titleist did any price matching and therefore neither admit nor deny the request.

408156                                    5

**REQUEST FOR ADMISSION NO. 10:**

Before April 1998, Ping employed a price-matching program to combat the gray marketing of its products.

**RESPONSE:**

Plaintiffs incorporate by reference objections and answer to Request No. 8, as to Ping.

**REQUEST FOR ADMISSION NO. 11:**

Before April 1998, Taylor Made employed a price-matching program to combat the gray marketing of its product.

**RESPONSE:**

Plaintiffs incorporate by reference objections and answer to Request No. 8, as to Taylor Made.

**REQUEST FOR ADMISSION NO. 12:**

When Adams Golf began production of the Tight Lies club in 1995, it featured a unique design unlike any other club on the market at that time.

**RESPONSE:**

Plaintiffs object to Request 12 because it is vague and ambiguous in claiming a "unique design". After reasonable inquiry, plaintiffs have insufficient knowledge as to whether the Tight Lies was unique and unlike any other club on the market in 1995, although Adams Golf claimed it had a unique design, and therefore neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 13:**

During the Class Period, Adams Golf did not have access to Costco's contemporaneous inventory records of Adams Golf clubs in its distribution warehouses.

**RESPONSE:**

Plaintiffs object to the word "access" and "its" as vague and ambiguous, and object to the request as irrelevant, since the only relevant time is before the IPO not during the Class Period.

408156                                      6

A 1112

Notwithstanding this objection, and after a reasonable inquiry, plaintiffs have insufficient

knowledge to admit or deny Request 13, because they do not know if Adams had access to

Costco's records, since defendants have admitted they were in contact with Costco, and

defendants could have sued or subpoenaed Costco in Washington (alleging intentional

interference with contractual relations or similar grounds) to get such access.

**REQUEST FOR ADMISSION NO. 14:**

    During the Class Period, Adams Golf did not have access to Costco's contemporaneous
inventory records of Adams Golf clubs available for sale in its stores.

**RESPONSE:**

    See response to Request 13.

**REQUEST FOR ADMISSION NO. 15:**

    Sales to Adams Golf's Canadian distributor in 1998 were less than three percent of
Adams Golf's total sales in 1998.

**RESPONSE:**

    Plaintiffs object to this request because it is vague and ambiguous. Plaintiffs admit that

for the 1998 year, Adams's sales to Mackenzie were approximately 3% of Adams Golf's total

sales in dollars.

**REQUEST FOR ADMISSION NO. 16:**

    WDC Mackenzie reported the presence of Adams Golf Tight Lies clubs in Costco stores
as soon as it was knowable.

**RESPONSE:**

    Plaintiffs object to this Request as vague and ambiguous, because of the words "as soon

as it was knowable." Subject to and without waiver of this objection, plaintiffs, after reasonable

inquiry cannot admit or deny this request, because plaintiffs do not know when the first Tight

A 1113

Lies appeared in a Costco store in Canada, although apparently Costco had ordered clubs well before Mackenzie discovered them. See COST 0005.

**REQUEST FOR ADMISSION NO. 17:**

As of July 1998, WDC Mackenzie owed Adams Golf $707,461, of which $696,073 was more than 60 days outstanding.

**RESPONSE:**

Plaintiffs object to this Request as neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of this objection, plaintiffs after reasonable investigation are without knowledge or information sufficient to admit or deny this request, because Adams Golf's accounting numbers apparently did not match Mackenzie's numbers. See Exhibit 47.

**REQUEST FOR ADMISSION NO. 18:**

The document Bates-labeled ADAMS 004005 reflects the reasons for return of Adams Golf clubs in 1998.

**RESPONSE:**

Plaintiffs object that this request is vague and misleading. Admitted in part and denied in part. Plaintiffs admit that document 004005 imprecisely states some of the reasons for returns in the last six months of 1998, but deny that the document reflects all of "the reasons", or that it refers to all of the year 1998.

**REQUEST FOR ADMISSION NO. 19:**

In 1998, shipping errors occurred in the normal course of Adams Golf's business.

**RESPONSE:**

Plaintiffs object to this Request as vague and ambiguous. Defendants have not supplied any examples of such errors. After reasonable inquiry, plaintiffs are without knowledge or

408156                                    8

A 1114

information sufficient to form a belief as to whether shipping errors occurred in the course of

Adams's business, and therefore neither admit nor deny this request.

### REQUEST FOR ADMISSION NO. 20:

KPMG LLP audited and approved Adams Golf's financial statements in the S-1.

### RESPONSE:

Plaintiffs admit that KPMG LLP audited Adams Golf's financial statements, but deny that the auditors "approved" them. The Registration Statements speaks for itself.

### REQUEST FOR ADMISSION NO. 21:

KPMG LLP audited and approved Adams Golf's financial statement in 1998 Form 10-K filed with the SEC.

### RESPONSE:

Plaintiffs admit that KPMG LLP audited Adams Golf's financial statements, but deny

that the auditors "approved" them. The Form 10-K Statement speaks for itself.

### REQUEST FOR ADMISSION NO. 22:

No retailers reported receiving double shipments of Tight Lies clubs in their accounts receivable confirmations sent to KPMG LLP.

### RESPONSE:

Plaintiffs object that this Request is vague in that it gives no date and does not identify

the "accounts receivable confirmations sent to KPMG." Plaintiffs further object that the request

is misleading, because it implies that retailers were asked about double shipping. Plaintiffs

admit that the accounts receivable confirmations produced by KPMG which were sent out in

April of 1998 and which reflect payments as of December 31, 1998, (KPMG 0048 to 0070) do

not report double shipping since they do not request that the retailers or distributors report

double-shipping. The confirmations merely ask if Adams's records of payments, charges and

408156                                    9

A 1115

amounts due are correct.

**REQUEST FOR ADMISSION NO. 23:**

In interviews conducted by representatives of the underwriters, no retailer reported receiving double shipments of Tight Lies clubs.

**RESPONSE:**

Plaintiffs object that this Request is vague in that it gives no dates and fails to identify the "interviews conducted by the underwriters." Plaintiffs further object that it is misleading because it implies that retailers were asked about double shipping. After reasonable inquiry, plaintiffs are without knowledge or information sufficient to form a determination as to the truth of the matters set forth in this request, and therefore neither admit or deny this request. Plaintiffs do not know what retailers may have said in the interviews, and the interview form does not ask about double shipping. Plaintiffs have only answered with regard to Ex. 161, but there may well have been further interviews at a later time in 1998. Moreover, the interviews took place in April, well before the IPO. (Ex. 161).

**REQUEST FOR ADMISSION NO. 24:**

The amount allocated in Adams Golf's return reserves in 1998 was sufficient to cover returns received in 1998.

**RESPONSE:**

Plaintiffs object to this request in that it calls for an expert opinion. Subject to and without waiver of this objection, and after a reasonable inquiry, plaintiffs are without knowledge or information sufficient to admit or deny this request, since they do not know if Adams accurately reported its returns from retailers and distributors. Plaintiffs admit that the reported reserves were adequate to cover the reported returns over the entire year. See also Lynch and Rainwater depositions.

408156                                   10

A 1116

**REQUEST FOR ADMISSION NO. 25:**

Actual returns may differ from estimated returns, but the return reserve may still comply with Generally Accepted Accounting Principles.

**RESPONSE:**

Plaintiffs object to this request on the grounds that it is vague and overbroad; because it is hypothetically stated and not linked to any specific facts; and because it provides an insufficient basis for formulation of a meaningful answer. Plaintiffs admit that in some circumstances the request may be true.

**REQUEST FOR ADMISSION NO. 26:**

During the Class Period, Adams Golf had a no-questions-asked, 90-day return policy.

**RESPONSE:**

Plaintiffs object to this request because it does not specify who would be bound by the return-policy and because the return policy for direct sales is irrelevant to this case. Admitted in part and denied in part. Plaintiffs admit that the Adams Golf Prospectus contained Notes to the Consolidated Financial Statements which stated, "the Company has a 90 day 'no questions asked' return policy" and that Dallas Rainwater apparently told KPMG that this was the policy (KPMG 0502). After a reasonable inquiry, plaintiffs believe this policy applied only to direct response sales and did not apply to the distributors and retailers Adams sold to, and therefore deny this Request in part. See Exhibit 86, 255, KPMG, 0503; Lynch and Rainwater Deposition Transcripts; response to Request 27.

**REQUEST FOR ADMISSION NO. 27:**

You do not dispute in this litigation that Adams Golf's return policy was truly and accurately described in the Registration Statement.

**RESPONSE:**

Plaintiffs object that this Request is irrelevant because the return policy described in the

Registration Statement did not apply to returns from distributors and retailers. Admitted as to

Adams return policy for clubs sold directly through its infomercials, but denied for clubs sold to

retailers or distributors. While Adams claimed Retailers and distributors had no right of return,

or had to get permission for returns, in fact Adams had a well established "practice" of returns

that rendered Adams's description of its return policy misleading. See Lynch Deposition

Transcript and answer to Request 26.

**REQUEST FOR ADMISSION NO. 28:**

Adams Golf's return reserves in 1998 were based on historical trends.

**RESPONSE:**

Plaintiffs object to this request as vague and ambiguous. Subject to and without waiver of

this objection, and after a reasonable inquiry, plaintiffs admit that Adams Golf personnel alleged

they considered 1997 returns when formulating 1998 return reserves, but Rainwater testified that

he did not know the basis for the percent of sales numbers that determined the reserves.

**REQUEST FOR ADMISSION NO. 29:**

Orlimar introduced its Trimetal club in February 1998.

**RESPONSE:**

Plaintiffs object that the Request does not identify the source of this statement. After a

reasonable inquiry, plaintiffs are without knowledge or information sufficient to form a

determination of the truth of the matters set forth in this request, but admit that Olimar

introduced the Trimetal before April 1998, since Golf Datatech did not begin to show Olimar

sales until April 1998. (Adams 006543).

408156                           12

A 1118

**REQUEST FOR ADMISSION NO. 30:**

Orlimar's Trimetal had a design similar to that of Adams Golf's Tight Lies club, featuring a shallow club face.

**RESPONSE:**

Plaintiffs object to this request as vague and ambiguous. Subject to and without waiver of this objection, plaintiffs admit that Olimar Trimetals were in some respects similar to Adams Tight Lies clubs.

**REQUEST FOR ADMISSION NO. 31:**

Callaway introduced Big Bertha Steelhead club in August 1998.

**RESPONSE:**

Plaintiffs object to this request as vague and ambiguous, in that it does not define the term "introduced." Subject to and without waiver of this objection, plaintiffs admit that the Callaway Big Bertha Steelhead clubs were first sold in August 1998. See Adams 006543.

**REQUEST FOR ADMISSION NO. 32:**

Callaway's Big Bertha Steelhead had a design similar to that of Adams Golf's Tight Lies club, featuring a shallow club face.

**RESPONSE:**

Plaintiffs object to this request as vague and ambiguous. Subject to and without waiver of this objection, denied, because underwriter reports describing the Callaway product differentiated the design of the club from the design of Adams's products. See Adams 004077 and UND 08538.

**REQUEST FOR ADMISSION NO. 33:**

In the third quarter of 1998, Callaway's sales were down 32% from the second quarter of 1998 and down 82% from the third quarter of 1997.

408156                                        13

A 1119

**RESPONSE:**

Plaintiffs object that defendants have mis-cited Callaway's October 21, 1998 press release. Denied. On October 21, 1998 in a press release, Callaway reported that net sales for the 3rd quarter of 1998 decreased by 32.8% from net sales in the 3rd quarter of 1997.

**REQUEST FOR ADMISSION NO. 34:**

Even prior to the IPO, the golf equipment industry suffered from oversupply of inventory at the retail level.

**RESPONSE:**

Plaintiffs admit that Adams asserted that oversupply at the retail level existed before the IPO. See Plaintiffs' Consolidated Amended Complaint.

**REQUEST FOR ADMISSION NO. 35:**

You do not contend that the historical financial statements contained in Adams Golf's Registration Statement were false or misleading.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 36:**

Adams Golf did not consider the presence of some unknown number of Tight Lies golf clubs in certain Costco stores through July 1998 to be a material risk to its business at the time of the IPO.

**RESPONSE:**

Plaintiffs object that this request is vague, ambiguous, misleading and overbroad and assumes that a company can "consider". The request is also irrelevant since what the Company "considered" is irrelevant under §§ 11 and 12 of the Securities Act. Subject to and without waiver of that objection, after a reasonable inquiry plaintiffs deny this request. The materiality of the risk is a genuine issue for trial. Some officers of Adams Golf considered gray marketing,

408156                                    14

A 1120