# Appendix
# A1121-A1160

including the presence of Tight Lies in Costco stores to be a serious problem. See, for example, Exhibit 257, and expert reports of Ochoa. Plaintiffs are without knowledge as to what "Adams Golf" considered.

## REQUEST FOR ADMISSION NO. 37:

The Underwriters did not consider the presence of some unknown number of Tight Lies golf clubs in Costco stores through July 1998 to be a material risk to Adams Golf's business at the time of the IPO.

## RESPONSE:

Plaintiffs object to this request as vague, misleading and ambiguous in that it lumps all the underwriters together. Subject to and without waiver of that objection, after a reasonable inquiry plaintiffs deny this request. The materiality of the risk is a genuine issue for trial.

## REQUEST FOR ADMISSION NO. 38:

In the due-diligence process, Adams Golf management and the Underwriters discussed the presence of Tight Lies golf clubs in certain Costco stores in spring of 1998.

## RESPONSE:

Plaintiffs object to this request as vague and ambiguous in that "due diligence process" is undefined. Subject to and without waiver of that objection, plaintiffs state they are not aware of any contemporaneous writing or notes taken at due diligence meetings mentioning a discussion of gray marketing or Costco. Moreover, the main due diligence meetings took place in April, before the full risks had materialized. Accordingly, after reasonable inquiry, plaintiffs have insufficient knowledge to admit or deny this request, but admit that Pulido-Crowe and Washburn testified about superficial discussions of the gray market issue even though the memory of each of them was generally very poor with respect to the IPO. See responses to underwriter interrogatories, and Washburn and Pulido-Crowe deposition Transcripts.

408156                                      15

A 1121

**REQUEST FOR ADMISSION NO. 39:**

Gray marketing was experienced by major golf-club manufacturers, including Callaway, Taylor Made, Ping, Titleist, Orlimar, and Cobra.

**RESPONSE:**

Plaintiffs object that there is no time frame and that the words "gray marketing was experienced" are vague and ambiguous. Plaintiffs admit that at differing times between 1992 and the autumn of 1998, Callaway, Taylor Made, Ping, and Orlimar experienced some amount of gray marketing, but that such gray marketing impacted each company in different ways, at different times, and triggered different responses. After a reasonable inquiry, plaintiffs are without knowledge sufficient to admit or deny this request as to Titleist and Cobra. Pratt testified that Titleist had few problems because Titleist enforced its contracts with retailers and was able to identify transhippers easily. Pulido-Crowe did not remember specific problems at Cobra. Pulido-Crowe dep. pp. 27, 163

**REQUEST FOR ADMISSION NO. 40:**

Before the IPO, the only complaints that Adams Golf received from Tight Lies appearing in Costco stores were from its Canadian distributor, WDC Mackenzie, and 9 U.S.-based retailers.

**RESPONSE:**

Plaintiffs object to this request as vague and ambiguous and object that the document containing calls from retailers before the IPO was not produced to plaintiffs until well after these Requests were issued. Denied. See Ex. VII to Grace Report. See Adams 064813. There is no evidence that the list of customer calls contains all calls or all complaints about Costco. Many complaints may have been made orally to salesmen, or in calls, emails or faxes that have been forgotten, lost, never written down or destroyed. Many complaints from retailers received by Mackenzie were relayed to Adams Golf's Beebe and Gonsalves. Defendants' own expert Grace

A 1122

lists more than 9 complaints in the document attached to his expert report, and his list is

incomplete.

**REQUEST FOR ADMISSION NO. 41:**

In April 1998, WDC Mackenzie expressed to Chris Beebe that it did not feel a price-matching program was necessary at that time.

**RESPONSE:**

Plaintiffs object that this request is incomplete and misleading. Plaintiffs admit that

Beebe's notes taken at a meeting with Mackenzie on April 28, 1998 reflect that "Feeling is that

most Costco's are out of most Tight Lies, so there is no reason to do anything in terms of price

support. However, we need to put a plan in place in case this occurs again . . ." Ex. 19, 84.

Deposition transcripts of Pratt and Magnussen.

**REQUEST FOR ADMISSION NO. 42:**

None of the Adams Golf retailers or distributors contacted by the Underwriters in the pre-IPO due-diligence process expressed concern about the presence of Tight Lies clubs appearing in certain Costco stores during the spring through July 1998.

**RESPONSE:**

Plaintiffs object that this request is misleading because it implies that retailers were asked

about Costco, and because the calls took place before the major influx of clubs into Costcos in

the U.S.A. Plaintiffs, after reasonable investigation, are without knowledge sufficient to form a

determination of the truth of the averment and therefore neither admit nor deny the same, because

plaintiffs were not privy to these conversations. Plaintiffs further state that to their knowledge

the underwriters did not ask retailers or distributors any specific questions regarding gray

marketing or Costco distribution of Adams products, and those interviews took place in April,

before the widespread presence of Adams clubs in Costco stores in the United States.

Apparently, the underwriters did not contact Mackenzie. See Exhibit 161; Pulido-Crowe

Deposition, pp. 31, 76.

**REQUEST FOR ADMISSION NO. 43:**

Before the IPO, Adams Golf received more than 14,000 telephone calls from retailers and only 9 of these complaints concerned Tight Lies clubs appearing in certain Costco stores.

**RESPONSE:**

Plaintiffs object to the word "complaints" as misleading, vague and ambiguous, and object that the documents showing the calls were not produced to plaintiffs at the time these Requests were made. Denied as stated. Most of the 14,000 calls were not "complaints." Mackenzie received 10-25 calls per day complaining about Tight Lies in Costco stores. Ex. 6. These calls were relayed to Adams Golf. See response to Request No. 40.

**REQUEST FOR ADMISSION NO. 44:**

The SEC asked Adams Golf to consider disclosing the Costco matter in its Registration Statement.

**RESPONSE:**

Plaintiffs admit that the SEC asked Adams Golf's lawyers to have the Company consider disclosing the "Costco matter" (meaning the action filed against Costco) in Adams Golf's Registration Statement. See Exs. 90, and 124.

**REQUEST FOR ADMISSION NO. 45:**

Adams Golf did not specifically disclose the Costco matter in its Registration Statement.

**RESPONSE:**

Plaintiffs object that the term "Costco matter" and the word "specifically" are vague and ambiguous. Plaintiffs admit that Adams Golf did not disclose the risk of gray marketing, the presence of Tight Lies for sale at Costco or the action Adams filed against Costco in its

A 1124

Registration Statement.

## REQUEST FOR ADMISSION NO. 46:

The SEC approved Adams Golf's Registration Statement, which did not specifically disclose the Costco matter.

## RESPONSE:

Denied. The SEC neither approved nor disapproved of the Registration Statement, which states in bold on the front, "These Securities have not been approved or disapproved by the Securities and Exchange Commission. . .nor has the Securities and Exchange Commission. . . passed upon the accuracy or adequacy of this Prospectus. Any representation to the contrary is a criminal offense."

## REQUEST FOR ADMISSION NO. 47:

Cobra did not list gray marketing as a specific risk factor in its IPO Registration Statement.

## RESPONSE:

Plaintiffs object that Adams Golf Defendants have not provided Cobra's Registration Statement, provided the date it was issued, nor, to plaintiffs' knowledge, produced it in this litigation. There is no evidence that Cobra was experiencing gray marketing at the time of its 1992 or 1993 IPO. See Pulido-Crowe deposition. Accordingly, after reasonable inquiry, plaintiffs are without knowledge sufficient to admit or deny this request.

## REQUEST FOR ADMISSION NO. 48:

Callaway did not list gray marketing as a specific risk factor in its IPO Registration Statement.

## RESPONSE:

Plaintiffs incorporate their objection and response to Request 47, as to Callaway.

408156                                    19

A 1125

Plaintiffs admit that Callaway listed gray marketing as a risk factor repeatedly in its 1997 (and

earlier) Forms 10-K filed with the SEC and in its Annual Reports to Shareholders.

**REQUEST FOR ADMISISON NO. 49:**

After the IPO through the end of July 1998, there were no new public reports – through
press releases, news and analyst reports, or SEC filings – about the presence of Tight Lies in
certain Costco Stores.

**RESPONSE:**

Denied.  Tight Lies were present in numerous Costco stores, on public display giving

notice to all shoppers.  The Golf Pro article may have been released before August 1st, and

Magnussen testified that public disclosure occurred in this period.  See Magnussen Deposition

Transcript, and Reports of Alan Miller.

**REQUEST FOR ADMISSION NO. 50:**

The Lehman analyst report published August 28, 1998, was not associated with a
statistically significant stock-price decline within a two-day window at the 95% confidence level.

**RESPONSE:**

Objection.  This request is misleading and incomplete.  The Lehman analyst report,

though it mentioned Costco, close to the end of the report, was, overall, a very positive report

designed to convince investors to buy the stock.  That the stock declined shows how important the

mention of gray marketing was.  See Reports of Alan Miller.  Notwithstanding other objections,

Plaintiffs admit that according to Dr. James's calculations, the price drop associated with the

publication of the August 28, 1998 Lehman report was not statistically significant at the 95%

confidence level.

**REQUEST FOR ADMISSION NO. 51:**

The Golf Pro article published August 1, 1998, was not associated with a statistically
significant stock-price decline within a two-day window at the 95% confidence level.

A 1126

**RESPONSE:**

Plaintiffs object that this request is misleading and premised on an unproven fact. After reasonable investigation plaintiffs neither admit nor deny this request. There is no reason to believe that Golf Pro, which was mailed to golf shops and others in the golf business, would have had a two-day window, nor is there knowledge that Golf Pro became available to the general public on August 1, 1998. As it was mailed, it probably arrived at different locations on different days. See Reports of Alan Miller.

**REQUEST FOR ADMISSION NO. 52:**

You do not have evidence of any Internet chat-room discussion in July 1998 about Tight Lies appearing in Costco stores.

**RESPONSE:**

Plaintiffs object that the phrase "have evidence" is vague and ambiguous with respect to internet information, but plaintiffs admit that they presently have no such evidence.

**REQUEST FOR ADMISSION NO. 53:**

You do not have evidence of any Internet chat-room discussion in August 1998 about Tight Lies appearing in Costco stores.

**RESPONSE:**

See objections and response to Request 52.

**REQUEST FOR ADMISSION NO. 54:**

Orlimar's Trimetal club took market share away from Adams Golf in the spring and summer of 1998.

**RESPONSE:**

Plaintiffs object that this request is misleading in that it assumes causation, when none can be proven. After reasonable inquiry, plaintiffs have insufficient knowledge to admit or deny

A 1127

this request. Plaintiffs do not admit this request because it implies causation, rather than simply

reciting the percents of market shares of the two companies. See Golf Data Tech., Adams

006676-77. Plaintiffs admit that in the face of price competition from Costco, some retailers

shifted to Orlimar.

Dated: August 24, 2006

                              As to Objections:
                              **ROSENTHAL, MONHAIT & GODDESS, P.A.**

                              By: *Carmella P. Keener*
                              Carmella P. Keener (DSBA No. 2810)
                              Suite 1401, Citizens Bank Center
                              P.O. Box 1070
                              Wilmington, DE. 19899
                              (302) 656-4433
                              ckeener@rmgglaw.com
                              *Liaison Counsel for Plaintiffs and the Class*


**BERGER & MONTAGUE, P.C.**
Todd S. Collins
Elizabeth Fox
Neil F. Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
Lead Counsel for Plaintiffs and the Class

408156                        22

A 1128

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

----------------------------------------x
                      :
IN RE ADAMS GOLF, INC.       : CONSOLIDATED C.A.
SECURITIES LITIGATION       : No. 99-371 KAJ
                      :
                      :
                      :
                      :
                      :
----------------------------------------x

### AFFIDAVIT OF OLGA A. PULIDO-CROWE

STATE OF CALIFORNIA)

COUNTY OF SAN FRANCISCO)

Olga A. Pulido-Crowe, being duly sworn, deposes and says:

1. I am a Senior Vice President at Lehman Brothers, Inc. I have been employed by Lehman Brothers since 1986.

2. At the time of the Adams Golf initial public offering, I was a Senior Vice President and head of West Coast consumer industrial banking. The underwriting team for the Adams Golf IPO was fully aware that in the spring of 1998 Adams Golf had received complaints that Adams Golf clubs were appearing for sale in Costco stores in Canada. We discussed those sales thoroughly with the management of Adams Golf. I was also aware that a letter was prepared and sent to distributors in May 1998 informing them that they were not allowed to sell Adams Golf clubs to discount stores.

3. We knew that the Canadian market, as a whole, was only a small fraction of Adams Golf's overall sales. We also understood that the Canadian market was less important for Adams Golf than other foreign markets, such as Asia.

4. After learning that some Adams Golf Clubs had appeared in some Costco stores in Canada, I personally visited Costco stores in the San Francisco Bay area, which is a major market for high-end golf equipment, to determine whether Costco was offering Adams Golf clubs for sale in stores in this market. I also visited Costco stores in other areas, including Southern California. I did not observe any Adams Golf clubs for sale in any Costco store that I visited.

_____
Olga A. Pulido-Crowe
Senior Vice President

Sworn to before me this
6 th day of Sept 2006
Notary Public

M. KATHLEEN BRANYON
Commission # 1629893
Notary Public - California
San Mateo County
My Comm. Expires Jan 12, 2010

29.MAI '98 19:02 GOLF SERVICESHP~          32 2 3313159          P.1

To :   Barney Adams                                    May 29, 1998
       Mark Gonsalves
       Marc Puglielli

From : Chris Beebe

Dear Barney and Mark,

I just received a voice mail message from Greg Pratt of WDC Mckenzie in Canada, and the Costco stores have just received a second shipment of *Tight Lies*, this time in master packs of 30 clubs each.

As I had mentioned in my notes from my meetings in Canada, the first shipment to Costco of 600 clubs caused a great deal of trouble up north. Luckily, WDC Mckenize was able to ask the pros and retailers to give them 60 days to correct the problem, and if things were not put right by that time, the retailers could ship their clubs back to WDC. The clubs had all sold through by the end of 60 days, so our distributors only had to deal with 10 or so returns from angry retailers.

However, during my visit and in conversations with 10 pros/retailers from across Canada, the same message came through. Taylor Made, Ping and Callaway all faced Costco/Price club trans-shipping their products into Canada, and each company ended up giving the retailers the right to match the Costco prices when needed. These manufacturers would then make up the difference in lost profit to the retailers with no charge products. The opinion across Canada is that any major golf manufacturer would have to put in place similar programs or they would have massive returns. And Adams Golf is seen as a major manufacturer.

I would like permission to put such a plan in action in Canada immediately. My notes from my Canadian meetings have the details, and I can send across another copy if need be. I will call the office later this afternoon to review this fax and to answer any questions that you may have. If we do not take some positive action quickly, Adams Golf stands to lose most of the goodwill we have built in Canada, and see the 15,000 clubs that Mckenzie is forecasting for sales through the end of the year disappear.

Regards,

Chris Beebe

ADAMS 001497

P.S. My hotel phone and fax number follow. I will be out for dinner this evening, but will return to call the office. T-011-32-2-640-8889  F-011-32-2-640-1611
      Room 37.

A 1131

Westlaw.

Not Reported in F.Supp.                                                                         Page 1

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

c

United States District Court, S.D. New York.
Competitive Associates, Inc.
v.
International Health Sciences, Inc. et al.
72 Civ. 1848-CLB

January 22, 1975

BRIEANT, Judge.
*1 Competitive Associates, Inc. (the "Fund") is a
Delaware corporation having its principal place of
business in California. It is an open-end
investment company registered with the Securities
and Exchange Commission ("SEC") pursuant to
Section 8 of the Investment Company Act of 1940,
as amended. Plaintiff is no stranger to this Court. FN1

> FN1 In addition to this action, plaintiff
> initiated the following cases in this Court,
> all arising directly or indirectly out of the
> depredations of Akiyoshi Yamada:
> *Competitive Associates, Inc., et ano. v. Visual*
> *Sciences, Inc., et al.*-72 Civ. 1844
> *Competitive Associates, Inc., et ano. v. Fantastic*
> *Fudge, Inc., et al.*-72 Civ. 1845
> *Competitive Associates, Inc., et ano. v. Children's*
> *World, Inc., et al.*-72 Civ. 1846
> *Competitive Associates, Inc., et ano. v. Firefly*
> *Enterprises, Inc., et al.*-72 Civ. 1847
> *Competitive Associates, Inc., et ano. v. Yamada, et*
> *al.*-72 Civ. 1986

The complaint was filed on May 4, 1972. The
claims of Competitive Capital Corporation,
originally joined as a plaintiff, were dismissed by
memorandum decision and order dated October 10,
1972.

Competitive, as its name implies, permits the
investment policies of its fund to be determined

differently with respect to separate segments, each
of which is supervised by a different investment
adviser. These advisers "compete" with each other
to achieve the best adaptation to the particular
exigencies of the securities markets during given
periods of time. In addition to serving as an
incentive to greater success, this method permits a
diversification of opinions; it is theoretically
impossible for all of several portfolio managers to
be wrong at the same time. Since the complaint
was filed, plaintiff has changed its name to
Seaboard Leverage Fund.

For the period from October 12, 1970 through May
14, 1971, Akiyoshi Yamada, acting either
individually, or through his controlled corporation,
Takara Asset Management Corp., was the
investment manager of a segment of plaintiff's
portfolio.

Defendant International Health Sciences, Inc. is a
Delaware corporation having its principal place of
business in New Jersey. It is now known as
Gilman Service, Inc., and is sometimes referred to
hereinafter for convenience as "the Issuer", or "IHS"
. Defendants P. K. Hickey, Wolff & Co., Provident
Securities, Inc., Delphi Capital Corporation,
Scheinman, Hochstin & Trotta, Incorporated,
Hartzmark & Co., Inc., L. C. Wegard & Co., Inc.,
S. J. Salmon & Co., Inc. and Ross, Low, Bull & Co.
are all broker-dealers, registered pursuant to Section
15 of the Securities Exchange Act of 1934.
Together they were underwriters or distributors of
common stock of the Issuer, which was issued and
sold on or about November 30 and December 1,
1970, pursuant to a Registration Statement, public
offering and prospectus. Defendant Scheinman,
Hochstin & Trotta, Incorporated was served and
appeared by counsel, but defaulted in its appearance
prior to trial. It is a subsidiary of Weis Securities,
Inc., and is defunct, although no official
proceedings have apparently been taken with
respect to it. Defendants Salmon and Provident are
in liquidation under the supervision of the Securities

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1132

Not Reported in F.Supp.                                                Page 2

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

Investor Protection Corporation ("SIPC"). The action was stayed as to them. The plaintiff stipulated to discontinue as to Salmon. The action against Provident can serve no purpose and is severed and dismissed without without prejudice to renew should any assets of that corporation turn up at some future date.

*2 Defendants Kalman Shmueli, Howard F. Cerny, Carl W. Anderson and Ralph P. Dodd are or were officers or directors of the Issuer, and defendant Pericles Constantinou was an officer or director of Provident Securities, Inc., a member of the underwriting group. Defendants Cerny, Anderson and Dodd were not served. There is no excuse for the failure to effect service, and accordingly, the action is dismissed as against them for failure to prosecute. Such dismissal shall be with prejudice. Rule 41(b), F. R. Civ. P.

The Fund seeks to recover damages arising out of the purchase by it of 40,000 shares of the Issuer on December 1st and 2,000 additional shares on December 23, 1970. It is claimed that the prospectus failed to state material facts required and necessary to make the prospectus not misleading in violation of Sections 11, 12(2) and 17(a)(2) of the Securities Act of 1933. Specifically, it is alleged that the prospectus failed to describe accurately the plan of distribution and "failed to state that the Defendants intended, in concert with a certain adviser of Competitive Associates [Yamada], to use Competitive Associates to support the market in these securities". (Complaint, P 6). Plaintiff alleges further that the use of this faulty prospectus was the use of a deceptive device in violation of Sections 17(a)(1) and 17(a)(3) of the 1933 Act and Sections 10(b) and 15(c) of the Securities Exchange Act of 1934. Plaintiffs plead use of a means of interstate commerce, or the mail, and that it acted in reliance upon the prospectus, and had no actual knowledge of the claimed omission or the misleading aspect thereof.

Answers, filed on behalf of defendants generally deny any wrongdoing, and plead various affirmative defenses, including the one year statute of limitations set forth in § 13 of the 1933 Act, and the underwriters assert the defense of due diligence

under § 11 thereof.

*Factual Background*

In early 1970, the Issuer was privately owned by a group of individuals, including the defendant Shmueli. One of the group, and its leader, was Robert Vesco, who held 17.9% thereof and, much later, was to become notorious. [FN2]

> FN2 Vesco, a sort of latter-day Samuel Insull, is a much travelled man. He journeyed first to Nassau and from thence to Costa Rica, where he has been found to be a substantial addition to the economy, and is well regarded by local officials. He is a fugitive defendant in at least four indictments pending in this District, charging him with criminal conduct in unrelated matters.

Although the Issuer had no business operations, and had experienced losses on a consolidated basis for 1968 and 1969, it did own a subsidiary, Clinical Analysis Service, Inc., which operated a medical laboratory in Connecticut. The laboratory had significant potential because it offered approximately 60 individual medical tests, including blood chemistry, hematology, urinalysis, serology, endocrinology and microbiology and thirteen selected combinations of such tests, called profiles. It was able to perform at least twenty of the individual tests by automation, and all of the profiles, except the inflamatory profile and pre-natal work-up profile, were substantially automated. It could render its services by mail and transmit test results by mail, telephone or telegraph to the patient's physician within 24 to 48 hours after receipt of the specimen.

*3 IHS's proposed offering of 200,000 shares of stock was intended to secure $887,500.00 for the Company, which it intended to use "to acquire one or more companies in the medical/health field." [FN3]

> FN3 The Company intended to use

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          Page 3

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

$56,700.00 for working capital, and to pay current debts, and had no immediate plans for acquisitions.

While the Issuer had no history of profitability, had operated its clinical testing subsidiary at a loss since acquisition, and may be characterized as insolvent without regard to the proceeds of the public offering, it could not be said that offering was wholly without merit as a speculative or "growth" situation. IHS's officers and directors were experienced men of business, and Vesco, together with Shmueli, Dodd, Anderson and others, had paid substantial funds to acquire the subsidiary and promote the enterprise.

The defendant underwriters led by P. K. Hickey, Wolff & Co. made a substantially firm commitment (Ex. 10) to distribute 200,000 shares. There was no mention in the prospectus (Ex. 11) of any of the activities of Yamada detailed below.

Plaintiff made the following purchases of IHS stock:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE    TABLE
It sold 2,000 shares at $6.00 on April 26, 1971 for $12,000.00 through Jefferies & Company, Inc. Further sales were made on and after August 29, 1972 at prices of $2.00 per share and lower-see Exhibit 16.

*The Conspiracy-Yamada and Vesco*

The Court finds that a conspiracy existed in which Yamada and Vesco were the central figures. We will discuss below, separately, our analysis of the extent and nature of the participation of others in this conspiracy, and whether they did so knowingly.

In this civil action, plaintiff will satisfy its burden of proof to show the conspiracy, by presenting credible evidence which proves the facts in issue by a mere preponderance, and accordingly, cases involving the federal crime of conspiracy, where the standard of proof is higher, are of little assistance. In determining the nature and extent of the conspiracy and delineating the members thereof, the Court may have reliance on the circumstantial

evidence showing its existence, the admissions of conspirators, and consideration of what others have done, including "verbal acts" insofar as such acts show the conspiracy's existence and scope, whereupon hearsay statements become admissible as to a person so connected to the conspiracy. The Court will make the ultimate finding on the basis of all evidence in the case. *Cf. United States v. Nuccio,* 373 F. 2d 168, 173 (2d Cir.), *cert. denied,* 387 U. S. 906 (1967).

The object of the conspiracy was, in violation of the rights of plaintiff, to make the underwriting and public offering of IHS shares a success beyond its normal expectations. Success, from the conspirators' point of view was based on a two part test; it was necessary first that all of the stock be sold, and secondly, that it be sold and held, in such a fashion as to create a stable post-offering public market in the security, at a price level no less than the offering price, and hopefully, somewhat more. These results were essential to the successful operations of IHS, and a failure of IHS to achieve these results would have had an adverse effect on Vesco with respect to his other business undertakings, many of which were of far greater scope than IHS.

*4 To the extent that the conspirators knew that Yamada had a fiduciary obligation as registered investment adviser to Competitive and other clients, and that his participation in the conspiracy required him to violate that obligation, a crime was committed.[FN4] See §§ 180.05 and 180.00 of the New York Penal Law, and 15 U. S. C. §§ 80b-6 and 80b-17. Implementation of the conspiracy constituted employment of a "device, scheme, or artifice to defraud." It violated 17 C. F. R. § 240.10b-5(a).

> FN4 Akiyoshi Yamada pleaded guilty to two indictments charging him with conspiring to file false statements and conspiracy to manipulate the market for securities. 73 Cr. 426, 427. Yamada received a sentence of two years in prison and $20,000.00 in fines. Yamada also pleaded guilty to six counts of a sixteen

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

count indictment charging him with conspiracy, mail fraud, obstruction of justice and the filing of false statements. 74 Cr. 100. He was sentenced to one year in prison, later reduced to six months, to run concurrently with his two year sentence. Yamada also pleaded guilty to a charge of conspiring to use a false and misleading offering circular. 72 Cr. 363. He was sentenced to five years probation with special conditions restricting his investment involvements and a $10,000.00 fine. An additional indictment, charging him with conspiracy and fraud in the offering and sale of securities, is pending in this District. 72 Cr. 528.

We begin the chain of circumstantial proof which establishes the existence of the conspiracy, by analyzing the bizarre and inexplicable conduct of Yamada in connection with placing Competitive's orders for IHS shares. The witness McSwain was plaintiff's "trader". As such, his function was to handle and record the execution of trades in securities, directed to him by the various portfolio managers of this and related mutual funds. Ordinarily McSwain enjoyed discretion with respect to selecting the source for his purchases, and also, ordinarily was permitted to secure the best possible price. Exhibit 1 and the testimony of McSwain show that at 7:40 o'clock (California time) on December 1, 1970, the morning after the effective date of the offering, Yamada gave an order to McSwain to purchase 3,000 shares of International Health Sciences, Inc. at 5 1/4 , (Tr. p. 32). Yamada used the telephone between New York and California to do so. At this time, the offering, which was priced at 5, was not fully sold out. While McSwain wrote the name of the firm "M. H. Meyerson" on his blotter (Exhibit 1), I find that McSwain was in fact directed by Yamada to place the trade with another firm, John J. Meyers & Co. of New York. Although the purchase was a directed trade at a specified price, it was not so unusual that acquisition of 3,000 shares under those circumstances, even at a price slightly higher than the offering price, should excite suspicion. However, about an hour or two later in the day, and before the trade had been executed, Yamada

telephoned McSwain again, and increased his order to 20,000 shares. This was 10% of the public offering. It was substantially equal to the amount of shares which the in-and-out trading operation of Dr. Greditor and Rosemary Gumper (see *infra*, p. 29 [p. 97,332]) had arranged to purchase that day in the public offering. The direction by Yamada of the purchase to John J. Meyers, which was in a position to acquire the Greditor-Gumper shares, is regarded by the Court as more than a mere coincidence. As was testified by Anthony Meyers of that firm, Greditor and Gumper were his valued customers (Tr. p. 321). The Court infers that when Yamada increased the order from 3,000 to 20,000 shares at a price 1/4 point higher than the offering price, and directed the trader to Meyers, Yamada knew that he was buying Greditor-Gumper shares, and knew that those shares were overhanging the market and imperiling the success of the issue insofar as its post-offering trading price was concerned, and that he intended thereby to purchase substantially all of the Greditor-Gumper shares. This indicates purposeful activity on Yamada's part, which could not possibly have been motivated by his fiduciary duty to get the best of it for Competitive, and indeed, his conduct is inconsistent with any such intention, or any other reasonable hypothesis.

*5 The situation was compounded by a further action on Yamada's part later in the afternoon on the same day when he directed McSwain to purchase an additional 20,000 shares from Eastman Dillion, Union Securities & Co. These shares were a part of the public offering. Eastman was a member of the "selected dealer" or selling group referred to at p. 20 of the prospectus. It obtained these shares from P. H. Hickey, Wolff & Co., the lead underwriter. Sale of these shares, again 10% of the offering, was essential in order to complete the distribution of the entire amount of shares.

It would appear most unusual in connection with an honestly conceived and executed trade, for a fund employing an expert trader for a fund employing an morning at 5 1/4 a block resold by Greditor-Gumper through Meyers, and to have purchased a like amount later in the same day from a member of the selling syndicate at the offering

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1135

Not Reported in F.Supp.                                                    Page 5

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

price, $.25 per share less.[FN5]

FN5 Exhibit 3. McSwain's blotter, or record of trades, shows the Eastman trade as placed at 7:04 A.M. on December 1st, and the time of execution is reported as 9:09 A.M. Clearly, the "time placed" has been written over on Exhibit 3, and appears originally to have been entered as 9:00 A.M., or later. The Meyers' order is written in as 9:15 A.M. on the line above the Eastman order. Its time of execution is listed as 10:47 A.M. Exhibit 1 shows that the original Meyers order, placed initially for 3,000 shares only, has been corrected and changed after the initial entry to show 20,000 shares. This order is there listed as received by McSwain from Yamada at 7:40 A.M.

The length of time which was needed in order to fill the Meyers order is accounted for in Anthony Meyers' testimony. He explained that he had to make inquiries, and talk to various possible sources before effecting an agency trade in behalf of his customers, Greditor and Gumper. On Exhibit 3 the hour of execution of the revised directed trade for 20,000 shares from Meyers is stated as 10:47 A.M.

Notwithstanding the apparent confusion and contradiction in these records, the Court finds that the Meyers purchase was both directed by Yamada and transmitted by McSwain to Meyers prior to the Eastman order. The confirmation of sale from Eastman Dillon, Union Securities & Co. (Exhibit 4) refers to the trade date as "December 3, 1970 as of November 30, 1970". The sales ticket at Eastman (Exhibit 18) is stamped as "Reported" on December 1st at 3:55 P.M. New York time, or 12:55 P.M. in California, rather than 9:09 A.M., as listed on Exhibit 3.

Stott of Eastman testified that McSwain had called him on the 28th or 29th of November in behalf of Competitive and asked about the IHS shares. He says that within 20 minutes after the inquiry he called McSwain on the 29th and had circled the amount of 20,000 shares. He testifies further that only after this expression of interest by Competitive did Eastman call defendant Hickey and ascertain that it could get 20,000 shares as a member of the

selling group.

The difference between this testimony and the documents mentioned is not explained, nor was Hickey asked. The Court credits McSwain and Exhibits 1, 3, 4 and 18 as being more likely correct with respect to the time sequence. Although McSwain testified before Stott he was not asked about any telephone conversation on November 28th or 29th with Eastman, Exhibit 24 sheds little light on the issue because the date of it is not shown by the trial record. However, Ferkauf's allocation of 21,500 shares, sold to Greditor-Gumper appears on that exhibit, together with Eastman's allocation of 20,000 shares. We have Greditor's testimony that the number of shares Ferkauf could obtain from him was first known in the morning of December 1st, just before he sold to Meyers, who did not sell to plaintiff until it had obtained Greditor's authority. This took place before 10:47 California time on December 1st (1:47 P.M. in New York). Unless stockjobbers in New York are keeping farmer's hours, the allocation to Ferkauf, as well as the allocation to Eastman were made to them on November 30th, before McSwain received his buy orders of December 1st regularly recorded on Exhibits 1 and 3.

*6 The result of Yamada's activities on December 1st was to place this mutual fund in the position of owning 20% of the outstanding public offering of 200,000 shares, and more than 5.1% of the total outstanding shares of the Issuer, which then amounted to 789,290 shares. Of the shares not registered, all but approximately 20,000 were at all relevant times, restricted as to transferability as investment letter, or as founders' or promoters' shares (Tr. pp. 229-30). Accordingly, the market was thin, and the float available for trading was extremely limited.

Competitive's investment effected on December 1, 1970, had the effect of making IHS an "affiliate" as defined in the Investment Company Act of 1940 of Competitive, because Competitive owned over 5% of the outstanding voting securities of IHS. This created an additional responsibility for Competitive's management, and it was necessary to disclose this fact in any prospectus furnished to new purchasers of shares in the Fund. 15 U. S. C. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

80z-8(b)(4). This represented a situation which the typical Fund portfolio manager ordinarily would avoid, although there were other securities held by Competitive during the relevant period in which its interest exceeded 5% of the voting shares.

John Galanis[FN6] was a general partner by estoppel in Takara Partners, a creature of Yamada. At some time prior to the public offering of IHS, Yamada asked Galanis to assist in placing IHS shares under the initial offering. Galanis declined. Yamada told Galanis that Robert Vesco controlled IHS and was apparently going to be taking control of Investors Overseas Services, a large financial corporation. Yamada expressed a desire to ingratiate himself with Vesco, and told Galanis that he had committed himself to Vesco to see that the IHS offering was completed successfully (Tr. pp. 77-78). Galanis had been introduced to Vesco by Anthony Pilaro (see *infra* p. 19 [p. 97,329]).

> FN6 John Peter Galanis was indicted three times for violations of the securities laws. Galanis was indicted along with Akiyoshi Yamada in a thirteen count indictment charging a conspiracy and substantive securities law violations. The Government ultimately determined not to prosecute under this indictment, 72 Cr. 520. Galanis pleaded guilty to an indictment in which Robert Hagopian was also charged, which accused him with participating in a conspiracy by an investment adviser to defraud by use of the mails and instrumentalities of interstate commerce, 72 Cr. 884. He was sentenced to five years in prison, but only served six months. The balance of the sentence was satisfied by a term of probation with the special condition that he could not serve in a fiduciary capacity regarding the investments of others and that he cannot deal in publicly traded securities without the written consent of his probation officer. Finally, Galanis pleaded guilty to a charge of conspiracy to file a false statement with the Securities and Exchange Commission for which he was placed

under similar probation terms, 73 Cr. 52.

*7 Vesco, at a conference attended by Galanis, Yamada and Pilaro prior to the underwriting, told Galanis and Yamada that International Controls, or an affiliate, controlled by Vesco, had pension funds, then being managed by a bank, and that Vesco would consider shifting investment control of these funds to Yamada, and/or Yamada and Galanis jointly, (Tr pp. 84-85).

Pilaro, before the introduction, had told Galanis and Yamada that there was "a reasonable chance that we [i.e. Takara or Yamada] could assume management control of the pension fund of International Controls, because Mr. Vesco and Mr. Pilaro had had a working relationship, and . . . [Pilaro's] company had assisted Mr. Vesco, and in fact Mr. Vesco very often followed his advice in certain matters." (Tr. p. 84). During the meeting Vesco expressed doubt as to whether the pension funds could be removed from the management of a bank or trust company.

Yamada told Galanis prior to the offering that he had sought or was going to seek the assistance of defendant Constantinou and his firm, Provident Securities, (Tr. p. 89), a concern not previously known to the lead underwriter.

After the offering of IHS shares was completed successfully with the aid of Yamada and Constantinou, Vesco made a valiant effort to get pension advisory business shifted to Yamada. This is discussed *infra*, pp. 24 and 26 [pp. 97,330 and 97,331]. The intensity of his efforts bespeaks greater motivation than would have been provided merely by respect for Yamada's professional competence, and Vesco's conduct confirms the existence of a substantial obligation under a prior agreement. This suspicious circumstance, together with Constantinou's efforts (noted below) to get a banking accommodation from Shmueli confirms the existence of greater obligations than would flow merely from good honest service in a successful underwriting.

*Constantinou*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 7

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

Pericles Constantinou[FN7] was the principal of Provident Securities, Inc. His firm, now defunct, was brought into the Hickey underwriting group through the efforts of Pilaro, whose roving commission from Vesco included the search for additional persons for underwriters or members of the selling group.

> FN7 Pericles Constantinou pleaded guilty to one count of a nine count indictment. The guilty plea was to a charge of extending unlawful credit in a securities transaction, 73 Cr. 260. Constantinou received a sentence of two years probation and a $1,000.00 fine.

In a conversation after the completion of the offering, during 1972, which testimony is taken solely as against Constantinou, Yamada and Constantinou made various representations or admissions to Galanis that they had helped in placing the initial offering of IHS (Tr. pp. 97-98). The bare facts stated in the admission are matters of record, and do not in themselves impel the inference of any wrongdoing.

Constantinou considered that IHS and its principals were obligated to him. In January 1971 he telephoned Shmueli, President of IHS, whom he had never met, introduced himself over the telephone, and asked Shmueli to make a deposit of IHS funds in a Texas bank in order to satisfy Constantinou's need to do a favor for the Texas banker. Shmueli did not reject the request, but stalled Constantinou by asking for financial statements of the bank.

*8 As previously noted, Provident was brought into the underwriting syndicate close to the effective date through the efforts of Vesco, acting through Pilaro. Constantinou agreed for Provident to take 10,000 additional shares of the underwriting, and made an arrangement with Robert Hagopian [FN8] whereby Carole Corporation, controlled by Hagopian, would purchase these shares by a check drawn on insufficient funds in the amount of $50,000.00. Hagopian testified that Constantinou had agreed in behalf of Provident that the check

would not be deposited, and that Hagopian would have a profit on a resale (Tr. pp. 415, 418).

> FN8 Robert R. Hagopian pleaded guilty to two counts of an indictment which charged that while acting as an investment adviser, he employed schemes to defraud by the use of the mails and instrumentalities of interstate commerce, and also that he embezzled moneys from an investment company, 72 Cr. 884. On the two counts, he was given a total sentence of one year in prison, a five year suspended sentence with probation, and a $10,000.00 fine. The terms of his probation restricted his future dealings in securities.

The Court does not rely on the indictment of Constantinou for the Regulation T violation in this and related matters to which he pleaded guilty. His plea was equivocal, since other claims were contained within the same indictment and the record is unclear as to precisely what admissions of guilty conduct Constantinou made or intended to make when he pleaded guilty. Furthermore, the Court declines to draw any inference adverse to Constantinou with respect to his plea on this trial of the privilege of self-incrimination, (see *infra*, p. 38). The Court, however, credits Hagopian's testimony with respect to the wooden ticket and places no weight or reliance on the conflicting testimony of Constantinou to the effect that he had no such agreement to hold Carole Corporation's check undeposited, and that there was no Regulation T violation, because had there been, "back office personnel" of Provident would have notified him as the registered representative who made the sale to Carole. Hagopian's recollection as to the profit he made, however, appears to be unfounded. The quoted pink sheet prices during December, 1970, when Hagopian's wooden ticket was covered do not rise to a price which would permit a $20,000.00 profit to Hagopian.

Constantinou's particular activity constitutes a knowing and willfull attempt to participate in, and become a part of the conspiracy to violate Rule 10b-5 of which Yamada and Vesco were the pivotal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1138

Not Reported in F.Supp.                                                                                                          Page 8

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

members. Although Hagopian misstated the amount of his profit, the Court does credit as truthful his testimony that Hagopian was permitted by Constantinou to make a wooden ticket purchase of 10,000 shares without any loss or risk of loss. Clearly, this advanced the cause insofar as the conspiracy was concerned, and Constantinou did so in behalf of Provident, knowingly.

*9 Constantinou's act in placing 50 shares of IHS in Galanis' account without payment and without his authority is considered to be *de minimis* and this particular episode had no material effect on the underwriting or on the market price of IHS stock. It was not an essential act committed in furtherance of the conspiracy. The Court believes that whatever Constantinou did for Galanis in this connection was unrelated to this litigation.

*Pilaro*

On the record before me I am unable to find that Anthony Pilaro was a conspirator of that he was engaged in any unlawful conduct. Considerable suspicion attaches to Pilaro,[FN9] but the evidence does not rise to the level of showing any wrongdoing on Pilaro's part in this case. Hickey first met Pilaro through Vesco in the Fall of 1970. Vesco told Hickey that Pilaro had a lot of experience and that it would be beneficial for Hickey to know him. Pilaro had colorable qualifications in the medical area and in financial and banking activities, and several days thereafter, Hickey met with him again, discussing generalities affecting the proposed underwriting of IHS and the company's "concept." It was agreed between Hickey and Pilaro that Pilaro would be employed by the underwriters to assist and would be paid a reasonable fee. This payment was disclosed by the following at p. 20 of the prospectus:

> FN9 At the time of the trial the Court was informed that Pilaro was a fugitive from justice believed to be residing in the British crown colony of Hong Kong.

"In addition to the payment of the underwriting discount of $.50 for each of the shares which are purchased by the Underwriters, the Company has agreed to pay $12,500.00 of the Underwriters' legal *and other expenses* (for which the Underwriters are not required to account)."

Pilaro told Hickey that he would introduce him to other security investment people and dealers in stocks, with a view towards becoming underwriters or selling group participants with respect to IHS, and that he would work on due diligence on the medical aspects and the background of the industry in which IHS was involved.

The record shows that Pilaro did do some legitimate work for the underwriters. His work was precisely in the area contemplated by Hickey when he was retained, and included introducing defendant Constantinou and Provident Securities as a member of the underwriting group. The firm of A. M. Pilaro & Son, Inc. was paid the sum of $10,300.00 by the underwriters. By virtue of this payment, the non-accountable expenses of the underwriters exceeded the budgeted amount by approximately $6,000.00, and this difference was absorbed by the underwriters out of the sum of $.50 a share paid to them in connection with their services, as profit.

Notwithstanding the subsequent activities of Constantinou and Provident, detailed herein, the Court finds no basis in this record for making any finding that Pilaro was a part of the corrupt and unlawful scheme or plan in which Vesco, Yamada and others were engaged or were to become engaged with respect to the distribution of IHS stock. The Court attaches no significance to the fact that one copy of the expense record of the underwriting lists the Pilaro concern by name as receiving $10,300.00 as a consultant, whereas the other merely mention "consultants" in that amount. Under the circumstances of this case it was highly unlikely that all the underwriters other than Hickey would have acquiesced, as they did, in a payment to Pilaro by Hickey, which had the effect of carrying the budget expense of the underwriters beyond the agreed amount by $6,000.00, unless they recognized the validity of his claim for legitimate services. The Court believes that Pilaro rendered colorably valuable services to the underwriting syndicate, which appeared to its members to be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1139

Not Reported in F.Supp.                                                                                    Page 9

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

*bona fide,* and that this appearance of regularity with respect to Pilaro's activities was such as to cause them to acquiesce in the overpayment of expenses. There is no credible evidence in this case to warrant a finding that Pilaro did anything other or different than what he was supposed to do, or that his services were useless, or connected in any way with corrupt conduct on the part of Vesco, Yamada or Constantinou. We are unable in the case of Pilaro to indulge in unwarranted inferences of guilt by association. Similarly, the Court attaches no significance to the fact that Pilaro was considered as a future nominee to the Board of Directors of IHS, or that he apparently was also on the payroll of International Controls, or IHS at some time during the period in which his corporation was purporting to earn the consultant's fee from the underwriting group. Plaintiff's contentions with respect to Pilaro's activities are in all respects rejected, and I decline to find any wrongdoing in connection with his activities.

*10 *Shmueli*

Defendant Shmueli was an experienced businessman who had come into the orbit of Vesco as a result of the merger in 1966 of Cryogenics, Inc. with a Vesco controlled company. He had been acquainted with Vesco since about 1960, and became Vice President of Corporate Development and Acquisition, with respect to the merged company. Through his wife, he became, together with Vesco and others, one of the initial investors in IHS, and the prospectus indicates that in addition, he purchased, between March 14th and April 14, 1970, 35,756 shares of IHS at $.50 per share. Prior to the offering, he and his wife, individually, and as custodian for minor children, owned 13.3% of the equity of IHS, compared to 17.9% belonging to Vesco, individually, and as custodian for his minor children. Along with Vesco, Shmueli was a "promoter" and a "parent" of IHS as such terms are generally used under the 1933 Act and rules and regulations promulgated thereunder, and, unlike Vesco, was an officer and director. These facts are all conceded, and set forth with sufficient clarity in the prospectus.

At Vesco's request, Shmueli had an initial introduction and meeting with Yamada where the future of IHS and its potential as an investment were discussed. On the next day or a few days later, Vesco asked for a report as to the meting with Yamada; Shmueli testified (Ex. 23, p. 70):

". . . He [Vesco] asked me how did it go, and I said fine. And he said, 'Good,' and that was the end of the conversation."

Plaintiff's charges against Shmueli are summarized at p. 39 of its Post-Trial Memorandum:

"Shmueli had actual knowledge of certain of the critical prospectus non-disclosures: namely that Pilaro and Yamada were underwriters, that Yamada was seeking to have International Controls pension or profit-sharing funds invested with him (Yamada) (or advised by him), that Pilaro was to become a paid consultant to and Director of IHS, and that Hickey was negotiating a deal between a Vesco related company and Radiation Machinery."

We have previously noted that there is no evidence of wrongdoing with respect to Pilaro or his conduct with respect to this underwriting. Yamada was no underwriter, he was at most the pivotal figure in a fraudulent scheme. Notice to Shmueli that Yamada was seeking to have International Controls pension or profit-sharing funds invested with him or adivsed by him was not in itself sufficient to make Shmueli a participant in the fraud, or put him on notice of the existence of a fraud, nor was it the sort of matter which standing alone reasonably should have been revealed in the prospectus.

Beatty's testimony shows that Shmueli attempted on several occasions to urge Beatty to accept Yamada as a pension trust adviser after the underwriting was concluded. We have previously noted with respect to Vesco the fact that Vesco was anxious to effect this result, although apparently not sufficiently anxious to bring down the house of International Controls about his shoulders. The decision whether or not to hire Yamada for the pension funds rested with Beatty and Richardson. They apparently exercised their discretion against such hiring and did so for *bona fide* reasons, arising out of their fiduciary obligations to the pension funds,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

and a preference on their part to do business with Prudential Insurance Company, whose integrity was unquestioned, and which was also owed a favor by the Vesco group.

*11 Theoretically, Vesco was not in a position to order the other two committee members or trustees, Beatty and Richardson, but Beatty admits that " faced with [the fact that] Mr. Vesco was Chairman of the Board or President at that time, naturally, [I] being an Executive Vice President, I am certainly going to take serious consideration of directions and orders he might give me." (Tr. p. 640). Shmueli had no direction over Beatty or Richardson, but Vesco, if he desired to pay the price in the form of organizational disruption, could have forced these two individuals to obey his wishes, or give up their employment. Shmueli's persistent efforts to swing Beatty's vote is consistent with Shmueli's closeness to Vesco, and is equally consistent with an innocent purpose, that is, to get Beatty to do what Vesco wanted, as it is consistent with knowing participation in the underlying fraud by Shmueli.

Shmueli's version of the meeting at International Controls after the underwriting was successfully completed, in which Yamada attempted to collect the reward for his activity, parallels the testimony of Beatty, except with respect to the phone calls made by Shmueli on Yamada's behalf.

He testified (Tr. p. 702) that no investment management contract for Yamada was discussed with respect to the pension fund. but does recall that Yamada was proposing, prior to the effective date of the prospectus, the possible investment of a portion of this fund in one. or more investment partnership funds controlled by Yamada. Shmueli denies that he came to any contract or agreement with regard to Yamada purchasing stock of IHS for himself or anyone else. Thereafter, Hickey reported to Shmueli that he had been in contact with Yamada, and that he believed Yamada "was interested in possibly having his funds or directly himself or in some way participating." (Tr. p. 705). Shmueli denies that he urged Beatty to give an investment contract to Yamada or do anything else for him, but I do not credit this testimony as true.

Early in 1971, Shmueli was visiting International Controls, and Beatty indicated to him by conversation that ICA was not going to make any investment of any type, either directly or indirectly with or through any of Yamada's entities. The Court credits Beatty's testimony at p. 641 as truthful:
"Q Did there come a time when you spoke with Mr. Vesco and in some way or another finally identified the decision as a formal matter, namely, the decision not to hire Mr. Yamada.
"A No, I think the matter simply died. I simply stalled it to death. I would not proceed with Mr. Yamada, and just stalled, and I donht recall subsequent discussions with Mr. Vesco about it."

This method is, of course, standard in all bureaucracies, including the Vesco controlled group of corporations. The record warrants a finding that Vesco had a strong wish that Yamada be compensated, but he was unable to effectuate that wish because of opposition within his own bureaucracy. Although anxious to compensate Yamada for his activities in connection with IHS stock, apparently Vesco was unwilling to disrupt his organization by putting sufficient pressue upon the co-trustees of the pension fund, Richardson and Beatty, to achieve that result.

*12 Shmueli's expressed interest in compensating Yamada through the pension fund was as great as Vesco's but this fact, standing alone or together with other facts concerning Vesco's conduct, does not warrant an inference of guilty knowledge or participation in the fraud by Shmueli. It is equally likely that Shmueli thought he was advancing Vesco's interests by trying to get Richardson and Beatty to pull together, and keep Vesco's word given to Yamada. Without additional evidence not present here, the Court must and does find that the plaintiff failed to prove any wrongful participation in the scheme or artifice, or violation of Rule 10b-5 on Shmueli's part.

*The Activities of Greditor-Gumper*

Dr. Greditor was a practicing chiropractor in November and December, 1970, and was an in-and-out trader in new issues. Rosemary Gumper

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 11

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

enjoyed the use of Dr. Greditor's office, where at that time there was a direct private telephone line to the stockbrokerage firm of Herzfeld & Stern.[FN10] Miss Gumper was in a position to follow Dr. Greditor's judgment in matters, and they ordinarily acted together in making trades. They were principally day traders. Dr. Greditor had the practice of reviewing the prospectus on most new offerings, and purchased those which appeared attractive. His purchases were *bona fide,* and insofar as this record appears, he paid for the stock he bought, and had the financial capacity to do so without regard to whether an immediate sale was effected.

> FN10 Later, the private wire was connected with John J. Meyers & Co.

His dealings in the stock of IHS are typical of his standard method of proceeding. He purchased 17,500 shares of IHS at $5.00 on December 1, 1970 from Ferkauf, Rogan, Grisman & Classen, a member of the selling group, but not an underwriter. The salesman at the Ferkauf firm had called him, and he believes that he had read the prospectus of IHS before the date of purchase. The morning that the stock became available, and at a time when the quoted price in the after issue market was slightly above the issue price, he purchased 17,500 shares from Ferkauf, and Miss Gumper at the same time, purchased 4,000 shares from the same source.

The Greditor-Gumper operation had a standard practice with respect to these issues; they sold promptly.

The operations of Greditor-Gumper were described at p. 430, *et seq.*:
"THE COURT: Are we to understand that if you had not been able to sell it at a profit you would have sold it within the ensuing week or two in any event?
THE WITNESS: My records would show that I played the secondary new issue market on the basis that if they break the offering price, I immediately sell.
THE COURT: If they do not?
THE WITNESS: If they rise up, I will either take a

profit or sit with them, or perhaps remove part of the position which I now own at free cost, and sell the balance.
THE COURT: If they remain the same or drop?
THE WITNESS: I immediately sell the stock. I would say my records would show 90 to 95% of my trades are in that category.
*13 THE COURT: What do you mean by immediately?
THE WITNESS: It could be within moments after the offering has come . . . ."

Anthony Meyers of John J. Meyers & Co. spoke with Dr. Greditor on December 1st and informed him that he, Meyers, was making a market in IHS stock that particular morning. As the price was up, and Meyers indicated to Greditor that he had a potential buyer for 20,000 shares [which was plaintiff, although Greditor did not know it], he and Miss Gumper sold through the Meyers firm. Greditor's and Gumper's shares comprised a total of 21,500. Meyers, as noted previously, made a trade as broker of 20,000 shares to Competitive, and took the balance of the Greditor-Gumper stock into the house for its own account.

The particular form of Poker, or more accurately Red Dog, which Greditor, Gumper and others were playing in the new issue market in 1970 was not in itself illegal. These individuals had no communication with Yamada or with any defendant in this case, but their operations with respect to new issues were well known, and while Hickey testified that he would have preferred to keep the stock out of such hands, this was, as a practical matter, almost impossible. The record warrants an inference that Yamada, Vesco and Constantinou were familiar with these practices and that at some point in the morning of December 1st, learned that the Greditor-Gumper block of stock was overhanging the market, that it was going to be sold regardless, and that unless purchasing strength were provided, the issue would fail tom et the necessities facing Vesco previously discussed, namely, that the underwriting be successful, and that the postoffering price of the stock not fall below the offering price.

Even if they did not know that Greditor or other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 12

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

day-traders were overhanging the market, or did not know the precise number of shares held by such traders, they knew the likelihood existed. By making the directed bid of 5 1/4 , pointed to Meyers, at the time he did so, Yamada was able to test the market quickly for the presence of such overhanging shares. If there were none, and if the underwriting had been successful, and all shares were in strong hands intending to hold for investment, then no sale would close for a mere quarter point, and Meyers would report back to McSwain his inability in whole or in part to fill the order at the price fixed by Yamada. It was foreseeable that if the day-traders held slightly more than the 20,000 bid by Yamada, Meyers, a market maker, would pick off their entire block, as in fact happened. If no such shares, or less than 20,000 shares were overhanging, Yamada would have known that fact by Meyers' response, and could have directed McSwain to increase the bid, or more likely, to reduce the size. All this points up Yamada's activities for just what they are; use of plaintiff's funds, credit, and facilities, not for its own benefit, but to aid Vesco in making the IHS offering an outstanding success.

*Hickey, and P. K. Hickey, Wolff & Co.*

**\*14** There is no evidence in the record to justify a finding that Hickey or his firm were parties to the illicit arrangement between Yamada, Vesco and Constantinou, or that they should have known of it. Hickey, in the Spring of 1970, was an officer and director of Radiation Machinery Corporation (" Radiation"), and his firm, P. K. Hickey & Company, a predecessor of P. K. Hickey, Wolff & Co., was its investment banker. Radiation was in financial difficulties. Hickey engaged in extensive negotiations with Vesco, acting for International Controls, to see if Radiation could be merged with a Vesco entity. There was nothing improper about this conduct, which ultimately came to fruition in a merger or acquisition of Radiation by a Vesco controlled entity after the effective date of the IHS underwriting. At that time, Hickey had no reason to believe that Vesco was a crook. It was natural that Vesco, who was dissatisfied with "best efforts" underwritings being proposed for IHS by others, would ask Hickey to take an interest in IHS and he

did so. The Court believes that this is an ordinary manner in which investment bankers obtain business, and while plaintiff has characterized it as " backscratching," there is nothing wrong or unlawful about such relationships in the context of this lawsuit. At the effective date of the prospectus, no agreements had been reached between Radiation and any Vesco entity, and the existence or nature of the ongoing confidential negotiations between Radiation and International Controls were not material facts insofar as concerns this underwriting. The prospectus showed that Shmueli had a history of prior connections with International Controls, that Anderson a director of IHS, had served as a director of International Controls, that Dodd, another director, had been an officer of International Controls, and that the issuer planned to elect Paul J. Hickey, characterized therein as a general partner of P. K. Hickey, Wolff & Co., to its board of directors. Vesco's position with International Controls was revealed (Prospecus, p. 17) and the prospectus suggested that Vesco was or might be a promoter or parent of IHS.

Hickey proceeded in behalf of his firm in an entirely normal and routine fashion with respect to the underwriting. While Vesco told Hickey that he would be of assistance in seeing that IHS offering would be fully sold, this statement by itself does not imply any intention to use wrongful means. While Vesco put Hickey in touch with Pilaro, the Court has found no evidence of wrongdoing on Pilaro's part. It is true that Pilaro brought in Provident and Constantinou, and introduced them into the underwriting syndicate, but Hickey made a good faith effort as a part of his due diligence procedures to check the honesty and reputation of Provident, and found nothing adverse. The Court cannot imply liability from these facts, taken alone, or together with anything else in the case.

We have noted previously in our discussion of Pilaro's efforts, that underwriters, including Hickey as lead underwriter, paid a substantial fee to Pilaro in part from their own funds. Had they known that there was a conspiracy afoot, engineered by Vesco, and had they believed that Pilaro was in any way related to it, it is doubtful they would have paid his fee from their own pockets. Furthermore, shortly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 13

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

before the offering, Hickey's firm decreased the
amount of its commitment. A part of this reduced
allotment to Hickey resulted in an increase of
10,000 shares of the allotment to Provident, which
as we observed *supra*, p. 17 [p. 97,328] was "sold"
to Hagopian. Were Hickey a participant in the
fraud, there would have been no reason for him to
reduce the allotment of his firm. We find no
wrongdoing in Hickey's dealings with Yamada.
Plaintiff asserts it was gulled by Yamada, and
believed him to be honest and upright. So did
Hickey.

*15 *Evidence Questions*

The Court declines to take Yamada's hearsay
statements as testified to by Galanis and others as
admissible under the exception to the hearsay rule
relating to statements against Yamada's pecuniary,
penal or proprietary interests at the time made. Of
course, the statements are admissible against those
persons, found on the entire evidence in the case to
be members of the conspiracy with Yamada, but the
statements are so vague taken by themselves, and
inconclusive, that they do not constitute a clear
admission against penal or related interests. A
statement so admitted must be such that the person
making it reasonably would believe himself to be
making a statement against his interests.

The concept of "helping" Vesco place an
underwriting, or complete an offering successfully,
are not by themselves statements that clearly stand
against Yamada's penal or other substantial
interests. As of the time they were made, and
before Vesco was known to be an international
crook Yamada could not have so considered them.
The statement of fact must be "distinctly" against
the interests of the declarant [5 Wigmore, § 1457],
and so "positive that it would naturally have been
present in the declarant's mind." Wigmore § 1461.
The Court declines to take any of the hearsay
statements attributed to Yamada or Vesco, except as
against those persons herein found to be
conspirators and accepts it as to them on agency
principles to the extent made during the course of
the conspiracy and prior to its discovery or
completion.

Furthermore, the Court declines to draw any
inference under the circumstances of this case
against any party by reason of the refusal of
Yamada and Constantinou to answer questions on
the ground of self-incrimination. Yamada was not
a party, nor was he under the control of any of the
party defendants, so that his refusal to testify would
be imputed to them. There is ample evidence
concerning Constantinou's role in the matter,
without recourse to any inference based upon the
taking of the Fifth, and the Court believes that
defendants should not be placed in jeopardy even in
a civil case, for exercising a right of constitutional
dimensions. See *Gardner v. Broderick*, 392 U. S.
273 (1967) and cases cited therein; *cf.* 8 Wigmore §
2272, (McNaughton Rev.).

*Liability Under § 12 of the Securities Act of 1933*

Competitive asserts that the defendant Issuer and
underwriters and their principals are liable under
Sec. 12 of the 1933 Act. Liability is premised on
material omissions and misleading statements in the
prospectus. Plaintiff misconstrues the scope of
liability that this section casts. The statute provides
that "[a]ny person who . . . (2) offers or sells a
security" by means of a faulty prospectus "shall be
liable to the person purchasing such security from
him. . . ." 15 U. S. C. Sec. 77l. Although the
statute has not been construed as limiting liability to
those in strict privity with the plaintiff, "
[u]ndoubtedly, the language of Sec. 12(2) envisions
the presence of some 'element of privity.'" *In re
Coesars Palace Securities Litigation*, 360 F. Supp.
366, 379 (S. D. N. Y. 1937).

*16 Competitive did not purchase its shares from
any of the defendants. Of the 42,000 shares which
Competitive purchased, 20,000 were bought from
Greditor-Gumper through John J. Meyers & Co.;
20,000 were bought from Eastman, Dillon Union
Securities & Co.; and 2,000 were bought from
John R. Maher Associates. None of the sellers
were made defendants in this action. None of the
sellers nor their principals, in the case of Meyers,
were members of the underwriting group. The
members of the underwriting group cannot be held
liable under Sec. 12 under these circumstances were
they were not palintiff's immediate sellers. *Unicorn*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 14

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

*Field, Inc. v. Cannon Group, Incorporated,* 60 F.
R. D. 217 (S. D. N. Y. 1973).

IHS may not be held liable under this section. The
distribution was a firm commitment underwriting.
Under this arrangement, there is no basis for tracing
liability to the Issuer as the ultimate seller of these
securities. See *DeMarco v. Edens,* 390 F. 2d 836
(2d Cir. 1968); 3 L. Loss, *Securities*

*Regulation,* 1719-20.

*Liability Under § 11 of the Securities Act of 1933*

Plaintiff relies upon the failure to disclose certain
transactions or facts in IHS's registration statement
and prospectus as the omission of material facts
upon which § 11 liability may be premised.
Specifically, the alleged material omissions are the
claimed "parking" arrangement engineered through
Galanis' account, the purchase of the shares from
the so-called "free riders" Greditor and Gumper,
and the wooden ticket purchase by Hagopian
through Provident Securities, one of the
underwriters.

A fact is proved to be material, for purposes of Sec.
11 of the 1933 Act, "when it is more probable than
not that a significant number of traders would have
wanted to know it before deciding to deal in the
security at the time and price in question." *Feit v.
Leasco Data Processing Equipment Corporation,*
332 F. Supp. 544, 571 (E. D. N. Y. 1971). As has
been previously noted *(supra,* p. 19 [p. 97,329]),
the Court views the Galanis transaction as *de
minimus* and believes it certainly does not rise to
this, or any magnitude of materiality.[FN11] The
Greditor-Gumper transaction was not a fact that
would influence the investment decisions of
potential traders. In the era of the "hot issues", "
free riders" were a factor to contend with, but it
would not be possible for the prospectus to
anticipate which issues would attract their attention,
nor for the underwriters to prevent purchases by
them.

FN11 As to an omission, the issue is now
phrased in terms of "might have" rather

than "would". See *Welch Foods, Inc. v.
Goldman Sachs & Co.,* - F. Supp. -,
Docket No. 70 Civ. 4811 (dated
September 30, 1974).

The Hagopian "wooden ticket" purchase from
Provident Securities, one of the underwriting firms
in this distribution, stands in a different order.
Although plaintiff did not purchase its shares from
Provident, it would be a concern of the plaintiff, as
it would be of any reasonably prudent investor, that
one of a select circle of underwriters had sold
10,000 shares, or 5% of the public issue, to a
favored customer in violation of credit restrictions.
Such dealing of a principal of a member of the
underwriting syndicate in violation of these
restrictions, to achieve the initial success of the
offering was a material fact which required
disclosure. As it was not disclosed, this material
omission is a basis for imposing § 11 liability on
defendant IHS. As noted *infra,* p. 46 [p. 97,336],
the underwriters other than Provident have
sustained their burden in showing due diligence.
Constantinou, as the controlling person of
Provident, is liable for this omission since the
credible evidence in this case indicates that the
wooden ticket purchase was consummated with his
knowledge. 15 U. S. C. Sec. 77o.

*17 It is unrealistic to characterize Yamada as an
underwriter, whose presence should have been
disclosed in the prospectus. The record shows that
Yamada purchased all of the shares he ordered as
an investment for Competitive; the only difficulty
with his conduct is that he was motivated not by his
fiduciary duty to plaintiff, but by his desire to
ingratiate himself with Vesco and give Vesco
consideration which would induce Vesco to have
pension trust advisory business awarded to Yamada.
There is no material omission with respect to
Yamada. We have dated the effectuation of the
fraud as having occurred in the morning of
December 1, 1970, when Yamada altered his
directions to McSwain and increased his initial
order of IHS stock from 3,000 to 20,000 shares.
Yamada continued his activity by purchasing the
additional 20,000 shares from Eastman later in the
day.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 15

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

The prospectus contains a general statement (p. 20) that:
"P. K. Hickey, Wolff & Co. has been authorized, for the accounts of the several Underwriters, to sell any or all of the Capital Common Stock to selected dealers who are members of the National Association of Securities Dealers, Inc. at the public offering price, less a concession of not more than $.25 per share...."

The Court attaches no significance whatsoever to the fact that there were such reallowances to members of a selling group, and that a firm refered to as BWA purchased shares thereunder. BWA was not a principal underwriter, assuming, as is apparently the case, that Vesco controlled BWA, or had an interest in it.

We have previously discussed Pilaro's role as a consultant, and believe that this was adequately disclosed in the prospectus. Defendant Issuer argues the point well concerning Pilaro (Brief, p. 41):
"to assert that disclosure is required of the services of a consultant in the context of this record is as absurd as to assert that the name of an underwriter's registered representative or back office employees, accountants or chauffeurs must be disclosed. It just is not material. No authority is cited for the peculiar and untenable position asserted by plaintiff that a consultant, employed to help an underwriter find co-underwriters becomes an underwriter, if successful. There is no evidence that Pilaro's compensation depended upon his finding co-underwriters, or that he purchased the stock, or that he sold any of the stock to anyone."

Furthermore, there is no evidence that the discussion concerning employment of Pilaro by IHS as a consultant or a Director had reached the point of firm reality to the extent that it should have been discussed in the prospectus. Indeed, if it had been menitoned under the facts of this case, it would be a false representation unless Pilaro had agreed to accept some particular employment. Furthermore, the prospectus does disclose an intention by the underwriters to engage in after market transactions.

*The "Due Diligence" Defenses*

Section 11(b) of the Securities Act of 1933 provides that "no person, other than the issuer, shall be liable " under § 11(a) "who shall sustain the burden of proof".
*18 "(3) that (A) as regards any part of the registrationstatement not purporting to be made on the authority of an expert ... he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement not purporting to that the statemens therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading; ...."

For purposes of determining what constitutes reasonable investigation and reasonable ground for belief, Sec. 11(c) sets the standard of reasonableness as "that required of a prudent man in the management of his own property."

The defense of due diligence would be available to all the defendants, with the exception of the Issuer, IHS. Section 11 imposes nearly absolute liability on the issuer. *Feit v. Leasco Data Processing Equipment Corporation,* 332 F. Supp. 544, 575 (E. D. N. Y. 1971).

The performance of due diligence "is a question of degree, a matter of judgment in each case." *Escott v. Barchris Construction Corporation,* 283 F. Supp. 643, 697 (S. D. N. Y. 1968).

The underwriting group was headed by P. K. Hickey, Wolff & Co., of which Paul K. Hickey was a partner. Hickey testified that his due diligence inquiry included a complete analysis of the company, its finances, management and future plans, as well as an analysis of the state of the industry (Tr. p. 259). Pilaro, as adviser to the underwriting syndicate, made an extensive study of the medical and health care fields (Tr. pp. 491-92). Investigations were made of opportunities for acquisitions which was the stated use to which the proceeds of the offering would be applied, (Tr. p. 494). Hickey and counsel visited IHS's clinical laboratory and acquainted themselves with its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 16

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

operation (Tr. pp. 484-87). Hickey, Wolff, as the lead underwriter, assembled the underwriting group. Hickey was acquainted with each firm that became a member of this group, with the exception of Provident. To assure that Provident would undertake a true public offering, Hickey investigated the reputation of Provident and Constantinou, since he did not have prior experience with that firm. Hickey testified that in all respects his due diligence efforts in this underwriting were similar to his normal practice in other underwritings (Tr. p. 511).

Immediately prior to the effective date, a due diligence meeting was held. At that meeting, Shmueli made a presentation on behalf of IHS, discussing the company's current status and its plans for the future, including potential acquisitions (Tr. p. 552). Dick Donner, an attorney who was present at the meeting due to the efforts within the Hickey firm, represented that, apart from the described " affiliate" status, there was no connection between IHS and International Controls (Tr. pp. 552-55). Copies of the prospectus were distributed to those in attendance (Tr. pp. 552, 556). Shmueli and Donner responded to questions. Additional questions were directed to Hickey regarding the mechanics of the underwriting (Tr. p. 507).

*19 While an element of levity was injected in the trial record concerning the due diligence meeting, to the effect that it took place in a private club where appetizers and liquor were served, and an effort was made to portray the due diligence meeting as a mere cocktail party, the Court does not accept this characterization, and believes that Hickey, his attorneys, Pilaro, and the underwriters other than Provident, went through all of the necessary procedures to justify a finding of due diligence on their part. Furthermore, the conspiracy which the Court does find to exist was by its very nature, secret, and knowledge of it most unlikely to be available to the non-participating underwriters, no matter how much diligence they used. A smaller investment in it would not have been unreasonable for plaintiff's funds. The initial order made by Yamada was for a mere 3,000 shares; this is in itself some evidence that the conspiracy did not flower until mid-morning on December 1st, and for

that reason alone could not have been known to the non-participants.

The plaintiff has attempted to place significance on the claimed failure of certain defendants to have representatives in attendance at the due diligence meeting (Tr. pp. 549-52). Plaintiff also attaches significance to Hickey's failure to have the due diligence meeting transcribed and its failure to prepare a post-meeting summary (Tr. pp. 547-48). Although the attendance of all the participating underwriters and the maintenance of these records may have been advisable, the significance of any failures on the part of the underwriting group must be viewed in the context of the issues raised by this lawsuit.

The claimed omission central to this action is the failure of the Issuer and its underwriters to disclose the existence of this conspiracy between Yamada, Vesco and Constantinou to assure the success of this offering by unlawful means. This covert and illicit situation would not have come to light had a greater number of the underwriters been present, or if notes of the meeting had been recorded. Diligent investigation by Hickey of the character and reputation of Provident failed to disclose intent to effect the Hagopian transaction.

To escape liability under Sec. 11, "[t]he defendant must establish (1) that he conducted a reasonable investigation and (2) that after such investigation he had reasonable ground to believe and did believe the accuracy of the registration statement." *Feit v. Leasco, supra,* at p. 576. I find that Hickey, Wolff, on its own behalf and in behalf of the other underwriters, made a reasonable investigation; that the degree of investigation required to have unveiled the conspiracy was far greater than "that required of a prudent man in the management of his own property." 15 U. S. C. Sec. 77k(c). Although each of the underwriters had a responsibility of due diligence, upon this record, I do not find that the other members of the underwriting group conducted their affairs in an unreasonable manner. The activities of Hickey, which inured to the benefit of all of the underwriters, indicate an exercise of due diligence throughout the offering. Hickey testified, and I find, he did so truthfully, that Vesco had never

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          Page 17

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

informed him of any specific connection or understanding between Vesco and Yamada, and Hickey knew nothing of any attempts by Yamada to acquire investment advisory business from Vesco controlled entities, nor did he have any knowledge of Hagopian's activities.

*20 Plaintiff has failed to prove any wrongdoing on the part of Hickey or his firm, P. K. Hickey, Wolff & Co. As lead underwriter, it exercised due diligence, an adequate defense under § 11 of the 1933 Act.

All underwriters, except Provident are entitled to prevail upon the affirmative defense of due diligence used.

The Court finds no negligence. Mere negligence, if present, would not constitute a basis for liability on the part of the underwriters for the Sec. 10b claims which plaintiff has proved against others. The underwriters had no actual knowledge, and there is no basis upon which the Court could find that they should have known or would have known of these improper activities.

Even if negligence were proved, it will not rise to the degree of culpability necessary to impose liability under Rule 10b-5. *Republic Technology Fund, Inc. v. Lionel Corp.,* 483 F. 2d 540 (2d Cir. 1973).

*The Statute of Limitations Defense*

Defendants assert that plaintiff failed to bring this action within one year after "discovery should have been made by the exercise of reasonable diligence," with the result that any claim under Sec. 11 or Sec. 12(2) is barred. 15 U. S. C. Sec. 77m.

It is true that as soon as the confirmations were received, perhaps earlier, plaintiff, through its employees not connected with the fraud, knew that the Fund had absorbed 20% of the new offering. Defendants urge that even rumor or vague charges are sufficient to put plaintiff on notice, and thereby start the limitations period running, if they were such as to arouse suspicion in a reasonable man. *Klein v. Shields & Co.,* 470 F. 2d 1344, 1347 (2d

Cir. 1972); *Clement A. Evans & Co. v. McAlpine,* 434 F. 2d 100, 104 (5th Cir. 1970), *cert. denied* 402 U. S. 988 (1971).

Even before Yamada was hired by plaintiff to manage a segment of its portfolio, there were rumors concerning his character, and it was understood by plaintiff's officers that the Securities and Exchange Commission was investigating him. Yamada's practice of directing trades to particular brokers had come to the attention of Randolph, plaintiff's principal officer, and had been cause for concern. McSwain's records clearly showed plaintiffs that this was a directed trade.

As early as January 13, 1971, Mr. James B. Baron, a Director of plaintiff, reached the conclusion that Yamada was a fraud, a cheat, and a person of bad character. He recommended that Yamada be discharged as a liar. Mr. Baron had no hard evidence on which to form this conclusion; he was a retired banker who had had many years experience dealing with borrowers and persons in the financial community, and reached his conclusion with respect to Yamada operating solely by intuition. The majority of the Board of Directors, and the balance of Competitive's management rejected this conclusion, and they were entitled to do so, even though by hindsight, the unsupported intuition of the former banker proved correct.

Even when, finally, Yamada was discharged by the Board of Directors for lying, this fact did not immediately place the Directors on notice of the claimed scheme in this case. It would be foolhardy to suggest that, having established Yamada was a crook, and that he had fleeced the Fund in connection with Fantastic Fudge or Firefly Enterprises, as he apparently did, a reasonable Director must immediately infer that *all* investments of the trust funds made by Yamada were fraudulent. What is clear today was not necessarily clear in early 1971. The Fund discharged Yamada on May 14, 1971, and in the Court's view under the circumstances of this case, was entitled to at least a 30 day period thereafter as a reasonable time within which to investigate and ascertain the facts concerning the IHS issue, some of which remain

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1148

Not Reported in F.Supp.                                                                          Page 18

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

unclear even to this day. This action was brought on May 4 1972. To require knowledge at a prior date necessitates judging the actions of the Directors "in the light of such subsequent events as could not, through compliance with their duty, have been anticipated. A wisdom developed after an event, and having it and its consequences as a source, is a standard no man should be judged by." *Costello v. Costello*, 209 N. Y. 252, 262 (1913).

*21 Defendants contend plaintiff's managers knew no later than January 13, 1971 that they had been damaged and "hid their heads in the sand because they were embarrassed." That inference or conclusion is unjustified.

In October 1971, Randolph, plaintiff's then President, and Markizon, its Secretary, weer given the assignment by plaintiff's Board to determine the true market value of the securities in Yamada's segment of the portfolio and determine whether or not they should be sold, and whether they could be sold, and shortly thereafter, on November 9, 1971, plaintiff's directors apparently authorized its attorneys to bring this litigation and other lawsuits. This action is timely.

The Court does not consider that plaintiff waived any rights against defendants, or became estopped in any fashion by the fact that subsequently, it apparently reported the IHS stock in its financial reports as having a value greater than that which it now contends.

*Section 17a Claim*

This Court has dealt previously with this issue in *Welch Foods, Inc. v. Goldman Sachs & Co.*, - F. Supp. - Docket No. 70 Civ. 4811-CLB (dated Sept. 30, 1974) [P 94,806-CCH.], relying on the opinion of Judge Gignoux in *Dyer v. Eastern Trust and Banking Company*, 336 F. Supp. 890 (D. Me. 1971). Since liability is found under Secs. 10b and 11, no purpose will be served in prolonging this opinion unduly by discussion of a Sec. 17a claim, which would parallel our consideration in the *Welch* case.

*Imputed Liability of IHS Under § 10b for Acts of Vesco and Yamada*

While the statute provides a basis for imputing liability of the issuer to its promoters [15 U. S. C. Secs. 77o and 78t], we find little reported authority concerning imputed or vicarious liability of an issuer because of the misconduct of its promoters or controlling persons. Under the circumstances of this case, and concededly in the prospectus, Vesco was a "promoter" of IHS. I find that he was more than that, and regard him as a *de facto* officer and director of IHS. He controlled 17.9% of the voting stock. An additional 13.3% was owned by Shmueli, who, as previously observed, was so involved with Vesco as to be under his domination and control. One Ballin, an unrelated person, who had a three year contract of employment at $20,000.00 with Issuer's wholly owned subsidiary, owned 9.1%. Of the directors and officers not mentioned, one was an attorney whose firm was expected to render legal services to the Company, and another hada prior history of close affiliation with International Controls.

At the time of the underwriting, the Issuer was Vesco's creature in all respects, and under his domination and control. His efforts in its behalf in connection with the sale of the stock inured to the benefit of the corporation as they were intended to do. We consider the corporation liable for the acts of Vesco previously mentioned on principles of agency, on the theory that Vesco was a *de facto* officer and director, wholly apart from his status as a promoter and controlling person.

*22 There are alternate theories available to plaintiff. One of these is, assuming the liability for Vesco's activities is not imputed to the Issuer, at least the Issuer received the proceeds of the underwriting, and as an innocent beneficiary of the tort, should be compelled to make restitution. Furthermore, even if the promoter were not a *de facto* officer and director, we see no sound basis by which the beneficiary of a promoter's wrongdoing should not have that wrongdoing imputed to it under general principles of agency, even absent any position as officer of director. Cf. *Hill York Corp. v. American International Franchises, Inc.*, 448 F. 2d 680 (5th Cir. 1971).

*Damages*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 19

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

Plaintiff is entitled to compensatory damages for the losses suffered as a result of the fraud and statutory violations. It remains subject to a duty to mitigate its damages and should have sold the IHS stock within a reasonable period of time after ascertaining the fraud. Plaintiff contends that it could not realize the prices quoted in the "pink sheets" by over-the-counter market makers, because it held almost 20% of the outstanding salable float, a figure computed by taking the total amount of the issue of 200,000 shares and adding approximately 20,000 unregistered shares which had been freed of restrictions by reason of the death of a shareholder or similar circumstances.

Plaintiff attempted to prove by the expert witness Drucker that its block was so large that it could not be sold for more than 50% of the pink sheet bid quotations. While Drucker was fully qualified to give such expert testimony, the hypotheses which were submitted to him for his consideration were so limited that it was impossible for him, or anybody, to have given a meaningful opinion based solely thereon. The Court attaches no weight whatsoever to his testimony. Specifically, all that Mr. Drucker relied upon was the float figure. Drucker testified that he could form an opinion and determine the market price which could have been obtained for this substantial block of shares during 1972 based solely upon consideration of the pink sheets, the prospectus issued in 1970 by IHS and the Annual Report of plaintiff, which certainly had no bearing on the market value of IHS stock. (Tr. pp. 281-82).

Specifically, when Drucker testified as to such market price, he did not know what unfulfilled customer orders were then on hand, at what specified price, with what dealers, and had no information whatsoever concerning the financial condition of IHS at the time of the proposed sale, or its profit and loss experience since 1970. He did not know the supply and demand ratio of stock of IHS existing in the market, the market climate, nor the short position of houses maintaining primary markets, all of which he conceded were relevant factors in connection with the opinion he was asked to give (Tr. p. 286.) His testimony is worthless.

Plaintiff advances the reasonable suggestion that

dumping this 40,000 share block on the market at or near the time of the discharge of Yamada would have depressed the price further. Galanis testified that he wanted to find out about the holdings of plaintiff because he believed that he could sell short with respect to issues which Yamada had purchased. He inferred, not unreasonably, and the Court believes any trader would conclude, that plaintiff was most likely to dispose of unseasoned stocks which Yamada had purchased. It would be expected to do so in order to realize all losses and potential losses, and permit the next portfolio manager to start with a clean record. But this fact depressing the market is not germane to the issue, because the Court finds that the reasonable period within which plaintiff should have sold began in mid-June, 1971. (See *supra*, p. 54 [p. 97,338]).

*23 More nearly in point on the issue of damages is the result of a clandestine attempt by plaintiff in September or October 1971 to sell its IHS stock. Plaintiff placed a tentative sell offer through one Spencer, a trader. That trader solicited Hickey as a possible purchaser. Hickey attempted to find out who the seller was, and to make certain that the block, originally offered at between fifteen and twenty-five thousand shares, did not have additional shares behind it, which would come on the market and depress the price, impeding Hickey's resale efforts. The trader acting for plaintiff admitted to Hickey that he had 35,000 shares, and Hickey quoted a bid price of $3.25 for these shares. I find Hickey would have purchased them himself for his firm. Hickey was able to ascertain by reference to the Issuer's stock records that "Gitfund", an *alter ego* or street name for plaintiff, owned 40,000 shares. He knew this when he made the bid, and though he was bidding for this specific block. Hickey did not know that Gitfund was an *alter ego* of Competitive Associates, but knew that it was the only holder of a salable block of stock in that number of shares. He made a bid for the "approximate amount of 35,000 shares" at a price of $3.25, and I find that he would have bid the same amount for the full 40,000 shares had it been tendered to him, and that his bid was a good faith bid. It was not accepted.

While Competitive disclaims knowledge that any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 20

Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,966
(Cite as: Not Reported in F.Supp.)

such offer was authorized, I am convinced that
Hickey testified truthfully in regard thereto, and that
he did in fact receive such a request, and correctly
deduced that the block involved was Gitfind's. Mr.
Spencer, of Herzog & Co., the stockbroker claimed
to have offered these shares to Hickey in behalf of
plaintiff was not called as a witness. There is no
other evidence that plaintiff could have liquidated
its sizable block at the prices quoted in the pnik
sheets or at any price higher than the Hickey offer,
during the aforementioned period.

The Court computes plaintiff's damages as follows:

TABULAR OR GRAPHIC MATERIAL SET AT
THIS POINT IS NOT DISPLAYABLE    TABLE
As compensatory damages for the wrongful
withholding of the money after demand, plaintiff
shall recover interest at 6% from May 4, 1972 to
date of entry of the judgment. The judgment shall
be entered against Gilman Service, Inc., and
Pericles Constantinou, jointly and severally, and
shall provide that the aciton is dismissed without
prejudice as to defendant Provident Securities, Inc.,
and with prejudice insofar as concerns defendants
P. K. Hickey, Wolff & Co., Delphi Capital
Corporation, Scheinman, Hochstin & Trotta, Inc.,
Hartzmark & Co., Inc., L. C. Wegard & Co., Inc.,
Ross, Low, Bull & Co., Kalman Shmueli, Howard
F. Cerny, Carl W. Anderson and Ralph P. Dodd.

Plaintiff's attorneys in their post-trial memorandum
requested this Court, for the first time, to award
plaintiff counsel fees, although the complaint,
requested compensatory damages, "together with
costs and disbursements . . . and such other relief as
to which the Plaintiffs may be entitled." No
evidence of the extent of the efforts by each of the
law firms which has represented Competitive in this
action was submitted. Defendants in their briefs
chose not to deal with the awarding of counsel fees.
On this record, the Court has no basis upon which
to make an award.

*24 The foregoing constitutes findings and
conclusions pursuant to Rule 52, F. R. Civ. P. Settle
a final Judgment on five (5) days notice.

S.D.N.Y. 1975.

Competitive Associates, Inc. v. International Health
Sciences, Inc.
Not Reported in F.Supp., 1975 WL 349 (S.D.N.Y.),
Fed. Sec. L. Rep. P 94,966

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1151

Westlaw.

Not Reported in F.Supp.                                                                  Page 1

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469
(Cite as: Not Reported in F.Supp.)

C
Briefs and Other Related Documents

United States District Court, C.D. California.
In re International Rectifier Securities Litigation
No. CV91-3357-RMT (BQRX).

March 31, 1997.

William S. Lerach, Patrick J. Coughlin and Spencer
Burkholz, Milberg, Weiss, Bershad, Hynes &
Lerach; and Edward P. Dietrich, Stull, Stull &
Brody; and Kevin J. Yourman, Weiss & Yourman,
for the plaintiffs.
Bruce G. Vanyo, Jared Kopel and Marta Cervantes,
Wilson, Sonsini, Goodrich & Rosati, for defendants
Montgomery Securities and Kidder Peabody &
Co.; Raymond C. Fisher and Daniel Slaughter,
Heller, Ehrman, White & McAuliffe, for
defendants Jack Vance, Rochus Vogt, Alan Lidow
and George Krsek; and B. Boyd Hight, Seth
Aronson, Glenn Trost, Paul Douglas and Marc
Feinstein, O'Melveny & Myers LLP, for defendants
International Rectifier Corporation, Eric Lidow and
Robert Mueller.
*1 Securities Act-Prospectuses-Registration St
atements-Liabilities-Misrepresentations-No
Concealment.-An underwriter's analyst's report did
not reveal new, material information that was
concealed in the prospectuses and registration
statements for a common stock public offering and
a conversion of debentures into common stock.
The company, a major semiconductor producer, had
discussed the constraint on production capacity at a
major plant due to a lack of backend test and
assembly, and a weakened demand for low margin
Power Products Division output due to a slow
European economy. Further, the analyst's
statement that a mix shift favoring the lower margin
automobile market at the expense of the more
profitable disk drive line that could dampen demand
in the Electronics Products Division was nothing
more than an opinion upon which no liability could

be premised. Summary judgment was entered for
the defendant issuer, underwriters and individuals.

See ¶ 4501 and 4735, "Securities Act-Liabilities"
division, Volume 2.

Securities        Act-Prospectuses-Registration    St
atements-Liabilities-Due     Diligence.-Underwriters
were not liable for false statements in prospectuses
and registration statements for a common stock
public offering and a conversion of debentures into
common stock because of a meritorious due
diligence defense. The underwriters exercised
reasonable care in investigating the issuer's
prospects by, among other things, 1) reviewing the
issuer's internal financial forecasts, contracts and
other important documents; 2) inspecting the
issuer's major facilities; 3) employing analysts
knowledgeable in the issuer's field, semiconductor
production; 4) conducting extensive interviews
with 11 of the issuer's senior and middle
management; 5) interviewing major customers,
outside quality consultants, the auditing firm and
legal counsel; and 6) obtaining written verification
from the issuer on the accuracy of the information
in the prospectus and a "cold comfort" letter from
the auditors warranting that no material changes had
taken place in the issuer's financial position since
the last audit.

See ¶ 4501 and 4735, "Securities Act-Liabilities"
division, Volume 2.

Securities        Act-Prospectuses-Registration    St
atements-Liabilities-Experts.-A witness who was
presented as an expert on due diligence, which the
court found "more than questionable," still did not
present reasonable criticisms of the underwriters'
due diligence efforts when the qualifications issue
was put aside. First, that the underwriters
examined annual rather than quarterly sales data
was dictated by availability of the reports, a matter
beyond their control. Second, there was no
impropriety in the underwriters' oral discussion with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1152

Not Reported in F.Supp.                                                                                                Page 2

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469
(Cite as: Not Reported in F.Supp.)

a consultant about the contents of his report, rather than a first-hand reading of the report. Nothing in the record suggested that the consultant was untruthful or incomplete, and any intimation in that regard was "rampant speculation." Third, it was appropriate for the underwriters to limit their examination of the issuer's employees to those in top-level or middle management positions, as they would have the broadest understanding of the issuer's operations. Finally, it did not defeat the reasonableness of the underwriters' inquiry that they only interviewed the issuer's largest customers. While cumulatively small customers can have a substantial impact on the issuer's prospects, the overall thoroughness and professionalism of the due diligence inquiry more than offset any lapse in judgment on this issue.

*2 See ¶ 4501 and 4735, "Securities Act-Liabilities " division, Volume 2.

Exchange Act-Antifraud-Misrepresentations-Due Diligence Determination.-In light of a previous determination on this motion for summary judgment that underwriters had conducted adequate due diligence on the veracity of the issuer's prospectus, scienter could not be established for a Rule 10b-5 claim. Consequently, that claim was also decided for the defendants on summary judgment.

See ¶ 22,721 and 22,725, "Exchange Act-Manipulations; National Market System" division, Volume 3.

TAKASUGI, District Judge.
This matter has come before the court on the motion for summary judgment by the underwriter defendants Kidder Peabody & Co. ("Kidder") and Montgomery Securities ("Montgomery") and the motion for summary judgment by defendants International Rectifier ("IR" or "the Company") and Eric Lidow, Robert Mueller, Jack Vance, Rochus Vogt, Alan Lidow and George Krsek (collectively "the Individual Defendants"). Having considered the pleadings and other documents filed herein, the court issues this memorandum in lieu of findings of fact and conclusions of law.

## I. INTRODUCTION

This is a class action lawsuit alleging securities fraud under Sections 11 and 12(2) of the Securities Act of 1933 ("1933 Act") and Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"). The plaintiff class consists of all persons who purchased or otherwise acquired the publicly traded securities of International Rectifier ("IR" or "the Company") between March 7, 1991 and October 18, 1991-the time period encompassing (a) IR's filing of its Registration Statement with the Securities Exchange Commission ("SEC") (March 7, 1991); (b) IR's stock offering (April 17, 1991); and (c) the conversion of IR's debentures into stock (May 15-June 14, 1991).

## II. FACTS

### A. The Company

The Company, founded in El, Segundo, California in 1947, is a company devoted to the manufacture and sale of semiconductors. In 1991, IR was divided into two divisions: (1) the power products division ("PPD"), responsible for manufacturing IR's traditional power semiconductor devices, and (2) the electronics products division ("EPD"), responsible for the development and manufacture of IR's newer and more technologically-advanced products. EPD was responsible for the manufacture of "HEXFETs," IR's trademark power MOSFET design,[FN1] which account for over 65% of IR's revenues.

> FN1. "MOSFET" stands for metal oxide semiconductor field effect transistor. A " power MOSFET" is a power transistor used in applications that call for electrical power to be turned on and off (such as a power switch) or otherwise controlled (such as the control for a motor used in the power windows of a car).

Anticipating increased demand for HEXFETs, IR constructed a $100 million manufacturing plant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                           Page 3

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469
(Cite as: Not Reported in F.Supp.)

called "Hexfet America" or "HexAm" in Temecula, California, which became operational in 1987. The significant construction and operational costs associated with the HexAm plant, among other things, caused IR to lose money from 1986-1989.

### B. IR's Operations

The manufacture of semiconductors is highly technical and involves two distinct operations, wafer fabrication and assembly. In terms of IR's overall semiconductor output, the assembly rate determined the levels of wafer fabrication-i.e. the HexAm plant only fabricated as many wafers as could, in turn, be assembled into the finished product.

*3 In order to meet rapidly rising demand, IR needed to expand its assembly capacity by purchasing and installing new assembly equipment at the HexAm plant.

Around this time, the defendant investment banks, Kidder and Montgomery (collectively "the Underwriters"), began their "courtship" of IR. The key players and events of this courtship are as follows:

### C. Kidder's Role (Cuhney, Whittington)

In 1990, Adam Cuhney, a Vice-President in Kidder's corporate finance department, who already possessed knowledge about the semiconductor industry and IR, made several presentations, on behalf of Kidder, to help IR obtain financial capital. In August of that year, Cuhney approached IR's management about the possibility of a stock offering. The idea, however, was ultimately rejected because IR's stock was valued too low for a stock offering to raise the capital IR needed.

Between August 1990 and January 1991, however, the price of IR's stock rose significantly. The Underwriters credit this higher valuation to a combination of growing HEXFET sales, increased plant utilization, and a major patent infringement victory involving the HEXFET. Plaintiffs, by

contrast, view IR's market gains in a more sinister light, attributing the increased stock prices "to the numerous misrepresentations made by the defendants to the market." In any event, by January of 1991, Cuhney considered a stock offering as a developmental strategy and organized a presentation to IR's management about the services Kidder could potentially offer.

In attendance at this presentation was Richard Whittington, a Kidder stock analyst who covered IR and, more broadly, the semiconductor industry. Whittington, who had previously rated IR's stock as a "hold" in December 1990 and January 1991, changed his rating the following month (February) to a "buy." IR retained Kidder that same month as lead underwriter for the stock offering.[FN2]

> FN2. Although not explicitly stated, the inference Plaintiffs intend for the Court to draw here is clear: Whittington changed his recommendation from "hold" to "buy" as part of Kidder's "courtship" of IR. However, Plaintiffs offer no evidence to support this inference.

### D. Montgomery's Role (Gerhardt, Joseph, Thornhill)

In January of 1991, Clark Gerhardt, the Managing Director of Montgomery's corporate finance department, solicited IR's management to allow Montgomery to participate in the stock offering. As a prerequisite to hiring Montgomery, IR's CEO insisted that Thomas Thornhill, an experienced semiconductor analyst, be assigned to follow IR. Along with Jonathan Joseph, another Montgomery semiconductor analyst, Thornhill issued a research report on February 14, 1991 with a "buy" rating for IR's stock. Montgomery was hired on February 19 as a comanager with Kidder for the public offering.

### E. The Due Diligence

As required by the SEC, the Underwriters commenced formal due diligence into IR's operations. The Underwriters first held an organizational meeting which was attended by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1154

Not Reported in F.Supp.                                                              Page 4

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469
(Cite as: Not Reported in F.Supp.)

Kidder, Montgomery, Latham & Watkins (the law firm representing the Underwriters), O'Melveny & Meyers (IR's attorneys), and Coopers & Lybrand (IR's outside accountants)-collectively "the Working Group." Building upon the Underwriters' already-existing base of knowledge about IR and the semiconductor industry, the diligence conducted in preparation for the stock offering was unquestionably extensive.

*4 At the outset, the Underwriters interviewed eleven senior and middle management employees on a variety of subjects including IR's management, operations, customer-base, technology, expenditures, and growth potential. The Underwriters interviewed IR's major customers, IR's outside quality consultants (Andersen Consulting), IR's outside accountants (Coopers & Lybrand), IR's patent attorney, and IR's outside environmental counsel. The Underwriters inspected IR's major factories and reviewed IR's internal financial forecasts and other important documents. Latham & Watkins examined IR's key contracts and its compliance with applicable laws.

The entire Working Group reviewed IR's preliminary prospectus line-by-line, maintaining contact with IR's management as revisions were made. The Underwriters conducted their own independent analysis of IR's business plan and created their own model of IR's expected earnings, which demonstrated that IR's internal forecasts were actually conservative. The Underwriters continued their diligence throughout the pre-offering period, receiving an oral confirmation from IR's management that they believed the prospectus to be correct, a written confirmation from IR's management stating the same and a "cold comfort" letter from Coopers & Lybrand representing that it knew of no material changes in IR's financial position since its last audit.

### F. The Stock Offering

On March 7, 1991, IR filed a Registration Statement with the SEC for the offering of 4.2 million shares of stock, with an over-allotment option of 525,000 additional shares. IR's stock was

then trading at approximately $17 per share. The Registration Statement was declared effective on April 16, 1991, and the stock offering became effective on April 17, 1991 at an offering price of $22 per share. One week later, IR reported third quarter earnings of $.29 per share, exceeding all analysts' expectations.

### G. The Debenture Conversion

Pursuant to the successful stock offering, Adam Cuhney (the Kidder Vice-President) recommended that IR conduct a "debenture conversion." IR's debenture holders were given the option of converting their debentures into common stock at $16,375 per share or redeeming the debentures at $1,045 per each $1,000 of face value.

Kidder was the sole underwriter for the debenture conversion, and assisted IR in the preparation of a prospectus for those debenture holders who opted to receive stock. In addition to conducting further interviews of IR's management and at least two of IR's major customers, Kidder received oral and written confirmation from management that there had been no adverse material changes in IR's business since the stock offering IR then "called" the convertible debentures on May 14, 1991, which could be irrevocably surrendered between May 15 and June 14, 1991. IR publicly announced the completion of the debenture conversion on June 19, 1991.

### H. The Whittington Report

On June 19, 1991, the same day IR publicly announced the completion of its debenture conversion, Richard Whittington (the Kidder analyst) issued a report in which he lowered his earning estimates for IR's June 1991 quarter and changed his short-term recommendation on IR's stock from a "buy" to a "hold." Whittington's report caused precipitous drop in IR's stock price,[FN3] and Plaintiffs filed this action the next day. Eight days after he issued his report, Whittington reinstated his "buy" recommendation. As discussed below, the Whittington report and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 5

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469
(Cite as: Not Reported in F.Supp.)

temporary devaluation of IR's stock thereafter is the crux of this entire lawsuit.

> FN3. On June 19, 1991, IR's stock dropped $5.625 per share (from a June 18 closing price of $22.125) and closed at $16.50.

*5 In his report, Whittington, while maintaining that IR's stock remained an excellent long-term investment, provided the following three reasons for downgrading his short-term recommendation and earnings estimates for IR's stock:

First, back-end test and assembly at IR's Power MOSFET facility is being added slower than we had thought. This problem results from the strapped financial position in which the company has operated until recently and should fairly quickly be resolved. Until it is, however, sales of their most profitable products, which account for 60%-plus of sales, are constrained.

Second, demand for older technology and relatively low margin Power Products Division output is weakened by the slow European economy, particularly in white goods and other consumer durables.

Third, a mix shift in Power MOSFETs favoring the lower margin automobile market at the expense of the more profitable · disk drive product could dampen an overall strong demand trend for IR's Electronics Products Division.

In his deposition, however, Whittington stated that the three reasons, listed above, were not the "main reasons" for downgrading IR's stock on June 19, 1991. Rather, his principal reason for the downgrading was his perception, acquired during his trip to the Far East, of a "general industry decline." Whittington stated:

As I wound my way from Japan to ... Taiwan and then to Singapore, it became clear that orders were dropping across the front, and that my premise of a rebounding economy were, you know, evaporating. And not just for disk drives, but for everything in the electronics industry.... Again, I never heard anything about IR specifically, but ... [t]he preponderance of inputs was overwhelming, which

led me to downgrade a number of stocks I was covering at that time.

Whittington's earnings estimate for IR proved, in fact, to be too low. Whittington even stated that his June 19 recommendation was "very poor performance, which I acknowledge." This is reinforced by the fact that eight days later, Whittington reinstated his "buy" recommendation for IR. Whittington's assertion that IR represented an excellent long term investment proved quite true. As of November of 1995, IR's stock was trading at approximately $46 per share, more than twice the secondary offering price and close to three times the debenture conversion price.

Plaintiffs contend that the information contained in Whittington's report was new, material, known to IR, and not disclosed to the market. Plaintiffs claim that IR's alleged concealment of this information violated Sections 11 and 12 of the 1933 Act. As discussed below, however, Plaintiffs are wrong. Each of the three factors discussed in Whittington's report were disclosed in IR's prospectuses. Defendants correctly assert (as demonstrated by the clear language of the prospectuses) that "[t]he only thing new in that report ... was Mr. Whittington's opinion-*no new facts were reported.*" Plaintiffs have failed to produce *any* evidence that Whittington withheld negative information before the completion of the debenture conversion.

### III. DISCUSSION

#### A. Sections 11 & 12(2) Claims Against All Defendants

*6 Plaintiffs bring claims against all of the defendants under Sections 11 and 12(2) of the 1933 Act. 15 U.S.C. § § 77k and 77l. Section 11 imposes liability "[i]n case any part of [a] registration statement ... contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1156

Not Reported in F.Supp.                                                Page 6

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469
(Cite as: Not Reported in F.Supp.)

77k(a); *In re Software Toolworks Inc.,* 50 F.3d 615, 621 (9th Cir.1994) ("*Toolworks II*"), *cert. denied,* 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). Section 12(2) imposes additional liability for using a prospectus "which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(2); *Toolworks II,* 50 F.3d at 621.

### 1. IR's Prospectuses Were Not False Or Misleading

Plaintiffs contend that IR concealed material, new information contained in Whittington's report. Whittington reported that IR's production capacity was constrained by a lack of back-end test and assembly at the HexAm. This was fully disclosed in the prospectus. (Prospectus Statements 70 and 71). Whittington stated that the demand for low margin Power Products Division output was weakened by the slow European economy. Again, this was fully disclosed in the prospectus. (Prospectus Statements 55, 56, and 57). Finally, Whittington stated that "a mix shift in Power MOSFETs favoring lower margin automobile market at the expense of more profitable disk drive product could dampen overall strong demand trend for IR's Electronic Products Division (EPD)." This is an opinion not a fact. There is no evidence that anyone at IR was aware of this opinion and no liability can be premised thereon.

The Whittington Report did not disclose facts that were concealed or misrepresented in the registration statements or prospectuses; nor is there any evidence that the registration statements or prospectuses otherwise contained misrepresentations or concealed information. As a result, all defendants are entitled to summary judgment on the claims brought pursuant to Sections 11 and 12(2) of the 1933 Act.

Because it appears that the common law fraud and negligent misrepresentation claims asserted against the Underwriters are based solely on representations contained in the prospectuses, the Underwriters are also entitled to summary judgment on said claims.

To the extent plaintiffs' claims for common law fraud and negligent misrepresentation as against IR and the Individual Defendants are based on alleged misrepresentations and/or concealment in the prospectuses, they too are entitled to summary judgment thereon.

### 2. The Underwriters' Due Diligence Defense

The underwriters have an additional basis upon which to avoid liability under Sections 11 and 12(2) of the 1933 Act by establishing a "due diligence" defense. Section 11(b)(3) requires the underwriters to demonstrate that they "had, after reasonable investigation, reasonable ground to believe and did believe ... that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3); *Toolworks II,* 50 F.3d at 621. Under Section 12(2), the underwriters must establish that they "did not know, and in the exercise of reasonable care, could not have known, of [the] untruth or omission." 15 U.S.C. § 77l(2); *Toolworks II,* 50 F.3d at 621.

#### a. Reasonable Investigation/Reasonable Care Defined

*7 In *Toolworks II,* the Ninth Circuit observed that the "reasonable investigation" standard set forth in Section 11(b)(3) and the "reasonable care" standard of Section 12(2) were "similar, if not identical." 50 F.3d at 621. Regarding summary judgment, the Court held that the appropriate due diligence analysis under either section would, accordingly, be the same: " 'the standard of reasonableness shall be that required of a prudent man in the management of his own property.' " *Id.* (quoting 15 U.S.C. § 77k(c)). Stated otherwise, the due diligence standard is, " 'in effect, ... a negligence standard.' " *Id.* (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 208, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1975)).

Whether "due diligence" has been adequately performed "is a question of degree, a matter of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 7

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469
(Cite as: Not Reported in F.Supp.)

judgment in each case." *Escott v. BarChris Constr. Corp.*, 283 F.Supp. 643, 697 (S.D.N.Y.1968); *see also Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544, 577 (E.D.N.Y.1971) (noting that underwriters play a crucial role in protecting the public against false or "unduly enthusiastic" information and "must make an investigation reasonably calculated to reveal all of those facts which would be of interest to a reasonably prudent investor").

It is clear, then, that the diligence conducted must be reasonable, not perfect. *In re Software Toolworks, Inc. Sec. Litig.*, 789 F.Supp. 1489, 1496-98 (N.D.Cal.1992) ("Toolworks I"), *aff'd in part and rev'd in part*, 38 F.3d 1078 (9th Cir.1994), amended 50 F.3d at 615 (9th Cir.1995). Without the benefit of hindsight, the Court must determine whether "[t]he overall investigation ... was reasonable under the circumstances at the time of the investigation." *Id.* at 1498 n. 14. To the extent that the underlying facts are undisputed, the adequacy of the diligence may be appropriately decided on summary judgment.

b. Factors for Determining Reasonableness

Courts have examined a variety of factors for the purpose of determining "reasonableness." *See Toolworks II*, 50 F.3d at 622-23 (defense established where underwriters obtained written representations from company and outside auditors that prospectus was accurate, confirmed certain facts with company's customers, and surveyed retailers to ensure that the company had not lowered its prices); *Weinberger v. Jackson*, 1990 WL 260676 at *3, Fed.Sec.L.Rep. ¶ 95,693 (N.D.Cal. Oct. 11, 1990) (defense established where underwriters reviewed industry publications and company documents, conducted meetings, interviewed personnel and customers, inspected facilities, and obtained written representations that the prepared prospectus was accurate); *Competitive Associates, Inc. v. International Health Sciences, Inc.*, 1975 WL 349 at *18, Fed.Sec.L.Rep. ¶ 94,966 (S.D.N.Y. Jan. 22, 1975) (defense established where underwriters' "inquiry included a complete analysis of the company, its finances,

management and future plans, as well as an analysis of the state of the industry"); *Leasco Data Processing*, 332 F.Supp. at 582-83 (defense established where underwriters conducted a " thorough review of all available financial data").

*8 Based on the foregoing, the following are factors this court considered in determining the " reasonableness" of the Underwriters' diligence:
(1) whether the Underwriters were familiar with IR's finances, management, and operations (*see Weinberger*, 1990 WL at *3; *Competitive Associates*, 1975 WL at *18; *Leasco Data Processing*, 332 F.Supp. at 582);
(2) whether the Underwriters possessed knowledge of the industry in which IR is involved (*see Weinberger*, 1990 WL at *3; *Competitive Associates*, 1975 WL at *18);
(3) whether the Underwriters conducted interviews of IR's employees (*see Toolworks II*, 50 F.3d at 622; *Weinberger*, 1990 WL at *3);
(4) whether the Underwriters conducted interviews of and/or confirmed data with IR's customers or other third parties (*see Toolworks II*, 50 F.3d at 623; *Weinberger*, 1990 WL at *3);
(5) whether the Underwriters obtained written verification from IR and/or outside accountants that the information contained in the prospectus was accurate (*see Toolworks II*, 50 F.3d at 623-25; *Weinberger*, 1990 WL at *3).

Applying the above factors to the present case establishes that the Underwriters' diligence was reasonable as a matter of law. Prior to the April 17th offering, the Underwriters and/or other members of the Working Group:
(1) reviewed IR's internal financial forecasts, contracts, and other important documents, and inspected IR's major facilities;
(2) employed analysts who were knowledgeable of the semiconductor industry;
(3) conducted interviews with eleven of IR's senior and middle management employees, inquiring about numerous aspects of IR's operations;
(4) conducted interviews with IR's major customers, IR's outside quality consultants, the public accounting firm responsible for auditing IR, IR's patent attorney, and IR's outside environmental

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep, P 99,469
(Cite as: Not Reported in F.Supp.)

Page 8

counsel;
(5) obtained written verification from IR's management that the information in the prospectus was correct and a "cold comfort" letter from IR's outside accountants indicating that there had been no material changes in IR's financial position since its last audit.

### c. Smith Declaration

In an effort to discredit the Underwriters' due diligence defense. Plaintiffs rely heavily on the declaration of Dr. Richard Smith, a finance professor at the Graduate Management Center of the Claremont Graduate School. Dr. Smith opines, for several reasons, that the diligence performed by the Underwriters in this case was "inadequate." Plaintiffs argue that the Smith Declaration, alone, precludes this Court from granting summary judgment on the due diligence defense. For reasons discussed below, this is not necessarily true.

### (1) Dr. Smith's "Expertise" Examined

First of all, Dr. Smith's "expertise" is more than questionable. The Underwriters contend, and this court agrees, that pursuant to Rule 702 of the Federal Rules of Evidence, Dr. Smith is not an expert in the area of underwriter due diligence and " is not qualified to opine on either practices and customs in the industry or the Underwriters' adherence to the legal requirements."

*9 And indeed, the most troubling aspect of Dr. Smith's declaration, as noted by the Underwriters, is that "nothing in his background indicat[es] that he has any first-hand knowledge of industry custom and practice pertaining to underwriters' due diligence, or that he has personally participated in the due diligence for a public offering." The Underwriters further point out that: (1) Dr. Smith has no background in securities law or due diligence case law; (2) Dr. Smith has never appeared as an expert on underwriters' due diligence; and (3) Dr. Smith has not written any articles about underwriters' due diligence. In other

words, while Dr. Smith may be an erudite individual in matters of finance and economics, he is not an expert on the subject of underwriter due diligence.

### (2) Reasonableness of Dr. Smith's Declaration

Even if, *arguendo*, Dr. Smith were an expert on due diligence, his declaration does not necessarily preclude this Court from granting summary judgment. As the Ninth Circuit held in *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir.1995):
Assertions in expert affidavits do not automatically create a genuine issue of material fact.... [W]e are obliged to look at the record to determine whether, in light of any undisputed facts, the inferences to be drawn from the expert's affidavits are reasonable. [Citation]. "When the expert opinion is not supported by sufficient facts to validate it in the eyes of the law or when indisputable record facts contradict or otherwise render the opinion unreasonable," summary judgment is appropriate. [Citation].

51 F.3d at 1440. *See also Toolworks II*, 50 F.3d at 628; *In re Wonder of the Worlds Sec. Litig.*, 35 F.3d 1407, 1426-27 (9th Cir.1994) ( "WOW"); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.1988) ("[W]here the evidence is as clear as that in this record, the court is not required to defer to the contrary opinion of plaintiffs' 'expert." ').

Dr. Smith takes issue with the Underwriters' diligence on four points:
(a) The Underwriters failed to examine quarterly as opposed to annual production and sales data. Such data, opines Dr. Smith, would have revealed IR's declining market share and decreasing output from the HexAm plant.
(b) The Underwriters failed to read reports from Andersen Consulting, IR's outside consultants, concerning issues such as plant capacity, growth potential and customer satisfaction. Dr. Smith asserts that these reports would have been a "red flag" to the Underwriters that the market had been misled about IR's ability to expand output. Acknowledging that a member of the underwriting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1159

Not Reported in F.Supp.                                                                                    Page 9

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469
(Cite as: Not Reported in F.Supp.)

team spoke by telephone with an Andersen consultant, presumably about the reports, Dr. Smith contends that "a conversation is not an adequate substitute for first-hand examination of the reports."

(c) The Underwriters, upon interviewing IR's employees, neglected to speak to plant employees, focusing instead on upper-level management. Dr. Smith asserts that "[i]t is not sufficient simply to speak with senior management since it is the representations of senior management that need to be tested."

*10 (d) The Underwriters interviewed only IR's largest customers, rather than selecting customers at random or by a stratified sampling. Dr. Smith contends that "[g]iven the size of IR backlog and the fact that IR output was being rationed, it would have been important to determine whether these customers were receiving priority treatment or were representative of the other customers."

At first blush, Dr. Smith's declaration appears to raise valid concerns about the diligence performed by the Underwriters. Under closer scrutiny, most of his criticisms lack merit. First, Dr. Smith criticizes the Underwriters for failing to examine quarterly as opposed to annual production and sales data. However, it appears that the Underwriters had no other choice. Quarterly data for the months of January through March did not become available until June (three months later), after the prospectuses for the secondary offering and debenture conversion were filed. Dr. Smith appears to be faulting the Underwriters for failing to examine data which were simply unavailable.

Second, Dr. Smith criticizes the Underwriters for failing to read the Andersen Consulting reports. Well-exceeding the bounds of his alleged "expertise," Dr. Smith asserts:

Andersen Consulting is in the business of selling consulting services to corporations such as IR. In a conversation, the underwriter would have to expect that Andersen Consulting would not volunteer negative information and would tend to portray IR in a generally positive light.

This statement, as characterized by the

Underwriters, amounts to nothing more than "rampant speculation." There is no evidence to suggest that the Andersen consultant misrepresented, in any sense, the state of affairs at IR. In fact, making such a false representation would have been foolish because the Underwriters would ultimately have been able to check the validity of the consultant's statements against the information in the written reports. It appears illogical to assert that the Anderson consultant would be less-than-forthcoming about IR on the telephone, but totally honest in the written report. Furthermore, if the consultant actually withheld negative information from the Underwriters on the telephone in the hope of ingratiating himself/Andersen Consulting with IR's management, as Dr. Smith speculates, then it would seem that the written reports would also be faulty for the same reason. Under such circumstances, review of the Andersen reports would be wholly unnecessary.

Thus, while it may have been preferable for the Underwriters to have read the Andersen reports as opposed to receiving an oral summation, the latter may have simply represented a better use of the Underwriters' limited time and resources. There is no authority cited by either party to support Dr. Smith's contention that a failure to examine, first-hand, the reports of a private consulting firm, commissioned by and prepared for the benefit of the defendant, was unreasonable.

*11 Third, Dr. Smith takes issue with the Underwriters' failure to interview lower-level employees at the HexAm plant, arguing that the "[U]nderwriters need to speak with employees who have first-hand knowledge of production problems." Dr. Smith's position is that senior management either lacked knowledge of the true state of affairs at the HexAm plant or had an incentive to misrepresent the same. Again there is no evidence to support Dr. Smith's position. Nor is any authority cited to suggest that, given the time constraints under which the Underwriters operated, their decision to interview only senior and middle management (the employees who would presumably possess the broadest knowledge about IR's operations, finances etc.), as opposed to lower level

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1160