# Appendix
# A1161-A1184

Not Reported in F.Supp.                                                    Page 10

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469
(Cite as: Not Reported in F.Supp.)

employees, was unreasonable.

Finally, Dr. Smith asserts that the Underwriters were negligent in interviewing only IR's largest customers as opposed to selecting customers at random or according to a stratified sampling. The Underwriters respond that "[i]t would hardly make sense to waste time and money calling customers that do not have a material impact on revenues in preference to those that do." The Underwriters' response is not entirely satisfactory on this point. Smaller customers *do* have a material impact on revenues, individually and, most certainly, in a collective sense. Perhaps the Underwriters should have interviewed IR's smaller customers to determine whether their needs were adequately met. However, one judgmental error on the part of the Underwriters, in light of the otherwise thorough due diligence investigation performed, should not, alone, negative the reasonableness of their investigation. And again, the Underwriters may have determined (perhaps in conformance with industry custom) that interviewing only IR's larger customers represented the best use of their limited time and resources.

In sum, the standard under which this Court must measure the Underwriters' due diligence is one of reasonableness, not perfection. Based on the authority cited above, the Underwriters have amply conformed with, if not exceeded, the industry standards in this area. Dr. Smith is an academic; he does not have first-hand knowledge of due diligence practice and custom; nor should he be allowed to assist this Court in understanding the same.

Even if Dr. Smith were an expert, identifying only one possible shortcoming in the Underwriter's due diligence (i.e. the failure to interview smaller customers), it would be truly surprising, given the advantage of hindsight, if he could not do so. Dr. Smith's ability to poke holes in the diligence conducted is not dispositive of the above. Cf. *Toolworks II*, 50 F.3d at 628 and *WOW*, 35 F.3d at 1427 (rejecting "self-righteous" statements of expert who appeared, in the court's eyes, to argue that because outside auditor did not perform audit as he would have, fraud could be found).

The undisputed facts of this case demonstrate that the Underwriters conducted thorough diligence into IR's affairs. The authorities discussed above demonstrate that the Underwriters' diligence is sufficient to establish a due diligence defense, as a matter of law, under Sections 11 and 12(2) of the 1933 Act.

### B. Section 10(b) and Rule 10b-5 Claims Against the Underwriters

*12 Plaintiffs also bring claims against the Underwriters pursuant to Section 10(b) of the 1934 Act and SEC Rule 10b-5 thereunder. Rule 10b-5 provides that it is unlawful "[t]o make any untrue statement of fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading." Rule 10b-5; *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Liability for damages will not lie under Section 10(b) and Rule 10b-5 in the absence of scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)

Under Rule 10b-5, scienter is defined as "a mental state embracing the intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193-94 n. 12 (1976); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 (9th Cir.1990) (en banc), cert. denied, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). For summary judgment purposes, Plaintiffs are required to produce "significant probative evidence" (see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) that the Underwriters had either (a) actual knowledge of the material misstatements or (b) acted with "recklessness"-i.e. " not merely simple, or inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger*, 914 F.2d at 1569 (citations omitted); *Toolworks II*, 50 F.3d at 626. *See also Weinberger*, 1990 WL 260676 at *3 (" '

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1161

Not Reported in F.Supp.                                                                    Page 11

Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469
(Cite as: Not Reported in F.Supp.)

[S]hould have been aware' is not the standard, and the underwriters can be liable under section 10(b) only if their misconduct rose to a level of recklessness.").

In light of the preceding discussion of the Underwriters' due diligence, the analysis of Plaintiffs' Section 10(b) claim is simple: if the Underwriters reasonably believed in the veracity of the prospectuses by virtue of the extensive due diligence they conducted, they cannot be said to have acted "recklessly," making an "extreme departure from the standards of ordinary care," with respect to the same assertions under Rule 10b-5. Simply stated, the Underwriters' establishment of a due diligence defense under Sections 11 and 12(2) of the 1933 Act negates the existence of scienter under Section 10(b) of the 1934 Act. *See Weinberger,* 1990 WL 260676 at *3 ("The underwriters ... made diligent inquiries, and evaluated the information they received. Their actions could not be held to be 'reckless.' ").

C. Section 10(b) and Rule 10b-5 Claims Against IR and the Individual Defendants

Plaintiffs also bring claims against IR and the Indivi dual Defendants pursuant to Section 10(b) of the 1934 Act and SEC Rule 10b-5. However, genuine issues of material fact remain as to such claims.

IV. CONCLUSION

For all of the foregoing reasons, the Underwriters are entitled to summary judgment with respect to all the claims asserted against them, and IR and the Individual Defendants are entitled to partial summary judgment as to the claims under Sections 11 and 12(2) of the 1933 Act and as to the common law fraud and negligent misrepresentation claims to the extent they are based on representations contained in the prospectuses.

C.D.Cal.,1997.
In re International Rectifier Securities Litigation
Not Reported in F.Supp., 1997 WL 529600 (C.D.Cal.), Fed. Sec. L. Rep. P 99,469

Briefs and Other Related Documents (Back to top)

• 2:91cv03357 (Docket) (Jun. 20, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1162

Not Reported in F.Supp., 1998 WL 513091 (W.D.Mich.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.
United States District Court, W.D. Michigan.
**PICARD CHEMICAL INC.** Profit Sharing Plan, et al., on behalf of themselves and all others similarly
situated, Plaintiffs,
v.
**PERRIGO** COMPANY, et al., Defendants.
No. 1:95-CV-141, 1:95-CV-290.
June 15, 1998.

Stephen C. Bransdorfer, Bransdorfer & Bransdorfer, PC, Grand Rapids, Reed Richard Kathrein,
Milberg, Weiss, Bershad, Hynes, LLP, San Francisco, CA, Ellen A. Gusikoff, Spector & Roseman, P.C.,
San Diego, CA, for Picard Chemical Inc. Profit Sharing Plan, On Behalf of Itself and All Others
Similarly Situated, Elizabeth B. Pilling, On Behalf of Herself and All Others Similarly Situated, Edward
R. Pepper, On Behalf of Himself and All Others Similarly Situated, David H. Levy, On Behalf of Himself
and All Others Similarly Situated, Elsie S. Feldman, Trustee, on behalf of self and all others similarly
situated, Elsie S. Feldman Trust, on behalf of self and all others similarly situated, Ted S. Goldberg,
on behalf of self and all others similarly situated, pltfs.
Stephen D. Turner, Law, Weathers & Richardson, Grand Rapids, Joe A. Sutherland, Gardner, Carton &
Douglas, Chicago, IL, Bruce W. Neckers, Rhoades, McKee, Boer, Goodrich, et al, Grand Rapids,
Michael B. Reuben, Gordon, Altman, Butowsky, Weitzen, et al, New York, NY, William K. Holmes,
Warner, Norcross & Judd, LLP, Grand Rapids, Dennis E. Glazer, Davis, Polk & Wardwell, New York, NY,
for Perrigo Company, Michael J. Jandernoa, Lonnie L. Smith, Richard G. Hansen, M. James Gunberg,
Steven N. Hutchinson, Robert P. Lasner, Mark Olesnavage, F. Folsom Bell, Henry L. Hillman, William
C. Swaney, Ralph E. Klingenmeyer, J.P. Morgan Securities, Ltd., Morgan Stanley International, Smith
Barney Shearson, Inc., Dean Witter Reynolds, Inc., Michael J. Jandernoa Trust, with Michael J.
Jandernoa as Trustee for, Michael J. Jandernoa, Trustee, for Michael J. Jandernoa Trust, Swaney
Associates, Hillman Family Trusts, the, Edward A. Craig, III, Ralph E. Klingenmeyer Trust, with Ralph
E. Klingenmeyer as Trustee for, Ralph E. Klingenmeyer, Trustee, for Ralph E. Klingenmeyer Trust,
Ralph E. Klingenmeyer, Mrs., as Trustee for Joseph Klingenmeyer Trust, Ralph E. Klingenmeyer, Mrs.,
as Trustee for John Klingenmeyer Trust, Ralph E. Klingenmeyer, Mrs., as Trustee for Amy
Klingenmeyer Trust, Joseph Klingenmeyer Management Trust, with Mrs. Ralph E. Klingenmeyer as
Trustee for, Ralph E. Klingenmeyer, Mrs., as Trustee for Joseph Klingenmeyer Management Trust,
John Klingenmeyer Management Trust, with Mrs. Ralph E. Klingenmeyer as Trustee for, Ralph E.
Klingenmeyer, Mrs., as Trustee for John Klingenmeyer Management Trust, Amy Klingenmeyer
Management Trust, with Mrs. Ralph E. Klingenmeyer as Trustee for, Ralph E. Klingenmeyer, Mrs., as
Trustee for Amy Klingenmeyer Management Trust, Sandra E. Hansen Trust, with Richard G. Hansen
as Trustee for, Richard G. Hansen, as Trustee for Sandra E. Hansen Trust, Richard G. Hansen Trust,
with Richard G. Hansen as Trustee for, Richard R. Hansen Trust, with Richard G. Hansen as Trustee,
Richard G. Hansen, as Trustee for Richard R. Hansen Trust, Elizabeth A. Hansen Trust, with Richard
G. Hansen as Trustee for, Henry L. Hillman Trust, individually, defts.
Grover H. Davis, Three Rivers, Po se.

OPINION

QUIST, District J.
Table of Contents

Background Facts                                              1
The Defendants                                               5
Standard for Summary Judgment                                6
Analysis                                                     8

A 1163

A. Analysis of Six Alleged Material Omissions ...................................................... 8··

  1. "The Company had learned that certain of its main retail chain customers ··· and certain   8
     major wholesale customers ··· were materially reducing or stopping their purchases from
     the Company." (Compl.¶ 51(g).) .....................................................................

  2. "Perrigo's switch from the LIFO to the FIFO method of valuin g inventory was to hide   12
     increasing cost-of-goods-sold in the fourth quarter of fiscal 1993 and subsequently,
     thereby allowing Perrigo to continue to announce increased earnings growth immediately
     prior to and following the October 1993 Offering." (Compl.¶ 51(j).)
     ...............................

  3. "The Company had been unusually aggressive in its 'early-ship' program and had   12
     convinced many of its retail companies ··· to stockpile inventory prior to and immediately
     after the October 1993 Offering to make its sales growth appear better than it actually
     was." (Compl.¶ 51(e).) ·················································································

  4. "Perrigo did not, in fact, have real plans to 'invest even more in fiscal 1994' as, in fact, a   14
     lesser amount was invested-and no explanation has ever been forthcoming from
     Perrigo." (Compl.¶ 47(b).)·············································································

  5. "Perrigo's results for the first two quarters of 1994 had been artificially inflated due to   21
     increased revenues generated by sales promotions which had borrowed large amounts of
     sales from the last two quarters of fiscal 1994 and would result in Perrigo's profit growth
     in the second half of fiscal 1994 slowing materially." (Compl.¶ 74(a).)
     ...............................

  6. "Perrigo would not achieve any substantial profit growth due to increased sales in   22
     international markets, at least in the near term, as defendants knew that the major
     company with which they had stated they would enter those markets-Wal-Mart-had
     informed them that it preferred regional suppliers." (Compl.¶ 74(b).)
     ...............................

  7. Admission of Immateriality ·················································································· 24
  8. Lack of a Causation Allegation ············································································· 25
B. Analysis of Underwriters' Separate Motions for Summary Judgment on Separate Grounds 26·
  1. Facts Regarding Underwriters ··············································································· 26
  2. Discussion of Due Diligence Defense ······································································ 33
    a. Due Diligence Standards ················································································· 34
    b. Due Diligence Investigation ············································································· 36
    c. Red Flags ································································································· 40
Conclusion ································································································· 40

OPINION

*1 This is a class action alleging securities fraud.

*Background Facts*

When publicly traded stock drops as quickly and as far as did the stock of Perrigo Company ("Perrigo"), one reasonably thinks that there is something wrong-probably fraud. In this case, Perrigo had a secondary public offering of 13 million shares at $31 per share in October 1993. In March 1994, the share price dropped from $28.25 to $22.375 over two days, and in May 1994, the price dropped suddenly again to $12.25. To date, the share price has not risen above $20 and has generally fluctuated between $10 and $15. The October 1993 offering (the "1993 Offering") was the largest offering up to that time on the National Association of Securities Dealers exchange. The corporate insiders of Perrigo and the largest shareholder of Perrigo reaped profits of tens of millions of dollars. In March 1995, persons who purchased Perrigo stock between May 11, 1993, and May 10, 1994, sued Perrigo, its officers and directors, and Henry L. Hillman, who was allegedly the largest shareholder and primary beneficiary of the secondary offering through trusts and other entities which he

A 1164

controlled. The Complaint alleges that the secondary public offering in October 1993 was fraudulent and in violation of federal securities laws. The Complaint does not allege that Perrigo created false books or that the Defendants made specific false statements. Rather, the Complaint alleges that Defendants failed to disclose facts that were material to helping a reasonable investor make an informed decision about whether to purchase Perrigo stock.

This Court granted Plaintiffs status as class representatives on September 27, 1996. This Court dismissed Henry L. Hillman and his trusts and associates on July 25, 1996, on the ground that these defendants were not "controlling persons" and Plaintiffs failed to allege as required by Fed.R.Civ.P. 9 (b) specific facts showing their involvement in the alleged fraudulent scheme. See *Picard Chem., Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101, 1129-30, 1135-36 (W.D.Mich.1996). The defendants in the case are Perrigo, its officers, its directors, and the Underwriters who participated in the secondary offering. In 1996, these defendants moved to dismiss the case on the grounds that Plaintiffs failed to state a claim upon which relief could be granted. In a lengthy opinion dated July 25, 1996, this Court granted the motions in part and denied the motions in part. See *Picard,* 940 F.Supp. at 1137-38. That ruling eliminated many of Plaintiffs' allegations of fraud but permitted the case to go forward on six of the alleged material omissions.[FN1]

> FN1. The Court relies on its July 1996 Opinion for a more comprehensive discussion of applicable securities law.

After that ruling, the parties engaged in an enormous amount of discovery involving scores of depositions, the production of hundreds of thousands of documents, numerous interrogatories, constant motions regarding discovery, and appeals of many of the Magistrate Judge's Orders regarding discovery. At the conclusion of discovery, Defendants moved for summary judgment. The motions for summary judgment were supported by numerous briefs which exceeded this Court's standard page limitations. The documents supporting and opposing the motions for summary judgment constituted the largest filing in the history of the Western District of Michigan, according to employees in the Clerk of Court's office.

*2 In response to Defendants' motions for summary judgment, Plaintiffs have changed the thrust of their claims, but have not formally abandoned all of their original theories and claims of fraud. Plaintiffs summed up their current position during the oral argument that this Court heard for several hours on April 24, 1998. Plaintiffs' counsel Paul Howes said:

What the Court heard this morning, what the plaintiffs have brought forward in our papers is this: From that manageable framework [in the July 25, 1996 Opinion] to an amended complaint [as currently proposed], ··· this case now is quite simple. This case is about sales and growth and projections.

(4/24/98 Hr'g Tr. at 123.) Plaintiffs' counsel Pamela Parker, in support of Plaintiffs' request to amend their complaint, stated:

Your Honor, what we are saying the evidence shows is that the projections that the defendants made publicly-of which there is much evidence, [20%/30%] projections-were undermined by facts known to the defendants, including information about declining sales growth, information about the need for acquisitions.

( *Id.* at 95.) Plaintiffs' counsel Reed Kathrein added that Defendants' "internal projections, their best-case projections, were completely contrary to" the 20%/30% projections that Defendants allegedly gave the market. ( *Id.*)

These oral statements were consistent with Plaintiffs' written arguments and other oral presentations in which they spent little time arguing about the six omissions and spent most of their space and time encouraging this Court to permit them to expand their claims and to amend their Complaint one more time to show that Defendants perpetrated a fraud by projecting high growth rate figures with knowledge of undisclosed facts that made a belief in those figures unreasonable. ( *See, e.g.,* Pls.' Resp. Br. at 1-51.)[FN2]

> FN2. Plaintiffs' counsel Mr. Kathrein argued that Plaintiffs' current theory is what they have "said from day one, that the projections are false and not believed." (4/24/98 Hr'g Tr. at 95.) This claim is true only in a very general sense, in that the specific fraud with which Defendants are charged in this case, the six alleged omissions, arguably resulted in an overstatement of Perrigo's growth rate. Nothing in the Complaint could possibly have

A 1165

Informed Defendants that Plaintiffs' theory was that specific statements regarding rate of growth were false and misleading. *See* Fed.R.Civ.P.9(b). As the parties and the Court have repeatedly stated, up until the Defendants filed their motion for summary judgment, this case has not been one of cooked books or positive misstatements. It has always been a case of alleged material omissions. Although they claim that the misstatements which they recently discovered "are entirely consistent with the nature of plaintiffs' claims and the theory of their case," Plaintiffs acknowledge that they did not allege the misstatements in their Complaint. (Pls.' Resp. Br. at 58, 59 n. 48.) Furthermore, by requesting more discovery regarding declining rates of sales and profit growth, Plaintiffs impliedly acknowledge that false representations regarding rates of growth are not in their original Complaint.

Because Plaintiffs have not formally abandoned all of their arguments regarding the six omissions, this Court will analyze each omission in turn. FN3

> FN3. For clarity of analysis, the facts relevant to the separate motions of the Underwriters will be described later in this Opinion.

### The Defendants

There are essentially two groups of Defendants left in this case.

The Perrigo Defendants include Perrigo Company, a Michigan corporation, Chairman and CEO Michael Jandernoa ("Jandernoa"), Board member William Swaney ("Swaney"), Swaney Associates, the partnership through which Swaney sold Perrigo stock, former Executive Vice President and Board member Ralph Klingenmeyer ("Klingenmeyer"), President and COO Richard Hansen ("Hansen"), Executive Vice President and CFO James Gunberg ("Gunberg"), Executive Vice President Mark Olesnavage ("Olesnavage"), Executive Vice President and Board member Lonnie Smith ("Smith"), Board member Folsom Bell ("Bell"), Board member Robert Lasner ("Lasner"), and Board member Steven Hutchinson ("Hutchinson").

The Underwriter Defendants include J.P. Morgan Securities Ltd., Morgan Stanley International, Smith Barney Shearson, Inc. ("Smith Barney"), and Dean Witter Reynolds ("Dean Witter" and collectively with J.P. Morgan Securities Ltd., Morgan Stanley International, and Smith Barney the "Underwriter Defendants"). As will be noted below, the 1993 Offering was managed by Underwriter Defendants Smith Barney, Dean Witter, and non-parties J.P. Morgan Securities, Inc. ("J.P.Morgan") and Morgan Stanley & Co. Incorporated ("Morgan Stanley"). Plaintiffs sued Underwriter Defendants Morgan Stanley International and J.P. Morgan Securities Ltd., who did not participate in the 1993 Offering, by mistake.

\*3 This Court will first analyze both the Perrigo Defendants' and Underwriter Defendants' motions for summary judgment with regard to the six alleged material omissions which Plaintiffs claim constitute fraud. Then, because the Underwriters have asserted alternative grounds for their motions, the Court will analyze the Underwriters' separate arguments. The Plaintiffs request to amend their Complaint to allege false and misleading statements regarding rate of growth is still under consideration.

### Standard for Summary Judgment

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *Id.* at 251, 106 S.Ct. at 2511 (citing *Improvement Co. v. Munson, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)*).

A moving party who does not have the burden of proof at trial may properly support a motion for

A 1166

summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324-25, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi,* 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

*Analysis*

A. *Analysis of Six Alleged Material Omissions*

It is not for this Court to speculate upon why the Perrigo stock dropped so swiftly starting in March 1994. Plaintiffs, of course, argue that starting in March 1994, the fraud of Defendants upon the market became apparent and the market then started to reflect the stock's true value. Perrigo Defendants have argued that an unexpectedly short cold-flu season in 1993-94 depressed Perrigo's earnings and the depression was reflected in Perrigo's market value. [FN4] This Court can only analyze whether there is more than a scintilla of evidence to support Plaintiffs' claims regarding the six alleged material omissions.

FN4. *See* "Big News on Stock? Hold on to Your Hat," *The Wall Street Journal,* Apr. 27, 1998, at C1 (describing fast and major market reaction when a stock misses analyst projections).

1. "The Company had learned that certain of its main retail chain customers ⋯ and certain major wholesale customers ⋯ were materially reducing or stopping their purchases from the Company." (Compl.¶ 51(g).)

*4 Plaintiffs support this allegation with evidence that the August 1993, September 1993, and October 1993 Status Reports showed declines in sales to several major customers compared with the same period in fiscal year 1993. [FN5] (SOE ¶¶ 348, 350, 352.) [FN6] However, as the Court summarizes in the chart below, those same reports show that both top account and overall sales for those months and for the 1994 fiscal year-to-date increased over fiscal year 1993, in both units and dollars:

FN5. Perrigo's fiscal year runs from July 1 to June 30.

FN6. "SOE" refers to Plaintiffs' Statement of Evidence and the exhibits cited therein.

Ex. No.[FN7] Percent increase over fiscal year 1993
_____

Key accounts
215      17.8% increase (dozens), FYTD as of August
         30.2% increase ($), FYTD as of August
         18% increase (dozens) for month of August
         26.4% increase ($) for month of August
All accounts
482 21% increase (dozens), FYTD as of August
216 30.8% increase ($), FYTD as of August
         20% increase (dozens) for month of August

A 1167

___% ($) for month of August [FN8]

Key accounts

212  26.4% increase (dozens), FYTD as of September

33.9% increase ($), FYTD as of September

39% increase (dozens) for month of September

43.6% increase ($) for month of September

All accounts

226  25% increase (dozens), FYTD as of September

33% increase ($), FYTD as of September

33% increase (dozens) for month of September

36.6% increase ($) for month of September

Key accounts

217  23.8% increase (dozens), FYTD as of October

34.1% increase ($), FYTD as of October

18% increase (dozens) for month of October

33.1% increase ($) for month of October

All accounts

217  24% increase (dozens), FYTD as of October

343  33.4% increase ($), FYTD as of October

217  20% increase (dozens) for month of October

343  34.3% increase ($) for month of October

FN7. Exhibit numbers, unless otherwise specified, correspond to Kathrein Declaration exhibit numbers.

FN8. The Status Reports submitted by Plaintiffs were not complete for every month and the Court was unable to locate this figure in the August report.

Plaintiffs do not dispute the fact that sales increased in absolute numbers in fiscal year 1994, ( see Pls.' Resp. Br. at 63), but they argue that Defendants' failure to disclose the declining growth trend in sales made Defendants' 20%/30% growth projections misleading. In further support of this theory, Plaintiffs produced evidence of a 7.6% drop in dollar sales between fiscal year 1992 and fiscal year 1993. ( See Ex. 209; SOE ¶ 342 .) Defendants argue that the document Plaintiffs cite is "demonstrably incorrect" because the total fiscal year 1992 sales figure it lists for L. Perrigo exceeds the total fiscal year 1992 sales for both parts of the entire company reported in other documents. ( See Form 10-K for fiscal year 1993, Gunberg Aff. Ex. D at 22, UF FN9 Document App. vol. 1, tab 6.) Defendants also produced evidence that sales actually increased between fiscal year 1992 and fiscal year 1993. ( Id. at 22, 26.) Plaintiffs have already conceded that they " 'do not allege that historic statements ··· are inaccurate." ' (Defs.' Resp. to SOE ¶ 342 (quoting 3/13/96 Hr'g Tr. at 79).)

FN9. "UF" refers to Defendants' Statement of Undisputed Facts.

*5 Moreover, despite Plaintiffs' attempts to link their current theory to their original allegation, the Court finds that the Complaint, quoted above, does not satisfy the requirements of Fed.R.Civ.P. 9(b) with regard to a declining growth trend omission. The plain language of the Complaint refers to a decline in absolute numbers, which contemplates a different set of "circumstances constituting fraud" than a decline in the growth trend. Fed.R.Civ.P. 9(b). As stated earlier in this Opinion, the Court will separately address the merits of granting Plaintiffs leave to amend the Complaint to add the growth trend theory.

In light of the undisputed fact that overall sales increased during the periods which Plaintiffs allege showed declines in sales to major customers, the Court finds that failure to disclose declines in sales

A 1168

to a few individual customers were not materially misleading omissions. *See Jakobe v. Rawlings Sporting Goods Co., 943 F.Supp. 1143, 1155-56 (E.D.Mo.1996)* (holding that defendants had no duty to disclose "whether each customer increased or decreased its orders, [because otherwise,] shareholders would be buried in an 'avalanche of trivial information-a result that is hardly conducive to informed decisionmaking' ") (quoting *TSC Indus. v. Northway, Inc., 426 U.S. 438, 448-49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

    2. "Perrigo's switch from the LIFO to the FIFO method of valuing inventory was to hide increasing cost-of-goods-sold in the fourth quarter of fiscal 1993 and subsequently, thereby allowing Perrigo to continue to announce increased earnings growth immediately prior to and following the October 1993 Offering." (Compl.¶ 51(j).)

In their brief, Plaintiffs concede that they "do not believe they have obtained sufficient evidence during discovery to withstand a motion for summary judgment" on this allegation. (Pls.' Resp. Br. at 71 n. 57.)

    3. "The Company had been unusually aggressive in its 'early-ship' program and had convinced many of its retail companies ⋯ to stockpile inventory prior to and immediately after the October 1993 Offering to make its sales growth appear better than it actually was." (Compl.¶ 51(e).)

Plaintiffs' only argument remotely related to this allegation is as follows: Perrigo's sales strategy and aggressive promotions "overdrove" its business to the point where several of its key customers became overstocked and thus purchased less in later quarters. K-Mart is one such customer. SOE ¶ 534. At the time of the October 1993 Offering, Walgreens also was having "soft" sales due to high inventories. SOE ¶ 538. (Pls.' Resp. Br. at 43.) To the extent this argument addresses the stockpiling allegation, as opposed to the over-promotion allegation discussed below in Section A.5., Plaintiffs have raised only circumstantial evidence that two of Defendants' customers were overstocked during the relevant time period, without any direct evidence that Defendants used incentives to cause this inventory situation. ( *See* SOE ¶¶ 534-38.)

*\*6* Defendants, on the other hand, presented evidence that they ran an "early ship" program every year in order to prevent backlogs of orders during busy seasons and maintain smoother production schedules. (UF ¶ 128.) They argue that Plaintiffs presented no evidence that their 1994 program was more aggressive than that of prior years. They also offered the testimony of numerous large customers that Defendants did not attempt to push products on customers which they otherwise would not have ordered or stimulate demand artificially. ( *See, e.g.,* Harris Dep. at 55-56, UF Document App. vol. IV, tab 30; Wagner Dep. at 31, *id.* vol. VI, tab 60; Prentice Dep. at 28-29, *id.* vol. V, tab 49; Marciniak Dep. at 64, *id.* vol. IV, tab 37; Carlson Dep. at 37, *id.* vol. III, tab 23; Sullivan Dep. at 85, *id.* vol. VI, tab 55; *cf.* UF ¶¶ 145-200.)

Plaintiffs rebut only by citing the testimony of Wagner, Wal-Mart's merchandising manager, that although he could not remember any details, he was "sure" that at some time a sales person or vendor had asked him "to buy more product to enhance a rebate." (Wagner Dep. at 60-61, UF Document App. vol. IV, tab 60.) However, Wagner testified that he could not recall any such incident with Perrigo. ( *Id.* at 61.) In the absence of any evidence of an unusually aggressive "early ship" program or any other form of incentives to customers to stockpile inventory, this rebuttal "evidence" is immaterial.

Defendants further argue that they have disclosed their "early ship" program several times in public filings and press releases since the company went public. ( *See* UF ¶¶ 201-06.) Plaintiffs' only response is that the general disclosure of the existence of the "early ship" program was insufficient to alert the market that Defendants were pursuing an unusually aggressive program in the first quarter of fiscal year 1994. (Pls.' Resp. to UF ¶¶ 201, 204.) As discussed above, Plaintiffs have failed to present any evidence of an unusually aggressive program in fiscal year 1994. Therefore, any allegation with regard to these omissions is not supported by the record.

    4. "Perrigo did not, in fact, have real plans to 'invest even more in fiscal 1994' as, in fact, a lesser amount was invested-and no explanation has ever been forthcoming from Perrigo." (Compl.¶ 47(b).)

The parties have two major disputes relating to the scope of this allegation as it survived dismissal.

A 1169

First, Plaintiffs claim that the allegation reaches both the $75 million projection for capital expenditures in the 1993 Annual Report ("Report") as well as the statement quoted in the Complaint from the "Fellow Shareholder" Letter ("Letter") that Perrigo expected to invest more in fiscal year 1994 than the $68 million it spent in fiscal year 1993. ( *See* Ex. 125 at P 01-0004-004190, P 01-0004-004207.) Perrigo ultimately reported spending of $62.251 million. (SOE ¶ 585.) This disagreement as to scope is important because Plaintiffs have presented evidence that at the time of the Report and Letter, Defendants' internal planning documents reflected a projection of $72.792 million, which is less than $75 million but still more than $68 million. In addition to disputing Plaintiffs' evidence, Defendants argue that the prediction was not misleading because their plans were always in excess of $68 million, indirectly arguing that the allegation is limited to the Letter.

**\*7** In discussing this allegation in its earlier Opinion, this Court employed the more restrictive phrase of "lack of plans to invest more money in fiscal 1994." *Picard,* 940 F.Supp. at 1113, 1138. The Court dismissed the first half of Plaintiffs' claim, paragraph 47(a), but did not strike the whole paragraph. *Id. at 1124, 1139.* The preamble section of paragraph 47 alleges that both the Report and the Letter were misleading because they failed to reveal the lack of plans to spend more money. Therefore, reading paragraph 47(b) in context, the Court finds that Plaintiffs are correct as to the scope of this allegation.

Plaintiffs' evidence that the $75 million projection was unreasonable at the time Defendants announced it is as follows:

(1) Defendants admit that their "total capital expenditure plan was the sum of the plans for Perrigo's OTC, vitamins and CSI's personal-care divisions." (Defs.' Resp. to SOE ¶ 562, vol. IV at 455.)

(2) Planning documents from March 1993 show estimated CSI spending of $20,292 million. (Ex. 349 at P 02-0002-005340.)

Neither party presented evidence that CSI spending plans increased before the Annual Report in September. Also, Defendants dispute the relevance of documents from March, but they assert a similar $20.5 million figure as of late September/early October 1993. (UF ¶ 356.)

(3) By the September planning meeting, capital spending plans for the OTC and vitamins divisions decreased from $57 million to $52.5 million. (Ex. 308 at P 01-0012-006186; Ex. 328 at P 01-0012-006127.)

(4) Therefore, as of the date of the Annual Report's $75 million projection, internal documents showed total planned capital spending of only $72.792 million.

Defendants argue that their projection also included a category of "Additional Requests" apart from the OTC/vitamin or CSI categories. They cite an October 1, 1993, CSI planning document showing several additional requests, including $2.05 million for child-resistant closures and $16 million for a LaVergne Distribution Center. (Smith Dep. Ex. 53 at P 02-0002-005372, UF Doc.App. vol. VI, tab 53.) However, the document post-dates the Annual Report and lists the $20.5 million figure discussed above under the heading "Current Plan," in distinction from these "Additional Requests." ( *Id.*) Defendants submit no evidence that the "Additional Requests" were part of their projection in the Annual Report and no explanation for the lack of documentation of the "Additional Requests" prior to October. Plaintiffs argue that the child-resistant closures and the LaVergne facility were both unfunded projects which were not certain enough to be included in the Annual Report's projection. ( *See* Pls.' Resp. to UF ¶ 357.)

Even drawing all reasonable inferences in favor of Plaintiffs, however, the Court finds that a discrepancy of $2.208 million, a 3% overstatement of investment plans, would have been immaterial to the reasonable investor as a matter of law. *See In re Westinghouse Sec. Litig.,* 90 F.3d 696, 714-15 (3d Cir.1996) (holding that understatement of loan loss reserves amounting to 0.54% of defendant's net income was quantitatively immaterial to decision making of reasonable investor); *Ferber v. Travelers Corp.,* 802 F.Supp. 698, 708 (D.Conn.1992) (holding that defendants' failure to disclose that mortgage portfolio contained second mortgages comprising 3% of total mortgage-loan and real estate portfolio was not material omission); *In re First Chicago Corp. Sec. Litig.,* 769 F.Supp. 1444, 1454 (N.D.Ill.1991) (mem.op.) (implying that allegation of defendants' initiation of risky real estate loan that constituted 5.59% of total real estate loan portfolio was immaterial for purposes of rendering defendant's optimistic statements about portfolio misleading).

**\*8** Plaintiffs also argue that the projection was unreasonable because of the constant admonitions to reduce capital outlays which demonstrate Defendants' knowledge that they would have to reduce expenditures at some point. ( *See* SOE ¶¶ 564, 569, 574, 595.) Defendants rebut with evidence that they had the directive to reduce capital spending every year and argue that the existence of the same directive in fiscal year 1994 is irrelevant to the reasonableness of the capital expenditure projection.

( *See* Defs.' Resp. to SOE ¶ 595, vol. IV at 472-74.) The Court agrees that the bare fact that Perrigo, like most companies, strove to reduce capital expenditures does not support an inference that Defendants' belief in their $75 million projection was unreasonable.

The second scope-related dispute between the parties concerns Defendants' duty to update their capital expenditure predictions once they had reason to believe that they would have to reduce the $75 million figure. *See Bomarko, Inc. v. Hemodynamics, Inc.,* 848 F.Supp. 1335, 1341 (W.D.Mich.1993) (mem.op.) (acknowledging "that a public statement, correct when issued, may become materially misleading in light of subsequent events, which effect may create a duty to update" and finding issue of fact regarding breach of duty to clarify prior statement that company approved repurchase of " 'up to 500,000 of its outstanding common shares' "). Defendants argue that the duty to update, to the extent it applies in this circuit, attaches only to historical statements which a company later discovers to have been incorrect. *See Pittiglio v. Michigan Nat'l Corp.,* 906 F.Supp. 1145, 1153-54 (E.D.Mich.1995) (mem.op.) (holding that defendants had no duty to correct pre-merger statement that Board was committed to maintaining company's independence because statement "expressed [defendants'] presumed opinion at the time that independence was in the best interest of MNC shareholders" and quoting *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1333 n. 9 (7th Cir.1995) for proposition that " 'a company has no duty to update forward-looking statements merely because changing circumstances have proven them wrong' "). Neither party cited, nor did the Court find, any Sixth Circuit precedent directly on point.

Defendants further argue, and the Court agrees, that the Complaint does not allege any breach of a . duty to update. The plain language of the allegation refers only to Defendants' lack of plans to increase spending as of the time of the Report and Letter. However, the Court will consider the merits of the claim for purposes of deciding whether an amendment would be futile.

In recognizing the duty to update, the *Bomarko* court relied on *Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444 (D.Mass.1989) (mem.op.), which applied the duty to update to the defendants' public growth rate projections, *id.* at 1450-51. *See Bomarko,* 848 F.Supp. at 1341. Based on *Bomarko,* a decision from this district, this Court rejects Defendants' argument that the duty to update in the Sixth Circuit applies only to historical statements which a company later discovers to have been incorrect.[FN10]

> FN10. Several other courts have also recognized a duty to update forward-looking statements which were not misleading when made but which became misleading in light of subsequent events. *See In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1245 (3d Cir.1989) (holding that "a subsequent change of intention will not, by itself, give rise to a cause of action under Section 10(b) or Rule 10b-5," but "that in these circumstances [ ] one can fairly require [ ] that notice of a change of intent be disseminated in a timely fashion"); *Backman v. Polaroid Corp.,* 910 F.2d 10, 17 (1st Cir.1990) (agreeing "that, in special circumstances, a statement, correct at the time, may have a forward intent and connotation upon which parties may be expected to rely. If this is a clear meaning, and there is a change, correction, more exactly, further disclosure, may be called for"); *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993) (agreeing "that a duty to update opinions and projections may arise if the original opinions or projections have become misleading as the result of intervening events" but holding that statements without "definite positive projections," such as predicted completion dates or the probability of a successful deal, did not require later correction).

**9** Plaintiffs allege several misrepresentations post-dating the 1993 Annual Report as evidence of Defendants' failure to correct their prior projections. ( *See, e.g.,* Ex. 361 at P 01-0006-002326, P 01-0006-002350 (showing in Board meeting documents "Current Projected FY 1994" capital spending at $45 million for OTC/Vitamins and $21.975 for CSI as of 2/2/94, plus a transfer of $2.686 million in spending on personal care lines from the OTC/Vitamins capital plan to CSI's); Ex. 344 at P 01-0005-000542 (stating in Perrigo's Form 10-Q, dated 2/7/94, that "[t]he Company's planned capital expenditures will require approximately $75,000[,000] during fiscal year 1994"); *cf.* UF ¶ 369 (noting transfer between OTC/Vitamins and CSI plans); Schmiege Dep. Ex. 90 at P 01-0012-006070, UF Document App. vol. VI, tab 51 (listing downward planning adjustments Perrigo made in December 1993 and May 1994).)

Although Plaintiffs' capital expenditure allegation survived dismissal, this Court never held that such

A 1171

an omission, even if proven, would be material standing alone. This Court held only that "certain omissions alleged in the Complaint may be found to be material omissions-some singly and some only in combination with others listed." *Picard*, 940 F.Supp. 1124. In light of the lack of evidence regarding any of the other alleged omissions that survived summary judgment, and in light of the general principle that lower capital expenditures increase earnings per share, the Court finds that Defendants' alleged failure to disclose the gradual decrease in planned expenditures from $72.792 million to $62.251 million was not material. "[W]here the disclosure duty arises from the combination of a prior statement and a subsequent event, which, if not disclosed, renders the prior statement false or misleading, the inquiries as to duty and materiality coalesce." *Time Warner*, 9 F.3d at 267. Therefore, Defendants had no duty to update their projection, and amendment would be futile.

5. "Perrigo's results for the first two quarters of 1994 had been artificially inflated due to increased revenues generated by sales promotions which had borrowed large amounts of sales from the last two quarters of fiscal 1994 and would result in Perrigo's profit growth in the second half of fiscal 1994 slowing materially." (Compl.¶ 74(a).)

In support of this allegation, Plaintiffs rely primarily on evidence that promotion sales increased dramatically just before the secondary public offering, especially in comparison to fiscal year 1993, (SOE ¶ 490; Ex. 212 at P 01-0008-008296), and that Defendants had spent 60%, or $8.215 million, of their promotions budget of $14 million by the middle of fiscal year 1994 (December 31, 1993), (SOE ¶ 487).

Defendants rebut with evidence that they spent $1.7 million more on promotions in the second half of fiscal year 1994 (January 1-June 30, 1994) than during the first half. (Elgersma Aff. ¶ 6, UF Document App. vol. I, tab 4; *cf.* UF ¶¶ 213-14.) Since Defendants were over-budget for the whole year, and since their spending was higher in the second half of the fiscal year than in the first, Plaintiffs' evidence is irrelevant. Plaintiffs have failed to create a genuine issue of material fact as to Defendants' "borrowing" of sales from the last half of fiscal year 1994 to inflate Perrigo's numbers for the offering.

6. "Perrigo would not achieve any substantial profit growth due to increased sales in international markets, at least in the near term, as defendants knew that the major company with which they had stated they would enter those markets-Wal-Mart-had informed them that it preferred regional suppliers." (Compl.¶ 74(b).)

**\*10** Defendants argue that Plaintiffs abandoned this allegation by failing to discuss it in their response brief. (Defs.' Reply Br. at 39.) However, Plaintiffs' response brief submits "that the lack of any near-term international sales opportunities is an actionable omission to the extent described in § II.K.2." (Pls.' Resp. Br. at 71 n. 57.) [FN11] Section II.K.2 cites the following evidence relating to international sales prospects.

FN11. At oral argument, Plaintiffs' attorney Mr. Kathrein made the following statement:

Let me address international, because I don't want you to think we're playing smoke with international. We agree that looking at everything they said about international, international was a long-term prospect. So we don't believe that international was an omission from the standpoint that they lied about international.

(4/24/98 Hr'g Tr. at 46.) Nevertheless, in the interest of clarity, the Court will address the evidence Plaintiffs presented in their briefs.

In slide presentations to investors, Defendants listed international expansion under "Longer term emerging opportunities," separately from the more immediate growth opportunities of existing customers, traditional new products, and Rx to OTC switches. ( *See* Ex. 138 at P 01-0006-002897.) The text of the presentation states that "We are starting today with research, we don't know which markets or how to address the individual markets in other parts of the world today. We need to do some research, get some background to understand how we should strategically approach those markets." ( *Id.*) These statements rebut, rather than support, Plaintiffs' position because they show

that Defendants explicitly disavowed any final plans to "achieve any substantial profit growth due to increased sales in international markets," (Compl.¶ 74(b)), rather than that Defendants failed to disclose a lack of prospects.

Plaintiffs also cite an analyst's report stating that expansion opportunities in international markets "are not reflected" in the report's EPS projections. (Ex. 181 at 4.) Again, rather than supporting Plaintiffs' allegation, this evidence shows that the market knew that Defendants had no definite international expansion plans.

Plaintiffs further offered evidence that Defendants knew that international sales would not contribute to the achievement of a 20%/30% growth rate. ( See SOE ¶¶ 314-18). However, in the absence of any evidence of affirmative misrepresentations as to international opportunities, and in light of the unrebutted evidence that Defendants actually disclosed a lack of international opportunities, this evidence is irrelevant.

### 7. Admission of Immateriality

Defendants further argue that through the testimony of Plaintiffs' expert, John Torkelson ("Torkelson"), Plaintiffs have admitted that:
1. None of the six alleged omissions, by itself, could be material.
2. At a bare minimum, plaintiffs must prove both (1) that sales to main retail customers were declining (# 15), and (2) that Perrigo had successfully encouraged customers to stockpile more inventory than they wanted (# 13), in order to meet the materiality requirement of the federal securities laws.
3. Even if plaintiffs could prove all four of the remaining other alleged omissions, it would not be material unless plaintiffs can also prove both declining sales to main customers (# 15) and stockpiling (# 13).
(Defs.' Reply Br. at 20-21 (emphasis in original) (footnote omitted); see also Torkelson Dep. at 23, 25-26, Consolidated Document App. to Defs.' Reply Br. & Defs.' Resp. to SOE vol. II, tab 36.)
*11 Defendants conflate statements of sufficiency with statements of necessity. Torkelson testified that he was opining on the six alleged omissions "[o]nly as a group together," not that his opinion was that the omissions could not be material if taken separately. (Torkelson Dep. at 23.) Likewise, Torkelson testified that, taken together, the declining sales and stockpiling omissions "would clearly be material," not that any combination lacking those two omissions would necessarily be immaterial. ( Id. at 26.) Lastly, Torkelson testified that "[s]ince some of the other statements are difficult to quantify at this time, I couldn't give you any other combinations other than those two and then the six taken together," not that no one could ever prove the materiality of other combinations. ( Id.) Therefore, the Court would not grant summary judgment to Defendants on the alternative ground of Plaintiffs' alleged admission as to immateriality.

### 8. Lack of a Causation Allegation

Defendants also argue that the allegations of causation in paragraphs 93 to 96 of the Complaint are exclusive of the six remaining omissions in this case. They argue that those allegations thereby constitute a judicial admission that the six omissions did not cause Plaintiffs' loss. ( See Defs.' Br. Supp. at 63-68; Defs .' Reply Br. at 15-19.) The Court disposed of this matter in its earlier opinion, where it held that "[t]he Complaint clearly alleges that defendants' fraud caused plaintiffs' economic injury in its very first page." Picard, 940 F.Supp. at 1126. Therefore, the Court would not grant summary judgment to Defendants on the alternative ground of Plaintiffs' admission as to causation.

### B. Analysis of Underwriters' Separate Motions for Summary Judgment on Separate Grounds

Because Plaintiffs' claims against the Underwriter Defendants are premised upon some or all of the six omissions, the Underwriter Defendants are also entitled to summary judgment. However, the Underwriter Defendants have asserted grounds in support of their motions apart from the six omissions. Because of the current posture of this case, the Underwriters' "due diligence" defense to the § 11 and § 12(2) claims deserves separate consideration.

### 1. Facts Regarding Underwriters

A 1173

Perrigo common stock was first offered for sale to the public in an Initial public offering ("IPO") of eight million shares on December 16, 1991. An additional five million shares of Perrigo stock owned by certain shareholders were sold in a secondary offering on September 30, 1992 (the "1992 Offering"). Morgan Stanley and J.P. Morgan, both non-parties to this action, served as the lead underwriters in both the IPO and the 1992 Offering. On July 14, 1993, Perrigo announced a two-for-one stock split. On October 20, 1993, thirteen million shares of Perrigo stock owned by certain shareholders were offered for sale in the secondary offering which is the subject of this case. *12 The 1993 Offering was managed by J.P. Morgan, the lead manager, Morgan Stanley, and Defendants Smith Barney and Dean Witter.[FN12] In connection with the 1993 Offering, the Underwriters conducted a due diligence investigation of Perrigo. The Underwriters began their investigation with a base of knowledge about Perrigo and its operations which they had obtained through prior due diligence investigations for the IPO, the 1992 Offering, and other various matters.[FN13] The due diligence investigation was led by investment bankers Sarah Nash ("Nash") and Sharon Jacquet ("Jacquet") of J.P. Morgan. Nash had conducted due diligence investigations of Perrigo in connection with various projects since 1991. (Nash Dep. at 41, Ballard Aff. Ex. 21.) Jacquet had organized the due diligence investigation for the IPO as a team leader at Morgan Stanley and, after leaving Morgan Stanley to join J.P. Morgan, participated extensively in the due diligence investigation for the 1992 Offering. (Jacquet Dep. at 19-22, Ballard Aff. Ex. 14.)[FN14] Ruth Porat ("Porat"), who left Morgan Stanley in June 1993 to join Smith Barney, also participated in the due diligence for the 1993 Offering. While at Morgan Stanley, Porat was involved in the due diligence investigation for both the IPO and the 1992 Offering. ( See Porat Dep. at 26-27, Ballard Aff. Ex. 25.)

> FN12. In total, thirty-one United States underwriters and thirteen international underwriters participated in the 1993 Offering.

> FN13. Ruth Porat, an investment banker with Smith Barney who participated in the due diligence for the IPO, the 1992 Offering, and the 1993 Offering, described the use of information obtained from prior due diligence investigations as "piggybacking." (Porat Dep. at 26, Ballard Aff. Ex. 25.) In other words, information obtained from the IPO and the 1992 Offering was built on and updated in the due diligence process for the 1993 Offering to avoid duplication of efforts.

> FN14. Jacquet testified that in the 1992 Offering, she

> attended all the meetings[,][ ] participated in the visits to the plants [,][ ] participated in conference calls with customers[,] [ ] participated in conference calls and meetings with respect to drafting the registration statement, [ ] read significant quantities of documents, [ ] with respect to Perrigo, with respect to the market for their products, with respect to their customers and everything imaginable.

> (Jacquet Dep. at 22, Ballard Aff. Ex. 14.)

On September 15, 1993, the Underwriters held an "all hands" due diligence meeting to review "the operating and financial soundness of" Perrigo. (Nash Dep. at 42, Ballard Aff. Ex. 21.) The participants included representatives from each of the Underwriters, Perrigo management, Perrigo's outside counsel, Perrigo's outside accountants, and the Underwriters' counsel. The full-day meeting was conducted pursuant to an outline of questions prepared by J.P. Morgan that were addressed to specific members of Perrigo management. ( See Nash Dep. at 287-88; Due Diligence Meeting Agenda; Due Diligence-Topics for Discussion, Ballard Aff. Exs. 21, 54, 55.) Morgan Stanley also prepared its own list of questions for Perrigo management which was intended to supplement the issues raised by J.P. Morgan. ( See Adams Dep. at 193-95; Morgan Stanley Sept. 13, 1993, Interoffice Mem., Ballard Aff. Exs. 1, 50.)
During the meeting, Perrigo's management addressed a variety of issues, including the effect of the cost of plastic on Perrigo's cost of goods sold, the change in accounting methods from LIFO to FIFO, switches from prescription to over-the-counter medications as a component of revenue growth, international market opportunities, levels of sales to key customers, and capital expenditure plans.

A 1174

( *See* Nash Dep. at 291-99; Jacquet Dep. at 57, 113-14, Ballard Aff. Exs. 21, 14.) The Underwriter participants also questioned Perrigo's management, its outside attorneys, and its outside auditors on a variety of other issues.

After the "all hands" meeting, the Underwriters continued their investigation by obtaining additional information and following up on issues that had not been fully addressed. For example, major customers were contacted, ( *see* Nash Dep. at 289-90; Jacquet Dep. at 115-17, Ballard Aff. Exs. 21, 14) [FN15]; information was obtained on an environmental issue, (Nash Dep. at 289, Ballard Aff. Ex. 21); and Perrigo provided more detailed information on its plans for capital expenditures for fiscal year 1994, ( *see* Jacquet Dep. at 121, Ballard Aff. Ex. 14). The Underwriters continued to conduct their investigation through closing. (Adams Dep. at 359, Ballard Aff. Ex. 1.) Shortly before the closing, the Underwriters conducted a "bring down" due diligence conference call to confirm that no changes had occurred in Perrigo's financial or operating condition that affected the information obtained during due diligence. By that time, all of the outstanding issues from the "all hands" due diligence meeting had been resolved. (Nash Dep. at 288, Ballard Aff. Ex. 21.) The Underwriters obtained written representations and warranties from Perrigo's management confirming that there had been no material changes in the company's financial condition as of the date of the closing, as well as comfort letters from Perrigo's outside counsel and auditors and from their own counsel.

> FN15. Jacquet and Porat both testified that Perrigo customers were contacted in connection with the IPO and the 1992 Offering, which gave the Underwriters an existing base of knowledge about Perrigo's customers. (Jacquet Dep. at 23-24; Porat Dep. at 259-60, Ballard Aff. Exs. 14, 25.)

*13 During the months leading up to the 1993 Offering and for several months thereafter, the Underwriters published various reports covering Perrigo's stock. Morgan Stanley analyst Debra Levin ("Levin") covered Perrigo throughout most of 1993. In her coverage during the first half of 1993, Levin predicted that Perrigo's earnings per share ("EPS") for fiscal year 1994 would be $1.42, with earnings growth rate estimated at 30%. In August 1993, Levin revised her 1994 EPS prediction upward to $1.43 per share but reduced her earnings growth rate estimate to 25%. Levin increased her 1994 EPS estimate to $1.44 on August 23, 1993. [FN16] On November 12, 1993, after the commencement of 1993 Offering, Levin increased her 1994 EPS post-split estimate to $0.76 and her earnings growth rate estimate to 26% to reflect Perrigo's positive first quarter earnings announcement. Levin's predictions did not change until March 15, 1994, when she reduced her 1994 EPS estimate to $0.74 and her third quarter EPS estimate to $0.17 after Perrigo announced that third quarter sales and earnings estimates would not be met due to the abrupt ending of the cough and cold season. (Ex. 401.) Levin reduced her predictions again on May 10, 1994, when she cut her 1994 EPS number to $0.72 and her earnings growth rate estimate to 21%, after Perrigo announced less-than-expected third quarter results and slower growth rate prospects. Levin maintained a "buy" rating on Perrigo's stock throughout this period. (Ex. 493.) [FN17]

> FN16. These estimates were based on the pre-stock split number of shares. EPS estimates issued by analysts after August 23, 1993, reflected the post-stock split number of shares.

> FN17. The notes or reports by Levin at issue in this case are her August 23, 1993, report, March 15, 1994, research notes, and May 9, 1994, research note. *See Picard*, 940 F.Supp. at 1128.

J.P. Morgan analyst Carol Pope ("Pope") began her coverage of Perrigo stock during the first half of 1993. In a report dated May 12, 1993, Pope predicted that Perrigo would achieve 1994 EPS of $1.42. Pope did not revise her 1994 EPS forecast until November 12, 1993, when she issued a report following Perrigo's announcement of positive first quarter results, in which she increased her post-split 1994 EPS two cents to $0.75 and maintained her earlier 1995 prediction of $0.92. Pope subsequently revised her 1994 EPS predictions up from $0.75 to $0.76 on February 9, 1994, to reflect that Perrigo's second quarter results had exceeded her predictions by $0.01. She revised her third quarter EPS down from $0.19 to $0.17 and her 1994 EPS estimate down from $0.76 to $0.72 on

A 1175

March 15, 1994, after Perrigo's announcement regarding the abbreviated cough and cold season. Except for reports issued on January 6, 1994, and March 15, 1994, Pope's reports did not include sales and earnings growth rate predictions.[FN18] In those reports, Pope predicted sales and earnings growth rates of 20%/25% and 17.5%/25%, respectively. Pope also maintained a consistent "buy" rating on the stock.

> FN18. The notes or reports by Pope at issue in this case are her January 31, 1994, research note, March 15, 1994, research note, and April 29, 1994, research note. *See Picard, 940 F.Supp. at 1128.*

Smith Barney analyst Joe Kozloff ("Kozloff") initiated coverage of Perrigo in a research note issued on August 26, 1993. In that note, Kozloff gave Perrigo's stock an "outperform" rating, predicted 1994 EPS at $0.73, and predicted future earnings growth rate of 25-30%. Kozloff increased his 1994 EPS predictions to $0.75 in a published research note issued on January 31, 1994, in response to an article which questioned the value of Perrigo stock as well as the company's prospects for future growth. ( *See* Ballard Aff. Ex. 100.) Kozloff reduced his 1994 EPS estimate to $0.73 in a March 14, 1994, note. Kozloff made his final revision to his 1994 EPS estimate in a May 10, 1994, research note to reflect negative third quarter earnings and muted future growth prospects announced by Perrigo.[FN19] Kozloff projected earnings growth rate of 25-30% in each of these reports.

> FN19. The Kozloff notes and reports at issue in this case are his August 26, 1993, research note, September 1, 1993, research report, January 31, 1994, research note, March 15, 1994, research note, and May 2, 1994, research note. *See Picard, 940 F.Supp. at 1128.*

**\*14** Dean Witter analyst Bill Steele ("Steele") did not initiate coverage of Perrigo until after the 1993 Offering commenced. In his first research note issued on November 9, 1993, Steele projected 1994 EPS to be $0.73 and estimated earnings growth rate of 26%. Steele subsequently revised his 1994 EPS prediction to $0.74 on November 18, 1994. Steele, like the other analysts, cut his 1994 EPS estimate by two cents in response to the March 1993 news from Perrigo about the abbreviated cough and cold season.[FN20] ( *See* Steele Mar. 16, 1994, Research Note, Ballard Aff. Ex. 113.) Steele projected earnings growth rate of 26% in each of his reports.

> FN20. The Steele notes and reports at issue are his November 9, 1993, research report, November 18, 1993, research note, November 23, 1993, "Company Brief," and March 16, 1994, research note. *See Picard, 940 F.Supp. at 1128.*

### 2. Discussion of Due Diligence Defense

Plaintiffs allege claims against the Underwriter Defendants under § 11 and § 12(2), as amended, of the 1933 Act. Section 11 allows a person to sue certain parties if a registration statement "contain[s] an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12 imposes liability upon a person who "offers or sells a security ··· by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2).

The Underwriter Defendants argue that they are entitled to summary judgment on Plaintiffs' § 11 and § 12(2) claims because they have established the due diligence defense as to both claims provided under §§ 77k(b)(3) and 77l(d)(2). The Underwriter Defendants contend that the undisputed evidence shows that their due diligence investigation met the standard required to establish the defense to both claims, that of the "reasonableness ··· required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c).

#### a. Due Diligence Standards

A 1176

The Underwriter Defendants may avoid liability under § 11 and § 12(2) by showing that they conducted a reasonable investigation and met the standards of due diligence. See *Phillips v. Kidder, Peabody & Co.,* 933 F.Supp. 303, 323 (S.D.N.Y.1996) (mem.op.), aff'd, 108 F.3d 1370 (2d Cir.1997). A defendant who relies on the due diligence defense to a claim under § 11 must show that "after reasonable investigation, [he had] reasonable ground to believe and did believe ··· that the statements [ ] were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements [ ] not misleading ." 15 U.S.C. § 77k(b)(3); *see also Dannenberg v. PaineWebber Inc. ( In re Software Toolworks Inc. Sec. Litig.),* 50 F.3d 615, 621 (9th Cir.1994); cf. *Picard,* 940 F.Supp. at 1131. The standard of due diligence under § 12(2) requires a defendant to show "he did not know, and in the exercise of reasonable care could not have known, of [the] truth or omission." 15 U.S.C. § 77l(a)(2). Both standards are "similar, if not identical." *Toolworks,* 50 F.3d at 621. The standard is essentially one of negligence. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 208, 96 S.Ct. 1375, 1388, 47 L.Ed.2d 668 (1976). The issue of reasonableness may, in appropriate cases, be resolved on summary judgment. *Toolworks,* 50 F.3d at 621.
**\*15** Plaintiffs argued at length in their written and oral presentations that the Court must measure the reasonableness of the Underwriter Defendants' investigation against the five factors set forth by the Sixth Circuit in *Davis v. Avco Financial Services, Inc.,* 739 F.2d 1057 (6th Cir.1984). [FN21] Based upon its review of *Davis,* the Court concludes that the factors identified in that case, [FN22] while potentially relevant to the consideration of whether a defendant has established the due diligence defense in a given case, are not by themselves determinative of the issue. Rather, the ultimate question is whether the defendant performed a reasonable investigation and had a reasonable belief that the information regarding the offering was true and accurate. See *Toolworks,* 50 F.3d at 621; *Eichenholtz v. Brennan,* 52 F.3d 478, 485 (3d Cir.1995). This standard requires examination of the steps taken by the Underwriters to ensure that the offering documents contained no material misrepresentations or omissions. See, e.g., *Phillips,* 933 F.Supp. at 318-19 (reviewing due diligence steps taken by underwriter); *In re Int'l Rectifier Sec. Litig.,* No. CV91-3357-RMT(BQRX), 1997 WL 529600, at *8 (C.D.Cal. Mar.31, 1997) (identifying and applying factors determining "reasonableness" of investigation).

   FN21. The Underwriter Defendants argue that *Davis* was completely overruled by the Supreme Court's decision in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Plaintiffs acknowledge that *Pinter* overruled *Davis* to the extent that it rejected the "substantial factor" test employed by the Sixth Circuit in *Davis* to determine whether a defendant is an "offeror" or "seller" potentially liable under § 12(1) and § 12 (2), see *Pinter,* 486 U.S. at 654, 108 S.Ct. at 2082, but contend that *Pinter* left intact the due diligence standard set forth in *Davis.* For purposes of this motion, the Court will assume that *Pinter* did not overrule the portion of *Davis* regarding due diligence factors.

   FN22. The court identified the following factors as "pertinent to an analysis" of whether a defendant has established the "due diligence" defense:

   (1) the quantum of decisional (planning) and facilitative (promotional) participation, such as designing the deal and contacting and attempting to persuade potential purchasers, (2) access to source data against which the truth or falsity of representations can be tested, (3) relative skill in ferreting out the truth ···, (4) pecuniary interest in the completion of the transaction, and (5) the existence of a relationship of trust and confidence between the plaintiff and the alleged "seller."

   739 F.2d at 1068.

### b. Due Diligence Investigation

The Underwriter Defendants have presented substantial evidence demonstrating the extent of the investigation which they performed in connection with the 1993 Offering. The starting point of the investigation was the substantial base of knowledge about Perrigo's financial and operating condition

that the Underwriter Defendants' personnel had acquired through their involvement in the due diligence investigations for the IPO, the 1992 Offering, and other financing projects. Personnel from the Underwriter Defendants who did not have prior experience with Perrigo familiarized themselves with the company by reviewing various SEC documents, annual reports, and research pieces written by analysts. ( See Adams Dep. at 28-30, Ballard Aff. Ex. 1.) The Underwriters held a day-long "all hands" due diligence meeting at which they questioned Perrigo management about a number of topics, including levels of sales to customers, capital expenditure plans, switches from Rx to OTC, and international market opportunities. During the meeting, the Underwriters also questioned Perrigo's outside accountants about various financial matters, including the effect of Perrigo's switch from the LIFO to FIFO system of accounting on Perrigo's financial statements.

In the course of their investigation, the Underwriters also reviewed Perrigo's internal growth plan, ( see Jandernoa Dep. at 319-24, Ballard Aff. Ex. 15), as well as Perrigo's internal sales and earnings projections. (Jacquet Dep. at 133-35, Ballard Aff. Ex. 14.) The Underwriters also contacted Perrigo's major customers, inspected Perrigo's facilities, and reviewed various sources of information regarding Perrigo and its industry. They reviewed drafts of the Prospectus for accuracy and relayed any suggested changes or revisions to management. Finally, the Underwriters obtained written representations from Perrigo that neither the Prospectus nor the Registration Statement contained any misstatements or omissions as of the date of the closing and obtained comfort letters from Perrigo's outside counsel and outside auditors and from the Underwriters' counsel. Based upon this evidence, the Court concludes that the Underwriters conducted a reasonable investigation and had a reasonable basis to believe, and did believe, that neither the Registration Statement nor the prospectus contained any material misstatement or failed to state a material fact.

*16 Plaintiffs contend that the inability of certain witnesses to recall specific details of the due diligence investigation undercuts the Underwriter Defendants' evidence supporting their due diligence defense and creates an issue for the jury. Plaintiffs have cited numerous instances in which the Underwriter Defendants' investment bankers testified in their depositions that they could not recall specific discussions or events that occurred during the due diligence investigation. ( See, e.g., Nash Dep. at 289-90 (failing to recall who contacted Wal-Mart and who at Wal-Mart was contacted); Jacquet Dep. at 114-15 (failing to recall who advised that sales to Eckerd had been declining, that sales to Kroger had been declining, and whether Perrigo's top ten customers during the 1992 Offering were also the top ten customers during the 1993 Offering), Pls.' App. Dep. Tr.)

Plaintiffs contend that while the Underwriter Defendants have presented evidence of what they intended to do and the questions they intended to ask during their "all hands" meeting or other tasks they intended to perform, the investment bankers' inability to recall specific questions that were asked or answers that were given renders their defense insufficient. This Court believes, however, that common everyday experience teaches us that very few persons, if any, can, after three or four years, recall the details of lengthy meetings. This judge has difficulty remembering the details of trials that occurred some months ago and must refer to transcripts. Attorneys order transcripts because they cannot, and are not expected to, recall the details of every argument and every bit of testimony. Based upon their individual differences in life, jurors often recall and forget different aspects of a trial that has just concluded. People with J.D.'s and M.D.'s, and maybe even Ph.D.'s, forget where they have parked their cars when returning from even fairly short trips by airplane. Despite these common shortcomings, the Underwriter Defendants have presented substantial evidence showing that they conducted an extensive inquiry into Perrigo's affairs. ( See, e.g., Nash Dep. at 41-43, 353-54 (discussing her role in leading "all hands" meeting and indicating that all questions on outline were covered, including items that came up as a result of management's answers); Adams Dep. at 214-15 (testifying that Jandernoa addressed all of the issues presented "and more" and that some topics were covered in management's presentation and others were covered through questions asked by participants); Adams Sept. 15, 1993, meeting notes, Ballard Aff. Exs. 1, 21, 56.) This evidence, which is uncontradicted, adequately supports the Underwriter Defendants' assertion that they conducted a thorough investigation in connection with the 1993 Offering. Thus, Plaintiffs' argument that the investment bankers' inability to recall every detail of their investigation precludes summary judgment is without merit.

### c. Red Flags

*17 Plaintiffs have also presented evidence which they allege should have alerted the Underwriters to the need for a further investigation. The Court has already found with respect to the Perrigo

A 1178

Defendants' Motions that Plaintiffs have failed to present any evidence to support the existence or materiality of the six omissions. Because Plaintiffs have failed to present evidence on the six omissions, the Plaintiffs' contention that the Underwriters should have discovered the existence of those omissions is without merit.

*Conclusion*

For the foregoing reasons, the Court will grant summary judgment to both the Perrigo Defendants and the Underwriter Defendants on the six alleged omissions which survived dismissal in this Court's July 1996 Opinion. The Court will address by separate Opinion and Order Plaintiffs' request for leave to file a Second Amended Complaint alleging that Defendants' knowledge of internal projections, the need for acquisitions, and declining sales and profit growth rates made their belief in publicly projected growth rate figures unreasonable and undermined the factual basis for those projections. An Order consistent with this Opinion will be entered.

Copr. (C) West 2006 No Claim to Orig. U.S. Govt. Works W.D.Mich.,1998.

Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.

Not Reported in F.Supp., 1998 WL 513091 (W.D.Mich.)


Motions, Pleadings and Filings (Back to top)

• 1:95cv00290 (Docket) (May. 10, 1995)
• 1:95CV00141 (Docket) (Mar. 08, 1995)
END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1179



Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 260676 (N.D.Cal.),   Fed. Sec. L. Rep. P 95,693
(Cite as: Not Reported in F.Supp.)

C
Briefs and Other Related Documents

United States District Court, N.D. California.
WEINBERGER
v.
JACKSON, et al.
No. C-89-2301-CAL.

Oct. 11, 1990.

Opinion

LEGGE, District Judge.
*1 Defendants have moved for summary judgment
or partial summary judgment. The motions and
oppositions were supported by extensive fact
records, and were argued and submitted for
decision. The court has reviewed the record of the
case, the moving and opposing papers, the fact
records, and the applicable authorities.

The court concludes that summary judgment on
some claims should be granted and some denied.
This order will discuss those claims as to which the
court believes there is no genuine issue of material
fact and summary judgment or partial summary
judgment should be entered. The motions for
summary or partial summary judgment on all other
claims are denied.

I.

Upon reviewing the earlier rulings on motions to
dismiss and motions for summary judgment made
by Judges Ingram and Aguilar, this court concludes
that the following are the causes of action remaining
in the case before the rulings made below: (1)
Section 11 of the Securities Act; (2) Section 12(2)
of the Securities Act. The Section 11 and Section
12(2) claims are based upon alleged false
statements or omissions in the offering materials.

(3) Section 10(b) of the Exchange Act and Rule
10(b)5, concerning alleged false statements or
omissions in the offering materials, press releases,
and "road shows." (4) California Corporations
Code Section 25400.

The alleged false statements or omissions concern
three subject matters: (1) Whether the 586 series
and the 6800 series of products were shipped in
quantity in November 1982. (2) Whether the
statement in the prospectus that software was
currently available for Alto's products was correct.
(3) Whether defendants projected sales, particularly
for fiscal year 1983, were actionably misleading.

II.

It is undisputed that defendants represented to the
brokerage community that Altos would have
projected gross revenue of eighty-five to ninety
million dollars for fiscal year 1983. Plaintiffs
contend that shortly before and shortly after the
public offering, defendants were aware that Altos
would not make that earnings projection. In fact,
the company's gross revenue for fiscal year 1983
was seventy-five million dollars.

Plaintiffs also complain that at the "road show"
presentations defendants showed a chart of Altos'
past net sales for fiscal years 1978 through 1982,
demonstrating that earnings had more than doubled
each year. However, that presentation was an
accurate statement of historical information. There
was no representation that the doubling of revenue
each year would continue. And the investment
community was advised that anticipated 1983
revenues would be in the seventy-five to ninety
million dollar range, less than a doubling of the
fifty-one million dollars of net sales for the prior
fiscal year.

The projection of gross revenue for fiscal year 1983
was not a part of the prospectus or otherwise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

Not Reported in F.Supp., 1990 WL 260676 (N.D.Cal.),  Fed. Sec. L. Rep. P 95,693
(Cite as: Not Reported in F.Supp.)

distributed to the investing public. Whether such projections are actionable misrepresentations is to be judged under the standard of 10(b). The Ninth Circuit's latest consideration of this issue is in *In re Apple Computer Securities Litigation,* 886 F.2d 1109 (9th Cir.1989). The Ninth Circuit said that a projection or expression of optimism is not actionable if (1) the statement was genuinely believed, (2) there was a reasonable basis for the belief, and (3) that the speaker was not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement (p. 1113).

*2 This court believes that there is no genuine issue of material fact on the application of that standard to this case. The eighty-five to ninety million dollar projection was reasonable and was genuinely believed. The company was constantly engaged in preparing and revising budgets, including sales estimates. In June 1982, the company projected revenue for fiscal year 1983 of 98.5 million. Company personnel examined that budget and believed that it was reasonable after assessing it against various factors. At the end of each quarter, the company reviewed the accuracy of the revenue estimates and revised its projections for future quarters. The company revised its 1983 fiscal year estimate downward to the eighty-five to ninety million range later in 1982, after considering the financial results for the quarter ending September 1982, and the production and sales plans of management. The company re-estimated in early January 1983 that its revenues would be in the seventy-two to seventy-eight million dollar range, after some difficulties with shipments in November and December and a power outage in December of 1982-all after the issuance of the prospectus.

Plaintiffs attempt to demonstrate a genuine issue of material fact by pointing to certain memos and testimony concerning a possible future slow down in gross sales in relation to budgets. However, the court does not believe that they show a genuine issue of material fact, or that they "seriously undermine the accuracy" of the projections. Such conservative statements internally, and to Altos' bank, were simply an ongoing part of the company's analysis of its sales and budgets. That process is necessarily flexible, constantly changing, and an

attempt by many persons to predict the future. Opinions about the future necessarily vary as various elements come into focus, fade from importance, and are replaced by other considerations. Management, particularly those in positions of financial control, would not be doing their job if they did not caution the company's senior management and board about the possibility of results being less favorable than some anticipated. But such statements and opinions are merely factors in the company's management evaluating its position and making projections on behalf of the company.

This court therefore concludes that the earnings projection was genuinely believed, that there was a reasonable basis for the belief, and that the company was not aware of any undisclosed facts tending to undermine the accuracy of the projection. The court also notes that the actual result of seventy-five million dollars of gross revenue was not far from the projection.

Summary judgment is therefore granted in favor of defendants and against plaintiffs on the claim of alleged misrepresentations with respect to sales projections.

III.

The underwriter defendants seek summary judgment on all claims against them.

A.

They contend that under section 11 they conducted a reasonable investigation and met the required standard of due diligence. Under section 12(2), they assert that they had no knowledge of any misrepresentations or omissions and exercised reasonable care. The standards under sections 11 and 12(2) are essentially the same in the context of this case. *Sanders v. John Nuven & Co.,* 619 F.2d 1222 (7th Cir.1980).

*3 After reviewing the record, this court concludes that there is no genuine issue of material fact that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 3

Not Reported in F.Supp., 1990 WL 260676 (N.D.Cal.),   Fed. Sec. L. Rep. P 95,693
(Cite as: Not Reported in F.Supp.)

the underwriters did meet the standards required of them by section 11 and section 12(2). Their investigation of Altos was conducted primarily by the managing underwriters. It was conducted by experienced people, who were assisted by attorneys and accountants. The underwriters reviewed the industry, the company, the company's management, and the company's past and projected manufacturing, sales and financial performance. The underwriters had over twenty meetings with various management personnel, covering all aspects of the company's business. Company personnel were specifically questioned about the development and scheduled availability of products, related operating systems and applications software. The underwriters also contacted many of Altos' suppliers, customers, and distributors, who were asked extensive questions about the company's operations. The underwriters reviewed company documents including operating plans, product literature, corporate records, financial statements, contracts, and lists of distributors and customers. They examined trade journals and other industry-related publications to ascertain industry trends, market trends and competitive information. They also made physical inspections of the company's facilities. When any negative or questionable information was developed as a result of their investigation, the underwriters discussed it with the appropriate persons and arrived at informed decisions and opinions. The underwriters also obtained written representations from the selling stockholders and the company that as of the closing date of the public offering, there were no misstatements or omissions.

As a result of that investigation and due diligence, the underwriters reasonably believed the accuracy of the information contained in the prospectus, including the information alleged to be misrepresented or omitted here. The underwriters had no knowledge of any misrepresentations or omissions, and their work met the standards of due diligence and reasonable investigation required by sections 11 and 12(2). Summary judgment is therefore granted to the underwriter defendants and against plaintiffs on the section 11 and section 12(2) claims.

**B.**

The underwriters also seek summary judgment on the 10(b) claims because of the absence of *scienter* as to the alleged misrepresentations about product shipments in November 1982 and the availability of software. As stated, the underwriters did a diligent investigation on all aspects of the company's business, including those subjects alleged to be misrepresented or omitted.

The underwriters focused on the scheduled shipment dates of the company's products. Plaintiffs argue that the underwriters saw certain weekly status summary reports from which they should have been aware that the scheduled shipments for November and December were going to be slow. However, "should have been aware" is not the standard, and the underwriters can be liable under section 10(b) only if their misconduct rose to a level of recklessness; *Apple*, p. 1117; *Hollings v. Titan*, — F.2d — (9th Cir.1990). The underwriters did focus on the issue, made diligent inquiries, and evaluated the information which they received. Their actions could not be held to be " reckless."

*4 The underwriters did receive some information which indicated that the company's products might have some difficulties with respect to software. However, again the underwriters did make inquiries on that negative subject, discussed it with the appropriate people, and arrived at reasonable judgments. That level of inquiry cannot be called " reckless."

Summary judgment will therefore be granted in favor of the underwriters on the motion 10(b) claims.

**IV.**

Defendant Valentine was an outside director. The only cause of action now pending against him is under section 11.

Section 11(b)(3) provides the so called "due diligence" defense. That is an affirmation defense

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1182

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 260676 (N.D.Cal.),   Fed. Sec. L. Rep. P 95,693
(Cite as: Not Reported in F.Supp.)

Page 4

which requires that a defendant show that "he had, after reasonable investigation, reasonable ground to believe and did believe" that there were no material misstatements or omissions. Section 11(c) imposes the measure of "reasonableness" as that of a reasonably prudent person managing his own property. Valentine's motion for summary judgment contends that there is no genuine issue of material fact but that he met those standards. This court agrees.

Since Valentine was an outside director, he was not obliged to conduct an independent investigation into the accuracy of all the statements contained in the registration statement. He could rely upon the reasonable representations of management, if his own conduct and level of inquiry were reasonable under the circumstances. He was reasonably familiar with the company's business and operations. He regularly attended board meetings at which the board discussed every aspect of the company's business. And he reviewed the company's financial statements. He was familiar with the company's development of its new product lines. He was involved with various company decisions. He reviewed six drafts of the registration statement and saw nothing suspicious or inconsistent with the knowledge that he had acquired as a director. And he discussed certain aspects of the registration statement with management.

With respect to the alleged misrepresentations about shipment of the lines of products, he could not reasonably have noticed any ambiguity in the phrase "in quantity" in light of his understanding of the company's business and its practice of increasing production from the time a new model is first introduced. With respect to alleged misrepresentations regarding the availability of software, Valentine knew what the prospectus stated, that is, that software was provided by outside vendors, and that application software might not be available for new models when they are first introduced.

Plaintiffs argue that Valentine did not make specific inquiries of the company's management with respect to the representations contained in the prospectus.

But he had no duty to do so as long as the prospectus statements were consistent with the knowledge of the company which he had reasonably acquired in his position as director. He was also given comfort by the fact that the prospectus and the information in it were reviewed by underwriters, counsel and accountants. This met the standards of due diligence and reasonable inquiry. See *Laven v. Flanagan,* 695 F.Supp. 800 (D.C.N.J.1988); *Goldstein v. Alodex Corp.,* 409 F.Supp. 1201 (E.D.Pa.1976); compared with *Escott v. Bar Chris,* 283 F.Supp. 643 (S.D.N.Y.1968).

*5 Judgment should therefore be granted in favor of defendant Valentine and against plaintiffs.

V.

Defendants also seek partial summary judgment to the effect that no class member who sold his Altos shares at a price of $21 or above may recover damages under section 11(e). This court does believe from the briefs that plaintiffs seriously contest this. And indeed that result is consistent with the language of section 11(e). Partial summary judgment is therefore granted in favor of defendants and against those class members who sold their Altos shares at a price of $21 or above, for purposes of their claims under section 11.

VI.

Defendants have also moved for summary judgment on the following issues: The prospectus statements about the November shipments of the 586 and the 6800 lines were not misrepresentations; the prospectus statements regarding the availability of software were not misstatements; the materiality of the alleged misstatements; causation resulting from the alleged misstatements; damages resulting from the alleged misstatements; and *scienter* under section 10(b). This court has examined the fact record on each of these issues and concludes that plaintiffs have established sufficient evidence to show genuine issues of material fact. Summary judgment on those issues is therefore denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1183

Not Reported in F.Supp.                                                    Page 5

Not Reported in F.Supp., 1990 WL 260676 (N.D.Cal.),   Fed. Sec. L. Rep. P 95,693
(Cite as: Not Reported in F.Supp.)

The court notes, however, that there does not
appear to be any direct evidence in the present
record of "leakage" in December 1982 and January
1983. If plaintiffs are unable to offer any further
evidence on this claim, the court may deny
admissibility of plaintiffs' present evidence on that
issue.

The court does not understand that defendants have
moved for summary judgment on the claims under
the California Corporations Code.

                            VII.

The case is presently set for trial on February 25,
1991. A status conference will be held on October
26, 1990, at 11:00 a.m. to consider whether the trial
date might be accelerated (which presently appears
unlikely from this court's calendar), and to set a date
for the pretrial conference and whatever other dates
the parties believe are necessary.

IT IS SO ORDERED.

N.D.Cal.,1990.
Weinberger v. Jackson
Not Reported in F.Supp., 1990 WL 260676
(N.D.Cal.),  Fed. Sec. L. Rep. P 95,693

Briefs and Other Related Documents (Back to top)

• 3:89cv02301 (Docket) (Oct. 07, 1983)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 1184