# Appendix
# A281-A322

Page 309

```
 1    underwriters' due diligence, are there any other

 2    opinions that you have formed and believe you may

 3    express in the litigation on the subject of due

 4    diligence?

 5            A.      If asked about the topic of due

 6    diligence with respect to other parties besides the

 7    underwriters, I would offer the same sort of opinion

 8    with respect to the conduct of due diligence by other

 9    parties being signatories or defendants in this matter

10    as well.

11            Q.      Can you describe briefly what the

12    basis of that opinion would rest upon?

13            A.      Basically, my understanding that the

14    opportunity afforded for the due diligence defense is

15    the same, or essentially the same, under Section 11,

16    that is, that a party can establish that he performed

17    a reasonable and adequate investigation and thereafter

18    had a reasonable basis to believe that the prospectus

19    was not misleading, and that that would be the primary

20    basis, that is, that the same essential standard

21    applies and the same result occurred here.

22            Q.      Have you formed any views,

23    preliminary or otherwise, as to whether the officer

24    and director defendants in this litigation are

25    entitled to avail themselves of the due diligence
```

A 281

1    defense?

2              A.        As I said, my understanding is that

3    that defense is available to them if they can

4    establish it.

5              Q.        Have you seen any facts that lead

6    you to believe they have established it or could

7    establish it?

8              A.        I have not seen any indication so

9    far that they have established it or, from what I have

10   seen, could do so.

11                   MR. LEWIS:  I have no further

12              questions.

13                   MR. GLUCKOW:  I'll note for the

14              record that notwithstanding the supposed

15              constraints on our time, Mr. Lewis just asked

16              far more than his one question and he asked

17              it without counsel for said director and

18              officer defendants being here, and that, as I

19              said, I have a lot more to cover and I'm sure

20              that my colleagues in the defense side would

21              like to speak to Mr. Miller about the topics

22              that have just been testified to which, as

23              far as I know, have not been covered in any

24              of the written reports.

25                   MR. LEWIS:  The record will reflect

Page 311

```
 1              my questions took about two minutes or less,

 2              and the record will reflect Mr. Bessette,

 3              without prior notice, absented himself from

 4              the deposition without saying he wasn't

 5              coming back, so I think we should close it

 6              down for the day.

 7                   MR. GLUCKOW:  Again, for the record,

 8              as far as I am concerned, this deposition has

 9              not concluded, remains open, and we reserve

10              all of our rights.

11

12                        - - -

13                        (Witness excused.)

14                        - - -

15         (Deposition concluded at 6:27 p.m.)

16                        - - -

17

18

19

20

21

22

23

24

25
```

R. ALAN MILLER

Page 312

```
 1                    C E R T I F I C A T E

 2

 3             I hereby certify that the witness was

 4   duly sworn by me and that the deposition is a true

 5   record of the testimony given by the witness.

 6

 7

 8                    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 9                    BETH A. BARKOCY, CSR

10                    Dated:  August 16, 2006

11

12

13             (The foregoing certification of this

14   transcript does not apply to any reproduction of the

15   same by any means, unless under the direct control

16   and/or supervision of the certifying shorthand

17   reporter.)

18

19

20

21

22

23

24

25
```

A 284

R. ALAN MILLER

Page 313

1                    INSTRUCTIONS TO THE WITNESS

2

3            Please read your deposition over carefully

4    and make any necessary corrections.  You should state

5    the reason in the appropriate space on the errata

6    sheet for any corrections that are made.

7            After doing so, please sign and date the

8    errata sheet.

9            You are signing same subject to the changes

10   you have noted on the errata sheet, which will be

11   attached to your deposition.

12           It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the transcript by you.  If you

15   fail to do so, the deposition transcript may be deemed

16   to be accurate as submitted and may be used in court.

17

18

19

20

21

22

23

24

25

A 285

R. ALAN MILLER

Page 314

```
 1          -   -   -   -   -   -

 2          E R R A T A

 3          -   -   -   -   -   -

 4     PAGE        LINE        CHANGE

 5     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _

 6     _ _ _      _ _ _     _ _ _ _ _ _ _ _        __

 7     _ _ _      _ _ _     _ _ _ _ _ _ _ _        ____

 8     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

 9     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

10     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

11     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

12     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

13     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

14     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

15     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

16     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

17     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

18     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

19     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

20     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

21     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

22     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

23     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

24     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __

25     _ _ _      _ _ _     _ _ _ _ _ _ _ _ _      __
```

A 286

Page 315

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3       I, _ _ _ _ _ _ _ _ _ _ _ _, do hereby certify

 4    that I have read the foregoing pages and that the same

 5    is a correct transcription of the answers given by me

 6    to the questions therein propounded except for the

 7    corrections or changes in form or substance, if any,

 8    noted in the attached Errata Sheet.

 9

10    _____          _____

11    Date                       Signature

12

13    Subscribed and sworn to before me this

14          day of                     ,

15    200 .

16    My commission expires:

17

18

19    Notary Public

20

21

22

23

24

25
```

A 287

Westlaw.

Not Reported in F.Supp.2d

. Page 1

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
DATAQUILL LIMITED, Plaintiff,
v.
HANDSPRING, INC. and Kyocera Wireless Corp.,
Defendants.
HANDSPRING, INC., Counterclaimant,
v.
DATAQUILL LIMITED, Counterdefendant.
KYOCERA WIRELESS CORP., Counterclaimant,
v.
DATAQUILL LIMITED, Counterdefendant.
No. 01 C 4635.

Feb. 28, 2003.

*MEMORANDUM OPINION*
KOCORAS, Chief J.
*1 This matter comes before the court on a motion
to strike an expert report and declaration and three
motions for summary judgment, all brought by
Defendant Handspring, Inc. ("Handspring"). For
the reasons set forth below, we grant the motion to
strike, grant in part and deny in part the summary
judgment motion for non-infringement, deny the
summary judgment motion for invalidity based on
alleged prior art devices, and grant in part and deny
in part the summary judgment motion for invalidity
based on prior art patents.

BACKGROUND

Plaintiff DataQuill Limited ("DataQuill") brought
this action against Handspring for patent
infringement, inducement of patent infringement,
and contributory patent infringement pursuant to 35
U.S.C. § 271(a)-(c). The patent in suit is U.S. Pat.
No. 6,058,304 (the " '304 patent"), which is owned
by DataQuill. The '304 patent describes a data entry

device that can be used for inventorying or other
data management purposes. The patent further
describes a mobile handheld unit that, alone or in
conjunction with a less mobile base unit, has an
integral sensor, control, storage, display means, and
a telecommunications interface that enable the
device to be used in an efficient and self-contained
manner for the capture, processing, storage, display,
and transmission of data. In other words, the device
is a handheld mobile computer that can input data,
display data, store data, process data, and exchange
data with a remote system.

Handspring makes and sells devices it markets
under the names Treo and Visor. It is not entirely
clear what the Treo and Visor products do, what
they look like, or how they operate. What is clear is
that DataQuill alleges that the Treo product directly
infringes and the Visor product indirectly infringes
by inducing and/or contributing to third party
infringement. The Visor product does not directly
infringe because, without the attachment of a
module providing telecommunication capabilities, it
is incapable of exchanging data with a remote
source. Handspring moves for summary judgment
of non-infringement, invalidity based on alleged
prior art devices, and invalidity based on prior art
patents. Additionally, Handspring moves to strike
DataQuill's expert's report and declaration.

MOTION TO STRIKE

Handspring moves to strike the expert report and
declaration of DataQuill's infringement expert,
Harvey Brodsky, pursuant to Federal Rule of Civil
Procedure 26(a)(2)(B) and Federal Rule of
Evidence 702. Rule 26(a)(2)(B) requires that an
expert report "shall contain a complete statement of
all opinions to be expressed and the basis and
reasons therefor." Fed. R. Civ P. 26(a)(2)(B). Rule
702 only permits expert testimony that "will assist
the trier of fact to understand the evidence or to
determine a fact in issue". Fed.R.Evid. 702. An

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 288

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

expert may so testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case ." *Id.* Pursuant to these requirements, "a district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 869 (7th Cir.2001) (citing *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 589 (1993). This gatekeeper function is entrusted to the discretion of the district court. *Liu v. Price Waterhouse LLP,* 302 F.3d 749, 755 (7th Cir.2002) ("We review a trial court's ruling on the admission of expert testimony for an abuse of discretion.")

\*2 Handspring contends that Brodsky's report is deficient for the following reasons:

Brodsky did not explain the methodology he employed;

He improperly considered the patent claims only in the context of the accused devices;

He assumed certain features of the accused devices were infringing;

He could not, at his deposition, explain the difference between certain claim limitations which he opined are met in the accused devices;

He could not recall why he opined that certain features of the accused devices satisfied claim elements;

He would not or could not explain the claim construction which he applied when analyzing the accused devices; and

He did not actually write his report.

DataQuill counters that Handspring's objections are not true, irrelevant, and go only to the weight (an issue for the jury), and not to the admissibility (an issue for the court), of Brodsky's testimony. We will address each of Handspring's contentions.

Handspring first complains that Brodsky failed to adequately explain his methodology, explaining it only as "[b]ased on [his] experience and expertise, [his] review of relevant documents, [his] operation of the devices, [his] examination of the devices, period." (Brodsky Dep. at 94:9-94:12.) We believe that operating and examining the accused devices (assuming it is done against the backdrop of a proper claim construction) is a reliable method of conducting an infringement analysis. *See Middleton, Inc. v. Minnesota Mining and Mfg.,* 311 F.3d 1384, 1387 (Fed.Cir.2002) ("A patent infringement analysis involves two steps: claim construction and application of the construed claim to the accused process or product."). At Brodsky's deposition, Handspring clearly wanted more detailed information about Brodsky's methodology but instead of asking details regarding his examination and operation of the devices, Handspring simply repeatedly questioned Brodsky about his general methodology. For instance, Handspring could have asked what operations (such as downloading, transmitting, inputting, etc.) he performed using the accused devices.

Next, Handspring argues that Brodsky improperly considered the asserted claims only in the context of the accused devices. In his report, Brodsky states, "I did not consider interpretation of claim terms in the abstract, but only in the context of their application to the specific devices I was asked to analyze." (Brodsky Rep. at 1-2.) At his deposition, he even admitted relying on the accused devices themselves to interpret claim limitations, which he then opined were present in the accused devices. (Brodsky Dep. 137:12-137:18.) In another instance, Brodsky disclosed that his infringement analysis applied a definition of a claim term that actually incorporated part of Handspring's device into the definition. When asked about the definition of "reading sensor" that he applied in his analysis, Brodsky corrected Handspring's counsel that it was not defined as any sensor that interfaced with *"a* CPU" but as any sensor that interfaced with *"the* CPU in the Visor". (Brodsky Dep. 249:16-249:19 (emphasis added).)

\*3 Next, Handspring argues that Brodsky simply assumed, rather than making his own assessment, that some of the accused devices' features met

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

certain claim limitations. In particular, Handspring alleges that Brodsky assumed the touch screen of the accused devices constituted a reading sensor-an element of the asserted claims. While this would be entirely improper, there is nothing in the record to support it. In actuality, Brodsky was not referring to the touch screen in the accused devices but rather to the term "touch sensitive screen" present in claims 9, 40, 61, and 62. Brodsky assumed, pursuant to counsel's instruction, that "touch sensitive screen forming a said reading sensor" meant that, with respect to claims 9, 40, 61, and 62, touch sensitive screen and reading sensor were one in the same. It is entirely proper for an expert to rely on counsel's claim construction when conducting his infringement analysis if the court has not yet construed the claims as a matter of law. In another instance, however, Brodsky made an inappropriate assumption. He assumed that the user interface of the Graffiti program-an available feature on the Treo devices-constituted a reading sensor as defined by the '304 patent. (Brodsky Dep. 241:23-242:1.)

Next, Handspring argues that Brodsky opined that certain elements of the claims were present in the accused devices without even having an understanding of the claim terms. In his report, Brodsky states, with respect to claim 20, that "the display is a carrier", meaning the Treo device has a display that constitutes a carrier as defined by claim 20. In his deposition, when asked for the interpretation of "carrier" which he applied to the Treo device in his infringement analysis of claim 20, Brodsky could not remember. In short, Brodsky cannot remember the definition of "display" that he used, but whatever it was, it covers Handspring's display.

Next, Handspring argues that Brodsky does not know why certain features of the accused devices satisfied certain claim elements. In his deposition, Handspring sought to understand his basis and reasons for concluding that the Visor device coupled to a GPS module constituted infringement. Brodsky, however, could not recall the logic supporting his determination that the coupled device infringed. (Brodsky Dep. 250:16-250:17) ("I honestly don't recall the complete logic of this.")

Next, Handspring argues that Brodsky failed to disclose the construction of the claims which he applied in his infringement analysis. Brodsky stated that in some cases he relied on DataQuill's counsel's claim construction and in other cases he did not. (Brodsky Dep. 107:12-107:15.) His declaration clearly implies that his only source of claim interpretation was DataQuill's counsel. (Brodsky Decl. ¶ 5.) Thus, on what claim interpretation did he rely in these "other cases"? Furthermore, he cannot even say for which claims he relied on DataQuill's counsel and on which claims he did not. (Brodsky Dep. 107:16-107:19.)

*4 Next, Handspring contends that Brodsky did not actually write his own expert report. Brodsky even admits that counsel for DataQuill actually did the typing. (Brodsky Dep. 76:4-76:6.) Large quantities of DataQuill's interrogatory responses appear verbatim in Brodsky's report. DataQuill's explanation for this is that "portions of the language used in DataQuill's interrogatory responses were used where appropriate to express Dr. Brodsky's conclusions." (DataQuill Resp. at 9.) Despite this admission that DataQuill expressed portions of his opinion for him, Brodsky declares under penalty of perjury that the report is his own opinion. (Brodsky Decl. ¶ 6.)

Brodsky's report and declaration are not reliable. See Fed.R.Evid. 702 (requiring reliability). He did not follow a proper infringement analysis of applying properly construed claims to the accused devices. First, it is not clear what or whose interpretation of the claims he applied in his analysis. Second, he determined some claim terms in light of the accused devices and in one instance incorporated the accused device into his definition. Third, in another instance he simply assumed that a device feature satisfied a claim term. Additionally, Brodsky's report and declaration will not assist the trier of fact. See Fed.R.Evid. 702 (requiring expert testimony to assist the trier of fact). We doubt the value to the trier of fact of a hired expert's opinion when the party hiring him has put words in his mouth-or in this case, in his report-leaving him, in essence, a highly qualified puppet. The report and declaration fail to comply with Federal Rule of Evidence 702.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 290

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Brodsky's report fails to state the basis and reasons therefor. *See* Fed. R. Civ. P. 26(a)(2)(B) (requiring " basis and reasons therefor"). Brodsky could not explain the definition of claim terms that he found present in the accused devices, could not explain why features satisfied particular claim limitations, and could not remember for which claims he was provided a claim construction by DataQuill's counsel. Thus, the report fails to comply with Federal Rule of Civil Procedure 26(a)(2)(B).

The motion to strike the expert report and declaration is granted.

### MOTIONS FOR SUMMARY JUDGMENT

#### I. Legal Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir.2000). The moving party bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the nonmovant bears the burden of proof at trial. *Id.* The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence. *Id.* A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

#### II. Non-Infringement

##### A. *Direct Infringement*

*5 DataQuill claims that the Treo device directly infringes the '304 patent. The patent statute states that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). In order for the accused device to constitute the patented invention, "every element in the claim must be found in the accused device either literally or equivalently." *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed.Cir.1991); *see also Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 1000 (Fed.Cir.1995) ("a claim is not infringed unless every element thereof is met in the accused device, either literally or by an equivalent"). Handspring argues that the Treo device does not infringe because it does not possess one of the claim elements: a reading sensor. DataQuill counters that a proper construction of the claim term "reading sensor" covers the touch screen in the Treo device. Thus, the issue with respect to direct infringement boils down to claim construction, which is a question of law. *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed.Cir.2003).

Every one of the sixty-three claims in the '304 patent includes the limitation "reading sensor". Claims 1-25 and 61-63 describe it as "a reading sensor responsive to commands and/or sensed commands and data." Claims 26-60 describe it as "a reading sensor for sensing commands and/or data." A touch sensitive screen is clearly capable of being responsive to commands and sensing commands. In fact, claims 9, 40, and 61-63 specifically employ a touch sensitive screen as the reading sensor. U.S. Pat. No. 6,058,304 claims 9, 40 ("a touch sensitive screen forming a said reading sensor"); claims 61-63 ("a touch sensitive screen forming said reading sensor"). Handspring argues that this language "does not mean, however, that the reading sensor is the touch screen: just that the touch screen could form part of the reading sensor by providing a frame on which the actual reading sensor is mounted." Pl. Memo. at 5. We disagree. These five claims clearly define the reading sensor to be a touch screen that can sense commands.

Handspring further argues that claims 9, 40, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

61-63 were added during prosecution of the patent (after the patent's priority date) and, therefore constitute new matter in violation of 35 U.S.C. § 112 ¶ 1. *See TurboCare Div. of Demag Delaval Turbomachinery v. General Elec.,* 264 F.3d 1111, 1118 (Fed.Cir.2001) ("When the applicant adds a claim or otherwise amends his specification after the original filing date, as [he] did in this case, the new claims or other added material must find support in the original specification."). First, our holding that reading sensor includes touch screens is not limited to these five claims. Second, the new matter issue is relevant to validity, not infringement. Third, these five claims do not include new matter anyway. Although Handspring states that the '304 patent essentially covers a pen-shaped bar code reader, the specification clearly explains how a touch screen can supplement or altogether replace the bar code reader. After describing the use of a touch screen, in particular with reference to Figure 8 of the patent, the specification states: "Touch screen entry can be used *in place of* or in addition to the entry of commands by scanning the bar codes on the command bar code card." U .S. Pat. No. 6,058,304 at 13:17-13:21 (emphasis added).

*6 Having interpreted the claim term reading sensor to include touch sensitive screens that can sense commands, the motion with respect to the Treo devices is denied.

### B. Indirect Infringement

DataQuill claims that the Visor device indirectly infringes the '304 patent. Indirect infringement, by way of inducing or contributing to infringement, is prohibited under the patent statute. 35 U.S.C. § 271(b) and (c). While acknowledging that the Visor alone does not possess all of the limitations of any of the claims, DataQuill alleges that the Visor is designed to receive expansion modules that bring with them the missing claim limitation, namely a communications or telecommunications interface. To prove indirect infringement by Handspring, DataQuill must prove that third parties are actually infringing its patent. *Sage Prods. v. Devon Industries, Inc.,* 45 F.3d 1575, 1577 (Fed.Cir.1995); *see also Joy Techs. v. Flakt, Inc.,* 6 F.3d 770, 774

(Fed.Cir.1993) ("Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement."). Thus, DataQuill must prove that end-users ultimately combine the Visor device with a module providing communications capabilities. DataQuill has offered no evidence of direct infringement by end-users. DataQuill's Response does not even address contributory infringement and devotes only a single bullet point to the issue of inducement. In that bullet point, DataQuill, instead of laying out its factual support, directs the court to read through a portion of its statement of facts. We did, and we disagree with DataQuill's summary assertion that such "evidence is more than sufficient to create a disputed issue of material fact precluding the entry of summary judgment." Indeed, it is not even sufficient. Nothing in those statements of fact pertains to actual infringement by end-users.

With respect to contributory infringement, DataQuill would also have to prove that the Visor device is "not a staple article or commodity of commerce suitable for substantial noninfringing use. " 35 U.S.C. 271(c); *Lummus Indus. v. D.M. & E. Corp.,* 862 F.2d 267, 272 (Fed.Cir.1988). DataQuill admits that the Visor device is capable of being operated by itself without attaching a communications module. DataQuill further admits that it is, in fact, frequently used without a communications module. In the face of this evidence, no reasonable jury could find that the Visor is not suitable for substantial non-infringing use.

Accordingly, the motion is granted with respect to the Visor line of products.

### III. Invalidity

Under the patent statute, a patent and its claims are presumed valid. 35 U.S.C. § 282. Despite this presumption, Handspring moves for summary judgment that most of the sixty-three claims of the '304 patent are invalid as anticipated by alleged prior art devices and by prior art patents. "Invalidity based on 'anticipation' requires that the invention

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

is not in fact new." *Verve, LLC v. Crane Cams, Inc.,* 311 F.3d 1116, 1120 (Fed.Cir.2002). More specifically, "anticipation requires that each limitation of a claim must be found in a single [prior art] reference." *Teleflex, Inc. v. Ficosa North Am. Corp.,* 299 F.3d 1313, 1335 (Fed.Cir.2002). Anticipation is a question of fact. *Minnesota Mining & Mfg. v. Chemque, Inc.,* 303 F.3d 1294, 1301 (Fed.Cir.2002). Because this is a summary judgment motion, Handspring must establish that there are "no material facts in dispute relating to its assertion of anticipation". *Helifix Ltd. v. Blok-Lok, Ltd.,* 208 F.3d 1339, 1346 (Fed.Cir.2000). Additionally, because the patent is presumed valid, Handspring must prove anticipation by "clear and convincing evidence". *Id.*

*7 Handspring's anticipation position relies on prior art that was not considered by the Patent and Trademark Office ("PTO") during examination of the '304 patent. Thus, although the patent is presumed valid in the absence of clear and convincing evidence to the contrary, we do not defer to the PTO as to the effect of prior art never before the PTO. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.1984) ("When an attacker, in sustaining the burden imposed by § 282, produces prior art or other evidence *not* considered in the PTO, there is, however, *no reason to defer* to the PTO so far as *its* effect on validity is concerned."); *EWP Corp. v. Reliance Universal Inc.,* 755 F.2d 898, 905 (Fed.Cir.1985) ("The PTO examiner did not cite the German or French '698 patents against the '036 patent application. Therefore, in considering obviousness, we have no PTO view before us on obviousness in view of those references and appellants' burden of proof under 35 U.S.C. § 282 is more easily carried."). Nevertheless, the '304 patent is presumed valid, and Handspring carries a burden of persuasion to prove otherwise by clear and convincing evidence. *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1573 (Fed.Cir.1984) ("Though the introduction of prior art not before the PTO may facilitate meeting the challenger's ability to meet the burden of proof on invalidity, the presumption remains intact, the burden of persuasion remains on the challenger, and the "clear and convincing" standard does not

change."); *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed.Cir.1986) ( "Notwithstanding that the introduction of prior art not before the examiner may facilitate the challenger's meeting the burden of proof on invalidity, the presumption remains intact and on the challenger throughout the litigation, and the clear and convincing standard does not change." ).

*A. Alleged Prior Art Devices*

Handspring contends that EO Corporation's EO Personal Communicator loaded with a EO Cellular Module (collectively the "EO") anticipates most of the claims of the '304 patent. Handspring claims that the EO constitutes prior art as defined in 35 U.S.C. § 102(a). Section 102(a) defines prior art as that which "was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a). Both parties agree that the invention date for the '304 patent is October 13, 1993. Thus, the EO is only relevant if it was known or used by others in this country prior to October 13, 1993. Such knowledge or use must have been available to the public. *See Carella v. Starlight Archery,* 804 F.2d 135, 139 (Fed.Cir.1986) ("The statutory language, 'known or used by others in this country' (35 U.S.C. § 102(a)), means knowledge or use which is accessible to the public.").

*8 There is a disputed issue of fact regarding whether the EO was publicly known or used prior to October 13, 1993. Handspring claims the EO was " publicly demonstrated" at a trade show in November 1992. Handspring, however, relies upon evidence not fully supportive of this claim. The evidence is only probative of the fact that brochures were distributed at a trade show in November 1992. Furthermore, the cited testimony fails to clarify what EO devices the brochures concerned or the depth of explanation given in the brochures. Handspring also claims that the EO was in "public use since at least February 1993". Again, Handspring relies upon evidence not fully supportive of its claim. The evidence only concerns

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 7

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

the EO 440 and EO 880 models, which remain unexplained to the court. There is no mention of the EO Personal Communicator loaded with a EO Cellular Module, which we have termed the EO in this opinion and on which Handspring bases its motion. Furthermore, the evidence is not probative of public use or knowledge of the EO 440 and EO 880. The witness merely states that the EO 440 and EO 880 were packaged prior to October 13, 1993. Just because a product was packaged does not mean it was sold to the public, and we decline to make such an inference on behalf of the moving party, Handspring. *See Gonzalez v. Kokot*, 314 F.3d 311, 315 (7th Cir.2002) (inferences on summary judgment should be made in a light most favorable to the *nonmoving* party).

Additionally, even if the EO was publicly known or used before the invention of the '304 patent, there appears to be questions of disputed fact regarding whether the EO possesses all the claim limitations of any of the claims. We do not have the EO before us for our own examination. What we do have is competing evidence regarding the EO's specifications and capabilities. This is a question for the jury.

### B. Prior Art Patents

Handspring contends that U.S. Pat. Nos. 5,335,276 and 5,465,401 (collectively the "Thompson patents" ) each independently anticipate the '304 patent. The Thompson patents have identical specifications, excluding their claims, and are treated as one in the same for purposes of this motion. It is not disputed that the Thompson patents constitute prior art as defined in 35 U.S.C. § 102(e)(2). Section 102(e)(2) defines prior art as that which is described in "a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent". 35 U.S.C. § 102(e)(2). The Thompson patents, filed in December 1992, qualify as prior art under section 102(e) because they were filed prior to the invention date of the '304 patent, October 13, 1993. Thus, the only issue with respect the Thompson patents is whether they disclose the '304 patent.

As stated above, "anticipation requires that each limitation of a claim must be found in a single [prior art] reference." *Teleflex*, 299 F.3d at 1335. Thus, if each limitation of a claim in the '304 patent is disclosed in the Thompson patents, that claim is invalid. Handspring argues that the Thompson patents anticipate claims 1-2, 4-6, 9-10, 18, 20, 22, 26-30, 32-35, 37, 40-41, 43, 51, 53, 55-56, 59-62 (the "claims at issue") of the '304 patent. We do not consider the remaining '304 patent claims on this motion.

*9 All of the claims at issue, except claims 27, 28, 30, 61, and 62, include the claim limitation: "to cause downloading of information from a remote processing center as required for updating information previously stored". The claim term "downloading of information" means that information is both received and stored. The Thompson patents state only that information is "transmitted" from the central facility/information service. There is no reference to such information being downloaded from the central facility/information service or stored on the device once it is transmitted to the device.

Claims 26-60 include the claim limitation "rewriteable storage". Handspring argues that the memory disclosed in the Thompson patents is rewriteable memory. Despite that the word rewriteable never appears in the Thompson patents, Handspring maintains that the "memory is clearly rewriteable because the device is capable of receiving new information (*e.g.*, message or prices), and such information is stored in memory." Handspring's premise that new information is stored in its memory is an invention in itself. In fact, the portions of the '276 Thompson patent that Handspring cites for support of its circular argument are wholly silent on the issue of rewriteable storage:
The information shown on display 60b indicates the status of information available to the user from either central facility 22 or information service 30 or 32. By touching the appropriate portion of touch sensitive display 60, each of these messages will be presented to the user.
When the price list application is activated for communication device 50 or 150, only changes in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 294

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

the price list need to be transmitted via the communication network.

U.S. Pat. No. 5,335,276 at 19:49-19:54; *Id* at 20:2-20:5. All the Thompson patents disclose is that information is "transmitted" from a remote source and "presented" to the user. To the extent that Handspring argues that downloading the new information onto rewriteable storage is inherently disclosed, the argument fails because downloading is not necessary. *See Transclean Corp. v. Bridgewood Servs., Inc.,* 290 F.3d 1364, 1373 (Fed.Cir.2002) ("anticipation by inherent disclosure is appropriate only when the reference discloses prior art that must *necessarily* include the unstated limitation"). For instance, a television is capable of presenting information to a user received from a remote source without downloading the information. The same is true for an Internet-equipped personal computer. Thus, it is not necessary, or inherent, to download data received from a remote source in order to present it to a user.

The only remaining claims at issue are claims 61 and 62, anticipation of which is not contested by DataQuill. Claims 61 and 62 do not require downloading of information or rewriteable storage. Claim 61 consists of the following elements:
(a) a reading sensor responsive to commands and/or sensed commands and data to produce input signals;
*10 (b) a controller coupled to said reading sensor to receive and process said input signals;
(c) said controller coupled to a communications interface to selectively control transmission over said communications interface of command and/or data signals as determined by said input signals processed by said controller; said communications interface being operable directly to connect said data entry device to a wireless telecommunications network;
(d) a display coupled to said controller to display commands and/or information under control of said input signals processed by said controller; and
(e) wherein said reading sensor, controller and display comprise a unitary assembly and said communications interface is a cellular telephone network interface and said wireless telecommunications network is a cellular telephone network; and wherein said display screen comprises

a touch sensitive screen forming said reading sensor, said controller being arranged to be responsive to a location at which said screen is touched for user input.

U.S. Pat. No. 6,058,304 claim 61. The Thompson patents disclose each and every element of claim 61. First, DataQuill admits that the Thompson patents disclose elements (a), (b), and (d) except for the "coupled" limitations in elements (b), and (d). (Pl. Resp. to Def. Stmt. of Facts ¶¶ 45 and 46.) Second, Figure 8 and its detailed description clearly disclose elements (c) and (e). Figure 8 details a block diagram of an electrical circuit showing a unitary assembly of, among other things, a touch screen reading sensor and display, a controller, and a cellular telephone network interface. Finally, Figure 8 depicts all of these components as electrically coupled with one another either directly or indirectly through a common bus, thereby satisfying the "coupled" limitations of elements (b), (c), and (d).

Claim 62 is identical to claim 61 except that it further requires that the "data entry device is integral with a cellular telephone". U.S. Pat. No. 6,058,304 claim 62. Figure 2 of the Thompson patents and the accompanying detailed description clearly disclose a preferred embodiment of the invention in which a cellular telephone embodies the features of the invention. Thus, the Thompson patents anticipate claim 62 as well.

## CONCLUSION

Based on the foregoing analysis, we grant the motion to strike, grant in part and deny in part the summary judgment motion for non-infringement, deny the summary judgment motion for invalidity based on alleged prior art devices, and grant in part and deny in part the summary judgment motion for invalidity based on prior art patents.

N.D.Ill.,2003.
DataQuill Ltd. v. Handspring, Inc.
Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 9

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents (Back to top)

• 2004 WL 2256632 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Handspring's (Third) Motion for Summary Judgment of Invalidity Based on Anticipation in View of ""Ti Patents' (Aug. 23, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 3756462 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Handspring's (Third) Motion for Summary Judgment of Invalidity Based on Anticipation in View of TI Patents' (Aug. 23, 2004) Original Image of this Document (PDF)
• 2004 WL 2256631 (Trial Motion, Memorandum and Affidavit) Defendant Handspring, Inc.'s Consolidated Memorandum in Opposition to Dataquill's Motions to Strike (Aug. 16, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 3749033 () Declaration of Mike Cheponis in Support of Handspring's Motion for Summary Judgment of Invalidity (Jul. 18, 2004) Original Image of this Document (PDF)
• 2004 WL 1173336 (Trial Motion, Memorandum and Affidavit) Handspring's Opposition to Dataquill's Motions in Limine (Mar. 30, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 1173337 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Handspring's Motions in Limine (Mar. 30, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 2256628 (Trial Motion, Memorandum and Affidavit) Handspring's Opposition to Dataquill's Motions in Limine (Mar. 30, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 2256629 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Handspring's Motions in Limine (Mar. 30, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 1173368 (Trial Motion, Memorandum and Affidavit) DataQuill's Memorandum In Support Of Its Motions In Limine (Mar. 16, 2004) Original Image of this Document (PDF)
• 2004 WL 1173369 (Trial Motion, Memorandum and Affidavit) Handspring's Consolidated Brief in Support of Its Motions in Limine (Mar. 16, 2004) Original Image of this Document (PDF)

• 2004 WL 2256626 (Trial Motion, Memorandum and Affidavit) DataQuill's Memorandum In Support Of Its Motions In Limine (Mar. 16, 2004) Original Image of this Document (PDF)
• 2004 WL 2256627 (Trial Motion, Memorandum and Affidavit) Handspring's Consolidated Brief in Support of Its Motions in Limine (Mar. 16, 2004) Original Image of this Document (PDF)
• 2004 WL 3737166 (Trial Motion, Memorandum and Affidavit) Data Quill's Memorandum in Support of its Motions in Limine (Mar. 16, 2004) Original Image of this Document (PDF)
• 2004 WL 3737167 (Trial Motion, Memorandum and Affidavit) Handspring's Consolidated Brief IN Support of its Motion IN Limine (Mar. 16, 2004) Original Image of this Document (PDF)
• 2004 WL 1173366 (Trial Motion, Memorandum and Affidavit) Plaintiff's Trial Brief (Feb. 17, 2004) Original Image of this Document (PDF)
• 2004 WL 1173367 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motions in Limine (Feb. 17, 2004) Original Image of this Document (PDF)
• 2004 WL 2256625 (Trial Motion, Memorandum and Affidavit) Plaintiff's Trial Brief (Feb. 17, 2004) Original Image of this Document (PDF)
• 2004 WL 2256630 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Trial Brief (Feb. 17, 2004) Original Image of this Document (PDF)
• 2004 WL 3737168 (Trial Motion, Memorandum and·Affidavit) Plaintiff's Motions in Limine (Feb. 17, 2004) Original Image of this Document (PDF)
• 2004 WL 3749032 () (Partial Testimony) (Jan. 29, 2004) Original Image of this Document (PDF)
• 2003 WL 24296520 () (Report or Affidavit) (Dec. 11, 2003) Original Image of this Document (PDF)
• 2003 WL 23817597 (Trial Motion, Memorandum and Affidavit) Reply In Support of DataQuill's Rule 37(c)(1) Motion To Exclude Expert Statement of Handspring Witness Dr. Allais (Dec. 9, 2003) Original Image of this Document (PDF)
• 2003 WL 23524819 (Trial Motion, Memorandum and Affidavit) DataQuill's Motion Rule 37(c)(1) Motion To Exclude Expert Statement of Handspring Witness Dr. Allais (Nov. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 23524820 (Trial Motion, Memorandum and Affidavit) DataQuill's Rule 37(c)(1) Motion To Exclude Undisclosed Fact Testimony of Mike

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Cheponis (Nov. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 23524815 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Motion to Set Settlement Conference (May 8, 2003) Original Image of this Document (PDF)
• 2003 WL 23524810 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Support of its Opposition to Dataquill's Motion to Reconsider Part of Memorandum Opinion and Order (Apr. 1, 2003) Original Image of this Document (PDF)
• 2003 WL 23524806 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to Reconsider Part of Memorandum Opinion and Order (Mar. 14, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23817596 (Trial Motion, Memorandum and Affidavit) Plaintiff Dataquill's Response to Defendant's Motion to Strike Brodsky Declaration (Feb. 10, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23524793 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Reply Brief in Support of its Renewed Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of United States Patent Nos. 5,465,401 and/or 5,335,276 (Jan. 21, 2003) Original Image of this Document (PDF)
• 2003 WL 23524797 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Reply Brief in Support of Its Renewed Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of the Eo Personal Communicator and Cellular Module (Jan. 21, 2003) Original Image of this Document (PDF)
• 2003 WL 23524799 (Trial Motion, Memorandum and Affidavit) Defendant Handspring, Inc.'s Memorandum in Support of Its Renewed Motion to Strike the Report, the Declaration, and Exclude the Testimony, of Harvey Brodsky (Jan. 21, 2003) Original Image of this Document (PDF)
• 2003 WL 23817590 (Trial Motion, Memorandum and Affidavit) Defendant Handspring, Inc.'s Reply in Support of Its Renewed Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,058,304 (Jan. 21, 2003) Original Image of this Document (PDF)
• 2003 WL 23817592 (Trial Motion, Memorandum

and Affidavit) Defendant Handspring's Reply Brief in Support of Its Renewed Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of United States Patent Nos. 5,465,401 and/or 5,335,276 (Jan. 21, 2003) Original Image of this Document (PDF)
• 2003 WL 23817594 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Reply Brief in Support of Its Renewed Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of the EO Personal Communicator and Cellular Module (Jan. 21, 2003) Original Image of this Document (PDF)
• 2003 WL 23817583 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant's Renewed Motion for Summary Judgment of Invalidity ""In Light of United States Patent Nos. 5,465,401 and/or 5,335,276" (Jan. 10, 2003) Original Image of this Document (PDF)
• 2003 WL 23817585 (Trial Motion, Memorandum and Affidavit) DataQuill's Response to Handspring's Renewed Motion for Summary Judgment of Non-Infringement and Invalidity (Jan. 10, 2003) Original Image of this Document (PDF)
• 2003 WL 23817588 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant's Motion for Summary Judgment of Invalidity ""In Light of the EO Personal Communicator and Cellular Module" (Jan. 10, 2003) Original Image of this Document with Appendix (PDF)
• 2002 WL 32510380 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Opposition to Dataquill's Motion to Strike Certain Statements of Fact Accompanying Handspring's Renewed Motions for Summary Judgment (Dec. 6, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32675930 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Opposition to Dataquill's Motion to Strike Certain Statements of Fact Accompanying Handspring's Renewed Motions for Summary Judgment (Dec. 6, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32510370 (Trial Motion, Memorandum and Affidavit) DataQuill's Motion to Strike Certain Statements of Fact Accompanying Handspring's Renewed Motions for Summary Judgment (Nov. 7, 2002) Original Image of this Document with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Appendix (PDF)
• 2002 WL 32510346 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Memorandum in Support of its Renewed Motion for Summary Judgment of Invalidity of U.S. Patent no. 6,058,304 in Light of United States Patent Nos. 5,465,401 and/or 5,335,276 (Oct. 29, 2002) Original Image of this Document (PDF)
• 2002 WL 32510354 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Memorandum in Support of its Renewed Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of the Eo Personal Communicator and Cellular Module (Oct. 29, 2002) Original Image of this Document (PDF)
• 2002 WL 32510363 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Memorandum in Support of Its Renewed Motion for Summary Judgment of Noninfringement and Invalidity of U.S. Patent No. 6,058,304 (Oct. 29, 2002) Original Image of this Document (PDF)
• 2002 WL 32675923 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Memorandum in Support of Its Renewed Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of United States Patent Nos. 5,465,401 and/or 5,335,276 (Oct. 29, 2002) Original Image of this Document (PDF)
• 2002 WL 32675925 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Memorandum in Support of Its Renewed Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of the EO Personal Communicator and Cellular Module (Oct. 29, 2002) Original Image of this Document (PDF)
• 2002 WL 32675927 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Memorandum in Support of Its Renewed Motion for Summary Judgment of Noninfringement and Invalidity of U.S. Patent No. 6,058,304 (Oct. 29, 2002) Original Image of this Document (PDF)
• 2002 WL 32995437 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Renewed Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of the Eo Personal Communicator and Cellular Module (Oct. 29, 2002) Original Image of this Document (PDF)
• 2002 WL 32675920 (Trial Motion, Memorandum and Affidavit) Plaintiff Dataquill's Combined

Response to Defendant's: (1) Motion to Strike Koch Declaration, and (2) Motion to Strike Brodsky Declaration (Sep. 18, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32924681 () Verified Expert Disclosure of Edward Koch Pursuant To Rule 26(a)(2)(B) (Sep. 18, 2002) Original Image of this Document (PDF)
• 2002 WL 32510313 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Reply Brief in Support of Its Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of the EO Personal Communicator and Cellular Module (Sep. 4, 2002) Original Image of this Document (PDF)
• 2002 WL 32510324 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Reply Brief in Support of Its Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of United States Patent Nos. 5,465,401 and/or 5,335,276 (Sep. 4, 2002) Original Image of this Document (PDF)
• 2002 WL 32675908 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Reply Brief in Support of Its Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of the EO Personal Communicator and Cellular Module (Sep. 4, 2002) Original Image of this Document (PDF)
• 2002 WL 32675910 (Trial Motion, Memorandum and Affidavit) Defendant Handspring, Inc.'s Reply in Support of Its Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,058,304 (Sep. 4, 2002) Original Image of this Document (PDF)
• 2002 WL 32675915 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Reply Brief in Support of Its Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of United States Patent Nos. 5,465,401 and/or 5,335,276 (Sep. 4, 2002) Original Image of this Document (PDF)
• 2002 WL 32510330 (Trial Motion, Memorandum and Affidavit) Defendant Handspring Inc.'s Memorandum in Support of Its Motion to Strike the Declaration, and Exclude the Testimony, of Edward Koch (Sep. 3, 2002) Original Image of this Document (PDF)
• 2002 WL 32510337 (Trial Motion, Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 298

Not Reported in F.Supp.2d                                                                                    Page 12

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

and Affidavit) Defendant Handspring Inc.'s Memorandum in Support of Its Motion to Strike the Report, the Declaration, and Exclude the Testimony, of Harvey Brodsky (Sep. 3, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32675905 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant's Motion for Summary Judgment of Invalidity ""In Light of the EO Personal Communicator and Cellular Module" (Aug. 28, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32676689 (Trial Motion, Memorandum and Affidavit) DataQuill's Response to Handspring's Motion for Summary Judgment of Non-Infringement (Aug. 28, 2002) Original Image of this Document (PDF)
• 2002 WL 32676690 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant Motion for Summary Judgment of Invalidity ""in Light of United States Patent Nos. 5,465,401 and/or 5,335,276" (Aug. 28, 2002) Original Image of this Document (PDF)
• 2002 WL 32510294 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Opposition to Dataquill's Motion to Strike Certain Testimony and Exhibits of Handspring (Aug. 27, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32676687 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Opposition to DataQuill's Motion to Strike Certain Testimony and Exhibits of Handspring (Aug. 27, 2002) Original Image of this Document (PDF)
• 2002 WL 32510305 (Trial Motion, Memorandum and Affidavit) DataQuill's Motion to Strike Certain Testimony and Exhibits of Handspring (Aug. 23, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32510273 (Trial Motion, Memorandum and Affidavit) Defendant Handspring, Inc.'s Memorandum in Support of Its Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,058,304 (Aug. 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32510280 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Support of Its Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of

the EO Personal Communicator and Cellular Module (Aug. 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32510287 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Support of its Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of United States Patent Nos. 5,465,401 And/Or 5,335,276 (Aug. 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32676685 (Trial Motion, Memorandum and Affidavit) Handspring's Motion for Summary Judgment of Noninfringement and Invalidity of U.S. Patent Number 6,058,304 (Aug. 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32995431 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Support of its Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of the Eo Personal Communicator and Cellular Module (Aug. 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32995432 (Trial Motion, Memorandum and Affidavit) Defendant Handspring, Inc.'s Statement of Material Facts Regarding its Motions for Summary Judgment for Noninfringement and Invalidity of U.S. Patent No. 6,058,304 (Aug. 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32995433 (Trial Motion, Memorandum and Affidavit) Handspring's Motion for Summary Judgment of Noninfringement and Invalidity of U.S. Patent Number 6,058,304 (Aug. 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32995434 (Trial Motion, Memorandum and Affidavit) Defendant Handspring, Inc.'s Memorandum in Support of its Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,058,304 (Aug. 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32995435 (Trial Motion, Memorandum and Affidavit) Handspring's Motion for Summary Judgment of Invalidity of U.S. Patent Number 6,058,304 in Light of U.S. Patent Nos. 5,465,401 and/or 5,335,276 (Aug. 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32995436 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Support of its Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,058,304 in Light of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 299

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

United States Patent Nos. 5,465,401 and/or 5,335,276 (Aug. 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32993524 () (Partial Testimony) (Jul. 17, 2002) Original Image of this Document (PDF)
• 2002 WL 32993525 () (Partial Testimony) (Jul. 16, 2002) Original Image of this Document (PDF)
• 2002 WL 33004049 () (Partial Testimony) (Jul. 16, 2002) Original Image of this Document (PDF)
• 2002 WL 32999068 () (Partial Testimony) (Jul. 10, 2002) Original Image of this Document (PDF)
• 2002 WL 32986771 () (Report or Affidavit) (Jul. 8, 2002) Original Image of this Document (PDF)
• 2002 WL 33004052 () Expert Disclosure and Report of Harvey Brodsky Pursuant to Rule 26(a)(2)(B) (Jul. 8, 2002) Original Image of this Document (PDF)
• 2002 WL 32510267 (Trial Motion, Memorandum and Affidavit) Motion for Clarification of Expert Discovery Schedule (Jun. 18, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32676682 (Trial Motion, Memorandum and Affidavit) DataQuill's Reply in Support of Its Motion for Leave to Submit Confidential-Designated Materials to Certain Third Parties (May 24, 2002) Original Image of this Document (PDF)
• 2002 WL 32676680 (Trial Motion, Memorandum and Affidavit) DataQuill's Response to Handspring's ""Renewed" Motion to Compel Pending Patent Application (May 22, 2002) Original Image of this Document (PDF)
• 2002 WL 32510259 (Trial Motion, Memorandum and Affidavit) Handspring's Renewed Motion to Compel Discovery of Related Patent Application Prosecution Files From Dataquill (May 21, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32995440 (Trial Motion, Memorandum and Affidavit) Handspring's Renewed Motion to Compel Discovery of Related Patent Application Prosecution Files from Dataquill (May 21, 2002) Original Image of this Document (PDF)
• 2002 WL 32510253 (Trial Motion, Memorandum and Affidavit) Motion for Leave to Submit Confidential-Designated Materials to Certain Third Parties (May 16, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32676676 (Trial Motion, Memorandum

and Affidavit) DataQuill's Response to Handspring's Motion to Compel (Apr. 19, 2002) Original Image of this Document (PDF)
• 2002 WL 32510248 (Trial Motion, Memorandum and Affidavit) Motion to Compel (Apr. 11, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32995439 (Trial Motion, Memorandum and Affidavit) Motion to Compel (Apr. 11, 2002) Original Image of this Document (PDF)
• 2002 WL 32510244 (Trial Motion, Memorandum and Affidavit) Handspring, Inc.'s Motion for Letter of Request to the Judicial Authorities of the Supreme Court of the Province of British Columbia (Apr. 9, 2002) Original Image of this Document (PDF)
• 2002 WL 32510236 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Opposition to Motion to Compel (Mar. 14, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32676674 (Trial Motion, Memorandum and Affidavit) Defendant Handspring's Brief in Opposition to Motion to Compel (Mar. 14, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32510240 (Trial Motion, Memorandum and Affidavit) Agreed Motion to Extend Discovery Period (Mar. 13, 2002) Original Image of this Document (PDF)
• 2002 WL 32510230 (Trial Motion, Memorandum and Affidavit) Motion to Compel (Feb. 19, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32995438 (Trial Motion, Memorandum and Affidavit) Motion to Compel (Feb. 19, 2002) Original Image of this Document (PDF)
• 2002 WL 32510216 (Trial Motion, Memorandum and Affidavit) Motion for Entry of Protective Order (Jan. 15, 2002) Original Image of this Document (PDF)
• 2002 WL 32510223 (Trial Motion, Memorandum and Affidavit) Motion for Stipulation to Clarify (Jan. 15, 2002) Original Image of this Document (PDF)
• 2001 WL 34665915 (Trial Motion, Memorandum and Affidavit) DataQuill's Reply to Kyocera Wireless Corp.'s Counterclaims (Aug. 24, 2001) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 300

Not Reported in F.Supp.2d                                                    Page 14

Not Reported in F.Supp.2d, 2003 WL 737785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

• 2001 WL 34665917 (Trial Motion, Memorandum
and Affidavit) DataQuill's Reply to Handspring's
Counterclaims (Aug. 24, 2001) Original Image of
this Document (PDF)
• 2001 WL 34890279 (Trial Pleading) Defendant
Handspring, Inc.'s Answer and Counterclaims (Aug.
1, 2001) Original Image of this Document (PDF)
• 2001 WL 34554298 (Trial Pleading) Complaint
(Jun. 19, 2001) Original Image of this Document
with Appendix (PDF)
• 2001 WL 34665913 (Trial Pleading) Complaint
(Jun. 19, 2001) Original Image of this Document
with Appendix (PDF)
• 2001 WL 34890278 (Trial Pleading) Complaint
(Jun. 19, 2001) Original Image of this Document
(PDF)
• 1:01CV04635 (Docket) (Jun. 19, 2001)
• 2001 WL 34896485 () (Report or Affidavit)
(2001) Original Image of this Document (PDF)
• 2001 WL 34896486 () Declaration of Kenneth
Maki (2001) Original Image of this Document
(PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 301

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

c

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
HIGHWAY MATERIALS, INC., Plaintiff,
v.
WHITEMARSH TOWNSHIP, MONTGOMERY
COUNTY, PENNSYLVANIA, et al., Defendants.
**No. CIV.A. 02-3212.**

Oct. 4, 2004.

*MEMORANDUM*
ROBERT F. KELLY, Sr. J.

### I. INTRODUCTION

*1 Presently before this Court is the Defendants',
Whitemarsh Township, the Board of Supervisors of
Whitemarsh Township, Ann D. Younglove ("
Younglove"), Ronald J. DeRosa ("DeRosa"),
William P. Rimel ("Rimel"), Peter P. Cornog ("
Cornog"), Michael A. Zeock ("Zeock") and
Thomas F. Zarko ("Zarko"), Motion for Summary
Judgment Pursuant to Rule 56(b) of the Federal
Rules of Civil Procedure. On May 24, 2002, the
Plaintiff, Highway Materials, Inc. ("HMI"), filed its
Complaint against the Defendants. Plaintiff's
Complaint contains three counts; specifically,
Plaintiff asserts that the Defendants violated its
substantive and procedural due process rights under
Counts I and II of the Complaint. Additionally, in
Count III, the Plaintiff asserts that the Defendants
denied it equal protection under the law. The instant
Motion asks this Court to enter summary judgment
in favor of the Defendants as to all three Counts.
For the following reasons, the Defendants' Motion
will be granted.

### II. BACKGROUND

This case arises from a land use dispute. HMI is the
owner of a 309-acre tract of land in Whitemarsh
Township, Montgomery County, Pennsylvania that
consists of three parcels. The property was
previously known as the Corson Limestone Quarry.
The Plaintiff purchased this property on June 21,
1997. The portion of HMI's property that is the
subject of this lawsuit is a fifty-four-acre portion of
the HMI owned property (hereinafter referred to as "
Parcel One").[FN1] Up until late 2001/early 2002,
the majority of Parcel One was zoned HVY-X
Industrial except for a small portion which was
zoned AA-Residential. The parties are in agreement
that the HVY-X zoning designation permitted a
wide array of uses, the principal exception being
that residential development was not permitted
under the HVY-X zoning regulations. (*See* Defs.'
Mem. Law in Supp. of Mot. for Summ. J., at 7;
Brief of Pl. in Opp'n to Defs' Mot. for Summ. J., at
6). To the east, north and south of Parcel One is the
Philadelphia Cricket Club Golf Course.

FN1. For the purposes of this
Memorandum, the other two parcels of
HMI's property shall be known as Parcel
Two and Parcel Three respectively. As
stated by the Plaintiff, "Parcel Two is a
67-acre tract consisting largely of a quarry
site that is in the process of being filled in.
HMI also operates a concrete production
business on this parcel. Parcel Three is a
188-acre trace which contains an active
quarry and a bituminous production
business." (Br. of Pl. in Opp'n to Defs.'
Mot. for Summ. J., at 5)(internal citations
omitted). With one exception, all the
properties surrounding HMI's property is
zoned residential. Indeed, the only
property near HMI's property that cannot
be considered residential, agricultural or a
golf course is a fifteen-acre parcel of land
located to the west of Parcel Two which is
zoned HVY-X. This fifteen-acre parcel is
owned by KYW and has a radio

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 302

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

transmitting tower and a small building on the property.

The Whitemarsh Township's subdivision and land development procedures, requirements and standards are set forth in the Township's Subdivision Land Development Ordinance (" SALDO"). Section 105-12 of the Whitemarsh SALDO provides a general outline of township land development procedures.[FN2] As the SALDO states, there are three steps in the land development process. The filing of a sketch plan constitutes the first step. This step is optional. As stated by Section 105-13 of the SALDO:

FN2. Section 105-12 of the Whitemarsh SALDO states the following:
A. There are three (3) stages in the procedure for approval of subdivision and land development plans. These stages are necessary to enable the Planning Commission and the Board of Supervisors to have an adequate opportunity to review the submissions and to ensure that their formal recommendations are reflected in the final plans.
B. The separate stages of approval include the submission of an optional sketch plan, a preliminary plan and a final plan. These plans differ in their purpose and required level of detail....
C. Sketch plans shall require no more than a sixty-day review period. The review process required for preliminary and final plans shall include no more than ninety (90) days starting from the date of the regular meeting of the Planning Commission next following the date the application is accepted by the Manager and ending with the applicant being notified of the decision of the Board of Supervisors.
D. The presentation of the preliminary plan and a final plan shall each be considered a separate submission and the maximum ninety-day review period may be required for each. A sixty-day review period may be required for a sketch plan. No limitations for the action of any public official or

agency set forth in this Article shall be construed as mandatory.
E. The applicant is encouraged to meet informally with the Township Planner and the Planning Commission to obtain information regarding zoning and subdivision requirements and development alternatives prior to the initial submission. (Defs.' Mot. for Summ. J. at Ex. H).

(1) [t]he purpose of the sketch plan, which is an optional submission, is to afford the applicant the opportunity to consult early and informally with both the Planning Commission and the Township Planner before the preparation of the preliminary plan and formal application for approval.
(2) During the sketch plan procedure, the applicant can advantageously make use of the services of the Planning Commission and the Township Planner to help him analyze the problem of the development and plan more adequately for its sound coordination with the community. The sketch plan procedure also affords the opportunity to give informal guidance to the applicant at a stage when potential points of difference can be more easily resolved. It can also simplify official action and safe unnecessary expense and delay.

(Defs.' Mot. for Summ. J. Ex. H). The filing of a preliminary plan is the second step of the process. Section 105-14 of the SALDO states that "[t]he purpose of the preliminary plan is to obtain formal conditional approval in order to minimize changes and revisions before final plans are submitted." (*Id.* ). Finally, Section 105-15 of the Whitemarsh SALDO states that "the final plan shall conform to the preliminary plan, as approved." (*Id.* ). Stated differently, "when a preliminary application has been duly approved, the applicant *shall be entitled* to final approval in accordance with the terms of the approved preliminary application as hereinafter provided." 53 Pa. Cons.Stat. Ann. § 10508(4)(i)(emphasis added).

## A. INITIAL LAND USE DISCUSSIONS

*2 While most of the facts giving rise to this case occurred in late 2001 and early 2002, HMI's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 303

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

interactions with the Township began several years before the most relevant facts giving rise to this case occurred. In 1999, the Plaintiff retained E. Van Rieker, a land planner to explore development possibilities for Parcel One. In early 2000, HMI requested a waiver from one of the Township's stormwater management requirements. As stated by the Plaintiff, "[u]nder Township regulations, in calculating the required size of a planned development's stormwater facilities, a developer must account for the difference between the stormwater runoff the project will create and the runoff a hypothetical 'meadow' would create at the site." (Br. Pl. in Opp'n to Defs. Mot. for Summ. J., at 7 n.5). After a request from the Township's engineer requesting as to what the site would look like if HMI complied with the existing requirements, HMI submitted three plans to the Township, each of which depicted a detention pond on a small area of Parcel One. As would become an issue later, this dentention basin was apparently depicted on a portion of Parcel One zoned AA-Residential. Ultimately, the Board rejected the wavier request because the Board found that options were available to HMI that would comply with the stormwater ordinance.

As this was going on, the Plaintiff was in the process of preparing a sketch plan for Parcel One. On November 30, 2000, Plaintiff submitted a sketch plan to the Township. This sketch plan was for what the parties have described as a "mixed-use" plan. The sketch plan proposed 450,000 square feet of office space along with 600 apartment units. Because this sketch plan called for residential units, as well as office space, it did not conform with the HVY-X zoning of Parcel One that was in place at the time of the sketch plan submission. Thus, if this "mixed-use" plan was to ever be approved, Parcel One would have to be rezoned or HMI would have to seek a variance from the Township's Zoning Hearing Board.

On January 29, 2001, the Montgomery County Planning Commission reviewed the "mixed-use" sketch plan.[FN3] Overall, the Montgomery County Planning Commission found that the "mixed-use" sketch plan was "too intense in both its impervious coverage and density for [Parcel One] and the

surrounding area." (Defs.' Mot. for Summ. J. at Ex. L). Additionally, the County Planning Commission recommended that:

> FN3. Upon review of the sketch plan, the Montgomery County Planning Commission issued a letter stating that "the review comments and recommendations contained in this report are advisory to the municipality and final disposition for the approval of any proposal will be made by the municipality." (Defs.' Mot. for Summ. J. at Ex. L).

the applicant and the township work together to draft a new zoning district that would allow office buildings and apartments in a campus setting, with appropriate dimensional requirements. To develop this site as proposed under the HVY-X District dimensional requirements will create a new, dense, village surrounded by a semi-rural area, disconnected from other dense areas of the township.
*3 (Id.). Subsequently, on February 27, 2001, the Whitemarsh Township Planning Commission reviewed the "mixed-use" sketch plan proposal at an open meeting attended by the public. At this meeting, Plaintiff's attorney, James Garrity ("Garrity "), made a presentation regarding the "mixed-use" sketch plan and "indicated that [HMI was] seeking comments from the Planning Commission." (Id. at Ex. N). Additionally, at this meeting, several people from the community spoke out against the proposal detailed in the "mixed-use" sketch plan. (Id.).

On May 24, 2001, the Plaintiff presented the " mixed-use" sketch plan to the Board of Supervisors at an open meeting. Once again, Garrity appeared on behalf of the Plaintiff to discuss the "mixed-use" sketch plan. As in the Planning Commission meeting, members of the Township spoke out against the development of Parcel One, or at least the proposal as set out in the "mixed-use" sketch plan.[FN4] For example, the Township citizens expressed concerns about additional traffic and that the HMI proposal was to large. Additionally, members of the Board of Supervisors also expressed their concerns about the HMI proposal.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

For example, Supervisors Elizabeth W. Graf and Rimel expressed concerns that the proposal was too dense.

> FN4. Some of the people that spoke out against the "mixed-use" sketch plan identified themselves as members of the Whitemarsh Township Residents Association ("WTRA"). The Plaintiff asserts that the WTRA was an ad hoc civic association "created to oppose development in the Township." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 9). Apparently, the WTRA has grown into quite a large civic organization comprising 1,500 members.

### B. REZONING

After sensing the reluctance of the Township and its citizens to its "mixed-use" sketch plan, HMI set to work on formulating a preliminary plan that would not require any rezoning of the property. Specifically, during the summer of 2001, HMI began to prepare a preliminary plan for an office park. According to the HVY-X zoning that Parcel One was under during the summer of 2001, if HMI were to submit an all office space plan, then no rezoning would be required since such a proposal would lack any residential component that was prohibited under the HVY-X regulations. Thus, during the summer months of 2001, HMI began to prepare a preliminary plan for an all office space development in Parcel One that would conform with the HVY-X zoning regulations. Subsequently, on September 10, 2001, HMI submitted its preliminary plan for Parcel One (hereinafter referred to as the "Initial Preliminary Plan"). The Initial Preliminary Plan submitted by HMI consisted of 500,000 square feet of office space. This office park was to be called "Creekside Commons." Since this plan lacked any residential space, no rezoning by the Township was required before the Board of Supervisors could approve Creekside Commons.

During the summer of 2001, the Township also began the process to rezone HMI's property. The Whitemarsh Township zoning ordinances allow individuals to submit proposals to change the Township's zoning map. Section 116-239 of Whitemarsh's zoning regulations states:

*4 [w]henever the owners of fifty per centum (50%) or more of the property owners within any district or the property fronting on the same street or streets or abutting on the property sought to be changed, and situate within one thousand (1,000) feet of the property sought to be change, shall present to the Board of Supervisors a petition duly signed and acknowledged, requesting an amendment, supplement, change, modification or repeal of the regulations prescribed, or of the Zoning Map, including such district, it shall be the duty of the Board of Supervisors to hold a public hearing thereon and cause notice thereof to be given in the manner prescribed in § 116-237.

(*Id.* at Ex. G). Subsequently, on July 3, 2001, an attorney representing a neighbor to HMI's property submitted a petition to rezone HMI's property to EX-Extraction.[FN5] As will be explained, HMI's property was properly rezoned in Feburary of 2002.

> FN5. As stated by the Defendants regarding changing the property from HVY-X to EX-Extraction:
> [t]he overall effect of the [proposed] changes in the Zoning Ordinance and Zoning Map was to rezone major portions of Plaintiff's three parcels, including the 54 acre parcel [Parcel One] (with the exception of the portion zoned AA-Residential) to EX-Extraction which ...
> as stated before, permitted the extractive quarry use to continue, but once abandoned and the property reclaimed, the land could be used for residential purposes. Previously, under the HVY-X Industrial District land use regulations, any use except those restricted (including residential), were permitted in the HVY-X District. Permitted uses in a HVY-X District would include administrative and executive offices.
> (Defs.' Mem. of Law in Supp. of their Mot. for Summ. J. at 17).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 305

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

At a Board of Supervisors meeting on September 20, 2001, the Whitemarsh Board of Supervisors voted to authorize the rezoning of Parcel One. Then, at their October 18, 2001 meeting the Board voted to rezone HMI's property to EX-Extraction. However, this action by the Board was procedurally improper, and HMI filed a challenge to the rezoning with the Township's Zoning Hearing Board. Ultimately, the October 18, 2001 rezoning was deemed procedurally defective and the rezoning was re-enacted on February 28, 2002.

It is important to note the timing of HMI's preliminary plan submission. As stated previously, HMI submitted their preliminary plan proposal for Creekside Commons on September 10, 2001. Since HMI's preliminary plan proposal for Creekside Commons was filed with the Township before the Board of Supervisors had enacted the EX-Extraction rezoning ordinance for Plaintiff's property, the preliminary plan proposal would be governed by the HVY-X zoning regulations. Pennsylvania Law states that:
[f]rom the time an application for approval of a plat, whether preliminary or final, is duly filed as provided in the subdivision and land ordinance, and while such application is pending approval or disapproval, no change or amendment of the zoning, subdivision or other governing ordinance shall affect the decision on such application adversely to the applicant and the applicant shall be entitled to a decision in accordance with the provisions of the governing ordinances or plans as they stood at the time the application was duly filed. In addition, when a preliminary application has been duly approved, the applicant shall be entitled to final approval in accordance with the terms of the approved preliminary application as hereinafter provided. However, if an application is properly and finally denied, any subsequent application shall be subject to the intervening change in governing regulations.

53 Pa. Cons.Stat. Ann. § 10508(4)(i).

B. REVIEW AND ULTIMATE DENIAL OF HMI'S PRELIMINARY PLAN

*5 As both parties recognize, "a Township must act on land development plans within ninety days after the first Planning Commission meeting after the filing of the plans. If no action is taken within the statutory time frame, the land development plans are deemed approved." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J. at 20-21)(internal citations omitted). However, HMI afforded the Township a routine extension of time.

After the preliminary plans were submitted on September 10, 2001, "in accordance with the provisions of the SALDO, the Township administrative staff distributed copies of the application and/or plans to various individuals and organizations, including the Montgomery County Planning Commission and ... Zarko, the Township's consulting engineer." (Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 18). The Montgomery County Planning Commission reviewed the Initial Preliminary Plan for Creekside Commons and stated the following in a November 20, 2001 letter to Whitemarsh Township:
[a]s we stated in our January 29, 2001 letter, we believe that this project is too intense for this site. The HVY-X zoning, under which the plan was submitted, was developed many years ago for heavy industrial uses. Hence, its development standards are not appropriate for redevelopment of this site. When applied to suburban-style office buildings the coverage of the site becomes excessive, resulting in buildings surrounding by acres of paving. As we previously stated in our earlier letter, we believe that this results in a project that, while initially attractive because of its newness, will not age well.

(Defs. Mot. for Summ. J. Ex. BB). The Montgomery County Planning Commission recommended the following:[w]e recommend that the applicant work with the township and their consultant on development scenarios for this site and the rest of the quarry. While we recognize that the applicant has vested property rights with the site, a project developed to this scale and intensity will have a deleterious effect on the surrounding area and will eventually lose its appeal for tenants as better designed projects with site amenities become available.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(*Id.*). As with the January 29, 2001 letter, the Montgomery County Planning Commission noted that its comments and recommendations were merely advisory and that final authority for disposition of the preliminary plan remained with the municipality.

Even before the Montgomery County Planning Commission issued its advisory report and recommendations, Zarko reviewed the Initial Preliminary Plan for Creekside Commons. On October 11, 2001, Zarko submitted his first review of HMI's Initial Preliminary Plan for Creekside Commons. This review detailed areas where the Initial Preliminary Plan was non-compliant with the SALDO, zoning ordinance and the grading ordinance.

As both sides attest, it is normal practice for a preliminary plan to undergo revisions before it is finally approved or denied. Indeed, in responding to Zarko's October 11, 2001 review letter, HMI submitted a revised preliminary plan for Creekside Commons on December 24, 2001 (hereinafter referred to as the "First Revised Preliminary Plan"). Engineer Zarko reviewed the First Revised Preliminary Plan, and while this plan had less deficiencies than the September 10, 2001 Initial Preliminary Plan proposal, Zarko continued to find deficiencies and non-compliances when compared to the Township's ordinances. [FN6] After this review letter by Zarko, the purported deficiencies as stated by the Defendants became evident. Indeed, the Defendants assert that "none of the three major zoning issues had been dealt with" in the First Revised Preliminary Plans. (Defs. Mem. of Law in Supp. of their Mot. for Summ. J., at 20). According to the Defendants, the First Revised Preliminary Plan failed to address the lack of a berm and fence to surround Creekside Commons as required by the HVY-X regulations, the continued location of a stormwater retention basin on the portion of Parcel One that was zoned AA-Residential and the selection of a sanitary stormwater option. The Plaintiff contests the impact or relevancy of these three items. First, HMI states that after its Initial Preliminary Plan was reviewed by Zarko in October of 2001, HMI constantly requested meetings with the Township on how best to move forward on the

storm sewer issue. Additionally, the Plaintiffs assert that on January 16, 2001, representatives of the Township contacted Garrity and advised HMI to continue to show both a public sanitary sewer and on-site sewer option on the Preliminary Plan so as to allow the Board to elect which option it preferred. Additionally, the Plaintiff asserts that as to the berm/fence requirement and the location of the detention basin, Zarko's zoning interpretations were simply incorrect.

> FN6. The Defendants assert that the Initial Preliminary Plan had ninety items of non-compliance and that the First Revised Preliminary Plan had seventy-three.

As the preliminary plan process continued for Creekside Commons, there was also movement toward revisiting the "mixed-use" plan for Parcel One. The Plaintiff asserts that Gregan and Weiss advised the Board of Supervisors had agreed to schedule a public meeting on HMI's "mixed-use" plan. HMI then submitted a "mixed-use" plan on February 12, 2002 and a public meeting to discuss the "mixed-use" plan was scheduled for March 7, 2002. As set out in the minutes of the March 7, 2002 meeting, "Mr. Garrity presented an alternative mixed use sketch plan for the site which he opined was less intense than the office use. The "mixed use" sketch plan proposed 308,000 sq. ft. of office space in four three-story buildings and 380 apartments in ten four-story buildings of 38 apartments each." (Defs. Mot. for Summ. J. Ex. S). As with the previous "mixed-use" sketch plan discussed at meetings in early and mid-2001, the "mixed-use" plan discussed at the March 7, 2002 meeting met with significant opposition from the public as well as from some Board members. [FN7]

> FN7. For example, "Supervisor Zeock opined that the project is too intense and that, in his opinion, the two big issues are traffic and drainage." (Defs. Mot. for Summ. J. Ex. S).

*6 A day after the March 7, 2002 Board meeting discussing the "mixed-use" concept, the Township

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Manager ("Gregan") sent a letter to Garrity stating that HMI's all-office preliminary plan proposal was going to be scheduled "for action" by the Whitemarsh Township Planning Commission on March 19, 2002 and would be acted upon by the Board of Supervisors Regular Meeting on March 21, 2002. The Defendants assert that since the First Revised Preliminary Plan was filed on December 24, 2001:

the Board of Supervisors was legally obligated to act on the [First Revised Preliminary Plan] by March 24, 2002 not only in accordance with the Municipalities Planning Code, but pursuant to HMI's offered extension which was accepted by the Board of Supervisors. If the Board did not act on the plans within that time frame, it ran the risk that the [First Revised Preliminary Plans], as deficient as they were, would be "deemed approved" in accordance with section 508 of the Municipalities Planning Code. 53 P.S. § 10508(3). That section of the Code provides for an automatic approval of plans if not acted upon within the 90 day period. Because the last Supervisors' meeting before the deadline was March 21, 2002, the [First Revised Preliminary Plans] had to be acted upon by that date, absent a further extension accepted by the Township.

(Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 27). The Plaintiff responds by providing this Court a letter dated March 12, 2002. In that letter, Garrity offered an extension of time for the Board of Supervisors to act so that the First Revised Preliminary Plans would not be deemed approved by a lack of Board action. As Plaintiff notes, even with an offer to extend the time for Board action, the Board refused to accept the Plaintiff's offer of an extension. Instead, the [First Revised Preliminary Plans] were to be ready "for action" at the March 19, 2002 Township Planning Commission meeting and then ready "for action" at the Board of Supervisors meeting two days later on March 21, 2002.

Leading up to the March 21 Board of Supervisors meeting, the Plaintiff prepared and ultimately filed a new revised preliminary plan for Creekside Commons on March 19, 2002 (hereinafter referred to as the "Second Revised Preliminary Plan").[FN8]

Since the Second Revised Preliminary Plans were filed on the same day as the Planning Commission meeting, the Planning Commission had no statement from the Township's engineer as to the adequacy of the newly submitted plan.

> FN8. The filing of the Second Revised Preliminary Plans on March 19, 2002 started a new ninety-day period for the Defendants to act.

*7 After receipt of the Second Revised Preliminary Plan, Zarko began to review it in preparation for the March 21, 2002 Board of Supervisors meeting. Zarko issued his review and report of the Second Revised Preliminary Plan on March 21, 2002, a few hours before the Board of Supervisors meeting was to take place. A copy of Zarko's report was faxed to Garrity approximately two hours before the Board of Supervisors meeting was to begin. In his report, Zarko set forth the areas he felt the Second Revised Preliminary Plan failed to comply with the Township's SALDO, zoning ordinance and grading ordinance. For example, Zarko once again noted HMI's proposal for a retention basin in the area of Parcel One that was zoned AA-Residential. Zarko also noted that the specifications concerning the Second Revised Preliminary Plan failed to provided details concerning the proposed on-site sewage treatment plant. Additionally, Zarko once again stated that the plan failed to provide a berm and chain link fence around the perimeter of the proposal.[FN9] The Plaintiff contends that the Township Solicitor, Weiss, instructed Zarko to deviate from his normal routine in making his report. Specifically, the Plaintiff asserts that Zarko's letter was not divided into sections entitled " Preliminary Plan Approval Requirements" as previous reports were noted and that Zarko intentionally jumbled the items on the March 21, 2002 report so they differed in order from the January 24, 2002 report.

> FN9. Specifically, Zarko provided the following comments in his March 21, 2002 review letter:
> 1. The plan that was submitted for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Project is inconsistent with the following provisions of Chapter 116 "Zoning" of the Whitemarsh Township Code:
a. The applicant proposes to construct a retention basin on the southeasterly portion of the Project site, which is located within the AA Residential Zoning District, which is not a permitted use within the aforementioned District. (Sections 116-35 and 116-48)
b. Details/design specifications concerning the proposed on-site sewage treatment plant depicted on the Plan were not submitted to the Township for review. (Section 116-152.A.4)
c. A suitably sized berm and chain link fencing were not provided around the perimeter of the proposed land development site in the specific locations required by the Whitemarsh Township Code. (Sections 116-156.B and C)
d. The applicant proposes to construct the on-site sewage treatment plant on the southeasterly portion of the project site, within the 200 ft. setback from the AA-Residential Zoning District, which is not permitted.
(Defs. Mot. for Summ. J. Ex. WW). The letter also details other problems/deficencies associated with the Second Revised Preliminary Plan. (*Id.*).

At the start of the March 21, 2002 Board meeting, Garrity made a short presentation of the plans and again reiterated HMI's request for an extension of time.[FN10] The Supervisors ultimately rejected Garrity's request for an extension of time and moved forward to vote on the Second Revised Preliminary Plan. At their depositions, the Board members testified as to the reasons for denying the preliminary plan. First, the members stated that they felt that no real progress had been made on the Creekside Commons all-office proposal and that the proposal was going nowhere. Thus, members of the Board thought an extension of time would be futile. Additionally, the Board members stated that they relied on the report issued by Zarko earlier in the day which stated that the plans did not conform to the Township Ordinances. Thus, the . Defendants

assert there were valid, legal reasons for denying the plans as well as denying Plaintiff's request for additional time.

> FN10. It should be noted that Weiss had arranged for a court reporter to document the proceedings, as well as chose to have the Township witnesses sworn.

By refusing to grant the extension as requested by HMI, and rejecting the Second Revised Preliminary Plan, the Board of supervisors essentially locked HMI into a plan that would have to be governed by the EX-Extraction zoning requirements. The parties are in agreement that any new submission made by HMI to the Township would be deemed a new plan and, therefore, would not be considered under the previous HVY-X zoning requirements. This is because such a new submission would be deemed a new plan and, therefore, would not be grandfathered in under the old zoning ordinance. As stated previously, the all-office space Creekside Commons proposal was allowed under the HVY-X zoning, but not under the new EX-Extraction zoning implemented initially in October of 2001, and then re-enacted in February of 2002.

### III. *STANDARD*

**\*8** Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

jury could find for the non-moving party. *Anderson,* 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.* at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir.1989)(citing *Celotex,* 477 U.S. at 325 (1986)). Further, the non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim. *Celotex,* 477 U.S. at 322-23. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. *Id.* at 322; *Wisniewski v. Johns-Manville Corp.,* 812 F.2d 81, 83 (3d Cir.1987).

## IV. *DISCUSSION*

Plaintiff's Complaint contains three counts. The Plaintiff asserts that through their actions, the Defendants violated its procedural and substantive due process rights under the Fourteenth Amendment. Additionally, the Plaintiff asserts that the Defendants did not afford it equal protection guaranteed under the law. Throughout its Brief, the Plaintiff refers to the actions of the Defendants as a " one-two punch." The Plaintiffs assert that "punch one" was the rezoning of its property from HVY-X to EX-Extraction. "Punch two" was the deficient process of consideration, and ultimate denial of its preliminary plans for Creekside Commons. Thus, this Court will analyze whether one or both of these "punches" can substantiate a procedural or substantive due process claim, and/or whether one or both of these "punches" can substantiate an equal protection claim. As will be discussed, after reviewing the Briefs and exhibits of the parties, this Court finds that summary judgment is proper as to all three claims and, therefore, Defendants' Motion

will be granted.

## A. PROCEDURAL DUE PROCESS

**\*9** It is important to first note the elements that are necessary to satisfy a procedural due process claim. As stated by the United States Court of Appeals for the Third Circuit ("Third Circuit"), "[t]o establish a cause of action for violation of procedural due process, a plaintiff in addition to proving that a person acting under color of state law deprived it of a protected property interest, must establish that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process." *Midnight Sessions, Ltd. v. City of Phila.,* 945 F.2d 667, 680 (3d Cir.1991), *overruled on other grounds, United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir.2003)(citing *Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)).[FN11] The parties agree that the Defendants were acting under color of state law and that the Plaintiff has a protected property interest. Both sides, however, do contest whether the Plaintiff has satisfied the other requirements of substantiating a procedural due process claim so as to defeat the Defendants Summary Judgment Motion. First, this Court will analyze whether the purported "punch one" substantiates a procedural due process claim. Then, this Court will analyze whether the purported " punch two" substantiates a procedural due process claim.

> FN11. As will be explained, the standard for establishing a substantive due process claim was fundamentally changed by the Third Circuit in *United Artists Theatre Circuit. See infra* Part IV.B. However, cases predating *United Artists Theatre Circuit* remain good law on the issue of substantiating a procedural due process claim including *Midnight Sessions* and similar cases.

### 1. "Punch One"

Regarding the rezoning issue, or "punch one," the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Third Circuit has stated that
[t]he Pennsylvania legislature has enacted a system for processing challenges to zoning ordinances.... A landowner who wishes to challenge the validity of a zoning ordinance or amendment that restricts the use or development of its land may file a challenge with the zoning hearing board and may appeal from any decision by the zoning officer applying the ordinance.

*Rogin v. Bensalem Township,* 616 F.2d 680, 694-95 (3d Cir.1980). Additionally:[i]f the landowner is dissatisfied with the Board's decision, it then has the right to appeal to the Court of Common Pleas. The appeal may take the form of direct judicial review of the Board's decision, or the court may take new evidence and enter its own findings of fact after trial de novo. The Court is authorized to declare any ordinance or map invalid and to set aside or modify any action, decision, or order of the Township, Zoning Officer, or Zoning Hearing Board.

*Id.* at 695 (footnotes omitted).

After the initial rezoning of HMI's property in October of 2001, the Plaintiff filed an appeal with the Township's Zoning Hearing Board. As was stated previously, the Township re-enacted the rezoning on February 28, 2002 due to procedural deficiencies associated with the October, 2001 rezoning. In *Rogin,* the Third Circuit affirmatively stated that "[i]n Pennsylvania the procedure for challenging zoning ordinances substantially conforms with the general due process guidelines enunciated by the Supreme Court." *Id.* at 695. There is clearly a full judicial mechanism from which HMI could have availed itself and, as one court has noted, "when a state affords a 'full judicial mechanism' with which to challenge administrative decisions of the type at issue, the state provides adequate procedural due process, regardless of whether the plaintiff avails herself of that appeal mechanism." *The Development Group, LLC v. Franklin Township Bd. of Supervisors,* No. 03-2936, 2003 WL 22358440, at *8 (E.D.Pa. Sept.24, 2003). Here, even though it appears as if HMI did not avail itself of the appeals procedures after the February, 2002 zoning re-enactment, the Pennsylvania process for challenging zoning

ordinances satisfies the procedural due process requirements under the Constitution. Thus, as to " punch one," this Court cannot find any violation of Plaintiff's procedural due process.

### 2. "Punch Two"

*10 The thrust of Plaintiff's procedural due process claim relates to "punch two" or the lead up to and ultimate denial of the Second Revised Preliminary Plan for Creekside Commons. Similar to the procedure for appealing the rezoning of a property, Pennsylvania provides a party with a full judicial mechanism to review the denial of a preliminary plan. Indeed, Pennsylvania allows a party to appeal a land use decision to the Court of Common Pleas where the land is located. *See* 53 Pa. Cons.Stat. Ann. § 11001-A *et seq.* As the Third Circuit has noted, "[i]t is the law in this Circuit that a state provides adequate due process when it provides reasonable remedies to rectify a legal error by a local administrative body." *Bello v. Walker,* 840 F.2d 1124, 1128 (3d Cir.1988), *overruled on other grounds, United Artists Theatre Circuit,* 316 F.3d 392. In *Bello,* the Plaintiff argued that the township denied it procedural due process by denying it a building permit. *Id.* at 1127. As the Third Circuit noted, "Pennsylvania affords a full judicial mechanism with which to challenge the administrative decision to deny an application for a building permit." *Id.* at 1128. The Third Circuit found that the plainitffs did not show that decision to deny the building permit was made pursuant to a constitutionally defective procedure. *Id.* Indeed, the Third Circuit reiterated this point in *Midnight Sessions,* by stating that "[t]he availability of a full judicial mechanism to challenge the administrative decision to deny an application, even an application that was wrongly decided, precluded a determination that the decision was made pursuant to a constitutionally defective procedure." 945 F.2d at 681.

Even though HMI clearly has a full judicial mechanism with which to challenge the Board of Supervisor's decision to deny its Second Revised Preliminary Plans, HMI still argues that the Defendants have violated its procedural due process

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

guarantee. Principally, the Plaintiff relies on *C & M Group, Inc. v. New Britain Township*, No. 90-4375, 1991 WL 25684 (E.D.Pa. Feb.14, 1991). Plaintiff quotes *C & M Group* which states that " post-deprivation remedies are adequate to satisfy due process only when the circumstances surrounding the deprivation require quick action by the state, or when pre-deprivation procedures are impractical. *Id.* at *3. However, the Plaintiff fails to consider the full breadth of *C & M Group*.

At the outset, *C & M Group* resolved a 12(b)(6) motion to dismiss. In *C & M Group*, the court noted that "[c]ourts have thus held that pre-deprivation procedures must be provided prior to the denial of a land-use permit." *Id.* at *3. Continuing, the court noted that Plaintiff's averments as to its procedural due process claim were that the board failed to provide a decision on the record and that the board failed to give the land development plan fair consideration. *Id.* However, the court noted that " even if the Board acted arbitrarily and failed to base its decision on the applicable law and the facts, that goes to substance rather than procedure. It does not amount to a failure to provide adequate procedure." [FN12] *Id.* (citing *Rogin*, 616 F.2d at 692-94). Additionally, the court noted that "the standard of procedural due process is not whether the municipality deviates from established procedure, but whether it deviates from constitutionally mandated procedure." *Id.* (citing *Eguia v. Tompkins*, 756 F.2d 1130, 1139 (5th Cir.1985)).

> FN12. Indeed, in their Reply Brief, the Defendants make a similar point by arguing that Plaintiff's complaints about how it was treated during the land development process and rezoning amount to substantive rather than procedural due process challenges since the Plaintiff was afforded pre and post deprivation procedures pursuant to the Township SALDO and Pennsylvania law.

In the case currently before this Court, there were pre-deprivation procedures utilized. These included meetings and conversations with Township officials as well as three reports issued by the Township's

engineer. Each of the Zarko's reports detailed deficiencies with HMI's proposal as it related to the Township's ordinances. The Plaintiff states that the third and final Zarko report was issued only two hours before the Board ultimately denied the Second Revised Preliminary Plan and that this third and final report by Zarko raised new issues not present in his other reviews. However, what is clear is that this third report issued on March 21, 2001 also detailed deficiencies that were present in previously submitted preliminary plans by the Plaintiff. While the Plaintiff vigorously states that its Second Revised Preliminary Plan was approvable, this goes to the substance rather than the procedure. The Board's reliance on an allegedly incorrect engineer's report attacks the substance of the decision and not the procedure with which it was made. Pennsylvania clearly has a scheme in place that allows HMI to appeal the denial of its preliminary plan.[FN13] Therefore, Plaintiff's procedural due process claim is knocked out.

> FN13. Indeed, HMI has taken advantage of these procedures by filing an appeal of the Township's denial of its Second Revised Preliminary Plan with the Montgomery County Court of Common Pleas in the spring of 2002.

### B. SUBSTANTIVE DUE PROCESS

**\*11** This Court will now turn its attention to Plaintiff's substantive due process claim. "To succeed in a substantive due process claim under Section 1983, a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Corneal v. Jackson Township*, 313 F.Supp.2d 457, 465 (M.D.Pa.2003), *aff'd*, 94 Fed. Appx. 76 (3d Cir.2004) (non-precedential)(internal quotation marks and citations omitted). Here, since HMI is the owner of a property interest that is subject to a local land use regulation, HMI is entitled to substantive due process protection. *Id.* (citing *DeBlasio v. Zoning Bd. of Adjustment for the Township of West Amwell*, 53 F.3d 592, 600 (3d Cir.1995)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Next, the Plaintiff must show that the government violated the relevant standard in depriving the plaintiff of that protected property interest. Until recently, Third Circuit precedent stated that if a Township's actions were governed by an improper motive, that was enough to establish a substantive due process violation. *See e.g., DeBlasio,* 53 F.3d at 598; *Midnight Sessions,* 945 F.2d at 683; *Bello,* 840 F.2d at 1129; *Rogin,* 616 F.2d at 689. However, in *United Artists Theatre Circuit,* the Third Circuit raised the standard for a substantive due process violation in the land use context. After analyzing *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Third Circuit held that the new standard to determine whether a substantive due process violation has taken place is whether the purported government action "shocks the conscience." *United Artists Theatre Circuit,* 316 F.3d at 400-01. With this holding, the "improper motive" test for substantive due process enunciated in *Bello* and its progeny was no longer good law. *Id.* at 401. Indeed, the Third Circuit noted that "[l]and use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper motives.' " *Id.* at 402.

The "shocks the conscience" test is not a precise test "and it also 'varies depending on the factual context.' " *Eichenlaub v. Township of Indiana,* -F.3d-, No. 03-2707, 2004 WL 2093439, at \*9 (3d Cir. Sept.21, 2004)(quoting *United Artists Theatre Circuit,* 316 F.3d at 400). As a result, it is necessary to delve into the factual context of this case to see if the Defendants have satisfied their summary judgment burden. It should also be noted however, that as the Third Circuit recently stated, "[w]hat is clear is that this ["shock the conscience"] test is designed to avoid converting federal courts into super zoning tribunals. What 'shocks the conscience ' is only the most egregious official conduct." *Id.* (internal quotation marks and citations omitted).

**\*12** Once again, Plaintiff asserts that the Defendants' purported "one-two punch" of rezoning and subsequent denial of the Second Revised Preliminary Plans on March 21, 2002 violated its substantive due process rights. First, this Court will

examine whether "punch one," the rezoning of the HMI property from HVY-X to EX-Extraction, " shocks the conscience." Then, this Court will analyze whether "punch two," the process and ultimate denial of HMI's Second Revised Preliminary Plan, "shocks the conscience."

### 1. "Punch One"

As the Third Circuit has noted, "[t]he federal courts largely defer to legislative judgment on such matters as zoning regulation 'because of the recognition that the process of democratic political decisionmaking often entails the accommodation of competing interests, and thus, necessarily produces laws that burden some groups and not others.' " *Pace Res., Inc. v. Shrewsbury Township,* 808 F.2d 1023, 1035 (3d Cir.1987)(quoting *Rogin,* 616 F.2d at 697). As to the rezoning of Plaintiff's property, this Court cannot say that the Defendants' actions were "conscience shocking." The steps that the Defendants undertook in rezoning the property from HVY-X to EX-Extraction were legitimate steps so as to conform HMI's property with the surrounding area. The Defendants rationale for the rezoning related to land use planning.

In *Pace Resources,* the Third Circuit determined whether the rezoning of property constituted a substantive due process violation. *Id.* at 1034-35. The Third Circuit stated that the plaintiff "does not present a case involving actions aimed at this developer for reasons unrelated to land use planning. Rather, the case involves a difference of opinion on how much industrial development is in the best interest of the Township and how that quantum of industrial development should be achieved." *Id.* at 1035. The Third Circuit continued by stating that "[t]he complaint states that the Township acted to curb industrial development within the Township. One can easily articulate a rational connection between each of the Township's actions and this legitimate purpose." [FN14] *Id.* Even though the Third Circuit was acting under the less stringent improper motive standard in *Pace Resources* for substantiating a substantive due process claim, it affirmed the district court's dismissal the substantive due process claim. As the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 313

Not Reported in F.Supp.2d                                                                Page 13

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Third Circuit noted, "[r]eduction of the amount of land zoned industrial and standards and procedures that allow the Township to closely monitor any industrial development that does occur are measures rationally related to the goal of restricting industrial presence in the Township for the benefit of the general welfare." *Id.*

> FN14. It should be noted that *Pace Resources* was decided in 1987, and thus was decided under the old, less stringent, and now defunct improper motive test for substantiating a substantive due process claim.

As in *Pace Resources,* the Whitemarsh Township's actions in rezoning related to the goal of conforming HMI's property with the surrounding area, as well as other concerns relating to commercial development in the Township. Certainly, therefore, the Township's actions in rezoning cannot meet the more stringent " conscience shocking" test. Thus, the Township's rezoning of Plaintiff's property does not amount to a substantive due process violation.

### 2. "Punch Two"

*13 Next, the Plaintiff asserts that the purported " punch two" violated its substantive due process guarantee. As previously mentioned, "punch two" relates to the process by which HMI's Creekside Commons plan was reviewed and ultimately denied by the Township's Board of Supervisors. For the following reasons, "punch two" does not amount to a substantive due process violation.

The Plaintiff argues that the Defendants conspired and executed a scheme intended to deprive HMI of its property rights. The Plaintiff cites to a number of actions that took place during the course of this supposed scheme designed to thwart the development of HMI's property. However, based on the case law decided in this Circuit after *United Artists Theatre Circuit,* this Court concludes that the facts as set out in *supra* Part II as it relates to " punch two"do not amount to a substantive due

process violation. First, this Court will analyze the relevant case law decided after *United Artists Theatre Circuit* so as to determine how the courts have grappled with the new "shocks the conscience" standard in a land use dispute. This step is important since the "shock the conscience" standard is relatively new to this Circuit as it relates to substantiating a substantive due process violation in the land use context. Then, using those cases as a backdrop, this Court will determine whether there is a material issue of fact outstanding as to whether the process and ultimate denial of HMI's Second Revised Preliminary Plan "shocked the conscience."

Perhaps most important for purposes of deciding this Motion is the recently decided case of *Eichenlaub v. Township of Indiana,* -.F.3d-, 2004 WL 2093439. In *Eichenlaub,* the plaintiffs asserted many of the same complaints against the defendants as HMI asserts here. As the Third Circuit noted:
[b]asically, the Eichenlaubs assert that zoning officials applied subdivision requirements to their property that were not applied to other parcels, that they pursued unannounced and unnecessary inspection and enforcement actions; that they delayed certain permits and approvals; that they improperly increased tax assessments; and that they maligned and muzzled the Eichenlaubs .... these complaints are examples of the kind of disagreement that is frequent in planning disputes. As counsel for appellants acknowledged during argument, there is no allegation of corruption or self-dealing here.

*Id.* at *10. The Third Circuit concluded by stating that the "District Court judge applied the correct legal standard ["shocks the conscience"] and did not abuse its discretion in dismissing the substantive due process claim." *Id* Many of the complaints HMI has levied against the Defendants are similar to those the Third Circuit examined in *Eichenlaub.* For example, the Plaintiff asserts that the Township officials deviated from the requirements and standards the Township followed as compared to other preliminary plans. Additionally, the Plaintiff asserts that the delay and tactics of the Defendants caused the Second Revised Preliminary Plan to be denied. However, as both the District Court and the Third Circuit found in *Eichenlaub,* this does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 314

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

meet the "shocks the conscience" test. Importantly, as was the case in *Eichenlaub*, there is simply no evidence in this case of corruption or self-dealing so as to find that the Defendants' actions were so egregious as to "shock the conscience."

*14 It should also be noted that *Eichenlaub* clearly distinguishes a case principally relied upon by HMI in its Brief in Opposition to the Defendants' Summary Judgment Motion. Specifically, the case relied upon by the Plaintiff in its Brief in Opposition to Defendants' Motion for Summary Judgment is *Associates in Obstetrics & Gynecology v. Upper Merion Township,* 270 F.Supp.2d 633 (E.D.Pa.2003). At the outset, it should be noted that *Associates in Obstetrics & Gynecology* dealt with a Rule 12(b)(6) motion to dismiss rather than one for summary judgment. *Id.* at 655. Quite obviously, the court in *Associates in Obstetrics & Gynecology* was dealing with a much more difficult standard for the Defendants to overcome than the one currently before this Court. Additionally, as stated by the Third Circuit, in *Associates in Obstetrics & Gynecology,* that case implicated more than just a disagreement about conventional zoning or planning rules. In *Obstetrics,* the District Court denied a motion to dismiss a claim that municipal defendants denied substantive due process when they selectively closed plaintiff's medical office for the purpose of blocking the provision of abortion services. Because the municipal action there implicated abortion rights, the District Court's analysis of the "shocks the conscience" standard proceeded largely under those judicial decisions that address protection of abortion services under the Fourteenth Amendment.

*Eichenlaub,* 2004 WL 2093439, at *9. Thus, as the Third Circuit found in *Eichenlaub,* this Court also finds that *Associates in Obstetrics & Gynecology* is also distinguishable from the present dispute between HMI and the Defendants since what is at issue in the present case is a disagreement about rezoning and land use planning rules as applied to the Plaintiff.

Other land use substantive due process cases decided in this District and recently affirmed by Third Circuit are also helpful in resolving the

instant Motion. A land use dispute arose in *Lindquist v. Buckingham Township,* No. 00-1301, 2003 WL 22757894 (E.D.Pa. April 15, 2003), *aff'd* 2004 WL 1598735 (3d Cir. July 19, 2004)(non precedential). Similar to the current case before this Court, *Lindquist* involved a denial of a preliminary plan after the Board amended the zoning ordinance. Specifically, the preliminary plan filed by the plaintiffs in that case sought to develop their property as a cluster subdivision using transferable development rights that would have included 216 lots for single family homes. *Id.* at *1. Based on a sketch plan, the plaintiffs submitted their phase one preliminary plan on March 29, 1996. *Id.* at *2 This preliminary plan called for clustered subdivisions in cul-de-sacs then permitted by the SALDO. *Id.* Additionally, at the time the March 29, 1996 plan was submitted, "the Zoning Ordinance permitted the subdivision of the property into cluster subdivision as a 'by right' use in the AG-1 zoning district without the need for a public hearing or ' conditional use' approval by the Board." *Id.* at *2 n. 8. After the preliminary plan was submitted to the Board,
*15 on February 26, 1997, the Board enacted an amendment to SALDO which prohibited cul-de-sacs streets within subdivisions. The concept of such a change had arisen years earlier. However, were the amendment to apply to Lindquists' Original Phase I submission, the plan proposed would be prohibited. On June 11, 1997, the Board enacted an additional amendment to the Zoning Ordinance which eliminated cluster subdivisions as a "by-right" use in AG-1 zoning districts and provided for cluster subdivisions only as a " conditional use."

*Id.* at *4. Ultimately, the Board denied the plaintiffs' preliminary plan even though the Plaintiff requested an extension. *Id.* Thus, "[a]s a result of the denial, the Lindquists were subject to the amended zoning ordinances and could not develop their property as a single family detached cluster development as a ' by-right' use." *Id.* After this denial, the Plaintiffs commenced an action in state court. However, this state court lawsuit was resolved by a settlement which allowed the plaintiffs to resubmit a revised preliminary plan under the old zoning ordinance. *Id.* After another round of revised preliminary plans

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 15

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

were submitted, the Board again rejected the preliminary plans. *Id.* at *5. By doing so, the Board again passed on the plaintiffs offer to extend the time for review, even though the Board had agreed to such extensions in the past. *Id.* at *5. Thereafter, the board of supervisors passed additional resolutions so as to correct legal errors in the earlier denial resolution. *Id.*

The district court in *Lindquist* found that the plaintiffs "failed to meet their burden of establishing a substantive due process violation."[FN15] *Id.* at 8. As the court stated:

> FN15. It should be noted that the *Lindquist* decision by the District Court were findings of fact and conclusions of law after a trial without jury was held. However, the case initially went to trial under the old "improper motive" standard and it was only after trial that the Third Circuit changed the standard to the more stringent "shock the conscience" standard in *United Artists Theatre Circuit. See Lindquist,* 2003 WL 22757894, at *7.

*16 [t]he development of the Lindquist farm was an extremely complex project, involving numerous governmental approvals from a variety of public bodies and agencies and requiring compliance with numerous ordinances, regulations, and laws on the local and state level. Not surprisingly, missteps, mistakes, and prolonged delay occurred as a result. It is true that the Township and Board decisions contributed at least some, but certainly not all, of the difficulties that the Lindquists encountered during the protracted subdivision approval process. In addition, the defendants may have been negligent at times and in 1998 may have acted with an improper motive toward the Lindquists and their representatives. However, there is nothing in the facts we have found to prove that the defendants conduct was so egregious as to be "conscious shocking."
*Id.* Indeed, the Third Circuit agreed with the District Court's conclusion, albeit in a non-precedential opinion, by stating "[t]he District Court concluded that while the Township 'may have been negligent' and 'may have acted with an improper motive,' *desirous of thwarting development of the property,* its conduct did not shock the conscience. We concur." *Lindquist,* 2004 WL 1598735, at *5 (emphasis added). Therefore, as in the present dispute between HMI and the Defendants, *Lindquist* also involved the purported "one-two punch" of 1) submission of a preliminary plan; 2) rezoning; and 3) denial of the preliminary plan so as to force the plaintiff to file a new preliminary plan that conformed to the new zoning regulations. Similar to the District Court's holding in *Lindquist,* this Court cannot find any disputed facts which if proven would satisfy the "shock the conscience standard." Rather, as the District Court held in *Lindquist,* the Defendants' actions in the case currently before this Court is not so egregious as to be "conscience shocking."

As the Third Circuit noted in its non-precedential *Lindquist* opinion, "without more, a violation of state law, even a bad faith violation of state law, will not support a substantive due process claim in a land-use dispute." *Id.* at *5 (citing *Baker v. Coxe,* 230 F.3d 470, 474 (1st Cir.2000); *Natale v. Town of Ridgefield,* 170 F.3d 258, 262 (2d Cir.1999)). Here, the record indicates that there are disputed issues of fact as to whether the Defendants properly applied the state and local ordinances to HMI's Creekside Commons proposal, and whether the Defendants deviated from their usual procedure in analyzing the Creekside Commons proposal. However, as the case law previously cited illustrates, this, without more, does not amount to actions by the Defendants that "shocks the conscience."

Another case that is instructive and helpful in this Court's analysis of the instant Motion is *Corneal,* 313 F.Supp.2d 457. In *Corneal,* the plaintiffs sought to subdivide and sell a portion of a tract of land they recently purchased. *Id.* at 459. They had the tract surveyed for such a purpose. *Id.* at 459-60. During this time however, the Township placed a "temporary moratorium on subdividing property pending the enactment of a formal ordinance governing subdivision and land development" in January of 2000 since the Township had no subdivision ordinance to govern land development. *Id.* at 460 Subsequently, in February of 2000, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 316

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

plaintiffs presented their original subdivision plan to the board. *Id.* In April of 2000, Mr. Corneal requested that the board sign five sewage modules, but the board refused. *Id.* Mr. Corneal had argued that he needed the sewage modules to begin to build his own personal house on the property, but the board stated that this would constitute a subdivision since the property already had an existing dwelling on it. *Id.* at 460-61. Later, the plaintiffs prepared a revised plan that reflected only subdividing the property into two lots. The plaintiffs would then sell one of the lots to a buyer. However, the plaintiffs never submitted the revised preliminary plan to the Township because of the moratorium that was in place. *Id.* at 461. The plaintiffs subsequently began to develop the land and constructed a 1.5 mile driveway through the tract in the spring of 2000. *Id.*

*17 Later, Mr. Corneal requested a building permit from the township's building permit officer to build his garage. *Id.* at 461-62. The building permit officer refused to issue the permit because the board had instructed him not to issue any permits to the Corneals. At his deposition, the township's building permit officer stated that although he had never refused to provide any other person in the Township with a permit, he refused to even provide the Corneals with a permit application. During his conversations with Mr. Corneal [the township's building permit officer] referred to Mr. Corneal as a "trouble making yuppie from over the mountain." [The township's building permit officer] used this term to describe Mr. Corneal because Mr. Corneal " just behaves like someone who wants to get their own way and his age group."

*Id.* at 462 (internal citations omitted). Ultimately, the buyer for the other tract pulled out of the agreement to purchase due to difficulties with the township associated with obtaining subdivision approval. *Id.* Additionally, after the buyers pulled out of the agreement to purchase, a board member's nephew approached the plaintiffs about purchasing the tract of land. *Id.* Ultimately, the Corneals brought a substantive due process claim against the township and the board.[FN16] As the district court noted:

FN16. The Corneals also brought other claims, but for purposes of this Court's analysis, only the substantive due process discussion is relevant.

[t]he crux of the Conreal's substantive due process claim is that Defendants acted in concert to frustrate the Conreals' effort to subdivide and develop their ninety-five acre tract of land. According to the Conreals, Defendants needlessly complicated and delayed the Conreals' applications for permits and subdivision, thereby causing the Buyers to cancel their sales contract with the Conreals. Drawing all genuine factual disputes in favor of the Conreals, it appears that Defendants intentionally opposed the Conreals' efforts, at least in part, because they did not like the Conreals.... Finally, the Conreals also contend that Defendant Wilson [a board member] intentionally held up the subdivision process so that the Conreals would be unable to convey a portion of the tract to the Buyers on June 30, 2000. According to the Conreals, Defendant Wilson wished to prevent this contract from culminating so that he or his nephew could purchase the property, which belonged to Defendant Wilson's grandfather until 1960.

**18 *Id.* at 464-65 (footnotes omitted).

Ultimately, the district court in *Corneal* granted summary judgment in favor of the defendants on plaintiffs' substantive due process claim. *Id.* at 470. The court began by setting out the relevant "shock the conscience test" and then stated that:

unless the evidence indicates that a challenged decision is completely unrelated in any way to a rational land use goal, there is no violation of substantive due process. The corollary of that rule being that where the locality's decision is related in any way to some rational goal, then no due process violation occurs even if the locality may have exceeded the scope of its jurisdiction.

*Id.* at 466. The court continued by stating that it uncovered only "a single case where a plaintiff's substantive due process challenge to a local land use decision survived a summary judgment motion under the 'shocks the conscience' test." *Id.* (citing *Collier v. Town of Harvard,* CV No. 95-11652-DPW, 1997 U.S. Dist. LEXIS 23582

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 17

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

(D.Mass. Mar. 28, 1997)). In the case currently before this Court, even HMI has come forward with no case arising in the land use context where a party overcame the stringent "shocks the conscience" standard so as to defeat a summary judgment motion.[FN17] As to the once case the court in *Conreal* found defeated a summary judgment motion, the court noted,

>   FN17. Indeed, aside from their expert reports, HMI cites to only a relatively few number of cases to support its substantive due process claim. First, Plaintiffs rely on *Associates in Obstetrics & Gynecology*, 270 F.Supp.2d 633. As previously stated, while a land use case, the decision by the district court arose out of a 12(b)(6) motion to dismiss rather than a summary judgment motion. *Id.* at 655-56. Additionally, for similar reasons that the Third Circuit distinguished *Associates in Obstetrics & Gynecology* in its recently decided *Eichenlaub* opinion, this Court has already distinguished *Associates in Obstetrics & Gynecology*. Additionally, the Plaintiffs rely on *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir.2003). At the outset, it should be noted, that *Estate of Smith* was not a land use case. The Plaintiffs argue that *Estate of Smith* stands for the proposition that a plaintiff's burden is less where the defendants actions are not in the context of a "hyperpressurized environment." However, in the precedential and non-precedential opinions that have been issued by the Third Circuit after *United Artists*, the Third Circuit has made no such distinction as it applies to a substantive due process challenge arising from a land use/zoning dispute. *See e.g.,* *Eichenlaub,*-F.3d-, 2004 WL 2093439; *Lindquist*, 2004 WL 1598735; *Corneal*, 94 Fed. Appx. 76.

[e]ssentially, *Collier* involved an allegation of governmental extortion. That is, the plaintiffs' applications would have been approved if they simply capitulated to the public official's request for

an easement across their property. As a result, the court found that a reasonable jury could have concluded that the [Zoning Board of Appeal's] decision to deny the plaintiffs' application was fueled solely by personal motivations totally devoid of any rational land use planning concerns. Thus, *Collier* fell within the very narrow class of challenges to local land decision which are "truly horrendous."

*Id.* at 467 (citing *Welch v. Paicos*, 66 F.Supp.2d 138, 169 (D.Mass.1999)). In *Conreal*, the court found that the facts viewed in the light most favorable to the Plaintiffs only established that the Defendants might have acted with mixed motives; " one related to a legitimate land regulation purpose (preserving land development status quo during the final approval process of the subdivision ordinance), the other related to illegitimate personal animus." *Id.* at 468. However, the court noted that " the plaintiff must demonstrate that the land use decision or regulation was so totally irrational that it could not possibly be the real reason for the locality's action, or alternatively, that the locality applied its decision selectively so that its land use concern could not have been legitimate despite the rational basis for it." *Id.* at 469. Indeed, albeit in a non-precedential opinion affirming the district court in *Corneal*, the Third Circuit stated that "[a]s noted by the district court, unless the defendants' actions were 'completely unrelated in any way to a rational land use goal,' there is no violation." 94 Fed. Appx. 76, 78 (citing *Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043).

*19 In the case currently before this Court, the Defendants did have rational reasons for denying the Second Revised Preliminary Plan. Most notably, the Board relied on Zarko's report which set forth the deficiencies in the Second Revised Preliminary Plan for Creekside Commons. Even if Zarko did in fact apply the wrong legal standard to these plans, this Court reiterates that an error in applying state or local law, even a bad faith mistake, does not amount to a violation of substantive due process. *See Conreal*, 313 F.Supp.2d at 470 (citations omitted). Additionally, as set out previously, the mere failure of the Defendants to agree to Garrity's request for more time was not completely irrational when coupled with the fact that the Board believed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 318

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

that the plans for Creekside Commons were not progressing in an adequate fashion.

### 3. Plaintiff's Expert Reports

The Plaintiff additionally relies on the reports of two of its experts, Joseph J. Viscuso, P.E. ("Viscuso ") and Marc D. Jonas, Esq. ("Jonas") to defeat Defendants' Summary Judgment Motion. For the following reasons, however, these two expert reports do not create a material issue of fact so as to defeat Defendants' Summary Judgment Motion.

Viscuso is "a licensed professional engineer with an M.S. degree in Civil Engineering who currently serves as municipal engineer or special consultant for seven municipalities and authorities." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 57). The report issued by Viscuso states that as submitted, the Second Revised Preliminary Plan is in compliance with the Township's SALDO. Such an opinion by Viscuso does not substantiate a substantive due process claim. Rather, Viscuso's report simply amounts to a difference of opinion he has with Zarko's interpretation of the Township's SALDO as it relates to the Second Revised Preliminary Plan for Creekside Commons. Even a bad faith violation of state law remains only a violation of state law. *United Artists Theatre Circuit,* 316 F.3d at 402 (citing *Chesterfield Development Corp. v. City of Chesterfield,* 963 F.2d 1102, 1104-05 (8th Cir.1992)). Thus, since Viscuso's report only goes to whether Zarko applied the correct legal standard under the local ordinance in his denial recommendation, it does not create a material issue of fact so as to preclude the Defendants' Summary Judgment Motion.

Plaintiff additionally submits the report of Jonas which it contends creates a material issue of fact as to its substantive due process claim. As the Plaintiff sets forth, Jonas is a distinguished land use attorney. Jonas' report sets forth twenty-four circumstances/actions by the Defendants that he believed could be considered "conscience-shocking. " (Br. Pl. in Opp'n to Defs. Mot. for Summ. J. Ex. 19). By doing so, Jonas is stating a legal conclusion drawn by applying the law to the facts. A similar

issue regarding an expert report occurred in *VIM, Inc. v. Somerset Hotel Association,* 19 F.Supp.2d 422, 427 n. 4 (W.D.Pa.1998), *aff'd* 187 F.3d 627 (3d Cir.1999). The issue in *VIM* was whether the defendants tactics in prosecuting an opposition to the building of a Hampton Inn was objectively baseless. *Id.* Before the court was a report by a former President Judge of the Commonwealth Court of Pennsylvania which purported to state that the Defendants land use appeals were not objectively baseless as a matter of law. *Id.* at 427 n. 4. As the court observed however:

**\*20** that lack of objective baselessness is not the sort of issue that lends itself to expert testimony under Fed.R.Evid. 702 and 704. While testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact, *an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts.*

*Id.* (emphasis added)(internal quotation marks omitted)(citing *Okland Oil Co. v. Conoco, Inc.,* 144 F.3d 1308, 1328 (10th Cir.1998); *accord Burger v. Mays,* 176 F.R.D. 153, 156-57 (E.D.Pa.1997); *Haberern v. Kaupp Vascular Surgeons, Ltd.,* 812 F.Supp. 1376, 1378 (E.D.Pa.1992); *Rich v. Bailey,* No. 95-6932, 1996 WL 745298, at *5 (E.D.Pa. Dec.23, 1996), *aff'd mem.* 135 F.3d 766 (3d Cir.1997)). Ultimately, then District Court Judge Smith ruled that "because such testimony would not assist the jury to determine a fact in issue, I cannot consider it as factual evidence on the motion for summary judgment." *VIM,* 19 F.Supp.2d at 427 n. 4 . However, Judge Smith did treat the report as additional legal argument. *Id.*

Similar to Judge Smith's analysis in *VIM,* Jonas' report cannot create a material issue of fact merely because he states that the Defendants' actions " shocked the conscience." Specifically, this amounts to a legal conclusion clearly within the purview of this Court's decision making power rather than a party's expert. This Court has already applied the factual scenario giving rise to this case to the " shock the conscience" standard and found that the Defendants' actions did not rise to such a stringent level. Thus, Jonas' report fails to create a material

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 19

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

issue of fact on this point.

For the reasons previously stated, and in light of the relevant case law in this Circuit, this Court has specifically found that there is no issue of material fact as to whether the Defendants' actions "shocked the conscience." Therefore, based on the relevant case law, the facts currently before this Court and that the Plaintiff's expert witnesses have failed to present a material issue of fact that could substantiate a substantive due process claim, Plaintiff's substantive due process claim must also be knocked out.[FN18]

> FN18. In support of their summary judgment motion, the individual Defendants also argue they are entitled to qualified immunity. However, as the court noted in *Corneal,* because there is no material issue of fact outstanding as to whether the Defendants' conduct "shocked the conscience," it is unnecessary for this Court to determine whether the individual Defendants are entitled to qualified immunity. 313 F.Supp.2d at 470 n. 11 (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

### C. EQUAL PROTECTION

**\*21** The final claim being brought by HMI against the Defendants is that the Defendants violated HMI's equal protection rights under the Fourteenth Amendment. The Fourteenth Amendment to the United States Constitution states that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Where the state law does not classify by suspect class, "the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Here, HMI does not argue that it is a member of a suspect class. Instead, it pursues its equal protection claim under a "class of one" theory. As the United States Supreme Court ("Supreme Court") has noted, "

cases have recognized equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in the treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)(per curiam) (citations omitted). Additionally, "a 'class of one' can attack intentionally different treatment if it is 'irrational and wholly arbitrary.' " *Eichenlaub,* 2004 WL 2093439, at \*10 (quoting *Olech,* 528 U.S. at 564).

The Third Circuit recently had the opportunity to compare an equal protection and substantive due process claim in the context of a land use/zoning dispute. As the Third Circuit noted:
[t]he "irrational and wholly arbitrary" standard is doubtless difficult for a plaintiff to meet in a zoning dispute, and we do not view an equal protection claim as a device to dilute the stringent requirements needed to show a substantive due process violation. It may be very unlikely that a claim that fails the substantive due process test will survive under an equal protection approach.

*Id.* (internal citation omitted). The Third Circuit in *Eichenlaub,* however, remanded the equal protection claim because the District Court had failed to address the equal protection claim. Thus, now that the relevant standard for HMI's equal protection claim has been set, this Court will now turn to analyzing whether an equal protection claim can be substantiated at this summary judgment stage so as to defeat the Defendants' Summary Judgment Motion.

As previously stated, there are two elements necessary to establish an equal protection claim under a "class of one" theory. First, a party has to show that they were intentionally treated differently than others who were similarly situated. If a party satisfies this first step, the second step requires a party to show that there was no rational basis for the difference in treatment. Both steps are required to substantiate an equal protection claim. The parties vigorously contest both steps. For the following reasons, this Court will decline to address step one of the equal protection analysis because step two

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 320

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

has failed to create a material issue of fact necessary to overcome Defendant's Summary Judgment Motion.[FN19]

> FN19. Initially the parties dispute whether HMI and its property is similarly situated. At the crux of this dispute is determining how to make such a comparison to determine whether HMI is similarly situated. HMI suggests that it should be compared to all other developers who filed plan applications to develop their properties in Whitemarsh Township. The Defendants assert that the proper comparison should be whether HMI's property is similarly situated to other properties in Whitemarsh Township. However, in the case currently before this Court, "it is undisputed that there are no other active quarry properties in Whitemarsh Township." (Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 71; Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 68). Thus, as Plaintiff notes, it would be impossible for them to be similarly situated since no other properties are even remotely similar to their parcel. However, since step two of the equal protection analysis has not been substantiated at this summary judgment stage, it is unnecessary for this Court to consider the issue what is the proper comparison.

*22 Even assuming *arguendo*, that the Plaintiff can show that it was intentionally treated differently from others similarly situated, the Plaintiff has not shown that there was no rational basis for the treatment. As the Supreme Court has noted, the issue is whether the Defendants' decision to rezone and ultimately deny HMI's Second Revised Preliminary Plan "so lack rationality that they constitute a constitutionally impermissible denial of equal protection." *City of New Orleans v. Dukes*, 427 U.S. 297, 305, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)(per curium). More specifically and more recently, the Supreme Court has noted:

[w]hether embodied in the Fourteenth Amendment

or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In the areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

*Fed. Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (citations omitted). As with the procedural and substantive due process claims, this Court will analyze whether the purported "one-two punch" substantiates Plaintiff's equal protection claim.

### 1. "Punch One"

"The equal protection clause affords the states particularly wide latitude with respect to zoning." *Acierno v. New Castle County*, No. 92-385, 2000 WL 718346, at *6 (D.Del. May 23, 2000)(citing *City of Cleburne*, 473 U.S. at 440). Thus,

a zoning ordinance not affecting suspect classes " cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead a classification must be upheld against equal protection if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."

*Id.* (quoting *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). As stated previously in *supra* Part IV.B.1, the Defendants did have a rational basis to rezone HMI's property. Here, the Township had a legitimate concern as to how the reclaimed quarry properties were going to interact and conform with the surrounding neighborhood. This is particularly the case where the entire surrounding neighborhood was residential, a golf course or agricultural properties.[FN20] Since rezoning the property to conform it to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

the immediate surrounding area is a rational reason for rezoning, the rezoning of HMI's property does not violate the Equal Protection Clause.

> FN20. This of course excludes the small 15-acre KYW property which had a radio antennae and a small building.

### 2. "Punch Two"

*23 As previously discussed in *supra* Part IV.B.2, the Defendants have set forth a rational basis for which they denied the Second Revised Preliminary Plan for Creekside Commons. Most notably, according to the Defendants, the Second Revised Preliminary Plan did not comport with the Township SALDO's requirements for approving a preliminary plan. Additionally, while the Plaintiff requested an extension, the denial of that proposal also had a rational basis since the Defendants believed that the proposal for Creekside Commons was not making any significant progress toward approval. Thus, there was a rational basis for denying the Second Revised Preliminary Plan, and since the rezoning of Plaintiff's property also had a rational basis, Plaintiff's equal protection claim must also be knocked out.[FN21]

> FN21. Additionally, the Plaintiff states that the Township implemented procedural " firsts" in reviewing the plan for Creekside Commons, which it asserts help to substantiate its equal protection claim. However, as one court has noted, "as a matter of logic and law a plaintiff may not convert a procedural due process claim into an equal protection claim by expediently alleging that he was denied procedural rights by an official who has accorded such rights to others in the past." *Stop-Save Township Open Places, Inc. v. Bd. of Supervisors of Montgomery Township,* No. 96-7325, 1996 WL 663875, at *3 (E.D.Pa. Nov.15, 1996) (citations omitted). As set out in *supra* Part IV.A, this Court has already examined and knocked out Plaintiff's procedural due

process claim.

### V. *CONCLUSION*

In conclusion, this Court has analyzed the Defendants' Motion for Summary Judgment under the relevant legal standards. The Defendants moved for summary judgment on all three counts of the Plaintiff's Complaint. The claims were procedural due process, substantive due process and equal protection. This Court has found that as to all three claims, the Defendants have met their burden and there are no material issues of fact outstanding requiring this Court to deny Defendants' Motion. As such, Defendants' Motion will be granted.

An appropriate Order follows.

### *ORDER*

AND NOW, this 4th day of October, 2004, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 64) as to all three claims of Plaintiff's Complaint, the Response and Replies thereto, it is hereby ORDERED that Defendants' Motion is GRANTED.

E.D.Pa.,2004.
Highway Materials, Inc. v. Whitemarsh Tp., Montgomery County, Pa.
Not Reported in F.Supp.2d, 2004 WL 2220974 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:02cv03212 (Docket) (May. 24, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.