# EXHIBIT
# A

# EXHIBIT
# A



2801 East Plano Parkway
Plano, Texas 75074
www.AdamsGolf.com
FAX: 972-398-8818
800-622-0609
Tel: 972-673-9673



*We make golf clubs.*

*From the desk of*
**B.H. (Barney) Adams**



To:  Mark Gonsalves, Ric Jarrett

Date:  August 14, 1998

RE:  SALES, CURRENT CONDITION

I cannot accurately describe the degree of upset that accompanies this memo. My concern is how deep do our problems go and have we been presenting a false image?

I always pointed to the inside sales group as the "bright star" at Adams. The best people, best management, the attitude, the driver, the core to our future.

In a chance undertaking I'm learning how wrong I was. George Klaus (my friend at Platinum) was asking me some questions on telesales parameters. I called Ric Jarrett for information and after receipt I started investigation of our numbers fully expecting to be able to tell George how much better than standard we performed.

What I got instead was a shock. Recognizing that there is generally more to a story I started an in depth evaluation of Inside Sales. What I learned is so upsetting that it has made me physically ill, discouragement equal to any time since the start of Adams Golf. In no particular order:

A.  The department staff has very low morale.
B.  They have no faith in their management and, in fact, there is serious concern (over 50%) that their management is self serving.
C.  They know cheating (at least in the form of double shipments) occurs and are concerned that such action is quietly endorsed.
D.  They feel that the income potential for the job was (politely) overstated.
E.  It is a unanimous feeling that departmental management is weak, undirected, especially as practiced by Craig Parrish.
F.  There is no sense of "we", they aren't part of the decisions, they are told what to do.
G.  Given all the worries about low income, the average phone time is 1 hour 20 minutes. I cannot interpret this unless it's a form of low morale and giving up.
H.  They feel that if there is superior financial performance the commissions will be cut anyway.



EXHIBIT

S7

Blewek

ADAMS028451



I.      They feel that they are too isolated, put in conflict with other departments. As a
result there is a defensive attitude that isn't healthy.

Here's what I know. I've researched this to the point where I know there is enough truth
that A – I have become reality. As a result this analysis is the worst performance
assessment I've ever written and that includes all my pre-Adams corporate days.

Our short term goals are to make the Q3, Q4 numbers. What is the plan to resurrect
this department, return it to what I thought it was and how it was presented in the Road
Show. I realize there are decisions we can make (like diverters) but we must rely on
these people.

Apparently we've made a lot of sales that have been falsely reported (as sales) and are
little more than consignments. Check July returns and tell me what they'll be during the
rest of the year.

I'm in agreement with the splitting of the department but only if it contains some deeper
use of management tools. Example: I want to see weekly/monthly forecasts by group
that the group agrees to as doable. I know we've done similar things before, but the
real question is are they management's numbers or sales numbers? If they're sales
numbers we should be able to get into detail – clubs/by variation/ by account. What can
we get from our people that will make us/them better. How do we effectively solve the
1½ hours on the phone. Mark G. says the new criteria should be 2, Ric said closer to
2½, even 3.

Given an hour off what specifically happens, the other 4½ to 5½ hours/day. It's not
service calls which go elsewhere. If it's pre-call planning, how do we help make that
time more efficient?

I don't think I need to write any more; the issue is squarely on the table and I'll clarify
what is making me sick. Are we living the big lie? Did we present Road Show numbers
for '98, '99 that we have no idea we can attain? Is the big lie catching up with us and
the reason our people are upset is that they know it?

Given the issue of the next two quarters I'll listen to suggestions; these are mine.

A.      Personal visits to the top 50 retail accounts where we get them to support us
(and what's coming).
B.      Terms. I don't favor a price decrease, I'll accept terms but no consignments.
C.      Our millionth club promotion.
      1.      Buy one Tight Lies®, get stand bag @ $50.00.
      2.      Buy a second Tight Lies and get stand bag free.

BHA:afn

ADAMS028452

# EXHIBIT
# B

# EXHIBIT
# B

United States District Court
District of Delaware

IN RE: ADAMS GOLF, INC.
CONSOLIDATED SECURITIES LITIGATION
C. A. No. 99-371 KAJ

EXPERT REPORT OF ED J. LYNCH, CPA
JULY 14, 2006

## A. BACKGROUND OF THE WITNESS

1.    I am Ed J. Lynch, a Certified Public Accountant ("CPA") and a Partner with Deloitte Financial Advisory Services LLP ("Deloitte FAS"), part of one of the largest professional services organizations in the United States with approximately 33,000 people in over 100 offices in the United States. My business address is 2200 Ross Avenue, Suite 1600, Dallas, Texas 75201-6778. Since graduating from college in 1977, I have practiced in the public accounting profession that includes accounting, auditing, tax, and management consulting services. I have experience in accounting, auditing, damage analysis, and other financial analyses. I have served on the professional ethics committees of three different state societies of CPA's over the last twenty years of my professional practice and I served as co-chair of the Missouri Society of CPA's Professional Ethics Committee in the mid-1990's. My training and experience as a CPA qualify me to analyze the matters in dispute in this case. Deloitte FAS is paid for my time spent analyzing this matter at a rate of $475 per hour. My resume is attached as Exhibit 1. My testimony history over the last four years is attached as Exhibit 2.

## B. SCOPE OF ASSIGNMENT

2.    I have been retained as an accounting expert in this case by Adams Golf, Inc. ("Adams Golf"), and B. H. (Barney) Adams, Darl P. Hatfield, Richard H. Murtland, Paul F. Brown, Roland E. Casati, Finis F. Conner and Stephen R. Patchin (collectively the "Individual Defendants") to analyze and render opinions regarding accounting and disclosure issues in this litigation. In particular, I have been asked to determine whether management of Adams Golf utilized accounting principles generally accepted in the United States of America, also known as generally accepted accounting principles ("GAAP"), in estimating and recording an allowance for sales returns and in the disclosures in regard to sales returns in the financial statements included in Adams Golf's registration statement and prospectus (the "Registration Statement" and the "Prospectus") effective July 9, 1998 (the "Effective Date"). I have also been asked to consider allegations regarding double shipping and consignment sales.

## C. DOCUMENTS CONSIDERED

3.    My conclusions have been reached after reviewing and analyzing documents produced as part of this dispute, analysis of deposition testimony of Mr. Adams, Mr. Hatfield, James Farrell, Mark Gonsalves, Chip Brewer, Olga Pulido-Crowe, Scott Blevins, Ryan Magnussen, Dave Brown, Jay Greaney and Sandra Brooks and discussion of certain facts with Mr. Hatfield, the Chief Financial Officer from 1998 to 2000. I began by reviewing a selection of documents provided by counsel and I asked for and was provided with additional documents and/or categories of documents as my investigation progressed. I also reviewed other publicly available information such as the company's SEC filings. I have been given access to all documents produced in this litigation. The documents I have consulted or relied on in performing my analyses and in forming my opinions are listed in Exhibit 3 and include the following:

Pleadings filed in this litigation

Adams Golf, Inc., Form S-1/A (July 7, 1998)

Adams Golf, Inc., Form 10-Qs (including amendments) for the quarters ended June 30,

1998 to March 31, 2000

Adams Golf, Inc., Form 10-Ks for the years ended December 31, 1998, 1999 and 2000.

Adams Golf / Lehman Brothers IPO "Roadshow" materials

Underwriter "Due Diligence" documents

Minutes of Regular and Special Meetings of Adams Golf Board of Directors

Adams Golf Board of Directors presentation materials

Press releases produced in this litigation

Internal Adams Golf memoranda produced in this litigation

Internal Adams Golf documentation including company return policies, customer sales data, financial data and forecasts.

SEC comments and responses to Adams Golf's Form S-1

KPMG audit work papers for years ended December 31, 1998 and 1999 and certain work papers for the year ended December 31, 1997

KPMG quarterly review work papers for the first three quarters of 1998

KPMG comfort letter and registration statement review work papers

## D. SUMMARY OF MY OPINIONS

4.    Adams Golf's accounting practices and disclosures with respect to provisions for sales returns and sales return reserves were in accordance with GAAP.

5.    As described below, based on the evidence reviewed, Adams Golf performed reasonable estimates of sales returns.

6.    The testimony and evidence which I have reviewed in this matter do not establish that there was a widespread practice, if any, of double shipping or consignment sales by Adams Golf.

7.    Adams Golf's net down program as of January 1, 1999 is unrelated to the provision for sales returns.

8.    The bases for my opinions are set forth in the following sections of this report.

## E. GAAP AND OTHER GUIDANCE RELEVANT TO THE ISSUES IN THIS MATTER

9.    Copies of accounting literature discussed below are included in Exhibit 5 to this report.

10.    Statement of Financial Accounting Standards 48 ("FAS 48") entitled "Revenue Recognition When Right of Return Exists" is applicable:

"This Statement specifies criteria for recognizing revenue on a sale in which a product may be returned, whether as a matter of contract or as a matter of existing practice, either by the ultimate customer or by a party who resells the product to others." (para. 3).

11.    FAS 48 goes on to state:

"If an enterprise sells its product but gives the buyer the right to return the product,

2

revenue from the sales transaction shall be recognized at time of sale only if all of the following conditions are met:

    a. The seller's price to the buyer is substantially fixed or determinable at the date of sale.

    b. The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.

    c. The buyer's obligations to the seller would not be changed in the event of theft or physical destruction or damage of the product.

    d. The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

    e. The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

    f. The amount of future returns can be reasonable estimated.

Sales revenue and cost of sales that are not recognized at the time of sale because the foregoing conditions are not met shall be recognized either when the return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first." (Para. 6)

"If sales revenue is recognized because the conditions of paragraph 6 are met, any costs or losses that may be expected in connection with any returns shall be accrued in accordance with FASB Statement No. 5, *Accounting for Contingencies*. Sales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns." (Para. 7)

"The ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that will vary from one case to the next. However, the following factors may impair the ability to make a reasonable estimate:

    a. The susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand

    b. Relatively long periods in which a particular product may be returned

    c. Absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances, for example, changes in the selling enterprise's marketing policies or relationships with its customers

    d. Absence of a large volume of relatively homogeneous transactions

3

The existence of one or more of the above factors, in light of the significance of other factors, may not be sufficient to prevent making a reasonable estimate; likewise, other factors may preclude a reasonable estimate." (Para. 8)

12.    Accounting Principles Board Opinion 20, entitled "Accounting Changes" ("APB 20"), provides the appropriate standard related to utilization of accounting estimates.  APB 20 states the following:

"Changes in estimates used in accounting are necessary consequences of periodic presentations of financial statements.  Preparing financial statements requires estimating the effects of future events.  Examples of items for which estimates are necessary are uncollectible receivables, inventory obsolescence, service lives and salvage values of depreciable assets, warranty costs, periods benefited by a deferred cost, and recoverable mineral reserves.  Future events and their effects cannot be perceived with certainty; estimating, therefore, requires the exercise of judgment.  Thus accounting estimates change as new events occur, as more experience is acquired, or as additional information is obtained." (Para. 10)

13.    APB 20 further states:

"The Board concludes that the effect of a change in accounting estimate should be accounted for in (a) the period of change if the change affects that period only or (b) the period of change and future periods if the change affects both.  A change in an estimate should not be accounted for by restating amounts reported in financial statements of prior periods or by reporting pro forma amounts for prior periods."(Para. 31)

14.    Statement of Position 94-6, Disclosure of Certain Significant Risks and Uncertainties, provides that "[f]inancial statements should include an explanation that the preparation of financial statement in conformity with GAAP requires the use of management's estimates." (para. .11)

## F. FACTS AND CIRCUMSTANCES UNDERLYING MY OPINIONS

### Accounting Policy Disclosures

15.    Note 1 to the consolidated financial statements of Adams Golf included in the Prospectus for the initial public offering in 1998 disclosed, at "(d) Revenue Recognition" that the company "records revenue as earned, which occurs when the product is shipped."[1]  This statement was consistent with statements in its public filings during the class period.

16.    Note 1 also includes, at "(h) Product Warranty and Sales Returns" that "The Company's golf equipment is sold under warranty against defects in material and workmanship for a period of two years.  In addition, the Company has a 90 day 'no questions asked' return policy.  An allowance for estimated future warranty and sales return costs is recorded in the period products are sold.  Such estimates have approximated actual costs incurred."[2]

---

[1] Adams Golf S-1/A (July 9, 1998) at p. F-7.
[2] Adams Golf S-1/A (July 9, 1998) at p. F-8.

4

17.    Note 1 further includes, at "(k) Use of Estimates The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates."

## Accounting Using FAS 48

18.    Adams Golf shipped products to customers on the basis of agreed prices and sent invoices to their customers following shipment. As such, the prices of Adams Golf clubs were fixed at the time of sale.

19.    I have not seen any evidence contrary to the customers' obligation to pay for them pursuant to the customary business terms or that any contingency or prerequisite existed that the products be resold before the customer was obligated to pay Adams Golf for the goods.

20.    Available documents indicate that sales were booked by Adams Golf when items were shipped and the risk of loss passed to the buyer at that point. No evidence has been provided which describes any available credit to Adams Golf customers for damaged or stolen merchandise after shipment.

21.    Plaintiffs have not specifically alleged any facts questioning the economic substance of Adams Golf's customers; and I am aware of no evidence indicating that Adams Golf's customers lacked substantial economic substance independent of Adams Golf.

22.    Adams Golf did not have any significant continuing obligation with respect to the shipped products to facilitate their resale. As described in more detail below, Adams Golf's post-sale obligations were limited to its 90-day "no questions asked" return policy on certain sales and warranty obligations based on its materials and workmanship. The company estimated and accrued for these types of obligations.

23.    As described below, Adams Golf future returns could be reasonably estimated.

## Estimating Sales Returns

24.    FAS 48 points out that the ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that will vary from one case to the next. FAS 48 provides examples of factors which might impair a reasonable estimate (as described above). Based on the evidence reviewed, Adams was not precluded from making a reasonable estimate of its sales returns.

25.    As described above, Adams Golf disclosed that it had a 90-day "no questions asked" return policy on its products. In fact, the 90-day "no questions asked" return policy did not apply to all sales, but rather only direct response sales.[3,4] All other sales were made without a right of

---

[3] Direct response sales refers to programs where customers may order Adams Golf products directly from the company via a toll free number and in response to the various company advertisements (TV, print, etc.)
[4] KPMG 0502-0503

return. The company did, however, accept non-direct response sales returns on a case-by-case basis, but only as an accommodation to maintain a customer relationship and only after that customer had been approved for the return.

26.  I do not consider the returns periods described above to be "relatively long" periods as that term is used in FAS 48.

27.  Adams Golf had historical experience in sales of its golf clubs and other products. Adams Golf had been in business since 1987 and began marketing its best-selling Tight Lies range of clubs in 1995.[5]

28.  Adams Golf sales were composed of a large volume of relatively homogenous sales. As of the Effective Date of the initial public offering, and throughout the class period (July 10, 1998 to October 22, 1998), Adams Golf focused exclusively on design, manufacture, and marketing of golf clubs, and did not have significant sales of other products. In the first quarter of 1998 (the last reported period included in the company's S-1/A as of the Effective Date) Adams Golf had $24.5 million in net sales, of which $24.4 million, or 99.5%, were golf clubs. Of these, $23.9 million, or 97%, were Tight Lies.[6]

29.  Adams Golf was aware of the susceptibility of its products to external factors, including technological changes, and changes in demand. Adams Golf did research and development as a mechanism to keep its products competitive and disclosed the nature of fierce competition from some of its competitors such as Callaway and Orlimar. These factors were not sufficient to prevent Adams Golf from making a reasonable estimate of sales returns during the class period.

30.  In addition, FAS 48 states that "other factors may preclude a reasonable estimate." I am not aware of any additional factors bearing on Adams Golf's ability to make a reasonable estimate of future returns. Further, there was no known change in circumstances during the period which would have rendered Adams Golf unable to apply its experience to estimate a reasonable allowance for returns of its clubs and merchandise.

31.  Adams Golf's allowance for sales returns was designed to account for all returns from any source. Any product returns based on Adams Golf's warranty were explicitly beyond the scope of FAS 48.[7]

32.  Adams Golf financial statements were audited by KPMG beginning in 1996[8] and continued through the class period. KPMG audit work papers indicated that they considered Adams Golf sales data going back to 1995.[9]

---

[5] Adams Golf S-1/A (July 9, 1998) at p. 17.
[6] KPMG 2013, Net Sales by Product. Net sales amount from 1st Quarter 1998 trial balance at KPMG 2325.
[7] SFAS 48, ¶4.
[8] Deposition of Darl Hatfield (June 8, 2006) at p. 7.
[9] KPMG 2009-2014, from KPMG's Registration Statement and Comfort Letter work papers.

### Adams Golf Sales Return Estimates

33.   Adams Golf disclosed sales on a net basis.  Therefore, all revenues shown in the company's financial statements, including the registration statement, were already reduced by an estimate of potential returns the company expected, regardless of the reason.[10]

34.   Adams Golf employed estimates of its sales returns when it booked its sales.  The company would revise its estimated reserve percentages during the year as new information became available.  It is apparent that KPMG subjected Adams Golf's sales returns estimates to testing as part of Adams Golf's year end audits.

35.   As of December 31, 1997, the company estimated its sales return rate for its 90 day "no questions asked" policy applicable to direct response sales to be approximately 12% of gross sales and estimated its commercial return rate at approximately 3% of gross sales. The company estimated that returns would be made over a four-month period following the initial date of sale.

36.   KPMG's work papers for the income statement in the quarter ended March 31, 1998 indicated that direct response gross sales were $3.6 million and gross sales from commercial accounts were $22 million.[11]   Adams Golf applied the same return rate estimates in this quarter and the resulting provision for returns on those sales was $1.1 million and the closing reserve balance was $0.7 million.

37.   In the quarter ended June 30, 1998, the company booked a provision for returns of $1.8 million on gross sales of $35.6 million (sales of $4.1 million for direct response and $31.5 million for commercial accounts). Adams Golf applied the same return rate estimates in this quarter, with the exception that the commercial accounts provision for return rate was increased to 4% for the months of April and May and was increased to 4.5% for the month of June.  The closing reserve balance increased to $0.9 million.

38.   According to KPMG's annual audit work papers for the year ended December 31, 1998, Adams Golf began to note an increasing sales return trend starting in the third quarter of that year.[12] KPMG made inquiries of Adams Golf's management. Adams Golf's management indicated that the increased rate of returns resulted from the use of an outbound call third-party provider. Adams Golf had begun testing new approaches to expand its direct response sales and utilized Telegolf to service its direct response accounts. Adams Golf determined that Telegolf's performance was unsatisfactory, attributed to a lack of knowledge of the sport and the company's products. Telegolf's performance resulted in increased return rates for Adams Golf's products.  In response to rising returns, the company increased its return estimate for direct sales from 12% to 30% beginning in July and Adams Golf took over Telegolf's duties in September of 1998.

39.   An estimate of 4.5% of returns was applied throughout the third quarter to commercial account sales and an estimate of 30% was applied for direct response sales throughout the third quarter. The resulting sales return provision for the quarter ended September 30, 1998 was $1.7

---

[10] A schedule analyzing gross sales, provision for returns, and net sales is at Exhibit 4.
[11] KPMG 2351.
[12] This trend was briefly noted by KPMG as part of its 3rd quarter review (KPMG 2223), but the matter was more fully documented in the year end work papers.

million on gross sales of $24.7 million (sales of $2.6 million for direct response sales and $22.1 million for commercial accounts) for the quarter. The closing reserve balance decreased to $0.8 million.

40.   In the fourth quarter, as the effect of Telegolf phased out, the direct response sales return estimate was adjusted from 30% in October, to 25% in November, and 22% in December. The return estimate for commercial accounts was 5.5% for the months of October and November and 6% in December.

41.   As part of the audit for the year ended December 31, 1998, KPMG concluded that Adams Golf had been too conservative in estimating its sales return reserve. Based on the over-accrual identified by KPMG, Adams Golf booked an adjusting entry to reduce its sales return accrual by $192,000, from $692,000 to $500,000. [13]   In their year end audit for 1998, KPMG documented in its work papers that Adams Golf's sales return reserve balance as adjusted was reasonable as of December 31, 1998. [14]

## Adams Golf Sales Methods

42.   Plaintiffs allege that Adams Golf engaged in questionable sales practices such as "double shipping, selling on consignment or with unlimited rights of return…" [15] I have examined deposition testimony and various documents produced in this matter regarding these allegations.

43.   The source of these allegations appears largely to stem from a memo from Adams Golf's then CEO and President Barney Adams dated August 14, 1998. [16]   That memo describes Mr. Adams' concerns regarding the operation of the Inside Sales group.  Among other things, the memo notes "[the Inside Sales staff] know cheating (at least in the form of double shipments) occurs and are concerned that such action is quietly endorsed" and that "Apparently, we've made a lot of sales that have been falsely reported (as sales) and are little more than consignments." The document further states "[c]heck July returns and tell me what they'll be during the rest of the year." However, Mr. Adams himself largely recants these comments and joins other members of Adams Golf management in denying that these issues were taking place.

44.   Mr. Adams' deposition testimony offers some context to these comments.  Asked by Plaintiffs' counsel why he wrote the memo, Mr. Adams responded:

> "I had a – I had expectations for the sales group: Morale, efficiency, and in a personal visit, I did not encounter that.  I encountered an environment that I didn't care for.
>
>      And as I said my normal, occasionally volatile way of handling things, I came up with this guilty-until-proven-innocent approach." [17]

Mr. Adams testified that the tone and content of the document was his way of motivating his sales management rather than documentation of any specific findings within the department.

---

[13] *See* KPMG 502-504 (Sales Return Testing), KPMG 2057-2058 (12/31/98 Trial Balance)
[14] KPMG 0502-0503, Sales Returns Reserve testing.
[15] Second Consolidated and Amended Class Action Complaint at ¶71.
[16] Adams 028451-028452.
[17] Deposition of Barney Adams (June 22, 2006) at p. 139.

45.   The memo raises the possibility of consignment sales. Asked about that portion of the memo, Mr. Adams states "…the word consignment is my word. My interpretation and I don't know if anybody in the department ever brought up the word 'consignment.'" [18]  Jay Greaney, one of Adams Golf's sales people, testified "I never sold clubs on consignment." [19]  He further testified that any practice of consignment sales predated the IPO stating "…that was really early on in the company, when there was really not enough demand for anyone to even accept the product in their store." [20]  Mark Gonsalves, Adams Golf Vice-President of Sales, also denied Mr. Adams' characterization testifying that while the company had participated in some limited consignment sales prior to the company's product infomercial in 1997, they were not occurring at the time of the IPO. [21]

46.   This testimony is supported by a March 28, 1998 memo written by Mr. Gonsalves and addressed to Dick Murtland. This memo describes Adams Golf declining a significant sale on the grounds that the customer was demanding a consignment agreement. Mr. Gonsalves writes:

> "…Dunham's had a solid order with us, but at the last minute, through [sic] us a curve ball by requiring us to sign a consignment agreement…[w]e as a sales department, stepped up and said no way. Dick, that's good stuff on our part, not bad. Again, we put the company first." [22]

47.   Chip Brewer replaced Mr. Gonsalves as VP of Sales in September 1998. With respect to the possibility of consignment sales raised by Mr. Adams' memo, Mr. Brewer testified:

> Q.    …Do you concur that a lot of sales had been falsely reported as sales and were, in fact, little more than consignment at that time?
>
> A.    No. I would – from the facts I've seen, I would disagree with that.
>
> Q.    So in your opinion that particular paragraph is wholly inaccurate in this exhibit, or –
>
> A.    In my opinion, that paragraph is – inaccurate. [23]

48.   Specific allegations of double shipping appear to center around a single sales person, Jay Greaney, who denied the allegations. In fact, what is described as double shipping, Mr. Greaney describes as prebooking or preordering. [24]  According to Mr. Greaney, due to the high demand for Adams Golf clubs prior to the IPO, the company would encourage customers to book future orders of specific quantities to be entered and shipped on particular dates. [25]  These orders were in writing and were referred to by the company as the guaranteed delivery. [26]  He indicated that this process was done with the consent of the customers and was intended to guarantee the customers delivery of product which was in demand.

---

[18] Deposition of Barney Adams (June 22, 2006) at p. 149.
[19] Deposition of Jay Greaney (May 18, 2006) at p. 97.
[20] Deposition of Jay Greaney (May 18, 2006) at p. 93.
[21] Deposition of Mark Gonsalves (June 6, 2006) at p. 140.
[22] ADAMS 007805
[23] Deposition of Chip Brewer (May 2, 2006) at p. 85.
[24] Deposition of Jay Greaney (May 18, 2006) at pp. 13-14, 67-69.
[25] Deposition of Jay Greaney (May 18, 2006) at pp. 13-14, 97-99.
[26] Deposition of Jay Greaney (May 18, 2006) at pp. 13-14.

49.  Mr. Greaney testified that incidents of so called "double shipping" were attributable to "system errors and some lack of demand for the product."[27]

50.  A transaction that may have been termed a "double shipment" was actually Adams Golf following its practice of allowing for a few of its commercial account customers to return clubs on a case-by-case basis. Mr. Greaney testified:

> "As demand for the product waned, a lot of customers would say: I didn't order the product. Or there were times when a prebook order was shipped, and the customer hadn't sold through their original order, so they refused an order --- in that instance, it was considered a double shipment."[28]

51.  Mr. Greaney's personnel file contains a letter from one of his customer accounts, Hoby Golf, which claims that Adams Golf shipped a number of clubs without authorization and charged his credit card for the balance due.[29] The letter claims that Adams Golf had shipped an order to the customer which was "supposed to be shipped over a course of time" and billed it to the customer's credit card. However, Mr. Greaney attributed the issue to a possible "system problem."[30]

52.  Mr. Greaney's testimony, as well as the documents in his personnel file, does not demonstrate that "double shipping" or "system problem" incidents were widespread. Although Mr. Greaney was confronted about certain of his sales practices by Mr. Brewer, which was shortly followed by Mr. Greaney resigning his position, no final determination was made regarding the allegations.[31]

53.  Darl Hatfield was a former KPMG audit partner and CFO of Adams at the time of the IPO. With respect to sales returns, Mr. Hatfield testified:

> Q  ...So do you agree with Barney's statement in this memo that there appear to have been what amounted to consignment sales as falsely booked?
>
> A.  No, that's not my opinion.
>
> Q  Okay. Did you conduct any independent research on this matter on your own?
>
> A  The only thing that we did from an accounting standpoint is make sure that we had adequate reserves for returns. And again, we – we determined that based on historical results.
>
> Q  Right.
>
> A  And made estimates. Each time we recorded sales during the month, we would make an estimate of the returns. And it was without looking at whatever the cause of the return was.[32]

[27] Deposition of Jay Greaney (May 18, 2006) at pp. 67-69.
[28] Deposition of Jay Greaney (May 18, 2006) at pp. 74-75.
[29] ADAMS 046813
[30] ADAMS 046813
[31] ADAMS 046814
[32] Deposition of Darl Hatfield (June 8, 2006) at pp. 67-68 (emphasis added).

54.   It should also be noted that KPMG sent accounts receivable confirmations directly to a selection of Adams Golf customers as part of its December 31, 1998 year end audit procedures.[33] These confirmations indicate the balance due shown on the company's records and provide an opportunity for customers to object to the amounts owed.  As a practical matter, such confirmations are also a chance for customers to air their complaints about the company.  The customer confirmations included in KPMG's 1998 work papers contain no evidence which would indicate double shipping, consignment sales or other questionable sales practices.

55.   The available documents[34] and testimony do not demonstrate that Adams Golf was engaged in any widespread practice of double shipping or in any consignment sales or sales with unlimited rights of return.

56.   I have not seen any evidence that specifically describes the details of any such transactions, identifies the parties involved, quantifies how significant in size the transactions were, or allows for any examination of the impact that such transactions, if they did occur, would have had on the financial reports and disclosures of Adams Golf.

57.   Had sales practices resulting in high returns regularly occurred at Adams Golf, the estimates determining the returns expense and reserves balances at the end of the accounting periods would have been prepared on the basis of returns experienced.  Had there been an isolated, material event of over-shipment and high returns, I would have expected a significant fluctuation in the provision for sales returns. Instead, I note a fairly steady increase in such provisions from the first quarter to the fourth quarter of 1998, as a percentage of gross sales, consistent with the testimony and periodic disclosures made by Adams Golf that I have read regarding an industry-wide slowdown during 1998.

**"Net-Down" Program**

58.   Plaintiffs allege that "it was probable that the Company would incur loss by double shipping, entering into what amounted to consignment arrangements, and underreserving for returns." [35]  Plaintiffs cite Adams Golf's $4.3 million charge taken in the fourth quarter of 1998 as supporting this position. [36]

59.   In the fourth quarter of 1998, management approved the Tight Lies Retail Partner Unconditional Floor Stock "Net Down" Program. [37]  This program was described as a price/margin protection program and was designed to protect Adams Golf's customer relationships in light of a change in the company's pricing structure at the introduction of its new line of Tight Lies products.[38]

60.   This program, which was a discretionary promotional program decided on by management at the end of 1998, granted an unconditional $25 per club credit for certain products still in select Adams Golf retailers' inventory as of January 4, 1999.  The credit was available in the form of

---

[33] KPMG 2110-2178
[34] KPMG 046794-46818
[35] Second Consolidated and Amended Class Action Complaint at ¶90.
[36] Second Consolidated and Amended Class Action Complaint at ¶90.
[37] KPMG 2100-2107
[38] KPMG 2100-2107

credit against future orders, offset to outstanding account balance, or in some cases a cash refund.[39] Adams Golf recorded its estimated liability for the Net Down program at $4.3 million and correspondingly reduced sales revenue in the fourth quarter of 1998.

61.    According to a memo written by KPMG to the December 31, 1998 audit file, the Net Down program was in "response to competitive pressures that existed during the latter half of 1998 and to establish a price distinction between the original Tight Lies product line and the new Tight Lies product line to be introduced in 1999."[40]

62.    As the Net Down program was a fourth quarter 1998 management decision related to the introduction of a new product line in 1999, this transaction is unrelated to either the provisions for sales returns in earlier quarters of 1998 or the Plaintiffs' allegations regarding double shipping, consignment sales or other questionable sales practices.

***********

63.    I may amend this report should additional documents or information become available. Should counsel request, I may create some demonstrative exhibits from the data and GAAP referred to in this report for testimony purposes.


_Ed J. Lynch_

Ed J. Lynch, CPA
Partner, Deloitte Financial Advisory Services LLP

Dated:    _July 14, 2006_

---

[39] KPMG 2100-2107
[40] KPMG 2103

# EXHIBIT
# C

# EXHIBIT
# C

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4    IN RE:  ADAMS GOLF, INC.   :    CONSOLIDATED

5    SECURITIES LITIGATION      :    C.A. NO. 99-371 KAJ

6    _____X

7

8           ORAL DEPOSITION OF ED J. LYNCH, CPA

9                Tuesday, August 1, 2006

10

11           The oral deposition of ED J. LYNCH, CPA,

12    was held at the law offices of Akin Gump Strauss

13    Hauer & Feld, LLP, 1700 Pacific Avenue, Suite

14    4100, Dallas, Texas, from 9:37 a.m. to 12:41 p.m.,

15    before Jamie K. Israelow, a Certified Shorthand

16    Reporter in and for the State of Texas, Registered

17    Professional Reporter, Certified Realtime

18    Reporter, and Certified LiveNote Reporter.

19

20

21           RSA/VERITEXT COURT REPORTING COMPANY

22              1845 Walnut Street, 15th Floor

23                Philadelphia, PA   19103

24              (215)241-1000     (888)777-6690

Page 14

1  those.
2      Q      Did you ask to see --
3      A      No.
4      Q      -- either invoices or any type of
5  sale contract?
6      A      Excuse me for cutting you off.
7  No, I did not.
8      Q      Moving on to Paragraph 19. I'll read
9  them for the record because they're short, and it
10  makes it easier to read the deposition later.
11             I have not seen any evidence
12  contrary to the customer's obligation to pay for
13  them pursuant to the customary business terms or
14  that any contingency or prerequisite existed that
15  the products be resold before the customer was
16  obligated to pay Adams Golf for the goods.
17             The same question: Did you
18  perform any independent review of evidence in an
19  effort to find out if any of those circumstances
20  existed?
21      A      I looked at a number of things to --
22  as a basis to make this statement. The things
23  that occur to me as I sit here are the
24  confirmations that were sent to the customers

Page 15

1  confirming their accounts receivable.
2             I read a number of the
3  depositions, particularly those that were of the
4  salespeople that were deposed, that I know that
5  were deposed, and I believe those people are
6  included earlier in my report. The ones that
7  occurred to me as I sit here are Mr. Gonsalves --
8  if I say his name right.
9      Q      Right.
10      A      In fact all these names, I may not
11  know the pronunciation. I just read about them.
12             Mr. Greaney. Ms. Brooks.
13  There may have been one or two others.
14  Mr. Brewer, I think, and then of course, Mr. Adams
15  had some things about the sales department in his
16  deposition.
17             And then I did have a
18  conversation with the former CFO -- Mr. Hatfield,
19  I believe is his name -- where I asked about how
20  the allowance for sales returns was done.
21             Those are the things that
22  occur to me in answer to your question.
23      Q      Did you interview anyone other than
24  Mr. Hatfield when preparing your report, Exhibit

Page 16

1  302?
2      A      No.
3      Q      Moving ahead to Paragraph 25, quote:
4  As described above, Adams Golf disclosed that it
5  had a 90-day "no questions asked" return policy on
6  its products. In fact, the 90-day "no questions
7  asked" return policy did not apply to all sales,
8  but rather only direct response sales. All other
9  sales were made without a right of return. The
10  company did, however, accept nondirect response
11  sales returns on a case-by-case basis, but only as
12  an accommodation to maintain a customer
13  relationship and only after that customer had been
14  approved for the return.
15             Do you know what percent of
16  Tight Lies sales were direct response as opposed
17  to nondirect response, I guess, retail, or
18  whatever the proper term would be?
19             MR. BESSETTE:  What point in
20  time?
21      Q      (By Mr. Mara) 1990 -- first two
22  quarters of '98.
23      A      I believe those facts are laid out in
24  Paragraphs 28 and -- not 28. Wrong paragraph.

Page 17

1  It's a later paragraph. It's the next page,
2  Page 7 of my report. You were asking about the
3  quarter ended March 31, '98?
4      Q      Yeah, or even the first two quarters
5  of '98. But sure, the first quarter of '98.
6      A      The first quarter of '98 is in
7  Paragraph 36.
8      Q      I see. Okay.
9      A      3.6 million compared to 22 million.
10  3.6 million were direct sales, 22 million were
11  from commercial accounts is how we've looked at
12  the data presented in the KPMG work papers.
13      Q      Okay.
14      A      And then subsequent paragraphs
15  outline the same numbers for other quarters.
16      Q      Thank you. Yeah, I see that.
17             You said: All other sales
18  were made without a right of return.
19             And again, the source of your
20  information for that simple statement is?
21      A      My recollection, as I sit here, is
22  that it was in the KPMG work papers that I saw
23  that, and I believe I discussed that with
24  Mr. Hatfield, too, in my interview of

Page 18

1    Mr. Hatfield, the former CFO.
2        Q    So I know in the paragraph you go on
3    to discuss a case-by-case basis where some returns
4    were permitted, so it's your statement that except
5    for those few instances, it was a blanket policy
6    across the board at Adams Golf that there was no
7    right of return on clubs in retail sales, what I'm
8    calling retail sales, which means nondirect
9    response?
10        A    Okay. I think I understand. I -- I
11    think I've referred to them as commercial, but --
12        Q    That's fine, too.
13        A    -- if you want to call them retail,
14    that's fine.
15        Q    Commercial.
16        A    And I'm sorry. I got hung up on the
17    difference in retail and commercial, and I lost
18    the gist of your question.
19        Q    For commercial sales, Adams Golf had
20    a blanket policy of no right of return? I know
21    you say there were exceptions and we'll talk about
22    those, but other than those exceptions which
23    you've carved out in this paragraph, commercial
24    sales, no right of return?

Page 19

1        A    I believe the documentation that we
2    saw in looking at what was available to us had
3    stated that there was not a right of return, but
4    there was a practice of return. And so what I was
5    trying to document here was what the policy was
6    and what the practice was, because accounting
7    looks at both.
8            And under generally accepted
9    accounting principles, if a company has a practice
10    allowing returns, whether or not they have a
11    policy, one should accrue for an estimated sales
12    return based on a pattern and practice, as well as
13    a policy. So you really have to look at both from
14    an accounting perspective.
15        Q    So again, did you go back to any
16    original documents or source documents when you
17    were making the statement that there was a policy
18    of no right of return? Do you want me to define
19    "original or source"?
20        A    No. I understand original and source
21    documents.
22            You know, I don't recall doing
23    that because we had a seen a practice. So
24    that's -- that's my recollection is I don't recall

Page 20

1    going back to the purchase order or to the sales
2    invoice, which I would consider the original
3    documents, or a sales contract, any of those
4    things, looking for that policy. I accepted the
5    evidence that I had seen that said there was no
6    right, rather than going back to the underlying
7    documents.
8        Q    So then, speaking as a layman,
9    when -- I'm trying to summarize. When you
10    identify a practice of return as an accountant or
11    auditor, the policy of the -- the written policy
12    concerning returns becomes less relevant?
13            MR. BESSETTE: I'm going to
14    object as vague and ambiguous.
15            MR. MARA: That's a good
16    objection.
17        A    The -- do you want me to answer it?
18        Q    (By Mr. Mara) Yeah.
19        A    The -- I think both facts can be
20    relevant. I think to me, as an accountant, it is
21    more relevant what is actually happening because
22    it's indicative of a pattern of practice that the
23    accounting literature would call for me, as an
24    accountant, to make allowance for.

Page 21

1        Q    Do you know what particular provision
2    of the accounting literature would address that
3    situation?
4        A    My recollection is that FAS 48,
5    F-A-S 48, would be the basis for making an accrual
6    for any kind of sales return, that which is
7    written or that which is unwritten.
8        Q    Is it common for a company to have a
9    written policy of no right of return but a
10    practice of right of return?
11        A    I don't know that I've ever done a
12    study of determining whether it's common or not.
13    I've seen it before, but I -- I'm not sure my
14    anecdotal seeing it in practice would necessarily
15    lead me to say that it's a common practice. I've
16    seen that kind of practice before.
17        Q    How often?
18        A    Well, as I sit here and think about
19    it, sometimes I'd say, just from a -- 12 years at
20    devoting all of my attention to auditing, I'd seen
21    it a number of times where the formal policies of
22    the company had not caught up to the practices of
23    the company in a -- as it relates to sales
24    returns.

6 (Pages 18 to 21)

Page 22

1    Q    Was it the formal policy of Adams
2  Golf to have no right of return on commercial
3  sales at the beginning of 1998?
4    A    I believe -- I believe maybe I
5  shouldn't say it was their formal policy of no
6  return. I think I should say that they did not
7  have a policy that allowed for returns on
8  commercial sales, so that, you know, there's a
9  slight difference in what I'm saying from your
10  question to what my answer is, because I would not
11  have expected, in looking at the underlying
12  documents, to see no return allowed, so that would
13  be a formal policy of no return.
14    Q    Yeah.
15    A    I would have expected not to see any
16  provisions allowing return.
17    Q    So -- but isn't it the same thing?
18  If you're saying -- so I guess what you're saying
19  is that instead of an affirmative statement
20  telling a retailer or a commercial account that
21  they couldn't return clubs, was it Adams' policy
22  just to be silent on the issue?
23    A    I -- I think the sentence I wrote was
24  purposeful here that said: All other sales were

Page 23

1  made without a right of return.
2    Q    Uh-huh.
3    A    What I intended to convey there was
4  not that I had gone and seen that there was no
5  return allowed, but that there was no provision
6  allowing a return or no return that -- that I
7  guess, in answer to your question, I expect if I
8  went back to the source documents it would be
9  silent, which is what I was trying to convey by
10  that sentence there.
11    Q    But isn't that silence different than
12  saying that -- all other sales were made without a
13  right of return. I submit that in reading that
14  sentence that means there was no right of return.
15    A    And -- and what I intended by that
16  sentence was "specified." I mean, there was no
17  right of return specified is what I think the
18  underlying documents will show.
19        But like I said, I haven't
20  looked at the underlying documents, so I am
21  speculating a bit here, but that's what I think.
22  That's what I was trying to convey by that
23  sentence.
24    Q    So then, sitting here, you don't know

Page 24

1  if there was a right of return or there was not a
2  right of return?
3        MR. BESSETTE: Objection. I
4  think that misstates the testimony and the report.
5    A    What I'm saying is I believe there
6  was no right of return, and there was a practice
7  that allowed returns that was contrary to that no
8  right of return.
9    Q    (By Mr. Mara) Is that an accepted
10  practice -- strike that.
11        You testified that as an
12  accountant and auditor you had encountered this
13  practice previously on a handful of occasions.
14        MR. BESSETTE: Well --
15    Q    (By Mr. Mara) Correct me if I'm
16  wrong. On some number of occasions.
17        MR. BESSETTE: Let me just
18  object. I'm sorry. "This practice." I think
19  that's different than what you're just talking
20  about.
21        MR. MARA: Okay. I'll define.
22    Q    (By Mr. Mara) By that I meant the
23  policy, whether written or unwritten, of no right
24  of return, but a practice of returns is what I'm

Page 25

1  talking about when I say "this practice."
2        And you testified -- correct
3  me if I'm wrong -- that you had encountered this
4  on some number of occasions in your career prior
5  to your analysis of Adams Golf?
6    A    Yes, I think you're right.
7    Q    Is that -- from an accounting and
8  auditing perspective, is that considered proper
9  business practices?
10        MR. BESSETTE: I'm going to
11  object as vague.
12    A    The term "proper business practices"
13  is not something that generally accepted --
14    Q    (By Mr. Mara) Fair enough.
15    A    -- accounting practices nor generally
16  accepted auditing standards I think would really
17  address. It's not really a term of art.
18    Q    Understood. It was an inartful
19  question.
20        Is it considered proper under
21  GAAP and GAAS?
22    A    And now we're talking about is
23  what considered --
24    Q    The practice of having either a

Page 30

1 and practice, including a summary document of
2 returns that was done at least quarterly, and some
3 done monthly by the company. It was a summary
4 document that summarized all of those returns for
5 that period of time.
6       Q       This practice of returns, as we've
7 been discussing it this morning, it was an
8 unwritten case-by-case practice, correct?
9       A       I think it was unwritten. It could
10 have been written somewhere in the company. I've
11 not seen any evidence it was written in the
12 company, but I think it was unwritten, and it was
13 a -- a practice that was at the company and
14 consistent with what I've seen at other companies
15 in the 29 years I've been doing accounting.
16       Q       Is there any guideline that I or
17 someone else could turn to to see how Adams Golf
18 made a decision concerning returns on this
19 case-by-case basis?
20       A       I have not seen a written guideline.
21       Q       Did you interview anyone who told you
22 what the subjective standard was, what that
23 someone at Adams Golf would apply when considering
24 whether to accept a return or not?

Page 31

1       A       I did not interview anybody that told
2 me how a return was accepted beyond asking
3 Mr. Hatfield, the CFO -- I believe I asked him
4 about how a -- a return was authorized at the
5 company. I believe he relayed to me that for a
6 customer to return a good, a commercial customer
7 to return a -- any goods back to the company, they
8 had to call and get a return authorization number.
9 But I believe I have not seen a particular
10 document that reflected that practice.
11       Q       Were there exceptions to the
12 requirement that a customer apply for a return
13 approval?
14       A       I don't know.
15       Q       So then isn't the process of allowing
16 a customer to apply for a return approval a right
17 of return?
18       A       To an accountant, it's a practice of
19 return rather than a right of return, but that's
20 just my accounting sense of what it means to me.
21       Q       So if I'm a retailer in Maine and I'm
22 experienced in the golf industry and I'm
23 experienced with Adams Golf, I know, and assuming
24 I know if I order 50 Tight Lies, I can apply to

Page 32

1 return some number of those?
2       MR. BESSETTE: I think it
3 calls for speculation.
4       MR. MARA: He's an expert.
5       Q       (By Mr. Mara) But doesn't that
6 contradict your sentence, then, that all other
7 sales were made without a right of return? I
8 think it does.
9       A       I don't think it does because I think
10 very few, a very small percentage of commercial
11 sales got returned.
12       Q       3 to 5 percent? Is that the --
13       A       In the time period you asked me about
14 earlier, that's what it had been.
15       Q       And just based on your experience, 3
16 to 5 percent is -- you consider to be an
17 insignificant amount?
18       MR. BESSETTE: Well, that
19 misstates --
20       Q       (By Mr. Mara) Yeah. I'm not trying
21 to put words in your -- very few, a few? You
22 know.
23       A       Well, 3 to 5 percent means 95 to
24 97 percent are not returning, so --

Page 33

1       Q       But that's not --
2       A       That's --
3       Q       Respectfully, that's not really
4 answering.
5       Is 3 to 5 percent in these
6 circumstances, is that considered -- would you
7 consider that, based on your experience, a
8 significant number of returns, however you define
9 the term "significant"? I'm -- I'm asking you.
10       A       Well, it's not an inconsequential
11 number, and as an accountant, I would want to
12 account for those returns. So the mere fact that
13 I would want to account for it would give me pause
14 to say that it was totally insignificant. But
15 applying FAS 48, I think I would want to account
16 for any returns.
17       So even if there was 1 percent
18 returns, I would want the company to account for
19 them if I were their accountant or their auditor.
20       Q       Does it trouble you in any way as an
21 auditor -- well, 3 to 5 percent is a number of
22 some consequence, however you would define
23 "consequence." I understand that.
24       Does it trouble you, based on

Page 90

1    A    Well, it was June 22, 2006.
2    Q    Okay. Your report, correct me if I'm
3  wrong, discounts the memo in favor of deposition
4  testimony?
5    A    In favor of deposition testimony and
6  the other facts that I've seen, yes, sir.
7    Q    Okay. But one of the reasons you
8  discount the memo is deposition testimony?
9    A    Yes. That's one of the reasons.
10    Q    Okay. And we can agree that that
11  deposition testimony is almost eight years removed
12  from the writing of the memo?
13    A    Almost.
14    Q    Okay. And we can agree that the
15  deposition testimony took place after Mr. Adams
16  consulted with counsel? Did you read that in the
17  deposition?
18    A    I don't recall that specifically, but
19  it wouldn't surprise me.
20    Q    Okay. Now, in reading the
21  August 14th, 1998 memo, which I do not have in the
22  room, but you'll recall there is a sentence in the
23  memo where Barney Adams, after reciting what he
24  considers to be problems in the inside sales

Page 91

1  group, states that he has researched these
2  problems enough to know that they're true.
3    Do you recall that sentence in
4  the August 14th memo?
5    A    I don't as I sit here, but -- I just
6  don't have a recollection of that.
7    Q    Well, assuming that Barney Adams said
8  that, did -- does that mean Barney Adams was being
9  untruthful on August 14th of 1998 or untruthful at
10  his deposition?
11    MR. BESSETTE: Objection,
12  misstates the record.
13    MR. McEVOY: Same objection.
14    A    I don't know.
15    Q    (By Mr. Mara) Here's an obvious
16  question I'll ask for the record: You were not
17  present at any of these depositions, whether it
18  was Barney Adams or Mark Gonsalves or Chip Brewer
19  or Jay Greaney?
20    A    No, I was not.
21    Q    Did you interview any of the
22  deponents whose testimony you read?
23    A    Yes. Mr. Hatfield.
24    Q    Okay. I'm sorry. Beyond

Page 92

1  Mr. Hatfield?
2    A    No.
3    Q    Specifically looking at Paragraph 52,
4  for the record, Mr. Greaney's testimony, as well
5  as the documents in his personnel file, does not
6  demonstrate that "double shipping" or "system
7  problems" incidents were widespread.
8    Although Mr. Greaney was
9  confronted about certain of his sales practices by
10  Mr. Brewer, which was shortly followed by
11  Mr. Greaney resigning his position, no final
12  determination was made regarding the allegations?
13    Did you review Chip Brewer's
14  deposition testimony?
15    A    Yes.
16    Q    Are you aware that in Mr. Brewer's
17  deposition he testifies that Jay Greaney was fired
18  for double shipping?
19    MR. BESSETTE: Objection.
20  That misstates the record.
21    MR. MARA: It's --
22    MR. BESSETTE: I looked at it
23  yesterday. I know that misstates the record.
24    MR. MARA: And you were there.

Page 93

1    MR. BESSETTE: And I was
2  there.
3    MR. MARA: And I have the
4  deposition transcript, so I don't need to -- I
5  don't want to misrepresent.
6    MR. BESSETTE: Okay.
7    MR. MARA: Oh, my
8  sophisticated filing system.
9    MR. BESSETTE: I think it's on
10  Page 23 or 22.
11    MR. MARA: But it goes beyond
12  that, back to Page 82.
13    Q    (By Mr. Mara) Okay. And counsel
14  will recall a significant -- this is not a
15  question. That's a statement so I won't make it.
16    You read the entire transcript
17  of the Chip Brewer testimony?
18    A    I think so. I may have only read
19  highlighted pieces of the deposition. I just
20  don't remember on Mr. Brewer whether I read the
21  whole thing or highlighted pieces.
22    Q    Okay. And -- and who highlighted
23  testimony for you?
24    A    Mr. Chris Meadors, who worked with me

24 (Pages 90 to 93)

Page 106

1  confirmations you looked at generally?
2      A    I would guesstimate 15 to 20, maybe
3  15 to 25.
4      Q    How many confirmations were made
5  available to you?
6      A    I think 15 to 25. I looked at all
7  the confirmations that existed in the KPMG work
8  papers in 1998.
9          MR. MARA:  Just a moment as
10 I --
11     Q    (By Mr. Mara)  The final issue in
12 your report is this net down program.
13     A    Yes.
14     Q    What did you understand that program
15 to be?
16     A    Well, the -- the program was
17 described in the KPMG work papers and in a memo,
18 think, by the company that was included in the
19 KPMG work papers as a -- a program that was
20 designed to protect Adams Golf's customer
21 relationships in light of the change of the
22 company's pricing structure at the introduction of
23 the new line of Tight Lies golf products.
24          So I have -- really, the basis

Page 107

1  of my understanding of that program is from the
2  KPMG work papers, primarily.
3      Q    Did you speak with Darl Hatfield or
4  anyone else at the company about the net down
5  program?
6      A    I didn't -- I did not speak with
7  anybody other than Mr. Hatfield. And I'm trying
8  to remember, I don't recall if I spoke to
9  Mr. Hatfield or not about the net down program. I
10 just don't recall whether we talked about the net
11 down program.
12     Q    Does the net down program, as it's
13 been defined here and as it was carried out, does
14 that affect in any way the notion of a fixed price
15 as it's used in FAS 48, that the product is
16 offered according to a fixed price or whatever the
17 language is?
18     A    I don't think that it particularly
19 negates the fixed price, although it is an offer
20 of a -- in essence, a return of some monies to
21 those who held those clubs at December 31, 1998.
22     Q    So to use a clumsy term, in your
23 opinion, it doesn't unfix the wholesale price?
24     A    I believe that's the case, yes, sir.

Page 108

1      Q    It does not impact the wholesale
2  price is your testimony?
3      A    I didn't say "doesn't impact." I
4  said: It doesn't unfix a price that was
5  determined some months prior.
6      Q    Okay. So in other words -- and I'm
7  trying to understand -- the net down program has
8  impact on returns?
9      A    Well, the net down program was
10 accounted for as a decrease to sales when the net
11 down program was implemented, which was effective
12 12/31/1998 for the program which was actually
13 announced January 1999 before the issuance of the
14 financial statements for the 12/31/98 period.
15     Q    So if I -- if I'm a retailer and I
16 buy a club for 100 bucks wholesale, and you say as
17 part of the net down program I'm going to get $25
18 back, that doesn't change that wholesale price?
19     A    It did not change the original
20 wholesale price. What it was a promotional
21 item, as I understand it, that was not changing
22 the original price, but making an offer to those
23 who held the clubs that were being, in essence,
24 superseded by new club offerings.

Page 109

1          So there was an activity
2  occurring at a future time from when the sale had
3  occurred that was given accounting treatment when
4  the activity occurred, which was the end of 1998.
5      Q    To the best of your knowledge, that
6  net down program was a one-time event in the
7  history of Adams Golf, as far as you studied it?
8      A    I have not seen any other programs
9  like it, but I did not look outside the window of
10 '97 to '99.
11     Q    What is the impact of the net down
12 program on the historical track for of Adams Golf
13 being able to estimate returns?
14     A    I don't think that the net down
15 program intersects with the returns, because the
16 clubs were not returned.
17     Q    So then, if you were attempting to
18 estimate returns, the net down program would not
19 enter into your thinking?
20     A    I do not think it -- it would,
21 because it's an allowance outside of a sales
22 return. I think you look at sales returns and
23 allowances separately, and you allow for them
24 separately, and I generally would not cloud one

# EXHIBIT
# D

# EXHIBIT
# D

*Adams Golf*
*A/R Confirms Received*
*12/31/98*

L-20A
AB
1/99

 **ADAMS**

AGS, Inc.
Accounts Payable
2801 E 10th Street
Sioux Falls, SD  57103

December 15, 1998

Ladies and Gentlemen:

In connection with an audit of the financial statements of Adams Golf, Inc. as of December 31, 1998 and for the year then ended, our independent auditors wish to determine whether our records of your indebtedness to us at <u>November 30, 1998</u> agree with your records.  According to our records, your indebtedness to us on that date is an aggregate balance totaling:

      **Customer Balance:  $          123,483.12**

See attached document for a detailed list of invoices which comprise the total balance owed as of November 30, 1998.  This is neither a request for payment, nor an indication of your total indebtedness to us.

Please compare the above information to your records, complete the statement below, and send this letter directly to our independent auditors, KPMG Peat Marwick LLP, 200 Crescent Court, Suite 300, Dallas, Texas 75201, **attention: Dannette Boyd, Box #80.**  An addressed envelope is enclosed for your convenience.

Sincerely,

*Kayla Mitchell*

Kayla Mitchell
*Sr. Manager - Accounts Receivable*

---

KPMG  2112

Page 2

**◢ADAMS**

The information stated above is    ✓ correct.

( ) not correct.

(Please give details of differences, if any.)

Company  _Att. Ann_

Signature  _Sandy Mudloff_

Title  _Accounts Payable_

Date  _12-22-98_

2801 East Plano Parkway, Plano, Texas 75074 • www.adamsgolf.com
(972) 673-9000 • (800) 622-0609 • FAX: (972) 398-8818

KPMG  2113

12/14/1998
04:36:49

Aged Receivables Report By: Customer Name
Adams Golf, Ltd.
Summary Style, As of 11/30/1998
Include Future Trx? NO  Include Trx PIF? NO

Page 1

Beginning Customer Code:05498
Beginning Customer Code:40623
Beginning Customer Code:114431seq
Beginning Customer Code:101253seq

Ending Customer Code:05498
Ending Customer Code:40623
Ending Customer Code:114431seq
Ending Customer Code:101253seq

| APPLY-TO NUMBER | CURRENCY CODE | TRX TYPE | APPLY DATE | DOCUMENT NUMBER | DOCUMENT DATE | << ADDITIONAL RANGES >> | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | UNDER 30 DAYS | 31 - 60 DAYS | 61 - 90 DAYS | 91 - 120 DAYS | OVER 120 DAYS |

Customer: 05498
AGS Inc-Sioux Falls, SD
AGS, Inc
Accounts Payable
2801 E. 10th St

Sioux Falls, SD 57103

| APPLY-TO NUMBER | CURRENCY CODE | TRX TYPE | APPLY DATE | DOCUMENT NUMBER | DOCUMENT DATE | UNDER 30 DAYS | 31 - 60 DAYS | 61 - 90 DAYS | 91 - 120 DAYS | OVER 120 DAYS |
|---|---|---|---|---|---|---|---|---|---|---|
| ARINV10063517 | USD | INVOICE | 07/01/1998 | ARINV10063517 | 07/01/1998 | 0.00 US | 0.00 US | 0.00 US | 0.00 US | 113.25 US |
| ARINV10075901 | USD | INVOICE | 07/31/1998 | ARINV10075901 | 07/31/1998 | 0.00 US | 0.00 US | 0.00 US | 0.00 US | 68,207.30 US |
| ARINV10076137 | USD | INVOICE | 07/31/1998 | ARINV10076137 | 07/31/1998 | 0.00 US | 0.00 US | 0.00 US | 0.00 US | 86.74 US |
| ARINV10083004 | USD | INVOICE | 08/19/1998 | ARINV10083004 | 08/19/1998 | 0.00 US | 0.00 US | 0.00 US | 145.49 US | 0.00 US |
| ARINV10083073 | USD | INVOICE | 08/19/1998 | ARINV10083073 | 08/19/1998 | 0.00 US | 0.00 US | 0.00 US | 145.49 US | 0.00 US |
| ARINV10084197 | USD | INVOICE | 08/21/1998 | ARINV10084197 | 08/21/1998 | 0.00 US | 0.00 US | 0.00 US | 247.73 US | 0.00 US |
| ARINV10087588 | USD | INVOICE | 09/01/1998 | ARINV10087588 | 09/01/1998 | 0.00 US | 0.00 US | 145.49 US | 0.00 US | 0.00 US |
| ARINV10088135 | USD | INVOICE | 09/03/1998 | ARINV10088135 | 09/03/1998 | 0.00 US | 0.00 US | 145.49 US | 0.00 US | 0.00 US |
| ARINV10089700 | USD | INVOICE | 09/10/1998 | ARINV10089700 | 09/10/1998 | 0.00 US | 0.00 US | 145.38 US | 0.00 US | 0.00 US |
| ARINV10092686 | USD | INVOICE | 09/21/1998 | ARINV10092686 | 09/21/1998 | 0.00 US | 0.00 US | 145.49 US | 0.00 US | 0.00 US |
| ARINV10092533 | USD | INVOICE | 09/21/1998 | ARINV10092533 | 09/21/1998 | 0.00 US | 0.00 US | 6,264.85 US | 0.00 US | 0.00 US |
| ARINV10093021 | USD | INVOICE | 09/21/1998 | ARINV10093021 | 09/21/1998 | 0.00 US | 0.00 US | 284.73 US | 0.00 US | 0.00 US |
| ARINV10102677 | USD | INVOICE | 11/05/1998 | ARINV10102677 | 11/05/1998 | 145.49 US | 0.00 US | 49,292.50 US | 0.00 US | 0.00 US |
| ARINV10104624 | USD | INVOICE | 11/13/1998 | ARINV10104624 | 11/13/1998 | 695.00 US | 0.00 US | 0.00 US | 0.00 US | 0.00 US |
| CMACCT | USD | CACH | 07/29/1998 | CRDOC10016135 | 07/22/1998 | -2,155.00 US | 0.00 US | -241.00 US | -53.50 US | -278.00 US |

Customer AGS Inc-Sioux Falls, SD, Currency: USD Totals:

| | 123,483.12 US | -1,314.51 US | 0.00 US | 56,382.93 US | 485.21 US | 68,129.49 US |
|---|---|---|---|---|---|---|

KPMG  2114

# EXHIBIT
# E

# EXHIBIT
# E

**R. Magnusson   28Apr06**

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

———————————————————x

IN RE ADAMS GOLF, INC. .   Consolidated
.   C.A. No. 99-371 KAJ
SECURITIES LITIGATION .   Class Action
.   Jury Trial Demanded

———————————————————x

APRIL 28, 2006
9:00 O'CLOCK A.M.

The Deposition of RYAN MAGNUSSEN,
taken before Ernest Kuemmel, CSR(A), Examiner,
pursuant to Rules 203, 728, 204(1) of the Court of
Queen's Bench of Alberta at the offices of Michael
C. Dunkley, Calgary, Alberta, on the 28th day of
April, A.D. 2006.

———————————————————

---

**2**

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Elizabeth W. Fox, Ms.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania   19103

and

Elizabeth A. Leland, Ms.
Keller Rohrback LLP
1201 Third Avenue, Suite 3200
Seattle, Washington   98101-3052

FOR THE DEFENDANTS:
(With the exception of the underwriters)

Michelle A. Reed, Ms. and
Laura Moriaty, Ms.
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas   78701-3911

OFFICIAL COURT REPORTER:

DONNA GERBRANDT, CSR(A)

---

**3**

1      RYAN CURTIS MAGNUSSEN, sworn, examined
2  by Ms. Leland:
3        Q.   Good morning.
4        A.   Good morning.
5        Q.   Thank you for being here.
6        A.   You're welcome.
7        Q.   My name is Elizabeth Leland. I'm from
8  the law firm of Keller Rohrback in Seattle, and I'm
9  one of the attorneys for the plaintiffs in this
10 case. Could you state your name and your address
11 for the record, please?
12       A.   Ryan Curtis Magnussen. Address is
13 135 Woodmont Drive, Southwest, Calgary, Alberta.
14       Q.   Thank you. Now, briefly, without
15 divulging the details of any of our communications,
16 can you tell me how the documents bearing the
17 numbers MCK on the bottom came to be in the
18 plaintiff's attorney's possession?
19       A.   Vance Mackenzie and I had a meeting, I
20 believe -- well, management had a meeting and Vance
21 contacted the Seattle law firm, when we found out
22 that the lawsuit was going on, to offer up any
23 information that we had that might help them to,
24 you know, pursue the case, that helps the case.
25       Q.   And the Seattle law firm took all the

---

**4**

1  documents that were offered?
2        A.   Yeah. I believe it was you came up to
3  our office in Calgary, and I had all my staff
4  supply you with their files from Adams, which you
5  went through and chose whichever documents you
6  wanted.
7        Q.   And that was all the documents that were
8  offered; correct?
9        A.   Yeah.
10       Q.   Okay. Can you give me a brief
11 background of your work history before you became
12 affiliated with WDC Mackenzie?
13       A.   I started work with Sears Canada, and I
14 worked with them for six years. I left as a retail
15 sales manager and I joined a bank, Canada Trust. I
16 became a branch manager at 25, and did that for
17 another seven years. I was one of the top
18 managers. And I decided that, based on how I was
19 successful in business and saw what my customers
20 did, that if I went out and did my own business
21 that I could be successful as well. So that's
22 where we started WDC after that.
23       Q.   And in what year was WDC started?
24       A.   In 1992.
25       Q.   And can you give me a brief background

---

**R. Magnusson    28Apr06**

---

**29**

1    A.    Yes.

2        Q.    And can you briefly explain to me what's

3    happening between January '98 to June of '98?

4        A.    That's when the product was popular and

5    the infomercial had hit in the last part of '97 and

6    the spring of '98. And so those were the club

7    sales we were purchasing to then put out in the

8    Canadian market. And we — they also come from the

9    spring booking shows from the previous fall. We

10    were — you know, we booked the majority of that

11    business in the fall to be sent out in March, when

12    the clubs open.

13        Q.    Were the sales generally trending

14    upwards between January of '98 and June of '98?

15        A.    Yes.

16        MS. FOX:        You said "were the

17    sales".

18        Q.    MS. LELAND:        I'm sorry. Were

19    your purchases trending upward?

20        A.    Yeah.

21        Q.    And as a corollary, Adams sales of clubs

22    to WDC Mackenzie was trending upward during this

23    time?

24        A.    Yeah.

25        Q.    According to this chart, the numbers

---

**31**

1    me why — the reasons for the decrease in purchases

2    in July of 1998?

3        A.    We have enough inventory to carry us for

4    a while and — yeah. We were trending up and we

5    bought up to June. That's mid-season for golf in

6    Canada, to what you're going to be bringing in.

7        Q.    Did customers return clubs to you during

8    the summer of 1998?

9        A.    Yeah.

10        Q.    What did WDC Mackenzie do with those

11    clubs when they were returned?

12        A.    Oh, they would either go back into

13    inventory for resale or they would be put aside for

14    return to Adams if they had been used or damaged at

15    all.

16        Q.    If the clubs were returned to Adams —

17        A.    Like we've got too much. And in some of

18    these sales or purchases from Adams is overshipment

19    from Adams.

20        Q.    Oh, okay.

21        A.    And the stock levels are high. So I

22    don't — you know, that just shows the drop-off.

23    The reason for an order in August is fill in

24    numbers, the different SKUs.

25        Q.    Different SKUs meaning different types

---

**30**

1    seem to drop off during July of 1998; is that

2    correct?

3        A.    Hmm hmm.

4        Q.    Can you explain that?

5        A.    On this chart?

6        Q.    On this chart.

7        A.    We have enough product and we've ordered

8    enough product that we don't — the reckon is that

9    in June we don't need anymore probably for the next

10    period of time, so there's no purchase orders

11    issued, no purchasing done.

12        Q.    At that point was the gray market an

13    issue, in July of '98?

14        A.    Yeah.

15        Q.    At that point were customers beginning

16    to return clubs?

17        A.    Yeah.

18        Q.    Were customers beginning to cancel

19    orders?

20        A.    Yes.

21        Q.    Did those numbers contribute to the

22    decrease in purchases in —

23        MS. REED:        Objection, form.

24        MS. MORIATY:        Objection.

25        Q.    MS. LELAND:        Could you explain to

---

**32**

1    of clubs?

2        A.    No, the stores have ordered the seven

3    wood or the nine wood, the left-hand regular or

4    right-hand stiff. You know, there's hundreds of

5    different clubs for one club. And to fill in a

6    customer's request, we had to place an order in

7    August.

8        Q.    Okay. You mentioned, I believe,

9    something to the effect of overshipment from Adams?

10        A.    They would —

11        Q.    Yes or no?

12        A.    We had one double shipment and —

13        Q.    When did that —

14        A.    Approximately May — early in the

15    spring.

16        Q.    Can you explain to me what you mean by

17    double shipment?

18        A.    They shipped the PO once and then they

19    shipped it again.

20        Q.    Once you received the second shipment,

21    what did you do with those clubs?

22        A.    We hung on to them.

23        Q.    You didn't send them back?

24        A.    No. Sales at that time were very brisk

25    so we wouldn't want to send them back.

---