# EXHIBIT
# F

# EXHIBIT
# F

**Rebuttal to Expert Report of Christiana Ochoa**
**H. Stephen Grace, Jr., Ph.D.**

## I.    SCOPE OF REBUTTAL REPORT

Counsel for Adams Golf, Inc. and the Individual Defendants in this case have retained me to opine on the reasonableness of the investigation they conducted in connection with Adams Golf, Inc.'s IPO. I am being compensated at an hourly rate of $550 per hour. On July 14, 2006, I submitted an expert report in this case. I am submitting this Rebuttal Report to rebut certain opinions and claims contained in the Expert Report of Christiana Ochoa, submitted by plaintiffs on July 14, 2006 (the "Ochoa Report").

My qualifications, prior testimony, and publications were set forth in my initial report. I have already opined that the Individual Defendants conducted a reasonable investigation in connection with the IPO and that this process resulted in a Registration Statement and related Prospectus that they had reasonable grounds to believe and did believe was complete and true. To formulate the opinions contained in this Rebuttal Report, I have reviewed the materials listed in my initial report and in the Document Index produced to plaintiffs on July 25, 2006, as well as additional materials, including the Ochoa Report, listed in Exhibit A to this Rebuttal Report. The additional opinions I express in this Rebuttal Report are based on my experience and the knowledge of customary and normal business practices developed over my 35 + years of senior management and consulting experience, as well as my review of documents and other materials listed in my initial report, my Document Index and Exhibit A.

## II.    SUMMARY OF REBUTTAL OPINIONS

Ochoa opines that, at the time of the Adams Golf IPO, gray market distribution was an important risk faced by investors in Adams Golf and that the gray market distribution and sale of Adams Golf's clubs was of such a nature as to be a material consideration to persons considering investing in Adams Golf's securities. Ochoa's attempt to support this position fails. Not only are her underlying assumptions and assertions about the gray market wrong (as will be addressed in the report of Gary Frazier), but as will be shown below, she relies on data that does not support her position and wrongly asserts the steps taken by Adams Golf management to investigate and manage Costco's gray marketing of this product were inadequate. Further, much of the information she relies on did not become available until after the IPO.

The Individual Defendants of Adams Golf addressed their responsibilities appropriately, and within customary and normal business guidelines, in connection with the initial public offering of Adams Golf. Adams Golf's management monitored the marketplace and responded to data flowing from the marketplace. They did so on a timely basis and in a thoughtful, thorough manner as was shown in Exhibit VII of my report.

From the outset, Adams Golf's management sought to determine the nature of the purported Adams Golf clubs acquired by Costco. When the Company first became aware

that purported Adams Golf clubs had been seen in Costco, management was uncertain whether the Company was facing a situation of counterfeit clubs (a black market problem) or a situation of an unauthorized distributor obtaining clubs from an authorized distributor (a gray market problem). Adams Golf's management worked diligently to manage this business issue. The steps that they took to investigate and address the issue were reasonable and demonstrated appropriate business judgment in light of the limited number of complaints they were receiving and the indication from WDC Mackenzie that Costco had a limited number of clubs.

Adams Golf and the Individual Defendants worked with experienced professionals in preparing for the Company's IPO. They interacted appropriately in the preparation of the Registration Statement and Prospectus. Those involved with the IPO understood that gray market issues had been present for a long period of time in the golf industry. They knew about the purported Adams Golf clubs appearing in Costco, and their respective analyses of the issue did not support including the gray market as a risk factor in the offering documents.

Adams Golf and the Individual Defendants understood gray market issues in the golf industry and their attendant effects, and they were diligent and timely in monitoring and addressing the gray market issues. The Individual Defendants followed customary and normal business guidelines in their management and oversight of Adams Golf and the gray market issue. And based on the information that existed at the time, they believed and had reasonable grounds to believe that the Registration Statement and Prospectus were true, complete and accurate without the inclusion of gray marketing as a specific risk factor.

III.    ADAMS GOLF'S OFFICERS AND DIRECTORS TOOK APPROPRIATE STEPS TO INVESTIGATE AND ADDRESS THE COSTCO ISSUE

Ochoa fails to put the Costco issue into the appropriate context. First, although she defines the black market and the gray market, she fails to note that when the problem with Costco in Canada first arose, both WDC Mackenzie and Adams Golf were trying to determine the nature of the problem at Costco in Canada, that is, whether it was a black market problem or a gray market problem. This is reflected in the correspondence between WDC Mackenzie and Costco, and the subsequent follow-up between Adams Golf and Costco. (Ex. 6, 7, 19, MCK 00087-00089, ADAMS 1505, ADAMS 1501-1503, ADAMS 1499, ADAMS 1498-1500) Importantly, despite the limited information available as to the magnitude of the problem and knowing the Canadian market in total represented a very small portion of Adams Golf's marketplace, Adams Golf was both diligent and timely in its efforts to determine what had happened. Exhibit VII of my report sets out the events and actions taken by Adams Golf.

Exhibit VII is useful in placing the Costco issue in the proper context. Adams Golf, as reflected in Exhibit VII, sold 188,898 clubs in the quarter ending March 31, 1998. (ADAMS 028669) Adams Golf sold 268,598 clubs in the quarter ending June 30, 1998, for a total of approximately 457,500 clubs in the first half of 1998. (ADAMS 028669) Exhibit VII also reveals that data obtained from Costco long after the IPO

3

indicates Costco obtained approximately 8,400 clubs in the US and Canada in total during this same six month period ending June 30,1998. As such, the Costco clubs available for sale (a smaller number was actually sold) represented less than 2% of Adams Golf's sales in that six month period. (ADAMS 028669.)

Further, Exhibit VII sets out the complaints received by Adams Golf from its authorized distributors. Only nine retailers/distributors (including WDC Mackenzie, the Canadian distributor) complained during the period prior to the July 1998 IPO. (ADAMS 040794-042910)

Exhibit VII sets out the interaction between WDC Mackenzie and Adams Golf in response to the appearance of Adams Golf clubs in Canadian Costcos. WDC Mackenzie had a continuous series of communications and meetings with Adams Golf personnel, as is reflected in the Exhibit. (ADAMS 9325, MCK 00093-00096, ADAMS 9325-9328, MCK 00087-00089, ADAMS 9405-9410, ADAMS 1497) In spite of the concerns WDC Mackenzie expressed to Adams Golf, the memo from Greg Pratt to Barney Adams dated August 19, 1998 sets out that Mackenzie expected to sell 23,800 Adams Golf clubs in 1998 as compared with the 5,000 clubs sold in 1997. (MCK 00072-00074) While Pratt states the 23,800 was less than WDC Mackenzie's originally projected sales of 26,000 clubs, he sets out several obstacles which he believed had impacted the sales of Adams Golf clubs. These included the fall of the Canadian dollar (over 15%), the emergence of the Orlimar club as a competitor to Adams Tight Lies, and the competition offered from the new Callaway Fairway Woods, in addition to the Costco problem. (MCK 00072-00074) Pratt actually failed to mention the general decline facing the golf equipment industry which had been identified by this time.

That background is useful for examining the actions of Adams Golf set out in Exhibit VII. Adams Golf moved directly and aggressively to address the Costco problem, and continually monitored the marketplace for other gray market distribution issues. Adams Golf began to monitor large orders for potential gray market problems. (ADAMS 1323) Adams Golf stopped a large order from going to King Par in Flint, Michigan for fear of potential gray marketing. (ADAMS 1323) Internal discussions at Adams Golf emphasized the diligence with which Adams Golf addressed gray market issues of all types, reflecting Adams Golf's understanding that gray market issues could not be totally eradicated but had to be properly controlled. (Ex. 109, ADAMS 003825) Adams Golf was timely and thorough in the actions taken to manage gray market issues.

Adams Golf had approximately 7,000 authorized U.S. retailers and a number of international distributors, and received complaints from only 9 of these in the pre-IPO period. Yet Adams Golf communicated with all of their distributors and threatened to terminate any who participated in gray marketing. (MCK 00081-00082) Adams Golf worked to make clear that they were going to take every step possible to properly control gray marketing and keep it from becoming a problem.

The CEO of Adams Golf, Barney Adams began to communicate directly with Costco to determine whether the clubs had actually been manufactured by Adams Golf

4

and, if so, the source from which Costco was obtaining the clubs. (ADAMS 1505, ADAMS 1501-1503, ADAMS 1499, ADAMS 1498-1500) After several communications with Costco proved unsatisfactory to Barney Adams, Adams Golf took legal action against Costco by filing a Bill of Discovery in Texas State Court. (ADAMS 1474-1493) Even though WDC Mackenzie and Adams Golf believed that the supply of clubs at Costco was drying up, Adams Golf remained determined to gain an understanding of the source of the problem. (ADAMS 001548-001549)

Adams Golf's business plan was to preserve its relationships with its authorized retailers and distributors and to protect the profit margins of these authorized sellers. Adams Golf implemented a price matching policy in Canada in a highly targeted fashion to address what WDC Mackenzie saw as a need for protection. (MCK 1053-1055)

Post-IPO, the intensity of Adams Golf's efforts to address gray market distribution issues continued. They remained dedicated to pursuing the issues on a timely and thorough basis. Adams Golf continued to consider alternative approaches to addressing the gray market distribution issue, ultimately making the decision to serialize their clubs. (ADAMS 9088-9091, ADAMS 27732-27735) Adams Golf believed that these gray market issues would be satisfactorily addressed by the end of 1998. (ADAMS 001548-001549)

The officers and directors of Adams Golf were familiar with the gray marketing issues in the golf equipment industry. The professionals assisting Adams Golf in preparing for their IPO were also familiar with these gray market issues. Adams Golf and the Individual Defendants took appropriate steps to investigate and address the Costco issue, and they concluded that gray marketing did not pose a material risk at the time of the IPO.

## IV.    THE OCHOA REPORT

Ochoa bypasses all of this information as she attempts to support the Plaintiffs' position set out earlier in this rebuttal. Here I comment on certain sections of Ochoa's report, understanding that other sections are being addressed by others.

Ochoa, in paragraph 15.A, attempts to cite 108 clubs being returned to WDC Mackenzie as a major problem, but this number pales compared to WDC Mackenzie's estimated 1998 sales of 23,800 clubs, in spite of the obstacles Greg Pratt pointed to in his August 19 memo to Barney Adams cited earlier. Ochoa's efforts to point to Chris Beebe's communications as a recognition of a major problem is misleading. Beebe's communications evidenced Adams Golf's efforts to be vigilant. As stated previously, Adams Golf treated gray market issues directly because they understood the importance of controlling these issues.

Ochoa, in paragraph 15.A, cites Chris Beebe's memo of May 6, 1998, but takes words out of context. Beebe is reviewing a number of matters and, in all of the cases, makes clear Adams Golf's dedication to protecting its authorized distributors and the profit margins they are earning. (Ex. 51) He is indicating the vigilance with which

5

Adams Golf will pursue these matters and sets them out as a warning in his memo which went to all of Adams Golf's distributors. (Ex. 51)

Ochoa, in paragraph 15.B and 15.C, cites sales data which was not available at the time of the IPO. As set out earlier in this rebuttal, when the data subsequently became known, it was reflective of the minor nature of the problem, less than 2% of Adams Golf's sales in the first half of 1998 (ADAMS 028669) Ochoa overlooks the immaterial size of the problem and more importantly overlooks the fact that Adams Golf was addressing the problem in a timely and thorough manner.

Again, in paragraph 16, Ochoa stretches in her attempt to say that Adams Golf, at the time of the initial public offering, "believed this was a serious problem." (Ochoa ¶ 15.A., 16) Ochoa failed to consider that Adams Golf knew it was important to address gray marketing matters in a timely and diligent manner to keep the gray marketing under control. The Beebe and Gonsalves memos reflect the diligence of Adams Golf's approach. The memos reflect the fact that the Company took the issues seriously, but they do not support a conclusion that there was any reason for management to believe that they could not monitor and minimize gray marketing of the Company's clubs. Ochoa's reference to the Company's Board of Directors seeming to have requested that it meet when serious issues such as Costco come up, is an extrapolation from a single line item in six handwritten pages of one of the attendee's notes from the October 1998 Board Meeting. (Ochoa ¶ 16) Gray marketing was felt to be a material issue in October 1998 (Ex 151 at ADAMS 2238-2243), and Adams Golf promptly disclosed it at that time. The notes from the Board Meeting, whatever their meaning at that time, do not reflect that gray marketing was a serious issue facing the Company pre-IPO.

Ochoa, in paragraph 17, fails to point out that the June 8th plan she references actually supports the fact that Adams Golf was taking appropriate actions to address the issue. The alternatives under consideration carried a small cost and were directed toward dealing with a temporary problem (as is reflected in that memo) and reflects Adams Golf's aggressive consideration of alternatives to control the well known gray market issues which face the golf equipment industry.

Ochoa, in paragraph 21.D, continues to take the position that the gray market sales were very damaging to Adams Golf, citing what occurred in Canada. Again, the facts do not support Ochoa, as records obtained much later reveal. Costco obtained only approximately 8,000 clubs in the pre-IPO period and only approximately 6,000 clubs in the post-IPO period. While Ochoa cites the Magnussen Declaration, she overlooks the memo from Greg Pratt of WDC Mackenzie to Barney Adams dated August 19, 1998 (cited earlier here in this rebuttal as well as in my report). To restate, Pratt sets out that WDC Mackenzie's current projection for 1998 sales were 23,800 units verses 5,000 units sold in 1997 and 335 units sold in 1996.

Ochoa, in paragraph 21.E, raises Adams Golf filing of a Bill of Discovery against Costco on June 9, 1998. (ADAMS 1474-1493) Once more, Ochoa fails to mention that Adams Golf was attempting to determine whether the clubs at Costco were from the gray market or the black market, as that had not been determined. There were no numbers of

how many clubs were in Costco's hands, nor were there facts relating to the source(s) of these clubs. What was apparent, and what Ochoa fails to mention, is that Adams Golf was taking action to determine the source of the problem, even though the sense of the situation at that point in time was that the problem was small, and this was validated by data that became available later.

There was no way for Adams Golf to determine at the time of the IPO how many clubs Costco had purchased before the IPO, contrary to Ochoa's implication that Adams Golf inflated its sales figures through these sales. (Ochoa ¶ 28.B.) Nor is there any evidence that these sales would not have been made to authorized sellers if the Company could have prevented its clubs from being diverted to Costco. These were not inflated sales—they were real sales to authorized retailers and distributors and ultimately to end users—the golfers purchasing them.

In summary, Ochoa's attempt to support the Plaintiffs' position fails. Adams Golf and the Individual Defendants were diligent, thorough and timely in addressing their responsibilities regarding the issues Ochoa raises. Notwithstanding that the Canadian marketplace in total comprised less than 2% of their sales, and notwithstanding that their Canadian distributor's sales were close to projected levels in the face of multiple obstacles unrelated to Costco, Adams Golf and the Individual Defendants worked timely and diligently to protect their authorized sellers and to control gray market issues. Adams Golf and the Individual Defendants understood gray market issues in the golf industry, understood the need to control gray market issues, and properly considered these points in arriving at the conclusion that the Prospectus and Registration Statement were true, complete, and accurate.

July 28, 2006

H. Stephen Grace, Jr., Ph.D.

7

## EXHIBIT A

Expert Report of Christina Ochoa dated July 14, 2006

ADAMS 001548-001549

MCK 00095-00096

ADAMS 009328

ADAMS 001478-001493

# EXHIBIT
# G

# EXHIBIT
# G

**Rebuttal to Expert Report of Christiana Ochoa**
**H. Stephen Grace, Jr., Ph.D.**

1



## I.    SCOPE OF REBUTTAL REPORT

Counsel for Adams Golf, Inc. and the Individual Defendants in this case have retained me to opine on the reasonableness of the investigation they conducted in connection with Adams Golf, Inc.'s IPO. I am being compensated at an hourly rate of $550 per hour. On July 14, 2006, I submitted an expert report in this case. I am submitting this Rebuttal Report to rebut certain opinions and claims contained in the Expert Report of Christiana Ochoa, submitted by plaintiffs on July 14, 2006 (the "Ochoa Report").

My qualifications, prior testimony, and publications were set forth in my initial report. I have already opined that the Individual Defendants conducted a reasonable investigation in connection with the IPO and that this process resulted in a Registration Statement and related Prospectus that they had reasonable grounds to believe and did believe was complete and true. To formulate the opinions contained in this Rebuttal Report, I have reviewed the materials listed in my initial report and in the Document Index produced to plaintiffs on July 25, 2006, as well as additional materials, including the Ochoa Report, listed in Exhibit A to this Rebuttal Report. The additional opinions I express in this Rebuttal Report are based on my experience and the knowledge of customary and normal business practices developed over my 35 + years of senior management and consulting experience, as well as my review of documents and other materials listed in my initial report, my Document Index and Exhibit A.

## II.    SUMMARY OF REBUTTAL OPINIONS

Ochoa opines that, at the time of the Adams Golf IPO, gray market distribution was an important risk faced by investors in Adams Golf and that the gray market distribution and sale of Adams Golf's clubs was of such a nature as to be a material consideration to persons considering investing in Adams Golf's securities. Ochoa's attempt to support this position fails. Not only are her underlying assumptions and assertions about the gray market wrong (as will be addressed in the report of Gary Frazier), but as will be shown below, she relies on data that does not support her position and wrongly asserts the steps taken by Adams Golf management to investigate and manage Costco's gray marketing of this product were inadequate. Further, much of the information she relies on did not become available until after the IPO.

The Individual Defendants of Adams Golf addressed their responsibilities appropriately, and within customary and normal business guidelines, in connection with the initial public offering of Adams Golf. Adams Golf's management monitored the marketplace and responded to data flowing from the marketplace. They did so on a timely basis and in a thoughtful, thorough manner as was shown in Exhibit VII of my report.

From the outset, Adams Golf's management sought to determine the nature of the purported Adams Golf clubs acquired by Costco. When the Company first became aware

that purported Adams Golf clubs had been seen in Costco, management was uncertain whether the Company was facing a situation of counterfeit clubs (a black market problem) or a situation of an unauthorized distributor obtaining clubs from an authorized distributor (a gray market problem). Adams Golf's management worked diligently to manage this business issue. The steps that they took to investigate and address the issue were reasonable and demonstrated appropriate business judgment in light of the limited number of complaints they were receiving and the indication from WDC Mackenzie that Costco had a limited number of clubs.

Adams Golf and the Individual Defendants worked with experienced professionals in preparing for the Company's IPO. They interacted appropriately in the preparation of the Registration Statement and Prospectus. Those involved with the IPO understood that gray market issues had been present for a long period of time in the golf industry. They knew about the purported Adams Golf clubs appearing in Costco, and their respective analyses of the issue did not support including the gray market as a risk factor in the offering documents.

Adams Golf and the Individual Defendants understood gray market issues in the golf industry and their attendant effects, and they were diligent and timely in monitoring and addressing the gray market issues. The Individual Defendants followed customary and normal business guidelines in their management and oversight of Adams Golf and the gray market issue. And based on the information that existed at the time, they believed and had reasonable grounds to believe that the Registration Statement and Prospectus were true, complete and accurate without the inclusion of gray marketing as a specific risk factor.

## III.    ADAMS GOLF'S OFFICERS AND DIRECTORS TOOK APPROPRIATE STEPS TO INVESTIGATE AND ADDRESS THE COSTCO ISSUE

Ochoa fails to put the Costco issue into the appropriate context. First, although she defines the black market and the gray market, she fails to note that when the problem with Costco in Canada first arose, both WDC Mackenzie and Adams Golf were trying to determine the nature of the problem at Costco in Canada, that is, whether it was a black market problem or a gray market problem. This is reflected in the correspondence between WDC Mackenzie and Costco, and the subsequent follow-up between Adams Golf and Costco. (Ex. 6, 7, 19, MCK 00087-00089, ADAMS 1505, ADAMS 1501-1503, ADAMS 1499, ADAMS 1498-1500) Importantly, despite the limited information available as to the magnitude of the problem and knowing the Canadian market in total represented a very small portion of Adams Golf's marketplace, Adams Golf was both diligent and timely in its efforts to determine what had happened. Exhibit VII of my report sets out the events and actions taken by Adams Golf.

Exhibit VII is useful in placing the Costco issue in the proper context. Adams Golf, as reflected in Exhibit VII, sold 188,898 clubs in the quarter ending March 31, 1998. (ADAMS 028669) Adams Golf sold 268,598 clubs in the quarter ending June 30, 1998, for a total of approximately 457,500 clubs in the first half of 1998. (ADAMS 028669) Exhibit VII also reveals that data obtained from Costco long after the IPO

3

indicates Costco obtained approximately 8,400 clubs in the US and Canada in total during this same six month period ending June 30,1998. As such, the Costco clubs available for sale (a smaller number was actually sold) represented less than 2% of Adams Golf's sales in that six month period. (ADAMS 028669.)

Further, Exhibit VII sets out the complaints received by Adams Golf from its authorized distributors. Only nine retailers/distributors (including WDC Mackenzie, the Canadian distributor) complained during the period prior to the July 1998 IPO. (ADAMS 040794-042910)

Exhibit VII sets out the interaction between WDC Mackenzie and Adams Golf in response to the appearance of Adams Golf clubs in Canadian Costcos. WDC Mackenzie had a continuous series of communications and meetings with Adams Golf personnel, as is reflected in the Exhibit. (ADAMS 9325, MCK 00093-00096, ADAMS 9325-9328, MCK 00087-00089, ADAMS 9405-9410, ADAMS 1497) In spite of the concerns WDC Mackenzie expressed to Adams Golf, the memo from Greg Pratt to Barney Adams dated August 19, 1998 sets out that Mackenzie expected to sell 23,800 Adams Golf clubs in 1998 as compared with the 5,000 clubs sold in 1997. (MCK 00072-00074) While Pratt states the 23,800 was less than WDC Mackenzie's originally projected sales of 26,000 clubs, he sets out several obstacles which he believed had impacted the sales of Adams Golf clubs. These included the fall of the Canadian dollar (over 15%), the emergence of the Orlimar club as a competitor to Adams Tight Lies, and the competition offered from the new Callaway Fairway Woods, in addition to the Costco problem. (MCK 00072-00074) Pratt actually failed to mention the general decline facing the golf equipment industry which had been identified by this time.

That background is useful for examining the actions of Adams Golf set out in Exhibit VII. Adams Golf moved directly and aggressively to address the Costco problem, and continually monitored the marketplace for other gray market distribution issues. Adams Golf began to monitor large orders for potential gray market problems. (ADAMS 1323) Adams Golf stopped a large order from going to King Par in Flint, Michigan for fear of potential gray marketing. (ADAMS 1323) Internal discussions at Adams Golf emphasized the diligence with which Adams Golf addressed gray market issues of all types, reflecting Adams Golf's understanding that gray market issues could not be totally eradicated but had to be properly controlled. (Ex. 109, ADAMS 003825) Adams Golf was timely and thorough in the actions taken to manage gray market issues.

Adams Golf had approximately 7,000 authorized U.S. retailers and a number of international distributors, and received complaints from only 9 of these in the pre-IPO period. Yet Adams Golf communicated with all of their distributors and threatened to terminate any who participated in gray marketing. (MCK 00081-00082) Adams Golf worked to make clear that they were going to take every step possible to properly control gray marketing and keep it from becoming a problem.

The CEO of Adams Golf, Barney Adams began to communicate directly with Costco to determine whether the clubs had actually been manufactured by Adams Golf

and, if so, the source from which Costco was obtaining the clubs. (ADAMS 1505, ADAMS 1501-1503, ADAMS 1499, ADAMS 1498-1500) After several communications with Costco proved unsatisfactory to Barney Adams, Adams Golf took legal action against Costco by filing a Bill of Discovery in Texas State Court. (ADAMS 1474-1493) Even though WDC Mackenzie and Adams Golf believed that the supply of clubs at Costco was drying up, Adams Golf remained determined to gain an understanding of the source of the problem. (ADAMS 001548-001549)

Adams Golf's business plan was to preserve its relationships with its authorized retailers and distributors and to protect the profit margins of these authorized sellers. Adams Golf implemented a price matching policy in Canada in a highly targeted fashion to address what WDC Mackenzie saw as a need for protection. (MCK 1053-1055)

Post-IPO, the intensity of Adams Golf's efforts to address gray market distribution issues continued. They remained dedicated to pursuing the issues on a timely and thorough basis. Adams Golf continued to consider alternative approaches to addressing the gray market distribution issue, ultimately making the decision to serialize their clubs. (ADAMS 9088-9091, ADAMS 27732-27735) Adams Golf believed that these gray market issues would be satisfactorily addressed by the end of 1998. (ADAMS 001548-001549)

The officers and directors of Adams Golf were familiar with the gray marketing issues in the golf equipment industry. The professionals assisting Adams Golf in preparing for their IPO were also familiar with these gray market issues. Adams Golf and the Individual Defendants took appropriate steps to investigate and address the Costco issue, and they concluded that gray marketing did not pose a material risk at the time of the IPO.

## IV.    THE OCHOA REPORT

Ochoa bypasses all of this information as she attempts to support the Plaintiffs' position set out earlier in this rebuttal. Here I comment on certain sections of Ochoa's report, understanding that other sections are being addressed by others.

Ochoa, in paragraph 15.A, attempts to cite 108 clubs being returned to WDC Mackenzie as a major problem, but this number pales compared to WDC Mackenzie's estimated 1998 sales of 23,800 clubs, in spite of the obstacles Greg Pratt pointed to in his August 19 memo to Barney Adams cited earlier. Ochoa's efforts to point to Chris Beebe's communications as a recognition of a major problem is misleading. Beebe's communications evidenced Adams Golf's efforts to be vigilant. As stated previously, Adams Golf treated gray market issues directly because they understood the importance of controlling these issues.

Ochoa, in paragraph 15.A, cites Chris Beebe's memo of May 6, 1998, but takes words out of context. Beebe is reviewing a number of matters and, in all of the cases, makes clear Adams Golf's dedication to protecting its authorized distributors and the profit margins they are earning. (Ex. 51) He is indicating the vigilance with which

Adams Golf will pursue these matters and sets them out as a warning in his memo which went to all of Adams Golf's distributors. (Ex. 51)

Ochoa, in paragraph 15.B and 15.C, cites sales data which was not available at the time of the IPO. As set out earlier in this rebuttal, when the data subsequently became known, it was reflective of the minor nature of the problem, less than 2% of Adams Golf's sales in the first half of 1998. (ADAMS 028669) Ochoa overlooks the immaterial size of the problem and more importantly overlooks the fact that Adams Golf was addressing the problem in a timely and thorough manner.

Again, in paragraph 16, Ochoa stretches in her attempt to say that Adams Golf, at the time of the initial public offering, "believed this was a serious problem." (Ochoa ¶ 15.A., 16) Ochoa failed to consider that Adams Golf knew it was important to address gray marketing matters in a timely and diligent manner to keep the gray marketing under control. The Beebe and Gonsalves memos reflect the diligence of Adams Golf's approach. The memos reflect the fact that the Company took the issues seriously, but they do not support a conclusion that there was any reason for management to believe that they could not monitor and minimize gray marketing of the Company's clubs. Ochoa's reference to the Company's Board of Directors seeming to have requested that it meet when serious issues such as Costco come up, is an extrapolation from a single line item in six handwritten pages of one of the attendee's notes from the October 1998 Board Meeting. (Ochoa ¶ 16) Gray marketing was felt to be a material issue in October 1998 (Ex 151 at ADAMS 2238-2243), and Adams Golf promptly disclosed it at that time. The notes from the Board Meeting, whatever their meaning at that time, do not reflect that gray marketing was a serious issue facing the Company pre-IPO.

Ochoa, in paragraph 17, fails to point out that the June 8th plan she references actually supports the fact that Adams Golf was taking appropriate actions to address the issue. The alternatives under consideration carried a small cost and were directed toward dealing with a temporary problem (as is reflected in that memo) and reflects Adams Golf's aggressive consideration of alternatives to control the well known gray market issues which face the golf equipment industry.

Ochoa, in paragraph 21.D, continues to take the position that the gray market sales were very damaging to Adams Golf, citing what occurred in Canada. Again, the facts do not support Ochoa, as records obtained much later reveal. Costco obtained only approximately 8,000 clubs in the pre-IPO period and only approximately 6,000 clubs in the post-IPO period. While Ochoa cites the Magnussen Declaration, she overlooks the memo from Greg Pratt of WDC Mackenzie to Barney Adams dated August 19, 1998 (cited earlier in this rebuttal as well as in my report). To restate, Pratt sets out that WDC Mackenzie's current projection for 1998 sales were 23,800 units verses 5,000 units sold in 1997 and 335 units sold in 1996.

Ochoa, in paragraph 21.E, raises Adams Golf filing of a Bill of Discovery against Costco on June 9, 1998. (ADAMS 1474-1493) Once more, Ochoa fails to mention that Adams Golf was attempting to determine whether the clubs at Costco were from the gray market or the black market, as that had not been determined. There were no numbers of

how many clubs were in Costco's hands, nor were there facts relating to the source(s) of these clubs. What was apparent, and what Ochoa fails to mention, is that Adams Golf was taking action to determine the source of the problem, even though the sense of the situation at that point in time was that the problem was small, and this was validated by data that became available later.

There was no way for Adams Golf to determine at the time of the IPO how many clubs Costco had purchased before the IPO, contrary to Ochoa's implication that Adams Golf inflated its sales figures through these sales. (Ochoa ¶ 28.B.) Nor is there any evidence that these sales would not have been made to authorized sellers if the Company could have prevented its clubs from being diverted to Costco. These were not inflated sales—they were real sales to authorized retailers and distributors and ultimately to end users—the golfers purchasing them.

In summary, Ochoa's attempt to support the Plaintiffs' position fails. Adams Golf and the Individual Defendants were diligent, thorough and timely in addressing their responsibilities regarding the issues Ochoa raises. Notwithstanding that the Canadian marketplace in total comprised less than 2% of their sales, and notwithstanding that their Canadian distributor's sales were close to projected levels in the face of multiple obstacles unrelated to Costco, Adams Golf and the Individual Defendants worked timely and diligently to protect their authorized sellers and to control gray market issues. Adams Golf and the Individual Defendants understood gray market issues in the golf industry, understood the need to control gray market issues, and properly considered these points in arriving at the conclusion that the Prospectus and Registration Statement were true, complete, and accurate.

July 28, 2006                    _____

                                 H. Stephen Grace, Jr., Ph.D.

# EXHIBIT
# H

# EXHIBIT
# H

Page 1

1            IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF DELAWARE

2

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3                                    :

IN RE:  ADAMS GOLF, INC.            :   CIVIL ACTION NO.

4   SECURITIES LITIGATION            :      99-371-KAJ

                                     :

5   . . . . . . . . . . . . . . . . . . :. . . . . . . . . . . . .

6

7              ORAL TELEPHONIC DEPOSITION OF

8               H. STEPHEN GRACE, JR., Ph.D.

9                   AUGUST 7, 2006

10

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

11

12       ORAL TELEPHONIC DEPOSITION OF H. STEPHEN GRACE,

13   JR., Ph.D., produced as a witness at the instance of

14   the Plaintiffs, and duly sworn, was taken in the

15   above-styled and numbered cause on Monday, August 7,

16   2006, from 10:08 a.m. to 4:42 p.m., via telephone

17   before Mary C. Dopico, Certified Shorthand Reporter

18   No. 463 and Notary Public in and for the State of

19   Texas, reported by machine shorthand at the offices

20   of Akin Gump Strauss Hauer & Feld, LLP, 1111

21   Louisiana Street, 42nd Floor, Houston, Texas,

22   pursuant to Notice and the Federal Rules of Civil

23   Procedure and the provisions stated on the record or

24   attached hereto.

Page 6

1  expertise you have that are relevant to this
2  litigation, sir.
3      A.  I think the primary areas of expertise in
4  this matter surround corporate -- the area of
5  corporate governance.
6      Q.  Okay.
7      A.  The roles of various parties involved in
8  the management and in the governance of businesses.
9      Q.  Okay.  Now, what does the management and
10  governances -- Sorry.
11          What does the management and
12  governance of businesses have to do with this case,
13  in your opinion?
14      A.  There was a -- and you and the -- all of
15  you in the legal community could say this better than
16  I could; but there was an issue that was raised in
17  the plaintiff's complaints about the prospectus and
18  the registration statement being deficient in certain
19  respects; in particular, the fact that the gray
20  market -- gray market the plaintiff saw as an
21  important fact that the gray market issue was not
22  included or discussed, whatever would be
23  appropriate.
24          When you look at -- When we look at

Page 7

1  something, myself and our team -- look at something
2  like that, we're looking not only at the issue itself
3  that was omitted and -- and its materiality; but we
4  also have to look at the framework within which
5  this -- you know, this decision was -- was made.
6  That decision being the production of a registration
7  statement and a prospectus.  That's sort of a brief
8  discussion of the thing.
9      Q.  So, therefore, as I understand it, your
10  view is that management and governance in this case
11  is background information?
12      A.  No.  It's the framework.  It's the
13  framework out of which the decision or -- The whole
14  governance is a structure and a process; and so we
15  would always be interested in what took place along
16  the way in connection with this IPO and whether that
17  was done in a satisfactory manner or not.
18      Q.  But what does that have to do with
19  disclosure issues, if anything?
20      A.  Well, because in the course of moving
21  toward the IPO, there would be the issue of how you
22  addressed the -- the production of the IPO documents.
23      Q.  Is it accurate, sir, that one could have
24  the greatest management and governance in the world

Page 8

1  and still issue a registration statement that
2  contains material omissions or misrepresentations?
3      A.  You know, in every case, you'd have to look
4  at the specifics; but offhand I would say it would
5  seem that that could happen.
6      Q.  Okay.  Now, I gather, Dr. Grace, that you
7  are not an expert with regard to marketing generally?
8      A.  We are not --  We were not employed from
9  that standpoint.  I mean, we've had -- myself and
10  others -- have certainly had a lot of experience in
11  the marketing of different products; but that's not
12  what we were charged with here.
13      Q.  All right.  Do you assert, sir, that you,
14  yourself, are an expert in marketing generally?
15      A.  I think I would say the answer to that's
16  no.
17      Q.  Now, specifically with regard to the gray
18  market, do you have an understanding of what that
19  means, "the gray market"?
20      A.  Yes.  And --
21          MR. BESSETTE:  In this case you mean?
22          MR. COLLINS:  Let's talk generally, if
23  we may.
24          MR. BESSETTE:  All right.

Page 9

1      A.  I was going to say particularly with regard
2  to golf equipment.
3  BY MR. COLLINS:
4      Q.  Okay.  Now let's talk generally.  What in
5  general does the gray market mean, if you would, sir?
6      A.  Well, to me it means that you've got a gray
7  market and a black market, in my simplistic way of
8  thinking.
9          Black market deals with
10  counterfeiting; and this is where the Louis Vuitton
11  luggage shows where you can find a Mont Blanc pen or
12  Canal Street in New York for $10 or $5.  Those are
13  not the actual products.
14          Gray market in terms of my familiarity
15  with it in the golf business is when the equipment
16  that is in fact produced by the actual manufacturer
17  shows up in distribution points that the manufacturer
18  has not approved, or is trying to keep the products
19  out of those places.  And I say "trying" because, you
20  know, there are limits, as I understand the law, as
21  to what manufacturers can do.
22      Q.  Okay.  Now, you talked about gray marketing
23  in the golf industry.  What is the basis of your
24  information or knowledge regarding that?

3 (Pages 6 to 9)

Page 34

1    Q. Absolutely. And I am drawing a distinction
2  between financial and statistical. So if I have
3  heard you correctly, and please correct me if I'm
4  wrong, Dr. Grace, in some cases in trying to
5  determine what caused the stock price to go down, you
6  and your firm consider it's appropriate for
7  statistical analysis to be used; and in other cases,
8  you and your firm deem it appropriate not to use
9  statistical analysis to determine what caused the
10  stock price to go down.
11        MR. BESSETTE: Objection, misstates
12  testimony, vague and ambiguous.
13  BY MR. COLLINS:
14    Q. Please tell me if I got it wrong.
15    A. Yeah. Right. I think I was saying that
16  there may be times when statistical analysis would be
17  useful. For example, some of the work we did here,
18  where we were adding up the number of complaints that
19  happen in a time period, that's a statistical
20  analysis, if you want to call it that.
21    Q. Right.
22    A. But on the micro level, you've got to help
23  me with some other examples. If we're in the micro
24  level and you're evaluating something from the inside

Page 35

1  of an operation, I'm not sure where what I would call
2  pure statistics comes in there --
3    Q. That's fine.
4    A. -- in any great way.
5    Q. That's fine.
6    A. Yeah. I mean --
7    Q. So to go back to the hypo I -- I'm sorry.
8  I didn't mean to cut you off.
9    A. I mean such as Exhibits 6 and 7 in my
10  report, where you have the data and you're lining it
11  up, because it's units and not dollars, we could call
12  that some sort of statistical analysis, whereas
13  dollars, it would be financial analysis.
14    Q. Sure. And all I'm getting at is this.
15  When your firm tries to determine what caused a stock
16  price to go down, you do not always deem it necessary
17  to test for levels of statistical significance with
18  respect to any particular day's stock movement; do I
19  understand that correctly?
20        MR. BESSETTE: Same objections.
21    A. Would you read that back, please?
22        (The requested testimony was read back
23  by the reporter, as follows:
24        QUESTION: "Sure. And all I'm getting

Page 36

1  at is this. When your firm tries to determine what
2  caused a stock price to go down, you do not always
3  deem it necessary to test for levels of statistical
4  significance with respect to any particular day's
5  stock movement; do I understand that correctly?")
6    A. I think that all I can say is that in each
7  situation, we try to do what we believe's
8  appropriate, using whatever types of combinations of
9  analysis seem to address the specifics of that
10  situation.
11  BY MR. COLLINS:
12    Q. Absolutely. And in some of those cases,
13  statistical analysis with regard to the return on any
14  particular day for a stock price, sometimes that
15  statistical analysis is appropriate; right?
16        MR. BESSETTE: Vague and ambiguous,
17  speculation.
18    A. You know --
19        MR. BESSETTE: Incomplete
20  hypothetical.
21    A. -- the -- in the sense of -- it would be --
22  it would obviously be more useful if we had specific
23  situations to address and look at in that context.
24  BY MR. COLLINS:

Page 37

1    Q. I see.
2    A. I mean, if you want -- I think what I said
3  before is there is a variety of tools that you can
4  use. You have to make the decision as to what tools
5  are appropriate at that point in time and use those.
6    Q. So with regard to the statistical approach
7  that I just described with regard to measuring the
8  return on a particular day, sometimes that's
9  appropriate, engaging loss causation issues,
10  sometimes it's not. Have I heard you correctly?
11        MR. BESSETTE: Same objections,
12  misstates testimony.
13    A. The -- The -- Again, here I'm afraid
14  we're getting off on a tangent in the sense that I've
15  never said that there is not usefulness to studying
16  the external marketplace. What's going on out there
17  in a macro level and picking up the consequences of
18  that. I'm just saying that most of our work lies in
19  this other area on the inside. I'm not discount that
20  go that could be important and should be considered.
21  BY MR. COLLINS:
22    Q. Is -- Does your firm, within your
23  expertise with regard to loss causation, negative
24  loss causation, and damages issues, do you -- do you

Page 38

1　have on staff persons who do regression analyses?
2　　A.　Certainly I have a background in that, and
3　there may be others.  I'm trying to -- as I think I
4　said, we are not -- We have some academics with whom
5　we're associate -- that are on our board of advisers.
6　Our work doesn't lead us into a need for much
7　regression analysis, as I mentioned before.
8　　Q.　I see.  And when your firm offers expert
9　advice on loss causation, negative loss causation,
10　and damages, is it your practice to hire outside
11　experts or consult with outside experts regarding
12　regression analysis, or is it your practice not to do
13　so?
14　　A.　We -- As I mentioned to you, if we ran
15　into a case, you know -- No, I -- I'd say most of
16　the time clients have already addressed this.  If
17　there is a macro issue, they would involve people who
18　do that type of work; and if it was something that in
19　the course of our work we felt there was a large
20　amount to be done there, just, for example, if we
21　felt like that we had to re-work the entire books of
22　MCI, that's not a project we're staffed to take on
23　ourselves.  We would suggest to the client that they
24　get one of the Big Four firms or someone like that to

Page 39

1　bring in those resources.
2　　Q.　Now are you -- We've been talking about
3　your areas of expertise and the areas of expertise of
4　your firm.
5　　　Are you experts with regard to the
6　concept of materiality under the U.S. securities
7　laws?
8　　A.　The -- I think we're certainly familiar
9　with them.  We've never been -- We've never been
10　required to be certified in some sense as experts.
11　　Q.　Are you experts with regard to what a
12　reasonable investor would consider important?
13　　A.　Well, I don't know what you mean by
14　"expert."  I mean, tell me -- Help me there.
15　　Q.　Do you feel that you have some special
16　knowledge or training or learning that puts you in a
17　position that you have the -- in your view -- the
18　ability to opine on materiality?
19　　A.　Yes.
20　　Q.　Okay.  And what's the basis of that?
21　　A.　Well, what's the situation?  It would
22　depend -- What's the situation where we're looking
23　at materiality?
24　　Q.　Well, let's --

Page 40

1　　A.　I mean --
2　　Q.　Let's -- Good question.  Let's start with
3　page 9 under "Conclusions."  The first sentence, "My
4　conclusion is that there were no misleading
5　statements or omissions connected with the
6　Registration Statement and the Prospectus."
7　　A.　Right.
8　　Q.　Now, that's not a -- You did not at least
9　in that sentence opine on materiality; correct?
10　　A.　Well, the -- there's no -- the word
11　"materiality"'s not in that sentence.  That's all
12　I'm saying.
13　　Q.　Okay.  Now --
14　　A.　To say there's no misleading statements or
15　omissions, I'll leave that up to you, that term.
16　　Q.　That's fine.  Now, we're agreed, aren't we,
17　that there was no risk disclosure in the Registration
18　Statement in this case with respect to gray
19　marketing; correct?
20　　A.　Right.  There was no disclosure in the --
21　in the published documents as -- as I recall, sitting
22　here.
23　　Q.　Okay.  So do you agree with me that the
24　issue here is not whether there was an omission.

Page 41

1　Clearly that risk, if it was a risk, was omitted.
2　The issue is really, in this case, is whether that
3　omission was material or misleading.
4　　　MR. BESSETTE:  Objection, to the
5　extent it calls for a legal conclusion.
6　BY MR. COLLINS:
7　　Q.　Absolutely.  You're not an expert on the
8　law; are you?
9　　A.　No.
10　　Q.　Okay.  So when you talk about the
11　Prospectus and the Registration Statement and when in
12　this case you opine with regard to there being no
13　misleading statements or omissions, what -- what are
14　you saying?  What are you opining on with regard to
15　any alleged gray marketing risk?
16　　A.　Right.  What we're saying is that in our
17　analysis, the gray market risk that was -- that was
18　not -- did not need to be disclosed.
19　　Q.　Okay.
20　　A.　All right?  I mean, that's the same thing
21　we would have addressed in many other forums or many
22　other fronts; and we're going to produce a document,
23　whether it be on public securities or private debt
24　financing or partnership type things.  We have a

11 (Pages 38 to 41)

Page 66

1  that, that Titleist had to rework their distribution
2  channels, trying to achieve the same goal. But
3  Fortune Brands, that owns Titleist and Cobra, there
4  was nothing said about gray market. Golden Bear,
5  nothing said about gray market. AmerSports, which
6  owns Wilson, has always had the problem with the
7  Wilson Staff equipment, protecting it through the pro
8  shops and the K-28s though the major retail
9  distributors -- said nothing about it. Callaway said
10  nothing about it in their press releases for the
11  second and third quarter of '98, as I recall -- and I
12  could get the specifics.
13          But we looked to see: Was this a
14  major issue that everyone else was beating the drum
15  about, or were our people correct in their decision
16  to leave it out? And the evidence we examined
17  certainly supports that it's there, but it's not
18  deemed to be a material consideration.
19      Q.  I see. All right. Now, I think you're
20  referring to paragraph -- to page 22 of your report
21  first and second paragraphs. And you can turn to
22  those pages if it would be helpful.
23          MR. COLLINS:  Ted, I trust you're able
24  to hear well enough.

Page 67

1          MR. McEVOY:  I am.
2          MR. COLLINS:  We might have put you to
3  sleep -- or I did -- just as long as you can hear
4  well enough.
5          MR. McEVOY:  It's fascinating.
6  BY MR. COLLINS:
7      Q.  All right. So --
8      A.  Let's see. Well, we're talk talking
9  about -- I'm talking about -- and often I say "we."
10  I'm just used to saying "we" instead of "I." It is
11  my report and my work.
12      Q.  Please.
13      A.  I'm trying to remember, is there somewhere
14  else that I discuss the fact that -- This -- This
15  is a statement here about what's happening to the
16  golf market in general, that there is an awareness
17  that breaks out at this point in time, that you've
18  got some serious problems in terms of a general
19  decline. But I was thinking there might be somewhere
20  else where I actually talked about no mention of
21  the -- of the gray market issue. So that --
22      Q.  Well, look --
23      A.  That's -- I think that paragraph is more
24  directed toward the general decline.

Page 68

1      Q.  By "that paragraph," sir, you mean --
2      A.  I'm sorry. Top of page 22.
3      Q.  Okay. Well, I just care about your
4  opinion. I appreciate your report, which as I say I
5  thought was very interesting. But I care about your
6  opinion, so refer to anything you'd like as I ask
7  these questions.
8          I'm sure you stand by your report, and
9  every word in your opening report and your rebuttal
10  report you -- you believe is accurate and complete
11  and reflects your views; correct?
12      A.  Yes.
13      Q.  Okay. All right. Well, let's -- let's
14  talk about this -- this first paragraph on page 22.
15          And again, Dr. Grace, my view isn't a
16  to parse a particular word from your report. It is
17  really to understand how you view the issue and what
18  your opinion is.
19          So is it your opinion that as of the
20  1997 Adams Golf 10-K, released in calendar year 1998,
21  Callaway viewed the gray market as something that
22  Callaway had dealt with in a manner that made the
23  gray market immaterial to Callaway?
24          MR. BESSETTE:  Okay. You might want

Page 69

1  to have that read back, Todd; but I think you said
2  the Adams Golf 10-K.
3          MR. COLLINS:  Ah.
4          MR. BESSETTE:  The rest of it was all
5  good.
6          MR. COLLINS:  Thank you. Thank you
7  for the comment. Could you read that question back,
8  please.
9          (The requested testimony was read back
10  by the reporter, as follows:
11          QUESTION:  "Well, let's -- let's talk
12  about this -- this first paragraph on page 22.
13          "And again, Dr. Grace, my view isn't
14  a to parse a particular word from your report. It is
15  really to understand how you view the issue and what
16  your opinion is.
17          "So is it your opinion that as of the
18  1997 Adams Golf 10-K, released in calendar year 1998,
19  Callaway viewed the gray market as something that
20  Callaway had dealt with in a manner that made the
21  gray market immaterial to Callaway?")
22  BY MR. COLLINS:
23      Q.  Well, it was correct, I meant the Callaway
24  10-K. Please.

18 (Pages 66 to 69)

Page 130

1   is that we were named in the documents presented to
2   the Court.
3       Q.   Sure.
4       A.   It settled before we ever got to, you know,
5   deposition.
6       Q.   And in all of those cases Akin Gump hired
7   you.
8       A.   Correct. Yes.
9       Q.   Okay. Now, in this case, I'm back to page
10  5, the third paragraph, you say that you've been
11  retained here "to provide an opinion regarding the
12  nature of the roles, responsibilities and actions
13  taken or omitted by the individual defendants."
14          What specifically were you asked to
15  do? Now, I'm not asking what you did, obviously,
16  because you have a nice long report here. But I'm
17  asking what were you asked to do at the beginning?
18      A.   Well, when you have the discussions
19  initially, as you would know, oftentimes there is
20  some generalized discussions; and you begin to come
21  in on what the customer, the client, yourselves -- be
22  it you or Paul -- want us to do. We talk about
23  things, what our background, where it might be
24  helpful, who else you're using on the team and so

Page 131

1   forth.
2          And as I sit here right now and try to
3   boil it down, I think it comes down to number one was
4   the governance process, the management and governance
5   of this was this process that led to the IPO. Was it
6   conducted properly? Was it thorough? Timely?
7   Diligent? That type of thing like that. Inside that
8   we had to address other issues.
9       Q.   Now, I'm intrigued by the distinction
10  between a due diligence opinion and an opinion
11  relating to what actions were taken in response to
12  indications of gray marketing. And it seems here
13  that you provided both. And I'm wondering what the
14  second part of that has to do with the due diligence
15  opinion.
16      A.   Well --
17          MR. BESSETTE: That's vague to me, so
18  I'm not sure if you understand it.
19  BY MR. COLLINS:
20      Q.   I think --
21          MR. BESSETTE: Go ahead.
22      Q.   -- many lawyers have asked better questions
23  than that one was. Let me try again.
24          I'm struck by your opinions here that

Page 132

1   they seem to be focused not just on whether -- on the
2   issue of whether the individual defendants exercise
3   due diligence in investigating the disclosures
4   required for the Registration Statement; but you also
5   go on it at considerable length with regard to what
6   the responses to the gray market situation were at
7   Adams Golf before the IPO; and I'm wondering why you
8   thought it appropriate to get into the second issue
9   in view of the fact, as you well know, this is a '33
10  Act case.
11      A.   The -- Because of the linkage to the due
12  diligence of the process, what the two parties are
13  saying -- defendants are saying we did it okay and
14  the plaintiffs are saying you didn't do it okay --
15  centered around this gray market issue.
16          So we're going to look at gray market,
17  look at what was going on out there with regard to
18  gray market, much to what I said earlier. Was there
19  something out there either then or even later that
20  would have been indicative that the process did not
21  work as you might hope for. That's how the gray
22  market gets wrapped into it here.
23      Q.   Okay.
24      A.   I think that's a fair -- I mean, it may

Page 133

1   be --
2       Q.   No, no, no.
3       A.   I think that's a fair statement as I sit
4   here.
5       Q.   No, no. That's helpful. But how does it
6   relate to the issues in this case, as you understand
7   them, as to how Adams Golf responded to gray
8   marketing? How does that relate to this case?
9       A.   I think I would say it this way. If we
10  looked at the process, the governance management
11  process and said they did everything we think they
12  should have, and just -- We found that. All right?
13  There are two other situ -- there are two other
14  outcomes that would be interesting. One is a problem
15  and the question is: Did they do everything they
16  should have? And we said: We think the process was
17  fine; but by the way, they either missed it or they
18  got it right. You know, because if they missed it,
19  if they missed it, that's one sort of problem. All
20  right. You've got a great process, but you missed
21  the situation.
22          If you had a great process but you
23  didn't miss the situation, then to us there is no
24  business liability issues there in terms of what we

34 (Pages 130 to 133)

Page 138

1  entire -- you know, trying to get a sense of
2  management, the board and the professionals, on how
3  they worked together or didn't work together, moving
4  towards this IPO.
5  BY MR. COLLINS:
6      Q. Ah, okay. --
7              MR. BESSETTE: A reasonable
8  investigation.
9              MR. COLLINS: Yes.
10             MR. BESSETTE: That's where you guys
11 are getting hung up.
12 BY MR. COLLINS:
13     Q. And I think it may be just my confusion.
14 Because hypothetically it would seem to me that you
15 could have come to the conclusion that the individual
16 defendants didn't discharge properly their duties to
17 the shareholders to investigate and follow-up on the
18 gray market problem. But nonetheless, you could have
19 concluded the gray market problem wasn't something
20 that should have been disclosed as a risk in this
21 Prospectus. Is that --
22     A. That --
23     Q. Is that --
24     A. You could have situations like that. I

Page 139

1  mean, you could have situations, you know, where
2  they're sort of what we would call liability -- and
3  whether that had damages to it or not. You know,
4  some document doesn't get delivered at a -- at a
5  financing closing; and, okay, somebody's got
6  liability for not delivering that document. But was
7  it consequential to losses --
8      Q. Right.
9      A. -- you know, we all know that, those
10 arguments, yeah.
11     Q. Right. Thank you. That is helpful.
12 Because what I am getting at is I don't know why you
13 stuck your neck out and why you thought it was
14 appropriate or necessary in this case not only to
15 look at whether the risk should have been disclosed
16 or the potential risk should have been disclosed in
17 the Registration Statement, but you also provided a
18 good bit of work on an opinion that seems to say that
19 Adams Golf responded appropriately from a corporate
20 standpoint to a problem. And I don't understand why
21 those two are linked.
22     A. What's the question?
23     Q. Thank you.
24             MR. BESSETTE: Why -- Oh, okay.

Page 140

1  BY MR. COLLINS:
2      Q. Why are they linked?
3      A. Well, I think as I said earlier, you come
4  in here and we're looking at the: Was a reasonable
5  process followed, reasonable investigation, whatever
6  you would want to call it -- refer to it.
7              And in the course of that, the
8  reasonableness, the thoroughness, diligence of the
9  process, seemed to center on the two parties'
10 disagreement about this one item. All right?
11             And so we look at the process. Part
12 of it is we look at that item and how these
13 parties -- again whether we're on the plaintiff's
14 side or defendant's side -- attempted to or appeared
15 to have addressed this along the way that they
16 made -- along their decision-making process or
17 trail.
18     Q. Uh-huh.
19     A. And so, you know, that's where we -- if --
20 if we had found something differently, we'd have to
21 say something differently. And we -- In the course
22 of that work and the evaluation of the process, I
23 think my feeling was it was most useful to do it
24 within a time frame pre-IPO, post-IPO that swung

Page 141

1  around the gray market.
2              Were there issues in the gray market
3  that were not being properly addressed in this
4  process that management, the board, and the
5  professionals had in place? And that's where we keep
6  looking at that other area.
7              But there -- It connects -- It
8  connects to a number of areas. In other words, you
9  had to -- You know, you're making a determination
10 about: What type of person is Barney Adams? What's
11 his style? What's the relationship of these
12 directors early-on before this thing goes public?
13 What's their relationship with what they perceived to
14 be their distribution base, their customer base? How
15 did they -- You know, you're attempting to assess
16 how they looked at all this, because they all come
17 back, they all come up -- most of them come up
18 centered, at the end of the day, about: Did this
19 impact gray market? Does this mean something should
20 have been said or not been said about gray market?
21     Q. Okay.
22             MR. BESSETTE: Lunch whenever you're
23 thinking about it, because I'm getting hungry.
24     A. Oh, it's five to 1:00. Time has gone by.

36 (Pages 138 to 141)

Page 142

BY MR. COLLINS:

1  Q. Heavens. We're having a good time.
2  A. Indeed.
3  Q. Just a couple more if I may --
4     MR. BESSETTE: Sure.
5  BY MR. COLLINS:
6  Q. -- because it is time for lunch.
7     Look, if you would, at page 5,
8  paragraph 5.
9  A. Yes.
10  Q. Paragraph starting out, "As is set out in
11  detail..."
12  A. Yes.
13  Q. This paragraph goes on to say "my
14  conclusion is that the company, its officers and its
15  directors satisfactorily addressed and fulfilled
16  their responsibilities and conducted a reasonable
17  investigation...immediately preceding and following
18  the initial public offering..."
19     That's fine. When you talk about
20  "their responsibilities" in this sentence, are you
21  referring to their responsibilities to investors in
22  the IPO or are you talking about some other set of
23  responsibilities?

Page 143

1  A. I'm talking about the process that they had
2  in place. I mean, you were going toward an IPO. The
3  IPO might or might not happen. We -- You know, we
4  know that can be the situation.
5     So what was the magic process they had
6  in place? How did they interrelate? Were they
7  transparent? Were documents moving back and forth
8  between management and the board that they had? All
9  these type -- these types of things is what I'm
10  addressing.
11  Q. Okay. And then this paragraph goes on and
12  you say that "The officers and directors exercised
13  proper due diligence," and you continue "followed
14  customary and normal business practices in addressing
15  and fulfilling their responsibilities..." The
16  sentence continues.
17  A. Uh-huh.
18  Q. In this sentence when you referred to
19  "their responsibilities," does that mean in
20  connection with the IPO or does that mean a broader
21  set of responsibilities?
22  A. In the overall sense, as we were examining,
23  we did not look, for example, at the quality of their
24  assembly process, such as an example, or their real

Page 144

1  estate process as they went from one situation to
2  another.
3     We were looking -- What we saw in
4  this evaluation of this -- of this -- of the workings
5  of the company as it moved toward the IPO we saw
6  processes that we thought were defective.
7  Q. So you mean processes in connection with
8  the IPO.
9  A. Primarily, that was true; although, if
10  there was something else that came to our attention,
11  it could -- You know, for example, it also came to
12  our attention what they -- how they perceived their
13  relationship with their -- with their distributors
14  and their retailers. That was something that came --
15  somewhere as any relationships they had with
16  component suppliers, we had no idea of what was going
17  on there.
18  Q. Okay. And what still confuses me is what
19  their -- the individual defendants' -- relationship
20  with distributors or authorized retailers has to do
21  with your opinion. That's -- That's what I don't
22  understand.
23  A. Well, it does, because it comes into --
24  again, it comes into an issue of the gray market and

Page 145

1  the -- and the relevancy of this gray market and how,
2  you know, whether our people -- albeit they may have
3  been trying to be doing the right thing -- missed it
4  as far as the gray market goes or didn't miss it.
5  And certainly there's things that are cited about
6  certain memos and other things like that that are
7  spoken to that the plaintiffs see one way, the
8  defendants see other way.
9  Q. Okay. And then the sentence goes on, "and
10  after their reasonable investigation, had reasonable
11  grounds to believe and did believe at the time the
12  Registration Statement became effective that it did
13  not contain any material misstatements or omit any
14  material facts."
15     Now, are you honestly opining on what
16  the individual defendants did believe?
17  A. I think that would come from the -- their
18  depositions; in other words, as they've all said that
19  they believed then and believe now.
20     I -- I wasn't inside of them as
21  you're -- as I think you're leading to, back on the
22  time that they signed this at the end of June, first
23  of July, so --
24  Q. You administered no lie detector tests.

37 (Pages 142 to 145)

---

Page 146

1    A.  At that time nor later.
2    Q.  Okay.  So I gather when you opine as to
3  what the individual defendants did believe, you don't
4  really know what they did believe at the time they
5  signed the Registration Statement.  You are not so
6  opining.
7    A.  No.  I'm not opining about that.
8    Q.  Okay.  Let us break for lunch and thank
9  you.
10        (Off the record from 12:55 - 1:40.)
11  BY MR. COLLINS:
12    Q.  Okay.  Let's resume.  Let me go briefly
13  back to something I touched upon this morning.  In
14  those situations where you -- you and your firm --
15  are retained to analyze loss causation or the lack of
16  it, can you tell me in general what your method of
17  analysis is?  How do you go about doing it?
18    A.  I think that's -- that's a good question.
19        I think in each case the best way I
20  can explain it is we try to get to the facts about
21  what -- what really took place.  Who did what, where,
22  when and why, and what emerges, an analysis of those
23  items, what does that tell us based on the evidence
24  based on our experience?

Page 147

1    Q.  Then on any particular day when there is a
2  stock price movement, what factors do you employ to
3  determine how on that particular day the stock price
4  movement can be explained?
5    A.  Well, as I --
6        MR. BESSETTE:  Again --
7    A.  -- mentioned earlier --
8        MR. BESSETTE:  -- asked and answered.
9    A.  I'm sorry.
10        MR. BESSETTE:  Go ahead.
11    A.  As I mentioned earlier, in most cases I
12  think you'd say you need to look at two -- two parts
13  of that.  We look at one part of it.  There is the
14  external part, as I've mentioned the economists and
15  so forth, people who do that type of -- as you
16  referred to it earlier -- statistical analysis or
17  combination of financial and statistical analysis and
18  look at what I'd call macroeconomic forces that are
19  moving in the marketplace.
20  BY MR. COLLINS:
21    Q.  Right.
22    A.  And what's happening.  You know, if all
23  these companies of whoever type that is drop 10
24  percent and you drop 5, you know, that's -- or you

Page 148

1  drop 15 and maybe 10 of it's explained by the market
2  and another 5 that's got to be explained by what we
3  find.
4    Q.  Right.
5    A.  Inside the company.  I think I would just
6  cut it up that way.
7    Q.  You said two parts though.  So one is the
8  external --
9    A.  Internal.
10    Q.  -- and the other is the internal.
11    A.  Let's just say the stock dropped 15
12  percent.
13    Q.  Right.
14    A.  And macroeconomist said:  Look, all of
15  those types of stock dropped 10.
16    Q.  Okay.
17    A.  Okay?  So that -- And upon looking at that
18  analysis, people agree the reasonable analysis, that
19  accounts for 10.  What accounted for the other 5?
20  What inside the company on that particular day or
21  that became known or was moving around, they could
22  have -- that could -- doesn't necessarily have to
23  be -- that could explain the 5 percent drop.
24    Q.  Okay.

Page 149

1    A.  You could have one seller that goes and
2  dumps on the marketplace.  You know, again, your
3  macro person may have caught that.  The market may
4  have perceived some turn in the company's operation.
5  That could be another thing.
6    Q.  Okay.  And then -- And then what process
7  do you use in general to determine whether the
8  company-specific movement on a particular day is a
9  significant movement or instead if it's just noise or
10  random movement that doesn't reflect company-specific
11  factors?
12    A.  Well --
13        MR. BESSETTE:  Objection.  I think
14  that's outside his area of expertise, which he's told
15  you several times.
16    A.  Yeah.
17  BY MR. COLLINS:
18    Q.  Well, go ahead.
19    A.  I was going to say that a lot of that
20  type of information will be picked up by the
21  macroeconomist.  All we're going to be looking at
22  is inside that company and the environment in which
23  they operate, what was going on there.  You know, are
24  there any explanatory factors in there that tell us

Page 154

1    A.  No, no.
2    Q.  -- in any of the --
3    A.  Long gone -- Long gone before any of that
4 emerged.  There would never -- Just having talked to
5 Marty, because I've known him many years, I don't --
6 Who knows?  Because there many have been litigation
7 filed back -- Because those companies always have
8 litigation, as you well know; but he was not involved
9 in any of that.
10   Q.  Was he on the board after that?
11   A.  I don't believe he did.  He always
12 continued to live in Wilmington, you know, where he
13 worked for duPont.  He was on the boards of other
14 companies, but not -- I don't think he stayed on
15 Northern Telecom, that being what it was called then,
16 as you know.
17   Q.  Now, if I could direct your attention to
18 page 9, please, the third paragraph.
19   A.  Yes.
20   Q.  The third sentence reads, "Gray market
21 issues had faced golf club manufacturers for many
22 years, and the industry-wide issues concerning gray
23 marketing were known to both investors and analysts."
24      Why is -- Is that -- Is that

Page 155

1 significant to your opinion?  And if so, how?
2    A.  Well, the first part of the statement that
3 says, "Gray market issues had faced golf club
4 manufacturers for many years," I think helped define
5 the problem.  In other words, the nature of the
6 problem, we had a long period of time -- we had some
7 personal familiarity, but the -- but the marketplace
8 had a long period of time to look at this problem and
9 figure out how to deal with it, how to try to control
10 it; and that was the ongoing struggle.
11      So it was, I think, I would say a
12 well-understood problem by the equipment
13 manufacturers and the other players in that
14 marketplace.
15   Q.  And that fact made it less likely to be
16 material for Adams?
17   A.  No, I think that's just a fact in and of
18 itself.  And so when you go to evaluate, you know,
19 the consideration they gave it, or what the
20 marketplace was saying about it later on, the
21 significance of it, it's just part -- it's just an
22 element in the -- in the analysis of the situation.
23   Q.  Uh-huh.  And how do you know that
24 "industry-wide issues concerning gray marketing were

Page 156

1 known to both investors and analysts"?
2    A.  Right.  The -- I might have used an
3 adjective before "investors."  It might have been
4 appropriate, let me just say that in the sense that,
5 you know, if you talk to any investor off the street,
6 they may have no idea what's going on in the golf
7 industry.  I agree.  That could very well be.
8       What I meant, for example, were the
9 investors --  All of the board members were investors
10 in Adams Golf.  It was a start-up company.  They had
11 bought into that technology, that hopefully
12 break-through technology, this thing.  So the
13 investors I'm talking about would be relatively
14 sophisticated.  There may be a better word to segment
15 them from just people who put money in mutual funds
16 that aren't making investment decisions, but
17 analysts, I think those analysts that covered the
18 sporting goods world, and particularly golf.  I
19 believe all of them, all of them -- It's fair to say
20 maybe you could find one or so that didn't.  But I
21 would think of all of them would be because it was
22 such a --
23   Q.  I see.
24   A.  -- problem that just wound through the

Page 157

1 whole situation in terms of being there.
2    Q.  So when you say "industry-wide issues
3 concerning gray marketing were known to both
4 investors and analysts," you're not referring to
5 investors in the Adams IPO?
6    A.  Oh, sure I could be.  I'm just saying in
7 the broadest sweep of investors -- In other words,
8 when people step up and look at Adams --  And we
9 didn't -- I --  And we were not inside of their
10 heads, obviously.  We saw, looking from where we did,
11 as a technology offering, new technology, that's why
12 these investors, directors previously had put money
13 in; and I think it's fair to presume that --  This
14 was the chance --  This was the next Callaway or the
15 next Ping possibly.  And so the people who came into
16 this, we've done no analysis on those investors; but
17 with the demand for this stock, when they were going
18 to increase the number of shares and increase the
19 price and all this, I think built off of this passion
20 for golf and these periodic technological
21 break-throughs, I would suspect most of the investors
22 had a sense of that.  That's what I'm --  That's what
23 I'm talking about.
24   Q.  Most of those investors --

40 (Pages 154 to 157)

Page 162

1  between Arter & Hadden, if I remember correctly, with
2  the SEC discussing various issues, the issue that
3  came us was raised -- let's just -- approximately in
4  June some time, maybe toward the end of June. In a
5  comment letter that Arter & Hadden wrote, excuse me,
6  if I remember -- remember correctly, sometime right
7  about -- getting close to the statement, the
8  registration going effective. It was not addressed
9  in there. There was no -- As I recall, there was no
10 explicit thing that said: By the way, you asked
11 about the bill of discovery and this is what we told
12 you about.
13          All I can indicate -- All that I can
14 draw from that is that this was resolved. That's
15 what I can draw from that.
16     Q.  Okay. And you're not offering an opinion
17 in this case with regard to what it means or what it
18 doesn't mean when the SEC allows a Registration
19 Statement to go effective; are you?
20     A.  I'm not offering an opinion upon that, just
21 an observation that they didn't require it to be
22 disclosed after in fact they observed it directly or
23 indirectly.
24     Q.  Okay. And you don't know what it was, if

Page 163

1  anything, that the SEC was told with regard to Costco
2  gray marketing; do you?
3     A.  I don't think as I sit here I can recall
4  anything that I know of, no.
5     Q.  Okay. And SEC as far as you know didn't
6  approve or endorse the Registration Statement in
7  that; do they?
8     A.  I don't think they approve anything. They
9  don't reject. They don't let you go forward. We're
10 going through that process right now in a mutual fund
11 related deal.
12     Q.  Okay. Now, page 10, paragraph 4, the first
13 sentence, "The officers and directors are expected to
14 exercise reasonable business judgment in addressing
15 their responsibilities." What does the exercise of
16 reasonable business judgment have to do with this
17 case?
18     A.  Well, in how this process flowed, in how
19 the governance and management structures were put
20 together and how this process flowed of moving toward
21 the IPO.
22     Q.  But you acknowledge, don't you, that --
23 that the officers and directors could have in fact
24 exercised reasonable business judgment and still,

Page 164

1  however, there could have been material
2  misrepresentations or omissions in the Registration
3  Statement?
4     A.  On -- We're talking about things in
5  general, of course.
6     Q.  Sure.
7     A.  And that people could follow the correct
8  whatever and a bad result at the end of the day
9  because something slipped through the cracks could
10 refer to it in that kind of slang. Somehow, even
11 though the process was as good as you could hope for
12 it to be, you know, there is no perfect processes.
13 But something got through there and you go in there
14 and you look at it, make a decision: Did it get
15 through there because the process was flawed or did
16 it work its way through for any other reasons?
17     Q.  But when you discuss in this report the
18 directors' and officers' exercise of business
19 judgment, I gather now you're talking about business
20 judgment both in addressing the gray market problem
21 and in determining not to disclose it in the
22 Registration Statement; is that accurate?
23     A.  We were --
24          MR. BESSETTE:  Objection. That

Page 165

1  misstates -- misstates the record.
2  BY MR. COLLINS:
3     Q.  Please.
4     A.  What we're talking about is reasonable
5  business judgment in terms of the process that was
6  performed. Now, you can cross that over into the
7  other areas because I've concluded that it, in my
8  opinion, I believe that they were accurate in the way
9  they treated the gray market issue. But where I was
10 coming from was their conduct in terms of the --
11 governance and management of the company in
12 connection with this IPO.
13     Q.  And I know you've referred to this before,
14 sir, so I just want to make sure I've got it down.
15 When you refer to "governance and management of the
16 company" in this context, you're referring to both
17 how to address the gray market problem and the due
18 diligence with regard to the IPO? Am I -- Do I
19 understand you correctly?
20     A.  I think the -- It started from the
21 standpoint, as I've said before, about the due
22 diligence with regard to the process itself. From
23 that, I examine the gray market situation to see if
24 the knowledge that I obtain there -- what that

42 (Pages 162 to 165)

Page 166

1  knowledge had to say about the appropriateness of its
2  process; and in doing that, I reached the conclusion
3  that it was appropriate to omit the gray market.
4        MR. COLLINS: Could you read that
5  back, please.
6        (The requested testimony was read back
7  by the reporter, as follows:
8        ANSWER: "I think the -- It started
9  from the standpoint, as I've said before, about the
10 due diligence with regard to the process itself.
11 From that, I examine the gray market situation to see
12 if the knowledge that I obtain there -- what that
13 knowledge had to say about the appropriateness of its
14 process; and in doing that, I reached the conclusion
15 that it was appropriate to omit the gray market.")
16 BY MR. COLLINS:
17    Q.  Okay.  In your determining that it was
18 appropriate to omit the gray market problem as a risk
19 on the Registration Statement, you're drawing upon no
20 special expertise with regard to SEC disclosure
21 requirements; is that accurate?
22    A.  I'm trying to draw on everything that I saw
23 in connection with this thing.
24    Q.  Okay.

Page 167

1     A.  And that would not be specialized SEC
2  expertise.  That would be one of the things I
3  observed.  They knew about it, they didn't stop it.
4  Different -- Just like I talked about the
5  underwriter memos.
6     Q.  But you're not here as an expert on gray
7  market.  You're not here as an expert on marketing.
8  You're not at least here in this case as an expert on
9  loss causation.  So in none of those areas did you
10 draw upon in coming to the conclusion that it was
11 appropriate to omit the disclosure; that's correct?
12    A.  No.  I -- Yeah, I was not named as an
13 expert in those different areas; but in terms of the
14 area in which I focused, again, we would want to look
15 at certain events and see if those events told us
16 anything about the process.
17    Q.  I see.
18    A.  That's how I'd relate it.
19    Q.  And the area on which you focused again was
20 process and governance?
21    A.  Right.
22    Q.  Okay.
23    A.  As it's set out there in the report.
24    Q.  I see.  Okay.  Now, in the fourth paragraph

Page 168

1  on page 11, under "Business Investment Decisions
2  Involve Risks," why do you consider it in your
3  opinion to be significant to discuss your assertion
4  that the development of new or improved products
5  involves risk?  Why is that relevant to your
6  opinion?
7     A.  Because, as I say later on in that
8  paragraph, "New product development is the area into
9  which Adams Golf entered with the development of
10 'Tight Lies' club."  Does that answer your
11 question?  I'm not sure I got the question right.
12    Q.  Well, I just may be a little bit confused.
13 Was there -- How was -- Was there something about
14 the Tight Lies being a new product that affected the
15 gray market risk?
16    A.  Well, that's pretty -- pretty broad in the
17 sense that -- I think one reason it became a target
18 in the gray market was because of the immense
19 popularity that it had.  It made it desirable for
20 those who were not authorized to try to get their
21 hands on to sell it.
22    Q.  Uh-huh.
23    A.  So that -- that would be one of the things
24 there.

Page 169

1     Q.  Okay.
2     A.  But you've got to -- You know, as I said
3  before a couple of times, technology is -- technology
4  offering here the break-through technology, which is
5  set out there in the -- in the Prospectus.
6     Q.  Okay.  I guess one of the things that I am
7  asking you here is there is some parts of your report
8  that I don't understand the significance to your
9  opinion about the process and the governance, so
10 that's -- that's motivating some of my questions.
11    A.  That's a good question.  It's one of the
12 factors that Adams Golf was facing that we would
13 consider in evaluating the process.  This was one of
14 those items that this was a company that potentially
15 offered break-through technology.  It was a company
16 whose sales were soaring.  Whatever -- You're
17 collecting those facts and framing up the situation.
18    Q.  I see.
19    A.  That's why --
20    Q.  So it's background, primarily.
21    A.  That's a fair word.
22    Q.  Do you recall whether there was a risk
23 disclosure with regard to product development or the
24 risks of product development in the Registration

43 (Pages 166 to 169)

Page 182

1  BY MR. COLLINS:
2      Q.  You may answer.
3          MR. BESSETTE:  Speculative.
4      A.  You know, again, all I -- all I can presume
5  from what I've examined is that in Adams' mind, this
6  was the way to maximize; and you can maximize -- it
7  might have been monetary or monetary and not monetary
8  ways to maximize.
9  BY MR. COLLINS:
10     Q.  Maximize -- "Monetary" means sales and
11 profits?  Is that right?
12     A.  Right.
13     Q.  And mone -- maximize non-monetary means --
14     A.  Could just be you don't want to have your
15 life disrupted.  You don't want people aggravated at
16 you.  You value quality relationships.  That type
17 thing.  It can mean it is how you treat employees,
18 treat customers, same type of things in other areas.
19     Q.  But Adams was a business and you spend much
20 of your life advising businesses and advising lawyers
21 about businesses I gather?
22     A.  (Nods head affirmatively.)  Correct.
23     Q.  And businesses in general, their goal and
24 their obligation to their shareholder is to maximize

Page 183

1  cash flow; correct?
2      A.  That is correct; but as we all know, there
3  are huge discussions about that.  Is the employee
4  number one?  Is the customer number one?  Along the
5  road to -- and it's clear that a lot of companies
6  decide they're going to enter into the social area,
7  social good area, even though the owners might say:
8  Look.  You just give us the money and let us use it
9  for the -- But they may believe that involvement in
10 those activities actually spurs their employers --
11 employees, raises their spirits.  So you get into
12 some interesting economic issues there.
13     Q.  Now, let me turn you, if I may, to page 14,
14 the first paragraph.  Now, I gather in your
15 discussion in this paragraph where you say, "The role
16 of the outside directors was described very well by
17 Finis Conner at his deposition."  I gather you
18 assumed that Mr. Conner was telling the truth.
19     A.  Well, you know, people testify under oath;
20 but, I mean, I think the strongest evidence that we
21 saw were the documents themselves about how things
22 worked.  I used that because I think he, as a
23 director who was trying to speak out of recall and
24 whatever, talked real clearly about things; but what

Page 184

1  we saw -- what I saw -- was that they did that in my
2  opinion.
3      Q.  On the basis of the documents you'd say.
4      A.  Yes.
5      Q.  Not on the basis of Conner's testimony.
6      A.  Not just on the basis of the testimony.
7  You know, on the basis of the documents almost
8  exclusively.  I refer to depositions like this in
9  this manner.
10     Q.  So in the second sentence where you say
11 that Conner provided -- he described the role of the
12 outside directors "very well," you mean eloquently or
13 accurately or both?
14     A.  I think I meant from the standpoint of
15 accuracy.  I mean, I did mean from the standpoint of
16 accuracy.
17     Q.  The next paragraph, the second sentence,
18 "Each independently reviewed the Registration
19 Statement and Prospectus, including the risk factors
20 and made a determination that the disclosures were
21 honest, true and correct."  "Each" refers to each
22 director, I presume?
23     A.  Everyone that signed -- You know, and
24 that -- But I'm talking about the board of directors

Page 185

1  there, so I would be referring to the board of
2  directors.
3      Q.  And now you don't know for sure that each
4  made -- that each independently reviewed the
5  Registration Statement and Prospectus; do you?
6      A.  Because I wasn't sitting there with them,
7  that would be true.
8      Q.  And you don't know what determination each
9  made about the honesty or completeness of the
10 disclosures; do you?
11     A.  I think in their depositions they've said
12 that they believed that.  I realize -- You know, I
13 think I know where you're going.  Did I know exactly
14 what was on their mind at that point in time?  And
15 the answer would be no.
16     Q.  So you don't know what each director
17 believed then or continues to believe now or feels
18 comfortable with or felt comfortable with unless you
19 were to take at face value their -- their testimony.
20     A.  I don't think that's completely true;
21 because I think there is a proc -- there is a process
22 or interaction involved that was -- Again, they had
23 a good professional team that was experienced that
24 they could reasonably rely upon; so -- I understand

47 (Pages 182 to 185)

Page 186

1  what you're saying; but I think there is -- that I'd
2  have to think through it a little bit -- a little bit
3  more; but that there was a basis for them to be quite
4  comfortable with what they were signing.
5      Q.  But whether they were or not, since you
6  can't get into their heads, you don't know.
7      A.  That would be --
8          MR. BESSETTE:  Do you mean beyond the
9  testimony?  I think that was the question.
10     A.  Beyond their testimony.  Yeah, I don't know
11 if I would limit it to their testimony.  I would have
12 to think about that.  But let's say primarily I would
13 draw from their testimony.
14 BY MR. COLLINS:
15     Q.  And you don't get inside their heads.
16     A.  I've not done that so far.
17     Q.  Now, on the carryover paragraph, you say
18 that you find interesting Conner's description of the
19 gray market issue which is "I have found that the
20 gray market issue is done -- is mostly done to
21 accommodate some retail house who is trying to use a
22 loss leader, and so they go by excess inventory from
23 people and low ball the price to get people in the
24 store.  That was never an issue as far as I was

Page 187

1  concerned relative to Adams.  It's my belief that all
2  the risk factors that were outlined covered every
3  known possible scenario that we had, and basically
4  alerted the buyer of the stock to be careful because
5  we don't know all things."
6      Q.  What was interesting about that?
7      A.  Well, he says a lot in there.  He sets
8  out -- He sets out and addresses quite a number of
9  points.
10     Q.  Tell me more about that, please.
11     A.  Well, I mean that's -- that's what I was
12 really -- That's what I was really referring to.  He
13 goes and here's somebody who's sets out in some
14 detail what their thinking is about all this.
15     Q.  Well, isn't it true that the gray market
16 issue could have been material even if Costco was
17 buying the clubs to use as a loss leader?  The fact
18 that some retailer might have been using the clubs as
19 a loss leader doesn't determine the issue as to
20 whether the risk was material to Adams; correct?
21         MR. BESSETTE:  Can I get that question
22 back, please.
23         (The requested testimony was read back
24 by the reporter, as follows:

Page 188

1          QUESTION:  "Well, isn't it true that
2  the gray market issue could have been material even
3  if Costco was buying the clubs to use as a loss
4  leader?  The fact that some retailer might have been
5  using the clubs as a loss leader doesn't determine
6  the issue as to whether the risk was material to
7  Adams; correct?")
8          MR. BESSETTE:  Compound, vague and
9  ambiguous.
10 BY MR. COLLINS:
11     Q.  I kind of liked it.
12     A.  The -- The fact that Costco was buying
13 clubs -- Let's say it was Costco was the buyer of
14 these excess clubs, I think that's what you're
15 saying, that doesn't make it -- Did you say
16 material?
17     Q.  Right.
18     A.  Yeah.  That doesn't make it material.
19 Because whoever's buying them, if it's a situation
20 that is out there, you deal with it, there are
21 approaches to dealing with it.  You know, it's a
22 phenomena, it's an occurrence, but it doesn't
23 necessarily make it material, in my opinion.
24     Q.  Sure.  And at some point somebody has to

Page 189

1  sit down, specifically the individual defendants and
2  the underwriters, and determine whether it's a
3  material phenomenon that's going on; right?
4      A.  Along with probably a whole lot of
5  things --
6      Q.  Sure.
7      A.  -- to make sure that they disclose
8  what-ifs.
9      Q.  And specifically with regard to the gray
10 marketing, the Registration Statement team needs to
11 add up a whole lot of factors to come to that
12 determination of whether it is or isn't material.  Am
13 I on the right track here?
14     A.  I think that's fair to say that all of
15 them, individually and jointly --
16     Q.  Sure.
17     A.  -- these different groups would be thinking
18 about scratching their head broadly and then
19 narrowing in.
20     Q.  Sure.  And I guess one factor in terms of
21 this materiality determination, one factor would be
22 whether there's been any gray marketing that's
23 occurred at all to date; correct?
24     A.  You know, I don't know if -- if it would

48 (Pages 186 to 189)

Page 194

1  time of the Registration Statement going effective.
2      A.  Right.  I think nobody knew how many clubs
3  they'd already bought.
4      Q.  And if you were trying to assess the
5  materiality of the gray market problem in connection
6  with the Registration Statement, would you want to
7  analyze whether there were any international
8  distributors who were involved in the gray marketing
9  process?  Is that one of the things you would look
10 at?
11     A.  In other words, by "international," their
12 relationship, do you mean they shipped out of the
13 country and they shipped back into the country?
14     Q.  Right.
15     A.  You know, that type of thing can happen and
16 does happen in all sorts of ways.  I think what you
17 would be trying to track is any avenue by which clubs
18 were getting out of the approved or authorized
19 distribution system.
20     Q.  Uh-huh.  Now, you -- And then in this
21 carryover paragraph you see that -- that one of the
22 statements that Conner made was "that" meaning I
23 guess gray marketing, the gray market issue --
24     A.  Uh-huh.

Page 195

1      Q.  -- the gray market issue was never an
2  issue, as far as I was concerned, relative to Adams.
3  That's a statement you agree with I presume at least
4  up until the IPO.
5      A.  Well, it's a statement that he made; and
6  when we looked at what we looked at, when I looked at
7  what I looked at, I don't disagree with him.
8      Q.  The period leading up to an IPO is a busy
9  time for management; correct?
10     A.  And it was for this company very busy at
11 that time because of all the production that I talked
12 about earlier.
13     Q.  What was going on?  They had the IPO going
14 on.  You said "all the production."  What did you
15 mean by that?
16     A.  The increase.  Remember you had to grow
17 space, you had to grow assembly, you had to grow
18 order-taking, you had to grow shipping.  They were
19 moving from one space to another to another.  And I
20 say it chuckling because it's very difficult to do
21 that, especially in a hands-on process.
22     Q.  Yes.
23     A.  You're not hiring -- I don't care what
24 level labor you're hiring -- that's difficult for you

Page 196

1  to grow from God knows whatever little group to where
2  they were two years later.
3      Q.  And the IPO process itself, dealing with
4  underwriters, road show process, working on the
5  Registration Statement, helping with the
6  underwriters' due diligence, all of that is very
7  time-consuming, too, isn't it?
8      A.  Absolutely.  Very important.
9      Q.  Now, here, as you discussed in your report,
10 Barney Adams, CEO, Mark Gonsalves, the head of sales,
11 Chris Beebe, the head of international sales, they
12 all spent time on the gray market issue, pre-IPO;
13 correct?
14     A.  There are certainly documents that point to
15 that, yes.
16     Q.  Isn't that by itself an indication that it
17 was an important issue, that these important
18 management personnel would have diverted their
19 attention to this issue at such a critical point?
20     A.  I think there is no doubt that they thought
21 it was an important issue, but not necessarily that
22 it was a material issue.
23     Q.  Now, tell me why you think there is no
24 doubt that they thought it was an important issue?

Page 197

1      A.  I think it all came off of that faith that
2  our authorized retailers and distributors mean a lot
3  to us and we're going to take care of those people.
4      Q.  And then the issuance of the press release
5  in June of 1998, is that also an indication in your
6  view that there's no doubt that management viewed it
7  as an important issue?
8      A.  I think that they have said or, you know,
9  in whatever the documents -- One of the things they
10 achieved, and forget what they said in a sense, but
11 I'm not doing that totally.  But one of the things
12 they achieved by that action was they told their
13 retailers, all their authorized retailers, "We're
14 going after these guys" -- that being Costco -- "and
15 we're going to figure out how they're getting these
16 clubs."
17         The implicit if not explicit message,
18 if some of our authorized retailers are selling them,
19 they're going to have a hard time receiving shipments
20 in the future.  You know, they're legalities --
21 they're legal things in the future or whatever, but a
22 manufacturer can make it difficult on a distributor
23 or retailer getting their hands on the club if they
24 want to, who was previously authorized.

50 (Pages 194 to 197)

Page 198

1    Q.  And at the time, June 1998, that was a more
2  message in the eyes of management to get out to those
3  authorized retailers, I gather.
4    A.  Because they valued -- That was part of
5  their modus operandi.  They really valued that
6  distribution, so they wanted to protect them.
7    Q.  Well, if what we're talking about here is
8  that you agreed that gray marketing was an issue at
9  Adams Golf before the IPO, you agree that management
10  considered it an important issue before the IPO,
11  isn't it really just a matter of an area where
12  reasonable people could differ as to whether it was a
13  material issue as of the effective date of the
14  Registration Statement?
15    A.  Oh, I -- I'm not sure exactly what you
16  mean when you say reasonable people could differ as
17  to whether it was material.  Everything that we saw
18  within the company and outside of the company pointed
19  to gray market, gray marketing as being an issue, but
20  a controllable issue that was part of the golf --
21  golf industry -- golf club manufacturing component of
22  the industry; but it was not one that needed to be --
23  that rose to the level of materiality, and for that
24  reason wasn't announced in these other -- that wasn't

Page 199

1  addressed in these other company documents that we
2  looked at.
3    Q.  Okay.  So reasonable people couldn't differ
4  on that.
5    A.  No.  I'm not saying --
6    Q.  Anyone looking at the situation.
7    A.  I'm not saying that reasonable people
8  couldn't differ.  I mean, that's -- that's a sweeping
9  statement there.  Maybe under some circumstances
10  people could look at something and come down on two
11  different points.  I'm not saying reasonable people
12  wouldn't disagree.  I'm just saying that that
13  situation, what I saw was, to me, compelling as far
14  as this, the basis.
15    Q.  Now, after the IPO Adams Golf made certain
16  disclosures with regard to the gray market and its
17  impact on Adams Golf; is that correct?
18    A.  Which --  What are you talking about
19  specifically?
20    Q.  Well, for example, on October 20 -- either
21  October 22nd or October 23rd, there was an
22  announcement with regard to the third quarter results
23  and also looking ahead to the fourth quarter.  Are
24  you familiar with that?

Page 200

1    A.  Yes.
2    Q.  And in that press release, as I think you
3  discussed in your report, there was a reference to
4  the impact or reference to an impact that the recent
5  gray marketing was expected to have on fourth quarter
6  results.  Do you recall that?
7    A.  Yes.  And I think Barney Adams a couple
8  weeks before had sent a memo to the board --
9    Q.  Right.
10    A.  -- calling for a special board meeting
11  emphasizing -- Yes, I recall those.
12    Q.  Okay.  So then why was that disclosure made
13  in October, the -- the press release disclosure?
14    A.  Well, I mean -- If it's fair to include
15  both the memo to the board --
16    Q.  Uh-huh.
17    A.  -- and in the press -- Because Barney
18  Adams perceived gray market to be a problem.  He
19  perceived it at that point in time to be a problem.
20    Q.  Now, in terms of whether a particular issue
21  is a problem and a material problem for a company, is
22  the CEO in general someone who is well-positioned to
23  make that assessment?
24    A.  Well, you have to look at the specific

Page 201

1  company; and in Adams Golf, Adams Golf in many
2  respects was Barney Adams.  He was the point guy out
3  there and he was a very -- as I mentioned earlier, a
4  very upfront transparent person.
5    If he saw an issue, he jumped on it.
6  He disclosed it.  He passed documents on to the --
7  All through the process you see this going on.  He
8  saw an issue and he saw an issue for the fourth
9  quarter -- perceived it.  He believed he saw an issue
10  for the fourth quarter of this company; because he
11  said somewhere between the memo and the special board
12  meeting and the press release that we can kill this
13  problem by the end of the fourth quarter because we
14  put in serialization.  All right.
15    But he also didn't have the numbers
16  then of what Costco was really doing.  They had --
17  They had this physical checking around that seemed to
18  indicate there were more clubs available at Costco
19  than before; but there's no --  You know, when we get
20  the numbers later on, they bought -- they, Costco --
21  bought 8,000 before, they bought 6,000 after; so I'm
22  not sure that what they were seeing was correct.  The
23  numbers don't seem to support that.
24    Q.  I see.  So you think Barney Adams was wrong

51 (Pages 198 to 201)

Page 214

1    Q.  Well, as part of Exhibit 186, there is a
2  September 29th letter, 1998, from an authorized
3  retailer who said that, in that letter, that before
4  the IPO there had been Costco -- that the Adams clubs
5  had been available at Costco.  Do you recall that
6  vaguely?
7    A.  This was -- Okay.  Some late September
8  memo.
9    Q.  No, no.
10   A.  From an authorized --
11   Q.  A September letter --
12   A.  Yeah.
13   Q.  -- from an authorized retailer in New
14  Jersey --
15   A.  To.
16   Q.  -- to Adams Golf saying that in June --
17   A.  Okay.
18   Q.  -- there had been Costco's -- the Costco
19  warehouses having Adams clubs.
20   A.  Okay.  So to some --
21   Q.  After the event, after the IPO, this
22  retailer was complaining about that.
23   A.  Okay.
24   Q.  So all I'm saying is you don't preclude the

Page 215

1  possibility that there were other authorized
2  retailers besides the eight or nine that you've
3  described --
4    A.  Who --
5    Q.  -- who were concerned about -- about gray
6  marketing but that you don't include them in your
7  eight or nine.
8    A.  That's -- That's a good example of
9  something that popped up later on that spoke to an
10  earlier period.
11   Q.  Okay.  And in your experience, where
12  authorized retailers have concerns, they don't always
13  complain.  They sometimes stop doing business.  Is
14  that accurate?
15   A.  Let me just put it this way.  It's
16  speculation on my part.  I haven't made a study of
17  that in any sense, but it wouldn't surprise me if you
18  had a large number of retailers and somebody became
19  angry.  They could leave for a lot of reasons.
20   Q.  And not complain before they went out the
21  door.
22   A.  (Nods head affirmatively.)  That's true.
23   Q.  Now, on page 15, in the second paragraph,
24  there is a reference to "The Company's lawyers, Arter

Page 216

1  & Hadden," having "extensive contact with the SEC to
2  ensure complete compliance."
3        Well, you don't know anything more
4  about that that you call "extensive contact" beyond
5  what you've already testified to today; do you?
6    A.  Right.  There are various letters -- I
7  mean, what -- what you do know is that you're going
8  to be working closely with the SEC because you have
9  to an IPO, and your communications and so forth;
10  so you have every re -- And the attorneys are the
11  ones that you would normally expect to be carrying
12  that ball.
13   Q.  Oh, sure.
14   A.  So, you know --
15   Q.  But the extent of the contact with the SEC,
16  you were not really somebody who's privy to it.
17   A.  There were, what, three or four different
18  S-1s that were issued before the final came out; so
19  maybe the adjective "extensive" is more than it needs
20  to be; but there was certainly dialogue going on and
21  they were refiling the S-1.
22   Q.  And that sentence goes on "Arter & Hadden,
23  had significant contact with the SEC to ensure
24  complete compliance with the federal securities law

Page 217

1  and full disclosures of any risks..."
2        Well, whatever contact the company's
3  lawyers had with the SEC didn't ensure any compliance
4  with the federal securities law; did it?  You can't
5  ensure compliance by contacting the SEC, however
6  extensively.
7    A.  Well, that may be a -- That may be a legal
8  question.  I may have -- I may have overwritten that
9  thing from an angle that -- What I was trying to say
10  is that the SEC, they're going to move slowly, as I
11  said earlier, before they give you clearance to go
12  forward; and that certainly gives you some comfort,
13  that you have complied with those regulations with --
14  with which you have to comply.  That's what --
15  That's where I was coming from.
16   Q.  And you say that as somebody who is not an
17  expert with regard to SEC procedures or approval
18  processes; correct?
19   A.  Who is familiar with them, but I'm not
20  putting myself forward as an expert, that's correct,
21  yes.
22   Q.  Now, in the next paragraph, do you -- You
23  know you have Exhibit 7 to -- You're familiar with
24  your --

55 (Pages 214 to 217)

Page 218

1    A.  Yes.
2    Q.  -- Exhibit 7 to this report.
3    A.  Right.
4    Q.  Do you know whether the underwriters were
5  familiar with all of the pre-IPO items?  Did they
6  know all the pre-IPO items you set forth on Exhibit 7
7  at the time of the IPO?
8    A.  I don't think -- I don't think that had
9  been assembled.  I think there's -- I don't think
10  that -- You know, I think that we had to construct
11  Exhibit 7, because there was nothing else that gave
12  us that.
13    Q.  Sure.  Now, in Exhibit 7 you list a lot of
14  different complaints to Adams Golf regarding Costco
15  in the fourth column.
16    A.  Yes.
17    Q.  The under -- And the underwriters, did
18  they know about all these complaints to Adams Golf
19  regarding Costco pre-IPO?
20    A.  I don't know if call by call -- I think --
21  Let me say this.  I think my sense was that all the
22  parties -- you know, representatives of all the
23  parties -- were familiar with the Canadian
24  situation.  I don't know if over the course of the

Page 219

1  next couple of months, as they moved toward the IPO,
2  that they were informed as each complaint -- each of
3  these other eight entities, let's call it, nine in
4  total, as they complained, I don't know whether they
5  were posted on there or not.
6    Q.  Now, page 16, paragraph 2, please.  In the
7  middle of the paragraph, you say, "As with any 'hot
8  product,' this popularity resulted in unauthorized
9  parties seeking to obtain Adams Golf clubs."
10    A.  Yes.
11    Q.  Do you see that sentence?
12    A.  (Nods head affirmatively.)  Uh-huh.
13    Q.  First of all, I guess we've already
14  established that you're not the gray marketing
15  expert, so you're not offering an opinion here as to
16  whether each and every hot product in any industry
17  always attracts gray marketers.  You aren't
18  authorized to provide any such opinion; are you?
19    A.  No, not in a -- not in an expert sense.  I
20  think in an experiential sense I could talk about
21  that what I observed, you know, at different places
22  as they seek to have the top line clubs.
23    Q.  Gray marketers.
24    A.  Yes.

Page 220

1    Q.  Well then, recognizing again that you don't
2  hold yourself out as an expert in this area, what is
3  likely to attract gray marketers, if anything,
4  besides the product being a hot product?  What other
5  preconditions do you need for gray marketing, so to
6  speak, in your experience?
7    A.  I haven't really -- I haven't focused on
8  those.  Obviously, your expert, Ochoa, lays out some
9  of the items that she says come out of the textbook
10  situations; and, you know, some of those have to do
11  with established brands.  I'm not sure that I agree
12  that Adams was an established brand at that point in
13  time.  Many of the media stories raise a question:
14  Are they just going to be one hot club and go away?
15        So -- But I'm not trying to apply --
16  I wasn't trying when I did this report to apply those
17  types of things.  This is a hot product and what
18  these people tend to want in terms of golf equipment
19  suppliers -- golf club suppliers are, you know, names
20  that are desired -- clubs that are desired by the
21  public.
22    Q.  So you are not offering any opinion, I
23  gather, in this case with regard to what the
24  preconditions for gray marketing are.

Page 221

1    A.  I think all I'm saying is that when you've
2  got a hot product, it's not surprising to see
3  unauthorized parties seeking the product.
4    Q.  Okay.  I thank you.
5        You're not offering any such opinion
6  in this case; are you?
7        MR. BESSETTE:  What opinion?
8  BY MR. COLLINS:
9    Q.  With respect to what the preconditions for
10  gray marketing are.
11        MR. BESSETTE:  Other than what he's
12  stated here.
13        MR. COLLINS:  Which I think Dr. Grace
14  has said he's not providing on any sort of expert
15  basis.
16        MR. BESSETTE:  I agree.
17  BY MR. COLLINS:
18    Q.  So I'm trying to make sure we know what
19  your opinion is and isn't.
20    A.  Right.
21    Q.  You talk about a lot of things in this
22  report, and I just want to make sure we -- I know
23  what you are offering an opinion on --
24    A.  Right.

56 (Pages 218 to 221)

Page 234

1 and what difference does it make to this case?
2    A.  It speaks to the dedication that they had
3 to their authorized retailers, that they -- that they
4 didn't linger back in the pre-IPO periods when this
5 first came up, even though Canada was a very small
6 part of their overall sales.  It indicated to me they
7 took the well-being of their distributors and their
8 retailers very seriously.
9    Q.  Well, what does that have to do with this
10 case?
11    A.  Well, because it speaks to -- It flows
12 right into the fact that they had -- they dealt with
13 the problem.  They went after it because it was
14 important to them, but it was not material as far as
15 being put in the company's statement -- in the IPO
16 documents.
17    Q.  I -- I guess we are getting metaphysical
18 these days, or I am, or Paul and I are; but you say
19 it's important but not material.  Surely you see that
20 as a fairly fine distinction, sir.
21    A.  No.  No.
22       MR. BESSETTE:  Yeah, explain.
23    A.  And the reason -- Yeah.  The reason why is
24 because this goes back to the employee, the customer

Page 235

1 what we're going to do as a company to take care of
2 things.  This company, as I see it, had a deep
3 concern for their customers.  They believed that that
4 was an important element of their success.  That was
5 important to them.  And so they had a -- one
6 authorized distributor or retailer who had a
7 problem.  They were going to address that problem.
8       And when they heard it was something
9 that could affect their standing with their retailers
10 and their distributors, just use retailer as a
11 general, you know, they went after it.  They went
12 after it.  And that was -- They were dedicated to
13 doing that.
14       That's why Gonsalves says this is a
15 serious problem, whatever.  It could be a serious
16 problem to him if one distributor complained, one
17 retailer complained.  That was within -- That was
18 within their psyche or modest operandi.  And it was
19 completely legitimate.  It was simply saying: Treat
20 your customers right.  Develop those relationships.
21 They'll take care of you if you take care of them.
22 All that type of stuff, whether it's relevant or not
23 relevant of the situation if the company thinks about
24 it.  And that's what was going on here, no matter

Page 236

1 how small that problem is.
2       Barney Adams said somewhere, in one of
3 the articles that he was quoted as saying about this
4 time, about -- He didn't want his customers unhappy.
5 That it was a pain in the back said.  I'm not sure
6 those are the words he used -- a pain in the back
7 side to deal with these kinds of things.  He wanted
8 his -- He wanted his retailers and his distributors
9 to be happy.
10 BY MR. COLLINS:
11    Q.  And his desire for the retailers to be
12 happy was partly tied to the business strategy of
13 Adams Golf; correct?
14    A.  I believe that it was.  Yes.
15    Q.  Because if your -- if your customers are
16 high end or reasonably high end golf course shops or
17 off course shops, as opposed to discount houses,
18 whether they are well treated, whether they have high
19 margins, matters more than would be the case if you
20 sold your golf clubs at gas stations and drug stores;
21 right?
22    A.  You know, again, each situation has to be
23 valued -- evaluated separately.  I mentioned about
24 Taylor Made along about this time made some sort of

Page 237

1 deal with Costco, where they were going to sell older
2 clubs, and I think even some of their new clubs they
3 got if they sold enough of the old clubs.  I don't
4 know what the deal was.  But each party is trying to
5 optimize as you said earlier for their shareholders,
6 take it and take into consideration what they think
7 those factors are, they have to address.
8    Q.  Okay.  And that's, what, Barney Adams,
9 Gonsalves --
10    A.  And Beebe.
11    Q.  -- and Beebe were doing when they
12 considered this issue important, although you say not
13 material.
14    A.  Yeah.  Financially, financially it was not
15 that significant.  I show that in the report, even in
16 something of some magnitude in Canada happened, it
17 wouldn't have much of a financial effect on Adams.
18       But -- and that's the effect now, in
19 this quarter.  They obviously -- "they" being the
20 management team -- were looking it appears to be much
21 further than that.  They wanted to keep these
22 relationships because they valued them.
23    Q.  And they valued them not out of the
24 goodness of their hearts, but because that was part

60 (Pages 234 to 237)

Page 238

1  of the business strategy.
2      A.  I can't speak to that as to what really
3  went on in their mind.  It could be that Adams was
4  just the kind of person that said, "I'm going to run
5  this company this way.  You can call it employees
6  first or customers first.  This is the way I should
7  do it from my own moral code."  Okay?  He can make
8  that call.
9      Q.  But certainly you're not opining to that
10 effect.
11     A.  I am not opining to that effect.  No.
12     Q.  Page 17, paragraph 3, "Barney Adams led the
13 effort by Adams Golf to further persuade Costco to
14 reveal their sources."  This was just before the IPO;
15 correct?
16     A.  Right.
17     Q.  This was a very busy time for Barney Adams;
18 right?
19     A.  Correct.
20     Q.  So the fact that Barney Adams was spending
21 his time just before the IPO and other members of top
22 management just before the IPO were spending their
23 time on gray marketing issues is -- as I understand
24 it from you -- perhaps an indication of the goodness

Page 239

1  of their hearts; but it's also perhaps an indication
2  of what they thought was important or even material
3  for the company; is that accurate?
4      A.  No.  I don't think so.  I think they
5  thought it was important, for whatever reasons, and
6  they went after it in a very serious manner.  He not
7  only filed the bill of discovery.  We know that he
8  wrote letters, he made demands on Costco trying to
9  find out who was their supplier.
10         If they had real clubs, real Adams
11 clubs and who their supplier was, they, again, to me,
12 that's a personification of the importance they
13 placed on their distribution network.  And supporting
14 that, making clear like you said in the article about
15 his long-term planning, I'm going to tell you what I
16 am going to do and I'm going to go do it.  I've told
17 you distributors and retailers I'm going to protect
18 you and I'm going to do it.  That's the same type of
19 color and thinking.  Again, I'm just looking at the
20 evidence.
21     Q.  Sure.  I appreciate that.  And, of course,
22 the importance that management attached to the
23 exclusive distribution network was something that was
24 highlighted in the Registration Statement; correct?

Page 240

1      A.  Right.  That they distributed, that Adams
2  distributed through an authorized network.  That
3  didn't mean that some people could get -- take Adams
4  clubs and run them out somewhere else, but that Adams
5  was not selling them to others.
6      Q.  Well, all that I'm asking is apart from the
7  goodness of their hearts, management by taking a
8  serious view of gray marketing were seeking to
9  preserve the rare -- the very exclusive retail
10 network that was extolled in the Registration
11 Statement; is that accurate?
12         MR. BESSETTE:  Objection, misstates
13 testimony.  I don't think the Prospectus has the word
14 "exclusive" in it with respect to the distribution
15 network.
16 BY MR. COLLINS:
17     Q.  "Selective," thank you.  I amend the
18 question to say "selective" not "exclusive."
19     A.  Could you read that back, please?
20     Q.  Let me ask it again.
21     A.  Okay.  Sure.
22     Q.  In considering the gray marketing problem
23 serious, don't you agree that Adams management was
24 acting consistent with the view that selective retail

Page 241

1  distribution was an important business strategy for
2  Adams?
3      A.  I believe that's correct.  They valued that
4  distribution network.  They set it up that way and
5  they wanted to support it.
6      Q.  Now, I have -- Paul can tell you I've
7  previously been confused by your numbers on page 18.
8  Maybe you can clear it up for me.
9          MR. BESSETTE:  Oh, yeah.
10 BY MR. COLLINS:
11     Q.  Fourth paragraph.
12     A.  Okay.
13     Q.  You reference pre -- the 3200 in the U.S.
14 and 660 in Canada refers to pre-IPO sales at Costco;
15 correct?
16     A.  Costco's records demonstrate 3860 were sold
17 in Costco, 3200 in the U.S., 660 in Canada.  Yes.
18     Q.  Now you then go on to talk about 2 percent
19 of the total sales and unit sold were less than
20 1 percent of the total units.  What do the 2 percent
21 represent and what does the 1 percent represent?
22     A.  The -- If you take the -- as your
23 denominator the 457,000 --
24     Q.  Right.

Page 246

1    Q.  So the question is:  Wouldn't you agree
2    it's a fairer comparison to look at Costco purchases
3    or perhaps Costco sales in the second quarter versus
4    Adams total sales in the second quarter rather than
5    look at the entire first half?
6    A.  What I'm thinking about though, too, is
7    that this whole IPO process was well underway in the
8    first quarter.  There was work going on, there was
9    information being exchanged, evaluations were being
10   made.  And if I remember right -- remember when those
11   investment banker memos were written -- may be near
12   the end of the March.  I'm not sure I remember
13   exactly.  So there were things happening through
14   there.
15         Now, if somebody wants to set up the
16   second quarter numbers and say hey, the second
17   quarter numbers show this, take a look at that.  You
18   know, for whatever reasons, I picked the first half,
19   but not to make the number look better than the first
20   quarter.
21   Q.  But the fact that the IPO process began
22   some months before July 10th had no limiting impact
23   on the disclosure required in the Registration
24   Statement; right?  In other words, the IPO process

Page 247

1    might have been ongoing for quite some time; but I'm
2    sure you agree that the Registration Statement needed
3    to give up to date risk disclosure.
4    A.  That's what you wanted to have in it,
5    right, if the information became available to people,
6    they became aware of something a week before that was
7    significant, you would expect them to put it in
8    there.
9    Q.  And in fact that would be their
10   obligations, even if they had to ferret it out.  If
11   it was not presented to them on a silver platter, but
12   their due diligence would uncover some risks, then
13   you certainly would expect that risk ferreted out
14   through proper due diligence procedures to be
15   disclosed in the Prospectus.
16   A.  You know --
17         MR. BESSETTE:  Objection, to the
18   extent that it calls for a legal conclusion.
19   A.  Legal opinion.  I was going to say, you
20   would talk something like that over with your team,
21   particularly your lawyers, I mean whatever it is,
22   because we haven't measured the consequence of it,
23   whatever the relative significance of it.  So -- But
24   it was something you would expect to be thought about

Page 248

1    and be conferred upon and a decision be made,
2    depending upon the outcome of those evaluations.
3    BY MR. COLLINS:
4    Q.  Well, quite apart from any legal conclusion
5    you might improperly draw, which I won't ask you to
6    do, it would be your expectation as a person who has
7    been involved in the career you've undertaken and
8    based upon your experience, it would -- it would be
9    your expectation that the Registration Statement for
10   any company would contain the most up to date
11   information that could be discerned through proper
12   due diligence; correct?
13   A.  I think that's basically -- basically
14   correct.  You want it to be as timely and accurate as
15   possible.
16   Q.  Professor Ochoa refers to some literature
17   on the -- a number of different articles dealing with
18   the gray market.  Are you familiar with the
19   literature to which she refers in her opening and
20   rebuttal reports?
21   A.  I -- I saw that -- I saw the articles to
22   which she referred.  I know that, you know, we just
23   happened to make a -- take note of the fact that five
24   of them are written after the IPO anyway.  But just

Page 249

1    from the phenomena, I think, as an economist of the
2    gray market, the counterfeit market, I have a
3    background in it; but I don't -- I don't spend time
4    pursuing those types of articles to read.  That's not
5    what I look for in my reading.
6    Q.  I see.  And the fact that five of them were
7    written -- if that's the number -- after the IPO, I
8    guess partly reflects how long this litigation has
9    been going on, but certainly you're not saying that
10   simply the date on which the article was written, you
11   don't have any basis to say that a 2003 article
12   improperly characterizes the gray market for golf
13   clubs in 1998.  You're not asserting that; are you?
14   A.  What I am saying is that I -- I don't
15   believe -- you could impute that knowledge to the
16   group that was making the evaluation back in the --
17   in the pre-IPO period because it didn't exist as she
18   has stated.  If it existed in some other form, she
19   ought to reference forms that were timely to the
20   people at that point in time.
21   Q.  Well, I think one of the things we'll
22   probably be able to agree on is when certain articles
23   were written; but you were not --
24   A.  It's there.

63 (Pages 246 to 249)

Page 250

1  Q. Right.
2  A. It's stated when she references them, yes.
3  Q. But you're not offering -- You haven't
4 read most of these articles; right?
5  A. I have not read any of those articles,
6 right.
7  Q. So you're not offering any opinion on which
8 pieces of the gray market literature are and which
9 pieces are not relevant to litigation, I presume.
10  A. No. I believe we have a marketing expert
11 and I would presume that, you know, they might or
12 might not look at that, but that wouldn't be
13 something that I would look at.
14  Q. All right.
15  A. I'm going to take it you're on a later
16 plane.
17  Q. Oh --
18  MR. BESSETTE: Oh, I didn't warn you,
19 sorry.
20  MR. COLLINS: Thank you, no. Off the
21 record for a second.
22  (Off the record from 3:51 - 3:58.)
23 BY MR. COLLINS:
24  Q. Let us look at page 22, last paragraph, a

Page 251

1 carryover paragraph beginning, 'Interestingly' -- now
2 interestingly this is one of the first paragraphs we
3 discussed today at this deposition. But with regard
4 to why it is that Adams Golf's stock price declined
5 in July, you are not offering an opinion in this
6 case, I presume.
7  A. Not as any type of expert. I mean, we
8 looked at factors, looked at factors and find a
9 number of interesting things, which I can -- have
10 sort of set some of those out on this little list of
11 documents that I'll give to you shortly.
12  Q. Well --
13  MR. BESSETTE: I think you should
14 answer as no.
15  A. Okay.
16  MR. BESSETTE: Let's just have a -- so
17 we're clear the question again.
18  (The requested testimony was read back
19 by the reporter, as follows:
20  QUESTION: "Let us look at page 22,
21 last paragraph. A carryover paragraph beginning,
22 'Interestingly' -- now interestingly this is one of
23 the first paragraphs we discussed today at this
24 deposition. But with regard to why it is that Adams

Page 252

1 Golf's stock price declined in July, you are not
2 offering an opinion in this case, I presume.")
3  A. No.
4 BY MR. COLLINS:
5  Q. Thank you. Are you about to give me more
6 documents?
7  MR. BESSETTE: Just what he --
8  A. Only the list.
9  MR. BESSETTE: The list he handed to
10 you earlier.
11  MR. COLLINS: Ah, thank you.
12  MR. BESSETTE: Right.
13 BY MR. COLLINS:
14  Q. Do you have any information on what
15 methodology was employed by layman, if any, with
16 regard to their assessment at the end of July as to
17 what caused that stock price drop?
18  A. It would all -- I mean, I am familiar that
19 they do this type of work all the time; but it would
20 just be speculating on my part as to what that
21 particular model was.
22  Q. And when you say you're familiar that they
23 do this type work all the time, what do you mean?
24  A. You see it referenced in the WALL STREET

Page 253

1 JOURNAL and analysts' columns and things like that.
2 We've looked at this and we've looked at that and we
3 see these general trends of this type of movement.
4 this is that macroeconomic realm that we talked about
5 earlier.
6  Q. Well, this is a -- Were all of the factors
7 that Lehman was discussing --
8  A. Oh, I'm sorry. I thought you meant the
9 first sentence, the small cap market. I'm sorry.
10 No.
11  Q. Thank you. No. There were -- What I am
12 asking is do you have any idea what methodology
13 Lehman provided with regard to its analysis of
14 several factors, according to Lehman, causing the
15 decline?
16  A. No.
17  Q. Okay. Now, in the second paragraph on page
18 23, you're referring to the October press release, I
19 believe, which we discussed earlier today; and in the
20 middle of that paragraph, with reference to Barney
21 Adams, you say, "He stated that Adams Golf
22 anticipated their sales would be further impacted by
23 the recent gray market distribution..."
24  The -- The reference there to

64 (Pages 250 to 253)