## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **IN RE ADAMS GOLF, INC.**<br>**SECURITIES LITIGATION** | **CONSOLIDATED**<br>**C.A. No. 99-371 KAJ** |

## PLAINTIFFS' OPENING BRIEF IN SUPPORT OF
## MOTION TO STRIKE AND EXCLUDE TESTIMONY
## OF EDWARD R. NECARSULMER III

ROSENTHAL, MONHAIT & GODDESS, P.A.
Carmella P. Keener (DSBA No. 2810)
919 N. Market Street, Suite 1401
P. O. Box 1070
Wilmington, DE 19899
(302) 656-4433

*Plaintiffs' Liaison Counsel*

BERGER & MONTAGUE, P.C.
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

DATED: September 11, 2006

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.     NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . 1

II.    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    Mr. Necarsulmer's Opinions Should Be Precluded
             Because They Are Grounded in Purported Business
             Practices or Standards That Conflict With Well-
             Established Legal Principles Governing The
             Sufficiency of Due Diligence Investigations . . . . . . . . . . . . . . . . . . . . . . . 3

             1.    The Legal Standards Governing Underwriter
                   Due Diligence Are Clear and Well-Established . . . . . . . . . . . . . 3

             2.    Mr. Necarsulmer's Opinions and Testimony
                   Demonstrate Unfamiliarity or Disagreement
                   With Controlling Due Diligence Principles . . . . . . . . . . . . . . . . . 8

             3.    Mr. Necarsulmer Has Applied Improper Standards
                   To T he Facts of This Case In An Illogical Manner
                   Which Has Generated Unreliable Conclusions . . . . . . . . . . . . . . 12

                   a.    Mr. Necarsulmer's Opinion Regarding The
                         Reasonableness of the Underwriters' Due
                         Diligence Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                   b.    Mr. Necarsulmer's Opinion Regarding The
                         Underwriters' Disclosure Obligations . . . . . . . . . . . . . . . 16

III.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

*Escott v. BarChris Construction Corp.*,
    283 F. Supp. 643 (S.D.N.Y. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Feit v. Leasco Data Processing Corp.*,
    332 F. Supp. 544 (E.D.N.Y. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 17

*Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Shaw v. Digital Equipment Corp.*,
    82 F.3d 1194 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Software Toolworks, Inc.*,
    50 F.3d 615 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Univ. Hill Foundation v. Goldman, Sachs & Co.*,
    422 F. Supp. 879 (S.D.N.Y. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In Re WorldCom, Inc. Securities Litigation*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 6, 9

### STATE CASES

*Mayhew v. Sullivan Mining Co.*,
    76 Me. 100 (Maine 1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

### FEDERAL STATUTES

15 U.S.C. §77k . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**MISCELLANEOUS**

*Report of the Task Force on Sellers' Due Diligence And Similar Defenses*
        *Under the Federal Securities Laws*,
        48 THE BUSINESS LAWYER 1185, 1191 (1993) . . . . . . . . . . . . . . . . . . . . . . . 4

*SEC Release No. 33-5275,*
        2 Fed. Sec. L. Rep. (CCH) ¶4506B (July 26, 1972) . . . . . . . . . . . . . . . . . . . . . . . 15

*Underwriter Due Diligence*, Cadwallader Wickersham & Taft (1999) . . . . . . . . . . . . . . 8

John C. Coffee, Jr., *A Statutory and Case Primer on Due Diligence*
        *Under the Securities Laws*,
        886 P.L.I./Corp. 11, 17 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## I. NATURE AND STAGE OF PROCEEDINGS

In this case discovery and expert discovery has been completed. Pursuant to the scheduling order entered by the Court, Plaintiffs submit this memorandum in support of their motion to strike and to preclude proposed expert witness testimony of Edward R. Necarsulmer III ("Mr. Necarsulmer").

## II. SUMMARY OF ARGUMENT

1.     Under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) and its progeny and Fed.R. Evid. 702, the court as gatekeeper should decide whether to admit expert testimony, considering the qualifications of the expert, the reliability of the testimony and whether the testimony will assist the jury. *See e.g.*, *Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003).

2.     In this case, Mr. Necarsulmer has opined that the underwriter defendants Lehman Brothers, Ferris, Baker, Watts and Nationsbanc used appropriate due diligence in issuing the Adams Golf Registration Statement and Prospectus without any mention of the risks of gray marketing or double selling of Adams Clubs.

3.     Mr. Necarsulmer failed to heed the teaching of the cases detailing what underwriters should do to investigate a company that seeks to issue an Initial Public Offering, to be sure that the Registration Statement and Prospectus are accurate and not misleading and do not omit any material facts. *In Re WorldCom, Inc. Sec. Litig.* 346 F. Supp. 2d. 643 (S.D.N.Y. 2004); *Feit v. Leasco Data Processing Corp.* 332 F. Supp. 544 (E.D.N.Y. 1971); *Escott v. BarChris Construction Corp.* 283 F. Supp. 643 (S.D.N.Y. 1968).

1

4.    Mr. Necarsulmer's opinion should be stricken because he is not qualified to give the opinion since he is not familiar with the law governing the duties of underwriters.

5.    Necarsulmer's opinion is not reliable and cannot help the jury because he has relied on improper standards based on what he as an underwriter and his colleagues did, rather than on what the case law requires.

### III.  STATEMENT OF FACTS

The underwriter defendants have sought to offer the opinions of Edward R. Necarsulmer III to the effect that (a) the "due diligence" investigation ostensibly conducted by the underwriter defendants (Lehman Brothers, lead underwriters for Adams's offering, and Ferris Baker Watts and NationsBanc, co-managers for that offering) was reasonable within the meaning of Section 11 of the Securities Act, and (b) that the underwriters' failure to require disclosure of the gray marketing risk or Costco distribution of Adam Golf products following that investigation was therefore appropriate. (See Report and Rebuttal Report of Edward R. Necarsulmer III, attached hereto as Exhibits 1 and 2.)

Plaintiffs move to strike and exclude  Mr. Necarsulmer's opinions, which purport to be based on specialized knowledge regarding the securities industry, because the principles underlying those opinions and the application of those principles in rendering the opinions are patently flawed.  They are flawed both because the proposed expert witness opinion and testimony lack "'a reliable basis in the knowledge and experience of [the relevant discipline],'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999), quoting *Daubert*, 509 U.S. at 592, and because they are not the product of reliable

2

principles and methods.

Mr. Necarsulmer's reports as well as his deposition testimony (attached hereto as Exhibit 3) show that he has reached his conclusions regarding the underwriters' due diligence solely on the basis of his experience as a participant in the securities industry and his purported familiarity with industry standards. However, this is not enough. His opinions are based upon supposed business practices and standards that sharply conflict with well-established legal requirements for due diligence investigations.

## II. ARGUMENT

A.  **Mr. Necarsulmer's Opinions Should Be Precluded Because They Are Grounded in Purported Business Practices or Standards That Conflict With Well-Established Legal Principles Governing The Sufficiency of Due Diligence Investigations**

To be admissible, expert witness testimony which is grounded in scientific or other specialized knowledge must have "'a reliable basis in the knowledge and experience of [the relevant discipline],'" *Kumho*, 526 U.S. at 149, quoting *Daubert*, 509 U.S. at 592. Mr. Necarsulmer's opinions do not satisfy that standard.

1.  **The Legal Standards Governing Underwriter Due Diligence Are Clear and Well-Established**

The relevant statutes and case law make clear the reasons why underwriters have been required to exercise due diligence in connection with issuances of stock, and the very strict standards that govern underwriter due diligence.[1]

---

[1]To prevail on a "due diligence defense," an underwriter must show not only that he conducted a "reasonable investigation," but that after conducting one he had reason to believe, and did in fact believe, that the prospectus and registration statement were not misleading. 15 U.S.C. §77k. Since Mr. Necarsulmer's conclusion that the underwriters conducted a "reasonable investigation" is demonstrably unfounded, it is unnecessary in this memorandum to discuss the remaining subjective elements of the due diligence defense.

3

A 1990's Task Force concluded that Congress' reasons for imposing liability on underwriters "stand out fairly clearly from the legislative history of the 1933 Act." Those reasons were that underwriters "were thought to be persons ( i ) who were able, because of their role in a distribution, to discover essential facts and ensure that they were disclosed and (ii) on whom the public relied for this purpose." *Report of the Task Force on Sellers' Due Diligence And Similar Defenses Under the Federal Securities Laws*, 48 *THE BUSINESS LAWYER* 1185, 1191 (1993) (emphasis in original).

As Judge Denise Cote recently held in a searching review of precedent in *In Re WorldCom, Inc. Securities Litig.*, 346 F. Supp. 2d at 674, although there are surprisingly few precedents with regard to due diligence, two early federal decisions, *Escott*, 283 F. Supp. 643, and *Feit v. Leasco Data Processing Corp.*, 332 F. Supp. 544 (E.D.N.Y. 1971), "remain 'the major polestars' in defining what constitutes a reasonable investigation." (citing, John C. Coffee, Jr., *A Statutory and Case Primer on Due Diligence Under the Securities Laws*, 886 P.L.I./Corp. 11, 17 (1995)).

*Escott* and *Feit* and their progeny establish a number of important guiding principles:

1.     Verification Requirements.  Searching, critical verification of information supplied by an issuer is perhaps the most basic and essential requirement of any due diligence investigation.

> In his seminal opinion in *Escott*, Judge McLain wrote:
>
> The purpose of Section 11 is to protect investors. To that end the underwriters are made responsible for the truth of the prospectus. If they may escape that responsibility by taking at face value representations made to them by the company's management, then the inclusion of underwriters among those liable under Section 11 affords the investors no additional protection. To effectuate the

4

> statute's purpose, the phrase "reasonable investigation" must be
> construed to require more effort on the part of the underwriters
> than the mere accurate reporting in the prospectus of "date [sic]
> presented" to them by the company....In order to make the
> underwriters' participation in this enterprise of any value to
> investors, the underwriters must make some reasonable effort to
> verify the data submitted to them. They may not rely solely on the
> company's officers or on the company's counsel. <u>A prudent man in
> the management of his own property would not rely on them.</u>

283 F. Supp. at 697 (emphasis added).

Applying these principles, the *Escott* court concluded that no reasonable
investigation had occurred where the underwriters "made almost no attempt to verify
management's representations." *Id.* In so doing, the court made abundantly clear that
digging and probing by underwriters is necessary, that it is simply not "sufficient to ask
questions, to obtain answers which, if true, would be thought satisfactory, and to let it go
at that, without seeking to ascertain <u>from the records</u> whether the answers in fact are true
and complete." *Id.* at 696 (emphasis added).

In a subsequent decision, *Feit*, Judge Weinstein expanded on the need for
verification, agreeing with a commentator that "the underwriter is the only participant in
the registration process who, as to matters not certified by the accountant, is able to make
the kind of investigation that will protect the purchasing public." 332 F. Supp. at 581
(citing Comment, *BarChris: Due Diligence Refined*, 68 COLUM. L. REV. 1411, 1421
(1968)). The court in *Feit* concluded that *Escott* teaches that in conducting a due
diligence investigation, underwriters "are supposed to assume an opposing posture with
respect to management." *Id.* (citing the admonition in *Escott*, 283 F. Supp. at 696) that
the positions of the underwriters and the Company's officers are "adverse," because "[i]t
is not unlikely that statements made by company officers to an underwriter to induce him

5

to underwrite may be self serving" or "unduly enthusiastic".

*Feit* admonished that underwriters therefore "must be expected to be alert to exaggerations and rosy outlooks and chary of all assurances by the issuer." 332 F. Supp. at 581. *Feit* also followed *Escott* by instructing that defendants in conducting a due diligence investigation are expected to examine those corporate documents which were "readily available." *Id.* at 577. *Feit* emphasized -- as clearly set forth in the text of Section 11 -- that the standard of reasonableness which applies "is that of a reasonably prudent man managing his own property." *Id.* at 576 (citing 15 U.S.C. § 77k(c)). *Feit* cautioned that the underwriters' use of experts, including marketing experts and consultants, might be necessary to improve due diligence. *Id.* at 581.

The rigorous, investor-protective standards of *Escott* and *Feit* have by no means been rendered obsolete by the passage of time. Judge Cote reiterated in *WorldCom*, 346 F. Supp. 2d at 628, that the underwriter's consequent obligation remains to "conduct a meaningful investigation," not "merely [to] listen to management's explanations of the company's affairs . . . . [t]acit reliance on management assertions is unacceptable; the underwriters must play devil's advocate." 346 F. Supp. 2d at 675 (citing *Feit*, 332 F. Supp. at 581-82) (emphasis added). Judge Cote also found that "[r]ecent Section 11 case law ... shows no signs of abandoning the early courts' demand that underwriters employ 'a high degree of care in investigation and independent verification of the company's representations.'" *Id.* at 675-76 (citing *Feit*, 332 F. Supp. at 582. Judge Cote also ruled that the term "investigate" should be construed in accordance with its ordinary or natural meaning, which would include a "thorough" or "searching inquiry" or alternatively "to inquire and examine into with systematic attention to detail and relationship." *Id.* at 678.

6

2.    Necessity of Continuing Investigation Through The Effective Date

("Bring Down Due Diligence").  The case law also makes clear that it is essential that an underwriter must continue to investigate an issuer and its business not just through the filing of a preliminary prospectus, but through and including  the effective date of the registration statement, lest some late-breaking development render a previously accurate registration statement misleading.  For a registration statement and prospectus must be accurate not merely at the time that a draft is filed with the SEC, but through and including the effective date of the offering.  *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1202-1211 (1st Cir. 1996).  As *Shaw* made clear, "the question is whether the nondisclosure of interim facts rendered the prospectus materially incomplete."  *Id*. at 1210.

The necessity that so-called "bring-down due diligence" continue through the effective date of an offering is well-established. In *Escott*, the court noted that one of the attorney defendants did not make a reasonable investigation because he failed to discover that statements made in January had become inaccurate by the May effective date of the registration.  283 F. Supp. at 690.

Thus, in *Software Toolworks, Inc. v. PaineWebber, Inc.*, 50 F.3d 615, 625-26 (9th Cir. 1994), with respect to the period following the issuer's filing of a preliminary prospectus, the Court reversed a grant of summary judgment against plaintiffs regarding claims that the underwriters in that case had failed to investigate relevant business developments.

3.    Heightened IPO Due Diligence Standards.  Underwriters' due diligence in the context of an initial public offering requires greater judicial scrutiny than in other

7

offerings. Courts and commentators have reasoned that a higher standard of due

diligence is necessary in initial public offerings, as these securities have never been

publicly traded and information about their issuer is often not readily available. *See*

*Underwriter Due Diligence*, Cadwallader Wickersham & Taft (1999) (citing *Glassman v.*

*Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996); *Shaw*, 82 F.3d at 1202 ("Indeed,

in the context of [an initial] public offering, there is a strong affirmative duty of

disclosure.")). As in *Escott* itself, a young company experiencing rapid growth and

change may well be subject to special risks that could go undetected without careful due

diligence.

    4.   <u>Storm Warnings</u>. It has also been established that where an underwriter

has been made aware of facts, so called "storm warnings," that may indicate potential

problems with the offering materials," its "normal due diligence procedures [are]

inadequate and ... require more concrete verification of management representations and

projections." *University Hill Foundation v. Goldman, Sachs & Co.*, 422 F. Supp. 879,

902 (S.D.N.Y. 1976); *cf. Worldcom*, 346 F. Supp. 2d at 672-73.

**2.    Mr. Necarsulmer's Opinions and Testimony**
**Demonstrate Unfamiliarity or Disagreement**
<u>**With Controlling Due Diligence Principles**</u>

    Mr. Necarsulmer's proposed testimony in this case is not informed by or based

upon the above-recited controlling principles governing underwriter due diligence.

    It is perhaps understandable that Mr. Necarsulmer, though a veteran securities

professional, has little familiarity with these guiding principles. Mr. Necarsulmer

admitted both that he has received no legal training and that he has never published with

respect to due diligence issues. (Ex. 3, at 14) He has in one limited sense "taught" about

8

due diligence, but only as part of classes to brokerage firm trainees, and only by use of the latest checklist his firm was using, a checklist that was not keyed to case law. (*Id*. at 14-15) He could not cite one time when he attended a special seminar on due diligence. (*Id*. at 19) He could also cite no publications that he had ever read about due diligence, or anything he had seen in writing about due diligence in the last five years. (*Id*. at 20)

Perhaps most important, Mr. Necarsulmer had never read any case law concerning the standards for due diligence. He had heard of (but not read) *Escott* but had not even heard of *Feit*. He had heard of Judge Cote's *Worldcom* decision, but had never read it and knew nothing about it except what he learned through press coverage, which did not include learning of any principles referred to or enunciated in the decision. (*Id*. at 21)

One of Mr. Necarsulmer's opinions is that the underwriter defendants had conducted a reasonable due diligence investigation that was "consistent with a standard of reasonableness as I understand it." (Ex. 1, Ex. 3 at 19) This conclusion was based on his purported sense that the investigation was in "compliance with what I've done in my own career," and his empirical observation and personal work rather than anything written in text. (*Id*. at 19) He asserted that the underwriter defendants complied with "industry standards," but those "standards" according to Mr. Necarsulmer were not written down in any industry publication or guidelines or elsewhere, but were just "business practice." (*Id*. at 18) He in fact did not believe that there were any industry standards relating to verification of information supplied by an issuer. (*Id*. at 29)

The flawed basis for Mr. Necarsulmer's opinion is readily apparent. In conflict with the most basic governing principles of *Escott* and its progeny:

9

1.      Mr. Necarsulmer stated in his opinion that the prospectus is "the Company's document" and disagreed at his deposition that underwriters have been considered responsible for assuring the accuracy of an issuer's offering materials. (Ex. 3 at 22) Mr. Necarsulmer's directly contrary view was: "I think among sophisticated investors, it's well-known that the company is, in fact, you know, the better source about its business and that underwriters will certainly do -- are certainly important in the process; but I don't believe that it's -- that that is part of the underwriters' responsibility." (*Id.* at 22) These views disregard central teachings of both *Escott* and *Feit.*

Judge McLain in *Escott* made clear the underwriters' responsibility for a prospectus: "The underwriters say that the prospectus is the company's prospectus, not theirs. Doubtless this is the way they customarily regard it. But the Securities Act makes no such distinction. The underwriters are just as responsible as the company if the prospectus is false." 283 F. Supp. at 696.

Thereafter, Judge Weinstein in *Feit* emphasized that investors will rely on the underwriters more so than on an issuer: "The average investor probably assumes that some issuers will lie, but he probably has somewhat more confidence in the average level of morality of an underwriter who has established a reputation for fair dealing." 332 F. Supp. at 581.

2.      Mr. Necarsulmer had never heard it said that underwriters were required to act as a prudent man would in the management of his property. He believed those principles pertained to "trust companies and mutual funds," not underwriters. (Ex. 3 at 28) But the requirement is set forth expressly in Section 11 and, as noted, was emphasized in *Feit. See* 332 F. Supp. at 576 (citing 15 U.S.C. §77k(c)).

10

3.    Mr. Necarsulmer denies that the underwriters had an obligation independently to verify all of the representations of the issuer, stating that "the basic description of their business and their business plan and these kinds of things are -- if you are going to do business with these people, you traditionally accept those at face value." (Ex. 3 at 32)

4.    Mr. Necarsulmer similarly would not admit that there are instances in which verification may require reviewing documents of a company that the company had not voluntarily supplied. As he stated, "I'm not really comfortable with the hypothetical. I'm sure there are situations, I just have never run into one." (*Id*. at 30) Tellingly, Mr. Necarsulmer could not recall <u>any</u> instances in which people working for him had ever interviewed lower level corporate employees for the purpose of verifying information supplied by management, and he recalled <u>no</u> due diligence investigation in his thirty-plus years in the industry in which he asked a company to grant him access to files they had not already provided to him. (*Id*. at 29-30)

5.    Mr. Necarsulmer would not even agree that as a general proposition in due diligence an underwriter should be skeptical of rosy outlooks by the issuer's management, stating that "just because someone is optimistic doesn't necessitate skepticism." (*Id*. at 53-54)

6.    With respect to vital "bringdown due diligence," Mr. Necarsulmer expressed no surprise at the fact that Lehman's was recorded in two sketchy, handwritten pages of notes. (Ex. 4 [Deposition Exhibit 159]) Of bring-down due diligence, his view was:

> It is often pro forma. If that's the -- you know. Unless
> there's some significant issue that comes up. In many cases,
> you know, people are on the road at different places; often
> the management -- you know, the CFO is in San Francisco,
> the CEO is in London making presentations and sometimes
> they are not even on the call, and it's usually just an update
> of where you are in terms of effectiveness, has it gotten
> NASD approval, that kind of stuff. So this [Ex. 4] doesn't
> surprise me, no.

(Ex. 3 at 59) (emphasis added).   His experience of a bringdown due diligence call was:

"it's quite informal; it's tick off three or four points, anything we should be aware of.  So

generally it takes this form [Ex. 4]."  (*Id.*)

      7.    Mr. Necarsulmer even disagreed that the securities industry as a whole

expects more due diligence work in an IPO than in a follow-on (subsequent) offering.

(*Id*. at 23.)

### 3.    Mr. Necarsulmer Has Applied Improper Standards To The Facts of This Case In An Illogical Manner Which Has Generated Unreliable Conclusions

      Not only is Mr. Necarsulmer's opinion not informed by the proper principles

governing due diligence investigations, but Mr. Necarsulmer has applied his mistaken

principles to the facts of this case in a manner that has generated thoroughly unreliable

opinions.

### a.    Mr. Necarsulmer's Opinion Regarding The Reasonableness of the Underwriters' Due Diligence Investigation

      Mr. Necarsulmer's opinion that the underwriters conducted a reasonable due

diligence investigation on gray marketing lacks any reasonably reliable rationale.

      Mr. Necarsulmer's claim that the underwriters reasonably investigated gray

marketing or Costco distribution of Adams products was, as has been noted, underpinned

by his observation of industry norms, that is, what he has seen or done in due diligence

12

investigations. (Ex. 3 at 18-19, 34-35)  This opinion rests exclusively on the notion that

Lehman Brothers "spent time with the marketing people at Adams and the subject [of

Costco distribution or gray marketing] was discussed" and that Lehman "participated in

the customer survey process," in which gray marketing was not "mentioned as an issue"

by a group of Adams customers.  (*Id*. at 37.)

In reaching this opinion, Mr. Necarsulmer relied exclusively on conclusionary,

unspecific testimony that the matter was ever discussed.  (*Id*. at 67-68, 74-75.)  He was

unable to point to anything specific that Lehman had thereafter done to verify

information provided by Adams management, other than to send out surveys to ten

customers of Adams.  He could not say why that group of customers conspicuously

excluded W.P. Mackenzie, a Canadian retailer who had first alerted Adams to the

Costco/gray marketing problem, except to hint that it was the Company's fault

(neglecting the fundamental requirements of verification).  Mr. Necarsulmer also

suggested that because Mackenzie was located in Canada, its status as a large customer

might be disregarded, and that issues relative to "southern California or Florida" may

have been of greater importance to a golf company.  (*Id* . at 44-45)

While Mr. Necarsulmer tried to characterize the sending of the customer surveys

as a form of verification, he had to admit that the surveys contained no specific mention

of or inquiry about gray marketing.  (*Id*. at 49)  Mr. Necarsulmer carefully avoided any

direct answer to whether the underwriters acted properly in choosing to accede to Barney

Adams' request to them that they not try to reach Costco to obtain information, a lapse in

efforts at verification grossly offensive to the principles of *Escott*.  He could state only

that he thought it was unlikely that a call to Costco would actually have turned up

13

information. (*Id*. at 42-43)

Mr. Necarsulmer admitted that he could not identify any request for documents the underwriters made to Adams that should have caused Adams to provide the underwriters with documents with respect to Costco or the gray market issue of which Adams had allegedly made the underwriters aware. (*Id*. at 54) He also had no knowledge of whether the underwriters reviewed a litany of pre-IPO complaints, compiled in Exhibit VII to the report of Stephen Grace -- which included gray marketing complaints from several California golf retailers -- and he admitted that, as far as he knew, the documents embodying those complaints would have been made available to the underwriters had they simply asked to see them. (*Id*. at 64-69.) He had no knowledge as to whether the underwriters were even aware of the identities of, much less had contacted, any of the customers who had actually complained about gray marketing through and including the effective date of the offering (*id*. at 69-70, 73) -- persons who were in a position to have verified or disputed Adams' assessment of the importance of gray marketing or Costco distribution.

Ignoring all requirements of "bring down" due diligence, Mr. Necarsulmer stated that he was not surprised that the underwriters' documents contained not a single reference to gray marketing or Costco. Mr. Necarsulmer tried to explain that the underwriters "had made a determination that this was not significant to the company's sales and earnings," and that there was "no benefit, no reason you know, to take it any further." (*Id*. at 76, 78.) However, he offered no explanation how a thorough investigation consistent with the principles of probing and verification, as required by law, could have uncovered not even a whisper of "Costco" or "gray marketing" before the

14

IPO -- when (a) less than a month <u>after</u> the IPO Lehman representatives were recording that this was a serious concern and a growing problem that the company was working hard to address; (b) a month <u>before</u> the IPO the company was issuing a press release about suing Costco to find out how Costco had obtained Adams Club; and (c) a number of Adams retailers, in diverse parts of the country, had gone out of their way to complain to Adams, in the period immediately preceding the IPO, that the problem was actually occurring.

Mr. Necarsulmer's subsidiary opinion concerned defendants Ferris Baker Watts and NationsBanc. These underwriters also satisfied due diligence requirements, according to Mr. Necarsulmer, simply because they "kept their own files, participated in various parts of this, were present at meetings,", and thus "performed in line with what I would have expected." (*Id*. at 20) Mr. Necarsulmer so opined even though he could recall nothing that either Ferris Baker or NationsBanc had done to investigate Costco distribution or gray marketing of Adams clubs. (*Id*. at 21) The SEC has taken a much different stance:

> "[Although] the [non-managing underwriter] may relieve himself of the task of actually verifying the representations in the registration statement ... <u>he must satisfy himself that the managing underwriter makes the kind of investigation the participant would have performed if he were the manager. He should assure himself that the manager's program of investigation and actual investigative performance are adequate. The participant's checks on the manager are vital since they may provide additional assurance of the verification of the statements in the registration statement</u>.

SEC Release No. 33-5275, 2 Fed. Sec. L. Rep. (CCH) ¶4506B, at 4058 (July 26, 1972) (emphasis added). There is no scintilla of evidence that Ferris Baker or Nationsbanc

performed these required duties.

### b.    Mr. Necarsulmer's Opinion Regarding
### The Underwriters' Disclosure Obligations

Another opinion of Mr. Necarsulmer, contained in his rebuttal report, is that based on their investigation the underwriters properly concluded that no disclosure was required regarding gray marketing issues. This opinion stands on no firmer grounds than his opinion regarding the "reasonableness" of the underwriters' "investigation."

This disclosure opinion has no basis other than Mr. Necarsulmer's flawed opinion that a reasonable due diligence investigation had been conducted. For Mr. Necarsulmer not only lacks legal training and familiarity with due diligence case law, but also he does not contend to be an expert in gray markets. (Ex. 3 at 38) Indeed, he has never except in this litigation offered an opinion as to whether some matter ought to have been disclosed as a result of due diligence. (*Id.* at 12) His opinion here admittedly does not rest on either supposed materiality standards, or SEC disclosure standards, but only upon the reasonableness of the investigation. (*Id.* at 38-40) And his opinion does not constitute an opinion that Adams Golf as the issuer was relieved of the obligation to disclose gray marketing, a matter beyond the scope of his assignment and expertise. (*Id.* at 40-41, 72)

All Mr. Necarsulmer's "disclosure" opinion apparently rests upon is the notion that, by conducting an appropriate due diligence investigation, the underwriters could not have learned that gray marketing and Costco distribution involved material facts and risks. That is palpably untrue, since by following required practices of probing and verification they would have learned these things. In fact, the underwriters, even in their pro forma efforts, did learn that Adams had been subjected to gray marketing, at least as

16

of the time of Adams's suit against Costco, and their failure to require disclosure of that fact is inexcusable.[2]

## III. CONCLUSION

Mr. Necarsulmer did not ground his opinions in the bedrock legal principles that govern due diligence, and his opinions are logically flawed and thoroughly unreliable and therefore subject to exclusion under the familiar principles of *Kumho Tire*. Accordingly, his testimony regarding supposed industry practice must be stricken and excluded, since it at most suggests that he, and other underwriters whom he has observed during his tenure in the securities industry, have conducted investigations that have fallen short of the requirements of law. His irrelevant testimony cannot offer the jury any appropriate or reliable guidance with respect to the conduct of a proper due diligence investigation.

In a venerable opinion, *Mayhew v. Sullivan Mining Co.*, 76 Me. 100, 112 (Maine 1884), the court wrote that even if defendants showed that "every mining establishment that has existed since the days of Tubal-Cain" engaged in the practice of cutting holes in mining platforms and then leaving them unguarded, it would have no tendency to show that "the act was consistent with ordinary prudence." So here, even establishing that Wall Street professionals have for decades conducted superficial, inadequate due diligence investigations could not possibly render reasonable a due diligence

---

[2]As noted in *Feit*, 332 F. Supp. at 577, inclusion or omission of an item without a reasonable investigation or verification will lead to liability "just as surely as if" the defendant "actually knew of the inaccuracy or had no reasonable belief in the accuracy."

17

investigation that departed from governing legal standards.  Mr. Necarsulmer's opinions

should be stricken and excluded from evidence.


Dated: September 11, 2006

**ROSENTHAL MONHAIT & GODDESS, P.A.**

**By:**      Carmella P. Keener

Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Wilmington, DE. 19801
(302) 656-4433
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs and the Class*

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000

*Lead Counsel for Plaintiffs and the Class*

18

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 11th day of September, 2006, I caused **PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION TO STRIKE AND EXCLUDE TESTIMONY OF EDWARD R. NECARSULMER III** to be served by hand delivery upon the below-listed Delaware counsel of record and to be electronically filed with the Clerk of Court using CM/ECF, which will send notification of such filing to:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

In addition, a copy has been served by electronic mail upon the following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

/s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com