# EXHIBIT 1

# EXHIBIT 1

## ADAMS GOLF INC. SECURITIES LITIGATION

### Expert Report of Edward Necarsulmer III

1. **Assignment**: I have been retained by counsel for the underwriter defendants in this action to opine as to the adequacy of the due diligence conducted by the underwriters in connection with initial public offering of Adams Golf, Inc. I am being compensated at an hourly rate of $600 per hour.

2. **Qualifications**: I have more than 33 years of experience in the investment banking and securities businesses. I have run the capital markets area as well as the North American Equities business for a major global investment bank. I have also been in charge of all equity underwriting, sales, research, and trading for two U.S. firms.

   I have been involved in all areas of due diligence from practitioner to supervisor over my career and additionally have had overall responsibility for the execution of numerous public offerings. I have also been a member of and/or chaired commitment committees who serve as the "first consumer" of the firm's due diligence efforts and are ultimately responsible for the determination of its adequacy before the firm agrees to go forward with the underwriting of the securities. In the underwriting business, this function is the firm's primary mechanism for the protection of its capital and most importantly its reputation.

   My Resume is attached as Exhibit A.

3. **Prior Testimony**. I have been retained as an expert in two other similar matters which have been settled prior to trial. I have written an expert report and have given a deposition in the AMF Bowling securities litigation. I am also currently retained as an expert in a matter before the United States District Court in the Northern District of Texas.

4. **Publications**. I have not authored any publication in the past 10 years.

5. **Materials Reviewed**. I have reviewed an extensive number of documents including depositions, exhibits, SEC filings, the Complaint, as well as the document production of the underwriters. A complete list of these documents is provided as Exhibit B.

6. **Summary of Opinions**.

    A. In my experience in the process of adequate due diligence, the underwriters should gather and review the following types of information. The contents and scope of this review may vary greatly depending on the issuer, but in general, these are the categories that should be considered.

   1. Complete review of the issuer's operations including business plans and strategy. Details as to distribution, manufacturing, products, and geographic scope. This should include analysis of any technological or other proprietary issues that significantly affect the company.

   2. Investigation of industry trends and the competitive environment. Utilizing outside experts for confirmation when possible.

   3. A complete and thorough review of financial performance - current and historical. Including thorough study of the income statement, balance sheet, and capital structure.

   4. Personal interviews with key executive, financial and operating managers.

   5. Physical visits to important and/or representative facilities.

   6. Meeting with the issuer's counsel and public accountants.

   7. Understanding of material outstanding litigation, regulatory or environmental issues.

   8. Consideration of any other risk factors. These could include geopolitical, governmental issues, for example.

B. The generally accepted practice, in my judgement is that the collection, review and analysis of the foregoing is an ongoing process shared by members of the investment banking team and its counsel during the preparation of the registration statement and prior to the pricing. Although the registration statement is the issuer's, the underwriting team-including its counsel is also responsible for the completeness, materiality, and veracity of this information. Independent and industry sources can be particularly useful in this pursuit. While the process requires co-operation between issuer and underwriters; it is essential for due diligence efforts to be thorough and their conclusions factually supportable.

C. Based on the documentation that I have reviewed, it is my conclusion that the underwriters conducted a thorough and complete due diligence process with regard to this offering. Specifically:

1. The offering process was staffed by a team of sufficient size, experience, and seniority to be appropriate for the project.

2. An extensive due diligence outline and materials request list was prepared and presented to company management at the organizational meeting.

3. The underwriters appear to have had an adequate amount of interaction with members of Adams's management including sales and marketing. These meetings were well organized, with management being provided proper outlines of topics to be discussed. Company facilities were visited by the team in accordance with industry practice.

4. The underwriters did extensive independent market research on selected Adams's customers. Thorough customers' due diligence questionnaires were prepared. Responses to these inquiries appear to reflect the views of the company's customers. Suppliers were also contacted.

5. The underwriters prepared lists of potential investor questions - in my experience this was always an effective mechanism for raising and responding to additional relevant issues.

6. The process was enhanced by the book-running firm's commitment process. A complete memo was prepared and presented to a group of senior firm members. This group further reviewed and validated the deal team's due diligence efforts.

7. As was permissible at the time, the underwriters utilized the experience of their securities analysts to provide perspective and insight into the company and the industry. In my career this was often a useful way to identify issues which might require further investigation.

8. Background checks on key Adams's managers were prepared and reviewed.

9. Golf industry data including GolfDataTech Market Surveys and Golf Market Research Institute Surveys was obtained and reviewed.

10. Interviews were conducted with independent experts on golf including Nick Faldo and Mark Berry.

11. Legal and accounting issues appear to have been given standard review in line with industry practice. Including interviews with the KPMG audit partner and Adams patent counsel.

7. **Summary**: Based on my long industry experience and the information presented to me, it is my opinion that, the underwriters of this offering performed due diligence in line with normal industry standards and practice. Their actions were consistent with a standard of reasonableness as I understand it, and were more than sufficient to satisfy me as to their adequacy and completeness. Responsibilities undertaken by the various underwriting firms and their counsel were also consistent with normal procedure. Again, based on my long industry experience and the information presented to me, it is further my opinion that the due diligence process described in the foregoing resulted in a registration statement that the underwriters reasonably believed was complete and accurate. Note that my work on this matter is ongoing and my opinions are subject to modification based on additional reports, depositions, or testimony that I might receive in the future.

July 12, 2006

*Edward Necarsulmer III*

Edward Necarsulmer III

**Exhibit A**

**Edward Necarsulmer III**
Box 1173 21 Leaward Lane
Quogue NY 11959
Telephone: 631-653-9035
Fax: 631-653-7934
ENIII@AOL.COM

**5/02 – Present Independent** Consultant to the financial service industry. Worked with global investment banks and domestic securities firms on issues related to research, sales, and investment banking businesses. Established expert witness practice. Member of the advisory board, Soleil Securities

**3/01-5/02** Dresdner Kleinwort Wasserstein Vice Chairman – Global Equities. Responsible for daily management of Domestic Equity business. Member commitment committee. Provide strategic advice to Global Heads of Equities. Member of North American Equity Management Committee. Represent the firm with key institutional and corporate clients.

**5/00-3/01** Wasserstein Perella Securities Chief Executive Officer – Equities Division. Managing Director. Responsible for sales, research, trading and equity capital markets activities. Principal liaison between Equities and Investment Banking activities of the firm. Member commitment committee.

**3/98-5/00** Independent Consultant to the financial services industry.

**3/95-3/98** Deutsche Morgan Grenfell Head of Equities, North America. Member of Global Equities Management Committee and DBNA Management Committee. Responsible for all equities activities in North America and for North American products globally. Areas supervised included: sales, research, trading, equity capital markets, proprietary trading, derivative and international equities. Maintained DMG relationships with regulators, NYSE, NASD, etc. Member global commitment committee.

**10/92-3/95** C.J. Lawrence/Deutsche Bank Securities Executive Vice President and Chief Operating Officer to C.J. Lawrence. Ran equity business for the firm. Helped lead transition from CLJ to DBSC. Head of equity capital markets – led major primary market transactions resulting from Deutsche Bank relationships. Chair, domestic commitment committee. Supervised due diligence.

**3/74-10/92** C.J. Lawrence, Inc. Executive Vice President and Director. Began in institutional sales. Established equity capital markets efforts for the firm in the mid-1970's. Ran that business and became responsible for trading and other equity businesses. Member of firm's Executive Committee and Board of Directors. Chaired firm commitment committee. Supervised due diligence on any managed/co-managed offering.

8/67-1/74   Hallgarten & Co.   General Partner. Roles in research, sales, and corporate finance. Performed due diligence in approximately 10 equity offerings from trainee to supervisory roles.

Education

B.A. Denison University, Granville Ohio

New York Institute of Finance-Professional Courses.

Securities Industry Association-Harvard Management Workshops

Certification & Registrations

While affiliated with member firms, I was a Registered Principal, NASD and NYSE, and was an Allied Member of the NYSE. and held a Series 63 Registration.

Regulatory Experience

Served on the NY District Business Conduct Committee (Board) of the NASD. Ran or participated in numerous hearing panels related to various aspects of firm and individual practices.

## EXHIBIT B

## MATERIALS CONSIDERED

### Pleadings

Second Consolidated and Amended Class Action Complaint

Transcript of Hearing on April 10, 2006

Order, dated April 11, 2006

Answer of Underwriter Defendants to the Second Consolidated and Amended Class Action Complaint

The Adams Golf Defendants' Answer to Plaintiffs' Second Consolidated and Amended Complaint

Underwriter Defendants' Responses and Objections to Plaintiffs' Sixth Set of Interrogatories Directed to Underwriter Defendants

Plaintiffs' Responses and Objections to Underwriter Defendants' First Set of Interrogatories to Class Representatives

Adams Golf Defendants' Objections and Responses to Plaintiffs' Fifth Set of Interrogatories

### Produced Documents

Underwriter Defendants' Document Production (UND 00001-011636)

### Deposition Transcripts

Barney Adams, 6/22/06 (with exhibits)

Chris Beebe, 5/23/06

Scott Blevens, 5/3/06 (with exhibits)

Chip Brewer, 5/2/06 (with exhibits)

Sandra Brooks, 6/30/06

Dave Brown, 4/27/06 (with exhibits)

Paul Brown, Jr., 5/16/06 (with exhibits)

2

Finnis Connor, 5/9/06 (with exhibits)

Patricia Craus, 2/18/05

James Farrell, 6/12/06 (with exhibits)

Marc Gonsalves, 6/6/06 (with exhibits)

Jay Greanay, 5/18/06 (with exhibits)

Darl Hatfield, 6/8/06 (with exhibits)

Brian Lantier, 6/5/06 (with exhibits)

Ryan Magnussen, 4/28/06 (with exhibits)

John Morrash, 2/23/05 (with exhibits)

Stephen Patchin, 6/13/06 (with exhibits)

Bernard Picchi, 6/9/06 (with exhibits)

Gregg Pratt, 4/27/06 (with exhibits)

Marco Puglielli, 5/10/06 (with exhibits)

Olga Pulido-Crowe, 5/17/06 (with exhibits)

Kenneth Shockley, 2/25/05

M. Bradley Smith, 6/13/06 (with exhibits)

Eddie Tate, III, 6/27/06 (with exhibits)

Joseph Teklits, 6/7/06 (with exhibits)

Todd Tonore, 2/25/05 (with exhibits)

Patrick Walravens, 5/26/06 (with exhibits)

Patty Walsh, 5/11/06 (with exhibits)

# EXHIBIT 2

# EXHIBIT 2

## ADAMS GOLF SECURITIES LITIGATION

Rebuttal Report of Edward Necarsulmer III

1. **Assignment**: I have been retained by counsel for the underwriter defendants in this action to opine as to the adequacy of the due diligence conducted by the underwriters in connection with the initial public offering of Adams Golf Inc. I have previously prepared and submitted a report in this connection. I have further been asked to comment on the plaintiffs' expert reports of R. Alan Miller and Christiana Ochoa.

2. **Materials Reviewed**. A list of materials reviewed in addition to those referenced in my original report is attached as Exhibit A.

3. **Summary of Opinions**: Miller and Ochoa have opined that the Adams S-1 Registration Statement was defective in that it did not reflect the issue of gray marketing in its enumeration of the risk factors affecting the Company. Ochoa specifically states:" This report has discussed above how the Company's business strengths could be damaged by gray market activity. These factors should reasonably have argued in favor of disclosure to investors even if the total volume of gray market sales was small relative to the total sales at the time of the initial public offering." To the extent that either expert is opining that the underwriters were unreasonable in concluding that a disclosure regarding gray marketing was not necessary, I disagree with that contention and believe, that after doing proper due diligence, the underwriters made a reasonable judgement related to disclosure of this issue.

  A. In reviewing the underwriter's document production and depositions they had extensive discussions with Company management including the subject of gray marketing. Specifically, the underwriters had discussions with Adams Golf management and management stated that there were only a small number of clubs being sold by Costco, this was not a material issue, and the company was taking appropriate steps to address the issue. See for example: Pulido-Crowe deposition 29-30,47-48,79-80,Lantier deposition 42-43,Gonsalves deposition 102,Adams deposition 251-253,Walsh deposition 148-150.

  B. As part of their due diligence the underwriters reviewed a significant number of documents related to Adams Golf business including sales and marketing materials. See for example: UND 4385-4395, 4986-4987, 5004-5005,5646-5647,5265-5303. The review of these materials did not give the underwriters any reason not to accept management's position that gray marketing was not a material issue.

  C. The underwriters also conducted eleven telephonic interviews with Adams Golf customers, retailers, and suppliers, during which the underwriters solicited and received information regarding the sales and marketing of Adams clubs. See: UND 6019-6021,

300-315, 10906-10909, 10644-10646, 10443-10446, 10638-10643. Also see: Walravens deposition 33-36 and Pulido-Crowe deposition 69-72. During these interviews the underwriters asked various questions, including "Are there any other issues (legal, contractual or otherwise) which you feel are important?" None of the individuals questioned mentioned gray marketing as an issue. Such interviews with independent parties are exactly the type of work underwriters should engage in to confirm discussions with company management. Further these interviews did not provide the underwriters with any reasons not to accept management's position that gray marketing was not a material issue.

D. I also note that the reasonableness of an underwriter's due diligence must be assessed based on the information that is reasonably available at the time of the offering. To the extent that Ochoa and Miller rely on events that occurred after the offering, I don't believe that it's reasonable to consider such points in this analysis.

E. Based on my assessment of the entire due diligence process performed by the underwriters, it's my opinion that they were reasonable in concluding that a disclosure of gray marketing was not necessary to make the registration statement complete and accurate.

F. Ochoa states in her report that Callaway Golf's reference to gray marketing in its 1997 Annual Report is "notable". While Ochoa's report is not clear on this point, although underwriters often review filings of other companies in the same industry, as they did here, the mention of a risk in such filings is not necessarily determinative of whether the risk needs to be included in the issuing company's registration statement. Each factual situation is different and the underwriters must evaluate appropriate disclosure on an individual basis.

4. <u>Summary.</u> As discussed in this rebuttal report and my initial report, and based on my long industry experience, and the information presented to me, it is my opinion that the underwriters conducted a complete and thorough due diligence process consistent with industry standards and practice. As a result of their investigation, the underwriters had reasonable grounds to believe that the statements in the registration statement were accurate and that there was no omission of a material fact that was needed for adequate disclosure. Note that my work on this matter is ongoing and that my opinions are subject to modification based on additional reports, depositions, or testimony that I might receive in the future.

July 26 2006

_____
Edward Necarsulmer III

## EXHIBIT A

## MATERIALS CONSIDERED IN CONNECTION WITH REBUTTAL REPORT

Expert Report of H. Stephen Grace

Expert Report of Christopher M. James

Expert Report of Ed J. Lynch

Expert Report of R. Alan Miller

Expert Report of Christiana Ochoa

Expert Report of Charles A. Sjoquist