# EXHIBIT
# 3

# EXHIBIT
# 3

Page 1

1

2                IN THE UNITED STATES DISTRICT COURT

3                  FOR THE DISTRICT OF DELAWARE

4                            - - -

5

6    IN RE: ADAMS GOLF, INC. :

7    SECURITIES LITIGATION    :

8

9                       ORAL DEPOSITION

10                            OF

11                 EDWARD NECARSULMER, III

12                  Monday, August 7, 2006

13                          - - -

14        Oral deposition of EDWARD NECARSULMER,

15    III, held at the offices of SIMPSON THACHER &

16    BARTLETT, LLP, 425 Lexington Avenue, New York,

17    New York, commencing at 12:08 p.m., reported

18    by Pamela Harrison, RMR, CRR, CSR and Notary

19    Public.

20                          - - -

21

22

23        RSA/VERITEXT COURT REPORTING COMPANY

             1845 Walnut Street, 15th Floor

24             Philadelphia, PA  19103

             (215) 241-1000  (888) 777-6690

25

## Page 2

APPEARANCES:

DONALD B. LEWIS, ESQUIRE
5 Cynwyd Road
Bala Cynwyd, Pennsylvania 19004
610-668-0331
For the Plaintiff

LAURA MORIATY, ESQUIRE
AKIN GUMP STRAUSS HAUER & FELD, LLP
300 West 6th Street
Suite 2100
Austin, Texas 78701-3911
512-499-6200
lmoriaty@akingump.com
For the Adams Golf Defendants

PAUL C. GLUCKOW, ESQUIRE
   and
RYAN ANTHONY KANE, ESQUIRE
SIMPSON THACHER & BARTLETT, LLP
425 Lexington Avenue
New York, New York 10017-3954
212-455-3056
pgluckow@stblaw.com
rkane@stblaw.com
For the Underwriter Defendants

## Page 3

### EXAMINATION INDEX

WITNESS: EDWARD NECARSULMER, III

BY MR. LEWIS . . . . . . . . . . . . 6, 188
BY MR. GLUCKOW . . . . . . . . . . 177
BY MS. MORIATY . . . . . . . . . 184

- - -

### EXHIBIT INDEX
320 Cover letter, 7/24/06, to Collins, Esq.,     7
   from McEvoy plus attachments NECARS
   00001-00029
321 Adams Golf Inc. Securities Litigation     10
   Expert Report of Edward Necarsulmer,
   III
322 Adams Golf Securities Litigation     10
   Rebuttal Report of Edward Necarsulmer,
   III
323 E-mail, 4/28/04, to "Ted" from "Paul"     13
324 AMF Bowling Securities Litigation     20
   Expert Report of Edward Necarsulmer,
   III
325 Adams Golf, Inc. Customer Due Diligence     144
   Questionnaire
326 Fax dated 8/7/06 plus attachment     144
327 Document entitled Exhibit VII     153
328 Deposition of Olga A. Pulido-Crowe     176

## Page 4

### DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer:
Page Line
(NONE)

Request for Production of Documents:
Page Line
(NONE)

Stipulations:
Page Line
5/1

Questions Marked:
Page Line
(NONE)

## Page 5

EDWARD NECARSULMER, III
   MR. LEWIS: The stipulations that
we have been proceeding under, as I
understand it, are waiving, sealing,
certification, and filing of the
transcript, and otherwise proceeding
under the federal rules.
   MR. GLUCKOW: Give me those
again.
   MR. LEWIS: Sealing.
   MR. GLUCKOW: Right.
   MR. LEWIS: Certification.
   MR. GLUCKOW: Okay.
   MR. LEWIS: And filing.
   MR. GLUCKOW: Okay.
   MR. LEWIS: Some of which
probably are already mooted by the
latest federal rules.
   MR. GLUCKOW: Right.
   MR. LEWIS: And I suppose you
want to reserve read and sign for
Mr. Necarsulmer?
   MR. GLUCKOW: Exactly. Yes.
   THE WITNESS: Perfect.
   - - -

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 6

EDWARD NECARSULMER, III

1   EDWARD NECARSULMER, III
2   EDWARD NECARSULMER, III, after
3   having been duly sworn, was examined
4   and testified as follows:
5                   - - -
6                EXAMINATION
7                   - - -
8   BY MR. LEWIS:
9       Q.    Would you state your name and
10  address for the record.
11      A.    Edward Necarsulmer, III, P.O.
12  Box 1173, Quogue, Q-U-O-G-U-E, New York, 11959.
13          MR. LEWIS:  As a preliminary,
14      since there is a simultaneous
15      deposition going on in this case in
16      Houston today, Mr. Collins suggested to
17      me that I pick up with numbering today
18      at 320, leaving a gap between the end
19      of the last deposition and his, which
20      might result in a few blank numbers but
21      will keep us from having two exhibits
22      with the same number.
23          So I'm going to pick up at 320,
24      and I'm just going to mark for the
25      record as Exhibit 320 a document -- a

Page 7

EDWARD NECARSULMER, III

1   EDWARD NECARSULMER, III
2   letter from Ted McEvoy to Todd Collins,
3   enclosing documents NECARS 1 through
4   29.
5          (Whereupon, a document was
6      marked, for identification purposes, as
7      Exhibit 320.)
8          MR. LEWIS:  I guess my question
9      really is to Mr. Gluckow.  Has there
10     been any other production of documents
11     from this witness that you are aware
12     of?
13         MR. GLUCKOW:  Yes, there was a
14     subsequent production I think just on
15     the heels of the rebuttal report.
16         MR. KANE:  Yes.
17         MR. GLUCKOW:  Ryan probably has
18     the Bates numbers.  I think it was just
19     a half dozen more pages.  We can
20     probably get a copy for you, but I
21     think it's NECARS 30 through 33 or 35
22     or 37, or something like that.
23         MR. LEWIS:  Somehow that seems to
24     have slipped through the cracks.  If I
25     could see a copy of that before.

Page 8

EDWARD NECARSULMER, III

1   EDWARD NECARSULMER, III
2          MR. KANE:  I can get it to you
3      during the break.  It was sent to
4      Mr. Collins.
5          MR. LEWIS:  Okay.
6   BY MR. LEWIS:
7       Q.    Mr. Necarsulmer, my name is Don
8   Lewis.  I represent the plaintiffs in this
9   action, and I'm going to be asking you some
10  questions this afternoon.  If I drop my voice,
11  garble my words, let me know and I'll have the
12  question read back to you.  If I ask the
13  question in an incomprehensible way to you, let
14  me know and I'll reframe the question for you.
15      A.    Fine.
16      Q.    How did you come to be retained
17  in this litigation?
18      A.    I have worked -- I have done
19  some prior work with the law firm, Simpson
20  Thacher.
21      Q.    Was that in the AMF Bowling
22  litigation?
23      A.    Correct.
24      Q.    Have you done other work as an
25  expert witness for Simpson Thacher?

Page 9

EDWARD NECARSULMER, III

1   EDWARD NECARSULMER, III
2       A.    I did work as a consulting
3   expert in a confidential matter prior to the
4   AMF.
5       Q.    A confidential matter involving
6   due diligence?
7       A.    Correct.  Similar situation,
8   just never -- it was settled.
9       Q.    Is there some reason that you
10  can't disclose the name of the client in that
11  matter?
12         MR. GLUCKOW:  Why don't I take it
13     up with Mr. Necarsulmer.  It may well
14     be that it was a confidential
15     engagement.  My understanding is that
16     there was no report and that it was
17     just a consulting behind the scenes.
18         MR. LEWIS:  All right.
19  BY MR. LEWIS:
20      Q.    Is that your understanding as
21  well?
22      A.    That's correct.
23      Q.    So have you generated expert
24  witness reports for the Simpson Thacher firm
25  before accepting the AMF litigation?

3 (Pages 6 to 9)

Page 10

EDWARD NECARSULMER, III
1
2       A.    No.
3             MR. GLUCKOW:  Object -- you've
4       got to give me a chance just to object
5       in general before you give your answer.
6             Objection to the form of the
7       question.
8             You can answer.
9             THE WITNESS:  The answer is no.
10            (Whereupon, documents were
11      marked, for identification purposes, as
12      Exhibit 321 and Exhibit 322.)
13      BY MR. LEWIS:
14      Q.    Let me hand you what I'm marking
15      as Exhibits 321 and 322.  321 is a copy of your
16      expert report, and 322 is a copy of your
17      rebuttal report.
18            Am I correct that Exhibit 321
19      is a copy of the expert report you rendered in
20      this litigation?
21      A.    Yes.
22      Q.    And that 322 is a copy of your
23      rebuttal report?
24      A.    Yes.
25      Q.    When were you retained in this

Page 11

EDWARD NECARSULMER, III
1
2       litigation, approximately?
3       A.    I believe in April.
4       Q.    Were you given any specific
5       instructions with respect to putting together an
6       expert report in this case?
7       A.    No.
8       Q.    What kind of guidance were you
9       given, if any?
10      A.    Basically to review the
11      material, make my own determination as to how I
12      felt about the issue to which I was going to
13      opine.  Really nothing further than that.
14      Q.    When did you start to review the
15      materials and to make your determination as to
16      what you thought about them?
17      A.    I think -- I'm not a hundred
18      percent certain that I remember the dates I
19      received them, but as soon as I began to get the
20      materials, which I believe was probably in
21      April, also.
22      Q.    Did anyone assist you in
23      drafting either of your reports?
24      A.    No.
25      Q.    Between the time of your initial

Page 12

EDWARD NECARSULMER, III
1
2       contact with Simpson Thacher in this litigation
3       and the time you generated your first expert
4       report, did you participate in any meetings with
5       respect to the report?
6             MR. GLUCKOW:  Objection to the
7       form.
8             You can answer.
9             THE WITNESS:  Yes; however, it
10      was really after the report was
11      written.
12      BY MR. LEWIS:
13      Q.    Okay.  And where was the
14      meeting?
15      A.    We did a conference call, a
16      web-based conference call.
17      Q.    Was that a type of call in which
18      you can see each other?
19      A.    No, it was a type of call in
20      which you could see a document.
21      Q.    And had you completed the final
22      touches on your expert report by the time that
23      web-based conference call was held?
24            MR. GLUCKOW:  Objection to the
25      form.

Page 13

EDWARD NECARSULMER, III
1
2             You can answer.
3             THE WITNESS:  Yes.
4       BY MR. LEWIS:
5       Q.    Who participated in that call?
6       A.    Mr. Gluckow and perhaps one of
7       his associates and a firm called Cornerstone,
8       and I don't actually recall if anyone from Akin
9       Gump was on the call or not.  I think they were
10      not on the call, so I would limit -- rephrase
11      the answer to someone from Cornerstone and from
12      Simpson Thacher.
13            (Whereupon, a document was
14      marked, for identification purposes, as
15      Exhibit 323.)
16      BY MR. LEWIS:
17      Q.    I'll show you next what has been
18      marked as Exhibit 323, which appears to be an
19      e-mail from Mr. Gluckow to yourself, dated April
20      28, 2006.
21            Did you receive some version of
22      that e-mail from Mr. Gluckow?
23      A.    I did.
24      Q.    The first line of the e-mail
25      reads: "It looks like the person from Lehman

4 (Pages 10 to 13)

Page 14

EDWARD NECARSULMER, III

1
2 will not be able to make a meeting on May 8th
3 (and in fact will be out that entire week)."
4        What do you understand the
5 reference to a meeting on May 8th to be?
6        A.   It was a meeting to meet with
7 the ultimate client and just to have them look
8 me over and shake my hand.
9        Q.   Was that meeting to occur before
10 you've completed your expert witness report?
11        A.   Yes.
12        Q.   Would it be fair to say your
13 expert witness report was completed on the date
14 you signed it?
15        A.   Correct.
16        Q.   Did you ever attend a meeting
17 with a person from Lehman to make the
18 determination you referred to?
19        A.   Yes.
20        Q.   And when did that take place?
21        A.   I don't recall the date.
22        Q.   Sometime in the month of May?
23        A.   Yes.
24        Q.   Was the person from Cornerstone
25 who participated in the web-based conference

Page 15

EDWARD NECARSULMER, III

1
2 call someone named Adel Turki?
3        A.   Yes.
4        Q.   Am I mispronouncing his name?
5        MR. GLUCKOW: It's Adel.
6        MR. LEWIS: Adel.
7 BY MR. LEWIS:
8        Q.   Who was Mr. Turki?
9        A.   He is the -- I believe he is the
10 manager of the project, the expert project,
11 working with Simpson Thacher.
12        Q.   Did you have an understanding as
13 to why he was participating in a web-based
14 conference call that dealt with your expert
15 witness report?
16        A.   To the best of my knowledge, he
17 was coordinating all the expert material and he
18 also was the facilitator.
19        Q.   Did Mr. Turki provide you with
20 any thoughts regarding your report?
21        A.   I don't believe he did.
22        Q.   Did anyone from Cornerstone
23 supply you with any materials relating to your
24 project before you completed your report?
25        A.   No.

Page 16

EDWARD NECARSULMER, III

1
2        Q.   At the time the web-based call
3 took place, was your expert report in exactly
4 the same form as it now appears --
5        A.   Yes.
6        Q.   -- as Exhibit 321?
7        A.   Yes.
8        Q.   Including your signature?
9        A.   No.
10        Q.   So when was the report actually
11 finished but for your signature?
12        A.   Either July 10th or July 11th, I
13 entered the date of the signature line.
14        Q.   And the web-based conference
15 call took place a month earlier?
16        A.   No. Maybe a week earlier, that
17 sort of a time period.
18        Q.   Between the time of your --
19 between the date July 12, on which your first
20 report was signed, and the date of July 26th,
21 2006, on which your rebuttal report was signed,
22 did you have any meetings with anyone concerning
23 your rebuttal report?
24        A.   We had a similar conference call
25 on the rebuttal report.

Page 17

EDWARD NECARSULMER, III

1
2        Q.   Can you recall any of the
3 participants in the similar conference call?
4        A.   I think it was a -- with the
5 exception of the associates from Cornerstone
6 whose name I just don't know, it would have been
7 the same cast of characters as the first
8 conference call.
9        Q.   And do you believe there was
10 someone from Akin Gump on that second call?
11        A.   Yes.
12        Q.   And who was it?
13        A.   I don't know.
14        MR. LEWIS: Off the record.
15        (A discussion was held off the
16        record.)
17 BY MR. LEWIS:
18        Q.   How long did it take you to
19 write your initial expert report?
20        MR. GLUCKOW: You mean --
21        MR. LEWIS: Drafting terms.
22        MR. GLUCKOW: So you're not
23        including all the time he spent
24        reviewing materials, you are just
25        talking about sitting at the computer

Page 18

EDWARD NECARSULMER, III

1
2  drafting?
3           MR. LEWIS: Drafting.
4           THE WITNESS: I mean, I would
5  estimate between, you know, four and
6  six hours of actual time, but my method
7  of working is I go back at this
8  thing -- you know, I'll write the
9  report, I'll go back at it, I'll think
10 about it, I might move things around a
11 little bit, so it may have been a
12 longer period than that, but, you know.
13 BY MR. LEWIS:
14          Q.    How long had you spent reviewing
15 the materials before you sat down to write the
16 report?
17          A.    I'm going to estimate 40-plus
18 hours.
19          Q.    Can you describe as you recall
20 it the process you went through in reviewing the
21 materials?
22          MR. GLUCKOW: Objection to the
23 form.
24          You can answer.
25          THE WITNESS: I usually do it box

Page 19

EDWARD NECARSULMER, III

1
2  by box, and what I'll do is I'll try to
3  order the boxes, actually just in
4  physical stack, as to the things that I
5  want to look at again or want to, you
6  know, give more scrutiny to.  But I
7  just go through things, documents one
8  after another, and I try to do it for
9  as long a period as I can and still
10 remain able to retain the material.
11 BY MR. LEWIS:
12          Q.    As you were doing that, did you
13 make notes?
14          A.    I did not.
15          Q.    Did you make notations on
16 Post-its?
17          A.    No.
18          Q.    You just segregated the
19 materials that you wanted to look back at?
20          A.    Yes.  The only indication I
21 would ever make is I would make a checkmark to
22 show that I've read it, and sometimes I put a
23 date on it to show that I've read it.
24          Q.    Is there some reason that you
25 didn't make notes on materials like that?

Page 20

EDWARD NECARSULMER, III

1
2          A.    It's -- I will always -- I've
3  been under the impression from when I've worked
4  on these cases that that's not -- that drafts
5  and notes are not the best things for expert
6  witnesses to do.
7          Q.    Did you receive instructions to
8  that effect in this case?
9          A.    No, no instructions in this
10 particular case, that's just my understanding of
11 the responsibilities.
12          Q.    When you actually wrote up your
13 report, did you use the AMF Bowling report as a
14 template --
15          A.    Yes.
16          Q.    -- for the report that you were
17 writing?
18          A.    Yes.
19          MR. LEWIS: Let me just mark that
20 as Exhibit 324.
21          (Whereupon, a document was
22 marked, for identification purposes, as
23 Exhibit 324.)
24 BY MR. LEWIS:
25          Q.    Do you recognize this as a copy

Page 21

EDWARD NECARSULMER, III

1
2  of an expert witness report that you generated
3  in the AMF case?
4          A.    Yes.
5          Q.    I'll try to put the questions
6  together for speed, but we'll break them apart
7  if it becomes a problem.
8          In drafting either the expert
9  report or the rebuttal expert report, did you
10 create any drafts?
11          A.    No.
12          Q.    Before you actually -- would it
13 be fair to say that before you actually signed
14 either of the reports, you participated in one
15 of these web-based conference calls in which the
16 text of the report was shown to your -- to the
17 attorneys who retained you before you actually
18 signed the document?
19          MR. GLUCKOW: Can I just have
20 that one read back?  I missed the
21 beginning.
22          (The court reporter read the
23 record as follows:
24          "QUESTION: Before you actually
25 -- would it be fair to say that before

6 (Pages 18 to 21)

Page 22

EDWARD NECARSULMER, III
1
2  you actually signed either of the
3  reports, you participated in one of
4  these web-based conference calls in
5  which the text of the report was shown
6  to your -- to the attorneys who
7  retained you before you actually signed
8  the document?")
9        MR. GLUCKOW: You can answer.
10       THE WITNESS: Yes.
11 BY MR. LEWIS:
12       Q.    Were any changes made to either
13 of the reports after the web-based conference
14 calls?
15       A.    The only change -- and it's true
16 of both reports -- were one of punctuation and
17 one of numbering. I can't tell you on which
18 report was which.
19       Q.    Fair enough.
20             But no substantive changes?
21       A.    Nothing of substance.
22       Q.    So after the punctuation or
23 numbering changes were made, you edited the
24 document in whatever word processing system you
25 had, finalized it, and never had a different

Page 23

EDWARD NECARSULMER, III
1
2  hard copy draft?
3        A.    No. I mean, that is correct.
4        Q.    You never -- you had it only on
5  your screen before the final version was printed
6  out?
7        A.    That is correct.
8        Q.    And approximately how many hours
9  in total have you devoted to this litigation so
10 far?
11       A.    I would have to look in my time
12 book, but right up around 60 before today.
13       Q.    In your expert report numbered
14 321 you have listed as Exhibit B Materials
15 Considered. Can you explain what the heading
16 Materials Considered means to you?
17       A.    Basically all the documents
18 involved in the case that I reviewed.
19       Q.    In rendering your opinion, did
20 you consider any information from sources other
21 than the items that are listed in Exhibit B to
22 your expert report?
23             MR. GLUCKOW: You mean specific
24       to this litigation?
25             MR. LEWIS: Specific -- well --

Page 24

EDWARD NECARSULMER, III
1
2        THE WITNESS: No.
3        MR. LEWIS: -- of any source.
4  BY MR. LEWIS:
5        Q.    Just -- I'm not trying to be
6  vague here. Did you receive any information
7  from Lehman Brothers --
8        A.    No.
9        Q.    -- regarding its due diligence
10 process other than what you saw in the
11 transcripts, court filings, exhibits?
12       A.    The answer is no.
13       Q.    And did you receive any
14 information from your -- from the counsel who
15 retained you, Simpson Thacher, about the due
16 diligence process or their views as to what had
17 happened in due diligence?
18       A.    No.
19             MR. GLUCKOW: Other than what's
20       set forth in the exhibit.
21             THE WITNESS: I thought that was
22       the question.
23 BY MR. LEWIS:
24       Q.    I'm sorry, I have a tendency to
25 try to sharpen at the end and it sometimes will

Page 25

EDWARD NECARSULMER, III
1
2  change the direction of the question, so you
3  will probably be better served if you wait for
4  me, and I'll try to wait for you and try not to
5  overspeak you on these questions.
6             Did you receive anything in the
7  nature of deposition summaries from anyone
8  related to this litigation?
9        A.    I -- no.
10       Q.    Did you receive any legal
11 analysis from counsel in this litigation other
12 than what may be reflected in Exhibit B?
13       A.    No.
14       Q.    Did anyone from Lehman Brothers
15 discuss the due diligence process with you at
16 all?
17       A.    No.
18       Q.    Have you, as an expert witness,
19 heard the term work product as relating to
20 lawyers?
21       A.    Yes.
22       Q.    Did you receive any work product
23 from your counsel in connection with your work
24 on the Adams Golf engagement?
25       A.    No.

7 (Pages 22 to 25)

Page 26

EDWARD NECARSULMER, III

1
2    Q.    Let me turn to the report, 321.
3    Just some basic things. I see that you have
4    listed your hourly rate as $600 per hour. Is
5    that the current rate?
6    A.    That is accurate.
7    Q.    Am I correct that in 2004 it was
8    $450, back in the AMF case?
9    A.    That's correct.
10   Q.    When did the rate change?
11   A.    In 2005.
12   Q.    What was the circumstance of
13   that?
14   A.    I was discussing being retained
15   in another case and discussed the going rate and
16   was informed that $600 was a fair rate.
17   Q.    In Paragraph 3 of the report, in
18   the category of Prior Testimony, you write: "I
19   am also currently retained as an expert in a
20   matter before the United States District Court
21   in the Northern District of Texas."
22           What is that matter, in general
23   terms?
24   A.    It is a -- it's a similar type
25   of case. The company is called Flowserve, and

Page 27

EDWARD NECARSULMER, III

1
2    it is plaintiffs coming after the company and
3    underwriter defendants based on a number of
4    issues which due diligence is one.
5    Q.    And what underwriters have
6    retained you in that case?
7    A.    The --
8           MR. GLUCKOW: Objection to the
9        form. It assumes facts not in
10       evidence.
11          MR. LEWIS: I'll withdraw the
12       question.
13   BY MR. LEWIS:
14   Q.    Who has retained you in that
15   case?
16   A.    The firm of Jenkens & Gilchrist.
17   Q.    And what underwriters are the
18   defendants in that case whose due diligence,
19   among other things, you are considering?
20   A.    CSFB and Banc of America
21   Securities.
22   Q.    Have you yet rendered any
23   opinions in that case?
24   A.    I have not.
25   Q.    Have you testified in that case?

Page 28

EDWARD NECARSULMER, III

1
2    A.    I have not.
3    Q.    Have you -- as a technical
4    matter, have you yet been found by any court
5    either qualified or unqualified to render an
6    expert witness opinion on any subject?
7           MR. GLUCKOW: Objection to the
8        form.
9           You can answer.
10          THE WITNESS: No.
11   BY MR. LEWIS:
12   Q.    Have you ever been retained as
13   an expert on matters of discloser?
14          MR. GLUCKOW: Objection to the
15       form.
16          You can answer.
17          THE WITNESS: Not specifically.
18       The assignment is usually phrased as
19       due diligence; however, you tend to get
20       asked whether the due diligence led to
21       the proper disclosure.
22   BY MR. LEWIS:
23   Q.    Have you ever, other than in
24   this present litigation, included an opinion in
25   one of your reports on the subject of whether

Page 29

EDWARD NECARSULMER, III

1
2    something should have been disclosed as a result
3    of due diligence?
4           MR. GLUCKOW: Objection to the
5        form.
6           I think you've already
7        established the only other report is
8        the Exhibit 324.
9           But you can answer.
10          THE WITNESS: No.
11   BY MR. LEWIS:
12   Q.    I note in your description of
13   your experience that both presently and between
14   March of '98 and May of 2000 you have acted as a
15   consultant to the financial services industry.
16   Is that fair?
17          MR. GLUCKOW: Just for the record
18       here, you are looking at what now?
19          MR. LEWIS: I'm looking at
20       Exhibit A to Court Exhibit 321, and
21       this is the part that includes
22       Mr. Necarsulmer's CV or biography.
23   BY MR. LEWIS:
24   Q.    Am I correct that between March
25   of 1998 and May 2000 you were a consultant to

8 (Pages 26 to 29)

Page 30

EDWARD NECARSULMER, III

1 the financial services industry?
2     A.    Yes.
3     Q.    And also between May of 2002 and
4 the present you have been a consultant to that
5 industry --
6     A.    That is correct.
7     Q.    -- is that fair?
8         In the course of your work as a
9 consultant, have you been asked by any
10 underwriters to render them an opinion outside
11 of court on whether something they did in due
12 diligence was appropriate or inappropriate?
13     A.    No. The scope of my work, just
14 if it's useful, the scope of my work has
15 traditionally been -- and I don't do much of it
16 anymore -- has been an operating practice,
17 should we -- how do we organize a sales group,
18 how do we organize a research group, will this
19 client's -- things like that.
20     Q.    So in what -- I'll try to ask
21 this fairly.
22         In the course of your career in
23 the financial industry, leaving aside your
24 expert witness work of the last several years,


Page 30

EDWARD NECARSULMER, III

1 the financial services industry?
2     A.    Yes.
3     Q.    And also between May of 2002 and
4 the present you have been a consultant to that
5 industry --
6     A.    That is correct.
7     Q.    -- is that fair?
8         In the course of your work as a
9 consultant, have you been asked by any
10 underwriters to render them an opinion outside
11 of court on whether something they did in due
12 diligence was appropriate or inappropriate?
13     A.    No. The scope of my work, just
14 if it's useful, the scope of my work has
15 traditionally been -- and I don't do much of it
16 anymore -- has been an operating practice,
17 should we -- how do we organize a sales group,
18 how do we organize a research group, will this
19 client's -- things like that.
20     Q.    So in what -- I'll try to ask
21 this fairly.
22         In the course of your career in
23 the financial industry, leaving aside your
24 expert witness work of the last several years,

Page 31

EDWARD NECARSULMER, III

1 have you been called upon to evaluate due
2 diligence investigations?
3     A.    Absolutely.
4     Q.    And when did that -- when was
5 that first the case in your practice?
6     A.    Through my whole career, I
7 mean. Either as practitioner or running a deal,
8 but most importantly as a commitment committee
9 chair or member, which I did for a number of
10 years, the heart of the work was evaluating your
11 own investment banker's due diligence or if you
12 were comanager, the due diligence done by
13 whoever was the book-running manager, so that
14 was a significant part of certainly the last 20
15 years of my career in banking.
16     Q.    Just by way of terminology, you
17 used the phrase book-running manager. Can you
18 explain what you mean by that?
19     A.    In virtually all offerings one
20 manager -- one of the underwriters -- one of the
21 managing underwriters is designated as the book
22 runner and he will be the responsible party.
23 Like Lehman was in this situation versus what a
24 Banc of America -- Nations Banc I guess in this

Page 32

EDWARD NECARSULMER, III

1 case or a Ferris Baker Watts did, they were
2 comanagers. So the primary responsibility is
3 based on the -- is in the arms of the
4 book-running manager.
5     Q.    So were there times while you
6 were working in the industry, say, on the
7 commitment committee that you had to send your
8 investment banking team back to do more due
9 diligence on a subject?
10     A.    Absolutely.
11     Q.    Have you ever authored any
12 publications with respect to due diligence
13 investigations?
14         MR. GLUCKOW: Object to the form.
15     You can answer.
16         THE WITNESS: Not external, not
17     things for general use. I certainly
18     was part of, in firms, making sure that
19     our standard due diligence procedure,
20     adding and editing to that, but nothing
21     for external use.
22 BY MR. LEWIS:
23     Q.    You helped create standard due
24 diligence procedures for one or more firms?

Page 33

EDWARD NECARSULMER, III

1     A.    Yes.
2     Q.    Which firms were they?
3     A.    For CJ Lawrence, which then
4 became Morgan Grenfell and then became Deutsche
5 Bank.
6         And Wasserstein Perella, I
7 certainly didn't create it, but as head of the
8 equity area I altered it to meet my own
9 practices and standards.
10     Q.    In the course of your work in
11 the financial industry, did you ever receive any
12 legal training?
13     A.    None.
14     Q.    Did you ever teach due diligence?
15     A.    Let me make sure I phrase this
16 properly.
17         Particularly in my Deutsche
18 Bank life, we had a significant number of
19 training classes, whether they were for MBAs
20 or for people from other parts of the world,
21 and I would do -- I would usually run the
22 equity capital markets classes. Due diligence
23 was certainly a part of that, would be a
24 subject underneath the general heading of

9 (Pages 30 to 33)

Page 34

```
1              EDWARD NECARSULMER, III
2     investment banking or equity capital markets
3     and that would be my responsibility.
4         Q.    As best you can recall it,
5     sitting here today, what in general did you --
6     by way of materials did you present to your
7     instructees about due diligence?
8              MR. GLUCKOW:  You are asking him
9         to recall the sum and substance of the
10        lectures?
11    BY MR. LEWIS:
12        Q.    Not the sum and substance, but
13    the nature of the materials that were given.
14    Were they case studies in due diligence, were
15    they outlines of or checklists, were they
16    discussions of cases, discussions of industry
17    standards?  What, in general, did you present
18    when you were teaching due diligence?
19             MR. GLUCKOW:  Objection to the
20        form.
21             You can answer.
22             THE WITNESS:  I would usually
23        include the most recent checklist that
24        the firm -- the appropriate firm was
25        using, and I might have some discussion
```

Page 35

```
1              EDWARD NECARSULMER, III
2         of how industry standards might have
3         changed or might be at the moment, but
4         I'm really not -- can't be any more
5         specific than that.
6     BY MR. LEWIS:
7         Q.    Do you recall whether the
8     checklist was annotated with legal authorities?
9              MR. GLUCKOW:  Objection to the
10        form.
11             You can answer.
12             THE WITNESS:  No.
13    BY MR. LEWIS:
14        Q.    Since I didn't ask the question
15    very well, I'm not sure whether you don't recall
16    whether it was, or recall that it wasn't.  To
17    the best of your knowledge, did you provide your
18    instructees with a checklist that was keyed to
19    cases --
20        A.    No.
21        Q.    -- that established
22    requirements?
23             I ask you to look to Paragraph
24    B on Page 2 of Exhibit 321.  In the middle of
25    the paragraph you use the phrase:  "Although
```

Page 36

```
1              EDWARD NECARSULMER, III
2     the registration statement is the issuer's,
3     the underwriting team," dash, "including its
4     counsel is also responsible for the
5     completeness, materiality, and veracity of
6     this information."
7              Why do you say that the
8     registration statement is the issuer's?
9         A.    It's a fact.  They file it, they
10    are the only ones who could make changes to it,
11    respond to comments.
12        Q.    Okay.  Have you ever heard
13    anyone express the view that as a matter of law
14    under the 1933 Act that both the underwriters
15    and the issuer are equally legally responsible
16    for the content of the document subject to the
17    due diligence defense?
18             MR. GLUCKOW:  Objection to the
19        form.  Calls for a legal conclusion.
20             You can answer.
21             THE WITNESS:  I do understand
22        that.  I guess my response would be to
23        the first -- back to the first part of
24        what the question is, as a matter of
25        business practice, the registration
```

Page 37

```
1              EDWARD NECARSULMER, III
2         statement, and certainly in the many
3         deals that I've worked on, is the
4         issuer's document.  Issuer's counsel,
5         you know, is the first name on the
6         agents for service.  It's just the way
7         things are done.
8     BY MR. LEWIS:
9         Q.    If you would just look for a
10    second and maybe keep by you the report from the
11    AMF litigation, Exhibit 324.
12             If you look to the same
13    Paragraph B in that report, you will see there
14    is no -- unless I miss it -- statement in that
15    paragraph to the effect that the registration
16    statement is the issuer's.
17             MR. GLUCKOW:  You mean those
18        words are not in Exhibit 324?
19             MR. LEWIS:  They are not on it.
20        Not that I see.
21             MR. GLUCKOW:  The document speaks
22        for itself.
23             MR. LEWIS:  Correct me if it's
24        somewhere else.
25             MR. GLUCKOW:  Is there a
```

10 (Pages 34 to 37)

EDWARD NECARSULMER, III
1
2    question?
3    BY MR. LEWIS:
4       Q.    Well, was there some reason that
5    you added that reference -- strike that.
6            Is there some reason that in
7    writing your report in this litigation you
8    felt it useful to include a reference that the
9    registration statement is the issuer's?
10      A.    There's no particular reason.
11   These are conclusions that I drew from reading
12   the material and thought that they were
13   relevant.
14      Q.    Getting back to 321 at Paragraph
15   6 on Page 3, describing the due diligence
16   process in this case, you write: "The process
17   was enhanced by the book-running firm's
18   commitment process. A complete memo was
19   prepared and presented to a group of senior firm
20   members. This group further reviewed and
21   validated the deal team's due diligence
22   efforts."
23           MR. GLUCKOW: Excuse me. If you
24   wouldn't mind, I think you lost the
25   witness in terms of where you were

EDWARD NECARSULMER, III
1
2    reading from. Would you mind going
3    back and redirecting us to where you
4    are.
5            MR. LEWIS: We are on Page 3,
6    Paragraph 6.
7            MR. GLUCKOW: And we are on 321;
8    correct?
9            MR. LEWIS: Right, 321.
10   BY MR. LEWIS:
11      Q.    "The process was enhanced by the
12   book-running firm's commitment process. A
13   complete memo was prepared and presented to a
14   group of senior firm members. This group
15   further reviewed and validated the deal team's
16   due diligence efforts."
17           When you wrote that, were you
18   referring to the commitment memo that appears
19   at Exhibit 74?
20      A.    Yes.
21           MR. GLUCKOW: When you said --
22   just for the record, I'm assuming your
23   question is referring to the commitment
24   memo as opposed to the process referred
25   to in Paragraph 6?

EDWARD NECARSULMER, III
1
2            MR. LEWIS: Right.
3    BY MR. LEWIS:
4       Q.    Exhibit 74 is the complete memo
5    that you referred to in Paragraph 6?
6       A.    To the best of my recollection.
7       Q.    Did you receive any information
8    from Lehman about the commitment process other
9    than appears in the documents that are listed in
10   your report?
11      A.    No.
12      Q.    Did you read Exhibit 74 from
13   cover to cover in the process of your work on
14   this case?
15      A.    Yes.
16      Q.    Did you find someplace in
17   Exhibit 74 where there is reference to either
18   potential gray marketing or to potential Costco
19   distribution?
20      A.    Not that I recall.
21      Q.    Do you have any reason to
22   believe that either gray marketing or Costco
23   distribution were mentioned orally to the
24   commitment committee, although those terms don't
25   appear in the memo?

EDWARD NECARSULMER, III
1
2       A.    I wouldn't know.
3       Q.    From your experience working in
4    the industry, would you expect that the
5    commitment committee would be provided with
6    facts at a commitment committee meeting that did
7    not appear in the memorandum that was being
8    presented to them?
9            MR. GLUCKOW: Objection. Calls
10   for speculation.
11           You can answer.
12           THE WITNESS: I just wasn't
13   there. Certainly, from a practice
14   matter, you might ask questions -- you
15   do ask questions; you frankly grill the
16   team -- the presenters. That's the
17   process.
18   BY MR. LEWIS:
19      Q.    What is the purpose of a
20   commitment committee memorandum, as you
21   understand it?
22      A.    It's really to generally
23   familiarize people who are not actively involved
24   with the transaction as to what they are going
25   to hear, the subject, and, maybe, hopefully --

EDWARD NECARSULMER, III
1  EDWARD NECARSULMER, III
2  it doesn't always work this way -- they'll think
3  about it before they walk in the door.
4      Q.   The "they" being the commitment
5  committee itself?
6      A.   The commitment committee,
7  correct.
8      Q.   Now, getting to Paragraph 7 of
9  your report, which includes a summary of your
10  opinions -- this is Paragraph 7, Summary, Page
11  4, the next page. Let me take this in pieces.
12      The first sentence reads:
13  "Based on my long industry experience and the
14  information presented to me, it is my opinion
15  that the underwriters of this offering
16  performed due diligence in line with normal
17  industry standards and practice."
18      Can you explain to me, sir,
19  what you mean by "in line with normal industry
20  standards and practice"?
21      A.   The years of experience that I
22  had actually doing this leads me to believe --
23  leads me to think I understand, you know, what
24  is required and what is expected for the
25  process, and when I opine that it's in line with

EDWARD NECARSULMER, III
1  EDWARD NECARSULMER, III
2  that, it means simply that, that I think they
3  complied with what I think is necessary to have
4  complete due diligence.
5      Q.   Are the industry standards that
6  you refer to in your opinion something that is
7  written down in some industry publication or
8  guideline?
9      A.   It's business practice.
10      Q.   An actual business practice that
11  you have observed in your years of working in
12  the financial industry, correct?
13      A.   Yes.
14      Q.   That experience was gained at
15  the firms that are mentioned -- that you've
16  already mentioned in your testimony and also
17  Hallgarten, H-A-L-L-G-A-R-T-E-N, and Company?
18      A.   Yes.
19      Q.   Hallgarten and Company was at
20  one point Moseley and Hallgarten?
21      A.   Actually, the opposite.
22  Hallgarten and Company was a firm of which there
23  were a great number. It was actually founded in
24  1850 and had a significant business but then
25  became part of Moseley and Hallgarten, and there

EDWARD NECARSULMER, III
1  EDWARD NECARSULMER, III
2  was a period in the '70s when there was a huge
3  conglomeration of firms.
4      Actually, I did a fair amount
5  of due diligence where I was the guy who
6  actually went and visited the factory at that
7  point in my career.
8      Q.   Opened the boxes?
9      A.   Correct.
10      Q.   Now, the next sentence of your
11  opinion, immediately following the one I read
12  previously, reads: "Their actions were
13  consistent with a standard of reasonableness as
14  I understand it, and were more than sufficient
15  to satisfy me as to their adequacy and
16  completeness."
17      Again, words are the heart of all
18  depositions, I guess. What do you mean by "a
19  standard of reasonableness as I understand it"?
20      A.   As we've already established, I
21  have no legal training, but it's certainly my
22  business understanding or concept that the
23  underwriters are supposed to conduct reasonable
24  due diligence, and, again, in compliance with
25  what I've done in my own career, I've felt and

EDWARD NECARSULMER, III
1  EDWARD NECARSULMER, III
2  feel that this meets those standards -- that
3  their efforts meet those standards. Let me
4  phrase that better.
5      Q.   The standard that you refer to
6  then in that sentence is a standard based on
7  your empirical observation and personal work in
8  the financial industry rather than anything that
9  is written down in text anywhere?
10      MR. GLUCKOW:  Objection to the
11  form.
12      You can answer.
13      THE WITNESS:  Yes.
14  BY MR. LEWIS:
15      Q.   Have you been a member of any
16  industry committees or associations at which
17  representatives of underwriting firms sit down
18  to discuss principles of due diligence?
19      A.   I've participated in numerous
20  industry panels and study groups and the like,
21  commented on rules, changing the department of
22  corporate financing's rules, et cetera. Due
23  diligence is certainly part of it, but I
24  couldn't cite you a time when I attended a
25  special seminar on due diligence, but I was an

Page 46

EDWARD NECARSULMER, III

1
2  active participant in Securities Industry
3  Association, Investment Bankers Association,
4  NASD, Group of Corporate Finance, I did a lot of
5  that kind of thing, yes.
6      Q.    You believe you've at least
7  heard people talk at such meetings, in such
8  context about due diligence?
9      A.    I do.
10     Q.    Have you read any publications
11  about due diligence?
12         MR. GLUCKOW:  Ever?
13         MR. LEWIS:  Ever.
14         THE WITNESS:  Yes, but I can't
15     really recall -- I can't recall any, but
16     I know that I've done so.
17  BY MR. LEWIS:
18     Q.    Do you recall anything you've
19  seen in writing about due diligence in the last
20  five years?
21         MR. GLUCKOW:  Object to the form.
22     You can answer.
23         THE WITNESS:  No.
24  BY MR. LEWIS:
25     Q.    In the first sentence of this

Page 47

EDWARD NECARSULMER, III

1
2  summary you refer to the underwriters of this
3  offering having performed due diligence in line
4  with normal industry standards and practice.
5         Are you referring there to
6  Lehman Brothers rather than to Ferris Baker
7  Watts or Nations Banc?
8      A.    I'm referring to all three
9  managers.
10     Q.    Do you believe that the
11  underwriters other than Lehman Brothers
12  satisfied their due diligence by delegating that
13  function to Lehman which, in your view,
14  satisfactorily performed it?
15         MR. GLUCKOW:  Objection to form.
16     Assumes facts not in evidence.
17     Mischaracterizes the testimony.
18         You can answer.
19         THE WITNESS:  I don't believe
20     they -- look, the practical reality is
21     that the managing underwriter is
22     responsible for the process, but I
23     think there's ample reference to the
24     fact that the other firms kept their
25     own files, participated in various

Page 48

EDWARD NECARSULMER, III

1
2  parts of this, were present at
3  meetings, so I would not use the word
4     -- I think the word you used was
5     advocated or --
6  BY MR. LEWIS:
7      Q.    Delegated.
8      A.    Delegated, I think to the extent
9  that it's industry standard to clearly delegate
10  the lead to the book-running manager, but I
11  think they performed in line with what I would
12  have expected.
13     Q.    What were you referring to with
14  respect to the other underwriters keeping their
15  own files?
16     A.    I have production from Nations
17  Banc; I've seen some of their work; I've seen
18  the fact that they participated in meetings.
19     Q.    As part of the overall
20  Underwriter Defendants Document Production Pages
21  1 to 11636?
22     A.    That's correct.
23     Q.    Can you recall anything that
24  Nations Banc did with respect to an evaluation
25  of possible gray marketing or Costco

Page 49

EDWARD NECARSULMER, III

1
2  distribution of Adams clubs?
3      A.    No.
4      Q.    Can you recall anything that
5  Ferris Baker Watts did with respect to gray
6  marketing or possible Costco distribution of
7  Adams clubs?
8      A.    No.
9      Q.    Just to be clear in terms of
10  your reading, have you ever read case law
11  regarding the legal standards for due diligence?
12         MR. GLUCKOW:  Object to the form.
13     You can answer.
14         THE WITNESS:  Not that I recall.
15  BY MR. LEWIS:
16     Q.    Have you heard of any cases,
17  legal cases, in the field of due diligence that
18  you consider to be important cases?
19     A.    No.
20     Q.    Have you ever heard of a
21  decision in a case called Escott, E-S-C-O-T-T,
22  versus Bar Chris, B-A-R capital C-H-R-I-S?
23     A.    I've heard of the case, but it
24  was in an earlier time.
25     Q.    Have you heard of a decision in

13 (Pages 46 to 49)

Page 50

EDWARD NECARSULMER, III

1 Feit, F-E-I-T, versus Leasco, L-E-A-S-C-O, by
2 Judge Weinstein?
3     A.    No.
4     Q.    Have you heard that a decision
5 was rendered in the Worldcom litigation by Judge
6 Denise Cote, C-O-T-E, on the subject of due
7 diligence?
8     A.    Yes.
9     Q.    Have you read that decision?
10     A.    I have not.
11     Q.    Have you been told anything
12 about the contents of the decision?
13     A.    Only what I've read.
14     Q.    And what have you read?
15     A.    Just in terms of general press
16 coverage of the matter.
17     Q.    Do you know any principles that
18 she referred to in her opinion?
19     A.    No.
20     Q.    Would you agree with the general
21 proposition -- and, please, if you don't agree,
22 tell me -- that over the years the underwriter
23 has been regarded as a type of gatekeeper to the
24 capital marketplace?

Page 51

EDWARD NECARSULMER, III

1     MR. GLUCKOW:  Object to the form.
2     You can answer.
3     THE WITNESS:  Yes.
4 BY MR. LEWIS:
5     Q.    You do agree with that?
6     A.    I do.
7     Q.    And would you agree that an
8 underwriter's reputation has helped small
9 companies gain access to capital markets?
10     MR. GLUCKOW:  Object to the form.
11     You can answer.
12     THE WITNESS:  Yes.
13 BY MR. LEWIS:
14     Q.    Do you believe that it is true
15 that underwriters have been considered
16 responsible for assuring the accuracy of an
17 issuer's offering materials?
18     A.    I don't believe that to be true.
19     Q.    And can you tell me why?
20     A.    I think among -- let me make
21 sure I phrase this properly.  I think among
22 sophisticated investors, it's well-known that
23 the company is, in fact, you know, the better
24 source about its business and that underwriters

Page 52

EDWARD NECARSULMER, III

1 will certainly do -- are certainly important in
2 the process; but I don't believe that it's -- it
3 completely -- that it's generally recognized
4 that that is part of the underwriters'
5 responsibility.
6     Q.    Do you believe that in initial
7 public offerings underwriters are heavily relied
8 upon by the investing public?
9     A.    I do believe that.
10     Q.    Do you believe that's true
11 especially where the companies doing the IPOs
12 are experiencing rapid growth and change just
13 before the IPO?
14     MR. GLUCKOW:  Object to the form.
15     You can answer.
16     THE WITNESS:  I don't think
17     there's any difference from your last
18     question.  I think your last question
19     is true, I wouldn't modify it.
20 BY MR. LEWIS:
21     Q.    Okay.
22     A.    The first question is true,
23 excuse me.
24     Q.    Do you agree that the

Page 53

EDWARD NECARSULMER, III

1 reasonableness of a due diligence investigation
2 varies with the factual circumstances of each
3 offering?
4     A.    I do.
5     Q.    To what extent do you believe
6 expense is a determinant in how thorough due
7 diligence should be?
8     MR. GLUCKOW:  Object to the form.
9     You can answer.
10     THE WITNESS:  Virtually not at
11     all.
12 BY MR. LEWIS:
13     Q.    And why is that?
14     A.    I think people's reputation and
15 their relationship with their clients -- I'm
16 talking about from an underwriter's point of
17 view now -- is priceless and cost, just for
18 better or worse, was never an issue.
19     Q.    Now, do you believe that in the
20 securities industry the standards for due
21 diligence are more rigorous in an IPO than in a
22 follow-on offer?
23     MR. GLUCKOW:  Object to the form.
24     You can answer.

14 (Pages 50 to 53)

Page 54

1    EDWARD NECARSULMER, III
2    THE WITNESS: I have a difficult
3    -- I think your concept is correct, but
4    I'm not sure rigorous -- I guess what
5    I'm trying to say is since there is
6    less information in the public domain,
7    more work is traditionally done, but I
8    think the standards are pretty much the
9    same.
10   BY MR. LEWIS:
11       Q.    So the standards are the same
12   but the work is more rigorous in the IPO than in
13   the follow-on offerings?
14       MR. GLUCKOW: Object to the
15   form. Mischaracterizes the testimony.
16       You can answer.
17       THE WITNESS: What I'm trying to
18   say -- maybe I didn't say it properly
19   -- is that if you are working on the
20   second, third, or fourth offering for a
21   company, A, you are knowledgeable,
22   assuming you have the same team in
23   place or parts of the same team in
24   place; and, B, the body of information
25   has been organized and is more easily

Page 55

1    EDWARD NECARSULMER, III
2    -- easy to digest and to process. An
3    IPO you tend -- sometimes have to
4    really break new ground to get
5    information.
6    BY MR. LEWIS:
7        Q.    Would you agree that the
8    securities industry as a whole expects more due
9    diligence work in an IPO than in a follow-on
10   offering?
11       MR. GLUCKOW: Object to the
12   form. Vague and ambiguous.
13       You can answer.
14       THE WITNESS: I wouldn't agree to
15   that.
16   BY MR. LEWIS:
17       Q.    I think -- strike that.
18       Is it true in an IPO that
19   because securities have not been previously
20   publicly traded, information about an issuer
21   is often not readily available to the public
22   as a whole?
23       MR. GLUCKOW: Object to the form.
24       You can answer.
25       THE WITNESS: It's too hard to

Page 56

1    EDWARD NECARSULMER, III
2    generalize. I mean, Google, there were
3    no secrets, yet I'm sure on some small
4    companies there are secrets, or that
5    may be the wrong way to phrase it, but
6    information that is not as available.
7    BY MR. LEWIS:
8        Q.    Would you disagree then that the
9    standards for due diligence are higher than
10   usual where a company going through an IPO is
11   experiencing rapid growth and change?
12       MR. GLUCKOW: Objection to the
13   form.
14       You can answer.
15       It's vague and ambiguous.
16       THE WITNESS: I don't think I can
17   answer. I'm not unwilling to, I just
18   don't think I can answer that. I don't
19   think the standards -- you are faced
20   with the same issue when you agree to
21   commit your capital and your reputation
22   to underwrite securities and there may
23   be a number of, you know, intensity, or
24   whatever the proper phrase would be,
25   someplace within the same scale and I

Page 57

1    EDWARD NECARSULMER, III
2    don't think it's just because it's an
3    initial public offering or just because
4    it's a company that's a rapidly growing
5    company.
6    BY MR. LEWIS:
7        Q.    So in the past when you -- I
8    take it you have performed -- you have
9    participated in some way or other in due
10   diligence investigations both of companies going
11   through IPOs and companies going through
12   follow-on offerings. Is that correct?
13       A.    That is correct.
14       Q.    And in those situations you did
15   not expect the due diligence team to adjust its
16   level of due diligence to take into account the
17   newness of the one company versus the previous
18   offering of the other?
19       MR. GLUCKOW: Object to the
20   form. Mischaracterizes the testimony.
21       You can answer.
22       THE WITNESS: I don't think
23   that's what I said, or if I did say
24   that, that's not what I meant. What I
25   meant was there are a whole set of

15 (Pages 54 to 57)

Page 58

EDWARD NECARSULMER, III

1  variables. Some of the ones you've
2  mentioned are variables -- are valid
3  ones, but there are -- just the
4  existence of the fact that it was a
5  fast growing company or it was a new
6  company would not be enough for me to
7  direct the team to do something
8  different.
9  BY MR. LEWIS:
10  Q. What variables, if any, would
11  cause you to direct the team to do something
12  different in due diligence?
13  MR. GLUCKOW: I'm going to object
14  to the form and object on the ground
15  that it's vague and ambiguous and quite
16  overbroad.
17  But you can answer.
18  THE WITNESS: I mean it's a
19  situation-by-situation issue. I think
20  that -- and I can only, you know,
21  really respond to it anecdotally if I
22  can think of some appropriate
23  anecdotes. But I guess my point is,
24  without belaboring this, is you look at
25  without belaboring this, is you look at

Page 59

EDWARD NECARSULMER, III

1  each situation and hopefully -- you
2  know, if you are managing the process,
3  you look at each situation and
4  hopefully you figure out, you know,
5  what you need to do to satisfy your
6  commitment committee, yourself, and the
7  marketplace. And there are really no
8  other rules specific -- you know,
9  templates I can honestly look at you
10  and offer beyond that.
11  BY MR. LEWIS:
12  Q. Have you ever had the experience
13  of adjusting the due diligence that you were
14  conducting on a company because the company had
15  management that had not had long experience in
16  running a public company?
17  A. Yes.
18  Q. And why did you do that?
19  A. Well, because simply as a matter
20  of mechanics. In many cases if a company had
21  done other offerings or was -- let's say had
22  done other offerings or had significant -- had
23  done private equity financings or other
24  transactions, typically they might be more

Page 60

EDWARD NECARSULMER, III

1  organized in terms of your ability to get
2  documents and things that were on point that
3  would go right to your organizational outline,
4  where if they hadn't, you might have to really
5  help them set up the process.
6  Q. Would you agree that in an
7  initial public offering there is a strong
8  affirmative duty of disclosure?
9  MR. GLUCKOW: Object to the
10  form. Vague and ambiguous. Calls for
11  a legal conclusion.
12  You can answer.
13  THE WITNESS: Yes.
14  BY MR. LEWIS:
15  Q. Would you agree that in
16  conducting due diligence it is necessary for the
17  due diligence team to continue its investigation
18  of the issuer up to and including the effective
19  date of the registration statement?
20  A. Yes.
21  Q. And a due diligence
22  investigation would be inadequate if the
23  underwriter did not do that?
24  MR. GLUCKOW: Object to the

Page 61

EDWARD NECARSULMER, III

1  form. It calls for a legal conclusion.
2  You can answer.
3  THE WITNESS: I mean, the easy
4  answer is yes, but -- well, okay, let
5  me just leave it at yes.
6  BY MR. LEWIS:
7  Q. Is it your understanding as a
8  non-lawyer that one of the duties of
9  underwriters is to deal fairly with the
10  investing public?
11  MR. GLUCKOW: Object to the form.
12  You can answer.
13  THE WITNESS: Absolutely.
14  BY MR. LEWIS:
15  Q. Isn't that sometimes referred to
16  as the shingle theory?
17  A. I'm not familiar with that.
18  Q. I take it from your initial
19  report that one of your beliefs is that an
20  underwriter has an obligation to conduct a
21  reasonable investigation in an IPO?
22  A. Yes.
23  Q. And there is a long tradition
24  since the securities laws were enacted in the

16 (Pages 58 to 61)

Page 62

EDWARD NECARSULMER, III

1
2   '30s of underwriters conducting due diligence
3   investigations?
4           MR. GLUCKOW: Object to the
5       form. Vague and ambiguous.
6           You can answer.
7           THE WITNESS: Yes.
8   BY MR. LEWIS:
9       Q.   To your knowledge, how far back
10  in time have due diligence investigations been
11  conducted by underwriters?
12      A.   I think they were formalized by
13  the 33 Act, but I don't go back quite that far,
14  but it's certainly my understanding that
15  particularly, you know, throughout history, you
16  know, you committed your own capital to a
17  greater extent I think than -- now things come
18  full cycle, but in the beginning I think people
19  did due diligence as, you know -- it's my
20  understanding that a lot of due diligence --
21  what due diligence was done was, in fact, you
22  know, a matter of, you know, of self-protection
23  as opposed to any responsibility -- as opposed
24  to exclusively a responsibility to, you know,
25  investors.

Page 63

EDWARD NECARSULMER, III

1
2       Q.   Did your work in the securities
3   industry begin in 1967 with Hallgarten?
4       A.   Correct.
5       Q.   In the time that you've been in
6   the industry, have you become aware of any
7   changes in practical standards for due diligence
8   investigations?
9           MR. GLUCKOW: Objection. Vague
10      and ambiguous. Overbroad.
11          You can answer.
12  BY MR. LEWIS:
13      Q.   Let me reframe the question.
14          Have you become aware of
15  changes in practice with respect to due
16  diligence investigations over the time since
17  1967 that you've been employed in the
18  industry?
19          MR. GLUCKOW: The same objection.
20          You can answer.
21          THE WITNESS: None to the basic
22      tenets of how the business or the
23      process is done. I think one of the
24      main changes that I've seen is that to
25      the extent that the managing

Page 64

EDWARD NECARSULMER, III

1
2   underwriter has taken an even larger
3   responsibility or has been delegated --
4   I don't like the word delegated, but
5   has been delegated a responsibility by
6   the other comanagers to a greater
7   extent.
8           And the other -- if I can just
9   illuminate. The process has gotten
10  better to the extent that investment
11  banks began to specialize in either
12  certain industries or had groups that
13  did certain industries; whereas, in my
14  life, everybody was a generalist and so
15  that if you were doing a
16  telecommunications deal, it would be
17  done by the telecommunications group in
18  Lehman Brothers or Goldman Sachs or
19  something, who really became quite
20  expert.
21          I know we had a significant
22  technology practice and management
23  would often tell me that some of the
24  people in that group are as
25  knowledgeable -- not as they were, of

Page 65

EDWARD NECARSULMER, III

1
2   course, but as their competitors were
3   about the business.
4           MR. GLUCKOW: I think we've been
5       going a little bit over an hour. If
6       there's a point in your outline where
7       we could take a short break.
8           MR. LEWIS: We can take it right
9       now.
10          MR. GLUCKOW: That would be
11      great.
12          (A recess was had from 1:18 p.m.
13      to 1:26 p.m.; and then the proceedings
14      continued as follows:)
15  BY MR. LEWIS:
16      Q.   Mr. Necarsulmer, outside of this
17  litigation, before you did your work in this
18  case, did you ever hear it said that
19  underwriters were required to act as a prudent
20  man would in the management of his own property?
21          MR. GLUCKOW: Those words?
22          MR. LEWIS: Yes.
23          THE WITNESS: I've certainly
24      heard of the prudent man rule, but I
25      thought it referred to trust companies

17 (Pages 62 to 65)

Page 66

EDWARD NECARSULMER, III
1
2   and mutual funds.
3   BY MR. LEWIS:
4       Q.   Okay.  Have you heard anything
5   else said about whether underwriters had to act
6   as a prudent man in the management of his own
7   property?
8       A.   I've never heard that.
9       Q.   Do you believe that underwriters
10  are entitled to rely solely on the
11  representations of a company's officers or
12  counsel?
13          MR. GLUCKOW:  Object to the form.
14      You can answer.
15          THE WITNESS:  No.
16  BY MR. LEWIS:
17      Q.   And why do you not believe that
18  they can do so?
19      A.   In my experience, when possible,
20  and when relevant, it always -- it wasn't always
21  the case.  If there are independent checks, you
22  can do formal or informal, it's a useful part of
23  the process.
24      Q.   Do you believe that verification
25  of information is a critical step in the due

Page 67

EDWARD NECARSULMER, III
1
2   diligence process?
3       A.   Yes.
4       Q.   And do you believe that that is
5   necessary because even honest clients can make
6   mistakes?
7           MR. GLUCKOW:  Objection to the
8       form.
9       You can answer.
10  BY MR. LEWIS:
11      Q.   Do you believe that one reason
12  that verification is necessary is because even
13  honest clients can make mistakes?
14          MR. GLUCKOW:  Same objection.
15      You can answer.
16          THE WITNESS:  Yes.  I don't
17      enthusiastically agree, but I will
18      concede that.
19  BY MR. LEWIS:
20      Q.   Okay.  Do you agree that another
21  reason that it may be necessary is because
22  honest clients can be overenthusiastic or
23  overoptimistic?
24      A.   Yes.
25          MR. GLUCKOW:  The "it" being

Page 68

EDWARD NECARSULMER, III
1
2   verification?
3           MR. LEWIS:  Yes.
4   BY MR. LEWIS:
5       Q.   And is it your belief that on
6   rare occasions statements may be made by company
7   officers to induce an underwriter to underwrite
8   an offering where those statements are
9   deliberately false?
10          MR. GLUCKOW:  Objection to the
11      form.  Vague and ambiguous.
12      You can answer.
13          THE WITNESS:  It certainly has
14      happened.
15  BY MR. LEWIS:
16      Q.   Can you think of any situations
17  where it has happened?
18          MR. GLUCKOW:  In his own
19      experience?
20  BY MR. LEWIS:
21      Q.   Either in your own experience or
22  those you have heard of?
23      A.   I can't give you a specific
24  example.
25      Q.   Do you agree with the

Page 69

EDWARD NECARSULMER, III
1
2   proposition that underwriters must be alert to
3   exaggerations by an issuer?
4           MR. GLUCKOW:  Object to the form
5       and object to the ground that like
6       these other questions, that it's vague
7       and ambiguous and overbroad.
8       But you can answer.
9           THE WITNESS:  Yes.
10  BY MR. LEWIS:
11      Q.   Now, do you believe that there
12  are any industry standards relating to
13  verification of information supplied by an
14  issuer?
15      A.   No.
16          MR. GLUCKOW:  I offer a belated
17      objection to the form.
18  BY MR. LEWIS:
19      Q.   Have there been instances in
20  your career where to verify information you or
21  people working for you interviewed lower level
22  employees of a corporation?
23      A.   I can't answer that yes or no.
24  I've seen it done, not in a verification sense,
25  but if I may, for example, in a business where

18 (Pages 66 to 69)

Page 70

EDWARD NECARSULMER, III

1  one particular product line, geographic line,
2  factory is critical or critical to driving
3  growth of sales and revenues, I've seen it done
4  where you've asked to be exposed to the actual
5  hands-on people in that area, but it's not
6  customary, except for, again, you might meet a
7  plant manager if you go look at a facility, that
8  kind of thing, but he would more be a tour guide
9  and you would generally speak to the designated
10  heads of marketing, finance, manufacturing,
11  whatever the traditional department heads of the
12  company are. That's certainly my experience.
13      Q.    In the instances you gave of
14  dealing with lower level employees, would it be
15  fair to say you were giving examples of
16  situations where the contacts were made for
17  evaluation of those people or examination of
18  facilities?
19          MR. GLUCKOW: Objection to the
20      form.
21          You can answer.
22          THE WITNESS: The latter, not the
23      former.
24  BY MR. LEWIS:

*(line numbers 1–25 on the left)*

Page 72

EDWARD NECARSULMER, III

1  manufacturing process or something? Typically
2  not. So oil and gas is the usual example
3  where you get your independent petroleum
4  engineer to verify reserves, or something like
5  that.
6      Q.    Do you believe that there are
7  instances in which verification may require
8  reviewing internal documents of a company that
9  the company has not voluntarily supplied?
10          MR. GLUCKOW: Object to the form.
11          You can answer.
12          THE WITNESS: I'm not really
13      comfortable with the hypothetical. I'm
14      sure there are situations, I just have
15      never run into one.
16  BY MR. LEWIS:
17      Q.    Do you believe that it's true
18  that during the due diligence process the
19  positions of the underwriters and the company's
20  officers should become somewhat adverse?
21          MR. GLUCKOW: Object to the form.
22          You can answer.
23          THE WITNESS: In an ideal world
24      there ought to be a nice balance

Page 71

EDWARD NECARSULMER, III

1      Q.    Okay. But not as a verification
2  on information that had been supplied by
3  management?
4      A.    Correct.
5      Q.    Have there been instances in
6  your career when either in participating in or
7  conducting a due diligence investigation you
8  asked a company to give you access to files that
9  they had not provided to you?
10      A.    I don't recall ever having done
11  that.
12      Q.    Do you believe that use of
13  industry experts in due diligence is a desirable
14  thing in general terms?
15      A.    Yes, with a qualification. I
16  think it's important to -- I think it's
17  important when there's something you don't
18  understand -- or, again, I'm a practical
19  character, so I can remember working on an
20  insurance company deal where there's no way we
21  would be able to understand actuarial
22  assumptions, so we would hire our own actuary.
23          But would I encourage the use
24  of an outside expert to look at somebody's

Page 73

EDWARD NECARSULMER, III

1  between friendly or, you know,
2  cooperation, but you still need to have
3  the ability to get the answers, and if
4  that causes adversity, so be it.
5  BY MR. LEWIS:
6      Q.    But would you agree that the due
7  diligence process often fosters a collaborative
8  atmosphere between the issuer and the
9  underwriters?
10      A.    It certainly always starts out
11  that way. Or I should rephrase, usually starts
12  out that way.
13      Q.    In fact, in your report in the
14  AMF case --
15      A.    Mm-hmm.
16      Q.    -- Exhibit 324, Page 2,
17  Paragraph B --
18          MR. GLUCKOW: Hold on; just let
19      us get there.
20          Okay.
21  BY MR. LEWIS:
22      Q.    -- the last sentence, you
23  wrote: "While the process often fosters a
24  collaborative atmosphere between issuer and

19 (Pages 70 to 73)

Page 74

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2    underwriters, it is essential for due diligence
3    efforts to be thorough and their conclusions
4    factually supportable."
5        Do you believe that as a
6    general proposition?
7        A.    I think that's just what I just
8    said, but, yes.
9        Q.    Is there a reason that in
10   writing your report in this case you took out
11   the reference to the fostering of a
12   collaborative atmosphere?
13       A.    No. I said to you before that I
14   used this as a template, but it was more in the
15   process of ordering things and what I wanted to
16   cover, but I frankly rethought what I would want
17   to include in my opinion.
18       MR. GLUCKOW:  By the way, for the
19   record, you are comparing B of 324 with
20   B of 321?
21       MR. LEWIS:  Yes.
22       MR. GLUCKOW:  And comparing
23   collaborative versus cooperation?
24       MR. LEWIS:  Right.
25       MR. GLUCKOW:  Okay.

Page 75

1        EDWARD NECARSULMER, III
2    BY MR. LEWIS:
3        Q.    In your report in 321 you have
4    written: "While the process requires
5    cooperation between issuer and underwriters, it
6    is essential for due diligence efforts to be
7    thorough and their conclusions factually
8    supportable."
9        I don't have a question, but if
10   you want to respond, you are free.
11       MR. GLUCKOW:  Wait for a
12   question.
13   BY MR. LEWIS:
14       Q.    Do you believe that in the due
15   diligence process the underwriters are
16   frequently required to play devil's advocate?
17       A.    Yes.
18       Q.    When, in your opinion, does that
19   become necessary?
20       A.    It's hard to be specific. I
21   mean, it could be from the first meeting to the
22   bringdown call right before you price. I mean,
23   it's just part of the ongoing process.
24       Q.    Do you agree in principle that
25   the underwriters must employ a high degree of

Page 76

1        EDWARD NECARSULMER, III
2    care in their investigations?
3        A.    I certainly do.
4        Q.    Do you agree that the
5    underwriters must independently verify the
6    company's representations?
7        MR. GLUCKOW:  Objection to the
8    form. Asked and answered.
9        You can answer.
10       THE WITNESS:  I don't think all
11   of the representations. I think -- you
12   know, the basic description of their
13   business and their business plan and
14   these kinds of things are -- if you are
15   going to do business with these people,
16   you traditionally accept those at face
17   value.
18   BY MR. LEWIS:
19       Q.    Do you believe that in each case
20   in which an underwriter conducts due diligence
21   it must conduct a meaningful investigation of
22   the company?
23       MR. GLUCKOW:  Objection to the
24   form.
25       You can answer.

Page 77

1        EDWARD NECARSULMER, III
2        THE WITNESS:  I agree with that.
3    BY MR. LEWIS:
4        Q.    Would you agree that in the due
5    diligence context the term investigation can be
6    defined as conducting a searching inquiry?
7        A.    I don't really have a response
8    to that. I think that's a matter of semantics.
9    I think you -- whatever procedure and process
10   you use and you feel is adequate and reasonable,
11   you do.
12       Q.    Is there a definition that you
13   have in your own mind for what an investigation,
14   a due diligence investigation, means?
15       A.    Yes, but it can vary from
16   company to company and project to project.
17       Q.    Would you agree that to
18   investigate means to inquire into a subject
19   matter with attention to detail?
20       A.    That's a fair definition.
21       Q.    That's a...?
22       A.    Fair definition.
23       Q.    Fair definition?
24       MR. GLUCKOW:  Delayed objection
25   to the form.

20 (Pages 74 to 77)

Page 78

EDWARD NECARSULMER, III
1       EDWARD NECARSULMER, III
2  You can answer. And you have.
3  BY MR. LEWIS:
4       Q.   Is it your view that if an
5  underwriter receives negative information from a
6  company of some sort, it's required -- it
7  becomes necessary to follow up on that
8  information?
9              MR. GLUCKOW: Objection to the
10       form. Vague and ambiguous.
11             You can answer.
12             THE WITNESS: I think it's
13        necessary to follow up on all
14        information - negative, positive, or
15        sideways.
16  BY MR. LEWIS:
17       Q.   And noninformation, also?
18             MR. GLUCKOW: Objection to the
19       form.
20             You can answer.
21             THE WITNESS: If something is
22        self-evident or that's just a fact, no,
23        you don't need to follow up on it,
24        but...
25  BY MR. LEWIS:

Page 79

1       EDWARD NECARSULMER, III
2       Q.   Do you use the term red flags in
3  your work?
4       A.   Yes.
5       Q.   How do you use that term?
6       A.   To define issues that either
7  require further attention or are not -- or
8  perhaps inconsistent with what we -- our, you
9  know, prior impression would be.
10       Q.   Is it your opinion that it is
11  necessary for an underwriter to follow up on any
12  red flag that suggests that a registration
13  statement may not be complete and accurate?
14       A.   I mean, the general answer to
15  the question is yes, but it's very hard just to
16  -- let me leave it there. Yes.
17       Q.   Would you agree that merely
18  spending a lot of time on an investigation,
19  meeting a lot of times with management, and
20  reviewing a lot of documents is not necessarily
21  sufficient in a due diligence investigation?
22             MR. GLUCKOW: Vague and
23       ambiguous.
24             You can answer.
25             THE WITNESS: It doesn't -- it's

Page 80

1       EDWARD NECARSULMER, III
2  not -- it's not the final answer.
3  BY MR. LEWIS:
4       Q.   Have you been involved in due
5  diligence investigations where a great amount of
6  time and money was spent in the investigation
7  and the investigation was not to your
8  satisfaction?
9       A.   Yes.
10       Q.   And can you give any anecdotal
11  examples of that?
12       A.   Well, all I can tell you is I
13  have been in situations where, either as a
14  commitment committee or as just a man heading up
15  a department, I didn't feel we had adequate
16  information to -- either in one specific area or
17  in general or that we had gone far enough to
18  sign off on underwriting the or presenting it to
19  whoever needed to sign off on it, so the answer
20  is yes.
21       Q.   What did you do in that instance
22  or instances?
23       A.   You go back and you do more
24  work.
25       Q.   Did you ever hold up an offering

Page 81

1       EDWARD NECARSULMER, III
2  to do more work?
3       A.   Yes.
4       Q.   How recently was that, in
5  general?
6       A.   I would say that would have been
7  pre-1998.
8       Q.   Do you have an opinion on
9  whether that portion of the due diligence
10  investigation which the underwriters in this
11  case did with respect to possible gray marketing
12  or Costco distribution of Adams products
13  satisfied industry standards?
14             MR. GLUCKOW: Objection to the
15       form. Vague and ambiguous. The report
16       speaks for itself.
17             You can answer.
18             THE WITNESS: I believe it does.
19  BY MR. LEWIS:
20       Q.   So you do in fact believe that
21  the underwriters in this case did investigate
22  possible gray marketing or Costco distribution
23  of Adams products?
24       A.   I believe that underwriters were
25  aware of the situation, made a judgment about

21 (Pages 78 to 81)

Page 82

```
 1              EDWARD NECARSULMER, III
 2  how impactful it was upon the company, and acted
 3  accordingly.
 4       Q.   And the opinion you have on that
 5  subject is based, as is your overall opinion, on
 6  industry standards rather than legal standards?
 7            MR. GLUCKOW: Objection to the
 8  form.
 9            You can answer.
10            THE WITNESS: Yes.
11  BY MR. LEWIS:
12       Q.   You are not relying on any cases
13  with respect to that?
14       A.   Right.
15       Q.   It's your observation of
16  industry norms?
17       A.   Correct.
18       Q.   Do you know of any investigation
19  that the underwriters conducted of gray
20  marketing or Costco issues than what is
21  reflected in the writings that you have listed
22  in the attachment to your report?
23            MR. GLUCKOW: Object to the form.
24            You are referring to Exhibit A to
25  321?
```

Page 83

```
 1              EDWARD NECARSULMER, III
 2            MR. LEWIS: 321.
 3            MR. GLUCKOW: Exhibit B?
 4            MR. LEWIS: Exhibit B.
 5            THE WITNESS: Those were the
 6  materials that I reviewed, solely and
 7  completely.
 8  BY MR. LEWIS:
 9       Q.   Do you believe that the best
10  record of what actions the underwriters take in
11  a due diligence investigation is what they
12  preserve in writing?
13            MR. GLUCKOW: Objection to the
14  form. Vague and ambiguous.
15            You can answer.
16            THE WITNESS: I don't know how to
17  answer the question.
18            The written record is certainly,
19  you know, significant in the part that
20  lasts, but when you sit in a commitment
21  committee or when you sit with your
22  boss and you say, you know, these are
23  important issues, that could be equally
24  important, but certainly the only thing
25  I can refer to is what I've seen.
```

Page 84

```
 1              EDWARD NECARSULMER, III
 2  BY MR. LEWIS:
 3       Q.   Based on your experience in the
 4  industry, is it customary to record in writing
 5  any significant activities you undertake as part
 6  of a due diligence investigation?
 7            MR. GLUCKOW: Objection to the
 8  form. Vague and ambiguous.
 9            You can answer.
10            THE WITNESS: Customary but not
11  exclusive.
12  BY MR. LEWIS:
13       Q.   Can you explain what you mean by
14  that?
15       A.   What I mean by that is that you
16  obviously want to write down and memorialize as
17  much as you possibly can, but this is a process
18  and you go out and you talk to people and you
19  are working with the CFO and you are talking
20  about an issue and you are -- you know, there
21  are things that you hope that the people on your
22  team are getting a feel for and digesting about
23  the company, and whether that all gets written
24  down or not, I can't tell you.
25       Q.   Is it customary in your
```

Page 85

```
 1              EDWARD NECARSULMER, III
 2  experience for an underwriter to document
 3  discussions regarding determinations of
 4  materiality?
 5            MR. GLUCKOW: Objection to the
 6  form. Vague and ambiguous.
 7            You can answer.
 8            THE WITNESS: I would say no.
 9  BY MR. LEWIS:
10       Q.   Why is that?
11       A.   Because if, you know, again, you
12  are determining something is not material, you
13  probably move on.
14       Q.   In your experience, is it
15  customary to document information which leads to
16  the decision to exclude something from a
17  prospectus?
18            MR. GLUCKOW: Object to the
19  form. Vague and ambiguous.
20            You can answer.
21            THE WITNESS: I'll answer again
22  no.
23  BY MR. LEWIS:
24       Q.   Now, is it customary in the
25  industry to keep notes regarding a due diligence
```

22 (Pages 82 to 85)

Page 86

EDWARD NECARSULMER, III
1  investigation, in your experience?
2  A.    Again, customary but not
3  exhaustive. I mean, anecdotally, you -- someone
4  tells you you have currency exposure to some
5  kind of currency, so you investigate and you
6  find out that in fact the contracts are written
7  in dollars -- I mean, I'm making this -- I'm
8  using an example -- so therefore I would never
9  expect for someone to write down, gee, I checked
10  out whether we were exposed to the Zambian
11  kwacha and found out the contracts were written
12  in dollars. Because we had already reviewed the
13  contracts or we had the contracts as another
14  part of our thing, I wouldn't have expected that
15  to be a separate analysis or separate record.
16  Q.    Is it your opinion that it is
17  desirable for an underwriter to prepare a list
18  of facts to be verified and then to address them
19  in a systematic fashion?
20  A.    Desirable? Absolutely.
21  Q.    What do you believe, as you sit
22  here and as you can recall, that the
23  underwriters did to investigate possible gray
24  marketing or Costco distribution of Adams
25

Page 87

EDWARD NECARSULMER, III
1  products?
2  MR. GLUCKOW: Objection to the
3  form. Overbroad.
4  In addition to what's in his
5  reports or in summarized reports?
6  BY MR. LEWIS:
7  Q.    As you sit here, can you recall
8  anything that Adams did to investigate possible
9  gray marketing or Costco distribution of Adams
10  products? And if you need to refer --
11  THE WITNESS: May I ask a
12  question?
13  MR. GLUCKOW: Let me object to
14  the form. I think you said what did
15  Adams do.
16  THE WITNESS: Yeah, that's what I
17  was going to ask.
18  MR. GLUCKOW: Do you want to have
19  it read back or fix it?
20  MR. LEWIS: I'll fix it.
21  BY MR. LEWIS:
22  Q.    As you sit here, can you recall
23  anything that the underwriters did to
24  investigate possible gray market distribution or
25

Page 88

EDWARD NECARSULMER, III
1  Costco distribution of Adams products?
2  MR. GLUCKOW: Objection to the
3  form.
4  You can answer.
5  THE WITNESS: They did a number
6  of things. They spent time with the
7  marketing people at Adams and the
8  subject was discussed. They
9  participated in the customer survey
10  process where that was, to the best of
11  my recollection, never mentioned as an
12  issue by a group of their -- a group of
13  customers.
14  BY MR. LEWIS:
15  Q.    Anything else that you can
16  recall?
17  A.    Those would be the two main
18  things that I can recall at this time.
19  Q.    Incidentally, maybe I can
20  short-circuit some paper, you referred in your
21  rebuttal report to a number of specific pages at
22  Pages 1 and 2 of the rebuttal report --
23  A.    Mm-hmm.
24  Q.    -- under underwriting document
25

Page 89

EDWARD NECARSULMER, III
1  pages, Paragraph B, Paragraph C.
2  Am I correct that none of those
3  pages specifically referred to the terms gray
4  marketing or Costco?
5  MR. GLUCKOW: You mean the UND
6  document production pages as opposed to
7  the deposition transcripts?
8  MR. LEWIS: Yes, correct.
9  THE WITNESS: I don't recall. I
10  can't tell you what said what. I know
11  they were both used and -- I can
12  certainly tell you in the deposition
13  transcripts it came up often. I just
14  don't recall.
15  MR. LEWIS: Okay, if we may go
16  through them.
17  BY MR. LEWIS:
18  Q.    Are you seeking to be qualified
19  in this case as an expert on the subject of what
20  disclosures were legally required?
21  MR. GLUCKOW: Objection to the
22  form.
23  You can answer.
24  THE WITNESS: To the extent that
25

23 (Pages 86 to 89)

Page 90

EDWARD NECARSULMER, III

1  EDWARD NECARSULMER, III
2  it's part of the due diligence
3  assignment, I guess the answer is yes,
4  but I wasn't specifically -- to the
5  best of my knowledge, I'm not
6  specifically trying to get there. I
7  think that it's all basically the same
8  issue to the investigation and I'm sure
9  that it was properly disclosed.
10  BY MR. LEWIS:
11      Q.    But you say in your rebuttal
12  report that the defendants made a reasonable
13  judgment on disclosure?
14          MR. GLUCKOW: Where are you
15  referring?
16          MR. LEWIS: The rebuttal report.
17          MR. GLUCKOW: What page? What
18  paragraph?
19          MR. LEWIS: Let's go to Paragraph
20  C. "After doing proper due diligence,
21  the underwriters made a reasonable
22  judgment related to disclosure of this
23  issue."
24          MR. GLUCKOW: Maybe we are on
25  different pages. I'm not finding what

Page 91

1  EDWARD NECARSULMER, III
2  you are referring to. 322, what
3  paragraph?
4          MR. LEWIS: 3.
5          MR. GLUCKOW: Oh, he said C.
6          THE WITNESS: I thought you said
7  C, I'm sorry.
8  BY MR. LEWIS:
9      Q.    Let me read it in full: "To the
10  extent that either expert is opining that the
11  underwriters were unreasonable in concluding
12  that a disclosure regarding gray marketing was
13  not necessary, I disagree with that contention
14  and believe, that after doing proper due
15  diligence, the underwriters made a reasonable
16  judgment related to disclosure of this issue."
17          You do not contend, do you,
18  that you are an expert in gray markets?
19      A.    Absolutely not.
20      Q.    Did you ever have experience
21  with gray market issues before this litigation?
22      A.    I actually did once. I worked
23  on a significant case for Daimler-Benz, and it
24  was -- one of the issues they were facing was
25  importation of cars not through their regular

Page 92

1  EDWARD NECARSULMER, III
2  channels --
3      Q.    Okay.
4      A.    -- and then the dealers would be
5  responsible for the cars. And one of the issues
6  was dealer relations and, you know, the whole --
7  how the US network hung together. So I
8  certainly was, you know, involved in that
9  particular case, and, you know, we determined
10  that it wasn't material to what we were doing,
11  but it was out there.
12          I can't think of others, but I
13  suspect there have been others.
14      Q.    When was that Daimler-Benz
15  matter?
16      A.    I guess that was a '93
17  offering. There were two or three, the rights
18  offering and an equity offering and all around
19  the -- that offering all around the same time.
20  I just remember it being brought up and us
21  discussing it and then doing a little research
22  on it at the time.
23      Q.    Well, is it your testimony that
24  if in this case there was in fact a serious gray
25  marketing issue and the underwriters did not

Page 93

1  EDWARD NECARSULMER, III
2  detect it, they are excused for overlooking it?
3          MR. GLUCKOW: Objection to the
4  form. It assumes facts not in
5  evidence. It calls for speculation and
6  an incomplete hypothetical. Overbroad.
7          THE WITNESS: I'd be happy to try
8  to answer your question, I'm just not
9  sure I can.
10  BY MR. LEWIS:
11      Q.    Well, let's take the
12  hypothetical assumption that -- not so
13  hypothetical -- that there was a serious
14  potential problem that existed, that the
15  underwriters conducted the investigation -- let
16  me reframe it.
17          Are you saying anything by your
18  opinion other than if the underwriters did a
19  diligent investigation, they were not required
20  to disclose something they didn't find?
21          MR. GLUCKOW: The same objections.
22          THE WITNESS: I fundamentally
23  agree with that, yes.
24  BY MR. LEWIS:
25      Q.    Your opinion does not rest on

24 (Pages 90 to 93)