Page 94

EDWARD NECARSULMER, III

1  materiality standards or SEC disclosure
2  standards, it's based in the reasonableness of
3  the investigation?
4  standards, it's based in the reasonableness of
5     A.    Yes.
6     Q.    And nothing else?
7        MR. GLUCKOW:  Objection to the
8  form.
9        The report speaks for itself.  I
10  don't know if you want to engage in any
11  dialog on this.
12        In the conclusion section here,
13  the last section on Page 2, Summary
14  Number 4, it talks about both the
15  reasonableness of the investigation and
16  the reasonableness of the belief.  If
17  you want to lump that all into the
18  reasonableness of the investigation,
19  that's fine.  I just don't want there
20  to be an unclear record; that there's
21  clearly at least two pieces of it in
22  terms of the written opinion.
23  BY MR. LEWIS:
24     Q.    Let me back up a different way.
25        In a case in which a problem

Page 95

EDWARD NECARSULMER, III

1  exists, the underwriters conduct a diligent
2  investigation, and notwithstanding having
3  conducted an investigation in full accordance
4  with reasonable industry standards, the
5  problem is still out there and it's not
6  disclosed in the prospectus or registration
7  statement and the problem then thereafter
8  bites the company, are you saying that the
9  underwriters have no disclosure obligation
10  because they conducted a reasonable
11  investigation?
12        MR. GLUCKOW:  The same objections
13  as before.  Incomplete hypothetical.
14  It calls for speculation.  It calls for
15  a legal conclusion.  Incomplete
16  hypothetical.  Assumes facts not in
17  evidence.
18        You can answer.
19        THE WITNESS:  I mean, here's what
20  I would say.  I would say that to the
21  extent that the underwriters made a
22  reasonable and diligent investigation,
23  they discovered -- and in this
24  investigation they discovered whatever

Page 96

EDWARD NECARSULMER, III

1  this thing is out there, they decided
2  it wasn't significant to the company's
3  sales and earnings, and then they
4  decided to move on, I would support
5  that, I think that's -- I think that's
6  proper.
7  BY MR. LEWIS:
8     Q.    And if that happened, do you
9  believe that excuses the company from any
10  disclosure obligation?
11        MR. GLUCKOW:  Objection to the
12  form.  Outside the scope of the
13  opinion.  He's not offering any expert
14  testimony as to the company's
15  disclosure obligations; he's offering
16  expert testimony with respect to the
17  underwriters' investigation and the
18  reasonableness of the underwriters'
19  beliefs in light of that investigation.
20  BY MR. LEWIS:
21     Q.    Well, let me back up and ask
22  that question, and that is at the heart of what
23  my question is about.  Does your opinion in any
24  way purport to address the company's disclosure

Page 97

EDWARD NECARSULMER, III

1  obligation, to your knowledge?
2     A.    No, I wasn't asked -- it's not
3  within the scope of my assignment.
4     Q.    And your opinion with respect to
5  disclosure such as it is relates only to the
6  underwriters' disclosure obligations, is that
7  fair?
8        MR. GLUCKOW:  Objection to the
9  form.  It's not the underwriters'
10  disclosure obligations; it's the
11  underwriters' investigation and the
12  reasonableness of their belief in the
13  accuracy and completeness of the
14  registration statement.
15        I'm not sure what you're getting
16  at with your parsing disclosure
17  obligations of the company --
18        MR. LEWIS:  I'm sitting here and
19  letting you filibuster, but you can
20  object to the questions, and you have,
21  and you've done it fully, on this whole
22  subject matter.  You don't have to
23  supply what his opinion is about.  He
24  knows what his opinion is about, and he

25 (Pages 94 to 97)

Page 98

EDWARD NECARSULMER, III

1    can tell me that, he can correct me,
2    but --
3              MR. GLUCKOW: I just think your
4    question is inherently misleading, and
5    I'm trying to make sure that both I and
6    the witness understand what it is you
7    are trying to ask.
8    BY MR. LEWIS:
9         Q.    Let's look at Paragraph F of
10   your rebuttal report, Exhibit 322.
11             You write, starting in the
12   second sentence of Paragraph F: "While
13   Ochoa's report is not clear on this point,
14   although underwriters often review filings of
15   other companies in the same industry, as they
16   did here, the mention of a risk in such
17   filings is not necessarily determinative of
18   whether the risk needs to be included in the
19   issuing company's registration statement."
20             Can you explain what you mean
21   by that?
22        A.    Sure.
23             What I'm saying is basically
24   that it's certainly good practice to look at

Page 99

EDWARD NECARSULMER, III

1    what the competition is doing, what they are
2    filing, the most recent, whatever, 10-K,
3    whatever they are filing with the SEC. The
4    fact that you see something doesn't
5    necessarily mean that it's a requirement to be
6    included in either your documents or in your
7    opinion.
8              I guess what I'm trying to say
9    in a broader sense is there's a huge body of
10   information out there, both things you learn
11   from the company and the things you might
12   learn from the industry and whatever else, and
13   when it comes down to it, the underwriter's
14   job is to go through those things and make a
15   decision as to what is material and what is
16   not.
17        Q.    You went on to say: "Each
18   factual situation is different and the
19   underwriters must evaluate appropriate
20   disclosure on an individual basis," correct?
21        A.    Correct.
22        Q.    Would it be fair to say that
23   your position is that because gray marketing
24   affects different companies in different ways,

Page 100

EDWARD NECARSULMER, III

1    each case has to be separately evaluated?
2              MR. GLUCKOW: Objection to the
3    form. Vague and ambiguous.
4              You can answer.
5              THE WITNESS: I think that's
6    fair.
7    BY MR. LEWIS:
8         Q.    After the due diligence
9    investigation in the Daimler case that you
10   mentioned, did gray marketing later affect the
11   results of Daimler-Benz?
12        A.    No, or not to my knowledge.
13   I... Not to my knowledge.
14        Q.    What information do you
15   understand the underwriters received from Adams
16   itself about gray marketing or Costco by the
17   time of the effective date of the IPO?
18        A.    They -- they -- you know,
19   there's a number of items. They knew that an
20   action -- I'm not sure of the word for it and if
21   action is the right word for it, but there had
22   been a legal challenge. I think they had
23   records from talking to marketing people, you
24   know, that they had discussed it. Certainly

Page 101

EDWARD NECARSULMER, III

1    Lehman in deposition, I believe from
2    Pulido-Crowe, they discussed whether they should
3    talk to Costco. Those are the types of things.
4         Q.    Do you think that Lehman should
5    not have talked to Costco because Barney Adams
6    purportedly stated that it was unnecessary to do
7    so?
8              MR. GLUCKOW: Objection to the
9    form. Calls for speculation.
10   Incomplete hypothetical.
11             You can answer.
12             THE WITNESS: I think probably
13   not necessarily. I think there's
14   another problem with talking to the
15   Costcos of the world, is you don't
16   normally -- it's pretty hard -- almost
17   by definition of who they are, they are
18   not going to tell you anything, and
19   that is part of their MO which is
20   relatively well-known. So whether they
21   are right for that reason or right
22   because that's what they heard from
23   Adams, I don't -- I think, it's my
24   opinion, that they were adequate in

26 (Pages 98 to 101)

Page 102

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2    what they did.
3    BY MR. LEWIS:
4        Q.    Do you agree that it would have
5    been better to try calling Costco to see what
6    could be found, if anything?
7        A.    I don't know that hindsight is
8    particularly useful for me in this case.
9        Q.    Well, if you apply it, with the
10   benefit of hindsight, do you think it would have
11   been a better thing to do?
12       MR. GLUCKOW: Objection. Asked
13   and answered.
14       You can answer it now.
15       THE WITNESS: I still don't think
16   they would have found anything
17   significant.
18   BY MR. LEWIS:
19       Q.    Now, you referred in Paragraph C
20   of your rebuttal report to the underwriters
21   having conducted 11 telephonic interviews.
22       Let me show you Exhibit 198.
23       MR. LEWIS: I'm sorry; this says
24   160, is it not?
25       MR. GLUCKOW: 160.

Page 103

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2        THE WITNESS: Mine says 198.
3    BY MR. LEWIS:
4        Q.    They were marked -- the same
5    document was marked several times. Just so we
6    are all looking at the same thing, you have in
7    front of you one numbered 160?
8        A.    I gave you back 198, which I
9    had.
10       Q.    Okay.
11       A.    Now I have 160.
12       Q.    Were the 11 calls that you
13   referred to in your rebuttal report the 11 calls
14   that are enumerated on the second page of this
15   exhibit under the heading of Customer Calls,
16   summaries circulated to underwriters by caller
17   and supplier calls?
18       A.    That is correct.
19       Q.    Do you know if any of these
20   calls were selected by the underwriters to be
21   made on a geographic basis?
22       A.    I don't.
23       Q.    Do you know how the calls were
24   selected to be made?
25       A.    It -- what -- how this list was

Page 104

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2    compiled; is that the question?
3        Q.    Not how the list was compiled,
4    but how when the customer calls were made by the
5    underwriters, the underwriters figured out who
6    they were going to call?
7        MR. GLUCKOW: And which
8    underwriters are going to call which
9    party, or...?
10       Objection to form.
11       THE WITNESS: I'm not sure.
12   BY MR. LEWIS:
13       Q.    Well, Adams had a large universe
14   of suppliers; is that fair to say?
15       A.    Yes.
16       Q.    And it had a large universe of
17   customers also, correct?
18       A.    Correct.
19       Q.    Do you know how the underwriters
20   made the determination of which customers they
21   would call?
22       A.    A list was provided by the
23   company.
24       Q.    Was that based on the size of
25   the customers' business with Adams?

Page 105

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2        A.    I don't know for sure, but I
3    assume so. That is traditionally the way it is
4    done.
5        Q.    Traditionally which -- what
6    level of customers of a company does an
7    underwriter call in due diligence?
8        A.    There's no magic to this, but
9    traditionally, you know, you say, "Give me your
10   top ten customers." It could be out of the top
11   50, the top five, but the top ten sticks in my
12   memory.
13       Q.    Is that a practice you have used
14   yourself?
15       A.    Yes, it is.
16       Q.    I'll show you what's previously
17   been marked as Exhibit 162. Was this one of the
18   documents that you reviewed in your work on this
19   case?
20       A.    It was.
21       Q.    Did you see in reviewing it that
22   on the right-hand column of the page for a
23   period of 1998, the firm of WDC Mackenzie,
24   M-A-C-K-E-N-Z-I-E, was listed as the third
25   largest customer of Adams?

27 (Pages 102 to 105)

Page 106

EDWARD NECARSULMER, III
1
2    A.    I do.
3    Q.    Do you believe that there was
4  any reason why the underwriter should not have
5  called Mackenzie in the due diligence process?
6            MR. GLUCKOW:  Objection to the
7        form.  Mischaracterizes the document in
8        the record.
9            You can answer.
10  BY MR. LEWIS:
11    Q.    Let me back up.  Do you know who
12  Mackenzie is?
13    A.    From reading the documents, I
14  know who they are; yes, I do.
15    Q.    Do you know that they are a
16  retailer who had spoken to Adams about a
17  potential gray market Costco problem in Canada?
18            MR. GLUCKOW:  Objection to the
19        form.  Mischaracterizes the record.
20            You can answer.
21            THE WITNESS:  I know they were
22        the Canadian, I'll say, distributor or
23        retailer of Adams.
24  BY MR. LEWIS:
25    Q.    And what, if any, communications

Page 107

EDWARD NECARSULMER, III
1
2  can you recall between Mackenzie and Adams on
3  the subject of gray market or Costco?
4            MR. GLUCKOW:  Between Mackenzie
5        and Adams?
6            MR. LEWIS:  Right, between
7        Mackenzie and Adams.
8            THE WITNESS:  I saw a series of
9        documentation -- faxes, memos, whatever
10        you want to call them -- going back and
11        forth suggesting that they were having
12        questioning of how these clubs -- were
13        they in Costco and how they got there
14        and what the company is going to do
15        about it.
16  BY MR. LEWIS:
17    Q.    Are you aware of any contact
18  between the underwriters and Mackenzie as part
19  of the due diligence process?
20    A.    None.
21    Q.    Did you have any understanding
22  as to why there was no contact between the
23  underwriters and Mackenzie in the due diligence
24  process?
25    A.    I don't.  I don't.

Page 108

EDWARD NECARSULMER, III
1
2    Q.    Do you believe that there should
3  have been contact between the underwriters and
4  Mackenzie as part of due diligence?
5    A.    No.
6    Q.    And why is that?
7    A.    I'll say that I don't know
8  whether they were given, you know -- the list of
9  customers that they were given simply didn't
10  include them.
11            I guess I would also add that
12  it's okay -- I wouldn't necessarily think --
13  and, again, it's very hard to put yourself
14  back in their place, but I wouldn't
15  necessarily think if I was trying to uncover
16  or discover or investigate, that Canada would
17  be a place that I would, you know, spend a lot
18  of time looking for issues relative to
19  southern California or Florida or someplace
20  where I would intuitively have thought may
21  have been more important to a golf club
22  company.
23    Q.    You have seen the questionnaire
24  that Adams sent to -- strike that; that the
25  underwriters sent to Adams' retailers as part of

Page 109

EDWARD NECARSULMER, III
1
2  the due diligence process?
3            MR. GLUCKOW:  Objection to the
4        form.  It assumes facts not in
5        evidence.
6            You can answer.
7  BY MR. LEWIS:
8    Q.    Have you seen questionnaires --
9    A.    Yes.
10    Q.    -- that were used in connection
11  with the underwriters' investigation of
12  retailers?
13    A.    I have.
14    Q.    And would it be fair to say that
15  those questionnaires did not include any
16  specific questions relating to gray marketing or
17  Costco?
18            MR. GLUCKOW:  Objection to the
19        form.  Vague and ambiguous.
20            You can answer.
21            THE WITNESS:  The answer is yes,
22        but I would think that the statement,
23        "Are there any other issues (legal,
24        contractual, or otherwise) which you
25        feel are important" would certainly

28 (Pages 106 to 109)

Page 110

EDWARD NECARSULMER, III
1  take care of that responsibility.
2  
3      MR. LEWIS: I move to strike the
4  latter part of that. We'll get to the
5  overall -- the larger question within
6  the questionnaires.
7  BY MR. LEWIS:
8      Q.  Have you seen Exhibit 193?
9      A.  Yes, I've seen it.
10      Q.  Is it your understanding that
11  this is a blank copy of a Customer Due Diligence
12  Questionnaire that was used by the underwriters
13  in connection with the due diligence
14  investigation?
15      A.  That's my understanding.
16      Q.  Now, you mentioned, in response
17  to an earlier question, that the underwriters
18  had received information about gray marketing
19  from marketing people at Adams.
20      Can you tell me when in your
21  understanding that information was received?
22      MR. GLUCKOW: Objection to the
23  form. It mischaracterizes the
24  testimony.
25      You can answer.

Page 111

EDWARD NECARSULMER, III
1  
2      THE WITNESS: I can't tell you
3  when. I know there was a press release
4  in June, I believe it was June.
5  BY MR. LEWIS:
6      Q.  June --
7      A.  I assume it was coincident or
8  before that time. I just can't tell you from
9  not having the documents; my memory isn't that
10  good.
11      Q.  Well, do you recall any
12  testimony by Ms. Pulido-Crowe that the subject
13  of gray marketing came up during drafting
14  sessions?
15      A.  I do recall that testimony. I
16  actually recall, to be exact, she said she
17  believed that it came up.
18      Q.  In the drafting sessions?
19      A.  Yes.
20      Q.  And the drafting sessions were
21  all held in April?
22      A.  Correct.
23      Q.  Do you know -- strike that.
24      Can you recall, as you sit
25  here, any inquiries made by the underwriters

Page 112

EDWARD NECARSULMER, III
1  to Adams concerning Costco or gray marketing
2  after Adams issued the press release that it
3  had filed a proceeding against Costco?
4      MR. GLUCKOW: Can I have that one
5  back, please. Thank you.
6  
7      (The court reporter read the
8  record as follows:
9      "QUESTION: Can you recall, as
10  you sit here, any inquiries made by the
11  underwriters to Adams concerning Costco
12  or gray marketing after Adams issued
13  the press release that it had filed a
14  proceeding against Costco?")
15      MR. GLUCKOW: Vague and
16  ambiguous.
17      You can answer.
18      THE WITNESS: I don't recall.
19  BY MR. LEWIS:
20      Q.  Have you, in your long career in
21  the securities industry, been the person who had
22  to ask a customer information that was set forth
23  on a questionnaire?
24      A.  I've done it but not in recent
25  memory or recent history.

Page 113

EDWARD NECARSULMER, III
1  
2      Q.  When you were --
3      A.  Younger.
4      Q.  -- younger and I was younger and
5  we all were browner on top.
6      Can you describe how difficult or
7  easy you found it to get a customer to answer
8  the questions on a due diligence questionnaire?
9      MR. GLUCKOW: Vague and
10  ambiguous.
11      You can answer.
12      THE WITNESS: My best
13  recollection is it's sort of both ends
14  of the spectrum. There are people who
15  like to talk; they are very
16  enthusiastic about XYZ's product; it's
17  important to them. There are other
18  people who basically tell you that they
19  don't talk much about, you know, their
20  suppliers. So it's -- people are
21  usually pretty cooperative, they are
22  usually -- but the value of the
23  information varies greatly.
24  BY MR. LEWIS:
25      Q.  And you never know when exactly

Page 114

EDWARD NECARSULMER, III
1
2 you are getting someone and what kind of mood
3 he's in or she is in at the time you catch them,
4 is that fair?
5         MR. GLUCKOW: Vague and
6     ambiguous.
7         You can answer.
8         THE WITNESS: It's fair, with the
9     exception that you hope that, you know,
10     that you are good enough and you
11     understand enough about the subject to
12     qualify the responses.
13 BY MR. LEWIS:
14     Q.    Was it your practice to actually
15 send customers questionnaires before you spoke
16 to them about the contents of them?
17     A.    No.
18     Q.    You used the questionnaire as a
19 guide to your conversation with the client and
20 pulled the information out of them as best you
21 could?
22         MR. GLUCKOW: Objection to the
23     form.
24         You can answer.
25         THE WITNESS: That's correct.

Page 115

EDWARD NECARSULMER, III
1
2 BY MR. LEWIS:
3     Q.    Do you know how the
4 questionnaires were completed in this case?
5     A.    They were -- it's my
6 understanding that they were -- there were
7 telephone or other conversations and they were
8 recorded by the questioner, the results were
9 recorded by the questioner.
10     Q.    So that the questionee did not
11 necessarily -- did not have the questionnaire in
12 front of him?
13     A.    I do not know that for a fact,
14 but that's my understanding.
15     Q.    Now, I showed you the blank
16 questionnaire and that questionnaire contains
17 the question that you alluded to in the portion
18 of your testimony that I asked to strike, which
19 is Question 13: "Are there any other issues
20 (legal, contractual or otherwise) which you feel
21 are important?"
22         That is Question 13, correct?
23     A.    Correct.
24     Q.    If you wanted to determine in a
25 due diligence investigation whether there was

Page 116

EDWARD NECARSULMER, III
1
2 ongoing gray marketing distribution or ongoing
3 Costco distribution, would you agree that
4 Question 13 would not be a very direct way to
5 find that out?
6         MR. GLUCKOW: Objection to the
7     form. Incomplete hypothetical.
8     Assumes facts not in evidence. Vague
9     and ambiguous.
10         You can answer.
11         THE WITNESS: I would not agree
12     to that. Often these -- whether they
13     are a list of questions or they are a
14     questionnaire, you sent them out there
15     to set a framework to find out what you
16     can find out, and often it's more
17     useful to ask a question like this one
18     than -- sometimes it is -- than a more
19     direct "Are you doing this?" or "Are
20     you seeing that?" Because you might
21     get a more helpful response.
22 BY MR. LEWIS:
23     Q.    Well, if the recipient of this
24 questionnaire had heard from Adams previously
25 that Adams was aware of some Costco distribution

Page 117

EDWARD NECARSULMER, III
1
2 and was taking steps to address it, the person
3 answering the questions might not think that
4 mentioning gray marketing was of any
5 importance. Is that fair?
6         MR. GLUCKOW: The same
7     objections.
8         You can answer.
9         THE WITNESS: I'm not trying to
10     be difficult; I just don't know how to
11     answer and the hypothetical is too far
12     out there for me.
13         It's certainly -- if someone
14     specifically told you, "Don't worry
15     about it; we are taking care of it,"
16     I'm not sure that would deter you from
17     saying there's an issue but the company
18     is taking care of it. I just don't
19     know.
20 BY MR. LEWIS:
21     Q.    In any event, there was no
22 specific question about Costco or gray marketing
23 on that questionnaire --
24         MR. GLUCKOW: Objection.
25 BY MR. LEWIS:

30 (Pages 114 to 117)

Page 118

EDWARD NECARSULMER, III

1      EDWARD NECARSULMER, III
2     Q.  -- the document that we just
3  looked at, 193?
4       MR. GLUCKOW: The document speaks
5    for itself.
6      You can answer.
7      THE WITNESS: I agree.
8  BY MR. LEWIS:
9     Q.  Do you believe that between the
10  time of the filing of the draft registration
11  statement with the SEC, which was on May the 4th
12  of 1998, and the effective date of the IPO,
13  which was July 10, 1998, the underwriters
14  received any information from Adams that gray
15  marketing was occurring at any location other
16  than in Canada?
17       MR. GLUCKOW: Can I get that read
18    back, please.
19      (The court reporter read the
20    pending question.)
21       MR. GLUCKOW: Objection to the
22    form. It assumes facts not in
23    evidence.
24      You can answer.
25      THE WITNESS: I don't recall the

Page 119

1      EDWARD NECARSULMER, III
2  dates. I know there was discussion,
3  but I can't tell you whether they were
4  between -- what periods they were or
5  what the dates were.
6  BY MR. LEWIS:
7     Q.  Well, are you aware of any
8  communication from Adams to the underwriters
9  that gray marketing was occurring other than at
10  a single location?
11       MR. GLUCKOW: The same
12    objections.
13      THE WITNESS: I'm not aware of
14    any communication.
15  BY MR. LEWIS:
16     Q.  Do you believe, as you sit here,
17  that it was true at the effective date that a
18  small set of Tight Lies clubs had reached Costco
19  at only one location?
20       MR. GLUCKOW: Objection to the
21    form. Mischaracterizes the record --
22      THE WITNESS: I really don't
23    know.
24       MR. GLUCKOW: Let me just finish.
25    -- vague and ambiguous.

Page 120

1      EDWARD NECARSULMER, III
2      You can answer.
3  BY MR. LEWIS:
4     Q.  Do you believe, as you sit here,
5  that it was true at the time of the
6  effective date a group of Adams' clubs had
7  reached the market through Costco as a result of
8  the efforts of a single Adams' retailer?
9       MR. GLUCKOW: Objection. Vague
10    and ambiguous. Incomplete
11    hypothetical. Mischaracterizes the
12    record.
13      You can answer.
14      THE WITNESS: In the materials
15    that I reviewed, there were references
16    to a number of potential sources, and I
17    don't know if it was ever determined as
18    to it was one or more than one.
19  BY MR. LEWIS:
20     Q.  Well, isn't it true that by the
21  time of the offering that there had been citings
22  of Adams' clubs at Costco locations in Canada,
23  in California, in Idaho?
24       MR. GLUCKOW: Objection to the
25    form. It mischaracterizes the record.

Page 121

1      EDWARD NECARSULMER, III
2      You can answer.
3      THE WITNESS: I think that's
4    true.
5  BY MR. LEWIS:
6     Q.  How did you learn that?
7     A.  It was in the documentation that
8  I read.
9     Q.  Did you see that in any other
10  place than in the attachments to Mr. Grace's
11  report?
12     A.  Yes.
13     Q.  Where did you see it?
14     A.  I'm not sure I can recall the
15  document. I'm not -- it may have been in a
16  deposition, either -- I'm not sure. I don't
17  want to speculate. I think Beebe's deposition,
18  but I'm not sure. I'm just not certain.
19     Q.  Would you agree that by the time
20  of the initial public offering Adams had been
21  unable to put a complete stop to gray marketing?
22       MR. GLUCKOW: Vague and
23    ambiguous.
24      You can answer.
25      THE WITNESS: I would agree with

31 (Pages 118 to 121)

Page 122

EDWARD NECARSULMER, III

1  that.
2
3  BY MR. LEWIS:
4      Q.    Have you seen any evidence that
5  the underwriters were aware of new or increased
6  distribution of Adams' products in Costco
7  locations between the time of Ms. Pulido-Crowe's
8  discussion with Barney Adams and the time of the
9  IPO?
10         MR. GLUCKOW: Objection. Vague
11     and ambiguous. Incomplete.
12         THE WITNESS: Not during that
13     period, no.
14  BY MR. LEWIS:
15     Q.    And do you have any reason to
16  believe, as you sit here, that the underwriters
17  learned anything about the changes in gray
18  market distribution between Ms. Pulido-Crowe's
19  discussion with Barney Adams and the IPO?
20         MR. GLUCKOW: Objection to the
21     form. It mischaracterizes the record
22     particularly with respect to the
23     reference to a discussion.
24         You can answer.
25         THE WITNESS: At some point, the

Page 123

EDWARD NECARSULMER, III

1
2  process of these pro shop surveys began
3  by the equity research analyst. I
4  believe that did start before the IPO.
5  I'm not certain that information would
6  have been -- in my experience, it was
7  unlikely that information would
8  have been shared with the banking team.
9  BY MR. LEWIS:
10     Q.    Why do you say it's unlikely it
11  would have been shared?
12     A.    Because in most cases as they --
13  that the research that was done out of the
14  equity department would not likely to be, you
15  know, shared with; it was not normal practice to
16  share it with the people in the investment
17  banking side.
18     Q.    Did that have to do with the
19  existence of so-called Chinese walls between
20  the investment banking and the research side,
21  the brokerage firms, in those days?
22     A.    Partially; although, there would
23  be nothing specifically prohibited of
24  information going that way.
25     Q.    "That way" meaning...?

Page 124

EDWARD NECARSULMER, III

1
2      A.    The direction from research to
3  banking. So it wasn't a normal -- to me, it
4  wouldn't have been a normal practice, normal
5  procedure.
6      Q.    There would have been a
7  prohibition on information going the other
8  direction, from banking to research?
9      A.    That is correct.
10         MR. GLUCKOW: Don, again, we've
11     been going another hour, so whenever
12     there is a convenient break.
13         MR. LEWIS: We can stop this
14     second.
15         MR. GLUCKOW: Okay.
16         (A recess was had from 2:31 p.m.
17     to 2:43 p.m.; and then the proceedings
18     continued as follows:)
19  BY MR. LEWIS:
20     Q.    Let me back up to go forward.
21  In your expert report in this case, the first
22  page --
23     A.    So this is also the rebuttal
24  report.
25         MR. GLUCKOW: Here we are, 321.

Page 125

EDWARD NECARSULMER, III

1
2         THE WITNESS: First page, yes.
3  BY MR. LEWIS:
4      Q.    The first page, Paragraph 6(A),
5  Summary of Opinions. You begin by saying: "In
6  my experience in the process of adequate due
7  diligence, the underwriters should gather and
8  review the following types of information. The
9  contents and scope of this review may vary
10  greatly depending on the issuer, but in general,
11  these are the categories that should be
12  considered."
13         In your expert report in the AMF
14  case --
15         MR. GLUCKOW: 324?
16         MR. LEWIS: 324.
17  BY MR. LEWIS:
18     Q.    -- you used the same words
19  except that instead of "should be considered,"
20  you had used the words "must be considered."
21     A.    Semantics.
22     Q.    Is there any significance to the
23  change in your report?
24     A.    Semantics.
25     Q.    Did you think it was more

32 (Pages 122 to 125)

Page 126

EDWARD NECARSULMER, III

1
2  correct to say "should" than "must"?
3      A.   I candidly can't answer that. I
4  think of -- I thought of the -- I tried to
5  conceive of the thought and I really didn't
6  refer to this much past -- the prior report,
7  much past kind of using it for form, and I knew
8  there was some boilerplate that would be
9  acceptable to be used in the beginning, and then
10 I kind of just went ahead and drafted as I saw
11 fit.
12     Q.   In the same Paragraph 6, the
13 next page --
14     A.   On AMF or Adams?
15     Q.   In Adams.
16          Well, let's look at -- do you
17 have AMF there?
18          MR. GLUCKOW: We have both, 321
19 and 324.
20 BY MR. LEWIS:
21     Q.   In AMF, among the steps you
22 listed was number 6: "Review of work performed
23 or reports prepared by underwriters' counsel and
24 the issuer's auditors."
25          Your Paragraph 6 in this case

Page 127

EDWARD NECARSULMER, III

1
2  simply read: "Meeting with the issuer's counsel
3  and public accountants."
4          Can you explain whether there was
5  a difference that caused you to change your
6  report?
7          MR. GLUCKOW: Object to the
8      characterization.
9  BY MR. LEWIS:
10     Q.   Is there any significance to the
11 change in terminology between the two reports?
12     A.   I thought in -- that the way I
13 said it in 321 was a better representation of
14 what the process really is.
15     Q.   Can you explain that thought?
16     A.   Because it occurred to me -- and
17 again, I didn't think it was a major thing -- it
18 sort of occurred to me that you weren't
19 necessarily just reviewing their work, you were
20 meeting with them, you were talking with them,
21 you were trying to understand, let's say, there
22 was a patent issue or an inventory issue, so it
23 wasn't just the report but you are trying to
24 have a dialog as part of your understanding of
25 the company; that was what I was really trying

Page 128

EDWARD NECARSULMER, III

1
2  to get at.
3      Q.   Okay. Would you agree with the
4  general proposition that in due diligence an
5  underwriter should be skeptical of rosy outlooks
6  by the issuer's management?
7          MR. GLUCKOW: Object to the
8      form. Vague and ambiguous. Asked and
9      answered.
10         You can answer.
11         THE WITNESS: I don't think --
12     just because someone is optimistic
13     doesn't necessitate skepticism. We've
14     come to learn to live with rapid growth
15     in our -- once we got out of the '60s
16     and '70s, rapid growth was a big part
17     of our lives. So I would have to say
18     even though intuitively I would agree
19     with you, I think the right answer is
20     no.
21 BY MR. LEWIS:
22     Q.   Now, in Paragraph 6(C)(2) of
23 your report, you state that "An extensive due
24 diligence outline and materials request list was
25 prepared and presented to company management at

Page 129

EDWARD NECARSULMER, III

1
2  the organizational meeting."
3          Just to make sure we are on the
4  same page: Are you referring to Exhibit
5  153? Specifically, to the due diligence -- due
6  diligence outline and request list that begins
7  at Page 8741?
8      A.   Yes, that is to what I was
9  referring.
10     Q.   And would it be fair to say that
11 there was no specific request in the due
12 diligence outline or materials request for data
13 relating to either Costco or gray marketing?
14         MR. GLUCKOW: Objection to the
15     extent the document speaks for itself.
16         You can answer.
17         THE WITNESS: That's correct. If
18     I could add, in this type of a list it
19     doesn't surprise me at all that there
20     isn't specific caption items. It's
21     usually given to let the company know
22     what the work ahead of them is.
23 BY MR. LEWIS:
24     Q.   Okay. Is there any item on the
25 due diligence list or materials request list

33 (Pages 126 to 129)

Page 130

```
1                EDWARD NECARSULMER, III
2    that you believe should have caused the company
3    to provide the underwriters with any data
4    regarding either Costco or gray market
5    distribution?
6            MR. GLUCKOW:  Object to the
7        form.  The document speaks for itself.
8        It calls for speculation.
9            You can answer.
10           THE WITNESS:  No.
11   BY MR. LEWIS:
12       Q.   Let me show you Exhibit 154,
13   previously marked, and this is a document with a
14   file folder tab Organization Meeting and some
15   handwritten notes that may be beyond my eyesight
16   or cryptography skills at this point.
17       A.   I'm with you.
18       Q.   Did you review a version of
19   Exhibit 154 in the course of your work?
20       A.   I did see this document.
21       Q.   Did you work your way through it
22   at the time?
23       A.   To the best of my ability.
24       Q.   Did you find any reference in it
25   that you thought was to gray marketing or Costco
```

Page 131

```
1                EDWARD NECARSULMER, III
2    distribution?
3            MR. GLUCKOW:  Object to the
4        extent the document speaks for itself.
5            You can answer.
6            THE WITNESS:  No.
7    BY MR. LEWIS:
8        Q.   Let me show you what has been
9    marked as Exhibit 228.  Did you review Exhibit
10   228 in the course of your work?
11       A.   I've seen this article before,
12   so the answer is yes.
13       Q.   If you just look at the last
14   page of the document, you'll see there's a
15   reference to Edwin Watts and some commentary
16   about various subjects.  Did you read that
17   paragraph?
18           MR. GLUCKOW:  Take your time and
19       make sure you read it before you
20       answer.
21           (Witness reviewing document.)
22           THE WITNESS:  I don't recall
23       reading that paragraph.
24   BY MR. LEWIS:
25       Q.   Okay.  Do you have any reason to
```

Page 132

```
1                EDWARD NECARSULMER, III
2    believe that the underwriters had a copy of
3    Exhibit 228 prior to the effective date of the
4    offering in their due diligence files?
5            MR. GLUCKOW:  Objection to the
6        form.
7            You can answer.
8            THE WITNESS:  I wouldn't know.
9    BY MR. LEWIS:
10       Q.   Let me show you Exhibit 197, and
11   this is a copy of what purports to be a Customer
12   Due Diligence Questionnaire completed with
13   respect to Edwin Watts.  Have you reviewed this
14   as part of your expert work in this case?
15       A.   Yes, it was in the material that
16   I was provided.
17       Q.   If you had been conducted --
18   strike that.
19           Do you have any reason to believe
20   that Mr. Watts was asked any specific questions
21   about Costco in the course of his interview,
22   which was, according to this date, on April 21,
23   1998?
24           MR. GLUCKOW:  The document speaks
25       for itself.
```

Page 133

```
1                EDWARD NECARSULMER, III
2            You can answer.
3            THE WITNESS:  I have no knowledge
4        of that question or response to it.
5    BY MR. LEWIS:
6        Q.   And you have no knowledge of
7    there being questions asked that are not
8    contained or commented on in this document
9    itself?
10       A.   I could respond that it would be
11   unusual that the conversation would just --
12   would you mind answering the following nine
13   questions; but I certainly couldn't support
14   that, I mean, cite any evidence of that.
15       Q.   Why do you say it would be
16   unusual?
17       A.   Well, the purpose of these type
18   of exercises is to engage the person you are
19   talking to in some sort of a dialog about the
20   company you are checking on.  Sometimes they are
21   expansive; sometimes they are not.  Usually the
22   questionnaire is, you know, an outline, a way to
23   memorialize the conversation, but, hopefully,
24   it's -- you know, there's some dialog, but I
25   don't know because I haven't seen it, and I have
```

Page 134

EDWARD NECARSULMER, III

1
2  no evidence to prove or no documentation to
3  prove that that's what took place.
4      Q.    In your experience, is it
5  customary for notes to be taken during customer
6  questionnaires?
7      A.    Customary, yes.
8      Q.    Are you aware of any customary
9  practices in the industry with respect to the
10 disposition of drafts and notes that were made
11 prior to an IPO?
12     MR. GLUCKOW:  Objection to the
13     form.  I also object to the extent it's
14     overbroad.
15     Do you mean at any point in his
16     career?  Are you talking about a
17     specific time frame?
18 BY MR. LEWIS:
19     Q.    Let's talk about the period
20 since 1998, do you believe that it is customary
21 in the industry for underwriters to dispose of
22 notes that they made during the due diligence
23 process?
24     MR. GLUCKOW:  The same
25     objections.

Page 135

EDWARD NECARSULMER, III

1
2      Go ahead.
3      THE WITNESS:  I wouldn't say
4      specific to due diligence process.
5      There certainly was a movement among
6      all of our client -- compliance
7      departments to be much more cognizant
8      of what we kept and didn't keep and at
9      what point, you know, like how long you
10     have to keep your tax-return-type
11     standards.  So I think people were more
12     careful to keep what they were supposed
13     to keep and more careful to keep -- not
14     to keep what didn't need to be kept.
15 BY MR. LEWIS:
16     Q.    And when did that begin?
17     A.    I couldn't give you a specific
18 date, but it was an evolving thing throughout --
19 certainly throughout the '90s, it would be a
20 more evolving practice.
21     Q.    So that by 1998 your people were
22 more careful to do what you said --
23     A.    Yes.
24     Q.    -- in your last answer?
25     Since 1998 you worked both at

Page 136

EDWARD NECARSULMER, III

1
2  Wasserstein Perella Securities and Dresdner
3  Kleinwort Wasserstein.  Did either of those
4  firms have a practice of disposing of notes of
5  due diligence after an IPO?
6      A.    Not a specific policy, no.
7      Q.    Let me start with a broad
8  question, and if I need to, I'll go to more
9  specific ones.
10     We've talked several times about
11 the Customer Due Diligence Questionnaires.  Did
12 you find reference to either gray marketing or
13 Costco distribution appearing in any of the
14 customer due diligence questionnaires?
15     A.    I don't believe I did.
16     Q.    Would you like to see them now
17 to check your answer, or --
18     MR. GLUCKOW:  The documents speak
19     for themselves.
20     THE WITNESS:  I don't think I
21     need to check my answer.
22 BY MR. LEWIS:
23     Q.    Okay.
24     A.    I'm not necessarily ready for a
25 memory test, but I believe that's the case; I'm

Page 137

EDWARD NECARSULMER, III

1
2  confident that that's the case.
3      Q.    Okay.  In Paragraph 5 on Page 3
4  of your expert report, Exhibit 321 --
5      A.    I'm sorry, Paragraph...?
6      Q.    5.
7      A.    Which is on Page 3.  Okay.
8      Q.    "The underwriters prepared lists
9  of potential investor questions," dash, "in my
10 experience this was always an effective
11 mechanism for raising and responding to relevant
12 issues."
13     When you wrote that, were you
14 referring to Exhibit 210?
15     A.    That's correct.
16     Q.    Were there any other lists of
17 investor questions that you were referring to in
18 Paragraph 5 of your opinion?
19     A.    This is what I was referring
20 to.
21     Q.    Do you know when this was
22 prepared, "this" being Exhibit 210?
23     A.    I don't know the specific date.
24 I know where in the process, which was prior to
25 the company going on the road to seek potential

35 (Pages 134 to 137)

Page 138

EDWARD NECARSULMER, III

1   EDWARD NECARSULMER, III
2   investors.
3       Q.   Sometime by June of 1998?
4       A.   By June, I don't -- we can look
5   at the road show schedule and have an exact
6   date, but I don't recall it.
7       Q.   Would you agree with me that
8   nothing in Exhibit 210 refers either to gray
9   marketing or to Costco?
10      MR. GLUCKOW:  The document speaks
11  for itself.
12      You can answer.
13      THE WITNESS:  That's correct.
14  BY MR. LEWIS:
15      Q.   It is correct that there's no
16  reference?
17      A.   It is correct that there's no
18  reference.
19      Q.   Let me show you what has been
20  marked as Exhibit 204, a memo to the file from
21  Joe Hoffman, dated June 25, 1998.  Do you recall
22  this document?
23      A.   I do.
24      Q.   Do you have any understanding of
25  how this document came to be in the

Page 139

1   EDWARD NECARSULMER, III
2   underwriters' files as reflected by the page
3   number in the bottom right-hand corner?
4       A.   As a matter of practice, if
5   there is dialog usually between the assigned
6   examiner of the commission and usually issuer's
7   counsel, they'll provide the underwriters a copy
8   of any information that comes of that source.
9       Q.   From your review of documents
10  and testimony, are you aware of any dialog
11  between Adams and the underwriters with respect
12  to this exhibit?
13      A.   I'm not.
14      Q.   Are you aware of any
15  communications between the underwriters and the
16  SEC related to this exhibit, based on your
17  review of the transcripts and exhibits?
18      A.   I don't recall any.
19      Q.   I would next like to show you
20  what has been marked as Exhibit 159, and this is
21  a two-page exhibit, the first page of which is
22  entitled Additional Due Diligence Material.
23      Do you have any understanding of
24  what this exhibit is?
25      A.   I believe right before -- really

Page 140

1   EDWARD NECARSULMER, III
2   prior to pricing, street practice is to have a
3   so-called bringdown due diligence call where you
4   just make sure there are no -- you try to ensure
5   there are no issues -- I don't know if the word
6   is material, but no significant change between
7   what you know and as you go to become effective
8   the next morning.  And this looks to me --
9   appears to be the notes from that type of
10  meeting.
11      Q.   Now, at the companies that
12  you've worked at, is bringdown due diligence
13  recorded more formally than by a set of notes?
14      MR. GLUCKOW:  Objection to the
15  form.
16      You can answer.
17      THE WITNESS:  No.  I mean, I
18  guess I would have assumed maybe the
19  notes were typed up, but basically this
20  is the form I'd be used to.
21      It is often pro forma, if that's
22  the -- you know.  Unless there's some
23  significant issue that comes up.  In
24  many cases, you know, people are on the
25  road at different places; often the

Page 141

1   EDWARD NECARSULMER, III
2   management -- you know, the CFO is in
3   San Francisco, the CEO is in London
4   making presentations and sometimes they
5   are not even on the call, and it's
6   usually just an update of where you are
7   in terms of the effectiveness, has it
8   gotten NASD approval, that kind of
9   stuff.  So this doesn't surprise me,
10  no.
11  BY MR. LEWIS:
12      Q.   Do you have any understanding as
13  to whose notes these are?
14      A.   I could guess, but I don't know.
15      Q.   As a general proposition, as you
16  were doing your work looking at documents and
17  transcripts, if you had a question about the
18  documents, did you from time to time consult
19  with Simpson Thacher about the significance of a
20  document or the author of a document?
21      A.   I don't believe we ever had -- I
22  mean, we were certainly in touch talking about
23  my progress and where -- you know, but I don't
24  -- it didn't really arise.  I mean, the answer
25  is no, it really did not -- it didn't come up.

36 (Pages 138 to 141)

EDWARD NECARSULMER, III

1
2      Q.    Okay. Is it your understanding
3  that these are notes of a telephone conversation
4  rather than that of a meeting?
5      A.    That would be my surmise, but
6  it's only that.
7      Q.    And what is that based on?
8      A.    Based on the way it's almost
9  always a so-called bringdown call because the
10  people are not usually in the same place.
11      Q.    Is there, in your experience, a
12  standard format for a bringdown call?
13      A.    No. In my experience, it's
14  quite informal; it's tick off three or four
15  points, anything we ought to be aware of. It
16  can be combined with an update of where you are
17  in terms of effectiveness, other forms need to
18  be filed. So generally it kind of takes this
19  form.
20      Q.    Did you see anything in this
21  document when you reviewed it that you believe
22  referred either to Costco or to gray marketing
23  more broadly?
24          MR. GLUCKOW: The document speaks
25  for itself.

EDWARD NECARSULMER, III

1
2          But you can answer.
3          THE WITNESS: No.
4  BY MR. LEWIS:
5      Q.    I previously showed you Exhibit
6  160 which was the July 14, 1998, summary of due
7  diligence conducted by the Lehman Brothers Adams
8  Golf team.
9          Did you see anything in Exhibit
10  198 which referred to either gray marketing or
11  Costco distribution?
12          MR. GLUCKOW: You said 198.
13  BY MR. LEWIS:
14      Q.    I'm sorry; that was the one that
15  has been variously numbered as 160 and 198.
16          So the question is, since you
17  have 160 in front of you, whether you saw
18  anything in the summary of due diligence
19  contained in Exhibit 160 that you believe
20  referred to either Costco or gray marketing
21  issues?
22          MR. GLUCKOW: The document speaks
23  for itself.
24          But you can answer it.
25          THE WITNESS: I'm assuming Page 3

EDWARD NECARSULMER, III

1
2  that there's nothing that I'm not
3  seeing. Correct?
4  BY MR. LEWIS:
5      Q.    I think your assumption is
6  absolutely correct.
7      A.    With that assumption, the answer
8  is there's nothing referring to either of those
9  subjects.
10          (Whereupon, documents were
11  marked, for identification purposes, as
12  Exhibit 325 and Exhibit 326.)
13  BY MR. LEWIS:
14      Q.    I'm going to hand you two
15  exhibits together, 325 and 326.
16          MR. LEWIS: Off the record.
17          (A discussion was held off the
18  record.)
19  BY MR. LEWIS:
20      Q.    325 is a copy of documents that
21  you referred to in your rebuttal report and some
22  of those pages -- there were a few pages not
23  included because some of the Adams advertising
24  materials were double-sided and someone, not
25  doing their due diligence in the copying

EDWARD NECARSULMER, III

1
2  process, left those pages out when the document
3  was compiled, so those missing pages are
4  contained in Exhibit 326.
5          You'll see that the documents
6  that are compiled in this exhibit include due
7  diligence questionnaires, sales data,
8  advertising data, and, to the best of my
9  knowledge, these are all the pages that you
10  referred to in your rebuttal report.
11          MR. GLUCKOW: Just to be clear,
12  we haven't obviously checked to make
13  sure this is the case, but what you are
14  saying is when you combine 325 and 326,
15  all of the documents cited in the
16  rebuttal report should be included in
17  325 and 326.
18          MR. LEWIS: They should be. And
19  the ones in 326 are all
20  advertising-type documents which go
21  sort of into the span of documents in
22  the middle that have Adams Tight Lies
23  advertisements and humorous items about
24  Barney and a press release here and
25  there.

37 (Pages 142 to 145)

EDWARD NECARSULMER, III

1   BY MR. LEWIS:
2       Q.    At the risk of beating the horse
3   dead, again, to your knowledge, is there
4   anyplace in any of the pages referred to in your
5   rebuttal report which touched on gray marketing
6   or Costco distribution?
7           MR. GLUCKOW: And again, you are
8       focused on the UND production which we
9       have in front of us and 325 and 326,
10      not on deposition testimony?
11          MR. LEWIS: That is correct.
12          THE WITNESS: Then I would say --
13      I was thinking aloud; excuse me. Let
14      me just make sure.
15          To the best of my knowledge, that
16      is correct.
17  BY MR. LEWIS:
18      Q.    Moving forward chronologically,
19  I will show you Exhibit 215 which is a Lehman
20  Brothers memorandum, facsimile, suggested
21  outline, and list of concerns. The transmittal
22  date on the fax is July 29, 1998.
23          Did you review this document?
24      A.    I did see this document.

EDWARD NECARSULMER, III

1       Q.    And did you see, on the third
2   page of the exhibit, the item "Discounting -
3   Tight Lies have been seen in many Costcos for
4   $146? How is product getting there? What is
5   Adams Golf doing about it?"
6       A.    I have seen that.
7       Q.    Have you seen any documents that
8   explain to you how that information came into
9   the possession of the underwriters?
10      A.    I had not seen a document
11  documentary of it, no.
12      Q.    Do you recall any testimonial
13  evidence?
14      A.    It is my recollection that
15  either Picchi or Lantier, who were the two
16  Lehman equity research analysts, did refer to
17  this in their deposition testimony. I can't
18  tell you which one. I would say Lantier, if I
19  had to make a determination.
20          L-A-N-T-I-E-R. P-I-C-C-I, I
21  think. It may be P-I-C-C-H-I.
22      Q.    So that other than the
23  deposition transcripts of the equity analysts,
24  you are unaware of any means by which one could

EDWARD NECARSULMER, III

1   determine how the information came into Lehman's
2   possession that caused someone to write the
3   words that appear on the page I read to you?
4           MR. GLUCKOW: Objection to the
5       form. It mischaracterizes the
6       testimony.
7           But you can answer.
8           THE WITNESS: I would add that,
9       you know, since this is post IPO, it's
10      highly plausible that's -- that this
11      came through an investor or type of
12      question to the research analyst.
13  BY MR. LEWIS:
14      Q.    Can you explain why you say
15  that?
16      A.    Well, what happens often is that
17  as you are talking about the story or the stock,
18  particularly if the stock is, you know, either
19  going up or down a lot and therefore is the
20  subject, research analysts are constantly
21  talking to their customers who are the --
22  they're counterpart analysts or portfolio
23  managers at usually large financial
24  institutions, or it could be an officer manager

EDWARD NECARSULMER, III

1   someplace, and a lot of the process is feedback,
2   and somebody said, you know, what do you think
3   is going on? I heard, you know, from my golf
4   pro or a guy at Fidelity asked me about... I
5   mean, in my experience a lot of the information
6   is actually incoming, so it could very well have
7   come through that way as well.
8       Q.    Let me show you what I've marked
9   previously as 217. This is a teleconference
10  script dated August 5, 1998, sent to Olga
11  Pulido-Crowe and Pat Walravens,
12  W-A-L-R-A-V-E-N-S, from the desk of Patty
13  Walsh. And at Page 40671, you will see a
14  reference, under the heading of Discounting, to
15  "Tight Lies have been seen in many Costcos for
16  $146. How is the product getting there?" and an
17  answer is given.
18          Does anything in this document --
19  strike that.
20          Do you have any reason to
21  believe that the information that's contained
22  on Page 40670, which is similar to the
23  information we saw in the "concerns" box on
24  Exhibit 215, came as a surprise to the

Page 150

```
1              EDWARD NECARSULMER, III
2   underwriters?
3              MR. GLUCKOW: Objection to the
4       form. Just to clean up the record, I
5       think you said 40670. I'm assuming you
6       must have meant 40671.
7              MR. LEWIS: I tried to say
8       40671. I probably sputtered it.
9              MR. GLUCKOW: And then you are
10      comparing the language at the bottom of
11      40671 with the language in 215?
12             MR. LEWIS: Correct.
13             MR. GLUCKOW: And what's the
14      question?
15  BY MR. LEWIS:
16      Q.    Looking at those two documents
17  together, do you recall -- strike that.
18             Seeing those two documents
19  together, do you have any recollection of any
20  explanation that you learned during your
21  investigation in this case of how the
22  underwriters came to learn of gray marketing
23  distribution through Costco after the IPO?
24             MR. GLUCKOW: Vague and
25      ambiguous.
```

Page 151

```
1              EDWARD NECARSULMER, III
2       But you can answer.
3       Asked and answered as well.
4       Go ahead.
5              THE WITNESS: Again, I can only
6       surmise that it came through investor
7       feedback or through the surveys that
8       the equity research analyst did.
9   BY MR. LEWIS:
10      Q.    You referred earlier to the
11  surveys. I'll place before you a copy of
12  Exhibit 180, previously marked, and specifically
13  I'll direct your attention to Page 27.
14             Is the survey that appears on
15  that page the survey you are referring to in
16  your testimony?
17      A.    Yes.
18      Q.    And do you have any reason to
19  believe that Lehman learned of Costco
20  distribution or gray market distribution through
21  the pro shop survey before the IPO date?
22             MR. GLUCKOW: Objection to the
23      form. Vague and ambiguous. Asked and
24      answered.
25             You can answer.
```

Page 152

```
1              EDWARD NECARSULMER, III
2              THE WITNESS: Absolutely not.
3       There's no reference that that happened
4       in any of the material that I reviewed.
5   BY MR. LEWIS:
6       Q.    Do you recall Mr. Lantier being
7   unable to date precisely when his pro shop
8   survey calls were made?
9              MR. GLUCKOW: Objection. The
10      deposition record speaks for itself.
11             You can answer.
12             THE WITNESS: I do recall that in
13      the deposition.
14  BY MR. LEWIS:
15      Q.    Would it be fair to say that to
16  the best of your recollection Mr. Lantier
17  couldn't speak to that subject one way or the
18  other?
19             MR. GLUCKOW: The same objection.
20             You can answer.
21             THE WITNESS: I don't have an
22      appropriate response. I don't know.
23             MR. LEWIS: Off the record.
24             (A discussion was held off the
25      record.)
```

Page 153

```
1              EDWARD NECARSULMER, III
2              (Whereupon, a document was
3       marked, for identification purposes, as
4       Exhibit 327.)
5   BY MR. LEWIS:
6       Q.    I've marked as Exhibit 327 a
7   document with the heading Exhibit VII. Do you
8   recognize this document?
9       A.    I've seen the document.
10      Q.    And where have you seen it?
11      A.    It was within the underwriter
12  production, I believe. It was within the
13  documents that I referred to in Schedule B.
14      Q.    Of your --
15      A.    Of 321.
16      Q.    Well, to be fair to you, sir,
17  this was an exhibit to the expert report of
18  Mr. Grace.
19      A.    Okay. I accept that as a fact.
20  As I said in my rebuttal report, I did review
21  that report as well, I just don't remember.
22      Q.    Did you review this -- did you
23  review the entirety of Mr. Grace's report in
24  preparation of your rebuttal report?
25      A.    "Preparation" is not the right
```

39 (Pages 150 to 153)

Page 154

EDWARD NECARSULMER, III

1 word. I read it as something related to the
2 case, related to what I -- you know, to what my
3 role was as well.
4 MR. GLUCKOW: But in terms of the
5 entirety, just to be clear, as the
6 attachment to the rebuttal report
7 indicates, we sent Mr. Necarsulmer
8 copies of all the expert reports
9 including the exhibits so this
10 (indicating) would have been included
11 in what we sent Mr. Necarsulmer.
12 MR. LEWIS: Right; but he
13 wouldn't have seen it before it was
14 issued.
15 MR. GLUCKOW: Correct.
16 MR. LEWIS: And this was in the
17 -- oh.
18 MR. GLUCKOW: I'm saying in the
19 rebuttal report.
20 THE WITNESS: Right. That's why
21 I said in Exhibit B to my rebuttal
22 report. Or Exhibit A, I guess it is,
23 in my rebuttal report.
24 BY MR. LEWIS:

Page 155

EDWARD NECARSULMER, III

1 Q. Did you read through this?
2 A. I did look through this.
3 Q. Did you specifically look at the
4 first six pages of this?
5 MR. GLUCKOW: Objection to the
6 form. He said he's read the entire
7 document, but -- you can answer.
8 BY MR. LEWIS:
9 Q. Well, when you read the entire
10 document, did you have any reason in your own
11 mind to focus on the first six pages of this?
12 A. I had no particular reason to do
13 that, no.
14 Q. Did you read through the
15 complaints to Adams Golf regarding Costco that
16 are listed in the chronological order that
17 Mr. Grace listed them in this report?
18 A. I did.
19 Q. And the solutions purportedly
20 implemented by Adams Golf as also listed on
21 this?
22 A. Correct.
23 Q. Had you previously seen the
24 complaints, the Adams numbered complaints, that

Page 156

EDWARD NECARSULMER, III

1 were listed by Mr. Grace in this report?
2 MR. GLUCKOW: You mean had he
3 seen reference to them in the materials
4 in Exhibit A -- or Exhibit B, rather,
5 to his report which included all the
6 depositions and the exhibits to the
7 depositions, or has he seen them in
8 this format (indicating)? I'm not sure
9 what the question is.
10 BY MR. LEWIS:
11 Q. Let me try a simple question.
12 MR. LEWIS: Off the record.
13 (A discussion was held off the
14 record.)
15 BY MR. LEWIS:
16 Q. Let me take you to Page 2 of
17 this -- of this report. You'll see that under
18 the date of May 6, 1998, according to this
19 table, Pro Golf Discount in Fairfax, Virginia,
20 canceled an order because Adams' clubs are in
21 Costco.
22 Do you recall seeing a reference
23 to that in any of the depositions or exhibits
24 that you had read in your work?

Page 157

EDWARD NECARSULMER, III

1 A. I don't.
2 Q. On May 7, 1998, according to
3 Mr. Grace, Adams Golf clubs were found in Costco
4 in Modesto, California.
5 Do you recall having seen a
6 reference to that in your work?
7 A. I can't recall.
8 Q. May 21, according to Mr. Grace,
9 Pro Golf complains that Costco is selling Adams
10 Golf product.
11 Do you recall having learned of
12 that in your investigation?
13 A. I don't recall that either.
14 Q. On May 29, 1998, according to
15 the table, "WDC Mackenzie reports that a new
16 shipment of Adams Golf clubs have hit Canadian
17 Costcos."
18 Do you remember seeing
19 reference to that in the --
20 A. I do remember seeing that in the
21 correspondence between the two.
22 Q. June 1, 1998, according to
23 Mr. Grace, "Centerville Golf in Centerville,
24 Virginia, complained about Adams clubs in

40 (Pages 154 to 157)

Page 158

EDWARD NECARSULMER, III
1
2   Costco."
3        Do you recall having learned that
4   in your work in the case prior to seeing
5   Dr. Grace's -- Mr. Grace's report?
6        A.   I don't recall that
7   specifically, no.
8        Q.   All right.  How about the item
9   for June 8, 1998; Merrifield Golf in Fairfax,
10  Virginia, called regarding Adams clubs seen at
11  Costco."
12       Do you recall learning that?
13       A.   I don't recall learning that.
14       Q.   June 11, 1998, Jack Tone,
15  T-O-N-E, Golf in Ripon, R-I-P-O-N, California,
16  called regarding Adams' clubs in Costco.
17       Do you remember seeing that?
18       A.   I don't.
19       Q.   June 24, Green River Golf Club
20  in Corona, California, called to complain about
21  clubs in Costco.  Do you recall learning that?
22       A.   I don't recall learning that
23  either.
24       Q.   June 25, two items, "Pro Golf
25  Discount in Boise, Idaho, called regarding their

Page 159

EDWARD NECARSULMER, III
1
2   problem selling clubs due to Costco," and
3   "Centerville Golf Center in Centerville,
4   Virginia, called to complain again about
5   Costco."
6        A.   I do recall -- I do recall the
7   one in Idaho.  I don't recall the other one in
8   California.
9        Q.   Just a couple more.
10       A.   Fine.
11       Q.   June 29, Tierneys,
12  T-I-E-R-N-E-Y-S, Golf in Walnut Creek,
13  California, called regarding a customer
14  returning clubs after seeing Adams Golf clubs in
15  Costco.
16       A.   I do recall seeing that.
17       Q.   July 3, '98, "Customer requests
18  Adams Golf hat offer after buying clubs at a
19  Costco in Livonia, Michigan."
20       A.   I don't recall that.
21       Q.   Would you agree that the
22  portions of the summary that we've just gone
23  over contain information that was different with
24  respect to gray marketing and Costco than the
25  information that Mr. Adams had originally

Page 160

EDWARD NECARSULMER, III
1
2   supplied to Ms. Pulido-Crowe?
3        MR. GLUCKOW:  Objection to the
4   form.  It mischaracterizes the record.
5   It mischaracterizes the testimony.
6        You can answer.
7        THE WITNESS:  If I recall from
8   Pulido-Crowe's deposition, the -- his
9   characterization of the problem was
10  that there was some problem with
11  Costco, they didn't believe it was
12  significant, and they were handling
13  it.  I mean, that was my summary of
14  what I believe was said.  And I don't
15  know that this is enough to tell me
16  that that's different, but it is a
17  little vague, my memory of same.
18  BY MR. LEWIS:
19       Q.   I'll show you this in a second.
20  At Page 47 of her deposition Ms. Pulido-Crowe
21  was asked the question: "How did you determine
22  whether the gray marketing was material or not?"
23       "Answer:  We of course first
24  spoke to the company, talked about the
25  distribution channels.  The issue of -- the

Page 161

EDWARD NECARSULMER, III
1
2   discussion of Costco came up because of discount
3   warehouses.  And we asked, was it much of a
4   problem?  They said no, there was -- it was an
5   isolated incident -- I recall something to that
6   effect.  My interpretation was it was an
7   isolated incident and that that person or
8   distributor, whoever it was that got those clubs
9   there, they were going to pursue that and put an
10  end to that."
11       MR. GLUCKOW:  Are you
12  representing to the witness that that
13  is the only time that Ms. Pulido-Crowe
14  testified about her discussions with
15  the company concerning Costco and/or
16  gray marketing?
17       I certainly hope not.
18       MR. LEWIS:  I'm not saying it's
19  the only time, but I'm not saying --
20       MR. GLUCKOW:  The inference of
21  your question is that that is the
22  record as to the conversations.
23       MR. LEWIS:  I haven't asked a
24  question, so I can't have an inference
25  to my question.

41 (Pages 158 to 161)

Page 162

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2  BY MR. LEWIS:
3      Q.    My question is --
4          MR. GLUCKOW: I suggest
5  otherwise, but proceed.
6          MR. LEWIS: You suggest I have a
7  question out there?
8          MR. GLUCKOW: No. I suggest that
9  the way you just read that into the
10  record following the exchange that we
11  have had is misleading. But proceed.
12  BY MR. LEWIS:
13      Q.    The first question is, was that
14  the testimony of Ms. Pulido-Crowe that you were
15  referring to?
16      A.    Partially.
17      Q.    Okay. Is there something else
18  that you recall?
19          You have the volume in front of
20  you and an index to it, if there's something
21  else you would like to refer my attention to.
22          Do you recall her ever telling --
23  strike that.
24          Do you recall her ever saying
25  that Barney Adams told her that Costco

Page 163

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2  distribution was other than an isolated
3  incident?
4          MR. GLUCKOW: Objection to the
5  form.
6          THE WITNESS: I don't recall him
7  saying -- her saying anything besides
8  that, no.
9  BY MR. LEWIS:
10      Q.    Okay. Would you agree that the
11  chart to Mr. Grace's report reflects that by the
12  time of the IPO, Costco distribution, whatever
13  it was, was not an isolated incident?
14          MR. GLUCKOW: It mischaracterizes
15  the record. It mischaracterizes the
16  testimony.
17          You can answer.
18          THE WITNESS: I mean, I just
19  don't know --
20          MR. GLUCKOW: Asked and answered
21  as well.
22          THE WITNESS: -- I just don't
23  know. If these were all coming from
24  the same source, then I suspect you
25  could characterize it as one -- you

Page 164

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2  know, one event. If they were coming
3  from multiple sources, I think it
4  wouldn't be.
5  BY MR. LEWIS:
6      Q.    All right. Do you have any
7  reason to believe based on your investigation in
8  this case as part of your expert work -- let me
9  reframe that.
10          Do you have any reason to believe
11  based on your work in this case that the
12  underwriters reviewed the complaints that were
13  listed between the dates of May 6th and I guess
14  I stopped reading at July 3?
15          MR. GLUCKOW: Objection to the
16  form.
17          You can answer.
18          THE WITNESS: I know that they
19  certainly -- I shouldn't say
20  certainly. I believe they knew about
21  the Canadian one. And I don't know to
22  the extent they knew about the others.
23  BY MR. LEWIS:
24      Q.    Forgive me if I'm asking you
25  something I've already asked you. Did I read

Page 165

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2  you the entry for July 8, 1998: "Golfdom in
3  McLean, Virginia, called regarding a credit for
4  clubs they had purchased at Costco"?
5          MR. GLUCKOW: The question is did
6  you already ask him about that one?
7          MR. LEWIS: Right.
8          MR. GLUCKOW: The record will
9  speak for itself, but...
10          THE WITNESS: I don't know; I
11  just don't.
12  BY MR. LEWIS:
13      Q.    Whether or not I read it to you
14  before, the entry here in Mr. Grace's report for
15  July 8, 1998, states that Golfdom in McLean,
16  Virginia, called regarding a credit for clubs
17  they had purchased at Costco.
18          Do you remember learning of that
19  prior to -- as a result of your work in this
20  case prior to the receipt of Dr. Grace's or
21  Mr. Grace's report?
22          MR. GLUCKOW: He's on Page 6.
23          THE WITNESS: I'll get to Page
24  6. I'm sorry, I went back to the
25  beginning.

42 (Pages 162 to 165)

Page 166

```
 1              EDWARD NECARSULMER, III
 2         MR. LEWIS: Take your time.
 3         MR. GLUCKOW: This one
 4    (indicating).
 5     A.    I don't -- I don't recall this
 6    specific one.
 7     Q.    Okay.  Based on your work in
 8    this case, do you know of any reason why the
 9    complaints -- the written complaints that are
10    listed by Mr. Grace in his report would not have
11    been available to the underwriters as part of
12    their due diligence investigation if they had
13    asked to see them?
14         MR. GLUCKOW: Objection to the
15         form.  It assumes facts not in
16         evidence.
17         You can answer.
18         THE WITNESS: I don't know why it
19         wouldn't have been available had they
20         asked to see them.
21    BY MR. LEWIS:
22     Q.    You don't know why it wouldn't
23    have been?
24     A.    Correct.
25     Q.    Do you have any knowledge, as
```

Page 167

```
 1              EDWARD NECARSULMER, III
 2    you sit here, that the underwriters contacted,
 3    as part of the due diligence investigation, any
 4    of the retailers who made the complaints about
 5    Costco that are listed between the dates of
 6    March 23, 1998, and July 8, 1998?
 7         MR. GLUCKOW: Objection to the
 8         form.  Are you asking him to compare
 9         this list of complaints with the list
10         of customer calls that we've looked at
11         previously?
12         MR. LEWIS: Sure, if you want to;
13         but none of them were on the list of
14         customer calls, so I don't think he has
15         to do that.
16    BY MR. LEWIS:
17     Q.    Do you have any knowledge that
18    any of the complaining retailers were contacted
19    by Lehman Brothers or any of the comanagers
20    during due diligence?
21     A.    I have no knowledge of that.
22     Q.    You have opined in your rebuttal
23    report on the subject of the disclosure that was
24    made in this case.  Would you agree that in
25    matters of disclosure that an underwriter should
```

Page 168

```
 1              EDWARD NECARSULMER, III
 2    err on the side of inclusion of fact rather than
 3    exclusion of fact?
 4         MR. GLUCKOW: Objection to the
 5         characterization of the report.
 6         But you can answer.
 7         THE WITNESS: I'm not sure that's
 8         accurate.  I think it's important to
 9         have a complete document, but I think
10         part of making it a useful document,
11         and for the benefit of the investors,
12         is making sure that the -- the things
13         that are -- the things that are
14         included are, you know, significant to
15         the company, and I think one of the --
16         having gone through this drafting
17         process a million times, one of the
18         great problems is what do you put in,
19         what do you put out, what do you leave
20         out, and it does start -- you know, can
21         strike likely debate, and I think
22         striking some balance is really the
23         goal.
24    BY MR. LEWIS:
25     Q.    Would you agree that if by the
```

Page 169

```
 1              EDWARD NECARSULMER, III
 2    time of the IPO the underwriters were unable to
 3    make a studied assessment of the scope of the
 4    risk of gray marketing that the risk of gray
 5    marketing should have been included as a risk
 6    disclosure?
 7         MR. GLUCKOW: Objection to the
 8         form.  Incomplete hypothetical.
 9         Assumes facts not in evidence.
10         You can answer.
11         THE WITNESS: I don't agree with
12         that.  I think, again, this is a
13         process, you make a judgment as to
14         those things you think are significant
15         and relevant, and those are the things
16         you include.
17    BY MR. LEWIS:
18     Q.    What if you concluded by the
19    time of the effective date that you just didn't
20    know what the scope of gray marketing was?
21         MR. GLUCKOW: Objection.  The
22         same objections, and it
23         mischaracterizes the evidence.
24         THE WITNESS: My interpretation
25         of what I read, what I reviewed, was
```

43 (Pages 166 to 169)

Page 170

EDWARD NECARSULMER, III

1    that they did make a judgment, and
2    their judgment was that they did know
3    enough and it was not material.
4    BY MR. LEWIS:
5        Q.    When was that judgment made, to
6    the best of your knowledge?
7        A.    Prior to the effective date of
8    the registration statement. I couldn't tell
9    you -- I couldn't make it any more specific than
10   that.
11       Q.    Prior to the Costco press
12   release?
13           MR. GLUCKOW: Objection to the
14       form. It mischaracterizes the record.
15       It mischaracterizes the testimony.
16           You can answer.
17   BY MR. LEWIS:
18       Q.    When I say the Costco press
19   release, I mean the Adams June 9, 1998, press
20   release relating to Costco.
21       A.    I don't know I would make -- you
22   know, the assumption I make from the data that I
23   reviewed is that that was their conclusion.
24       Q.    But are you aware of any meeting

(lines numbered 1–25)

Page 171

EDWARD NECARSULMER, III

1    or meetings at which that conclusion was
2    reached?
3        A.    Not specifically, no.
4        Q.    Are you familiar with the term
5    stickering in the context of a prospectus or
6    registration statement?
7        A.    I am.
8        Q.    What does that term mean to you?
9        A.    You can add information via a
10   label, a long label, onto the cover of a
11   prospectus.
12       Q.    And under what circumstances in
13   your opinion does one sticker a registration
14   statement or a prospectus?
15       A.    Some fact coming out subsequent
16   to the printing of that prospectus that, you
17   know, you deem is material. Sometimes the SEC
18   will ask you to sticker if something comes up.
19   If effectiveness gets delayed for some reason
20   and, you know, a quarter ends or a contract gets
21   canceled or something like that, they'll often
22   allow that as a -- recommend that as a way to
23   make sure the disclosure is complete.
24       Q.    Have you seen stickering done

(lines numbered 1–25)

Page 172

EDWARD NECARSULMER, III

1    after the effective date of a registration
2    statement?
3        A.    I would have -- I would say yes,
4    but it's more usual on the date. But it could
5    be -- it could be shortly thereafter, not long
6    thereafter.
7        Q.    Are you aware of any limitation
8    to how long after the effective date a
9    prospectus can be stickered?
10       A.    I'm not aware of that, if there
11   is one.
12       Q.    Do you believe that's a legal
13   issue rather than a practice issue?
14           MR. GLUCKOW: Objection. It
15       calls for a legal conclusion.
16           But you can answer.
17           THE WITNESS: I don't know. I
18       don't know.
19   BY MR. LEWIS:
20       Q.    Do you know if any consideration
21   was given in this case to stickering the
22   registration statement?
23       A.    I don't know.
24           MR. LEWIS: Let's take a

(lines numbered 1–25)

Page 173

EDWARD NECARSULMER, III

1    five-minute break and I may be done.
2           (A recess was had from 3:46 p.m.
3       to 4:00 p.m.; and then the proceedings
4       continued as follows:)
5    BY MR. LEWIS:
6        Q.    A point of clarification. When
7    we referred to a file memo from Joe Hoffman
8    relating to the SEC, I believe you used the term
9    signing official at the SEC?
10       A.    Examining official.
11       Q.    Examining?
12       A.    Sorry.
13       Q.    I think you actually used the
14   word sign at one point. Is that a synonym for
15   the examining official?
16           MR. GLUCKOW: I don't recall
17       those words being used, but the record
18       will speak for itself.
19           THE WITNESS: Should I respond?
20           MR. GLUCKOW: Yes, if you --
21           THE WITNESS: If I said it, I
22       didn't mean to say it. I meant to say
23       examiner.
24   BY MR. LEWIS:

(lines numbered 1–25)

44 (Pages 170 to 173)

Page 174

EDWARD NECARSULMER, III
1
2      Q.    A point of clarification. You
3  have reached no conclusion as a result of your
4  work in this case with respect to issuer
5  disclosure obligations, is that fair?
6      A.    That is fair.
7      Q.    In Exhibit 321 --
8           MR. GLUCKOW: Hold on; I've got
9      the official copy here.
10          MR. LEWIS: It's hopefully the
11     last time we'll go back to it.
12  BY MR. LEWIS:
13     Q.    -- in your enumeration of
14  categories of things to be considered, Item 7
15  was: "Understanding of material outstanding
16  litigation, regulatory or environmental
17  issues."
18          Is it your opinion that the
19  underwriters had any obligation to evaluate the
20  litigation between Adams and Costco --
21          MR. GLUCKOW: Objection to the
22     form.
23  BY MR. LEWIS:
24     Q.    -- for materiality?
25     A.    No. Practice is that you ask --

Page 175

EDWARD NECARSULMER, III
1
2  you know, you ask that question of your counsel,
3  and if they give you a clean bill of health on
4  what you've done so far, you typically keep
5  going.
6      Q.    "Your counsel" meaning the
7  issuer's counsel or the underwriter's counsel?
8      A.    The underwriter's counsel.
9      Q.    Going back to Exhibit-7 to
10  Mr. Grace's report, I take it that in the course
11  of your --
12          MR. GLUCKOW: Hold on, let me
13     just get it.
14          THE WITNESS: Got it.
15  BY MR. LEWIS:
16     Q.    In the course of your work on
17  this engagement, did you ever try to go through
18  the exhibits to collect complaints related to
19  gray marketing and line them up chronologically?
20     A.    I did not.
21     Q.    Do you have any reason to
22  believe that the underwriters were aware of the
23  identities of the retailers who complained to
24  Adams about Costco's appearing -- Tight Lies
25  appearing at Costco locations?

Page 176

EDWARD NECARSULMER, III
1
2      A.    With the exception of WDC
3  Mackenzie, I don't.
4           MR. LEWIS: I have no further
5      questions at this time.
6           MR. GLUCKOW: Okay.
7           I'm going to have a few
8      questions, but I just need five
9      minutes, so if we can take a
10     five-minute break. Is that okay?
11          MR. LEWIS: Okay. I'll ask you
12     what you discussed with the witness.
13          MR. GLUCKOW: No, I'm going to
14     sit right here. I'm not going
15     anywhere.
16          MR. LEWIS: Okay; fine. Take
17     your time.
18          MR. GLUCKOW: I just need to
19     compare two things quickly.
20          MR. LEWIS: Take your time.
21          (A recess was had from 4:04 a.m.
22     to 4:13 p.m.; and then the proceedings
23     continued as follows:)
24               - - -

Page 177

EDWARD NECARSULMER, III
1
2      (Whereupon, a document was
3      marked, for identification purposes, as
4      Exhibit 328.)
5               - - -
6           EXAMINATION
7               - - -
8  BY MR. GLUCKOW:
9      Q.    This is a copy of the deposition
10  transcript of Olga Pulido-Crowe. Mr. Lewis
11  mentioned this deposition during his examination
12  and in fact read from it but didn't mark it,
13  which is why I'm marking it now.
14          Mr. Necarsulmer, let me ask you,
15  first, do you recall reviewing
16  Ms. Pulido-Crowe's deposition as part of your
17  work in this matter?
18     A.    I do.
19     Q.    Did you rely on her testimony?
20     A.    Heavily.
21     Q.    Why?
22     A.    In my experience, the captain of
23  the underwriting team takes particular weight --
24  or deserves particular weight, I should say.
25     Q.    Let me direct your attention to

45 (Pages 174 to 177)

EDWARD NECARSULMER, III
1
2 the top of Page 48, Line 6.
3       A.   The top of Page 48, Line 6.
4       Q.   The question is: "Do you recall
5 who spoke with Adams Golf about this issue?"
6            And the answer is: "It would
7 have been Barney or Mark -- or I don't recall
8 exactly who, but it was a group of many people
9 that were -- that would have been present."
10            Do you recall reading that when
11 you read Ms. Pulido-Crowe's deposition
12 transcript?
13       A.   Yes.
14       Q.   Did you rely on that in any way?
15       A.   I did.
16       Q.   Why?
17       A.   Because I think it was
18 demonstrative of the fact that there was an
19 ongoing process of the underwriters in the
20 company talking about this and other issues.
21       Q.   And I may have misinterpreted
22 some of Mr. Lewis's questions earlier, but I
23 couldn't help get the impression from some of
24 the questions that he was asking that the
25 impression that he was leaving on me anyway was

EDWARD NECARSULMER, III
1
2 that there was only one discussion between
3 Ms. Pulido-Crowe and Mr. Adams and that that one
4 discussion happened in April or May of '98.
5            Is that impression that I had
6 in my mind consistent with your review of the
7 materials in this matter?
8            MR. LEWIS:  Objection to form.
9            THE WITNESS:  I --
10            MR. LEWIS:  You can answer.
11            THE WITNESS:  I don't know who
12       has to tell me this in this case.
13       Absolutely not.  The one thing
14       that is clear to me throughout, and
15       this demonstration -- this deposition
16       is sort of important to that, is that
17       there was, as there normally should be
18       in these cases, a significant number of
19       -- amount of interaction between the
20       company's marketing people and the
21       underwriters.
22 BY MR. GLUCKOW:
23       Q.   Let me turn your attention to
24 Page 78, at the top, Line 3.
25            MR. LEWIS:  What is this?

EDWARD NECARSULMER, III
1
2            MR. GLUCKOW:  I'm sorry, Page 78,
3       Line 3 through Line 6.
4 BY MR. GLUCKOW:
5       Q.   The question is: "Did you have
6 any discussions with anyone at Adams concerning
7 the litigation between June 9 of '98 and July 9
8 of '98?"
9            The answer is: "I believe we
10 (sic) did."
11            Line 7: "Who did you have
12 those discussions with?"
13            "Answer: I don't recall.  I
14 can recall conversations.  I don't remember
15 who was actually there, but I recall
16 conversations."
17            Did you review this?
18       A.   I did.
19       Q.   Did you rely on it?
20            MR. LEWIS:  Objection to form.
21       Vague.  Overbroad.
22            THE WITNESS:  I did rely on it.
23 BY MR. GLUCKOW:
24       Q.   Why?
25       A.   Again, it was evidence of this

EDWARD NECARSULMER, III
1
2 ongoing discussion between the company and the
3 underwriters as part of the due diligence
4 process.
5       Q.   Let me actually have you turn
6 back to Page 77, the prior page.  I should have
7 started here; I apologize.
8            On Page 76, Exhibit 163 is marked
9 -- and then there's a question -- which is the
10 press release concerning the Costco action,
11 which Mr. Lewis asked you about, and on top of
12 Page 77, the question is: "Do you recall
13 whether you saw it," meaning this press release,
14 "prior to the IPO?"
15            And the answer is: "Yes."
16            Skipping down to Line 14, the
17 question is: "Did you discuss the litigation
18 with anyone at Adams prior to them filing
19 suit?"
20            The answer is, on Line 16: "I
21 believe it was prior, yes."
22            17.  "Who did you discuss this
23 with?"
24            18.  "Answer: I don't recall
25 exactly, but it would have -- it was a group

EDWARD NECARSULMER, III

1
2  of senior management at the company and/or our
3  counsel, underwriters' counsel or their
4  counsel. It was discussed."
5       Do you see what I've just read
6  there?
7       A.   I do.
8       Q.   Did you read that as part of
9  your evaluation of this matter?
10      A.   I did.
11      Q.   Did you rely on what I've just
12 read?
13           MR. LEWIS:  Objection.
14           THE WITNESS:  I did.
15 BY MR. GLUCKOW:
16      Q.   Please explain how and why.
17      A.   I relied on it because, again, I
18 was -- one of the things I was trying to
19 investigate as part of my project was, you know,
20 were the underwriters thorough and consistent in
21 trying to discuss, you know, these -- the
22 marketing issues, the distribution issues, legal
23 issues, with the company, and this is another
24 evidence that they did and that they followed up
25 on it.

EDWARD NECARSULMER, III

1
2       Q.   There are a number of documents
3  that Mr. Lewis showed you -- examples would be
4  the Lehman Brothers Commitment Committee
5  memorandum, Exhibit 74; the due diligence
6  memorandum, Exhibit 160, also marked as 198; the
7  notes of the bringdown diligence discussion,
8  Exhibit 159 -- where the questioning pointed out
9  that there was no reference in those documents
10 and other documents to gray marketing or Costco.
11      Do you recall that line of
12 questioning?
13      A.   I do.
14      Q.   Did it surprise you in any way
15 that there was no reference to gray marketing or
16 Costco in those documents?
17           MR. LEWIS:  Objection.  Vague and
18 overbroad.
19           THE WITNESS:  It didn't surprise
20 me at all.
21 BY MR. GLUCKOW:
22      Q.   Why?
23      A.   Because the underwriters had
24 made a determination that this was not
25 significant to the company's sales and earnings;

EDWARD NECARSULMER, III

1
2  therefore, like many other issues, it just
3  wasn't part of the conversation.
4           MR. GLUCKOW:  I have no further
5  questions at this time.
6           MS. MORIATY:  I've got just a
7  few.
8           THE WITNESS:  Sure.
9               - - -
10          EXAMINATION
11              - - -
12 BY MS. MORIATY:
13      Q.   I want to turn everybody back to
14 Exhibit I think it's 327 which was the exhibit
15 to Mr. Grace's report.
16          MR. GLUCKOW:  Here it is.
17          THE WITNESS:  Okay.
18 BY MS. MORIATY:
19      Q.   Well done, okay.
20      During your research for your
21 report in this case, did you learn how many
22 retailers Adams Golf had in 1998?
23      A.   The number 7,000 sticks in my
24 mind.
25      Q.   Do you know how many phone calls

EDWARD NECARSULMER, III

1
2  Adams Golf received to its call center in total
3  between about January 1st and July 8 of 1998?
4           MR. LEWIS:  Objection to form.
5           THE WITNESS:  A thousand -- I --
6  BY MS. MORIATY:
7       Q.   Did you read this information in
8  the course of your research for this report?
9       A.   Yes.
10          MR. LEWIS:  Objection to form.
11          THE WITNESS:  Yes, I did.
12 BY MS. MORIATY:
13      Q.   I'm going to represent to you
14 that -- you just told me it was 7,000
15 retailers.
16      A.   Right.
17      Q.   I'm going to represent to you
18 that they had 12,885 calls to this call center.
19 You can believe that or not.  Based on whatever
20 impression you had during your research, based
21 on that.
22      So I'm going to look at Exhibit
23 327.  And we discussed earlier the complaints
24 to Adams Golf regarding the Costco column, and
25 in this column by my count there are 12

47 (Pages 182 to 185)

EDWARD NECARSULMER, III

1 retailers complaining between the beginning of
2 this chart and the IPO -- the beginning of
3 this chart starts February 16th, '98; and
4 there are nine calls that come into the call
5 center.
6
7          So with all of your experience
8 working as an underwriter in various IPOs, and
9 in light of the information in Exhibit 327 and
10 the number of retailers -- 7,000 -- and calls
11 to the call center -- upwards of 12,000 -- do
12 you think gray marketing should have been
13 listed as a risk factor in the Adams Golf
14 prospectus?
15          MR. LEWIS: Objection to form and
16 foundation.
17          MR. GLUCKOW: I'll just --
18          MR. LEWIS: Beyond the scope of
19 his purpose in this litigation
20 according to his testimony.
21          THE WITNESS: Should I answer?
22          MR. LEWIS: You may answer, if
23 you can.
24          THE WITNESS: I mean, it seems to
25 me, again, as I just answered

EDWARD NECARSULMER, III

1 Mr. Gluckow, they made a determination
2 that while they knew of the issue, that
3 it simply wasn't -- didn't rise to the
4 level of, and I would rather use the
5 word significant than material because
6 I think material actually has a legal
7 connotation, also. So, therefore, like
8 many other issues, they made the
9 determination, the underwriters made
10 the determination, that there was no
11 benefit, no reason, you know, to take
12 it any further. And that's a judgment
13 you make when you are an underwriter,
14 when you do due diligence. There are
15 lots of factors to consider; you just
16 -- you make these decisions.
17 BY MS. MORIATY:
18     Q.    If you as an underwriter heard
19 that 12 retailers out of 7,000 complained, would
20 you think that this is a significant issue?
21          MR. LEWIS: Objection to form.
22          THE WITNESS: I would think that
23 it would be less than I would have
24 guessed the normal sample would be, so

EDWARD NECARSULMER, III

1 I think it would not be a significant
2 issue.
3 BY MS. MORIATY:
4     Q.    And if you heard that nine calls
5 out of more than 12,000 were regarding a certain
6 issue, would you have thought that issue
7 significant enough to investigate further or put
8 as a risk factor?
9          MR. LEWIS: Objection to form and
10 foundation.
11          THE WITNESS: It's hard to, you
12 know -- no, the answer is no, the
13 numbers are simply too small, putting
14 myself in that spot.
15          MS. MORIATY: Thanks. No further
16 questions here.
17          - - -
18          EXAMINATION
19          - - -
20 BY MR. LEWIS:
21     Q.    Mr. Necarsulmer, can you say
22 that as someone who is overseeing due diligence
23 investigations in the past if you had
24 Mr. Grace's report before you at the time of the

EDWARD NECARSULMER, III

1 IP -- just before the IPO was effective and saw
2 that Adams' clubs were appearing in Costco
3 warehouses in diverse locations in the country,
4 that that was something you wouldn't have asked
5 some questions about?
6          MR. GLUCKOW: Objection to form.
7 Incomplete hypothetical.
8 Mischaracterizes the record.
9          You can answer.
10          THE WITNESS: I mean, you know,
11 it's very hard to look back, but I
12 again think that -- I again think that
13 you -- the judgment -- I keep going
14 back -- the totality of this, it is my
15 opinion, and I certainly believe it,
16 that they made an informed -- given all
17 the facts that they knew, they made a
18 reasonable judgment that it was not --
19 did not rise to the level of being a
20 risk factor.
21 BY MR. LEWIS:
22     Q.    The underwriters could have kept
23 the offering from going forward any time up to
24 the effective date, could they not, if they were

48 (Pages 186 to 189)

Page 190

EDWARD NECARSULMER, III
1
2  not satisfied as to -- that all proper
3  disclosures were being made?
4          MR. GLUCKOW:  Incomplete
5  hypothetical.  Assumes facts not in
6  evidence.
7          You can answer.
8          THE WITNESS:  Sure; you can even
9  do it after the effective date.
10 BY MR. LEWIS:
11     Q.    How late after the effective
12 date can you do it?
13         MR. GLUCKOW:  It calls for a
14 legal conclusion.
15 BY MR. LEWIS:
16     Q.    In your understanding, to the
17 best of your knowledge, how late after the
18 effective date can you stop an underwriting?
19         MR. GLUCKOW:  The same
20 objections.
21         THE WITNESS:  I don't remember --
22 I don't know if it's 30 or 40.  There's
23 a number, I just don't know what it is,
24 or I don't remember what it is, and it
25 may have changed since I was actively

Page 191

EDWARD NECARSULMER, III
1
2  doing this.  I thought there was some
3  sort of -- I don't remember.  The
4  answer is I don't remember whether it's
5  30 days or 45 days or whether it's even
6  a specific number any longer, but...
7          MR. LEWIS:  Nothing further.
8          MR. GLUCKOW:  Nothing further.
9          MS. MORIATY:  No.  Good.
10         MR. GLUCKOW:  Thank you very
11 much.
12         (Deposition concluded at
13 4:26 p.m.)
14             -O-
15
16
17
18
19
20
21
22
23
24

Page 192

1
2          C E R T I F I C A T E
3          I, Pamela Harrison, a Notary
4  Public, do hereby certify:
5          That EDWARD NECARSULMER, the
6  witness whose testimony is hereinbefore set
7  forth, was duly sworn by me and that such
8  testimony given by the witness was taken down
9  stenographically by me and then transcribed.
10         I further certify that I am not
11 related to any of the parties to this
12 action by blood or marriage, and that I am in
13 no way interested in the outcome of this
14 matter.
15
16
17         _____
           Pamela Harrison
           Registered Merit Reporter
18         Certified Realtime Reporter
           CSR-NJ # 30XI00221600
19         Notary Public
           Date: August 8, 2006
20
21     (The foregoing certification of
   this transcript does not apply to any
22 reproduction of the same by any means, unless
   under the direct control and/or supervision of
23 the certifying shorthand
   reporter.)
24

Page 193

1
2          INSTRUCTIONS TO WITNESS
3          Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason in
6  the appropriate space on the errata sheet for
7  any corrections that are made.
8          After doing so, please sign the
9  errata sheet and date it.
10         You are signing same subject to
11 the changes you have noted on the errata sheet,
12 which will be attached to your deposition.
13         It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within thirty (30) days of receipt of
16 the deposition transcript by you.  If you fail
17 to do so, the deposition transcript may be
18 deemed to be accurate and may be used in court.
19
20
21
22
23
24

49 (Pages 190 to 193)

Page 194

```
1
2          - - - - - - - -
3          E R R A T A
4          - - - - - - - -
5     PAGE   LINE   CHANGE
6     ___    ___  _____
7     ___    ___  _____
8     ___    ___  _____
9     ___    ___  _____
10    ___    ___  _____
11    ___    ___  _____
12    ___    ___  _____
13    ___    ___  _____
14    ___    ___  _____
15    ___    ___  _____
16    ___    ___  _____
17    ___    ___  _____
18    ___    ___  _____
19    ___    ___  _____
20    ___    ___  _____
21    ___    ___  _____
22    ___    ___  _____
23    ___    ___  _____
24    ___    ___  _____
25    ___    ___  _____
```

Page 195

```
1
2          ACKNOWLEDGMENT OF DEPONENT
3
4         I,_____ , hereby certify
5     that I have read the foregoing pages ____
6     to ____ and that the same is a correct
7     transcription of the answers given by me
8     to the questions therein propounded,
9     except for the corrections or changes
10    in form or substance, if any, noted in
11    the attached Errata Sheet.
12    _____
13    DATE            SIGNATURE
14
15
16    Subscribed and sworn to before me this
17    _____ day of _____,
18    200__.
19    My commission expires: _____
20
21    _____
22    Notary Public
23
24
```

50 (Pages 194 to 195)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588