## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**IN RE ADAMS GOLF, INC.**
**SECURITIES LITIGATION**

**CONSOLIDATED**
**C.A. No. 99-371 KAJ**

## PLAINTIFFS' OPENING BRIEF IN SUPPORT OF
## MOTION TO STRIKE AND EXCLUDE TESTIMONY
## OF CHRISTOPHER JAMES, Ph.D.

ROSENTHAL, MONHAIT & GODDESS, P.A.
Carmella P. Keener (DSBA No. 2810)
919 N. Market Street, Suite 1401
P. O. Box 1070
Wilmington, DE 19899
(302) 656-4433

*Plaintiffs' Liaison Counsel*

BERGER & MONTAGUE, P.C.
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

DATED: September 11, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.      NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Dr. James' Opinions Are Unreliable Because He Violates
                Accepted Practice with Respect to "Event Study" Regression
                Analysis of Daily Stock Returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      Dr. James' Opinions Are Unreliable Because of His
                Improper Reliance Upon Monthly Regressions that He
                Runs Long After the Class Period Concluded . . . . . . . . . . . . . . . . . . . . . 11

        C.      Dr. James' Opinions Are Unreliable and he Lacks Objectivity . . . . . . . . 13

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Crowley v. Chait*,
  322 F. Supp. 2d 530 (D.N.J. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Daubert v. Merrell Dow Pharmaceuticals Inc.*,
  509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 4

*Material Techs., Inc. v. Carpenter Tech. Corp.*,
  2005 U.S. Dist. LEXIS 32087 (D.N.J. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*RMED International Inc. v. Sloan's Supermarkets*,
  2000 U.S. Dist. LEXIS 3742 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Schneider v. Fried*,
  320 F.3d 396 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

*Surace v. Caterpillar, Inc.*,
  111 F,3d 1938 *3d Cur, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## FEDERAL STATUTES

Fed.R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

## I.    NATURE AND STAGE OF PROCEEDINGS

In this case discovery and expert discovery has been completed. Pursuant to the scheduling order entered by the Court, Plaintiffs submit this memorandum in support of their motion to strike and to preclude proposed expert witness testimony of Dr. Christopher James ("Dr. James").

## II.    SUMMARY OF ARGUMENT

1.    Defendant Adams Golf (the "Company") and the Individual Defendants proffer the opinions of Christopher M. James, PhD, in an effort to satisfy their burden to prove negative loss causation with respect to gray marketing experienced by the Company. Dr. James' methodology is flawed to a degree to make it unreliable and thus improper under *Daubert* and its progeny. The opinions of Dr. James should be disallowed.

2.    Under *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579 (1993) and its progeny and Fed. R. Evid. 702, the court as gatekeeper should decide whether to admit expert testimony, considering the qualifications of the expert, the reliability of the testimony and whether the testimony will assist the jury. *See e.g., Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

3.    In this case, Dr. James has opined that *none* of the dramatic decline in the price of Adams Golf (the "Company") stock during the class period was attributable to the Company's post-IPO disclosure of widespread gray marketing. In reaching his opinion, Dr. James purported to make use of an "event study" involving regression analysis of daily stock price returns.

1

4.    Dr. James' methodology is flawed and his opinion is unreliable because he violates accepted practice with respect to "event study" regression analysis of daily stock returns.

5.    Dr. James' methodology is flawed and his opinion is unreliable because in his event study, he relies improperly on monthly regressions that he runs long after the class period concluded.

6.    Finally, Dr. James' methodology is flawed and his opinion is unreliable because he lacks objectivity- described by the academic community as an essential element of event study analysis.

### III.    STATEMENT OF FACTS

The Adams Golf defendants offer the testimony of Dr. Christopher James in an effort to meet their burden of proving "negative loss causation". Plaintiffs move to strike and exclude Dr. James' opinions because the principles underlying those opinions and the application of those principles in rendering his opinions amount to a patently flawed methodology that renders his opinion unreliable under *Daubert v. Merrell Dow Pharmaceuticals Inc., supra.*

Dr. James' reports as well as his deposition testimony show that he has reached his conclusions regarding the decline in the Company's stock price by utilizing improper methods, and then applying those improper methods incorrectly to the facts of this case.

### IV.  ARGUMENT

In *Daubert v. Merrell Dow Pharmaceuticals Inc.*, the Supreme Court directed the district courts to perform a gatekeeping function in determining the reliability of scientific expert testimony. In this regard, this court should flexibly consider a number of factors,

2

such as: (1) whether the technique or theory has been tested; (2) whether the technique or

theory has been subjected to peer review and publication; (3) the qualifications of the

expert witness testifying based on the methodology; and (4) the non-judicial uses to

which the methodology has been put. *Id.*, at 593 (setting forth first two factors listed

above); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 n. 8 (3d Cir.

1994)(identifying other relevant factors). In applying these factors, the court must "solely

focus on the principles and methodology, not on the conclusions they generate." *Daubert,*

at 595.

This list of factors is not exclusive, and each factor need not be applied in every

case. Rather, the court must tailor its inquiry to the facts of each case and should consider

the specific factors identified in *Daubert* where they are reasonable measures of the

reliability of expert testimony. *Material Technologies, Inc. v. Carpenter Technology*

*Corp.*, 2005 U.S. Dist LEXIS 32087 (D. NJ 2005).

The Third Circuit has described the conditions imposed by Fed. R. Evid. 702 and

*Daubert* as a "trilogy of restrictions on expert testimony: qualifications, reliability, and

fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The qualification restriction

permits the exclusion of an expert "when his training and experience is lacking in the

particular area in which his testimony is offered." *Surace v. Caterpillar, Inc.*, 111 F.3d

1039, 1055 (3d Cir. 1997). The reliability restriction demands that the Court inquire into

the principles and methodology employed by the expert. *Schneider, supra* at 404.

Daubert's "fit" requirement, as defined in this Circuit, "is that the testimony must in fact

assist the jury by providing it with relevant information necessary to a reasoned decision

of the case." *Crowley v. Chait*, 322 F. Supp. 2d 530, 542 (D. NJ. 2004).

3

As discussed below, Dr. James' unreliable methodology, and the application of that unreliable methodology to the facts of this case, render his opinion unable to withstand *Daubert* scrutiny. In considering Dr. James's flawed methods, it is instructive to note Dr. James's harsh criticisms of the opinions of plaintiffs' causation and damages expert, Alan Miller. According to Dr. James, Mr. Miller fails to use "scientific and objective methods"; engages in "subjective review of public and non-public information"; puts forward "unsupported claims"; advances no "coherent estimation" of damages; "fails to isolate dates of material stock price movement and relate those . . . to curative disclosures"; and offers "analysis [that] does not meet the standards of rigor and scientific objectivity." James rebuttal report at 2-3 (attached as exhibit 1). These are serious charges, indeed. However, the flaws Dr. James describes, and the unreliable methodologies he condemns, are his own, not Mr. Miller's.

## A.    Dr. James' Opinions Are Unreliable Because He Violates Accepted Practice With Respect To "Event Study" Regression Analysis Of Daily Stock Returns

In reaching his opinions that post-IPO disclosure of widespread gray marketing caused *none* of the dramatic decline in the price of Adams Golf stock during the class period, Dr. James first purported to make use of an "event study" involving regression analysis of daily stock price returns. In doing so, Dr. James – paying scant attention, (as described more fully below), to plaintiffs' evidence – disregarded or ignored serious questions with respect to whether event study analysis could reasonably be applied in this case.

Plaintiffs have uncovered strong evidence that the bad news about gray marketing and its devastating impact on Adams Golf "leaked" into the market in the days and weeks

4

following the July 9, 1998 IPO. Adams Golf management, having omitted any disclosure of the gray market issue in the Registration Statement, continued to stay silent, failing to make any public disclosure for three months. Meanwhile, in bits and pieces, through rumor, sightings of growing numbers of Adams Golf clubs on sale at discount outlets, and similar avenues, the public gradually began to learn the truth. The truth "leaked" out in a variety of ways, including, for example:

- purchases of Adams Golf clubs for the account of a principal gray marketer, Costco, peaked, alerting various Costco personnel, Adams Golf personnel, Adams Golf distributors and retailers, and others that Adams Golf's gray marketing problems were deepening. For example, Costco issued purchase orders for 3,111 clubs on July 21-22, 1998, and Adams Golf stock dropped 27 percent over the six-day period beginning before and ending after the purchases. As Mr. Miller observed in his rebuttal report:

> It would be very surprising if there were not significant overlap between these various parties [who were involved in the Costco purchases] and investors in Adams Golf stock, as it is common practice with a niche company such as Adams Golf, for its stockholders to be people with an interest in such a market or company, such as avid golfers, distributors, retailers, suppliers, and others with a likely knowledge of the company and the market.

Miller rebuttal report at para. 22 (A), (C) (attached at exhibit 2).

- indicative of growing unease about gray marketing, a representative of defendant Lehman – as lead underwriter for the IPO, carefully attuned to the market for Adams Golf stock – warned Adams Golf CEO Barney Adams on July 29, 1998 to be prepared for questions about gray marketing at an upcoming investor conference call. Less than a week later, in an August 4, 1998 report, an analyst with NationsBanc (also an underwriter in the IPO), attributed recent volatility in Adams Golf stock to investor concerns about

gray marketing. *Id.* at para. 22 (F), (H), (J).

It was not until October 22, 1998, following a three-month decline in the price of
Adams Golf stock far exceeding stock price drops at Adams Golf's principal competitors
over the same period, that defendants finally began to disclose publicly what many
investors had already begun to glean through "leakage". After CEO Barney Adams
informed the board of directors that he expected a 20 to 25 percent sales impact from gray
marketing in the December 1998 quarter, the company announced that gray marketing
would seriously affect results. *See* Dep. exhibit 80 and the Company's October 22, 1998
press release (ADAMS 005060-5063), (attached hereto at exhibits 3 and 4 respectively).
Adams Golf stock dropped still further, in an amount that even Dr. James concedes to
have been statistically significant. James Expert Report at para. 53-54 (attached at
exhibit 5).

It is against this backdrop that an investigator should have given serious
consideration to whether event study regression analysis is appropriate for this case. A.
Craig MacKinlay is a leading authority in the field (and Dr. James relied upon Dr.
Mackinlay in his opening report in this case). *See* Ex. 5 at footnote 9. According to Dr.
Mackinlay, there are more successful and less successful applications of event study
regression analyses:

> An important characteristic of a successful event study is the ability to
> identify precisely the date of the event. In cases where the event date is
> difficult to identify or the event date is partially anticipated, studies have
> been less useful. For example, the wealth effects of regulatory changes for
> affected entities can be difficult to detect using event study methodology.
> The problem is that regulatory changes are often debated in the political
> arena over time and any accompanying wealth effects generally will
> gradually be incorporated into the value of a corporation as the probability
> of the change being adopted increases.

6

A. Craig MacKinlay, Event Studies in Economics and Finance, <u>Journal of Economic Literature</u> (March 1997), p.37 (attached hereto at exhibit 6).

The present case is analogous. Bearing the negative loss causation burden, defendants struggle to find some basis to deny that, in the days immediately following the IPO, investors started turning away from Adams Golf stock, sending the price sharply downward, as they observed in their local Costco store, or learned from fellow golfers, or otherwise detected, that Adams Golf's supposedly premium products were becoming a commodity. It is hard for either side, defendants or plaintiffs, to state precisely when this process began. It is hard, in Dr. MacKinlay's words, "to identify precisely the date of the event." Dr. James uses flawed methods to attempt to cram the square pegs of a "leakage" case – where the stock fell more than 75 percent prior to the October 22, 1998 company disclosure -- into the round holes of his event study regression analysis.[1]

Dr. MacKinlay aptly describes what happens when the investigator proceeds to mash the peg into the hole it does not fit:

> Schipper and Thompson (1983, 1985) also encounter this problem in a study of merger related regulations. They attempt to circumvent the problem of regulatory changes being anticipated by identifying dates when the probability of a regulatory change being passed changes. However, they find largely insignificant results *leaving open the absence of distinct event dates as the explanation of the lack of wealth effects.*

*Id.* at pp. 37-38 (emphasis added).

---

[1]    Dr. MacKinlay is hardly the only proponent of event study regression methodology to recognize its limits. David I. Tabak and Frederick C. Dunbar of National Economic Research Associates (NERA), a consulting and expert firm that frequently is retained by defendants' counsel in securities litigation, observe that "an event study is a common method" for computing damages in such litigation but add: "It is, however, not the only way to compute damages. Sometimes a fundamental analysis is appropriate. . . . " Materiality and Magnitude: Event Studies in the Courtroom (April 1999), p. 6 and n. 11 (attached hereto as exhibit 7).

This, unfortunately, is precisely what happened here. Dr. James has come up with a daily regression that has produced insignificant results that, as a result of the absence of reasonable or realistic event dates (or event "windows"), fail to observe the impact of gray market "leakage" on the price of Adams Golf stock.

Indeed, Dr. James's approach is so flawed that the results he reports simply make no sense on their face. First, according to Dr. James, there was no day (or "event") during the entire class period when the stock price returns were statistically significant *and* negative. That is, despite the fact that the stock price collapsed during the class period, and Adams Golf stock materially underperformed the company's main competitors, Dr. James's analysis cannot spew out a single date when "new, material firm-specific [negative] information about the firm's future earnings prospects reached the market that trading day." *See* (Ex. 5, p. 11). Despite the stock price collapse, the stock price returns on each and every day during the class period (up until October 23, 1998, which ended the class period), were described – with the exception of two or three days – as follows:

> The relatively smaller movements on other days are typically the results of normal, volatile trading activity and do not represent the pricing effects of material firm-specific information; such small movements are not statistically distinguishable from zero firm-specific movement.

*Id.*

The two or three days that were the exception, August 12, September 1, and October 2, 1998, had statistically significant stock returns, and these were *positive. Id.* at para. 53-54, and tab 6.

This leads to the second reason why Dr. James's report, on its face, makes no sense. In total, Dr. James's flawed analysis came up with three or (depending upon the

8

regression) four statistically significant days – as noted, August 12, September 1, October 2, and October 23, 1998. The day with the largest return (residual price change) on a percentage basis was September 1. *Id.* at tab 6. Yet, as to the return on this day, Dr. James apparently has no explanation. He does not attempt to explain why, according to his analysis, the return was statistically significant. All Dr. James offers on the subject is the following: "There was no news released on September 1, 1998 or the day before." *Id.* at para. 23(c). To put it mildly, then, the explanatory power of Dr. James's daily regression model is extremely weak.

Additional problem present themselves, revealing further flaws in the method employed in the daily regressions, including:

- Dr. James generally used a one-day event window (though at deposition he testified that he also ran some regressions with two-day event windows), on the grounds that Adams Golf traded in an efficient market and thus "[n]ew and material information about the company and its business was impounded in the stock price rapidly after its arrival to the market place." *Id* at para. 55. In view of the "leakage" into the market regarding the gray market, such a short event window represented a flawed approach – assuming, of course, that there was any basis at all to use an event study regression approach. As Mark L. Mitchell and Jeffrey M. Netter have written:

> For those events that are subject to leakage, defining the beginning of the event window can be problematic. Consider the case of a merger in which the target company is rumored to be "in play" prior to the announcement. For such a case, the event window should begin prior to the actual merger announcement, perhaps as long as a week or two. . . . In practice, this date is difficult to define and some degree of judgment is required generally based on price and volume movements prior to the merger announcement.

The Role of Financial Economics in Securities Fraud Cases: Applications at the

9

Securities and Exchange Commission, the Business Lawyer, p. 559 (February 1994) (attached hereto as exhibit 8) (footnote deleted).

Dr. James's method was deficient because the event window he designed was too brief to capture the movement of the stock price as a result of "leaked" gray market disclosures. *See* Ex. 2, para. 14, and n.l (citing authority).

- Dr. James used a flawed comparative or "control" index in his daily regressions. Event study regression analysis involves the use of an expert-selected index, which is used to predict movements in the company's share price during the period under study. As Tabak and Dunbar point out: "[A]n index is suspect when the choice of companies in the index is made by the expert without recourse to objective criteria." Ex. 7, p. 10. Violating scientific principles, Dr. James's primary index for his daily regressions, the NASDAQ index, is suspect for just the reason cited by Tabak and Dunbar. As noted by Mr. Miller, the NASDAQ is dominated by high technology companies and does not even include industry-leader Callaway Golf, which was identified by a Lehman analyst as the only stock comparable to Adams Golf stock. Ex. 2, para. 5. Indeed, according to Mr. Miller: "Mr. James has not established that Adams Golf's stock price moved, consistently or at all, in response to any particular industry or other indicator." *Id.*

- Dr. James uses an arbitrary and unscientific estimation or base period, which he runs contemporaneously with the class period. Here, as in *RMED International Inc. v. Sloan's Supermarkets*, 2000 U.S. Dist. LEXIS 3742 (S.D.N.Y 2000*), the class period began with an initial public offering. Thus, in both cases there was no meaningful price history that the investigator could use as the estimation or base period from which to estimate the stock's predicted returns during the class period. The *RMED* court cited

10

various authorities, including MacKinlay, for the principle that the estimation or base

period must not affect the normal relation between the stock under study and the index.

*Id.* As MacKinlay wrote:

> Given the selection of a normal performance model, the estimation
> window needs to be defined. The most common choice, when feasible, is
> using the period prior to the event window for the estimation window. . . .
> Generally *the event period itself is not included in the estimation period* to
> prevent the event from influencing the normal performance parameter
> estimates.
>
> *             *             *
>
> For some events it is not feasible to have a pre-event estimation period for
> the normal model parameters, and a market-adjusted abnormal return is
> used. The market-adjusted return model can be viewed as a restricted
> market model . . . . A general recommendation is to *only use such
> restricted models if necessary, and if necessary, consider the possibility of
> biases arising from the imposition of restrictions*.

Ex. 6, pp. 15, 18-19 (emphasis added).

In this light, Mr. Miller observes in his rebuttal report that, given the limitations

arising from the absence of a "clean" or uncontaminated estimation period, Dr. James's

analysis "is only a measure of contemporaneous association or correlation, not a

measurement of prediction, deviation therefrom and 'explanation'". Ex. 2, para. 14. In

sum, Dr. James's regressions fail to meet scientific standards.

**B.    Dr. James's Opinions Are Unreliable Because Of His
        Improper Reliance Upon Monthly Regressions That He
        Runs Long After The Class Period Concluded**

As part of his analysis, Dr. James makes use of monthly (not daily) regressions for

time periods that extend months or even a year or more beyond the end date of the class

period, and long past the period of any significant decline in the price of Adams Golf

11

stock. These monthly regressions reflect a flawed approach that, once again, is at odds

with accepted scientific technique.

Dr. MacKinlay points out that stock return data can be obtained at different

sampling intervals, including daily and monthly intervals. He sternly warns against use of

monthly data:

> Given the availability of various intervals, the question of the gains of
> using more frequent sampling arises. To address this question one needs
> to consider the power gains from shorter intervals. . . . As one would
> expect given the analysis of Section 7, the decrease in power going from a
> daily interval to a monthly interval is severe. For example, with 50
> securities [analyzed in one study] the power for a 5 percent test using daily
> data is 0.94, whereas the power using monthly data is only 0.35 and 0.12
> respectively. The clear message is that there is a substantial payoff in
> terms of increased power from reducing the sampling interval.

Ex. 6, pp. 34- 35

Equally as questionable as the use of monthly as opposed to daily stock return

data is the running of the regressions to a point long after the end of the three and one-

half month class period. Dr. James's monthly regressions extend as far as June and

December 1999, even though the class period ended in October 1998. *See* Ex. 5, para.

67, 69. Running the regressions for such a long span after the end of the class period

violates standard practice in the field. As Tabak and Dunbar note: "In securities fraud

cases, the events of interest usually include all the alleged disclosures of fraud and/or the

dates when fraudulent statements were made." Ex. 7, p. 7. Mr. Miller labels Dr. James's

monthly regression analyses "meaningless, as the great bulk of the decline in Adams

stock price occurred within several weeks after the IPO, not stretching out over a period

of more than a year. In fact, such an analysis using scant data stretched out over an

irrelevant time period would provide a misleading result." Ex. 2, para. 17.

Why did Dr. James run his monthly regressions for so long a span after the class

period was over? Dr. James was quite candid about this. He did so because, otherwise,

the monthly regression analysis could not be used: "Since the revised class period

contains only three months of data, I did not have a sufficient number of monthly data

points to conduct a reliable statistical analysis." Ex. 5, n. 29 (at p. 30). It violates

scientific principle to structure the regression to analyze irrelevant data simply because a

properly designed study would involve an insufficient number of datapoints to allow

reliable statistical analysis.

## C.    Dr. James's Opinions Are Unreliable Because He Lacks Objectivity

As Tabak and Dunbar note: "The most important reason to consider the use of an

event study is that it is likely to provide a *highly objective methodology* for calculating the

magnitude of damages and the materiality of the event that may have caused damages."

Ex. 7, p. 34 (emphasis added). Unfortunately, in performing his work in this case, Dr.

James has demonstrated a lack of objectivity, rendering his opinions unreliable.

Dr. James's lack of objectivity can be seen in his inconsistent, and unscientific,

approach to the manner in which the market absorbs new information. As discussed

above, he asserted that only a one- or two-day event window should be used in his daily

regressions, even though plaintiffs' evidence shows that, for the most part, disclosure

with respect to gray marketing during the class period was in the form of "leakage" or

publication by non-company sources (such as a Golf Pro article available sometime in

July or August 1998 and an August 28, 1998 analyst report). Dr. James, asserting the

efficiency of the market for Adams Golf stock, looked at only the day, and perhaps the

day following, the release of any such disclosure. See Ex. 5, para. 6 (c).

13

But Dr. James took a dramatically different approach in running monthly regressions using, as datapoints, monthly reports of the market share of Orlimar, an Adams Golf competitor, and Adams Golf's closing stock price each month. With regard to these regressions, Dr. James had no information as to the exact date that the Orlimar market share reports became available to the market. *See* James Deposition exhibit 338 (stating that "the normal turn around time" was 25 to 33 days after the last day of the month being reported on) (attached hereto at exhibit 9). Moreover, the Orlimar market share information was old – relating either to the preceding month or the month before that. *See* Ex. 5, para. 69. Dr. James took this approach, with respect to his monthly regressions, despite the fact that he insisted that "the stock rapidly incorporated new information about the company and its business." *Id.* at para. 48.

Dr. James evidenced further inconsistency in his treatment of a June 9, 1998 press release, which Adams Golf issued *before* the IPO. According to Dr. James, this press release "disclosed the existence of a gray market in connection with sales of golf clubs at Costco. This created a situation in which – again, according to Dr. James – at the time of the IPO and throughout the class period: "Market participants . . . knew of the risk of the gray market due to the prior disclosure." Ex. 5, para. 6 (a), (b). However, Dr. James overlooks or disregards the fact that, at the time of the June 9,1998 press release, Adams Golf remained a private company. The IPO was still a month away. Accordingly, there was no efficient market, no "rapid incorporat[tion of] new information about the company and its business", *id.,* and hence no possibility that "[m]arket participants . . . knew of the

risk of the gray market due to" the June 9, 1998 press release.[2]

There is still more to Dr. James's bias and inconsistency on this point. As noted, he took the position that, as a result of the June 9, 1998 press release, the market was fully informed about the gray marketing risk from the time of the IPO and throughout the class period, and "the existence and risk associated with gray market sales" were incorporated into the IPO price. Ex. 5, para. 6 (b). Moreover, James said the statistically significant stock price decline on October 23, 1998, had nothing to do with gray marketing. This was despite the fact that the October 22, 1998 press release stated that the company anticipated sales would be "further impacted by the recent gray market distribution". According to Dr. James, the market reacted on October 23 to *other* disclosures, not gray marketing-related, including "new information regarding market conditions and future performance" that led analysts to revise downward their consensus earnings estimates. In this connection, Dr. James simply disregards the fact that, soon

---

[2]     Dr. James mischaracterizes the June 9, 1998 press release, which hardly "disclosed the existence of a gray market". Instead, the press release merely stated that the company had filed what was described a Bill of Discovery to determine "*whether* Costco's claims that they had properly acquired Adams' Tight Lies fairway woods for resale *were accurate.*" *Id.,* at para. 26 (emphasis added). In any event, the June 9, 1998 press release, as equivocal as it was, issued as it was at a time that Adams Golf was not trading in an efficient market, could hardly have been very important to any potential IPO investors who might happened to have run across it. This is because, one month later, the Registration Statement contained no risk disclosure concerning Costco or the gray market. *See* Ex. 2 para. 13 (market participants understand that registration statement and prospectus for a public offering are "required to contain all material information relevant to the issuer").

Dr. James also asserts that the gray marketing risk was known during the class period – despite the Registration Statement's silence – because "it was widely known that gray marketing was occurring in the industry." Ex. 5 para. 6 (a). In fact, general knowledge of what might be a risk for some other company or companies in the golf equipment industry would provide no material information to a prospective investor in Adams Golf. As Professor Frazier, defendants' own gray marketing expert, readily admits, gray marketing difficulties varied within the industry, one company to the next. *See* Deposition transcript of Dr. Gary Frazier, pp. 256, 280. (attached hereto as Exhibit 10).

before the October 22 press release, Barney Adams, Adams Golf's CEO, informed the board of directors that he expected a 20-25 percent negative sales impact from gray marketing during the fourth quarter. See Ex. 3. Dr. James asserts that gray marketing had nothing to do with the revised analysts' estimates, even though he admitted that Barney Adams communicated with the analysts in connection with fourth quarter expectations. James deposition transcript, p. 238 (attached hereto at exhibit 11).

As before, the contrast is striking with respect to Dr. James's treatment of information apart from information regarding the gray market. According to Dr. James, it was known at the time of the IPO – and expressly disclosed in the Registration Statement – that Adams Golf operated in a highly competitive industry, and that its major competitors included Orlimar. Ex. 5, para. 11. With respect to gray marketing, according to Dr. James, "market efficiency implies that once a curative disclosure is made, no future price changes after the immediate reaction can be attributed to Plaintiffs' allegations." *Id.* at 23. What this means, apparently, is that the equivocal June 9, 1998 press release, issued at a time that Adams Golf was not trading in an efficient market, overshadowed and outweighed by the silence of the Registration Statement, provided full and complete discovery of all material facts about gray marketing. By contrast, Dr. James ran monthly regressions to capture the "material" impact of information about Orlimar competition – which had been thoroughly addressed in the Registration Statement.

Dr. James's lack of objectivity, in sum, robs his opinions of reliability.

16

## V. **CONCLUSION**

WHEREFORE, for all the foregoing reasons, the opinions, and testimony of

Christopher James should be disallowed.

Dated: September 11, 2006

**ROSENTHAL MONHAIT & GODDESS, P.A.**

*Camella P. Keener*

Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Wilmington, DE. 19801
(302) 656-4433
Ckeener@rmgglaw.com

*Liaison Counsel for Plaintiffs and the Class*

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000

*Lead Counsel for Plaintiffs and the Class*

17

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 11th day of September, 2006, I caused

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION TO STRIKE AND**

**EXCLUDE TESTIMONY OF CHRISTOPHER JAMES, PH.D.** to be served by hand

delivery upon the below-listed Delaware counsel of record and to be electronically filed with the

Clerk of Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

In addition, a copy has been served by electronic mail upon the following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

/s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com