# EXHIBIT
# 1

# EXHIBIT
# 1

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

<table>
<tr><td>In Re Adams Golf, Inc.<br>Securities Litigation</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Consolidated<br>C.A. No. 99-371 KAJ</td></tr>
</table>

## REBUTTAL EXPERT REPORT OF CHRISTOPHER M. JAMES

### I.    Qualifications and Assignment

1    I have been asked on behalf of Defendants to respond to the expert report of R.

Alan Miller ("Mr. Miller's report").   My qualifications are outlined in my expert

report dated July 14, 2006 ("Dr. James' report").

2    In addition to the documents listed in my previous report, I have reviewed the

following:

a.    R. Alan Miller expert report dated July 14, 2006.

b.    John F. Gould & Allan W. Kleidon, Market Maker Activity on Nasdaq:

Implications for Trading Volume, *Stanford Journal of Law, Business &*

*Finance*, November 1994.

c.    *Richard Kaufman v. Motorola, Inc*, United States District Court for the

Northern District of Illinois, Eastern Division, No. 95 C 1069.

Page 1



d.    *Robert K. Bell v. Fore Systems, Inc.*, United States District Court for the
Western District of Pennsylvania, Civil Action No. 97-1265.

## II.    Summary of Opinions

3.    In an efficient stock market, a stock's price reflects the total mix of information
available in the marketplace about the company's future earnings prospects and
only *new material* information about a company's earnings prospects leads to a
significant change its stock price. In order to determine whether information is
new and material information, one must conduct a statistical analysis. The
objective of a statistical analysis is to test whether the stock price is being affected
*significantly* by any information. A significant stock price movement would
indicate that new material information has entered the marketplace.

4.    Mr. Miller's approach is to attribute the entire price decline of Adams Golf's
stock during the class period to Plaintiffs' allegations about gray market
information without conducting any scientific statistical analysis. None of Mr.
Miller's assertions about materiality are based on scientific and objective
methods, and he fails to provide any evidence that the gray market information
was material. His analysis rests on 1) his subjective review of public and non-
public information and 2) his unsupported claims. As a result, Mr. Miller has not
provided a coherent estimation of any alleged Section 11 or Section 12(a)(2)
damages.

5.    Mr. Miller's methodology is flawed and it is not scientifically sound. Mr. Miller
fails to isolate dates of material stock price movements and relate those stock

price movements to curative disclosures regarding alleged omissions and misrepresentations in the offering materials.

6. Mr. Miller provides no statistical analysis relating the stock returns of Adams Golf to industry or market factors nor does he provide any statistical analysis relating Adams Golf's stock returns to information regarding the risks associated with gray marketing. His analysis does not meet the standards of rigor and scientific objectivity that are a pre-requisite for publication in a peer-reviewed academic journal.

7. Putting any methodological problems aside, Mr. Miller's report presents no evidence of the materiality of Plaintiffs' specific allegations as he has shown no evidence of material price declines that can be directly linked to the disclosures of *new* information regarding Plaintiffs' *specific allegations*. He has instead chosen to accrue inflation, and thus damages, from price declines on numerous days whether or not the price movements on those days are statistically distinguishable from zero, whether the "news" he is pointing to is, in fact, new, or whether the news is even directly related to Plaintiffs' specifically enumerated allegations, thus ignoring materiality entirely.

8. Moreover, my event study provides statistical evidence that none of the information about the gray market disclosed during the class period resulted in a statistically significant stock price decline. Combined with the fact the Adams Golf disclosed the existence of the gray market before the IPO, I conclude that the information about the gray market was either not new or immaterial.

9       As I demonstrated in my previous report and discuss in this report, factors other than Plaintiffs' allegations about gray marketing—other information disclosed in the October 22, 1998 press release, general industry slowdown and Adams Golf's loss of market share—explain the decline in Adams Golf's stock price during the class period

10.     In my opinion, there are no damages from the offering attributable to Plaintiffs' allegations associated with the gray marketing and sales practice risks because there are no material price declines that can be causally linked to these allegations.

### III.    Mr. Miller's Analysis of Adams Golf's Stock is Unscientific

11.     Mr. Miller attributes the entire decline in Adams Golf's stock price during the class period to investors learning about gray marketing problems. There is nothing from what Mr. Miller says or has turned over which suggests that he has considered any statistical and/or economic model to analyze Adams Golf's stock. His analysis lacks scientific rigor.

12.     In this section I will demonstrate that Mr. Miller's claims about materiality of gray market information are subjective, unscientific and inconsistent with sound economic and statistical analysis. Mr. Miller presents no evidence of materiality resulting from Plaintiffs' specific allegations as he has shown no evidence of material price declines that can be directly linked to the disclosure of *new* information regarding Plaintiffs' *specific allegations*.

a)    **Mr. Miller Does Not Have a Reliable Statistical Model**

13.    Mr. Miller does not provide any statistical and/or economic model which attempts to analyze the stock price of Adams Golf. There is nothing from what Mr. Miller says or has turned over that suggests that he has considered any model.

14.    As described in my previous report, the correct methodology to examine the materiality of new information should be a scientific and a systematic method. The event study methodology is widely-employed in academic research on the behavior of security prices.[1] The price of a security (such as common stock) in an efficient market reflects the total mix of information available in the marketplace about the company's future earnings prospects and only *new* material information about a company's earnings prospects changes security prices.

15.    Security prices respond to a variety of information which is *not* specific to the firm but nonetheless affects the value of future earnings, including information about the broad economy and information about the particular industry in which the firm operates. The goal of an event study analysis is to remove such broad economic and industry effects from daily price movements and develop a model to quantify the firm-specific price movements.

16.    The first step in event study analysis is to derive a relationship that explains security price movements based on broad economic and industry-specific factors. Once this relationship is modeled, a researcher can isolate the portion of daily

---

[1] See, for example, Campbell, John, Andrew W. Lo and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997

security price movements that is firm-specific. Statistical tests can be applied to these daily firm-specific price movements to determine which are abnormal, or "statistically significant."

17    Statistically significant movements typically indicate that new, material firm-specific information about the firm's future earnings prospects reached the market that trading day. The relatively smaller movements on other days are typically the result of normal trading activity and do not represent the pricing-effects of material firm-specific information; such small movements are not statistically distinguishable from zero firm-specific movement.

18.   No damages should result from firm-specific price movements that are not statistically significant  This is because such normal movements cannot be causally tied to *any* firm-specific information, let alone to potentially curative disclosures relating to this litigation. These movements are typically a result of general market and industry trends or normal, volatile trading behavior.

19.   As I discussed in my previous report, to determine what factors are moving security prices over the relevant time periods, I performed an event study and analyzed each day where there was a statistically significant share price movement. Only the days on which new firm-specific information was released that relates to Plaintiffs' allegations can be claimed by Plaintiffs as days on which they suffered any damage. The movements on other significant days are the result of firm-specific news (negative or positive) that is unrelated to this litigation and for which no damages can result. In my previous report, I provided a full discussion about the event study methodology and the results of my analysis.

20.    Furthermore, market efficiency implies that once a curative disclosure is made, no future price changes after the immediate reaction can be attributed to Plaintiffs' allegations. Thus, any price declines after the first curative disclosure cannot be claimed as losses caused by Plaintiff's allegations.

21.    Mr. Miller fails to present a statistical and/or an economic model to analyze Adams Golf's stock returns. In addition, Mr. Miller fails to account for the effects of broad economic, industry-specific, and firm-specific factors, unrelated to alleged omissions of gray market information from the Prospectus, that cause the value of Adams Golf's stock to decline substantially during the class period. Mr. Miller's unscientific approach results in an overestimation of damages per share attributable to Plaintiffs' allegations.

### b)    Mr. Miller's Report on Materiality

22.    Mr. Miller fails to offer any scientific methodology and/or acceptable financial economic approach to address whether announcements concerning gray marketing were material to Adams Golf's stock price. In this section, I will discuss Mr. Miller's approach. Mr. Miller proposes several curative disclosure dates on which information about gray marketing was available to some market participants, and concludes that they obviously were material. He does not provide any statistical and/or scientific analysis to support his claims

23.    After a discussion of Mr. Miller's methodology, I will describe the correct and scientific financial economic approach (i.e., using an event study) to analyze

whether any information during the class period about gray marketing had a material impact on Adams Golf's stock price (the event study methodology was discussed in the previous section and in my previous report as well).

24      First Mr. Miller states, "There can be no question that the risk and impact of gray marketing were material to investors or potential investors in Adams Golf."[2] Then, Mr. Miller offers several dates (pre-IPO and post-IPO) on which information about gray marketing was available to at least some market participants. And lastly, he concludes, "The materiality of the risks and extent of gray marketing is further demonstrated by price declines following the IPO related to various partial disclosures of these matters, viewed through appropriate disclosure event windows."[3] Mr. Miller does not point to any significant stock price reactions to the release of information about gray marketing, which one would expect in an efficient market, and therefore fails to demonstrate that the information about gray marketing was either new or material to investors after Adams Golf's IPO.

## (i)      Pre-IPO Disclosures and Secondary Market Prices Immediately After the IPO

### a)      June 9, 1998

25.      The first date Mr. Miller addresses is June 9, 1998. In the press release issued by Adams Golf on June 9, 1998, before the IPO, Adams Golf first disclosed the

---

[2] Mr. Miller's report page 7, ¶13
[3] Mr. Miller's report page 11, ¶17

existence of gray marketing. The Company issued a press release announcing it

had filed a Bill of Discovery against Costco.[4]

26.     Mr. Miller states that the June 9, 1998 press release was indicative of the

importance of gray marketing as recognized by Adams Golf.[5] He admits that this

new information was released to the marketplace by the Company before the IPO

and at the time of the IPO was part of the total mix of information.

27.     At the time of Adams Golf's IPO, it was widely known that gray marketing was

occurring at the industry level. Mr. Miller mentions that he reviewed Callaway's

1997 10K, but he does not mention that the 10K indicates that gray marketing was

an industry-wide issue, and was part of the total mix of information that both the

underwriters and investors possessed before the IPO, as mentioned in my previous

report.[6] Titleist, a brand owned by Fortune Brands, another golf club industry

peer, also disclosed information about its gray marketing issues in a May 18, 1998

press release.[7]

28.     The information about gray marketing faced by Adams Golf and the overall

industry were part of the total mix of information before the IPO. These

disclosures, in conjunction with Adams Golf underwriters' deposition testimony,

clearly show that the underwriters knew of the gray marketing faced by Adams

Golf, as well as its industry peers, before Adams Golf's IPO, and considered it as

one of many factors in their due diligence process.[8] Given that the gray

---

[4] Dr. James' report page 12, ¶26
[5] Mr. Miller's report page 7, ¶13
[6] Dr. James' report page 13, ¶27
[7] Dr. James' report page 13, ¶28
[8] Dr. James' report page 14, ¶29

marketing disclosures were part of the total mix of information considered by both the underwriters and investors at the time the offering price was determined (based upon supply and demand forces during the pre-IPO process), no damages could be attributed to the alleged omissions of the gray marketing from the Prospectus.

29.    Mr. Miller mentions on page 9, ¶15 that "Strong indications of interest and demand for shares will cause an increase in [offer] price; weak demand will cause a reduction in [offer] price." Since the information about gray marketing at Adams Golf was part of the total mix of information starting June 9, 1998, and given the general knowledge of gray marketing in the industry, market participants would factor this information into their demand for Adams Golf's stock and thus it would be reflected in the IPO offer price.

**b)    July 10, 1998**

30.    Mr. Miller recognizes in his report that on July 10, 1998, market participants also knew of the risk of the gray market due to the disclosure on June 9, 1998.[9] However, Mr. Miller fails to address the lack of materiality of this information in the public domain when the stock for Adams Golf started to trade on July 10, 1998. The existence and risk associated with gray market sales were already reflected in the price of Adam Golf's stock when it began trading in the secondary market on July 10, 1998. On the first day of trading, July 10, 1998, the closing price of Adams Golf's stock was $18.375, which was above the IPO offer price of $16.00. Since Adams Golf's stock price did not decline on July 10, 1998, I

---

[9] Mr. Miller's report, pages 8-10

conclude that the information provided by the first disclosure of gray marketing was either already embedded in the offer price or otherwise not material. There is no evidence of any loss arising from the alleged omissions of gray marketing in the Prospectus.

### (ii)    Post-IPO Analysis of Additional Gray Market Discussion

31.    Post-IPO, Mr. Miller suggests several dates on which information about the gray market was disclosed to the marketplace. Mr Miller states that these disclosures are clearly significant and therefore material, however, he again fails to provide any statistical or economic support to his claims

### a)    July 29, 1998

32.    The first post-IPO disclosure date that Mr. Miller proposes is July 29, 1998. On page 9, ¶14, he writes, "In a memorandum to Adams Golf dated July 29, 1998, Lehman Brothers personnel advised Adams to be prepared to answer investor questions about gray marketing."

33.    To begin, this information was an internal document or otherwise a nonpublic document which discussed the gray market allegation, and not part of the total public mix of information. Mr. Miller states on page 7, ¶13 of his report that "There can be no question that the risk and impact of gray marketing were material to investors...," however he fails to provide any indication concerning how the information supposedly impacted Adams Golf's stock price. In the financial economics academic literature there is no evidence to support the notion that private information or nonpublic information affects stock prices.

34.    Moreover, the lack of a significant stock price reaction on July 29, 1998 or the
following trading day demonstrates that the nonpublic information in the memo
about the gray market was either not new or not material. On July 29, 1998,
Adams Golf's stock residual return was 2.4%  In case the memo was issued after
the close of trading, I also looked at Adams Golf's stock residual return the next
trading day. On July 30, 1998, Adams Golf's stock residual return was a decline
of less than 1%. The residual returns on both days were statistically insignificant.

   **b)     August 1, 1998**

35.    The next post-IPO date that Mr. Miller[10] suggests as being material is August 1,
1998. On that date, *Golf Pro* published an article containing a reference to gray
marketing at Adams Golf and its competitors [11]

36.    Furthermore, on page 10, ¶16.C, Mr. Miller contradicts himself and states that the
*Golf Pro* article "…was apparently available in the middle of July and discussed
gray market concerns." Despite the published date on the article, Mr. Miller does
not provide any evidence that the article was available in mid-July.

37.    Again, in an efficient market, if the information about the gray market disclosed
in the *Golf Pro* article is new to the marketplace and it has a material impact on
the total mix of information, one would expect that the stock price for Adams
Golf would react significantly. Mr. Miller does not investigate the statistical
significance of the Adam Golf's stock returns associated with the publication of
the *Golf Pro* article. He only states on page 7, ¶13 of his report that "[t]here can

---

[10] Mr. Miller's report page 8, ¶13 A
[11] Dr. James' report page 24, ¶56

be no question that the risk and impact of gray marketing were material to investors or potential investors in Adams Golf."

38.   In my previous report I found that Adams Golf's residual stock price movement was -4.1% on August 3, 1998 (the first trading day after *Golf Pro*'s publication); however, this decline is not statistically significant, meaning that the decline was attributable to market movement rather than firm-specific information. This is consistent with the conclusion that the information about gray marketing was either not new or not material to the market.

39.   Moreover, Mr. Miller suggests that the *Golf Pro* article was available to investors already in mid-July 1998 (again, without providing any support for his claims). My objective event study analysis found that there are no statistically significant price declines during the month of July 1998. This evidence indicates that even if Mr. Miller's unfounded claims are correct, the information disclosed in the *Golf Pro* article about the gray marketing was either not new or not material to investors.

c)   **August 4, 1998**

40.   The next date that Mr. Miller suggests was important, is August 4, 1998. On page 10, ¶16.D, Mr. Miller states "An August 4 Nations Bank analyst report states that when it was a new company, Callaway's shares were 'often volatile in response to concerns such as "I saw a Big Bertha in Costco"', and that 'We expect Adams stock to also be volatile.'" Not only is Mr. Miller mistaken about the name of the bank, but more importantly, he also misrepresents the analyst's comment. The complete quotation from the NationsBanc analyst report states, "Callaway shares

were often volatile in response to concerns such as 'I saw a Big Bertha in Costco' or 'some retailer offered a Big Bertha at $10 below an earlier price' that proved to be irrelevant. We expect Adams stock to also be volatile."

41. The NationsBanc analyst's comments about the volatility of Callaway's stock price and its relation to the volatility of Adams Golf's stock prices have nothing to do with the materiality of the gray market information. Since the gray marketing information was available to investors prior to August 4, 1998, it should not cause the stock to be more volatile starting August 4, 1998, i.e., it was already part of the total mix of information. In addition, regardless of how volatile Adams Golf's stock had been, Mr. Miller does not establish that this information was material.

42. The NationsBanc disclosure on August 4, 1998 was either not new information or not material, as evidenced by the stock price increase on that day. In case the NationsBanc analyst report came out after the market closed, I also looked at the following trading day. On August 5, 1998, the residual return was 0.7%, which is statistically insignificant.

   **d)    August 28, 1998**

43. Mr. Miller next addresses August 28, 1998 and states in ¶¶16, 16.F that "Information concerning gray marketing which existed in the marketplace... included (at least) the following. ...Lehman Brothers' August 28, 1998 report mentions speaking with golf shops over 'the past three months' as the basis for their comments, including the appearance of Adams clubs in Costco as 'an extremely serious issue that Adams is working hard to correct.'"

44.    Despite Mr. Miller's contention that the Lehman Brothers report was new material information, the report failed to elicit a statistically significant reaction in the price of Adams Golf's stock. If the Lehman report was published before the market closed on August 28, the relevant residual stock price return was a decline of less than 1%; if published after the market closed, the residual stock price return on the next trading day (Monday, August 31) was -5.2%. Neither decline is statistically significant.

e)    **October 8, 1998**

45.    The next date that Mr. Miller suggests was important is October 8, 1998. On page 8, ¶13 B Mr. Miller states "Barney Adams issued an internal memorandum dated October 8, 1998 which stated: 'One thing that is hurting us badly is Costco. It was a problem before, but has greatly escalated in the last two weeks and will be very difficult in Q4 (Christmas).' 'We estimate a negative sales effect in Q4 of 20%-25%...'"

46.    First, the information about the gray market was already disclosed at least three times prior to this date, on June 9, 1998, on August 1, 1998 and on August 28, 1998. Certainly Adams Golf was aware that the gray marketing existed and this seemed to be an industry-wide issue. Mr. Miller seems to suggest the future "impact" of the problem should have been disclosed in the Prospectus. However, Mr. Adams' quote on page 8, ¶13.B demonstrates that the gray marketing had "... greatly escalated in the last two weeks...." Thus, this information does not appear to have been knowable at the time of the IPO.

47.    Moreover, this information was an internal document or otherwise a nonpublic
       document which discussed the gray market allegation, and not part of the total
       *public* mix of information. Mr. Miller states on page 7, ¶13 of his report that
       "There can be no question that the risk and impact of gray marketing were
       material to investors ...," however he fails to provide any indication about how the
       information impacted Adams Golf's stock price. In the financial economics
       academic literature there is no evidence to support the conclusion that private
       information or nonpublic information affects stock prices. This is further
       supported by the fact that Adams Golf's stock residual return is 3.7% on October
       8, 1998 and statistically insignificant. In case the internal memo was distributed
       after the close of trading, I also looked at the residual return on October 9, 1998,
       which was -2.1% and also statistically insignificant.

       **f)    A Set of Trading Days in the Aftermarket**

48.    Mr. Miller refers to a vague set of trading days in the aftermarket. He states that
       "Information concerning gray marketing which existed in the marketplace...
       included (at least) the following. ... Documents reflecting the underwriters' and
       their customers' trading activity in Adams stock throughout the aftermarket,
       implying that the underwriters' knowledge [of gray marketing] would have been
       reflected in the stock price."[12]

49.    Again, Mr. Miller fails to demonstrate that the information about gray marketing
       was new material information which had an impact on Adams Golf's stock price.
       Instead Mr. Miller chooses to make unsupported statements and ignores the facts

---

[12] Mr. Miller's report pages 9 and 10, ¶¶ 16 and 16 E

of this case. As I addressed in my previous report, the regression model estimation indicates that there are only three significant days during the class period at a 95% confidence interval: August, 12, 1998; September 1, 1998; and October 23, 1998. None of these days can be considered as curative disclosure dates since none of these dates contains new information directly linked to Plaintiffs' allegations about gray marketing.

g)    **October 22, 1998**

50.    Lastly, Mr. Miller addresses October 22, 1998.[13, 14]  On October 22, 1998 at 7:10 PM, Adams Golf issued a press release. As part of its press release Adams Golf announced that (1) it expected fourth quarter sales to be affected by weakness in the golf equipment market; (2) it anticipated fourth quarter sales to be further impacted by "the recent gray market distribution" of its products; and (3) it anticipated net income for the fourth quarter to be at or slightly above a break even level. In addition, analysts revised their fourth quarter consensus earnings estimates on October 23, 1998 from $0.11 per share to $0.05 per share. On October 23, 1998, Adams Golf's stock price declined significantly, rapidly incorporating the new unexpected information. On October 23, 1998 the price of

---

[13] Mr Miller also mentions October 19, 1998, the date on which the Company held a Special Meeting of the Board of Directors in advance of the October 22, 1998 press release. Mr Millers states that "[t]he minutes . show the major topic to have been the substantial negative effects of gray marketing " Again, this information was an internal document, and there is no evidence in financial economics academic literature that nonpublic information affects stock prices Moreover, Adams Golf's stock residual return on October 19, 1998 was 5.3% and statistically insignificant In case the meeting took place after the market closed, I also looked at Adams Golf's stock residual return on October 20, 1998, which was -0 4% and statistically insignificant

[14] Mr Miller also offers several disclosure dates after the end of the class period. However, because the alleged inflation had to have been cured by the end of the class period, I did not consider these disclosures to be relevant

Adams Golf's stock fell 16 2% or $0 75. The residual decline was -14 1% and statistically significant.

51. However, it is my opinion that this decline is *not* attributable to the gray market discussion in Adams Golf's press release. My analysis of the first gray market disclosure on June 9, 1998, as well as the additional public discussions on the subject in August of 1998, shows that gray marketing information was either immaterial, or had already been incorporated into the IPO offer price and was therefore not new.

52. In any event the risks associated with gray marketing were reflected in Adams Golf's stock price well before October 23, 1998. The statistically significant decline on October 23, 1998 must therefore be attributable instead to the other news that was added to the total mix of information at that time. In the October 22, 1998 press release, Adams Golf announced that it expected fourth quarter sales to be affected by weakness in the golf equipment market. The company also disclosed that it anticipated net income for the fourth quarter to be at or slightly above a break even level. Furthermore, analysts revised their fourth quarter consensus earnings estimates on October 23, 1998 from $0.11 per share to $0.05 per share. Unlike the gray marketing discussion, this information was both new and material to the market, which explains the statistically significant drop in Adams Golf's stock price on October 23, 1998.

IV. **Negative Causation**

53.    In this section, I will demonstrate that factors other than the alleged omissions of

gray marketing information caused the decline in value of Adams Golf's stock

price during the class period.

54     The decline in Adams Golf's stock price was caused by factors other than the

alleged omissions about gray marketing:  other new information disclosed in the

October 22, 1998 press release, general industry softness and Adams Golf's loss

of market share  My event study analysis shows that the information about gray

marketing was known before the IPO, and therefore was part of the total mix of

information.  In its press release issued after market close on October 22, 1998,

Adams Golf disclosed new information to the market, and mentioned again

information about gray marketing.  Given the prior disclosures regarding gray

marketing, the October 23, 1998 price decline must be attributable to the other

information disclosed in the press release.  In addition, during the class period

Adams Golf's stock price declined due to an industry-wide decline in demand and

new competitive products in Adam Golf's segment of the market.

a)    **The October 22, 1998 Press Release**

55     As discussed in the previous section, none of the disclosures before October 22,

1998, which Mr. Miller cites in his report, were statistically significant; therefore

none of them could be viewed as either new information or material information

that could have changed the total mix of information; therefore, none of these

disclosures can be linked to Plaintiffs' specific allegations about gray marketing

56.    The only statistically significant disclosure was the October 22, 1998 press release.[15] After the close of trading on October 22, 1998, Adams Golf announced operating results for the third quarter of 1998. In addition to several other pieces of information, the press release stated that the company anticipated its fourth quarter sales to be impacted by "the recent gray market distribution" of its products. On October 23, 1998 the price of Adams Golf's stock fell 16.2% or $0.75. The residual return was -14.1% and statistically significant.

57.    My previous report and my current analysis of materiality in the preceding section clearly demonstrate that the information about Adams Golf's gray marketing and the industry-wide issue with gray marketing were part of the total mix of information even before the IPO. From the first disclosure on June 9, 1998 as well as the additional public press on the subject in August of 1998, it has been shown that gray marketing information was either not material, or had already been embedded in the IPO offer price and was therefore not new.

58.    Therefore, I conclude that the statistically significant decline on October 23, 1998 must be attributable instead to the other news that was added to the total mix of information at that time. In the October 22, 1998 press release, Adams Golf announced that it expected fourth quarter sales to be affected by weakness in the golf equipment market. The company also disclosed that it anticipated net income for the fourth quarter to be at or slightly above a break even level. Furthermore, analysts revised their fourth quarter consensus earnings estimates on October 23, 1998 from $0.11 per share to $0.05 per share. Unlike the gray

---

[15] "Adams Golf Reports Third Quarter Operating Results," PR Newswire, 10/22/98, 7:10 PM

marketing discussion, this information was both new and material to the market, which explains the statistically significant drop in Adams Golf's stock price on October 23, 1998.

59. Further evidence that the significant stock price reaction was not related to the gray market allegation is the fact that the analysts did not emphasize the gray marketing issue in their reports when they revised their estimates and/or price targets for Adams Golf downward. Instead they pointed to other items in the press release. For example:

    a. Lehman Brothers stated on October 23, 1998: "Top-line growth was slowed by weakening end-demand for all golf equipment and intense competition in the fairway wood market (particularly in off-course stores)."

    b. Ferris Baker Watts stated on October 26, 1998: "We are lowering Q4:98 EPS to $0.02 from $0.09 based on increased marketing expenses, and 1999 to $0.85 from $0.88. . ."

    c. Ferris Baker Watts also stated the following on October 28, 1998: "With competition in the shallow-faced fairway woods market intensifying, and having the need [to] add additional clubs to what is basically a one-club arsenal, we believe Adams Q4:98 strategy of increasing marketing expenses to defend its market position... will continue in 1999. ... Despite the increased marketing efforts, we are lowering our expectation for domestic Tight Lies sales in 1999 to a 19% decline from an 11% decline due to stiff competition, the

anniversarying of this year's pipeline fill, and an ever-shortening maturity cycle of metalwoods in today's market."

d.    Lehman Brothers stated on November 6, 1998: "[W]e are lowering our 1999 EPS projections to $0.50/share from $0.88/share. Weak demand for all golf clubs, over-supply of merchandise in the retail channel, and increased competition have converged to weaken the near-term outlook for Adams. Higher marketing costs tied to the introduction of a driver and likely weaker sales of the company's Tight Lies fairway woods are the primary reasons for our earnings reduction."

b)    **Industry-wide Factors Affecting Adams Golf Stock's Price**

60    As discussed in my previous report, Adams Golf's stock price declined for reasons completely unrelated to the alleged omissions or misrepresentations in the Prospectus. During the class period, Adams Golf's stock price declined from an IPO offer price of $16.00 to a closing price of $3.875 on October 23, 1998. Exhibit 9 in my previous report lists some of the industry information released in the last half of 1998, describing the problems confronting the industry and general weakness in the market that impacted the results of several of Adams Golf's competitors.

61.    Mr. Miller mentions in his report that he has reviewed the Golf Datatech information, the daily index data on Bloomberg Golf Index, press releases and

analysts' reports on Adams Golf,[16] but he provides no mention of how this impacts his analysis. Mr. Miller fails to recognize that most of the decline in Adams Golf's stock price during the class period was due to 1) the general slowdown in the golf industry during the second half of 1998; and 2) the decline of Adams Golf's market share relative to Orlimar, one of its smaller competitors that was not publicly traded.

62. It is clear that all the competitors in the golf industry were facing a very competitive environment and a general slowdown in the golf industry. Adams Golf's stock price was still influenced by industry factors (see Exhibit 10 in my previous report). More specifically, it was strongly affected by Orlimar, one of its smaller competitors that was not publicly traded. Orlimar was Adams Golf's closest competitor in the fairway woods product segment, as it had introduced a club much like Adams Golf's Tight Lies in January 1998. Orlimar quickly began to take sales, or market share, away from Adams Golf. Exhibit 11 in my previous report illustrates the market share increase experienced by Orlimar, which coincided with a decline in Adams Golf's market share.

63. In my previous report, I have demonstrated the strong correlation between the decline in the relative market share of Adams Golf (relative market share of Adams Golf is Adams Golf market share divided by Orlimar market share) to the decline in Adams Golf's stock price (see Exhibit 12 and Exhibit 13 in my previous report).

---

[16] Mr Miller's report, page 6, ¶11

V.    Other Flaws in Mr. Miller's Report

64.    The analysis in the previous sections shows that Mr. Miller failed to demonstrate

the materiality of the gray market information and its impact on Adams Golf's

stock price during the class period.  In addition, I have shown that the price

decline in Adams Golf's stock from the IPO on July 10, 1998 until October 23,

1998 can be explained by factors other than Plaintiffs' allegations.  In this section,

I will address additional flaws and unscientific approaches taken by Mr. Miller,

and will demonstrate that his results are unreliable and lack any systematic

statistical and/or economic foundations.


a)    Market Reaction to New Material Information in Efficient Markets

65.    Mr. Miller states on pages 9-10, ¶16 "Information concerning gray marketing

which existed in the marketplace and was available to *at least some market*

*participants* included (at least) the following... At a minimum, the people who

would have known about this information [Adams Golf's club sales at Costco]

would have been Costco personnel and customers and the various Adams

distributors whom Costco directed to purchase the clubs.  It would be surprising if

there were not some significant overlap between these various parties and

investors in Adams Golf stock, as it is common practice with a niche company

such as Adams Golf, for its stockholders to be people with an interest in such a

market or company, such as avid golfers, distributors, retailers, suppliers, and

others with a likely knowledge of the company and the market.  Accordingly,

knowledge among Adams authorized dealers that widespread gray marketing was

occurring *may have represented important leakage* to the market for Adams'
stock." (emphasis added). He also says on page 11, ¶17 "The materiality of the
risks and extent of gray marketing is further demonstrated by price declines
following the IPO related to various partial disclosures of these matters, viewed
through appropriate disclosure event windows."

66.     Again, Mr. Miller makes general statements about the market for Adams Golf's
stock without any scientific evidence and ignores the facts of this case. First, Mr.
Miller's provides no economic or statistical support for his conjecture about
"leakage." In my previous report, I have established that Adams Golf's stock was
traded in an efficient market. In an efficient market, stock price changes will
result from new information concerning the company and its business, rather than
in an arbitrary manner without reference to new information that should affect the
stock's value.

67.     Thus, once new information (or unexpected news) about the company and its
business enters the public domain, this information remains part of the total mix
of information and is embedded in the stock price until new information arrives.
In the case of Adams Golf's stock, the market was efficient; therefore any
disclosures about gray marketing would be incorporated in the stock price when
this information entered the public domain. It would then remain embedded in
the stock price until any new information materially changed the total mix of
information, causing a statistically significant change in Adams Golf's stock
price. Adams Golf disclosed on June 9, 1998 information about sales at Costco,

and this information had become part of the total mix of information prior to the IPO and thereafter.

68.    Again, Mr. Miller's suggestion about "leakage" implies that information is incorporated in stock prices slowly over time. However, the speed of the reaction to new information is very rapid in an efficient market. As discussed in Brealey and Myers, "prices will adjust immediately to public information" in an efficient market.[17] Brealey and Myers cite a study by Patell and Wolfson of the market's reaction to the public announcement of companies' earnings and dividends, which shows that "the major part of the adjustment in price occurs within 5 to 10 minutes of the announcement."[18]

69.    Second, Mr. Miller makes claims about information regarding sales at Costco that various alleged "investors" (e.g., avid golfers, distributors, retailers, suppliers, Costco personnel and customers, etc.) had: "It would be surprising if there were not some significant overlap between these various parties and investors in Adams Golf stock". This statement is unfounded and unscientific; again, Mr. Miller does not provide any facts and/or analyses that support his claims that various parties that were involved in the sales at Costco were also investors in Adams Golf's stock.

70.    Moreover, if Mr. Miller were correct that those who knew about the gray marketing were Adams Golf's investors, then this information would be part of the total mix of information. This implies that there are no damages since it was

---

[17] Brealey and Myers, 7th Ed., p 351
[18] Brealey and Myers, 7th Ed., p 353, citing Patell and Wolfson, 1984, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13, 223-252

not new information. The event study presented in my previous report provides scientific evidence that there are no significant price reactions to any of the publicly available information about gray marketing, and also there are no other significant days during the class period that could be linked to other available information about gray marketing. Thus, this information was either not new or immaterial.

### b) Mr. Miller's Trading Model

71.    Mr. Miller makes further errors in using an assumed trading model to calculate aggregate damages. Such models have not been generally accepted or tested in the economics profession, and error rates for such models are not known. Even among those models, Mr. Miller's is particularly poorly conceived and implemented.

#### (i) A Trading Model is Unnecessary to Calculate Aggregate Damages

72.    Aggregate damages are based on two distinct analyses. The first concerns per-share damages, which are analyzed in the report above, and as I concluded there are no damages per share attributable to Plaintiffs' allegations associated with the gray marketing and sales practice risks because there are no material price declines that can be causally linked to these allegations. The second component of aggregate damages, however, is intrinsically tied to the particular trading behavior of individual Plaintiffs during the class period. Total damages for an individual Plaintiff are a function of the per-share damages on the particular dates

on which he or she traded. An accurate measurement of that Plaintiff's damages, if any, will depend on the particular timing and amount of trading during the class period.

73.    Mr. Miller calculates aggregate damages using an assumed trading model. Such models have not been generally accepted or tested in the economics profession and error rates for such models are not known. Total damages, including correct application of the PSLRA, can be calculated from the application to per-share damages of actual shareholder trading records gathered through proofs of claims, without resorting to Mr. Miller's unsupported computer trading model.

74.    Trading models attempt to simulate the trading behavior of individuals during the class period. There has been little systematic study of actual recoverable damages in securities class actions compared with estimates provided by computer models that are not based on individual Plaintiffs' trading records or proofs of claim. Extant studies rely on a limited sample of anecdotes. Nevertheless, every study of which I am aware demonstrates that any computer model that is not based on individual Plaintiffs' trading records and proofs of claim cannot accurately measure aggregate recoverable damages in a securities class action. While there is dispute concerning exactly how inaccurate such computer models are, and some dispute concerning the reasons for their inaccuracy, the evidence is clear that they are inaccurate.

75.   In *Kaufman v. Motorola*,[19] the Court held that a computer model that assumed all
      shareholders can be treated as trading with equal probability – the so called one-
      trader or proportional trading model – was inadmissible under Daubert standards.
      In *Fore Systems, Inc. Securities Litigation*,[20] the Court held that another computer
      trading model was inadmissible because the PSLRA mandated an individualized
      damages limitation for each Plaintiff that was not satisfied by the computer
      model's estimates.  Mr. Miller's computer trading model suffers from similar
      flaws.

###   (ii)    Flaws in Mr. Miller's Trading Model

76.   Setting aside the fact that a trading model is unnecessary, Mr. Miller's particular
      trading model has many flaws.  I discuss a number of them briefly.

      a)    It is widely recognized that Nasdaq's reported trading volume for common
            stocks is overstated.  Mr. Miller reduces the reported daily trading volume
            for Adams Golf by 30% to calculate actual daily trading volume.[21]
            Kleidon & Gould (1994)[22] found that reported Nasdaq trading volumes
            should be reduced by approximately 58%, on average, to estimate true
            trading volume.  This error causes Mr. Miller to overestimate all of his
            aggregate damages figures.

---

[19] *Richard Kaufman v. Motorola, Inc.*, United States District Court for the Northern District of Illinois, Eastern Division, No. 95 C 1069
[20] *Robert K. Bell v. Fore Systems, Inc.*, United States District Court for the Western District of Pennsylvania, Civil Action No. 97-1265
[21] Mr. Miller's report, Exhibit B, page 3
[22] John F. Gould & Allan W. Kleidon, Market Maker Activity on NASDAQ: Implications for Trading Volume, *Stanford Journal of Business and Finance*, Fall 1994.

b)   Mr. Miller's trading model relies on a calculation of the number of Adams

Golf shares that were available for trade during the class period ("the

float"). He overestimates the number of shares available for trade by

taking as his starting point the maximum number of shares issued as a

result of the IPO, including the 900,000 over-allotment shares held by the

underwriters, which were not all exercised on the first day of trading.

c)   Most trading models used in securities cases work with *daily* trading

volumes, which at least synchronizes with daily closing prices and daily

estimates of inflation. Mr. Miller's trading model, on the other hand,

groups trading days into aggregates he calls "model subperiods."[23] As

implemented, Mr. Miller's trading model is unable to predict *daily* trading

volumes or predict, for a share purchased on a particular *day*, what later

*day* is that share sold. Moreover, the choice of the number of subperiods

and the binning of a day into the prior or subsequent subperiods are

judgmental, subjective, and un-reproducible (ex ante).

d)   After Mr. Miller has estimated the float and daily trading volume and

collected trading days into model subperiods, he applies an assumed

"decline curve." Miller's decline curve is an estimate of a sequence of

trading probabilities for subsequent periods. The decline curve is an

arbitrary, unpublished and non-peer-reviewed methodology. I have no

reason to believe that (nor do I have any way of knowing whether) Miller's

---

[23] Mr. Miller's report, Exhibit B, page 4. He does say his decline curve is "based to some degree on PIBC's experience with stock trading in general as well as continual research and communications with market participants. " Mr. Miller's report, Exhibit B, page 3

assumed decline curve accurately predicts when Adams Golf shares
bought in model subperiod 1 would be sold in subsequent periods

e)    Mr. Miller does not explain how he estimates the decline curve. He does,
however, say that a key determination is "the float turnover rate, that is the
number or fraction of times the float turns over during the class period."[24]
"For Adams Golf, the class period adjusted volume was 28.18 million
shares; thus, the 6.9 million share float turned over about four times during
the class period."[25] As discussed above, however, Mr. Miller
overestimates actual trading volume and inaccurately estimates the float.
These errors likely mean that his float turnover rate is inaccurate.

f)    Not surprisingly, a simple assumed decline curve applied throughout the
class period does not accurately predict traded volumes. Sometimes Mr.
Miller's decline curve underestimates and sometimes it overestimates, in
the aggregate, subsequent trading volumes. Mr. Miller calls
overestimation "discrepancies" and then makes manual "revisions" to his
model, without any systematic method.[26] The need for adjustments is a
result of his predictive model failing to accurately predict subsequent
volumes. Unfortunately for the integrity of the trading model, the manual
"revisions" Mr. Miller makes are subjective and unscientific

---

[24] Mr. Miller's report, Exhibit B, page 3
[25] Mr. Miller's report, Exhibit B, page 4
[26] "The decline curve for certain model subperiods is then adjusted if necessary based on actual market
conditions, as follows: The model detects and flags discrepancies of sale allocations. It tracks the
allocations of purchased shares to subsequent selling subperiods to detect if more shares are being assigned
for sale in any given subperiod than were actually traded. When such discrepancies are flagged, the decline
curve is revised for the appropriate subperiod(s)." Mr. Miller's report, Exhibit B, page 4

## VI.    Conclusions

77.    In my opinion, Mr. Miller's report lacks scientific support and his damages analysis is flawed. Materiality, in financial economics, is determined by a scientific statistical analysis, and not by subjective judgment and a selective read of events. Mr. Miller's analysis fails to demonstrate that any of the alleged omissions about the gray market were materially new information. Moreover, an analysis of the dates Mr. Miller identifies as gray market disclosure dates demonstrates that the gray market disclosures after the IPO have no significant impact on Adams Golf's stock price (since it was already part of the total mix of information before the IPO). Mr. Miller's report presents no evidence for the materiality of Plaintiffs' specific allegations as he has no evidence of material price declines that can be directly linked to the disclosure of *new* information regarding Plaintiffs' *specific allegations*.

78.    In my opinion, there are no damages from the offering attributable to Plaintiffs' allegations associated with the gray marketing and sales practice risks because the gray marketing risks were disclosed prior to the IPO and there are no material price declines that can be causally linked to either of the allegations. I conclude that factors other than the alleged omissions of gray marketing and sales practice risks caused the decline in value of Adams Golf's stock price during the class period.

79.  I reserve the right to amend, revise and/or modify these opinions based upon
changes, clarifications, and additions to any reports and documents I have
reviewed and based on any new information provided to me or that may become
available in the future.

Christopher M. James

7/28/06

Date

# EXHIBIT
# 2

# EXHIBIT
# 2

# PHILADELPHIA INVESTMENT BANKING COMPANY

## ADAMS GOLF SECURITIES LITIGATION

## REBUTTAL EXPERT REPORT OF R. ALAN MILLER

P.O. BOX 209, ONE ALDWYN CENTER, VILLANOVA, PA 19085-0209
PHONE (610) 527-5346 / FAX (610) 527-1629 / email: pibc@pibc.net

## ADAMS GOLF SECURITIES LITIGATION

## REBUTTAL EXPERT REPORT OF R. ALAN MILLER

I.    INTRODUCTION

1.      I have been asked by counsel for the plaintiffs in this matter to review the reports of defendants' experts and for any opinions I have in rebuttal. My background and qualifications, compensation, and information reviewed have been provided in my initial expert report dated July 12, 2006. In addition, I have reviewed the expert reports of Messrs. James, Sjoquist, Lynch, Grace and Necarsulmer. The reports which address the areas of my anticipated testimony are those of Messrs. James and Necarsulmer.

II.    ANALYSIS AND OPINIONS—EXPERT REPORT OF CHRISTOPHER M. JAMES

2.      To determine whether defendants have met their burden and established any negative loss causation, I reviewed the expert report of Christopher M. James. A review of Mr. James' resume indicates considerable academic background, but no background, experience, or qualifications in the fields of investment banking, investment research, brokerage or any other discipline related to actual, real world participation and valuation of securities in connection with investor transactions involving real money.

3.      There can be no question that the gray marketing issue was material to investors or potential investors in Adams Golf. I have presented the basis for this opinion in my report previously submitted in this matter. Mr. James does not demonstrate that gray marketing was not material to the investment community.

4.      Considering the importance attached to gray marketing by Adams Golf, and its obviously significant impact on margins and earnings, it is clear that the IPO offering price

1

would have been substantially lowered if this information had been properly disclosed in the prospectus.

5.      In my opinion, Mr. James does not establish or show negative loss causation with respect to the gray marketing issue. He does not show why Adams' stock price declined at any particular times during the Class Period or thereafter and does not examine, or refute, repeated partial disclosures concerning gray marketing, which can be associated with and very likely caused stock price declines. Mr. James presents and defends the use of an "event study" methodology to perform his analysis, but in fact does not identify many relevant specific event dates and examine related stock price movements. Instead, he attempts to relate stale information (time-lagged market share growth for Orlimar, an Adams competitor) to a long-term Adams stock price decline, without identifying any specific release date for the Orlimar information, even though he claims an efficient market would suggest a one-day price response to new material information. In this examination the Orlimar market share data is lagged by two months and the Adams' stock price used is month-end. There is no reason to believe these dates would be related in time or in investors' consideration and Mr. James presents no such reason. So the conditions he claims are necessary for a valid event study—a clear, identifiable discrete one-time disclosure of new information and a clearly associated statistically significant stock price movement—are absent from his analysis. Equally vague and meaningless is Mr. James' use of a "regression" using monthly golf industry data for a time period which extends well past the Class Period, and well past the period of significant Adams stock price decline. To attempt to "explain" that decline, Mr. James also ignores the price action of Callaway Golf, Adams' only comparable stock as identified by defendant Lehman Brothers analyst in its detailed report of August 28, 1998. In fact, Mr. James uses as a comparative or "control"

2

index in his "analyses" the NASDAQ Index, which is dominated by high technology companies and which does not even contain the stock of Callaway which is traded on the New York Stock Exchange. See Exhibit A, which displays the stock prices of the various publicly traded golf equipment manufacturers, including the contrasting stock price movements of Callaway and Adams. See also Exhibit B, which presents data on several publicly traded golf stocks as well as associated events—news releases, articles, analyst reports, etc. Clearly the stocks of these companies do not move in tandem on a daily (or any other periodic) basis. Mr. James has not established that Adams Golf's stock price moved, consistently or at all, in response to any particular industry or other indicator. Further, Mr. James fails to establish that company-specific factors that moved Adams Golf stock price were other than gray marketing. See paragraph 22 hereafter.

6.      In his paragraphs 6, and 25 through 30, Mr. James references the Adams Golf press release issued on June 9, 1998 to support a claim that the underwriters knew about the existence and risks of gray marketing at Adams and incorporated that information into the IPO price. He quotes the June 9 press release that:

> The Bill of Discovery was filed in order to determine whether Costco's claims that they had properly acquired Adams' Tight Lies® fairway woods for resale were accurate. Adams Golf became concerned when it learned that Costco was selling their Tight Lies® fairway woods because Costco is not an authorized distributor.

Mr. James also cites Callaway's 1997 10K discussion of gray marketing as well as a May 18, 1998 press release by "Fortune Brands, another golf industry peer" to support his claim of underwriter knowledge of gray marketing and therefore its incorporation into the IPO price. What he omits is any indication of pre-IPO knowledge on the part of prospective buyers of

3

Adams stock of the impact and risk of gray marketing at Adams. That is, Mr. James omits

from his quote the last part of the Adams June 9, 1998 press release which states: "'We are

committed to our program of partnership with our retail accounts,' stated Barney Adams,

Chief Executive Officer of Adams Golf. 'We are prepared to take every legal action required

to ensure that our valuable relationship with our retailers is maintained and remains fully

intact,' Adams added." Thus, accompanying Adams' statement of "concern" was the

statement that Adams Golf was attempting to determine whether it should be concerned, and

the statement that Adams was committed to maintaining the integrity of its marketing strategy.

This did not constitute disclosure of what plaintiffs allege was omitted regarding the material

risk of gray marketing, the fact that it was already occurring, and its impact on Adams. Mr.

James concedes that stock prices are based on the total mix of information in the market at any

time regarding a security. A critically important piece of information for an IPO company is

the prospectus, as the investment community understands that it is required to be complete and

not misleading, particularly with respect to known risks. The undisclosed material risk and

impact of gray marketing to Adams continued with the silence of the prospectus when Adams

knew gray marketing was already a fact.

7.    In his paragraph 30, Mr. James says:

> Moreover, had the underwriters *not* known about the gray
> marketing or failed to incorporate this information into the offer
> price, thereby arguably overpricing the offering, the market
> would have responded to the June 9, 1998 press release as shares
> began trading in the secondary market on July 10, 1998. If a loss
> had occurred on the first day of trading, it could potentially be
> attributed to the curative disclosure on June 9 and result in
> damages. However, Adams Golf's stock price rose $2.375 from
> $16.00 to close at $18.375 on the first day of trading. Since the
> stock price did not decline on July 10, 1998, I conclude that the
> information provided by the first disclosure of gray marketing

4

> was either already embedded in the offer price or otherwise not
> material. Thus no damages resulted from the alleged omissions
> or misrepresentations of the gray marketing from the Prospectus.

This reasoning and conclusion is faulty, misleading as to how the markets operate, and incorrect. Mr. James speaks as though the June 9, 1998 press release constituted complete disclosure of the information plaintiffs allege was omitted from the prospectus, and that no other information regarding Adams existed before the IPO. When the June 9, 1998 press release was published, there was no public market for Adams stock and no reason for market participants to pay much attention to the release. Also, as discussed heretofore, the complete contents of the press release would have been considered by market participants, as would all other relevant information regarding Adams, including, far more important than the press release, the prospectus. The absence of a risk factor regarding gray marketing in the prospectus was much closer in time to the IPO and would have reached a much wider audience of prospective investors more directly than the press release. Indeed, the absence of any reference to Costco or gray marketing in the prospectus a month following the June 9 press release would be interpreted as meaning that any potential problem that may have existed in June had been resolved by July. To suggest that the fact that the Adams stock price increased the first day of trading means that the partial contents of the press release of one month earlier (when there was no public market for Adams' stock) cited by Mr. James was already in the price (and implicitly "curative" of plaintiffs alleged omissions) or "otherwise not material" is completely incorrect, without basis, and makes no sense. In fact, the price increased about 16% on the first trading day—about the amount underwriters usually try to achieve for IPOs.

8.     Mr. James cites in his footnote 13 to a letter to the SEC from Company attorney Joseph Hoffman as evidence of immateriality of the gray market issue. That is, the Hoffman

5

letter claimed in substance that Company counsel and underwriters' counsel had reviewed the
publicity leading up to and after the filing of the registration statement and both believed that
Mr. Adams' public statements (in pre-IPO statements) squared with and were adequately
addressed in the prospectus. But that prospectus contained no risk factor whatsoever regarding
gray marketing. The last page of the draft Hoffman letter (apparently not sent to the SEC),
which describes the bill of discovery matter against Costco, concluded: "The Company does
not believe that this proceeding is material" (not that gray marketing was immaterial). The
absence from the prospectus of a disclosure concerning gray marketing risk and impact
confirmed to potential investors the absence of a material problem. As noted herein, however,
this problem was highly material.

      9.     In his paragraphs 6 c and d, Mr. James cites three instances in which gray
marketing involving Adams was to some extent publicly discussed during the Class Period:

> The first was a *Golf Pro* article published on Saturday, August 1,
> 1998. On the Monday following the *Golf Pro* article, there was
> no statistically significant price reaction.

There is no reason to believe that the *Golf Pro* magazine actually reached the market on August
1. In fact, inquiries have shown, and the text itself strongly suggests, that it may well have
been distributed in the middle of July. This is consistent with the practice at many magazines
in which cover dates are considerably later than the actual distribution dates. It also very
likely arrived at recipients by mail over at least a several day or longer period. If the
information in *Golf Pro* in fact reached the market approximately in the middle of July, it
might very well explain the significant decline in Adams Golf's stock price which occurred at
that time and thereafter. Also, the entire contents of the article would be absorbed by the

market. The gray market discussion represented only the 35th and 36th paragraphs of 37

paragraphs in the article.

The next discussion Mr. James cites is a Lehman Brothers analyst report dated August

28, 1998, in which the Lehman Brothers analyst expressed a concern about Tight Lies®

appearing in Costco wholesale stores with increasing regularity. What is missing again, from

Mr. James's report, is the context; this item appeared on page 27 of a 28-page analyst report,

as virtually the only cautionary note in the entire report. In fact, the vast bulk of the Lehman

report, which contained a "buy" recommendation, was overwhelmingly positive with respect

to Adams Golf and its prospects, therefore diluting the impact of this gray market

"disclosure". Notwithstanding that positive content, Adams' stock price declined 5% on the

28th and 16% on the 31st, the next trading day.

Mr. James concludes (paragraph 6c):

> Post-IPO disclosures regarding the gray market did not result in
> statistically significant price movement and therefore this alleged
> omission was previously known to the market or not material . . .
> The lack of a significant price reaction on these dates (August 1
> and 28, 1998) together with the announcement of gray marketing
> before the IPO imply that there is no evidence that a discussion of
> gray marketing risk in the Prospectus would have had an impact
> in the pricing of Adams Golf's IPO. In my opinion there are no
> damages associated with these alleged misrepresentations and
> omissions.

Mr. James is assuming (or opining?) that the *Golf Pro* article and the August 28 analyst

report represent full, clear, timely, and undiluted "disclosure" of what plaintiffs allege was

omitted from the prospectus—disclosure of the risk, existence, extent and impact of gray

marketing. Clearly they do not, as they are partial, "seeping" comments by non-Company

sources which are in no way equivalent to a proper company disclosure in an SEC-filed

prospectus. Nonetheless, the Adams stock price declined throughout the second half of July when *Golf Pro* was likely out, and as Costco sales of Tight Lies® peaked, and especially on August 28th and 31st.

10.    The final "disclosure" mentioned by Mr. James was the October 22, 1998 press release which discussed gray marketing as having a significant impact on expected margins in the short term at that time.

Mr. James writes in his paragraph 6d:

> The only disclosure related to the gray market that is associated with a statistically significant negative decline was the October 22, 1998 press release, which was made after the close of trading. The price decline on October 23, 1998 was statistically significant, but was due to other information released. In the October 22, 1998 press release, Adams Golf announced operating results for the third quarter of 1998. As part of its press release Adams Golf announced that it expected fourth quarter sales to be affected by weakness in the golf equipment market; it anticipated sales to be impacted by "the recent gray market distribution" of its products; and it anticipated net income for the fourth quarter to be at or slightly above a break even level. In addition, analysts revised their fourth quarter consensus earnings estimates on October 23, 1998 from $0.11 per share to $0.05 per share. On October 23, 1998 the price of Adams Golf's stock price fell 16.2% or $0.75. Given that (a) the market was aware of the gray market problem before October 22, 1998; (b) the announcement contained new information regarding market conditions and future performance; and (c) analysts revised their consensus earnings estimates, the price decline on October 23, 1998 was not in my opinion due to a disclosure of the risk of gray market sales in Adams Golf's products.

Although it appears that the market, or at least certain participants, was likely aware of a gray market problem before October 22, 1998, this appears to have been the first Company press release admitting the existence of a major impact of gray marketing. Mr. James attributing the related stock price decline to other factors (market factors, future performance,

8

revisions in analysts' earnings estimates) however ignores that future performance and earnings are substantially affected by gray marketing. See the contents of Barney Adams' October memo (Ex. 80) in which he complains of a negative impact on fourth quarter sales of 20-25% due to Costco. And in this instance Mr. James suggests that other factors in a multi-factor communication do affect the stock price, even though he did not consider the effect of other factors in opining that, since the 35th and 36th paragraphs of 37 (*Golf Pro*) or the 27th page of 28 (Lehman Brothers August 28, 1998 analyst report) did not (according to James) cause a stock price move, that information was therefore already known or not material. This inconsistent approach demonstrates the complete lack of basis for Mr. James' opinions.

Mr. James attempts to minimize the content of the October 22, 1998 announcement with respect to gray marketing by only reporting a portion of the quote in his report. An examination of the entire quote shows the obvious significance of the gray marketing disclosure:

> "We are pleased with our third quarter results, especially considering the general softening we have seen in the golf equipment market," stated Barney Adams, Chairman, CEO and President of Adams Golf.
>
> Commenting on the Company's outlook for the fourth quarter, Mr. Adams stated, "At this time, we expect our fourth quarter sales will be affected by continuing weakness in the golf equipment market. In addition, we anticipate our sales will be further impacted by the recent gray market distribution of our products to a membership warehouse club. While we are working diligently to identify and stop the unauthorized distribution of our products to this retailer, we anticipate this process will take at least through the end of the year. As a result of these market conditions, we anticipate that our net income for the fourth quarter will be at or slightly above a break even level. We remain optimistic, however, about our ability to increase our sales and earnings in 1999 through the introduction of new products and the continued expansion of our marketing efforts both domestically and internationally." [emphasis added]

9

Further Mr. Adams stated, "In response to current market conditions, we have recently rolled out a new marketing campaign offering a high quality golf bag free to consumers who purchase any two Tight Lies® fairway woods. Based on preliminary reaction from our retailers, we believe this promotion will help stimulate sales and reduce the gray market distribution as the free bag is available only to customers who purchase Tight Lies® clubs through authorized Adams Golf retailers. In addition, we will begin doing a new Tight Lies® infomercial within the next week which focuses on the expanded line of Tight Lies® products and highlights the benefits of the Tight Lies® fairway wood over clubs currently offered by our competitors. Meanwhile, we are continuing our research and development efforts and the new driver remains on track for introduction in the first quarter of the new year," concluded Barney Adams. [emphasis added]

Note that on October 23, 1998 Adams stock declined over 16%.

Mr. James concludes this section by stating that none of the October 23, 1998 decline is attributable to the disclosure of the gray market because that information was already reflected in the pre-disclosure price. However, he has not demonstrated that, except to claim, without support, that the June 9 press release constituted such "disclosure" and that gray marketing was known to be an industry problem as it was referenced in a Callaway 10-K and a Fortune Brands press release. However, these "disclosures" are not clear, unambiguous statements of the risk, existence and impact of gray marketing on Adams, and were nullified by the silence of the prospectus, as explained above. In addition, the October 22 release provided new information regarding a) the expected impact of the gray market on fourth quarter results, and b) the need to combat gray marketing by instituting a significant new marketing campaign (free golf bags).

11.    In his paragraph 6g, Mr. James concludes "Thus there is no evidence of a curative disclosure pertaining to the allegations in the Complaint leading to significant decline

10

in Adams Golf's stock price during the class period". However, he does not attempt to

evaluate the effect of the extensive purchases and sales of Adams clubs by Costco and the

widespread appearance of Adams clubs in Costco along with the likely effect on Adams stock

price. The Nations Bank analyst noted in his August 4, 1998 report (page 2):

> In addition, Callaway shares were often volatile in response to
> concerns such as "I saw a Big Bertha in Costco" or "some
> retailer offered a Big Bertha at $10 below an earlier price" that
> proved to be irrelevant. We expect Adams stock to also be
> volatile.

Nor does Mr. James consider the knowledge of Adams distribution and sales people; Costco

purchasing, distribution and sales personnel or affiliates; and readers of *Golf Pro* magazine and

their customers and contacts—which very likely constituted some significant portion of the

golfing community.

      12.    In his description of methodology, Mr. James then says that he will analyze the

factors that were affecting Adams Golf's stock price; and examine directly the public

announcements Adams Golf made about the unauthorized distribution of its golf clubs. By so

limiting his examination, he completely excludes the highly likely possibility that information

about gray marketing of Adams' clubs reached the marketplace from sources other than Adams

Golf's public announcements, such as from rumors, employee "leaks", and information

possessed or disseminated by participants in the gray marketing process itself.

      13.    In his section V, Mr. James concludes that there were no damages from the

omission of the gray market information from the prospectus because the stock price did not

decline on July 10, 1998, and in an efficient market, all publicly available information would

be reflected in the stock price. Therefore, he says, if there was information in the market

about gray marketing (from the June 9, 1998 press release discussed heretofore), it would have

11

caused the price to decline on July 10. This reflects a strange, incorrect view of how the market actually works to price IPOs and trade the securities in the after market. The concept that market participants would "sit on" information released into a market in which the stock was not trading and then wait for an IPO to occur, then sell or short the stock based on information not disclosed in a prospectus, and ignore all other information, is simply not realistic. The most significant piece of information affecting that market would be the registration statement and prospectus, which market participants believe is required to contain all material information relevant to the issuer. The fact that there was no risk factor for gray marketing, nor a discussion of the actual extent and impact of gray marketing, would inform the market that there was not such a risk at that time, even if conceivably there might have been one at the time of the June 9 press release. Accordingly, it is unreasonable to assume that after the IPO prospectus became available the stock price would decline before any new negative information (such as regarding gray marketing) became available to the market.

14.    Beginning in his paragraph 51, Mr. James then describes the "event study" methodology he purportedly used to deconstruct stock price movements and identify their causes. He reports that he found the NASDAQ Index explained 17.6% of Adams Golf's daily stock price returns and that a "modified Bloomberg Golf Index" explained 12.9% of the daily stock price movements. In fact, the terminology is incorrect; neither index explains these movements, they simply correlate or are associated to that degree with them by James's examination. Most statistics textbooks contain a caution to the effect that "association is not causation". In regression analysis, the data being studied is often labeled the "dependent variable" and the data regressed against is the "independent variable". This is a convention

12

but implies nothing about the actual causal relationship which may or may not exist between the data.

Further, the fact that Adams was an IPO causes a further problem for Mr. James's use of the term "explain". That is, in a properly conducted regression analysis, the relationship between a dependent variable and an independent variable is established by studying their relative movements during a "base period", often the one year period prior to the study period, which is usually a period in which the subject stock price is arguably unaffected by fraud. The resulting formula of the relationship between the variables is then applied to the study period and the predicted dependent variable is generated. The actual dependent variable (stock price) is then compared with the predicted and the difference is termed a "residual". The size of the residual is measured for statistical significance. Since there was (by definition in an IPO) no unaffected period of time for Adams Golf's stock to have traded prior to the IPO and prior to the class period, no such base period examination could occur. Thus, Mr. James's regression analysis/event study is only a measure of contemporaneous association or correlation, not a measurement of prediction, deviation therefrom and "explanation".

The common sense of this can be seen in that the NASDAQ Index is dominated by high technology companies and the Golf Index is assumedly comprised of companies in the golf industry. The fact that the NASDAQ Index correlates more closely to Adams Golf stock price than a golf index does not make common sense and is simply a statistical result of data correlation during a particular short time period. Note that Adams used the S&P Small Cap Index and peer group comparables in its proxy statements as the most comparable data, not the NASDAQ Index.

13

Mr. James says in footnote 20 "I examined the days where the residual stock price returns were statistically significant at the 95% level. A 95% confidence interval is the standard level used in event studies". First, the 95% level is often used; the 90% level is also often used. There is no particularly compelling reason why one is significantly more meaningful than the other in the context of stock price changes. An examination of Mr. James' exhibits shows that on many days, price movements in the study period came very close to reaching his statistically significant threshold line, but appeared to be unexamined by Mr. James. Second, it must be remembered that these confidence levels relate to a model which, in this case, correlates or associates with (not causes) only 17.6%, at best, of Adams Golf's movements. The meaning of this is that one is, say, 95% confident of the non-random statistical significance of an event measured against a model that is only 17.6% "explanatory" in the first place; 82.4% of the stock price movement remains unexplained by the chosen index, regardless of how confident one is. Third, the "total mix of information" phrase is meaningful here, as, for example in the August 1998 Lehman Brothers report, which recommended the purchase of the stock, much positive commentary is presented along with the gray marketing disclosure; it is the total amount of information in that report that would affect the stock price, not simply one sentence out of many, and although one would expect a strong positive purchase recommendation by the lead analyst and underwriter to raise a stock price, the price declined substantially after this report. Finally, the announcements or events that are examined in event studies are typically those shown on a printout and/or which are obtainable from electronic data retrieval services often years after the "events" being studied occurred. What is often not shown on such event studies is information from all possible sources that may have reached the market, especially oral information transmitted among members of a

14

particular community such as golfers, brokerage customers, retailers, gray market participants, etc. And the dates and times of the content of that information reaching the market may well not be those shown on the face of a later printout as can be seen in the *Golf Pro* magazine example. "Event windows", or the time period over which events occur and stock prices are measured, can therefore be of different lengths than one day, and very often are. This is especially true when the "event" occurs in multiple places at multiple times, such as reading or discussing *Golf Pro* magazine, spotting Adams clubs at Costco, etc. These shortcomings pervade Mr. James's analysis and render its results meaningless.

If the 90% confidence level were used as the threshold, or if a two-or-more-day event window were used, then a number of additional Adams Golf stock price declines during the Class Period could well become statistically significant even using such a nonintuitive, questionable index as the NASDAQ. It is particularly appropriate for event windows to consist of more than one day where the partial disclosure occurs through such means as rumor, magazine distribution occurring over several days, or "anecdotal" observations (such as market participants observing Tight Lies® in Costco). Longer event windows are also appropriate when the impact of the information on the company is complex.[1]

15.    Mr. James concludes, based on his "event study" methodology (which only studied certain selected "events") that no damages resulted from the omissions regarding gray marketing. Of course, he does not address whether damages could be observed based on any

---

[1] See "Event Studies And The Importance Of Longer-Term Measures In Assessing the Performance Of Complex Events" by Jeffrey S. Harrison of the Robins School of Business, University of Richmond; Derek Oler of the Kelley School of Business, Indiana University; and Matthew R. Allen of the School of Industrial and Labor Relations, Cornell University; dated February 11, 2005, which summarizes, on page 5: "Put another way, the full ramifications of a complex event may take longer to be compounded into stock prices because market participants may take longer to process complex information."

other methodology, including a fundamental analysis that the stock price in the offering would be lower if the risk, extent and impact of gray marketing were disclosed and considered at that time in evaluating Adams Golf. That is, such a factor would cause projected sales, margins, and earnings to be lowered and should therefore result in a lower share price in the offering.

16. In his Section VIII, Mr. James attempts to attribute the decline in Adams Golf stock price to "other factors" such as "problems confronting the industry and general weakness in the market that impacted the results of several of Adams Golf's competitors". He then cites seven analyst reports and a newspaper article (from Knight-Ridder Tribune Business News: The Sun News, Myrtle Beach, SC). But while earlier in his report he said such news items had to have a measurable, statistically significant effect on the subject company stock price to cause damages, in this section he has abandoned that requirement, yet conclusorily states they constitute causation. He does not cite the August 4, 1998 Nations Bank analyst report which specifically likens Adams' stock price volatility to that of Callaway's stock price reaction to gray marketing after its IPO.

17. In his paragraph 67, Mr. James discusses having performed an analysis regressing Adams Golf's stock price on the industry stock index on a monthly basis over the original longer proposed class period and "found that it was statistically significant and explained 38.9% of the stock price decline". Despite his attempt to explain why a regression using monthly data points is useful, it is clear that this analysis is meaningless, as the great bulk of the decline in Adams stock price occurred within several weeks after the IPO, not stretching out over a period of more than a year. In fact, such an analysis using scant data stretched over an irrelevant time period would provide a misleading result. Nonetheless, the analysis, according to James, "explained" only 38.9% of the stock price decline. What

16

"explained" the other 61%? Again, association does not constitute causation. That using

monthly data points for a stock price-reaction analysis is wrong, meaningless and misleading

can be seen by considering two hypothetical stocks which both start a month at $10 and end at

$5. The first declines from $10 to $5 on day one, the second stays at $10 and declines to $5

on day 28. Clearly they were not affected by the same pricing factors in a market which

typically reacts to news in one day, as Mr. James says Adams does, or even in several days.

18.     In his paragraph 68, Mr. James says:

> Although an industry index was ultimately not used in my event
> study model of daily stock price returns, Adams Golf's stock
> price was still influenced by industry factors.

He segues into a discussion of Orlimar, an Adams competitor, and product market share. The

quote shown here, however, certainly undermines the validity of his "event study" regression

comparison with the NASDAQ index.

19.     Mr. James's thesis in his paragraph 69 is that as Orlimar's market share grew,

Adams' market share declined and that this explains a significant portion of the decline in

Adams Golf's share price. Although Mr. James juxtaposes the data in such a way to appear

facially attractive, any analysis that goes beyond this surface level shows this association to be

meaningless at best.

A.     His thesis presumes (but does not state the presumption) that there is a

fixed number of golf clubs that will be sold as between Orlimar and Adams together, and that

therefore the market share of the two companies is a zero sum proposition. In fact, the

Lehman Brothers analyst report referenced earlier identifies the only true competitor to Adams

Golf as Callaway Golf. There appears to be ample purchasing capacity in the golf club market

to allow for more than one successful company. More important, Adams Golf's share price

17

would be determined as the present value of its expected future earnings/cash flows, and at the time that Adams' share price was declining rapidly shortly after the IPO, there was no disappointing financial information in the market about Adams. Even if Orlimar's club sales were growing faster than Adams' at that time, Adams was still being favorably commented upon by analysts. When future financial performance was announced to be disappointing on October 22, it was due at least significantly to the impact of gray marketing.

      B.     Mr. James lags the market share data by one and two months (to allow for market participants to learn of it) to compare it to Adams' share price. He reports no basis on which to believe that the market share data was available to the public a) at any time, b) if so, when, or c) at a lag of one to two months or any other period. One cannot determine its statistical significance, either, without being able to identify a disclosure date.

      C.     Furthermore, the availability and competitiveness of the Orlimar club was known prior to the Adams IPO. According to Mr. James's thesis, the information would therefore already be reflected in Adams' stock price, and would not cause further decline.

      D.     The use of monthly stock price data to analyze causation in the sense of price declines is novel and without basis, and because of the stock price chart of Adams showing the significant decline occurring within a short period after the IPO, is meaningless in this matter as well.

      E.     Although Mr. James presents the data on a graph which has two different scales presenting the stock price data and the market share data in such a fashion to make them appear related, there is no apparent relationship between them, without substantial financial analysis which is not presented by Mr. James. The effect may appear attractive from defendants' standpoint but is misleading and meaningless.

18

F.       It appears that Orlimar sales increased at least to some degree because some of Adams authorized retailers were attracted by Orlimar's higher margins as Adams' margins contracted due to gray marketing.

G.       The same or similar correlations could be shown between other data which happen to occur at approximately that time. It would not surprise me if the sales of baseball equipment also correlated strongly with Adams' stock price decline, given their seasonality. Sales of swimwear might well do the same. Each is as relevant and "comparable" as Mr. James's data.

20.     In his paragraph 70, Mr. James says that "39% of Adams Golf's price decline was attributable to the problem in the industry and at least 60% of the stock price decline was related to Adams Golf's loss of market share". He observes these figures are not additive. But his analyses are extremely flawed and inconsistent with his own professed methodology.

21.     In his paragraph 71, Mr. James says:

> Factors other than Plaintiffs' allegations—general industry decline and loss of market share—contributed to most of the decline in Adams Golf's stock price. These findings reinforce my conclusion that no losses can be attributed to the alleged omissions of gray marketing from the Prospectus.

And in paragraph 72:

> In my opinion, there are no damages from the offering attributable to Plaintiffs' allegations associated with the gray marketing and sales practice risks because there are no material price declines that can be causally linked to these allegations.

However, there are no material price declines causally linked by Mr. James to causes other than gray marketing, including his two selections—industry factors and market share. Mr. James has not demonstrated negative loss causation.

19

22.     In fact, information concerning gray marketing which existed in the marketplace and was available to various parties included the following.

A.     Costco national purchase orders, indicating Adams authorized dealers' purchases of Adams clubs at the behest of Costco, which were issued for the following quantities of clubs as follows.

| Date of P.O. | # of Clubs | Adams Stock Price Decline |
|---|---|---|
| 7/21 & 22/98 | 3,111 | 27% |
| 7/29/98 | 500 | 13% |
| 8/19/98 | 2,918 | 14% |
| 9/10/98 | 250 | 21% |

The stock price decline is measured from two days before the purchase order dates to two days after to allow for gradual leakage of the information. At a minimum, the people who would have known about this information would have been Costco personnel and/or affiliates and the various Adams distributors whom Costco directed to purchase the clubs. It would be very surprising if there were not some significant overlap between these various parties and investors in Adams Golf stock, as it is common practice with a niche company such as Adams Golf, for its stockholders to be people with an interest in such a market or company, such as avid golfers, distributors, retailers, suppliers, and others with a likely knowledge of the company and the market. Accordingly, knowledge among Adams authorized dealers that widespread gray marketing was occurring may have represented important leakage to the market for Adams' stock.

B.     The knowledge of gray marketing possessed by the sales and marketing personnel at Adams who were involved in dealing with the gray market issues.

C.    The significant sales of Adams clubs at Costco, as discussed in the Ochoa report. In the four week period beginning immediately prior to the IPO, Costco sales of Tight Lies® reached their highest level ever.

D.    A Callaway release dated July 23, 1998 mentioned that most of its major competitors were discounting their clubs.

E.    The *Golf Pro* article, which may have been available beginning approximately in the middle of July and discussed gray market concerns. If, as often occurs with magazines, this arrived at subscribers and recipients over a period of days to weeks, it corresponds closely in time with the Adams stock price decline. Adams' stock price declined substantially during mid and late July.

F.    A Lehman Brothers memo dated July 29, 1998 discussing expected investor questions indicates market participants' concern about this issue.

G.    The Lehman Brothers August 28, 1998 analyst report referenced information (including gray marketing) obtained from a pro shop survey extending back several months.

H.    Trading records show that Lehman and its clients were trading Adams stock throughout the Class Period; Lehman's knowledge can be inferred to have had at least some effect on this trading.

I.    Testimony of industry personnel indicates a knowledge of the existence of gray marketing.

J.    The Nations Bank analyst report of August 4 attributes stock price volatility to gray marketing.

21

Mr. James has failed to analyze properly movements during these critical periods when information regarding gray marketing was reaching market participants. He failed to establish that stock price movements set forth above were not caused by gray marketing partial disclosures.

## III.    REPORT OF EDWARD NECARSULMER, III

23.    In his report, Mr. Necarsulmer outlines the responsibilities of an underwriter to conduct a reasonable and adequate due diligence investigation in connection with a public offering of securities—however, he does so in a very general way. That is, he notes that an underwriter must obtain information, conduct meetings, review drafts, interview company personnel, etc. in the conduct of its work. He opines that the underwriters in Adams Golf did follow the general steps and procedures he identifies and that therefore their due diligence investigation was reasonable and adequate. However, he provides no detail nor identifies any specific information about Adams Golf's IPO which correlates with the categories of information he says need to be investigated, nor how that information was then disclosed in the Prospectus. No specific fact or set of facts addressing the primary issues complained of in this matter is presented. Nowhere does Mr. Necarsulmer discuss the critically important need for an underwriter to obtain independent verification of the information presented by the issuer. There is no reference to any such investigation, analysis, or meaningful discussions with major distributors, Costco, outside experts, nor any review of Adams' correspondence concerning gray marketing. There is no evidence presented on which the underwriters relied to conclude that the existence, risk or impact of gray marketing was immaterial.

24.    In fact, it appears that at some point during the Prospectus drafting process, underwriter personnel did become aware that clubs were appearing (or may have been) in

22

Costco, as one underwriter employee visited a local Costco to investigate. Therefore, Necarsulmer's conclusory opinions, unsupported by any specific factual description, remain particularly meaningless as either a) having asserted that they followed the correct procedures, the underwriters failed to discover the importance of material information which was omitted from the prospectus, or b) regardless of whether the correct procedures were followed, they did discover such information and failed to ensure that it was published in the Prospectus.

25.    My understanding is that if a prospectus is found to contain material omissions and/or misrepresentations, the underwriters, in order to escape liability, must demonstrate at a minimum that they performed a reasonable, adequate due diligence investigation and thereafter had reasonable grounds to believe, and did believe, that the prospectus was not misleading. In my opinion, the expert report of Mr. Necarsulmer does not meet the underwriters' burden to demonstrate that the investigation and/or resulting disclosures were reasonable and adequate.

26.    The following exhibits are attached hereto:

| | |
|---|---|
| Exhibit A | Stock Prices of Adams Golf Inc. vs. Comparables 7/9/98 to 12/31/99 |
| Exhibit B | Data on publicly traded golf stocks and associated news releases, articles and analyst reports |

_7|27|06_

Date

_R. Alan Miller_

R. Alan Miller, President
Philadelphia Investment Banking Company