Operating income increased to $8.9 million for the three months ended March 31, 1998 from $65,000 for the comparable period of 1997 due to increased sales Total operating expenses increased to $9 8 million for the three months ended March 31, 1998 from $0.8 million for the comparable period of 1997, principally as a result of increased selling and advertising costs related to the promotion of the Tight Lies fairway woods and increased administrative costs resulting primarily from the hiring of additional employees and slightly higher occupancy costs. As a r ntage of net sales, operating expenses decreased for the three months ended March 31, 1998 to 39.9% from 55.8% for the comparable of 1997

YEAR ENDED DECEMBER 31, 1996 COMPARED TO YEAR ENDED DECEMBER 31, 1997

Net sales increased to $36.7 million for 1997 from $3.5 million for 1996, primarily due to increased market acceptance of the Company's Tight Lies fairway woods. Net sales of the Tight Lies fairway woods increased to $34.6 million for 1997, from $1.7 million for 1996, and increased as a percentage of net sales to 94.3% from 47 2%, respectively. Net sales of other product lines increased to $2.1 million for 1997 compared to $1 8 million for 1996, but decreased as a percentage of net sales to 5.7% for 1997 from 52 8% for 1996.

Gross profit increased to $26.7 million for 1997 from $1 9 million for 1996, and increased as a percentage of net sales to 72.8% from 54.9%, respectively. Gross profit for 1997 was favorably affected by an increased percentage of sales attributable to the higher margin Tight Lies fairway woods and the inherent cost savings associated with buying components in large volumes and assembling them on a substantially increased scale.

The Company experienced operating loss of $4.0 million for 1997 as compared to operating income of $9,000 for 1996. Total operating expenses increased to $30.7 million for 1997 from $1.9 million for 1996 Of the $30.7 million of operating expenses for 1997, $14.8 million, or 48 4%, of expenses related to stock compensation and bonus awards to the Company's founder, Chief Executive Officer and President. See "Certain Transactions" and Note 9 of Notes to Consolidated Financial Statements The expense recognized in 1996 in conjunction with these awards was $0 2 million, or 11 1% of operating expenses. In 1997, the Company also incurred higher expenses for selling and royalties and provision for bad debts, in each case due principally to increased sales of the Tight Lies fairway woods General and administrative expenses also increased in 1997 due to the hiring of additional employees, and research and development expenses.

YEAR ENDED DECEMBER 31, 1995 COMPARED TO YEAR ENDED DECEMBER 31, 1996

Net sales increased to $3.5 million for 1996 from $1 1 million for 1995, primarily due to the introduction of the original Tight Lies fairway wood in the fall of 1995. Net sales of the original Tight Lies fairway wood increased to $1.7 million for 1996 from $0.1 million for 1995, and ir--ased as a percentage of net sales to 47.2% from 9.6%, respectively. Net sales of other products increased to $1.8 million for 1996 from illion for 1995, but decreased as a percentage of net sales to 52 8% from 90 4%, respectively The increase in sales of other products in ate dollars was due to increased sales of custom fitted golf clubs resulting from an increased number of teaching professionals who became certified Adams Golf club fitters during 1996

Gross profit increased to $1.9 million for 1996 from $0 4 million for 1995, and increased as a percentage of net sales to 54.9% from 32 8%, respectively. The increase in gross profit was due to higher sales of the Company's products in 1996, specifically the higher margin original Tight Lies fairway wood

Operating income was $9,000 for 1996 compared to an operating loss of $0.2 million for 1995. Total operating expenses increased to $1.9 million for 1996 from $0.6 million for 1995 and remained relatively flat as a percentage of net sales Of the $1 9 million of operating expenses in 1996, $0.2 million, or 11 1%, of expenses were related to a bonus award to the Company's founder, Chief Executive Officer and President The Company also incurred additional selling and general and administrative expenses in 1996 as a result of increased sales and hiring additional employees

QUARTERLY RESULTS AND SEASONALITY

The following table sets forth certain unaudited quarterly financial operational data for the five most recent quarters. A review in accordance with Statement on Auditing Standards No. 71 has not been performed by the Company's independent certified public accountants on the
 ited information in the table below

|  | | QUARTER ENDED | | | |
|---|---|---|---|---|---|
|  | MARCH 31, 1997 | JUNE 30, 1997 | SEPT. 30, 1997 | DEC. 31, 1997 | MARCH 31, 1998 |
| Net sales | $ 1,475 | $ 3,974 | $ 14,236 | $ 17,005 | $ 24,511 |
| Gross profit | 888 | 2,418 | 10,633 | 12,759 | 18,649 |
| Operating income (loss) | 65 | 4 | 4,212 | (8,250) | 8,872 |
| Net income (loss) | 45 | (4) | 3,144 | (7,039) | 5,642 |

Golf generally is regarded as a warm weather sport and sales of golf equipment historically have been strongest during the second and third quarters, with the weakest sales occurring during the fourth quarter. Although the Company's rapid growth has offset this trend in recent periods, no assurances can be given that the Company's growth will continue to offset the impact of seasonality, and therefore results for any one or more quarters are not necessarily indicative of annual results or continuing trends. In addition, sales of golf clubs are dependent on discretionary consumer spending, which may be affected by general economic conditions. A decrease in consumer spending generally could result in decreased spending on golf equipment, which could have a material adverse effect on the Company's business, operating results and financial condition. In addition, the Company's future results of operations could be affected by a number of other factors, such as unseasonal weather patterns; demand for and market acceptance of the Company's existing and future products; new product introductions by the Company's competitors; competitive pressures resulting in lower than expected average selling prices; and the volume of orders that are received and that can be fulfilled in a quarter. Any one or more of these factors could result in the Company failing to achieve its expectations as to future sales or net income.

Because most operating expenses are relatively fixed in the short term, the Company may be unable to adjust spending sufficiently in a timely manner to compensate for any unexpected sales shortfall, which could materially adversely affect quarterly results of operations. If technological advances by competitors or other competitive factors require the Company to invest significantly greater resources than anticipated in research and development or sales and marketing efforts, the Company's business, operating results or financial condition could be materially adversely affected. Accordingly, the Company believes that period- to-period comparisons of its results of operations should not  ied upon as an indication of future performance. In addition, the results of any quarter are not indicative of results to be expected for a full   ear. As a result of fluctuating operating results or other factors discussed above and below, in certain future quarters the Company's   s of operations may be below the expectations of public market analysts or investors. In such event, the market price of the Company's Common Stock would be materially adversely affected.

STOCK-BASED COMPENSATION

In December 1997, the Board of Directors of the Company approved a stock compensation award of 2,000,000 shares of Common Stock to the Company's founder, Chief Executive Officer and President. The Company agreed to pay all income taxes due by the officer relating to such stock award and related tax bonus. As a result, compensation expense of approximately $12.5 million was charged to operations in 1997. In addition, this officer notified the Company of his intent to exercise stock options and an additional compensation expense of approximately $2.3 million was recorded in 1997. With respect to certain stock options granted to employees, the Company recorded deferred compensation of $981,000 and $788,000, respectively, in the first and second quarters of 1998. The Company will begin amortizing deferred compensation in the second quarter of 1998 over the vesting period, generally four years. In addition, in connection with its stock grant to Nick Faldo, the Company recorded deferred compensation of $10.1 million in the second quarter of 1998. This amount will be amortized to expense ratably over 10 years.

20

beginning in the second quarter of 1998. See "Certain Transactions" and Note 9 of Notes to Consolidated Financial Statements.

## YEAR 2000 COMPLIANCE

existing computer systems and applications and other control devices use only two digits to identify a year in the date field, without ering the impact of the upcoming change in the century. As a result, as year 2000 approaches, computer systems and applications used by many companies may need to be upgraded to comply with "Year 2000" requirements. The Company relies on its systems in operating and monitoring many significant aspects of its business, including financial systems (such as general ledger, accounts payable, accounts receivable, inventory and order management), customer services, infrastructure and network and telecommunications equipment. The Company also relies directly and indirectly on the systems of external business enterprises such as customers, suppliers, creditors, financial organizations and domestic and international governments. The Company currently estimates that its costs associated with Year 2000 compliance, including any costs associated with the consequences of incomplete or untimely resolution of Year 2000 compliance issues, will not have a material adverse effect on the Company's business, financial condition or results of operations. However, the Company has not exhaustively investigated and does not believe it has fully identified the impact of Year 2000 compliance and has not concluded that it can resolve any issues that may arise in complying with Year 2000 without disruption of its business or without incurring significant expense. In addition, even if the Company's internal systems are not materially affected by Year 2000 compliance issues, the Company could be affected through disruption in the operation of the enterprises with which the Company interacts.

## LIQUIDITY AND CAPITAL RESOURCES

The Company historically has financed its operations principally through internally generated funds and funds from the private placement of equity securities. Such funds have been supplemented from time to time with short-term borrowings under the Company borrowing facilities. Primarily as a result of tax payments made by the Company in the first quarter of 1998, for the three months ended March 31, 1998 net cash used in operating activities was $1.5 million. Net cash provided by operating activities was $1.1 million for the year ended December 31, 1997

Working capital totaled $12.3 million at March 31, 1998 compared to $6.9 million at December 31, 1997. Net trade accounts receivable amounted to $14.7 million at March 31, 1998 compared to $7.7 million at December 31, 1997. The increase was primarily due to increased net sales in the first three months of 1998. Inventory totaled $5.6 million at March 31, 1998 and $4.5 million at December 31, 1997.

The Company has a $10.0 million revolving credit facility, which expires on December 31, 1998. At May 31, 1998, the Company had no outstanding borrowings under this facility. Borrowings under the Company's revolving credit facility agreement are at interest rates based on the lending bank's general refinance rate of interest or certain LIBOR rates of interest. Obligations under the revolving credit facility loan
: ent are collateralized by substantially all of the accounts receivable, inventory and equipment of the Company. See Note 7 of Notes to
idated Financial Statements. During the first quarter of 1998, the Company borrowed approximately $1.1 million in the form of a note payable to the Company's founder, Chief Executive Officer and President to be used for working capital purposes. The remaining principal amount of the note ($534,899 at April 30, 1998) is payable in two installments on December 15, 1998 and April 14, 1999 at an interest rate of 5.39%.

The Company's capital expenditures amounted to $1.7 million, $0.8 million and $0.1 million for the three months ended March 31, 1998 and the years ended December 31, 1997 and 1996, respectively. The Company anticipates making capital expenditures in the ordinary course of business of approximately $6.0 million in the balance of 1998, which includes implementing a customer management information system at an estimated cost of $1.9 million

The Company believes that the cash flow from operations, the net proceeds of the Offering and the Company's $10.0 million credit facility will be sufficient to meet operating needs and capital expenditures for at least the next 12 months

BUSINESS

## GENERAL

: designs, manufactures and markets premium quality, technologically innovative golf clubs. The Company's design objective is to
. :e golf clubs that deliver meaningful performance benefits and inspire player confidence. The Company believes that its most successful
product line to date, the Tight Lies fairway woods, meets this objective by providing golfers with the ability to hit the ball from virtually any lie
while maximizing distance. The patented Tight Lies fairway woods feature an upright trapezoidal head, a shallow face and a lower center of
gravity as compared to conventional fairway woods. Adams has developed a marketing model that integrates direct response and traditional
image-based advertising to generate brand awareness and drive retail sales. The complete Tight Lies line of products includes the original,
Strong 3, Strong 5, Strong 7 and Strong 9 fairway woods. According to the Golf Market Research Institute, the Tight Lies fairway woods were
the top-selling single fairway woods in the U.S. on a unit volume basis during the three months ended March 31, 1998. During this period, the
Company achieved a 27% market share of the single fairway woods category

The Company's growth strategy is to continue to increase its share of the fairway woods market, leverage consumer acceptance of the Tight
Lies brand, expand international sales and develop new technologies and product designs.

## GOLF INDUSTRY OVERVIEW

According to the National Golf Foundation ("NGF"), there are approximately 49 million golfers worldwide, including approximately 25
million in the U.S. In 1997, golfers in the U.S. played an estimated 547 million rounds of golf and, according to the National Sporting Goods
Association, are estimated to have spent $5.8 billion on golf equipment, apparel and accessories. Of the 25 million U.S. golfers, about 5.2
million, characterized by the NGF as "avid golfers." play over 25 rounds of golf per year. The Company believes that avid golfers are the first
to seek out performance-oriented golf equipment and generally drive golf club product trends

In 1997, wholesale sales of golf equipment in the U.S. reached an estimated $2.4 billion. Wholesale sales of golf clubs increased at a
compound annual growth rate of approximately 13% over the 5-year period from 1992 to 1997. The Company believes that sales of golf clubs
will continue to grow in the future due to a number of factors including:

INCREASING AVAILABILITY OF GOLF FACILITIES. According to the NGF, approximately 900 new golf courses, the vast majority of
which will be available to the public, are expected to open in the U.S. by the year 2000. The Company believes that these additional facilities
v    1ke golf more accessible and convenient, leading to a further increase in golf participation rates

INCREASING INTEREST FROM NON-TRADITIONAL GOLFERS. The game of golf has become increasingly attractive to segments of the
population that have not historically been well-represented among golfers. Most notably, Tiger Woods has made golf more appealing to junior
and minority golfers. According to the NGF, the total number of beginning and junior golfers increased by over 40% in 1997 compared to the
previous year. In addition, the success of the Ladies Professional Golf Association (the "LPGA") Tour and such female golfers as Annika
Sorenstam of Sweden have increased the appeal of the sport to women.

FAVORABLE POPULATION TRENDS. The Company believes that two population trends are likely to benefit the golf industry over the next
several years: (i) the aging of Baby Boomers (those born between 1946 and 1964) and (ii) the emergence of the Echo Boom generation (those
born between 1977 and 1995). As golfers age, they tend to play golf more often and spend more money on the sport, particularly in the over-50
age group. Accordingly, because a majority of Baby Boomers are entering their 40s and 50s, the Company expects interest in and spending on
golf to increase. Further, because Echo Boomers are

22

beginning to enter their 20s, the age most golfers begin to play the sport, the Company believes they will further increase their participation in and spending on golf

NEW PRODUCT INNOVATIONS. In recent years, the golf equipment industry has made significant advances in product designs and nologies to enhance golfers' performance and overall enjoyment of the game. The Company believes that this rapid evolution of golf clubs ates the rate at which golfers purchase new or additional clubs

GROWTH IN FAIRWAY WOODS. The Company believes that sales of fairway woods are growing for a number of reasons. Fairway woods have proven to be more versatile and dependable than long irons (specifically, the 1-4 irons), which many golfers find inherently difficult to hit. In addition, an increasing number of professional golfers on each of the Professional Golf Association ("PGA"), LPGA, Senior PGA and Nike Tours are carrying multiple fairway woods in competition, thereby validating the use of fairway woods as an accepted substitute for long irons Finally, changes in course architectures and turf maintenance techniques are placing a premium on shots that fly higher and land softer (I.E., the types of shots typically produced by fairway woods).

## COMPANY HISTORY

Barney Adams founded the Company in 1987. After an initial period of supplying components and performing contract manufacturing, the Company established a custom fitting operation at the Hank Haney Golf Ranch in McKinney, Texas, a well-known teaching and practice facility. As a result of the knowledge and experience gained through custom fitting, Mr. Adams concluded that the greatest difference in skill between a professional golfer and an amateur golfer is the ability to successfully hit the long second shot to the green. Similarly, Alastair Cochran and John Stobbs previously concluded in their book "THE SEARCH FOR THE PERFECT SWING" that the long approach shot affects a player's score more than any other. After a period of further research, development and testing, the Company introduced a patented trapezoidal head, a shallow face, a low center of gravity and 16 DEG of loft to assist the golfer in getting the ball airborne quickly and efficiently from a variety of lies while maximizing distance. In late 1996, Adams extended the Tight Lies line of fairway woods to include the Strong 3, Strong 5 and Strong 7 and, one year later, the Strong 9.

In an effort to generate maximum exposure and retail sell-through of the original Tight Lies fairway wood, the Company debuted its professionally produced infomercial in April 1997 This 30-minute informational commercial is hosted by veteran golf announcer Jack Whitaker and features former PGA Teacher of the Year Hank Haney, former British Open Champion Bill Rogers and LPGA Hall of Famer Carol Mann. Demand for the Tight Lies fairway woods increased significantly after the introduction of the infomercial. To meet this demand, the Company increased its distribution capacity by expanding its network of on- and off-course golf shops and selected sporting goods retailers

. ternational Network of Golf, an 800-member organization of leading media and golf industry executives, named the original Tight Lies fairway wood the "Breakthrough Product of the Year" in 1996 In addition, the Tight Lies fairway wood received the 1997/98 Certificate of Excellence from the Golf Industry Association Since the introduction of the original Tight Lies fairway wood in late 1995, more than 50 professionals on the PGA, LPGA and Senior PGA Tours have carried one or more Tight Lies fairway woods in competition, none of whom were then under contract with or paid by the Company.

23

BUSINESS STRENGTHS

The Company has developed the following business strengths that it believes provide it with a competitive advantage over many other golf club manufacturers:

NGTH OF THE TIGHT LIES BRAND. The Company believes that it has established a significant presence in the fairway woods market category. According to the Golf Market Research Institute, the Tight Lies fairway woods were the top selling single fairway woods in the U.S. on a unit volume basis during the three months ended March 31, 1998. During this period, the Company achieved a 27% market share of the single fairway woods category. The Company believes that the strength of its brand is further demonstrated by the rapid acceptance of the expanded line of Tight Lies fairway woods. Although at the time the Company only advertised the original Tight Lies fairway wood, sales of the expanded line represented 48.8% of net sales for the three months ended March 31, 1998.

INNOVATIVE MARKETING MODEL AND STRONG RETAIL DISTRIBUTION. Adams has developed a marketing model that integrates direct response and traditional image-based advertising to generate brand awareness and drive retail sales. For the three months ended March 31, 1998, approximately 79% of the Company's sales occurred at the retail level. To preserve the integrity of its image and reputation, the Company currently limits its distribution to retailers that market premium golf equipment and provide a high level of customer service and technical expertise. The Company currently sells its products to on- and off-course golf shops and selected sporting goods retailers. The Company does not sell its products through price sensitive general discount warehouses, department stores or membership clubs. The Company believes its selective retail distribution helps its retailers to maintain profitable margins and maximize sales of Adams products. The Company further believes it is well-positioned to utilize its marketing model and retail distribution for future products.

RELATIONSHIP WITH NICK FALDO. The Company has recently entered into a relationship with Nick Faldo. Mr. Faldo was inducted into the World Golf Hall of Fame in May 1998 and has won more major championships in the 1990s than any other golfer. In addition to numerous other domestic and international championships, Mr. Faldo has won the Masters three times (1989, 1990 and 1996) and the British Open three times (1987, 1990 and 1992). Mr. Faldo uses the Tight Lies fairway woods in competition and has agreed to work closely with the Company to assist in the design and testing of future golf clubs and other equipment. The Company believes that Mr. Faldo's comprehensive knowledge of the game of golf and reputation for technical excellence complements the Company's capabilities and strong brand identity.

SALES AND CUSTOMER SERVICE INFRASTRUCTURE. Adams has committed significant resources to developing its sales and customer service infrastructure. Rather than relying on independent sales representatives, as do many other golf equipment companies, Adams maintains an inside sales department that currently consists of 25 employees who are in regular telephone contact with the Company's over 7,000 retailers. These sales representatives are supported by 13 field-based Regional Account Coordinators who maintain personal contact with the Company's retailers nationwide. The Company believes that using and carefully managing its own sales force enables it to significantly reduce expenses. Adams also has a separate 30-seat customer call center that provides customer service to retailers and consumers. The majority of the Company's sales and customer service personnel are experienced golfers. The Company believes interaction with its knowledgeable representatives promotes customer satisfaction and helps to strengthen the Adams brand.

EMPHASIS ON QUALITY. Due in large part to its heritage in custom club fitting, Adams emphasizes quality control and precise adherence to design specifications. The Company has redundant sources of supply for each of the component parts used in the manufacture of its golf clubs and has established a quality assurance program at those manufacturing facilities located in Taiwan and China that are collectively responsible for producing substantially all of the Company's performance club heads. Upon arrival at the Company's manufacturing facilities in Plano, Texas, each component used in the Company's clubs is

24

again checked to ensure consistency with strict design specifications. Components are then sorted to identify variations in characteristics, such as head weight and shaft flexibility, that, although within the specified manufacturing tolerances, may affect club performance. The Company uses its patented variable moment of inertia ("VMI") formula to combine compatible components to produce a consistent swing feel across an entire set of clubs

## ίWTH STRATEGY

The Company's goal is to establish itself as a leading developer of technologically innovative, performance-oriented golf clubs. The Company's strategy to achieve this goal includes the following elements:

**BUILDING MARKET SHARE IN FAIRWAY WOODS**  The Company's first priority is to build its share of the premium fairway woods market. The Company believes it can increase its market share by (i) continuing to build demand using the Company's marketing model; (ii) assisting existing retailers to increase their sales of the Tight Lies fairway woods by maintaining the relatively high margins currently enjoyed by such retailers; and (iii) increasing the number of on- and off-course golf shops and selected sporting goods retailers that distribute the Tight Lies fairway woods

**LEVERAGING CONSUMER ACCEPTANCE OF TIGHT LIES BRAND.**  The Company intends to leverage acceptance of the Tight Lies brand to develop and sell additional products, a strategy that has proven effective in marketing the Company's expanded line of Tight Lies fairway woods. For the three months ended March 31, 1998, sales of the expanded line of Tight Lies fairway woods exceeded sales of the original club. The Company believes that the success and performance of its Tight Lies fairway woods have earned Adams a reputation as a manufacturer of technologically innovative, performance-oriented golf clubs among its customers and avid golfers. The Company further believes that it will be able to efficiently introduce new products to this customer base through its recent investments in infrastructure, thereby generating sales and receiving valuable product feedback

**EXPANDING INTERNATIONAL SALES.**  Until recently, the Company has focused on developing sales domestically. For the year ended December 31, 1997 and the three months ended March 31, 1998, approximately 2% and 6%, respectively, of the Company's net sales were derived from international sales. Accordingly, the Company's sales to date have been achieved without significant contribution from international markets. Beginning in late 1997, the Company began leveraging its domestic strength to attract qualified international distributors The Company currently has a network of 33 distributors located in 39 countries including Canada, Japan and the United Kingdom and expects to continue to build its international distribution. Toward this end, the Company has recently hired a Director of International Sales who has significant international golf equipment sales experience. Additionally, the Company believes that Nick Faldo's worldwide reputation will help drive international demand for the Company's products

**ΔOPING NEW TECHNOLOGIES AND PRODUCT DESIGNS.**  The Company engages continuously in the process of developing new technologies and product designs that, when incorporated into golf clubs, are expected to provide golfers with meaningful performance benefits. Capitalizing on the technical knowledge and expertise gained through the Tight Lies fairway woods, the Company is currently testing prototypes of a potential new driver. This new product is expected to combine the distance of a driver with the playability of a fairway wood. The Company currently expects the new driver to be introduced after the end of fiscal year 1998 The Company is working with Mr. Faldo to design and test this new driver as well as other potential new products. To the extent that any new technology or product design can be developed to the point of commercial viability, the Company intends to introduce such technology or design into a single product and, if the product is well received by consumers, develop a broader product line around the core club category. The Company believes that the affiliation, endorsement and support of Nick Faldo will provide important credibility in the development and marketing of new technologies and product designs.

The Company's continued growth and success depend, in large part, on its ability to successfully develop and introduce new products that achieve widespread market acceptance. Failure by the Company to identify and develop innovative new technologies and product designs could adversely affect the Company's future growth and profitability. See "Risk Factors--Dependence on New Product Introductions; Uncertain Consumer Acceptance."

)UCTS

The Company currently offers the following products:

ORIGINAL TIGHT LIES FAIRWAY WOOD. The original Tight Lies fairway wood has an innovative upright trapezoidal or "upside down" head shape that incorporates a distinctive shallow face, a low center of gravity and 16 DEG. of loft. The Company believes that this club is ideal for getting the ball airborne quickly and efficiently with optimum spin to maximize distance from the critical scoring area of 185 to 225 yards from the green. The Company further believes that the Tight Lies fairway woods are particularly effective from virtually any lie on the course including the rough, hard pan, fairway bunkers and divots.

EXPANDED LINE OF TIGHT LIES FAIRWAY WOODS. In late 1996, based on initial consumer acceptance of the original Tight Lies fairway wood, the Company expanded its line to include the Tight Lies Strong 3 (13 DEG. loft), the Tight Lies Strong 5 (19 DEG. loft) and the Tight Lies Strong 7 (24 DEG. loft). In January 1998, the Company expanded the line again to include the Tight Lies Strong 9 (28 DEG. loft). The expanded line of Tight Lies fairway woods incorporates the same design innovations as the original club while providing golfers with increased flexibility to play these clubs from different distances on the course. For the three months ended March 31, 1998, sales of the expanded line of Tight Lies fairway woods exceeded sales of the original club.

OTHER CLUB LINES. The Company's other clubs include the Air Assault Driver and the Assault-VMI irons. The Air Assault Driver was the Company's first product to incorporate the patented upright trapezoidal head. The Company's Assault-VMI irons are perimeter-weighted, cavity-backed, slightly offset irons which incorporate the Company's patented VMI design formula producing consistent swing feel across an entire set of clubs. The Company markets the Assault-VMI irons to professional and avid golfers exclusively through its network of over 100 certified custom fitting accounts. The Company believes that its custom fitting activities provide Adams with an in-depth understanding of golf club design and credibility in the golf industry.

Each golf club manufactured by the Company is available in a variety of shaft lengths and flexes to accommodate both men and women golfers of all ages and ability levels. In addition, once a club has received a certain degree of market acceptance, the Company has historically ir  ʰuced a left-handed model. Currently, the Company offers each of its golf clubs in a left-handed model, with the exception of the recently    ced Tight Lies Strong 9

26

The following table indicates the percentage of net sales in each major product group for the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998. Historical percentages may not be indicative of the Company's future product mix

## PERCENTAGE OF NET SALES BY PRODUCT GROUP

| PRODUCT GROUP | YEAR ENDED DECEMBER 31. | | THREE MONTHS ENDED MARCH 31. 1998 |
|---|---|---|---|
| | 1996 | 1997 | |
| Original Tight Lies | 45.6% | 55.9% | 48.5% |
| 3, 5, 7 and 9 Tight Lies | 1.6 | 38.4 | 48.8 |
| Other Club Lines | 52.8 | 5.7 | 2.7 |
| Total | 100.0% | 100.0% | 100.0% |

The Company supports each of its products with a two-year warranty. The warranty provides for repair or replacement of the golf club, except in the case of abuse. The Company has not experienced material amounts of breakage with respect to its golf clubs

## DESIGN AND DEVELOPMENT

The Company's design and development team is responsible for developing, testing and introducing new technologies and product designs. This team is currently spearheaded by Barney Adams, the founder of the Company and inventor of the Tight Lies fairway wood; Richard H. Murtland, Vice President-- Research and Development; Mr. Nick Faldo and, independent consultants, Robert R. Bush and Dr. Michael M. Carroll. Mr. Bush has over 30 years of experience in golf club development, most notably, as Director of Technical Services for True Temper Sports, a leading shaft manufacturer, where from 1966 to 1993, he was responsible for testing all golf club shafts. Mr. Bush was instrumental in the development of "Iron Byron," the industry standard for the mechanical testing of golf clubs and balls. Mr. Bush is currently a member of the Technical Advisory Panel for GOLF DIGEST. Dr. Michael M. Carroll is Dean of the George R. Brown School of Engineering at Rice University in Houston, Texas. Dr. Carroll holds doctorate degrees in both physics and mathematics and is an avid golfer. Dr. Carroll has worked with the Adams design and development team since April 1, 1998 and is responsible for the scientific analysis of each new product under development by the Company.

T' sign and development team engages in a five-step process to create new products.

CONCEPT DEVELOPMENT. During concept development, Adams' design and development team identifies specific desirable ball flight objectives. In addition, the Company considers new ideas from professional golfers, inventors, distributors and others. The Company expects that Nick Faldo will play a significant role in future concept development.

DESIGN SPECIFICATIONS. The Company's product design and development team determines design specifications for the club, including shaft length, flex and weight, head design, loft and overall club weight. Throughout the design specifications process, the Company refers to and incorporates the golf equipment standards developed by the USGA. Although the standards set by the USGA only apply to competitive events sanctioned by that organization, the Company believes it is critical for new clubs to comply with these standards. At this time, the product design and development team also determines the optimal materials to use in the club. The Company will not use higher cost materials, such as titanium or other alloys, unless such expensive materials provide meaningful performance benefits. This stage of product development typically takes 6 to 8 weeks after a concept has been clearly identified.

PATENT REVIEW. The Company considers patent protection for its technologies and product designs to be an important part of its development strategy. The Company and its patent attorneys conduct a search

of prior art and existing products to determine whether a new product idea may be covered by an existing patent. Patent review, depending upon the complexity and novelty of the design involved, generally requires between 3 to 18 months to complete. however, this stage of product development typically occurs in conjunction with one or more of the other steps.

ᵣ    ᴼUCT DESIGN AND ENGINEERING REVIEW. If a product concept continues past the patent review stage, the Company translates
    parameters into working designs. When appropriate, these designs are modeled and developed using computer aided design
ᵗᵉ   .ologies and subjected to rigorous engineering review to validate the effectiveness of the technology or design. Dr. Carroll is expected to
play a key role in this stage of product development. The Company estimates that it will take between 4 to 6 months to successfully complete
product design and engineering review

TESTING. Once a specific design has been decided upon, the Company creates and tests one or more prototypes. The Company has a testing facility at the Hank Haney Golf Ranch in McKinney, Texas. As part of the testing process, the Company records, analyzes and interprets data associated with each prototype including ball flight, distance, spin and accuracy. Using feedback from these tests, the Company modifies its designs to achieve its performance objective. Additionally, the Company applies for official USGA approval of the resulting club at this time. Upon approval of a new product from the USGA, it becomes considered for commercial release. The Company believes that in order to properly field test a new product. it must expect between 4 to 6 months of additional development time

The Company's research and development expenses were $18,516, $51,101 and $557,513 during 1995, 1996 and 1997, respectively

MARKETING

The goals of the Company's marketing efforts are to build its brand identity and drive sales through its retail distribution channel. To accomplish these goals, Adams utilizes direct response and traditional image-based advertising, engages in promotional activities and capitalizes on its relationship with Nick Faldo and other well known golf figures

ADVERTISING. The Company uses a combination of direct response and traditional image-based advertising

- DIRECT RESPONSE ADVERTISING. The Company intends to continue to build brand awareness and stimulate product demand through its direct response advertising, which includes a variety of mediums including television, radio, print and direct mail. Direct response advertising, in which consumers may order products directly from the Company by calling a toll-free telephone number, provides a cost-effective vehicle enabling Adams to communicate a compelling product story and build brand recognition. The Company's direct response advertising serves to iᵣ    ᵎce the Company's products to consumers, many of whom will subsequently purchase Adams clubs directly from the Company's
ᵢ       In April 1997, Adams debuted a 30-minute Tight Lies infomercial, which has contributed significantly to the Company's recent
gᵣ    ₂ This infomercial received the award for "Best Infomercial Demonstration Show" from the National Infomercial Marketing Association in September 1997. The Tight Lies infomercial routinely runs on The Golf Channel, regional sports stations, national networks and local, market-specific broadcast stations. In addition, the Company utilizes 30- and 60-second direct response television commercials as well as radio advertising. The Company advertises regularly in major golf and industry publications, general consumer magazines and local newspapers nationwide. These include GOLF DIGEST, GOLF MAGAZINE, SPORTS ILLUSTRATED, THE WALL STREET JOURNAL and USA TODAY. Finally, the Company engages in regularly scheduled direct mail advertising campaigns.

- TRADITIONAL IMAGE-BASED ADVERTISING. The Company's direct response sales revenue has enabled Adams to broaden its advertising efforts to include traditional image-based advertising. This

28

advertising includes a series of 30-second commercials which run during major golf tournaments and golf related programs; newspaper, magazine and radio ad campaigns; sponsorship of selected golf tournaments; exclusive sponsorship of The Golf Channel's weekly instructional program, "LIVING ROOM LESSONS" and a recently updated and professionally redesigned web site located at www.adamsgolf.com

ɔmpany has received extensive editorial coverage in golf, consumer and trade publications as well as general consumer magazines and apers worldwide.

PROMOTIONAL ACTIVITIES. The Company engages in a variety of promotional activities to sell and market its products. Such activities include (i) consumer sweepstakes like the Company's "Ramble in the Bramble," where the winner will receive an all expense paid, luxury tour for two of Scotland's most legendary golf courses; (ii) promotional giveaways with certain purchases, including items such as instructional videos and audio tapes; and (iii) promotional campaigns like the "90-Day Challenge," in which the Company advertises its 90-day return policy

RELATIONSHIP WITH NICK FALDO AND OTHERS. The Company has recently formed a lifetime relationship with Nick Faldo, an internationally recognized professional golfer and winner of numerous U.S and international championships, including three Masters (1989, 1990 and 1996) and three British Opens (1987, 1990 and 1992) Mr Faldo led the Official World Golf Ranking for 81 weeks during 1993 and 1994. Mr. Faldo also has made the most Ryder Cup appearances in the history of golf. Adams expects Nick Faldo to be actively and directly involved in the design, testing and development of new technologies and products. Mr. Faldo is noted for his precise play as a golfer and his reputation as a perfectionist. The Company believes that by aligning itself with Mr Faldo, it can further promote the Adams brand, while at the same time demonstrating the Company's ability to deliver golf clubs that satisfy the specific and demanding requirements of tour professionals

The Company has also obtained endorsements from Hank Haney, Bill Rogers and Carol Mann. Mr. Haney was named the 1993 PGA Teacher of the Year and is a five-time recipient of the Northern Texas Section PGA Teacher of the Year Award. Mr Haney has instructed over 100 touring professionals from the PGA, LPGA, European, Japanese and Asian Tours along with several top rated junior golfers. Mr. Haney is a member of the advisory staff for GOLF DIGEST Mr Rogers won the British Open championship in 1981 and was the 1981 PGA Player of the Year. Ms. Mann is a member of the LPGA Hall of Fame

SALES AND CUSTOMER SUPPORT

The Company sells its products through on- and off-course golf shops and selected sporting goods retailers, direct sales to consumers, international distributors and the Company's custom fitting accounts

ꜱ TO RETAILERS. The Company sells a significant majority of its products to selected retailers. To maintain its high quality reputation aₙₔ generate retailer loyalty, the Company does not sell its products through price sensitive general discount warehouses, department stores or membership clubs. The Company believes its selective retail distribution strategy helps its retailers to maintain profitable margins and maximize sales of Adams products. In the three months ended March 31, 1998, sales to retailers accounted for approximately 79% of the Company's total sales

Adams maintains an inside sales department that currently consists of 25 employees who are in regular contact with the Company's over 7,000 retailers. These sales representatives are supported by 13 field-based Regional Account Coordinators who maintain personal contact with the Company's retailers nationwide. The Company generally has been successful in delivering product to its retailers within one week of a placed order. The Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers

29

CUSTOMER SUPPORT AND DIRECT SALES. Adams believes that superior customer service can significantly enhance its marketing efforts. Accordingly, the Company maintains an in-house customer call center whose representatives provide technical assistance to Adams' customers and field calls resulting from the Company's direct response advertising. The Company also outsources a portion of its call center activities. The Company provides its staff with computerized access to its retailer database enabling call center representatives to guide c─── mers to their nearest Adams retailer.

I...ERNATIONAL SALES. International sales are made in 39 countries (including Japan, Canada and the United Kingdom) through approximately 33 independent distributors. The international distributors sell to retailers for end sale to the consumer. International sales have increased from $0.6 million for 1996 to $0.9 million for 1997 and $0.2 million for the first three months of 1997 to $1.4 million for the first three months of 1998. The Company recently expanded its international sales staff to include a Director of International Sales to identify, develop, engage and support the Company's worldwide distributor base.

CUSTOM FITTING SALES. The Company employs six sales representatives who manage the Company's custom fitting sales and support division and administer Adams' custom fitting training program for golf professionals. Adams' custom fitting training program has received PGA certification and provides continuing education credits for PGA Member Professionals. Since 1992, the Company has certified in excess of 300 golf professionals to custom fit its Assault-VMI irons, which are sold exclusively through its over 100 custom fitting accounts. Custom fitters measure data relating to swing and ball flight characteristics. Based on the interpretation of the data, a set of clubs is manufactured that is specifically tailored to that golfer.

The majority of the Company's sales and customer service personnel are experienced golfers, including a number of former collegiate and professional golfers. Further, each of the Company's new employees attends an 8-hour, in-house seminar which provides training on club specifications, performance, design and manufacturing. Adams believes interaction with its knowledgeable representatives promotes customer satisfaction and helps to strengthen the Adams brand image.

## MANUFACTURING AND ASSEMBLY

The Company manages all stages of manufacturing, from sourcing to assembly, in order to maintain a high level of product quality and consistency. The Company establishes product specifications, selects the materials used to produce the components and tests the specifications of all components received by the Company. In addition, the Company has redundant sources of supply for each of the component parts used in the manufacture of its golf clubs and has established a quality assurance program at those manufacturing facilities located in Taiwan and China that are collectively responsible for producing substantially all of the Company's performance club heads. Upon arrival at the Company's manufacturing facilities in Plano, Texas, each component used in the Company's clubs is again checked to ensure consistency with strict design ·cations. Components are then sorted to identify variations in characteristics, such as head weight and shaft flexibility, that, although the specified range, may affect club performance. Golf clubs are then built by the Company's manufacturing personnel using the appropriate component parts and the Company's patented VMI technology. See "Risk Factors—Sources of Supply."

## PATENTS

The Company's ability to compete effectively in the golf club market will depend, in large part, on the ability of the Company to maintain the proprietary nature of its technologies and products. The Company currently holds six U.S. patents relating to certain of its products and proprietary technologies and has two patent applications pending. Assuming timely payment of maintenance fees, if any, the Company expects that the six currently issued patents will expire on various dates between 2009 and 2013. The Company has been awarded patents with respect to the design of the Tight Lies fairway wood and the VMI design formula. There can be no assurance, however, as to the degree of protection afforded by these or any other

patents held by the Company or as to the likelihood that patents will be issued from the pending patent applications. Moreover, these patents may have limited commercial value or may lack sufficient breadth to adequately protect the aspects of the Company's products to which the patents relate. The Company does not hold any foreign patents and no foreign patent applications are pending. The U.S. patents held by the Company do not preclude competitors from developing or marketing products similar to the Company's products in international markets.

can be no assurance that competitors, many of which have substantially greater resources than the Company and have made substantial investments in competing products, will not apply for and obtain patents that will prevent, limit or interfere with the Company's ability to make and sell its products. The Company is aware of numerous patents held by third parties that relate to products competitive to the Company's, including products competitive with the Tight Lies fairway woods. There is no assurance that these patents would not be used as a basis to challenge the validity of the Company's patent rights, to limit the scope of the Company's patent rights or to limit the Company's ability to obtain additional or broader patent rights. A successful challenge to the validity of the Company's patents may adversely affect the Company's competitive position. Moreover, there can be no assurance that such patent holders or other third parties will not claim infringement by the Company with respect to current and future products. Because U.S. patent applications are held and examined in secrecy, it is also possible that presently pending U.S. applications will eventually issue with claims that will be infringed by the Company's products or technologies. The defense and prosecution of patent suits is costly and time-consuming, even if the outcome is favorable. This is particularly true in foreign countries where the expenses associated with such proceedings can be prohibitive. An adverse outcome in the defense of a patent suit could subject the Company to significant liabilities to third parties, require the Company and others to cease selling products or require disputed rights to be licensed from third parties. Such licenses may not be available on satisfactory terms, or at all.

Despite the Company's efforts to protect its patent and other intellectual property rights, unauthorized parties have attempted and are expected to continue to attempt to copy all, or certain aspects of, the Company's products. Policing unauthorized use of the Company's intellectual property rights can be difficult and expensive, and while the Company takes appropriate action whenever it discovers any of its products or designs have been copied, knock-offs and counterfeit products are a persistent problem in the performance-oriented golf club industry. There can be no assurance that the Company's means of protecting its patent and other intellectual property rights will be adequate.

## INFORMATION SYSTEMS

The Company believes that a comprehensive and integrated infrastructure of information technology, systems and services is a significant factor in maintaining and improving its competitive position. Systems in place, including order fulfillment and distribution, financial and decision support and operational planning, have supported the growth of the Company to date. The Company is aggressively enhancing its current capabilities to meet the demands of the Company's growth. Special emphasis is being placed on systems for customer management, supply chain management and business analysis and planning. The Company believes that its current and enhanced computer systems, along ormal upgrades and extensions, will be sufficient to accommodate the Company's anticipated growth of sales and planned expansion for eseeable future. There can be no assurance that any upgrades of its information systems will be completed in a timely manner, that any suun upgrades will be adequate to meet the needs of the Company or that these upgrades will not strain the Company's financial resources.

## COMPETITION

The Company competes with a number of established golf club manufacturers, many of which have greater financial and other resources than the Company. Adams' competitors include Callaway Golf Company, adidas-Salomon AG (Taylor Made) and Fortune Brands, Inc. (Titleist and Cobra). The

31

Company competes primarily on the basis of performance, brand name recognition, quality and price. The Company believes that its ability to market its products through multiple distribution channels, including on- and off-course golf shops, selected sporting goods retailers and through direct response advertising, is important to its ability to compete

‾olf club industry is generally characterized by rapid and widespread imitation of popular technologies, designs and product concepts. Due success of the Tight Lies fairway woods, the Company expects that one or more competitors may introduce products similar to the Tight ‾. fairway woods. The buying decisions of many purchasers of golf clubs are often the result of highly subjective preferences which can be influenced by many factors, including, among others, advertising media, promotions and product endorsements The Company may face competition from manufacturers introducing other new or innovative products or successfully promoting golf clubs that achieve market acceptance. The failure to compete successfully in the future could result in a material deterioration of customer loyalty and the Company's image and could have a material adverse effect on the Company's business, operating results or financial condition See "Risk Factors-- Dependence on New Product Introductions; Uncertain Consumer Acceptance" "--Highly Competitive Industry" and "--Historical Dependence on Television Advertising."

## EMPLOYEES

At May 31, 1998, the Company had 264 full-time employees, including 113 engaged in manufacturing and assembly, 26 in research and development and quality control, 86 in sales support and 39 in management and administration. Adams' employees are not unionized. Management believes its relations with its employees are good

## PROPERTIES

The Company's administrative offices and manufacturing facilities currently occupy approximately 65,000 square feet of space in Plano, Texas. This facility is leased by the Company pursuant to a lease agreement expiring in 2004 and may be extended for an additional five years The Company maintains the right to terminate the lease if it moves to a larger facility owned by the current lessor The Company has also leased an additional 33,000 square feet of space and expects to take possession of the additional space before July 31, 1998 pursuant to the terms of a lease also expiring in 2004 The Company believes that these facilities will be sufficient through at least the end of 1999

## LEGAL PROCEEDINGS

The Company is not involved in any material legal proceedings.

32

## MANAGEMENT

### DIRECTORS AND EXECUTIVE OFFICERS

llowing table sets forth certain information with respect to the directors and executive officers of the Company, as of May 31, 1998:

| NAME | AGE | POSITION(S) HELD |
|------|-----|------------------|
| B. H. (Barney) Adams | 59 | Chairman of the Board, Chief Executive Officer and President |
| Darl P. Hatfield | 51 | Senior Vice President--Finance and Administration and Chief Financial Officer |
| Richard H. Murtland | 57 | Vice President--Research and Development, Secretary, Treasurer and Director |
| James E. Farrell | 39 | Vice President--Finance |
| Mark D. Gonsalves | 38 | Vice President--Sales and Marketing, Retail |
| Steven P. Sanazaro | 50 | Vice President--Information Technology |
| Paul F. Brown, Jr. | 51 | Director |
| Roland E. Casati | 67 | Director |
| Finis F. Conner | 54 | Director |
| Mark R. Mulvoy | 56 | Director |
| Stephen R. Patchin | 39 | Director |

The Company's Certificate of Incorporation was amended and restated effective May 1, 1998 to provide, among other things, that the Board of Directors be divided into three classes, each of whose members serve for staggered three-year terms. Commencing with the 1999 Annual Meeting of Stockholders, one class of directors will be elected each year for a three-year term. Messrs. Conner and Patchin are members of C'   I, the term of which expires at the 1999 Annual Meeting of Stockholders, Messrs. Murtland and Casati are members of Class II, the term \    h expires at the 2000 Annual Meeting of Stockholders and Messrs. Adams, Brown and Mulvoy are members of Class III, the term of Provisions."    expires at the 2001 Annual Meeting of Stockholders. See "Description of Capital Stock--Delaware Law and Certain Charter and Bylaw

The number of members of the Board of Directors of the Company is currently fixed at nine and, as a result, the Board presently has two vacancies. The Company intends to fill these vacancies as soon as practicable after the completion of the Offering. Under the terms of the agreement between the Company and Nick Faldo, the Company has agreed that, for so long as royalties remain payable to Mr. Faldo, it will use commercially reasonable efforts to cause a designee of Mr. Faldo to be nominated for, and elected to, the Board. As of the date of this Prospectus, Mr. Faldo has not notified the Company of his designee to the Board.

Certain additional information concerning the directors and executive officers is set forth below.

B. H. (BARNEY) ADAMS. Mr. Adams founded the Company in 1987 and has served as Chairman of the Board, Chief Executive Officer and President since that time. Mr. Adams is the inventor of the Tight Lies fairway wood. Prior to founding the Company, Mr. Adams served as President of Intertest, Inc. (a manufacturer of semiconductor testing equipment), Senior Vice President of Margaux Controls, Inc. (a manufacturer of energy control systems) and Executive Vice President of Maytex Manufacturing Co., Inc. (a manufacturer of store fixtures). Mr. Adams has authored several magazine articles concerning the technical aspects of golf equipment and is a frequent PGA section speaker.

DARL P. HATFIELD. Mr. Hatfield joined the Company as Senior Vice President—Finance and Administration and Chief Financial Officer in May 1998. Prior to joining the Company, Mr. Hatfield was a partner

33

with KPMG Peat Marwick LLP ("KPMG") from July 1977 to April 1998. Mr. Hatfield has 30 years of experience in accounting and auditing and is a Certified Public Accountant.

RICHARD H. MURTLAND. Mr. Murtland joined the Company in 1994 as Vice President--Operations and has been a director of the ...any since August 1995. He became Vice President--Research and Development in April 1998. Mr. Murtland has approximately 30 years ...erience in operations and engineering, most recently serving as Project Manager with ARCO International Oil and Gas Company (an ... ...national oil exploration and production company) from June 1976 to March 1994.

JAMES E. FARRELL. Mr. Farrell joined the Company as Vice President--Finance in September 1997. From June 1995 to September 1997, Mr. Farrell served as a Manager for The Pittson Company (a diversified holding company), where he was responsible for financial review and re-engineering in the security services and air freight divisions. From May 1994 to June 1995, Mr. Farrell was employed by ADT Security Systems, Inc. as a Manager of Planning and Marketing. Prior thereto, he served as Director of Accounting for Brinks Home Security, Inc. from September 1986 to December 1993. Mr. Farrell has over 15 years of business experience and is a Certified Public Accountant.

MARK D. GONSALVES. Mr. Gonsalves joined the Company in July 1995 as Vice President--Sales and Marketing and now serves as Vice President--Sales and Marketing, Retail. Prior to joining the Company, Mr. Gonsalves was President and Chief Executive Officer of In-Sync Sport International, Inc. (a sports psychology company founded by Mr. Gonsalves) from January 1992 to July 1995. He was a professional golfer from 1990 to 1992. Mr. Gonsalves has 16 years of sales and marketing experience.

STEVEN P. SANAZARO. Mr. Sanazaro joined the Company as Vice President--Information Technology in January 1998. Prior to joining Adams, Mr. Sanazaro served as Director, Information Technology for Sprint Corporation from June 1987 to November 1992, as Vice President, Information Technology for Pepsico, Inc. from May 1996 to January 1998 and as Vice President, Research and Development and Chief Technology Officer for Harbinger Corporation (a supplier of electronic commerce software and network services) from August 1993 to May 1996. Mr. Sanazaro has approximately 30 years of business technology experience.

PAUL F. BROWN, JR. Mr. Brown became a director of the Company in August 1995. Mr. Brown has been Vice President--Finance and Chief Financial Officer of Royal (a holding company with diversified interests) since 1990. Mr. Brown has 29 years of experience in accounting, auditing, and finance and is a Certified Public Accountant.

ROLAND E. CASATI. Mr. Casati became a director of the Company in November 1995. Mr. Casati has been Chairman of the Board of Continental Offices, Ltd. for over five years. Continental Offices, Ltd. is engaged in the development of residential and commercial real estate ar ' 'iversified personal investments. Mr. Casati is a director of Zeigler Coal Holding Co. (one of the largest coal producers in the U.S.) and Visits, Inc. (a company engaged in the design of Internet web sites for the promotion of golf products).

FINIS F. CONNER. Mr. Conner became a director of the Company in October 1996. From 1985 to February 1996, Mr. Conner was Chairman of the Board and Chief Executive Officer of Conner Peripherals, Inc. (a manufacturer of disk drives for personal computers founded by Mr. Conner in 1986) which, in February 1996, merged with Seagate Technology, Inc. ("Seagate") (a publicly traded manufacturer of computer components co-founded by Mr. Conner in 1979). Mr. Conner served as Vice-Chairman of Seagate from 1979 to 1985. Since February 1996, Mr. Conner has been a principal of the Conner Group, an independent consulting organization, and Chairman of the Board of Virtual Visits, Inc. Mr. Conner is also a director of Box Hill Systems Corp., a manufacturer of high performance data storage systems.

MARK R. MULVOY. Mr. Mulvoy became a director of the Company in April 1998. Mr. Mulvoy is a retired executive of Sports Illustrated magazine, where he was employed from 1965 to 1998. Mr. Mulvoy was Managing Editor of Sports Illustrated from 1984 through 1996 and Publisher from 1990 to 1992.

34

Mr. Mulvoy has written 12 books including "GOLF - THE PASSION AND THE CHALLENGE." He is also a director of Tosco Corporation (the largest independent refiner and marketer of petroleum products in the U.S.).

STEPHEN R. PATCHIN. Mr. Patchin became a director in October 1993. He has been President and Chief Executive Officer of Royal Oil and ⊃rp., an oil and gas exploration and production company and wholly owned subsidiary of Royal, since June 1985 and President and Chief ive Officer of Royal since February 1990.

Executive officers of the Company are elected by and serve at the discretion of the Board of Directors.

## KEY MANAGEMENT EMPLOYEES

The following table sets forth certain information with respect to certain additional key management employees of the Company

| NAME | AGE | POSITION(S) HELD |
|------|-----|------------------|
| Walter G. DeVault | 47 | Director of Customer Service and Consumer Sales |
| Cindy A. Herington | 36 | Director of Advertising and Direct Response Marketing |
| Christopher K. Beebe IV | 41 | Director of International Sales |

Certain additional information concerning these individuals is set forth below.

WALTER G. DEVAULT. Mr. DeVault joined the Company as Director of Customer Service and Consumer Sales in February 1998. He has worked in the home security industry for the last eight years. Mr. DeVault served as Director of Sales for X-Trader, Inc. (a home security company) from February 1992 to July 1994 and as National Sales Director for Brink's Home Security, Inc. from August 1994 to February 1998. Mr. DeVault has over 25 years of sales and sales management experience.

CINDY A. HERINGTON. Ms. Herington joined the Company as Director of Special Projects in May 1997. Ms. Herington became Director of Advertising and Direct Response Marketing in April 1998. Prior to joining the Company, Ms. Herington had been employed from August 1987 to May 1997 by The Neiman Marcus Group, Inc. in a variety of sales management positions. Ms. Herington is the daughter of Mr. Adams, the ⌐ny's Chairman of the Board, Chief Executive Officer and President.

CHRISTOPHER K. BEEBE IV. Mr. Beebe joined the Company as Director of International Sales in March 1998. He has been involved with international sales for the past 10 years. From June 1989 through July 1994, Mr. Beebe held various international sales positions with Ram Golf Corporation (a golf equipment manufacturer), and from August 1994 through April 1997 he was Vice President--Asia/Pacific with Lynx Golf, Inc. (a golf equipment manufacturer).

## COMMITTEES OF THE BOARD OF DIRECTORS

The Board of Directors currently has two standing committees: the Compensation/Plan Committee and the Audit Committee. The Compensation/Plan Committee is responsible for the recommendation to the Board of Directors of annual salaries for senior management as well as the administration and grant of awards under the Company's Incentive Plan and the Company's Bonus Plan (the "Bonus Plan"). The Compensation/Plan Committee is comprised of Messrs. Casati, Mulvoy and Patchin.

The Audit Committee is responsible for meeting periodically with representatives of the Company's independent public accountants to review the general scope of audit coverage, including consideration of the Company's accounting practices and procedures and system of internal accounting controls, and to report to the Board of Directors with respect thereto. The Audit Committee also makes recommendations to the Board of Directors with respect to appointment of the Committee's independent auditors. The Audit Committee is comprised of Messrs. Brown and Conner.

## EXECUTIVE COMPENSATION

The following table sets forth all compensation received by the Company's Chief Executive Officer and the executive officers whose total annual salary and bonus exceeded $100,000 during the fiscal year ended December 31, 1997 (collectively, the "Named Executive Officers").

### SUMMARY COMPENSATION TABLE

| NAME AND PRINCIPAL POSITION | YEAR | ANNUAL COMPENSATION | | OTHER ANNUAL COMPENSATION | ALL OTHER COMPENSATION |
| --- | --- | --- | --- | --- | --- |
| | | SALARY | BONUS | | |
| B. H. Adams<br>Chairman of the Board, Chief Executive Officer and President | 1997 | $ 162,940 | $ 10,015,000(1) | $ 2,541,680(2) | $ 4,185(3) |
| Richard H. Murtland<br>Vice President-Research and Development<br>Secretary and Treasurer | 1997 | 72,548 | 40,000 | -- | -- |
| Mark D. Gonsalves<br>Vice President--Sales and Marketing, Retail | 1997 | 62,400 | 352,144(4) | -- | -- |

(1) Represents (a) $15,000 cash bonus and (b) value of 2,000,000 shares of Common Stock granted on December 31, 1997 having a fair market value, as determined by the Board of Directors, of $5.00 per share on the date of grant. See "Certain Transactions."

(2) Represents reimbursement of federal income taxes and Medicare tax liability associated with the grant of certain restricted shares of Common Stock. See "Certain Transactions."

(3) Comprised of premiums for a life insurance policy for which members of Mr. Adams' family are the beneficiaries.

(4) Represents bonus earned in 1997 pursuant to the terms of a sales commission agreement which expired by its terms on December 31, 1997.

### FISCAL YEAR-END OPTION VALUES

| NAME | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR-END(#) | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END($)(1) | |
| --- | --- | --- | --- | --- |
| | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| B. H. Adams | 1,520,766 | 0 | $ 7,033,552 | -- |
| Richard H. Murtland | 222,214 | 0 | 1,027,739 | -- |
| Mark D. Gonsalves | 333,320 | 0 | 1,542,605 | -- |

(1) Calculated by determining the difference between the fair market value of the Common Stock underlying the options at December 31, 1997 ($5.00 per share), as determined by the Board of Directors, and the exercise price of such options. See "Certain Transactions." Each of the options referred to herein was exercised by the respective option holder during January 1998.

## BENEFIT PLANS

1998 STOCK INCENTIVE PLAN. In February 1998, the Company adopted the 1998 Stock Incentive Plan. The purpose of the Incentive Plan is to provide incentives and rewards for participating employees and consultants of the Company (i) to support the execution of the Company's business strategies and the achievement of its goals and (ii) to associate the interests of such persons with those of the Company's stockholders. In furtherance of this purpose, the Incentive Plan authorizes the granting of stock options, including incentive stock options (within the meaning of Section 422 of the Internal Revenue Code of

36

1986, as amended) (the "Code"), stock appreciation rights, restricted and performance shares, restricted and performance share units, performance stock awards, dividend or equivalent rights, or other awards that are valued in whole or in part by reference to, or otherwise based on, the Common Stock of the Company (each, an "Award") A total of 1,800,000 shares of Common Stock have been reserved for issuance upon the exercise of Awards granted under the Incentive Plan, subject to adjustment in accordance with the terms of the Incentive Plan.

    :onsummation of the Offering, the Incentive Plan will be administered by the Compensation/ Plan Committee comprised of Messrs. Cocati, Mulvoy and Patchin. The Compensation/Plan Committee has discretion to select the persons to whom Awards will be granted (each, a "Participant"), to determine the type, size and terms and conditions applicable to each Award and the authority to interpret, construe and implement the provisions of the Incentive Plan. Each Award under the Incentive Plan shall be evidenced by an Award Agreement.

Under the Incentive Plan, the Company may grant, in addition to other Awards, incentive or nonqualified stock options  The exercise price of any option granted under the Incentive Plan must be at least equal to the fair market value of the Common Stock on the date of the grant, and in the case of a grant of an incentive stock option to any Participant who owns stock representing more than 10% of the Common Stock, the exercise price shall at least equal 110% of the fair market value of the shares at the time the incentive stock option is granted. In addition, no incentive stock option is exercisable more than 10 years from the date of grant (5 years if such option is granted to a Participant who owns in excess of 10% of the Common Stock) and the aggregate fair market value, determined on the date of grant, of the Common Stock as to which such incentive stock options are exercisable for the first time by any Participant in the Incentive Plan shall be limited to $100,000 per calendar year. The Incentive Plan also permits the grant of stock appreciation rights (rights to receive the excess of the fair market value of a share of Common Stock on the date the Award is exercised over the fair market value of a share of Common Stock on the date of grant for such period as the Compensation/Plan Committee may determine); restricted and performance shares (a transfer of shares of Common Stock to a Participant, subject to such restrictions on transfer or other incidents of ownership, or subject to specified performance standards as the Compensation/Plan Committee may determine); restricted or performance share units (fixed or variable share or dollar-denominated units subject to conditions of vesting, performance and time of payment as the Compensation/Plan Committee may determine, which may be paid in shares of Common Stock, cash or a combination of both); dividend or equivalent rights (rights to receive dividends or their equivalent in value in shares of Common Stock, cash or in a combination of both with respect to any new or previously existing Award); performance stock awards (rights to receive restricted shares that will not be issued until after the end of the applicable performance period, subject to the satisfaction of specified performance goals); and other Common Stock-based Awards, in each case, as set forth in the Incentive Plan

At May 31, 1998, the Company had granted Awards under the Incentive Plan consisting of (i) options to purchase an aggregate of 382,000 shares of Common Stock, none of which were exercisable at such date and (ii) 900,000 shares of restricted Common Stock  It is anticipated that all of the Company's employees will be considered for participation in the Incentive Plan.

J     ticipant terminates his or her service for reasons other than retirement, permanent and total disability or death, the Participant may ‹      ‹, no later than the date of termination, only those stock options vested as of the date of termination  Upon retirement, a Participant's opti..ns immediately vest and such Participant may exercise nonqualified stock options within one year of retirement and incentive stock options within three months of such retirement. In order to retire under the Incentive Plan, a Participant must have attained the age of 62 and have had 10 years of continuous employment with the Company. In the case of termination as a result of permanent and total disability, a Participant's options will immediately vest and such Participant will have one year from termination to exercise any outstanding options. If a Participant who was granted stock options dies while employed by the Company, or during the period which options may be exercised following termination of employment due to retirement or permanent and

total disability, all stock options granted under the Incentive Plan immediately vest and must be exercised by the Participant's estate no later than the termination date of such option. Except to the extent permitted by the Code and the rules and regulations promulgated under Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (i) no Award under the Incentive Plan is assignable or transferable except by will, by the laws of descent and distribution or pursuant to a qualified domestic relations order and (ii) during the lifetime of a Participant, the Award will be exercisable only by such Participant or such Participant's guardian, legal entative or assignee pursuant to a qualified domestic relations order.

The Incentive Plan provides that, in the event of a "change of control" (as defined below), the following may, in the sole discretion of the Compensation/Plan Committee, occur with respect to any and all Awards outstanding as of such change of control:

(i) automatic maximization of performance standards, lapse of all restrictions and acceleration of any time periods relating to the exercise, realization or vesting of such Awards so that such Awards may be immediately exercised, realized or vested in full on or before the relevant date fixed in the applicable Award Agreement;

(ii) performance shares or performance units shall be paid entirely in cash;

(iii) upon the exercise of a stock option during the 60-day period from and after the date of the change of control, the Participant exercising the option may in lieu of the receipt of Common Stock upon exercise, elect by written notice to the Company to receive an amount in cash equal to the excess of the aggregate Value (as hereinafter defined) of the shares of Common Stock covered by the option or portion thereof surrendered, determined on the date the option is exercised, over the aggregate exercise price of the option (the "Aggregate Spread") However, if the end of such 60 day period is within six months of the date of grant of the option held by a Participant subject to the reporting requirements of Section 16 of the Exchange Act, such option shall be canceled in exchange for a cash payment to the participant equal to the Aggregate Spread on the day which is six months and one day after the date of grant of such option. "Value," as more fully defined in the Incentive Plan, means the higher of (i) the highest fair market value during the 60-day period after the date of a change of control and (ii) if the change of control is the result of a transaction described in paragraphs (i) or (iii) under the definition of a change of control, the highest price per share of the Common Stock paid in such transaction

(iv) if a Participant's employment or engagement terminates for any reason other than retirement or death following a change of control, any options held by such Participant may be exercised by such Participant until the earlier of three months after the termination of employment or engagement or the expiration date of such options; and

(v) all Awards become non-cancellable

1    rposes of the Incentive Plan, "change of control" is defined, in general, to mean the occurrence of any of the following events: (i) the acquisition, other than from the Company, by an individual, entity or group (other than Royal or B H. Adams) of beneficial ownership of thirty percent (30%) or more of either the then outstanding shares of Common Stock or the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in election of directors, (ii) the ceasing, for any reason, of individuals who, as of January 1, 1998, constitute the Board of Directors to constitute at least a majority of the Board, provided that any individual becoming a director subsequent to such date whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the incumbent Board shall be considered as though such individual were a member of the incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the directors of the Company; (iii) approval by the stockholders of the Company of a

38

reorganization, merger or consolidation of the Company, in each case, whereby the individuals who were the respective beneficial owners of the Common Stock and voting securities of the Company immediately prior to such reorganization, merger or consolidation do not, following such reorganization, merger or consolidation, beneficially own, directly or indirectly, more than sixty percent (60%) of the then outstanding shares of Common Stock and the combined voting power of the then outstanding voting securities entitled to vote generally in election of ? ·ors, as the case may be, of the corporation resulting from such reorganization, merger or consolidation, or complete liquidation or ition of the Company or the sale or other disposition of all or substantially all of the assets of the Company. The Incentive Plan .ates on February 25, 2008.

1996 STOCK OPTION PLAN. In April 1996, the Company adopted a stock option plan (the "1996 Plan") providing for the issuance to certain officers, directors, employees and advisors of the Company of incentive stock options within the meaning of Section 422 of the Code and stock options that are nonqualified for federal income tax purposes. A total of 800,000 shares of Common Stock have been reserved for issuance upon the exercise of options granted under the 1996 Plan, subject to adjustment in accordance with such plan. At May 31, 1998, options to purchase an aggregate of 659,694 shares of Common Stock had been granted under the 1996 Plan, of which 618,030 had been exercised. All such stock options were granted at an exercise price that was, at the time of grant, equal to the fair market value of a share of Common Stock, as determined by the Board of Directors. The Company currently does not anticipate making additional grants under the 1996 Plan.

401(K) PLAN. In February 1998, the Company adopted its 401(k) Retirement Plan (the "Retirement Plan"). Generally, all employees who are 18 years of age and who have completed a three-month consecutive period of service are eligible for participation in the Retirement Plan.

The Retirement Plan is a defined contribution plan intended to qualify under Section 401 of the Code, such that participants generally may elect to contribute to the Retirement Plan, on a pretax basis, up to 15% of their compensation per pay period in the form of voluntary payroll deductions (for which the statutorily prescribed annual limit in 1998 is $10,000 per participant) ("Voluntary Contributions"). The Company makes matching contributions equal to 50% of the first 6% of a participant's compensation contributed to the Retirement Plan during such pay period ("Mandatory Matching Contributions"). From time to time, the Company may make additional discretionary contributions to the Retirement Plan ("Discretionary Contributions," and together with Mandatory Matching Contributions. "Company Contributions").

Participants who were employed by the Company at May 1, 1998 are immediately vested in all Company Contributions. Participants who were not employed by the Company on May 1, 1998 are gradually vested in all Company Contributions over a period of three years of credited service, vesting 33 1/3% a year for each full year of service beginning with the participant's first anniversary, and becoming fully vested after three years of service or upon death, total and permanent disability, retirement under the Retirement Plan or Retirement Plan termination. Participants are always fully vested in their Voluntary Contributions.

\    ANY BONUS PLAN. In February 1998, the Company adopted the Bonus Plan to become effective for the fiscal quarter commencing January 1. 1998. The Bonus Plan is administered by the Compensation/ Plan Committee. Participation is based upon individual selection by the Compensation/Plan Committee from among key employees who, in the judgment of the Compensation/Plan Committee, make significant contributions to the performance of the Company and whose decisions and actions most significantly affect the growth, profitability and efficient operations of the Company. It is anticipated that approximately 22 individuals will initially participate in the Bonus Plan. The aggregate amount of any awards paid with respect to calendar year 1998 to any participant under the Bonus Plan shall not exceed 8% of the Company's net pre-tax operating profits.

39

Awards are based upon the extent to which the Company's financial performance (measured in terms of financial goals or objectives as may be determined by the Compensation/Plan Committee) during the appropriate measurement period for each award (e.g., the calendar year, calendar quarter, etc.) has met or exceeded certain performance goals specified by the Compensation/Plan Committee. Some performance goals applicable to participants in the Bonus Plan may include elements which specify individual achievement objectives directly related to such idual's area of responsibility. The Compensation/Plan Committee may, in its discretion, decrease, but not increase, the amount of any granted under the Bonus Plan. Additionally, the Compensation/Plan Committee may alternatively grant discretionary bonuses

Because the performance goals under the Bonus Plan are determined by the Compensation/Plan Committee in its discretion, it is not possible to determine the benefits and amounts that will be received by any individual participant or group of participants in the future. The Board of Directors may terminate, modify or suspend the Bonus Plan, in whole or in part, at any time; provided that no such termination or modification may impair any rights which may have accrued under such Bonus Plan.

## COMPENSATION OF DIRECTORS

Prior to the Offering, directors did not receive compensation to serve as directors of the Company but did receive reimbursement for expenses traveling to and from meetings of the Board of Directors. The Company intends to continue to reimburse directors for their reasonable expenses associated with attending meetings. The Company is also considering the adoption of a Director Plan to further incentivize the directors and align their interests with those of the stockholders.

## LIMITATION OF LIABILITY AND INDEMNIFICATION MATTERS

The Company's Certificate of Incorporation limits the liability of directors to the maximum extent permitted by Delaware law. Delaware provides that a corporation's certificate of incorporation may contain a provision eliminating or limiting the personal liability of directors for monetary damages for breach of their fiduciary duties as directors, except for liability (i) for any breach of their duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) for unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the DGCL or (iv) for any transaction from which a director derives an improper personal benefit.

The Company's Certificate of Incorporation and Bylaws provide that the Company will indemnify, to the fullest extent permitted by applicable law as from time to time may be in effect, any person against all liability and expense (including attorneys' fees and settlement costs) incurred by reason of the fact that he is or was a director or officer of the Company. Expenses (including reasonable attorneys' fees) incurred in ding any proceeding or prosecution will be paid by the Company in advance of the final disposition of such proceeding or suit upon of a written affirmation by the director or officer of his or her good faith belief that he or she has met the standard of conduct necessary demnification and a written undertaking by such person to repay such amount if it is ultimately determined that he or she is not entitled to indemnification. The Company may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, or agent of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against any liability asserted against and incurred by such person in any such capacity or arising out of such person's position, whether or not the Company would have the power to indemnify against such liability under the provisions of the Certificate of Incorporation or Bylaws of the Company.

40

The indemnification provided by the Certificate of Incorporation is not deemed to be exclusive of any other rights to which those indemnified may be entitled under any Bylaw, agreement or vote of stockholders or disinterested directors, or otherwise, and inures to the benefit of their heirs, executors and administrators. Further, such indemnification shall continue as to a person who has ceased to be a director or officer. The provisions of the Bylaws specifically permit the Company to indemnify other persons from similar or other expenses and liabilities as the ' of Directors may determine. Insofar as indemnification for liabilities under the Securities Act may be permitted to directors, officers or s controlling the Company pursuant to the foregoing provisions, the Company has been informed that, in the opinion of the Commission, indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

The Company is not aware of any pending litigation or proceeding involving any director, officer, employee or agent of the Company where indemnification will be required or permitted, nor any threatened litigation or proceeding that might result in a claim for such indemnification.

The foregoing description of certain provisions of the Company's Certificate of Incorporation and Bylaws is qualified in its entirety by the actual Certificate of Incorporation and Bylaws filed as exhibits to the Registration Statement of which this Prospectus is a part.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

Prior to April 29, 1998, the Company did not have a Compensation Committee or other committee of the Board of Directors performing similar functions. Decisions concerning compensation of executive officers have generally been made by Mr. Adams in consultation with the other members of the Board of Directors. None of the executive officers of the Company currently serves on the Compensation Committee of another entity or on any other committee of the Board of Directors of another entity performing similar functions.

41

## CERTAIN TRANSACTIONS

In September 1995, the Company effected a reorganization (the "Reorganization") pursuant to which it (i) distributed to its stockholders the shares of common stock of Supershafts, Inc., a Texas corporation ("Supershafts"), held by the Company and constituting a minority interest in ʿ    ʾshafts, (ii) issued four shares of Common Stock in exchange for each share of Supershafts common stock then outstanding and (iii)     ʾified, on a 1 for 1 basis, all of the outstanding Series A Preferred Stock and Series B Preferred Stock of the Company as Common Stock ʾ    ʾesult of the Reorganization, the Company issued an aggregate of 5,827,406 shares of Common Stock. Supershafts became a wholly-owned subsidiary of the Company and the Common Stock became the only class of capital stock of the Company outstanding. Mr. Adams and Royal Holding Company, Inc received 820,000 and 3,706,382 shares of Common Stock, respectively, in the Reorganization

In 1996 and 1997, the Company borrowed an aggregate of $450,000 from Royal of which $250,000 was advanced in 1997, to finance the production of the Company's infomercial. Such advances bore interest at the prime rate. In September 1997, the Company paid accrued interest of $29,233 on this debt and issued 900,000 shares of Common Stock (at a rate of $.50 of principal indebtedness per share) to Royal in cancellation of the principal amount

In December 1997, the Board of Directors of the Company granted to Mr. Adams, the Company's Chairman of the Board, Chief Executive Officer and President, 2,000,000 shares of Common Stock. The Board of Directors also provided Mr. Adams with a cash payment of $2,541,688, an amount equal to the federal income tax and Medicare tax liability associated with such stock grant and bonus. In the first quarter of 1998, Mr. Adams loaned $1 1 million of such funds back to the Company pursuant to an unsecured promissory note at an interest rate of 5 39% per annum. The Company repaid $600,142 of the note on April 14, 1998 and the remaining principal amount of the note ($534,899) is payable in installments of $312,500 and $222,399 on December 15, 1998 and April 14, 1999, respectively. In determining that the stock grant and bonus to Mr. Adams were appropriate and in the best interests of the Company and its stockholders, the Board of Directors considered, among other factors, the Company's revenue and operating income growth and improved competitive position under Mr. Adams' leadership. Mr. Adams' historical cash compensation and the Board of Directors' desire to increase Mr. Adams' equity interest in the Company to a level commensurate with his contributions to and role with the Company  The Board of Directors determined that the value of Mr Adams' services to the Company exceeded the fair market value of the stock ($10,000,000) and bonus  The Company does not consider these payments to be indicative of future levels of compensation to Mr Adams or other executives of the Company

The agreement between the Company and Nick Faldo (the "Faldo Agreement") became effective May 1, 1998 and provides that Mr. Faldo will exclusively endorse the Company's clubs and undertake certain other promotional activities on behalf of the Company. Pursuant to the Faldo Agreement, the Company and Mr Faldo will design a line of clubs to be used by Mr Faldo in tournaments and other events, provided such clubs are suitable for Mr. Faldo's use. Under the Faldo Agreement, the Company has licensed the worldwide rights to the Nick Faldo trademark f    ʾ  ʾin connection with the distribution of its golf clubs, head covers, golf bags, travel covers, golf towels and umbrellas which it designs or     ctures.

As compensation for the licensing and endorsement arrangement set forth in the Faldo Agreement, the Company has granted 900,000 shares of Common Stock to Mr. Faldo  Subject to certain exceptions including transfers to Mr. Faldo's agent, Mr. Faldo may not transfer, dispose of or otherwise assign any rights in more than 100,000 shares of Common Stock in any calendar year prior to 2002. In addition, Mr. Faldo is entitled to receive a royalty of 5% of the net sales price of all Adams golf clubs (other than certain specialty items for which the royalty equals 10% of the net sales price) sold outside the U.S. throughout the term of the Faldo Agreement. The Faldo Agreement provides for a minimum royalty of $1.5 million in 1999 escalating to $4 0 million for years 2004 through 2008. From 2009 through 2014, the minimum royalty is $1.5 million, as adjusted for changes in the consumer price index  After 2014, the Faldo

42

Agreement does not provide for a minimum royalty. Commencing with 2009, however, the Faldo Agreement provides for a maximum royalty of $4.0 million, as adjusted for changes in the consumer price index. In the event Mr. Faldo does not compete in a minimum number of worldwide golf events each year, such royalty payments shall be reduced on a pro-rata basis, unless such events are missed as a result of illness or injury. The Company has also agreed that through the year 2008, it will support the "Faldo Junior Series" in the United Kingdom by making a    nual contribution to the sponsoring organization of not less than $45,000 for each year the tournament is played under that name. The        Agreement further provides that, so long as royalties remain payable thereunder, the Company will use commercially reasonable efforts t    se a designee of Mr. Faldo to be nominated for, and elected to, the Board of Directors of the Company. As of the date of this Prospectus. Mr. Faldo has not notified the Company of his designation to the Board.

The Faldo Agreement extends through Mr. Faldo's lifetime; however, the Company has the right to terminate the Faldo Agreement earlier if Mr. Faldo (a) is unable to perform the duties required by the Faldo Agreement for a period of 12 consecutive months, (b) retires or becomes officially ineligible to compete on the PGA and/or Senior PGA tour, or (c) has engaged in illegal or immoral conduct resulting in a felony conviction, or has otherwise conducted himself in a manner not in keeping with the standards of professional conduct set forth in the Faldo Agreement. In the event of the death of Mr. Faldo prior to May 1, 2030, the Company may, at its option, continue the terms of the Faldo Agreement until May 1, 2030, in which case, Mr. Faldo's heirs or estate shall be entitled to any royalties due.

KPMG, a public accounting firm in which Mr. Hatfield was a partner until April 30, 1998, has provided accounting and auditing services to the Company during 1997 and 1998. The amounts paid to KPMG for services rendered during 1997 and 1998 were $112,887 and $403,520, respectively. Mr. Hatfield is currently Senior Vice President--Finance and Administration and Chief Financial Officer of the Company. The Company has an agreement with Mr. Hatfield providing that, upon Mr. Hatfield's termination without cause following certain change of control events, Mr. Hatfield's stock options will become fully vested and Mr. Hatfield will be paid an amount equal to one year of his base salary.

From January 1, 1998 through May 31, 1998, the Company paid Virtual Visits, Inc. ("Virtual Visits"), a company engaged in the design of Internet Web sites for the promotion of golf products, approximately $60,000. The Company expects to pay at least an additional $10,000 to Virtual Visits during 1998. Mr. Conner and Mr. Casati, directors of the Company, are also directors and significant stockholders of Virtual Visits.

In January 1998, the Company made loans of $83,330 and $125,000 to Mr. Murtland and Mr. Gonsalves, respectively, to finance the aggregate exercise price of stock options then exercised by such individuals. The loans bore interest at the rate of 5% per annum and were due January 14, 2001. The loan to Mr. Murtland was repaid in April 1998. Messrs. Murtland and Gonsalves are each executive officers of the Company

Th  Company has granted options to purchase the Company's Common Stock to certain of its officers and directors. See "Management-- `Plans" and "Principal and Selling Stockholders."

The Company believes that all of the transactions set forth above were made on terms no less favorable to the Company than could have been obtained from unaffiliated third parties. All future transactions between the Company and its officers, directors, principal stockholders and their affiliates will be approved by a majority of the Board of Directors, including a majority of the independent and disinterested outside directors

43

## PRINCIPAL AND SELLING STOCKHOLDERS

The following table and the notes thereto set forth certain information regarding the beneficial ownership of the Common Stock as of May 31, 1998, by

.  h person known by the Company to own beneficially more than 5% of the outstanding shares of the Common Stock, (ii) each director of mpany, (iii) each Named Executive Officer, (iv) all directors and executive officers of the Company as a group, and (v) each Selling Stockholder. Unless otherwise noted in the notes to the table, the Company believes the executive officers and directors can be contacted at the principal offices of the Company

| NAME OF BENEFICIAL OWNERS | BENEFICIAL OWNERSHIP OF COMMON STOCK PRIOR TO THE OFFERING(1) | | NUMBER OF SHARES OF COMMON STOCK TO BE SOLD(2) | BENEFICIAL OWNERSHIP OF COMMON STOCK AFTER THE OFFERING(1)(2) | |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | NUMBER | PERCENT |
| DIRECTORS AND NAMED EXECUTIVE OFFICERS | | | | | |
| B. H. Adams | | | | | |
| Richard H. Murtland | 4,482,321 | 23 5% | 920,000 | 3,554,321 | 15 4% |
| Mark D. Gonsalves | 333,952 | 1 7 | 66,750 | 267,202 | 1.2 |
| Paul F. Brown, Jr.(3)(4) | 333,320 | 1.7 | 0 | 333,320 | 1 4 |
| Roland E. Casati | 7,405,438 | 38 8 | 454,745(5) | 6,950,693 | 30 1 |
| Finis F. Conner | 1,838,600 | 9.6 | 0 | 1,838,600 | 8.0 |
| Mark R. Hulvoy | 1,942,776 | 10.2 | 388,555 | 1,554,221 | 6.7 |
| Stephen R. Patchin(3)(4) | 0 | 0 0 | 0 | 0 | 0 0 |
| ALL EXECUTIVE OFFICERS AND DIRECTORS AS A GROUP (11 PERSONS)(4)(6) | 7,405,438 | 38 8 | 454,745(5) | 6,950,963 | 30.1 |
| BENEFICIAL OWNERS OF 5% OR MORE OF THE COMPANY'S COMMON STOCK | 16,301,407 | 85 6 | 1,838,050 | 14,543,537 | 62 8 |
| Royal Holding Company, Inc (3)(4) | 7,405,438 | 38 8 | 454,745 | 6,950,693 | 30.1 |
| OTHER SELLING STOCKHOLDERS | | | | | |
| Lincoln Trust Company Custodian f/b/o Richard Urdahl | 116,592 | * | 77,000 | 39,592 | * |
| Richard Urdahl(7) | 119,392 | * | 79,800(8) | 39,592 | * |
| Faris McMullin | 111,730 | * | 73,750 | 37,980 | * |
| Peter Cassady | 8,400 | * | 8,400 | 0 | 0 0 |

.than one percent

(1) Applicable percentage of ownership is based on 19,099,282 shares of Common Stock outstanding on May 31, 1998, and 23,099,282 shares of Common Stock to be outstanding upon completion of the Offering Common Stock is the only class of equity securities outstanding Beneficial ownership is determined in accordance with the rules of the Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options that are presently exercisable or exercisable within 60 days of May 31, 1998 are deemed to be beneficially owned by the person holding such options for the purpose of computing the beneficial ownership of such person, but are not treated as outstanding for the purpose of computing the beneficial ownership of any other person

(2) Does not give effect to the exercise of the Underwriters' over-allotment option or to purchases in the Offering, if any If the Underwriters over-allotment option is exercised in full, Messrs. Adams, Murtland, Gonsalves, Conner, Urdahl, McMullin and Cassady would beneficially own 3,362,321 (14 6%), 250,464 (1.1%), 303,320 (1.3%), 1,554,221 (6 7%), 30,000 (less than 1%) (representing 30,000 shares held of record by Lincoln Trust Company as custodian for Mr. Urdahl), -0- and -0- shares of Common Stock, respectively, and Royal Holding Company, Inc and Lincoln Trust Company would own 6,374,511 (27.6%) and 30,000 (less than 1%) shares, respectively, after the Offering. See "Underwriting."

(3) The address for Messrs. Patchin and Brown and for Royal is c/o Royal Holding Company, Inc , 300 Delaware Avenue, Suite 306, Wilmington, Delaware 19801.

(4) Includes 7,405,438 shares of Common Stock owned directly by Royal. Messrs. Patchin and Brown, directors of the Company, are the (i) Chief Executive Officer and President and (ii) Chief Financial Officer and Vice President-- Finance, respectively, of Royal and, by virtue of their positions with Royal, may be deemed to share the power to vote or direct the vote of, and to share the power to dispose or direct the disposition of, these shares of Common Stock. Each of Messrs. Patchin and Brown disclaim beneficial ownership of the shares of Common Stock held by Royal

(5) Represents shares sold for the account of Royal Holding Company, Inc.

.  .des 45,000 shares of Common Stock subject to options exercisable by Darl P Hatfield, an executive officer of the Company, within 60 d.,  .t May 31, 1998.

(7) Includes 116,592 shares of Common Stock held of record by Lincoln Trust Company as custodian for Mr. Urdahl and 2,800 shares of Common Stock held of record by Mr. Urdahl.

(8) Represents 77,000 shares sold for the account of Lincoln Trust Company as custodian for Mr Urdahl and 2.800 shares sold for the account of Mr. Urdahl

44

## DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company consists of 50,000,000 shares of Common Stock, $.001 par value per share, and 5,000,000 shares of Preferred Stock, $.01 par value per share (the "Preferred Stock"). The following description of certain characteristics of the capital stock of mpany does not purport to be complete and is subject to, and qualified in its entirety by, the provisions of the Certificate of oration, Bylaws and the Registration Rights Agreement, as defined below, each of which is included as an exhibit to the Registration Statement of which this Prospectus is a part, and by the provisions of applicable law.

## COMMON STOCK

As of May 31, 1998, there were 19,099,282 shares of Common Stock outstanding held of record by 101 stockholders. The holders of Common Stock are entitled to share pro rata in dividends and distributions, if any, with respect to the Common Stock when, as and if declared by the Board of Directors, from funds legally available therefor. See "Dividend Policy". Holders of Common Stock are entitled to one vote per share, are not entitled to cumulative voting in the election of directors and have no preemptive, subscription, redemption or conversion rights. Upon the liquidation, dissolution or winding up of the Company, the assets of the Company remaining after payment of or provision for liabilities and payment to the holders of Preferred Stock of such preferential amounts that they are entitled to receive will be distributed pro rata on a share-for-share basis among the holders of Common Stock. All outstanding shares of Common Stock are, and the shares to be issued and sold in the Offering will be, duly authorized, validly issued, fully paid and non-assessable. The rights, preferences and privileges of holders of Common Stock are subject to any series of Preferred Stock that the Company may issue in the future.

The Company effected a two-for-one stock split on May 1, 1998 in contemplation of this Offering. The Company had 9,549,641 shares of Common Stock issued and outstanding immediately prior to the stock split.

## PREFERRED STOCK

The Company's Board of Directors is authorized, without further action by the stockholders, to divide the Preferred Stock into series and, with respect to each series, to determine the preferences and rights, and the qualifications, limitations or restrictions thereof, including the dividend rights, conversion rights, voting rights, redemption rights and terms, liquidation preferences, sinking fund provisions, the number of shares constituting the series and the designation of such series. The Board of Directors could, without stockholder approval, issue Preferred Stock with voting and other rights that could adversely affect the voting power of the holders of Common Stock and could have certain anti-takeover effects. The Company has no present plans to issue any shares of Preferred Stock.

thority possessed by the Board of Directors to issue Preferred Stock could potentially be used to discourage attempts by others to obtain control of the Company through merger, tender offer, proxy contest or otherwise by making such attempts more costly or difficult to achieve.

## REGISTRATION RIGHTS

Pursuant to the terms of that Registration Rights Agreement dated April 30, 1998 (the "Registration Rights Agreement") by and among the Company and certain stockholders of the Company holding an aggregate of 17,797,087 shares of Common Stock as of May 31, 1998, the Company has granted certain registration rights to such stockholders. Specifically, under the terms of the Registration Rights Agreement, the stockholders holding in excess of 40% of the Common Stock covered by such agreement have a right commencing at any time not earlier than the latter of (i) the expiration of any of the "lock-up" period prescribed by the Lock-up Agreement and (ii) the date on which the Company shall become eligible to use the Form S-3 Registration Statement (or any successor to such form) for the purpose of registering outstanding securities for the account of any person other than the Company, to demand that the shares of the Common Stock held by them be registered under the Securities Act. However, if the Board of Directors determines, in its good faith, that such registration would be detrimental to the Company and, as a result, that it is necessary to defer the filing of such registration statement at such time, the Company may defer such registration for a period not to exceed 180 days. The Company has agreed to pay all costs and expenses necessary to effect the registration of the shares of Common Stock to be sold by the stockholders in this first registration statement (other than underwriting and brokerage commissions, if

any, and legal fees incurred by the selling holders) If, after the Company has effected the first such registration statement, it shall receive a request for registration from the stockholders holding a majority of the shares of Common Stock subject to the Registration Rights Agreement not previously registered, the Company shall file a second or third registration statement for the purpose of registering such shares under the Securities Act; however, the Company and such stockholders have agreed to defer the filing of such registration statements in the same manner ‥ ‥ on the same basis as the first registration. The stockholders having shares registered in such subsequent registration statements have agreed all costs and expenses related thereto including the Company's fees and expenses relating to counsel, accountants and filing under the ‥ities Act.

The Registration Rights Agreement also grants certain piggy-back registration rights to the stockholders. Accordingly, whenever the Company proposes to register any shares of Common Stock under the Securities Act (other than registrations on Form S-4 or S-8), certain of the stockholders have the right to include the shares of Common Stock held by them in any such registration However, if the managing underwriter of such registration advises the Company in writing that, in its opinion, the total number or dollar amounts of securities requested to be included in such registration exceeds the number or dollar amount of shares of Common Stock that can be sold in such offering, the Company may exclude certain shares from the offering. In such a case, the order of priority in which shares are to be included in the proposed offering will be as follows: first, all shares of Common Stock that the Company proposes to sell; and second, up to the full number or dollar amount of shares of Common Stock requested by the stockholders to be included in such registration in excess of the number or dollar amount of shares of the Common Stock the Company proposes to sell which, in the opinion of such underwriter, can be sold, allocated pro rata among the participating stockholders on the basis of the number of shares of Common Stock requested to be included therein by each. The Company generally is obligated to bear the expenses, other than underwriting discounts and sales commissions, of the registration of such shares. Any exercise by the holders of such incidental registration rights may hinder efforts by the Company to arrange future financings and may have an adverse impact on the market price of the Common Stock

## DELAWARE LAW AND CERTAIN CHARTER AND BYLAW PROVISIONS

Following the consummation of the Offering, the Company will be subject to Section 203 of the DGCL, the "business combinations" statute. In general, such statute prohibits a publicly held Delaware corporation from engaging in various "business combinations" with any "interested stockholder" for a period of three years after the time that such stockholder became an "interested stockholder," unless (i) the business combination or the transaction by which such stockholder became an "interested stockholder" was approved by the Board of Directors prior to such time, (ii) upon consummation of the transaction which resulted in the stockholder becoming an "interested stockholder," the "interested stockholder" owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced (excluding for purposes of determining the number of shares outstanding those shares owned by (a) persons who are directors and also officers and (b) certain employee stock ownership plans) or (iii) on or subsequent to such time ‥ "business combination" is approved by the Board of Directors and authorized at an annual or special meeting of stockholders by the ‥itive vote of at least 66 2/3% of the outstanding voting stock which is not owned by the "interested stockholder." A "business ‥ ‥nation" includes mergers, asset sales and other transactions resulting in financial benefit to a stockholder. In general, an "interested stockholder" is a person who, together with affiliates and associates, owns (or within three years, did own) 15% or more of a corporation's outstanding voting stock The statute could prohibit or delay mergers or other takeover or change in control attempts with respect to the Company and, accordingly, may discourage attempts to acquire the Company.

In addition, certain provisions of the Company's Certificate of Incorporation and Bylaws summarized in the following paragraphs may be deemed to have an anti-takeover effect and may delay, defer or prevent an attempt to obtain control of the Company by means of a proxy contest, tender offer, merger or other transaction that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares held by stockholders.

CLASSIFIED BOARD OF DIRECTORS The Company's Certificate of Incorporation provides for the Board of Directors to be divided into three classes of directors serving staggered three-year terms. As a result, approximately one-third of the Board of Directors will be elected each year. Moreover, under the DGCL, in the case of a corporation having a classified board, stockholders may remove a director only for cause.

This provision, when coupled with the provision of the Bylaws authorizing the Board of Directors to fill vacant directorships, may preclude a stockholder from removing incumbent directors without cause and simultaneously gaining control of the Board of Directors by filling the vacancies created by such removal with its own nominees.

IAL MEETING OF STOCKHOLDERS The Company's Bylaws provide that special meetings of stockholders of the Company may be only by the Board of Directors, or the Executive Committee of the Board of Directors, if any, or the President. This provision will make it more difficult for stockholders to take actions opposed by the Board of Directors.

STOCKHOLDER ACTION BY WRITTEN CONSENT The Company's Certificate of Incorporation provides that no action required or permitted to be taken at any annual or special meeting of the stockholders of the Company may be taken without a meeting, and the power of stockholders of the Company's to consent in writing, without a meeting. for the taking of any action is specifically denied

ADVANCE NOTICE REQUIREMENTS FOR STOCKHOLDER PROPOSALS AND DIRECTOR NOMINATIONS The Bylaws provide that stockholders seeking to bring business before an annual meeting of stockholders, or to nominate candidates for election as directors at an annual or special meeting of stockholders, must provide timely notice thereof in writing. In order to be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Company no later than 90 days prior to the meeting; provided, however, that in the event that less than 100 days notice or prior public disclosure of the date of the meeting is given and made to stockholders. notice by the stockholder must be received no later than the close of business on the tenth day following the earlier of the day on which such notice of the date of the meeting was mailed or such public disclosure was made in order to be timely The Bylaws specify certain requirements for a stockholder's notice to be in proper form These provisions may preclude some stockholders from bringing matters before the stockholders at an annual or special meeting or from making nominations for directors at an annual or special meeting.

The Company believes the foregoing provisions are necessary to attract and retain qualified persons as directors and officers.

## MARKET INFORMATION

Prior to the Offering, there has been no established public trading market for the Common Stock The Common Stock has been approved for listing on the Nasdaq National Market under the symbol "ADGO."

## TRANSFER AGENT AND REGISTRAR

ompany has appointed The Bank of New York as the transfer agent and registrar for the Common Stock

47

### SHARES ELIGIBLE FOR FUTURE SALE

Upon the closing of the Offering, the Company will have 23,099,282 shares of Common Stock outstanding. Of these shares, the 4,000,000 shares sold by the Company and the 2,000,000 shares sold by the Selling Stockholders in the Offering will be freely tradeable without tion or further registration under the Securities Act unless held by an "affiliate" of the Company (as that term is defined below) Any such stock currently outstanding are "restricted securities" for purposes of Rule 144 ("Restricted Shares") Restricted Shares may be sold in the public market only if registered or if they qualify for an exemption from registration under Rule 144 or Rule 701 promulgated under the Securities Act. As a result of contractual restrictions and the provisions of Rule 144 and Rule 701, additional shares will be available for sale in the public market as follows: (i) no Restricted Shares will be eligible for immediate sale on the date of this Prospectus; (ii) no additional Restricted Shares will be eligible for sale 90 days after the date of this Prospectus; and (iii) an additional 16,184,282 Restricted Shares will be eligible for sale upon expiration of the Lock-up Agreements, 180 days after the date of this Prospectus.

After the expiration of the Lock-up Agreements, the Company may file a Registration Statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance to its employees, officers, directors and consultants under its employee benefit plans. Upon the effective date of such Registration Statement, shares of Common Stock issued upon exercise of options granted under the plans generally will be available for sale in the open market As of the date of this Prospectus, the Company has granted outstanding options to purchase up to 423,666 shares of Common Stock to certain employees, officers, directors and consultants under the 1996 Plan and the Incentive Plan, none of which were then exercisable. In addition, Mr Faldo has been granted 900,000 shares of Common Stock pursuant to the terms of the Incentive Plan, however, subject to certain exceptions including transfers to Mr. Faldo's agent, he may not transfer. dispose of or otherwise assign any rights in any more than 100,000 shares of Common Stock in any calendar year prior to 2002

In general under Rule 144 as currently in effect, a person (or persons whose shares may be deemed to be an "affiliate" of the Company as that term is defined under the Securities Act, is entitled to sell within any three-month period a number of shares beneficially owned for at least one year that does not exceed the greater of (i) 1% of the then outstanding shares of Common Stock (approximately 230,993 shares immediately after the Offering) or (ii) the average weekly trading volume of the outstanding shares of Common Stock during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and the availability of current public information about the Company. A person (or persons whose shares are aggregated) who is not an "affiliate" of the Company during the 90 days immediately preceding a proposed sale by such person and who has beneficially owned "restricted securities" for at least two years is entitled to sell such shares under Rule 144(k) without regard to the volume, manner of sale, public information or notice requirements As defined in Rule 144, an "affiliate" of an issuer is a person that directly or indirectly controls, or is c  lled by, or is under common control with such issuer  In general, under Rule 701 under the Securities Act as currently in effect, any ee, consultant or advisor of the Company who purchases shares from the Company in connection with a compensatory stock or option p  r other written agreement related to compensation is eligible to resell such shares 90 days after the effective date of the offering in reliance on Rule 144, but without compliance with certain restrictions contained in Rule 144.

Prior to this Offering, there has been no public market for the Common Stock of the Company and no predictions can be made of the effect, if any, that future sales of shares of Common Stock, and options to acquire shares of Common Stock, or the availability of shares for future sale, will have on the market price prevailing from time to time. Sales of substantial amounts of Common Stock in the public market, or the perception that such sales could occur. could adversely affect prevailing market prices of the Common Stock

48

## UNDERWRITING

Subject to certain terms and conditions contained in the Underwriting Agreement. Lehman Brothers Inc., NationsBanc Montgomery Securities LLC and Ferris, Baker Watts, Incorporated (the "Underwriters") have severally agreed to purchase from the Company and the Selling holders, and the Company and the Selling Stockholders have agreed to sell to each of the Underwriters, the number of shares of Common set forth opposite their respective names below:

| UNDERWRITER | NUMBER OF SHARES |
|---|---|
| Lehman Brothers Inc. | 1.602.000 |
| NationsBanc Montgomery Securities LLC | 1.601.000 |
| Ferris, Baker Watts, Incorporated | 1 601 000 |
| CIBC Oppenheimer Corp. | 104.000 |
| Donaldson, Lufkin & Jenrette Securities Corporation | 104.000 |
| A G. Edwards & Sons, Inc. | 104.000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 104.000 |
| Morgan Stanley & Co. Incorporated | 104.000 |
| PaineWebber Incorporated | 104.000 |
| Prudential Securities Incorporated | 104.000 |
| Wheat First Securities. Inc | 104.000 |
| First Southwest Company | 104.000 |
| Hoak Breedlove Wesneski & Co. | 52.000 |
| Janney Montgomery Scott Inc. | 52.000 |
| Ragen MacKenzie Incorporated | 52.000 |
| Raymond James & Associates, Inc. | 52.000 |
| Sands Brothers & Co , Ltd. | 52.000 |
| J E. Sheehan & Co., Inc | 52.000 |
| Total | 6.000 000 |

The Underwriting Agreement provides that the obligations of the Underwriters thereunder are subject to various conditions. The nature of the Underwriters' obligations are such that they are committed to take and pay for all of the shares offered hereby if any are purchased.

ompany and the Selling Stockholders have been advised by the Underwriters that they propose to offer the shares of Common Stock to lic at the public offering price set forth on the cover page hereof and to certain selected dealers (who may include the Underwriters) at price less a concession not in excess of $.65 per share. The Underwriters may allow, and such dealers may reallow, a concession not in excess of $.10 per share to certain other dealers After the initial offering, the public offering price, the concession to selected dealers and the reallowance to other dealers may be changed by the Underwriters.

The Company and certain of the Selling Stockholders have granted to the Underwriters an option to purchase up to an additional 900.000 shares of Common Stock, at the public offering price less the underwriting discounts and commissions shown on the cover page of this Prospectus, solely to cover over- allotments. if any  Such option may be exercised at any time up to 30 days after the date of this Prospectus. To the extent that the Underwriters exercise such option, each of the Underwriters will be committed, subject to certain conditions, to purchase a number of additional shares that is proportional to such Underwriter's initial commitment.

The Company's directors, officers and certain stockholders of the Company including the Selling Stockholders have agreed that they will not. without the prior written consent of Lehman Brothers Inc , during the 180 days following the date of this Prospectus, directly or indirectly, (1) offer for sale, sell, pledge or otherwise dispose of (or enter into any transaction or device which is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any shares of Common Stock (including, without limitation. in the case of Selling Stockholders. shares of Common Stock that may

49

be deemed to be beneficially owned in accordance with the rules and regulations of the Securities and Exchange Commission and shares of Common Stock that may be issued upon exercise of any option or warrant) or securities convertible into or exchangeable for Common Stock (other than the shares of Common Stock to be sold in the Offering), or (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of such shares of Common Stock, whether any such transaction ꞏbed in clause (1) or (2) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise (other than, in the f the Company, the grant of options pursuant to option plans existing on the date hereof)

Until the distribution of the shares of Common Stock is completed, rules of the Commission may limit the ability of the Underwriters and certain selling group members to bid for and purchase shares of Common Stock As an exception to these rules, the Underwriters are permitted to engage in certain transactions that stabilize the price of the Common Stock. Such transactions may consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of the Common Stock.

In addition, if the Underwriters over-allot (I E , if they sell more shares of Common Stock than are set forth on the cover page of this Prospectus), and thereby create a short position in the Common Stock in connection with the Offering, the Underwriters may reduce that short position by purchasing Common Stock in the open market. The Underwriters also may elect to reduce any short position by exercising all or part of the over-allotment option described herein.

The Underwriters also may impose a penalty bid on certain dealers and certain selling group members. This means that if the Underwriters purchase shares of Common Stock in the open market to reduce the Underwriter short position to stabilize the price of the Common Stock, they may reclaim the amount of selling concession from such dealers and the selling group who sold shares as part of the Offering

In general, purchases of a security for the purpose of stabilization or to reduce a syndicate short position could cause the price of the security to be higher than it might otherwise be in the absence of such purchases. The imposition of a penalty bid might have an effect on the price of a security, to the extent that it were to discourage resales of the security by purchasers in the Offering

Neither the Company nor any of the Underwriters makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the Common Stock. In addition, neither the Company nor any of the Underwriters makes any representation that the Underwriters will engage in such transactions or that such transactions, once commenced, will not be discontinued without notice.

The Company and each of the Selling Stockholders have agreed to indemnify the Underwriters against certain liabilities, including liabilities t゙ ꞏ the Securities Act, and to contribute to payments the Underwriters may be required to make in respect thereof.

Fꞏ. to the sale of shares in the Offering, there has been no active public market for the Common Stock of the Company. The initial public offering price of the shares of Common Stock will be determined by negotiation among the Company, the Selling Stockholders and the Underwriters. Among the factors that will be considered in determining the initial public offering price will be the prospects of the Company and its industry in general, the Company's past and present operations, the Company's position in the industry, an assessment of the Company's management, the general condition of securities markets at the time of the Offering and the demand for similar securities.

At the request of the Company, the Underwriters have reserved up to 575,000 shares of Common Stock offered hereby for sale to certain officers, directors, employees, business associates and related parties of the Company at the initial public offering price set forth on the cover page of this Prospectus. Such persons must commit to purchase no later than the close of business on the day following the date hereof. The number of shares available for sale to the general public will be reduced to the extent such persons purchase such reserved shares

50

## LEGAL MATTERS

The validity of the shares of Common Stock offered hereby will be passed upon for the Company by Arter & Hadden LLP, Dallas, Texas. Certain legal matters in connection with the Offering will be passed upon for the Underwriters by Cooley Godward LLP, San Francisco, rnia.

## EXPERTS

The consolidated financial statements and financial statement schedule of the Company as of December 31, 1996 and 1997, and for each of the years in the three-year period ended December 31, 1997, have been included herein and elsewhere in the Registration Statement in reliance upon the report of KPMG Peat Marwick LLP, independent certified public accountants, appearing elsewhere herein and in the Registration Statement, and upon the authority of such firm as experts in accounting and auditing.

The statements in this Prospectus set forth under "Risk Factors--Patents and Protection of Proprietary Technology," "Business--Design and Development—Patent Review" and "Business--Patents," together with the last paragraph of the inside front cover of this Prospectus, have been reviewed and approved by Aquilino & Welsh, Arlington, Virginia, as experts in patent and trademark law, and are included herein in reliance upon that review and approval. A partner in Aquilino & Welsh owns 59,106 shares of Common Stock of the Company. Purchasers of the securities offered hereby should not rely on Aquilino & Welsh with respect to any matters other than as set forth above.

## ADDITIONAL INFORMATION

The Company has filed with the Commission a Registration Statement on Form S-1 under the Securities Act with respect to the Common Stock offered hereby. This Prospectus constitutes a part of the Registration Statement and does not contain all of the information set forth therein and in the exhibits thereto, certain portions of which have been omitted as permitted by the rules and regulations of the Commission. For further information with respect to the Company and the Common Stock offered hereby, reference is hereby made to such Registration Statement and exhibits. Statements contained in this Prospectus as to the contents of any document are not necessarily complete and in each instance are qualified in their entirety by reference to the copy of the appropriate document filed with the Commission. The Registration Statement, including the exhibits thereto, may be examined without charge at the Commission's public reference facility at Room 1024, Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C. 20549, and at the following regional offices of the Commission: 7 World Trade Center, New York, NY 10048, and Northwestern Atrium Center, 500 West Madison Street, Suite 1400, Chicago, IL 60601. Copies of such material may be obtained from the Public Reference Section of the Commission at its principal office at 450 Fifth Street, N.W., Washington, D.C. 20549, upon pr   nt of the fees prescribed by the Commission. Copies of such material are also available through the Commission's website located at     www.sec.gov.

51

[This Page Intentionally Left Blank]

# INDEX TO FINANCIAL STATEMENTS

Independent Auditors' Report ....... .. .............. ..... ...... ... ........... ....  F-2

Consolidated Balance Sheets as of December 31. 1996 and 1997 and March 31. 1998
(unaudited)... .. ... .... ......... .. .. .. .. .. .............. ...... ...  F-3

Consolidated Statements of Operations for the years ended December 31. 1995. 1996 and
1997 and the three months ended March 31. 1997 and 1998 (unaudited) ... ... .....  F-4

Consolidated Statements of Stockholders' Equity for the years ended December 31.
1995. 1996 and 1997 and the three months ended March 31. 1998 (unaudited).. ... .....  F-5

Consolidated Statements of Cash Flows for the years ended December 31. 1995. 1996 and
1997 and the three months ended March 31. 1997 and 1998 (unaudited).. . ...........  F-6

Notes to Consolidated Financial Statements... ... ..... ............. ..... .. .. ...  F-7

Financial Statement Schedule:
II--Valuation and Qualifying Accounts for the years ended December 31. 1995. 1996
and 1997 and the three months ended March 31. 1998 (unaudited) . .. . ..........  F-16

All other schedules are omitted since the required information is not present or is not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements and notes thereto

### INDEPENDENT AUDITORS' REPORT

The Board of Directors and Stockholders
Adams Golf, Inc. and subsidiaries:

       ...ave audited the consolidated financial statements of Adams Golf, Inc. and subsidiaries as listed in the accompanying index. In connection
with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in the accompanying
index. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our
responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit
to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test
basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles
used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our
audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Adams
Golf, Inc. and subsidiaries as of December 31, 1996 and 1997, and the results of their operations and their cash flows for each of the years in
the three-year period ended December 31, 1997, in conformity with generally accepted accounting principles. Also in our opinion, the related
financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all
material respects, the information set forth therein.

<div align="center">

KPMG PEAT MARWICK LLP          —

</div>

Dallas, Texas
April 29, 1998

<div align="center">

F-2

</div>

ADAMS GOLF, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

ASSETS

| | DECEMBER 31, | | MARCH 31, |
|---|---|---|---|
| | 1996 | 1997 | 1998 |
| | | | (UNAUDITED) |
| **Current assets:** | | | |
| Cash and cash equivalents | $    854,543 | $   1,955,563 | $    602,290 |
| Trade receivables net of allowance for doubtful accounts of $26,199, $690,341 and $1,126,831 (unaudited) in 1996, 1997 and 1998, respectively (note 7) | 497,787 | 7,670,960 | 14,708,636 |
| State income taxes refundable | -- | 221,637 | 221,637 |
| Inventories (notes 2 and 7) | 674,737 | 4,486,563 | 5,559,699 |
| Prepaid expenses | 20,007 | 509,350 | 1,106,635 |
| Deferred income tax assets (note 8) | -- | 390,164 | 650,626 |
| Other current assets | -- | 715,670 | 352,795 |
| Total current assets | 2,055,074 | 15,949,907 | 23,202,318 |
| Property and equipment, net (note 3) | 123,950 | 603,023 | 2,094,794 |
| Deferred income tax assets (note 8) | -- | 182,621 | 209,942 |
| Other assets, net (note 4) | 379,697 | 623,728 | 285,705 |
| Total assets | $   2,558,721 | $  17,360,079 | $  25,792,759 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | DECEMBER 31, | | MARCH 31, |
|---|---|---|---|
| | 1996 | 1997 | 1998 |
| **Current liabilities:** | | | |
| Notes payable | $ | $ | $ |
| Note payable to shareholder (note 7) | 230,406 | -- | -- |
| Accounts payable | 17,526 | 377,622 | 912,642 |
| Federal income taxes payable | -- | 1,020,980 | 2,732,215 |
| Accrued expenses (note 5) | 332,423 | 7,636,157 | 2,940,390 |
| Total current liabilities | 580,355 | 9,034,759 | 4,317,926 |
| es payable to shareholder, less current portion (note 7) | -- | -- | 10,903,173 |
| | | | 222,399 |
| Total liabilities | 580,355 | 9,034,759 | 11,125,572 |
| **Stockholders' equity (note 9):** | | | |
| Common stock, $.001 par value. Authorized 50,000,000 shares; 11,873,234, 15,719,338 and 18,199,282 (unaudited) shares issued and outstanding at December 31, 1996 and 1997 and March 31, 1998, respectively | 11,873 | 15,719 | 18,199 |
| Additional paid-in capital | 3,126,073 | 14,123,398 | 16,031,896 |
| Common stock subscription | -- | -- | (230,459) |
| Deferred compensation | -- | -- | (981,000) |
| Accumulated deficit | (1,159,580) | (5,813,797) | (171,449) |
| Total stockholders' equity | 1,978,366 | 8,325,320 | 14,667,187 |
| Commitments (note 6) | | | |
| | $   2,558,721 | $  17,360,079 | $  25,792,759 |

See accompanying notes to consolidated financial statements

F-3

ADAMS GOLF, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS

| | YEARS ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | | | | (UNAUDITED) | |
| Net sales | $ 1,125,115 | $ 3,521,788 | $ 36,690,090 | $ 1,474,940 | $ 24,510,808 |
| Cost of goods sold | 756,400 | 1,589,696 | 9,991,132 | 586,538 | 5,862,255 |
| Gross profit | 368,715 | 1,932,092 | 26,698,958 | 888,402 | 18,648,553 |
| Operating expenses: | | | | | |
| Research and development expenses | 18,516 | 51,101 | 557,513 | -- | 196,997 |
| Selling and royalty expenses | 312,785 | 625,897 | 13,093,174 | 418,737 | 6,248,196 |
| General and administrative expenses: | | | | | |
| Stock compensation and bonus award (note 9) | -- | 213,760 | 14,841,711 | -- | -- |
| Provision for bad debts | 12,791 | 51,306 | 738,805 | 75,768 | 466,213 |
| Other | 268,518 | 981,219 | 1,436,995 | 328,727 | 2,865,198 |
| Total operating expenses | 612,610 | 1,923,283 | 30,668,198 | 823,232 | 9,776,604 |
| Operating income (loss) | (243,895) | 8,809 | (3,969,240) | 65,170 | 8,871,949 |
| Other income (expense): | | | | | |
| Interest income | 1,226 | 3,938 | 15,325 | 4,451 | 10,550 |
| Interest expense | -- | -- | (69,731) | (13,090) | (9,362) |
| Other | -- | -- | (47,800) | 4,350 | (100,621) |
| Income (loss) before income taxes | (242,669) | 12,747 | (4,071,454) | 60,881 | 8,772,516 |
| Income tax expense (note 8) | | | 582,763 | 15,586 | 3,130,168 |
| Net income (loss) | $ (242,669) | $ 12,747 | $ (4,654,217) | $ 45,295 | $ 5,642,348 |
| Income (loss) per common share: | | | | | |
| Basic | $ (.05) | $ .00 | $ (.37) | $ .00 | $ .32 |
| Diluted | $ (.05) | $ .00 | $ (.37) | $ .00 | $ .31 |

See accompanying notes to consolidated financial statements.

F-4

### ADAMS GOLF, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### YEARS ENDED DECEMBER 31, 1995, 1996 AND 1997 AND THE
### THREE MONTHS ENDED MARCH 31, 1998 (UNAUDITED)

| | SHARES OF PREFERRED STOCK | PREFERRED STOCK | SHARES OF COMMON STOCK | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | COMMON STOCK SUBSCRIPTION | DEFERRED COMPENSATION |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 1994 (unaudited) | 772,551 | $ 773 | 1,066,514 | $ 1,067 | $ 1,327,799 | $ -- | $ -- |
| Conversion of preferred stock to common stock (note 9) | (772,551) | (773) | 1,545,102 | 1,545 | (772) | -- | -- |
| Sale of stock | -- | -- | 4,168,980 | 4,169 | 453,507 | -- | -- |
| Stock distribution (note 9) | -- | -- | 4,282,304 | 4,282 | (4,282) | -- | -- |
| Net loss | -- | -- | -- | -- | -- | -- | -- |
| Balance, December 31, 1995 | -- | $ -- | 11,062,900 | 11,063 | 1,776,252 | -- | -- |
| Sale of stock | | | 1,501,126 | 1,501 | 1,594,362 | -- | -- |
| Common stock repurchased and retired (note 9) | | | (770,800) | (771) | (244,541) | -- | -- |
| Net income | | | -- | -- | -- | -- | -- |
| Balance, December 31, 1996 | | | 11,873,234 | 11,873 | 3,126,073 | -- | -- |
| Stock compensation award (note 9) | | | 2,000,000 | 2,000 | 9,998,000 | -- | -- |
| Exercise of stock options | | | 946,104 | 946 | 550,225 | -- | -- |
| Exchange of debt for common stock (note 9) | | | 900,000 | 900 | 449,100 | -- | -- |
| Net loss | | | -- | -- | -- | -- | -- |
| Balance, December 31, 1997 | | | 15,719,338 | 15,719 | 14,123,398 | -- | -- |
| Issuance of stock options | | | -- | -- | 981,000 | -- | (981,000) |
| Exercise of stock options | | | 2,479,944 | 2,480 | 927,498 | (230,459) | -- |
| Net income | | | -- | -- | -- | -- | -- |
| Balance, March 31, 1998 (unaudited) | | | 18,199,282 | $ 18,199 | $ 16,031,896 | $ (230,459) | $ (981,000) |

| | ACCUMULATED DEFICIT | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|
| Balance, December 31, 1994 (unaudited) | $ (929,658) | $ 399,981 |
| Conversion of preferred stock to common stock (note 9) | -- | -- |
| Sale of stock | -- | 457,676 |
| Stock distribution (note 9) | -- | -- |
| Net loss | (242,669) | (242,669) |
| Balance, December 31, 1995 | (1,172,327) | 614,988 |
| Sale of stock | -- | 1,595,943 |
| Common stock repurchased and retired (note 9) | -- | (245,312) |
| Net income | 12,747 | 12,747 |
| Balance, December 31, 1996 | (1,159,580) | 1,978,366 |
| Stock compensation award (note 9) | -- | 10,000,000 |
| Exercise of stock options | -- | 551,171 |
| Exchange of debt for common stock (note 9) | -- | 450,000 |
| Net loss | (4,654,217) | (4,654,217) |
| Balance, December 31, 1997 | (5,813,797) | 8,325,320 |
| Issuance of stock options | -- | -- |
| Exercise of stock options | -- | 699,519 |
| Net income | 5,642,348 | 5,642,348 |

```
                                    .............   ...............
Balance, March 31, 1998
   (unaudited)   . . . . . .        $  (171,419)    $ 34,667,187
                                    .............   ...............
                                    .............   ...............
```

companying notes to consolidated financial statements

F-5

ADAMS GOLF, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | YEARS ENDED DECEMBER 31 | | | THREE MONTHS ENDED MARCH 31 | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | | | | (UNAUDITED) | |
| Cash flows from operating activities: | | | | | |
| Net income (loss) | $ (242,669) | $ 12,747 | $(4,654,217) | $ 45,295 | $ 5,642,348 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | 8,291 | 19,278 | 302,589 | 16,374 | 218,959 |
| Loss on retirement of fixed assets | -- | -- | 134,009 | -- | 100,617 |
| Stock compensation and bonus award | -- | -- | 10,000,000 | -- | -- |
| Deferred income taxes | -- | -- | (572,705) | -- | (137,657) |
| Allowance for doubtful accounts | -- | 26,199 | 672,142 | 71,207 | 1,126,831 |
| Changes in assets and liabilities: | | | | | |
| Trade and other receivables | (93,649) | (374,228) | (8,066,952) | (399,963) | (8,164,507) |
| Inventories | (81,470) | (476,467) | (3,811,826) | (103,962) | (1,073,136) |
| Prepaid assets | (27,589) | (418) | (481,343) | 406 | (597,285) |
| Other current assets | 2,860 | -- | (715,670) | (257,186) | 362,875 |
| Other assets | (4,073) | (361,916) | (390,442) | 67,478 | 248,022 |
| Accounts payable | 40,252 | (22,726) | 360,096 | 60,688 | 991,032 |
| Accrued expenses | 2,728 | 329,302 | 7,303,734 | 187,607 | (2,105,596) |
| Federal income taxes payable | -- | -- | 1,020,980 | 15,586 | 1,919,410 |
| Net cash provided by (used in) operating activities | (396,119) | (848,229) | 1,100,315 | (296,470) | (1,466,487) |
| Cash flow from investing activities--purchase of equipment | (9,287) | (121,444) | (770,060) | (46,277) | (1,721,347) |
| Cash flows from financing activities: | | | | | |
| Proceeds from notes payable and line of credit | -- | 230,406 | 1,050,000 | 250,000 | 4,635,041 |
| Repayment of line of credit borrowings | -- | -- | (800,000) | -- | (3,500,000) |
| Repayment of notes payable | -- | -- | (30,406) | (1,494) | -- |
| Issuance of common stock | 457,676 | 1,350,631 | 551,171 | -- | 699,520 |
| Net cash provided by financing activities | 457,676 | 1,581,037 | 770,765 | 248,506 | 1,834,561 |
| Net increase (decrease) in cash and cash equivalents | 52,270 | 611,364 | 1,101,020 | (94,241) | (1,353,273) |
| Cash and cash equivalents at beginning of period | 190,909 | 243,179 | 854,543 | 854,543 | 1,955,563 |
| Cash and cash equivalents at end of period | $ 243,179 | $ 854,543 | $ 1,955,563 | $ 760,302 | $ 602,290 |
| Supplemental disclosure of cash flow information: | | | | | |
| Interest paid | $ -- | $ -- | $ 69,731 | $ 13,090 | $ 9,362 |
| Income taxes paid | $ -- | $ -- | $ 356,204 | $ -- | $ 1,293,820 |
| Supplemental disclosure of financing activity-- exchange of debt for common stock | $ -- | $ -- | $ 450,000 | $ -- | $ -- |

See accompanying notes to consolidated financial statements.

F-6

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(a) GENERAL

Adams Golf, Inc. (the "Company") was founded in 1987. The Company designs, manufactures, markets and distributes golf clubs and provides custom golf club fitting technology. The Company's primary products are fairway woods that are marketed under the trademark "Tight Lies."

The Company has both domestic and international sales. International sales were $647,325, $878,666, and $1,387,325 for the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998, respectively. There were no international sales in 1995.

The consolidated financial statements include the accounts of Adams Golf, Inc. and its wholly-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation.

The consolidated financial statements of the Company as of March 31, 1998 and for the three months ended March 31, 1997 and 1998 are unaudited, but in the opinion of management reflect all adjustments (consisting only of normal recurring accruals) which are necessary for a fair statement of the results of the interim periods presented. Results for interim periods are not necessarily indicative of the results to be expected for a full year due in part to the Company's growth.

(b) INVENTORIES

Inventories are valued at the lower of cost or market and primarily consists of completed golf clubs and component parts. Cost is determined using the first-in, first-out method.

(c) PROPERTY AND EQUIPMENT

     ty and equipment are stated at cost. Depreciation is calculated using the straight-line method over the estimated useful lives of the respective assets, which range from three to seven years.

(d) REVENUE RECOGNITION

The Company records revenue as earned, which occurs when the product is shipped.

(e) OTHER ASSETS AND RELATED AMORTIZATION EXPENSE

Other assets consist primarily of the cost of obtaining patents, development costs of an infomercial and various deposits. Patent amortization is computed on the straight-line method over the estimated useful lives of the assets, which range from 5 to 15 years.

(f) RESEARCH AND DEVELOPMENT

Research and development costs consist of all costs incurred in planning, designing and testing of golf equipment, including salary costs related to research and development, and are expensed as incurred.

(g) ADVERTISING COSTS

Advertising media costs, other than infomercial costs, are expensed as incurred. Production costs are charged to expense ratably in relation to sales over the year in which incurred. Advertising costs other than infomercials were $35,300, $33,503 and $8,651,420 for the years ended December 31, 1995, 1996 and 1997, respectively, and $59,049 (unaudited) and $2,333,406 (unaudited) for the three months ended March 31, 1997 and 1998, respectively.

F-7

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED) Infomercial costs are amortized based on revenues generated compared to total estimated revenues expected to result from the airing of such infomercial generally over an 18 month period. Amortization expense for the years ended December 31, 1995, 1996 and 1997 was $3,161. $3,738 and $146,411, respectively, and $89,200 (unaudited) for the three months ended March 31, 1998

(h) PRODUCT WARRANTY AND SALES RETURNS

The Company's golf equipment is sold under warranty against defects in material and workmanship for a period of two years. In addition, the Company has a 90 day "no questions asked" return policy. An allowance for estimated future warranty and sales return costs is recorded in the period products are sold. Such estimates have approximated actual costs incurred.

(i) INCOME TAXES

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforwards. Deferred tax assets and liabilities are measured using enacted rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date

(j) INCOME (LOSS) PER SHARE

The weighted average common shares used for determining basic net income (loss) per common share was 4,423,146, 11,237,794 and 12,519,392. for the years ended December 31, 1995, 1996 and 1997, respectively, and 11,873,234 (unaudited) and 17,662,189 (unaudited) for the three months ended March 31, 1997 and 1998, respectively. The effect of dilutive s*    options added 678,263 (unaudited) shares for the three months ended March 31, 1998 for the computation of diluted income (loss) per     n share Stock options outstanding for the years ended December 31, 1995, 1996 and 1997 and the three months ended March 31, 1997 \     .ot considered in the computation of net income (loss) per common share since their effect is immaterial or antidilutive.

(k) USE OF ESTIMATES

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(l) FINANCIAL INSTRUMENTS

The carrying amount of cash and cash equivalents, accounts receivable, accounts payable, and accrued expenses and note payable to stockholder approximates fair value due to the short maturity of these instruments.

F-8

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
(m) IMPAIRMENT OF LONG-LIVED ASSETS AND LONG-LIVED ASSETS TO BE DISPOSED OF

The Company adopted the provisions of Statement of Financial Accounting Standards (SFAS) No. 121, ACCOUNTING FOR THE IMPAIRMENT OF LONG-LIVED ASSETS AND FOR LONG-LIVED ASSETS TO BE DISPOSED OF, on January 1, 1996. This Statement requires that long-lived assets and certain identifiable intangibles be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceed the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell. Adoption of this Statement did not impact the Company's financial position, results of operations, or liquidity.

(n) STATEMENTS OF CASH FLOWS

The Company considers all short-term highly liquid instruments, with an original maturity of three months or less, to be cash equivalents.

(o) NEWLY ADOPTED ACCOUNTING PRONOUNCEMENTS

The Company adopted the reporting and disclosure requirements of SFAS No. 130, REPORTING COMPREHENSIVE INCOME, on January 1, 1998. This Statement requires the display of comprehensive income and its components in a financial statement that is displayed in equal prominence with other financial statements. As the Company has not had any comprehensive income components, the reporting and disclosure requirements of this statement have not altered the consolidated financial statements presented herein.

Effective January 1, 1998, the Company adopted Statement of Position (SOP) 98-1, ACCOUNTING FOR THE COSTS OF COMPUTER SOFTWARE DEVELOPED OR OBTAINED FOR INTERNAL USE, which was issued in March 1998. The SOP requires that certain costs to the development or purchase of internal-use software be capitalized and amortized over the estimated useful life of the software. The SOP also requires that costs related to the preliminary project stage and the post-implementation/operations stage of an internal-use computer software development project be expensed as incurred.

(2) INVENTORIES

Inventories consist of the following:

|  | DECEMBER 31 | | MARCH 31, 1998 |
|---|---|---|---|
|  | 1996 | 1997 | (UNAUDITED) |
| Finished goods | $ 41,323 | $ 2,063,803 | $ 2,526,767 |
| Component parts | 633,414 | 2,422,760 | 3,032,932 |
|  | $ 674,737 | $ 4,486,563 | $ 5,559,699 |

F-9

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(3) PROPERTY AND EQUIPMENT, NET

Property and equipment consists of the following:

|  | DECEMBER 31, | | MARCH 31, 1998 (UNAUDITED) |
|---|---|---|---|
|  | 1996 | 1997 | |
| Manufacturing equipment | $ 70,728 | $ 142,137 | $ 151,979 |
| Office and computer equipment | 100,368 | 660,145 | 2,237,891 |
| Accumulated depreciation | (47,146) | (198,459) | (295,076) |
|  | $ 123,950 | $ 603,823 | $ 2,094,794 |

(4) OTHER ASSETS, NET

Other assets, net, consist of the following:

|  | DECEMBER 31, | |
|---|---|---|
|  | 1996 | 1997 |
| Deposits, including amounts for fixed assets purchased | $ 97,498 | $ 380,836 |
| Infomercial costs | 267,677 | 233,365 |
| Patents | 14,522 | 9,527 |
|  | $ 379,697 | $ 623,728 |

(5) ACCRUED EXPENSES

Accrued expenses consist of the following:

|  | DECEMBER 31, | | MARCH 31, 1998 (UNAUDITED) |
|---|---|---|---|
|  | 1996 | 1997 | |
| Payroll, bonuses and commissions (see note 9) | $ 277,810 | $ 5,576,134 | $ 1,115,699 |
| Sales, property and state income taxes | 4,604 | 271,225 | 204,501 |
| Royalties | -- | 392,541 | 477,163 |
| Advertising | -- | 470,500 | 795,260 |
| Product warranty and sales returns | -- | 449,200 | 732,100 |
| Professional services | 9,807 | 340,389 | 220,491 |
| Other | 40,202 | 136,168 | 772,712 |
|  | $ 332,423 | $ 7,636,157 | $ 4,317,926 |

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(6) COMMITMENTS

The Company is obligated under certain noncancelable leases for office space. A summary of the minimum rental commitments under noncancelable leases is as follows:

| YEARS ENDING DECEMBER 31, | |
|---|---|
| 1998 | $ 360,700 |
| 1999 | 456,000 |
| 2000 | 480,400 |
| 2001 | 480,500 |
| 2002 | 512,900 |
| Thereafter | 651,400 |

Rent expense was $32,540, $45,603, $104,480 $26,694 (unaudited) and $64,075 (unaudited) for the years ended December 31, 1995, 1996 and 1997, and the three months ended March 31, 1997 and 1998, respectively.

The Company had outstanding commitments (denominated in U.S. dollars) on letters of credit of $459,167 at December 31, 1997, and $989,419 (unaudited) at March 31, 1998 for the purchase of inventory from foreign vendors.

(7) DEBT

The Company entered into a $1,500,000 revolving line of credit agreement with a bank on May 30, 1997. The line of credit is secured by trade receivables and inventories, matures on May 15, 1998 and bears interest, payable quarterly, at the bank's prime rate (8.5% at December 31, 1997). At December 31, 1997, there was no balance outstanding on this line of credit. The Company pays an annual commitment fee of 0.5% unused portion of the line of credit

On February 27, 1998, the Company entered into a new $10,000,000 revolving credit facility with a bank which replaced the existing $1,500,000 line of credit. The facility is secured by eligible trade receivables, inventories and equipment, matures on December 31, 1998 and bears interest, payable monthly, at the bank's prime rate of interest minus 25 basis points (8.25% at March 31, 1998) or LIBOR rates plus 1.75% interest. At March 31, 1998, there was no balance outstanding on this credit facility. The Company pays an annual commitment fee of 0.25% on the unused portion of the credit facility.

During the first quarter of 1998, the Company borrowed $1,135,041 in the form of an unsecured note payable to the Chief Executive Officer. The principal balance is payable in three installments, matures on April 14, 1999, and bears interest at 5.39%

F-11

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(8) INCOME TAXES

Income tax expense (benefit) for the year ended December 31, 1997 consists of the following:

|  | YEAR ENDED DECEMBER 31, 1997 | | |
|  | CURRENT | DEFERRED | TOTAL |
|---|---|---|---|
| Federal | $ 1,020,980 | $ (572,785) | $ 448,195 |
| State | 134,568 | -- | 134,568 |
|  | $ 1,155,548 | $ (572,785) | $ 582,763 |

Actual income tax expense differs from the "expected" income tax expense (benefit) (computed by applying the U.S. federal corporate tax rate of 34% to income (loss) before income taxes) for the years ended December 31, 1995, 1996 and 1997 as follows:

|  | YEARS ENDED DECEMBER 31, | | |
|  | 1995 | 1996 | 1997 |
|---|---|---|---|
| Computed "expected" tax expense (benefit) | $ (82,507) | $ 4,334 | $ (1,384,294) |
| State income taxes, net of federal tax benefit | -- | -- | 88,815 |
| Stock compensation and bonus award | -- | -- | 2,159,000 |
| Change in valuation allowance for deferred tax assets | 81,352 | (4,334) | (337,558) |
| Other | 1,155 | -- | 56,800 |
|  | $ -- | $ -- | $ 582,763 |

The tax effects of temporary differences that give rise to deferred tax assets and deferred tax liabilities are presented below:

|  | DECEMBER 31 | | MARCH 31, 1998 (UNAUDITED) |
|  | 1996 | 1997 | |
|---|---|---|---|
| Deferred tax assets: | | | |
| Allowance for bad debts | $ 8,908 | $ 237,436 | $ 394,391 |
| Research and development costs | 7,563 | 974 | -- |
| Bonus compensation | 72,678 | -- | -- |
| Product warranty and sales returns | -- | 152,728 | 256,235 |
| Net operating tax loss carryforwards | 389,528 | 311,100 | 320,250 |
| Total gross deferred tax assets | 478,677 | 702,238 | 970,876 |
| Less valuation allowance | (387,667) | (50,109) | (59,259) |
| Net deferred tax assets | 91,010 | 652,129 | 911,617 |
| Deferred tax liabilities--infomercial costs | (91,010) | (79,344) | (51,049) |
| Net | $ -- | $ 572,785 | $ 860,568 |

In assessing the realizability of deferred income tax assets, management considers whether it is more likely than not that some portion or all of the deferred income tax assets will not be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during

F-12

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(8) INCOME TAXES (CONTINUED) the periods in which those temporary differences become deductible. Based upon projections for future taxable income over the periods which the deferred tax assets are deductible, management believes it is more likely than not that the Company will realize the benefits of these deductible differences, net of the existing valuation allowance at December 31, 1997.

The valuation allowance for deferred tax assets at December 31, 1996 and 1997 was $387,667 and $50,109, respectively. The net change in the total valuation allowance for the years ended December 31, 1996 and 1997 were decreases of $4,334 and $337,558, respectively.

At December 31, 1997, the Company has net operating tax loss carryforwards for federal income tax purposes of approximately $915,000 which are available to offset future federal taxable income through 2010. The availability of the net operating loss carryforwards to reduce future taxable income is subject to certain limitations. As a result of a change in ownership, the Company believes utilization of its net operating tax loss carryforwards is limited to approximately $62,000 per year for the remaining life of the net operating losses.

(9) STOCKHOLDERS' EQUITY

(a) STOCK OPTION PLANS

In April 1996, the Company adopted the 1996 Stock Option Incentive Plan ("the Stock Option Plan"), pursuant to which stock options covering an aggregate of 800,000 shares of the Company's common stock may be granted. Options awarded under the Stock Option Plan (i) are generally granted at prices that equate to or are above fair market value on the date of the grant; (ii) generally become exercisable over a period of one to four years; and (iii) generally expire five years subsequent to award.

At December 31, 1997 and March 31, 1998, there were 140,310 shares available for grant under the Plan. The per share weighted-average fair value of stock options granted during 1995 and 1996 was $0.25 and $0.06, respectively, on the date of grant using the Black Scholes option-pricing model with the following weighted-average assumptions: Risk-free interest rate, 6%; expected life, two-five years and expected dividend yield, 0%.

In connection with an employment agreement entered into in September 1995 with the Company's chief executive officer and founder, the Company granted the chief executive officer options to acquire 1,520,766 shares of common stock at $.375 per share, the market price at date of grant. Vesting of the stock options was conditioned upon meeting certain revenue and earnings requirements, which were met during 1996 and 1997. Also, the agreement provided for a bonus to be paid to the officer in an amount equal to the exercise price of the options plus any related income tax due by the officer upon exercise of the options. The officer notified the Company of his intent to exercise the options in December 1997 and the shares were issued in January 1998. Compensation expense of $213,760 and $2,300,023 was charged to operations in 1996 and 1997, respectively, to recognize the bonus due to the officer.

In conjunction with a 1996 stock purchase agreement, the Company granted options to a shareholder to acquire an aggregate of 942,632 shares of common stock at option exercise prices ranging from $0.375, the market price at date of grant, to $0.625 per share. During 1997, the shareholder exercised the options for an aggregate exercise price of $549,869

F-13

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(9) STOCKHOLDERS' EQUITY (CONTINUED) In February 1998, the Company adopted the 1998 Stock Incentive Plan ("the 1998 Stock Option Plan"), pursuant to which stock options covering an aggregate of 1,800,000 shares of the Company's common stock may be granted The Company granted 218,000 options to employees on February 26, 1998 at $2.50 per share. For financial statement reporting purposes, the grant was deemed to have a fair market value of $7.00 per share at the date of grant. Accordingly, the Company has recorded deferred compensation of $981,000 at March 31, 1998

The Company applies Accounting Principles Board Opinion 25 in accounting for its stock plans and, accordingly, no compensation cost has been recognized for its stock options in the financial statements. Had the Company determined compensation cost based on the fair value at the grant date for its stock options under SFAS No. 123, the Company's net income (loss) would have been adjusted to the pro forma amounts indicated below:

| | YEARS ENDED DECEMBER 31 | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| Net income (loss): | | | |
| As reported | $ (242,669) | $ 12,747 | $ (4,654,217) |
| Pro forma | (242,669) | (13,361) | (4,743,744) |
| Diluted income (loss) per common share: | | | |
| As reported | $ (0.05) | $ 0.00 | $ (0.37) |
| Pro forma | (0.05) | (0.00) | (0.38) |

Pro forma net loss reflects only options granted in 1995, 1996 and 1997. Therefore, the full impact of calculating compensation cost for stock options under SFAS No. 123 is not reflected in the pro forma net loss amounts presented above because compensation cost is reflected over the respective options vesting periods of up to four years.

A summary of stock option activity follows:

| | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|
| Options outstanding at December 31, 1994 | -- | $ -- |
| Options granted | 1,520,766 | 0.375 |
| Options outstanding at December 31, 1995 | 1,520,766 | 0.375 |
| Options granted | 1,946,948 | 0.50 |
| Options outstanding at December 31, 1996 | 3,467,714 | 0.44 |
| Options exercised | (946,104) | 0.583 |
| Options outstanding at December 31, 1997 | 2,521,610 | 0.375 |
| Options granted | 272,000 | 2.50 |
| Options exercised | (2,479,944) | 0.375 |
| Options outstanding at March 31, 1998 (unaudited) | 313,666 | $ 2.22 |

At December 31, 1997, the exercise price and weighted-average remaining contractual life of outstanding options was $0.375 and 3.5 years, respectively.

At December 31, 1996 and 1997, the number of options exercisable was 467,970 and 2,114,492, respectively, and the weighted-average exercise price of those options was $0.375.

F-14

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(9) STOCKHOLDERS' EQUITY (CONTINUED)
(b) STOCK DISTRIBUTION

In connection with the acquisition of a related entity, the Company distributed 4,282,304 shares of common stock to its shareholders during the year ended December 31, 1995. As a result of the common control existing between the Company and the related entity, the transaction was accounted for in a manner similar to a pooling of interests. Accordingly, the transaction resulted in no increase to stockholders' equity since the recorded net asset value of the related entity was not material. The resulting subsidiary has been inactive during the three years ended December 31, 1997 and has no assets or liabilities.

(c) STOCK COMPENSATION AWARD

In December 1997, the Board of Directors of the Company approved a stock compensation award of 2,000,000 shares of common stock to its chief executive officer and founder of the Company. In addition, the Company agreed to pay all income taxes payable by the officer relating to such stock award and related tax bonus. Aggregate compensation of $12,541,688 (including $2,541,688 for estimated taxes) was recorded by the Company during the year ended December 31, 1997 based on the fair market value of the stock.

(d) NOTE WITH STOCKHOLDER CONVERTED TO STOCK

The Company borrowed $200,000 from a stockholder in October 1996 and an additional $250,000 from the same stockholder in 1997. The aggregate notes payable balance of $450,000 was converted into 900,000 shares of the Company's stock in September 1997.

(e) STOCK CONVERSION

During 1995, the Company amended its Certificate of Incorporation to provide the authority to issue up to 25,000,000 shares of $.001 per share value stock. All such shares were to be designated as common stock and, accordingly, all stockholders of preferred stock surrendered such for an equivalent number of shares of common stock.

(f) STOCK SPLIT AND AUTHORIZED CLASSES OF STOCK

Effective April 29, 1998, the stockholders of the Company authorized a two-for-one stock split for holders of record on May 1, 1998. The stock split has been reflected in the accompanying consolidated financial statements and, accordingly, all applicable dollar, share and per share amounts have been restated to reflect the stock split. In addition, the stockholders of the Company also approved an increase in the number of authorized shares of Common Stock to 50,000,000 and established a class of preferred stock with a par value of $.01 per share and authorized shares of 5,000,000.

(10) SUBSEQUENT EVENTS (UNAUDITED)

Effective May 1, 1998, the Company entered into an agreement with Nicholas A. Faldo, a professional golfer (the "Agreement"). The Agreement with Faldo, provides the Company with Faldo's endorsement and use of Adams products, as well as the design, development and testing of new technologies and products. As consideration for such services, Faldo will receive 900,000 shares of the Company's common stock which will be recorded and amortized over the estimated period benefited. In addition, Mr. Faldo will receive royalty payments representing 5% of net sales outside the U.S., with a minimum annual amount of $1,500,000 beginning in 1999 and increasing ratably to $4,000,000 in 2004. Under certain conditions, including the failure by the Company to effect an initial public offering by December 31, 1998, Faldo has the right to require the Company to repurchase the shares for $5,000,000 at which point the Company would have the right to terminate the agreement.

F-15

SCHEDULE II

ADAMS GOLF, INC. AND SUBSIDIARIES
YEARS ENDED DECEMBER 31, 1995, 1996
AND 1997 AND THREE MONTHS ENDED MARCH 31, 1998 (UNAUDITED)
VALUATION AND QUALIFYING ACCOUNTS

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS CHARGED TO: | | DEDUCTIONS (1) | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| | | COSTS AND EXPENSES | OTHER | | |
| Allowance for doubtful accounts: | | | | | |
| Year ended December 31, 1995 | $   -- | $   12,791 | $   -- | $   12,791 | $   -- |
| Year ended December 31, 1996 | $   -- | $   51,306 | $   -- | $   25,107 | $   26,199 |
| Year ended December 31, 1997 | $   26,199 | $   738,805 | $   -- | $   66,663 | $   698,341 |
| Three months ended March 31, 1998 (unaudited) | $   698,341 | $   466,213 | $   -- | $   37,723 | $   1,126,831 |
| Product Warranty and Sales Returns: | | | | | |
| Year ended December 31, 1995 | $   -- | $   -- | $   -- | $   -- | $   -- |
| Year ended December 31, 1996 | $   -- | $   1,733 | $   -- | $   1,733 | $   -- |
| Year ended December 31, 1997 | $   -- | $   1,808,154 | $   -- | $   1,358,954 | $   449,200 |
| Three months ended March 31, 1998 (unaudited) | $   449,200 | $   1,078,407 | $   -- | $   795,507 | $   732,100 |

(1) Represents uncollectible accounts charged against the allowance for doubtful accounts and actual costs incurred for warranty repairs and sales returns.

F-16

[This Page Intentionally Left Blank]

[This Page Intentionally Left Blank]

NO DEALER, SALESPERSON OR OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE. SUCH OTHER INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED ON AS HAVING BEEN AUTHORIZED BY THE COMPANY. THE SELLING STOCKHOLDERS OR THE UNDERWRITERS. THIS PROSPECTUS DOES NOT STITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OTHER THAN THE STERED SECURITIES TO WHICH IT RELATES IN ANY STATE TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE OFFER OR SOLICITATION IN SUCH STATE. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Prospectus Summary | |
| Risk Factors | 3 |
| Disclosure Regarding Forward-Looking Statements | 6 |
| Use of Proceeds | 12 |
| Dividend Policy | 13 |
| Dilution | 13 |
| Capitalization | 14 |
| Selected Consolidated Financial Information | 15 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 16 |
| Business | 17 |
| Management | 22 |
| Certain Transactions | 33 |
| Principal and Selling Stockholders | 42 |
| Description of Capital Stock | 44 |
| Shares Eligible for Future Sale | 45 |
| Underwriting | 48 |
| Legal Matters | 49 |
| Experts | 51 |
| Additional Information | 51 |
| Index to Financial Statements | F-1 |

UNTIL AUGUST 4, 1998 (25 DAYS AFTER THE DATE OF THIS PROSPECTUS), ALL DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

6,000,000 SHARES

[LOGO]

COMMON STOCK

PROSPECTUS

July 9, 1998

LEHMAN BROTHERS

NATIONSBANC MONTGOMERY SECURITIES LLC

FERRIS, BAKER WATTS

INCORPORATED

of Filing