EXHIBIT 75

FROM    ADAMS GOLF & GAS            FAX NO. : 128 495 8282                          R3JECT3    REERVE    P 27 5

# ADAMS GOLF, INC.

## MINUTES

## OF THE PRICING COMMITTEE

### Dated as of July 9, 1998

A telephonic meeting of the Pricing Committee of the Board of Directors of ADAMS
GOLF, INC., a Delaware corporation (the "Corporation"), was held by conference telephone at
4:30 p.m. E.D.T. on July 9, 1998. Present in person were B. H. Adams, Paul Brown and Finis
Conner. All of the members of the Pricing Committee participated in the meeting and were able
to speak and hear one another throughout the meeting. Upon motion duly made, the following
recitals and resolutions were unanimously adopted by the Pricing Committee of the Board of
Directors:

WHEREAS, by Resolution of the Board of Directors of the Corporation
adopted April 29, 1998, there was created a Pricing Committee consisting of B.H.
(Barney) Adams, Paul Brown and Finis Conner; and

WHEREAS, B.H. (Barney) Adams, Paul Brown and Finis Conner, in
their capacity as members of the Pricing Committee, are authorized, empowered
and directed to establish on behalf of the Corporation, (i) the aggregate number of
shares of common stock, par value $0.001 per share (the "Common Stock"), to be
issued by the Corporation in the public offering, (ii) the price at which the
Common Stock shall be sold by the Corporation to the underwriters and the price
at which the Common Stock included in the Registration Statement shall be sold
to the public, (iii) the underwriting discounts and commissions to be paid to the
underwriters, and (iv) such other matters relating to the public offering as the
Pricing Committee shall deem necessary or appropriate, such action thereby to be
conclusive evidence as to their authority to act on behalf and in the name of the
Board and the Corporation.

NOW, THEREFORE, the Pricing Committee of the Corporation hereby
resolves as follows:

RESOLVED, that the Corporation authorize and issue up to 4,000,000
shares of Common Stock to the several underwriters at the public offering price of
$16.00 per share less the underwriters' discounts and commissions of $1.12 per

185174.1

Δ π EXHIBIT 75
Deponent F. Conner
Date 5/9/06 Rptr. AMH
WWW.DEPOBOOK.COM

UND 02694

share constituting the number of primary shares to be issued and sold in the Corporation's public offering; and be it

**FURTHER RESOLVED,** that the Corporation authorize and issue up to 37,500 additional shares of Common Stock to the several underwriters on the same terms and conditions as set forth above in connection with the exercise of the underwriters over-allotment option, if and when such over-allotment option is exercised; and be it

**FURTHER RESOLVED,** that in addition to and without limiting the foregoing, the appropriate officers of the Corporation be, and each of them hereby is, authorized, empowered and directed to take, or cause to be taken, such further action and to execute and deliver, or cause to be executed and delivered, for and in the name and on behalf of the Corporation, all such further instruments and documents as such proper officers, with the advice of counsel, may deem to be necessary or advisable in order to effect the purpose and intent of the foregoing resolutions and to be in the best interest of the Corporation (as conclusively evidenced by the taking of such action or the execution and delivery of such instruments or documents, as the case may be, by or under the direction of any authorized officer), and all action heretofore taken by the officers of the Corporation in connection with the subject of the foregoing resolutions be, and it hereby is, approved, ratified and confirmed in all respects as the act and deed of the Corporation.

There being no further business to come before the meeting, upon motion duly made, seconded and unanimously adopted, the meeting was adjourned.

_Paul Brown_
Paul Brown, Authorized Member of the Pricing Committee

105114 1

2

UND 02695

EXHIBIT 76



## MINUTES OF THE REGULAR MEETING OF
## THE BOARD OF DIRECTORS OF

### ADAMS GOLF, INC.

**July 22, 1998**

The regular meeting of the Board of Directors of **ADAMS GOLF, INC.**, a Delaware corporation (the "Corporation"), was held in accordance with the provisions of Article 141 of the General Corporation Law of the State of Delaware at 2801 E. Plano Parkway, Plano, Texas, on the 22nd day of July, 1998 beginning at the hour of 9:00 a.m.

The following directors constituting a quorum were present and participated in the meeting:

B.H. Adams
Paul F. Brown, Jr.
Finis Conner
Mark Mulvoy
Richard Murtland
Stephen R. Patchin

Darl Hatfield, Senior Vice President, Finance and Administration, attended the first portion of the meeting at the invitation of the Board of Directors. Joe Hoffman, outside counsel with the law firm of Arter & Hadden LLP, also attended the meeting at the invitation of the Board of Directors. Also present was John Simpson, Nick Faldo's agent and a nominee for the Board of Directors.

B. H. Adams acted as Chairman and Secretary of the meeting. After the Chairman called the meeting to order, certain actions were considered and discussed by the Board of Directors, and certain resolutions were adopted.

The Board of Directors first reviewed minutes of the April 29, 1998 Board Meeting and approved the minutes with no corrections.

Led by Darl Hatfield, the Board of Directors then reviewed the Corporation's press release for the second quarter, results for the second quarter and first six months of 1998 and the business plan/forecast for the remainder of 1998. An extensive discussion ensued among the Directors and management. All Directors actively participated and asked various questions of management relating to different aspects of the forecast, component variables and comparisons to competitor companies.

The Board next considered certain amendments to the securities law policies previously adopted by the Board on June 3, 1998. Specifically, the Board amended the Corporation's trading window policy so that it only applies to statutory insiders and a list of designated insiders, including accounting personnel. After due discussion, motion duly made and seconded the following resolutions were unanimously adopted:

ADAMS 004492

*106197.1*

WHEREAS, the Corporation has previously adopted a (i) Pronouncement of Policies and Procedures (Insider Trading), (ii) Pronouncement of Policies and Procedures (Insider Trading - Additional Limitations Applicable to All "Designated Insiders") and (iii) Pronouncement of Policies and Procedures (Insider Trading - Additional Limitations Applicable to "Affiliates").

WHEREAS, the Corporation's management has determined following consultation with counsel to the Corporation that the Corporation's policies described above should be amended principally to require that designated insiders, directors, officers and 10% stockholders of the Corporation, but not all employees, observe a "trading window" restriction.

NOW, THEREFORE, BE IT RESOLVED, that the Corporation hereby approves and adopts (i) Pronouncement of Policies and Procedures (Insider Trading - All Employees) in the form attached hereto as <u>Exhibit A</u> (the "Insider Trading Policy"), (ii) Pronouncement of Policies and Procedures (Insider Trading - Additional Limitations Applicable to All "Designated Insiders") in the form attached hereto as <u>Exhibit B</u> (the "Designated Insider Supplement") and (iii) Pronouncement of Policies and Procedures (Insider Trading - Additional Limitations Applicable to Officers, Directors and 10% Stockholders) in the form attached hereto as <u>Exhibit C</u> (the "Officer, Director, and 10% Stockholder Supplement").

FURTHER RESOLVED, that each of the Insider Trading Policy, the Designated Insider Supplement and the Officer, Director and 10% Stockholder Supplement (collectively referred to as the "Policies") shall supersede and replace the Corporation's prior policy with respect to the subject matter thereof.

FURTHER RESOLVED, that the Corporation ratifies the actions of its officers with respect to the enforcement of the Policies.

The Board also advised management that these policies should be incorporated into packages for use in orientation for new hires by the Human Resources Department and that the Human Resources Department should obtain a Confidential/Nondisclosure Agreement from each employee.

The Board then discussed the Corporation's relationship with Fanny Sunesson, Nick Faldo's caddy.

The Board next discussed the Corporation's investment policy. After discussion of the policy, including returns and liquidity considerations and upon motion duly made and seconded, the following resolutions were unanimously adopted:

WHEREAS, the Board of Directors has been presented with a proposed Investment Policy a copy of which is attached hereto as <u>Exhibit D</u>.

WHEREAS, the Board of Directors desires to approve the Investment Policy.

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors hereby approves and adopts the Investment Policy in the form attached hereto as Exhibit D.

FURTHER RESOLVED, that the proper officers of the Corporation hereby are authorized to carry out the Investment Policy.

The Board then discussed the contributions to the Corporation of Skip Corn, a former director who resigned in April, 1998. Upon motion duly made and seconded, the following resolutions were adopted:

WHEREAS, Skip Corn served as a Director of the Corporation from June of 1996 until April of 1998.

WHEREAS, in consideration of Skip Corn's service to the Corporation as a director, the Board of Directors desires that the Corporation make a cash payment to Skip Corn.

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors of the Corporation authorizes management to make a cash payment to Skip Corn in consideration of services rendered to the Corporation in an amount to be determined by the President of the Corporation.

The Board asked management to furnish them a summary of the Corporation's director and officer insurance coverage.

The Board then discussed and instructed management and the Compensation Committee to continue to explore the market place and recommend an outside director plan that would provide for meeting and committee fees (cash and/or stock based), annual director fees (cash and/or stock based) and/or matching charitable contribution provisions.

The Board then discussed filling the two vacancies on the Board by the election of Clint Eastwood to the class of directors whose term expires at the Annual Meeting of Stockholders to be held in the spring of 1999, and John Simpson, as Nick Faldo's Designee, to the class of directors whose term expires at the Annual Meeting of Stockholders to be held in the spring of 2000. Upon motion made and seconded, the following resolutions were adopted:

WHEREAS, the Board of Directors previously increased the authorized number of directors of the Corporation from seven to nine.

WHEREAS, the Board of Directors desires to fill the two vacancies created by such increase in the authorized number of directors as permitted by Section 3.3 of the Corporation's Bylaws.

NOW, THEREFORE, BE IT RESOLVED, that Clint Eastwood and John Simpson be, and they hereby are, elected to fill the two vacancies created by such increase in the authorized number of directors, each to hold his directorship in Class 1 and 2, respectively, with the term expiring at the 1999 and 2000 Annual

Meeting, respectively, or until his successor is duly elected and qualified, or until his sooner death, resignation, retirement or removal.

FURTHER RESOLVED, that Clint Eastwood's election to the Board be conditioned upon Mr. Eastwood's acceptance of such position.

The Board then authorized a personal usage discount (PUD) for the director's purchase of golf equipment from the Corporation.

Upon motion duly made and seconded, the following resolutions were unanimously adopted:

RESOLVED, that any and all transactions by any of the officers or representatives of the Corporation, for and in the name and on behalf of the Corporation, in connection with any of the transactions contemplated by the foregoing resolutions before the adoption of the foregoing resolutions, be, and they hereby are, ratified, confirmed and approved in all respects for all purposes; and

FURTHER RESOLVED, that in addition to and without limiting the foregoing, the appropriate officers of this Corporation be, and each of them hereby is, authorized, empowered and directed to take, or cause to be taken, such further action and to execute and deliver, or cause to be executed and delivered, for and in the name and on behalf of this Corporation, all such instruments and documents as such proper officer may deem appropriate in order to effect the purpose and intent of the foregoing resolutions (as conclusively evidenced by the taking of such action or the execution and delivery of such instruments, as the case may be, by or under the direction of any authorized officer), and all action heretofore taken by the officers of the Corporation in connection with the subject of the foregoing resolutions be, and it hereby is, approved, ratified and confirmed in all respects as the act and deed of this Corporation.

There being no further business to come before the meeting, upon motion duly made, seconded and carried, the meeting was adjourned.

CHAIRMAN OF THE MEETING:

_B. H. Adams_

SECRETARY OF THE MEETING:

_B. H. Adams_

ADAMS 004495

ADAMS 004496

EXHIBIT A

ADAMS GOLF, INC.

PRONOUNCEMENT OF POLICIES AND PROCEDURES

| | |
|---|---|
| **SUBJECT:** | Insider Trading |
| **APPROVED:** | July 23, 1998, by the Board of Directors |
| **EFFECTIVE DATE:** | Immediately |
| **AFFECTED PARTIES:** | All Employees |

THIS PRONOUNCEMENT OF POLICIES AND PROCEDURES of ADAMS GOLF, INC. AND ITS SUBSIDIARIES (collectively, the "Company") has been approved by the Board of Directors to be effective immediately upon notice to each officer, director and employee of the Company and shall continue in full force and effect until amended or terminated thereby.

COMPANY POLICY PROHIBITS INSIDER TRADING.

A.    Insider Trading is a violation of law and can subject the employee and the Company to significant sanctions, including sanctions under the Insider Trading Sanctions Act of 1984 and the Insider Trading and Securities Fraud Enforcement Act of 1988. A violation of the Company's policy against Insider Trading by an employee may result in disciplinary action up to and including discharge.

For the purpose of this policy, "Insider Trading" means a disclosure other than to an authorized person of, or trading in securities (e.g. stocks, notes or bonds) of the Company or other companies while in possession of, material, <u>nonpublic</u> information concerning the Company or such other companies. Such information is nonpublic until it has been disseminated to the market by a press release, a filing with the Securities and Exchange Commission ("SEC") or other similar means. Information continues to be nonpublic even after dissemination until the passage of a period of time sufficient to allow the market to digest and react to the information (generally at least 48 hours).

Information is material when it is reasonable to assume that such information can have a direct impact on the market price of the securities of the Company or other companies. Information is material if there is a substantial likelihood that the information will be viewed by a reasonable investor as significant in deciding to buy or sell securities. The Company regards the following kinds of information as likely to be material in many circumstances:

- Monthly operating statements and quarterly and annual financial results;

- Changes in financial results (either good or bad);

- Trends in financial results (either good or bad);

- Budgets or projections of financial performance;

- Potential sales or purchases of assets outside of routine sales or purchases;

- Potential mergers and acquisitions;

- Potential entry into new lines of business;

- Any potential financing, restructuring or recapitalization; and

- Product/Technology advancements, results, plans, etc., including new product developments and introductions.

B.    Any disclosure to an unauthorized person or personal use of material information, prior to public disclosure, is a violation of Company policy. Authorized persons to whom this information may be communicated (but only to the extent reasonably necessary) are:

- Other employees to whom the information is provided to advance the business objectives of the Company; or

- The Company's accountants, investment advisors, bankers, attorneys or other persons who have been retained by the Company for the purpose of advising the Company in connection with the information.

C.    For the purpose of controlling sensitive information, the following procedures are to be observed:

- Monthly operating results are to be treated as confidential information by all employees and are not to be disclosed or discussed in the presence of, or otherwise disclosed to, unauthorized persons.

- Quarterly or annual results should not be discussed in the presence of, or otherwise disclosed to, unauthorized persons until publicly released.

- Changes in financial results, trends in financial results, budgets or projections of financial performance are confidential information and are not to be discussed in the presence of, or otherwise disclosed to, unauthorized persons until such results or trends become public information. This information is usually published by the Company through filings with the SEC (to the extent it is disclosed at all).

- Potential sales and purchases (other than routine sales and purchases), acquisitions and mergers ought not to be discussed in the presence of, or

otherwise disclosed to, unauthorized persons until such information becomes public information

If you have any questions as to whether material information has been published, call the Company's Director of Investor Relations at (972) 673-9595.

D.    For your assistance in understanding the Company policy, the following hypothetical examples are provided:

Example.  The Company is in the process of preparing the release of its annual operating results.  An employee of the Company has seen a draft of the press release which contains financial statements that show earnings exceeding the estimates of financial analysts that follow the Company.  The employee calls his broker to place an order to buy the Company's stock.  This is a violation of the Company's policy and the law.  The employee would be subject to disciplinary action up to and including discharge.

Example.  The Company is considering acquiring all the assets or stock of company B.  One of the Company's employees calls his brother and suggests that he buy B's stock.  This is a violation of the Company's policy and the law.  The employee would be subject to disciplinary action up to and including discharge.

E.    Adherence to this policy is important to the Company and to you as an individual. In addition to any disciplinary action that the Company might take against you, you, as a "tippee" or as a user of material, nonpublic information, are subject to personal liability to persons who contemporaneously traded in the securities, civil penalties which may be the greater of $1,000,000 or three times the gains made or the loss avoided by trading on the inside information and criminal sanctions, including imprisonment.

This policy is in addition to any obligations of Company personnel (i) to maintain the confidentiality of Company information, whether such obligations arise under confidentiality agreements or otherwise, and (ii) to maintain the confidentiality of information obtained by the Company from other parties under a duty of confidentiality (such as in negotiation of an acquisition).

F.    After you have read this policy, please sign and return the attached Agreement Regarding Pronouncement of Policies and Procedures (Insider Trading).

ADAMS 004499

ADAMS GOLF, INC.

## AGREEMENT REGARDING PRONOUNCEMENT
## OF POLICIES AND PROCEDURES
## (INSIDER TRADING)

The undersigned hereby certifies that he or she has read and understands the Pronouncement of Policies and Procedures regarding Insider Trading (the "Policies and Procedures") of Adams Golf, Inc. and its subsidiaries (collectively, the "Company") attached as Exhibit A hereto and incorporated herein for all purposes.

I agree to strictly abide by the Policies and Procedures and agree and understand that failure to do so constitutes grounds for my immediate dismissal. I agree that, prior to taking any action potentially inconsistent with the Policies and Procedures, I will request clarification thereon from my supervisor.

Name: _____

Address: _____

Date: _____

Acknowledged and Agreed to this _____
day of _____, 1998.

ADAMS GOLF, INC.

By: _____
Name: _____
Title: _____

ADAMS 004500

103256.2

EXHIBIT B

ADAMS GOLF, INC.

PRONOUNCEMENT OF POLICIES AND PROCEDURES

| | |
|---|---|
| **SUBJECT:** | Insider Trading - Additional Limitations Applicable to All "Designated Insiders" |
| **APPROVED:** | July 23, 1998, by the Board of Directors |
| **EFFECTIVE DATE:** | Immediately |
| **AFFECTED PARTIES:** | "Designated Insiders" |

THIS PRONOUNCEMENT OF POLICIES AND PROCEDURES of ADAMS GOLF, INC. AND ITS SUBSIDIARIES (collectively, the "Company") has been approved by the Board of Directors to be effective immediately upon notice to each "Designated Insider" of the Company and shall continue in full force and effect until amended or terminated thereby.

INSIDER TRADING - ADDITIONAL LIMITATIONS APPLICABLE TO ALL "DESIGNATED INSIDERS"

A.    This Pronouncement of Policies and Procedures is intended to supplement the Company's basic policy concerning Insider Trading (the "Policy") and will discuss generally the additional restrictions imposed on the Company's "Designated Insiders." The term "Designated Insider" includes any person who is designated as an affiliate by the Company. Attached as Schedule 1 hereto is a current list of the Company's Designated Insiders. The restrictions discussed herein are in addition to those discussed in the Policy, which apply to all employees of the Company, including Designated Insiders.

B.    *Sales of Unregistered and Control Securities.*  Designated Insiders also have certain obligations and responsibilities under the Securities Act of 1933, as amended (the "Securities Act"). There are restrictions on the right to sell securities publicly that apply to two classes of persons: (i) stockholders who have acquired their securities directly from the Company or another stockholder in a private transaction or chain of private transactions (i.e., transactions not registered with the Securities and Exchange Commission ("SEC")) (for this purpose, such privately acquired shares are designated "restricted" shares); and (ii) controlling persons of the issuer. Nonrestricted shares held by controlling persons are designated "control" shares.

Designated Insiders are deemed to be controlling persons of the Company. Persons who are not controlling persons are restricted only with respect to their privately acquired or restricted

ADAMS 004501                    *103620.3*

shares. If noncontrolling persons happen to own additional shares that were acquired in the public securities market, the restrictions do not apply to such additional shares. There are certain "dribble-out" provisions under Rule 144 (adopted by the SEC pursuant to the Securities Act) that are available to both holders of restricted shares and controlling persons to enable them to sell small amounts of stock over specified periods.

- Holders of restricted shares may not sell any such shares until the specific shares have been held continuously by the seller for a period of at least one year and the additional requirements listed below are met. Holding periods may be combined in certain circumstances provided by Rule 144. For example, the holding periods related to shares passing from one holder to another by gift or bequest or shares pledged as collateral may be combined. The holding period applies with respect to restricted shares, whether held by a controlling person or any other person, but does not apply with respect to nonrestricted shares held by controlling persons ("control" shares). Controlling persons selling control shares must meet the other requirements listed below. Restricted shares held by noncontrolling persons for more than three years become freely tradeable and are not subject to the following requirements.

- Rule 144 generally requires that the sale be handled as a routine open-market brokerage transaction.

- During each three month period, the holder of restricted or control shares may sell an amount of shares equal to the greater of:

> one percent of the number of shares of the class outstanding; or

> the average reported weekly trading volume during the four calendar weeks preceding the filing of the Form 144 notice of sale referred to below.

The sales of closely related persons such as spouses, a parent and minor children, donor and donee, and pledgor and pledgee must be combined in applying the numerical limitation.

- The person selling in reliance on Rule 144 must file a notice on Form 144 with the SEC and the Nasdaq Stock Market. The Form 144 can be transmitted to the SEC concurrently with placing the order for sale; that is, the Form 144 can be mailed to the SEC when the sell order is placed. There is an exemption from the filing requirement for transactions during any three month period that do not exceed either 500 shares or an aggregate sale price of $10,000. If the sales are not completed within 90 days, a new Form 144 must be filed if additional sales are to be made.

- The dribble-out provisions described above are available only if the issuer is current in its reporting obligations under the Securities Act of 1934.

- The foregoing is an extremely simplified summary of very complex and detailed provisions that may vary in their impact on individual stockholders. Any holder

of restricted or control shares should seek specific advice in advance, related to his or her individual circumstances at the time, before committing to make any public sale of stock.

    •    The preceding discussion relates solely to an exemption from the Securities Act registration requirements. Whether or not registration is required with respect to any proposed sale, the antifraud provisions of the securities laws remain applicable. Thus, even if Rule 144 provides an exemption from Securities Act registration, no holder of restricted or control shares should make any sale of any securities if he or she is then aware of material information about the Company that has not been publicly disclosed.

    It should be noted that holders of restricted or control shares have certain rights to sell their shares privately under circumstances where they could not sell their shares publicly.

    C.   In order to protect the Company and you against potential insider trading claims, it is the Company's policy that any purchases and sales of securities of the Company be made during each fifteen business day period beginning on the third business day following the date the Company releases to the public by press release or otherwise its quarterly or annual summary statements of sales and earnings and ending with the seventeenth business day following such date. The Company believes that limiting transactions to the fifteen business day period discussed above will lessen the likelihood that sales or purchases of the Company's securities would be based on material nonpublic information. **If you possess material nonpublic information that is not conveyed by the release of quarterly or annual results, you should refrain from trading even during the "window period."**

    In addition, quarterly trading window will open late, close early or not at all if, in the opinion of the Company's Chief Executive Officer, material information exists that has not been disclosed to the public.

    D.   After you have read this policy, please sign and return the attached Agreement Regarding Pronouncement of Policies and Procedures (Insider Trading - Additional Limitations Applicable to All "Designated Insiders").

ADAMS 004503

*103620.3*

ADAMS GOLF, INC.

## AGREEMENT REGARDING PRONOUNCEMENT
## OF POLICIES AND PROCEDURES
## (INSIDER TRADING - ADDITIONAL LIMITATIONS
## APPLICABLE TO ALL "DESIGNATED INSIDERS")

The undersigned hereby certifies that he or she has read and understands the Pronouncement of Policies and Procedures regarding Insider Trading - Additional Limitations Applicable to all "Designated Insiders" (the "Policies and Procedures") of Adams Golf, Inc. and its subsidiaries (collectively, the "Company") attached as Exhibit A hereto and incorporated herein for all purposes.

I agree to strictly abide by the Policies and Procedures and agree and understand that failure to do so constitutes grounds for my immediate dismissal. I agree that, prior to taking any action potentially inconsistent with the Policies and Procedures, I will request clarification thereon from my supervisor.

Name: _____

Address: _____

Date: _____

Acknowledged and Agreed to this _____
day of _____, 1998.

ADAMS GOLF, INC.

By: _____
Name: _____
Title: _____

ADAMS 004504

Schedule 1

Designated Insiders:

| | |
|---|---|
| Chris Beebe | Director of International Sales |
| Mary Cheddie | Director of Human Resources |
| Walt DeVault | Director of Customer Service and Consumer Sales |
| Cindy Herington | Director of Advertising and Direct Response Marketing |
| Gabe Nill | Director of Budgeting and Financial Planning |
| Craig Parrish | Inside Sales Supervisor |
| Max Puglielli | Director of Custom Fitting |
| Dallas Rainwater | Assistant Controller |
| Bill Schaulin | Director of Manufacturing |
| Patty Walsh | Director of Investor Relations |
| Charlie Galloway | Accounting |
| John Joyce | Accounting |
| Donnie Belk | Accounting |

ADAMS 004505

## EXHIBIT C

## ADAMS GOLF, INC.

## PRONOUNCEMENT OF POLICIES AND PROCEDURES

| | |
|---|---|
| **SUBJECT:** | Insider Trading – Additional Limitations Applicable to Officers, Directors and 10% Stockholders |
| **APPROVED:** | July 23, 1998, by the Board of Directors |
| **EFFECTIVE DATE:** | Immediately |
| **AFFECTED PARTIES:** | Officers, Directors and 10% Stockholders |

THIS PRONOUNCEMENT OF POLICIES AND PROCEDURES of ADAMS GOLF, INC. AND ITS SUBSIDIARIES (collectively, the "Company") has been approved by the Board of Directors to be effective immediately upon notice to each officer, director and 10% Stockholder of the Company and shall continue in full force and effect until amended or terminated thereby.

### INSIDER TRADING – ADDITIONAL LIMITATIONS APPLICABLE TO ALL OFFICERS, DIRECTORS AND 10% STOCKHOLDERS

This Pronouncement of Policies and Procedures is intended to supplement the Company's basic policy concerning Insider Trading (the "Policy") and will discuss generally the principal obligations and responsibilities that apply to the Company's officers, directors and 10% stockholders (referred to herein as "affiliates") under the Securities Act of 1933, as amended (the "Securities Act"), and the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Specifically, this Addendum covers (i) Section 16 of the Exchange Act, including (1) Section 16(a) (Reporting Obligations, (2) Section 16(b) (Prohibition of Short-Swing Trading), and (3) Section 16(c) (Prohibition of Short Sales); and (ii) Sales of Unregistered and Control Securities under the Securities Act. Attached as <u>Schedule 1</u> hereto is a current list of the Company's officers, directors and 10% stockholders. <u>The restrictions discussed herein are in addition to those discussed in the Policy, which apply to all employees of the Company.</u>

These statutes and their related regulations and interpretations change constantly and the application of the federal securities laws may vary depending upon particular fact situations. This Addendum is not intended to replace the advise of counsel as to specific questions.

A.    *Section 16 of the Exchange Act.* Section 16 of the Exchange Act was designed to provide the public with information on the securities holdings and transactions of corporate

ADAMS 004506

insiders – directors, certain executive officers and 10% stockholders, who are referred to in this Addendum as "affiliates." Section 16 also attempts to deter those individuals from profiting on short-term trading in the securities of their companies while in possession of material inside information by requiring the disgorgement of any profits realized on trades in violation of Section 16.

(1)    *Section 16(a) Reporting Obligations*

•    Each affiliate must file a report on Form 3 with the Securities and Exchange Commission (the "SEC") within 10 days after becoming an affiliate. A report must also be filed on Form 4 for each calendar month during which a change of beneficial ownership occurs, which form is due to the SEC by the 10th day of the next calendar month. No report is due for a month in which there is no change in ownership. A report must be filed on Form 5 for each year in which a transaction has occurred, reporting (i) small acquisitions not required to be immediately reported on Form 4, (ii) certain exempt transactions and (iii) transactions that were required to be reported but were not. In addition, all reporting persons are required to send a copy of each foregoing report to the Company and the Nasdaq Stock Market. As an enforcement mechanism, issuers are required to identify in their proxy statements and Forms 10-K persons who failed to timely file any required reports.

•    Section 16(a) speaks in terms of "beneficial ownership" rather than legal or record ownership. The SEC uses a beneficial ownership concept based on a person's direct or indirect pecuniary interest in securities to determine which transactions need to be reported and are subject to potential profit disgorgement. Essentially, beneficial ownership is predicated on an affiliate's ability to profit from purchases or sales of securities. A person is considered to have a pecuniary interest in securities held by members of his or her immediate family if they share the same household. An affiliate may also be held to be the beneficial owner of securities held by a partnership, corporation, trust or other entity over which the affiliate has a controlling influence. Finally, special rules exist for fiduciaries and beneficiaries of trusts and partners of partnerships.

•    All changes in beneficial ownership are reportable, not only transactions that are purchases or sales. For example, gifts are reportable. Reports may be due even though the reported change in beneficial ownership is not a transaction of a type that can be matched for Section 16(b) purposes.

ADAMS 004507

- The consequences of a late filing or a failure to file could be significant:

    Public embarrassment to the individual and the company from the disclosures of the late filer in the Company's proxy statement and the Form 10-K.

    Fines of up to $5,000 per day for each filing violation by an affiliate (and up to $500,000 for violation by companies), under the Securities Enforcement Remedies Act of 1990.

- The obligation to file reports is a personal responsibility. For convenience and to avoid unnecessary disclosure in the Company's public filings, the Chief Financial Officer is available to assist in the preparation of Form 3, Form 4 and Form 5 reports, and each affiliate should promptly report to one of these individuals whenever a change in the affiliate's beneficial ownership occurs.

### (2)   Section 16(b) Prohibition of Short-Swing Trading.

- Supplementing the reporting requirements of Section 16(a) is the so-called short-swing trading provision contained in Section 16(b) of the Exchange Act. This section provides that any profit realized by an affiliate from any purchase and sale or sale and purchase of any equity security of the Company within a period of six months or less will inure to and be recoverable by the Company. Unlike other provisions of the federal securities laws, intent to take unfair advantage of nonpublic information is not required for recovery under Section 16(b). In other words, transactions in the Company's equity securities within six months of one another can lead to disgorgement irrespective of the reasons for or purposes of the transaction.

- To effectuate the remedial purposes of Section 16(b), courts compare the amount of profit realized from short-swing transactions in a manner that will maximize recovery. In a computation involving a single purchase and a single sale, the profit realized (which is the amount to be disgorged) is the difference between the insider's purchase price and the sale price. When multiple transactions are involved in a six month period, courts will generally match the highest sale price with the lowest purchase price to determine the largest possible spread.

- Unlike most provisions of the federal securities laws, Section 16(b) does not confer enforcement authority on the SEC. Congress has determined that reliance on issuers of stock and their stockholders is the most effective means of enforcing the strict rule against insider trading. If an issuer declines to bring a Section 16(b) action against the offending affiliate within 60 days after demand by a stockholder, or fails to prosecute the action "diligently," then a stockholder may institute an action to recover insider short-swing profits for the issuer. Although the Exchange Act does not require a grant of attorneys' fees, courts in their equitable discretion award reasonable attorneys' fees and expenses to a stockholder who brings a derivative action or who otherwise provides efforts that ultimately result in a recoupment of short-swing profits by the issuer. The

*PRONOUNCEMENT OF POLICIES AND PROCEDURES - Page 3*
(Adams Golf, Inc.)

ADAMS 004508

*1036543*
*10/12/98 4:53 PM*

result has been a cottage industry of lawyers who monitor trading by affiliates and make a living by prosecuting Section 16(b) derivative actions.

•    The Company's 1998 Stock Incentive Plan has been qualified under Rule 16b-3 of the Exchange Act. As a result of such qualification, if a transaction by an affiliate under one of the plans meets the conditions of Rule 16b-3, the transaction is exempt from short-swing profit liability.

•    The grant of an option under the 1998 Stock Incentive Plan and the exercise of such an option (but not the sale of stock obtained upon the exercise of an option) are exempt from the Section 16(b) short-swing provisions if the stock obtained upon exercise of the option is not sold prior to the expiration of six months after the date of grant of the option. Thus, an option held for over six months can be exercised and the stock sold immediately without disgorgement of any resulting profit so long as there has been no purchase of stock within the six-month period preceding such sale. If an affiliate fails to adhere to this condition and sells stock obtained upon exercise of an option within six months after receiving the option, the exemption for the grant of the option and the sale is lost and the sale is matchable with the option grant or other nonexempt acquisition for purposes of short-swing profit recovery.

•    To help minimize inadvertent violations of Section 16(b)'s prohibition on "short-swing" transactions, we suggest that you take advantage of the following preventive procedures:

Prior to engaging in any transaction involving Company stock, we encourage you to check with the Chief Financial Officer.

These individuals can review with you any Section 16(b) matchable transactions you may have had within the preceding six months as well as possible transactions within the coming months. Such a prior check could also help prevent inadvertent violations of other SEC rules, including the antifraud rules discussed in this memorandum (Rule 10b-5) or Rule 144, discussed below.

A simple Checklist is attached to this memorandum that should help prevent the most common short-swing profit rule violations.

The Company often will not be in a position to prevent short-swing profit violations because it may not learn of a transaction until after the fact (hence the importance of you utilizing the Checklist and checking with the Chief Financial Officer whenever possible prior to any transaction involving Company stock). One person, however, who invariably is in a position to help prevent violations involving open market transactions before they happen is your broker. The broker's role should be to serve as an additional line of defense against inadvertent violations. Remember, however, a broker has no legal responsibility for a client's Section 16 filing

or short-swing profit rule violations; hence, the best protection will come from your own awareness of the potential pitfalls.

(3)    *Section 16(c) Prohibition of Short Sales.*

- Section 16(c) of the Exchange Act prohibits any short sale or short sale "against-the-box" of Company stock by any affiliate. A short sale is the sale of stock not owned by the seller, or if owned, not delivered (the so-called short sale "against-the-box"), which involves the borrowing of shares by the seller's broker for the account of the seller and delivery of the borrowed shares to the buyer. At some point in the future, the short seller must purchase shares to cover the short position. Because the short seller hopes to purchase at a price lower than the price at which the short sale was made, a short seller expects the stock to decline in market value from present levels.

- The cashless exercise feature of the Company's 1998 Stock Incentive Plan, which allows optionee to exercise an option and simultaneously sell the shares to the issuer, so long as settlement occurs within five business days after the issuer's receipt of an irrevocable notice of exercise and simultaneous sale, does not violate Section 16c.

- While the Company will provide whatever assistance it can to prevent Section 16 violations, you should recognize that it will remain your obligation to see that your Section 16(a) filings are made timely and correctly, that you do not engage in short-swing transactions prohibited by Section 16(b) and that you do not violate the prohibition of short sales imposed by Section 16(c). The Company assumes no legal responsibility in this regard.

B.    *The Securities Act: Sales of Unregistered and Control Securities.* There are restrictions on the right to sell securities publicly that apply to two classes of persons: (i) stockholders who have acquired their securities directly from the Company or another stockholder in a private transaction or chain of private transactions (i.e., transactions not registered with the SEC) (for this purpose, such privately acquired shares are designated "restricted" shares); and (ii) controlling persons of the issuer. Nonrestricted shares held by controlling persons are designated "control" shares.

Affiliates are deemed to be controlling persons of the Company. Persons who are not controlling persons are restricted only with respect to their privately acquired or restricted shares. If noncontrolling persons happen to own additional shares that were acquired in the public securities market, the restrictions do not apply to such additional shares. There are certain "dribble-out" provisions under Rule 144 (adopted by the SEC pursuant to the Securities Act) that are available to both holders of restricted shares and controlling persons to enable them to sell small amounts of stock over specified periods.

- Holders of restricted shares may not sell any such shares until the specific shares have been held continuously by the seller for a period of at least one year and the additional requirements listed below are met. Holding periods may be combined in certain circumstances provided by Rule 144. For example, the holding periods related to

---

*PRONOUNCEMENT OF POLICIES AND PROCEDURES - Page 5*
(Adams Golf, Inc.)

ADAMS 004510

*103654.3*
*10/12/98 4:53 PST*

shares passing from one holder to another by gift or bequest or shares pledged as collateral may be combined. The holding period applies with respect to restricted shares, whether held by a controlling person or any other person, but does not apply with respect to nonrestricted shares held by controlling persons ("control" shares). Controlling persons selling control shares must meet the other requirements listed below. Restricted shares held by noncontrolling persons for more than three years become freely tradeable and are not subject to the following requirements.

- Rule 144 generally requires that the sale be handled as a routine open-market brokerage transaction.

- During each three month period, the holder of restricted or control shares may sell an amount of shares equal to the greater of:

> one percent of the number of shares of the class outstanding; or

> the average reported weekly trading volume during the four calendar weeks preceding the filing of the Form 144 notice of sale referred to below.

The sales of closely related persons such as spouses, a parent and minor children, donor and donee, and pledgor and pledgee must be combined in applying the numerical limitation.

- The person selling in reliance on Rule 144 must file a notice on Form 144 with the SEC and the Nasdaq Stock Market. The Form 144 can be transmitted to the SEC concurrently with placing the order for sale; that is, the Form 144 can be mailed to the SEC when the sell order is placed. There is an exemption from the filing requirement for transactions during any three month period that do not exceed either 500 shares or an aggregate sale price of $10,000. If the sales are not completed within 90 days, a new Form 144 must be filed if additional sales are to be made.

- The dribble-out provisions described above are available only if the issuer is current in its Exchange Act reporting obligations.

- The foregoing is an extremely simplified summary of very complex and detailed provisions that may vary in their impact on individual stockholders. Any holder of restricted or control shares should seek specific advice in advance, related to his or her individual circumstances at the time, before committing to make any public sale of stock.

- The preceding discussion relates solely to an exemption from the Securities Act registration requirements. Whether or not registration is required with respect to any proposed sale, the antifraud provisions of the securities laws remain applicable. Thus, even if Rule 144 provides an exemption from Securities Act registration, no holder of restricted or control shares should make any sale of any

ADAMS 004511

*PRONOUNCEMENT OF POLICIES AND PROCEDURES – Page 6*
(Adams Golf, Inc.)

*103654.3*
*10/12/98 4:53 PM*

securities if he or she is then aware of material information about the Company that has not been publicly disclosed.

It should be noted that holders of restricted or control shares have certain rights to sell their shares privately under circumstances where they could not sell their shares publicly.

It should also be noted that an exemption from the registration requirements under Rule 144 does not have any bearing on the exposure to short-swing profit recapture under Section 16(b) of the Exchange Act, as discussed above. Thus, a sale exempt from registration under Rule 144 may nevertheless result in a short-swing profit recoverable by the issuer under Section 16(b).

C.    In order to protect the Company and you against potential insider trading claims, it is the Company's policy that any purchases and sales of securities of the Company be made during each fifteen business day period beginning on the third business day following the date the Company releases to the public by press release or otherwise its quarterly or annual summary statements of sales and earnings and ending with the seventeenth business day following such date. The Company believes that limiting transactions to the fifteen business day period discussed above will lessen the likelihood that sales or purchases of the Company's securities would be based on material nonpublic information. **If you possess material nonpublic information that is not conveyed by the release of quarterly or annual results, you should refrain from trading even during the "window period."**

In addition, quarterly trading windows will open late, close early or not at all if, in the opinion of the Company's Chief Executive Officer, material information exists that has not been disclosed to the public.

D.    After you have read this policy, please sign and return the attached Agreement Regarding Pronouncement of Policies and Procedures (Insider Trading - Additional Limitations Applicable to Affiliates).

ADAMS 004512

## SHORT-SWING PROFIT RULE § 16(b) CHECKLIST

*Note: ANY combination of PURCHASE AND SALE or SALE AND PURCHASE within six months of each other results in a violation of § 16(b) and the "profit" must be recovered by the Company. It makes no difference how long the shares being sold have been held, or that one of the two matching transactions occurs after you are no longer a Section 16 insider. And the highest priced sale will be matched with the lowest priced purchase.*

### SALES

If a sale is to be made by a director, officer or 10% stockholder (or any member of his or her immediate family):

1. Have there been any purchases by the insider (or family members) within the past six months?

2. Are any purchases anticipated or required within the next six months?

3. Has the person responsible for preparing the Form 4 been advised?

4. Has a Form 144 been prepared and has the broker been reminded to sell pursuant to Rule 144?

### PURCHASES

If a purchase is to be made by a director, officer 10% stockholder (or any member of his or her immediate family):

1. Have there been any sales by the insider (or family members) within the past six months?

2. Are any sales anticipated or required within the next six months (such as tax-related or year-end transactions)? Note, even though an option grant or an exercise under the 1998 Stock Incentive Plan is not considered a purchase, a sale of option stock is still matchable against other purchases within six months before or after the sale.

3. Has the person responsible for prepare the Form 4 been advised?

*Note: Before proceeding with a purchase or sale, consider whether you are aware of material inside information that could affect the price of the stock.*

ADAMS 004513

ADAMS GOLF, INC.

AGREEMENT REGARDING PRONOUNCEMENT
OF POLICIES AND PROCEDURES
(INSIDER TRADING - ADDITIONAL LIMITATIONS
APPLICABLE TO ALL OFFICERS, DIRECTORS AND 10% STOCKHOLDERS)

The undersigned hereby certifies that he or she has read and understands the Pronouncement of Policies and Procedures regarding Insider Trading - Additional Limitations Applicable to all Officers, Directors and 10% Stockholders (the "Policies and Procedures") of Adams Golf, Inc. and its subsidiaries (collectively, the "Company") attached as Exhibit A hereto and incorporated herein for all purposes.

I agree to strictly abide by the Policies and Procedures and agree and understand that failure to do so constitutes grounds for my immediate dismissal. I agree that, prior to taking any action potentially inconsistent with the Policies and Procedures, I will request clarification thereon from my supervisor.

Name: _____

Address: _____

Date: _____

Acknowledged and Agreed to this _____
day of _____, 1998.

ADAMS GOLF, INC.

By: _____
Name: _____
Title: _____

ADAMS 004514

PRONOUNCEMENT OF POLICIES AND PROCEDURES - Page 9
(Adams Golf, Inc.)

103654.3
10/12/98 4:53 PM

Schedule 1

Officers, Directors and 10% Stockholders:

| | |
|---|---|
| Barney Adams | Chairman of the Board, CEO and President |
| Mark Gonsalves | Vice President - Sales and Marketing, Retail |
| Darl Hatfield | Senior Vice President - Finance and Administration |
| Dick Murtland | Vice President - Research & Development, Secretary, Treasurer and Director |
| Steve Sanazaro | Vice President - Information Technology |
| Paul Brown | Director |
| Roland Casati | Director |
| Finis Conner | Director |
| Mark Mulvoy | Director |
| Steve Patchin | Director |
| Royal Oil and Gas | Director |
| John Simpson | Director (as of July 23, 1998) |
| Nick Faldo | Contract Right to appoint Director (John Simpson) |

ADAMS 004515

**EXHIBIT D** 

Adams Golf, Inc.

## Investment and Policy Guidelines

### I.    Purpose

The purpose of this policy is to establish guidelines for the management of cash and investments

### II.    Responsibilities

    A. It is the responsibility of the Chief Executive Officer and the Board of Directors to approve the Investment policy.

    B. It is the responsibility of the Chief Financial Officer to:
1. Monitor the portfolio for suitability
2. Propose alterations to the investment policy
3. Maintain administrative approvals
4. Execute investment policy and designate those who can execute it.

### III.    Investment Objectives

    A. Preserve capital

    B. Maximize yield within the constraint of maximum safety

    C. Optimize tax benefits

    D. Ensure liquidity by defining maturities as required by cash flow projections.

    E. The company may not borrow money for short-term investment purposes.

    F. The average weighted maturity in the portfolio will be maintained at twelve months or less.

### IV.    Assets Approved for Investment

    A. Securities and/or obligations issued by or guaranteed by the U. S. Government and its Federal Agencies

    B. Repurchase Agreements (Repo) limited to U. S. Government securities or Agencies

    C. Securities issued by Corporations including:
- Commercial Paper (CP)
- Certificates of Deposits (CDs)
- Banker's Acceptance (BAs)
- Auction Rate Securities (SAVRs, DRD eligible preferred stock)
- Money Market Preferred Stock (MMP)
- Bonds
- Medium Term Notes (MTNs)

ADAMS 004516

- Master Notes
D. Municipal Securities including:
- Notes
- Bonds – including PreRefunded bonds and Put bonds
- Commercial Paper (CP)
- Auction Rate Securities (SAVRs)
- Daily, Weekly, Monthly, Floaters

## V.    Concentration Limits/Credit Quality

| | Type | Minimum Rating | Maximum Maturity | Maximum % of Portfolio | Single Issuer of Port |
|---|---|---|---|---|---|
| Taxable Investments | U. S. Treasury/ Agency | Aaa/AAA | 2 Years | 100 | N/A |
| | Commercial Paper | A1/P1 | 270 Days | 50 | 15 |
| | Certificate of Deposit/Bank Notes | A1/P1 | 1 Year | 50 | 15 |
| | Bankers Acceptance | A1/P1 | 1 Year | 50 | 15 |
| | Auction Rate Securities | Aa/AA | 1 Year | 20 | 10 |
| | Money Market Preferred | Aa/AA | 49 Days | 20 | 10 |
| | Corporate Bonds | A/A | 2 Years | 20 | 10 |
| | Medium Term Notes | A/A | 2 Years | 20 | 10 |
| | Master Notes | A1/P1 | 30 Days | 100 | 100 |
| Tax Exempt Investments | Municipal Notes | MIG1/SP1 | 15 Months | 100 | 10 |
| | Municipal Bonds (including PreRe's/ Put Bonds | Aaa/AAA* | 3 Years | 100 | 10 |
| | Commercial Paper | A1/P1 | 270 Days | 50 | 10 |
| | Auction Rate Securities (SAVRs) | Aa/AA | 1 Year | 30 | 10 |
| | Municipal Floaters | MIG1/SP1 | N/A | 100 | 10 |

* or short term rating equivalent

## VI.    Administration

A. Administration of the investment policy and execution of the investment strategy shall be the responsibility of the Chief Financial Officer.

B. The Chief Financial Officer or Vice-President – Finance may authorize investments permitted by this policy. No other persons are authorized to make investments except for interest bearing deposits at the bank where the company has its accounts.

ADAMS 004517

### Internal Approvals

A. This investment policy shall be approved by the Board of Directors.
B. The procedures shall be approved by the Chief Financial Officer.
C. The Chief Financial Officer shall vest authority to
   1. Execute wire transfers on behalf of the company
   2. Execute investments on the part of the company
D. Bank confirmations of wire transfers shall be maintained

## VIII.   Transfer of Funds

A. A Letter of Authorization shall be completed prior to a fund transfer. Each transfer will be assigned a new reference number.
B. A Wire Transfer Log will be maintained for all trades.
C. There will be a Monthly Investment Portfolio report each month to coincide with the account reconciliation submitted for management review.

ADAMS 004518

# EXHIBIT 77

Adams Golf

 





## Press Releases

### Adams Takes Legal Action Against Costco
**Plano, Texas – June 9, 1998**

Adams Golf filed a Bill of Discovery against Costco on June 9, 1998.

The Bill of Discovery was filed in order to determine whether Costco's claims that they had properly acquired Adams' Tight Lies® fairway woods for resale were accurate.

Adams Golf became concerned when it learned that Costco was selling their Tight Lies® fairway woods because Costco is not an authorized distributor.

"We are committed to our program of partnership with our retail accounts," stated Barney Adams, Chief Executive Officer of Adams Golf. We are prepared to take every legal action required to ensure that our valuable relationship with our retailers is maintained and remains fully intact," Adams added.

#### Back to the List of Press Releases

---

Copyright © 1998 - Adams Golf
All Rights Reserved

This website created by
**Virtual Visits, Inc.**



ADAMS 001494

EXHIBIT 78

2801 Plano Parkway
Plano, Texas 75074
www.adamsgolf.com
e-mail: info@adamsgolf.com
Fax: (972) 398-8818
(800) 622-0609
Tel: (972) 673-9299



## MEMO

**To:**   Board of Directors

**From:**   Barney Adams/Darl Hatfield

**Re:**   Conference Call with Lehman Brothers

On July 28, 1998 a conference call was held with the following individuals participating:

Adams Golf:

> Barney Adams—CEO
> Darl Hatfield—CFO
> Finis Conner—Board of Directors (Pricing Committee Member)
> Paul Brown—Board of Directors (Pricing Committee Member)

Lehman Brothers:

> J. Stuart Francis—Managing Director (Investment Banking)
> Olga Pulido—Senior Vice President (Investment Banking)
> Patrick Walravens—Associate (Investment Banking)
> Mark Paley—Managing Director (Equity Syndicate)
> Brad Smith—Vice President (Equity Syndicate)

A general discussion was had to determine what has affected the price of the Company's stock. The primary reasons presented by Brad Smith and Mark Paley concerned the following:

- General market conditions for small to mid cap companies have reflected poor performance of this group as demonstrated by a 6.8% decline in the Russell 2000 Index since the Company went public.



Δ π EXHIBIT 78
Deponent F. Conner
Date 5/8/06 Rptr. AmH
WWW.DEPOBOOK.COM

ADAMS 003947

- Calloway's press release for the second quarter reflected much poorer performance than had been predicated by analysts.
- Golden Bear : Stock has been suspended from trading and will likely be delisted.
- Adidas: Reported poor results for its Taylor Made Division.
- Orlimar: Has continued to have success at the retail level and has been aggressive in providing incentives to retail sales personnel to promote their club.
- Reuters: Presented erroneous information regarding our second quarter by originally indicating we had incurred a loss. It is believed that Reuter's report had a negative influence on investors and therefore adversely affected the price of the stock.

    In view of the above factors, it was recommended that we have a conference call with investors, analysts, and other interested parties to calm the market by discussing our business model. It was suggested that we review the timing of the new product introductions and present information similar to our road show presentations. Finis Conner emphasized that we should not accelerate new product introductions unless the business opportunity warrants such action and that we should limit our discussion to Adams Golf and how we differentiate ourselves from other models which are experiencing difficulty in the current market. It was also suggested that we survey our top retailers to determine our current status relative to our competitors.

    If you have any questions regarding the above information, please don't hesitate to call Darl or myself. We expect to hold the conference call on either August 5th or 6th and will fax you an announcement once the timing is determined.

ADAMS 003948

EXHIBIT 80

2801 East Plano Parkway
Plano, Texas 75074
www.AdamsGolf.com
FAX: 972-398-8818
800-622-0609
Tel: 972-673-9673

**ADAMS**

*From the desk of:*
B.H. (Barney) Adams

## Memo

**To:** Paul Brown, Roland Casati, Finis Conner, Mark Mulvoy, Dick Murtland, Steve Patchin, John Simpson

**Date:** October 8, 1998

**RE:** 4TH QUARTER

One thing that is hurting us badly is Costco. It was a problem before, but has greatly escalated in the last two weeks and will be very difficult in Q4 (Christmas).

A.  We don't sell Costco
B.  They have previously bought our product through some of our customers looking to make a quick buck. This is a modus operandi for Costco. We were never able to trace sources, we attempted to file suit but were unsuccessful.
C.  We committed $125K to an engraving machine which will engrave a serial number on the hosel of every club head. It's a long lead time product and requires sophisticated installation with our computer system providing tracing ability. The machine should be up and running by end Q4.
D.  In the meantime, the product volume at Costco has increased dramatically (as of the last two weeks), and to our great surprise we are relatively sure their source is one of our largest retail accounts. (A process of elimination with this new volume, not a paper trail.)

Costco makes its money from memberships. They buy a hot product like ours and sell it at a low price ($149.00 for graphite). Our normal channels can't compete, retailers get mad and stop buying. We can:

A.  Buy the product out of Costco   (They'll just get more).
B.  Compensate our retailers.

We estimate a negative sales effect in Q4 of 20%-25% based on a market survey (customers who refuse to buy). We are countering with our Thank You America program where you get a free $150.00 stand bag with the purchase of two Tight Lies®, and Costco does not participate.

Except for a lesser amount in the pipeline we'll have this under control by Q1 '99, but it's a problem that has become a major issue in the last two weeks.

BHA:aln



Δ π EXHIBIT 80
Deponent F. Conner
Date 5/9/06 Rptr. AmH
WWW.DEPOBOOK.COM

ADAMS036832

EXHIBIT 81

### MINUTES OF A SPECIAL MEETING OF
### THE BOARD OF DIRECTORS OF

### ADAMS GOLF, INC.

#### October 19, 1998

A Special meeting of the Board of Directors of ADAMS GOLF, INC., a Delaware corporation (the "Corporation"), was held by conference telephone call whereby all participants could hear each other. The meeting was held in accordance with the provisions of Article 141 of the General Corporation Law of the State of Delaware on the 19th day of October, 1998 beginning at the hour of 9:30 a.m. central time.

The following directors constituting a quorum participated in the conference telephone meeting:

B.H. Adams
Paul F. Brown, Jr.
Roland Casati
Finis Conner
Mark Mulvoy
Richard Murtland
Stephen R. Patchin
John Simpson

Darl Hatfield, Senior Vice President, Finance and Administration, Chip Brewer, Senior Vice President Sales & Marketing, and Patty Walsh, Director, Investor Relations, participated in the meeting at the invitation of the Board of Directors.

An information packet concerning the Company's 3rd quarter 1998 results, 4th quarter 1998 and fiscal year 1999 forecasts were provided to all Directors in advance of the meeting. After the Chairman called the meeting to order, a general discussion of these documents took place and is recapped below.

Costco

In response to questions concerning Costco's effect on projected 4th quarter 1998 sales, Barney Adams and Chip Brewer reported that Costco has significantly increased its inventory of Tight Lies, using unauthorized diverters, and is selling the graphite club for $149. Adams authorized retailers in Costco's territories are under pressure either to (1) match Costco's price resulting in substantially decreased margins, or (2) maintain a $199 price and risk consumer backlash. The result has been a slowdown in sales to retailers in these areas which is expected to continue throughout the 4th quarter. Management is working to identify the retailers who are supplying Costco. In addition, management is



Δ π EXHIBIT 81
Deponent F. Conner
Date 5/9/06 Rptr. AMH
www.cdprocog.com

ADAMS 004519

working with legal counsel to determine what actions may be taken to prevent authorized retailers from diverting product to Costco.

Orlimar's clubs have begun to appear at Costco at $199 graphite. Suggested retail is approximately $269 providing up to a 50% margin to their top retailers. Callaway's new Steelhead clubs have not been seen in Costco. The Steelhead, in graphite, retails for approximately $249 with a 30% to 35% retail margin.

1998/1999 Financials
The Board requested copies of the Company's previous 1998 and 1999 projections for comparison with current estimates. Darl Hatfield will provide these at the 10/28/98 Board of Directors meeting.

4th Quarter 1998 Projection
Selling and Royalty expense for the 4th quarter reflects an increase over the 3rd quarter 1998 with a significant reduction in sales estimates. Darl Hatfield noted that part of the increase in expenses can be attributed to production costs for the new Tight Lies infomercial, creative and production costs for the new driver infomercial and costs associated with the bag promotion. Additional discussion took place regarding variable expenses and professional services.

The Board recommended that management review the 4th quarter 1998 budget to determine if reductions in expenses could be made in order to improve operating results.

Details of the 4th Quarter 1998 and the 1999 Annual Forecasts were requested to be provided at the October 28, 1998 Board of Directors meeting.

General Market Conditions
In response to questions concerning the golf equipment market in general, Chip Brewer reported that Adams and its competition all appear to be experiencing a slowdown in the market. Sales during the 3rd quarter filled the retail channel. Retailers have reported to Adams management they think Orlimar will begin to suffer due to their high rate of returns, pricing policies and the appearance of their products at Costco.

Share Repurchase Program
Darl Hatfield reported, due to concerns expressed by the Board, the share repurchase program has been temporarily discontinued until after the conference call with investors and analysts.

Third Quarter 1998 Conference Call
In response to questions concerning the October 23, 1998 analyst teleconference, Barney Adams stated the message to be communicated is that the golf market is very soft and Costco makes the situation more difficult. It was added that the continued investment in R&D should be highlighted as well, pointing out that the Company is on track to introduce the new driver in early 1999. In addition, the Board indicated the Company should clearly acknowledge the gray market which has developed in the Company's

ADAMS 004620

distribution channel and that management is working to resolve this issue which is expected to take through the end of 1998. The Board further recommended that Joe Hoffman, outside counsel with the law firm of Arter & Hadden LLP, be included in the teleconference scripting/rehearsal.

Analyst Reports
The Board requested a copy of all future analysts' reports.

Directors & Officers Insurance
Darl Hatfield reported he has requested estimates to increase D&O insurance from $7.5 million to $15 million, $20 million, $30 million, and $40 million.

Driver Update
Dick Murtland reported driver development is on track with a target introduction date of January 1999. Barney Adams noted that Nick Faldo has been involved in the driver development process and will participate in the advertising as well. The driver is expected to retail between $350 and $400. Teaser ads are expected to be used prior to the introduction.

Next Board Meeting
The next Adams Golf Board of Directors meeting is scheduled for Wednesday, 10/28/98 with dinner on the preceding evening.

There being no further business to come before the meeting, upon motion duly made, seconded and carried, the meeting was adjourned at 10:40 a.m. central time.

CHAIRMAN OF THE MEETING:

B.H. Adams

SECRETARY OF THE MEETING:

B.H. Adams

ADAMS 004521

EXHIBIT 85

29 MAI '98 19:02 GOLF SERVICESHP-                    32 2 3313159            P.1

To :   Barney Adams                              May 29, 1998
       Mark Gonsalves
       Marc Puglielli

From : Chris Beebe

Dear Barney and Mark,

I just received a voice mail message from Greg Pratt of WDC Mckenzie in Canada, and the Costco stores have just received a second shipment of *Tight Lies*, this time in master packs of 30 clubs each.

As I had mentioned in my notes from my meetings in Canada, the first shipment to Costco of 600 clubs caused a great deal of trouble up north. Luckily, WDC Mckenzie was able to ask the pros and retailers to give them 60 days to correct the problem, and if things were not put right by that time, the retailers could ship their clubs back to WDC. The clubs had all sold through by the end of 60 days, so our distributors only had to deal with 10 or so returns from angry retailers.

However, during my visit and in conversations with 10 pros/retailers from across Canada, the same message came through. Taylor Made, Ping and Callaway all faced Costco/Price club trans-shipping their products into Canada, and each company ended up giving the retailers the right to match the Costco prices when needed. These manufacturers would then make up the difference in lost profit to the retailers with no charge products. The opinion across Canada is that any major golf manufacturer would have to put in place similar programs or they would have massive returns. And Adams Golf is seen as a major manufacturer.

I would like permission to put such a plan in action in Canada immediately. My notes from my Canadian meetings have the details, and I can send across another copy if need be. I will call the office later this afternoon to review this fax and to answer any questions that you may have. If we do not take some positive action quickly, Adams Golf stands to lose most of the goodwill we have built in Canada, and see the 15,000 clubs that Mckenzie is forecasting for sales through the end of the year disappear.

Regards,

Chris Beebe

EXHIBIT
85
Puglielli

ADAMS 001497

P.S. My hotel phone and fax number follow. I will be out for dinner this evening, but will return to call the office. T-011-32-2-640-8889 F-011-32-2-640-1611
Room 37.

EXHIBIT 86

To:    Barney Adams                                                           May 29, 1998
        Mark Gonsalves
        Marc Puglielli

From:  Chris Beebe

Re:    Notes From Canadian Visit

Here are notes from my Canada meetings. While I believe that there can be a difference between what the
pro shops and off course retailers are offered, I think that we need to keep this simple and make sure that
we do not lose any support. Therefore I would suggest that we offer everyone the same deal, that being
that when appropriate, they can match the Costco pricing and Adams Golf will make up the difference in
no charge goods. Depending upon which price level they are selling *Tight Lies* at, retailers will receive one
free club for each 2.5, 3, or 3.5 clubs that have to be sold at the Costco price.

COSTCO
It has been a very big thorn in their side. 600 woods have made it into Costco stores across Canada (how
many stores?) Has created a mixed reaction between the various accounts.
-    WDC told the retailers that within 60 days, if any woods were left in the stores, then WDC
      would buy back any stock the retailers wished to return.
Costco is a very large chain in Canada and has a huge membership. Big impact on many middle-lower end
shops.
Feeling is that now that most Costco's are out of most *Tight Lies*, so there is no reason to do anything in
terms of price support.
However, we need to put a plan in place in case this occurs again, as several other major companies
(Callaway, Ping and Taylor Made) have all reacted to similar problems by buying back the Costco
stock or helping pros match the Costco pricing. If nothing is put in place, Adams Golf could lose
a great deal of pro and retail support.
Suggested policy (all prices in Canadian $):
-    Prices of *Tight Lies* run from $349 to $299, with top prices found in private courses which are
      not affected by Costco. Will concentrate the policy on the $329 level on down (unless prices
      falls in the mean time).
-    Will split customers into three price points - $329, $315 and $300. Also need to split them
      into those who can be trusted and those who will abuse the system, as well as which
      customers are close enough to a Costco store to be affected.
-    While most pros feel that a $50 difference between their prices and retailers such as Nevada
      Bob's is not too difficult to overcome, they feel that they need a smaller difference to deal
      with Costco. We decided to set that at $20.
-    The retailers do not feel that they have any such advantage, believe to a man that they must
      match the Costco prices. However, many feel that less than half their sales would be
      impacted.
-    Pros would get support to offer *Tight Lies* at $270 to compete with Costco's $249 if
      challenged during a sale. Adams Golf would offer the difference to be made up in free
      product (pro price of $235).
-    Those pros that can be trusted would report to WDC how many sales were affected by the
      Costco pricing each week (those clubs that they had to sell at $270).
-    Those that could not be trusted would have an inventory of their stock taken. WDC would
      then estimate what percentage of their sales could be impacted by the Costco pricing. (The
      larger the potential match with Costco patrons, the larger the percentage ) They would
      receive "no cost" equipment up front.
-    Weekly reports regarding stock in the various Costco stores would be made, and once the
      majority of stock is gone, the program would end.
-    Need to review this with Barney and MG in order to get final approval.



EXHIBIT

FDN0AO 660-651-6599

ADAMS 005046

EXHIBIT 90



# ARTER & HADDEN LLP

## MEMORANDUM

<u>VIA FACSIMILE</u>

TO:  <u>Adams Golf, Inc.</u> (972.398.8818)
Darl P. Hatfield
James E. Farrell

<u>Cooley Godward</u> (415.951.3699)
Karyn Smith, Esq.
Rich Jasen, Esq.
Steve Harmon, Esq.

<u>KPMG Peat Marwick</u> (214.754.2485)
Manny Fernandez
Rick Ehrman

FROM:  J. David Washburn

DATE:  July 2, 1998

RE:  Response Letter

Attached please find a draft of our response to the SEC's oral comments given June 25, 1998. Please provide comments to me, if any, at your convenience.

Thanks.

cc:  Joseph A. Hoffman, Esq.
Robin Bradford, Esq.



EXHIBIT
90
Walsh

104439.1
69168/20294

AH 000005

ARTER & HADDEN LLP
1717 MAIN STREET, SUITE 4100
DALLAS, TEXAS 75201-7366
214-761-2100 Telephone
214-741-7139 Facsimile

JULY 6, 1998

VIA EDGAR TRANSMISSION

SECURITIES AND EXCHANGE COMMISSION
Division of Corporation Finance
Judiciary Plaza
450 Fifth Street, N.W.
Mail Stop 3-5
Washington, D.C.  20549

Re:  ADAMS GOLF, INC.
     Amendment No. 2 to Registration Statement on Form S-1
     File No. 333-51715

Ladies and Gentlemen:

On behalf of Adams Golf, Inc. (the "Company"), we have electronically transmitted herewith Amendment No. 2 to the above-referenced Registration Statement, which has been marked to indicate the changes effected by the Amendment.  In addition, we have today forwarded, by way of overnight delivery, five (5) marked copies of Amendment No. 2 to the Registration Statement, c/o Ms. Letty Lynn, for the convenience of the Staff.

This letter summarizes the Company's responses to the Staff's oral comments, received June 25, 1998. The undersigned and David Washburn of this firm previously discussed the Company's responses, at greater length, with Ms. Carolyn Kurr of the Staff on July 1, 1998.

1.    COMMENT:

The Staff has conducted a review of press releases and other publicity regarding the Company and noted that Mr. Adams, the Chairman of the Company, was quoted in a number of articles. Please make a good faith effort to review recent publicity and to square the information therein with the Prospectus.

RESPONSE:

The Company utilizes B.H. Adams, its Chairman and President, as the key spokesperson for the Company's products. Further, Mr. Adams is a respected expert on golf equipment and is often asked to comment on issues related to golf equipment. Prior to and since the filing of the Registration Statement, Mr. Adams has attempted to focus his public statements on the Company's products, and his intent has only been to promote the Company's products. It is the Company's belief that keeping products in the public eye is crucial in the marketing of consumer retail products such as those of the Company, especially at the peak of the season. Since the announcement of the offering, Mr. Adams has [refused various requests from the media for interviews and] consistently noted to the media that he was prevented by SEC rules from discussing the offering.

AH 000006

SECURITIES AND EXCHANGE COMMISSION
July 6, 1998
Page __

A number of the articles about the Company that have recently appeared in the media have been the result of either prior public relations activities (e.g. the PGA show in Florida in late January 1998) or coverage generated by the press itself. Because of the seasonal nature of golf, many of these articles are timed to run during May, June and July, the peak of the golf season.

The timing with respect to the announcement of the Company's contract with Nick Faldo was unavoidable. Mr. Faldo's contract with Mizuno ended April 30, 1998. The Company was unable to announce its new relationship with Mr. Faldo until his Mizuno contract expired, and this occurred at or about the time of the initial filing of the Company's Registration Statement. The Company incurred significant expense in connection with the signing of Nick Faldo and needed to announce this significant corporate event. The Company expects that its relationship with Mr. Faldo will promote sales, especially international sales given Mr. Faldo's international reputation.

The undersigned counsel and the Underwriters' counsel have reviewed the publicity leading up to and after the filing of the Registration Statement. Both believe that Mr. Adams' public statements square with and are adequately addressed in the Prospectus.

2.   COMMENT:

The Staff has noticed that the Company has an interactive site with Mr. Adams on its web page. Please discontinue the use of this feature until the Registration Statement has become effective.

RESPONSE:

As requested, this site was disabled [Friday June 25, 1998?] and shall remain disabled until after the Registration Statement has become effective.

3.   COMMENT:

Consider updating disclosure in the Prospects regarding USGA approval of golf equipment.

RESPONSE:

Updated disclosure relating to the USGA's recent announcement is included on page 6 under "Dependence on New Product Introductions; Uncertain Consumer Acceptance."

4.   COMMENT:

The Staff notes that the Company has filed an action in Texas against Costco Companies, Inc. d/b/a Costco Wholesale. Please supplementally advise the Staff of the significance of this action.

AH 000007

SECURITIES AND EXCHANGE COMMISSION
July 6, 1998
Page ___

RESPONSE:

The Company filed a Bill of Discovery with the District Court in Collin County, Texas (Cause No. 219-922-98) on June 11, 1998 against Costco Companies, Inc. d/b/a Costco Wholesale ("Costco") for the purpose of obtaining the identity of the Company's distributors who are apparently selling the Company's products in violation of the Company's policies and agreements with such distributors. The Company does not believe that this proceeding is material.

KPMG has informed us that the original date of their auditors' report, January 16, 1998, was in error. The appropriate date, which has now been included in the Amendment No. 2, is April 29, 1998. KPMG has informed us that this date of April 29, 1998 complies with the standards included in Statement on Auditing Standards No 1 (AICPA AU Section 530.01). This information is consistent with the discussion held between Sam Ranzilla of KPMG and Kathy Mathis of the Staff on June 19, 1998. In addition, we have EDGARized the letter from KPMG to the Company dated June 8, 1998 and attached same to this correspondence as requested by the Staff. Updated consents have been included in the amended Registration Statement.

As we discussed on July 1, 1998, the Company plans to price on July 9, 1998 and to go effective on that date. Requests for acceleration from the Company and the Underwriters are attached.

Please do not hesitate to call me at 214-761-4779 or J. David Washburn of this office at 214-761-4309 if we can be of any further assistance.

Thank you for your assistance.

Very truly yours,

Joseph A. Hoffman

J20/sjm

cc:  Mr. Darl P. Hatfield
     Mr. James E. Farrell
     Kenneth L. Guernsey, Esq.
     Karyn Smith, Esq.
     J. David Washburn, Esq.

104366.2

AH 000008