EXHIBIT 177

01/03/06   16:47  FAX 215 875 5715          BERGER&MONTAGUE                              ⓐ003

07/29/98      14:24       LEHMAN BROTHERS → 972 398  8818                      NO.620     D01

# LEHMAN BROTHERS

FACSIMILE

*Has a question discounting re return to costos* 

**DATE:**    July 29, 1998              **PAGES (INCLUDING COVER): 3**

**TO:**
Barney Adams
Darl Hatfield
Adams Golf, Inc.
(972) 673-9000
(972) 398-8818  (Fax Number)

**FROM:**
Patrick Walravens
Lehman Brothers
(415) 274-5285
(415) 274-5381  (Fax Number)

**MESSAGE:**

Please deliver upon arrival.
Thank You.

Barney and Darl,

Attached are a summary outline and a summary of likely investor concerns for the Adams Golf
conference call next week.

Pat

EXHIBIT
177
5/17/06   de

ADAMS 004394

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

TELEPHONE 415-274-5285

01/03/06  16:47 FAX 215 875 5715        BERGER&MONTAGUE                        @004

07/29/98    14:24    LEHMAN BROTHERS → 972 398  8818                  NO.620    P02

# ADAMS GOLF CONFERENCE CALL
## SUGGESTED SUMMARY OUTLINE

- Welcome investors to first Adams Golf conference call + introduce who is there from the Company
- Read safe harbor language (get this from Arter & Hadden)
- **Barney Adams**
  - Pleased to announce introduction of our 2 wood and 11 wood
  - Now that quiet period has ended pleased to discuss Q2 results
  - Our business model is intact
    - On target for projections
    - New product development (driver) is on track
    - Very pleased with results to date
    - ADGO is one largest revenue companies in the industry
    - One of the fast growing companies in golf
    - It's a $4 billion market worldwide
    - We continue to feel good about the business and to feel comfortable with the estimates the analysts have put forward
- **Darl Hatfield**
  - Q2 was a great quarter for Adams Golf
  - Revenues
    - We are comfortable with the analyst projections for the quarter and the year
    - Breakdown by Product
    - Breakdown by direct, non-direct, international
  - Gross margin (cost of goods sold)
  - Operating margin (operating expenses)
- Questions & Answer

ADAMS 004395

LEHMAN BROTHERS

· 01/03/06  16:47 FAX 215 875 5715     BERGER&MONTAGUE                    ☒005

      07/23/98     14:24     LEHMAN BROTHERS → 972 398  8818              NO.620   D03

## ADAMS GOLF CONFERENCE CALL
## CONCERNS TO EXPECT FROM INVESTORS
## JULY 29, 1998

| CONCERN | RESPONSE |
|---|---|
| • Orlimar<br>— Are retailers swapping Adams floor space for Orlimar?<br>— Everyone is seeing the Orlimar commercials over the weekends.<br>— Why does Orlimar dominate Darrell Survey rankings?<br>— Does Orlimar beat you at your own game by offering retailers higher margins | |
| • Recent performance<br>— How is this quarter shaping up?<br>— Are you confident that you are in line for Q3?<br>— What were the Golf Data Tech numbers for June?<br>— How is retail sell through going? | |
| • Callaway<br>— What is the story behind the new Callaway club?<br>— What impact will it have on Adams Golf's sales and projections? | |
| • New products<br>— Is driver development on track? | |
| • Domestic sales<br>— What were your domestic vs. international sales in Q2?<br>— Did international sales make up for weak domestic sales in Q2? | |
| • Discounting<br>— Tight Lies have been seen in many Costcos for $146?<br>— How is product getting there?<br>— What is Adams Golf doing about it? | |

LEHMAN BROTHERS                              ADAMS 004396

EXHIBIT 180



D. HATFIELD

# LEHMAN BROTHERS

August 28, 1998

**Growth Stocks**

**Brian Lantier**
1 212 526-5977
*blantier@lehman.com*

**Bernard J. Picchi, CFA**
1 212 526-5344
*bpicchi@lehman.com*



# ADAMS GOLF, INC.

## FORE!  A GOLF EQUIPMENT GIANT IS HEADED YOUR WAY

**1 Buy**

| ADGO 6 5/8 | | 52-Wk Range 19-6 | | | FY 12/31 | | S&P 500 1042.57 |
|---|---|---|---|---|---|---|---|
| | 1Q | 2Q | 3Q | 4Q | Year | P/E | Div. |
| 1997A | - | - | - | - | -0.37 | NM | Nil |
| 1998E | 0.31a | 0.35a | 0.23e | 0.19e | 1.05e | 6.3 | Nil |
| 1999E | 0.29 | 0.36 | 0.32 | 0.29 | 1.26 | 5.3 | Nil |
| Shares Outstanding   23.1 Million | | | | | | | DJIA 8165.99 |

### Growth Drivers: New Products, International Sales and Market Share

- We have initiated research coverage of Adams Golf, Inc., with a 1 Buy recommendation.  Adams Golf has grown into one of the top five manufacturers of premium golf equipment in the U.S. and has its sights set on becoming the top domestic equipment manufacturer before long.

- The success of the company's fairway woods – marketed under the "Tight Lies" brand – have made Adams Golf the market leader in this segment.  As all successful golf companies before it have done, Adams has established a position of dominance in its chosen sector (fairway woods) upon which it can build a larger company.

- Adams should experience solid top- and bottom-line growth fueled by new product introductions (a new driver introduced in 1999) and a meaningful expansion of international sales.  All growth will be anchored by the company's position as the leading manufacturer of fairway woods in the U.S.

- We believe that despite some areas of weakness in the domestic market for golf equipment (weakness that, in our opinion, is driven by a lack of new innovations in the equipment market) there are specific areas of strength.  For example, we believe that firms specializing in fairway woods are enjoying a fairly healthy operating environment.

- We have a 12-month price target for Adams Golf of $23 (18 times our 1999 estimate of $1.26)  and recommend purchase of the shares with a 1 Buy.



EXHIBIT
180
5/17/06

ADAMS 004035



LEHMAN BROTHERS

"My neighbor carries an Adams Tight Lies and if it wasn't for his wife, I believe he would marry his."

*- Taken from iGOLF's (www.iGOLF.com) product review forum*

**COMPANY DESCRIPTION**

Adams Golf, Inc. manufactures premium golf clubs based on innovative designs to provide enhanced performance for the average golfer. The success of the company's fairway woods – marketed under the "Tight Lies" brand – has made Adams Golf the market leader in fairway woods. As all successful golf companies before it, Adams has established a position of dominance in its chosen sector (fairway woods) upon which it can build a larger company. (See Appendix 2 for golf-related terms.)

**INVESTMENT THESIS**

Adams Golf should be viewed as a new breed of company in the golf business with a unique sales and distribution model, rather than simply a company with a hot product. The success of Adams Golf to date has, in large part, been due to the high quality clubs that it manufactures, but we believe that the company's unique marketing model and its ability to deliver margin to its retailers have been equally important. It is important to note that the Adams story has the legs to travel beyond the Tight Lies fairway woods. The key is its relationship with retailers and its innovative marketing techniques that should make the introduction of new products easier.

Adams Golf has entered the top tier of golf companies at an opportune time. Traditional industry powerhouses did not focus on the fairway wood market prior to the success of Adams Golf (most clubs developed were simply scaled down versions of the company's driver). In addition, recent weak market conditions for firms with broad product profiles have combined with a changing industry landscape (major players such as Cobra and Taylor Made were acquired by larger conglomerates) to open a window of opportunity for Adams. We expect Adams to introduce new product lines, enter new markets and enhance its retail sell-through to achieve our growth expectations.

Behind each of our emerging growth stock recommendations must be a true growth company. Few companies can pass the six-level "growth litmus test" that we apply to all comers. In Figure 1 we list these criteria and show how Adams measures against this profile.

2

ADAMS 004036

LEHMAN BROTHERS

Figure 1: Adams Golf, Inc.
Adams Golf as Growth Company – How It Measures Up (Inside and Outside the Box)

| Growth Characteristics | | Adams Golf – How It Measures Up |
|---|---|---|
| Unique Business Model | X | The company's marketing model was unique at the time of its introduction (imitators have followed) and we expect Adams to continually innovate marketing and product delivery in the world of golf. |
| Improves Client Productivity | | Although a good round of golf may improve one's spirits, we don't think this translates to productivity gains. |
| Suite of Services (No "One Trick Pony") | • | Adams has successfully expanded its line of fairway woods from one club to a family of fairway woods. More product line extensions (like a driver, irons, putters and wedges) should boost Adam's long-term returns. |
| Internal Revenue Growing at ≥ 20% Yearly | X | Our current projections are for annual revenue growth of roughly 20% for the foreseeable future. |
| Barriers to Entry | • | Adams continues to build its brand equity, which could ultimately be a barrier for new entrants, but today the barriers are few. |
| Recession Resistant | | High end premium golf clubs do not sell well in a recession. |

Source: Lehman Brothers.

This exercise would rate Adams Golf as a 3 out of 6 on our growth scale, not a terribly strong rating. However, we have reserved the right to *think outside the box* and Adams is positioned to be an "outside the box" kind of growth company. If a company is early in its life cycle, delivers tangible or psychological benefits to its customers, is in a growing industry, and is gaining market share, we consider the company an "outside the box" growth stock. Consider companies such as Timberland or The Gap that do not fit the traditional mold of a growth company, but have nonetheless performed extremely well.

Below we review what we believe to be the key investment points of Adams Golf.

### 1. The Strength of the Tight Lies Brand

Adams Golf has successfully and recently established its Tight Lies brand as one of the major premium brands in the golf equipment industry. We expect Adams to end 1998 among the four or five golf equipment manufacturers in the United States with sales in excess of $100 million (others: Callaway, Taylor Made, Titleist/Cobra and possibly Karsten Manufacturing). To achieve this level of success while offering *only one* product line – Adams is not a meaningful competitor in any other golf club categories (irons, drivers, wedges or putters) – is testament to the strength of the company's business model and the quality of its clubs.

### 2. Unique Marketing Approach

Adams Golf has redefined the marketing model for golf companies through its unique sales and marketing methods, as we show below:

| Adams Golf | Traditional Golf Equipment Co. |
|---|---|
| In-House Salesforce | Independent Agent Salesforce |
| Direct Response Advertising | N/A (None) |
| Targeted Image Advertising | General Image Advertising |

3

ADAMS 004037

LEHMAN BROTHERS

### 3. New Products Will Offer Long-Term Growth

As we noted above, we expect Adams Golf to be among the top five manufacturers of golf clubs in the U.S. in 1998 with just a single line of clubs (seven fairway woods offered in both graphite and steel shafts). Adams looks to leverage its brand strength and strong retail relationships to enter the premium driver and iron markets over the next three years.

### 4. Strong Design Team = Meaningful New Products

Senior management of Adams Golf complements its own knowledge of club design with industry experts — like Bob Bush (30 years of experience, including Director of Technical Services for True Temper, a leading shaft manufacturer) — who are focused on delivering high quality new products to the market.

### 5. Nick Faldo Endorsement

The lifetime endorsement agreement with Mr. Faldo should benefit Adams Golf in a number of ways. *First*, international sales, which are not now a major portion of sales, should benefit from the endorsement of one of golf's most accomplished players. Mr. Faldo's successful European career should help sales to that continent in particular. *Second*, Mr. Faldo's input on club design (especially for specialty products like wedges) should improve the final product. *Finally*, Mr. Faldo should improve the company's exposure on the major professional golf tours.

### 6. Favorable Trends for Golf

Golf continues to attract a wider audience as a result of increased media coverage of young stars like Tiger Woods, Annika Sorenstam, Se Ri Pak and Ernie Els. In 1997, three million new golfers tried the sport for the first time (a 50% increase over 1996 figures). Although the typical Adams customer is still a middle-aged, avid golfer, expansion of the golf industry will benefit Adams in the long run.

**VALUATION**

Adams shares currently trade at a 1999 P/E of just 5.3 times and just 21% of its long-term EPS growth rate of 25%. The company's purest comparable, Callaway Golf, has a 30-day average multiple of 11.4 times 1999 consensus estimates or 74% of its long-term growth rate. We argue that the growth prospects for Adams Golf are far superior to those of Callaway Golf and as such Adams' shares should trade more in line with its long-term growth rate. At 74% of its growth rate (the current PEG for Callaway) Adams Golf should trade at 18 times our 1999 estimate of $1.26, yielding a 12-month price target of $23 per share.

**BACKGROUND AND OPERATING ANALYSIS**

#### Current Products Offer Solid Growth Prospects

Adams Golf's recent success has been tied directly to the phenomenal market response to its fairway woods.

#### Fairway Woods: What They Are and What Defines the Market

Fairway woods have typically been the stepchild of the golf industry, often overlooked by the major manufacturers in favor of more high profile products like drivers and irons. A fairway wood is defined by the loft angle of the clubhead, which typically ranges from 12 degrees to 32 degrees (See Figure 2). The increase in the loft angle means that the club is further from perpendicular (a 0 degree loft would be perpendicular to the horizon, a 16 degree loft would be 16 degrees back from the perpendicular). As the number of the wood increases, the loft increases as well and the distance that the golf ball will travel falls.

4

ADAMS 004038

Figure 2: Adams Golf, Inc.
The Tight Lies Family of Clubs

| Club | Loft | Distance |
|------|------|----------|
| Strong 2 Tour Brassie | 12° | 225-250 yds |
| Strong 3 Wood | 13° | 210-225 yds |
| The Original 16 | 16° | 190-210 yds |
| Strong 5 Wood | 19° | 175-190 yds |
| Strong 7 Wood | 24° | 165-175 yds |
| Strong 9 Wood | 28° | 155-165 yds |
| Strong 11 Wood | 32° | 140-155 yds |

Source: Lehman Brothers and company reports.

The early 1990s were dominated by manufacturers producing oversized metal club heads that promoted improved accuracy off the tee, especially for less-than-ideal swings. When a ball is not hit in the best spot on the clubface of a persimmon club (the so-called "sweet spot"), the results will be more erratic than those shots taken with the more forgiving metalwood. Because the average golfer (and professionals, for that matter) prefer to the limit the downside of a poorly struck ball, large head metal (steel, titanium, etc.) drivers have enjoyed great success in the 1990s and have made the game more enjoyable for all golfers.

Against this backdrop the market for fairway woods languished over the past 10 years. Most major manufacturers offered scaled down versions of their drivers for the fairway wood market. Unfortunately, what makes the large head clubs work well off the tee — a deep face (taller clubhead) and an oversized head — prevents them from easily getting the ball in the air from the fairway, rough or divots. Golfers facing the daunting task of hitting a second shot 220 yards to a green with a deep-faced metalwood or a long iron were left without an easy solution.

**The Answer to Long Second Shots to the Green: The Tight Lies From Adams Golf**

Barney Adams realized through years of interacting with average golfers as a custom fitter that long irons and fairway woods were the hardest clubs to master. The challenge was to improve the ball flight for the average golfer on the second shot to the green, so that the ball would land more softly than if it were struck with a traditional club (i.e., make the ball travel the distance of a long iron, with the high, soft arc of a short iron).

With a given ball flight in mind, Barney Adams set off to design a golf clubhead that would deliver the ball flight pattern shown in Figure 3. The resulting design was the inverted trapezoid shown in Figure 4, which was designed to lower the center of gravity on the clubhead below the equator of the golf ball. By lowering the center of gravity, a manufacturer can increase the ease with which a golfer can hit a fairway wood. Adams Golf accomplished this with the introduction of the Tight Lies Fairway Woods.

5

ADAMS 004039

LEHMAN BROTHERS

Figure 3: Adams Golf, Inc.
Ball Flight Trajectory



Source: Lehman Brothers.

### A Marketing Epiphany

In 1995 and Adams Golf began testing its Tight Lies Fairway Woods at local driving ranges. The club performed as promised, delivering high, long shots for average golfers from a variety of lies. With a club in hand that delivered the results that were eluding other golf companies, Adams Golf was at a crossroads. Because product introduction costs in the U.S. golf market can be astoundingly high (note the 1996 advertising budgets of leading firms in Figure 5) and this spending in no way guarantees meaningful market penetration, any advertising by Adams had to deliver bottom line results. Understanding that the company was without the financial means to compete (via traditional means) with firms like Callaway, Cobra, Titleist and Taylor Made, the marketing and sales team at Adams elected to use non-traditional forms of advertising such as infomercials and direct response advertising. The key benefits of direct response advertising include the fact that it is at least "earnings neutral," as revenues from the commercial or print ad offset the cost of advertising, it improves market awareness and retail sell-through, and it establishes a national price point for the product.

Figure 4: Adams Golf, Inc.
Clubhead Comparisons

The Adams Tight Lies



A "Traditional" Fairway Wood



Source: Adams Golf.

6

ADAMS 004040

LEHMAN BROTHERS

Figure 5: Adams Golf, Inc.
Advertising Spending by Major Golf Manufacturers

| Manufacturer | Advertising Dollars | % Magazine Spending | % Television Spending |
|---|---|---|---|
| Callaway Golf | $14.5 | 24% | 74% |
| Cobra Golf | $13.7 | 38% | 62% |
| Taylor Made | $12.7 | 40% | 59% |
| Ping Golf | $8.7 | 56% | 44% |
| Tommy Armour | $8.5 | 45% | 49% |
| Titleist Golf Clubs | $7.3 | 41% | 58% |
| Lynx Golf | $7.1 | 14% | 86% |
| Top-Flite Golf Clubs | $6.3 | 32% | 65% |

* Percentages may not equal 100% due to other advertising costs.
Source: LNA Multi-Media Report 1996.

### The Adams Marketing Model Is a Hybrid....

The direct response base from which Adams Golf was truly born is based on using an infomercial to establish initial sales and brand awareness that will drive customers to retail locations. Although final sales predominantly occur in the retail locations (88% of second quarter 1998 sales occurred at on- and off-course golf shops), the company's method for gaining initial floor space (direct response advertising) was unique at the time of its introduction.

Traditionally, golf club manufacturers have used image-based advertising and sponsoring individual golf professionals through endorsement contracts to increase the visibility of their clubs and gain retail floor space. We believe that the current golf industry is capable of supporting both the traditional marketing model and the hybrid model developed by Adams Golf. However, we believe that the Adams model will be much more flexible and more responsive to changes in consumer tastes than the traditional marketing model. Consider how Dell Computer receives instant feedback on consumer demand via its website sales — this is like the feedback Adams Golf receives from its infomercials that will prove to be a leading indicator for end consumer demand.

### ...That Parallels Another Industry

"When the company first opened its doors, many in the industry had a good laugh at how the company distributed and marketed its products."(*Informix Magazine*, Winter 1998). The company referred to in this article is not Adams Golf, but rather Dell Computer. Dell redefined the marketing and distribution model for the PC business by selling directly to the end user. Similarly, Adams Golf has redefined the marketing and distribution systems of the golf industry.

### Retail Partners

Adams Golf currently has relationships with roughly 8,000 retail accounts ranging from on-course golf pro shops to off-course golf specialty stores (Edwin Watts, GolfDay) to large sporting goods stores with a commitment to price integrity (Sports Authority). Our thesis on the golf industry is centered on the concept of retail sell-throughs. Those equipment manufacturers that deliver customers and a sustainable operating margin to the retailers will be the most successful in the competitive world of golf equipment.

7

ADAMS 004041

LEHMAN BROTHERS

Adams Golf has rapidly become a major player in the golf industry by delivering solid operating margins to its retail customers. The company is able to deliver strong margins because of its low cost of goods and strong brand image. Its increasingly popular brand has taken hold and Adams is now delivering the second half of the success formula: customers to the retailer. Retailers need to drive customers into their stores because once they are inside they tend to buy more high margin products such as golf balls, gloves or apparel.

### The Outlook for the Fairway Woods Market

As we indicated earlier, the fairway wood has long been the stepchild of all clubs in a player's bag. A traditional golf bag with 14 clubs (the maximum allowed by USGA rules) would normally include irons numbered 3 to 9 (seven clubs), a driver, a putter, and two wedges (pitching and sand). This leaves three available slots for a 3 wood, other fairway woods, wedges or long irons (like a 1 or 2 iron). The current trend for professionals and amateurs alike is to replace the 2, 3 and 4 irons with two fairway woods (like the Original 16 degree and a Strong 5). This switch benefits players in two ways: First, the player can now add up to three more clubs to his or her bag (usually extra wedges) and still be within the guidelines and, second, the fairway woods will typically be easier to hit than long irons if they are shallow-faced.

A recent survey by Golfonline (www.golfonline.com) revealed the increasing popularity of fairway woods as shown by the number of woods carried by average players (Figure 6).

Figure 6: Adams Golf, Inc.
How Many Woods Do You Carry?

| # of Woods Carried | % of Respondents |
|---|---|
| 0 | 0.6% |
| 1 | 3.2% |
| 2 | 23.5% |
| 3 | 47.4% |
| 4 or More | 25.3% |

Source: Golfonline Survey

### Avid Golfers – An Avenue for Growth

The growth of fairway woods' popularity in the last 18 months has also been driven by the desire of avid golfers (those playing more than 25 times per year and averaging 66 rounds per year) to try any and all new equipment on the market. It is estimated by the National Golf Foundation (NGF) that roughly 5.6 million of the 26.5 million golfers in the U.S. are "avid." These golfers are predominately male, older, have more disposable income than the mean and are much more dedicated to game improvement through equipment advancements than less frequent players. The number of avid golfers in the U.S. has not changed meaningfully since 1991 (the six-year compounded annual growth rate was just +0.8%). However, we believe that there is an important trend developing in the golfing statistics for 1997 that indicates the number of avid golfers could soon begin to increase significantly. In Figure 7, we review the current trends in the number of golfers by category.

We believe that the increase in core golfers reported in 1997 could be the beginning of a trend toward a greater level of commitment to the game of golf by the leading edge of the "Baby Boom" generation. This is best evidenced by the increase in the

8

ADAMS 004042

LEHMAN BROTHERS

number of core golfers relative to occasional golfers. The ratio of core golfers to occasional golfers ranged between 0.62 and 0.66 to 1 between 1991 and 1996 but in 1997, this ratio jumped to 1 to 1.

Figure 7: Adams Golf, Inc.
Player Categories

| | Avid Golfer (25+ Rounds) | % of Total Golfers | Core Golfer (8-24 Rounds) | % of Total Golfers | Occasional (1-7 Rounds) | % of Total Golfers | Beginner First Round | % of Total Golfers | Juniors 12-17 yrs old | % of Total Golfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 1991 | 5,348 | 21.6% | 6,152 | 24.8% | 9,244 | 37.3% | 2,256 | 9.1% | 1,800 | 7.3% |
| 1992 | 5,316 | 21.7% | 6,274 | 25.1% | 9,468 | 38.2% | 2,037 | 8.2% | 1,700 | 6.9% |
| 1993 | 5,518 | 22.5% | 5,782 | 23.6% | 9,286 | 37.9% | 2,014 | 8.2% | 1,900 | 7.8% |
| 1994 | 5,113 | 21.0% | 6,087 | 25.0% | 9,818 | 40.4% | 1,582 | 6.5% | 1,700 | 7.0% |
| 1995 | 5,512 | 22.0% | 6,088 | 24.4% | 9,569 | 38.3% | 1,831 | 7.3% | 2,000 | 8.0% |
| 1996 | 5,266 | 21.2% | 6,134 | 24.7% | 9,641 | 38.9% | 1,959 | 7.9% | 1,800 | 7.3% |
| 1997 | 5,600 | 20.9% | 7,900 | 29.5% | 7,900 | 29.5% | 3,000 | 11.2% | 2,400 | 9.0% |

1997's meaningful jump in the number of core golfers could forecast an eventual jump in the number of avid golfers.

Source: National Golf Foundation and Lehman Brothers.

We believe that by the end of 1998 Adams Golf will have sold over 1.0 million Tight Lies in the U.S. This leaves significant upside potential for the company over the next two to three years in the high end fairway wood market given that its target market includes the expanding avid golfer segment (5.6 million golfers) and a portion (the more committed golfers) of the core golfer market (7.9 million in 1997).

*Competition Heats Up*

Callaway – An 800-lb Gorilla Stubs Its Toe

Callaway golf emerged from relative obscurity in the late 1980s with the introduction of the S2H2 (Short Straight Hollow Hosel) metalwoods. But when the company introduced its first Big Bertha metalwood in 1991, its growth rate shifted into overdrive. Callaway rapidly grew into a dominant position in the consumer driver market that it still holds. The company successfully extended its product lines to irons, putters, wedges and accessories and followed the success of the Big Bertha driver with the even more successful introduction of The Great Big Bertha titanium driver.

Callaway Golf remains king of the mountain (despite setbacks discussed later) and the model for true success for a golf company. On August 12, Callaway Golf introduced a new line of drivers and fairway woods called the Big Bertha Steelhead. Despite early reports to the contrary, the new Steelhead *is not* a shallow-faced wood like the Adams Tight Lies. To achieve the ball flight desired, Callaway combined a fairly standard clubhead, a light crown plate, and steel weight chip (from 2 to 20 grams) inserted in the base of the club to lower the center of gravity. Callaway's marketing angle is based on the premise that with a larger clubhead, the Steelhead will have a larger effective hitting area than shallow-faced woods like the Adams Tight Lies. The Big Bertha Steelhead carries a suggested retail price of $295 for a graphite shafted club but is retailing for $35 below this price — $260. At this price point the new Callaway club will be priced slightly below Orlimar's Tri-Metal fairway wood ($270) and well above the average Tight Lies price of $199.

9

ADAMS 004043

LEHMAN BROTHERS

A key point for investors to consider is that Callaway is entering the current boom in fairway woods mid cycle with a product that does not have the characteristics of the most popular clubs – a low profile design. We liken this to introducing a new steel headed driver in the middle of the 1996/97 titanium craze or (continuing with our earlier computer analogy) introducing a new computer in 1996 without a modem because "How many people really want to use the Internet?"

Callaway Golf will phase out its Big Bertha Warbird fairway woods and drivers and replace them with its new Steelhead line. Our channel checks have indicated that the demand for this new club is high (on a par with the introduction of The Great Big Bertha in 1995) and most stores sold out of their allotted stock in only a few days. If this trend continues through the end of September we will reconsider the impact of the Callaway Big Bertha Steelhead on our earnings estimates for Adams Golf.

### Callaway's Growing Pains

Callaway Golf has experienced a rough 1998. The Street's earnings estimates for the company have gone from $2.35 per share and $2.67 per share at the beginning of 1998 to just $0.46 per share (down 80%) and $1.14 per share (down 57%) for 1998 and 1999, respectively, in just over seven months.

Callaway began 1998 with expectations that it would achieve revenues of $1.0 billion during the year. The company built its operating infrastructure to support a billion-dollar firm. On its second quarter conference call, the company conceded that it would not realize $1.0 billion in revenues and that the more realistic target would be $750-$800 million. The shortfall has been blamed on a number of influences including El Niño, the Asian crisis and the USGA rules committee, but we believe the single biggest factor has been the performance of Adams Golf. Callaway has been unsuccessful in defending its lucrative metalwoods franchise and as a result both top- and bottom-line results have suffered.

### Orlimar Golf: The Tri-Metal Plays Follow the Leader

Orlimar Golf introduced a premium fairway wood in January 1998 and has followed the Adams Golf marketing model (principally direct response marketing) to grow sales from under $1.5 million in 1997 to a projected level in excess of $75 million in 1998. Orlimar's golf club utilizes a shallow-faced design like the Adams Tight Lies combined with exotic metals (maraging steel, copper/tungsten alloys) for an additional marketing angle. The company has positioned its products as an advance in technology rather than an advance in design. Orlimar Golf has built a loyal following of players eagerly awaiting its next product introduction.

Orlimar's Tri-Metal fairway wood appears to be particularly popular among better amateur players and professionals. Indeed, on July 5, of the 769 woods in play on the professional golf tours, Orlimar held a surprising second behind Callaway Golf, with a 14.9% share (see Figure 8). Orlimar has blitzed the media with this information and it appears to be improving the company's position in the consumer market.

10

ADAMS 004044

LEHMAN BROTHERS

Figure 8: Adams Golf, Inc.
Number of Woods in Play on the Professional Tours

| Manufacturer | Clubs in Play | % of Total |
|---|---|---|
| Callaway | 369 | 48.8% |
| *Orlimar* | *113* | *14.9%* |
| Taylor Made | 86 | 11.4% |
| Titleist | 33 | 4.4% |
| Top-Flite | 25 | 3.3% |
| Cobra | 23 | 3.0% |
| Ping | 22 | 2.9% |
| *Adams* | *17* | *2.2%* |
| Mizuno | 8 | 1.1% |
| Others | 60 | 7.9% |

Source: Darrell Survey.

It should be noted that usage by professional golfers does not guarantee success in the consumer market. Firms such as Mizuno (the #1 iron on tour), Cleveland (the #1 wedge on tour), Lynx and Ram have long been staples on the major professional tours, yet the combined revenues of these firms in 1997 was just $117 million (estimated by *Golf Pro* magazine). Traditionally, clubs designed for the professional golfer are built to offer better feedback to the golfer and tend to be very unforgiving on miss hits. Any amateur golfer who has hit a Mizuno MP-14 3 iron (Tiger Woods' iron of choice before signing with Titleist) quickly understands that although the clubs perform wonderfully for a professional, the amateur is likely to have much greater success with a forgiving, cavity-backed iron.

Our channel checks with retailers indicated that some stores continue to see Orlimar clubs (particularly the lower lofts – 9 degree and 11 degree) returned at a double digit rate. Speculation from retailers we spoke to was that the return rates for Orlimar were dramatically higher than for Adams because of the Orlimar 90-day money back guarantee, because certain clubs proved to be less accurate than expected (particularly in the lower lofts), and because the ability to hit out of certain lies was limited (again mainly for lower lofts).

As we highlight in our retailer survey, Orlimar offers a meaningful rebate program to its most significant customers. This convoluted plan is open only to certain customers and thus may damage Orlimar's relationship with some of its other customers (see Appendix 1).

### Orlimar's Product Extensions — Is It Too Much, Too Fast?

The most successful emerging golf equipment companies have made it a point to dominate their core business first and only then extend the product line. Callaway Golf was a classic example: Callaway's 1991 introduction of the Big Bertha woods led to rapid gains in market share. Callaway extended its line with the new Big Bertha irons in January 1996, wedges in September 1996, and putters in September 1996. As we noted earlier, Adams does not expect to extend its product line until 1999. Orlimar Golf has introduced a new driver, a stainless steel shell with an "Alpha Maraging" steel face and a line of Tri-Metal irons. We believe the company runs the risk of spreading its resources fairly thin at a critical stage of its development. Investors should know that early production problems at Orlimar appear to have been corrected and we will closely watch for future developments.

As we were writing this report, Orlimar Golf issued a press release that indicated it is exploring the possibility of filing a registration statement with the SEC for an IPO, which we expect to come to the market in the fourth quarter.

11

ADAMS 004045

LEHMAN BROTHERS

**Others**

Taylor Made and Titleist, both top tier golf equipment manufacturers in the U.S., have both either announced plans to introduce a new fairway wood or are rumored to be working on a new fairway wood.

Taylor Made has successfully expanded its share of the total woods market in 1998 through an aggressive price reduction campaign and the success of its professional endorsers. By meaningfully lowering the wholesale price for its drivers, Taylor Made has increased its consumer use. If consumers are pleased with the Taylor Made driver, this potential base of Adams customers could consider a new Taylor Made product if it offered comparable performance benefits.

Titleist continues to ride a wave successful product launches, including its new drivers (the 975D and 976R) and its Scotty Cameron putters, both of which have impacted the market share of Callaway Golf. During a mid-July conference call for Fortune Brands (owner of Titleist, Cobra and Foot Joy), management indicated that Titleist would soon be introducing its response to the Adams Tight Lies. We view Titleist as an excellent manufacturer and innovator in the golf equipment industry and believe that its new product could be a meaningful competitor for Adams. However, if recent history is a guide, Titleist will likely price its product at the high end of the range for fairway woods, and thus we do not believe its club will attract significant unit volumes.

**GROWTH WILL BE "DRIVEN" BY NEW PRODUCTS**

Adams Golf will look to expand its product offerings in 1999 and we expect the company's first product extension to be a new driver (a.k.a. "1 wood").

### Definition of a Driver and the Driver Market

A driver is the club most frequently used off the tee by professionals and amateurs. It is typically designed with a deep face and low loft angle (typically less than 10 degrees). A driver is designed to hit a golf ball for maximum distance — 250 yards+ — with limited loft. Recent advancement in materials have lead to lighter overall drivers and specifically more forgiving clubheads (i.e., a shot will deliver the desired results when struck on a wider area of the clubface, or the "sweet spot" has been enlarged).

Despite the high degree of difficulty associated with consistently hitting a driver, the limited number of times a driver is used in a round of golf (maybe 10-12 times out of 80 to 100 shots) and the extremely high price points of premium drivers, most amateurs own at least one of the market's leading drivers, i.e., a Callaway, Taylor Made, Titleist or Cobra. The typical life cycle for drivers is four years — meaning that every four years the early adopters will enter the marketplace looking for the latest technology to improve their game.

The driver market, roughly $1.0 billion annually, has been deluged by clubs featuring titanium heads during the three and one half years since the introduction of The Great Big Bertha from Callaway Golf in 1995. We believe that we are currently in a lull between driver innovations and as a result we've seen sales for the major titanium golf manufactures tail off.

### The Adams Driver

Adams should introduce a new driver in the beginning of 1999, hitting the four-year sweet spot since the last meaningful innovation in driver technology. Although we can not forecast the success of a product that we have not yet seen, we believe that the market is properly conditioned for a major new product and the history of innovative designs at Adams could forecast an excellent new product offering.

12

ADAMS 004046

LEHMAN BROTHERS

We believe that Adams Golf is dedicated to a philosophy of improving club designs rather than using improved materials. Having said this, we believe that Adams' new driver:

- Will be designed to optimize the carry (distance in the air) of a tee shot and

- Will use a variety of shafts to optimize individual results.

As Adams works to develop a new driver, we believe management will aim to deliver a product that will retail for roughly $300-$350 per club. In addition, Adams will likely design the new driver with features that will be difficult to copy.

The company's design team is headed by Barney Adams, CEO and Chairman of Adams Golf, whose 12+ years of experience in the custom fitting business and the success of his Tight Lies design increase our confidence that Adams Golf will deliver a meaningful new product. The design team at Adams includes Bob Bush, the former Director of Technical Services at True Temper (a major golf shaft company); Richard Murtland, VP of R&D; Dr. Michael Carroll, the former Dean of Engineering at Rice University; and professionals such as Carol Mann, Hank Haney and Nick Faldo. A final and key component of the new product development process at Adams Golf will be the role of custom fitters. The company has a network of over 100 authorized custom fitters (professionals who personally fit a set of golf clubs to an individual like a tailor) who will be able to provide high quality feedback on new products from their customers.

When Adams moved to its new location in Plano, Texas, it secured enough manufacturing space to produce three to four million clubs annually. We are currently forecasting total unit sales of just 1.17 million clubs in 1999 (1,031,500 fairway woods and 144,500 drivers). Thus manufacturing capacity will not be strained by the introduction of new products.

### Marketing Model

We expect the company to continue to use its direct response marketing model to introduce its new driver to the public. Adams will likely use a high quality infomercial and direct response print advertising to provide high profile, earnings neutral advertising.

Furthermore, the company has compiled a sizable database of existing customers to whom it may direct market its new product. If a customer has purchased a Tight Lies through an infomercial or print ad or if he or she has completed a warranty card, Adams Golf will have the information necessary to direct market its new products. If just 15% of the company's fairway wood customers purchase the new driver, the company will easily meet our expectations for the driver's 1999 sales.

### Current Trends in the Driver Market

#### 1. Market Saturation
As we've noted, many of the more established golf manufacturers have cited market weakness in the U.S. as a factor in their current weak operating performance. We believe that it is less a question of market demand than of weak demand for specific products. For example, Titleist's new 975D driver is experiencing very strong demand, as are products in new categories like the Adams Tight Lies and Orlimar's Tri-Metal fairway woods. Certain products (the Callaway Great Big Bertha, for example) have enjoyed a position of market strength for almost four years and the potential customer base continues to shrink with every new club sold. In Figure 9 we highlight the market (avid golfers) for premium golf clubs relative to the annual

13

ADAMS 004047

LEHMAN BROTHERS

club sales of one of the most popular clubs of the 1990s, the Callaway Great Big Bertha driver.

Figure 9: Adams Golf, Inc.
**Great Big Bertha Sales — Is the Market for Titanium Drivers Becoming Saturated?**

| | Est. Great Big Bertha Sales (in units)[1] | # of Avid Golfers Less Total GBB's Sold[2] | Cumulative % of Avid Golfers |
|---|---|---|---|
| 1995E | 300,000 | 5,212,000 | 5.4% |
| 1996E | 994,182 | 3,971,818 | 24.6% |
| 1997E | 1,068,000 | 3,237,818 | 42.2% |

[1] Estimated from Callaway Golf financial statements.
[2] Total Avid Golfers for 1995, 1996, and 1997 equals 5.5 mil, 5.3 mil and 5.6 mil, respectively.

Source: Callaway Golf and industry reports.

As Figure 9 shows, a hugely popular golf club like the Callaway Great Big Bertha can reach a point of market saturation fairly quickly when its market is somewhat restricted by its high price. We believe that the $350-$400 average retail price for Callaway's Great Big Bertha limited its target market to avid golfers – 5.3 million in 1997 – and probably 50% of core golfers (it is estimated that there were 6.0 million moderate golfers in 1997 in the U.S. who average 8 to 24 rounds annually). Thus, the total addressable market for The Great Big Bertha and its successor, 1997's Biggest Big Bertha, was roughly 8.3 million golfers in the U.S.

We believe that Adams Golf will follow a pricing standard established with the Tight Lies – pricing its new driver in the middle of the market for premium drivers. We believe that the days of the $500 driver are gone (for now) and that any new successful driver must retail for $300-$350 to achieve the mass market success that will ensure an extended life cycle. At this price point a product offering meaningful performance benefits has the opportunity to achieve success across all key categories — avid golfers, moderate golfers, and occasional golfers

## 2. Competition

Competition in the driver market should be viewed on two fronts: competition from existing products and competition from products yet to be introduced.

**Existing Products:**

The current market for drivers is dominated by the major players in the golf equipment industry. Specifically, Callaway Golf, Taylor Made, and Titleist/Cobra (a Fortune Brands company) far outdistance their competitors in terms of units and dollar sales. The second tier players in drivers include companies like Ping, Top-Flite, Wilson, Goldwin and Lynx; these are well behind the elite manufacturers in both unit and dollar volume.

As we've discussed, there has not been a meaningful innovation in the driver industry since the introduction of titanium clubheads in 1995. There has been a slight shift of market share in 1997/1998 among the industry leaders as Titleist and Taylor Made have taken some market share from Callaway with new products (Titleist's 975D and 976R have been well received) and price discounting (Taylor Made has lowered its wholesale price).

14

ADAMS 004048



LEHMAN BROTHERS

**New Products:**

Most companies in the industry are continually developing new products, but we believe that most companies will avoid introducing any meaningful new designs or materials until after a September meeting between manufacturers and the USGA on new club testing requirements. The USGA's concerns are centered on the issue of the "spring-effect" — a question of whether certain thin-faced metalwoods are affecting the flight of a golf ball.

As we noted earlier, Callaway has introduced a new driver and fairway wood called the Big Bertha Steelhead. We believe that this is not the only driver in Callaway's pipeline and that a new titanium driver could be introduced in January 1999.

Given the mixed market response to Callaway's new products (mass acceptance of its latest iron – the X-12, and limited acceptance of the Biggest Big Bertha) we believe handicapping the success of any potential product is a fool's game.

### Growth Fueled by the International Expansion of the Tight Lies Brand

It is estimated that for every golfer in the U.S., there is another golfer located somewhere else on the planet. There are roughly 26 million golfers in the U.S. and another 26 million spread around the world, with particular concentrations in Canada and Asia. Adams has elected to cautiously enter international markets to ensure that it establishes relationships with the premier distributors in each of its chosen markets. To date the company has signed relationships with 33 distributors in 39 countries.

The company's initial focus in international sales will be Western Europe and Canada, where word-of-mouth marketing is making the Tight Lies introduction go very smoothly. Although we have not included meaningful sales to Asia in our models, it should be noted that in the most recent quarter Adams Golf recorded nearly $1.25 million of sales to the Asian region (principally Japan). We believe that despite the weak Asian economies, the buzz around the Adams Tight Lies has allowed the company to realize a limited amount of success in this region without a significant marketing effort. In the second quarter of 1998, Adams Golf's total international sales (principally, Canada, U.K. and Japan) equaled 12% of total revenues. In Figure 10 we review the estimated number of golfers around the globe. We believe that Adams will concentrate on entering the largest non-Asian markets first.

15

ADAMS 004049

LEHMAN BROTHERS

Figure 10: Adams Golf, Inc.
Global Golfer Profile

| Country | Total Golfers | Adams Distributor |
|---|---|---|
| United States | 26,500,000 | Yes |
| Japan | 15,000,000 | Yes |
| Canada | 4,785,000 | Yes |
| South Korea | 1,000,000 | Yes |
| England | 827,129 | Yes |
| Sweden | 373,430 | Yes |
| Germany | 272,830 | Yes |
| France | 253,800 | Yes |
| Scotland | 222,000 | Yes |
| Taiwan | 200,000 | Yes |
| Ireland | 190,000 | Yes |
| Indonesia | 110,000 | Yes |
| Spain | 108,204 | Yes |
| Netherlands | 101,000 | Yes |
| Thailand | 100,000 | |
| Other | 555,792 | Partial Coverage |
| Total | 50,599,185 | |

Source: National Golf Foundation, Canadian Golf Foundation, European Golf Association 1997.

### The International Marketing Model

Despite the success of Adams Golf in the U.S., with its unique brand of marketing heavily weighted toward direct response advertising, we believe that this model will have to be altered to achieve success in the international marketplace.

The international markets are not well suited to Adams' direct response marketing model because of reluctance to accept infomercials as a legitimate form of advertising, fewer television viewers, limited access to air time and generally weaker distribution networks than the U.S. Historically, American consumer products that have flourished in the overseas markets have done so through the use of more traditional image-based advertising.

### Nick Faldo and Adams Golf

To enhance the company's international marketing efforts, Adams Golf entered into a lifetime agreement with Nick Faldo. Mr. Faldo, one of golf's most accomplished players over the last 10 years with six major victories to his credit, agreed to the lifetime endorsement agreement in exchange for roughly 3.9% of the post-offering equity and a royalty fee of up to 5% of all international sales of Adams clubs. The agreement with Nick Faldo is more involved than that of the typical tour professional with a sponsoring golf equipment manufacturer. Mr. Faldo will be involved in the design, testing and development of new products, as well as a key figure in positioning the Tight Lies brand among international golfers. Much of the company's international image advertising will feature Mr. Faldo, a golfer long associated with high quality products.

The compensation agreement with Mr. Faldo, while generous, is in line with other endorsement contracts for top tier golfers and is unique in that it is tied to the performance of international operations. In Figure 11 we review a list of the 10 golfers with the highest endorsement incomes in 1997.

16

ADAMS 004050

LEHMAN BROTHERS

Figure 11: Adams Golf, Inc.
Golf's Leading Endorsers

| Player | Total Endorsement Income (in $Mil.) |
|---|---|
| Tiger Woods | $28 |
| Arnold Palmer | $20 |
| Greg Norman | $14 |
| Jack Nicklaus | $11 |
| Fred Couples | $10 |
| Ernie Els | $9 |
| Nick Faldo | $8 |
| Davis Love III | $8 |
| Corey Pavin | $7 |

Source: SportsBusiness Journal, May 1998.

The company also plans to open a line of "Faldo/Adams Golf" golf schools in conjunction with Marriott International. Currently Mr. Faldo has one golf school located in Orlando, Florida at the Marriott Grande Vista, but the number of golf schools could grow to as many as 20 in the coming years. We view these schools as an excellent example of "earnings neutral" advertising because the Adams Golf name will be prominently featured throughout the location and revenues from pro shop sales should more than offset the cost of establishing these locations.

## The $64,000 Question: Is the Golf Equipment Market Strong or Weak?

A number of the larger equipment manufacturers have recently described the golf equipment market as weak. With roughly half of the world's golfers residing in the U.S., any domestic weakness would compound the extremely weak operating environment in Asia and would have a meaningful impact on the industry as a whole. Our belief is that these companies have simply run out of customers to sell products to in the U.S. Over the past three years Callaway Golf and its competitors such as Cobra/Titleist and Taylor Made have sold nearly 6.0 million titanium drivers by some estimates. A high end club like a titanium driver or an Adams Tight Lies will appeal most to the 5.6 million avid golfers in the U.S. Callaway might sell some Titanium drivers to core golfers (8 to 24 rounds per year), but with a limited number of avid golfers, product saturation was bound to become an issue.

As shown in Figures 12 and 13, golf continues to grow in popularity. However, we believe that lack of innovation in the equipment market has combined with poor early season weather to produce a weak operating environment for golf equipment companies with broad diversified product lines.

Golf course construction, long noted as a sign of end demand, continues to spiral upward. At the end of 1997 a record number of new courses were under development — 932 at December 31, 1997 — of which 485 are expected to be completed in 1998. Amazingly, 3,573 new courses have been added to the U.S. supply over the last 10 years (roughly 1 new course/day) bringing the total supply of golf courses to just over 16,000. Figure 12 reviews recent trends in new course construction.

17

ADAMS 004051

LEHMAN BROTHERS

Figure 12: Adams Golf, Inc.
Domestic Golf Course Construction



Source: National Golf Foundation "Golf Facilities in the U.S./1998 Edition."

Measuring the total golfers in the U.S., especially beginning golfers and the avid golfing segment, is another critical measure of golf's increasing popularity. In 1997 participation rates soared, crossing the 25,000,000 mark for the first time in seven years. As we've said, there is an interesting trend developing as occasional golfers convert to core golfers. This bodes well for the long-term health of the equipment industry, as avid and core golfers spend a disproportionately high amount of money on equipment.

18

ADAMS 004052

LEHMAN BROTHERS

Figure 13: Adams Golf, Inc.
Composition of U.S. Golfers by Category



Source: Golf Participation in the U.S./1998 Edition.

Keys in 1997:
New golfers
boosted total
beginning
golfers by 50%
to 3 million.
In addition,
more
occasional
golfers became
core golfers (8-
24 rounds per
year) in 1997.

Although the data for 1997 are compelling and could forecast another upturn in the golf cycle, we caution that weather (particularly in strong golfing states like California and Florida) wreaked havoc on the golf market in the first quarter of 1998 and the positive participation trends in 1997 could reverse in 1998-1999. In addition, 1997 could prove to be a "head fake" like 1990, when the total number of U.S. golfers grew by 7% and then fell off by a like amount in 1991 and remained around 24.5 million until 1997.

Recent data on 1998 equipment sales seem to indicate that 1997's strong participation and new course construction have not converted into stronger equipment sales (both in dollar and unit volume). In the first four months of 1998 equipment sales were dramatically weaker than in the same period in 1997 as a result of a series of factors that we list in Figure 14.

Figure 14: Adams Golf, Inc.
Recent Equipment Sales Trends and Analysis

| | | Jan-Apr 98 | Jan-Apr 97 | % Change | Reason |
|---|---|---|---|---|---|
| Woods | Dollar Sales (in Millions) | $144.3 | $163.1 | -11.5% | Weak unit sales, lower proportion of titanium clubs |
| | Unit Sales | 656,000 | 727,000 | -9.8% | Lack of new products, weather |
| Irons | Dollar Sales (in Millions) | $136.4 | $151.4 | -9.9% | Discounting as Callaway/Taylor Made replaced existing irons |
| | Unit Sales | 1,920,520 | 1,968,230 | -2.4% | New products and lower pricing |
| Balls | Dollar Sales (in Millions) | $102.9 | $101.8 | 1.1% | Mix shift toward premium priced balls |
| | Unit Sales (Dozens Sold) | 4,500,000 | 4,570,000 | -1.5% | Weather |

Source: Golf Datatech and Lehman Brothers.

19

ADAMS 004053

**LEHMAN BROTHERS**

So is the domestic golf equipment market weak or strong? Our opinion is that the general market for golf equipment is relatively weak as a result of limited new products to stir consumer interest. This weakness has the greatest impact on companies that offer a diverse product base of woods, irons, putters and/or golf balls. However, we believe that there are specific areas of strength within the market — fairway woods for example — and companies focused on these areas will have a fairly healthy operating environment for the foreseeable future.

**VALUATION**

As shown in Figure 19 (a post-IPO price chart for Adams Golf), Adams' shares have been extremely weak since its IPO. Negative sentiment has settled around the entire golf industry following a series of press releases from companies like Callaway Golf, Titleist, Arnold Palmer Golf, and Golden Bear Golf. We do not believe that these negative news items should impact Adams Golf; in fact, we believe that on the contrary, the weak results of the other companies in the industry could actually improve the competitive scene for Adams Golf.

We have compiled a list of firms "comparable" to Adams Golf in Figure 20. However, we caution that there is still only one true publicly traded company comparable to Adams Golf and that is Callaway Golf. Unfortunately, the growth rates and product portfolios are so dramatically different for these companies that even this comparison is not completely accurate.

We have established a 12-month price target on the shares of Adams Golf of $23 per share.

We summarize our methodology as follows:

The current consensus estimate for Callaway Golf's earnings in 1999 is $1.14 per share (with a high estimate of $1.45 per share and a low estimate of $0.76 per share). Callaway has traded at an average multiple of 11.4 times the 1999 consensus estimate of $1.14 per share over the past 30 days. By simply applying this multiple to our Adams Golf 1999 estimate of $1.26 per share our target would be $14.36 per share or 117% upside.

The consensus long-term growth rate assumption for Callaway Golf is still a fairly aggressive 15% per annum. By applying Callaway's current 1999 P/E to its long-term growth rate, a 1999 PEG ratio can be calculated of 0.74. This compares with the current PEG ratio for Adams Golf of just 0.21 for 1999. If Adams Golf is simply assigned the same PEG ratio as its slow growth competitor (0.74 * 25% = 18 P/E on 1999 earnings) our target becomes – 18 * $1.26 per share or $23 per share (232% upside).

We believe that an argument can be made that Adams Golf should trade in line with other early stage golf companies like Cobra Golf and Callaway Golf in the first year after their IPOs, which averaged 22 times the forward earnings estimates of these companies. On this basis Adams Golf could trade as high as $28 per share in the next 12 months. However, given the increasingly competitive market for golf equipment, we believe that these multiples may never again be attainable and consequently we have elected to use the more conservative target of $23 per share.

20

ADAMS 004054

LEHMAN BROTHERS

Figure 15: Adams Goll, Inc.
Income Statement, 1998E ($ Thousands)

| Product Sales | | 3rd.Qtr | 4th.Qtr | 1998 |
|---|---|---|---|---|
| Existing Products | | $25.503 | $21.993 | $105,824 |
| New Products | | 0 | 0 | $0 |
| Total Revenues | | $25.503 | $21.993 | $105,824 |
| Costs of Goods Sold | | | | |
| Existing Products | | 7.377 | 6,452 | 27,533 |
| New Products | | 0 | 0 | 0 |
| Gross Profit | | $18.126 | $15,541 | $78,291 |
| Gross Margin | | 71.1% | 70.7% | 74.0% |
| Research and Development | | 408 | 308 | 1,380 |
| Selling Expense | | 6,631 | 5,718 | 29,736 |
| General and Administrative | | 3.315 | 3,029 | 13,412 |
| Operating Income (Loss) | | $7.772 | $6,436 | $33,758 |
| Operating Margin | | 30.5% | 29.3% | 31.9% |
| Interest Income/(Expense) | | 708 | 648 | 1,357 |
| Other | | 0 | 0 | (112) |
| Earnings Before Tax | | $8.480 | $7,084 | $35,004 |
| Income Taxes | | 3.231 | 2,699 | 13,124 |
| Tax Rate | | 38.1% | 38.1% | 37.5% |
| Net Income (Loss) | | $5.249 | $4,385 | $21,880 |
| Net Margin | | 20.6% | 19.9% | 20.7% |
| Earnings (Loss) Per Share | $ | 0.23 $ | 0.19 $ | 1.05 |
| Shares Outstanding (millions) | | 22.840 | 23.364 | $20,906 |
| F'way Wood-US Wholesale | | 140,240 | 121,038 | 603,080 |
| F'way Wood-US Direct Res | | 15.794 | 14,215 | 63,328 |
| Fairway Wood Units - Int'l | | 34.786 | 31,308 | 116,556 |

| | | | | |
|---|---|---|---|---|
| F'way Wood ASP - US Whol | $134.00 | $134.00 | $132.00 | $130.00 |
| F'way Wood ASP - US DR | $190.00 | $190.00 | $190.00 | $190.00 |
| Fairway Wood ASP - Int'l | $105.00 | $104.99 | $104.99 | $104.99 |

1998 Model: Our estimate for 1998 EPS is $1.05/share, which assumes that the second half of 1998 will be
the company's first period of sequentially declining earnings since the introduction of the Tight Lies. We have
assumed that the company experiences some limited pricing pressure in the back half of 1998 and that
margins stabilize around 30% (on an operating basis).

Domestic Wholesale Fairway Woods: Revenues from this division will experience the most seasonality of
any of the company's businesses. The weaker third and fourth quarters should combine with a tougher
domestic pricing environment.

Domestic Direct Response Fairway Woods: Revenues from direct response should be little changed
throughout the remainder of 1998. The impact of seasonal factors is less profound on this line of business.

International Fairway Woods: As the company is slowly rolling out its international distribution and because
of the high levels of international demand, we do not expect international sales to show meaningful
seasonality in the second half of 1998.

Source: Lehman Brothers and company reports.

21

ADAMS 004055

LEHMAN BROTHERS

Figure 16: Adams Golf, Inc.
Income Statement, 1999E ($ Thousands)

| Product Sales | 1st Qtr | 2nd Qtr | 3rd Qtr | 4th Qtr | 1999 |
|---|---|---|---|---|---|
| Existing Products | $32,274 | $39,309 | $32,881 | $28,830 | $133,294 |
| New Products | 5,033 | 6,823 | 9,955 | 10,514 | $32,325 |
| Total Revenues | $37,307 | $46,132 | $42,836 | $39,344 | $165,618 |
| Costs of Goods Sold | | | | | |
| Existing Products | 9,605 | 11,488 | 9,875 | 8,719 | 39,687 |
| New Products | 1,575 | 2,135 | 3,116 | 3,291 | 10,117 |
| Gross Profit | $26,126 | $32,508 | $29,846 | $27,334 | $115,815 |
| Gross Margin | 70.0% | 70.5% | 69.7% | 69.5% | 69.9% |
| Research and Development | 746 | 923 | 878 | 787 | 3,333 |
| Selling Expense | 9,393 | 12,340 | 11,566 | 10,780 | 44,479 |
| General and Administrative | 5,036 | 5,813 | 5,612 | 5,193 | 21,654 |
| Operating Income (Loss) | $10,551 | $13,433 | $11,791 | $10,573 | $46,348 |
| Operating Margin | 28.3% | 29.1% | 27.5% | 26.9% | 28.0% |
| Interest Income/(Expense) | 549 | 436 | 410 | 396 | 1,791 |
| Other | 0 | 0 | 0 | 0 | 0 |
| Earnings Before Tax | $11,099 | $13,869 | $12,201 | $10,970 | $48,139 |
| Income Taxes | 4,218 | 5,270 | 4,636 | 4,169 | 18,293 |
| Tax Rate | 38.0% | 38.0% | 38.0% | 38.0% | 38.0% |
| Net Income (Loss) | $6,882 | $8,599 | $7,564 | $6,801 | $29,846 |
| Net Margin | 18.4% | 18.6% | 17.7% | 17.3% | 18.0% |
| Earnings (Loss) Per Share | $ 0.29 | $ 0.36 | $ 0.32 | $ 0.29 | $ 1.26 |
| Shares Outstanding (millions) | 23,480 | 23,596 | 23,213 | 23,831 | 23,655 |
| F'way Wood-US Wholesale | 176,136 | 213,001 | 174,707 | 149,680 | 713,524 |
| F'way Wood-US Direct Res | 17,684 | 20,337 | 18,303 | 16,473 | 72,797 |
| Fairway Wood Units - Int'l | 51,962 | 70,149 | 63,134 | 59,977 | 245,221 |
| Driver Units | 22,500 | 30,500 | 44,500 | 47,000 | 144,500 |
| F'way Wood ASP - US Whol | $130.00 | $129.00 | $127.00 | $126.00 | |
| F'way Wood ASP - US DR | $190.00 | $190.00 | $190.00 | $190.00 | |
| Fairway Wood ASP - Int'l | $105.00 | $105.00 | $105.00 | $105.00 | |
| Driver ASP | $223.70 | $223.70 | $223.70 | $223.70 | |

1999 Model: Our estimate for 1999 EPS is $1.26/share, which would represent 20% EPS growth over 1998's results. The improvement will be driven by maintenance of a stable share of the expanding domestic fairway wood market, expansion of international sales and the introduction of a driver in 1999.

Domestic Wholesale Fairway Woods: Revenues from this division will be driven by an 18% increase in unit sales, offset partially by the 3.5% decline of average selling prices. We have forecast that the fairway wood market will grow at 15% for the next 2-3 years and that Adams will secure a larger piece of this market.

Domestic Direct Response Fairway Woods: Revenues from direct response advertising should track the growth of the market at 15% in 1999.

International Fairway Woods: Revenues from international operations are expected to double in 1999 as a result of the company's push into European and North American markets.

Driver: Revenues from the company's driver (expected to be introduced in early 1999) are expected to ramp steadily throughout the year as demand spikes for this new product.

Source: Lehman Brothers.

22

ADAMS 004056

## LEHMAN BROTHERS

Figure 17: Adams Golf, Inc.
Income Statement, 1995-2001E ($ Thousands)

| Share of Fairway Woods | | | | 17.1% | 13.8% | 15.0% | 16.6% | 18.9% |
| Global Fairway Woods Mkt | $758,333 | $875,000 | $962,500 | $1,034,688 | $1,086,422 | $1,113,582 | |

| Share of Drivers | | | | 0.0% | 7.9% | 6.1% | 6.9% | 11.9% |
| Domestic Driver Mkt | | $915,981 | $961,780 | $1,106,047 | $1,271,954 | $1,367,350 | $1,401,534 | 98 - 02 |

| | 1995 | 1996 | 1997 | | | | | | 4 YR CAGR |
|---|---|---|---|---|---|---|---|---|---|
| **Product Sales** | | | | | | | | | |
| Existing Products | $1,125 | $3,522 | $26,690 | | | | | | 19% |
| New Products | 0 | 0 | 0 | | | | | | NA |
| **Total Revenues** | $1,125 | $3,522 | $36,690 | | | | | | 44% |
| **Costs of Goods Sold** | | | | | | | | | |
| Existing Products | 756 | 1,590 | 9,992 | | | | | | |
| New Products | 0 | 0 | 0 | | | | | | |
| **Gross Profit** | $369 | $1,932 | $26,698 | | | | | | 40% |
| Gross Margin | 32.8% | 54.9% | 72.8% | | | | | | |
| | | | | | | | | | |
| Research and Development | 19 | 51 | 558 | | | | | | |
| Selling Expense | 313 | 626 | 13,093 | | | | | | |
| General and Administrative | 281 | 1,246 | 13,013 | | | | | | |
| Operating Income (Loss) | (244) | 59 | (33,969) | | | | | | 34% |
| Operating Margin | -21.7% | 0.7% | -18.9% | | | | | | |
| Interest Income/(Expense) | 51 | 14 | (554) | | | | | | |
| Other | 0 | 0 | (548) | | | | | | |
| | | | | | | | | | |
| **Earnings Before Tax** | (243) | 313 | (54,071) | | | | | | 33% |
| Income Taxes | 0 | 0 | 583 | | | | | | |
| Tax Rate | 0.0% | 0.0% | -14.3% | | | | | | |
| Net Income (Loss) | (243) | 313 | (54,655) | | | | | | 33% |
| Net Margin | 0.0% | 0.0% | -31.7% | | | | | | |
| | | | | | | | | | |
| Earnings (Loss) Per Share | (0.05) | 0.00 | (0.37) | | | | | | 27% |
| Shares Outstanding (millions) | 4.423 | 11.238 | 12.519 | | | | | | |
| | | | | | | | | | |
| Research and Development | 1.6% | 1.5% | 1.5% | | | | | | |
| Selling Expense | 27.8% | 17.8% | 35.7% | | | | | | |
| General and Administrative | 25.0% | 35.4% | 46.4% | | | | | | |
| | | | | | | | | | |
| F'way Wood-US Wholesale | | | | 603,080 | 713,524 | 798,131 | 892,105 | 1,014,026 | |
| F'way Wood-US Direct Res | | | | 63,323 | 72,793 | 76,437 | 80,259 | 78,252 | |
| Fairway Wood Units - Int'l | | | | 116,556 | 245,221 | 355,571 | 490,688 | 672,242 | |
| Driver Units | | | | 0 | 144,500 | 361,220 | 637,388 | 948,281 | |
| Iron Sets | | | | 0 | 0 | 18,000 | 45,000 | 75,600 | |
| | | | | | | | | | |
| F'way Wood ASP - US Whol | | | | $132.73 | $128.13 | $126.00 | $124.00 | $120.00 | |
| F'way Wood ASP - US DR | | | | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 | |
| Fairway Wood ASP - Int'l | | | | $104.99 | $105.00 | $105.00 | $105.00 | $105.00 | |
| Driver ASP | | | | | $223.70 | $214.20 | $214.20 | $204.70 | |
| Irons ASP | | | | | | $704.56 | $675.67 | $656.78 | |

Source: Lehman Brothers and company reports.

23

ADAMS 004057

## LEHMAN BROTHERS

**Figure 18: Adams Golf, Inc.**
**Balance Sheet**

| | 1996 | 1997 | 1998E | 1999E | 2000E | 2001E | 2002E |
|---|---|---|---|---|---|---|---|
| **Current Assets:** | | | | | | | |
| Cash and Equivalents | $855 | $1,956 | $54,000 | $53,330 | $49,530 | $45,730 | $41,930 |
| Trade Receivables | 524 | 8,369 | 28,123 | 43,106 | 61,726 | 85,251 | 111,836 |
| Less: Allow. for Doubtful Accts | 26 | 698 | 1,678 | 2,506 | 3,730 | 5,113 | 6,701 |
| Trade Receivables, net | 498 | 7,671 | 26,445 | 40,600 | 57,995 | 80,137 | 105,135 |
| Inventories | 675 | 4,487 | 9,052 | 16,101 | 24,672 | 36,006 | 48,128 |
| Other | 28 | 1,832 | 2,316 | 2,256 | 2,298 | 2,840 | 2,882 |
| Total Current Assets | $2,055 | $15,950 | $92,213 | $112,788 | $134,995 | $164,713 | $198,075 |
| | | | | | | | |
| Property and Equipment | $124 | $604 | $9,935 | $16,340 | $16,941 | $16,966 | $16,172 |
| Deferred Taxes | 0 | 183 | 0 | 0 | 18,000 | 46,000 | 87,200 |
| Intangible Assets | 268 | 233 | 8,961 | 7,966 | 6,971 | 5,976 | 4,981 |
| Other Assets | 112 | 390 | 777 | 285 | 293 | 801 | 809 |
| Total Assets | $2,559 | $17,360 | $111,887 | $137,879 | $177,701 | $234,457 | $307,238 |
| | | | | | | | |
| **Current Liabilities** | | | | | | | |
| Notes Payable | $230 | $0 | $0 | $0 | $0 | $0 | $0 |
| Accounts Payable | 18 | 378 | 4,903 | 7,095 | 10,727 | 14,716 | 18,833 |
| Taxes Payable | 0 | 1,021 | 1,041 | 1,062 | 1,083 | 1,105 | 1,127 |
| Accrued Expenses | 332 | 7,636 | 9,630 | 3,563 | 670 | 104 | -115 |
| Total Current Liabilities | $580 | $9,035 | $15,575 | $11,720 | $12,431 | $15,925 | $20,075 |
| | | | | | | | |
| **Stockholder's Equity** | | | | | | | |
| Common Stock | 12 | 16 | 23 | 24 | 24 | 24 | 25 |
| Additional Paid-In Capital | 3,126 | 14,123 | 80,223 | 80,223 | 80,223 | 80,223 | 80,223 |
| Retained Earnings | (1,160) | (5,814) | 16,066 | 45,912 | 85,023 | 138,284 | 206,915 |
| Total Stockholders' Equity | $1,978 | $8,325 | $96,312 | $126,159 | $165,270 | $218,531 | $287,163 |
| | | | | | | | |
| Total Liabilities & Stockholders' Equity | $2,559 | $17,360 | $111,887 | $137,879 | $177,701 | $234,457 | $307,238 |
| | | | | | | | |
| **Financial Returns** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net Profit Margin | 0.0% | -12.7% | 20.7% | 18.0% | 16.0% | 15.4% | 15.1% |
| x Avg. Asset Turnover | 1.4 | 3.7 | 1.6 | 1.3 | 1.6 | 1.7 | 1.7 |
| x Avg. Financial Leverage | 1.3 | 1.9 | 1.2 | 1.1 | 1.1 | 1.1 | 1.1 |
| = Return on Equity | 0.00% | NM | 41.82% | 26.83% | 26.84% | 27.75% | 27.14% |

Source: Lehman Brothers and company reports.

24

ADAMS 004058

## LEHMAN BROTHERS

**Figure 19: Adams Golf, Inc.**
**Club Units and Pricing**



**Figure 20: Adams Golf, Inc.**
**Price Chart**

Source: Baseline Financial Services and Lehman Brothers.

ADAMS 004059

25

LEHMAN BROTHERS

Figure 21: Adams Golf, Inc.
Comparable Companies

| Company | Niche | Market Capitalization | Price 4/24/98 | 1 Yr Price Change | EPS 1998E | EPS 1999E | P/E 1998E | P/E 1999E | LT-Growth Rate | 1998 P/E to Gr. Rate | 1999 P/E to Gr. Rate | Firm Value/ EBITDA | Gross Margin | Operating Margin | Net Margin |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Callaway Golf Company | Premium Golf Equipment | 1922 | 12 1/16 | +93.8% | 10.46 | 11.14 | 20.8 | 18.8 | 14.5% | 145% | 74% | 4.6 | 52.2% | 28.5% | 18.5% |
| **Firms with Golf Subsidiaries** | | | | | | | | | | | | | | | |
| Adidas-Salomon AG | Over / Apparel/Golf, Shoes, Apparel | 15,646 | 52 1/4 | -1.4% | 13.02 | 13.83 | 20.4 | 19.3 | 26.8% | 77% | 81% | NA | NA | NA | NA |
| Fortune Brands | Consumer Goods, Titleist/Cobra/Footjoy | 15,877 | 32 13/16 | -8.5% | 11.88 | 11.91 | 19.3 | 17.2 | 14.0% | 140% | 123% | 5.7 | 47.8% | 15.8% | 7.2% |
| **Average** | | 15,774 | | -4.2% | | | 20.1 | 18.7 | 20.4% | 109% | 97% | | | | |
| **Hard and Soft Goods Makers** | | | | | | | | | | | | | | | |
| Ashworth, Inc. | Premium Golf Apparel | $104 | 8 15/16 | -21.1% | 10.55 | NA | 12.4 | NA | 20.0% | 55% | NM | 8.5 | 42.5% | 18.7% | 11.8% |
| Cutter & Buck, Inc. | Premium Golf Apparel | $123 | 26 3/4 | 40.8% | 11.14 | $1.64 | 23.2 | NA | 20.0% | 78% | NM | 14.2 | 45.0% | 18.1% | 13.0% |
| K2, Inc. | Ski Equipment, Recreational Equip. | $508 | 18 1/8 | +0.1% | $1.44 | $1.84 | 12.5 | 11.1 | 12.0% | 105% | 92% | 7.1 | 20.5% | 8.4% | 4.8% |
| Nike, Inc. | Athletic Footwear, Apparel | $11,222 | 39 5/16 | -21.2% | $1.62 | NA | 24.7 | NA | 15.5% | 25% | NM | 12.7 | 32.2% | 11.1% | 2.3% |
| The Northface Company, Inc. | Athletic Apparel | $173 | 14 7/16 | -23.2% | 11.13 | 11.50 | 12.9 | 8.6 | 25.0% | 51% | 59% | 6.3 | 43.0% | -8.3% | -8.9% |
| Columbia Southwear | Athletic Apparel | $288 | 15 1/2 | -12.8% | 11.13 | 11.33 | 12.7 | 11.7 | 16.0% | 78% | 83% | NM | 43.5% | -1.7% | -2.6% |
| **Average** | | 12,072 | | -17.5% | | | 18.6 | 10.8 | 17.5% | 100% | 65% | | | | |

* Lehman Estimates
** The percentage price change for Adams Golf and Columbia Southwear are since their 1998 IPO's.
Source: Lehman Brothers and Baseline Financial Services.

26

ADAMS 004060

LEHMAN BROTHERS

**APPENDIX 1: PRO SHOP SURVEY**

We have spoken with a number of leading on- and off-course golf shops in the U.S. over the past three months and have arrived at some conclusions about the fairway woods marketplace.

### Adams Golf

Sales of the Tight Lies this summer have been characterized as "steady" and "strong." We are encouraged by the strong retail sell-through that the company continues to achieve. Our checks with retailers have indicated that the Tight Lies continue to be a top selling product. Although returns are historically lower at the retail level than through direct response, we would note that many retailers we spoke with indicated that returns for Adams clubs tend to be much lower than average.

#### Margins/Pricing

One concern that we should report is that Adams Tight Lies are appearing in Costco Wholesale stores with increasing regularity. Adams has filed a suit of discovery against Costco to determine how Costco — an unauthorized retailer — has secured this inventory. One retailer in particular indicated that *"Costco is flooding the market with Adams clubs at $149"* (versus an average wholesale price of $144) — a trend that we have seen in a few markets. Although, this is an extremely serious issue that Adams is working hard to correct, we think investors should note that Costco is also selling popular clubs from Callaway and Taylor Made.

### Orlimar Golf

Orlimar Golf's Tri-Metal woods continue to sell through the retail market well. Retailers indicated that the marketplace is becoming more aware of the relative benefits of the Orlimar clubs (principally designed for better golfers) and thus returns have slowed (down from high double digits to roughly 10%). An interesting note for investors is the issue of retailer margins provided by the Orlimar clubs. Orlimar's Tri-Metal woods currently retail for roughly $269 per club and the standard wholesale rate for an Orlimar club, we estimate, is roughly $230 per club or a $40 profit (15% margin) on the clubs. Below we compare retail prices, wholesale prices and margins for Orlimar and Adams products.

Figure 22: Adams Golf, Inc.
Average Retail, Wholesale and Margin Comparison

| Company | Avg. Retail Price | Avg. Wholesale Price | Margin |
|---|---|---|---|
| Adams Golf – *Tight Lies* | $199 | $144 | 27.6% |
| Orlimar Golf – *Tri-Metal* | $269 | $230 | 14.9% |

Source: Lehman Brothers.

However, certain larger customers of Orlimar Golf indicated to us that they are offered a quarterly "rebate" by Orlimar that can lower the average cost per club by as much $100 per club. At a "modified" wholesale price (after rebate) of $130 per club a large customer's margin can grow to $149 per club or 53% — which is dramatically higher than its competitors. We view the Orlimar margin difference as a critical point for investors. We believe that rebates are offered to only the largest customers of Orlimar and as such, many average retailers do not realize a meaningful margin benefit with the Orlimar product.

27

ADAMS 004061

LEHMAN BROTHERS

### Callaway Golf

Finally, on Callaway's new fairway wood product, the Big Bertha Steelhead, our retailer checks indicate that these clubs have been selling very briskly in the weeks since its August 12 introduction. We believe that it is too early in the sales cycle of this new product to make definitive observations on the long-term success of the Big Bertha Steelhead, but we will watch the market's long-term response to this product closely.

28

ADAMS 004062

LEHMAN BROTHERS

**APPENDIX 2:**
**GLOSSARY OF GOLF**
**TERMS**

| | |
|---|---|
| Address | The process a player goes through in positioning his/her body and the club prior to taking a stroke. |
| Center of Gravity | The point on a club where the upper mass, lower mass, right and left sides all balance. |
| Divot | A piece of turf displaced by a golf club. Reflects a correctly descending swing when taken in front of the ball and is the effect of most good iron shots. |
| Fairway Wood | A club designed for hitting a golf ball off the fairway. Distance varies according to the swing speed of the golfer and the club design but, in general, fairway woods fly 170-225 yards in the air. |
| Fluffy Lie | A ball resting on top of long grass presenting the potential for the clubface to slide under the ball, resulting in little impact and reduced distance. |
| Graphite | A synthetic material that is used to make carbon/graphite filaments. Graphite shafts are much lighter than steel and can thus be swung faster to create more clubhead velocity and, in turn, greater distance. |
| Hosel | The neck of a club into which the shaft fits. |
| Lie (of the Ball) | The position of the ball after it has come to rest. |
| Lie (of the Club) | The angle the shaft makes with the clubhead as measured from the center of the shaft to a line extending tangentially from the lowest point on the sole. |
| Loft | The degree of the pitch angle built into the clubface. Short irons (numbers 7-9) have more loft than long irons (numbers 3-5). |
| Sky/Balloon | To hit under the ball on the upper part of the clubface, sending the ball high and a short distance. |

Sources: Lehman Brothers, The PGA, and iGOLF's "Glossary of Equipment Terms."

29

ADAMS 004063

LEHMAN BROTHERS

30

ADAMS 004064

LEHMAN BROTHERS

31

ADAMS 004065

# GLOBAL EQUITY RESEARCH

New York (1) 212 526-3070     London (44) 171 601-0011-5524     Tokyo (81) 3 5571-7462     Hong Kong (852) 2869-3189

## CONGLOMERATES & DIVERSIFIED

### AMERICAS

**BUSINESS SERVICES**
Jeffrey T. Kessler            (1) 212 526-5162

**MULTI-INDUSTRY**
Phua K. Young                (1) 212 526-2805

**SELECTED GROWTH STOCKS**
Bernard J. Picchi            (1) 212 526-5344
Monica Logani                (1) 212 526-5996
Sean Kraus                   (1) 212 526-3896

### EUROPE

**SELECTED GROWTH STOCKS**
Ann Popelka                  (44) 171 260-3027
Markus Reichle               (44) 171 260-2849

### ASIA

**CONGLOMERATES**
Christopher Alexander        (852) 2869-3100
Philip Tulk                  (852) 2869-3890

**TRADING COMPANIES**
Nozomu Kunishige             (81) 3 5571-7482

For additional copies of Lehman Brothers research reports, call (201) 963-0572 or fax (201) 216-0705.

Lehman Brothers, Inc. has managed or co-managed within the past three years a public offering of the securities of Adams Golf, Inc.

Lehman Brothers, Inc. makes a market in the securities of Adams Golf, Inc.

Any OTC security mentioned herein may not be blue skied in all states; brokers should check the FCI system or call the Blue Sky department before placing any orders.

Key to Investment Rankings: This is a guide to expected total return (price performance plus dividend) relative to the total return of the stock's local market over the next 12 months. 1 = Buy (expected to outperform the market by 15 or more percentage points); 2 = Outperform (expected to outperform the market by 5-15 percentage points); 3 = Neutral (expected to perform in line with the market, plus or minus 5 percentage points); 4 = Underperform (expected to underperform the market by 5-15 percentage points); 5 = Sell (expected to underperform the market by 15 or more percentage points); V = Venture (return over multiyear time frame consistent with venture capital; should only be held in a well-diversified portfolio).

No part of this report may be reproduced in any manner without the written permission of Lehman Brothers Inc. We do not represent that this information is complete or accurate and it should not be relied upon as such. All opinions expressed herein are subject to change without notice. Lehman Brothers Inc., its affiliated companies, or their respective shareholders, directors, officers and/or employees, may have long or short positions in the securities discussed herein. The securities mentioned in this document may not be eligible for sale in some states or countries, nor suitable for all types of investors; their value and the income they produce may fluctuate and/or be adversely affected by exchange rates, interest rates or other factors. ©1998 Lehman Brothers Inc. All rights reserved. Member SIPC.

U598-1369

ADAMS 004066

EXHIBIT 233



EXHIBIT

233

106 of 181 DOCUMENTS

Copyright 1998 Information Access Company,
a Thomson Corporation Company
IAC (SM) PROMT (R)
Copyright 1998 Fairchild Publications Inc.
Golf Pro

August, 1998

SECTION: Pg 17; ISSN: 1072-1274

IAC-ACC-NO: 50240756

LENGTH: 2037 words

HEADLINE: Barney's Army

BYLINE: Jacobsen, Michael

THIS IS THE FULL TEXT

BODY:

MICHAEL JACOBSEN

It sounds like a Horatio Alger story: Small clubfitter listens to customers begging for a fairway wood they can actuallyhit ... company bets the ranch on upscale infomercial and inventory ... television exposure drives sales to retailers, who help make it the hottest club of the year ... company grows from $ 1 million in sales in 1996 to $ 24.5 million in the first quarter of 1998 ... dynamic owner decides to feed at the public trough, and an IPO scheduled for this summer brings it the much-needed capital to shed the 'one-hit-wonder' label.

But, Adams Golf, what have you done for me lately?

That'sexactly the question Adams Golf founder and chief executive officer Barney Adams is going to be asked more often than a starter gets asked how long's the wait. With some incredible success in its immediate past, Adams is poised to take the next step to either play with the big boys ... or become the next Alien.

Don't think Adams isn't aware of the challenge, or the doubting eyes the entire the golf industry - grateful retailers and jealous vendors alike - is casting upon his company's next step.

Yup, the pressure sure is on Barney Adams, who exudes the down-home charm of an executive who would just as soon sip a lemonade on the clubhouse veranda as he would travel to New York to meet with the financial sharks. Ask him just how he's going to feed the voracious appetite of Wall Street for its ROI and golfers for new products, and he'll give you a 'Shucks, I don't know.'

But that's justthe flying-under-the-radar persona he's been exhibiting all along ashis Tight Lies took the industry by storm. He does indeed have a plan. 'You tell them what you're going to do,' he says. 'And then you doit.'

What, exactly, is that plan for the future? 'I tell them that Adams Golf is not a product. it's a company. That's our real story,' Adams says.

Adams Golf is a company that grew extraordinarily fast. but had the foresight to invest in the infrastructure to deliver once the hoped-for demand kicked in. It had the executive talent to realizeit couldn't go head-to-head with

Callaway or Taylor Made, and to pull off a much-copied, but bet-the-farm risky, infomercial concept And it has the design staff to make many believe that there is something behind Tight Lies to keep the Adams momentum going

'They've been successful because it has been a while since a major company had introduced anything in the fairway woods sector,' says Robert Marvin, an analyst for Seidler Companies in Los Angeles. 'If you look at it, we really have had few interesting new choices other than Adams and Orlimar.'

Don't think the retailers haven't sat up and taken notice, either, even though there were a few bumps in the road in the early going. 'There's no doubt they've been a good seller for us over the last six to 12 months,' says Thomas Hurford, executive v.p at Las Vegas Golf & Tennis 'The margins had eroded for a while because of their split-level pricing that didn't allow for a level playing field, but that's been taken care of.'

Hurford calls himself both a fan and a critic of Adams Golf. On the one hand, he praises its ability through the roller-coaster ride of the past two years to develop a product, and then deliver it. The shallow face was a new concept, and it works, so that got it started,' he says 'But a big thing for us is fill rates. If a company has a new product and can't fill it fast enough, it doesn't do us any good. Adams has done an admirable job in keeping up with it.'

On the other hand, sales of product from that other hot company - Orlimar - have surpassed Adams at Las Vegas Golf, and in usage on tour. That doesn't mean the bloom is off the Adams rose, however, and overall Hurford remains sold on a brand that is still seeing eight turns a year at retail. But, he adds, 'Now they have to go to that next level.'

That's what Wall Street and the financial analysts are saying as well, and they are unsure of where that next level will be once the likes of Callaway, Titleist and Taylor Made really turn their attention to Adams' niche in fairway woods. 'You are about to see some increased emphasis on this category from some very well-funded companies,' Seidler's Marvin predicts, not going too far out on a limb.

Noone has to tell Barney Adams that what he has is a promising but one-dimensional company with a bull's-eye on its back. 'We understand the challenge,' he says. 'We are a company that's being given the opportunity to become a major player in this industry. You do that by continuing to do what you do well.'

What Adams has done best is make excellent fairway woods. Fickle consumers and the financial markets are demanding an extension into either drivers or irons Again, Marvin has doubts as to whether Adams can pull it off.

'The lower center of gravity is a good idea, but I don't know how that transfers to the other clubs,' he says 'Maybe they will come out with something completely different in irons, but then they have to be concerned with the consistency of their message. For Callaway, that's always been 'bigger is better,' and for Adams it's been 'lower is better.'

Barney Adams, of course, isn't about to tip his hand as to what's next, other than some minor line extensions (reportedly a two-wood and an 11-wood) to be unveiled at the PGA International Show this month. Industry speculation is that a totally different technology concept will follow Tight Lies arguing, in effect, that the larger problem is being boxed into a 'lower is better' corner. Adams doesn't disagree.

'Lower is better is not the only theme of Adams,' says Adams, who claims he doesn't know what's coming down the pike. 'I might like a project, whether it's a driver or something else, but my staff might say it's best to go in a different direction.'

While the industry keeps a close watch on the next Adams Golf product direction - which it is now apparent won't be until the 1999 PGA Merchandise Show at the earliest - it casts a questioning eye on some of its recent marketing moves and fears its distribution will change as it transitions from fast-moving upstart to a bona fide member of the vendor community

Some observers question Barney Adams being golf's answer to Wendy's Dave Thomas in a highly visible personality campaign. Others point to the signing this year of Nick Faldo as an indication Adams feels it has hit the big time after only one success story And the green-grass retailers are again concerned they will be left in the dark as a company they backed from the beginning focuses on the brighter retail lights of the off-course shops.

'The signs are all there that they're seeing themselves as a company at the top,' says Las Vegas Golf's Hurford. 'An expensive advertising campaign, the personality treatment of Barney Adams, signing up Nick Faldo These are the signs of a company that grew too quickly and is perhaps a bit out of touch.'

Golf Pro August 1998

Marvin agrees, to an extent. 'Thesigning of Nick Faldo is a benchmark in the growth of the company,' he says, but one whose importance is still to be determined. 'If all he does is carry the Tight Lies in his bag, then it won't be important at all. But if he can help them develop a set of irons and puts it in his bag, then it will have an impact '

It is vital for Adams to introduce products and/or technology to keep the fickle golfer on board, says Marvin. 'It is important for them to the extent that it could kill them if the consumer sees them as a flash in the pan.' And, as an analyst, Marvin can't help looking at the financial implications aswell. 'Adams especially has to do something new to keep Wall Street happy. And they have to do it right away,' says Marvin.

Others wonderhow the company will meld the disparate images of the free-spirited Adams and the notoriously upright Faldo into a cohesive corporate image. Barney Adams chuckles at the thought, but politely disagrees. 'Weare a lot alike,' he says. 'Nick's a grinder, he reinvented his swing, he's a worker. Everybody thinks I'm an overnight success, but it took me 15 years to be one. Nick is tough, and so is Barney.'

Mike Andrusin, assistant golf pro at New Jersey National GC, Basking Ridge, N.J., like most pros, remains blissfully unaware of all the Adams IPO rumblings and cares little about the Barney/Nick synergies. Instead, he tells the story of ordering six Tight Lies last fall, receiving 12, selling them all at $ 205, and needing to reorder this spring.

But he, too, has been caught in Adams' growing pains. It has shipped late, and he's noticed a lack of merchandising and POP support. 'Everyone else gives us banners and signs, no questions asked. It would be nicefor Adams to do the same,' Andrusin says. In response to dealer feedback such as this, Adams is offering more display and POP options.

John Jackson, director of golf operations at Phoenician GC in Phoenix, Ariz., doesn't see the brand as much more than a one-shot product. 'The way I see it, soon Callaway will have something just like it. I see lots of these fads, and I get a kick out of them because I like clubs. But I've got to be here for the long term,' says Jackson.

Like most other retailers, Bill Harden, golf buyer at Chick's Sporting Goods, an eight-store West Coast chain based in Covina, Calif., couldn't care less about where Adams is getting the capital to take its next step, only that he wants it taken in his direction. 'I know they're going to have to keep Wall Street happy, but they're going to have to keep retailers happy, too,' he says. He has already noticed a weakening of margins on the Adams line, a trend he attributes more to increased competition than to a softening of demand. 'Our concern is for them to keep focused on keeping margins strong for retailers. That will keep Adams popular,' says Harden.

Barney Adams listens to all of these concerns and, of course, has a response.

On playing the Dave Thomasrole: 'First of all, Dave's a lot heavier than I am,' Adams says. 'But we did it the personality campaign on purpose. Having a face associated with a company is valuable, and it's worked for others in thepast. It's working for us now.'

On Nick Faldo: 'The biggest benefit is his knowledge of golf equipment and about what makes a good golf club. But beyond that, if you are going into the public arena, you have to have a plan to increase visibility. In the history of golf, no one has ever succeeded without some form of tour affiliation. Nick is our answer to that, and more.'

On green-grass concerns: 'They haven'texperienced any situations where the big retailers could get productand they couldn't. By and large, our goal is to treat our customers fairly in terms of product, price and delivery. We have no intention of changing that.'

On thinking too big: 'From my perspective, I'm still the guy in the 10-by-10-foot booth at the PGA Show hoping someone stops by to say hello.'

Nonetheless, Adams Golf did move into a new, 65,000-square-foot facility in Plano, Tex., recently and occupied another 35,000 square foot building last month. It had been operating from a 38,000-square-foot base nearby.

The company joined the ignominious ranks of the big boys in another way this year: Tight Lies started showing up in Costco, prompting a lawsuit from Adams' with two different aims. The first is to find out how the discount giant is getting the clubs. The second is to prove to its traditional retailers thatAdams Golf will not sit around and take it, even if it's an '800-pound gorilla' that's dishing it out. 'We have to show we're making the effort,' Adams says.

Barney Adams deals with this latest challenge with his same unique outlook. 'Yeah, this means Adams has joined the big boys, but if Costco and 16 or 17 knockoffs are the payoff, I'd almost have rather stayed small. It's really a giant pain in the ass,' Adams says.

Golf Pro August, 1998                                    Page 2

Wait until he feels the full weight of outside investors, you think. But then he comes back to the message he is sending Wall Street as it learns about the distinction between Tight Lies and Adams Golf. 'They have to realize that Adams is not a product, it is a company,' says Adams. 'You're wrong if you think we're just a product.'

IAC-CREATE-DATE: August 17, 1998

LOAD-DATE: August 18, 1998

uns Golf Center

Page 1 of 1

PGA TOUR PROS    ABOUT US    FIT TO GAME    CRAFTSMANSHIP    PRESS RELEASES    CONTACT US

+ BACK

# ADAMS IN THE NEWS

## Adams Golf Reports Record Second Quarter Sales and Earnings

--7/22/98

PLANO, Texas, July 22, 1998 -- Adams Golf (Nasdaq:ADGO) today announced record sales and earnings for the second quarter ended June 30, 1998. Net sales increased 751 percent to $33,817,000 as compared to net sales of $3,974,000 during the second quarter of 1997. Net income increased to $6,657,000, or $0.35 per share on a diluted basis, for the three month period ended June 30, 1998 from a loss of $4,000, or $0.00 per share, for the comparable period in 1997.

For the six month period ended June 30, 1998, net sales were $58,328,000, an increase of 970 percent from $5,449,000 for the comparable period in 1997. Net income for the six month period ended June 30, 1998 was $12,299,000 or $0.66 per share on a diluted basis, versus $41,000 or $0.00 per share for the first six months of 1997.

B.H. (Barney) Adams, Chairman, CEO and President of Adams Golf, stated, "The Company has enjoyed tremendous growth because of the demand by golfers for our innovative clubs. We are pleased to report such outstanding results in our first earnings report as a publicly held company."

The Company designs, manufactures and markets premium quality, technologically innovative golf clubs including the Tight Lies® fairway woods. The Company's Common Stock began trading on the Nasdaq Stock Market's National Market on Friday, July 10, 1998. Further information on the Company can be found on its Internet site, www.adamsgolf.com.

[Note: The original copy of this news release included a second page, consisting of the Company's Consolidated Statements of Operations. If you would like to receive a copy of the full 2-page news release, please call (972) 673-9850 and leave your fax telephone number. A copy of the release will be faxed to you as soon as possible.

To view Adams financial news releases, click here



EXHIBIT
174
5/17/06

-116-

From:        Patrick_Walravens@usccmail.lehman.com
Sent:        Thursday, July 23, 1998 9:39 AM
To:          bpicchi@examnyc.lehman.com; blantier@examnyc.lehman.com
Subject:     Adams Closing

Are you guys available on Thursday September 10th for an Adams closing dinner?

_____ Forward Header _____
Subject: Adams Closing
Author:  Rachel Rodrigues at SFIB1
Date:    7/23/98 8:22 AM


    Patrick -

    Stu is available to attend the closing dinner on Thursday, September
    10th.  He will be on vacation on Aug. 27.

    Rachel


From:        Lantier, Brian J
Sent:        Wednesday, July 22, 1998 7:30 PM
To:          Walravens, Patrick D
Cc:          'bpicchi@aol.com'
Subject:     ELY Results

Pat,

    If you didn't get a chance to listen to the ELY call there were some interesting points:

    They specifically talked about Adams and the way Adams was impacting their market share.

    The fairway wood will be stainless steel, will be priced above the Tight Lies and WILL NOT BE LOW-PROFILE
    (i.e. shallow face)

    They expect total revenues for 1998 of $750-$800 million (down from original estimates of $1.0 billion) and
    since they built the infrastructure to support a $1.0 billion company, with revenues of $750 million they will produce
    $0.20/share) loss in the second half.  Total year EPS could be as low as $0.25/share.

    Callaway will lay off 300 temporary workers immediately and is looking cut other costs.

    ELY should be very weak tomorrow (but then again I thought Adams would be strong today) and we'll have to
    watch its impact on ADGO.

    Brian

UND 08476

Weavers 217

Callaway Earnings Release Conference Call
7/22/1998

- New metal wood in August – not low profile – will make life more interesting for Orlimar and Adams Golf
- Suggested retail will be above former suggested retail of the Warbird. Don't discuss wholesale prices as a general rule. But will be higher than former wholesale price of Warbird.
- Mid-30s to mid-20s per golf data tech in metal woods
-

CONFIDENTIAL

UND 011029

EXHIBIT 245


RECYCLED

ADAMS Golf Center

POA TOUR PROG   ASK BARNEY   COMPASSION   CLINIC DAYS   CRAFTSMANSHIP   **PRESS RELEASES**   CONTACT US

BACK

# ADAMS IN THE NEWS

## Adams Golf Reports Third Quarter Operating Results

--10/22/98

PLANO, Texas, October 22, 1998 -- Adams Golf (Nasdaq:ADGO) today announced operating results for the third quarter ended September 30, 1998. Net sales increased 61.5 percent to $22,986,702 as compared to net sales of $14,236,078 during the third quarter of 1997. Net income increased to $4,346,389 for the three months ended September 30, 1998 from $3,143,967 for the comparable period in 1997. Net income per common share decreased to $0.19 for the three months ended September 30, 1998 from $0.26 per share for the comparable period of 1997 based on weighted average diluted common shares outstanding of 22,748,523 and 12,156,878, respectively.

For the nine months ended September 30, 1998, net sales were $81,314,895, an increase of 313 percent from $19,684,813 for the comparable period in 1997. Net income for the nine months ended September 30, 1998 was $16,645,897 versus $3,184,807 for the first nine months of 1997. Net income per common share increased to $0.83 for the nine months ended September 30, 1998 from $0.27 per share for the comparable period of 1997 based on weighted average diluted common shares outstanding of 20,011,800 and 11,968,472, respectively.

"We are pleased with our third quarter results, especially considering the general softening we have seen in the golf equipment market," stated Barney Adams, Chairman, CEO and President of Adams Golf.

Commenting on the Company's outlook for the fourth quarter, Mr. Adams stated, "At this time, we expect our fourth quarter sales will be affected by continuing weakness in the golf equipment market. In addition, we anticipate our sales will be further impacted by the recent gray market distribution of our products to a membership warehouse club. While we are working diligently to identify and stop the unauthorized distribution of our products to this retailer, we anticipate this process will take at least through the end of the year. As a result of these market conditions, we anticipate that our net income for the fourth quarter will be at or slightly above a break even level. We remain optimistic, however, about our ability to increase our sales and earnings in 1999 through the introduction of new products and the continued expansion of our marketing efforts both domestically and internationally."

Further Mr. Adams stated, "In response to current market conditions, we have recently rolled out a new marketing campaign offering a high quality golf bag free to consumers who purchase any two Tight Lies® fairway woods. Based on preliminary reaction from our retailers, we believe this promotion will help stimulate sales and reduce the gray market distribution as the free bag is available only to customers who purchase Tight Lies clubs through authorized Adams Golf retailers. In addition, we will begin

EXHIBIT
248

-119-

ADAMS Golf Center

airing a new Tight Lies infomercial within the next week which focuses on the expanded line of Tight Lies products and highlights the benefits of the Tight Lies fairway wood over clubs currently offered by our competitors. Meanwhile, we are continuing our research and development efforts and the new driver remains on track for introduction in the first quarter of the new year," concluded Barney Adams.

On October 1, 1998, Adams Golf announced that its Board of Directors had authorized the repurchase of up to two million shares of the Company's common stock. With respect to this share repurchase program, Adams Golf has purchased 657,500 shares of the Company's common stock to date.

Adams Golf designs, manufactures and markets premium quality, technologically innovative golf clubs including the Tight Lies fairway woods. Further information on the Company can be found on its Internet site, www.adamsgolf.com.

*This release, other than historical information, includes forward-looking statements with respect to industry trends and certain other matters. These statements are made under the*
*"safe*
*harbor"*
*provisions of the Private Securities Litigation Reform Act of 1995 and involve risks and uncertainties which could cause actual results to differ materially from those in the forward-looking statements, including but not limited to the following: product development; product introductions; market demand and acceptance of products; the impact of changing economic conditions; business conditions in the golf industry; reliance on third parties including suppliers; the impact of market peers and their products; the actions of competitors, including pricing; risks concerning future technology; and one time events and other factors detailed in the Company's*
*prospectus, and other Securities and Exchange Commission filings. These filings can be obtained by contacting Adams Golf Investor Relations.*

[Please note: The original copy of this news release included two additional pages, consisting of the Company's Condensed Consolidated Statements of Operations and Balance Sheets. If you would like to receive a copy of the full news release, please call (972) 673-9850 and leave your fax telephone number. A copy of the release will be faxed to you as soon as possible.]

To view Adams financial news releases, click here

EXHIBIT 255


RECYCLED

**Adams Golf, Inc.**

# Memo

**To:**    Dick Murtland

**From:**  Mark D. Gonsalves

**CC:**

**Date:**  3/27/98

**Re:**    Customer Returns

---

Thank you for bringing the recent returned order of King Par and Dunham's canceled order to my attention. Here are my thoughts on the subject.

First, with King Par, they refused their order even though we have signed PO's on their order forms. The reason, I believe, is that we called them to task this week for trans-shipping to a retailer in Massachusetts named MVP Sports who are selling our club for $179 and advertising that price in the newspaper. We cannot allow trans-shipment of our clubs. We should be credited with taking a long-term Adams view on the trans-shipment issue.

Second, Dunham's had a solid order with us, but at the last minute, through us a curve ball by requiring us to sign a consignment agreement. This was to be their first order or consequence and I think they tried to make us fold on terms with the clubs on the shipping dock. We, as a sales department, stepped up and said no way. Dick, that's good stuff on our part, not bad. Again, we put the company first.

As for future orders, here is my plan. You come up with a order size you would like to see us have more documentation on besides the normal company PO. Let's say it's 500 clubs- you pick the amount. For any order over this amount of clubs, we will send to that customer, up front, a document that reconfirms the following: Order Quantities, Price, Terms, Delivery Date and Method. We will include sections on our trans-shipment policy, pricing policy and return policy. They will be REQUIRED to sign the document and return it, BEFORE we process their order. You should be aware that in our industry return policies are ignored- I don't see that changing any time soon. I've have been over this once before with Barney.

Remember, to implement this will require extra steps which can have an effect on slowing down the machine. I would be fiscally irresponsible if I did not point this out. The document needs to be drafted by an attorney. Would you like to suggest one or take ownership of getting this done? Either way is OK with me.

Lastly, I will address Jay and all of our sales staff on the effect of returned or changed orders. You make a very valid point on the problems it causes. Please know how you would like me to proceed.



EXHIBIT

255

ADAMS 007805

EXHIBIT 258

To:    Mark Gonsalves                                                April 15, 1998

From: Chris Beebe

Re:    Parallel Exports/Grey Market Sales of Adams' *Tight Lies*

The transshipment of *Tight Lies* clubs has been detected recently, both in the United States and in Canada. Incidences that I have been made aware of are

- King Par transshipping clubs to accounts in the Boston area
- Costco receiving a stock of Adams' products from unknown sources
- Jay told me that some clubs with light shafts, at that time only being shipped to Asia, once found their way into at least one of his accounts

These gray market operations hurt Adams Golf no matter where they occur, for the outlets that receive these goods 1) have not been approved as an Adams' outlet for a variety of reasons, 2) are not required to standby our pricing policies, which can impact our good accounts and 3) can cost Adams Golf a great deal of money and/or sales. One action that I would recommend taking is the adoption of a policy similar to that of Titleist's (see attached sheet).

Regarding the Canadian Costco problem, I have spoken with WDC MacKenzie as well as others involved in the golf industry in Canada. They all confirm that in the past, companies that faced similar problems in the Canadian market took one of two actions:

1) The firms went into Costco and purchased any inventory of clubs there, or
2) The firms took inventories of the clubs in each of the affected accounts and issued credits or discounts which allowed these outlets to either match or become competitive with the Costco price (one firm internally divided these accounts into A/B/C categories, each of which received slightly different treatment). Once Costco has sold out of their products, the retail prices were brought back to the price level prevailing before Costco upset the market. (Callaway, Ping and Taylor Made all chose this option in the recent past.)

I would not recommend purchasing any Costco stock, for that only promotes inventory turns and encourages the discounter to buy more Adams' products (this happened to Lynx in Hawaii). While the other option can cost a good bit, it seems to be the better move, both from a tactical point of view as well as from the publicity standpoint. Additionally, as other companies have taken similar actions, it is expected that any major player in the golf market will react in such a way.

This problem was first discovered on March 23rd, and brought to Adams' attention shortly thereafter. I believe that Adams Golf should make a decision on how to respond to this problem, for the longer it drags on the more it could impact our relations with the Canadian retailers.

EXHIBIT

258

FENGAD 800-631-6989

ADAMS 005045

# MINUTES OF A SPECIAL MEETING OF
# THE BOARD OF DIRECTORS OF

## ADAMS GOLF, INC.

### April 29, 1998



A special meeting of the Board of Directors of **ADAMS GOLF, INC.**, a Delaware corporation (the "Corporation"), was held in accordance with the provisions of Article 141 of the General Corporation Law of the State of Delaware at 2801 E. Plano Parkway, Plano, Texas, on the 29th day of April, 1998 beginning at the hour of 9:00 a.m.

The following directors constituting a quorum were present and participated in the meeting:

B.H. Adams
Paul F. Brown, Jr.
Roland Casati
Finis Conner
Richard Murtland
Stephen R. Patchin

Jim Farrell, Vice President, Finance, attended the meeting at the invitation of the Board of Directors. Joe Hoffman, outside counsel with the law firm of Arter & Hadden, LLP, also attended in the meeting at the invitation of the Board of Directors.

B. H. Adams acted as Chairman of the meeting and Richard Murtland acted as Secretary of the meeting. After the Chairman called the meeting to order, certain actions were considered and discussed by the Board of Directors, and certain Resolutions were adopted.

The Board of Directors first reviewed minutes of the February 26, 1998 and April 20, 1998 Board Meetings and approved the minutes with minor corrections.

The Board of Directors then reviewed the Corporation's business plan/forecast for the remainder of 1998 and 1999. An extensive discussion ensued among the Directors and Management. All Directors actively participated and asked various questions of management relating to different aspects of the forecast, component variables and comparisons to competitor companies.

The Board next reviewed a draft of the Corporation's proposed Form S-1 Registration Statement. After review of the Form S-1, a number of corrections were noted. After due discussion, upon motion duly made and seconded, the Board unanimously adopted the following resolutions.

WHEREAS, the Board of Directors of the Corporation believes that it would be in the best interest of the Corporation to increase the capitalization of the Corporation and to create a public market for its shares of common stock, par value $.001 per share (the "Common Stock"), by means of selling shares of Common

Minutes of Special Meeting of Board of Directors - Page 1

99937.1

UND 02964

Stock through an underwritten public offering and to use the proceeds of such offering to increase working capital and for other general corporate purposes as determined by the Board of Directors; and

WHEREAS, certain officers of the Corporation have negotiated with Lehman Brothers (the "Representative") to act as the representative of a group of underwriters (collectively the "Underwriters") to be formed for the purposes of offering up to 7,500,000 shares of the Common Stock, consisting of up to 5,000,000 shares of Common Stock to be issued and sold by the Corporation and up to 2,500,000 shares of Common Stock to be sold by certain selling stockholders of the Corporation (the "Selling Stockholders"), plus up to 1,125,000 additional shares of Common Stock to be issued and sold by the Corporation and/or for the Selling Stockholders pursuant to an over-allotment option, all of which are to be sold to the public on the basis of a firm commitment underwriting;

NOW, THEREFORE, BE IT RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and directed to do or cause to be done all such acts and things as he may deem necessary or advisable in connection with the public offering of such shares of Common Stock by the Corporation and the Selling Stockholders, including, without limitation, the preparation, execution and filing with the Securities and Exchange Commission (the "Commission") of a registration statement (and all necessary amendments, including post-effect amendments) on Form S-1 (the "Registration Statement"), covering the offering of such shares by the Corporation and the Selling Stockholders in accordance with the requirements of the Securities Act of 1933, as amended (the "Act"), and the rules and regulations of the Commission adopted thereunder; and all such acts of such officers, whether heretofore or hereafter done or performed, which are in accordance with the purposes and intent of these resolutions, are hereby adopted, ratified, confirmed and approved as the valid and binding acts of the Corporation;

FURTHER RESOLVED, that each officer and director who may be required to sign and execute the Registration Statement or any amendments thereto or any documents in connection therewith or in connection with the offering contemplated thereby (whether on behalf of the Corporation, as an officer or director of the Corporation, or otherwise) be, and each of them hereby is, authorized and empowered to execute a power of attorney appointing B.H. (Barney) Adams and Richard Murtland, and each of them, severally, as his true and lawful attorneys-in-fact and agents, to sign in his name, place and stead in any such capacity, such Registration Statement and all amendments thereto and documents in connection therewith; and that each of said attorneys-in-fact and agents is hereby authorized and empowered to sign such Registration Statement, amendments and documents in the place and stead of each such officer and director who shall have executed such power of attorney (whether acting on behalf of the Corporation, as an officer or director of the Corporation, or otherwise);

FURTHER RESOLVED, that B.H. (Barney) Adams, be, and he hereby is, designated as the Corporation's agent for services of process, and authorized to

UND 02965

receive communications and notices from the Commission with respect to the Registration Statement, and with power of attorney for the Corporation to exercise all powers conferred upon such agents by the rules and regulations of the Commission under the Act;

FURTHER RESOLVED, that B.H. (Barney) Adams, Paul Brown and Finis Conner shall constitute a Pricing Committee of the Board of Directors of the Corporation, and to facilitate the offering, B.H. (Barney) Adams, Paul Brown and Finis Conner, in their capacity as members of the Pricing Committee, are hereby authorized, empowered and directed to establish on behalf of the Corporation (i) the aggregate number of shares of Common Stock to be issued by the Corporation in the public offering, (ii) the price at which the Common Stock shall be sold by the Corporation to the Underwriters and the price at which the Common Stock included in the Registration Statement shall be sold to the public, (iii) the underwriting discounts and commission to be paid to the Underwriters, and (iv) such other matters relating to the public offering as the Pricing Committee shall deem appropriate, such action thereby to be conclusive evidence as to their authority to act on behalf and in the name of the Board of Directors and the Corporation;

FURTHER RESOLVED, that a form of Underwriting Agreement between the Corporation and the Representative on behalf of the several Underwriters named therein, providing for the purchase of the Common Stock from the Corporation and the Selling Stockholders by said Underwriters severally, the proposed form of which is to be contained as an exhibit to the Registration Statement, is hereby approved; that the President or any senior Vice President is, and each of them hereby is, authorized, empowered and directed to execute the Underwriting Agreement, in the name and on behalf of the Corporation, and deliver such Underwriting Agreement (with the appropriate blanks filled in, in accordance with the terms established by the Pricing Committee and with such changes therein as the officer executing the Underwriting Agreement shall reasonably approve, the execution of the Underwriting Agreement by such officer to be conclusive evidence of such approval);

FURTHER RESOLVED, that there are hereby reserved from the Corporation's authorized but unissued shares for issuance upon the sale of Common Stock pursuant to the public offering 5,000,000 shares of the Corporation's authorized but unissued Common Stock (which amount may be increased or decreased by up to 1,000,000 shares by the Pricing Committee); that the Pricing Committee of the Corporation be and hereby is authorized, empowered and directed, in the name and on behalf of the Corporation, to increase or decrease (i) the number of shares of Common Stock reserved for issuance for sale pursuant to the public offering, (ii) the number of shares of Common Stock to be included in the Registration Statement, and (iii) the number of shares to be issued and sold to the Representative under the Underwriting Agreement pursuant to the public offering, as the Pricing Committee may deem necessary or desirable in its sole discretion; and that the issuance of such shares is hereby authorized pursuant to the terms and conditions of the foregoing Underwriting Agreement upon the terms and for the

99937.1

UND 02966

consideration determined by the Pricing Committee; and such shares, when so issued, shall be fully paid and nonassessable shares of Common Stock;

FURTHER RESOLVED, that the President and any senior Vice President of the Corporation be, and each of them hereby is, authorized, empowered and directed to take any and all actions as they deem necessary or advisable to effect the registration or qualification (or exemption therefrom) of the Common Stock for issue, offer, sale or trade under the "blue sky" or any other securities laws of any of the states of the United States, or to have the Corporation registered or licensed as a dealer or broker in such states, and, in connection therewith, to execute, acknowledge, verify, deliver or file or cause to be published any application, report, issuer's covenant, consent to service of process, appointment of attorneys to receive service of process, and other papers and instruments that may be required under said laws and to take any and all further action they deem necessary or advisable in order to maintain any such registration, qualification, exemption or license for as long as they deem necessary or as required by law;

FURTHER RESOLVED, that the Board of Directors hereby adopts the form of any resolution required by a state in connection with the registration or qualification of the shares of the Common Stock to be sold by the Corporation in connection with the offering; and

FURTHER RESOLVED, that the appropriate officers of the Corporation be, and each of them hereby is, authorized, empowered and directed, for any on behalf of the Corporation, to pay all fees incidental to making the aforementioned securities filings and such other expenses of the offering as are allocated to the Corporation by any agreements entered into, or to be entered into, with the Selling Stockholders or the Representative.

The Board next considered various committees of the Board. After due discussion, motion duly made and recorded the following resolutions were unanimously adopted:

RESOLVED, that Roland Casati, Mark Mulvoy and Steve Patchin shall constitute a Compensation/Plan Committee of the Board of Directors of the Corporation and in their capacity as members of the Compensation/Plan Committee, are hereby authorized, empowered and directed to (i) recommend to the Board of Directors the annual salaries for senior management, and (ii) administer and, grant awards under, the Corporation's 1998 Incentive Stock Plan and the Corporation's Bonus Plan; and

FURTHER RESOLVED, that Paul Brown and Finis Conner shall constitute an Audit Committee of the Board of Directors of the Corporation and in their capacity as members of the Audit Committee, are hereby authorized, empowered and directed to (i) meet periodically with representatives of the Corporation's independent public accountants to review the general scope of audit coverage, including consideration of the Corporation's accounting practices and procedures and system of internal accounting controls, and to report to the Board of

99937.1

UND 02967

Directors with respect thereto, and (ii) recommend to the Board of Directors the appointment of the Audit Committee's independent auditors.

FURTHER RESOLVED, that each of Paul Brown and Finis Conner have been, after consideration by the entire Board (except for Messrs. Brown and Conner who have abstained for all purposes), determined to be "independent" as required by the rules of The Nasdaq Stock Market.

The Board then discussed the resignation of Skip Corn as a director and the filling of such vacancy by Mark Mulvoy, a retired executive of *Sports Illustrated* magazine. Upon motion made and seconded, the following resolution was unanimously adopted;

WHEREAS, Skip Corn has resigned as a director of the Corporation;

NOW, THEREFORE, BE IT RESOLVED, that Mark Mulvoy be, and he hereby is, elected to fill the vacancy created by such resignation, to hold his directorship in class 3 with a term expiring at the 2001 Annual Meeting or until his successor is duly elected and qualified, or until his sooner death, resignation, retirement or removal.

The Board next discussed a proposal to make certain option grants under the Stock Incentive Plan. Upon motion duly made and seconded, the following Resolutions were unanimously adopted:

WHEREAS, the Board of Directors deems it to be in the best interest of the Corporation to award options to purchase an aggregate of 10,000 shares (pre-split) of the Corporation's Common Stock to certain individuals who are employed by one of the Corporation's subsidiaries;

NOW, THEREFORE, BE IT RESOLVED, that the following grants of options (incentive or nonstatutory as indicated) to purchase shares of the Corporation's Common Stock be made to the following individuals, in the following amounts, each such option to vest as to twenty-five percent (25%) of the number of shares purchasable thereunder on each of the first four anniversaries of the date of grant:

| Optionee | Shares Covered By Options/Type | Exercise Price | Expiration Date |
|---|---|---|---|
| Chris Beebe | 5,000/Incentive | $11.25 | 4/29/03 |
| Rick Nelson | 5,000/Incentive | $11.25 | 4/29/03 |

FURTHER RESOLVED, that the President of the Corporation is hereby authorized, empowered and directed to execute and deliver for and on behalf of the Corporation, incentive stock option agreements with respect to the above grants of options in the form of such document approved by the President, with such changes therein as the President may deem appropriate in his sole discretion,

99937.1

UND 02968

the due authorization thereof to be conclusively evidenced by such officer's execution and delivery thereof.

Barney Adams then discussed with the Board of Directors the Corporation's relationship with Evolution Golf, Inc., John Pierandozzi, et al. (the "Evolution Golf Parties") and related technology and product development efforts. The Board authorized Barney Adams to negotiate a contract with the Evolution Golf Parties. Upon motion made and seconded the following resolution was unanimously adopted:

> RESOLVED, that Barney Adams be, and he hereby is, authorized, empowered and directed to negotiate with the Evolution Golf Parties to acquire all rights to the subject technologies and designs and in connection therewith to issue or commit to issue up to 30,000 (pre-split) shares of the Company's Common Stock (in a grant or in an option) to the Evolution Golf Parties on such terms and conditions as Mr. Adams deems appropriate.

The Board next determined to elect officers of the Corporation to serve until their respective successors are elected and qualified. Upon motion made and seconded the following resolution was unanimously adopted:

> RESOLVED, that the following persons be, and they hereby are, elected and appointed to the offices set forth opposite their respective names, such officers to serve in accordance with the provisions of the Bylaws and until their respective successors are elected and qualified, or until their sooner death, resignation, retirement or removal:

| | |
|---|---|
| B.H. (Barney) Adams | Chairman of the Board, Chief Executive Officer and President |
| Darl P. Hatfield | Senior Vice President - Finance and Administration and Chief Financial Officer |
| Richard H. Murtland | Vice President - Research and Development, Secretary, Treasurer and Director |
| James E. Farrell | Vice President - Finance |
| Mark D. Gonsalves | Vice President - Sales and Marketing, Retail |
| Steven P. Sanazaro | Vice President - Information Technology |

The Board then instructed management and the Compensation Committee to explore and recommend an outside director plan that would provide for meeting and committee fees (cash and/or stock based) and annual director fees (cash and/or stock based).

Upon motion duly made and seconded, the following resolutions were unanimously adopted:

99937.1

UND 02969

RESOLVED, that any and all transactions by any of the officers or representatives of the Corporation, for and in the name and on behalf of the Corporation, in connection with any of the transactions contemplated by the foregoing resolutions before the adoption of the foregoing resolutions, be, and they hereby are, ratified, confirmed and approved in all respects for all purposes; and

FURTHER RESOLVED, that in addition to and without limiting the foregoing, the appropriate officers of this Corporation be, and each of them hereby is, authorized, empowered and directed to take, or cause to be taken, such further action and to execute and deliver, or cause to be executed and delivered, for and in the name and on behalf of this Corporation, all such instruments and documents as such proper officer may deem appropriate in order to effect the purpose and intent of the foregoing resolutions (as conclusively evidenced by the taking of such action or the execution and delivery of such instruments, as the case may be, by or under the direction of any authorized officer), and all action heretofore taken by the officers of the Corporation in connection with the subject of the foregoing resolutions be, and it hereby is, approved, ratified and confirmed in all respects as the act and deed of this Corporation.

There being no further business to come before the meeting, upon motion duly made, seconded and carried, the meeting was adjourned.

SECRETARY OF THE MEETING:

_Richard Murtland_

97937.1

UND 02970