EXHIBIT 302





Δ π EXHIBIT 302
Deponent Lynch
Date 8/01/06 Rptr. ji
WWW.DEPOBOOK.COM

United States District Court
District of Delaware

IN RE: ADAMS GOLF, INC.
CONSOLIDATED SECURITIES LITIGATION
C. A. No. 99-371 KAJ

EXPERT REPORT OF ED J. LYNCH, CPA
JULY 14, 2006

## A. BACKGROUND OF THE WITNESS

1.    I am Ed J. Lynch, a Certified Public Accountant ("CPA") and a Partner with Deloitte Financial Advisory Services LLP ("Deloitte FAS"), part of one of the largest professional services organizations in the United States with approximately 33,000 people in over 100 offices in the United States. My business address is 2200 Ross Avenue, Suite 1600, Dallas, Texas 75201-6778. Since graduating from college in 1977, I have practiced in the public accounting profession that includes accounting, auditing, tax, and management consulting services. I have experience in accounting, auditing, damage analysis, and other financial analyses. I have served on the professional ethics committees of three different state societies of CPA's over the last twenty years of my professional practice and I served as co-chair of the Missouri Society of CPA's Professional Ethics Committee in the mid-1990's. My training and experience as a CPA qualify me to analyze the matters in dispute in this case. Deloitte FAS is paid for my time spent analyzing this matter at a rate of $475 per hour. My resume is attached as Exhibit 1. My testimony history over the last four years is attached as Exhibit 2.

## B. SCOPE OF ASSIGNMENT

2.    I have been retained as an accounting expert in this case by Adams Golf, Inc. ("Adams Golf"), and B. H. (Barney) Adams, Darl P. Hatfield, Richard H. Murtland, Paul F. Brown, Roland E. Casati, Finis F. Conner and Stephen R. Patchin (collectively the "Individual Defendants") to analyze and render opinions regarding accounting and disclosure issues in this litigation. In particular, I have been asked to determine whether management of Adams Golf utilized accounting principles generally accepted in the United States of America, also known as generally accepted accounting principles ("GAAP"), in estimating and recording an allowance for sales returns and in the disclosures in regard to sales returns in the financial statements included in Adams Golf's registration statement and prospectus (the "Registration Statement" and the "Prospectus") effective July 9, 1998 (the "Effective Date"). I have also been asked to consider allegations regarding double shipping and consignment sales.

## C. DOCUMENTS CONSIDERED

3.    My conclusions have been reached after reviewing and analyzing documents produced as part of this dispute, analysis of deposition testimony of Mr. Adams, Mr. Hatfield, James Farrell, Mark Gonsalves, Chip Brewer, Olga Pulido-Crowe, Scott Blevins, Ryan Magnussen, Dave Brown, Jay Greaney and Sandra Brooks and discussion of certain facts with Mr. Hatfield, the Chief Financial Officer from 1998 to 2000. I began by reviewing a selection of documents provided by counsel and I asked for and was provided with additional documents and/or categories of documents as my investigation progressed. I also reviewed other publicly available information such as the company's SEC filings. I have been given access to all documents produced in this litigation. The documents I have consulted or relied on in performing my analyses and in forming my opinions are listed in Exhibit 3 and include the following:

Pleadings filed in this litigation

Adams Golf, Inc., Form S-1/A (July 7, 1998)

Adams Golf, Inc., Form 10-Qs (including amendments) for the quarters ended June 30,

1998 to March 31, 2000

Adams Golf, Inc., Form 10-Ks for the years ended December 31, 1998, 1999 and 2000.

Adams Golf / Lehman Brothers IPO "Roadshow" materials

Underwriter "Due Diligence" documents

Minutes of Regular and Special Meetings of Adams Golf Board of Directors

Adams Golf Board of Directors presentation materials

Press releases produced in this litigation

Internal Adams Golf memoranda produced in this litigation

Internal Adams Golf documentation including company return policies, customer sales data, financial data and forecasts.

SEC comments and responses to Adams Golf's Form S-1

KPMG audit work papers for years ended December 31, 1998 and 1999 and certain work papers for the year ended December 31, 1997

KPMG quarterly review work papers for the first three quarters of 1998

KPMG comfort letter and registration statement review work papers

## D. SUMMARY OF MY OPINIONS

4.      Adams Golf's accounting practices and disclosures with respect to provisions for sales returns and sales return reserves were in accordance with GAAP.

5.      As described below, based on the evidence reviewed, Adams Golf performed reasonable estimates of sales returns.

6.      The testimony and evidence which I have reviewed in this matter do not establish that there was a widespread practice, if any, of double shipping or consignment sales by Adams Golf.

7.      Adams Golf's net down program as of January 1, 1999 is unrelated to the provision for sales returns.

8.      The bases for my opinions are set forth in the following sections of this report.

## E. GAAP AND OTHER GUIDANCE RELEVANT TO THE ISSUES IN THIS MATTER

9.      Copies of accounting literature discussed below are included in Exhibit 5 to this report.

10.     Statement of Financial Accounting Standards 48 ("FAS 48") entitled "Revenue Recognition When Right of Return Exists" is applicable:

> "This Statement specifies criteria for recognizing revenue on a sale in which a product may be returned, whether as a matter of contract or as a matter of existing practice, either by the ultimate customer or by a party who resells the product to others." (para. 3).

11.     FAS 48 goes on to state:

> "If an enterprise sells its product but gives the buyer the right to return the product,

revenue from the sales transaction shall be recognized at time of sale only if all of the following conditions are met:

    a.  The seller's price to the buyer is substantially fixed or determinable at the date of sale.

    b.  The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.

    c.  The buyer's obligations to the seller would not be changed in the event of theft or physical destruction or damage of the product.

    d.  The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

    e.  The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

    f.  The amount of future returns can be reasonable estimated.

Sales revenue and cost of sales that are not recognized at the time of sale because the foregoing conditions are not met shall be recognized either when the return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first." (Para. 6)

"If sales revenue is recognized because the conditions of paragraph 6 are met, any costs or losses that may be expected in connection with any returns shall be accrued in accordance with FASB Statement No. 5, *Accounting for Contingencies*. Sales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns." (Para. 7)

"The ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that will vary from one case to the next. However, the following factors may impair the ability to make a reasonable estimate:

    a.  The susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand

    b.  Relatively long periods in which a particular product may be returned

    c.  Absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances, for example, changes in the selling enterprise's marketing policies or relationships with its customers

    d.  Absence of a large volume of relatively homogeneous transactions

The existence of one or more of the above factors, in light of the significance of other factors, may not be sufficient to prevent making a reasonable estimate; likewise, other factors may preclude a reasonable estimate." (Para. 8)

12.    Accounting Principles Board Opinion 20, entitled "Accounting Changes" ("APB 20"), provides the appropriate standard related to utilization of accounting estimates. APB 20 states the following:

> "Changes in estimates used in accounting are necessary consequences of periodic presentations of financial statements. Preparing financial statements requires estimating the effects of future events. Examples of items for which estimates are necessary are uncollectible receivables, inventory obsolescence, service lives and salvage values of depreciable assets, warranty costs, periods benefited by a deferred cost, and recoverable mineral reserves. Future events and their effects cannot be perceived with certainty; estimating, therefore, requires the exercise of judgment. Thus accounting estimates change as new events occur, as more experience is acquired, or as additional information is obtained." (Para 10)

13.    APB 20 further states:

> "The Board concludes that the effect of a change in accounting estimate should be accounted for in (a) the period of change if the change affects that period only or (b) the period of change and future periods if the change affects both. A change in an estimate should not be accounted for by restating amounts reported in financial statements of prior periods or by reporting pro forma amounts for prior periods."(Para. 31)

14.    Statement of Position 94-6, Disclosure of Certain Significant Risks and Uncertainties, provides that "[f]inancial statements should include an explanation that the preparation of financial statement in conformity with GAAP requires the use of management's estimates." (para. .11)

## F. FACTS AND CIRCUMSTANCES UNDERLYING MY OPINIONS

**Accounting Policy Disclosures**

15.    Note 1 to the consolidated financial statements of Adams Golf included in the Prospectus for the initial public offering in 1998 disclosed, at "(d) Revenue Recognition" that the company "records revenue as earned, which occurs when the product is shipped."[1] This statement was consistent with statements in its public filings during the class period.

16.    Note 1 also includes, at "(h) Product Warranty and Sales Returns" that "The Company's golf equipment is sold under warranty against defects in material and workmanship for a period of two years. In addition, the Company has a 90 day 'no questions asked' return policy. An allowance for estimated future warranty and sales return costs is recorded in the period products are sold. Such estimates have approximated actual costs incurred."[2]

---

[1] Adams Golf S-1/A (July 9, 1998) at p. F-7.
[2] Adams Golf S-1/A (July 9, 1998) at p. F-8.

17.   Note 1 further includes, at "(k) Use of Estimates The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates."

**Accounting Using FAS 48**

18.   Adams Golf shipped products to customers on the basis of agreed prices and sent invoices to their customers following shipment. As such, the prices of Adams Golf clubs were fixed at the time of sale.

19.   I have not seen any evidence contrary to the customers' obligation to pay for them pursuant to the customary business terms or that any contingency or prerequisite existed that the products be resold before the customer was obligated to pay Adams Golf for the goods.

20.   Available documents indicate that sales were booked by Adams Golf when items were shipped and the risk of loss passed to the buyer at that point. No evidence has been provided which describes any available credit to Adams Golf customers for damaged or stolen merchandise after shipment.

21.   Plaintiffs have not specifically alleged any facts questioning the economic substance of Adams Golf's customers; and I am aware of no evidence indicating that Adams Golf's customers lacked substantial economic substance independent of Adams Golf.

22.   Adams Golf did not have any significant continuing obligation with respect to the shipped products to facilitate their resale. As described in more detail below, Adams Golf's post-sale obligations were limited to its 90-day "no questions asked" return policy on certain sales and warranty obligations based on its materials and workmanship. The company estimated and accrued for these types of obligations.

23.   As described below, Adams Golf future returns could be reasonably estimated.

**Estimating Sales Returns**

24.   FAS 48 points out that the ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that will vary from one case to the next. FAS 48 provides examples of factors which might impair a reasonable estimate (as described above). Based on the evidence reviewed, Adams was not precluded from making a reasonable estimate of its sales returns.

25.   As described above, Adams Golf disclosed that it had a 90-day "no questions asked" return policy on its products. In fact, the 90-day "no questions asked" return policy did not apply to all sales, but rather only direct response sales.[3,4] All other sales were made without a right of

---

[3] Direct response sales refers to programs where customers may order Adams Golf products directly from the company via a toll free number and in response to the various company advertisements (TV, print, etc)
[4] KPMG 0502-0503

return. The company did, however, accept non-direct response sales returns on a case-by-case basis, but only as an accommodation to maintain a customer relationship and only after that customer had been approved for the return.

26.   I do not consider the returns periods described above to be "relatively long" periods as that term is used in FAS 48.

27.   Adams Golf had historical experience in sales of its golf clubs and other products. Adams Golf had been in business since 1987 and began marketing its best-selling Tight Lies range of clubs in 1995.[5]

28.   Adams Golf sales were composed of a large volume of relatively homogenous sales. As of the Effective Date of the initial public offering, and throughout the class period (July 10, 1998 to October 22, 1998), Adams Golf focused exclusively on design, manufacture, and marketing of golf clubs, and did not have significant sales of other products. In the first quarter of 1998 (the last reported period included in the company's S-1/A as of the Effective Date) Adams Golf had $24.5 million in net sales, of which $24.4 million, or 99 5%, were golf clubs. Of these, $23.9 million, or 97%, were Tight Lies.[6]

29.   Adams Golf was aware of the susceptibility of its products to external factors, including technological changes, and changes in demand. Adams Golf did research and development as a mechanism to keep its products competitive and disclosed the nature of fierce competition from some of its competitors such as Callaway and Orlimar. These factors were not sufficient to prevent Adams Golf from making a reasonable estimate of sales returns during the class period.

30.   In addition, FAS 48 states that "other factors may preclude a reasonable estimate." I am not aware of any additional factors bearing on Adams Golf's ability to make a reasonable estimate of future returns. Further, there was no known change in circumstances during the period which would have rendered Adams Golf unable to apply its experience to estimate a reasonable allowance for returns of its clubs and merchandise.

31.   Adams Golf's allowance for sales returns was designed to account for all returns from any source. Any product returns based on Adams Golf's warranty were explicitly beyond the scope of FAS 48.[7]

32.   Adams Golf financial statements were audited by KPMG beginning in 1996[8] and continued through the class period. KPMG audit work papers indicated that they considered Adams Golf sales data going back to 1995.[9]

---

[5] Adams Golf S-1/A (July 9, 1998) at p. 17.
[6] KPMG 2013, Net Sales by Product. Net sales amount from 1st Quarter 1998 trial balance at KPMG 2325.
[7] SFAS 48, ¶4.
[8] Deposition of Darl Hatfield (June 8, 2006) at p. 7.
[9] KPMG 2009-2014, from KPMG's Registration Statement and Comfort Letter work papers

**Adams Golf Sales Return Estimates**

33.    Adams Golf disclosed sales on a net basis. Therefore, all revenues shown in the company's financial statements, including the registration statement, were already reduced by an estimate of potential returns the company expected, regardless of the reason.[10]

34.    Adams Golf employed estimates of its sales returns when it booked its sales. The company would revise its estimated reserve percentages during the year as new information became available. It is apparent that KPMG subjected Adams Golf's sales returns estimates to testing as part of Adams Golf's year end audits.

35.    As of December 31, 1997, the company estimated its sales return rate for its 90 day "no questions asked" policy applicable to direct response sales to be approximately 12% of gross sales and estimated its commercial return rate at approximately 3% of gross sales. The company estimated that returns would be made over a four-month period following the initial date of sale.

36.    KPMG's work papers for the income statement in the quarter ended March 31, 1998 indicated that direct response gross sales were $3.6 million and gross sales from commercial accounts were $22 million.[11]    Adams Golf applied the same return rate estimates in this quarter and the resulting provision for returns on those sales was $1.1 million and the closing reserve balance was $0.7 million.

37.    In the quarter ended June 30, 1998, the company booked a provision for returns of $1.8 million on gross sales of $35.6 million (sales of $4.1 million for direct response and $31.5 million for commercial accounts). Adams Golf applied the same return rate estimates in this quarter, with the exception that the commercial accounts provision for return rate was increased to 4% for the months of April and May and was increased to 4.5% for the month of June. The closing reserve balance increased to $0.9 million.

38.    According to KPMG's annual audit work papers for the year ended December 31, 1998, Adams Golf began to note an increasing sales return trend starting in the third quarter of that year.[12] KPMG made inquiries of Adams Golf's management. Adams Golf's management indicated that the increased rate of returns resulted from the use of an outbound call third-party provider. Adams Golf had begun testing new approaches to expand its direct response sales and utilized Telegolf to service its direct response accounts. Adams Golf determined that Telegolf's performance was unsatisfactory, attributed to a lack of knowledge of the sport and the company's products. Telegolf's performance resulted in increased return rates for Adams Golf's products. In response to rising returns, the company increased its return estimate for direct sales from 12% to 30% beginning in July and Adams Golf took over Telegolf's duties in September of 1998.

39.    An estimate of 4.5% of returns was applied throughout the third quarter to commercial account sales and an estimate of 30% was applied for direct response sales throughout the third quarter. The resulting sales return provision for the quarter ended September 30, 1998 was $1.7

---

[10] A schedule analyzing gross sales, provision for returns, and net sales is at Exhibit 4.
[11] KPMG 2351.
[12] This trend was briefly noted by KPMG as part of its 3rd quarter review (KPMG 2223), but the matter was more fully documented in the year end work papers.

million on gross sales of $24.7 million (sales of $2.6 million for direct response sales and $22.1 million for commercial accounts) for the quarter. The closing reserve balance decreased to $0.8 million.

40.   In the fourth quarter, as the effect of Telegolf phased out, the direct response sales return estimate was adjusted from 30% in October, to 25% in November, and 22% in December. The return estimate for commercial accounts was 5.5% for the months of October and November and 6% in December.

41.   As part of the audit for the year ended December 31, 1998, KPMG concluded that Adams Golf had been too conservative in estimating its sales return reserve.   Based on the over-accrual identified by KPMG, Adams Golf booked an adjusting entry to reduce its sales return accrual by $192,000, from $692,000 to $500,000.[13]   In their year end audit for 1998, KPMG documented in its work papers that Adams Golf's sales return reserve balance as adjusted was reasonable as of December 31, 1998.[14]

**Adams Golf Sales Methods**

42.   Plaintiffs allege that Adams Golf engaged in questionable sales practices such as "double shipping, selling on consignment or with unlimited rights of return…"[15] I have examined deposition testimony and various documents produced in this matter regarding these allegations.

43.   The source of these allegations appears largely to stem from a memo from Adams Golf's then CEO and President Barney Adams dated August 14, 1998.[16]   That memo describes Mr. Adams' concerns regarding the operation of the Inside Sales group.   Among other things, the memo notes "[the Inside Sales staff] know cheating (at least in the form of double shipments) occurs and are concerned that such action is quietly endorsed" and that "Apparently, we've made a lot of sales that have been falsely reported (as sales) and are little more than consignments." The document further states "[c]heck July returns and tell me what they'll be during the rest of the year." However, Mr. Adams himself largely recants these comments and joins other members of Adams Golf management in denying that these issues were taking place.

44.   Mr. Adams' deposition testimony offers some context to these comments.  Asked by Plaintiffs' counsel why he wrote the memo, Mr. Adams responded:

> "I had a – I had expectations for the sales group:  Morale, efficiency, and in a personal visit, I did not encounter that.  I encountered an environment that I didn't care for.
>         And as I said I my normal, occasionally volatile way of handling things, I came up with this guilty-until-proven-innocent approach."[17]

Mr. Adams testified that the tone and content of the document was his way of motivating his sales management rather than documentation of any specific findings within the department.

---

[13] *See* KPMG 502-504 (Sales Return Testing), KPMG 2057-2058 (12/31/98 Trial Balance)

[14] KPMG 0502-0503, Sales Returns Reserve testing.

[15] Second Consolidated and Amended Class Action Complaint at ¶71.

[16] Adams 028451-028452.

[17] Deposition of Barney Adams (June 22, 2006) at p. 139.

45.    The memo raises the possibility of consignment sales. Asked about that portion of the memo, Mr. Adams states "...the word consignment is my word. My interpretation and I don't know if anybody in the department ever brought up the word 'consignment.'"[18]  Jay Greaney, one of Adams Golf's sales people, testified "I never sold clubs on consignment."[19]  He further testified that any practice of consignment sales predated the IPO stating "...that was really early on in the company, when there was really not enough demand for anyone to even accept the product in their store."[20]  Mark Gonsalves, Adams Golf Vice-President of Sales, also denied Mr. Adams' characterization testifying that while the company had participated in some limited consignment sales prior to the company's product infomercial in 1997, they were not occurring at the time of the IPO.[21]

46.    This testimony is supported by a March 28, 1998 memo written by Mr. Gonsalves and addressed to Dick Murtland. This memo describes Adams Golf declining a significant sale on the grounds that the customer was demanding a consignment agreement. Mr. Gonsalves writes:

> "...Dunham's had a solid order with us, but at the last minute, through [sic] us a curve ball by requiring us to sign a consignment agreement...[w]e as a sales department, stepped up and said no way. Dick, that's good stuff on our part, not bad. Again, we put the company first."[22]

47.    Chip Brewer replaced Mr. Gonsalves as VP of Sales in September 1998. With respect to the possibility of consignment sales raised by Mr. Adams' memo, Mr. Brewer testified:

Q.    ...Do you concur that a lot of sales had been falsely reported as sales and were, in fact, little more than consignment at that time?

A.    No. I would – from the facts I've seen, I would disagree with that.

Q.    So in your opinion that particular paragraph is wholly inaccurate in this exhibit, or –

A.    In my opinion, that paragraph is – inaccurate.[23]

48.    Specific allegations of double shipping appear to center around a single sales person, Jay Greaney, who denied the allegations. In fact, what is described as double shipping, Mr. Greaney describes as prebooking or preordering.[24]  According to Mr. Greaney, due to the high demand for Adams Golf clubs prior to the IPO, the company would encourage customers to book future orders of specific quantities to be entered and shipped on particular dates.[25]  These orders were in writing and were referred to by the company as the guaranteed delivery.[26]  He indicated that this process was done with the consent of the customers and was intended to guarantee the customers delivery of product which was in demand.

---

[18] Deposition of Barney Adams (June 22, 2006) at p. 149.
[19] Deposition of Jay Greaney (May 18, 2006) at p. 97.
[20] Deposition of Jay Greaney (May 18, 2006) at p. 93.
[21] Deposition of Mark Gonsalves (June 6, 2006) at p. 140.
[22] ADAMS 007805
[23] Deposition of Chip Brewer (May 2, 2006) at p. 85.
[24] Deposition of Jay Greaney (May 18, 2006) at pp. 13-14, 67-69.
[25] Deposition of Jay Greaney (May 18, 2006) at pp. 13-14, 97-99.
[26] Deposition of Jay Greaney (May 18, 2006) at pp. 13-14.

49.  Mr. Greaney testified that incidents of so called "double shipping" were attributable to "system errors and some lack of demand for the product."[27]

50.  A transaction that may have been termed a "double shipment" was actually Adams Golf following its practice of allowing for a few of its commercial account customers to return clubs on a case-by-case basis. Mr. Greaney testified:

> "As demand for the product waned, a lot of customers would say: I didn't order the product. Or there were times when a prebook order was shipped, and the customer hadn't sold through their original order, so they refused an order --- in that instance, it was considered a double shipment."[28]

51.  Mr. Greaney's personnel file contains a letter from one of his customer accounts, Hoby Golf, which claims that Adams Golf shipped a number of clubs without authorization and charged his credit card for the balance due.[29] The letter claims that Adams Golf had shipped an order to the customer which was "supposed to be shipped over a course of time" and billed it to the customer's credit card. However, Mr. Greaney attributed the issue to a possible "system problem."[30]

52.  Mr. Greaney's testimony, as well as the documents in his personnel file, does not demonstrate that "double shipping" or "system problem" incidents were widespread. Although Mr. Greaney was confronted about certain of his sales practices by Mr. Brewer, which was shortly followed by Mr. Greaney resigning his position, no final determination was made regarding the allegations.[31]

53.  Darl Hatfield was a former KPMG audit partner and CFO of Adams at the time of the IPO. With respect to sales returns, Mr. Hatfield testified:

> Q   ...So do you agree with Barney's statement in this memo that there appear to have been what amounted to consignment sales as falsely booked?
>
> A.   No, that's not my opinion.
>
> Q   Okay. Did you conduct any independent research on this matter on your own?
>
> A   The only thing that we did from an accounting standpoint is make sure that we had adequate reserves for returns. And again, we – we determined that based on historical results.
>
> Q   Right.
>
> A   And made estimates. Each time we recorded sales during the month, we would make an estimate of the returns. And it was without looking at whatever the cause of the return was.[32]

---

[27] Deposition of Jay Greaney (May 18, 2006) at pp. 67-69.
[28] Deposition of Jay Greaney (May 18, 2006) at pp. 74-75.
[29] ADAMS 046813
[30] ADAMS 046813
[31] ADAMS 046814
[32] Deposition of Darl Hatfield (June 8, 2006) at pp. 67-68 (emphasis added).

54.   It should also be noted that KPMG sent accounts receivable confirmations directly to a selection of Adams Golf customers as part of its December 31, 1998 year end audit procedures.[33] These confirmations indicate the balance due shown on the company's records and provide an opportunity for customers to object to the amounts owed. As a practical matter, such confirmations are also a chance for customers to air their complaints about the company. The customer confirmations included in KPMG's 1998 work papers contain no evidence which would indicate double shipping, consignment sales or other questionable sales practices.

55.   The available documents[34] and testimony do not demonstrate that Adams Golf was engaged in any widespread practice of double shipping or in any consignment sales or sales with unlimited rights of return.

56.   I have not seen any evidence that specifically describes the details of any such transactions, identifies the parties involved, quantifies how significant in size the transactions were, or allows for any examination of the impact that such transactions, if they did occur, would have had on the financial reports and disclosures of Adams Golf.

57.   Had sales practices resulting in high returns regularly occurred at Adams Golf, the estimates determining the returns expense and reserves balances at the end of the accounting periods would have been prepared on the basis of returns experienced. Had there been an isolated, material event of over-shipment and high returns, I would have expected a significant fluctuation in the provision for sales returns. Instead, I note a fairly steady increase in such provisions from the first quarter to the fourth quarter of 1998, as a percentage of gross sales, consistent with the testimony and periodic disclosures made by Adams Golf that I have read regarding an industry-wide slowdown during 1998.

"Net-Down" Program

58.   Plaintiffs allege that "it was probable that the Company would incur loss by double shipping, entering into what amounted to consignment arrangements, and underreserving for returns."[35] Plaintiffs cite Adams Golf's $4.3 million charge taken in the fourth quarter of 1998 as supporting this position.[36]

59.   In the fourth quarter of 1998, management approved the Tight Lies Retail Partner Unconditional Floor Stock "Net Down" Program.[37] This program was described as a price/margin protection program and was designed to protect Adams Golf's customer relationships in light of a change in the company's pricing structure at the introduction of its new line of Tight Lies products.[38]

60.   This program, which was a discretionary promotional program decided on by management at the end of 1998, granted an unconditional $25 per club credit for certain products still in select Adams Golf retailers' inventory as of January 4, 1999. The credit was available in the form of

---

[33] KPMG 2110-2178
[34] KPMG 046794-46818
[35] Second Consolidated and Amended Class Action Complaint at ¶90.
[36] Second Consolidated and Amended Class Action Complaint at ¶90.
[37] KPMG 2100-2107
[38] KPMG 2100-2107

11

credit against future orders, offset to outstanding account balance, or in some cases a cash refund.[39]  Adams Golf recorded its estimated liability for the Net Down program at $4.3 million and correspondingly reduced sales revenue in the fourth quarter of 1998.

61.    According to a memo written by KPMG to the December 31, 1998 audit file, the Net Down program was in "response to competitive pressures that existed during the latter half of 1998 and to establish a price distinction between the original Tight Lies product line and the new Tight Lies product line to be introduced in 1999."[40]

62.    As the Net Down program was a fourth quarter 1998 management decision related to the introduction of a new product line in 1999, this transaction is unrelated to either the provisions for sales returns in earlier quarters of 1998 or the Plaintiffs' allegations regarding double shipping, consignment sales or other questionable sales practices.

***********

63.    I may amend this report should additional documents or information become available. Should counsel request, I may create some demonstrative exhibits from the data and GAAP referred to in this report for testimony purposes.

_Ed J. Lynch_

Ed J. Lynch, CPA
Partner, Deloitte Financial Advisory Services LLP

Dated:  _July 14, 2006_

---

[39] KPMG 2100-2107
[40] KPMG 2103

**Exhibit 1**

# Deloitte.

---

Financial Advisory Services

---

**Ed J. Lynch, CPA**
Partner
Deloitte Financial Advisory Services LLP
2200 Ross Avenue, Suite 1600
Dallas, TX 75201
Office Phone: +1 214 840 7691
Fax: +1 214 840 7781
elynch@deloitte.com

### Profile

Mr. Lynch has directed and/or participated in consulting engagements, audits, forensic investigations, acquisition reviews, bankruptcy matters, numerous litigation projects, and other special projects during his career.

His broad industry experience includes accounting, consulting, and auditing for technology companies; manufacturing/distribution businesses; chemical companies; oil and gas and related businesses; real estate; banking/financial services; retail; health care; computer software and services; employee benefit plans; nonprofit entities; and governmental entities.

In addition to serving clients and serving as the Deloitte FAS Deputy CEO–Risk Management, Mr. Lynch serves on the U. S. FAS Executive Committee, the U. S. Executive Committee of Forensic & Dispute Services, the Advisory Council to the Chief Ethics and Compliance Officer of Deloitte & Touche USA LLP, and he is also a member of the Board of Directors of Deloitte Financial Advisory Services LLP.

### Experience

#### Arbitrations as Either Arbitrator or Expert Witness

- Served as sole arbitrator in a purchase price dispute over 10 disputed working capital items between the parties

- Served as sole arbitrator in a purchase price dispute over 15 working capital disputed items

- Served as sole arbitrator in a purchase price earn-out dispute between a Fortune 1000 company and a business purchased by that company

- Served as sole arbitrator in a purchase price dispute over the net working capital determination in a sale of a business specializing in manufacturing and installation of pallet and shelving products

- Served as sole arbitrator in a purchase price dispute over closing balance of stockholders' equity in a financial institution stock purchase agreement

- Served as sole arbitrator in a purchase price dispute over closing balance sheet in a construction company stock purchase

Copyright © 2006 Deloitte Development LLC. All rights reserved.

Member of
Deloitte Touche Tohmatsu

**Exhibit 1**
Page 2

- Testified in deposition and at arbitration hearing on damages from the alleged wrongful termination of an independent representative of a multilevel marketing company in the business of selling telecommunications services

- Served as expert witness in jury trial over breach of a confidentiality agreement, among others causes of action. Case resulted in jury verdict for lost profits for our client

- Testified at arbitration hearing and deposition as damage expert in a dispute in an insurance brokerage company

- Testified at arbitration hearing and deposition as accounting expert in a working capital dispute in a technology company

- Served as arbitrator in a purchase price dispute in the telecommunications industry

- Served as arbitrator in a purchase price dispute between two large companies arising after bankruptcy by the selling entity

- Served as consultant to a seller of a large water utility in a $150 million transaction that is in a working capital purchase price dispute

- Served as arbitrator between two companies over disputed shipments resulting in written findings about the shipments

- Served as sole arbitrator between two computer companies resolving purchase price dispute issues

- Performed damage analysis of plaintiff claims against a telecommunications company for an alleged breach of contract. Testified about lost profits to Arbitrator as a rebuttal witness to plaintiff's expert

- Served as the sole arbitrator between two Fortune 500 companies regarding interpretation of accounting issues related to contract terms in a business acquisition. Issues involved percentage completion in the financial statements of the seller. The case was settled prior to the conclusion of the process

- Served as a financial expert in a dispute over environmental indemnification language in a purchase agreement between two Fortune 500 companies. Testified to a panel of three arbitrators

- Served as an expert witness in an arbitration over accounting issues involved in a legal contract

- Served as the sole arbitrator in a dispute resulting from the acquisition of a food business by a Texas company. Primary issues involved disputes over accrued liabilities and promotion accruals

- Performed damage computations in an arbitration of a sale of a fast-food restaurant chain for the seller of the business. The case was settled prior to the arbitration hearing

- Served as a consultant to a party in arbitration over the sale of a water distribution business. The issues involved were capital expenditures and collectibility of accounts receivable

Breach of Contract

- Served as expert witness in jury trial over breach of a confidentiality agreement, among other causes of action. Case resulted in jury verdict of lost profits and punitive damages

Copyright © 2006 Deloitte Development LLC. All rights reserved.

Member of
Deloitte Touche Tohmatsu

**Exhibit 1**
Page 3

- Served as expert witness in case alleging breach of contract by a parking lot operator. The case settled following expert reports
- Served as expert witness in a breach of contract claim regarding a computer-outsourcing contract. The case settled after deposition
- Served as expert witness in a breach of contract dispute in the telecommunications industry in Texas state court. Issues involved a lost profits claim from an alleged contract for communications equipment and services. Case settled subsequent to deposition
- Served as expert witness in a breach of contract claim over a franchise to telecommunications revenues. Case settled after deposition
- Served as an expert witness for the state of Texas in defense of a breach of contract claim where damages claimed by numerous defendants approximated $250 million. The State had terminated a contract and faced numerous types of damage claims. Mr. Lynch analyzed the claims, prepared a report, gave a deposition, and testified at trial in state court in Austin
- Served as an expert witness in a breach of contract claim by an independent representative of a telecommunications company. Mr. Lynch testified at the arbitration hearing on lost profit damages
- Served as an expert in a case involving damages in the termination of a physician in a private practice. The case was settled after deposition
- Analyzed airport services contract damages in a claim of fraudulent misrepresentation
- Served as an expert in a lender liability case in Illinois state court

Business Interruption

- Served as an expert witness in a case involving damages from an alleged equipment failure at a power plant. Analyzed the types of costs claimed as damages by the plaintiff's expert and gave deposition and trial testimony about the damages
- Advised global company in two different business interruptions claims involving furnaces in a steel plant. Issues involved lost profits due to lost production capacity. Advice included both formulation of claim and negotiation of settlement
- Assisted insurance company in analysis of a fire loss claim by a law firm after a computer room fire. Analysis included law firm revenues generated before, during, and after the fire
- Assisted insurance company in analysis of two fire loss claims—one by a restaurant and another by an animal clinic
- Served as consultant in a fire loss claim by a start-up business

Bankruptcy/Reorganization Services

- Served as financial expert to Liquidating Trustee who asserted a preference against a creditor of a candy company
- Served as financial expert hired by a company that allegedly received a preference payment. Testified in deposition for this Northern District of Texas bankruptcy action. Case settled prior to trial

Copyright © 2006 Deloitte Development LLC. All rights reserved.

Member of
Deloitte Touche Tohmatsu

**Exhibit 1**
Page 4

- Served as the lead business turnaround consultant to a $130 million uniform sales and rental business in the Midwest. Assignment included renegotiation of $35 million secured lending facilities, advice on cash management issues, profitability analysis of lines of business, and consultation with the executives of the company and lending institutions. This work resulted in a new debt agreement and the ultimate sale of a line of business by the company

- Appointed as a financial advisor and accountants to the Unsecured Creditor's Committee of Nu-Era Group. Work included the investigation of a check kiting scheme and analysis of a reorganization plan by the debtor

- Served as a financial advisor to the debtor in the Valley Industries, Inc. Chapter 11 bankruptcy in the Eastern District of Missouri. Services included liquidation analysis, analysis of profitability of the lines of business, and investigation into an NOL carryforward to a reorganized entity. The company was liquidated for the benefit of its creditors after the profitability analysis was completed

- Assisted a company in preparing liquidation accounting reports to creditors in and out of court liquidation of two meatpacking businesses. Provided other liquidation services after the business was discontinued

- Investigated operations of two physicians' practices for a bankruptcy trustee in Little Rock, Arkansas. Investigations focused on receivables collections and Medicare aspects of those receivables

Dealer/Distribution

- Served as consultant to Toyota Motor Sales in two dealer cases. Cases involved allegations of lost profits by dealers resulting from alleged improper allocations of vehicles among dealers

- Served as consultant to American Honda in several cases for the years 1995–1996. Mr. Lynch's initial involvement was as engagement partner and his involvement was curtailed after his transfer to Dallas

Environmental

- Served as the engagement partner on an assignment to analyze strategic direction in the management of remediation and related environmental liabilities for a confidential Fortune 500 company. The end product of this confidential assignment was recommendations to alter practices in the financial management of environmental matters

- Served as the reviewing partner in a litigation over asbestos removal costs and related damages to owners of a regional shopping mall

- Analyzed compliance efforts by a confidential Fortune 500 company in relation to the U.S. Sentencing Commission's definition of an "effective compliance program" and the draft environmental sentencing guidelines "commitment to environmental compliance." Reported recommendations to the CEO and Board of Directors

- Served as a financial expert for the Texas Natural Resource Conservation Commission in two contracts involving vehicle emissions testing in the state of Texas

Ethics/Compliance Program Consulting

- Consulted with outside counsel on design and operation of a Fortune 500 company's compliance and ethics program. Compared the program to the 2004 revised definition of an effective compliance program. Reported to counsel and the Board

Copyright © 2006 Deloitte Development LLC. All rights reserved.

Member of
Deloitte Touche Tohmatsu

**Exhibit 1**
Page 5

- Serving as a damage expert witness in a breach of contract/business interference case in the Western District of Texas. The business involves compliance consulting for health care entities. No testimony has yet been rendered

- Acted as a consultant to a former U.S. prosecuting attorney who served as outside counsel to a Fortune 500 multinational company. That engagement compared the company's compliance efforts to the elements of an effective compliance program in the Federal Sentencing Guidelines

- Assisted two large companies in the design of their compliance programs using the Federal Sentencing Guidelines definition of an effective compliance program. Also consulted with a Fortune 500 company regarding risk assessments in its operations

- Worked with a large hospital system's corporate compliance committee as the outside consultant to counsel in developing a compliance program responsive to the Federal Sentencing Guidelines. The project entailed consulting regarding the composition of the compliance committee, the drafting of the outline for a code of conduct, working with counsel on the drafting of the code of conduct, and consulting on implementation of the program

- Served on a team of consultants rendering consulting to the outside counsel of a Fortune 500 company that assessed the effectiveness of its compliance program as it related to the Food and Drug Administration regulatory scheme. This project resulted in recommendations to counsel and its client

Forensic/Investigative

- Served as a forensic accountant to outside counsel defending a federal grand jury subpoena in the cable industry. The company cooperated with the Department of Justice, which resulted in an interview of Mr. Lynch by the FBI and Assistant U.S. Attorneys. The company was not indicted

- Served as a damage witness in a suit against an officer which alleged that the officer was negligent for not detecting a fraud and illegal act by another officer of the company, a third-party administrator. Case settled prior to trial but after deposition

- Investigated allegations of financial improprieties for the audit committee of a Registrant. Allegations arose from a letter from managers in the operation

- Served as an expert witness in a claim by cooperative members against the officers of the cooperative and the cooperative itself. Analyzed allegations of fraud and testified in a deposition. The case was resolved prior to trial

- Served as an expert witness in an investigation of a fraud by a fiduciary (attorney) in a real estate business. Case was settled prior to testimony

- Part of a team that investigated a fraud by an employee of a telecommunications company

- Advised an internal audit team of a public utility in an investigation of a lapping scheme by a cashier. Advice also involved critique of a fidelity bond claim drafted by the internal auditors

- Investigated a fraud by an employee perpetrated against the personal assets of a CEO of a public entity. Analysis has included assistance to the private investigator and attorneys in a quantification of the fraud and understanding the accountant's role in discovery of the fraud

Copyright © 2006 Deloitte Development LLC. All rights reserved.                    Member of
                                                                    Deloitte Touche Tohmatsu

**Exhibit 1**
Page 6

- Analyzed metal broker transactions for a company with a disputed balance. The broker had been indicted by a federal grand jury for illegal activity. Analysis was used to fully document the transactions and settle the disputed balances

- Performed an analysis of an employee's mortgage loan account as part of a fraud investigation at a savings and loan audit client

- Investigated financial activities of a property manager of a hotel and commercial real estate project in Little Rock

- Performed an investigation of crop yields for a foreign landowner on farms in Arkansas and Oklahoma. Reported results of analyses to owner's counsel in London

Health Care

- Provided expert witness services to an IPA in two class-action claims by hundreds of physicians in Tarrant County court. Gave a deposition in this case following a written report on damages and then case settled

- Served as damage expert in a contract dispute between Caremark and a computer outsource provider. Case settled prior to trial

- Provided consulting services to a hospital in employment litigation related to whether the historical numbers of terminations indicated a pattern of discrimination. Testified in Federal District Court in Lexington, Kentucky, regarding expectations of the controller

- Provided special investigation services to the trustee for two different physicians' bankruptcies. Developed schedules for use by the trustee

- Analyzed damages in the termination of an anesthetist in a litigation in St. Louis. The case settled prior to trial

Independent Judge or Consultant to Neutral

- Served as an independent judge in a consumer contest sponsored by Anheuser-Busch. Appointed after a printing and production error in the contest game pieces was discovered. Administered the awarding of an additional $2 million prize pool and the $1 million in gold at the contest's conclusion

- Served as accounting neutral in a dispute between parties in Texas state court. Reported on accounting matters was submitted to the parties for use with the judge in 2002

- Served as accountant to trustees in the refund of an adjudged illegally collected use tax of $10 million in the state of Arkansas. Duties included managing approximately 2,000 claims for referrals and the $10 million invested until refund checks were authorized by the court and its trustees

- Served as the reviewing partner on the refund of a $3.2 million settlement of a class-action refund to health insurance policyholders after settlement of a copay calculation dispute

Intellectual Property

- Serving as expert witness in a patent case in the Northern District of Texas

- Served as a consultant in a trade secrets case in Louisiana

- Served as expert witness in a patent case in the Western District of Tennessee involving a patented feature on a hip implant cup. Rendered a written damage report

Copyright © 2006 Deloitte Development LLC. All rights reserved.

Member of
Deloitte Touche Tohmatsu

**Exhibit 1**
Page 7

on lost profits and reasonable royalty and a deposition on behalf of defendant company. Case settled prior to trial

- Served as an expert witness in a Texas trade secrets case involving a counterclaim by defendants for business interference. Testified at trial in Dallas County, Texas, regarding damages

- Served as an expert witness in a patent case in the Northern District of Texas involving cholesteric liquid crystal display technology. Testified at two trials and gave numerous depositions in this case over a four-year period

- Consulted about damages in a patent infringement and trade secrets litigation in the Northern District of Texas. Testified about alleged price erosion, lost profits, disgorgement of profits by the defendant, and the effects on an acquisition by the plaintiff company. The case was settled after deposition

- Served as an expert witness in a case involving a patent on a toolbox. Examined the damage claim of a Ph.D. economist who claimed price erosion, lost profits, and royalty. Examination of all of the facts showed price erosion was due to the plaintiff's own competing products and that lost profits were vastly overstated. The case was settled prior to trial after deposition

- Served as a damages expert in a design patent case in the Northern District of Texas involving design patent on roofing shingles. Case settled prior to trial

- Served as expert witness in an attorney malpractice case arising from an intellectual property case. Mr. Lynch gave a deposition for the defendant attorneys on damages. Case settled prior to trial

- Served as an expert witness in a trade dress case in the Eastern District of Louisiana. The case was settled prior to trial or deposition

- Analyzed damages in a trade dress, trademark, and patent case in federal district court in St. Louis. Testified about lost profits damages and a reasonable royalty. Products involved were Vaseline Intensive Care Lotion and a store brand of hand lotion

- Analyzed damages in a patent litigation. Determined reasonable royalty and lost profits and testified about both in federal district court in St. Louis. The patent involved the processing of tuna

- Analyzed lost profits and reasonable royalty in a patent litigation over diode rectifiers in battery chargers. Testified in several depositions and at the jury trial

- Consulted with counsel for a Midwest university regarding damages from infringement of a patent by a manufacturer. The case was settled before any testimony was rendered

- Consulted with counsel in a patent litigation and counterclaim for infringement of patents on vending machines. Analysis involved discovery consulting to assist in arriving at profits from the patented items. The case was settled prior to any testimony

Mergers and Acquisitions Matters (see Arbitrations also)

- Served as expert witness on accounting and disclosure matters in a dispute over representations and warranties by a seller of a telecommunications services business. Issues involve generally accepted accounting practices. Testified in deposition prior to case settling

Copyright © 2006 Deloitte Development LLC. All rights reserved.

Member of
Deloitte Touche Tohmatsu

**Exhibit 1**
Page 8

- Served as expert witness on damages alleged by a party who did not get an acquisition to which he alleged he was entitled. Damages allegedly included lost profits and discounted cash flow

- Served as financial consultant in dispute over financial terms in a sale of a battery business in the 1990s. Issues involved accounting reserves and obsolete inventory

- Served as financial expert in dispute over financial terms in a business sale. Issues involved earn out and adjusted net worth calculation. Testified in deposition and arbitration hearing in Chicago, Illinois

- Served as financial expert for purchasing company in litigation over the effects of a financial fraud on an asset purchase by a public company. Depositions and written a report were rendered. Case settled prior to trial

- Rendered business-consulting services to former shareholders in a dispute with the purchasing corporation. The dispute involved interpretation of guarantee agreement provision and opinions as to what constituted a default and normal business practices

- Rendered financial advice and expert testimony in a dispute arising from the sale of a group of mental health clinics. Testified at arbitration prior to settlement between the parties

- Analyzed financial terms of an employment agreement granted as part of an acquisition and gave deposition and trial testimony about the financial performance of a portfolio of loans related to the financial terms of the employment agreement. The defendant company was a sub-prime auto lender

Oil and Gas Matters

- Served as a damage witness in an oil and gas antitrust and breach of contract case filed by Trans-American Natural Gas against El Paso Energy and several other parties. Analyzed 15 years of gas production and marketing data and summarized rebuttal opinions in a report. After deposition and in the first week of trial, the case settled. The defendants, our clients, settled the matter in the face of a $1.5 billion damage claim and a claim for trebling

- Served as damage witness in a fraud claim over the purchase of numerous gas stations. Testified in deposition and arbitration proceeding, which resulted in a damage award

- Served as an expert witness regarding financial matters in litigation over an acquisition of a leased asset. Case ended after deposition and a summary judgment motion

- Consulted with a gas transmission company that was a co-defendant in an antitrust claim involving gas fields in east Texas. Our services included financial analysis and critiques of plaintiff's expert reports

- Audited personal trusts of a wealthy family in the 1980s that included numerous oil and gas properties and interests

- Audited oil and gas service businesses in the early 1980s, including an offshore drilling services business, a drilling mud company, and a drill bit manufacturer and a geophysical equipment manufacturer

Copyright © 2006 Deloitte Development LLC. All rights reserved.

Member of
Deloitte Touche Tohmatsu

**Exhibit 1**
Page 9

Product Liability

- Analyzed damages allegedly resulting from poor-performing batteries distributed by an Italian company. The batteries were purchased in the United States and used in emergency lighting sold in Europe. Testified about damages in deposition and jury trial in Kansas City, Missouri

- Analyzed damages allegedly resulting from a bad chemical in the microchip manufacturing process. Testified in deposition. Case settled prior to trial

Securities Cases

- Served as an expert witness on accounting in a securities class action claim. The primary issue was allowance for doubtful accounts. Testified in a deposition prior to case settling

- Served as consultant to outside counsel in an investigation into a restatement of financial statements by a registrant. Outside counsel reported the findings to the Board of Directors. Registrant is defending numerous class-action complaints in Texas

- Served as consultant to outside counsel who was responding to a Milberg Weiss class action claim against a distributor of products. Case was dismissed by summary judgment motion in Miami

- Consultant to counsel defending a securities class action claim in technology/telecommunications business. Issues involve revenue and expense recognition allegations

- Analyzed damages alleged by equity holders in a class-action suit against a large agricultural cooperative. Analysis involved financial trends over 15 years, as well as financial facts related to the class members. After deposition, the judge granted summary judgment to the defendants

- Served as a financial and accounting expert in two different class action claims against a sub-prime auto lender. Was hired by counsel for the officers and directors and the corporation. Rendered financial reports rebutting the accounting claims of the plaintiff's experts

- Consulted with counsel answering allegations of securities fraud relating to accounting and disclosure matters in a technology company

Accounting, Auditing, and Professional Malpractice Claims

- Served as an expert on fraud and accounting/auditing for a regional accounting firm being sued by a former client in the financial services industry in 2002. Assisted counsel on issues related to causation and damages. Defendant CPA firm won summary judgment

- Analyzed accounting and reporting by a real estate joint venture and testified about those practices in a deposition. Case settled prior to trial

- For a plaintiff corporation, analyzed tax and business records of the defendant company in a series of hearings regarding a garnishment. Testified in state district court in Tarrant County, Texas

- Analyzed the accounting treatment for a voice mail software license agreement and testified about the accounting in a deposition and trial testimony in a state court in

Copyright © 2006 Deloitte Development LLC. All rights reserved.

Member of
Deloitte Touche Tohmatsu

**Exhibit 1**
Page 10

Omaha, Nebraska. The underlying product of the company was utilized by Cable & Wireless

- Served as an expert witness in a litigation alleging accounting malpractice by an Illinois CPA. The case was settled prior to trial

- Served as an expert witness in Arkansas state court in litigation against a national CPA firm. The business owner alleged a conflict of interest by the CPA. The case was settled prior to trial

- Testified as an expert witness in St. Louis city court regarding the AICPA Code of Conduct and its applicability to certain audits that were used as a basis for damage determination

- Provided litigation consulting services to the FDIC and RTC in three separate causes of action against CPA firms for audits of savings and loans. Served as an accounting and auditing consultant

- Served as consultant to counsel defending an Oklahoma CPA in a claim by the FDIC in a bank audit. Claim was settled prior to completion of discovery

## Prior Experience

- Price Waterhouse LLP, Partner
- Controller, Mangan Rains Ginnaven Associates

## Professional Affiliations and Certifications

- American Institute of Certified Public Accountants
- Texas Society of Certified Public Accountants
- Former Member (and Co-Chair for one year) of Professional Ethics Committee of three different state societies of CPAs
- Licensing Executives Society
- Certified Public Accountant in Texas, Missouri, Arkansas, Oklahoma, and Colorado

## Education

- University of Arkansas, B.S.B.A., Accounting

## Publications

- Co-authored "Blue Ribbon Blues: What the SEC's New Audit Committee Rules Mean for Public Companies" *Corporate Legal Times,* July 2000

- Co-authored "Is It Fraud or Just a Misstatement?" published in *Corporate Legal Times* in 2000

- Authored "Is a Damage Study an Audit?"—Published in internal newsletter June 1997; Co-authored "Environmental Corporate Compliance Program—Why Should I Get Interested in an Environmental Compliance Program?" published in the *Southeast White Collar Crime Subcommittee* newsletter, October 1996

- Authored summaries of the Federal Sentencing Guidelines for Corporations, 1993 and 1998

Dated: June 2006

Copyright © 2006 Deloitte Development LLC. All rights reserved.

Member of
Deloitte Touche Tohmatsu

**EXHIBIT 2**

## ED J. LYNCH
## TRIAL TESTIMONY[1]

Administrative Exchange, Inc. v. CDI Engineering Group, Inc., et al. (281st Judicial District, Houston, Texas) (November 2004)

The United States of America for the Use and Benefit of Johnson Pugh Mechanical, Inc. v. Landmark Construction Corporation and The Mountbatten Surety Co., Inc; and Doug Pourier, William Clary, Kathleen Clary and PI Construction Corporation, Third-party Defendants (United States District Court, District of Colorado) ( February 2004)

Inkjet International, Ltd. v. Jason Sweet, et al. (191st Judicial District, Dallas County, Texas) (October 2003)

John Gergen, et al. v. Excel Telecommunications, Inc., et al. (American Arbitration Association, Dallas, Texas) (August 2003)

FFP Partners, L.P. v. Jack J. Ceccarelli, et al. (American Arbitration Association, Houston, Texas) (May 2003)

Lambert Fenchurch U.S. Holdings, Inc., Claimant, v. Richard K. Kerr, Ken Lewis, Jan Smith and Krista Tankersley, Respondents (American Arbitration Association, Dallas) (December 2002)

Cirrus Logic, Inc. v. All The Shareholders of LuxSonor Semiconductor, Inc. (American Arbitration Association, Austin, Texas) (November 2002)

Updated: June 2006

---

[1] Trial and arbitration testimony over the last four years. Dates are approximate.

EXHIBIT 2

## ED J. LYNCH
### DEPOSITION TESTIMONY[2]

The Local Church, Living Stream Ministry, et al. v. Harvest House Publishers, et al. (80th Judicial District Harris County, Texas) (January 2005)

Administrative Exchange, Inc. v. CDI Engineering Group, Inc., et al. (281st Judicial District, Houston, Texas) (October 2004)

George Lehocky, et al v. Tidel Technologies, Inc., et al. (United States District Court, Southern District of Texas, Houston Division) (March 2004)

Platinum Equity, LLC, et al v. Williams Communications, LLC, et al. (District Court of Oklahoma County, State of Oklahoma) (March 2004)

Inkjet International, Ltd. v. Jason Sweet, et al. (191st Judicial District, Dallas County, Texas) (October 2003)

Michigan National Bank, N. A. v. David Butler (165th Judicial District, Harris County, Texas) (April 2003)

John Gergen, et al v. Excel Telecommunications, Inc., et al. (American Arbitration Association, Dallas) (March 2003)

FFP Partners, L.P. v. Jack J. Ceccarelli, et al. (American Arbitration Association, Houston, Texas) (January and February 2003)

Lambert Fenchurch U.S. Holdings, Inc., Claimant, v. Richard K. Kerr, Ken Lewis, Jan Smith and Krista Tankersley, Respondents (American Arbitration Association, Dallas) (November 2002)

Cirrus Logic, Inc. v. All The Shareholders of LuxSonor Semiconductor, Inc. (American Arbitration Association, Austin, Texas) (November 2002)

Updated: June 2006

---

[2] Deposition testimony over the last four years. Dates are approximate.

**Exhibit 3**

## Documents Considered by Ed J. Lynch

### Pleadings
Second Consolidated and Amended Class Action Complaint
The Adams Golf Defendants' Answer to Plaintiffs' Second
    Consolidated and Amended Complaint

### SEC Filings
Adams Golf, Inc. Form S-1/A (July 9, 1998)
Adams Golf, Inc. Form 10-K (December 31, 1998)
Adams Golf, Inc. Form 10-K405 (December 31, 1999)
Adams Golf, Inc. Form 10-Q (June 30, 1998)
Adams Golf, Inc. Form 10-Q & Q/A (September 30, 1998)
Adams Golf, Inc. Form 10-Q (March 31, 1998)
Adams Golf, Inc. Form 10-Q (June 30, 1999)
Adams Golf, Inc. Form 10-Q (September 30, 1999)

### Depositions
Barney Adams (June 22, 2006)
Chip Brewer (May 2, 2006)
Sanda Brooks (June 30, 2006)
James Farrell (June 12, 2006)
Mark Gonsalves (June 6, 2006)
Jay Greaney (May 18, 2006)
Darl Hatfield (June 8, 2006)

Ryan Magnussen (April 28, 2006)
Scott Blevins (May3, 2006)
Olga A. Pulido-Crowe (May17,2006)
Dave Brown (April 27, 2006)

### Documents
ADAMS 001268-001319
ADAMS 002393-002400
ADAMS 002401-002402
ADAMS 002789-002797
ADAMS 003893-003895
ADAMS 004492-004518
ADAMS 004519-004521
ADAMS 004576-004613
ADAMS 004614-004633
ADAMS 004806-004807
ADAMS 004959-004960
ADAMS 004961-004962
ADAMS 005155-005159
ADAMS 007703-007704
ADAMS 007805
ADAMS 009457-009461

ADAMS 009602-009634
ADAMS 025645-025646
ADAMS 025698-025720
ADAMS 026290-026330
ADAMS 026635-026698
ADAMS 027443-027448
ADAMS 027449
ADAMS 027450-002751
ADAMS 027452-027453
ADAMS 027454-027455
ADAMS 027456-027457
ADAMS 027458-027459
ADAMS 027460-027461
ADAMS 027462
ADAMS 027495-027539
ADAMS 027540-027584

**Exhibit 3**

ADAMS 027694
ADAMS 027714
ADAMS 027725-027726
ADAMS 027738-027740
ADAMS 028451-028452
ADAMS 028493-028494
ADAMS 028664
ADAMS 028852
ADAMS 028994-029002
ADAMS 029877-029895
ADAMS 031202-031203
ADAMS 031778
ADAMS 031981
ADAMS 033252-033260
ADAMS 033465-033467
ADAMS 035106-035115
ADAMS 035126
ADAMS 038152
ADAMS 038995
ADAMS 038589-038592
ADAMS 039002
ADAMS 040594
ADAMS 040673-040675
ADAMS 040766
ADAMS 040705-040720
ADAMS 046794-046818

AH 00001-00004
AH 000027-000031

KPMG 001-003
KPMG 004-045
KPMG 046-114
KPMG 500-510
KPMG 2295-2439
KPMG 3001-3007

UND 00052-00091
UND 00097-00109
UND 00261-00282
UND 00288-00320
UND 00389-00390
UND 00687-00699
UND 00713-00785
UND 00788-00862

UND 02782-02813
UND 03079-03080
UND 04385-04395
UND 04979-04987
UND 05002-05003
UND 05200-05238
UND 08608-08650
UND 08823-08826
UND 09781-09822

Exhibit 4

**Adams Golf, Inc.**
**Analysis of Sales, Net Sales, Returns, and Return Reserve**
**January 1, 1997 - December 31, 1998**
**Amounts in $000's**

| | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/1997 | 6/30/1997 | 9/30/1997 | 12/31/1997 | 3/31/1998 | 6/30/1998 | 9/30/1998 | 12/31/1998 (1) |
| Gross sales | $ 1,547 | $ 4,200 | $ 14,847 | $ 17,903 | $ 25,590 | $ 35,626 | $ 24,683 | $ 8,138 |
| Provision for returns | (72) | (226) | (611) | (898) | (1,079) | (1,809) | (1,696) | (542) |
| Net sales | 1,475 | 3,974 | 14,236 | 17,005 | 24,511 | 33,817 | 22,987 | 7,596 |
| | | | | | | | | |
| Net income (loss) before income taxes | 61 | (6) | 4,224 | (8,351) | 8,773 | 10,746 | 6,876 | (6,700) |
| | | | | | | | | |
| *Returns as a percentage of gross sales* | *4.7%* | *5.4%* | *4.1%* | *5.0%* | *4.2%* | *5.1%* | *6.9%* | *6.7%* |

| | Twelve Months Ended | Three Months Ended | | | |
|---|---|---|---|---|---|
| | 12/31/1997 | 3/31/1998 | 6/30/1998 | 9/30/1998 | 12/31/1998 (2) |
| **Return reserve** | | | | | |
| Opening balance | - | 449 | 732 | 881 | 826 |
| Actual returns | (1,359) | (790) | (1,660) | (1,751) | (867) |
| Provision for returns | 1,808 | 1,079 | 1,809 | 1,696 | 542 |
| Closing balance | 449 | 732 | 881 | 826 | 501 |
| | | | | | |
| *Reserve as % of quarterly gross sales* | *2.5%* | *2.9%* | *2.5%* | *3.3%* | *6.2%* |
| *Actual returns as % of quarterly gross sales* | | *3.1%* | *4.7%* | *7.1%* | *10.7%* |
| | | | | | |
| *Reserve estimate for Direct Response sales* | *12%* | *12%* | *12%* | *30%* | *30% - 22%* |
| *Reserve estimate for Commercial sales* | *3%* | *3%* | *4% - 4.5%* | *4.5%* | *5.5% - 6%* |

| 3/31/1997 | 6/30/1997 | 9/30/1997 | 12/31/1997 | 3/31/1998 | 6/30/1998 | 9/30/1998 | 12/31/1998 |
|---|---|---|---|---|---|---|---|
| Sources | | | | | | | |
| S-1 ADAMS02651 | 10-Q (2Q98) KPMG 2272 | 10-Q(3Q98) KPMG 2211 KPMG 2214 | S-1 ADAMS02852 KPMG 2326 | S-1 KPMG 2086 | 10-Q (2Q98) KPMG 2086 KPMG 2281 | 10-Q (3Q98) KPMG 2086 KPMG 2223 | 10-K KPMG 2086 KPMG 0504 |

**Notes**
(1) Excludes 12/31/98 Net Down amount of $4,300.
(2) Includes the year-end adjusting journal entry of $192 to reduce the return reserve

**Exhibit 5**

**Accounting Literature**

# Statement of Financial Accounting Standards No. 48

### FAS48 Status Page
### FAS48 Summary

## Revenue Recognition When Right of Return Exists

June 1981



**Financial Accounting Standards Board**
of the Financial Accounting Foundation
401 MERRITT 7, P.O. BOX 5116, NORWALK, CONNECTICUT 06856-5116

Copyright © 1981 by Financial Accounting Standards Board. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the Financial Accounting Standards Board.

Statement of Financial Accounting Standards No. 48

Revenue Recognition When Right of Return Exists

June 1981

CONTENTS

Paragraph
Numbers

Introduction ............................................................................................................ 1–2
Applicability and Scope ........................................................................................... 3–5
Standards of Financial Accounting and Reporting:
    Criteria for Recognizing Revenue When Right
      of Return Exists................................................................................................ 6–8
    Amendment to Statement ................................................................................... 32–9
    Effective Date and Transition ............................................................................ 10–12
Appendix A: Background Information......................................................................... 13–17
Appendix B: Summary of Consideration
    of Comments on Exposure Draft ......................................................................... 18–25

# FAS 48: Revenue Recognition When Right of Return Exists

### FAS 48 Summary

This Statement specifies how an enterprise should account for sales of its product in which the buyer has a right to return the product. Revenue from those sales transactions shall be recognized at time of sale only if *all* of the conditions specified by the Statement are met. If those conditions are not met, revenue recognition is postponed; if they are met, sales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns and expected costs or losses shall be accrued.

## INTRODUCTION

1. As discussed in FASB Statement No. 32, *Specialized Accounting and Reporting Principles and Practices in AICPA Statements of Position and Guides on Accounting and Auditing Matters,* the FASB is extracting the specialized [1] accounting and reporting principles and practices from AICPA Statements of Position (SOPs) and Guides on accounting and auditing matters and issuing them in FASB Statements after appropriate due process. This Statement extracts the specialized principles and practices from SOP 75-1, *Revenue Recognition When Right of Return Exists,* and establishes accounting and reporting standards for sales of an enterprise's product in which the buyer has a right to return the product.

2. The Board has concluded that it can reach an informed decision on the basis of existing information without a public hearing and that the effective date and transition specified in paragraphs 10-12 are advisable in the circumstances.

## APPLICABILITY AND SCOPE

3. This Statement specifies criteria for recognizing revenue on a sale in which a product may be returned, whether as a matter of contract or as a matter of existing practice, either by the ultimate customer or by a party who resells the product to others. The product may be returned

Copyright © 1981, Financial Accounting Standards Board                                    Not for redistribution

for a refund of the purchase price, for a credit applied to amounts owed or to be owed for other purchases, or in exchange for other products. The purchase price or credit may include amounts related to incidental services, such as installation.

4.    This Statement does not apply to: (a) accounting for revenue in service industries if part or all of the service revenue may be returned under cancellation privileges granted to the buyer, (b) transactions involving real estate or leases, or (c) sales transactions in which a customer may return defective goods, such as under warranty provisions.

5.    This Statement does not modify any of the provisions of FASB Statement No. 49, *Accounting for Product Financing Arrangements.* A product financing arrangement as defined in that Statement should be accounted for as a borrowing rather than as a sale.

## STANDARDS OF FINANCIAL ACCOUNTING AND REPORTING

**Criteria for Recognizing Revenue When Right of Return Exists**

6.    If an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if all of the following conditions are met:

a.    The seller's price to the buyer is substantially fixed or determinable at the date of sale.
b.    The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.
c.    The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.
d.    The buyer acquiring the product for resale has economic substance apart from that provided by the seller.[2]
e.    The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.
f.    The amount of future returns [3] can be reasonably estimated (paragraph 8).

Sales revenue and cost of sales that are not recognized at time of sale because the foregoing conditions are not met shall be recognized either when the return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first.

7.    If sales revenue is recognized because the conditions of paragraph 6 are met, any costs or losses that may be expected in connection with any returns shall be accrued in accordance with FASB Statement No. 5, *Accounting for Contingencies.* Sales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns.

Copyright © 1981, Financial Accounting Standards Board    Not for redistribution

8.    The ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that will vary from one case to the next. However, the following factors may impair the ability to make a reasonable estimate:

a    The susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand
b.    Relatively long periods in which a particular product may be returned
c    Absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances, for example, changes in the selling enterprise's marketing policies or relationships with its customers
d.    Absence of a large volume of relatively homogeneous transactions

The existence of one or more of the above factors, in light of the significance of other factors, may not be sufficient to prevent making a reasonable estimate; likewise, other factors may preclude a reasonable estimate.

**Amendment to Statement 32**

9. The reference to SOP 75-1, *Revenue Recognition When Right of Return Exists,* is deleted from Appendix A of Statement 32. The specialized accounting provisions of that SOP are superseded by this Statement.

**Effective Date and Transition**

10.    This Statement shall be effective for fiscal years beginning after June 15, 1981, with earlier application encouraged. Accounting changes adopted to conform to the provisions of this Statement shall be applied retroactively. In the year that this Statement is first applied, the financial statements shall disclose the nature of any restatement and its effect on sales, income before extraordinary items, net income, and related per-share amounts for each year restated.

11.    If retroactive restatement of all years presented is not practicable, the financial statements presented shall be restated for as many consecutive years as practicable and the cumulative effect of applying the Statement shall be included in determining net income of the earliest year restated (not necessarily the earliest year presented). If it is not practicable to restate any prior year, the cumulative effect shall be included in net income in the year in which the Statement is first applied. (Refer to paragraph 20 of APB Opinion No. 20, *Accounting Changes.*) The effect on sales, income before extraordinary items, net income, and related per-share amounts of applying this Statement in a year in which the cumulative effect is included in determining that year's net income shall be disclosed for that year.

12.    Retroactive application of the provisions of paragraph 7 may require estimates of returns

and costs or losses from returns that the enterprise has not previously made; information that may have become available after the year being restated may be considered in making those estimates.

> **The provisions of this Statement need
> not be applied to immaterial items.**

*This Statement was adopted by the unanimous vote of the seven members of the Financial Accounting Standards Board:*

> Donald J. Kirk, *Chairman*
> Frank E. Block
> John W. March
> Robert A. Morgan
> David Mosso
> Robert T. Sprouse
> Ralph E. Walters

## Appendix A:  BACKGROUND INFORMATION

13.    It is the practice in some industries for customers to be given the right to return a product to the seller under certain circumstances.  In the case of sales to the ultimate customer, the most usual circumstance is customer dissatisfaction with the product.  For sales to customers engaged in the business of reselling the product, the most usual circumstance is that the customer has not been able to resell the product to another party.  (Arrangements in which customers buy products for resale with the right to return products often are referred to as *guaranteed sales.*)

14.    Sometimes, the returns occur very soon after a sale is made, as in the newspaper and perishable food industries.  In other cases, returns occur over a longer period, such as with book publishing and equipment manufacturing.  The rate of returns varies considerably from a low rate usually found in the food industry to a high rate often found in the publishing industry.

15.    Situations that pose particular problems occur when sales result in significant overstocking by customers acquiring product for resale   In those situations, the recognition of revenue in one period often is followed by substantial returns in a later period.

16.    SOP 75-1 was developed to reduce diversity in the accounting for revenue when the right of return exists.  The following alternative accounting practices were being used when the SOP was issued: (a) no sale was recognized until the product was unconditionally accepted, (b) a sale was recognized and an allowance for estimated returns was provided, and (c) a sale was recognized without providing an allowance for returns and, instead, sales returns were recognized

Copyright © 1981, Financial Accounting Standards Board

Not for redistribution

when the product was returned. The SOP established criteria that had to be met before sales revenue could be recognized.

17. The Board has not undertaken a comprehensive reconsideration of the accounting issues discussed in SOP 75-1 and has extracted the specialized accounting and reporting principles without significant change. Accordingly, some of the background material and discussion of accounting alternatives have not been carried forward from the SOP. The Board's conceptual framework project on accounting recognition criteria will address revenue recognition issues that may pertain to those addressed in this Statement. A Statement of Financial Accounting Concepts resulting from that project in due course will serve as a basis for evaluating existing standards and practices. Accordingly, the Board may wish to evaluate the standards in this Statement when its conceptual framework project is completed.

## Appendix B: SUMMARY OF CONSIDERATION OF COMMENTS ON EXPOSURE DRAFT

18. An Exposure Draft of a proposed Statement, *Revenue Recognition When Right of Return Exists,* was issued February 9, 1981. The Board received 36 comment letters in response to the Exposure Draft. Certain of the comments received and the Board's consideration of them are discussed in this appendix.

19. Some respondents requested that the Statement not apply to enterprises that account for inventory using the retail method of accounting. They recommended that sales returns of retailers be permitted to be recognized when merchandise actually is returned for refund or credit. They said that method is appropriate because accounting for sales returns at time of sale for each product sold is not cost justified, for three reasons. First, they believe that the results of recognizing sales returns when returns are made gives substantially the same results as applying the provisions of the Statement, that is, the Statement would have an insignificant effect on sales, gross margins, and earnings. Second, they state that enterprises using the retail method have not maintained historic data on sales returns. They believe that determining the percentage of sales of one accounting period returned in a later accounting period would be time-consuming and costly, because of the number of transactions to be reviewed. Third, if they were to follow the provisions of the Statement, providing for estimated returns for each product would be complex and costly. Others disagreed with the suggestion of exempting retailers from the Statement.

20. The Board believes that the fundamental issue is materiality. The Board recognizes that the provisions of this Statement may not materially affect the financial position and results of operations of some enterprises that currently account differently than specified by this Statement. Like other FASB Statements, the provisions of this Statement need not be applied to immaterial items. With respect to those enterprises for which this Statement would have a material effect, the Board recognizes that detailed record keeping for returns for each product line might be

Copyright © 1981, Financial Accounting Standards Board

costly in some cases; this Statement permits reasonable aggregations and approximations of product returns.

21.    Some respondents suggested that exchanges by ultimate customers of one item for another of the same kind, quality, and price (for example, one color or size for another) should not be treated as sales returns for purposes of this Statement. They noted that retailers do not account for those exchanges as sales returns. The Board adopted that suggestion in footnote 3.

22.    Several respondents, particularly in the publishing industry, expressed concern that the wording of the condition in paragraph 6(b) (paragraph 11(b) of the Exposure Draft) changed its meaning from the similar condition in SOP 75-1. The Board has refined the wording to clarify that the condition is met if the buyer pays the seller at time of sale or if the buyer does not pay at time of sale but is obligated to pay at a specified date or dates. If, however, the buyer does not pay at time of sale and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product, then the condition is not met.

23.    The transition provisions in the Exposure Draft proposed that either prospective application with cumulative effect of a change in accounting principles or retroactive restatement be permitted   The Notice for Recipients of the Exposure Draft requested respondents to comment on whether the proposed transition is appropriate or whether the transition provisions should be limited to one of the alternatives. Of those respondents who commented on the transition provisions, a substantial majority recommended that one method be specified, but they disagreed on which method. The Board believes that, for recurring revenue recognition issues, comparability is enhanced if enterprises apply accounting standards retroactively by restating the financial statements of previous periods, and the Board has, therefore, adopted that method in this Statement. This Statement, however, calls for enterprises that are unable to restate previous years' financial statements to include the cumulative effect of those years in the earliest year restated.

24.    Several individual respondents suggested various substantive changes to the Exposure Draft. Adoption of those suggestions would have required a reconsideration of the provisions of SOP 75-1. Those suggestions were not adopted because such a reconsideration is beyond the scope of extracting the specialized accounting and reporting principles and practices from the SOP, none of the changes was broadly supported, and the Board believes the suggestions should not be adopted.

25.    Several respondents requested guidance regarding specific implementation questions; for example, treatment of partial or limited refunds and balance sheet presentation of accruals for expected returns. SOP 75-1 did not provide specific guidance about those questions and the Board concluded that it should not address those questions at this time.

Copyright © 1981. Financial Accounting Standards Board

Not for redistribution

### Footnotes

FAS48, Footnote 1--The term *specialized* is used to refer to those accounting and reporting principles and practices in AICPA Guides and SOPs that are neither superseded by nor contained in Accounting Research Bulletins, APB Opinions, FASB Statements, or FASB Interpretations.

FAS48, Footnote 2--This condition relates primarily to buyers that exist "on paper," that is, buyers that have little or no physical facilities or employees. It prevents enterprises from recognizing sales revenue on transactions with parties that the sellers have established primarily for the purpose of recognizing such sales revenue.

FAS48, Footnote 3--Exchanges by ultimate customers of one item for another of the same kind, quality, and price (for example, one color or size for another) are not considered returns for purposes of this Statement.

Copyright © 1981, Financial Accounting Standards Board

Not for redistribution

**Source:**
FASB Literature/Original Pronouncements (as amended)/Accounting Principles Board Opinions/APB 20:
Accounting Changes

# APB 20:  Accounting Changes

### APB 20 STATUS

Issued:  July 1971

Effective Date:  For fiscal years beginning after July 31, 1971

Affects:    Amends ARB 43, Chapter 2A, paragraph 3

Amends ARB 44 (Rev.), paragraph 3

Amends APB 9, paragraph 20

Deletes APB 9, paragraph 25

Amends APB 15, paragraph 13

Amends APS 4, paragraph 199

Affected by:    Paragraph 3 amended by FAS 71, paragraph 26(h), and FAS 95, paragraph 152(a)

Paragraphs 4, 7, and 9 amended by FAS 111, paragraphs 7(a), 9(a), and 8(h), respectively

Paragraphs 12 and 35 amended by FAS 141, paragraph E2

Paragraph 16 amended by FAS 111, paragraph 7(b)

Paragraphs 20, 21, 42 through 44, and 46 through 48 amended by FAS 128, paragraph 163

Paragraph 27 amended by FAS 73, paragraph 2

Paragraph 34 amended by FAS 58, paragraph 8

Footnote 2 deleted by FAS 111, paragraph 9(a)

Footnote 4 amended by FAS 111, paragraph 9(a)

Footnote 5 replaced by FAS 32, paragraph 11

Footnote 5 deleted by FAS 111, paragraph 7(b)

Footnote 9 deleted by FAS 16, paragraph 16(b)

Superseded by FAS 154, paragraph C1(a)

Other Interpretive Pronouncements:    AIN-APB 20, Interpretations No. 1 and 2 (Superseded by FAS 128)

FIN 1

FIN 20

FTB 87-1 (Superseded by FAS 106)

Issues Discussed by FASB Emerging Issues Task Force (EITF)

Affects:  No EITF Issues

Interpreted by:  Paragraphs 7 and 16 interpreted by EITF Issue No. 84-9

Related Issues:  EITF Issue No. 84-10 and Topics No. D-1 and D-74

## INTRODUCTION

1.    A change in accounting by a reporting entity may significantly affect the presentation of both financial position and results of operations for an accounting period and the trends shown in comparative financial statements and historical summaries.  The change should therefore be reported in a manner which will facilitate analysis and understanding of the financial statements.

**Scope of Opinion**

2.    This Opinion defines various types of accounting changes and establishes guides for determining the manner of reporting each type.  It also covers reporting a correction of an error in previously issued financial statements.

3.    The Opinion applies to financial statements which purport to present financial position, cash flows, and results of operations in conformity with generally accepted accounting principles.  The guides in this Opinion also may be appropriate in presenting financial information in other forms or for special purposes.

4.    This Opinion does not change the policy of the Board that its Opinions, unless otherwise stated, are not intended to be retroactive.  Each Statement and Interpretation of the Financial

Accounting Standards Board (FASB), Opinion of the Accounting Principles Board, and AICPA Accounting Research Bulletin specifies its effective date and the manner of reporting a change to conform with the conclusions of that pronouncement. Other pronouncements of the FASB or other designated bodies as described in categories *(b)-(d)* of AICPA Statement on Auditing Standards (SAS) No. 69, *The Meaning of "Present Fairly in Conformity with Generally Accepted Accounting Principles" in the Independent Auditor's Report,* may also prescribe the manner of reporting a change in accounting principle. Accordingly, the provisions of this Opinion do not apply to changes made in conformity with such pronouncements issued in the past or in the future.

5.    This Opinion reaffirms the provisions of previous Board Opinions that prescribe the manner of reporting a change in accounting principle, an accounting estimate, or reporting entity except for the following paragraphs of Accounting Research Bulletins (ARB) or Opinions of the Accounting Principles Board (APB): [1]

a.    Paragraph 3 of Chapter 2, Section A, *Comparative Financial Statements,* of ARB No. 43 is amended to insert a cross reference to this Opinion. This Opinion identifies numerous accounting changes and specifies the manner of reporting each change.

b.    Paragraphs 20 of APB Opinion No. 9, *Reporting the Results of Operations,* and paragraph 13 of APB Opinion No. 15, *Earnings per Share,* are amended. This Opinion specifies an additional element in the presentation of the income statement.

c.    Paragraph 25 of APB Opinion No. 9 is superseded. Although the conclusion of that paragraph is not modified, this Opinion deals more completely with accounting changes.

## TYPES OF ACCOUNTING CHANGES

6.    The term *accounting change* in this Opinion means a change in (a) an accounting principle, (b) an accounting estimate, or (c) the reporting entity (which is a special type of change in accounting principle classified separately for purposes of this Opinion). The correction of an error in previously issued financial statements is not deemed to be an accounting change.

### Change in Accounting Principle

7.    A change in accounting principle results from adoption of a generally accepted accounting principle different from the one used previously for reporting purposes. The term *accounting principle* includes not only accounting principles and practices but also the methods of applying them.

---

[2][This footnote has been deleted. See Status page.]

8.    A characteristic of a change in accounting principle is that it concerns a choice from among two or more generally accepted accounting principles. However, neither (a) initial adoption of an accounting principle in recognition of events or transactions occurring for the first time or that previously were immaterial in their effect nor (b) adoption or modification of an accounting principle necessitated by transactions or events that are clearly different in substance from those previously occurring is a change in accounting principle.

9.    Changes in accounting principle are numerous and varied. They include, for example, a change in the method of inventory pricing, such as from the last in, first out (LIFO) method to the first in, first out (FIFO) method; a change in depreciation method for previously recorded assets, such as from the double declining balance method to the straight line method; [3] a change in the method of accounting for long-term construction-type contracts, such as from the completed contract method to the percentage of completion method. (Paragraph 11 covers a change in accounting principle to effect a change in estimate.)

## Change in Accounting Estimate

10.    Changes in estimates used in accounting are necessary consequences of periodic presentations of financial statements. Preparing financial statements requires estimating the effects of future events. Examples of items for which estimates are necessary are uncollectible receivables, inventory obsolescence, service lives and salvage values of depreciable assets, warranty costs, periods benefited by a deferred cost, and recoverable mineral reserves. Future events and their effects cannot be perceived with certainty; estimating, therefore, requires the exercise of judgment. Thus accounting estimates change as new events occur, as more experience is acquired, or as additional information is obtained.

11.    *Change in estimate effected by a change in accounting principle.* Distinguishing between a change in an accounting principle and a change in an accounting estimate is sometimes difficult. For example, a company may change from deferring and amortizing a cost to recording it as an expense when incurred because future benefits of the cost have become doubtful. The new accounting method is adopted, therefore, in partial or complete recognition of the change in estimated future benefits. The effect of the change in accounting principle is inseparable from the effect of the change in accounting estimate. Changes of this type are often related to the continuing process of obtaining additional information and revising estimates and are therefore considered as changes in estimates for purposes of applying this Opinion.

## Change in the Reporting Entity

12.    One special type of change in accounting principle results in financial statements which, in effect, are those of a different reporting entity. This type is limited mainly to (a) presenting consolidated or combined statements in place of statements of individual companies, (b) changing specific subsidiaries comprising the group of companies for which consolidated financial statements are presented, and (c) changing the companies included in combined financial statements. A different group of companies comprise the reporting entity after each change.

### Correction of an Error in Previously Issued Financial Statements

13.    Reporting a correction of an error in previously issued financial statements concerns factors similar to those relating to reporting an accounting change and is therefore discussed in the Opinion. [4] Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared. In contrast, a change in accounting estimate results from new information or subsequent developments and accordingly from better insight or improved judgment. Thus, an error is distinguishable from a change in estimate. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error for purposes of applying this Opinion.

## VIEWS ON REPORTING CHANGES IN ACCOUNTING PRINCIPLES

14.    An essential question in reporting a change in accounting principle is whether to restate the financial statements currently presented for prior periods to show the new accounting principle applied retroactively. A summary of differing views bearing on that question is:

a.    Accounting principles should be applied consistently for all periods presented in comparative financial statements. Using different accounting principles for similar items in financial statements presented for various periods may result in misinterpretations of earnings trends and other analytical data that are based on comparisons. The same accounting principle therefore should be used in presenting financial statements of current and past periods. Accordingly, financial statements presented for prior periods in current reports should be restated if a reporting entity changes an accounting principle.

b.    Restating financial statements of prior periods may dilute public confidence in financial statements and may confuse those who use them. Financial statements previously prepared on the basis of accounting principles generally accepted at the time the statements were issued should therefore be considered final except for changes in the reporting entity or corrections of errors.

c.    Restating financial statements of prior periods for some types of changes requires considerable effort and is sometimes impossible. For example, adequate information may not be available to restate financial statements of prior periods if the method of recording revenue from long-term contracts is changed from the completed contract method to the percentage of completion method.

d.    Restating financial statements of prior periods for some changes requires assumptions that may furnish results different from what they would have been had the newly adopted principle been used in prior periods. For example, if the method of pricing inventory is changed from the FIFO method to the LIFO method, it may be assumed that the ending inventory of the immediately preceding period is also the beginning inventory of the current period for the LIFO method. The retroactive effects under that assumption may be different from the effects of assuming that the LIFO method was adopted at an earlier date.

## OPINION

### Justification for a Change in Accounting Principle

☒15.    The Board concludes that in the preparation of financial statements there is a presumption that an accounting principle once adopted should not be changed in accounting for events and transactions of a similar type. Consistent use of accounting principles from one accounting period to another enhances the utility of financial statements to users by facilitating analysis and understanding of comparative accounting data.

☒16.    The presumption that an entity should not change an accounting principle may be overcome only if the enterprise justifies the use of an alternative acceptable accounting principle on the basis that it is preferable. However, a method of accounting that was previously adopted for a type of transaction or event which is being terminated or which was a single, nonrecurring event in the past should not be changed. For example, the method of accounting should not be changed for a tax or tax credit which is being discontinued or for preoperating costs relating to a specific plant. The Board does not intend to imply, however, that a change in the estimated period to be benefited for a deferred cost (if justified by the facts) should not be recognized as a change in accounting estimate. The issuance of a new pronouncement by the FASB or by other designated bodies as described in categories *(a)-(d)* of SAS 69 that creates a new accounting principle, interprets an existing principle, expresses a preference for an accounting principle, or rejects a specific principle *may require* an entity to adopt a change in accounting principle. The issuance of such a pronouncement is considered to constitute sufficient support for making a change in accounting principle provided that the hierarchy established by SAS 69 is followed. The burden of justifying other changes rests with the entity proposing the change.

---

⁵[This footnote has been deleted. See Status page.]

### General Disclosure – A Change in Accounting Principle

☒17.    The nature of and justification for a change in accounting principle and its effect on income should be disclosed in the financial statements of the period in which the change is made. The justification for the change should explain clearly why the newly adopted accounting principle is preferable.

## Reporting A Change in Accounting Principle

☒18.    The Board believes that, although they conflict, both (a) the potential dilution of public confidence in financial statements resulting from restating financial statements of prior periods and (b) consistent application of accounting principles in comparative statements are important factors in reporting a change in accounting principles. The Board concludes that most changes in accounting should be recognized by including the cumulative effect, based on a retroactive computation, of changing to a new accounting principle in net income of the period of the

change (paragraphs 19 to 26) but that a few specific changes in accounting principles should be reported by restating the financial statements of prior periods (paragraphs 27 to 30 and 34 to 35).

19.   For all changes in accounting principle except those described in paragraphs 27 to 30 and 34 to 35, the Board therefore concludes that:

a.   Financial statements for prior periods included for comparative purposes should be presented as previously reported.

b.   The cumulative effect of changing to a new accounting principle on the amount of retained earnings at the beginning of the period in which the change is made should be included in net income of the period of the change (paragraph 20).

c.   The effect of adopting the new accounting principle on income before extraordinary items and on net income (and on the related per share amounts) of the period of the change should be disclosed.

d.   Income before extraordinary items and net income computed on a pro forma basis [6] should be shown on the face of the income statements for all periods presented as if the newly adopted accounting principle had been applied during all periods affected (paragraph 21).

Thus, income before extraordinary items and net income (exclusive of the cumulative adjustment) for the period of the change should be reported on the basis of the newly adopted accounting principle.  The conclusions in this paragraph are modified for various special situations which are described in paragraphs 23 to 30.

20.   *Cumulative effect of a change in accounting principle.*  The amount shown in the income statement for the cumulative effect of changing to a new accounting principle is the difference between (a) the amount of retained earnings at the beginning of the period of a change and (b) the amount of retained earnings that would have been reported at that date if the new accounting principle had been applied retroactively for all prior periods which would have been affected and by recognizing only the direct effects of the change and related income tax effect. [7] The amount of the cumulative effect should be shown in the income statement between the captions "extraordinary items" and "net income." The cumulative effect is not an extraordinary item but should be reported in a manner similar to an extraordinary item.  Presentation of per-share amounts for the cumulative effect of an accounting change shall be made either on the face of the income statement or in the related notes.

21.   *Pro forma effects of retroactive application.*  Pro forma effects of retroactive application (paragraph 19-d including footnote 6) should be shown on the face of the income statement for income before extraordinary items and net income.  The earnings per share amounts (basic and diluted, as appropriate under FASB Statement No. 128, *Earnings per Share*) for income before extraordinary items and net income computed on a pro forma basis should be shown on the face of the income statement.  If space does not permit, such per share amounts may be disclosed prominently in a separate schedule or in tabular form in the notes to the financial statements with appropriate cross reference; when this is done the actual per share amounts should be repeated

for comparative purposes. Pro forma amounts should be shown in both current and future reports for all periods presented which are prior to the change and which would have been affected. Appendix A illustrates the manner of reporting a change in accounting principle. If an income statement is presented for the current period only, the actual and the pro forma amounts (and related per share data) for the immediately preceding period should be disclosed.

22. The principal steps in computing and reporting the cumulative effect and the pro forma amounts of a change in accounting principle may be illustrated by a change in depreciation method for previously recorded assets as follows:

a. The class or classes of depreciable assets to which the change applies should be identified. (A "class of assets" relates to general physical characteristics.)

b. The amount of accumulated depreciation on recorded assets at the beginning of the period of the change should be recomputed on the basis of applying retroactively the new depreciation method. Accumulated depreciation should be adjusted for the difference between the recomputed amount and the recorded amount. Deferred taxes should be adjusted for the related income tax effects.

c. The cumulative effect on the amount of retained earnings at the beginning of the period of the change resulting from the adjustments referred to in (b) above should be shown in the income statement of the period of the change.

d. The pro forma amounts should give effect to the pro forma provisions for depreciation of each prior period presented and to the pro forma adjustments of nondiscretionary items, [8] computed on the assumption of retroactive application of the newly adopted method to all prior periods and adjusted for the related income tax effects.

23. *Change in method of amortization and related disclosure.* Accounting for the costs of long-lived assets requires adopting a systematic pattern of charging those costs to expense. These patterns are referred to as depreciation, depletion, or amortization methods (all of which are referred to in this Opinion as methods of amortization). Various patterns of charging costs to expenses are acceptable for depreciable assets; fewer patterns are acceptable for other long-lived assets.

24. Various factors are considered in selecting an amortization method for identifiable assets, and those factors may change, even for similar assets. For example, a company may adopt a new method of amortization for newly acquired, identifiable, long-lived assets and use that method for all additional new assets of the same class but continue to use the previous method for existing balances of previously recorded assets of that class. For that type of change in accounting principle, there is no adjustment of the type outlined in paragraphs 19-22, but a description of the nature of the change in method and its effect on income before extraordinary items and net income of the period of the change, together with the related per share amounts, should be disclosed. If the new method of amortization is however applied to previously recorded assets of that class, the change in accounting principle requires an adjustment for the cumulative effect of the change and the provisions of paragraphs 15 to 22 should be applied.

¶25.   *Pro forma amounts not determinable.* In rare situations the pro forma amounts described in paragraph 21 cannot be computed or reasonably estimated for individual prior periods, although the cumulative effect on retained earnings at the beginning of the period of change can be determined. The cumulative effect should then be reported in the income statement of the period of change in the manner described in paragraph 20. The reason for not showing the pro forma amounts by periods should be explained because disclosing those amounts is otherwise required and is expected by users of financial statements.

¶26.   *Cumulative effect not determinable.* Computing the effect on retained earnings at the beginning of the period in which a change in accounting principle is made may sometimes be impossible. In those rare situations, disclosure will be limited to showing the effect of the change on the results of operations of the period of change (including per share data) and to explaining the reason for omitting accounting for the cumulative effect and disclosure of pro forma amounts for prior years. The principal example of this type of accounting change is a change in inventory pricing method from FIFO to LIFO for which the difficulties in computing the effects of that change are described in paragraph 14-d.

¶27.   *Special changes in accounting principle reported by applying retroactively the new method in restatements of prior periods.* Certain changes in accounting principle are such that the advantages of retroactive treatment in prior period reports outweigh the disadvantages. Accordingly, for those few changes, the Board concludes that the financial statements of all prior periods presented should be restated. The changes that should be accorded this treatment are: (a) a change from the LIFO method of inventory pricing to another method, (b) a change in the method of accounting for long-term construction-type contracts, (c) a change to or from the "full cost" method of accounting which is used in the extractive industries, and (d) a change from retirement-replacement-betterment accounting to depreciation accounting.

¶28.   The nature of and justification for a change in accounting principle described in paragraph 27 should be disclosed in the financial statements for the period the change was adopted. In addition, the effect of the change on income before extraordinary items, net income, and the related per share amounts should be disclosed for all periods presented. This disclosure may be on the face of the income statement or in the notes. Appendix B illustrates the manner of reporting a change in accounting principle retroactively by restating the statements of those prior periods affected. Financial statements of subsequent periods need not repeat the disclosures.

¶29.   *Special exemption for an initial public distribution.* The Board concludes that in one specific situation the application of the foregoing provisions of this Opinion may result in financial statement presentations of results of operations that are not of maximum usefulness to intended users. For example, a company owned by a few individuals may decide to change from one acceptable accounting principle to another acceptable principle in connection with a forthcoming public offering of shares of its equity securities. The potential investors may be better served by statements of income for a period of years reflecting the use of the newly adopted accounting principles because they will be the same as those expected to be used in future periods. In recognition of this situation, the Board concludes that financial statements for all prior periods presented may be restated retroactively when a company first issues its financial statements for any one of the following purposes: (a) obtaining additional equity capital from

investors, (b) effecting a business combination, or (c) registering securities. This exemption is available only once for changes made at the time a company's financial statements are first used for any of those purposes and is not available to companies whose securities currently are widely held.

30.     The company should disclose in financial statements issued under the circumstances described in paragraph 29 the nature of the change in accounting principle and the justification for it (paragraph 17).

## Reporting a Change in Accounting Estimate

31.     The Board concludes that the effect of a change in accounting estimate should be accounted for in (a) the period of change if the change affects that period only or (b) the period of change and future periods if the change affects both. A change in an estimate should not be accounted for by restating amounts reported in financial statements of prior periods or by reporting pro forma amounts for prior periods.

---

9[This footnote has been deleted. See Status page.]

32.     A change in accounting estimate that is recognized in whole or in part by a change in accounting principle should be reported as a change in an estimate because the cumulative effect attributable to the change in accounting principle cannot be separated from the current or future effects of the change in estimate (paragraph 11). Although that type of accounting change is somewhat similar to a change in method of amortization (paragraphs 23 and 24), the accounting effect of a change in a method of amortization can be separated from the effect of a change in the estimate of periods of benefit or service and residual values of assets. A change in method of amortization for previously recorded assets therefore should be treated as a change in accounting principle, whereas a change in the estimated period of benefit or residual value should be treated as a change in accounting estimate.

33.     *Disclosure.* The effect on income before extraordinary items, net income and related per share amounts of the current period should be disclosed for a change in estimate that affects several future periods, such as a change in service lives of depreciable assets or actuarial assumptions affecting pension costs. Disclosure of the effect on those income statement amounts is not necessary for estimates made each period in the ordinary course of accounting for items such as uncollectible accounts or inventory obsolescence; however, disclosure is recommended if the effect of a change in the estimate is material.

## Reporting a Change in the Entity

34. The Board concludes that accounting changes which result in financial statements that are in effect the statements of a different reporting entity (paragraph 12) should be reported by

restating the financial statements of all prior periods presented in order to show financial information for the new reporting entity for all periods. [9a]

35.    *Disclosure.* The financial statements of the period of a change in the reporting entity should describe the nature of the change and the reason for it. In addition, the effect of the change on income before extraordinary items, net income, and related per share amounts should be disclosed for all periods presented. Financial statements of subsequent periods need not repeat the disclosures. (Paragraphs 51?58 of FASB Statement No. 141, *Business Combinations*, describe the manner of reporting and the disclosures required for a change in reporting entity that occurs because of a business combination.)

## Reporting a Correction of an Error in Previously Issued Financial Statements

36.    The Board concludes that correction of an error in the financial statements of a prior period discovered subsequent to their issuance (paragraph 13) should be reported as a prior period adjustment. (Paragraph 18 of APB Opinion No. 9 covers the manner of reporting prior period adjustments.)

37.    *Disclosure.* The nature of an error in previously issued financial statements and the effect of its correction on income before extraordinary items, net income, and the related per share amounts should be disclosed in the period in which the error was discovered and corrected. Financial statements of subsequent periods need not repeat the disclosures.

### Materiality

38.    The Board concludes that a number of factors are relevant to the materiality of (a) accounting changes contemplated in this Opinion and (b) corrections of errors, in determining both the accounting treatment of these items and the necessity for disclosure. Materiality should be considered in relation to both the effects of each change separately and the combined effect of all changes. If a change or correction has a material effect on income before extraordinary items or on net income of the current period before the effect of the change, the treatments and disclosures described in this Opinion should be followed. Furthermore, if a change or correction has a material effect on the trend of earnings, the same treatments and disclosures are required. A change which does not have a material effect in the period of change but is reasonably certain to have a material effect in later periods should be disclosed whenever the financial statements of the period of change are presented.

### Historical Summaries of Financial Information

39.    Summaries of financial information for a number of periods are commonly included in financial reports. The summaries often show condensed income statements, including related earnings per share amounts, for five years or more. In many annual reports to stockholders, the financial highlights present similar information in capsule form. The Board concludes that all such information should be prepared in the same manner (including the presentation of pro forma amounts) as that prescribed in this Opinion for primary financial statements (paragraphs 15 to

38) because the summaries include financial data based on the primary financial statements. In a summary of financial information that includes an accounting period in which a change in accounting principle was made, the amount of the cumulative effect of the change that was included in net income of the period of the change should be shown separately along with the net income and related per share amounts of that period and should not be disclosed only by a note or parenthetical notation.

## EFFECTIVE DATE

**40.** The provisions of this Opinion are effective for fiscal years beginning after July 31, 1971. However, the Board encourages application of the provisions of this Opinion in reporting any accounting changes included in fiscal years beginning before August 1, 1971 but not yet reported in financial statements issued for the year of the change.

*The Opinion entitled "Accounting Changes" was adopted by the assenting votes of twelve members of the Board. Messrs. Catlett, Halvorson, Harrington, Kessler, Luper, and Watt dissented.*

Messrs. Catlett, Kessler and Luper dissent to this Opinion because they believe that when a change in accounting principles is made the financial statements for prior periods should be restated on the same basis as those for the current period. The Board has reached a similar conclusion in most previous Opinions, since such Opinions have encouraged or required retroactive treatment for recommended changes in accounting principles. They also believe that the cumulative adjustments applicable to prior periods arising from changes in accounting principles have no bearing upon the current results of operations and should not be included in the determination of net income for the current period. This Opinion recognizes that consistent use of accounting principles "enhances the utility of financial statements to users by facilitating analysis and understanding of comparative accounting data" and that changes in accounting principles should not be made unless the principle adopted is "preferable." Yet, when such changes are made, this Opinion places severe constraints on restatement and thus not only precludes "preferable" accounting for prior periods in many areas but also impairs the comparability of the financial statements.

Mr. Harrington and Messrs. Catlett, Kessler and Luper dissent to this Opinion because in their view the great divergence between the selective requirements for restatement in paragraphs 27, 29 and 34 and the general requirements for cumulative adjustments in paragraphs 19 and 24 is not based on any supportable rationale; and such general requirements will be confusing and will contribute far more to the dilution of public confidence in financial reporting than would the restatement of prior periods for all changes in accounting principles. Furthermore, Messrs. Catlett, Harrington and Luper are particularly concerned with the continuing tendency of the Board to attempt to eliminate alleged "abuses" by means of arbitrary rules and to use accounting requirements as a disciplinary tool rather than to establish standards for the most meaningful financial reports for investors and other users of financial statements. They believe that the cumbersome requirements of this Opinion will discourage improvements in accounting in numerous areas on which the Board will not issue Opinions for many years.

Mr. Halvorson dissents because he believes that all income and expense should be included in the income statement once and neither more nor less than once, and that this can really be achieved only if newly-adopted principles are applied prospectively. The cumulative adjustment required by the Opinion for most accounting changes ignores this cardinal tenet of reporting by effectively obscuring the result if the one-time inclusion is accommodated in the cumulative adjustment and completely negating the desired result when the cumulative adjustment requires duplication in the future of items already accounted for and reported in earlier periods. He believes that restatement ("actual" or pro forma) of information previously published in good faith will endanger the credibility of financial reporting and that availability of the cumulative-adjustment device will minimize the disciplinary effect that accounting has on the issuers of financial statements. It should be sufficient to report the dollar effect of a change (the "inconsistency") in the year of change, and in a multi-period statement including the year of change to disclose the principle applied in each of the several included periods. It is the further view of Mr. Halvorson that the required pro forma presentation for past years cannot properly report the operating results for such years as they would have been if the newly-adopted principle had then been used, because reported operating results themselves have a compelling influence on non-accounting operating decisions in such areas as pricing and methods of financing, and the effect of such decisions cannot be arithmetically reconstructed to reflect the effect of what might have been.

Mr. Watt dissents to this Opinion because its conclusions are not in accord with his view that the best presentation is one that does not require excessive interpretation by the financial statement user. He believes that, with respect to accounting changes, it is more important for statements presented in comparative form to be comparable in detail than for historical continuity to be retained there; such continuity is important and changes to amounts previously reported can be adequately reconciled in the notes to financial statements. Thus, the presumption should be that, with respect to accounting changes, retroactive restatement is most desirable wherever statements are presented in comparative form. The exception to this would be where the change relates to items whose carrying amount involves a substantial valuation judgment. Mr. Watt is in agreement with the conclusion in the Opinion that depreciation lives of assets are an element of the estimation process and changes therein should be applied prospectively. He believes, however, that depreciation method changes, although conceptually accounting changes, are inextricably tied to subjective judgment of the periods of exhaustion of the useful lives of assets and therefore the selection of a method is usually the result of a composite decision involving both methods and estimated useful lives. Thus, it is his view that all changes in depreciation methods should be reflected prospectively. Similarly, accounting changes relating to the amortization of depletable costs, goodwill, preoperating and research and development cost, etc. should be reflected prospectively. This view as it relates to pension accruals is also consistent with that expressed in paragraph 47 of APB Opinion No. 8, *Accounting for the Cost of Pension Plans*, that a change in accounting method should be applied prospectively.

## APB 20 NOTES

*Opinions of the Accounting Principles Board present the conclusions of at least two-thirds of the members of the Board, which is the senior technical body of the Institute authorized to issue pronouncements on accounting principles.*

Board Opinions are considered appropriate in all circumstances covered but need not be applied to immaterial items.

Covering all possible conditions and circumstances in an Opinion of the Accounting Principles Board is usually impracticable. The substance of transactions and the principles, guides, rules, and criteria described in Opinions should control the accounting for transactions not expressly covered.

Unless otherwise stated, Opinions of the Board are not intended to be retroactive.

Council of the Institute has resolved that Institute members should disclose departures from Board Opinions in their reports as independent auditors when the effect of the departures on the financial statements is material or see to it that such departures are disclosed in notes to the financial statements and, where practicable, should disclose their effects on the financial statements (Special Bulletin, Disclosure of Departures from Opinions of the Accounting Principles Board, *October 1964*). *Members of the Institute must assume the burden of justifying any such departures.*

### Accounting Principles Board (1971)

| | | |
|---|---|---|
| Philip L. Defliese, *Chairman* | Robert L. Ferst | Louis M. Kessler |
| Donald J. Bevis | Newman T. Halvorson | Oral L. Luper |
| Milton M. Broeker | Robert Hampton, III | David Norr |
| Leo E. Burger | Emmett S. Harrington | George C. Watt |
| George R. Catlett | Charles B. Hellerson | Glenn A. Welsch |
| Joseph P. Cummings | Charles T. Horngren | Frank T. Weston |

**Appendix A: An Illustration of Reporting a Change in Accounting Principles (Pursuant to paragraphs 19 to 22)**

41.    ABC Company decides in 1971 to adopt the straight line method of depreciation for plant equipment. The straight line method will be used for new acquisitions as well as for previously acquired plant equipment for which depreciation had been provided on an accelerated method.

42.    This illustration assumes that the direct effects are limited to the effect on depreciation and related income tax provisions and that the direct effect on inventories is not material. The pro forma amounts have been adjusted for the hypothetical effects of the change in the provisions for incentive compensation. The per share amounts are computed assuming that 1,000,000 shares of common stock are issued and outstanding, that 100,000 additional shares would be issued if all outstanding bonds are converted, and that the annual interest expense, less taxes, for the convertible bonds is $25,000. Other data assumed for this illustration are—

| Year | Excess of Accelerated Depreciation Over Straight Line Depreciation | Effects of Change Direct, Less Tax Effect | Pro forma (Note A) |
|---|---|---|---|
| Prior to 1967 | $ 20,000 | $ 10,000 | $ 9,000 |
| 1967 | 80,000 | 40,000 | 36,000 |
| 1968 | 70,000 | 35,000 | 31,500 |
| 1969 | 50,000 | 25,000 | 22,500 |
| 1970 | 30,000 | 15,000 | 13,500 |
| Total at beginning of 1971 | $250,000 | $125,000 | $112,500 |

43.    The manner of reporting the change in two-year comparative statements is—

| | 1971 | 1970 |
|---|---|---|
| Income before extraordinary item and cumulative effect of a change in accounting principle | $1,200,000 | $1,100,000 |
| Extraordinary item (description) | (35,000) | 100,000 |
| Cumulative effect on prior years (to December 31, 1970) of changing to a different depreciation method (Note A) | 125,000 | |
| Net Income | $1,290,000 | $1,200,000 |
| Per share amounts— | | |
| Earnings per common share—assuming no dilution: | | |
| Income before extraordinary item and cumulative effect of a change in accounting principle | $ 1.20 | $1.10 |
| Extraordinary item | (0.04) | 0.10 |
| Cumulative effect on prior years (to December 31,1970) of changing to a different depreciation method | 0.13 | |
| Net income | $ 1.29 | $ 1.20 |
| Earnings per common share—assuming dilution: | | |
| Income before extraordinary item and cumulative effect of a change in accounting principle | $ 1.11 | $1.02 |
| Extraordinary item | (0.03) | 0.09 |

| | | |
|---|---|---|
| Cumulative effect on prior years (to December 31,1970) of changing to a different depreciation method | 0.11 | |
| Net income | $ 1.19 | $1.11 |
| Pro forma amounts assuming the new depreciation method is applied retroactively— | | |
| Income before extraordinary item | $1,200,000 | $1,113,500 |
| Earnings per common share—assuming no dilution | $1 20 | $1 11 |
| Earnings per common share—assuming dilution | $1 11 | $1 04 |
| Net income | $1,165,000 | $1,213,500 |
| Earnings per common share—assuming no dilution | $1.17 | $1 21 |
| Earnings per common share—assuming dilution | $1 08 | $1.13 |
| (See accompanying note to the financial statements) | | |

**NOTE A:**
**Change in Depreciation Method for Plant Equipment**

Depreciation of plant equipment has been computed by the straight line method in 1971. Depreciation of plant equipment in prior years, beginning in 1954, was computed by the sum of the years digits method. The new method of depreciation was adopted to recognize . . . (state justification for change of depreciation method) . . . and has been applied retroactively to equipment acquisitions of prior years. The effect of the change in 1971 was to increase income before extraordinary item by approximately $10,000 (or one cent per share). The adjustment of $125,000 (after reduction for income taxes of $125,000) to apply retroactively the new method is included in income of 1971. The pro forma amounts shown on the income statement have been adjusted for the effect of retroactive application on depreciation, the change in provisions for incentive compensation which would have been made had the new method been in effect, and related income taxes.

¶44.    The manner of reporting the change in five-year comparative statement is—

| | 1971 | 1970 | 1969 | 1968 | 1967 |
|---|---|---|---|---|---|
| Income before extraordinary item and cumulative effect of a change in accounting principle | $1,200,000 | $1,100,000 | $1,300,000 | $1,000,000 | $800,000 |
| Extraordinary item | (35,000) | 100,000 | | 40,000 | |
| Cumulative effect on prior years (to December 31, 1970) of changing to a different depreciation method (Note A) | 125,000 | | | | |
| Net income | $1,290,000 | $1,200,000 | $1,300,000 | $1,040,000 | $800,000 |
| Earnings per common share—assuming no dilution: | | | | | |
| Income before extraordinary item and cumulative effect of change in accounting principle | $1.20 | $1.10 | $1.30 | $1.00 | $0.80 |
| Extraordinary item | (0.04) | 0.10 | | 0.04 | |
| Cumulative effect on prior years (to December 31, 1970) of changing to a different depreciation method | 0.13 | | | | |
| Net income | $1.29 | $1.20 | $1.30 | $1.04 | $0.80 |
| Earnings per common share—assuming dilution: | | | | | |
| Income before extraordinary item and cumulative effect of change in accounting principle | $1.11 | $1.02 | $1.20 | $0.93 | $0.75 |
| Extraordinary item | (0.03) | 0.09 | | 0.04 | |
| Cumulative effect on prior years (to December 31, 1970) of changing to a different depreciation method | 0.11 | | | | |
| Net income | $1.19 | $1.11 | $1.20 | $0.97 | $0.75 |
| Pro forma amounts assuming the new depreciation method is applied retroactively: | | | | | |
| Income before extraordinary item | $1,200,000 | $1,113,500 | $1,322,500 | $1,031,500 | $826,000 |
| Earnings per common share—assuming no dilution | $1.20 | $1.11 | $1.32 | $1.03 | $0.84 |
| Earnings per common share—assuming dilution | $1.11 | $1.04 | $1.23 | $0.96 | $0.78 |
| Net income | $1,165,000 | $1,213,500 | $1,322,500 | $1,071,500 | $895,000 |
| Earnings per common share—assuming no dilution | $1.21 | $1.21 | $1.32 | $1.07 | $0.84 |
| Earnings per common share—assuming dilution | $1.08 | $1.13 | $1.23 | $1.00 | $0.78 |

A note similar to Note A of this Appendix should accompany the five-year comparative income statement.

Appendix B: An Illustration of Reporting a Special Change in Accounting Principle by Restating Prior Period Financial Statements (Pursuant to paragraphs 27 and 28)

45. XYZ Company decides in 1971 to adopt the percentage of completion method in accounting for all of its long-term construction contracts. The company has used in prior years the completed contract method and had maintained records which are adequate to apply retroactively the percentage of completion method. The change in accounting principle is to be reported in the manner described in paragraphs 27 and 28 of this Opinion.

46. The direct effect of the change in accounting principle and other data assumed for this illustration are—

|  | Pre-tax Income Reported by | | Difference in Income | |
|  | Percentage of Completion | Completed Contract | | Less Tax |
| Year | Method | Method | Direct | Effect |
| Prior to 1967 | $1,800,000 | $1,300,000 | $ 500,000 | $ 250,000 |
| 1967 | 900,000 | 800,000 | 100,000 | 50,000 |
| 1968 | 700,000 | 1,000,000 | (300,000) | (150,000) |
| 1969 | 800,000 | 600,000 | 200,000 | 100,000 |
| 1970 | 1,000,000 | 1,100,000 | (100,000) | (50,000) |
| Total at beginning of 1971 | 5,200,000 | 4,800,000 | 400,000 | 200,000 |
| 1971 | 1,100,000 | 900,000 | 200,000 | 100,000 |
| Total | $6,300,000 | $5,700,000 | $ 600,000 | $ 300,000 |

The per share amounts are computed assuming that 1,000,000 shares of common stock are issued and outstanding, that 100,000 additional shares would be issued if all outstanding bonds are converted, and that the annual interest expense, less taxes, for the convertible bonds is $25,000.

47. The manner of reporting the change in two-year comparative statements is—

| Income Statement: | 1971 | 1970 as adjusted (Note A) |
|---|---|---|
| Income before extraordinary item | $ 550,000 | $ 500,000 |
| Extraordinary item (description) |  | (80,000) |
| Net Income | $ 550,000 | $ 420,000 |
| Per share amounts: |  |  |
| Earnings per common share—assuming no dilution: |  |  |
| Income before extraordinary item | $0.55 | $0.50 |
| Extraordinary item |  | (.08) |
| Net income | $0.55 | $0.42 |
| Earnings per common share—assuming dilution: |  |  |
| Income before extraordinary item | $0.52 | $0.47 |
| Extraordinary item |  | (.07) |
| Net income | $0.52 | $0.40 |
| Statement of Retained Earnings: | 1971 | 1970 as adjusted (Note A) |
| Balance at beginning of year, as previously reported | $17,800,000 | $17,330,000 |

| | | |
|---|---|---|
| Add adjustment for the cumulative effect on prior years of applying retroactively the new method of accounting for long-term contracts (Note A) | 200,000 | 250,000 |
| Balance at beginning of year, as adjusted | $18,000,000 | $17,580,000 |
| Net income | 550,000 | 420,000 |
| Balance at end of year | $18,550,000 | $18,000,000 |

(See accompanying note to the financial statements)

**NOTE A:**

Change in Method of Accounting for Long-Term Contracts

    The company has accounted for revenue and costs for long-term construction contracts by the percentage of completion method in 1971, whereas in all prior years revenue and costs were determined by the completed contract method. The new method of accounting for long-term contracts was adopted to recognize . . . (state justification for change in accounting principle) . . . and financial statements of prior years have been restated to apply the new method retroactively. For income tax purposes, the completed contract method has been continued. The effect of the accounting change on income of 1971 and on income as previously reported for 1970 is—

| | Increase (Decrease) | |
|---|---|---|
| Effect on— | _1971_ | _1970_ |
| Income before extraordinary item and net income | $100,000 | $(50,000) |
| Earnings per common share—assuming no dilution | $0.10 | ($0.05) |
| Earnings per common share—assuming dilution | $0.09 | ($0.05) |

The balances of retained earnings for 1970 and 1971 have been adjusted for the effect (net of income taxes) of applying retroactively the new method accounting.

¶48.    A note to a five-year summary of financial statements should disclose the effect of the change on net income and related per share amounts for the periods affected in the following manner:

NOTE A:
Change in Method of Accounting for Long-Term Contracts

The company has accounted for revenue and costs for long-term construction contracts by the percentage of completion method in 1971, whereas in all prior years revenue and costs were determined by the completed contract method. The new method of accounting for long-term contracts was adopted to recognize . . . (state justification for change in accounting principle) . . . and financial statements of prior years have been restated to apply the new method retroactively. For income tax purposes, the completed contract method has been continued. The effect of the accounting change on net income as previously reported for 1970 and prior years is—

| | 1970 | 1969 | 1968 | 1967 |
|---|---|---|---|---|
| Net income as previously reported | $470,000 | $300,000 | $500,000 | $400,000 |
| Adjustment for effect of a change in accounting   principle that is applied retroactively | (50,000) | 100,000 | (150,000) | 50,000 |
| Net income as adjusted | $420,000 | $400,000 | $350,000 | $450,000 |
| Per share amounts: | | | | |
| Earnings per common share—assuming no dilution: | | | | |
| Net income as previously reported | $0.47 | $0.30 | $0.50 | $0.40 |
| Adjustment for effect of a change in accounting principle that is applied retroactively | (0.05) | 0.10 | (0.15) | 0.05 |
| Net income as adjusted | $0.42 | $0.40 | $0.35 | $0.45 |
| Earnings per common share—assuming dilution: | | | | |
| Net income as previously reported | $0.45 | $0.30 | $0.47 | $0.38 |
| Adjustment for effect of a change in accounting principle that is applied retroactively | (0.05) | 0.09 | (0.13) | 0.05 |
| Net income as adjusted | $0.40 | $0.39 | $0.34 | $0.43 |

Confidential and Proprietary — for Use Solely by Authorized Personnel
FASB Original Pronouncements updated as of November 15, 2005
Copyright © 1979-2005 Financial Accounting Standards Board

FASB Literature/Original Pronouncements (as amended)/Accounting Principles Board Opinions/APB 20:
Accounting Changes/Popup note

**1 (Popup-Popup)**
APB20, Footnote 1—This Opinion amends APB Statement No. 4, *Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises*, to the extent that it relates to reporting accounting changes.

**2 (Popup-Popup)**
APB20, Footnote 3—A change to the straight line method at a specific point in the service life of an asset may be planned at the time the accelerated depreciation method is adopted to fully depreciate the cost over the estimated life of the asset. Consistent application of such a policy does not constitute a change in accounting principle for purposes of applying this Opinion. (tParagraph 5-d of APB Opinion No. 12 covers disclosure of methods of depreciation.)

**3 (Popup-Popup)**
APB20, Footnote 4—Section 561 of Statement on Auditing Standards No. 1, *Codification of Auditing Standards and Procedures*, discusses other aspects of errors in previously issued financial statements.

**4 (Popup-Popup)**
APB20, Footnote 6—The pro forma amounts include both (a) the direct effects of a change and (b) nondiscretionary adjustments in items based on income before taxes or net income, such as profit sharing expense and certain royalties, that would have been recognized if the newly adopted accounting principle had been followed in prior periods: related income tax effects should be recognized for both (a) and (b). Direct effects are limited to those adjustments that would have been recorded to restate the financial statements of prior periods to apply retroactively the change. The nondiscretionary adjustments described in (b) should not therefore be recognized in computing the adjustment for the cumulative effect of the change described in paragraph 20 unless nondiscretionary adjustments of the prior periods are actually recorded.

**5 (Popup-Popup)**
APB20, Footnote 7—See footnote 6.

**6 (Popup-Popup)**
APB20, Footnote 8—See footnote 6.

**7 (Popup-Popup)**
APB20, Footnote 9a—The amount of interest cost capitalized through application of FASB Statement No. 58, *Capitalization of Interest Cost in Financial Statements That Include Investments Accounted for by the Equity Method*, shall not be changed when restating financial statements of prior periods.

Confidential and Proprietary — for Use Solely by Authorized Personnel
FASB Original Pronouncements updated as of November 15, 2005
Copyright © 1979-2005 Financial Accounting Standards Board

**Document 1 of 1**

**Source:**
AICPA Literature/Technical Practice Aids/AICPA Technical Practice Aids /Statements of Position — Accounting
[ACC]/ACC Section 10,000 — Statements of Position — Accounting/SOP 94-6: Disclosure of Certain Significant
Risks and Uncertainties (ACC Section 10,640)

# ACC Section 10,640

## *Statement of Position 94-6 Disclosure of Certain Significant Risks and Uncertainties*

December 30, 1994

> **NOTE**
>
> Statements of Position of the Accounting Standards Division present the conclusions of at least two-thirds of the Accounting Standards Executive Committee, which is the senior technical body of the Institute authorized to speak for the Institute in the areas of financial accounting and reporting. Statement on Auditing Standards No. 69, *The Meaning of* Present Fairly in Conformity With Generally Accepted Accounting Principles, identifies AICPA Statements of Position as sources of established accounting principles that an AICPA member should consider if the accounting treatment of a transaction or event is not specified by a pronouncement covered by Rule 203 of the AICPA Code of Professional Conduct. In such circumstances, the accounting treatment specified by this Statement of Position should be used, or the member should be prepared to justify a conclusion that another treatment better presents the substance of the transaction in the circumstances.

### Introduction

.01    The volatile business and economic environment underscores a need for improved disclosure about the significant risks and uncertainties that face reporting entities. In 1987, the AICPA issued its *Report of the Task Force on Risks and Uncertainties* (the Report), which was intended to help standards-setting bodies and others identify practical methods of improving the information communicated to users of financial statements to help them assess those risks and uncertainties. This statement of position (SOP) is largely based on the Report. The central feature of this SOP's disclosure requirements is selectivity: specified criteria serve to screen the host of risks and uncertainties that affect every entity so that required disclosures are limited to matters significant to a particular entity.

.02    The disclosures focus primarily on risks and uncertainties that could significantly affect the amounts reported in the financial statements in the near term or the near-term functioning of the reporting entity. The risks and uncertainties this SOP deals with can stem from the nature of the entity's operations, from the necessary use of estimates in the preparation of the entity's financial statements, and from significant concentrations in certain aspects of the entity's operations.

### Scope

.03    This SOP applies to financial statements prepared in conformity with generally accepted accounting principles (GAAP) applicable to nongovernmental entities. It applies to all entities that issue such statements. While this SOP applies to complete interim financial statements, it does not apply to condensed or summarized interim financial statements. **fn 1** If comparative financial statements are presented, the disclosure requirements apply only to the financial

statements for the most recent fiscal period presented.

.04   The disclosure requirements do not encompass risks and uncertainties that might be associated with management or key personnel, proposed changes in government regulations, proposed changes in accounting principles, fn 2  or deficiencies in the internal control structure. Nor do they encompass the possible effects of acts of God, war, or sudden catastrophes.

## Relationship to Other Pronouncements

.05   The disclosure requirements of this SOP in many circumstances are similar to or overlap the disclosure requirements in certain pronouncements of the Financial Accounting Standards Board (FASB), such as FASB Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*, and, for public business enterprises, FASB Statement No. 14, *Financial Reporting for Segments of a Business Enterprise*. fn *  The disclosure requirements of this SOP in many circumstances also are similar to or overlap the disclosure requirements in certain pronouncements of the Securities and Exchange Commission (SEC). This SOP does not alter the requirements of any FASB or SEC pronouncement.

.06   Certain disclosure requirements in this SOP supplement the requirements of other authoritative pronouncements. In many cases, however, the disclosure requirements in this SOP, particularly those relating to certain significant estimates, will be met or partly met by compliance with such other pronouncements.

## Definitions

.07   This SOP uses the following terms with the definitions indicated:

*Near term.*     A period of time not to exceed one year from the date of the financial statements.

*Severe impact.*     (Used in reference to current vulnerability due to certain concentrations. See paragraph .21.) A significant financially disruptive effect on the normal functioning of the entity. Severe impact is a higher threshold than material. Matters that are important enough to influence a user's decisions are deemed to be material, fn 3  yet they may not be so significant as to disrupt the normal functioning of the entity. Some events are material to an investor because they might affect the price of an entity's capital stock or its debt securities, but they would not necessarily have a severe impact on (disrupt) the enterprise itself. The concept of severe impact, however, includes matters that are less than catastrophic. fn 4

## Conclusions

.08   The Accounting Standards Executive Committee (AcSEC) of the AICPA has concluded that reporting entities should make disclosures in their financial statements beyond those now required or generally made in financial statements about the risks and uncertainties existing as of the date of those statements in the following areas:

*a.*     Nature of operations

*b.*     Use of estimates in the preparation of financial statements

*c.*     Certain significant estimates

*d.*     Current vulnerability due to certain concentrations

These four areas of disclosure are not mutually exclusive. The information required by some may overlap. Accordingly, the disclosures required by this SOP may be combined in various ways, grouped together, or placed in diverse parts of the financial statements, or included as part of the disclosures made pursuant to the requirements of other authoritative pronouncements.

.09   The following detailed discussion of the four areas of disclosure enumerated in

paragraph .08 should be read in conjunction with the "Illustrative Disclosures" in appendix A [paragraph .27] of this SOP, which provide guidance for implementing them.

## Nature of Operations

.10    Financial statements should include a description of the major products or services the reporting entity sells or provides and its principal markets, including the locations of those markets. If the entity operates in more than one business, the disclosure should also indicate the relative importance of its operations in each business and the basis for the determination—for example, assets, revenues, or earnings. Not-for-profit organizations' disclosures should briefly describe the principal services performed by the entity and the revenue sources for the entity's services. Disclosures about the nature of operations need not be quantified; relative importance could be conveyed by use of terms such as *predominately*, *about equally*, or *major and other*. fn 5

## Use of Estimates in the Preparation of Financial Statements

.11    Financial statements should include an explanation that the preparation of financial statements in conformity with GAAP requires the use of management's estimates.

## Certain Significant Estimates

.12    Various accounting pronouncements require disclosures about uncertainties addressed by those pronouncements. In particular, paragraphs 9 through 12, and 17b, and footnote 6 of FASB Statement No. 5 specify disclosures to be made about contingencies fn 6 that exist at the date of the financial statements. The disclosure requirements of paragraphs 9 through 12 of Statement No. 5 are further clarified in FASB Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss*. In addition to disclosures required by FASB Statement No. 5 and other accounting pronouncements, this SOP requires disclosures regarding estimates used in the determination of the carrying amounts of assets or liabilities or in disclosure of gain or loss contingencies, as described below.

.13    Disclosure regarding an estimate should be made when known information available prior to issuance of the financial statements indicates that *both* of the following criteria are met:

*a.*    It is at least reasonably possible fn 7 that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events.

*b.*    The effect of the change would be material to the financial statements.

.14    The disclosure should indicate the nature of the uncertainty and include an indication that it is at least reasonably possible fn 8 that a change in the estimate will occur in the near term. fn 9 If the estimate involves a loss contingency covered by FASB Statement No. 5, the disclosure also should include an estimate of the possible loss or range of loss, or state that such an estimate cannot be made. Disclosure of the factors that cause the estimate to be sensitive to change is encouraged but not required.

.15    Many entities use risk-reduction techniques to mitigate losses or the uncertainty that may result from future events. If the entity determines that the criteria in paragraph .13 are not met as a result of risk-reduction techniques, the disclosures described in paragraph .14 and disclosure of the risk-reduction techniques are encouraged but not required.

.16    This SOP's disclosure requirements are separate from and do not change in any way the disclosure requirements or criteria of FASB Statement No. 5; rather, the disclosures required under this SOP supplement the disclosures required under Statement No. 5 as follows:

?    If an estimate (including estimates that involve contingencies covered by FASB