Statement No. 5) meets the criteria for disclosure under <u>paragraph .13</u> of this SOP, this SOP requires disclosure of an indication that it is at least reasonably possible that a change in the estimate will occur in the near term; FASB Statement No. 5 does not distinguish between near-term and long-term contingencies.

? An estimate that does not involve a contingency covered by Statement No. 5, such as estimates associated with long-term operating assets and amounts reported under profitable long-term contracts, may meet the criteria in <u>paragraph .13</u>. This SOP requires disclosure of the nature of the estimate and an indication that it is at least reasonably possible that a change in the estimate will occur in the near term.

.17    Whether an estimate meets the criteria for disclosure under this SOP does not depend on the amount that has been reported in the financial statements, but rather on the materiality of the effect that using a different estimate would have had on the financial statements. Simply because an estimate resulted in the recognition of a small financial statement amount, or no amount, does not mean that disclosure is not required under this SOP.

.18    The following are examples of assets and liabilities and related revenues and expenses, and of disclosure of gain or loss contingencies included in financial statements that, based on facts and circumstances existing at the date of the financial statements, may be based on estimates that are particularly sensitive to change in the near term:

?    Inventory subject to rapid technological obsolescence

?    Specialized equipment subject to technological obsolescence

?    Valuation allowances for deferred tax assets based on future taxable income

?    Capitalized motion picture film production costs

?    Capitalized computer software costs

?    Deferred policy acquisition costs of insurance enterprises

?    Valuation allowances for commercial and real estate loans

?    Environmental remediation-related obligations

?    Litigation-related obligations

?    Contingent liabilities for obligations of other entities

?    Amounts reported for long-term obligations, such as amounts reported for pensions and postemployment benefits

?    Estimated net proceeds recoverable, the provisions for expected loss to be incurred, or both, on disposition of a business or assets

?    Amounts reported for long-term contracts

The above list is not intended to be all-inclusive.

.19    Paragraph 5 of FASB Statement No. 121, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of,* **fn ?**  provides examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed. **[fn 10]** [Revised, April 1996, to reflect conforming changes necessary due to the issuance of recent authoritative literature.]

**Current Vulnerability Due to Certain Concentrations**

.20    Vulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk through diversification. Such risks of loss manifest themselves differently, depending on the nature of the concentration, and vary in significance.

.21    Financial statements should disclose the concentrations described in <u>paragraph .22</u> if,

based on information known to management prior to issuance of the financial statements, *all* of the following criteria are met:

*a.*   The concentration exists at the date of the financial statements.

*b.*   The concentration makes the enterprise vulnerable to the risk of a near-term severe impact.

*c.*   It is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

.22   Concentrations, including known group concentrations, described below require disclosure if they meet the criteria of paragraph .21. (Group concentrations exist if a number of counterparties or items that have similar economic characteristics collectively expose the reporting entity to a particular kind of risk.) Some concentrations may fall into more than one category.

*a.*   *Concentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor.*   The potential for the severe impact can result, for example, from total or partial loss of the business relationship. For purposes of this SOP, it is always considered at least reasonably possible that any customer, grantor, or contributor will be lost in the near term.

*b.*   *Concentrations in revenue from particular products, services, or fund-raising events.* The potential for the severe impact can result, for example, from volume or price changes or the loss of patent protection for the particular source of revenue.

*c.*   *Concentrations in the available sources of supply of materials, labor, or services, or of licenses or other rights used in the entity's operations.*   The potential for the severe impact can result, for example, from changes in the availability to the entity of a resource or a right.

*d.*   *Concentrations in the market or geographic area* **[fn 11]** *in which an entity conducts its operations.*   The potential for the severe impact can result, for example, from negative effects of the economic and political forces within the market or geographic area. For purposes of this SOP, it is always considered at least reasonably possible that operations located outside an entity's home country will be disrupted in the near term.

.23   Concentrations of financial instruments, and other concentrations not described in paragraph .22, are not addressed in this SOP. However, these other concentrations may be required to be disclosed pursuant to other authoritative pronouncements, such as FASB Statement No. 107, *Disclosures About Fair Value of Financial Instruments,* **fn ||**  as amended by FASB Statement No. 126, Exemption From Certain Required Disclosures About Financial Instruments for Certain Nonpublic Entities. [Revised, June 2004, to reflect conforming changes necessary to reflect the issuance of FASB Statement No.133, as amended by FASB Statements No. 137, No. 138, and No. 149.]

.24   Disclosure of concentrations meeting the criteria of paragraph .21 should include information that is adequate to inform users of the general nature of the risk associated with the concentration. For those concentrations of labor (paragraph .22c) subject to collective bargaining agreements and concentrations of operations located outside of the entity's home country (paragraph .22d) that meet the criteria of paragraph .21, the following specific disclosures are required:

?   For labor subject to collective bargaining agreements, disclosure should include both the percentage of the labor force covered by a collective bargaining agreement and the percentage of the labor force covered by a collective bargaining agreement that will expire within one year.

?   For operations located outside the entity's home country, disclosure should include

the carrying amounts of net assets and the geographic areas in which they are located.

Adequate information about some concentrations may already be presented in diverse parts of the financial statements. For example, adequate information about assets or operations located outside the entity's home country may be included in disclosures made to comply with FASB Statement No. 131. In accordance with paragraph .08 of this SOP, such information need not be repeated. [Revised, June 2004, to reflect conforming changes necessary due to the issuance of FASB Statement No. 131. fn # ]

**Application of Disclosure Criteria**

.25    An assessment of whether a disclosure is required should not be found to be in error simply as a result of future events. For example, reporting a concentration not followed by a severe impact does not imply that the disclosure should not have been made, because something that has only a reasonably possible chance of occurring obviously might not occur. Similarly, the occurrence of a severe impact related to a concentration not disclosed in the prior-year financial statements would not suggest noncompliance with this SOP's requirements if an appropriate judgment had been made that a near-term severe impact was not at least reasonably possible at the prior reporting date. In addition, a severe impact may arise from a concentration of which management did not have knowledge at the time the financial statements were issued.

**Effective Date**

.26    This SOP is effective for financial statements issued for fiscal years ending after December 15, 1995, and for financial statements for interim periods in fiscal years subsequent to the year for which this SOP is to be first applied. Early application is encouraged but not required.

**Appendix A**

**Illustrative Disclosures**

.27

| *Contents* | *Paragraph Numbers* |
|---|---|
| **Nature of Operations** | |
| Illustrative Disclosure A—Nature of Operations | A-2?A-4 |
| Illustrative Disclosure B—Combined Disclosure: | |
| Nature of Operations and Customer Concentration | A-5?A-7 |
| **Use of Estimates in the Preparation of Financial Statements** | |
| Illustrative Disclosure—Pervasiveness of Estimates | A-8?A-10 |
| **Certain Significant Estimates** | |
| Illustrative Disclosure A—Inventories | A-11?A-16 |
| Illustrative Disclosure B—Discontinued Operations: | |
| Assets Held for Sale | A-17?A-19 |
| Illustrative Disclosure C—Specialized Manufacturing Equipment | A-20?A-23 |

Illustrative Disclosure D—Capitalized Software Costs ........................ A-24?A-27

Illustrative Disclosure E—Environmental Remediation Liability ........ A-28?A-33

Illustrative Disclosure F—Guarantee of Debt ................................ A-34?A-36

Illustrative Disclosure G—Long-Term Construction Contract ............. A-37?A-42

Illustrative Disclosure H—Realizability of a Deferred Tax Asset ........ A43?A-45

Illustrative Disclosure I—Litigation ........................................ A-46?A-48

### Current Vulnerability Due to Certain Concentrations

Illustrative Disclosure A—Supplier/Sources of Supply ...................... A-49?A-52

Illustrative Disclosure B—Supplier/Sources of Supply ...................... A-53?A-55

Illustrative Disclosure C—Patent ............................................ A-56?A-59

Illustrative Disclosure D—Source of Supply of Labor ....................... A-60?A-62

Illustrative Disclosure E—Contributor ...................................... A-63?A-65

Illustrative Disclosure F—Geographic Area of Operations .................. A-66?A-68

A-1.    The kinds of disclosures required by this SOP are illustrated below. Each illustrative disclosure is accompanied by a scenario in which the disclosure would likely be made or not made and by a discussion of how and why the illustrative disclosure complies with the requirements of this SOP or why no disclosure is required by this SOP.

## Nature of Operations

### *Illustrative Disclosure A—Nature of Operations*

A-2.    *Scenario.*    Conglomerate, Inc. is a United States-based multinational corporation. Conglomerate's principal lines of business are automotive products, aerospace products and technologies, textiles, and nonprescription health-care products. The principal markets for the company's automotive and aerospace products and technologies are European- and Far East-based industrial concerns. Textiles are sold primarily to U.S. clothing manufacturers, while nonprescription health-care products are sold to wholesale and retail distributors worldwide. The operations of the company in any one country are not significant in relation to the company's overall operations. The following illustrates disclosure of the nature of operations required by this SOP.

A-3.    *Disclosure.*    **Conglomerate, Inc. is a multinational manufacturer and engineering concern. The company's principal lines of business are automotive products, aerospace products and technologies, textiles, and nonprescription health-care products, all of which are about equal in size based on sales. The principal markets for the automotive and aerospace products and technologies are European- and Far East—based industrial concerns. Textiles are sold primarily to domestic clothing manufacturers, while nonprescription health-care products are sold primarily to wholesale and retail distributors worldwide.**

A-4.    *Discussion.*    This disclosure provides—

a.    Information necessary for users not familiar with the operations of the company to identify and consider the broad risks and uncertainties associated with the businesses and markets in which the company operates and competes. From the disclosures provided, financial statement users having a general knowledge of business matters should be able to assess that the company's product lines are subject to different and varied risks. Those financial statement users familiar with the businesses recognize the general risks associated with each of these businesses and their related markets.

b.    Information that facilitates the overall understanding of the financial information presented. This kind of disclosure could provide users with a basis for comparing an enterprise's financial information with that of competitors or with applicable industry statistics.

c.    Insight into the location of the company's principal markets, although on a broad scale. Because the company's markets are so diverse, it likely would not be useful to enumerate the specific locations of the company's markets. For this reason, the manner in which the information is disclosed in the illustrative disclosure is sufficient to meet the broad objectives of paragraph .10 of this SOP.

*Illustrative Disclosure B—Combined Disclosure: Nature of Operations and Customer Concentration*

A-5.    *Scenario.*    Smith Corporation, formerly Smith Munitions Corporation, was founded in 1940. At that time, Smith's principal business was the design and manufacture of artillery ammunition and other explosives. In 1959, commensurate with the evolution of its principal business to the design, engineering, and manufacture of military aircraft for sale to the U.S. government, Smith changed its name to Smith Corporation. Smith has one factory, located in New York. The following illustrates disclosure of the nature of operations required by this SOP.

A-6.    *Disclosure.*    **Smith Corporation is engaged principally in the design, engineering, and manufacturing of military aircraft and related peripheral equipment for sale primarily to the U.S. government.**

A-7.    *Discussion.*    This disclosure provides—

a.    Information needed by users who are not familiar with the operations of the enterprise to identify and consider the broad risks and uncertainties faced by all or most enterprises operating in a specific business or market, which in this case is the defense contracting business. From this disclosure, financial statement users having a general knowledge of business matters should know that the enterprise's business may be heavily affected by future changes in U.S. defense and foreign policies.

b.    Information that aids in the overall understanding of the other financial information presented. Certain accounting procedures involving estimation may apply only to particular industries or may be relevant in comparing a business enterprise's financial reports with those of business enterprises in other industries.

c.    Insight into the location of the company's principal product markets and information about its current vulnerability due to concentrations. In the illustration, users would be able to recognize and assess the company's dependency on sales to the U.S. government (assuming the loss of the government as a customer would result in a near-term severe impact to the company).

## Use of Estimates in the Preparation of Financial Statements

*Illustrative Disclosure—Pervasiveness of Estimates*

A-8.    *Scenario.*    The following illustrates disclosure of the pervasiveness of estimates in the financial statements of all reporting entities.

**A-9.** *Disclosure.* **The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.**

**A-10.** *Discussion.* This disclosure is intended to inform users of the inherent uncertainties in measuring assets and liabilities and related revenues and expenses and contingent assets and liabilities, and that subsequent resolution of some matters could differ significantly from the resolution that is currently expected. Such disclosure alerts users that uncertainties are present in the financial statements of all reporting entities.

**Certain Significant Estimates**

*Note: Some of the following disclosures contain certain information that is already required to be disclosed under FASB Statement No. 5; in those cases, the FASB Statement No. 5 requirements are supplemented by an indication that it is at least reasonably possible that a change in an estimate will occur in the near term. Others may not be covered by FASB Statement No. 5.*

*Illustrative Disclosure A—Inventories*

**A-11.** *Scenario.* XYZ Corporation manufactures high technology stereo equipment. In June 19X7, one of XYZ's competitors introduced a new model stereo system with the same features as XYZ's Model A. The competitor's version sells for significantly less than XYZ's suggested retail price for Model A. The introduction of this product resulted in a sharp decrease in the sales volume of Model A. At December 31, 19X7, XYZ has accumulated significant inventory quantities beyond its normal short-term needs of its Model A system. Inventory for Model A ($6 million) represents approximately 20 percent of XYZ's inventory at that date. The remaining 80 percent of XYZ's inventory consists of products experiencing only normal competitive pressures. XYZ has established provisions for obsolescence for this latter group of products in the normal course of business.

**A-12.** Management has developed a program to provide substantial dealer incentives on purchases of the Model A, which it expects will result in the sale of this inventory in the near term. Because of the existing high profit margin on its stereo systems, XYZ would continue to earn a marginal profit on sales of the Model A under the new program. It is also reasonably possible, however, that the program will not be wholly successful, and, accordingly, a material loss could ultimately result on the disposal of the inventory.

**A-13.** *Disclosure.* **At December 31, 19X7, some portion of $6 million of inventory of one of the company's products is in excess of XYZ's current requirements based on the recent level of sales. Management has developed a program to reduce this inventory to desired levels over the near term and believes no loss will be incurred on its disposition. No estimate can be made of a range of amounts of loss that are reasonably possible should the program not be successful.**

**A-14.** *Discussion.* This situation meets the criteria for disclosure under paragraph .13 of this SOP because circumstances that existed at the date of the financial statements, including the decreasing sales volume and excessive quantities of inventory of Model A, make it at least reasonably possible that management's plan to liquidate its excess inventory without a loss will be less than fully successful and that such an outcome would have a near-term material effect on the enterprise's financial statements.

**A-15.** In this illustration, XYZ discloses the existence of potentially excess quantities of inventory at the date of the financial statements and indicates that the uncertainty is expected to be resolved in the near term. The disclosure is intended to provide users with insight into management's assessment of recoverability of the cost of inventories existing at the date of the financial statements. Although disclosure of the $6 million carrying amount of the inventory of Model A is not required

because, based on the facts presented, $6 million does not constitute a reasonable estimate of loss on the disposal of the inventory or the maximum amount in an estimated range of loss, disclosure of this amount is not misleading and may provide useful information.

A-16.  Discussion of XYZ's provision for obsolescence for the remaining 80 percent of its inventory is not required because it is not considered reasonably possible that additional material losses on this inventory will occur.

### Illustrative Disclosure B—Discontinued Operations: Assets Held for Sale

A-17.  *Scenario.*  Axel Industries, a manufacturer of automotive parts and heavy trucks, currently has facilities in Michigan, Tennessee, and Ontario, Canada. Axel's automotive parts segment constitutes a component of the entity because the operations of and cash flows of the automotive parts segment can be clearly distinguished, operationally and for financial reporting purposes, from the rest of the entity. As a result of weak demand in the automobile industry, Axel's management decided during the current year to exit the automotive parts segment, which is located entirely at the company's Michigan facility, and commits to a plan to sell the automotive parts segment. Axel's automotive parts segment is classified as held for sale at that date and measured at the lower of its carrying amount or fair value less cost to sell. The operations and cash flows of the automotive parts segment will be eliminated from ongoing operations as a result of the sale transaction, and Axel will have no continuing involvement in the operations of the product group after it is sold. The scenario meets the requirements of FASB Statement No. 144. Therefore Axel will report the results of operations of the component, including any gain or loss, in discontinued operations. The following illustrates disclosure of significant estimates and would likely appear as part of the disclosure of the disposition of a component of an entity made pursuant to APB Opinion 30, *Reporting the Results of Operations-Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions,* as amended by FASB Statement No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* and FASB Statement No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment to FASB Statement No. 13, and Technical Corrections.* [Revised, July 2004, to reflect the conforming changes necessary due to the issuance of FASB Statements No. 144 and No. 145.]

A-18.  *Disclosure.*  Included in discontinued operations was a write down associated with our automotive components parts business. The write down was based on management's best estimates of the fair value of the assets less costs to sell. The amount included in discontinued operations could be adjusted in the near term if experience differs from current estimates. [fn 12] [Revised, July 2004, to reflect the conforming changes necessary due to the issuance of FASB Statements No. 144 and No. 145.]

A-19.  *Discussion.*  Determining a provision for discontinued operations required the use of assumptions and estimates. In this case, the disclosure is required because circumstances that existed at the date of the financial statements indicated it was at least reasonably possible that estimates of the loss on the disposal of discontinued operations could differ in the near term from the current estimates used as a basis for recognizing the charge to income by an amount that would be material to the entity's financial statements. [Revised, July 2004, to reflect the conforming changes necessary due to the issuance of FASB Statements No. 144 and No. 145.]

### Illustrative Disclosure C—Specialized Manufacturing Equipment

A-20.  *Scenario.*  Offshore Industries is a manufacturer of offshore drilling rigs and platforms. The company's manufacturing process requires significant specialized equipment, which it currently owns. As a result of a decline in the price of oil, the demand for its products and services has fallen dramatically in the past two years, resulting in a significant underutilization of its manufacturing capacity.

A-21.  The company depreciates its investments in specialized equipment based on its original

estimate of the remaining useful lives of the equipment using the units-of-production method, since it believes that the exhaustion of usefulness of these specialized assets relates more to their use than to the passage of time. The company reevaluates these estimates in light of current conditions in accordance with generally accepted accounting principles. The company also monitors the policies of its major competitors and is aware that several have reported large write-downs of similar assets. Nevertheless, while the company believes that it is at least reasonably possible that its estimate that it will recover the carrying amount of those assets from future operations will change during the next year, it believes it is more likely that conditions in the industry will improve and that no write-down for impairment will be necessary.

A-22.  *Disclosure.*  **Offshore's policy is to depreciate specialized manufacturing equipment (with a net book value of $25 million at December 31, 19X7) over its remaining useful life using the units-of-production method and to evaluate the remaining life and recoverability of such equipment in light of current conditions. fn 13 [Given the excess capacity in the industry, fn 14 it is reasonably possible that the company's estimate that it will recover the carrying amount of this equipment from future operations will change in the near term.**

A-23.  *Discussion.*  In this illustration, the company acknowledges that the carrying amount of the specialized assets is subject to significant uncertainty based on current conditions. The uncertainty relates to the measurement of the specialized assets at the date of the financial statements, and the company's disclosure makes clear that it is at least reasonably possible that the carrying amount will change in the near term.

### *Illustrative Disclosure D—Capitalized Software Costs*

A-24.  *Scenario.*  Software, Inc. develops and markets computer programs. In 20X3, it acquired a software company. A significant portion of the purchase price was allocated to (capitalized) Product A (present net book value of $5 million), the most significant and profitable software program currently being marketed by the acquired company. Only nominal amounts of other software costs have been capitalized. Software, Inc. expects Product A and its derivatives to be among its most significant products over the next several years. However, a competitor has recently released a new product designed to compete directly with Product A. Software, Inc. amortizes the capitalized software costs of Product A by the greater of (a) the ratio that current gross revenues for a product bear to the total of current and anticipated future gross revenues for that product or (b) the straight-line method over the remaining estimated economic life of the product including the period being reported on, pursuant to FASB Statement No. 86, *Accounting for the Costs of Computer Software to Be Sold, Leased, or Otherwise Marketed.* The amount of the amortization computed for year 20X4 was equal to 20 percent of the beginning-of-the-year capitalized amount and was a significant component of cost of sales. [Revised, June 2004, to reflect conforming changes necessary due to the issuance of FASB Statement No. 141.]

A-25.  The segment of the computer software industry in which Software, Inc. operates is characterized by sales of products occurring primarily on the basis of customers' perceptions of the relative technical merits of competing products. Those perceptions are greatly influenced by product reviews in technical journals and advertising, and they can change rapidly. Innovative products have been introduced in recent years that have reduced quickly and significantly the volume of sales of pre-existing products in the same market niche. While management of Software, Inc. believes its estimates of future gross revenues and the estimated economic life of Product A used in the determination of the amortization of capitalized software costs are reasonable, new products introduced by its competitors, such as the one discussed in paragraph A-24, could have a significant near-term negative effect on such estimates. As a result, the amount of periodic amortization could increase in the near term in amounts that could be material to the enterprise's financial statements.

A-26.  *Disclosure.*  **Software, Inc.'s policy is to amortize capitalized software costs by the**

greater of ( a   ) the ratio that current gross revenues for a product bear to the total of current and anticipated future gross revenues for that product or (b) the straight-line method over the remaining estimated economic life of the product including the period being reported on. fn 15  It is reasonably possible that those estimates of anticipated future gross revenues, the remaining estimated economic life of the product, or both will be reduced significantly in the near term [due to competitive pressures]. fn 16 As a result, the carrying amount of the capitalized software costs for Product A ($5 million) may be reduced materially in the near term.

A-27.   *Discussion.*   In this illustration, the company acknowledges that the carrying amount of its capitalized software costs is subject to significant uncertainty. The uncertainty relates to estimates of future years' revenues and useful lives that are made at the date of the financial statements, and the company is aware that circumstances exist that could cause such estimates to change in the near term. The company's disclosure makes clear that it is at least reasonably possible that the carrying amount could be reduced in the near term.

*Illustrative Disclosure E—Environmental Remediation Liability*

A-28.   *Scenario.*   Ace Oil Company is a distributor of heating oil with four storage and distribution facilities located in Anystate. Federal, state, and local laws and regulations govern the operation of the company's facilities. The company has determined that, beginning in the coming year, a significant number of its storage tanks and a significant amount of its other equipment will need to be removed, replaced, or modified to satisfy regulations that go into effect in varying stages over the next seven years. In addition, the company has a present obligation to decontaminate the soil in the near term at its largest facility.

A-29.   The company hired a consultant to evaluate the technological, regulatory, and legal factors involved. Based on the consultant's findings, the company estimated that total environmental expenditures over the next seven years related to the tanks and equipment will aggregate approximately $5 million. Of this amount, approximately $4.75 million represents capital expenditures, which are expected to be recoverable through operations. The existing tanks have a net book value of $500,000, and the equipment has a net book value of $475,000. The cost of soil decontamination is estimated to be at least $1 million, which is material to the company's operations, and may be as high as $3 million. Exposure to legal liability to third parties is considered remote.

A-30.   The consultant has demonstrated substantial experience with similar sites, and the technical aspects of upgrading storage facilities and decontaminating soil appear to be fairly straightforward.

A-31.   *Disclosure.*   **The company will begin a project to decontaminate the soil at its Anytown, Anystate facility in the coming year. The company estimates the cost of decontamination to total at least $1 million and has accrued that amount as an operating expense in the current year.** fn 17  The ultimate cost [however, will depend on the extent of contamination found as the project progresses and fn 18 ] may be as much as $3 million. The company expects decontamination to be substantially completed within one year.

A-32.   *Discussion.*   This disclosure informs financial statement users of the existence of the soil contamination problem at the financial statement date and indicates that the liability is susceptible to change in the near term. This SOP does not require disclosure of the capital commitment because it is not a present obligation for which an estimate is reflected in the company's financial statements.

A-33.   Although, in this case, the near-term nature of the possible change is indicated by a statement that the company expects decontamination to be substantially completed within one year, an expectation that decontamination will take more than one year to complete would not preclude the estimate from being susceptible to near-term change. In such cases, the disclosure could be worded to specifically refer to the near term.

*Illustrative Disclosure F—Guarantee of Debt*

A-34.    *Scenario.*    Shipping Company operates a shipping center in Local City. In 19X0, Shipping decided to raise money for modernization of facilities through a debt offering. In order for the offering to take place, Smokestack Company, a local manufacturer, agreed to guarantee the bonds if Shipping's revenues were insufficient to pay debt service. In May 19X4 (four years later when the bonds had an outstanding balance of $55 million), Shipping lost two of its major shipping customers, constituting 35 percent of its prior-year revenues, to a company in a neighboring port. At Smokestack's June 30, 19X4, year end, Shipping was directing substantial efforts toward finding new customers. It is reasonably possible, however, that Shipping will not replace the lost revenue in time to pay debt service installments at December 30, 19X4, and June 30, 19X5, totaling $6 million.

A-35.    *Disclosure.*    **In 19X0, Smokestack guaranteed the Series AA debt of Shipping Company, which operates a shipping center within Local City. Smokestack continues as guarantor of such debt totaling $55 million. In May 19X4, Shipping Company lost two of its major customers. Although Shipping Company is directing substantial efforts toward obtaining new customers, it is at least reasonably possible that Shipping Company will not replace lost revenues sufficient to    make its December 19X4 and June 19X5 debt service payments totaling $6 million. If so, the company will become responsible for repayment of at least a portion of that amount and possibly additional amounts over the debt term. No amount has been reported in the company's financial statements pending the outcome of Shipping Company's efforts during the next fiscal year.**

A-36.    *Discussion.*    This example illustrates the potential near-term effect of a change in estimate of a contingent liability resulting from the guarantee of the debt of another entity. Shipping's loss of customers causes the potential for a near-term material change in that estimate within the next fiscal year. Although disclosure of Shipping's ongoing efforts to replace those customers is not required, this additional information may be presented.

### *Illustrative Disclosure G—Long-Term Construction Contract*

A-37.    *Scenario.*    Rivet Construction Company is a nonpublic general contractor specializing in the construction of commercial buildings. Rivet has three long-term projects underway that are in various stages of completion. Rivet has a substantial history of making reasonably dependable estimates of the extent of progress towards completion, contract revenues, and contract costs, and it uses the percentage-of-completion method of accounting for all of its long-term contracts.

A-38.    Shortly after December 31, 19X2, but before the 19X2 financial statements were issued, subsoil conditions were discovered at the site of Project A that will require Rivet to incur substantial additional, unbudgeted costs in completing the project. The nature of the subsoil problem is unusual in the region in which Rivet operates. The additional estimated costs are not considered to be a normal, recurring contract-accounting adjustment. Engineers have estimated the additional construction cost to be 10 to 40 percent of the original estimated construction cost, with 15 percent ($1.5 million) being their best estimate, and delays in construction are expected to add an additional 3 to 7 percent to the cost of construction, depending on the time involved, with 5 percent ($500,000) being the best estimate. Accordingly, Rivet has revised upward its estimate of costs to complete the project by $2 million. Project A, which was begun in 19X1 under a fixed-price contract, is still expected to be completed in the coming year (19X3), and it is still expected to be profitable.

A-39.    The following is a summary of financial data at December 31, 19X2, for Project A.

|  | *Before Discovery of Condition* | *After Discovery of Condition* |
|---|---|---|
| Contract price | $15,000,000 | $15,000,000 |
| Estimated total cost | 10,000,000 | 12,000,000 |

| Estimated gross profit | 5,000,000 | 3,000,000 |
| Costs incurred to date | 6,400,000 | 6,400,000 |
| Percentage of completion | 64% | 53% |

Rivet's other two projects are proceeding as planned.

**A-40.** *Disclosure.* As a result of the discovery of unusual subsoil conditions at the site of Project A, estimated contract completion costs have been revised upward by $2 million. [Due to uncertainties inherent in the estimation process, fn 19 ] it is at least reasonably possible that completion costs for Project A will be further revised in the near-term [by up to an additional $2.7 million]. fn 20

**A-41.** *Discussion.* In addition to any disclosures regarding the change in estimates that might be required by APB Opinion 20, fn 21 the disclosure requirements of this SOP focus on the effects of possible near-term changes in estimates. Disclosure is required under this SOP because it is at least reasonably possible that the estimated cost of completing Project A will change in the near term and that the change will be material to the financial statements.

**A-42.** Disclosure of the potential for changes in other estimates used in determining amounts reported for Rivet's long-term contracts is not required because, given Rivet's history of making similar estimates, it is not considered at least reasonably possible that they will change in the near term by amounts that would be material to the financial statements.

*Illustrative Disclosure H—Realizability of a Deferred Tax Asset*

**A-43.** *Scenario.* XYZ Corporation develops, manufactures, and markets limited-use vaccines. The company has a dominant share of the narrow market it serves. As of December 31, 19X4, the company has no temporary differences and has aggregate loss carryforwards of $12 million that originated in prior years and that expire in varying amounts between 19X5 and 19X7. As of December 31, 19X4, the company has a deferred tax asset of $4.8 million that represents the benefit of the remaining $12 million in loss carryforwards, and it has concluded at that date that a valuation allowance is unnecessary. The loss carryforwards arose during the company's development stage when it incurred high levels of research and development expenses prior to commencing sales. While the company has earned, on average, $6 million income before tax (taxable income before carryforwards) in each of the last five years, future profitability in this competitive industry depends on continually developing new products. The company has a number of promising new vaccines under development, but it is aware that other companies recently began testing vaccines that would compete with the vaccines being developed by the company as well as products that will compete with the vaccines that are currently generating the company's profits. Rapid introduction of competing products or failure of the company's development efforts could reduce estimates of future profitability in the near term, which could affect the company's ability to fully utilize its loss carryforward.

**A-44.** *Disclosure.* fn 22 The company has recorded a deferred tax asset of $4.8 million reflecting the benefit of $12 million in loss carryforwards, which expire in varying amounts between 19X5 and 19X7. Realization is dependent on generating sufficient taxable income prior to expiration of the loss carryforwards. Although realization is not assured, management believes it is more likely than not that all of the deferred tax asset will be realized. The amount of the deferred tax asset considered realizable, however, could be reduced in the near term if estimates of future taxable income during the carryforward period are reduced.

**A-45.** Discussion. This disclosure informs users that (*a*) realization of the deferred tax asset depends on achieving a certain minimum level of future taxable income within the next three years and (*b*) although management currently believes that achievement of the required future taxable income is

more likely than not, it is at least reasonably possible that this belief could change in the near term, resulting in establishment of a valuation allowance.

### Illustrative Disclosure I—Litigation

**A-46.**    *Scenario.*    ABC Company is the defendant in litigation involving a major competitor claiming patent infringement. The suit claims damages of $200 million. Discovery has been completed, and ABC is engaged in settlement discussions with the plaintiff. ABC has made an offer of $5 million to settle the case, which offer was rejected by the plaintiff; the plaintiff has made an offer of $35 million to settle the case, which offer was rejected by ABC. Based on the expressed willingness of the plaintiff to settle the case along with information revealed during discovery and the likely cost and risk to both sides of litigating, the company believes that it is probable the case will not come to trial. Accordingly, the company has determined that it is probable that it has some liability. The company's reasonable estimate of this liability is a range between $10 million and $35 million, with no amount within that range a better estimate than any other amount; accordingly, $10 million was accrued.

**A-47.**    *Disclosure.*    **On March 15, 19X1, the DEF Company filed a suit against the company claiming patent infringement. While the company believes it has meritorious defenses against the suit, the ultimate resolution of the matter, which is expected to occur within one year, could result in a loss of up to $25 million in excess of the amount accrued. fn 23**

**A-48.**    *Discussion.*    FASB Statement No. 5 requires accrual of a loss contingency and disclosure of the nature of the contingency, the exposure to loss in excess of the amount accrued, and, depending on the circumstances, the amount accrued. This SOP requires disclosure of an indication that it is at least reasonably possible that a change in the company's estimate of its probable liability could occur in the near term.

## Current Vulnerability Due to Certain Concentrations

*Note:    The following are illustrations of the disclosures required by paragraph .21 of this SOP. Some of the concentrations described may fall into more than one of the categories of concentrations given in paragraph .22, a through d.*

### Illustrative Disclosure A—Supplier/Sources of Supply

**A-49.**    *Scenario.*    Hi-Tech Corp. is a manufacturer of electronic equipment in which integrated circuits are an important component. Substantially all of Hi-Tech's customers require that only those vendors that meet quality criteria be used as sources for integrated circuits. Hi-Tech currently buys all of its integrated circuits from one manufacturer in the Far East, and no long-term supply contract exists. There are only a limited number of manufacturers of these particular integrated circuits, and a change of supplier could significantly disrupt the business due to the time it would take to locate and qualify a new vendor.

**A-50.**    *Disclosure.*    **The company currently buys all of its integrated circuits, an important component of its products, from one supplier. Although there are a limited number of manufacturers of the particular integrated circuits, management believes that other suppliers could provide similar integrated circuits on comparable terms. A change in suppliers, however, could cause a delay in manufacturing and a possible loss of sales, which would affect operating results adversely.**

**A-51.**    *Discussion.*    Although other sources of supply of this particular kind of integrated circuit are currently available, the limited number of such sources and the time it takes to qualify new vendors makes Hi-Tech currently vulnerable to the risk of a near-term severe impact.

**A-52.**    Disclosure is required because it is considered at least reasonably possible, based on information known to management prior to issuance of the financial statements, that the events that could cause the severe impact will occur.

### Illustrative Disclosure B—Supplier/Sources of Supply

**A-53.**   *Scenario.*   Minnesota Company manufactures various products in which wheat is an important raw material. It currently buys 80 percent of its wheat from one supplier, but numerous alternate sources of supply are readily available on comparable terms.

**A-54.**   *Disclosure.*   (No disclosure is required.)

**A-55.**   *Discussion.*   The concentration exists at the date of the financial statements, and an inability to obtain wheat could result in a near-term severe impact. No disclosure is required, however, because numerous alternative suppliers are available and, therefore, it is not considered at least reasonably possible that events that could cause a near-term severe impact will occur.

### Illustrative Disclosure C—Patent

**A-56.**   *Scenario.*   Felt Pharmaceutical Company is a national pharmaceutical manufacturer headquartered in Atlanta, Georgia. The company markets a wide range of pharmaceutical products. One of its better-known name-brand products, a significant source of profits and cash flow, is an antibiotic on which there is a patent that will expire in six months. Competitors are preparing to enter the market with generic alternatives when Felt's patent expires, and the concentration therefore has the potential for a severe impact.

**A-57.**   *Disclosure.*   **Felt Pharmaceutical Company is a national pharmaceutical manufacturer with sales throughout the United States. The patent on one of its major products expires next year. This product accounts for approximately one-third [or "a significant portion"] of the company's revenues and a higher percentage of its gross profit.**

**A-58.**   *Discussion.*   The disclosure focuses on the nature of the business and on Felt's current vulnerability due to a concentration of its patented products. Disclosure is required because the concentration exists at the date of the financial statements, because the effect on the company's cash flows and profitability of competitors entering the market when the patent expires could be a severe impact, and because it is considered at least reasonably possible that the events that could cause the severe impact will occur in the near term.

**A-59.**   Because the risk is evident from the description of the concentration, no further explanation of the risk is necessary.

### Illustrative Disclosure D—Source of Supply of Labor

**A-60.**   *Scenario.*   Team Company is a manufacturer of industrial hardware. The contract with the union representing Team's labor force is due to expire in the coming year. Over the past thirty years, Team has, in rare instances, been affected by work stoppages in the course of contract negotiations; they have always been of short duration, and none has had a significant effect on Team's financial statements. Although management expects that there will initially be some differences between its offer to the union and union demands, based on preliminary discussions with union leaders, management believes it is very unlikely that those differences will result in a protracted conflict.

**A-61.**   *Disclosure.*   **(No disclosure is required.)**

**A-62.**   *Discussion.*   Although the concentration of labor exists at the date of the financial statements and it could result in a severe impact in the near term due to the potential of a protracted work stoppage, no disclosure is required because it is not considered at least reasonably possible in the light of past experience and current conditions that a protracted work stoppage will take place.

### Illustrative Disclosure E—Contributor

**A-63.**   *Scenario.*   Zebra Zoo, a not-for-profit organization, is supported by contributions from the public. In the current year, two contributors provided 35 percent of the organization's combined

revenues.

**A-64.**    *Disclosure.*    **Approximately 35 percent of the organization's combined revenues were provided by two contributors.**

**A-65.**    *Discussion.*    Disclosure is required because the two contributors provided a significant portion of the organization's revenues. As noted in underlined paragraph .22, it is always considered reasonably possible that a customer, grantor, or contributor will be lost in the near term.

### *Illustrative Disclosure F—Geographic Area of Operations*

**A-66.**    *Scenario.*    Offshore Productions, Inc. (Offshore), a Delaware corporation, designs and manufactures optical lenses, which it markets throughout the United States. Substantially all of its manufacturing operations are carried out in a single facility, which is located in Switzerland and which is owned by Offshore's subsidiary. Offshore does not carry insurance for risks of loss. Offshore's consolidated balance sheet includes $20 million representing the net assets of those operations.

**A-67.**    *Disclosure.*    **Included in the company's consolidated balance sheet at December 31, 19X4, are the net assets of the company's manufacturing operations, all of which are located in a single facility in Switzerland and which total approximately $20 million. [fn 24]**

**A-68.**    *Discussion.*    All of Offshore's specialized manufacturing capacity is concentrated in a single facility. As noted in underlined paragraph .22, it is always considered at least reasonably possible that the use of a facility located outside of an entity's home country could be disrupted in the near term. Due to the specialized nature of the assets, it would not be possible to find replacement capacity quickly. Accordingly, loss of the facility could produce a near-term severe impact to Offshore. This disclosure informs financial statement users of that concentration of operations in a particular geographic area and informs them of the risks and uncertainties associated with the concentration. Because the concentration is one of operations located outside of Offshore's home country, the disclosure also sets forth the carrying amount of the net assets, as required by underlined paragraph .24 of this SOP.

## Appendix B

## Background Information and Basis for Conclusions

.28

**B-1.**    FASB Statement of Financial Accounting Concepts No. 1, *Objectives of Financial Reporting by Business Enterprises,* states that financial reporting should "provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions" (paragraph 34). To support that decision-making process, financial reports should help such users "assess the amounts, timing, and uncertainty of prospective net cash inflows to the related enterprise" (paragraph 37) by providing "information about the economic resources of an enterprise, the claims to those resources...and the effects of transactions, events, and circumstances that change resources and claims to those resources" (paragraph 40). Without additional disclosure in financial reports about significant risks and uncertainties, these objectives may not be fully met in today's environment.

**B-2.**    Recognizing that a riskier business and economic climate equates to a riskier investment and lending climate, users increasingly are asking that financial statements include more information to help them assess the risks and uncertainties concerning a reporting entity's future cash flows and results of operations. These requests are underscored in calls for an "early warning system" expressed in the financial press and in congressional hearings.

**B-3.**    No system of reporting can provide early warnings of all future detrimental events. Indeed, management may be unaware, and reasonably so, of some significant risks and uncertainties. And, clearly, financial statements should not be burdened in an attempt to describe every possible risk and

uncertainty facing the reporting entity.

**B-4.**    But such limitations should not prevent users from receiving improved disclosures concerning significant risks and uncertainties. Their existence merely means that any new disclosure requirements must focus on what is important. New disclosure requirements should effectively separate the significant matters that warrant reporting from the host of lesser risks and uncertainties that do not. fn 25 AcSEC believes that the requirements in this SOP meet those objectives.

**B-5.**    In reaching the conclusions in this SOP, AcSEC considered and evaluated users' reliance on financial information, sources of financial information, current accounting and disclosure requirements, current SEC requirements, and users' perceptions of the kinds of information that should be presented in financial statements.

## Users' Reliance on Financial Information

**B-6.**    Information in financial statements, shaped by generally accepted accounting principles (GAAP) and, for SEC registrants, by the additional regulatory requirements of the Commission, is considered important to users in making investment and lending decisions. Financial statements provide information about certain current conditions and trends that help users in predicting reporting entities' future cash flows and results of operations. The quality of users' predictions depends to a significant degree on their assessment of the risks and uncertainties inherent in entities' operations and of the information about those operations that financial reporting provides.

**B-7.**    Financial reporting largely reflects the effects of past transactions and other events that have already affected a reporting entity. Such information can help users in assessing the future. But that does not mean the future can be predicted merely by extrapolating past trends or relationships. Indeed, volatility in the economic environment almost always means that simply extrapolating past trends and relationships will lead to inaccurate predictions. Users need to assess all currently available information to form their own expectations about the future and its relation to the past. Forming expectations—making predictions—is a vital part of the decision process. But it is a function of financial analysis, not of financial reporting. Furthermore, financial reporting is only one source of information required for making investment and credit decisions.

**B-8.**    Reporting entities and those who have economic interests in them are affected by many factors that interact in complex ways. Those who use financial information for business and economic decisions need to combine information provided by financial reports with pertinent information from other sources, including additional information provided by issuers, financial analysts' reports, business and trade publications, and reports of macroeconomic and other local, national, and international events.

## Sources of Financial Information

**B-9.**    Financial reporting encompasses the financial statements and notes, required information supplementary to the financial statements, and other information, such as that included in Management's Discussion and Analysis (MD&A), which the SEC requires publicly held business enterprises to provide in their annual and quarterly reports. Additional sources of information include company releases, current information filings of publicly held business enterprises, investment advisory services, analysts' reports, the financial press, general economic statistics, and general news reports.

**B-10.**    The major sources of financial information and their relationships for business and not-for-profit entities are illustrated in the following diagram, taken from FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises.*



## Current Accounting Requirements

**B-11.** Disclosing information to help users assess major risks and uncertainties is consistent with the established objectives of financial reporting, and some such information is already presented in financial statements. Such information includes, for example, information about financial instruments with off-balance-sheet risk and financial instruments with concentrations of credit risk, related party disclosures and information about receivables, leases, pensions, postretirement benefits, and commitments and contingencies. In addition, publicly held business enterprises are required to disclose in their financial statements segment information and information about foreign operations, export sales, and major customers, which, among other things, helps users to assess risks and uncertainties. This SOP, however, is intended to extend disclosures beyond those currently required and to help users discern those risks that are of particular importance.

### Nature of Operations

**B-12.** Current GAAP (FASB Statement No. 14, *Financial Reporting for Segments of a Business Enterprise*) requires a public business enterprise to disclose the major types of products and services that generate revenues, that is, the nature of its businesses, as part of segment information in its financial statements, even if the business enterprise operates in only one industry. fn 26 Information presented includes a description of the types of goods or services provided, operating revenues, operating income or loss, net income or loss, net working capital, and total assets for each segment. But other reporting entities are not required to disclose such information. fn 27 Thus, financial statement users now sometimes cannot discern the nature of the operations of such other entities from information presented in their financial statements.

**B-13.** Information about the nature of operations is helpful because the various kinds of

businesses in which reporting entities operate have diverse degrees and kinds of risks. Certain of these risks are inherent to the business in which an entity is engaged. Simply by knowing the nature of an entity's business and the principal markets for its products or services, a financial statement user is alerted, indirectly, about the risks common to that business.

**B-14.** Some have expressed concerns about whether this SOP conflicts with FASB Statement No. 21, *Suspension of the Reporting of Earnings per Share and Segment Information by Nonpublic Enterprises*. AcSEC believes that, while the information that this SOP requires to be disclosed concerning the nature of a reporting entity's operations overlaps in certain respects the information public business enterprises are required to report under FASB Statement No. 14, it is significantly different in other respects. Accordingly, AcSEC does not believe this SOP conflicts with Statement No. 21.

**B-15.** Further, AcSEC notes that, for public business enterprises that already disclose information about the nature of their operations pursuant to FASB Statement No. 14, this SOP requires disclosure of additional information about the nature of their operations.

**B-16.** The disclosure required by paragraph .10 of this SOP focuses on the entity's principal markets, including their locations. Current segment information for business enterprises, in contrast, focuses on the nature of the segments' operations and their identifiable assets and the geographic location of assets outside the enterprise's home location. Disclosure of the locations of a business or not-for-profit entity's principal markets provides information useful in assessing risks and uncertainties related to the environments in which the entity operates. The risks and the uncertainties associated with selling products and services in various regions in the United States may differ significantly. And they do differ significantly from the risks and the uncertainties in selling products and services outside the United States. Knowing those environments in which an entity sells its products or provides services helps users of financial reports to assess certain risks based on day-to-day national and world events.

**B-17.** The following table compares and contrasts the information required of public companies by FASB Statement No. 14 with paragraph .10.

| Disclosure | FASB Statement No. 14 | Paragraph .10 |
|---|---|---|
| Description of the types of products or services sold | X | X |
| Revenue, profitability, identifiable assets, and other related disclosures for each reportable segment | X | fn ** |
| Revenue, profitability, identifiable assets for foreign operations, by geographic area | X | fn ?? |
| Export sales by domestic operations, by geographic area | X | |
| Significant sales to single customer, foreign government, or domestic governmental agency | X | fn ?? |
| Identification of principal markets | | X |
| Description of location of principal markets | | X |

**B-18.** AcSEC considered whether disclosure of an entity's principal operating locations would be informative to financial statement users and should, therefore, be included in paragraph .10. AcSEC concluded that, although in certain circumstances such information would be relevant, generally it would not be. In addition, disclosure of an entity's principal operating locations would be required under paragraph .21 (current vulnerability due to certain concentrations) in circumstances where operating in

that particular environment created substantive near-term risk to the entity. Knowing, however, that a manufacturing plant is located in Dallas, Texas, for example, was not considered particularly relevant information. In contrast, knowing where a residential housing construction contractor's principal market is located was considered to be highly relevant. As a result, disclosure of the location of principal markets was chosen by AcSEC for inclusion in paragraph .10, while disclosure of the location of principal operating units was considered unnecessary.

### Use of Estimates in the Preparation of Financial Statements

**B-19.**   Auditors are required under generally accepted auditing standards (GAAS) fn 28 to acknowledge in their standard reports the use of estimates in the preparation of financial statements. AcSEC has concluded, however, that an explanation that the preparation of financial information requires the use of estimates and assumptions should be included in the financial statements by the reporting entity to inform users of the nature and limitations of those financial statements. AcSEC acknowledges that the disclosure would usually be standardized. AcSEC nevertheless believes it would help users make sounder use of financial statements.

**B-20.**   There is a need to communicate explicitly to users of financial reports that the inescapable use of estimates in the preparation of financial information, including the estimation of fair and, in some cases, market values for assets carried at such bases, results in the presentation of a number of approximate rather than exact amounts. If users understand better the inherent limitations on precision in financial statements, they will be better able to make decisions.

**B-21.**   Estimates inherent in the current financial reporting process inevitably involve assumptions about future events. For example, accruing income for the current period under a long-term contract requires an estimate of the total profit to be earned on the contract. For another example, carrying inventories at the lower of cost or market is based on an assumption that there will be sufficient demand for that product in the future to be able to sell the quantity on hand without incurring losses on the sales or, if market is used, that it can be estimated. Making reliable estimates for such matters is often difficult even in periods of economic stability; it is more so in periods of economic volatility. Although many users of financial reports are aware of that aspect of financial reporting, others often assume an unwarranted degree of reliability in financial statements. The disclosure required by this SOP should help dispel any such erroneous assumptions.

**B-22.**   A number of publicly held business enterprises now include management reports in annual reports to stockholders. Many such reports and letters state that estimates and assumptions are required to prepare financial statements in conformity with GAAP. AcSEC acknowledges that development, but it believes the disclosure should be mandated and included in the notes to financial statements.

### Certain Significant Estimates

**B-23.**   FASB Statement No. 5 requires reporting entities to disclose certain loss contingencies, as follows:

> If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or *if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.*6 The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. [Emphasis added.] [FASB Statement No. 5, paragraph 10]

Footnote 6 to Statement No. 5 states:

> For example, disclosure shall be made of any loss contingency that meets the condition in paragraph 8(a) but that is not accrued because the amount of loss cannot be reasonably

> estimated (paragraph 8(b)). Disclosure is also required of some loss contingencies that do not meet the condition in paragraph 8(a)—namely, those contingencies for which there is a *reasonable possibility* that a loss may have been incurred even though information may not indicate that it is *probable* that an asset has been impaired or a liability had been incurred at the date of the financial statements. [Emphasis in original.]

FASB Statement No. 5 defines loss contingencies as:

> an existing condition, situation, or set of circumstances involving uncertainty as to possible . . . loss . . . to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur. Resolution of the uncertainty may confirm the acquisition of an asset or the reduction of a liability or the loss or impairment of an asset or the incurrence of a liability. [paragraph 1]

The recognition and disclosure requirements of Statement No. 5 are further clarified in FASB Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss*. This SOP does not change the requirements of FASB Statement No. 5 or FASB Interpretation No. 14; the requirements of this SOP supplement those requirements. For example, if a loss contingency meets the criteria for disclosure under both Statement No. 5 and paragraph .13 of this SOP, this SOP requires disclosure that it is at least reasonably possible that future events confirming the fact of the loss or the change in the estimated amount of the loss will occur in the near term.

**B-24.**    This SOP also requires disclosure of matters that may not be deemed to be contingencies requiring disclosure under current GAAP. FASB Statement No. 5 distinguishes loss contingencies from other uncertainties inherent in making accounting estimates, as follows:

> Not all uncertainties inherent in the accounting process give rise to contingencies as that term is used in this Statement. Estimates are required in financial statements for many on-going and recurring activities of an enterprise. The mere fact that an estimate is involved does not of itself constitute the type of uncertainty referred to in the definition [of a contingency] in paragraph 1. For example, the fact that estimates are used to allocate the known cost of a depreciable asset over the period of use by an enterprise does not make depreciation a contingency; the eventual expiration of the utility of the asset is not uncertain. Thus, depreciation of assets is not a contingency as defined in paragraph 1, nor are such matters as recurring repairs, maintenance, and overhauls, which interrelate with depreciation. Also, amounts owed for services received, such as advertising and utilities, are not contingencies even though the accrued amounts may have been estimated; there is nothing uncertain about the fact that those obligations have been incurred. [paragraph 2]

FASB Statement No. 5 acknowledges, however, that the distinction between uncertainties inherent in making accounting estimates and uncertainties that give rise to a contingency is not always clear:

> A question has been raised whether uncollectibility of receivables and product warranties constitute contingencies within the scope of this Statement. The Board recognizes that uncertainties associated with uncollectibility of some receivables and some product warranties are likely to be, in part, inherent in making accounting estimates (described in paragraph 2) as well as, in part, the type of uncertainties that give rise to a contingency (described in paragraph 1). The Board believes that no useful purpose would be served by attempting to distinguish between those two types of uncertainties for purposes of establishing conditions for accrual of uncollectible receivables and product warranties. Consequently, those matters are deemed to be contingencies within the definition of paragraph 1 and should be accounted for pursuant to the provisions of this Statement. [paragraph 58]

**B-25.**    AcSEC believes that requiring disclosure of certain estimates not deemed to be covered by

current GAAP, for example, some amounts reported for long-term contracts, would enhance the usefulness of financial statements in assessing risks and uncertainties.

**B-26.** Among the matters specifically excluded from the scope of FASB Statement No. 5 is the write-down of operating assets. Paragraph 31 of Statement No. 5 states:

> In some cases, the carrying amount of an operating asset not intended for disposal may exceed the amount expected to be recoverable through future use of that asset even though there has been no physical loss or damage of the asset or threat of such loss or damage. For example, changed economic conditions may have made recovery of the carrying amount of a productive facility doubtful. The question of whether, in those cases, it is appropriate to write down the carrying amount of the asset to an amount expected to be recoverable through future operations is not covered by this Statement.

The requirements of paragraph .13 of this SOP are applicable to long-lived assets whose value may become impaired in the near term.

**B-27.** On November 29, 1993, the FASB issued an exposure draft of a Proposed Statement of Financial Accounting Standards, *Accounting for the Impairment of Long-Lived Assets*. That exposure draft is expected to result ultimately in the promulgation of authoritative guidance on recognition, measurement, and disclosure requirements for long-lived assets whose carrying amounts may not be recoverable. Paragraphs 102 and 103 of the exposure draft state:

> In 1985, the AICPA established a task force to consider the need for improved disclosures about risks and uncertainties that affect companies and the manner in which they do business. In July 1987, the task force published *Report of the Task Force on Risks and Uncertainties*, which concluded that companies should be making early warning disclosures as part of their financial statements. In March 1993, AcSEC issued an exposure draft of a proposed Statement of Position, *Disclosure of Certain Significant Risks and Uncertainties and Financial Flexibility*. That proposed SOP would require entities to include in their financial statements disclosures about (*a*) the nature of their operations, (*b*) the use of estimates in the preparation of their financial statements, (*c*) certain significant estimates, (*d*) current vulnerability due to concentrations, and (*e*) financial flexibility.

Board members observed that for some impairments early warning disclosures would be useful. However, they were in general agreement, based on comment letters and testimony, that it would not be possible to adequately describe those situations and develop adequate disclosure requirements. Some Board members also believed that the proposed SOP is a much broader disclosure requirement that could have implications in several other Board projects. Board members therefore concluded not to require early warning disclosures in this Statement.

AcSEC notes that, while the exposure draft would not require early warning disclosures concerning impairment of long-lived assets, it acknowledges the usefulness of such disclosures and recognizes that the disclosure requirement of this SOP is a much broader requirement than the FASB considered.

*Current Vulnerability Due to Certain Concentrations*

**B-28.** Current GAAP requires disclosure of certain concentrations (for example, credit concentrations under FASB Statement No. 105, *Disclosure of Information about Financial Instruments with Off-Balance-Sheet Risk and Financial Instruments with Concentrations of Credit Risk*, and information about major customers under FASB Statement No. 14 for public enterprises) but does not specifically address disclosures of concentrations on a comprehensive basis. This SOP addresses known concentrations more comprehensively but stops short of requiring disclosure of all concentrations.

**B-29.** Some believe that disclosure of economic dependency is required under current literature.

A requirement to disclose economic dependency was included in SAS No. 6, *Related Party Transactions*. But, partly in response to the issuance of FASB Statement No. 57, *Related Party Transactions*, the AICPA superseded SAS No. 6 in August 1983 with the issuance of SAS No. 43, *Omnibus Statement on Auditing Standards—1983*, which, among other things, "remov[ed] guidance on accounting considerations and disclosure standards . . . provided in FASB Statement of Financial Accounting Standards No. 57, *Related Party Disclosures*." Statement No. 57 states, in turn, that it "does not address the issues pertaining to economic dependency."

**B-30.**     The FASB observed in Statement No. 21, *Suspension of the Reporting of Earnings per Share and Segment Information by Nonpublic Enterprises*, which was issued in April 1978 and which eliminated the requirement for nonpublic enterprises to disclose information about major customers, that FASB Statement No. 21 "does not affect the disclosure of information about economic dependency when such disclosure may be necessary for a fair presentation." That observation, however, refers to the now-superseded SAS No. 6.

**B-31.**     AcSEC believes that disclosure in the notes to financial statements about current vulnerability due to concentrations of customers, grantors, and contributors is necessary for a fair presentation when the criteria in paragraph .21 of this SOP are met. Assessing the likelihood of loss of relationships with these parties would often present difficulties, however. Accordingly, for purposes of this SOP, it is always considered at least reasonably possible that any of these relationships will be lost in the near term. Similarly, because of the difficulty in assessing the political and economic risks associated with operations located outside an entity's home country, for purposes of this SOP, it is always considered at least reasonably possible that those operations might be disrupted in the near term. This SOP does not, however, prohibit entities from also stating in disclosures of concentrations related to customers, grantors, or contributors or operations located outside the entity's home country that the entity does not expect that the business relationship will be lost or does not expect that the foreign operations will be disrupted if such is the case.

**B-32.**     AcSEC considered whether it would be useful to establish quantitative criteria for disclosure of concentrations, either in place of or in addition to the qualitative criteria provided. AcSEC believes that a quantitative approach might not provide meaningful information about an enterprise (for example, a critical supplier is not necessarily a major supplier). Any potential simplification in implementing the disclosure requirements that might result from a quantitative approach would be outweighed by deterioration in the quality of information provided.

**Current SEC Requirements**

**B-33.**     The SEC requirement for information to be included in MD&A expands the information that financial reporting otherwise provides to include certain specific kinds of information related to liquidity, capital resources, and results of operations. It further expands the information to include management analysis of trends and other factors. Thus, management's subjective analysis is a significant part of the information users obtain from financial reporting of publicly held business enterprises as the data for their decisions.

**B-34.**     The FASB's Concepts Statements present the view that such analysis is helpful to users. For example, in Concepts Statement No. 1, the FASB observes that financial reporting should include explanations and interpretations and cites as an example management's explanation of the information as a significant aid to users.

**B-35.**     Under SEC requirements relating to MD&A, publicly held business enterprises are required to describe, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" (Regulation S-K, Item 303(a)(3)(ii)). SEC Financial Reporting Release (FRR) No. 36 clarifies that disclosure is required unless management determines that the trend or uncertainty is not reasonably likely to occur or that a material effect on the registrant's

financial condition or results of operations is not reasonably likely to occur. Publicly held business enterprises are encouraged but not required to include forward-looking information relevant to a full understanding of their past and anticipated operations.

**B-36.**     The disclosure of current vulnerability due to certain concentrations required by paragraph .21 of this SOP differs from the MD&A requirement in two important respects. First, the MD&A rules apply broadly to "any known trends or uncertainties," whereas paragraph .21 applies only to certain known concentrations. Second, this SOP requires disclosure only if the effect would cause a severe impact in the near term—a higher threshold than "material" used for MD&A purposes. AcSEC believes a higher threshold is needed for these disclosures to avoid required disclosure of lengthy lists of risks related to concentrations that are reasonably possible in today's environment and at the same time still meet the objective of providing an early warning of the potential for a disruptive set of events occurring in the near term.

**B-37.**     The SEC also requires registrants, "where appropriate," to include in prospectuses offering securities to the public "a discussion of the principal factors that make the offering speculative or one of high risk." Among the factors cited are "the financial position of the registrant" and "the nature of the business in which the registrant is engaged or proposes to engage" (Regulation S-K, Item 503(c)).

**B-38.**     This information required by the SEC is not now required for entities not subject to SEC regulation. However, expanding the scope of financial statements to include some of such information is compatible with the objectives of financial reporting. This SOP requires disclosure in the notes to financial statements of some of the information now reported in MD&A or as risk factors but might also require disclosure of certain information not currently required in either place.

**Comments Received on Exposure Draft**

**B-39.**     An exposure draft of a proposed Statement of Position, *Disclosure of Certain Significant Risks and Uncertainties and Financial Flexibility*, was issued for public comment on March 31, 1993, and distributed to approximately 20,000 interested parties to encourage comment by those who would be affected by the proposal. Over 300 comment letters were received in response to the exposure draft. Substantially all of the responses expressed reservations regarding the exposure draft's required disclosures of certain significant estimates, current vulnerability due to concentrations, and financial flexibility, while relatively few respondents expressed concerns regarding the disclosure of the nature of the reporting entity's operations or the use of estimates in the preparation of financial statements.

**B-40.**     The most significant and pervasive concerns can be summarized in three areas:

*a.*     The cost of determining the necessity of the disclosures will exceed the benefit received from providing them, particularly for small, privately owned entities, and particularly with respect to the requirements for disclosure of financial flexibility.

*b.*     Requiring disclosures based on information "of which management is reasonably expected to have knowledge" is too subjective and unnecessarily expands costs and liability as well as the "expectation gap."

*c.*     "Reasonably possible" is too low a threshold and is an insufficiently objective criterion for disclosure of a broad range of possible future events.

**B-41.**     AcSEC considered the comments received on the exposure draft and took the following actions in response to them.

*a.*     The requirement for disclosure of financial flexibility has been eliminated from this SOP. Financial flexibility was the exposure draft's most controversial requirement, with deep concerns expressed about the cost of compliance. Other concerns were expressed regarding the overlap between the exposure draft's requirements and the requirements of SAS No. 59, *The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern*, and the ability of the

exposure draft's criteria to highlight meaningful information and to differentiate among entities that have different risks.

AcSEC does, however, continue to consider financial flexibility disclosures to be relevant early warnings for financial statement users. AcSEC also believes that disclosure requirements such as those included in SAS No. 59 should be included in accounting rather than auditing standards. Therefore, AcSEC and the AICPA's Auditing Standards Board are considering forming an interdivisional task force to develop accounting standards to provide the appropriate early warnings of possible financial difficulties and to replace disclosure requirements currently included only in auditing standards.

*b.* This SOP requires disclosure of certain defined concentrations known to management rather than a wider range of concentrations based on information of which management "is reasonably expected to have knowledge." Further, because of the continuing activity of the FASB in establishing disclosure requirements related to financial instruments, none of the defined concentrations relate specifically to financial instruments. The disclosures are to be made when (*a*) the concentrations are known to exist at the date of the financial statements, (*b*) they make the enterprise vulnerable to the risk of a near-term severe impact, and (*c*) it is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

AcSEC considered eliminating the reasonably possible and severe-impact disclosure criteria, but decided that retention of these criteria should promote disclosures that are more significant and useful than standardized listings that might otherwise result.

*c.* The requirements to disclose certain significant estimates have been clarified to make them more consistent with the requirements of FASB Statement No. 5. This SOP requires discussion of estimates when, based on known information available prior to the issuance of the financial statements, it is reasonably possible that the estimate will change in the near term and the effect of the change will be material. AcSEC responded to concerns regarding the predictive nature of this disclosure requirement by stipulating that it is the estimate of the effect of a change in a condition, situation, or set of circumstances that existed at the date of the financial statements that must be disclosed and that the evaluation should be based on known information available prior to issuance of the financial statements.

AcSEC also revised the disclosure requirements included in the exposure draft applicable to estimates not involving loss contingencies covered by FASB Statement No. 5. With respect to such estimates, this SOP does not require the disclosure of the possible loss or range of loss or the statement that such an estimate cannot be made.

*Placement of Disclosures*

**B-42.**    A significant number of commentators recommended that, because of the subjectivity associated with some of the disclosures required by this SOP, they should be presented outside the basic financial statements, either as supplemental information or in MD&A.

**B-43.**    FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises,* distinguishes between information that should be part of the basic financial statements and that which should be provided as supplementary information. Paragraph 7 of Concepts Statement No. 5 emphasizes that information disclosed as part of the basic financial statements amplifies or explains information recognized in financial statements and is essential to understanding that information. FASB Statement No. 107, however, points out in paragraph 75 a need for disclosure about "many important items . . . not recognized as assets and liabilities in financial statements, and many transactions and other events . . . not recognized when they occur but only later when uncertainty about them is reduced sufficiently so that their effects are clear."

**B-44.**    The disclosures required by this SOP build on disclosures already included in the basic

financial statements and, like them, serve one of the major purposes of disclosure summarized in Appendix D of FASB Statement No. 105, that is, to help in assessing risks and potentials. AcSEC also believes that the changes made in response to the comments received on the exposure draft have significantly reduced the subjectivity of the disclosures. Accordingly, AcSEC concluded that all of the disclosures now required by this SOP should be included in the basic financial statements.

### *Scope*

**B-45.**    The exposure draft of this SOP would have applied to state and local governmental units. However, concern was expressed that inclusion of such entities unduly complicated the SOP. Further, resolving financial reporting issues unique to state and local governments that were brought up by commentators on the exposure draft—especially in the light of the other substantive changes made to the exposure draft—would have unduly delayed the issuance of this SOP. AcSEC believes the understandability of this SOP is improved by not including state and local governmental units in its scope. **fn 29**

**B-46.**    Many commentators on the exposure draft recommended that other reporting entities, especially smaller nonpublic reporting entities, be exempted from this SOP's disclosure requirements. AcSEC considered those recommendations and concluded that the disclosures required by this SOP are no less relevant for such entities and that the changes made to the exposure draft sufficiently mitigate the concerns expressed by commentators.

**B-47.**    Some commentators requested that AcSEC clarify the applicability of the SOP's requirements to financial statements prepared using an Other Comprehensive Basis of Accounting (OCBOA). AcSEC concluded that the applicability of disclosures required by GAAP to OCBOA financial statements is a pervasive issue that is beyond the scope of this SOP.

### Field Tests

**B-48.**    The March 31, 1993 exposure draft *Disclosure of Certain Significant Risks and Uncertainties and Financial Flexibility* was subjected to limited field testing in which the exposure draft was applied to small and medium-size businesses, a not-for-profit organization, and case studies. The issues highlighted by the results of those tests were similar to the issues raised in the comment letters on the exposure draft. The results of the field tests were considered by AcSEC in its deliberations of this SOP.

### Cost/Benefit

**B-49.**    AcSEC believes the disclosures required by this SOP will improve financial reporting by providing, in a number of situations, information that will assist financial statement users in assessing certain risks and uncertainties inherent in financial reporting. AcSEC also believes the changes made to the exposure draft, which are discussed in paragraph B-41, are reasonably responsive to concerns expressed by commentators about the cost of determining the need for and making those disclosures.

**B-50.**    FASB Concepts Statement No. 2, *Qualitative Characteristics of Accounting Information*, states in paragraph 142 that:

> The costs and benefits of a standard are both direct and indirect, immediate and deferred. They may be affected by a change in circumstances not foreseen when the standard was promulgated. There are wide variations in the estimates that different people make about the dollar values involved and the rate of discount to be used in reducing them to a present value . . . [It has been observed that] "the merits of any Standard, or of the Standards as a whole, can be decided finally only by judgments that are largely subjective. They cannot be decided by scientific test."

**B-51.**    While a reliable evaluation of costs versus benefits is not possible, AcSEC believes that the benefits of the disclosures required by this SOP will outweigh their costs.

## AICPA Special Committee on Financial Reporting

**B-52.**    In the Spring of 1991, the AICPA's Board of Directors formed a Special Committee on Financial Reporting to address increasing concerns about the relevance and usefulness of financial reporting. The committee's charge is to recommend to standards setters and regulators (1) the nature and extent of information that should be made available to others by management and (2) the extent to which auditors should report on the various elements of that information. The focus of the Special Committee's work is on the information needs of investors and creditors, and its recommendations will be responsive to those needs.

**B-53.**    In its November 1993 report on the information needs of today's users of financial reporting, *The Information Needs of Investors and Creditors*, the Special Committee stated:

> Users want operating opportunities and risks identified based on the company and its segments rather than on an industry-wide basis. They also want information about opportunities and risks resulting from concentrations in assets, customers and suppliers.

**B-54.**    AcSEC considered the Special Committee's preliminary findings in developing this SOP, and AcSEC may reconsider the guidance in this SOP in the light of the Special Committee's recommendations, if and when the conclusions are implemented by standards-setting bodies.

Accounting Standards Executive Committee (1993?1994)

| | |
|---|---|
| NORMAN N. STRAUSS, *Chair* | SALLY L. HOFFMAN |
| PHILIP D. AMEEN | JAMES A. JOHNSON |
| ERNEST F. BAUGH, JR. | KRISTA MARIE KALAND |
| G. MICHAEL CROOCH | ROBERT S. KAY |
| H. JOHN DIRKS | ARAM G. KOSTOGLIAN |
| GEORGE P. FRITZ | JAMES T. PARKS |
| STUART H. HARDEN | EDWARD W. TROTT |
| JAMES E. HEALEY | |

Risks and Uncertainties Task Force

| | |
|---|---|
| RICHARD DIETER, *Chair* | JAMES E. HEALEY |
| ERNEST F. BAUGH, JR. | SALLY L. HOFFMAN |
| H. JOHN DIRKS | JAMES C. MEEHAN |
| SUSAN A. FRIEDEN | GERALD I. WHITE |

AICPA Staff

| | |
|---|---|
| JOHN F. HUDSON<br>*Vice President*<br>*Technical Standards and Services* | ARLEEN RODDA THOMAS<br>*Director*<br>*Accounting Standards* |
| FREDERICK GILL<br>*Senior Technical Manager*<br>*Accounting Standards* | |

Confidential and Proprietary — for Use Solely by Authorized Personnel

Print Selected Documents

AICPA Technical Practice Aids
Copyright © 2006 American Institute of Certified Public Accountants, Inc.

EXHIBIT 303



ADAMS GOLF SECURITIES LITIGATION

EXPERT REPORT OF CHRISTIANA OCHOA

INDIANA UNIVERSITY SCHOOL OF LAW, 211 SOUTH INDIANA AVENUE, BLOOMINGTON, IN 47405
PHONE: (812) 856-1516/ FAX (812) 855-0555/ EMAIL: cochoa@indiana.edu

EXHIBIT

303

8·4·06

ADAMS GOLF SECURITIES LITIGATION

EXPERT REPORT OF CHRISTIANA OCHOA

I.    INTRODUCTION

1.    I have been asked by plaintiff's counsel in this matter for my opinion as
to:

A.    The characteristics of gray marketing and the effects it can have on brand
name products and the trademark owners or manufacturers thereof.

B.    Given the business strengths and strategies of Adams Golf (hereinafter
"Adams" or "the Company"), whether at the time of and subsequent to its initial public
offering, gray market distribution was an important risk faced by investors in the
Company and whether the gray market distribution and sale of Adams golf clubs was of
such a nature as to be a material consideration to persons considering investing in the
Company's securities.

II.    BACKGROUND AND QUALIFICATIONS

2.    I am an Associate Professor of Law at Indiana University School of Law.
This report summarizes my opinion regarding the above question.

3.    My curriculum vitae, which is attached as Exhibit A hereto, summarizes
my educational and professional experiences, as well as my areas of expertise. This is the
first time I have provided an expert opinion in connection with litigation.

4.    I am providing this opinion independent of my relationship with Indiana
University, including Indiana University School of Law. The opinion expressed herein is
entirely my own and does not represent the opinions of these institutions.

1

5.     Indiana University School of Law is a top-tier law school, devoted to the

education and training of attorneys. My courses include International Business

Transactions, which includes materials on gray market activity in the golf industry. I also

teach Corporate Finance, Contracts and two courses in Human Rights. My research

includes topics related to corporate social responsibility, human rights and international

law.

6.     I graduated with a dual B.A. degree in History and American Culture from

the University of Michigan in 1993. I also received a J.D. from Harvard Law School in

1998. I have attended many continuing legal education sessions on topics related to

corporate law and corporate finance transactions.

7.     I have worked as a transactional attorney and professor. My work

experience includes:

- Indiana University School of Law - Bloomington, 2003-present. As an Associate
  Professor my duties are divided into three categories: research, teaching and
  service. My research currently is concerned with theoretical aspects of customary
  international law. It has previously been focused on the intersection of cross-
  border business activity and human rights. As discussed above, my courses
  include International Business Transactions, including a section devoted to
  counterfeit and gray market activity, especially in the golf industry, Corporate
  Finance, Contracts and two courses in Human Rights. My teaching responsibilities
  also include mentoring and guiding students through law school and into their first
  years as practicing attorneys. The service aspect of my duties is primarily fulfilled
  via membership on various law school committees, including as an elected
  representative on the law school's policy committee. I have also acted as the
  faculty supervisor to the Public Interest Law Foundation and the Indiana
  University Journal of Global Legal Studies.

- Clifford Chance, an international law firm, summer 1997 (summer associate) and
  from 1999-2001 (attorney). I represented investment banks and institutional
  investors in all aspects of various loan transactions, corporate restructurings,
  securities transactions and aircraft purchases. I drafted and negotiated loan
  agreements and collateral agreements and other transactional documentation,
  prepared offering circulars and performed due diligence in connection with
  securities offerings.

2

- Universidad de los Andes, a premier law school in Bogotá, Colombia, 1998-1999. As a visiting professor of law, I developed and taught a law school course entitled "Economic Globalization, Labor and Migration. I also prepared the first runner-up student team for the Organization of American States Human Rights Moot Court Competition.

- Colombian Commission of Jurists, a prominent human rights and humanitarian law organization in Bogotá, Colombia, 1999. I researched Colombia's constitutional mechanisms for human rights protections, in particular the constitution's applicability in addressing violations of such rights by private actors.

8.      I am being compensated for the time I spend on this matter at my current

hourly rate of $425.00 per hour. Secretarial assistance and research assistance, when

utilized, is being compensated at a nominal hourly rate of between $15 and $20 per hour.

Indiana University School of Law and Indiana University are not being compensated in

this matter.

9.      I am familiar with the causes and effects of gray market activity. In

connection with this matter, I have reviewed the following articles related to the gray

market generally:

- Assmus, Gert, & Wiese, Carsten, Sloan Management Review, "How to Address the Gray Market Threat Using Price Coordination", Spring 1995, vol. 36 no. 3, p.31.
- Berman, Barry, Business Horizons, "Strategies to Combat the Sale of Gray Market Goods", July-August 2004, vol. 47 no.4, p. 51.
- Cespedes, Frank, et. al., "Gray Markets: Causes and Cures", Harvard Business Review, July-August, 1988, p. 75.
- Eagle, Lynne, et. al., "Brand Equity and Brand Vulnerability: The Impact of Gray Marketing/Parallel Importing on Brand Equity and Values", European Journal of Marketing, 2003, vol.37 no.10, p. 1332.
- Maskulka, James, Gulas, Charles, "The Long-term Dangers of Gray-Market Sales", Business, Jan-Mar 1987, vol. 37, p. 25.
- Myers, Mathew, "Incidents of Gray Market Activity Among US Exporters: Occurrences, Characteristics and Consequences", Journal of International Business Studies, 1st Qtr., 1999, vol. 30 no. 1, p. 105.

3

- Myers, Matthew B., Griffith, David A, Business Horizons, "Strategies for Combating Gray Market Activity", Nov. 1999, vol.42 i.6, p2.
- Myers, Mathew, Griffith, David A., "Organizational- and Product – Related Influences of Gray Market Channel Activity", Journal of Marketing Channels, 2000, vol.7 no.4, p. 45.

10.    I have familiarized myself with the gray market activity Adams was experiencing at the time of and following its initial public offering and have developed insights and opinions regarding the causes of gray market distribution of Adams golf clubs as well as the nature of the risk such activity posed to investors in the Company's securities at the time of the initial public offering. I have reviewed and/or relied on the following documents, among others, in arriving at these opinions:

- Depositions and transcripts and exhibits of all deponents except plaintiffs
- Declarations of Mark Woodrich and Ryan Magnussen
- Costco Wholesale's sales history inquiries by item by region for fiscal years 1998-2001.
- 1997 Callaway Golf 10-K.
- Opinion of R. Allan Miler

III.    ANALYSIS AND OPINION

11.    Gray market goods, also referred to as "parallel imports", are genuine goods, produced lawfully and with the permission of the manufacturer or trademark holder (in this case, Adams). Unlike the black market, which serves as the distribution channel for counterfeit and other illegal goods, the gray market is not necessarily illegal. What distinguishes gray market goods is that they are sold through distribution channels that the trademark owner did not authorize or plan, often without valid licenses or in violation of trade regulations. (Myers & Griffith, 1999, p. 2)

12.    Gray market activity creates intra-brand competition and can provide a larger selection of goods or goods at lower prices than authorized retailers would

4

normally provide. However, gray market goods may be sold without valid warranties and the customer service the manufacturer and/or authorized retailers would normally provide. This report is concerned with the short and long term effects of the gray market on the manufacturer or trademark holder, this case, Adams.

13.    The gray market can be beneficial to the trademark owner, in that it may allow for increased sales. However, as this report will discuss, these are generally short term benefits. In the long term, the gray market is often detrimental to trademark holders. Problems can arise in the form of "ineffective pricing policies, deteriorated distributor relationships, low sales force morale" (Meyers, 1999, p. 106, citing Cespedes, 1988) and decreased prestige associated with a trademark or brand name. (Meyers, 1999, p. 106)

14.    Goods sold through gray market distribution channels can be manufactured within or outside of the country in which they are sold to consumers. In the case of Adams, all golf clubs were manufactured in the United States and were sold both in the United States and internationally.

15.    Adams golf clubs were being sold though gray market distribution channels at the time of the initial public offering. The gray market distribution occurred both in the United States and in Canada, when the Company's golf clubs appeared in Costco stores throughout both countries and in other unauthorized stores. While the absolute number of Adams golf clubs sold through Costco stores may seem relatively small when compared to total sales, there are a number of reasons even these sales posed a significant risk to investors. These include: 1) the Company's business model and the desirability of the Adams brand, if unchanged, would continue to make Adams golf clubs particularly attractive to gray marketers; 2)  the Company's business model and the

5

desirability of the Adams brand were particularly susceptible to damage from gray market activity; 3) gray market Adams clubs were available in Costco stores throughout the United States and Canada and required the attention of Adams' distributors, sales personnel and retailers throughout this large geographic region; 4) Costco records indicate that, at the time of Adams' initial public offering, Costco had purchased over 8,400 golf clubs, indicating that gray market sales were likely to continue or intensify; 5) Once there is an established gray market distribution channel for a given product, the volume of sales made through discount retailers can increase rapidly; and 6) reducing gray market activity requires manufacturers to exercise constant vigilance and expend resources on an ongoing basis These reasons and others will be discussed herein.

     A.    Adams' experience with gray marketing illustrates how quickly a gray market problem can arise and spread for a manufacturer or trademark owner. The apparent "first lead" on Adams golf clubs being sold through Costco was on March 23, 1998. This information was passed on to the Company soon thereafter. (Exs. 6, 7, 258) On April 16, 1998, the Company received a letter from WDC Mackenzie Distributors, Ltd. (hereinafter "Mackenzie"), its only authorized distributor in Canada, indicating that it had received 108 returned clubs in the weeks since Adams golf clubs appeared in Costco stores. (Ex. 9) In a fax to Barney Adams, Mark Gonsalves and Marc Puglielli dated May 29, 1998, Chris Beebe, Adams' head of international sales, conveys that the first shipment of Adams clubs to Costco "caused a great deal of trouble" for Adams' Canadian distributor and for authorized Canadian retailers. Mr. Beebe also expresses his concern that the Company "stands to lose most of the goodwill we [Adams] have built in Canada, and see the 15,000 clubs that McKenzie is forecasting for sales through the end

6

of the year disappear." (Ex. 85, ADAMS 001497) By May 6, 1998, the Company had heard of several cases of gray marketing occurring in the United States and internationally. (Ex 51 MCK00081)

        B.     Discount retail chains such as Costco have the capacity to ensure that a given gray market product will be sold in numerous geographic regions. A study on the long term effects of the gray market which was available at the time of the Company's initial public offering states:

> Once established, the gray market tends to exhibit a "snowball effect," forcing traditional marketing channel members to participate in order to compete. Even those firms that would normally be geographically removed from the center of gray-market activity are drawn into direct competition with the gray market....Thus, gray marketing can reach all markets. The disturbing consequence for domestic marketers is that all domestic channels are subject to pressure from the gray market. (Maskulka & Gulas, 1987, p. 26)

Costco records show that prior to the initial public offering, at least 3915 golf clubs were sold in Costco stores. Of these, 3200 (82%) were sold in the United States and 715 (18%) were sold in Canada. During the period of March 15 to July 5, 1998, Costco stores in every region of the United States and in Canada had purchased and were selling Adams golf clubs. (Cost 0009-52)

        C.     Gray market sales of Adams golf clubs grew in the period leading up to the initial public offering and were highest in the time immediately surrounding the initial public offering. (Cost 0024) Costco sales of Adams golf clubs grew from 223 clubs in the United States and Canada combined during the period such sales were first discovered (March 15 – April 11, 1998) to 2,008 golf clubs during the period of July 5 to August 1, 1998. (Cost 0024, 0051 and Cost 0052).

7

16.    As described in paragraph 15.A and 15.B above, gray market sales were

occurring at the time of the initial public offering. There is ample contemporaneous

evidence the Company believed this was a serious problem. In a fax to Mark Gonsalves

dated April 15, 1998, Chris Beebe explains that gray market operations detected recently

in the United States and Canada could "hurt Adams Golf no matter where they occur, for

the outlets that receive these goods 1) have not been approved as an Adams outlet for a

variety of reasons, 2) are not required to standby our pricing policies, which can impact

our good accounts and 3) can cost Adams Golf a *great deal* of money and/or sales."

(emphasis added, Ex. 258, ADAMS 005045) Mark Gonsalves, Adams' vice president for

sales, viewed gray market sales of Adams clubs as a "serious situation" (Ex. 257,

ADAMS 002472) which required Adams to "take all necessary action to help prevent this

from happening again." (Ex.63 ADAMS 002470) After the initial public offering, the

Company's Board of Directors also seems to have requested that it meet "when serious

issues such as Costco come up." (Ex. 151 ADAMS 002241)

17. '    Before the initial public offering Adams developed a plan to deal with

gray market sales that would affect the Company's profit margins. As discussed in

paragraph 15.A above, gray market sales had the capacity to negatively impact its

relationship with authorized retailers, to decrease profit margins (Ex. 258, ADAMS

005045) and to affect the perception of Adams golf clubs in the market. (Ex. 6

MCK00094) In reaction to the Costco sales, by June 8, 1998, the Company had

established a plan to deter the sale of its clubs to and through Costco stores in Canada.

This plan was to "remain in effect until the stock of Costco products is too low to

realistically impact the *Tight Lies* selling price." (Ex. 10)  In addition, by the end of July

1998 Adams had installed its "Thank-you America buy two Tight Lies©, get a free stand bag" program, which was utilized, at least in part, to deal with the appearance of Adams clubs in Costco stores. (Ex. 80 ADAMS036832 and Exhibit 56, ADAMS036843)

18.     The Company had a gray market problem at the time of the initial public offering which had already begun to threaten its relationships with retailers, its profit margins and its perception in the market place. Numerous articles written on gray market activity discuss methods companies can employ in attempting to eradicate gray market activity once it has begun. These strategies can be very complex and costly. To my knowledge there is no significant evidence that any approach will ensure eradication of a company's gray market problem. The Company's experience with the gray market indicates the difficulty in stopping gray market activity once it has begun. In an email written just over a year after Adams first discovered its clubs were being sold in Costco stores, Patty Walsh expressed the Company's belief that the gray market distribution of its clubs could "never be eradicated altogether." (Ex. 109, ADAMS 003825)

19.     The Company's business model made it particularly vulnerable to gray marketers. It also made it particularly susceptible to the types of damage the gray market can bring to a manufacturer or trademark holder. In the long term, the gray market is known to be potentially detrimental to consumers and trademark holders alike. Problems can arise in the form of "ineffective pricing policies, deteriorated distributor relationships, low sales force morale, poor customer service" (Meyers, 1999, p. 106, citing Cespedes, 1988) and decreased prestige associated with a trademark or brand name. (Meyers, 1999, p. 106)

9

20.    Adams' business strengths, as stated in the Prospectus filed with the SEC and in its Roadshow Presentation, were strongly reliant on three aspects of the Company's business on which the gray market can readily prey and on which it can have significant detrimental effects: a) a prestigious brand image of the clubs b) high profit margins and c) strong and exclusive relationships with its distributors and authorized retailers. (Ex. 167 UND 00016, 00017, 00028, 00029 and Ex.72, p 24)

21.    The prestigious image enjoyed by Adams golf clubs made Adams an attractive gray market target. At the same time, the gray market had the potential of degrading this prestigious image.

A.    When a good is in high demand, its suppliers or manufacturers may discourage competition among authorized retailers, as Adams sought to do through supposedly strong relationships with its retailers. This creates a price umbrella likely to draw unauthorized dealers into the market. (Cespedes, et.al., p78) In addition, gray marketers gain a "free ride" on the market demand and brand image created by authorized distributors and retailers, without having to incur the costs of promoting the product which have helped build the brand's image. "Brand images are a fragile asset and can easily be tarnished by gray market activities. Since gray marketers have no investment in the brand name they have no incentive to protect it." (Maskulka & Gulas, 1987, p.27) The built-in cost differential created by this "free ride" makes gray marketing in prestigious brand name products attractive. The gray market literature suggests that high profile brands are attractive gray market targets. (Eagle, et. al., 2003, p. 1344) When combined with opportunities for arbitrage created by high profit margins, currency fluctuation or price differentials, a prestigious brand name becomes highly attractive to

10

retailers such as Costco, which can provide such products at reduced prices to price-sensitive consumers.

        B.      Two aspects of a prestigious trademark or brand name can be damaged as a result of the gray market: First, the goodwill established or being established by the trademark owner is threatened when gray market consumers do not receive the full "extended product" in the form of pre- and post-sale service that buyers from authorized retailers receive. Second, a prestigious trademark or brand name can lose its esteemed status when it appears at reduced prices through unauthorized distributors. (Meyers and Grifith, 2000 p. 47) It should be noted that the marketing activity of a gray market retailer, such as Costco, is not coordinated by the manufacturer. As a result, a brand name such as *Tight Lies*, which Adams marketed by emphasizing its quality can be damaged when a gray market retailer instead focuses on discount prices. (Eagle, et.al., 2003, p, 1337) In a recent study of the effects of gray marketing on brand image, each of fifteen brand owners "believed that parallel import activity of their products into discount retail stores was negatively impacting, or had the potential to impact on their brand's perceptions. Their major concerns related to the lowering of prestige images by the brands' placement in what the brand controllers perceived to be an incompatible retail environment."(Eagle, et. al., 2003, p. 1342.) This same study concludes that in at least some situations, "a decline in brand valuation could presage a fall in shareholder value and thus investor attractiveness." (Eagle, et. al., 2003, p. 1347)

        C.      By extension, when a brand name is strongly identified with its manufacturer, as it was in the case of Adams golf clubs, the manufacturer's own image in the marketplace may be eroded together with the market image of its products. "[T]he

manufacturer and its legitimate dealers are left with a tarnished reputation that may require a substantial investment of time and money to correct." (Maskulka & Gulas, 1987, p. 30) This is likely to be particularly true for relatively new brand names and manufacturers, like *Tight Lies* and Adams for at least three reasons. First, consumers unfamiliar with the brand may first see and learn of the brand on the floor of a discount retail shop, rather than in an authorized golf shop, giving the impression that this new brand is not prestigious. Second, the name "ADAMS" appeared on each club (Ex. 167 UND00014) , together with the trademark *Tight Lies*. In addition, *Tight Lies* made up over 95% of the Company's sales prior to its initial public offering. This ensured that the Company name and the *Tight Lies* trademark were closely associated and any damage to the value of the *Tight Lies* trademark would likely redound to the Company as well.

       D.     In Adams' case, the availability of its clubs in Costco stores and retail sales of its clubs through Costco stores grew steadily prior to the initial public offering and then rose sharply immediately after its initial public offering. (Cost 0024) The Magnussen declaration states that sales by Mackenzie "plummeted during July, particularly after the IPO." (Ex. 50, p.3)  An issue of Golf Pro magazine which was apparently available in the middle of July discussed the availability of Adams golf clubs in Costco stores. (Ex. 233, p. 3) In an industry in which "word gets around quickly" (Ex. 50, p.4) the availability of a high-prestige product in a discount retailer is likely to be known and the negative effects of that knowledge are likely to be felt quickly. The close correlation between increasing gray market sales and decreasing authorized sales, therefore, strongly suggests that the damage to Adams name and the *Tight Lies* brand

12

resulting from the gray market was great immediately after the Company's initial public offering.

        E.     Consumer and investor knowledge of gray marketing likely increased in tandem with the increase of Adams golf clubs available and/or sold through gray market channels. On June 9, 1998, the Company issued a press release that it had filed a Bill of Discovery against Costco on June 9, 1998. (Ex. 20 MCK 01358) This was not effective notice to potential investors about gray market sales of Adams clubs, nor did it adequately explain the risks associated with investing in Adams. The press release did not clearly state that Adams was experiencing gray market sales. Also, even the potential investor who knew of this press release could reasonably believe that the absence of any mention of gray market sales in the Company's Prospectus indicated that either 1) Costco had not obtained the Company's clubs or 2) the gray market was no longer posing a problem for Adams.

    22.    The Company boasted higher retailer profit margins than any of its competitors as of the time of its Roadshow. (Ex. 167, UND00029) The high retailer profit margins built in to the Adams business strategy made its golf clubs especially attractive to gray marketers. Once established, the availability of Adams clubs through gray market distributors had the potential of eroding such high margins.

        A.     Gray marketing is often described as a form of arbitrage. Gray marketing takes advantage of price differentials created by currency fluctuation and differences in pricing in different markets. It also becomes possible as a result of high profit margins, such as those which were at the center of the Adams business model. Adams boasted retail margins of 31% (significantly higher than its competitors, such as

Callaway, Taylor Made or Cobra, which offered margins of 15%, 26% and 25%, respectively) (Ex. 167, UND00029). This allowed authorized retailers to purchase quantities of Adams clubs which they did not sell through their stores, but instead sold to Costco at a price that presumably fell somewhere between the wholesale price of $138.00 and Costco's retail price. High profit margins allow for each party in a gray market distribution chain to earn a profit even after the accounting for the additional shipping, storage and other costs associated with diverted sales. (See, Berman, 2004, p.55; Myers and Griffith, 1999, p. 3, Figure 1)

        B.     The Company's own Director of Investor Relations described the effects of the gray market on profit margins as follows: "While it may seem advantageous at first glance, the truth is this type of distribution can erode our retailers' profit margins, i.e. the on- and off-course golf shops which make up our customer base." (Ex.127, ADAMS 003672)

        C.     Gray market sales also resulted in less effective pricing policies. Authorized retailers sold Adams clubs for an average price of $199.00. Costco stores sold the same clubs at a significantly lower price. This price difference threatened sales at authorized retailers. Sales of Adams clubs through gray market channels resulted the Company's "retailers in the affected markets [being] reluctant to sell Adams equipment for little or no margin and therefore orders in these areas have been soft." (Ex. 112, ADAMS 003648) As a result, the Company implemented short term plans which cut into its own profits. These have been discussed previously herein at paragraph 17. In the long term, the Company overhauled its pricing policy in reaction to unauthorized sales of its products, reducing its suggested retail and minimum advertised pricing levels to $199.95

and $149.95, respectively, thereby eroding authorized retailers' profit margins – one of the Company's business strengths. In fact, by November 25, 1998, Eddie Tate, one of Adams' Regional Account Coordinators, stated that "once our pricing dropped to $179.00 in many of our markets, our once favorable margin was lost forever." (Ex. 299, TATE 0002) This new pricing policy is illustrative of the significant damage a Company can suffer from gray market activity.

23.    The Company relied on strong and exclusive relationships with on and off-course golf shops and selected sporting good retailers. Gray market sales are known to have a negative impact on a manufacturer's relationship with its distributors and authorized retailers.

A.    "When a distributor loses a sale to a gray marketer, the manufacturer hears about it in seven different languages." (Cespedes, et.al., p.75) Authorized retailers see sales decrease and/or their profit margins eroded from gray market sales, which they believe the manufacturer has a duty to control. As a result, even when a manufacturer is able to profit from gray market sales, its relationship with its authorized retailers is typically strained. (Myers and Griffith, 2000, p.47; Berman, 2004, p. 54; Assmus & Weise, 1995). The displeasure Adams' authorized retailers felt with gray market sales is well documented and described in part in paragraph 15.A above. (See, e.g. Ex. 85, ADAMS 001497)

24.    The Company's strategy for growth included internationalization. (ex.167 UND 00033 and Ex. 72, p. 25) The gray market can increase in at least three ways when products are sold internationally. First, if a product is priced lower in its country of manufacture than it is in a foreign country and the additional costs of shipping, storage,

15

etc. are lower than the price difference, parallel importing is economically viable.

Second, if a product in a foreign market is cheaper than in the country of manufacture

(due to currency differences or due to lower pricing in a softer market) and the additional

costs of gray marketing are lower than the price difference, there is economic incentive to

reimport the goods for gray market distribution. Finally, if there are price differences

between two countries, neither of which is the country of distribution, the product can be

sold through what is referred to as "lateral importation." (See Assmus and Wiese, p. 32

and Cespedes article, p. 77). A significant amount of the literature on gray marketing

discusses it in an international context, given the increased opportunities for arbitrage

once largely undifferentiated products are sold internationally.

     25.    Also, at the time of the initial public offering, the Company used a

network of thirty-three distributors such as Mackenzie in its international operations (Ex.

72, p. 25) and intended to continue to build its international operations. The gray market

literature indicates that firms, such as Adams, which outsource the distribution functions

in their export operations through the use of commission agents and merchant distributors

(as opposed to directing in-house employees to perform these functions), suffer most

from gray market sales. (Meyers, 1999, p. 117) Thus, the international distribution model

Adams employed made it particularly vulnerable to gray marketing.

     26.    Given the fact that gray marketing was already occurring at the time of the

initial public offering, the Company's plans to expand international sales would likely

create additional opportunities for gray market activity. This report has discussed above

how the Company's business strengths could be damaged by gray market activity. These

factors should reasonably have argued in favor of disclosure to investors, even if the total

16

volume of gray market sales was small relative to total sales at the time of the initial public offering.

27.    Low sales force morale is another common effect of gray market activity. (Meyers, 1999, p. 106) On August 14, 1998, Barney Adams' sent a memo to Marc Gonsalves and Ric Jerrett in which he provided a very negative assessment of the Company's sales department. Among other similar comments, he stated that the "staff [had] very low morale", including having "no faith in their management." (Ex. 57, ADAMS 028451)

28.    While the Company's business model was endangered by gray market activity in the long term, it is also important to note that Adams may have been enjoying the benefits of gray market sales in the short term. It is well established that the availability of goods in a greater number of retail outlets, especially at reduced prices, can have the effect of increasing sales volumes as price-sensitive consumers who lie outside of a manufacturer's target consumer base gain access to lower-priced goods. Anecdotally, one sales manager has stated, "[s]hort term, the gray market gives us good incremental business and it moves product. But longer term, we wind up competing with ourselves at a lower price."(Cespedes, et.al., 1988, p. 76) This appears to have been Adams' experience as well.

A.    During the time preceding the initial public offering, Adams golf clubs were a high-prestige brand. By the Company's design they had traditionally been sold primarily through high-end on and off-course golf shops and selected sporting good retailers. This report has previously established that a "hot" brand name characteristic

17

together with the large profit margin built into the retail sales price made Adams golf clubs attractive to gray marketers and to gray market distribution outlets such as Costco.

        B.     The addition of Costco as a buyer from the Company's authorized distributors or retailers had the effect of driving sales volumes upward during the time sales volume figures were being scrutinized by investors prior to the initial public offering. In all, Costco purchased in excess of 8,400 Adams golf clubs in the second quarter of 1998, prior to the initial public offering. The Company repeatedly stated before and after the initial public offering that it did not intend to sell its golf clubs through the "big box" retailers. Nonetheless, these unauthorized and unplanned sales to Costco were included in the Company's sales volume figures thereby skewing these same figures. In other words, if the Company could have prevented all sales to Costco, it may have sold in excess of 8,400 fewer golf clubs during the pre-initial public offering period. These 8,400 plus sales were nonetheless included in the Company's total sales volume figures as presented to potential investors.

        C.     The Company's future sales might also be at risk as a result of gray market activity for at least two reasons.

        1.     First, there was substantial risk and likelihood that the initial Costco shipments were just the beginning of a long term gray market problem for the Company. This could have and should have been predicted given the nature of the gray market and the amenability of the Company's business model to the gray market. Given the gray market activity it was experiencing, if the Company intended to stamp out gray market activity, it would lose at least a portion of whatever sales were being made to Costco and other gray market retail outlets. Thus, while the projected sales figures

18

presented to potential investors may have been accurate, they included gray market distribution of the Company's golf clubs, which the Company claimed to prohibit and appears to have wanted to eliminate.

    2.  In addition, the sales in Costco stores had the effect of diminishing the prestige and desirability of its clubs among high-end consumers thus reducing sales though the high-end retailers. On October 8, 1998, Barney Adams recognized this problem when he estimated that the gray market had a "negative sales effect in Q4 of 20%-25% based on a market survey (customers who refuse to buy)."(Ex. 80, ADAMS 036832) This is consistent with the experience of other brand owners suffering from gray market sales. Many trademark holders have "noted substantial losses in sales (up to 30%) as the direct result of parallel import activity." (Eagle, et al., 2003, p. 1342)

  29.  A company can suffer the negative effects of gray marketing even if only a relatively small percentage of their products are being diverted to discount retailers. This is especially true when sales are occurring in a broad geographic area, as they were in the case of Adams golf clubs which were sold at Costco stores throughout the United States and Canada.

    A.  As described above, there are specific business strategies that make particular products or companies vulnerable to gray market activity. In Adams' case, there was a strong congruence between the Company's business strengths and the characteristics that lead to gray market activity. In addition, the Company's intentions to further internationalize, especially using independent distributors, ensured that unless the Company devoted significant resources to deterring gray marketing, the Company would

continue to be an attractive target for gray marketers before and after its initial public offering.

        B.      Once there is an established gray market distribution channel for a given product, the volume of sales made through discount retailers can increase rapidly if a manufacturer does not counter quickly and effectively. This appears to have been the case for Adams which was "slow to react when unauthorized resellers, such as Costco, hurt retail margins" (Ex.17, MCK00026; Ex. 299, TATE 0002) despite the fact that gray market sales were growing each month leading up to the initial public offering. When Adams did respond, they appear not to have responded effectively, as the Company was later surprised that the plan they had established "in case Q4 turned sour" did not adequately counter the Costco sales (Ex. 56, ADAMS036843).

        C.      Finally, gray market activity can cause enduring harm as a manufacturer must exercise constant vigilance and expend resources on an ongoing basis to keep gray market distribution of its products at bay. In Adams' case, manpower, profits and capital resources were all affected by its attempts to stem gray market activity. The Company dedicated a four person "Costco Buster" team (Ex. 64, ADAMS 001524) charged with studying and stemming gray market sales. The Company implemented the plans described at 17.A and 22.C above which cut into the Company's profits and/or retailer profit margins. The Company also purchased equipment to place serial numbers on each of its clubs in an effort to deter gray marketing by allowing each club to be traceable through its distribution channel (Ex. 61). It is worth noting that at the time of the initial public offering this technique of addressing gray marketing had been criticized

as "administratively time consuming and costly" and was "not recommended as a long-term solution." (Maskulka & Gulas, 1987, p. 29)

30.     At the time of its initial public offering, Callaway had disclosed its gray market problem to investors through its 1997 Annual Report. In this report Callaway informed investors that:

> Some quantities of the Company's products find their way to unapproved outlets or distribution channels. This "gray market" in the Company's products can undermine authorized retailers and distributors who promote and support the Company's products, and can injure the Company's image in the minds of its customers and consumers. On the other hand, stopping such commerce could result in a potential decrease in sales to those customers who are selling Callaway Golf products to unauthorized distributors and/or an increase in sales returns over historical levels. While the Company has taken some lawful steps to limit commerce in its products in the "gray market" in both domestic and international markets, it has not stopped such commerce. The Company's efforts to address gray market issues could have an adverse impact on the Company's sales and financial performance.

This is notable because in determining whether a given disclosure is necessary it is common to consult the risk factors described by others in a given market segment when drafting disclosure documents such as the Company's Prospectus. Despite its on-going gray market problem and likelihood that such activity would continue or increase, Adams chose not to disclose its gray market problem or describe the risks its gray market problem posed to investors.

31.     On October 13, 1998, Barney Adams stated that Costco sales had a greater negative impact on the Company's fourth quarter sales than competition. (Ex. 56, ADAMS 036843) In his deposition he also stated that the gray market activity Adams was experiencing in October was no worse than it had been at the time of the initial

public offering. Nonetheless, Adams chose not to disclose the gray market distribution of its goods. Thus, under the Company's own admission, at the time of its initial public offering the gray market was a greater problem than competition (which was described to potential investors as a risk factor). Still, despite strong indications that the characteristics of the gray market posed considerable risk to the Company's business strategy, Adams chose not to disclose its gray market problem to potential investors.

32. I have prepared this report before the final completion of fact discovery and before reviewing defendant's expert report(s), which may cause me to modify or amplify views expressed herein.

July 4, 2006
Date

Christiana Ochoh
Associate Professor of Law

22

# EXHIBIT A

## CHRISTIANA OCHOA
Indiana University School of Law,
211 South Indiana Avenue, Bloomington, IN 47405
Phone: (812) 856-1516
email: cochoa@indiana.edu

### TEACHING EXPERIENCE

**INDIANA UNIVERSITY,** BLOOMINGTON, INDIANA                                      JUNE 2003 - PRESENT
*Associate Professor of Law, School of Law:* Courses include Contracts, Human Rights, International
Business Transactions and Corporate Finance. Research interests include the intersection of human rights
and international economic activity as well as, more generally, international law, finance and globalization.

*Adjunct Professor, Latino Studies Program*

*Faculty Reference, Center for Latin American and Caribbean Studies*

**UNIVERSIDAD DE LOS ANDES,** BOGOTÁ, COLOMBIA                      SEPTEMBER 1998 – JULY 1999
*Visiting Professor and Researcher:* Developed and taught a law school course entitled "Economic
Globalization, Labor and Migration." Prepared first runner-up student team for the Inter-American Human
Rights Moot Court Competition.

### OTHER WORK EXPERIENCE

**INDIANA UNIVERSITY,** BLOOMINGTON, INDIANA
*Faculty Colloquium for Excellence in Teaching (FACET)* – One of five Bloomington campus faculty
representatives engaged in a university wide Leadership Institute exploring issues related to developing
civic and moral responsibility in a global context.

**CLIFFORD CHANCE,** LONDON AND NEW YORK                    SUMMER 1997, SEPTEMBER 1999 –
APRIL 2001
Attorney in corporate department of law firm specializing in cross-border transactions. Represented
investment banks and institutional investors in all aspects of various loan transactions, corporate
restructurings, securities transactions and aircraft purchases. Served as elected associate representative to
Personnel                                                                                   Committee.

**COLOMBIAN COMMISSION OF JURISTS,** BOGOTÁ, COLOMBIA                      APRIL – JULY 1999
*Visiting Researcher:* Researched Colombia's constitutional mechanisms for human rights protections, in
particular, the constitution's applicability in addressing violations of human rights by private actors.

**HUMAN RIGHTS WATCH/AMERICAS AND CEJIL,** RIO DE JANEIRO, BRAZIL.    SUMMER 1996, JANUARY 1997
Conducted research for and wrote petitions for submission to the Inter-American Commission on Human
Rights -- one concerning systemic police violence in Rio de Janeiro and the other on the massacre of a
community of Yanomami Indians.

**UNITED NATIONS,** GENEVA, SWITZERLAND                                              AUGUST 1996
Participated in successful lobby of the Sub-Commission on the Prevention of Discrimination and Protection
of Minorities to investigate the relationship between human rights and the activities of transnational
corporations. Prepared an intervention for presentation to the Sub-Commission and participated in a panel
discussion organized by Japanese non-governmental organizations attending the annual meeting of the Sub-
Commission.

**WITHERAL SCHOOL,** ST. JOSEPH, MICHIGAN                                   JANUARY - AUGUST 1995

24

*Head Teacher:* Planned and taught academic and cultural activities for thirty children aged four to eight, many of them with learning or emotional disabilities.

FUNDECI, MANAGUA, NICARAGUA                                                                       SUMMER 1994
Prepared development loan applications for community development non-governmental organization. Translated human rights petitions. Organized and served as translator to medical delegations. Coordinated summer volunteers.

WORLD TEACH, LA CRUZ, COSTA RICA                                                         SPRING 1994
*Head Teacher:* Taught English and environmental education to rural Costa Rican elementary school children.

OFFICE OF COMMUNITY SERVICE AND LEARNING, UNIVERSITY OF MICHIGAN          JUNE 1992 – JUNE 1993
*Adrian High School Project, Coordinator:* Prepared and conducted weekly seminars for undergraduate students regarding the educational experience of Latinos in the United States. Organized volunteer tutors for Latino high school students.
*Migrant Labor Project:* Taught English as a Second Language to Latino migrant laborers in Michigan.

## PUBLICATIONS

Book review, *Companies, International Trade and Human Rights* 28 HUM. RTS. Q. 289 (2006).

*Towards a Cosmopolitan Vision of Customary International Law: Identifying and Defining CIL Post SOSA V. ALVAREZ-MACHAIN,* 74 U. CIN. L. REV. 105 (2006).

*Access to U.S. Federal Courts as a Forum for Human Rights Disputes: Pluralism and the Alien Tort Claims Act,* 12 IND. J. GLOBAL LEGAL STUD. 631 (2005).

*Advancing the Language of Human Rights in a Global Economic Order: An Analysis of a Discourse,* 23 B.C. THIRD WORLD L.J. 57 (2003).

*Comparación de negociaciones de paz en conflictos políticos y étnicos: los casos de Irelanda del Norte y de España [Comparison of Peace Negotiations in Ethnic and Political Conflicts: The Cases of Northern Ireland and Spain], in* LA OTRA GUERRA: EL DERECHO COMO CONTINUACIÓN DEL CONFLICTO Y LENGUAJE DE LA PAZ 271 (Rivera et al. eds., 1998).

*SALSA...Latino to Latino...A Tutoring/Mentoring Project, in* PRAXIS II: SERVICE LEARNING RESOURCES FOR UNIVERSITY STUDENTS, STAFF AND FACULTY 301, 313-14 (Galura et al. eds., 1993).

## INVITED PRESENTATIONS

*Refugees and Human Rights,* Panel Discussant at Conference entitled The History of Human Rights, Indiana University, Center for History and Memory and the Department of History, Bloomington, IN (March 8, 2006).

*Fair Trade: Definitions and Developments,* Paper presentation at Indiana University conference entitled The University and Fair Trade, Bloomington, IN (September 29, 2005).

*Can Legal Pluralism Inform the Inclusion of International Law in Judicial Decision Making?,* Paper presentation at the Law and Society 2005 Annual Meeting, Las Vegas, NV (June 5, 2005).

*Disparate Impact, Disparate Treatment: Discrimination in American Society,* Panel Discussant at the Law and Society 2005 Annual Meeting, Las Vegas, NV (June 5, 2005).

*Disjunctures in International Law: The role of the individual under customary international law treaties.* Paper presentation at Indiana University Institute for Advanced Study, Bloomington, IN (April 28, 2005).

*Identification and Definition of Customary International Law for Purposes of ATCA Litigation Post Sosa v. Alvarez-Machain: Towards a Cosmopolitan Theory,* Paper presentation at University of Cincinnati School of Law symposium entitled Corporate Social Responsibility in the International Context, Cincinnati, Ohio (February 18, 2005).

*Globalization and the New Politics of Labor and Law & Society Workshop,* discussant for panel entitled: *Human Trafficking and the Politics of Labor Migration,* Indiana University School of Law, Bloomington, IN (February 11, 2005)

*Liability of Union Carbide Under the Alien Tort Claims Act,* presentation to Association for India's Development, Bloomington, IN (December 3, 2004).

*Access to U.S. Courts as a Forum for Human Rights Disputes: The Alien Tort Claims Act Under Scrutiny,* Paper presentation at University of Trento Law Faculty conference entitled Back to Government? The Pluralistic Deficit in Decision-Making Processes and Before the Courts, Trento, Italy (June 11-12, 2004).

*The role of International Law and Institutions in Relation to Hardt and Negri's Empire.* Presentation at the Indiana University, Bloomington American Studies/Cultural Studies conference entitled Empire, Bloomington, IN (April 10, 2004).

*Human Rights and the Formation of Corporate Duties Under International Law.* Presentation to the International Law Society, Indiana University School of Law (March 10, 2004).

*Advancing Corporate Responsibility in the Global Economy: The Global Compact and Other Business-based Initiatives.* Presentation at California Western School of Law conference entitled The Rule of Law: Creating an Effective Legal Environment for the Global Economy, San Diego, California (November 16, 2002).

*Peace Negotiations: The Examples of Northern Ireland and Spain.* Panel Presentation at Javeriana University conference entitled Rights and Peace: Possibilities for Interaction, Bogotá, Colombia (October 1998).

*The Responsibility of Transnational Corporations for Violations of Human Rights.* Panel Presentation before Japanese non-governmental organizations attending annual meeting of the United Nations Sub-Commission on the Prevention of Discrimination and Protection of Minorities. Geneva, Switzerland (August 1996).

## EDUCATION

**HARVARD LAW SCHOOL, J.D., JUNE 1998**

Activities:  *Harvard Human Rights Journal,* EDITOR IN CHIEF; Harvard International Human Rights Project; Dean's Ad-Hoc Public Interest Committee, Student Representative; Student Public Interest Network, Chairperson; Public Interest Auction, Co-Chairperson

Honors:  Harvard Human Rights Fellowship; Reginald F. Lewis Traveling Fellowship; Irving R. Kaufman Public Interest Fellowship; Deborah K. Hauger Memorial Fellowship

**UNIVERSITY OF MICHIGAN, B.A. HISTORY, B.A. AMERICAN CULTURE, JUNE 1993**

Honors/Activities: *cum laude*; Honors Program; Michigan Student Assembly-Women's Issues Commission

## PROFESSIONAL ASSOCIATIONS

- Admitted to the New York Bar

- American Society of International Law
- New York Bar Association
- The Association of the Bar of the City of New York, Member of the International Security Affairs Committee (2000-2002)
- American Society of International Law

## LANGUAGES

Native English; Native Spanish; Proficient Portuguese

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 14th day of July, 2006, I caused the

**EXPERT REPORT OF CHRISTIANA OCHOA** to be electronically filed the with the Clerk

of Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

and a copy has been served by electronic mail upon the following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com