EXHIBIT 330





**Expert Report of**
**Charles A. Sjoquist, CFA**
**Manager, FTI Consulting, Inc.**

**In Re Adams Golf, Inc. Securities Litigation**
**Consolidated Civil Action No. 99-371 KAJ**

**Qualifications**

I am a Chartered Financial Analyst with more than 32 years of financial experience gained at the Securities and Exchange Commission ("SEC"), the Small Business Administration and in private business.

For twenty four years, I was a financial analyst on the staff of the Division of Corporation Finance at the SEC. For approximately twelve of those years, I was a Branch Chief responsible for the examination, analysis and processing of public company disclosure documents, including registration statements for the public offering of securities, annual and other periodic reports and proxy statements. I was responsible for administering the SEC's full disclosure program, including the review of filings, issuing comments to registrants and resolving those comments through additional disclosure or supplemental information supporting non-disclosure.

I was also on the staff of the Small Business Administration for approximately five and a half years in the Investment Division. I was Chief of the Licensing Unit responsible for administering the licensing of Small Business Investment Companies ("SBIC"). I was also an Area Chief responsible for the financial and regulatory oversight of a portfolio of licensed SBICs.

Subsequent to my career in public service, I provided consulting services to the SBIC industry.

I am a Chartered Financial Analyst ("CFA"). I graduated from St. Cloud State University in Minnesota with a BA in Business Management in 1968 and a MBA in Finance in 1973. I was in the US Marine Corps from 1968-1970 as a disbursing clerk at the Marine Corps Finance Center.

I have attached a professional biography at Exhibit A.

My employer is being compensated at an hourly rate of $400 per hour for my work in this matter.

**Background**

In connection with Akin Gump Strauss Hauer & Feld L.L.P.'s ("Akin Gump") representation of Adams Golf, Inc. ("Adams Golf" or the "Company") in the case styled *In re Adams Golf, Inc. Securities Litigation,* I have been requested to review and analyze the SEC's Division of Corporation Finance's processing of the Form S-1 Registration Statement (the "IPO"), which was filed with the Securities and Exchange Commission (the "Commission" or "SEC") on May 4, 1998 and subsequent amendments thereto.[1] Specifically, I have been asked to review the issuance by the SEC staff of an oral

---

[1] The Company's IPO offered for sale approximately 6.0 million common shares. Of such shares offered, approximately 4.0 million shares were being offered by the Company and 2.0 million shares were being offered by certain stockholders of the Company.

-2-

comment on June 25, 1998 relating to a legal action against Costco (the "Costco Matter") and its resolution.

In preparation for this assignment, I have read the materials listed in Exhibit B.

**Conclusion**

Based on the documents reviewed and all relevant facts, it is my opinion that the SEC staff had information submitted by the Company or otherwise made available to it to provide a reasonable basis for concluding that, at the time of effectiveness of the registration statement, disclosure of the Costco Matter was not material and therefore the registration statement was declared effective without such disclosure. The Assistant Director, who has the delegated authority to declare registration statements effective, would not have declared the registration statement effective with an open unresolved comment.

Executed this the 14 th day of July 2006 at Washington, D.C.

Charles A. Sjoquist

-3-

## Analysis

### The Registration Statement Review Process

When an IPO registration statement is filed with the SEC it will generally be reviewed by the SEC staff in the Division of Corporation Finance. The result of that review is the issuance of a comment letter to the Company, which sets forth the staff's views on areas where, in their view, the disclosure may be deficient or areas where more information or further explanation is requested. The Company will then respond to these comments by filing an amendment to the registration statement. The amendment will typically be accompanied by a cover letter which responds to each comment issued by the staff and explains the changes to the disclosure or provides the reason(s) why additional disclosure is not deemed necessary. The staff will review the amendment and responses and will either find them acceptable or issue further comments. If further comments are issued by the staff, another amendment will typically be filed by the Company responding to the second comment letter. The staff will review it for satisfactory compliance with the comments. If the staff is still not satisfied, additional comments will again be issued, which may be orally communicated if they are not numerous.

Upon resolution of the comments and upon receipt of a request for effectiveness from the Company, the examiner and reviewer on the registration statement will present the registration statement to the Assistant Director for sign-off on effectiveness. The Assistant Director is a senior level official in the Division of Corporation Finance who has the delegated Authority from the Commission to declare registration statements effective. The Assistant Director may have additional concerns not previously raised by the staff and these concerns would be communicated to the Company (either orally or in writing) by the staff for appropriate response. Once all comments have been satisfactorily resolved the registration statement is declared effective and sales of the securities being offered can commence.

The Adams Golf, Inc. registration statement was filed with the SEC on May 4, 1998. The initial SEC staff comment letter was dated June 5, 1998. Amendment No. 1 to the registration statement was filed June 10, 1998. On June 25, 1998, the staff issued oral comments. In response to such comments, Amendment No. 2 was filed July 6, 1998. Amendment No. 3 was filed July 9, 1998. There is no indication that the SEC staff issued comments on Amendments Nos. 2 or 3 relating to the Costco Matter. The registration statement went effective on July 9, 1998. On July 10, 1998, a Rule 462(b) filing was made for the purpose of increasing the size of the offering. Rule 462(b) is promulgated under Regulation C of the Securities Act of 1933. Under Rule 462(b), the prospectus was automatically effective upon filing.

As noted above, on June 25, 1998, the staff issued oral comments to the Company. In this regard, the staff's oral comment 4 requested the Company "to consider whether disclosure of the Costco [M]atter was necessary."[2] A draft response to the SEC staff's

---

[2] Refer to Exhibit B -- Memo dated June 25, 1998 to the File from Joe Hoffman of Arter & Hadden LLP re: Adams Golf SEC comments.

June 25, 1998 oral comment circulated by Arter & Hadden on July 2, 1998 repeats the oral comment number 4 as follows: "The staff notes that the Company has filed an action in Texas against Costco Companies, Inc. d/b/a Costco Wholesale. Please supplementally advise the staff of the significance of this action."[3] It is clear from this draft that the SEC staff requested more information on the Costco Matter for their further consideration. The Company filed via EDGAR on July 6, 1998 its response to the staff's oral comments, although oral comment 4 was not addressed in the response. However, the Company indicated in its response letter that:

> [t]his letter summarizes the Company's responses to the Staff's oral comments, received June 25, 1998. The undersigned [Joseph A. Hoffman] and J. David Washburn of this firm [Arter & Hadden LLP] previously discussed the Company's responses, at greater length, with Ms. Carolyn Kurr of the Staff on July 1, 1998."

Accordingly, in view of the above disclosure and based on my 24 years' experience as a member of the SEC staff and as a former branch chief, it is my opinion this comment was satisfactorily resolved. That fact that the registration statement was declared effective demonstrates that the SEC staff was provided information sufficient for them to be comfortable that disclosure of the Costco Matter was not necessary. As noted in the staff's June 5, 1998 comment letter, the Company was advised that "upon resolution of all outstanding comments, furnish your request for acceleration at least two business days prior to the requested effective date". The Company and its underwriters did furnish requests for acceleration on July 6, 1998 requesting effectiveness for the registration statement to July 9, 1998 or as soon thereafter as possible. As requested by the Company, the registration statement was declared effective on July 9, 1998 at 4:30 P.M.[4]

---

[3] Refer to Exhibit B – Arter & Hadden LLP Memorandum dated July 2, 1998.
[4] Refer to Exhibit B – letters from the Company and Lehman Brothers Inc. et al. requesting effectiveness of the registration statement.

**EXHIBIT A - Professional Bio of Charles A. Sjoquist, CFA**

Charles A. Sjoquist is a Manager in the FTI Forensic and Litigation Consulting practice and is located in Washington, D.C. Mr. Sjoquist has over thirty years' experience as a financial analyst with the Securities & Exchange Commission (SEC) and the Small Business Administration (SBA). Mr. Sjoquist has experience in SEC rules and regulations and reporting requirements. Mr. Sjoquist's SEC experience is in the Division of Corporation Finance where he worked in a wide variety of industries, including natural resources, computers, finance, asset securitizations, leisure and manufacturing. Mr. Sjoquist also has experience in SBA's Small Business Investment Company (SBIC) program, a program designed to bring needed venture capital to America's small businesses. Mr. Sjoquist has experience in all aspects of venture capital and private equity financing, including structuring, portfolio valuation and exit strategies.

Most recently, Mr. Sjoquist, through a sole member LLC, provided consulting services to a Baltimore based law firm advising the firm's clients on SBIC related matters, including licensing and regulatory oversight.

**Securities Expertise**

- US Securities & Exchange Commission - Branch Chief/Supervisory Accountant-Finance

Reviewed public company disclosure documents filed with the SEC for compliance with regulatory requirements. Examined registration statements for public offerings of securities, including IPOs, proxy statements for mergers and acquisitions and periodic reports. Issued comment letters to issuers citing deficiencies and negotiated appropriate changes. Supervised a staff of attorneys, accountants and analysts in the examination process.

**Small Business Expertise**

- US Small Business Administration - Chief Licensing Unit/Area Chief

Managed the Licensing Unit. Processed applications for SBIC licenses. Assessed the qualifications of the management team in terms of skills and track record. Conducted due diligence on the experience of managers. Licensed approximately 180 new SBICs representing over $2 billion in private capital. Held the position of Area chief with oversight responsibility for approximately 200 licensees. Considered requests for Leverage, government financial assistance. Participated in decisions on licensing, regulatory and credit matters as a member of the Investment Committee and the Credit Committee.

**Education**

Mr. Sjoquist holds both an MBA degree in finance and a BA degree in business management from St. Cloud State University in Minnesota. Mr. Sjoquist is a Chartered Financial Analyst and a member of the CFA Institute and the Washington Society of Investment Analysts. Mr. Sjoquist has also completed the Venture Capital Institute program cosponsored by the National Venture Capital Association and the National Association of Small Business Investment Companies.

**EXHIBIT B - Materials Considered in the Preparation of the Report**

Second Consolidated and Amended Class Action Complaint in the Adams Golf, Inc. Securities Litigation.

Adams Golf, Inc. prospectus dated July 9, 1998.

Comment Letter dated June 5, 1998 from the SEC to Adams Golf, Inc.

Letter dated April 21, 1998 to Adams Golf, Inc. from the SEC.

Letter dated May 4, 1998 to the SEC from Arter & Hadden LLP transmitting the Adams Golf. Inc. initial registration statement.

Letter dated June 8, 1998 from Arter & Hadden LLP to the SEC.

Letter dated June 8, 1998 from KPMG Peat Marwick to Adams Golf, Inc.

Letter dated June 10, 1998 from Arter & Hadden LLP to the SEC transmitting Amendment No. 1 and responding to the SEC comment letter.

Memo dated June 25, 1998 to the File from Joe Hoffman of Arter & Hadden LLP re: Adams Golf SEC Comments.

Arter & Hadden LLP Memorandum dated July 2, 1998 circulating an attached draft Response letter to the SEC's oral comments given June 25, 1998.

Cover letter dated July 6, 1998 transmitted via Edgar to the SEC with Amendment No. 2 to the Registration Statement on Form S-1.

Letter dated July 6, 1998 from James E. Farrell, Vice President – Finance, Adams Golf, Inc. to the Securities & Exchange Commission requesting acceleration of its registration statement.

Letter dated July 6, 1998 from Lehman Brothers Inc. et al., to the Securities & Exchange Commission requesting acceleration of Adams Golf, Inc. registration statement.

Memo dated July 8, 1998 to the File from J. David Washburn of Arter & Hadden LLP.

Letter dated July 9, 1998 to the SEC from Arter & Hadden LLP transmitting Amendment No. 3.

Letter dated July 10, 1998 to the SEC from Arter & Hadden LLP transmitting the Rule 462(b) filing.

CAS 0319

Letter dated July 10, 1998 to the SEC from Arter & Hadden LLP transmitting the Rule 424(b) (4) prospectus.

CAS 0320

SENT BY:ARTER & HADDEN-DALLAS : 7- 1-98 : 9:54PM :    ARTER & HADDEN→    2665X2245;# 7/ 6

# M E M O R A N D U M

June 25, 1998

TO:      File

FROM:    Joe Hoffman

RE:      Adams Golf SEC Comments

    Carolyn Kurr of the SEC called to relay to me the SEC's comments on the Adams Golf S-1 Registration Statement Amendment No. 1 filing.

    The following is a summary of the Staff's comments:

1.  The Staff has conducted a review of press releases and other publicity regarding the Company and noted that Mr. Adams, the Chairman of the Company, was quoted in a number of articles. Please make a good faith effort to review recent publicity and to square the information therein with the Prospectus.

2.  The Staff has noticed that the Company has an interactive site with Mr. Adams on its web page. Please discontinue the use of this feature until the Registration Statement has become effective.

3.  Consider updating disclosure in the Prospectus regarding USGA approval of golf equipment.

4.  The Staff wanted the Company to consider whether disclosure of the Costco matter was necessary.

104367.1

Ex. 164

UND 02708

CAS 0538

# ARTER & HADDEN LLP

## MEMORANDUM

<u>VIA FACSIMILE</u>

TO: Adams Golf, Inc. (972.398.8818)
   Darl P. Hatfield
   James R. Farrell

   Cooley Godward (415.951.3699)
   Karyn Smith, Esq.
   Rich Jaden, Esq.
   Steve Harmon, Esq.

   KPMG Peat Marwick (214.754.2485)
   Manny Fernandez
   Rick Ehrman

FROM: J. David Washburn

DATE: July 2, 1998

RE:  Response Letter

Attached please find a draft of our response to the SEC's oral comments given June 25, 1998. Please provide comments to me, if any, at your convenience.

Thanks.

cc: Joseph A. Hoffman, Esq.
  Robin Bradford, Esq.

EXHIBIT
90
Walsh

104426.1
60160/00224

AH 000005

CAS 0541

ARTER & HADDEN LLP
1717 MAIN STREET, SUITE 4100
DALLAS, TEXAS 75201-7366
214-761-2100 Telephone
214-741-7139 Facsimile

JULY 6, 1998

VIA EDGAR TRANSMISSION

SECURITIES AND EXCHANGE COMMISSION
Division of Corporation Finance
Judiciary Plaza
450 Fifth Street, N.W.
Mail Stop 3-5
Washington, D.C. 20549

Re:    ADAMS GOLF, INC.
       Amendment No. 2 to Registration Statement on Form S-1
       File No. 333-51715

Ladies and Gentlemen:

On behalf of Adams Golf, Inc. (the "Company"), we have electronically
transmitted herewith Amendment No. 2 to the above-referenced Registration
Statement, which has been marked to indicate the changes effected by the
Amendment. In addition, we have today forwarded, by way of overnight
delivery, five (5) marked copies of Amendment No. 2 to the Registration
Statement, c/o Ms. Letty Lynn, for the convenience of the Staff.

This letter summarizes the Company's responses to the Staff's oral
comments, received June 25, 1998. The undersigned and David Washburn of this
firm previously discussed the Company's responses, at greater length, with Ms.
Carolyn Kurr of the Staff on July 1, 1998.

1.    COMMENT:

The Staff has conducted a review of press releases and other publicity
regarding the Company and noted that Mr. Adams, the Chairman of the
Company, was quoted in a number of articles. Please make a good faith
effort to review recent publicity and to square the information therein
with the Prospectus.

RESPONSE:

The Company utilizes B.H. Adams, its Chairman and President, as the key
spokesperson for the Company's products. Further, Mr. Adams is a
respected expert on golf equipment and is often asked to comment on
issues related to golf equipment. Prior to and since the filing of the
Registration Statement, Mr. Adams has attempted to focus his public
statements on the Company's products, and his intent has only been to
promote the Company's products. It is the Company's belief that keeping
products in the public eye is crucial in the marketing of consumer
retail products such as those of the Company, especially at the peak of
the season. Since the announcement of the offering, Mr. Adams has
[refused various requests from the media for interviews and]
consistently noted to the media that he was prevented by SEC rules from
discussing the offering.

AH 000006

CAS 0542

SECURITIES AND EXCHANGE COMMISSION
July 6, 1998
Page

A number of the articles about the Company that have recently appeared
in the media have been the result of either prior public relations
activities (e.g. the PGA show in Florida in late January 1998) or
coverage generated by the press itself. Because of the seasonal nature
of golf, many of these articles are timed to run during May, June and
July, the peak of the golf season.

The timing with respect to the announcement of the Company's contract
with Nick Faldo was unavoidable. Mr. Faldo's contract with Mizuno ended
April 30, 1998. The Company was unable to announce its new relationship
with Mr. Faldo until his Mizuno contract expired, and this occurred at
or about the time of the initial filing of the Company's Registration
Statement. The Company incurred significant expense in connection with
the signing of Nick Faldo and needed to announce this significant
corporate event. The Company expects that its relationship with Mr.
Faldo will promote sales, especially international sales given Mr.
Faldo's international reputation.

The undersigned counsel and the Underwriters' counsel have reviewed the
publicity leading up to and after the filing of the Registration
Statement. Both believe that Mr. Adams' public statements square with
and are adequately addressed in the Prospectus.

2.   COMMENT:

The Staff has noticed that the Company has an interactive site with Mr.
Adams on its web page. Please discontinue the use of this feature until
the Registration Statement has become effective.

RESPONSE:

As requested, this site was disabled (Friday June 25, 1998?) and shall
remain disabled until after the Registration Statement has become
effective.

3.   COMMENT:

Consider updating disclosure in the Prospects regarding USGA approval of
golf equipment.

RESPONSE:

Updated disclosure relating to the USGA's recent announcement is
included on page 6 under "Dependence on New Product Introductions;
Uncertain Consumer Acceptance."

4.   COMMENT:

The Staff notes that the Company has filed an action in Texas against
Costco Companies, Inc. d/b/a Costco Wholesale. Please supplementally
advise the Staff of the significance of this action.

AH 000007

CAS 0543

SECURITIES AND EXCHANGE COMMISSION
July 6, 1998
Page __

RESPONSE:

The Company filed a Bill of discovery with the District Court in Collin
County, Texas (Cause No. 219-922-98) on June 11, 1998 against Costco
Companies, Inc. d/b/a Costco Wholesale ("Costco") for the purpose of
obtaining the identity of the Company's distributors who are apparently
selling the Company's products in violation of the Company's policies
and agreements with such distributors. The Company does not believe that
this proceeding is material.

KPMG has informed us that the original date of their auditors' report,
January 16, 1998, was in error. The appropriate date, which has now been
included in the Amendment No. 2, is April 29, 1998. KPMG has informed us that
this date of April 29, 1998 complies with the standards included in Statement
on Auditing Standards No 1 (AICPA AU Section 530.01). This information is
consistent with the discussion held between Sam Renzilla of KPMG and Kathy
Mathis of the Staff on June 19, 1998. In addition, we have EDGARized the
letter from KPMG to the Company dated June 9, 1998 and attached same to this
correspondence as requested by the Staff. Updated consents have been included
in the amended Registration Statement.

As we discussed on July 1, 1998, the Company plans to price on July 9,
1998 and to go effective on that date.  Requests for acceleration from the
Company and the Underwriters are attached.

Please do not hesitate to call me at 214-761-4775 or J. David Washburn
of this office at 214-761-4309 if we can be of any further assistance.

Thank you for your assistance.

Very truly yours,


Joseph A. Hoffman

J20/sjm

cc:    Mr. Darl P. Hatfield
       Mr. James E. Ferrell
       Kenneth L. Guernsey, Esq.
       Karyn Smith, Esq.
       J. David Washburn, Esq.

104366.2

AH 000008

CAS 0544

ARTER & HADDEN LLP
1717 MAIN STREET, SUITE 4100
DALLAS, TEXAS 75201-7366
214-761-2100 Telephone
214-741-7139 Facsimile

JULY 6, 1998

VIA EDGAR TRANSMISSION

SECURITIES AND EXCHANGE COMMISSION
Division of Corporation Finance
Judiciary Plaza
450 Fifth Street, N.W.
Mail Stop 3-5
Washington, D.C.  20549

Re:  ADAMS GOLF, INC.
      Amendment No. 2 to Registration Statement on Form S-1
      File No. 333-51715

Ladies and Gentlemen:

On behalf of Adams Golf, Inc. (the "Company"), we have electronically transmitted herewith Amendment No. 2 to the above-referenced Registration Statement, which has been marked to indicate the changes effected by the Amendment.  In addition, we have today forwarded, by way of overnight delivery, five (5) marked copies of Amendment No. 2 to the Registration Statement, c/o Ms. Letty Lynn, for the convenience of the Staff.

This letter summarizes the Company's responses to the Staff's oral comments, received June 25, 1998. The undersigned and J. David Washburn of this firm previously discussed the Company's responses, at greater length, with Ms. Carolyn Kurr of the Staff on July 1, 1998.

1.    COMMENT:

The Staff has conducted a review of press releases and other publicity regarding the Company and noted that Mr. Adams, the Chairman of the Company, was quoted in a number of articles.  Please make a good faith effort to review recent publicity and to square the information therein with the Prospectus.

RESPONSE:

The Company utilizes B.H. Adams, its Chairman and President, as the key spokesperson for the Company's products.  Further, Mr. Adams is an industry expert on golf equipment and is often asked to comment on issues relating to golf equipment.  Prior to and since the filing of the Registration Statement, Mr. Adams has attempted to focus his public statements on the Company's products, and his intent has only been to promote the Company's products.  It is the Company's belief that keeping products in the public eye is crucial in the marketing of consumer retail products such as those of the Company, especially at the peak of the season.  Since the announcement of the offering, Mr. Adams has refused various requests from the media for interviews and consistently noted to the media that he was prevented by SEC rules from discussing the offering.



EXHIBIT
165
5/17/06  dl

SECURITIES AND EXCHANGE COMMISSION
July 6, 1998
Page 2

A number of the articles about the Company that have recently appeared in
the media have been the result of either prior public relations activities
(e.g. the PGA show in Florida in late January 1998) or coverage generated
by the press itself. Because of the seasonal nature of golf, many of these
articles are timed to run during May, June and July, the peak of the golf
season.

The timing with respect to the announcement of the Company's contract with
Nick Faldo was unavoidable. Mr. Faldo's contract with Mizuno ended April
30, 1998. The Company was unable to announce its new relationship with Mr.
Faldo until his Mizuno contract expired, and this occurred at or about the
time of the initial filing of the Company's Registration Statement. The
Company incurred significant expense in connection with the signing of Nick
Faldo and needed to announce this significant corporate event. The Company
expects that its relationship with Mr. Faldo will promote sales, especially
international sales, given Mr. Faldo's international reputation.

The undersigned counsel and the Underwriters' counsel have reviewed the
publicity leading up to and after the filing of the Registration Statement.
Both believe that the Prospectus adequately addresses Mr. Adams' public
statements and Company generated publicity.

2.   COMMENT:
The Staff has noticed that the Company has an interactive site with Mr.
Adams on its web page. Please discontinue the use of this feature until
the Registration Statement has become effective.

RESPONSE:

As requested, this site was disabled Friday, June 26, 1998 and shall
remain disabled until after the 25-day quiet period following the effective
date of the Registration Statement has passed.

3.   COMMENT:

Consider updating disclosure in the Prospectus regarding USGA approval of
golf equipment.

RESPONSE:

Updated disclosure relating to the USGA's recent announcement is included
on page 6 under "Dependence on New Product Introductions; Uncertain
Consumer Acceptance."

UND 02702

SECURITIES AND EXCHANGE COMMISSION
July 6, 1998
Page 3

KPMG has informed us that the original date of their auditors' report, January 16, 1998, was in error. The appropriate date, which has now been included in the Amendment No. 2, is April 29, 1998. KPMG has informed us that this date of April 29, 1998 complies with the standards included in Statement on Auditing Standards No 1 (AICPA AU Section 530.01). This information is consistent with the discussion held between Sam Ranzilla of KPMG and Kathy Mathis of the Staff on June 18, 1998. In addition, we have EDGARized the letter from KPMG to the Company dated June 8, 1998 and attached the same to this correspondence as requested by the Staff. Updated consents have been included in the amended Registration Statement.

As we discussed on July 1, 1998, the Company plans to price on July 9, 1998 and to go effective on that date.  Requests for acceleration from the Company and the Underwriters are attached.

Please do not hesitate to call me at 214-761-4779 or J. David Washburn of this office at 214-761-4309 if we can be of any further assistance.

Thank you for your assistance.

Very truly yours,

/s/ Joseph A. Hoffman
Joseph A. Hoffman

J2D/sjm

cc:  Mr. Darl P. Hatfield
     Mr. James E. Farrell
     Kenneth L. Guernsey, Esq.
     Karyn Smith, Esq.
     J. David Washburn, Esq.

UND 02703

EXHIBIT 331



EXHIBIT
331
8-9-06

## REBUTTAL EXPERT REPORT OF DR. GARY L. FRAZIER

**I.    Qualifications**

1.    I am the Richard and Jarda Hurd Professor of Distribution Management in the
Department of Marketing within the Marshall School of Business at the
University of Southern California. I have focused my research, teaching, and
consulting on marketing and distribution management over the past thirty years. I
have frequently published in the top marketing journals. I am one of the top
contributors in the history of the *Journal of Marketing*, a leading academic
marketing journal started in the 1930s. I have frequently consulted for companies
on marketing issues, beginning with General Motors in 1977 and including such
leading companies since as Coca-Cola, Honeywell, IBM, Intel, and Texas
Instruments. I also have been qualified as an expert witness in the areas of
marketing and distribution management on a number of occasions. In my role as
an expert witness, I have been retained by counsel for companies of various sizes
and in various industries. I have testified on behalf of both plaintiffs and
defendants. In 1995, I served as an expert for the Justice Department on the
question of whether it was unfair for Microsoft to use Windows95 as the
distribution channel for the Microsoft Network.

2.    Marketing as an academic discipline is concerned with how to gain and keep
customers. Within the marketing discipline, distribution management is
concerned with how firms organize and manage inter-firm relationships involving
manufacturers, wholesalers, retailers, and other organizations, to serve end-
consumers. Gray market issues frequently arise when marketing and distributing
products. I have dealt with gray market issues in my research, teaching,
consulting, and expert witnessing for over twenty years.

3.    A copy of my curriculum vitae is provided in Exhibit A, which lists all the
publications I have authored in the past ten years and all cases in which I have
testified as an expert at trial or by deposition in the past four years. My billing
rate for this engagement is $500 per hour.

II.     **Assignment**

4.     I have been retained by Akin Gump Strauss Hauer & Feld LLP, attorneys for
Adams Golf, Inc. ("Adams Golf" or the "Company") and the Individual
Defendants, and Simpson Thacher & Bartlett LLP, attorneys for the Underwriter
Defendants, in In re: Adams Golf, Inc. Securities Litigation to review and
comment on the Expert Report of Christiana Ochoa submitted July 14, 2006. In
particular, I was asked to discuss the nature of gray markets, potential strategies
for dealing with gray market activities, and their impact on Adams Golf.

5.     In conducting my analysis, I have reviewed the complaint and other legal filings
in the case, documents produced by the parties in this litigation, depositions,
declarations, expert reports, academic literature, trade and public press, and
analyst reports. See Exhibit B for a list of documents specifically considered. I
reserve the right to supplement or amend my opinions should additional
information be produced that is relevant to them.

III.    **Summary of Opinions**

6.     Ms. Ochoa presents an inaccurate and incomplete picture of how gray markets
function, their potential impact on companies in general, and in particular their
impact on Adams Golf.

- Contrary to Ms. Ochoa's statements in her expert report, gray markets are
  not always negative for manufacturers in the long run. In fact, gray
  markets can be beneficial in both the short and long run to companies like
  Adams Golf that are attempting to compete with more established brand
  names.

- Contrary to Ms. Ochoa's statements in her expert report, gray markets can
  be managed effectively.

- Contrary to Ms. Ochoa's statements in her expert report, Adams Golf's
  business model did not make it particularly vulnerable to gray marketers.

- Contrary to Ms. Ochoa's statements in her expert report, at the time of the IPO, the gray market posed minimal, if any, risk to Adams Golf's business for several reasons:

  i. gray market sales were potentially beneficial to the Company;

  ii. the magnitude of gray market sales was extremely small;

  iii. gray market sales had not degraded the brand image of Adams Golf's clubs with end consumers;

  iv. gray market sales had not degraded Adams Golf's relationships with channel partners; and

  v. Adams Golf was taking reasonable steps to deal with gray market activity.

## IV.    Definition of Gray Markets

7.    Gray marketing is the sale of authorized branded products through unauthorized distribution channels – usually bargain or discount outlets that provide less customer service than do authorized channels.[1]  A wide range of products are sold through gray markets across a variety of firms and industries.  Well-established brands with high sales and consumer demand are highly sought after by members of unauthorized channels.  Firms building their reputations in industries with products that become "hot" in the marketplace also may find their products in the gray market.

8.    Manufacturers use authorized channels when they decide that significant quality control and intermediary value-added is desirable in their channels of distribution. Examples of firms using authorized channels include Baume & Mercier, a Swiss manufacturer of watches, Honeywell, a manufacturer of temperature controls and air treatment products, Intel, a manufacturer of semi-conductors, Joico, a

---

[1] Coughlan, Anderson, Stern, and El-Ansary, <u>Marketing Channels</u>, 2005, Prentice Hall, p. 260

3

manufacturer of hair treatment products, and Lehmann Gross Bahn (LGB), a German manufacturer of toy trains and equipment.

9. Gray markets represent a form of arbitrage. They are driven by product demand and price differentials which may be the result of exchange rates, volume price discounts, or other factors. Gray market suppliers may include international importers, authorized distributors or retailers selling to discount chains, or diverters specializing in acquiring products for sale to unauthorized channel members.

10. Gray marketing comes in a variety of forms. Parallel importation occurs when products from the home market are priced lower than in the export market, and the gray marketer exports from the home market to the export market.[2] Reimportation occurs when products from the export market are cheaper than products in the home market, and the gray marketer exports from the foreign market to the home market.[3] Lateral importation occurs when there are price differences between two export markets, and the gray marketer exports from one to the other.[4] Trans-shipments concern gray marketing within a single country, and occur when distributors can acquire products at low prices and resell them to unauthorized channel members.

11. Gray market activities are commonplace in a wide variety of industries, from expensive consumer durables like cars to inexpensive household products like cosmetics. They even exist in markets for life-saving pharmaceuticals and intangibles such as broadcast signals. Surveys confirm increasing incidence and scope of gray market activities and estimates are that such activities account for many billions of dollars worldwide.[5]

---

[2] Assmus, Gert, & Wiese, Carsten, Sloan Management Review, "How to Address the Gray Market Threat Using Price Coordination," Spring 1995, Volume 36, Number 3, p 32
[3] *Ibid*
[4] *Ibid.*
[5] Antia, Kersi D , Bergen, Mark, and Dutta, Shantanu, "Competing with Gray Markets," MIT Sloan Management Review, Fall 2004, Volume 46, Number 1, p 63

## V.     Gray Market Activities Can Be Beneficial

12.     The existence of gray markets has potential benefits for the manufacturer. Market coverage is normally enhanced, leading to increased sales and increased market share for the firm. In fact, "unauthorized distributors can aid a manufacturing firm by serving price-sensitive consumers and other buyers who lie outside the reach of traditional channels."[6] Moreover, consumers who are focused on getting an excellent price and require less service are often attracted to gray market goods sold in discount outlets. Ultimately, "a certain level of gray market activity ... is acceptable if it leads to incremental profits without damaging relationships with the trade or customers' perception of the product in the high-priced segment."[7]

13.     There are distinct segments of consumers in the golf industry. The professional or highly skilled segment contains the most competent and committed golfers. "Average golfers" play a minimum of 10 rounds a year, generally have handicaps above 18, and buy new equipment every two to three years.[8] "Occasional golfers" play one to seven rounds per year. "Beginning golfers" play their first round in a given year and are highly price sensitive.[9] Beginners represent the segment most likely to shop in unauthorized channels due to relatively low prices found there.

14.     There are always delicate trade-offs to be made in any company's pricing, distribution, brand image, and other marketing strategies. In the effort to optimize a company's business strategy, there are trade-offs between short and long run interests, as well as the relative interests of all agents involved. Manufacturers' interests, distributors' interests, retailers' interests, and consumers' interests must be carefully balanced, as all participants attempt to extract as much value as

---

[6] Myers, Matthew B., Griffith, David A , Business Horizons, "Strategies for Combating Gray Market Activity," November 1999, Volume 42i6, p. 3; Myers, Matthew, "Incidents of Gray Market Activity among U S Exporters: Occurrences, Characteristics and Consequences," Journal of International Business Studies, March 22, 1999, Volume 30, Number 1, p. 106.
[7] Assmus, *op cit*, p. 33.
[8] Callaway Golf Company, Harvard Business School Case, 9-501-019, August 11, 2000, p 5
[9] *Ibid*, p. 6

possible in the process, while maintaining the overall health of the distribution chain.

15.    Ms. Ochoa admits that benefits from gray market sales exist at least in the short term, saying "It is well established that the availability of goods in a greater number of retail outlets, especially at reduced prices, can have the effect of increasing sales volumes as price-sensitive consumers who lie outside of a manufacturer's target consumer base gain access to lower-priced goods."[10]

16.    The benefits to the manufacturer of having its products sold in gray markets can also be long-term in nature,[11] contrary to what Ms. Ochoa claims.[12]  Gray markets can provide many benefits to manufacturers, including:

- increased sales volumes to price-sensitive customers who would not otherwise be reached;

- validation that a brand or product is desirable—gray marketers typically only target products that are highly sought after in the marketplace and do not require any marketing effort on their part (*i.e.*, established brands or "hot" products);

- increased exposure of the brand;

- a larger customer base for future sales and service.[13]

17.    If not properly managed, gray markets can have detrimental effects for the firm if the magnitude of gray market sales is high and intra-brand competition (*i.e.*, competition among all resellers of a given brand like Adams Golf) becomes extreme.  However, as discussed below, gray market activities can be effectively managed to avoid these negative effects.

---

[10] Expert Report of Christiana Ochoa, July 14, 2006, ¶ 28. (Hereafter, "Ochoa")
[11] Coughlan, *op cit*, p 66
[12] Ochoa, ¶ 13
[13] Antia, *op cit*, p 66

VI.    **Gray Market Activities Can Be Effectively Managed**

18.    The key imperative for manufacturers is to adequately manage gray market activities. If the magnitude of gray market sales to the firm's overall sales is relatively low and intra-brand competition is also relatively low, the firm can gain some of the benefits of gray market activity while still managing any potential negative impact.

19.    In her expert report, Ms. Ochoa seems to imply that gray market activity is akin to finding termites in a house; that is, once you find them, you cannot effectively combat them except at great cost. She states "Once there is an established gray market distribution channel for a given product, the volume of sales made through discount retailers can increase rapidly if a manufacturer does not counter quickly and effectively."[14] She also says that "there is no significant evidence that any approach will ensure eradication of a company's gray market problem."[15]

20.    Ms. Ochoa misses the point that the goal is not to completely eradicate gray markets (which have some beneficial characteristics, especially for a firm like Adams Golf) but to manage gray market activities. The evidence clearly shows that this can be and is done by firms in many industries every day.

21.    The literature (including that cited by Ms. Ochoa) is replete with examples of strategies available to firms wishing to mitigate the prevalence of gray market sales of their products. These strategies fall into several broad categories: restricting the supply of products to the gray market; exerting more control over the distribution channel; changing pricing strategies; reducing consumer demand for gray market goods; and taking legal action against gray marketers after the fact. Some of the many ways to manage gray market activities are discussed below.

22.    Restricting the supply of products to the gray market: A company can track the sale of its products using serial numbers and punish offending distributors by

---

[14] Ochoa, ¶ 29B
[15] Ochoa, ¶ 18.

restricting future shipments of its products.[16] A company may also reduce gray
market activity by offering to repurchase excess stocks of its products before
distributors divert them to unauthorized channels.[17] A company which operates
internationally and licenses its brand to third parties in its export markets can
often reduce gray marketing by tightening its licensing policies.[18]

23.   Exerting more control over the distribution channel: A company may also reduce
      the gray marketing of its products by exerting increased control over its
      distribution network. Improved contact and information sharing between a
      company and its channel members "can enhance the overall relationship and help
      combat gray markets."[19] A company can also discourage gray marketing by
      carefully examining new distributors before forming relationships with them, and
      then by closely monitoring distribution channels thereafter.[20] A firm can
      sometimes reduce gray marketing by ensuring that its popular products are being
      equally and equitably allocated among its distributors.[21] Finally, a company may
      improve its control of its distribution channels by choosing to integrate parts of its
      network, often by acquiring its distributors, or by altering its distribution model to
      make increased use of in-house sales agents.[22]

24.   Changing pricing strategies: A company can also reduce gray market activity by
      implementing pricing policies which reduce arbitrage opportunities across (or
      within) markets. A firm may control prices through a variety of actions, including
      adjusting transfer prices, rationing the supply of a product, and centralizing
      control of pricing decisions.[23] One pricing strategy involves implementing a one-
      price policy for all markets, a tactic which "can eliminate an important source of

---

[16] Berman, Barry, Business Horizons, "Strategies to Combat the Sale of Gray Market Goods," July-August
2004, Volume 47, Number 4, p 57
[17] Maskulka, James, Gulas, Charles, "The Long-term Dangers of Gray-Market Sales," Business, January-
March 1987, Volume 37, p 30
[18] *Ibid.*
[19] Myers & Griffith, *op cit*, pp. 7-8.
[20] Berman, *op cit*, pp. 56-7; Maskulka, *op cit*, p 30
[21] Cespedes, Frank, et al, "Gray Markets: Causes and Cures," Harvard Business Review, July-August,
1998, p. 79; Maskulka, *op cit*, p 30
[22] Myers (Incidents), *op cit*, p. 108
[23] Myers (Incidents), *op cit*, p. 107; Assmus, *op. cit*, p 34

arbitrage and allow the supplier to reassert a measure of channel control."[24]
Alternatively, a firm may lower the price of sales to more expensive markets,
thereby reducing price differentials and the consequent incentive to divert its
products.[25] One form of this strategy involves offering rebates to consumers who
purchase the company's products through authorized channels, thus lowering
demand for gray market versions of its products.[26]

25.     Reducing consumer demand for gray market goods: A firm may also choose to
combat gray marketing by communicating to consumers the benefits of
purchasing its products through authorized channels (and the risks of purchasing
its products elsewhere), in this way reducing consumer demand for gray market
goods.[27] A manufacturer can also differentiate the products it sells to different
markets, reducing the ability of distributors to divert goods.[28]

26.     Taking legal action against gray marketers: Finally, a company may combat gray
marketing by taking legal action against offending distributors.[29] Even if the legal
action is not ultimately successful, it will often signify support to a company's
authorized retailers.

## VII.     Ms. Ochoa's Conclusion That Adams Golf Was "Particularly Vulnerable" to Damage From Gray Market Activities Is Unfounded

27.     In her expert report, Ms. Ochoa states "The Company's business model made it
particularly vulnerable to gray marketers. It also made it particularly susceptible
to the types of damage the gray market can bring to a manufacturer or trademark
holder. In the long term, the gray market is known to be potentially detrimental to
consumers and trademark holders alike."[30]

---

[24] Cespedes, *op cit.*, p 79; Maskulka, *op cit*, p 29
[25] Eagle, Lynne, et al , "Brand Equity and Brand Vulnerability: the Impact of Gray Marketing/Parallel Importing on Brand Equity and Values," European Journal of Marketing, 2003, Volume 37, Number 10, p. 1338
[26] Berman, *op cit*, p. 56.
[27] Berman, *op. cit*, p 56; Maskulka, *op. cit*, p 30
[28] Berman, *op cit*, p 56
[29] Berman, *op cit*, p 58; Maskulka, *op cit*, p 28.
[30] Ochoa, ¶¶ 19, 28C

28. Ms. Ochoa provides little or no evidence to support her contention that Adams Golf's business model made it particularly vulnerable to gray marketers. The same is true for her contention that Adams Golf was particularly susceptible to the types of damage the gray market can bring to a manufacturer or trademark holder.[31]

29. The literature cited by Ms. Ochoa demonstrates that a large number of characteristics impact the degree to which gray market activity is likely to occur and/or affect different firms. Environmental influences leading to greater gray market activity include increased export activity, heightened competitive pressures, foreign currency fluctuations, and restrictive import taxes. Technological influences on gray market activity include improved information flows that allow distributors to more effectively identify arbitrage opportunities across markets.

30. Firm-specific influences on gray market activity include a firm's commitment to a particular market or channel, communication between the manufacturer and its distributors, and the existence of multiple pricing policies across markets. The companies who are most susceptible to damage from gray market sales are large firms with global brands that are indistinguishable across markets and those that license to a large number of competing distributors. This was not the position of Adams Golf, which was a relative newcomer with a hot product.

31. If anything, given the highly competitive golf equipment industry in the late 1990s, gray market sales were potentially more of an issue for the many well-established and well-financed companies with popular brand names.[32] Callaway Golf, (with 28.8% of total 1997 U.S. supply), Taylor Made Golf (13.2%), Fortune Brands' Titleist and Cobra (10.5%), and Ping Golf were among the top firms in the industry.[33]

---

[31] *Ibid*
[32] Callaway (HBS), *op. cit*, p. 10
[33] "Golf Equipment/Accessories – Golf Clubs Mkt Trends," MarkIntel, The Investext Group, October 1, 1998, p 8

32.     Ms. Ochoa provides no direct evidence that any of the factors she identified as
        making Adams Golf supposedly more vulnerable to gray market sales actually led
        to any impact on Adams Golf. Moreover, Ms. Ochoa improperly relies on and
        mischaracterizes information that was not known at the time of the IPO. As noted
        by Prof. Chris James in his expert report, many factors other than gray marketing
        impacted Adams after the IPO,[34] yet Ms. Ochoa ignores these factors.

VIII.   **The Gray Market Posed Minimal, if Any, Business Risk to Adams Golf at the
        Time of the IPO**

        **A. Gray Market Sales Were Potentially Beneficial to Adams Golf**

33.     As discussed earlier in paragraphs 12-17, the existence of gray markets has
        potential benefits for a manufacturer such as Adams Golf, particularly in that
        market coverage may be enhanced, leading to increased sales and increased
        market share for the firm.

        **B. The Magnitude of Gray Market Sales Was Extremely Small**

34.     The number of gray market sales of Adams Golf clubs prior to the IPO was
        extremely small. According to Stephen Grace's expert report, Costco records
        indicate that prior to the IPO, only 3,200 clubs were sold in the U.S. and 660 in
        Canada.[35] This number of Adams Golf clubs sold through Costco was extremely
        low relative to Adams Golf's total sales of 457,000 clubs in 1998 prior to the
        IPO.[36] Thus, Costco sales represented less than 0.84% of 1998 pre-IPO sales.

35.     Damage from gray market activity typically occurs only once that activity has
        become severe. Left unchecked, gray marketing can eventually jeopardize
        relationships with authorized channel members and damage a product's brand
        image. The gray marketing that Adams Golf was experiencing, however, did not
        rise to this level of severity.

---

[34] Expert Report of Christopher M. James, July 14, 2006, p 6 and Exhibit 9; KPMG 2100-2107.
[35] Expert Report of H. Stephen Grace, July 14, 2006, p 18
[36] *Ibid*

### C. Gray Market Sales Had Not Degraded Adams Golf's Brand Image with Consumers

36.    Ms. Ochoa states that two aspects of a prestigious brand name can be damaged as a result of the gray market. First, she states that the goodwill being established by the trademark owner is threatened when gray market consumers do not receive the full "extended product" in the form of pre- and post-sales service that buyers from authorized retailers receive. Second, she says a prestigious brand name can lose its esteemed status when it appears at reduced prices through unauthorized distributors.[37]

37.    Ms. Ochoa provides no evidence to support the contention that Adams Golf's goodwill with consumers was damaged by the low number of gray market sales prior to the IPO. If anything, the consumers shopping at Costco were likely those who cared more about low prices and did not value the pre- and post-sales service as much as consumers who typically shop in specialty stores or pro shops.[38] There is no evidence that consumers complained to authorized distributors about low prices at Costco (other than to attempt to get the same bargain themselves) and no evidence that consumers stopped wanting Adams Golf's clubs due to a tarnishing of brand image from the clubs being available at some Costco stores.

38.    Ms. Ochoa provides no evidence that Adams Golf's brand name lost status with consumers as a result of the low magnitude of gray market sales experienced by Adams Golf. Consumers gaining an authentic product with high brand prestige at a great price are often very satisfied with their purchases and still hold the brand in high esteem. If the magnitude of gray market sales is not that high, customers who typically buy through authorized channels are unlikely to be impacted in any way.

---

[37] Ochoa, ¶ 21B
[38] Coughlan, *op cit*, p 262

### D. Gray Market Sales Had Not Degraded Adams Golf's Relationships with Authorized Retailers

39. Ms. Ochoa states that the "displeasure Adams Golf's authorized retailers felt with gray market sales is well documented . . ."[39] In support of this statement, Ms. Ochoa cites one internal Adams Golf document that reports one complaint by one distributor. In my opinion, this is not indicative of a gray marketing problem of any significance.

40. In total, only eight of Adams Golf's more than 7,000 retailers ever complained of gray marketing activities prior to the IPO.[40] This is an incredibly low number of complaints and in no way indicates the existence of degraded relationships with Adams Golf's authorized retail network.

41. Further, some authorized channel partners will always complain about any level of gray market sales; however, a few isolated complaints do not demonstrate widespread damage to these relationships.

42. Ms. Ochoa overreaches hugely, generalizing from the experience of a single distributor (citing declining sales reported by WDC Mackenzie, its Canadian distributor, during July at the time of a magazine article regarding availability of Adams Golf's clubs at Costco) to state that "The close correlation between increasing gray market sales and decreasing authorized sales, therefore, strongly suggests that the damage to Adams name and the *Tight Lies* brand resulting from the gray market was great immediately after the Company's initial public offering."[41] A decline in sales at a single distributor, whose sales of Adams Golf's products represented less than 3% of Adams Golf's total sales,[42] even if it did occur at the same time as the possible appearance of an article on gray market sales, hardly constitutes proof of a causal relationship for even that one distributor, let alone throughout Adams Golf's network of authorized channel partners.

---

[39] Ochoa, ¶ 23A
[40] Grace report, *op cit* , p. 18
[41] Ochoa, ¶ 21D.
[42] Grace report, *op cit* , pp. 17-18

43.    Ms. Ochoa states that Adams Golf's management apparently believed that even the small number of sales at Costco prior to the IPO was a serious issue.[43]  She misconstrues Adams Golf's quick response to WDC Mackenzie's concerns as meaning that Adams Golf's management viewed the small number of gray market sales as a serious problem for the entire Company at the time of the IPO.  In addition, evidence from WDC Mackenzie indicates that they felt Adams was responding to its concerns.[44]

### E. Adams Golf Took Reasonable Steps to Deal with Gray Market Sales

44.    Further, Adams Golf took steps to manage the gray market activities.  Prior to the IPO, Adams Golf took at least the following steps to address the small number of gray market sales:[45]

- Adams Golf let its authorized channel members know that it did not sell to Costco;[46]

- Adams Golf brought a bill of discovery against Costco to discover its supplier;[47]

- The Company discussed and addressed the gray market concerns of its channel partners;[48]

- Adams Golf's personnel were open to information on gray market activity and actively sought to determine how unauthorized intermediaries were acquiring its products;[49]

- Adams Golf punished authorized channel members who were found to be diverting product.[50]

---

[43] Ochoa, ¶ 16.
[44] Exhibit 6 (MCK 00093); Exhibit 85 (ADAMS 001497).
[45] Grace report, *op cit*, Ex VII.
[46] Deposition of Mark Gonsalves, June 6, 2006, p. 90.
[47] Adams Golf, Inc., Press Release, June 9, 1998.
[48] Gonsalves deposition, *op. cit*, pp. 59-62; Exhibit 63
[49] Gonsalves deposition, *op. cit*, pp. 68-69; Exhibit 9
[50] Gonsalves deposition, *op. cit*, pp. 24-25.

45.    In my opinion, the steps taken by Adams Golf were appropriate given the nature and magnitude of gray market sales prior to the IPO. Ms. Ochoa admits that Adams Golf took actions prior to the IPO to deal with gray market sales, but questions the timeliness of these actions and asserts (without proof) that Adams Golf's efforts to manage gray market sales were damaging to the Company.[51]  On the contrary, Adams Golf's efforts to manage its relationships with authorized channel partners were fully appropriate, and the Company responded in a timely manner.

46.    Based on its status in the industry, the low magnitude of gray market sales, the low incidence of channel partner complaints, and the steps the Company was taking to manage gray market sales, it is my opinion that the gray market posed minimal, if any, risk to Adams Golf's business at the time of the IPO.

### IX.    Conclusions

47.    Based on my review of the record in this case and my experience as an expert in marketing and distribution, it is my opinion that:

- Ms. Ochoa presents an inaccurate and incomplete description of how gray markets function, including their potential impact on companies in general and on Adams Golf in particular.

- Gray markets are a well-known aspect of markets in many industries, have both costs and benefits, and can be managed through a variety of strategies.

- At the time of the IPO, gray market sales posed minimal, if any, risk to Adams Golf's business.  Gray market sales were potentially beneficial to the Company, the magnitude of such sales was insignificant, complaints from channel partners were rare, and the Company was taking reasonable steps to address gray market activity.

Gary L. Frazier

July 28, 2006

---

[51] Ochoa, ¶¶ 17, 22C, 29B, 29C.

# EXHBIT A
# CURRICULUM VITAE OF GARY L. FRAZIER

**PERSONAL DATA:**

**Address:**
Office:  University of Southern California                    Home:  27 Buggy Whip Drive
         Marshall School of Business                                 Rolling Hills, CA 90274-5008
         Department of Marketing                                     (310) 377-6311
         Accounting 215E
         Los Angeles, CA 90089-0443
         (213) 740-5032

**Date of Birth:**  September 28, 1951

**Family Status:**  Married to Kyoung with a daughter, Jean (12 years), and a son, Ryan (6 years)

**Citizenship:**  U S A

**EDUCATION:**

        D B A.:  Indiana University, Bloomington, 1979
                 Major Field:       Marketing
                 Minor Field:       Physical Distribution
                 Minor Field:       Quantitative Analysis
                 Dissertation:      An Empirical Examination of the Power-Influence Process in a
                                    Channel of Distribution

        M B.A :  Indiana University, Bloomington, 1977

        B S  in Business Administration and B.A. in History and Social Studies, magna cum laude:
             Bemidji State University, Bemidji, Minnesota, 1975

**PROFESSIONAL POSITIONS:**

September 1993          The Richard and Jarda Hurd Professor of Distribution Management, Marshall
    to                 School of Business, University of Southern California, Los Angeles
Present

September 1992         Academic Director of the Program in Distribution Management, Marshall
    to                 School of Business, University of Southern California, Los Angeles
May 2000

November 1990          The Jerry and Nancy Neely Professor of Marketing, Marshall School of
    to                 Business, University of Southern California, Los Angeles
August 1993

September 1990         Full Professor of Marketing, Marshall School of Business, University of
    to                 Southern California, Los Angeles; notified of promotion to Full Professor in
Present                November 1989

July 1990              Chairperson of the Department of Marketing, Marshall School of Business,
    to                 University of Southern California, Los Angeles
September 1995

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PROFESSIONAL POSITIONS (continued):**

| | |
|---|---|
| June 1984 to August 1990 | Associate Professor of Marketing, Marshall School of Business, University of Southern California, Los Angeles; tenured since September 1, 1986 |
| April 1984 | Notified of promotion to Associate Professor of Business Administration (Marketing) with tenure, College of Commerce and Business Administration, University of Illinois, Urbana-Champaign; effective August 21, 1984 |
| August 1979 through May 1984 | Assistant Professor of Business Administration (Marketing), College of Commerce and Business Administration, University of Illinois, Urbana-Champaign |
| August 1975 through May 1979 | Associate Instructor of Marketing, Graduate School of Business, Indiana University, Bloomington |

**PROFESSIONAL HONORS:**

Among the finalists for the Editor of the Journal of Marketing, 2002 to 2005 and 2005 to 2008

Golden Apple Award from the undergraduate program in the Marshall School of Business, USC, for outstanding teaching, Spring, 1997

Outstanding Educator Award from the MBA Association, University of Illinois, Spring, 1984

Distinguished Teaching Award from the Graduate College, Indiana University, Spring, 1978

Honorable mention in the MBA Golden Apple award competition for outstanding teaching of an elective course, Marshall School of Business, USC, 2000-2001 academic year

Among the finalists for the 1988 William O'Dell Award given by the Journal of Marketing Research based on a 1983 sole-authored article entitled "On the Measurement of Interfirm Power in Channels of Distribution"; the award is given to the article that has made the most significant long-run contribution to marketing theory, methodology, or practice

Participated in Arizona State University's "Distinguished Visiting Professor Program," May, 1986

Faculty member at the 1999 AMA Ph.D Consortium at the University of Southern California, August 3 through August 7

Faculty member at the 1996 AMA Ph.D. Consortium at the University of Colorado, July 31 through August 2

Faculty Member at the 1992 AMA Ph.D. Consortium at Michigan State University, August 4 through August 8

Dean's Fellow in the School of Business Administration at USC, Fall 1986 through Summer, 1990

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PROFESSIONAL HONORS (continued):**

Nominated for the University Associates Award for "creativity in research and scholarship" at USC during Fall semester, 1989 and 1990

On list of "excellent professors," University of Illinois, each semester, Spring, 1980 through Spring, 1984

Named outstanding graduate business student (all DBAs and MBAs considered), Indiana University, 1977-78

Passed major and minor D.B A. comprehensive examinations with distinction, Indiana University, Summer, 1978

Elected to Beta Gamma Sigma, 1978

Honorary Membership in Alpha Kappa Psi, 1981

Investors in Business Education general research grants, University of Illinois, Summers, 1980 and 1982

General research grant from Caterpillar Tractor Company, Summer, 1983

Internship with Famous Barr Department Stores, St Louis, July, 1983; examined buyer-vendor relations

Research grant from the Research Board at the University of Illinois, Fall, 1983, for a study of industrial distributorships

Research grant from Procter and Gamble, Fall, 1983, for a study of industrial distributorships

Research grant from Beltone Electronics Corporation, Spring, 1987, for a study of hearing aid dealers

Research Grants from the Marketing Science Institute and the Institute for the Study of Business Markets, Summer, 1990, for a study on channel structure

Chaired dissertation of Kirti Shawney Celli, who won a grant from the Institute for the Study of Business Markets at Penn State in 1990 for her dissertation

**PROFESSIONAL SERVICE:**

Member of the Editorial Review Board of the Journal of Marketing since December of 1984

Member of the Editorial Review Board of the Journal of International Business Studies since June of 2005

Member of the Editorial Review Board of the Journal of Marketing Research from July of 1985 through December of 2003

Served as a "Guest Editor" on a paper for Wagner Kamakura, Editor of the Journal of Marketing Research, Summer, 2002

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PROFESSIONAL SERVICE (continued):**

Member of the Board of Consulting Editors of the International Journal of Research in Marketing since January of 2001

Leader of the "Inter-organizational Marketing" Special Interest Group (SIG), May 1, 2001 through September 1, 2003

Member of the Selection Committee for the 1989 William O'Dell Award at the Journal of Marketing Research

Member of the Selection Committee for the 1992 William O'Dell Award at the Journal of Marketing Research

Represented the Editor of the Journal of Marketing Research, Russ Winer, at a "Meet the Editors' session at the Academy of Marketing Science Annual Conference, Norfolk, Virginia, May 28, 1998

Member of Advisory Board of the Review of Marketing from Fall of 1987 to Fall of 1993

Member of the Advisory Board of South-Western Publishing Company during 1989

Member of the Editorial Review Board of the Journal of Retailing from December of 1986 until July of 1994

Member of the Editorial Review Board of the Journal of Business-to-Business Marketing from September of 1990 to September of 1995

Reviewer for the Journal of Marketing Research from June of 1983 to June of 1985

Reviewer for the Journal of Marketing from April of 1983 to November of 1984

Reviewer for Marketing Science in 1996

Reviewer for the Administrative Science Quarterly from 1982 to 1990

Reviewer for the The Academy of Management Review from 1988 to 1992

Reviewer for Management Science from 1987 to 1992

Reviewer for Research in Marketing from 1982 to 1993

Reviewer for Psychology and Marketing from 1987 to 1990

Reviewer for Sloan Management Review from 1988 to 1992

Reviewer for Advances in International Marketing Research in 1989

Reviewer for International Journal of Research in Marketing in 1989

Member of MSI's Business-to-Business Steering Committee, summer 1991 - summer 1995

Co-chair of the 1988 AMA Educators' Conference held in San Francisco

# EXHBIT A
# CURRICULUM VITAE OF GARY L. FRAZIER

**PROFESSIONAL SERVICE (continued):**

Co-chair of the 1991 AMA Ph D. Consortium held at USC, August 13 through August 17

Chair of the Marketing Management and Institutions Track of the 1987 AMA Educators' Conference

Chair of the Marketing Strategy, Planning, and Control Track of the 1985 AMA Educators' Conference

Chair of the Exchange Theory Track of the 1989 AMA Winter Theory Conference

Chair of a special session at the 1988 AMA Winter Theory Conference entitled "The Interface of Macro and Micro Channel Issues," February 9

Chair of a competitive paper session at the 1990 AMA Winter Theory Conference entitled, "Interfunctional Aspects of Marketing Management," February 26

Chair of a competitive paper session at the 1990 AMA Summer Educators' Conference entitled, "Channel Management and Physical Distribution Management," August 7

Chair of a competitive paper session at the 1991 AMA Summer Educators' Conference entitled, "Channels and Strategy," August 18

Member of a panel on "The American Marketing Association's Doctoral Consortium: 25 Years Later" at the 1991 AMA Summer Educators' Conference, August 18

Served on "Blue Ribbon Panel" to select best paper for the 1989 AMA Educators' Conference

Co-organizer (along with Jagdish Sheth) of the Stellner Symposium on Theories of Marketing Practice, Champaign, Illinois, May 23 to May 25, 1985

Reviewer for the Marketing Management Track of the 1986 AMA Educators' Conference

Reviewer for the Marketing Mix and Marketing Institutions Track of the 1983 AMA Educators' Conference

Reviewer for the Marketing Management Track of the 1987 AMA Winter Theory Conference

Reviewer for the Marketing Research Track of the 1989 AMA Educators' Conference

Reviewer for the Marketing Theory Track and the Marketing Implementation Track of the 1990 Winter Educators' Conference

Reviewer for the Marketing Planning and Strategy Track and the Marketing Management and Institutions Track of the 1990 AMA Educators' Conference

Reviewer for the Marketing Theory Track of the 1991 Winter Educators' Conference

Reviewer for the Marketing Planning and Strategy Track of the 1991 AMA Educators' Conference

Discussant of papers in a session on "Channel Relationships" at the 1987 AMA Winter Theory Conference

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PROFESSIONAL SERVICE (continued):**

Discussant of papers in a session on "Scaling and Measurement Issues in Marketing Research" at the 1989 AMA Educators' Conference

Judge for the annual AMA Doctoral Dissertation Competition since 1984

Judge of Research Proposals for Faculty Summer Fellowships at the University of Cincinnati during spring semester of 1985

Reviewer for the University of Pennsylvania Press during 1985

Reviewer for Random House during 1983

Appeared on ESPN's "Business Times" cable television program, speaking on the use of sales incentives to motivate salespeople, April 8, 1985

Appeared on CNN discussing the marketing strategy of non-profit and for-profit organizations, January 7, 1987

**PROFESSIONAL ORGANIZATIONS:**

American Marketing Association
Beta Gamma Sigma

**RESEARCH AND TEACHING INTERESTS:**

Distribution channel organization and management, and marketing strategy

**PUBLICATIONS:**

**Book Contributions**

Gary L. Frazier, <u>Organizing and Managing Channels of Distribution</u>, Thousand Oaks, CA: Sage Publications, Inc., forthcoming

Gary L. Frazier, <u>Strategies of Distribution</u>, New York: Oxford University Press, forthcoming

Gil P. Harrell and Gary L. Frazier (1999), <u>Principles of Marketing</u>, Upper Saddle River, NJ: Prentice-Hall.

Jagdish N. Sheth and Gary L. Frazier (1993), <u>Advances in Telecommunications Management</u>, Volume 4, Ruby Dholakia, (volume editor), "Strategic Perspective on the Marketing of Information Technologies", Greenwich, CT: JAI Press.

Gary L. Frazier (ed.) (1992), <u>Advances in Distribution Channels Research</u>, Volume 1, Greenwich, CT: JAI Press.

Jagdish N. Sheth and Gary L. Frazier (eds ) (1990), <u>Advances in Telecommunications Management</u>, Volume 1, Massoud Saghafi and Ashok Gupta (volume editors), "Managing the R&D - Marketing Interface," Greenwich, CT: JAI Press

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PUBLICATIONS (continued):**

**Book Contributions:**

Jagdish N. Sheth and Gary L. Frazier (eds ) (1990), Advances in Telecommunications Management, Volume 2, Wesley Johnston (volume editor), "Purchasing in the 1990s," Greenwich, CT: JAI Press.

Jagdish N Sheth and Gary L Frazier (1990), Advances in Telecommunications Management, Volume 3, Thomas Housel (volume editor), "Information Technology and Crisis Management," Greenwich, CT: JAI Press.

Richard P Bagozzi, J Paul Peter, Terry L Childers, A Fuat Firat, Gary L Frazier, Erdogan Kumcu, Michael L. Rothschild, Alan Sawyer, Edward C. Strong, and Alladi Venkatesh (eds ) (1989), Proceedings, American Marketing Associations' Winter Theory Conference, Chicago: American Marketing Association, February

Gary L Frazier, Charles Ingene, David Aaker, Avijit Ghosh, Tom Kinnear, Sidney Levy, Rick Staelin, and John Summers (eds ) (1988), Proceedings, American Marketing Association's National Educators' Conference, Chicago: American Marketing Association, August.

Gary L Frazier and Jagdish N. Sheth (eds ) (1987), Contemporary Views on Marketing Practice, Lexington, MA: Lexington Books

Susan Douglas, Michael Solomon, Mark Alpert, James Anderson, Peter Doyle, Gary Ford, Gary L Frazier, Vijay Mahajan, and William Pride (eds ) (1987), Proceedings, American Marketing Association's National Educators' Conference, Chicago: American Marketing Association, August

Robert F Lusch, Gary T. Ford, Gary L Frazier, Roy D Howell, Charles A. Ingene, Michael Reilly and Ronald W Stampfl (eds ) (1985), Proceedings, American Marketing Association's National Educators' Conference, Chicago: August.

**Articles**

Tassu Shervani, Gary L. Frazier, and Goutam Challagalla, "The Moderating Influence of Firm Market Power on the Transaction Cost Economics Model: An Empirical Test in a Forward Channel Integration Context," Strategic Management Journal, forthcoming

Gary L Frazier, "International Channels of Distribution: An Assessment," International Journal of Research in Marketing, forthcoming.

Kersi Antia and Gary L. Frazier (2001), "The Severity of Contract Enforcement in Inter-firm Channel Relationships," Journal of Marketing, 65 (October), 67-81

Gary L. Frazier (1999), "Organizing and Managing Channels of Distribution", Journal of the Academy of Marketing Science, 27 (Spring), 226-240.

Keysuk Kim and Gary L Frazier (1997), "On the Measurement of Distributor Commitment in Industrial Channels of Distribution," Journal of Business Research, 40 (October), 139-154

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

PUBLICATIONS (continued):

### Articles

Keysuk Kim and Gary L Frazier (1997), "On Distributor Commitment in Industrial Channels of Distribution: A Multi-component Approach," Psychology and Marketing, 14 (December), 847-877.

Gary L. Frazier and Walfried M Lassar (1996), "Determinants of Distribution Intensity," Journal of Marketing, 60 (October), 39-51.

Kirti Celly and Gary L Frazier (1996), "Outcome-based and Behavior-based Coordination Efforts in Channel Relationships," Journal of Marketing Research, 33 (May), 200-210.

Keysuk Kim and Gary L Frazier (1996), "A Typology of Distribution Channel Systems: A Contextual Approach," International Marketing Review, 13 (1), 19-32.

Gary L. Frazier and Kersi Antia (1995), "Exchange Relationships and Inter-firm Power in Channels of Distribution," Journal of the Academy of Marketing Science, 23 (Fall), 321-326.

Gary L. Frazier, Bernard J. Jaworski, Ajay K. Kohli, and Barton A. Weitz (1994), "Buyer-Supplier Relational Characteristics and Joint Decison Making," Marketing Letters, 5 (July), 259-270

Gary L Frazier (1994), "A Perspective on Interorganizational Exchange in Channels of Distribution," in Research Traditions in Marketing, Gilles Laurent, Gary Lilien, and Bernard Pras, editors, New York: Kluwer Academic Publishers, 378-382

David W Stewart, Gary L Frazier, and Ingrid Martin (1993), "Integrated Channel Management: Merging the Communications and Distribution Functions of the Firm," in The Psychology of Integrated Communication, Ester Thorson and Jeri Moore, eds Hillsdale, NJ: Lawrence Erlbaum

Gary L Frazier and Jagdish N Sheth (1993), "The Vertical Integration Issure in Channels of Distribution," in Strategic Perspectives on the Marketing of Information Technologies, Rudy Dholakia, ed , Greenwich, CT: JAI Press

Gary L. Frazier and Tassu Shervani (1992), "Multiple Channels of Distribution and Their Impact on Retailing," in The Future of U.S. Retailing: An Agenda for the 21st Century Robert Peterson, ed., New York: Quorum Books, 217-237.

Gary L Frazier and Raymond C. Rody (1991), "The Use of Influence Strategies in Interfirm Relationships in Industrial Product Channels," Journal of Marketing, 55 (January), 52-69

Gary L. Frazier, Kirti Sawhney, and Tassu Shervani (1990), "Intensity, Functions, and Integration in Channels of Distribution," Review of Marketing, Volume 4, 263-298

Gary L. Frazier (1990), "The Design and Management of Channels of Distribution: A State-of-the-Art Perspective," in The Interface of Marketing and Strategy, George Day, Barton Weitz, and Robin Wensley, eds , Greenwich, CT: JAI Press, 255-304

# EXHBIT A
# CURRICULUM VITAE OF GARY L. FRAZIER

**PUBLICATIONS (continued):**

_Articles_

Saul Klein, Gary L. Frazier, and Victor J Roth (1990), "A Transaction Cost Analysis Model of Channel Integration in International Markets," Journal of Marketing Research, 27 (May), 196-208

Gary L. Frazier and David W. Stewart (1990), "Channel Member Response to Trade Programs," Research in Marketing, Volume 10, 15-59

Gary L. Frazier, James D Gill, and Sudhir H Kale (1989), "Dealer Dependence Levels and Reciprocal Actions in a Channel of Distribution in a Developing Country," Journal of Marketing, 53 (January), 50-69

Gary L Frazier and Sudhir H. Kale (1989), "Distribution Channel Relationships:  A Sellers' versus Buyers' Market Perspective," International Marketing Review, 6 (6), 7-26

Gary L. Frazier, Robert E. Spekman, and Charles R O'Neal (1988), "Just-In-Time Exchange Relationships in Industrial Markets," Journal of Marketing, 52 (October), 52-67.

One of the articles in the eighth edition of Marketing Classics.

Prem N. Shamdasani and Gary L. Frazier (1988), "Intrachannel Complaining Behavior and Conflict," Journal of Consumer Satisfaction, Dissatisfaction, and Complaining Behavior, Volume 1, 97-103

Gary L. Frazier and John O. Summers (1987), "Push and Pull Strategies in Industrial Markets: a Normative Framework," in Contemporary Views on Marketing Practice, Gary Frazier and Jagdish Sheth, eds , Lexington, MA:  Lexington Books, 217-235

Gary L. Frazier and John O. Summers (1986), "Perceptions of Interfirm Power and Its Use within a Franchise Channel of Distribution," Journal of Marketing Research, 23 (May), 169-176

Gary L. Frazier and Jagdish N. Sheth (1985), "An Attitude-Behavior Framework for Distribution Channel Management," Journal of Marketing, 49 (Summer), 38-48.

Gary L Frazier and Roy D Howell (1985)," The Data Aggregation Issue in Empirical Analysis for Strategic Market Planning," in Strategic Marketing and Management, Howard Thomas and David Gardner, eds , London:  John Wiley Limited, 167-180.

Gary L. Frazier (1984), "The Interfirm Power-Influence Process within a Marketing Channel," Research in Marketing, Volume 7, 63-91

Gary L Frazier and John O  Summers (1984), "Interfirm Influence Strategies and Their Application within Distribution channels," Journal of Marketing, 48 (Summer), 43-55

Gary L. Frazier (1983),"Interorganizational Exchange Behavior in Marketing Channels:  A Broadened Perspective," Journal of Marketing, 47 (Fall), 68-78

Reprinted in Marketing Theory:  Classic and Contemporary Readings, Jagdish N  Sheth and Dennis Garrett, eds., Cincinnati, OH:  Southwestern Publishing Company, 1986, 702-721.

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PUBLICATIONS (continued):**

**Articles:**

Gary L. Frazier (1983), "On the Measurement of Interfirm Power in Channels of Distribution," Journal of Marketing Research, 20 (May), 158-166.

Finalist for the 1988 Journal of Marketing Research William O'Dell Award for making a "significant long-run contribution to marketing theory, methodology, or practice."

Gary L. Frazier and Roy D. Howell (1983), "Business Definition and Performance," Journal of Marketing, 47 (Spring), 59-67.

Jagdish N. Sheth and Gary L. Frazier (1983), "A Margin-Return Model for Strategic Market Planning," Journal of Marketing, 47 (Spring), 100-109

Request made to the Journal of Marketing in 1984 for translation and reprinting of the article in an Italian quarterly journal; request made to Journal of Marketing in 1985 for reprinting of the article in a marketing management readings book.

One of the articles in the eighth edition of Marketing Classics

Gary L. Frazier and Roy D. Howell (1982), "Intraindustry Marketing Strategy Effects on the Analysis of Firm Performance," Journal of Business Research, 10 (December), 431-443

Roy D. Howell, Gary L. Frazier, and P. Ronald Stephenson (1982), "Using Industry Data in Small Business Decision Making: Potential Problems," Journal of Small Business Management, 20 (April), 45-56

Jagdish N. Sheth and Gary L. Frazier (1982), "A Model of Strategy Mix Choice for Planned Social Change," Journal of Marketing, 46 (Winter), 15-26

Request made to Journal of Marketing in 1985 for reprinting of the article in a marketing management readings book

P. Ronald Stephenson, William L. Cron, and Gary L. Frazier (1979), "Delegating Pricing Authority to the Sales Force: The Effects on Sales and Profit Performance," Journal of Marketing, 43 (Spring), 21-28.

**Dictionary**

Contributed conceptual definitions in the channels of distribution area for Peter Bennett (ed.) (1994), Dictionary of Marketing Terms, Chicago: American Marketing Association.

**Published Proceedings**

Gary L. Frazier (1987), "On the Theory of Distribution Channel Structure," Proceedings, 12th Paul D. Converse Symposium, Devanathan Sudharshan and Frederick Winter, eds., Chicago: American Marketing Association, 138-160

James R. Brown and Gary L. Frazier (1978), "The Application of Channel Power: Its Effects and Connotations," Proceedings, Marketing Educators' Conference, Chicago: American Marketing Association

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PUBLICATIONS (continued):**

<u>Published Proceedings</u>

Gary L. Frazier (1978), "An Indirect Approach to Measuring Power in Distribution Channels," <u>Proceedings, Midwest AIDS</u>, May.

Gary L. Frazier and James R. Brown (1978), "Use of Power in the Interfirm Influence Process," <u>Proceedings</u>, Albert Haring Doctoral Symposium, Indiana University, May.

Donald Granbois, John O. Summers, and Gary L. Frazier (1977), "Correlates of Consumer Expectations and Complaining Behavior," <u>Consumer Satisfaction, Dissatisfaction, and Complaining Behavior</u>, Ralph Day, ed., Division of Research: Indiana University, August.

**SUBMISSIONS:**

Gary L. Frazier, Elliot Maltz, Arnold Maltz, and Kersi Antia, "The Sharing of Strategic Information in Distribution Channel Relationships," under first revision for the <u>Journal of Marketing</u>.

Elliot Maltz, Kersi Antia, and Gary L. Frazier, "Exploring the Impact of Traditional Media and Web-Based Media on Sales in Indirect Channels of Distribution," under third revision for the <u>Journal of Marketing</u>.

**WORK IN PROCESS:**

Gary L. Frazier, Xavier Dreze, and Matthew Thomson, "The Adoption of New Channels of Distribution," intended for the <u>Journal of Marketing</u>.

Gary L. Frazier and David W. Stewart, "Relational Exchange in Channels of Distribution: A Multi-Level Conceptual Framework," intended for the <u>Journal of Marketing</u>.

Kersi Antia and Gary L. Frazier, "Attributed Opportunism in Distribution Channel Relationships," intended for the <u>Journal of Marketing</u>.

Gary L. Frazier, Key-Suk Kim, and David W. Stewart, "Resource Allocations to Push and Pull Strategies," intended for the <u>Journal of Marketing</u>.

**PRESENTATIONS:**

AMA Summer Educators' Conference, July 29, 2005, 5th Annual Doctoral Student SIG Pre-Conference Symposium, "Navigating the Publishing Process," (with Greg Gundlach)

AMS Summer Eductors' Conference, July 29, 2005, 5th Annual Doctoral Student SIG Pre-Conference Symposium, Member of a Round Table on Research and Teaching in the Marketing Discipline

AMA Summer Educators' Conference, August 17, 2003, "Innovative Channels Research."

AMA Ph.D. Consortium, Emory University, June 8, 2002, "Problem-Driven Theory Development."

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

PRESENTATIONS (continued):

Research seminar, Department of Marketing, University of Southern California, April 20, 2001,
"The Adoption of New Channels of Distribution "

AMA Ph.D Consortium, University of Southern California, August 4, 1999, "The Boundaries of
Relationship Marketing in Channels of Distribution."

AMA Summer Educators' Conference, August 15, 1998, "Power and Relationship Marketing"; a
special session held in honor of Louis Stern

Research Conference of the Journal of Marketing and the Marketing Science Institute, Boston,
June 5, 1998, "The Boundaries of Relationship Marketing in Channels of Distribution",
with Dave Stewart

Research Seminar, University of Georgia, April 26, 1997, "Channel Research:  Challenges and
Opportunities "

Research Seminar, University of Georgia, April 25, 1997, "Distributor Information Sharing in
Channels of Distribution "

AMA Ph D  Consortium, University of Colorado, July 31, 1996, "Channel Systems:  A Macro
Perspective."

AMA Faculty Consortium on Strategic Marketing, Arizona State University, June 12, 1996,
"Interorganizational Perspectives:  Redrawing Boundaries and Managing Strategic
Interdependencies "

Research Seminar, University of Houston, October 27, 1995, "Outcome-based and behavior-based
Coordination Efforts in Channel Relationships "

Research Seminar, University of Florida, April 8, 1995, "Outcome-based and Behavior-based
Channel Coordination Efforts."

Doctoral Internationalization Consortium, University of Texas, Austin, March 25, 1995,
"International Channels Research."

AMA Winter Educators' Conference, February 13, 1995, "Close Channel Relationships:  To Be
or Not to Be "

Research Seminar, University of Colorado Boulder, March 20, 1994, "Distribution Intensity."

AMA Summer Educators' Conference, August 10, 1993, "Channel Systems in the Global
Arena:  A Typology" (with Keysuk Kim).

MSI Charleston Conference on Understanding Competitive Decision-Making, June 15, 1993,
"Buyer-Seller Relational Characteristics and Joint Decision-Making" (with Bernie
Jaworski, Ajay Kohli, and Bert Weitz)

Research Seminar, Penn State University, September 23, 1992, "Behavioral Channels Research:
Future Challenges "

AMA Ph.D. Consortium, Michigan State University, August 5, 1992, "Behavioral Channels
Research:  Progress and Problems."

# EXHBIT A
# CURRICULUM VITAE OF GARY L. FRAZIER

PRESENTATIONS (continued):

USC/UCLA Marketing Colloquium, May 15, 1991, "Behavioral Channel Research: Present Knowledge and Needed Research."

Research Seminar, University of Pittsburgh, April 19, 1991, "Behavioral Channel Research: Present Knowledge and Needed Research."

Retailing in the Year 2000 Symposium, University of Texas, Austin, November 16th 1990, "Multiple Channels of Distribution and Their Impact on Retailing."

Research Seminar, University of California-Irvine, March 9, 1990, "The Use of Influence Strategies in Interfirm Relationships in Industrial Product Channels."

Research Seminar, University of Alabama, February 16, 1989, "The Use of Influence Strategies in Channel Relationships in Industrial Product Channels."

Special Session on Behavioral Channels Research at the AMA Winter Theory Conference, February 13, 1989, "Future Challenges in Distribution Channel's Research."

Center for Telecommunications Management Conference on Marketing Strategies for Information Technologies, November 18, 1988, "The Vertical Integration Issue in Channels of Distribution."

AMA Faculty Consortium on Marketing Channels and Distribution, July 27, 1988, "Marketing Channel Behavior."

Research Seminar, University of Minnesota, May 6, 1988, "Dealer Dependence Levels and Reciprocal Actions in a Channel of Distribution in a Developing Country."

Academy of Marketing Science Conference, April 28, 1988, Montreal, Canada, "The Status of Distribution Channel Research;" this was an invited presentation in a special session on channels research

Research Seminar, University of California-Irvine, February 17, 1988, "Strategic Implications of Channels Research."

Marketing Theory Conference, February 9, 1988, "The Interface of Macro and Micro Channel Issues."

Research Seminar, University of Washington-Seattle, March, 1987, "Challenges in Conducting Distribution Channel Research."

Research Seminar, University of California-Irvine, January, 1987, "Challenges in Conducting Distribution Channel Research."

USC/UCLA Marketing Colloquium, May 30, 1986, "Push and Pull Marketing Strategy for Industrial Markets: A Normative Framework."

Twelfth Ph.D Converse Symposium, American Marketing Association, University of Illinois-Urbana, May 19, 1986, "On the Theory of Distribution Channel Structure."

Research Seminar, Distinguished Professor Program, Arizona State University, May 2, 1986, "Push and Pull Marketing Strategy for Industrial Markets: A Normative Framework."

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**PRESENTATIONS (continued):**

Research Seminar, Distinguished Professor Program, Arizona State University, May 1, 1986, "Problems and Challenges in Distribution Channel Research."

Stellner Symposium on Theories of Marketing Practice, University of Illinois, May, 1985, "Push and Pull Marketing Strategy for Industrial Markets: A Normative Framework."

Research Seminar, University of Cincinnati, March, 1985, "Push and Pull Marketing Strategy for Industrial Markets."

Research Seminar, Southern Methodist University, February, 1985, "Interfirm Power and Its Use within a Channel of Distribution."

Strategic Marketing Seminar, American Marketing Association, Urbana, Illinois, April, 1983, "The Data Aggregation Issue in Empirical Analysis for Strategic Market Planning."

Research Seminar, University of Minnesota, June, 1982, "A Model of Interorganizational Exchange Behavior in Marketing Channels."

Guest Lecture Series, Ohio State University, June, 1981, "Marketing Management and Distribution Channels."

Logistics and Marketing Management Seminar, American Marketing Association, Mobile, Alabama, May, 1981, "Problems and Prospects for Increased Vertical and Horizontal Coordination of a Channel's Logistics Responsibilities."

Marketing Educators' Conference, American Marketing Association, Chicago, August, 1978, "The Application of Channel Power: Its Effects and Connotations."

Midwest AIDS, Cincinnati, May, 1978, "An Indirect Approach to Measuring Power in Distribution Channels."

Albert Haring Doctoral Symposium, Indiana University, April, 1978, "Use of Power in the Interfirm Influence Process."

**DOCTORAL DISSERTATION COMMITTEES:**

Kersi Antia, University of Southern California, 1994 to 1997 (chair)

Keysuk Kim, University of Southern California, 1990 to 1992 (chair)

Walfried Lassar, University of Southern California, 1990 to 1992 (chair)

Kirti Sawhney Celli, University of Southern California, 1989 to 1992 (chair)

Raymond C. Rody, University of Southern California, 1989 to 1992 (chair)

Tassu Shervani, University of Southern California, 1988 to 1991 (chair)

Scott Koslow, University of Southern California, 1989 to 1991

Kerri Acheson, University of Southern California, 1986 to 1989 (chair)

EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**DOCTORAL DISSERTATION COMMITTEES (continued):**

Robert Allerheiligen, University of Southern California, 1984 to 1985

Dennis Garrett, University of Illinois, 1984 to 1985

Sudhir Kale, University of Illinois, 1983 to 1984

**CONSULTING EXPERIENCE:**

| Year | Company | Areas |
|------|---------|-------|
| 1977 | General Motors | Distribution and promotion management |
| 1978 | Paul Harris Company (retailer of women's fashion products) | Market segmentation and promotion management |
| 1978 | Olympia Brewing Company | Market expansion and distribution management |
| 1979 | Wholesalers in the medical supply and equipment channel | Sales force and distribution management |
| 1980 | Hewlett-Packard | Personal selling and sales force management |
| 1981 | Richard Newman Associates, Inc. (advertising agency) | Personal selling and channel design |
| 1982 and 1983 | Pullman Trailmobile (manufacturer of truck trailers) | Personal selling, sales force management, and distribution management |
| 1983 | Famous Barr Department Stores (member of the May Department Stores Company) | Buyer-vendor relations and negotiating strategy |
| 1983 | Western Electric (now AT&T Technologies) | Marketing strategy and sales force management |
| 1984 | Christie Clinic (health care provider) | Branch location and promotional strategy |
| 1984 | Therapy Selection Services (health care provider) | Strategic marketing and marketing strategy |
| 1985 | Northrop Corporation (manufacturer of aerospace products) | Distribution channel design and management, sales force management, and countertrading |
| 1985 | Foot Leveler, Inc. (manufacturer of medical equipment) | Expert witness on marketing and distribution |

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**CONSULTING EXPERIENCE (continued):**

| Year | Company | Areas |
|------|---------|-------|
| 1985 | Deluca Wine and Spirits Corporation (distributor of wine and liquor) | Expert witness on marketing and distribution |
| 1985 and 1986 | Carnation | New product development and marketing strategy |
| 1986 | Standard Abrasives, Inc (manufacturer of industrial abrasive products) | Supplier distributor relationships, marketing research, and new product development |
| 1986 | Photo-Graphix Systems, Inc. (manufacturer of photographic business cards) | Supplier-distributor relationships and distributor sales training programs |
| 1987 and 1988 | C & C Wholesale (distributor of beverages and food products) | Expert witness on marketing and distribution |
| 1987 | Maury Abrams Co., Inc (real estate developer and shopping center owner) | Expert witness on marketing and distribution |
| 1988 | 3M | The management of distribution channel relationships |
| 1988 | Valcom, Inc (franchisor of computer products) | Expert witness on marketing and distribution |
| 1988 | TRW | The design and management of channels of distribution, and market segmentation |
| 1989 | Merck Pharmaceutical | The building and maintenance of business partnerships |
| 1990 | Southern California Edison | Expert witness on marketing strategy |
| 1990 | Pedo-Seed (producer of hybrid vegetable and fruit seeds) | The design and management of channels and distribution |
| 1990 | Omaha Vaccine Corporation (manufacturer of vaccines for livestock) | Expert witness on marketing and distribution |
| 1990 | Comac (marketing services provider) | Personal selling and sales force management |
| 1991 | Holmes-Hally Industries (manufacturer of garage doors) | Building a market-focused organization |

**EXHBIT A**
**CURRICULUM VITAE OF GARY L. FRAZIER**

CONSULTING EXPERIENCE (continued):

| Year | Company | Areas |
|---|---|---|
| 1991 and 1992 | Adrays (retailer of appliances and home entertainment products) | Expert witness on trademarks, marketing, and distribution |
| 1992 | Arthur Andersen | Building a market-focused organization |
| 1992 | Sunrider International (direct selling organization) | Building a market-focused organization |
| 1992 | Navistar (manufacturer of farm equipment) | Expert witness on marketing and distribution |
| 1993 | All-West (distributor of pet food) | Expert witness on marketing and distribution |
| 1993 | Shipley's (fashion retailer) | Expert witness on marketing and distribution |
| 1993 and 1994 | Several former distributors of Mac Tools, Inc | Expert witness on marketing and distribution |
| 1994 | Joico (manufacturer of hair care products) | Expert witness on marketing and distribution |
| 1995 | U S. Justice Department | Distribution expert in evaluating Microsoft's inclusion of MSN in Windows' '95' software |
| 1995 | Honeywell, Perfect Climate Division | Distribution practices |
| 1995 | Letro, Inc (manufacturer of automatic pool cleaning equipment) | Expert witness on trade dress, marketing, and distribution |
| 1995 | Hewlett-Packard | The productivity of marketing and sales tactics with distributors |
| 1996 | Vanstar (distributor of computer products) | Expert witness on marketing and distribution |
| 1996 | AirTouch Cellular (cellular telephone service provider) | Expert witness on marketing and distribution |
| 1996 | Santa Monica Honda (motorcycle dealer) | Expert witness on marketing and distribution |
| 1996 | LGB (German manufacturer of model trains) | Expert witness on trademarks, marketing, and distribution |

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**CONSULTING EXPERIENCE (continued):**

| Year | Company | Areas |
|------|---------|-------|
| 1996 | Telesphere Liquidating Trust (telephone services) | Expert witness on marketing and distribution |
| 1997 | Bergen-Brunswig (distributor of pharmaceuticals) | Expert witness on marketing and |
| 1997 | AirTouch Cellular | Expert witness on marketing and distribution |
| 1997 | Playtex (sun care products division) | Expert witness on marketing and distribution |
| 1997 | Micron Electronics (manufacturer of computer products) | Expert witness on marketing and distribution |
| 1997 | Hasbro, Inc. | Expert witness on marketing and distribution on the Internet |
| 1997 | LGB | Expert witness on marketing and distribution |
| 1997 | Oakland Raiders | Expert witness on licensing, marketing, and distribution |
| 1997 | Super Sports, Inc (retailer of sporting goods) | Expert witness on trademarks and their effects |
| 1998 | Michael Taylor (former owner of Andesite, a manufactuer of spill clean-up products) | Expert witness on marketing and distribution |
| 1998 | Anheuser-Busch | Expert witness on marketing and distribution |
| 1998 | Cambro (manufacturer of food service products) | Expert witness on distribution |
| 1998 | Dynamic (manufacturer of car alarms) | Expert witness on marketing and distribution |
| 1998 | Honeywell | Marketing and distribution |

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**CONSULTING EXPERIENCE (continued):**

| Year | Company | Areas |
|------|---------|-------|
| 1998 | SPARC International | Expert witness on marketing and distribution |
| 1998 | Snap-On | Expert witness on distribution |
| 1998 | Bilstein (manufacturer of shock absorbers) | Expert witness on distribution |
| 1998 | Atwood-Richards (distributor of consumer products) | Expert witness on marketing and distribution |
| 1998 and 1999 | Coca-Cola | Re-design of channels in China |
| 1998 and 1999 | Lipton | Expert witness on marketing and distribution |
| 1998 and 1999 | AirTouch Cellular | Expert witness on marketing and distribution |
| 1999 | C & L Distribution (distributor of auto parts) | Expert witness on distribution |
| 1999 | Dacor (Manufacturer of kitchen appliances) | Expert witness on distribution |
| 1999 | 3M | Channel organization and management |
| 2000 | Tarkett (manufacturer of flooring products) | Expert witness on marketing and distribution |
| 2000 | Sky One (retailer of electronics) | Expert witness on marketing and distribution |
| 2000 | Dallo and Company (operator of supermarkets) | Expert witness on marketing and distribution |
| 2000 | Taco Bell | Expert witness on marketing and distribution |
| 2000 and 2001 | American Booksellers' Association | Expert witness on marketing and distribution |

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**CONSULTING EXPERIENCE (continued):**

| Year | Company | Areas |
|------|---------|-------|
| 2000 and 2001 | Wal-Mart | Expert witness on marketing and distribution |
| 2001 | Pensoil | Expert witness on marketing and distribution |
| 2001 | Medibuy (an internet-based supplier of medical supplies) | Expert witness on marketing and distribution |
| 2001 | Arctic Cat (manufacturer of snowmobiles and ATVs) | Channel organization and management |
| 2001 | Australia Vision (manufacturer of sunglasses) | Expert witness on marketing and distribution |
| 2001 and 2002 | Former distributors of Sara Lee | Expert witness on marketing and distribution |
| 2002 and 2004 | Gillette | Expert witness on marketing and distribution |
| 2002 | Wal-Mart (USA and Mexico) | Expert witness on marketing and distribution |
| 2002 | Edwards Cinemas | Expert witness on marketing and distribution |
| 2002 | Scotts' (lawn and garden products) | Expert witness on marketing and distribution |
| 2002 | Mobil Oil Corporation | Expert witness on marketing and distribution |
| 2002 | Pacific Bell | Expert witness on marketing and distribution |
| 2002 | Pegasus (distributor of satellite television service) | Expert witness on marketing and distribution |
| 2002 and 2003 | Microsoft | Expert witness on distribution |
| 2002 and 2003 | Pelican Products (manufacturer of carrying cases) | Expert witness on marketing and distribution |

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**CONSULTING EXPERIENCE (continued):**

| Year | Company | Areas |
|------|---------|-------|
| 2003 | Oakland Raiders | Expert witness on marketing and distribution |
| 2003 and 2004 | Nitgen (manufacturer of biometric products) | Expert witness on marketing and distribution |
| 2004 | Cyclone USA (manufacturer of automotive after-market products) | Expert witness on marketing and distribution |
| 2004 | EPI (distributor of automotive after-market products) | Expert witness on marketing and distribution |
| 2004 and 2005 | Mastercard International | Expert witness on marketing and distribution |
| 2004 and 2005 | Tong Yang (manufacturer) and Keystone (distributor) of automotive after-market products | Expert witness on marketing and distribution |
| 2004 and 2005 | C &L (former distributor of automotive after-market products) | Expert witness on marketing and distribution |
| 2005 | City of New York (vs gun manufacturers and distributors) | Expert witness on marketing and distribution |

**GRADUATE AND UNDERGRADUATE TEACHING EXPERIENCE:**

Marketing Channels, undergraduate, MBA, and Ph.D
Marketing Strategy and Implementation, Ph D
Sales Force Management, MBA and undergraduate
Promotion Management, MBA and undergraduate
Marketing Management, MBA and undergraduate

**EXECUTIVE EDUCATION EXPERIENCE:**

| Year | Program | Areas |
|------|---------|-------|
| 1980-1984 | Faculty member, Industrial Marketing Management Seminar, University of Illinois | Distribution, sales force, and promotion management; sales forecasting; political processes within organizations; industrial buyer behavior |
| 1982 | Faculty member, Automotive Services Industry Association | New product development |

# EXHBIT A
# CURRICULUM VITAE OF GARY L. FRAZIER

### EXECUTIVE EDUCATION EXPERIENCE (continued):

| Year | Program | Areas |
|---|---|---|
| 1983 | Faculty member, Western Electric (now AT&T Technologies) Seminar, Chicago, Illinois | Marketing strategy, personal selling, and negotiating Strategy |
| 1984 and 1985 | Marketing of Professional Health Care Services, California Marketing Associates, Los Angeles | Strategic marketing and negotiating strategy |
| 1986 | General Electric, Management Development Institute, Crotonville, New York | Marketing strategy and management |
| 1988 and 1989 | Weyerhaeuser Corporation, Sales Leadership Seminar | The interface of marketing and sales management |
| 1991 | IBM Corporation, Business Partner Seminar | Channel management and building of partnerships in the channel |
| 1991 | USC Advanced Manager Program | Building a market-focused organization and channel management |
| 1992 | USC Advanced Manager Program | Creating value for customers |
| 1992 | Intel Foreign Manager Program | The structure and management of channels of distribution |
| 1992 and 1993 | Intel Marketing Program | The structure and management of channels of distribution, push and pull strategy, and retailing management |
| 1992 to 1995 | Honeywell Leadership Program | The structure and management of channels of distribution |
| 1994 to 1997 | USC Marketing Seminar | The structure and management of channels of distribution |
| 1994 | Hotai Marketing Program | The structure and management of channels of distribution |
| 1995 to 1997 | Texas Instruments | The structure and management of channels of distribution |
| 1996 and 1997 | Samsung | The structure and management of channels of distribution |

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**SERVICE, UNIVERSITY OF SOUTHERN CALIFORNIA, 1984 to present:**

### University Level

> Member of the University Committee on Appointment, Promotion, and Tenure, beginning Fall, 2002 to Spring, 2007

> USC Ambassador, beginning Fall of 2001 to the present

> Member of the Committee on Faculty Tenure and Privileges Appeals, beginning Spring, 2001

> Member of the University Research Committee, 1986-1987, 1987-1988, 1988-1989

> ♦ Chaired a sub-committee on "Research Support for Faculty in the Arts, Humanities, and Social Science" during 1987-1988

> ♦ Chaired a sub-committee on "The Development Effort and Research Support" during 1988-1989

### School of Business Administration Level

> Member of the MBA Curriculum and Over-site Committee, beginning Fall, 2002

> Chair of the MBA Curriculum and Over-site Committee, Spring, 2001 through Summer, 2002

> Chair of the Committee on Chaired Appointments, Fall, 2002

> Member of an MBA teaching awards committee, Spring, 2000

> Member of a committee evaluating the merits of Ananth Madaven's record for a distinguished chaired position, Spring, 2000

> Member of the School's Personnel Committee, September 1, 1995 to May 1, 1999

> Chaired Ph D Committee on identifying cross-departmental Ph.D Courses, Fall, 1998

> Head of School's Personnel Committee, September 1, 1995 to May 1, 1997

> Director of Research Conferences at the Center for Telecommunications Management from Fall, 1987 to Summer, 1990

> Member of the Ph.D. Quest Committee, School of Business Administration 1984-1985

> Member of the Ph D. Committee, School of Business Administration, Spring semester, 1985 to 1989

> Member of the Strategic Planning Committee since July of 1989

> Member of the MBA Task Force, November of 1989 to present

> Member of the Dean's Fellows Committee from January of 1988 to May of 1990

## EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

### School of Business Adminstration Level (continued):

Member of the Distance Teaching Committee, Fall of 1989

Panelist at the doctoral workshops held at the Los Angeles MBA Forums,
November 9th and 10th, 1990

Presentation at Ph D Recruitment Program, December 1989 and 1990

Presentation at Undergraduate Recruitment Program, November 20, 1988

Organized FBE and Marketing Research Seminars with Tom Gilligan, 1987-1988

Member of the Research Committee, School of Business Administration, 1984 to 1987

Attended Directors of Doctoral Programs in Business Administration meeting in Seattle,
September 13-15, 1985

Project research advisor for students in the IBEAR program, School of Business Administration,
1984-1987

### Marketing Department Level

Chair of Allen Weiss' Peer Evaluation Group, Fall, 2002

Member of Shantanu Dutta's Peer Evaluation Group, Fall, 2002

Chaired recruiting committee for an Assistant Clinical Professor position, Spring, 2002

Chair of Debbie MacInnis' Peer Evaluation Group, Fall, 2000

Served on the guidance committees of Youngshuan Bao, Matthew Thomson, and Shoming Qu
during the summer of 2000

Chaired recruiting committee for an Assistant Clinical Professor position, Spring, 2000

Chaired committee evaluating the status of the Ph D program in Marketing, Spring, 2000

Chaired committee evaluating annual faculty performance, Spring, 1999

Coordinated faculty recruiting effort, Summer, 1998
Chaired staff evaluation committee, Spring, 1998

Chairman of Robert Spekman's PEG Committee during the Spring of 1990

Served on two PEG Committees during the Fall of 1989

Served on three PEG Committees during the Fall of 1988; chairman of Wesley Johnston's
committee

Served on four PEG Committees during the Fall of 1987; chairman of Valerie Folkes'
committee

Coordinator of recruiting efforts in the Department, 1985 through 1988

# EXHBIT A
## CURRICULUM VITAE OF GARY L. FRAZIER

**Marketing Department Level (continued):**

Member of the "Chairman's Advisory Committee," 1987 to 1989

Member of the "Ph.D. Committee," 1985 to 1990

Coordinator of the Ph.D. Program in Marketing, 1985 to 1987

Served on committee to develop a "mission statement" for the department, Fall semester, 1986

Served on committee to evaluate a proposal for a revised M.B.A. Program, April 1986
Co-coordinator (along with John Graham) of the "Guest Speaker Series," Spring semester, 1985

Represented the Department at the Forum for University Admissions Staff, August 24, 1988 and August 16, 1989

Developed Ph.D. courses on "Marketing Strategy and Implementation" and "Implementation of Marketing Programs"

Course Section Coordinator for the undergraduate Sales Force Management (MKT 415) class from Fall of 1987 through Spring of 1990

**SERVICE, UNIVERSITY OF ILLINOIS, 1979-1984:**

Developed a Ph.D. course on "Interorganizational Marketing Systems," an MBA course on "Sales Force Management," and an undergraduate course on "Industrial Marketing"

Dealt with members of the Central States Industrial Distributors Association in funding and developing an education program in Industrial Distribution

Served on Committee to develop a "mission statement" for the Department, Fall semester, 1983

Served on the Graduate Admissions, Library, and Capricious Grading Committees

Coordinated faculty recruiting efforts at the American Marketing Association's Educators' Conference, 1980 and 1982

Faculty advisor to Alpha Kappa Psi, 1981 through 1984

Faculty advisor for students in the Individualized Plan of Study Program

**SERVICE, INDIANA UNIVERSITY, 1975-1979:**

President of DBA Association, 1978-1979

Member of the DBA Association's Policy Committee, 1977-1978 and 1978-1979

Athletic chairman of DBA Association, 1977-1978

Assisted Ralph L. Day in editing Consumer Satisfaction, Dissatisfaction, and Complaining Behavior, (Division of Research: Indiana University), Summer 1977

Coordinator of Albert Haring Doctoral Symposium, Spring 1977

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

Second Consolidated and Amended Class Action Complaint

Transcript of April 10, 2006 Hearing

Court Order, April 11, 2006

Answer of Underwriter Defendants to the Second Consolidated and Amended Class Action Complaint

The Adams Golf Defendants' Answer to Plaintiffs' Second Consolidated and Amended Complaint

Underwriter Defendants' Responses and Objections to Plaintiffs' Sixth Set of Interrogatories Directed to Underwriter Defendants, June 30, 2006

Plaintiffs' Responses and Objections to Underwriter Defendants' First Set of Interrogatories to Class Representatives, June 5, 2006

Plaintiffs' Amended Response to Defendant Adams Golf's Second Set of Interrogatories to Proposed Class Representatives, May 17, 2000

Adams Golf Defendants' Objections and Responses to Plaintiffs' Fifth Set of Interrogatories, June 30, 2006

Notice of Filing and Service of the Defendants' Expert Disclosure, July 14, 2006

Deposition of Barney Adams with Exhibits, June 22, 2006

Deposition of Scott Blevins with Exhibits, May 3, 2006

Deposition of Chip Brewer with Exhibits, May 2, 2006

Deposition of David Brown with Exhibits, April 27, 2006

Deposition of Paul Brown, Jr. with Exhibits, May 16, 2006

Deposition of Finnis Conner, Jr. with Exhibits, May 9, 2006

Deposition of James Farrell with Exhibits, June 12, 2006

Deposition of Mark Gonsalves with Exhibits, June 6, 2006

Deposition of Jay Greaney with Exhibits, May 18, 2006

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

Deposition of Darl Hatfield with Exhibits, June 8, 2006

Deposition of Brian Lantier with Exhibits, June 5, 2006

Deposition of Ryan Magnussen with Exhibits, April 28, 2006

Deposition of Stephen R. Patchin with Exhibits, June 13, 2006

Deposition of Bernard Picchi with Exhibits, June 9, 2006

Deposition of Greg Pratt with Exhibits, April 27, 2006

Deposition of Marco Puglielli with Exhibits, May 10, 2006

Deposition of Olga A. Pulido-Crowe with Exhibits, May 17, 2006

Deposition of Michael Bradley Smith with Exhibits, June 13, 2006

Deposition of Eddie Tate III with Exhibits, June 27, 2006

Deposition of Joseph D. Teklits with Exhibits, June 7, 2006

Deposition of Patrick D. Walravens with Exhibits, May 26, 2006

Deposition of Patty Walsh with Exhibits, May 11, 2006

Deposition of Lehman Brothers, Inc. Taken Through Its Representative James G. Holderman, with Exhibits, February 28, 2006

Declaration of Ryan Magnussen, February 25, 2006

Declaration of Mark Woodrich (unsigned), June, 2006

Costco Document Production
*COST 0001-0052*

KPMG Document Production
*KPMG 2100-2107*

Expert Report of Christiana Ochoa, July 14, 2006

Expert Report of H. Stephen Grace, July 14, 2006 (including documents cited in Exhibit VII)

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

Expert Report of Christopher M. James, July 14, 2006

Expert Report of Charles A. Sjolquist, July 14, 2006

Expert Report of Ed J. Lynch, July 14, 2006

Expert Report of R. Alan Miller, July 12, 2006

Expert Report of Edward Necarsulmer III, July 12, 2006

Lantier, B. and B. Picchi, CFA. "Adams Golf Inc: Initiating Coverage with a 1-Buy - Target $23 Pt. 1." Lehman Brothers (August 4, 1998)
*ADAMS 008264-71*

Weiss, John W., and Bracken J. White. "Adams Golf, Inc." NationsBanc Montgomery Securities LLC 29 (August 4, 1998)
*ADAMS 004249-64*

Lantier, B. and B. Picchi, CFA. "Adams Golf, Inc: Product Line Extensions Announced on Q2 Conference Ca..." Lehman Brothers (August 7, 1998)
*ADAMS 008260-63*

Teklits, Joseph and David Turner. "Adams Golf, Inc. - New Recommendation: Buy." Ferris Baker Watts (August 12, 1998)
*ADAMS 004175-98*

Lantier, Brian and Bernard J. Picchi, CFA. "Adams Golf, Inc. - Fore! A Golf Equipment Giant is Headed Your Way." Lehman Brothers (August 28, 1998)
*ADAMS 004302-33*

Weiss, John W. and Anne-Marie Lillestrand. "Adams Golf, Inc. - EPS Estimates Reduced Due to Competitive Environment; New Estimates Exclude Possible Share Repurchase Which Could Add $0.35 to EPS; Stock Price Approximates Net Working Capital Per Share." NationsBanc Montgomery Securities (September 25, 1998)
*ADAMS 004465-71*

Lantier, B. and B. Picchi, CFA. "Adams Golf, Inc: Pre-Announces Q3 Results: EPS and Target Lowered." Lehman Brothers (September 29, 1998)
*ADAMS 007976-9*

Teklits, Joseph and David Turner. "Revising Estimates for 4Q:98; Sales And Earnings Projected Lower." Ferris Baker Watts, Equity Research (October 9, 1998)

# Exhibit B

## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

Lantier, B. and B. Picchi, CFA. "Adams Golf, Inc: Reports 3Q98 $0.19/sh Outlook Weakens." Lehman Brothers (October 23, 1998)
*ADAMS 7952-53*

Teklits, Joseph and David Turner. "ADGO: Q3:98 In-Line with Pre-Announced Guidance - Lowering Q4:98, 1999 EST's." Ferris Baker Watts (October 26, 1998)

Teklits, Joseph and David Turner. "ADGO: Lowering 1999 EPS to Low End of Potential Range." Ferris Baker Watts (October 28, 1998)

Lantier, B. and B. Picchi, CFA. "Adams Golf, Inc: Lowering 1999 Estimates." Lehman Brothers (November 6, 1998)
*ADAMS 4199-202*

Lantier, B. and B. Picchi, CFA. "Adams Golf, Inc: Lowering 1999 Estimates." Lehman Brothers (November 6, 1998)
*ADAMS 4450-8*

Proxy Analysis of Adams Golf, Prepared by The Investext Group (March 31, 1999)

Proxy Analysis of Adams Golf, Inc., Prepared by Suzy Keady, Thomson Financial (April 22, 2000)

Company Report on Adams Golf Inc, Prepared by Mergent FIS

Ryan, Thomas M. and David Hone. "Callaway Golf Company - Estimates Reduced--'Market Perform' Rating Reiterated." BT Alex Brown Research (July 13, 1998)

Eisenberg, Steven. "Coastcast Corporation - Reports Q2 Slightly Ahead of Out Forecast; Lowering '98,'99 EPS Estimates." CIBC Oppenheimer (July 15, 1998)

Eisenberg, Steven. "Callaway Golf - Dramatically Lowering Expectations; Rating Cut to Hold from Buy." CIBC Oppenheimer (July 23, 1998)

Rose, David L. and James S. Pott. "Callaway Golf Company - Missing the Ball." Jefferies & Company, Inc. (July 24, 1998)

Ryan, Thomas M. and David Hone. "Callaway Golf Company - 2Q 1998 Results Reported--Estimates Lowered Again --'Market Perform' Rating Reiterated." BT Alex Brown Research (July 27, 1998)

"Golf Equipment/Accessories - Golf Clubs Mkt Trends." MarkIntel (October 1, 1998)

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

"Golf Equipment/Accessories - Distribution Channels." MarkIntel (October 1, 1998)

Teklits, Joseph and David Turner. "ELY: 3Q:98 Below Our Estimate - No Positive Trends Visible." Ferris Baker Watts (October 22, 1998)
*ADAMS 4138-45*

Eisenberg, Steven and Todd Denker. "Fortune Brands - Initiating Coverage with a Buy Rating." CIBC Oppenheimer, Equity Research (November 24, 1998)

Van Kampen, Ken. "Uphill Climb." Golf Pro (September 1, 1998)

Ramsey, Tom. "Golf's Retail Slump Puts Bite on Tiger." Daily Telegraph (September 19, 1998)

McNulty, Mike and the Plastic News Staff. "Spalding Looking to Expand Products." Rubber & Plastics News (September 21, 1998)

"3, Sports." The Financial Post (September 29, 1998)

"Adams Golf Reports Record Third Quarter Operating Results." Adams Golf Inc., Press Release (October 22, 1998)

"Adams Golf Reports Record Second Quarter Sales and Earnings." Adams Golf Inc., Press Release (July 22, 1998)

"Fortune Brands Inc 3rd Quarter & 9 Mths Results." Regulatory News Service (October 23, 1998)

"Callaway Golf Earnings - 3: Sees Improved Margins In '99> ELY." Dow Jones News Service (July 22, 1998)

"Callaway Golf Reports Second Quarter Sales and Earnings" Callaway Golf Press Release (July 22, 1998)

"Adams Golf/Costco - 2: Says Costco Not Authorized Reseller." Dow Jones News Service (June 9, 1998)

Rajiv, Lal and Edith D. Prescott. "Calloway Golf Company." Harvard Business School, Case Study No. 9-501-019 (2000, Revised September 26, 2005)

Antia, Kersi D., Mark Bergen, and Shantanu Dutta. "Competing with Gray Markets." MIT Sloan Management Review 46, no. 1 (Fall 2004): 63-69

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

Assmus, Gert and Carsten Wiese. "How to Address the Gray Market Threat Using Price Coordination." MIT Sloan Management Review 36, no. 3 (Spring 1995)

Cespedes, Frank V., Assistant Professor. "Peripheral Products Company: The 'Gray Market' for Disk Drives." Harvard Business School, Case Study No. 9-586-124 (1986, Revised September 7, 1988): 1-22

Chen, Hsiu-Li. "Gray Marketing and Unfair Competition." Atlantic Economic Journal 30, no. 2 (June 2002)

Hilke, John C. "Free Trading or Free Riding: An Examination of Theories and Available Empirical Evidence on Gray Market Imports." Chapter 12 in The Economics of Intellectual Property IV, Competition and International Trade, edited by Ruth Towse and Rudi Holzhauer

Mullen, Michael R., C.M. Sashi, and Patricia M. Doney. "Gray Markets: Threat or Opportunity? The Case of Herman Miller v. ASAL GmbH." in Advances in International Marketing, Reviving Traditions in Research on International Market Entry (2003): 77-105

Gaffney, Andrew. "Fore Scores." Sporting Good Business 28, no. 6 (June 1995): 50-51

Stogel, Chuck. "Maxfli Takes Aim at Unmet Needs; Hot Gray Market Prompts Responses." Brandweek 41, no. 7 (February 14, 2000): 14

Murray, Kathleen. "Shades of Gray Goods Again, European Consumers Find Themselves on the Losing Side of the Battle Over Who Sets Prices." Time International 152, no. 19 (November 9, 1998)

Johnson, Greg. "Gray Wail Several Southern California Companies Are Among The Many Upscale Manufacturers Voicing Their Displeasure About Middlemen Delivering Their Goods Into The Hands of Unauthorized Discount Retailers." Los Angeles Times (March 30, 1997)

Jacoby, Jacob and Maureen Morrin. "Not Manufactured or Authorized by...': Recent Federal Cass Involving Trademark Disclaimers." Journal of Public Policy & Marketing 17, no. 1 (April 1, 1998)

"Germany - Golf Equipment Market (1) (4115)." Industry Sector Analysis (May 28, 1998)

"Adams Golf Reports Third Quarter Operating Results." PR Newswire (October 22, 1998)

"FFBN Research: Adams Golf At Bargain Valuations (Cont.)." Federal Filings Newswires (November 2, 1998)

"Adams Golf Comments on Fourth Quarter Outlook." PR Newswire (January 7, 1999)

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

"Adams Golf Comments on Earnings Outlook." Adams Golf Investor Relations (September 28, 1998)

"Adams Golf Estimate - 3: Sets Ups New Price Structure>." PR Newswire (January 7, 1999)

"Adams Golf Reports 1998 Operating Results." PR Newswire (February 4, 1999)

"Adams Golf Identifies Source of Gray Market Supply." PR Newswire (March 18, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers And Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (June 14, 1999)

"Seattle's Keller Rohrback L.L.P. Investigates Adams Golf, Inc. and Its Top Officers and Directors." Business Wire (June 15, 1999)

"Seattle's Keller Rohrback L.L.P. Investigates Adams Golf, Inc. and Its Top Officers and Directors." Business Wire (June 16, 1999)

"Adams Golf, Inc. and Top Officers and Directors Are Sued by The Shareholders in Class Actions Lawsuits Filed by Keller Rohrback LLP." Business Wire (June 23, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." Business Wire (August 5, 1999)

"Wechsler Harwood Files Class Action Against Adams Golf, Inc." Business Wire (August 6, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." Business Wire (August 7, 1999)

Branch, Shelly. "Inside The Cult of Costco Diamonds and Tires and Bras, Oh, My!" Fortune 140, no. 5 (September 6, 1999)

"Titleist Selects GenuOne for Brand Security Solution; Leading Golf Manufacturer Taps Innovative Company for Strategic Approach To Product Diversion and Proactive Brand Management." Business Wire (October 12, 2000)

Greenwald, Judy. "Losses of Intangible Assets Can Be Costly: Brand Risk Require Careful Management." Business Insurance 35, no. 47 (November 19, 2001)

# Exhibit B

## Documents Considered by Gary L. Frazier

<u>Document Title, Date, Bates No (if available):</u>

"Callaway Golf Company - SWOT Analysis." Datamonitor Company Profiles (June 17, 2004)

Sporting Good Business, May 17, 2005

"Wolf Haldenstain Announces Filing of Class Actions Against Adams Golf, Inc." Business Wire (July 6, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by the Shareholders As Per the Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (July 7, 1999)

"Keller Rohrback L.L.P. Announces Updated Procedures on Suit Against Adams Golf, Inc. and Top Officers and Directors." Business Wire (July 8, 1999)

"Adams Golf, Inc. and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." Business Wire (July 10, 1999)

"Adams Golf, Inc. and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." Business Wire (July 14, 1999)

"Law Suits Against Adams Golf, Inc. Assigned to Judge Roderick R. McKelvis in The U.S. District Court in Delaware Announces Keller Rohrback L.L.P." Business Wire (July 16, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholder As Per The Class Action Lawsuit Filed by Berger & Montague." Business Wire (July 17, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholder As Per The Class Action Lawsuit Filed by Berger & Montague." Business Wire (July 20, 1999)

"Stull, Stull & Brody Announces Class Action Against Adams Golf Inc." Business Wire (July 22, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by the Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (July 24, 1999)

"Keller Rohrback L.L.P. Announces New Class Action Against Adams Golf Inc." Business Wire (July 29, 1999)

# Exhibit B
## Documents Considered by Gary L. Frazier

**Document Title, Date, Bates No (if available):**

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholder As Per The Class Action Lawsuit Filed by Berger & Montague." PR Newswire (July 17, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (July 20, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (August 4, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (August 5, 1999)

"Adams Golf, Inc. (Nasdaq: ADGO) and Its Top Officers and Directors Are Sued by The Shareholders As Per The Class Action Lawsuit Filed by Berger & Montague, P.C." PR Newswire (August 7, 1999)

"How To Fit Your Game from Head to Toe." Golf Digest (December 1998)

Rob Sauerhaft's Review of Adam's Strong 3, Tight Lies, Strong. Golf Magazine 40, no. 3 (March 1998)

Rob Sauerhaft's Review of Fairway Woods and Drivers from Daiwa. Golf Magazine 40, no. 3 (March 1998)

Rob Sauerhaft's Review of Super Megasize Grooveless Drives and Megasize Offset Fairway Wood from Cubic Balance. Golf Magazine 40, no. 3 (March 1998)

Cespedes, Frank V., E. Raymond Corey, and V. Kasturi Rangan. "Gray Markets: Causes and Cures." Harvard Business Review (July-August 1988)

Mitchell, Alan, "Customer Rights a Gray Area in Distribution Ban," Marketing Week 21, no. 21 (July 23, 1998)

Coughlan, Anderson, Stern, and El-Ansary, Marketing Channels, 2005, Prentice Hall