EXHIBIT 334

RECYCLED



## PHILADELPHIA INVESTMENT BANKING COMPANY

**ADAMS GOLF SECURITIES LITIGATION**

**EXPERT REPORT OF R. ALAN MILLER**

P.O. BOX 209, ONE ALDWYN CENTER, VILLANOVA, PA 19085-0209
PHONE (610) 527-5346 / FAX (610) 527-1629 / email: pibc@pibc.net

## ADAMS GOLF SECURITIES LITIGATION

### EXPERT REPORT OF R. ALAN MILLER

I.    INTRODUCTION

1.    I have been asked by counsel for the plaintiffs in this matter for my opinions as to:

A.    The materiality to the investment community of the alleged omissions and misstatements described in the Second Consolidated and Amended Class Action Complaint (the "Complaint") in this action and/or which are identified herein,

B.    Damages under Section 11 of the Securities Act of 1933,

C.    Damages under Section 12 of the Securities Act of 1933 with respect to shares sold in the offering by Lehman Brothers,

D.    Upon receipt of the expert report(s) of defendants, whether defendants have demonstrated that disclosure of the alleged omissions and misstatements described in the Consolidated and Amended Class Action Complaint in this action and/or which are identified herein did not affect the price at which Adams Golf ("Adams" or the "Company") stock traded at and following the time of its IPO, or the amount of any such effect, and/or whether they have provided any proper basis for establishing "negative loss causation" and, if so, any effect on damages thereof,

E.    A description of the workings of the stock market and the roles of various participants therein, including particularly underwriting firms, and the standards and practices applicable thereto,

1

F.    If the underwriter defendants assert their "due diligence" defense, the adequacy of the due diligence investigation conducted by the underwriters in connection with the IPO and issuance of the Prospectus,

More specifically, in connection with the underwriter's "due diligence" issue, I have been asked:

a.    What type of information must properly be gathered by an underwriter regarding the issuer's business plan, business operations and prospects, products, distribution, management experience and competence, financial performance, condition and needs, manufacturing capabilities, industry trends and performance, risks of operations and achieving the business plan, etc. in order to properly assess whether the Prospectus disclosure is complete and not misleading?

b.    What type of information is material to investors and what level of investigation into an issuer is appropriate to determine that all material information is obtained for inclusion, and in fact is included in the Prospectus?

c.    Assuming the allegations of Plaintiffs as set forth in the Complaint to be true and considering the facts developed in the case to date, was the disclosure made in the Prospectus for Adams Golf's initial public offering adequate or misleading, or did it omit material information necessary to make it not misleading?

d.    Was the due diligence investigation conducted by the underwriters in connection with this offering reasonable and adequate?

G.    Possible rebuttal to defendants' experts.

2

II.    BACKGROUND AND QUALIFICATIONS

2.    I am President of Philadelphia Investment Banking Company ("PIBC") and am submitting this report summarizing my opinions in this matter.

3.    A copy of my résumé is attached as Exhibit A hereto to outline my education, professional experience and expertise. I have testified at trial or hearings thirty times; I have been qualified or accepted as an expert on the operations of the securities market, damages, materiality issues, investment banking practices, valuations and related corporate finance matters in numerous federal and state courts nationwide beginning in 1977. I have provided many depositions and submitted numerous Declarations, Affidavits, and Reports on matters in these areas, including many dealing with investment banking practices, materiality and damage questions and/or the factors relevant to such studies.

4.    PIBC has provided a wide range of corporate finance services to clients. These services include raising capital through private placements of debt and equity financings; advisory services re: public offerings of securities; merger, acquisition and divestiture services; evaluation and economic analysis services; consulting and litigation support; and other advisory services.

5.    PIBC and its staff perform a considerable amount of work in the area of evaluation of businesses and securities and the factors involved in such evaluation. These are done on a formal basis for a wide variety of purposes, as well as continuously on an informal basis in the process of performing our corporate finance functions such as raising capital, assisting in mergers and acquisitions, and providing advisory services. The factors used in such evaluations and their importance and materiality to the investment community are areas in which I have developed expertise and have had substantial experience over the last thirty-three

3

years.  Additionally, we have prepared a substantial number of analyses of market impact and

damages in connection with numerous shareholder litigations.

      6.     I received a B.S. in Economics from Cornell University in 1970, and a Masters

in Business Administration (major in Financial Accounting) from the Wharton School of

Finance and Commerce of the University of Pennsylvania in 1973.  I have attended various

Practising Law Institute and similar programs and seminars on topics such as corporate finance

and due diligence.

      7.     I have actively worked in the investment banking field for 33 years.  My work

experience includes:

- Howard & Co., a corporate finance research and consulting firm, Philadelphia, 1972 to 1976.  Performed research, writing and consulting on a wide range of corporate finance topics including bank debt, long term debt—private and public, mergers and acquisitions, equity capital—private and public, going public, being public, etc.  Topics included cost of each type of capital or project, terms, advantages and disadvantages to issuer and financing party, sources of capital, roles of participants (agents, underwriters, counsel, accountants, rating agencies, regulators, issuers, sources of financing), time to accomplish tasks, etc.  Such research included a detailed and comprehensive study of 550 IPO's that had occurred in the five years prior to 1973; issues studied included determination of required disclosures, materiality, due diligence practices and procedures, terms and pricing, roles of participants, costs, timing, other issues that arose.  Authored and/or edited numerous articles in a series of newsletters on above topics and prepared research for presentation at seminars and to clients.  Consultation to clients on corporate finance projects and issues.

- Butcher and Singer, a major regional investment banking firm headquartered in Philadelphia, corporate finance department 1976 to 1980.  Performed corporate finance functions for investment banking/brokerage firm.  Work included private placements and public offerings of debt and equity securities, merger and acquisition work, evaluations, fairness opinions, tender offer management, creating and structuring leasing transactions, corporate finance advisory and consulting work.  Early work on "securitization" financing structures of leasing transactions for railroad and

4

municipal equipment. Obtained professional license as registered representative.

- Philadelphia Capital Advisors, a corporate finance services group of Philadelphia National Bank, 1980 to 1983. Continued corporate finance functions, except for public offering activities, for a wide rage of clients. Supervised and instructed other group members.

- Philadelphia Investment Banking Company, a corporate finance services firm, 1983 to present. Continued corporate finance activities, with increasing work in litigation support.

8.      I have extensively researched and studied the applicable professional standards, customs and practices within the investment banking profession. I have been accepted as an expert witness in various contested matters involving professional standards, customs and practices within the investment banking profession. As an investment banker, I have functioned as an underwriter and dealer-manager and have advised clients concerning mergers and acquisitions and financings (including debt and equity, in both public and private offerings). I am familiar with the applicable professional standards, customs and practices within the investment banking community as they relate to the underwriting of corporate securities.

9.      At PIBC, we subscribe to and regularly review a wide range of business, financial and legal publications, including many which bear on the topics of investment banker and underwriter performance, regulation, standards and practices.

10.     PIBC is being compensated for the time spent by its personnel on this matter at its normal hourly rates on a non-contingent basis. Currently my rate is $495 per hour. Others in the firm are billed at rates from $75 to $435 per hour.

11.     We have familiarized ourselves with the market conditions which existed for

Adams in connection with the IPO during the Class Period (July 10, 1998 through October 22,

1998) and thereafter, as well as stock market and economic factors pertaining to this industry,

and in general. The following is among the information we have reviewed to date:

- Second Consolidated and Amended Class Action Complaint

- Golf Data Tech Market Share Information—Monthly Reports for 1998

- Articles, press releases, brokerage firm analyst reports on Adams Golf

- Costco Purchase Order and Sales Data

- Adams Golf 1999 Proxy Statement

- Daily stock price and volume data on Adams Golf, Callaway, Teardrop, Aldila, Coastcast, Arnold Palmer and Golden Bear

- Daily Index data on Bloomberg Golf Index, NASDAQ

- Callaway Golf 10-K for 1997

- Deposition transcripts and exhibits of all deponents except plaintiffs

- Opinion of Christiana Ochoa

III.    ANALYSIS AND OPINIONS

12.     I will be prepared to present at trial a description of common stocks; the markets

for such securities; the participants in such markets including, among others, issuers,

brokerage firms, traders and specialists, research analysts, retail customers, institutions and

regulators; and how these parties interact to evaluate and trade securities at price levels. Such

information may include the following:

A.    A description of common stock as a share of ownership in a company which
entitles the holder to a share of its earnings -- either paid out as a dividend or
reinvested in the company.

B.    How stock in a company becomes publicly traded, including the roles of
underwriters, brokers, attorneys, accountants, regulators, and others.

C.    How information is transmitted to market participants, including through filings
with the Securities and Exchange Commission (the "SEC"), newspaper articles,
financial and trade press articles, brokerage firm analyst reports, and through
"leakage" and oral communications among market participants and others.

D.    The presence of institutional investors and their analytical functions.

E.    How the investment community prices securities and how the information
described above causes investors and potential investors to analyze information
versus the (contemporaneous) price and decide to buy or sell, creating supply
and demand pressures, and the role of brokerage firm analysts in this process.

13.    There can be no question that the risk and impact of gray marketing were
material to investors or potential investors in Adams Golf. The Company, like most public
companies, was valued based on expected future earnings and cash flows. Factors affecting
the generation of earnings and cash flows, and their anticipated growth rates, are of primary
importance to the investment community. Gray marketing reduces profit margins by causing a
company to take costly steps to protect authorized retailers' margins. If the retailers have to
match lower sales prices from gray market sellers, their wholesale price must be reduced (or
some other incentive provided) to keep margins intact. Lowered retailer's margins often

7

translate into lower sales. Earnings are therefore reduced directly by the existence of gray marketing.

The Company itself recognized the importance of gray marketing in at least the following ways:

A.    It issued a June 9, 1998 press release to reassure authorized retailers that Adams was protecting them from the possibility of gray marketing (according to an interview with Barney Adams, reported in a <u>Golf Pro</u> magazine article which appeared in an issue with a cover date of August 1, 1998, the contents of which interview also reflect the importance of gray marketing).

B.    Barney Adams issued an internal memorandum dated October 8, 1998 which stated: "One thing that is hurting us badly is Costco. It was a problem before, but has greatly escalated in the last two weeks and will be very difficult in Q4 (Christmas)." "We estimate a negative sales effect in Q4 of 20%-25% . . ."

C.    The minutes of the Special Meeting of the Board of Directors of October 19, 1998 show the major topic to have been the substantial negative effects of gray marketing.

D.    On October 22, 1998 Adams Golf disclosed "recent gray market distribution of our products" and its effect on future sales.

E.    On January 7, 1999, the Company disclosed in a press release that results had been and would continue to be materially adversely affected by gray marketing. Results were disappointing in part because of "the gray market distribution of its products to a membership warehouse club".

8

F.    In March 1999, in the Company's Form 10-K Report for 1998, the Company said it "does not believe the gray marketing of its products can be totally eliminated".

14.    In a memorandum to Adams Golf dated July 29, 1998, Lehman Brothers personnel advised Adams to be prepared to answer investor questions about gray marketing. The Lehman Brothers analyst covering Adams Golf also expressed a concern (on August 28, 1998) about Tight Lies appearing in Costco wholesale stores with increasing regularity. However, this item appeared on page 27 of a 28-page analyst report, as virtually the only cautionary note in the entire report.

15.    Considering the importance attached to gray marketing by Adams Golf, and its obviously significant impact on margins and earnings, it is clear that the IPO offering price would have been substantially lowered if the risk and extent of gray marketing had been properly disclosed in the prospectus. In determining the price at which an IPO is sold, a preliminary prospectus, generally known as a red herring, is circulated by the underwriters to prospective investors to generate indications of interest in the stock. Feedback from these investors in the form of comments as well as demand for shares is then reflected in the IPO price set by the underwriter. Strong indications of interest and demand for shares will cause an increase in price; weak demand will cause a reduction in price.

16.    Information concerning gray marketing which existed in the marketplace and was available to at least some market participants included (at least) the following.

A.    Costco national purchase orders, indicating Adams authorized dealers' purchases of Adams clubs at the behest of Costco, were issued for thousands of clubs, and Costco sales data shows extensive sales both before, and immediately after, the IPO. At a

9

minimum, the people who would have known about this information would have been Costco personnel and customers and the various Adams distributors whom Costco directed to purchase the clubs. It would be surprising if there were not some significant overlap between these various parties and investors in Adams Golf stock, as it is common practice with a niche company such as Adams Golf, for its stockholders to be people with an interest in such a market or company, such as avid golfers, distributors, retailers, suppliers, and others with a likely knowledge of the company and the market. Accordingly, knowledge among Adams authorized dealers that widespread gray marketing was occurring may have represented important leakage to the market for Adams' stock.

        B.     The knowledge of gray marketing possessed by the sales and marketing personnel at Adams who were involved in dealing with the gray market issues.

        C.     The <u>Golf Pro</u> article, which was apparently available in the middle of July and discussed gray market concerns. If, as almost always occurs with magazines, this arrived at subscribers/recipients and/or was purchased at newsstands over a period of days to weeks preceding the cover date, it corresponds closely in time with the Adams stock price decline. Adams' stock price declined substantially during mid and late July.

        D.     An August 4 Nations Bank analyst report states that when it was a new company, Callaway's shares were "often volatile in response to concerns such as 'I saw a Big Bertha in Costco'", and that "We expect Adams stock to also be volatile".

        E.     Documents reflecting the underwriters' and their customers' trading activity in Adams stock throughout the aftermarket, implying that the underwriters' knowledge would have been reflected in the stock price.

F.    Lehman Brothers' August 28, 1998 report mentions speaking with golf shops over "the past three months" as the basis for their comments, including the appearance of Adams clubs in Costco as "an extremely serious issue that Adams is working hard to correct".

17.    The materiality of the risks and extent of gray marketing is further demonstrated by price declines following the IPO related to various partial disclosures of these matters, viewed through appropriate disclosure event windows.

18.    To determine whether defendants have met their burden and established any negative loss causation, I will review their expert report(s).

UNDERWRITER DUE DILIGENCE

19.    The type of information normally required by prospective underwriters in order to assess a prospective issuer and insure adequate disclosure would include, at least, a complete business plan or other materials describing in detail the following:

- The products, services, or areas of operation provided

- The market and competitive positioning including price and performance analysis versus alternative and competitive products

- Industry information, including trend data and analyses

- Proposed channels of distribution and the economics thereof for participants

- Risks to achieving the business plan and each major element thereof

- Management background and experience including detailed and comprehensive historical chronological biographies and references

- Manufacturing processes, facilities, or arrangements

11

- Historical financial performance and trends, financial condition and projected needs and results of operations, and the underlying assumptions. Factors affecting growth rates and profitability are among the most important to analyze.

- Any relevant litigation, regulation, insurance or environmental concerns

With respect to each of the above areas, sufficient detail should be obtained such that the underwriter can understand how each will impact the ability of the company to generate revenues, earnings and cash going forward. An underwriter need not become an engineer or industry expert or other operational specialist, but needs to understand the critical elements of the business with respect to generating revenues and earnings, technology, competition, staffing and personnel needs, marketing, etc. to ensure that the company has the best chance to succeed and meet its business plan, or be able to adequately disclose what shortcomings and risks exist in each area. Management's knowledge of its business is also an essential element of success; the underwriters need to assess management's knowledge and competence to accurately describe the company's business and risks.

The proper attitude of the underwriter has to be one of skepticism when reviewing information provided by the issuer, particularly with respect to a new company experiencing substantial and rapid growth. That is, independent confirmation of representations made by the issuer for inclusion in the Prospectus should be able to be obtained from unrelated parties, or tested in some fashion. Therefore, reviewing industry or market research reports, consulting with industry or product market experts, independent product tests, exploring sales and distribution channels, interviewing management and checking references are standard practice in assessing a prospective issuer and ensuring that the disclosures related thereto would be complete, accurate, and not misleading and that pricing would be done properly.

20.    The standard in the investment banking industry for the appropriate level of investigation necessary to obtain sufficient knowledge of the issuer's business to be able to describe it accurately and completely is that of materiality to investors. Investors are most interested in the prospective future revenues and earnings ability of companies whose common stock they purchase. Therefore, any factors critical to generating revenues and earnings in the future such as product/service attributes, industry conditions and trends, competitive posture, marketing, pricing and profitability, cost of manufacture, management competence, etc., are of extreme importance to investors.

21.    In addition, with further reference to my opinion as to whether defendants have met their burden of having performed a reasonable and adequate due diligence investigation, I will review any expert reports or evidence regarding that topic.

22.    Having reviewed the information listed heretofore, it is my opinion that disclosure in the Prospectus was inadequate in at least the area of the risks and extent of gray marketing and their potential significantly negative effect on the Company.

SECTION 11 DAMAGES

23.    Section 11 damages in this matter are measured by the difference between the price paid (capped by the Offering Price) and the price received upon sale if sold at a loss, plus interest. The price during the Class Period would not have been lower than the true value at time of suit, nor did it recover thereafter. As shown in Exhibit B, that figure is $84,090,000 (without interest). Adding interest at the appropriate rate of 9.75% (simple, from November 1998 to June 2006 inclusive) would increase damages by $62,857,275 to a total of $146,947,275. Damages could be reduced by any "negative loss causation" if successfully demonstrated by defendants.

13

**SECTION 12 DAMAGES**

24.    We have calculated damages under Section 12 with regards to shares sold by

Lehman Brothers in the underwriting.  Those damages total $5,579,215, before interest.

Adding interest would increase damages by $4,170,463 to total $9,749,678.  See Exhibit B.

25.    The following exhibits are attached hereto:

| | |
|---|---|
| Exhibit A | Resume of R. Alan Miller |
| Exhibit B | Adams Golf Estimated Section 11 and 12 Damages—<br>PIBC Market Simulation Methodology |

26.    We have generated this report in advance of the final completion of fact

discovery, and before reviewing defendants' expert report(s), which may cause us to modify or

amplify views expressed in this report.


_____7/12/06_____
Date

R. alan Mille

R. Alan Miller, President
Philadelphia Investment Banking Company

14

# EXHIBIT A

## RESUME OF R. ALAN MILLER

EXHIBIT A

# PHILADELPHIA INVESTMENT BANKING COMPANY

### R. ALAN MILLER

#### President

Mr. Miller was a founder of PIBC in September of 1983. A summary of PIBC's services is attached.

From November of 1980 until the formation of PIBC, Mr. Miller served as Senior Vice President of Philadelphia Capital Advisors, the corporate finance services division of the Philadelphia National Bank. At Philadelphia Capital Advisors, Mr. Miller was responsible for corporate finance activities, including private placements of debt and equity capital; mergers, acquisitions and divestitures; financial consulting, evaluation and expert witness services; leasing and other alternate sources of capital; and for providing assistance and advice to PCA's staff on their projects.

Prior to joining Philadelphia Capital Advisors, Mr. Miller was Vice President, Corporate Finance at Butcher & Singer, Inc., an investment banking firm based in Philadelphia, from 1976 to 1980. At Butcher & Singer his duties included private placements of debt and equity capital; mergers and acquisitions; public offerings of securities; leasing, evaluations, financial consulting and expert witness assignments.

From 1972 to 1976 Mr. Miller was a Senior Associate and General Manager with Howard & Co., a Philadelphia based financial consulting company. Assignments there included research and consulting on a wide range of corporate finance topics. Mr. Miller also edited and wrote many of the articles for a series of newsletters on corporate finance published by Howard & Co.

Mr. Miller received a B.S. in Economics from Cornell University in 1970 and an M.B.A. in Financial Accounting from the Wharton School of the University of Pennsylvania in 1973. He served in the United States Marine Corps Reserve from 1970 through 1976. Mr. Miller has authored several articles on various corporate finance topics and has been a guest lecturer at the Wharton School and La Salle University. He currently lives in Wayne, Pa.

# PHILADELPHIA INVESTMENT BANKING COMPANY

## Summary of Services

The following are specific categories of PIBC services.  All situations are unique; we invite your inquiries as to our capabilities.

### FINANCINGS

Private debt and equity financings
Joint ventures
"Operational" or trade financing
Marketing/distribution arrangements as capital sources
Public offerings--advisory
Leasing and "managed" equipment financing
Other specialized financings

### EVALUATIONS AND ECONOMIC ANALYSES

Litigation consulting and support
General business valuations
Merger, acquisition and divestiture analyses
Shareholder representation
Fairness opinions
Estate or gift tax; estate planning
Marital or property settlement; other dispute resolution
ESOP transactions/annual evaluations; corporate repurchases
Recapitalizations
Assistance to fiduciaries
Offeree representative, prospective investor analysis

### MERGERS AND ACQUISITIONS, LEVERAGED AND MANAGEMENT BUYOUTS

### REFINANCING, TURNAROUND "PROJECT MANAGEMENT" AND WORKOUT FINANCING; BANKRUPTCY PLANS

### TRUSTEE/FIDUCIARY, ASSET MANAGER ASSIGNMENTS

### CORPORATE FINANCIAL ADVISORY; CONSULTING; "WORKING DIRECTOR" ASSIGNMENTS

# R. ALAN MILLER

## Expert Witness Testimony in Court

1. <u>Vadakin v. Vadakin.</u> State Court of Ohio Court System, Marietta, Ohio, 1977.

2. <u>Baer v. Fidelco Growth Investors.</u> Court of Common Pleas, Montgomery County, PA, 1978.

3. <u>Shanno v. Magee Industrial Enterprises, Inc.</u> United States District Court for the Eastern District of Pennsylvania. Civil Action 79-2038, J. Fullam, October 12, 1983.

4. <u>Raymond K. Peil v. Speiser, et al.</u> (Health-Chem Securities Litigation). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 82-1289, J. O'Neill, April 1985.

5. <u>Gordon McShane, et al. v. Pennwalt Corporation, et al.</u> United States District Court for the Eastern District of Pennsylvania. Civil Action No. 85-6020, J. Ludwig, March 10, 1986.

6. <u>Harry Lewis v. John D. DePaul, et al.</u> (Lehigh Press Litigation). Court of Common Pleas, Philadelphia County, PA. Civil Action No. 4760, November Term, 1986. March 5, 1987.

7. <u>California Natural v. Nestle.</u> United States District Court for the District of New Jersey, J. Brotman, June 1987.

8. <u>GCA Corporation Securities Litigation.</u> United States District Court for the District of Massachusetts, Master File No. 85-4693-c, J. Caffrey. October 1987.

9. <u>Van de Walle v. Unimation, et al.</u> Court of Chancery of the State of Delaware, New Castle County. Civil Action No. 7046, Vice Chancellor Jack B. Jacobs, February and April 1989.

10. <u>U.S. Healthcare Securities Litigation.</u> United States District Court for the Eastern District of Pennsylvania. Civil Action No. 88-0559, J. McGlynn, April 1989.

11. <u>California Natural v. Nestle.</u> United States District Court for the District of New Jersey (Camden). J. Brotman. April 1989.

12. <u>IA Holdings Corporation Dissenter's Appraisal Action.</u> Court of Common Pleas, Delaware County, Pennsylvania. Civil Action 86-14981, J. Lawhorne, October 1989.

R. Alan Miller / Expert Witness Testimony in Court / Page 2

13. Kulicke & Soffa Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Master File No. 86-1656, J. Ditter, March 1990.

14. McKinley Allsopp, Inc. v. Jetborne International, Inc. United States District Court for the Southern District of New York. 89 CIV. 1489 (DNC), J. Leval, May 1990.

15. Kay Jewelers Securities Litigation. United States District Court for the Eastern District of Virginia, Alexandria Division. Civil Action No. 90-1663-A through 90-1688-A, J. Bryan, June 1991.

16. Pennsylvania Enterprises Securities Litigation (Lindner Fund, et al. v. Pollock, et al.). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 91-6901, J. VanArtsdalen, December 1991.

17. O & M Investment Partners v. Windon, et al. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 91-CV1970, J. Robert F. Kelly, September 1992.

18. National Media (Derivative) Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 90-8113, J. Bechtle, November 1992.

19. First Pennsylvania Securities Litigation (Grossman v. First Pennsylvania Corporation, et al.). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 89-9234, J. Brody, July 1993.

20. In the Matter of R. Glen Fenstermacher, et al., Debtors. United States Bankruptcy Court for the District of New Jersey. Case No. 93-13041, J. Wizmur, July 1993.

21. Sunkyong America, Inc. v. Omega Sports, Inc. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 93-CV-5355, J. Van Antwerpen, September 1994.

22. Geriatric & Medical Centers Securities Litigation (Hoffman v. Geriatric & Medical Centers, Inc., et al.). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 93-CV-2129, J. Fullam, May and June, 1995.

23. U.S. Banknote Securities Litigation (Vladimir v. U.S. Banknote and Morris Weissman). United States District Court for the Southern District of New York. 94 Civ. 0255(MGC), J. Cedarbaum, January 1997.

R. Alan Miller / Expert Witness Testimony in Court / Page 3

24. <u>Lewin, et. al. v. Saidel, et al.</u> (MetroBank Proxy/Securities Litigation). Court of Common Pleas, County of Philadelphia, PA. No. 96-04-SD-0015. J. Levin, November 1997.

25. <u>Kenney (as Ch. 11 Trustee for Daisy Systems Corp., et al.) v. Bear Stearns & Co., Inc.</u> United States District Court for the Northern District of California, Oakland Division. No. C92-1845-DLJ, J. Jensen, April 1998.

26. <u>Alpha Group Consultants, Ltd., et al., and Pension Reserves Investment Trust Fund of the Commonwealth of Massachuetts v. Bear Stearns & Co., Inc.</u> United States District Court for the Southern District of California. Case No. CV-91-00143-IEG, J. Gonzalez, July and August, 1998.

27. <u>Fightertown Entertainment, Inc. v. Robertson, Stephens & Company, et al.</u> Superior Court of the State of California In and For the County of Orange. No. 750511, J. Kline, October 1998.

28. <u>First Pension Cases I—Murray v. Belka.</u> Superior Court of the State of California In and For the County of Orange. No. 740706, J. Firmat, April 2000.

29. <u>Krogman, et al. v. Sterritt, et al. (Continental Investment Corp. Securities Litigation).</u> United States District Court for the Northern District of Texas. Civil Action No. 3-98-CV 2895-T, J. Lynn, November 2000.

30. <u>Heiser, et al., v. Southeastern Pennsylvania Transportation Authority.</u> City of Philadelphia Court of Common Pleas. Case No. 9907-3167, J. Shepard, December 2002.

31. <u>PolyMedica Corp. Securities Litigation.</u> United States District Court for the District of Massachusetts, Civil Action No. 00-12426 REK, J. Young, March 23, 2006.

# R. ALAN MILLER

## Deposition and Arbitration Testimony

The following list is of matters in which I have given testimony at deposition or in arbitration since January 1, 1990.

## Depositions

1. Shearson/Indian Wells Securities Litigation. United States District Court for the Western District of Washington at Seattle. No. C88-695WD, May 14, 15 and 16, 1990.

2. Kay Jewelers Securities Litigation. United States District Court for the Eastern District of Virginia, Alexandria Division. Civil Action No. 90-1663-A through 90-1688-A, May 15, 1991.

3. Rospatch Securities Litigation. United States District Court for the Western District of Michigan, Southern Division. No. 1:90-CV-805, February 4, 1992, March 6, 1992.

4. National Media (Derivative) Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 90-8113, October 21, 1992.

5. Federal Express Securities Litigation. United States District Court for the Western District of Tennessee. Master File No. 90-2359-4B, November 24, 1992.

6. Gillette Securities Litigation. United States District Court for the District of Massachusetts. Civil Action No. 88-1858-K, March 12 and 26, 1993.

7. HBO & Co. Securities Litigation. United States District Court for the Northern District of Georgia, Atlantic Division. Civil Action No. 1:87-CV-657A-JTC, May 6, 1993.

8. American Dental Laser Securities Litigation. United States District Court for the Eastern District of Michigan, Southern Division. Master File No. 92-CV-71917-DT, August 3, 11, 18, and 31, 1993.

9. Mesa Petroleum Securities Litigation. United States District Court for the Northern District of Texas, Dallas Division. Case No. 3:91-CV-2376-x, March 28, 1994.

10. Geriatric and Medical Centers Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Civil Action Nos. 92-CV-5113 and 93-CV-2129, October 10 and 20, 1994.

R. Alan Miller / Deposition and Arbitration Testimony / Page 2

11. Moore Medical Corporation Securities Litigation. United States District Court for the Southern District of New York. Civil Action No. 91 Civ. 3701 (ML), November 3 and 4, 1994.

12. Cellcor Securities Litigation. Court of Chancery of the State of Delaware in and for New Castle County. Civil Action No. 12725, April 12 and 13, 1995.

13. New America Securities Litigation. United States District Court for the District of Massachusetts. Civil Action No. 90-10782-MA, May 11 and 12, 1995.

14. U.S. Banknote Securities Litigation. United States District Court for the Southern District of New York. Civil Action No. 94 Civ. 0255(MGC), February 23, 1996.

15. U.S. Wireless Data Securities Litigation. United States District Court for the District of Colorado. Civil Action No. 94-2-2258, April 9, 1996.

16. Bay Financial Corporation Securities Litigation. United States District Court for the District of Massachusetts. Civil Action Master File No. 89 2377-WD, April 18 and 19, 1996.

17. American Mobile Systems, Inc. Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 92-1782, May 21, 1996.

18. Clinicorp Securities Litigation. United States District Court for the Southern District of Florida--West Palm Beach Division. 94-8163-CIV-RYSKAMP, July 9, 1996.

19. Circle K Bankruptcy Litigation. United States Bankruptcy Court for the District of Arizona. Bankruptcy Court Nos. 90-5052-PHX-GBN to 90-5075-PHX-GBN Jointly Administered, Advisory Proceeding No. 93-1123, August 8, 1996.

20. People's Bank Securities Litigation. United States District Court, District of Connecticut. Civil Action No. B-90-600 (JAC), February 5 and 6, 1997.

21. Castle Pines Securities Litigation. District Court, County of Douglas, Colorado. Civil Action No. 91-CV-429, Division 2, August 21, 1997.

22. Thomas P. Jasin v. Brown & Company Securities Corporation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 96-CV-6872, October 31, 1997.

23. Goldfine v. Steinberg, et al. (Shearson) Litigation. Circuit Court of Cook County, Illinois. No. 93L5223, February 11 and 12, 1998.

R. Alan Miller / Deposition and Arbitration Testimony / Page 3

24. Kenney (as Ch. 11 trustee for Daisy Systems Corp., et al.) vs. Bear Stearns & Co., Inc. United States District Court for the Northern District of California, Oakland Division. Case No. C-92-1845-DLJ, March 20, 1998.

25. Rolite, Inc. v. Wheelabrator Environmental Systems, Inc. and WMX Technologies, Inc. United States District Court for the Eastern District of Pennsylvania, No. 94-CV-5894, April 29, 1998.

26. Alpha Group Consultants, Ltd., et al., and Pension Reserves Investment Trust Fund of the Commonwealth of Massachusetts v. Bear Stearns & Co., Inc. United States District Court for the Southern District of California, Case No. CV-91-00143-IEG (JAH), July 8, 1998.

27. Fightertown Entertainment, Inc. v. Robertson, Stephens & Co. Superior Court of the State of California for the County of Orange, Case No. 750511, August 6 and 7, 1998.

28. Kidder Peabody Securities Litigation. United States District Court for the Southern District of New York, Master File Civil Action No. 94-CV-3954 (BSJ) (MHD), January 28, 1999 and February 18, 1999.

29. Micrion Corporation Securities Litigation. United States District Court for the District of Massachusetts, No. 96-11596-REK, May 7, 1999.

30. Mizel IRA et al. v. Butler et al.—Avatex Derivative Litigation. Supreme Court of the State of New York—County of New York, Index No. 602773/98, September 8, 1999.

31. First Pension Cases—Coordination Proceeding No. 3131 (Murray v. Belka et al.). Superior Court of the State of California for the County of Orange, No. 740706, December 15, 16 and 17, 1999.

32. Miller Industries Securities Litigation. United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action, Master File No. 1:97-CV-2811 (TWT), March 15 and 16, 2000.

33. Continental Investment Corp. Securities Litigation. United States District Court for the Northern District of Texas, Civil Action No. 3-98-CV2895-T, May 8, 2000.

34. IKON Office Solutions, Inc. Securities Litigation. United States District Court for the Eastern District of Pennsylvania, MDL Docket No. 1318 (MK) No. 98-CV-4286, September 27 and 28, 2000.

35. PaineWebber Incorporated v. NetRatings, Inc. Supreme Court of the State of New York, County of New York, Index No. 99/605036, October 20, 2000.

R. Alan Miller / Deposition and Arbitration Testimony / Page 4

36. Jacobs, et al. v. Coopers & Lybrand, L.L.P., et al. (Happiness Express Securities Litigation). United States District Court for the Southern District of New York, Case No. 97 CIV. 3374 (RPP), January 18, 2001.

37. Robert Mowbray, et al. v. Waste Management Holdings, Inc. United States District Court for the District of Massachusetts, Civil Action No. 98-11534-WG4, March 22 and 23, 2001.

38. Lee Adams v. Western Micro Technology, Inc., et al. Superior Court of the State of California, In and For the County of Orange, Case No. 810801, June 8, 2001.

39. BankAmerica Corp. Securities Litigation. United States District Court for the Eastern District of Missouri—Eastern Division, MDL No. 1264 (Judge Nangle), July 26 and 27, and December 6, 2001.

40. Sternbach and Ancowitz v. Network Associates and Lichtman. United States District Court for the District of New Jersey, Civil Action No. CIV. 00-1576 (JCL), August 1, 2001.

41. Sunbeam Corporation Securities Litigation (Debentures). United States District Court for the Southern District of Florida, Miami Division, MDL No. 1297, November 1 and 2, 2001.

42. Infocure Corporation Litigation. United States District Court for the Northern District of Georgia, Atlanta Division, C.A. No. 01-CV-0001-TWT, November 14, 2001.

43. Equimed, Inc. Securities Litigation. United States District Court for the Eastern District of Pennsylvania, Master File No. 98-CV-5374 (NS), December 20, 2001.

44. Merz Pharmaceuticals v. Accupac, Inc. United States District Court for the Eastern District of Pennsylvania, Civil Action No. 01-CV-1668, January 23, 2002.

45. Smallworldwide PLC Securities Litigation. United States District Court for the District of Colorado, Civil Action No. 99-K-1254, March 28 and April 24, 2002.

46. PSINet Securities Litigation. United States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action No. 00-1850-A, January 8, 2003.

47. DaimlerChrysler Securities Litigation. United States District Court for the District of Delaware, Master Docket No. 00-0993 (JJF), January 13, 2003.

R. Alan Miller / Deposition and Arbitration Testimony / Page 5

48. Hayden v. FleetBoston Financial Corporation and Robertson Stephens, Inc. JAMS Arbitration, August 27, 2003.

49. Rollins-Safety Kleen (Proxy) Litigation. United States District Court for the District of South Carolina, Civil Action No. 3:00-1343-17, October 1, 2003.

50. AMF Bowling Securities Litigation. United States District Court for the Southern District of New York, Civil Action No. 99 CIV 3023 (DL), December 17, 2003.

51. Telxon Corporation Securities Litigation and Hayman v. PricewaterhouseCoopers, LLP. United States District Court for the Northern District of Ohio—Eastern Division, Case No. 5:98-CV-2876, January 13 and 14, 2004.

52. Apropos Securities Litigation. United States District Court for the Northern District of Illinois, Civil Action No. 01C8406, January 30, 2004.

53. Safeguard Scientifics Securities Litigation. United States District Court for the Eastern District of Pennsylvania, Civil Action 01-3208, June 29, 2004.

54. Official Committee of Unsecured Creditors of Tri-Valley Growers vs. Deloitte & Touche LLP. Superior Court of the State of California, County of San Francisco, No. 406914, August 25 and 26, 2004.

55. Levitan v. McCoy, et al. (Bank One Securities Litigation). United States District Court for the Northern District of Illinois—Eastern Division, Civil Action No. 00-C-5096, May 4, 2005.

56. Commercial Financial Services, Inc. v. Chase Securities, Inc. United States District Court for the Northern District of Oklahoma, May 25, 2005.

57. Ahearn v. Credit Suisse First Boston (Winstar). United States District Court for the District of Massachusetts, No. 03-CV-10956 (JLT), January 3, 2006.

58. Touch America Holdings, Inc. (Montana Power Company) ERISA Litigation. United States District Court for the District of Montana—Butte Division, No. CV-02-106-BU-SHE, June 27, 2006.

R. Alan Miller / Deposition and Arbitration Testimony / Page 6

Arbitrations

1. Liberty University v. Kemper. American Arbitration Association. AAA Arbitration No. 11-136-00194-91, November 21, 1991.

2. Raymond James Customer Arbitration. NYSE. November 17 and 18, 1992. NYSE Arbitration Docket No. 1991-001538.

3. Saponaro Customer Arbitration. NASD. March 8, 1996. NASD No. 94-01491.

4. Kennilworth Partners v. Bear Stearns. NASD. February 26 and 27, 2003. NASD No. 00-01232.

5. Hayden v. FleetBoston Financial Corporation and Robertson Stephens, Inc. JAMS Arbitration, September 9, 2003.

# EXHIBIT B

## ADAMS GOLF
## ESTIMATED SECTION 11 AND 12 DAMAGES
## PIBC MARKET SIMULATION METHODOLOGY

7/11/06

## PIBC MARKET SIMULATION METHODOLOGY

### ADAMS GOLF, INC.

PIBC utilizes its proprietary Market Simulation Methodology to estimate the likely timing and proceeds of sales of securities purchased during a specified period. In connection with damages/losses estimates, the methodology can be used to estimate market sale mitigation to purchase inflation measures, to estimate market losses, or holders through specified dates. It can also be used for other similar analyses and to derive estimates of shares held through certain defined dates, for example to determine the value effect of a stock price decrease that results from a particular announcement or event.

We describe the process as a methodology, not a model. That is, the approach we use, the steps in the analysis and the type of data are the same for each case, but since the specific model created for each analysis is driven by actual data, each model will differ. The description set forth below focuses on a purchaser analysis; the methodology can be used for a seller analysis as well.

### Step 1: Float Calculation

The first step in creating a company-specific model is to estimate the "PIBC float," that is the number of shares that are available for purchase at any point in the class period. The PIBC float calculation takes into account the fact that there are generally long-term holders of a given security whose shares are not available for purchase during the class period, that is, owners who purchased before the class period and did not sell during the class period. These holders are typically excluded from the damage calculations.

In general, the PIBC float is derived from several components:

- Shares Outstanding. This information is usually obtained from the company's 10Q, 10K, or other SEC filings. For Adams Golf, shares outstanding during the class period were approximately 6.9 million shares sold in the Public Offering.

- Institutional Long-Term Holds, defined as shares owned by institutions before the class period and not sold during the class period. By examining institutional ownership data from various sources, PIBC estimates the number of shares that were owned by each institution at the beginning of the class period and the number of these shares that each institution sold during the class period. Using the FIFO assumption, it can then be estimated how many of each institution's shares were not available for purchase during the class period. For Adams Golf,

1

the estimated institutional long-term holds were not estimated as Adams Golf was an IPO.

- Insider Long-Term Holds, defined as shares owned by insiders before the class period and not sold during the class period. PIBC researches the company's Forms 4, annual proxy reports, the complaint, and other available sources to estimate the shares owned by officers, directors, and others, that were not available for purchase during the class period. For Adams Golf, the estimated institutional long-term holds were not estimated as Adams Golf was an IPO.

- Individual Long-Term Holds, defined as shares owned by individuals before the class period and not sold during the class period. PIBC first estimates the number of shares that were owned by individuals at the beginning of the class period by subtracting from the total shares outstanding at the beginning of the class period the sum of institutional holdings at the beginning of the class period and insider holdings at the beginning of the class period. Then, based on PIBC's experience and such factors as type of stock, speed of turnover, and price and volume activity, the number of these shares owned by individuals before the start of the class period that were not sold during the class period is estimated. For Adams Golf, the estimated institutional long-term holds were not estimated as Adams Golf was an IPO.

The estimated PIBC float is the number of shares outstanding less the sum of the institutional, insider, and individual long-term holds. PIBC estimated that the Adams Golf PIBC float was 6.9 million shares.

### Step 2: Model Subperiods

The class period daily trading data—closing prices and volumes—is then divided into a number of subperiods to allow for shares purchased in a given subperiod to be allocated to likely sale subperiods thereafter (or after the end of the class period), resulting in the development of what PIBC terms a "decline curve." In order to obtain logical groupings of purchasers and to lessen the need for later adjustments in certain sale subperiods to reflect actual volumes, these groupings are made to achieve subperiods with roughly equal volumes; however, often new subperiods begin and end at significant price break points or at points where drop analyses are to be performed. PIBC attempts to create at least 10-15 subperiods as a minimum, up to as many as 30 or 40 subperiods for a very long class period, to ensure good operation of the curve/allocation methodology described below. For Adams Golf, the relatively short class period was divided into 18 subperiods after the IPO.

Volumes and weighted average prices are calculated for each subperiod. For the "hold-through" subperiod, which is the subperiod containing those shares purchased during the class period but not sold during the class period, a "terminal value" price is assigned. The

2

7/11/06

terminal value is usually the actual price at or just after the end of the class period. It is assumed that those shares purchased during the class period but not sold during the class period are sold at the terminal value price. For Adams Golf, the terminal value price was $4.02 per share. All subperiod trading data is then entered into the Market Simulation model.

Then, when appropriate, PIBC reduces all subperiod reported trading volumes by a certain percentage to account for possible double-reporting of customer stock purchases and sales by inclusion of certain intermediary trading data (note that in the case of a public offering subperiod, no downward volume adjustment is made for the offering). PIBC terms the resultant reduced volumes the "Adjusted Volume." In the case of Adams Golf which was traded on the NASDAQ, the reduction was 30%, that is, the adjusted volume in each subperiod was set at 70% of the reported volume.

In this analysis, Adams Golf's reported volume of 37.3 million shares was reduced to an adjusted volume of 28.18 million shares, which is the volume utilized in the damage estimates.

Again when appropriate, PIBC reduces each subperiod's volume a second time to account for intra-subperiod trading which by definition would produce breakeven results (again excepting a public-offering subperiod where no adjustment is made). For example, if it appears that 20% of the volume purchased in a subperiod would have been sold in that subperiod, then the maximum damaged volume is reduced by 20%. For the Adams Golf analysis, the adjusted volume was reduced by 20% for all subperiods except the IPO period.

## Step 3: The Decline Curve

Next, a decline curve is developed. The decline curve represents PIBC's estimate of the rate at which those who purchased shares during the class period subsequently sold their shares. The rate of sale declines over time because in general (a) more purchasers sell sooner than hold longer, and (b) if shares did not sell off in such a fashion, too many shares would quickly accumulate such that the subsequent purchase volume could not be accommodated.

Although based to some degree on PIBC's experience with stock trading in general as well as continual research and communications with market participants, a key factor in the decline curve determination is the float turnover rate, that is the number or fraction of times the float turns over during the class period. For example, if the total adjusted volume during the class period is 90 million shares and the float is 25 million shares, then the float is said to have turned over 3.6 times during the class period. The velocity of this float turnover determines the shape, or steepness, of the decline curve. If the turnover is rapid,

3

the curve will be steeper than if the turnover is slower. A dot.com IPO could be expected to have a far steeper curve than that of a railroad or utility stock, for example.

For Adams Golf, the class period adjusted volume was 28.18 million shares; thus, the 6.9 million share float turned over about four times during the class period. Therefore, PIBC's initial estimate was the decline curve set forth below:

### Adams Golf Basic Decline Curve

| subperiod | % sold | subperiod | % sold |
|-----------|--------|-----------|--------|
| 2 | 23% | 10 | .8% |
| 3 | 17% | 11 | .6% |
| 4 | 13% | 12 | .4% |
| 5 | 7% | 13 | .2% |
| 6 | 4% | 14 | .1% |
| 7 | 3% | 15 | .1% |
| 8 | 2% | 16 | .1% |
| 9 | 1% | 17 | .1% |
| 10 | .9% | 18 | .1% |

The decline curve for certain model subperiods is then adjusted if necessary based on actual market conditions, as follows:

- The model detects and flags discrepancies of sale allocations. It tracks the allocations of purchased shares to subsequent selling subperiods to detect if more shares are being assigned for sale in any given subperiod than were actually traded. When such discrepancies are flagged, the decline curve is revised for the appropriate subperiod(s). For Adams Golf, revisions were required in subperiods where the sales produced by PIBC's model exceeded the actual sales. Percentages were reduced in those subperiods and increased in other subperiods where the model produced sales that were less than the actual sales, as indicated in the attached table.

- The decline curve is revised if it produces an amount of held-through shares—shares purchased during the class period but not sold during the class period—that is significantly different than the number of shares in the PIBC float.

- The intra-period trading discount is increased, meaning that the number of potential damaged/loss shares is lowered, for any period in which PIBC believes that there was an excessive amount of intra-period trading. This typically occurs in the several subperiods following a public offering, or in a one-day subperiod with excessive volume, for example. For Adams Golf, no adjustment was made.

4

7/11/06

- The validity of the decline curve, with adjustments, is verified by the number of shares produced by the model as being held through the end of the Class Period equaling the float. In the case of an IPO, all shares from the offering are shown as being held through the end of the Class Period.

## Step 5: Damage Estimates

PIBC then calculates, by appropriate methods and measures in each case, the damages and or losses incurred by purchasers who bought during the class period.

Section 11 Damages: estimates damages incurred by those who purchased shares during the class period and subsequently sold shares at a price lower than their purchase price. If a purchaser sold during the class period, then the actual purchase and sale prices are compared to see if a loss occurred; if a purchaser did not sell during the class period, then a sale is assumed to occur at the terminal value and the actual purchase price and the terminal value are compared to see if a loss occurred. For example, if the actual purchase price on a given date was $50 and the actual sales price on a subsequent date was $21, then a purchaser who bought and sold on those dates incurred $29 of market losses; however, if the sale price was $51, then no market losses were incurred. Losses calculated by this method are an estimate of the amount lost upon subsequent sale by class period purchasers. For Section 11 and Section 12 Estimated Damages, the average purchase price is limited by the offering price in the IPO.

For Adams Golf, the estimated Section 11 damages are estimated as $84,090,000.

For Adams Golf, the estimated Section 12 Lehman Brothers damages are estimated as $5,579,215.

Intermediate Adams Golf worksheet grids are attached, which show the intermediate stages of some of the model calculations as generated.

5

**ADAMS GOLF, INC.**

Selling Month (Period)-Percent Allocation

| Selling Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sell Price | 16 | 16 | 16 | 16 | 16 | 14.9 | 14.2 | 12.2 | 9.94 | 9.77 | 9.68 | 9.37 | 7.09 | 6.21 | 4.9 | 4.85 | 4 | 4.39 | 4.8 | 4.02 |
| Pur. Price | 8.2 | 6.2 | 1.2 | 1.4 | 1.0 | 0.9 | 1.1 | 0.7 | 1.1 | 1.2 | 1.2 | 1.2 | 1.1 | 1.0 | 1.2 | 0.6 | 1.6 | 1.3 | 1.2 | 0.0 |

| Pur. Mo | Pur. Price | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.000 | | | | | | 3 | 3 | 0.6 | 1.2 | 1.3 | 1.2 | 1 | 0.7 | 0.4 | 0.1 | 0.1 | 0.08 | 0.06 | 0.04 | 35 |
| 2 | 16.000 | | | | | | 3 | 3 | 0.5 | 1.2 | 1.2 | 1.2 | 1 | 0.7 | 0.4 | 0.2 | 0.1 | 0.08 | 0.06 | 0.04 | 20 |
| 3 | 16.000 | | | | | | 9 | 10 | 4 | 3 | 1.2 | 1.1 | 0.9 | 0.8 | 0.6 | 0.4 | 0.2 | 0.1 | 0.1 | 0.1 | 12 |
| 4 | 16.000 | | | | | | 10 | 11 | 6 | 4 | 3 | 2 | 1 | 0.9 | 0.9 | 0.6 | 0.4 | 0.1 | 0.1 | 0.1 | 16 |
| 5 | 16.000 | | | | | | 16 | 17 | 11 | 6 | 6 | 5 | 4 | 2 | 0.9 | 0.6 | 0.6 | 0.4 | 0.2 | 0.1 | 6 |
| 6 | 14.938 | | | | | | | 23 | 13 | 13 | 14 | 7 | 5 | 3 | 1 | 0.8 | 0.7 | 0.5 | 0.4 | 0.2 | 4.4 |
| 7 | 14.242 | | | | | | | | 19 | 17 | 17 | 9 | 7 | 4 | 3 | 2 | 1 | 0.9 | 0.7 | 0.6 | 4.7 |
| 8 | 13.203 | | | | | | | | | 23 | 21 | 13 | 13 | 7 | 4 | 3 | 2 | 1 | 0.8 | 0.8 | 7.7 |
| 9 | 9.938 | | | | | | | | | | | 17 | 16 | 14 | 7 | 4 | 3 | 3 | 0.9 | 0.9 | 9.3 |
| 10 | 9.760 | | | | | | | | | | | 21 | | 13 | 11 | 7 | 5 | 2 | 2 | 0.9 | 9.1 |
| 11 | 9.679 | | | | | | | | | | | | | 14 | 15 | 11 | 7 | 7 | 1 | | 10 |
| 12 | 9.374 | | | | | | | | | | | | | 21 | 17 | 12 | 9 | 9 | 2 | | 11 |
| 13 | 7.090 | | | | | | | | | | | | | | 23 | 17 | 11 | 9 | 3 | | 15 |
| 14 | 6.233 | | | | | | | | | | | | | | | 23 | 14 | 11 | 4 | | 18 |
| 15 | 4.899 | | | | | | | | | | | | | | | | | 18 | 13 | 7 | 28 |
| 16 | 4.545 | | | | | | | | | | | | | | | | | 23 | 17 | | 20 |
| 17 | 4.000 | | | | | | | | | | | | | | | | | | 23 | | 27 |
| 18 | 4.380 | | | | | | | | | | | | | | | | | | | | 57 |
| 19 | 4.802 | | | | | | | | | | | | | | | | | | | | 60 |
| 20 | 4.022 | | | | | | | | | | | | | | | | | | | | |

ADAMS GOLF, INC.
PRELIMINARY ANALYSIS
SUMMARY OF RESULTS
ESTIMATED SECTION 11 DAMAGES

| (Period) | Ave Purchase Price | Reported Volume (000) | Adjusted Volume (000) | Est Damaged Vol (000) | Est Damaged Shrs (%) | Est Damages |
|---|---|---|---|---|---|---|
| IPO | 16.00 | 6,900.0 | 6,900.0 | 3,310.6 | 48 | $32,763,052 |
| 07/10/98 | 16.00 | 7,437.4 | 5,206.2 | 2,117.9 | 41 | 20,321,212 |
| 07/13/98 | 16.00 | 1,473.8 | 1,031.7 | 448.8 | 44 | 2,557,026 |
| 07/14/98-07/16/98 | 16.00 | 1,744.2 | 1,220.9 | 684.9 | 56 | 4,131,322 |
| 07/17/98-07/20/98 | 16.00 | 1,229.9 | 860.9 | 688.7 | 80 | 3,263,702 |
| 07/21/98 | 14.94 | 1,031.5 | 722.1 | 577.6 | 80 | 2,362,547 |
| 07/12/98-07/23/98 | 14.24 | 1,315.2 | 920.6 | 736.5 | 80 | 3,588,920 |
| 07/24/98-07/27/98 | 12.20 | 805.3 | 563.7 | 451.0 | 80 | 1,622,707 |
| 07/28/98-07/29/98 | 9.94 | 1,302.6 | 911.8 | 729.5 | 80 | 1,386,555 |
| 07/30/98-08/04/98 | 9.77 | 1,456.8 | 1,019.8 | 815.8 | 80 | 1,978,283 |
| 08/05/98-08/10/98 | 9.68 | 1,472.3 | 1,030.6 | 824.5 | 80 | 2,647,297 |
| 08/11/98-08/20/98 | 9.37 | 1,413.0 | 989.1 | 791.3 | 80 | 3,102,579 |
| 08/21/98-08/27/98 | 7.09 | 1,314.8 | 920.4 | 736.3 | 80 | 1,581,409 |
| 08/28/98-09/08/98 | 6.21 | 1,226.1 | 858.3 | 686.6 | 80 | 1,229,661 |
| 09/09/98-09/18/98 | 4.90 | 1,475.8 | 1,033.1 | 826.4 | 80 | 547,687 |
| 09/19/98-09/28/98 | 4.55 | 778.8 | 545.2 | 365.3 | 67 | 159,868 |
| 09/29/98 | 4.00 | 1,976.9 | 1,383.8 | 0.0 | 0 | 0 |
| 09/30/98-10/07/98 | 4.39 | 1,521.3 | 1,064.9 | 607.0 | 57 | 222,162 |
| 10/08/98-10/22/98 | 4.80 | 1,428.6 | 1,000.0 | 800.0 | 80 | 624,012 |
| Terminal Value | 4.02 | | | | | |
| | | | | | | |
| Total | | 37,304.3 | 28,183.0 | 16,198.7 | | 84,090,000 |

ADAMS GOLF, INC.
PRELIMINARY ANALYSIS
SUMMARY OF RESULTS
ESTIMATED SECTION 12 DAMAGES - LEHMAN

| (Period) | Ave Purchase Price | Reported Volume (000) | Adjusted Volume (000) | Est Damaged Vol (000) | Est Damaged Shrs (%) | Est Damages |
|---|---|---|---|---|---|---|
| IPO * | 16.00 | 1,175.0 | 1,175.0 | 563.8 | 48 | $5,579,215 |
| 07/10/98 | 16.00 | 7,437.4 | 5,206.2 | 0.0 | 0 | 0 |
| 07/13/98 | 16.00 | 1,473.8 | 1,031.7 | 0.0 | 0 | 0 |
| 07/14/98-07/16/98 | 16.00 | 1,744.2 | 1,220.9 | 0.0 | 0 | 0 |
| 07/17/98-07/20/98 | 16.00 | 1,229.9 | 860.9 | 0.0 | 0 | 0 |
| 07/21/98 | 14.94 | 1,031.5 | 722.1 | 0.0 | 0 | 0 |
| 07/12/98-07/23/98 | 14.24 | 1,315.2 | 920.6 | 0.0 | 0 | 0 |
| 07/24/98-07/27/98 | 12.20 | 805.3 | 563.7 | 0.0 | 0 | 0 |
| 07/28/98-07/29/98 | 9.94 | 1,302.6 | 911.8 | 0.0 | 0 | 0 |
| 07/30/98-08/04/98 | 9.77 | 1,456.8 | 1,019.8 | 0.0 | 0 | 0 |
| 08/05/98-08/10/98 | 9.68 | 1,472.3 | 1,030.6 | 0.0 | 0 | 0 |
| 08/11/98-08/20/98 | 9.37 | 1,413.0 | 989.1 | 0.0 | 0 | 0 |
| 08/21/98-08/27/98 | 7.09 | 1,314.8 | 920.4 | 0.0 | 0 | 0 |
| 08/28/98-09/08/98 | 6.21 | 1,226.1 | 858.3 | 0.0 | 0 | 0 |
| 09/09/98-09/18/98 | 4.90 | 1,475.8 | 1,033.1 | 0.0 | 0 | 0 |
| 09/19/98-09/28/98 | 4.55 | 778.8 | 545.2 | 0.0 | 0 | 0 |
| 09/29/98 | 4.00 | 1,976.9 | 1,383.8 | 0.0 | 0 | 0 |
| 09/30/98-10/07/98 | 4.39 | 1,521.3 | 1,064.9 | 0.0 | 0 | 0 |
| 10/08/98-10/22/98 | 4.80 | 1,428.6 | 1,000.0 | 0.0 | 0 | 0 |
| Terminal Value | 4.02 | | | | | |
| Total | | 31,579.3 | 22,458.0 | 563.8 | | 5,579,215 |

* Lehman Shares

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 14th day of July, 2006, I caused the

**EXPERT REPORT OF R. ALAN MILLER** to be electronically filed the with the Clerk of

Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

and a copy has been served by electronic mail upon the following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com

EXHIBIT 335



REDACTED