EXHIBIT 411



# ARTER & HADDEN LLP

ATTORNEYS AT LAW

*founded 1843*

Austin
Cleveland
Columbus
Dallas
Dayton
Irvine
Los Angeles
San Antonio

1717 Main Street, Suite 4100
Dallas, Texas 75201-4605

*telephone* 214.761.2100
*facsimile* 214.741.7139

San Diego
San Francisco
Washington, D.C.
Woodland Hills
*Affiliated Offices*
Brussels, Belgium
Geneva, Switzerland

Direct Dial: (214) 761-4422
Email: lreenan@arterhadden.com

June 11, 1998

County Clerk
Collin County
200 South McDonald
First Floor Courthouse Annex A
McKinney, Texas 76069

Re:    *Adams Golf, LP Limited v. Costco Companies, Inc. d/b/a Costco Wholesale*

Dear Clerk:

Enclosed for filing are one original and six photocopies of a Bill of Discovery with attached Exhibits. Also enclosed is a check in the amount of $180.00 ($170.00 for the filing fee, and $10.00 for issuance of a citation to the Secretary of State). Please file stamp two copies of the Bill of Discovery and return them via the courier. Please mail the citation for the Secretary of State to me in the envelope provided.

If you have any questions, please do not hesitate to contact me.

Sincerely yours,

Lara L. Reenan

Enclosures

102795

ADAMS 001474

REDACTED

# ARTER & HADDEN LLP

### ATTORNEYS AT LAW

*founded 1843*

| | | |
|---|---|---|
| Austin | | San Diego |
| Cleveland | | San Francisco |
| Columbus | 1717 Main Street, Suite 4100 | Washington, D.C. |
| Dallas | Dallas, Texas 75201-4605 | Woodland Hills |
| Dayton | | *Affiliated Offices* |
| Irvine | *telephone* 214.761.2100 | Brussels, Belgium |
| Los Angeles | *facsimile* 214.741.7139 | Geneva, Switzerland |
| San Antonio | | |

Direct Dial: (214) 761-4422
Internet Address: LReenan@arterhadden.com

June 17, 1998

**VIA CERTIFIED MAIL #P 966 982 648**
**RETURN RECEIPT REQUESTED**
Secretary of State
804 Capitol Extension, E1
Austin, Texas 78711

> Re:    *Adams Golf, LP Limited v. Costco Companies, Inc.*
>        Cause No. 219-922-98

Dear Secretary of State:

Enclosed with regard to the above-referenced matter are the following:

1.  Two photocopies of Plaintiff's Bill of Discovery;
2.  One original and one photocopy of a Citation for Personal Service; and
3.  One check in the amount of $50, and another check in the amount of $40 to cover expenses incurred for service on Defendant.

Costco Companies is a Washington corporation. Therefore, service of the Citation on the Secretary of State will be necessary, and is being sent to you under the long arm statute. Please serve the Bill of Discovery and Citation as soon as possible.

Thank you for your assistance in this matter, and if you have any questions, please do not hesitate to contact me.

Sincerely,

Lara L. Reenan

bcc:    Joseph Hoffman, Esq. (w/encl.)
        Jacqueline Valenzuela, Esq. (w/encl.)                    ADAMS 001476

JUN-09-98 11:58 AM  ADAMS GOLF          1    760 771 0645          P.01

**◢ ADAMS**

FOR IMMEDIATE RELEASE

### *ADAMS TAKES LEGAL ACTION AGAINST COSTCO*

PLANO, TEXAS, JUNE 9, 1998—Adams Golf filed a Bill of Discovery against Costco on June 9, 1998.

The Bill of Discovery was filed in order to determine whether Costco's claims that they had properly acquired Adams' Tight Lies® fairway woods for resale were accurate.

Adams Golf became concerned when it learned that Costco was selling their Tight Lies® fairway woods because Costco is not an authorized distributor.

"We are committed to our program of partnership with our retail accounts," stated Barney Adams, Chief Executive Officer of Adams Golf. "We are prepared to take every legal action required to ensure that our valuable relationship with our retailers is maintained and remains fully intact," Adams added.

# # #

For more information,
Please contact:

Mary Beth Lacy
(760) 771-3411

ADAMS 001477

2001 East Plano Parkway, Plano, Texas 75074 • www.adamsgolf.com

CAUSE NO. _____

| | | |
|---|---|---|
| ADAMS GOLF, LP LIMITED, A TEXAS LIMITED PARTNERSHIP, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | ____ JUDICIAL DISTRICT |
| | § | |
| COSTCO COMPANIES, INC. d/b/a | § | |
| COSTCO WHOLESALE, | § | |
| Defendant. | § | COLLIN COUNTY, TEXAS |

### BILL OF DISCOVERY

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW Adams Golf, LP, Limited ("Adams" or "Plaintiff"), Plaintiff in the above-styled and numbered cause and brings this Bill of Discovery pursuant to Rule 737 of the Texas Rules of Civil Procedure against Defendant Costco Companies, Inc. d/b/a Costco Wholesale ("Costco" or "Defendant"), and would show the Court the following:

### PARTIES

1.      Plaintiff Adams is a limited partnership, organized and existing under the laws of the State of Texas, having its principal place of business at 2901 Summit Avenue, Suite 100, Plano, Texas 75074.

2.      Adams alleges upon information and belief that Costco is a Washington corporation with its principal place of business at 999 Lake Drive, Issoquah, Washington 98027.  Adams further alleges upon information and belief that Costco does business in this judicial district and in interstate commerce, and makes solicitations to customers in the County of Collin, State of Texas.  Costco is engaged in business in Texas and does not maintain a regular place of business in Texas and does not have a registered agent in Texas.  This lawsuit arises out of Costco's business in Texas.  Thus, Costco may be served pursuant to the Long

ADAMS 001478

Arm Statute CPRC §17.041 *et seq.*, with substitute service on the Secretary of State for the State of Texas, Statutory Documents Section, 1019 Brazos Street, Rudder Building, Room 214, Austin, Texas 78701, P.O. Box 12887, Austin, Texas 78711-2889.

<div align="center">FACTS</div>

3.    Adams designs, develops, markets and distributes high quality, innovative golf clubs. Adams' primary product currently is its Tight Lies® all metal woods. (the "Clubs").

4.    Adams sells all of its Clubs either directly to the public through its representatives or to retailers who are under contract.

5.    Adams has an advertised pricing policy which is part of all of its contracts with retailers (the "Policy"). That Policy governs its relations with all of its distributors and retailers. This Policy spells out at what prices sellers of Adams products may sell the Clubs. The Policy also states that Adams will only do business with sellers that comply with the guidelines. Additionally, the Policy restricts sales of golf clubs by retailers to end-user customers only. In the Policy, Adams Golf also reserves the right to choose whom it will do business with, and the right to accept or reject any order.

6.    Adams has recently discovered that Costco, a bargain retail company with which Adams has not agreed to sell its Clubs, is selling the Clubs at some of its Costco stores. Because Adams is not selling directly to Costco, and because the Policy prohibits sales to other retail entities, it is evident that Costco has purchased the Clubs from a company in violation of the Policy.

7.    Adams has been unable to determine the identity of the company who is supplying the Clubs to Costco and who is therefore, violating the Policy. Costco has refused to divulge the identity of that company. The identity of the company cannot be determined from

ADAMS 001479

any other source. Therefore, Adams' only recourse is to ask this Court to permit discovery to determine the company's identity so that Adams can pursue its legal rights against that company in order to protect itself.

### RELIEF REQUESTED

8.    Pursuant to Rules 737 and 215 of the Texas Rules of Civil Procedure, Plaintiffs request that this Court issue an order as follows:

(a)    Compelling Defendant to produce documents requested in the Notice of Deposition of Costco's Corporate Representative and Subpoena Duces Tecum, attached hereto as Exhibit "A";

(b)    Compelling Defendant to answer the interrogatories attached hereto as Exhibit "B";

(c)    Compelling Defendant's Corporate Representative to appear for deposition in order to clarity and verify its responses to the Request for Production and Interrogatories;

(d)    For such other and further relief, both general and special, at law and in equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

JACQUELINE I. VALENZUELA
State Bar No. 00790114
LARA REENAN
State Bar No. 24002814
ARTER & HADDEN LLP
1717 Main Street, Suite 4100
Dallas, Texas 75201-4605
Telephone: (214) 761-2100
Facsimile: (214) 741-7139

ATTORNEYS FOR PLAINTIFF

ADAMS 001480

102346.1                                 3.

CAUSE NO. _____

| | | |
|---|---|---|
| ADAMS GOLF, LP LIMITED, A TEXAS LIMITED PARTNERSHIP,<br>　　　Plaintiff, | §<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | _____ JUDICIAL DISTRICT |
| COSTCO COMPANIES, INC. d/b/a COSTCO WHOLESALE,<br>　　　Defendant. | §<br>§<br>§ | COLLIN COUNTY, TEXAS |

### PLAINTIFF'S NOTICE OF DEPOSITION DUCES TECUM TO COSTCO WHOLESALE

**TO:**　Defendant Costco Companies, Inc. d/b/a Costco Wholesale, 999 Lake Drive, Issoquah, Washington, 98027.

Defendant is hereby notified pursuant to the Texas Rules of Civil Procedure that Plaintiff will take the deposition of Defendant in connection with the above numbered and entitled cause. Defendant is hereby directed to designate a person or persons who will testify concerning the following matters: (1) the documents requested in the duces tecum attached hereto; and (2) the purchase by Defendant of any items manufactured or thought to be manufactured by Plaintiff.

Defendant is further instructed to produce the documents requested in Exhibit "A" attached hereto, on which examination will be conducted. The deposition will occur at a mutually agreeable time and place, not to exceed 45 days from this notice at the offices of Arter & Hadden, LLP, 1717 Main Street, Suite 4100, Dallas, Texas 75201.

As used herein, the following words, terms, and phrases shall have the meaning indicated below:

1.　"Plaintiff" or "Adams." "Plaintiff" or "Adams" as used herein refers to Adams Golf LP, Limited, and all persons acting and purporting to act upon its behalf.

102368.1　　　　　　　　　　1.　　　　ADAMS 001481

**EXHIBIT**

**A**

2.    "Defendant," "Costco," "you," "your" or "yours." "Defendant," "Costco," "you," "your"
or "yours," as used herein refers to Defendant Costco Companies, Inc. d/b/a Costco
Wholesale, and all persons acting and purporting to act upon its behalf, including, but not
limited to, all past and present employees, officers, directors, attorneys, consultants,
agents, adjusters or any other representatives.

3.    "Document" or "documents." "Document" or "documents" as used herein refers to all
written, printed or graphic matters, drafts, originals, copies, non-conforming copies which
contain deletions, insertions, hand-written notes or comments, however produced or
reproduced and to any other means of retention of information, including without
limitation all letters, correspondence, records of conferences, memoranda, telegrams,
stenographic or hand-written notes, summaries, telephone logs and records, teletypes,
bank checks, bank deposits and withdrawal slips, bank credit and debit memoranda, bank
drafts, bank statements, telexes, private wire messages, communications, desk calendars,
diaries, appointment books, agendas, meetings, conversations, schedules, reports, studies,
appraisals, analysis lists, surveys, budgets, financial statements, financial projections,
financial calculations, contracts, agreements or proposed agreements, notice of wired
transfer of funds or other notices, canceled checks, periodicals, charts, graphs, interviews,
speeches, transcripts, depositions, press releases, brochures, books of account, affidavits,
communications of government bodies, invoices, notices of minutes of meetings of board
of directors, and audit committees, and financial committees, and executive committees,
interoffice communications, results of investigations, working reports, newspaper or
magazine articles, records of payment, releases, receipts, computer data, maps, tax
returns, vouchers, microfilm, videotapes, photographs, phone records, tape recordings,
wire recordings, diagrams, computer tapes, projections, microfiche and other data
computations and papers similar to any of the foregoing and other writings of every kind
and description (whether or not actually used) and other data computations from which
information can be obtained.

Additionally, "document" and "documents" shall include documents considered to be
privileged by you, which shall be identified, in order to assist Plaintiff and the Court in
determining whether privilege may be properly claimed, by stating the subject matter of
each such document, the names of all persons preparing and receiving the document, the
names of all persons to whom the document was distributed and the privilege claimed,
and the reasons which justify the assertion of privilege by you should be included in your
answer herein.

4.    "Identify." "Identify" or any form of that word, shall have the following meanings and
include the following instructions: (a) "identify" when used in reference to a natural
person, means to state (i) the full name, (ii) present or last known complete residential
and business address and phone numbers, and (iii) the name of the current or last known
employer; (b) "identify" when used in reference to an entity, means to state (i) the current
name for the entity, (ii) its principal home office address and telephone number, (iii) the
state of legal formation, (iv) identify all officers, directors, partners and/or principals, and

(v) state the name of the natural person with whom most of the communications with such entity are made or the name of the natural person whom the party responding to these interrogatories believes would have personal knowledge regarding the information requested in the interrogatory; and (c) "identify," when used in reference to a document, means to state (i) the name, date and subject of the document, (ii) the type of document (e.g., letter, memorandum, note, report), (iii) the identity of the author and all recipients of the document, (iv) the identity of the custodian or possessor of the document or a copy thereof, and (v) the location of the document or a copy thereof.

5.    "Person" or "persons." "Person" or "persons" as used herein shall include natural persons, male or female, in any capacity whatsoever, and all types and kinds of businesses or other entities, including, but not limited to, public or private corporations, partnerships, joint ventures, firms, voluntary or unincorporated associations, trusts, estates, proprietorships or government agencies.

6.    "Relate to" or "relating to." "Relate to" or "relating to" as used herein shall include referring to, alluding to, responding to, concerning, connected with, commenting on, in respect of, in respect to, about, regarding, discussing, describing, measuring, reflecting, supporting, analyzing, explaining, constituting, evidencing, or pertaining to.

7.    "Evidence" or "evidencing." "Evidence" or "evidencing" as used herein means tending to show, in any probative manner, the existence or nonexistence of any matter.

8.    "Concerning" or "concern." "Concerning" or "concern" as used herein shall include relating to, pertaining to, describing, evidencing, involving or constituting.

9.    "Describe." "Describe," or any form of that word, as used herein shall have the following meanings and include the following instructions: (a) "describe" shall generally mean to describe, explain, illustrate, represent or characterize; (b) "describe" when used in reference to a transaction, event or activity means to state (i) the identity of each person who participated in or was present during the transaction, event or activity, (ii) the location of the transaction, event or activity, and (iii) the date of the transaction, event or activity; and (c) "describe" when used in reference to a communication means to state (i) the identity of each person who participated in or was present when the communication was made, (ii) the date of the communication, (iii) the substance and subject matter of the communication, and (iv) identify all documents relating to or evidencing the communication.

10.    "Communication" or "communications." "Communication" or "communications" as used herein means any contract or act by which information or knowledge is transmitted or conveyed between two or more persons and includes, without limitation: (a) written contacts (whether by letter, memoranda, telegram, telex or other documents); (b) oral contacts (whether by face-to-face meetings, telephone conversations or otherwise); and

ADAMS 001483

(c) nonverbal acts intended to communicate or convey any meaning, understanding or other message.

11.    The word "or" means and/or and the word "and" means and/or.

12.    Each of the words "each," "any" and "all" mean each, any and all.

13.    "Fact." "Fact" as used herein refers to and includes all circumstances, events, and evidence pertaining to or touching upon the items in question.

14.    "Clubs" Clubs as used herein means Adams Golf Tight Lies® products.

ADAMS 001484

<u>Exhibit A</u>

## <u>PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT</u>

**REQUEST NO. 1:**  Any written, verbal or any other kind of statement made to you by the Company that provides Costco with the Clubs.  For purposes of this request, a statement previously made is (a) a written statement signed or otherwise adopted or approved by the person making it, or (b) a stenographic, mechanical, electrical or other type of recording, or any transcription thereof which is a substantially verbatim recital of a statement made by the person and contemporaneously recorded.

**REQUEST NO. 2:**  Any and all documents concerning, demonstrating, reflecting, relating to how Costco obtains or obtained the Clubs.

**REQUEST NO. 3:**  Any and all contracts or agreements between any two of the following: a) Adams; b) Costco; and c) any company who provides or provided Costco.

**REQUEST NO. 4:**  Any and all documents which reference, pertain or relate to Adams.

**REQUEST NO. 5:**  Any and all documents which reference, pertain or relate to the Clubs.

**REQUEST NO. 6:**  Any and all documents which reference, pertain or relate to the name of any company who provides or ever provided Costco with the Clubs.

Respectfully submitted,

JACQUELINE I. VALENZUELA
State Bar No. 00790114
LARA REENAN
State Bar No. 24002814
ARTER & HADDEN LLP
1717 Main Street, Suite 4100
Dallas, Texas 75201-4605
Telephone: (214) 761-2100
Facsimile: (214) 741-7139

**ATTORNEYS FOR PLAINTIFF**

102368.1                                    5.

ADAMS 001485

CAUSE NO. _____

| | | |
|---|---|---|
| ADAMS GOLF, LP LIMITED, A TEXAS LIMITED PARTNERSHIP, | § § § | IN THE DISTRICT COURT |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | _____ JUDICIAL DISTRICT |
| | § | |
| COSTCO COMPANIES, INC. d/b/a | § | |
| COSTCO WHOLESALE, | § | |
| **Defendant.** | § | COLLIN COUNTY, TEXAS |

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO COSTCO WHOLESALE

**TO:**  Defendant Costco Companies, Inc. d/b/a Costco Wholesale, 999 Lake Drive, Issoquah, Washington, 98027.

### I.   GENERAL INSTRUCTIONS

STATUTORY AUTHORITY

The party represented by the undersigned attorneys are sending the attached questions to

you under the provisions of Rule 168 of the Texas Rules of Civil Procedure.

TIME FOR ANSWERING INTERROGATORIES

Pursuant to TEX. R. CIV. P. 168, Plaintiff, Adams Golf, LP Limited, requests that

complete and responsive answers to these questions be received within 30 days after hand

delivery service, or within 33 days after U.S. Mail delivery service, of these questions.

INSTRUCTIONS FOR ANSWERING

In answering these questions, please furnish all of the information available to you,

including information in the possession of your attorneys or their investigators, and all persons

acting on your behalf, and not merely such information known of your own personal knowledge.

ADAMS 001486

PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT - Page 1

EXHIBIT

B

If you cannot answer the question in full after exercising due diligence to secure the information, say so in your answer, and to the extent possible, answer stating whatever information or knowledge you have.

If any interrogatory is not answered through the claim of privilege, including the work product doctrine, state the claim of privilege or other reason for answering with specificity and provide all information necessary to evaluate the claim of privilege, including, without limitation, the date of the communications and the subject matter therein, and the identity of all persons to whom any portion of the contents of the communications have been disclosed. Such information should be provided in a manner sufficient to allow it to be described to the court for ruling on the privilege or other reason asserted.

## II.    DEFINITIONS

As used herein, the following words, terms, and phrases shall have the meaning indicated below:

1. "Plaintiff" or "Adams." "Plaintiff" or "Adams" as used herein refers to Adams Golf, LP Limited, and all persons acting and purporting to act upon its behalf.

2. "Defendant," "Costco," "you," "your" or "yours." "Defendant," "Costco," "you," "your" or "yours," as used herein refers to Defendant Costco Companies, Inc. d/b/a Costco Wholesale and all persons acting and purporting to act upon its behalf, including, but not limited to, all past and present employees, officers, directors, attorneys, consultants, agents, adjusters or any other representatives.

3. "Document" or "documents." "Document" or "documents" as used herein refers to all written, printed or graphic matters, drafts, originals, copies, non-conforming copies which contain deletions, insertions, hand-written notes or comments, however produced or reproduced and to any other means of retention of information, including without limitation all letters, correspondence, records of conferences, memoranda, telegrams, stenographic or hand-written notes, summaries, telephone logs and records, teletypes, bank checks, bank deposits and withdrawal slips, bank credit and debit memoranda, bank drafts, bank statements, telexes, private wire messages, communications, desk calendars,

<u>**PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT**</u> - **Page 2**          102367.1

ADAMS 001487

diaries, appointment books, agendas, meetings, conversations, schedules, reports, studies, appraisals, analysis lists, surveys, budgets, financial statements, financial projections, financial calculations, contracts, agreements or proposed agreements, notice of wired transfer of funds or other notices, canceled checks, periodicals, charts, graphs, interviews, speeches, transcripts, depositions, press releases, brochures, books of account, affidavits, communications of government bodies, invoices, notices of minutes of meetings of board of directors, and audit committees, and financial committees, and executive committees, interoffice communications, results of investigations, working reports, newspaper or magazine articles, records of payment, releases, receipts, computer data, maps, tax returns, vouchers, microfilm, videotapes, photographs, phone records, tape recordings, wire recordings, diagrams, computer tapes, projections, microfiche and other data computations and papers similar to any of the foregoing and other writings of every kind and description (whether or not actually used) and other data computations from which information can be obtained.

Additionally, "document" and "documents" shall include documents considered to be privileged by you, which shall be identified, in order to assist Plaintiff and the Court in determining whether privilege may be properly claimed, by stating the subject matter of each such document, the names of all persons preparing and receiving the document, the names of all persons to whom the document was distributed and the privilege claimed, and the reasons which justify the assertion of privilege by you should be included in your answer herein.

4.   "Identify." "Identify" or any form of that word, shall have the following meanings and include the following instructions:  (a) "identify" when used in reference to a natural person, means to state (i) the full name, (ii) present or last known complete residential and business address and phone numbers, and (iii) the name of the current or last known employer; (b) "identify" when used in reference to an entity, means to state (i) the current name for the entity, (ii) its principal home office address and telephone number, (iii) the state of legal formation, (iv) identify all officers, directors, partners and/or principals, and (v) state the name of the natural person with whom most of the communications with such entity are made or the name of the natural person whom the party responding to these interrogatories believes would have personal knowledge regarding the information requested in the interrogatory; and (c) "identify," when used in reference to a document, means to state (i) the name, date and subject of the document, (ii) the type of document (e.g., letter, memorandum, note, report), (iii) the identity of the author and all recipients of the document, (iv) the identity of the custodian or possessor of the document or a copy thereof, and (v) the location of the document or a copy thereof.

5.   "Person" or "persons." "Person" or "persons" as used herein shall include natural persons, male or female, in any capacity whatsoever, and all types and kinds of businesses or other entities, including, but not limited to, public or private corporations, partnerships, joint ventures, firms, voluntary or unincorporated associations, trusts, estates, proprietorships or government agencies.

ADAMS 001488

PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT - Page 3          102367.1

6.     "Relate to" or "relating to." "Relate to" or "relating to" as used herein shall include referring to, alluding to, responding to, concerning, connected with, commenting on, in respect of, in respect to, about, regarding, discussing, describing, measuring, reflecting, supporting, analyzing, explaining, constituting, evidencing, or pertaining to.

7.     "Evidence" or "evidencing." "Evidence" or "evidencing" as used herein means tending to show, in any probative manner, the existence or nonexistence of any matter.

8.     "Concerning" or "concern." "Concerning" or "concern" as used herein shall include relating to, pertaining to, describing, evidencing, involving or constituting.

9.     "Describe." "Describe," or any form of that word, as used herein shall have the following meanings and include the following instructions: (a) "describe" shall generally mean to describe, explain, illustrate, represent or characterize; (b) "describe" when used in reference to a transaction, event or activity means to state (i) the identity of each person who participated in or was present during the transaction, event or activity, (ii) the location of the transaction, event or activity, and (iii) the date of the transaction, event or activity; and (c) "describe" when used in reference to a communication means to state (i) the identity of each person who participated in or was present when the communication was made, (ii) the date of the communication, (iii) the substance and subject matter of the communication, and (iv) identify all documents relating to or evidencing the communication.

10.     "Communication" or "communications." "Communication" or "communications" as used herein means any contract or act by which information or knowledge is transmitted or conveyed between two or more persons and includes, without limitation: (a) written contacts (whether by letter, memoranda, telegram, telex or other documents); (b) oral contacts (whether by face-to-face meetings, telephone conversations or otherwise); and (c) nonverbal acts intended to communicate or convey any meaning, understanding or other message.

11.     The word "or" means and/or and the word "and" means and/or.

12.     Each of the words "each," "any" and "all" mean each, any and all.

13.     "Fact." "Fact" as used herein refers to and includes all circumstances, events, and evidence pertaining to or touching upon the items in question.

14.     "Clubs." Clubs as used herein means Adams Golf Tight Lies® products.

ADAMS 001489

### III.    PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT

**INTERROGATORY NO. 1:**    Identify each person having knowledge or involvement in Costco's purchase of the Clubs.

    **ANSWER:**

**INTERROGATORY NO. 2:** Describe all conversations or communications you have had with Adams concerning the Clubs.

    **ANSWER:**

**INTERROGATORY NO. 3:**  Identify the person who sold you the Clubs or any other product for which you have reason to believe was manufactured by Adams.

    **ANSWER:**

**INTERROGATORY NO. 4:**  Describe all conversations or communications you have had with any and all of the persons identified in Interrogatory No. 3.

    **ANSWER:**

ADAMS 001490

**INTERROGATORY NO. 5:**   Describe in detail how you obtained the Clubs or any other products for which you have reason to believe was produced by Adams.

     **ANSWER:**

**INTERROGATORY NO. 6:**   State in detail the amount of money and/or any other form of compensation you originally contracted to receive from any and all parties identified in Interrogatory No. 3 and the amount of money and/or any other form of compensation you actually received or plan to receive for the same.

     **ANSWER:**

**INTERROGATORY NO. 6:**   State in detail each and every contention or reason by which you believe you have a lawful right to sell the Clubs.

     **ANSWER:**

Respectfully Submitted

ARTER & HADDEN LLP

By: _____
JACQUELINE L VALENZUELA
State Bar No. 00790114
LARA REENAN
State Bar No. 24002814
ARTER & HADDEN LLP
1717 Main Street, Suite 4100
Dallas, Texas 75201-4605
Telephone: (214) 761-2100
Facsimile: (214) 741-7139

ATTORNEYS FOR PLAINTIFF    ADAMS 001491

PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT - Page 6    102367.1

FILE NO. 219-00922-98

**CITATION
FOR PERSONAL SERVICE
(District Court)**

# THE STATE OF TEXAS

TO: SECRETARY OF STATE,1019 BRAZOS ST., AUSTIN, TEXAS TO BE SERVED UPON

COSTCO COMPANIES, 999 LAKE DR.

ISSOUAH, WA. 98027

NOTICE TO DEFENDANT 'You have been sued. You may employ an attorney. If you or
your attorney do not file a written answer with the clerk who issued this citation by
10:00 a.m. on the Monday next following the expiration of twenty days after you were
served this citation and petition, a default judgment may be taken against you.'

Defendant, Greetings:

You are hereby commanded to appear by filing a written answer to Plaintiff's
Petition at or before ten o'clock A.M. on the
Monday next after the expiration of twenty days after the date of service of this
citation before the Honorable District Court 219 th Judicial District of Collin
County, Texas at the Courthouse of said County in McKinney, Texas.

Said Plaintiff's Petition was filed in said court, by IARA REENAN
(attorney for Plaintiff or Plaintiff) whose

address is 1717 MAIN STREET, SUITE 4100, DALLAS, TX 75201 4605 (214)761-2100,
on the 12TH day of JUNE A.D. 1998 , in this case, numbered 219-00922-98

on the docket of said court, and styled,

ADAMS GOLF LP LIMITED, A TEXAS LIMITED PARTNERSHIP         Plaintiff

VS.

COSTCO GOLF LP LIMITED, D/B/A COSTCO WHOLESALE             Defendant

IN THE 219 DISTRICT COURT
COLLIN COUNTY TEXAS

BY: _____ Deputy

ADAMS GOLF LP LIMITED, A
TEXAS LIMITED PARTNERSHIP

VS.

COSTCO COMPANIES, INC., D/B/A
COSTCO WHOLESALE

ISSUED THIS
12TH DAY OF JUNE, 1998

BY: MARY HANING
                        Deputy

HANNAH KUNKLE

SERVICE FILED

The natures of Plaintiff's demand is fully shown by a true and correct copy of
Plaintiff's BILL OF DISCOVERY Petition accompanying this citation
and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements
of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at McKinney, Texas, this 12TH
day of JUNE A.D. 1998 .

Attest:                          HANNAH KUNKLE
                                 CLERK, DISTRICT COURTS
BY:                              COLLIN COUNTY, TEXAS

_____

CLERK OF THE COURT
DISTRICT CLERK
P.O. BOX 578
COLLIN COUNTY COURTHOUSE
MCKINNEY, TEXAS 75069

(SEAL)

Rule 106: '...citation shall be served by the officer delivering to each defendant,
in person, a true copy of the citation with the date of delivery endorsed thereon and
with a copy of the petition attached thereto.'                          ,Deputy

219-00922-98

185 - K8 - DC

ADAMS 001492

## SHERIFF'S RETURN

Came to hand on the _____ day of _____,19____, at ____o'clock ____M., and executed in _____County, Texas, by delivering to the within named Respondent/Defendant, to-wit:

_____ , at _____o'clock____M.,_____ , 19____;

_____ , at _____o'clock____M.,_____ , 19____;

_____ , at _____o'clock____M.,_____ , 19____;

_____ , at _____o'clock____M.,_____ , 19____;

_____ , at _____o'clock____M.,_____ , 19____;

each, in person, a true copy of this instrument with a true and correct copy of the document attached thereto having first endorsed on such copy of said instrument the date of delivery.

The distance actually traveled by me in serving such process was _____miles, and my fees are as follows:

For service....................$_____

For mileage....................$_____

Total Fees....................$_____

To certify which witness my hand officially.

_____

Sheriff/Constable of _____County, Texas

By_____ , Deputy

## CERTIFICATE OF DELIVERY

I do hereby certify that I delivered to _____

_____on the _____day of _____ , 19_____,

at _____o'clock ____M., a copy of this instrument.

_____Sheriff/Constable

_____County, Texas

By_____ , Deputy

## VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Notary Public, this _____day of _____ , 19_____.

_____

ADAMS 001493

EXHIBIT 412

**Callaway Golf Introduces Big Bertha(R) Steelhead(TM) Metal Woods The Company's Best Stainless Steel Woods Ever**
825 words
12 August 1998
07:19
PR Newswire
English
(c) 1998 PR Newswire

CARLSBAD, Calif., Aug. 12 /PRNewswire/ -- **Callaway Golf** Company (NYSE: ELY) has done it again. The industry's acknowledged leader in golf club innovation today announced the introduction of its latest design breakthrough, Big Bertha(R) Steelhead(TM) Metal Woods. These **new** stainless steel metal woods, which will replace the existing line of Big Bertha War Bird(R) Stainless Steel Metal Woods, are loaded with the superior design features and playability benefits that golfers worldwide have come to expect from **Callaway Golf**.

The **new** Big Bertha Steelhead Metal Woods were designed by **Callaway Golf**'s Senior Executive Vice President and Chief of **New** Products, Richard C. Helmstetter, and his team. They have a unique design made of three different parts: (1) an extremely lightweight, very thin crown plate; (2) a super strong solid face and lower body with varied internal thicknesses; and (3) a precision-cast, stainless steel variable weight chip that is individually inserted into the interior of the clubhead to achieve the exact weighting and ensure the right inertial properties.

Like every **new** Callaway(R) product introduced since the Company first revolutionized the industry with the original Big Bertha Driver, the Big Bertha Steelhead Metal Woods have been rigorously tested and found to be demonstrably superior to, and pleasingly different from, any comparable golf club on the market. The Big Bertha Steelhead Metal Woods conform with United States Golf Association Rules.

"Our goal was to produce a metal wood with a very low center of gravity while not sacrificing the larger effective hitting area of the clubface," said Donald H. Dye, President and CEO of **Callaway Golf**. "We wanted to increase the average golfer's chances for a better shot from a greater variety of lies. We are very excited about the **new** Big Bertha Steelhead Metal Woods, because we believe they have accomplished our goals. For golfers of all skill levels, we believe they perform better than shallow-faced fairway woods or anything else being offered by our competitors."

The unique design features in the Big Bertha Steelhead Metal Woods have allowed us to move much of the weight lower in the body of the clubhead; to lower the center of gravity; and to maintain a large effective hitting area above the center of gravity -- at least 33 percent larger than shallow-faced or low profile fairway woods. This increases the club's forgiveness on off- center hits and delivers a better trajectory.

"We believe golfers everywhere identify the Big Bertha(R) trademark with our continuing tradition of making golf more enjoyable for the average golfer," Mr. Helmstetter said. "These **new** Big Bertha Steelhead Metal Woods deliver that sort of satisfaction. All of our testing with average golfers has shown the same thing. Some of them had problems hitting our competitor's low-profile or shallow-faced woods from fluffy lies in the rough or off the tee because those conditions occasionally cause the ball to "pop up." The Big Bertha Steelhead Metal Woods have a larger hitting area above the center of gravity, and so pop-ups aren't likely to be a problem. The Big Bertha(R) Steelhead(TM) Metal Woods are the most forgiving stainless steel metal woods we have ever developed."

In addition to all the unique design features above the center of gravity, the Big Bertha(R) Steelhead(TM) Metal Woods also have a **new** sole. It is convex, to push the turf down as the club glides through impact. Our designers have also increased the bounce to propel the club forward and help eliminate digging on fairway shots.

Reaction from **Callaway Golf** Staff Professionals who have tested the Big Bertha Steelhead Metal Woods has been very positive. Five-time European Order of Merit winner Colin Montgomerie will have a Big Bertha Steelhead 3-wood in his bag this week at the PGA Championship. Other Callaway Staff Professionals on the PGA Tour, LPGA Tour, Senior PGA Tour, PGA European Tour and Nike Tour have indicated they will put the clubs in play very soon.

The Big Bertha(R) Steelhead(TM) Driver is available in lofts starting at 6 degrees. A complete line of Big Bertha Steelhead Fairway Woods is available in both right and left-handed in both men's and ladies' models, including: 2, 3, Strong 3, 4, Strong 4, 5, 7 (HeavenWood(R)), 9 (Divine Nine(R)) and 11 (Ely Would(R)). The suggested retail price for the **new** Big Bertha Steelhead Metal Woods is $295 with an RCH Series(R) 99 graphite shaft and $195

with a steel shaft.

The Big Bertha Steelhead Metal Woods are available in retail shops around the world. For more information and for photographs of Big Bertha Steelhead Metal Woods, visit the company's website at www.callawaygolf.com.

/NOTE

/CONTACT: Krista Mallory of **Callaway Golf**, 760-931-1771/ 08:01 EDT

Document prn0000020010918du8c02ftt

© 2006 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

EXHIBIT 413





June 26, 1998

Larry Tatro
Manatee Golf
3908 Manatee Avenue West
Bradenton, FL 34205

VIA FACSIMILE
941-745-1693

Dear Mr. Tatro:

As you know, our Distribution Agreement and the business arrangements that follow therefrom and are provided to you periodically in writing, permit you to sell Adams Golf products to end-user consumers. We have been advised that one or more of our distributors has been selling Adams Golf products to wholesalers, such as Costco Wholesale. As we are investigating this information, we write to remind you of your agreement and the limitation within the Agreement as stated above.

Please acknowledge your understanding and receipt of this notification by signing below where indicated.

For the benefit of all of our customers, Adams Golf will continue to ensure that each distributor abides by the terms of its Distribution Agreement and business arrangements.

Thank you for your cooperation.

Yours truly,

B.H. (Barney) Adams

ACKNOWLEDGED AND RECEIVED:

ADAMS 001457

BHA:afn

cc:    J. Valenzuela

| Post-It® Fax Note | 7671 | Date 6/26/98 | # of pages ► 2 |
|---|---|---|---|
| To Jacquie Valenzuela | | From Ann Neff | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # | thanks! |
| Fax # | | Fax # | |

2801 East Plano Parkway, Plano, Texas 75074 • www.adamsgolf.com
(972) 673-9000 • (800) 622-0609 • FAX: (972) 398-8818

EXHIBIT 414

RECYCLED



June 26, 1998

Dan Straka                                VIA FACSIMILE
King Par Golf                             816-732-6662
G-5140 Flushing Road
Flushing, MI 48433

Dear Mr. Straka:

As you know, our Distribution Agreement and the business arrangements that follow
therefrom and are provided to you periodically in writing, permit you to sell Adams Golf
products to end-user consumers. We have been advised that one or more of our
distributors has been selling Adams Golf products to wholesalers, such as Costco
Wholesale. As we are investigating this information, we write to remind you of your
agreement and the limitation within the Agreement as stated above.

Please acknowledge your understanding and receipt of this notification by signing below
where indicated.

For the benefit of all of our customers, Adams Golf will continue to ensure that each
distributor abides by the terms of its Distribution Agreement and business arrangements.

Thank you for your cooperation.

Yours truly,

*B.H. Adams*

B.H. (Barney) Adams

ACKNOWLEDGED AND RECEIVED:

ADAMS 001473

_____

BHA:afn

cc:    J. Valenzuela

Post-it® Fax Note    7671   Date 7/6/98   # of pages ►
To J. Valenzuela              From B.H. Adams
Co./Dept.                     Co.
Phone #                       Phone #
Fax #  716/010               Fax #

2801 East Plano Parkway, Plano, Texas 75074 • www.adamsgolf.com
(972) 673-9000 • (800) 622-0609 • FAX: (972) 398-8818

EXHIBIT 415


RECYCLED

**Callaway Golf Introduces Big Bertha(R) Steelhead(TM) Metal Woods The Company's Best Stainless Steel Woods Ever**
825 words
12 August 1998
07:19
PR Newswire
English
(c) 1998 PR Newswire

CARLSBAD, Calif , Aug. 12 /PRNewswire/ -- **Callaway Golf** Company (NYSE: ELY) has done it again. The industry's acknowledged leader in golf club innovation today announced the introduction of its latest design breakthrough, Big Bertha(R) Steelhead(TM) Metal Woods. These **new** stainless steel metal woods, which will replace the existing line of Big Bertha War Bird(R) Stainless Steel Metal Woods, are loaded with the superior design features and playability benefits that golfers worldwide have come to expect from **Callaway Golf**.

The **new** Big Bertha Steelhead Metal Woods were designed by **Callaway Golf**'s Senior Executive Vice President and Chief of **New** Products, Richard C. Helmstetter, and his team. They have a unique design made of three different parts: (1) an extremely lightweight, very thin crown plate; (2) a super strong solid face and lower body with varied internal thicknesses; and (3) a precision-cast, stainless steel variable weight chip that is individually inserted into the interior of the clubhead to achieve the exact weighting and ensure the right inertial properties.

Like every **new** Callaway(R) product introduced since the Company first revolutionized the industry with the original Big Bertha Driver, the Big Bertha Steelhead Metal Woods have been rigorously tested and found to be demonstrably superior to, and pleasingly different from, any comparable golf club on the market. The Big Bertha Steelhead Metal Woods conform with United States Golf Association Rules.

"Our goal was to produce a metal wood with a very low center of gravity while not sacrificing the larger effective hitting area of the clubface," said Donald H. Dye, President and CEO of **Callaway Golf**. "We wanted to increase the average golfer's chances for a better shot from a greater variety of lies. We are very excited about the **new** Big Bertha Steelhead Metal Woods, because we believe they have accomplished our goals. For golfers of all skill levels, we believe they perform better than shallow-faced fairway woods or anything else being offered by our competitors ."

The unique design features in the Big Bertha Steelhead Metal Woods have allowed us to move much of the weight lower in the body of the clubhead; to lower the center of gravity; and to maintain a large effective hitting area above the center of gravity -- at least 33 percent larger than shallow-faced or low profile fairway woods. This increases the club's forgiveness on off- center hits and delivers a better trajectory.

"We believe golfers everywhere identify the Big Bertha(R) trademark with our continuing tradition of making golf more enjoyable for the average golfer," Mr. Helmstetter said. "These **new** Big Bertha Steelhead Metal Woods deliver that sort of satisfaction. All of our testing with average golfers has shown the same thing. Some of them had problems hitting our competitor's low-profile or shallow-faced woods from fluffy lies in the rough or off the tee because those conditions occasionally cause the ball to "pop up." The Big Bertha Steelhead Metal Woods have a larger hitting area above the center of gravity, and so pop-ups aren't likely to be a problem. The Big Bertha(R) Steelhead(TM) Metal Woods are the most forgiving stainless steel metal woods we have ever developed."

In addition to all the unique design features above the center of gravity, the Big Bertha(R) Steelhead(TM) Metal Woods also have a **new** sole. It is convex, to push the turf down as the club glides through impact. Our designers have also increased the bounce to propel the club forward and help eliminate digging on fairway shots.

Reaction from **Callaway Golf** Staff Professionals who have tested the Big Bertha Steelhead Metal Woods has been very positive. Five-time European Order of Merit winner Colin Montgomerie will have a Big Bertha Steelhead 3- wood in his bag this week at the PGA Championship. Other Callaway Staff Professionals on the PGA Tour, LPGA Tour, Senior PGA Tour, PGA European Tour and Nike Tour have indicated they will put the clubs in play very soon.

The Big Bertha(R) Steelhead(TM) Driver is available in lofts starting at 6 degrees. A complete line of Big Bertha Steelhead Fairway Woods is available in both right and left-handed in both men's and ladies' models, including: 2, 3, Strong 3, 4, Strong 4, 5, 7 (HeavenWood(R)), 9 (Divine Nine(R)) and 11 (Ely Would(R)). The suggested retail price for the **new** Big Bertha Steelhead Metal Woods is $295 with an RCH Series(R) 99 graphite shaft and $195

with a steel shaft.

The Big Bertha Steelhead Metal Woods are available in retail shops around the world. For more information and for photographs of Big Bertha Steelhead Metal Woods, visit the company's website at www.callawaygolf.com.

/NOTE

/CONTACT: Krista Mallory of **Callaway Golf**, 760-931-1771/ 08:01 EDT

Document prn0000020010918du8c02ftt

© 2006 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

EXHIBIT 416

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE ADAMS GOLF, INC. SECURITIES LITIGATION | CONSOLIDATED C.A. No. 99-371 KAJ |

## PLAINTIFFS' AMENDED AND SUPPLEMENTED RESPONSES TO ADAMS GOLF DEFENDANTS FIRST REQUEST FOR ADMISSIONS TO PLAINTIFFS

Plaintiffs hereby respond to Defendants' Adams Golf, Inc., Barney Adams, Darl Hatfield, Richard Murtland, Paul Brown, Jr., Roland Casati, Finis Conner and Stephen Patchin (collectively, "Adams Golf Defendants") requests for admissions (the "Requests") as follows:

### GENERAL OBJECTIONS

1.      Plaintiffs object to Adams Golf Defendants' definitions and instructions to the extent that they are inconsistent with or would impose obligations upon plaintiffs in excess of those set forth in the Federal Rules of Civil Procedure, including Rule 36 which permits a party to state that after reasonable inquiry "the information known or readily obtainable by the party is insufficient to enable the party to admit or deny", and permits, after an objection, that the "answer . . . set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter."

2.      Plaintiffs object to Adams Golf Defendants' definitions and instructions to the extent that they are unduly burdensome.

3.      Plaintiffs object to Adams Golf Defendants' definitions and instructions to the extent that they are vague and overbroad.

408156

4.    Plaintiffs reserve the right to amend these admissions on the discovery of new

information

## SPECIFIC OBJECTIONS AND RESPONSES

### REQUEST FOR ADMISSION NO. 1

The only statements in Adams Golf's Registration Statement that you contend in the
Complaint are false and misleading are the following:

> To preserve the integrity of its image and reputation, the Company
> currently limits its distribution to retailers that market premium
> quality golf equipment and provide a high level of customer service
> and technical expertise. The Company currently sells its products to
> on-and-off-course golf shops and selected sporting goods retailers.
> The Company believes its selective retail distribution helps its
> retailers to maintain profitable margins and maximum sales of
> Adams' products.

> The Company sells a significant majority of its products to selected
> retailers. To maintain its high quality reputation and generate retailer
> loyalty, the Company does not sell its product through price sensitive
> general discount warehouses, department stores or membership clubs

### RESPONSE:

Objection  This discovery is duplicative of other discovery and motions. Plaintiffs admit

that both statements quoted are false and misleading, but deny that they are the only false or

misleading statements. The false and misleading statements as well as material omissions are set

forth in the Second Amended Complaint, and explained in detail in plaintiffs' responses to

defendants' motions to dismiss, as well as in Plaintiffs' Responses and Objections to the Adams

Golf Defendants' Third Set of Interrogatories to Plaintiffs and the Underwriter Defendants'

Interrogatories to Plaintiffs

### REQUEST FOR ADMISSION NO. 2:

Costco refused to identify the source of their Adams Golf clubs.

408156                                    2

**RESPONSE:**

After reasonable inquiry, plaintiffs have insufficient knowledge to admit or deny this request, since Plaintiffs do not know what oral communications went on between Costco and Adams Golf personnel. Plaintiffs admit that there is evidence that Costco refused to identify its sources of Adams Golf clubs in response to questions from Adams Golf and Mackenzie.

**REQUEST FOR ADMISSION NO. 3:**

Costco refused to provide Adams Golf with information about the number of Adams Golf clubs that it had obtained.

**RESPONSE:**

After reasonable inquiry, Plaintiffs do not have sufficient information to admit or deny this request. Plaintiffs are not aware of any documentary evidence that Adams asked Costco about the number of Adams clubs Costco had obtained, nor of any letter from Costco refusing to supply such number.

**REQUEST FOR ADMISSION NO. 4:**

The document Bates-labeled COST 0001 - COST 0005 represents the number of Adams Golf clubs in Costco distribution warehouses.

**RESPONSE:**

Plaintiffs object that the term "distribution warehouses" is vague and ambiguous. Notwithstanding this objection, Plaintiffs deny that COST 0001-0005 represents the number of Adams Golf clubs in Costco distribution warehouses. Plaintiffs understand that COST 001-005 is a compilation prepared by Costco and believe COST 0001-0005 sets forth clubs purchased by Costco or for Costco's account as shown by records currently available to Costco. See Declaration of Mark Woodrich and exhibits.

408156                                3

**REQUEST FOR ADMISSION NO. 5:**

No pre-IPO documents reflect the number of Adams Golf clubs in Costco stores.

**RESPONSE:**

Plaintiffs object to the term "pre-IPO documents," since it is vague and ambiguous. After a reasonable inquiry, plaintiffs have insufficient information to admit or deny the existence of pre-IPO documents reflecting the number of Adams clubs in Costco stores, since plaintiffs do not know what documents existed at Costco before the IPO. However, on the basis of documents produced by Costco in 2005 and 2006, it appears that before the IPO, Costco did have documents reflecting the number of Adams Golf clubs in Costco stores.

**REQUEST FOR ADMISSION NO. 6:**

No Costco distribution warehouse in Canada received a shipment of Adams Golf clubs between March 27, 1998 and December 31, 1998.

**RESPONSE:**

Plaintiffs object that the term "distribution warehouses" is ambiguous as Costco uses the term "warehouse" to mean store. Denied. After a reasonable inquiry, and study of the Declaration of Woodrich and COST 0005, apparently National placed orders for clubs for Canada on February 6, March 3, and March 26, 1998 as shown by records currently available at Costco. COST 0005 does not say when those clubs were shipped to Costco "distribution warehouses" in Canada. Mackenzie officers and Chris Beebe stated that almost 600 Adams clubs were in Costco stores in Canada starting in late March, 1998 and that a new shipment of Adams clubs arrived at Canadian Costcos at the end of May, 1998. Ex. 83, 84, 85. In MCK 00373, Pratt states that Costco received at least three shipments by August 1998

**REQUEST FOR ADMISSION NO. 7:**

On June 8, 1998, Adams Golf implemented a price-matching program in Canada.

**RESPONSE:**

Plaintiffs object that the term "price-matching program" which is not defined, is vague and ambiguous. Notwithstanding this objection, plaintiffs admit that Adams Golf implemented the plan reflected in deposition Exhibits 10 and 11 and the deposition testimony of Pratt, Brown and Magnussen.

**REQUEST FOR ADMISSION NO. 8:**

Before April 1998, Callaway employed a price-matching program to combat the gray marketing of its products

**RESPONSE:**

Plaintiffs object that the term "price-matching program" is undefined and the date and details of Callaway's alleged plan are not included. After a reasonable inquiry, plaintiffs have insufficient knowledge to admit or deny whether Callaway had such a program, but admit that Pratt wrote that "Callaway, Taylor Made and Ping either match the pricing of Costco to its accounts or go to Costco and purchase all of the product." MCK 00093. See also ADAMS 009406.

**REQUEST FOR ADMISSION NO. 9:**

Before April 1998, Titleist employed a price-matching program to combat the gray marketing of its product.

**RESPONSE:**

Plaintiffs incorporate by reference objections to Request No.8, as to Titleist. After reasonable investigation, plaintiffs are without information on whether Titliest did any price matching and therefore neither admit nor deny the request.

408156                                     5

**REQUEST FOR ADMISSION NO. 10:**

Before April 1998, Ping employed a price-matching program to combat the gray marketing of its products.

**RESPONSE:**

Plaintiffs incorporate by reference objections and answer to Request No. 8, as to Ping.

**REQUEST FOR ADMISSION NO. 11:**

Before April 1998, Taylor Made employed a price-matching program to combat the gray marketing of its product.

**RESPONSE:**

Plaintiffs incorporate by reference objections and answer to Request No. 8, as to Taylor Made.

**REQUEST FOR ADMISSION NO. 12:**

When Adams Golf began production of the Tight Lies club in 1995, it featured a unique design unlike any other club on the market at that time.

**RESPONSE:**

Plaintiffs object to Request 12 because it is vague and ambiguous in claiming a "unique

design". After reasonable inquiry, plaintiffs have insufficient knowledge as to whether the Tight

Lies was unique and unlike any other club on the market in 1995, although Adams Golf claimed

it had a unique design, and therefore neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 13:**

During the Class Period, Adams Golf did not have access to Costco's contemporaneous inventory records of Adams Golf clubs in its distribution warehouses.

**RESPONSE:**

Plaintiffs object to the word "access" and "its" as vague and ambiguous, and object to the

request as irrelevant, since the only relevant time is before the IPO not during the Class Period

408156                                6

Notwithstanding this objection, and after a reasonable inquiry, plaintiffs have insufficient

knowledge to admit or deny Request 13, because they do not know if Adams had access to

Costco's records, since defendants have admitted they were in contact with Costco, and

defendants could have sued or subpoenaed Costco in Washington (alleging intentional

interference with contractual relations or similar grounds) to get such access.

### REQUEST FOR ADMISSION NO. 14:

During the Class Period, Adams Golf did not have access to Costco's contemporaneous
inventory records of Adams Golf clubs available for sale in its stores.

### RESPONSE:

See response to Request 13.

### REQUEST FOR ADMISSION NO. 15:

Sales to Adams Golf's Canadian distributor in 1998 were less than three percent of
Adams Golf's total sales in 1998.

### RESPONSE:

Plaintiffs object to this request because it is vague and ambiguous. Plaintiffs admit that

for the 1998 year, Adams's sales to Mackenzie were approximately 3% of Adams Golf's total

sales in dollars.

### REQUEST FOR ADMISSION NO. 16:

WDC Mackenzie reported the presence of Adams Golf Tight Lies clubs in Costco stores
as soon as it was knowable.

### RESPONSE:

Plaintiffs object to this Request as vague and ambiguous, because of the words "as soon

as it was knowable." Subject to and without waiver of this objection, plaintiffs, after reasonable

inquiry cannot admit or deny this request, because plaintiffs do not know when the first Tight

Lies appeared in a Costco store in Canada, although apparently Costco had ordered clubs well before Mackenzie discovered them. See COST 0005.

**REQUEST FOR ADMISSION NO. 17:**

As of July 1998, WDC Mackenzie owed Adams Golf $707,461, of which $696,073 was more than 60 days outstanding.

**RESPONSE:**

Plaintiffs object to this Request as neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of this objection, plaintiffs after reasonable investigation are without knowledge or information sufficient to admit or deny this request, because Adams Golf's accounting numbers apparently did not match Mackenzie's numbers. See Exhibit 47.

**REQUEST FOR ADMISSION NO. 18:**

The document Bates-labeled ADAMS 004005 reflects the reasons for return of Adams Golf clubs in 1998.

**RESPONSE:**

Plaintiffs object that this request is vague and misleading. Admitted in part and denied in part. Plaintiffs admit that document 004005 imprecisely states some of the reasons for returns in the last six months of 1998, but deny that the document reflects all of "the reasons", or that it refers to all of the year 1998.

**REQUEST FOR ADMISSION NO. 19:**

In 1998, shipping errors occurred in the normal course of Adams Golf's business.

**RESPONSE:**

Plaintiffs object to this Request as vague and ambiguous. Defendants have not supplied any examples of such errors. After reasonable inquiry, plaintiffs are without knowledge or

408156                                    8

information sufficient to form a belief as to whether shipping errors occurred in the course of

Adams's business, and therefore neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 20:**

KPMG LLP audited and approved Adams Golf's financial statements in the S-1.

**RESPONSE:**

Plaintiffs admit that KPMG LLP audited Adams Golf's financial statements, but deny that the auditors "approved" them. The Registration Statements speaks for itself.

**REQUEST FOR ADMISSION NO. 21:**

KPMG LLP audited and approved Adams Golf's financial statement in 1998 Form 10-K filed with the SEC.

**RESPONSE:**

Plaintiffs admit that KPMG LLP audited Adams Golf's financial statements, but deny

that the auditors "approved" them. The Form 10-K Statement speaks for itself.

**REQUEST FOR ADMISSION NO. 22:**

No retailers reported receiving double shipments of Tight Lies clubs in their accounts receivable confirmations sent to KPMG LLP.

**RESPONSE:**

Plaintiffs object that this Request is vague in that it gives no date and does not identify

the "accounts receivable confirmations sent to KPMG." Plaintiffs further object that the request

is misleading, because it implies that retailers were asked about double shipping. Plaintiffs

admit that the accounts receivable confirmations produced by KPMG which were sent out in

April of 1998 and which reflect payments as of December 31, 1998, (KPMG 0048 to 0070) do

not report double shipping since they do not request that the retailers or distributors report

double-shipping. The confirmations merely ask if Adams's records of payments, charges and

amounts due are correct.

## REQUEST FOR ADMISSION NO. 23:

In interviews conducted by representatives of the underwriters, no retailer reported receiving double shipments of Tight Lies clubs.

## RESPONSE:

Plaintiffs object that this Request is vague in that it gives no dates and fails to identify the "interviews conducted by the underwriters." Plaintiffs further object that it is misleading because it implies that retailers were asked about double shipping. After reasonable inquiry, plaintiffs are without knowledge or information sufficient to form a determination as to the truth of the matters set forth in this request, and therefore neither admit or deny this request. Plaintiffs do not know what retailers may have said in the interviews, and the interview form does not ask about double shipping. Plaintiffs have only answered with regard to Ex. 161, but there may well have been further interviews at a later time in 1998. Moreover, the interviews took place in April, well before the IPO. (Ex. 161).

## REQUEST FOR ADMISSION NO. 24:

The amount allocated in Adams Golf's return reserves in 1998 was sufficient to cover returns received in 1998.

## RESPONSE:

Plaintiffs object to this request in that it calls for an expert opinion. Subject to and without waiver of this objection, and after a reasonable inquiry, plaintiffs are without knowledge or information sufficient to admit or deny this request, since they do not know if Adams accurately reported its returns from retailers and distributors. Plaintiffs admit that the reported reserves were adequate to cover the reported returns over the entire year. See also Lynch and Rainwater depositions.

408156                                    10

**REQUEST FOR ADMISSION NO. 25:**

Actual returns may differ from estimated returns, but the return reserve may still comply with Generally Accepted Accounting Principles.

**RESPONSE:**

Plaintiffs object to this request on the grounds that it is vague and overbroad; because it is hypothetically stated and not linked to any specific facts; and because it provides an insufficient basis for formulation of a meaningful answer. Plaintiffs admit that in some circumstances the request may be true.

**REQUEST FOR ADMISSION NO. 26:**

During the Class Period, Adams Golf had a no-questions-asked, 90-day return policy.

**RESPONSE:**

Plaintiffs object to this request because it does not specify who would be bound by the return-policy and because the return policy for direct sales is irrelevant to this case. Admitted in part and denied in part. Plaintiffs admit that the Adams Golf Prospectus contained Notes to the Consolidated Financial Statements which stated, "the Company has a 90 day 'no questions asked' return policy" and that Dallas Rainwater apparently told KPMG that this was the policy (KPMG 0502). After a reasonable inquiry, plaintiffs believe this policy applied only to direct response sales and did not apply to the distributors and retailers Adams sold to, and therefore deny this Request in part. See Exhibit 86, 255, KPMG, 0503; Lynch and Rainwater Deposition Transcripts; response to Request 27.

**REQUEST FOR ADMISSION NO. 27:**

You do not dispute in this litigation that Adams Golf's return policy was truly and accurately described in the Registration Statement.

**RESPONSE:**

Plaintiffs object that this Request is irrelevant because the return policy described in the Registration Statement did not apply to returns from distributors and retailers. Admitted as to Adams return policy for clubs sold directly through its infomercials, but denied for clubs sold to retailers or distributors. While Adams claimed Retailers and distributors had no right of return, or had to get permission for returns, in fact Adams had a well established "practice" of returns that rendered Adams's description of its return policy misleading. See Lynch Deposition Transcript and answer to Request 26.

**REQUEST FOR ADMISSION NO. 28:**

Adams Golf's return reserves in 1998 were based on historical trends.

**RESPONSE:**

Plaintiffs object to this request as vague and ambiguous. Subject to and without waiver of this objection, and after a reasonable inquiry, plaintiffs admit that Adams Golf personnel alleged they considered 1997 returns when formulating 1998 return reserves, but Rainwater testified that he did not know the basis for the percent of sales numbers that determined the reserves.

**REQUEST FOR ADMISSION NO. 29:**

Orlimar introduced its Trimetal club in February 1998.

**RESPONSE:**

Plaintiffs object that the Request does not identify the source of this statement. After a reasonable inquiry, plaintiffs are without knowledge or information sufficient to form a determination of the truth of the matters set forth in this request, but admit that Olimar introduced the Trimetal before April 1998, since Golf Datatech did not begin to show Olimar sales until April 1998. (Adams 006543).

408156                                    12

**REQUEST FOR ADMISSION NO. 30:**

Orlimar's Trimetal had a design similar to that of Adams Golf's Tight Lies club, featuring a shallow club face.

**RESPONSE:**

Plaintiffs object to this request as vague and ambiguous. Subject to and without waiver of this objection, plaintiffs admit that Olimar Trimetals were in some respects similar to Adams Tight Lies clubs

**REQUEST FOR ADMISSION NO. 31:**

Callaway introduced Big Bertha Steelhead club in August 1998.

**RESPONSE:**

Plaintiffs object to this request as vague and ambiguous, in that it does not define the term "introduced." Subject to and without waiver of this objection, plaintiffs admit that the Callaway Big Bertha Steelhead clubs were first sold in August 1998. See Adams 006543.

**REQUEST FOR ADMISSION NO. 32:**

Callaway's Big Bertha Steelhead had a design similar to that of Adams Golf's Tight Lies club, featuring a shallow club face.

**RESPONSE:**

Plaintiffs object to this request as vague and ambiguous. Subject to and without waiver of this objection, denied, because underwriter reports describing the Callaway product differentiated the design of the club from the design of Adams's products. See Adams 004077 and UND 08538.

**REQUEST FOR ADMISSION NO. 33:**

In the third quarter of 1998, Callaway's sales were down 32% from the second quarter of 1998 and down 82% from the third quarter of 1997.

**RESPONSE:**

Plaintiffs object that defendants have mis-cited Callaway's October 21, 1998 press

release. Denied. On October 21, 1998 in a press release, Callaway reported that net sales for the

3rd quarter of 1998 decreased by 32.8% from net sales in the 3rd quarter of 1997.

**REQUEST FOR ADMISSION NO. 34:**

Even prior to the IPO, the golf equipment industry suffered from oversupply of inventory
at the retail level.

**RESPONSE:**

Plaintiffs admit that Adams asserted that oversupply at the retail level existed before the

IPO. See Plaintiffs' Consolidated Amended Complaint.

**REQUEST FOR ADMISSION NO. 35:**

You do not contend that the historical financial statements contained in Adams Golf's
Registration Statement were false or misleading.

**RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 36:**

Adams Golf did not consider the presence of some unknown number of Tight Lies golf
clubs in certain Costco stores through July 1998 to be a material risk to its business at the time of
the IPO.

**RESPONSE:**

Plaintiffs object that this request is vague, ambiguous, misleading and overbroad and

assumes that a company can "consider". The request is also irrelevant since what the Company

"considered" is irrelevant under §§ 11 and 12 of the Securities Act. Subject to and without

waiver of that objection, after a reasonable inquiry plaintiffs deny this request. The materiality of

the risk is a genuine issue for trial. Some officers of Adams Golf considered gray marketing,

408156                                      14

including the presence of Tight Lies in Costco stores to be a serious problem. See, for example,

Exhibit 257, and expert reports of Ochoa. Plaintiffs are without knowledge as to what "Adams

Golf" considered.

### REQUEST FOR ADMISSION NO. 37:

The Underwriters did not consider the presence of some unknown number of Tight Lies
golf clubs in Costco stores through July 1998 to be a material risk to Adams Golf's business at
the time of the IPO.

### RESPONSE:

Plaintiffs object to this request as vague, misleading and ambiguous in that it lumps all

the underwriters together. Subject to and without waiver of that objection, after a reasonable

inquiry plaintiffs deny this request. The materiality of the risk is a genuine issue for trial.

### REQUEST FOR ADMISSION NO. 38:

In the due-diligence process, Adams Golf management and the Underwriters discussed
the presence of Tight Lies golf clubs in certain Costco stores in spring of 1998.

### RESPONSE:

Plaintiffs object to this request as vague and ambiguous in that "due diligence process" is

undefined. Subject to and without waiver of that objection, plaintiffs state they are not aware of

any contemporaneous writing or notes taken at due diligence meetings mentioning a discussion

of gray marketing or Costco. Moreover, the main due diligence meetings took place in April,

before the full risks had materialized. Accordingly, after reasonable inquiry, plaintiffs have

insufficient knowledge to admit or deny this request, but admit that Pulido-Crowe and Washburn

testified about superficial discussions of the gray market issue even though the memory of each

of them was generally very poor with respect to the IPO. See responses to underwriter

interrogatories, and Washburn and Pulido-Crowe deposition Transcripts.

**REQUEST FOR ADMISSION NO. 39:**

Gray marketing was experienced by major golf-club manufacturers, including Callaway, Taylor Made, Ping, Titleist, Orlimar, and Cobra

**RESPONSE:**

Plaintiffs object that there is no time frame and that the words "gray marketing was experienced" are vague and ambiguous. Plaintiffs admit that at differing times between 1992 and the autumn of 1998, Callaway, Taylor Made, Ping, and Orlimar experienced some amount of gray marketing, but that such gray marketing impacted each company in different ways, at different times, and triggered different responses. After a reasonable inquiry, plaintiffs are without knowledge sufficient to admit or deny this request as to Titleist and Cobra. Pratt testified that Titleist had few problems because Titleist enforced its contracts with retailers and was able to identify transshippers easily. Pulido-Crowe did not remember specific problems at Cobra. Pulido-Crowe dep. pp. 27, 163

**REQUEST FOR ADMISSION NO. 40:**

Before the IPO, the only complaints that Adams Golf received from Tight Lies appearing in Costco stores were from its Canadian distributor, WDC Mackenzie, and 9 U.S.-based retailers.

**RESPONSE:**

Plaintiffs object to this request as vague and ambiguous and object that the document containing calls from retailers before the IPO was not produced to plaintiffs until well after these Requests were issued. Denied. See Ex. VII to Grace Report. See Adams 064813. There is no evidence that the list of customer calls contains all calls or all complaints about Costco. Many complaints may have been made orally to salesmen, or in calls, emails or faxes that have been forgotten, lost, never written down or destroyed. Many complaints from retailers received by Mackenzie were relayed to Adams Golf's Beebe and Gonsalves. Defendants' own expert Grace

408156                                        16

lists more than 9 complaints in the document attached to his expert report, and his list is

incomplete.

## REQUEST FOR ADMISSION NO. 41:

In April 1998, WDC Mackenzie expressed to Chris Beebe that it did not feel a price-matching program was necessary at that time.

## RESPONSE:

Plaintiffs object that this request is incomplete and misleading. Plaintiffs admit that

Beebe's notes taken at a meeting with Mackenzie on April 28, 1998 reflect that "Feeling is that

most Costco's are out of most Tight Lies, so there is no reason to do anything in terms of price

support  However, we need to put a plan in place in case this occurs again . . ." Ex. 19, 84.

Deposition transcripts of Pratt and Magnussen.

## REQUEST FOR ADMISSION NO. 42:

None of the Adams Golf retailers or distributors contacted by the Underwriters in the pre-IPO due-diligence process expressed concern about the presence of Tight Lies clubs appearing in certain Costco stores during the spring through July 1998.

## RESPONSE:

Plaintiffs object that this request is misleading because it implies that retailers were asked

about Costco, and because the calls took place before the major influx of clubs into Costcos in

the U.S.A. Plaintiffs, after reasonable investigation, are without knowledge sufficient to form a

determination of the truth of the averment and therefore neither admit nor deny the same, because

plaintiffs were not privy to these conversations. Plaintiffs further state that to their knowledge

the underwriters did not ask retailers or distributors any specific questions regarding gray

marketing or Costco distribution of Adams products, and those interviews took place in April,

before the widespread presence of Adams clubs in Costco stores in the United States.

Apparently, the underwriters did not contact Mackenzie. See Exhibit 161; Pulido-Crowe

Deposition, pp. 31, 76.

**REQUEST FOR ADMISSION NO. 43:**

Before the IPO, Adams Golf received more than 14,000 telephone calls from retailers and only 9 of these complaints concerned Tight Lies clubs appearing in certain Costco stores.

**RESPONSE:**

Plaintiffs object to the word "complaints" as misleading, vague and ambiguous, and

object that the documents showing the calls were not produced to plaintiffs at the time these

Requests were made. Denied as stated. Most of the 14,000 calls were not "complaints."

Mackenzie received 10-25 calls per day complaining about Tight Lies in Costco stores. Ex. 6.

These calls were relayed to Adams Golf. See response to Request No. 40.

**REQUEST FOR ADMISSION NO. 44:**

The SEC asked Adams Golf to consider disclosing the Costco matter in its Registration Statement.

**RESPONSE:**

Plaintiffs admit that the SEC asked Adams Golf's lawyers to have the Company consider

disclosing the "Costco matter" (meaning the action filed against Costco) in Adams Golf's

Registration Statement. See Exs. 90, and 124.

**REQUEST FOR ADMISSION NO. 45:**

Adams Golf did not specifically disclose the Costco matter in its Registration Statement.

**RESPONSE:**

Plaintiffs object that the term "Costco matter" and the word "specifically" are vague and

ambiguous. Plaintiffs admit that Adams Golf did not disclose the risk of gray marketing, the

presence of Tight Lies for sale at Costco or the action Adams filed against Costco in its

408156                                    18

Registration Statement.

## REQUEST FOR ADMISSION NO. 46:

The SEC approved Adams Golf's Registration Statement, which did not specifically disclose the Costco matter.

## RESPONSE:

Denied. The SEC neither approved nor disapproved of the Registration Statement, which states in bold on the front, "These Securities have not been approved or disapproved by the Securities and Exchange Commission. . .nor has the Securities and Exchange Commission. . . passed upon the accuracy or adequacy of this Prospectus. Any representation to the contrary is a criminal offense."

## REQUEST FOR ADMISSION NO. 47:

Cobra did not list gray marketing as a specific risk factor in its IPO Registration Statement.

## RESPONSE:

Plaintiffs object that Adams Golf Defendants have not provided Cobra's Registration Statement, provided the date it was issued, nor, to plaintiffs' knowledge, produced it in this litigation. There is no evidence that Cobra was experiencing gray marketing at the time of its 1992 or 1993 IPO. See Pulido-Crowe deposition. Accordingly, after reasonable inquiry, plaintiffs are without knowledge sufficient to admit or deny this request.

## REQUEST FOR ADMISSION NO. 48:

Callaway did not list gray marketing as a specific risk factor in its IPO Registration Statement.

## RESPONSE:

Plaintiffs incorporate their objection and response to Request 47, as to Callaway.

408156                          19

Plaintiffs admit that Callaway listed gray marketing as a risk factor repeatedly in its 1997 (and

earlier) Forms 10-K filed with the SEC and in its Annual Reports to Shareholders.

## REQUEST FOR ADMISISON NO. 49:

After the IPO through the end of July 1998, there were no new public reports – through
press releases, news and analyst reports, or SEC filings – about the presence of Tight Lies in
certain Costco Stores.

## RESPONSE:

Denied. Tight Lies were present in numerous Costco stores, on public display giving

notice to all shoppers. The Golf Pro article may have been released before August 1st, and

Magnussen testified that public disclosure occurred in this period. See Magnussen Deposition

Transcript, and Reports of Alan Miller.

## REQUEST FOR ADMISSION NO. 50:

The Lehman analyst report published August 28, 1998, was not associated with a
statistically significant stock-price decline within a two-day window at the 95% confidence level.

## RESPONSE:

Objection. This request is misleading and incomplete  The Lehman analyst report,

though it mentioned Costco, close to the end of the report, was, overall, a very positive report

designed to convince investors to buy the stock. That the stock declined shows how important the

mention of gray marketing was. See Reports of Alan Miller. Notwithstanding other objections,

Plaintiffs admit that according to Dr. James's calculations, the price drop associated with the

publication of the August 28, 1998 Lehman report was not statistically significant at the 95%

confidence level.

## REQUEST FOR ADMISSION NO. 51:

The Golf Pro article published August 1, 1998, was not associated with a statistically
significant stock-price decline within a two-day window at the 95% confidence level.

**RESPONSE:**

Plaintiffs object that this request is misleading and premised on an unproven fact. After

reasonable investigation plaintiffs neither admit nor deny this request. There is no reason to

believe that Golf Pro, which was mailed to golf shops and others in the golf business, would have

had a two-day window, nor is there knowledge that Golf Pro became available to the general

public on August 1, 1998. As it was mailed, it probably arrived at different locations on different

days. See Reports of Alan Miller.

**REQUEST FOR ADMISSION NO. 52:**

You do not have evidence of any Internet chat-room discussion in July 1998 about Tight
Lies appearing in Costco stores

**RESPONSE:**

Plaintiffs object that the phrase "have evidence" is vague and ambiguous with respect to

internet information, but plaintiffs admit that they presently have no such evidence.

**REQUEST FOR ADMISSION NO. 53:**

You do not have evidence of any Internet chat-room discussion in August 1998 about
Tight Lies appearing in Costco stores.

**RESPONSE:**

See objections and response to Request 52.

**REQUEST FOR ADMISSION NO. 54:**

Orlimar's Trimetal club took market share away from Adams Golf in the spring and

summer of 1998.

**RESPONSE:**

Plaintiffs object that this request is misleading in that it assumes causation, when none

can be proven. After reasonable inquiry, plaintiffs have insufficient knowledge to admit or deny

408156                                    21

this request. Plaintiffs do not admit this request because it implies causation, rather than simply

reciting the percents of market shares of the two companies. See Golf Data Tech , Adams

006676-77. Plaintiffs admit that in the face of price competition from Costco, some retailers

shifted to Orlimar.

Dated: August 24, 2006

<div style="margin-left: 40%">

As to Objections:
**ROSENTHAL, MONHAIT & GODDESS, P.A.**

By: *Carmella P. Keener*

Carmella P. Keener (DSBA No. 2810)
Suite 1401, Citizens Bank Center
P.O. Box 1070
Wilmington, DE 19899
(302) 656-4433
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs and the Class*

</div>

**BERGER & MONTAGUE, P.C.**
Todd S. Collins
Elizabeth Fox
Neil F. Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
Lead Counsel for Plaintiffs and the Class

408156                        22

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE ADAMS GOLF, INC. | : | CONSOLIDATED |
| SECURITIES LITIGATION | : | C.A. NO. 99-371 KAJ |

### NOTICE OF SERVICE

PLEASE TAKE NOTICE that the undersigned hereby certifies that she caused copies of the following documents:

1.    This Notice of Service; and

2.    Plaintiffs' Amended and Supplemented Responses to Adams Golf Defendants First Request for Admissions to Plaintiffs

to be served on August 24, 2006, by hand delivery upon the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

and by electronic mail upon the following:

Theodore McEvoy, Esquire (tmcevoy@stblaw.com)
Elaine Divelbliss, Esquire (edivelbliss@stblaw.com)
Michael J. Chepiga, Esquire (mchepiga@stblaw.com)
Paul R. Bessette, Esquire (pbessette@akingump.com)
Jennifer R. Brannen, Esquire (jbrannen@akingump.com)

ROSENTHAL, MONHAIT & GODDESS, P.A.

By: /s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Citizens Bank Building
Wilmington, DE 19899-1070
(302) 656-4433
ckeener@rmgglaw.com

*Delaware Liaison Counsel for Plaintiffs*

EXHIBIT 417

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE ADAMS GOLF SECURITIES | : | CONSOLIDATED |
| LITIGATION | : | C.A. No. 99-371-KAJ |
| | : | |

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO
## DEFENDANT ADAMS GOLF'S THIRD SET OF INTERROGATORIES
## DIRECTED TO CLASS REPRESENTATIVES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs hereby

submit the following responses and objections to Defendant Adams Golf's Third Set of

Interrogatories Directed to Class Representatives ("Interrogatories"). Plaintiffs reserve the right

to supplement their responses and objections. The failure to object to any request does not waive

any general or specific objections or privilege.

## GENERAL OBJECTIONS TO INTERROGATORIES

1.    Plaintiffs specifically reserve the right to make any use of, or introduce at any

hearing or at trial, information or documents responsive to Defendants' Interrogatories but

discovered, analyzed, used, or made available subsequent to the date of the responses.

2.    Plaintiffs specifically reserve all objections or other issues with respect to any

question as to the competency, relevance, materiality, privilege or admissibility of any evidence

for trial.

3.    Plaintiffs object to all of the Interrogatories on the ground that they are premature

at this stage of the litigation. Defendants continue to produce substantial and substantive

documents even after the beginning of deposition discovery on May 2, 2006. The parties are

currently in the middle of an intense and contracted deposition discovery period, with many

probative depositions to be taken prior to the June 30, 2006 discovery deadline. Plaintiffs

their responses at the conclusion of discovery and/or in connection with plaintiffs' submission of pretrial materials, including but not limited to the pretrial order.

    4.    Plaintiffs object to any interrogatory as unduly burdensome, harassing, cumulative and duplicative to the extent that it seeks the production of any document or information previously produced by Plaintiffs, or as to which they previously objected, in this litigation.

    5.    Plaintiffs object to Defendants' definitions, instructions, and interrogatories to the extent that they seek information or the production of documents protected from discovery by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or doctrine on the grounds that such documents or information are not properly discoverable under the Federal Rules of Civil Procedure.

    6.    Any inadvertent disclosure of any document or information shall not constitute a waiver of any of Plaintiffs' rights or privileges, and Plaintiffs reserve the right to demand and obtain the return of any such document or information and all copies thereof. If the production of any document or information is deemed to be a waiver of any right or privilege, the waiver shall be a limited waiver relating to that document or information only.

    7.    Plaintiffs object to Defendants' definitions, instructions, and interrogatories to the extent that they seek to impose any burdens, obligations or duties beyond those set forth in the Federal Rules of Civil Procedure and the District of Delaware Local Rules.

    8.    Plaintiffs object to Defendants' definitions, instructions, and interrogatories to the extent that it seeks information already in the possession of Defendants and as to which Defendants have access greater than or equal to Plaintiffs'.

9.    Plaintiffs object to Defendants' definitions, instructions, and interrogatories to the extent that the information sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive, as is prohibited by the Federal Rules of Civil Procedure.

10.    Plaintiffs object to Defendants' definitions, instructions, and interrogatories to the extent that they purport to require searches of files and the production of documents or information in the possession, custody or control of third parties.

11.    Plaintiffs object to Defendants' interrogatories as overly broad and unduly burdensome to the extent that they seek production of "all" documents or information concerning a specific subject.

12.    Plaintiffs object to Defendants' definitions, instructions, and interrogatories to the extent that they are vague, ambiguous, overly broad, unduly burdensome, or seek information that is not relevant to any party's claim or defense or to the subject matter of this litigation.

13.    Plaintiffs object to Defendant's interrogatories to the extent that they are duplicative of prior discovery requests.

14.    Each of these general objections is incorporated by reference into each of the specific responses set forth below, which responses Plaintiffs make without waiver of any of these general objections.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 1

Identify in chronological order each and every alleged material misstatement made by any defendant that forms the basis of your claims under Section 11 or Section 12(a)(2) of the 1933 Act or

3

any other securities provision. Your response should include: (1) a detailed description of the alleged misstatement; (2) the date of the alleged misstatement; and (3) the person who made the alleged misstatement.

RESPONSE TO INTERROGATORY NO. 1

In addition to the general objections, Plaintiffs object to this interrogatory pursuant to Rule 33(c) of the Federal Rules of Civil Procedure on the grounds that it is premature at this stage of the litigation as discovery is ongoing. Numerous depositions have been taken in the past three weeks, and many others are scheduled before the June 30, 2006 expiration of the discovery period. In addition to preparing for scheduled depositions and analyzing just-obtained deposition transcripts (while awaiting the arrival of transcripts from depositions taken within days of these responses), Plaintiffs continue to receive late (and substantial) document productions from defendants, including documents produced in the last two weeks and since the beginning of deposition discovery on May 2, 2006. Plaintiffs reserve the right to supplement and/or amend this response at the conclusion of discovery in this case.

Under Section 11, all misstatements were made simultaneously by all defendants on July 9, 1998 and thereafter in the Registration Statement. Under Section 12 (a)(2), Lehman Brothers made material misstatements on July 9, 1998 in the Prospectus. As to misstatements by Lehman in other communications, plaintiffs will supplement this answer promptly at the close of discovery.

As to the alleged misstatements, Plaintiffs refer defendants to the detailed allegations in the following paragraphs in the Second Consolidated and Amended Class Action Complaint ("SAC"): ¶ ¶22-23, ¶¶ 25-37, ¶ ¶ 41-65, ¶¶ 71-80, ¶¶ 89-91.

4

INTERROGATORY NO. 2

Identify in chronological order each and every alleged omission of material fact that forms the basis of your claims under Section 11 or Section 12(a)(2) of the 1933 Act or any other securities provision. Your response should include a detailed description of the alleged omission (*i.e.*, the specific material fact(s) you claim were not disclosed) and the specific defendant or defendants who allegedly had a duty to disclose such information.

RESPONSE TO INTERROGATORY NO. 2

In addition to the general objections, Class Plaintiffs object to this interrogatory pursuant to Rule 33(c) of the Federal Rules of Civil Procedure on the grounds that it is premature at this stage of the litigation as discovery is ongoing. Numerous depositions have been taken in the last three weeks, and many others are scheduled before the June 30, 2006 expiration of the discovery period. In addition to preparing for scheduled depositions and analyzing just-obtained deposition transcripts (while awaiting the arrival of transcripts from depositions taken within days of these responses), Plaintiffs continue to receive late (and substantial) document productions from defendants, including documents produced in the last two weeks and since the beginning of deposition discovery on May 2, 2006. Plaintiffs reserve the right to supplement and/or amend this response at the conclusion of discovery in this case.

Under Section 11, all omissions were made simultaneously by all defendants on July 9, 1998 and thereafter in the Registration Statement. Under Section 12 (a)(2), Lehman Brothers made material misstatements on July 9, 1998 in the Prospectus. As to misstatements by Lehman in other communications, plaintiffs will supplement this answer promptly at the close of discovery.

5

Each of the defendants had a duty to disclose the material facts alleged to have been omitted from the Registration Statement and the Prospectus.

As to the alleged omissions, Plaintiffs refer defendants to the detailed allegations in the following paragraphs in the SAC: ¶ 22; ¶ 23; ¶¶ 25-30; ¶¶ 38-41; ¶¶ 63-64, ¶¶ 71-80; ¶¶ 89-91.

INTERROGATORY NO. 3

For each alleged material misstatement and omission identified in your responses to Interrogatory Nos. 1 and 2, describe all facts that support your contention that the alleged misstatement or omitted fact(s) were material.

RESPONSE TO INTERROGATORY NO. 3

In addition to the general objections, Plaintiffs object to this interrogatory pursuant to Rule 33(c) of the Federal Rules of Civil Procedure on the grounds that it is premature at this stage of the litigation as discovery is ongoing. Numerous depositions have been taken in the last three weeks, and many others are scheduled before the June 30, 2006 expiration of the discovery period. In addition to preparing for scheduled depositions and analyzing just-obtained deposition transcripts (while awaiting the arrival of transcripts from depositions taken within days of these responses), Plaintiffs continue to receive late (and substantial) document productions from Defendants, including documents produced in the last two weeks and since the beginning of deposition discovery on May 2, 2006. Plaintiffs reserve the right to supplement and/or amend this response at the conclusion of discovery in this case.

Plaintiffs refer defendants to the following paragraphs in the SAC: ¶¶ 22-23; ¶¶ 28-29; ¶35; ¶¶ 38-41; ¶¶ 44-45; ¶¶ 48-49; ¶¶ 51-54; ¶ 56; ¶¶ 58-80. Plaintiffs are continuing to analyze all documents produced, all exhibits marked to date at depositions (May 2, 2006- May 22, 2006), and all

6

deposition transcripts to uncover further such facts. In addition, expert reports are due in July, and materiality may be a subject of expert opinion.

INTERROGATORY NO. 4

For each alleged material misstatement or omission identified in your responses to Interrogatory Nos. 1 and 2, describe all facts that support your contention that the alleged misstatement or omission caused damages.

RESPONSE TO INTERROGATORY NO. 4

In addition to the general objections, Class Plaintiffs object to this interrogatory pursuant to Rule 33(c) of the Federal Rules of Civil Procedure on the grounds that it is premature at this stage of the litigation as discovery is ongoing. Numerous depositions have been taken in the last three weeks, and many others are scheduled before the June 30, 2006 expiration of the discovery period. In addition to preparing for scheduled depositions and analyzing just-obtained deposition transcripts, (while awaiting the arrival of transcripts from depositions taken within days of these responses) Plaintiffs continue to receive late document productions from defendants, including documents produced in the last two weeks and since the beginning of deposition discovery on May 2, 2006. Plaintiffs reserve the right to supplement and/or amend this response at the conclusion of discovery in this case.

Plaintiffs also object to this interrogatory on the grounds that it calls for legal arguments and conclusions and for premature disclosure of matters that are the subject of expert testimony.

Subject to and without waiver of the General Objections, which are incorporated herein, Plaintiffs refer defendants to the detailed allegations in the following paragraphs in the SAC: ¶¶ 25-93; ¶¶ A-E of the "Wherefore" Clause. Plaintiffs are continuing to analyze all documents produced, all exhibits marked

7

to date at depositions (May 2, 2006- May 22, 2006), and all deposition transcripts to uncover further

such facts. In addition, expert reports are due in July, and damages may be a subject of expert opinion.

INTERROGATORY NO. 5

For all damages identified in your responses to interrogatory No. 4, describe all facts that

support your contention that the alleged damages were not caused by something other than the alleged

misstatement or omission.

RESPONSE TO INTERROGATORY NO. 5

In addition to the general objections, Plaintiffs object to this interrogatory pursuant to Rule

33(c) of the Federal Rules of Civil Procedure on the grounds that it is premature at this stage of the

litigation as discovery is ongoing. Numerous depositions have been taken in the last three weeks, and

many others are scheduled before the June 30, 2006 expiration of the discovery period. In addition to

preparing for scheduled depositions and analyzing just-obtained deposition transcripts, (while awaiting

the arrival of transcripts from depositions taken within days of these responses) Plaintiffs continue to

receive late document productions from defendants, including documents produced in the last two

weeks and since the beginning of deposition discovery on May 2, 2006. Plaintiffs reserve the right to

supplement and/or amend this response at the conclusion of discovery in this case.

Plaintiffs further object to this interrogatory to the extent it suggests that it is necessary for

Plaintiffs to prove that the alleged damages were not caused by something other than the alleged

misstatements or omissions. Defendants bear the burden of proof on this issue. In addition, expert

reports are due in July, and causation may be a subject of expert opinion.

8

INTERROGATORY NO. 6

For each alleged omission identified in your response to Interrogatory No. 2, describe all facts supporting your contention that each Defendant did not make a reasonable investigation or have reasonable ground to believe and did believe as of the Effective Date that the statements in the Adams Golf Registration Statement were true and that there was no omission to state a material fact required to be stated or necessary to make the statements therein not misleading.

RESPONSE TO INTERROGATORY NO. 6

In addition to the general objections, Plaintiffs object to this interrogatory pursuant to Rule 33(c) of the Federal Rules of Civil Procedure on the grounds that it is premature at this stage of the litigation as discovery is ongoing. Numerous depositions have been taken in the last three weeks, and many others are scheduled before the June 30, 2006 expiration of the discovery period. In addition to preparing for scheduled depositions and analyzing just-obtained deposition transcripts, (while awaiting the arrival of transcripts from depositions taken within days of these responses), Plaintiffs continue to receive late document productions from defendants, including documents produced in the last two weeks and since the beginning of deposition discovery on May 2, 2006. Plaintiffs reserve the right to supplement and/or amend this response at the conclusion of discovery in this case.

Plaintiffs refer defendants to the following paragraphs in the SAC: ¶ 23-29; ¶¶ 31-32, ¶¶ 34-36; ¶¶ 38-40; ¶¶ 42-52; ¶¶ 53-65; ¶¶ 66-69; ¶¶ 71-80. In addition, expert reports are due in July, and standards of reasonable investigation and due diligence may be a subject of expert opinion.

9

INTERROGATORY NO. 7

For each alleged omission identified in your response to Interrogatory No. 2, describe all facts supporting your contention that each Defendant had a duty to disclose the omitted fact(s) (*i.e.*, the exact statute or law requiring disclosure or the precise statement in the Adams Golf Registration Statement that was somehow made false or misleading by the alleged omission) and the exact date you claim any such duty arose.

RESPONSE TO INTERROGATORY NO. 7

In addition to the general objections, Class Plaintiffs object to this interrogatory pursuant to Rule 33(c) of the Federal Rules of Civil Procedure on the grounds that it is premature at this stage of the litigation as discovery is ongoing. Numerous depositions have been taken, and many others are scheduled before the June 30, 2006 expiration of the discovery period. In addition to preparing for scheduled depositions and analyzing just-obtained deposition transcripts, (while awaiting the arrival of transcripts from depositions taken within days of these responses), Plaintiffs continue to receive late document productions from defendants, including documents produced in the last two weeks and since the beginning of deposition discovery on May 2, 2006. Plaintiffs reserve the right to supplement and/or amend this response at the conclusion of discovery in this case.

Plaintiffs further object to this interrogatory on the grounds that it is overly broad and unduly burdensome, particularly at the present stage of discovery. Plaintiffs also object to this interrogatory on the grounds that it calls for legal arguments and conclusions.

Defendants bore duties to disclose under Securities Act §§ 11, 12(a)(2), and 15, as signatories, solicitors, controlling persons, and underwriters.

10

Plaintiffs refer Defendants to the following paragraphs of the SAC: ¶¶ 10(a)-(g); ¶¶ 89-91; ¶¶ 94-102; ¶¶ 103- 113; ¶¶ 114-118.

INTERROGATORY NO. 8

Please state each item of damage that you claim and include in your answer the category into which each item of damages falls, *i.e.*, general damages, special or consequential damages (such as lost profits), interests, and any other relevant categories; the factual basis for each item of damages; and an explanation of how you computed each item of damages, including any mathematical formula used.

RESPONSE TO INTERROGATORY NO. 8

In addition to the general objections, Plaintiffs object to this interrogatory pursuant to Rule 33(c) of the Federal Rules of Civil Procedure on the grounds that it is premature at this stage of the litigation as discovery is ongoing. Numerous depositions have been taken in the last three weeks, and many others are scheduled before the June 30, 2006 expiration of the discovery period. In addition to preparing for scheduled depositions and analyzing just-obtained deposition transcripts, (while awaiting the arrival of transcripts from depositions taken within days of these responses), Plaintiffs continue to receive late document productions from defendants, including documents produced in the last two weeks and since the beginning of deposition discovery on May 2, 2006. Plaintiffs reserve the right to supplement and/or amend this response at the conclusion of discovery in this case.

Plaintiffs also object to this interrogatory on the grounds that it is overly broad and unduly burdensome, particularly at the present stage of discovery. Plaintiffs also object to this interrogatory on the grounds that it calls for legal arguments and conclusions and for premature disclosure of matters that are the subject of expert testimony.

11

Plaintiffs repeat and incorporate herein by reference their response to Interrogatory No. 4.

Dated: May 26, 2006

As to objections only:

ROSENTHAL, MONHAIT & GODDESS, P.A.

By: _Carmella P Keener_

Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, DE. 19801
(302) 656-4443
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs and the Class*

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000

*Lead Counsel for Plaintiffs and the Class*

405944

12

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE ADAMS GOLF, INC. | : | CONSOLIDATED |
| SECURITIES LITIGATION | : | C.A. NO. 99-371 KAJ |

### NOTICE OF SERVICE

PLEASE TAKE NOTICE that the undersigned hereby certifies that she caused copies of the following documents:

1.   Notice of Service; and

2.   Plaintiffs' Responses and Objections to Defendant Adams Golf's Third Set of Interrogatories Directed to Class Representatives

to be served on May 26, 2006, by hand delivery upon the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

and by electronic mail upon the following:

Theodore McEvoy, Esquire (tmcevoy@stblaw.com)
Elaine Divelbliss, Esquire (edivelbliss@stblaw.com)
Michael J. Chepiga, Esquire (mchepiga@stblaw.com)
Paul R. Bessette, Esquire (pbessette@akingump.com)
Jennifer R. Brannen, Esquire (jbrannen@akingump.com)

ROSENTHAL, MONHAIT & GODDESS, P.A.


By: /s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Citizens Bank Building
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
ckeener@rmgglaw.com
   Delaware Liaison Counsel for Plaintiffs

EXHIBIT 418

```
COSTCO WHOLESALE
**MODESTO  #26**

BUSINESS MEMBER 302205603010        7

RESALE ON
7 @ 109.99
          25927 ADAMS WOOD      769.93




11 @ 149.99
          25926 ADAMS WOOD    1,649.89




END OF RESALE

     RESALE TOTAL       2,419.82
     NON RESALE TOTAL         .00

              TOTAL  2,419.82

     Check/Member Prntd  2,419.82

     CHANGE                   .00

TOTAL NUMBER OF ITEMS SOLD =  18
CASHIER:ADELINE              REG#3
5/07/98 15:53 0026 03 0149 13

1-800-774-2678 Member Service
```

ADAMS 001504

EXHIBIT 419

REDACTED

EXHIBIT 420



# FORM 10-Q

## ADAMS GOLF INC – ADGO

**Filed: November 12, 1998 (period: September 30, 1998)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART II

OTHER INFORMATION

| | |
|---|---|
| Item 3. | Defaults Upon Senior Securities N/A |
| Item 4. | Submissions of Matters to a Vote of Security Holders N/A |
| Item 5. | Other Information N/A |
| Item 6. | Exhibits and Reports on Form 8−K 15 |
| ITEM 1. | LEGAL PROCEEDINGS |
| ITEM 2. | CHANGES IN SECURITIES AND USE OF PROCEEDS |
| ITEM 6(a). | EXHIBITS |

SIGNATURES:

EX−11.1 (Statement regarding computation of per−share earnings)

EX−27.1

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C  20549

FORM 10-Q

(Mark One)

[X]   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934

For the quarterly period ended September 30. 1998

or

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number:  0-24583


ADAMS GOLF, INC
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| DELAWARE<br>(State or other jurisdiction<br>of incorporation organization) | 75-2320087<br>(I R.S. Employer or<br>Identification No.) |
| 300 Delaware Avenue. Suite 548. Wilmington. Delaware<br>(Address of principal executive offices) | 19801<br>(Zip Code) |

(302) 427-5892
(Registrant's telephone number. including area code)

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports). and (2) has been subject to
such filing requirements for the past 90 days    [X] Yes  [ ] No

The number of outstanding shares of the registrant's common stock. par value
$ 001 per share. was 22.479.282 on November 10. 1998

ADAMS GOLF, INC AND SUBSIDIARIES

TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| PART I | Item 1. | FINANCIAL STATEMENTS | |
| | | Condensed Consolidated Balance Sheets – December 31, 1997 and September 30, 1998 (unaudited) | 3 |
| | | Unaudited Condensed Consolidated Statements of Operations – Three months and nine months ended September 30, 1997 and September 30, 1998 | 4 |
| | | Unaudited Condensed Consolidated Statements of Stockholders' Equity – Nine months ended September 30, 1998 | 5 |
| | | Unaudited Condensed Consolidated Statements of Cash Flows – Nine months ended September 30, 1997 and September 30, 1998 | 6 |
| | | Notes to Unaudited Condensed Consolidated Financial Statements | 7–8 |
| | Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 9–14 |
| | Item 3. | Quantitative and Qualitative Disclosures about Market Risk | N/A |
| PART II | | OTHER INFORMATION | |
| | Item 1. | Legal Proceedings | 15 |
| | Item 2. | Changes in Securities and Use of Proceeds | 15 |
| | Item 3. | Defaults Upon Senior Securities | N/A |
| | Item 4. | Submissions of Matters to a Vote of Security Holders | N/A |
| | Item 5. | Other Information | N/A |
| | Item 6. | Exhibits and Reports on Form 8-K | 15 |

ADAMS GOLF, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED BALANCE SHEETS
(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

### ASSETS

| | DECEMBER 31, 1997 | SEPTEMBER 30, 1998 |
|---|---|---|
| | | (UNAUDITED) |
| **Current assets:** | | |
| Cash and cash equivalents | $ 1,956 | $ 29,196 |
| Marketable securities (note 3) | - | 8,120 |
| Trade receivables, net of allowance for doubtful accounts of $698 and $1,444 (unaudited) in 1997 and 1998, respectively | 7,671 | 12,899 |
| Inventories (note 4) | 4,487 | 10,879 |
| Prepaid expenses | 509 | 1,074 |
| Income tax receivable | - | 1,431 |
| Deferred income tax assets | 390 | 866 |
| Other current assets | 937 | 908 |
| Total current assets | 15,950 | 65,373 |
| Property and equipment, net | 604 | 3,524 |
| Marketable securities (note 3) | - | 26,263 |
| Deferred income tax assets | 183 | - |
| Professional services agreement (note 5) | - | 9,703 |
| Other assets, net | 623 | 1,800 |
| | $17,360 | $106,663 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | DECEMBER 31, 1997 | SEPTEMBER 30, 1998 |
|---|---|---|
| **Current liabilities:** | | |
| Note payable to shareholder | $ - | $ 535 |
| Accounts payable | 378 | 438 |
| Federal income taxes payable | 1,021 | - |
| Accrued expenses | 7,636 | 7,000 |
| Total current liabilities | 9,035 | 7,973 |
| Deferred income tax liabilities | - | 3,182 |
| Total liabilities | 9,035 | 11,155 |
| **Stockholders' equity:** | | |
| Common stock, $.001 par value. Authorized 50,000,000 shares; 15,719,338 and 23,136,782 (unaudited) shares issued and outstanding at December 31, 1997 and September 30, 1998, respectively | 16 | 23 |
| Additional paid-in capital | 14,123 | 85,891 |
| Common stock subscription | - | (22) |
| Deferred compensation | - | (1,303) |
| Accumulated other comprehensive income | - | 87 |
| Retained earnings (accumulated deficit) | (5,814) | 10,832 |
| Total stockholders' equity | 8,325 | 95,508 |
| Commitments (note 6) | | |
| | $17,360 | $106,663 |

See accompanying notes to unaudited condensed consolidated financial statements.

3

ADAMS GOLF, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

(UNAUDITED)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 1997 | 1998 | 1997 | 1998 |
| Net sales | $14,236 | $22,987 | $19,685 | $81,315 |
| Cost of goods sold | 3,603 | 6,001 | 5,745 | 19,626 |
| Gross profit | 10,633 | 16,986 | 13,940 | 61,689 |
| Operating expenses: | | | | |
| Research and development expenses | 260 | 454 | 298 | 1,118 |
| Selling and royalty expenses | 5,568 | 7,296 | 7,854 | 24,683 |
| General and administrative expenses | 376 | 2,443 | 1,214 | 8,820 |
| Provision for bad debts | 217 | 568 | 293 | 1,214 |
| Total operating expenses | 6,421 | 10,761 | 9,659 | 35,835 |
| Operating income | 4,212 | 6,225 | 4,281 | 25,854 |
| Other: | | | | |
| Interest income | - | 668 | 2 | 702 |
| Interest expense | (27) | (15) | (48) | (58) |
| Other income (expense) | 39 | (2) | 44 | (104) |
| Income before income taxes | 4,224 | 6,876 | 4,279 | 26,394 |
| Income tax expense | 1,080 | 2,530 | 1,094 | 9,748 |
| Net income | $ 3,144 | $ 4,346 | $ 3,185 | $16,646 |
| Income per common share (note 7): | | | | |
| Basic | $ 0.26 | $ 0.19 | $ 0.27 | $ 0.84 |
| Diluted | $ 0.26 | $ 0.19 | $ 0.27 | $ 0.83 |

See accompanying notes to unaudited condensed consolidated financial statements.

4

ADAMS GOLF, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

NINE MONTHS ENDED SEPTEMBER 30, 1998
(UNAUDITED)

| | SHARES OF COMMON STOCK | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | COMMON STOCK SUBSCRIPTION | DEFERRED COMPENSATION | ACCUMULATED OTHER COMPREHENSIVE INCOME |
|---|---|---|---|---|---|---|
| Balance, December 31, 1997 | 15,719,338 | $  16 | $ 14,123 | $  – | $  – | $– |
| Issuance of common stock | 4,037,500 | 4 | 58,824 | – | – | – |
| Issuance of stock options | – | – | 2,027 | – | (2,027) | – |
| Stock option forfeiture | – | – | (135) | – | 135 | – |
| Exercise of stock options | 2,479,944 | 2 | 928 | (230) | – | – |
| Payment of stock subscription | – | – | – | 208 | – | – |
| Grant of stock (note 5) | 900,000 | 1 | 10,124 | – | – | – |
| Deferred compensation amortization | – | – | – | – | 589 | – |
| Comprehensive income: | | | | | | |
| Net income | – | – | – | – | – | – |
| Other comprehensive income, net of tax – unrealized gains on marketable securities | – | – | – | – | – | 87 |
| Comprehensive income | – | – | – | – | – | – |
| Balance, September 30, 1998 | 23,136,782 | $  23 | $ 85,891 | $(22) | $ (1,303) | $ 87 |

| | RETAINED EARNINGS (ACCUMULATED DEFICIT) | COMPREHENSIVE INCOME | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|---|
| Balance, December 31, 1997 | $ (5,814) | $  – | $  8,325 |
| Issuance of common stock | – | – | 58,828 |
| Issuance of stock options | – | – | – |
| Stock option forfeiture | – | – | – |
| Exercise of stock options | – | – | 700 |
| Payment of stock subscription | – | – | 208 |
| Grant of stock (note 5) | – | – | 10,125 |
| Deferred compensation amortization | – | – | 589 |
| Comprehensive income: | | | |
| Net income | 16,646 | 16,646 | 16,646 |
| Other comprehensive income, net of tax – unrealized gains on marketable securities | – | 87 | 87 |
| Comprehensive income | – | $16,733 | – |
| Balance, September 30, 1998 | $ 10,832 | | $ 95,508 |

See accompanying notes to unaudited condensed consolidated financial statements.

5

ADAMS GOLF, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(IN THOUSANDS)

(UNAUDITED)

| | NINE MONTHS ENDED SEPTEMBER 30, | |
| --- | --- | --- |
| | 1997 | 1998 |
| Cash flows from operating activities: | | |
| Net income | $ 3,185 | $16,646 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization of property and equipment and intangible assets | 164 | 1,495 |
| Loss on retirement of fixed assets | – | 101 |
| Amortization of deferred compensation | – | 589 |
| Deferred income taxes | – | 2,889 |
| Allowance for doubtful accounts | 446 | 746 |
| Changes in assets and liabilities: | | |
| Trade receivables | (6,648) | (5,974) |
| Inventories | (2,016) | (6,392) |
| Prepaid expenses | (381) | (565) |
| Income tax receivable | – | (1,431) |
| Other current assets | (103) | 29 |
| Other assets | 53 | (1,394) |
| Accounts payable | 698 | 60 |
| Federal income taxes payable | 875 | (1,021) |
| Other current liabilities | 2,016 | – |
| Accrued expenses | 985 | (636) |
| Net cash provided by (used in) operating activities | (726) | 5,142 |
| Cash flows from investing activities: | | |
| Purchases of marketable securities | – | (34,251) |
| Purchase of equipment | (382) | (3,922) |
| Net cash used in investing activities | (382) | (38,173) |
| Cash flows from financing activities: | | |
| Proceeds from initial public offering | – | 60,078 |
| Initial public offering costs | – | (1,250) |
| Proceeds from notes payable and line of credit | 250 | 7,135 |
| Repayment of line of credit borrowings | (30) | (6,000) |
| Repayment of notes payable | (450) | (600) |
| Issuance of common stock | 1,000 | 908 |
| Net cash provided by financing activities | 770 | 60,271 |
| Net increase (decrease) in cash and cash equivalents | (338) | 27,240 |
| Cash and cash equivalents at beginning of period | 855 | 1,956 |
| Cash and cash equivalents at end of period | $ 517 | $29,196 |
| Supplemental disclosure of cash flow information: | | |
| Interest paid | $ 48 | $ 34 |
| Income taxes paid | $ – | $11,916 |
| Supplemental disclosure of non-cash investing activity – change in unrealized holding gains and losses on investment securities available for sale, net of taxes | $ – | $ 87 |
| Supplemental disclosure of non-cash financing activity: | | |
| Stock issued for professional services agreement (note 5) | $ – | $10,125 |
| Exchange of debt for common stock | $ 450 | $ – |

See accompanying notes to unaudited condensed consolidated financial statements.

6

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

1.  BASIS OF PRESENTATION

The unaudited condensed consolidated financial statements of Adams Golf, Inc.
(the "Company") for the three and nine month periods ended September 30, 1997
and 1998 have been prepared by the Company, pursuant to the rules and
regulations of the Securities and Exchange Commission ("SEC")  The
information furnished herein reflects all adjustments (consisting only of
normal recurring accruals and adjustments) which are, in the opinion of
management, necessary to fairly state the operating results for the
respective periods  However, these operating results are not necessarily
indicative of the results expected for the full fiscal year  Certain
information and footnote disclosures normally included in annual consolidated
financial statements prepared in accordance with generally accepted
accounting principles have been omitted pursuant to SEC rules and
regulations.  The notes to the condensed consolidated financial statements
should be read in conjunction with the notes to the consolidated financial
statements contained in the Company's registration statement on Form S-1 (the
"S-1") declared effective by the SEC on July 9, 1998.

The Company, founded in 1987, designs, manufactures, markets, and distributes
premium quality, technologically innovative golf clubs and provides custom
golf club fitting technology  The Company's primary products are fairway
woods that are marketed under the trademark Tight Lies-Registered Trademark-.

2.  INITIAL PUBLIC OFFERING

The Company completed the sale of 4,000,000 shares of common stock through an
initial public offering (the "Offering") on July 15, 1998.  The Offering
resulted in net proceeds to the Company of approximately $58.3 million after
deducting offering expenses, discounts and commissions.  On July 20, 1998,
the Company completed the sale of an additional 37,500 shares of common stock
in connection with the underwriters' exercise of their option to cover
over-allotments, resulting in net proceeds of $0.5 million.

3.  MARKETABLE SECURITIES

Marketable securities, consisting of commercial paper, governmental and
corporate bonds and other high quality debt securities, are managed under
agreements with investment managers  The agreements provide terms related to
the quality, diversification and maturities of the investments in the managed
portfolios.  The investments are classified as available-for-sale and are
carried at fair value, with unrealized gains and losses, net of the related
tax effect, reported as comprehensive income in the statement of
stockholders' equity.

4.  INVENTORIES

Inventories consist of the following (in thousands):

|                  | DECEMBER 31, 1997 | SEPTEMBER 30, 1998 |
|------------------|------------------:|-------------------:|
|                  |                   | (UNAUDITED)        |
| Finished goods   | $  2,064          | $  2,851           |
| Component parts  |    2,423          |    8,028           |
|                  | $  4,487          | $ 10,879           |

7

5.   PROFESSIONAL SERVICES AGREEMENT

The professional services agreement consists of a contract entered into by
the Company and Nicholas A. Faldo ("Faldo"), a professional golfer, which
provides for Faldo's endorsement and use of the Company's products, as well
as the design, development and testing of new technologies and products. As
consideration for such services, Faldo received 900,000 shares of the
Company's common stock, which were valued at the fair market value of the
stock ($11.25 per share) as of May 1, 1998, the effective date of the
agreement.  The value of the stock will be amortized over ten years, which
represents the estimated period during which the Company will realize
benefits under the agreement.

6.   COMMITMENTS

The Company had outstanding commitments (denominated in U.S. dollars) on
letters of credit of $803,000 at September 30, 1998 for the purchase of
inventory from foreign vendors.

7.   INCOME PER SHARE

The weighted average common shares used for determining basic income per
common share were 12,156,878 and 22,695,478 for the three months ended
September 30, 1997 and 1998, respectively, and 11,968,472 and 19,714,997 for
the nine months ended September 30, 1997 and 1998, respectively  The effect
of dilutive stock options added 53,045 shares and 296,803 shares for the
three and nine months ended September 30, 1998, respectively, for the
computation of diluted income per common share. Stock options outstanding for
the three and nine months ended September 30, 1997 were not considered in the
computation of net income per common share because their effect is immaterial
or antidilutive.

8.   NEW ACCOUNTING PRONOUNCEMENTS

The Company is assessing the reporting and disclosure requirements of SFAS
No. 131, DISCLOSURES ABOUT SEGMENTS OF AN ENTERPRISE AND RELATED INFORMATION.
 This statement requires a public business enterprise to report financial and
descriptive information about its reportable operating segments.   The
statement is effective for financial statements for periods beginning after
December 15, 1997, but is not required for interim financial statements in
the initial year of its application.   The Company will adopt the provisions
of SFAS No. 131 in its December 31, 1998 consolidated financial statements.

In April 1998, the American Institute of Certified Public Accountants issued
Statement of Position 98-5 ("SOP 98-5"), REPORTING OF THE COSTS OF START-UP
ACTIVITIES, which is effective for financial statements issued for periods
beginning after December 15, 1998.  SOP 98-5 requires costs of start-up
activities and organization costs to be expensed as incurred.  The Company
believes SOP 98-5 will not have a material impact on its financial statements
or accounting policies.  The Company will adopt the provisions of SOP 98-5 in
the first quarter of 1999.

The Company is also assessing the reporting and disclosure requirements of
SFAS No. 133, ACCOUNTING FOR DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES.
This statement establishes accounting and reporting standards for derivative
instruments and hedging activities.  The statement is effective for financial
statements for fiscal years beginning after June 15, 1999.  The Company
believes SFAS No. 133 will not have a material impact on its financial
statements or accounting policies   The Company will adopt the provisions of
SFAS No. 133 in the first quarter of 2000.

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis is management's representation of the
financial position as of September 30, 1998 and the results of operations of
the Company for the three months and nine months ended September 30, 1997 and
1998. This discussion and analysis should be read in conjunction with the
attached unaudited condensed consolidated financial statements and notes
thereto, and with the Company's consolidated financial statements and notes
thereto included in the S-1.

OVERVIEW

The Company designs, manufactures, markets and distributes premium quality,
technologically innovative golf clubs. Founded in 1987, the Company operated
initially as a components supplier and contract manufacturer. Thereafter, the
Company established its custom fitting operation, which currently services a
network of over 100 certified custom fitting accounts. In the fall of 1995,
the Company introduced the original Tight Lies-Registered Trademark- fairway
wood and, in December 1996, the Company extended the Tight Lies-Registered
Trademark-line to include the Tight Lies-Registered Trademark- Strong 3,
Strong 5 and Strong 7, with the Tight Lies-Registered Trademark- Strong 9
being introduced in January 1998. Sales of the Tight Lies-Registered
Trademark- line of products increased significantly subsequent to the second
quarter of 1997 when the Company launched an infomercial relating to the
original Tight Lies-Registered Trademark- fairway wood   To further enhance
the Tight Lies-Registered Trademark- line of products, the Company introduced
the Strong 2 Tour Brassie and the Strong 11 in late August 1998.  The
Company's net sales are primarily derived from sales to on- and off-course
golf shops and selected sporting goods retailers and, to a lesser extent,
direct sales to consumers, international distributors and the Company's
custom fitting accounts.

The Company does not currently manufacture the components required to
assemble its golf clubs, relying instead on various component suppliers.
Costs of the Company's Tight Lies-Registered Trademark- fairway woods consist
primarily of component parts, including the head, shaft and grip. To a lesser
extent, the Company's cost of goods sold includes labor and occupancy costs
in connection with the inspection, testing and assembly of component parts at
its facility in Plano, Texas

9

RESULTS OF OPERATIONS

The following table sets forth operating results expressed as a percentage of
net sales for the periods indicated  All information is derived from the
accompanying unaudited condensed consolidated financial statements.  Results
for any one or more periods are not necessarily indicative of annual results
or continuing trends  See "Seasonality and Quarterly Fluctuations" below.

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30. | |
|---|---|---|---|---|
| | 1997 | 1998 | 1997 | 1998 |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 25.3 | 26.1 | 29.2 | 24.1 |
| Gross profit | 74.7 | 73.9 | 70.8 | 75.9 |
| Operating expenses | 45.1 | 46.8 | 49.1 | 44.1 |
| Operating income | 29.6 | 27.1 | 21.7 | 31.8 |
| Interest income (expense). net | (0.2) | 2.8 | (0.2) | 0.8 |
| Other income (expense) | 0.3 | 0.0 | 0.2 | (0.1) |
| Income before income taxes | 29.7 | 29.9 | 21.7 | 32.5 |
| Income tax expense | 7.6 | 11.0 | 5.5 | 12.0 |
| Net income | 22.1 | 18.9 | 16.2 | 20.5 |

THREE MONTHS ENDED SEPTEMBER 30, 1997 COMPARED TO THREE MONTHS ENDED
SEPTEMBER 30, 1998

Net sales increased to $23.0 million for the three months ended September 30.
1998 from $14.2 million for the comparable period of 1997, primarily due to
the continued market acceptance of the Company's Tight Lies-Registered
Trademark-line of fairway woods, and, to a lesser extent, the introduction of
the Strong 2 Tour Brassie and the Strong 11 in late August 1998. Net sales of
the Tight Lies-Registered Trademark- line of fairway woods increased to $22.1
million for the three months ended September 30. 1998 from $13.5 million for
the comparable period of 1997. and increased as a percentage of net sales to
96.1% from 95.1%, respectively.  Sales of the Tight Lies-Registered
Trademark- fairway woods increased subsequent to the Company's introduction
of an infomercial marketing its original Tight Lies-Registered
Trademark-fairway wood in the second quarter of 1997. Net sales of other
product lines for the three months ended September 30, 1998 increased to $0.9
million from $0.7 million for the comparable period of 1997, but decreased as
a percentage of net sales to 3.9% from 4.9%, respectively. Net sales of the
Company's products outside the U.S  increased to $3.3 million for the three
months ended September 30, 1998 from $0.1 million for the three months ended
September 30, 1997. and increased as a percentage of net sales to 14.3% from
0.7%, respectively  The increase in international sales was due to increased
market acceptance of the Tight Lies-Registered Trademark-fairway woods and
expanded international marketing efforts beginning in the last half of 1997
During August and September 1998, the Company offered extended credit terms
to certain customers. See "Liquidity and Capital Resources "

Cost of goods sold increased to $6.0 million for the three months ended
September 30. 1998 from $3.6 million for the comparable period of 1997, and
increased as a percentage of net sales to 26.1% from 25.3%, respectively,
primarily due to lower average selling prices during the three months ended
September 30, 1998 resulting primarily from the sale of the Company's
inventory of "demo" clubs, and an increase of sales to retailers compared to
sales to direct consumers.

10

Operating expenses are composed primarily of selling and royalty expenses, general and administrative expenses, and to a lesser extent, research and development expenses. Selling and royalty expenses increased to $7.3 million for the three months ended September 30, 1998 from $5.6 million for the comparable period of 1997 as a result of hiring additional employees, incurring increased levels of services provided by independent contractors and increased marketing and advertising efforts. Selling and royalty expenses decreased as a percent of net sales to 31.7% from 39.1% respectively, primarily due to the economies of scale of providing advertising for a substantially higher volume of sales. General and administrative expenses, including provisions for bad debts, increased to $3.0 million, or 13.1% as a percent of sales, for the three months ended September 30, 1998 from $0.6 million, or 4.2% as a percent of sales, for the comparable period ended September 30, 1997, primarily due to the hiring of additional employees, use of additional outside services, higher occupancy costs and additional bad debt expense related to increased revenues. Research and development expenses for the three months ended September 30, 1998 increased to $0.5 million from $0.3 million for the same period in 1997, and increased as a percent of net sales to 2.0 % from 1.8 %, primarily due to increased salaries, consulting, and tooling expenses associated with the development of new products.

Operating income increased to $6.2 million for the three months ended September 30, 1998 from $4.2 million for the comparable period of 1997, and decreased as a percentage of net sales to 27.1% from 29.6%, respectively.

NINE MONTHS ENDED SEPTEMBER 30, 1997 COMPARED TO NINE MONTHS ENDED SEPTEMBER 30, 1998

Net sales increased to $81.3 million for the nine months ended September 30, 1998 from $19.7 million for the comparable period of 1997, primarily due to the continued market acceptance of the Company's Tight Lies-Registered Trademark-line of fairway woods, and, to a lesser extent, the introduction of the Strong 2 Tour Brassie and the Strong 11, and a price increase effective January 1, 1998. Net sales of the Tight Lies-Registered Trademark- line of fairway woods increased to $78.7 million for the nine months ended September 30, 1998 from $18.0 million for the comparable period of 1997, and increased as a percentage of net sales to 96.8% from 91.4%, respectively. Sales of the Tight Lies-Registered Trademark- fairway woods increased subsequent to the Company's introduction of an infomercial marketing its original Tight Lies-Registered Trademark- fairway wood in the second quarter of 1997. Net sales of other product lines for the nine months ended September 30, 1998 increased to $2.6 million from $1.7 million for the comparable period of 1997, but decreased as a percentage of net sales to 3.2% from 8.6%, respectively. Net sales of the Company's products outside the U.S. increased to $8.8 million for the nine months ended September 30, 1998 from $0.5 million for the nine months ended September 30, 1997, and increased as a percentage of net sales to 10.8% from 2.5%, respectively. The increase in international sales was due to increased market acceptance of the Tight Lies-Registered Trademark- fairway woods and expanded international marketing efforts beginning in the last half of 1997. During August and September 1998, the Company offered extended credit terms to certain customers. See "Liquidity and Capital Resources."

Cost of goods sold increased to $19.6 million for the nine months ended September 30, 1998 from $5.7 million for the comparable period of 1997, but decreased as a percentage of net sales to 24.1% from 29.2%, respectively, primarily due to an increased percentage of net sales attributable to the higher margin Tight Lies-Registered Trademark- fairway woods and the inherent cost savings associated with buying components in large volumes and assembling them on a substantially increased scale. The decrease in cost of goods sold as a percentage of sales was partially offset by the effect of lower average selling prices during the three months ended September 30, 1998

Operating expenses are composed primarily of selling and royalty expenses, general and administrative expenses, and to a lesser extent, research and development expenses. Selling and royalty expenses increased to $24.7 million for the nine months ended September 30, 1998 from $7.9 million for the comparable period in 1997 as a result of hiring additional employees, incurring increased levels of services provided by independent contractors and increased marketing and advertising efforts. Selling and royalty expenses decreased as a percent of net sales to 30.4% from 39.9%, respectively, primarily due to the economies of scale of providing advertising for a substantially higher volume of sales. General and administrative expenses, including provisions for bad debts, increased to $10.0 million, or 12.3% as a percent of sales, for the nine months ended September 30, 1998 from $1.5 million, or 7.6% as a percent of sales, for the comparable period ended September 30, 1997, primarily due to the hiring of additional employees, use of additional outside services, higher occupancy costs and additional bad debt expense related to increased revenues. Research and development expenses for the nine months ended September 30, 1998 increased to $1.1 million from $0.3 million for the comparable period in 1997, primarily due to outside consulting services and increased salaries in connection with new product developments.

Operating income increased to $25.9 million for the nine months ended September 30, 1998 from $4.3 million for the comparable period of 1997, and increased as a percentage of net sales to 31.8% from 21.7% respectively.

LIQUIDITY AND CAPITAL RESOURCES

Cash and cash equivalents increased to $29.2 million at September 30, 1998 from $2.0 million at December 31, 1997, primarily as a result of $5.1 million provided by cash flows from operations and $60.3 million provided from financing activities, less $38.2 million used for investing activities. The increase in cash flows provided by operations was primarily a result of increased net income. Primary uses of operating cash flows were increases in trade receivables and inventory of $6.0 million and $6.4 million, respectively, for the nine months ended September 30, 1998. The increases in receivables and inventory are primarily the result of continued sales growth.

During August and September 1998, the Company offered extended credit terms (i.e., due dates in excess of 30 days) to certain customers in order to match terms being offered by certain competitors. The extensions of these terms may have a negative impact on results of operations and financial position during the fourth quarter of 1998 as certain merchants may have accelerated orders as a result of the terms offered. The Company does not expect to offer extended credit terms in the fourth quarter of 1998.

Cash used in investing activities of $38.2 million for the nine months ended September 30, 1998, is primarily related to purchases of marketable securities, computer equipment and software, telephone systems, and furniture and fixtures. The Company anticipates making capital expenditures in the ordinary course of business of approximately $2.0 million in the balance of 1998, which includes implementing a customer management information system and an enterprise resource planning system. Cash provided by financing activities of $60.3 million was primarily a result of net proceeds of the initial public offering of $58.8 million.

Working capital totaled $57.4 million at September 30, 1998 compared to $6.9 million at December 31, 1997.

The Company has a $10.0 million revolving credit facility, which expires on December 31, 1998. At September 30, 1998, the Company had no outstanding borrowings under this facility. Borrowings under the Company's revolving credit facility agreement are at interest rates based on the lending bank's general refinance rate of interest or certain LIBOR rates of interest. Obligations under the revolving credit facility loan agreement are collateralized by substantially all of the accounts receivable, inventory and equipment of the Company. During the first quarter of 1998, the Company borrowed approximately $1.1 million in the form of a note payable to the Company's founder, Chief Executive Officer and President to be used for working capital purposes. The remaining principal amount of the note (approximately $535,000 at September 30, 1998) is payable in two installments on December 15, 1998 and April 14, 1999 at an interest rate of 5.39%.

12

The Company is not aware of any event or trend which would potentially affect its liquidity.  In the event such a trend would develop, the Company believes that the cash flow from operations and the net proceeds of the Offering (approximately $58.8 million) would be sufficient to meet operating needs and capital expenditures for at least the next 12 months.

SEASONALITY AND QUARTERLY FLUCTUATIONS

Golf generally is regarded as a warm weather sport and sales of golf equipment historically have been strongest during the second and third quarters. with the weakest sales occurring during the fourth quarter.  In addition, sales of golf clubs are dependent on discretionary consumer spending, which may be affected by general economic conditions. A decrease in consumer spending generally could result in decreased spending on golf equipment, which could have a material adverse effect on the Company's business, operating results and financial condition. In addition, the Company's future results of operations could be affected by a number of other factors, such as unseasonal weather patterns; demand for and market acceptance of the Company's existing and future products; new product introductions by the Company's competitors; competitive pressures resulting in lower than expected average selling prices; and the volume of orders that are received and that can be fulfilled in a quarter. Any one or more of these factors could result in the Company failing to achieve its expectations as to future sales or net income.

YEAR 2000 READINESS DISCLOSURE

The Year 2000 will have a broad impact on the business environment in which the Company operates due to the possibility that many computerized systems across all industries will be unable to process information containing the dates beginning in the Year 2000.  The Company relies on its internal information technology systems in operating and monitoring many significant aspects of its business, including financial systems, customer services, infrastructure and network and telecommunications equipment.  The Company also relies directly and indirectly on the systems of external business enterprises such as suppliers, customers, creditors, financial organizations and domestic and international governments.  The Company has established an enterprise-wide program to prepare its computer systems and applications for the Year 2000 and is utilizing both internal and external resources to identify, correct and test the systems for Year 2000 compliance.  The Company's legacy information system, as well as the information system currently being implemented, are certified as Year 2000 compliant.  The Company has substantially completed an inventory of all information technology and non-information technology equipment as of September 30, 1998 and anticipates that the majority of its remediation plan will be completed by March 31, 1999.  The Company expects that all systems critical to the conduct of the Company's operations will be Year 2000 compliant prior to the end of the 1999 calendar year.

The nature of the Company's business is such that the business risks associated with the Year 2000 can be reduced by closely assessing the vendors supplying the components used in assembling the Company's products.  Because third party failures could have a material impact on the Company's ability to conduct business. questionnaires have been sent to the Company's significant vendors to obtain reasonable assurance that plans are being developed to address the Year 2000 issue.  The returned questionnaires are currently being assessed by the Company. and are being categorized based upon readiness for the Year 2000 issues and prioritized in order of significance to the business of the Company.  To the extent that vendors do not provide the Company with satisfactory evidence of their readiness to handle Year 2000 issues, contingency plans will be developed.

13

The Company does not believe the costs related to the Year 2000 compliance
project will be material to its financial position or results of operations
However, the cost of the project and the date on which the Company plans to
complete the Year 2000 modifications are based on management's best estimates,
which were derived utilizing numerous assumptions of future events including the
continued availability of certain resources. third party modification plans, and
other factors   Unanticipated failures by critical vendors, as well as failure
by the Company to execute its own remediation efforts, could have a material
adverse effect on the cost of the project, its completion date, and the
Company's results of operations and financial position.  As a result, there can
be no assurance that these forward-looking estimates will be achieved and the
actual cost and vendor compliance could differ materially from those plans.
resulting in material financial risk.


FORWARD-LOOKING STATEMENTS

This Quarterly Report contains "forwarding-looking statements" made under the
"safe harbor" provisions of the Private Securities Litigation Reform Act of
1995. These forward-looking statements are based on the beliefs of the Company's
management as well as assumptions made by and information currently available to
the Company's management.  When used in this report, the words "anticipate,"
"believe," "expect" and words or phrases of similar import. as they relate to
the Company or Company management, are intended to identify forward-looking
statements.  Such statements reflect the current view of the Company with
respect to future events and are subject to certain risks. uncertainties and
assumptions related to certain factors including, without limitation, product
development; product introductions; market demand and acceptance of products;
the impact of changing economic conditions; business conditions in the golf
industry; reliance on third parties including suppliers; the impact of market
peers and their products; the actions of competitors, including pricing; risks
concerning future technology; and one time events and other factors detailed in
the Company's prospectus and other Securities and Exchange Commission filings
Although the Company believes that the expectations reflected in such
forward-looking statements are reasonable, it can give no assurance that such
expectations will prove to have been correct   Based upon changing
conditions, should any one or more of these risks or uncertainties
materialize. or should any underlying assumptions prove incorrect, actual
results may vary materially from those described herein.  The Company does
not intend to update these forward-looking statements   All subsequent
written and oral forward-looking statements attributable to the Company or
persons acting on its behalf are expressly qualified in their entirety by the
applicable cautionary statements.

PART II.  OTHER INFORMATION


ITEM 1.  LEGAL PROCEEDINGS

The Company is a party to certain legal actions arising in the ordinary course
of business.  Based upon information presently available to the Company,
management believes that the outcome of all matters currently pending will not
have a material adverse effect on the Company's results of operations or
financial position.


ITEM 2.  CHANGES IN SECURITIES AND USE OF PROCEEDS

Use of Proceeds

        (1)        On July 9, 1998 the Securities and Exchange Commission declared
                   effective the Company's Registration Statement on Form S-1 (File
                   No. 333-51715) and related Registration Statement on Form S-1
                   (333-58917) filed pursuant to Rule 462(b).  Pursuant to the
                   offering made thereby, the Company derived $58,828,000 in net
                   proceeds which, pending final application thereof. have been
                   invested primarily in interest bearing marketable securities.
                   Information concerning the Company's Use of Proceeds is set forth
                   in its Quarterly Report on Form 10-Q for the quarter ended June
                   30, 1998 and will be updated as necessary.



ITEM 6(a).  EXHIBITS

See exhibit index at page 16.

ITEM 6(b).  REPORTS ON FORM 8-K

None



SIGNATURES:

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company
has duly caused this report to be signed on its behalf by the undersigned
thereonto duly authorized.

                              ADAMS GOLF, INC.


Date: November 12, 1998       By:
                                 ---------------------------------------------
                                 B. H. (Barney) Adams, Chairman of the Board.
                                 Chief Executive Officer and President


Date: November 12, 1998       By:
                                 ---------------------------------------------
                                 Darl P. Hatfield,
                                 Senior Vice President - Finance and
                                 Administration and Chief Financial Officer

EXHIBIT INDEX

| Exhibit | Description | Location |
| ------- | ----------- | -------- |
| Exhibit 3.1 | Amended and Restated Certificate of Incorporation | Incorporated by reference to Form S-1 (Exhibit 3.1) |
| Exhibit 3.2 | Amended and Restated By-laws | Incorporated by reference to Form S-1 (Exhibit 3.2) |
| Exhibit 4.1 | 1998 Stock Incentive Plan of the Company dated February 26, 1998 | Incorporated by reference to Form S-1 (Exhibit 4.1) |
| Exhibit 4.2 | 1996 Stock Option Plan dated April 10. 1998 | Incorporated by reference to Form S-1 (Exhibit 4.2) |
| Exhibit 4.3 | Registration Rights Agreement dated April 30, 1998. among the Company and certain stockholders of the Company | Incorporated by reference to Form S-1 (Exhibit 4.3) |
| Exhibit 4.4 | Adams Golf, Ltd. 401(k) Retirement Plan | Incorporated by reference to Form S-1 (Exhibit 4.4) |
| Exhibit 10.1 | Agreement between the Registrant and Nick Faldo, dated April 22, 1998 | Incorporated by reference to Form S-1 (Exhibit 10.1) |
| Exhibit 10.2 | Revolving credit agreement dated February 27, 1998, between Adams Golf Direct Response, Ltd., Adams Golf, Ltd. And NationsBank of Texas N.A | Incorporated by reference to Form S-1 (Exhibit 10.2) |
| Exhibit 10.3 | Commercial lease agreement dated December 5, 1997, between Jackson-Shaw Technology Center II, Ltd. and the Company | Incorporated by reference to Form S-1 (Exhibit 10.3) |
| Exhibit 10.4 | Commercial lease agreement dated April 6, 1998, between Jackson-Shaw Technology Center II, Ltd. and the Company | Incorporated by reference to Form S-1 (Exhibit 10.4) |
| Exhibit 10.5 | Letter agreement dated April 13. 1998, between the Company and Darl P. Hatfield | Incorporated by reference to Form S-1 (Exhibit 10.5) |
| Exhibit 11.1 | Computation of Per Share Earnings | Included in this filing |
| Exhibit 27.1 | Financial Data Schedule | Included in this filing |

16

```
</TEXT>
</DOCUMENT>
```

EARNINGS PER SHARE - EXHIBIT 11.1
(IN THOUSANDS, EXCEPT SHARE AND PER SHARE AMOUNTS)

(UNAUDITED)

BASIC INCOME PER SHARE:

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 1997 | 1998 | 1997 | 1998 |
| Net income | $    3,144 | $    4,346 | $    3,185 | $   16,646 |
| Weighted average shares outstanding | 12,156,878 | 22,695,478 | 11,968,472 | 19,714,997 |
| Income per share | $     0.26 | $     0.19 | $     0.27 | $     0.84 |

DILUTED INCOME PER SHARE:

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 1997 | 1998 | 1997 | 1998 |
| Net income | $    3,144 | $    4,346 | $    3,185 | $   16,646 |
| Weighted average shares outstanding | 12,156,878 | 22,695,478 | 11,968,472 | 19,714,997 |
| Effect of dilutive shares-stock options | - | 53,045 | - | 296,803 |
| Total weighted average dilutive shares | 12,156,878 | 22,748,523 | 11,968,472 | 20,011,799 |
| Income per common share | $     0.26 | $     0.19 | $     0.27 | $     0.83 |

</TEXT>
</DOCUMENT>

```
<ARTICLE> 5
<LEGEND>
THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM THE
UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS FOR ADAMS GOLF, INC. AND
ITS SUBSIDIARIES FOR THE NINE MONTHS ENDED SEPTEMBER 30, 1998 AND IS QUALIFIED
IN ITS ENTIRETY BY REFERENCE TO SUCH UNAUDITED CONDENSED CONSOLIDATED FINANCIAL
STATEMENTS.
</LEGEND>


<PERIOD-TYPE>                    9-MOS
<FISCAL-YEAR-END>                         DEC-31-1998
<PERIOD-END>                              SEP-30-1998
<CASH>                                         29.196
<SECURITIES>                                    8.120
<RECEIVABLES>                                  14.343
<ALLOWANCES>                                    1.444
<INVENTORY>                                    10.879
<CURRENT-ASSETS>                               65.373
<PP                                       4.528
<DEPRECIATION>                                  1.004
<TOTAL-ASSETS>                                106.663
<CURRENT-LIABILITIES>                           7.973
<BONDS>                                             0
<PREFERRED-MANDATORY>                               0
<PREFERRED>                                         0
<COMMON>                                           23
<OTHER-SE>                                     95.485
<TOTAL-LIABILITY-AND-EQUITY>                  106.663
<SALES>                                        81.315
<TOTAL-REVENUES>                               81.315
<CGS>                                          19.626
<TOTAL-COSTS>                                  24.683
<OTHER-EXPENSES>                                9.938
<LOSS-PROVISION>                                1.214
<INTEREST-EXPENSE>                                 50
<INCOME-PRETAX>                                26.394
<INCOME-TAX>                                    9.748
<INCOME-CONTINUING>                            16.646
<DISCONTINUED>                                      0
<EXTRAORDINARY>                                     0
<CHANGES>                                           0
<NET-INCOME>                                   16.646
<EPS-PRIMARY>                                     .84
<EPS-DILUTED>                                     .83


</TEXT>
</DOCUMENT>
```

Created by 10KWizard    www.10KWizard.com