EXHIBIT 421



# FORM 10−K

## ADAMS GOLF INC − ADGO

**Filed: March 29, 1999 (period: December 31, 1998)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

Part III

incorporates certain information by reference from the Registrant's

ITEM 1.     BUSINESS
ITEM 2.     PROPERTIES
ITEM 3.     LEGAL PROCEEDINGS
ITEM 4.     SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

PART II

ITEM 5.     MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED
            STOCKHOLDER MATTERS
ITEM 6.     SELECTED FINANCIAL DATA
ITEM 7.     MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
            CONDITION AND RESULTS
ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET
            RISK
ITEM 8.     FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA
ITEM 9.     CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON
            ACCOUNTING AND

PART III

ITEM 10.    DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT
ITEM 11.    EXECUTIVE COMPENSATION
ITEM 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND
            MANAGEMENT
ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

PART IV

ITEM 14.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON
            FORM 8-K.
SIGNATURES
EX-10.2 (Material contracts)

EX-21.1 (Subsidiaries of the registrant)

EX-23.1 (Consents of experts and counsel)

EX-27.1

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

[X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1998

OR

[ ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

Commission File Number: 0-24583

ADAMS GOLF, INC.
(Exact name of registrant as specified in its charter)

DELAWARE                                    75-2320087
(State or other jurisdiction of        (I.R.S. Employer Identification No.)
incorporation or organization)

300 Delaware Avenue, Suite 572, Wilmington, Delaware        19801
(Address of principal executive offices)                (Zip Code)

(302) 427-5892
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

None

Securities registered pursuant to Section 12(g) of the Act:

Title of Class
--------------
Common Stock $.001 Par Value

Indicate by check mark whether the Registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the Registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days. [X] Yes [ ] No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of Registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [ ]

At March 15, 1999, the aggregate market value of the Registrant's Common Stock
held by nonaffiliates of the Registrant was $38,941,431 based on the closing
sales price of $3 11/16 per share of the Registrant's Common Stock on the Nasdaq
Stock Market's National Market.

The number of outstanding shares of the Registrant's Common Stock, par value
$.001 per share, was 22,479,282 on March 15, 1999.

DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates certain information by reference from the Registrant's
definitive proxy statement for the annual meeting of stockholders to be held on
May 5, 1999, which proxy statement was filed with the Securities and Exchange
Commission on April 7, 1999.

ITEM 1  BUSINESS

GENERAL

Adams Golf, Inc. (the "Company" or "Adams Golf") designs, manufactures and
markets premium quality, technologically innovative golf clubs. Adams Golf's
primary products include the Tight Lies line of fairway woods, SC Series
Titanium drivers, Assault-VMI Irons, and the Faldo Series wedges. The Company
was incorporated in Texas in 1987 and reincorporated in Delaware in 1990. The
Company completed an internal reorganization in 1997 and now conducts its
operations through several direct and indirect wholly owned subsidiaries.

SEGMENTS AND PRODUCTS

The Company operates in a single segment (golf clubs) within the golf industry
and within that segment offers more than one class of product (fairway woods,
custom fitted clubs, drivers, wedges)

The Company currently offers the following products:

FAIRWAY WOODS - The Tight Lies line of fairway woods has an innovative upright
trapezoidal or "upside down" head shape that incorporates a distinctive shallow
face and a low center of gravity. The Company believes that this club is ideal
for getting the ball airborne quickly and efficiently with optimum spin to
maximize distance from virtually any lie on the course including the rough, hard
pan, fairway bunkers and divots.

CUSTOM FITTED CLUBS — The Company's custom fitted clubs consist primarily of the
Assault-VMI irons which are perimeter-weighted, cavity-backed, slightly offset
irons incorporating the Company's patented variable moment of inertia ("VMI")
design formula producing consistent swing feel across an entire set of clubs.
The Company markets the Assault-VMI irons to professional and avid golfers
exclusively through its network of over 100 certified custom fitting accounts.
The Company believes that its custom fitting activities provide an in-depth
understanding of golf club design and credibility in the golf industry.

DRIVERS — In January 1999, the Company introduced the SC Series Titanium drivers
which have been designed to achieve a specific ball flight objective: longer and
straighter tee shots resulting from reduced side spin and increased forward
momentum. These qualities are achieved through a complex patented asymmetrical
bulge design which incorporates precisely controlled relationships between the
curvature of the face and the center of gravity.

WEDGES - In January 1999, the Company also introduced the Faldo Series wedges
featuring a classic style with a unique asymmetric sole designed to deliver
three different wedge shots – pitch, sand, and open-face finesse from a single
club. Utilizing input from Nick Faldo, a professional golfer, regarding his own
wedge play, the sole of the Faldo Series wedges have been designed to provide
maximum playability from a variety of lies, giving golfers the confidence to
execute even the toughest wedge shots.

The following table sets forth the contribution to net sales attributable to the
product groups for the years indicated. Because the SC Series Titanium drivers
and the Faldo Series wedges were not introduced by the Company until fiscal
1999, these product groups are not referenced in the table. Historical
percentages may not be indicative of the Company's future product mix.

PERCENTAGE OF NET SALES BY PRODUCT GROUP

|                       | 1996   | 1997   | 1998   |
| --------------------- | ------ | ------ | ------ |
| Fairway Woods         | 47.2%  | 94.3%  | 96.5%  |
| Custom Fitted Clubs   | 52.8%  | 5.7%   | 3.5%   |
| Total                 | 100.0% | 100.0% | 100.0% |

The Company supports each of its products with a two year warranty. The warranty
provides for repair or replacement of the golf club, except in the case of
abuse. The Company has not experienced material amounts of warranty claims with
respect to its golf clubs.

1

DESIGN AND DEVELOPMENT

The Company's design and development team is responsible for developing, testing and introducing new technologies and product designs. This team is currently led by Barney Adams, the founder of the Company and inventor of the Tight Lies fairway wood; Richard H. Murtland, Vice President-Research and Development; Adams Golf's in-house design development team, Nick Faldo and independent consultants. Robert R. Bush and Dr. Michael M. Carroll. Mr. Bush has over 30 years of experience in golf club development, most notably as Director of Technical Services for True Temper Sports, a leading shaft manufacturer, where from 1966 to 1993, he was responsible for testing all golf club shafts. Mr. Bush was instrumental in the development of "Iron Byron," the industry standard for the mechanical testing of golf clubs and balls. Mr. Bush is currently a member of the Technical Advisory Panel for GOLF DIGEST. Dr. Michael M. Carroll is Dean of the George R. Brown School of Engineering at Rice University in Houston, Texas. Dr. Carroll holds doctorate degrees in both physics and mathematics and is an avid golfer. Dr. Carroll has worked with the Company's design and development team since April 1, 1998 and is responsible for the scientific analysis of each new product under development by the Company.

The design and development team engages in a five-step process to create new products.

CONCEPT DEVELOPMENT - During concept development, Adams Golf's design and development team identifies specific desirable ball flight objectives. In addition, the Company considers new ideas from professional golfers, inventors, distributors and others. The Company expects that Nick Faldo will continue to play a significant role in future concept development.

DESIGN SPECIFICATIONS - The Company's product design and development team determines design specifications for the club, including shaft length, flex and weight, head design, loft and overall club weight. Throughout the design specifications process, the Company refers to and incorporates the golf equipment standards developed by the USGA. Although the standards set by the USGA only apply to competitive events sanctioned by that organization, the Company believes it is critical for new clubs to comply with these standards. At this time, the product design and development team also determines the optimal materials to use in the club. The Company will not use higher cost materials, such as titanium or other alloys, unless such expensive materials provide meaningful performance benefits. This stage of product development typically takes 6 to 8 weeks after a concept has been clearly identified.

PATENT REVIEW - The Company considers patent protection for its technologies and product designs to be an important part of its development strategy. The Company and its patent attorneys conduct a search of prior art and existing products to determine whether a new product idea may be covered by an existing patent. Patent review, depending upon the complexity and novelty of the design involved, generally requires between 3 to 18 months to complete, however, this stage of product development typically occurs in conjunction with one or more of the other steps.

PRODUCT DESIGN AND ENGINEERING REVIEW - If a product concept continues past the patent review stage, the Company translates design parameters into working designs. When appropriate, these designs are developed using computer aided design software and modeled using in-house rapid prototyping systems. Once modeled the prototype is subjected to rigorous engineering review to validate the effectiveness of the technology or design. The Company estimates that it takes between 4 to 6 months to successfully complete product design and engineering review.

TESTING - Once a specific design has been decided upon, the Company creates and tests one or more prototypes. The Company has a product testing facility at the Hank Haney Golf Ranch in McKinney, Texas and utilizes an independent mechanical test facility in Fort Worth, Texas for comparative performance testing. In addition, prototypes are also tested for performance and player preferences by Nick Faldo. As part of the testing process, the Company records, analyzes and interprets data associated with each prototype including ball flight, distance, spin and accuracy. Using feedback from these tests, the Company modifies its designs to achieve its performance objective. Additionally, the Company applies for official USGA approval of the resulting club at this time. Upon approval of a new product from the USGA, it becomes considered for commercial release. The Company believes that in order to properly field test a new product, it must expect between 4 to 6 months of additional development time.

The Company's research and development expenses were approximately $51,000, $557,000 and $1,532,000 during 1996, 1997 and 1998, respectively.

2

## MARKETS AND METHODS OF DISTRIBUTION

The Company sells its products through on- and off-course golf shops and selected sporting goods retailers, direct sales to consumers, international distributors and the Company's custom fitting accounts.

SALES TO RETAILERS - The Company sells a majority of its products to selected retailers. To maintain its high quality reputation and generate retailer loyalty, the Company currently does not sell its products through price sensitive general discount warehouses, department stores or membership clubs. The Company believes its selective retail distribution strategy helps its retailers maintain profitable margins and maximize sales of the Company's products. For the year ended December 31, 1998, sales to retailers accounted for approximately 73% of the Company's total sales.

Despite the Company's efforts to limit its distribution to selected retailers, Adams Golf products have been found in a certain membership warehouse club, which the Company believes has obtained the products through the use of unauthorized distribution channels. Adams Golf has taken steps to limit this unauthorized distribution through the serialization of all Adams Golf club heads but does not believe the gray marketing of its products can be totally eliminated.

Adams Golf maintains an inside sales department that at March 15, 1999 consisted of 23 employees who are in regular contact with the Company's retail accounts (over 7,000 retailers). These sales representatives are supported by 18 field-based regional account coordinators who maintain personal contact with the Company's retailers nationwide. The Company generally has been successful in delivering product to its retailers within one week of a placed order. The Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers.

CUSTOMER SUPPORT AND DIRECT SALES - Adams Golf believes that superior customer service can significantly enhance its marketing efforts. Accordingly, the Company maintains an in-house customer call center whose representatives provide technical assistance to its customers and field calls resulting from the Company's direct response advertising. The Company also outsources a portion of its call center activities. The Company provides its staff with computerized access to its retailer database enabling call center representatives to guide consumers to their nearest Adams Golf retailer.

INTERNATIONAL SALES - International sales are made in 41 countries (primarily Japan, Canada and the United Kingdom) through approximately 34 independent distributors. The international distributors sell to retailers for end sale to the consumer. International sales have increased from $0.6 million for 1996, $0.9 million for 1997, to $11.0 million for 1998.

CUSTOM FITTING SALES - The Company employs six sales representatives who manage the Company's custom fitting sales and support division and administer its custom fitting training program for golf professionals. The Company's custom fitting training program has received PGA certification and provides continuing education credits for PGA Member Professionals. Since 1992, the Company has certified in excess of 300 golf professionals to custom fit its Assault-VMI irons, which are sold exclusively through its over 100 custom fitting accounts. Custom fitters measure data relating to swing and ball flight characteristics. Based on the interpretation of the data, a set of clubs is manufactured that is specifically tailored to that golfer.

## MARKETING

The goals of the Company's marketing efforts are to build its brand identity and drive sales through its retail distribution channel. To accomplish these goals, Adams Golf utilizes direct response and traditional image-based advertising, engages in promotional activities and capitalizes on its relationship with Nick Faldo and other well known golf personalities.

ADVERTISING - The Company uses a combination of direct response and traditional image-based advertising.

- DIRECT RESPONSE ADVERTISING - The Company intends to continue to build brand awareness and stimulate product demand through its direct response advertising, which includes a variety of mediums including television. radio. print and direct mail. Direct response advertising, in which consumers may order products directly from the Company by calling a toll-free telephone number, provides a cost-effective vehicle enabling the Company to communicate a compelling product story and build brand recognition. The Company's direct response advertising serves to introduce the Company's products to consumers, many of whom will subsequently purchase the Company's clubs from retailers. During early 1998, the Company continued to air the original Tight Lies 30-minute infomercial that was introduced in early 1997 In October 1998, the Company began to air a refreshed version of the original Tight Lies infomercial routinely running it on The Golf Channel, regional sports stations, national networks and local, market-specific broadcast stations In addition, the Company continues to utilize 30- and 60-second direct response television commercials as well as radio advertising. The Company advertises regularly in major golf and industry publications, general consumer magazines and local newspapers nationwide. These include GOLF DIGEST, GOLF MAGAZINE, SPORTS ILLUSTRATED, THE WALL STREET JOURNAL and USA TODAY. Finally, the Company engages in regularly scheduled direct mail advertising campaigns.

- TRADITIONAL IMAGE-BASED ADVERTISING - The Company's direct response sales revenue has enabled Adams Golf to broaden its advertising efforts to include traditional image-based advertising This advertising includes a series of 30-second commercials which run during major golf tournaments and golf related programs; newspaper, magazine and radio ad campaigns; sponsorship of selected golf tournaments; exclusive sponsorship of The Golf Channel's weekly instructional program, "LIVING ROOM LESSONS". and a recently updated and professionally redesigned web site located at www.adamsgolf.com

PROMOTIONAL ACTIVITIES - Company engages in a variety of promotional activities to sell and market its products. Such activities include (i) consumer sweepstakes such as the Company's "Ramble in the Bramble," where the winner received an all expense paid, luxury tour for two to Scotland's most legendary golf courses; (ii) promotional giveaways with certain purchases, including items such as instructional videos, audio tapes. and golf bags; and (iii) promotional campaigns like the "90-Day Challenge." in which the Company advertises its 90-day return policy

RELATIONSHIP WITH NICK FALDO AND OTHERS - In May 1998. the Company formed a lifetime relationship with Nick Faldo, an internationally recognized professional golfer and winner of numerous U.S. and international championships, including three Masters (1989, 1990 and 1996) and three British Opens (1987. 1990 and 1992). Mr. Faldo led the Official World Golf Ranking for 81 weeks during 1993 and 1994. Mr Faldo also has made the most Ryder Cup appearances in the history of golf The Company expects Nick Faldo to continue to be actively and directly involved in the design, testing and development of new technologies and products. Mr. Faldo is noted for his precise play as a golfer and his reputation as a perfectionist. The Company believes that by aligning itself with Mr. Faldo, it can further promote the Adams Golf brand, while at the same time demonstrating the Company's ability to deliver golf clubs that satisfy the specific and demanding requirements of tour professionals

In addition. the Company has also obtained endorsements from Hank Haney. Mr. Haney was named the 1993 PGA Teacher of the Year and is a five-time recipient of the Northern Texas Section PGA Teacher of the Year Award. Mr Haney has instructed over 100 touring professionals from the PGA, LPGA. European. Japanese and Asian Tours along with several top rated junior golfers. Mr. Haney is a member of the advisory staff for GOLF DIGEST.

4

RAW MATERIALS. MANUFACTURING AND ASSEMBLY

The Company manages all stages of manufacturing, from sourcing to assembly, in order to maintain a high level of product quality and consistency. The Company establishes product specifications, selects the materials used to produce the components and tests the specifications of all components received by the Company. In addition. the Company has redundant sources of supply for each of the component parts used in the manufacture of its fairway woods and irons and has established a quality assurance program at those manufacturing facilities located in Taiwan and China that are collectively responsible for producing substantially all of the Company's performance fairway and iron club heads. With regard to the Company's SC Series Titanium drivers, the Company utilizes one source of supply in Australia for the club head and redundant sources of supply for the remaining component parts. Upon arrival at the Company's manufacturing facilities in Plano, Texas. each component used in the Company's clubs is again checked to ensure consistency with strict design specifications. Components are then sorted to identify variations in characteristics, such as head weight and shaft flexibility. that, although within the specified range, may affect club performance. Golf clubs are then built by the Company's manufacturing personnel using the appropriate component parts and the Company's patented VMI technology. The Company could in the future experience shortages of components or periods of increased price pressures, which could have a material adverse effect on the Company's business, operating results or financial condition. In addition. failure to obtain adequate supplies or fulfill customer orders on a timely basis could have a material adverse effect on the Company's business. results of operations. financial position or liquidity.

PATENTS

The Company's ability to compete effectively in the golf club market will depend. in large part. on the ability of the Company to maintain the proprietary nature of its technologies and products. The Company currently holds seven U.S. patents relating to certain of its products and proprietary technologies and has three patent applications pending. Assuming timely payment of maintenance fees, if any, the Company expects that the seven currently issued patents will expire on various dates between 2009 and 2013. The Company has been awarded patents with respect to the design of the Tight Lies fairway wood and the VMI design formula. There can be no assurance, however, as to the degree of protection afforded by these or any other patents held by the Company or as to the likelihood that patents will be issued from the pending patent applications. Moreover, these patents may have limited commercial value or may lack sufficient breadth to adequately protect the aspects of the Company's products to which the patents relate. The Company does not hold any foreign patents and no foreign patent applications are pending. The U.S. patents held by the Company do not preclude competitors from developing or marketing products similar to the Company's products in international markets.

There can be no assurance that competitors, many of which have substantially greater resources than the Company and have made substantial investments in competing products. will not apply for and obtain patents that will prevent. limit or interfere with the Company's ability to make and sell its products. The Company is aware of numerous patents held by third parties that relate to products competitive to the Company's. including products competitive with the Tight Lies fairway woods. There is no assurance that these patents would not be used as a basis to challenge the validity of the Company's patent rights, to limit the scope of the Company's patent rights or to limit the Company's ability to obtain additional or broader patent rights. A successful challenge to the validity of the Company's patents may adversely affect the Company's competitive position. Moreover. there can be no assurance that such patent holders or other third parties will not claim infringement by the Company with respect to current and future products. Because U.S. patent applications are held and examined in secrecy, it is also possible that presently pending U.S. applications will eventually issue with claims that will be infringed by the Company's products or technologies. The defense and prosecution of patent suits is costly and time-consuming, even if the outcome is favorable. This is particularly true in foreign countries where the expenses associated with such proceedings can be prohibitive. An adverse outcome in the defense of a patent suit could subject the Company to significant liabilities to third parties, require the Company and others to cease selling products or require disputed rights to be licensed from third parties. Such licenses may not be available on satisfactory terms, or at all.

Despite the Company's efforts to protect its patent and other intellectual property rights, unauthorized parties have attempted and are expected to continue to attempt to copy all, or certain aspects of, the Company's products. Policing unauthorized use of the Company's intellectual property rights can be difficult and expensive, and while the Company takes appropriate action whenever it discovers any of its products or designs have been copied, knock-offs and counterfeit products are a persistent problem in the performance-oriented golf club industry. There can be no assurance that the Company's means of protecting its patent and other intellectual property rights will be adequate.

INDUSTRY SPECIFIC REQUIREMENTS

Due to industry sensitivity to consumer buying trends and available disposable income, the Company has in the past extended payment terms for specific retail customers. Issuance of these terms (i.e. greater than 30 days) are dependent on the Company's relationship with the customer and payment history. In addition to extended payments terms, the nature of the industry also requires that the Company carry a higher level of inventory due to the lead times associated with purchasing components overseas coupled with the seasonality of customer demand.

MAJOR CUSTOMERS

Currently, the Company does not have dependence on a single or small number of major customers for which the loss of one or all would have a material adverse effect on consolidated revenues.

SEASONALITY

Golf generally is regarded as a warm weather sport and sales of golf equipment historically have been strongest during the second and third quarters, with the weakest sales occurring during the fourth quarter. In addition, sales of golf clubs are dependent on discretionary consumer spending, which may be affected by general economic conditions. A decrease in consumer spending generally could result in decreased spending on golf equipment, which could have a material adverse effect on the Company's business, operating results and financial condition. In addition, the Company's future results of operations could be affected by a number of other factors, such as unseasonal weather patterns; demand for and market acceptance of the Company's existing and future products; new product introductions by the Company's competitors; competitive pressures resulting in lower than expected average selling prices; and the volume of orders that are received and that can be fulfilled in a quarter. Any one or more of these factors could result in the Company failing to achieve its expectations as to future sales or net income.

Because most operating expenses are relatively fixed in the short term, the Company may be unable to adjust spending sufficiently in a timely manner to compensate for any unexpected sales shortfall, which could materially adversely affect quarterly results of operations. If technological advances by competitors or other competitive factors require the Company to invest significantly greater resources than anticipated in research and development or sales and marketing efforts, the Company's business, operating results or financial condition could be materially adversely affected. Accordingly, the Company believes that period-to-period comparisons of its results of operations should not be relied upon as an indication of future performance. In addition, the results of any quarter are not indicative of results to be expected for a full fiscal year. As a result of fluctuating operating results or other factors discussed above and below, in certain future quarters the Company's results of operations may be below the expectations of public market analysts or investors. In such event, the market price of the Company's Common Stock would be materially adversely affected.

BACKLOG

The amount of the Company's backlog orders at any particular time is affected by a number of factors, including seasonality and scheduling of the manufacturing and shipment of products. At March 15, 1999, the Company did not have a significant level of orders on backlog and does not anticipate that a significant level of orders will not be filled within the current fiscal year. In addition, the Company believes that the amount of its backlog is not an appropriate indicator of levels of future production.

6

COMPETITION

The Company competes with a number of established golf club manufacturers. some of which have greater financial and other resources. The Company's competitors include Callaway Golf Company. Adidas-Salomon AG (Taylor Made). Fortune Brands. Inc (Titleist and Cobra) and Orlimar Golf Company. among others The Company competes primarily on the basis of performance. brand name recognition. quality and price. The Company believes that its ability to market its products through multiple distribution channels. including on- and off-course golf shops. selected sporting goods retailers and through direct response advertising. is important to its ability to compete

The golf club industry is generally characterized by rapid and widespread imitation of popular technologies. designs and product concepts  Due to the success of the Tight Lies fairway woods, the Company has experienced several competitors introducing similar products  The buying decisions of many purchasers of golf clubs are often the result of highly subjective preferences, which can be influenced by many factors, including, among others. advertising media, promotions and product endorsements. The Company may face competition from manufacturers introducing other new or innovative products or successfully promoting golf clubs that achieve market acceptance. The failure to compete successfully in the future could result in a material deterioration of customer loyalty and the Company's image and could have a material adverse effect on the Company's business. results of operations. financial position or liquidity.

FOREIGN AND DOMESTIC OPERATIONS

For the years ended December 31, 1996, 1997 and 1998 approximately $2,900,000, $35,808.000 and $73,580.000, respectively. of the Company's net sales were derived from operations within the United States. In addition, no one customer contributed greater than 10% of the Company's consolidated net revenues in any one of the years identified.

For the years ended December 31, 1996, 1997 and 1998 approximately $600,000, $882.000 and $11,031,000, respectively, of the Company's net sales were derived from operations outside the United States. In addition. no one customer contributed greater than 10% of the Company's consolidated net revenues in any one of the years identified.

EMPLOYEES

At March 15. 1999, the Company had 248 full-time employees, including 86 engaged in manufacturing and assembly, 14 in research and development and quality control, 88 in sales support and 60 in management and administration  Adams Golf' employees are not unionized. Management believes that its relations with its employees are good

ITEM 2.  PROPERTIES

The Company's administrative offices and manufacturing facilities currently occupy approximately 98,000 square feet of space in Plano, Texas. This facility is leased by the Company pursuant to a lease agreement expiring in 2004 and may be extended for an additional five years  The Company maintains the right to terminate the lease if it moves to a larger facility owned by the current lessor  The Company believes that these facilities will be sufficient through at least the end of 1999.

ITEM 3.  LEGAL PROCEEDINGS

Adams Golf is a party to certain lawsuits and administrative proceedings arising in the ordinary course of its business. Adams Golf evaluates such lawsuits and proceedings on a case-by-case basis. and its policy is to vigorously contest any such claims which it believes are without merit. Based upon information presently available to the Company, management believes that the ultimate resolution of such pending matters will not materially adversely affect the Company's business. financial position. results of operations or liquidity.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

Not Applicable.

PART II

ITEM 5.  MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

The Company's common stock is listed and traded on the Nasdaq Stock Market's
National Market under the symbol "ADGO." The prices in the table below
represent, for the periods indicated, the quarterly high and low sales price for
Adams Golf, Inc. common stock as reported by The Nasdaq Stock Market. All price
quotations represent prices between dealers, without retail mark-ups, mark-downs
or commissions and may not represent actual transactions.

| Fiscal year ended December 31, 1998 | HIGH | LOW |
| --- | --- | --- |
| Third Quarter (beginning July 10, 1998) | $18 7/8 | $3 7/8 |
| Fourth Quarter | 5 3/16 | 3 |

On March 15, 1999, the last reported sale price of the common stock on The
Nasdaq Stock Market's National Market was $3 11/16 per share.

At March 15, 1999, Adams Golf, Inc. had approximately 7,000 stockholders
based on the number of holders of record and an estimate of the number of
individual participants represented by security position listings.

No dividends have been declared or paid relating to the Company's common
stock

8

ITEM 6    SELECTED FINANCIAL DATA

The selected financial data presented below are derived from the Company's
consolidated financial statements for the years ended December 31. 1995, 1996.
1997 and 1998. respectively. The data should be read in conjunction with
"Management's Discussion and Analysis of Financial Condition and Results of
Operations". the consolidated financial statements and related notes and other
financial information included elsewhere in this document.

|  | YEAR ENDED DECEMBER 31, | | | |
|---|---|---|---|---|
|  | 1995 | 1996 | 1997 | 1998 |
|  | (IN THOUSANDS. EXCEPT PER SHARE DATA) | | | |
| Consolidated Statements of Operations Data(1): | | | | |
| Net sales | $1.125 | $ 3,522 | $36,690 | $84,611 |
| Operating income (loss) | (244) | 9 | (3,969) | 18,500 |
| Net income (loss) | $ (243) | $  13 | $(4,654) | $12,510 |
| Income (loss) per common share(2): | | | | |
| Basic | $(0.05) | $   - | $ (0.37) | $  0.61 |
| Diluted | $(0.05) | $   - | $ (0.37) | $  0.61 |
| Weighted average common shares(2): | | | | |
| Basic | 4,423 | 11,238 | 12,519 | 20,435 |
| Diluted | 4,423 | 11,238 | 12,519 | 20,677 |

|  | DECEMBER 31, | | | |
|---|---|---|---|---|
|  | 1995 | 1996 | 1997 | 1998 |
|  | (IN THOUSANDS) | | | |
| Consolidated Balance Sheet Data(1): | | | | |
| Total assets | $ 658 | $2.559 | $17,360 | $96,906 |
| Total debt (including current maturities) | - | 230 | - | 175 |
| Stockholders' equity | 615 | 1,978 | 8.325 | 88,190 |

(1) This table excludes summary financial information for the fiscal year ended
    December 31, 1994 because operations in that year were not comparable in
    size or scope to current operations.

(2) See Note 1 of Notes to Consolidated Financial Statements for information
    concerning the calculation of income (loss) per common share and weighted
    average common shares outstanding.

9

ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
         OF OPERATIONS

OVERVIEW

The Company, which participates in the highly competitive golf industry.
designs, manufactures. markets and distributes premium quality, technologically
innovative golf clubs. Founded in 1987, the Company operated initially as a
components supplier and contract manufacturer. Thereafter. the Company
established its custom fitting operation, which currently services a network of
over 100 certified custom fitting accounts. In the fall of 1995, the Company
introduced the original Tight Lies fairway wood and. in December 1996. the
Company extended the Tight Lies line to include the Tight Lies Strong 3, Strong
5 and Strong 7, with the Tight Lies Strong 9 being introduced in January 1998.
Sales of the Tight Lies line of products increased significantly subsequent to
the second quarter of 1997 when the Company launched an infomercial relating to
the original Tight Lies fairway wood. To further enhance the Tight Lies line of
products, the Company introduced the Strong 2 Tour Brassie and the Strong 11 in
late August 1998. The Company's net sales are primarily derived from sales to
on-and off-course golf shops and selected sporting goods retailers and. to a
lesser extent, direct sales to consumers, international distributors and the
Company's custom fitting accounts

The Company believes that during the second half of 1998. the golf industry
experienced declining sales. Despite the industry trend of declining sales. the
Company has experienced significant positive sales growth over prior years.
However, the Company's ability to continue to generate positive sales trends
into 1999 is dependent upon the successful introduction of new products and the
continued acceptance of its Tight Lies line of fairway woods. No assurances can
be given that demand for the Company's current products or the introduction of
new products will allow the Company to continue its trend of increasing sales.
or to maintain historical levels of sales in the future. The Company introduced
the SC Series Titanium drivers and the Faldo Series wedges in January 1999. and.
accordingly. no sales for these products were recorded in the years ended
December 31, 1996. 1997 and 1998.

The Company does not currently manufacture the components required to assemble
its golf clubs, relying instead on various component suppliers. Fairway wood
components are each available from multiple suppliers. Currently, certain
components for the new SC Series Titanium drivers and the Faldo Series wedges
are produced by a single supplier. Costs of the Company's current Tight Lies
line of fairway woods. new SC Series Titanium drivers and Faldo Series wedges
consist primarily of component parts. including the head. shaft and grip. To a
lesser extent, the Company's cost of goods sold includes labor and occupancy
costs in connection with the inspection. testing and assembly of component parts
at its facility in Plano, Texas

RESULTS OF OPERATIONS

The following table sets forth operating results expressed as a percentage of
net sales for the periods indicated

| | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| | 1996 | 1997 | 1998 |
| Net sales | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 45.1 | 27.2 | 25.3 |
| Gross profit | 54.9 | 72.8 | 74.7 |
| Operating expenses | 54.6 | 83.6 | 52.8 |
| Operating income (loss) | 0.3 | (10.8) | 21.9 |
| Interest income (expense), net | – | (0.2) | 1.5 |
| Other income (expense), net | 0.1 | (0.1) | (0.1) |
| Income (loss) before income taxes | 0.4 | (11.1) | 23.3 |
| Income tax expense | – | 1.6 | 8.5 |
| Net income (loss) | 0.4% | (12.7)% | 14.8% |

YEAR ENDED DECEMBER 31, 1996 COMPARED TO YEAR ENDED DECEMBER 31, 1997

Net sales increased to $36.7 million for 1997 from $3.5 million for 1996,
primarily due to increased market acceptance of the Company's Tight Lies fairway
woods. Net sales of the Tight Lies fairway woods increased to $34.6 million for
1997, from $1.7 million for 1996, and increased as a percentage of net sales to
94.3% from 47.2%, respectively. Net sales of other product lines increased to
$2.1 million for 1997 compared to $1.8 million for 1996, but decreased as a
percentage of net sales to 5.7% for 1997 from 52.8% for 1996.

Gross profit increased to $26.7 million for 1997 from $1.9 million for 1996, and
increased as a percentage of net sales to 72.8% from 54.9%, respectively. Gross
profit for 1997 was favorably affected by an increased percentage of sales
attributable to the higher margin Tight Lies fairway woods and the inherent cost
savings associated with buying components in large volumes and assembling them
on a substantially increased scale.

The Company experienced an operating loss of $4.0 million for 1997 as compared
to operating income of $9,000 for 1996. Total operating expenses increased to
$30.7 million for 1997 from $1.9 million for 1996. Of the $30.7 million of
operating expenses for 1997, $14.8 million, or 48.4% of expenses related to
stock compensation and bonus awards to the Company's Chairman, Chief Executive
Officer and President. See "Certain Transactions" and Note 13 of Notes to
Consolidated Financial Statements. The expense recognized in 1996 in conjunction
with these awards was $0.2 million, or 11.1% of operating expenses. In 1997, the
Company also incurred higher expenses for selling and royalties and provision
for bad debts, in each case due principally to increased sales of the Tight Lies
fairway woods. General and administrative expenses and research and development
expenses also increased in 1997 due to the hiring of additional employees.

YEAR ENDED DECEMBER 31, 1997 COMPARED TO YEAR ENDED DECEMBER 31, 1998

Net sales increased 131% to $84.6 million for the year ended December 31, 1998
from $36.7 million for 1997, primarily due to the continued market acceptance of
the Company's Tight Lies line of fairway woods, and, to a lesser extent, the
introduction of the Strong 2 Tour Brassie and the Strong 11 in late August 1998.
Net sales for 1998 have been reduced by a $4.3 million unconditional credit
given to retailers during the fourth quarter in connection with the Company's
new suggested retail pricing structure. The Company does not expect changes to
its suggested retail pricing structure during 1999. Net sales of the Tight Lies
line of fairway woods increased to $81.6 million for the year ended December 31,
1998 from $34.6 million for 1997, and increased as a percentage of net sales to
96.5% from 94.3%, respectively. Sales of the Tight Lies fairway woods increased
subsequent to the Company's introduction of an infomercial marketing its
original Tight Lies fairway wood in the second quarter of 1997. Net sales of
other product lines for the year ended December 31, 1998 increased to $3.0
million from $2.1 million for 1997, but decreased as a percentage of net sales
to 3.5% from 5.7%, respectively. Net sales of the Company's products outside the
U.S. increased to $11.0 million for the year ended December 31, 1998 from $0.9
million for the year ended December 31, 1997, and increased as a percentage of
net sales to 13.0% from 2.5%, respectively. The increase in international sales
was due to increased market acceptance of the Tight Lies fairway woods and
expanded international marketing efforts beginning in the last half of 1997.

Net sales for 1999 are expected to be positively impacted by the introductions
of the SC Series Titanium drivers and the Faldo Series wedges. However, the
Company believes that declining sales in the golf equipment industry and
increased competition in the fairway wood segment will diminish the growth trend
of sales experienced over the past two years.

Cost of goods sold increased to $21.4 million for the year ended December 31,
1998 from $10.0 million for 1997, and decreased as a percentage of net sales to
25.3% from 27.2%, respectively, primarily due to an increased percentage of net
sales attributable to the higher margin Tight Lies fairway woods and the
inherent cost savings associated with buying components in large volumes and
assembling them on a substantially increased scale. Offsetting the above factors
were lower average selling prices during the second half of 1998 resulting
primarily from the sale of the Company's inventory of "demo" clubs, an increase
of sales to retailers compared to sales to direct consumers and the $4.3 million
credit given to retailers. The introduction of the new product lines (i.e., SC
Series Titanium drivers and the Faldo Series wedges) combined with the new
suggested retail pricing structure for the Tight Lies fairway woods is expected
to increase cost of sales as a percentage of net sales in future periods.

Operating expenses are composed primarily of selling and royalty expenses, general and administrative expenses, and to a lesser extent, research and development expenses. Selling and royalty expenses increased to $31.2 million for the year ended December 31, 1998 from $13.1 million for 1997 as a result of hiring additional employees, incurring increased levels of services provided by independent contractors and increased marketing and advertising efforts. Selling and royalty expenses increased as a percent of net sales for the year ended 1998 to 36.9% from 35.7%, respectively, primarily due to the increased advertising initiatives which included a revised infomercial, television commercials and print advertising. Selling and royalty expenses also include the costs associated with a golf bag giveaway promotion conducted during the fourth quarter of 1998. General and administrative expenses, including provisions for bad debts, increased to $11.9 million, or 14.1% as a percent of sales, for the year ended December 31, 1998 from $2.2 million, or 6.0% as a percent of net sales, excluding stock compensation and bonus awards for the year ended December 31, 1997, primarily due to the hiring of additional employees, use of additional outside services, higher occupancy costs and additional bad debt expense related to increased revenues. For the year ended December 31, 1997, the Company incurred $14.8 million, or 40.5% as a percent of net sales, relating to stock compensation and bonus awards to the Company's Chairman and Chief Executive Officer. Research and development expenses for the year ended December 31, 1998 increased to $1.5 million from $0.6 million for 1997, and increased as a percent of net sales to 1.8% from 1.5%, primarily due to increased salaries, consulting, and tooling expenses associated with the development of new products.

Operating income increased to $18.5 million for the year ended December 31, 1998 from a loss of $4.0 million for 1997.

LIQUIDITY AND CAPITAL RESOURCES

Cash and cash equivalents increased to $23.7 million at December 31, 1998 from $2.0 million at December 31, 1997, primarily as a result of $3.7 million provided by cash flows from operations and $56.4 million provided from financing activities, offset by $38.4 million used for investing activities. The increase in cash flows provided by operations was primarily a result of increased net income. Primary uses of operating cash flows were increases in inventory and income taxes receivable of approximately $8.8 million and $2.1 million, respectively, for the year ended December 31, 1998. The increase in inventory is primarily the result of declining sales in the third and fourth quarter of 1998.

Cash used in investing activities of $38.4 million for the year ended December 31, 1998, is primarily related to purchases of marketable securities, computer equipment and software, telephone systems, and furniture and fixtures. Capital expenditures made in the ordinary course of business relating to the implementation of a customer management information system and enterprise resource planning system for the year ended December 31, 1998 approximated $4.3 million. Cash provided by financing activities of $56.4 million was primarily a result of net proceeds of the initial public offering of $50.5 million.

Working capital totaled $53.0 million at December 31, 1998 compared to $6.9 million at December 31, 1997.

The Company has a $10.0 million revolving credit facility, which expires on May 31, 2000. At December 31, 1998, the Company had no outstanding borrowings under its facility. Borrowings under the Company's revolving credit facility agreement are at interest rates based on the lending bank's general refinance rate of interest or certain LIBOR rates of interest. During the first quarter of 1998, the Company borrowed approximately $1.1 million in the form of a note payable to the Company's Chairman and Chief Executive Officer to be used for working capital purposes. The remaining principal amount of the note (approximately $175,000 at December 31, 1998) is payable on April 14, 1999 at an interest rate of 5.39%.

The Company expects to meet future liquidity requirements primarily through cash flows generated from operations. In 1999, cash flows from operations will be affected by the impact of the Company's net-down program implemented in the fourth quarter of 1998, which reduced accounts receivable by approximately $4.3 million. It is anticipated that operating cash flows and current cash reserves will adequately fund capital expenditure programs which will include continued upgrade of the newly integrated information systems. These capital expenditure programs can be suspended or delayed at any time with minimal disruption to the Company's operations if cash is needed in other areas of the Company's operations. In addition, cash flows from operations will be utilized to support purchasing of more expensive components associated with the SC Series Titanium drivers. The expected net positive cash flows, current cash reserves and flexibility regarding the Company's revolving credit facility allow the Company to meet working capital requirements during periods of low cash flows resulting from the seasonality of the industry.

Capital expenditures for the three years ended December 31, 1996, 1997 and 1998 were approximately $0.1 million, $0.8 million and $4.3 million, respectively. The expenditures made were primarily associated with development of information systems and reporting technologies to adequately monitor business operations. Capital expenditures in the future are not expected to include expenditures outside the ordinary course of business.

The Company is not aware of any event or trend that would potentially affect its liquidity. In the event such a trend should develop, the Company believes that the cash flow from operations, current cash reserves and the revolving credit facility would be sufficient to meet operating needs and capital expenditures for at least the next 12 months.

SEASONALITY AND QUARTERLY FLUCTUATIONS

Golf generally is regarded as a warm weather sport and sales of golf equipment historically have been strongest during the second and third quarters, with the weakest sales occurring during the fourth quarter. In addition, sales of golf clubs are dependent on discretionary consumer spending, which may be affected by general economic conditions. A decrease in consumer spending generally could result in decreased spending on golf equipment, which could have a material adverse effect on the Company's business, operating results and financial condition. In addition, the Company's future results of operations could be affected by a number of other factors, such as unseasonal weather patterns; demand for and market acceptance of the Company's existing and future products; new product introductions by the Company's competitors; competitive pressures resulting in lower than expected average selling prices; reliance on third parties including suppliers; and the volume of orders that are received and that can be fulfilled in a quarter. Any one or more of these factors could result in the Company failing to achieve its expectations as to future sales or net income.

YEAR 2000 READINESS DISCLOSURE

The year 2000 will have a broad impact on the business environment in which the Company operates due to the possibility that many computerized systems across all industries will be unable to process information containing the dates beginning in the year 2000. The Company relies on its internal information technology systems in operating and monitoring many significant aspects of its business, including financial systems, customer services, infrastructure and network and telecommunications equipment. The Company also relies directly and indirectly on the systems of external business enterprises such as suppliers, customers, creditors, financial organizations and domestic and international governments. The Company has established an enterprise-wide program to prepare its computer systems and applications for the year 2000 and is utilizing both internal and external resources to identify, correct and test the systems for Year 2000 compliance. The Company's legacy information system, as well as the information system currently being implemented, are certified as Year 2000 compliant. The Company has substantially completed an inventory of all information technology and non-information technology equipment as of December 31, 1998 and anticipates that the majority of its remediation plan will be completed by April 30, 1999. The Company expects that all systems critical to the conduct of the Company's operations will be Year 2000 compliant prior to the end of the 1999 calendar year.

13

The nature of the Company's business is such that the business risks associated
with the Year 2000 can be reduced by closely assessing the vendors supplying the
components used in assembling the Company's products. Because third party
failures could have a material impact on the Company's ability to conduct
business. questionnaires have been sent to the Company's significant vendors to
obtain reasonable assurance that plans are being developed to address the Year
2000 issue. The returned questionnaires are currently being assessed by the
Company. and are being categorized based upon readiness for the Year 2000 issues
and prioritized in order of significance to the business of the Company. To the
extent that vendors do not provide the Company with satisfactory evidence of
their readiness to handle Year 2000 issues, contingency plans will be developed
by July 31, 1999.

The Company does not believe the costs related to the Year 2000 compliance
project will be material to its financial position or results of operations.
However, the cost of the project and the date on which the Company plans to
complete the Year 2000 modifications are based on management's best estimates,
which were derived utilizing numerous assumptions of future events including the
continued availability of certain resources, third party modification plans. and
other factors. Unanticipated failures by critical vendors, as well as failure by
the Company to execute its own remediation efforts, could have a material
adverse effect on the cost of the project, its completion date, and the
Company's results of operations and financial position. As a result, there can
be no assurance that these forward-looking estimates will be achieved and the
actual cost and vendor compliance could differ materially from those plans,
resulting in material financial risk.

NEW ACCOUNTING PRONOUNCEMENTS

In April 1998, the American Institute of Certified Public Accountants issued
Statement of Position 98-5 ("SOP 98-5"). REPORTING OF THE COSTS OF START-UP
ACTIVITIES, which is effective for financial statements issued for periods
beginning after December 15, 1998. SOP 98-5 requires costs of start-up
activities and organization costs to be expensed as incurred. The Company
believes SOP 98-5 will not have a material impact on its financial statements or
accounting policies. The Company will adopt the provisions of SOP 98-5 in the
first quarter of 1999.

The Company is also assessing the reporting and disclosure requirements of SFAS
No. 133, ACCOUNTING FOR DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES. This
statement establishes accounting and reporting standards for derivative
instruments and hedging activities. The statement is effective for financial
statements for fiscal years beginning after June 15, 1999. The Company believes
SFAS No. 133 will not have a material impact on its financial statements or
accounting policies. The Company will adopt the provisions of SFAS No. 133 in
the first quarter of 2000.

FORWARD-LOOKING STATEMENTS

This Annual Report contains "forward-looking statements" made under the "safe
harbor" provisions of the Private Securities Litigation Reform Act of 1995.
These forward-looking statements are based on the beliefs of the Company's
management as well as assumptions made by and information currently available to
the Company's management. When used in this report, the words "anticipate,"
"believe," "expect" and words or phrases of similar import, as they relate to
the Company or Company management. are intended to identify forward-looking
statements. Such statements reflect the current view of the Company with respect
to future events and are subject to certain risks, uncertainties and assumptions
related to certain factors including, without limitation, product development;
product introductions; market demand and acceptance of products; the impact of
changing economic conditions; business conditions in the golf industry; reliance
on third parties including suppliers; the impact of market peers and their
products; the actions of competitors, including pricing; risks concerning future
technology; and one-time events and other factors detailed in the Company's
prospectus and other Securities and Exchange Commission filings. Although the
Company believes that the expectations reflected in such forward-looking
statements are reasonable, it can give no assurance that such expectations will
prove to have been correct. Based upon changing conditions, should any one or
more of these risks or uncertainties materialize, or should any underlying
assumptions prove incorrect, actual results may vary materially from those
described herein. The Company does not intend to update these forward-looking
statements. All subsequent written and oral forward-looking statements
attributable to the Company or persons acting on its behalf are expressly
qualified in their entirety by the applicable cautionary statements.

14

ITEM 7A   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The Company, in the normal course of doing business, is exposed to market risk
through changes in interest rates with respect to its cash equivalents and
available-for-sale marketable securities. All of the Company's cash equivalents
and available-for-sale marketable securities are fixed rate state government,
municipal or corporate bonds  At December 31, 1998, the cost and market value of
such cash equivalents and marketable securities was approximately $58,629,000
and $58,862,000, respectively  A significant increase in interest rates would
result in a decrease in the bond prices  The Company's investment policy sets
minimum standards related to the quality, maturity and liquidity of such
investments

The table below presents principal amounts and related weighted-average interest
rates by year of maturity for the Company's investment portfolio (in thousands,
except percentages).

|  | 1999 | 2000 | 2001 | TOTAL | FAIR VALUE |
|---|---|---|---|---|---|
| Cash equivalents: |  |  |  |  |  |
| Fixed rate | $24,484 | $      - | $      - | $24,484 | $24,487 |
| Average interest rate (1) | 4.3% | - | - | 4.3% |  |
| Marketable securities: |  |  |  |  |  |
| Fixed rate | $13,019 | $15,206 | $5,920 | $34,145 | $34,375 |
| Average interest rate (1) | 3.5% | 3.9% | 3.8% | 3.7% |  |

(1)   The majority of cash equivalents and marketable securities are
      tax-exempt, resulting in a lower average interest rate than taxable
      investments


ITEM 8   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The financial statements are set forth herein under Item 14 commencing on page
F-1. Schedule II to the financial statement is set forth herein under Item 14 on
page S-1  In addition, quarterly financial data is not required as the Company
has not met the requirements of net income after taxes, but before extraordinary
items and cumulative effect of any change in accounting of $250,000, for each
year in the three year period ended December 31, 1998, or total assets at
December 31, 1998 of $200 million


ITEM 9   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
         FINANCIAL DISCLOSURE

Not Applicable

15

PART III

ITEM 10.   DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The information required by this Item is incorporated by reference from pages
3 through 7, inclusive, of the Company's Proxy Statement dated April 7, 1999
for the annual meeting of shareholders on May 5, 1999 (the "1999 Proxy
Statement") under the respective captions, "Election of Directors", "Section
16(a) Beneficial Ownership Reporting Compliance" and "Executive Officers".

ITEM 11.   EXECUTIVE COMPENSATION

The information required by this Item is incorporated by reference from pages
8 through 10, inclusive, of the Company's 1999 Proxy Statement under the
caption "Compensation of Executive Officers".

ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The information required by this Item is incorporated by reference from page
6 of the Company's 1999 Proxy Statement under the caption "Beneficial
Ownership of Certain Stockholders, Directors and Executive Officers".

ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The information required by this Item is incorporated by reference from pages
10 through 12, inclusive, of the Company's 1999 Proxy Statement under the
captions "Employment Contracts and Change in Control Agreements" and
"Compensation Committee Interlocks and Insider Participation"

16

PART IV

ITEM 14.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K.

(a)  The following documents are filed as a part of this report:

(1)  CONSOLIDATED FINANCIAL STATEMENTS

| ITEM | PAGE |
|------|------|
| Index to Consolidated Financial Statements and Related Financial Statement Schedule | F-1 |
| Independent Auditors' Report | F-2 |
| Consolidated Balance Sheets as of December 31, 1997 and 1998 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 1996, 1997, and 1998 | F-4 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 1996, 1997, and 1998 | F-5 - F-6 |
| Consolidated Statements of Cash Flows for the years ended December 31, 1996, 1997, and 1998 | F-7 |
| Notes to Consolidated Financial Statements | F-8 - F-20 |

(2)  FINANCIAL STATEMENT SCHEDULE

The following financial statement schedule of the Company for the years
ended December 31, 1996, 1997, and 1998 is filed as part of this Annual
Report and should be read in conjunction with the Consolidated Financial
Statements of the Company  All other schedules have been omitted because
said schedules are not required under the related instructions or are not
applicable or because the information required is included in the Company's
consolidated financial statements or the notes thereto

Schedule II - Valuation and Qualifying Accounts                           S-1

17

(3) EXHIBITS

The exhibits listed below are filed as a part of or incorporated by reference in
this Annual Report. Where such filing is made by incorporation by reference to a
previously filed document, such document is identified in parenthesis. See the
Index of Exhibits included with the exhibits filed as part of this Annual
Report.

| EXHIBIT | DESCRIPTION | LOCATION |
|---------|-------------|----------|
| Exhibit 3.1 | Amended and Restated Certificate of Incorporation | Incorporated by reference to Form S-1 (Exhibit 3.1) |
| Exhibit 3.2 | Amended and Restated By-laws | Incorporated by reference to Form S-1 (Exhibit 3.2) |
| Exhibit 4.1 | 1998 Stock Incentive Plan of the Company dated February 26, 1998 | Incorporated by reference to Form S-1 (Exhibit 4.1) |
| Exhibit 10.1 | Agreement between the Registrant and Nick Faldo, dated April 22, 1998 | Incorporated by reference to Form S-1 (Exhibit 10.1) |
| Exhibit 10.2 | Amended and Restated Revolving credit dated dated February 26, 1999, between Adams Golf Direct Response, Ltd., Adams Golf. Ltd. and NationsBank of Texas N.A. and related promissory note and guaranty. | Included in this filing |
| Exhibit 10.3 | Commercial Lease Agreement dated December 5, 1997, between Jackson-Shaw Technology Center II, Ltd. and the Company | Incorporated by reference to Form S-1 (Exhibit 10.3) |
| Exhibit 10.4 | Commercial Lease Agreement dated April 6, 1998, between Jackson-Shaw Technology Center II, Ltd. and the Company | Incorporated by reference to Form S-1 (Exhibit 10.4) |
| Exhibit 10.5 | Letter agreement dated April 13, 1998, between the Company and Darl P. Hatfield | Incorporated by reference to Form S-1 (Exhibit 10.5) |
| Exhibit 21.1 | Subsidiaries of the Registrant | Included in this filing |
| Exhibit 23.1 | Consent of KPMG LLP | Included in this filing |
| Exhibit 27.1 | Financial Data Schedule | Included in this filing |
| Exhibit 99.1 | Proxy Statement of Registrant dated April 7, 1999 | Incorporated by reference to the 1999 Proxy Statement |

(b) REPORTS ON FORM 8-K

    None

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange
Act of 1934, the registrant has duly caused this report to be signed on its
behalf by the undersigned. thereunto duly authorized.

ADAMS GOLF. INC. a Delaware corporation

Date:    March 29. 1999          By: /s/ B. H. (Barney) Adams
                                 ----------------------------------------
                                 B. H. (Barney) Adams,
                                 Chairman of the Board, Chief Executive
                                 Officer and President

Date:    March 29, 1999          By: /s/ Darl P. Hatfield
                                 ----------------------------------------
                                 Darl P. Hatfield,
                                 Senior Vice President - Finance and
                                 Administration and Chief Financial
                                 Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report
has been signed below by the following persons on behalf of the registrant and
in the capacities and on the dates indicate.

Date:    March 29, 1999          /s/ B. H. (Barney) Adams
                                 ----------------------------------------
                                 B. H. (Barney) Adams, Chairman of the
                                 Board, Chief Executive Officer and
                                 President (Principal Executive Officer)

Date:    March 29, 1999          /s/ Paul F. Brown, Jr.
                                 ----------------------------------------
                                 Paul F Brown, Jr..
                                 Director

Date:    March 29, 1999          /s/ Roland E. Casati
                                 ----------------------------------------
                                 Roland E. Casati,
                                 Director

Date:    March 29, 1999          /s/ Mark R. Mulvoy
                                 ----------------------------------------
                                 Mark R. Mulvoy
                                 Director

Date:    March 29, 1999          /s/ Richard H. Murtland
                                 ----------------------------------------
                                 Richard H. Murtland,
                                 Vice President - Research and
                                 Development Secretary. Treasurer and
                                 Director

Date:    March 29, 1999          /s/ Stephen R. Patchin
                                 ----------------------------------------
                                 Stephen R. Patchin
                                 Director

Date:    March 29, 1999          /s/ John S. Simpson
                                 ----------------------------------------
                                 John S  Simpson
                                 Director

19

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS
AND RELATED FINANCIAL STATEMENT SCHEDULE

CONSOLIDATED FINANCIAL STATEMENTS
- --------------------------------

PAGE
----

Independent Auditors' Report    F-2

Consolidated Balance Sheets as of December 31, 1997 and 1998    F-3

Consolidated Statements of Operations for the years ended December 31, 1996, 1997 and 1998    F-4

Consolidated Statements of Stockholders' Equity for the years ended December 31, 1996, 1997 and 1998    F-5 - F-6

Consolidated Statements of Cash Flows for the years ended December 31, 1996, 1997 and 1998    F-7

Notes to Consolidated Financial Statements    F-8 - F20

FINANCIAL STATEMENT SCHEDULE
- ----------------------------

The following financial statement schedule of the Company for the years
ended December 31, 1996, 1997, and 1998 is filed as part of this Report
and should be read in conjunction with the Consolidated Financial
Statements of the Company.

Schedule II - Valuation and Qualifying Accounts    S-1

All other schedules are omitted since the required information is not
present, or is not present in amounts sufficient to require submission
of the schedule, or because the information required is included in the
consolidated financial statements and notes thereto.

F-1

INDEPENDENT AUDITORS' REPORT

The Board of Directors and Stockholders
Adams Golf, Inc. and subsidiaries:

We have audited the consolidated financial statements of Adams Golf, Inc. and
subsidiaries as listed in the accompanying index. In connection with our audits
of the consolidated financial statements, we have also audited the financial
statement schedule as listed in the accompanying index. These consolidated
financial statements and financial statement schedule are the responsibility of
the Company's management. Our responsibility is to express an opinion on these
consolidated financial statements and financial statement schedule based on our
audits.

We conducted our audits in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to obtain
reasonable assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting
the amounts and disclosures in the financial statements. An audit also includes
assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.
We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present
fairly, in all material respects, the financial position of Adams Golf, Inc. and
its subsidiaries as of December 31, 1997 and 1998, and the results of their
operations and their cash flows for each of the years in the three-year period
ended December 31, 1998 in conformity with generally accepted accounting
principles. Also, in our opinion, the related financial statement schedule, when
considered in relation to the basic consolidated financial statements taken as a
whole, presents fairly, in all material respects, the information set forth
therein.

                                        KPMG LLP

Dallas, Texas
January 25, 1999

                              F-2

ADAMS GOLF. INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

ASSETS

| | DECEMBER 31, | |
| --- | --- | --- |
| | 1997 | 1998 |
| Current assets: | | |
| Cash and cash equivalents | $1,956 | $23,688 |
| Marketable securities (note 2) | - | 13,084 |
| Trade receivables, net (note 3) | 7,671 | 2,022 |
| Inventories (note 4) | 4,487 | 13,312 |
| Prepaid expenses | 509 | 885 |
| Income tax receivable | - | 2,088 |
| Deferred income tax assets (note 12) | 390 | 2,386 |
| Other current assets | 937 | 1,287 |
| Total current assets | 15,950 | 58,752 |
| Property and equipment, net (note 5) | 604 | 3,468 |
| Marketable securities (note 2) | - | 21.291 |
| Deferred income tax assets (note 12) | 183 | - |
| Professional services agreement (note 6) | - | 9,450 |
| Other assets, net (note 7) | 623 | 3,945 |
| | $17,360 | $96.906 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
| --- | --- | --- |
| Current liabilities: | | |
| Note payable to shareholder (note 11) | $ - | $ 175 |
| Accounts payable | 378 | 1,152 |
| Income taxes payable | 1,021 | - |
| Accrued expenses (note 8) | 7,636 | 4,418 |
| Total current liabilities | 9,035 | 5,745 |
| Deferred income tax liabilities (note 12) | - | 2,971 |
| Total liabilities | 9,035 | 8.716 |
| Stockholders' equity (note 13): | | |
| Preferred stock, $0.01 par value; authorized 5,000.000 shares; none issued and outstanding | - | - |
| Common stock, $.001 par value; authorized 50,000,000 shares; 15,719,338 shares issued and outstanding at December 31, 1997 and 23,136,782 shares issued and 22,479.282 shares outstanding at December 31. 1998 | 16 | 23 |
| Additional paid-in capital | 14,123 | 85,183 |
| Common stock subscription | - | (22) |
| Deferred compensation | - | (704) |
| Accumulated other comprehensive income | - | 150 |
| Retained earnings (accumulated deficit) | (5,814) | 6,696 |
| Treasury stock, 657,500 shares at cost | - | (3,136) |
| Total stockholders' equity | 8,325 | 88,190 |
| Commitments and contingencies (notes 6 and 9) | | |
| | $17,360 | $96.906 |

See accompanying notes to consolidated financial statements.

F-3

ADAMS GOLF, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

|  | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
|  | 1996 | 1997 | 1998 |
| Net sales (note 3) | $3,522 | $36,690 | $84,611 |
| Cost of goods sold | 1,590 | 9,991 | 21,441 |
| Gross profit | 1,932 | 26,699 | 63,170 |
| Operating expenses: | | | |
| Research and development expenses | 51 | 557 | 1,532 |
| Selling and royalty expenses | 626 | 13,093 | 31,239 |
| General and administrative expenses: | | | |
| Stock compensation and bonus award (note 13) | 214 | 14,842 | – |
| Provision for bad debts | 51 | 739 | 1,464 |
| Other | 981 | 1,437 | 10,435 |
| Total operating expenses | 1,923 | 30,668 | 44,670 |
| Operating income (loss) | 9 | (3,969) | 18,500 |
| Other income (expense): | | | |
| Interest income | 4 | 15 | 1,367 |
| Interest expense | – | (70) | (71) |
| Other | – | (48) | (103) |
| Income (loss) before income taxes | 13 | (4,072) | 19,693 |
| Income tax expense (note 12) | – | 582 | 7,183 |
| Net income (loss) | $   13 | $(4,654) | $12,510 |
| Income (loss) per common share: | | | |
| Basic | $    – | $ (0.37) | $  0.61 |
| Diluted | $    – | $ (0.37) | $  0.61 |

See accompanying notes to consolidated financial statements.

F-4

ADAMS GOLF. INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(IN THOUSANDS. EXCEPT SHARE AMOUNTS)

YEARS ENDED DECEMBER 31. 1996. 1997 AND 1998

| | SHARES OF COMMON STOCK | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | COMMON STOCK SUBSCRIPTION | DEFERRED COMPENSATION | ACCUMULATED OTHER COMPREHENSIVE INCOME |
|---|---|---|---|---|---|---|
| Balance, December 31, 1995 | 11,062,908 | $ 11 | $ 1,776 | $ - | $ - | $ - |
| Net income | | - | - | - | - | - |
| Sale of stock | 1,581,126 | 2 | 1,594 | - | - | - |
| Common stock repurchased and retired (note 13) | (770,800) | (1) | (244) | - | - | - |
| Balance, December 31, 1996 | 11,873,234 | 12 | 3,126 | - | - | - |
| Net loss | - | - | - | - | - | - |
| Stock compensation award (note 13) | 2,000,000 | 2 | 9,998 | - | - | - |
| Exercise of stock options | 946,104 | 1 | 550 | - | - | - |
| Exchange of debt for common common stock (note 13) | 900.000 | 1 | 449 | - | - | - |
| Balance, December 31, 1997 | 15,719,338 | $16 | $14,123 | $ - | $ - | $ - |

| | RETAINED EARNINGS (ACCUMULATED DEFICIT) | COMPREHENSIVE INCOME | COST OF TREASURY STOCK | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|---|---|
| Balance, December 31, 1995 | $(1,173) | | $ - | $ 614 |
| Net income | 13 | $ 13 | - | 13 |
| Sale of stock | - | | - | 1,596 |
| Common stock repurchased and retired (note 13) | - | | - | (245) |
| Balance, December 31, 1996 | (1,160) | | - | 1,978 |
| Net loss | (4,654) | $(4,654) | - | (4,654) |
| Stock compensation award (note 13) | - | | - | 10,000 |
| Exercise of stock options | - | | - | 551 |
| Exchange of debt for common common stock (note 13) | - | | - | 450 |
| Balance, December 31, 1997 | $(5,814) | | $ - | $ 8,325 |

(continued)

ADAMS GOLF, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (CONTINUED)
(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

YEARS ENDED DECEMBER 31, 1996, 1997 AND 1998

| | SHARES OF COMMON STOCK | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | COMMON STOCK SUBSCRIPTION | DEFERRED COMPENSATION | ACCUMULATED OTHER COMPREHENSIVE INCOME | RETAINED EARNINGS (ACCUMULATED DEFICIT) | COMPREHENSIVE INCOME | COST OF TREASURY STOCK | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 1997 | 15,719,338 | $ 16 | $14,123 | $ - | $ - | $ - | $(5,014) | $ - | $ - | $ 8,325 |
| Comprehensive income: | | | | | | | | | | |
| Net income | - | - | - | - | - | - | 12,510 | $12,510 | - | 12,510 |
| Other comprehensive income, net of tax - unrealized gains on marketable securities | - | - | - | - | - | 150 | | 150 | - | 150 |
| Comprehensive income | - | - | - | - | - | - | - | $12,660 | - | - |
| Issuance of common stock | 4,037,500 | 4 | 58,468 | - | - | - | - | | - | 58,472 |
| Issuance of stock options | - | - | 2,027 | - | (2,027) | - | - | | - | - |
| Stock option forfeiture | - | - | (487) | - | 487 | - | - | | - | - |
| Exercise of stock options | 2,479,944 | 2 | 928 | (230) | - | - | - | | - | 700 |
| Payment of stock subscription | - | - | - | 208 | - | - | - | | - | 208 |
| Grant of stock (note 6) | 900,000 | 1 | 10,124 | - | - | - | - | | - | 10,125 |
| Treasury stock purchases (657,500 shares) | - | - | - | - | - | - | - | | (3,136) | (3,136) |
| Amortization of deferred compensation | - | - | - | - | 836 | - | - | | - | 836 |
| Balance, December 31, 1998 | 23,136,782 | $23 | $85,183 | $ (22) | $ (704) | $150 | $ 6,696 | | $(3,136) | $88,190 |

See accompanying notes to consolidated financial statements.

ADAMS GOLF. INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(IN THOUSANDS)

|  | YEARS ENDED DECEMBER 31. | | |
|  | 1996 | 1997 | 1998 |
| Cash flows from operating activities: | | | |
| Net income (loss) | $13 | $(4,654) | $12,510 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization of property and equipment and intangible assets | 19 | 302 | 2,204 |
| Loss on retirement of fixed assets | - | 134 | 111 |
| Stock compensation and bonus award | - | 10,000 | - |
| Amortization of deferred compensation | - | - | 836 |
| Deferred income taxes | - | (573) | 1,077 |
| Allowance for doubtful accounts | 26 | 672 | 596 |
| Changes in assets and liabilities: | | | |
| Trade receivables | (374) | (8,067) | 5,053 |
| Inventories | (476) | (3,812) | (8,825) |
| Prepaid expenses | - | (481) | (376) |
| Income tax receivable | - | - | (2,088) |
| Other current assets | - | (716) | (350) |
| Other assets | (362) | (390) | (3,567) |
| Accounts payable | (23) | 360 | 774 |
| Income taxes payable | - | 1,021 | (1,021) |
| Accrued expenses | 329 | 7,304 | (3,218) |
| Net cash provided by (used in) operating activities | (848) | 1,100 | 3,716 |
| Cash flows from investing activities: | | | |
| Purchases of marketable securities | - | - | (34,145) |
| Purchase of equipment | (121) | (770) | (4,258) |
| Net cash used in investing activities | (121) | (770) | (38,403) |
| Cash flows from financing activities: | | | |
| Proceeds from initial public offering | - | - | 60,078 |
| Initial public offering costs | - | - | (1,606) |
| Purchase of treasury stock | - | - | (3,136) |
| Proceeds from notes payable and line of credit | 230 | 1,050 | 7,135 |
| Repayment of line of credit borrowings | - | (800) | (6,000) |
| Repayment of notes payable | - | (30) | (960) |
| Issuance of common stock | 1,351 | 551 | 908 |
| Net cash provided by financing activities | 1,581 | 771 | 56,419 |
| Net increase in cash and cash equivalents | 612 | 1,101 | 21,732 |
| Cash and cash equivalents at beginning of year | 243 | 855 | 1,956 |
| Cash and cash equivalents at end of year | $ 855 | $ 1,956 | $ 23,688 |
| Supplemental disclosure of cash flow information: | | | |
| Interest paid | $ - | $ 70 | $ 27 |
| Income taxes paid | $ - | $ 356 | $ 9,298 |
| Supplemental disclosure of non-cash financing activity-stock issued for professional services agreement (note 6) | $ - | $ - | $ 10,125 |
| Exchange of debt for common stock | $ - | $ 450 | $ - |

See accompanying notes to consolidated financial statements.

F-7

ADAMS GOLF, INC AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(1)    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(A)    GENERAL

Adams Golf, Inc (the "Company") was founded in 1987. The Company
designs, manufactures, markets and distributes premium quality,
technologically innovative golf clubs and provides custom golf
club fitting technology. The Company's primary products are
fairway woods and drivers that are marketed under the trademarks
"Tight Lies" and "SC Series," respectively. The SC Series was
introduced in January 1999 and, accordingly, had no sales for the
three-year period ended December 31, 1998.

The consolidated financial statements include the accounts of
Adams Golf, Inc. and its subsidiaries, all of which are wholly
owned. All significant intercompany accounts and transactions have
been eliminated in consolidation.

(B)    MARKETABLE SECURITIES

Marketable securities, primarily consisting of governmental and
corporate bonds, are managed under agreements with investment
managers. The agreements provide terms related to the quality,
diversification and maturities of the investments in the managed
portfolios. The investments are classified as available-for-sale
and are carried at fair value, with unrealized gains and losses,
net of the related tax effect, reported as other comprehensive
income in the consolidated statement of stockholders' equity. The
balance sheet classification of the Company's marketable
securities is based upon the contractual maturity date of such
securities.

(C)    INVENTORIES

Inventories are valued at the lower of cost or market and
primarily consist of completed golf clubs and component parts.
Cost is determined using the first-in, first-out method.

(D)    PROPERTY AND EQUIPMENT

Property and equipment are stated at cost. Depreciation and
amortization are calculated using the straight-line method over
the estimated useful lives of the respective assets, which range
from three to seven years

(E)    REVENUE RECOGNITION

The Company records revenue as earned, which generally occurs when
the product is shipped.

F-8

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(F)    OTHER ASSETS AND RELATED AMORTIZATION EXPENSE

Other assets consist primarily of the cost of implementing an
enterprise resource planning (ERP) software system, obtaining
patents, development costs of an infomercial and various deposits.
The ERP software system costs have been capitalized in accordance
with AICPA Statement of Position 98-1, ACCOUNTING FOR THE COSTS OF
COMPUTER SOFTWARE DEVELOPED OR OBTAINED FOR INTERNAL USE, which
was adopted by the Company on January 1, 1998. These costs are
being amortized using the straight-line method over five years.
Patent amortization is computed using the straight-line method
over the estimated useful lives of the assets, which range from 5
to 15 years. Infomercial costs are amortized over a 6 to 24 month
period based on the estimated useful life and on revenues
generated compared to total estimated revenues resulting from the
airing of such infomercials.

(G)    RESEARCH AND DEVELOPMENT

Research and development costs consist of all costs incurred in
planning, designing and testing of golf equipment, including
salary costs related to research and development, and are expensed
as incurred.

(H)    ADVERTISING COSTS

Advertising costs, other than direct response (infomercial) costs,
are expensed as incurred and aggregated approximately $34,000,
$8,651,000 and $17,083,000 in 1996, 1997 and 1998, respectively.

(I)    PRODUCT WARRANTY

The Company's golf equipment is sold under warranty against
defects in material and workmanship for a period of two years. In
addition, the Company has a 90 day "no questions asked" return
policy applicable to direct response sales. An allowance for
estimated future warranty and sales return costs is recorded in
the period products are sold.

(J)    INCOME TAXES

The Company accounts for income taxes using the asset and
liability method. Deferred tax assets and liabilities are
recognized for the future tax consequences attributable to
differences between the financial statement carrying amounts of
existing assets and liabilities and their respective tax bases and
operating loss carryforwards. Deferred tax assets and liabilities
are measured using enacted rates expected to apply to taxable
income in the years in which those temporary differences are
expected to be recovered or settled. The effect on deferred tax
assets and liabilities of a change in tax rates is recognized in
income in the period that includes the enactment date.

F-9

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(K)    INCOME (LOSS) PER SHARE

The weighted average common shares used for basic net income
(loss) per common share were 11,237,794, 12,519,392, and
20,434,775 for 1996, 1997 and 1998, respectively. The effect of
dilutive stock options added 241,520 shares for 1998 for the
computation of diluted income per common share. Options to
purchase 100,000 shares of common stock which were outstanding
during 1998 were not included in the computation of diluted
earnings per share as their effect would have been antidilutive.
Stock options outstanding in 1996 and 1997 were not considered in
the computation of net income (loss) per common share since their
effect is either immaterial or antidilutive.

(L)    FINANCIAL INSTRUMENTS

The carrying amounts of cash and cash equivalents, accounts
receivable, accounts payable, accrued expenses and note payable to
shareholder approximate fair value, due to the short maturity of
these instruments. The carrying amount of marketable securities
is based upon quoted market prices.

(M)    IMPAIRMENT OF LONG-LIVED ASSETS AND LONG-LIVED ASSETS TO BE
       DISPOSED OF

The Company reviews long-lived assets and certain identifiable
intangibles for impairment whenever events or changes in
circumstances indicate that the carrying amount of an asset may
not be recoverable. Recoverability of assets to be held and used
is measured by a comparison of the carrying amount of an asset to
future net cash flows expected to be generated by the asset. If
such assets are considered to be impaired, the impairment to be
recognized is measured by the amount by which the carrying amount
of the assets exceed the fair value of the assets. Assets to be
disposed of are reported at the lower of the carrying amount or
fair value less costs to sell.

(N)    COMPREHENSIVE INCOME

In 1998, the Company adopted Statement of Financial Accounting
Standards (SFAS) No. 130, REPORTING COMPREHENSIVE INCOME. This
statement establishes rules for the reporting of comprehensive
income and its components. Comprehensive income consists of net
income and unrealized gains and losses, net of related tax effect,
on marketable securities classified as available-for-sale and is
presented in the consolidated statement of shareholders' equity.

F-10

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(O)   STATEMENTS OF CASH FLOWS

The Company considers all short-term highly liquid instruments,
with an original maturity of three months or less, to be cash
equivalents.

(P)   USE OF ESTIMATES

The preparation of financial statements in conformity with
generally accepted accounting principles requires management to
make estimates and assumptions that affect the reported amounts of
assets and liabilities and disclosure of contingent assets and
liabilities at the date of the financial statements and the
reported amounts of revenues and expenses during the reporting
period. Actual results could differ from those estimates.

(2)   MARKETABLE SECURITIES

Marketable securities consist of the following at December 31, 1998:

|  | COST | UNREALIZED GAINS | FAIR VALUE |
|---|---|---|---|
| Governmental bonds | $ 32,342 | $229 | $ 32,571 |
| Corporate bonds | 1,803 | 1 | 1,804 |
|  | 34,145 | 230 | 34,375 |
| Less current amounts | (13,019) | (65) | (13,084) |
| Long-term marketable securities | $ 21,126 | $165 | $ 21,291 |

During the year ended December 31, 1998, there were no proceeds from the
sale of available-for-sale securities. All marketable securities mature
within three years.

F-11

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(3)    TRADE RECEIVABLES

Trade receivables consist of the following at December 31, 1997 and 1998:

|  | 1997 | 1998 |
|---|---|---|
| Trade receivables | $8,369 | $ 3,316 |
| Allowance for doubtful accounts | (698) | (1,294) |
|  | $7,671 | $ 2,022 |

During the fourth quarter of 1998, the Company provided retailers an
unconditional credit ("Net-down Credit") in connection with the Company's
new suggested retail pricing structure. The Net-down Credit, which
aggregated approximately $4,300,000, has been reflected as a reduction in
net sales and accounts receivable in the Company's consolidated financial
statements as of and for the year ended December 31, 1998

(4)    INVENTORIES

Inventories consist of the following at December 31, 1997 and 1998:

|  | 1997 | 1998 |
|---|---|---|
| Finished goods | $2,064 | $ 2,880 |
| Component parts | 2,423 | 10,432 |
|  | $4,487 | $13,312 |

(5)    PROPERTY AND EQUIPMENT, NET

Property and equipment consists of the following at December 31, 1997 and
1998:

|  | 1997 | 1998 |
|---|---|---|
| Manufacturing equipment | $ 142 | $  244 |
| Office equipment | 660 | 4,112 |
| Accumulated depreciation and amortization | (198) | (888) |
|  | $ 604 | $3,468 |

F-12

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(6)  PROFESSIONAL SERVICES AGREEMENT

The professional services agreement consists of a contract entered into
by the Company and Nicholas A. Faldo ("Faldo"), a professional golfer,
which provides, among other things, for Faldo's endorsement and use of
the Company's products, as well as the design, development and testing of
new technologies and products. As consideration for such services, Faldo
received 900,000 shares of the Company's common stock, which were valued
at the fair market value of the stock ($11.25 per share) as of May 1,
1998, the effective date of the agreement. The value of the stock is
being amortized over ten years, which represents the estimated period
during which the Company will realize benefits under the agreement.

In addition, Faldo will receive royalty payments representing 5% of net
sales outside the U.S., with a minimum annual amount of $1,500,000
beginning in 1999 and increasing ratably to $4,000,000 in 2004.

(7)  OTHER ASSETS, NET

Other assets, net, consist of the following at December 31, 1997 and
1998:

|  | 1997 | 1998 |
|---|---|---|
| Enterprise resource planning software | $     - | $3,618 |
| Deposits, including amounts for fixed assets purchased | 381 | 274 |
| Infomercial costs | 233 | - |
| Patents | 9 | 7 |
| Other | - | 46 |
|  | $  623 | $3,945 |

(8)  ACCRUED EXPENSES

Accrued expenses consist of the following at December 31, 1997 and 1998:

|  | 1997 | 1998 |
|---|---|---|
| Payroll, bonuses and commissions (see note 13) | $5,576 | $  476 |
| Royalties | 393 | 506 |
| Advertising | 471 | 1,661 |
| Product warranty expense and sales return | 449 | 736 |
| Professional services | 340 | 605 |
| Other | 407 | 434 |
|  | $7,636 | $4,418 |

F-13

ADAMS GOLF. INC  AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands. except share amounts)

December 31, 1997 and 1998

(9)    COMMITMENTS AND CONTINGENCIES

The Company is obligated under certain noncancelable operating leases for
manufacturing, warehouse and office space. A summary of the minimum
rental commitments under noncancellable leases is as follows:

| YEARS ENDING DECEMBER 31. | |
|---|---|
| 1999 | $687 |
| 2000 | 717 |
| 2001 | 732 |
| 2002 | 767 |
| 2003 | 785 |
| Thereafter | 262 |

Rent expense was approximately $46,000 $104,000 and $472,000 for the
years ended December 31, 1996, 1997 and 1998. respectively.

The Company had outstanding commitments on letters of credit of
approximately $144.000 at December 31. 1998. for the purchase of
inventory from foreign vendors

From time to time, the Company is a party to various legal proceedings
arising from the ordinary course of business. While any proceeding has an
element of uncertainty, management believes that the final outcome of all
matters currently pending will not have a materially adverse effect on
the Company's financial position, results of operations or liquidity.

(10)   RETIREMENT PLAN

In February 1998, the Company adopted the Adams Golf, Ltd. 401(k)
Retirement Plan (the "Plan"), which covers substantially all employees.
The Company matches 50% of employee contributions up to a maximum of 6%
of the employee's compensation. For the year ended December 31. 1998. the
Company contributed approximately $74,000 to the Plan.

F-14

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(11)  DEBT

On February 27, 1998, the Company entered into a $10,000,000 revolving
credit facility (the "Facility") bearing interest payable monthly at the
bank's prime rate minus 25 basis points (7.50% at December 31, 1998) or
LIBOR plus 1.75%, which expired December 31, 1998. Subsequent to December
31, 1998, the Company amended the Facility's maturity date to May 31,
2000 and the interest rate to the bank's prime rate of interest minus 50
basis points or LIBOR plus 1.00%. At December 31, 1998, there were no
amounts outstanding under the Facility. The Company pays a commitment fee
on the unused portion of the Facility of one-eighth of one percent per
annum.

During the first quarter of 1998, the Company borrowed $1,135,000 in the
form of an unsecured note payable to the Chief Executive Officer. The
remaining principal balance of the note of $175,000, which bears interest
at 5.39%, is due on April 14, 1999.

(12)  INCOME TAXES

Income tax expense (benefit) for the years ended December 31, 1997 and
1998 consists of the following:

|                    | 1997  | 1998   |
|--------------------|-------|--------|
| Federal - current  | $1,021 | $5,486 |
| Federal - deferred | (573) | 1,077  |
| State - current    | 134   | 620    |
|                    | $ 582 | $7,183 |

Actual income tax expense differs from the "expected" income tax expense
(benefit) (computed by applying the U.S. federal corporate tax rate of
34% for 1996 and 1997 and 35% for 1998 to income (loss) before income
taxes) for the years ended December 31, 1996, 1997 and 1998 as follows:

|                                                      | 1996  | 1997     | 1998    |
|------------------------------------------------------|-------|----------|---------|
| Computed "expected" tax expense (benefit)            | $  4  | $(1,384) | $6,892  |
| State income taxes, net of federal tax benefit       | -     | 89       | 403     |
| Non-taxable interest income                          | -     | -        | (286)   |
| Stock compensation and bonus award                   | -     | 2,159    | -       |
| Change in valuation allowance for deferred tax assets | (4)   | (338)    | (50)    |
| Other                                                | -     | 56       | (224)   |
|                                                      | $  -  | $   582  | $7,183  |

F-15

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

The tax effects of temporary differences that give rise to deferred tax
assets and deferred tax liabilities at December 31 are presented below:

|  | 1997 | 1998 |
|---|---|---|
| **Deferred tax assets:** | | |
| Allowance for bad debts | $ 237 | $   453 |
| Research and development costs | 1 | 160 |
| Net-down credit | – | 1,505 |
| Product warranty and sales returns | 153 | 258 |
| Obsolete inventory reserve | – | 77 |
| Other reserves | – | 93 |
| Net operating loss carryforwards | 311 | 275 |
| Total gross deferred tax assets | 702 | 2,821 |
| Less valuation allowance | (50) | – |
| Net deferred tax assets | 652 | 2,821 |
| **Deferred tax liabilities:** | | |
| Infomercial costs | 79 | – |
| Prepaid professional services | – | 3,308 |
| Tax/book depreciation difference | – | 17 |
| Unrealized gain on marketable securities | – | 81 |
| Total gross deferred tax liabilities | 79 | 3,406 |
| Net deferred tax assets (liabilities) | $ 573 | $ (585) |

In assessing the realizability of deferred income tax assets, management
considers whether it is more likely than not that some portion or all of
the deferred income tax assets will not be realized. The ultimate
realization of deferred income tax assets is dependent upon the
generation of future taxable income during the periods in which those
temporary differences become deductible.

The valuation allowance for deferred tax assets at December 31, 1997 was
$50,000. The net change in the total valuation allowance for the years
ended December 31, 1997 and 1998 was a decrease of $338,000 and $50,000,
respectively.

At December 31, 1998, the Company has net operating loss carryforwards
for federal income tax purposes of approximately $786,000 which are
available to offset future federal taxable income through 2010. The
availability of the net operating loss carryforwards to reduce future
taxable income is subject to certain limitations. As a result of a change
in ownership, utilization of its net operating loss carryforwards is
limited to approximately $71,000 per year for the remaining life of the
net operating losses.

ADAMS GOLF, INC AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

(13)  STOCKHOLDERS' EQUITY

    (A)   INITIAL PUBLIC OFFERING

        The Company completed the sale of 4,000,000 shares of common stock through an initial public offering (the "Offering") on July 15, 1998. The Offering resulted in net proceeds to the Company of approximately $58,000,000 after deducting offering expenses, discounts and commissions. On July 20, 1998, the Company completed the sale of an additional 37,500 shares of common stock in connection with the underwriters' exercise of their option to cover over-allotments, resulting in net proceeds of $500,000.

    (B)   STOCK OPTION PLANS

        In April 1996, the Company adopted the 1996 Stock Option Incentive Plan (the 1996 Stock Option Plan), pursuant to which stock options covering an aggregate of 800,000 shares of the Company's common stock may be granted. Options awarded under the 1996 Stock Option Plan (i) are generally granted at prices that equate to or are above fair market value on the date of the grant; (ii) generally become exercisable over a period of one to four years; and (iii) generally expire five years subsequent to award.

        At December 31, 1998, there were 140,310 shares available for grant under the 1996 Stock Option Plan. The per share weighted-average fair value of stock options granted during 1996 was $0.06, on the date of grant using the Black Scholes option-pricing model with the following weighted-average assumptions: Risk-free interest rate, 6%; expected life, two - five years and expected dividend yield, 0%. For the years ended December 31, 1997 and 1998, there were no stock options granted, nor does the Company intend to make future grants, under the 1996 Stock Option Plan.

        In connection with an employment agreement entered into in September 1995 with the Company's Chief Executive Officer, the Company granted options to acquire 1,520,766 shares of common stock at $0.375 per share. Vesting of the stock options was conditioned upon meeting certain revenue and earnings requirements, which were met during 1996 and 1997. Also, the agreement provided for a bonus to be paid to the Chief Executive Officer in an amount equal to the exercise price of the options plus any related income tax due by the Chief Executive Officer upon exercise of the options. The Chief Executive Officer notified the Company of his intent to exercise the options in December 1997 with the shares issued in January 1998. Compensation expense of approximately $214,000 and $2,300,000 was charged to operations in 1996 and 1997, respectively, to recognize the bonus due to the Chief Executive Officer.

F-17

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

In conjunction with a 1996 stock purchase agreement, the Company
granted options to a shareholder to acquire an aggregate of
942,632 shares of common stock at option exercise prices ranging
from $0.375 to $0.625 per share. During 1997, the shareholder
exercised the options for an aggregate exercise price of
approximately $550,000.

In February 1998, the Company adopted the 1998 Stock Incentive
Plan ("the 1998 Stock Option Plan"), pursuant to which stock
options covering an aggregate of 1,000,000 shares (of which
900,000 were utilized as a direct stock grant to Faldo (see note
6)) of the Company's common stock may be granted. The Company
granted 467,700 options, which generally vest over four years, to
employees during 1998 at a weighted average price of $3.39 per
share. At December 31, 1998, 541,940 shares remain available for
grant, including forfeitures. For financial statement reporting
purposes, the 1998 grants were deemed to have fair market values
ranging from $3.75 to $11.25 per share at the date of grant.
Accordingly, the Company has recorded deferred compensation of
approximately $704,000, net of amounts amortized and forfeited, at
December 31, 1998. The deferred compensation is being amortized to
expense over the vesting period of the options.

The Company applies Accounting Principles Board Opinion 25 in
accounting for its stock plans, and no compensation cost is
recognized for its stock options in the consolidated financial
statements for those stock options granted at fair market value.
Had the Company determined compensation cost based on the fair
value at the grant date for its stock options under SFAS No. 123,
the Company's net income (loss) would have been the pro forma
amounts indicated below:

|  | 1996 | 1997 | 1998 |
| --- | --- | --- | --- |
| Net income (loss): |  |  |  |
| As reported | $ 13 | $(4,654) | $12,510 |
| Pro forma | (13) | (4,744) | 12,445 |
| Diluted income (loss) per common share: |  |  |  |
| As reported | $ - | $ (0.37) | $ 0.61 |
| Pro forma | - | (0.38) | 0.60 |

The per share weighted-averages fair value of stock options
granted during 1998 under the 1998 Stock Option Plan was $5.22 on
the date of grant using the Black Scholes option-pricing model
with the following weighted-average assumptions: Risk-free
interest rate, 6%; expected life, 5 years; and expected dividend
yield, 0%.

F-18

ADAMS GOLF, INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands, except share amounts)

December 31, 1997 and 1998

Pro forma net income (loss) reflects only options granted in 1996, 1997 and 1998. Therefore, the full impact of calculating compensation cost for stock options under SFAS No. 123 is not reflected in the pro forma net income (loss) amounts presented above because compensation cost is reflected over the respective options vesting periods of up to four years.

A summary of stock option activity follows:

|  | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|
| Options outstanding at December 31, 1995 | 1,520,766 | $0.375 |
| Options granted | 1,946,948 | 1.00 |
| Options outstanding at December 31, 1996 | 3,467,714 | 0.44 |
| Options exercised | (946,104) | 0.583 |
| Options outstanding at December 31, 1997 | 2,521,610 | 0.375 |
| Options granted | 467,700 | 3.39 |
| Options exercised | (2,479,944) | 0.375 |
| Options forfeited | (151,304) | 1.91 |
| Options outstanding at December 31, 1998 | 358,062 | $3.67 |

At December 31, 1998, the exercise prices ranged from $2.50 to $11.25 per share, and the weighted-average remaining contractual life of outstanding options is approximately 4.37 years.

At December 31, 1997 and 1998, the number of options exercisable was 2,114,492 and 45,000, respectively, and the per share weighted-average exercise price of those options was $0.375 and $2.50, respectively. At December 31, 1998, the remaining contractual life of options exercisable was 4.5 years.

(C)    STOCK COMPENSATION AWARD

In December 1997, the Board of Directors of the Company approved a stock compensation award of 2,000,000 shares of common stock to the Chief Executive Officer of the Company. In addition, the Company agreed to pay all income taxes due by the Chief Executive Officer relating to such stock award and related tax bonus. Aggregate compensation of $12,542,000 (including $2,542,000 for estimated taxes) was recorded by the Company during the year ended December 31, 1997 based on the fair market value of the stock.

F-19

ADAMS GOLF. INC. AND SUBSIDIARIES

Notes to Consolidated Financial Statements
(Tables in thousands. except share amounts)

December 31, 1997 and 1998

(D)   NOTE WITH SHAREHOLDER CONVERTED TO STOCK

The Company borrowed $200,000 from a shareholder in October 1996
and an additional $250,000 from the same shareholder in 1997. The
aggregate notes payable balance of $450,000 was converted into
450.000 shares of the Company's stock in September 1997.

(E)   STOCK SPLIT AND AUTHORIZED CLASSES OF STOCK

Effective April 29, 1998, the stockholders of the Company
authorized a two-for-one stock split for holders of record on May
1, 1998. The stock split has been reflected in the accompanying
consolidated financial statements and, accordingly, all applicable
dollar, share and per share amounts have been restated to reflect
the stock split. In addition, the stockholders of the Company also
approved an increase in the number of authorized shares of Common
Stock to 50,000,000 and established a class of preferred stock
with a par value of $ 01 per share and authorized shares of
5,000.000.

(F)   COMMON STOCK REPURCHASE PROGRAM

In October 1998, the Board of Directors approved a plan whereby
the Company is authorized to repurchase from time to time on the
open market up to 2,000,000 shares of its common stock. At
December 31, 1998, the Company had repurchased 657,500 shares of
common stock at an average price per share of $4 77 for a total
cost of approximately $3.136,000 and the repurchased shares are
held in treasury.

(14)   GEOGRAPHIC SEGMENT AND DATA

In 1998, the Company adopted SFAS No. 131, DISCLOSURES ABOUT SEGMENTS OF
AN ENTERPRISE AND RELATED INFORMATION. This statement establishes
standards for reporting information about operating segments and related
disclosures about products and services. geographic areas and major
customers.

The Company generates substantially all revenues from the design.
manufacturing, marketing and distribution of premium quality,
technologically innovative golf clubs. The Company's products are
distributed in both domestic and international markets. Net sales for
these markets consisted of the following for the years ended December 31.
1996, 1997 and 1998:

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| United States | $2,922 | $35,808 | $73,580 |
| Rest of World | 600 | 882 | 11,031 |
|  | $3,522 | $36,690 | $84,611 |

At December 31, 1998. the Company has no assets outside of the United
States.

(15)   SUBSEQUENT EVENT

In February 1999, the Company signed a letter of intent to acquire
certain assets of its exclusive distributor for the United Kingdom, which
is majority owned by Faldo. Consideration will include approximately
$200,000 in cash and a contingent cash payment of $200,000 due at the end
of 1999 based upon the achievement of certain minimum levels of operating
results.

SCHEDULE II

ADAMS GOLF, INC.
VALUATION AND QUALIFYING ACCOUNTS
FOR THE YEARS ENDED DECEMBER 31, 1996, 1997, AND 1998

(DOLLARS IN THOUSANDS)

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS | | DEDUCTIONS(1) | BALANCE AT END OF PERIOD |
| | | CHARGED TO COSTS AND EXPENSES | CHARGED TO OTHER ACCOUNTS | | |
| --- | --- | --- | --- | --- | --- |
| Allowance for doubtful accounts: | | | | | |
| Year ended December 31, 1996 | $  - | 51 | - | 25 | $   26 |
| Year ended December 31, 1997 | 26 | 739 | - | 67 | 698 |
| Year ended December 31, 1998 | 698 | 1,464 | - | 868 | 1,294 |
| Product Warranty and Sales Returns: | | | | | |
| Year ended December 31, 1996 | - | 2 | - | 2 | - |
| Year ended December 31, 1997 | - | 1,808 | - | 1,359 | 449 |
| Year ended December 31, 1998 | $449 | 5,476 | - | 5,189 | $  736 |

(1)    Represents uncollectable accounts charged against the allowance for
       doubtful accounts and actual costs incurred for warranty repairs and
       sales returns

S-1

</TEXT>
</DOCUMENT>

AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT

THIS AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT (this "AGREEMENT") is entered into as of February 26, 1999 by and between ADAMS GOLF DIRECT RESPONSE, LTD., a Texas limited partnership, and ADAMS GOLF, LTD., a Texas limited partnership (each a "BORROWER" and collectively, "BORROWERS"), and NATIONSBANK, N.A., a national banking association, successor in interest by merger to NationsBank of Texas, N.A., a national banking association ("LENDER").

## W I T N E S S E T H:

1. Borrowers and Lender entered into that certain Revolving Credit Agreement dated as of February 27, 1998 (as modified, amended, renewed, extended, and restated from time to time, the "ORIGINAL LOAN AGREEMENT"), pursuant to which Lender provided to Borrowers a revolving credit facility upon the terms and subject to the conditions set forth in the Original Loan Agreement.

2. Borrowers and Lender desire and have agreed, subject to the terms and conditions set forth herein, to amend and restate the Original Loan Agreement in its entirety as and pursuant to this Agreement.

NOW, THEREFORE, in consideration of the mutual promises herein contained and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1

## DEFINITION OF TERMS

1.1 DEFINITIONS. As used in this Agreement, all exhibits and schedules hereto and in any note, certificate, report, or other Loan Documents made or delivered pursuant to this Agreement, the following terms have the respective meanings assigned to them in this SECTION 1 or in the SECTION or recital referred to below:

"ADJUSTED EURODOLLAR RATE" means, with respect to any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16th of 1%) equal to the quotient of (a) the Eurodollar Rate with respect to such Interest Period, DIVIDED BY (b) the remainder of 1.00 MINUS the Eurodollar Reserve Requirement in effect on such date.

"ADVANCE" means (a) the disbursement by Lender of a sum or sums lent to any Borrower pursuant to this Agreement, (b) the conversion of a Borrowing from one type of Borrowing to another type of Borrowing pursuant to SECTION 2.14, and (c) the continuation of a Eurodollar Borrowing to a new Interest Period pursuant to SECTION 2.14.

"ADVANCE DATE" has the meaning set forth in SECTION 2.2(a).

"AFFILIATE" of any Person means any other Person directly or indirectly, controlling, controlled by, or under common control with, such Person.

"AFTER-ACQUIRED SUBSIDIARY" has the meaning set forth in SECTION 6.13.

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

"AGI" means Adams Golf. Inc . a Delaware corporation.

"AGREEMENT" means this Revolving Credit Agreement, including the SCHEDULES and EXHIBITS hereto. as the same may be renewed. extended. amended. or modified from time-to-time.

"APPLICABLE MARGIN" means, at the time of determination thereof, the interest margin over the Base Rate or the Adjusted Eurodollar Rate. as the case may be. as follows:

| APPLICABLE MARGIN BASE RATE BORROWINGS | APPLICABLE MARGIN EURODOLLAR BORROWINGS |
|---|---|
| - 0.50% | 1.00% |

"BASE RATE" means the variable rate of interest established from time-to-time by Lender as its general reference rate of interest (which rate of interest may not be the lowest rate charged by Lender on similar loans). Each change in the Base Rate shall become effective without prior notice to Borrowers automatically as of the opening of business on the date of such change in the Base Rate.

"BASE RATE BORROWING" means any portion of the Principal Debt with respect to which the interest rate is calculated by reference to the Base Rate.

"BORROWING" means a Eurodollar Borrowing or a Base Rate Borrowing.

"BUSINESS DAY" means (a) for all purposes, any day OTHER THAN a Saturday, Sunday, or day on which national banks are authorized to be closed under the laws of the State of Texas, and (b) for purposes of any Eurodollar Borrowing, a day that satisfies the requirements of CLAUSE (A) and is a day when commercial banks are open for domestic or international business in London.

"CAPITAL LEASE" means, for any Person, any capital lease or sublease that has been (or under GAAP should be) capitalized on a balance sheet of such Person.

"CASH INTEREST EXPENSE" means (without duplication), for the Companies for any period, total interest expense in respect of Indebtedness actually paid or that is payable during such period, including. without limitation, all commissions, discounts, and other fees and charges with respect to letters of credit, but excluding interest expense not payable in cash. all as determined in accordance with GAAP.

"CHANGE IN CONTROL" means (a) AGI shall cease to own, directly or indirectly, one hundred percent (100%) of all of the issued and outstanding capital Stock of each other material Company, or (b) any Person or group of related Persons (other than B H. Adams or Royal Holding Company. Inc. or their respective Affiliates) shall have acquired beneficial ownership of more than thirty-five percent (35%) of the outstanding Stock of AGI, or (c) at any time during any period of twelve (12) consecutive calendar months commencing on or after the date of this Agreement. a majority of the Board of Directors of AGI shall no longer be comprised of individuals (i) who were members of such Board of Directors on the first (1st) day of such period. (ii) whose election or nomination to such Board of Directors was approved by individuals referred to in CLAUSE (I) above constituting at the time of such election or nomination at least a majority of such Board of Directors, or (iii) whose election or nomination to such

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350 3

Board of Directors was approved by individuals referred to in CLAUSES (I) and (II) above constituting at the time of such election or nomination at least a majority of such Board of Directors

"CODE" means the INTERNAL REVENUE CODE OF 1986, as amended, and all regulations promulgated and rulings issued thereunder.

"COMMITMENT USAGE" means, as of any date, THE SUM OF (a) the Principal Debt PLUS (b) the LC Exposure

"COMPANIES" means Borrowers and Guarantors, and "COMPANY" means any one of the Companies.

"COMPLIANCE CERTIFICATE" means a certificate substantially in the form of EXHIBIT A, executed by an authorized officer of each Borrower, stating that a review of the activities of the Companies during the subject period has been made under such Person's supervision and that the Companies have performed each and every obligation and covenant contained herein and the other Loan Documents and are not in default under any of the same or, if any such default shall have occurred, then specifying the nature and status thereof, and setting forth a computation in reasonable detail as of the end of the period covered by such statements, of compliance with SECTIONS 7.14 and 7.15.

"CONSOLIDATED ADJUSTED NET INCOME" means, for the Companies for any period, consolidated net earnings (after income taxes) determined in accordance with GAAP, but excluding (a) extraordinary gains, (b) gains due to sales or write-up of assets, (c) earnings of any Person newly acquired, if earned prior to acquisition, or (d) gains due to acquisitions of any Stock of any Company.

"CONSTITUENT DOCUMENTS" means, with respect to any Person, its articles or certificate of incorporation, bylaws, partnership agreements, organizational documents, limited liability company agreements, trust agreement, or such other document as may govern such Person's formation, organization, and management.

"CONTRACT RATE" means (a) with respect to a Base Rate Borrowing, the Base Rate PLUS the Applicable Margin, and (b) with respect to a Eurodollar Borrowing, the Adjusted Eurodollar Rate PLUS the Applicable Margin.

"DEBTOR LAWS" means all applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, receivership, insolvency, reorganization, or similar laws from time-to-time in effect affecting the rights of creditors generally.

"DIVIDENDS" means, with respect to any Stock issued by any Person, (a) the retirement, redemption, purchase, or other acquisition for value of such Stock by such Person, (b) the declaration or payment of any dividend or distribution on or with respect to such Stock by such Person, and (c) any other payment by such Person with respect to such Stock.

"EBITDA" means, for the Companies for any period, THE SUM OF (a) Consolidated Adjusted Net Income, PLUS (b) depreciation and amortization expense, PLUS (c) Cash Interest Expense, PLUS (d) federal,

state. local. and foreign income taxes deducted from Consolidated Adjusted Net Income in accordance with GAAP.

"ENVIRONMENTAL LAWS" means any Legal Requirements pertaining to air. emissions. water discharge. noise emissions. solid or liquid waste disposal. hazardous waste or materials, industrial hygiene, or other environmental. health, or safety matters or conditions on. under or about real property or any portion thereof. and similar laws of any Governmental Authority having jurisdiction over real property as such Legal Requirements may be amended or supplemented from time-to-time, and regulations promulgated and rulings issued pursuant to such laws.

"ERISA" means the EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974. as amended, and the regulations and published interpretations thereunder.

"ERISA AFFILIATE" means any Subsidiary or trade or business (whether or not incorporated) which is a member of a group of which any Company is a member and which is under common control with any Company within the meaning of SECTION 414 of the Code.

"EURODOLLAR BORROWING" means any portion of the Principal Debt with respect to which the interest rate is calculated by reference to the Adjusted Eurodollar Rate for a particular Interest Period.

"EURODOLLAR RATE" means. for any Eurodollar Borrowing for any Interest Period therefor, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of one percent) equal to the rate appearing on the Dow Jones Markets Page 3750 (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a m. (London time) two (2) Business Days prior to the first (1st) day of such Interest Period for a term comparable to such Interest Period. If for any reason such rate is not available, then such rate shall be the rate appearing on the Reuters Screen LIBO Page as the London interbank offered rate for deposits in Dollars at approximately 11:00 a m. (London time) two (2) Business Days prior to the first (1st) day of the such Interest Period for a term comparable to such Interest Period; PROVIDED. HOWEVER. if more than one rate is specified on the Reuters Screen LIBO Page, then the applicable rate shall be the arithmetic mean of all such rates. If neither of such rates are available. then such rate shall be determined on the basis of the rates at which deposits in United States dollars are offered by Lender at approximately 11:00 a.m. (London time) on the day that is two (2) Business Days preceding the first (1st) day of the relevant Interest Period to prime banks in the London interbank market and for a period equal to such Interest Period commencing on the first (1st) day of such Interest Period.

"EURODOLLAR RESERVE REQUIREMENT" means. on any day. that percentage (expressed as a decimal fraction) that is in effect on such day. as provided by the Board of Governors of the Federal Reserve System (or any successor governmental body) applied for determining the maximum reserve requirements (including. without limitation, basic. supplemental, marginal and emergency reserves) under REGULATION D with respect to "EUROCURRENCY LIABILITIES" as currently defined in REGULATION D, or under any similar or successor regulation with respect to Eurocurrency liabilities or Eurocurrency funding. Each determination by Lender of the Eurodollar Reserve Requirement shall, in the absence of manifest error, be conclusive and binding.

"EVENT OF DEFAULT" has the meaning set forth in SECTION 8.1.

"FIXED CHARGES" means, for the Companies. for any period. the sum of (a) Cash Interest Expense. (b) operating lease expenses. and (c) rent expenses.

"FUNDING LOSS" has the meaning set forth in SECTION 2 16(e).

"GAAP" means those generally accepted accounting principles and practices, applied on a consistent basis, which are recognized as such by the American Institute of Certified Public Accountants acting through its Accounting Principles Board and the Financial Accounting Standards Board and/or their respective successors and which are applicable in the circumstances as of the date in question

"GOVERNMENTAL AUTHORITY" means, with respect to any Person, any government (or any political subdivision or jurisdiction thereof), court, bureau, agency. or other governmental authority having jurisdiction over such Person or any of its business. operations. or properties.

"GOVERNMENTAL AUTHORIZATION" means any approval, consent. license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement

"GUARANTORS" means AGI, Adams Golf Holding Corp.. a Delaware corporation, Adams Golf GP Corp., a Delaware corporation. Adams Golf Management Corp., a Delaware corporation. Adams Golf IP, L. P., a Delaware limited partnership. and each other After-Acquired Subsidiary of AGI.

"GUARANTY" of any Person means any contract or understanding of such Person pursuant to which such Person guarantees, or in effect guarantees, any Indebtedness of any other Person (the "PRIMARY OBLIGOR") in any manner, whether directly or indirectly, including agreements to assure the holder of the Indebtedness of the Primary Obligor against loss in respect thereof; PROVIDED THAT "GUARANTY" shall not include endorsements, in the ordinary course of business. of negotiable instruments or documents for deposit or collection.

"HAZARDOUS MATERIAL" means any hazardous, toxic. or dangerous waste, substance, or material defined as such in or for the purpose of any Environmental Law

"INDEBTEDNESS" means. for any Person. all Liabilities of such Person, excluding accounts payable, deferred taxes. deferred liabilities, and accrued expenses in each case incurred in the ordinary course of business and the payment of which is not past-due (unless payment is being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained in accordance with GAAP).

"INTANGIBLE RIGHTS" means, for any Person, any permits. franchises, licenses, patents, trademarks, trade names. intellectual property rights, technology, know-how. and processes of such Person.

"INTEREST PERIOD" means. with respect to a Eurodollar Borrowing. a period commencing:

      (a)        on the Advance Date thereof; or

(b) on the conversion date pertaining to such Eurodollar Borrowing, if such Eurodollar Borrowing is made pursuant to a conversion as described in SECTION 2.13; or

(c) on the last day of the preceding Interest Period in the case of a rollover to a successive Interest Period;

and ending one (1) month or three (3) or six (6) months thereafter, as Borrowers shall elect in accordance with SECTION 2.13 or SECTION 2.14, PROVIDED THAT:

(i) any Interest Period that would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day, UNLESS such Business Day falls in another calendar month in which case such Interest Period shall end on the next preceding Business Day;

(ii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month or at the end of such Interest Period) shall, subject to CLAUSE (I) above, end on the last Business Day of a calendar month; and

(iii) if the Interest Period for any Eurodollar Borrowing would otherwise end after the final maturity date of the Note, then such Interest Period shall end on the final maturity date of the Note.

"INVESTMENT" in any Person means any investment, whether by means of Stock purchase, loan, advance, extension of credit, capital contribution, or otherwise, in or to such Person, the Guaranty of any Indebtedness of such Person, or the subordination of any claim against such Person to other Indebtedness of such Person.

"LC" means a documentary or standby letter of credit issued for the account of Borrowers by Lender under this Agreement and under an LC Agreement

"LC AGREEMENT" means a letter of credit application and agreement (in form and substance satisfactory to Lender) executed by Borrowers and submitted to Lender for an LC for the account of Borrowers

"LC EXPOSURE" means, without duplication, the SUM of (a) the total face amount of all undrawn and uncancelled LCs PLUS (b) the total unpaid reimbursement obligations of Borrowers under drawings under any LC

"LC REQUEST" means a request substantially in the form of EXHIBIT B executed by a responsible officer of each Borrower.

"LC SUB-FACILITY" means a sub-facility of the Revolving Credit Commitment for the issuance of LCs, as described in SECTION 2.3, under which the LC Exposure (a) may never collectively exceed $5,000,000, and (b) TOGETHER WITH the Principal Debt may never exceed the Revolving Credit Commitment.

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

"LEGAL REQUIREMENT" means any federal, state, local, municipal, foreign, international, multi-national, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty as in effect on the date in question.

"LIABILITIES" means (without duplication), with respect to any Person, all indebtedness, obligations, and liabilities of such Person, including without limitation (a) all "LIABILITIES" which would be reflected on a balance sheet of such Person, (b) all obligations of such Person in respect of any Guaranty, letter of credit, or bankers' acceptance, (c) all obligations of such Person in respect of any Capital Lease, (d) all obligations, indebtedness, and liabilities secured by any lien or any security interest on any property or assets of such Person, and (e) any obligation to redeem or repurchase any of such Person's Stock.

"LIEN" means any lien, mortgage, security interest, tax lien, pledge, encumbrance, conditional sale or title retention arrangement, or any other interest in property designed to secure the repayment of Indebtedness, whether arising by agreement or under any statute or law, or otherwise.

"LOAN DOCUMENTS" means this Agreement, the Note, and any agreements, documents (and with respect to this Agreement, and such other agreements and documents, any renewals, extensions, amendments, or supplements thereto), or certificates at any time executed or delivered pursuant to the terms of this Agreement.

"MATERIAL ADVERSE EFFECT" means any material adverse changes in, or effect upon, (a) the validity, performance or enforceability of any Loan Documents, (b) the financial condition or business operations of any Company, or (c) the ability of any Company to fulfill its obligations under the Loan Documents.

"MAXIMUM RATE" means the highest non-usurious rate of interest (if any) permitted from day to day by applicable law. Lender hereby notifies and discloses to Borrowers that, for purposes of Tex. Rev. Civ. Stat. Ann. art. 5069-1D.001 (codified in the TEXAS FINANCE CODE Section 303.001), as it may from time to time be amended, the "APPLICABLE CEILING" shall be the "WEEKLY CEILING" from time to time in effect as limited by article 5069-1D.009 (codified in the TEXAS FINANCE CODE Section 303.305); PROVIDED, HOWEVER, that to the extent permitted by applicable law, Lender reserves the right to change the "APPLICABLE CEILING" from time to time by further notice and disclosure to Borrowers.

"MULTI-EMPLOYER PLAN" means a multi-employer plan as defined in SECTIONS 3(37) or 4001(A)(3) of ERISA or SECTION 414 of the Code to which any Company or any ERISA Affiliate is making, or has made, or is accruing, or has accrued, an obligation to make contributions.

"NOTE" means the Amended and Restated Promissory Note executed by Borrowers and delivered pursuant to the terms of this Agreement, together with any renewals, extensions, modifications, or restatements thereof.

"NOTICE OF BORROWING" means a notice in the form of EXHIBIT C attached hereto.

"OBLIGATION" means all present and future Indebtedness, obligations, and Liabilities and all

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350 3

renewals and extensions thereof. or any part thereof. now or hereafter owed to Lender by Borrowers. whether arising pursuant to any of the Loan Documents. or otherwise, and all modifications. amendments. renewals. extensions. and restatements thereof. together with all interest accruing thereon and costs. expenses. and attorneys' fees incurred in the enforcement or collection thereof.

"OTHER TAXES" has the meaning set forth in SECTION 2.17.

"PBGC" means the Pension Benefit Guaranty Corporation, and any successor to all or any of the Pension Benefit Guaranty Corporation's functions under ERISA.

"PERSON" shall include an individual, corporation, joint venture, general or limited partnership, limited liability company. trust, unincorporated organization. or government, or any agency or political subdivision thereof.

"PERMITTED LIENS" means (a) Liens in favor of Lender to secure the Obligation. (b) pledges or deposits made to secure payment of worker's compensation (or to participate in any fund in connection with worker's compensation). unemployment insurance, pensions. or social security programs. (c) Liens imposed by mandatory provisions of law such as for materialmen's, mechanic's, warehousemen's, and other like Liens arising in the ordinary course of a Company's business, securing Indebtedness whose payment is not yet due. (d) Liens for taxes imposed upon a Person or upon such Person's income. profits, or property. if the same are not yet due and payable or if the same are being contested in good faith and for which adequate reserves are maintained in accordance with GAAP, (e) good faith deposits in connection with leases. real estate bids or contracts (OTHER THAN contracts involving the borrowing of money), pledges or deposits to secure (or in lieu of) surety, stay, appeal. or customs bonds and deposits to secure the payment of taxes, assessments. customs. duties, or other similar charges. (f) encumbrances consisting of zoning restrictions, easements, or other restrictions on the use of real property, PROVIDED THAT such encumbrances do not impair the use of such property for the uses intended. and none of which is violated by existing or proposed structures or land use. and (g) Liens described on EXHIBIT F, and Liens resulting from the refinancing of the related Indebtedness secured thereby, PROVIDED THAT the Indebtedness secured thereby shall not be increased and the Liens shall not cover additional assets of any Company.

"PLAN" means an employee benefit plan or other plan maintained by any Company or any ERISA Affiliate and which is covered by TITLE IV of ERISA or subject to the minimum funding standards under SECTION 412 of the Code. as amended.

"PLANO FACILITY" means the Companies new facility located at 2801 East Plano Parkway, Plano. Texas.

"POTENTIAL DEFAULT" means the occurrence of any event which with passage of time or giving of notice or both would become an Event of Default.

"PRINCIPAL DEBT" means, as of any date, the sum of the outstanding principal balance of all outstanding Borrowings hereunder as of such date.

"REPORTABLE EVENT" has the meaning assigned to that term in TITLE IV of ERISA. but shall not

AMENDED AND RESTATED          REVOLVING CREDIT AGREEMENT D-0601350 3

include an event with respect to which the PBGC has waived the reporting requirement by regulation

"REPRESENTATIVES" means representatives. officers. directors. employees. attorneys. and agents

"REVOLVING CREDIT COMMITMENT" means $10,000.000.00, as the same may be decreased by Borrowers pursuant to SECTION 2 1 or terminated by Lender pursuant to SECTION 8.2.

"SOLVENT" means. as to a Person, that (a) the aggregate fair market value of its assets exceeds its Liabilities, (b) such Person is able to pay and is paying its Liabilities as they mature. and (c) it does not have unreasonably small capital to conduct its businesses.

"STOCK" means all shares, options. warrants, general or limited partnership interests, membership interests. or other ownership interests (regardless of how designated) of or in a corporation, partnership, limited liability company, trust, or other entity. whether voting or nonvoting, including common stock, preferred stock, or any other "EQUITY SECURITY" (as such term is defined in RULE 3A11-1 of the GENERAL RULES AND REGULATIONS promulgated by the Securities and Exchange Commission under the SECURITIES EXCHANGE ACT OF 1934. as amended).

"SUBSIDIARY" means any corporation of which more than fifty percent (50%) (in number of votes) of the issued and outstanding Stock having ordinary voting power for the election of at least a majority of the directors is owned or controlled. directly or indirectly, by AGI, any Subsidiary of AGI, or any combination thereof.

"TAXES" has the meaning set forth in SECTION 2 17.

"TEMPORARY CASH INVESTMENT" means any Investment (a) in direct obligations of the United States of America or any agency thereof. or obligations fully guaranteed by the United States of America or any agency thereof. PROVIDED THAT such obligations mature within one (1) year of the date of acquisition thereof, (b) commercial paper rated in the highest grade by two (2) or more national credit rating agencies and maturing not more than 180 days from the date of creation thereof, and (c) time deposits with, and certificates of deposit and bankers' acceptances issued by, Lender or any United States bank having capital surplus and undivided profits aggregating at least $1,000.000,000.00.

"TERMINATION DATE" means the earlier of (a) May 31, 2000, (b) the date Lender's commitment to fund Advances hereunder is terminated pursuant to SECTION 8.2, or (c) the date that Lender's commitment to fund Advances hereunder is reduced to zero pursuant to SECTION 2.1.

"UNUSED COMMITMENT" means, as of any date. (a) the Revolving Credit Commitment. MINUS (b) the Commitment Usage

1.2 ACCOUNTING TERMS. As used in this Agreement, and in any certificate, report, or other document made or delivered pursuant to this Agreement, accounting terms not defined in SECTION 1 1, and accounting terms partly defined in SECTION 1 1 to the extent not defined, have, as of any date. the respective meanings given to them under GAAP and all references to balance sheets or other financial statements means such statements. prepared in accordance with GAAP as of such date.

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

1.3 RULES OF CONSTRUCTION. When used in this Agreement: (a) "OR" is not exclusive; (b) a reference to a law includes any amendment or modification to such law; (c) a reference to a Person includes its permitted successors and permitted assigns; (d) except as provided otherwise, all references to the singular shall include the plural and VICE VERSA; (e) except as provided in this Agreement, a reference to an agreement, instrument, or document shall include such agreement, instrument, or document as the same may be amended, modified, renewed, extended, restated, or supplemented from time to time in accordance with its terms and as permitted by the Loan Documents; (f) all references to SECTIONS, SCHEDULES, or EXHIBITS shall be to Sections, Schedules, or Exhibits of this Agreement, unless otherwise indicated; (g) all EXHIBITS to this Agreement shall be incorporated into this Agreement; (h) the words "INCLUDE," "INCLUDES," and "INCLUDING" shall be deemed to be followed by the phrase "WITHOUT LIMITATION;" and (i) except as otherwise provided herein, in the computation of time from a specified date to a later specified date, the word "FROM" means "FROM AND INCLUDING" and words "TO" and "UNTIL" each mean "to but excluding."

1.4 JOINT AND SEVERAL.

(a) All representations contained herein shall be deemed individually made by each Borrower, and each of the covenants, agreements, and obligations set forth herein shall be deemed to be the joint and several covenants, agreements, and obligations of each Borrower. Any notice, request, consent, report, or other information or agreement delivered to Lender by any Borrower shall be deemed to be ratified by, consented to, and also delivered by each other Borrower. Each Borrower recognizes and agrees that each covenant and agreement of a "BORROWER" and "BORROWERS" in this Agreement and in any other Loan Document shall create a joint and several obligation of such entities, which may be enforced against such entities jointly or against each entity separately.

(b) Each Borrower hereby irrevocably and unconditionally agrees: (i) that it is jointly and severally liable to Lender for the full and prompt payment of the Obligation and the performance by each other Borrower of its obligations hereunder in accordance with the terms hereof; (ii) to fully and promptly perform all of its obligations hereunder with respect to the Obligation; and (iii) as a primary obligation to indemnify Lender on demand for and against any loss incurred by Lender as a result of any of the obligations of any one or more of Borrowers being or becoming void, voidable, unenforceable, or ineffective for any reason whatsoever, whether or not known to Lender or any Person, the amount of such loss being the amount which Lender would otherwise have been entitled to recover from any one or more Borrowers.

SECTION 2

THE REVOLVING CREDIT LOAN

2.1 THE REVOLVING CREDIT COMMITMENT. Subject to the terms and conditions of this Agreement, Lender agrees to extend to Borrowers, from the date hereof through the Termination Date, a revolving line of credit which shall not exceed at any one time outstanding the then-current Revolving Credit Commitment. Within the limits of this SECTION 2.1, during such period, Borrowers may borrow, repay, and reborrow the Unused Commitment in accordance with this Agreement. Borrowers shall have

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

the right, upon three (3) Business Days' prior written notice to Lender, to permanently reduce the unutilized portion of the Revolving Credit Commitment; PROVIDED THAT if any such reduction does not reduce the Revolving Credit Commitment to $0.00, then any partial reduction shall be in the minimum amount of $1,000,000.00 or a greater integral multiple of $500,000.00.

    2.2   MANNER OF BORROWING

    (a) NOTICE OF BORROWING. Borrowers may request an Advance by submitting to Lender a Notice of Borrowing (in writing or by telephone followed by written notice within one (1) Business Day), which is irrevocable and binding on Borrowers. Each Notice of Borrowing must be received by Lender no later than 10:00 a.m. (Dallas, Texas time) on the third (3rd) Business Day before the date on which funds are requested (the "ADVANCE DATE") for any Advance that will be a Eurodollar Borrowing or no later than 10:00 a.m. (Dallas, Texas time) on the Advance Date for any Advance that will be a Base Rate Borrowing.

    (b) MINIMUM ADVANCES. Each Advance under the Revolving Credit Commitment shall be in an amount of $100,000.00 or a greater integral multiple of $50,000.00.

    (c) FUNDING. Subject to the terms and conditions in this Agreement, by not later than 2:00 p.m., Dallas, Texas time, on the date specified, Lender shall make available to Borrowers, at Lender's offices in Dallas, Texas, the amount of a requested Advance under the Revolving Credit Commitment in immediately available funds.

    2.3   LETTERS OF CREDIT.

    (a) CONDITIONS. Subject to the terms and conditions of this Agreement, Lender agrees, if requested by Borrowers, to issue LCs upon Borrowers' making or delivering an LC Request and delivering an LC Agreement, both of which must be received by Lender no later than the third (3rd) Business Day before the Business Day on which the requested LC is to be issued. PROVIDED THAT (i) no LC may expire after a date that is one (1) month before the Termination Date, (ii) the LC Exposure may not exceed the limitations set forth in the definition of LC Sub-facility, and (iii) each LC must expire no later than one (1) year following the date of its issuance.

    (b) REIMBURSEMENT OBLIGATION. To induce Lender to issue and maintain LCs, Borrowers agree, jointly and severally, to pay or reimburse Lender (i) on the first (1st) Business Day after Lender notifies Borrowers that Lender has made payment under an LC, the amount paid by Lender, and (ii) within three (3) Business Days after demand, the amount of any additional fees Lender customarily charges for amending LCs Agreements, for honoring drafts under LCs, and for taking similar action in connection with letters of credit. If Borrowers have not reimbursed Lender for any drafts paid by the date on which reimbursement is required under this SECTION, then Lender is irrevocably authorized to fund Borrowers' reimbursement obligations as a Base Rate Borrowing if the conditions in this Agreement for such a Borrowing (OTHER THAN any notice requirements or minimum funding amounts) have been satisfied. The proceeds of such Borrowing shall be advanced directly to Lender to pay Borrowers' unpaid reimbursement obligations. If funds cannot be advanced as a result of Borrowers' failure to satisfy any condition precedent set forth in SECTION 4, then Borrowers' reimbursement obligation shall constitute a

demand obligation. Borrowers' obligations under this SECTION are absolute and
unconditional under any and all circumstances and irrespective of any setoff,
counterclaim, or defense to payment that any Borrower may have at any time
against Lender or any other Person. From the date that Lender pays a draft
under a LC until Borrowers either reimburse or are obligated to reimburse
Lender for such draft under this SECTION, the amount of such draft bears
interest payable to Lender at the rate then applicable to Base Rate
Borrowings. From the due date of the respective amounts due under this
SECTION, to the date paid (including any payment from proceeds of a Base Rate
Borrowing), unpaid reimbursement amounts accrue interest that is payable on
demand at the default rate set forth in SECTION 2.10.

(c) GENERAL. Lender shall promptly notify Borrowers of the date and
amount of any draft presented for honor under any LC (but failure to give
notice will not affect Borrowers' obligations under this Agreement). Lender
shall pay the requested amount upon presentment of a draft unless presentment
on its face does not comply with the terms of the applicable LC. When making
payment, Lender may disregard (i) any default or potential default that
exists under any other agreement, and (ii) obligations under any other
agreement that have or have not been performed by the beneficiary or any
other Person (and Lender is not liable for any of those obligations).
Borrowers' reimbursement obligations to Lender under this SECTION are
absolute and unconditional irrespective of, and Lender is not responsible
for, (i) the validity, enforceability, sufficiency, accuracy, or genuineness
of documents or endorsements (even if they are in any respect invalid,
unenforceable, insufficient, inaccurate, fraudulent, or forged), (ii) any
dispute by any Company with or any Company's claims, setoffs, defenses,
counterclaims, or other rights against Lender or any other Person, or (iii)
the occurrence of any Potential Default or Event of Default. However, nothing
in this Agreement constitutes a waiver of Borrowers' rights to assert any
claim or defense based upon the gross negligence or willful misconduct of
Lender or its Representatives.

(d) DUTIES OF LENDER. Lender and each Borrower agree that, in paying
any draft under any LC, Lender has no responsibility to obtain any document
(OTHER THAN any documents expressly required by the respective LC) or to
ascertain or inquire as to any document's validity, enforceability,
sufficiency, accuracy, or genuineness or the authority of any Person
delivering it. Neither Lender nor its Representatives will be liable to any
Company for any LC's use or for any beneficiary's acts or omissions
(INCLUDING, WITHOUT LIMITATION, ANY ACTS OR OMISSIONS CONSTITUTING ORDINARY
NEGLIGENCE). Any action, inaction, error, delay, or omission taken or
suffered by Lender or any of its Representatives in connection with any LC,
applicable drafts or documents, or the transmission, dispatch, or delivery of
any related message or advice, if in good faith and in conformity with
applicable Legal Requirements and in accordance with the standards of care
specified in the UNIFORM CUSTOMS AND PRACTICES FOR DOCUMENTARY CREDITS (1993
REVISION), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 500 (as amended
or modified), is binding upon the Companies and Lender and, except as
provided in SECTION 2.3(d), does not place Lender or any of its
Representatives under any resulting liability to any Company. Lender is not
liable to any Company for any action taken or omitted, in the absence of
gross negligence or willful misconduct, by Lender or its Representative in
connection with any LC.

(e) CASH COLLATERAL. On the Termination Date and if requested by Lender
while a Potential Default or Event of Default exists, then Borrowers shall
provide Lender cash collateral in an amount to equal the then-existing LC
Exposure.

(f) INDEMNIFICATION. EACH BORROWER SHALL PROTECT, INDEMNIFY, PAY, AND SAVE
LENDER

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

AND ITS REPRESENTATIVES, HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, DAMAGES, COSTS, CHARGES, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) WHICH ANY OF THEM MAY INCUR OR BE SUBJECT TO AS A CONSEQUENCE OF THE ISSUANCE OF ANY LC, ANY DISPUTE ABOUT IT, OR THE FAILURE OF LENDER TO HONOR A DRAW REQUEST UNDER ANY LC AS A RESULT OF ANY ACT OR OMISSION (WHETHER RIGHT OR WRONG) OF ANY PRESENT OR FUTURE GOVERNMENTAL AUTHORITY. ALTHOUGH LENDER AND ITS REPRESENTATIVES HAVE THE RIGHT TO BE INDEMNIFIED UNDER THIS AGREEMENT FOR ITS OR THEIR OWN ORDINARY NEGLIGENCE, NO PERSON IS ENTITLED TO INDEMNITY UNDER THE FOREGOING FOR ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(g) LC AGREEMENTS. Although referenced in any LC, terms of any particular agreement or other obligation to the beneficiary are not incorporated into this Agreement in any manner. The fees and other amounts payable with respect to each LC are as provided in this Agreement, drafts under each LC are part of the Obligation, only the events specified in this Agreement as a Default shall constitute a default under any LC or LC Agreement, and the terms of this Agreement control any conflict between the terms of this Agreement and any LC Agreement.

2.4    COMMITMENT FEES.

(a) UNUSED FEE. Borrowers agree to pay to Lender a commitment fee equal to one-eighth of one percent (0.125%) per annum on the daily Unused Commitment. Such commitment fee shall be payable quarterly in arrears on the last day of each March, June, September, and December during the term hereof, commencing on March 31, 1999, and continuing regularly thereafter so long as the Revolving Credit Commitment is in effect, and on the Termination Date.

(b) LC FEES. Borrowers agree to pay to Lender, as a condition precedent to the issuance (including the extension) of each LC, an issuance fee payable on the date of issuance equal to (i) two percent (2%) per annum of the face amount of such LC on the date of issuance for a standby LC, and (ii) the greater of (A) $125.00, and (B) one-quarter of one percent (0.25%) per annum of the face amount of such LC on the date of issuance, for a documentary LC.

(c) GENERALLY. Borrowers acknowledge that the commitment fees payable hereunder are bona fide commitment fees and are intended as reasonable compensation to Lender for committing to make funds available to Borrowers as described herein and for no other purposes.

2.5 NOTE. The Principal Debt shall be evidenced by the Note in form and substance satisfactory to Lender executed by Borrowers, which Note shall be (a) dated the date hereof, (b) in the amount of $10,000,000.00, and (c) payable to the order of Lender.

2.6    INTEREST AND PRINCIPAL PAYMENTS.

(a) INTEREST PAYMENTS. Accrued interest on each Eurodollar Borrowing shall be due and payable on the last day of its respective Interest Period. If any Interest Period is a period greater than three (3) months, then accrued interest shall also be due and payable on the date ending each three (3) month period after the commencement of the Interest Period. Accrued interest on each Base Rate Borrowing shall be due and payable on the last day of each March, June, September, and December during the term hereof, commencing on March 31, 1999, with a final scheduled interest payment on all

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

Borrowings on the Termination Date; PROVIDED, HOWEVER, that accrued interest on each Base Rate Borrowing shall also be due and payable upon conversion of such Base Rate Borrowing to a Eurodollar Borrowing pursuant to SECTION 2.14

(b) PRINCIPAL PAYMENTS. The unpaid Principal Debt shall be due and payable on the Termination Date

(c) OPTIONAL PREPAYMENTS. Borrowers shall have the right, from time-to-time, to prepay the unpaid Principal Debt, in whole or in part, without premium or penalty (EXCEPT FOR any Funding Loss), upon the payment of accrued interest on the amount prepaid to and including the date of payment; PROVIDED, HOWEVER, that partial prepayments of principal shall be in an amount equal to $100,000.00 or a greater integral multiple of $50,000.00 (or. if less, the unpaid Principal Debt)

2.7 MANNER AND APPLICATION OF PAYMENTS. All payments and prepayments by Borrowers on account of principal, interest, and fees hereunder shall be made in immediately available funds. All such payments shall be made to Lender at its principal office in Dallas. Texas. not later than 12:00 noon, Dallas, Texas time, on the date due and funds received after that hour shall be deemed to have been received by Lender on the next following Business Day. If any payment is scheduled to become due and payable on a day which is not a Business Day, then such payment shall instead become due and payable on the immediately following Business Day and interest on the principal portion of such payment shall be payable at the then applicable rate during such extension. All payments made on the Note shall be applied first to accrued interest and then to principal (in the inverse order of maturity in the case of prepayments).

2.8 INTEREST OPTIONS. Except where specifically otherwise provided, Borrowings bear interest at an annual rate equal to the lesser of EITHER (a) THE SUM OF (i) the Base Rate or the Adjusted Eurodollar Rate (in each case as designated or deemed designated by Borrowers). as the case may be, PLUS (ii) the Applicable Margin, OR (b) the Maximum Rate. Each change in the Base Rate and the Maximum Rate is effective, without notice to Borrowers or any other Person. upon the effective date of change.

2.9 QUOTATION OF RATES. A responsible officer of Borrowers may call Lender before delivering a Notice of Borrowing to receive an indication of the interest rates then in effect, but the indicated rates do not bind Lender or affect the interest rate that is actually in effect when Borrowers deliver a Notice of Borrowing

2.10 DEFAULT RATE. If permitted by law, all past-due principal of and accrued interest on the Note bears interest from maturity (stated or by acceleration) at the Maximum Rate. or if there is no Maximum Rate in effect, then fourteen percent (14%) per annum, until paid. regardless whether payment is made before or after entry of a judgment.

2.11 INTEREST RECAPTURE. If the Contract Rate applicable to any Borrowing exceeds the Maximum Rate, then the interest rate on that Borrowing is limited to the Maximum Rate. but any subsequent reductions in the Contract Rate shall not reduce the interest rate thereon below the Maximum Rate until the total amount of accrued interest equals the amount of interest that would have accrued if Contract Rate had always been in effect. If at maturity (stated or by acceleration) the total interest paid or

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

accrued is less than the interest that would have accrued if the Contract Rates had always been in effect, then. at that time and to the extent permitted by law, Borrowers shall pay an amount equal to the difference between (a) the lesser of the amount of interest that would have accrued if the Contract Rates had always been in effect and the amount of interest that would have accrued if the Maximum Rate had always been in effect. and (b) the amount of interest actually paid or accrued on the Note.

2 12   INTEREST CALCULATIONS.

(a)  Interest shall be calculated on the basis of actual number of days (including the first day but excluding the last day) elapsed but computed as if each calendar year consisted of 360 days (unless the calculation would result in an interest rate greater than the Maximum Rate, in which event interest will be calculated on the basis of a year of 365 or 366 days. as the case may be). All interest rate determinations and calculations by Lender are conclusive and binding absent manifest error.

(b)  The provisions of this Agreement relating to calculation of the Base Rate and the Eurodollar Rate are included only for the purpose of determining the rate of interest or other amounts to be paid under this Agreement that are based upon those rates. Lender may fund and maintain its funding of all or any part of each Borrowing as it selects.

2.13  SELECTION OF INTEREST OPTION. On making a Notice of Borrowing under SECTION 2.2(a), Borrowers shall advise Lender as to whether the Advance shall be (a) a Eurodollar Borrowing. in which case Borrowers shall specify the applicable Interest Period therefor, or (b) a Base Rate Borrowing. Notwithstanding anything to the contrary contained herein, (a) no more than three (3) Interest Periods shall be in effect at any one time with respect to Eurodollar Borrowings, (b) Borrowers shall have no right to request a Eurodollar Borrowing if the interest rate applicable thereto would exceed the Maximum Rate in effect on the first day of the Interest Period applicable to such Borrowing, and (c) each Eurodollar Borrowing shall be in the amount of $250.000.00 or a greater integral multiple of $50,000.00.

2.14  ROLLOVERS AND CONVERSIONS. Borrowers may (a) convert a Eurodollar Borrowing on the last day of the applicable Interest Period to a Base Rate Borrowing. (b) convert a Base Rate Borrowing at any time to a Eurodollar Borrowing, and (c) elect a new Interest Period for a Eurodollar Borrowing, by giving a Notice of Borrowing to Lender no later than 12:00 noon on the third (3rd) Business Day before the conversion date or the last day of the Interest Period. as the case may be (for conversion to a Eurodollar Borrowing or election of a new Interest Period), and no later than 12:00 noon one (1) Business Day before the last day of the Interest Period (for conversion to an Base Rate Borrowing); PROVIDED THAT each Eurodollar Borrowing shall be in the amount of $250,000.00 or a greater integral multiple of $50,000.00. Absent Borrowers' Notice of Borrowing. a Eurodollar Borrowing shall be deemed converted to a Base Rate Borrowing effective when the applicable Interest Period expires.

2.15  BOOKING BORROWINGS. To the extent permitted by law, Lender may make, carry. or transfer its Borrowings at, to. or for the account of any of its branch offices or the office of any of its Affiliates. However, no Affiliate is entitled to receive any greater payment under SECTION 2.16(b) than Lender would have been entitled to receive with respect to those Borrowings. Lender agrees that it will use its reasonable efforts (consistent with its internal policies and applicable law) to make. carry, maintain, or transfer its Borrowings with its Affiliates or branch offices in an effort to eliminate or reduce to the extent possible the aggregate amounts due to it under SECTIONS 2 16(b) and 2.16(c) if. in its

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

reasonable judgment, such efforts will not be disadvantageous to it.

2.16  SPECIAL PROVISIONS FOR EURODOLLAR BORROWINGS

(a) BASIS UNAVAILABLE OR INADEQUACY OF EURODOLLAR LOAN PRICING  If with
respect to an Interest Period for any Eurodollar Borrowing, (a) Lender
determines that, by reason of circumstances affecting the interbank
eurodollar market generally, deposits in Dollars (in the applicable amounts)
are not being offered to or by Lender in the interbank eurodollar market for
such Interest Period, or (b) Lender determines that the Eurodollar Rate as
determined by Lender will not adequately and fairly reflect the cost to
Lender of maintaining or funding the Eurodollar Borrowing for such Interest
Period, then Lender shall forthwith give notice thereof to Borrowers,
whereupon until Lender notifies Borrowers that the circumstances giving rise
to such suspension no longer exist, (i) the obligation of Lender to make
Eurodollar Borrowings shall be suspended, and (ii) Borrowers shall either (A)
repay in full the then-outstanding principal amount of the Eurodollar
Borrowings, together with accrued interest thereon on the last day of the
then current Interest Period applicable to such Eurodollar Borrowings. or (B)
convert such Eurodollar Borrowings to Base Rate Borrowings in accordance with
SECTION 2.14 on the last day of the then-current Interest Period applicable
to each such Eurodollar Borrowing.

(b) ILLEGALITY. If. after the date of this Agreement. the adoption of
any applicable law, rule. or regulation. or any change therein. or any change
in the interpretation or administration thereof by any Governmental
Authority. central bank. or comparable agency charged with the interpretation
or administration thereof. or compliance by Lender with any request or
directive (whether or not having the force of law) of any such authority,
central bank, or comparable agency shall make it unlawful or impossible for
Lender to make. maintain or fund Eurodollar Borrowings, then Lender shall so
notify Borrowers  Before giving any notice pursuant to this SECTION. Lender
shall designate a different Eurodollar lending office if such designation
will avoid the need for giving such notice and will not be otherwise
disadvantageous to any non-trivial extent to Lender (as determined in good
faith by Lender)  Upon receipt of such notice, Borrowers shall either (i)
repay in full the then outstanding principal amount of all Eurodollar
Borrowings, together with accrued interest thereon, or (ii) convert each
Eurodollar Borrowing to a Base Rate Borrowing. on either (A) the last day of
the then-current Interest Period applicable to such Eurodollar Borrowing if
Lender may lawfully continue to maintain and fund such Eurodollar Borrowing
to such day or (B) immediately if Lender may not lawfully continue to fund
and maintain such Eurodollar Borrowing to such day, PROVIDED THAT Borrowers
shall be liable for any Funding Loss arising pursuant to such conversion

(c) INCREASED COSTS FOR EURODOLLAR BORROWINGS. If any Governmental
Authority, central bank, or other comparable authority, shall at any time
impose, modify. or deem applicable any reserve (including, without
limitation, any imposed by the Board of Governors of the Federal Reserve
System but excluding any reserve requirement included in the Eurodollar
Reserve Requirement), special deposit, or similar requirement against assets
of, deposits with, or for the account of, or credit extended by, Lender, or
shall impose on Lender (or its Eurodollar lending office) or the interbank
eurodollar market any other condition affecting its Eurodollar Borrowings,
the Note, or its obligation to make Eurodollar Borrowings; and the result of
any of the foregoing is to increase the cost to Lender of making or
maintaining Eurodollar Borrowings. or to reduce the amount of any sum
received or receivable by Lender under this Agreement, or under the Note, by
an amount deemed by Lender to be material, then. within five (5) days after
demand by Lender. Borrowers shall pay to Lender such additional amount or
amounts as will

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350 3

compensate Lender for such increased cost or reduction. Lender will promptly notify Borrowers of any event of which it has knowledge, occurring after the date hereof. which will entitle Lender to compensation pursuant to this SECTION. No failure by Lender to immediately demand payment of any additional amounts payable hereunder shall constitute a waiver of Lender's right to demand payment of such amounts at any subsequent time. A certificate of Lender claiming compensation under this SECTION and setting forth the additional amount or amounts to be paid to it hereunder. together with a description in reasonable detail of the manner in which such amounts have been calculated. shall be delivered by Lender to Borrower within one hundred eighty (180) days after the incurrence thereof and shall be conclusive in the absence of manifest error. If Lender demands compensation under this SECTION. then Borrowers may at any time, upon at least five (5) Business Days' prior notice to such Lender, either convert such Eurodollar Borrowings to Base Rate Borrowings in accordance with the provisions of this Agreement; PROVIDED, HOWEVER, that Borrowers shall be liable for any Funding Loss arising pursuant to such actions

(d) EFFECT ON BASE RATE BORROWINGS. If notice has been given pursuant to SECTION 2.16(a) or SECTION 2.16(b) requiring that Eurodollar Borrowings to be repaid or converted, then unless and until Lender notifies Borrowers that the circumstances giving rise to such repayment no longer apply, all Borrowings shall be Base Rate Borrowings. If Lender notifies Borrowers that the circumstances giving rise to such repayment no longer apply, then Borrowers may thereafter select Borrowings to be Eurodollar Borrowings in accordance with SECTION 2.13 and SECTION 2.14.

(e) FUNDING LOSSES. Borrowers shall jointly and severally indemnify Lender against any loss or reasonable expense (such loss or expense is referred to herein as a "FUNDING LOSS." such term including, but not limited to, any loss or reasonable expense sustained or incurred or to be sustained or incurred in liquidating or reemploying deposits from third parties acquired to effect or maintain such Borrowing or any part thereof as a Eurodollar Borrowing) with respect to Eurodollar Borrowings which Lender may sustain or incur as a consequence of (i) any failure by Borrowers to fulfill on the date of any Borrowing hereunder the applicable conditions set forth in SECTION 4, (ii) any failure by Borrowers to borrow hereunder or to convert Borrowings hereunder after a Conversion Notice has been given, (iii) any payment, prepayment, or conversion of a Eurodollar Borrowing required or permitted by any other provisions of this Agreement, including, without limitation. payments made due to the acceleration of the maturity of the Borrowings pursuant to SECTION 8.2. or otherwise made on a date OTHER THAN the last day of the applicable Interest Period, (iv) any default in the payment or prepayment of the principal amount of any Eurodollar Borrowing or any part thereof or interest accrued thereon, as and when due and payable (at the due date thereof. by notice of prepayment or otherwise), or (v) the occurrence of a Potential Default or an Event of Default. The term "FUNDING LOSS" includes, without limitation. an amount equal to the excess, if any. as determined by Lender of (A) its cost of obtaining the funds for the Borrowing being paid, prepaid. or converted or not borrowed or converted (based on the Adjusted Eurodollar Rate applicable thereto) for the period from the date of such payment. prepayment, or conversion or failure to borrow or convert to the last day of the Interest Period for such Borrowing (or, in the case of a failure to borrow or convert, the Interest Period for the Borrowing which would have commenced on the date of such failure to borrow or convert) over (B) the amount of interest (as estimated by Lender) that would be realized by Lender in reemploying the funds so paid, prepaid or converted or not borrowed or converted for such period or Interest Period. as the case may be. A certificate of Lender setting forth any amount or amounts which Lender is entitled to receive pursuant to this SECTION 2.16(e), together with a description in reasonable detail of the manner in which such amounts have been calculated. shall be delivered to

AMENDED AND RESTATED                          REVOLVING CREDIT AGREEMENT D-0601350.3

Borrowers and shall be conclusive, absent manifest error. Borrowers shall pay to Lender the amount shown as due on any certificate within five (5) days after its receipt of the same. Notwithstanding the foregoing, in no event shall Lender be permitted to receive any compensation hereunder constituting interest in excess of the Maximum Rate. Without prejudice to the survival of any other obligations of Borrowers hereunder, the obligations of Borrowers under this SECTION 2.16(e) shall survive the termination of this Agreement and/or the payment or assignment of the Note.

    2.17  TAXES.

    (a) Any and all payments by Borrowers hereunder or under the Note shall be made free and clear of and without deduction for any and all present or future taxes, levies. imposts, deductions, charges, or withholdings, and all liabilities with respect thereto (hereinafter referred to as "TAXES"), excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender. by the jurisdiction under the laws of which Lender is organized or is or should be qualified to do business or any political subdivision thereof and, taxes imposed on Lender's income, and franchise taxes imposed on Lender by the jurisdiction of Lender's lending office or any political subdivision thereof. If Borrowers shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Note to Lender, then (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this SECTION 2.17) Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrowers shall make such deductions, and (iii) Borrowers shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

    (b) In addition, Borrowers agree to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, or similar levies which arise from any payment made hereunder or under the Loan Documents or from the execution. delivery, or registration of, or otherwise with respect to, this Agreement or the other Loan Documents (hereinafter referred to as "OTHER TAXES").

    (c) Borrowers shall indemnify Lender for the full amount of Taxes or Other Taxes (including. without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this SECTION 2.17) paid by Lender or any liability (including penalties and interest) arising therefrom or with respect thereto. whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within five (5) days from the date Lender makes written demand therefor.

    (d) Within thirty (30) days after the date of any payment of Taxes. Borrowers shall furnish to Lender, at its address referred to in SECTION 9.4, the original or a certified copy of a receipt evidencing payment thereof.

    (e) Without prejudice to the survival of any other agreement of Borrowers hereunder, the agreements and obligations of Borrowers contained in this SECTION 2.17 shall survive the payment in full of principal and interest hereunder and under the other Loan Documents.

SECTION 3

GUARANTIES

AMENDED AND RESTATED            REVOLVING CREDIT AGREEMENT D-0601350.3

3.1 GUARANTIES. Payment of the Obligation shall be unconditionally guaranteed by Guarantors.

## SECTION 4

## CONDITIONS PRECEDENT

4.1 INITIAL ADVANCE. The obligation of Lender to make the initial Advance or issue the initial LC hereunder is subject to the conditions precedent that, on or before the date of such Advance or issuance of such LC. (a) Borrowers shall have paid to Lender all fees to be received by Lender pursuant to this Agreement or any other Loan Document. and (b) Lender shall have received duly executed copies of each of the documents listed on EXHIBIT E, each dated as of the date of such Advance, and each in form and substance satisfactory to Lender.

4.2 ALL ADVANCES. The obligation of Lender to make any Advance and issue each LC under this Agreement (including the initial Advance or LC) shall be subject to the conditions precedent that, as of the date of such Advance or issuance of such LC and after giving effect thereto: (a) there exists no Potential Default or Event of Default; (b) no change that would cause a Material Adverse Effect has occurred since the date of the financial statements referenced in SECTION 5.6; (c) Lender shall have received from Borrowers a Notice of Borrowing or LC Request, as appropriate, dated as of the date of such Advance or issuance of such LC, as appropriate, and all of the statements contained in such Notice of Borrowing or LC Request, as the case may be, shall be true and correct; (d) the representations and warranties contained in each of the Loan Documents shall be true in all respects as though made on the date of such Advance or issuance of such LC; and (e) the Maximum Rate exceeds the Contract Rate.

## SECTION 5

## REPRESENTATIONS AND WARRANTIES

To induce Lender to make Advances and issue LCs hereunder, Borrowers represent and warrant to Lender that:

5.1 ORGANIZATION AND GOOD STANDING. Each Company is duly organized, validly existing. and in good standing under the laws of the state of its incorporation or formation, is duly qualified and is in good standing in all states in which it is doing business (except where the failure to be so qualified and maintain good standing could not have a Material Adverse Effect), has the power and authority to own its properties and assets and to transact the business in which it is engaged in each jurisdiction in which it operates. and is or will be qualified in those states wherein it proposes to transact business in the future (except where the failure to be so qualified could not have a Material Adverse Effect).

5.2 AUTHORIZATION AND POWER. Each Company has full power and authority to execute, deliver, and perform the Loan Documents to be executed by such Person, all of which has been duly authorized by all proper and necessary action.

5 3 NO CONFLICTS OR CONSENTS. Neither the execution and delivery of the Loan Documents. nor the consummation of any of the transactions therein contemplated, nor compliance with the terms and

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

provisions thereof, will contravene or materially conflict with any Legal Requirement to which any Company is subject, any Governmental Authorization applicable to any Company, any indenture, loan agreement, mortgage. deed of trust. or other agreement or instrument binding on any Company, or any provision of the Constituent Documents of any Company. No consent, approval, authorization, or order of any court. Governmental Authority, stockholder. or third party is required in connection with the execution, delivery. or performance by any Company of any of the Loan Documents.

    5.4 ENFORCEABLE OBLIGATIONS  The Loan Documents have been duly executed and delivered by each Company, as appropriate. and are the legal and binding obligations of each Company, as appropriate, enforceable in accordance with their respective terms. except as limited by Debtor Laws.

    5.5 NO LIENS. Except for the Permitted Liens, all of the properties and assets of each Company are free and clear of all Liens and other adverse claims of any nature, and each Company has good and marketable title to such properties and assets.

    5.6 FINANCIAL CONDITION. Borrowers have delivered to Lender copies of the financial statements of the Companies, as of September 30, 1998; such financial statements are true and correct, fairly represent the financial condition of the Companies as of such date, and have been prepared in accordance with GAAP; as of the date hereof, there are no obligations, Liabilities, or Indebtedness (including contingent and indirect Liabilities) of the Companies which are material and are not reflected in such financial statements; no Material Adverse Effect has occurred since the date of such financial statements.

    5.7 FULL DISCLOSURE. There is no fact known to any Borrower that such Borrower has not disclosed to Lender which could have a Material Adverse Effect. No certificate or statement delivered by any Borrower to Lender in connection with this Agreement contains any untrue statement of a material fact or omits to state any material fact necessary to keep the statements contained herein or therein from being misleading.

    5.8 NO POTENTIAL DEFAULT  No event has occurred and is continuing which constitutes a Potential Default or an Event of Default.

    5.9 MATERIAL AGREEMENTS. No Company is in default in any material respect under any contract or agreement to which it is a party or by which any of its properties is bound. except where such default could not have a Material Adverse Effect.

    5.10 NO LITIGATION  Except as disclosed on SCHEDULE 5.10, there are no actions, suits. or legal, equitable, arbitration, or administrative proceedings pending, or to the knowledge of any Borrower threatened. against any Company that could. if adversely determined. have a Material Adverse Effect

    5.11 USE OF PROCEEDS; MARGIN STOCK. The proceeds of each Advance will be used by each Borrower solely for the purposes specified in the preamble. None of such proceeds will be used for the purpose of purchasing or carrying any "MARGIN STOCK" as defined in REGULATIONS T, U, or X of the Board of Governors of the Federal Reserve System or for any other purpose which might constitute this transaction a "PURPOSE CREDIT" within the meaning of such Regulations  If requested by Lender, then Borrowers shall furnish to Lender a statement in conformity with the requirements of the Federal Reserve

AMENDED AND RESTATED                   REVOLVING CREDIT AGREEMENT D-0601350.3

Form U-1 referred to in said REGULATION U to the foregoing effect. No part of the proceeds of any Advance will be used for any purpose which violates. or is inconsistent with. the provisions of REGULATION X.

5.12 TAXES. All tax returns required to be filed by each Company in any jurisdiction have been filed and all taxes (including mortgage recording taxes). assessments. fees, and other governmental charges upon each Company or upon any of its properties, income, or franchises have been paid EXCEPT FOR taxes being contested in good faith by appropriate proceedings diligently projected and for which adequate reserves are maintained in accordance with GAAP. To the best of each Borrower's knowledge, there is no proposed tax assessment against any Company, and all tax Liabilities of each Company are adequately provided for. No income tax liability of any Company has been asserted by the Internal Revenue Service for taxes in excess of those already paid

5.13 PRINCIPAL OFFICE. ETC. The principal office, chief executive office, and principal place of business of each Company are set forth on EXHIBIT D. Each Company maintains its principal records and books at such address.

5.14 COMPLIANCE WITH LAW.

(a) Except as disclosed on SCHEDULE 5.14-1: (i) each Company is in compliance with its respective Constituent Documents and all Legal Requirements which are applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets. except where such non-compliance could not have a Material Adverse Effect; and (ii) no Company has received any notice or other communication from any Governmental Authority or other Person of any event or circumstance that could constitute a violation of, or failure to comply with, any Legal Requirement.

(b) Except as disclosed on SCHEDULE 5.14-1: (i) each Company is in compliance with all of the terms and requirements of each Governmental Authorization held by such Person, except where such non-compliance could not have a Material Adverse Effect; (ii) no Company has received any notice or other communication from any Governmental Authority or other Person of any event or circumstance which could constitute a violation of, or failure to comply with. any term or requirement of any Governmental Authorization. or of any actual or potential revocation, withdrawal, cancellation, or termination of, or material modification to. any Governmental Authorization; (iii) all applications required to have been filed for the renewal of any required Governmental Authorizations have been duly filed on a timely basis with the appropriate Governmental Authorities. and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authorities; (iv) upon consummation of the transactions contemplated hereby, each Company will lawfully hold all such Governmental Authorizations; and (v) none of the Governmental Authorizations of any Company will terminate upon consummation of the transactions contemplated hereby.

(c) Set forth on SCHEDULE 5.14-2 is a list of each of the Governmental Authorizations of each Company: (i) necessary to permit each such Person to lawfully conduct and operate its respective business in the manner it currently conducts and operates such business and to permit such Person to own and use its assets in the manner in which it currently owns and uses such assets; and (ii) necessary to permit each such Person, upon a consummation of the transactions contemplated hereby, to lawfully

AMENDED AND RESTATED                        REVOLVING CREDIT AGREEMENT D-0601350.3