conduct and operate its business and to permit each such Person to own and use its assets.

5.15 SUBSIDIARIES. Set forth on EXHIBIT D hereto is a complete and accurate list of all Subsidiaries as of the date hereof, showing as of such date (as to each such Subsidiary) the jurisdiction of its incorporation, the owner of the outstanding Stock of such Subsidiary, and the jurisdictions in which such Subsidiary is qualified to do business as a foreign corporation. To the extent applicable, all of the outstanding Stock of all Subsidiaries has been validly issued. is fully paid and nonassessable, and is owned by AGI or a Subsidiary free and clear of all Liens.

5.16 CASUALTIES. Neither the business nor the properties of any Company are affected by any environmental hazard, fire, explosion, accident. strike, lockout, or other labor dispute, drought, storm. hail, earthquake, embargo. act of God. or other casualty (whether or not covered by insurance), which could have a Material Adverse Effect.

5.17 SUFFICIENCY OF CAPITAL. Each Company is, and after consummation of this Agreement and after giving effect to all Indebtedness incurred and Liens created by the Companies in connection herewith will be, Solvent.

5.18 LOCATION OF ASSETS. All tangible assets of the Companies are located at the addresses listed on EXHIBIT D hereto except for inventory that is, in the ordinary course of the Companies' business, in transit. No asset of any Company will be kept at any other address.

5.19 CORPORATE NAME. No Company has, during the preceding five (5) years, (a) used any other corporate name or tradename. or (b) been the surviving corporation of a merger or consolidation or acquired all or substantially all of the assets of any Person.

5.20 LEASES. Except as set forth on SCHEDULE 5.20. no Company is the lessee of any real or personal property

5.21 ERISA. Each Company and each ERISA Affiliate has fulfilled its obligations under the minimum funding standards of ERISA and the Code with respect to each Plan and is in compliance in all material respects with the presently applicable provisions of ERISA and the Code, and has not incurred any liability to the PBGC or a Plan under TITLE IV of ERISA.

5.22 LABOR MATTERS. There are no controversies pending between any Company and any of their employees which could have a Material Adverse Effect.

5.23 BURDENSOME CONTRACTS. No Company is a party to any contract, the breach. violation. or termination of which could result in a Material Adverse Effect.

5.24 PERMITS. FRANCHISES, INTELLECTUAL PROPERTY, AND OTHER INTANGIBLE RIGHTS. Each Company owns, holds, and has the lawful right to use, all material Intangible Rights used in or necessary for the conduct of its business as currently conducted or proposed to be conducted.

5.25 FULL DISCLOSURE OF RIGHTS AND CLAIMS. Except as disclosed on SCHEDULE 5.10, no claims are pending. or, to the best of any Borrower's knowledge, threatened, that any Company is infringing or

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

otherwise adversely affecting the Intangible Rights of any other Person. The consummation of the transactions contemplated by the Loan Documents will not impair the ownership of. or rights with respect to, any material Intangible Rights of any Company.

5.26 YEAR 2000 COMPLIANCE. Each Company has (a) initiated a review and assessment of all areas within its business and operations (including those affected by suppliers and vendors) that could be adversely affected by the "YEAR 2000 PROBLEM" (that is, the risk that computer applications used by the Companies (or its suppliers and vendors) may be unable to recognize and perform properly date-sensitive functions involving certain dates prior to and any date after December 31, 1999). (b) developed a plan and timeline for addressing the Year 2000 Problem on a timely basis, and (c) to date, implemented that plan in accordance with that timetable. Borrowers reasonably believe that all computer applications (including those of suppliers and vendors) that are material to the Companies' respective business and operations will on a timely basis be able to perform properly date-sensitive functions for all dates before and after January 1. 2000 (that is, be "YEAR 2000 COMPLIANT"), except to the extent that a failure to do so could not reasonably be expected to have Material Adverse Effect.

5.27 REPRESENTATIONS AND WARRANTIES. Each Notice of Borrowing shall constitute, without the necessity of specifically containing a written statement, a representation and warranty by Borrowers that no Potential Default or Event of Default exists and that all representations and warranties contained in this SECTION 5 or in any other Loan Document are true and correct on and as of the date the requested Advance is to be made.

5.28 SURVIVAL OF REPRESENTATIONS AND WARRANTIES. All representations and warranties by Borrowers herein shall survive delivery of the Note and the making of each Advance. and any investigation at any time made by or on behalf of Lender shall not diminish Lender's right to rely thereon.

SECTION 6

AFFIRMATIVE COVENANTS

So long as Lender has any commitment to make Advances or issue LCs hereunder, and until payment in full of the Obligation and termination of all LCs. Borrowers agree that (unless Lender shall otherwise consent in writing):

6.1 FINANCIAL STATEMENTS, REPORTS. AND DOCUMENTS. Borrowers shall deliver to Lender each of the following:

(a) PERIODIC STATEMENTS. As soon as available. and in any event within forty-five (45) days after the last day of each fiscal quarter of each fiscal year of the Companies. copies of the consolidated balance sheet of the Companies as of the end of such fiscal quarter. and statements of income, retained earnings, and changes in cash flow of the Companies for that fiscal period and for the portion of the fiscal year ending with such period, all in reasonable detail, and certified by the chief financial officer of AGI as being true and correct and as having been prepared in accordance with GAAP, subject to year-end audit adjustments;

(b) ANNUAL STATEMENTS. As soon as available and in any event within one hundred and

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350 3

twenty (120) days after the last day of each fiscal year of the Companies, copies of the consolidated balance sheet of AGI as of the close of such fiscal year and statements of income, retained earnings, and changes in cash flow of AGI for such fiscal year, in each case setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail and accompanied by an opinion thereon (which shall not be qualified by reason of any limitation imposed by any Company) of independent public accountants of recognized national standing selected by AGI and satisfactory to Lender, to the effect that (i) such consolidated financial statements have been prepared in accordance with GAAP (EXCEPT FOR changes in which such accountants concur), (ii) the examination of such accountants in connection with such financial statements has been made in accordance with generally accepted auditing standards and, accordingly, includes such tests of the accounting records and such other auditing procedures as were considered necessary under the circumstances, and (iii) in making their audit, such accountants have not become aware of any condition or event which would constitute a Potential Default or an Event of Default under any of the terms or provisions of this Agreement (insofar as any such terms or provisions pertain to accounting matters) and, if any such condition or event then exists, specifying the nature and period of existence thereof;

(c) COMPLIANCE CERTIFICATE. Contemporaneously with the delivery of the financial statements required by SECTION 6.1(a), a compliance Certificate and an accounts receivable aging report; and

(d) OTHER INFORMATION. Such other information concerning the business, properties or financial condition of any Company as Lender shall reasonably request including audit reports, registration statements, or other reports or notices provided to shareholders of AGI and, if applicable, filed with the Securities and Exchange Commission.

6.2 PAYMENT OF TAXES AND OTHER INDEBTEDNESS. Borrowers shall, and shall cause each of the other Companies to, pay and discharge (a) all taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits, or upon any property belonging to it, before delinquent, (b) all lawful claims (including claims for labor, materials, and supplies), which, if unpaid, might give rise to a Lien upon any of its property, and (c) all of its other Indebtedness, except as prohibited under the Loan Documents; PROVIDED, HOWEVER, that the Companies shall not be required to pay any such tax, assessment, charge, or levy if and so long as the amount, applicability, or validity thereof shall currently be contested in good faith by appropriate proceedings and appropriate accruals and appropriate reserves have been established in accordance with GAAP.

6.3 MAINTENANCE OF EXISTENCE AND RIGHTS; CONDUCT OF BUSINESS. Borrowers shall, and shall cause each of the other Companies to, preserve and maintain its existence and all of its rights, privileges, and franchises (including Intangible Rights) necessary or desirable in the normal conduct of its business, and conduct its business in an orderly and efficient manner consistent with good business practices and in accordance with all Legal Requirements of any Governmental Authority, except where the failure to so preserve or maintain could not have a Material Adverse Effect.

6.4 NOTICE OF DEFAULT. Borrowers shall furnish to Lender, immediately upon becoming aware of the existence of any condition or event which constitutes a Potential Default or an Event of Default, written notice specifying the nature and period of existence thereof and the action which Borrowers are taking or proposes to take with respect thereto.

AMENDED AND RESTATED                          REVOLVING CREDIT AGREEMENT D-0601350.3

6.5 OTHER NOTICES. Borrowers shall, and shall cause each of the other Companies to, promptly notify Lender of (a) any material adverse change in its financial condition or its business, (b) any default under any material agreement, contract, or other instrument to which it is a party or by which any of its properties are bound, or any acceleration of the maturity of any Indebtedness owing by any Company, (c) any material adverse claim against or affecting any Company or any of its properties, and (d) the commencement of, and any material determination in, any litigation with any third party or any proceeding before any Governmental Authority affecting any Company.

6.6 OPERATIONS AND PROPERTIES. Borrowers shall, and shall cause each of the other Companies to, (a) act prudently and in accordance with customary industry standards in managing and operating its assets and properties, and (b) keep in good working order and condition, ordinary wear and tear excepted, all of its assets and properties which are necessary to the conduct of its business.

6.7 BOOKS AND RECORDS; ACCESS. Borrowers shall, and shall cause each of the other Companies to, give any representative of Lender access upon reasonable notice and during all business hours to, and permit such representative to examine, copy, or make excerpts from, any and all books, records, and documents in the possession of any Company and relating to its affairs, and to inspect any of the properties of any Company. Borrowers shall, and shall cause each of the other Companies to, maintain complete and accurate books and records of its transactions in accordance with good accounting practices.

6.8 COMPLIANCE WITH LAW. Borrowers shall, and shall cause each of the other Companies to, comply with all applicable Legal Requirements of any Governmental Authority, a breach of which could have a Material Adverse Effect.

6.9 INSURANCE. Borrowers shall, and shall cause each of the other Companies to, keep all insurable property, real and personal, adequately insured at all times in such amounts and against such risks as are customary for Persons in similar businesses operating in the same vicinity, specifically to include a policy of hazard, casualty, fire, and extended coverage insurance covering all assets, business interruption insurance (where feasible), liability insurance, and worker's compensation insurance, in every case under a policy with a financially sound and reputable insurance company and with only such deductibles as are customary, and all to contain a mortgagee or loss payee clause naming Lender as its interest may appear.

6.10 AUTHORIZATIONS AND APPROVALS. Borrowers shall, and shall cause each of the other Companies to, promptly obtain, from time to time at its own expense, all Governmental Authorizations as may be required to enable it to comply with its obligations hereunder and under the other Loan Documents.

6.11 FURTHER ASSURANCES. Borrowers shall, and shall cause each of the other Companies to, make, execute, and deliver or file or cause the same to be done, all such notices, additional agreements, mortgages, assignments, financing statements, or other assurances, and take any and all such other action, as Lender may, from time to time, deem reasonably necessary or proper in connection with any of the Loan Documents, the obligations of any Company thereunder.

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

6.12 INDEMNITY BY BORROWERS  Borrowers shall indemnify, defend, and hold harmless Lender and its Representatives (individually, an "INDEMNITEE" and collectively. the "INDEMNITEES") from and against any and all loss. liability, obligation, damage, penalty. judgment, claim. deficiency, and expense (including interest, penalties. attorneys' fees. and amounts paid in settlement) to which any Indemnitee may become subject arising out of this Agreement and the other Loan Documents OTHER THAN those which arise by reason of the gross negligence or willful misconduct of Lender, BUT SPECIFICALLY INCLUDING ANY LOSS, LIABILITY, OBLIGATION, DAMAGE. PENALTY, JUDGMENT, CLAIM. DEFICIENCY, OR EXPENSE ARISING OUT OF THE SOLE OR CONCURRENT NEGLIGENCE OF LENDER OR ANY OF ITS REPRESENTATIVES. Borrowers shall also indemnify, protect, and hold each Indemnitee harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, proceedings, costs, expenses (including without limitation all reasonable attorneys' fees and legal expenses whether or not suit is brought). and disbursements of any kind or nature whatsoever which may at any time be imposed on. incurred by, or asserted against such Indemnitee. with respect to or as a direct or indirect result of the violation by any Company of any Environmental Law; or with respect to or as a direct or indirect result of any Company's use. generation, manufacture. production, storage, release, threatened release, discharge, disposal. or presence of a Hazardous Material on. under. from, or about real property. The provisions of and undertakings and indemnifications set forth in this SECTION 6.12 shall survive (a) the satisfaction and payment of the Obligation and termination of this Agreement. and (b) the release of any Liens held by Lender on real property or the extinguishment of such Liens by foreclosure or action in lieu thereof; PROVIDED, HOWEVER. that the indemnification set forth herein shall not extend to any act or omission to any property subsequent to Lender becoming the owner of such property and with respect to which property such claim, loss, damage. liability, fine, penalty. charge, proceeding. order, judgment, action. or requirement arises subsequent to the acquisition of title thereto by Lender.

6.13 AFTER-ACQUIRED SUBSIDIARIES. Concurrently upon the formation or acquisition by any Company of any Subsidiary after the date hereof (an "AFTER-ACQUIRED SUBSIDIARY"), Borrowers shall, and shall cause each of the other Companies to, deliver Constituent Documents for such After-Acquired Subsidiary and such opinions as Lender shall require and shall cause the After-Acquired Subsidiary to execute a guaranty in favor of Lender

6.14 ERISA COMPLIANCE. Borrowers shall. and shall cause each of the other Companies and each ERISA Affiliate to: (a) at all times. make prompt payment of all contributions required under all Plans and required to meet the minimum funding standards set forth in ERISA with respect to its Plan; (b) within thirty (30) days after the filing thereof, furnish to Lender copies of each annual report/return (FORM 5500 series). as well as all schedules and attachments required to be filed with the Department of Labor and/or the Internal Revenue Service pursuant to ERISA, and the regulations promulgated thereunder. in connection with each of its Plans for each Plan year; (c) notify Lender immediately of any fact including but not limited to, any Reportable Event arising in connection with any of its Plans, which might constitute grounds for termination thereof by the PBGC or for the appointment by the appropriate United States District Court of a trustee to administer such Plan, together with a statement, if requested by Lender, as to the reason therefor and the action. if any, proposed to be taken with respect thereto; and (d) furnish to Lender upon its request. such additional information concerning any of its Plans as may be reasonably requested

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350 3

6.15 INTANGIBLE RIGHTS LITIGATION. If any Person files an action, suit, or legal, equitable, arbitration, or administrative proceeding against any Company asserting that such Company is infringing or otherwise adversely affecting the rights of such Person with respect to any Intangible Rights, then Borrowers shall, within sixty (60) days after the filing of such action, suit, or proceeding, provide to Lender evidence reasonably satisfactory to Lender (including, without limitation, opinions of counsel) that such Company is not infringing upon the Intangible Rights of any Person.

6.16 YEAR 2000 COMPLIANCE. Each Borrower shall promptly notify Lender in the event such Borrower discovers or determines that any computer application (including those of suppliers and vendors) that is material to its or any Company's business and operations will not be Year 2000 Compliant on a timely basis, except to the extent that such failure to be Year 2000 Compliant could not reasonably be expected to have a Material Adverse Effect.

### SECTION 7

### NEGATIVE COVENANTS

So long as Lender has any commitment to make Advances or issue LCs hereunder, and until payment in full of the Obligation and termination of all LCs, Borrowers agree that (unless Lender shall otherwise consent in writing):

7.1 LIMITATION ON INDEBTEDNESS. Borrowers shall not, and shall not permit any of the other Companies to, incur, guarantee, or otherwise be or become, directly or indirectly, liable in respect of any Indebtedness, except (a) Indebtedness arising out of this Agreement, (b) Indebtedness secured by the Permitted Liens (EXCEPT FOR Indebtedness incurred, borrowed, or guaranteed after the date hereof), and any renewals and extensions (but not increases) thereof, (c) Indebtedness not to exceed $750,000.00 in the aggregate at any time outstanding to finance the purchase or lease of telecommunications equipment and furnishings and fixtures to be used in the Plano Facility, (d) Indebtedness payable by Adams Golf, Ltd. to Barney Adams in the aggregate principal amount of approximately $1,100,000.00, (e) Indebtedness of any Company owed to any other Company, and (f) other Indebtedness not to exceed $1,000,000.00 in the aggregate at any time outstanding; PROVIDED THAT the Indebtedness permitted under (C) and (F) shall not exceed $1,500,000.00 in the aggregate at any time outstanding.

7.2 NEGATIVE PLEDGE. Borrowers shall not, and shall not permit any of the other Companies to, create, incur, permit, or suffer to exist any Lien upon any of its property or assets, now owned or hereafter acquired, EXCEPT FOR (a) Permitted Liens and (b) Liens securing the Indebtedness described in SECTION 7.1(c) and (f).

7.3 NEGATIVE PLEDGE AGREEMENTS. Borrowers shall not, and shall not permit any of the other Companies to, enter into any agreement (excluding this Agreement or any other Loan Documents) prohibiting the creation or assumption of any Lien upon any of its property, revenues, or assets, whether now owned or hereafter acquired, or the ability of any Subsidiary to make any payments, directly or indirectly, to AGI by way of Dividends, advances, repayments of loans, repayments of expenses, accruals, or otherwise.

7.4 RESTRICTIONS ON DIVIDENDS. AGI shall not, if an Event of Default exists, declare or

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

make, or incur any liability to make, any Dividend. Borrower shall not, and shall permit any of the other Companies to, declare or make, or incur any liability to make, any Dividend except to another Company.

7.5 LIMITATION ON INVESTMENTS. Borrowers shall not, and shall not permit any of the other Companies to, make or have outstanding any Investments in any Person, EXCEPT FOR (a) the Companies' ownership of Stock of Subsidiaries, (b) Temporary Cash Investments and such other "CASH EQUIVALENT" investments as Lender may from time to time approve in writing, (c) advances to employees and third parties not to exceed $250,000.00 in the aggregate at any time outstanding, (d) acquisitions of stock or other assets in the sports equipment and accessories business from any Person PROVIDED THAT the aggregate purchase price of such acquisitions do not exceed $2,000,000.00 in any calendar year, and (e) advances by any Company to another Company.

7.6 CERTAIN TRANSACTIONS. Borrowers shall not, and shall not permit any of the other Companies to, enter into any transaction with, or pay any management fees to, any Affiliate; PROVIDED, HOWEVER, that the Companies may enter into transactions with (a) any other Company, and (b) with Affiliates (other than the Companies) upon terms not less favorable to the Companies than would be obtainable at the time in comparable, arms-length transactions with Persons OTHER THAN Affiliates.

7.7 EXECUTIVE PERSONNEL. Borrowers shall not, and shall not permit any of the other Companies (other than Adams Golf Holding Corp.) to, permit Barney Adams to cease to be involved in its present executive management.

7.8 LIMITATION ON SALE OF PROPERTIES. Borrowers shall not, and shall not permit any of the other Companies to (a) sell, assign, exchange, lease, or otherwise dispose of any of its properties, rights, assets, or business, whether now owned or hereafter acquired, except in the ordinary course of its business and for a fair consideration, or (b) sell, assign, or discount any accounts receivable.

7.9 ACQUISITIONS; SUBSIDIARIES. Borrowers shall not, and shall not permit any of the other Companies to, (a) form, incorporate, acquire, or make any Investment in any Subsidiary, except the Subsidiaries listed on EXHIBIT D and wholly-owned After-Acquired Subsidiaries formed in accordance with SECTION 6.13, or (b) acquire all or substantially all of the assets or Stock of any class of any other Person, except for Investments permitted under SECTION 7.5.

7.10 LIQUIDATION, MERGERS, CONSOLIDATIONS, AND DISPOSITIONS OF SUBSTANTIAL ASSETS. Borrowers shall not, and shall not permit any of the other Companies to, dissolve or liquidate, or become a party to any merger or consolidation, or acquire by purchase, lease, or otherwise all or substantially all of the assets or Stock of any Person, or sell, transfer, lease, or otherwise dispose of all or any substantial part of its property or assets or business; PROVIDED, HOWEVER, that any Company may merge with any other Company.

7.11 LINES OF BUSINESS; RECEIVABLES POLICY. Borrowers shall not, and shall not permit any of the other Companies to, directly or indirectly, engage in any business OTHER THAN the sports equipment and accessories business, or discontinue any of its material existing lines of business. Borrowers shall not, and shall not permit any of the other Companies to, make any material change in its credit and collection policy, which change would materially impair the collectibility of its receivables, or rescind, cancel, or modify any receivable, except in the ordinary course of business.

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

7.12 GUARANTIES. Borrowers shall not, and shall not permit any of the other Companies to, become or be liable in respect of any Guaranty.

7.13 SALE AND LEASEBACK. Borrowers shall not, and shall not permit any of the other Companies to, enter into any arrangement with any Person pursuant to which any Company will lease, as lessee, any property which it owned as of the date hereof and which it sold, transferred, or otherwise disposed of to such other Person.

7.14 FIXED CHARGES COVERAGE. Borrowers shall not, as of the last day of any fiscal quarter, permit the ratio of (a) the sum of Consolidated Adjusted Net Income, PLUS federal, state, local, and foreign income taxes deducted from Consolidated Adjusted Net Income in accordance with GAAP, PLUS Fixed Charges, to (b) Fixed Charges, in each case for the four (4) fiscal quarters ending on the date of determination, to be less than 3.0 to 1.0.

7.15 DEBT TO EBITDA. Borrowers shall not permit, as of the last day of any fiscal quarter, the ratio of (a) all Indebtedness of the Companies as of such date, to (b) EBITDA for the four (4) fiscal quarters ending on the date of determination, to be greater than 2.0 to 1.0.

7.16 FISCAL YEAR. Borrowers shall not, and shall not permit any of the other Companies to, change its fiscal year or method of accounting.

### SECTION 8

### EVENTS OF DEFAULT

8.1 EVENTS OF DEFAULT. An "EVENT OF DEFAULT" shall exist if any one or more of the following events (herein collectively called "EVENTS OF DEFAULT") shall occur and be continuing:

(a) any Company shall fail to pay when due the Obligation or any part thereof; or

(b) any representation or warranty made under this Agreement, or any of the other Loan Documents, shall prove to be untrue or inaccurate in any material respect as of the date on which such representation or warranty is made or deemed to have been made; or

(c) default shall occur in the performance of (i) any of the covenants or agreements of any Company contained in SECTION 6.1 and SECTION 7, or (ii) any other covenants or agreements of any Company contained herein or in any of the other Loan Documents and, in the case of (II), such failure shall continue for thirty (30) days after written notice thereof from Lender to Borrower; or

(d) default shall occur in the payment of any material Indebtedness (OTHER THAN the Obligation) of any Company or default shall occur in respect of any note or credit agreement relating to any such Indebtedness and such default shall continue for more than the period of grace, if any, specified therein; or

(e) any of the Loan Documents shall cease to be legal, valid, and binding agreements enforceable against the Person executing the same in accordance with its terms, shall be terminated.

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

become or be declared ineffective or inoperative or cease to provide the respective liens, security interests. rights, titles, interests, remedies, powers, or privileges intended to be provided thereby; or any Company shall deny that such Company has any further liability or obligation under any of the Loan Documents; or

       (f) any Company shall (i) apply for or consent to the appointment of a receiver, trustee, custodian, intervenor, or liquidator of itself or of all or a substantial part of such Person's assets, (ii) file a voluntary petition in bankruptcy, admit in writing that such Person is unable to pay such Person's debts as they become due. or generally not pay such Person's debts as they become due, (iii) make a general assignment for the benefit of creditors, (iv) file a petition or answer seeking reorganization of an arrangement with creditors or to take advantage of any bankruptcy or insolvency laws, (v) file an answer admitting the material allegations of. or consent to, or default in answering, a petition filed against such Person in any bankruptcy, reorganization, or insolvency proceeding, or (vi) take corporate or partnership action for the purpose of effecting any of the foregoing; or

       (g) an involuntary proceeding shall be commenced against any Company seeking bankruptcy or reorganization of such Person or the appointment of a receiver, custodian, trustee, liquidator, or other similar official of such Person, or all or substantially all of such Person's assets. and such proceeding shall not have been dismissed within sixty (60) days of the filing thereof; or an order, order for relief, judgment, or decree shall be entered by any court of competent jurisdiction or other competent authority approving a petition or complaint seeking reorganization of any Company or appointing a receiver, custodian, trustee, liquidator, or other similar official of such Person. or of all or substantially all of such Person's assets; or

       (h) any final judgment(s) for the payment of money in excess of the sum of $100,000.00 in the aggregate shall be rendered against any Company and such judgment(s) shall not be satisfied or discharged at least ten (10) days prior to the date on which any of such Person's assets could be lawfully sold to satisfy such judgment; or

       (i)     a Change in Control shall occur.

       8.2 REMEDIES UPON EVENT OF DEFAULT. If any Event of Default shall occur and be continuing, then Lender may, without notice. exercise any one or more of the following rights and remedies, and any other remedies provided in any of the Loan Documents, as Lender in its sole discretion may deem necessary or appropriate: (a) terminate Lender's commitment to lend hereunder, (b) declare the Obligation or any part thereof to be forthwith due and payable. whereupon the same shall forthwith become due and payable without presentment, demand, protest, notice of default, notice of acceleration or of intention to accelerate. or other notice of any kind, all of which Borrowers hereby expressly waive. anything contained herein or in the Note to the contrary notwithstanding, (c) reduce any claim to judgment, or (d) without notice of default or demand. pursue and enforce any of Lender's rights and remedies under the Loan Documents. or otherwise provided under or pursuant to any applicable law or agreement; PROVIDED, HOWEVER, if any Event of Default specified in SECTIONS 8.1(f) or (g) shall occur. then the Obligation shall thereupon become due and payable concurrently therewith, and Lender's obligation to lend shall immediately terminate hereunder, without any further action by Lender and without presentment, demand, protest, notice of default. notice of acceleration or of intention to accelerate, or

AMENDED AND RESTATED               REVOLVING CREDIT AGREEMENT D-0601350 3

other notice of any kind, all of which Borrowers hereby expressly waive

8.3 PERFORMANCE BY LENDER. If any Company fails to perform any covenant, duty, or agreement contained in any of the Loan Documents, then Lender may perform or attempt to perform such covenant, duty, or agreement on behalf of such Company. In such event, Borrowers shall, at the request of Lender, promptly pay any amount expended by Lender in such performance or attempted performance to Lender at its principal office in Dallas, Texas together with interest thereon at the Maximum Rate from the date of such expenditure until paid. Notwithstanding the foregoing, it is expressly understood that Lender shall not assume any liability or responsibility for the performance of any duties of any Company hereunder or under any of the Loan Documents and none of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Lender the right or power to exercise control over the management and affairs of any Company.

8.4     ORDER OF APPLICATION.

(a) NO DEFAULT. If no Event of Default exists, then except as specifically provided in the Loan Documents, any payments shall be applied to the Obligation in the order and manner as Borrowers direct.

(b) DEFAULT. If an Event of Default exists, then any payment (including proceeds from the exercise of any rights and remedies in any collateral, if any) shall be applied in the following order:

(i)     to all fees and expenses which Lender has not been paid or reimbursed in accordance with the Loan Documents;

(ii)    to accrued interest on the Principal Debt;

(iii)   to the remaining Obligation in the order and manner as Lender deems appropriate; and

(iv)    as a deposit with Lender as security for the payment of any LC Exposure.

SECTION 9

MISCELLANEOUS

9.1 ACCOUNTING REPORTS. All financial reports or projections furnished by any Person to Lender pursuant to this Agreement shall be prepared in such form and such detail as shall be satisfactory to Lender, shall be prepared on the same basis as those prepared by such Person in prior years, and, where applicable, shall be the same financial reports and projections as those furnished to such Person's officers and directors.

9.2 WAIVER. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender under the Loan Documents shall be in addition to all other rights provided by law. No modification or waiver of

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

any provision of any Loan Document, nor consent to departure therefrom. shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same. similar, or other instances without such notice or demand.

9.3 PAYMENT OF EXPENSES. Borrowers agree to pay Lender on demand all out-of-pocket costs and expenses of Lender (including, without limitation, the reasonable attorneys' fees of Lender's counsel) incurred in connection with the preservation and enforcement of Lender's rights under the Loan Documents. and all reasonable costs and expenses of Lender (including without limitation the reasonable fees and expenses of Lender's counsel) in connection with the negotiation, preparation, execution, delivery, and administration of the Loan Documents (except for the costs and expenses related to the negotiation. preparation. execution, and delivery of this Agreement and the Loan Documents executed on or prior to the date hereof).

9.4 NOTICES. Any communications required or permitted to be given by any of the Loan Documents must be (a) in writing and personally delivered or mailed by prepaid certified or registered mail, or (b) made by facsimile transmission delivered or transmitted, to the party to whom such notice of communication is directed, to the address of such party shown opposite its name on the signature pages hereof. Any such communication shall be deemed to have been given (whether actually received or not) on the day it is personally delivered or. if transmitted by facsimile transmission, on the day that such communication is transmitted as aforesaid subject to telephone confirmation of receipt; PROVIDED, HOWEVER. that any notice received by Lender after 10:00 a.m. Dallas. Texas time on any day from Borrowers pursuant to SECTION 2.2 (with respect to a Notice of Borrowing) or SECTION 2.3 (with respect to an LC Request) shall be deemed for the purposes of such SECTION to have been given by Borrowers on the next succeeding day. or if mailed, on the third (3rd) day after it is marked as aforesaid. Any party may change its address for purposes of this Agreement by giving notice of such change to the other parties pursuant to this SECTION 9.4.

9.5 GOVERNING LAW. THIS AGREEMENT HAS BEEN PREPARED, IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED IN THE STATE OF TEXAS AND THE SUBSTANTIVE LAWS OF SUCH STATE AND THE APPLICABLE FEDERAL LAWS OF THE UNITED STATES OF AMERICA SHALL GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THIS AGREEMENT AND ALL OF THE OTHER LOAN DOCUMENTS.

9.6 CHOICE OF FORUM; CONSENT TO SERVICE OF PROCESS AND JURISDICTION. Any suit, action, or proceeding against Borrowers with respect to this Agreement, the Note, or other Loan Documents, or any judgment entered by any court in respect thereof, may be brought in the courts of the State of Texas. County of Dallas, or in the United States courts located in the State of Texas as Lender in its sole discretion may elect and Borrowers hereby irrevocably submit to the nonexclusive jurisdiction of such courts for the purpose of any such suit, action, or proceeding. Borrowers hereby irrevocably consent to the service of process in any suit, action, or proceeding in said court by the mailing thereof by Lender by registered or certified mail. postage prepaid, to each Borrower's address shown opposite its name on the signature pages hereof. Nothing herein or in any of the other Loan Documents shall affect the right of Lender to serve process in any other manner permitted by law or shall limit the right of Lender to bring any action or proceeding against Borrowers or with respect to any of its property in courts in other jurisdiction. Borrowers hereby irrevocably waive any objections which it may now or hereafter have to

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

the laying of venue of any suit, action, or proceeding arising out of or relating to this Agreement, the Note, or any other Loan Documents brought in the courts located in the State of Texas. County of Dallas, and hereby further irrevocably waive any claim that any such suit, action, or proceeding brought in any such court has been brought in any inconvenient forum. Any action or proceeding by any Borrower against Lender shall be brought only in a court located in Dallas County, Texas.

9.7 INVALID PROVISIONS. Any provision of any Loan Document held by a court of competent jurisdiction to be illegal, invalid or unenforceable and shall not invalidate the remaining provisions of such Loan Document which shall remain in full force and the effect thereof shall be confined to the provision held invalid or illegal.

9.8 MAXIMUM INTEREST RATE. Regardless of any provision contained in any of the Loan Documents, Lender shall never be entitled to receive, collect, or apply as interest (whether termed interest herein or deemed to be interest by operation of law or judicial determination) on the Note any amount in excess of interest calculated at the Maximum Rate, and, in the event that any Lender ever receives. collects, or applies as interest any such excess. then the amount which would be excessive interest shall be deemed to be a partial prepayment of principal and treated hereunder as such; and, if the principal amount of the Obligation is paid in full, then any remaining excess shall forthwith be paid to Borrowers. In determining whether or not the interest paid or payable under any specific contingency exceeds interest calculated at the Maximum Rate, Borrowers and Lender shall, to the maximum extent permitted under applicable law: (a) characterize any non-principal payment as an expense, fee, or premium rather than as interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate, and spread, in equal parts, the total amount of interest throughout the entire contemplated term of the Note; PROVIDED THAT. if the Note is paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds interest calculated at the Maximum Rate, then Lender shall refund to Borrowers the amount of such excess or credit the amount of such excess against the principal amount of the Note and, in such event, Lender shall not be subject to any penalties provided by any laws for contracting for, charging. taking, reserving. or receiving interest in excess of interest calculated at the Maximum Rate.

9.9 NON-LIABILITY OF LENDER. The relationship between the Companies and Lender is. and shall at all times remain, solely that of borrower and lender and Lender has no fiduciary or other special relationship with any Company.

9.10 OFFSET. Borrowers hereby grant to Lender the right of offset. to secure repayment of the Obligation, upon any and all moneys. securities. or other property of Borrowers and the proceeds therefrom. now or hereafter held or received by or in transit to Lender or its agents, from or for the account of Borrowers or any Guarantor, whether for safe keeping. custody, pledge, transmission, collection, or otherwise, and also upon any and all deposits (general or special) and credits of each Borrower, and any and all claims of Borrowers against Lender at any time existing.

9.11 SUCCESSORS AND ASSIGNS. The Loan Documents shall be binding upon and inure to the benefit of Borrowers and Lender and their respective successors, assigns. and legal representatives; PROVIDED, HOWEVER, that Borrowers may not. without the prior written consent of Lender. assign any rights, powers. duties, or obligations thereunder. Lender reserves the right to sell all or a portion of its interest in the Loan Documents, and Lender shall have the right to disclose any information in its

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

possession regarding any Company, or any assets pledged to Lender in connection herewith to any potential transferee of the Note or any part thereof.

9.12 TEXAS FINANCE CODE. Borrowers and Lender hereby agree that the provisions of CHAPTER 346 of the TEXAS FINANCE CODE, as amended (regulating certain revolving credit loans and revolving tri-party accounts), shall not apply to the Loan Documents.

9.13 HEADINGS. SECTION headings are for convenience of reference only and shall in no way affect the interpretation of this Agreement.

9.14 SURVIVAL. All representations and warranties made by Borrowers herein shall survive delivery of the Note and the making of the Loan.

9.15 PARTICIPATIONS. Lender shall have the right to enter into participation agreements with other banks with respect to the Note, and grant participations in the rate of other loan documents but such participation shall not affect the rights and duties of such Lender hereunder vis-a-vis Borrowers. Each actual or proposed participant shall be entitled to receive all information received by Lender regarding the creditworthiness of Borrowers, including, without limitation, information required to be disclosed to a participant pursuant to BANKING CIRCULAR 181 (REV., AUGUST 2, 1984), issued by the Comptroller of the Currency (whether the actual or proposed participant is subject to the circular or not).

9.16 NO THIRD PARTY BENEFICIARY. The parties do not intend the benefits of this Agreement to inure to any third party, nor shall any Loan Document or any course of conduct by any party hereto be construed to make or render Lender or any of its officers, directors, agents, or employees liable (a) to any materialman, supplier, contractor, subcontractor, purchaser, or lessee of any property owned by any Borrower, or (b) for debts or claims accruing to any such Persons against any Borrower.

9.17 WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWERS HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY OR THE ACTIONS OF LENDER IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT THEREOF.

9.18 CAPITAL ADEQUACY. If, after the date hereof, Lender shall have determined that either (a) the adoption of any applicable law, rule, regulation, or guideline regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank, or comparable agency charged with the interpretation or administration thereof, or (b) compliance by Lender (or any lending office of Lender) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank, or comparable agency, has or would have the effect of reducing the rate of return on Lender's capital as a consequence of its or Borrowers' obligations hereunder to a level below that which Lender could have achieved but for such adoption, change, or compliance (taking into consideration Lender's policies with respect to capital adequacy) by an amount deemed by Lender to be material, then from time-to-time, within ten (10) days after demand by Lender, Borrowers shall pay to Lender such additional amount or amounts as will adequately compensate Lender for such reduction. Lender will promptly notify Borrowers of any event of which it has actual knowledge, occurring after the date thereof, which will

AMENDED AND RESTATED                    REVOLVING CREDIT AGREEMENT D-0601350.3

entitle Lender to compensation pursuant to this SECTION 9.18. A certificate of Lender claiming compensation under this SECTION 9.18 and setting forth the additional amount or amounts to be paid to it hereunder, together with the description of the manner in which such amounts have been calculated, shall be conclusive in the absence of manifest error. In determining such amount, Lender may use any reasonable averaging and attribution methods.

9.19 MULTIPLE COUNTERPARTS. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.

9.20 ARBITRATION. ANY CONTROVERSY OR CLAIM BETWEEN OR AMONG THE PARTIES HERETO INCLUDING BUT NOT LIMITED TO THOSE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR INSTRUMENTS, INCLUDING ANY CLAIM BASED ON OR ARISING FROM AN ALLEGED TORT, SHALL BE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (OR IF NOT APPLICABLE, THE APPLICABLE STATE LAW), THE RULES OF PRACTICE AND PROCEDURE FOR THE ARBITRATION OF COMMERCIAL DISPUTES OF J.A.M.S./ENDISPUTE OR ANY SUCCESSOR THEREOF (J.A.M.S.), AND THE "SPECIAL RULES" SET FORTH BELOW. IN THE EVENT OF ANY INCONSISTENCY, THE SPECIAL RULES SHALL CONTROL. JUDGMENT UPON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. ANY PARTY TO THIS AGREEMENT MAY BRING AN ACTION, INCLUDING A SUMMARY OR EXPEDITED PROCEEDING, TO COMPEL ARBITRATION OF ANY CONTROVERSY OR CLAIM TO WHICH THIS AGREEMENT APPLIES IN ANY COURT HAVING JURISDICTION OVER SUCH ACTION.

(a) SPECIAL RULES. THE ARBITRATION SHALL BE CONDUCTED IN THE CITY OF BORROWERS' DOMICILE AT THE TIME OF THIS AGREEMENT'S EXECUTION AND ADMINISTERED BY J.A.M.S. WHO WILL APPOINT AN ARBITRATOR; IF J.A.M.S. IS UNABLE OR LEGALLY PRECLUDED FROM ADMINISTERING THE ARBITRATION, THEN THE AMERICAN ARBITRATION ASSOCIATION WILL SERVE. ALL ARBITRATION HEARINGS WILL BE COMMENCED WITHIN 90 DAYS OF THE DEMAND FOR ARBITRATION; FURTHER, THE ARBITRATOR SHALL ONLY, UPON A SHOWING OF CAUSE, BE PERMITTED TO EXTEND THE COMMENCEMENT OF SUCH HEARING FOR UP TO AN ADDITIONAL 60 DAYS. THE PARTIES SHALL REQUEST THAT THE ARBITRATOR SHALL MAKE FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH SUCH ARBITRATION PROCEEDING, PROVIDED THAT SUCH FINDINGS OF FACT AND CONCLUSIONS OF LAW SHALL NOT AFFECT THE FINALITY OF THE ARBITRATOR'S DECISION.

(b) RESERVATION OF RIGHTS. NOTHING IN THIS AGREEMENT SHALL BE DEEMED TO (I) LIMIT THE APPLICABILITY OF ANY OTHERWISE APPLICABLE STATUTES OF LIMITATION OR REPOSE AND ANY WAIVERS CONTAINED IN THIS AGREEMENT; OR (II) BE A WAIVER BY LENDER OF THE PROTECTION AFFORDED TO IT BY 12 U.S.C. §§ 91 OR ANY SUBSTANTIALLY EQUIVALENT STATE LAW; OR (III) LIMIT THE RIGHT OF LENDER HERETO (A) TO EXERCISE SELF HELP REMEDIES SUCH AS (BUT NOT LIMITED TO) SET-OFF, OR (B) TO FORECLOSE AGAINST ANY REAL OR PERSONAL PROPERTY COLLATERAL, OR (C) TO OBTAIN FROM A COURT PROVISIONAL OR ANCILLARY REMEDIES SUCH AS (BUT NOT LIMITED TO) INJUNCTIVE RELIEF OR THE APPOINTMENT OF A RECEIVER. LENDER MAY EXERCISE SUCH SELF HELP RIGHTS, FORECLOSE UPON SUCH PROPERTY, OR OBTAIN SUCH PROVISIONAL OR ANCILLARY REMEDIES BEFORE, DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING BROUGHT PURSUANT TO THIS AGREEMENT. AT LENDER'S OPTION, FORECLOSURE UNDER A DEED OF TRUST OR MORTGAGE MAY BE ACCOMPLISHED BY ANY OF THE FOLLOWING: THE EXERCISE OF A POWER OF SALE UNDER THE DEED OF TRUST OR MORTGAGE, OR BY JUDICIAL SALE UNDER THE DEED OF TRUST OR MORTGAGE, OR BY JUDICIAL FORECLOSURE. NEITHER THIS EXERCISE OF SELF HELP REMEDIES NOR THE INSTITUTION OR MAINTENANCE OF AN ACTION FOR FORECLOSURE OR PROVISIONAL OR ANCILLARY

REMEDIES SHALL CONSTITUTE A WAIVER OF THE RIGHT OF ANY PARTY, INCLUDING THE CLAIMANT IN ANY SUCH ACTION TO ARBITRATE THE MERITS OF THE CONTROVERSY OR CLAIM OCCASIONING RESORT TO SUCH REMEDIES.

(c) CONFIDENTIALITY. ANY ARBITRATION PROCEEDING, AWARD, FINDINGS OF FACT, CONCLUSIONS OF LAW, OR OTHER INFORMATION CONCERNING SUCH ARBITRATION MATTERS SHALL BE HELD IN CONFIDENCE BY THE PARTIES AND SHALL NOT BE DISCLOSED EXCEPT TO EACH PARTIES EMPLOYEES OR AGENTS AS SHALL BE REASONABLY NECESSARY FOR SUCH PARTY TO CONDUCT ITS BUSINESS; PROVIDED, HOWEVER, THAT EITHER PARTY MAY DISCLOSE SUCH INFORMATION FOR AUDITING PURPOSES BY INDEPENDENT CERTIFIED ACCOUNTANTS, FOR COMPLYING WITH APPLICABLE GOVERNMENTAL LAWS, REGULATIONS OR COURT ORDERS, OR THAT IS OR BECOMES PART OF THE PUBLIC DOMAIN THROUGH NO BREACH OF THIS AGREEMENT.

9.21 ENTIRETY. THIS AGREEMENT, THE NOTE, AND THE OTHER LOAN DOCUMENTS REFERRED TO HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO. THE PROVISIONS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH ANY BORROWER IS A PARTY MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE PARTIES HERETO.

9.22 CONFIDENTIALITY. Lender agrees to keep confidential any information furnished or made available to it by any Company pursuant to this Agreement that is marked confidential; PROVIDED THAT nothing herein shall prevent Lender from disclosing such information (a) to any Affiliate of Lender, or any officer, director, employee, agent, or advisor of Lender or any Affiliate of Lender, (b) to any other Person if reasonably incidental to the administration of the credit facility provided herein, (c) as required by any Legal Requirement, (d) upon the order of any court or administrative agency, (e) upon the request or demand of any Governmental Authority, (f) that is or becomes available to the public or that otherwise becomes available to Lender other than as a result of a disclosure by Lender prohibited by this Agreement, (g) in connection with any litigation to which Lender or any of its Affiliates may be a party, (h) to the extent necessary in connection with the exercise of any remedy under this Agreement or any other Loan Document, and (i) subject to provisions substantially similar to those contained in this SECTION, to any actual or proposed participant or assignee.

9.23 AMENDMENT AND RESTATEMENT. This Agreement is in renewal, extension, modification, amendment, and restatement of the Original Loan Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES TO FOLLOW]

AMENDED AND RESTATED                     REVOLVING CREDIT AGREEMENT D-0601350 3

      IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written.

Address for Notice:                 BORROWERS:

c/o Adams Golf, Inc.                ADAMS GOLF DIRECT RESPONSE. LTD..
2801 East Plano Parkway
Plano, Texas 75074                  By: ADAMS GOLF GP CORP., a Delaware
Attention: Darl P. Hatfield             corporation, General Partner
Telecopy No: 972-424-0721

                                            By:
                                            Name:
                                            Title:


Address for Notice:                 ADAMS GOLF, LTD., a Texas limited
                                    partnership
c/o Adams Golf, Inc.
2801 East Plano Parkway             By: ADAMS GOLF GP CORP., a Delaware
Plano, Texas 75074                      corporation. General Partner
Attention: Darl P. Hatfield
Telecopy No: 972-424-0721                   By:
                                            Name:
                                            Title:


Address for Notice:                 LENDER:

901 Main Street. 7th Floor          NATIONSBANK, N.A., a national
P.O. Box 831000                     banking association (successor in
Dallas, Texas 75202                 interest by merger to NationsBank
Attention: Mr. Russell P. Hartsfield  of Texas. N.A.)
Telecopy No.: (214) 508-3139
                                            By:
                                                Russell P. Hartsfield
                                                Senior Vice President


AMENDED AND RESTATED                REVOLVING CREDIT AGREEMENT D-0601350.3

[logo]

NationsBank. N A.                    AMENDED AND RESTATED PROMISSORY NOTE
- ----------------------------------------------------------------------------
                                    Date          February 26, 1999
                                    Amount        $   10.000.000 00

FOR VALUE RECEIVED, the undersigned (jointly and severally, "Borrowers")
unconditionally promise to pay to the order of NationsBank, N A., successor
in interest by merger to NationsBank of Texas. N.A. ("Bank"), Dallas (Banking
Center) without setoff, at its offices at 901 MAIN STREET, DALLAS, Texas, or
at such other place as may be designated by Bank, the principal amount of TEN
MILLION AND NO/100 Dollars ($10,000,000.00), or so much thereof as may be
advanced from time to time in immediately available funds, together with
interest computed daily on the outstanding principal balance hereunder, at an
annual interest rate, and in accordance with the payment schedule, indicated
below. [This Note contains some provisions preceded by boxes. Mark only those
boxes beside provisions which will be applicable to this transaction. A box
which is not marked means that the provision beside it is not applicable to
this transaction.]

RATE

/ /    PRIME RATE. The rate shall be the Prime Rate, plus _____ percent, per
       annum. The "Prime Rate" is the fluctuating rate of interest established
       by Bank from time to time. at its discretion, whether or not such rate
       shall be otherwise published. The Prime Rate is established by Bank as
       an index or base rate and may or may not at any time be the best or
       lowest rate charged by Bank on any loan.

/ /    FIXED RATE.  The Rate shall be fixed at _____ percent, per annum.

/ /    TREASURY SECURITIES RATE. The Rate shall be the Treasury Securities Rate,
       plus _____ percent. per annum. The "Treasury Securities Rate" is a
       fluctuating rate of interest applied by Bank from time to time, based on
       the most recent monthly average of daily yields on all outstanding United
       States Treasury Securities adjusted to a constant maturity of _____
       years. as made available by the Federal Reserve Board, rounded upwards to
       the nearest one-eighth of one percentage point (0.125%).

/X/    OTHER. THE RATE SHALL BE THE BASE RATE PLUS THE APPLICABLE MARGIN OR
       THE ADJUSTED EURODOLLAR RATE PLUS THE APPLICABLE MARGIN (AS SUCH
       TERMS ARE DEFINED BELOW), AS SELECTED BY BORROWERS PURSUANT TO THE
       AMENDED AND RESTATED REVOLVING CREDIT AGREEMENT DATED OF EVEN DATE
       HEREWITH, EXECUTED BY BORROWERS AND BANK (AS MODIFIED, AMENDED.
       RENEWED, EXTENDED, AND RESTATED FROM TIME TO TIME, THE "CREDIT
       AGREEMENT").

Notwithstanding any other provision contained in this Note, Bank does not
intend to charge and Borrowers shall not be required to pay any amount of
interest or other fees or charges that is in excess of the maximum permitted
by applicable law. Borrowers agree that during the full term hereof, the
maximum lawful interest rate for this Note as determined under Texas law
shall be the monthly ceiling as specified in Article 5069-1.D. of the
V.A.T.S. Further. to the extent that any other lawful rate ceiling exceeds
the rate ceiling so determined. then the higher rate ceiling shall apply. Any
payment in excess of such maximum shall be refunded to Borrowers or credited
against principal. at the option of Bank

ACCRUAL METHOD

Interest at the Rate set forth above, unless otherwise indicated, will be
calculated on the basis of the 365/360 method, which computes a daily amount
of interest for a hypothetical year of 360 days, then multiplies such amount
by the actual number of days elapsed in an interest calculation period.

RATE CHANGE DATE

Any Rate based on a fluctuating index or base rate will change. unless
otherwise provided, each time and as of the date that the index or base rate
changes. In the event any index is discontinued, Bank shall substitute an
index determined by Bank to be comparable, in its sole discretion.

PAYMENT SCHEDULE

All payments received hereunder shall be applied first to the payment of any
expense or charges payable hereunder or under any other documents executed in
connection with this Note ("Loan Documents"), then to interest due and
payable, with the balance being applied to principal, or in such other order
as Bank shall determine at its option.

/ / PRINCIPAL  Principal shall be paid in _____ (____) equal: / / monthly.
    / / quarterly or / / PLUS installments of $_____ each, commencing on
    _____ . 19__.

INTEREST together with accrued interest thereon and continuing on the same
day of each successive month/quarter/or other period (as applicable)

thereafter. with a final payment of all unpaid principal and interest thereon on _____. 19__.

/ / PRINCIPAL  Principal and interest shall be paid in _____ (____) equal: / / monthly. (____) equal: / / monthly, / / quarterly or / / AND installments of $_____  each. commencing on ____, 19__.

INTEREST and continuing on the same day of each successive month/quarter/or other period (as applicable) thereafter. with a final payment of all unpaid principal and interest thereon on _____, 19__; provided that, if accrued interest on any payment exceeds the installment amount set forth above. Borrowers will pay an additional amount equal to such excess interest.

/X/  SINGLE  Principal shall be paid in full in a single payment on May 31. 2000. Interest  thereon shall be payable as provided in the Credit Agreement.

/ /  DEMAND.  NOTWITHSTANDING ANY PROVISIONS CONTAINED HEREIN WHICH MAY BE INCONSISTENT WITH A DEMAND NOTE, INCLUDING BUT NOT LIMITED TO ANY REFERENCES TO INSTALLMENTS, A MATURITY DATE, ACCELERATION OR EVENTS OF DEFAULT, BORROWERS ACKNOWLEDGE THAT BANK MAY DEMAND PAYMENT AT ANY TIME, IN ITS SOLE DISCRETION.

/ /  OTHER

REVOLVING FEATURE

/X/  Borrowers may borrow, repay and reborrow hereunder at any time, up to a maximum aggregate amount outstanding at any one time equal to the principal amount of this Note; provided, however, that Borrowers are not in default under any provision of the Credit Agreement, this Note, any Loan Document. or any other obligation of Borrowers to Bank, and provided that the borrowings hereunder do not exceed any limitations on borrowings by Borrowers set forth in the Credit Agreement  Bank shall have no liability for its

AMENDED AND RESTATED PROMISSORY

refusal to advance funds based upon its determination that any
conditions of such further advances have not been met. Bank records
of the amounts borrowed from time to time shall be conclusive proof
thereof.

AUTOMATIC PAYMENT

/ /    Borrowers have elected to authorize Bank to effect payment of sums due
       under this Note by means of debiting Borrowers' account number
       _____. This authorization shall not affect the obligation of
       Borrowers to pay such sums when due, without notice. if there are
       insufficient funds in such account to make such payment in full on the
       due date thereof. or if Bank fails to debit the account.

BORROWERS REPRESENT TO BANK THAT THE PROCEEDS OF THIS LOAN ARE TO BE USED
PRIMARILY FOR BUSINESS, COMMERCIAL OR AGRICULTURAL PURPOSES. BORROWERS
ACKNOWLEDGE HAVING READ AND UNDERSTOOD, AND AGREE TO BE BOUND BY, ALL TERMS
AND CONDITIONS OF THIS NOTE.

ADDITIONAL TERMS AND CONDITIONS

1.    WAIVERS, CONSENTS AND COVENANTS. Borrowers, any indorser, or guarantor
hereof or any other party hereto (collectively "Obligors") are each of them
jointly and severally (a) waive presentment, demand. notice of demand, notice
of intent to accelerate, and notice of acceleration of maturity. protest,
notice of protest. notice of nonpayment, notice of dishonor, and any other
notice required to be given under the law to any of Obligors, in connection
with the delivery, acceptance. performance, default or enforcement of this
Note, of any indorsement or guaranty of this Note of any Loan Documents; (b)
consent to any and all delays, extensions. renewals or other modifications of
this Note or the Loan Documents, or waivers of any term hereof or of the Loan
Documents, or releases or discharge by Bank of any of Obligors or release,
substitution, or exchange of any security for the payment hereof, or the
failure to act on the part of Bank or any indulgence shown by Bank, from time
to time and in one or more instances (without notice to or further assent
from any Obligors) and agree that no such action. failure to act or failure
to exercise any right or remedy on the part of Bank shall in any way affect
or impair the obligations of any Obligors or be construed as a waiver by Bank
of. or otherwise affect, any of Bank's rights under this Note, under any
indorsement or guaranty of this Note or under any of the Loan Documents; and
(c) agree to pay, on demand. all out-of-pocket costs and expenses of
collection of this Note or of any indorsement or guaranty hereof and/or the
enforcement of Bank's rights with respect to. or the administration,
preservation, protection of, or realization upon, any property securing
payment hereof. including, without limitation, reasonable attorney's fees,
including fees related to any trial. arbitration, bankruptcy, appeal or other
proceeding.

2.    INDEMNIFICATION. Obligors agree to promptly pay, indemnify and hold Bank
harmless from all state and federal taxes of any kind and other liabilities
with respect to or resulting from advances made pursuant to this Note. If
this Note has a revolving feature and is secured by a mortgage, Obligors
expressly consent to the deduction of any applicable taxes from each taxable
advance extended by Bank.

3.    PREPAYMENTS. Subject to the terms and conditions set forth in the Credit
Agreement, prepayments may be made in whole or in part at any time on any
loan for which the Rate is based on the Prime Rate. All prepayments of
principal shall be applied in the inverse order of maturity, or in such other
order as Bank shall determine in its sole discretion. Except as set forth in
the Credit Agreement, no prepayment of any other loan shall be permitted
without the prior written consent of Bank.

4.    EVENTS OF DEFAULT. A "default" or an "event of default" shall exist if an
Event of Default (as defined in the Credit Agreement) shall occur and be
continuing.

5.    REMEDIES UPON DEFAULT. Whenever there is a default under this Note (a) the
entire balance outstanding and all other obligations of Obligor to Bank
(however acquired or evidenced) shall, at the option of Bank, become
immediately due and payable, and/or (b) to the extent permitted by law, the
Rate of interest on the unpaid principal shall, at the option of the Bank, be
increased at Bank's discretion up to the maximum rate allowed by law, or if
none, 14% per annum, (the "Default Rate"). The provisions herein for a
Default Rate or a delinquency charge shall not be deemed to extend the time
for any payment hereunder or to constitute a "grace period" giving the
Obligors a right to cure any default. At Bank's option, any accrued and
unpaid interest, fees or charges may. for purposes of computing and accruing
interest on a daily basis after the due date of the Note or any installment
thereof, be deemed to be a part of the principal balance, and interest shall
accrue on a daily compounded basis after such date at the rate provided in
this Note until the entire outstanding balance of principal and interest is
paid in full. Bank is hereby authorized at any time to set off and charge
against any deposit accounts of any Obligor, as well as any other property of
such party at or under the control of Bank, without notice or demand, any and
all obligations due hereunder.

6.    NON-WAIVER. The failure at any time of Bank to exercise any of its options

or any other rights hereunder shall not constitute a waiver thereof, nor shall it be a bar to the exercise of any of its options or rights at a later date. All rights and remedies of Bank shall be cumulative and may be pursued singly, successively or together, at the option of Bank. The acceptance by Bank of any partial payment shall not constitute a waiver of any default or of any Bank's rights under this Note. No waiver of nay of its rights hereunder, and no modification or amendment of this Note, shall be deemed to be made by Bank unless the same shall be in writing. duly signed on behalf of Bank; and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Bank or the obligations of Obligor to Bank in any other respect at any other time.

7.   APPLICABLE LAW. This Note is delivered in and shall be construed under the internal laws and judicial decisions of the State of Texas, and the laws of the United States as the same may be applicable.

8.   PARTIAL INVALIDITY. The unenforceability or invalidity of any provision of this Note shall not affect the enforceability or the validity of any other provision herein and the invalidity or unenforceability of any provision of this Note or of the Loan Documents to any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

9.   JURISDICTION AND VENUE. In any litigation in connection with or to enforce this Note or any indorsement or guaranty of this Note or any Loan Documents, Obligors, and each of them, irrevocably consent to and confer personal jurisdiction on the courts of the State of Texas or the United States courts located within the State of Texas, and expressly waive any objections as to venue in any such courts, and agree that service of process may be made on Obligors by mailing a copy of the summons and complaint by registered or certified mail, return receipt requested, to their respective addresses. Nothing contained herein shall, however. prevent Bank from bringing any action or exercising any rights within any other state or jurisdiction or from obtaining personal jurisdiction by any other means available by applicable law.

10  INTEREST DEFINITIONS AND TERMS.

    (a)  DEFINITIONS.

         "ADJUSTED EURODOLLAR RATE" means an interest rate per annum (rounded upwards, if necessary. to the next 1/16th of 1%) equal to the sum of the quotient of (a) the Eurodollar Rate with respect to such Interest Period, divided by (b) the remainder of 1 00 MINUS the Eurodollar Reserve Requirement in effect on such date.

                          AMENDED AND RESTATED PROMISSORY NOTE d-601455.1

"APPLICABLE MARGIN" means. at the time of determination thereof, the interest margin over the Base Rate or the Adjusted Eurodollar Rate, as the case may be. as follows:

| APPLICABLE MARGIN BASE RATE BORROWINGS | APPLICABLE MARGIN EURODOLLAR BORROWINGS |
|---|---|
| -0.50% | 1.00% |

"BASE RATE" means the sum of the variable rate of interest established from time-to-time by Bank as its general reference rate of interest (which rate of interest may not be the lowest rate charged by Bank on similar loans). Each change in the Base Rate shall become effective without prior notice to Borrowers automatically as of the opening of business on the date of such change in the Base Rate.

"EURODOLLAR RATE" means the rate per annum (rounded upwards, if necessary, to the nearest 1/16th of one percent) equal to the rate appearing on the Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first (1st) day of such Interest Period for a term comparable to such Interest Period. If for any reason the Dow Jones Markets Page 3750 rate is not available. then the "EURODOLLAR RATE" shall be the rate appearing on the Reuters Screen LIBO Page as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m (London time) two (2) Business Days prior to the first (1st) day of the such Interest Period for a term comparable to such Interest Period; PROVIDED, HOWEVER, if more than one rate is specified on the Reuters Screen LIBO Page, then the applicable rate shall be the arithmetic mean of all such rates.

"EURODOLLAR RESERVE REQUIREMENT" means, on any day, that percentage (expressed as a decimal fraction) that is in effect on such day, as provided by the Board of Governors of the Federal Reserve System (or any successor governmental body), applied for determining the maximum reserve requirements (including, without limitation, basic, supplemental, marginal, and emergency reserves) under Regulation D, with respect to "EUROCURRENCY LIABILITIES" as currently defined in Regulation D, or under any similar or successor regulation with respect to Eurocurrency liabilities or Eurocurrency funding. Each determination by Bank of the Eurodollar Reserve Requirement shall. in the absence of manifest error, be conclusive and binding

(b)    INTEREST PERIODS. TERMS, ETC. Reference is hereby made to the Credit Agreement for certain provisions relating the determination of the Base Rate and the Eurodollar Rate and Borrowers' rights. limitations. and restrictions to select such rates.

11. ARBITRATION. ANY CONTROVERSY OR CLAIM BETWEEN OR AMONG THE PARTIES HERETO INCLUDING BUT NOT LIMITED TO THOSE ARISING OUT OF OR RELATING TO THIS NOTE OR ANY RELATED NOTES OR INSTRUMENTS, INCLUDING ANY CLAIM BASED ON OR ARISING FROM AN ALLEGED TORT, SHALL BE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (OR IF NOT APPLICABLE, THE APPLICABLE STATE LAW), THE RULES OF PRACTICE AND PROCEDURE FOR THE ARBITRATION OF COMMERCIAL DISPUTES OF J.A.M.S. D/B/A ENDISPUTE, INC. ("J.A.M.S.") AND THE "SPECIAL RULES" SET FORTH BELOW. IN THE EVENT OF ANY INCONSISTENCY, THE SPECIAL RULES SHALL CONTROL JUDGMENT UPON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION  ANY PARTY TO THE NOTE MAY BRING AN ACTION, INCLUDING A SUMMARY OR EXPEDITED PROCEEDING, TO COMPEL ARBITRATION OF ANY CONTROVERSY OR CLAIM TO WHICH THIS NOTE APPLIES IN ANY COURT HAVING JURISDICTION OVER SUCH ACTION.

(A)    SPECIAL RULES. THE ARBITRATION SHALL BE CONDUCTED IN THE CITY OF BORROWERS' DOMICILE AT THE TIME OF THE NOTE'S EXECUTION AND ADMINISTERED BY J.A.M.S. WHO WILL APPOINT AN ARBITRATOR.; IF J.A.M.S. IS UNABLE OR LEGALLY PRECLUDED FROM ADMINISTERING THE ARBITRATION, THEN THE AMERICAN ARBITRATION ASSOCIATION WILL SERVE. ALL ARBITRATION HEARINGS WILL BE COMMENCED WITHIN 90 DAYS OF THE DEMAND FOR ARBITRATION; FURTHER, THE ARBITRATOR SHALL ONLY, UPON A SHOWING OF CAUSE, BE PERMITTED TO EXTEND THE COMMENCEMENT OF SUCH HEARING FOR AN ADDITIONAL 60 DAYS.

(B)    RESERVATION OF RIGHTS. NOTHING IN THIS NOTE SHALL BE DEEMED TO (I) LIMIT THE APPLICABILITY OF ANY OTHERWISE APPLICABLE STATUTES OF LIMITATION OR REPOSE AND ANY WAIVERS CONTAINED IN THIS NOTE; OR (II) BE A WAIVER BY THE BANK OF THE PROTECTION AFFORDED TO IT BY 12 U.S.C  SS 91 OR ANY SUBSTANTIALLY EQUIVALENT STATE LAW; OR (III) LIMIT THE RIGHT OF THE BANK HERETO (A) TO EXERCISE SELF HELP REMEDIES SUCH AS (BUT NOT LIMITED TO) SETOFF, OR (B) TO FORECLOSURE AGAINST ANY REAL OR PERSONAL PROPERTY COLLATERAL, OR (C) TO OBTAIN FROM A COURT PROVISIONAL OR ANCILLARY REMEDIES SUCH AS (BUT NOT LIMITED TO) INJUNCTIVE RELIEF, WRIT OF POSSESSION OR THE APPOINTMENT OF A RECEIVER. THE BANK MAY EXERCISE SUCH SELF HELP RIGHTS, FORECLOSURE UPON SUCH PROPERTY, OR OBTAIN SUCH PROVISIONAL OR ANCILLARY REMEDIES BEFORE. DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING

BROUGHT PURSUANT TO THIS NOTE. NEITHER THE EXERCISE OR SELF HELP REMEDIES NOR THE INSTITUTION OR MAINTENANCE OF AN ACTION FOR FORECLOSURE OR PROVISIONAL OR ANCILLARY REMEDIES SHALL CONSTITUTE A WAIVER OF THE RIGHT OF ANY PARTY. INCLUDING THE CLAIMANT IN SUCH ACTION, TO ARBITRATE THE MERITS OF THE CONTROVERSY OR CLAIM OCCASIONING RESORT TO SUCH REMEDIES.

12. BINDING EFFECT. This note shall be binding upon and inure to the benefit of Borrowers. Obligors and Bank and their respective successor, assigns, heirs and personal representatives. provided, however, that no obligations of the Borrowers or the Obligors hereunder can be assigned without prior written consent of Bank.

13. NOTICE OF FINAL AGREEMENT. THIS WRITTEN PROMISSORY NOTE AND ANY OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

14. RENEWAL NOTE. This note is in modification, amendment, renewal, extension, and restatement, but not extinguishment, of that certain Promissory Note dated as of February 27, 1998, executed by Borrowers and payable to the order of Bank in the original principal amount of $10,000,000.00.

BORROWERS:

AMENDED AND RESTATED PROMISSORY NOTE d-601455.1

ADAMS GOLF DIRECT RESPONSE, LTD., a Texas
limited partnership

By: ADAMS GOLF GP CORP., a Delaware corporation,
General Partner

      By:

            Name:
            Title:

ADAMS GOLF, LTD., a Texas limited partnership

By: ADAMS GOLF GP CORP., a Delaware corporation,
General Partner

      By:

            Name:
            Title:

AMENDED AND RESTATED PROMISSORY NOTE d-601455.1

[Logo]

NationsBank. N.A.    AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY
- ----------------------------------------------------------------------------

    1.  GUARANTY.  FOR VALUE RECEIVED. and to induce NationsBank. N.A., DALLAS
COMMERCIAL BANKING
                            Banking Center

901 MAIN STREET. 7TH FLOOR. DALLAS. TEXAS. 75202
Bank Street Address          City    State  Zip Code

(Attn:  MR. RUSSELL P HARISFIELD) (herein called "Bank"), to make loans or
advances or to extend credit or other financial accommodations or benefits,
with or without security. to or for the account of

ADAMS GOLF DIRECT RESPONSE, LTD. AND/OR ADAMS GOLF. LTD.
                Borrower's Name
2801 EAST PLANO PARKWAY, PLANO. TEXAS. 75074
Street Address          City    State  Zip Code

(herein collectively called "Borrowers"), the undersigned (jointly and
severally called "Guarantors"), jointly and severally, hereby become surety
for and irrevocably and unconditionally guarantee to Bank the full and prompt
payment when due, whether by acceleration or otherwise. of any and all
Liabilities (as hereinafter defined) of Borrowers to Bank, together with
reasonable attorneys' fees, costs and expenses incurred by Bank in enforcing
any and all of such indebtedness. This Guaranty is continuing and unlimited
as to the amount.

Guarantors further unconditionally guarantee the faithful, prompt and
complete compliance by Borrowers with all terms, conditions, covenants.
agreements and undertakings of Borrowers (herein collectively referred to as
the "Obligations") under all notes and other documents evidencing the
Liabilities, as hereinafter defined, and under all deeds to secure debt.
deeds of trust, mortgages, security agreements and other agreements,
documents and instruments executed in connection with the Liabilities or
related thereto (all such deeds to secure debt. deeds of trust. mortgages,
security agreements and other documents securing payment of the Liabilities
and all notes and other agreements, documents, and instruments evidencing or
relating to the Liabilities and Obligations being herein collectively called
the "Loan Documents"). The undertakings of Guarantors hereunder are
independent of the Liabilities and Obligations of Borrowers and a separate
action or actions for payment, damages or performance may be brought or
prosecuted against Guarantors, whether or not an action is brought against
Borrowers or to realize upon the security for the Liabilities and/or
Obligations and whether or not Borrowers are joined in any such action or
actions, and whether or not notice is given or demand is made upon the
Borrowers

Bank shall not be required to proceed first against any Borrower, or any
other person, firm or corporation, whether primarily or secondarily liable,
or against any Collateral held by it, before resorting to Guarantors for
payment, and Guarantors shall not be entitled to assert as a defense to the
enforceability of the Guaranty any defense of any Borrower with respect to
any Liabilities or Obligations.

2. PARAGRAPH HEADINGS AND GOVERNING LAW. Guarantors agree that the paragraph
headings in this Guaranty are for convenience only and that they will not
limit any of the provisions of this Guaranty. Guarantors further agree that
this Guaranty shall be governed by and construed in accordance with the laws
of the State of Texas and applicable United States federal law. Guarantors
further agree that this Guaranty shall be deemed to have been made in the
State of Texas at Bank's address indicated herein, and shall be governed by.
and construed in accordance with. the laws of the State of Texas, or the
United States courts located within the State of Texas, and is performable in
Dallas, Dallas County, Texas.

3.  DEFINITIONS.

    A. "Liability" or "Liabilities" as used herein shall include without
limitation, all liabilities, overdrafts, indebtedness, and obligations of
Borrowers to Bank, whether direct or indirect, absolute or contingent, joint
or several, secured or unsecured, due or not due, contractual or tortious,
liquidated or unliquidated. arising by operation of law or otherwise, now or
hereafter existing, or held or to be held by the Bank for its own account or
as agent for another or others. whether created directly, indirectly, or
acquired by assignment or otherwise. including but not limited to all
extensions or renewals thereof, and all sums payable under or by virtue
thereof, including without limitation, all amounts of principal and interest.
all expenses (including attorney's fees and cost of collection as specified)
incurred in the collection thereof or the enforcement of rights thereunder or
in enforcing this Guaranty (including without limitation, any liability
arising from failure to comply with state or federal laws. rules and
regulations concerning the control of hazardous wastes or substances at or
with respect to any real estate securing any loan guaranteed hereby), whether
arising in the ordinary course of business or otherwise, and whether held or
to be held by Bank for its own account or as agent for another or others. If

Borrowers are a partnership, corporation or other entity the term "Liability" or "Liabilities" as used herein shall include all Liabilities to Bank of any successor entity or entities.

B. "Guarantor" as used herein shall mean Guarantors or any one or more of them. Anyone executing this Guaranty shall be bound by the terms hereof without regard to execution by anyone else. This Guaranty is binding upon Guarantors, their executors, administrators. successors or assigns. and shall inure to the benefit of Bank, its successors. endorsees or assigns.

"Guarantors" as used in this instrument shall be construed as singular or plural to correspond with the number of persons executing this instrument as a Guarantor. The pronouns used in this Agreement are in the masculine gender but shall be construed as female or neuter as an occasion may require.

C. "Collateral" means the property subject to a security interest. and includes accounts and chattel paper which have been sold, including but not limited to all additions and accessions thereto, all replacements or substitutes therefor, and all immediate and remote proceeds of the sale or other disposition thereof.

AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY

4. WAIVERS BY GUARANTORS. Each Guarantor waives notice of acceptance of this Guaranty, notice of any Liability or Obligations to which it may apply, and waives presentment, demand for dayment, protest, notice of dishonor or nonpayment of any Liabilities, waiver of notice of intent to accelerate, waiver of notice of acceleration and notice of any suit or the taking of other action by Bank against any Borrower, any Guarantor, or any other person and any other notice to any party liable thereon (including such Guarantor) and any applicable statute of limitations.

Until the indefeasible payment of all Liabilities and Obligations, each Guarantor also hereby waives any claim, right or remedy which such Guarantor may now have or hereafter acquire against each Borrower that arises hereunder and/or from the performance by any Guarantor hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration. contribution, indemnification, or participation in any claim. right or remedy of the Bank against any Borrower or any security which the Bank now has or hereafter acquires, whether or not such claim, right or remedy arises in equity. under contract. by statute, under common law or otherwise.

Each Guarantor hereby agrees to waive the benefits of any provision of law requiring that the Bank exhaust any right or remedy, or take any action, against any Borrower, any Guarantor, any other person and/or property including but not limited to the provisions of the Texas Civil Practice and Remedies Code ss. 17.001, Texas Rules of Civil Procedure Rule 31 and the Texas Business and Commerce Code ss. 34.03, as amended. or otherwise.

Bank may at any time and from time to time (whether before or after revocation or termination of this Guaranty) without notice to any Guarantor (except as required by law), without incurring responsibility to any Guarantor. without impairing. releasing, or otherwise affecting the obligations of any Guarantor, in whole or in part, and without the endorsement or execution by any Guarantor of any additional consent, waiver or guaranty: (a) change the manner, place or terms of payment; (b) change or extend the time of or renew or alter, any Liability or Obligation or installment thereof, or any security therefor; (c) loan additional monies or extend additional credit to any Borrower, with or without security, thereby creating new Liabilities or Obligations the payment or performance of which shall be guaranteed hereunder. and the Guaranty herein made shall apply to the Liabilities and Obligations as so changed, extended, surrendered, realized upon or otherwise altered; (d) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property at any time pledged or mortgaged to secure the Liabilities or Obligations and any offset there against; (e) exercise or refrain from exercising any rights against any Borrower or others (including any Guarantor) or act or refrain from acting in any other manner; (f) settle or compromise any Liability or Obligation or any security therefor and subordinate the payment of all or any part thereof to the payment of any Liability or Obligation of any other parties primarily or secondarily liable on any of the Liabilities or Obligations; (g) release or compromise any liability of any Guarantor hereunder or any Liability or Obligation of any other parties primarily or secondarily liable on any of the Liabilities or Obligations; or (h) apply any sums from any sources to any Liability without regard to any Liabilities remaining unpaid.

5. CREDIT AGREEMENT. Each Guarantor agrees that certain representations set forth in the Credit Agreement (defined below) are applicable to it and that certain covenants set forth in the Credit Agreement are binding upon it.

6. WAIVERS BY BANK. No delay on the part of Bank in exercising any of its options, powers or rights. or any partial or single exercise thereof, shall constitute a waiver thereof. No waiver of any of its rights hereunder, and no modification or amendment of this Guaranty, shall be deemed to be made by Bank unless the same shall be in writing, duly signed on behalf of Bank; and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Bank or the obligations of Guarantors to Bank in any other respect at any other time.

7. TERMINATION. This Guaranty shall continue until written notice of revocation signed by each respective Guarantor or until written notice of the death of such Guarantor shall actually have been received by Bank, notwithstanding any change in name, location, composition or structure of, or the dissolution. termination or increase, decrease or change in personnel, owners or partners of any Borrower, or any one or more of Guarantors, provided, however, that no notice of revocation or termination hereof shall affect in any manner rights arising under this Guaranty with respect to Liabilities or Obligations that shall have been created, contracted, assumed or incurred prior to receipt of such written notice pursuant to any agreement entered into by Bank prior to receipt of such notice, and the sole effect of such notice of revocation or termination hereof shall be to exclude from this Guaranty, Liabilities or Obligations thereafter arising that are unconnected with Liabilities or Obligations theretofore arising or transactions entered into theretofore.

8. PARTIAL INVALIDITY AND/OR ENFORCEABILITY OF GUARANTY. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision herein and the invalidity or unenforceability of any provision of any Loan Document as it may apply to

any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

In the event Bank is required to relinquish or return the payments. the Collateral or the proceeds thereof, in whole or in part. which had been previously applied to or retained for application against any Liability, by reason of a proceeding arising under the Bankruptcy Code. or for any other reason. this Guaranty shall automatically continue to be effective notwithstanding any previous cancellation or release effected by the Bank.

9. OBLIGATIONS OF GUARANTORS. In the event that any Borrower fails to perform any of the Obligations or pay any of the Liabilities, Guarantors shall upon demand by Bank, promptly and with due diligence pay all Liabilities and perform and satisfy for the benefit of Bank all Obligations.

10. FINANCIAL AND OTHER INFORMATION. Each Guarantor has made an independent investigation of the financial condition and affairs of Borrowers prior to entering into this Guaranty, and such Guarantor has made and will continue to make an independent appraisal of the creditworthiness of Borrowers; and in entering into this Guaranty such Guarantor has not relied upon any representation of the Bank as to the financial condition, operation or creditworthiness of Borrowers. Each Guarantor further agrees that the Bank shall have no duty or responsibility now or hereafter to make any investigation or appraisal of any Borrower on behalf of such Guarantor or to provide such Guarantor with any credit or other information which may come to its attention now or hereafter.

11. NOTICES. All notices required or permitted to be given to Bank herein shall be sent by registered or certified mail. return receipt requested to the Bank at the address shown in the preamble to this agreement. Each Guarantor agrees that all notices required or permitted to be given to such Guarantor shall be sent by first class mail, postage prepaid United States mail. The parties agree that the notice shall be considered received by a Guarantor five (5) days after being placed in the United States mail.

12. EVENTS OF DEFAULT. An "event of default" shall exist if an Event of Default (as defined in the Amended and Restated Revolving Credit Agreement (as modified, amended, renewed, extended, and restated from time to time, the "CREDIT AGREEMENT") dated of even date herewith. executed by Borrowers and

AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY d-601468 2

Bank. and all modifications. amendments. and restatements thereof) shall occur and be continuing.

13. REMEDIES. Upon the occurrence of any event of default hereunder, Bank shall have all of the remedies of a creditor and, to the extent applicable. of a secured party, under all applicable law, and without limiting the generality of the foregoing, Bank may, at its option and without notice of demand: (a) declare any Liability accelerated and due and payable at once; and (b) take possession of any Collateral wherever located, and sell. resell, assign, transfer and deliver all or any part of said Collateral of any Borrower or any Guarantor at any public or private sale or otherwise dispose of any or all of the Collateral in its then condition, for cash or on credit or for future delivery. and in connection therewith Bank may impose reasonable conditions upon any such sale. Bank, unless prohibited by law the provisions of which cannot be waived. may purchase all or any part of said Collateral to be sold, free from and discharged of all trusts, claims, rights or redemption and equities of Borrowers or Guarantors whatsoever; each Guarantor acknowledges and agrees that the sale of any Collateral through any nationally recognized broker-dealer, investment banker or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and (c) set-off against any or all liabilities of any Guarantor all money owed by Bank in any capacity to such Guarantor whether or not due, and also set-off against all other Liabilities of any Borrower or any Guarantor to Bank all money owed by Bank in any capacity to any Borrower or any Guarantor. and if exercised by Bank, Bank shall be deemed to have exercised such right of set-off and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

14. ATTORNEY FEES, COST AND EXPENSES. Guarantors shall pay all costs of collection and reasonable attorneys' fees, including reasonable attorney's fees in connection with any suit. mediation or arbitration proceeding. out of court payment agreement, trial, appeal, bankruptcy proceedings or otherwise, incurred or paid by Bank in enforcing the payment of any Liability or enforcing or preserving any right or interest of Bank hereunder, including the collection. preservation, sale or delivery of any Collateral from time to time pledged to Bank, and after deducting such fees, costs and expenses from the proceeds of sale or collection, Bank may apply any residue to pay any of the Liabilities and Guarantors shall continue to be liable for any deficiency with interest at the rate specified in any instrument evidencing the Liability or. at the Bank's option. equal to the highest lawful rate, which shall remain a liability.

15. PRESERVATION OF PROPERTY. Bank shall not be bound to take any steps necessary to preserve any rights in any of the property of any Guarantor pledged to Bank to secure any Guarantor's obligations against prior parties who may be liable in connection therewith, and each Guarantor hereby agrees to take any such steps. Bank, nevertheless, at any time. may (a) take any action it deems appropriate for the care or preservation of such property or of any rights of Guarantors or Bank therein, (b) demand, sue for. collect or receive any money or property at any time due, payable or receivable on account of or in exchange for any property of any Guarantor, (c) compromise and settle with any person liable on such property, or (d) extend the time of payment or otherwise change the terms of the Loan Documents as to any party liable on the Loan Documents, all without notice to, without incurring responsibility to, and without affecting any of the obligations or liabilities of any Guarantor

16. COLLATERAL. Bank shall have a properly perfected security interest in all of Guarantor's funds on deposit with Bank to secure the balance of any liabilities and/or obligations that Guarantors may now or in the future owe the Bank. Bank is granted a contractual right of set-off and will not be liable for dishonoring checks or withdrawals where the exercise of Bank's contractual right of set-off or security interest results in insufficient funds in Guarantors' accounts. As authorized by law, Guarantors grant to Bank this contractual right of set-off and security interest in all property of Guarantors now or at anytime hereafter in the possession of Bank, including but not limited to any joint account, special account, account by the entireties, tenancy in common, and all dividends and distributions now or hereafter in the possession or control of Bank

17. ARBITRATION. ANY CONTROVERSY OR CLAIM BETWEEN OR AMONG THE PARTIES HERETO INCLUDING BUT NOT LIMITED TO THOSE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR INSTRUMENTS, INCLUDING ANY CLAIM BASED ON OR ARISING FROM AN ALLEGED TORT, SHALL BE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (OR IF NOT APPLICABLE, THE APPLICABLE STATE LAW), THE RULES OF PRACTICE AND PROCEDURE FOR THE ARBITRATION OF COMMERCIAL DISPUTES OF J.A.M.S. D/B/A ENDISPUTE, INC. ("J.A.M.S."), AND THE "SPECIAL RULES" SET FORTH BELOW. IN THE EVENT OF ANY INCONSISTENCY, THE SPECIAL RULES SHALL CONTROL. JUDGMENT UPON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. ANY PARTY TO THIS AGREEMENT MAY BRING AN ACTION, INCLUDING A SUMMARY OR EXPEDITED PROCEEDING. TO COMPEL ARBITRATION OF ANY CONTROVERSY OR CLAIM TO WHICH THIS AGREEMENT APPLIES IN ANY COURT HAVING JURISDICTION OVER SUCH ACTION

A. SPECIAL RULES  THE ARBITRATION SHALL BE CONDUCTED IN THE CITY OF THE

BORROWERS' DOMICILE AT THE TIME OF THIS AGREEMENT'S EXECUTION AND
ADMINISTERED BY J.A.M.S. WHO WILL APPOINT AN ARBITRATOR; IF J.A.M.S. IS
UNABLE OR LEGALLY PRECLUDED FROM ADMINISTERING THE ARBITRATION, THEN THE
AMERICAN ARBITRATION ASSOCIATION WILL SERVE. ALL ARBITRATION HEARINGS WILL BE
COMMENCED WITHIN 90 DAYS OF THE DEMAND FOR ARBITRATION; FURTHER, THE
ARBITRATOR SHALL ONLY, UPON A SHOWING OF CAUSE, BE PERMITTED TO EXTEND THE
COMMENCEMENT OF SUCH HEARING FOR UP TO AN ADDITIONAL 60 DAYS.

     B. RESERVATION OF RIGHTS. NOTHING IN THIS AGREEMENT SHALL BE DEEMED TO
(I) LIMIT THE APPLICABILITY OF ANY OTHERWISE APPLICABLE STATUTES OF
LIMITATION OR REPOSE AND ANY WAIVERS CONTAINED IN THIS AGREEMENT; OR (II) BE
A WAIVER BY THE BANK OF THE PROTECTION AFFORDED TO II BY 12 U.S.C. SEC. 91 OR
ANY SUBSTANTIALLY EQUIVALENT STATE LAW; OR (III) LIMIT THE RIGHT OF THE BANK
HERETO (A) TO EXERCISE SELF HELP REMEDIES SUCH AS (BUT NOT LIMITED TO)
SET-OFF, OR (B) TO FORECLOSURE AGAINST ANY REAL OR PERSONAL PROPERTY
COLLATERAL, OR (C) TO OBTAIN FROM A COURT PROVISIONAL OR ANCILLARY REMEDIES
SUCH AS (BUT NOT LIMITED TO) INJUNCTIVE RELIEF, WRIT OF POSSESSION OR THE
APPOINTMENT OF A RECEIVER. THE BANK MAY EXERCISE SUCH SELF HELP RIGHTS,
FORECLOSE UPON SUCH PROPERTY, OR OBTAIN SUCH PROVISIONAL OR ANCILLARY
REMEDIES BEFORE, DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING
BROUGHT PURSUANT TO THIS AGREEMENT. AT BANK'S OPTION, FORECLOSURE UNDER A
DEED OF TRUST OR MORTGAGE MAY BE ACCOMPLISHED BY ANY OF THE FOLLOWING: THE
EXERCISE OF A POWER OF SALE UNDER THE DEED OF TRUST OR MORTGAGE, OR BY
JUDICIAL SALE UNDER THE DEED OF

AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY d-601468.2

TRUST OR MORTGAGE, OR BY JUDICIAL FORECLOSURE. NEITHER THIS EXERCISE OF SELF
HELP REMEDIES NOR THE INSTITUTION OR MAINTENANCE OF AN ACTION FOR FORECLOSURE
OR PROVISIONAL OR ANCILLARY REMEDIES SHALL CONSTITUTE A WAIVER OF THE RIGHT
OF ANY PARTY, INCLUDING THE CLAIMANT IN ANY SUCH ACTION, TO ARBITRATE THE
MERITS OF THE CONTROVERSY OR CLAIM OCCASIONING RESORT TO SUCH REMEDIES.

18. NOTICE OF FINAL AGREEMENT. THIS WRITTEN CONTINUING AND UNCONDITIONAL
GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE
CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL
AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE
PARTIES.

19. AMENDMENT AND RESTATEMENT. This Guaranty is in amendment and restatement
of that certain Continuing and Unconditional Guaranty dated February 27,
1998, executed by Guarantors in favor of Bank.

Dated:    February _____, 1999

NATIONSBANK, N.A., a national banking association

By:

RUSSELL P. HARTSFIELD, SENIOR VICE PRESIDENT
Print Name and Title

                    GUARANTORS:

                    ADAMS GOLF, INC., a Delaware corporation

                    By:
                            Name:
                            Title:

                    ADAMS GOLF HOLDING CORP., a Delaware corporation

                    By:
                            Name:
                            Title:

                    ADAMS GOLF GP CORP., a Delaware corporation

                    By:
                            Name:
                            Title:

                    ADAMS GOLF MANAGEMENT CORP., a Delaware corporation

                    By:
                            Name:
                            Title:

                    ADAMS GOLF IP, L.P., a Delaware limited partnership

                    By: ADAMS GOLF GP CORP., a Delaware corporation,
                        General Partner

                    By:
                            Name:
                            Title:

        AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY d-601468.2

ADAMS GOLF FOREIGN SALES CORPORATION, a
Barbados corporation

By:
    Name:
    Title:

ADAMS GOLF RAC CORP., a Delaware corporation

By:
    Name:
    Title:

State of Texas    )
               )
County of Dallas  )

This instrument was acknowledged before me on February ___, 1999 by
_____, _____ of ADAMS GOLF, INC., a
Delaware corporation, on behalf of said corporation.

(Seal)                 Notary Public
                       in and for the State of Texas

My Commission Expires       Print Name of Notary

State of Texas    )
               )
County of Dallas  )

This instrument was acknowledged before me on February ___, 1999 by
_____, _____ of ADAMS GOLF HOLDING CORP.,
a Delaware corporation, on behalf of said corporation.

(Seal)                 Notary Public
                       in and for the State of Texas

My Commission Expires       Print Name of Notary

State of Texas    )
               )
County of Dallas  )

This instrument was acknowledged before me on February ___, 1999 by
_____, _____ of ADAMS GOLF MANAGEMENT
CORP., a Delaware corporation, on behalf of said corporation.

(Seal)                 Notary Public
                       in and for the State of Texas

AMENDED AND RESTATED CONTINUING AND UNCONDITIONAL GUARANTY d-601468.2

My Commission Expires                    Print Name of Notary

State of Texas            )
                          )
County of Dallas          )

This instrument was acknowledged before me on February ___, 1999 by
_____, _____ of ADAMS GOLF GP CORP., a
Delaware corporation. General Partner of ADAMS GOLF IP. L.P., a Delaware
limited partnership. on behalf of said partnership

(Seal)                                   Notary Public
                                         in and for the State of Texas

My Commission Expires                    Print Name of Notary

State of Texas            )
                          )
County of Dallas          )

This instrument was acknowledged before me on February ___, 1999 by
_____, _____ of ADAMS GOLF FOREIGN SALES
CORPORATION., a Barbados corporation, on behalf of said corporation.

(Seal)                                   Notary Public
                                         in and for the State of Texas

My Commission Expires                    Print Name of Notary

State of Texas            )
                          )
County of Dallas          )

This instrument was acknowledged before me on February ___, 1999 by
_____, _____ of ADAMS GOLF RAC CORP., a
Delaware corporation, on behalf of said corporation.

(Seal)                                   Notary Public
                                         in and for the State of Texas

My Commission Expires                    Print Name of Notary

</TEXT>
</DOCUMENT>

EXHIBIT 21 1

ADAMS GOLF, INC , A DELAWARE CORPORATION

SUBSIDIARIES

The Company conducts its operations through several direct and indirect wholly-owned subsidiaries, including (i) Adams Golf Holding Corp , which holds limited partnership interests of certain indirect subsidiaries of the Company; (ii) Adams Golf GP Corp , which holds capital stock or general partnership interests, as applicable, of certain indirect subsidiaries of the Company; (iii) Adams Golf Direct Response, Ltd., which operates direct-to-consumer sales and advertising activities; (iv) Adams Golf, Ltd., which operates the golf club design, assembly and retail sales business; (v) Adams Golf IP, L.P., which holds the intellectual property rights of the Company, and (vi) Adams Golf Management Corp , which provides management and consulting services to certain of the Company's indirect subsidiaries. A complete list of the Company's subsidiaries at March 15, 1999 is as follows:

Adams Golf, Ltd , a Texas limited partnership
Adams Golf Direct Response, Ltd , a Texas limited partnership
Adams Golf Holding Corp., a Delaware corporation
Adams Golf GP Corp , a Delaware corporation
Adams Golf Management Corp., a Delaware corporation
Adams Golf RAC Corp , a Delaware corporation
Adams Golf IP, L.P , a Delaware limited partnership
Adams Golf Foreign Sales Corporation, a Barbados, W.I corporation
Adams Golf U.K . Ltd . a United Kingdom private limited company

</TEXT>
</DOCUMENT>

EXHIBIT 23.1

INDEPENDENT AUDITORS' CONSENT

The Board of Directors
Adams Golf. Inc and Subsidiaries :

We consent to incorporation by reference in Registration Statement 333-58917 on
Form S-8 of Adams Golf, Inc. of our report dated January 25, 1999 relating to
the consolidated balance sheets of Adams Golf, Inc. and subsidiaries as of
December 31. 1997 and 1998 and the related consolidated statements of
operations, stockholders' equity and cash flows for each of the years in the
three-year period ended December 31, 1998. and the related financial statement
schedule, which report is included in the December 31, 1998 Annual Report on
Form 10-K of Adams Golf, Inc.

                                    KPMG LLP

Dallas, Texas
March 29. 1999
</TEXT>
</DOCUMENT>

```
<ARTICLE> 5
<LEGEND>
THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM THE
CONSOLIDATED FINANCIAL STATEMENTS FOR ADAMS GOLF, INC. AND ITS SUBSIDIAIRIES FOR
THE YEAR ENDED DECEMBER 31, 1998 AND IS QUALIFIED IN ITS ENTIRETY TO SUCH
CONSOLIDATED FINANCIAL STATEMENTS.
</LEGEND>
<MULTIPLIER> 1,000


<PERIOD-TYPE>                     YEAR
<FISCAL-YEAR-END>                          DEC-31-1998
<PERIOD-END>                               DEC-31-1998
<CASH>                                          23.688
<SECURITIES>                                    13,084
<RECEIVABLES>                                    3,316
<ALLOWANCES>                                     1.294
<INVENTORY>                                     13,312
<CURRENT-ASSETS>                                58,752
<PP>                                       4,356
<DEPRECIATION>                                     888
<TOTAL-ASSETS>                                  96,906
<CURRENT-LIABILITIES>                            5,745
<BONDS>                                              0
<PREFERRED-MANDATORY>                                0
<PREFERRED>                                          0
<COMMON>                                            23
<OTHER-SE>                                      88.167
<TOTAL-LIABILITY-AND-EQUITY>                    96.906
<SALES>                                         84.611
<TOTAL-REVENUES>                                84.611
<CGS>                                           21,441
<TOTAL-COSTS>                                   31.239
<OTHER-EXPENSES>                                11,967
<LOSS-PROVISION>                                 1.464
<INTEREST-EXPENSE>                                  71
<INCOME-PRETAX>                                 19,693
<INCOME-TAX>                                     7,183
<INCOME-CONTINUING>                             12,510
<DISCONTINUED>                                       0
<EXTRAORDINARY>                                      0
<CHANGES>                                            0
<NET-INCOME>                                    12,510
<EPS-PRIMARY>                                      .61
<EPS-DILUTED>                                      .61


</TEXT>
</DOCUMENT>
```

Created by 10KWizard   www.10KWizard.com