EXHIBIT 422

1

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        -  -  -

4    IN RE ADAMS GOLF, INC.        :  CONSOLIDATED
     SECURITIES LITIGATION         :  C.A. No. 99-371-KAJ
5
                                      -  -  -
6
                         Wilmington, Delaware
7                        Monday, April 10, 2006
                              2:00 p.m.
8
                                   -  -  -
9
     BEFORE:  HONORABLE KENT A. JORDAN, U.S.D.C.J.
10
     APPEARANCES:
11
             CARMELLA P. KEENER, ESQ.
12           Rosenthal, Monhait & Goddess, P.A.
                      -and-
13           TODD S. COLLINS, ESQ., and
             ELIZABETH W. FOX, ESQ.
14           Berger & Montague, P.C.
             (Philadelphia, PA)
15                    -and-
             DONALD B. LEWIS, ESQ.
16           Law Offices of Donald B. Lewis
             (Bala Cynwyd, PA)
17
                         Counsel for Plaintiffs
18
             AlYSSA M. SCHWARTZ, ESQ.
19           Richards, Layton & Finger
                      -and-
20           PAUL R. BESSETTE, ESQ., and
             LAURA L. MORIARTY, ESQ.
21           Akin Gump Strauss Hauer & Feld LLP
             (Austin, Texas)
22
                         Counsel for Defendants Adams Golf,
23                       Inc., B.H. Barney Adams, Richard H.
                         Murtland, Darl P. Hatfield, Paul F.
24                       Brown, Jr., Roland E. Casati,
                         Finis F. Connor, and Stephen R.
25                       Patchin

2

1  APPEARANCES CONTINUED:

2  JOHN E. JAMES, ESQ.
   Potter Anderson & Corroon LLP
3  -and-
   MICHAEL J. CHEPIGA, ESQ.
4  Simpson Thacher & Bartlett
   (New York, New York)

5
   Counsel for Underwriter
6  Defendants

7                     - - -

8        THE COURT:  Good afternoon.  Please be seated.
9  All right.  This is the time we set to deal with yet another
10 motion to dismiss in this case.  So why don't we go ahead
11 and do the introductions.
12       Mr. James.
13       MR. JAMES:  Your Honor, let me introduce Michael
14 Chepiga from Simpson Thacher.  Mr. Chepiga has been admitted
15 pro hac.
16       THE COURT:  You are here for the underwriters.
17       MR. JAMES:  Underwriter defendants.
18       MS. SCHWARTZ:  Good morning, Your Honor.  Alyssa
19 Schwartz from Richards, Layton & Finger on behalf of the
20 Adams Golf defendants.  With me today I have Paul Bessette
21 and Laura Moriarty, who have been admitted pro hac vice,
22 from Akin Gump Strauss Hauer & Feld.
23       THE COURT:  Okay.  On the plaintiffs' side.
24       MS. KEENER:  Good afternoon, Your Honor.
25 Carmella Keener of Rosenthal, Monhait & Goddess.  Present at

3

1  counsel table are Todd Collins and Elizabeth Fox of Berger &
2  Montague.  Both have been admitted pro hac vice.  And Donald
3  Lewis of the Law Offices of Donald v. Lewis, also admitted
4  pro hac vice.
5        THE COURT:  All right.  Thank you.
6        Mr. Bessette, am I correct in assuming you will
7  be speaking on behalf of Adams Golf defendants here?
8        MR. BESSETTE:  Yes, Your Honor.
9        THE COURT:  It is your motion, so the floor is
10 yours, sir.
11       MR. BESSETTE:  Thank you, Your Honor.
12       As this Court recognizes, this is yet another
13 motion to dismiss, this time the second amended complaint
14 brought by the plaintiffs, who chose to amend and supplement
15 their gray marketing claim and add several new related
16 claims, in their words, to strengthen and broaden their
17 claims in light of their continued investigation.
18       We submit, Your Honor, that what the plaintiffs
19 have succeeded in doing is to plead themselves out of court.
20       THE COURT:  Hold on just a moment, if you would,
21 please.  Let me ask you specifically about that.  The
22 assertion that they pled themselves out of court, I think,
23 is based on, at least as to the gray marketing claims, that
24 they somehow made this an industry-wide practice with their
25 allegations or talked about it in terms of an industry-wide

4

1  practice and that under the Third Circuit's opinion in this
2  case, that means they are out of luck.  Did I understand
3  that argument correctly?
4        MR. BESSETTE:  That is essentially right.  There
5  are three reasons why, one is gray marketing, for the very
6  reason you stated.
7        THE COURT:  As to that one, you seem to rely
8  on -- I am going to take a look at your reply brief, not
9  because it is the only place it comes up but because it
10 seems to be where you make this point -- Page 7, going over
11 to Page 8, the line is what matters is that the Third
12 Circuit expressly rejected any securities claim based on the
13 failure to disclose industry-wide phenomena.  You cite the
14 Third Circuit opinion at 278-79 and quote it as holding that
15 Adams Golf was not duty-bound to disclose general
16 industry-wide trends easily discernible from information
17 already available in the public domain.
18       Having looked at the plaintiffs' amended
19 complaint, I want you to tell me, what is it about the gray
20 marketing allegations, in particular those affecting others
21 in the industry, which you start getting into at Paragraph
22 66, that you think could fairly be characterized as, quote
23 from the Third Circuit, easily discernible from information
24 already available in the public domain?
25       MR. BESSETTE:  Your Honor --

5

1        THE COURT:  That is a long question.  I don't
2  know if I made it clear.
3        MR. BESSETTE:  I think it is, Your Honor.  I
4  think it is the heart of the matter on the gray marketing,
5  is what new allegations have they alleged that has turned
6  this from a firm-specific occurrence that Section 11 and the
7  laws require to be disclosed to an industry-wide occurrence
8  that need not be disclosed under the law of the case and the
9  case law cited by the Third Circuit in the Adams Golf case,
10 particularly Cline and Commonwealth Edison.  The answer is
11 this.
12       They have alleged in those four, five or six
13 paragraphs two things.  One, gray marketing, which we all
14 know only occurs for a name-brand popular product in
15 whatever industry it is in.  That is what gray marketing is.
16 If you have a name-brand popular product, the risk of gray
17 marketing is there.  So what the plaintiffs have alleged is
18 two things.  One, that gray marketing was common in the
19 particular golf industry that had hot products.  For
20 example, Callaway, Taylor Made, Ping, and Titleist.  That is
21 the relevant golf industry.  Each of those manufacturers
22 suffered gray marketing.
23       THE COURT:  So your position here depends upon
24 my agreeing with you that those allegations reflect
25 information which was in the market that all consumers

6

1  should have known about, and therefore without saying
2  anything about the gray marketing problem that they have
3  alleged with respect to Adams Golf, consumers should have
4  known and discounted for that fact.
5          MR. BESSETTE: Almost. There is a second point
6  to that, though, Your Honor. All I was saying there was
7  they have alleged that it was common. In other words, each
8  of these four suffered. And then they also allege that it
9  was public and publicly available, that it was available to
10  those investors who took the time to discover it. In
11  particular, there were news reports about it, Callaway
12  disclosed it in their own filings.
13          So the touchstone that the Third Circuit
14  referred to in Cline and Commonwealth Edison was that a
15  company, under Section 11, is only required to reveal in its
16  prospectus information that is useful to professional
17  traders and investors, that is, new information specific to
18  the issuer, not public information that is common to the
19  industry. That is the key, not public information that is
20  common to the industry.
21          What I am saying, Your Honor, is those
22  allegations have established both of those predicates. It
23  was common in the industry of golf manufacturers with hot
24  products, they all suffered gray marketing. And that was
25  easily discernible by professional traders and investors

7

1  because it was public knowledge.
2          THE COURT: Okay. Do you have any other
3  arguments about why the gray marketing allegations should be
4  dismissed? I take it that there are several, you have got a
5  variety of things that you disagree with in this second
6  amended complaint -- I guess I would like to hit them to the
7  extent possible one at a time -- that I understand to be at
8  least one of your arguments, maybe the argument, for
9  dismissing gray marketing claims.
10          Is there any other argument for dismissing gray
11  marketing claims?
12          MR. BESSETTE: I think, Your Honor, it is sort
13  of related to it. It goes back to the consolidated amended
14  complaint, which had the retail oversupply allegations. For
15  the very reason that the District Court and then the Third
16  Circuit affirmed that those allegations were industry-wide
17  occurrences that need not be disclosed under the law, if you
18  look at those allegations in the CAC and compare those with
19  the second amended complaint's allegations about gray
20  marketing, that it is common in the industry, that it was
21  publicly available, what I am saying is, for the exact same
22  reasons, that's another reason why, it underscores what they
23  have pled, which is the two predicates, common information
24  and publicly available.
25          THE COURT: Okay. Let's turn to other aspects

8

1  of the second amended complaint that you think ought to be
2  dismissed. What else are you going after?
3          MR. BESSETTE: Your Honor, what we are claiming
4  is they pled themselves out of court for three reasons.
5  Gray marketing is one of them. The new allegations, we just
6  talked about that. The other is, they have turned what was
7  a negligence-based case, a Section 11 case, into a
8  quintessential fraud case. I don't say that lightly. It is
9  not like I am here to revisit that issue.
10          There are new allegations in the complaint that
11  change the nature of the case. And there is no doubt that
12  if the case brought under the '33 Act sounds in fraud, then
13  Rule 9(b) applies. That was recently affirmed in the Third
14  Circuit with the Suprema Specialties case. That is still
15  the appropriate law.
16          The Court has to look at the allegations, not
17  the legal theory the plaintiffs pronounce and not the
18  conclusion that this was negligence and not fraud. But you
19  have to look at the underlying allegations.
20          THE COURT: Don't I have to look at the 12(b)(6)
21  standards that say they are only thrown out if there is no
22  theory under which they can prevail on the facts they
23  allege? Help me. I hear you telling me, forget what they
24  tell you their theory is. Look at the allegations. If it
25  sounds in fraud, they have to lose.

9

1          It seems at odds to me with the 12(b)(6)
2  standard I am familiar with, which to me is they are only
3  out if there is no way they can prevail on the basis of
4  their allegations. Straighten me out.
5          MR. BESSETTE: That is exactly right. What I am
6  saying, Your Honor, is, but now you have to determine
7  whether Rule 9(b)'s particularity requirements apply to
8  their allegations. And if they do, and they haven't met
9  them, then you can toss it out for that reason. And what I
10  am saying is, this is a fraud case. What they have alleged,
11  at its core, is that the defendants knew about gray
12  marketing. And they go to great lengths in the allegations
13  to talk about different memos and other reasons that they
14  knew, that they knew about gray marketing and they concealed
15  it from investors by not referring to it in the prospectus.
16          This isn't a case where the plaintiffs alleged
17  that the defendants should have done an investigation or if
18  they did they could have discovered this and so they were
19  negligent. That's not at all -- you can't find that
20  anywhere in the complaint. The basis for this case now,
21  with this additional pleading, is that the defendants
22  concealed it. They knew prior to the IPO about gray
23  marketing and the related problems. They didn't disclose it
24  purposefully in the prospectus.
25          THE COURT: Okay.

10

1    Now, let me ask the folks on the other side to
2    respond to that right now. Mr. Collins, you have got the
3    floor on this.
4        MR. COLLINS: Thank you, Your Honor.
5        THE COURT: Help me out with how to address Mr.
6    Bessette's concern that you have just changed the basis of
7    your complaint.
8        MR. COLLINS: Can I start with sounds in fraud,
9    Your Honor?
10       THE COURT: Sure.
11       MR. COLLINS: I heard Mr. Bessette say that
12   plaintiffs have alleged that the defendants knew about gray
13   marketing at the time of the IPO. Of course, that is
14   correct. That is the allegation, Your Honor. And that was
15   exactly the situation before, when Judge McKelvie said,
16   plaintiffs merely allege that the IPO offering materials
17   included materially false and misleading statements and
18   omitted to disclose material facts.
19       Nowhere in the complaint do plaintiffs'
20   allegations focus or even refer to the defendants' state of
21   mind. It was true then. It is true now. Law of the case.
22   That's what Judge McKelvie ruled in December of '01. No
23   appeal was taken. At Page 274, Note 5, the Circuit Court
24   indicated it had no concern with that conclusion by Judge
25   McKelvie.

11

1        THE COURT: That is a puzzling thing. You are
2    telling me that it's law of the case that none of your
3    allegations deal with state of mind. But you have added
4    allegations since the time Judge McKelvie made those
5    statements and that's the basis of their argument. How
6    could the law of the case about allegations which have been
7    changed prevent me from asking what the allegations as now
8    amended look like?
9        MR. COLLINS: I think we should go through that,
10   Your Honor. Those allegations haven't changed.
11       THE COURT: That's what I need you to talk
12   about. It won't help me a bit for you to say it is law of
13   the case as to what was in front of Judge McKelvie four
14   years, five years ago, because you did amend the complaint.
15   That's what I have to wrestle with now.
16       MR. COLLINS: That's fine. Let me deal with one
17   thing that is consistent throughout the current complaint
18   and the prior complaint.
19       The thing that is consistent is prior to the IO
20   there was a press release. And that press release addressed
21   gray marketing. So that was the state of play at the time
22   that Judge McKelvie concluded that there were no allegations
23   as to state of mind, because, Your Honor, knowledge of the
24   existence of the issue and alleging knowledge of the
25   existence of the gray marketing issue is not sounding in

12

1    fraud.
2        THE COURT: How about addressing the assertion
3    that you have gone beyond knowledge of the issue to
4    allegations that there was active concealment.
5        That is the assertion. Right, Mr. Bessette?
6        MR. BESSETTE: Yes, Your Honor.
7        THE COURT: Now you are talking about active
8    concealment. And that is a fraud, and you are not allowed to
9    do that under the guise of a Section 11 case.
10       MR. COLLINS: Your Honor, the word concealment
11   does not appear anywhere in the allegations with regard to
12   gray marketing.
13       THE COURT: Let's get to the specific here. We
14   will do point-counterpoint.
15       Mr. Bessette, you tell me what it is you are
16   pointing out exactly, and I will have Mr. Collins address it
17   exactly, then we are not talking about it does say this, it
18   doesn't say that. Say what you are pointing at, and he can
19   address that expressly. What are you pointing out when you
20   say that's a fraud, that's an allegation?
21       MR. BESSETTE: Paragraph 86 of the second
22   amended complaint, Your Honor.
23       THE COURT: Let's look at it.
24       MR. BESSETTE: I just want to get my copy.
25       "The registration statement and prospectus,

13

1    however, omitted any discussion of Adams Golf's material
2    risk that authorized retailers' margins might decline. This
3    material risk to the company was acknowledged by defendants
4    among themselves, pre-IPO, but concealed from investors in
5    the registration statement and the prospectus."
6        That is one sentence where they use the word
7    conceal. And my argument is, that goes to retail margins.
8    I have got a case to talk about this. But if the predicate
9    of their case throughout, gray marketing and other things,
10   were known pre-IPO and not disclosed, that construct is a
11   fraud case. It is not as if had the defendants done a
12   reasonable investigation they might have discovered this.
13   Therefore, it is an innocent or negligent omission. That is
14   a negligence case. But when it's knowledge pre-IPO, failed
15   to disclose in the prospectus, no matter what it relates to,
16   that is a fraud construct.
17       THE COURT: All right. What is your response to
18   that, Mr. Collins?
19       MR. COLLINS: Your Honor, first of all, as I
20   said, that allegation has nothing to do with gray marketing.
21   That has to do with one of the three new claims, which has
22   to do with retailers' margins. Second, Your Honor, we do
23   not agree that the one word "concealed" in a 25-page
24   complaint converts it to fraud.
25       You can have a ball concealed by bushes. You

14

1  can have the sun concealed by clouds. It seems to me it is
2  parsing things a little too fine for the defendants to say,
3  aha, the word concealed went in and we define that in a way
4  that means that the whole complaint has to sound in fraud,
5  including allegations where the word concealed doesn't even
6  appear.
7          Your Honor, the touchstone here cannot be
8  whether the defendants knew at the time of the IPO that gray
9  marketing existed, because that is the situation. They did
10  know that. We have alleged that. But that is not what the
11  law says, Your Honor.
12          If you look at the Suprema case, for example,
13  that complaint, in Suprema, you actually had fraud
14  allegations in the complaint. It referred to massive fraud.
15  It referred to one of the worst frauds in the State of New
16  Jersey, ever. But because the Section 11 allegation,
17  separate from the 10(b) allegations, contained no such
18  language, then it was found as long as you plead negligence,
19  according to the Third Circuit and this opinion in February
20  of this year, you plead negligence, then you have a
21  negligence claim.
22          Your Honor, the situation with regard to gray
23  marketing in particular is precisely the situation that
24  existed before, before Judge McKelvie ruled, and the
25  defendants did not appeal on that that point, Your Honor,

15

1  and the Third Circuit indicated acceptance.
2          THE COURT: Okay. I think I have your argument
3  on that.
4          I am giving the ball back to Mr. Bessette. You
5  will have your chance to speak. By the time we finish, Mr.
6  Collins, I will have given you a chance to wear yourself
7  out. But we have given it back to Mr. Bessette now.
8          MR. BESSETTE: Just briefly on this one point,
9  Your Honor.
10          This case is not like Suprema Specialties,
11  because in that case what the Court was deciding was, you
12  have got a mixed case. You have 10(b) claims, you have
13  Section 11 claims, like Shapiro, and the Third Circuit said,
14  when you construct them and try to do it this way and just
15  plead negligence here, that is going to be okay. This case
16  is much like the Leadis Technology case, decided five weeks
17  ago by Judge Breyer in the Northern District of California.
18  I have given a copy to plaintiffs' counsel. I would like to
19  hand a copy up to the Court.
20          Briefly, why that case is important, because it
21  goes to the construct. That was just a Section 11 case.
22  But the predicate was that the defendants were aware —
23  well, defendants made cautionary statements about various
24  things. The plaintiffs alleged that the defendants were
25  aware of what they were saying in the cautionary

16

1  statements was actually occurring pre-IPO and they concealed
2  it in the prospectus. What the Judge said was, there is no
3  way that can be a negligence case. He said that the alleged
4  material misrepresentations and omissions were not and could
5  not have been a result of a failure to exercise reasonable
6  care. This was something about knowledge prior to the IPO
7  and failing to disclose. That construct is fraud, not
8  negligence requiring 9(b).
9          THE COURT: Okay. Let's play out a hypothetical
10  for a second here. Assume for the sake of our discussion
11  that I shared your distress about retail margin arguments in
12  the complaint, their assertions in that regard, but that the
13  plaintiffs' assertion that they were pursuing only a
14  negligence claim on gray marketing, whether they pled it
15  inartfully or not in their second amended complaint, it was
16  still focused on a negligence claim, and that's what they
17  intended to pursue at trial. Is your assertion that I would
18  be bound to still dismiss the complaint on the gray
19  marketing charges?
20          MR. BESSETTE: I think, Your Honor, whatever
21  they intended, what they actually pled in our view was
22  fraud, and if they didn't meet the specificity of 9(b),
23  there is that.
24          Now, the Court could conclude that 9(b) applies
25  and with respect to gray market, because there is a lot of

17

1  specifics there, maybe they even met the 9(b) standard for
2  gray marketing allegations. We don't think they have. But
3  that is really the inquiry, is, do they have to go back and
4  do specifically more detail on gray marketing because now
5  9(b) applies?
6          THE COURT: If they did meet it, then what?
7          MR. BESSETTE: If they met it, the gray
8  marketing claim survives. All we are saying there on the
9  9(b) part is particularity. On the other parts we are
10  saying they haven't stated a claim, gray marketing, for the
11  reasons we discussed briefly, then the new claims, for
12  reasons we will get to.
13          THE COURT: Let's get to those, to the other
14  reasons why these other claims, what you characterize as
15  other claims need to get ushered out the door.
16          MR. BESSETTE: Well, since we are on retail
17  margins, Your Honor, let's stick with that.
18          The essence of plaintiffs' claim, and I think we
19  laid it out in the briefs very well, is we, Adams Golf,
20  didn't use the phrase retail margins in the prospectus and
21  in all of its warnings. What Adams Golf warned was of
22  significant price erosion and it warned that there may be
23  competitive pressures resulting in lower than expected
24  average selling prices. So you have got retail prices,
25  sufficiently warned about, that they might fall. But retail

18

1  margins will necessarily fall as well if retail prices fall.
2  That is one of those specifics that, it's intuitive for a
3  reasonable investor. And under the Tracinda case, Adams
4  Golf is not required to disclose information that is obvious
5  or easily inferred from other disclosures. That is exactly
6  what the basis of this argument is. We warned about falling
7  prices, average retail prices falling.
8         The fact that that meant retailers would have a
9  smaller margin because the sales price is falling, that is
10  easily inferred. We don't have to put all the detail in.
11  That is one point on retail margins.
12        The other sort of related argument is the
13  selective retail distribution. That is another claim that
14  comes, from our point of view, out of nowhere, which is
15  related to gray marketing. But essentially they are saying,
16  we should have warned that we didn't have adequate means to
17  stop gray marketing, that we didn't have written contracts
18  with retailers, that we didn't have serialization and these
19  other things. All of that --
20        THE COURT: Let me ask them a question, because
21  I don't know that that is meant as a separate claim. We
22  will take up those two things right now.
23        Mr. Collins: I can take the second of those
24  first. Is your assertion that these folks should have told
25  the investing public we don't have contracts, we don't mark

19

1  our goods, we don't do anything to make sure that there is
2  no gray marketing? Is that a separate claim?
3         MR. COLLINS: It is, Your Honor.
4         May I have the temerity to ask the Court's leave
5  for one thing? I have not had an opportunity yet to talk
6  about industry-wide issues. I am itching to do so, but only
7  when Your Honor is ready for it.
8         THE COURT: Okay. Well, not yet, because I want
9  you to answer the questions that are on the table.
10        MR. COLLINS: It is a separate claim, Your
11  Honor. May I explain why?
12        THE COURT: Yes.
13        MR. COLLINS: One of the things that the Third
14  Circuit ruled was that the selective retail distribution
15  representation in the registration statement was false and
16  misleading, although technically accurate, it was false and
17  misleading because there was no disclosure of the gray
18  marketing problem. That's at Pages 277-278 of the opinion.
19        Here again, we have a situation in which we have
20  representations in the registration statement with regard to
21  selective retail distribution, very important, according to
22  the registration statement, with regard to the business plan
23  and the possibility of this being a profitable company, very
24  important. The touchstone of that was maintaining retail
25  margins.

20

1         Retail margins meant something very important.
2  It didn't just mean the price at which the clubs were sold.
3  It meant the margins or profits going to the authorized
4  retailers. The one did not lead to the other.
5         THE COURT: I feel like we just morphed out of
6  the no contracts and no marking of clubs into the margins.
7  I take it that those are two separate claims in the
8  plaintiffs' mind, at least that's how the defense
9  characterizes it. Are they right?
10        MR. COLLINS: They are two separate claims.
11        THE COURT: Leave the margins piece aside for a
12  second and focus in on the assertion that you have a claim
13  because the prospectus didn't have in it some sort of a
14  statement that was to the effect of we have nothing in place
15  to track our clubs.
16        MR. COLLINS: Yes, Your Honor.
17        THE COURT: Help me understand how that is some
18  claim other than or separate from or apart from the gray
19  marketing claim that you are pushing forward.
20        MR. COLLINS: First, because it makes the -- it
21  is related to gray marketing, certainly, Your Honor. Yes,
22  it is. But it is separate because it constitutes a separate
23  material risk.
24        THE COURT: How?
25        MR. COLLINS: There was a listing of material

21

1  risks in the registration statement. That listing was
2  incomplete because it didn't include gray marketing. But it
3  also didn't include this listing of the absence of
4  reasonable and necessary precautions with regard to the
5  marking of clubs and also the contractual provisions.
6         THE COURT: Which is only meaningful in the
7  context of gray marketing. Right?
8         MR. COLLINS: It is related -- yes, correct.
9         THE COURT: Please don't tell me it is related
10  to. I need you to conceptually help me. I am not trying to
11  mess with either side's theory of the case. I am only
12  trying to understand it so I can deal with it. If there is
13  some basis for recovery other than gray marketing that's
14  associated with this contract lack, or contract control,
15  marking control issue that is in play here, help me
16  understand what it is.
17        MR. COLLINS: All right. It's gray marketing.
18        THE COURT: That's what I think.
19        MR. COLLINS: Can I take a moment of
20  explanation?
21        THE COURT: Sure.
22        MR. COLLINS: It should have been listed as a
23  separate material risk because it was a separate material
24  risk. Gray marketing was a risk at the time of the IPO that
25  was specific to this company. In addition to that, the gray

22

1  marketing risk was behind because of the failure to disclose
2  that this company didn't have in place these reasonable and
3  necessary precautions. So therefore, the way the risk
4  disclosure should have looked would have been to have listed
5  the gray marketing risk and also separately list this
6  particular risk of the lack of reasonable precautions.
7        THE COURT: Okay. Now let's talk about the
8  margins.
9        MR. COLLINS: Thank you, Your Honor.
10       I think the important difficulty, and the thing
11 that the defendants are missing here, is that the price of
12 Adams golf clubs going down in general to the retailer does
13 not mean the same thing as retailers' margins getting
14 squeezed. And it doesn't say to the market that there is a
15 separate particular risk to Adams Golf in the event of a
16 squeezing of those retailer margins.
17       There are at least two ways we know that. Your
18 Honor, it might occur that there is a decline in the price
19 of Adams golf clubs in general, but there is not a decline
20 in the retailer margins, the authorized retailer margins,
21 because, for example, as we alleged at Paragraph 63 of our
22 complaint, there might be a price matching program, as there
23 was pre-IPO in Canada.
24       In addition to that, Your Honor, there might be
25 no dollar-for-dollar, so to speak, impact because there

23

1  might be a credit given to authorized retailers, as, in
2  fact, there was in the fourth quarter of 1998, as alleged in
3  the complaint at Paragraph 69. In other words, Your Honor,
4  the one doesn't necessarily mean the other.
5        Beyond that, Your Honor, this issue of how
6  critical the retailer margins, the authorized retailer
7  margins are to the company was described at length, for
8  example, at Page A25 of the prospectus, the registration
9  statement prospectus, which is attached to the defendant's
10 opening brief, To preserve the integrity of its image and
11 reputation, the company currently limits its distribution to
12 retailers that market premium-quality golf equipment and
13 provide a high level of service and technical expertise.
14       In other words, image, reputation, and profits
15 turn on keeping those authorized retailers happy.
16       THE COURT: And you don't think that
17 sophisticated and knowledgeable investors, the investing
18 public would know --
19       MR. COLLINS: I think they would not, Your
20 Honor. I don't think they would know that.
21       THE COURT: You don't think that people looking
22 at falling prices would say, there is a squeeze coming from
23 this?
24       MR. COLLINS: There are two things they wouldn't
25 know, I think. One is, as I say, it doesn't follow that a

24

1  squeeze to the authorized retailer margins necessarily
2  follows from the decline in the price overall. But the
3  second thing the market wouldn't know is that the price
4  matching program in Canada, pre-IPO, the 4.3 million credit
5  fourth quarter '98, would pose additional material
6  undisclosed risks as Adams Golf goes out there and spends
7  its dollars to make sure it keeps its authorized retailers
8  happy. That, too, was not disclosed.
9        So therefore, the failure to disclose the risk
10 to Adams because the authorized retailers' margins might get
11 hurt or might decline, leading to various different negative
12 ramifications for Adams, wasn't disclosed and should have
13 been.
14       THE COURT: Now, the defense argues, I think --
15 help me out if I have got it wrong -- that the Third Circuit
16 has already ruled that an industry-wide oversupply is not
17 something you needed to tell people about, that that meant,
18 by inference, sensible people looking at it would know there
19 would be downward price pressure, and that, you can put a
20 different hat on it and say profit margins would be
21 squeezed, but what you are really saying is, when your price
22 drops, it makes retailers unhappy. Maybe I have read too
23 much into their argument.
24       MR. COLLINS: Maybe they are saying that, Your
25 Honor. I think they are saying that there is a one-to-one

25

1  relationship between the price of Adams golf clubs out there
2  and retailers' margins. And that is inaccurate.
3        THE COURT: Okay.
4        MR. COLLINS: It also leaves out the other
5  element of the issue here, which is the additional risk,
6  which came to fruition in the fourth quarter of '98 and also
7  before the IPO in Canada with price matching, more dollars
8  out of Adams Golf to try to address this authorized retailer
9  margin issue.
10       THE COURT: All right.
11       MR. COLLINS: Your Honor, can I, without being
12 too pushy, address industry-wide problems?
13       THE COURT: Sure, go ahead.
14       MR. COLLINS: Very quickly, Your Honor. I will
15 just say this.
16       I thought I heard Mr. Bessette say, that is the
17 industry, those four companies, which were the ones we cited
18 at Paragraphs 67 and 69, Callaway, Taylor Made, Ping and
19 Titleist. There is a factual issue as to what the industry
20 was and wasn't. As we get into discovery, Your Honor, we
21 will have lots of discovery as to what the industry
22 consisted of. We will, for example, look at analysts'
23 reports and what companies those list as the industry. We
24 will look at the 1999 proxy statements.
25       THE COURT: Have you been taking discovery?

26

1       MR. COLLINS: We have been, Your Honor. But I
2  would have to go outside the record, tell you a whole list
3  of other competitors, which you don't want to hear right
4  now, Your Honor.
5       THE COURT: You are right. It made me a little
6  nervous when you said get into discovery, because I was sort
7  of under the impression that that was going on.
8       MR. COLLINS: We have. We have document
9  discovery. We haven't started taking deps yet.
10      In other words, what Mr. Bessette is putting
11  forward here is something not on the motion to dismiss stage
12  but the summary judgment stage if he wants to, as to whether
13  those four companies constitute the industry, because all of
14  the litigants know that is not at all the case, and one
15  could cite from public documents to that effect. But I
16  won't take your time with that, Your Honor. It is probably
17  not appropriate now.
18      THE COURT: And the matching program that is
19  discussed in 63, this is pre-IPO in Canada. Correct?
20      MR. COLLINS: Correct.
21      THE COURT: And the allegation is that because
22  this was happening in Canada, they should have figured it
23  was happening in the United States, therefore, a failure to
24  say it in an IPO in the U.S. is actionable.
25      MR. COLLINS: Not exactly, Your Honor. We are

27

1  not alleging that the matching program in Canada by itself
2  should have been disclosed. Instead, as you will recall, at
3  an earlier stage of this litigation, the defendants argued
4  materiality. That is what the District Court ruled against
5  plaintiffs on with regard to gray marketing, and there was
6  the reversal, because the Third Circuit said it could not be
7  said -- it could not be concluded at the motion to dismiss
8  stage that there was no materiality there.
9      So what we did was, when we amended the
10  complaint, having taken a lot of document discovery, Your
11  Honor, we were faced with a situation, we had a deadline for
12  filing the amended complaint. And we thought it fair so
13  that there not be surprise to the other side that to the
14  extent that we had additional information, it was
15  appropriate at this stage, consistent with our '33 Act
16  negligence pleadings, to set forth that additional
17  information.
18      And one of the things the defendants challenged
19  us on at the motion to dismiss stage, initially successfully
20  then unsuccessfully at the appellate level, was the
21  materiality of the gray marketing allegations.
22      So we therefore thought it was appropriate and
23  fair and reasonable and necessary to add to basically the
24  gray marketing materiality allegations.
25      The price matching program in Canada pre-IPO was

28

1  not by itself material, at least we have not so alleged.
2  But it is part of what adds to the very grave problems
3  presented to Adams Golf in terms of the risk and also the
4  ongoing operation of this gray marketing problem at the time
5  of the IPO.
6      THE COURT: But if I understand you correctly,
7  you are saying that apart from the risk of the gray market,
8  and the risk that the gray market would mean a threat to the
9  high-end sales network, which by your theory was key to
10  Adams Golf success, that there should have been another
11  disclosure that said profit margins are at risk and that's
12  also going to wreck our marketing network. Is that right?
13      Again, I am back to the question of, how is this
14  different from gray market? And let me just tell you right
15  up front. I have spent a significant amount of time with
16  your briefing and thinking about this. You know, I think
17  your gray marketing stuff stands.
18      I don't think they have pled themselves out of
19  court, Mr. Bessette. I think this gray marketing thing,
20  it's been here, it's been up, it's been back, they may have
21  added facts, but they are not out the door, and we are going
22  to trial on this case and we are going to trial on time in
23  this case. My only question is, what are the causes of
24  action that we are going to go to trial on? The lack of
25  controls? I will tell you right now, I am unimpressed by

29

1  that. If you feel like you want to say something else about
2  it, I will let you. That doesn't sound to me like anything
3  more than evidence that there may have been a gray marketing
4  problem, but not an independent basis or cause of action
5  that there was some material omission because they didn't
6  write in the prospectus we don't mark our clubs, or
7  something like that.
8      I want to make it clear, I am not making
9  evidentiary, in limine rulings at this point. I am not
10  saying you can't put on evidence about what did or didn't
11  happen. What I am saying is, I want to pin down what your
12  cause of action is. And if your cause of action, you
13  thought you have a cause of action, that is, they didn't say
14  in their prospectus we don't mark our clubs, I would agree
15  that that is a cause of action that had to be dismissed
16  because that doesn't strike me as something which is
17  separately actionable on material risk in and of itself. It
18  is nothing more than evidence associated with your gray
19  marketing claim.
20      Now, I hope that gives you a good idea of why I
21  am asking the kinds of questions I am asking.
22      As to this profit margin issue, if this is
23  something different than gray marketing, as to which you are
24  saying there should have been a statement in the prospectus,
25  I need you to be explicit about that, because that's

30

1  something I am trying to explore here. I am just frank to
2  say, but, guys, this case is now seven years old. And come
3  hell or high water, this case is going to trial, unless
4  something remarkable happens at the dispositive motion
5  stage. At the case dismissal stage here, we are not cutting
6  this off.
7          That says nothing about what record you guys may
8  be developing that I don't see. It could be that they are
9  successful in creating a crushing record that shows there is
10  no material issue of fact and you can't win. Barring that,
11  we are going to trial, I think it's August of this year.
12  Unless I am mistaken, it is August of this year.
13          So help me understand, if you think you have got
14  a separate cause of action, what it is, on this margins
15  issue.
16          MR. COLLINS: There was no disclosure that as a
17  result of the risk posed by retailer margins, the company
18  faced the risk that it would have to pay out millions of
19  dollars to the authorized retailers to maintain its
20  so-called selective retail distribution. That in fact
21  occurred.
22          THE COURT: What is the threat to the margins
23  coming from? Is it coming from industry-wide falling
24  prices? Is it coming from gray marketing? Is it coming
25  from both? Or is there something else out there?

31

1          MR. COLLINS: It's coming, to the extent we are
2  aware at this point, Your Honor, it was coming from
3  industry-wide competition. It was coming from gray
4  marketing. It was coming from perhaps changes in the golf
5  world in general. It was coming from a lot of different
6  things. However, how those things applied particularly to
7  Adams Golf were specific to Adams Golf.
8          So, for example, this Canadian price matching
9  program pre-IPO is something nobody of course outside the
10  company knew anything about. There was no way you could
11  check up. There was no public source with regard to any
12  such things like that.
13          But the need to maintain retailers' happiness so
14  that they kept selling Adams golf clubs was something that
15  turned on company-specific factors primarily, and certainly
16  industry-wide factors beyond that. But it was more than
17  gray marketing because it meant dollars out of pocket.
18          THE COURT: When you say it meant dollars out of
19  pocket, you are saying that based on the Canadian program.
20          MR. COLLINS: We knew that. Certainly, the
21  company knew that at the time. And certainly, the proof was
22  in the pudding by the fourth quarter.
23          THE COURT: Do you have some other pre-IPO event
24  associated with the United States that was money out of
25  pocket, like the Canadian matching program?

32

1          MR. COLLINS: We have allegations -- the only
2  matching program, money out of pocket that we are aware of
3  and have alleged was Canada. We have also alleged, however,
4  Your Honor, that I believe in three different states,
5  pre-IPO, gray marketing was going on. And so, therefore, it
6  was logical to assume that price matching credit to retailer
7  sorts of programs constituted -- it was knowable as opposed
8  to known, but it was knowable. And that's all we need to do
9  under the Circuit Court of Appeals opinion, it was knowable
10  that this risk, dollars out of pocket, existed.
11          THE COURT: All right. Okay. I will give the
12  floor back to your opposing counsel.
13          MR. COLLINS: Thank you.
14          MR. BESSETTE: On the retail margin issue, Your
15  Honor, we stand by the argument. They make a separate claim
16  that there should have been a separate disclosure. What our
17  disclosure was was that average selling prices may drop. So
18  does a reasonable investor think if prices drop they are
19  going to spend money to try to get efficiencies or price
20  match or do whatever? Yes. It is an obvious fact. If the
21  prices are dropping, margins may squeeze and drop. The
22  company may take steps to combat the competition or whatever
23  it might be. We do not have to provide every little detail.
24  That's the law. That's what I think a year ago in the
25  Tracinda case Judge Farnan said the same thing. You don't

33

1  have to have the detail. That is all I have heard here:
2  Adams Golf should have provided the detail.
3          THE COURT: What is the next claim you think
4  they are trying to insert here as a separate cause of action
5  that you want to take a crack at?
6          MR. BESSETTE: I think, Your Honor, given your
7  sort of remarks and where we stand, we ought to move to the
8  questionable sales practices. That is starting at Page 18
9  of the second amended complaint, which essentially says that
10  Adams Golf failed to disclose term risks posed by pre-IPO
11  sales practices and under-reserving. And what we are
12  talking about are --
13          THE COURT: Double shipping.
14          MR. BESSETTE: Double shipping, unlimited return
15  rights and inadequate return reserves. Those things that
16  are new to this case now are all material risks according to
17  the plaintiffs that Adams Golf should have disclosed.
18          Now, the only possible legal basis providing
19  Adams Golf with a duty to disclose those practices is Item
20  303 of Regulation S-K. There is no other basis, because the
21  plaintiffs admit that these were not and did not have an
22  effect on the IPO financial statements, but that this was a
23  material risk that would impact future results.
24          The only basis is 303. Our argument is very
25  clearly that they don't even meet the elements of 303.

34

1   There are four of them: a known trend or uncertainty exists
2   which was known to management pre-IPO, that the company
3   reasonably expects to have a material impact on net sales or
4   revenues, and that the trend is persistent and quantifiable.
5          What plaintiffs have done, actually, pretty
6   remarkably, is in their opposition they actually disclaim
7   that management knew any of these things pre-IPO and only
8   learned of them post-IPO. That's in their opposition,
9   refers to the paragraphs in their complaint. That should
10  end the case for those claims.
11         If there is no duty to disclose under 303
12  because these practices were not known to management
13  pre-IPO, you can't state a duty to disclose. That's Item 1.
14         Item 2 is that these three different things,
15  double shipping and all of that, don't qualify as known
16  trends. I meant to make it clear, we don't even have to get
17  into this part of the argument because they don't have a
18  retort to that. They have already disclaimed knowledge by
19  management. They can't find a duty to disclose.
20         But let's just say Mr. Collins comes up with
21  something. As we put in the briefs, there is no known trend
22  on any of these things, just as they have alleged in the
23  complaint. Double shipping, for example. I think it was
24  one salesperson was involved. They don't say how many clubs
25  or how many times or for what period of time. It's just Jay

35

1   Greaney, the salesperson, did some double shipping. That on
2   its face doesn't qualify as a known trend, quantifiable by
3   the company. It is not even quantifiable by the plaintiffs.
4          Increasing returns, same thing. They don't talk
5   about the company's stated 90-day returns policy or that any
6   returns from Hawaii or anywhere else were outside of that
7   policy. There is no detail. There is nothing to establish
8   this was a known trend. Clearly, it wasn't known to
9   management, according to the plaintiffs themselves, not
10  quantifiable, so there is no duty to disclose.
11         And with the reserves, all they point to is the
12  returns in July post-IPO to say that the reserves pre-IPO
13  must have been inadequate. Classic sort of hindsight
14  analysis. Nothing to say that the reserves pre-IPO were
15  inadequate. In fact, they were consistent with their long
16  practice.
17         So in other words, these newly manufactured
18  claims of questionable sales practices that the plaintiffs
19  want to put in the rubric of a material risk known pre-IPO
20  that should have been disclosed, they can't get there. They
21  can't get there for a number of reasons. So those claims
22  ought to be tossed.
23         THE COURT: All right. Any others besides
24  these? I think we have hit the four that you hit in your
25  brief. Is there anything else?

36

1          MR. BESSETTE: No. Those are the claims. We
2   have got some control person allegations we would like to
3   talk about. But those are the only claims, Your Honor.
4          THE COURT: That also hits the financial
5   accounting issue or not?
6          MR. BESSETTE: I think -- Mr. Collins can
7   correct me -- I understood that was just sort of flavor as
8   to why these practices were material risks. I don't think
9   there are separate claims. There are no accounting claims
10  according to plaintiffs in their opposition.
11         THE COURT: All right.
12         MR. COLLINS: Thank you, Your Honor.
13         Questionable sales practices, Your Honor, there
14  are at least three different reasons why the questionable
15  sales practices should have been disclosed. And the least
16  of them is 303. Although they did constitute a known trend,
17  that is the least of the reasons.
18         The first reason these questionable sales should
19  have been disclosed was, again, they were a material risk.
20  They constituted a material risk with respect to post-IPO
21  results. And, in fact, Your Honor, we know that there were,
22  indeed, the September quarter results were indeed
23  disappointing, and the defendants at an earlier stage urged
24  this Court that the class period should end with the
25  disclosure of those third quarter results in October.

37

1          First of all, it is a material risk, it wasn't
2   included in the list of material risks, and it should have
3   been there.
4          THE COURT: Your opposing counsel says you have
5   acknowledged that the management didn't know about this.
6          MR. COLLINS: Your Honor --
7          THE COURT: Yes or no.
8          MR. COLLINS: First of all, if it is a material
9   risk, it doesn't need to be known. And the Third Circuit
10  specifically addressed this in a footnote, which I could
11  probably give you, it does not need to be known for federal
12  risk analysis. It only needs to be knowable. And in fact,
13  the Third Circuit said, Footnote 7, if I may, Your Honor,
14  the Third Circuit said that the District Court made a
15  mistake, this is Judge McKelvie, when it required the
16  plaintiffs -- Footnote 7, Your Honor.
17         THE COURT: All right.
18         MR. COLLINS: In addition to materiality, the
19  District Court required the plaintiffs to show that an
20  omission or misstatement was known to the company at the
21  time of the IPO. The Court goes on to say, in very strong
22  terms, that is not correct.
23         For material risk disclosure, the standard, the
24  requirement is knowability, not whether it's known.
25         So first of all, it wasn't listed as a material

38

1 risk. Secondly, Your Honor, something that I think is
2 clear, but maybe I should make explicit, when we said that
3 there was disclosure that was required that was not set
4 forth, it is not just a matter of there being material risk
5 disclosure that is incomplete so there are material
6 omissions. There is actually a requirement in Form S-1, as
7 the drafters of the registration statement were well-aware,
8 and that requirement sends the drafter of the S-1 to
9 Regulation S-K, which at Item 3 sets forth that it is
10 necessary to include the -- Item 3 of Form S-1 directs the
11 drafter to Item 503 of Regulation S-K. And Item 503
12 requires a listing of material risks: When appropriate,
13 provide under the caption risk factors a discussion of the
14 most significant factors that make the offering speculative
15 or risky.
16         Nothing, Your Honor, about known. It's
17 knowability.
18         Now, there is an issue in addition to that, an
19 additional reason why disclosure should have been provided.
20 I would put it the third out of three, is Item 303 of
21 Regulation S-K. And that does refer to disclosure of known
22 trends. And as defendants describe carefully in their reply
23 brief, a known trend in that case, assuming this is the one
24 area in which it's required that we have known, not just
25 knowability, but known, it says that it's known to

39

1 management. And as you will also see from the defendants'
2 brief, they list the members of management. And they
3 include, among the members of management, Mr. Gonsalves.
4 Mr. Gonsalves was head of sales. Mr. Gonsalves is not a
5 defendant. The defendants themselves say he is management.
6 What we allege, Your Honor, at Paragraph 72, is that he was
7 a friend of Mr. Greaney, who was the person we identify as
8 engaging in the double sales.
9         We also go on at length, Paragraph 76 to 80,
10 saying that Barney Adams, when he found out about what was
11 going on, apparently hit the roof. He said things such as,
12 Are we living the big lie? And if you look at Paragraph 80,
13 Your Honor, the logical reasonable inference was as soon as
14 Mr. Adams figured out what was going on, he fired Gonsalves.
15 So therefore, Your Honor, from defendants' own papers, it
16 would appear, to the extent we even have to get that far,
17 that under 303(k), this was a known trend, and it's a
18 logical, reasonable inference that management knew, not
19 because Barney Adams knew but because non-defendant Mark
20 Gonsalves knew. He was canned as soon as the information
21 was made available.
22         So therefore, in addition to the failure to list
23 all material risks when they list some material omission, in
24 addition to the violation of Form S-1 incorporating Item 503
25 of S-K, the second failure to disclose material risks that

40

1 are required, in addition to that, under S-K, it is true, it
2 was a trend known to management, Mr. Gonsalves, it wasn't
3 known to Barney Adams or the other defendants, or at least
4 we don't believe, and we haven't so alleged.
5         So we believe, Your Honor, it is material, it is
6 quite distinct from gray marketing. And we think that the
7 claim does need to be sustained.
8         THE COURT: Talk about whether accounting is or
9 isn't some separate thing you are trying to raise.
10         MR. COLLINS: It isn't, Your Honor. It really
11 relates to no more than we have just discussed. It relates
12 to a known trend at the time of the IPO that wasn't
13 disclosed. There are so many other reasons. Yes, there
14 were known trends, including with regard to what was going
15 on with gray marketing that should have been disclosed. It
16 was a known trend. But there are so many other reasons why
17 the gray marketing allegations should have been disclosed --
18 sorry. I talk too much.
19         Yes, it is not anything other than an additional
20 reason why disclosure was required.
21         THE COURT: Gotcha, I think.
22         All right. Mr. Bessette, I will give you the
23 last word here.
24         MR. BESSETTE: Thank you, Your Honor.
25         Mr. Collins has succeeded in clouding the issue.

41

1 I think we need to get back to what the definitions are.
2 Footnote 7 of the Adams Golf Third Circuit opinion states
3 nothing more than what the law is under Section 11, which is
4 an obligation, a duty to disclose a material misstatement or
5 omission of existing fact. That's what we are talking
6 about. He is not saying -- he has already said that these
7 things did not affect the IPO financials. These weren't
8 material misstatements or omissions of existing fact that
9 affected the state of affairs at this point.
10         THE COURT: Unless I misunderstood -- and you
11 correct me if I am wrong, Mr. Collins -- the assertion of
12 plaintiffs is this was an existing statement of affairs
13 known within the company, certainly known to the head of
14 sales, that the head of sales knowing it, it was knowable to
15 other management personnel. It was a knowable fact. Have I
16 got you wrong?
17         MR. COLLINS: If I may, Your Honor, it was
18 knowable, it was a knowable fact. It was a known fact to a
19 member of management, Mr. Gonsalves. That is the reasonable
20 inference.
21         THE COURT: That's what I was trying to say.
22 Gonsalves, when I said head of sales, that's who I was
23 referring to. That is the person. Right?
24         MR. COLLINS: Yes.
25         THE COURT: Was he not identified here --

**42**

1    MR. BESSETTE: He is one of management, that's
2    correct, Your Honor.
3    THE COURT: Then I gotcha.
4    MR. BESSETTE: The point is, what they are
5    claiming is not that these are material facts at the time
6    that would impact the result at the time. These were what
7    they are calling material risks, that is risks that they
8    would have material effects post-IPO. That is a separate
9    issue than a material fact existing at the time. What they
10   pled is these are material risks that would impact, that is,
11   have a material effect, post-IPO.
12   THE COURT: Hold on a second. Are you trying to
13   say that if these folks -- posit this. Everybody knows in
14   the company, as a hypothetical, that stuff has been going on
15   which the next day after the IPO is going to cause the whole
16   thing to tank, that if it doesn't hit the IPO financials the
17   day of, that that is not a risk factor that needs to be
18   disclosed?
19   MR. BESSETTE: I am saying, Your Honor, that the
20   analysis that is undertaken in that scenario is 303. That
21   is the only basis in which a company has to disclose
22   information that is a material risk to future results.
23   THE COURT: Section 11 itself does not impose on
24   a company or people marketing securities an obligation to
25   describe the risk of the investment? You are making a

**43**

1    distinction which I am having a hard time getting my head
2    around. Maybe I am not sophisticated enough to understand
3    this. It sounds to me like the plaintiffs are saying they
4    were monkeying with the numbers ramping up to the IPO, and
5    that there were at least some folks in management who knew
6    it, and that it was at least knowable as well as to some
7    degree known, and therefore, people discharging their
8    obligations to the investing public under Section 11 should
9    have noted the risk associated with that. I hear you saying
10   to me that is just not a cause of action.
11   MR. BESSETTE: No. What I am saying, Your
12   Honor, is what Section 11 says, it puts an obligation on the
13   issuer to disclose material facts that existed at the time,
14   whether they were known or not, they are knowable, if they
15   existed at the time, then those are facts, you have to
16   disclose them. Now, if those facts are going to have
17   material risks in the future, and that's what the risk
18   factors disclose, all of the risk factors disclose is a 303
19   analysis.
20   What I am saying is the only obligation,
21   legally, to disclose a material risk that exists at the time
22   of the IPO that the company reasonably expects will have an
23   impact on net sales and revenues in the future, that is 303,
24   that is the obligation, that is the legal predicate.
25   THE COURT: And independent of this 303, there

**44**

1    is no legal obligation stemming from Section 11 itself.
2    MR. BESSETTE: That's right. A material fact,
3    if you are going to disclose a fact that in your view, as
4    the issuer, is reasonably expected to have a material impact
5    in the future, you have an obligation to disclose that.
6    What I am saying is the obligation arises under
7    S-K 303. And I heard Mr. Collins say, there is two or three
8    other bases. There are no other legal bases. 303 is the
9    only one. And they haven't met it.
10   THE COURT: Well, here is the great thing -- Mr.
11   Collins, you look like you have something you feel you must
12   say.
13   MR. COLLINS: No. If you tell me to sit down, I
14   will sit down.
15   THE COURT: I don't think I need to hear
16   anymore. All right.
17   I have some rulings for you, and we will get
18   this thing moving on. I have already spoken about a couple
19   of these. We will run through them and get this done.
20   The gray marketing, effort to dismiss that, is
21   denied. The gray marketing cause of action stands.
22   The lack of controls, to the extent that is
23   asserted as a separate cause of action, it should have been
24   separately disclosed. The motion is granted. That is, if
25   anything, only evidence that goes to the assertion that

**45**

1    there was a gray marketing problem and it doesn't stand as
2    an independent thing that needed to be disclosed. I don't
3    see any basis for treating it differently than that. In
4    short, I reject the notion that that, standing alone, was a
5    material fact that needed to be placed in a prospectus.
6    The margins aspect, that I am also going to
7    grant the motion to dismiss on. I think that the Tracinda
8    case is apt in this regard, where Judge Farnan said,
9    "Corporations are not required to address stockholders as if
10   they were children in kindergarten. It is thus sufficient
11   if the company provides information as to material facts in
12   a format from which a reasonable investor could reach his
13   own conclusions as to the risks of the transaction."
14   And calling this a margin issue as opposed to a
15   falling price issue is just an attempt to slice things so
16   thinly as to enter into that realm that Judge Farnan
17   expressly condemned.
18   The sales practices, however, I am denying the
19   motion to dismiss there. At a minimum, there is an issue of
20   fact here as to whether these trends were known to
21   management, known trends that were quantifiable. And so
22   even independent of the argument that we have been dealing
23   with as to whether there was some different legal basis on
24   which they had to make out their claim here, even if the
25   defense were correct that this were solely based on 303,

46

1  that there was no other legal basis, the defense has not
2  demonstrated that there is no material issue in this regard,
3  that somehow it is admitted that they can't make out a claim
4  there. It looks to me like there are issues of fact with
5  regard to these so-called questionable sales practices.
6          I will reserve till a later time if I ever have
7  to address it -- maybe I will in the context of dispositive
8  motions at the end of the case -- whether or not the defense
9  is right here that there is not an obligation under Section
10  11 independent of what Mr. Bessette calls the only
11  obligation, which is one arising under Section 303, if I am
12  using that nomenclature correctly.
13          I am having a hard time putting my hand right on
14  your brief, Mr. Bessette.
15          Maybe you will be able to establish that there
16  really is no issue of material fact, and then we will
17  confront the issue of whether Mr. Collins is right that
18  there is some other basis other than the one you have
19  asserted is the only basis. For now, though, it is enough
20  to say there are issues of fact here, and I am not
21  dismissing it, because even on the legal basis you say could
22  be a legal basis, you haven't demonstrated to me that they
23  have admitted they can't meet the elements of this
24  claim, this cause of action.
25          Now, I had one additional point I wanted to

47

1  raise with you folks. This is this big case in the sense of
2  a lot of effort has gone into it. I would customarily, if I
3  were granting any part of a motion to dismiss, file a
4  written opinion or memorandum order. But the parties in
5  this case have had the benefit of a very lengthy District
6  Court opinion, round one, a lengthy Circuit Court opinion,
7  round two, a less lengthy but still a product of significant
8  effort memorandum order, including considerable supplemental
9  briefing on class certification, and yet another order which
10  was put out in January of this year. And the basis of that
11  one is escaping me at the moment.
12          The short of it is, we have been around the
13  block a few times, and we are coming up on a trial date
14  here.
15          I am not going to take this under advisement for
16  two or three months. I am not going to bump other people
17  out of the queue who are waiting for decisions from me. So
18  I am giving you my decision on this record. If somebody has
19  got an issue with that, you know, they need to let me know
20  right away and I guess I will try to address that.
21          But I think this is adequate or should be
22  adequate to explain to you the bases of my rulings, what my
23  rulings are, to have you moving forward.
24          I don't intend for us to be delayed in getting
25  this to resolution anymore. Seven years is enough. It's

48

1  not going to be eight.
2          Now, if we do get to trial, I think I allowed
3  myself to be persuaded to give three weeks for this trial,
4  and 35 hours per side. I am convinced and persuaded at this
5  point that that was overly generous, particularly in light
6  of how the claims now stand. I am quite sure that this is a
7  case that can be tried in two weeks. So we will go to trial
8  as scheduled, end of August, unless another scheduling order
9  came to the fore which I am not aware of.
10          I believe we are talking about August 28, 2006
11  as the trial date. I will put this down for now a ten-day
12  jury trial, 22 hours per side, which, even in a case that's
13  got the number of lawyers that are going into it that this
14  one does, given the character of the allegations, that is
15  sufficient time for the parties to put on their case.
16          So you can expect to get an order from me today
17  that says the following. The motion to dismiss is granted
18  in part and denied in part. It is granted to the extent
19  that a claim associated with margin squeeze as a separate
20  cause of action is dismissed, a claim associated with lack
21  of controls on distribution of golf equipment as a separate
22  cause of action is dismissed, that in all the respects the
23  motion is denied, and that the trial is scheduled to go
24  forward on its current date for ten days, 22 hours per side.
25          Does anybody have any questions or issues they

49

1  want to raise while we are all here together about anything
2  I have just said or other matters you may have had that you
3  think need to be put on the table? Mr. Collins.
4          MR. COLLINS: Quickly, Your Honor. Do I
5  understand that plaintiffs are permitted to take discovery
6  with respect to the lack of controls, lack of preventive
7  measures claim, which the Court has granted the motion with
8  respect to? That is, if it is part of gray marketing, we
9  want to take discovery on it.
10          THE COURT: Yes. I have not made an evidentiary
11  ruling that this is not probative of a gray marketing
12  problem that the defendants should have known about or did
13  know about. I don't expect to hear discovery disputes in
14  that regard. I am saying, as an independent cause of
15  action, it doesn't stand up. But you can certainly inquire
16  into it, for the reasons I just noted.
17          MR. COLLINS: Finally, Your Honor, there was an
18  amendment to the November 29th order, dated September 1st.
19  I apologize, Your Honor, I don't know if that has an impact
20  on the trial date. I would need to study the orders to see
21  if that is the case. I am not asking for it, Your Honor. I
22  wanted to bring it to the Court's attention.
23          THE COURT: I will check.
24          Whatever our trial date is, it's sticking. All
25  right? The only difference now is we are going to have a

50

1    ten-day trial, 22 hours per side. And now our claims are
2    set. We are moving past the motions to dismiss. Okay?
3              Get your discovery done. Hit your marks on the
4    case-dispositives, if you feel you have got something there.
5    And we will get those turned around and get to the pretrial
6    conference, ready to put this thing in shape to put it in
7    front of a jury if it is still alive at that point, if you
8    haven't otherwise resolved it either amongst yourselves or
9    by dispositive motion that I grant. All right?
10             We stand in recess.
11             (Court recessed at 3:20 p.m.)
12                  - - -
13   Reporter: Kevin Maurer
14
15
16
17
18
19
20
21
22
23
24
25

**'**

'01 [1] - 10:22
'33 [2] - 8:12, 27:15
'98 [2] - 24:5, 25:6

**1**

1 [1] - 34:13
10 [1] - 1:7
10(b [2] - 14:17, 15:12
11 [13] - 5:6, 6:15, 8:7, 12:9, 14:16, 15:13, 15:21, 41:3, 42:23, 43:8, 43:12, 44:1, 46:10
12(b)(6 [2] - 8:20, 9:1
18 [1] - 33:8
1998 [1] - 23:2
1999 [1] - 25:24
1st [1] - 49:18

**2**

2 [1] - 34:14
2006 [2] - 1:7, 48:10
22 [3] - 48:12, 48:24, 50:1
25-page [1] - 13:23
274 [1] - 10:23
277-278 [1] - 19:18
278-79 [1] - 4:14
28 [1] - 48:10
29th [1] - 49:18
2:00 [1] - 1:7

**3**

3 [2] - 38:9, 38:10
303 [14] - 33:20, 33:24, 33:25, 34:11, 36:16, 38:20, 42:20, 43:18, 43:23, 43:25, 44:7, 44:8, 45:25, 46:11
303(k [1] - 39:17
35 [1] - 48:4
3:20 [1] - 50:11

**4**

4.3 [1] - 24:4

**5**

5 [1] - 10:23
503 [3] - 38:11, 39:24

**6**

63 [2] - 22:21, 26:19
66 [1] - 4:22
67 [1] - 25:18
69 [2] - 23:3, 25:18

**7**

7 [4] - 4:10, 37:13, 37:16, 41:2
72 [1] - 39:6
76 [1] - 39:9

**8**

8 [1] - 4:11
80 [2] - 39:9, 39:12
86 [1] - 12:21

**9**

9(b [7] - 8:13, 16:8, 16:22, 16:24, 17:1, 17:5, 17:9
9(b)'s [1] - 9:7
90-day [1] - 35:5
99-371-kaj [1] - 1:4

**A**

A25 [1] - 23:8
able [1] - 46:15
absence [1] - 21:3
acceptance [1] - 15:1
according [5] - 14:19, 19:21, 33:16, 35:9, 36:10
accounting [3] - 36:5, 36:9, 40:8
accurate [1] - 19:16
acknowledged [2] - 13:3, 37:5
Act [2] - 8:12, 27:15
action [15] - 28:24, 29:4, 29:12, 29:13, 29:15, 30:14, 33:4, 43:10, 44:21, 44:23, 46:24, 48:20, 48:22, 49:15
actionable [2] - 26:24, 29:17
active [2] - 12:4, 12:7
Adams [4] - 1:4, 1:22, 1:23, 2:20, 3:7, 4:15, 5:9, 6:3, 13:1, 17:19, 17:21, 18:3, 22:12, 22:15, 22:19, 24:6, 24:10, 24:12,

25:1, 25:8, 28:3, 28:10, 31:7, 31:14, 33:2, 33:10, 33:17, 33:19, 39:10, 39:14, 39:19, 40:3, 41:2
add [2] - 3:15, 27:23
added [1] - 11:3, 28:21
addition [7] - 21:25, 22:24, 37:18, 38:18, 39:22, 39:24, 40:17
additional [6] - 9:21, 24:5, 25:5, 27:14, 27:16, 38:19, 40:19, 46:25
address [6] - 10:5, 12:16, 12:19, 25:8, 25:12, 45:9, 46:7, 47:20
addressed [2] - 11:20, 37:10
addressing [1] - 12:2
adds [1] - 28:2
adequate [3] - 18:16, 47:21, 47:22
admit [1] - 33:21
admitted [6] - 2:14, 2:21, 3:2, 3:3, 46:3, 46:23
advisement [1] - 47:15
affairs [2] - 41:9, 41:12
affect [1] - 41:7
affected [1] - 41:9
affecting [1] - 4:20
affirmed [2] - 7:16, 8:13
afternoon [2] - 2:8, 2:24
ago [3] - 11:14, 15:17, 32:24
agree [1] - 13:23, 29:14
agreeing [1] - 5:24
aha [1] - 14:3
ahead [2] - 2:10, 25:13
Akin [2] - 1:21, 2:22
alive [1] - 50:7
allegation [5] - 10:14, 12:20, 13:20, 14:16, 26:21
allegations [37] - 3:25, 4:20, 5:5, 5:24, 6:22, 7:3, 7:14, 7:16, 7:18, 7:19, 8:5, 8:10, 8:16, 8:19, 8:24, 9:4, 9:8, 9:12, 10:20, 11:3, 11:4, 11:6, 11:7,

11:10, 11:22, 12:4, 12:11, 14:5, 14:14, 14:17, 17:2, 27:21, 27:24, 32:1, 36:2, 40:17, 46:14
allege [4] - 6:8, 8:23, 10:16, 39:6
alleged [18] - 5:5, 5:12, 5:17, 6:3, 6:7, 9:10, 9:16, 10:12, 14:10, 15:24, 16:3, 22:21, 23:2, 28:1, 32:3, 34:22, 40:4
alleging [1] - 11:24, 27:1
allowed [2] - 12:8, 48:2
Almost [1] - 6:5
alone [1] - 45:4
Alyssa [2] - 1:18, 2:18
amend [2] - 3:14, 11:14
amended [12] - 3:13, 4:18, 7:6, 7:13, 7:19, 8:1, 11:8, 12:22, 16:15, 27:9, 27:12, 33:9
amendment [1] - 49:18
amount [2] - 28:15
analysis [4] - 35:14, 37:12, 42:20, 43:19
analysts' [1] - 25:22
Anderson [1] - 2:2
answer [2] - 5:10, 19:9
apart [2] - 20:18, 28:7
apologize [1] - 49:19
appeal [2] - 10:23, 14:25
Appeals [1] - 32:9
appear [3] - 12:11, 14:6, 39:16
Appearances [2] - 1:10, 2:1
appellate [1] - 27:20
applied [1] - 31:6
applies [3] - 8:13, 16:24, 17:5
apply [1] - 9:7
appropriate [5] - 8:15, 26:17, 27:15, 27:22, 38:12
April [1] - 1:7
apt [1] - 45:8
area [1] - 38:24
argued [1] - 27:3
argues [1] - 24:14

argument [13] - 4:3, 7:8, 7:10, 11:5, 13:7, 15:2, 18:6, 18:12, 24:23, 32:15, 33:24, 34:17, 45:22
arguments [3] - 7:3, 7:8, 16:11
arises [1] - 44:6
arising [1] - 46:11
aside [1] - 20:11
aspect [1] - 45:6
aspects [1] - 7:25
asserted [2] - 44:23, 46:19
assertion [1] - 3:22, 12:2, 12:5, 16:13, 16:17, 18:24, 20:12, 41:11, 44:25
assertions [1] - 16:12
associated [6] - 21:14, 29:18, 31:24, 43:9, 48:19, 48:20
assume [2] - 32:6
Assume [1] - 16:10
assuming [2] - 3:6, 38:23
attached [1] - 23:9
attempt [1] - 45:15
attention [1] - 49:22
August [1] - 30:11, 30:12, 48:8, 48:10
Austin [1] - 1:21
authorized [1] - 13:2, 20:3, 22:20, 23:1, 23:6, 23:15, 24:1, 24:7, 24:10, 25:8, 30:19
available [7] - 4:17, 4:24, 6:9, 7:21, 7:24, 39:21
average [2] - 17:24, 18:7, 32:17
aware [6] - 15:22, 15:25, 31:2, 32:2, 38:7, 48:9

**B**

Bala [1] - 1:16
ball [2] - 13:25, 15:4
Barney [1] - 1:23, 39:10, 39:19, 40:3
Barring [1] - 30:10
Bartlett [1] - 2:4
based [3] - 3:23, 4:12, 8:7, 31:19, 45:25
bases [3] - 44:8, 47:22

**basis** [19] - 9:3, 9:20, 10:6, 11:5, 18:6, 21:13, 29:4, 33:18, 33:20, 33:24, 42:21, 45:3, 45:23, 46:1, 46:18, 46:19, 46:21, 46:22, 47:10

**behalf** [2] - 2:19, 3:7

**behind** [1] - 22:1

**benefit** [1] - 47:5

**Berger** [2] - 1:14, 3:1

**Bessette** [41] - 1:20, 2:20, 3:6, 3:8, 3:11, 4:4, 4:26, 5:3, 6:5, 7:12, 8:3, 9:5, 10:11, 12:5, 12:6, 12:15, 12:21, 12:24, 15:4, 15:7, 15:8, 16:20, 17:7, 17:16, 25:16, 26:10, 28:19, 32:14, 33:6, 33:14, 36:1, 36:6, 40:22, 40:24, 42:1, 42:4, 42:19, 43:11, 44:2, 46:10, 46:14

**Bessette's** [1] - 10:6

**between** [1] - 25:1

**Beyond** [1] - 22:5

**beyond** [2] - 12:3, 31:16

**Bh** [1] - 1:23

**big** [2] - 39:12, 47:1

**bit** [1] - 11:12

**block** [1] - 47:13

**bound** [2] - 4:15, 16:18

**brand** [2] - 5:14, 5:16

**Breyer** [1] - 15:17

**brief** [4] - 4:8, 23:10, 35:25, 38:23, 39:2, 46:14

**briefing** [2] - 28:16, 47:9

**briefly** [2] - 15:8, 17:11

**Briefly** [1] - 15:20

**briefs** [2] - 17:19, 34:21

**bring** [1] - 49:22

**broaden** [1] - 3:16

**brought** [2] - 3:14, 8:12

**Brown** [1] - 1:24

**bump** [1] - 47:16

**bushes** [1] - 13:25

**business** [1] - 19:22

---

**— C —**

**Ca** [1] - 1:4

**Cac** [1] - 7:18

**California** [1] - 15:17

**Callaway** [3] - 5:20, 6:11, 25:18

**Canada** [8] - 22:23, 24:4, 25:7, 26:19, 26:22, 27:1, 27:25, 32:3

**Canadian** [3] - 31:8, 31:19, 31:25

**canned** [1] - 39:20

**cannot** [1] - 14:7

**caption** [1] - 38:13

**care** [1] - 16:6

**carefully** [1] - 38:22

**Carmella** [2] - 1:11, 2:25

**Casati** [1] - 1:24

**case** [53] - 2:10, 4:2, 5:8, 5:9, 8:7, 8:8, 8:11, 8:12, 8:14, 9:10, 9:16, 9:20, 10:21, 11:2, 11:6, 11:13, 12:9, 13:8, 13:9, 13:11, 13:14, 14:12, 15:10, 15:11, 15:12, 15:15, 15:16, 15:20, 15:21, 16:3, 18:3, 21:11, 26:14, 28:22, 28:23, 30:2, 30:3, 30:5, 32:25, 33:16, 34:10, 38:23, 45:8, 46:8, 47:1, 47:5, 48:7, 48:12, 48:15, 49:21, 50:4

**case-dispositives** [1] - 50:4

**causes** [1] - 28:23

**cautionary** [2] - 15:23, 15:25

**Certainly** [1] - 31:20

**certainly** [5] - 20:21, 31:15, 31:21, 41:13, 49:15

**certification** [1] - 47:9

**challenged** [1] - 27:18

**chance** [2] - 15:5, 15:6

**change** [1] - 8:11

**changed** [3] - 10:6, 11:7, 11:10

**changes** [1] - 31:4

**character** [1] - 48:14

**characterize** [1] - 17:14

**characterized** [1] - 4:22

**characterizes** [1] -

20:9

**charges** [1] - 16:19

**check** [2] - 31:11, 49:23

**Chepiga** [3] - 2:3, 2:14

**children** [1] - 45:10

**chose** [1] - 3:14

**Circuit** [20] - 4:12, 4:14, 4:23, 5:9, 6:13, 7:16, 8:14, 10:23, 14:19, 15:1, 15:13, 19:14, 24:15, 27:6, 32:9, 37:9, 37:13, 37:14, 41:2, 47:8

**Circuits** [1] - 4:1

**cite** [2] - 4:13, 26:15

**cited** [2] - 5:9, 25:17

**claim** [25] - 3:15, 4:12, 14:21, 16:14, 16:16, 17:8, 17:10, 17:18, 18:13, 18:21, 19:2, 19:10, 20:12, 20:18, 20:19, 29:19, 32:15, 33:3, 40:7, 45:24, 46:3, 46:24, 48:19, 48:20, 49:7

**claiming** [2] - 8:3, 42:5

**claims** [22] - 3:16, 3:17, 3:23, 7:9, 7:11, 13:21, 15:12, 15:13, 17:11, 17:14, 17:15, 20:7, 20:10, 34:10, 35:18, 35:21, 36:1, 36:3, 36:9, 48:6, 50:1

**class** [2] - 36:24, 47:9

**Classic** [1] - 35:13

**clear** [4] - 5:2, 29:8, 34:16, 38:2

**Clearly** [1] - 35:8

**clearly** [1] - 33:25

**Cline** [2] - 5:10, 6:14

**clouding** [1] - 40:25

**clouds** [1] - 14:1

**clubs** [11] - 20:2, 20:6, 20:15, 21:5, 22:12, 22:19, 25:1, 29:6, 29:14, 31:14, 34:24

**Collins** [59] - 1:13, 3:1, 10:2, 10:4, 10:8, 10:11, 11:9, 11:16, 12:10, 12:16, 13:18, 13:19, 15:6, 18:23, 19:3, 19:10, 19:13, 20:10, 20:16, 20:20, 20:25, 21:8, 21:17, 21:19, 21:22, 22:9,

23:19, 23:24, 24:24, 25:4, 25:11, 25:14, 26:1, 26:8, 26:20, 26:25, 30:16, 31:1, 31:20, 32:1, 32:13, 34:20, 36:6, 36:12, 37:6, 37:8, 37:18, 40:10, 40:25, 41:11, 41:17, 41:24, 44:7, 44:11, 44:13, 46:17, 49:3, 49:4, 49:17

**combat** [1] - 32:22

**coming** [11] - 23:22, 30:23, 30:24, 31:1, 31:2, 31:3, 31:4, 31:5, 47:13

**common** [7] - 5:18, 6:7, 6:18, 6:20, 6:23, 7:20, 7:23

**Commonwealth** [2] - 5:10, 6:14

**companies** [3] - 25:17, 25:23, 26:13

**company** [21] - 6:15, 13:3, 19:23, 21:25, 22:2, 23:7, 23:11, 30:17, 31:10, 31:15, 31:21, 32:22, 34:2, 35:3, 37:20, 41:13, 42:14, 42:21, 42:24, 43:22, 45:11

**company's** [1] - 35:5

**company-specific** [1] - 31:15

**compare** [1] - 7:18

**competition** [2] - 31:3, 32:22

**competitive** [1] - 17:23

**competitors** [1] - 26:3

**complaint** [27] - 3:13, 4:19, 7:6, 7:14, 8:1, 8:10, 9:20, 10:7, 10:19, 11:14, 11:17, 11:18, 12:22, 13:24, 14:4, 14:13, 14:14, 16:12, 16:15, 16:18, 22:22, 23:3, 27:10, 27:12, 33:9, 34:9, 34:23

**complaint's** [1] - 7:19

**conceal** [1] - 13:7

**concealed** [3] - 9:14, 9:22, 13:4, 13:23, 13:25, 14:1, 14:3, 14:5, 16:1

**concealment** [3] - 12:4, 12:8, 12:10

**conceptually** [1] - 21:10

**concern** [2] - 10:6, 10:24

**conclude** [1] - 16:24

**concluded** [2] - 11:22, 27:7

**conclusion** [2] - 8:18, 10:24

**conclusions** [1] - 45:13

**condemned** [1] - 45:17

**conference** [1] - 50:6

**confront** [1] - 46:17

**Connor** [1] - 1:24

**considerable** [1] - 47:8

**consisted** [1] - 25:22

**consistent** [4] - 11:17, 11:19, 27:15, 35:15

**consolidated** [1] - 7:13

**Consolidated** [1] - 1:4

**constitute** [2] - 26:13, 36:16

**constituted** [2] - 32:7, 36:20

**constitutes** [1] - 20:22

**construct** [5] - 13:10, 13:16, 15:14, 15:21, 16:7

**consumers** [2] - 5:25, 6:3

**contained** [1] - 14:17

**context** [2] - 21:7, 46:7

**Continued** [1] - 2:1

**continued** [1] - 3:17

**contract** [2] - 21:14

**contracts** [3] - 18:17, 18:25, 20:6

**contractual** [1] - 21:5

**control** [3] - 21:14, 21:15, 36:2

**controls** [4] - 28:25, 44:22, 48:21, 49:6

**converts** [1] - 13:24

**convinced** [1] - 48:4

**copy** [3] - 12:24, 15:18, 15:19

**core** [1] - 9:11

**Corporations** [1] - 45:9

**Correct** [2] - 26:19, 26:20

correct [8] - 3:6, 10:14, 21:8, 36:7, 37:22, 41:11, 42:2, 45:25

correctly [3] - 4:3, 28:6, 46:12

Corroon [1] - 2:2

Counsel [3] - 1:17, 1:22, 2:5

counsel [4] - 3:1, 15:18, 32:12, 37:4

counterpoint [1] - 12:14

couple [1] - 44:18

course [2] - 10:13, 31:9

Court [92] - 1:1, 2:8, 2:16, 2:23, 3:5, 3:9, 3:12, 3:20, 4:7, 5:1, 5:23, 7:2, 7:15, 7:25, 8:16, 8:20, 9:25, 10:5, 10:10, 10:23, 11:1, 11:11, 12:2, 12:7, 12:13, 12:23, 13:17, 15:2, 15:11, 15:19, 16:9, 16:24, 17:6, 17:13, 18:20, 19:8, 19:12, 20:5, 20:11, 20:17, 20:24, 21:6, 21:9, 21:18, 21:21, 22:7, 23:16, 23:21, 24:14, 25:3, 25:10, 25:13, 25:25, 26:5, 26:18, 26:21, 27:4, 28:6, 30:22, 31:18, 31:23, 32:9, 32:11, 33:3, 33:13, 35:23, 36:4, 36:11, 36:24, 37:4, 37:7, 37:14, 37:17, 37:19, 37:21, 40:8, 40:21, 41:10, 41:21, 41:25, 42:3, 42:12, 42:23, 43:25, 44:10, 44:15, 47:6, 49:7, 49:10, 49:23, 50:11

court [4] - 3:19, 3:22, 8:4, 28:19

Courts [2] - 19:4, 49:22

crack [1] - 33:5

creating [1] - 30:9

credit [3] - 23:1, 24:4, 32:6

critical [1] - 23:6

crushing [1] - 30:9

current [2] - 11:17, 48:24

customarily [1] - 47:2

cutting [1] - 30:5

Cynwyd [1] - 1:16

D

Darl [1] - 1:23

date [5] - 47:13, 48:11, 48:24, 49:20, 49:24

dated [1] - 49:18

days [1] - 48:24

deadline [1] - 27:11

deal [4] - 2:9, 11:3, 11:16, 21:12

dealing [1] - 45:22

December [1] - 10:22

decided [1] - 15:16

deciding [1] - 15:11

decision [1] - 47:18

decisions [1] - 47:17

decline [5] - 13:2, 22:18, 22:19, 24:2, 24:11

defendant [2] - 39:5, 39:19

defendant's [1] - 23:9

Defendants [2] - 1:22, 2:6

defendants [23] - 2:17, 2:20, 3:7, 9:11, 9:17, 9:21, 10:12, 13:3, 13:11, 14:2, 14:8, 14:25, 15:22, 15:23, 15:24, 22:11, 27:3, 27:18, 36:23, 38:22, 39:5, 40:3, 49:12

defendants' [1] - 10:20, 39:1, 39:15

defense [1] - 20:8, 24:14, 45:25, 46:1, 46:8

define [1] - 14:3

definitions [1] - 41:1

degree [1] - 43:7

Delaware [2] - 1:2, 1:6

delayed [1] - 47:24

demonstrated [2] - 46:2, 46:22

denied [3] - 44:21, 48:18, 48:23

denying [1] - 45:18

deps [1] - 26:9

describe [2] - 38:22, 42:25

described [1] - 23:7

detail [6] - 17:4, 18:10, 32:23, 33:1,

33:2, 35:7

determine [1] - 9:6

developing [1] - 30:8

difference [1] - 49:25

different [10] - 9:13, 24:11, 24:20, 28:14, 29:23, 31:5, 32:4, 34:14, 36:14, 45:23

differently [1] - 45:3

difficulty [1] - 22:10

directs [1] - 38:10

disagree [1] - 7:5

disappointing [1] - 36:23

discernible [3] - 4:16, 4:23, 6:25

discharging [1] - 43:7

disclaim [1] - 34:6

disclaimed [1] - 34:18

disclose [25] - 4:13, 4:15, 9:23, 10:18, 13:15, 16:7, 18:4, 22:1, 24:9, 33:10, 33:19, 34:11, 34:13, 34:19, 35:10, 39:25, 41:4, 42:21, 43:13, 43:16, 43:18, 43:21, 44:3, 44:5

disclosed [18] - 5:7, 5:8, 6:12, 7:17, 13:10, 24:8, 24:12, 27:2, 33:17, 35:20, 36:15, 36:19, 40:13, 40:15, 40:17, 42:18, 44:24, 45:2

disclosure [13] - 19:17, 22:4, 28:11, 30:16, 32:16, 32:17, 36:25, 37:23, 38:3, 38:5, 38:19, 38:21, 40:20

disclosures [1] - 18:5

discounted [1] - 6:4

discover [1] - 6:10

discovered [2] - 9:18, 13:12

discovery [10] - 25:20, 25:21, 25:25, 26:6, 26:9, 27:10, 49:5, 49:9, 49:13, 50:3

discussed [2] - 17:11, 26:19, 40:11

discussion [3] - 13:1, 16:10, 38:13

dismiss [12] - 2:10, 3:13, 16:18, 26:11,

27:7, 27:19, 44:20, 45:7, 45:19, 47:3, 48:17, 50:2

dismissal [1] - 30:5

dismissed [5] - 7:4, 8:2, 29:15, 48:20, 48:22

dismissing [3] - 7:9, 7:10, 46:21

dispositive [3] - 30:4, 46:7, 50:9

dispositives [1] - 50:4

disputes [1] - 49:13

distinct [1] - 40:6

distinction [1] - 43:1

distress [1] - 16:11

distribution [6] - 18:13, 19:14, 19:21, 23:11, 30:20, 48:21

District [8] - 1:1, 1:2, 7:15, 15:17, 27:4, 37:14, 37:19, 47:5

document [2] - 26:8, 27:10

documents [1] - 26:15

dollar [2] - 22:25

dollar-for-dollar [1] - 22:25

dollars [6] - 24:7, 25:7, 30:19, 31:17, 31:18, 32:10

domain [2] - 4:17, 4:24

Donald [4] - 1:15, 1:16, 3:2, 3:3

done [5] - 9:17, 13:11, 34:5, 44:19, 50:3

door [2] - 17:15, 28:21

double [3] - 34:15, 35:1, 39:8

Double [3] - 33:13, 33:14, 34:23

doubt [1] - 8:11

down [5] - 22:12, 29:11, 44:13, 44:14, 48:11

downward [1] - 24:19

drafter [2] - 38:8, 38:11

drafters [1] - 38:7

drop [3] - 32:17, 32:18, 32:21

dropping [1] - 32:21

drops [1] - 24:22

duty [7] - 4:15,

33:19, 34:11, 34:13, 34:19, 35:10, 41:4

duty-bound [1] - 4:15

E

easily [5] - 4:16, 4:23, 6:25, 18:5, 18:10

Edison [2] - 5:10, 6:14

effect [4] - 20:14, 26:15, 33:22, 42:11

effects [2] - 42:8

efficiencies [1] - 32:19

effort [3] - 44:20, 47:2, 47:8

eight [1] - 48:1

either [2] - 21:11, 50:8

element [1] - 25:5

elements [2] - 33:25, 46:23

Elizabeth [2] - 1:13, 3:1

end [5] - 28:9, 34:10, 36:24, 46:8, 48:8

engaging [1] - 39:8

enter [1] - 45:16

equipment [2] - 23:12, 48:21

erosion [1] - 17:22

escaping [1] - 47:11

Esq [9] - 1:11, 1:13, 1:13, 1:15, 1:18, 1:20, 1:20, 2:2, 2:3

essence [1] - 17:18

essentially [3] - 4:4, 18:15, 33:9

establish [2] - 35:7, 46:15

established [1] - 6:22

event [2] - 22:15, 31:23

evidence [4] - 29:3, 29:10, 29:18, 44:25

evidentiary [2] - 29:9, 49:10

exact [1] - 7:21

exactly [6] - 9:5, 10:15, 12:16, 12:17, 18:5, 26:25

example [7] - 5:20, 14:12, 22:21, 23:8, 25:22, 31:8, 34:23

exercise [1] - 16:5

existed [5] - 14:9,

14:24, 32:10, 43:13, 43:15

existence [2] - 11:24, 11:25

existing [4] - 41:5, 41:8, 41:12, 42:9

exists [2] - 34:1, 43:21

expect [2] - 48:16, 49:13

expected [2] - 17:23, 44:4

expects [2] - 34:3, 43:22

expertise [1] - 23:13

explain [2] - 19:11, 47:22

explanation [1] - 21:20

explicit [2] - 29:25, 38:2

explore [1] - 30:1

expressly [3] - 4:12, 12:19, 45:17

extent [6] - 7:7, 27:14, 31:1, 39:16, 44:22, 48:18

**F**

face [1] - 35:2

faced [2] - 27:11, 30:18

fact [22] - 6:4, 18:8, 23:2, 30:10, 30:20, 32:20, 35:15, 36:21, 37:12, 41:5, 41:8, 41:15, 41:18, 42:9, 44:2, 44:3, 45:5, 45:20, 46:4, 46:16, 46:20

factor [1] - 42:17

factors [6] - 31:15, 31:16, 38:13, 38:14, 43:18

facts [8] - 8:22, 10:18, 28:21, 42:5, 43:13, 43:15, 43:16, 45:11

factual [1] - 25:19

failed [2] - 13:14, 33:10

failing [1] - 16:7

failure [7] - 4:13, 16:5, 22:1, 24:9, 26:23, 39:22, 39:25

fair [2] - 27:12, 27:23

fairly [1] - 4:22

fall [1] - 17:25, 18:1

falling [6] - 18:6,

18:7, 18:9, 23:22, 30:23, 45:15

false [3] - 10:17, 19:15, 19:16

familiar [1] - 9:2

far [1] - 39:16

Farnan[3] - 32:25, 45:8, 45:16

February[1] - 14:19

federal [1] - 37:11

Feld[2] - 1:21, 2:22

few [1] - 47:13

figured [2] - 26:22, 39:14

file [1] - 47:3

filing [1] - 27:12

filings [1] - 6:12

Finally[1] - 49:17

financial [2] - 33:22, 36:4

financials [2] - 41:7, 42:16

fine - 11:16, 14:2

Finger[2] - 1:19, 2:19

Finis[1] - 1:24

finish [1] - 15:5

fired [1] - 39:14

firm [1] - 5:6

firm-specific [1] - 5:6

first [4] - 13:19, 18:24, 36:18, 37:25

First[3] - 20:20, 37:1, 37:8

five [3] - 5:12, 11:14, 15:16

flavor [1] - 36:7

floor [3] - 3:9, 10:3, 32:12

focus [2] - 10:20, 20:12

focused [1] - 16:16

folks [5] - 10:1, 18:24, 42:13, 43:5, 47:1

follow [1] - 23:25

following [1] - 48:17

follows [1] - 24:2

footnote [1] - 37:10

Footnote[3] - 37:13, 37:16, 41:2

fore [1] - 48:9

forget [1] - 8:23

Form[3] - 38:6, 38:10, 39:24

format [1] - 45:12

forth [3] - 27:16, 38:4, 38:9

forward [4] - 20:19,

26:11, 47:23, 48:24

four [7] - 5:12, 6:8, 11:13, 25:17, 26:13, 34:1, 35:24

fourth [4] - 23:2, 24:5, 25:6, 31:22

Fox[2] - 1:13, 3:1

frank [1] - 30:1

fraud [17] - 8:8, 8:12, 8:18, 8:25, 9:10, 10:8, 12:1, 12:8, 12:20, 13:11, 13:16, 13:24, 14:4, 14:13, 14:14, 16:7, 16:22

frauds [1] - 14:15

friend [1] - 39:7

front [3] - 11:13, 28:15, 50:7

fruition [1] - 25:6

future [5] - 33:23, 42:22, 43:17, 43:23, 44:5

**G**

general [4] - 4:15, 22:12, 22:19, 31:5

generous [1] - 48:5

given [6] - 15:6, 15:7, 15:18, 23:1, 33:6, 48:14

Goddess[2] - 1:12, 2:25

golf [10] - 5:19, 5:21, 6:23, 22:12, 22:19, 23:12, 25:1, 31:4, 31:14, 48:21

Golf[22] - 1:4, 1:22, 2:20, 3:7, 4:15, 5:9, 6:3, 17:19, 17:21, 18:4, 22:15, 24:6, 25:8, 28:3, 28:10, 31:7, 33:2, 33:10, 33:17, 33:19, 41:2

Golfs [1] - 13:1

Gonsalves[8] - 39:3, 39:4, 39:14, 39:20, 40:2, 41:19, 41:22

goods [1] - 19:1

gotcha [1] - 42:3

Gotcha[1] - 40:21

grant [2] - 45:7, 50:9

granted [4] - 44:24, 48:17, 48:18, 49:7

granting [1] - 47:3

grave [1] - 28:2

Gray[2] - 8:5, 21:24

gray [70] - 3:15, 3:23, 4:5, 4:19, 5:4, 5:13, 5:15, 5:16, 5:18, 5:22,

6:2, 6:24, 7:3, 7:9, 7:10, 7:19, 9:11, 9:14, 9:22, 10:12, 11:21, 11:25, 12:12, 13:9, 13:20, 14:8, 14:22, 16:14, 16:18, 16:25, 17:2, 17:4, 17:7, 17:10, 18:15, 18:17, 19:2, 19:17, 20:18, 20:21, 21:2, 21:7, 21:13, 21:17, 21:25, 22:5, 27:5, 27:21, 27:24, 28:4, 28:7, 28:8, 28:14, 28:17, 28:19, 29:3, 29:18, 29:23, 30:24, 31:3, 31:17, 32:5, 40:6, 40:15, 40:17, 44:20, 44:21, 45:1, 49:8, 49:11

Greanay[1] - 39:7

Greaney[1] - 35:1

great [2] - 9:12, 44:10

guess [2] - 7:6, 47:20

guise [1] - 12:9

Gump[2] - 1:21, 2:22

guys [2] - 30:2, 30:7

**H**

hac [4] - 2:15, 2:21, 3:2, 3:4

hand [2] - 15:19, 46:13

happiness [1] - 31:13

happy [2] - 23:15, 24:8

hard [2] - 43:1, 46:13

hat [1] - 24:20

Hatfield[1] - 1:23

Hauer[2] - 1:21, 2:22

Hawaii[1] - 35:6

head [5] - 39:4, 41:13, 41:14, 41:22, 43:1

hear [5] - 8:23, 26:3, 43:9, 44:15, 49:13

heard [4] - 10:11, 25:16, 33:1, 44:7

heart [1] - 5:4

hell [1] - 30:3

Help[5] - 8:23, 10:6, 20:17

help [5] - 11:12, 21:10, 21:15, 24:15, 30:13

high [3] - 23:13,

28:9, 30:3

high-end [1] - 28:9

hindsight [1] - 35:13

hit [5] - 7:6, 35:24, 39:11, 42:16

Hit [1] - 50:3

hits [1] - 36:4

Hold [2] - 3:20, 42:12

holding [1] - 4:14

Honor[77] - 2:13, 2:18, 2:24, 3:8, 3:11, 3:18, 4:25, 5:3, 6:6, 6:21, 7:12, 8:3, 9:6, 10:4, 10:9, 10:14, 11:10, 11:23, 12:6, 12:10, 12:22, 13:19, 13:22, 14:7, 14:11, 14:22, 14:25, 15:9, 16:20, 17:17, 19:3, 19:7, 19:11, 20:16, 20:21, 22:9, 22:18, 22:24, 23:3, 23:5, 23:20, 24:25, 25:11, 25:14, 25:20, 26:1, 26:4, 26:16, 26:25, 27:11, 31:2, 32:4, 32:15, 33:6, 36:3, 36:12, 36:13, 36:21, 37:6, 37:13, 37:16, 38:1, 38:16, 39:6, 39:13, 39:15, 40:5, 40:10, 40:24, 41:17, 42:2, 42:19, 43:12, 49:4, 49:17, 49:19, 49:21

Honorable [1] - 1:9

hope [1] - 29:20

hot [2] - 5:19, 6:23

hours [4] - 48:4, 48:12, 48:24, 50:1

hurt [1] - 24:11

hypothetical [2] - 16:9, 42:14

**I**

idea [1] - 29:20

identified [1] - 41:25

identify [1] - 39:7

image [2] - 23:10, 23:14

impact [8] - 22:25, 33:23, 34:3, 42:6, 42:10, 43:23, 44:4, 49:19

important [5] - 15:20, 19:21, 19:24, 20:1, 22:10

impose [1] - 42:23

impression [1] - 26:7

inaccurate [1] - 25:2
inadequate [3] -
33:15, 35:13, 35:15
inartfully [1] - 16:15
Inc [2] - 1:4, 1:23
include [4] - 21:2,
21:3, 38:10, 39:3
included [2] - 10:17,
37:2
including [3] - 14:5,
40:14, 47:8
incomplete [2] -
21:2, 38:5
incorporating [1] -
39:24
increasing [1] - 35:4
indeed [1] - 36:22
independent [6] -
29:4, 43:25, 45:2,
45:22, 46:10, 49:14
indicated [2] - 10:24,
15:1
industry [25] - 3:24,
3:25, 4:13, 4:16, 4:21,
5:7, 5:15, 5:19, 6:21,
6:19, 6:20, 6:23, 7:16,
7:20, 19:6, 24:16,
25:12, 25:17, 25:19,
25:21, 25:23, 26:13,
30:23, 31:3, 31:16
industry-wide [12] -
3:24, 3:25, 4:13, 4:16,
5:7, 7:16, 19:6, 24:16,
25:12, 30:23, 31:3,
31:16
inference [4] - 24:18,
39:13, 39:18, 41:20
inferred [2] - 18:5,
18:10
information [14] -
4:16, 4:23, 5:25, 6:16,
6:17, 6:18, 6:19, 7:23,
18:4, 27:14, 27:17,
39:20, 42:22, 45:11
innocent [1] - 13:13
inquire [1] - 49:15
inquiry [1] - 17:3
insert [1] - 33:4
Instead [1] - 27:2
integrity [1] - 23:10
intend [1] - 47:24
intended [2] - 16:17,
16:21
introduce [1] - 2:13
introductions [1] -
2:11
intuitive [1] - 18:2
investigation [3] -
3:17, 9:17, 13:12
investing [3] - 18:25,

23:17, 43:8
investment [1] -
42:25
investor [3] - 18:3,
32:18, 45:12
investors [6] - 6:10,
6:17, 6:25, 9:15, 13:4,
23:17
involved [1] - 34:24
Io [1] - 11:19
ipo [23] - 13:4, 13:10,
13:14, 16:1, 22:23,
24:4, 26:19, 27:25,
31:9, 31:23, 32:5,
33:10, 34:2, 34:7,
34:8, 34:13, 35:12,
35:14, 35:19, 36:20,
42:8, 42:11
ipo [17] - 9:22, 10:13,
10:16, 14:8, 16:6,
21:24, 25:7, 26:24,
28:5, 33:22, 37:21,
40:12, 41:7, 42:15,
42:16, 43:4, 43:22
issue [24] - 8:9,
11:24, 11:25, 12:3,
21:15, 23:5, 25:5,
25:9, 25:19, 29:22,
30:10, 30:15, 32:14,
36:5, 38:18, 40:25,
42:9, 45:14, 45:15,
45:19, 46:2, 46:16,
46:17, 47:19
issuer [3] - 6:18,
43:13, 44:4
issues [4] - 19:6,
46:4, 46:20, 48:25
itching [1] - 19:6
item [9] - 33:19,
34:13, 34:14, 38:9,
38:10, 38:11, 38:20,
39:24
itself [5] - 27:1, 28:1,
29:17, 42:23, 44:1

J

James [4] - 2:2, 2:12,
2:13, 2:17
January [1] - 47:10
Jay [1] - 34:25
Jersey [1] - 14:16
John [1] - 2:2
Jordan [1] - 1:9
Jr [1] - 1:24
Judge [13] - 10:15,
10:22, 10:24, 11:4,
11:13, 11:22, 14:24,
15:17, 16:2, 32:25,
37:15, 45:8, 45:16

judgment [1] - 26:12
July [1] - 35:12
jury [2] - 48:12, 50:7

K

Keener [3] - 1:11,
2:24, 2:25
keeping [1] - 23:15
keeps [1] - 24:7
Kent [1] - 1:9
kept [1] - 31:14
Kevin [1] - 50:13
key [2] - 6:19, 28:9
kindergarten [1] -
45:10
kinds [1] - 29:21
knowability [3] -
37:24, 38:17, 38:25
knowable [10] - 32:7,
32:8, 32:9, 37:12,
41:14, 41:15, 41:18,
43:6, 43:14
knowing [1] - 41:14
knowledge [7] - 7:1,
11:23, 11:24, 12:3,
13:14, 16:6, 34:18
knowledgeable [1] -
23:17
known [38] - 6:1, 6:4,
13:10, 32:8, 34:1,
34:2, 34:12, 34:15,
34:21, 35:2, 35:8,
35:19, 36:16, 37:9,
37:11, 37:20, 37:24,
38:16, 38:21, 38:23,
38:24, 38:25, 39:17,
40:2, 40:3, 40:12,
40:14, 40:16, 41:13,
41:18, 43:7, 43:14,
45:20, 45:21, 49:12
knows [1] - 42:13

L

lack [7] - 21:14, 22:6,
28:24, 44:22, 48:20,
49:6
laid [1] - 17:19
language [1] - 14:18
last [1] - 40:23
Laura [2] - 1:20, 2:21
law [10] - 5:8, 5:9,
7:17, 8:15, 11:2, 11:6,
11:12, 14:11, 32:24,
41:3
Law [3] - 1:16, 3:3,
10:21
laws [1] - 5:7
lawyers [1] - 48:13

Layton [2] - 1:19,
2:19
lead [1] - 20:4
leading [1] - 24:11
Leads [1] - 15:16
learned [1] - 34:8
least [11] - 3:23, 7:8,
20:8, 22:17, 28:1,
36:14, 36:15, 36:17,
40:3, 43:5, 43:6
Leave [1] - 20:11
leave [1] - 19:4
leaves [1] - 25:4
legal [9] - 8:17,
33:18, 43:24, 44:1,
44:8, 45:23, 46:1,
46:21, 46:22
legally [1] - 43:21
length [2] - 23:7,
39:9
lengths [1] - 9:12
lengthy [3] - 47:5,
47:6, 47:7
less [1] - 47:7
level [2] - 23:13,
27:20
Lewis [4] - 1:15, 1:16,
3:3
lie [1] - 39:12
light [2] - 3:17, 48:5
lightly [1] - 8:8
limine [1] - 29:9
limits [1] - 23:11
line [1] - 4:11
list [7] - 22:5, 25:23,
26:2, 37:2, 39:2,
39:22, 39:23
listed [3] - 21:22,
22:4, 37:25
listing [4] - 20:25,
21:1, 21:3, 38:12
litigants [1] - 26:14
Litigation [1] - 1:4
litigation [1] - 27:3
living [1] - 39:12
Llp [2] - 1:21, 2:2
logical [3] - 32:6,
39:13, 39:18
Look [1] - 8:24
look [12] - 4:8, 7:18,
8:16, 8:19, 8:20, 11:8,
12:23, 14:12, 25:22,
25:24, 39:12, 44:11
looked [2] - 4:18,
22:4
looking [2] - 23:21,
24:18
looks [1] - 46:4
lose [1] - 8:25
lower [1] - 17:23

luck [1] - 4:2

M

maintain [2] - 30:19,
31:13
maintaining [1] -
19:24
management [17] -
34:2, 34:7, 34:12,
34:19, 35:9, 37:5,
39:1, 39:2, 39:3, 39:5,
39:18, 40:2, 41:15,
41:19, 42:1, 43:5,
45:21
manufactured [1] -
35:17
manufacturers [2] -
5:21, 6:23
margin [7] - 16:11,
18:9, 25:9, 29:22,
32:14, 45:14, 48:19
margins [29] - 13:2,
13:7, 13:22, 17:17,
17:20, 18:1, 18:11,
19:25, 20:1, 20:3,
20:6, 20:11, 22:8,
22:13, 22:16, 22:20,
23:6, 23:7, 24:1,
24:10, 24:20, 25:2,
28:11, 30:14, 30:17,
30:22, 32:21, 45:6
mark [3] - 18:25,
29:6, 29:14
Mark [1] - 39:19
market [5] - 5:25,
16:25, 22:14, 23:12,
24:3, 28:7, 28:8,
28:14
marketing [70] -
3:15, 3:23, 4:5, 4:20,
5:4, 5:13, 5:15, 5:17,
5:18, 5:22, 6:2, 6:24,
7:3, 7:9, 7:11, 7:20,
8:5, 9:12, 9:14, 9:23,
10:13, 11:21, 11:25,
12:12, 13:9, 13:20,
14:9, 14:23, 16:14,
16:19, 17:2, 17:4,
17:8, 17:10, 18:15,
18:17, 19:2, 19:18,
20:19, 20:21, 21:2,
21:7, 21:13, 21:17,
21:24, 22:1, 22:5,
27:5, 27:21, 27:24,
28:4, 28:12, 28:17,
28:19, 29:3, 29:19,
29:23, 30:21, 31:4,
31:17, 32:5, 40:6,
40:15, 40:17, 42:24,

44:20, 44:21, 45:1,
49:8, 49:11
  **marking** [3] - 20:6,
21:5, 21:15
  **marks** [1] - 50:3
  **massive** [1] - 14:14
  **match** [1] - 32:20
  **matching** [10] -
22:22, 24:4, 25:7,
26:18, 27:1, 27:25,
31:8, 31:25, 32:2,
32:6
  **material** [50] - 10:18,
13:1, 13:3, 16:4,
20:23, 20:25, 21:23,
24:5, 28:1, 29:5,
29:17, 30:10, 33:16,
33:23, 34:3, 35:19,
36:8, 36:19, 36:20,
37:1, 37:2, 37:8,
37:23, 37:25, 38:4,
38:5, 38:12, 39:23,
39:25, 40:5, 41:4,
41:8, 42:5, 42:7, 42:8,
42:9, 42:10, 42:11,
42:22, 43:13, 43:17,
43:21, 44:2, 44:4,
45:5, 45:11, 46:2,
46:16
  **materiality** [5] - 27:4,
27:8, 27:21, 27:24,
37:18
  **materially** [1] - 10:17
  **materials** [1] - 10:16
  **matter** [3] - 5:4,
13:15, 38:4
  **matters** [2] - 4:11,
49:2
  **Maurer** [1] - 50:13
  **Mckelvie** [8] - 10:15,
10:22, 10:25, 11:4,
11:13, 11:22, 14:24,
37:15
  **mean** [4] - 20:2,
22:13, 23:4, 28:8
  **meaningful** [1] - 21:6
  **means** [3] - 4:2,
14:4, 18:16
  **meant** [6] - 18:8,
18:21, 20:1, 20:3,
24:17, 31:17, 31:18,
34:16
  **measures** [1] - 49:7
  **meet** [4] - 16:22,
17:6, 33:25, 46:23
  **member** [1] - 41:19
  **members** [2] - 39:2,
39:3
  **memorandum** [2] -
47:4, 47:8

---

  **memos** [1] - 9:13
  **merely** [1] - 10:16
  **mess** [1] - 21:11
  **met** [4] - 9:8, 17:1,
17:7, 44:9
  **Michael** [2] - 2:3,
2:13
  **might** [10] - 13:2,
13:12, 17:25, 22:18,
22:22, 22:24, 23:1,
24:10, 24:11, 32:23
  **million** [1] - 24:4
  **millions** [1] - 30:18
  **mind** [4] - 10:21,
11:3, 11:23, 20:8
  **minimum** [1] - 45:19
  **misleading** [3] -
10:17, 19:16, 19:17
  **misrepresentations**
[1] - 16:4
  **missing** [1] - 22:11
  **misstatement** [2] -
37:20, 41:4
  **misstatements** [1] -
41:8
  **mistake** [1] - 37:15
  **mistaken** [1] - 30:12
  **misunderstood** [1] -
41:10
  **mixed** [1] - 15:12
  **moment** [1] - 3:20,
21:19, 47:11
  **Monday** [1] - 1:7
  **money** [1] - 31:24,
32:2, 32:19
  **Monhait** [1] - 1:12,
2:25
  **monkeying** [1] - 43:4
  **Montague** [2] - 1:14,
3:2
  **months** [1] - 47:16
  **Moriarty** [1] - 1:20,
2:21
  **morning** [1] - 2:18
  **morphed** [1] - 20:5
  **most** [1] - 38:14
  **motion** [16] - 2:10,
3:9, 3:13, 26:11, 27:7,
27:19, 30:4, 44:24,
45:7, 45:19, 47:3,
48:17, 48:23, 49:7,
50:9
  **motions** [2] - 46:8,
50:2
  **move** [1] - 33:7
  **moving** [1] - 44:18,
47:23, 50:2
  **Murtland** [1] - 1:23
  **must** [2] - 35:13,
44:11

---

**N**

  **name** [2] - 5:14, 5:16
  **name-brand** [2] -
5:14, 5:16
  **nature** [1] - 8:11
  **necessarily** [3] -
18:1, 23:4, 24:1
  **necessary** [4] - 21:4,
22:3, 27:23, 38:10
  **need** [16] - 5:8, 7:17,
11:11, 17:15, 21:10,
29:25, 31:13, 32:8,
37:9, 37:11, 40:7,
41:1, 44:15, 47:19,
49:3, 49:20
  **needed** [2] - 24:17,
45:2, 45:5
  **needs** [2] - 37:12,
42:17
  **negative** [1] - 24:11
  **negligence** [12] -
8:7, 8:18, 13:14,
14:18, 14:20, 14:21,
15:15, 16:3, 16:8,
16:14, 16:16, 27:16
  **negligence-based**
[1] - 8:7
  **negligent** [2] - 9:19,
13:13
  **nervous** [1] - 26:6
  **net** [2] - 34:3, 43:23
  **network** [1] - 28:9,
28:12
  **New** [3] - 2:4, 14:15
  **new** [8] - 3:15, 5:5,
6:17, 8:5, 8:10, 13:21,
17:11, 33:16
  **newly** [1] - 35:17
  **news** [1] - 6:11
  **next** [2] - 33:3, 42:15
  **nobody** [1] - 31:9
  **nomenclature** [1] -
46:12
  **non** [1] - 39:19
  **non-defendant** [1] -
39:19
  **none** [1] - 11:2
  **Northern** [1] - 15:17
  **Note** [1] - 10:23
  **noted** [2] - 43:9,
49:16
  **nothing** [6] - 13:20,
20:14, 29:18, 30:7,
35:7, 41:3
  **Nothing** [1] - 35:14,
38:16
  **notion** [1] - 45:4
  **November** [1] - 49:18
  **nowhere** [1] - 18:14

---

  **Nowhere** [1] - 10:19
  **number** [2] - 35:21,
48:13
  **numbers** [1] - 43:4

---

**O**

  **obligation** [10] -
41:4, 42:24, 43:12,
43:20, 43:24, 44:1,
44:5, 44:6, 46:9,
46:11
  **obligations** [1] - 43:8
  **obvious** [2] - 18:4,
32:20
  **occur** [1] - 22:18
  **occurred** [1] - 30:21
  **occurrence** [2] - 5:6,
5:7
  **occurrences** [1] -
7:17
  **occurring** [1] - 16:1
  **occurs** [1] - 5:14
  **October** [1] - 36:25
  **odds** [1] - 9:1
  **offering** [2] - 10:16,
38:14
  **Offices** [2] - 1:16, 3:3
  **old** [1] - 30:2
  **omission** [5] - 13:13,
29:5, 37:20, 39:23,
41:5
  **omissions** [3] - 16:4,
38:6, 41:8
  **omitted** [2] - 10:18,
13:1
  **one** [30] - 4:5, 4:7,
7:7, 7:8, 8:5, 11:16,
13:6, 13:21, 13:23,
14:15, 15:8, 18:2,
18:11, 19:5, 20:4,
23:4, 24:25, 26:14,
27:18, 34:24, 38:23,
42:1, 44:9, 46:11,
46:18, 46:25, 47:6,
47:11, 48:14
  **One** [4] - 5:13, 5:18,
19:13, 23:25
  **one-to-one** [1] -
24:25
  **ones** [1] - 25:17
  **ongoing** [1] - 28:4
  **opening** [1] - 23:10
  **operation** [1] - 28:4
  **opinion** [6] - 4:1,
4:14, 14:19, 19:18,
32:9, 41:2, 47:4, 47:6
  **opportunity** [1] -
19:5
  **opposed** [2] - 32:7,

---

45:14
  **opposing** [2] - 32:12,
37:4
  **opposition** [3] -
34:6, 34:8, 36:10
  **order** [6] - 47:4, 47:8,
47:9, 48:8, 48:16,
49:18
  **orders** [1] - 49:20
  **otherwise** [1] - 50:8
  **ought** [3] - 8:1, 33:7,
35:22
  **outside** [3] - 26:2,
31:9, 35:6
  **overall** [1] - 24:2
  **overly** [1] - 48:5
  **oversupply** [2] -
7:14, 24:16
  **own** [3] - 6:12, 39:15,
45:13

---

**P**

  **Page** [5] - 4:10, 4:11,
10:23, 23:8, 33:8
  **Pages** [1] - 19:18
  **papers** [1] - 39:15
  **Paragraph** [7] - 4:21,
12:21, 22:21, 23:3,
39:6, 39:9, 39:12
  **Paragraphs** [1] -
25:18
  **paragraphs** [2] -
5:13, 34:9
  **parsing** [1] - 14:2
  **part** [7] - 17:9, 28:2,
34:17, 47:3, 48:18,
49:8
  **particular** [6] - 4:20,
5:19, 6:11, 14:23,
22:6, 22:15
  **particularity** [2] -
9:7, 17:9
  **particularly** [3] -
5:10, 31:6, 48:5
  **parties** [2] - 47:4,
48:15
  **parts** [1] - 17:9
  **past** [1] - 50:2
  **Patchin** [1] - 1:25
  **Paul** [3] - 1:20, 1:23,
2:20
  **pay** [1] - 30:18
  **Pc** [1] - 1:14
  **people** [6] - 23:21,
24:17, 24:18, 42:24,
43:7, 47:16
  **per** [4] - 48:4, 48:12,
48:24, 50:1
  **perhaps** [1] - 31:4

**period** [2] - 34:25, 36:24
**permitted** [1] - 49:5
**persistent** [1] - 34:4
**person** [3] - 36:2, 39:7, 41:23
**personnel** [1] - 41:15
**persuaded** [2] - 48:3, 48:4
**phenomena** [1] - 4:13
**Philadelphia** [1] - 1:14
**phrase** [1] - 17:20
**piece** [1] - 20:11
**pin** [1] - 29:11
**Ping** [2] - 5:20, 25:18
**place** [3] - 4:9, 20:14, 22:2
**placed** [1] - 45:5
**Plaintiffs** [1] - 1:17
**plaintiffs** [21] - 3:14, 3:18, 5:17, 8:17, 9:16, 10:12, 10:16, 15:24, 27:5, 33:17, 33:21, 34:5, 35:3, 35:9, 35:18, 36:10, 37:16, 37:19, 41:12, 43:3, 49:5
**plaintiffs'** [7] - 2:23, 4:18, 10:19, 15:18, 16:13, 17:18, 20:8
**plan** [1] - 19:22
**play** [3] - 11:21, 16:9, 21:15
**plead** [4] - 3:19, 14:18, 14:20, 15:15
**pleading** [1] - 9:21
**pleadings** [1] - 7:11
**pled** [7] - 3:22, 7:23, 8:4, 16:14, 16:21, 28:18, 42:10
**Pm** [2] - 1:7, 50:11
**pocket** [5] - 31:17, 31:19, 31:25, 32:2, 32:10
**point** [15] - 4:10, 6:5, 12:14, 14:25, 15:8, 18:11, 18:14, 29:9, 31:2, 35:11, 41:9, 42:4, 46:25, 48:5, 50:7
**point-counterpoint** [1] - 12:14
**pointing** [3] - 12:16, 12:18, 12:19
**policy** [1] - 35:5, 35:7
**popular** [2] - 5:14, 5:16

**pose** [1] - 24:5
**posed** [2] - 30:17, 33:10
**posit** [1] - 42:13
**position** [1] - 5:23
**possibility** [1] - 19:23
**possible** [2] - 7:7, 33:18
**post** [5] - 34:8, 35:12, 36:20, 42:8, 42:11
**post-ipo** [5] - 34:8, 35:12, 36:20, 42:8, 42:11
**Potter** [1] - 2:2
**practice** [3] - 3:24, 4:1, 35:16
**practices** [10] - 33:8, 33:11, 33:19, 34:12, 35:18, 36:8, 36:13, 36:15, 45:18, 46:5
**pre** [18] - 13:4, 13:10, 13:14, 16:1, 22:23, 24:4, 26:19, 27:25, 31:9, 31:23, 32:5, 33:10, 34:2, 34:7, 34:13, 35:12, 35:14, 35:19
**pre-ipo** [18] - 13:4, 13:10, 13:14, 16:1, 22:23, 24:4, 26:19, 27:25, 31:9, 31:23, 32:5, 33:10, 34:2, 34:7, 34:13, 35:12, 35:14, 35:19
**precautions** [3] - 21:4, 22:3, 22:6
**precisely** [1] - 14:23
**predicate** [3] - 13:8, 15:22, 43:24
**predicates** [2] - 6:22, 7:23
**premium** [1] - 23:12
**premium-quality** [1] - 23:12
**Present** [1] - 2:25
**presented** [1] - 28:3
**preserve** [1] - 23:10
**press** [1] - 11:20
**pressure** [1] - 24:19
**pressures** [1] - 17:23
**pretrial** [1] - 50:5
**pretty** [1] - 34:5
**prevail** [2] - 8:22, 9:3
**prevent** [1] - 11:7
**preventive** [1] - 49:6
**price** [17] - 17:22, 18:9, 20:2, 22:11, 22:18, 22:22, 24:2,

24:3, 24:19, 24:21, 25:1, 25:7, 27:25, 31:8, 32:6, 32:19, 45:15
**prices** [10] - 17:24, 18:1, 18:7, 23:22, 30:24, 32:17, 32:18, 32:21
**primarily** [1] - 31:15
**pro** [4] - 2:15, 2:21, 3:2, 3:4
**probative** [1] - 49:11
**problem** [6] - 6:2, 19:18, 28:4, 29:4, 45:1, 49:12
**problems** [3] - 9:23, 25:12, 28:2
**product** [3] - 5:14, 5:16, 47:7
**products** [2] - 5:19, 6:24
**professional** [2] - 6:16, 6:25
**profit** [3] - 24:20, 28:11, 29:22
**profitable** [1] - 19:23
**profits** [2] - 20:3, 23:14
**program** [9] - 22:22, 24:4, 26:18, 27:1, 27:25, 31:9, 31:19, 31:25, 32:2
**programs** [1] - 32:7
**pronounce** [1] - 8:17
**proof** [1] - 31:21
**prospectus** [15] - 6:16, 9:15, 9:24, 12:25, 13:5, 13:15, 16:2, 17:20, 20:13, 23:8, 23:9, 29:6, 29:14, 29:24, 45:5
**provide** [3] - 23:13, 32:23, 38:13
**provided** [2] - 33:2, 38:19
**provides** [1] - 45:11
**providing** [1] - 33:18
**provisions** [1] - 21:5
**proxy** [1] - 25:24
**public** [11] - 4:17, 4:24, 6:9, 6:18, 6:19, 7:1, 18:25, 23:18, 26:15, 31:11, 43:8
**publicly** [3] - 6:9, 7:21, 7:24
**pudding** [1] - 31:22
**purposefully** [1] - 9:24
**pursue** [1] - 16:17
**pursuing** [1] - 16:13

**pushing** [1] - 20:19
**pushy** [1] - 25:12
**put** [12] - 18:10, 24:19, 29:10, 34:21, 35:19, 38:20, 47:10, 48:11, 48:15, 49:3, 50:6
**puts** [1] - 43:12
**putting** [2] - 26:10, 46:13
**puzzling** [1] - 11:1

### Q

**qualify** [2] - 34:15, 35:2
**quality** [1] - 23:12
**quantifiable** [5] - 34:4, 35:2, 35:3, 35:10, 45:21
**quarter** [6] - 23:2, 24:5, 25:6, 31:22, 36:22, 36:25
**questionable** [5] - 33:8, 35:18, 36:14, 36:18, 46:5
**Questionable** [1] - 36:13
**questions** [3] - 19:9, 29:21, 48:25
**queue** [1] - 47:17
**Quickly** [1] - 49:4
**quickly** [1] - 25:14
**quintessential** [1] - 8:8
**quite** [2] - 40:6, 48:6
**quote** [2] - 4:14, 4:22

### R

**raise** [3] - 40:9, 47:1, 49:1
**ramifications** [1] - 24:12
**ramping** [1] - 43:4
**Rq** [1] - 1:4
**reach** [1] - 45:12
**read** [1] - 24:22
**ready** [2] - 19:7, 50:6
**really** [4] - 17:3, 24:21, 40:10, 46:16
**realm** [1] - 45:16
**reason** [7] - 4:6, 7:15, 7:22, 9:9, 36:18, 38:19, 40:20
**reasonable** [12] - 13:12, 16:5, 18:3, 21:4, 22:2, 22:6, 27:23, 32:18, 39:13, 39:18, 41:19, 45:12

**reasonably** [3] - 34:3, 43:22, 44:4
**reasons** [13] - 4:5, 7:22, 8:4, 9:13, 17:11, 17:12, 17:14, 35:21, 36:14, 36:17, 40:13, 40:16, 49:16
**recently** [1] - 8:13
**recess** [1] - 50:10
**recessed** [1] - 50:11
**recognizes** [1] - 3:12
**record** [4] - 26:2, 30:7, 30:9, 47:18
**recovery** [1] - 21:13
**refer** [1] - 10:20, 38:21
**referred** [3] - 6:14, 14:14, 14:15
**referring** [2] - 9:15, 41:23
**refers** [1] - 34:9
**reflect** [1] - 5:24
**regard** [13] - 12:11, 14:22, 16:12, 19:20, 19:22, 21:4, 27:5, 31:11, 40:14, 45:8, 46:2, 46:5, 49:14
**registration** [8] - 12:25, 13:5, 19:15, 19:20, 19:22, 21:1, 23:8, 38:7
**Regulation** [4] - 33:20, 38:9, 38:11, 38:21
**reject** [1] - 45:4
**rejected** [1] - 4:12
**related** [8] - 3:15, 7:13, 9:23, 18:12, 18:15, 20:21, 21:8, 21:9
**relates** [2] - 13:15, 40:11
**relationship** [1] - 25:1
**release** [2] - 11:20
**relevant** [1] - 5:21
**rely** [1] - 4:7
**remarkable** [1] - 30:4
**remarkably** [1] - 34:6
**remarks** [1] - 33:7
**reply** [2] - 4:8, 38:22
**Reporter** [1] - 50:13
**reports** [2] - 6:11, 25:23
**representation** [1] - 19:15
**representations** [1] - 19:20
**reputation** [2] - 23:11, 23:14

require [1] - 5:7
required [5] - 6:15, 18:4, 37:15, 37:19, 38:3, 38:24, 40:1, 40:20, 45:9
requirement [3] - 37:24, 38:6, 38:8
requirements [1] - 9:7
requires [1] - 38:12
requiring [1] - 16:8
reserve [1] - 46:6
reserves [4] - 33:15, 35:11, 35:12, 35:14
reserving [1] - 33:11
resolution [1] - 47:25
resolved [1] - 50:8
respect [5] - 6:3, 16:25, 36:20, 49:6, 49:8
respects [1] - 48:22
respond [1] - 10:2
response [1] - 13:17
result [3] - 16:5, 30:17, 42:6
resulting [1] - 17:23
results [5] - 33:23, 36:21, 36:22, 36:25, 42:22
retail [16] - 7:14, 13:7, 16:11, 17:16, 17:20, 17:24, 17:25, 18:1, 18:7, 18:11, 18:13, 19:14, 19:21, 19:24, 30:20, 32:14
Retail[1] - 20:1
retailer [10] - 22:12, 22:16, 22:20, 23:6, 24:1, 25:8, 30:17, 32:6
retailers [9] - 18:8, 18:18, 20:4, 23:1, 23:12, 23:15, 24:7, 24:22, 30:19
retailers' [6] - 13:2, 13:22, 22:13, 24:10, 25:2, 31:13
retort [1] - 34:18
return [2] - 33:14, 33:15
returns [4] - 35:4, 35:5, 35:6, 35:12
reveal [1] - 6:15
revenues [2] - 34:4, 43:23
reversal [1] - 27:6
revisit [1] - 8:9
Richard [1] - 1:23
Richards[2] - 1:19,

2:19
rights [1] - 33:15
risk [40] - 5:16, 13:2, 13:3, 20:23, 21:23, 21:24, 22:1, 22:3, 22:5, 22:6, 22:15, 24:9, 25:5, 28:3, 28:7, 28:8, 28:11, 29:17, 30:17, 30:18, 32:10, 33:23, 35:19, 36:19, 36:20, 37:1, 37:9, 37:12, 37:23, 38:1, 38:4, 38:13, 42:17, 42:22, 42:25, 43:9, 43:17, 43:18, 43:21
risks [14] - 21:1, 24:6, 33:10, 33:16, 36:8, 37:2, 38:12, 39:23, 39:25, 42:7, 42:10, 43:17, 45:13
risky [1] - 38:15
Roland[1] - 1:24
roof [1] - 39:11
Rosenthal[2] - 1:12, 2:25
round [2] - 47:6, 47:7
rubric [1] - 35:19
Rule[2] - 8:13, 9:7
ruled [1] - 10:22, 14:24, 19:14, 24:16, 27:4
ruling [1] - 49:11
rulings [1] - 29:9, 44:17, 47:22, 47:23
run [1] - 44:19

S

S-1 [4] - 38:6, 38:8, 38:10, 39:24
sake [1] - 16:10
sales [17] - 18:9, 28:9, 33:8, 33:11, 34:3, 35:18, 36:13, 36:15, 36:18, 39:4, 39:8, 41:14, 41:22, 42:23, 45:18, 46:5
salesperson [2] - 34:24, 35:1
scenario [1] - 42:20
scheduled [2] - 48:8, 48:23
scheduling [1] - 48:8
Schwartz[3] - 1:18, 2:18, 2:19
seated [1] - 2:8
Second[1] - 13:22
second [1] - 3:13, 6:5, 7:5, 7:19, 8:1, 12:21, 16:10, 16:15,

18:23, 20:12, 24:3, 33:9, 39:25, 42:12
Secondly[1] - 38:1
Section[14] - 5:6, 6:15, 8:7, 12:9, 14:16, 15:13, 15:21, 41:3, 42:23, 43:8, 43:12, 44:1, 46:9, 46:11
Securities[1] - 1:4
securities [2] - 4:12, 42:24
see [4] - 30:8, 39:1, 45:3, 49:20
seem [1] - 4:7
selective [4] - 18:13, 19:14, 19:21, 30:20
selling [3] - 17:24, 31:14, 32:17
sends [1] - 38:8
sense [1] - 47:1
sensible [1] - 24:18
sentence [1] - 13:6
separate [22] - 14:17, 18:21, 19:2, 19:10, 20:7, 20:10, 20:18, 20:22, 21:23, 22:15, 30:14, 32:15, 32:16, 33:4, 36:9, 40:9, 42:8, 44:23, 48:19, 48:21
separately [3] - 22:5, 29:17, 44:24
September[2] - 36:22, 49:18
serialization [1] - 18:18
service [1] - 23:13
set [4] - 2:9, 27:16, 38:3, 50:2
sets [1] - 38:9
seven [1] - 30:2
Seven[1] - 47:25
several [2] - 3:15, 7:4
shape [1] - 50:6
Shapiro[1] - 15:13
shared [1] - 16:11
shipping [5] - 33:13, 33:14, 34:15, 34:23, 35:1
short [2] - 45:4, 47:12
show [1] - 37:19
shows [1] - 30:9
side [7] - 2:23, 10:1, 17:13, 48:4, 48:12, 48:24, 50:1
side's [1] - 21:11
significant [4] - 17:22, 28:15, 38:14, 47:7

Simpson[2] - 2:4, 2:14
sit [2] - 44:13, 44:14
situation [6] - 10:15, 14:9, 14:22, 14:23, 19:19, 27:11
six [1] - 5:12
Sk[7] - 33:20, 38:9, 38:11, 38:21, 39:25, 40:1, 44:7
slice [1] - 45:15
smaller [1] - 18:9
so-called [2] - 30:20, 46:5
sold [1] - 20:2
solely [1] - 45:25
soon [2] - 39:13, 39:20
sophisticated [2] - 23:17, 43:2
sorry [1] - 40:18
sort [7] - 7:12, 18:12, 20:13, 26:6, 33:7, 35:13, 36:7
sorts [1] - 32:7
sound [2] - 14:4, 29:2
sounding [1] - 11:25
sounds [4] - 8:12, 8:25, 10:8, 43:3
source [1] - 31:11
speaking [1] - 3:7
Specialties[2] - 8:14, 16:10
specific [6] - 5:6, 6:17, 12:13, 21:25, 31:7, 31:15
specifically [3] - 3:21, 17:4, 37:10
specificity [1] - 16:22
specifics [2] - 17:1, 18:2
speculative [1] - 38:14
spend [1] - 32:19
spends [1] - 24:6
spent [1] - 28:15
spoken [1] - 44:18
squeeze [4] - 23:22, 24:1, 32:21, 48:19
squeezed [2] - 22:14, 24:21
squeezing [1] - 22:16
stage [9] - 26:11, 26:12, 27:3, 27:8, 27:15, 27:19, 30:5, 36:23
stand [5] - 32:15,

33:7, 45:1, 48:6, 49:15, 50:10
standard [3] - 9:2, 17:1, 37:23
standards [1] - 8:21
standing [1] - 45:4
stands [2] - 28:17, 44:21
start [2] - 4:21, 10:8
started [1] - 26:9
starting [1] - 33:8
state [6] - 10:20, 11:3, 11:21, 11:23, 34:13, 41:9
State[1] - 14:15
statement [11] - 12:25, 13:5, 19:15, 19:20, 19:22, 20:14, 21:1, 23:9, 29:24, 38:7, 41:12
statements [6] - 10:17, 11:5, 15:23, 16:1, 25:24, 33:22
States[3] - 1:1, 26:23, 31:24
states [2] - 32:4, 41:2
stemming [1] - 44:1
Stephen[1] - 1:24
steps [1] - 32:22
stick [1] - 17:17
sticking [1] - 49:24
still [5] - 8:14, 16:16, 16:18, 47:7, 50:7
stockholders [1] - 45:9
stop [1] - 18:17
Straighten[1] - 9:4
Strauss[2] - 1:21, 2:22
strengthen [1] - 3:16
strike [1] - 29:16
strong [1] - 37:21
study [1] - 49:20
stuff [2] - 28:17, 42:14
submit [1] - 3:18
succeeded [2] - 3:19, 40:25
success [1] - 28:10
successful [1] - 30:9
successfully [1] - 27:19
suffered [3] - 5:22, 6:8, 6:24
sufficient [2] - 45:10, 48:15
sufficiently [1] - 17:25
summary [1] - 26:12

sun [1] - 14:1
supplement [1] - 3:14
supplemental [1] - 47:8
Suprema [4] - 8:14, 14:12, 14:13, 15:10
surprise [1] - 27:13
survives [1] - 17:8
sustained [1] - 40:7

**T**

table [3] - 3:1, 19:9, 49:3
tank [1] - 42:16
Taylor [2] - 5:20, 25:18
technical [1] - 23:13
technically [1] - 19:16
Technology [1] - 15:16
temerity [1] - 19:4
ten [3] - 48:11, 48:24, 50:1
ten-day [2] - 48:11, 50:1
term [1] - 33:10
terms [3] - 3:25, 28:3, 37:22
Texas [1] - 1:21
Thacher [2] - 2:4, 2:14
themselves [7] - 3:19, 3:22, 8:4, 13:4, 28:18, 35:9, 39:5
theory [5] - 8:17, 8:22, 8:24, 21:11, 28:9
Therefore [1] - 13:13
therefore [9] - 6:1, 22:3, 24:9, 26:23, 27:22, 32:5, 39:15, 39:22, 43:7
thinking [1] - 28:16
thinly [1] - 45:16
third [2] - 36:25, 38:20
Third [18] - 4:1, 4:11, 4:14, 4:23, 5:9, 6:13, 7:15, 8:13, 14:19, 15:1, 15:13, 19:13, 24:15, 27:6, 37:9, 37:13, 37:14, 41:2
threat [2] - 28:8, 30:22
three [10] - 4:5, 8:4, 13:21, 32:4, 34:14, 36:14, 38:20, 44:7,

47:16, 48:3
throughout [2] - 11:17, 13:9
thrown [1] - 8:21
Titleist [2] - 5:20, 25:19
today [2] - 2:20, 48:16
Todd [2] - 1:13, 3:1
together [1] - 49:1
took [1] - 6:10
toss [1] - 9:9
tossed [1] - 35:22
touchstone [3] - 6:13, 14:7, 19:24
Tracinda [3] - 18:3, 32:25, 45:7
track [1] - 20:15
traders [2] - 6:17, 6:25
transaction [1] - 45:13
treating [1] - 45:3
trend [11] - 34:1, 34:4, 34:21, 35:2, 35:8, 36:16, 38:23, 39:17, 40:2, 40:12, 40:16
trends [6] - 4:16, 34:16, 38:22, 40:14, 45:20, 45:21
trial [16] - 16:17, 28:22, 28:24, 30:3, 30:11, 47:13, 48:2, 48:3, 48:7, 48:11, 48:12, 48:23, 49:20, 49:24, 50:1
tried [1] - 48:7
true [3] - 10:21, 40:1
try [4] - 15:14, 25:8, 32:19, 47:20
trying [7] - 21:10, 21:12, 30:1, 33:4, 40:9, 41:21, 42:12
turn [2] - 7:25, 23:15
turned [4] - 5:5, 8:6, 31:15, 50:5
two [12] - 5:13, 5:18, 7:23, 18:22, 20:7, 20:10, 22:17, 23:24, 44:7, 47:7, 47:16, 48:7

**U**

uncertainty [1] - 34:1
under [21] - 4:1, 5:8, 6:15, 7:17, 8:12, 8:22, 12:9, 18:3, 26:7, 32:9,

33:11, 34:11, 38:13, 39:17, 40:1, 41:3, 43:8, 44:6, 46:9, 46:11, 47:15
under-reserving [1] - 33:11
underlying [1] - 8:19
underscores [1] - 7:22
understood [1] - 36:7
undertaken [1] - 42:20
Underwriter [2] - 2:5, 2:17
underwriters [1] - 2:16
undisclosed [1] - 24:6
unhappy [1] - 24:22
unimpressed [1] - 28:25
United [3] - 1:1, 26:23, 31:24
unless [2] - 30:3, 48:8
Unless [2] - 30:12, 41:10
unlimited [1] - 33:14
unsuccessfully [1] - 27:20
up [10] - 4:9, 15:19, 18:22, 28:15, 28:20, 31:11, 34:20, 43:4, 47:13, 49:15
urged [1] - 36:23
Usdcj [1] - 1:9
useful [1] - 6:16
ushered [1] - 17:15

**V**

variety [1] - 7:5
various [2] - 15:23, 24:11
vice [3] - 2:21, 3:2, 3:4
view [3] - 16:21, 18:14, 44:3
violation [1] - 39:24

**W**

waiting [1] - 47:17
wants [1] - 26:12
warned [5] - 17:21, 17:22, 17:25, 18:6, 18:16
warnings [1] - 17:21
water [1] - 30:3

ways [1] - 22:17
wear [1] - 15:6
weeks [3] - 15:16, 48:3, 48:7
well-aware [1] - 38:7
whole [3] - 14:4, 26:2, 42:15
wide [12] - 3:24, 3:25, 4:13, 4:16, 5:7, 7:16, 19:6, 24:16, 25:12, 30:23, 31:3, 31:16
Wilmington [1] - 1:6
win [1] - 30:10
word [6] - 12:10, 13:6, 13:23, 14:3, 14:5, 40:23
words [6] - 3:16, 6:7, 23:3, 23:14, 26:10, 35:17
world [1] - 31:5
worst [1] - 14:15
wreck [1] - 28:12
wrestle [1] - 11:15
write [1] - 29:6
written [2] - 18:17, 47:4

**Y**

year [5] - 14:20, 30:11, 30:12, 32:24, 47:10
years [4] - 11:14, 30:2, 47:25
York [2] - 2:4
yourself [1] - 15:6
yourselves [1] - 50:8