EXHIBIT 425



*2801 East Plano Parkway*
*Plano, Texas 75074*
*www.AdamsGolf.com*
*FAX: 972-398-8818*
*800-622-0609*
*Tel: 972-673-9601*



*From the desk of*
***Ann Neff***

# Memo

To:  Roland Casati, Finis Conner

Date:  May 8, 1998                                     Pages:  39

RE:  ATTACHED

Enclosed is the following information you requested this morning from Darl.

1.    Faldo press release
2.    SEC press release
3.    12/31/97 valuation

ADAMS 003949

*Courtesy of PR Newswire*

*PR Newswire*                                                                 *05/04/98 11:13 AM*

### Faldo Joins Forces With Adams Golf

```
/FROM PR NEWSWIRE LOS ANGELES  213-626-5500/
[STK]
[IN]
[SU] CON
TO BUSINESS AND SPORTS EDITORS:
```

### Faldo Joins Forces With Adams Golf

PLANO, Texas, May 4 /PRNewswire/ -- With more than forty victories worldwide including six major championships, Nick Faldo will partner with Barney Adams, Chief Executive Officer and Founder of Adams Golf, on the development of new product lines.

Faldo has become a stockholder in Adams Golf and has the right to appoint a director to the company's board. The arrangement is a long term commitment by Faldo and Adams Golf. Faldo will continue to play with the Tight Lies(R) fairway woods, and will now carry an Adams tour professional staff bag in competition as well as wear an Adams golfcap.

"Becoming associated with a player of Nick Faldo's stature is more than a pleasure, it's a challenge," stated Adams. "Our goal in working together is to develop and introduce the best line of golf clubs available in the marketplace. It's a project I can't wait to start. Nick and our team will go through the bag in an effort to develop a dramatic new line of golf equipment," Adams added.

"The Tight Lies fairway woods are the best woods I have ever played," said Faldo. "I asked my Manager, John Simpson, to investigate the company regarding working with Barney Adams on new club designs. I am really excited about our future, especially after discovering how committed Adams is to high performance equipment. I truly look forward to working with Barney Adams," Faldo concluded.

"This is not the typical golf contract," said Adams. "Adams Golf plans to continue its policy of not paying weekly or pool monies on tour. This is a mutual effort; we will tell everyone from the beginning that he will continue to play the Tight Lies fairway woods. Beyond that fact, it's the combination of our expertise in the development of new products. It's these new products that Faldo and I will stand behind," stated Adams.

Fannie Sunnesson, Faldo's colorful caddie of many years, is also under contract to wear an Adams golfcap or visor in tournament play.

```
SOURCE  Adams Golf
    -0-                          05/04/98
    /CONTACT: Mary Beth Lacy for Adams Golf, 760-771-3411/

CO:  Adams Golf
ST:  Texas
IN:
SU:  CON
```

ADAMS 003950

# ADAMS GOLF, INC.
2801 East Plano Parkway
Plano, Texas 75074

FOR IMMEDIATE RELEASE

### ADAMS GOLF - SEC FILING OF IPO

PLANO, TEXAS, May 4, 1998. Adams Golf, Inc. announced today that it has filed a registration statement with the Securities and Exchange Commission relating to the initial public offering of its common stock. Certain stockholders of the Company also will sell certain shares in the offering. The offering is to be underwritten by a syndicate to be managed by Lehman Brothers, NationsBanc Montgomery Securities LLC and Ferris, Baker Watts, Incorporated. The proceeds from the sale of the shares by the Company will be utilized for working capital and general corporate purposes, including capital expenditures, expansion of the Company's product development efforts, additional advertising and expansion of the Company's international sales efforts. In addition, the Company may use all or a portion of the net proceeds from the offering for possible acquisitions. A copy of the prospectus can be obtained from Lehman Brothers, c/o ADP Prospectus Plus by faxing a request to (516) 249-7942.

Adams Golf designs, manufactures and markets premium quality, technologically innovative golf clubs, including the Tight Lies® fairway woods.

A registration statement relating to these securities has been filed with the Securities and Exchange Commission but has not yet become effective. These securities may not be sold nor may offers to buy be accepted prior to the time the registration statement becomes effective. This press release shall not constitute an offer to sell or the solicitation of an offer to buy nor shall there by any sale of these securities in any State in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such State.

# # #

For more information,
Please contact:

Mary Beth Lucy
(760) 771-3411

99991.1
09168.80294

FAIR MARKET VALUE ANALYSES OF
THE COMMON STOCK OF
ADAMS GOLF COMPANY
AND OF
THE INTELLECTUAL PROPERTY OF
ADAMS GOLF COMPANY
AS OF DECEMBER 31, 1997

PREPARED BY
BUSINESS VALUATION SERVICES, INC.

FEBRUARY 18, 1998

ADAMS 003952



Business Valuation Services

February 18, 1998

Mr. James E. Farrell
Chief Financial Officer
Adams Golf Company
2901 Summit Avenue
Suite 100
Plano, TX 75074

Dear Mr. Farrell:

Pursuant to your authorization, Business Valuation Services, Inc. ("BVS") has completed
a valuation analysis of the common stock of Adams Golf Company ("Adams" or the
"Company") on a marketable, minority-interest basis for financial reporting purposes. As
of December 31, 1997, the Company had outstanding 9,120,473 shares of Common Stock
on a fully diluted basis. We have also completed a valuation analysis of the Company's
trademarks and patents ("Trademarks," "Patents," or collectively, "Intellectual Property")
for federal income tax purposes related to a proposed corporate restructuring. No other
use for our analysis is intended or should be inferred.

**ENGAGEMENT SUMMARY**

For purposes of this report, we define fair market value as the price at which property
would change hands between a willing buyer and a willing seller when the former is not
under any compulsion to buy and the latter is not under any compulsion to sell, both
parties having reasonable knowledge of all relevant facts.

We appraised the subject stock in accordance with generally accepted appraisal standards
and, accordingly, included such valuation tests and procedures as we considered
necessary and appropriate under the circumstances.

To develop our conclusions of value, we considered factors listed in Revenue Ruling 59-
60 that are found in traditional business appraisals. These factors include the following:

ADAMS 003953

Mr. James E. Farrell
February 18, 1998
Page 2

1)   The nature of the business and its history from inception;

2)   The economic outlook in general and the condition and outlook of the specific industry in which the company operates;

3)   The book value of the stock and the financial condition of the business;

4)   The earning capacity of the company;

5)   The dividend paying capacity of the company;

6)   Whether the enterprise has goodwill or other intangible value;

7)   Prior sales of the stock and the size of the block to be valued; and

8)   The market price of the stock of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over-the-counter.

## WORK STEPS COMPLETED

Our valuation analysis included, but was not limited to, the following procedures:

1)   A review of economic and demographic statistics, both historical and prospective, for the market in which the Company sells its products;

2)   An analysis of historical trends and projections relating to the industry in which the company operates;

3)   An examination of audited financial statements for the fiscal years ended December 31, 1995 through December 31, 1997, and unaudited financial statements for the year ended December 31, 1995;

4)   An examination of corporate income tax returns for the years ended December 31, 1993 through December 31, 1996;

5)   A review of a summary schedule of the Company's patents, trademarks and logos;



Business Valuation Services

ADAMS 003954

Mr. James E. Farrell
February 18, 1998
Page 3

6)     A review of a summary schedule detailing the Company's common stock
       and stock option ownership composition as of December 31, 1997;

7)     A review of a document prepared by the Company entitled "Confidential
       Overview" and dated December 1997. We will refer to this document as
       the "Business Plan;"

8)     Discussions with management concerning historical operating results and
       the prospects for future results, as well as economic, industry and
       competitive trends; and

9)     Application of appropriate valuation tests and procedures, including a
       discounted cash flow analysis.

We have accepted this information as fairly reflecting Adams' operating and financial
characteristics as of the valuation date. Business Valuation Services has made limited
investigation as to the accuracy and completeness of the information. In addition, we
relied on information from various published sources, including Ibbotson Associates'
(1996), Stocks, Bonds, Bills and Inflation, Ibbotson Associates' 1996 Cost of Capital
Quarterly, The Federal Reserve Bulletin (December 1997), the Value Line Investment
Survey, *Marketline*, the Securities Data Corp., the Dow Jones News Service and the
Bloomberg News.

## DESCRIPTION OF THE COMPANY AND FINANCIAL REVIEW

### The Company

Adams originated in 1987 as a supplier of component golf parts when Barney Adams
purchased the assets of Dave Pelz Golf. The Company eventually evolved into a
manufacturer and supplier of custom-fit golf clubs and, by 1995, had obtained patents for
its "VMI Technology" method of manufacturing balanced clubs and for its "Air Assault
Driver" design and utility. The Air Assault Driver eventually became Adams'
breakthrough product, the "Tight Lies™" fairway wood.

By early 1996, the Company was experiencing modest success with sales of the Tight
Lies™ club through the retail market. A re-evaluation of the Company's marketing
strategy led to the production of a 30-minute television infomercial. The purpose of the
infomercial was to generate direct sales for the Tight Lies™ #4 fairway wood through the



Business Valuation Services

ADAMS 003955

Mr. James E. Farrell
February 18, 1998
Page 4

direct-response mail order channel, coupled with the larger goal of stimulating demand for the Company's other Tight Lies™ clubs (the #3, #5, #7 and #9 fairway woods) through the established retail channels. The infomercial marketing strategy was a complete success. Adams' monthly net sales exceeded $1 million for the first time in May 1997, and by August 1997 monthly net sales exceeded $5 million.


**Financial Performance**

Our examination of the Company's financial statements focused on the fiscal years ended December 31, 1995 through December 31, 1997. We relied on the Company's audited balance sheets as of December 31, 1996 and December 31, 1997, audited income statements for the years ended December 31, 1995 through December 31, 1997 and unaudited balance sheet as of December 31, 1995 as the basis for our analysis. We adjusted the December 31, 1997 balance sheet and income statement in order to reflect the Company's 1997 awards of common stock and stock options to an officer of the Company. In our opinion, these awards would not be considered recurring items and should be adjusted accordingly. Historical and common-size financial statements and financial ratio analyses are presented as Exhibit I.

*Balance Sheets*

The Company reported total assets of $17,360,079 as of December 31, 1997, an increase of approximately 578.5% over the $2,558,721 reported as of December 31, 1996. The year-end 1996 level represented an increase of approximately 251.7% over the $727,571 reported as of December 31, 1995. Total assets as of December 31, 1997 were comprised of current assets of $15,949,907 (91.9% of total assets), net property and equipment of $603,823 (3.5% of total assets) and other assets of $806,349 (4.6% of total assets). The significant increase in total assets during the review period was due to the Company's extremely rapid sales and profit growth during the period.

Current assets consisted of cash, accounts receivable, inventory and prepaid expenses. The most significant component of current assets was accounts receivable of $7,670,960, which represented 44.2% of the total assets reported as of December 31, 1997. Accounts receivable, expressed as a percentage of total assets, generally increased during the review period. The Company's receivable turnover ratio increased from 7.5 times for the year ended December 31, 1995 to 10.9 times for the year ended December 31, 1996 before decreasing to 9.0 times for the year ended December, 31, 1997. The latest year-end ratio of 9.0 represented an average day's sales in accounts receivable of



Business Valuation Services

ADAMS 003956

Mr. James E. Farrell
February 18, 1998
Page 5

approximately 41 days. The average number of days sales in accounts receivable during the review period was also approximately 41 days, a level consistent with industry norms.

Inventory, which also comprised a significant portion of the Company's total assets during the review period, totaled $4,486,563 as of December 31, 1997. As a percentage of total assets, inventory was quite consistent throughout the review period, ranging from a low of 25.8% as of December 31, 1997 to a high of 27.2% as of December 31, 1995 and averaging 26.5% throughout the review period. The inventory turnover ratio ranged from a low of 3.6 times for the year ended December 31, 1996 to a high of 3.9 times for the year ended December 31, 1997. These levels represented a number of days' cost of goods sold in inventory of approximately 100 days and 94 days, respectively. The average number of days' cost of goods sold in inventory reported by the Company over the entire review period was approximately 97 days. These levels are also consistent with industry norms. The composition of assets during the period of review was represented by a general trend of increasing proportions of current assets relative to total assets, relatively consistent proportions of net property and equipment to total assets, and decreasing proportions of other assets relative to total assets.

As of December 31, 1997, total liabilities consisted entirely of current liabilities of $4,193,048 (24.2% of total assets), while shareholders' equity represented the remaining 75.8% of total assets. The Company carried no long- or short-term debt as of the valuation date. Accrued expenses and taxes payable represented the largest components of current liabilities as of December 31, 1997, with a balances of $2,794,466 and $1,020,980, respectively. Together, these two accounts represented 91.0% of current liabilities and 22.0% of total assets as of December 31, 1997. Accounts payable of $377,622 (2.2% of total assets) comprised the remainder of current liabilities. The Company reported minimal current liability balances for the first two years of the projection period of 0.3% and 22.7% of total assets, respectively.

Shareholders' equity increased steadily throughout the review period. The Company reported total shareholders' equity of $13,167,031 as of December 31, 1997, compared with the levels of $1,978,366 and $725,616 reported as of December 31, 1996 and December 31, 1995, respectively. As a percentage of total assets, shareholders' equity decreased from 99.7% as of December 31, 1995 to 77.3% as of December 31, 1996 and then to 75.8% as of December 31, 1997.

*Income Statements*

As previously mentioned, net sales increased significantly during each year of the review period. Adams reported net sales of $36,690,090 for the year ended December 31, 1997.



Business Valuation Services

ADAMS 003957

Mr. James E. Farrell
February 18, 1998
Page 6

This compares with the levels of $3,521,788 and $1,125,115 reported for the years ended December 31, 1996 and December 31, 1995, respectively. The Company's sales growth during 1997 was characterized by significant increases in monthly and quarterly sales. Approximately 84.8% of the Company's total sales for 1997 were recorded in the second half of the year.

## Table I

| 1997 SALES | 1st QTR. | 2nd QTR. | 3rd QTR. | 4th QTR. |
|---|---|---|---|---|
| 1997 Quarterly Sales | $1,402,300 | $4,197,900 | $14,150,100 | $16,939,700 |
| Percent of 1997 Total Sales | 3.8% | 11.4% | 38.6% | 46.2% |
| Quarterly Sales Growth | - | 199.4% | 237.1% | 19.7% |

The Company's cost of goods sold percentage decreased during each of the last two years, mainly as a result of increasing sales volumes and improved manufacturing efficiencies. Cost of goods sold (as a percentage of sales) decreased from 67.2% for the year ended December 31, 1995 to 45.1% for the year ended December 31, 1996 and then to 27.2% for the year ended December 31, 1997. This, of course, led to corresponding increases in the Company's gross profit margin. Adams' gross profit margin for the year ended December 31, 1997 was 72.8%.

Adams separated its operating expenses into two categories: selling expenses and general and administrative expenses. Total selling expenses reported for the year ended December 31, 1997 increased to $13,093,174 (35.7% of net sales) from the level of $625,897 (17.8% of net sales) reported for the year ended December 31, 1996. Total general and administrative expenses reported for the year ended December 31, 1997 increased to $2,430,569 (6.6% of net sales) from the level of $1,297,386 (36.8% of net sales) reported for the year ended December 31, 1996. Advertising and salaries represented the largest components of selling expense for the year ended December 31, 1997, while salaries represented the largest component of general and administrative expense for the period.



Business Valuation Services

ADAMS 003958

Mr. James E. Farrell
February 18, 1998
Page 7

## VALUATION ANALYSIS – ADAMS GOLF COMPANY

### Introduction

Although there are numerous individual valuation formulae and techniques, they may all be categorized into three standard business valuation approaches: income, market and cost. The method or methods selected for a valuation analysis depend upon the appraiser's judgment and experience with similar valuations and upon the quantity and quality of available financial, operational and industry data.

In our determination of the fair market value of the Company, we relied on the results of the income approach. We supported this conclusion through application of the market approach. However, we did not rely explicitly on the market approach in our final conclusion of value due to the difficulty in constructing an adequate sample of either 1) comparable firms that had operations similar to those of Adams or 2) market transactions involving firms comparable to Adams. In addition, a thorough assessment of company-specific risk factors is more readily accomplished through the development of an income approach analysis relative to a market approach analysis. With respect to the cost approach, we believe the value of the Company's assets on a going-concern basis is directly related to the Company's ability to generate a fair rate of return on invested capital, a factor that is more directly considered in the income and market approaches.

### Discounted Cash Flow Analysis

We performed a discounted cash flow analysis (DCF) to arrive at an income approach-based estimate of Adams' fair market value. The discounted cash flow analysis is based on the premise that the value of an asset is equal to the present value of the future economic benefits that accrue to its owners, using an appropriate discount rate that adequately considers the risk related to an investment in the business. Generally, application of the discounted cash flow technique involves first forecasting revenues, operating expenses, capital expenditures and incremental working capital requirements for a discrete period such as five years. Based on these forecasts, the net cash flow to be generated by the business is determined and discounted to present value. Next, the value of the business at the end of this projection period is determined and discounted to present value. The sum of the present value of the net cash flows during the projection period and the present value of the business at the end of the projection period represents the fair market value of the business. We utilized an unlevered cash flow forecast and a weighted-average cost of capital of approximately 11.2% as the discount rate. The



Business Valuation Services

ADAMS 003959

Mr. James E. Farrell
February 18, 1998
Page 8

resulting value indication includes the value of all of the business' capital, both debt and equity. Our discounted cash flow analysis is included as Exhibit II.

*Revenue Forecasts*

We forecast revenue growth of 100.0% for the first year of the projection period, followed by a decline in revenue of 25.0% in the second and third years of the projection. We then forecast revenue growth of 5.0% throughout the remainder of the projection period. It should be noted that due to the Company's rapid growth during 1997, the forecast revenue growth of 100.0% for the first year of the projection represents revenue growth of approximately 8.3% over the annualized revenue based on the average monthly revenue realized by the Company during the fourth quarter of 1997. We based our forecasts in part on the historical operating performance of the Company as well as on management expectations for future growth and on various industry analyses related to market size and market growth.

*Expense Forecasts*

With respect to expenses, we based our estimates in part on the historical reported profitability of the Company as well as on management assumptions and other data we developed. We forecast cost of goods sold for the first year of the projection period at 30.0% of revenues, leaving a projected gross profit margin of 70.0%. Our forecast called for increases in cost of goods sold, on a relative basis, during the second and third years of the projection period to coincide with the projected decreases in sales volume. We forecast cost of goods sold at 32.5% and 35.0% in years two and three of the projection and carried the 35.0% estimate forward throughout the remainder of the projection period. We forecast selling expenses at 40.0% of total revenues for the first year of the projection period, followed by 45.0% throughout the remainder of the projection period. We forecast general and administrative expenses at 5.0% of revenues throughout the projection period.

*Working Capital, Capital Expenditures and Depreciation Forecasts*

With respect to working capital, we forecast incremental working capital requirements at 15.0% of incremental revenues. We forecast capital expenditures at 2.5% of total revenues throughout the projection period, depreciating new and existing assets on a straight-line basis over seven and five years, respectively. This level was consistent with both the Company's historical level of capital expenditures and industry norms. The impact of any timing differences related to differences between book and tax depreciation were considered but not included in our analysis since any impact would be expected to



Business Valuation Services

ADAMS 003960

Mr. James E. Farrell
February 18, 1998
Page 9

be negligible. We forecast tax expense at 36.0% of pre-tax income throughout the projection period based on management's forecasts of the Company's expected marginal tax rates.

*Terminal Value*

The terminal, or residual, value of the firm at the end of the five-year discrete forecast period was calculated using the Gordon growth model. The formula for the Gordon model is as follows:

$$S_t = \frac{D_t}{k - g}$$

where $S_t$ is the present value of all future income streams as of the terminal year, $D_t$ is the income stream in the terminal year and g is the growth rate of the income stream.

The terminal income stream was derived in our cash flow model using the underlying assumptions previously discussed. The residual growth rate in the terminal year was forecast at 3.0%

*Valuation Indication -- DCF Analysis*

Based on the above discounted cash flow analysis, the fair market value of Adams' common stock, on a non-marketable minority-interest basis, as of December 31, 1997, is indicated as follows:

$47,775,000

FORTY-SEVEN MILLION SEVEN HUNDRED SEVENTY-FIVE THOUSAND DOLLARS

**Market Analysis**

*Introduction*

The market approach is performed by observing the price at which companies comparable to the subject company, or shares of those comparable companies, are bought and sold. Adjustments are made to the data to account for operational and other relevant differences between the subject company and the comparable companies. The market approach is most applicable to assets that are homogeneous in nature and are actively



Business Valuation Services

ADAMS 003961

Mr. James E. Farrell
February 18, 1998
Page 10

traded. Relative to other approaches to value, the key strength of the market approach is that it provides objective indications of value while requiring relatively few assumptions be made. Assessing relative values under a market approach can be difficult where significant differences exist in the fundamental outlook of the subject and the comparable firms.

We elected to investigate the business transaction technique in our market approach analysis to determine a value for the Company under the market approach. In general, the market approach determines the value of the business enterprise by comparing the subject firm with comparable firms or shares of such comparable firms that have been bought or sold during a reasonably recent period of time. A business transaction analysis is different from a capital market analysis in that a business transaction analysis focuses on sales of entire companies, while the capital market technique focuses on minority interests in comparable companies. We did not perform a capital market analysis because of the difficulty associated with selecting companies with operations that closely resembled those of the subject company.

*Business Transaction Technique*

The first step in performing a business transaction analysis is the selection of comparable transactions. We researched several databases and various publications and journals and identified several recent market transactions involving companies similar to Adams. Some of the transactions we identified were also identified by Adams in the Business Plan. Because most of the transactions involved private companies, the information made available by the parties was generally quite limited.[1]  For the transactions identified, the available information was too limited to provide meaningful indications of value with respect to the subject company. Accordingly, we placed no reliance on the business transaction technique in arriving at our final conclusion of value. However, the transactions identified are briefly discussed in the following paragraphs in order to illustrate the level of recent acquisition and consolidation activity in the industry.

In August 1997, Callaway Golf Company ("Callaway") purchased Odyssey Putters ("Odyssey") from U.S. Industries, Inc. ("U.S. Industries") for $130 million in cash. The purchase was strategic from Callaway's perspective in that it provided Callaway a strong market share position in all club categories. Prior to this transaction, Callaway was

---

[1] In addition, the financial statements of companies acquired by public companies become required disclosures only if the assets of the acquired company are equal to or greater than 10% of the acquiring companies' assets. This further limits the availability of financial information related to a market transaction.



Business Valuation Service

ADAMS 003962

Mr. James E. Farrell
February 18, 1998
Page 11

strong in the fairway wood, driver and iron market segments but lacking in the putter segment. The $130 million purchase price indicated a price to sales multiple of approximately 2.0 estimated 1997 Odyssey revenues (2.3 times trailing revenues), a price to EBIT multiple of 11.8 times, a price to EBITDA multiple of 11.2 times and a price to earnings multiple of approximately 21.0 times. No other financial information was available for Odyssey.

With respect to Adams, this transaction indicated an unadjusted fair market value on a marketable, wholly owned basis in the range of $70 million to $150 million. The range of value indicated by the transaction would need to be adjusted downward significantly for two important reasons. First, the strong strategic fit of Odyssey's product line of putters into Callaway's existing business model (which lacked a competitive line of putters) indicated significant synergistic value to the buyer. This opportunity does not exist for a potential purchaser of Adams since all leading manufacturers and marketers of golf clubs already have a competitive fairway wood product line and, as such, view Adams as a competitor instead of as a company with a complementary product line that could provide a strategic fit to an existing product line. Second, Adams has not established a track record of stability and/or growth in revenues and profits. The Company's short operating history necessarily makes the sustainability of certain levels of revenues and profits much more suspect than would be the case for firms with proven track records.

In January 1996, Cobra Golf ("Cobra") was sold to Fortune Brands ("Fortune") for approximately $700 million. The purchase price indicated approximate multiples of 4.0 times trailing 12-month revenues, 13.0 times trailing EBIT and 21.0 times trailing earnings. With respect to Adams, this transaction indicated an unadjusted fair market value on a marketable, wholly owned basis in the range of $140 million to $150 million. Similar to the Odyssey transaction, Adams' short operating history is a significant consideration that would cause the multiples indicated by the Cobra transaction to be adjusted downward to adequately reflect Adams' operating performance.

U.S. Industries sold Tommy Armour ("Armour") to TearDrop Golf Company ("TearDrop") in November 1997 for approximately $25.5 million in cash and stock. It was estimated that the consideration consisted of approximately $10 million cash, $10 million in TearDrop convertible preferred stock and 1 million TearDrop common shares. TearDrop made specialty golf clubs, including putters and wedges, while Armour specialized in drivers and irons. The acquisition gave TearDrop a full line of premium clubs. TearDrop completed an initial public offering ("IPO") of its common stock in December 1996. Prior to the IPO, TearDrop revenue increased approximately 35.0% from $0.785 million in 1994 to $1.057 million in 1995.



Business Valuation Services

ADAMS 003963

Mr. James E. Farrell
February 18, 1998
Page 12

In December 1997, TearDrop acquired certain assets and assumed certain liabilities of
Ram Golf for $2.7 million cash, 187,357 common shares and the assumption of
approximately $1.6 million in liabilities. Also in December 1997, Brassie Golf
Corporation (Brassie) signed a definitive agreement that purchase the Lady Fairway brand
from Ladies Golf Equipment Co. No terms were released. No other financial
information or transaction multiples were available for these transactions, so comparisons
relative to Adams were not possible.

*Valuation Indication -- Market Analysis*

Because of the difficulty in assembling a sample of comparable firms that we consider to
closely resemble the Company's operations, we do not rely on the market approach in
determining our final conclusion of value.

## CONCLUSION

With respect to Adams' valuation, we formulated a valuation conclusion based on the
results of the income approach and supported that conclusion with the limited market data
available. Based on the above analysis, in our opinion, the fair market value of the
common stock of Adams Golf, Inc. as of December 31, 1997, on a non-marketable,
minority-interest basis, is reasonably stated as:

**$47,775,000**
FORTY-SEVEN MILLION SEVEN HUNDRED SEVENTY-FIVE THOUSAND DOLLARS

## ADJUSTMENTS TO FAIR MARKET VALUE

### Introduction

Once the value of a business has been determined, certain adjustments may be required to
determine the appropriate value of a specific ownership interest in the business. The two
most common adjustments are for 1) control vs. minority interest and 2) marketability.

### Control vs. Minority Interest

The term "minority interest" is defined as a non-controlling interest in a business
enterprise where the necessary elements of control are lacking. These elements of control
include choosing management and the related levels of compensation and perquisites,



Business Valuation Services

Mr. James E. Farrell
February 18, 1998
Page 13

acquiring or liquidating assets, setting of dividend or distribution policies and controlling company strategy and direction. A shareholder possessing a minority interest lacks some, if not all, potentially valuable rights that a controlling shareholder or group of shareholders enjoy. It should be noted, however, that the key to identification of a minority interest is the lack of elements of control, not a certain level of ownership. In certain situations, a shareholder may possess certain elements of control even though the shareholder's interest does not exceed a majority (50%) of the voting stock.

In performing an appraisal of closely held stock, it is necessary to evaluate the facts and circumstances surrounding the subject shares to determine whether effective control exists. The analysis must then be prepared such that the final conclusion of value reflects the appropriate standard of value. If, for example, the valuation technique(s) employed yield a conclusion of value on a control basis, a minority-interest discount may be required in order to appropriately value a minority-interest block of shares. Conversely, if the valuation techniques employed yield a conclusion of value on a minority basis, a controlling-interest premium may be required in order to appropriately value a controlling-interest block of shares. The estimate of fair market value as determined above represents the value of the Company on a minority-interest basis. As such, a minority-interest discount would not be appropriate when determining the value of a minority interest in the Company.

## Marketability

The final issue to be addressed in this analysis is the discount for marketability. It is clear that the common stock of a relatively small, closely traded entity will result in some reduction in the fair market value due to marketability. The following factors need to be considered in determining marketability:

1.      Dividend-paying history and capacity relative to earnings -  The higher the dividend-paying capacity and the higher the willingness to pay dividends, the lower the marketability discount. Minority investments in a real estate investment trust would, thus, have smaller discounts associated with them relative to investments in a small growth company that pays no dividends.

2.      Size of the firm -  Larger entities tend to have smaller discounts. The prestige associated with owning an interest in a large firm results in a lower discount. Larger firms are deemed to have more stability and control associated with them. Other entities may be interested in acquiring an interest in a large company in order to have access to its financial data and to influence, even if insignificantly, its policies.



Business Valuation Services

ADAMS 003965

Mr. James E. Farrell
February 18, 1998
Page 14


3.     The configuration of interests present – If a single shareholder or family owns a majority of the shares, the discount is likely to be larger because a minority shareholder will have fewer options to dispose of an interest. On the other hand, a 20% shareholder with two other shareholders owning 40% possesses a "swing" vote. In the case of a swing vote, the minority interest may have little or no discount associated with it and may even sell for a full control premium should an acquirer desire influence (especially if the acquirer is one of the two existing shareholders in a dispute).

4.     Possibilities for the sale or merger of the corporation – A corporation may be an attractive acquisition target and have controlling shareholders who might be inclined to sell their interests at some future date. The premium that might be realized by the minority shareholders can influence the size of the discount. A family business with no interest in selling would have a larger marketability discount relative to a larger entity that is controlled by individuals not related to management.

5.     Possibilities for going public – Even family businesses and tightly controlled businesses go public. The prospects for and ability of a company to conduct an initial public offering and to begin active trading in its shares can result in a significant reduction in the discount associated with marketability.

6.     Rights and restrictions associated with shares –  Some shares of common stock provide the holders with certain liquidation rights such as shares held by an ESOP. Other shares may be restricted as to ownership and transferability. The more rights and the fewer restrictions, the smaller the discount associated with the shares.

7.     Financial Performance – Companies that are financially sound and are not selling shares specifically in the interest of raising capital typically report lower discounts than companies without these attributes.


### Discussion of the Evidence

Studies on marketability discounts are quite plentiful. The marketability discounts claimed in these studies can range from a premium to discounts as large as 96%. We have observed discounts for non-transferable, restricted common stock that were in excess of 60% relative to the publicly traded value of equivalent shares in the same corporation.   Studies by Willamette Management Associates have suggested marketability discounts in the range of between 40% and 60%. A more quoted set of studies by John D. Emory attempted to quantify the marketability discount associated with common shares by studying private transactions that occurred prior to an initial



Business Valuation Services

ADAMS 003966

Mr. James E. Farrell
February 18, 1998
Page 15

public offering of the same shares. His conclusion was that mean and median marketability discounts were typically between 40% and 45% throughout much of the 1980s. Steven E. Bolten, in a review of past studies with regard to marketability and minority-interest value, found that marketability discounts averaged 39.86% ("Discounts for Stocks of Closely Held Corporations," *Trusts & Estates*, December 1990, pp. 47-48.).

The typical discount cited for restricted (Rule 144) stock is 35% (William Frazier, *Business Valuation Review*, December 1989, p. 159). Tax Court decisions between 1975 and 1987 have provided discounts of between 15% and 75% with some clustering around 35% (Philip W. Moore, "'Blockage' Redux: The Challenge Posed By Blockage," *Trusts & Estates*, February 1992, p. 44). This 35% figure is consistent with the conclusions of a study by J. Michael Maher ("Discounts for Lack of Marketability for Closely Held Business Interests," Taxes, September 1976, pp. 562-571). Similarly, the often-quoted, but now aged, Securities and Exchange Commission study found that marketability discounts associated with letter stock transactions ranged from 30% to 40% for non-reporting OTC companies.

A distinction should be made between these studies and the closely held stock in general. Most of the studies we have examined are not appropriate for direct application to closely held shares that are not actively traded or are unregistered but are also not similarly restricted. The restricted stock studies assume the shares are restricted as opposed to merely unregistered. The discounts for marketability are, thus, inherently higher in these studies compared with shares that are merely unregistered. The marketability discount for unrestricted and unregistered securities probably ranges from 20% to 30%, as opposed to 30% to 40%.

In many of the studies it is not possible to view the actual data used to arrive at the conclusions. In the series of studies produced by John Emory, the data on the actual transactions is available. Our review of those transactions suggests most involved options issued to management. Only a few involved sales, and those sales were to insiders. There is a substantial risk of indirect compensation to management by issuing shares at favorable (lower) prices relative to the prices the subsequent initial public offering (IPO) provided. Further, the Emory studies did not adequately account for the natural appreciation that occurs in the value of many companies in the six months prior to an initial public offering. Many IPOs are timed to maximize the amount raised by the issue. Favorable earnings reports and new developments may have occurred in the interim period between the private transactions and the IPOs. Correcting the Emory studies for the problems of undervaluation and for the natural appreciation in the value of the shares suggests a marketability discount closer to 20% to 25% would be appropriate for companies capable of going public. Indeed, a number of the discounts in Emory's



Business Valuation Services

ADAMS 003967

Mr. James E. Farrell
February 18, 1998
Page 16

February 1989 to June 1990 and August 1987 to January 1989 studies are quite small (between 4% and 25%), suggesting there is no systematic tendency toward large marketability discounts.

Overall, we believe the evidence suggests the average marketability discount is approximately 25%, but evidence does indicate there can be substantial variation in the marketability discount in different transactions and for different corporations depending on the dividend paying capacity, the degree to which the corporation is closely held, the types of restrictions and rights associated with the interests being considered, and the reason for the transaction.

**Application of a Marketability Discount**

Our subject company has the following characteristics relative to the criteria set forth earlier. The following is a list of the relevant facts to consider:

1.    A low dividend payout rate would suggest a higher marketability discount. The Company did not pay any dividends during the review period, suggesting a higher marketability discount.

2.    The Company's relatively small size would suggest a higher marketability discount. Discounts are closely related to the size of the Company and tend to increase for smaller firms.

3.    Ownership is tightly controlled, with few major shareholders and only a few minority shareholders with relatively small percentage interests. A higher marketability discount would be justified for this factor.

4.    Adams' attractiveness as an acquisition or public offering candidate would increase as the Company establishes a longer history of new product development and continued growth in sales and profits. The Company's lack of established track record suggests a higher marketability discount.

5.    The rights and restrictions associated with the Company's common stock are typical for a private, rapidly growing firm such as Adams. This suggests a moderate marketability discount.

6.    Adams' financial performance for the year ended December 31, 1997 was outstanding and, if considered independently of any other factors, would typically suggest



Business Valuation Services

ADAMS 003968

Mr. James E. Farrell
February 18, 1998
Page 17

a lower marketability discount. However, the lack of an established history of sound financial performance and the related uncertainty surrounding the Company's ability to continue to perform at a high level suggests a higher marketability discount. Overall, the Company's financial performance would suggest a moderate to high marketability discount.

All of the factors, with the exception of the fifth and sixth factors, indicate that a high marketability discount would be appropriate. The fifth factor suggests a moderate discount, while the sixth factor suggests a moderate to high discount. In the aggregate, however, these factors indicate a high marketability discount is appropriate. Based on this information, we selected a marketability discount of:

30.0%    —
THIRTY PERCENT

## SYNTHESIS AND CONCLUSION

Based on the analysis discussed above, we determined the fair market value of the common stock of Adams Golf, Inc. on a marketable, minority-interest basis, as of December 31, 1997, is reasonably stated as:

$33,443,000
THIRTY-THREE MILLION FOUR HUNDRED FORTY-THREE THOUSAND DOLLARS

or
$3.65 per share (rounded)

Business Valuation Services

ADAMS 003969

Mr. James E. Farrell
February 18, 1998
Page 18

## VALUATION ANALYSIS - INTELLECTUAL PROPERY

### Introduction

We have also completed a valuation analysis of the Company's Intellectual Property for federal income tax purposes related to a proposed corporate restructuring. This analysis is presented as Exhibit III. For purposes of this analysis, we consider the Company's Intellectual Property to consist of all Trademark and Patent intangible assets owned by the Company as of the valuation date. The Company's Trademarks consisted principally of the "Tight Lies™" trademark associated with the Company's golf clubs and the "Adams Golf" tradename. The Company's Patents were primarily related to the design and production of the Tight Lies™ golf clubs. The remaining intangible assets are grouped together as Goodwill/Going Concern. These intangible assets, which include the Company's infomercial, customer list, avoided start up costs and established work force, were not individually valued for purposes of this analysis.

### Valuation Analysis

In our determination of the fair market value of Adams' Intellectual Property, we prepared a DCF analysis. The DCF approach measures the fair market value of both the Trademark and the Patents by analyzing the cash flows derived through ownership of each, assuming the assembly and distribution of Adams-branded products. The DCF analysis used in the Intellectual Property valuation is similar to the DCF used in the valuation of the Company's common stock in that the analysis is based on the premise that the value of an asset is equal to the present value of the future economic benefits which accrue to its owners, using an appropriate discount rate that adequately considers the risk related to an investment in the business.

### Royalty Income Approach

The royalty income approach measures fair market value by analyzing the cash flows derived through ownership of the Intellectual Property and the influx of royalty payments negotiated through exclusive or non-exclusive licensing agreements. To determine the royalty rate associated with an exclusive Adams licensing agreement, we examined various comparable royalty agreements existing within the industry. We also studied the relationship between debt-free net income margins and intangible returns of companies with well-known brand names, as studied by Smith and Parr in <u>Intellectual Property - Licensing and Joint Venture Profit Strategies</u>. Based on this analysis, we chose an



Business Valuation Services

Mr. James E. Farrell
February 18, 1998
Page 19

implied royalty rate of 3.0% of sales for the Trademarks and 6.5% of sales for the Patents. Using the projected revenues and costs from the discounted cash flow analysis prepared in conjunction with our valuation of Adams' common stock, we developed a royalty income model.

With respect to the Trademarks (Exhibit III-2), we estimated a five-year economic life with no residual value. We assumed that all but 2.0% of the Company's sales during the five-year projection period would be for trademarked items. The analysis implies no incremental research, development or advertising costs related to the maintenance of the Company's Trademarks. With respect to the Patents (Exhibit III-3), we estimated a 15-year economic life with no residual value. We assumed that in order to maximize the value of Adams as a going concern, management would continually introduce and sell new products which would not be protected by the Company's currently registered Patents. This assumption is reflected in our model through the "Non-royalty qualifying revenue," which represents the estimated revenue that would not be related to the Company's existing Patents. By the final year of the projection period, the non-royalty qualifying revenue is estimated to equal to the total projected revenue for Adams. This implies the end of the economic life of the Patents since estimated incremental revenues generated through the sales of products produced with the existing Patents would be zero.

## CONCLUSION

We have conducted a discounted cash flow analysis with respect to the Intellectual Property of Adams Golf, Inc. Based on the this analysis, we conclude the fair market value of the Intellectual Property of Adams, as of December 31, 1997, can be reasonably stated as:

**Table II**

| INTELLECTUAL PROPERTY | FAIR MARKET VALUE |
|---|---|
| TRADEMARK | $ 5,382,000 |
| PATENT | $ 13,140,000 |
| TOTAL INTELLECTUAL PROPERTY | $ 18,522,000 |

EIGHTEEN MILLION FIVE HUNDRED TWENTY TWO THOUSAND DOLLARS



Business Valuation Services

ADAMS 003971

Mr. James E. Farrell
February 18, 1998
Page 20

This valuation analysis was conducted in accordance with generally accepted valuation procedures and included such substantive valuation tests as we considered necessary and appropriate under the circumstances. We relied on various information received regarding the Company's operations as a fair reflection on its operations and have made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information as well as on other data we developed.

Our valuation reflects the premise of value as a going concern, assuming the business will continue to operate in its present configuration. A liquidation of operating assets on an individual basis or for uses other than the current use is not considered in our analysis. Such an analysis could provide indications of value substantially different than our conclusion.

We are independent of Adams Golf, Inc. and have no current or prospective interest in the subject assets. Our fee for this appraisal was in no way influenced by the results of our analysis.

The Statement of Limiting Conditions and the Appraisal Certification are integral parts of this valuation opinion letter.

We appreciate the opportunity to provide you with these valuation services.

Respectfully submitted,

BUSINESS VALUATION SERVICES, INC.

By: _____

Todd G. Poling, CPA
Associate



Business Valuation Services

ADAMS 003972

## STATEMENT OF LIMITING CONDITIONS

This value opinion report has been prepared pursuant to the following general assumptions and general limiting conditions:

1.  We assume no responsibility for the legal description of real property or matters including legal or title considerations. For real property included in this appraisal, we were not furnished legal descriptions or other detailed site and improvement drawings. Title to the subject assets, properties or business interests are assumed to be good and marketable unless otherwise stated.

2.  The subject assets, properties or business interests are appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.  We assume responsible ownership and competent management with respect to the subject assets, properties or business interests.

4.  The information furnished by Management is believed to be reliable. However, we issue no warranty or other form of assurance regarding its accuracy.

5.  We assume that there is full compliance with all applicable federal, state and local regulations and laws unless non-compliance is stated, defined and considered in the appraisal report.

6.  We assume that all required licenses, certificates of occupancy, consents or legislative or administrative authority from any local, state or national government, private entity or organization have been or can be obtained or renewed for any use on which the valuation opinion contained in this report is based.

7.  Possession of this valuation report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any person other than the party to whom it is addressed without our written consent and, in any event, only with proper written qualifications and only in its entirety.

8.  We, by reason of this valuation, are not required to give testimony or to be in attendance in court with reference to the assets, properties or business interests in question unless arrangements have been previously made.

9.  This valuation report has been prepared in conformity with, and is subject to, the requirements of the code of professional ethics and standards of professional conduct of the professional appraisal organizations of which we are members.



Business Valuation Services

ADAMS 003973

10. Disclosure of the contents of this valuation report is governed by the bylaws and regulations of the Association for Investment Management and Research and the American Society of Appraisers.

11. No part of the contents of this report, especially any conclusions of value, the identity of the appraisers or the firm with which the appraisers are associated, shall be disseminated to the public through advertising, public relations, news, sales or other media without our prior written consent and approval.

12. We assume no responsibility for any financial reporting judgments that are appropriately those of management. Management accepts the responsibility for any related financial reporting with respect to the assets, properties or business interests encompassed by this appraisal.



Business Valuation Services

ADAMS 003974

## APPRAISAL CERTIFICATION

We hereby certify the following statements regarding this appraisal:

1. We have not inspected the assets, properties or business interests encompassed by this appraisal.

2. We have no present or contemplated future interest in the assets, properties or business interests that are the subject of this appraisal report.

3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4. Our compensation for making the appraisal is in no way contingent upon the value reported.

5. To the best of our knowledge and belief, the statements of facts contained in this report, upon which the analyses, conclusions and opinions expressed herein are based, are true and correct.

6. No persons other than the appraisers whose qualifications are included herein have prepared the analyses, conclusions and opinions concerning the assets, properties or business interests set forth in this report.

Todd G. Poling
Associate



Business Valuation Services

ADAMS 003975

# TODD G. POLING, CPA

### *Associate*

Mr. Poling is an Associate with Business Valuation Services, Inc., specializing in the valuation of closely held businesses and business interests. He has valued several types of securities, including common stock, options, warrants and partnership interests. These analyses have been prepared for merger and acquisition transactions, litigation support, tax-related issues, regulatory compliance and financial reporting requirements.

Mr. Poling has focused primarily in the transaction arena, having participated in numerous engagements involving corporate restructurings, initial public offerings, mergers and acquisitions and fairness opinions. He also has significant experience providing valuation consulting services in litigation support situations and has provided testimony as an expert witness in both trial and deposition settings.

Prior to joining BVS, Mr. Poling served as General Manager of ADR, Inc., leading a start-up manufacturing entity to immediate profitability and market presence. He evaluated a proposed merger during his internship at Southern Methodist University, performing financial analyses, completing pro-forma financial plans and studying various qualitative aspects of the transaction. Mr. Poling received an MBA in Finance and Entrepreneurial Studies from Southern Methodist University and a BS degree in Accounting from the University of South Dakota. Mr. Poling is a Certified Public Accountant (CPA) and a candidate for Chartered Financial Analyst (CFA).



Business Valuation Services

ADAMS 003976

**EXHIBIT I-1**
**ADAMS GOLF, INC.**
**ADJUSTED HISTORICAL FINANCIAL STATEMENTS**
**BALANCE SHEETS**

| | 12/31/97 | 12/31/96 | 12/31/95 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash | $ 1,955,563 | $ 854,543 | $ 243,179 |
| Accounts receivable | 7,670,960 | 497,787 | 149,757 |
| Prepaid expenses and other | 1,836,821 | 28,007 | 27,859 |
| Inventory | 4,486,563 | 674,737 | 198,000 |
| Total current assets | 15,949,907 | 2,055,074 | 618,795 |
| Net property and equipment | 603,823 | 123,950 | 18,047 |
| Other assets: | | | |
| Investments | - | - | 29,201 |
| Other assets | 806,349 | -379,697 | 3,616 |
| Intangible assets | - | - | 57,912 |
| Total other assets | 806,349 | 379,697 | 90,729 |
| **TOTAL ASSETS** | $ 17,360,079 | $ 2,558,721 | $ 727,571 |
| | | | |
| **LIABILITIES AND EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 377,622 | $ 17,526 | $ 1,955 |
| Notes payable | - | 230,406 | - |
| Accrued expenses and other current | 2,794,446 | 332,423 | - |
| Taxes payable | 1,020,980 | - | - |
| Total current liabilities | 4,193,048 | 580,355 | 1,955 |
| **TOTAL LIABILITIES** | 4,193,048 | 580,355 | 1,955 |
| Shareholders' equity: | | | |
| Common stock | 6,860 | 5,937 | 1,462,495 |
| Additional paid in capital | 4,132,257 | 3,132,009 | 350,000 |
| Treasury stock | (400) | (400) | (400) |
| Retained earnings | 9,028,314 | (1,159,180) | (1,086,479) |
| Total shareholders' equity | 13,167,031 | 1,978,366 | 725,616 |
| **TOTAL LIABILITIES & EQUITY** | $ 17,360,079 | $ 2,558,721 | $ 727,571 |

ADAMS 003977

**EXHIBIT I-2**
**ADAMS GOLF, INC.**
**ADJUSTED HISTORICAL FINANCIAL STATEMENTS**
**BALANCE SHEETS, COMMON SIZE**

|  | 12/31/97 | 12/31/96 | 12/31/95 |
|---|---|---|---|
| *ASSETS* | | | |
| Current assets: | | | |
| Cash | 11.3% | 33.4% | 33.4% |
| Accounts receivable | 44.2% | 19.5% | 20.6% |
| Prepaid expenses | 10.6% | 1.1% | 3.8% |
| Inventory | 25.8% | 26.4% | 27.2% |
| Total current assets | 91.9% | 80.3% | 85.0% |
| Net property and equipment | 3.5% | 4.8% | 2.5% |
| Other assets: | | | |
| Investments | 0.0% | 0.0% | 4.0% |
| Other assets | 4.6% | 14.8% | 0.5% |
| Intangible assets | 0.0% | 0.0% | 8.0% |
| Total other assets | 4.6% | 14.8% | 12.5% |
| *TOTAL ASSETS* | 100.0% | 100.0% | 10 |
| *LIABILITIES* | | | |
| *AND EQUITY* | | | |
| Current liabilities: | | | |
| Accounts payable | 2.2% | 0.7% | 0.3% |
| Notes payable | 0.0% | 9.0% | 0.0% |
| Accrued expenses and other current | 16.1% | 13.0% | 0.0% |
| Taxes payable | 5.9% | 0.0% | 0.0% |
| Total current liabilities | 24.2% | 22.7% | 0.3% |
| *TOTAL LIABILITIES* | 24.2% | 22.7% | 0.3% |
| Shareholders' equity: | | | |
| Common stock | 0.0% | 0.2% | 201.0% |
| Additional paid in capital | 23.8% | 122.4% | 48.1% |
| Treasury stock | 0.0% | 0.0% | -0.1% |
| Retained earnings | 52.0% | -45.3% | -149.3% |
| Total shareholders' equity | 75.8% | 77.3% | 99.7% |
| *TOTAL LIABILITIES* | 100.0% | 100.0% | 100.0% |
| *& EQUITY* | | | |

ADAMS 003978

**EXHIBIT I-3**
**ADAMS GOLF, INC.**
**ADJUSTED HISTORICAL FINANCIAL STATEMENTS**
**INCOME STATEMENTS**

| | 12/31/97 | 12/31/96 | 12/31/95 |
|---|---|---|---|
| Sales | $ 36,690,090 | $ 3,521,788 | $ 1,125,115 |
| Cost of goods sold | 9,991,132 | 1,589,696 | 756,400 |
| Gross profit | 26,698,958 | 1,932,092 | 368,715 |
| Operating expenses: | | | |
| Selling expense | 13,093,174 | 625,897 | 331,301 |
| General and administrative expense | 2,430,569 | 1,297,386 | 281,309 |
| Total operating expenses | 15,523,743 | 1,923,283 | 612,610 |
| Operating margin (EBITDA) | 11,175,215 | 8,809 | (243,895) |
| Depreciation and amortization | 302,744 | | |
| Operating profit (EBIT) | 10,872,471 | 8,809 | (243,895) |
| Other income | (102,214) | 3,938 | 1,226 |
| Earnings before taxes (EBT) | 10,770,257 | 12,747 | (242,669) |
| Income taxes | 3,877,293 | - | - |
| Net income | $ 6,892,964 | $ 12,747 | $ (242,669) |

*EBITDA = Earnings before interest, taxes, depreciation and amortization*
*EBIT = Earnings before interest and taxes*
*EBT = Earnings before taxes*

ADAMS 003979

**EXHIBIT I-4**
**ADAMS GOLF, INC.**
**ADJUSTED HISTORICAL FINANCIAL STATEMENTS**
**INCOME STATEMENTS, COMMON SIZE**

| | 12/31/97 | 12/31/96 | 12/31/95 |
|---|---|---|---|
| Sales | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 27.2% | 45.1% | 67.2% |
| Gross profit | 72.8% | 54.9% | 32.8% |
| Operating expenses: | | | |
|    Selling expense | 35.7% | 17.8% | 29.4% |
|    General and administrative expense | 6.6% | 36.8% | 25.0% |
| Total operating expenses | 42.3% | 54.6% | 54.4% |
| Operating margin (EBITDA) | 30.5% | 0.3% | -21.7% |
| Depreciation and amortization | 0.8% | 0.0% | 0.0% |
| Operating profit (EBIT) | 29.6% | 0.3% | -21.7% |
| Other income | -0.3% | 0.1% | 0.1% |
| Earnings before taxes (EBT) | 29.4% | 0.4% | -21.6% |
| Income taxes | 10.6% | 0.0% | 0.0% |
| Net income | 18.8% | 0.4% | -21.6% |

*EBITDA = Earnings before interest, taxes, depreciation and amortization*
*EBIT = Earnings before interest and taxes*
*EBT = Earnings before taxes*

ADAMS 003980

**EXHIBIT I-5**
**ADAMS GOLF, INC.**
**HISTORICAL FINANCIAL STATEMENTS**
**FINANCIAL RATIO ANALYSIS**

| Period: | Year End 12/31/97 | | Year End 12/31/96 | | Year End 12/31/95 | |
|---|---|---|---|---|---|---|
| **Profitability** | | | | | | |
| Operating margin (EBITDA) | 30.5% | | 0.3% | | -21.7% | |
| Asset turnover | 92.1% | | 53.6% | | 154.6% | |
| Financial leverage | 131.5% | | 121.5% | | 100.3% | |
| Return on assets | 69.2% | | 0.8% | | -33.4% | |
| Return on equity | 91.0% | | 0.9% | | -33.4% | |
| **Liquidity** | | | | | | |
| Current ratio | 3.8 | | 3.5 | | 316.5 | |
| Quick ratio | 2.7 | | 2.4 | | 215.2 | |
| Working Capital (WC) | $ | 11,756,859 | $ | 1,474,719 | $ | 616,840 |
| Average Working Capital (AWC) | $ | 6,615,789 | $ | 1,045,780 | $ | 616,840 |
| WC to sales | 32.0% | | 41.9% | | 54.8% | |
| AWC to sales | 18.0% | | 29.7% | | 54.8% | |
| **Efficiency** | | | | | | |
| Receivables turnover | 9.0 | | 10.9 | | 7.5 | |
| Days receivables | 40.6 | | 33.6 | | 48.6 | |
| Inventory turnover | 3.9 | | 3.6 | | 3.8 | |
| Days inventory | 94.3 | | 100.2 | | 95.5 | |
| Payables turnover | 2.2 | | 2.7 | | 313.4 | |
| Days payables | 165.6 | | 133.6 | | 1.2 | |
| Sales to net fixed assets | 60.8 | | 28.4 | | 62.3 | |
| **Leverage** | | | | | | |
| Total liabilities to total assets | 24.2% | | 22.7% | | 0.3% | |
| Long-term debt to total capital | 0.0% | | 0.0% | | 0.0% | |
| **Cash flow** | | | | | | |
| EBITDA | $ | 11,175,215 | $ | 8,809 | $ | (243,895) |
| EBIT | $ | 10,872,471 | $ | 8,809 | $ | (243,895) |
| EBIT to sales | 29.6% | | 0.3% | | -21.7% | |
| Net capital expenditures | $ | 782,617 | $ | 105,903 | | N/A |
| Net capital expenditures to sales | 2.1% | | 3.0% | | N/A | |
| Depreciation and amortization | $ | 302,744 | $ | - | $ | - |
| Depreciation and amort  to sales | 0.8% | | 0.0% | | 0.0% | |

| Growth | 1996-1997 | | 1995-1996 | |
|---|---|---|---|---|
| Net sales | 941.8% | | 213.0% | |
| EBITDA | 126761.3% | | -103.6% | |
| Net income | 53975.2% | | -105.3% | |
| Total assets | 578.5% | | 251.7% | |
| Book value of equity | 565.6% | | 172.6% | |

ADAMS 003981

EXHIBIT II-1
ADAMS GOLF, INC.
DISCOUNTED CASH FLOW ANALYSIS

| For the Year Ending | Projected | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/98 | 12/31/99 | 12/31/00 | 12/31/01 | 12/31/02 | Residual |
| Sales Growth Rate | 100.0% | -25.0% | -25.0% | 5.0% | 5.0% | 5.0% |
| Cost of Goods Sold | 30.0% | 32.5% | 35.0% | 35.0% | 35.0% | 35.0% |
| Operating Expenses: | | | | | | |
| Selling | 40.0% | 45.0% | 45.0% | 45.0% | 45.0% | 45.0% |
| General & Administrative | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |

| | | |
|---|---|---|
| Income Taxes | 36.0% | of pretax income |
| Required Working Capital | 15.0% | of incremental revenues |
| Capital Expenditures | 2.5% | of total revenues |
| Discount Rate | 11.2% | weighted average cost of capital |
| Residual Growth Rate | 3.0% | long-term inflation estimate |

| For the Year Ending | Historical | Projected | | | | | |
|---|---|---|---|---|---|---|---|
| | 12/31/97 | 12/31/98 | 12/31/99 | 12/31/00 | 12/31/01 | 12/31/02 | Residual |
| Sales | $36,690,090 | $73,380,180 | $55,035,135 | $41,276,351 | $43,340,169 | $45,507,177 | $47,782,536 |
| Cost of Goods Sold | 9,991,132 | 22,014,054 | 17,886,419 | 14,446,723 | 15,169,059 | 15,927,512 | 16,723,888 |
| Gross Margin | 26,698,958 | 51,366,126 | 37,148,716 | 26,829,628 | 28,171,110 | 29,570,665 | 31,058,648 |
| Gross Margin Percentage | 72.8% | 70.0% | 67.5% | 65.0% | 65.0% | 65.0% | 65.0% |
| Operating Expenses: | | | | | | | |
| Selling | 13,093,174 | 29,352,072 | 24,765,811 | 18,574,358 | 19,503,076 | 20,478,230 | 21,502,141 |
| General & Administrative | 2,430,569 | 3,669,009 | 2,751,757 | 2,063,818 | 2,167,008 | 2,275,359 | 2,389,127 |
| Total Operating Expenses | 15,523,743 | 33,021,081 | 27,517,568 | 20,638,176 | 21,670,084 | 22,753,589 | 23,891,268 |
| EBITDA | 11,175,215 | 18,345,045 | 9,631,149 | 6,191,453 | 6,501,025 | 6,826,077 | 7,167,380 |
| EBITDA Percentage | 30.5% | 25.0% | 17.5% | 15.0% | 15.0% | 15.0% | 15.0% |
| Depreciation and Amortization | 302,744 | 382,837 | 579,391 | 726,806 | 881,593 | 1,044,110 | 1,094,006 |
| Operating Profit (EBIT) | 10,872,471 | 17,962,208 | 9,051,758 | 5,464,646 | 5,619,433 | 5,781,958 | 6,073,375 |
| Operating Profit Percentage | 29.6% | 24.5% | 16.4% | 13.2% | 13.0% | 12.7% | 12.7% |
| Income Taxes | 3,877,293 | 6,466,395 | 3,258,633 | 1,967,273 | 2,022,996 | 2,081,505 | 2,186,415 |
| Net Income | $6,995,178 | $11,495,813 | $5,793,125 | $3,497,374 | $3,596,437 | $3,700,453 | $3,886,960 |
| Net Income Percentage | 19.1% | 15.7% | 10.5% | 8.5% | 8.3% | 8.1% | 8.1% |
| Adjustments to Cash Flow: | | | | | | | |
| Net Income | | $11,495,813 | $5,793,125 | $3,497,374 | $3,596,437 | $3,700,453 | $3,886,960 |
| Add: Depreciation and Amortization | | 382,837 | 579,391 | 726,806 | 881,593 | 1,044,110 | 1,094,006 |
| Less: Capital Expenditures | | 1,834,505 | 1,375,878 | 1,031,909 | 1,083,504 | 1,137,679 | 1,094,006 |
| Less: Incremental Working Capital | | 5,503,514 | (2,751,757) | (2,063,818) | 309,573 | 325,051 | 341,304 |
| Net Cash Flow | | 4,540,632 | 7,748,394 | 5,256,089 | 3,084,953 | 3,281,841 | 3,545,656 |
| PV Factor | | 0.9482 | 0.8525 | 0.7665 | 0.6892 | 0.6196 | |
| PV Cash Flows | | 4,305,466 | 6,605,768 | 4,028,859 | 2,126,060 | 2,033,538 | |
| Sum of PVs | | 19,099,691 | | | | | |
| PV Residual | | 26,719,777 | | | Residual Value Multiple: | | 12.16 |
| | | | | | Residual Value: | | $43,121,912 |
| FMV of Capital | | 45,819,468 | | | | | |
| Add: Cash | | 1,955,563 | | | | | |
| Less: Long-term Debt | | | | | | | |
| FMV of Equity | | $47,775,031 | | | | | |
| Rounded | | $47,775,000 | | | | | |

ADAMS 003982

**EXHIBIT II-2**
**ADAMS GOLF, INC.**
**DISCOUNTED CASH FLOW ANALYSIS**

| | | |
|---|---|---:|
| Fair Market Value, marketable minority interest basis | | $ 47,775,000 |
| *Less:* | | |
| Marketability discount | 30.0% | 14,332,500 |
| *Equals:* | | |
| Fair Market Value, minority interest, non-marketable basis | | $ 33,442,500 |
| *Rounded:* | | $ 33,443,000 |
| *Divided by:* | | |
| Shares Outstanding, After Issuance of New Shares (Fully Diluted) | | 9,120,473 |
| *Equals:* | | |
| Share Price | | $ 3.67 |
| *Rounded:* | | $ 3.65 |

ADAMS 003983

EXHIBIT III-1
ADAMS GOLF, INC.
FAIR MARKET VALUE BALANCE SHEET
SUMMARY

| | | |
|---|---|---|
| Working Capital | $ 11,757,000 | Book Value |
| Fixed Assets | 703,000 | Mid-point of Cost and Net Book Value |
| Other Assets | 806,000 | Book Value |
| Trademark | 5,382,000 | Fair Market Value |
| Patents | 13,140,000 | Fair Market Value |
| Goodwill/Going Concern Value | 15,987,000 | Fair Market Value (Residual) |
| Total | $47,775,000 | Business Enterprise Value |

ADAMS 003984

**EXHIBIT III-2**
**ADAMS GOLF, INC.**
**RELIEF FROM ROYALTY ANALYSIS**
**TRADEMARK**

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Total Revenue | $ 73,380,180 | $ 55,035,135 | $ 41,276,351 | $ 43,340,169 | $ 45,507,177 |
| Less: Adams Golf Royalty Revenue | | | | | |
| Total Internal Royalty-Qualifying Revenue | 73,380,180 | 55,035,135 | 41,276,351 | 43,340,169 | 45,507,177 |
| Less: Non-Royalty Qualifying Revenue | 1,467,604 | 1,100,703 | 825,527 | 866,803 | 910,144 |
| Adjusted Internal Royalty-Qualifying Revenue | 71,912,576 | 53,934,432 | 40,450,824 | 42,473,365 | 44,597,034 |
| | | | | | |
| Licensable Revenue | | | | | |
| Relief from Internal Royalty-Qualifying Revenues | 71,912,576 | 53,934,432 | 40,450,824 | 42,473,365 | 44,597,034 |
| Royalty Rate | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| | | | | | |
| Licensing Revenue from Internal Royalty-Qualifying Revenues | 2,157,377 | 1,618,033 | 1,213,525 | 1,274,201 | 1,337,911 |
| Licensing Revenue from External Royalty-Qualifying Revenues | | | | | |
| | | | | | |
| Total Licensing Revenue | 2,157,377 | 1,618,033 | 1,213,525 | 1,274,201 | 1,337,911 |
| Less: | | | | | |
| Amortization of Trademark Value | 1,076,381 | 1,076,381 | 1,076,381 | 1,076,381 | 1,076,381 |
| Equals: | | | | | |
| Trademark Operating Income | 1,080,996 | 541,652 | 137,144 | 197,820 | 261,530 |
| Less: | | | | | |
| Income Taxes | 389,159 | 194,995 | 49,372 | 71,215 | 94,151 |
| Equals: | | | | | |
| Licensing Net Income | 691,838 | 346,657 | 87,772 | 126,605 | 167,379 |
| Plus: | | | | | |
| Amortization | 1,076,381 | 1,076,381 | 1,076,381 | 1,076,381 | 1,076,381 |
| Equals: | | | | | |
| Licensing Cash Flow | 1,768,219 | 1,423,038 | 1,164,153 | 1,202,986 | 1,243,760 |
| | | | | | |
| Present Value Factor | 0.9482 | 0.8525 | 0.7665 | 0.6892 | 0.6195 |
| Present Value of Licensing Cash Flow | $ 1,676,640 | $ 1,213,188 | $ 892,338 | $ 829,063 | $ 770,675 |

Total Present Value of Licensing Cash Flow    $ 5,381,905

Rounded    $ 5,382,000

ADAMS 003985

EXHIBIT III-3
ADAMS GOLF, INC.
RELIEF FROM ROYALTY ANALYSIS
PATENTS

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenue | $73,380,180 | $55,035,135 | $41,276,351 | $43,340,169 | $45,507,177 | $47,782,536 | $49,216,012 | $50,692,493 | $52,213,267 | $53,779,665 |
| Less: Adams Golf Royalty Revenue | | | | | | | | | | |
| Total Internal Royalty-Qualifying Revenue | 73,380,180 | 55,035,135 | 41,276,351 | 43,340,169 | 45,507,177 | 47,782,536 | 49,216,012 | 50,692,493 | 52,213,267 | 53,779,665 |
| Less: Non-Royalty-Qualifying Revenue | 3,470,451 | 5,328,776 | 6,137,728 | 8,799,139 | 11,833,273 | 15,266,898 | 18,796,229 | 22,673,192 | 26,927,247 | 31,590,232 |
| Adjusted Internal Royalty-Qualifying Revenue | 69,909,729 | 49,706,359 | 35,138,628 | 34,541,029 | 33,678,904 | 32,516,638 | 30,419,783 | 28,019,300 | 25,286,020 | 22,189,433 |
| | | | | | | | | | | |
| Licensable Revenue | | | | | | | | | | |
| Relief from Internal Royalty-Qualifying Revenues | 69,909,729 | 49,706,359 | 35,138,626 | 34,541,029 | 33,678,904 | 32,516,638 | 30,419,783 | 28,019,300 | 25,286,020 | 22,189,433 |
| Royalty Rate | 6.5% | 6.5% | 6.5% | 6.5% | 6.5% | 6.5% | 6.5% | 6.5% | 6.5% | 6.5% |
| | | | | | | | | | | |
| Licensing Revenue from Internal Royalty-Qualifying Revenues | 4,544,132 | 3,230,913 | 2,284,011 | 2,245,167 | 2,189,129 | 2,113,516 | 1,977,286 | 1,821,255 | 1,643,591 | 1,442,313 |
| Licensing Revenue from External Royalty-Qualifying Revenues | | | | | | | | | | |
| Total Licensing Revenue | 4,544,132 | 3,230,913 | 2,284,011 | 2,245,167 | 2,189,129 | 2,113,516 | 1,977,286 | 1,821,255 | 1,643,591 | 1,442,313 |
| Less: | | | | | | | | | | |
| Amortization of Trademark Value | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 |
| Equals: | | | | | | | | | | |
| Trademark Operating Income | 3,668,135 | 2,354,916 | 1,408,013 | 1,369,169 | 1,313,131 | 1,237,519 | 1,101,288 | 945,257 | 767,594 | 566,316 |
| Less: | | | | | | | | | | |
| Income Taxes | 1,320,529 | 847,770 | 506,885 | 492,901 | 472,727 | 445,507 | 396,464 | 340,293 | 276,334 | 203,874 |
| Equals: | | | | | | | | | | |
| Licensing Net Income | 2,347,606 | 1,507,146 | 901,128 | 876,268 | 840,404 | 792,012 | 704,825 | 604,965 | 491,260 | 362,442 |
| Plus: | | | | | | | | | | |
| Amortization | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 |
| Equals: | | | | | | | | | | |
| Licensing Cash Flow | 3,223,604 | 2,383,144 | 1,777,120 | 1,752,266 | 1,716,401 | 1,668,010 | 1,580,822 | 1,480,962 | 1,367,258 | 1,238,440 |
| Present Value Factor | 0.9482 | 0.8525 | 0.7665 | 0.6892 | 0.6196 | 0.5571 | 0.5009 | 0.4504 | 0.4049 | 0.3641 |
| Present Value of Licensing Cash Flow | $ 3,056,849 | $ 2,031,710 | $ 1,362,190 | $ 1,207,611 | $ 1,063,540 | $ 929,286 | $ 791,832 | $ 666,963 | $ 553,626 | $ 450,067 |

Total Present Value of Licensing Cash Flow: $ 13,139,982

Rounded: $ 13,140,000

ADAMS 003986

EXHIBIT III-J
ADAMS GOLF, INC.
RELIEF FROM ROYALTY ANALYSIS
PATENTS

| | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|
| Total Revenue | $ 55,393,055 | $ 57,054,847 | $ 58,766,492 | $ 60,529,487 | $ 62,345,372 |
| Less: Adams Golf Royalty Revenue | | | | | |
| Total Internal Royalty-Qualifying Revenue | 55,393,055 | 57,054,847 | 58,766,492 | 60,529,487 | 62,345,372 |
| Less: Non-Royalty Qualifying Revenue | 36,696,558 | 42,283,411 | 48,390,973 | 55,062,658 | 62,345,372 |
| Equals: | | | | | |
| Adjusted Internal Royalty-Qualifying Revenue | 18,696,497 | 14,771,436 | 10,375,519 | 5,466,829 | 0 |
| | | | | | |
| Licensable Revenue | | | | | |
| Relief from Internal Royalty-Qualifying Revenues | 18,696,497 | 14,771,436 | 10,375,519 | 5,466,829 | 0 |
| Royalty Rate | 6.5% | 6.5% | 6.5% | 6.5% | 6.5% |
| | | | | | |
| Licensing Revenue from Internal Royalty-Qualifying Revenues | 1,215,272 | 960,143 | 674,409 | 355,344 | 0 |
| Licensing Revenue from External Royalty-Qualifying Revenue | | | | | |
| | | | | | |
| Total Licensing Revenue | 1,215,272 | 960,143 | 674,409 | 355,344 | 0 |
| Less: | | | | | |
| Amortization of Trademark Value | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 |
| Equals: | | | | | |
| Trademark Operating Income | 339,275 | 84,146 | (201,589) | (520,654) | (875,997) |
| Less: | | | | | |
| Income Taxes | 122,139 | 30,293 | (72,572) | (187,435) | (315,359) |
| Equals: | | | | | |
| Licensing Net Income | 217,136 | 53,853 | (129,017) | (333,218) | (560,638) |
| Plus: | | | | | |
| Amortization | 875,997 | 875,997 | 875,997 | 875,997 | 875,997 |
| Equals: | | | | | |
| Licensing Cash Flow | 1,093,133 | 929,851 | 746,981 | 542,779 | 315,359 |
| Present Value Factor | 0.3273 | 0.2943 | 0.2646 | 0.2379 | 0.2139 |
| Present Value of Licensing Cash Flow | $ 357,812 | $ 273,654 | $ 197,654 | $ 129,130 | $ 67,456 |

Total Present Value of Licensing Cash Flow

Rounded

ADAMS 003987