# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION | § § § § | CIVIL ACTION NO. 99-371-KAJ (CONSOLIDATED) REDACTED - PUBLIC VERSION |

## APPENDIX OF EXHIBITS TO THE DECLARATION OF JENNIFER R. BRANNEN IN SUPPORT OF THE ADAMS GOLF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Volume 4)

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Of Counsel:                          Alyssa M. Schwartz (#4351)
Paul R. Bessette                     schwartz@rlf.com
Jennifer R. Brannen                  Richards, Layton & Finger, P.A.
Michelle A. Reed                     One Rodney Square, P.O. Box 551
Laura L. Moriaty                     Wilmington, Delaware 19899
Akin Gump Strauss Hauer & Feld LLP   (302) 651-7700
300 West 6th Street, Suite 2100
Austin, Texas 78701

Attorneys for Defendants Adams Golf, Inc.,
B.H. Adams, Richard H. Murtland, Darl P.
Hatfield, Paul F. Brown, Jr., Roland E. Casati,
Finis F. Conner, and Stephen R. Patchin

Dated: September 18, 2006

ADAMS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.  :    CONSOLIDATED

SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

————————————————————X

ORAL AND VIDEOTAPED DEPOSITION

OF BARNEY ADAMS

Thursday, June 22, 2006

The oral deposition of BARNEY ADAMS was

held at the law offices of Akin Gump Strauss Hauer

& Feld, LLP, 1700 Pacific Avenue, Suite 4100,

Dallas, Texas, from 9:32 a.m. to 4:53 p.m., before

Jamie K. Israelow, a Certified Shorthand Reporter

in and for the State of Texas, Registered

Professional Reporter, Certified Realtime Reporter

and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000    (888)777-6690

Page 14

```
09:45:36  1   time, seeing it happen to other people. It was
09:45:39  2   just -- just one of those -- it's like "they"
09:45:42  3   It's one of those known things.
09:45:44  4       Q   Do you -- do you have a belief as to
09:45:46  5   why it happens, where there's a hot product in the
09:45:49  6   golf industry?
09:45:51  7       A   Why? Can you define that for me, so
09:45:56  8   I don't jump to a conclusion.
09:45:57  9       Q   My pleasure.
09:46:00  10          I believe you said, Mr. Adams,
09:46:02  11  that your understanding in the golf industry is
09:46:04  12  that where there is a hot product, gray marketing
09:46:09  13  occurs. My question is: Why?
09:46:13  14      A   I would -- this is just my
09:46:16  15  assumption, because I'm now in the minds of the --
09:46:21  16  that channel of distribution, but if it's a hot
09:46:23  17  product and they have it in their store, you know,
09:46:28  18  that's -- that's good retailing, I guess, from
09:46:30  19  their perspective. I could say that's -- I'm
09:46:34  20  thinking for them now.
09:46:43  21      Q   In your last answer when you referred
09:46:46  22  to "them," were you referring to a nonauthorized
09:46:53  23  dealer who receives product through gray market
09:46:59  24  channels?
```

Page 15

```
09:46:59  1       A   Nonauthorized -- yeah, I mean, I
09:47:04  2   think I'm responding or I'm -- I believe I'm
09:47:06  3   responding to what you asked me, which was: Why
09:47:09  4   would somebody who was a nonauthorized dealer want
09:47:13  5   to have Adams product?
09:47:18  6       Q   Okay. Why would somebody who's an
09:47:22  7   authorized dealer or distributor want to
09:47:26  8   transship?
09:47:26  9       MR. BESSETTE: I'm just going
09:47:27  10  to object again  It's asking him to be in the
09:47:29  11  mind of one of those folks, so it's speculation.
09:47:32  12      MR. COLLINS: Sure
09:47:34  13      Q   (By Mr. Collins) And you know, I
09:47:35  14  think Paul is right, so let me rephrase the
09:47:37  15  question.
09:47:37  16          Based on your experience in
09:47:39  17  the industry, what were the circumstances, if you
09:47:42  18  know, under which authorized distributors or
09:47:47  19  retailers of hot products transshipped? Under
09:47:54  20  what circumstances did that transshipping occur?
09:47:58  21      A   I have no idea  I mean, I'd only be
09:48:00  22  guessing
09:48:03  23      Q   Okay. Now, transshipment or gray
09:48:08  24  marketing did occur at -- at Adams Golf pre-IPO,
```

Page 16

```
09:48:14  1   correct?
09:48:20  2       A   The only incident that I was aware
09:48:24  3   of, or purported incident, was a very small
09:48:28  4   quantity in Canada.
09:48:53  5       Q   Okay. When you say "a very small
09:48:55  6   quantity," how many clubs?
09:48:56  7       A   I have no idea.
09:48:59  8       Q   More than 100?
09:49:01  9       A   Again, it was -- it was my
09:49:06  10  recollection it was just a very minor thing, so I
09:49:08  11  don't know what the definition of "minor" is.
09:49:13  12      Q   Okay. Pre-IPO, before -- before the
09:49:18  13  IPO, is it correct that you were not aware of any
09:49:23  14  other transshipping or gray marketing going on
09:49:26  15  apart from this very small quantity in Canada?
09:49:32  16      MR. BESSETTE: Can I get that
09:49:32  17  question back, please.
09:49:32  18          (The reporter read back the
09:49:46  19          requested text.)
09:49:46  20      MR. BESSETTE: Thank you.
09:49:47  21      A   Okay. Answer?
09:49:49  22      Q   (By Mr. Collins) Please.
09:49:53  23      A   That sounds very specific to me.  If
09:49:59  24  I was aware of any product in the gray market
```

Page 17

```
09:50:02  1   pre-IPO, it was extremely minor, and so to say
09:50:09  2   that I wasn't aware of anything at all -- I mean,
09:50:12  3   we had a million things going on at that time.  I
09:50:15  4   might have heard about, you know, a few pieces at
09:50:18  5   some location. I honestly don't remember, but it
09:50:21  6   certainly wasn't anything of any significance, any
09:50:28  7   substance
09:50:28  8       Q   Uh-huh. Okay.  Let's -- let's talk
09:50:44  9   for a moment why it wasn't anything of any
09:50:46  10  significance or any substance  I want to
09:50:50  11  understand, Mr. Adams, the reasons why you believe
09:50:54  12  pre-IPO gray marketing wasn't of any significance
09:50:57  13  or any substance
09:50:59  14          First, do I -- is it correct
09:51:01  15  that it wasn't of any significance or any
09:51:04  16  substance because the number of clubs involved was
09:51:13  17  small?
09:51:14  18      A   I think the answer is it was, you
09:51:15  19  know -- it was basically a nonissue  Well, that's
09:51:20  20  not fair  It certainly was a very small number of
09:51:25  21  clubs, if it was even going on
09:51:38  22      Q   Okay  What do you mean by "a very
09:51:40  23  small number of clubs"?
09:51:43  24      A   You mean in volume?
```

5  (Pages 14 to 17)

## Page 22

```
09:56:34  1          MR. BESSETTE: Objection,
09:56:35  2   vague.
09:56:36  3      A     Yeah, I was just going to ask you,
09:56:38  4   you're going to have to -- again, you're going to
09:56:40  5   have to help me.
09:56:45  6      Q    (By Mr. Collins) Not a problem.
09:56:46  7          Before the IPO, did Adams Golf
09:56:54  8   take any action to try to stem gray marketing in
09:56:57  9   Canada?
09:56:57  10         MR. BESSETTE: Same objection.
09:57:03  11     A     I'm sorry, but again, if you can --
09:57:04  12  if you could be specific, I'll do the best I can
09:57:07  13  to give you an answer.
09:57:11  14     Q    (By Mr. Collins) I know you will.
09:57:11  15         Before the IPO, did the
09:57:13  16  company, Adams Golf, authorize a -- a price
09:57:16  17  matching program for Canadian retailers?
09:57:29  18     A     I remember that Chris Beebe made a
09:57:35  19  recommendation. I forget the details of the
09:57:37  20  recommendation.
09:57:37  21     Q    Let me ask you to look at Exhibit 85,
09:57:39  22  please.
09:57:39  23     A     Okay.
09:57:48  24     Q    Take your time, Mr. Adams. The
```

## Page 23

```
09:57:50  1   question, first of all, is whether you've seen
09:57:54  2   this document before.
09:57:58  3          And the second question will
09:57:59  4   be: Does this document reflect the recommendation
09:58:06  5   that Beebe made?
09:58:06  6          Take your time.
09:58:27  7      A     I've seen this before.
09:58:29  8      Q    Did you see --
09:58:30  9      A     I say -- it's addressed to me, so
09:58:32  10  I -- it's a fair thing to say I've seen it before.
09:58:35  11     Q    That's fine.
09:58:36  12         Does this document discuss the
09:58:38  13  recommendation that Mr. Beebe made that you just
09:58:40  14  referred to?
09:58:48  15     A     I'm reading it. I want to be
09:58:49  16  specific here, so excuse me.
09:59:03  17         Yes. What he refers to here
09:59:05  18  is that it -- it happened to all these other
09:59:09  19  companies in golf. They ran into a similar
09:59:12  20  situation at one time in their corporate lives,
09:59:15  21  and responded in -- in a specific manner, and he's
09:59:22  22  asking if it's -- if it's okay for us to respond
09:59:26  23  in the same manner.
09:59:26  24     Q    And did you give your okay?
```

## Page 24

```
09:59:31  1      A     I can't answer if I gave my personal
09:59:40  2   okay. I think we did something, but I don't
09:59:43  3   remember.
09:59:44  4      Q    You -- you believe Adams Golf
09:59:46  5   authorized some program in Canada pre-IPO?
09:59:51  6      A     I believe that we gave Chris the --
09:59:54  7   the necessary tools to do a job for our
09:59:57  8   distributor. I don't have a recollection as to
10:00:00  9   specifically what it was.
10:00:01  10     Q    That's fine.
10:00:03  11         Take a look, if you would, at
10:00:07  12  Exhibit 11. Again, take your time, sir. The
10:00:15  13  question is: First, have you seen this before?
10:00:19  14         And second: Does this
10:00:20  15  describe the program that was put into effect in
10:00:24  16  Canada pre-IPO?
10:00:49  17     A     And your question again, please.
10:00:51  18     Q    Have you seen this document before?
10:00:52  19     A     I don't remember this document.
10:00:53  20     Q    Does this document describe the
10:00:55  21  program that was put into place in Canada pre-IPO?
10:01:02  22     A     It's a WDC Mackenzie document, and a
10:01:07  23  WDC Mackenzie program, so I can't -- I think I'd
10:01:14  24  be inaccurate if I said I knew what they were
```

## Page 25

```
10:01:17  1   doing.
10:01:19  2      Q    Okay. Did -- did Adams Golf
10:01:22  3   authorize WD Mackenzie to institute a
10:01:26  4   price-matching program with credit given in the
10:01:28  5   form of reduced prices on future shipments?
10:01:38  6      A     I think the fair answer is that I
10:01:42  7   don't think WDC Mackenzie would have instituted
10:01:46  8   something like that if we hadn't supported them in
10:01:48  9   some manner. As to what we did, I don't have any
10:01:51  10  idea.
10:01:51  11     Q    Okay. Now, you -- you mentioned a
10:01:54  12  moment ago that the gray marketing problem wasn't
10:01:56  13  of any significance or any substance pre-IPO. It
10:02:01  14  wasn't of any significance or any substance in
10:02:05  15  Canada; is that correct, or just overall to Adams
10:02:08  16  Golf, it wasn't of any significance or any
10:02:11  17  substance?
10:02:11  18     A     Certainly overall.
10:02:12  19     Q    Was it of any significance or any
10:02:15  20  substance for Adams Golf in Canada?
10:02:21  21     A     Well, it's a -- it's a kind of a
10:02:25  22  beauty-in-the-eyes-of-the-beholder answer. From
10:02:28  23  our standpoint, our Canadian sales were
10:02:33  24  incremental, and it's -- it's not -- from a
```

7 (Pages 22 to 25)

### Page 26

```
10:02:37  1   corporate standpoint, it is not a significant
10:02:42  2   issue.
10:02:42  3              But again, being fair, and you
10:02:45  4   have a distributor up there, and if they think
10:02:48  5   it's a problem, regardless of the degree, I think
10:02:51  6   the professional thing to do is support your
10:03:07  7   distributor.
10:03:20  8        Q    When you say: To support your
10:03:22  9   distributor is the professional thing to do, what
10:03:25 10   do you mean?
10:03:26 11        A    Could be a lot of things.
10:03:33 12        Q    Give me -- give me a list.
10:03:39 13              MR. BESSETTE: Just maybe some
10:03:40 14   top highlights, you know, or we're going to be
10:03:44 15   here all day.
10:03:45 16        A    It could be, you know, you listen to
10:03:47 17   them. You send a representative to their area.
10:03:51 18   You -- you show them general support. I mean,
10:03:54 19   they don't buy product without responsibility
10:03:58 20   themselves, so it's not just: Hey, guys, we'll
10:04:04 21   solve all your problems for you, especially in WDC
10:04:09 22   Mackenzie's case, because my recollection is that
10:04:11 23   they were new to the golf business themselves.
10:04:13 24              So this was kind of a dual
```

### Page 27

```
10:04:14  1   learning process. So you -- you, like I said
10:04:18  2   before, you make professional judgments.
10:04:21  3        Q    (By Mr. Collins) And do you spend
10:04:24  4   dollars? Do you commit resources to support your
10:04:32  5   distributor in those circumstances?
10:04:35  6        A    That's a relative -- I mean, my
10:04:39  7   answer's a relative answer. If you send somebody
10:04:42  8   up there, you've spent dollars, so you're
10:04:45  9   obviously doing something.
10:04:55 10        Q    Let's go back to this question of why
10:04:58 11   pre-IPO gray marketing was of any significance or
10:05:03 12   substance.
10:05:03 13              In analyzing whether it was
10:05:05 14   any significance -- of any significance or any
10:05:06 15   substance, I understand from your prior testimony
10:05:10 16   that one consideration was whether it was a very
10:05:14 17   small number of clubs.
10:05:18 18              Beyond that, in considering
10:05:19 19   whether it was any significance or any substance
10:05:22 20   pre-IPO, is it a relevant consideration as to
10:05:27 21   whether major customers of Adams Golf complained?
10:05:34 22        A    I think if they did, it would be,
10:05:36 23   sure.
10:05:36 24        Q    Why?
```

### Page 28

```
10:05:40  1        A    Well, I don't -- I'm not trying to
10:05:43  2   sound trite, but I don't think anybody wants their
10:05:47  3   customers to complain.
10:05:48  4        Q    Now, in considering why you don't
10:05:54  5   want your customers to complain, especially your
10:05:59  6   major customers, you don't want them to complain
10:06:01  7   because if they complain, they may get unhappy,
10:06:04  8   right?
10:06:05  9              MR. BESSETTE: Objection,
10:06:05 10   vague.
10:06:07 11        Q    (By Mr. Collins) You don't want your
10:06:08 12   customers unhappy, do you, Mr. Adams?
10:06:11 13        A    I prefer that they be happy.
10:06:13 14        Q    Because if your customers are
10:06:15 15   unhappy, one of the things your customers can do
10:06:19 16   is stop dealing with you and start dealing with a
10:06:20 17   competitor, correct?
10:06:22 18        A    Well, I guess they can do that at any
10:06:25 19   time. It's the nature of business.
10:06:27 20        Q    And preventing major customers or any
10:06:31 21   customers from dropping Adams Golf clubs and
10:06:35 22   starting to sell other clubs is something that you
10:06:39 23   have an interest in doing, correct?
10:06:43 24              MR. BESSETTE: Can I get that
```

### Page 29

```
10:06:43  1   question back?
10:06:45  2        A    Yeah, I was just going to ask the
10:06:47  3   same thing.
10:06:47  4        Q    (By Mr. Collins) How about I
10:06:49  5   translate that question so it can be understood.
10:06:52  6              MR. BESSETTE: Okay.
10:06:53  7        Q    (By Mr. Collins) Adams Golf pre-IPO
10:06:57  8   and all the time has an interest in preventing its
10:06:57  9   customers from dropping Adams Golf and picking up
10:06:58 10   some competitor?
10:06:58 11              THE REPORTER: I'm sorry. Can
10:06:58 12   you say that again?
10:06:58 13              MR. COLLINS: Sorry.
10:07:04 14        Q    (By Mr. Collins) Pre-IPO, and at all
10:07:07 15   times, Adams Golf doesn't want to lose customers
10:07:12 16   to competitors, does it?
10:07:15 17        A    I don't think any business does.
10:07:17 18        Q    Now, in trying to analyze whether
10:07:25 19   gray marketing was of any significance or
10:07:27 20   substance pre-IPO, was it relevant as to whether
10:07:31 21   the problem was occurring in more places than just
10:07:39 22   Canada?
10:07:39 23        A    Excuse me. Again, I'm going to have
10:07:42 24   to ask you to repeat that.
```

8  (Pages 26 to 29)

9946c097-09d6-4975-9215-f12a9a4984b6

## Page 30

```
10:07:43  1    Q.  Not a problem.
10:07:44  2        In coming to a conclusion as
10:07:47  3   to whether the problem was of any significance
10:07:52  4   pre-IPO, is it relevant to inquire where gray
10:07:57  5   marketing is going on?
10:07:59  6        MR. BESSETTE:  Let me just
10:08:00  7   object.  It's sort of a hypothetical.  Do you want
10:08:02  8   to know did he consider that, or in some
10:08:06  9   hypothetical context would he have considered
10:08:08 10   that?
10:08:08 11        MR. COLLINS:  That's fair.
10:08:10 12   Mr. Adams said that in his opinion pre-IPO, gray
10:08:16 13   marketing was not of any significance or any
10:08:20 14   substance.
10:08:21 15    Q.  (By Mr. Collins)  My question is --
10:08:22 16        MR. BESSETTE:  Or if it was
10:08:23 17   even going on, I believe is what he testified.
10:08:25 18        MR. COLLINS:  Well, Mr. -- I
10:08:26 19   believe he testified it was going on in Canada.
10:08:29 20    Q.  (By Mr. Collins)  So the question is:
10:08:30 21   In coming to that conclusion that it wasn't of any
10:08:33 22   significance or any substance, apart from
10:08:36 23   considering the number of clubs, and apart from
10:08:40 24   considering any complaints from customers,
```

## Page 31

```
10:08:42  1   especially major customers, is it also a
10:08:46  2   consideration as to the number of locations, the
10:08:50  3   number of geographical areas in which gray
10:08:54  4   marketing is going on?
10:08:56  5        MR. BESSETTE:  Same objection.
10:08:57  6    A.  Yeah.  I'm sorry.  Like I say, I'm
10:09:00  7   not trying to appear argumentative, but that was a
10:09:02  8   very long introduction to that question.  If you
10:09:04  9   can break it down for me, I will do my best to
10:09:08 10   answer it.
10:09:08 11        MR. BESSETTE:  Would it
10:09:10 12   shortcut it if you just asked him what his reasons
10:09:12 13   were for that conclusion?
10:09:13 14    Q.  (By Mr. Collins)  What were your
10:09:15 15   reasons for that conclusion?
10:09:15 16    A.  The -- we wanted to protect our chain
10:09:29 17   of distribution.
10:09:40 18    Q.  Okay.
10:09:40 19        MR. BESSETTE:  What he wants
10:09:41 20   to know is what was the reasons for your
10:09:43 21   conclusion that gray marketing was not a
10:09:44 22   significant issue to the company pre-IPO.
10:09:50 23    A.  Sorry.  I've got to stop and think
10:09:53 24   here.
```

## Page 32

```
10:09:53  1    Q.  (By Mr. Collins)  Take your time.
10:09:55  2    A.  The reason -- if I may repeat the
10:09:58  3   question back so I can get it right.  The reason
10:10:00  4   that gray marketing wasn't an issue pre-IPO?
10:10:03  5        MR. BESSETTE:  Uh-huh.
10:10:05  6    A.  It wasn't -- it wasn't going on.  I
10:10:07  7   mean, outside of a -- like I said, I -- I alluded
10:10:10  8   to Canada, which is a very tiny market and a very
10:10:14  9   small incident in a very tiny market.  That was
10:10:21 10   it.  We didn't have a gray market issue pre-IPO.
10:10:29 11    Q.  (By Mr. Collins)  Okay.
10:10:29 12    A.  To be -- I'm trying to be specific to
10:10:31 13   your question.  We didn't have quantities of
10:10:34 14   product showing up in the gray market pre-IPO.  I
10:10:36 15   guess that's a better answer.
10:10:37 16    Q.  And when I asked you, Mr. Adams, what
10:10:40 17   you mean by quantities, can you tell me, please?
10:10:43 18    A.  Same answer I gave you before.  I
10:10:44 19   mean, if it's a nonissue, it's a nonissue.
10:10:48 20    Q.  And it wasn't -- it was a nonissue,
10:10:50 21   you said in part, because there weren't quantities
10:10:52 22   of product coming up.  So in order to understand
10:10:56 23   why you thought it was a nonissue, I need to know
10:10:59 24   what you meant by "quantities."
```

## Page 33

```
10:11:02  1    A.  And my answer to that would be:
10:11:05  2   Nothing came to my attention.
10:11:20  3    Q.  Well, sure.  Because you can't
10:11:23  4   personally consider that something is a material
10:11:26  5   problem unless you're aware of the facts, right?
10:11:35  6    A.  I can't be sure if something is a
10:11:37  7   material problem?  I'm aware of the facts?
10:11:46  8        I think in -- my answer to
10:11:48  9   that would be:  In my job, I did my best to act on
10:11:48 10   facts.
10:11:54 11        MR. COLLINS:  Okay.  I am
10:11:54 12   going to mark Exhibit 291, if I may, Adams 28492.
10:12:15 13        MR. BESSETTE:  Thank you.
10:12:15 14        (Deposition Exhibit 291
10:12:15 15        was marked.)
10:12:15 16    Q.  (By Mr. Collins)  Tell me, please, if
10:12:17 17   you've seen this document before.
10:12:24 18    A.  Yes, I have.
10:12:25 19    Q.  Are you the author of this document?
10:12:29 20    A.  It's not signed by me, but my name is
10:12:33 21   on it, and I think it's a fair assumption that I
10:12:36 22   authored it.
10:12:36 23    Q.  And you authored it in the course of
10:12:39 24   your regular duties in or about June of '98?
```

9  (Pages 30 to 33)

## Page 34

10:12:40 1    A    I think that would be fair, yes.

10:12:42 2    Q    Now, why did you write this letter?

10:12:53 3    A    It sounds like it's just an effort on

10:12:55 4    our part to make sure that these guys were doing

10:13:02 5    what they told us they were doing.

10:13:04 6    Q    By "these guys," you mean King Par?

10:13:08 7    A    They're the -- they're the object of

10:13:10 8    the letter, yes.

10:13:10 9    Q    And as of June '98, you had some

10:13:13 10    reason to believe, Mr. Adams, that King Par was

10:13:17 11    transshipping?

10:13:17 12    A    I don't know if you can make that

10:13:19 13    conclusion or not. I mean, it's -- it's --

10:13:24 14    certainly no hard facts.

10:13:29 15    Q    Fine. What did you know about King

10:13:31 16    Par at that time?

10:13:33 17    A    That they were a very -- if I

10:13:36 18    remember correctly, they were a pretty good-sized

10:13:39 19    customer, I think, in the upper Midwest.

10:13:44 20    Q    Okay. What else did you know about

10:13:49 21    them?

10:13:49 22    A    I think that's about it, to be honest

10:13:51 23    with you.

10:13:55 24    Q    Did you have any reason to think they

## Page 35

10:13:57 1    were -- they were transshipping?

10:14:00 2    A    I think I said that I -- I don't have

10:14:03 3    any record of any specific incident.

10:14:05 4    Q    By "record," sir, did you mean

10:14:08 5    recollection or record?

10:14:12 6    A    I guess one would lead to the other,

10:14:14 7    but whichever. I don't remember any specific

10:14:17 8    incident.

10:14:17 9    Q    Look at 292, if you would, Adams

10:14:23 10    28486. Tell me if you have seen this, before.

10:14:23 11            (Deposition Exhibit 292

10:14:40 12            was marked.)

10:14:41 13    A    Yes, I have.

10:14:45 14    Q    (By Mr. Collins) You're the author

10:14:46 15    of this document on or about June 26, '98, in the

10:14:51 16    normal course of your duties?

10:14:52 17    A    Same answer as the other one. It's

10:14:54 18    not signed, but I -- it's a fair assumption.

10:14:57 19    Q    Why did you write this letter?

10:15:00 20    A    My -- my -- my -- excuse me.

10:15:07 21            It looks like I'm saying:

10:15:09 22    Hey, you guys, if you're thinking about doing

10:15:13 23    this, don't do it.

10:15:23 24    Q    Did you have reason to believe that

## Page 36

10:15:24 1    Manatee was thinking of transshipping?

10:15:27 2    A    I don't remember any specific

10:15:28 3    incident.

10:15:28 4    Q    Did you have reason to believe that

10:15:31 5    Manatee hadn't transshipped?

10:15:34 6    A    Same answer. I don't have any

10:15:35 7    specific information.

10:15:44 8    Q    Now, I believe you testified that

10:15:48 9    gray marketing has occurred before in the golf

10:15:52 10    industry, correct?

10:15:55 11    A    It was common knowledge.

10:15:56 12    Q    And gray marketing, as of this

10:15:58 13    moment, certainly has occurred before today at

10:16:04 14    Adams Golf, correct?

10:16:06 15    MR. BESSETTE: I'm sorry.

10:16:06 16    Before today?

10:16:08 17    Q    (By Mr. Collins) Gray marketing has

10:16:09 18    occurred at Adams Golf, right?

10:16:11 19    A    You -- are you referring to Canada?

10:16:14 20    Q    Sure.

10:16:16 21    A    There was a -- a incident of clubs

10:16:21 22    showing up in Costco of Canada.

10:16:22 23    Q    And then post -- post -- I'm sorry to

10:16:25 24    cut you off.

## Page 37

10:16:25 1    A    That's all right.

10:16:26 2    Q    Post-IPO, there was more gray

10:16:30 3    marketing that went on with regard to Adams

10:16:33 4    products, and not just in Canada, correct?

10:16:36 5    A    Post-IPO. I'm sorry. That's a long

10:16:39 6    period of time. Can you -- can you narrow it down

10:16:40 7    a little bit?

10:16:41 8    Q    Not a problem.

10:16:42 9            What I'm getting to is this:

10:16:45 10    At this point, as you sit in your chair right now,

10:16:49 11    you are sensitive to gray marketing issues, I

10:16:51 12    presume, and I presume that once you hear of gray

10:16:54 13    marketing, you probably want to inquire to find

10:16:59 14    out what's going on; is that fair?

10:17:03 15    A    As I sit in this chair. We had said

10:17:13 16    as a company that we are going to market our

10:17:15 17    product through -- I don't remember the

10:17:19 18    terminology, but classic or standard lines of

10:17:26 19    distribution. That does not include what you -- I

10:17:30 20    guess you generally refer to as big-box stores,

10:17:33 21    for example, United States.

10:17:38 22            I think once you have made

10:17:39 23    that statement as a company, and especially since

10:17:45 24    it's Adams Golf and I'm Adams, that to follow up

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

9946c097-09d6-4975-9215-f12a9a4984b6

Page 38

10:17:48  1  on the word "sensitive," I would be sensitive to
10:17:51  2  the fact that we did what we said we were going to
10:17:54  3  do.
10:17:54  4      Q    Sure. Accordingly, you would be
10:18:02  5  sensitive to know whether gray marketing is going
10:18:04  6  on, correct?
10:18:07  7      A    You mean would I want to know if it
10:18:09  8  was going on?
10:18:10  9      Q    Yes.
10:18:15 10      A    I'm sure I would want to know as much
10:18:17 11  as I could about everything.
10:18:20 12      Q    Okay. Let's talk about how much and
10:18:21 13  what you'd like to know about gray marketing.
10:18:23 14           You'd like to know, I presume,
10:18:26 15  the number of clubs involved. Is that fair?
10:18:29 16           MR. BESSETTE: Can we figure
10:18:30 17  out when we're talking about, because we're
10:18:30 18  just --
10:18:33 19           THE WITNESS: I was just going
10:18:34 20  to ask that.
10:18:35 21           MR. BESSETTE: -- in
10:18:36 22  generalities here.
10:18:37 23           MR. COLLINS: Well, you know,
10:18:37 24  yeah, this is a general question, and this is

Page 39

10:18:41  1  directed on the basis of Mr. Adams' knowledge of
10:18:44  2  industry, his experience with Adams Golf. I'm
10:18:49  3  asking what are the relevant considerations once
10:18:51  4  there is a suspicion or a reason to be concerned
10:18:57  5  about gray marketing.
10:18:57  6           MR. BESSETTE: And for him as
10:18:57  7  a CEO at the time, or, just so I'm clear, what are
10:19:00  8  we talking about?
10:19:01  9           MR. COLLINS: I think in -- I
10:19:02 10  think the consideration right now, especially
10:19:04 11  since we are dealing with something that happened
10:19:07 12  eight years ago, I'm asking on the basis of
10:19:11 13  Mr. Adams' considerable experience and background,
10:19:14 14  what are the relevant factors.
10:19:17 15      Q    (By Mr. Collins) So again, once you
10:19:19 16  are apprised of the possibility of gray marketing,
10:19:21 17  what are the things you want to know?
10:19:27 18      A    Assuming I were apprised of gray
10:19:34 19  marketing, because I'm -- well, let me -- can I --
10:19:36 20  I have to ask you a question.
10:19:38 21      Q    Please.
10:19:39 22      A    Are you asking me to answer what
10:19:41 23  happened, or are you asking me to answer how I
10:19:43 24  would react if it happened?

Page 40

10:19:45  1      Q    Okay. For the moment, I want to know
10:19:53  2  what your general procedure is, how you would
10:19:57  3  react, what is, in your view, the appropriate way
10:20:00  4  to act when there are reports of gray marketing.
10:20:03  5  And then as the day goes on, we can ask more about
10:20:06  6  specific instances pre- and post-IPO.
10:20:10  7           But in general, as a CEO of
10:20:12  8  Adams Golf, what is, in your opinion, the
10:20:15  9  appropriate response?
10:20:17 10      A    If I had -- this is all hypothetical,
10:20:25 11  so I'm going to be a little slow with my answer
10:20:27 12  here.
10:20:27 13      Q    Take your time, sir.
10:20:29 14      A    If I have knowledge of product,
10:20:33 15  significant amounts of product showing up at
10:20:46 16  nonaccredited channels of distribution, I would
10:20:54 17  have a concern, and I would want to find out where
10:21:04 18  they were coming from. I guess -- I'm trying to
10:21:06 19  think of my course of action. That would be my
10:21:08 20  first course of order, you know, where are they
10:21:10 21  getting this stuff.
10:21:22 22      Q    Okay. Would you want to find out --
10:21:28 23  well, in your answer, of course, you refer to
10:21:30 24  significant amounts of product. And you know my

Page 41

10:21:33  1  next question is: What do you mean by significant
10:21:35  2  amounts of product?
10:21:35  3      A    Right.
10:21:35  4      Q    But I gather, Mr. Adams, you wouldn't
10:21:39  5  be concerned if you had a report that there were
10:21:42  6  two gray market clubs showing up in a retailer in
10:21:48  7  Poughkeepsie. That wouldn't bother you?
10:22:00  8      A    No.
10:22:00  9      Q    It might bother you a little bit more
10:22:02 10  if the retailer in Poughkeepsie was Costco, as
10:22:04 11  opposed to a mom-and-pop shop. Is that fair?
10:22:08 12      A    No.
10:22:09 13      Q    What --
10:22:09 14      A    It would not bother me.
10:22:12 15      Q    Okay. Now, we change the
10:22:14 16  hypothetical from two clubs to 200 clubs, a
10:22:18 17  retailer in Poughkeepsie. Does that bother you?
10:22:21 18           MR. BESSETTE: Let me just
10:22:22 19  object. This is calling for a lot of speculation
10:22:24 20  and hypotheticals without a lot of circumstance
10:22:27 21  behind it, so I think it's vague and speculative.
10:22:30 22           MR. COLLINS: Okay.
10:22:30 23           MR. BESSETTE: And
10:22:32 24  hypothetical.

11 (Pages 38 to 41)

Page 42

10:22:32 1    Q    (By Mr Collins) Yeah, and what I'm
10:22:33 2  really asking for are -- are the criteria you use
10:22:37 3  to judge possible instances of gray marketing
10:22:42 4            MR. BESSETTE: That's a better
10:22:43 5  question. Maybe just let him answer that
10:22:45 6            MR COLLINS: Good.
10:22:47 7    A    Okay.
10:22:48 8    Q    (By Mr Collins) So the criteria --
10:22:49 9  yeah, I think you just testified to such, that a
10:22:51 10  report of two gray-marketed clubs in Poughkeepsie
10:22:55 11  don't constitute significant amounts of product.
10:22:58 12        So the next question is: Do
10:23:01 13  200 clubs constitute, at one location in
10:23:06 14  Poughkeepsie, significant amounts of product?
10:23:08 15            MR. BESSETTE: Same objection.
10:23:09 16  It's hypothetical. You know, why don't you ask
10:23:11 17  him what his criteria is instead of dancing around
10:23:15 18  with hypotheticals?
10:23:17 19    Q    (By Mr. Collins) You can go ahead.
10:23:19 20    A    Okay. Again. Which one am I
10:23:20 21  answering now? Am I answering the hypothetical or
10:23:23 22  am I answering the 200 clubs?
10:23:25 23    Q    Well, Paul's a good guy, but I'm the
10:23:28 24  one asking the questions here, and Paul's job is

Page 43

10:23:30 1  to object.
10:23:31 2    A    Okay.
10:23:31 3    Q    So the question is: When you apply
10:23:34 4  your criteria and you are analyzing whether it is
10:23:39 5  significant amounts of product showing up, are 200
10:23:43 6  clubs at a Poughkeepsie site, a single site in
10:23:47 7  Poughkeepsie, significant amounts of product?
10:23:51 8            MR. BESSETTE: Objection,
10:23:52 9  calls for hypothetical, inadequate basis for
10:23:55 10  circumstance and an answer, so it's speculative.
10:23:59 11    Q    (By Mr. Collins) You may answer.
10:24:00 12    A    So am I supposed to answer now?
10:24:02 13            MR. BESSETTE: Yes.
10:24:03 14    Q    (By Mr. Collins) If you would.
10:24:04 15            MR. BESSETTE: If you can.
10:24:04 16    A    Well. I real -- I'd be -- I can
10:24:05 17  answer hypothetical with hypothetical. That's all
10:24:07 18  I can do.
10:24:09 19    Q    (By Mr. Collins) Sure.
10:24:11 20    A    You referred specifically to Costco,
10:24:13 21  and you referred specifically to a number of
10:24:18 22  clubs. Whether it's 3 or 13 or 140 or 216, or,
10:24:23 23  you know, so on. I mean, I guess we can keep
10:24:26 24  increasing the amount.

Page 44

10:24:28 1        Number one, in my position,
10:24:37 2  which is, I think, how you're asking me the
10:24:37 3  question, I'm always concerned about any problem
10:24:40 4  or perceived problem. I have to be. That's my
10:24:44 5  job. If I think that the problem is something
10:24:54 6  that needs attention -- and again, I don't like
10:24:57 7  that wording because every problem needs attention
10:25:00 8  to some degree, and I don't want to pretend here
10:25:06 9  like I'm ignoring my customers and so on.
10:25:06 10        But in retrospect, the only --
10:25:09 11  the only background I have is what was going on.
10:25:12 12  What was going on pre-IPO and during the IPO is we
10:25:18 13  were shipping more product than we had in the
10:25:20 14  entire history of the company beforehand. The
10:25:24 15  Tight Lies was the hottest selling club in its
10:25:27 16  category of golf.
10:25:29 17        If a few pieces showed up at a
10:25:33 18  Costco or a gas station -- I keep referring to a
10:25:36 19  gas station because that actually happened once --
10:25:39 20  you know, that's going to happen. I mean, how
10:25:41 21  they got them, I don't know how they got them.
10:25:45 22        My issue is to -- to -- or my
10:25:48 23  job, my responsibility is to look at it on an
10:25:55 24  overview, and if it -- if it looks like it's

Page 45

10:25:56 1  something that's going to impact us, then I take
10:26:00 2  action. I mean, you're going to ask me, again, I
10:26:03 3  guess: Well, you know, does that start at 200
10:26:07 4  pieces in Poughkeepsie or 300 pieces someplace
10:26:12 5  else?
10:26:12 6        That's impossible for me to
10:26:13 7  answer. I have -- we have to -- you know, we were
10:26:15 8  shipping -- at the time, we were shipping, I don't
10:26:18 9  know, I think 100,000 pieces in one month or
10:26:21 10  something like that. So on the one hand you're
10:26:26 11  always sensitive to customer problems, but on the
10:26:29 12  other hand you just have to analyze the situation
10:26:31 13  as it -- as it really happens.
10:26:34 14    Q    Sure. So if it is something that is
10:26:38 15  going to affect us, then you take action? Did I
10:26:41 16  hear that correctly?
10:26:43 17    A    If it's something I think is going to
10:26:45 18  affect us. I mean, I don't always know.
10:26:47 19    Q    Sure. And one way to take action, if
10:26:49 20  you think gray marketing is going to affect you,
10:26:52 21  is to send Beebe to Canada to find out the extent
10:26:55 22  of the problem there; is that accurate?
10:26:58 23            MR. BESSETTE: Objection,
10:26:59 24  misstates testimony.

12 (Pages 42 to 45)

9946c097-09d6-4975-9215-f12a9a4984b6

Page 46

```
10:27:03 1      A    Yeah.  We kind of jumped from
10:27:06 2  Poughkeepsie to Canada here.  I think I testified
10:27:09 3  earlier that in Canada we had a new distributor
10:27:11 4  and a new distributor to golf equipment.  And --
10:27:13 5  and when Chris went to Canada, it was a
10:27:16 6  multipurpose, if I remember correctly, a
10:27:18 7  multipurpose visit.  And that's, you know,
10:27:20 8  partially to assess them to see if there's a real
10:27:23 9  problem, to see what we can do about -- the real
10:27:26 10  objective was about helping them increase their
10:27:29 11  distribution, so you know, again, you make
10:27:32 12  decisions based on the circumstances.
10:27:35 13      Q    (By Mr. Collins)  Well, what
10:27:36 14  other things do you do to take action besides
10:27:47 15  investigate?
10:27:47 16              MR. BESSETTE:  I'm not quite
10:27:48 17  sure I understand.
10:27:49 18      A    Yeah, I'm not quite sure I do either.
10:27:51 19  Again, I don't want to appear argumentative,
10:27:53 20  but --
10:27:53 21      Q    (By Mr. Collins)  You're not
10:27:54 22  argumentative.
10:27:54 23      A    -- you have to be more -- more
10:27:56 24  specific than that, please.
```

Page 47

```
10:27:57 1      Q    You said a moment ago:  If it is
10:27:59 2  something that is going to affect us, then I take
10:28:02 3  action
10:28:02 4      A    Right
10:28:02 5      Q    My question is:  What action do you
10:28:04 6  take?
10:28:04 7      A    Well, you asked me a hypothetical
10:28:07 8  question and I was giving you a hypothetical
10:28:08 9  answer.  So if we're going to stay in the world
10:28:10 10  of -- of hypothetical questions --
10:28:12 11      Q    Well, you know, this isn't all that
10:28:14 12  hypothetical, because you are an experienced CEO
10:28:17 13  with experience with regard to this particular
10:28:19 14  question, so the -- the -- what I would like you
10:28:23 15  to answer, Mr. Adams, is:  What is the range of
10:28:27 16  action that you have available to you, if it -- if
10:28:33 17  it, the gray marketing, is something that's going
10:28:35 18  to affect you?
10:28:36 19              MR. BESSETTE:  That is a
10:28:37 20  hypothetical, Todd.  I mean, why don't you ask him
10:28:40 21  about what actually happened at Adams Golf pre-IPO
10:28:47 22  and use facts instead of asking him these kind of
10:28:49 23  general hypotheticals.
10:28:50 24      Q    (By Mr. Collins)  Please, if you
```

Page 48

```
10:28:52 1  could answer the question.
10:28:52 2      A    Could you repeat the question?
10:28:54 3      Q    Not a problem.
10:28:55 4              Once you conclude that gray
10:28:57 5  marketing is something that is going to affect us
10:29:01 6  or may affect us, then what is the range of action
10:29:04 7  available to you?
10:29:05 8              MR. BESSETTE:  Objection,
10:29:07 9  calls for hypothetical.
10:29:08 10              THE WITNESS:  Right.
10:29:08 11              MR. BESSETTE:  And
10:29:11 12  speculation.
10:29:11 13      A    You're -- you said that you were
10:29:13 14  asking me, you know, based on my expertise as a
10:29:16 15  CEO, et cetera; is that correct?  I mean, how I
10:29:21 16  would proceed?
10:29:21 17      Q    (By Mr. Collins)  Yes.
10:29:22 18      A    What I would do, if there -- in this
10:29:23 19  hypothetical situation, if there were a problem, I
10:29:26 20  would ask the individual whose area of
10:29:34 21  responsibility under which it fell, say it was a
10:29:44 22  quality problem, or whatever, to get back to me
10:29:44 23  with his analysis or her analysis, as the case may
10:29:47 24  be, and -- series of recommendations and we would
```

Page 49

```
10:29:51 1  go from there.
10:29:57 2              MR. BESSETTE:  Todd, we've
10:29:58 3  been going about an hour, so let me know when
10:30:01 4  you're ready for a break.
10:30:01 5              MR. COLLINS:  We've got to
10:30:03 6  be here -- just a couple more questions on this
10:30:04 7  line and then we'll break.  You know, let's break
10:30:13 8  now.
10:30:15 9              THE WITNESS:  Breaking
10:30:21 10              MR. PARKER:  All right.  We're
10:30:22 11  going off the record at 10:30 a.m.  This is the
10:30:24 12  end of Tape 1.
10:30:24 13              (A recess was taken from
10:40:18 14              10:30 to 10:40.)
10:40:20 15              MR. PARKER:  We are now back
10:40:21 16  on the record at 10:40 a m
10:40:24 17      Q    (By Mr. Collins)  Before the break,
10:40:26 18  you said:  We market our product through classic
10:40:30 19  and standard lines of distribution, not big-box
10:40:36 20  stores.
10:40:36 21              That's -- that's the case
10:40:38 22  today and that was the case at the time of the
10:40:41 23  IPO, correct?
10:40:42 24      A    It's not the case today.
```

13  (Pages 46 to 49)

Page 66

```
11:00:55  1    Q    Yes.
11:00:56  2    A    To the best of my knowledge.
11:01:00  3    Q    Were you concerned that, as a result
11:01:01  4  of the appearance of Adams product in Costcos,
11:01:08  5  that retailers thought that the -- Costco was
11:01:13  6  buying from Adams?
11:01:19  7           MR. BESSETTE:  Can I get that
11:01:21  8  back, please.
11:01:22  9           MR. COLLINS:  Let me rephrase
11:01:23 10  it.
11:01:24 11    Q    (By Mr. Collins)  Were you concerned
11:01:27 12  that Adams' authorized retailers thought that
11:01:30 13  Adams was selling directly to Costco?
11:01:40 14    A    Well, I would have been concerned if
11:01:42 15  they were.  Let's put it that way.
11:01:44 16    Q    You have to explain that, if you
11:01:45 17  would.
11:01:46 18    A    We gave our word that we sold through
11:01:55 19  normal channels of distribution.  If somebody
11:01:58 20  thought we were lying, I would be concerned.
11:02:01 21    Q    Sure.  Did Gonsalves respond to this
11:02:40 22  memo?
11:02:41 23    A    I don't remember.
11:02:41 24    Q    Did you ever determine whether there
```

Page 67

```
11:02:44  1  was language in our purchase order that precludes
11:02:46  2  selling to other retailers?
11:02:50  3    A    I don't remember that.  I don't
11:02:53  4  remember what language we had.
11:02:57  5    Q    Do you know whether as of the time of
11:02:59  6  this memo there was any obligation on the part of
11:03:03  7  authorized retailers and distributors not to
11:03:07  8  transship?
11:03:14  9    A    I'm struggling with the word
11:03:17 10  "obligation," because that's -- my interpretation
11:03:21 11  is that's a -- a legal arrangement, and I don't --
11:03:26 12  I mean, I don't have an answer for that.
11:03:29 13    Q    Was there a legal obligation at the
11:03:32 14  time?
11:03:32 15    A    I -- I don't think we -- we didn't
11:03:34 16  have any, you know, legal contracts or contracts
11:03:38 17  by lawyers written up with our retailers.
11:03:40 18    Q    Was there any other non -- was there
11:03:44 19  any other obligation, not of a legal nature,
11:03:48 20  preventing the retailers or distributors from
11:03:53 21  transshipping?
11:03:54 22    A    Would you repeat that, please.
11:03:55 23    Q    Apart from any legal obligation, was
11:03:58 24  there any other sort of obligation that prevented
```

Page 68

```
11:04:02  1  retailers or distributors from transshipping?
11:04:10  2    A    I think that the -- to the best of
11:04:18  3  our ability, if we felt that a retailer were
11:04:25  4  transshipping, again, I'm getting hypothetical
11:04:29  5  here, we would -- I guess we would do whatever we
11:04:37  6  could to make sure that didn't happen.
11:04:42  7    Q    And I showed you before Exhibits 291
11:04:45  8  and 292, which were your letters of June 26, '98,
11:04:50  9  to King Par and Manatee.
11:04:55 10    A    Right.
11:04:55 11    Q    Was that part of your efforts to try
11:04:57 12  to prevent transshipping from happening?
11:05:00 13    A    I think, as I testified, those
11:05:01 14  letters were kind of like:  Hey, if you're
11:05:04 15  thinking about this, don't do it.
11:05:05 16    Q    And was the lawsuit one of the
11:05:08 17  ways -- the bill of discovery, one of the ways you
11:05:12 18  tried to prevent transshipping from occurring?
11:05:15 19    A    I -- no, I don't think you can state
11:05:19 20  that, though -- I mean, the bill of discovery was
11:05:22 21  our attempt to -- to base -- to -- really to do
11:05:27 22  two things:  If it were going on or if Costco were
11:05:34 23  planning on having it go on, to force them to tell
11:05:38 24  us where it was coming from.
```

Page 69

```
11:05:40  1           And secondly, I think the
11:05:42  2  other objective was to give our people, our
11:05:48  3  salespeople, a -- a vehicle, for lack of a better
11:05:51  4  word, that says:  Look, you know, if it ever comes
11:05:56  5  up, we don't sell to Costco.  And not only do we
11:05:58  6  not sell them, we sue them.
11:06:00  7           I think those would be the --
11:06:04  8  the two objectives.
11:06:13  9    Q    Okay.  What was the objective of the
11:06:13 10  press release with regard to the bill of
11:06:13 11  discovery?
11:06:13 12    A    To get the story out.  As a small
11:06:16 13  company, nonpublic company at the time, we didn't
11:06:18 14  have a -- much of a vehicle to tell a story, and
11:06:22 15  we felt that this was a way to -- to nip anything
11:06:28 16  in the bud that might come up if it ever were to
11:06:30 17  come up.
11:06:34 18    Q    On Exhibit 293, the first sentence
11:06:36 19  reads:  As we proceed, understand that we're
11:06:39 20  taking on the 800 -- is that 800-pound gorilla?
11:06:43 21    A    That would be my interpretation, yes.
11:06:45 22    Q    And they've done this 1,000 times.
11:06:48 23    A    Yes.
11:06:48 24    Q    Costco is the 800-pound gorilla?
```

18  (Pages 66 to 69)

Page 98

11:53:23 1 mean, do you want me to list every risk that I can
11:53:26 2 think of that's --
11:53:28 3    Q    And --
11:53:29 4    A    Now pertaining to then --
11:53:31 5    Q    Please.
11:53:31 6    A    -- is that what you're asking me?
11:53:37 7    Q    If you would.
11:53:37 8    A    Competition, some -- something
11:53:45 9 causing the market to, you know, crash, some --
11:53:50 10 some negative effect on the marketplace, I guess,
11:54:00 11 a major quality problem with your product that --
11:54:07 12 that taints the company. Let me think. I'm sure
11:54:17 13 there's lots of them. I'm just doing the best I
11:54:20 14 can here. Competition. I don't know -- did I say
11:54:29 15 competition? I'm sorry. I'm --
11:54:32 16    Q    No. No. I --
11:54:33 17    A    I'm drifting here. But so many, you
11:54:39 18 know, knock-offs, counterfeits. Certainly those
11:54:46 19 are what comes to mind.
11:54:47 20    Q    And what you just testified to were
11:54:50 21 risks that applied to everybody in the golf
11:54:52 22 manufacturing industry at the time of the IPO,
11:54:59 23 generally?
11:55:00 24    A    I can only be, you know, as -- as

Page 99

11:55:04 1 accurate as I am, I can only be accurate for us --
11:55:08 2 pardon me -- but I think those things were
11:55:15 3 generally pervasive throughout the industry.
11:55:18 4    Q    Let me switch you, if I may, to
11:55:30 5 Page 160. In the first full paragraph of text, it
11:55:40 6 reads, second sentence here: Golf clubs tend to
11:55:44 7 have a limited life cycle, and at some point the
11:55:48 8 company can expect the sales of its clubs will
11:55:52 9 diminish and that average selling prices will
11:55:56 10 decline.
11:55:56 11             Was that accurate, an accurate
11:55:58 12 statement, in your opinion, at the time of the
11:56:00 13 IPO?
11:56:00 14    A    As generally applied to the golf
11:56:02 15 industry, I think yes. Excuse me.
11:56:04 16    Q    And -- I'm sorry.
11:56:05 17             And was that also an accurate
11:56:08 18 statement as of the time of the IPO with --
11:56:10 19 specifically with regard to the Tight Lies?
11:56:15 20    A    Yes.
11:56:15 21    Q    And the average sales -- selling
11:56:17 22 price did decline over time with regard to the
11:56:20 23 Tight Lies subsequent to the IPO, correct?
11:56:26 24    A    I mean, I would say yes. I would say

Page 100

11:56:28 1 "over time," you'd have to define that for me, but
11:56:30 2 yes.
11:56:31 3    Q    Do you happen to recall at the time
11:56:33 4 of the IPO what the average retail and average
11:56:37 5 wholesale prices were?
11:56:39 6    A    No, I do not remember.
11:56:43 7    Q    Okay. And then this statement goes
11:56:44 8 on to read: Accordingly, the company's continued
11:56:50 9 growth and success depend on its ability to
11:56:53 10 successfully develop and introduce new products
11:56:54 11 that meet with consumer and retailer acceptance.
11:56:57 12             Is that an accurate statement
11:56:59 13 as of the time of the IPO?
11:57:01 14    A    I'd say that's a fair comment, yes.
11:57:04 15    Q    And then this goes on: With respect
11:57:06 16 to retailers, the company must ensure its products
11:57:09 17 continue to offer retailers high margins and are
11:57:12 18 not discounted.
11:57:14 19             Is that an accurate statement
11:57:16 20 as of the time of the IPO?
11:57:20 21             MR. BESSETTE: Well, let me
11:57:21 22 object. That's an opinion, obviously.
11:57:24 23    Q    (By Mr. Collins) You may answer.
11:57:31 24    A    Okay. My answer is that the key word

Page 101

11:57:34 1 here is "offer." All you can do is offer. What
11:57:36 2 they do, if they -- if they decide to, do some
11:57:43 3 reason or another, who knows, do something with
11:57:47 4 their margin, I mean, you don't have control over
11:57:52 5 that. I only have control over what we sell to
11:57:52 6 these retailers.
11:57:53 7    Q    Okay.
11:57:54 8    A    I don't think we have control, but we
11:57:55 9 have -- do our best job.
11:57:58 10    Q    So -- so are you saying that at the
11:58:01 11 time of the IPO, you couldn't control what the
11:58:06 12 retailer sold his product at?
11:58:11 13    A    I'm saying at the time of the IPO,
11:58:17 14 you had arguably the hottest product in the entire
11:58:23 15 golf industry, and what -- there were no issues
11:58:26 16 involving what they sold them for and so on, at
11:58:29 17 least nothing that I was aware of. Our issues
11:58:32 18 were trying to meet demand.
11:58:37 19    Q    Okay. Did you believe that at the
11:58:39 20 time of the IPO it was accurate that the company
11:58:42 21 must ensure its products continue to offer
11:58:46 22 retailers high margins and are not discounted?
11:58:49 23             MR. McEVOY: Todd, I'm just
11:58:50 24 going to object again --

26 (Pages 98 to 101)

9946c097-09d6-4975-9215-f12a9a4984b6

## Page 102

11:58:50 1    THE REPORTER: I'm sorry. I
11:58:50 2 can barely hear you. I'm just going to object
11:58:50 3 again --
11:58:50 4    MR. McEVOY: Sorry. Just
11:58:54 5 going to object again to you asking him about an
11:58:57 6 analysis and summary that he did not prepare,
11:58:58 7 didn't sign, and doesn't recall stating.
11:59:01 8    MR. BESSETTE: And I'm just
11:59:02 9 going to object to the -- asking for the accuracy
11:59:04 10 of somebody else's opinion.
11:59:07 11    Q    (By Mr. Collins) Please, go ahead.
11:59:09 12    A    Finally me?
11:59:12 13    Q    Well, Michelle -- maybe Michelle
11:59:14 14 could chime in, but go ahead.
11:59:14 15    A    Right.
11:59:16 16    Again, all we can do is all we
11:59:21 17 can do. Make good, new, innovative product and
11:59:25 18 price it in a way that it's attractive to our
11:59:38 19 customers.
11:59:38 20    Q    As of the I -- the time of the IPO,
11:59:41 21 did you have an opinion as to the ramifications
11:59:48 22 and consequences, if any, if the company failed to
11:59:51 23 ensure that its products continued to offer
11:59:54 24 retailers high margins, and if the company failed

## Page 103

11:59:56 1 to ensure that its products were not discounted?
12:00:01 2    MR. BESSETTE: Objection,
12:00:04 3 vague and ambiguous, assumes facts not in
12:00:05 4 evidence, calling for opinions.
12:00:15 5    A    At the time of the IPO, our -- my
12:00:21 6 concentration on -- was on the incredible growth
12:00:25 7 of the company, building the infrastructure to --
12:00:30 8 to assist with this growth, you know, meeting the
12:00:36 9 demand that -- that we had.
12:00:40 10    I -- I -- I can't remember
12:00:44 11 that we, you know, sat there and involved -- or I
12:00:48 12 sat there and involved myself in that particular
12:00:50 13 thought process.
12:00:51 14    Q    (By Mr. Collins) Now, let me ask
12:00:56 15 you, to the happiness of everyone around the
12:01:00 16 table, that you look at the document that I
12:01:02 17 believe you did participate in drafting. This is
12:01:05 18 Exhibit 72.
12:01:08 19    Have you seen this document
12:01:09 20 before, sir?
12:01:23 21    A    This is the prospectus.
12:01:24 22    Q    Now, what was your role in the
12:01:27 23 drafting of the prospectus, please?
12:01:29 24    A    I was asked many questions about us,

## Page 104

12:01:36 1 the industry, state of the company, so to speak.
12:01:43 2    Q    Who asked the questions, please?
12:01:50 3    A    While I don't remember specifically,
12:01:51 4 generally, underwriters, the -- excuse me -- the
12:01:55 5 underwriters, attorneys, financial people, a
12:02:03 6 variety of experts.
12:02:07 7    Q    You -- there were drafting sessions
12:02:14 8 involving underwriters, lawyers, and company
12:02:19 9 people with respect to the prospectus; is that
12:02:19 10 accurate?
12:02:20 11    A    Yes, it is.
12:02:21 12    Q    Were you, as CEO, one of the
12:02:25 13 participants in those drafting sessions, or did
12:02:27 14 you leave that to other persons?
12:02:29 15    A    I don't remember specifically.
12:02:34 16    Q    Were you ever given a draft of the
12:02:38 17 prospectus to make comments on or changes to?
12:02:44 18    A    I believe so.
12:02:44 19    Q    And did you, in fact, make comments
12:02:47 20 or changes?
12:02:49 21    A    I'm sure I did.
12:02:55 22    Q    Let's look at the risk factor section
12:02:57 23 beginning on Page 6, please.
12:02:59 24    A    Page 6.

## Page 105

12:03:02 1    Q    It runs through -- I suppose Page 14
12:03:16 2 through --
12:03:16 3    MR. BESSETTE: Eight pages of
12:03:17 4 risk factors.
12:03:22 5    Q    (By Mr. Collins) And I -- I'm --
12:03:27 6    MR. COLLINS: One sec.
12:03:29 7    I just knocked this camera
12:03:33 8 again. Is it all right?
12:03:35 9    MR. MAHONEY: It's fine.
12:03:36 10    THE WITNESS: Want me to dodge
12:03:37 11 one way or the other?
12:03:40 12    Q    (By Mr. Collins) You read over the
12:03:41 13 risk factors section of the prospectus before you
12:03:46 14 signed the registration statement, didn't you?
12:03:48 15    A    I would have, yes.
12:03:49 16    Q    Okay. And are there any risks here
12:03:54 17 that were left out; that is, were there any
12:03:57 18 risks -- risk factors that were, to your
12:04:00 19 recollection, considered for inclusion, but then
12:04:03 20 deleted from the document in final form?
12:04:06 21    A    Not that I know of.
12:04:08 22    Q    Were there any of these risk factors
12:04:11 23 listed here that you suggested didn't need to be
12:04:14 24 included or shouldn't be included?

27  (Pages 102 to 105)

Page 106

12:04:17 1  A    My memory is that at the beginning I
12:04:23 2  didn't understand the process very well, so I -- I
12:04:28 3  asked some questions or I questioned some of the
12:04:30 4  decisions, but then I was -- you know, this is not
12:04:35 5  my world. I was -- this was something I had no
12:04:37 6  experience with, so maybe at that juncture only.
12:04:46 7  Q    Now, to your knowledge, we -- we were
12:04:48 8  just talking a moment ago about a particular
12:04:51 9  provision of Exhibit 212, which is this
12:04:54 10 institutional sales memorandum --
12:04:56 11 A    Uh-huh.
12:04:56 12 Q    -- which, as Ted quite correctly
12:05:00 13 points out, you didn't draft.
12:05:01 14    I wanted to ask you about a
12:05:03 15 particular sentence that you read on Page 160 of
12:05:06 16 Exhibit 212. This was the -- first sentence
12:05:11 17 on the second paragraph: With respect to
12:05:14 18 retailers, the company must ensure its products
12:05:17 19 continue to offer retailers high margins and are
12:05:19 20 not discounted.
12:05:21 21    Was that, in one form or
12:05:23 22 another, to your knowledge, included as a risk
12:05:26 23 factor in the prospectus?
12:05:29 24 A    I have no specific knowledge.

Page 107

12:05:33 1  Q    Can you point to where that
12:05:35 2  appears -- I'm not aware of it, so I'm just asking
12:05:38 3  if you can tell me anywhere that that appears or
12:05:40 4  words to that effect?
12:05:43 5  MR. McEVOY: Todd, do you want
12:05:43 6  us to sit here and go through the documents and --
12:05:46 7  MR. BESSETTE: I mean,
12:05:47 8  everybody can do it the same. I mean, that's
12:05:49 9  going to waste a lot of time
12:05:51 10 MR. COLLINS: Right
12:05:52 11 THE WITNESS: You're asking me
12:05:53 12 if I know where it showed up in the prospectus and
12:05:57 13 so on?
12:05:57 14 Q    (By Mr. Collins) Did the sum and
12:05:58 15 substance of that statement: With respect to
12:06:00 16 retailers, the company must ensure its products
12:06:01 17 continue to offer retailers high margins and are
12:06:04 18 not discounted, show up in the risk factors of the
12:06:08 19 prospectus, to your knowledge?
12:06:09 20 A    To my knowledge, there was wording in
12:06:13 21 the prospectus about margins and price
12:06:16 22 compressions and so on and so forth that -- that
12:06:23 23 was something that you had to be aware of as a
12:06:25 24 company.

Page 108

12:06:25 1    I don't remember the specific
12:06:27 2  wording, and I frankly, as I sit here, can't point
12:06:30 3  my finger to it, but that's my recollection.
12:06:32 4  Q    Now, if you would, turn to Page 6 of
12:06:37 5  the prospectus, which is Exhibit 72. Under
12:06:50 6  Dependence of New -- On New Product Introductions
12:06:52 7  on Certain Consumer Acceptance, I'm going to pick
12:06:56 8  out a particular sentence
12:06:57 9  A    Okay
12:06:57 10 Q    And naturally, I'll ask my
12:07:01 11 convoluted, endless question, and then after I do
12:07:03 12 so, feel free to read the whole paragraph or the
12:07:07 13 whole risk section if you want.
12:07:08 14    I want you to focus, though,
12:07:09 15 on a particular sentence:  A decline in demand
12:07:12 16 for --
12:07:13 17 A    Somebody give me -- thank you
12:07:16 18 MR. BESSETTE: Here.
12:07:18 19 Q    (By Mr. Collins) Yeah. Thank you.
12:07:19 20    This is the second sentence
12:07:20 21 under Dependence on New Products Introductions: A
12:07:22 22 decline in demand for or average selling prices of
12:07:26 23 the Tight Lies line of products would have a
12:07:29 24 material adverse effect on the company's business,

Page 109

12:07:33 1  operating results, and financial condition.
12:07:36 2    Do you see that?
12:07:37 3  A    Yes, I do.
12:07:37 4  Q    Can you -- that's a true statement,
12:07:39 5  as far as you know?
12:07:40 6  A    As far as I know, yes.
12:07:41 7  Q    Can you tell me why that is so?
12:07:43 8  A    Why that is so?
12:07:44 9  Q    Uh-huh
12:07:45 10 A    You mean, if you're -- if nobody
12:07:47 11 wants your product, I would say that that would
12:07:51 12 have a serious effect on the company.
12:08:01 13 Q    Okay. Okay. Well, that makes sense
12:08:02 14    And then the average selling
12:08:04 15 prices, is that referring to selling prices at the
12:08:10 16 wholesale or retail level?
12:08:11 17 A    Can you tell me where you are here,
12:08:14 18 please?
12:08:14 19 Q    A decline in demand for --
12:08:15 20 MR. BESSETTE: Same sentence
12:08:16 21 A    Oh, same sentence. Excuse me.
12:08:16 22 Q    (By Mr. Collins) -- or -- or average
12:08:17 23 selling prices of the Tight Lies line of products,
12:08:21 24 et cetera.

28  (Pages 106 to 109)

9946c097-09d6-4975-9215-f12a9a4984b6

Page 138

```
13:43:32 1        A    Would you repeat that, please.
13:43:35 2        Q    Did you ever investigate or ask
13:43:38 3   somebody else to investigate whether some or all
13:43:41 4   of the 33.8 million in sales for the quarter were
13:43:46 5   sales that were purchased to transship to or for
13:43:52 6   the account of gray marketers?
13:44:00 7        A    I don't remember -- pardon me again.
13:44:03 8        I don't remember any
13:44:08 9   investigation.  It was a nonissue, as I've said
13:44:10 10  before.  Does that mean that something could have
13:44:15 11  happened with an employee that I don't know
13:44:17 12  anything about?  You know, who knows.
13:44:19 13       But to me -- it's hard for me
13:44:23 14  to answer this question because you're asking me
13:44:25 15  about something that just wasn't going on --
13:44:27 16       Q    Okay.
13:44:27 17       A    -- or didn't happen.
13:44:46 18       Q    Exhibit 57, please.  Have you seen
13:44:54 19  this document before?
13:45:01 20       A    Yes, I have.
13:45:01 21       Q    You were the author of this document?
13:45:04 22       A    Well, probably.  It's not signed, and
13:45:08 23  I think this is a classic case of my volatility,
13:45:14 24  and this would have been one that I hoped I looked
```

Page 139

```
13:45:18 1   at in the next morning and never sent out, but I
13:45:22 2   could easily have done it.
13:45:24 3        Q    But whether you sent it or not, you
13:45:27 4   authored this document, correct?
13:45:28 5        A    That's fair.
13:45:29 6        Q    And you authored it on or about
13:45:31 7   August 14th in your role as CEO?
13:45:34 8        A    That's fair.
13:45:36 9        Q    Now, what -- what was going on here?
13:45:37 10  Why -- whether you sent it or not, why did you
13:45:39 11  write this document?
13:45:48 12       A    I had a -- I had expectations for the
13:45:54 13  sales group:  Morale, efficiency, and in a
13:46:04 14  personal visit, I did not encounter that.  I
13:46:09 15  encountered an environment that I didn't care for.
13:46:14 16       And as I said, in my normal,
13:46:20 17  occasionally volatile way of handling things, I
13:46:23 18  came up with this guilty-until-proven-innocent
13:46:28 19  approach.
13:46:28 20       Q    And you thought the guilty parties
13:46:32 21  were Mark Gonsalves and Ric Jarrett?
13:46:35 22       A    Well, I started with them.  Let's put
13:46:37 23  it that way.
13:46:38 24       Q    What do you mean you started with
```

Page 140

```
13:46:39 1   them?
13:46:40 2        A    Well, it's addressed to them.  I'm
13:46:48 3   being flip.  It was addressed to them.
13:46:50 4        Q    In the first paragraph, what did you
13:46:51 5   mean:  Have we been presenting a false image?
13:46:58 6        A    My image of the sales department was
13:47:01 7   as a very efficient, high morale, on top of
13:47:05 8   situations, you know, an area to be admired.  And
13:47:14 9   what I saw in my personal visit made me question
13:47:17 10  there.
13:47:17 11       Q    Were you referring to the image you
13:47:20 12  held in your mind of inside sales, or instead, the
13:47:25 13  image that the investing public had with regard to
13:47:28 14  Adams Golf's prospects?
13:47:29 15       A    No.  This -- excuse me
13:47:32 16       MR. BESSETTE:  Go ahead.
13:47:33 17       A    It's a personal reaction.
13:47:42 18       Q    (By Mr. Collins)  In what way were
13:47:42 19  you concerned that we had been presenting a false
13:47:45 20  image with regard to inside sales?  What was
13:47:47 21  false?
13:47:48 22       MR. BESSETTE:  Asked and
13:47:48 23  answered.
13:47:48 24       But go ahead.
```

Page 141

```
13:47:52 1        A    Well, I have to rely on their ability
13:47:55 2   to give me good numbers, good forecasts, good
13:47:58 3   market analyses and so on.  And when I visit them
13:48:04 4   and I see disarray, bickering, finger-pointing,
13:48:12 5   you know, childish stuff going on, then, you know,
13:48:16 6   where does it stop?  It wasn't the image I had of
13:48:22 7   the sales department.
13:48:25 8        Q    (By Mr. Collins)  This visit that you
13:48:26 9   made, was it on or about August 14th?
13:48:32 10       A    I would guess prior to, but I
13:48:32 11  wouldn't -- I wouldn't know when.
13:48:32 12       Q    How long was the visit?
13:48:35 13       A    Again, I don't remember specifically.
13:48:40 14       Q    Where was sales located in relation
13:48:40 15  to your office at the time?
13:48:43 16       A    Down the hall and to the right.
13:48:47 17       Q    Did you speak to persons in sales on
13:48:49 18  the occasion of this visit?
13:48:52 19       A    Yes, I'm sure I spoke to one or more
13:48:57 20  members of the sales group.
13:49:00 21       Q    In the third paragraph, there's a
13:49:01 22  reference to George Clouse referred to as:  My
13:49:05 23  friend at Platinum.
13:49:06 24       A    Yes.
```

36 (Pages 138 to 141)

Page 142

```
13:49:06  1      Q    Could you identify him further,
13:49:08  2  please.
13:49:08  3      A    George is CEO of -- it was Platinum
13:49:13  4  Software then.  It's -- oh, I forget their name.
13:49:18  5  Now they've changed their name.  But they were
13:49:20  6  making a presentation to us about changing -- or
13:49:24  7  about upgrading our internal software package.
13:49:37  8      Q    And is -- Telesales' parameters
13:49:42  9  refers to the direct -- direct marketing as
13:49:45 10  opposed to the inside sales function?
13:49:47 11      A    No.  Telesales is inside sales.
13:49:56 12      Q    Now, the conclusion at Paragraph A:
13:50:00 13  The department staff has very low morale, is that
13:50:03 14  something you encountered yourself, or is that
13:50:06 15  what someone told you?
13:50:11 16      A    I would -- I would define this one as
13:50:14 17  my interpretation of what I saw.
13:50:18 18      Q    Did people complain to you?
13:50:22 19      A    I don't remember specifically.
13:50:37 20      Q    And C:  They know cheating (at least
13:50:42 21  in the form of double shipments) occurs, and a
13:50:46 22  concern that such action is quietly endorsed.
13:50:48 23           How -- on what basis did you
13:50:51 24  conclude that the inside sales staff knows that
```

Page 143

```
13:50:54  1  cheating, at least in the form of double
13:50:57  2  shipments, occurs?
13:50:59  3      A    Accusations.  Somebody said:  I think
13:51:05  4  somebody double-ships, something along those
13:51:08  5  lines.
13:51:08  6      Q    Who said that?
13:51:10  7      A    Oh, I don't remember.  I don't
13:51:10  8  remember who I spoke to.
13:51:12  9      Q    And was -- do you remember who the
13:51:14 10  alleged double-shipper or shippers were?
13:51:16 11      A    No, I do not.
13:51:17 12      Q    Was the alleged double-shipper or one
13:51:20 13  of them Jay Greaney?
13:51:22 14      A    I don't remember specifically.
13:51:30 15      Q    Now, on the next page in the second
13:51:36 16  full paragraph under Our Short-Term Goals.
13:51:40 17      A    Our Short-Term Goals.
13:51:42 18      Q    Our Short-Term Goals are to make the
13:51:44 19  Q3, Q4 numbers?
13:51:46 20      A    Oh, yes.  Sorry.
13:51:47 21      Q    It goes on at the end of the
13:51:49 22  paragraph to say -- or the paragraph continues to
13:51:55 23  say:  What is the plan to resurrect this
13:52:01 24  department, return it to what I thought it was and
```

Page 144

```
13:52:02  1  how it was presented in the road show.
13:52:04  2           How was it presented in the
13:52:05  3  road show?
13:52:06  4      A    As the -- as a very precised --
13:52:14  5  excuse me, precised -- as a very precise, tight,
13:52:21  6  well-managed organization.  These were one of our
13:52:25  7  stars.  Bright star, I think I used
13:52:29  8      Q    The next sentence reads:  I realize
13:52:31  9  there are decisions we can make (like diverters),
13:52:35 10  but we must rely on these people.
13:52:38 11           What did you mean
13:52:40 12  by "diverters"?
13:52:42 13      A    I don't know specifically.
13:52:44 14      Q    Were you saying in this sentence --
13:52:48 15  weren't you saying that you realized that Adams
13:52:50 16  Golf could increase sales by selling to outlets
13:52:57 17  that weren't authorized dealers by selling to
13:53:03 18  discount warehouses, for example?
13:53:06 19      A    I think -- no, but I do think what I
13:53:09 20  was saying is that you want to be absolutely sure
13:53:20 21  there's not an environment where something like
13:53:23 22  that could happen  That's what I mean -- I mean,
13:53:27 23  it's not a specific thing  It's just a general
13:53:30 24  lack of professionalism that I -- that I felt that
```

Page 145

```
13:53:33  1  I saw.  And as I said, this was an over-the-top,
13:53:38  2  guilty-until-proven-innocence response.
13:53:38  3      Q    I see.
13:53:41  4           So you were concerned at the
13:53:43  5  time you wrote this that sales had been made or
13:53:46  6  might be made to diverters or customers that
13:53:53  7  weren't authorized retailers or distributors; is
13:53:56  8  that right?
13:53:56  9      A    No, not at all.  I think you're
13:53:58 10  putting words in my mouth.
13:53:59 11           What I said was:  If you
13:54:01 12  have -- excuse me -- if you have an organization
13:54:04 13  that's not tightly managed, lots of things can
13:54:06 14  happen, and this is a -- this is an example.  I
13:54:09 15  mean, I use it because it's a very egregious
13:54:14 16  example, something we would never do.  But I'm
13:54:17 17  trying to make a point here:  You guys get your
13:54:19 18  act together.
13:54:20 19      Q    What are double shipments, when you
13:54:23 20  refer to -- as you refer to in this memo?
13:54:28 21      A    They could be anything  That's a
13:54:30 22  long answer.
13:54:30 23      Q    Tell me, please.  I'm referring
13:54:32 24  specifically --
```

37 (Pages 142 to 145)

## Page 146

```
13:54:32  1      A    Right.
13:54:33  2      Q    -- to how you referred to double
13:54:35  3  shipments in C on Page 1. What did you mean by
13:54:41  4  that?
13:54:41  5      A    I'm going to read C here.
13:54:47  6           It could be, for example, a
13:54:50  7  customer who feels he ordered 50 pieces and
13:54:56  8  got 100 and that we intentionally shipped 100 to
13:54:59  9  boost our sales for that period of time. I mean,
13:55:02 10  that could be a case.
13:55:02 11      Q    And -- and you heard accusations
13:55:04 12  along those lines when you visited inside sales,
13:55:08 13  correct?
13:55:08 14      A    What I knew was that I -- I've been
13:55:13 15  through this double-shipping business, and I know
13:55:20 16  that it's -- it's a much broader and more complex
13:55:24 17  area than simply somebody deciding to ship an
13:55:29 18  extra 20 or 50 pieces.
13:55:32 19           A retailer calls up and says:
13:55:35 20  I'm going to send this stuff back. You
13:55:38 21  double-shipped me. And we never double-shipped
13:55:40 22  him at all, but maybe he was a little short on
13:55:40 23  money, couldn't pay his bill or whatever, you
13:55:43 24  know, a million reasons.
```

## Page 147

```
13:55:45  1           But if you've got low morale
13:55:47  2  and a poorly run department, all of a sudden the
13:55:50  3  fact doesn't come out, it just comes out as
13:55:52  4  double-shipping, and that just adds to bad morale.
13:55:55  5  And that's the kind of stuff I was trying to
13:55:58  6  uproot, so to speak.
13:55:59  7      Q    On the second page, the memo goes on
13:56:01  8  to read: Apparently we've made a lot of sales
13:56:05  9  that have been falsely reported as sales and is
13:56:08 10  little more than consignments.
13:56:08 11      A    Uh-huh.
13:56:09 12      Q    What's the basis for that?
13:56:11 13      A    It's the same thing. And again, I
13:56:13 14  want to emphasize that this is -- I'm not real
13:56:15 15  proud of this memo, frankly. It's a little over
13:56:18 16  the top, even for me, but -- it's a
13:56:23 17  guilty-until-proven-innocent approach. You get on
13:56:24 18  the phone with the customer and say: Hey, look,
13:56:28 19  you know, we -- we are -- are -- our terms are
13:56:29 20  normally 30 days, we'll give you 60. Now, for me
13:56:33 21  to call that a consignment, of course, is a big
13:56:36 22  stretch.
13:56:37 23           But that's not the point. The
13:56:39 24  point is -- because, you know, you're not -- I'm
```

## Page 148

```
13:56:42  1  talking about things in a well-run, well-managed
13:56:46  2  department that's on top of things. You know,
13:56:50  3  you -- you just don't hear about this kind of
13:56:52  4  stuff. I'm not saying -- of course it happens. I
13:56:55  5  mean, good heaven's, you have human beings.
13:56:57  6           You know, you have double
13:57:00  7  shipments, triple shipments, no shipments. You
13:57:03  8  know, the kind of volume that we were dealing in,
13:57:07  9  human beings make mistakes. I was interested in
13:57:07 10  the way the -- the way the sales department was
13:57:11 11  being managed.
13:57:11 12      Q    So when you visited the sale -- the
13:57:14 13  inside sales department, people made accusations
13:57:16 14  about consignments, the recording of sales; is
13:57:19 15  that right?
13:57:20 16      A    I think I used the word
13:57:24 17  "consignments." I don't know if they used the
13:57:24 18  word "consignments." As I said before, I took
13:57:26 19  everything to -- I wanted -- I wanted Mark and Ric
13:57:29 20  go come back to me and -- and absolutely embarrass
13:57:35 21  me by putting this thing to bed and showing me how
13:57:39 22  squared away they were.
13:57:40 23      Q    But as I was asking a moment ago,
13:57:43 24  whether people in inside sales used the word
```

## Page 149

```
13:57:46  1  "consignment" or not, one or more persons during
13:57:50  2  your visit told you that there had been amounts
13:57:53  3  falsely reported as sales that were, in fact, not
13:57:59  4  properly recordable as sales; is that right?
13:58:01  5           MR. BESSETTE: That misstates
13:58:02  6  what he said.
13:58:03  7      Q    (By Mr. Collins) You may answer.
13:58:05  8      A    Again, the word "consignment" is my
13:58:07  9  word, my interpretation. I don't know if anybody
13:58:12 10  in the department ever brought up the word
13:58:14 11  "consignment."
13:58:15 12           What I'm saying is that it's
13:58:19 13  the same -- I see the same pattern in several
13:58:21 14  different areas. This -- this -- this
13:58:24 15  complaining, this finger-pointing, this lack of
13:58:26 16  professionalism, and this was supposed to be our
13:58:29 17  bright star, our great group of people.
13:58:33 18           And I have to -- in my role, I
13:58:34 19  have to depend on their information. So I was
13:58:38 20  upset just to hear this -- this bickering. I use
13:58:43 21  that word, but it wasn't professional. It wasn't
13:58:47 22  what it should have been.
13:58:48 23      Q    And respectfully, you didn't answer
13:58:50 24  my question.
```

**VERITEXT PA COURT REPORTING COMPANY**
(215) 241-1000    (888) 777-6690    (610) 434-8588

9946c097-09d6-4975-9215-f12a9a4984b6

## Page 150

13:58:50 1          Did somebody tell you that
13:58:51 2   there were amounts recorded as sales that
13:58:54 3   shouldn't have been?
13:58:55 4       A    I don't remember that.
13:58:58 5       Q    Check July returns -- the memo goes
13:59:01 6   on -- and tell me what they'll be during the rest
13:59:04 7   of the year.
13:59:05 8       A    Okay.
13:59:06 9       Q    What did you mean by that?
13:59:07 10      A    It means that I'm accusing you and
13:59:08 11  prove me wrong.
13:59:09 12      Q    What does "checking July returns"
13:59:12 13  have to do with it?
13:59:17 14      A    I guess that would be one way of
13:59:18 15  finding out if anything came back that was beyond
13:59:21 16  a normal shipping date or, you know, whatever the
13:59:24 17  parameters were.
13:59:24 18      Q    So is it that you were saying that an
13:59:27 19  indication of a jump in returns in July would
13:59:32 20  substantiate or tend to substantiate the concerns
13:59:35 21  you expressed in this memo?
13:59:50 22      A    I'm -- again, you know, it isn't this
13:59:51 23  one particular item. I have no knowledge then or
13:59:54 24  now that July returns were anything. It's like

## Page 151

13:59:56 1   saying: Here's a way you can prove me wrong. You
13:59:59 2   know, I don't want to give you all the ways you
14:00:02 3   can prove me wrong. You prove me wrong. Show me
14:00:09 4   that this memo is -- is completely erroneous.
14:00:09 5       Q    Did you make no inquiry on July
14:00:15 6   returns after you wrote this memo?
14:00:15 7       A    No.
14:00:15 8       Q    You never checked?
14:00:17 9       A    No. At least not that I remember.
14:00:18 10      Q    Okay.
14:00:18 11      A    I guess that's a fairer statement.
14:00:21 12      Q    Okay. Did you ever look at the
14:00:23 13  analysis of returns -- of returns allowance for
14:00:26 14  the month of July '98?
14:00:30 15      A    I have no specific recollection.
14:00:33 16      Q    All right. I'm going to ask you to
14:00:35 17  look at a document marked as --
14:00:39 18           THE REPORTER:  295.
14:00:41 19      Q    (By Mr. Collins)  295. Adams 40594.
14:00:44 20  That needs to be marked, if I may.
14:00:44 21      A    Oh, I'm sorry. Grabbed it out of
14:01:05 22  your hands.
14:01:05 23           (Deposition Exhibit 295
14:01:07 24           was marked.)

## Page 152

14:01:07 1       Q    (By Mr. Collins)  Do you see that --
14:01:10 2   have you seen this page before?
14:01:13 3       A    Not to my recollection.
14:01:14 4       Q    Did you from time to time, in your
14:01:16 5   job as CEO, analyze what the returns allowance
14:01:26 6   was?
14:01:26 7       A    Well, if Darl Hatfield had expressed
14:01:28 8   a serious concern, I would probably go over it
14:01:32 9   with him.
14:01:32 10      Q    Do you see that this document
14:01:34 11  indicates that the unexpected returns were 370,000
14:01:39 12  against an expense that had been expected of
14:01:45 13  494,000 for the month of July?
14:01:49 14      A    I'm sorry. If you would --
14:01:50 15      Q    If you look at the last two entries
14:01:52 16  on this page. Expense expected --
14:01:57 17      A    Okay.
14:01:57 18      Q    -- and then unexpected returns.
14:01:59 19           Do you see those two entries?
14:02:03 20      A    Expected returns, 493; and
14:02:05 21  unexpected, 370.
14:02:08 22      Q    Right.
14:02:09 23      A    Okay.
14:02:10 24      Q    Before you came into this conference

## Page 153

14:02:12 1   room today, did you ever know that the unexpected
14:02:14 2   returns were in this amount in the month of July?
14:02:19 3       A    It looks to me like they're under
14:02:23 4   what we thought they would be.
14:02:26 5       Q    Did you ask Gonsalves to report back
14:02:30 6   to you on what July returns were?
14:02:34 7       A    I asked him to report back to me on
14:02:36 8   the condition of the sales department.
14:02:39 9       Q    So as far as you know, after you
14:02:40 10  wrote this memo, you never received any additional
14:02:45 11  information with regard to July returns before
14:02:48 12  this moment today?
14:02:50 13      A    I don't remember anything.
14:02:53 14      Q    Let's go back, again, if we may, to
14:02:56 15  57. Farther down on the page, the paragraph
14:03:09 16  reads --
14:03:09 17      A    Excuse me. Page 1 or 2?
14:03:11 18      Q    I'm so sorry. Second page.
14:03:11 19      A    Okay.
14:03:14 20      Q    Page 452.
14:03:16 21      A    Okay.
14:03:16 22      Q    I don't think I need to write
14:03:18 23  anymore. The issue is squarely on the table, and
14:03:20 24  I'll clarify what is making me sick. Are we

39 (Pages 150 to 153)

## Page 174

14:29:54 1         Hypothetically, you -- you sit
14:29:57 2 down with your sales group. They have a handle on
14:30:02 3 current conditions. They have a handle on
14:30:03 4 competitive conditions. They have a handle on
14:30:05 5 where they think the marketplace is headed, what
14:30:08 6 do we have to do to do the best possible job to
14:30:12 7 support our retailers. It's a -- it's
14:30:16 8 a decision -- it's not a -- it's not a simple
14:30:17 9 decision at all. It's a decision that requires a
14:30:21 10 great deal of -- of input from your own, you know,
14:30:24 11 people who live with us on a daily basis.
14:30:27 12     Q   (By Mr. Collins) Uh-huh. What you
14:30:27 13 just said in your last answer would -- applied or
14:30:30 14 would have applied at any time during 1998 in the
14:30:34 15 process of setting the wholesale price, correct?
14:30:41 16     A   Yes and no. I mean, the first half
14:30:43 17 of 1998, the wholesale price was -- was not too
14:30:47 18 critical, because the issue was -- keeping up with
14:30:50 19 demand. And when -- like I say, it's a supply and
14:30:55 20 demand formula. When the demand is that high,
14:30:55 21 then you get other issues, shipping on time, good
14:31:01 22 quality, et cetera. So I think we had another set
14:31:03 23 of issues in the first half of '98.
14:31:06 24     Q   The other set of issues in the first

## Page 175

14:31:09 1 half of '98 was keeping up with demand?
14:31:13 2     A   I think that was the primary one, and
14:31:15 3 the support -- excuse me -- infrastructure support
14:31:17 4 it needed it and so on.
14:31:19 5     Q   But at all times during '98, this
14:31:23 6 process of setting the wholesale price included
14:31:29 7 considerations of what was happening at the retail
14:31:32 8 end, correct?
14:31:33 9     A   That's an input.
14:31:34 10     Q   Also in this analyst report, also on
14:31:36 11 Page 242, there's a paragraph that begins: The
14:31:46 12 Reasonable Proposition. Projections for a new
14:31:47 13 product are inherently speculative.
14:31:55 14     If you could read that
14:31:56 15 paragraph to yourself
14:32:05 16     A   Okay. I've read it.
14:32:06 17     Q   In the second half of the paragraph,
14:32:08 18 it reads: Callaway shares were often volatile in
14:32:12 19 response to concerns such as, quote, I saw a Big
14:32:16 20 Bertha in Costco or, quote, some retailer offered
14:32:20 21 a Big Bertha at $10 below an earlier price that
14:32:25 22 proved to be irrelevant. We expect Adams stock to
14:32:25 23 also be volatile.
14:32:32 24     Do you see that?

## Page 176

14:32:36 1     A   I read that, yes, I have.
14:32:38 2     Q   Do you have any opinion as to whether
14:32:41 3 Adams stock was volatile because of reports of
14:32:46 4 seeing Adams product for sale in Costco?
14:32:50 5     A   At what time frame, please?
14:32:52 6     Q   Anytime in '98.
14:32:53 7     A   Anytime in '98?
14:32:55 8     Q   Well, from the IPO on.
14:33:05 9     A   I don't know if this is going to be
14:33:06 10 the answer. I mean, I -- I may be confused,
14:33:10 11 because I tend to look at things operationally,
14:33:19 12 but there was a significant shift in the
14:33:21 13 marketplace with -- coincident with the Callaway
14:33:24 14 press release, and if -- if -- if that provided
14:33:31 15 volatility, then that would be an example.
14:33:36 16     Q   What -- when you say there was a
14:33:38 17 shift in the marketplace coincident with the
14:33:42 18 Callaway press release, what do you mean?
14:33:47 19     A   That -- I forget the date, but in
14:33:49 20 late July Callaway made a press release that
14:33:53 21 their -- they weren't making their numbers. I
14:33:56 22 don't remember the exact wording. And that the
14:33:58 23 marketplace was soft and it was going to stay
14:34:02 24 soft. That certainly had ramifications throughout

## Page 177

14:34:07 1 the industry.
14:34:09 2     MR. BESSETTE: Todd, we've
14:34:10 3 been going about another hour, so whenever
14:34:13 4 you're at a break.
14:34:14 5     MR. COLLINS: I hate to be so
14:34:16 6 accommodating, but let's break.
14:34:17 7     MR. BESSETTE: All right.
14:34:18 8     MR. MAHONEY: We're off the
14:34:19 9 record at 2:34 p.m.
14:34:19 10     (A recess was taken from
14:51:20 11 2:34 to 2:51.)
14:51:20 12     MR. MAHONEY: All right. We
14:51:21 13 are back on the record. It is 2:51 p.m. beginning
14:51:26 14 at Tape 5.
14:51:28 15     Q   (By Mr. Collins) Do you have any
14:51:29 16 reason to think that Adams Golf stock price was
14:51:32 17 affected by people seeing Adams Golf clubs for
14:51:36 18 sale at Costco?
14:51:39 19     A   I would have no idea.
14:51:41 20     Q   Now, there's an article in "Golf Pro"
14:51:52 21 magazine?
14:51:58 22     A   In what magazine?
14:51:59 23     Q   "Golf Pro," Exhibit 233.
14:52:03 24     A   Okay.

45 (Pages 174 to 177)

## Page 182

14:57:13 1  area and ask questions.
14:57:17 2     Q.   Okay. That's good.
14:57:21 3          Exhibit 99. Now, does this
14:57:37 4  appear to be the transcript of the August 6th
14:57:42 5  conference call?
14:57:46 6     A.   That's what it appears to be, yes.
14:57:48 7     Q.   Do you recall participating in the
14:57:51 8  conference call?
14:57:52 9     A.   I'd say generally. Not specifically,
14:57:55 10 but generally.
14:57:56 11    Q.   Now, this was the first conference
14:57:57 12 call you had after you went public, correct?
14:58:05 13    A.   I'll take your word for that.
14:58:07 14    Q.   Okay.
14:58:10 15    A.   I don't remember.
14:58:23 16    Q.   All right. There is -- now, the --
14:58:29 17 do you recall that the stock price declined
14:58:33 18 generally after the IPO during July and August?
14:58:38 19 Do you recall that?
14:58:43 20    A.   Yes, I believe it did.
14:58:47 21    Q.   Did the company take any steps in
14:58:49 22 response to the decline in the stock price?
14:58:56 23    A.   My recollection is that the company's
14:58:59 24 position was the best thing we could do would be

## Page 183

14:59:01 1  to operate as well as we could.
14:59:03 2     Q.   Was there a -- was there
14:59:07 3  consideration given to a stock buyback by the
14:59:13 4  company?
14:59:13 5     A.   My recollection is that that was
14:59:15 6  something that was suggested by somebody. It
14:59:22 7  might have been a fund manager or something, but I
14:59:25 8  think that suggestion did come up, yes.
14:59:27 9     Q.   All right. In fact, there's some
14:59:27 10 discussion of it on Page 4351.
14:59:30 11    A.   Okay.
14:59:31 12    Q.   In response to a question by Brian
14:59:35 13 Wall.
14:59:39 14    A.   Okay. Let me get to this page,
14:59:41 15 please.
14:59:42 16    Q.   This is his second entry on that
14:59:45 17 page, and then you will see your response.
15:00:10 18    A.   All right.
15:00:11 19    Q.   Did -- in or about August '98, were
15:00:19 20 there discussions with Lehman about doing a
15:00:23 21 buyback?
15:00:23 22    A.   I don't remember any.
15:00:34 23    Q.   Did the board consider a buyback as
15:00:37 24 early as August?

## Page 184

15:00:41 1     A.   Kind of the same answer as before.
15:00:45 2  My recollection doesn't have any. If there's
15:00:49 3  documents that could help me, I'd be happy to look
15:00:51 4  at them, but I don't remember any.
15:00:53 5     Q.   That's fine. Okay. Sorry.
15:02:17 6          Exhibit 175, please. This is
15:02:35 7  a document that you authored on or about
15:02:37 8  September 25th, 1998?
15:02:40 9     A.   I believe so. Again, it's unsigned,
15:02:43 10 but I'll take responsibility.
15:02:45 11    Q.   And you did so in your role as CEO,
15:02:50 12 board chairman?
15:02:52 13    A.   Yes, sir.
15:02:55 14    Q.   You'll see on the first page it says
15:02:57 15 under A-1: Mark Gonsalves left the company.
15:03:01 16    A.   That's correct.
15:03:02 17    Q.   Why did that occur?
15:03:06 18    A.   Best of my recollection is he
15:03:09 19 felt that he -- he resigned and he felt that he
15:03:10 20 had gotten a lot of exposure and could capitalize
15:03:14 21 on that and, you know, take advantage of the
15:03:20 22 situation.
15:03:20 23    Q.   Was he asked to leave?
15:03:22 24    A.   No, sir.

## Page 185

15:03:22 1     Q.   You recall we looked earlier at
15:03:24 2  Exhibit 57, the August 14th, 1998 memo?
15:03:28 3     A.   57.
15:03:32 4     Q.   It was you expressed concerns about a
15:03:34 5  variety of matters, including the inside sales
15:03:37 6  group.
15:03:38 7     A.   It's in the pile here. I'll have to
15:03:39 8  find it.
15:03:39 9          MR. BESSETT:   Get it so you
15:03:39 10 will have it.
15:03:50 11         THE WITNESS:   Right. You went
15:03:51 12 through all of them. That's 97. I thought that
15:03:57 13 was a 5. Thank you.
15:04:06 14    A.   Okay. I have it.
15:04:08 15    Q.   (By Mr. Collins) Was his departure
15:04:10 16 unrelated to the concerns expressed in this
15:04:13 17 Exhibit 57? In other words, you said some pretty
15:04:21 18 harsh things in the August 14th memo at
15:04:21 19 Exhibit 57.
15:04:27 20         Was his departure unrelated to
15:04:29 21 this memo or your discussions with him about it?
15:04:33 22    A.   In a subsequent meeting, when Mark,
15:04:40 23 you know, nicely explained to me, nicer than I
15:04:45 24 was, nicely explained to me that I'd gone over the

47 (Pages 182 to 185)

Page 186

15:04:48 1 top here and these things were easily explained --

15:04:52 2         MR. BESSETTE: The things in

15:04:53 3 this --

15:04:54 4     A   I'm sorry. I beg your pardon. I'm

15:04:57 5 looking at -- these things being A through I, I

15:04:59 6 think, all of my points.

15:05:03 7         No, we -- you know, he -- to

15:05:07 8 Mark's credit, he was used to dealing with my

15:05:10 9 volatility, and it wasn't acrimonious. It was

15:05:12 10 more about getting on with business.

15:05:20 11     Q   (By Mr. Collins) Did you ask him not

15:05:24 12 to leave?

15:05:28 13     A   I don't remember that. I remember

15:05:33 14 that he -- as I said, he said that he felt that he

15:05:39 15 was at a unique time in his life, and you know,

15:05:44 16 who am I to deny that -- that opportunity.

15:06:40 17         THE WITNESS: Good idea. This

15:06:41 18 might -- excuse me, this might be superfluous

15:06:44 19 because I'm just sitting here with my water. What

15:06:48 20 I remember most about this was that when Mark and

15:06:57 21 I met I was a little embarrassed because it was

15:06:58 22 obvious that I'd gone way over the top. I think I

15:07:01 23 said up front I'm not too proud of this memo and

15:07:04 24 my style at the time.

Page 187

15:07:07 1         You know, we were very busy,

15:07:10 2 very tough times, and Mike -- Mark and I had a

15:07:13 3 nice evening conversation. And I don't remember

15:07:15 4 the specific details, but that, you know, he

15:07:24 5 pointed out that this was just a product of gossip

15:07:28 6 and bickering and so on and so forth, as I'd said.

15:07:33 7     Q   Now, did Mr. Bessette just suggest

15:07:35 8 that you add that comment?

15:07:42 9     A   No. I'm --

15:07:43 10         MR. BESSETTE: Telepathic

15:07:44 11         MS. REED: You have amazing

15:07:46 12 skills

15:07:46 13     A   No. I was -- I was -- the truth of

15:07:47 14 the matter is I thought about it before. I had

15:07:50 15 forgotten about it, to tell you the truth, and it

15:07:53 16 just -- you know, we're going over a lot of stuff

15:07:55 17 here and it just kind of came to me.

15:08:11 18     Q   (By Mr. Collins) Exhibit 80 --

15:08:14 19     A   80.

15:08:17 20     Q   -- if I may.

15:08:19 21     A   Is that a new one or --

15:08:22 22     Q   I'm about to hand it to you.

15:08:25 23     A   Okay. I guess it's a new one, then.

15:08:31 24     Q   And I have many copies of this, none

Page 188

15:08:34 1 of which I can now find, so just take a look at

15:08:36 2 that, if you would.

15:08:37 3         You were the author of that

15:08:42 4 document?

15:08:42 5     A   Same answer, not signed, but yes.

15:08:45 6     Q   You -- you -- and you -- you wrote it

15:08:49 7 on or about the date indicated --

15:08:52 8     A   Yeah, it's --

15:08:53 9     Q   -- in your duties as CEO?

15:08:56 10     A   Excuse me.

15:08:58 11     Q   Is that right?

15:08:59 12     A   Yes.

15:09:01 13     Q   What happened within the last two

15:09:04 14 weeks, as stated there, to change the situation,

15:09:10 15 vis-a-vis the impact of Costco?

15:09:23 16     A   I think in the first place, for me to

15:09:25 17 give you a better answer, give me the reference to

15:09:28 18 the two weeks, and I think I can do a better job

15:09:30 19 for you.

15:09:33 20     Q   May I?

15:09:35 21     A   Sure.

15:09:36 22     Q   Sorry to take it back.

15:09:37 23         In the beginning it says: One

15:09:39 24 thing that is hurting us badly is Costco. It was

Page 189

15:09:41 1 a problem before, but has greatly escalated in the

15:09:44 2 last two weeks and will be very difficult in Q4 --

15:09:48 3     A   Okay.

15:09:49 4     Q   -- around Christmas.

15:09:51 5     A   That's what you're referring to?

15:09:52 6     Q   Yes.

15:09:53 7     A   I'm forecasting to the fourth

15:09:54 8 quarter, and I'm saying it's -- it's my analysis

15:09:57 9 or the analysis, based on information that's been

15:09:59 10 given to me, that there's -- I didn't go into this

15:10:04 11 detail, but there's two factors at work here.

15:10:09 12         One is the significant

15:10:11 13 fall-off in the market. I mean, that's the big

15:10:14 14 one, of course, from the Callaway statement, and

15:10:17 15 so on and so forth. And then the fourth quarter

15:10:21 16 is historically a weak quarter anyway. It's one

15:10:24 17 of the weakest -- I think it's the -- I think it's

15:10:26 18 the weakest quarter of -- of the fiscal year.

15:10:29 19         So anything that goes on is

15:10:32 20 now much more sensitive than it was before. And

15:10:39 21 I'm -- I am, in this memo, forecasting to the

15:10:41 22 board what I see happening in Q4.

15:10:43 23     Q   Respectfully though, the question I

15:10:45 24 asked was: What happened in the last two weeks

48 (Pages 186 to 189)

Page 190

```
15:10:47  1  that you refer to in the first paragraph?
15:10:51  2      A    And I think my answer is that in the
15:10:52  3  last two weeks, I had sat down and I'd -- I want
15:10:56  4  to use correct English  In the last two weeks, I
15:10:59  5  had undergone the process of sitting down and
15:11:02  6  taking a look at what was coming up over the next
15:11:06  7  quarter, and this memo was the result.
15:11:08  8      Q    Well, then, during the two weeks
15:11:10  9  before October 8, did something happen to make you
15:11:15 10  think that Costco represented more of a concern
15:11:19 11  than you had previously thought?
15:11:25 12      A    I would say it was the awareness of
15:11:27 13  how -- the -- the increasing severity of the
15:11:30 14  market drop  And again, as I said, anything that
15:11:34 15  I had encountered before had all of a sudden taken
15:11:37 16  on new significance, as, you know -- as
15:11:40 17  a percentage of a bad situation, so to speak
15:11:43 18      Q    But now, you didn't say that in that
15:11:45 19  memo  Was that just because your -- you were
15:11:50 20  inartful in the memo, or is it instead because you
15:11:53 21  were being coy?
15:11:54 22      A    Oh, I'm not very coy  I'm sorry
15:11:59 23  Nobody's ever accused me of being coy  I --
15:12:01 24  I'm -- I just -- this is what I believed to be
```

Page 191

```
15:12:04  1  true
15:12:06  2      Q    Let me take a look at that again, if
15:12:07  3  I may.
15:12:08  4      A    Sure
15:12:09  5      Q    Now, it says here:  We estimate a
15:12:14  6  negative sales effect in Q4 of 20 to 25 percent,
15:12:19  7  based on a market survey (customers who refuse to
15:12:25  8  buy).
15:12:27  9      A    Yes.
15:12:27 10      Q    In that -- what was the basis of --
15:12:30 11  tell me what the market survey was.
15:12:34 12      A    I can only guess it was something
15:12:35 13  that Chip provided me.
15:12:37 14      Q    And the 20 to 25 percent that you
15:12:43 15  estimated was based on customers who refused to
15:12:45 16  buy for what reason?
15:12:46 17      A    I have no idea.
15:12:53 18      Q    When you sent this memo, was there
15:12:56 19  anybody who wrote back a response?
15:13:01 20      A    Same answer as before  If you have a
15:13:03 21  document, I don't remember anything
15:13:05 22      Q    When you wrote this memo, you
15:13:08 23  believed what you set forth in the memo at the
15:13:10 24  time you wrote it, correct?
```

Page 192

```
15:13:12  1      A    Yes, I did.
15:13:13  2      Q    Was this another time, writing this
15:13:15  3  memo, of your being -- I've forgotten what words
15:13:21  4  you used
15:13:22  5      A    Volatile?
15:13:23  6      Q    Well, your words, not mine, sir
15:13:25  7      A    Okay.
15:13:25  8      Q    Was this memo something you wrote
15:13:27  9  when you were volatile, or was this something that
15:13:33 10  you wrote when you were being clear-eyed and
15:13:40 11  analytical?
15:13:40 12          MR. BESSETTE:  Or somewhere in
15:13:41 13  between.
15:13:42 14          THE WITNESS:  Yeah, hopefully
15:13:43 15  somewhere in between.
15:13:45 16      A    Well, it is what it is  I'm just
15:13:49 17  trying to lay out the facts as I see them.  No
15:13:55 18  embellishment, you know, no finger-pointing.  You
15:13:58 19  know, life is what it is, and our job is to get on
15:14:01 20  with it and do the best job we can  However you
15:14:04 21  describe that, I mean, it's not up to me.
15:14:07 22      Q    (By Mr. Collins)  Now, you say in
15:14:08 23  that first paragraph that Costco was a problem
15:14:10 24  before  Do you see that?
```

Page 193

```
15:14:12  1      A    Yes.
15:14:12  2      Q    But it's gotten worse in the last two
15:14:15  3  weeks.
15:14:16  4      A    Yes.
15:14:16  5      Q    Describe to me the change that
15:14:19  6  occurred.
15:14:19  7      A    The change that occurs is relative to
15:14:22  8  the upcoming fourth quarter where, as I said
15:14:25  9  before, you have a combination of a basically slow
15:14:28 10  time of year anyway  A lot of major manufacturers
15:14:33 11  like to clean out their inventories that time of
15:14:35 12  year, so there's eight million deals in the
15:14:38 13  marketplace, and so it's a -- you know, it's a
15:14:40 14  tough market and it's a down market, so everything
15:14:43 15  that happens as a percentage of the total is going
15:14:46 16  to be exacerbated.
15:14:48 17      Q    Now, Mr. Adams, when you wrote this
15:14:52 18  memo, you were writing this memo to inform the
15:14:56 19  members of the board of something you hadn't
15:14:58 20  informed them of before?
15:14:59 21      A    I don't have any recollections of,
15:15:03 22  you know, this kind of information, me presenting
15:15:07 23  this kind of infor- -- me presenting this kind of
15:15:10 24  information to the board before.
```

49 (Pages 190 to 193)

## Page 194

15:15:11  1    Q    Well, the board knew that the fourth
15:15:14  2  quarter was coming up before you wrote this memo,
15:15:17  3  correct?
15:15:17  4    A    Yeah.
15:15:17  5    Q    The board knew because you had
15:15:20  6  disclosed it in public reports, as well as other
15:15:23  7  places I'm sure, that the fourth quarter is a weak
15:15:27  8  quarter on a seasonal basis for the company,
15:15:29  9  correct? This wasn't the first time you had
15:15:31  10  informed the board that the fourth quarter is a
15:15:35  11  seasonally weak time of the year, correct?
15:15:37  12    A    I don't know if I informed them, but
15:15:39  13  let's say they knew.
15:15:40  14    Q    Okay. So my question is the same:
15:15:42  15  What's the new thing that happened that prompted
15:15:43  16  you to write this memo?
15:15:44  17          MR. BESSETTE: Okay. This is
15:15:45  18  the third time, I think, but --
15:15:46  19          THE WITNESS: It's okay.
15:15:48  20          MR. BESSETTE: Let's do --
15:15:49  21          THE WITNESS: Maybe I'll get
15:15:50  22  it clearer if I keep going.
15:15:51  23    A    You had a different marketplace. You
15:15:53  24  had a completely different marketplace. Once the

## Page 195

15:15:56  1  Callaway memo came out and -- or I'm sorry -- the
15:16:05  2  Callaway commentary with the quarterly report,
15:16:07  3  that had a serious negative effect on the
15:16:11  4  marketplace.
15:16:11  5          And it's -- you know, again,
15:16:13  6  just being honest, it's not stated in here. I
15:16:16  7  don't -- I don't talk about it -- enough about our
15:16:18  8  competition, Orlimar. Maybe I was embarrassed.
15:16:21  9  But they were -- they were beating us -- they were
15:16:25  10  beating us up in some areas.
15:16:26  11    Q    (By Mr. Collins) Well, now, you --
15:16:28  12  you -- you entitled the memo --
15:16:38  13    A    Here, I'll save your --
15:16:38  14    Q    Thank you.
15:16:40  15    A    -- save your -- I have a copy now.
15:16:43  16    Q    I don't have a microphone yet,
15:16:43  17  though.
15:16:54  18          MR. COLLINS: Thank you.
15:16:55  19    Q    (By Mr. Collins) You entitled the
15:16:57  20  memo Fourth Quarter. The first paragraph refers
15:16:59  21  to Costco, not to Orlimar, not to Callaway.
15:17:02  22          Am I reading that correctly?
15:17:09  23    A    Yes.
15:17:09  24    Q    And then A deals with Costco.

## Page 196

15:17:11  1  B deals with Costco.
15:17:12  2          Am I reading that correctly?
15:17:15  3    A    Yes.
15:17:15  4    Q    And then C deals with an engraving
15:17:19  5  machine that is necessary to deal with Costco, not
15:17:24  6  with market downturn or Orlimar.
15:17:26  7          Is that accurate?
15:17:28  8          MR. BESSETTE: That's a
15:17:30  9  misstate, his prior testimony.
15:17:32  10    Q    (By Mr. Collins) Well, what was the
15:17:33  11  purpose of the engraving machine?
15:17:35  12    A    To be able to track product into the
15:17:37  13  field.
15:17:38  14    Q    And that was necessary because of
15:17:39  15  competition with Orlimar?
15:17:44  16    A    Could have been. Could have been a
15:17:46  17  million reasons. I mean, I -- if you would like
15:17:48  18  me to give you some, I certainly can, but it's --
15:17:51  19  it's -- there are a lot of reasons for being able
15:17:54  20  to track your product into the field.
15:17:55  21    Q    Sure. Well, now, Paragraph 4 also
15:17:58  22  deals with Costco and not with Orlimar or general
15:18:01  23  market conditions, right?
15:18:02  24    A    That's correct.

## Page 197

15:18:03  1    Q    And then the next paragraph after
15:18:05  2  that, talking about how Costco makes its money,
15:18:12  3  also deals with Costco and not Orlimar or general
15:18:15  4  market conditions or seasonal problems in the
15:18:17  5  fourth quarter, right?
15:18:18  6    A    That's -- right, yes.
15:18:19  7    Q    And so are you really arguing that
15:18:21  8  Paragraph C about committing $125,000 to an
15:18:26  9  engraving machine is something that you were
15:18:29  10  discussing in this context because of that million
15:18:33  11  reasons, or you were discussing it in this context
15:18:35  12  because of the serious problem posed by Costco?
15:18:38  13    A    I was discussing it in that context
15:18:42  14  as a way of tracking product into the field, that
15:18:49  15  if applicable to Costco, certainly we could use.
15:18:55  16          Now, this says we have
15:18:59  17  committed $125,000 on an engraving machine. I
15:19:03  18  suspect that thing wasn't up and running until
15:19:06  19  about the following, I don't know, March or April.
15:19:10  20  It --
15:19:10  21    Q    But of course --
15:19:12  22    A    -- certainly wasn't imminent.
15:19:12  23    Q    Forgive me.
15:19:15  24          But, of course, the reason you

50 (Pages 194 to 197)

9946c097-09d6-4975-9215-f12a9a4984b6

Page 214

15:39:30 1    going to be marked?
15:39:33 2        A    I have no idea.
15:39:34 3        Q    And when did the marking begin?
15:39:39 4        A    I'm sorry. Same answer. I don't
15:39:40 5    have any idea.
15:39:41 6        Q    Okay. And in this case, with regard
15:39:42 7    to those retail accounts, the purpose of the
15:39:49 8    marking was specifically to cut down on
15:39:52 9    transshipment, I gather, correct?
15:39:5410        A    It looks like for those particular
15:39:5711    accounts that's what the objective was, yes.
15:40:1112        Q    Exhibit 245, please.
15:40:2113            You remember this press
15:40:2914    release?
15:40:2915        A    Again, generally, but not
15:40:3316    specifically.
15:40:3417        Q    You approved its issuance?
15:40:3718        A    I would have.
15:40:5919        Q    In this press release, in the fourth
15:41:0920    paragraph, with reference to the outlook for the
15:41:1221    fourth quarter, you were quoted as saying, and I'm
15:41:1522    just reading part of this: In addition, we
15:41:1723    anticipate our sales will be further impacted by
15:41:1924    the recent gray market distribution of our

Page 215

15:41:22 1    products to a membership warehouse club.
15:41:24 2            Do you see that?
15:41:25 3        A    Yes, I do.
15:41:26 4        Q    It was an accurate statement as of
15:41:28 5    October 22nd?
15:41:29 6        A    I believe it was.
15:41:31 7        Q    And the membership warehouse club, I
15:41:33 8    presume, was -- was Costco?
15:41:35 9        A    I think that's a fair assumption.
15:41:3710        Q    And what did you mean by "further"?
15:41:4311        A    I'm reading this. I'm sorry.
15:41:4512        Q    Please.
15:41:5113        A    That as the -- again, as the -- with
15:41:5414    the tightening of the market, as I said, I think
15:41:5715    the -- I was reading the sentence below it: The
15:42:0116    continuing weakness in the golf equipment market.
15:42:0317    Just as I said before, any problem was going to
15:42:0718    become exacerbated because the market is getting
15:42:1719    worse.
15:42:1720        Q    Okay. Weren't you saying that prior
15:42:1821    to the fourth quarter sales had been impacted by
15:42:2422    gray market distribution?
15:42:2623            MR. BESSETTE: Misstates
15:42:2724    testimony.

Page 216

15:42:27 1        Q    (By Mr. Collins) Please.
15:42:31 2        A    No. It -- I mean, if I'm reading
15:42:33 3    this, it says "our -- our fourth quarter sales,"
15:42:39 4    and I think I'm -- I interpret this as I'm saying:
15:42:41 5    Look, I'm talking about what's coming up in the
15:42:44 6    fourth quarter. The marketplace looks lousy and
15:42:47 7    all problems are exacerbated.
15:42:50 8            I'm sorry I'm putting this
15:42:53 9    into slang, but that's how -- that's how I
15:42:5910    interpret it.
15:42:5911        Q    Now, Orlimar eventually was
15:43:0312    gray-marketed, correct?
15:43:0313        A    I -- I believe that's true.
15:43:1114        Q    Do you have any view on -- on the
15:43:1515    basis of your experience with the market,
15:43:2016    experience with gray marketing, why Orlimar was
15:43:2417    targeted for Costco?
15:43:2818            MR. BESSETTE: Can I --
15:43:3019            MR. COLLINS: I'll make that a
15:43:3120    better question.
15:43:3221        Q    (By Mr. Collins) If you have any
15:43:3322    opinion on this, why do you think that Orlimar, as
15:43:3523    well as Adams Golf, suffered from gray marketing
15:43:4224    at Costco?

Page 217

15:43:43 1        A    Hot product.
15:43:46 2        Q    Did the margins and other forms of
15:43:51 3    consideration paid to Orlimar retailers have
15:43:53 4    anything to do with the gray marketing?
15:43:57 5            MR. BESSETTE: Wait. I don't
15:43:57 6    understand that.
15:43:59 7        Q    (By Mr. Collins) Was the -- Orlimar
15:44:01 8    paid a healthy margin to retailers compared to
15:44:04 9    other golf manufacturers, correct?
15:44:0510        A    That's --
15:44:0611            MR. BESSETTE: Objection.
15:44:0712    Again, I don't think a wholesaler pays margins.
15:44:1113        A    Yeah. That's worth --
15:44:1314            MR. COLLINS: That's quite
15:44:1515    right. Thank you. But I think we all know what
15:44:1616    we're talking about.
15:44:1717        Q    (By Mr. Collins) Orlimar retailers,
15:44:1918    in general, received, compared to the industry, a
15:44:2319    large margin on retail sales in 1998, true?
15:44:2720        A    I believe that's true, yes.
15:44:3121        Q    Okay. Did that have anything to do,
15:44:3322    in your opinion, with why Orlimar was hit with
15:44:3723    gray marketing in Costco?
15:44:3924        A    I don't think so. I would think that

55 (Pages 214 to 217)

## Page 218

```
15:44:41  1  the Costco decision would be based on the
15:44:43  2  popularity of the product. That would be my
15:44:56  3  opinion.
15:45:04  4      Q    Exhibit 17, please.
15:45:14  5          Have you seen this document
15:45:15  6  before?
15:45:15  7      A    Yes, I have.
15:45:16  8      Q    And that is your signature?
15:45:19  9      A    Yes, it is.
15:45:20 10      Q    And you had approved and sent out
15:45:21 11  this letter on or about January 4th, '99 to
15:45:25 12  retailers?
15:45:25 13      A    Yes, I did.
15:45:31 14      Q    In the middle of the page you say:
15:45:34 15  We can't help but be a little dissatisfied. Why?
15:45:39 16  And then: One, we failed to defend our market
15:45:41 17  position strongly enough. We didn't respond to
15:45:45 18  misleading advertising from both legitimate
15:45:50 19  competitors and knockoffs.
15:45:50 20          What did you mean by that,
15:45:59 21  please?
15:46:00 22      A    The Orlimar ads were rigged to make
15:46:05 23  their product look superior. I guess I didn't
15:46:14 24  think we made enough of an issue out of that.
```

## Page 219

```
15:46:18  1      Q    By "legitimate competitors," were you
15:46:22  2  referring to Orlimar?
15:46:24  3      A    Yes.
15:46:24  4      Q    And who were you referring to by
15:46:28  5  "knockoffs"?
15:46:28  6      A    I think there were 40 of them at one
15:46:30  7  time. Take your pick.
15:46:31  8      Q    They were engaged in misleading
15:46:36  9  advertising, the knockoffs?
15:46:36 10      A    Well, we had a guy that ran an ad in
15:46:39 11  "USA Today," called his club the TL240 and didn't
15:46:46 12  even use his own picture. He actually used a
15:46:48 13  picture of our club.
15:46:50 14      Q    Now, Point 2: We were slow to react
15:46:53 15  when unauthorized resellers, such as Costco, hurt
15:46:56 16  retail margins.
15:46:58 17          Do you see that?
15:46:59 18      A    Yes, I do.
15:47:00 19      Q    So it was accurate that in 1998
15:47:05 20  Costco hurt retail margins for authorized
15:47:14 21  retailers at Adams?
15:47:14 22          THE REPORTER: I'm sorry.
15:47:14 23  Could you repeat that? Costco hurt retailers --
15:47:14 24      Q    (By Mr. Collins) Hurt retail margins
```

## Page 220

```
15:47:20  1  for authorized retailers at Adams.
15:47:20  2      A    The statement -- unfortunately, I do
15:47:23  3  remember this one because this was a bit of an
15:47:26  4  early argument between Chip and myself. He didn't
15:47:28  5  think that statement even belonged in there. He
15:47:30  6  thought we had reacted very, very quickly.
15:47:32  7          So I was just taking the
15:47:36  8  position kind of like before: Look, if -- if any
15:47:41  9  retailer thinks we reacted slowly, let's admit it
15:47:45 10  and go on forward.
15:47:46 11      Q    Okay. But now I wasn't asking in
15:47:48 12  that question --
15:47:49 13      A    I'm sorry.
15:47:49 14      Q    -- about the speed of reaction.
15:47:50 15      A    Oh, I'm sorry.
15:47:54 16      Q    I was just asking you to agree with
15:47:57 17  what you wrote here, which is that Costco in 1998
15:47:57 18  hurt retail margins for Adams authorized
15:47:57 19  retailers.
15:48:02 20          You aren't denying that now,
15:48:04 21  are you?
15:48:04 22      A    We were slow to react when
15:48:06 23  unauthorized resellers, such as Costco, hurt
15:48:08 24  retail margins.
```

## Page 221

```
15:48:09  1          As I said before, it could
15:48:11  2  be -- it could easily be true. It could easily be
15:48:13  3  true in, say, one marketplace, maybe two
15:48:16  4  marketplaces. I remember the argument that -- not
15:48:18  5  the -- the discussion that I had with Chip was
15:48:20  6  that there was no evidence that this happened
15:48:22  7  across the board or was even significant. All I
15:48:27  8  was trying to do, as I said before, was, you know,
15:48:32  9  listen, if you think it's our problem, we'll admit
15:48:35 10  it and let's go forward.
15:48:36 11      Q    You said in your last answer "one
15:48:39 12  marketplace, maybe two marketplaces," but this
15:48:41 13  letter, I gather, was sent to all Adams Golf
15:48:45 14  retailers in the U.S.?
15:48:47 15      A    I believe it was, yes.
15:48:48 16      Q    Why didn't you send it just to the
15:48:50 17  one or two marketplaces where you claim -- where
15:48:52 18  the only locations where retail margins were hurt
15:48:55 19  by Costco?
15:48:56 20      A    Oh, I don't know. I don't -- I don't
15:48:58 21  see any sense in doing it that way to tell you the
15:49:00 22  truth. You're making a -- you're making a
15:49:03 23  statement that says: Hey, we're on your side.
15:49:07 24  We're trying to help you. If you're going to make
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

9946c097-09d6-4975-9215-f12a9a4984b6

Page 226

16:08:35 1    A   I don't know. I mean, it -- I'd have
16:08:39 2  to see numbers.
16:08:41 3    Q   Unquestionably, there was a time when
16:08:44 4  Tight Lies was a hot product. Was the Tight Lies
16:08:49 5  still a hot product in 1999?
16:08:54 6    A   I mean, by definition, as the product
16:08:56 7  gets older, it's -- it's not as desirable as it
16:09:00 8  was previously. I mean, it's all relative.
16:09:04 9    Q   Did gray marketing continue with
16:09:06 10 regard to the Tight Lies, even as the product got
16:09:12 11 older?
16:09:12 12   A   I can only answer based on what I
16:09:14 13 have in my hand, which says as of March it had
16:09:19 14 continued.
16:09:19 15   Q   Why did you issue this press release,
16:09:22 16 the March '99 press release?
16:09:38 17   A   I don't know specifically.
16:09:45 18   Q   Did you believe that this press
16:09:49 19 release would improve your relations with Adams'
16:09:54 20 retailers?
16:09:55 21   A   If I was -- if I was, you know,
16:09:58 22 making an assessment, that's how I would read it.
16:10:08 23   Q   Do you have any recollection as to
16:10:15 24 whether gray marketing of the Tight Lies occurred

Page 227

16:10:19 1  after March '99?
16:10:23 2    A   Again, I think you -- I thought I
16:10:25 3  answered that, but excuse me if I didn't. My --
16:10:30 4  my recollection is that it happened -- and my
16:10:34 5  recollection fortified by this document is that it
16:10:36 6  happened in March of 1999 or thereabouts.
16:10:40 7        If you're going to ask me
16:10:42 8  anything after that, I would request some
16:10:44 9  documents to refresh my memory because I --
16:10:47 10 it's -- it's -- outside of the fact that some
16:10:52 11 degree of it always is going to happen forever and
16:10:56 12 ever, I couldn't give you a good answer.
16:10:59 13   Q   So it's your opinion that some amount
16:11:01 14 of gray marketing will occur regardless of how hot
16:11:04 15 the product is?
16:11:06 16   A   Oh, I think if the product has no
16:11:09 17 value, I can't imagine anybody would want to gray
16:11:12 18 market it.
16:11:13 19   Q   Okay. But it's your opinion that
16:11:15 20 with a hotter product, there's generally going to
16:11:17 21 be more gray marketing?
16:11:19 22   A   I mean, you're going to -- you're
16:11:20 23 asking me to think like a gray marketer, so to
16:11:24 24 speak, but that would be -- you know, if I had to

Page 228

16:11:28 1  make a guess, that's -- that's how I would look at
16:11:46 2  it.
16:11:46 3    Q   Have you ever heard of a company by
16:11:48 4  the name of TeleGolf?
16:11:52 5    A   No.
16:11:52 6    Q   It was a company hired by Adams to
16:11:54 7  handle direct response sales?
16:11:58 8    A   Okay. I mean, I -- the name doesn't
16:12:00 9  ring a bell.
16:12:02 10   Q   Now, direct response sales, what sort
16:12:07 11 of sales were those, please?
16:12:09 12   A   Direct response refers to people who
16:12:12 13 saw the infomercial on television and called up to
16:12:15 14 buy a product.
16:12:17 15   Q   Okay. Was the -- the persons who
16:12:22 16 called up, were they speaking during '98 to Adams
16:12:26 17 employees or to some -- someone to whom you had
16:12:30 18 contracted that job?
16:12:31 19   A   It would be someone who -- with whom
16:12:33 20 we had contracted.
16:12:37 21   Q   Okay. Was there a change in that
16:12:37 22 company during 1998?
16:12:39 23   A   To TeleGolf?
16:12:42 24   Q   From -- well, actually, what I'm

Page 229

16:12:43 1  asking you is -- I'll mark it.
16:12:48 2        MR. COLLINS: Exhibit?
16:12:50 3        THE REPORTER: 296.
16:12:52 4        MR. COLLINS: 296. Thank you
16:12:54 5  very much. I'll ask you to mark this.
16:13:03 6        And I only have this copy. I
16:13:06 7  apologize.
16:13:07 8        MR. BESSETTE: It's going to
16:13:07 9  be hard to ask questions from it
16:13:11 10       MR. COLLINS: Just you watch
16:13:11 11 me.
16:13:12 12       (Deposition Exhibit 296
16:13:13 13       was marked.)
16:13:13 14   Q   (By Mr. Collins) This is from the
16:13:14 15 KPMG workpapers with regard to the third quarter
16:13:19 16 review, and if you could read to yourself from
16:13:24 17 the -- the discussion at the bottom of the page
16:13:24 18 about TeleGolf and reserves.
16:13:34 19   A   Okay. I read it.
16:13:35 20   Q   Are you familiar with the increase in
16:13:38 21 reserves for direct response sales in the third
16:13:43 22 quarter?
16:13:44 23   A   No, not specifically.
16:13:45 24   Q   Okay. Were you aware of allegations

58  (Pages 226 to 229)

Page 242

16:36:34 1 decision or not, I mean, I'm sure Chip's memory
16:36:38 2 for that is a lot better than mine's -- mine is.
16:36:40 3 Excuse me.
16:36:41 4     Q    But is it fair to say that the
16:36:45 5 $4.3 million credit resulted from an amalgam of
16:36:51 6 factors, including Orlimar competition, Costco
16:36:57 7 gray marketing, the decline of the -- or the
16:37:01 8 difficulty in the manufacturing industry as a
16:37:05 9 whole?  Is that a fair statement?
16:37:07 10     MR. BESSETTE:  Calls for
16:37:07 11 speculation.  In --
16:37:10 12     Q    (By Mr. Collins)  Please.
16:37:10 13     A    I would say certainly not an equal
16:37:12 14 measure.  The decline in the marketplace and
16:37:18 15 Orlimar, definitely.  To what degree, if any, at
16:37:21 16 that late juncture Costco had an effect on
16:37:24 17 anything, again, Chip could tell you better than I
16:37:26 18 could.
16:37:27 19     Q    But you can't exclude any one of
16:37:29 20 those three factors as at least a partial cause, I
16:37:32 21 gather.  You can't exclude the market conditions,
16:37:35 22 you can't exclude Costco, and you can't exclude
16:37:38 23 Orlimar, correct?
16:37:39 24     A    I don't think I could exclude any of

Page 243

16:37:40 1 them, you know, sitting here trying to remember
16:37:44 2 back eight years with any degree of accuracy, heck
16:37:47 3 no.
16:37:48 4     Q    That's fine.  Thank you, sir, for
16:37:50 5 your time.
16:37:50 6     A    And by the way, I did remember an
16:37:52 7 answer to one of your questions, if you care.
16:37:54 8     Q    Of course, please.
16:37:55 9     A    But -- I don't know if it's relevant
16:37:55 10 or not, but you asked me about the D&O insurance.
16:37:57 11     Q    Please.
16:38:00 12     A    There are actually two things.  One
16:38:02 13 was that -- I don't think they're related either,
16:38:06 14 but who knows.
16:38:07 15         Clint Eastwood had agreed to
16:38:09 16 go on our board of directors, and I think we were
16:38:11 17 all pretty excited, if not star-struck about that.
16:38:15 18 And then his advisors told him not to do it
16:38:20 19 because, in their diligence, they didn't think we
16:38:22 20 had enough D&O insurance.  So that was a big
16:38:25 21 disappointment.  We looked forward to having Clint
16:38:27 22 come in every month to our meetings.
16:38:29 23         And then Darl, in his role as
16:38:32 24 chief financial guy with his experience in public

Page 244

16:38:35 1 companies and so on, if I remember correctly, did
16:38:38 2 an analysis, and his conclusion was that we needed
16:38:41 3 to upgrade our D&O insurance.  But I don't know if
16:38:44 4 that was influenced by Clint Eastwood's decision
16:38:47 5 or not.
16:38:48 6     Q    Okay.  Just one follow-up on that.
16:38:50 7 I'll leave Clint Eastwood alone, but with regard
16:38:53 8 to Darl, he came to the company before the IPO,
16:38:58 9 correct?  I believe it was --
16:39:00 10     A    Yeah.  I believe he did.  I think it
16:39:03 11 was fairly close, but yes.
16:39:04 12     Q    Okay.  And even though he came before
16:39:09 13 the IPO, it wasn't until October that it was --
16:39:13 14 that any action was taken in -- in connection with
16:39:20 15 increasing the D&O coverage?  Is that accurate?
16:39:23 16     A    I mean, again, the records will show
16:39:23 17 the dates.  I don't remember specifically.
16:39:26 18     MR. COLLINS:  All right.  No
16:39:26 19 further questions and thank you again.
16:39:27 20     MR. BESSETTE:  I've got a
16:39:28 21 couple.  And I don't think we'll need to switch.
16:39:30 22 I was thinking we would, but --
16:39:31 23     MR. COLLINS:  Go ahead.
16:39:31 24     EXAMINATION

Page 245

16:39:33 1 BY MR. BESSETTE:
16:39:33 2     Q    So, Mr. Adams, if you would take
16:39:36 3 Exhibit 57, which you have, I think, now in front
16:39:38 4 of you, and Mr. Collins asked you quite a few
16:39:41 5 questions about it, but I'm not sure the record is
16:39:44 6 clear, so to be clear:  How did you resolve the
16:39:48 7 issues that you raised in this memorandum?  How
16:39:51 8 did you resolve them with Mark?
16:39:54 9     A    Well, I think I testified to this,
16:39:57 10 but, you know, Mark came back and we spoke.  We
16:40:00 11 had -- I said -- I think I said we had a meeting
16:40:02 12 one evening, and he proceeded to verify pretty
16:40:09 13 much what I -- I knew when I wrote this, that all
16:40:13 14 these allegations were, you know, the result of
16:40:16 15 backbiting and bickering and low morale and so on
16:40:19 16 and so forth, and that they, you know -- I had
16:40:25 17 overstated my case.  And, you know, I kind of
16:40:31 18 understood that.
16:40:33 19         But I guess, you know, it's
16:40:35 20 also fair to say that when I asked Mark, I said:
16:40:40 21 Okay.  I'll buy all that.  I kind of knew all
16:40:41 22 that.  What I really wanted to get out of you was:
16:40:45 23 Where are we going from here?  What are we going
16:40:47 24 to do?

62 (Pages 242 to 245)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

9946c097-09d6-4975-9215-f12a9a4984b6

Page 246

16:40:50 1    My recollection is that I
16:40:51 2  don't think my -- I don't think his -- his answer
16:40:56 3  to that or his analysis of that was as dynamic as
16:40:59 4  I hoped it would be.
16:41:01 5    Q    What do you mean?
16:41:05 6    A    That we got this program in place.
16:41:07 7  We're going to implement this. You know, I'm
16:41:10 8  making these changes; you know, we have really got
16:41:12 9  this thing under control; you know, we're going to
16:41:16 10  go forward; and -- and, you know, you're going to
16:41:19 11  be just really impressed with all the things we're
16:41:22 12  doing and so on and so forth.
16:41:23 13    I -- I think there was another
16:41:24 14  thing to it. I guess I had a little bit of a
16:41:27 15  leaning towards wanting to have people in the
16:41:28 16  field, salespeople in the field, and I don't think
16:41:34 17  that -- I don't think he was too excited about
16:41:39 18  that.
16:41:39 19    Q    Was there any -- did you find any
16:41:41 20  evidence of intentional double shipping?
16:41:44 21    A    No. I mean, we -- Mark and I talked
16:41:46 22  about that, that those were the -- like I say,
16:41:51 23  those were the office cooler gossip-type stuff,
16:41:54 24  and there was no records, no evidence, no proof,

Page 247

16:41:56 1  no nothing. It was just that I was so
16:41:59 2  disappointed that it even came up.
16:42:01 3    Q    Same question with respect to
16:42:02 4  consignment sales.
16:42:03 5    A    Yeah, the whole -- I mean, I think --
16:42:05 6  again, maybe I was just too brief with it. I
16:42:08 7  said: 8 high, all those -- all those allegations.
16:42:10 8  I said: I knew they were -- they just weren't the
16:42:14 9  kind of conversations I wanted to hear from people
16:42:16 10  in a sharp, progressive department.
16:42:18 11    Q    Why did you write in the memo, you
16:42:21 12  know: I know this is going on, they say this is
16:42:24 13  going on? What were you trying to communicate?
16:42:25 14    A    I was trying to communicate that --
16:42:31 15  that -- that I had -- my expectation for that
16:42:33 16  group was very high, and I wanted to be very,
16:42:35 17  very, very clear that that was no reaction I
16:42:42 18  got when I went down and talked to them myself.
16:42:45 19  And I just wasn't going to leave any room, you
16:42:48 20  know -- searching for words here.
16:42:53 21    It was -- I wanted to let them
16:42:56 22  know, darn it all, that this isn't the way you ran
16:42:59 23  a sales department, and I depend on -- on you
16:43:01 24  guys. You're supposed to be one of my absolute

Page 248

16:43:04 1  strongest factors in the company.
16:43:06 2    And when I hear this kind of
16:43:08 3  backbiting and arguing and so on and so forth, you
16:43:11 4  know, don't tell me that so and so really meant
16:43:14 5  something else when they said it or whatever the
16:43:15 6  deal is. That's -- that's, you know -- I don't
16:43:23 7  know what the word is -- childish almost. How
16:43:26 8  about a department that's -- that's on top of --
16:43:30 9  of its game, so to speak, and it's got plans going
16:43:33 10  forward. That's what I wanted to hear.
16:43:36 11    Q    All right. Let me ask you to look at
16:43:38 12  Exhibit 80. I think in your stack it's the one
16:43:40 13  with the yellow sticker on top.
16:43:45 14    A    Yes.
16:43:45 15    Q    Okay. That should be the October
16:43:50 16  8th, 1998 memo to the board members regarding the
16:43:55 17  fourth quarter.
16:43:56 18    A    Right.
16:43:56 19    Q    And you talked with Mr. Collins quite
16:44:00 20  a bit about that, but again, I'm not sure the
16:44:02 21  record is real clear.
16:44:03 22    Why did the Costco issue take
16:44:05 23  on added significance in October 1998, more so
16:44:09 24  than it had pre-IPO or even up till October 1998?

Page 249

16:44:22 1    MR. COLLINS: Asked and
16:44:22 2  answered.
16:44:22 3    A    Now do I answer?
16:44:22 4    MS. REED: Yeah.
16:44:22 5    Q    (By Mr. Bessette) Yeah.
16:44:22 6    A    Because the market had changed. I
16:44:24 7  mean, Callaway had come out with a statement that
16:44:29 8  said, they're -- if I remember correctly, they
16:44:32 9  didn't meet their numbers or their expectations,
16:44:34 10  that the market was -- was soft, the Asian market
16:44:38 11  was bad shape. And that Asian market is a
16:44:42 12  big percentage of the world market. And I'm
16:44:45 13  paraphrasing here, but that's pretty much what
16:44:47 14  Callaway said.
16:44:47 15    And when that comment was
16:44:49 16  made, Callaway was the -- the voice of the public
16:44:53 17  market for golf equipment. I mean, they were the
16:44:55 18  only public company that Wall Street even -- in
16:44:57 19  fact, they might have been the only public company
16:45:00 20  period, but they certainly were the only public
16:45:02 21  company that Wall Street looked at.
16:45:03 22    So when Callaway said that,
16:45:05 23  that was a major, major, major thing, and it got
16:45:08 24  reported in all the golf magazines and so on and

63  (Pages 246 to 249)

9946c097-09d6-4975-9215-f12a9a4984b6

Page 250

```
16:45:11  1   so forth.
16:45:12  2          So what happens is retailers
16:45:14  3   start -- they react to that. They say: Oh, my
16:45:17  4   gosh. Things are going to get bad. Maybe we
16:45:20  5   better cut back on our inventories. We better cut
16:45:23  6   back on our buying. Well, now the snowball is
16:45:26  7   starting.
16:45:27  8          They cut back on their buying.
16:45:28  9   The big guys, the Callaways, Taylor Mades, they'd
16:45:32 10   all go back and say: Wait a minute, wait a
16:45:33 11   minute, you know, we'll make you a deal. We'll
16:45:35 12   give you six-month terms. We'll do this, we'll do
16:45:37 13   that, whatever the -- whatever we can do to
16:45:40 14   protect their position.
16:45:40 15          Meanwhile, we're in there as
16:45:45 16   the company with the least amount of brand equity
16:45:48 17   compared to those big guys, you know, trying to
16:45:51 18   protect our position, and it just gets harder and
16:45:54 19   harder and harder.
16:45:55 20          So if -- just to throw a
16:45:56 21   number at it, if -- if, you know, we use the
16:46:00 22   Poughkeepsie story, if it's 300 clubs at Costco,
16:46:06 23   it's 300 out of half a million; and then in the
16:46:11 24   fourth quarter, it's 300 out of -- I don't know
```

Page 251

```
16:46:14  1   what we shipped in the fourth quarter, but it
16:46:18  2   wasn't very many. So it was a percentage. It
16:46:19  3   just becomes a much more serious issue, and a much
16:46:21  4   more visible issue.
16:46:22  5      Q   Is that the reason you wrote the
16:46:24  6   memo?
16:46:24  7      A   Yeah. You couldn't hide from it. I
16:46:26  8   had to show the board that I was aware of the
16:46:28  9   situation and that, you know, we were going to do
16:46:29 10   something about it.
16:46:34 11      Q   Okay. In the last subject area, you
16:46:38 12   talked a little bit about the due diligence
16:46:40 13   process in connection with the initial public
16:46:43 14   offering. And I think you made it clear that you
16:46:46 15   and other management members of Adams Golf were
16:46:49 16   aware, pre-IPO, of certain -- certain number of
16:46:55 17   clubs purporting to be Adams Golf clubs in certain
16:46:59 18   Costco stores.
16:46:59 19          Do I understand that right?
16:47:02 20          MR. COLLINS: Vague and
16:47:02 21   ambiguous.
16:47:04 22          THE WITNESS: Boy. Thanks.
16:47:07 23      A   Pre-IPO, when we discussed this with
16:47:12 24   all of the people, that was the situation in
```

Page 252

```
16:47:18  1   Canada, no matter how small it was, it was still
16:47:21  2   the situation in Canada, and the fact that there
16:47:25  3   were always going to be some golf clubs in the
16:47:32  4   gray market because that's the way life was. I
16:47:34  5   thought I was clear about that, but I may not --
16:47:40  6   it was just fully discussed.
16:47:42  7      Q   (By Mr. Bessette) That's what I want
16:47:42  8   to explore. You say it was fully discussed. Who
16:47:49  9   discussed it and among -- among who was it
16:47:48 10   discussed, I should say?
16:47:49 11      A   I mean, I can't speak for other
16:47:51 12   people. I can only speak for myself, you know,
16:47:53 13   when I had conversations, but I mean, with Lehman
16:47:57 14   Brothers, with any of the analysts or
16:48:00 15   representatives of the bankers that we talked to,
16:48:04 16   the lawyers, the financial people. There were
16:48:09 17   just a myriad of -- of discussions with a myriad
16:48:12 18   of -- of, I guess, experts in their particular
16:48:15 19   fields, and that along with many other things was
16:48:18 20   discussed.
16:48:18 21      Q   And did any of those people, whether
16:48:21 22   they be underwriters, lawyers, financial people,
16:48:24 23   or anyone else involved in the due diligence
16:48:26 24   process, ever express the view to you that there
```

Page 253

```
16:48:30  1   should be a separate stand-alone risk factor in
16:48:34  2   the prospectus concerning the gray market or
16:48:36  3   Costco?
16:48:36  4      A   No, they did not.
16:48:39  5      Q   Did you think that there should be a
16:48:40  6   separate risk-factor disclosure in the prospectus
16:48:44  7   about gray marketing or Costco?
16:48:45  8      A   No, I did not.
16:48:46  9      Q   Why?
16:48:46 10      A   It wasn't significant. I mean, you
16:48:49 11   brought it up because -- I guess I'm anticipating
16:48:51 12   a question here, but -- because I brought up
16:48:55 13   everything I could think of, but it just wasn't
16:48:58 14   significant.
16:48:58 15          MR. BESSETTE: That's all I
16:48:59 16   have. Thank you very much.
16:49:00 17          MR. COLLINS: Well, let me
16:49:01 18   follow up just a little bit.
16:49:01 19          FURTHER EXAMINATION
16:49:05 20   BY MR. COLLINS:
16:49:06 21      Q   Exhibit 80, the October 8th, '98
16:49:08 22   memo. If I'm really hearing you correctly,
16:49:12 23   Mr. Adams, you're saying that the real issue as of
16:49:14 24   October 8th, '98, the real issue was A, industry
```

64 (Pages 250 to 253)

Page 254

16:49:18 1 conditions, and B, Orlimar; is that right?
16:49:21 2     A    Yes.
16:49:22 3     Q    Then why in the world did you only
16:49:23 4 talk about Costco in that memo?
16:49:27 5         MR. BESSETTE: Asked and
16:49:27 6 answered, but let's do it again for the record.
16:49:29 7     A    Because this was a Costco memo.
16:49:33 8     Q    (By Mr. Collins) Oh, okay. So tell
16:49:35 9 me where I can find the industry conditions memo
16:49:37 10 and the Orlimar memo.
16:49:39 11         I'm sorry. I apologize for
16:49:41 12 the facetiousness of that.
16:49:44 13     A    Okay. It's late.
16:49:45 14     Q    I sincerely apologize.
16:49:47 15         But Mr. Adams, if this is a
16:49:50 16 Costco memo, did you on or about October 8, 1998,
16:49:56 17 write a memo on industry conditions, or did you
16:50:00 18 write a memo on Orlimar?
16:50:04 19     A    I don't remember a specific memo on
16:50:06 20 industry conditions or Orlimar. I certainly
16:50:09 21 remember discussing those subjects with the board.
16:50:11 22     Q    Okay. Now we -- we looked earlier at
16:50:13 23 the board minutes for the October board meeting,
16:50:18 24 and you recall that the first subject matter was

Page 255

16:50:22 1 Costco? Do you recall that?
16:50:24 2     A    Yes, I do. It was first in line,
16:50:29 3 yes.
16:50:29 4     Q    And that's despite the fact that you
16:50:31 5 claim now the industry conditions and Orlimar were
16:50:38 6 more important at the time.
16:50:39 7         Why didn't you discuss Orlimar
16:50:41 8 or industry conditions first?
16:50:42 9         MR. BESSETTE: Objection,
16:50:43 10 assumes facts not in evidence, but the mere fact
16:50:44 11 that it's listed first means it's the most
16:50:47 12 important. I --
16:50:47 13     Q    (By Mr. Collins) Go ahead.
16:50:47 14         MR. BESSETTE: -- don't think
16:50:47 15 that's his testimony.
16:50:48 16         MR. COLLINS: It might be your
16:50:49 17 testimony, Paul, but I don't know that it's his
16:50:50 18 testimony.
16:50:51 19         MR. BESSETTE: No. I said
16:50:52 20 it's not his testimony.
16:50:53 21     Q    (By Mr. Collins) You can go ahead,
16:50:55 22 Mr. Adams.
16:50:56 23     A    Well, what I was going to say was,
16:50:59 24 and now it's going to sound like he framed my

Page 256

16:51:00 1 answer for me, but --
16:51:02 2     Q    No.
16:51:02 3     A    We didn't have a -- you know, it
16:51:04 4 wasn't any particular agenda, let's hit the most
16:51:07 5 important thing first and so on and so forth.
16:51:09 6         And also, I'd say by October,
16:51:13 7 the -- the industry conditions weren't much of a
16:51:16 8 secret. They had been written about in all the
16:51:18 9 golf magazines and on and on and on, so -- we
16:51:21 10 certainly didn't ignore them, but -- you know,
16:51:26 11 Orlimar was certainly no secret. They had been
16:51:28 12 written about in all the golf magazines. Costco
16:51:32 13 was a -- was an Adams situation, internal Adams
16:51:35 14 situation. Maybe that's why it came first. I
16:51:37 15 don't know. I mean, it doesn't mean it's the most
16:51:38 16 important. It means the other two were certainly
16:51:41 17 industry situations -- situations.
16:51:43 18     Q    So as of October 1998, Costco was
16:51:49 19 affecting Adams differently from how it was
16:51:51 20 affecting the rest of the industry?
16:51:55 21     A    I would have no idea how it was
16:51:56 22 affecting the rest of the industry.
16:51:58 23     Q    And as I understand it, what was a
16:52:14 24 problem before October 8, 1998, with respect to

Page 257

16:52:19 1 Costco became a more serious problem after --
16:52:25 2 start again.
16:52:26 3         In the October 8, 1998 memo,
16:52:31 4 Exhibit 80 --
16:52:32 5     A    Right.
16:52:32 6     Q    -- you talk about Costco from the
16:52:35 7 standpoint, if I understand your testimony today,
16:52:38 8 as something that was a problem before, but is a
16:52:42 9 greater problem now because of industry conditions
16:52:42 10 and Orlimar.
16:52:47 11         Do I have that right?
16:52:48 12     A    I think that's a -- that's a fair
16:52:50 13 assessment. I mean, it's -- it's -- this is
16:52:53 14 talking about the fact that -- I mean, number one,
16:52:55 15 this is the beginning of the fourth quarter, and
16:52:58 16 it's talking about what's coming in the next three
16:53:00 17 months.
16:53:00 18     Q    Okay.
16:53:00 19     A    And what it's saying is that as
16:53:04 20 a percentage of the whole, the Costco situation
16:53:07 21 is -- is obviously going to be worse. You know,
16:53:09 22 it's by definition.
16:53:11 23     Q    So Costco represents a greater risk
16:53:14 24 in a situation in which you've got declining

65  (Pages 254 to 257)

BEEBE

## CHRISTOPHER BEEBE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:  ADAMS GOLF, INC.   )
                           ) Case No. 99-371 KAJ
SECURITIES LITIGATION.     )
_____)

DEPOSITION OF CHRISTOPHER K. BEEBE

Taken at San Diego, California

May 23, 2006

Reported by Catherine Gautereaux, CSR
Certificate No. 3122

## CHRISTOPHER BEEBE

Page 18

1    A  In 1998 I don't think that was the case,
2  because the Tight Lies, T-i-g-h-t, L-i-e-s -- that was
3  our product, that was the hot seller at the time --
4  Tight Lies was a very hot product. And people,
5  retailers, want what's hot and will sell what's hot if
6  they are making a lot of money or making little money
7       Taylor Made, Callaway, other big people
8  usually would give a retailer very little margin, but
9  because it was selling, they want what's hot to bring
10  people into their stores. Whether they bait and switch
11  or whether they sell the product, they want what's hot
12  in their stores
13    Q  Did that change during the course of 1998 with
14  regard to Adams Golf?
15    A  Did what change? I'm sorry
16    Q  Adams Golf -- I'm sorry -- the Tight Lie being
17  a hot product that retailers want.
18    A  No. It was -- it was the hot product. Other
19  products came along, that were also well received, that
20  became hot during the year.
21    Q  Okay. Now, during 1998 there was gray
22  marketing going on in Canada; is that correct?
23    A  Yes, it is
24    Q  How did you become aware of that?
25    A  I believe it was by that fine welcome note

Page 19

1  from Greg Pratt that said, "Welcome" -- "Welcome, and we
2  have a problem."
3    Q  Well, you know, I take lots of depositions,
4  and it almost never occurs that a deponent says, "There
5  is a particular document, and that document is the
6  document immediately in front of me." But maybe I'm
7  wrong
8       Take a look at a document previously marked
9  Exhibit 6, and take your time. But after you look at
10  it, tell me if that's the welcome note, the "fine
11  welcome note" you just referred to
12    A  Yes, this is the note.
13    Q  Now, in this -- at the time, WDC Mackenzie was
14  the Canadian distributor for Adams Golf, correct?
15    A  That is correct.
16    Q  And at the time, the way things were supposed
17  to work was that there was no product sold at retail
18  that hadn't been obtained by the retailer from WDC
19  Mackenzie, correct?
20    A  That's how we envisioned it working, that's
21  correct.
22    Q  And before you received this "fine welcome
23  note" at Exhibit 6, as I understand it, you had no
24  information that there were any retail sales going on in
25  Canada that hadn't been obtained from WDC Mackenzie?

Page 20

1    A  I believe, reading this message -- this note,
2  it seems that I knew -- that they had told me
3  previously, because I had stopped a shipment to King Par
4  just after arriving. In the second-to-the-last
5  paragraph, it says I stopped something up.
6       So if that's the case, I would assume that I
7  was aware, because they had told me. But this is the
8  first time I saw something in writing where they
9  explained the situation in detail.
10    Q  Okay. Thank you. Now, let's talk about that
11  King Par order for a moment.
12    A  Okay.
13    Q  You were good enough to point out that it's
14  referenced here. Do you remember that order?
15    A  I believe I do.
16    Q  What do you remember about it, please?
17    A  I believe it was -- do you mean the order or
18  the circumstances surrounding the order?
19    MR. BESSETTE: I think he wants all of it, whatever
20  you remember about it.
21    MR. COLLINS: Please.
22    MR. BESSETTE: Okay. Sorry.
23    MR. COLLINS: No, no.
24    THE WITNESS: Getting into the company, Adams Golf,
25  everything was new. It was a little bit crazy. The

Page 21

1  company was growing. Shipments were going out in great
2  numbers. WDC Mackenzie said, I believe, that they heard
3  there was a shipment -- shipments going into their
4  market from gray marketers, and they believed that King
5  Par was one of these people.
6       I had never heard of King Par before. So I
7  went into our order base to find out about who this King
8  Par was, what they ordered in the past, what their order
9  history was, and what they had on order. And the order
10  history was not huge with us. Decent numbers, but
11  nothing spectacular.
12       And then you have a number of 1500 clubs.
13  It's out of the ordinary. And in my experience with
14  parallel exporters, this was one indication that someone
15  could be a parallel exporter -- or a gray marketer,
16  excuse me.
17  BY MR. COLLINS:
18    Q  What do you mean by "parallel exporter"?
19    A  Parallel exporter is the same as a gray
20  marketer. You have your parallel -- you export things
21  to your distributor, and on parallel lines someone else
22  is sending product into the country.
23    Q  I see.
24    A  Usually it goes directly to a retailer who has
25  friends in one country, brings the product over.

6 (Pages 18 to 21)

22f6c819-64f3-4b8d-8135-5743df6e3fc8

# CHRISTOPHER BEEBE

Page 22

1  Q   Now, what was your experience, before Adams
2  Golf, with parallel exporters?
3  A   In the golf industry, as well as a good number
4  of industries, unfortunately, there is a lot of gray
5  ship -- gray market or parallel products that go on.
6  Depending on the company and their sales practices and
7  their dedication to minimizing it, some companies have a
8  lot of parallel exports, some do not.
9  I worked at Lynx Golf previously, and Lynx
10 Golf was stronger outside the United States than inside
11 the United States. So people -- some retailers, some
12 salesmen in the United States, had a practice of
13 shipping product to other countries to increase their
14 commissions and their sales.
15 MR. COLLINS: (To the Reporter) Would you mind
16 reading that back.
17 (Answer read.)
18 BY MR. COLLINS:
19 Q   Now, with regard to gray-market or parallel
20 shipments, did I hear you correctly that the amount
21 of -- of that depends on the company and their sales
22 practices and their dedication to minimizing the
23 parallel or gray-market shipments?
24 A   Yes.
25 Q   Now, what did you mean when you referred to

Page 23

1  the company and their sales practices as -- as something
2  that affects the amount of gray-market shipments?
3  A   Some companies turn a blind eye to parallel
4  shipments or let it happen knowingly by encouraging
5  shipments to someone that would ship overseas.
6  Q   Now, in your last answer you referred to "some
7  companies."
8  A   Yes.
9  Q   Do I understand that other companies, in 1998,
10 reacted differently?
11 A   That's correct.
12 Q   What would other companies do when they --
13 what did other companies do in 1998?
14 A   They had sales practices, such as Adams Golf,
15 where they found -- if they knew a product was going
16 overseas or a shipment was going somewhere that it was
17 not supposed to, they would stop that shipment.
18 When I worked at Ram Golf, the same thing
19 happened: You found a paralleler, you would stop them;
20 stop the shipment.
21 Q   Apart from stopping a shipment to a
22 paralleler --
23 A   Yes.
24 Q   -- were there any other devices available to a
25 golf-club manufacturer in 1998 to minimize gray

Page 24

1  marketing?
2  A   When we -- in some positions, when we expected
3  someone -- suspected someone was a paralleler, we would
4  somehow mark product, such as take off the grip, put a
5  mark inside the head, put the grip back on.
6  And then, when the shipment was found to be at
7  a location that it wasn't supposed to be, we'd remove
8  the grip. If we found the mark, we could then find out
9  this person was, indeed, a paralleler, and we would
10 close them down. If we found their packing list or
11 addresses on boxes that ended up overseas or in other
12 places, that was another way it would happen.
13 Q   Okay. Okay. So apart from stopping shipments
14 to known parallelers, apart from marking products or
15 checking the shipping or packing information, were there
16 any other steps available in 1998 to minimize?
17 MR. BESSETTE: Just generally, to any manufacturer?
18 MR. COLLINS: I'm sorry. My question is limited to
19 golf-club manufacturers in 1998.
20 MR. BESSETTE: All right.
21 THE WITNESS: Golf-club manufacturers. I'm looking
22 back, recalling. At that time, most of the major
23 manufacturers did not do anything different than that --
24 those tasks.
25

Page 25

1  BY MR. COLLINS:
2  Q   In 1998, at Adams, to the extent that you
3  know, were retailers and distributors, in the U.S. and
4  internationally, contractually prohibited from
5  trans-shipping?
6  MR. BESSETTE: (To the Reporter) Can I get that
7  back, please.
8  (Question read.)
9  THE WITNESS: Distributors were not allowed to
10 trans-ship inside the United States. I am not one
11 hundred percent sure of the details, but I'm sure
12 that -- I'm fairly certain that there was language that
13 they could not ship. If they got a product, it was for
14 their store; they could not pass it on to other
15 locations.
16 BY MR. COLLINS:
17 Q   Okay. And I know you weren't certain of that,
18 but when you referred in your last answer to "language,"
19 where was that language found, to your knowledge?
20 A   Okay. I don't recall, but I believe that for
21 distributors, it was in the distributing contract. For
22 the -- I believe, for Adams Golf, on the back of our
23 invoices, we had a sales policy.
24 Q   Okay. So if we're talking about weapons in a
25 golf-club manufacturer's arsenal, in 1998, to combat

7 (Pages 22 to 25)

22f6c819-64f3-4b8d-8135-5743df6e3fc8