BLEVINS

SCOTT BLEVINS

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.  :    CONSOLIDATED

SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

_____X

ORAL DEPOSITION OF SCOTT BLEVINS

Wednesday, May 3, 2006

The oral deposition of Scott Blevins was

held at the law offices of Akin Gump Strauss Hauer

& Feld, LLP, 1700 Pacific Avenue, Suite 4100,

Dallas, Texas, from 9:36 a.m. to 2:26 p.m., before

Jamie K. Israelow, a Certified Shorthand Reporter

in and for the State of Texas, Registered

Professional Reporter, Certified Realtime Reporter

and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000     (888)777-6690

## SCOTT BLEVINS

**Page 46**

```
10:24:55 1   They display one, and then they have backstock, so
10:24:58 2   we were trying to find out if they only had one --
10:25:01 3       Q   Uh-huh.
10:25:02 4       A   -- in a store or if they had 12 or
10:25:06 5   200.
10:25:06 6       Q   Okay.
10:25:06 7       A   That was the next step: Once they
10:25:09 8   had them, can we figure how many they had.
10:25:15 9       Q   So in the first part of this first
10:25:18 10  wave, were your RACs calling back and saying they
10:25:23 11  had one?
10:25:24 12      A   We didn't know how to figure out how
10:25:26 13  many they had until one -- one of them stumbled
10:25:29 14  upon a way to find out.
10:25:32 15      Q   Okay. So this backstock technique
10:25:36 16  used by Costco was unknown to you before you
10:25:40 17  started sending people out?
10:25:41 18      A   Right. We just knew they had one on
10:25:43 19  display.
10:25:43 20      Q   Okay.
10:25:43 21      A   And that's all you could see.
10:25:47 22      Q   Okay.
10:25:48 23          MS. BRANNEN: If this isn't a
10:25:49 24  good time, in the next few minutes can we take a
```

**Page 47**

```
10:25:52 1   break?
10:25:52 2           MR. MARA: We can take one
10:25:54 3   right now.
10:25:54 4           (A recess was taken from
10:25:54 5           10:25 to 10:37.)
10:25:54 6           (Off the record, the attorneys
10:25:54 7           stipulated to the Federal
10:37:58 8           Rules.)
10:37:58 9       Q   (By Mr. Mara) Okay. Before the
10:38:03 10  break, we were talking about Costco and
10:38:14 11  backstocking. How did you figure it out or how
10:38:20 12  did you deal with it?
10:38:21 13      A   With what specifically?
10:38:22 14      Q   Correct me if I'm wrong, but I
10:38:25 15  believe you testified that Costco put one club out
10:38:28 16  on the sales floor?
10:38:29 17      A   Right.
10:38:30 18      Q   And I'm assuming would have stock in
10:38:31 19  a back room?
10:38:32 20      A   Right.
10:38:33 21      Q   So it was physically in the Costco
10:38:35 22  store, it just wasn't on the sales floor?
10:38:39 23      A   Correct.
10:38:40 24      Q   And that stymied your efforts in the
```

**Page 48**

```
10:38:45 1   beginning to figure out how many clubs were in a
10:38:48 2   given Costco?
10:38:49 3       A   Yes. It's not easy to figure it out.
10:38:51 4       Q   To get --
10:38:51 5       A   You can walk into the warehouse.
10:38:53 6       Q   It takes a little sleuthing?
10:38:56 7       A   Yes.
10:38:56 8       Q   So how did you deal with that issue?
10:38:59 9       A   Eventually, we found that if you
10:39:01 10  could find the right person in the Costco, which
10:39:04 11  was tough to do because they don't have many
10:39:07 12  people servicing you when you're shopping the
10:39:09 13  store.
10:39:09 14      Q   Right.
10:39:10 15      A   You could ask for: Hey, I need to
10:39:14 16  buy 24 clubs or 48 of these. Do you have that
10:39:20 17  many? And they would say yes or no. And
10:39:23 18  occasionally, then, you could get them to walk you
10:39:26 19  over to the computer to see if they had clubs in
10:39:28 20  one of their neighboring stores.
10:39:30 21      Q   Oh, I see.
10:39:31 22      A   I only have 24, but there's 12 over
10:39:40 23  here.
10:39:40 24      Q   And -- and your regional account
```

**Page 49**

```
10:39:45 1   coordinators, did they inquire as to whether or
10:39:49 2   not those inventory levels reflected on the Costco
10:39:53 3   computer were current and accurate? I can't -- it
10:39:58 4   was just an informal: Thank you?
10:40:00 5       A   Yes.
10:40:06 6       Q   Just one moment. Again, I'm just
10:40:12 7   trying to keep a running tally.
10:40:14 8           Okay. What -- how else did
10:40:19 9   this Blevins group work?
10:40:22 10          MS. BRANNEN: I'm going to
10:40:23 11  object to the "Blevins group work." Can we go
10:40:27 12  back to the investigatory team? That's kind of
10:40:30 13  vague to me.
10:40:31 14          MR. MARA: I'm using it --
10:40:34 15  investigatory is too hard to say. That's the only
10:40:34 16  reason I'm calling it the Blevins group. What --
10:40:38 17  the Costco --
10:40:38 18          MR. McEVOY: Can we call them
10:40:40 19  the regional account --
10:40:42 20          MR. MARA: Okay. The regional
10:40:44 21  account group --
10:40:44 22          MS. BRANNEN: Corrodinators.
10:40:45 23          THE WITNESS: I just want to
10:40:46 24  make sure everyone understands that it was not a
```

13 (Pages 46 to 49)

d90ff0a7-ab51-4519-a4df-add3b26a3c2e

SCOTT BLEVINS

**Page 50**

10:40:49 1 formal team put together to go identify this
10:40:51 2    Q    (By Mr. Mara) Understood.
10:40:51 3    A    It was my folks already in place,
10:40:54 4 just you've got them -- you've got people where
10:40:57 5 they've got a lot of stores --
10:40:59 6    Q    Right.
10:40:59 7    A    -- figure it out. And he did. So it
10:41:02 8 was a natural, I guess, that I should try to
10:41:04 9 figure it out if I've got people out there.
10:41:06 10    Q    Sure.
10:41:07 11    A    It wasn't a specific formed team
10:41:10 12 of -- that that's all we did.
10:41:11 13    Q    Understood.
10:41:11 14    A    We still had, you know, a number of
10:41:13 15 other things on our plate that we had to get
10:41:15 16 done --
10:41:16 17    Q    Right.
10:41:16 18    A    and make sure stores were
10:41:19 19 merchandised and check competition, which was, you
10:41:22 20 know, tough at the time, so --
10:41:24 21    Q    Right. So we'll call it the Costco
10:41:29 22 group, for purposes of this deposition only and
10:41:31 23 it's just referring to anyone who participated in
10:41:35 24 this effort to figure out --

**Page 51**

10:41:37 1        MS. BRANNEN: Can we not just
10:41:38 2 go with the RACs?
10:41:42 3        MR. MARA: That's fine, the
10:41:45 4 RACs.
10:41:45 5        MS. BRANNEN: Is that right?
10:41:46 6 Doesn't that cover everybody?
10:41:46 7        THE WITNESS: That's right.
10:41:46 8 There was never a formal group.
10:41:49 9        MR. MARA: I didn't for a
10:41:50 10 moment think it was.
10:41:52 11    Q    (By Mr. Mara) So the RACs. Okay.
10:41:54 12    What else did the RACs do to
10:41:57 13 investigate this problem?
10:42:03 14    A    That's about it.
10:42:04 15    Q    Okay. Did there ever come a time
10:42:11 16 when the investigatory relationship with Costco
10:42:15 17 became more formal?
10:42:17 18        MS. BRANNEN: I'm going to
10:42:18 19 object. That's vague and ambiguous.
10:42:21 20    Q    (By Mr. Mara) Was there ever a
10:42:22 21 time -- you've described the effort so far as
10:42:24 22 really just walking into the store --
10:42:25 23    A    Right.
10:42:26 24    Q    -- getting a salesperson and saying:

**Page 52**

10:42:28 1 Can you help me?
10:42:28 2    A    Correct.
10:42:29 3    Q    Did the investigation take any form
10:42:31 4 beyond that at any point or was that it?
10:42:34 5    A    That was it for my group.
10:42:44 6    Q    Okay. Do you know if any other
10:42:45 7 people within Adams were conducting similar
10:42:50 8 investigations or efforts?
10:42:51 9    A    I don't recall. I don't know.
10:42:52 10    Q    Do you know if anyone at Adams or --
10:42:54 11 do you know if anyone at Adams was investigating
10:43:01 12 suspected gray marketers other than Costco at the
10:43:03 13 time that your RACs were investigating Costco?
10:43:14 14    A    Not that I could recall.
10:43:22 15    Q    I believe you testified the reporting
10:43:27 16 structure -- I'm using that loosely. I know you
10:43:30 17 didn't say it was structured. But the reporting
10:43:34 18 mechanism was simply for your RAC basically to
10:43:37 19 walk out of the Costco, call you from the car --
10:43:39 20    A    Correct.
10:43:39 21    Q    -- and say: Here's what I just found
10:43:41 22 out --
10:43:42 23    A    Correct.
10:43:42 24    Q    -- in Anytown, USA?

**Page 53**

10:43:44 1    A    Right.
10:43:45 2    Q    Was there a time that that reporting
10:43:47 3 structure became more formalized, or did it remain
10:43:50 4 that way throughout the RACs' efforts?
10:43:55 5    A    It wasn't any formal than that. Like
10:43:59 6 I said, they could fax it. If you knew your store
10:44:03 7 list and you had your best guesstimate on numbers,
10:44:08 8 you could fax it in.
10:44:09 9    Q    When -- how often did you report
10:44:11 10 to -- strike that.
10:44:11 11        Who did you report to as it --
10:44:14 12    A    At what time?
10:44:15 13    Q    -- as it relates to the efforts of
10:44:17 14 your RACs to deal with the Costco problem?
10:44:21 15    A    It would have been Chip.
10:44:22 16    Q    Okay. Did you report to anyone else
10:44:25 17 about the RACs' efforts?
10:44:28 18    A    No.
10:44:28 19    Q    How often did you report to Chip?
10:44:33 20    A    There was nothing structured set up,
10:44:35 21 so we probably spoke about it every few days, if I
10:44:39 22 had new information.
10:44:45 23    Q    Did you draft any reports or
10:44:47 24 memoranda to Chip about the -- the efforts of your

14  (Pages 50 to 53)

d90ff0a7-ab51-4519-a4df-add3b26a3c2e

SCOTT BLEVINS

| Page 54 | Page 56 |
|---|---|
| 10:44:51 1 RACs related to Costco? | 10:47:23 1    A    Probably because I could never find |
| 10:44:54 2    A    Not that I recall. I think I recall | 10:47:26 2 any real information on it. |
| 10:44:56 3 showing him the numbers and the stores, and I may | 10:47:32 3    Q    And what do you mean by "real |
| 10:45:02 4 have drafted a note or two -- | 10:47:33 4 information"? |
| 10:45:04 5    Q    Okay. | 10:47:34 5    A    I couldn't track where the clubs came |
| 10:45:04 6    A    -- but I can't remember. | 10:47:39 6 from. I -- we had identified what stores had |
| 10:45:10 7    Q    Other than Chip, did you talk about | 10:47:41 7 them, and we knew approximately the number of |
| 10:45:16 8 the efforts of the RACs with anyone else at Adams, | 10:47:46 8 clubs in those stores, and then I ran through any |
| 10:45:26 9 other than the RACs? I mean -- by that I mean | 10:47:50 9 reports I could find to try to see how the |
| 10:45:26 10 Adams management. | 10:47:55 10 quantities could have ended up there, and at the |
| 10:45:26 11    A    So Mark -- Mark -- well, at the time, | 10:47:57 11 end of the day, it was like finding a needle in a |
| 10:45:26 12 I guess he wouldn't have even been there, so I | 10:48:00 12 haystack. We had sold so many clubs, I |
| 10:45:28 13 doubt it. | 10:48:00 13 couldn't -- there was nothing else for me to do. |
| 10:45:35 14    Q    So then specifically, you never | 10:48:05 14 I didn't know what to do. |
| 10:45:38 15 discussed it with Darl Hatfield? | 10:48:07 15    Q    Did you -- during the course of the |
| 10:45:43 16    A    Not that I can recall. | 10:48:09 16 investigation by the RACs, did you discuss |
| 10:45:44 17    Q    Okay. Or Jim Farrell? | 10:48:17 17 methods, alternative methods to run the |
| 10:45:50 18    A    I don't recall having many | 10:48:19 18 investigation with Chip? I mean, you were running |
| 10:45:51 19 conversations with Jim. | 10:48:24 19 the investigation as you've described. Were any |
| 10:45:54 20    Q    The efforts by the RACs related to | 10:48:26 20 other alternatives to that form of investigation |
| 10:46:00 21 the Costco problem, were they the subject at any | 10:48:29 21 considered? |
| 10:46:05 22 staff meetings? | 10:48:30 22    A    Not that I know of. I don't know |
| 10:46:06 23    A    I didn't attend many because I was on | 10:48:31 23 what else we could have done. |
| 10:46:08 24 the road -- | 10:48:38 24    Q    Around Thanksgiving of 1998, did you |

| Page 55 | Page 57 |
|---|---|
| 10:46:08 1    Q    Right. | 10:48:43 1 wrap up the investigation by the RACs with any |
| 10:46:08 2    A    -- but I'm assuming since it was an | 10:48:48 2 formal report? |
| 10:46:11 3 item at one point in time in the staff meetings | 10:48:51 3    A    I don't believe so. |
| 10:46:13 4 that it was followed up on in some way, shape, or | 10:48:55 4    Q    Did you orally wrap it up with Chip |
| 10:46:16 5 form, but I don't know that for sure. | 10:48:57 5 Brewer? Was there ever a final -- I'm sorry. |
| 10:46:22 6    Q    The investigation by the RACs, how | 10:49:00 6 Strike that. It's a multiple question. |
| 10:46:32 7 long did it last? | 10:49:03 7            How did the investigation by |
| 10:46:33 8    A    In total? | 10:49:05 8 the RACs end? Did Chip Brewer say: That's |
| 10:46:34 9    Q    Yeah. From -- | 10:49:10 9 enough? |
| 10:46:35 10    A    From the time -- | 10:49:11 10    A    I don't think so. I think the -- I |
| 10:46:36 11    Q    I believe we said it would have | 10:49:13 11 don't recall why it ended or how or him ever |
| 10:46:38 12 started -- didn't we say late October, early | 10:49:17 12 saying to stop looking at the stores. We had just |
| 10:46:42 13 November of '98? The record will speak -- | 10:49:21 13 moved on at that point, probably. |
| 10:46:45 14    A    Sometime in October it started. | 10:49:31 14    Q    By the end of October when -- |
| 10:46:47 15    Q    Yeah. | 10:49:34 15 approximately the time you were getting the |
| 10:46:48 16    A    And you know, as I recall, | 10:49:36 16 investigation by the RACs going, had -- were the |
| 10:46:54 17 Thanksgivingish time frame, I don't remember doing | 10:49:42 17 rumblings concerning Costco and/or gray marketing |
| 10:46:56 18 anything with it the following year. | 10:49:45 18 even louder still within Adams? Were you hearing |
| 10:47:00 19    Q    Okay. | 10:49:48 19 about it more frequently? |
| 10:47:00 20    A    So it must have been | 10:49:52 20    A    I was hearing it more frequently |
| 10:47:04 21 Thanksgivingish -- | 10:49:53 21 because I was obviously researching it at the |
| 10:47:05 22    Q    Okay. | 10:49:56 22 time, so I would hear it in passing from random, |
| 10:47:05 23    A    -- of '98 | 10:49:59 23 probably, in the sales group I would imagine is |
| 10:47:14 24    Q    Why did it stop? | 10:50:01 24 where I heard it. |

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

d90ff0a7-ab51-4519-a4df-add3b26a3c2e

## SCOTT BLEVINS

### Page 166

14:10:44 1   record.

14:10:45 2        A    Okay

14:10:46 3        Q    One is: On Exhibit 63, this is the

14:10:49 4   memo from Mark Gonsalves to you, to the RACs, to

14:10:55 5   inside sales and Craig Parrish about Costco.

14:10:58 6        Do you recall why -- why

14:11:00 7   didn't you discuss the Costco issue with the RACs

14:11:05 8   after Mark sent you this memo?

14:11:10 9        A    I can only speculate  At the time,

14:11:13 10  it must not have been as -- we had a lot of other

14:11:17 11  things to deal with in the field other than that,

14:11:20 12  so it obviously didn't hit the radar as being a

14:11:24 13  big enough issue to address at that point is my

14:11:31 14  only assumption.

14:11:31 15       Q    What were some of those other issues

14:11:35 16  you were dealing with in the field at the time?

14:11:37 17       A    In May, there were -- you know, the

14:11:40 18  feedback that I got from the RACs, and then I saw

14:11:44 19  our in the field, was Competitive Issue Number 1,

14:11:48 20  the first and foremost in my mind, which was

14:11:51 21  Orlimar  At the time, we were more concerned

14:11:53 22  about what they were doing than anything else that

14:12:03 23  I can recall because they essentially took what

14:12:03 24  looked like our business plan and repeated it with

### Page 167

14:12:03 1   better product and had a club that had multi

14:12:08 2   materials, where ours was steel only  So they had

14:12:11 3   a sexier product, was selling it for more, maybe

14:12:14 4   50 to $100 more than ours was

14:12:17 5        So the retailers were making

14:12:18 6   more margin  And we had heard several times from

14:12:22 7   the floor people, just in the chats about our

14:12:25 8   positioning in there, that they were getting paid

14:12:27 9   to sell the product.

14:12:30 10       Q    The salespeople were?

14:12:31 11       A    The salespeople on the floor, by

14:12:34 12  Orlimar, which we weren't doing at the time, and I

14:12:37 13  don't think anyone else other than brands you'd

14:12:39 14  never heard of were being spiffed or compensated

14:12:43 15  on the floor  So that was a primary issue that I

14:12:47 16  was trying to address at the time.

14:12:50 17       Q    Was there anything else that was a

14:12:52 18  significant issue at the time?

14:12:56 19       A    No.  I think we were closing in on

14:12:58 20  the time, though, certainly toward the end of '98,

14:13:03 21  where we had some stores closing  We had

14:13:05 22  retailers closing, and we were -- not we as Adams

14:13:09 23  were losing accounts  but I think in general we

14:13:13 24  were all losing accounts because there was a

### Page 168

14:13:15 1   massive expansion of golf when Tiger Woods came

14:13:19 2   onto the scene

14:13:19 3        And it's pretty obvious to

14:13:22 4   everyone that -- they've even dubbed it the Tiger

14:13:25 5   Woods effect, that golf courses were built,

14:13:27 6   retailers opened shops, franchises sold very well

14:13:33 7   at the time Golf USA was in stores, and retailers

14:13:36 8   were loading up on product in the end of '97 into

14:13:40 9   '98 because Tiger Woods came onboard, and

14:13:44 10  everybody thought that now that he's playing,

14:13:46 11  every person on the planet was going to start

14:13:48 12  playing golf, and it actually didn't happen

14:13:52 13       Q    So towards the end of '98, was that

14:13:54 14  when this Tiger Woods effect came -- started to

14:13:57 15  become apparent?

14:13:59 16       A    In hindsight, that's when it became

14:14:01 17  an issue, because if you look back at -- Callaway,

14:14:06 18  I think, was the only bellwether of the golf

14:14:10 19  industry at the time  Their only stock traded --

14:14:13 20  I think they called it out sometime in July or

14:14:16 21  August in a press release when their stock price

14:14:20 22  dove 30-some-odd percent in a day, and I think

14:14:23 23  they were the first ones to say:  Hey, we've got a

14:14:27 24  problem.  The industry has an issue.

### Page 169

14:14:30 1        Q    Do -- in terms of the concerns that

14:14:33 2   you had at the time of this memo, the competition,

14:14:37 3   the Orlimar issues that you were just talking

14:14:39 4   about --

14:14:39 5        A    Uh-huh

14:14:40 6        Q    -- did you report any of those --

14:14:41 7   those concerns to Mark Gonsalves since he was your

14:14:49 8   supervisor?

14:14:49 9        A    Yes  We had some discussions on

14:14:50 10  that, yes

14:14:51 11       Q    And so why -- why would you have

14:14:53 12  discussed that issue with him, as I believe your

14:14:55 13  testimony was that you didn't really talk about

14:14:56 14  the Costco issue with him or you don't recall

14:14:59 15  having discussions about that?

14:15:00 16       A    Again, it was much -- it would have

14:15:02 17  been much more of a pertinent issue at the time to

14:15:05 18  talk about Orlimar and the competition and -- than

14:15:10 19  this, which at the time was a different issue in

14:15:13 20  my world

14:15:22 21       Q    And based on your job duties when you

14:15:25 22  were the regional account coordinator supervisor,

14:15:28 23  would you have been involved in any conversations

14:15:31 24  with Mark Gonsalves about serialization, if they

43  (Pages 166 to 169)

SCOTT BLEVINS

Page 174

14:19:56 1 buying decision. They just might not have the
14:20:00 2 clientele to -- you know, like I said, buy a big
14:20:03 3 jar of mayonnaise and a golf club at the same
14:20:08 4 time.
14:20:09 5    Q    So -- at the time of this e-mail in
14:20:11 6 Exhibit 69, you're talking about other retailers
14:20:15 7 that have issues with their clubs being in Costcos
14:20:19 8 as well?
14:20:19 9    A    Other manufacturers.
14:20:20 10    Q    Right. Right. Sorry.
14:20:22 11    A    It's okay.
14:20:23 12    Q    Did you know at the time anything
14:20:26 13 more specific than you put in this e-mail about
14:20:28 14 what they were doing to combat gray marketing?
14:20:34 15    A    No, other than what I put in there.
14:20:36 16    Q    Okay. And do you know now what -- is
14:20:38 17 there anything different that people -- other --
14:20:42 18 other manufacturers do to combat gray marketing?
14:20:46 19 Is there any other way to do it besides marking
14:20:50 20 the products?
14:20:54 21    A    That's still the main way to do it.
14:20:56 22 And I mean, some don't do it and choose not to.
14:21:00 23 I -- I can't prove it, but I think Taylor Made has
14:21:02 24 been selling Costco since this e-mail, so

Page 175

14:21:06 1 obviously I don't think they think it hurts their
14:21:10 2 sales.
14:21:11 3    Q    Uh-huh.
14:21:11 4    A    And that's the only one I noted that
14:21:18 5 I thought was selling to them.
14:21:18 6    Q    And what effect, if any, would
14:21:21 7 competition like you were talking about from
14:21:23 8 Orlimar, would that effect be on Costco's
14:21:27 9 sell-through of Adams golf clubs?
14:21:30 10    A    It would have a negative effect on
14:21:33 11 sell-through everywhere because the issue with
14:21:37 12 Orlimar, the competitive nature of Orlimar was
14:21:40 13 that it was the exact same golf club. We had one
14:21:44 14 product, one SKU, one loft. They came out with a
14:21:48 15 club identical. We're not talking about a driver
14:21:51 16 versus a putter. They came out with a trump
14:21:54 17 utility club that was the exact same purpose that
14:21:57 18 ours existed.
14:21:59 19        So if they had good marketing
14:22:01 20 and if they were getting the consumer to look at
14:22:03 21 it, which it's obvious they were, it's a very
14:22:08 22 simple decision. You're not going to buy an Adams
14:22:11 23 if you're going to buy an Orlimar. You can't have
14:22:14 24 both.

Page 176

14:22:14 1    Q    And when did Orlimar really start
14:22:31 2 having this effect on Adams Golf's market, as far
14:22:31 3 as you know?
14:22:31 4    A    They were -- well, they're a West
14:22:31 5 Coast company, so out west, you know, they've been
14:22:31 6 selling a lot of golf clubs since the '60s. But
14:22:32 7 the TriMetal, which was our competitor, I believe
14:22:36 8 January of '98 was when they got significant
14:22:43 9 sell-through out west, or significant presence in
14:22:45 10 the stores where we would notice it.
14:22:53 11    Q    And why would an account complain
14:22:56 12 about double shipping? We talked a little bit
14:22:59 13 about double shipping earlier.
14:23:02 14    A    Well, you'd complain just for the
14:23:04 15 same reason if you ordered something and it showed
14:23:06 16 up and you were happy about it, and then it came
14:23:11 17 again. There's a number of reasons. You'd
14:23:13 18 complain either A, you didn't order it; or B, you
14:23:20 19 did order it and had it on a prebook, and the
14:23:23 20 order came and for some reason your business or
14:23:26 21 your sell-through has slowed down, you would call
14:23:29 22 the company to say: Hey, it's a prebook. I don't
14:23:32 23 want it. You're double shipping me.
14:23:35 24    Q    And what's a -- what's a prebook?

Page 177

14:23:37 1 Can you explain what that means?
14:23:38 2    A    Just a way to take orders when a club
14:23:44 3 is selling through, you know, you're going to go
14:23:46 4 ahead and book it out so the retailer -- you don't
14:23:49 5 have to go through the sales process every time
14:23:51 6 you want to put product in your shop.
14:23:54 7        So if I'm selling 24 clubs a
14:23:56 8 month at my store, it's wasting both of our times
14:24:01 9 to talk every month and order 24 more clubs. Just
14:24:04 10 book me out for the next six months for 24 clubs
14:24:07 11 so I know I have them coming. And that's what a
14:24:11 12 prebook is.
14:24:13 13    Q    And so the retail account would agree
14:24:16 14 to have a set -- standing order basically?
14:24:19 15    A    Yes.
14:24:19 16    Q    And then it would just automatically
14:24:24 17 ship without them having to call in?
14:24:25 18    A    Correct.
14:24:26 19    Q    At whatever time frame was set?
14:24:28 20    A    Correct. It's just an order for a
14:24:30 21 future date.
14:24:31 22    Q    And so then, what you were just
14:24:32 23 saying about double shipping is if they've done
14:24:35 24 that and they've booked out into the future, this

45 (Pages 174 to 177)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

d90ff0a7-ab51-4519-a4df-add3b26a3c2e

## SCOTT BLEVINS

### Page 178

14:24:38 1  standing order, but then all of a sudden they stop
14:24:42 2  selling clubs?
14:24:43 3      A    Their sell-through slows down, all of
14:24:45 4  a sudden you don't need 24, you just need 12. You
14:24:49 5  know, I would call in to the company and say:
14:24:52 6  Hey, I didn't order this. You just shipped it. I
14:24:56 7  only want half of it. Give me an RA to send half
14:24:59 8  of it back.
14:25:00 9      Q    Even if you had this standing order
14:25:02 10 with your salesperson?
14:25:02 11     A    Sure. I probably wouldn't do it. I
14:25:05 12 would probably get my warehouse person or somebody
14:25:06 13 to call in. But that's one reason.
14:25:10 14          The others are obviously, like
14:25:12 15 I mentioned before, credit issues. You know, if
14:25:14 16 your store is going downhill and you just want to
14:25:17 17 clean your books, this is just one of the things
14:25:19 18 the retailer uses to try to get out of paying a
14:25:23 19 bill. It's one of the methods. There's many.
14:25:29 20          MS. BRANNEN: I think that's
14:25:29 21 all the questions I have right now.
14:25:33 22          Oh, let me -- let me ask one
14:25:35 23 thing to clarify.
14:25:38 24     Q    (By Ms. Brannen) In a prebook

### Page 179

14:25:39 1  situation like that, would the retailer know that
14:25:42 2  he had this standing order? That's kind of what
14:25:45 3  we were just talking about.
14:25:46 4      A    Yes.
14:25:47 5      Q    You're saying you might not call, but
14:25:48 6  you might have your warehouse person call. Would,
14:25:50 7  generally, whoever did the ordering for the
14:25:53 8  retailer know that they had this standing order?
14:25:56 9      A    Yes. The -- whoever the buyer would
14:25:59 10 be.
14:26:00 11     Q    They would know?
14:26:01 12     A    And it's up to them to communicate it
14:26:03 13 to the rest of their team. So if they communicate
14:26:06 14 it to the warehouse, the receiving person, then
14:26:09 15 they know. But you know, occasionally, that
14:26:12 16 wouldn't happen, so someone in receiving might
14:26:14 17 say: I'm not supposed to have this order.
14:26:17 18     Q    Right.
14:26:17 19     A    And just refuse it.
14:26:20 20     Q    Okay.
14:26:20 21     A    But generally, yes, everyone is aware
14:26:22 22 of a prebook because it's on the books.
14:26:29 23     Q    Okay.
14:26:29 24          MS. BRANNEN: I think I don't

### Page 180

14:26:30 1  have any more questions at this point.
14:26:33 2          MR. MARA: That concludes the
14:26:35 3  deposition.
         4          (Off the record at 2:26 p.m.)
         5          - - - - -
         6
         7
         8
         9
        10
        11
        12
        13
        14
        15
        16
        17
        18
        19
        20
        21
        22
        23
        24

### Page 181

1  STATE OF TEXAS    X
2  COUNTY OF DALLAS  X
3
4          I, Jamie K. Israelow, a
5  Certified Shorthand Reporter duly commissioned and
6  qualified in and for the State of Texas,
7  Registered Professional Reporter, Certified
8  Realtime Reporter and Certified LiveNote Reporter,
9  do hereby certify that there came before me on the
10 3rd day of May at Akin Gump Strauss Hauer & Feld,
11 LLP, located at 1700 Pacific Avenue, Suite 4100,
12 in the city of Dallas, County of Dallas, State of
13 Texas, the following named person, to-wit: SCOTT
14 BLEVINS, who was duly sworn to testify the truth,
15 the whole truth, and nothing but the truth of
16 knowledge touching and concerning the matters in
17 controversy in this cause; and that he was
18 thereupon examined upon oath and his examination
19 reduced to typewriting under my supervision; that
20 the deposition is a true record of the testimony
21 given by the witness, and signature of the witness
22 is to be before any notary public and returned
23 within 30 days from date of receipt of transcript.
24          I further certify that

46  (Pages 178 to 181)

BREWER

CHIP BREWER

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.  :    CONSOLIDATED

SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

_____X

ORAL DEPOSITION OF CHIP BREWER

Tuesday, May 2, 2006

The oral deposition of Chip Brewer was

held at the law offices of Akin Gump Strauss Hauer

& Feld, LLP, 1700 Pacific Avenue, Suite 4100,

Dallas, Texas, from 11:03 a.m. to 2:44 p.m.,

before Jamie K. Israelow, a Certified Shorthand

Reporter in and for the State of Texas, Registered

Professional Reporter, Certified Realtime Reporter

and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000    (888)777-6690

4ff0f050-6cb7-4342-9ea4-8251278cb358

CHIP BREWER

Page 10

11:10:08 1   place?
11:10:09 2       A    I don't recall when the interview
11:10:10 3   took place.
11:10:10 4       Q    Okay. But sometime in the summer of
11:10:12 5   1998?
11:10:12 6       A    I believe so.
11:10:13 7       Q    So it's reasonable to say that the --
11:10:18 8   from first learning of the opportunity to being
11:10:20 9   hired was two months' time?
11:10:21 10      A    It was a short period of time.
11:10:23 11      Q    Okay.
11:10:23 12      A    I don't know whether -- what the time
11:10:25 13  period was.
11:10:28 14      Q    Are you able to recall what, if any,
11:10:32 15  problems or -- problems were presented with the
11:10:36 16  job at Adams Golf?
11:10:38 17      A    At the interview, Neil?
11:10:40 18      Q    Yeah.
11:10:41 19      A    At the interview, we talked about
11:10:44 20  opportunities, mostly, I believe, but again, I
11:10:48 21  don't recall the specifics of the interview.
11:10:49 22      Q    Do you recall -- were you introduced
11:10:51 23  to anyone else then other than Barney Adams and
11:10:55 24  Mr. Murtland?

Page 11

11:10:58 1       A    I don't recall being introduced to
11:11:00 2   anybody other than Barney and Dick.
11:11:06 3       Q    Now -- and you remain with the
11:11:07 4   company today?
11:11:08 5       A    Yes.
11:11:08 6       Q    And your current title is?
11:11:11 7       A    President and CEO.
11:11:21 8       Q    Okay. Are you able to recall what
11:11:22 9   day you started at Adams Golf? You said it was
11:11:26 10  September of '98?
11:11:28 11      A    I believe it was September 8th of
11:11:32 12  1998.
11:11:35 13      Q    Okay. When you first took over your
11:11:43 14  original position as vice president of sales and
11:11:48 15  marketing, what, if anything, did you do?
11:11:51 16      A    Just for clarification, I believe my
11:11:53 17  first position was vice president of sales. It
11:11:56 18  did not initially include marketing.
11:11:59 19      Q    Okay. Vice president of sales.
11:12:00 20      When you hit the ground at
11:12:02 21  Adams Golf, what did you do?
11:12:03 22      A    When I hit the ground at Adams Golf,
11:12:06 23  I trained under Mark Gonsalves. Mark Gonsalves
11:12:10 24  was still with the company, and I worked under him

Page 12

11:12:18 1   in a transition mode for a majority of September.
11:12:25 2       Q    And did there come a time that that
11:12:28 3   transition mode ended?
11:12:29 4       A    Yes.
11:12:29 5       Q    And when was that?
11:12:30 6       A    Sometime end of Septemberish. Now,
11:12:34 7   exactly whether it was the last day of September
11:12:36 8   or not, I don't recall.
11:12:37 9       Q    And why did that transition mode come
11:12:40 10  to an end?
11:12:51 11      A    Mark left the company.
11:12:51 12      Q    And why did Mark Gonsalves leave the
11:12:58 13  company?
11:12:58 14      A    He had accepted a position with a ski
11:13:00 15  company, I believe.
11:13:03 16      Q    Are you able to recall what company?
11:13:09 17      A    No.
11:13:17 18      Q    When you started at Adams Golf and
11:13:19 19  began this transitional period, did you know that
11:13:24 20  Mark Gonsalves was leaving the company?
11:13:25 21      A    Yes.
11:13:28 22      Q    And when did you learn that
11:13:28 23  information?
11:13:29 24      A    I knew that Mark was leaving the

Page 13

11:13:30 1   company at the interview.
11:13:41 2       Q    Okay. What were you told, I guess by
11:13:44 3   Barney, about the circumstances of Mark
11:13:47 4   Gonsalves's departure at the end of the interview?
11:13:51 5       A    I was told he was leaving to join
11:13:52 6   that ski company.
11:13:56 7       Q    Was there any other discussion of
11:13:59 8   Mark Gonsalves at the interview between yourself
11:14:01 9   and Barney Adams?
11:14:03 10      A    I don't recall the interview.
11:14:04 11      Q    So same answer as to Murtland, then?
11:14:11 12      A    Correct.
11:14:12 13      Q    You've described it as a transitional
11:14:15 14  or transitory period. I can't remember the term.
11:14:17 15  Can you describe what that period involved? What
11:14:20 16  were you doing?
11:14:22 17      A    I was -- you know, I visited
11:14:26 18  customers with Mark and Mark introduced me to
11:14:31 19  staff and Mark briefed me on the nature of my
11:14:39 20  responsibilities and --
11:14:43 21      Q    When you say you visited customers,
11:14:47 22  where were those customers located?
11:14:50 23      A    I believe -- there were several
11:14:52 24  customers that we visited. I specifically recall

4  (Pages 10 to 13)

# CHIP BREWER

### Page 22

11:24:22 1    Q    Are you able to recall who the strong
11:24:25 2  performers were?
11:24:26 3    A    Yes.
11:24:26 4    Q    Who were they?
11:24:28 5    A    Two strong performers are Debbie
11:24:31 6  Chandler and Jay Greaney.
11:24:44 7    Q    Now, how were sales responsibilities
11:24:46 8  divided among members of the inside sales staff?
11:24:51 9  Was it geographically or by customer or --
11:24:56 10    A    I don't recall, Neil. I think -- I
11:25:01 11  don't recall whether it was -- I don't recall
11:25:04 12  exactly how it was divided at that point.
11:25:07 13    Q    And are you able to recall what
11:25:12 14  customers or -- or regions or divisions Debbie
11:25:16 15  Chandler or Jay Greaney were selling to at that
11:25:20 16  time?
11:25:20 17    A    I know Debbie Chandler sold Family
11:25:26 18  Golf, and I do not recall any specifics of who
11:25:31 19  Jay's customers were.
11:25:42 20    Q    And is Debbie Chandler still with the
11:25:44 21  company?
11:25:44 22    A    No.
11:25:46 23    Q    Do -- are you able to recall when she
11:25:47 24  left the company?

### Page 23

11:25:49 1    A    I believe Debbie left in '99 or 2000.
11:25:59 2    Q    And do you know why Debbie Chandler
11:26:04 3  left?
11:26:04 4    A    I know she lives in Austin now with
11:26:06 5  her husband down there. I believe she left
11:26:13 6  because he -- his business moved there.
11:26:16 7    Q    And Jay Greaney is no longer with the
11:26:19 8  company?
11:26:20 9    A    That's correct.
11:26:20 10    Q    Are you able to recall when he left
11:26:22 11  the company?
11:26:22 12    A    I believe Jay left in the fall of
11:26:26 13  1998
11:26:27 14    Q    And why did Jay Greaney leave?
11:26:30 15    A    He resigned.
11:26:31 16    Q    And do you know what was the reason
11:26:33 17  for his resignation?
11:26:35 18    A    We asked for Jay's resignation.
11:26:40 19    Q    Why did you ask for Jay Greaney's
11:26:43 20  resignation?
11:26:43 21    A    I was -- at the time, when I joined
11:26:46 22  the company, I became aware of some aggressive
11:26:49 23  sales tactics that I wasn't comfortable with
11:26:58 24    Q    When did you become aware of the

### Page 24

11:27:01 1  aggressive sales tactics?
11:27:04 2    A    I don't recall specifically, but you
11:27:07 3  know, whether it was -- I don't recall the
11:27:10 4  specifics of when I had that conversation or those
11:27:15 5  conversations with Jay.
11:27:16 6    Q    Was it prior to Gonsalves's departure
11:27:20 7  from the company or subsequent to Gonzalves's
11:27:25 8  departure from the company?
11:27:26 9    A    It would have been after Gonzalves's
11:27:29 10  departure with the company.
11:27:32 11    Q    I'm just trying to keep up.
11:27:46 12        What were the aggressive sales
11:27:53 13  tactics?
11:27:54 14    A    We received complaints from customers
11:28:00 15  regarding Jay. If I recall, the customer would
11:28:11 16  not have ordered the same quantity product or
11:28:14 17  would not have ordered product, and then the
11:28:20 18  orders would somehow be entered into the system.
11:28:28 19    Q    Who did you receive those customer
11:28:30 20  complaints from?
11:28:30 21    A    I don't recall the specifics.
11:28:32 22    Q    How many did you receive?
11:28:33 23    A    I don't recall. It would -- you
11:28:35 24  know, it was a -- a few. One or two is my guess.

### Page 25

11:28:49 1    Q    Did you personally receive those
11:28:52 2  complaints from customers?
11:28:53 3    A    I don't think I did.
11:28:56 4    Q    Who, if anyone -- if it wasn't you,
11:29:00 5  who, if anyone, would have received those
11:29:05 6  complaints?
11:29:05 7    A    I don't know. It -- it somehow would
11:29:07 8  have come up to me from the -- somewhere in the
11:29:12 9  organization, but where it would have come through
11:29:14 10  is not clear. It could have come from several
11:29:18 11  paths. Eventually I would have heard about it.
11:29:24 12    Q    What did you do when you first heard
11:29:28 13  of these customer complaints, that this was going
11:29:32 14  on?
11:29:32 15    A    I spoke with, you know, Jay regarding
11:29:36 16  the issue.
11:29:43 17    Q    And what did you say to Jay Greaney?
11:29:46 18    A    I don't recall the specifics of the
11:29:50 19  conversation.
11:29:50 20    Q    Where was the meeting?
11:29:51 21    A    I don't recall that.
11:29:52 22    Q    Was it on campus at Adams Golf, or
11:29:55 23  did it take place outside the physical --
11:29:58 24    A    I assume it was on campus only

7  (Pages 22 to 25)

4ff0f050-6cb7-4342-9ea4-8251278cb358

CHIP BREWER

**Page 26**

11:30:00 1  because I do not recall having any off-campus
11:30:04 2  meetings.
11:30:04 3      Q    Who else was present at the meeting?
11:30:06 4      A    I don't recall the meeting.
11:30:07 5      Q    How many meetings took place --
11:30:08 6      A    Don't recall.
11:30:09 7      Q    -- between you and Jay Greaney?
11:30:12 8            Are you familiar with the term
11:30:13 9  "double shipping"?
11:30:19 10      A    I've heard the term before.
11:30:23 11      Q    And what do you understand that term
11:30:23 12  to mean?
11:30:23 13      A    I don't -- I've heard it being used
11:30:25 14  in different contexts, so it has potentially
11:30:29 15  different meanings.
11:30:31 16      Q    What's the first meaning you
11:30:33 17  understand it to be?
11:30:35 18      A    One of the meanings could be that
11:30:40 19  you -- an order would in some way, shape, or form,
11:30:46 20  be entered into the system two times, an actual
11:30:52 21  order, and therefore, the customer receives twice
11:30:59 22  the desired amount of product. That happens from
11:31:01 23  time to time in -- in a lot of businesses.
11:31:10 24      Q    Was that happening here with Jay

**Page 27**

11:31:11 1  Greaney's aggressive sales tactics?
11:31:19 2          MR. BESSETTE: The way you
11:31:19 3  just defined it?
11:31:22 4          MR. MARA: Yeah. Yeah.
11:31:23 5      A    The -- you know, I don't know for a
11:31:34 6  fact whether that happened with -- with Jay or
11:31:41 7  not. You know, there were some concerns about
11:31:44 8  Jay's business practice, which included double
11:31:48 9  shipment.
11:31:48 10          The -- you know, this happened
11:31:51 11  a long time ago. I remember the context of why
11:31:56 12  Jay was asked to resign, was regarding, you know,
11:32:02 13  sales practices, but whether there were specific
11:32:07 14  double-shipment issues or not, I can't recall.
11:32:13 15      Q    (By Mr. Mara) I believe you
11:32:14 16  testified that you understand double shipping to
11:32:17 17  mean different things in different contexts, and
11:32:19 18  you just described --
11:32:21 19      A    One.
11:32:21 20      Q    -- your first understanding.
11:32:22 21          What is another context of
11:32:26 22  double shipping?
11:32:26 23      A    I've heard people using double
11:32:29 24  shipment for -- also for entering orders that are

**Page 28**

11:32:34 1  not valid customer orders, and the --
11:32:44 2      Q    Can you explain what you mean by
11:32:46 3  that?
11:32:46 4      A    Well, if the customer hasn't
11:32:48 5  confirmed the order, and so there may be an
11:32:51 6  indication that the order may become live, and the
11:32:55 7  salesman might jump the gun and enter the order
11:32:59 8  without a -- a confirmation or a final
11:33:04 9  confirmation from the customer.
11:33:08 10      Q    Can you explain the confirmation
11:33:10 11  process? What -- in a -- in a proper sale, how --
11:33:18 12  how does that process work?
11:33:19 13      A    It varies by the setting, you know,
11:33:21 14  what that confirmation process would be, I think.
11:33:24 15      Q    Well, if I were just to say: Inside
11:33:28 16  sales succeeds --
11:33:29 17      A    Right.
11:33:30 18      Q    -- in contacting a green-grass
11:33:32 19  account or a retailer, and succeeds in arranging
11:33:38 20  for the sale of 40 clubs --
11:33:41 21      A    It would simply be --
11:33:42 22          MR. BESSETTE: Hold on. This
11:33:43 23  is still in '98?
11:33:45 24          MR. MARA: Yeah. I'm sorry.

**Page 29**

11:33:47 1  Everything is 1998.
11:33:48 2      A    September/October '98 specifically,
11:33:51 3  because when I was with the company, my
11:33:53 4  understanding is if the customer, you know,
11:33:56 5  verbally confirmed that they wanted to place that
11:33:58 6  order, it was --
11:33:59 7      Q    (By Mr. Mara) That was sufficient?
11:34:00 8      A    That's my understanding.
11:34:04 9      Q    Okay. So then, in your second
11:34:07 10  understanding of double shipping, perhaps sales
11:34:10 11  are logged without that type of either verbal or
11:34:13 12  written confirmation from the customer?
11:34:15 13      A    Yes.
11:34:15 14      Q    In September or the fall of 1998, was
11:34:24 15  it predominantly verbal confirmations or was there
11:34:29 16  a system for written confirmations? I don't know.
11:34:33 17      A    I believe, it was predominantly
11:34:35 18  verbal.
11:34:35 19      Q    Was Jay Greaney engaging in this
11:34:39 20  second type of double shipping at the time?
11:34:41 21      A    We had heard of one -- at least one
11:34:48 22  customer complaint regarding that.
11:34:50 23      Q    Who was that customer?
11:34:52 24      A    I don't recall.

8 (Pages 26 to 29)

## CHIP BREWER

### Page 30

11:34:52 1      Q      How did you learn of that customer
11:34:55 2  complaint?
11:34:55 3      A      I don't recall.
11:35:01 4      Q      Who, if anyone else, did you discuss
11:35:05 5  Jay Greaney's aggressive sales tactics with?
11:35:08 6      A      I discussed it with many people,
11:35:11 7  including human resources, Jay, you know, Mark,
11:35:21 8  you know, various folks in the organization, Jay's
11:35:24 9  direct supervisors, which was Craig Parrish was
11:35:29 10  one. I do not know -- he had another direct boss
11:35:34 11  between him and Craig, and I don't recall who that
11:35:36 12  was.
11:35:36 13      Q      Did you discuss it with Barney Adams?
11:35:44 14      A      Yes.
11:35:52 15      Q      Did any members of the inside sales
11:35:55 16  staff complain about Jay Greaney's sales tactics
11:35:59 17  at that time?
11:36:09 18      A      I don't recall. I don't recall
11:36:15 19  anybody complaining about Jay Greaney's sales
11:36:19 20  tactics at that time within the inside sales
11:36:24 21  staff.
11:36:24 22      Q      What, if any, other concerns did you
11:36:26 23  have about Jay Greaney at that time, in the fall
11:36:30 24  of 1998?

### Page 31

11:36:31 1      A      I don't recall having any other
11:36:33 2  concerns about Jay Greaney at that time.
11:36:39 3      Q      What was the quantity -- oh, I'm
11:36:41 4  sorry. Strike that
11:36:44 5          Do you have any other
11:36:45 6  understanding of the term "double shipping" --
11:36:48 7      A      No.
11:36:48 8      Q      -- other than the two contexts you've
11:36:50 9  discussed it in?
11:36:56 10          What was the quantity of clubs
11:36:59 11  involved in this double shipping by Jay Greaney?
11:37:05 12      A      My understanding was it was fairly
11:37:07 13  minor, but I don't have a specific number.
11:37:10 14      Q      What amount to you would be fairly
11:37:19 15  minor?
11:37:19 16      A      Fairly minor depends on the context.
11:37:21 17  My guess, which is a guess, that this was, you
11:37:24 18  know, less than 50 clubs and probably somewhere in
11:37:28 19  the neighborhood of 25 clubs. But "minor" is a
11:37:35 20  very subjective --
11:37:46 21      Q      And Jay Greaney reported directly to
11:37:51 22  Craig Parrish?
11:37:52 23      A      You know, I think he reported to
11:37:54 24  somebody between him and Craig, but I don't recall

### Page 32

11:37:55 1  who that was. There were three teams, I believe,
11:38:00 2  of which Ed Hunt, I mentioned, and Roger Wilde
11:38:05 3  were team leaders. There was somebody else and I
11:38:08 4  can't recall and I don't remember where Jay fit
11:38:10 5  into that.
11:38:10 6      Q      Okay. But the normal chain of
11:38:12 7  command, then, would have been inside sales staff
11:38:14 8  to the intermediate level --
11:38:16 9      A      Yes.
11:38:17 10      Q      -- and then --
11:38:18 11      A      To Craig.
11:38:19 12      Q      -- up to Craig.
11:38:20 13          And above Craig would have
11:38:22 14  been Mark Gonsalves?
11:38:23 15      A      Until Mark's departure.
11:38:29 16      Q      Did you discuss Jay Greaney's sales
11:38:32 17  tactics with Mark Gonsalves?
11:38:34 18      A      Yes.
11:38:34 19      Q      And what, if anything, did Mark
11:38:36 20  Gonsalves say about it?
11:38:36 21      A      My recollection is Mark didn't think
11:38:38 22  it was much of an issue.
11:38:43 23      Q      Was Gonsalves aware of it prior to
11:38:45 24  you bringing it to his attention?

### Page 33

11:38:47 1      A      Yes.
11:38:57 2      Q      How was Mark Gonsalves made aware of
11:39:00 3  it?
11:39:00 4      A      I believe that, you know, Mark would
11:39:02 5  have become aware of it through the normal course
11:39:05 6  of business, you know, and conversations that
11:39:11 7  happened within the company.
11:39:21 8      Q      Well, correct me if I'm wrong. I
11:39:24 9  believe you've testified that no one within the
11:39:26 10  inside sales staff complained about Jay Greaney's
11:39:32 11  activity.
11:39:32 12      A      I believe I testified that I don't
11:39:33 13  recall whether they --
11:39:34 14      Q      Okay.
11:39:34 15      A      -- testified on -- or whether they
11:39:37 16  complained about Jay's activities or not.
11:39:47 17      Q      Okay. But you're confident there
11:39:48 18  were complaints coming into the company from
11:39:51 19  outside from the customers?
11:39:52 20      A      I'm not even confident of that. I
11:39:54 21  think the question was: Did Mark talk to me
11:39:56 22  about -- did Mark and I discuss Jay Greaney's
11:40:01 23  performance and business practices, which the
11:40:03 24  answer was yes.

9  (Pages 30 to 33)

4ff0f050-6cb7-4342-9ea4-8251278cb358

# CHIP BREWER

### Page 70

13:13:34 1    Q    But you are aware that that -- a
13:13:37 2  number of reports are prepared by Darl Hatfield
13:13:40 3  in the fall of 1998 on these subjects?
13:13:42 4    A    On --
13:13:42 5    Q    Fall/winter of 1998?
13:13:44 6    A    On what subjects?
13:13:46 7    Q    On financial reports or sales reports
13:13:48 8  or a hybrid of the two?
13:13:53 9    A    Yes, yeah. I have seen a document
13:13:5410  that -- that was, I believe, -- I'm assuming it
13:13:5911  was prepared by Darl --
13:14:0012    Q    Okay.
13:14:0013    A    -- that was a -- was financial
13:14:0314  reporting or -- in that time period.
13:14:0615    Q    Okay.
13:14:0616    A    So therefore --
13:14:0717    Q    Because the reason I'm asking, we --
13:14:1018  we asked for that document. We haven't seen it.
13:14:1219    MR. BESSETTE: He's talking
13:14:1320  about periodic financial reports. I don't know --
13:14:1621  make sure you guys are on the same page.
13:14:1922    A    Yeah, monthly numbers.
13:14:2123    Q    (By Mr. Mara) I'm just explaining
13:14:2324  I'm not trying to be coy.

### Page 71

13:14:25 1          He produced monthly numbers,
13:14:27 2  but to the best of your recollection, there wasn't
13:14:29 3  a stand-alone, unique, unprecedented report
13:14:36 4  prepared by Darl Hatfield in the fall or early
13:14:38 5  winter or -- fall or winter of 1998?
13:14:42 6    A    I don't recall it.
13:14:48 7    Q    The market-share decline, what
13:14:50 8  percentage or amount of the market-share decline
13:14:53 9  in 1998 did you attribute to problems with gray
13:14:5710  marketing or your clubs appearing at Costco?
13:15:0311    A    I can't contribute specific
13:15:0712  percentages to, you know, any specific category.
13:15:1013  There were a whole myriad of issues which I think,
13:15:1614  you know, again, in hindsight, contributed to our
13:15:2015  loss of market share in the fall of 1998.
13:15:2316          The competitive launches of
13:15:2617  the Orlimar product, I think, was a very
13:15:3118  substantial issue. Callaway, who was the largest
13:15:3619  equipment manufacturer launched a market called
13:15:3920  Steel Head that targeted us specifically in the
13:15:4121  second half, I believe, of 1998.
13:15:4522          We were -- we had maturing
13:15:4823  product line at that point, if you -- you know,
13:15:5124  normal S curve on product life cycles. We were

### Page 72

13:15:55 1  working with a product that had been in the
13:15:58 2  marketplace since 1996, I believe, so two and a
13:16:02 3  half years. That's a very long period of time for
13:16:08 4  a product to -- to remain vibrant.
13:16:14 5          The -- you know, there --
13:16:17 6  there were a whole myriad of issues that in
13:16:21 7  hindsight, I think, contributed to that
13:16:26 8  market-share erosion that occurred at that point
13:16:27 9  in time.
13:16:2810    Q    And the gray marketing situation at
13:16:3311  Costco being one of those myriad issues?
13:16:3612    A    Gray marketing or product being at
13:16:4113  Costco was clearly an issue. That became
13:16:4614  increasingly clear, but I don't have the feel that
13:16:5315  it was a dominant issue, nor do I have the feel
13:16:5716  that I can give a percentage answer in terms of
13:17:0217  what it was or was not as a contributing factor.
13:17:0618    Q    When you were confronted with these
13:17:1219  varying contributors in the market-share decline,
13:17:1720  is this what -- do you believe this is what Barney
13:17:2021  Adams was referring to as things that would have
13:17:2322  inflicted irreparable damage on the company?
13:17:2623    A    I really don't know what Barney was
13:17:2824  referring to in this note. I'd be speculating on

### Page 73

13:17:33 1  what he might be referring to.
13:17:34 2    Q    Did you have a sense at the time in
13:17:35 3  September 1998 that it was a company facing
13:17:38 4  potentially crippling damage in its sales
13:17:40 5  department?
13:17:40 6    A    No.
13:17:40 7    Q    Did you ever -- was there ever a time
13:17:44 8  that you arrived at that same conclusion that
13:17:48 9  Barney's writing in this letter, that the sales
13:17:5210  department was facing potentially crippling damage
13:17:5211  or irreparable damage?
13:17:5612    A    The sales department specifically,
13:17:5813  no.
13:17:5914    Q    Okay. What, if any, steps did you
13:18:0315  take at that time to combat this problem with
13:18:0616  market share and decline?
13:18:0817    A    I don't know whether I fully
13:18:1118  recognized that issue as well at that point in
13:18:1319  time as I feel that I do now. Again, I use the
13:18:1720  term "hindsight." It's difficult, as you know,
13:18:2121  not to view any context without the knowledge that
13:18:2522  you currently have.
13:18:2523          But the -- you know, at that
13:18:3224  point in time, and the point in time you're

19 (Pages 70 to 73)

CHIP BREWER

**Page 82**

13:29:40 1  it, and it doesn't appear to be covered here in
13:29:42 2  the memo I just read.
13:29:46 3      Q.    After Jay Greaney tendered his
13:29:53 4  resignation, was double shipping ever an issue
13:29:56 5  again in the inside sales department?
13:29:57 6      A.    Double shipping still happens today.
13:30:00 7  Double shipping happens at times just out of
13:30:04 8  mistakes, you know, which are no honest, you know,
13:30:07 9  goof-ups. So double shipments, yes.
13:30:12 10     Q.    So it's fair to assume, then, that
13:30:14 11 because he was terminated, Jay Greaney's activity
13:30:17 12 was not considered to be an honest goof-up?
13:30:27 13     A.    Yes.
13:30:32 14     Q.    Are you aware of why the inside sales
13:30:36 15 staff would feel that double shipments were
13:30:39 16 quietly endorsed --
13:30:42 17     A.    No.
13:30:42 18     Q.    -- at Adams Golf?
13:30:51 19          What problems in management
13:30:53 20 style did Craig Parrish have? I'm citing Item E
13:31:00 21 on this document in the exhibit.
13:31:03 22          MR. BESSETTE: You mean from
13:31:04 23 his perspective?
13:31:06 24          MR. MARA: Yeah.

**Page 83**

13:31:06 1      Q.    (By Mr. Mara) After -- I mean, I --
13:31:07 2  I would assume that any weakness or lack of
13:31:13 3  direction as practiced by Craig Parrish in August
13:31:16 4  of 1998 was -- remained an issue in September of
13:31:19 5  1998?
13:31:20 6      A.    Craig remained in his position when I
13:31:26 7  took over as inside sales. There were some strong
13:31:29 8  supporters of his within this department; there
13:31:31 9  were some detractors. And the -- you know, the
13:31:36 10 best I recall, Craig remained in good
13:31:40 11 stead with the company until he left at his own
13:31:53 12 volition.
13:31:53 13     Q.    On the next page, just after Item I,
13:31:57 14 quoting Barney, he says: Here's what I know.
13:32:00 15 I've researched this to the point where I know
13:32:02 16 there is enough truth that A through I have become
13:32:05 17 reality.
13:32:09 18          How did Barney go about
13:32:11 19 researching these items?
13:32:13 20     A.    I don't have any idea.
13:32:16 21     Q.    At no point after you joined the
13:32:18 22 company did he share all of the information that
13:32:21 23 he had obtained and gathered as part of writing
13:32:24 24 this memorandum?

**Page 84**

13:32:25 1      A.    Barney is very much a
13:32:28 2  stream-of-consciousness guy. He shoots opinions
13:32:32 3  very quickly and often, you know, off-the-cuff,
13:32:37 4  goes to extreme positions. You know, he shared,
13:32:41 5  you know, his perspectives, including concerns as
13:32:46 6  well as goals and opportunities with me. He, you
13:32:53 7  know, didn't have -- he never was wanting to go
13:32:56 8  through or have tons of data behind anything of
13:33:05 9  that.
13:33:05 10     Q.    Who, if anyone, collaborated with him
13:33:10 11 in researching this background? Do you know?
13:33:15 12     A.    Before my time. I don't know.
13:33:16 13     Q.    The next sentence, and I quote: As a
13:33:18 14 result, this analysis is the worst performance
13:33:22 15 assessment I've ever written, and that includes
13:33:25 16 all my pre-Adams corporate days.
13:33:34 17          It's reasonable to assume,
13:33:35 18 then, that the relationship between Mark Gonsalves
13:33:38 19 and Barney Adams by August 14th, 1998, had
13:33:43 20 deteriorated significantly?
13:33:44 21     A.    Barney would shoot from the hip. You
13:33:46 22 know, he -- at any one time, he might, you know,
13:33:52 23 chew somebody out fairly graphically at any point
13:33:55 24 in time. We've all experienced that. He's a

**Page 85**

13:33:57 1  passionate individual and, you know, I've already
13:34:03 2  testified I think their relationship was strained.
13:34:06 3  I don't think you can take that from this one
13:34:08 4  specific instance, owing anything too significant.
13:34:11 5      Q.    Did -- and then following further
13:34:15 6  down, and again quoting: Apparently, we've made a
13:34:18 7  lot of sales that have been falsely reported (as
13:34:22 8  sales) and are little more than consignments.
13:34:25 9  Check July returns and tell me what they'll be
13:34:27 10 during the rest of the year.
13:34:31 11          Do you concur that a lot of
13:34:33 12 sales had been falsely reported as sales and were,
13:34:36 13 in fact, little more than consignments at that
13:34:38 14 time?
13:34:38 15     A.    No. I would -- from the facts I've
13:34:40 16 seen, I would disagree with that.
13:34:42 17     Q.    So in your opinion that particular
13:34:44 18 paragraph is wholly inaccurate in this exhibit,
13:34:48 19 or --
13:34:48 20     A.    In my opinion, that paragraph is --
13:34:50 21 is inaccurate.
13:34:52 22     Q.    Okay. Did you ever discuss the issue
13:34:54 23 of consignment sales and -- with Barney?
13:35:04 24     A.    I don't recall specifically.

22  (Pages 82 to 85)

4ff0f050-6cb7-4342-9ea4-8251278cb358

BROOKS

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.  :    CONSOLIDATED

SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

_____X

ORAL DEPOSITION OF SANDRA BROOKS

Friday, June 30, 2006

The oral deposition of SANDRA BROOKS was

held at the law offices of Akin Gump Strauss Hauer

& Feld, LLP, 1700 Pacific Avenue, Suite 4100,

Dallas, Texas, from 10:38 a.m. to 12:09 p.m.,

before Jamie K. Israelow, a Certified Shorthand

Reporter in and for the State of Texas, Registered

Professional Reporter, Certified Realtime Reporter

and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000      (888)777-6690

40096982-c941-434d-817c-5cbf01179c3e

Page 74

11:45:30 1    Q   And they started complaining, and as
11:45:30 2 you say, they got more and more disgruntled, and
11:45:32 3 it took months, and then at some point they slowed
11:45:34 4 their orders and it stopped altogether?
11:45:37 5    A   Yeah.
11:45:37 6    Q   And the records of the company and
11:45:40 7 the sales records would reflect all the sales that
11:45:42 8 were made?
11:45:44 9    A   Yeah.
11:45:44 10    Q   So we could see, presumably, whether
11:45:48 11 anybody actually slowed or stopped?
11:45:50 12    A   Yeah, I would guess.
11:46:15 13       MR. MARA: Is now a good time?
11:46:17 14       MR. BESSETTE: Yeah. Let's
11:46:18 15 break.
11:46:18 16       (A recess was taken from
11:46:00 17       11:46 to 11:56.)
11:56:00 18       MR. BESSETTE: Okay. Back on.
11:56:05 19    Q   (By Mr. Bessette) In the --
11:56:07 20 Ms. Brooks, in the -- again, same time frame we've
11:56:09 21 been talking about. moving into the new building
11:56:12 22 on Plano Parkway, March/April, till the IPO, how
11:56:15 23 many inside salespeople do you think the company
11:56:17 24 had at that time, that you recall?

Page 75

11:56:25 1    A   12, maybe. I don't remember. I'm
11:56:28 2 trying to think of who all was there. I know it
11:56:31 3 was more than the initial six.
11:56:33 4    Q   Uh-huh.
11:56:33 5    A   10, 10, 12, somewhere around there.
11:56:36 6    Q   That's your recollection?
11:56:36 7    A   I think -- I don't really remember.
11:56:38 8 I'm just trying to think of who the salespeople
11:56:40 9 were, because they were the original six, and then
11:56:45 10 there was like Darin and Andrea and all those
11:56:47 11 people got hired, and the little guy that drove
11:56:51 12 the Jeep. I can't remember his name. I don't
11:56:53 13 remember. I know it was more.
11:56:54 14    Q   Okay. And do you remember -- do you
11:56:56 15 remember about the time of the IPO again, so we're
11:56:59 16 in the summer of '98, about how many retail
11:57:02 17 accounts were there overall that the company had?
11:57:03 18    A   I don't know.
11:57:04 19    Q   No idea?
11:57:05 20    A   Huh-uh.
11:57:06 21    Q   You don't know if it was 5,000 or
11:57:09 22 10,000 or anything like that?
11:57:11 23    A   No.
11:57:11 24    Q   With lots of accounts and lots of

Page 76

11:57:14 1 salespeople, did you -- how well did you know
11:57:16 2 other people's accounts? Did you have time to
11:57:18 3 know other salespeople's accounts?
11:57:20 4    A   Some of the bigger ones that maybe
11:57:22 5 affect your territory, maybe you would know.
11:57:25 6    Q   Uh-huh.
11:57:30 7    A   That way.
11:57:31 8    Q   Okay. I can see that. Any other
11:57:32 9 way?
11:57:32 10    A   Just chatting. Like I'll give you an
11:57:36 11 example that kind of -- like the -- there's a golf
11:57:38 12 club in Pennsylvania called Squires Club. It's a
11:57:43 13 pretty high-end -- when I say high-end, men-only
11:57:47 14 club, and I got to be such good friends with the
11:57:51 15 pro there that he actually sent me a wedding
11:57:54 16 present, and he thanked me when I sent Dr. Jay to
11:57:57 17 his club to buy a golf club.
11:57:58 18       So I told everybody the
11:58:00 19 Dr. Jay story a hundred times. So you know
11:58:03 20 things, if have like a story or something. We
11:58:05 21 knew things about maybe special accounts.
11:58:07 22    Q   Okay. All right. Good.
11:58:16 23       Now, Jay Greaney was the top
11:58:20 24 salesperson at the time?

Page 77

11:58:20 1    A   Correct.
11:58:22 2       MR. MARA: The time being?
11:58:23 3    Q   (By Mr. Bessette) The time being,
11:58:24 4 again, it's March/April to --
11:58:26 5    A   While Jay was there, best of my
11:58:28 6 recollection, he was usually the top salesperson,
11:58:31 7 so --
11:58:31 8    Q   And why was that, in your view?
11:58:33 9    A   He was a good salesperson, and he
11:58:36 10 also padded his orders.
11:58:40 11    Q   Yeah. So let me explore that a
11:58:42 12 little.
11:58:42 13       Why do you think he padded his
11:58:45 14 orders?
11:58:46 15    A   To make more money.
11:58:47 16    Q   Let me ask you a better question:
11:58:50 17 How do you know? How do you have the opinion that
11:58:52 18 he padded his orders?
11:58:53 19    A   Because my -- I know he had a lot of
11:59:01 20 returns and -- and it was kind of common
11:59:04 21 knowledge.
11:59:04 22    Q   Okay. So besides water cooler talk
11:59:06 23 and people not liking Jay for whatever reason --
11:59:08 24    A   I never said I didn't like Jay. I do

20 (Pages 74 to 77)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

40096982-c941-434d-817c-5cbf01179c3e

Page 78

11:59:11 1 like Jay
11:59:12 2    Q    Okay. Let me ask you this in one
11:59:14 3 pointed question: Do you have any personal
11:59:17 4 knowledge that he actually, as you said, padded
11:59:19 5 his numbers?
11:59:20 6    A    I can't think of anything specific.
11:59:23 7 Eight years ago, I probably could have cited
11:59:25 8 something pretty specific, but right now, no, I
11:59:27 9 can't.
11:59:27 10    Q    So as you sit here, no personal
11:59:29 11 knowledge?
11:59:29 12    A    That I can remember.
11:59:30 13    Q    That's all I want to know, is what
11:59:32 14 you remember.
11:59:32 15    A    Yeah. I can't think of anything
11:59:34 16 right now. If someone were to jog my memory or
11:59:36 17 give me some specific examples, maybe I'd remember
11:59:38 18 something, maybe I wouldn't. I don't know.
11:59:42 19    Q    Okay. You also testified earlier
11:59:43 20 about this California store that Jay shipped to.
11:59:46 21    A    Uh-huh.
11:59:47 22    Q    So let me understand, are you saying
11:59:48 23 that you were out in California and you knew the
11:59:51 24 specific address?

Page 79

11:59:52 1    A    No. No. No. Other people, such as
11:59:54 2 myself -- I was giving you an example of when I
11:59:56 3 went to California and I would go look at other
11:59:58 4 people, but I do remember him having an account in
12:00:04 5 California that did not have a storefront.
12:00:07 6    Q    Okay.
12:00:07 7    A    I believe -- I believe maybe he's the
12:00:09 8 one who told us. I don't recall. I don't
12:00:11 9 remember, but it -- the inside sales team knew
12:00:16 10 that Jay had a customer, client, whatever you want
12:00:21 11 to call them, in California that did not have a
12:00:35 12 storefront.
12:00:35 13            I think maybe one of his other
12:00:35 14 clients found that out. I'm not really sure
12:00:35 15 exactly how it came to light, but that did come to
12:00:35 16 light.
12:00:35 17    Q    Okay. And what did that mean to you?
12:00:35 18 Because I don't know what that means.
12:00:35 19    A    Well, that meant to me: He is
12:00:39 20 selling clubs at the wholesale price to some guy
12:00:41 21 who doesn't have a store for people to come and
12:00:44 22 buy them in.
12:00:46 23    Q    Okay. So besides that, you don't
12:00:49 24 know -- is there any other meaning to that?

Page 80

12:00:52 1    A    I take it is that he is selling them
12:00:54 2 to this guy and this guy is probably, I'm
12:00:58 3 thinking, Mr. Gray Market guy.
12:01:01 4    Q    But again, no personal knowledge?
12:01:03 5    A    No. But it was -- the whole inside
12:01:06 6 sales team, including Mark and Craig and everybody
12:01:09 7 else, knew about this. We talked about it openly.
12:01:13 8 It wasn't some big secret.
12:01:15 9    Q    So wouldn't that suggest it was
12:01:17 10 appropriate and aboveboard, just a little unusual
12:01:19 11 and not something sinister?
12:01:22 12    A    No --
12:01:22 13            MR. MARA: Objection to the
12:01:23 14 form of the question.
12:01:23 15            But answer it. Sorry.
12:01:26 16    A    No, because didn't Jay get fired?
12:01:33 17    Q    (By Mr. Bessette) Is that your
12:01:33 18 recollection?
12:01:33 19    A    Yeah, I think he got fired
12:01:36 20 eventually. I mean, Jay had a unique way of
12:01:41 21 selling clubs, I'll say, and I personally don't
12:01:44 22 find it to have been an ethical way to sell clubs
12:01:50 23    Q    What do you mean by that?
12:01:54 24    A    Some people, when you -- you say:

Page 81

12:01:56 1 Okay. I'll take six clubs.
12:02:00 2            Send them a dozen. He would
12:02:01 3 do that. That was his method. I don't believe
12:02:04 4 there's any secret. A person tells me: Send me
12:02:08 5 six clubs, I sent them six clubs. So that's what
12:02:10 6 I'm talking about.
12:02:11 7    Q    All right. So let's explore that
12:02:13 8 again. Besides the knowledge that you say was
12:02:16 9 around the water cooler --
12:02:17 10    A    Do I have something pinpoint specific
12:02:20 11 to document or anything, no, I don't.
12:02:21 12    Q    So no personal knowledge, no seeing
12:02:23 13 an order, knowing that somebody ordered six and --
12:02:25 14    A    No.
12:02:25 15    Q    -- seeing that Jay actually shipped
12:02:28 16 12?
12:02:29 17    A    No.
12:02:29 18    Q    Nothing like that?
12:02:29 19    A    No.
12:02:30 20    Q    Just talk around the halls?
12:02:32 21    A    Yeah.
12:02:35 22    Q    Okay. Now, you testified earlier
12:02:44 23 that -- I think you said Costco, you know, it was
12:02:47 24 a big problem for your -- the accounts we've

21 (Pages 78 to 81)

### Page 82

12:02:50 1 already talked about --
12:02:51 2   A   Right.
12:02:51 3   Q   -- who they were. And that
12:02:54 4 eventually, over time, they got so disgruntled
12:02:58 5 that they slowed or stopped orders?
12:03:00 6   A   Right.
12:03:00 7   Q   Sitting here, looking back on it now,
12:03:04 8 so this time frame in '98 --
12:03:06 9   A   Uh-huh.
12:03:07 10   Q   -- let's say all of -- let's say that
12:03:10 11 same time frame, the April -- March/April, going
12:03:13 12 to the new building, to say, the IPO, how -- how
12:03:18 13 many clubs -- how many -- how many clubs did
12:03:20 14 Costco sell in your territory? Do you have any
12:03:24 15 sense?
12:03:25 16   A   No. I mean, I couldn't tell you. I
12:03:27 17 mean, I never went there. I don't know how many
12:03:29 18 they had, but according to my clients who told me
12:03:33 19 that they had, you know, in the -- a hundred clubs
12:03:37 20 or so sitting right there. It was always full and
12:03:40 21 it was all freshly stocked, so I'm going to say a
12:03:43 22 lot.
12:03:43 23   Q   A lot.
12:03:43 24   A   Yeah. I don't have a number to put

### Page 83

12:03:45 1 on it because I wasn't there. I didn't count
12:03:47 2 them. I'm just going by what my people told me
12:04:05 3   Q   Okay. And you have no reason to
12:04:07 4 dispute that whatever the Costco records show what
12:04:10 5 their sales were in particular regions, you don't
12:04:13 6 have any reason to believe that that wouldn't be
12:04:15 7 accurate?
12:04:16 8   A   No.
12:04:25 9   Q   Okay. And if -- for example, if
12:04:28 10 Costco had showed that in the second quarter of
12:04:32 11 1998 -- and again, that's right at the time frame
12:04:34 12 we're talking about, April, May, June 1998 --
12:04:37 13   A   Uh-huh.
12:04:39 14   Q   -- in the states of Alaska and Idaho
12:04:42 15 and Montana and Oregon and Utah and Washington,
12:04:48 16 there were just over 700 clubs sold, does that
12:04:52 17 sort of sound accurate to you?
12:04:54 18        MR. MARA: Objection, assumes
12:04:55 19 facts not in evidence.
12:04:55 20        But go ahead.
12:04:57 21   A   I figured it would be a lot more than
12:04:58 22 that, but I -- I have never been to any of those
12:05:04 23 places, so I have no idea. I mean --
12:05:06 24   Q   (By Mr. Bessette) And that's a good

### Page 84

12:05:07 1 point. You would have thought it was more because
12:05:10 2 it seemed more to you because your customers
12:05:13 3 were -- were complaining to you?
12:05:15 4   A   Uh-huh.
12:05:15 5   Q   But you don't, as you sit here, know
12:05:17 6 how many actual sales were being made in Costco
12:05:20 7 and how it was affecting the company overall,
12:05:22 8 meaning Adams Golf?
12:05:23 9   A   Right.
12:05:26 10   Q   Okay. And would it surprise you to
12:05:28 11 learn -- and again, in the same time frame, April,
12:05:30 12 May, June of 1998 -- in what Costco calls the
12:05:36 13 Southeast region, but it's the states of Alabama
12:05:38 14 and Florida, Georgia, Maryland, North Carolina,
12:05:41 15 portions of New Jersey -- I don't know why that's
12:05:47 16 Southeast, but -- Puerto Rico, South Carolina,
12:05:47 17 Tennessee, and portions of Virginia, there were
12:05:50 18 only 150 clubs sold by Costco in that time frame?
12:05:54 19        MR. MARA: Same objection.
12:05:54 20   Q   (By Mr. Bessette) Is that surprising
12:05:55 21 to you as well?
12:05:57 22   A   Yeah.
12:05:58 23   Q   Again, you would have thought it
12:05:59 24 would be more?

### Page 85

12:06:00 1   A   Yeah. Maybe they're all sold out of
12:06:02 2 Miami, I don't know, but --
12:06:05 3   Q   Maybe you know, maybe not. We don't
12:06:07 4 know.
12:06:25 5        When did you -- let's see.
12:06:27 6 You said you got married in April?
12:06:29 7   A   Uh-huh.
12:06:30 8   Q   1998?
12:06:30 9   A   Uh-huh.
12:06:31 10   Q   You got married to Michael Brooks?
12:06:33 11   A   Right.
12:06:33 12   Q   He was an employee of Adams Golf?
12:06:35 13   A   Right.
12:06:35 14   Q   And you met him at Adams Golf?
12:06:42 15   A   Right.
12:06:42 16   Q   He was in what department?
12:06:44 17   A   He started off in customer service,
12:06:46 18 and then he moved up, and he was like the
12:06:49 19 purchasing manager or something like that. He --
12:06:52 20 he was in charge of purchasing the components.
12:07:00 21   Q   We won't be too much longer.
12:07:02 22        Purchasing. Who was his boss
12:07:06 23 in 1998/1999 time frame? Do you know?
12:07:09 24   A   Well, Dick Murtland was his boss, and

22  (Pages 82 to 85)

D. BROWN

**Dave Brown**
04/27/06

**DAVE BROWN - April 27, 206**

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------x

IN RE ADAMS GOLF, INC.     Consolidated
          C.A. No. 99-371 KAJ
SECURITIES LITIGATION      Class Action
              Jury Trial Demanded

------------------------x

APRIL 27, 2006
9:00 O'CLOCK A.M.

          The Deposition of <u>DAVE BROWN</u>, taken
before Ernest Kuemmel, CSR(A). Examiner, pursuant
to Rules 203, 728, 204(1) of the Court of Queen's
Bench of Alberta at the offices of Michael C.
Dunkley, Calgary, Alberta, on the 27th day of
April, A.D. 2006.

*Complimentary Client Copy*

---

**2**

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Elizabeth W. Fox, Ms.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania   19103

and

Elizabeth A. Leland, Ms.
Keller Rohrback LLP
1201 Third Avenue, Suite 3200
Seattle, Washington   98101-3052


FOR THE DEFENDANTS:
(With the exception of the underwriters)

Michelle A. Reed, Ms. and
Laura Moriaty, Ms.
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas   78701-3911


OFFICIAL COURT REPORTER:

:lm L. Morosse, CSR(A) RPR

---

**3**

I N D E X

<u>DAVE BROWN</u>, sworn

Examined by Ms. Leland                    4
Examined by Ms. Reed                     32


Reporter's certificate                   72


Listing of exhibits                      73

---

**4**

1          <u>DAVE BROWN</u>, sworn, examined by
2    Ms. Leland:
3          Q.   Thank you for coming today   My name is
4    Elizabeth Leland. I'm with the firm of Keller
5    Rohrback. I'm one of the attorneys for the
6    plaintiffs in this litigation.
7                Could you state your name for the
8    record, please.
9          A.   **David Paul Brown.**
10         Q.   And could you state your current
11   address?
12         A.   **Current address is 2228, 1010 Arbour**
13   **Lake Road northwest, Calgary.**
14         Q.   And you're formerly affiliated with the
15   company by the name of WDC Mackenzie; is that
16   correct?
17         A.   **That's correct.**
18         Q.   Were you involved in the starting or the
19   founding of Mackenzie?
20         A.   **I was one of the original founders,**
21   **three original founders.**
22         Q.   What was your role in founding the
23   company?
24         A.   **My position in the company was vice**
25   **president of operations. My job was basically Ryan**

---

5

Magnussen and myself were the key initial guys who
started the company. We started it from scratch.
There was nothing.
4    Q.   What was your business experience before
5 starting this company?
6    A.   Previous to that, I had worked at Canada
7 Trust banking here in Calgary, as an assistant bank
8 manager. Previous to that, I had been in retail
9 sales for nine or ten years.
10    Q.   What were your title and duties at WDC
11 Mackenzie beginning in -- as of 1998?
12    A.   In 1998, I was vice president of
13 operations. My duties basically were to oversee --
14 report directly to Ryan Magnussen, who was the
15 president at the time, and oversee the whole
16 structure of the company, build up certain parts of
17 it, to hire staff and make sure that we were taking
18 care of certain sections of the company.
19    Q.   How did Mackenzie get Adams Golf as a
20 line of products to sell?
21    A.   We were distributing a product called
22 Soft Spikes that originated out of Boyse, Idaho.
23 There was a gentleman named Ferris McMulland who
24 was founder and starter of that company. Farris
25 was friends with Barney Adams. And we were doing a

6

1 pretty good job for Soft Spikes up in Canada and we
2 were looking for more products, to expand.
3         So in conversations with Farris, he
4 had mentioned Barney's name, and he had set up a
5 interesting products coming out and had set up a
6 time for me to meet with Barney Adams at a golf
7 trade show.
8    Q.   When was that?
9    A.   Trade show would have been in 1996.
10    Q.   And did you meet with Barney at the
11 trade show, and if so, what happened?
12    A.   Yes, I met with Barney Adams, spoke for
13 quite a while, explained where we were from.
14         He had been up to Canada a few
15 times. He had some friends up in Ontario. Quite
16 liked Canada and was interested in starting his
17 products and expanding it up there, and was
18 interested in working with a company that was
19 established in Canada.
20    Q.   From there, you entered into an
21 arrangement to distribute?
22    A.   That's correct. Barney was very much,
23 those times, a down to earth guy, that he wanted to
24 do things on a handshake rather than formal
25 contracts.

7

1    Q.   Okay, what was the arrangement between
2 Mackenzie and Adams Golf concerning the
3 distribution of Adams clubs?
4    A.   The arrangement was Barney would --
5 wanted us to take the product, put it into our
6 line.
7         We already had sales guys that were
8 going out calling on the golf courses, et cetera.
9 And he wanted us to take the product and introduce
10 it to the existing golf courses and golf shops in
11 Canada.
12    Q.   And sorry, what year did you begin
13 distributing for Adams Golf?
14    A.   For Adams, 199 -- late '96.
15    Q.   And is it correct that you were the only
16 retail distributor in Canada?
17    A.   We're a wholesaler. We're their only
18 wholesaler in Canada, and we distributed to all the
19 retail shops, golf and -- what we call green grass
20 and non-green grass shops. Green grass being all
21 the golf courses; and non-green grass, the Nevada
22 Bob's, the Pro Golfs and those guys.
23    Q.   Are you familiar with the term "gray
24 marketing"?
25    A.   Yes, I am.

8

1    Q.   What does that term mean to you?
2    A.   Gray marketing is basically taking the
3 products or getting hold of products that are under
4 a certain distribution system right now, getting
5 hold of the products and distributing them or
6 selling them without going through proper channels,
7 would probably be the easiest way to explain it.
8    Q.   Did you ever discuss gray marketing with
9 Barney Adams?
10    A.   When the gray market problem surfaced,
11 Barney's company was growing tremendously, and we
12 were advised to talk to the people below him, which
13 were Mark Gonzales at first and then later Chris
14 Beebe.
15    Q.   Let me back up. Could you briefly
16 explain the gray marketing situation that you just
17 referenced regarding Canada gray marketing sales?
18    A.   I'm not sure if I understand that.
19    Q.   Can you give me a brief background of
20 the gray market problem that you encountered?
21    A.   The gray market problem we had, had to
22 do with Costco. Costco Canada. We got a call fro
23 one of our representatives out of Vancouver that
24 all of a sudden our products were showing up at
25 Costco stores.

2 of 7

**DAVE BROWN – April 27, 206**

25

1        EXHIBIT NO. 44 - ONE-PAGE DOCUMENT
          HEADED "ADAMS GOLF WDC MACKENZIE
          SALES SINCE 1997" - MCK00297
4        Q.  MS. LELAND:      Mr. Brown, the court
5    reporter has just marked a document as Exhibit
6    No. 44. It's Bates numbered MCK00297.
7                Are you familiar with this
8    document?
9        A.  Yes, I am.
10       Q.  Do you know who created this document?
11       A.  It was created by Greg Pratt.
12       Q.  Can you tell me what this document
13   represents?
14       A.  The document represents WDC's sale of
15   Adams Golf clubs the year 1997, '98 and first part
16   of -- the first half of 1999. The dollar figures
17   that you see are broke down month by month.
18       Q.  Are these in Canadian or U.S. dollars?
19       A.  These would be in Canadian dollars, I do
20   believe. Everything that we worked on was based
21   upon Canadian dollars.
22       Q.  Okay. Going through some of these notes
23   on the right-hand side of the document, can you
24   read me what it says with respect to May of 1998?
         A.  "Product hit Costco Canada."

26

1        Q.  And earlier you testified that the
2    product was in as early as March; is that correct?
3        A.  That's correct.
4        Q.  Could you read what it says by July of
5    1998?
6        A.  "Customers started returning
7        clubs and didn't want Adams due to
8        Costco. $200,000 loss due to exchange
9        on the Canadian dollar."
10       Q.  Okay, can you read the comments by the
11   September '98 entry?
12       A.  "Only way they would take clubs
13       is on consignment for Christmas
14       season."
15               We had quite a stock, and obviously
16   we were trying to get product in there. Some of
17   the stores stay open during the Christmas periods,
18   especially on the west coast, in Vancouver areas.
19       Q.  Can you read to me what it says by, I
20   believe it's November of 1998.
         A.  "Slow Christmas season. We get
         filled in on consignment and customers
         are still reluctant to bring in
24       product."
25       Q.  To the best of your recollection, are

27

1    these notations, were they true at the time?
2        A.  They're accurate. "Product hits Costco
3    in May." It's a little off. I would say that's
4    when a majority of it hit Costco, not the very
5    beginning. The very beginning started, as we said,
6    back in March.
7        Q.  Okay, can we skip ahead of January of
8    1999?
9        A.  Certainly.
10       Q.  What are the recorded sales there?
11       A.  Our losses, 77,000.
12       Q.  $77,000 in losses in January of 1999?
13       A.  That's correct.
14       Q.  Can you read to me the comment next to
15   that entry?
16       A.  "New pricing was introduced." Most
17   customers from Christmas consignment returned the
18   clubs to us. They hadn't sold during the Christmas
19   season. We had put it out on consignment. They
20   returned the clubs.
21       MS. LELAND:       Okay. One more
22   document.
23       EXHIBIT NO. 45 – SEPTEMBER 13, 1999
24       FAX FROM MARC PUGLIELLI TO WDC
25       MACKENZIE DIST. LTD. C/O RYAN

28

1        MAGNUSSEN, WITH FOUR ATTACHMENTS -
2        MCK00002 TO MCK00006
3        Q.  MS. LELAND:      Being marked as
4    document number 45 is Bates number MCK02107 (sic)
5    through 02111 (sic).
6                Can you take a look at this
7    document and tell me if you recognize it?
8        A.  Yes, I do.
9        Q.  Can you tell me what this document is?
10       A.  Ryan Magnussen had requested some
11   information from Marc Puglielli with Adams Golf.
12   This is the information that was sent to Ryan. It
13   gave us a breakdown of WDC's sales for 1999, by
14   product.
15       Q.  This came from WDC files; correct?
16       A.  This came from WDC files, as well as
17   Marc Puglielli had sent it up from their system, I
18   believe, directly from Adams Golf.
19       Q.  Could you take a look at the page Bates
20   number MCK02109. That would be the third page.
21   The bar graph
22       A.  Okay.
23       Q.  Looking at the bar graph, can you tell
24   me what the figures here represent?
25       A.  This is sales from 1998 and 1999,

### 29

1  starting in January. And it shows --
2      Q. Now, is this sales or is this the amount
3  of clubs that --
4      A. This is purchases that we made from
5  Adams Golf.
6      Q. Okay.
7      A. And these numbers coincide with our golf
8  season.
9      Q. Okay. In looking at the beginning,
10  starting at '98, the numbers generally trend upward
11  toward -- through June, 1988; is that correct?
12      A. That's correct.
13      Q. And then what happens in July, '98?
14      A. We sell -- we buy little to none.
15      Q. Why was that?
16      A. We were starting to get our product back
17  and clients were refusing to purchase it.
18      Q. Why was that?
19      A. Again, going to the product being in
20  Costco. We had prebooked various different sales.
21  A certain amount of clubs had come in at certain
22  times. Whether we had got everything we ordered,
23  they had shipped to us, we had bought from them;
24  and all of a sudden everything came to a halt at
25  the end of June.

### 30

1      Q. Okay. Were Adams gray market problems
2  known in the golf community in Canada?
3      A. Yes.
4      Q. Who all in the golf community was aware
5  of the problems?
6      A. Distributors, golf pros, and golf shop
7  owners and managers. We have a small network up
8  here. Some guys work in Ontario and then they're
9  shipped out to Vancouver, et cetera, so a lot of
10  people know a lot of people right across the
11  country.
12      Q. How about in the United States?
13      A. In the United States -- we dealt
14  directly in Canada. What was happening in the
15  United States market, we were unaware of. If they
16  were in the Costcos or the Golf Pros knew about it
17  down there, we were unaware of it.
18      Q. Had you expected, when you ordered your
19  clubs from Adams Golf, the club sales would
20  continue to escalate per the trend we just looked
21  at in Exhibit 45, through July of '98?
22      A. Yes. I believe we also had a
23  conversation with Adams Golf earlier in 1998,
24  January, February, before the gray market incidents
25  happened, to be able to get their feel that their

### 31

1  product was going to be able to keep up with our
2  demand up here.
3          The numbers that we see here in
4  February, March, April and May, we expected tha
5  continue right on into December of that year and
6  into the following year.
7      Q. It failed to continue into the following
8  year; correct?
9      A. It failed -- the middle, the end of
10  June, it was just history.
11      Q. And that was due to the gray marketing,
12  to the best of your knowledge?
13          MS. REED:          Objection. Form.
14      A. That's correct.
15      Q. MS. LELAND:      Why do you believe
16  the sales did not continue to trend upward during
17  1998?
18      A. I mean, Costco was offering the product
19  for $15 over our wholesale. Our guys were buying
20  them at 235. They were selling them at 299 to 350,
21  which is normal margins on golf equipment. And the
22  guy off the street could walk into Costco,
23  everybody has a Costco membership, and they could
24  walk in and get it for 250 there. Why would they
25  go buy it at the golf course for 350?

### 32

1      Q. Did the Costco problem before the IPO in
2  July of '98, do any permanent damage to Mackenzie's
3  sales of Adams products?
4      A. Definitely. We had customers that would
5  not buy product from us, period. They didn't
6  want -- we had a new driver coming out, there was
7  all sorts of things. They didn't want anything to
8  do with us.
9          MS. LELAND:       That is, I think,
10  all I have. We'll take a quick break.
11          (BRIEF ADJOURNMENT)
12          MS. LELAND:       I have no further
13  questions.
14      MS. REED EXAMINES THE WITNESS:
15      Q. I'm Michelle Reed, and I represent the
16  defendant Adams Golf and the individual defendants.
17  The underwriter defendants are represented by
18  Simpson Thatcher, who is not here today. And
19  thanks so much for staying with us and being here
20  so late.
21          Tell me a little bit about
22  what your role was at the company. You talked
23  about how you were the operations. I'm just trying
24  to get a feel for what you do from day-to-day, in
25  1998.