P. BROWN

## PAUL BROWN, JR.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.   :   CONSOLIDATED

SECURITIES LITIGATION     :   C.A. NO. 99-371 KAJ

_____X

ORAL DEPOSITION OF PAUL BROWN, JR.

Tuesday, May 16th, 2006

The oral deposition of PAUL BROWN, JR.,

was held at the law offices of Akin Gump Strauss

Hauer & Feld, LLP, 1700 Pacific Avenue, Suite

4100, Dallas, Texas, from 9:41 a.m. to 12:57 p.m.,

before Jamie K. Israelow, a Certified Shorthand

Reporter in and for the State of Texas, Registered

Professional Reporter, Certified Realtime Reporter

and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000    (888)777-6690

## PAUL BROWN, JR.

Page 10

09:50:52 1 accurate and complete, as far as you know, isn't
09:50:58 2 it?
09:50:59 3     A    Yes.
09:50:59 4     Q    Why did you sell in the IPO?
09:51:06 5     A    I think in part to recover some of
09:51:09 6 the funds we had invested. I think it's typical
09:51:14 7 of investors to get a return on what we had done.
09:51:18 8     Q    There's nothing wrong with selling
09:51:20 9 stock, and you didn't sell all of your interest by
09:51:22 10 any means --
09:51:23 11    A    No.
09:51:23 12    Q    -- you just sold a small portion.
09:51:27 13         Was there a time prior to the
09:51:29 14 IPO that you had sold Adams stock or securities?
09:51:35 15    A    No.
09:51:35 16    Q    Now, when in these questions -- when
09:51:37 17 I ask about your transactions, I'm referring to
09:51:40 18 the shares in which you held of beneficial
09:51:43 19 interest, so I presume the record owner was -- was
09:51:51 20 Royal Holding; is that accurate?
09:51:52 21    A    Yes, that's correct.
09:51:53 22    Q    When I talk about you selling, I'm
09:51:54 23 referring to those shares in which, as I
09:51:56 24 understand it, you had a beneficial interest. Do

Page 11

09:51:59 1 you understand that?
09:52:01 2     A    Yes. I don't agree that I had a
09:52:04 3 beneficial interest.
09:52:04 4     Q    Oh, I'm sorry. Why not?
09:52:08 5     A    I -- I'm not an owner of Royal
09:52:14 6 Holding Company. I'm an officer and a director,
09:52:16 7 but not an owner.
09:52:19 8     Q    Okay.
09:52:19 9     A    I think the rules say I'm a
09:52:22 10 beneficial owner, but I'm not.
09:52:25 11    Q    Okay. Mr. Patchin is an owner of
09:52:28 12 Royal Holding?
09:52:29 13    A    One of the owners, yes.
09:52:32 14    Q    How many owners are there?
09:52:37 15    A    There are actually five shareholders.
09:52:41 16    Q    Who are they, please, besides
09:52:44 17 Mr. Patchin?
09:52:44 18    A    His brother, his mother, and two
09:52:52 19 trusts.
09:52:52 20    Q    Are they Patchin family trusts?
09:52:56 21    A    Yes.
09:52:56 22    Q    Did you participate in the decision
09:53:02 23 to sell Royal Holdings in Adams in the Adams IPO?
09:53:14 24    A    Yes.

Page 12

09:53:14 1     Q    Was it your recommendation to make
09:53:16 2 that sale?
09:53:24 3     A    Yes.
09:53:29 4     Q    Had Royal sold any stock or
09:53:35 5 securities prior to the IPO?
09:53:37 6     A    No.
09:53:37 7     Q    To this day, since the IPO, has Royal
09:53:40 8 sold or divested itself of any Adams stock?
09:53:47 9     A    Royal, the company?
09:53:48 10    Q    Yes.
09:53:49 11    A    No, they have not.
09:53:53 12    Q    So there have been no sales -- so is
09:53:58 13 it correct that as of today, Royal owns
09:54:02 14 approximately 7 million shares of Adams common
09:54:09 15 stock?
09:54:10 16    A    Yes, precisely, 6,374,511.
09:54:18 17    Q    Thank you.
09:54:18 18         If you take 7,405,438 and
09:54:23 19 subtract from that 454,745, you don't get
09:54:27 20 6.3 million. So what happened to the difference?
09:54:30 21    A    I don't know.
09:54:31 22    Q    But there haven't been any further
09:54:35 23 divestitures of Royal stock since the IPO?
09:54:39 24         MS. REED: To the best of your

Page 13

09:54:39 1 recollection? It's been 8 years.
09:54:42 2         MR. COLLINS: I must say,
09:54:43 3 Mr. Brown has a pretty good recollection.
09:54:45 4     A    We've not sold any stock.
09:55:16 5     Q    (By Mr. Collins) Now, let's look a
09:55:17 6 little bit more at the prospectus.
09:55:19 7         Now, you are a signatory to
09:55:21 8 the registration statement to which the prospectus
09:55:23 9 is an exhibit, correct?
09:55:26 10    A    Yes.
09:55:27 11    Q    And when you put your signature on
09:55:29 12 the S1, you did so, I gather, believing that the
09:55:36 13 S -- that the S1 and the prospectus were true,
09:55:40 14 accurate, and complete. Is that accurate?
09:55:45 15    A    Yes.
09:55:45 16    Q    Did you read drafts of the prospectus
09:55:49 17 before you signed the registration statement?
09:55:55 18    A    Yes.
09:55:55 19    Q    More than one?
09:56:01 20    A    Yes, I'm sure it would be more than
09:56:02 21 one.
09:56:03 22    Q    Were there any particular parts of
09:56:05 23 the prospectus that you focused on when you read
09:56:10 24 the prospectus before signing the registration

4  (Pages 10 to 13)

ef6783c8-d39a-4ca7-b0f4-84b6f348ecbd

## PAUL BROWN, JR.

Page 14

09:56:16 1  statement?
09:56:21 2      A    Yes.
09:56:21 3      Q    What were those, please?
09:56:28 4      A    I looked at the numbers, of course,
09:56:31 5  on the balance sheet.
09:56:33 6      Q    The historical results?
09:56:37 7      A    Yes. And with particular attention
09:56:42 8  to accounts receivable, inventories, other assets,
09:56:51 9  and also looked at the risk factors and the
09:56:57 10 description of the business.
09:57:01 11     Q    Now, your focus on the financial
09:57:07 12 statements, I'm sure, was partly because you're a
09:57:10 13 CPA. Is that accurate?
09:57:12 14     A    Yes.
09:57:12 15     Q    Any other reasons why you were
09:57:16 16 focused, for example, on accounts receivable?
09:57:21 17     A    Generally, it's a pretty big number
09:57:25 18 in the balance sheet. It's just one of those
09:57:28 19 assets that you -- that you look at closely, I
09:57:33 20 think.
09:57:33 21     Q    And when you say it's generally a
09:57:36 22 pretty big number, you mean with regard to Adams
09:57:39 23 Golf or with regard to all companies?
09:57:41 24     A    With regard to Adams, it would have

Page 15

09:57:43 1  been a significant number. With regard to our
09:57:48 2  company, it's a significant number.
09:57:51 3      Q    Now let's talk about the risk factors
09:57:54 4  for a moment. I believe they begin on Page 6 of
09:58:00 5  the document.
09:58:25 6          Who did the first draft of the
09:58:26 7  risk factors?
09:58:27 8      A    Actually, I don't know.
09:58:28 9      Q    Was it somebody inside the company?
09:58:30 10     A    Inside Adams?
09:58:31 11     Q    Right.
09:58:32 12     A    I don't know that.
09:58:32 13     Q    Do you know if it was a lawyer?
09:58:36 14     A    I -- I don't know that.
09:58:38 15     Q    Okay. Did you -- I know it's a long
09:58:41 16 time ago, but when you focused on the risk
09:58:47 17 factors, did you have any suggestions for
09:58:51 18 different language?
09:58:55 19     A    I don't recall having any, no.
09:58:57 20     Q    Did you suggest that any of the
09:59:06 21 factors listed didn't need to be listed, they
09:59:12 22 weren't really risk factors?
09:59:14 23         MR. COLLINS: You know what,
09:59:16 24 that wasn't comprehensive. Let me translate into

Page 16

09:59:18 1  English.
09:59:20 2      Q    (By Mr. Collins) When you looked at
09:59:21 3  a draft or drafts of the prospectus and you read
09:59:24 4  the risk factors disclosure in that draft, did you
09:59:28 5  see at any time any risk that you didn't think
09:59:30 6  needed to be included?
09:59:40 7      A    No. But that's really more based on
09:59:43 8  what gets put into these than whether or not I
09:59:48 9  viewed something as an actual risk. Most of these
09:59:53 10 things were -- such as raw material sourcing,
10:00:00 11 competition. They were all valid, valid things.
10:00:04 12     Q    And when you say "valid things,"
10:00:06 13 please, you mean what?
10:00:12 14     A    Obviously, they were factors to be
10:00:15 15 considered because competition is -- in the
10:00:20 16 business was pretty keen. We were essentially a
10:00:22 17 new company for all intents and purposes in that
10:00:29 18 business. Sourcing the raw materials was not
10:00:34 19 always going to be easy.
10:00:39 20     Q    Sure.
10:00:39 21     A    So those kind of things, I felt, were
10:00:46 22 important.
10:00:46 23     Q    And when you say they were important,
10:00:48 24 you meant it was important to tell investors these

Page 17

10:00:51 1  were material risks to Adams Golf in its business
10:00:58 2  going forward?
10:01:01 3      A    Yes.
10:01:01 4      Q    Now, the -- the raw materials, that
10:01:06 5  was a risk that applied to any company in the golf
10:01:09 6  equipment industry, right?
10:01:14 7      A    Yes.
10:01:14 8      Q    And you mentioned that Adams Golf was
10:01:22 9  a newer company. I think I heard you say:
10:01:25 10 Certainly it was a smaller company in the
10:01:25 11 industry.
10:01:28 12         But the fact is that every
10:01:31 13 golf club manufacturer also faced a risk with
10:01:36 14 regard to competition; is that accurate?
10:01:43 15     A    Yes
10:01:43 16     Q    Now, is there any -- and I'm going to
10:01:52 17 switch you over to Page 6 now.
10:01:55 18         Is it accurate that other --
10:02:02 19 is it accurate that other participants --
10:02:08 20         MR. COLLINS: Off the record,
10:02:10 21 please.
10:02:10 22         (An off-the-record discussion
10:02:46 23 was held from 10:02 to 10:02.)
10:02:47 24         MR. COLLINS: Let's go back.

5  (Pages 14 to 17)

ef6783c8-d39a-4ca7-b0f4-84b6f348ecbd

PAUL BROWN, JR.

| | |
|---|---|
| **Page 18** | **Page 20** |

**Page 18**

10:02:49 1 Q (By Mr. Collins) Let's look at
10:02:51 2 Page 6 under Risk Factors. The first one
10:02:55 3 mentioned: Dependence on new product
10:02:58 4 introductions
10:02:58 5 That was a risk in general
10:03:03 6 that every club manufacturer faced, correct?
10:03:08 7 A Yes.
10:03:08 8 Q And uncertain consumer acceptance of
10:03:11 9 the company's product was also what I would call
10:03:13 10 an industrywide risk, correct?
10:03:16 11 A Yes.
10:03:20 12 Q Okay. Same with regard to patents
10:03:22 13 and protection of proprietary technology,
10:03:29 14 dependence upon key personnel and endorsements and
10:03:35 15 risks associated with acquisitions, correct?
10:03:40 16 A The last --
10:03:42 17 Q Sorry. Let me say it again
10:03:44 18 Is it also accurate that other
10:03:47 19 companies in the golf club industry, in addition
10:03:50 20 to Adams, faced risks arising out of protection of
10:03:58 21 proprietary technology, dependence on key
10:04:03 22 personnel and endorsements, and risks associated
10:04:07 23 with acquisitions?
10:04:17 24 A Yes

**Page 19**

10:04:17 1 Q By the same token, other companies in
10:04:19 2 the industry faced risks with regard to the
10:04:26 3 seasonality of business. Some quarters are better
10:04:30 4 than others in this industry with regard to
10:04:33 5 conducting business abroad; is that correct?
10:04:45 6 A The question that everybody faces
10:04:47 7 that risk?
10:04:48 8 Q In the golf club industry, yes
10:04:51 9 A Yes, pretty much.
10:04:53 10 Q Okay. Now, as you well know, one of
10:04:55 11 the things -- you know you're a defendant in this
10:04:58 12 lawsuit, Mr. Brown?
10:04:59 13 A Yes.
10:04:59 14 Q And you know that one of the issues
10:05:02 15 in this lawsuit is that this set of risk factors
10:05:06 16 didn't include any mention of gray marketing.
10:05:09 17 You're aware of that?
10:05:12 18 A Yes.
10:05:13 19 Q Okay. Now, tell me why this set of
10:05:18 20 risk factors didn't include gray marketing.
10:05:27 21 A From my review of it?
10:05:36 22 Q If you would
10:05:36 23 Now, as a preface, I'm asking
10:05:36 24 this question because you are a signatory of the

**Page 20**

10:05:36 1 registration statement, so I want your opinion as
10:05:42 2 to why you think -- you thought it was okay not to
10:05:46 3 include gray marketing in the risk factors,
10:05:49 4 correct?
10:05:50 5 A Yes.
10:05:50 6 Q Tell me why, please.
10:05:52 7 A I did not view it as a significant
10:05:55 8 risk.
10:05:57 9 Q Okay. Why not, please?
10:06:00 10 A I don't believe it had a significant
10:06:03 11 impact on the company. At the time, I did not
10:06:06 12 believe it would have a significant impact on the
10:06:10 13 company.
10:06:14 14 Q Okay. Now, as of the time of the
10:06:18 15 IPO, did you believe that gray marketing had
10:06:21 16 affected some company or companies in the golf
10:06:24 17 club industry?
10:06:35 18 A I -- I suspect -- or I felt it might
10:06:38 19 have had some impact, but there were other things,
10:06:42 20 such as the statements by the USGA, for instance,
10:06:51 21 that I felt had much more impact on actually
10:06:57 22 individual companies, as well as the industry --
10:06:59 23 Q I see.
10:07:00 24 A -- as a whole.

**Page 21**

10:07:02 1 Q I see.
10:07:04 2 Now, in your last answer when
10:07:06 3 you say you thought gray marketing might have had
10:07:08 4 some impact, you were referring, I gather, to
10:07:11 5 companies other than Adams in the industry?
10:07:24 6 A Yes.
10:07:25 7 Q So am I getting this correct, that as
10:07:29 8 of the time of the IPO you think gray marketing
10:07:32 9 might have been a material risk for other
10:07:36 10 companies in the industry, just not Adams Golf?
10:07:41 11 A I didn't think gray marketing was
10:07:46 12 material.
10:07:46 13 Q So with regard to other companies, at
10:07:49 14 the time of the Adams IPO, you thought it might
10:07:52 15 have been a factor for other companies in the golf
10:07:56 16 industry, but not a material factor, not a
10:07:58 17 material risk?
10:07:59 18 MS. REED: Are you asking for
10:08:00 19 his personal knowledge of other companies, or what
10:08:02 20 are you asking?
10:08:04 21 MR. COLLINS: Well, no.
10:08:05 22 Q (By Mr. Collins) Actually, what I'm
10:08:06 23 talking about is your understanding at the time of
10:08:09 24 the IPO, based upon the work you did to put your

6 (Pages 18 to 21)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

ef6783c8-d39a-4ca7-b0f4-84b6f348ecbd

# PAUL BROWN, JR.

**Page 22**

| | |
|---|---|
| 10:08:16 1 | signature to this registration statement |
| 10:08:19 2 | So based upon what you knew at |
| 10:08:21 3 | the time of the IPO, what is it that made you |
| 10:08:26 4 | think it was a risk for other companies, but not a |
| 10:08:29 5 | material risk, if I heard you correctly? |
| 10:08:32 6 | MS. REED: Objection, |
| 10:08:33 7 | misstates prior testimony. |
| 10:08:35 8 | Q    (By Mr. Collins) Let's start again. |
| 10:08:36 9 | Why didn't you believe at the |
| 10:08:38 10 | time of the Adams IPO that gray marketing was a |
| 10:08:47 11 | material risk for other companies in the industry? |
| 10:08:54 12 | A    I didn't believe it was a material |
| 10:08:56 13 | risk at any time. |
| 10:08:57 14 | Q    Okay.  Tell me why. |
| 10:09:07 15 | A    I would believe there were two |
| 10:09:08 16 | reasons, maybe more.  The most significant reason, |
| 10:09:13 17 | from the company's perspective, those clubs being |
| 10:09:17 18 | sold on the gray market represented sales from the |
| 10:09:19 19 | company, so they were selling their clubs.  They |
| 10:09:21 20 | were not -- as opposed to being stolen, they were |
| 10:09:29 21 | being paid for those golf clubs. |
| 10:09:31 22 | Q    I see. |
| 10:09:33 23 | A    The second thing is that the number |
| 10:09:34 24 | of clubs involved for Adams, or any other company, |

**Page 23**

| | |
|---|---|
| 10:09:42 1 | I do not feel was significant relative to the -- |
| 10:09:48 2 | the overall totals. |
| 10:09:56 3 | Q    Now, in your last answer, when you |
| 10:10:00 4 | talked about the number of clubs being sold to the |
| 10:10:02 5 | gray market not being significant, were you |
| 10:10:05 6 | referring to Adams or other companies? |
| 10:10:09 7 | A    Actually, any -- any of the |
| 10:10:11 8 | companies, but I don't think -- I don't think they |
| 10:10:15 9 | were significant to Adams either. |
| 10:10:20 10 | Q    Let's go back to Adams. |
| 10:10:22 11 | At the time of the IPO, had |
| 10:10:29 12 | any gray marketing occurred with regard to Adams' |
| 10:10:36 13 | clubs? |
| 10:10:36 14 | A    There -- there may have been some. |
| 10:10:38 15 | There was some. |
| 10:10:39 16 | Q    What was the basis of your |
| 10:10:40 17 | information about that at the time of the IPO? |
| 10:10:45 18 | A    Basis?  I was advised as -- I was |
| 10:10:51 19 | advised that by the people in the company, in |
| 10:10:56 20 | Adams, that some -- some gray market activity. |
| 10:11:00 21 | Q    And who told you that? |
| 10:11:05 22 | A    I -- exactly who, I'm not sure. |
| 10:11:11 23 | Q    Barney Adams? |
| 10:11:14 24 | A    It could have been. |

**Page 24**

| | |
|---|---|
| 10:11:14 1 | Q    Were you advised orally or in writing |
| 10:11:18 2 | or both? |
| 10:11:26 3 | A    I'd say probably orally.  I just |
| 10:11:30 4 | don't remember. |
| 10:11:31 5 | Q    It's a long time ago. |
| 10:11:33 6 | You're aware that a press |
| 10:11:35 7 | release was issued by Adams in June with regard to |
| 10:11:41 8 | the appearance of Adams Golf clubs at Costco? |
| 10:11:46 9 | You're aware of that? |
| 10:11:51 10 | A    Yes. |
| 10:11:51 11 | Q    And you were aware of that fact at |
| 10:11:53 12 | the time of the IPO? |
| 10:12:00 13 | A    Yes. |
| 10:12:00 14 | Q    Did you ever say to anybody, Barney |
| 10:12:03 15 | Adams, a lawyer, anybody:  Do we need to disclose |
| 10:12:06 16 | this Costco action in the IPO, in the prospectus? |
| 10:12:14 17 | A    I don't -- I don't believe so. |
| 10:12:15 18 | Q    Anybody besides yourself raise that |
| 10:12:18 19 | question, who was signatory to the registration |
| 10:12:22 20 | there? |
| 10:12:22 21 | MS. REED:  Are you saying to |
| 10:12:23 22 | the extent he knows or he had the conversation? |
| 10:12:26 23 | MR. COLLINS:  Oh, yes.  Yes, |
| 10:12:28 24 | of course. |

**Page 25**

| | |
|---|---|
| 10:12:29 1 | A    Yes. |
| 10:12:30 2 | Q    (By Mr. Collins) Anybody who |
| 10:12:31 3 | participated -- there were a number of people, I |
| 10:12:37 4 | presume, with this registration statement who |
| 10:12:37 5 | participated in the drafting, lawyers, company |
| 10:12:48 6 | personnel, others, correct?  Is that accurate, |
| 10:12:48 7 | sir? |
| 10:12:48 8 | A    I guess I don't know for certain. |
| 10:12:48 9 | Q    To your knowledge, did anybody who |
| 10:12:49 10 | participated in the preparation of the |
| 10:12:53 11 | registration statement question whether there |
| 10:12:56 12 | should be a reference to the gray market activity |
| 10:13:01 13 | or the Costco litigation in the prospectus? |
| 10:13:04 14 | A    I'm not aware of anyone. |
| 10:13:07 15 | Q    Okay.  Okay.  Now, I want to ask you |
| 10:13:19 16 | a couple of questions now relating to the period |
| 10:13:22 17 | after the IPO, and I'll probably drag you back to |
| 10:13:25 18 | the IPO later. |
| 10:13:27 19 | As you understand it, you're |
| 10:13:28 20 | saying that at the time of the IPO, you personally |
| 10:13:32 21 | believed gray marketing was not a material risk to |
| 10:13:35 22 | Adams, correct? |
| 10:13:36 23 | A    Yes. |
| 10:13:37 24 | Q    Did there come a time subsequent to |

7 (Pages 22 to 25)

ef6783c8-d39a-4ca7-b0f4-84b6f348ecbd

## PAUL BROWN, JR.

Page 62

11:23:44 1 $40 or whatever that number is to join so that I
11:23:48 2 can save $40 on a golf club? I might, I might
11:23:58 3 not, unless I thought I was going to use Costco
11:24:02 4 beyond that.
11:24:08 5    Q    Why did Adams issue that press
11:24:10 6 release in June about the bill of discovery filed
11:24:14 7 in connection with Costco, if you know?
11:24:22 8    A    I suspect it was to demonstrate to
11:24:24 9 retailers that we were, in fact, pursuing it
11:24:32 10 because we felt that somehow Costco got the clubs,
11:24:36 11 and we wanted to know how they did that.
11:24:44 12    Q    Okay. Well, was it that you wanted
11:24:46 13 to get information, if you know? Was -- was it
11:24:52 14 that Adams wanted to get information from Costco,
11:24:54 15 or was it that Adams wanted to show its retailers
11:24:58 16 Adams would defend the retailers' interest?
11:25:04 17         MS. REED: Objection, vague.
11:25:08 18         MR. COLLINS: Rephrase it --
11:25:08 19 no, no. Rephrase it.
11:25:10 20    Q    (By Mr. Collins) Did Adams Golf, to
11:25:16 21 your knowledge, file the bill of discovery in
11:25:18 22 order to obtain information from Costco, or
11:25:22 23 instead, did Adams Golf file the bill of discovery
11:25:26 24 to send a message to Adams' own retailers.

Page 63

11:25:34 1    A    I guess I don't know precisely why
11:25:36 2 they did that. It could be both.
11:25:38 3    Q    Were you informed before the press
11:25:40 4 release went out that there was going to be a
11:25:42 5 press release?
11:25:50 6    A    Yes, I believe so
11:25:50 7    Q    And were you informed before the
11:25:52 8 lawsuit went out that there was going to be this
11:25:54 9 bill of discovery?
11:26:00 10    A    Before which --
11:26:00 11    Q    I'm sorry. Forgive me
11:26:02 12         The press release, which I can
11:26:04 13 show you, the press release says: A bill of
11:26:08 14 discovery has been filed.
11:26:08 15         My question is: Before the
11:26:10 16 bill of discovery was filed, were you consulted?
11:26:18 17    A    We were told that we were going to
11:26:20 18 pursue that --
11:26:20 19    Q    And "we" meaning the board of
11:26:22 20 directors was told?
11:26:24 21    A    Yes. I don't think collectively,
11:26:30 22 individually, because we were all together in one
11:26:32 23 place.
11:26:32 24    Q    What became of that bill of

Page 64

11:26:32 1 discovery?
11:26:34 2    A    Specifically, I'm not sure, other
11:26:36 3 than we probably didn't discover anything  I
11:26:38 4 think we -- we didn't get any information from
11:26:44 5 Costco.
11:26:44 6    Q    What's the basis of your information
11:26:46 7 for that answer?
11:26:48 8    A    I think we've discussed it, over-time
11:26:52 9 buyback.
11:26:52 10    Q    And "we" meant --
11:26:54 11    A    We, the board members, Barney and
11:27:04 12 management --
11:27:04 13    Q    Now, going back to this particular
11:27:10 14 sentence: The company believes that selective
11:27:14 15 retail distribution helps its retailers to
11:27:18 16 maintain profitable margins and maximize sales of
11:27:20 17 Adams product.
11:27:22 18         At the time of the IPO, was it
11:27:24 19 possible for Adams Golf to maximize sales of Adams
11:27:30 20 products in the event that its retailers did not
11:27:32 21 maintain profitable margins?
11:27:40 22         MS REED: Objection, improper
11:27:42 23 hypothetical, calls for speculation.
11:27:44 24    Q    (By Mr. Collins) Do you want me to

Page 65

11:27:46 1 rephrase it?
11:27:46 2    A    Well, you know, again, it comes down
11:27:48 3 to are we talking about all of our retailers or
11:27:52 4 are we talking about two or five?
11:27:56 5    Q    What I'm really trying to ask is a
11:27:59 6 business plan, the approach  What's the approach
11:28:01 7 or the business plan of Adams Golf as of the time
11:28:05 8 of the IPO?  We are going to maximize sales and
11:28:09 9 the way we are going to do it is by maintaining
11:28:11 10 profitable margins for our retailers?  Was that
11:28:15 11 what the business plan was?
11:28:18 12    A    I believe that was part of it, sure.
11:28:23 13 The industry is competitive, so if you can provide
11:28:30 14 a margin equal to or greater than your competition
11:28:35 15 that's going to help in selling your clubs.
11:28:38 16    Q    Okay.
11:28:38 17    A    All other things being equal.
11:28:40 18    Q    Sure. And by the same token, if your
11:28:46 19 retailers are going to make a lower margin selling
11:28:49 20 an Adams club than, say, an Orlimar club, that
11:28:54 21 presents at least an issue for Adams to consider;
11:28:58 22 is that accurate?
11:29:03 23    A    Yes
11:29:03 24    Q    Did Adams, from time to time,

17  (Pages 62 to 65)

# PAUL BROWN, JR.

Page 66

11:29:06 1 undertake any consideration of whether its
11:29:14 2 authorized retailers were getting a better or less
11:29:17 3 good margin selling Adams clubs, as opposed to
11:29:22 4 some other company's clubs?
11:29:29 5     A   I don't think I had specific
11:29:32 6 discussions about that, but that -- in general,
11:29:35 7 that's -- that's one of the things that they do,
11:29:39 8 is track what the competition is doing, sure.
11:29:41 9     Q   And how margins compare is a relevant
11:29:46 10 consideration at the time of the IPO, true?
11:29:57 11     A   I'm not -- I'm not sure about that.
11:29:59 12     Q   Okay. Let me -- let me rephrase
11:29:59 13 that
11:30:01 14     At the time of the IPO, with
11:30:06 15 respect to whether Adams was going to be
11:30:09 16 successful in maximizing sales, was it a relevant
11:30:14 17 consideration for Adams whether retailers could
11:30:20 18 enjoy a good margin or a better margin selling
11:30:24 19 Adams clubs as some other company's clubs?
11:30:30 20     A   I'd say yes, that would have been a
11:30:34 21 consideration from -- in order -- in pricing them,
11:30:38 22 sure.
11:30:38 23     Q   And -- and you agree, I gather, that
11:30:44 24 gray marketing can, at least in some

Page 67

11:30:45 1 circumstances, decrease those retail margins for
11:30:52 2 Adams authorized retailers?
11:30:54 3     MS. REED: Objection,
11:30:55 4 misstates prior testimony, assumes facts not in
11:30:55 5 evidence.
11:30:59 6     Q   (By Mr. Collins) You may answer
11:31:01 7     A   Specific locations, I would agree
11:31:04 8 that it may.
11:31:11 9     Q   Okay. Now, tell me about the pricing
11:31:13 10 committee that you were a member of What was it?
11:31:15 11     A   The pricing committee consisted of
11:31:18 12 myself and Finis Conner and others, and we -- we
11:31:27 13 were the part of the board that, I guess, at the
11:31:34 14 end of the day recommended a -- a number of shares
11:31:43 15 at a -- at an offering price with those costs and
11:31:54 16 deductions from the underwriter to the board.
11:31:58 17     Q   How did you come into making that
11:32:02 18 recommendation? What factors did you consider?
11:32:08 19     A   I think we looked at basically --
11:32:13 20 well, we listened to advice from the bankers. We
11:32:21 21 looked at the marketplace relative to other
11:32:27 22 companies, Callaway, those that you could see, and
11:32:37 23 the -- actually recommend -- recommendations from
11:32:40 24 those familiar with the -- with the market at the

Page 68

11:32:46 1 time as to what was a -- you know, a reasonable
11:32:52 2 price, capitalization, and so forth.
11:32:57 3     Q   Now, naturally, the -- the company
11:33:01 4 wanted the price to be as high as practicable; is
11:33:06 5 that accurate?
11:33:09 6     A   We didn't actually discuss that, but
11:33:11 7 yes, I would think that's a given.
11:33:13 8     Q   And the selling shareholders felt the
11:33:15 9 same way?
11:33:19 10     A   Yes, but probably less so.
11:33:21 11     Q   Why do you say that?
11:33:23 12     A   The goal here was -- was the IPO,
11:33:31 13 we -- the new shares, and to bring working capital
11:33:38 14 into the company. The purpose of this IPO was not
11:33:41 15 for Royal or anybody else to sell their shares.
11:33:47 16     Q   Were there any risks that you were
11:33:49 17 aware of at the time of setting the price too
11:33:54 18 high?
11:33:54 19     MS. REED: Objection, calls
11:33:56 20 for speculation.
11:33:57 21     Q   (By Mr. Collins) I'm just asking you
11:33:58 22 whether you were aware of any risks occurring.
11:34:02 23     A   Of setting too high? No.
11:34:05 24     Q   There was certainly the risk that

Page 69

11:34:07 1 nobody would buy.
11:34:08 2     A   Certainly that's a risk, but other
11:34:10 3 than that obvious risk, no.
11:34:13 4     Q   Okay. And the underwriters didn't
11:34:16 5 tell you any risks apart from the possibility that
11:34:19 6 the IPO might not sell out if the price was too
11:34:22 7 high; is that accurate?
11:34:26 8     A   No, they never -- they never conveyed
11:34:29 9 any risks to me.
11:34:30 10     Q   Anybody from the company or --
11:34:32 11     A   No.
11:34:38 12     Q   Okay. Now, the price went down after
11:34:50 13 the IPO, fairly soon after the IPO. Do you recall
11:34:55 14 that?
11:34:59 15     A   Yes.
11:34:59 16     Q   And Exhibit 78, if could you take a
11:35:23 17 look at this, please, previously marked as 78.
11:35:31 18     MR. COLLINS: Katherine.
11:35:32 19     MS. WEALL: I've got one.
11:35:36 20     Q   (By Mr. Collins) You've seen this
11:35:37 21 document before?
11:35:38 22     A   I'm sure I have. It was sent to me.
11:35:46 23     Q   Okay. Do you remember the conference
11:35:47 24 call with Lehman Brothers that's described here?

18 (Pages 66 to 69)

ef6783c8-d39a-4ca7-b0f4-84b6f348ecbd

## PAUL BROWN, JR.

Page 70

11:35:51 1    A    In general, yes, I remember having --
11:35:54 2    being on a conference call with them, yes.
11:35:57 3    Q    And then when did you last see this
11:35:59 4    document, if I may, most recently?
11:36:06 5    A    I'm not --
11:36:08 6    Q    You don't know if you looked at this
11:36:09 7    document in preparing for this deposition?  You
11:36:12 8    just don't recall?
11:36:13 9    A    No.
11:36:14 10    Q    Okay.  That's fine.  Now, there are
11:36:17 11    factors mentioned.  A general discussion was
11:36:20 12    held -- was had to determine what has affected the
11:36:23 13    price of the company's stock?
11:36:24 14    A    Uh-huh.
11:36:24 15    Q    The primary reasons by -- presented
11:36:27 16    by Brad Smith and Mark Paley concerned the
11:36:31 17    following, and then there are six items mentioned
11:36:34 18    on those two pages.  Do you see those items?
11:36:37 19    A    Uh-huh  Yes, sir.
11:36:39 20    Q    Do you have any recollection at this
11:36:41 21    great distance in time with regard to Smith and
11:36:46 22    Paley's listing of factors that caused the stock
11:36:48 23    price to go down?
11:36:51 24    A    Do I have --

Page 71

11:36:51 1    Q    I'm sorry.  Do you remember the
11:36:53 2    discussion on this conference call?
11:36:57 3    A    Not specifically, but in general
11:37:02 4    terms --
11:37:02 5    Q    Sure
11:37:02 6    A    -- yes.
11:37:13 7    Q    Do these bullet points, these six
11:37:13 8    bullet points encapsulate the points that were
11:37:13 9    raised by Smith or Paley or anybody else as to why
11:37:13 10    the price went down?
11:37:18 11    A    I think it covers what we viewed as
11:37:21 12    the issues.
11:37:25 13    Q    Okay.  Did you as of July 28th, '98,
11:37:30 14    or at a point soon after the IPO, did you yourself
11:37:34 15    have any -- have your own views as to what had
11:37:39 16    caused the price to go down from the IPO price?
11:37:45 17    A    Me, just myself?
11:37:46 18    Q    Yes.
11:37:49 19    A    Yeah.  I -- I felt it was kind of
11:37:52 20    these issues, just the general state of the
11:37:59 21    business, the business, you know, Callaway, Taylor
11:38:03 22    Made, all of them, because this -- this is
11:38:05 23    actually a month after the USGA kind of struck
11:38:11 24    fear into the manufacturers, and I think

Page 72

11:38:14 1    purchasers, too, with their Coefficient of
11:38:25 2    Restitution issue, because I think they did that
11:38:27 3    in June, and it did cause some consternation in
11:38:34 4    the industry.
11:38:34 5        And for people that were going
11:38:35 6    to go buy clubs, they were never confident that
11:38:41 7    their clubs would always be considered conforming.
11:38:46 8    And I think, too, there was the memory of the
11:38:53 9    Ping/USGA episode, that I think kind of left
11:39:00 10    scars.
11:39:00 11    Q    What was that episode, please?
11:39:02 12    A    The USGA -- I don't recall the year.
11:39:06 13    I happened to own a set of the clubs that were
11:39:08 14    involved.  The USGA called Ping to task and said:
11:39:13 15    We're not going to allow square grooves.
11:39:16 16        At the time, Ping was the
11:39:17 17    number one iron on the planet, I think, and it was
11:39:23 18    because even somebody like me could hit a Ping
11:39:27 19    iron and get the golf ball to stop on the green.
11:39:30 20    It was because of the square grooves and the size
11:39:33 21    of them and the structure, and it was technical
11:39:36 22    issues.
11:39:37 23        USGA said they weren't going
11:39:40 24    to allow that.  Ping sued, and it was -- I wasn't

Page 73

11:39:43 1    involved, but it was pretty ugly.  The settlement
11:39:48 2    was Ping -- Ping agreed not to make those kind of
11:39:51 3    grooves anymore, and the USGA agreed that
11:39:54 4    everybody that had those kind of clubs could have
11:39:57 5    them forever  They would never be outlawed.
11:39:59 6    Q    And that settlement was reached
11:40:01 7    before the IPO?
11:40:02 8    A    Oh, yes, but it was -- it was -- I
11:40:07 9    think many viewed the USGA's stance on -- now on
11:40:12 10    drivers, or any -- any club that exceeded -- and
11:40:19 11    they had not -- I don't believe they had set what
11:40:21 12    the -- what the core was going to be this time,
11:40:25 13    but I think everybody viewed it as:  Golly, here
11:40:29 14    it comes again.
11:40:30 15        And I'm thinking Callaway was
11:40:34 16    the most outspoken in that arena because Callaway
11:40:39 17    was considered an illegal driver.  It was also
11:40:42 18    split in that the RNA, which governs the rest of
11:40:46 19    the planet, did not side with the USGA, and so
11:40:58 20    people could actually play with clubs in Ireland
11:41:01 21    and England that were considered illegal in the
11:41:05 22    United States.
11:41:05 23    Q    So as I understand it, USGA actions
11:41:09 24    had an impact on the entire industry?

19  (Pages 70 to 73)

ef6783c8-d39a-4ca7-b0f4-84b6f348ecbd

PAUL BROWN, JR.

Page 74

11:41:11 1    A    I -- I think in part, yeah.
11:41:13 2    Q    Maybe more Callaway than other
11:41:20 3  companies?
11:41:21 4    A    Anybody who would have a big driver,
11:41:22 5  a high-tech driver, it would have impacted.
11:41:25 6  Different companies took different approaches. I
11:41:29 7  can't believe any of them were happy. Callaway
11:41:31 8  was more outspoken. We did not make -- at that
11:41:34 9  time, we did not make a driver. We were
11:41:40 10 developing one.
11:41:41 11   Q    Uh-huh. Now, I'm going to draw your
11:41:50 12 attention to the fifth bullet point on the second
11:41:58 13 page: Orlimar has continued to have success at
11:42:01 14 the retail level and has been aggressive in
11:42:04 15 providing incentives to retail sales personnel to
11:42:08 16 promote their club.
11:42:08 17        That was an accurate statement
11:42:10 18 as to one of the factors in causing the price to
11:42:12 19 go down at Adams? Is that your thought?
11:42:18 20   A    Yes, they were. Orlimar was very
11:42:21 21 competitive.
11:42:21 22   Q    And what's your understanding of this
11:42:23 23 reference to Orlimar being aggressive in providing
11:42:29 24 incentives to retail sales personnel, what were

Page 75

11:42:31 1  they doing?
11:42:33 2    A    I don't know if they were actually
11:42:36 3  providing spiffs, which means something --
11:42:41 4  basically the salesman gets $10, $20, $50, gets
11:42:45 5  something, the salesman gets it.
11:42:48 6    Q    Uh-huh. They were doing something
11:42:55 7  like that, something to increase the amount of
11:42:58 8  money that went into the salesperson's pocket?
11:43:02 9    A    Sure, yes.
11:43:19 10   Q    When the conference call was taking
11:43:21 11 place that's described in this memo, was there any
11:43:24 12 disagreement or dissent as to whether the six
11:43:27 13 listed factors were the reason for the price
11:43:37 14 decline?
11:43:37 15   A    I don't recall any.
11:43:39 16   Q    And then, apparently, this memo was
11:43:41 17 sent to the board of directors. Is that your
11:43:43 18 understanding?
11:43:44 19   A    Uh-huh. Yes.
11:43:44 20   Q    Did any member of the board of
11:43:46 21 directors, to your understanding, express a
11:43:49 22 contrary view to the issue of what caused the
11:43:53 23 price to go down?
11:43:54 24   A    Not that I recall, no.

Page 76

11:43:57 1    Q    Okay. Now, was Mr. Patchin on the
11:44:17 2  pricing committee?
11:44:18 3    A    No, I don't believe so.
11:44:19 4    Q    Did you -- you consult, I'm sure,
11:44:24 5  constantly with Mr. Patchin regarding Royal's
11:44:29 6  business, correct?
11:44:29 7    A    As -- as necessary, sure.
11:44:32 8    Q    He is chairman of the board of Royal;
11:44:34 9  is that correct?
11:44:35 10   A    Yes, he is.
11:44:36 11   Q    And you're chief financial officer?
11:44:38 12   A    Yes, I am.
11:44:39 13   Q    And each of you has held those
11:44:41 14 positions since 1998?
11:44:47 15   A    Probably it's 1994. That's when --
11:44:50 16   Q    Okay.
11:44:50 17   A    That's when we reorganized Royal.
11:44:59 18   Q    Did you discuss with Mr. Patchin
11:45:07 19 Adams Golf's business in 1998?
11:45:08 20   A    I'm sure I did. Sure.
11:45:10 21   Q    Did you have those discussions out --
11:45:12 22 outside the context of an Adams Golf board
11:45:23 23 meeting?
11:45:23 24   A    I'm sure we did.

Page 77

11:45:26 1    Q    Did Mr. Patchin express to you any
11:45:29 2  view soon after the IPO as to why the stock price
11:45:32 3  was falling?
11:45:38 4    A    I don't recall specific discussion
11:45:41 5  about that, other than beyond just the general
11:45:49 6  things we knew about that were going on in the
11:45:53 7  industry.
11:45:53 8    Q    Which you have described in your
11:45:54 9  testimony?
11:45:56 10   A    Yes.
11:46:01 11   Q    Now, were you in touch yourself with
11:46:04 12 the underwriters or any of the analysts who worked
11:46:08 13 for the underwriting firms?
11:46:11 14   A    Me -- me personally?
11:46:13 15   Q    Yes.
11:46:13 16   A    One on one?
11:46:14 17   Q    Yes.
11:46:18 18   A    No.
11:46:18 19   Q    Was Mr. Patchin, to your knowledge?
11:46:23 20   A    Not to my knowledge.
11:46:24 21   Q    Did Mr. Patchin ever receive drafts
11:46:27 22 of analyst reports, to your knowledge?
11:46:30 23   A    I have no idea.
11:46:34 24   Q    Did Mr. Patchin discuss with you --

20  (Pages 74 to 77)

PAUL BROWN, JR.

| Page 78 |
|---|

11:46:38 1  let me start again.

11:46:40 2          To your knowledge, did Royal

11:46:42 3  or anyone at Royal consider selling Adams Golf

11:46:48 4  stock post IPO?

11:46:52 5      A    You mean selling shares out of what

11:46:54 6  we currently hold now?

11:46:56 7      Q    Yes. Had there been any

11:46:59 8  consideration since the IPO?

11:47:05 9      A    Nothing specific. We -- we're a

11:47:11 10 business, so we -- we look at everything --

11:47:13 11     Q    Sure.

11:47:14 12     A    -- we do, and --

11:47:17 13     Q    Royal didn't consider selling at

11:47:19 14 least some of its holdings in Adams Golf as the

11:47:22 15 price declined after the IPO?

11:47:25 16     A    Oh, no.

11:47:25 17     Q    Do you know why not?

11:47:32 18     A    This may sound stupid, but it just

11:47:34 19 never occurred to us --

11:47:36 20     Q    Okay.

11:47:36 21     A    -- that we would do that. We were a

11:47:40 22 major -- I mean, we were a major shareholder,

11:47:45 23 you know, as I said, we -- we supported -- and we

11:47:49 24 supported the IPO to build the company, and the

| Page 79 |
|---|

11:47:53 1  fact that we were able to sell some, that was nice

11:47:56 2  for us, but we would have supported the IPO,

11:47:58 3  whether we sold any shares or not.

11:48:27 4      Q    Exhibit 56, have you seen those two

11:48:59 5  pages before? Of course, you're not copied on

11:49:04 6  that. It's not addressed to you?

11:49:06 7      A    I don't think, but --

11:49:08 8      Q    Just take a moment to read it, if you

11:49:12 9  would, please.

11:49:14 10     A    (Witness complies.)

11:52:07 11     Q    Have you had a chance to read it?

11:52:10 12     A    (Witness nods.)

11:52:10 13     Q    Have you seen those two pages before?

11:52:13 14     A    I don't believe so, but it's vintage

11:52:21 15 Barney, so -- I mean, he's very -- he describes

11:52:28 16 things, sick at his stomach, things like that.

11:52:32 17 I've heard him talk that way before.

11:52:34 18     Q    Did he at any time in 1998 tell you

11:52:37 19 he was concerned that the company had made a lot

11:52:42 20 of sales that had been falsely reported as sales

11:52:45 21 and were little more than consignments?

11:52:49 22     A    I don't recall that, no.

11:52:51 23     Q    Now, is it -- as a CPA and a CFO,

11:52:55 24 that would have concerned you if he had told you

| Page 80 |
|---|

11:52:58 1  that, I presume?

11:53:00 2      A    I -- I think it would have till it

11:53:03 3  was quantified, sure. The concept is -- is

11:53:09 4  disconcerting.

11:53:10 5      Q    Sure.

11:53:11 6      A    Without specifics.

11:53:13 7      Q    Let me -- thank you.

11:53:23 8          MR. COLLINS:  Off the record

11:53:23 9  for one second.

11:53:23 10         (A recess was taken from

11:53:23 11         11:53 to 12:01.)

12:01:47 11         MR. COLLINS:  Let's go back on

12:01:48 12 the record.

12:01:48 13

12:01:49 14     Q    (By Mr. Collins) And you will be

12:01:50 15 pleased to know that I will not hound you as to

12:01:53 16 what you said over this break, only because I know

12:01:56 17 you didn't talk to your counsel over this break.

12:01:58 18         Take a look at Exhibit 56, if

12:02:00 19 you would

12:02:03 20         MS. WEALL:  Before we get into

12:02:05 21 that exhibit, I want to return to that question on

12:02:07 22 speaking to counsel. I want to make it clear on

12:02:12 23 the record that the underwriters do object to that

12:02:14 24 line of questioning. We consider it clearly

| Page 81 |
|---|

12:02:18 1  improper.

12:02:18 2          To the extent that the witness

12:02:21 3  answered in this instance, we don't consider it a

12:02:24 4  waiver of the privilege in any way, nor do we

12:02:27 5  consider that it should set precedent or will set

12:02:30 6  a precedent for future depositions, especially in

12:02:33 7  light of the fact that it's inconsistent with

12:02:35 8  positions taken at prior depositions, so that's --

12:02:38 9          MR. COLLINS:  That's fine.

12:02:39 10 And I agree. Nothing said at this deposition by

12:02:43 11 the witness constituted a waiver.

12:02:45 12     Q    (By Mr. Collins) Have you seen this

12:02:55 13 document before?

12:03:04 14     A    Yes.

12:03:04 15     Q    Did you see it in or about October

12:03:07 16 1998?

12:03:07 17     A    I'm sure.

12:03:10 18     Q    And is this -- do you understand this

12:03:13 19 to be a memo to you and other board members from

12:03:13 20 Barney Adams?

12:03:21 21     A    Uh-huh. Yes.

12:03:24 22     Q    Did you respond to this memo? Did

12:03:28 23 you talk to Barney Adams or communicate with him

12:03:30 24 about this?

21 (Pages 78 to 81)

ef6783c8-d39a-4ca7-b0f4-84b6f348ecbd

# PAUL BROWN, JR.

## Page 82

12:03:32 1    A    I'm sure eventually we did, sure.

12:03:35 2    Q    Probably at a board meeting?

12:03:37 3    A    Yes.

12:03:42 4    Q    Okay. Now, in the second paragraph,

12:03:47 5 it reads: Why is Q4 so weak? Terrible golf

12:03:52 6 market, Costco, and to a lesser degree,

12:03:56 7 competition.

12:03:57 8            And the memo goes on. Do you

12:03:59 9 see where I read from?

12:04:00 10    A    Uh-huh. Yes, sir.

12:04:00 11    Q    Do you have any reason to dispute

12:04:02 12 that as of October 1998, one reason why the fourth

12:04:08 13 quarter was weak was Costco?

12:04:12 14    A    I -- I didn't -- I didn't believe

12:04:14 15 that that was significant, actually.

12:04:19 16    Q    Okay. And did you tell anyone or

12:04:23 17 communicate to anyone at any time your belief in

12:04:25 18 that regard?

12:04:26 19    A    I don't know if I did or not.

12:04:29 20    Q    Did you believe that the terrible

12:04:31 21 golf market was a factor for the fourth quarter

12:04:37 22 being weak?

12:04:37 23    A    I believe that was part of it.

12:04:39 24    Q    And did you believe that to a lesser

## Page 83

12:04:41 1 extent, competition was a factor of the fourth

12:04:45 2 quarter being weak?

12:04:46 3    A    I think competition was a big part of

12:04:48 4 it as well.

12:04:48 5    Q    And what other factors did you

12:04:51 6 believe in October were causing the fourth quarter

12:04:54 7 to be weak, apart from those two factors?

12:04:57 8    A    I think it's -- it's -- I believe it

12:05:02 9 is weak relative to the forecast.

12:05:04 10    Q    Okay.

12:05:04 11    A    And so this -- this is trying to

12:05:09 12 explain why the actual Q4 is going to be weak

12:05:17 13 relative to the forecast.

12:05:19 14    Q    Okay.

12:05:19 15    A    And I think all these things were

12:05:24 16 going on. And so if you're going to miss your

12:05:27 17 number, you missed everything that may have had

12:05:34 18 any impact on missing your number.

12:05:36 19    Q    In your last answer, when you said

12:05:38 20 all these things were going on, did you mean

12:05:41 21 terrible golf market, Costco, and to a lesser

12:05:44 22 degree, competition?

12:05:45 23    A    But I wouldn't say to a lesser

12:05:47 24 degree. I would say that the competition was

## Page 84

12:05:50 1 right there.

12:05:51 2    Q    Okay.

12:05:51 3    A    Because by then, the -- you know,

12:05:55 4 the -- the Tight Lies concept, the thin-faced,

12:06:01 5 shallow-faced fairway wood, was obviously here to

12:06:07 6 stay, and so others were busy making theirs.

12:06:16 7            Orlimar was first out of the

12:06:18 8 box, but Callaway, Taylor Made, Titleist, those

12:06:23 9 guys were all there, and I'm not sure exactly when

12:06:26 10 they introduced their products, but they wouldn't

12:06:29 11 have -- it would have been -- I mean, this -- the

12:06:33 12 Tight Lies was two years old at this point,

12:06:43 13 approximately.

12:06:43 14    Q    Did anybody express to you on the

12:06:48 15 board, in management that they agreed with you,

12:06:55 16 that Costco was not a major component of the

12:06:59 17 weakness for the fourth quarter?

12:07:04 18    A    Anyone on the board?

12:07:05 19    Q    Anyone on the board, sure.

12:07:09 20    A    Anyone? I would think Steve agreed

12:07:18 21 that it -- because again, the clubs were sold.

12:07:25 22 The club Costco was selling, Adams had sold and

12:07:32 23 gotten paid for.

12:07:33 24    Q    Sure.

## Page 85

12:07:33 1    A    The -- the issue here was, I would

12:07:39 2 think, was going to become market share, and as

12:07:43 3 more people -- I'm not even sure that there was a

12:07:46 4 fairway wood category at this time in terms of

12:07:52 5 keeping track of who sells what. There's

12:07:58 6 companies out there that do that, Datatech, and

12:08:02 7 those guys, and I think there was just a woods

12:08:05 8 category, actually.

12:08:07 9    Q    So what's the significance of that?

12:08:09 10    A    Well, that there -- when you look

12:08:11 11 at -- when you look at what's going on, that

12:08:15 12 the -- the category of fairway wood just as right

12:08:21 13 now, the category of i-Wood is -- is just coming

12:08:28 14 into its own, that, you know, prior to -- prior to

12:08:33 15 this period of time, fairway woods weren't

12:08:37 16 considered to be such a big deal. They were just

12:08:40 17 woods. Everything was woods.

12:08:41 18            And now there were -- you

12:08:44 19 know, Callaway had one, Taylor Made had one, we

12:08:48 20 had one, and Orlimar had one, and so they became a

12:08:57 21 separate -- a separate item to keep track of.

12:09:05 22            And that's how we actually got

12:09:05 23 better able to keep track of our market share, is

12:09:05 24 because fairway woods were -- were singled out.

22 (Pages 82 to 85)

ef6783c8-d39a-4ca7-b0f4-84b6f348ecbd

CONNER

## FINIS F. CONNER

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

* * *


IN RE ADAMS GOLF, INC.          :  CONSOLIDATED
                                :
SECURITIES LITIGATION           :  C.A. No. 99-371 KAJ


DEPOSITION OF FINIS F. CONNER


The following deposition was given on the 9th

day of May, 2006, commencing at the hour of 9:24 a.m.,

before Anne M. Hall, a Certified Shorthand Reporter,

License Number 4942.

The witness personally appeared at The

Monterey Marriott, 350 Calle Principal, Santa Barbara

Conference Room, Monterey, California.

* * *


RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA 19103

(215) 241-1000     (888) 777-6690

c5f1b96a-de6b-41d2-ba56-db7a5459ba19

FINIS F. CONNER

Page 10

1    A.  Probably in the time frame of 2001 and closed
2    in 2005.
3    Q.  Okay.  And did you have a title at that
4    company?
5    A.  Chairman and CEO.
6    Q.  Mr. Conner, are you presently a member of the
7    board of Adams Golf?
8    A.  No.
9    Q.  Can you tell me what years you were a board
10   member there?
11   A.  October of 1996 and I resigned in February of
12   '99.
13   Q.  Have you been a -- other than the companies
14   that are listed here in which you were an officer, have
15   you been a board member of any other companies besides
16   Adams Golf?
17   A.  No.
18   Q.  Okay.  How did you first become involved with
19   Adams Golf, do you recall?
20   A.  I was introduced to Adams by Mr. Roland
21   Casati.
22   Q.  Mr. Casati, what is his position with Adams
23   Golf or his relationship to Adams Golf at the time he
24   introduced you to the company?

Page 11

1    A.  I don't know.
2    Q.  When you say introduced you to the company,
3    can you describe for me what you mean by that?
4    A.  He had invested some money and suggested that
5    I consider it as an investment.
6    Q.  And did you invest in the company at that
7    time?
8    A.  I don't know what time it was, but I did
9    invest in the company, yes.
10   Q.  I'm sorry.  That was going to be my next
11   question.  Do you remember when this was?
12   A.  Not particularly.  I don't recall the exact
13   date.
14   Q.  Sometime before October 1996, though?
15   A.  Obviously.
16   Q.  Okay.  Do you remember how you proceeded from
17   that initial conversation or introduction to the company
18   to becoming a board member of the company?
19   A.  I discussed the possible investment with
20   Mr. Adams, and one of the requirements would be for my
21   participation at the board level.
22   Q.  And so am I understanding you correctly that
23   in order -- one of your requirements for investing was
24   that you also become a member of the board, is that

Page 12

1    correct?
2    A.  Correct.
3    Q.  Okay.  And so, eventually, you became a member
4    of the board as a result of that conversation.  Did you
5    also invest in the company at that time?
6    A.  I did not become a member of the board as a
7    result of that conversation, but as a result of making a
8    subsequent investment.
9    Q.  Okay.  Do you recall when that was when you
10   made your investment?
11   A.  No.
12   Q.  Other than the things that you've told me,
13   were there any other conversations or steps involved to
14   your becoming a board member?
15   A.  Not to my recollection.
16   Q.  Okay.  While you were on the Adams Golf board,
17   did you serve on any committees, board committees?
18   A.  I don't recall.
19   Q.  Did you serve on a committee called the
20   pricing committee at one time?
21   A.  Yes.
22   Q.  What were the responsibilities of that
23   committee?
24   A.  It was to participate in discussions with the

Page 13

1    underwriters in establishing pricing for the stock, if
2    in fact we were to go forward with a public offering.
3    Q.  I'm sorry.  Let me back up a little bit.
4        Do you remember what your initial investment
5    in the company was?
6    A.  I believe it was a million dollars.
7    Q.  Okay.  Do you remember what percentage of
8    ownership you had in the company at that time?
9    A.  No.
10   Q.  You remember the pricing committee.  Do you
11   recall whether there were any other committees that you
12   served on on the Adams Golf board while you were a
13   member?
14   A.  I don't recall.
15   Q.  Now, I'm going to ask you some questions about
16   the exhibit, the prospectus that I put in front of you,
17   so if you can take a moment to review it.
18       My questions are going to be fairly general,
19   except I'll tell you that I will ask you some questions
20   about the risk section of that, which I believe is on
21   page six.
22   A.  What page?
23   Q.  The risk factors on page six.  The other
24   questions I'm going to ask you are just general.

4  (Pages 10 to 13)

FINIS F. CONNER

Page 14

1  But I do want to give you time to look at it
2  and once you've had a chance to do that, let me know and
3  I'll ask you whether you recognize the document.
4  A.  Okay.
5  Q.  Do you recognize that document?
6  A.  Yes.
7  Q.  Can you tell us what it is for the record?
8  A.  It is a copy of the terms put into the
9  prospectus of -- in an effort of marketing the stock.
10  Q.  The Adams Golf stock?
11  A.  Right.
12  Q.  And do you remember reviewing that document
13  prior to its issuance?
14  A.  I remembered that I reviewed it.  I don't
15  remember when.
16  (Deposition Exhibit Number 73 marked
17  for identification.)
18  BY MS. DESPER:
19  Q.  Okay.  I'm also going to hand you what's been
20  marked as Exhibit Number 73, and I would like you to
21  take a look at that and let me know if you can identify
22  it.
23  The questions that I would ask you on this
24  document really are going to just be related to page

Page 15

1  three, which is the signature page.
2  But take your time to review the whole
3  document.
4  A.  Okay.
5  Q.  All right.  Do you recognize this document and
6  can you identify it for the record, please?
7  A.  It's identified as a Securities and Exchange
8  Commission form S-1 for Adams Golf.
9  Q.  Okay.  Other than just reviewing it since
10  we've been sitting here today, do you remember seeing
11  that document before?
12  A.  I don't recall.
13  Q.  Could you turn to page three of the document?
14  In the middle of that page towards the bottom
15  there is an electronic signature page with your name on
16  it.
17  Do you recall signing or authorizing your name
18  to be signed on a registration, this registration form
19  or one substantially similar to it that was filed with
20  the SEC?
21  A.  Yes.
22  Q.  Did you review the registration statement that
23  was filed with the SEC before it was submitted to the
24  SEC?

Page 16

1  A.  Yes.
2  Q.  Okay.  Now, with respect to both the
3  registration statement and the prospectus, did you
4  review those prior to their submission to the SEC?
5  A.  Yes.
6  Q.  Did you believe that they were accurate when
7  they were submitted?
8  A.  Yes.
9  Q.  Did you, yourself, perform any steps, and I'm
10  asking for you personally, did you personally perform
11  any steps to assure yourself that they were accurate?
12  A.  Yes.
13  Q.  Can you tell me what you did?
14  A.  There were discussions with management on the
15  contents and review of the market and different
16  information contained in this and reviewed by
17  management.
18  There was additional discussions with members
19  of the board in comparing our thoughts and in trying to
20  get a complete and accurate understanding of what was
21  contained in that.  So yes, those are the types of
22  discussions that I had and would normally have in these
23  kind of operations.
24  Q.  When you say management, are there specific

Page 17

1  individuals that to whom -- that you're referring to?
2  A.  Particularly, Barney Adams and -- particularly
3  Barney Adams.
4  Q.  And when you refer to members of the board,
5  were there particular members of the board with whom you
6  discussed this?
7  A.  I would -- I don't recall the particular
8  meetings.
9  Q.  Do you recall whether it was all of the board
10  members or just some of the board members?
11  A.  Well, all the board members had discussions in
12  the forum of a board meeting.
13  Q.  Okay.  And other than the discussions that
14  you've just described to me, were there any other steps
15  that you personally conducted to assure the accuracy of
16  these documents?
17  A.  I don't recall.
18  Q.  Okay.  Were there any -- when you had
19  conversations with Barney Adams, would you say that you
20  were relying on his -- on information that he provided
21  you in determining that these documents were accurate?
22  A.  Yes.
23  Q.  Were there any others besides Barney Adams,
24  and let's start with inside the company, who provided

5  (Pages 14 to 17)

c5f1b96a-de6b-41d2-ba56-db7a5459ba19

FINIS F. CONNER

Page 18

1  information to you on which you relied in determining
2  that these documents were accurate?
3      A.  From time to time, the financial officer of
4  the company, as well as -- you're saying inside the
5  company?  Yeah.
6      Q.  Okay.  And then the same question outside the
7  company, were there any individuals outside of the
8  company upon whom you relied to determine that these
9  documents were accurate?
10     A.  Yes.
11     Q.  And who were they?
12     A.  Analysts in the industry that had information
13 about competitors, suppliers, such as Calloway, also the
14 underwriters in talking with them about the opportunity
15 here and getting their inputs as well.
16     Q.  Do you remember which analysts you -- let me
17 back up.  Did you speak to the analysts directly or did
18 you read things that they had prepared?
19     A.  I don't recall.
20     Q.  Okay.  Do you remember which analysts you
21 relied upon?
22     A.  No.
23     Q.  With respect to underwriters, did you speak
24 directly with underwriters in conjunction with the

Page 19

1  preparation of these documents?
2      A.  Well, as a member of the pricing committee,
3  yes, we certainly had communications with the bankers.
4      Q.  Okay.  Do you remember which bankers you spoke
5  with at which companies?
6      A.  Do you mean individuals?
7      Q.  I was going to try to ask you the easy
8  question first, so --
9          MR. BESSETTE:  Which of the banks.
10 BY MS. DESPER:
11     Q.  Which banks did you speak with?
12     A.  Both, two lead banks that were providing this
13 funding.
14     Q.  Do you recall their names?
15     A.  I believe they're listed on the front of the
16 prospectus here.  Yes.  It was National Bank Montgomery
17 and Lehman Brothers.
18     Q.  Okay.  Any others that you recall?
19     A.  Not to my recollection.
20     Q.  Now, do you remember the names of any
21 individuals at Lehman Brothers with whom you spoke?
22     A.  I don't recall.
23     Q.  And then -- I'm going to get the name wrong.
24 With the other underwriter, was it National --

Page 20

1          MR. BESSETTE:  I think it was Nationsbanc
2  Montgomery Securities.
3  BY MS. DESPER:
4      Q.  Nationsbanc?
5      A.  Right.
6      Q.  Do you remember any of the individuals at
7  Nationsbanc with whom you spoke?
8      A.  No.
9      Q.  Other than those we've already named, were
10 there any other individuals or companies that you recall
11 speaking to about the -- about these documents before
12 they were filed?
13     A.  No.
14     Q.  Okay.  Were there any other steps that I
15 haven't asked you about that you recall performing and
16 prior -- to assure that these documents were accurate
17 before they were filed?
18         MR. BESSETTE:  I'm sorry.  Any additional
19 steps?
20 BY MS. DESPER:
21     Q.  Any additional steps that we haven't already
22 discussed?
23     A.  I don't recall.
24     Q.  Okay.  Now, let's turn to the page 6 of

Page 21

1  Exhibit 72, which is the page that contains the risk
2  factors.
3          Do you recall reviewing this particular
4  section of the prospectus before it was issued?
5      A.  No.
6      Q.  Do you remember having any discussion
7  regarding what would or would not be included in this
8  section before it was filed with the SEC?
9      A.  No.
10         MR. BESSETTE:  I'm sorry.  Can I have that
11 last question and answer read back?
12         (Record read as requested.)
13         MR. BESSETTE:  You know what she's talking
14 about, the risk factors?
15         THE WITNESS:  Maybe I'm missing something.
16 Repeat it for me, please.
17         MS. DESPER:  Would you read it back, please?
18         (Record read as requested.)
19 BY MS. DESPER:
20     Q.  Your answer can be your answer.
21     A.  That's still my answer.
22     Q.  Okay.  That's your answer.
23         Okay.  Do you recall one way or the -- sorry.
24 Let me just clarify, when you say you don't recall, do

6  (Pages 18 to 21)

FINIS F. CONNER

Page 22

1  you know for a fact whether you were involved in
2  discussions about this or not or you just don't remember
3  either way?
4      A.  I believe what you asked me, did I participate
5  in preparing this, that's what I understood you to say.
6      Q.  Okay.
7          MR. BESSETTE:  See, I think --
8  BY MS. DESPER:
9      Q.  Let me ask a slightly different question,
10  because you are being very precise.  You're doing a good
11  job of answering the question I ask.
12         Did you participate in any discussion about
13  what risk factors would be included in the prospectus?
14     A.  I don't recall.
15     Q.  Okay.  Do you know whether anyone at the
16  company considered including gray marketing as a risk
17  factor in this prospectus?
18     A.  No.
19     Q.  Did anyone ever discuss with you what risk
20  factors should or should not be included in this
21  prospectus?
22     A.  No.
23     Q.  Okay.  Do you recall how much time was spent
24  on preparing the IPO documents?

Page 23

1      A.  No.
2      Q.  Do you recall how much time -- let me try to
3  ask you a question I think you'll know.
4          Do you remember how much time elapsed from the
5  point at which you first heard about the IPO and the
6  time that the issuance actually occurred?
7      A.  No.
8      Q.  Okay.  Have you been involved in other IPOs
9  besides this particular one?
10     A.  Yes.
11     Q.  In comparison to the others with which you
12  have experience, was the process here as you recall
13  longer or shorter than those others?
14     A.  I don't recall.
15     Q.  Okay.  Did you play any role in selecting the
16  underwriters for this Adams Golf IPO?
17     A.  Other than providing my input to the board and
18  to Barney Adams, my experience with these bankers.
19     Q.  Can you explain what you mean by that?
20     A.  I have had previous experience with both
21  Lehman and Montgomery in previous IPO situations.  And
22  my recommendation to the board and to management that
23  they were the top tier people to participate.
24     Q.  Okay.  And when you talk about prior IPOs, are

Page 24

1  there specific IPOs that you're referring to during
2  which you had experience with these two companies?
3      A.  Yes.
4      Q.  Can you tell me what they are?
5      A.  Conner Peripheral predominantly.  Excuse me.
6      Q.  Okay.
7          MR. BESSETTE:  Do you need some --
8          THE WITNESS:  Another cup of coffee.
9          MS. DESPER:  I'm going to mark this as
10  Exhibit 74.  This is one of the underwriter documents.
11  And the questions I have are only from the first part.
12         But what I thought I would do, because of the
13  way we're handling exhibits, is mark the entire thing in
14  case it's going to be used in another deposition.
15         So can you mark that please?
16             (Deposition Exhibit Number 74 marked
17             for identification.)
18  BY MS. DESPER:
19     Q.  Okay.  Mr. Conner, I'm going to hand you
20  what's been marked as Exhibit 74.  It's a fairly long
21  exhibit.  But the only questions that I want to ask you
22  are on the page that's been marked with Bates number
23  UND06028, which is titled the Lehman Brothers
24  relationship.

Page 25

1          It's right in the front.
2      A.  Okay.
3      Q.  It's page three of the first document.
4      A.  I have it.
5      Q.  Okay.  And can you just read through that
6  paragraph and then tell me when you've finished?
7      A.  Which paragraph?
8      Q.  The paragraph that's marked C, Lehman
9  Brothers' relationship.
10     A.  Yes.
11     Q.  Okay.  I'll just state for the record that
12  this is a document that's titled confidential, Lehman
13  Brothers memorandum.  And it is Bates number UND06024
14  through 06044.
15         Mr. Conner, this paragraph has a description
16  from Lehman Brothers.  Do you think that this is an
17  accurate description of the manner in which Lehman
18  Brothers was introduced to Adams Golf and your
19  involvement in that?
20     A.  Yes.
21     Q.  Was there anything else?  Does this refresh
22  your recollection at all about how that occurred?  Or --
23     A.  Yes.
24     Q.  Okay.  You're hesitating I think because

7  (Pages 22 to 25)

c5f1b96a-de6b-41d2-ba56-db7a5459ba19

FINIS F. CONNER

Page 26

1  you're thinking it doesn't refresh your recollection,
2  but it's consistent with what you already remembered, is
3  that right?
4      A.  Correct.
5      Q.  Okay.  Was there anything else that you
6  haven't told me about in relation to how Adams Golf and
7  Lehman Brothers were introduced that you can remember
8  now?
9      A.  No.
10         MS. DESPER:  Okay.  Let me get my next exhibit
11  out.  Mark this as 75.
12            (Deposition Exhibit 75 marked for
13            identification.)
14  BY MS. DESPER:
15      Q.  Mr. Conner, I'm going to hand you what's been
16  marked as Exhibit 75 and give you a minute to review it
17  and let me know when you're through.
18      A.  Okay.
19      Q.  All right.  Do you recognize this document?
20      A.  I don't recall.
21      Q.  Do you know whether you've seen it before?
22      A.  I don't recall.
23      Q.  Okay.  Can you identify it for the record?
24      A.  It's entitled Adams Golf, Incorporated,

Page 27

1  minutes of the pricing committee, dated as of July 9th,
2  1998.
3      Q.  And this is the pricing committee that you
4  described earlier that you were a member of?
5      A.  Correct.
6      Q.  Do you remember attending a telephonic meeting
7  of the pricing committee on or about July 9, 1998?
8      A.  I have a question.
9      Q.  Sure.
10      A.  I don't recall the date, but I recall the
11  meeting.
12         MR. BESSETTE:  That's fine.
13  BY MS. DESPER:
14      Q.  That's fine.  Was there more than one meeting
15  of the pricing committee as you recall?
16      A.  I don't recall.
17      Q.  Okay.  But you remember at least one meeting?
18      A.  Yes.
19      Q.  Okay.  Do you remember whether you were
20  present by telephone or whether you were present in
21  person at that meeting?
22      A.  This document reflects being present by
23  telephone, which I would recall as being accurate.
24      Q.  Okay.  And the reason I wanted to clarify is

Page 28

1  to me the minutes are a little confusing because the
2  first sentence says it was a telephonic meeting, then BH
3  Adams, Paul Brown and Finis Conner.
4         Does that to your recollection, when it says
5  present in person, it means in person by telephone, is
6  that correct?
7      A.  That would be my conclusion, yes.
8      Q.  Okay.  Can you describe to me what the role of
9  the pricing committee was with respect to the IPO?
10      A.  It was primarily to interact with the bankers
11  and discuss the market conditions that would be
12  receiving the stock, and to recommend and jointly
13  negotiate with the bankers the price that we would
14  recommend to the board of directors.
15      Q.  Okay.  And you can feel free to use the
16  minutes to refresh your recollection.  Can you tell me
17  what happened at this particular meeting?
18      A.  I believe that the meeting as described here
19  was to determine the size of the offering and that is
20  the number of shares and also the recommended price that
21  would be placed on the stock to go to market.
22      Q.  What do you recall about how the price was
23  determined?
24      A.  I don't recall.

Page 29

1      Q.  Do you remember whether there was any
2  difference of opinion or any discussion about what the
3  price should be?
4      A.  No.
5      Q.  By that, do you -- is it your recollection
6  that there was no difference of opinion or you just
7  don't recall one way or the other?
8      A.  I don't recall one way or the other.
9      Q.  Okay.  Do you know why a price of $16 per
10  share was selected?
11      A.  No.  I don't recall.
12      Q.  Do you recall any discussion about the size of
13  the offering?
14      A.  I don't recall.
15      Q.  Do you know whether there was any difference
16  of opinion or discussion on what the size of the
17  offering should be?
18      A.  I don't recall.
19      Q.  Okay.  Is there anything that you remember
20  about the pricing committee discussion or decision other
21  than what's reflected in these minutes?
22      A.  No.
23      Q.  Okay.  Do you believe after reading them that
24  these minutes accurately reflect what took place at the

8  (Pages 26 to 29)

c5f1b96a-de6b-41d2-ba56-db7a5459ba19

FINIS F. CONNER

Page 30

1 meeting?
2   A. Yes.
3   Q. Is there anything that happened that you
4 recall that's not in the minutes?
5   A. I don't understand the question.
6   Q. Okay. Other than what -- you said that the
7 minutes accurately reflect the meeting. I'm just
8 wondering if you remember anything that's not reflected
9 in the minutes that happened at the meeting?
10   A. No.
11   Q. Okay.
12       MR. BESSETTE: Let's take a quick break. Just
13 a quick one.
14       MS. DESPER: Sure.
15           (Recess taken from 10:06 a.m. to
16           10:10 a.m.)
17       (Deposition Exhibit Number 76 marked
18           for identification.)
19 BY MS. DESPER:
20   Q. I'm going to hand you what's been marked as
21 exhibit number 76.
22   A. Before we do this, can I go back on something?
23 Because I'm afraid that I didn't either hear correctly
24 one of your discussions in talking about the risk

Page 31

1 factors.
2   Q. Sure.
3   A. I want to clarify a point, what I was trying
4 to institute.
5       I did not participate in the creation of these
6 risk factors, but clearly I reviewed those.
7   Q. Right.
8   A. And my background of doing at least two prior
9 public offerings, that's a very important part for me as
10 an officer and as a participant.
11   Q. Right.
12   A. So the creation of these, I didn't sit down
13 and say put that in and put this in.
14       We reviewed them as a team and I did
15 personally as an individual and contributed, and
16 particularly on being on the pricing committee, I wanted
17 to make sure that we had sufficient enough information
18 on here to make sure everything that we knew about the
19 company at that point in time had to be in here and
20 covered by these factors.
21       And when you brought up this issue of the gray
22 market, that was never an issue discussed at this point
23 in time when this was being created about the gray
24 markets.

Page 32

1   Q. Okay. What -- now that you've clarified, what
2 is it that you do recall about those discussions? With
3 whom did you discuss it and what factors did you
4 discuss?
5   A. I can only speak for myself as to how I manage
6 this or reviewed this. Risk factors to me are extremely
7 important.
8       And the benefit of having leading bankers who
9 have done multiple public offerings, they have been
10 through this many, many times before.
11       My own personal experience in at least two
12 public offerings, a lot of time was spent on discussing
13 risk factors and are we disclosing fully.
14       So when I reviewed them personally, I found
15 them to be more than adequate to describe to the best of
16 my knowledge what represents the company at the time of
17 an IPO. Okay?
18       And so, these factors more than cover what I
19 thought was needed to disclose to the potential buyer.
20   Q. Based on the information that you had at that
21 time?
22   A. Correct.
23   Q. Okay. You mentioned just now meeting some of
24 the team. To whom were you referring when you said

Page 33

1 that?
2   A. All board members.
3   Q. Okay. Were there any other -- any others
4 besides the board members who were involved in those
5 discussions with you when you were reviewing these risk
6 factors that were so important?
7   A. No.
8   Q. Okay. Was there any discussion with you or
9 that you're aware of about whether to include gray
10 market in -- as part of these risk factors?
11       MR. BESSETTE: At what time? I'm sorry.
12 BY MS. DESPER:
13   Q. At any time before this document was issued.
14   A. There is no discussion of that because it was
15 not an issue to us at that time as far as we were
16 concerned.
17   Q. Okay. But what I'm trying to clarify is was
18 there a discussion about it and then a decision was made
19 to leave it out or there was no discussion about it at
20 all?
21   A. I don't recall.
22   Q. Okay. Did you have any discussion with anyone
23 at that time about any comments from the SEC about
24 whether risk factors -- whether gray marketing should be

9  (Pages 30 to 33)

c5f1b96a-de6b-41d2-ba56-db7a5459ba19

## FINIS F. CONNER

Page 34

1  disclosed as a risk factor?
2      A.  No.
3      Q.  And were you aware to your knowledge, so far
4  as you knew, had any discussions like that taken place?
5          MR. BESSETTE: I'm sorry. Between who?
6  BY MS. DESPER:
7      Q.  Sorry. I asked you just now whether you
8  participated in any discussions about risk -- about gray
9  marketing being a risk factor or whether you
10  participated in any discussions with the SEC.
11         And I just also want to make sure that I
12  understand whether you are aware of whether such
13  discussions took place with anyone at the company before
14  this was issued?
15     A.  Between whom?
16     Q.  Between the SEC and anyone at the company
17  about whether gray marketing should be disclosed as a
18  risk factor before this document was issued?
19     A.  To the best of my knowledge, it was not
20  discussed because it was never an issue.
21     Q.  Okay. And what about at any time after this
22  document was issued before the offering actually took
23  place?
24     A.  Discussions with whom?

Page 35

1      Q.  Discussions -- I'll break it down a little
2  bit. But first, discussions between the SEC and anyone
3  at the company about whether gray market should be
4  disclosed as a risk factor?
5          MR. BESSETTE: I'm sorry. I thought you said
6  after the IPO. Was I --
7  BY MS. DESPER:
8      Q.  I'm sorry. I asked you about before this
9  document was issued, this prospectus was -- sorry.
10  We're on the registration statement. This was filed in
11  July. And I'm sorry. I'm confused myself. I asked a
12  bad question. So never mind.
13         Let me just start over.
14         MR. BESSETTE: Sure.
15  BY MS. DESPER:
16     Q.  I just want to confirm, so I'm not meaning to
17  repeat myself, I just want to make sure that I
18  understood you.
19         Were you aware of any discussions between the
20  SEC and anyone at the company about whether gray
21  marketing should be disclosed as a risk factor at any
22  time before the public offering?
23     A.  No.
24     Q.  Okay. Were you aware of any discussions

Page 36

1  inside the company or between individuals at the company
2  and the board or the underwriters or anyone else
3  participating in the IPO before it was issued about
4  whether gray marketing should be disclosed as a risk
5  factor?
6      A.  Gray market, the gray marketing statement --
7  well, let me see. Gray marketing was never considered
8  an issue of any, from a business standpoint, that needed
9  to be disclosed because it wasn't significant at all.
10         The only thing that I recall was the public
11  disclosure that we had filed an action against Costco to
12  stop it.
13     Q.  Okay. So, what I'm trying to confirm, though,
14  and I'm sure it's clear in your mind, it's just not
15  clear in mine, whether there was discussion about it and
16  a decision was made that it was not important or whether
17  to your knowledge the issue never even came up?
18     A.  I just don't recall.
19     Q.  Okay. I'm looking for the -- I'm going to
20  skip in time because I had one document marked since you
21  brought it up, I thought I'd mark a different document.
22         (Deposition Exhibit Number 77 marked
23                 for identification.)
24  BY MS. DESPER:

Page 37

1      Q.  I'm going to hand you what's been marked
2  Exhibit Number 77. Can you take a look at that and let
3  me know when you've finished reviewing it?
4      A.  Okay.
5      Q.  Is this -- can you identify that for the
6  record?
7      A.  It's a press release by Adams entitled Adams
8  takes legal action against Costco, June 9, 1998.
9      Q.  Is this the action you were referring to a
10  moment ago?
11     A.  Yes.
12     Q.  And did you know about this at the time the
13  press release was issued in June?
14     A.  I just -- I don't recall.
15     Q.  Okay. Do you remember whether you were aware
16  of this action prior to the issuance of the stock in the
17  IPO?
18     A.  Yes.
19     Q.  Yes, you were aware or yes --
20     A.  Yes, I saw the press release and it was before
21  the issuance of the stock.
22         MS. DESPER: I have to remember what
23  document --
24         MR. BESSETTE: 76 was the minutes. Is that

10 (Pages 34 to 37)

FINIS F. CONNER

**Page 38**

1  what you want?
2  BY MS. DESPER:
3    Q.  Yes.  Now I'm going to hand you or ask Paul to
4  hand you what's been marked as Exhibit 76 and ask you to
5  take a look at it and let me know when you're finished
6  reviewing it.
7    A.  Okay.
8    Q.  Okay.  Can you identify this document for the
9  record?
10   A.  It's titled, Minutes of the Regular Meeting of
11 the Board of Directors of Adams Golf, July 22, 1998.
12   Q.  And do you recall attending this meeting?
13   A.  Yes.
14   Q.  And other than seeing your name on the front
15 pages as one of the attendees, do you have a specific
16 recollection of the meeting?
17   A.  No.
18   Q.  Can you turn to the third page of the minutes?
19 I just had a question for you from that page.
20     In the middle of the page after the
21 resolutions, there is a statement that the board asked
22 management to furnish a summary of the corporation's
23 director and officer insurance coverage, do you recall
24 that discussion at a board meeting?

**Page 39**

1    A.  No.
2    Q.  Do you remember any requests by the board
3  regarding the corporation's D and O policy?
4    A.  No.
5        (Deposition Exhibit Number 78 marked
6        for identification.)
7  BY MS. DESPER:
8    Q.  Okay.  Mr. Conner, I would like to hand you
9  what's been marked as Exhibit 78 and ask you to review
10 that.
11     Let me know when you're finished.
12   A.  Okay.
13   Q.  Can you identify this for the record?
14   A.  This is a memo to the board of directors from
15 Barney Adams.  I don't know.  The document doesn't have
16 a date on it.  It refers to a conference call of
17 July 28th.
18   Q.  And you're listed as one of the participants
19 in that call, is that correct?
20   A.  That's correct.
21   Q.  Do you have a recollection of this particular
22 call?
23   A.  Not in detail.  I recall the call, but I don't
24 recall the detail.

**Page 40**

1    Q.  Okay.  From your own recollection, you can
2  feel free to use this document to refresh your
3  recollection.
4        What do you remember about that call and why
5  it took place?
6    A.  To the best of my recollection, it was really
7  a call to discuss with the bankers the pricing pressure
8  on our stock and a review of the industry issues that
9  were the -- that were contributing to that and trying to
10 decide how we should address it.
11   Q.  Okay.  Now that you've had a chance to review
12 these minutes, do you believe they accurately reflect
13 the discussion that took place on the call?
14   A.  Yes.
15   Q.  Were there any other factors that were
16 discussed that are not reflected in these minutes?
17   A.  Not to my recollection.
18   Q.  Are there any things listed here that you do
19 not believe were discussed on the call?
20   A.  I thought I said I thought this represented
21 the discussion.
22   Q.  Okay.  I just want to make sure I've got it
23 right.
24     Now, in the --

**Page 41**

1    A.  This, by the way, this discussion here really
2  is to address what's happening in the market, what's
3  creating the overall market pressure.  Because, we were
4  not only having problems, the entire industry was having
5  problems.  And we were trying to see what was
6  contributing to that.  There were industry reviews and
7  seeing what we could do about it.
8    Q.  Okay.  On the second page, second to the last
9  paragraph, there is a sentence that says, Finis Conner
10 emphasized that we should not accelerate new product
11 introductions unless the business opportunity warrants.
12     I haven't read the whole sentence, but I would
13 like you to read that, and I want to ask you whether you
14 remember making that statement and why?
15   A.  I don't recall.
16       (Deposition Exhibit Number 79 marked
17       for identification.)
18 BY MS. DESPER:
19   Q.  Okay.  Mr. Conner, I'm going to hand you what's
20 been marked as Exhibit 79.  I'll ask you to take a look
21 at that and let me know when you're finished reviewing
22 it.
23   A.  Okay.
24   Q.  Can you describe this document for the record?

11  (Pages 38 to 41)

c5f1b96a-de6b-41d2-ba56-db7a5459ba19

FINIS F. CONNER

## Page 42

1   A   It's a memo from -- it's a memo to the board
2   of directors from Barney Adams dated September 25th,
3   1998 referencing the third quarter results.
4   Q.   Do you recall receiving this document?
5   A   I don't recall.
6   Q.   Do you have any reason to believe you would
7   not have received it at the time?
8   A   No.
9   Q.   Okay.  I had a couple questions about this
10  document for you.  On the first page, under Section A,
11  at the end of that line, it says, serious problems were
12  found and changes were made, more are coming,
13  referencing the sales department.
14      Do you remember what problems those are that
15  are referenced there?
16  A   No, I don't recall.
17  Q.   Okay.  On the next page, in the middle of the
18  page, there is a -- sorry, the fourth paragraph, it says
19  at the same time, we need to better understand and
20  improve our budgeting process.  We made a very poor
21  business judgment recently which adversely affected
22  third quarter sales.
23      Do you recall what is meant by a very poor
24  business judgment?

## Page 43

1   A   I think that's described in the subsequent
2   paragraph.
3   Q.   All right.  And can you explain to me what
4   that discussion is about?
5      MR. BESSETTE: I'm sorry.  What's reflected
6   here --
7   BY MS. DESPER:
8   Q.   What's reflected here in these two paragraphs?
9   What is Mr. Adams talking about here?
10  A   It appears that he was over budget in a -- he
11  was over budget I guess in sales expense and trying to
12  bring the costs down.  They subsequently cut some
13  variable selling and advertising expenses, which turned
14  out to be the wrong thing to do, according to what's
15  written here.
16  Q.   Other than what you're reading there, do you
17  have any recollection about this particular incident?
18  A   No.
19  Q.   Okay.  Now, I'm sorry.  I didn't mean to make
20  you read the document.
21  A   This is a document that appears to me that
22  Barney is acknowledging and telling the board there's
23  some issues that he's dealing with, from a management
24  issue, which is a proper thing to do.

## Page 44

1   Q.   Okay.  Do you have any recollection, though,
2   other than now, reading the document as you sit here
3   today, about that particular incident?
4   A   No.
5      (Deposition Exhibit Number 80 marked
6      for identification.)
7   BY MS. DESPER:
8   Q.   I'm going to hand you what's been marked as
9   Deposition Exhibit 80 and ask you to take a look at
10  that.
11  A   Okay.
12  Q.   Can you identify this document for the record?
13  A   This is a memo from Barney Adams dated
14  October 8th, 1998 referencing the fourth quarter.
15  Q.   And your name is listed as one of the people
16  who this document is to, is that correct?
17  A   That's correct.
18  Q.   Do you remember receiving this document?
19  A   I don't recall.
20  Q.   Do you have any reason to believe you didn't
21  receive it?
22  A   No.
23  Q.   Okay.  There are a number of other people
24  listed in the to line for this document.  Are those

## Page 45

1   individuals also board members?
2   A   Yes.
3   Q.   Other than as we just read through this
4   document sitting here today, do you have any
5   recollection of receiving this information at the time,
6   on or about October '98?
7   A   Well, I recall that we were seeing an
8   acceleration of gray marketing, as you called it,
9   through Costco and getting feedback from customers that
10  it was disrupting their business.
11     And we were trying to find a solution for that
12  in conjunction with all the other marketing issues that
13  were contributing.
14     The gray market was not as big a percent of
15  the problem, I don't believe, my recollection, as the
16  rest of the economic conditions.
17  Q.   Okay.  Now, this is the first document that we
18  have seen to the board that specifically addresses the
19  Costco issue.  Do you recall receiving information from
20  the company about this issue prior to the date of this
21  document?
22     MR. BESSETTE: I know that's been asked and
23  answered.  But go ahead.
24     THE WITNESS: Yes.  And it was the press

12 (Pages 42 to 45)

c5f1b96a-de6b-41d2-ba56-db7a5459ba19

## FINIS F. CONNER

Page 46

1  release that was released identifying an action to be
2  taken against Costco prior to the IPO.
3  BY MS. DESPER:
4      Q.  Okay.  Was there, other than that one
5  document, was there anything else before this
6  October 8th document that you recall?
7      A.  Not to my recollection.  But that was never an
8  issue.  It was never an issue that warranted much
9  discussion because it was not a big part of our
10  business, at all.
11          It's -- gray marketing is part of business.
12  And what has to happen is you have to try to shut it
13  down when you can, support your customers, and that's
14  what management was doing.
15          It was not a big issue until all the other
16  economic conditions contributed to it.  That, to me, was
17  the biggest problem.
18          (Deposition Exhibit number 81 marked
19          for identification.)
20  BY MS. DESPER:
21      Q.  Okay.  I'm going to hand you what's been
22  marked as Exhibit 81.  And let me know when you've had a
23  chance to review it.
24      A.  Okay.

Page 47

1      Q.  Can you identify this for the record?
2      A.  It's titled, Minutes of a Special Meeting of
3  the Board of Directors of Adams Golf, dated October 19,
4  1998.
5      Q.  Do you remember attending this meeting in
6  October of 1998?
7      A.  It was a teleconference, telephone conference
8  meeting.
9      Q.  Do you recall attending it by telephone?
10     A.  Yes.
11     Q.  Other than what's written in this document, do
12  you have a specific recollection of what transpired at
13  the meeting?
14     A.  No.
15     Q.  Okay.  Do you have so far as you recall, does
16  this document accurately reflect what transpired at the
17  meeting?
18     A.  Yes.
19     Q.  Okay.  I just had a couple questions for you,
20  one on the second page, the first line of the second
21  page refers to management working with legal counsel to
22  determine what actions may be taken to prevent
23  authorized retailers from diverting product to Costco.
24          Do you recall discussion on what actions at

Page 48

1  that point might be taken?
2      A.  I don't recall that.
3      Q.  Okay.  And then on the last page there is a
4  sentence at the end of the first paragraph there that
5  the board recommended that outside counsel be included
6  in the teleconference scripting rehearsal, do you recall
7  that discussion?
8      A.  Where do you see that?
9      Q.  The top of the page, the first -- last line of
10  the first paragraph on the third page?
11     A.  Okay.  I see it.
12     Q.  Do you recall that discussion?
13     A.  No.
14     Q.  Okay.  We're through with that one, then.
15          (Deposition Exhibit number 82 marked
16          for identification.)
17  BY MS. DESPER:
18     Q.  Okay.  I'm going to hand you what's been
19  marked as Exhibit 82 and give you a moment to review it.
20          Let me know when you're finished -- you know
21  what?  I'm sorry.  Can I take those back?  There is a
22  document stapled to the second page that shouldn't be
23  there.  Sorry.
24          I'll try to be a little more careful with the

Page 49

1  exhibit.
2          Okay.  That's the one Mr. Conner should have.
3  That's the original I think.
4      A.  Okay.
5      Q.  Can you identify this document for the record,
6  please?
7      A.  It's titled -- it's a press release from
8  Adams, Adams Golf, identifying the source of gray market
9  supply.
10     Q.  Do you remember reading or knowing about the
11  information contained in this document at the time it
12  was issued?
13     A.  No.  I was off the board of directors by then.
14     Q.  Okay.  So, would you know who the source that
15  is identified in this document is?
16     A.  No.
17     Q.  Okay.  And I know you told me this earlier,
18  but when did you go off the Adams Golf board?
19     A.  I believe it was February 3rd or 4th,
20  something like that.  Early February 1999.
21     Q.  And why?
22     A.  It was my decision to leave the company
23  because I didn't believe I could be effective anymore.
24     Q.  And why was that?

13  (Pages 46 to 49)

c5f1b96a-de6b-41d2-ba56-db7a5459ba19

FINIS F. CONNER

Page 50

1    A. It was really that my participation at the
2  board level was such that I didn't feel that I could
3  contribute effectively to the company going forward and
4  decided to remove myself from the board.
5    Q. And why did you feel you couldn't participate
6  effectively?
7    A. The -- I don't recall specifics, but I knew
8  that I was not comfortable being on the board and I
9  wanted to remove myself, and Barney and I both agreed
10  that it was the right time to do so.
11    Q. Were the reasons issues within the company, or
12  for reasons that had nothing to do with the company?
13    A. It had -- it was management style more than
14  anything else between Barney and I, and I had other
15  things I was beginning to do and I needed more time.
16    Q. Okay. And when you say management style
17  between you and Barney, what do you mean by that?
18    A. Difference of opinion on how we would run a
19  business. Since I'm a businessman I was giving input
20  and he would run it his way and I would do it
21  differently. And at a time that members cannot serve
22  the board and shareholders properly, then I think it's
23  time to make a separation.
24    Q. How would you describe the differences in your

Page 51

1  management style?
2    A. I don't recall that. That's been seven, eight
3  years ago now, so I don't recall what the specifics were
4  about it.
5    Q. Okay. Were there any other factors in your
6  decision to resign from the board?
7    A. No.
8      MS. DESPER: I have no further questions.
9      THE WITNESS: Well, good.
10      MR. BESSETTE: Are you kidding?
11      MS. DESPER: That was it.
12      (Discussion off the record.)
13      (Recess taken from 10:49 a.m. to
14      10:58 a.m.)
15        EXAMINATION
16  BY MR. BESSETTE:
17    Q. All right. Just a couple of quick clean-up
18  questions.
19      Mr. Conner, is it your testimony that the
20  statements in the prospectus and registration statement
21  that counsel was showing you today were true and
22  accurate at the time you signed them?
23    A. Yes.
24    Q. Would you describe for us what you did to give

Page 52

1  yourself a reasonable basis to believe that the
2  statements were true and accurate at the time you signed
3  the registration statement and prospectus?
4    A. The comfort I -- that I gained out of -- let
5  me start over.
6      To gain comfort that the numbers and all the
7  information that was being presented to me was accurate,
8  we had several surrounding entities that were certifying
9  and authenticating information. We had attorneys. We
10  had auditors. We had bankers. We had a lot of
11  independent support there.
12      And certainly, I felt very comfortable that
13  the information and the accuracy of the numbers
14  presented to me being audited by the auditors was
15  accurate.
16      In talking with the bankers and my own
17  experience in the past of working on at least two major
18  IPOs it was historically, having a bank like Montgomery
19  and like Lehman to be your lead bankers, the benefit of
20  that is the resources they can supply to do the due
21  diligence, to do the research, to do the competitive
22  analysis, to do all those things.
23      And clearly, I gained comfort in having them
24  be my partner to do that.

Page 53

1      So, in looking at the risk assessment, which
2  is or risk factors, I've always thought that area
3  should -- that area should disclose any and all things
4  that are possibly known at that time that could be an
5  issue.
6      And in particular, my background relative to
7  gray market, I have found that the gray market issue is
8  mostly done to accommodate some retail house who is
9  trying to use a loss leader, and so they go buy excess
10  inventory from people and low ball the price to get
11  people in the store. That was never an issue as far as
12  I was concerned relative to Adams.
13      It's my belief that all the risk factors that
14  were outlined covered every known possible scenario that
15  we had, and basically alerted the buyer of the stock to
16  be careful because we don't know all things. We didn't
17  know the conditions that the market would change. We
18  don't know all those kind of situations.
19      So, I wanted to make sure that the risk
20  factors did cover that and it was my belief that it
21  covered all those unknown kind of circumstances.
22      MR. BESSETTE: Okay. I have no further
23  questions. All right.
24      MS. DESPER: All right. That's it.

14  (Pages 50 to 53)

c5f1b96a-de6b-41d2-ba56-db7a5459ba19

## FINIS F. CONNER

Page 54

1    THE REPORTER: Do you want a copy?
2    MR. BESSETTE: Yes. I don't know what details
3  you all work out.
4         (Whereupon, the deposition concluded
5         at 11:02 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 55

1    I, FINIS F. CONNER, have read my statement
2  consisting of the preceding 54 pages, taken on May 9,
3  2006, and I certify that:
4
5    (Check one.)
6  _____ I have no corrections.
7
8    _____ I have corrections as reflected on the
9  attached errata sheet and I now approve my statement as
10  true and correct.
11
12    Dated this _____ day of _____, _____
13
14
15
16    _____
17    FINIS F. CONNER
18
19
20
21
22
23
24

Page 56

1  STATE OF CALIFORNIA )
2                      )Ss
3  COUNTY OF MONTEREY )
4         The witness in the foregoing deposition
5  appeared before me, ANNE M. HALL, a Certified Shorthand
6  Reporter for the State of California.
7         Said witness then and there at the time and
8  place previously stated testified under penalty of
9  perjury given on said day.
10        The testimony of the witness and all the
11  questions and remarks requested by counsel were taken by
12  me in shorthand at the time and place therein named and
13  thereafter, under my direction, transcribed into
14  longhand.
15        I further certify that I am not of counsel or
16  attorney for either or any of the parties to said
17  deposition, nor in any way interested in the outcome of
18  the cause named in said caption and that I am not
19  related to any party thereto.
20        IN WITNESS WHEREOF, I have hereunto set my
21  hand this _____ of _____ 2006.
22
23
   _____
24    CERTIFIED SHORTHAND REPORTER
      FOR THE STATE OF CALIFORNIA

15  (Pages 54 to 56)

c5f1b96a-de6b-41d2-ba56-db7a5459ba19