FRAZIER

IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3    - - - - - - - - - - - - - - - - - - - - - -

4    IN RE:   ADAMS GOLF,      CA. NO.

5    INCORPORATED              99-371-KAJ

6

7    SECURITIES LITIGATION

8    - - - - - - - - - - - - - - - - - - - - - -

9              Wednesday, August 9, 2006

10

11        Oral deposition of GARY L. FRAZIER,

12   was taken pursuant to Notice, at the

ɜ    offices of SIMPSON THACHER & BARTLETT LLP,

14   425 Lexington Avenue, New York, NY

15   10017-3954 on the above date before

16   DEBRA G. JOHNSON-SPALLONE, CSR, RPR,

17   Notary Public, and a Federally Approved

18   Reporter of the United States District

19   Court commencing at or about 10:40 a.m.

20

21        RSA/VERITEXT COURT REPORTING COMPANY

22        1845 Walnut Street, 15th Floor

23            Philadelphia, PA   19103

          (215) 241-1000   (888) 777-6690

Page 2

1  A P P E A R A N C E S:
2
3
4     BERGER & MONTAGUE, P.C.
      BY: TODD S. COLLINS, ESQUIRE
5     1622 Locust Street
      Philadelphia, PA 19103-6305
6     (215) 875-3000
      tcollins@bm.net
7     Representing the Plaintiffs
8
9     LAW OFFICES OF DONALD B. LEWIS
      BY: DONALD B. LEWIS, ESQUIRE
10    5 Cynwyd Road
      Bala Cynwyd, PA 19004
11    (610) 668-0331
      Representing the Plaintiffs
12
13
      SIMPSON THACHER & BARTLETT LLP
14    BY: PAUL C. GLUCKOW, ESQUIRE
         RYAN ANTHONY KANE, ESQUIRE
15    425 Lexington Avenue
      New York, NY 10017-3954
16    (212) 455-3056
      pgluckow@stblaw.com
17    Representing the Underwriter
      Defendant
18
19
      AKIN GUMP STRAUSS HAUER & FELD,
20    LLP
      BY: LAURA MORIATY, ESQUIRE
21    300 West 6th Street
      Suite 2100
22    Austin, TX 78701-3911
      (512) 499-6200
23    lmoriaty@akingump.com
      Representing the Defendant, Adams
24    Golf, Incorporated

Page 3

1           I N D E X
2           - - - - -
3
4  TESTIMONY OF:   GARY L. FRAZIER
5  By Mr. Collins. ............    4
6
7
8           - - - - -
9         E X H I B I T S
10          - - - - - -
11 EXHIBIT              PAGE
12 NUMBER     DESCRIPTION   MARKED
13          - - - - - - -
14 Exhibit-331  Rebuttal Expert Report of
15        Gary L. Frazier      4
16
17 Exhibit-332  Production Documents  129
18
19 Exhibit-333  Timeline of Events   131
20
21
22
23
24

Page 4

1        - - -
2        (It is stipulated and
3     agreed by and between
4     counsel that sealing and
5     certification of the within
6     deposition be waived; and
7     that all objections, except
8     as to the form of the
9     question, be reserved until
10    the time of trial.)
11       - - - -
12    GARY L. FRAZIER, after
13    having been first duly sworn
14    as a witness, testified as
15    follows:
16       - - - -
17    (Whereupon the
18    document was marked, for
19    identification purposes, as
20    Exhibit Number 331.)
21       - - -
22    EXAMINATION
23       - - -
24 BY MR. COLLINS:

Page 5

1     Q. Professor, thank you for        10:34:55AM
2  coming.                              10:34:57AM
3     A. Okay.                          10:34:57AM
4     Q. You have been deposed in        10:34:58AM
5  other litigation --                  10:35:00AM
6     A. Yes.                           10:35:00AM
7     Q. — correct?                     10:35:00AM
8     A. Correct.                       10:35:01AM
9     Q. And, in fact, you have given    10:35:01AM
10 testimony both at deposition and otherwise   10:35:04AM
11 on a number of occasions; right?       10:35:06AM
12    A. That's correct.               10:35:08AM
13    Q. Have you ever testified at     10:35:08AM
14 trial?                               10:35:09AM
15    A. Yes.                           10:35:09AM
16    Q. You have also written          10:35:10AM
17 exclusively also?                    10:35:13AM
18    A. To some degree.               10:35:15AM
19    Q. When did somebody first        10:35:16AM
20 contact you with regard to this       10:35:21AM
21 litigation?                          10:35:23AM
22    A. July 17th of this year.       10:35:23AM
23    Q. And who was that?             10:35:26AM
24    A. Adele Tooki at Cornerstone    10:35:29AM

2 (Pages 2 to 5)

Page 298

| | | |
|---|---|---|
| 1 | Well, let us do this. | 03:26:04PM |
| 2 | MR. GLUCKOW: We have a | 03:26:05PM |
| 3 | copy coming, but it's not | 03:26:06PM |
| 4 | here yet. | 03:26:08PM |
| 5 | MR. COLLINS: That's | 03:26:08PM |
| 6 | fine. Let's do this. | 03:26:09PM |
| 7 | Let's keep going with | 03:26:10PM |
| 8 | the deposition. | 03:26:11PM |
| 9 | THE WITNESS: All | 03:26:11PM |
| 10 | right. | 03:26:11PM |
| 11 | - - - | 03:26:11PM |
| 12 | BY MR. COLLINS: | 03:26:11PM |
| 13 | Q. If any one of the articles | 03:26:12PM |
| 14 | in Exhibit-332 comes to mind while we are | 03:26:13PM |
| 15 | continuing with the questioning, would you | 03:26:16PM |
| 16 | be kind enough to tell me that you just | 03:26:21PM |
| 17 | thought of another article that might | 03:26:24PM |
| 18 | support your prediction? | 03:26:26PM |
| 19 | A. It is unlikely I am going to | 03:26:27PM |
| 20 | remember that doing this -- | 03:26:30PM |
| 21 | Q. All right. | 03:26:31PM |
| 22 | A. -- but sure, I promise. | 03:26:32PM |
| 23 | Q. Then we will stop and look | 03:26:34PM |
| 24 | at the article you referred to -- | 03:26:35PM |

Page 299

| | | |
|---|---|---|
| 1 | A. Yes. | 03:26:37PM |
| 2 | Q. -- and we'll show you the | 03:26:37PM |
| 3 | documents. | 03:26:39PM |
| 4 | Okay. Thank you. | 03:26:40PM |
| 5 | Now, paragraph five, the | 03:26:41PM |
| 6 | first bullet point on page three; Adams | 03:26:53PM |
| 7 | Golf has taken reasonable steps to deal | 03:26:57PM |
| 8 | with gray market activity. | 03:27:00PM |
| 9 | That is as of the time of | 03:27:01PM |
| 10 | the IPO; correct? | 03:27:03PM |
| 11 | A. Yes. | 03:27:05PM |
| 12 | Q. All right. | 03:27:05PM |
| 13 | Now, as of the time of the | 03:27:08PM |
| 14 | IPO, was the -- was the jury in on the | 03:27:13PM |
| 15 | issue of how well Adams Golf was dealing | 03:27:18PM |
| 16 | with gray marketing? | 03:27:22PM |
| 17 | That is; to rephrase the | 03:27:23PM |
| 18 | question, as of the time of the IPO, | 03:27:25PM |
| 19 | wasn't it still possible that Adams could | 03:27:28PM |
| 20 | goof it up and fail to deal effectively | 03:27:31PM |
| 21 | with ongoing gray market issues? | 03:27:34PM |
| 22 | MR. GLUCKOW: Objection. | 03:27:36PM |
| 23 | Overbroad, vague and | 03:27:38PM |
| 24 | ambiguous. Calls for | 03:27:39PM |

Page 300

| | | |
|---|---|---|
| 1 | speculation. | 03:27:40PM |
| 2 | You can answer. | 03:27:41PM |
| 3 | MR. COLLINS: Let me | 03:27:41PM |
| 4 | rephrase it one more time | 03:27:42PM |
| 5 | THE WITNESS: All | 03:27:43PM |
| 6 | right. | 03:27:43PM |
| 7 | - - - | 03:27:43PM |
| 8 | BY MR. COLLINS: | 03:27:43PM |
| 9 | Q. As of the time of the IPO, | 03:27:43PM |
| 10 | did the possibility exist that Adams would | 03:27:47PM |
| 11 | cease dealing effectively with gray | 03:27:51PM |
| 12 | marketing issues? | 03:27:55PM |
| 13 | MR. GLUCKOW: Same | 03:27:55PM |
| 14 | objections, but you can | 03:27:56PM |
| 15 | answer. | 03:27:56PM |
| 16 | (Pause) | 03:27:56PM |
| 17 | THE WITNESS: I don't | 03:28:05PM |
| 18 | believe so. | 03:28:05PM |
| 19 | Again, I would -- would | 03:28:07PM |
| 20 | go back to the level of gray | 03:28:08PM |
| 21 | market activity and the | 03:28:09PM |
| 22 | steps the firm had already | 03:28:12PM |
| 23 | taken pre-IPO to confront | 03:28:13PM |
| 24 | this issue and maintain | 03:28:16PM |

Page 301

| | | |
|---|---|---|
| 1 | their -- their relationships | 03:28:17PM |
| 2 | with their authorized | 03:28:18PM |
| 3 | channel members | 03:28:20PM |
| 4 | So, I believe they took | 03:28:21PM |
| 5 | appropriate steps pre-IPO, | 03:28:22PM |
| 6 | and I don't believe there | 03:28:24PM |
| 7 | was a risk at that time that | 03:28:27PM |
| 8 | they ceased being effective | 03:28:31PM |
| 9 | in managing the gray | 03:28:32PM |
| 10 | marketing activity, because | 03:28:34PM |
| 11 | you can effectively manage | 03:28:36PM |
| 12 | gray market activity. | 03:28:37PM |
| 13 | MR. COLLINS: Ochoa? | 03:28:49PM |
| 14 | MR. GLUCKOW: I believe | 03:28:50PM |
| 15 | so. | 03:28:51PM |
| 16 | MR. KANE: I don't know | 03:28:58PM |
| 17 | if this is a copy that we | 03:28:58PM |
| 18 | picked up. | 03:29:03PM |
| 19 | - - - | 03:29:03PM |
| 20 | (Discussion held off the record.) | 03:29:03PM |
| 21 | - - - | 03:29:03PM |
| 22 | THE WITNESS: Here we | 03:29:18PM |
| 23 | go. | 03:29:18PM |
| 24 | - - - | 03:29:18PM |

76 (Pages 298 to 301)

**Page 294**

```
 1    something or nothing to              03:23:35PM
 2    support this, because that           03:23:35PM
 3    is going to take me awhile.          03:23:37PM
 4    I will do it if you want me          03:23:38PM
 5    to do it.                            03:23:40PM
 6         - - -                           03:23:40PM
 7    BY MR. COLLINS:                      03:23:40PM
 8       Q. Well, I don't want to keep     03:23:40PM
 9    you all that long, but you did refer to --  03:23:42PM
10    it would be helpful to know if you had      03:23:46PM
11    some support for that prediction.    03:23:48PM
12         Even though you backed away     03:23:50PM
13    from the prediction a little bit, I would   03:23:52PM
14    like to know if you have some support       03:23:53PM
15       A. I am going to review          03:23:56PM
16    articles.                            03:23:57PM
17       Q. Is that necessary?            03:23:57PM
18       You have to review the           03:23:59PM
19    entire article?                      03:24:00PM
20       A. I am afraid if I just skim    03:24:02PM
21    it, I might miss something.          03:24:03PM
22         So that the basic premise      03:24:06PM
23    would be that; a more well-established,     03:24:07PM
24    much larger firm like Callaway at a given   03:24:09PM
```

**Page 295**

```
 1    point in time, would have more gray market  03:24:13PM
 2    sales than a company of the size and        03:24:15PM
 3    stature of Adams?                    03:24:18PM
 4       Q. Right.                        03:24:19PM
 5         Coupled with the fact that     03:24:20PM
 6    Adams has higher margins, does that effect  03:24:22PM
 7    your analysis?                       03:24:26PM
 8         In other words, when you       03:24:28PM
 9    made your prediction --              03:24:29PM
10       A. Huh-huh --                    03:24:29PM
11       Q. -- Professor, were you        03:24:30PM
12    cranking into the equation Adams higher     03:24:32PM
13    margin?                              03:24:36PM
14       MR. GLUCKOW: Vague and           03:24:36PM
15    ambiguous. Overbroad.                03:24:37PM
16       You can answer.                  03:24:38PM
17       THE WITNESS: I                   03:24:39PM
18    consider that, offsetting            03:24:39PM
19    that there was a volume of           03:24:40PM
20    Callaway, its size and the           03:24:42PM
21    credibility factor.                  03:24:44PM
22         So, if you take                03:24:45PM
23    everything involved in               03:24:46PM
24    Callaway and everything              03:24:47PM
```

**Page 296**

```
 1    involved in Adams, I would            03:24:47PM
 2    still make that prediction.           03:24:49PM
 3    Here it's more just the               03:24:50PM
 4    issue of absolute size                03:24:51PM
 5    itself.                               03:24:55PM
 6       MR. GLUCKOW: When you             03:24:56PM
 7    say "here," you mean that is          03:24:57PM
 8    what you were looking for?            03:24:57PM
 9       THE WITNESS: That is             03:24:58PM
10    what I was looking for;               03:24:59PM
11    correct.                              03:25:01PM
12         So, definitively to           03:25:01PM
13    answer that, it is going to           03:25:03PM
14    take some time.                       03:25:05PM
15         I certainly did not           03:25:05PM
16    have that opinion coming in           03:25:06PM
17    here today.                           03:25:07PM
18       You asked me the                 03:25:07PM
19    question. I gave you the              03:25:08PM
20    best answer I can.                    03:25:09PM
21       I can try to read this,          03:25:11PM
22    but it is going to take               03:25:12PM
23    awhile.                               03:25:13PM
24         - - -                          03:25:13PM
```

**Page 297**

```
 1    BY MR. COLLINS:                      03:25:13PM
 2       Q. Now, there is no -- you        03:25:14PM
 3    are familiar with the documents in   03:25:16PM
 4    Exhibit-332; correct?                03:25:18PM
 5       A. Sure.                         03:25:19PM
 6       Q. You are familiar with that    03:25:19PM
 7    literature?                          03:25:22PM
 8       A. But I don't have a perfect    03:25:22PM
 9    memory, and there is a lot of information.  03:25:24PM
10    So, I tried to get -- review the articles   03:25:26PM
11    in general, but for a specific question     03:25:30PM
12    like that, it takes some time.       03:25:33PM
13       Q. So, the only one -- as you     03:25:35PM
14    are sitting here now, the only article      03:25:37PM
15    that, as you are sitting here now, might    03:25:38PM
16    support your prediction, at least, the      03:25:41PM
17    only one that comes to mind is this         03:25:48PM
18    article that Ochoa cited, which was -- who  03:25:50PM
19    was the author again?                03:25:53PM
20       A. It's in the Journal of        03:25:55PM
21    Marketing Channels, I believe, 2003. If I   03:25:57PM
22    -- I -- if memory serves me, I think the    03:25:59PM
23    authors were Myers, Griffith.        03:26:02PM
24       Q. Okay.                         03:26:03PM
```

                                    75 (Pages 294 to 297)

Page 302

BY MR. COLLINS:                          03:29:18PM
   Q.  Just for the record, what        03:29:19PM
are you looking at -- this is from the   03:29:20PM
Ochoa documents?                         03:29:21PM
   A.  Yes.                             03:29:22PM
   Q.  What are you looking at?         03:29:22PM
   A.  Ochoa 0032 to Ochoa 0034.        03:29:24PM
It is an article by Myers, Griffith.     03:29:29PM
   Q.  Please.                          03:29:31PM
   A.  Organizational and               03:29:32PM
Product-Related Influences of Gray Market 03:29:37PM
Channel Activity.                        03:29:40PM
    So, they measure firm size     03:29:42PM
as number of employees and sales volume, 03:29:45PM
and their measure of gray marketing      03:29:47PM
activity was unauthorized imports of our 03:29:49PM
product are a major problem for our firm. 03:29:53PM
We have complete control over who        03:29:57PM
distributes our product in this market,  03:29:59PM
and they refer to -- and they found that 03:30:01PM
the greater number of employees and the  03:30:06PM
greater the sales volume, the more likely 03:30:07PM
it was that they did not have complete   03:30:10PM
control over who distributes the product 03:30:11PM

Page 303

in the market, and that unauthorized     03:30:14PM
imports of our products are a major      03:30:16PM
problem for our firm.                    03:30:18PM
    So, that -- I believe that      03:30:20PM
does support, to some extent, my -- my   03:30:22PM
prediction.                              03:30:24PM
   Q.  Now, this study does not,       03:30:24PM
however, factor in higher margins; does  03:30:29PM
it?                                      03:30:38PM
   A.  It does not.                    03:30:38PM
   Q.  So, therefore, this study       03:30:39PM
doesn't really support your assertions or 03:30:41PM
your prediction?                         03:30:44PM
   A.  Completely                      03:30:46PM
   Q.  Okay.                           03:30:49PM
   A.  Partial support.                03:30:49PM
   Q.  Partial support, to the         03:30:50PM
extent that it suggests that, everything 03:30:52PM
else being the same, including margins   03:30:55PM
being the same, the larger the size of the 03:30:58PM
company, the greater the amount of gray  03:31:01PM
marketing activity                       03:31:04PM
    Have I got that right?          03:31:05PM
    MR. GLUCKOW: I'm just            03:31:06PM

Page 304

going to object                          03:31:07PM
    Overbroad, vague and            03:31:07PM
ambiguous                                03:31:08PM
    You can answer                  03:31:09PM
    THE WITNESS:  Correct.          03:31:10PM
    - - -                           03:31:10PM
BY MR. COLLINS:                          03:31:10PM
   Q.  And does this article go        03:31:13PM
to a greater percentage or a greater     03:31:14PM
dollar volume of gray marketing?         03:31:16PM
   A.  Well, you see that's --         03:31:19PM
that's the issue.  I don't -- it doesn't 03:31:20PM
directly measure either.                 03:31:22PM
    It -- it -- the gray            03:31:24PM
marketing activity is measured on; one,  03:31:26PM
strongly agrees.  Strongly disagree.     03:31:29PM
    So, let me add --               03:31:31PM
    So, in your firm, do            03:31:33PM
unauthorized imports of our product, is  03:31:36PM
that a major problem for your firm?      03:31:39PM
    You would either say; one,      03:31:41PM
strongly agree; seven, strongly disagree 03:31:42PM
or somewhere in between.                 03:31:44PM
    So you can say that; well,      03:31:46PM

Page 305

if imports are a major problem, it could 03:31:47PM
impact -- adversely impact sales on the  03:31:50PM
higher percentage of gray marketing      03:31:54PM
activity, but they did not directly      03:31:56PM
measure it.                              03:31:58PM
   Q.  Sure.                           03:31:58PM
   A.  But; secondly, do you have      03:31:58PM
complete control over who distributes your 03:32:01PM
product?  And if you strongly disagreed  03:32:03PM
with that -- again, it is not a direct   03:32:05PM
measure --                               03:32:07PM
   Q.  Sure.                           03:32:08PM
   A.  -- but it's -- so it's -- so    03:32:08PM
you have to look at the measure, too.    03:32:11PM
   Q.  Absolutely.                     03:32:12PM
   A.  Yeah.                           03:32:13PM
   Q.  And, interestingly, this        03:32:13PM
study is conducted by Askin Corporate    03:32:15PM
Management; right?                       03:32:18PM
   A.  Oh, that is true.               03:32:19PM
   Q.  So, here, this author, on       03:32:20PM
whom you relied, or you were contemplating 03:32:24PM
relying --                               03:32:26PM
   A.  Huh-huh.                         03:32:28PM

77 (Pages 302 to 305)

Page 306

| | | |
|---|---|---|
| 1 | Q. -- seems to have a greater | 03:32:28PM |
| 2 | faith in the views of corporate management | 03:32:30PM |
| 3 | that are contemporaneous than you do? | 03:32:32PM |
| 4 | MR. GLUCKOW: Objection | 03:32:35PM |
| 5 | to the characterization, and | 03:32:35PM |
| 6 | also, objection to the | 03:32:36PM |
| 7 | reference to relying. | 03:32:37PM |
| 8 | I think Professor | 03:32:39PM |
| 9 | Frazier's been quite clear. | 03:32:41PM |
| 10 | MR. COLLINS: I -- I -- | 03:32:41PM |
| 11 | MR. GLUCKOW: I want to | 03:32:42PM |
| 12 | make one thing very clear, | 03:32:43PM |
| 13 | for the record, that what | 03:32:45PM |
| 14 | he has been talking about | 03:32:46PM |
| 15 | responding to your questions | 03:32:47PM |
| 16 | about Callaway, but he was | 03:32:48PM |
| 17 | very careful to say; this is | 03:32:49PM |
| 18 | something he said today in | 03:32:51PM |
| 19 | response to your question, | 03:32:52PM |
| 20 | as opposed to something he | 03:32:53PM |
| 21 | was relying on for purposes | 03:32:55PM |
| 22 | of giving his opinion. | 03:32:56PM |
| 23 | I want to make sure | 03:32:57PM |
| 24 | that we are clear on that. | 03:32:57PM |

Page 307

| | | |
|---|---|---|
| 1 | THE WITNESS: Could I | 03:32:59PM |
| 2 | answer? | 03:32:59PM |
| 3 | MR. COLLINS: Please. | 03:33:00PM |
| 4 | THE WITNESS: They are | 03:33:00PM |
| 5 | two different purposes when | 03:33:03PM |
| 6 | you do a piece of research | 03:33:04PM |
| 7 | that -- where you want to | 03:33:05PM |
| 8 | increase general knowledge | 03:33:08PM |
| 9 | in your discipline, and in | 03:33:09PM |
| 10 | order to test hypothesis, | 03:33:11PM |
| 11 | you need data and often | 03:33:14PM |
| 12 | times in survey data, what | 03:33:15PM |
| 13 | you are doing is, you are | 03:33:17PM |
| 14 | taking a large sample of a | 03:33:18PM |
| 15 | certain population of firms. | 03:33:19PM |
| 16 | You send out surveys to its | 03:33:21PM |
| 17 | managers. You analyze the | 03:33:22PM |
| 18 | data. | 03:33:23PM |
| 19 | That's a completely | 03:33:24PM |
| 20 | different purpose than in my | 03:33:26PM |
| 21 | role, as an expert in this | 03:33:29PM |
| 22 | case, where I have the | 03:33:30PM |
| 23 | luxury of a lot of facts | 03:33:32PM |
| 24 | that are not survey related | 03:33:34PM |

Page 308

| | | |
|---|---|---|
| 1 | at all, but they are facts | 03:33:36PM |
| 2 | related to Adams, facts | 03:33:37PM |
| 3 | related to gray market | 03:33:39PM |
| 4 | sales, facts related to | 03:33:40PM |
| 5 | complaints, facts related to | 03:33:41PM |
| 6 | challenges confronting Adams | 03:33:45PM |
| 7 | from a marketing point of | 03:33:45PM |
| 8 | view. | 03:33:45PM |
| 9 | So, it's not an | 03:33:46PM |
| 10 | inconsistancy. I am using | 03:33:47PM |
| 11 | this to partially support | 03:33:49PM |
| 12 | my answer to one of your | 03:33:54PM |
| 13 | questions that you raised | 03:33:55PM |
| 14 | today, and I would not | 03:33:56PM |
| 15 | say that any one single, | 03:33:58PM |
| 16 | empirical study, | 03:34:00PM |
| 17 | especiallily when published | 03:34:01PM |
| 18 | in a non-pretigious journal | 03:34:03PM |
| 19 | like Journal of Marketing | 03:34:06PM |
| 20 | Channels, not one of our | 03:34:06PM |
| 21 | major journals. | 03:34:06PM |
| 22 | So, I wouldn't put a | 03:34:08PM |
| 23 | lot of stock in this study | 03:34:09PM |
| 24 | anyway. | 03:34:10PM |

Page 309

| | | |
|---|---|---|
| 1 | But it's partial | 03:34:10PM |
| 2 | support of the findings are | 03:34:12PM |
| 3 | indicative, at least to some | 03:34:13PM |
| 4 | extent, of support for my | 03:34:15PM |
| 5 | answer. | 03:34:19PM |
| 6 | - - - | 03:34:19PM |
| 7 | BY MR. COLLINS: | 03:34:19PM |
| 8 | Q. Do you also agree that this | 03:34:20PM |
| 9 | non-prestigious article which provides | 03:34:22PM |
| 10 | partial support, you claim, to your | 03:34:26PM |
| 11 | prediction, lends support to the approach | 03:34:28PM |
| 12 | that, if you want to know the effect of | 03:34:34PM |
| 13 | gray marketing at any particular time at | 03:34:37PM |
| 14 | any particular firm, one place you might | 03:34:42PM |
| 15 | go for answers is the company's | 03:34:45PM |
| 16 | management? | 03:34:47PM |
| 17 | MR. GLUCKOW: Objection. | 03:34:48PM |
| 18 | Overbroad. | 03:34:49PM |
| 19 | You can answer. | 03:34:49PM |
| 20 | THE WITNESS: You -- | 03:34:50PM |
| 21 | you wouldn't do something | 03:34:51PM |
| 22 | like this across firms if | 03:34:54PM |
| 23 | you wanted to give advice to | 03:34:55PM |
| 24 | a particular firm. | 03:34:57PM |

78 (Pages 306 to 309)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - -

IN RE:  ADAMS GOLF,       CA. NO.

INCORPORATED              99-371-KAJ


SECURITIES LITIGATION

- - - - - - - - - - - - - - - - - - - -

Wednesday, August 9, 2006


Oral deposition of GARY L. FRAZIER,

was taken pursuant to Notice, at the

offices of SIMPSON THACHER & BARTLETT LLP,

425 Lexington Avenue, New York, NY

10017-3954 on the above date before

DEBRA G. JOHNSON-SPALLONE, CSR, RPR,

Notary Public, and a Federally Approved

Reporter of the United States District

Court commencing at or about 10:40 a.m.


RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215) 241-1000   (888) 777-6690

## Page 138

```
1    where the magnitude of gray        12:37:26PM
2    market sales is high that          12:37:32PM
3    have tremendous intra-brand        12:37:36PM
4    competition for their brand        12:37:38PM
5    can face a precarious              12:37:43PM
6    situation, because in              12:37:45PM
7    instances where there are          12:37:49PM
8    a lot of gray market sales         12:37:50PM
9    and rami -- intra-brand            12:37:52PM
10   competition among and              12:37:57PM
11   between both authorized            12:37:59PM
12   channel members and                12:38:01PM
13   unauthorized channel               12:38:02PM
14   members, your relationships        12:38:03PM
15   with your authorized channel       12:38:04PM
16   members can deteriorate.           12:38:06PM
17       The authorized channel         12:38:08PM
18   members will complain.             12:38:09PM
19   Conflict can turn from             12:38:14PM
20   functional to dysfunctional.       12:38:16PM
21   Investments in the brand           12:38:20PM
22   may be reduced or absent           12:38:22PM
23   altogether.                        12:38:25PM
24       - - -                          12:38:25PM
```

## Page 139

```
1    BY MR. COLLINS:                    12:38:25PM
2       Q.  I didn't mean to stop you,  12:38:27PM
3    but that last point, investments, whose  12:38:28PM
4    investments?                       12:38:31PM
5       A.  By the authorized channel   12:38:31PM
6    member.                            12:38:33PM
7       Q.  Please continue.            12:38:34PM
8       A.  So, for example, it is very 12:38:34PM
9    important for a shopping good like golf  12:38:38PM
10   clubs to have sales personnel in the     12:38:45PM
11   on-course and off-course establishments  12:38:49PM
12   trained in your clubs and the benefits of 12:38:51PM
13   your club, and why they should introduce 12:38:53PM
14   it to their customers.             12:38:55PM
15       And if -- if the magnitude     12:38:57PM
16   of gray market sales is extreme and 12:38:58PM
17   intra-brand competition is too high, 12:39:03PM
18   the upper management of the retail  12:39:05PM
19   establishment will simply not expend the 12:39:08PM
20   resources necessary to have these sales 12:39:12PM
21   people trained adequately.  That can be 12:39:14PM
22   very adverse.  Prices can erode.  Service 12:39:16PM
23   can erode.  Margins can erode.     12:39:19PM
24       So, in -- in -- in certain     12:39:25PM
```

## Page 140

```
1    contexts and certain situations of that 12:39:27PM
2    type, clearly gray -- once all of those 12:39:30PM
3    conditions exist, whether short or long 12:39:35PM
4    run, that's adverse to the company 12:39:37PM
5       Q.  Okay.  That's helpful.      12:39:40PM
6       You talk in your last answer    12:39:46PM
7    about intra-brand competition.     12:39:49PM
8       What does that mean?            12:39:52PM
9       A.  So, for example, 54,000 Ford 12:39:52PM
10   dealers, and many Ford dealers are within 12:39:55PM
11   a few miles of each other, so that the 12:39:58PM
12   same customers -- can get -- can sort of 12:40:01PM
13   pick one dealer against another and 12:40:05PM
14   negotiate on price, such as, many Ford 12:40:10PM
15   dealers will be selling product below what 12:40:14PM
16   they really want the product to be sold 12:40:17PM
17   at, and so intra-brand competition -- 12:40:19PM
18   competition for a particular brand. 12:40:22PM
19       Q.  I see.                      12:40:25PM
20       And --                          12:40:26PM
21       A.  And the intra-brand         12:40:27PM
22   competition is based upon sales in both 12:40:28PM
23   authorized and unauthorized channels 12:40:31PM
24       Q.  I see.                      12:40:33PM
```

## Page 141

```
1       A.  It could be sales over the  12:40:34PM
2    Internet in particular cases as well 12:40:35PM
3       Q.  Okay.                        12:40:38PM
4       So, if you have a situation     12:40:39PM
5    with a golf club or anything elsewhere, 12:40:41PM
6    Costco is selling in the same geographical 12:40:44PM
7    location as an authorized dealer, that 12:40:52PM
8    constitutes intra-brand competition? 12:40:58PM
9       MR. GLUCKOW:  Objection         12:41:00PM
10      Overbroad.                       12:41:01PM
11      You can answer                   12:41:02PM
12      MR. COLLINS:  I'm not            12:41:02PM
13   asking you whether it                12:41:04PM
14   matters very much                    12:41:04PM
15      I'm just asking you             12:41:05PM
16   whether it is -- that is             12:41:06PM
17   intra-brand competition.             12:41:07PM
18      THE WITNESS:  It is not         12:41:09PM
19   always a given because you           12:41:10PM
20   have to look at the segments         12:41:13PM
21   of people shopping at a              12:41:17PM
22   Costco, and the segments of          12:41:19PM
23   customers, end customers,            12:41:19PM
24   shopping at an authorized            12:41:21PM
```

36  (Pages 138 to 141)

## Page 142

```
 1  store.                    12:41:23PM
 2      A sale in a           12:41:25PM
 3  non-authorized channel may    12:41:26PM
 4  not mean that the store in    12:41:27PM
 5  the same area is losing a     12:41:29PM
 6  sale.                     12:41:31PM
 7      MR. COLLINS: Sure.    12:41:31PM
 8      THE WITNESS: It might     12:41:32PM
 9  be someone who would never    12:41:32PM
10  buy at a specialty store,     12:41:36PM
11  but suddenly sees a club      12:41:38PM
12  in-house.                 12:41:39PM
13      Hey, there weren't    12:41:41PM
14  clubs here last week, but     12:41:42PM
15  there is clubs here this      12:41:44PM
16  week.                     12:41:45PM
17      So, simply because you    12:41:45PM
18  have brought us in Costco     12:41:49PM
19  and product in another store  12:41:50PM
20  in the same area, that        12:41:51PM
21  doesn't necessarily mean      12:41:52PM
22  there will be any             12:41:54PM
23  intra-brand competition.      12:41:55PM
24      - - -                 12:41:55PM
```

## Page 143

```
 1  BY MR. COLLINS:           12:41:55PM
 2      Q. There might be -- there    12:41:57PM
 3  might not be intra-brand competition if,    12:41:59PM
 4  in one geographical area, you have Costco    12:42:01PM
 5  selling and you have an authorized    12:42:04PM
 6  retailer selling; correct?    12:42:07PM
 7      A. May or may not be      12:42:08PM
 8      Q. Okay. Fair enough      12:42:10PM
 9      And there's more likely to    12:42:18PM
10  be such intra-brand competition where the    12:42:23PM
11  market is segmented with high, medium,    12:42:27PM
12  low; correct?             12:42:30PM
13      MR. GLUCKOW: Objection    12:42:31PM
14      Mischaraterizes his      12:42:32PM
15  testimony                 12:42:32PM
16      - - -                 12:42:32PM
17  BY MR. COLLINS:           12:42:32PM
18      Q. High, medium, low consumers    12:42:34PM
19  Am I understanding        12:42:36PM
20  correctly?                12:42:36PM
21      A. Let me give you an example    12:42:37PM
22  I did a consulting study for    12:42:38PM
23  Paul Harris once. I'm not sure if they    12:42:40PM
24  even exist. But, they had retail stores    12:42:43PM
```

## Page 144

```
 1  in the mid-west and southeast selling    12:42:45PM
 2  women's fashions.         12:42:47PM
 3      And they used me when I was    12:42:48PM
 4  at IU to decide whether or not they should    12:42:50PM
 5  open up a discount store where they had    12:42:53PM
 6  unsold merchandise in the their regular    12:42:55PM
 7  stores, and instead of keeping it in the    12:42:57PM
 8  regular store, you would go to Paul Harris    12:43:00PM
 9  discount stores and sell it at a much    12:43:02PM
10  lower price and their certain was    12:43:04PM
11  cannibalization.          12:43:04PM
12      And so my research, we did    12:43:07PM
13  consumer studies that indicated that the    12:43:08PM
14  people who shop in the regular stores    12:43:10PM
15  would not generally be the people shopping    12:43:13PM
16  in discount stores.       12:43:15PM
17      There is little market or    12:43:16PM
18  segment overlap, therefore, go ahead and    12:43:18PM
19  open up the stores and -- and --    12:43:20PM
20      Q. I see.             12:43:22PM
21      A. -- they did, and they did    12:43:23PM
22  pretty well with that.    12:43:24PM
23      So -- so, if there are more    12:43:25PM
24  segments in an industry, you get more    12:43:27PM
```

## Page 145

```
 1  distribution.             12:43:29PM
 2      But, if certain segments go    12:43:30PM
 3  one way and certain segments go another,    12:43:32PM
 4  there can be very little intra-brand    12:43:35PM
 5  competition.              12:43:37PM
 6      Q. I see. All right      12:43:39PM
 7      So, let's say we are talking    12:43:39PM
 8  about a situation that already exists --    12:43:40PM
 9      A. Huh-huh.           12:43:41PM
10      Q. -- where Costco was selling    12:43:42PM
11  and the authorized retailer is selling,    12:43:44PM
12  how do you measure?       12:43:47PM
13      Whom do you talk to?     12:43:49PM
14      What tests do you run to    12:43:50PM
15  determine whether Costco is reducing the    12:43:52PM
16  sales that the authorized retailer would    12:43:58PM
17  otherwise enjoy?          12:44:00PM
18      MR. GLUCKOW: Objection    12:44:01PM
19      Overbroad             12:44:02PM
20      You can answer.       12:44:03PM
21      - - -                 12:44:03PM
22  BY MR. COLLINS:           12:44:03PM
23      Q. Can I just make --    12:44:06PM
24      A. Sure.              12:44:07PM
```

37 (Pages 142 to 145)

Page 226

| | | |
|---|---|---|
| 1 | trying to support a new | 02:22:24PM |
| 2 | distributor in Canada, and | 02:22:26PM |
| 3 | I believe they did try to | 02:22:30PM |
| 4 | keep the relationship | 02:22:32PM |
| 5 | strong. | 02:22:33PM |
| 6 | I don't see complaints | 02:22:33PM |
| 7 | as indicant of detriment. | 02:22:35PM |
| 8 | MR. COLLINS: Sure. | 02:22:35PM |
| 9 | - - - | 02:22:35PM |
| 10 | BY MR. COLLINS: | 02:22:35PM |
| 11 | Q. Actually, I -- believe it or | 02:22:38PM |
| 12 | not, I can understand that. | 02:22:40PM |
| 13 | We had this discussion with | 02:22:43PM |
| 14 | Dr. Grace the other day that, a lot of | 02:22:45PM |
| 15 | times customers will walk -- will go with | 02:22:46PM |
| 16 | their feet, right? | 02:22:50PM |
| 17 | A lot of times customers who | 02:22:50PM |
| 18 | are unhappy aren't going to call Barney | 02:22:52PM |
| 19 | Adams and say; I'm certainly concerned | 02:22:54PM |
| 20 | about gray marketing. I'd love to stop | 02:22:57PM |
| 21 | by | 02:22:57PM |
| 22 | Isn't that accurate? | 02:22:57PM |
| 23 | MR. GLUCKOW: Objection. | 02:22:59PM |
| 24 | Overbroad, vague and | 02:23:00PM |

Page 227

| | | |
|---|---|---|
| 1 | ambiguous. | 02:23:01PM |
| 2 | You can answer. | 02:23:02PM |
| 3 | THE WITNESS: Are you | 02:23:03PM |
| 4 | talking about the end | 02:23:03PM |
| 5 | consumer, or are you talking | 02:23:04PM |
| 6 | about authorized channel | 02:23:06PM |
| 7 | members? | 02:23:07PM |
| 8 | MR. COLLINS: | 02:23:07PM |
| 9 | Authorized channel members. | 02:23:07PM |
| 10 | THE WITNESS: | 02:23:07PM |
| 11 | Authorized channel memebers | 02:23:09PM |
| 12 | are different in their | 02:23:09PM |
| 13 | behavior than end consumers | 02:23:10PM |
| 14 | on consumer complaining. | 02:23:13PM |
| 15 | - - - | 02:23:13PM |
| 16 | BY MR. COLLINS: | 02:23:13PM |
| 17 | Q. So, you think that | 02:23:15PM |
| 18 | authorized channel participants -- members | 02:23:17PM |
| 19 | who are dissatisfied with gray marketing | 02:23:18PM |
| 20 | complained? | 02:23:25PM |
| 21 | MR. GLUCKOW: Objection | 02:23:26PM |
| 22 | Overbroad | 02:23:26PM |
| 23 | Mischaracterizes his | 02:23:27PM |
| 24 | testimony. | 02:23:29PM |

Page 228

| | | |
|---|---|---|
| 1 | You can answer. | 02:23:29PM |
| 2 | THE WITNESS: I can't | 02:23:29PM |
| 3 | say all | 02:23:31PM |
| 4 | - - - | 02:23:31PM |
| 5 | BY MR. COLLINS: | 02:23:31PM |
| 6 | Q. So, it could be that there | 02:23:31PM |
| 7 | were a number who were dissatisfied and | 02:23:32PM |
| 8 | stopped dealing with Adams Golf that did | 02:23:34PM |
| 9 | not complain | 02:23:38PM |
| 10 | That is at least possible; | 02:23:38PM |
| 11 | isn't it? | 02:23:39PM |
| 12 | MR. GLUCKOW: Same | 02:23:40PM |
| 13 | objection | 02:23:40PM |
| 14 | It calls for | 02:23:41PM |
| 15 | speculation. | 02:23:42PM |
| 16 | You can answer | 02:23:42PM |
| 17 | THE WITNESS: I have | 02:23:43PM |
| 18 | seen no definitive evidence | 02:23:44PM |
| 19 | in this case that any dealer | 02:23:45PM |
| 20 | terminated its relationship | 02:23:48PM |
| 21 | with Adams because of gray | 02:23:49PM |
| 22 | market sales | 02:23:53PM |
| 23 | Now, I would like to | 02:23:53PM |
| 24 | see that evidence. If you | 02:23:55PM |

Page 229

| | | |
|---|---|---|
| 1 | have some of the evidence, I | 02:23:56PM |
| 2 | would like to see it. | 02:23:57PM |
| 3 | But, in everything I | 02:23:58PM |
| 4 | have read, I found no | 02:23:59PM |
| 5 | definitive piece of | 02:24:00PM |
| 6 | information that, on their | 02:24:02PM |
| 7 | own volition, a retailer | 02:24:04PM |
| 8 | stopped selling Adams | 02:24:05PM |
| 9 | because of gray market | 02:24:07PM |
| 10 | sales | 02:24:07PM |
| 11 | MR. COLLINS: Well, | 02:24:09PM |
| 12 | let's explore that a little, | 02:24:09PM |
| 13 | at least, hypothetically | 02:24:14PM |
| 14 | THE WITNESS: All | 02:24:15PM |
| 15 | right. | 02:24:15PM |
| 16 | - - - | 02:24:15PM |
| 17 | BY MR. COLLINS: | 02:24:15PM |
| 18 | Q. If a retailer stopped | 02:24:15PM |
| 19 | selling Adams because of gray market | 02:24:19PM |
| 20 | sales, that might occur, at least | 02:24:23PM |
| 21 | hypothetically, because the retailer is | 02:24:26PM |
| 22 | enjoying lower margins now than was the | 02:24:28PM |
| 23 | case before the gray market sales? | 02:24:32PM |
| 24 | MR. GLUCKOW: Objection. | 02:24:34PM |

58 (Pages 226 to 229)

8b484321-616e-4e54-9765-25c5397efc36

Page 230

```
1        - - -              02:24:34PM
2  BY MR. COLLINS:              02:24:34PM
3      Q. Is that -- is that a logical   02:24:34PM
4  assumption so far?          02:24:36PM
5          MR. GLUCKOW: Objection.  02:24:37PM
6      Overbroad and          02:24:38PM
7  incomplete hypothetical.        02:24:39PM
8      You can answer          02:24:40PM
9      THE WITNESS: Let me      02:24:41PM
10  make sure I understand.        02:24:41PM
11       - - -              02:24:41PM
12  BY MR. COLLINS:              02:24:41PM
13      Q. So, I am to presume      02:24:42PM
14  that there is a retailer out there,    02:24:44PM
15  potentially, that stopped selling Adams  02:24:46PM
16  products because its margins were    02:24:49PM
17  adversely effected by gray market sales?  02:24:54PM
18      MR. COLLINS: Right        02:24:54PM
19      THE WITNESS: It would      02:24:57PM
20  be possible -- potentially      02:24:59PM
21  possible              02:25:04PM
22       - - -              02:25:04PM
23  BY MR. COLLINS:              02:25:04PM
24      Q. Whether there was any such  02:25:07PM
```

Page 231

```
1  retailer who stopped buying Adams product  02:25:08PM
2  because of lower margins caused by gray  02:25:13PM
3  marketing, wasn't it possible, as of the  02:25:17PM
4  time of the IPO, that might occur in the  02:25:20PM
5  future?              02:25:23PM
6      That is; wasn't Adams facing  02:25:25PM
7  a risk or a danger that, in the future,  02:25:28PM
8  from gray marketing it would lose    02:25:33PM
9  customers because of lower margins from  02:25:34PM
10  gray market sales?          02:25:39PM
11      MR. GLUCKOW: Objection    02:25:39PM
12      Incomplete          02:25:40PM
13  hypothetical. Vague,        02:25:41PM
14  ambiguous            02:25:42PM
15      You can answer          02:25:43PM
16      THE WITNESS: So, it is      02:25:44PM
17  a hypothetical you are        02:25:44PM
18  asking me?            02:25:45PM
19      MR. COLLINS: Right.        02:25:46PM
20      It is actually not, no      02:25:47PM
21      THE WITNESS: No.        02:25:49PM
22      MR. COLLINS: I am        02:25:49PM
23  asking whether the          02:25:49PM
24  possibility of the risk        02:25:50PM
```

Page 232

```
1  existed at the time of the      02:25:51PM
2  IPO              02:25:52PM
3      MR. GLUCKOW: Same        02:25:52PM
4  objection.            02:25:53PM
5      You can answer          02:25:54PM
6      THE WITNESS: Risks        02:25:55PM
7  to me means there is a        02:25:55PM
8  condition faced by the        02:25:59PM
9  company that can adversely      02:26:02PM
10  effect sales and earnings in      02:26:05PM
11  the future.            02:26:07PM
12      It is a real serious        02:26:09PM
13  issue, a significant issue.      02:26:10PM
14      Competition is one        02:26:11PM
15  Competition leading to lower      02:26:14PM
16  prices is one.            02:26:16PM
17      There are a number of      02:26:18PM
18  risk factors -- risks that      02:26:19PM
19  Adams was facing at the time      02:26:23PM
20  of the IPO            02:26:24PM
21      I think we have talked      02:26:25PM
22  about some of them from a      02:26:26PM
23  marketing point of view.        02:26:27PM
24      Given the information I      02:26:29PM
```

Page 233

```
1  have, the facts I have, I        02:26:31PM
2  don't believe gray market      02:26:33PM
3  sales was a risk to Adams at      02:26:35PM
4  the time of the IPO          02:26:37PM
5       - - -              02:26:37PM
6  BY MR. COLLINS:              02:26:37PM
7      Q. Well, isn't it possible      02:26:38PM
8  that, at the time of the IPO, there were  02:26:40PM
9  authorized retailers who knew of the gray  02:26:45PM
10  marketing, were concerned about it, but  02:26:48PM
11  did not complain to Adams because Adams  02:26:50PM
12  had issued the June press release?    02:26:53PM
13      Q. You are familiar with the    02:26:57PM
14  June press release?          02:26:58PM
15      A. You mean the litigation with  02:26:59PM
16  Costco?              02:27:01PM
17      Q. Right.            02:27:01PM
18      MR. GLUCKOW: Objection    02:27:03PM
19  Incomplete hypothetical.        02:27:03PM
20  Calls for speculation        02:27:04PM
21      You can answer          02:27:05PM
22      THE WITNESS: So, you      02:27:05PM
23  are asking me to presume        02:27:06PM
24  that they saw that and        02:27:07PM
```

59 (Pages 230 to 233)

8b484321-616e-4e54-9765-25c5397efc36

GONSALVES

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE INDEX NO. 99-371-KAJ

_____x                  09:38:48 AM

IN RE:  ADAMS GOLF, INC.                             09:38:48 AM

CONSOLIDATED SECURITIES LITIGATION                   09:38:48 AM

_____x                  09:38:48 AM

                                                     09:38:48 AM

          DEPOSITION OF MARK GONSALVES               09:38:48 AM

             (Taken by Plaintiff)                    09:38:48 AM

                June 6, 2006                         09:38:48 AM

                 9:30 AM                             09:38:48 AM

                                                     09:38:48 AM

                                                     09:38:48 AM

                                                     09:38:48 AM

                                                     09:38:48 AM

                                                     09:38:48 AM

                                                     09:38:48 AM

                                                     09:38:48 AM

                                                     09:38:48 AM

                                                     09:38:48 AM

                                                     09:38:48 AM

                                                     09:38:48 AM

Reported by:  Arne' Davis, CCR-Huseby No: 7299       09:38:48 AM

**Page 6**

1                    09:38:48 AM
2        P R O C E E D I N G S:
3                    09:38:48 AM
4    M A R K   G O N S A L V E S, called as a witness    09:51:22 AM
5    by Plaintiff, having been first duly sworn by    09:46:56 AM
6    Arne' B. Davis, a stenographic reporter within    09:46:56 AM
7    and for the State of Georgia, was examined and    09:46:56 AM
8    testified as follows:                09:46:56 AM
9            EXAMINATION        09:51:22 AM
10   BY MR. COLLINS:                09:51:22 AM
11       Q.  Thank you for coming today.  I'm Todd    09:51:22 AM
12   Collins, one of the Plaintiff's lawyers in the    09:51:25 AM
13   case.  Do you have a lawyer representing you    09:51:27 AM
14   today?                    09:51:30 AM
15       A.  Yes (indicating).            09:51:31 AM
16       Q.  That's Mr. Bessette?            09:51:32 AM
17       A.  Yes.                09:51:34 AM
18       Q.  Who is paying for Mr. Bessette's    09:51:39 AM
19   services?                    09:51:41 AM
20       A.  Adams Golf.                09:51:46 AM
21       Q.  Now, you used to work for Adams Golf?    09:51:52 AM
22       A.  Yes.                09:51:57 AM
23       Q.  Have you ever been deposed before?    09:51:58 AM
24       A.  Many, many years ago.        09:52:00 AM
25       Q.  If you don't understand any of my    09:52:02 AM

**Page 7**

1    questions, if you would let me know, I would    09:52:03 AM
2    appreciate it                09:52:06 AM
3        A.  Okay.                09:52:08 AM
4        Q.  If you need a break, that's great;    09:52:09 AM
5    we'll take a break, just not while the question    09:52:11 AM
6    is pending, if you would.  Okay?        09:52:14 AM
7        A.  Yes.                09:52:17 AM
8        Q.  Let me mark as Exhibit 253, a document    09:52:17 AM
9    that's UND 369-38-70 and, while I'm at it, 254,    09:52:21 AM
10   adams 040748 through 65            09:52:31 AM
11          (Whereupon Plaintiff's Exhibit Number    09:52:59 AM
12       253 and 254 were marked for identification.)    09:52:59 AM
13       Q.  (By Mr. Collins) Let's look at 253    09:52:59 AM
14   first.  This is -- These are the departmental and    09:53:30 AM
15   functional organizational charts as of 1998 at    09:53:36 AM
16   Adams Golf; is that accurate?            09:53:43 AM
17       A.  Yes                09:53:56 AM
18       MR. GLUCKOW:  Objection to form.        09:53:56 AM
19       MR. COLLINS:  Grounds, counsel?        09:54:02 AM
20       MR. GLUCKOW:  I don't see any question    09:54:04 AM
21   based on the basis of the document itself,    09:54:04 AM
22   and I think you're saying things about the    09:54:07 AM
23   document that are not clear from the    09:54:10 AM
24   document.                    09:54:11 AM
25       MR. COLLINS:  That's one of the reasons    09:54:13 AM

**Page 8**

1    I ask questions.            09:54:14 AM
2        Q.  (By Mr. Collins) Now, you are over on    09:54:16 AM
3    the left-hand side on each of these two pages,    09:54:17 AM
4    Vice President of Sales; is that correct?  That    09:54:20 AM
5    was your position in 1998 up until the time you    09:54:25 AM
6    left Adams Golf?                09:54:31 AM
7        A.  I think my title when I left was VP of    09:54:33 AM
8    Sales and of Retail Marketing.  I think there was    09:54:37 AM
9    something in regard to marketing as the title as    09:54:47 AM
10   well but, suffice it to say, it was the sales    09:54:49 AM
11   function                    09:54:52 AM
12       Q.  Now, first of all, look at the    09:54:53 AM
13   departmental organizational chart:  Under your    09:54:56 AM
14   name there are three boxes, Wholesale, Custom    09:55:02 AM
15   Fitting and International.  Are those three    09:55:06 AM
16   different departments of sales as of 1998?    09:55:09 AM
17       A.  That's correct.            09:55:14 AM
18       Q.  What was the wholesale department?    09:55:15 AM
19       A.  The wholesale department sold golf    09:55:17 AM
20   clubs to our accounts.            09:55:21 AM
21       Q.  Is that retail accounts?        09:55:24 AM
22       A.  Yes, the people that would sell to    09:55:26 AM
23   end user, pro shop, golf shop.        09:55:29 AM
24       Q.  Was it the wholesale division, group,    09:55:33 AM
25   what did you call it?            09:55:36 AM

**Page 9**

1        A.  We called it Inside Sales.        09:55:41 AM
2        Q.  Inside Sales sold to US retailers,    09:55:43 AM
3    correct, as opposed to foreign distributors?    09:55:47 AM
4        A.  That's correct.            09:55:52 AM
5        Q.  What was Custom Fitting?        09:55:53 AM
6        A.  It was a smaller department that had    09:55:56 AM
7    various golf professionals that custom fit our    09:55:58 AM
8    equipment through their membership, primarily, on    09:56:05 AM
9    course, what we call Green Grass.        09:56:08 AM
10       Q.  Would the Custom Fitting group or    09:56:13 AM
11   department sold clubs at a higher price than the    09:56:19 AM
12   wholesale group?                09:56:22 AM
13       A.  They sold a different product        09:56:26 AM
14       Q.  How was it different?            09:56:28 AM
15       A.  They sold iron, sets of irons, which    09:56:30 AM
16   were custom fit, whereas the Inside Sales sold    09:56:33 AM
17   woods, Tight Lies.            09:56:37 AM
18       Q.  The International department, to whom    09:56:40 AM
19   did they sell?                09:56:43 AM
20       A.  International distributors        09:56:45 AM
21       Q.  Now, this says three employees for    09:56:47 AM
22   International.  Were there only three employees    09:56:50 AM
23   in International sales in 1998 while you were at    09:56:56 AM
24   Adams Golf?                09:56:59 AM
25       A.  I can think of three.            09:57:09 AM

3  (Pages 6 to 9)

f92e7ed2-5ede-4eca-894b-b07359f40feb

```
                                              Page 10
1      Q.  Who can you think of?            09:57:12 AM
2      A.  A gentleman by the name of Chris Beebe,   09:57:12 AM
3   Marc Puglielli, and I believe there was an    09:57:26 AM
4   assistant named Pamela.                09:57:43 AM
5      Q.  At the time you left Adams Golf, did   09:57:52 AM
6   those three people comprise the International   09:57:54 AM
7   department to the best of your recollection?   09:57:57 AM
8      A.  I know Marc and Chris would have been   09:58:05 AM
9   there; I can't remember Pamela.        09:58:08 AM
10     Q.  If you go to the second page, under   09:58:10 AM
11  Sales, there is a different grouping under your   09:58:12 AM
12  name.  Is it correct that Inside Sales and   09:58:15 AM
13  domestic retail accounts were part of wholesale,   09:58:21 AM
14  as indicated on the first page of this document?   09:58:27 AM
15     A.  That's correct.                09:58:33 AM
16     Q.  Then, Custom Fitting corresponded to   09:58:35 AM
17  the Custom Fitting back on Page 1, correct?   09:58:37 AM
18     A.  That's correct.                09:58:43 AM
19     Q.  Where did Green Grass accounts fit in   09:58:43 AM
20  with regard to the three boxes on Page 1?   09:58:46 AM
21     A.  Inside Sales function           09:58:49 AM
22     Q.  International distribution on Page 2 is   09:58:53 AM
23  the same as International under Page 1, right?   09:58:55 AM
24     A.  That's correct.                09:58:59 AM
25     Q.  Now, as far as you know, these two   09:59:00 AM
```

```
                                              Page 11
1   pages of Exhibit 253, did they represent the   09:59:02 AM
2   organizational chart of Adams Golf as of the time   09:59:06 AM
3   of the IPO?                          09:59:11 AM
4      MR. GLUCKOW:  Objection to form.     09:59:16 AM
5      Q.  (By Mr. Collins) You may answer   09:59:20 AM
6      A.  To the best of my memory.       09:59:22 AM
7      Q.  Let me ask you about 254.  You might   09:59:25 AM
8   want to read to yourself that first paragraph on   09:59:32 AM
9   the first page.                      09:59:35 AM
10     A.  Okay.                         10:00:16 AM
11     Q.  Have you seen Exhibit 254 before?  Feel   10:00:16 AM
12  three to flip through the pages if that will   10:00:19 AM
13  help.                                10:00:24 AM
14     A.  (Complying).                   10:00:25 AM
15     Q.  Thank you for taking the time to look   10:04:29 AM
16  over the document.                   10:06:07 AM
17     Have you seen the document?         10:06:09 AM
18     A.  I believe I have; it's such long time   10:06:15 AM
19  ago I could not tell you specifically.  I don't   10:06:18 AM
20  see my signature anywhere on the document.  I see   10:06:21 AM
21  at the end that it says provided by but --   10:06:24 AM
22     Q.  You're referring to Page 40765, where   10:06:29 AM
23  it says provided by Mark Gonsalves to John Joyce,   10:06:32 AM
24  April 1998; is that correct?           10:06:38 AM
25     A.  Correct.                       10:06:42 AM
```

```
                                              Page 12
1      Q.  Do you have any reason -- Did you   10:06:43 AM
2   prepare the projections contained on Page 40765?   10:06:46 AM
3      A.  I remember providing projections,   10:07:17 AM
4   whether this is the actual projection, I could   10:07:19 AM
5   not tell you.                        10:07:22 AM
6      Q.  Who was John Joyce?             10:07:25 AM
7      A.  To my knowledge, John Joyce worked in   10:07:29 AM
8   the finance department.               10:07:34 AM
9      Q.  At Adams Golf?                  10:07:36 AM
10     A.  Correct.                       10:07:38 AM
11     Q.  Did John Joyce or someone explain --   10:07:39 AM
12  Did John Joyce or someone else ask you to prepare   10:07:42 AM
13  these projections?                   10:07:46 AM
14     MR. BESSETTE:  I would object.  He said   10:07:50 AM
15  he did not know if these were the ones he   10:07:51 AM
16  prepared.                            10:07:54 AM
17     Q.  (By Mr. Collins) I'll rephrase:  It is   10:07:55 AM
18  correct that John Joyce or someone asked you to   10:07:57 AM
19  prepare 1999 and 1998 projections and that   10:08:00 AM
20  request was made sometime in early or the first   10:08:05 AM
21  half of 1999?                        10:08:09 AM
22     A.  That would be correct.           10:08:12 AM
23     Q.  Was it Joyce who asked you to do this?   10:08:13 AM
24     A.  That I'm not sure                10:08:17 AM
25     Q.  Was it Barney Adams who ask you to do   10:08:20 AM
```

```
                                              Page 13
1   it?                                  10:08:23 AM
2      A.  Possibly.                      10:08:23 AM
3      Q.  Do you have an understanding as to why   10:08:27 AM
4   it was that you were asked to prepare these   10:08:34 AM
5   projections -- to prepare projections?   10:08:36 AM
6      A.  I would have been asked to prepare   10:08:42 AM
7   projections because I had the responsibility for   10:08:44 AM
8   sales.                               10:08:48 AM
9      Q.  Before 1998, had you prepared   10:08:49 AM
10  multi-year projections?               10:08:52 AM
11     MR. BESSETTE:  At Adams Golf?        10:08:58 AM
12     MR. COLLINS:  Thank you, yes.        10:09:02 AM
13     A.  I prepared projections prior to 1998,   10:09:05 AM
14  whether they were multi year or not, that I don't   10:09:09 AM
15  know.                                10:09:13 AM
16     Q.  Did you have an understanding as to the   10:09:14 AM
17  purpose of preparing 1998 and 1999 projections in   10:09:16 AM
18  or about the first half of 1998?       10:09:22 AM
19     MR. BESSETTE:  I'm sorry.  Asked and   10:09:28 AM
20  answered.  I'm going to object as vague.   10:09:29 AM
21  You can answer the question.           10:09:35 AM
22     A.  Restate it, now.               10:09:38 AM
23     Q.  Not a problem:  Why did you prepare   10:09:41 AM
24  projections for 1998 and 1999?         10:09:50 AM
25     A.  To provide our finance department and   10:09:59 AM
```

4  (Pages 10 to 13)

f92e7ed2-5ede-4eca-894b-b07359f40feb

Page 22

1  you can remember going back that far, starting in    10:24:05 AM
2  1997. Did that ongoing crisis have any impact on    10:24:08 AM
3  your thinking about Asia as a growth percentage?    10:24:13 AM
4      A.  That's a good point but, because we    10:24:18 AM
5  were not entrenched yet, starting pretty much    10:24:21 AM
6  from zero in spite of the fact that the economies    10:24:26 AM
7  of Asia were struggling at that point in time,    10:24:29 AM
8  because we were so new into that market, there    10:24:33 AM
9  was still a significant demand for our product    10:24:38 AM
10  there by golfing enthusiasts in that part of the    10:24:42 AM
11  world.    10:24:51 AM
12      Q.  Let me ask you to look at another    10:24:52 AM
13  document.    10:24:54 AM
14      (Whereupon a discussion ensued off the    10:25:47 AM
15  record.)    10:24:57 AM
16      (Whereupon Plaintiff's Exhibit Number    10:25:47 AM
17  255 was marked for identification.)    10:25:47 AM
18      Q.  (By Mr. Collins) Take your time looking    10:25:47 AM
19  over this document. My first question would be    10:25:56 AM
20  whether you were the author of it.    10:25:59 AM
21      A.  Yes, it looks like me.    10:27:45 AM
22      Q.  And you authored this document on or    10:27:47 AM
23  about March 27th, 1998, in the course of your    10:27:48 AM
24  normal business?    10:27:53 AM
25      A.  Sounds correct. I can't remember    10:27:56 AM

Page 23

1  anything from March of 1998, but with the dates    10:28:00 AM
2  on there I'm confident that's accurate    10:28:04 AM
3      Q.  Mr. Murtland, what was his position at    10:28:09 AM
4  the time?    10:28:13 AM
5      A.  He was Vice President of Operations.    10:28:14 AM
6      Q.  Why did you write this memo to him?    10:28:16 AM
7      A.  Because Dick had approached me    10:28:21 AM
8  regarding these orders because he handled the    10:28:24 AM
9  production side of Adams Golf. When he's gone    10:28:29 AM
10  through the effort of producing a large order and    10:28:34 AM
11  that order either comes back or does not get    10:28:37 AM
12  shipped, it would be a normal concern for him.    10:28:40 AM
13  So I'm addressing his concerns by providing him    10:28:46 AM
14  the rationale on what went on in those specific    10:28:50 AM
15  orders.    10:28:55 AM
16      Q.  If you remember with regard to Dunham,    10:28:56 AM
17  was this order eventually -- If I'm understanding    10:28:59 AM
18  the gist of this memo, have I got it correct that    10:29:05 AM
19  the order was not shipped originally anyway    10:29:08 AM
20  because of Dunham's insistence on a consignment    10:29:12 AM
21  arrangement, is that right so far?    10:29:18 AM
22      A.  That's correct.    10:29:22 AM
23      Q.  Was the order ever shipped, if you    10:29:23 AM
24  know?    10:29:24 AM
25      A.  That I don't remember.    10:29:26 AM

Page 24

1      Q.  Let's talk about King Par. What was    10:29:29 AM
2  it?    10:30:09 AM
3      A.  A retail operation in the upper    10:30:10 AM
4  midwest, I think, Michigan.    10:30:15 AM
5      Q.  Was King Par an authorized retailer of    10:30:16 AM
6  Adams Golf?    10:30:20 AM
7      A.  Initially, they were an authorized    10:30:25 AM
8  retailer    10:30:28 AM
9      Q.  Did it come a time when they ceased    10:30:30 AM
10  being an authorized user?    10:30:34 AM
11      A.  I can't remember the specifics    10:30:36 AM
12      MR. BESSETTE: That's a yes or no    10:30:38 AM
13      A.  I don't know    10:30:40 AM
14      Q.  Although you can't remember the    10:30:42 AM
15  specifics, do you remember what about King Par?    10:30:43 AM
16      A.  I remember what's illustrated in this    10:30:48 AM
17  memo, that we had an order that came back to us    10:30:51 AM
18  from them.    10:30:56 AM
19      Q.  What was the reason why the order came    10:31:02 AM
20  back?    10:31:04 AM
21      MR. BESSETTE: Objection, vague. You    10:31:13 AM
22  mean, as expressed in the memo?    10:31:14 AM
23      Q.  (By Mr. Collins) In your last answer,    10:31:18 AM
24  you said there was an order that came back. I'm    10:31:18 AM
25  asking you why, to your understanding, did it    10:31:20 AM

Page 25

1  come back?    10:31:22 AM
2      A.  They refused the order    10:31:23 AM
3      Q.  Their refusal, as you understood it,    10:31:31 AM
4  was related to Adams Golf calling King Par to    10:31:33 AM
5  task for trans-shipping to a retailer in    10:31:39 AM
6  Massachusetts named MVP Sports?    10:31:42 AM
7      A.  MVP Sports    10:31:44 AM
8      Q.  How did Adams Golf learn that King Par    10:31:49 AM
9  had trans-shipped to MVP Sports?    10:31:55 AM
10      A.  I don't know how we discovered that.    10:32:08 AM
11      Q.  Did you personally discover that or did    10:32:16 AM
12  somebody inform you of that?    10:32:19 AM
13      A.  I don't know. That was a long time    10:32:37 AM
14  ago    10:32:40 AM
15      Q.  It is that    10:32:41 AM
16      Just to probe a little: The person who    10:32:42 AM
17  informed you, Mr. Gonsalves, of that    10:32:44 AM
18  trans-shipment, was that somebody at Adams Golf?    10:32:47 AM
19      MR. BESSETTE: Objection, assumes facts    10:32:53 AM
20  not in evidence    10:32:54 AM
21      A.  I can't remember how we discovered King    10:32:59 AM
22  Par was trans-shipping golf clubs to MVP Sports    10:33:04 AM
23  How I learned about it -- I can't recall how I    10:33:08 AM
24  learned about it    10:33:12 AM
25      Q.  MVP Sports at the time was not an    10:33:15 AM

7  (Pages 22 to 25)

Page 26

1 authorized retailer of Adams; is that correct?    10:33:18 AM
2    A  That is correct    10:33:21 AM
3    Q  How many clubs did MVP Sports receive    10:33:26 AM
4 by way of this trans-shipment, please?    10:33:31 AM
5    A  I don't remember    10:33:39 AM
6    Q  In view of the fact that, according to    10:33:47 AM
7 this memo, MVP Sports was advertising it must    10:33:49 AM
8 have been more than a handful of clubs, I gather;    10:33:55 AM
9 is that your understanding?    10:34:00 AM
10    MR. BESSETTE:  Calls for speculation.    10:34:02 AM
11    A  I can't go there only because retailers    10:34:04 AM
12 are fairly notorious for advertising a product    10:34:06 AM
13 they have very limited quantity to provide    10:34:11 AM
14 traffic to their store.  I'm not sure of the    10:34:14 AM
15 intent of that advertisement    10:34:17 AM
16    Q  That's fine    10:34:20 AM
17    In this paragraph you say:  We called    10:34:30 AM
18 them to task, that is, King Par, for the    10:34:33 AM
19 trans-shipping.    10:34:37 AM
20    What does that mean?    10:34:38 AM
21    A  Having that been my words, I would say    10:34:46 AM
22 what I was doing at that time was addressing our    10:34:50 AM
23 non trans-shipment policy to King Par.    10:34:59 AM
24    Q  When you say, addressing to King Par,    10:35:09 AM
25 do you mean you simply informed King Par of that    10:35:11 AM

Page 27

1 policy?    10:35:14 AM
2    A  That would be correct.  I informed    10:35:15 AM
3 them.  I'm not sure at this point who at King Par    10:35:20 AM
4 I would have spoken with, but that would have    10:35:24 AM
5 been correct.  It would have been their buyer, I    10:35:30 AM
6 would say.    10:35:37 AM
7    Q  Do you know who that was?    10:35:39 AM
8    A  I think he was a large fat man.  I'm    10:35:42 AM
9 not good with the names but really good with    10:35:56 AM
10 physical traits of people.    10:35:58 AM
11    Q  How did the large fat man react?    10:36:01 AM
12    A  Nothing I can recall was any behavior I    10:36:06 AM
13 thought was unusual.    10:36:12 AM
14    Q  This large fat man, I gather he was the    10:36:15 AM
15 buyer on behalf of King Par, correct?    10:36:20 AM
16    A  That would be correct.    10:36:23 AM
17    Q  That was an employee of King Par?    10:36:24 AM
18    A  I believe so.    10:36:29 AM
19    Q  Did the buyer, when you called him to    10:36:29 AM
20 task, express surprise at the existence of any    10:36:33 AM
21 such no trans-shipment policy?    10:36:39 AM
22    A  I can't remember the specifics of the    10:36:42 AM
23 conversation    10:36:43 AM
24    Q  Now, you referred a moment ago to the    10:36:46 AM
25 no trans-shipment policy.  When was that policy    10:36:53 AM

Page 28

1 created?    10:36:57 AM
2    A  As a company, we have or had -- I don't    10:36:58 AM
3 know what they do now, but there was a document    10:37:05 AM
4 that we would provide to customers in regard to    10:37:08 AM
5 our policies, pricing and the fact that they're    10:37:13 AM
6 selling to the end user, the golfer, but they're    10:37:20 AM
7 not to be re-sold in a trans-shipment type    10:37:24 AM
8 manner.  When that document became a formal    10:37:27 AM
9 document, that I don't recall, but it would have    10:37:32 AM
10 been -- I don't recall.    10:37:38 AM
11    There was a document.  When it came    10:37:46 AM
12 into being, I'm not sure.  It would have been as    10:37:48 AM
13 we were starting to develop our brand.  Prior to    10:37:51 AM
14 that, there was no need for a document because we    10:37:54 AM
15 had no customers.  At some point, it came into    10:37:57 AM
16 being so that we were able to be clear with our    10:38:01 AM
17 customer base.    10:38:05 AM
18    Q  Was this document in being as March    10:38:10 AM
19 27th, 1998?    10:38:15 AM
20    A  That is a good question.    10:38:18 AM
21    Q  Was it in being as of July 9th, 1998?    10:38:20 AM
22    A  I don't remember when the document came    10:38:25 AM
23 into being.    10:38:26 AM
24    Q  Was the document relayed or transmitted    10:38:31 AM
25 to authorized retailers once it came into being?    10:38:35 AM

Page 29

1    A  That would have been correct.    10:38:42 AM
2    Q  How would that transmission have gone?    10:38:43 AM
3    A  To my recollection, we did a mailing to    10:38:48 AM
4 our customers, and I believe you may want to    10:38:50 AM
5 check with the credit department on this, but I    10:38:57 AM
6 believe our invoices at one point in time created    10:38:59 AM
7 that document.    10:39:04 AM
8    Q  By that document, you're referring to a    10:39:05 AM
9 statement that trans-shipment of sales to anyone    10:39:07 AM
10 other than an end user is prohibited?    10:39:13 AM
11    A  That would have been one of the points    10:39:17 AM
12 in that document, words to that effect    10:39:18 AM
13    Q  Now, as of March 27th, 1998, was there    10:39:21 AM
14 any policy as to what would be what Adams Golf    10:39:26 AM
15 would do if an authorized retailer trans-shipped?    10:39:32 AM
16    A  Because I don't remember when that    10:39:54 AM
17 document came into being, that's a difficult    10:39:55 AM
18 question to answer.  I don't know the timeline of    10:39:57 AM
19 that    10:40:02 AM
20    Q  Once the document you referred to came    10:40:09 AM
21 into being what, if anything, was the sanction,    10:40:10 AM
22 if an authorized dealer trans-shipped?    10:40:13 AM
23    A  We would have addressed what we    10:40:18 AM
24 perceived to be the trans-shipment and restate    10:40:21 AM
25 our policy.  To my knowledge, we would have -- I    10:40:27 AM

8  (Pages 26 to 29)

Page 86

1  Mr. Beebe?                          12:27:36 AM
2      A. Okay (complying).              12:27:39 AM
3      Q. Did you receive these two documents 85   12:31:02 AM
4  and 86 on or about May 29th. 1998?      12:31:04 AM
5      A. I believe so.                   12:31:09 AM
6      Q. Did he prepare these memos, sending    12:31:10 AM
7  them to you in the normal course of his duties?   12:31:13 AM
8      A. Yes.                          12:31:16 AM
9      Q. Did you ever tell Beebe or anyone else   12:31:17 AM
10  that you thought Beebe in these two memos was   12:31:21 AM
11  exaggerating the situation in Canada with respect   12:31:26 AM
12  to Costco?                          12:31:30 AM
13      A. I think there were two sides of the   12:31:48 AM
14  issue: One is, we had obviously a genuine   12:31:50 AM
15  concern for our distributor and our accounts. On   12:31:55 AM
16  the other hand, we always realized that a good   12:31:59 AM
17  salesperson will take a potential issue that a   12:32:04 AM
18  customer faces and tend to make it of great   12:32:08 AM
19  importance at the time. I know that I would have   12:32:14 AM
20  done that in my sales career. So that's where   12:32:19 AM
21  we're trying to weigh it out.           12:32:23 AM
22      Q. Did you ever tell Mr. Beebe or anybody   12:32:26 AM
23  else that you thought that in these two memos, 85   12:32:27 AM
24  and 86, that Beebe was exaggerating regarding its   12:32:31 AM
25  situation in Canada?                   12:32:37 AM

Page 87

1      A. I would not have used that term; I   12:32:44 AM
2  don't recall.                        12:32:47 AM
3      Q. Did you ever tell anybody that you   12:32:48 AM
4  thought Beebe got it wrong or was stating   12:32:49 AM
5  inaccurately what the situation was in Canada?   12:32:53 AM
6      A. I think that it's not so much feeling   12:33:05 AM
7  like he got it wrong as maybe understanding the   12:33:14 AM
8  scale.                           12:33:21 AM
9      Q. Well, that's fine.                12:33:24 AM
10      With all due respect, I'm going to ask   12:33:25 AM
11  the question one more time because, if you   12:33:27 AM
12  expressed this to someone, I want you to tell me   12:33:29 AM
13  about it, but I'm really not asking you your   12:33:32 AM
14  impression right now to the completeness of --   12:33:39 AM
15  Respectfully, all I'm asking is, when you   12:33:39 AM
16  received 85 and 86, I presume, on or about May   12:33:42 AM
17  29, 1998, did you say to anybody, Beebe is   12:33:47 AM
18  smoking something; it's not that bad?         12:33:50 AM
19      A. I don't remember.                12:33:53 AM
20      Q. You have no recollection of having done   12:33:54 AM
21  so, correct?                        12:33:55 AM
22      A. I don't remember.                12:33:58 AM
23      Q. That's fine                     12:34:00 AM
24      Soon after May 29, 1998, you and Barney   12:34:02 AM
25  Adams authorized the price-matching program,   12:34:05 AM

Page 88

1  true?                           12:34:08 AM
2      A. Again, it's very hard for me to provide   12:34:10 AM
3  specifics on the timeline. My best judgment   12:34:19 AM
4  would say that's true.                  12:34:26 AM
5      Q. Now, there was a press release issued   12:34:30 AM
6  on June 9th, 1998. I show you --            12:34:34 AM
7      (Whereupon a discussion ensued off the   12:34:56 AM
8  record)                          12:34:52 AM
9      Q. (By Mr. Collins) Exhibit 20: You've   12:35:04 AM
10  seen this before, I gather?               12:35:10 AM
11      A. Yeah, I'm familiar with this.         12:35:44 AM
12      Q. Were you consulted before the release   12:35:47 AM
13  was issued?                        12:35:50 AM
14      A. Not to my knowledge.              12:35:54 AM
15      Q. Who decided to issue this release?     12:35:56 AM
16      A. Would have been Barney Adams         12:36:01 AM
17      Q. Who decided to institute the          12:36:02 AM
18  litigation?                         12:36:04 AM
19      A. Barney Adams.                   12:36:07 AM
20      Q. Did Adams ask your opinion on either   12:36:09 AM
21  the release or the litigation before they were   12:36:12 AM
22  instituted?                        12:36:18 AM
23      A. During that period of time, we        12:36:25 AM
24  certainly discussed Costco and the potential   12:36:26 AM
25  remedies that would be available to us. Barney   12:36:30 AM

Page 89

1  is the one that took those conversations and   12:36:44 AM
2  manifested it into this document, into the legal   12:36:48 AM
3  action.                          12:36:51 AM
4      Q. In your last answer, when you referred   12:36:53 AM
5  to "we", were you referring to just you and   12:36:55 AM
6  Barney Adams or did the discussions include   12:36:59 AM
7  others as well?                      12:37:02 AM
8      A. I don't recall who else might have been   12:37:06 AM
9  party to those conversations. So I don't want to   12:37:08 AM
10  exclude anyone by saying it was only me and   12:37:17 AM
11  Barney, but I would think that he would have had   12:37:20 AM
12  most of that conversation with me and potentially   12:37:28 AM
13  Chris.                           12:37:31 AM
14      Q. Did you ever offer your opinion on the   12:37:35 AM
15  advisability of filing suit?               12:37:37 AM
16      A. Did you talk to Barney yet?          12:37:46 AM
17      Q. Soon.                        12:37:52 AM
18      A. Say the question again. I'm sorry      12:38:00 AM
19      Q. Whose idea was it to file the Bill of   12:38:06 AM
20  Discovery?                        12:38:10 AM
21      A. Barney Adams.                   12:38:11 AM
22      Q. Did you ever say to him, that's a lame   12:38:12 AM
23  brain idea, don't bother with it?           12:38:14 AM
24      A. No                          12:38:18 AM
25      Q. What was the thinking behind it, the   12:38:19 AM

23  (Pages 86 to 89)

f92e7ed2-5ede-4eca-894b-b07359f40feb

Page 90

1  rationale, as you understood it?                    12:38:22 AM
2        MR. BESSETTE: Objection, calls for       12:38:26 AM
3  speculation                                        12:38:27 AM
4     Q.  (By Mr. Collins) What did you think or   12:38:29 AM
5  what did Barney tell you he thought was the good  12:38:30 AM
6  that it served by filing a lawsuit?               12:38:34 AM
7     A.  Again, you're asking me to speculate     12:38:39 AM
8  what Barney's motives were, but my understanding  12:38:40 AM
9  would be that he wanted to serve notice to our    12:38:47 AM
10 partners, as he referred to them in this release, 12:38:56 AM
11 that we do not sell to Costco.                     12:39:01 AM
12       It's one thing for you to tell the        12:39:07 AM
13 customer that; it's another thing for them to see 12:39:09 AM
14 a legal document that says that you don't.  I      12:39:14 AM
15 believe he may have felt that that would          12:39:18 AM
16 clarify -- Because you have to remember, we were  12:39:23 AM
17 in an environment where there was a lot of        12:39:27 AM
18 competition so, of course, a competitor is going  12:39:30 AM
19 to use any advantage that they have, namely, a    12:39:34 AM
20 competitor named Orlimar, who would have been     12:39:37 AM
21 more than happy to describe to any retailer, oh,  12:39:42 AM
22 yeah, those guys sell to Costco                   12:39:45 AM
23       I think that might have been -- Your       12:39:48 AM
24 answer lies with Barney, not with me, but I       12:39:51 AM
25 believe that might have been part of his          12:39:54 AM

Page 91

1  motivation and, of course, the other part was to  12:39:57 AM
2  be able to the serve notice to Costco that we     12:40:01 AM
3  were serious about the issue of trans-shipment.   12:40:04 AM
4     Q.  Wasn't grey market -- Is that right --    12:41:40 AM
5  Start again:                                       12:41:45 AM
6       Whatever the degree of seriousness of      12:42:00 AM
7  the trans-shipment, the grey marketing problem,   12:42:02 AM
8  one reason it was serious to whatever extent it   12:42:09 AM
9  was, was because of the possibility that          12:42:16 AM
10 retailers might have thought that Adams Golf was  12:42:19 AM
11 selling to Costco; is that right?                 12:42:27 AM
12       MR. BESSETTE: Objection, ambiguous         12:42:30 AM
13    Q.  (By Mr Collins) One reason               12:42:45 AM
14 trans-shipment, grey marketing, was a concern was 12:42:46 AM
15 because of the possibility that some retailer     12:42:49 AM
16 might have thought Adams Golf was selling         12:42:52 AM
17 directly to Costco; is that right?               12:42:56 AM
18       MR. GLUCKOW: Objection, vague and         12:43:00 AM
19 ambiguous.                                         12:43:01 AM
20    A.  I would say that's a definite            12:43:05 AM
21 possibility                                        12:43:10 AM
22    Q.  But even apart from that, it was still   12:43:12 AM
23 a concern, that is, even apart from the risk or   12:43:14 AM
24 the danger that some retailer might have gotten   12:43:19 AM
25 the idea that Adams Golf was selling to Costco,   12:43:21 AM

Page 92

1  even apart from that, you were still concerned    12:43:24 AM
2  about the market?                                  12:43:28 AM
3     A.  Every golf manufacturer that has a       12:43:30 AM
4  popular product is going to have concerns about   12:43:33 AM
5  trans-shipment of their product and also          12:43:36 AM
6  duplication of their product that comes in the    12:43:39 AM
7  form of direct copying or what we refer to in the 12:43:43 AM
8  business as clones, clubs that appear very        12:43:48 AM
9  similar to the hot-selling product of the day.    12:43:52 AM
10    Q.  Very good                                 12:43:55 AM
11       Now, just focusing on the                  12:43:58 AM
12 trans-shipment, grey marketing matter: You refer  12:44:00 AM
13 to every golf manufacturer having concerns.       12:44:03 AM
14 Those concerns are going to be heightened when    12:44:06 AM
15 you have occasions that grey marketing,           12:44:10 AM
16 trans-shipment, is actually occurring, correct?   12:44:12 AM
17       MR. BESSETTE: Objection, calls for        12:44:17 AM
18 speculation                                        12:44:19 AM
19       MR. GLUCKOW: Also mischaracterizes his    12:44:20 AM
20 testimony                                          12:44:23 AM
21    Q.  (By Mr. Collins) You may answer          12:44:25 AM
22    A.  If I understand the question correctly,  12:44:25 AM
23 in the normal course of business, it would be one 12:44:28 AM
24 of our many concerns that we would have as a      12:44:35 AM
25 business, sure.                                    12:44:38 AM

Page 93

1     Q.  In your last answer, when you say, one   12:44:41 AM
2  of our main concerns, were you referring to       12:44:43 AM
3  actual instances of trans-shipment and grey       12:44:46 AM
4  marketing occurring?  Is that what you were       12:44:53 AM
5  referring to?                                      12:45:00 AM
6     A.  One of those many concerns, yes          12:45:02 AM
7        MR. COLLINS:  Why don't we break          12:45:07 AM
8     (Whereupon a lunchbreak ensued at 12:45 to   12:45:09 AM
9     1:41 PM)                                       12:45:13 AM
10    Q.  (By Mr. Collins) What were the other     01:41:46 PM
11 concerns, besides in the normal course of         01:41:47 PM
12 business as of June-July?                          01:41:50 PM
13    A.  Economic concerns, competitor concerns,  01:41:53 PM
14 supplier concerns, weather concerns, personnel    01:42:05 PM
15 concerns, advertising concerns                    01:42:13 PM
16    Q.  By economic, you do mean financial?      01:42:17 PM
17    A.  Really more economic in the sense of     01:42:20 PM
18 the economy                                        01:42:22 PM
19    Q.  Was there a concern about whether it     01:42:26 PM
20 would be continue to be a hot product?            01:42:30 PM
21    A.  I don't think anyone shared that         01:42:35 PM
22 concern at that time                               01:42:35 PM
23    Q.  Was there a concern about whether Adams  01:42:38 PM
24 Golf would be able to develop additional products 01:42:41 PM
25 beyond the Tight Lies?                             01:42:46 PM

24  (Pages 90 to 93)

## Page 94

1    A. I think every golfer, stated or     01:42:50 PM
2  unstated, has a concern about the consumer    01:42:53 PM
3  acceptance. That would be true of any     01:42:56 PM
4  manufacturer, not specific to golf.     01:42:58 PM
5    Q. Now, the IPO occurred and soon    01:43:04 PM
6  thereafter Adams Golf released its June 1998    01:43:10 PM
7  numbers, which exceeded expectations, if you    01:43:17 PM
8  recall that. Do you have a recollection of that?    01:43:21 PM
9    A. I don't have a recollection of the    01:43:25 PM
10 numbers, but my memory is that we did okay.    01:43:26 PM
11   Q. Soon after the IPO, the price of the    01:43:31 PM
12 stock declined. Do you remember that?    01:43:36 PM
13   A. Yes.     01:43:40 PM
14   Q. There was a marked decline, even during    01:43:42 PM
15 July, which was the month when the IPO occurred?    01:43:45 PM
16   A. Yes.     01:43:49 PM
17   Q. Do you recall any of the reasons for    01:43:50 PM
18 that decline?     01:43:52 PM
19    MR. BESSETTE: Assumes facts not in    01:43:58 PM
20 evidence.     01:44:00 PM
21    MR. COLLINS: You're right about that.    01:44:01 PM
22 Let me rephrase.     01:44:02 PM
23   Q. (By Mr. Collins) With regard to the    01:44:04 PM
24 decline in the stock price, did you ever give any    01:44:05 PM
25 thought as to why the decline occurred in July    01:44:09 PM

## Page 95

1  and in August?     01:44:12 PM
2    A. Yes.     01:44:14 PM
3    Q. Did you discuss your thoughts with    01:44:17 PM
4  anyone?     01:44:18 PM
5    A. I would think there was probably some    01:44:29 PM
6  conversation regarding the stock.     01:44:33 PM
7    Q. With whom?     01:44:37 PM
8    A. It's a conversation that Barney and I    01:44:48 PM
9  might have had a discussion or two about it. We    01:44:50 PM
10 were focused on our business and trying to --    01:44:54 PM
11 trying to improve our business, but it wasn't    01:44:59 PM
12 something we focused on but, obviously, knew that    01:45:04 PM
13 it was there.     01:45:07 PM
14   Q. In July and August, did you come to any    01:45:08 PM
15 conclusions as to why you thought the stock price    01:45:11 PM
16 was declining?     01:45:14 PM
17   A. The conclusions that I would have had    01:45:21 PM
18 at that point would have been from a couple of    01:45:24 PM
19 different vantage points. One, would have been    01:45:27 PM
20 the original quiet period that we had to go    01:45:31 PM
21 through. I don't know all of the SEC    01:45:37 PM
22 requirements; I'm not an expert by any means, but    01:45:40 PM
23 I know there was a period of time that we had to    01:45:45 PM
24 reduce our public exposure of the company.    01:45:48 PM
25   At the exact time, Orlimar they had a    01:45:57 PM

## Page 96

1  young fellow who was basically in my position, in    01:46:00 PM
2  the sense of sales there, named Nathaniel Crosby,    01:46:05 PM
3  son of Bing Crosby. Nathaniel Crosby had a lot    01:46:10 PM
4  of traction in the marketplace because he was a    01:46:15 PM
5  very good player, he won the US Amateur and, of    01:46:19 PM
6  course, his lineage. So we were having to reduce    01:46:24 PM
7  our profile at the very time they turned their    01:46:29 PM
8  profile straight up. It would be like Pepsi    01:46:32 PM
9  stopping advertising. What would happen to    01:46:36 PM
10 Coca-Cola? They would take market share. That    01:46:38 PM
11 was a big concern at that point in time in    01:46:44 PM
12 retrospect and, then, the economy as related to    01:46:44 PM
13 golf in general was starting to really soften.    01:46:47 PM
14   So that really -- Calloway was kind of    01:46:56 PM
15 the bellwether, I would say. So I think as goes    01:46:59 PM
16 Calloway, the perception was, as goes the    01:47:03 PM
17 industry. I think we really suffered the    01:47:06 PM
18 coattailing effect of that, if my memory is    01:47:09 PM
19 right. I could be way off base, but if my memory    01:47:13 PM
20 is right, we announced our second quarter    01:47:18 PM
21 earnings which were positive. They announced    01:47:21 PM
22 their second quarter earnings, which were below    01:47:25 PM
23 expectation. So I think we really suffered from    01:47:30 PM
24 that.     01:47:33 PM
25   Q. Was Adams, in your opinion, partly    01:47:36 PM

## Page 97

1  responsible for Calloway's under performance?    01:47:39 PM
2    A. I don't believe so.     01:47:42 PM
3    Q. Not compete in the same club    01:47:55 PM
4  categories?     01:47:57 PM
5    A. I think Calloway's under performance    01:48:01 PM
6  had more to do with what we would call their line    01:48:04 PM
7  extension. They moved into a lot of different    01:48:09 PM
8  areas with their brand, publishing clothing, golf    01:48:11 PM
9  balls and a variety of things. They were    01:48:17 PM
10 investing significant time and capital in that    01:48:21 PM
11 and taking away from their core competency    01:48:25 PM
12   Q. Did you ever talk to any of the    01:48:33 PM
13 underwriters? The IPO had several underwriters,    01:48:34 PM
14 correct?     01:48:40 PM
15   A. Yes.     01:48:41 PM
16   Q. Did you ever talk to any of the    01:48:41 PM
17 underwriters about the reason for the stock price    01:48:42 PM
18 decline at Adams post IPO?     01:48:45 PM
19   A. I don't know if I did. I don't know if    01:48:53 PM
20 anyone specifically called me and made such a    01:48:55 PM
21 request.     01:49:01 PM
22   (Whereupon Plaintiff's Exhibit Number    01:49:18 PM
23 259 was marked for identification.)    01:49:18 PM
24    MR. COLLINS: Adams 14012    01:49:19 PM
25   Q. (By Mr. Collins) When you can, tell me    01:49:41 PM

25 (Pages 94 to 97)

Page 118

1   speculation                        02:29:35 PM
2       MR. BESSETTE: With the Calloway club?    02:29:37 PM
3       MR. COLLINS: Yes              02:29:42 PM
4   A   I don't know how to answer to that. I    02:29:43 PM
5   don't know what Calloway's policies were in    02:29:44 PM
6   relation to their own distribution.          02:29:47 PM
7       Q   Now, you know there was some        02:29:49 PM
8   information in this Exhibit 167 with regard to   02:29:50 PM
9   Calloway retailer margins?                   02:29:55 PM
10  A   That's correct.                  02:29:58 PM
11  Q   Where was that information obtained?    02:29:59 PM
12  A   Is there a notation on the slot       02:30:02 PM
13  Q   It's Page 29 of Exhibit 167.        02:30:05 PM
14  A   I don't know where that number came   02:30:21 PM
15  from                              02:30:23 PM
16  Q   In regard to Calloway on this page, 29,    02:30:25 PM
17  is that the blended margin for discounters and   02:30:28 PM
18  also for golf shops or is that instead the golf   02:30:32 PM
19  shop margin?                          02:30:39 PM
20  A   Because there's no reference on this    02:30:41 PM
21  slide and it was eight years ago, I could not    02:30:43 PM
22  tell you where those numbers came from        02:30:46 PM
23  Q   As you can see in from this page,     02:30:53 PM
24  Calloway's margin is less than half of the Adams'   02:30:56 PM
25  margin. Is that as a result, as you described, a   02:31:01 PM

Page 119

1   motion that the Calloway clubs by 1998 were    02:31:05 PM
2   becoming a more widely distributed product? By   02:31:10 PM
3   widely distributed, I mean distributed through   02:31:17 PM
4   discounters as well as golf shops.           02:31:21 PM
5       MR. GLUCKOW: Objection, calls for    02:31:26 PM
6   speculation                        02:31:27 PM
7       MR. BESSETTE: I agree.           02:31:31 PM
8   A   I can't say that specifically  My       02:31:32 PM
9   thought is that -- purely my thought -- is that   02:31:34 PM
10  Calloway had enjoyed a very significant period of   02:31:42 PM
11  success prior to 1998. The retail community are   02:31:49 PM
12  a very competitive bunch of folks, whether it's   02:31:58 PM
13  golf or anything else  So over time, I think the   02:32:05 PM
14  retail community is competing with themselves and   02:32:11 PM
15  created their own margin story, if this makes    02:32:14 PM
16  sense to you. That's what I believe happened.    02:32:21 PM
17  Q   What did you mean when you say       02:32:28 PM
18  competing with themselves, created their own    02:32:31 PM
19  margin story?                        02:32:34 PM
20  A   Well, you have golf shops in a similar    02:32:37 PM
21  geographical area, and one golf shop wants to    02:32:42 PM
22  gain advantage over his competitor. He may     02:32:47 PM
23  promote the club at a price point that is lower   02:32:52 PM
24  than its competitor to drive his own traffic    02:32:57 PM
25  The response from the competitor is, I will map   02:33:02 PM

Page 120

1   the price. It becomes a spiral that starts to    02:33:05 PM
2   work downward as far as margins.            02:33:08 PM
3       Q   Now, in your last two answers, what's    02:33:13 PM
4   the basis of your information there?         02:33:15 PM
5   A   Having been in golf as a player for     02:33:19 PM
6   30-some-odd years and having worked in the     02:33:21 PM
7   industry for a period of time               02:33:27 PM
8       Q   Thank you                   02:33:32 PM
9       Did you personally encourage any      02:33:50 PM
10  distributors or retailers to purchase shares in   02:33:52 PM
11  the IPO?                           02:34:03 PM
12  A   I did not encourage them to purchase    02:34:07 PM
13  shares in the IPO, although there were retailers   02:34:10 PM
14  who wanted to avail, I think it's called friends   02:34:13 PM
15  and family list that a company will have that   02:34:21 PM
16  they could purchase shares at the going-out     02:34:28 PM
17  price. So there were retailers that were on that   02:34:34 PM
18  list. So we made them aware they could         02:34:41 PM
19  participate, if they so chose to do that.        02:34:43 PM
20  Q   Did you or anyone at Adams encourage or   02:34:48 PM
21  urge those retailers to show support for Adams    02:34:51 PM
22  Golf by purchasing in the IPO?              02:34:56 PM
23  A   I think that we maintained a mutual     02:35:01 PM
24  position there. Were we enthusiastic about our   02:35:04 PM
25  IPO? I would say, like any company going through   02:35:12 PM

Page 121

1   an IPO, there were some general enthusiasm, but I   02:35:16 PM
2   think it was not in our best interest to        02:35:26 PM
3   encourage people to take actions that they did   02:35:32 PM
4   not willfully want to do. We simply availed    02:35:36 PM
5   opportunity to them.                    02:35:38 PM
6       Q   How about the distributors? Did you    02:35:41 PM
7   urge or encourage any distributors to purchase in   02:35:44 PM
8   the IPO personally or Adams Golf?            02:35:48 PM
9   A   We had WDC MacKenzie was part of that   02:35:53 PM
10  friends and family list. I can't recall who else   02:35:58 PM
11  from the international distribution side of our   02:36:01 PM
12  business may have been on that list. I suspect   02:36:06 PM
13  there may have been others.                02:36:09 PM
14  Q   Did you fly to Canada to discuss this    02:36:11 PM
15  with WDC MacKenzie?                    02:36:16 PM
16  A   I did fly to Canada to meet with WDC    02:36:19 PM
17  MacKenzie and, certainly, one of the topics at   02:36:21 PM
18  the meeting that you're pointing out would have   02:36:24 PM
19  been their inclusion on the friends and family   02:36:29 PM
20  list if they so chose to want to participate.    02:36:32 PM
21  Q   Did you tell the people at WDC        02:36:36 PM
22  MacKenzie how many shares you thought was      02:36:38 PM
23  appropriate or reasonable for them to purchase?   02:36:41 PM
24  A   No. I told them what they would have    02:36:44 PM
25  the opportunity to purchase.               02:36:46 PM

31 (Pages 118 to 121)

**Page 122**

```
1      Q.   Did you encourage them to take      02:36:48 PM
2   advantage of that opportunity and make a     02:36:50 PM
3   purchase?                                    02:36:52 PM
4      A.   Again. I think. it's kind of like    02:36:54 PM
5   picking your wife: It's got to be an individual   02:36:57 PM
6   decision.                                    02:37:01 PM
7      All I was simply providing was the        02:37:02 PM
8   opportunity for them to participate if they so   02:37:04 PM
9   chose                                        02:37:08 PM
10     (Whereupon a break ensued at 2:39       02:42:07 PM
11  to 2:45 PM)                                  02:42:01 PM
12     Q.  (By Mr. Collins) I have given Mr.     02:42:07 PM
13  Gonsalves the Exhibit 57, and I presume you've   02:45:32 PM
14  seen it before but I'll ask you to take a moment   02:45:35 PM
15  to look over it. Let me know when I can ask a   02:45:39 PM
16  question                                     02:45:43 PM
17     A.  Okay.                                 02:48:41 PM
18     Q.  Have you seen these two pages before?   02:48:42 PM
19     A.  Yes.                                  02:48:44 PM
20     Q.  Was this memo sent to you on or about   02:48:45 PM
21  August 14, 1998?                             02:48:48 PM
22     A.  Yes                                   02:48:51 PM
23     Q.  May I ask your reaction to this when   02:48:57 PM
24  you received it?                             02:48:59 PM
25     A.  My reaction was taken in context with   02:49:00 PM
```

**Page 123**

```
1   the person who sent it to me.                02:49:04 PM
2      Q.  Which means what?                     02:49:09 PM
3      A.  Which means, Barney is at times able to   02:49:11 PM
4   allow his emotions to distort his thinking on   02:49:23 PM
5   certain topics. So I took that in context as   02:49:31 PM
6   related to the content of the memo          02:49:38 PM
7      Q.  Did you make any writing in response to   02:49:41 PM
8   this?                                        02:49:43 PM
9      A.  Not that I know of. I'm sure I spent   02:49:45 PM
10  time with him in regard to this memo.        02:49:48 PM
11     Q.  Do you know George Klaus?            02:49:56 PM
12     A.  I know of him; I don't know him.      02:49:59 PM
13     Q.  Did you talk to George Klaus about this   02:50:01 PM
14  memo or the subject matter?                  02:50:03 PM
15     A.  Not to my knowledge.                  02:50:06 PM
16     Q.  On Point A on Page 1, that's a        02:50:12 PM
17  subjective statement but it says: The department   02:50:18 PM
18  staff. presumably refers to Inside Sales staff,   02:50:21 PM
19  has very low morale.                         02:50:28 PM
20     Was that accurate statement as of         02:50:31 PM
21  August 1998.                                 02:50:32 PM
22     A.  I believe that for certain individuals   02:50:34 PM
23  that may have been an accurate statement.    02:50:37 PM
24     Q.  Why. please                           02:50:41 PM
25     A.  I think that for a few reasons. I     02:50:42 PM
```

**Page 124**

```
1   think one is the commission plans were changed a   02:50:49 PM
2   number of times as the company continued to gain   02:50:58 PM
3   more and more momentum. So I think that      02:51:02 PM
4   potentially had something to do with it.     02:51:05 PM
5      I think Number 2, is that prospectus      02:51:08 PM
6   pretty clearly illustrates who is going to gain   02:51:12 PM
7   what. A the time, people could take out a     02:51:20 PM
8   calculator and figure out what people's newfound   02:51:23 PM
9   paper wealth was, and I think there may have been   02:51:26 PM
10  some feelings because of that and I think,   02:51:29 PM
11  thirdly, I think there was some friction between   02:51:35 PM
12  departments and sales.                       02:51:39 PM
13     Q.  The second point, were you referring to   02:51:50 PM
14  the decline in the stock price post IPO, to pull   02:51:52 PM
15  out a calculator and determine -- I didn't   02:51:58 PM
16  understand?                                  02:52:01 PM
17     A.  When the IPO came out, it showed the   02:52:01 PM
18  holdings of the individuals, the officers and so   02:52:05 PM
19  on. So a person could determine their newfound   02:52:10 PM
20  worth of those individuals.                  02:52:13 PM
21     Q.  I understand.                         02:52:16 PM
22     So --                                     02:52:18 PM
23     A.  Everything I just told you is         02:52:19 PM
24  speculation on my part, but it's what I believe.   02:52:21 PM
25     Q.  The third point you raised was a      02:52:24 PM
```

**Page 125**

```
1   conflict between departments and sales?      02:52:27 PM
2      A.  Yes                                   02:52:29 PM
3      Q.  What did you mean?                     02:52:30 PM
4      A.  I think in most companies there is a   02:52:31 PM
5   natural conflict between Sales and Credit as an   02:52:33 PM
6   example, Sales and Order Entry. Sales is viewed   02:52:38 PM
7   as a more lucrative profession by those that are   02:52:45 PM
8   not necessarily in it.                       02:52:50 PM
9      Q.  Point C: They know cheating, at least   02:52:59 PM
10  in the form of double shipments occurs and our   02:53:08 PM
11  concern is quietly endorsed.                 02:53:13 PM
12     What is your reaction to that             02:53:18 PM
13  statement?                                   02:53:19 PM
14     MR. BESSETTE:  At the time?               02:53:23 PM
15     MR. COLLINS:  Yes.                        02:53:24 PM
16     A.  At the time, I knew of no activity.    02:53:24 PM
17  There was no evidence that has ever been     02:53:27 PM
18  presented to me that would make me believe Letter   02:53:29 PM
19  C was correct.                               02:53:32 PM
20     Q.  Jay Graeney was an Inside Sales       02:53:36 PM
21  associate?                                   02:53:40 PM
22     A.  Yes.                                  02:53:41 PM
23     Q.  Were there complaints from customers   02:53:42 PM
24  about his activities?                        02:53:43 PM
25     A.  I think there were complaints that    02:53:52 PM
```

VERITEXT PA COURT REPORTING COMPANY
(215)  241-1000   (888)  777-6690   (610)  434-8588

f92e7ed2-5ede-4eca-894b-b07359f40feb

## Page 126

```
 1  customers had about probably every salesperson.   02:53:55 PM
 2  Did Jay have complaints? I'm sure he did. When    02:54:01 PM
 3  you have that many accounts, I would think        02:54:05 PM
 4  there's probably some accounts that you just, for  02:54:07 PM
 5  whatever set of reasons. don't connect with as    02:54:12 PM
 6  well.                                             02:54:16 PM
 7     Q.  Was he one of the top sellers in Inside    02:54:17 PM
 8  Sales?                                            02:54:22 PM
 9     A.  He was                                     02:54:23 PM
10     Q.  Were you friendly on a social basis        02:54:25 PM
11  with Jay Graeney?                                 02:54:30 PM
12     A.  I was not one to socialize. I played       02:54:36 PM
13  on the company softball team, which he played on  02:54:39 PM
14  as well as other people from Inside Sales. To     02:54:44 PM
15  that extent that would be the end of our social   02:54:47 PM
16  activity.                                         02:54:50 PM
17     Q.  On the second page, there is a             02:55:05 PM
18  reference to -- There is a paragraph that begins:  02:55:06 PM
19  Our short-term goals. The paragraph ends: I       02:55:10 PM
20  realize there are decisions we can make, but just  02:55:17 PM
21  like (ph) diverters, we must rely on these        02:55:24 PM
22  people.                                           02:55:27 PM
23     Do you have opinion as to what is meant        02:55:30 PM
24  by diverters.                                     02:55:32 PM
25     A.  I really don't, short term.                02:55:33 PM
```

## Page 127

```
 1     Q.  Is that a reference to trans-shippers,     02:55:38 PM
 2  if you know?                                      02:55:41 PM
 3     A.  I'm not sure what Barney -- I would not    02:55:57 PM
 4  know what Barney's intended use of that word is.  02:56:05 PM
 5     Q.  Did he ever refer to trans-shippers or     02:56:10 PM
 6  grey marketers as diverters?                      02:56:14 PM
 7     A.  It's not a term that I'm overly            02:56:18 PM
 8  familiar with. He may have.                       02:56:20 PM
 9     Q.  Then, in the next paragraph there is a     02:56:22 PM
10  statement: Apparently, he had made a lot of       02:56:24 PM
11  sales that had been falsely reported (as sales)   02:56:29 PM
12  and a little more than consignments. I gather     02:56:30 PM
13  you don't think that an accurate statement,       02:56:37 PM
14  as far as you know?                               02:56:40 PM
15     A.  That's correct.                            02:56:41 PM
16     Q.  Did Barney tell you the basis of that      02:56:43 PM
17  statement?                                        02:56:46 PM
18     A.  He did not tell me the basis of that       02:56:50 PM
19  statement.                                        02:56:52 PM
20     Q.  Did you undertake any investigation to     02:56:53 PM
21  determine whether there was any basis to that     02:56:56 PM
22  statement?                                        02:56:59 PM
23     A.  I had been approached by a couple of       02:57:09 PM
24  people in regard to the potential of this issue   02:57:13 PM
25  of double shipment and so on. I asked for         02:57:18 PM
```

## Page 128

```
 1  evidence of that of which I never saw any. The    02:57:25 PM
 2  individual that you referenced earlier was the    02:57:28 PM
 3  person who had been pinpointed by others as       02:57:30 PM
 4  having taken this action.                         02:57:36 PM
 5     Upon not receiving any hard evidence as        02:57:39 PM
 6  relates to any double shipments, I called him     02:57:43 PM
 7  into my office and I asked him, as I'm staring at  02:57:48 PM
 8  you, whether he did that. He told me he did not.  02:57:52 PM
 9  So I supported a member of our team that his      02:57:55 PM
10  word, based on any -- the lack of evidence, to    02:58:00 PM
11  persuade my opinion any other way               02:58:06 PM
12     Although he was the Number 1                   02:58:10 PM
13  salesperson at that time, it also should be noted  02:58:11 PM
14  that the Number 2 salesperson we terminated from  02:58:16 PM
15  the company -- I terminated from the company for  02:58:19 PM
16  actions that we felt weren't in keeping with our  02:58:23 PM
17  sales team. In her case, it was disciplinary --   02:58:28 PM
18  attendance really was the ultimate problem that   02:58:32 PM
19  she faced.                                        02:58:40 PM
20     Q.  Who was that Number 2 person?              02:58:42 PM
21     A.  Boy, (pause) I think her first name was    02:58:50 PM
22  Corolla.                                          02:58:59 PM
23     Q.  Now, at the beginning of --                02:59:03 PM
24     A.  That would have been prior to 1998, I      02:59:06 PM
25  believe.                                          02:59:08 PM
```

## Page 129

```
 1     Q.  At the beginning of your answer a          02:59:09 PM
 2  moment ago, I believe you said that persons came  02:59:10 PM
 3  to you with allegations of double shipping. Who   02:59:18 PM
 4  would those persons be?                           02:59:21 PM
 5     A.  The individual that I remember coming      02:59:24 PM
 6  to me on this was a gentleman name Steve          02:59:30 PM
 7  Sanazaro, who was relatively new to the company   02:59:34 PM
 8  in the computer department, IT department. Then   02:59:38 PM
 9  Sherry Braby, who was our credit manager          02:59:43 PM
10     Q.  Did Braby and Sanazaro come to you         03:00:02 PM
11  after or before the August 14th memo from Barney?  03:00:19 PM
12     A.  That's a good question. I don't            03:00:29 PM
13  remember the timeline of that.                    03:00:30 PM
14     Q.  Did Sanazaro tell you what the basis of    03:00:43 PM
15  his concern or question was, why he thought the   03:00:46 PM
16  double shipping might be --                       03:00:51 PM
17     A.  I think for me that was the challenge.     03:00:55 PM
18  There was no documents; there was no evidence     03:00:58 PM
19  that I ever saw that indicated this was           03:01:00 PM
20  happening. So in the face of no evidence, I put   03:01:04 PM
21  me in a very difficult position, other than to    03:01:12 PM
22  try to address it directly with the individual    03:01:15 PM
23  involved                                          03:01:17 PM
24     Q.  I presume Braby also gave you no basis     03:01:19 PM
25  or evidence of double shipping?                   03:01:25 PM
```

33  (Pages 126 to 129)

## Page 130

1    A  I never saw any evidence, never saw        03:01:27 PM
2  double purchase orders, never saw hard evidence    03:01:29 PM
3    Q  Further down in the memo in the          03:01:37 PM
4  paragraph beginning:  I don't think, it goes      03:01:38 PM
5  on to say:  Are we living a big lie to present     03:01:42 PM
6  road show numbers for '98-'99 that we have no     03:01:46 PM
7  idea we can attain                  03:01:50 PM
8        Was any analysis done with regard to      03:01:58 PM
9  road show presentations by you or anybody else     03:02:03 PM
10  after this August 14 memo to your knowledge?      03:02:10 PM
11    A  I don't know the answer to that.  I        03:02:46 PM
12  don't know if we revisited the forecast at that    03:02:48 PM
13  time or not.                    03:02:51 PM
14    Q  As part of the road show, forecasts       03:02:53 PM
15  were provided in the 3rd and 4th quarters of 1998   03:03:00 PM
16  and also for '99; is that correct?            03:03:06 PM
17    A  I'm not sure.  It's so long ago; I         03:03:09 PM
18  don't have a recollection that I can commit to     03:03:13 PM
19    Q  Is it correct that financial             03:03:16 PM
20  projections were provided but you don't know for   03:03:17 PM
21  what period?                    03:03:21 PM
22      MR. BESSETTE:  Vague, provided by whom    03:03:24 PM
23  or to whom?                    03:03:29 PM
24    Q  As part of road show presentations?       03:03:30 PM
25    A  I would think Darl had a part of this      03:03:32 PM

## Page 131

1  presentation that dealt with projections  That's    03:03:35 PM
2  to the best of my knowledge              03:03:38 PM
3    Q  What happened after this memo, if        03:03:40 PM
4  anything?                      03:03:42 PM
5      MR. BESSETTE:  Regarding the memo?       03:03:46 PM
6    Q  (By Mr. Collins)  Regarding -- What was   03:03:51 PM
7  the next occurrence, if anything?            03:03:54 PM
8      MR. BESSETTE:  I'm going to object,        03:03:58 PM
9    assumes facts not evidence.            03:03:59 PM
10    A  I'm trying to place myself back:  I        03:04:05 PM
11  believe at the time Barney and I reviewed this     03:04:24 PM
12  memo together, and I gave him my input in regard   03:04:26 PM
13  to these specific items that he lists here  I      03:04:33 PM
14  think we tried to find common solutions that      03:04:37 PM
15  would be beneficial to the company as related to    03:04:40 PM
16  any degree of truth in any of these points       03:04:43 PM
17    I tried to provide him the best            03:04:54 PM
18  information I could in regard to maybe where I     03:04:56 PM
19  thought he was not fully abreast of the topic.     03:04:59 PM
20  An example would be the reference to          03:05:05 PM
21  telemarketing and being on the phone for an hour   03:05:10 PM
22  and a half                      03:05:13 PM
23      If you're on the phone for an hour and     03:05:14 PM
24  a half with customers, it may take you four or     03:05:16 PM
25  five hours of phone time to talk to customers for   03:05:20 PM

## Page 132

1  an hour and a half because you've got busy       03:05:24 PM
2  signals, voice mails, people are not there, the     03:05:27 PM
3  phone doesn't get through, there is a variety of   03:05:30 PM
4  things that can happen to reduce your talk time    03:05:33 PM
5  dramatically.  I think those types of things were   03:05:34 PM
6  discussed.                     03:05:46 PM
7    Q  Now, you resigned not long after this?     03:05:48 PM
8    A  I'm not sure how long.  At that time,       03:05:52 PM
9  of course, through the IPO, there were -- During    03:05:53 PM
10  those summer months, let's call them, there were   03:06:01 PM
11  a lot of recruiters that had been calling.  I had   03:06:03 PM
12  some visibility through trade publications and     03:06:08 PM
13  golf publications and, certainly, within the golf   03:06:11 PM
14  community.  So there were a lot of opportunities    03:06:17 PM
15  that were presenting themselves to me at that     03:06:19 PM
16  point in time.                   03:06:22 PM
17    Q  But you resigned in 1998?             03:06:23 PM
18    A  That's correct.                 03:06:26 PM
19    Q  When you left the company, were you       03:06:32 PM
20  paid money?                    03:06:34 PM
21    A  No.                      03:06:37 PM
22    Q  Did you sign an agreement in connection   03:06:40 PM
23  with your leaving the company?            03:06:42 PM
24    A  I know I provided a letter of            03:06:48 PM
25  resignation upon my leaving and I helped the      03:06:50 PM

## Page 133

1  person who replaced me, Jeff Brewer, to our       03:06:53 PM
2  larger customers to introduce him and try to      03:06:58 PM
3  familiarize him with the operation that he was     03:07:05 PM
4  inheriting, and I don't know if there was a       03:07:08 PM
5  formal document, there may have been, that I      03:07:14 PM
6  signed that said that my last day is such and     03:07:16 PM
7  such, I don't know.  My resignation letter       03:07:20 PM
8  certainly indicated that, but I don't know if      03:07:23 PM
9  there was another document that was part of my     03:07:25 PM
10  leaving, my exit.                  03:07:29 PM
11    Q  Did you undertake any obligation not to   03:07:31 PM
12  disparage or reveal secrets of Adams Golf at the   03:07:35 PM
13  time you left?                   03:07:44 PM
14    A  I don't believe so.               03:07:45 PM
15    Q  Where did you go?                03:07:46 PM
16    A  I went to a ski manufacturer back in      03:07:47 PM
17  New England, which is where I'm from           03:07:50 PM
18    Q  In what position?                03:07:52 PM
19    A  Vice President of Sales and Marketing.     03:07:53 PM
20    Q  Now, as I get it going back to an        03:07:58 PM
21  earlier topic, in 1998 and up through the time     03:08:02 PM
22  that you left Adams, you're not aware of any      03:08:07 PM
23  retailer or distributor who was ever cut off with   03:08:10 PM
24  respect to future sales of Adams products for     03:08:15 PM
25  trans-shipping or grey marketing?            03:08:23 PM

34  (Pages 130 to 133)

Page 134

```
1      MR. BESSETTE: Objection, misstates    03:08:29 PM
2   testimony.                               03:08:29 PM
3   Q. (By Mr. Collins) Let me restate it:   03:08:33 PM
4      Tell me which retailer or distributor, 03:08:35 PM
5   if anyone, who was cut off for trans-shipping 03:08:37 PM
6   during 1998.                             03:08:43 PM
7      A. I hate to sound like a broken record on 03:08:48 PM
8   this: It was such a long time ago, I don't know 03:08:50 PM
9   if or who that would have been.          03:08:53 PM
10     Q. Then, up until -- In 1998 up until the 03:08:59 PM
11  IPO, just to recap, the instances of     03:09:05 PM
12  trans-shipping that you personally had become 03:09:10 PM
13  aware of included MVP Sports in New England? 03:09:15 PM
14     A. Yes.                               03:09:25 PM
15     Q. And it included sightings of clubs in 03:09:26 PM
16  Boise at Costco, correct?                03:09:33 PM
17     A. Yes.                               03:09:37 PM
18     Q. And it included several instances or a 03:09:43 PM
19  number of instances of clubs appearing at a Costco 03:09:53 PM
20  in Canada, correct?                      03:09:57 PM
21     A. I only visited a couple of Costcos in 03:09:59 PM
22  Canada. If you're talking about me physically 03:10:02 PM
23  going into a Costco versus the clubs that were 03:10:09 PM
24  alleged to be a Costco.                  03:10:14 PM
25     Q. But you went to a couple Costcos    03:10:18 PM
```

Page 135

```
1   yourself in Canada where you saw Adams clubs 03:10:20 PM
2   being sold before the IPO, correct?      03:10:25 PM
3      A. I would think it was before the IPO. 03:10:30 PM
4      Q. In addition to that, it was Pro Golf. 03:10:33 PM
5   Pro Golf also informed you that they had received 03:10:41 PM
6   reports of Costco selling Adams Golf clubs before 03:10:45 PM
7   the IPO?                                 03:10:51 PM
8      A. Pro Golf made inquiry as related to our 03:10:54 PM
9   product in Costco.                       03:10:59 PM
10     Q. Now, in addition to what you and I have 03:11:01 PM
11  just discussed in the last moment, were there any 03:11:03 PM
12  other reports of trans-shipping, grey marketing 03:11:07 PM
13  or Adams clubs being sold to Costco or Price Club 03:11:10 PM
14  that you were aware of pre IPO?           03:11:16 PM
15     A. Not to my knowledge.               03:11:22 PM
16     Q. Did you hear reports of trans-shipping 03:11:24 PM
17  going on in Florida?                     03:11:28 PM
18     A. I believe there was an account in  03:11:34 PM
19  Florida that over time we had concern about the 03:11:35 PM
20  disposition of those clubs.              03:11:43 PM
21     Q. What do you mean by that?          03:11:46 PM
22     A. How was he selling those clubs, who was 03:11:49 PM
23  he selling them to.                      03:11:52 PM
24     Q. Who would that have been?          03:11:55 PM
25     A. It was an account, if memory serves me, 03:11:56 PM
```

Page 136

```
1   Manatee Golf.                            03:12:00 PM
2      Q. That was before the IPO first      03:12:07 PM
3   developed?                               03:12:13 PM
4      A. Hard for me to put a time line on that. 03:12:14 PM
5      Q. Might have been before the IPO?    03:12:18 PM
6      A. Could very well have been.         03:12:21 PM
7      Q. I believe you also heard reports in 03:12:23 PM
8   Northern Virginia of grey marketing?     03:12:27 PM
9      A. Yes.                               03:12:31 PM
10     Q. Who was the trans-shipper in that  03:12:31 PM
11  instance, if you know?                   03:12:33 PM
12     A. I don't know.                      03:12:34 PM
13     Q. Then did you hear reports before the 03:12:35 PM
14  IPO of grey marketing or trans-shipping in the 03:12:37 PM
15  Pacific Northwest?                       03:12:44 PM
16     A. The only reference I could make there 03:12:51 PM
17  would have been that Costco was based in the 03:12:54 PM
18  Pacific Northwest, their corporate headquarters 03:12:57 PM
19  was based in the Pacific Northwest.      03:13:01 PM
20     Q. You recall that we looked at a May 8th 03:13:15 PM
21  memo that you wrote, Exhibit 256. Did you or 03:13:27 PM
22  anyone ever contact National Clothing or US 03:13:33 PM
23  Merchants about, what, if anything, they were 03:13:40 PM
24  doing about making sales or clubs that ended up 03:13:43 PM
25  at Costco?                               03:13:47 PM
```

Page 137

```
1      A. If my memory serves me correctly, I 03:13:51 PM
2   believe that we tried to understand more fully 03:13:54 PM
3   how those clubs were getting to Costco as far as 03:14:00 PM
4   these particular entities. Obviously, they would 03:14:03 PM
5   know why you're trying to discuss this with him. 03:14:10 PM
6   No conversations took place, to my knowledge, 03:14:14 PM
7   with these companies as related to them diverting 03:14:17 PM
8   the club over to Costco.                 03:14:23 PM
9      Q. Any conversations with National     03:14:26 PM
10  Clothing or US Merchants as to how they came to 03:14:28 PM
11  be in possession of the clubs?           03:14:33 PM
12     A. Again, I don't recall conversations 03:14:36 PM
13  with these companies.                    03:14:40 PM
14     Q. Do you recall an investigation that was 03:14:44 PM
15  undertaken by you or someone else?       03:14:47 PM
16     A. Right, trying to figure it out and how 03:14:50 PM
17  we got to the point of got information on this 03:14:53 PM
18  memo, at this point, my memory escapes me on how 03:14:56 PM
19  we would have done that.                 03:15:00 PM
20     MR. COLLINS: I don't have any more     03:15:04 PM
21  questions. I thank you.                  03:15:05 PM
22     MR. BESSETTE: Just a few questions     03:15:11 PM
23                                           03:15:15 PM
24  ///                                      03:15:15 PM
25     EXAMINATION                           03:15:15 PM
```

35 (Pages 134 to 137)

Page 138

BY MR. BESSETTE:                                          03:15:15 PM
1
2    Q.  Grab that document back, the August          03:15:12 PM
3    14th memo from Barney.                                03:15:17 PM
4    A.  Okay.                                                    03:15:19 PM
5    Q.  Points A through I in Mr. Adams' memo?    03:15:32 PM
6    A.  Yes.                                                       03:15:38 PM
7    Q.  To you and Rick?                                    03:15:39 PM
8    A.  Yes.                                                       03:15:40 PM
9    Q.  I believe you recalled talking with Mr.      03:15:40 PM
10   Adams about the criticism in this memo?         03:15:44 PM
11   A.  Yes.                                                       03:15:47 PM
12   Q.  Is that your recollection?                        03:15:48 PM
13   A.  Yes, that's what I stated.                        03:15:50 PM
14   Q.  With respect to Letters A through I,         03:15:51 PM
15   which of those, if any, have merit in your view?   03:15:58 PM
16   In other words, which of these criticisms had    03:16:04 PM
17   some merit in your view?                              03:16:08 PM
18   A.  I would say D, to a lesser extent E, H        03:16:26 PM
19   and I                                                           03:16:44 PM
20   Q.  Okay.  With respect to I, I think you         03:16:57 PM
21   already testified to that in response to Mr         03:17:00 PM
22   Collins questions.                                         03:17:02 PM
23   A.  Yes.                                                       03:17:06 PM
24   Q.  What about H, what was valid about H?      03:17:08 PM
25   A.  Historically, that could happen.               03:17:16 PM

Page 139

1    Q.  Meaning, commissions were cut?              03:17:21 PM
2    A.  That's correct                                         03:17:26 PM
3    Q.  Do you know why they were cut?              03:17:27 PM
4    A.  They were cut because Barney had the       03:17:30 PM
5    belief that the sales team should not be overpaid   03:17:36 PM
6    for a product that was very rapidly gaining        03:17:42 PM
7    market share.                                               03:18:03 PM
8    Q.  And very popular?                                   03:18:07 PM
9    A.  Very popular  The perception was easy        03:18:08 PM
10   to sell.                                                        03:18:17 PM
11   Q.  With respect to Item E, what was valid      03:18:18 PM
12   about that one?                                            03:18:20 PM
13   A.  I think that Craig Parish was                     03:18:22 PM
14   originally an Inside Salesperson.  So one person   03:18:28 PM
15   was promoted out of that group to be able to      03:18:31 PM
16   manage the group  He was the person that was    03:18:34 PM
17   chosen which by definition means the others were   03:18:40 PM
18   not chosen  He was new to the job, as any of      03:18:46 PM
19   them would have been, and I think that he was in   03:18:49 PM
20   the learning process of maturing in the job         03:18:54 PM
21   Q.  Just to be clear, to reaffirm, you            03:19:01 PM
22   never saw any evidence of double shipping        03:19:05 PM
23   occurring while you were at Adams Golf; is that   03:19:08 PM
24   right?                                                          03:19:11 PM
25        MR. COLLINS: Objection, leading.           03:19:13 PM

Page 140

1        MR. BESSETTE:  Let me ask it again      03:19:15 PM
2    Q.  (By Mr. Bessette) Did you ever see any     03:19:16 PM
3    evidence of double shipping while you were at    03:19:17 PM
4    Adams Golf?                                             03:19:19 PM
5    A.  No.                                                       03:19:21 PM
6    Q.  Did you ever see any evidence or            03:19:21 PM
7    otherwise know about any consignment sales while   03:19:22 PM
8    you were at Adams Golf?                               03:19:26 PM
9    A.  At the very beginning of Adams Golf,        03:19:28 PM
10   before we had an infomercial, before there was a   03:19:31 PM
11   brand, before there was consumer interest in the   03:19:38 PM
12   product, there was in isolated cases the            03:19:42 PM
13   opportunity to provide customers the product on   03:19:46 PM
14   consignment.                                               03:19:49 PM
15   Q.  When did that change?                           03:19:51 PM
16   A.  When we established consumer demand for   03:19:56 PM
17   the product, advertising creating the interest in   03:20:00 PM
18   the marketplace for the product                     03:20:03 PM
19   Q.  Do you recall when that was, the             03:20:06 PM
20   infomercial?                                               03:20:07 PM
21   A.  It was launched in '97, to the best of      03:20:11 PM
22   my recollection, May, springish, late spring.     03:20:14 PM
23   Q.  Then, on the second page of Exhibit 57,   03:20:34 PM
24   Mr. Adams in that third full paragraph says:     03:20:36 PM
25   Check July returns and tell me what they'll be   03:20:41 PM

Page 141

1    during the rest of the year                          03:20:46 PM
2        Do you recall having discussions with      03:20:48 PM
3    him about that topic?                                  03:20:49 PM
4    A.  I can't recall specific conversations        03:20:51 PM
5    regarding July returns  I know that I believe in   03:20:56 PM
6    and around this time we used a company that was   03:21:00 PM
7    doing direct consumer sales with the clubs, and   03:21:05 PM
8    that was something that was not part of my        03:21:10 PM
9    jurisdiction.  That would have been Walt and     03:21:15 PM
10   maybe Cindy and Barney may have had a hand in    03:21:19 PM
11   that  I think the company was called Telegolf or   03:21:24 PM
12   something to that effect. So they were selling    03:21:31 PM
13   the golf club direct to consumers and using what   03:21:33 PM
14   I believe were practices, although normally       03:21:38 PM
15   practiced within the industry of direct sales,     03:21:43 PM
16   were practices that encouraged returns. So the   03:21:46 PM
17   July time frame, it may very well may have been   03:21:58 PM
18   Q.  Was it your understanding these sales       03:22:02 PM
19   by Telegolf had higher returns with them?        03:22:07 PM
20   A.  Yes.                                                      03:22:35 PM
21   Q.  If you can find Exhibit 257  That's         03:22:36 PM
22   your memo of June 2nd  I think you testified      03:22:41 PM
23   that you wrote this memo.                             03:23:06 PM
24   A.  That's correct.                                       03:23:09 PM
25   Q.  Tell us, then, when you meant when you      03:23:09 PM

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

f92e7ed2-5ede-4eca-894b-b07359f40feb

# GREANEY

## JAY GREANEY

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.  :    CONSOLIDATED

SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

_____X

ORAL DEPOSITION OF JAY GREANEY

Thursday, May 18, 2006

The oral deposition of JAY GREANEY was
held at the law offices of Locke Liddell & Sapp,
LLP, 1700 Pacific Avenue, Suite 2200, Dallas,
Texas, from 10:08 a.m. to 12:45 p.m., before Jamie
K. Israelow, a Certified Shorthand Reporter in and
for the State of Texas, Registered Professional
Reporter, Certified Realtime Reporter and
Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000    (888)777-6690

## JAY GREANEY

### Page 10

```
10:15:37  1  house account or serviced by a -- another division
10:15:43  2  of the company.
10:15:48  3     Q    What division was that?
10:15:51  4     A    That would have been what was called
10:15:52  5  the -- the big-box retailers.
10:15:56  6     Q    That was the name of the division,
10:16:00  7  the big-box retailer division?
10:16:02  8     A    I don't know if that was the name of
10:16:03  9  it. I don't recall the actual name, but I know
10:16:06 10  those particular stores were categorized as key
10:16:09 11  accounts or big-box retailers.
10:16:11 12     Q    Who was in charge of the area of the
10:16:15 13  company dealing with key accounts or big-box
10:16:18 14  retailers in the first half of '98?
10:16:20 15     A    The -- I believe it was the vice
10:16:26 16  president of sales.
10:16:28 17     Q    Mark Gonsalves?  Is that --
10:16:39 18     A    Yes.
10:16:39 19     Q    Were there particular accounts in
10:16:44 20  1998 before the IPO that were taken away from you
10:16:51 21  and taken to the big box or national account
10:16:59 22  division?
10:16:59 23     A    There -- no, there weren't particular
10:17:02 24  accounts. There was a shifting of -- of
```

### Page 11

```
10:17:06  1  territory, but I -- I didn't ever handle any of
10:17:10  2  the key accounts, so they would not have been
10:17:13  3  taken from me.
10:17:13  4     Q    I see. So then is it accurate that
10:17:19  5  in 1998 up until the IPO, your territory was
10:17:26  6  Southern California, some parts of Michigan, some
10:17:28  7  parts of New York, all of Utah, and all of Hawaii?
10:17:35  8     A    Yes, if I recall.
10:17:38  9     Q    Okay. In Hawaii, what were your big
10:17:40 10  accounts in 1998, to the extent that you can
10:17:49 11  recall? What I'm asking: Tell me the two or
10:17:52 12  three or four biggest accounts you had in Hawaii.
10:17:56 13     A    That was several years ago. There
10:17:57 14  was one that I recall, Piece of Time; possibly
10:18:13 15  Supreme Golf, and I -- I don't recall the names of
10:18:15 16  the other -- any other accounts.
10:18:18 17     Q    Thank you. Okay. Now, let's focus
10:18:32 18  on 1998, January 1 until the IPO in July 1998.
10:18:38 19  During that time, how were you -- what was the
10:18:40 20  basis of your compensation, please?
10:18:43 21     A    Salary plus commission.
10:18:54 22     Q    How was the commission determined,
10:18:56 23  please?
10:18:56 24     A    The commission was based on sales,
```

### Page 12

```
10:19:04  1  based on shipment to accounts, less returns.
10:19:23  2     Q    Was your entitlement to commissions
10:19:34  3  or the terms of your commission remuneration
10:19:38  4  reduced to writing? Let me translate that into
10:19:46  5  English away from lawyerese.
10:19:47  6            Was there a document that
10:19:49  7  says:  Mr. Greaney, these are the terms under
10:19:52  8  which we'll pay you commissions?
10:19:54  9     A    Yes. If I understand the question,
10:19:56 10  there was a commission schedule.
10:20:18 11     Q    What were your -- going back a step,
10:20:21 12  what were your accounts in Michigan? Tell me some
10:20:23 13  of the bigger accounts in Michigan, to the extent
10:20:25 14  you can recall.
10:20:27 15     A    Karl's Golf Land, King Par. There
10:20:44 16  were several golf courses. Pro Golf. I don't
10:20:55 17  recall many others.
10:20:57 18     Q    Now, again, same time period, '98 up
10:21:09 19  through the IPO, describe for me, please, the
10:21:17 20  process from receipt of order to shipment. What
10:21:26 21  steps did you go through?
10:21:31 22     A    '98. From when in '98?
10:21:36 23     Q    January 1 through July 10.
10:21:41 24     A    Okay. There -- there would have been
```

### Page 13

```
10:21:44  1  two processes, because there would have been a PGA
10:21:47  2  trade show, which would have meant that there was
10:21:51  3  an acceptance of orders that were placed by
10:21:59  4  customers at a trade show. And then there were
10:22:01  5  orders that were placed through call-ins from
10:22:07  6  customers, verbal calls, as well as from -- at the
10:22:13  7  time there was an outside servicing group that
10:22:16  8  would have serviced retailers, and they would have
10:22:19  9  either -- called to say:  Send a customer clubs.
10:22:23 10     Q    Uh-huh.
10:22:23 11     A    It was a faith market.
10:22:29 12     Q    Forgive me. What does that mean?
10:22:32 13     A    What I mean by that is they were
10:22:35 14  verbal orders.
10:22:35 15     Q    I see. So on the basis of a verbal
10:22:46 16  order, you would ship?
10:22:47 17     A    To a certain degree, yes. There were
10:22:51 18  orders that were placed for immediate delivery,
10:22:54 19  and then there were backup orders, which were
10:22:57 20  considered prebooks for future delivery.
10:23:03 21     Q    Are you telling me that for future
10:23:06 22  deliveries, those orders required some sort of
10:23:10 23  writing?
10:23:10 24     A    Yes.
```

4  (Pages 10 to 13)

## JAY GREANEY

**Page 14**

10:23:10 1    Q    Whereas the immediate deliveries
10:23:13 2    entailed somebody calling you up or you calling
10:23:15 3    one of your customers and the customer saying:
10:23:19 4    Send me 10 clubs, and you'd say: Right away, and
10:23:24 5    there would be no purchase order, for example, in
10:23:29 6    that circumstance, that you would receive from the
10:23:32 7    customer?
10:23:32 8    A    There were a combination of purchase
10:23:35 9    orders and verbal orders.
10:23:36 10    Q    Okay.
10:23:36 11    A    So there were orders that were placed
10:23:38 12    for immediate delivery, and then there were orders
10:23:41 13    that were placed for immediate delivery and for --
10:23:45 14    for future business to guarantee delivery, and I
10:23:50 15    believe that was the -- the terminology that was
10:23:57 16    used
10:23:58 17    Q    Which terminology?
10:23:59 18    A    Guaranteed delivery is what I recall
10:24:03 19    the company had used in their tactic.
10:24:05 20    Q    And guaranteed delivery referred to
10:24:08 21    future orders?
10:24:12 22    A    Yes.
10:24:12 23    Q    Was there any policy that you were
10:24:15 24    aware of in effect January 1, '98, through July 10

**Page 15**

10:24:20 1    at Adams Golf regarding whether a written purchase
10:24:24 2    order was required?
10:24:29 3    A    Not that I'm aware of.
10:24:38 4    Q    Okay. Let's talk for a moment about
10:24:41 5    situations, January 1 through July 10, '98, in
10:24:45 6    which you received a verbal order.
10:24:47 7    Once you received the verbal
10:24:50 8    order, what was your next step?
10:24:53 9    A    The next step would have been to
10:25:00 10    write the order and process that through data
10:25:05 11    entry, to physically hand the -- the order to a
10:25:09 12    data-entry person, who would input the order, and
10:25:12 13    then it would go through the system
10:25:21 14    Q    Through the system at Adams Golf?
10:25:23 15    A    Yes.
10:25:23 16    Q    And when you say "through the
10:25:26 17    system," you mean that the order would be
10:25:29 18    processed all the way to the shipping dock?  Is
10:25:35 19    that what you mean?
10:25:36 20    A    Yes.  There were steps that the order
10:25:38 21    would have to go through.  There was a process
10:25:40 22    where the order was entered, and then it would go
10:25:44 23    through to the accounting department and then
10:25:48 24    through to shipping if it was released.

**Page 16**

10:25:54 1    Q    What do you mean "if it was
10:25:56 2    released"?
10:25:57 3    A    Well, the order would have had to
10:25:59 4    have been approved for release through the
10:26:03 5    accounting and credit department.
10:26:21 6    Q    Now, after you received a verbal
10:26:28 7    order, did you customarily, January 1 through
10:26:32 8    July 10, '98, send anything in writing to the
10:26:39 9    customer to confirm the order?
10:26:43 10    A    No.  That -- that was not a -- a
10:26:45 11    policy that was in place, is my understanding.
10:26:49 12    Q    Okay.  So as far as the customer was
10:26:52 13    concerned, after he placed the verbal order with
10:26:55 14    you, the next communication he received from Adams
10:27:02 15    Golf was delivery of the club?
10:27:09 16    A    Yes, in most instances  There were
10:27:12 17    times, as I mentioned, that there were written
10:27:15 18    orders that were generated rarely by a purchase
10:27:18 19    order, but that's accurate
10:27:22 20    Q    Okay  And the purchase order
10:27:24 21    procedure usually was only followed with regard to
10:27:27 22    future delivery or guaranteed delivery orders; is
10:27:30 23    that right?
10:27:35 24    A    No.  That's not completely right.

**Page 17**

10:27:37 1    There were times when there were purchase orders
10:27:40 2    that were just according to the way a particular
10:27:45 3    customer placed their orders.  At the time, there
10:27:52 4    were not very many written purchase orders, at
10:27:55 5    least in the territory that I was handling.
10:27:59 6    Q    I see.  Now, you said at the time
10:28:02 7    there weren't many written purchase orders, at
10:28:06 8    least in your territory.  Did that change at a
10:28:09 9    subsequent point?  Rephrase that, if I may.
10:28:14 10    After July 10th, 1998, until
10:28:17 11    your departure in November 1998, did there come a
10:28:20 12    time when it became more common to use written
10:28:23 13    purchase orders?
10:28:25 14    A    Yes, it became more common at the
10:28:30 15    time prior to 1998, there -- there was just a
10:28:35 16    flurry of business and customers were saying:
10:28:39 17    Send me whatever you can get me.
10:28:40 18    Q    Sure.
10:28:41 19    A    And then as time went on, there was a
10:28:46 20    bit more conservatism, customers were concerned
10:28:50 21    about demand, so they were -- in general, the
10:28:53 22    business was leaning toward purchase orders.  I
10:28:59 23    don't know that it was particular to Adams Golf.
10:29:01 24    Q    I see.  And this change that the

5  (Pages 14 to 17)

# JAY GREANEY

### Page 18

10:29:06 1 customers began to lean more toward purchase
10:29:11 2 orders occurred after the IPO?
10:29:13 3    A    Possibly. And I can't say that it's
10:29:16 4 particular to the IPO. It's possible that it was
10:29:19 5 just within the industry as a whole.
10:29:21 6    Q    I see. But in terms of time when
10:29:25 7 this change, leaning more toward purchase orders
10:29:28 8 on the part of customers, this change occurred or
10:29:31 9 began to occur after July 10th, 1998?
10:29:39 10    A    I can't say that that's something
10:29:41 11 that's concurrent with July 10th, 1998. I just
10:29:45 12 know that it happened.
10:29:47 13    Q    The -- the change, customers leaning
10:29:50 14 more toward purchase orders, that was a change in
10:29:58 15 the customers' practice, as opposed to Adams
10:30:02 16 Golf's practice, right?
10:30:03 17    A    Yes, that's accurate.
10:30:04 18    Q    Did there come a time during 1998,
10:30:06 19 after July 10, when Adams Golf changed its policy
10:30:11 20 about accepting verbal orders?
10:30:18 21    A    I don't recall. I wasn't there very
10:30:20 22 much longer after July 10th.
10:30:34 23    Q    Okay. Now, in -- in taking verbal
10:30:42 24 orders before 1998, before July 10, were there any

### Page 19

10:30:47 1 rules, any procedures that Adams Golf provided for
10:30:55 2 you, any rules as to what sort of orders to take,
10:30:58 3 what sort of orders not to take?
10:31:03 4    A    There were rules that changed over
10:31:05 5 time, and much was based on demand. There --
10:31:08 6 there was a lot of demand for the product, and
10:31:13 7 there was a time when literally we would just
10:31:20 8 accept orders from a customer, and that's what I
10:31:29 9 recall. It was just simply a busy time.
10:31:31 10    Q    Sure.
10:31:32 11    A    The product was in high demand.
10:31:34 12    Q    Sure. And that began to change
10:31:36 13 before you left Adams Golf, I gather?
10:31:41 14    A    Yes.
10:31:41 15    Q    When did that begin to change?
10:31:48 16    A    It began to change at the time
10:31:53 17 when -- there was another company, Orlimar, that
10:31:56 18 came into the marketplace with -- with a similar
10:32:01 19 product in that fairway wood category, and they
10:32:05 20 began to start taking some market share, so it may
10:32:09 21 have been toward the end of -- toward the end of
10:32:18 22 '97. I don't recall the actual date.
10:32:20 23    Q    Uh-huh. Okay. Now, something --
10:32:26 24 forgive me for changing course for a sec. I

### Page 20

10:32:28 1 should have asked you this before: Did you do
10:32:31 2 anything to prepare for this deposition?
10:32:36 3    A    I don't understand the question.
10:32:37 4    Q    Well, you were nice enough to come,
10:32:40 5 that's one form of preparation. Did you talk to
10:32:43 6 Peg before the deposition about some of the
10:32:46 7 subject matter of the deposition and what the
10:32:49 8 procedure would be?
10:32:50 9         MS. HALL: And I'm going to
10:32:51 10 caution the witness to -- you can tell him if we
10:32:54 11 talked, but not what we discussed.
10:32:56 12    A    I just spoke with Peg before with
10:32:59 13 regard to the scheduling of the deposition.
10:33:03 14    Q    (By Mr. Collins) Good. And when did
10:33:04 15 that discussion take place?
10:33:11 16    A    This morning and on one other day
10:33:14 17 last week.
10:33:18 18    Q    Okay. And when you spoke to Peg, was
10:33:20 19 there anyone else present besides the two of you?
10:33:25 20    A    No.
10:33:25 21    Q    Now, have you met Michelle before
10:33:27 22 this morning?
10:33:27 23    A    No, I haven't.
10:33:28 24    Q    And have you -- have you spoken to

### Page 21

10:33:30 1 Michelle or anybody from the Akin Gump firm before
10:33:34 2 this morning?
10:33:35 3    A    I've spoken with them only to -- to
10:33:39 4 understand that there was some sort of a matter
10:33:42 5 regarding this
10:33:45 6    Q    Okay. And when did that -- was that
10:33:47 7 one discussion with Akin Gump, or more than one?
10:33:53 8    A    If I recall, it was two discussions
10:33:56 9    Q    Okay. Were those over the phone or
10:33:58 10 in person?
10:33:59 11    A    Over the phone
10:34:01 12    Q    And Akin Gump has lots of fine
10:34:03 13 lawyers. Do you happen to remember if it was
10:34:06 14 Michelle Reed or someone else you spoke to at Akin
10:34:10 15 Gump?
10:34:11 16    A    I think I had spoken with Michelle
10:34:13 17 and possibly one other lawyer. I don't recall her
10:34:16 18 name, though.
10:34:16 19    Q    Jenny Brannen?
10:34:19 20    A    Yes
10:34:19 21    Q    And during those discussions with
10:34:25 22 Jenny Brannen and/or Michelle Reed, did they tell
10:34:32 23 you anything about the sorts of questions you
10:34:33 24 might be asked at a deposition?

6  (Pages 18 to 21)

d802fe04-283e-43f9-b076-ee84209ac8d9

JAY GREANEY

| | | |
|---|---|---|
| | **Page 22** | |

10:34:35 1    A    No

10:34:35 2    Q    How long were the discussions with
10:34:40 3    Jenny and/or Michelle?

10:34:47 4    A    They were brief, 30 minutes or so.

10:34:51 5    Q    Did they send you any documents?

10:34:52 6    A    The only document that I received was
10:34:54 7    the actual claim.

10:34:56 8    Q    The complaint?

10:34:57 9    A    Complaint, yes.

10:34:59 10    Q    Okay. Did they tell you anything
10:35:00 11    about the complaint?

10:35:03 12    A    No.

10:35:03 13    Q    Did they tell you anything about how
10:35:07 14    their clients were defending against the
10:35:11 15    complaint?

10:35:13 16    A    No.

10:35:13 17    Q    Did they describe to you what the
10:35:15 18    lawsuit was about?

10:35:18 19    A    To a certain degree. They mentioned
10:35:21 20    that there was a -- a class-action suit of some
10:35:27 21    kind.

10:35:27 22    Q    And did they tell you what your role
10:35:29 23    in the litigation might be?

10:35:33 24    A    No, not in detail.

| | | |
|---|---|---|
| | **Page 23** | |

10:35:34 1    Q    But I do hope they told you you were
10:35:37 2    in -- you have no dog in this fight, and they did
10:35:39 3    tell you that you're not a plaintiff or a
10:35:41 4    defendant?

10:35:42 5    A    Yes. Yes, I understood that.

10:35:44 6    MS. HALL: Are you from Texas?

10:35:46 7    You're using -- I guess "dog in this hunt" would
10:35:48 8    be the way we would say it.

10:35:50 9    MR. COLLINS: It would be
10:35:51 10    "ain't got no dog in this deer hunt."

10:35:56 11    Q    (By Mr. Collins) In the IPO, did you
10:35:58 12    buy any stock?

10:35:59 13    A    Yes, I did.

10:36:00 14    Q    How much did you buy?

10:36:10 15    A    I bought either a thousand or 1,500
10:36:14 16    shares, and then I bought 2- or 300 shares in the
10:36:23 17    aftermarket.

10:36:23 18    Q    In the IPO, did you pay the IPO price
10:36:26 19    of $16 a share, or was it some reduced number?

10:36:29 20    A    It was the IPO price.

10:36:30 21    Q    Do you still own those shares?

10:36:33 22    A    No, I don't.

10:36:37 23    Q    Good. When did you sell?

10:36:41 24    A    Well after the stock had dropped

| | | |
|---|---|---|
| | **Page 24** | |

10:36:45 1    dramatically, over the course of time.

10:36:48 2    Q    Bad. Bad.

10:36:51 3    A    Bad, yes.

10:36:54 4    Q    Now, with regard to commissions, you
10:36:57 5    mentioned that in '98 up through July 10 your
10:37:02 6    commissions were based on sales, which I
10:37:05 7    understood to be shipments less returns. Is that
10:37:07 8    right?

10:37:07 9    A    Yes, that's right.

10:37:09 10    Q    Now, was there some method by which
10:37:13 11    shipments were tracked, that you're aware of?

10:37:22 12    A    I don't understand the question.

10:37:24 13    Q    Well, it wasn't a good question.

10:37:29 14    Was there some form that you
10:37:31 15    needed to fill out to make sure you got paid,
10:37:34 16    which after all was something you were entitled
10:37:36 17    to? Was there some procedure you followed to make
10:37:38 18    sure that all your shipments were recorded and you
10:37:46 19    were credited for them?

10:37:46 20    A    No. There was no procedure. There
10:37:47 21    was a commission statement that was generated by
10:37:49 22    the company.

10:37:55 23    Q    On what sort of -- how frequently was
10:37:58 24    that statement generated?

| | | |
|---|---|---|
| | **Page 25** | |

10:37:58 1    A    Monthly basis.

10:38:01 2    Q    And the commission statement that was
10:38:03 3    generated by the company, what information was
10:38:07 4    contained in it, please?

10:38:10 5    A    If I recall, it -- it would contain
10:38:13 6    the name of the customer and the shipment date and
10:38:23 7    the -- the commission amount, possibly or the
10:38:32 8    shipment of dollar amount. I don't recall. The
10:38:36 9    company records would reflect that information.

10:38:38 10    Q    Sure. Did this commission statement
10:38:40 11    reflect any returns --

10:38:43 12    A    Yes.

10:38:43 13    Q    -- or list any returns?

10:38:53 14    Did you receive on a monthly
10:38:57 15    basis just one commission statement broken down by
10:38:59 16    account, or did you receive a separate commission
10:39:03 17    statement for each one of your accounts in which
10:39:06 18    there had been activity?

10:39:10 19    A    I recall there would have been one
10:39:12 20    commission statement that would list all of the
10:39:15 21    accounts, all of the shipments for the month.

10:39:18 22    Q    I see. And I presume you received
10:39:25 23    this commission statement early in the following
10:39:32 24    month?

7  (Pages 22 to 25)

d802fe04-283e-43f9-b076-ee84209ac8d9

## JAY GREANEY

Page 66

11:48:14 1  the defendants in this case.
11:48:18 2        MR. COLLINS: That you haven't
11:48:19 3  yet or you will not in the future.
11:48:22 4        MS. HALL: I will not be.
11:48:23 5        MR. COLLINS: Thank you very
11:48:24 6  much.
11:48:24 7        MS. HALL: Sure.
11:48:26 8    Q    (By Mr. Collins) Now, you read over
11:48:29 9  the termination and release agreement, 815 through
11:48:33 10  818, before you signed it, I presume?
11:48:54 11    A    Yes.
11:48:54 12        MR. COLLINS: Are you going
11:48:55 13  to -- if I may, Peg, are you going to be paid by
11:49:00 14  directors' and officers' insurance.
11:49:05 15        MS. HALL: No.
11:49:08 16    Q    (By Mr. Collins) Okay. Let's look
11:49:16 17  at Page 811, if we may. This is not a document
11:49:26 18  you prepared, correct?
11:49:29 19    A    Correct.
11:49:30 20    Q    Have you seen before today Craig
11:49:34 21  Parrish's handwriting?
11:49:43 22    A    Yes, but I don't recall what it looks
11:49:49 23  like.
11:49:49 24    Q    So you don't know whether Page 811 is

Page 67

11:49:52 1  Craig Parrish's handwriting?
11:49:54 2    A    I don't know.
11:49:57 3    Q    Page 808, second line, is that his
11:50:05 4  signature at the "from" line, his initials?
11:50:11 5    A    I don't know. I don't recall if
11:50:13 6  that's his signature. It's been a long time.
11:50:18 7    Q    All right. Well, let -- let me,
11:50:21 8  without trying to be too unpleasant about all
11:50:24 9  this, ask you -- ask you this way: Is it correct
11:50:31 10  that Parrish criticized some of your sales
11:50:37 11  practices?
11:50:38 12    A    Yes.
11:50:38 13    Q    And what, in general, did he say?
11:50:42 14    A    There -- there were some mistakes
11:50:44 15  that were made, and he criticized and asked what
11:50:52 16  mistakes had been made and why.
11:50:59 17    Q    Okay. May I ask what you meant by
11:51:00 18  your reference to "mistakes"?
11:51:07 19    A    There were -- there were some double
11:51:12 20  shipments that took place as a result of some --
11:51:14 21  some system errors and some lack of demand for the
11:51:22 22  product, and there was some criticism placed on me
11:51:26 23  as a result of that.
11:51:49 24    Q    What did you mean by "system errors,"

Page 68

11:51:52 1  please?
11:51:53 2    A    There were -- there were times when a
11:51:58 3  customer would place an order, and then it was
11:52:01 4  encouraged to -- to receive a prebook, a backup
11:52:06 5  order for future delivery, and those orders were
11:52:12 6  collected and -- and either put into the system or
11:52:17 7  given to somebody who would enter the order, and
11:52:20 8  then there was some criticism of me as a result of
11:52:22 9  the fact that those orders were shipped.
11:52:27 10        MR. COLLINS: I apologize
11:52:29 11  Could you read that last answer?
11:52:29 12        (The reporter read back the
11:52:54 13  requested text.)
11:52:55 14    Q    (By Mr. Collins) You say it was
11:52:55 15  encouraged to receive a prebook or a backup order.
11:53:02 16  Who so encouraged, please?
11:53:04 17    A    It was encouraged by -- by our sales
11:53:08 18  manager and the vice president of sales. If we're
11:53:15 19  at a trade show or if we're speaking with a
11:53:18 20  customer, there was encouragement to have an order
11:53:21 21  placed, but to also receive a backup order, a
11:53:25 22  prebook order, in order to guarantee delivery in a
11:53:29 23  way that would help to be sure that manufacturing
11:53:33 24  built enough product to avoid backorders.

Page 69

11:53:50 1    Q    The backup or prebook order, was that
11:53:53 2  something obtained from the client, from the
11:53:56 3  customer?
11:53:56 4    A    Yes. There were times when they were
11:53:58 5  actually obtained by the client, and then there
11:54:00 6  were also times when -- at the direction of the
11:54:05 7  sales manager or the vice president of sales, we
11:54:08 8  were encouraged to request a prebook for the same
11:54:14 9  order or a future order for the next month, the
11:54:18 10  following months.
11:54:19 11    Q    I see. In those instances in which
11:54:42 12  the -- the customer did not place the prebook
11:54:47 13  order, backup order, what procedure did you follow
11:54:51 14  when you entered the prebook or the backup order?
11:54:59 15    A    I didn't enter the order
11:55:03 16    Q    Who did?
11:55:05 17    A    Data entry would enter the orders
11:55:07 18    Q    At whose instruction?
11:55:12 19    A    At the instruction of whomever it was
11:55:15 20  that delivered the orders to data entry.
11:55:18 21    Q    Who was that?
11:55:19 22    A    It would have been an administrator,
11:55:23 23  someone who collected the orders. It may have
11:55:27 24  been a sales manager. It may have been just an

18  (Pages 66 to 69)

# JAY GREANEY

### Page 70

11:55:29 1 administrative assistant who collected the orders
11:55:33 2 for data entry.
11:55:33 3     Q    I see. And the person who collected
11:55:35 4 such orders did so at the instruction of the sales
11:55:38 5 manager or vice president of sales; is that right?
11:55:43 6     A    I believe so.
11:55:45 7     Q    Okay. The vice president of sales,
11:55:53 8 at least until October 1998, was Gonsalves?
11:55:59 9     A    Yes.
11:55:59 10     Q    Who was the sales manager?
11:56:03 11     A    Craig Parrish.
11:56:13 12     Q    Okay. In the period during 1998, at
11:56:18 13 least through the IPO, was it the general practice
11:56:24 14 for there to be a backup or prebook order whenever
11:56:28 15 an order was placed?
11:56:51 16     A    Yes.
11:56:51 17     Q    In '98, before -- up until the time
11:56:55 18 of the IPO, how often did the client deliver to
11:57:10 19 you the backup and prebook order? Was it
11:57:15 20 10 percent of the time? 80 percent of the time?
11:57:20 21 And how often was the prebook or backup order
11:57:24 22 generated without receiving a request from the
11:57:32 23 customer?
11:57:32 24     A    Typically, more prebook orders were

### Page 71

11:57:36 1 placed at the trade shows in January and
11:57:43 2 September. And if I recall, perhaps 10 -- 10 to
11:57:49 3 20 percent of the time, a prebook would be placed
11:57:51 4 just throughout the -- the course of a regular
11:57:57 5 order for immediate delivery being placed.
11:58:03 6     Q    Does -- does that mean 80 to
11:58:07 7 90 percent of the time the prebook or backup order
11:58:10 8 would be placed not by the customer, but instead
11:58:16 9 by an administrator or sales manager at Parrish's
11:58:20 10 or Gonzalves' instruction?
11:58:22 11     MS. REED: Objection, assumes
11:58:23 12 facts not in evidence, misstates prior testimony.
11:58:27 13 You can still answer.
11:58:30 14     Q    (By Mr. Collins) I don't think
11:58:31 15 that's a good objection, but I can never be sure
11:58:34 16 so let me try again.
11:58:35 17     Does that mean 80, 90 -- 80 to
11:58:39 18 90 percent of the time that a prebook or backup
11:58:42 19 order was entered, it was not at the request of
11:58:51 20 the customer?
11:58:51 21     MS. REED: Objection,
11:58:53 22 misstates prior testimony, assumes facts not in
11:58:53 23 evidence.
11:58:53 24     But you can answer.

### Page 72

11:58:54 1     Q    (By Mr. Collins) Please.
11:59:02 2     A    I don't understand the question.
11:59:04 3     Q    No problem. I think you said, if I
11:59:06 4 got it correctly, that 10 to 20 percent of the
11:59:09 5 time a prebook order or a backup order was placed,
11:59:14 6 it was placed by the customer, correct?
11:59:19 7     A    Prebook orders were -- were placed by
11:59:21 8 the customer. 10 to 20 percent of the time, when
11:59:27 9 a customer placed an order, they would also place
11:59:30 10 a prebook order to back up the order.
11:59:32 11     Q    I see.
11:59:32 12     (The reporter read back the
11:59:55 13 requested text.)
11:59:55 14     Q    (By Mr. Collins) Then perhaps I
11:59:57 15 misunderstood.
11:59:58 16     Were there some times that
11:59:59 17 prebook or backup orders were not placed by the
12:00:03 18 customer, but nonetheless they were delivered to
12:00:11 19 data entry at the instruction of Parrish or
12:00:16 20 Gonzalves?
12:00:16 21     A    Not to my knowledge. The orders were
12:00:25 22 placed. And if there were prebook orders that
12:00:25 23 were placed, those orders were collected by data
12:00:29 24 entry or the sales manager, and I don't know what

### Page 73

12:00:32 1 they did with the orders after that.
12:00:41 2     Q    Were there occasions on which prebook
12:00:45 3 or backup orders were presented to data entry when
12:00:49 4 the customer had not placed the prebook or backup
12:01:04 5 order?
12:01:04 6     A    I don't know. I know there were
12:01:06 7 times that, as I said, that prebook orders for
12:01:09 8 future delivery were collected and either went
12:01:18 9 into the system or -- I don't know what they did
12:01:20 10 with them.
12:01:22 11     Q    When you say "collected or put into
12:01:25 12 the system," you mean put into the system for
12:01:27 13 immediate delivery?
12:01:28 14     A    Possibly, yes. There were certainly
12:01:31 15 mistakes that took place. Just as there were
12:01:36 16 orders that were delivered late, there were orders
12:01:41 17 that were delivered early. They were just
12:01:45 18 mistakes.
12:01:45 19     Q    Okay. And if I understand correctly,
12:01:48 20 with respect to some of these shipments of prebook
12:01:56 21 orders early, Adams Golf blamed you?
12:02:05 22     A    Yes, that's accurate. That's --
12:02:06 23 that's what I know. I don't know if anyone else
12:02:09 24 was also blamed.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

d802fe04-283e-43f9-b076-ee84209ac8d9

JAY GREANEY

Page 74

12:02:11 1    Q    Was any explanation given to you as
12:02:14 2  to why you particularly were being blamed for
12:02:20 3  that?
12:02:22 4    A    No, no particular explanation.
12:02:25 5    Q    Now, the document -- or the Pages 808
12:02:37 6  through at least 810 contain allegations that you
12:02:42 7  engaged in aggressive practices. You mentioned
12:02:47 8  that you were criticized for shipment of prebook
12:02:54 9  orders. Were you criticized for anything else?
12:03:01 10    A    No, not to my knowledge.
12:03:07 11    Q    A few minutes ago you mentioned that
12:03:11 12  double shipments were made as a result of system
12:03:13 13  errors and a lack of demand for the product.
12:03:15 14          Can you tell me what the
12:03:16 15  connection between a double shipment and a lack of
12:03:19 16  demands is or was?
12:03:24 17    A    Yes. There was a -- there was a time
12:03:26 18  when the product was a lot more popular than other
12:03:34 19  times. Earlier, 1997 and up to parts of 1998,
12:03:40 20  there was a time when the customer would just call
12:03:43 21  or -- or a customer would -- or I would call a
12:03:48 22  customer or salespeople would call a customer and
12:03:50 23  the customer would say: Send me as many as you
12:03:54 24  can. And then as the demand for the product

Page 75

12:03:57 1  waned, a lot of customers would say: I didn't
12:04:02 2  order the product.
12:04:04 3          Or there were times when a
12:04:07 4  prebook order was shipped, and the customer hadn't
12:04:11 5  sold through their original order, so they refused
12:04:14 6  an order or -- in that instance, it was considered
12:04:19 7  a double shipment.
12:04:21 8    Q    With regard to a prebook or a backup
12:04:24 9  order, was a delivery date specified, generally?
12:04:33 10    A    Generally, there was a delivery date,
12:04:35 11  and it was usually one month after the date of the
12:04:41 12  order.
12:04:41 13    Q    And I gather -- with respect to the
12:04:45 14  discussion of errors that were made, I gather
12:04:47 15  you're saying that sometimes the delivery was made
12:04:50 16  prior to that date?
12:04:53 17    A    Yes. There were some mistakes that
12:04:57 18  happened at that time.
12:04:58 19    Q    And do you have an understanding as
12:04:59 20  to why or by whom these mistakes occurred?
12:05:07 21    A    I don't know for sure why or how. I
12:05:12 22  don't know that they were intentional. I know
12:05:17 23  that it was just busy and times when the company
12:05:19 24  was trying to meet demand. And then there were

Page 76

12:05:21 1  times when the product was less popular and, as a
12:05:27 2  result, there were some sell-through issues.
12:05:40 3    Q    By "sell-through issues," you mean
12:05:43 4  the customers were not selling out their stock?
12:05:46 5    A    Yes.
12:05:46 6    Q    And do you mean that under those
12:05:49 7  circumstances the customers didn't want the
12:05:52 8  prebook or backup order, but the order was sent
12:05:58 9  anyway?
12:05:58 10    A    Yes, that's possible.
12:06:03 11    Q    Now, before the -- before July 10,
12:06:14 12  1998, was there some way in which Adams Golf
12:06:25 13  created a record of the amount or the extent of
12:06:32 14  these backup or prebook orders that were sent too
12:06:35 15  early or when they weren't requested?
12:06:40 16    A    Company records would reflect that
12:06:42 17  information.
12:06:42 18    Q    What records would I look for that
12:06:44 19  would indicate the amount of the prebook or backup
12:06:51 20  orders sent when they weren't requested?
12:06:55 21          MS. REED: Objection,
12:06:56 22  misstates prior testimony.
12:07:00 23    Q    (By Mr. Collins) Let me rephrase it.
12:07:01 24          What documents would I look

Page 77

12:07:02 1  for that would indicate instances of such
12:07:05 2  shipments?
12:07:05 3          MS. REED: Same objection.
12:07:09 4    Q    (By Mr. Collins) Go ahead.
12:07:13 5    A    I don't know. I -- it was not
12:07:18 6  under -- within my purview to keep a record, so if
12:07:23 7  the company has records of that information, then
12:07:26 8  they would be in the company's records.
12:07:30 9    Q    Now, do you remember -- there's a
12:07:35 10  reference on Pages 4608 through 811 -- what it
12:07:49 11  says here is: A conversation with Jay.
12:07:52 12          It appears to -- from Page 809
12:07:55 13  to have occurred on October 20th. And then on
12:08:01 14  811, there's a reference to Jay's comments on
12:08:05 15  October 20th.
12:08:09 16          Do you recall whether you, in
12:08:11 17  fact, had a conversation with Parrish on or about
12:08:17 18  October 20th?
12:08:22 19    A    I don't recall.
12:08:24 20    Q    Now, I know you might not remember
12:08:27 21  the exact date, but I assume this was a fairly
12:08:31 22  unusual conversation, so I gather you recall in
12:08:34 23  general you had a conversation or conversations
12:08:38 24  with Parrish regarding criticisms of your

20  (Pages 74 to 77)

# JAY GREANEY

## Page 78

12:08:41 1 practices; is that accurate?

12:08:48 2     A   I believe I had answered that

12:08:49 3 question earlier in testimony.

12:08:53 4     Q   Okay. Forgive me for making you go

12:08:55 5 through it again. I think you said yes. You said

12:08:58 6 yes?

12:08:59 7     A   Yes.

12:08:59 8     Q   Okay. Now, apart from the -- the

12:09:01 9 criticism with regard to errors about shipment of

12:09:06 10 prebooks or preorders, what other criticisms were

12:09:11 11 leveled against you, if any?

12:09:15 12     A   I don't recall any other criticisms.

12:09:21 13     Q   And then if you turn to Page 811

12:09:26 14 on -- under the date October 20, where it says:

12:09:29 15 Jay's comments, and then the first bullet point:

12:09:31 16 Up until we went public, his practices were

12:09:37 17 condoned, even supported. Since then, he was

12:09:40 18 spoken to and he has changed his practices.

12:09:43 19         Does that refresh your

12:09:45 20 recollection as to any of the content of your

12:09:49 21 conversations with Parrish or anyone else?

12:09:57 22     A   I recall a conversation here with

12:09:58 23 regard to this -- after reading this Sunset

12:10:03 24 letter -- Sunset Golf letter.

## Page 79

12:10:09 1     Q   Uh-huh.

12:10:10 2     A   I recall being criticized for that

12:10:19 3 particular letter, and only because it was

12:10:22 4 encouraged to be aggressive and putting a golf

12:10:24 5 club in somebody's hand at a trade show. But I

12:10:27 6 think after there was a change in management, that

12:10:30 7 was not encouraged, so that's what, I believe,

12:10:33 8 this is relating to.

12:10:40 9     Q   Okay. What other practices, if any,

12:10:42 10 were condoned or even supported that you were

12:10:47 11 criticized for?

12:10:53 12     A   I don't -- I don't know of any other

12:10:55 13 practices that I was criticized for.

12:11:01 14     Q   Were you spoken to at any time about

12:11:04 15 changing certain practices?

12:11:10 16     A   I don't recall being spoken to about

12:11:14 17 changing practices.

12:11:15 18     Q   Well, you mentioned putting -- giving

12:11:17 19 the golf club to the customer as described in the

12:11:22 20 Sunset Golf letter at Page 812. Any other

12:11:26 21 practices that you were criticized for before

12:11:28 22 the --

12:11:29 23     A   No. With regard to this -- this

12:11:31 24 letter, this would have been at a trade show that

## Page 80

12:11:34 1 would have occurred just before or -- or -- I

12:11:37 2 believe just before this time, so I was following

12:11:39 3 the company's standard of putting a golf club

12:11:44 4 in -- in a customer's hand.

12:11:45 5         And then at some point, the --

12:11:49 6 the policy changed, and I was unaware that the

12:11:52 7 policy changed, if it had, so I was spoken to in

12:11:55 8 that regard.

12:12:04 9     Q   Now, the -- the document -- or the

12:12:07 10 page, 46809, the 10/20/98 date at the top refers

12:12:15 11 specifically to a conversation among Jay Greaney,

12:12:21 12 Roger Wilde, and Parrish on October 20, 1998.

12:12:27 13         Do you recall that

12:12:29 14 conversation?

12:12:29 15         MS. REED: Objection, assumes

12:12:31 16 facts in evidence.

12:12:32 17     Q   (By Mr. Collins) You may answer.

12:12:34 18     A   Can you say the question again? I

12:12:37 19 didn't understand it.

12:12:39 20     Q   The conversation involving yourself,

12:12:42 21 Roger Wilde, and Craig Parrish on or about October

12:12:48 22 20, 1998 --

12:12:52 23         MS. REED: Same objection.

12:12:54 24     Q   (By Mr. Collins) -- do you remember

## Page 81

12:12:54 1 it?

12:12:54 2     A   I remember this being a conversation

12:12:56 3 that took place with regard to a double shipment.

12:13:04 4 Yes, I remember.

12:13:05 5     Q   Was it a particular double shipment?

12:13:08 6     A   I don't recall.

12:13:12 7     Q   Do you remember whether it was a

12:13:14 8 double shipment to -- do you remember the customer

12:13:16 9 involved with regard to the double shipment?

12:13:21 10     A   I don't remember. I don't recall.

12:13:30 11     Q   And in the first paragraph of these

12:13:31 12 notes on Page 809, there's a -- there's a

12:13:35 13 reference, to the author's understanding, that

12:13:41 14 Mark Gonsalves and Craig Parrish had spoken to

12:13:46 15 you, Jay Greaney, about this issue prior to

12:13:49 16 October 20th, 1998.

12:13:51 17         Do you recall that prior

12:13:54 18 conversation or conversations?

12:13:58 19     A   Yes. As I mentioned earlier, I

12:14:01 20 recall having a conversation with -- with Mark

12:14:05 21 Gonsalves or with Craig Parrish regarding a double

12:14:16 22 shipment, possibly the King Par double shipment,

12:14:19 23 or if it was considered double shipment. I don't

12:14:25 24 know

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

d802fe04-283e-43f9-b076-ee84209ac8d9

# JAY GREANEY

### Page 82

12:14:25 1      Q    Now, in your last answer, when you
12:14:30 2  referred to the King Par double shipment, what
12:14:32 3  were you referring to?
12:14:35 4      A    Actually, I was referring to the --
12:14:37 5  the order that was refused, not a double shipment.
12:14:41 6      Q    Now, this first paragraph also
12:14:47 7  contained a reference to an allegation: Padded
12:14:52 8  orders.
12:14:53 9          Do you have any idea what --
12:14:57 10  or did anybody accuse you of padding orders?
12:15:00 11     A    I don't recall being accused of
12:15:02 12  padding orders.
12:15:13 13     Q    Now --
12:15:13 14         (A recess was taken from
12:19:36 15         12:15 to 12:19.)
12:19:37 16     Q    (By Mr. Collins) I want you, if
12:19:44 17  you -- I want you, if you would, to -- to read on
12:19:50 18  Page 810 to yourself the first half of the page
12:19:55 19  from: Jay said through "policy change."
12:20:02 20         If you could just read that to
12:20:34 21  yourself.
12:20:35 22         MS. HALL: Jay, if you feel
12:20:35 23  like you need to read more of it to understand
12:20:37 24  that, please feel free to do so.

### Page 83

12:20:40 1          MR. COLLINS: Please do
12:20:48 2      A    Okay.
12:20:48 3      Q    (By Mr. Collins) Do you have an
12:20:49 4  understanding what the policy change referred to
12:20:52 5  here is?
12:20:57 6      A    No, I don't. I don't recall what is
12:20:59 7  meant by a "policy change."
12:21:05 8      Q    Was there a time to your
12:21:06 9  understanding that Barney Adams expressed concern
12:21:12 10  about practices in the inside sales department?
12:21:20 11     A    No. I didn't have very much contact
12:21:22 12  with Barney Adams, so I don't know if -- if he had
12:21:25 13  expressed concern. I know that he always seemed
12:21:33 14  pleased with my performance.
12:21:36 15     Q    Did either Parrish or Gonsalves or
12:21:45 16  Roger Wilde tell you that Barney Adams had
12:21:47 17  concerns about practices in inside sales?
12:21:54 18     A    No, not to my recollection.
12:22:00 19     Q    Now, is it accurate that -- that the
12:22:02 20  company asked for your resignation?
12:22:07 21     A    They permitted me to resign.
12:22:09 22     Q    And did they tell you why they
12:22:13 23  thought you should separate yourself from the
12:22:18 24  company?

### Page 84

12:22:18 1      A    No.
12:22:19 2      Q    Did they tell you it had to do with
12:22:23 3  allegedly aggressive sales practices?
12:22:27 4      A    No. I don't recall ever being given
12:22:29 5  a reason.
12:22:31 6      Q    Did you ask?
12:22:35 7      A    Yes.
12:22:35 8      Q    And what was the response to your
12:22:38 9  question?
12:22:38 10     A    The -- the response was: This is a
12:22:45 11  severance agreement, and review it. And at that
12:22:55 12  time, there was a request to -- by John Harris to
12:23:04 13  write this letter from November 5th indicating
12:23:10 14  that I would be happy to help in the transition.
12:23:14 15     Q    Who was John Harris?
12:23:18 16     A    He was or is the director of human
12:23:28 17  resources.
12:23:28 18     Q    Roger Wilde was -- he was a sales
12:23:49 19  manager?
12:23:49 20     A    Yes. He was an inside sales rep who
12:23:51 21  became a sales manager just before I left the
12:23:55 22  company
12:24:02 23     Q    Okay. Now, I may have gone over
12:24:03 24  this, and I apologize if that's so, but I believe

### Page 85

12:24:06 1  you said you had seen the Sunset Golf letter
12:24:11 2  before, 812?
12:24:14 3      A    I had not seen this letter. I recall
12:24:24 4  that Chip Brewer spoke with me about this, but not
12:24:34 5  to the extent of any shipment, but it was putting
12:24:37 6  a golf club in that particular person's hands, so
12:24:39 7  I had not seen this letter.
12:24:41 8      Q    Do you know who James Lyons is?
12:24:48 9      A    No.
12:24:48 10     Q    Do you recall -- was James Lyons the
12:24:54 11  person into whose hands you put a golf club?
12:24:56 12     A    I don't recall. I don't recall
12:25:00 13  Sunset Golf or ever having dealt with them
12:25:10 14     Q    Ohio was not part of your territory
12:25:12 15  as of 1998, correct?
12:25:14 16     A    That's correct.
12:25:16 17     Q    Nonetheless, to the extent you made
12:25:18 18  sales at a trade show or a convention, you were
12:25:25 19  entitled to a commission for those sales, correct?
12:25:28 20     A    I was -- I would have only been
12:25:30 21  entitled to commission for sales that were
12:25:32 22  generated in my territory. So for instance, if an
12:25:38 23  order was placed to Ohio, I would not have gotten
12:25:42 24  a commission for that.

22 (Pages 82 to 85)

d802fe04-283e-43f9-b076-ee84209ac8d9

## JAY GREANEY

Page 90

12:31:51 1    Q    Was anyone's approval needed within
12:31:54 2  Adams Golf to charge a credit card?
12:31:57 3    A    Yes.
12:31:57 4    Q    What was that process?
12:31:59 5    A    Credit cards would have to be charged
12:32:01 6  through the credit department. So for instance, I
12:32:05 7  would not be able to process a credit card charge
12:32:08 8  through my doing.
12:32:10 9    Q    Were you in a position to instruct
12:32:13 10 the credit department to process the charge?
12:32:18 11   A    I was in a position to -- yes, I
12:32:21 12 would be in a position to have an order placed
12:32:23 13 with a credit card, but I could not charge the
12:32:27 14 credit card myself.
12:32:28 15   Q    Now, in the third bullet point,
12:32:31 16 there's a reference to July, your
12:32:34 17 clubs were for sale in Costco for less than my
12:32:37 18 wholesale price.
12:32:39 19        I gather it occurred from time
12:32:41 20 to time that customers told you that they were
12:32:49 21 aware that clubs were being sold at Costco?
12:32:53 22   A    Yes.
12:32:56 23   Q    Do you have any reason to doubt the
12:32:58 24 accuracy of this statement that: As early as

Page 91

12:33:01 1  June, your clubs were for sale in Costco for less
12:33:04 2  than my wholesale price, in the vicinity of
12:33:12 3  Manalapan, New Jersey?
12:33:17 4    A    No. I recall that there was an issue
12:33:19 5  with Costco, so -- and it was a nationwide issue,
12:33:23 6  so that would include Manalapan, New Jersey.
12:33:28 7    Q    And this was a reference to June. It
12:33:31 8  was a nationwide issue as of June 1998?
12:33:42 9    A    Yes.
12:33:42 10   Q    I want to take a break, if we may.
12:33:44 11        (A recess was taken from
12:35:17 12        12:33 to 12:35.)
12:35:17 13   Q    (By Mr. Collins) The termination and
12:35:18 14 release agreement at 815 through 818, have you
12:35:26 15 abided by the terms of this agreement?
12:35:34 16   A    Yes, as far as I know.
12:35:35 17   Q    And that's -- has it been something
12:35:38 18 you have striven to do, to abide by the terms of
12:35:42 19 this agreement?
12:35:48 20   A    Yes. I haven't made any effort
12:35:51 21 either way to do anything other than what I would
12:35:55 22 normally do, so it hasn't been an issue, for me at
12:36:03 23 least.
12:36:04 24   Q    There have been allegations of

Page 92

12:36:06 1  consignment sales at Adams Golf. Do you know what
12:36:09 2  a consignment -- let me -- let me rephrase that
12:36:12 3  I don't mean a consignment sale.
12:36:14 4         There have been allegations
12:36:15 5  that Adams Golf made shipments, recorded them as
12:36:19 6  sales, even though there was an unlimited right of
12:36:24 7  return. Are you familiar with those allegations?
12:36:26 8    A    Yes
12:36:26 9    Q    Did it occur?
12:36:30 10   A    Not to my understanding of
12:36:35 11 consignment. My understanding of consignment is
12:36:39 12 that, as it relates to the golf business, would be
12:36:41 13 that a customer would just simply pay for product
12:36:44 14 when it was sold, and there was always a -- an
12:36:50 15 understanding that the company would stand behind
12:36:51 16 the product because they were confident that the
12:36:56 17 quality and the sell-through was going to be
12:36:56 18 there.
12:37:01 19        So customers always understood
12:37:03 20 they would receive an invoice and they would have
12:37:06 21 to pay for the product, but if they couldn't sell
12:37:08 22 it, then we would accept or the company would
12:37:11 23 accept the product back as a return and credit
12:37:14 24 them.

Page 93

12:37:16 1    Q    And that would occur in situations in
12:37:19 2  which the customer was unable to sell the product;
12:37:21 3  is that right?
12:37:22 4    A    Yes. And it was really only early on
12:37:25 5  in the company, when there was really not enough
12:37:31 6  demand for anyone to even accept the product in
12:37:34 7  their store.
12:37:38 8    Q    Now, we have also heard about --
12:37:41 9  Hawaii was your territory in '98, correct?
12:37:47 10   A    Yes.
12:37:47 11   Q    Are you aware of allegations that
12:37:49 12 there were 600 clubs sent to a customer -- 600 or
12:37:54 13 more clubs sent to a customer in Hawaii in '98
12:37:57 14 that were returned?
12:37:59 15   A    No, I don't recall that ever
12:38:02 16 happening.
12:38:03 17   Q    Did you have any customers in Hawaii
12:38:05 18 who lodged complaints about you or Adams Golf?
12:38:11 19   A    Not to my knowledge.
12:38:17 20   Q    What was the procedure when clubs
12:38:19 21 were returned? Were you informed, generally?
12:38:26 22   A    If -- if a club was going to be
12:38:28 23 returned, there would have been a return
12:38:32 24 authorization number that was issued by the

24  (Pages 90 to 93)

JAY GREANEY

Page 94

```
12:38:33 1  customer service department. So yes, there were
12:38:36 2  times when I would be informed.
12:38:38 3          If a product was refused, then
12:38:40 4  I would be informed when the product was received
12:38:45 5  from the company.
12:38:46 6      Q    I see. You mean when it was received
12:38:47 7  back from the customer?
12:38:49 8      A    Yes.
12:38:49 9      Q    Are you aware of any situation in
12:38:52 10 which clubs sent to a customer in Hawaii were
12:38:58 11 refused?
12:38:58 12     A    I'm not aware of any -- any
12:39:04 13 specifics.
12:39:04 14     Q    What are you aware of?
12:39:05 15     A    I know that there -- it's possible
12:39:08 16 that there could have been a mistake, a
12:39:13 17 misshipment of individual clubs, but I'm not aware
12:39:17 18 of a -- there isn't anything that I specifically
12:39:23 19 recollect.
12:39:23 20     Q    What do you mean by a mistake in the
12:39:25 21 shipment of individual clubs in golf?
12:39:28 22     A    It's possible that there could have
12:39:30 23 been a -- club that was tagged for a particular
12:39:34 24 customer in a store, and -- and the customer --
```

Page 95

```
12:39:38 1  the consumer didn't want the product, so the store
12:39:42 2  refused the product, something like that. But I'm
12:39:44 3  not aware of any -- any particulars.
12:39:49 4      Q    I gather in your last couple of
12:39:51 5  answers you were referring to a recollection you
12:39:53 6  have of something that happened with regard to
12:39:58 7  Hawaiian customers?
12:40:04 8      A    Yes. I just recall that there was --
12:40:07 9  there may have been because Hawaii is a tourist
12:40:10 10 area. I recall that there were a couple of
12:40:14 11 instances where someone may have ordered --
12:40:17 12 special-ordered a club at a store and then they
12:40:20 13 didn't want the club, so that product was returned
12:40:23 14 or refused because they were not on the island any
12:40:27 15 longer, something like that. That's just
12:40:32 16 something that I recall.
12:40:33 17     Q    How did you learn about that instance
12:40:35 18 or these instances?
12:40:37 19     A    Typically, it would be from either a
12:40:39 20 report that was generated -- usually a report that
12:40:44 21 would be generated on a commission statement, or I
12:40:46 22 may be informed by customer service.
12:41:00 23     Q    You mentioned that your commissions
12:41:02 24 were reduced by returns. Were your commissions
```

Page 96

```
12:41:07 1  also reduced by clubs that were -- were refused?
12:41:14 2      A    Yes. They were -- if the clubs were
12:41:17 3  refused, that would be considered a return,
12:41:19 4  unless -- unless they were reshipped and accepted.
12:41:25 5          MR. COLLINS: I have no more
12:41:27 6  questions now, and I thank you again for your
12:41:29 7  patience.
12:41:29 8          MS. REED: And I only have a
12:41:30 9  few questions.
12:41:30 10         EXAMINATION
12:41:33 11 BY MS. REED:
12:41:33 12     Q    I'm sure you answered this in the
12:41:35 13 beginning, but I don't have it in my notes, so I
12:41:38 14 just wanted to ask you: What type of customers
12:41:40 15 did you sell clubs to? You were an inside
12:41:44 16 salesperson. Who did you sell your clubs to?
12:41:46 17     A    To golf courses, golf course
12:41:55 18 retailers, typically single stores or small
12:41:59 19 regional outlets that had less than 10 stores.
12:42:09 20     Q    When are the trade shows that happen
12:42:11 21 in golf?
12:42:14 22     A    January and September. I don't know
12:42:23 23 if they still have a September trade show, though.
12:42:26 24     Q    Did you ever prebook orders that were
```

Page 97

```
12:42:27 1  not ordered by a customer?
12:42:35 2          MR. COLLINS: Vague and
12:42:38 3  ambiguous.
12:42:38 4      A    As I mentioned earlier, there were
12:42:41 5  orders that were -- that were prebooked at trade
12:42:46 6  shows as a backup to a current order, so the
12:42:51 7  answer would be no.
12:42:56 8      Q    (By Ms. Reed) Were you aware of
12:42:57 9  anyone at Adams Golf that prebooked orders that
12:43:00 10 were not ordered by the customer?
12:43:04 11     A    No, I don't know.
12:43:07 12     Q    And in 1998, did you ever sell clubs
12:43:11 13 on consignment?
12:43:15 14     A    No, I had never sold clubs on
12:43:20 15 consignment.
12:43:20 16         MS. REED: That's all I have.
12:43:20 17         MR. COLLINS: A couple of
12:43:18 18 follow-ups.
12:43:19 19         FURTHER EXAMINATION
12:43:25 20 BY MR. COLLINS:
12:43:26 21     Q    Prebooking occurred not just with
12:43:29 22 regard to trade show orders, correct?
12:43:31 23     A    That's correct.
12:43:31 24     Q    It occurred in other instances as
```

25 (Pages 94 to 97)