HATFIELD

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE:  ADAMS GOLF, INC.  :    CONSOLIDATED

SECURITIES LITIGATION     :    C.A. NO. 99-371 KAJ

_____X

ORAL DEPOSITION OF DARL HATFIELD

Thursday, June 8, 2006

The oral deposition of DARL HATFIELD was

held at the law offices of Akin Gump Strauss Hauer

& Feld, LLP, 1700 Pacific Avenue, Suite 4100,

Dallas, Texas, from 9:34 a.m. to 12:52 p.m.,

before Jamie K. Israelow, a Certified Shorthand

Reporter in and for the State of Texas, Registered

Professional Reporter, Certified Realtime Reporter

and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000     (888)777-6690

Page 42

10:22:29 1 from a financial standpoint, at least through the
10:22:34 2 third quarter. The only time that it started to
10:22:36 3 have an impact is when you started to get a
10:22:41 4 customer -- well, you had one customer that said
10:22:44 5 they wouldn't purchase.
10:22:44 6       You also had some customers in
10:22:47 7 fourth quarter later that said: We need some
10:22:50 8 price support for the club.
10:22:56 9       All of this happened after the
10:22:59 10 market slowed substantially, and the supply and
10:23:02 11 demand equation kind of changed at that point, so
10:23:05 12 retailers had a lot of clubs, and they wanted to
10:23:08 13 sell them at a lower price.
10:23:10 14    Q    Right.
10:23:11 15    A    And at that point, one thing that
10:23:13 16 they could use as kind of a bargaining, I think,
10:23:18 17 matter is the fact that Costco was selling clubs
10:23:21 18 cheaper than they were.
10:23:24 19    Q    Uh-huh. Well, as you know -- again,
10:23:29 20 a topic of much discussion in this lawsuit: What
10:23:34 21 is your opinion? What do you view as the factors
10:23:37 22 that contributed to the decline in the Adams share
10:23:42 23 price post-IPO?
10:23:46 24       MR. BESSETTE: Just

Page 43

10:23:46 1 immediately post? Post-IPO could be --
10:23:51 2       MR. MARA: Yeah. Yeah.
10:23:53 3    Q    (By Mr. Mara) In July of '98.
10:23:55 4       MR. BESSETTE: Okay.
10:23:56 5    A    I think it probably -- the primary
10:23:58 6 factor was just a slowdown in the golf market in
10:24:01 7 general. The -- all of the golf companies in --
10:24:04 8 in the industry had significant slowdown, had
10:24:07 9 talked about it, and I think we probably got drug
10:24:15 10 in with the rest of that.
10:24:16 11       I guess the other factors that
10:24:19 12 contributed were, of course, the seasonality of
10:24:21 13 the club, third and fourth quarter normally are
10:24:26 14 going to be worst quarters than the second
10:24:36 15 quarter, and the fact that the club had been very,
10:24:38 16 very popular. We sold a lot of clubs, and there's
10:24:43 17 a limited market potential for that club.
10:24:45 18    Q    (By Mr. Mara) That third one, is
10:25:00 19 that also referred -- is that product maturity?
10:25:03 20 Is that --
10:25:04 21    A    I think that's an appropriate
10:25:06 22 description.
10:25:07 23    Q    Same thing.
10:25:07 24       Anything else, in your

Page 44

10:25:08 1 opinion, that in July of '98 had a negative impact
10:25:15 2 on the share price?
10:25:17 3    A    Oh, July of '98 --
10:25:19 4    Q    Yeah.
10:25:19 5    A    -- immediately after offering?
10:25:21 6       No, I don't think the gray
10:25:22 7 marketing had any effect on that. I think it was
10:25:25 8 simply the golf market in general. I know that
10:25:29 9 Callaway had -- had put out some very negative
10:25:33 10 comments about the market, and I think that's
10:25:36 11 primarily the reason the stock dropped. But
10:25:38 12 that's all speculation.
10:25:40 13    Q    Understood. I'm simply asking your
10:25:45 14 opinion. I'm not -- and sitting here today,
10:25:52 15 that's -- that's about it, as far as these
10:25:56 16 negative influences that you can think of this
10:25:58 17 morning?
10:25:59 18    A    Yes.
10:26:01 19    Q    And you've made it clear that you do
10:26:03 20 not include gray marketing among them?
10:26:05 21    A    I do not. I don't think it had any
10:26:07 22 effect at all. It just was not significant.
10:26:29 23       MR. MARA: Does anybody need a
10:26:30 24 break? I actually kind of do.

Page 45

10:26:34 1       MR. BESSETTE: It's time to --
10:26:34 2       (A recess was taken from
10:40:24 3       10:26 to 10:40.)
10:40:24 4       MR. MARA: Back on the record.
10:40:40 5 Not much yet happening on the record, but we're
10:40:42 6 back on the record.
10:40:43 7    Q    (By Mr. Mara) Well, I brought along,
10:40:46 8 as all the practice of depositions, a number of
10:40:48 9 documents, so I'll just kind of start plowing
10:40:51 10 through them. I have limited questions on each
10:40:54 11 one.
10:40:56 12       This document is rather thick,
10:40:59 13 but my question pertains only to the first page,
10:41:04 14 and we haven't even really dealt with the other
10:41:06 15 pages. This was previously marked as Exhibit 76.
10:41:14 16 It is the minutes of the regular meeting of the
10:41:17 17 board of directors of Adams Golf of July 22nd,
10:41:22 18 1998.
10:41:34 19       MR. MARA: For the record,
10:41:35 20 it's Adams 004492 through 004518.
10:42:05 21    Q    (By Mr. Mara) And again, to save
10:42:06 22 time and to focus your thoughts, my question very
10:42:11 23 simply is: Toward the bottom of the first page,
10:42:15 24 there's a paragraph that begins with the words:

12  (Pages 42 to 45)

Page 54

10:54:36 1 that I did after the call

10:54:59 2 Q (By Mr. Mara) I believe you said

10:55:00 3 that the -- as a group, you were shocked or

10:55:04 4 surprised by what had happened with the stock

10:55:07 5 price up till July 28th. Is that fair?

10:55:12 6 A I think that's a fair

10:55:15 7 characterization, yeah.

10:55:16 8 Q What -- which of these factors listed

10:55:20 9 on Adams 003948 shocked you the most? Which do

10:55:27 10 you feel had the greatest negative impact?

10:55:29 11 MR. BESSETTE: I'm just going

10:55:29 12 to object. Those -- those might be two separate

10:55:33 13 questions.

10:55:33 14 MR. MARA: Okay.

10:55:34 15 Q (By Mr. Mara) Which -- which do you

10:55:35 16 think had the greatest negative impact?

10:55:40 17 A On what?

10:55:41 18 Q On share price.

10:55:43 19 A Okay.

10:55:44 20 Q Sorry,.

10:55:44 21 MR. BESSETTE: On the decline

10:55:45 22 in share price?

10:55:46 23 MR. MARA: Yeah.

10:55:47 24 A I would say probably, in my opinion,

Page 55

10:55:50 1 it would be Callaway's press release.

10:55:55 2 Q (By Mr. Mara) And why? What was it

10:55:56 3 about that?

10:55:57 4 A I think Callaway was perceived as

10:55:59 5 kind of an industry leader, and they were having

10:56:02 6 some problems.

10:56:12 7 Q Were any of these one, two, three,

10:56:15 8 four, five factors, as of July 28th, 1998 -- were

10:56:22 9 you blindsided by any of them? In other words,

10:56:24 10 I'll be specific: Were any of them events or

10:56:30 11 things that came to your knowledge just days

10:56:32 12 before July 28th, 1998?

10:56:41 13 A I don't know exactly when these came

10:56:43 14 to our attention.

10:56:49 15 Q Okay. But had there been -- for

10:56:50 16 example, are you able to recall if there were

10:56:52 17 discussions that Adidas may report poor results

10:56:58 18 for its Taylor Made division?

10:57:00 19 A No, I don't remember any discussions

10:57:02 20 of that nature.

10:57:06 21 Q Okay. And now, I know from the

10:57:07 22 record in the case that Orlimar was a significant

10:57:12 23 topic of discussion at Adams Golf at that time.

10:57:18 24 A Yes.

Page 56

10:57:18 1 Q So, for example, the -- the line item

10:57:22 2 with Orlimar certainly didn't come as a surprise?

10:57:27 3 A No.

10:57:45 4 Q Okay. However, Callaway's did, I

10:57:47 5 assume, just by reading this: The release for the

10:57:51 6 second quarter predicted much poorer performance

10:57:54 7 than had been predicted by analysts.

10:57:56 8 So that was -- you guys at

10:58:02 9 Adams Golf were expecting much better numbers out

10:58:08 10 of Callaway?

10:58:08 11 A I can't say what anybody else was

10:58:08 12 expecting, but I was personally surprised at the

10:58:11 13 Callaway press release.

10:58:22 14 Q Okay. The next document was

10:58:24 15 previously marked as Exhibit Number 57.

10:58:33 16 MR. BESSETTE: Thank you

10:58:34 17 MR. MARA: And for the record,

10:58:36 18 it is Adams 0028451, 0028452.

11:01:19 19 Q (By Mr. Mara) You've had a chance to

11:01:20 20 familiarize yourself with the document?

11:01:21 21 A Yes.

11:01:22 22 Q Have you seen this document before

11:01:34 23 today?

11:01:34 24 A I may have seen it back in '98, but I

Page 57

11:01:37 1 don't specifically recall this

11:01:41 2 Q Okay Why do you think you may have

11:01:42 3 seen it back in '98?

11:01:43 4 A Because I had discussions with

11:01:45 5 Barney. He was very upset with the inside sales

11:01:51 6 group, and he had told me about that on a couple

11:01:54 7 of occasions, and some of the things that he has

11:01:58 8 in here are basically what I heard during those

11:02:01 9 conversations.

11:02:03 10 Q So it's reasonable to assume those

11:02:05 11 conversations took place prior to August 14th,

11:02:10 12 1998?

11:02:11 13 A Well, I think it's reasonable to

11:02:14 14 assume they took place sometime around that date.

11:02:22 15 Q Okay. Ric Jarrett was a consultant?

11:02:26 16 Well, I'll strike that

11:02:27 17 Who was Ric Jarrett?

11:02:28 18 A The only thing I know about Ric

11:02:30 19 Jarrett is he was an acquaintance of Barney's

11:02:40 20 Q Are you able to recall, was he -- he

11:02:42 21 left the company?

11:02:43 22 A As far as I know, he never worked for

11:02:45 23 the company.

11:02:45 24 Q Okay. He was --

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

b62b3ff5-1d3b-45f6-9642-e36a82a00e3c

Page 58

11:02:47 1    A    At least not since I had been there.
11:02:57 2    Q    Well, in general, if -- if I may,
11:03:01 3    just turning to the first paragraph on the second
11:03:05 4    page, again, I -- this very much appears to have
11:03:10 5    been written by Barney Adams. Is that fair, the
11:03:13 6    memo?
11:03:14 7    A    This would definitely be a Barney
11:03:17 8    memo.
11:03:18 9    Q    Okay. It's -- Barney says on the
11:03:20 10   second page, quote: Here's what I know. I've
11:03:24 11   researched this to the point where I know there's
11:03:26 12   enough truth that A through I had about reality.
11:03:30 13         Did you participate in
11:03:35 14   researching the points A through I in this memo?
11:03:38 15   A    No.
11:03:38 16   Q    Did you discuss -- well, strike that.
11:03:50 17         Do you agree -- we'll take it
11:03:52 18   quickly point by point
11:03:53 19         Do you agree, or at that time
11:03:55 20   in August of 1998 did you agree that the
11:03:59 21   department staff had very low morale in inside
11:04:05 22   sales?
11:04:05 23         MR. BESSETTE: And if you
11:04:06 24   know.

Page 59

11:04:06 1    Q    (By Mr. Mara) I mean, if you know.
11:04:07 2    A    I don't think that I can give an
11:04:09 3    opinion on that, because I wasn't close enough to
11:04:12 4    the sales group in general to know.
11:04:16 5    Q    Mark Gonsalves was -- headed up that
11:04:18 6    group at that time --
11:04:19 7    A    Yes.
11:04:19 8    Q    -- is that true?
11:04:21 9         How often did you speak with
11:04:24 10   Mark Gonsalves, we'll say formally, on -- on
11:04:27 11   business at that time?
11:04:31 12   A    Formally, probably only at the
11:04:33 13   management meetings that we had.
11:04:34 14   Q    Okay. And those were weekly?
11:04:36 15   A    Generally, yes.
11:04:39 16   Q    And then informally, you'd bump into
11:04:43 17   him in the hallway?
11:04:44 18   A    His office was right next to mine, so
11:04:46 19   I would see him frequently throughout the day.
11:04:49 20   Q    But he was not a direct report to
11:04:51 21   you, so --
11:04:52 22   A    No, he was not.
11:04:56 23   Q    So then it's reasonable for me to say
11:04:58 24   that you did not have discussions with any members

Page 60

11:05:01 1    of the inside sales staff?
11:05:03 2    A    No, I did not.
11:05:03 3    Q    Prior to August 14th of 1998?
11:05:06 4    A    No.
11:05:08 5    Q    Okay.
11:05:08 6    A    Or subsequent to that.
11:05:10 7    Q    So to cut to the chase, this memo was
11:05:12 8    prepared without your participation?
11:05:14 9    A    That's correct.
11:05:22 10   Q    All right. Are you able to recall
11:05:24 11   Item C: They know cheating (at least in the form
11:05:28 12   of double shipments) occurs and are concerned that
11:05:33 13   such action is quietly endorsed?
11:05:36 14        Were you -- had you had any
11:05:39 15   discussions about double shipments with Barney
11:05:43 16   Adams or anyone else in August of 1998 or July of
11:05:50 17   1998?
11:05:50 18   A    I did not have any discussions with
11:05:53 19   Barney. I did have someone, and I can't recall
11:05:56 20   who it was, that came to me and said that there
11:06:00 21   was one inside salesperson that they thought had
11:06:04 22   overshipped a customer.
11:06:09 23   Q    Okay. And you're unable to recall
11:06:10 24   who conveyed that message to you?

Page 61

11:06:12 1    A    I don't recall who it was.
11:06:14 2    Q    And the inside sales staff member,
11:06:15 3    again, cutting to the chase, was that Jay Greaney?
11:06:22 4    A    Yes.
11:06:22 5    Q    Did you work with -- did you talk to
11:06:25 6    Jay Greaney?
11:06:26 7    A    I did not talk to him.
11:06:27 8    Q    Either formally or informally?
11:06:30 9    A    No.
11:06:30 10   Q    Just your business passed --
11:06:32 11   A    I did not talk to him.
11:06:36 12   Q    Are you aware that, obviously, Jay
11:06:38 13   Greaney was asked to resign from Adams Golf?
11:06:42 14   A    Yes.
11:06:43 15   Q    Did you participate in any
11:06:44 16   discussions with anyone about asking him to tender
11:06:47 17   his resignation?
11:06:49 18   A    No.
11:06:49 19   Q    Were you aware that it was taking
11:06:50 20   place when it took place?
11:06:56 21   A    I'm not sure that I was aware of it
11:06:58 22   until after he was terminated, or at the time he
11:07:01 23   was terminated.
11:07:01 24   Q    Did you have an opinion at that time

16  (Pages 58 to 61)

b62b3ff5-1d3b-45f6-9642-e36a82a00e3c

## Page 62

11:07:06 1 as to whether or not his termination was
11:07:06 2 appropriate?
11:07:09 3    A    I have no opinion.
11:07:16 4    Q    The -- when the message was conveyed
11:07:20 5 to you about this suspected double shipment, are
11:07:28 6 you aware of what, if any, investigation took
11:07:30 7 place after that?
11:07:30 8    A    Are you talking about personally?
11:07:32 9    Q    Well, I assume you didn't investigate
11:07:34 10 it in any way, or is that assumption incorrect?
11:07:39 11    A    The only thing that I did is when I
11:07:40 12 became aware of it, I went in and told Mark that
11:07:44 13 I -- this person had told me that this had
11:07:47 14 occurred, and asked him, one, if he was aware of
11:07:52 15 it, and two, if he condoned it.  And he said
11:07:56 16 absolutely not in both indications.
11:08:00 17    Q    Is it fair to say, then, that -- I
11:08:02 18 know you've testified you do not recall who
11:08:04 19 brought that information to you.  Was it someone
11:08:11 20 from outside the inside sales staff?  Are you able
11:08:13 21 to say that much?
11:08:14 22    A    I -- I really don't recall.
11:08:18 23    Q    Okay.
11:08:18 24    A    I suspect that it probably is,

## Page 63

11:08:19 1 because I really didn't have many conversations
11:08:23 2 with the inside sales group.
11:08:26 3    Q    Was -- how did Gonsalves react when
11:08:29 4 you relayed this information to him about the
11:08:34 5 suspected double shipment?
11:08:34 6    A    He acted very surprised.
11:08:45 7    Q    And that you -- you believe this
11:08:47 8 morning that that discussion with Gonsalves took
11:08:50 9 place prior to August 14th, 1998?
11:08:53 10    A    No, I can't say that.
11:09:00 11    Q    Okay.  Did you have any follow-up
11:09:01 12 discussions with Mark Gonsalves about this issue
11:09:05 13 after that initial discussion when you told him
11:09:08 14 you had heard this was going on and whether or not
11:09:10 15 he condoned it?
11:09:12 16    A    No, I had no follow-up with him.
11:09:13 17    Q    What was your reaction when this
11:09:15 18 message was conveyed to you that this activity was
11:09:20 19 suspected?
11:09:22 20    A    My reaction was I didn't have a whole
11:09:25 21 lot of concern because, as I understood it, it
11:09:27 22 involved one individual and an individual that
11:09:31 23 sold primarily to on-course golf shops, which was
11:09:36 24 a very, very small percentage of our sales.

## Page 64

11:09:38 1        I guess the other factors that
11:09:40 2 I considered was that most people, when they
11:09:45 3 receive more clubs than they order, call us up and
11:09:49 4 say:  You sent me too many.  I need to return
11:09:53 5 them.
11:09:53 6        The other thing I think
11:09:58 7 entered my mind at that time was that we do
11:10:00 8 establish a provision for returning clubs, and we
11:10:04 9 look at historical history and trends, and we look
11:10:09 10 at them without regard to why people are returning
11:10:13 11 clubs.  So this -- if people were returning clubs
11:10:16 12 because of this factor, first of all, I felt that
11:10:19 13 they would be very insignificant; and secondly,
11:10:22 14 they would have been included in our provision for
11:10:25 15 returning clubs.
11:10:25 16    Q    I see.  Okay.  I may have asked this,
11:10:38 17 but were you aware of what, if any, investigation
11:10:42 18 Mark Gonsalves took after you conveyed this
11:10:44 19 information to him?
11:10:45 20    A    I'm not.
11:10:46 21    Q    And there was no subsequent
11:10:47 22 conversation.  Okay.
11:10:50 23        MR. BESSETTE:  Didn't he ask
11:10:50 24 you to address the group?

## Page 65

11:10:53 1        THE WITNESS:  He did ask me to
11:10:56 2 attend a sales meeting.
11:10:58 3        MR. BESSETTE:  That might be
11:10:58 4 part of your question.  That's why --
11:11:00 5        THE WITNESS:  I don't know
11:11:00 6 what he did.
11:11:02 7    Q    (By Mr. Mara)  Then I'll make it
11:11:03 8 official.  What, if anything, did you do?
11:11:06 9    A    Mark asked me if I would attend their
11:11:09 10 weekly sales meeting right after I told him about
11:11:11 11 this occurring and talk to the sales group about
11:11:18 12 SEC requirements and what constituted a sale?
11:11:23 13    Q    Okay.  And at that time, how were
11:11:25 14 sales recorded?  When -- when was a sale a sale?
11:11:29 15    A    Sales were recorded when the clubs
11:11:31 16 were shipped.
11:11:33 17    Q    Okay.
11:11:33 18    A    And a provision for returns was
11:11:37 19 recorded at the same time.
11:11:41 20    Q    The regular -- was it a weekly sales
11:11:44 21 meeting, did you say?
11:11:45 22    A    I believe it was weekly.
11:11:46 23    Q    A regular meeting.
11:11:47 24        Were those recorded?

17  (Pages 62 to 65)

Page 66

11:11:49 1    A    Not that I know of.
11:12:02 2    Q    Do you have an opinion on Item E: It
11:12:04 3  is a unanimous feeling that departmental
11:12:04 4  management is weak, undirected, especially as
11:12:06 5  practiced by Craig Parrish?
11:12:07 6          Was that within your body of
11:12:11 7  knowledge in July or August of 1998, or June?
11:12:14 8    A    No, I have no opinion on that.
11:12:27 9    Q    Okay. And in Item G: Given all the
11:12:30 10  worries about low income, the average phone time
11:12:32 11  is one hour 20 minutes.
11:12:34 12          What is -- are you -- do you
11:12:36 13  know what is meant by "average phone time"?
11:12:40 14    A    I believe that's the length of time
11:12:42 15  that they are on the phone talking to customers,
11:12:48 16  so that would represent apparently the average
11:12:51 17  amount of time that they were on the phone during
11:12:53 18  the day.
11:12:54 19    Q    Okay. During an eight-hour workday?
11:12:56 20    A    Right.
11:12:56 21    Q    I see. Okay. Again, turning to the
11:13:11 22  second page, third full paragraph, it states:
11:13:19 23  Apparently, we've made a lot of sales that have
11:13:22 24  been falsely reported (as sales) and are little

Page 67

11:13:29 1  more than consignments.
11:13:31 2          Did you have any discussion
11:13:32 3  with Barney at or around August 14th of 1998 about
11:13:38 4  his suspicions about consignment sales?
11:13:44 5    A    No.
11:13:44 6    Q    Did you have discussions with anyone
11:13:46 7  else in the company about the possibility of
11:13:50 8  having sales falsely reported and little more than
11:13:54 9  consignments?
11:13:54 10    A    I did talk to Mark Gonsalves about
11:13:58 11  the right of return on clubs, and he indicated
11:14:04 12  that there was no return right on a club that
11:14:08 13  they -- the clubs that we were selling, and that
11:14:12 14  wasn't part of my discussion when I talked about
11:14:15 15  what constituted a sale with the salespeople.
11:14:18 16    Q    Right. So were you satisfied at that
11:14:21 17  time that -- I'm sorry, strike that.
11:14:26 18          So do you agree with Barney's
11:14:29 19  statement in this memo that there appear to have
11:14:32 20  been what amounted to consignment sales as falsely
11:14:36 21  booked?
11:14:37 22    A    No, that's not my opinion.
11:14:39 23    Q    Okay. Did you conduct any
11:14:41 24  independent research on this matter on your own?

Page 68

11:14:45 1    A    The only thing that we did from an
11:14:48 2  accounting standpoint is make sure that we had
11:14:49 3  adequate reserves for returns. And again, we --
11:14:54 4  we determined that based on historical results
11:15:00 5    Q    Right.
11:15:01 6    A    And made estimates. Each time we
11:15:04 7  recorded sales during the month, we would make an
11:15:08 8  estimate of the returns. And it was without
11:15:11 9  looking at whatever the cause of the return was.
11:15:13 10    Q    I see.
11:15:14 11    A    And the other thing that gave me a
11:15:16 12  little bit of comfort is that all of the financial
11:15:19 13  information that we present ourselves of the company
11:15:22 14  is always presented at net sales, so that
11:15:25 15  provision is netted against sales.
11:15:27 16    Q    I see. Okay. So to put this to bed,
11:15:30 17  at no point did Barney or anyone else come in to
11:15:33 18  you and say: We have a problem with consignment
11:15:36 19  sales?
11:15:36 20    A    No.
11:15:36 21    Q    Or we have a problem with rights of
11:15:38 22  return?
11:15:39 23    A    No.
11:15:39 24    Q    Did there ever come a time -- and I

Page 69

11:15:42 1  don't know this. I'm asking: Did there ever come
11:15:46 2  a time -- strike that.
11:15:47 3          Did you ever draft a return
11:15:50 4  policy for Adams Golf?
11:15:53 5    A    There was revision, I believe, that
11:15:58 6  was made to the invoices that stated that there
11:16:04 7  was no return right, and I can't remember all the
11:16:06 8  specifics of it, but I know that was one of the
11:16:09 9  things that was specifically put in writing on the
11:16:10 10  invoice.
11:16:12 11    Q    And do you know when that occurred?
11:16:16 12    A    I don't recall when that occurred.
11:16:18 13  It was -- obviously it was in '98, but I don't
11:16:21 14  recall when.
11:16:21 15    Q    Are you able to say whether it was
11:16:24 16  pre-IPO or post-IPO?
11:16:25 17    A    It was post.
11:16:26 18    Q    And why was that change made?
11:16:27 19    A    In the golf industry, there are --
11:16:30 20  there's generally clients that believe that they
11:16:34 21  can return clubs, and it's commonplace in the golf
11:16:39 22  industry. And not so much the large retailers,
11:16:42 23  but the smaller shops that are on-course. They
11:16:45 24  get done with the season, and they want to send

18  (Pages 66 to 69)

| Page 70 | Page 72 |
|---|---|

**Page 70**

11:16:47 1   back any inventory that they have, and that's one
11:16:51 2   reason why the reserve for returns was as high as
11:16:55 3   it was
11:16:56 4      Q   I see. Okay. Were there other
11:16:59 5   reasons why the reserve for return was as high as
11:17:02 6   it was?
11:17:03 7      MR. BESSETTE: In '98 you're
11:17:06 8   talking about?
11:17:06 9      MR. MARA: Yeah. Yeah.
11:17:08 10   Again, in this.
11:17:08 11      A   I think there are probably a number
11:17:10 12   of reasons, you know, just generally. Again, the
11:17:14 13   seasonal, that last half of the year, the clubs,
11:17:18 14   the Christmas season. There were -- I think some
11:17:23 15   programs, towards the end of the year that we will
11:17:26 16   to try to move clubs
11:17:28 17      There was also, if my memory
11:17:30 18   is correct, a 90-day, no-questions-asked return
11:17:34 19   policy, where people could go out and play with
11:17:36 20   the club two or three months and decide: I don't
11:17:39 21   like it, I'll return it.
11:17:41 22      Q   (By Mr. Mara) Right.
11:17:41 23      A   All of those factors, I think,
11:17:44 24   contributed to that reserve.

**Page 71**

11:17:45 1      Q   Did there come a time in 1998 when
11:17:48 2   you had concerns about inventory levels?
11:17:52 3      A   I don't recall if it was '98. I
11:17:57 4   guess as a CFO trying to control, you know, how we
11:18:00 5   spend our money, I always had concerns about
11:18:04 6   inventory levels and the number of turns and so
11:18:06 7   forth in the inventory
11:18:07 8      Q   Well, I mean -- again, I'm not trying
11:18:09 9   to. you know, hide the ball. I think I recall
11:18:13 10   reading something from the SEC or someone that
11:18:15 11   said your inventory levels are X and you felt
11:18:19 12   comfortable with the inventory levels in mid 1998.
11:18:24 13      And I'm just asking, and I
11:18:26 14   don't want to put words in your mouth and I don't
11:18:29 15   want to mischaracterize things.
11:18:31 16      I'm saying: Is there a time,
11:18:37 17   the IPO, let's say, that inventory levels became a
11:18:44 18   concern after the IPO to first quarter of '99?
11:18:47 19      A   I don't recall if -- if that was the
11:18:47 20   case. I know at some point, and I don't recall if
11:18:48 21   it was in the period of time you mentioned, the
11:18:52 22   inventory of the original Tight Lies club was a
11:18:58 23   concern because we had -- we had been growing so
11:19:01 24   quickly that they built up the inventory as fast

**Page 72**

11:19:05 1   as they could, and demand dropped for the -- we
11:19:08 2   were sitting with a pretty large inventory of the
11:19:13 3   original Tight Lies club.
11:19:18 4      Q   Okay. Thanks.
11:19:22 5      Now, going toward the bottom
11:19:38 6   of Page 2 of Exhibit 57 -- oh, I'm sorry.
11:19:38 7      In the middle of the page,
11:19:39 8   there's a paragraph that begins with: I'm in
11:19:43 9   agreement with the splitting of the department,
11:19:44 10   but only if it contains some deeper use of
11:19:48 11   management tools.
11:19:50 12      I suspect I may know the
11:19:51 13   answer to this, but did you participate in a
11:19:56 14   suggestion of splitting the department?
11:20:04 15      A   No.
11:20:04 16      Q   And did you participate in the rest
11:20:06 17   of the paragraph where Barney says: If their
11:20:10 18   sales numbers, which we should be able to get into
11:20:13 19   detail, was that in any way -- did he write that
11:20:17 20   after discussing the issue with you?
11:20:23 21      A   No.
11:20:23 22      Q   Then you get down to the rather
11:20:24 23   strong language at the bottom of the page: I
11:20:26 24   don't think I need to write anymore. The issue is

**Page 73**

11:20:28 1   squarely on the table, and I'll clarify what is
11:20:30 2   making me sick. Are we living the big lie? Did
11:20:33 3   we present road show numbers for '98/'99 that we
11:20:36 4   have no idea we can attain?
11:20:43 5      Prior witnesses have testified
11:20:44 6   that Barney Adams was one to use strong or
11:20:48 7   aggressive language. Did you question the
11:20:52 8   contents of that paragraph with Barney Adams in
11:20:55 9   August of 1998 or July of 1998?
11:21:01 10      A   No.
11:21:01 11      Q   Or June of 1998?
11:21:02 12      A   No.
11:21:05 13      Q   Okay. Did you have any concerns at
11:21:06 14   or around August 14th of 1998 that perhaps some of
11:21:11 15   the road show numbers that were offered were --
11:21:17 16   you know, that you had no idea you could attain
11:21:22 17   them?
11:21:23 18      A   First of all, I'm not sure that we
11:21:24 19   offered any prospective numbers in the road show.
11:21:27 20      Q   Uh-huh.
11:21:27 21      A   I think that the analysts had
11:21:29 22   presented numbers, so you know, I had some
11:21:32 23   problems that we could make the numbers that they
11:21:36 24   reported, but they were not our -- our numbers.

19 (Pages 70 to 73)

Page 82

11:30:47 1  the reason you asked for his departure from the
11:30:50 2  company was performance-based? He just didn't
11:30:54 3  have the body of knowledge he needed to carry out
11:30:56 4  the role even as controller?
11:30:58 5          MR. BESSETTE: Objection. I
11:30:59 6  think that mixes prior -- misstates prior
11:31:02 7  testimony. I think the second half was right, but
11:31:06 8  "performance-based" implies something different.
11:31:10 9      Q    (By Mr. Mara) Did you ask Jim
11:31:15 10 Farrell to leave the company because he wasn't a
11:31:18 11 fair and competent controller?
11:31:18 12     A    No. The only reason I asked him to
11:31:27 13 leave was because he didn't have a body of
11:31:27 14 knowledge about SEC regulations.
11:31:27 15     Q    Was the parting amicable?
11:31:33 16     A    I don't know if I would characterize
11:31:34 17 it as amicable. Nobody's happy when they're
11:31:42 18 terminated.
11:31:42 19     Q    Was it hostile? I mean --
11:31:44 20     A    No, I didn't perceive it as being
11:31:47 21 hostile.
11:31:48 22     Q    Okay. Okay. All right. Okay.
11:32:15 23          This is Exhibit 79, previously
11:32:20 24 marked as Exhibit 79, Adams 036839 through -841

Page 83

11:32:30 1  Again, my -- I'm sorry. My question is --
11:32:34 2          MR. BESSETTE: Thank you
11:32:35 3          MR. MARA: All of these
11:32:36 4  exhibits have become well-known to counsel.
11:35:52 5      Q    (By Mr. Mara) Have you had a chance
11:35:53 6  to read the document?
11:35:54 7      A    Yes
11:35:56 8      Q    Okay. Have you seen this document
11:35:57 9  before this morning?
11:36:04 10     A    I believe I have.
11:36:05 11     Q    When would that have been?
11:36:10 12     A    I'm assuming it would have been
11:36:12 13 around that date, but I can't say with any
11:36:14 14 certainty
11:36:15 15     Q    Around September 25th?
11:36:16 16     A    September 25th.
11:36:17 17     Q    1998?
11:36:18 18     A    Uh-huh.
11:36:18 19     Q    Did you have any role in the drafting
11:36:20 20 of this document?
11:36:22 21     A    Other than providing some numbers,
11:36:26 22 the per-share amounts, so forth, no, I didn't have
11:36:30 23 any role
11:36:31 24     Q    And it appears from the document that

Page 84

11:36:33 1  Barney Adams is the author?
11:36:36 2      A    Yes
11:36:45 3      Q    Just looking at the first page, at
11:36:48 4  the bottom of the first page, in Paragraph A
11:36:55 5  there, the second sentence, Barney writes: When I
11:36:59 6  came off the road show, I started spending much of
11:37:02 7  my time in sales, not reviewing numbers, but
11:37:05 8  working with the salespeople
11:37:06 9          Do you know why Barney Adams,
11:37:09 10 when he came off the road show, started working in
11:37:11 11 the sales department?
11:37:13 12     A    No.
11:37:15 13     Q    Did you discuss -- were you aware at
11:37:17 14 that time that he was devoting a lot of his
11:37:21 15 energies to the sales department?
11:37:21 16     A    Yes.
11:37:22 17     Q    And did -- how were you aware of that
11:37:26 18 at that time, just by watching?
11:37:30 19     A    Just because of what he was saying,
11:37:32 20 that he was spending a great deal of time with
11:37:35 21 them and trying to determine, you know, how he
11:37:40 22 could be better organized and so forth.
11:37:44 23     Q    Was there an event or a happening
11:37:46 24 that occurred that caused Barney Adams to want to

Page 85

11:37:50 1  evaluate the inside staff when he came off the
11:37:55 2  road show?
11:37:56 3      A    Not that I'm aware of.
11:37:59 4      Q    Did you have any discussions with,
11:38:02 5  I'll say the underwriters, about the inside sales
11:38:05 6  staff during the road show?
11:38:07 7      A    No.
11:38:09 8      Q    Do you know if Barney did?
11:38:10 9      A    I'm not aware of that.
11:38:11 10     Q    I'm just curious why he came off the
11:38:15 11 road show and went -- by reading this, I'm
11:38:18 12 characterizing it that he went right over to
11:38:21 13 inside sales and started working there.
11:38:22 14     A    I can't --
11:38:24 15     Q    No idea what his motive was?
11:38:26 16     A    I can't --
11:38:28 17     Q    The -- the next sentence says:
11:38:30 18 Serious problems were found and changes were made
11:38:34 19 (more are coming).
11:38:38 20          Do you know what the serious
11:38:39 21 problems that were found at that time?
11:38:45 22     A    Which paragraph are you talking
11:38:46 23 about?
11:38:47 24     Q    Right at the bottom of Page 1,

22 (Pages 82 to 85)

b62b3ff5-1d3b-45f6-9642-e36a82a00e3c

Page 86

11:38:48 1  Paragraph A.
11:38:50 2      A    All right.
11:38:50 3      Q    The last sentence:  Serious problems
11:38:53 4  were found and changes were made.
11:38:58 5      A    No, I don't know what serious
11:39:00 6  problems he's referring to.
11:39:07 7      Q    And he's -- okay.
11:39:09 8           And is the reason you don't
11:39:10 9 know this is because this was divorced from your
11:39:14 10 area?  Is that safe to say?  You were CFO?
11:39:18 11     A    As far as the sales, yes.  The sales
11:39:22 12 area was not part of my responsibility and --
11:39:26 13     Q    So in other words, there was no
11:39:28 14 reason for you to know this, other than perhaps
11:39:33 15 informally?
11:39:33 16     A    That's true.
11:39:34 17     Q    Did you have any concerns personally
11:39:37 18 from your office as CFO about the inside sales
11:39:43 19 department post road show?
11:39:48 20     A    No.  I had -- I had no problems
11:39:50 21 because what I was hearing were things that were
11:39:53 22 very insignificant to the financial statements, so
11:39:56 23 it did not cause me concern.
11:39:58 24     Q    Okay.  And what were you hearing?

Page 87

11:39:59 1      A    The factors that we discussed before
11:40:06 2  regarding an individual on the inside sales
11:40:10 3  group --
11:40:10 4      Q    Okay.
11:40:10 5      A    -- that had double-shipped items.
11:40:13 6      Q    Right.  Anything else other than that
11:40:15 7  alleged double shipping?
11:40:16 8      A    The only thing that came up other
11:40:19 9  than that was the on-course shops returning clubs
11:40:25 10 at the end of the season.
11:40:34 11     Q    Okay.  So Paragraph A, Item 2 there
11:40:36 12 at the bottom of Page 1:  The inside sales
11:40:39 13 organization has been changed.
11:40:41 14     A    (Witness nods.)
11:40:42 15     Q    Do you know -- so do you know how it
11:40:43 16 was changed?
11:40:47 17     A    I do not.  I'd only be guessing --
11:40:49 18     Q    Okay.
11:40:49 19     A    -- if I tried to speculate.
11:40:52 20     Q    The next sentence, Item 3:  Darl
11:40:55 21 conducted a detailed analysis on the financial
11:41:03 22 side.
11:41:03 23          What -- do you recall
11:41:03 24 conducting that detailed analysis?  Do you know

Page 88

11:41:12 1  what the detailed analysis entailed?
11:41:12 2      A    I don't know what he's referring to.
11:41:12 3      Q    Did you ever prepare any report or
11:41:13 4  memoranda to Barney --
11:41:15 5      A    Not that I --
11:41:16 6      Q    -- as part of a detailed analysis?
11:41:19 7      A    Not that I can remember.
11:41:24 8      Q    Do you recall performing any analysis
11:41:26 9  of the financial side at Adams Golf prior to
11:41:31 10 September 25th, 1998?
11:41:40 11     A    No.  Other than my normal
11:41:42 12 responsibilities of reviewing the financial
11:41:45 13 statements, no, I didn't perform any detailed
11:41:48 14 analysis.
11:41:48 15     Q    If you -- the next sentence in that
11:41:52 16 clause is:  Jim Farrell has left the company.
11:41:55 17     A    Yes.
11:41:55 18     Q    Did -- do you have reason to believe
11:42:00 19 that a -- well, here's the -- the silly question,
11:42:03 20 I suppose:  You have no reason to think Barney is
11:42:06 21 lying when he's saying that Darl conducted a
11:42:09 22 detailed analysis on the financial side?
11:42:14 23     A    No.  I think that's just, you know,
11:42:17 24 terminology that he's using for performing the

Page 89

11:42:21 1  normal CFO responsibilities.
11:42:24 2      Q    Okay.  When you performed the normal
11:42:25 3  CFO responsibilities, did anything at that time --
11:42:30 4  did you discover anything about crunching the
11:42:33 5  numbers, in laymen's terms, that caused you
11:42:36 6  concern about Jim Farrell?
11:42:38 7      A    No.
11:42:38 8      Q    Okay.  So it was only his lack of
11:42:40 9  knowledge --
11:42:40 10     A    SEC requirements.
11:42:42 11     Q    -- of SEC requirements?  Okay.  All
11:42:45 12 right.
11:42:55 13          So to the best of your
11:42:56 14 knowledge, there is no memorandum out there or
11:42:59 15 report out there saying:  This is Darl Hatfield's
11:43:02 16 analysis of the -- of the financial side?
11:43:05 17     A    No.  I feel very certain --
11:43:07 18     Q    Okay.
11:43:07 19     A    -- that there is not a report that
11:43:10 20 he's describing right here.  That doesn't mean in
11:43:15 21 his mind that he didn't think that I performed
11:43:18 22 that type of analysis, but just through
11:43:21 23 discussions.  They're just the normal CFO
11:43:24 24 responsibilities.

23  (Pages 86 to 89)

**Page 102**

```
12:00:48  1   of January of 1999? Was that within the scope of
12:00:51  2   your knowledge at that time?
12:00:52  3      A    It may have been, but I don't recall
12:00:54  4   what the locations were.
12:00:57  5      Q    Retailer margins, in general, those
12:01:00  6   would have been a concern to you as CFO?
12:01:08  7      A    Yes.
12:01:08  8      Q    So now you disagree that the company
12:01:10  9   was slow to react to Costco or other
12:01:16 10   unauthorized --
12:01:16 11      A    Yes, I do.
12:01:17 12      Q    And why do you disagree?
12:01:19 13      A    Because from a financial standpoint,
12:01:21 14   it did not hurt our financial performance until we
12:01:25 15   got into that fourth quarter. We immediately took
12:01:28 16   steps to try and find out who was diverting the
12:01:32 17   clubs.
12:01:32 18      Q    Okay. So in your opinion, then,
12:01:34 19   Adams acted very quickly once it had the
12:01:38 20   information in that quarter to -- to try and deal
12:01:42 21   with the problem?
12:01:43 22      A    Well, I think once it became more of
12:01:48 23   a financial problem to us, then yes, I think we
12:01:52 24   acted very quickly.
```

**Page 103**

```
12:02:02  1      Q    And this -- oh, no. Okay. Okay.
12:02:14  2           Now, I believe -- based on
12:02:20  3   earlier testimony, I think you may be talking
12:02:22  4   about this sentence: Secondly, effective with
12:02:24  5   this letter, we are introducing dramatic new sales
12:02:25  6   policies and programs designed to enhance and
12:02:27  7   protect your margins.
12:02:33  8           Is that what you were
12:02:33  9   referring to when Chip Brewer discussed the new
12:02:33 10   sales pricing policy with you?
12:02:37 11      A    Yes.
12:02:37 12      Q    And what was the motive behind the
12:02:41 13   new pricing policy?
12:02:43 14      A    Obviously the motive is to sell more
12:02:46 15   clubs.
12:02:46 16      Q    Yeah. Right.
12:02:47 17      A    And I think at that period of time,
12:02:50 18   there still was some pretty significant
12:02:53 19   inventories out there. In order to move product
12:02:56 20   to the end user, the retailer was having to reduce
12:03:00 21   the -- the sales price.
12:03:09 22      Q    Was there any discussion about --
12:03:11 23   between yourself and Chip Brewer in establishing
12:03:19 24   this new pricing policy? Was the impact of Costco
```

**Page 104**

```
12:03:22  1   considered as part of that new pricing policy?
12:03:27  2      A    Well, this would just be my own
12:03:29  3   opinion --
12:03:29  4      Q    Sure.
12:03:30  5      A    -- but I think the Costco portion of
12:03:31  6   it was a very, very small portion, because
12:03:35  7   there's -- if I remember the inventories
12:03:38  8   correctly, there were, you know, a few thousand
12:03:40  9   clubs that were in the Costco stores. I think the
12:03:45 10   bigger factor of it was just the weakness in
12:03:48 11   demand for clubs in general.
12:03:52 12      Q    Do you recall, as part of the
12:03:55 13   discussions and part of the formulation in this
12:03:57 14   new pricing policy, discussing Costco with Chip
12:04:00 15   Brewer?
12:04:01 16      A    I don't recall specifically talking
12:04:02 17   about Costco.
12:04:06 18      Q    I guess the reverse side of that coin
12:04:08 19   is: Do you have reason to believe you did not
12:04:10 20   discuss Cos -- do you have reason to believe that
12:04:13 21   you affirmatively were not concerned?
12:04:16 22           MR. BESSETTE: I'm sorry. The
12:04:17 23   question is vague.
12:04:23 24      Q    (By Mr. Mara) I guess it's -- I
```

**Page 105**

```
12:04:24  1   guess my prior question was: Did you -- do you
12:04:26  2   have reason to believe you did discuss Costco. I
12:04:30  3   guess I'm asking, though, the other side of that
12:04:32  4   coin is: Do you have reason to believe you did
12:04:34  5   not discuss Costco?
12:04:36  6      A    I don't think we got into any type of
12:04:39  7   detailed discussion about Costco. I think we
12:04:42  8   talked only about the pricing policy and how that
12:04:44  9   would affect our financial statements going --
12:04:47 10   going forward. It's more from a financial
12:04:50 11   standpoint as opposed to what are the reasons why
12:04:53 12   we need to do this?
12:05:01 13      Q    Much is made in -- in gray
12:05:04 14   marketing -- about gray marketing, and in the --
12:05:08 15   in the discovery provided in this case about sort
12:05:12 16   of the psychic damage to the product, to its
12:05:18 17   image, that you do not want a prestige product in
12:05:22 18   a -- a box warehouse store because it has a
12:05:26 19   negative impact on the -- on the image of the
12:05:30 20   brand.
12:05:31 21           With that long introduction, I
12:05:34 22   trust that that was not a concern of yours as CFO?
12:05:37 23      A    No. My --
12:05:39 24      Q    Okay.
```

27 (Pages 102 to 105)

Page 106

```
12:05:39  1      A    My concern was just basically with
12:05:41  2   the numbers.
12:05:49  3      Q    Okay. Moving along -- oh, you know
12:05:55  4   what, I'm sorry. Returning back to Exhibit 57,
12:05:58  5   which was that August 14th, 1998 memo that I asked
12:06:01  6   you several questions about, Barney's memo to Mark
12:06:05  7   Gonsalves and Ric Jarrett.
12:06:07  8      A    Yes.
12:06:07  9      Q    Just very quickly, and I know you've
12:06:09 10   testified to this. We talked about the paragraph
12:06:12 11   that mentions consignment sales, or you know,
12:06:14 12   suspected, and you said that you didn't believe it
12:06:16 13   was a problem or existed.
12:06:18 14           The second sentence in that
12:06:21 15   paragraph says:  Check July returns and tell me
12:06:23 16   what they'll be during the rest of the year.
12:06:26 17           Did you, as -- in your
12:06:29 18   functions as CFO, you evaluate monthly returns,
12:06:33 19   correct?
12:06:34 20      A    Yes.
12:06:34 21      Q    Okay. Did you -- were there
12:06:36 22   anything -- was there anything about July 1998
12:06:40 23   return route that aroused your interest or
12:06:43 24   you believed was out of the ordinary?
```

Page 107

```
12:06:47  1      A    I don't recall anything about that
12:06:50  2   particular month. I know we looked at them every
12:06:53  3   month, and we looked at our adjusted return based
12:06:58  4   on actual terms that took place some period of
12:07:01  5   time prior to that particular month, so --
12:07:03  6      Q    Was there a month in 1998 that the
12:07:07  7   return level caused you concern or you thought was
12:07:10  8   out of the ordinary?
12:07:14  9      A    I can't say that without going back
12:07:17 10   and looking at the work papers that were
12:07:20 11   pertaining to that.
12:07:20 12      Q    Okay. But sitting here this morning,
12:07:23 13   you don't recall any particular --
12:07:26 14      A    I don't recall a particular month. I
12:07:28 15   do recall the returns for the year were -- I guess
12:07:34 16   I'd characterize it as significant, but also
12:07:37 17   relative to the number of clubs that were sold.
12:07:39 18   If you look at prior years and the year after
12:07:42 19   that, those reserves stayed kind of at the same
12:07:48 20   level.
12:07:48 21      Q    They were proportionate?
12:07:50 22      A    They were proportionate to sales.
12:07:53 23      Q    Okay. So then, is it fair to say
12:07:55 24   that -- that returns in 1998, as far as you're
```

Page 108

```
12:07:59  1   able to recall sitting here this morning, did not
12:08:02  2   cause you any particular concern?
12:08:06  3      A    No.
12:08:07  4      Q    Now, that's not a fair question.
12:08:09  5           There was nothing about
12:08:10  6   returns in 1999 that you thought was out of the
12:08:16  7   ordinary?
12:08:16  8      A    I think that's a fair statement.
12:08:32  9      Q    Okay. This document has already been
12:08:32 10   marked Exhibit 61. I think it was also marked --
12:08:43 11   oh, no. No.
12:08:45 12           MR. MARA: For the record.
12:08:46 13   it's MCK 01486, and it's an Adams press release
12:08:55 14   from March 18, 1999.
12:09:15 15           Off the record.
12:09:15 16           (A recess was taken from
12:23:32 17           12:09 to 12:23.)
12:23:40 18           MR. MARA: Back on the record.
12:23:42 19      Q    (By Mr. Mara) Just prior to the
12:23:43 20   break, I handed you what has been marked as
12:23:45 21   Exhibit 61. Have you had a chance to read through
12:23:49 22   it?
12:23:51 23      A    Yes.
12:23:51 24      Q    Again, have you seen this document
```

Page 109

```
12:23:53  1   before this afternoon?
12:23:56  2      A    I don't recall this document.
12:23:59  3      Q    Okay. Just very simply, do you know
12:24:01  4   who was the source of the gray market supply?
12:24:05  5      A    No.
12:24:05  6      Q    Do you recall having any discussions
12:24:10  7   in or about March of 1999 about the source of the
12:24:14  8   gray market supply?
12:24:15  9      A    I don't recall that.
12:24:18 10      Q    Do you recall having any discussions
12:24:22 11   with Barney Adams about any of the content of this
12:24:25 12   press release at that time or at about March of
12:24:31 13   1999?
12:24:31 14      A    No, I don't think that I had any
12:24:32 15   discussion with him about this press release.
12:24:36 16      Q    Do you recall whether or not any
12:24:41 17   retail or distributor accounts were terminated at
12:24:45 18   or about March 18th of 1999?
12:24:49 19      A    No. I don't know who he's referring
12:24:51 20   to in this press release.
12:25:09 21      Q    This press release was not the
12:25:12 22   subject of water cooler conversation around the
12:25:14 23   company at the time?
12:25:15 24      A    Not that I recall.
```

28 (Pages 106 to 109)

# JAMES

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF DELAWARE
3                    -  -  -
4    IN RE: ADAMS GOLF, INC. :
5    SECURITIES LITIGATION    :
6
                              X
7
                     ORAL DEPOSITION
8
                          OF
9
                 CHRISTOPHER M. JAMES
10
               Friday, August 11, 2006
11
                      -  -  -
12
          Oral deposition of CHRISTOPHER M.
13
     JAMES, held at the offices of AKIN GUMP
14
     STRAUSS HAUER & FELD, LLP, 590 Madison Avenue,
15
     New York, New York, commencing at 8:30 a.m.,
16
     reported by Pamela Harrison, RMR, CRR, CSR and
17
     Notary Public.
18
                      -  -  -
19
20
21
22
          RSA/VERITEXT COURT REPORTING COMPANY
23           1845 Walnut Street, 15th Floor
                 Philadelphia, PA  19103
             (215) 241-1000  (888) 777-6690

Page 2

```
 1   APPEARANCES:
 2
 3   TODD S. COLLINS, ESQUIRE
     and ELIZABETH W. FOX, ESQUIRE
 4   BERGER & MONTAGUE, P C
     1622 Locust Street
 5   Philadelphia, Pennsylvania 19103-6305
     215.875.3000
 6   tcollins@bm.net
     efox@bm.net
 7   For the Plaintiff
 8
 9
     MICHELLE A. REED, ESQUIRE
10   AKIN GUMP STRAUSS HAUER & FELD, LLP
     300 West 6th Street
11   Suite 2100
     Austin, Texas 78701-3911
12   512.499.6200
     mreed@akingump.com
13   For the Adams Golf Defendants
14
15
     THOEDORE J. McEVOY, ESQUIRE
16   SIMPSON THACHER & BARTLETT, LLP
     425 Lexington Avenue
17   New York, New York 10017-3954
     212-455-2831
18   tmcevoy@stblaw.com
     rkane@stblaw.com
19   For the Underwriter Defendants
20
21
22
23
24
```

Page 3

```
 1      EXAMINATION INDEX
 2
     CHRISTOPHER M. JAMES
 3
       BY MR. COLLINS          5
 4
 5
 6
         EXHIBIT INDEX
 7
              PAGE
 8
     **335              Rebuttal Expert Report
     of R. Alan    **87
 9        Miller with attachments
10   336  Expert Report of Christopher M. James    5
          with attachments
11
     337  Rebuttal Expert Report of Christopher   5
12        M. James
13   338  E-mail from Terpsma to James, 8/3/06;   5
          e-mail from Phillips to Goodman
14        8/2/06, Bates stamped CMJ 0562
15   339  Graph analysis, Bates stamped CMJ 0560   5
16   340  Analysis of Peer Performance Around      5
          July Purchase Order Dates, Bates
17        stamped CMJ 0561
18   341  Adams Golf, Inc., Integrated           5
          Chronology, Bates stamped CMJ 0563
19
     342  Memorandum to Collins from Reed dated   72
20        7/20/06 with attachments
21
22
23
24
```

Page 4

```
 1        DEPOSITION SUPPORT INDEX
 2
 3      Direction to Witness Not to Answer:
 4             Page Line
 5             (NONE)
 6
 7
 8      Request for Production of Documents:
 9             Page Line
10             103/6
11             121/4
12
13
14           Stipulations:
15             Page Line
16             (NONE)
17
18
19         Questions Marked:
20             Page Line
21             (NONE)
22
23
24
```

Page 5

```
 1        (Whereupon, documents were      08:51:07a
 2   premarked, for identification purposes,   08:51:07a
 3   as Exhibits 336 through 341 )       08:51:07a
 4      THE COURT REPORTER: Are there    09:02:05a
 5   any stipulations today?            09:02:05a
 6      MS. REED: No, there are not.     09:02:08a
 7      THE COURT REPORTER: Are you      09:02:19a
 8   having him read and sign?          09:02:19a
 9      MS. REED: Yes. Sorry.           09:02:22a
10      ---                            09:02:23a
11      CHRISTOPHER M. JAMES, after      09:02:23a
12   having been duly affirmed, was examined   09:02:23a
13   and testified as follows:          09:02:23a
14      ---                            09:02:34a
15   E X A M I N A T I O N              09:02:34a
16      ---                            09:02:34a
17   BY MR. COLLINS:                    09:02:34a
18      Q.  Dr. James, thank you very much   09:02:34a
19   for coming                         09:02:36a
20      A.  My pleasure                 09:02:38a
21      Q.  Michelle had sent me an e-mail   09:02:41a
22   last night, which I couldn't open, and when I   09:02:43a
23   walked in this morning, I see she was good   09:02:46a
24   enough to give an extra copy of what she   09:02:49a
```

CHRISTOPHER M. JAMES

Page 110

1    think are in Exhibit 4, I believe I did the same        12:00:29p
2    thing with respect to -- I simply -- my              12:00:40p
3    recollection -- here's what I can recall           12:00:47p
4            I did one-factor and two-factor          12:00:50p
5    models to see if the explanatory power was any     12:00:53p
6    different or the R-squareds were any            12:00:57p
7    different, that's what I recall  And I recall       12:00:59p
8    concluding based on that analysis that there       12:01:03p
9    weren't any difference, that my results would      12:01:05p
10   not change if I substituted the S&P index for      12:01:07p
11   the NASDAQ, for example.                      12:01:15p
12       Q.   In constructing an index, one of        12:01:20p
13   the things a researcher does is try to find a       12:01:23p
14   good fit; correct?                         12:01:26p
15       A.   That -- that depends on the          12:01:28p
16   purpose.  I mean, typically it is not -- if       12:01:35p
17   you're simply looking for a good fit without any    12:01:46p
18   a priori reason for including a variable in a       12:01:52p
19   regression, then that is thought of as data        12:01:59p
20   mining and is not generally accepted as a         12:02:05p
21   scientific inquiry.                         12:02:13p
22           One begins with a hypothesis           12:02:16p
23   about what relationship should be expected and     12:02:18p
24   then empirically tests that relationship and       12:02:24p

Page 111

1    set up the experiment in a way that can be         12:02:29p
2    replicated by a third party utilizing the           12:02:32p
3    techniques that you have described             12:02:35p
4        Q    Okay  Why did you use NASDAQ?        12:02:38p
5        A    Well, because Adams was trading        12:02:42p
6    on the OTC or NASDAQ                        12:02:52p
7        Q    Any other reason?                  12:03:04p
8        A.   It's my practice if you want to        12:03:05p
9    look at general market movements, the index you    12:03:07p
10   use where you would expect to see a relationship   12:03:13p
11   would be companies that are trading on a similar   12:03:18p
12   exchange                               12:03:24p
13       Q.   And it's true that the NASDAQ,        12:03:24p
14   as Mr. Miller pointed out in his rebuttal, it's     12:03:27p
15   true that at the time the NASDAQ was dominated   12:03:30p
16   by high tech companies; correct?             12:03:33p
17       A    I don't know what he means by         12:03:35p
18   "dominated."  Certainly the NASDAQ is more      12:03:37p
19   heavily weighted towards growth companies at     12:03:41p
20   this particular point in time, which was before    12:03:47p
21   the '99 run-up in tech stocks.  It was -- I        12:03:49p
22   mean, certainly the NASDAQ is more heavily       12:03:58p
23   weighted towards tech and growth stocks than,     12:04:00p
     say, the Dow Jones Industrial Average or the      12:04:02p

Page 112

1    NYCE index.                             12:04:10p
2        Q.   In your last answer you referred       12:04:11p
3    to growth stocks.  Did you consider Adams to be    12:04:14p
4    a growth stock?                           12:04:16p
5        A    Yes, I think it was generally         12:04:17p
6    considered to be a type of stock that would be     12:04:19p
7    considered to be a growth stock.             12:04:23p
8        Q    Did you consider it to be a tech       12:04:25p
9    stock, a high tech stock?                    12:04:27p
10       A.   No, I think I considered it to        12:04:29p
11   be a growth stock.                        12:04:30p
12       Q.   Now, at the time you used            12:04:33p
13   NASDAQ, did you consider any other index besides  12:04:35p
14   this modified Bloomberg golf?               12:04:37p
15       A.   No                             12:04:41p
16       Q.   Did you -- you didn't consider        12:04:42p
17   the Dow Jones?                           12:04:46p
18       A.   Industrial?                      12:04:47p
19       Q.   Yes.                          12:04:47p
20       A.   No.                          12:04:48p
21       Q.   You didn't consider S&P 500 or       12:04:49p
22   S&P small cap?                           12:04:52p
23       A.   I didn't consider S&P 500, I         12:04:54p
24   didn't consider the Dow Jones, I didn't consider   12:04:58p

Page 113

1    the S&P small cap.                         12:05:00p
2        Q.   Okay.  Apart from NASDAQ,           12:05:01p
3    modified Bloomberg golf, and apart from the two   12:05:07p
4    of those together, did you do runs or           12:05:12p
5    regressions on using any other indices?          12:05:18p
6        A.   Other than the -- no, other than      12:05:21p
7    the analysis that we were just talking about a      12:05:26p
8    moment ago.                             12:05:29p
9        Q.   And by that analysis you are          12:05:30p
10   referring to the analysis done after           12:05:32p
11   Mr. Miller's rebuttal report --               12:05:37p
12       A.   Yes                            12:05:39p
13       Q.   -- using the Miller peer group,       12:05:40p
14   or what you call that, and the S&P small cap?     12:05:43p
15       A.   Yes.                          12:05:49p
16       Q.   Okay  Let's talk about event         12:05:50p
17   windows.  What is an event window, please?       12:06:06p
18       A.   I'm sorry?                       12:06:10p
19       Q.   What is an event window?             12:06:11p
20       A    An event window and is commonly       12:06:19p
21   referred -- the most common definition of an      12:06:26p
22   event window is the time period over which       12:06:30p
23   someone undertaking an event study investigates   12:06:38p
24   the impact of information on stock prices or      12:06:42p

29 (Pages 110 to 113)

CHRISTOPHER M JAMES

Page 114

1    stock returns.                          12:06:49p
2        Q.    Now, you used an event window or      12:06:50p
3    event windows in this work; correct?          12:06:53p
4        A.    Yes                            12:06:59p
5        Q.    And the event window you used,      12:07:00p
6    for all aspects of your work here, was one day?      12:07:01p
7        A.    No.                           12:07:08p
8        Q.    Okay.  You used, at least in      12:07:09p
9    some parts of your work, a one-day event window;      12:07:14p
10   is that --                             12:07:18p
11       A.    That is correct.                  12:07:18p
12       Q.    Okay.  In what part of your work      12:07:19p
13   did you use a one-day event window?            12:07:24p
14       A.    As is indicated in my report,        12:07:26p
15   when I was able to identify when a piece of      12:07:36p
16   information was either published or became      12:07:42p
17   available to market participants, I utilized --      12:07:46p
18   I used the day on which that information was      12:07:53p
19   first available during trading hours          12:07:55p
20       Q    Okay                           12:07:58p
21       A.    Now, on -- the one I remember in      12:07:59p
22   particular was the April -- I'm sorry, the April      12:08:07p
23   -- the August 28th Lehman Brothers report.  It      12:08:09p
24   has a date on it, but not a time stamp, so then      12:08:15p

Page 115

1    the question becomes is it a -- was it available      12:08:19p
2    to market participants during trading hours.      12:08:26p
3    And, as I indicate in my report, I look at both      12:08:33p
4    the 28th and the 31st and see whether either one      12:08:37p
5    of those days is statistically significant.      12:08:41p
6    Now --                               12:08:43p
7        Q.    Can I stop you?  Forgive me.      12:08:46p
8          With regard to that, when you      12:08:48p
9    did that work regarding the Lehman report and      12:08:49p
10   you looked at the 28th and you looked at the      12:08:52p
11   31st, you looked at each on a one-day event      12:08:54p
12   window basis; correct?                    12:08:57p
13       A.    And I also calculated the         12:08:59p
14   statistical significance on a two-day basis.      12:09:04p
15       Q.    Okay.  With respect to Lehman,      12:09:07p
16   that Lehman August 28th report?              12:09:12p
17       A.    Yes                            12:09:14p
18       Q.    All right.  And why with regard      12:09:20p
19   to the Lehman report did you use a two-day event      12:09:23p
20   window?                               12:09:26p
21       A.    Well, I think it would be a mis      12:09:28p
22   -- it would be a mischaracterization to say that      12:09:31p
23   -- I investigated a two-day event window to      12:09:37p
24   determine whether the conclusions that I was      12:09:40p

Page 116

1    reaching regarding the materiality of that      12:09:41p
2    information would be changed if I used a broader      12:09:44p
3    window than one day                      12:09:51p
4        Q.    Okay.  How did you investigate?      12:09:56p
5        A.    In the manner that I just          12:09:59p
6    described, that I looked at each day          12:10:00p
7    individually in the combination of those two      12:10:02p
8    days.                                12:10:06p
9          In addition, even though the      12:10:06p
10   Lehman report has no time stamp on it, I      12:10:10p
11   believe, both in reading Mr. Lantier's        12:10:14p
12   deposition, and it's my understanding, having      12:10:18p
13   worked with buy and sell side analysts, that      12:10:21p
14   typically the written report will be disclosed      12:10:25p
15   to market participants and the content would      12:10:33p
16   be disclosed to the market participants in the      12:10:36p
17   day -- on the day on which the report is      12:10:39p
18   dated, during trading hours, or before the      12:10:42p
19   start of trading on the day that it is dated.      12:10:51p
20          Consistent with that, I also      12:10:51p
21   looked at what the closing price was referred      12:10:52p
22   to in the August 28th report for Adams Golf to      12:10:55p
23   determine whether the closing price pertained      12:11:01p
24   to the 28th or the day before, and it          12:11:04p

Page 117

1    pertained to the day before, which is          12:11:10p
2    consistent with the report being published on      12:11:13p
3    the 28th.                             12:11:16p
4        Q.    I asked you a question a moment      12:11:19p
5    ago about what you did to investigate a two-day      12:11:22p
6    event window and you said you already answered      12:11:26p
7    that.                                12:11:28p
8        A.    Yes.                          12:11:29p
9        Q.    Tell me, again, what you did to      12:11:29p
10   investigate a two-day event window consisting of      12:11:32p
11   the 28th and the 31st.  Did you run regressions      12:11:37p
12   on it?                               12:11:41p
13       A.    I aggregated the abnormal         12:11:44p
14   returns or the residual returns              12:11:46p
15       Q.    Okay.                         12:11:49p
16       A.    And then used -- and then tested      12:11:51p
17   whether they were significant based upon a      12:11:53p
18   standard error that was estimated to be        12:11:57p
19   consistent with a two-day return.  So this -- I      12:12:01p
20   have used and others use in published work an      12:12:07p
21   estimate of the two-day standard error is simply      12:12:12p
22   the square root of two times the daily standard      12:12:16p
23   error.                               12:12:19p
24       Q.    When you did so, what did you      12:12:27p

CHRISTOPHER M. JAMES

### Page 118

1  come up with; a lack of statistical significance        12:12:29p
2  on the two-day basis?                                   12:12:32p
3      A.   Yes.                       12:12:33p
4      Q.   That work with regard to the        12:12:34p
5  two-day event window analysis or investigation,         12:12:37p
6  does that appear somewhere in your report or            12:12:42p
7  your rebuttal report, with respect to the Lehman        12:12:44p
8  August 28th report?                          12:12:46p
9      A.   I don't -- as I sit here, I          12:12:57p
10  don't recall. I believe in the report I discuss       12:13:00p
11  both the return on the 28th and the 31st.            12:13:04p
12      Q.   Can you retrieve, please, the         12:13:20p
13  investigation you did of the two-day event           12:13:23p
14  window with respect to the Lehman August 28        12:13:26p
15  report?                          12:13:31p
16      A.   I don't know whether I still        12:13:41p
17  have it. I think that you could get very close        12:13:42p
18  to that result by -- actually, by going to my        12:13:50p
19  report.                        12:14:03p
20          I believe on Paragraph 59, as I      12:14:28p
21  outline, the residual return was less than one        12:14:43p
22  percent on the 28th and the residual return on        12:14:53p
23  the 31st was minus 5.2, so the cumulative           12:14:59p
24  residual would be somewhere around 6.2. The          12:15:05p

### Page 119

1  one-day -- so that -- that's -- that would be        12:15:12p
2  the two-day abnormal return, would be 6.2           12:15:18p
3  percent.                       12:15:22p
4          Since neither return is          12:15:23p
5  statistically significant on a one-day basis,         12:15:25p
6  combining the two, given that the standard         12:15:29p
7  error for a two-day return is bigger than the        12:15:31p
8  one-day return, is not going to result in the        12:15:37p
9  6.2 percent return or something less than 6.2        12:15:39p
10  percent return to be statistically              12:15:47p
11  significant.                    12:15:49p
12      Q.   Okay. Tell me about the          12:15:50p
13  standard error with regard to how the standard        12:15:51p
14  error changes depending upon the event -- the        12:15:54p
15  length of the event window. Would you describe       12:15:57p
16  to me how that works.                   12:16:01p
17      A.   Generally the longer the event        12:16:03p
18  window, the larger the standard error because        12:16:06p
19  the volatility of two-day returns is generally        12:16:18p
20  higher than one-day returns under the assumption      12:16:25p
21  of independence in the returns.              12:16:27p
22          Now, some analysts, when          12:16:30p
23  looking at two or -- two-day abnormal returns        12:16:32p
24  or three-day abnormal returns will also           12:16:38p

### Page 120

1  compute, based on the data, the              12:16:41p
2  autocorrelation in the return series and try         12:16:44p
3  to include that in the calculation of the          12:16:47p
4  standard error.                     12:16:50p
5      Q.   What does autocorrelation mean?       12:16:52p
6      A.   It refers to -- if you think         12:16:55p
7  about correlation as being how two series move        12:16:59p
8  together, autocorrelation refers to how a series       12:17:06p
9  is related to the series lagged one day or one        12:17:14p
10  month.                         12:17:20p
11      Q.   What's the effect of             12:17:26p
12  autocorrelation that some analysts use in this        12:17:28p
13  context?                       12:17:33p
14      A.   It depends on the size of the         12:17:34p
15  autocorrelation. If the autocorrelation is          12:17:36p
16  positive, it tends to make the standard error        12:17:40p
17  somewhat bigger than the standard error that you      12:17:44p
18  would get, assuming independence             12:17:47p
19      Q.   And what do you mean by            12:17:51p
20  "assuming independence"?                 12:17:53p
21      A.   Assuming independence means that      12:17:54p
22  you are assuming that the autocorrelation is        12:17:58p
23  zero on a one-day lag period                12:18:01p
24      Q.   Okay. So, now, the regression        12:18:05p

### Page 121

1  you ran, if any, with regard to the two-day        12:18:08p
2  period, I hope I have the presence of mind to        12:18:13p
3  ask you to be good enough to produce that to us       12:18:17p
4  if you can so retrieve it.                12:18:19p
5      A.   I'll take it under               12:18:23p
6  consideration.                    12:18:24p
7      Q.   I appreciate it.               12:18:24p
8          Now, other than that, that is,       12:18:27p
9  other than with respect to the August -- wait        12:18:30p
10  a minute, one other thing. You mentioned a         12:18:34p
11  few minutes ago that it's your experience that        12:18:37p
12  sometimes where there is a written report by         12:18:40p
13  an analyst -- did I hear you correctly, that        12:18:44p
14  it's your experience that sometimes the           12:18:48p
15  contents of that written report are             12:18:50p
16  disseminated orally prior to the issuance?          12:18:54p
17      A.   In the morning conference call        12:18:58p
18  on the day that the report is issued.            12:19:00p
19      Q.   Okay. Is it your experience         12:19:03p
20  that the contents are sometimes disseminated         12:19:05p
21  prior to that on an oral basis?             12:19:09p
22      A.   I'm not sure what you mean by        12:19:14p
23  "the contents disseminated."               12:19:19p
24      Q.   An analyst calls up a good          12:19:21p

31 (Pages 118 to 121)

CHRISTOPHER M. JAMES

Page 122

1    client and says, "I'm going to issue an analyst    12:19:24p
2    report tomorrow that is going to have an impact    12:19:26p
3    on the stock price. I just wanted you to know    12:19:28p
4    what I'm going to say."    12:19:31p
5        A.    That -- I'm not familiar with    12:19:33p
6    that practice.    12:19:35p
7        Q.    You are familiar with the    12:19:36p
8    occurrence that stock prices move sometimes on    12:19:40p
9    the basis of oral information being disseminated    12:19:45p
10   into the marketplace?    12:19:51p
11       A.    Are you saying --    12:19:55p
12       Q.    Rumors move stock prices    12:19:58p
13   sometimes, don't they?    12:20:00p
14       A.    If they are material and -- if    12:20:02p
15   they are material, they certainly can move stock    12:20:13p
16   prices, and there are scientific methods for the    12:20:15p
17   determination of whether a specific rumor or    12:20:21p
18   conjecture is disseminated to the market.    12:20:31p
19       Q.    What are those scientific    12:20:36p
20   methods?    12:20:37p
21       A.    Let me give a couple of    12:20:42p
22   examples.    12:20:44p
23           There is academic literature    12:20:45p
24   that looks at the impact of, say, chat room    12:20:50p

Page 123

1    information, and that literature asks the    12:21:02p
2    question of whether chat room information is    12:21:10p
3    viewed as material to investors.    12:21:12p
4           Now, what that literature    12:21:19p
5    recognizes is that a reference in a chat room    12:21:21p
6    to a particular company, whether that is    12:21:25p
7    favorable or unfavorable, is likely to be a    12:21:32p
8    subjective evaluation. So those studies    12:21:39p
9    provide objective measures of the extent to    12:21:41p
10   which there is discussion within a chat room    12:21:46p
11   and objective measures as to whether that --    12:21:51p
12   those discussions are favorable or unfavorable    12:21:54p
13   and then attempts to test whether that    12:21:59p
14   information is viewed by market participants    12:22:04p
15   as being material.    12:22:07p
16       Q.    What are these objective    12:22:11p
17   measures determining whether the information is    12:22:18p
18   favorable or unfavorable?    12:22:20p
19       A.    The -- and I'm going by    12:22:26p
20   recollection, this is an article published in    12:22:27p
21   the Journal of Finance maybe five years ago --    12:22:29p
22   the researchers set up a text-based search of    12:22:36p
23   chat room information and identify certain words    12:22:42p
24   that would be considered to be unambiguous with    12:22:51p

Page 124

1    favorable such as "buy" --    12:22:59p
2        Q.    "Hot"?    12:23:01p
3        A.    Something like that.    12:23:03p
4           -- and "negative," and then    12:23:09p
5    try to come up with a quantitative measure of    12:23:09p
6    the frequency on a particular day in which    12:23:12p
7    those words appear, and then to use that    12:23:14p
8    quantitative measure to examine whether on    12:23:20p
9    that day there is a significant stock price    12:23:24p
10   movement, and so what the researcher is doing    12:23:29p
11   is setting up a -- an experiment that can be    12:23:34p
12   replicated by a third party that is testing,    12:23:37p
13   using objective scientific measures, the    12:23:43p
14   significance of a piece of information.    12:23:49p
15       Q.    And you said Journal of Finance    12:23:55p
16   five years ago or thereabouts?    12:23:58p
17       A.    Or thereabouts, yes.    12:24:00p
18       Q.    Who wrote it?    12:24:01p
19       A.    My recollection is a guy -- at    12:24:04p
20   least one of the authors was at the University    12:24:06p
21   of British Columbia. I don't recall, as I sit    12:24:09p
22   here, who the authors are.    12:24:13p
23       Q.    That article dealt with chat    12:24:14p
24   room --    12:24:16p

Page 125

1        A.    Right.    12:24:17p
2        Q.    -- communication.    12:24:18p
3           Did it deal with oral rumors?    12:24:19p
4        A.    I don't recall.    12:24:25p
5        Q.    Rumor or other forms of oral    12:24:28p
6    communication can, if material, affect stock    12:24:34p
7    price; correct?    12:24:37p
8        A.    If that information is material    12:24:40p
9    and becomes available to market participants    12:24:43p
10       Q.    And how in that case does one    12:24:46p
11   objectively measure, if at all, as to whether    12:24:48p
12   the information has materially affected the    12:24:53p
13   market?    12:24:56p
14       A.    The procedure that I think I've    12:24:57p
15   used and would use is to first provide    12:25:01p
16   information -- to ascertain whether the    12:25:05p
17   information that is characterized as -- you are    12:25:09p
18   characterizing as rumor or opinion is publicly    12:25:15p
19   available. So there is a news report, an    12:25:21p
20   analyst report, a company disclosure, a    12:25:27p
21   disclosure, say, of a government regulatory    12:25:33p
22   agency, some objective way of determining    12:25:37p
23   whether the information is publicly available.    12:25:39p
24           And then the second step would    12:25:45p

32 (Pages 122 to 125)

CHRISTOPHER M. JAMES

Page 214

```
1   are you?                              03:55:25p
2       A.   That's not -- if -- I'm not sure    03:55:25p
3   why you would draw that inference. That's not    03:55:30p
4   an inference that I -- that I have made.    03:55:33p
5       Q.   Well, maybe we are          03:55:38p
6   misunderstanding each other or maybe I misspoke.    03:55:39p
7       Exhibit 5 --                     03:55:44p
8       A.   Yes.                         03:55:47p
9       Q.   -- and the statistical      03:55:47p
10  conclusions you reached there with respect to    03:55:50p
11  your report, are those conclusions of no    03:55:50p
12  statistically significant individual event    03:55:51p
13  consistent with the discussion as contained in    03:55:55p
14  the July 28th memo regarding what has caused the    03:56:03p
15  decline in Adams stock?                03:56:07p
16      A.   Yeah, I think the confusion    03:56:10p
17  is -- and this was the source of confusion    03:56:12p
18  earlier today -- that my report contains both an    03:56:15p
19  analysis on a daily basis of the materiality of    03:56:22p
20  certain disclosures as well as an analysis using    03:56:27p
21  monthly returns, market share, industry indices    03:56:36p
22  which reflect the relationship between Adams    03:56:43p
23  Golf stock price or returns and general industry    03:56:46p
24  and market-wide factors. And --        03:56:49p
```

Page 215

```
1       Q.   I'm sorry, please.          03:56:54p
2       A.   And it was with respect to that    03:56:55p
3   latter statistical analysis that I was referring    03:56:57p
4   to this being consistent with (indicating).    03:57:01p
5       Q.   Okay. That's good.          03:57:05p
6       So you believe that the July    03:57:06p
7   28th memo -- Exhibit 176?              03:57:08p
8       A.   Mm-hmm.                     03:57:11p
9       Q.   -- is consistent with the    03:57:12p
10  statistical analysis as reflected in Exhibit 12,    03:57:14p
11  but not necessarily the statistical analysis    03:57:18p
12  showing no statistically significant events at    03:57:21p
13  Exhibit 5. Have I got that right?      03:57:24p
14      A.   I was not -- again, I wasn't    03:57:26p
15  narrowing it to just Exhibit 12, I was also    03:57:29p
16  referring to the analysis in Exhibit, say, 10.    03:57:33p
17      Q.   Okay.                        03:57:43p
18      A.   When you get there, why don't we    03:57:44p
19  -- can I just take another short break?    03:57:47p
20      Q.   Of course.                   03:57:51p
21      A    Thank you.                   03:57:52p
22      (A recess was had from 3:57 p.m.    03:57:53p
23  to 4:06 p.m.; and then the proceedings    03:57:53p
24  continued as follows:)                 03:57:53p
```

Page 216

```
1   BY MR. COLLINS:                        04:06:22p
2       Q.   Could you explain the analysis    04:06:22p
3   of Exhibit 12, please.                 04:06:24p
4       A.   Exhibit 12 again?            04:06:28p
5       Q.   Yes, you just -- I'm so sorry,    04:06:32p
6   no, no, no. You just referred to Exhibit 10    04:06:32p
7       A.   Yes. When I refer to that, I    04:06:36p
8   meant to refer to both Exhibit 10 and Exhibit 4    04:06:40p
9       Q.   Okay. Thank you.            04:06:45p
10      Could you explain that          04:06:48p
11  analysis, please.                      04:06:49p
12      A.   Sure. Let's start with Exhibit    04:06:50p
13  4. This indicates a statistically significant    04:06:53p
14  relationship both between the NASDAQ and -- used    04:07:08p
15  in a single factor, and the industry, as defined    04:07:17p
16  by Gold -- Bloomberg golf index excluding Axtive    04:07:25p
17  and Family Golf Centers.                04:07:31p
18      Q.   That's the modified Bloomberg    04:07:34p
19  golf index you referred to in your report;    04:07:36p
20  correct?                               04:07:39p
21      A.   That's correct               04:07:39p
22      Q.   Why did you take out those two    04:07:40p
23  companies?                             04:07:41p
24      A.   One is a software company, not a    04:07:41p
```

Page 217

```
1   golf company, which is not atypical in -- when    04:07:44p
2   you are looking at indices that sometimes    04:07:51p
3   something that is related to, say, golf    04:07:54p
4   industries but is not a golf equipment seller,    04:07:59p
5   say, might be in an index. Okay?       04:08:02p
6       And Family Golf Centers, my      04:08:05p
7   recollection is Family Golf Centers is a REIT,    04:08:11p
8   R-E-I-T, which invests principally --  04:08:15p
9   exclusively in golf resort properties    04:08:21p
10      Q.   Okay.                        04:08:28p
11      A.   Now, Exhibit 10 looks at, based    04:08:30p
12  on the monthly returns, the relationship between    04:08:43p
13  Adams Golf and that same industry index and    04:08:54p
14  tests whether there is a statistically    04:09:00p
15  significant result.                    04:09:03p
16      Q.   This says this is monthly       04:09:08p
17  observations in Exhibit 10?            04:09:09p
18      A.   Right.                       04:09:12p
19      Q.   That means one observation or    04:09:13p
20  one data point per month?              04:09:14p
21      A.   Yes                          04:09:16p
22      Q.   And does that apply for both the    04:09:17p
23  industry index and the Adams stock price?    04:09:19p
24      A.   Yes -- or stock return        04:09:22p
```

55 (Pages 214 to 217)

CHRISTOPHER M. JAMES

Page 218

1  Q.  Stock return.                    04:09:25p
2      And how do you choose what        04:09:26p
3  stock return you use?                 04:09:29p
4  A.  Over the month?                   04:09:32p
5  Q.  For each return.                  04:09:33p
6  A.  It's from the close of the prior  04:09:37p
7  month to the close of the current month, so it   04:09:40p
8  would be the cumulative return over the month,   04:09:44p
9  so all of the returns in the month are used.     04:09:49p
10  All the daily returns are incorporated into the  04:09:53p
11  monthly return.                       04:09:57p
12  Q.  And for the monthly observation   04:09:57p
13  for the industry index, how did you determine    04:10:00p
14  that?                                 04:10:02p
15  A.  The same, the same way.  So you   04:10:02p
16  take each component of the industry -- I think   04:10:05p
17  the index -- the Bloomberg index is on --        04:10:08p
18  can -- I think -- I think I recall seeing it on   04:10:12p
19  a level basis, you just take level prior month   04:10:15p
20  -- level at the end of the month plus level at   04:10:22p
21  the prior month divided by level at the prior    04:10:25p
22  month will give you the return over that month,  04:10:28p
23  the same way you calculate a return over the     04:10:30p
24  month.                                04:10:32p

Page 219

1  Q.  Why did you perform the           04:10:33p
2  regression in Exhibit 10; what did that add to   04:10:35p
3  the work you were doing otherwise?    04:10:37p
4  A.  I think we touched on this topic  04:10:40p
5  this morning when we had a discussion of why     04:10:43p
6  market participants and researchers utilize,     04:10:52p
7  say, monthly returns.  I said if you  04:10:56p
8  look at Ibbitson or Barra or other vendors of    04:11:01p
9  what are called betas, how stock moves with the  04:11:08p
10  market, those vendors may also have how stock    04:11:11p
11  moves with industry comparables; that generally  04:11:15p
12  that analysis -- not always, but typically that  04:11:19p
13  analysis is done to figure out the influence of  04:11:22p
14  general industry factors, is done on a monthly   04:11:26p
15  basis as opposed to a daily basis for the        04:11:28p
16  reasons I gave you before, which is that on a    04:11:34p
17  monthly basis you are basically taking out a lot 04:11:35p
18  of noise that occurs, what a statistician would  04:11:40p
19  refer to as noise, on the daily returns due to   04:11:45p
20  randomness.                           04:11:48p
21  Q.  So, again, with regard to        04:11:51p
22  Exhibit 10, if there were volatility in either   04:11:52p
23  the index on an intramonth basis or in Adams     04:11:56p
24  Golf stock on an intramonth basis, that would    04:11:59p

Page 220

1  not be reflected; that would be washed out by    04:12:03p
2  your monthly observation?             04:12:07p
3  A.  Yes, but it would be only         04:12:10p
4  looking at how one could explain monthly         04:12:12p
5  variations in the stock return relative to       04:12:17p
6  monthly variations in the industry index.        04:12:22p
7  Q.  Why was the period under study    04:12:28p
8  in Exhibit 10, why did that cut off at June 11?  04:12:31p
9  A.  You know, I looked at Exhibit 10  04:12:34p
10  and I knew you were going to ask that question,  04:12:36p
11  and I don't recall.  I think it, frankly, might  04:12:38p
12  be an oversight.                      04:12:42p
13  Q.  "An oversight" meaning what?      04:12:43p
14  A.  On my part.  So I need to go      04:12:46p
15  back -- in just assembling this, as I sit here,  04:12:48p
16  I don't recall why it ended in June of 1999.     04:12:55p
17  Q.  Did you consider -- and I         04:12:58p
18  understand, I respect people that forget things,  04:13:02p
19  I do that, too.  But did you consider, if you    04:13:04p
20  know, running the regression at Exhibit 10       04:13:06p
21  through December '99 as you ran the regressions  04:13:09p
22  in Exhibit 12?                        04:13:18p
23  A.  I don't recall making a           04:13:24p
24  distinction between June of 1999 and December of 04:13:27p

Page 221

1  1999, so as I sit here I don't recall making any 04:13:35p
2  conscious decision to cut one analysis at 6/99   04:13:44p
3  and the other analysis at year-end 1999.         04:13:48p
4  Q.  I want to go back to a couple of  04:13:58p
5  points you raised earlier.  First, you said that 04:14:00p
6  you did consider a two-day event window in       04:14:03p
7  response to the August 28, 1998, Lehman analyst  04:14:07p
8  report; correct?                      04:14:14p
9  A.  Right.                            04:14:15p
10  Q.  Did you consider a three-day      04:14:15p
11  event window?                         04:14:17p
12  A.  No.                               04:14:18p
13  Q.  Did you consider a two-day event  04:14:18p
14  window with regard to any other periods of the   04:14:21p
15  class period?                         04:14:25p
16  A.  I don't recall that I did.        04:14:29p
17      I do recall, as we mentioned      04:14:34p
18  earlier today, doing an analysis in response     04:14:37p
19  to something which was in Mr. Miller's report,   04:14:43p
20  and that was he indicated -- he made two         04:14:50p
21  points:  First, that, you know, while I looked   04:14:55p
22  at statistical significance at a 95 percent      04:15:00p
23  level, I didn't look at the significance at      04:15:04p
24  other levels.  And, as I indicated in my         04:15:06p

56 (Pages 218 to 221)

CHRISTOPHER M. JAMES

Page 222

1 report, the 95 percent level is the 04:15:08p
2 conventional level; although, some researchers 04:15:11p
3 will report significance at a 10 percent 04:15:17p
4 level. And so I examined whether there were 04:15:21p
5 days that were significant at a 90 percent 04:15:31p
6 level and what information was coming to the 04:15:36p
7 market on those days 04:15:47p
8 Second is in response to a 04:15:49p
9 comment in his report concerning looking at the 04:15:51p
10 returns over multiple days. I asked the 04:16:01p
11 question of whether if the results and my 04:16:03p
12 conclusions regarding statistical significance 04:16:11p
13 and the information coming to the market on 04:16:16p
14 those days would be altered if I used a two-day 04:16:18p
15 window, and concluded that -- my conclusions 04:16:25p
16 were the same whether I used a two-day window or 04:16:33p
17 a one-day window for each of the events that I 04:16:36p
18 analyzed. 04:16:43p
19 So if you take the Golf Pro 04:16:44p
20 August 1st article and say, well, look at a 04:16:47p
21 two-day window around that, that would alter 04:16:50p
22 your conclusion regarding the statistical 04:16:53p
23 significance, would using a 90 percent 04:16:58p
24 confidence interval as opposed to a 95 percent 04:17:05p

Page 223

1 confidence interval impact the conclusion, and 04:17:08p
2 the answer to both of those questions is no. 04:17:11p
3 Q. Which events or which time 04:17:19p
4 periods during the class period did you consider 04:17:21p
5 using a multiple-day event window for? 04:17:25p
6 A. Every day. 04:17:29p
7 Q. Okay. And which events did you 04:17:31p
8 consider using the 90 percent confidence level 04:17:33p
9 for? 04:17:37p
10 A. Every day. 04:17:38p
11 Q. And how did you apply that using 04:17:40p
12 every day? For example, if I can turn you to 04:17:42p
13 Page Exhibit 5? 04:17:46p
14 A. Mm-hmm. 04:17:54p
15 Q. With regard to using a 04:17:55p
16 multiple-day event window, what did you mean by 04:18:00p
17 that; three days or five days? 04:18:03p
18 A. Two days 04:18:04p
19 Q. Okay. You didn't look at 04:18:05p
20 anything more than two days, did you? 04:18:06p
21 A. No, I had no information that 04:18:08p
22 would indicate to me that the market would not 04:18:10p
23 operate in an efficient way and I had no 04:18:15p
24 information to me that indicated any uncertainty 04:18:18p

Page 224

1 regarding -- there would be no reason to use a 04:18:22p
2 multiple-day window more than two days for this 04:18:28p
3 analysis because you would use that if you were 04:18:34p
4 uncertain as -- you have a news announcement -- 04:18:37p
5 we talked about this earlier today; if you had a 04:18:40p
6 news announcement and you weren't sure whether 04:18:44p
7 that news announcement was made -- you know what 04:18:46p
8 day it was made on, but you don't know whether 04:18:48p
9 it was during trading hours or not. 04:18:54p
10 Q. Sure. 04:18:54p
11 But you might also have new 04:18:54p
12 information enter in the market or allegedly 04:18:55p
13 new information enter in the market that might 04:18:58p
14 be in the form of rumor or oral communication 04:19:01p
15 which would be another situation in which you 04:19:03p
16 were uncertain as to what the disclosure date 04:19:06p
17 is Correct? 04:19:08p
18 A. No, I would certainly think that 04:19:09p
19 if there was an allegation that a rumor or oral 04:19:11p
20 communication were material, that you would be 04:19:18p
21 able to identify the date at which that 04:19:25p
22 information became available to the market. I 04:19:30p
23 would also say that -- and be able to relate it, 04:19:33p
24 as I talked about earlier today, in an objective 04:19:37p

Page 225

1 scientific manner, to the price reaction. 04:19:44p
2 As I have indicated, oral 04:19:48p
3 communication, as it would be in the context 04:19:51p
4 of a conference call with investors, you would 04:19:52p
5 look at the day on which that conference call 04:19:57p
6 occurred, that oral communication, for 04:19:59p
7 purposes of determining whether that 04:20:03p
8 communication was material. 04:20:07p
9 Q. If it were a rumor, however, you 04:20:09p
10 might not know when the rumor first started 04:20:11p
11 circulating; correct? 04:20:15p
12 A. I think that's -- I mean, again, 04:20:19p
13 it's -- and we went through this before -- I 04:20:22p
14 would -- if I were asked to assess the 04:20:25p
15 materiality of an alleged rumor, the first step 04:20:28p
16 I would take is to try to determine when that 04:20:33p
17 rumor was being utilized by market participants 04:20:35p
18 for purposes of pricing or valuing the stock. 04:20:45p
19 I would also think that -- 04:20:48p
20 there's certainly -- and I would -- I would 04:20:54p
21 expect to see, if it was a rumor that was 04:20:59p
22 material and significant to investors, that -- 04:21:02p
23 as I indicated before, that there would be 04:21:06p
24 some commentary on it, in some source. 04:21:08p

57 (Pages 222 to 225)

CHRISTOPHER M. JAMES

Page 226

1    Q.   Let me give you another    04:21:14p
2 example. How about with regard to insider    04:21:16p
3 trading? Now, insider trading is not the    04:21:20p
4 dissemination of -- the example is the    04:21:25p
5 dissemination of insider information and    04:21:28p
6 accompanying insider trading. Now, that is not    04:21:33p
7 rumor, that is dissemination or acting upon    04:21:36p
8 certain information. And there may be in case    04:21:41p
9 case of insider trading no writing that    04:21:44p
10 commemorates or confirms the information on    04:21:50p
11 which the trading is occurring    04:21:53p
12    A.   No, I think my experience    04:21:56p
13 certainly with insider trading cases would be    04:21:58p
14 that the insiders trade on what they believe to    04:22:01p
15 be material information which is subsequently    04:22:06p
16 revealed to the market, and when that    04:22:08p
17 information is revealed to the market, there is    04:22:10p
18 a significant price reaction, unless you have    04:22:13p
19 situations in which you have an insider trading    04:22:17p
20 a large block and that insider's trade is    04:22:22p
21 identified by market participants as his or her    04:22:27p
22 trade.    04:22:32p
23    Q.   I don't know why you are so    04:22:32p
24 restrictive. Hasn't it frequently been the    04:22:33p

Page 227

1 experience that in advance of mergers, for    04:22:37p
2 example, there has been unexplained trading to    04:22:42p
3 the extent that there are some people on Wall    04:22:47p
4 Street who believe that it's a fairly common    04:22:49p
5 experience, or has been at different points in    04:22:54p
6 time, for insider trading to occur where it's    04:22:57p
7 very difficult to identify who the participants    04:23:04p
8 in that trading are?    04:23:07p
9    A.   I think you need to draw a    04:23:09p
10 distinction between the trading and material new    04:23:11p
11 information and that's what I'm trying to do,    04:23:15p
12 which is that it certainly may be an insider may    04:23:18p
13 trade in front of an information release and the    04:23:22p
14 reason that that trader can profit either    04:23:26p
15 through purchasing or selling is because they    04:23:30p
16 are trading at a price that doesn't reflect that    04:23:32p
17 information. When that information becomes    04:23:35p
18 available to the market and if it is material,    04:23:37p
19 then it will move the stock price.    04:23:39p
20    Q.   Are you denying that insider    04:23:41p
21 trading itself can move the stock price?    04:23:43p
22    A.   No, I'm not. I'm saying that    04:23:45p
23 it's certainly possible under certain    04:23:47p
24 circumstances for insider trading to move the    04:23:50p

Page 228

1 stock price. Typically under those    04:23:53p
2 circumstances in which insider trading does move    04:23:55p
3 the stock price, there's some knowledge by    04:23:58p
4 market participants of the identity of the    04:24:01p
5 trader or the size of the trade is significant    04:24:04p
6 and reflective of an insider trade.    04:24:09p
7    Q.   Well, just because a trade is    04:24:13p
8 large doesn't necessarily mean it has to be an    04:24:16p
9 insider trade. And just because there's insider    04:24:18p
10 trading doesn't mean anybody ever has to find    04:24:22p
11 out who it is who was doing the trading and, in    04:24:25p
12 fact, sadly, it happens frequently, at least the    04:24:27p
13 SEC and the general public never do learn who    04:24:30p
14 that insider trader is. Correct?    04:24:35p
15    A.   And those are the reasons you    04:24:38p
16 are providing as to why insider trading often    04:24:39p
17 goes undetected and often is profitable, because    04:24:42p
18 it doesn't move the stock price.    04:24:47p
19    Q.   Right, but you just said    04:24:48p
20 yourself a moment ago it might.    04:24:50p
21    A.   Under certain circumstances, the    04:24:52p
22 circumstances of which I indicated to you,    04:24:54p
23 where, for example, the identity of the trader    04:25:00p
24 or the size of the trade would reveal that it    04:25:02p

Page 229

1 was a, quote, information-based trade.    04:25:07p
2    Q.   And barring that, you don't    04:25:11p
3 believe that insider trading moves stock prices,    04:25:14p
4 has a material impact on stock prices?    04:25:18p
5    A.   I'm not saying that it does --    04:25:21p
6 that some instances of insider trading might not    04:25:24p
7 have a material impact on stock prices. I think    04:25:27p
8 that is -- if I were to undertake, say, an    04:25:29p
9 analysis of a company stock to determine whether    04:25:35p
10 insider trading had a material impact on the    04:25:38p
11 stock price, I would undertake the same type of    04:25:43p
12 analysis that I conducted here. I would look to    04:25:45p
13 objective evidence as to whether there was    04:25:48p
14 insider trading and then to analyze whether    04:25:50p
15 there was a statistically significant stock    04:25:53p
16 price movement on that day.    04:25:56p
17    Q.   Very good.    04:25:57p
18    However, you might, under those    04:26:01p
19 circumstances, if you believe the insider    04:26:03p
20 trading occurred over a variety of days, use    04:26:06p
21 an event window of more than one day; correct?    04:26:10p
22    A.   If I had reason to believe that    04:26:13p
23 a particular -- that there were -- that there    04:26:17p
24 was a -- I think it would depend on the    04:26:20p

CHRISTOPHER M. JAMES

Page 246

```
 1    A.   I don't have -- I don't think          05:08:04p
 2  one can state for a particular day, with a      05:08:06p
 3  reasonable degree of scientific certainty, the  05:08:15p
 4  reason for that particular day's unexplained    05:08:19p
 5  stock price movement.                           05:08:25p
 6         As I indicated, when asked               05:08:26p
 7  similar kinds of questions earlier today, that  05:08:31p
 8  should not be and would be a mistake to         05:08:35p
 9  conclude from that that a model that explains,  05:08:37p
10  say, 17 or 20 percent of the daily volatility   05:08:44p
11  leaves unexplained 80 percent of the price      05:08:52p
12  movement over, say, a class period, that would  05:08:55p
13  be an incorrect inference.                      05:08:57p
14         And the reason that inference            05:09:01p
15  would be incorrect, as I talked about earlier   05:09:03p
16  today, is that while using a model might not be 05:09:06p
17  able to explain intraday or daily volatility    05:09:09p
18  greater than, say, 20 percent, that model       05:09:19p
19  could be very good, and this model in fact      05:09:21p
20  very good, at explaining why the stock price    05:09:23p
21  went from 18 at the first day of trading down   05:09:29p
22  to four, because the predictions of that        05:09:35p
23  model, both the daily and monthly model, would  05:09:40p
24  predict such a movement based upon the          05:09:48p
```

Page 247

```
 1  relationship that the model identifies between  05:09:51p
 2  industry or market factors and the stock        05:09:54p
 3  return                                          05:09:59p
 4    Q.   I'll tell you, I really don't            05:10:00p
 5  understand how you can say that with regard to  05:10:02p
 6  the daily return models, so please can you just 05:10:04p
 7  explain one more time exactly what you were just 05:10:09p
 8  describing a moment ago --                      05:10:12p
 9    A.   Certainly                                05:10:13p
10    Q.   -- how when you have a model             05:10:15p
11  that has an index that has a 17 or 18 percent   05:10:17p
12  fit, you can use that to explain more than 17 to 05:10:23p
13  18 percent of the movement to the extent that   05:10:28p
14  that is explained by the model or alluded to by 05:10:31p
15  the model and how you can explain more than the 05:10:35p
16  statistically significant firm-related movements 05:10:39p
17  that you identified on three days.              05:10:43p
18         Explain to me just one more              05:10:46p
19  time, please, how you can explain any more of   05:10:47p
20  the movement than 17 or 18 percent plus the     05:10:50p
21  amount of movement reflected by those three     05:10:56p
22  statistically significant events, please.       05:11:00p
23    A.   Well, because the three -- let's         05:11:06p
24  take them in reverse order. The three           05:11:06p
```

Page 248

```
 1  statistically significant events, say. that     05:11:09p
 2  those are days in which material new information 05:11:12p
 3  comes to the market as measured by the stock    05:11:14p
 4  return adjusted for the movements in the market 05:11:18p
 5  on that particular day  So, for example, if the 05:11:23p
 6  market were up 20 percent on a particular day   05:11:27p
 7  and a model has a coefficient that says the     05:11:30p
 8  relationship between the market and the stock is 05:11:35p
 9  one in which if the market on average goes up by 05:11:37p
10  20 percent, the stock goes up by 35 percent, if 05:11:40p
11  the stock were down 20 percent, hypothetically, 05:11:43p
12  then that might be an unusual market movement   05:11:51p
13  relative to what would be expected by the       05:11:54p
14  market.                                         05:11:56p
15         Now, that model might be able            05:11:57p
16  to explain on daily variability only 20         05:11:59p
17  percent of the variability, but over a period   05:12:03p
18  of time if, again, every time the market        05:12:05p
19  moves, on average when the market moves the     05:12:10p
20  stock moves by, what did I say, two times, or   05:12:13p
21  whatever the market movement, so over that      05:12:17p
22  period of time, if the market is up 20          05:12:20p
23  percent, I would expect the company to be up    05:12:26p
24  40 percent; if the market is, in this case,     05:12:30p
```

Page 249

```
 1  down 20 percent, I would expect the company to  05:12:34p
 2  be down 40 percent, just by looking at the      05:12:37p
 3  market parameters that have been estimated      05:12:41p
 4  Okay?                                           05:12:44p
 5         So if that would occur. even if          05:12:45p
 6  the market -- even if the market had -- even    05:12:49p
 7  if the model had explanatory power on a         05:12:52p
 8  particular day of explaining the variability    05:12:55p
 9  at, say, 20 percent, the model still could be   05:12:57p
10  very good at picking up long-term trends in     05:13:02p
11  the stock price that are related to market      05:13:09p
12  factors.                                        05:13:14p
13    Q.   That's fine                              05:13:15p
14         So leaving apart the                     05:13:18p
15  regressions that use monthly observations, is   05:13:20p
16  there any evidence in your report, any          05:13:24p
17  exhibit, any set of numbers, establishing, you  05:13:29p
18  believe, that that has in fact occurred here?   05:13:34p
19    A.   I think that the results in              05:13:38p
20  Exhibit 4 are indicative of that. I think, also 05:13:41p
21  -- and this may have been a -- I mean, you would 05:13:46p
22  expect given the -- given knowledge that the    05:13:58p
23  NASDAQ was down during the class period -- I    05:14:04p
24  believe it was -- my recollection of it was     05:14:09p
```

63 (Pages 246 to 249)

CHRISTOPHER M. JAMES

Page 250

1  maybe 20 percent -- that Adams Golf, given its                05:14:16p
2  relationship with the NASDAQ, would also be down             05:14:26p
3  a substantial amount for the reasons I gave you              05:14:31p
4  earlier today.                05:14:37p
5     Q.   And you've been very patient                05:14:38p
6     A.   Okay.                05:14:40p
7     Q.   But I would think for a                05:14:41p
8  scientist it's a little too loose for you just               05:14:42p
9  to say, well, the NASDAQ was down 20 percent                05:14:45p
10 during the period, so you would expect Adams to             05:14:47p
11 be down, too.                05:14:50p
12        On the contrary, you said there                05:14:51p
13 is a 17 percent fit between -- 17 6 percent                05:14:52p
14 fit between NASDAQ's movement and Adams Golf's              05:14:58p
15 movement, so I don't know any reason why one                05:15:06p
16 would expect -- on the basis of what you've                05:15:08p
17 testified to today or from any more than one               05:15:10p
18 can read from your report, to expect that any               05:15:15p
19 more than 17 percent or 17 6 percent of Adams'             05:15:17p
20 movement can be explained by the index that               05:15:21p
21 you say is a 17.6 percent fit?                05:15:23p
22    A.   Well, certainly my statements                05:15:29p
23 were not loose in any way, they were very                05:15:30p
24 precise.  And I think your confusion is a                05:15:34p

Page 251

1  confusion that frankly your expert suffers from             05:15:43p
2  as well, and it is a confusion over the                05:15:46p
3  explanatory power of a model on an individual               05:15:52p
4  day versus the ability of a model to explain a              05:15:56p
5  trend, and, again, it is just -- the coefficient           05:16:00p
6  estimates in the model are used to estimate                05:16:13p
7  -- are used to estimate trends, so it is                05:16:21p
8  incorrect, just as a statistical proposition, to           05:16:24p
9  say that because the explanatory power of the              05:16:31p
10 model is 17 percent, it can only explain over a            05:16:35p
11 period of time 17 percent of the price movement            05:16:40p
12 -- okay? -- and to imply by that that if a stock           05:16:44p
13 were down, that only 17 percent of the decline             05:16:49p
14 can be explained by that model.                05:16:53p
15    Q.   So the evidence that more than                05:16:56p
16 17 percent of the decline can be explained by              05:16:59p
17 the model, or more than 18 percent, that                05:17:02p
18 evidence is presented here on Exhibit 4 in the             05:17:05p
19 coefficient factor?                05:17:08p
20    A.   I think that those coefficients                05:17:09p
21 are consistent with and can be used to identify            05:17:12p
22 that a substantial portion, virtually all of the           05:17:20p
23 decline in Adams Golf price, is explained by the           05:17:24p
24 model over the class period.                05:17:31p

Page 252

1     Q.   So, if you would, explain with                05:17:39p
2  regard to the coefficient t statistics the                05:17:41p
3  meaning of the two-factor model NASDAQ and                05:17:53p
4  industry where you list 0.89, can you tell me              05:17:57p
5  what that means, please                05:18:01p
6     A.   You are on Exhibit 4?                05:18:03p
7     Q.   I'm on Exhibit 4, right, under                05:18:05p
8  two-factor model NASDAQ and industry.                05:18:07p
9     Q.   Where is zero?                05:18:13p
10       Oh, 0.89?                05:18:14p
11    Q.   Please.                05:18:16p
12    A.   What that is saying is that on                05:18:16p
13 average a 1 percent move in the NASDAQ would               05:18:21p
14 yield a .89 percent move in Adams stock return,            05:18:31p
15 and that a one percent move in the industry               05:18:42p
16 would explain or would -- model would predict a           05:18:45p
17 .58 percent move in the Adams stock return.               05:18:52p
18    Q.   And what's the negative 0.01?                05:18:57p
19    A.   That's called the intercept, and                05:19:01p
20 that would say that since this is under a                05:19:09p
21 returns basis that in terms of forecasting a              05:19:12p
22 return on a particular day it would be minus .01          05:19:19p
23 plus .89 times the return on the NASDAQ on that           05:19:25p
24 day plus .58 times the return on the industry on          05:19:30p

Page 253

1  that day.                05:19:36p
2     Q.   Tell me about the negative 2 45                05:19:36p
3  or the "(2 45)."                05:19:40p
4     A.   That is the t statistic on that                05:19:45p
5  coefficient.                05:19:48p
6     Q.   And "t statistic" means what,                05:19:49p
7  please?                05:19:51p
8     A.   It is a test for the statistical                05:19:52p
9  significance of that coefficient.                05:19:55p
10    Q.   And what in general is the                05:19:57p
11 threshold for statistical significance in the             05:19:59p
12 use of t statistics?                05:20:04p
13    A.   Typically, 95 percent.                05:20:07p
14    Q.   Okay  In your various analyses                05:20:09p
15 here, am I correct that you don't rely at all on          05:20:26p
16 changes in volume?                05:20:29p
17    A.   I haven't -- I believe I record                05:20:33p
18 -- I'm sorry, I do have and did look at volume            05:20:48p
19 information.  I did not examine materiality               05:20:53p
20 based on abnormal volume.                05:21:02p
21    Q.   Why not?                05:21:04p
22    A.   Because I was looking for                05:21:05p
23 whether that piece of information had a material          05:21:09p
24 impact on the value of the stock.                05:21:17p

CHRISTOPHER M. JAMES

Page 254

```
  2   Q.  Are there models that can be          05:21:20p
  3   used that test materiality on the basis of    05:21:21p
  4   volume or some combination of volume and price  05:21:25p
  5   movement?                            05:21:29p
  6   A.  I mean, I have not seen that          05:21:37p
  7   analysis done in the context of, say, a damage  05:21:40p
  8   analysis.  I have seen some academic studies    05:21:43p
  9   that ask the question of whether information has  05:21:49p
 10   an effect on trading volume.            05:22:01p
 11   Q.  And do you have any opinion as        05:22:11p
 12   to the usability or appropriateness of those    05:22:13p
 13   models?                              05:22:17p
 14   A.  I think the appropriateness          05:22:20p
 15   would depend on the purpose of their being      05:22:23p
 16   used.  I would have to go back and look at some  05:22:31p
 17   of those papers.  Most of the paper -- the      05:22:36p
 18   academic literature in finance is more focused  05:22:40p
 19   on how information impacts value as opposed to  05:22:48p
 20   trading value.  Although, there are a few       05:22:53p
 21   papers out there that look at trading volume.  I  05:22:55p
 22   just don't recall what the conclusions are       05:22:58p
 23   Q.  The famous Golf Pro article          05:22:59p
 24   allegedly of August or August 1, 1998, when was  05:23:03p
      that available to the market?            05:23:08p
```

Page 255

```
  1   A.  As I indicate in my report, it's        05:23:10p
  2   my opinion that it's available to the market on  05:23:16p
  3   August 1st.                           05:23:19p
  4   Q.  Well, surely you're not offering      05:23:19p
  5   an opinion on that now, Dr. James, are you?    05:23:21p
  6   A.  Yes, I am.                        05:23:23p
  7   Q.  You might be making an              05:23:24p
  8   assumption, but you are offering -- are you an   05:23:26p
  9   expert with regard to when Golf Pro appeared in  05:23:29p
 10   1998?                                05:23:32p
 11   A.  I'm not representing myself to         05:23:33p
 12   be an expert in when Golf Pro appeared.  I am    05:23:35p
 13   representing myself to be an expert in, first of  05:23:40p
 14   all, knowing what the publication date and the  05:23:43p
 15   convention of using publication dates.  I       05:23:50p
 16   believe your own expert uses the publication    05:23:52p
 17   date as the date referenced in his chronology.  05:23:55p
 18   Second, I undertook an              05:23:59p
 19   investigation to determine whether there was    05:24:01p
 20   any evidence that suggests that the Golf Pro    05:24:03p
 21   article was available prior to the cover day     05:24:06p
 22   and concluded based on that analysis that       05:24:12p
 23   there was none.                       05:24:14p
 24   Q.  Okay.  Do you know of any            05:24:15p
```

Page 256

```
  1   evidence, apart from what you've put in your    05:24:16p
  2   reports, to indicate when that Golf Pro article  05:24:21p
  3   was available?                        05:24:24p
  4   A.  Yes.                             05:24:26p
  5   Q.  When?                            05:24:26p
  6   A.  In response to the Miller report      05:24:28p
  7   where he conjectures that it might have been    05:24:32p
  8   available earlier, I performed the following     05:24:37p
  9   test.  Based upon communications that I'm aware  05:24:40p
 10   of between Cornerstone and the publishers of    05:24:46p
 11   Golf Pro, which is now not currently published,  05:24:53p
 12   they were unable to answer the question as to    05:25:04p
 13   whether it was available before or after the    05:25:05p
 14   cover price -- cover date.              05:25:08p
 15   So I conducted a Factiva search        05:25:11p
 16   between 1995 and 2000 in which I used the       05:25:15p
 17   keywords "Golf Pro magazine," and then I        05:25:22p
 18   looked at all of the articles that were         05:25:26p
 19   available on Factiva that reference Golf Pro    05:25:29p
 20   magazine and asked the question of whether      05:25:34p
 21   there was any reference in the public press to  05:25:36p
 22   a Golf Pro magazine article prior to the        05:25:41p
 23   stated publication date on the cover, and I     05:25:46p
 24   was able to identify several instances in       05:25:50p
```

Page 257

```
  1   which there is a reference to a particular      05:25:53p
  2   issue of Golf Pro magazine, and all of the      05:25:57p
  3   references were after the publication date      05:26:01p
  4   which is consistent with -- which is            05:26:04p
  5   inconsistent with the conjecture by Mr. Miller  05:26:09p
  6   that the information was available to the       05:26:13p
  7   market prior to the cover date.          05:26:19p
  8   Q.  Did you save those searches?          05:26:27p
  9   A.  No.                              05:26:29p
 10   Q.  Did you communicate with your        05:26:30p
 11   office about providing to us information with    05:26:34p
 12   regard to the additional regressions you said   05:26:35p
 13   you would have?                       05:26:38p
 14   A.  I have -- it's not my office         05:26:41p
 15   Q.  Cornerstone.  Whomever you had        05:26:43p
 16   to communicate with.                   05:26:44p
 17   A.  Yes, and the individual that is       05:26:46p
 18   available -- the individual who undertook that  05:26:53p
 19   analysis is not available, he's -- that's Amir   05:26:59p
 20   Rosen, and I believe he's attending a deposition  05:27:07p
 21   today.                               05:27:10p
 22   Q.  Not in this case?                  05:27:11p
 23   A.  Yes, I believe he's downstairs,       05:27:12p
 24   two stories down.                     05:27:14p
```

65 (Pages 254 to 257)

CHRISTOPHER M. JAMES

Page 258

| | | |
|---|---|---|
| 1 | Q. Have you spoken to him about | 05:27:17p |
| 2 | this? | 05:27:18p |
| 3 | A. I have spoken to him and said I | 05:27:20p |
| 4 | don't have my computer with me. He did not have | 05:27:24p |
| 5 | his computer with him either, so... | 05:27:27p |
| 6 | MR. COLLINS: Okay, counsel and I | 05:27:31p |
| 7 | will have to talk about that, but we | 05:27:32p |
| 8 | can in a moment off the record. | 05:27:33p |
| 9 | BY MR. COLLINS: | 05:27:37p |
| 10 | Q. Apart from what you have said | 05:27:37p |
| 11 | today and apart from what is in your rebuttal, | 05:27:40p |
| 12 | do you have any further criticisms of Miller's | 05:27:43p |
| 13 | report? | 05:27:46p |
| 14 | A. I think my rebuttal report is a | 05:27:52p |
| 15 | fair summary of the criticisms that I had of | 05:27:59p |
| 16 | Mr. Miller's report. | 05:28:02p |
| 17 | Q. Apart from what you put in both | 05:28:03p |
| 18 | reports and apart from what you said today, are | 05:28:07p |
| 19 | you going to opine on anything else in this | 05:28:10p |
| 20 | case? | 05:28:13p |
| 21 | A. I think the deposition questions | 05:28:17p |
| 22 | and my expert reports have covered the general | 05:28:24p |
| 23 | areas that I expect to opine on. | 05:28:27p |
| 24 | Q. Are there any specific areas | 05:28:31p |

Page 259

| | | |
|---|---|---|
| 1 | that have not yet been covered? | 05:28:33p |
| 2 | A. I don't -- as I sit here, I | 05:28:36p |
| 3 | can't think of anything. I can't represent to | 05:28:41p |
| 4 | you that there is not some specific issue or | 05:28:43p |
| 5 | fact that I might not utilize, but it's a | 05:28:49p |
| 6 | summary of the issues that I will address -- I | 05:28:55p |
| 7 | expect to address in my testimony. | 05:28:58p |
| 8 | There is one, actually, and | 05:29:01p |
| 9 | that has to do with in reviewing my report, I | 05:29:06p |
| 10 | became aware that in some sense -- in certain | 05:29:16p |
| 11 | instances I state there are no Section 11 | 05:29:23p |
| 12 | damages, and I make reference to an analysis | 05:29:30p |
| 13 | of Section 11 damages, and just for the sake | 05:29:35p |
| 14 | of completeness, I was referring to -- because | 05:29:38p |
| 15 | Section 11 and Section 12 damages are computed | 05:29:44p |
| 16 | in the same way, that I was covering under | 05:29:48p |
| 17 | that umbrella both Section 11 and Section 12. | 05:29:54p |
| 18 | Q. That's fine. | 05:29:59p |
| 19 | We're going to break. While we | 05:30:00p |
| 20 | are on the break, if you can think about | 05:30:00p |
| 21 | whether there is anything you expect to | 05:30:02p |
| 22 | opine on, I would appreciate it. | 05:30:04p |
| 23 | A. Sure. | 05:30:07p |
| 24 | MR. COLLINS: Let's break. | 05:30:07p |

Page 260

| | | |
|---|---|---|
| 1 | (A recess was had from 5:30 p.m. | 05:30:13p |
| 2 | to 5:36 p.m.; and then the proceedings | 05:30:13p |
| 3 | continued as follows:) | 05:30:13p |
| 4 | MR. COLLINS: No further | 05:36:42p |
| 5 | questions. Thank you. | 05:36:43p |
| 6 | (Deposition concluded at | |
| 7 | 5:36 p.m.) | |
| 8 | ----0---- | |
| 9 | | |
| 10 | | |

Page 261

| | |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | I, Pamela Harrison, a Notary |
| 3 | Public, do hereby certify: |
| 4 | That CHRISTOPHER M. JAMES, the |
| 5 | witness whose testimony is hereinbefore set |
| 6 | forth, was duly sworn by me and that such |
| 7 | testimony given by the witness was taken down |
| 8 | stenographically by me and then transcribed. |
| 9 | I further certify that I am not |
| 10 | related to any of the parties to this |
| 11 | action by blood or marriage, and that I am in |
| 12 | no way interested in the outcome of this |
| 13 | matter. |
| 14 | |
| 15 | |
| 16 | Pamela Harrison |
| | Registered Merit Reporter |
| 17 | Certified Realtime Reporter |
| | CSR-NJ # 30XI00221600 |
| 18 | Notary Public |
| | Date: August 11, 2006 |
| 19 | |
| 20 | (The foregoing certification of |
| | this transcript does not apply to any |
| 21 | reproduction of the same by any means, unless |
| | under the direct control and/or supervision of |
| 22 | the certifying shorthand |
| | reporter.) |
| 23 | |
| 24 | |

66 (Pages 258 to 261)

LANTIER

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


-------------------------------------------------


IN RE:  ADAMS GOLF, INC.     :     CONSOLIDATED


SECURITIES LITIGATION        :     C.A. NO. 99-371-KAJ



-------------------------------------------



ORAL DEPOSITION OF BRIAN LANTIER


         Monday, June 5, 2006


         The oral deposition of BRIAN LANTIER

    was held at the Wyndham Syracuse Hotel,

    6301 Route 298, East Syracuse, New York,

    from 12:00 noon to 4:59 p.m., before

    Cynthia A. Sanders, a Certified Shorthand

    Reporter in and for the State of New York

    and Registered Professional Reporter.

Page 38

1    Q    -- by you?
2    A    These would have been my calls.
3          MR. McEVOY:  Wait for him to finish
4      the question.
5    Q    And did you have a standard format that you
6  used when you made your due diligence calls?
7    A    It was pretty informal.
8    Q    But you kept records of the calls?
9    A    I don't have the records, but I assume
10  there was -- there would be -- there would have been a
11  form of some sort that I would have written things
12  down on.
13    Q    And did there ever come a time when you
14  disposed of those notes?
15    A    No.
16    Q    Were they, to the best of your knowledge,
17  in the files when you left Lehman Brothers?
18    A    They should have been.  When I resigned,
19  you just hand in your card key and you just leave, you
20  just walk out; you don't get to pack up or anything.
21    Q    Can you recall any other due diligence that
22  you did, that you wrote down in some form, other than
23  the calls to Edwin Watts and similar calls that you
24  just referred to?

Page 39

1    A    There were a number of calls.  I mentioned
2  that was the retailer that stuck out in my head, but I
3  do recall there being a list of 50 to 100 retailers,
4  and we called a lot of them; we called the majority of
5  them.  That was the primary due diligence, because it
6  was a retail product, you could see it going into one
7  side and coming out the other side.  So that was the
8  primary due diligence that we did.
9    Q    Now, I don't want to skip too far ahead,
10  but do you recall your research report that you
11  generated on Adams in August of 1998?
12    A    Yes; I've seen a copy, yes.
13    Q    And it refers to, at some point, a pro shop
14  survey?
15    A    Yes.
16    Q    Were the calls to Edwin Watts and other
17  retailers that you just referred to part of what you
18  later described as a pro shop survey?
19    A    I believe so, yes.
20    Q    So when did the pro shop survey begin?
21    A    It was ongoing, it was something that we
22  did -- that I did pre-IPO, post-IPO into 1999.  We
23  would call as the club cycle began, mid-cycle when
24  it's January, February and everyone is buying their

Page 40

1  clubs for the year, and then it continued on until
2  when the actual season starts in the northeast, into
3  May.
4    Q    But at what point before the IPO had you
5  begun the pro shop survey?
6    A    I can't give you a specific date, but it
7  was before the IPO started.
8    Q    Sometime between the management meeting and
9  the IPO?
10    A    The April meeting?
11    Q    Yes.
12    A    I would assume it would be after the April
13  meeting.
14          (Whereupon, Exhibit No. 226 was marked
15      for identification.)
16  BY MR. LEWIS:
17    Q    I have marked as 226 a document numbered
18  UND-8587 through 8590 from Brian J. Lantier to
19  Bernard J. Picchi on the subject of Adams summary.
20          (Document handed.)
21          (Witness reviewed document.)
22    Q    Do you recognize this document?
23    A    Yes.
24    Q    What is it?

Page 41

1    A    This is an internal document created for
2  the sales department -- actually created for the
3  research analyst to communicate with the sales
4  department.
5    Q    And when you say sales department, are you
6  referring to the department that dealt with sales
7  institutions, or are you using the term more broadly?
8    A    They were principally institutional
9  salespeople.
10    Q    Was this a draft that you created?
11    A    I'm not sure if this is the final or draft
12  version.
13    Q    And what was the purpose of it?
14    A    It creates a series of talking points for
15  the research analyst when discussing a potential IPO
16  with the institutional sales department.
17    Q    And when a document of this type was
18  finalized, to whom was it distributed?
19    A    I'm trying to think what the policy was,
20  but, if I remember correctly, we would allow the
21  salespeople to see these documents when they are
22  finalized.  But clearly it says for internal use; it
23  never left the building, it never was to go out to
24  customers.

11 (Pages 38 to 41)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

Page 42

1    Q    By the time you sent this document to
2                    42
3  Mr. Picchi at the end of April of 1998, had you heard
4  the term gray marketing in connection with Adams Golf?
5    A    April of '98? I'm not sure when I first
6  heard the term the gray market. I've seen that in a
7  lot of documents, the term gray marketing, and I'm not
8  sure that's an actual true definition, but it might be
9  some terminology that I can correct at some point.
10   Q    Well, I would like to get to some
11 terminology that might save us some time.
12   A    Um-hmm.
13   Q    By the time the commitment committee at
14 Lehman had approved going forward with the Adams
15 offering, do you remember having heard of alleged
16 illegal distribution of Adams products?
17   A    I believe it may have come up -- I don't
18 know when it came up. I remember hearing about it
19 prior to the IPO, and the determination was it was
20 such a small insignificant number of clubs, at the
21 time limited to one retailer, that it wasn't a --
22 going to have a material financial impact.
23   Q    How did you hear of this illegal
24 distribution issue, as best you can recall?
25   A    I can't recall whether it was -- how it

Page 43

1  came up; I don't know whether it was through pro shop
2                    43
3  calls -- We had heard from conversations with pro
4  shops that there were some clubs showing up in big box
5  retailers, but if that was post-IPO or pre-IPO, I
6  can't recall.
7    Q    From what pro shops did you hear that from?
8    A    I can't recall. I mean, we spoke to
9  dozens, I don't know which pro shop that was.
10   Q    Is it -- Just so we're on solid ground to
11 start with at least: Is it your recollection that the
12 first way that you heard of an illegal distribution
13 issue was through a pro shop rather than some other
14 source?
15   A    I don't know how we -- how it may have come
16 up first.
17   Q    Do you remember ever discussing the issue
18 of illegal distribution of Adams clubs with the
19 investment banking team prior to the IPO?
20   A    I'm sure we may have discussed it at some
21 point, but I can't recall the -- It was not a high
22 priority, again because of the size. It was not --
23 There were far more pressing issues.
24   Q    What were they?
25   A    The potential outlook for competition, new

Page 44

1  clubs being buzzed by Callaway or Title Lies and
2                    44
3  Orlimar's filing; all those were things which we
4  focused a lot more attention on.
5    Q    What did you learn about the number of
6  clubs that made -- Strike that.
7         You said that a determination was made that
8  the number of clubs was small and insignificant. Who
9  made the determination that the number of clubs was
10 small and insignificant?
11   A    I don't recall who may have made that
12 specific determination, but I remember calling around
13 to Costco's when the issue first came up, and I
14 couldn't find the clubs on the east coast; so we had
15 some understanding that they were not in the east
16 coast. And as, you know, we went along, we could not
17 locate any of these clubs. So we assumed that if it
18 was going on, it was not, you know -- In a company
19 that was selling 600,000 clubs a year, a few thousand
20 clubs wasn't going to make or break their year.
21   Q    And was it your conclusion, prior to the
22 IPO, that there were a few thousand clubs out there
23 that had gotten into Costco's?
24   A    No, we didn't have a firm number  The
25 first time I ever saw a number was in your complaint,

Page 45

1  I had not seen a number prior to that.
2                    45
3    Q    Were you ever a participant in a meeting at
4  Lehman Brothers that involved the discussion of the
5  size of the possible Costco distribution of Adams
6  products?
7    A    I don't believe prior to the -- I don't
8  know that I had a meeting prior to the IPO to discuss
9  that.
10   Q    Do you know of a meeting having taken place
11 prior to the IPO?
12   A    That discussed --
13   Q    To discuss the subject --
14   A    To discuss the clubs and Costco?
15   Q    Yes.
16   A    No; no, I don't recall any meeting.
17   Q    Did you participate, prior to the IPO, in
18 any discussion of the risk that distribution of Adams
19 products in Costco stores might pose in the future to
20 the company?
21   A    That, I don't -- I don't recall a specific
22 conversation. Clearly, as I was doing the research,
23 it came up in our research report, that the clubs were
24 there. At that point, I would have addressed it with
25 the company, but that was post-IPO. So pre-IPO, I

12  (Pages 42 to 45)

Page 178

1  the issue of Callaway and Orlimar would come up in
                    178
3  seven or eight of those calls.
4      Q    When the question of Costco was raised, did
5  the investors ever say why they were raising the
6  issue?
7      A    Not that I can recall, no.
8      Q    Are you familiar with the name of
9  King Parr?
10      A    I was not until a day or so ago when I read
11  the complaint.
12      Q    Are you familiar with the name of
13  Manatee Golf?
14      A    No.
15      Q    I take it you never called them in the
16  course of your --
17      A    No.
18      Q    -- pro shop survey?
19      A    Or at least I don't recall calling them.
20      Q    Do you recall Adams ever informing you as
21  to who was responsible for the unauthorized
22  distribution of its products?
23      A    I don't recall ever getting resolution on
24  that.
25          MR. LEWIS:  Nothing further.

Page 179

1          MR. McEVOY:  I have nothing.
                    179
3          MS. MORIATY:  I only have two.
4
5  EXAMINATION BY MS. MORIATY:
6      Q    I'm going to turn you first to Exhibit 179.
7          MR. LEWIS:  What date is that?
8          MS. MORIATY:  August 4th, 1998.
9      Q    Okay.  This report is dated August 4th,
10  1998.  In this report you write that:  Recently
11  Callaway Golf commented that a domestic demand for
12  golf clubs is weak.  And then you go on to say that:
13  Adams Golf is not being affected by this.
14          In retrospect, is it true that Adams Golf
15  was not being affected by the weakness of domestic
16  demand for golf clubs on August 4th, 1998?
17          MR. LEWIS:  Objection to form and
18      foundation.
19      A    In retrospect, to say that they were not
20  affected at all on August 4th, was probably not a
21  correct statement.
22      Q    Why is that?
23      A    There was a combination of events which led
24  to new product introductions from Callaway, Orlimar
25  pushing toward their own IPO, which they knew was

Page 180

1  going to require a lot of sales and some really
                    180
3  attractive financial statements, and which, coupled
4  with Adams introducing a new club, in a marketplace
5  that was not -- It was not typical for people to go
6  out and buy a $200 fairway wood.  Prior to Adams and
7  Orlimar introducing these clubs, they were
8  typically --  If you had one of these, you used it,
9  but no one went out and bought one.  So they were
10  introducing a new market.  And it was a market that
11  was being seized upon by Callaway, Orlimar and Adams.
12          And, in retrospect, we thought they were
13  going to be a little more insulated than they were.
14  Those would be my observations on what impacted them.
15          We did not see that on August 4th -- Is
16  that the date of this?  August 4th, yes.
17      Q    I'm going to ask you a similar question
18  about Exhibit 180.
19          We looked at this document earlier and you
20  testified that you took part in authoring it, and it's
21  dated August of 1998.  And I will turn you to page 20,
22  which is Bates labeled 4054, and the paragraph that's
23  tagged valuation.  And it -- In the second sentence
24  of this paragraph it says that:  Negative sentiment
25  has settled around the entire golf industry following

Page 181

1  a series of press releases from companies like
                    181
3  Callaway Golf, Title Lies, Arnold Palmer Golf and
4  Golden Bear Golf.
5          You go on again to say that:  These
6  negative sentiments that affected these other
7  companies shouldn't affect Adams Golf.
8          Can you tell me if any of those sentiments
9  were affecting Adams Golf as of the date of this
10  report?
11          MR. LEWIS:  Objection to form and
12      foundation.
13      A    Yes.  I think in retrospect again, if we
14  had --  At the time, the thing was, that part of the
15  weakness seen by Title Lies, Callaway, to a lesser
16  degree Arnold Palmer and Golden Bear, the weakness
17  that the major manufacturers were seeing were
18  attributable to Adams and Orlimar; and I think that
19  was true through the first part of the summer.
20          As we got into the second part of the
21  summer of 1998, then there were market saturation; too
22  many clubs, not enough buyers, and we didn't
23  accurately capture that turn in the market.  It was,
24  the market has shifted and it's not just Adams and
25  Orlimar are taking share from Callaway and TaylorMade.

46 (Pages 178 to 181)

1920df68-47f2-4c39-84d4-e4d47d54295d

Page 182

```
 1   And that was something -- I don't know how we would
 2                              182
 3   have seen that other than it was something that was
 4   going to lag. We were going to lag that by watching
 5   total -- We could see the shifts in market share, but
 6   we could not see the shifts in total sales until about
 7   three months after the affect.
 8          And, you know, I wish the timing could have
 9   been a little better, but it didn't work out with
10   those events. They were clearly canaries in the coal
11   mine for what was coming for Adams, and those press
12   releases were pretty important.
13          MS. MORIATY: Okay. That's all I've
14   got.
15          MR. McEVOY: Okay. Any follow-up?
16          MR. LEWIS: No.
17          MR. McEVOY: That's it.
18          (Whereupon, the proceedings were
19   adjourned at 4:59 p.m.)
20
21          *        *        *
22
23
24
25
```

Page 183

```
 1
 2                              183
 3   STATE OF NEW YORK :
                        :ss.   CERTIFICATE OF WITNESS
 4   COUNTY OF ONONDAGA :
 5          I, Brian Lantier, hereby certify that I
 6   have read the foregoing transcript of my deposition
 7   taken June 5, 2006, at approximately 12:00 p.m., at
 8   East Syracuse, New York, pursuant to the applicable
 9   Rules of Civil Procedure, and that the foregoing
10   182 pages of transcript are in conformity with my
11   testimony given at that time (with the exception of
12   any corrections made by me, in ink, and initialed by
13   me).
14
15          _____
16          Brian Lantier
17
18
19   STATE OF NEW YORK :
                        :
20   COUNTY OF ONONDAGA :
21          SUBSCRIBED AND SWORN to before me, the
22   undersigned authority on this, the _____ day of
23   _____, 2006.
24
25
```

Page 184

```
 1          Notary Public]
 2                              184
 3
 4
 5
 6          C E R T I F I C A T I O N
 7
 8
 9          I, Cynthia A. Sanders, Court Reporter
10   and Notary Public in and for the State of
11   New York, do hereby certify that I attended
12   the foregoing proceedings and took
13   stenographic notes of the same, and that
14   the annexed foregoing printed matter is a
15   true and accurate transcript of the same,
16   and of the whole thereof, to the best of my
17   knowledge and ability.
18
19
20
21
22          _____
23          Cynthia A. Sanders
            Notary Public
24
25
```

Page 185

```
 1
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

1920df68-47f2-4c39-84d4-e4d47d54295d