# LYNCH

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.       :    CONSOLIDATED

SECURITIES LITIGATION         :    C.A. NO. 99-371 KAJ

_____X

ORAL DEPOSITION OF ED J. LYNCH, CPA

Tuesday, August 1, 2006

The oral deposition of ED J. LYNCH, CPA, was held at the law offices of Akin Gump Strauss Hauer & Feld, LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas, from 9:37 a.m. to 12:41 p.m., before Jamie K. Israelow, a Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter, Certified Realtime Reporter, and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA   19103

(215)241-1000     (888)777-6690

Page 10

1  Q    And what do you mean by that?
2  A    Well, estimations are done by
3  accountants in preparing accounting entries.
4  Estimations are done by accountants in setting
5  accruals under Financial Accounting Standard
6  Number 5. Estimations are used in a number of
7  places in the accounting literature. So when I
8  see the word "approximated," I liken it
9  to "estimated."
10 Q    Is there a standard that accountants
11 apply when they're using a term like "estimates
12 have approximated actual costs incurred"? Is
13 there some type of standard that one could turn to
14 to say: Yeah, objectively, this is approximate?
15 A    As I sit here, I don't recall. Well,
16 I don't recall ever doing a search on the
17 term "approximated" or "approximate" in the
18 accounting literature. And as I sit here and
19 think about the literature, which is rather
20 lengthy, that makes up generally accepted
21 accounting principles in the US, I can't think of
22 a particular standard that -- that would define
23 that, but I -- like I said, haven't done a search
24 for that.

Page 11

1  Q    So then is it reasonable to say that
2  that sentence is subjective in its use of
3  "approximated actual costs incurred," that the
4  writer of that sentence is the person who believes
5  that the estimates were reasonably proximal to the
6  actual costs incurred?
7  A    Well, I don't really know who the
8  writer of that sentence was to tell you what that
9  person meant. I -- I would have to speculate to
10 tell you that. I can tell you what it means to
11 me, but I just don't know what the person that
12 wrote it was thinking at the time they wrote that.
13 Q    So when you read that sentence, if
14 I'm understanding your testimony correctly,
15 "approximated" there is to be understood, almost
16 in layman's terms, that it was near? That they
17 approximated -- that the word "approximately" is
18 to be understood as the way a layman would
19 understand it, that it's not an accounting term of
20 art, necessarily?
21 A    Well, I'm not -- I don't think it's
22 an accounting term of art. To give you an opinion
23 about that, I'd do a search in my technical
24 library and see if "approximated" came up. If it

Page 12

1  comes up in a search doesn't necessarily mean it's
2  a term of art in the accounting profession,
3  because I can imagine that "approximated" is in
4  the accounting literature numerous times.
5        And that doesn't necessarily
6  mean that, after reading those hits in a search,
7  that I would conclude it's a term of art in
8  accounting. I -- I could look at that, but I just
9  have not looked at the term "approximated." I
10 don't think I've ever looked at the term
11 "approximated" that I can recall.
12 Q    So there's no standard, in other
13 words, that says: If something is within
14 5 percent, 10 percent, 15 percent, if the
15 estimates and the actual costs incurred are within
16 10 percent of each other, that that's approximate?
17 And if it's beyond -- if they're beyond 10 percent
18 of each other, then they're no longer approximate?
19 A    Well, I haven't done a search of
20 the --
21 Q    Okay.
22 A    -- of the accounting literature to
23 see if, the way you just defined that question,
24 literature would pop up, so I don't know.

Page 13

1  Q    Okay. I invite your attention to
2  Paragraph 18, which says: Adams Golf shipped
3  products to customers on the basis of agreed
4  prices and sent invoices to their
5  customers following shipment. As such, the prices
6  of Adams Golf clubs were fixed at the time of
7  sale.
8        What's the -- what's the basis
9  for your information? I'm sorry. You did write
10 that paragraph; is that correct?
11 A    Yes. I either wrote it or revised
12 it. And the basis of that paragraph is a study of
13 the disclosures by the company and the depositions
14 that I read in this case, which are outlined in my
15 report. And I'm trying to think if there's
16 anything else that comes to my mind, other than
17 the -- the filings of S-1A and the Qs. I think
18 there was some mention of revenue recognition in
19 each of those. I'm pretty sure it was in the Qs.
20 I know it was in the Ks.
21 Q    Did you personally review or analyze
22 any sales invoices or sales contracts between
23 Adams Golf and their retailers or distributors?
24 A    I don't recall seeing either of

Page 14

1  those.
2      Q    Did you ask to see --
3      A    No.
4      Q    -- either invoices or any type of
5  sale contract?
6      A    Excuse me for cutting you off.
7           No, I did not.
8      Q    Moving on to Paragraph 19. I'll read
9  them for the record because they're short, and it
10 makes it easier to read the deposition later.
11          I have not seen any evidence
12 contrary to the customer's obligation to pay for
13 them pursuant to the customary business terms or
14 that any contingency or prerequisite existed that
15 the products be resold before the customer was
16 obligated to pay Adams Golf for the goods.
17          The same question: Did you
18 perform any independent review of evidence in an
19 effort to find out if any of those circumstances
20 existed?
21     A    I looked at a number of things to --
22 as a basis to make this statement. The things
23 that occur to me as I sit here are the
24 confirmations that were sent to the customers

Page 15

1  confirming their accounts receivable.
2           I read a number of the
3  depositions, particularly those that were of the
4  salespeople that were deposed, that I know that
5  were deposed, and I believe those people are
6  included earlier in my report. The ones that
7  occurred to me as I sit here are Mr. Gonsalves --
8  if I say his name right.
9      Q    Right.
10     A    In fact all these names, I may not
11 know the pronunciation. I just read about them.
12          Mr. Greaney. Ms. Brooks.
13 There may have been one or two others.
14 Mr. Brewer, I think, and then of course, Mr. Adams
15 had some things about the sales department in his
16 deposition.
17          And then I did have a
18 conversation with the former CFO -- Mr. Hatfield,
19 I believe is his name -- where I asked about how
20 the allowance for sales returns was done.
21          Those are the things that
22 occur to me in answer to your question.
23     Q    Did you interview anyone other than
24 Mr. Hatfield when preparing your report, Exhibit

Page 16

1  302?
2      A    No.
3      Q    Moving ahead to Paragraph 25, quote:
4  As described above, Adams Golf disclosed that it
5  had a 90-day "no questions asked" return policy on
6  its products. In fact, the 90-day "no questions
7  asked" return policy did not apply to all sales,
8  but rather only direct response sales. All other
9  sales were made without a right of return. The
10 company did, however, accept nondirect response
11 sales returns on a case-by-case basis, but only as
12 an accommodation to maintain a customer
13 relationship and only after that customer had been
14 approved for the return.
15          Do you know what percent of
16 Tight Lies sales were direct response as opposed
17 to nondirect response, I guess, retail, or
18 whatever the proper term would be?
19          MR. BESSETTE: What point in
20 time?
21     Q    (By Mr. Mara) 1990 -- first two
22 quarters of '98.
23     A    I believe those facts are laid out in
24 Paragraphs 28 and -- not 28. Wrong paragraph.

Page 17

1  It's a later paragraph. It's the next page,
2  Page 7 of my report. You were asking about the
3  quarter ended March 31, '98?
4      Q    Yeah, or even the first two quarters
5  of '98. But sure, the first quarter of '98.
6      A    The first quarter of '98 is in
7  Paragraph 36.
8      Q    I see. Okay.
9      A    3.6 million compared to 22 million.
10 3.6 million were direct sales, 22 million were
11 from commercial accounts is how we've looked at
12 the data presented in the KPMG work papers.
13     Q    Okay.
14     A    And then subsequent paragraphs
15 outline the same numbers for other quarters.
16     Q    Thank you. Yeah, I see that.
17          You said: All other sales
18 were made without a right of return.
19          And again, the source of your
20 information for that simple statement is?
21     A    My recollection, as I sit here, is
22 that it was in the KPMG work papers that I saw
23 that, and I believe I discussed that with
24 Mr. Hatfield, too, in my interview of

Page 18

1  Mr. Hatfield, the former CFO.
2      Q    So I know in the paragraph you go on
3  to discuss a case-by-case basis where some returns
4  were permitted, so it's your statement that except
5  for those few instances, it was a blanket policy
6  across the board at Adams Golf that there was no
7  right of return on clubs in retail sales, what I'm
8  calling retail sales, which means nondirect
9  response?
10     A    Okay. I think I understand. I -- I
11 think I've referred to them as commercial, but --
12     Q    That's fine, too.
13     A    -- if you want to call them retail,
14 that's fine.
15     Q    Commercial.
16     A    And I'm sorry. I got hung up on the
17 difference in retail and commercial, and I lost
18 the gist of your question.
19     Q    For commercial sales, Adams Golf had
20 a blanket policy of no right of return? I know
21 you say there were exceptions and we'll talk about
22 those, but other than those exceptions which
23 you've carved out in this paragraph, commercial
24 sales, no right of return?

Page 19

1      A    I believe the documentation that we
2  saw in looking at what was available to us had
3  stated that there was not a right of return, but
4  there was a practice of return. And so what I was
5  trying to document here was what the policy was
6  and what the practice was, because accounting
7  looks at both.
8           And under generally accepted
9  accounting principles, if a company has a practice
10 allowing returns, whether or not they have a
11 policy, one should accrue for an estimated sales
12 return based on a pattern and practice, as well as
13 a policy. So you really have to look at both from
14 an accounting perspective.
15     Q    So again, did you go back to any
16 original documents or source documents when you
17 were making the statement that there was a policy
18 of no right of return? Do you want me to define
19 "original or source"?
20     A    No. I understand original and source
21 documents.
22          You know, I don't recall doing
23 that because we had a seen a practice. So
24 that's -- that's my recollection is I don't recall

Page 20

1  going back to the purchase order or to the sales
2  invoice, which I would consider the original
3  documents, or a sales contract, any of those
4  things, looking for that policy. I accepted the
5  evidence that I had seen that said there was no
6  right, rather than going back to the underlying
7  documents.
8      Q    So then, speaking as a layman,
9  when -- I'm trying to summarize. When you
10 identify a practice of return as an accountant or
11 auditor, the policy of the -- the written policy
12 concerning returns becomes less relevant?
13          MR. BESSETTE: I'm going to
14 object as vague and ambiguous.
15          MR. MARA: That's a good
16 objection.
17     A    The -- do you want me to answer it?
18     Q    (By Mr. Mara) Yeah.
19     A    The -- I think both facts can be
20 relevant. I think to me, as an accountant, it is
21 more relevant what is actually happening because
22 it's indicative of a pattern of practice that the
23 accounting literature would call for me, as an
24 accountant, to make allowance for.

Page 21

1      Q    Do you know what particular provision
2  of the accounting literature would address that
3  situation?
4      A    My recollection is that FAS 48,
5  F-A-S 48, would be the basis for making an accrual
6  for any kind of sales return, that which is
7  written or that which is unwritten.
8      Q    Is it common for a company to have a
9  written policy of no right of return but a
10 practice of right of return?
11     A    I don't know that I've ever done a
12 study of determining whether it's common or not.
13 I've seen it before, but I -- I'm not sure my
14 anecdotal seeing it in practice would necessarily
15 lead me to say that it's a common practice. I've
16 seen that kind of practice before.
17     Q    How often?
18     A    Well, as I sit here and think about
19 it, sometimes I'd say, just from a -- 12 years at
20 devoting all of my attention to auditing, I'd seen
21 it a number of times where the formal policies of
22 the company had not caught up to the practices of
23 the company in a -- as it relates to sales
24 returns.

Page 22

1  Q   Was it the formal policy of Adams
2  Golf to have no right of return on commercial
3  sales at the beginning of 1998?
4  A   I believe -- I believe maybe I
5  shouldn't say it was their formal policy of no
6  return. I think I should say that they did not
7  have a policy that allowed for returns on
8  commercial sales, so that, you know, there's a
9  slight difference in what I'm saying from your
10 question to what my answer is, because I would not
11 have expected, in looking at the underlying
12 documents, to see no return allowed, so that would
13 be a formal policy of no return.
14 Q   Yeah.
15 A   I would have expected not to see any
16 provisions allowing return.
17 Q   So -- but isn't it the same thing?
18 If you're saying -- so I guess what you're saying
19 is that instead of an affirmative statement
20 telling a retailer or a commercial account that
21 they couldn't return clubs, was it Adams' policy
22 just to be silent on the issue?
23 A   I -- I think the sentence I wrote was
24 purposeful here that said: All other sales were

Page 23

1  made without a right of return.
2  Q   Uh-huh.
3  A   What I intended to convey there was
4  not that I had gone and seen that there was no
5  return allowed, but that there was no provision
6  allowing a return or no return that -- that I
7  guess, in answer to your question, I expect if I
8  went back to the source documents it would be
9  silent, which is what I was trying to convey by
10 that sentence there.
11 Q   But isn't that silence different than
12 saying that -- all other sales were made without a
13 right of return. I submit that in reading that
14 sentence that means there was no right of return.
15 A   And -- and what I intended by that
16 sentence was "specified." I mean, there was no
17 right of return specified is what I think the
18 underlying documents will show.
19         But like I said, I haven't
20 looked at the underlying documents, so I am
21 speculating a bit here, but that's what I think.
22 That's what I was trying to convey by that
23 sentence.
24 Q   So then, sitting here, you don't know

Page 24

1  if there was a right of return or there was not a
2  right of return?
3         MR. BESSETTE: Objection. I
4  think that misstates the testimony and the report.
5  A   What I'm saying is I believe there
6  was no right of return, and there was a practice
7  that allowed returns that was contrary to that no
8  right of return.
9  Q   (By Mr. Mara) Is that an accepted
10 practice -- strike that.
11        You testified that as an
12 accountant and auditor you had encountered this
13 practice previously on a handful of occasions.
14        MR. BESSETTE: Well --
15 Q   (By Mr. Mara) Correct me if I'm
16 wrong. On some number of occasions.
17        MR. BESSETTE: Let me just
18 object. I'm sorry. "This practice." I think
19 that's different than what you're just talking
20 about.
21        MR. MARA: Okay. I'll define.
22 Q   (By Mr. Mara) By that I meant the
23 policy, whether written or unwritten, of no right
24 of return, but a practice of returns is what I'm

Page 25

1  talking about when I say "this practice."
2         And you testified -- correct
3  me if I'm wrong -- that you had encountered this
4  on some number of occasions in your career prior
5  to your analysis of Adams Golf?
6  A   Yes, I think you're right.
7  Q   Is that -- from an accounting and
8  auditing perspective, is that considered proper
9  business practices?
10        MR. BESSETTE: I'm going to
11 object as vague.
12 A   The term "proper business practices"
13 is not something that generally accepted --
14 Q   (By Mr. Mara) Fair enough.
15 A   -- accounting practices nor generally
16 accepted auditing standards I think would really
17 address. It's not really a term of art.
18 Q   Understood. It was an inartful
19 question.
20         Is it considered proper under
21 GAAP and GAAS?
22 A   And now we're talking about is
23 what considered --
24 Q   The practice of having either a

Page 26

1  written or unwritten policy of no right of return
2  but an actual practice of returns.
3  　　　MR. BESSETTE: Let me just
4  object. Are you talking about as laid out in
5  Paragraph 25 of Exhibit 302, or what's the
6  difference?
7  　　　MR. MARA: Yeah, I'm basing it
8  strictly on Paragraph 25 and Mr. Lynch's testimony
9  this morning. I'm not --
10 　A　My understanding of how GAAP deals
11 with this is related to what FAS 48 and practice
12 around applying FAS 48 has been in the accounting
13 world, which I live in, and that is whether the
14 policy specifically states return or not. If
15 there's a practice of return, generally accepted
16 accounting principles would acquire the company to
17 accrue for the expected returns.
18 　Q　(By Mr. Mara) As an auditor, would
19 you ask that company to comport its practice with
20 its policy?
21 　A　I cannot recall ever doing that in my
22 audit days, so I guess I'd have to say I
23 probably -- well, I didn't, so I'm not sure I
24 would, even today if I were auditing a company

Page 27

1  that had a practice different from its written
2  terms.
3  　Q　So if there was a practice of return,
4  as we've discussed it this morning, at Adams Golf
5  in the first two quarters of '98 -- or the
6  calendar year of 1998, what is the value of your
7  sentence: All other sales were made without a
8  right of return?
9  　　　In fact, there was a right of
10 return is what I'm hearing from you.
11 　A　Well, I think what the value of the
12 sentence was as contrast to the next sentence.
13 　Q　And for the record, the next sentence
14 being: The company did, however, accept nondirect
15 response sales returns on a case-by-case basis,
16 but only as an accommodation to maintain a
17 customer relationship and only after that customer
18 had been approved for return.
19 　　　Just for clarity of the
20 record.
21 　　　The sentence I just read,
22 then, does that describe, or was that your effort
23 to describe what we've been calling this practice
24 of return this morning?

Page 28

1  　A　Yes, sir.
2  　Q　How frequently did this acceptance of
3  nondirect response sales returns occur in 1998?
4  We'll start with the first two quarters of 1998.
5  　A　In the range of 3 to 5 percent.
6  　Q　So that's 3 to 5 percent of
7  commercial sales?
8  　A　Yes, sir.
9  　Q　Okay. Do you know what customers
10 were involved in those nondirect response sales
11 returns?
12 　A　As I sit here, I cannot think of a
13 particular customer.
14 　Q　Did you go back and look at customer
15 records, or again, did you go back to any source
16 documents for that information?
17 　A　The -- the source document that I
18 recall looking at that relates to this issue is a
19 confirmation from one of the customers that talked
20 about a return -- I think it was a return --
21 talked about -- I should say an exception that I
22 think was a return in their confirmation back to
23 KPMG, the outside auditors.
24 　Q　And that was from one customer?

Page 29

1  　A　Yes.
2  　Q　And you -- you used that confirmation
3  to identify that there was a practice of return?
4  　A　No. No. I was answering your other
5  question.
6  　Q　Okay.
7  　A　I thought I was answering your other
8  question.
9  　Q　Right. So that was the source
10 information you went back to?
11 　A　Well, you asked me if I'd seen any
12 source information, and I answered that the thing
13 I could think of related to a commercial customer
14 was the confirmation response of one of the
15 commercial customers, related to one of the
16 invoices on the invoices that they still owed to
17 the company.
18 　Q　And from that one confirmation
19 referencing one invoice, did you extrapolate that
20 out somehow to say that there was a practice of
21 returns?
22 　A　No. I didn't do -- I didn't do an
23 extrapolation of that to get to there. I looked
24 at other documents that were evidencing a pattern

Page 38

1 circumstances were for returns, and he generally
2 described them to me, and I used these words to
3 document the kind of information that I had seen
4 and heard.
5  Q  Did you ask him how many times it
6 happened?
7  A  I don't recall asking that specific
8 question.
9  Q  Did you ask him who the customers
10 were?
11  A  No.
12  Q  And did you ask him what were the
13 needs in the customer relationship that were being
14 addressed by allowing the return?
15  A  No.
16  Q  Who approved returns at Adams Golf in
17 1998?
18  A  I don't remember.
19  Q  Did you ask Darl Hatfield that
20 question?
21  A  I don't think I asked who
22 specifically. I think I asked about the practice
23 of a return authorization, but I don't think I
24 asked who granted that.

Page 39

1  Q  What was the practice of a return
2 authorization in 1998?
3  A  What I recall was that Mr. Hatfield
4 indicated to me that without a return
5 authorization, the customer could not return
6 goods. They would not be accepted. And that was
7 the extent of what my inquiry was about the return
8 authorization process.
9  Q  Did -- did he show you a return
10 authorization form?
11  A  No.
12  Q  Did you ask to see one?
13  A  No.
14  Q  Did he -- how many commercial account
15 sales returns were rejected by Adams Golf in 1998?
16  A  I don't know.
17  Q  Did you ask that question of Darl
18 Hatfield?
19  A  No.
20  Q  Did you look for that information in
21 the KPMG work papers?
22  A  No.
23  Q  Did any of your investigation -- did
24 anything in your investigation tell you why

Page 40

1 returns would be rejected, if they were?
2  A  I don't recall seeing anything like
3 that.
4  Q  And I guess the flip side of that
5 coin is: Did you encounter any information in
6 your investigation that told you why returns were
7 being accepted?
8  A  I don't recall seeing anything to
9 that effect either.
10  Q  So then, in summary, and correct me
11 if this is fair or unfair to say, there was a
12 practice of returns at Adams Golf in 1998, and it
13 was done on a case-by-case subjective basis; is
14 that fair?
15  A  I don't know that I could say
16 specifically that it was subjective. I think I
17 could agree with there was a pattern of -- of
18 returns on a case-by-case basis.
19      Because I was not there
20 granting or not granting the return authorization,
21 I couldn't tell you if it was subjective or
22 objective.
23  Q  Is it fair to say you've seen no
24 evidence that says it was objective?

Page 41

1  A  I think I can say that I've seen no
2 evidence of an objective set of criteria. I think
3 I've already testified about that.
4      MR. MARA: Everybody okay?
5 We'll take a very short break and off the record.
6      (A recess was taken from
7      10:31 to 10:37.)
8      MR. MARA: Back on the record.
9  Q  (By Mr. Mara) We're going to move
10 off Paragraph 25 of Exhibit 302, and if I can
11 direct your attention to Paragraph 26. Just one
12 moment, if I may.
13      And again, I started doing it,
14 I'll keep doing it, Paragraph 26 reads as follows:
15 I do not consider the returns periods described
16 above to be "relatively long" periods as that term
17 is used in FAS 48.
18      What's your basis for that
19 statement?
20  A  Purely my experience as a public
21 accountant over the last 28, 29 years.
22  Q  Is there any accounting literature or
23 written guidance to consult on what is a
24 relatively long period or what is not a relatively

11 (Pages 38 to 41)

Page 50

1 returns?
2    A    Well, there are a number of
3 implications of a hot-selling product, not the
4 least of which is whether you can produce enough,
5 supply enough, as well as how you estimate the
6 flow of goods coming back to you so that you
7 monitor both what goes out to the customer and
8 what comes back from the customer, monitoring what
9 comes back not only from a simple return basis,
10 but also from a -- a warranty basis.
11         So those things have been done
12 by many companies. Almost every company that was
13 highly successful had to estimate what's coming
14 back on both returns and warranty.
15   Q    Does it make it harder to do those
16 estimates, to make those estimates?
17   A    From an accounting perspective, I
18 would not say particularly harder. Where you have
19 a great deal of volume, it probably makes the
20 accountant's job a bit easier.
21         What's more difficult for the
22 accountant is if you sell three clubs and one of
23 them comes back, the next three clubs you sell,
24 should you allow for one? But when you're selling

Page 51

1 30,000, from purely an accountant's perspective,
2 you can get a better sense for how things are
3 going when you're selling a high volume than you
4 can when you're selling a very low volume.
5    Q    If sales are X and in a very short
6 period of time sales go to X plus 100, does that
7 make it difficult for company management to look
8 back at an historical track record of returns and
9 estimate future returns?
10   A    Not --
11        MR. BESSETTE: I was going to
12 say incomplete hypothetical, but go ahead.
13   A    Not necessarily.
14   Q    (By Mr. Mara) Okay. And the
15 reason -- and to cut to the chase, then, company
16 management would simply rely on existing tools,
17 their experience in the golf industry to estimate
18 returns, even given the much higher sales volume?
19        MR. BESSETTE: Same objection.
20   Q    (By Mr. Mara) Is that a fair
21 statement?
22        MR. BESSETTE: Same objection.
23   A    Yeah, and a whole bunch of other
24 things.

Page 52

1    Q    (By Mr. Mara) Oh, sure.
2    A    Depending on what else that they
3 knew, saw, observed.
4    Q    Sure. But those items I mentioned
5 would be at least components of the
6 decision-making process: Experience in the golf
7 industry, experience as club makers and sellers?
8    A    As well as experience of returns of
9 what they're selling, because some returns happen
10 very quickly. Some returns happen over the next
11 month. Some returns happen over the next two
12 months. So it's not like you have -- it's not
13 like you're in a vacuum. You have information.
14   Q    Right. Moving on, if I may, to
15 Paragraph 28, which is too long to read, and the
16 question is very simple: What were the other
17 products? 99.5 percent of Adams Golf sales were
18 clubs.
19   A    My recollection is that there were
20 some golf bags, and other than the golf bags, I
21 don't remember anything else, but there could have
22 been some other kind of promotional items that
23 they sold. I call them promotional items, like
24 other golf things.

Page 53

1    Q    Okay. Paragraph 29, which I'll take
2 a shot at, for clarity of the record: Adams Golf
3 was aware of the susceptibility of its products to
4 external factors, including technological changes
5 and changes in demand. Adams Golf did research
6 and development as a mechanism to keep its
7 products competitive and disclose the nature of
8 fierce competition from some of its competitors,
9 such as Callaway and Orlimar, O-r-l-i-m-a-r. These
10 factors were not sufficient to prevent Adams Golf
11 from making a reasonable estimate of sales returns
12 during the class period.
13        Well, simply, what's the basis
14 for your opinion that these factors were not
15 sufficient?
16   A    Well, a couple of things that I think
17 of as I sit here. One is the company tracked
18 returns by type monthly, and the other basis for,
19 you know, these kinds of facts is basically the
20 disclosures of the company in the S-1A.
21        And then I guess the third
22 basis is, having been in the accounting profession
23 since 1977, I've seen other companies face similar
24 types of technological and demand changes with the

14 (Pages 50 to 53)

### Page 54

1  ability to track returns and make estimates in a
2  similar fashion.
3      Q    How does disclosing fierce
4  competition make it easier for Adams Golf to make
5  a reasonable estimate of sales returns?
6      A    If I stated it that way, I didn't
7  state it very artfully. I was trying to say that
8  the company experienced fierce competition, and
9  the matter of fierce competition does not prevent
10 a company, any company, from estimating its sales
11 returns in and of itself from fierce competition.
12     Q    I see. Okay. So the existence of
13 fierce competition does not prevent accurate sales
14 return estimates?
15     A    Well, I would say reasonably accurate
16 or reasonable --
17     Q    Sure.
18     A    -- sales return estimates, because
19 sales return estimates are always an estimate.
20 They're never going to be accurate. They can only
21 be reasonable or unreasonable estimates based on
22 what happens.
23     Q    So then disclosure of fierce
24 competition really has no impact on a company's

### Page 55

1  estimates of sales returns?
2      A    That's correct. Not the disclosure.
3      Q    Okay.
4      A    I just inartfully stated on the
5  record here.
6      Q    Got you.
7           Did you -- in reaching this
8  conclusion in Paragraph 29, did you look at the
9  history of Adams Golf? I mean, what period of
10 technological change are we talking about? Is
11 this in 1998, or did you go back and look at how
12 the company had reacted to competition or
13 technological change in prior years?
14     A    What I looked at was a number of
15 factors. Number one, that the company had been in
16 business for a number of years. I think it was
17 '87 that they started.
18          Number two, that they had
19 introduced the Tight Lies in about 1995 and that
20 they had introduced some new clubs in 1999, so
21 that they had gone through some product
22 introductions in the past.
23          Those are the things that I
24 recall, as I sit here, as well as a -- now that I

### Page 56

1  think a little further, as well as looking at
2  their history of returns in 1997 and throughout
3  1998, tracking that history of the company.
4      Q    Do you know when the Orlimar
5  Tri-Metal club appeared on the market?
6           MR. MARA: And please,
7  Counsel, correct me if I'm wrong. That was the
8  Orlimar competitive club, the Tri-Metal.
9           MR. BESSETTE: Uh-huh. The
10 Tri-Metal.
11     A    No, I don't know specifically the
12 month that it appeared on the market.
13     Q    (By Mr. Mara) Did your analysis of
14 Adams Golf return estimates and return rates
15 indicate to you that the presence of the Orlimar
16 Tri-Metal had an impact on Adams' returns?
17     A    I don't recall making that
18 observation.
19     Q    Did you ask anyone at Adams Golf what
20 technological changes they confronted in 1997 and
21 1998?
22     A    No, I did not.
23     Q    Did you ask anyone at Adams Golf
24 about their experiences in '97 or '98 with changes

### Page 57

1  in demand?
2      A    I don't recall that I asked anybody
3  that.
4      Q    How do you know that Adams Golf did
5  research and development as a mechanism to keep
6  its products competitive?
7      A    I believe they disclosed that in
8  their S-1A that I read.
9      Q    What are the circumstances that would
10 be sufficient to prevent a company from making a
11 reasonable estimate of sales returns? What are --
12 I mean, what technological changes or changes in
13 demand would be sufficient?
14     A    Well, in a -- as I sit here, thinking
15 hypothetically, I suppose you could dream up a
16 number of circumstances where demand went totally
17 away for a club or a product line or all your
18 products. If something -- some tremendous event
19 happened -- you know, I think we saw some of that
20 with 9/11, when the airplanes quit flying. But
21 returns in the airplane business, I guess you had
22 people canceling orders of planes post 9/11, just
23 as you had ticket holders getting refunds on plane
24 reservations for multiple reasons. Some because

Page 70

1  A    I guess generally would be a
2  reasonable qualifier to that answer.
3     Q    Okay. And skipping ahead now to
4  Paragraph 38, which is too long to read, but
5  inevitably I end up reading it.
6           MR. MARA: Off the record for
7  one second.
8           (An off-the-record discussion
9           was held from 11:30 to 11:30.)
10          MR. MARA: Back on. Sorry.
11    Q    (By Mr. Mara) Paragraph 38, do you
12 know if -- did Adams Golf blame increased
13 third-quarter returns on anything other than
14 Telegolf?
15    A    I don't recall seeing any evidence or
16 hearing anything from Mr. Hatfield, other than the
17 experience with Telegolf.
18    Q    Did you ask him if he blamed anything
19 else?
20    A    I asked him a slightly different
21 question, which was: Why the greater experience?
22 But when he answered the question, I don't recall
23 if I asked: Was there anything else, because of
24 the way we discussed Telegolf.

Page 71

1     Q    What was it about the way you
2  discussed Telegolf that made you think that that
3  was as far as you needed to go?
4     A    It just seemed like that was the
5  reason that -- that he had described.
6     Q    Why was Telegolf unsatisfactory?
7     A    Well, something -- I think it was a
8  deposition -- attributed the unsatisfactory
9  performance of them to Telegolf's lack of
10 knowledge of the sport and the company's products.
11 I think there was a deposition -- a set of
12 deposition testimony that talked about that.
13    Q    And what does that mean? What is
14 "lack of knowledge of the sport and the company's
15 products"? What does that mean?
16    A    Well, as I took it, it meant that
17 they were doing something that Adams Golf felt
18 wasn't really taking into account the customer
19 base that they were selling to and the products
20 that Adams had. I mean, that's how I took it.
21    Q    So beyond this interview with Darl
22 Hatfield, what, if any, other research did you do
23 about the increased sales return trend in the
24 third quarter of the year?

Page 72

1     A    I remember looking at some deposition
2  testimony around Telegolf, but other than that,
3  the other thing I did was I looked at the actual
4  return history of the company in this period and
5  in the prior period and in the subsequent period.
6     Q    Was there a fairly dramatic increase
7  in returns in July of 1998?
8     A    You know, I never could get the month
9  of July isolated on a schedule that I thought was
10 reliable. I could only get the quarter of
11 September 30, 1998, which includes the month of
12 July.
13    Q    There was an increase in return rate
14 in the third quarter of 1998?
15    A    There was a slight increase, quite
16 slight, less than 10 percent increase in actual
17 returns for the third quarter 1998.
18    Q    And you're looking at? I'm sorry.
19    A    I'm looking at Exhibit 4 to my
20 report.
21    Q    Okay.
22    A    Which is about 30 pages in from the
23 back.
24    Q    Okay. And based on your analysis, do

Page 73

1  you blame or credit or view Telegolf as the cause
2  of that 10 percent increase?
3     A    Well, I think I said it was less than
4  10 percent.
5     Q    I'm sorry.
6     A    It's less than $100,000 increase from
7  one quarter to the other. And I don't think I
8  have done enough work on the million seven in
9  returns for the quarter ended 9/30/98 to give you
10 a specific cause of that. I can tell you what the
11 evidence that was documented by KPMG and the
12 evidence in the deposition suggests, but it just
13 suggests that to me. It could have been Telegolf
14 and five other things.
15          But the increase for the
16 quarter ended 9/30/98 was only 95 -- $91,000 in
17 more returns in that quarter than in the quarter
18 ended June 30, 1998.
19    Q    But -- I suppose this was repetitive,
20 but you did not go back and look at source
21 documents when reaching the conclusions you state
22 in this Paragraph 38?
23    A    I could not find source documents
24 that would add up to the totality of all of the

Page 74

1  returns, so I did not look at source documents.
2  Q   Did that trouble you in any way, that
3  you could not find source documents?
4  A   Not particularly. It doesn't
5  surprise me at all that years later source
6  documents for returns would not be maintained by a
7  company.
8  Q   Did you ask for them?
9  A   I asked to see all the documents
10 discovered in this case in order to look to see if
11 those kinds of documents were there.
12 Q   So sitting here this morning, are you
13 able to say exactly what returns were in July of
14 1998?
15 A   No. I couldn't give you the exact
16 number.
17 Q   For that matter, are you able to say
18 what returns were for any month in 1998?
19 A   I think I've seen some documents in
20 some of the months in 1998 that did track to the
21 reserve amounts that were on the books. So there
22 were some months in 1998 where there was a
23 discovered document that looked like it was
24 verifiable back to the books and records of the

Page 75

1  company.
2  Q   Did you make -- did you do
3  comparisons of return rates on a monthly basis in
4  1998 to return rates on a monthly basis in 1997?
5  A   I had a schedule that had, I think,
6  quarterlies in '98 to quarterlies in '97, but I'm
7  not sure that I've seen any discovered document
8  that had monthlies in '98 compared to monthlies in
9  '97.
10 Q   And I'll ask the same question of,
11 say, even '96. Did you do any analysis of
12 comparing, let's say, 1997 monthly to 1996? I
13 suppose the answer is no.
14 A   Well, as I sit here, I don't remember
15 seeing many 1996 documents. The '98 documents
16 that I saw, I just don't remember if there was a
17 month or two from '96 or not.
18 Q   So when Darl Hatfield said: We were
19 able to estimate our reserves based on our
20 history, did you just accept that statement, or
21 did you seek out facts to back that up?
22 A   I sought out discovered facts to look
23 at the history in 1997.
24 Q   And by relying on our history -- and

Page 76

1  again, I don't want to put words either in your
2  mouth or Darl Hatfield's mouth -- does that
3  translate, then, into relying on 1997?
4       That's a bad question.
5       In estimating return reserves,
6  a company relies on its history as one component
7  to estimate return reserves. Is history in this
8  case a shorthand for 1997 when estimating 1998
9  return reserves?
10 A   I believe, in this case, the
11 documents that I've been able to locate are
12 limited to 1997 documents for history, and of
13 course, 1998 for later quarters in 1998.
14 Q   Sure.
15 A   But for -- for instance, the first
16 quarter of 1998, I was unable to locate detailed
17 quarterly information for 1997, but was able to
18 locate annual information for 1997 to be able to
19 compare percentages of reserves by product line to
20 the prior year's historical information.
21      So yes, it was -- my
22 historical information was 1997 that I was looking
23 at for the 1998 first quarter.
24 Q   Okay.

Page 77

1       MR. BESSETTE: I want to -- I
2  guess I want to make sure the record is clear. He
3  just explained what -- what he did and what he
4  looked at, but was your question that or what the
5  company did?
6       MR. MARA: No, just in pure
7  shorthand, you know. We say: You look at a
8  history, which is accepted by all on their own.
9  And my only question is: For Adams Golf, did
10 history mean 1997 --
11      MR. BESSETTE: Okay.
12      MR. MARA: -- for people in
13 1998 trying to look forward or make estimates?
14 I'm just saying, you know, the company hasn't been
15 around since 1850.
16      MR. BESSETTE: So I think what
17 he wants to know is: When they were making
18 estimates in '98, were they only looking at '97 or
19 did they do something else, or do you know?
20 Q   (By Mr. Mara) That's exactly it.
21 A   I think the best estimates I have are
22 from the KPMG work papers, where the KPMG work
23 papers document what the company looked at and
24 what they looked at, which was that period for the

20 (Pages 74 to 77)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

28771fc5-ae8a-4364-81c7-b1ff9a5dac69