# MAGNUSSEN

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Complimentary Client Copy

IN RE ADAMS GOLF, INC., SECURITIES LITIGATION

Consolidated C.A. No. 99-371 KAJ
Class Action
Jury Trial Demanded

APRIL 28, 2006
9:00 O'CLOCK A.M.

The Deposition of RYAN MAGNUSSEN, taken before Ernest Kuemmel, CSR(A), Examiner, pursuant to Rules 203, 728, 204(1) of the Court of Queen's Bench of Alberta at the offices of Michael C. Dunkley, Calgary, Alberta, on the 28th day of April, A.D. 2006.

2

APPEARANCES

FOR THE PLAINTIFFS:

Elizabeth W. Fox, Ms.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103

and

Elizabeth A. Leland, Ms.
Keller Rohrback LLP
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052

FOR THE DEFENDANTS:
(With the exception of the underwriters)

Michelle A. Reed, Ms. and
Laura Moriaty, Ms.
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas 78701-3911

OFFICIAL COURT REPORTER:

DONNA GERBRANDT, CSR(A)

3

RYAN CURTIS MAGNUSSEN, sworn, examined by Ms. Leland:

Q. Good morning.

**A. Good morning.**

Q. Thank you for being here

**A. You're welcome.**

Q. My name is Elizabeth Leland. I'm from the law firm of Keller Rohrback in Seattle, and I'm one of the attorneys for the plaintiffs in this case. Could you state your name and your address for the record, please?

**A. Ryan Curtis Magnussen. Address is 135 Woodmont Drive, Southwest, Calgary, Alberta.**

Q Thank you. Now briefly, without divulging the details of any of our communications, can you tell me how the documents bearing the numbers MCK on the bottom came to be in the plaintiff's attorney's possession?

**A. Vance Mackenzie and I had a meeting, I believe -- well, management had a meeting and Vance contacted the Seattle law firm, when we found out that the lawsuit was going on, to offer up any information that we had that might help them to, you know, pursue the case, that helps the case.**

Q. And the Seattle law firm took all the

4

documents that were offered?

**A. Yeah. I believe it was you came up to our office in Calgary, and I had all my staff supply you with their files from Adams, which you went through and chose whichever documents you wanted.**

Q. And that was all the documents that were offered; correct?

**A. Yeah.**

Q. Okay. Can you give me a brief background of your work history before you became affiliated with WDC Mackenzie?

**A. I started work with Sears Canada, and I worked with them for six years. I left as a retail sales manager and I joined a bank, Canada Trust. I became a branch manager at 25, and did that for another seven years. I was one of the top managers. And I decided that, based on how I was successful in business and saw what my customers did, that if I went out and did my own business that I could be successful as well. So that's where we started WDC after that.**

Q. And in what year was WDC started?

**A. In 1992.**

Q. And can you give me a brief background

Objection, mischaracterizing former testimony. You may answer.

**A. The bottom line is my business is golf. I can golf free everywhere all over here. So I travelled and golfed and met with pros all over the place and stayed in contact with my company daily.**

Q. MS. **REED:** Before 1992, did you have any involvement in the golf industry?

**A. No.**

**MS. LELAND:** Can you clarify what you mean by "involvement"?

**MS. REED:** Sure.

Q. Before 1992, did you have any knowledge of golf industry sales? Let's start with that.

**A. Reasonably, yeah.**

Q. Now, I'm not a golfer and so I have to ask lots of non-golf questions and get educated through all of this. Tell me a little bit about the golf season in Canada. So in Canada, when is the high golf season and when is the low golf season?

**A. It usually starts at the end of March, beginning of April and will end about mid-October.**

Q. And Greg Pratt earlier testified that the peak of the golf season was Father's Day. Does

that sound about right to you?

**A. Yeah, June.**

Q. And typically would sales through the golf season -- how are they distributed? When do you have higher sales and when do you have lower sales?

**MS. LELAND:** Object as to form.

Q. MS. **REED:** Okay. Let's start with this: When do you have higher sales in the golf season?

**A. Generally your spring shipment will be a large amount, followed by either pre-arranged fill-in shipments or -- and then followed up with retailer later for further business.**

Q. Now, in 1998 was Adams Golf a "hot" product?

**A. Yeah, I would say.**

Q. And tell me a little bit about hot products? How long does a product usually stay hot?

**MS. LELAND:** Can we define "hot", just to make sure everybody is on the same page?

Q. MS. **REED:** Well, how would you define "hot"?

**A. Very popular in the marketplace.**

Q. Okay. How long would a golf club remain very popular?

**MS. LELAND:** Object as to form.

**A. Depending on distribution, exclusively up to three or four years.**

Q. MS. **REED:** And at some point you would expect sales to slow down of a hot product?

**A. Yeah.**

Q. And companies typically, to make sure that they have continued sales, introduce new products; is that right?

**A. Yeah.**

Q. And so if they have one product, they try and follow it up by a second product to continue the momentum?

**MS. LELAND:** Object to form.

**A. If the momentum on the first product is no longer there, they generally will start to develop -- research and develop a new product.**

Q. MS. **REED:** And tell me a little bit about what made the Adams Golf club hot in 1998?

**A. It was upside down.**

Q. And tell me a little bit about that.

**A. There you go. The club was designed upside down. In golf clubs, if you look, in the normal design the top is larger than the bottom, the sole, and Adams Golf widened the sole and lowered the top to give it more weight at the bottom to get the ball airborne. So it was incredible technology to come up with, and the club performed unbelievably well. So that's what made that one hot.**

Q. So I need to get myself an Adams Golf club because mine doesn't go very far. When Adams introduced that club, did anyone else have a club that was similar to Adams?

**A. Not even -- there were similar -- no.**

Q. Did at some point --

**A. It was a happening new thing.**

Q. Did at some point competitors introduce clubs that were similar to Adams?

**A. They tried to, yeah, introduce clubs that would compete with Adams. Fairway would.**

Q. Did Orlimar introduce a club in late summer, early fall 1998 that would compete with Adams?

**A. Yes.**

Q. Did Callaway introduce a club that would

compete with Adams?

**A. Maybe. To the best of my recollection, I didn't pay a lot of attention to what Callaway did, so...**

Q. Tell me a little bit about the golf industry and who you would consider Adams Golf competitors in 1998?

**A. In '98. Due to the product, design, and innovation it was a top club, top of the market. And so its competitors would have been the Callaway, Taylor Made. The top-end manufacturers.**

Q. Can you think of any others?

**A. Titleist, Nazumo.**

Q. What's that one?

**A. Nazumo.**

Q. Does that sort of sum up Adams Golf's competition?

**MS. LELAND:** To the best of your recollection

**A. To the best of my recollection, but there are 50 club manufacturers probably out there, and they're all Adams' competition.**

Q. MS. **REED:** Had any of these other manufacturers experienced gray marketing of their clubs --

**MS. LELAND:** Object to form.

Q. MS. **REED:** -- in 1998?

**MS. LELAND:** Object as to form.

**A. To the best of my knowledge, yes.**

Q. MS. **REED:** Which golf manufacturers experienced gray marketing in 1998?

**A. Particularly -- in 1998?**

Q. Yes.

**A. To the best of my knowledge, I don't know.**

Q. Or previous to 1998.

**A. Titleist, Callaway.**

Q. Did Taylor Made --

**A. I don't shop at Costco.**

Q. Excuse me?

**A. I don't shop at Costco, so I don't...**

Q. But based on your knowledge from being in the company, were you aware of any other manufacturers that had previously experienced gray marketing in 1998?

**A. To the best of my knowledge, the two I mentioned.**

Q. Do you know if Taylor Made did?

**A. That's... I had a letter -- is it Titleist Kober (phonetic) or is it --**

**MS. LELAND:** You just answer to the best of your recollection We're trying to get at what you know, so...

**A. Yeah.**

Q. MS. **REED:** Callaway and Titleist?

**A. Yeah.**

Q. That's good. And even after gray marketing, would you consider Callaway to be a major name brand club?

**MS. LELAND:** Object as to form. You can answer.

**A. Yes, but it's not comparing apples with apples. You know, one's an established business and one is a new business.**

Q. MS. **REED:** Even after gray marketing would you consider Titleist to be a major name brand club?

**MS. LELAND:** Object to form. Yes.

**A. The same thing?**

**MS. FOX:** Finish.

**MS. LELAND:** You go ahead and finish your answer.

**MS. REED:** Counsel, I would

appreciate it if you wouldn't coach the witness either verbally or through your actions during the Deposition.

**MS. LELAND:** I'm sorry. I was not coaching the witness, but go ahead and answer the question.

**THE WITNESS:** Please repeat the question.

**MS. REED:** I can just move on.

Q. Earlier you had talked about the various products that WDC Mackenzie marketed. Was WDC Mackenzie focussed on selling popular products?

**MS. LELAND:** Object as to form.

**A. Our goal was to gain exclusive Canadian rights to a product so that we had control in Canada of how the product sold and... quickly repeat the question.**

Q. MS. **REED:** Were you focussed on selling hot or revolutionary products?

**MS. LELAND:** Object to the form.

**A. Again, no. We wanted to get the Canadian distribution for whatever we coul[illegible] st off, and we had to believe that it had a pro[illegible] r the product had potential in the marketplace. [illegible]e generally had products that were not in the**

# MILLER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

IN RE ADAMS GOLF, INC. : CONSOLIDATED
:
SECURITIES LITIGATION : C.A. No. 99-371 KAJ

---

Friday, August 11, 2006

---

Oral deposition of R. ALAN MILLER, taken pursuant to notice, was held at the offices of AKIN, GUMP, STRAUSS, HAUER AND FELD, LLP, 590 Madison Avenue, 18th Floor, New York, New York 10022-2524 commencing at 8:50 a.m. on the above date, before Beth A. Barkocy, Certified Shorthand Reporter and Notary Public.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
(215)241-1000 (888)777-6690

dd4ef471-83c3-4335-98b4-b754f02fe045

type of disclosure of the issue of gray marketing.

By the way, I would suggest that the entire press release was new information, not just the portion of it you asked me about, and it would be taken by the market in its entirety. That doesn't say that there weren't some people who knew in the spring of '98, and I think it was April and May, that there was some level of gray marketing going on.

I'm thinking of some of the references in Mackenzie's work, and some of the complaint letters, I think, referenced in Mr. Grace's work, that there was some level of knowledge about some of it, but I think in terms of public information to the market, that this is the first such piece, but when I say "to the market" here, we have to remember there was no public stock at that time, so even though it was released to the market and to the public, there would have been no community of stockholders or analysts, for example, to follow this at the time.

BY MR. BESSETTE:

Q. This press release was contemporaneous with the IPO roadshow, was it not?

MR. LEWIS: Objection to form, foundation.

THE WITNESS: Yeah, I believe that's right.

BY MR. BESSETTE:

Q. Let me show you what's been marked as Exhibit-233 (indicating). This is the Golf Pro article that you reference in your report at Paragraph 13A?

A. Right.

Q. On Page 3 of the article, it states that the company joined the ignominious ranks of the big boys in another way this year; Tight Lies started showing up in Costco, prompting a lawsuit from Adams with two different aims. Do you see that?

A. Yes.

Q. Was this information released on or about August 1, 1998 publish date?

A. I haven't seen any reason to think so.

Q. Is this information in this report new information --

MR. LEWIS: Object to the form.

BY MR. BESSETTE:

Q. -- or old information?

MR. LEWIS: Object to the form.

BY MR. BESSETTE:

Q. The part I just read.

MR. LEWIS: Same objection.

THE WITNESS: I think the --

BY MR. BESSETTE:

Q. Let me withdraw it and make the question a little more precise.

The information about Tight Lies showing up in Costco, prompting a lawsuit, is that new information or old information?

MR. LEWIS: Objection to form and foundation.

THE WITNESS: That's a good question. It's technically old information by that point because they refer to information that had occurred sometime previously and had been discussed in the press release sometime previously, but it's the type of information in the form of distribution that would fit into the messier category we talked about earlier as opposed to the clean, simple major national

impact-type release or earnings-type information for a large-cap company followed widely by Wall Street or whatever the examples were that we were talking about; that is, you've got this article appearing to the trade, as my understanding goes, in, most likely, mid July, as best I can tell, and that's not -- I don't think there's any certainty as to the dates when this thing actually reached people.

BY MR. BESSETTE:

Q. You're just guessing when it reached people, right?

MR. LEWIS: Objection to form.

THE WITNESS: No. My understanding is there has been work done on that issue that the best information is that it was most likely the middle of July, and if you analyze the text of the article, it appears to make sense that it would be out sometime in the middle of July.

BY MR. BESSETTE:

Q. What work has been done?

A. My understanding is contact had been made with -- I think it was the circulation director

dd4ef471-83c3-4335-98b4-b754f02fe045

of the magazine, who indicated a likely distribution date of mid month before the cover date.

Q. Who is that person?

A. I don't know.

Q. Who made the contact?

A. Counsel.

Q. Which one?

A. I'm sorry, I don't know which one of plaintiff's counsel.

Q. Which one told you?

A. I think it was Mr. Collins.

There had been other contact that it might have been the middle of August with another person with some role, I believe, at Fairchild Publications, not positive of that but I think that's right, but the weight of that information seemed to go to the middle of July and our general experience about magazine release dates, and I think most people's, is that they come out before the cover date, not after.

Q. Do you have any actual evidence that it came out in the middle of July?

MR. LEWIS: Objection to the form.

BY MR. BESSETTE:

Q. That's a yes or no. Do you have any evidence that it came out in the middle of July?

MR. LEWIS: Same objection.

THE WITNESS: I'm not sure what you mean by evidence because in my view if you analyze the text, it looks to be likely that it came out earlier than later, that is, in July as opposed to in August, and we looked at the text pretty closely for that and we looked at the text of an article that appeared in the September issue of Golf Pro, and it appeared as though that most likely was written to come out in August.

Having said all that, I am certainly not certain of that distribution date.

BY MR. BESSETTE:

Q. What text are you referring to?

A. I'd have to try to go through this and pick it all out, but if there's some reference in here that indicates it was written before the IPO, which occurred around the beginning of January.

MR. LEWIS: You said January.

THE WITNESS: July, I'm sorry.

Thanks.

BY MR. BESSETTE:

Q. I'd like to at least see what text you're talking about that leads you to the conclusion

that it's likely it came out in mid July.

A. This may take a while because I did this a while ago, but I'll go through it and see if I can find it.

Q. Let's do it on the lunch break.

A. That's fine with me.

Q. The information about Tight Lies showing up in Costco, prompting a lawsuit, I think you said that was old information but also -- you started to go through some explanation about how it was messy as well. I'm not sure I understand. Is that information, whether it came out in July or on the publish date, is that old or new information?

MR. LEWIS: Objection to form.

THE WITNESS: I think what I said about that is that although it's technically old information in the sense that it refers to information that it occurred previously, that is, the lawsuit and the fact of the clubs showing up in Costco, but that it's not of the clean, simple national impact type of information we had discussed earlier when you asked me a general question about this sort of thing, which came out on Monday, repeated on Wednesday, would likely not have an effect

on Wednesday.

This is in the category, to me, of messier information, that is, in a trade publication, to my understanding distributed primarily to the trade, and following an earlier disclosure of the information in the form of a press release into a market in which there was no publicly traded stock for market participants to follow.

BY MR. BESSETTE:

Q. Do you think that information as conveyed in this article is material?

MR. LEWIS: Objection to form, foundation.

THE WITNESS: Yes.

BY MR. BESSETTE:

Q. How do you determine that?

A. I think that taking the paragraph you focused on, the use of the words join the ignominious ranks of the big boys would suggest that for a small growth company to join the ranks of the big boys would be an important event. The ignominious suggests potentially important just by the use of the word. The fact that Tight Lies started showing up in Costco, I think would be important for the reasons we

report, if you would, please. You should still have it there.

A. (Witness complies.)

MR. BESSETTE: Mark this as 350, please.

(Fax dated 08/04/98 was marked Exhibit-350 for identification.)

BY MR. BESSETTE:

Q. I've handed you Exhibit-350, which is the August 4 Lehman Brothers' initiation of coverage report on Adams Golf. You also have Exhibit-180, which is the August 28 Lehman report on Adams Golf.

A. Right.

Q. The Paragraph 9 of your rebuttal report -- you can turn to it if you want -- you say that, in talking about this Lehman report on August 28, that the bulk of it -- that it contained a buy recommendation and the bulk of it was overwhelmingly positive with respect to Adams Golf and its prospects, therefore diluting the impact of the gray market disclosure that's at the end that we already looked at, right?

A. Right.

Q. Your view is the August 28, 1998

report by Lehman was material and it was overwhelmingly positive for Adams Golf?

MR. LEWIS: Objection to form and foundation.

THE WITNESS: (No response.)

BY MR. BESSETTE:

Q. Let me strike that on the material.

It's overwhelmingly positive, as you say in your report. Is it material, in your opinion?

MR. LEWIS: Objection to form and foundation.

THE WITNESS: Let me strike that question.

BY MR. BESSETTE:

Q. Is it your opinion, sir -- strike that.

In the report, you're offering a rebuttal to Mr. James that I think goes like this: The reason that the Lehman Brothers' August 28 report didn't affect the stock price was because it was overwhelmingly positive and diluted the impact of the gray market disclosure; do I have that right?

MR. LEWIS: Objection to form and foundation.

THE WITNESS: Slightly different

tilt on it. I think what I'm saying there is that in the context of analyzing Mr. James' claim that the fact that there was not a statistically significant negative reaction to the quote disclosure unquote of the gray marketing problem in this report should be viewed in the context of the entire report being overwhelmingly positive and that the market deals with all the information received -- it receives when it receives it and does not select one page out of 28 or one paragraph, whatever it is, out of 28 and respond only to it and ignore all the rest. I think that was basically the point, that the attempted measurement and reaching a conclusion based on the measurement of one small piece of an entire report is not appropriate.

BY MR. BESSETTE:

Q. Looking at Exhibit-350, the earlier Lehman report, I want you to compare them, because when I do, I see the investment thesis, the recommendation, and the target prices are identical.

MR. LEWIS: Is there a question?

BY MR. BESSETTE:

Q. I want you to go ahead and look at that because my question is going to be what is new in the August 28 report that is not merely a restatement of the August 4 report.

MR. LEWIS: Objection, overbroad, vague and unintelligible.

THE WITNESS: Approximately 25 additional pages of material, and if the question is what's in the 25 pages, the 25 new pages that's not in the original report, I'd have to go through it, basically, paragraph by paragraph to see what it is.

The point that I was making in the rebuttal report that you identified was not, in essence, a stand-alone point as to the August 28 report but a response to Mr. James reaching a conclusion based on one paragraph in that report, one or two paragraphs, whatever it is, as opposed to the contents of the entire report and the context in which it appears.

BY MR. BESSETTE:

Q. As part of your work in this case, you did not compare the Lehman August 28 report with its initiation coverage report on August 4 to see if

there was any new material information in the August 28 report; is that right?

MR. LEWIS: Objection to form and foundation; misstates the testimony.

THE WITNESS: That's probably about a third or half right. I don't remember doing that as a separate exercise like that, just focused on those two items; that is, we reviewed the information that came in the marketplace, generally speaking, on a chronological basis and also by source of that information, so I went through the Lehman Brothers' reports at one time, I went through the Ferris Baker reports at another time, and all that in conjunction with looking at the stock price, volume, movements relative to the comparable companies and the other sorts of information we've discussed earlier today, so I was reading them pretty close in time but I don't recall doing it for the purpose you asked, to determine what new information existed in the 28th that did not come out in the 4th.

BY MR. BESSETTE:

Q. Did you see before today the

August 4 report?

A. Yes.

Q. Have you attempted to quantify the impact of Costco sales on Adams' pre-IPO sales volume?

MR. LEWIS: Objection to form.

THE WITNESS: I was aware of what the numbers were while going through this analysis. I don't recall trying to do anything more specific like dividing one into the other or anything like that, but sure, I knew what the Costco numbers were and purchases and sales, I believe, of Costco and roughly what the Adams numbers were at about the time of the IPO; sure.

BY MR. BESSETTE:

Q. What impact did Costco sales have on Adams' reported profitability pre-IPO?

MR. LEWIS: Objection to form and foundation.

THE WITNESS: I don't recall seeing that broken out anyplace. I think with respect to historical profitability covering the period prior to the IPO, you'd have to try to determine the effect on sales and costs to answer that. Sorry, that might be

too obvious when you read that, but you'd have to try to figure out what the company spent to keep retailers happy and the number of sales they lost, if you could do this from the information -- starting, I suppose, with the information compiled by Mr. Grace and then trying to extrapolate from that as best you could as to what other customers were lost that you never heard from, but that's not an exercise that we undertook and I don't know that anybody else has here.

BY MR. BESSETTE:

Q. Have you read Mr. James' rebuttal report?

A. Yes.

Q. Summarize, if you would, for me your critiques of his rebuttal report.

MR. LEWIS: Objection, overbroad, vague and ambiguous.

THE WITNESS: I could try to do that quickly if you had a copy for me to look at.

BY MR. BESSETTE:

Q. Have you already sort of done that, taken some notes, prepared something, a summary of your critiques of his rebuttal report?

A. No, I don't think so. I remember reading through it fairly quickly when I got it and having some thoughts, but I haven't prepared anything.

Q. I had some questions about the roadshow, and I think we determined that it started in mid June or so?

A. Right.

Q. The book building process, that occurs well before the roadshow, does it not, generally speaking?

MR. LEWIS: Objection to form.

THE WITNESS: Usually, it does. Well, it starts -- did you say occurs? It starts before the roadshow and continues well, probably, through the IPO.

BY MR. BESSETTE:

Q. Okay.

Are you expressing any opinions in your reports or do you intend to express any concerning plaintiff's allegations of questionable sales practices?

MR. LEWIS: Object to the form.

THE WITNESS: My understanding is that I probably don't.

BY MR BESSETTE: