OCHOA

PART 1

Page 1

1              IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF DELAWARE

2

3    IN RE:  ADAMS GOLF, INC. :

4    SECURITIES LITIGATION      :

5                               X

6

7              The Expert Discovery Deposition of

8    CHRISTIANA OCHOA, taken in the above-entitled case

9    before KATHLEEN J. PACULT, a Certified Shorthand

10   Reporter within and for the County of Cook, State of

11   Illinois, taken pursuant to the provisions of the

12   Federal Rules of Civil Procedure and the Rules of

13   the Supreme Court thereof pertaining to the taking

14   of depositions for the purpose of discovery, taken

15   on the 4th day of August 2006, at the hour of

16   9:30 a.m., at 6100 North River Road, Rosemont,

17   Illinois.

18

19

20

21

22

23

24

Page 10

1  other conversations after that.          09:41:16
2      Q.   In any of those -- well, strike that.  09:41:17
3          When Mr. Collins re-contacted you  09:41:25
4  in the summer of this year and you were entertaining  09:41:28
5  the thought of becoming an expert for the plaintiffs  09:41:31
6  in this case, did you have to seek permission or  09:41:34
7  consult with anybody at the university about whether  09:41:38
8  you could do that or not?          09:41:41
9      A.   I don't think I actually had to seek  09:41:41
10 permission, but I did check to see whether I had to  09:41:44
11 seek permission. I spoke with my -- with the  09:41:44
12 associate dean at my law school. The dean at my law  09:41:44
13 school was out of town and he made clear to me that  09:41:49
14 it wasn't necessary to speak with her as well. I  09:41:50
15 asked him what the issues -- what the constraints  09:41:53
16 were on my serving as an expert, and he gave me  09:41:57
17 those constraints          09:42:00
18     Q.   Now, you had not served as an expert  09:42:02
19 witness in any sort of litigation prior to this  09:42:05
20 engagement, is that right?          09:42:09
21     A.   That's correct.          09:42:09
22     Q.   Were you concerned during the process  09:42:10
23 of talking with Mr. Mara or Mr. Collins about  09:42:11
24 whether you would qualify as an expert witness?  09:42:14

Page 11

1      A.   I wanted to make sure that the  09:42:17
2  qualifications that I do possess were adequate and  09:42:19
3  sufficient for their needs.          09:42:21
4      Q.   How did you do that?          09:42:23
5      A.   I made sure that they were entirely  09:42:24
6  aware of the entirety of my knowledge of the gray  09:42:27
7  market, my expertise in the gray market, and my  09:42:31
8  expertise in other matters as well, and let them  09:42:34
9  make their decision about that.          09:42:37
10     Q.   Did you express concern to the  09:42:39
11 assistant dean or anybody at the university when you  09:42:44
12 were inquiring about the constraints about whether  09:42:47
13 or not you qualified as an expert?          09:42:49
14         MR. COLLINS: Foundation.          09:42:52
15         You may answer.          09:42:52
16 BY THE WITNESS:          09:42:53
17     A.   No.          09:42:54
18 BY MR. BESSETTE:          09:42:54
19     Q.   Did you consult with anybody -- other  09:42:54
20 than the plaintiffs in this case, Mr. Collins or Mr.  09:42:57
21 Mara, about whether -- well, did you express to  09:42:59
22 anybody, other than Mr. Collins or Mr. Mara,  09:43:01
23 thoughts about whether you qualified as an expert in  09:43:04
24 this case?          09:43:07

Page 12

1         MR. COLLINS: Foundation.          09:43:07
2         Go ahead.          09:43:08
3  BY THE WITNESS:          09:43:25
4      A.   I have -- my sister-in-law is -- has  09:43:26
5  some experience in litigation, complex litigation.  09:43:29
6  And I spoke with her about my qualifications -- I  09:43:31
7  spoke with my sister-in-law who has some litigation  09:43:31
8  experience about her knowledge of expert witnesses  09:43:32
9  and the kinds of qualifications they have and need  09:43:36
10 to have, and my qualifications relative to this  09:43:40
11 case.          09:43:43
12 BY MR. BESSETTE:          09:43:43
13     Q.   What is your sister-in-law's  09:43:43
14 experience in litigation?          09:43:46
15     A.   She was a litigator at I believe at  09:43:46
16 Cooley Godward in Palo Alto and was a litigator  09:43:49
17 there.          09:43:56
18     Q.   Is she a litigator now?          09:43:56
19     A.   She is not. She transferred to a  09:43:58
20 different firm and that does -- she sort of retooled  09:44:03
21 herself and now she does trust and estates.  09:44:04
22     Q.   Okay. What is her name?          09:44:04
23     A.   Her name is Julie Lanz.          09:44:05
24     Q.   What were -- what do you understand  09:44:06

Page 13

1  you were asked to opine on or to be an expert on in  09:44:13
2  this case?          09:44:16
3      A.   Characteristics of the gray market and  09:44:17
4  specifically how they applied to Adams Golf  09:44:21
5      Q.   Anything more specific or is that what  09:44:24
6  you understood your assignment was?          09:44:26
7      A.   That was essentially my assignment.  09:44:28
8      Q.   Okay. Now, let me ask you to -- well,  09:44:30
9  actually, let me give you all of these. The court  09:44:34
10 reporter has marked these exhibits as 303, 304 and  09:44:37
11 305, and I believe they are your expert report in  09:44:44
12 the case, your rebuttal expert report, and then the  09:44:48
13 expert report of Mr. Gary Frazier in order.  09:44:51
14         Does that look to be the case?          09:44:57
15     A.   Yes.          09:44:58
16     Q.   And I know you are familiar with your  09:44:58
17 expert reports. Are you familiar with Exhibit, I  09:45:01
18 guess, 305, which is Mr. Frazier's?          09:45:06
19     A.   Yes.          09:45:08
20     Q.   Okay. Turning to -- whether it's page  09:45:09
21 1 of Exhibit 303, your report, or Exhibit A, your  09:45:45
22 resume, whichever you would like, but I want to ask  09:45:51
23 some questions about your qualifications, background  09:45:55
24 and experience          09:45:57

Page 14

1     You are currently an associate      09:45:59
2  professor of law at Indiana University School of      09:46:00
3  Law?      09:46:04
4     A.    That's correct.      09:46:04
5     Q.    And as I understand it, you say in the  09:46:05
6  report or in your resume that your duties are      09:46:07
7  divided into three sort of buckets or categories?  09:46:10
8     A.    Yes.      09:46:13
9     Q.    Okay.  Would you tell me what those  09:46:13
10  are, please?      09:46:15
11     A.    Those are teaching, research and      09:46:15
12  service.      09:46:17
13     Q.    Okay.  What are your primary duties  09:46:17
14  with respect to the research prong of your duties?  09:46:21
15     A.    To research and publish my work.      09:46:23
16     Q.    And what work?      09:46:33
17     A.    I guess I am curious about what you  09:46:34
18  mean by what work.      09:46:42
19     Q.    I just want to understand what you  09:46:42
20  meant, research and publish your work.      09:46:44
21     A.    Yeah.  It is law professors typically  09:46:44
22  write legal scholarship articles, they are published  09:46:47
23  in various law journals, as well as other locations.  09:46:51
24  And we are expected to produce in that way      09:46:55

Page 15

1     Q.    How many articles have you published?  09:46:57
2     A.    I don't remember right now.  It is on  09:47:01
3  my resume.  It is five and a book review.      09:47:05
4     Q.    Now, in the teaching category, if I  09:47:10
5  understand this right, you teach international      09:47:20
6  business transactions as one of the courses?      09:47:24
7     A.    Yes.      09:47:26
8     Q.    I guess there is five courses, is that  09:47:26
9  right?      09:47:30
10     A.    That's correct.      09:47:30
11     Q.    And international business      09:47:30
12  transactions, in that course, I understand there is  09:47:35
13  a section devoted to counterfeits and gray market  09:47:38
14  activity, including in the golf industry?      09:47:42
15     A.    Correct, yes.      09:47:45
16         (Off the record      09:47:45
17         discussion.)      09:47:45
18  BY MR. BESSETTE:      09:47:48
19     Q.    International business transactions  09:47:48
20  has a section devoted to counterfeits and gray  09:47:55
21  marketing including in the golf industry, is that  09:47:59
22  right?      09:48:03
23     A.    That's correct.      09:48:03
24     Q.    And you understand that that syllabus  09:48:03

Page 16

1  of that course with that section in it was on the  09:48:06
2  internet and that's how the plaintiff's lawyers  09:48:08
3  found you?      09:48:10
4     A.    That's what I understand.      09:48:11
5     Q.    Okay.  Now, explain to me, this course  09:48:12
6  that you teach, international business transactions,  09:48:13
7  is that a course for one semester?      09:48:17
8     A.    Yes.      09:48:20
9     Q.    And this is at the law school?      09:48:20
10     A.    Correct.      09:48:23
11     Q.    Which level of student?      09:48:23
12     A.    Upper level students.      09:48:26
13     Q.    So second and third years?      09:48:28
14     A.    Correct.  And also graduate students.  09:48:30
15     Q.    What are the -- I mean, is there a  09:48:33
16  textbook or multiple textbooks that you use to teach  09:48:40
17  that class?      09:48:43
18     A.    I teach from one textbook.      09:48:44
19     Q.    Which one is that?      09:48:49
20     A.    It's Folsom, Gordon and Spanogle  09:48:50
21  International Business Transaction.  Folsom is  09:48:59
22  F-o-l-s-o-m, Gordon is Gordon, and Spanogle I  09:48:59
23  believe is S-p-a-n-g -- S-p-a-n-o-g-l-e.      09:49:17
24     Q.    And is there one or more chapters in  09:49:17

Page 17

1  that textbook that deals with gray marketing?      09:49:26
2     A.    There is one chapter that deals with  09:49:29
3  counterfeiting and gray marketing.  Let me rephrase  09:49:33
4  There are chapters in the book, the chapters are  09:49:36
5  divided into what the authors call problems or  09:49:39
6  sections, and one of those is devoted to gray  09:49:41
7  marketing and counterfeiting.      09:49:45
8     Q.    Okay.  And how extensive is that  09:49:47
9  section or chapter?  In other words, how many pages?  09:49:50
10     MR. COLLINS:  The document speaks for  09:49:51
11  itself, and as you know, was produced      09:49:53
12  BY THE WITNESS:      09:49:56
13     A.    I don't remember exactly the page  09:49:57
14  length.      09:49:58
15  BY MR. BESSETTE:      09:49:59
16     Q.    Did you select that course book for  09:49:59
17  that class?      09:50:01
18     A.    I did.      09:50:01
19     Q.    How did you select that?  What was  09:50:02
20  your criteria?      09:50:04
21     A.    I used a few criteria.  I selected  09:50:05
22  it -- I taught international business transactions  09:50:09
23  the first year that I taught at the law school, and  09:50:12
24  went through a process that a new professor      09:50:16

Page 18

1  typically goes through in selecting a course book  09:50:20
2  and choosing that one.                    09:50:23
3      Q.   Okay. And would you just explain for  09:50:25
4  the jury what that process is?              09:50:26
5      A.   Sure. That process includes reviewing  09:50:27
6  the world of possible international business  09:50:30
7  transactions textbooks, looking at them seeing which  09:50:34
8  ones has materials that you think are presented  09:50:39
9  clearly, neatly, in a way that is well organized,  09:50:41
10 easy to understand and will capture the students'  09:50:44
11 attention.                          09:50:44
12          In addition, I spoke with other  09:50:51
13 professors who I knew had taught in the area before  09:50:53
14 and asked them about their experiences in teaching  09:50:55
15 international business transactions and the  09:50:59
16 textbooks that they had used and the problems and  09:51:01
17 the benefits that they had encountered with each of  09:51:02
18 them.                            09:51:07
19     Q.   Now, only one section in that course  09:51:08
20 book is devoted to gray marketing. Do I have that  09:51:10
21 right?                            09:51:15
22     A.   Yes.                      09:51:15
23     Q.   And do the materials in that section  09:51:15
24 deal with the golf industry exclusively or just sort  09:51:18

Page 19

1  of mention it?                       09:51:24
2          MR. COLLINS: I am sorry. I think you  09:51:25
3  are misunderstanding some of the thrust of the  09:51:27
4  testimony here, but -- so therefore, I object on  09:51:30
5  grounds that you mangled the testimony  09:51:35
6          Go ahead and answer        09:51:37
7  BY THE WITNESS:                    09:51:39
8      A.   There are, in the textbook itself,  09:51:40
9  there is no -- I believe no mention of the golf  09:51:43
10 industry at all. It is my supplemental materials  09:51:47
11 that include that.                    09:51:49
12 BY MR. BESSETTE:                   09:51:50
13     Q.   Okay. What supplementary materials  09:51:50
14 are those?                         09:51:51
15     A.   Every year in addition to the textbook  09:51:52
16 I assign a course packet of supplemental materials  09:51:55
17 that I believe are particularly useful in  09:51:59
18 illucidating particular topics, and I chose some  09:52:07
19 materials on the gold industry and the golf  09:52:08
20 equipment industry in particular in the presentation  09:52:08
21 of counterfeiting and gray marketing material.  09:52:11
22     Q.   And when did you add those  09:52:12
23 supplementary materials, the particular ones on the  09:52:16
24 golf industry?                      09:52:19

Page 20

1      A.   They have been changed over the course  09:52:19
2  of the time that I have taught the class. I have  09:52:21
3  now taught the class three times. Each year I  09:52:24
4  believe they have been slightly different, those  09:52:26
5  materials have been slightly different. So in  09:52:29
6  preparation for teaching each year, I reevaluate  09:52:32
7  and -- I reevaluate the materials I have used before  09:52:35
8  and add or subtract materials that were included  09:52:39
9      Q.   So the course book itself doesn't have  09:52:42
10 a section on gray materials as it deals with the  09:52:44
11 golf industry, it is the supplemental materials. Do  09:52:47
12 I understand that right?                09:52:50
13     A.   It is has a section on the gray  09:52:50
14 market. It does not have a section on the gray  09:52:53
15 market in relation to the golf industry  09:52:56
16     Q.   Okay. And when you first started  09:52:58
17 teaching, is it your understanding that in the first  09:53:00
18 year, which I guess we'll get to here, '03 maybe,  09:53:03
19 you provided supplemental materials that focused on  09:53:05
20 gray marketing in the golf industry?        09:53:08
21          MR. COLLINS: Asked and answered.  09:53:10
22          Go ahead                 09:53:12
23 BY THE WITNESS:                    09:53:13
24     A.   In the first year that I taught the  09:53:13

Page 21

1  course, I did include those materials, yes  09:53:16
2  BY MR. BESSETTE:                   09:53:18
3      Q.   I'm sorry, you did?           09:53:18
4      A.   I did include those materials, yes.  09:53:18
5      Q.   Okay. Now, where did you find those  09:53:19
6  materials?                         09:53:20
7          MR. COLLINS: And we're asking  09:53:23
8  specifically with regard to the first year?  09:53:24
9          MR. BESSETTE: Right.         09:53:26
10 BY THE WITNESS:                    09:53:26
11     A.   The first year that I taught the  09:53:27
12 class, again, I followed pretty standard practice  09:53:29
13 for new professors. I used materials that a person  09:53:32
14 who had taught international business transactions  09:53:39
15 introduced me to                    09:53:42
16 BY MR. BESSETTE:                   09:53:43
17     Q.   And the supplemental materials that  09:53:43
18 you used starting in '03 and continuing to the  09:53:45
19 present have been produced?             09:53:48
20     A.   Yes. I believe. And materials that I  09:53:49
21 taught the last time that I taught have been  09:53:52
22 produced.                         09:53:55
23     Q.   Do you have in your possession the  09:53:56
24 materials starting from the first time you taught to  09:53:59

6 (Pages 18 to 21)

Page 22

1  the present?                          09:54:01
2      A.  I may.  I'm not sure.          09:54:01
3      Q.  All right.  Could you do a search for  09:54:03
4  us and if you have them, would you produce them with  09:54:04
5  counsel's permission?                 09:54:08
6      MR. COLLINS:  Well, we will take it  09:54:08
7  under advisement.  What you are asking for is the  09:54:09
8  materials from the first year and the second year,  09:54:13
9  to the extent they are different from the materials  09:54:15
10  for the third year, which I believe have been  09:54:18
11  produced?                             09:54:21
12      MR. BESSETTE:  Yes.               09:54:21
13  BY MR. BESSETTE:                      09:54:23
14      Q.  And I believe your testimony was you  09:54:23
15  kind of look to change and look to update.  So if  09:54:25
16  you have materials from '03 or prior years before  09:54:28
17  the ones you produced that are different than the  09:54:31
18  ones you produced, I would like to see those.  09:54:33
19      MR. COLLINS:  We will take it under  09:54:34
20  advisement.                           09:54:36
21  BY MR. BESSETTE:                      09:54:36
22      Q.  Do the materials either in the  09:54:37
23  textbook or the supplemental materials deal with the  09:54:38
24  economic and financial consequences of gray markets  09:54:42

Page 23

1  on manufacturers, do you know?        09:54:46
2      MR. COLLINS:  The documents speak for  09:54:48
3  themselves.                           09:54:50
4      Go ahead.                         09:54:51
5  BY THE WITNESS:                       09:54:51
6      A.  Could you ask the question again?  09:54:52
7  Sorry.                                09:54:53
8  BY MR. BESSETTE:                      09:54:53
9      Q.  Yeah.                         09:54:53
10      Do the supplemental materials --   09:54:54
11  well, actually, strike that           09:54:54
12      Do the materials on gray          09:54:56
13  marketing, whether in the textbook or the  09:54:57
14  supplemental materials, deal with the economic and  09:54:59
15  financial consequences of the gray market on  09:55:02
16  manufacturers?                        09:55:07
17      MR. COLLINS:  Same objection.     09:55:07
18      Go ahead.                         09:55:08
19  BY THE WITNESS:                       09:55:08
20      A.  I don't actually know whether the  09:55:09
21  materials themselves contain that or whether that is  09:55:10
22  part of the class that I bring out during class  09:55:13
23  discussion.  So to clarify, often in preparing for a  09:55:16
24  class, a professor, or at least in my strategy in a  09:55:23

Page 24

1  classroom, would be to give students enough material  09:55:26
2  that they have a good basis for discussion.  And  09:55:30
3  then I will come to the class with additional  09:55:32
4  information, additional materials to make for  09:55:34
5  interesting classroom experience, as well as  09:55:39
6  interesting reading.                  09:55:42
7      So I'm not really -- I don't        09:55:43
8  remember entirely whether the topics specifically  09:55:45
9  asked about are contained in the written materials  09:55:48
10  or whether they are contained in my head when I walk  09:55:51
11  into the classroom.                   09:55:55
12  BY MR. BESSETTE:                      09:55:57
13      Q.  But as you sit here, it is your  09:55:57
14  understanding that whether in the written materials  09:55:59
15  or in your head, your class deals with the financial  09:56:01
16  and economic consequences of the gray market to  09:56:03
17  manufacturers?                        09:56:07
18      A.  Yes.                         09:56:07
19      Q.  Okay.  And if it is not in the written  09:56:08
20  materials, where did you get the source material for  09:56:11
21  that information?                     09:56:14
22      A.  From a variety of sources.  One place  09:56:15
23  is through -- let me back up.  In preparing for  09:56:17
24  class, in addition to obviously reading the  09:56:21

Page 25

1  materials that I have asked my students to read, I  09:56:24
2  also do additional reading.  And in the course of  09:56:27
3  the time that I have been teaching at IU, I have  09:56:31
4  read countless scholarly articles that supplement  09:56:35
5  the materials that I teach.            09:56:39
6      Q.  Countless scholarly articles, is that  09:56:43
7  what you said?                        09:56:47
8      A.  Yes.                         09:56:47
9      Q.  Do you know any off the top of your  09:56:47
10  head?                                 09:56:51
11      MR. COLLINS:  With regard to gray  09:56:51
12  marketing?                            09:56:52
13      MR. BESSETTE:  Yes.               09:56:53
14  BY THE WITNESS:                       09:56:53
15      A.  Yeah, sure.  Some of them were cited  09:56:54
16  in my reports and are in the records.  09:56:56
17  BY MR. BESSETTE:                      09:56:56
18      Q.  Well, go ahead and turn to page I  09:56:59
19  guess 3 and 4 of your report where you cite eight  09:57:00
20  articles related to gray marketing that you -- well,  09:57:05
21  strike that                           09:57:05
22      You cite eight articles related to  09:57:10
23  gray marketing.  I take it you reviewed those  09:57:13
24  articles which -- in the process of your work in  09:57:15

Page 26

1  this case?                            09:57:18
2    A    Yes.                           09:57:18
3    Q    Did you review any other academic    09:57:19
4  articles on gray marketing in your work in this case  09:57:23
5  that you have not listed here?         09:57:27
6    A    No, I don't think so.  Let me actually  09:57:28
7  rephrase.  After receiving Mr. Frazier's report, I  09:57:32
8  also reviewed the articles that he submitted that    09:57:38
9  were not on this list.                 09:57:42
10   Q    Okay.  So prior to receiving his    09:57:43
11 report, you didn't review anything more than the    09:57:45
12 eight articles in your report?         09:57:48
13       MR. COLLINS:  In connection with this  09:57:49
14 case?                                  09:57:51
15       MR. BESSETTE:  Yes.             09:57:51
16 BY THE WITNESS:                        09:57:52
17   A    Correct.                       09:57:53
18 BY MR. BESSETTE:                       09:57:53
19   Q    Okay.  How did you -- what search did  09:57:53
20 you undertake to decide on these eight articles to   09:57:54
21 review?                                09:57:58
22   A    I did -- I went through the process    09:57:58
23 that I often go through in performing my research.    09:58:01
24 I got online, I looked at our library's holdings, I   09:58:05

Page 27

1  used databases that are available to me as a        09:58:11
2  professor, and looked for articles that I thought    09:58:16
3  were useful and pertinent.             09:58:20
4    Q    Why did you exclude some and include    09:58:23
5  these eight?                           09:58:27
6       MR. COLLINS:  Foundation.        09:58:27
7       Go ahead.                       09:58:28
8  BY THE WITNESS:                        09:58:28
9    A    I tried to find articles that I       09:58:30
10 thought specifically dealt with the questions that I  09:58:32
11 was asked to address, the types of profiles that     09:58:34
12 make a business particularly susceptible to gray     09:58:39
13 marketing, and also the kinds of impacts that gray    09:58:43
14 marketing can have on a business.      09:58:46
15 BY MR. BESSETTE:                       09:58:48
16   Q    In your review that produced the eight  09:58:48
17 articles that are listed in your report, do you      09:58:51
18 recall whether you reviewed any of the articles that  09:58:53
19 you saw listed in Mr. Frazier's report, Exhibit 305?  09:58:55
20   A    No, I don't think I did.         09:59:01
21   Q    To the best of your knowledge, in your  09:59:03
22 search for articles related to gray marketing, you    09:59:07
23 didn't come across any of the ones Mr. Frazier       09:59:10
24 listed?                                09:59:13

Page 28

1    A    That's correct.                09:59:13
2    Q    Do you teach courses in marketing?    09:59:14
3    A    No.                           09:59:16
4    Q    Have you ever taught a course in       09:59:16
5  marketing?                             09:59:18
6    A    No.                           09:59:19
7    Q    Have you ever taken a course in        09:59:19
8  marketing?                             09:59:21
9    A    That's thinking back a long ways.  I   09:59:22
10 don't think so.                        09:59:27
11   Q    Have you ever published a paper on      09:59:27
12 gray marketing?                        09:59:30
13   A    No.                           09:59:31
14   Q    Have you ever published an article or   09:59:31
15 book on gray marketing?                09:59:33
16   A    No.                           09:59:35
17   Q    Have you ever given a presentation on  09:59:35
18 gray marketing?                        09:59:37
19       MR. COLLINS:  Outside the class work   09:59:38
20 that she has described?                09:59:41
21       MR. BESSETTE:  Yeah.            09:59:43
22 By MR. BESSETTE:                       09:59:43
23   Q    I am not viewing teaching law students  09:59:45
24 as a presentation.  That's your profession.          09:59:48

Page 29

1       Have you ever given a presentation   09:59:50
2  outside the law school on gray marketing?            09:59:52
3    A    No.                           09:59:54
4    Q    How about on marketing generally?      09:59:56
5  Have you ever give a presentation on marketing       09:59:59
6  generally?                             10:00:02
7    A    No.                           10:00:02
8    Q    Prior to your employment as an        10:00:02
9  assistant -- I am sorry -- as an assistant          10:00:09
10 professor --                           10:00:16
11   A    Associate professor.            10:00:18
12   Q    Oh, is it associate?  I am sorry.      10:00:21
13 Okay.                                  10:00:23
14       So prior to your employment as an     10:00:24
15 associate professor, had you ever -- Strike that.    10:00:26
16       Prior to your employment as an       10:00:32
17 associate professor, did you have any involvement    10:00:34
18 with gray marketing?                   10:00:39
19       MR. COLLINS:  Vague and ambiguous.    10:00:41
20 BY THE WITNESS:                        10:00:45
21   A    I would agree.  I'm not sure what you   10:00:45
22 mean.                                  10:00:47
23 BY MR. BESSETTE:                       10:00:47
24   Q    Well, did you ever get involved with   10:00:48

8 (Pages 26 to 29)

Page 30

1  gray marketing?                    10:00:50
2      MR. COLLINS: Same objection.    10:00:50
3  BY MR. BESSETTE:                   10:00:52
4      Q.   Whether in your life as a lawyer in    10:00:52
5  practice, doing research about it, studying it in    10:00:55
6  school, I mean, anything related to gray marketing.    10:01:00
7  Did you have any concept of what gray marketing was?    10:01:03
8      MR. COLLINS: Compound, vague and    10:01:06
9  ambiguous.                    10:01:09
10  BY THE WITNESS:                   10:01:10
11      A.   Yeah, there were a lot of questions in    10:01:11
12  what you asked. The contact that I would say I had    10:01:12
13  most with gray marketing before I became a professor    10:01:16
14  is as a consumer.                10:01:19
15  BY MR. BESSETTE:                  10:01:20
16      Q.   Okay. Nothing beyond being a    10:01:20
17  consumer?                     10:01:23
18      A.   I don't believe so.         10:01:24
19      Q.   Now, prior to joining I guess Indiana    10:01:33
20  University faculty, you were an attorney, is that    10:01:45
21  right?                        10:01:48
22      A.   Correct.                10:01:48
23      Q.   Well, strike that.          10:01:57
24          You worked as an attorney?    10:01:58

Page 31

1      A.   Yes.                    10:01:59
2      Q.   All right. Did you ever represent a    10:02:00
3  party in a matter involving gray marketing as an    10:02:02
4  attorney?                     10:02:06
5      A.   No. Actually, can you ask that    10:02:06
6  question again? I'm not --          10:02:10
7      Q.   Sure.
8      A.   -- I need to think about it again.
9      MR. BESSETTE: Go ahead and just
10  repeat it.
11          (Record read.)
12      MR. COLLINS: I'm sorry. I should    10:02:20
13  have objected on grounds of vague and ambiguous.    10:02:20
14  You might want to clean it up just a touch. I    10:02:24
15  mean --                       10:02:24
16      MR. BESSETTE: Let me ask it again.    10:02:26
17  BY MR. BESSETTE:                  10:02:26
18      Q.   Did you ever represent a party in a    10:02:27
19  matter involving gray marketing?      10:02:30
20      A.   Okay. No.               10:02:32
21      Q.   Now, if I am reading your resume    10:02:37
22  right, you last worked at Clifford Chance in    10:02:40
23  April 2001, is that right?          10:02:44
24      A.   Correct.                10:02:45

Page 32

1      Q.   And then joined the faculty at Indiana    10:02:46
2  University School of Law in June 2003?    10:02:51
3      A.   Correct.                10:02:52
4      Q.   Okay. What did you do between that --    10:02:53
5  or in that time period?            10:02:55
6      A.   My husband and I who had decided --    10:02:56
7  decided together that we wanted to leave our law    10:03:00
8  firms in New York, and wanted to leave New York as    10:03:04
9  well. We bought a pickup truck and drove around the    10:03:07
10  country for a year or a little bit over a year. We    10:03:12
11  got married in the middle of that period. We drove    10:03:14
12  from the Florida Keys to the Arctic Circle, and    10:03:18
13  everywhere in between.            10:03:18
14      Q.   Wow. Sounds interesting.      10:03:18
15      A.   And slept in the back of the pickup    10:03:24
16  truck.                        10:03:28
17      Q.   That's interesting.         10:03:28
18      A.   In addition, then we settled in San    10:03:30
19  Diego for a year where I was looking for my academic    10:03:34
20  job.                          10:03:39
21      Q.   Okay. Now, let's see. You graduated    10:03:39
22  from law school in June 1998?        10:03:46
23      A.   Correct.                10:03:49
24      Q.   So as we sit here today, you have been    10:03:49

Page 33

1  a lawyer for I guess eight years?      10:03:52
2      A.   Yeah.                   10:03:54
3      Q.   Are you currently admitted to the New    10:03:55
4  York Bar?                     10:04:07
5      A.   Yes.                    10:04:07
6      Q.   Okay. When were you first admitted to    10:04:07
7  the New York Bar?                10:04:10
8      A.   I was admitted -- oh, boy, I don't    10:04:10
9  remember. What does it say? Let me look.    10:04:12
10      Q.   It doesn't say, that's --       10:04:14
11      A.   Oh, yeah?               10:04:14
12      Q.   Or at least I didn't see it.    10:04:14
13      A.   It was -- so I went to Columbia. I    10:04:16
14  came back and was then admitted. So it must have    10:04:20
15  been 2000 by the time the admission ceremony    10:04:26
16  actually took place.              10:04:32
17      Q.   Okay. You graduated in June 1998 from    10:04:33
18  Harvard, is that right?            10:04:36
19      A.   Correct.                10:04:37
20      Q.   Did you take the bar that summer?    10:04:37
21      A.   I did take the bar that summer.    10:04:39
22      Q.   The New York Bar?           10:04:41
23      A.   Yes.                    10:04:43
24      Q.   Did you pass it?           10:04:44

9 (Pages 30 to 33)

Page 34

1     A.    No.                    10:04:46
2     Q.    And then what did you do?         10:04:46
3     A.    I was planning to go to Columbia       10:04:47
4  already. I went to Columbia. I worked there at a   10:04:51
5  law school and also in a human rights organization   10:04:55
6  in Bogota, Columbia. While I was there, I also came   10:04:59
7  back to take the bar again, passed it and then was   10:05:01
8  admitted.                  10:05:04
9     Q.    Okay. And the second time you took    10:05:05
10 the bar was in 2000?               10:05:06
11    A.    No. it was in 1999 February.      10:05:08
12    Q.    The next year, 1999, okay        10:05:12
13    A.    Correct. The next available time     10:05:13
14    Q.    Again. the New York Bar?        10:05:15
15    A.    Yes.              10:05:17
16    Q.    And passed it that time?        10:05:18
17    A.    Yes              10:05:19
18    Q.    And then what did you do after passing 10:05:20
19 the bar in terms of working?           10:05:26
20    A.    I was already in Columbia, committed  10:05:28
21 to working there for a year. And I fulfilled that   10:05:30
22 obligation. and then came back to the offer that I   10:05:34
23 had open for my law firm, Clifford Chance, and began 10:05:37
24 working as I had agreed with them before I went to   10:05:41

Page 35

1  Columbia                  10:05:44
2     Q.    Okay. So through July 1999 at      10:05:46
3  Columbia. and then started back at Clifford Chance   10:05:49
4  in September '99 then, is that right?        10:05:53
5     A.    That's correct          10:05:54
6     Q.    When did you decide you wanted to, you 10:05:55
7  know. go into teaching, being a law professor?     10:06:01
8     A.    It is hard to remember when I didn't   10:06:03
9  think I might be a teacher. I think I finally      10:06:06
10 ultimately decided that I wanted to go into      10:06:10
11 academia -- well, no. Let me rephrase. That I    10:06:15
12 wanted to be a law professor during the trip that my 10:06:17
13 husband and I took in 2001 and 2002        10:06:21
14    Q.    Okay When -- Professor, when do you  10:06:33
15 believe you became knowledgeable about the gray    10:06:44
16 market, gray marketing, I should say?        10:06:47
17    A.    What do you mean by knowledgeable?   10:06:50
18    Q.    Beyond a consumer, beyond somebody   10:06:52
19 just being a consumer. but having specialized    10:06:56
20 knowledge about gray marketing. When do you think  10:07:01
21 you attained that specialized knowledge?       10:07:03
22    A.    My knowledge in the area has been    10:07:03
23 evolving, has been developing over the course of the 10:07:06
24 last three years as I have been teaching at Indiana  10:07:09

Page 36

1  University.                  10:07:13
2     Q.    Can you explain for me marketing as a 10:07:13
3  discipline in academia and business?        10:07:16
4           MR. COLLINS: Outside the scope of the 10:07:20
5  opinion.                   10:07:22
6  BY THE WITNESS:               10:07:22
7     A.    It's not my area of expertise      10:07:23
8  BY MR. BESSETTE:             10:07:23
9     Q.    What is not?            10:07:25
10    A.    Marketing.            10:07:26
11    Q.    Okay. So do you acknowledge you are  10:07:27
12 not an expert in marketing?            10:07:32
13    A.    In marketing generally?         10:07:33
14    Q.    Yes.              10:07:35
15    A.    Yes.              10:07:35
16    Q.    So you view gray marketing as      10:07:36
17 something different than marketing generally?     10:07:40
18    A.    Yes.              10:07:42
19    Q.    Can you explain that to me?       10:07:42
20    A.    Sure. The reason I teach gray      10:07:44
21 marketing in my class, the reason I believe that the 10:07:47
22 authors of my book have included it in a book on    10:07:50
23 international business transactions is because the   10:07:52
24 gray market can have significant impact on a     10:07:56

Page 37

1  business. And as a result, both I and the authors   10:07:59
2  of the book I would expect, though I don't know    10:08:02
3  their exact reasoning, believe that students who are 10:08:05
4  holding themselves out as particularly knowledgeable 10:08:09
5  about international business transactions ought to   10:08:12
6  have some background in gray marketing.       10:08:16
7           (Off the record          10:08:16
8           discussion.)            10:08:16
9  BY MR. BESSETTE:             10:08:28
10    Q.    So I take it if I asked you what is   10:08:28
11 commonly known as the four Ps of marketing, you    10:08:43
12 wouldn't know what they were?           10:08:47
13    A.    No.                10:08:48
14    Q.    Okay. Let me ask you, do you think   10:08:48
15 holding yourself out as an expert in gray marketing  10:08:51
16 without having any background knowledge or      10:08:55
17 specialized experience in marketing generally, you  10:08:59
18 can feel comfortable that you are an expert in gray  10:09:03
19 marketing without having that marketing generally   10:09:06
20 background?                 10:09:10
21           MR. COLLINS: I think you are calling 10:09:11
22 for a legal opinion.               10:09:12
23           MR. BESSETTE: No, I am not.      10:09:14
24           MR. COLLINS: What do you mean by    10:09:15

10 (Pages 34 to 37)

Page 38

1    expert then?                          10:09:16
2          MR. BESSETTE: All right. Let me    10:09:17
3    withdraw the question.                10:09:17
4    BY MR. BESSETTE:                      10:09:17
5       Q.   Let me ask you this: You are here    10:09:38
6    today as an expert in gray marketing. Do I    10:09:41
7    understand that right?                10:09:50
8       A.   Yes.                          10:09:52
9       Q.   And that expertise has been developed    10:09:52
10   over the last three years in connection with your    10:09:55
11   teaching duties at the Indiana University School of    10:09:58
12   Law?                                 10:10:03
13      A.   Correct.                      10:10:03
14      Q.   All right. You have no background,    10:10:04
15   expertise or knowledge in marketing generally?    10:10:05
16      A.   Correct.                      10:10:07
17      Q.   To what extent in your view,    10:10:08
18   Professor, is gray marketing related to marketing    10:10:11
19   generally?                           10:10:18
20      A.   Again, I am not an expert in marketing    10:10:20
21   generally. So how much it relates and in what    10:10:23
22   manners it relates to marketing generally, I    10:10:29
23   wouldn't be qualified to answer.      10:10:32
24      Q.   Okay. And when do you believe you    10:10:35

Page 39

1    became an expert in gray marketing?    10:10:47
2       A.   I'm not sure exactly what you mean by    10:10:49
3    the question.                        10:10:54
4       Q.   Let me ask you this -- let me    10:10:55
5    withdraw                             10:10:58
6          MR. COLLINS: I should have objected    10:10:59
7          Go ahead.                      10:11:00
8    BY MR. BESSETTE:                      10:11:01
9       Q.   Would you consider yourself an expert    10:11:02
10   in gray marketing the first year you taught a class    10:11:04
11   that had one component of it gray marketing?    10:11:09
12      A.   I think my students --         10:11:12
13         MR. COLLINS: I'm sorry. Objection,    10:11:12
14   vague and ambiguous when you use the word "expert."    10:11:13
15   because one doesn't know the context you are using    10:11:17
16   it.                                  10:11:17
17         In any event, go ahead and answer.    10:11:20
18         MR. BESSETTE: Well, let me clarify.    10:11:20
19   She has testified that she is holding herself out as    10:11:20
20   an expert in gray marketing             10:11:24
21         MR. COLLINS: In connection with this    10:11:25
22   litigation, yes.                     10:11:26
23         MR. BESSETTE: Correct. And that's    10:11:26
24   the definition I am using. so.        10:11:27

Page 40

1    BY MR. BESSETTE:                      10:11:28
2       Q.   To do that, you are sitting here today    10:11:30
3    as an expert in gray marketing in connection with    10:11:32
4    this case. When do you believe you first acquired    10:11:37
5    the requisite knowledge and expertise to sit in this    10:11:39
6    chair today and offer testimony as an expert in gray    10:11:42
7    marketing?                           10:11:49
8          MR. COLLINS: You may answer.    10:11:49
9    BY THE WITNESS:
10      A.   To offer testimony in this case as an    10:11:49
11   expert in gray marketing?
12   BY MR. BESSETTE:
13      Q.   No. Do you understand the question    10:11:49
14   is, when do you believe you acquired the requisite    10:11:50
15   knowledge and expertise to hold yourself out as an    10:11:53
16   expert in gray marketing, such as you are doing    10:11:55
17   today in this case?                  10:11:59
18      A.   Okay. Again, I think I answered this    10:11:59
19   question already. Over the course of the last    10:12:02
20   three years, I have been evolving and developing as    10:12:04
21   an expert in a variety of fields, including the gray    10:12:08
22   market.                              10:12:11
23      Q.   I understand the evolvement part. Can    10:12:11
24   you tell me when you believe you acquired a certain    10:12:16

Page 41

1    knowledge of level and expertise that you deemed    10:12:19
2    yourself qualified to be an expert such as you are    10:12:22
3    holding yourself out today?           10:12:25
4       A.   It is a hard answer to give you, since    10:12:27
5    I didn't assess myself in that way until after I was    10:12:29
6    asked to serve in this case. However, the first    10:12:32
7    time I walked into a classroom to reach gray market    10:12:35
8    issues, I certainly had to have acquired the    10:12:41
9    knowledge that I believed was necessary in order to    10:12:41
10   educate -- I had to acquire the knowledge that was    10:12:41
11   necessary in order to educate students about issues    10:12:50
12   that they may not have known about, or may have had    10:12:53
13   quite a lot of knowledge about before I walked in    10:12:56
14   the room, and nonetheless, be able to teach them    10:12:59
15   something. And as a result, I think, of the first    10:13:02
16   time I walked into a classroom to teach gray market    10:13:04
17   issues, I was certainly holding myself out as an    10:13:07
18   expert to my students.               10:13:10
19      Q.   And to acquire the knowledge to hold    10:13:11
20   yourself out as an expert to your student was    10:13:13
21   acquired by what, reading the course book or what    10:13:16
22   did you do to acquire the knowledge that you think    10:13:19
23   was sufficient to hold yourself out as an expert to    10:13:22
24   your students?                       10:13:25

11 (Pages 38 to 41)

Page 42

1    A    What I typically do in preparing for    10:13:25
2    class.    10:13:28
3    Q.    And tell me what that is, please.    10:13:28
4        MR. COLLINS: Asked and answered.    10:13:31
5        Go ahead.    10:13:31
6    BY THE WITNESS:    10:13:32
7    A.    Again, I read the materials that are    10:13:33
8    necessary -- that I have assigned to my students. I    10:13:35
9    also read outside materials that are out there for    10:13:37
10    them to read, but I am fairly sure they don't read.    10:13:42
11    BY MR. BESSETTE:    10:13:46
12    Q.    Fair enough. So outside of reading    10:13:46
13    materials that other people have published, anything    10:13:48
14    else to gain the knowledge that you think is    10:13:57
15    appropriate to hold yourself out as an expert as you    10:14:00
16    do to your students?    10:14:04
17    A.    No.    10:14:05
18    Q.    Okay. And how many articles would you    10:14:05
19    say you have read in total dealing with the gray    10:14:07
20    market or gray marketing activity?    10:14:09
21    A.    Again, that's -- that would be hard to    10:14:12
22    say. I don't keep a tally.    10:14:14
23    Q.    I mean, a dozen, two dozen, three    10:14:16
24    dozen? I mean, can you give me an estimate?    10:14:21

Page 43

1    A.    Again, it is hard to say simply    10:14:23
2    because I don't keep a tally, I don't keep a log.    10:14:26
3    And for each section in each class that I teach, of    10:14:29
4    which now there have been many over the course of    10:14:32
5    the last three years, I do the same. I engage in    10:14:35
6    the same activities.    10:14:39
7    Q.    Well, I mean, just give me a sense for    10:14:41
8    how many articles you review, published articles    10:14:44
9    that deal with gray marketing?    10:14:47
10        MR. COLLINS: May I? You mean ever?    10:14:52
11        MR. BESSETTE: In total.    10:14:52
12        MR. COLLINS: The total number of    10:14:52
13    articles ever reviewed to the extent that Professor    10:14:53
14    Ochoa can give you a number    10:14:55
15    BY MR. BESSETTE:    10:14:55
16    Q.    Well, if it is easier to do it by    10:14:55
17    year, maybe. If you can think of a particular class    10:14:58
18    year and you review materials, as you say, to get    10:15:00
19    ready. How many -- let's do it that way, if that's    10:15:03
20    easier.    10:15:03
21        How many articles or books or    10:15:03
22    publications would you review that deal with gray    10:15:04
23    marketing activity in any given year, say, in the    10:15:07
24    last three years?    10:15:10

Page 44

1    A.    Again, the number is hard to estimate,    10:15:12
2    simply because the kinds of materials I review may    10:15:14
3    be very lengthy, they may be very short. So if I --    10:15:18
4    I could easily tell you that I have reviewed 90    10:15:20
5    published pieces in the gray market, that may not be    10:15:24
6    accurate, depending on the length of the pieces that    10:15:28
7    I was reviewing.    10:15:31
8    Q.    You've never served as an expert    10:15:32
9    witness before in litigation?    10:15:34
10    A.    Correct.    10:15:35
11    Q.    Never testified in court as an expert    10:15:36
12    witness either?    10:15:41
13    A.    Correct.    10:15:41
14    Q.    Somewhere in here, I think Paragraph 8    10:15:41
15    of your report, Exhibit 303, you say you are being    10:15:55
16    compensated for the time spent in this matter at    10:15:59
17    your current hourly rate of 425. How did you    10:16:04
18    determine what your current hourly rate is?    10:16:07
19    A.    Again, as we just discussed, I had not    10:16:09
20    served as an expert before, had not given expert    10:16:11
21    testimony before. And as a result, sought advise of    10:16:14
22    colleagues, both in fields of securities litigation    10:16:17
23    and also colleagues who are professors. And I also    10:16:20
24    believe I spoke to the partners with whom I worked    10:16:28

Page 45

1    at Clifford Chance.    10:16:31
2    Q.    And how did you settle on 425?    10:16:33
3    A.    Given the information that I received    10:16:36
4    from all the people with whom I spoke, it seemed    10:16:38
5    like a reasonable rate.    10:16:41
6    Q.    Did Mr. Collins or anyone on the    10:16:42
7    plaintiffs -- plaintiffs' lawyers have input into    10:16:45
8    what your rate should be?    10:16:47
9    A.    They agreed    10:16:49
10        MR. COLLINS: I think what we did was    10:16:49
11    to pay it.    10:16:51
12    BY MR. BESSETTE:    10:16:52
13    Q.    But before you settled on the rate,    10:16:52
14    did you inquire of the plaintiff's lawyers whether    10:16:54
15    that was appropriate? Were they part of the    10:16:57
16    information you took into account in deciding on    10:16:59
17    425?    10:17:08
18    A.    No. I stated my rate, they agreed    10:17:08
19    Q.    Okay. On page 3, again of Paragraph 9    10:17:12
20    of your initial report, you say, "I am familiar with    10:18:12
21    the causes and effects of gray market activity."    10:18:19
22        That familiarity with the causes    10:18:23
23    and effects, again, does that come from what you    10:18:25
24    have told us here today, your reading of various    10:18:27

12 (Pages 42 to 45)

Page 46

1  articles and teaching at the law school?    10:18:30
2      A.   Yes.    10:18:32
3      Q.   Now, if you would turn to page 15 and  10:18:32
4  16 of your initial report. It is actually the last  10:19:23
5  sentence of Paragraph 24 on page 16, but if you want  10:19:30
6  to see that paragraph in total, you say that, "A    10:19:33
7  significant amount of the literature on gray    10:19:38
8  marketing discusses it in an international context,  10:19:41
9  given the increased opportunities for arbitrage once  10:19:46
10  largely undifferentiated products are sold    10:19:50
11  internationally."    10:19:54
12          How do you define "significant" in  10:19:55
13  that sentence, Professor?    10:19:57
14      A.   Again, I am not comfortable with    10:19:59
15  giving a percentage. It is a feel more than a    10:20:09
16  quantitative measure.    10:20:13
17      Q.   I mean, is it a super majority, a    10:20:15
18  majority, some?    10:20:18
19      A.   A good body    10:20:19
20      Q.   So that would be less than a majority?  10:20:20
21      A.   Again, I'm not sure about the    10:20:24
22  percentages. I would say it is somewhere -- well,  10:20:28
23  I'm just not sure about the percentages. It is a  10:20:31
24  feel. It is a lot of material on gray marketing  10:20:33

Page 47

1      Q.   Going back I guess to pages 3 and 4,  10:20:42
2  the eight articles, the eight academic articles that  10:20:52
3  you reviewed in connection with your work in this  10:20:54
4  case. I think I already have the answer to this,  10:20:58
5  but that's not the universe of academic literature  10:20:59
6  related to gray marketing, right?    10:21:05
7      A.   Correct.    10:21:06
8      Q.   Okay. How many academic articles are  10:21:07
9  you aware of that deal with gray marketing?    10:21:10
10          MR. COLLINS:  In the universe?    10:21:13
11          MR. BESSETTE:  Yeah.    10:21:16
12  BY MR. BESSETTE:    10:21:16
13      Q.   How many exist?    10:21:17
14      A.   I don't know.    10:21:18
15      Q.   No sense at all?    10:21:19
16      A.   It is like any area. If you ask me to  10:21:20
17  give you a sense of how many academic articles exist  10:21:22
18  in the area in which I focus my research, I couldn't  10:21:26
19  even venture a guess. And it would be the same with  10:21:32
20  gray marketing    10:21:35
21      Q.   Well, if you don't know how many    10:21:36
22  articles about gray marketing exist, how can you  10:21:43
23  assert that there is a significant amount of the  10:21:47
24  literature, as you do here, dealing with it in an  10:21:49

Page 48

1  international context?    10:21:57
2      A.   In my experience of reading articles  10:21:58
3  on gray marketing and in pulling up articles on gray  10:22:00
4  marketing and seeing articles on gray marketing,  10:22:02
5  those which I have read, those I have seen titled,  10:22:05
6  those which I have scanned, a significant portion of  10:22:09
7  those deal with gray marketing in the international  10:22:11
8  context    10:22:14
9      Q.   So what you are saying is Paragraph  10:22:14
10  24, that last sentence should say a significant  10:22:18
11  amount of the literature on gray marketing that you  10:22:19
12  have reviewed discuss it in an international    10:22:22
13  context?    10:22:26
14      A.   I don't think that would be accurate.  10:22:27
15      Q.   How can you say that a significant  10:22:28
16  amount of the total body of literature, which you  10:22:30
17  are implying to me here today when you don't know  10:22:34
18  how many that is, how can you say a significant  10:22:36
19  amount deals with international? I am just curious  10:22:41
20          MR. COLLINS:  Misstates the testimony.  10:22:44
21          Go ahead and answer    10:22:45
22  BY THE WITNESS:    10:22:46
23      A.   Again, I stated that I wouldn't be  10:22:47
24  able to give you a percentage. And the reason I  10:22:48

Page 49

1  wouldn't be able to give you a percentage is because  10:22:52
2  I haven't tallied up how many articles there are,  10:22:53
3  how many of them deal with international gray    10:22:57
4  marketing. It is my experience in not just in    10:23:01
5  reviewing articles, but also in seeing the titles of  10:23:04
6  articles and doing research that pulls up lists of  10:23:06
7  articles, that a significant percentage of the    10:23:10
8  articles that are out there deal with gray marketing  10:23:14
9  in the international context.    10:23:18
10      Q.   That's your basis for this statement?  10:23:18
11      A.   Let me rephrase. They either deal  10:23:18
12  specifically with gray marketing in the    10:23:18
13  international context, or at least touch on the    10:23:20
14  issue    10:23:21
15      Q.   That's the basis for your statement?  10:23:21
16      A.   Yes    10:23:23
17      Q.   And if you look at Exhibit 304, your  10:23:23
18  rebuttal report, in Paragraph 4, which is on page 2,  10:23:33
19  second sentence, you say, "The overwhelming    10:23:47
20  attention national/international gray marketing  10:23:51
21  receives in the academic literature."    10:23:56
22          Is that also based on -- what is  10:24:00
23  that sentence based on?    10:24:00
24      A   The same    10:24:01

13 (Pages 46 to 49)

Page 50

1    Q.   Okay  The eight articles you have    10:24:02
2  listed and your research and reviewing any number of 10:24:03
3  articles that you can't tell me how many and pulling 10:24:07
4  things up on the internet?                10:24:10
5         MR. COLLINS: Asked and answered.    10:24:11
6  BY THE WITNESS:                           10:24:12
7    A.   Correct.                10:24:13
8  BY MR. BESSETTE:                          10:24:13
9    Q.   Okay  Let me ask you to look at    10:24:29
10 Exhibit 305, Mr. Frazier's report.        10:24:36
11        MR. COLLINS: Off the record.
12        MR. BESSETTE: Oh, is it time for a
13 break?
14        MR. COLLINS: No, no, I don't know.
15 But you're reaching a point when you can stop, I
16 presume?                                  10:24:42
17        MR. BESSETTE: I can stop any time.   10:24:42
18        THE WITNESS: If this is a good      10:24:44
19 breaking point, it might be good.          10:24:46
20        MR. BESSETTE: Sure, that's fine.     10:24:46
21        (Break taken.)       10:24:46
22                       10:24:46
23
24

Page 51

1  BY MR. BESSETTE:                          11:04:43
2    Q.   Professor, what are some of the other 11:04:58
3  topics in the international business transaction 11:05:00
4  course book?                     11:05:02
5         MR. COLLINS: Document speaks for    11:05:03
6  itself                          11:05:05
7         Go ahead.            11:05:05
8  BY MR. BESSETTE:                          11:05:07
9    Q.   And I apologize  We are going to have 11:05:07
10 it soon  We are having copies made.        11:05:10
11        MR. COLLINS: Off the record.        11:05:15
12            (Off the record       11:05:19
13            discussion.)    11:06:32
14            (Exhibit No. 306 was  11:06:32
15            marked for       11:06:32
16            identification.)   11:06:33
17 BY MR. BESSETTE:                          11:06:33
18   Q.   All right  Professor, I'm handing you 11:06:34
19 what the court reporter has marked as Exhibit 306. 11:06:34
20 And for the record, would you just identify that, 11:06:38
21 including the Bates numbers, which are printed at 11:06:41
22 the bottom, from just the first one to the last one? 11:06:44
23   A.   The Bates Numbers OCH 0137 to OCH    11:06:47
24 0199  And it is the front page or the first sort of 11:06:53

Page 52

1  the title page of the international business  11:06:58
2  transactions book from which I teach  And then the 11:07:01
3  section which includes the materials on    11:07:04
4  counterfeiting and gray marketing.         11:07:08
5    Q.   Okay  And that section I think is    11:07:11
6  titled or numbered 9 2?            11:07:14
7    A.   Correct.               11:07:17
8    Q.   And is 9 3 a different section?      11:07:17
9    A.   Yes.                11:07:21
10   Q.   So just 9.2 is the portion of the    11:07:21
11 course book that involves gray marketing?       11:07:27
12   A.   Correct.               11:07:33
13   Q.   And then there are supplemental      11:07:33
14 materials as well, which you talked about earlier, 11:07:36
15 which I understand do you pass out to your students 11:07:38
16 as part of your class or is that just what you teach 11:07:42
17 from?                         11:07:45
18   A.   Yeah --               11:07:45
19        MR. COLLINS: Let him finish.
20        THE WITNESS: Right, right, right.
21        MR. COLLINS: Do you have the
22 question?
23        THE WITNESS: Yes, I do.
24

Page 53

1  BY THE WITNESS:
2    A.   The supplemental materials are       11:07:51
3  materials that I assign similarly to how I assign 11:07:52
4  the book  The students are expected to purchase the 11:07:57
5  materials in advance of the class.         11:08:00
6  BY MR. BESSETTE:                          11:08:01
7    Q.   Okay  How many times a year do you   11:08:01
8  teach the international business transactions class? 11:08:05
9    A.   I teach it -- so far it has been once 11:08:07
10 a year  That may change.             11:08:09
11   Q.   So, so far between '03 and the present 11:08:11
12 it has been once a year?            11:08:14
13   A.   Correct               11:08:16
14   Q.   And that module 9.2 and whatever     11:08:16
15 supplemental materials dealing with gray market, how 11:08:20
16 big a portion of that class that runs a semester is 11:08:24
17 that?                         11:08:29
18   A.   Typically we devote between three and 11:08:29
19 four class sessions to these issues.       11:08:32
20   Q.   And then how much preparation work do 11:08:34
21 you do to be able to teach those three or four 11:08:42
22 classes that deal with the subject matter we are 11:08:45
23 talking about, gray marketing?            11:08:47
24   A.   How much in time?            11:08:49

Page 54

1  Q.   Yes                    11:08:51
2  A.   I typically allot really between three  11:08:53
3  and five hours preparation time for every hour that  11:08:57
4  I spend in class.                 11:09:01
5  Q.   And when you said three to four  11:09:02
6  sessions, how many hours is a session?    11:09:04
7  A.   One hour.                11:09:06
8  Q.   So three to five hours preparation on  11:09:07
9  average for one hour of class. And during a  11:09:13
10 semester, you have three or four classes throughout  11:09:17
11 the year that deal with gray marketing issues?  11:09:22
12 A.   Yeah, let me back up, actually. I was  11:09:25
13 speaking about what I do now after having taught all  11:09:27
14 of my classes more than once. In the first year  11:09:31
15 that I was teaching, the amount of prep time that I  11:09:34
16 devote has decreased, mostly because I have read the  11:09:37
17 course materials before, the textbook materials  11:09:41
18 before. And so the majority of my time now is spent  11:09:44
19 reading outside materials.            11:09:47
20     In the first year that I taught  11:09:50
21 the class, I can remember that it was not unusual to  11:09:52
22 spend something more like 10 hours per class session  11:09:58
23 preparing for class. The second year that I taught,  11:10:01
24 it was somewhat less than that. And the last time  11:10:04

Page 55

1  that I taught it, it was between three and  11:10:09
2  five hours.                    11:10:12
3  Q.   Okay. What are some of the other  11:10:12
4  subject areas in the international business  11:10:13
5  transactions class? So we have gray marketing we  11:10:15
6  have talked about. What are some of the other big  11:10:18
7  topics that are within the class?         11:10:19
8  A.   Okay. There are a number of topics,  11:10:21
9  obviously. We start talking about the prevalence of  11:10:24
10 international business transactions generally, the  11:10:27
11 growth of international business transactions, sort  11:10:30
12 of those wider phenomenons, contextualizing the  11:10:34
13 reasons for the course and the importance of the  11:10:39
14 course                       11:10:39
15     We move on by talking about really  11:10:41
16 mechanic transactions, how it is that an  11:10:44
17 international business transaction may occur. So we  11:10:47
18 talk about letters of credit, we talk about the  11:10:50
19 relationships that the buyer and a seller would have  11:10:53
20 with a bank, the relationships that they might have  11:10:55
21 with each other, and how it is that individuals and  11:10:58
22 companies engaged in international business  11:11:04
23 transactions gain the confidence that is necessary  11:11:06
24 to transact across borders.          11:11:11

Page 56

1     We also talk about, again in the  11:11:14
2  introductory part of the class, we talk about some  11:11:20
3  of the difficulties that arise in international  11:11:23
4  transactions, international business transactions  11:11:27
5  typically, which involve issues of language, issues  11:11:31
6  of trust, and issues of varying cultures. We talk  11:11:35
7  about in addition to -- well, that's sort of the  11:11:38
8  very beginning of the class.          11:11:39
9     We also talk about different kinds  11:11:41
10 of international business transactions, different  11:11:48
11 categories of international business transactions.  11:11:51
12 And so we move from --               11:11:54
13         (Off the record      11:11:54
14          discussion.)        11:11:54
15 BY THE WITNESS:                 11:11:54
16 A.   So we move from international sale of  11:12:04
17 goods to more complex levels of involvement. So we  11:12:05
18 will talk about licensing, franchising, foreign  11:12:10
19 direct investment and the kinds of partnerships that  11:12:16
20 a U.S. entity might have with foreign entities in  11:12:23
21 each of those kinds of transactions. That takes up  11:12:27
22 a great bulk of the class. That was a very quick  11:12:30
23 summary of a lot of the class.          11:12:36
24     And then we also devote a section  11:12:37

Page 57

1  of the class to what I like to call sort of the  11:12:40
2  underbelly of international business transactions,  11:12:43
3  and the gray marketing and counterfeit materials are  11:12:45
4  sort of a nice transition into that material. I  11:12:48
5  teach this material and then I teach about some of  11:12:53
6  the environmental concerns and human rights concerns  11:12:55
7  that are attendant to international business  11:12:58
8  transactions. I talk about some of the materials or  11:13:01
9  some of the efforts that have been made over the  11:13:04
10 course of the last 35 years or so to alleviate some  11:13:08
11 of those concerns, going all the way -- going into  11:13:13
12 the history of it, as well as covering fairly recent  11:13:17
13 material.                     11:13:22
14     After that section, we talk  11:13:23
15 about -- after that section we talk about -- I am  11:13:25
16 trying to picture my syllabus. The reason I am  11:13:31
17 struggling with the last section is because that  11:13:36
18 section I play with occasionally. And I often play  11:13:39
19 with whether I want to change it. And the last time  11:13:42
20 I taught it, I wasn't entirely happy with it. And  11:13:43
21 there is a lot of material that I exclude that's in  11:13:47
22 the textbook that I don't included in the class.  11:13:49
23 Q.   I think that's good. Unless you want  11:13:53
24 to go on, I won't stop you.           11:13:53

15 (Pages 54 to 57)

Page 58

1    A.   No                    11:13:53
2    Q.   Okay.                 11:13:54
3         MR. COLLINS: And we don't want you to  11:13:54
4    answer more than he asks, so good answer.   11:13:57
5         THE WITNESS: Right.        11:14:00
6    BY MR. BESSETTE:               11:14:00
7    Q.   So let me just ask, on the licensing  11:14:01
8    you talked about licensing as it relates to  11:14:04
9    international business transactions, that's one  11:14:07
10   section or component of the class. Do you consider  11:14:09
11   yourself an expert in licensing in international  11:14:13
12   business transactions?          11:14:16
13   A.   Sure.                 11:14:17
14   Q.   And that's based on the same criteria  11:14:18
15   that you've used before, you read materials, you  11:14:20
16   presented in your class, so you think you are an  11:14:22
17   expert?                    11:14:24
18   A.   Yes.                  11:14:24
19   Q.   Okay. Same thing with respect to  11:14:25
20   franchising in connection with the international  11:14:27
21   business transactions. Because it is in the class  11:14:30
22   and you teach it, do you feel that you are an expert  11:14:32
23   in franchising in connection with international  11:14:36
24   business transactions?         11:14:39

Page 59

1    A.   Yes                   11:14:40
2    Q.   Same question with respect to foreign  11:14:41
3    direct investment?             11:14:44
4    A.   Yes. And I would say there are areas  11:14:44
5    in which I feel more and less comfortable. For  11:14:46
6    various reasons, I may have other pressing issues  11:14:50
7    that are going on during the time that I am  11:14:52
8    preparing for a class and may have read less or more  11:14:55
9    outside materials as a result.        11:15:00
10   Q.   Is there any area that you can tell me  11:15:02
11   now in connection why the international business  11:15:06
12   transactions and the course book that you teach from  11:15:08
13   and whatever other materials you read to prepare,  11:15:08
14   that you do not consider yourself an expert in?  11:15:17
15        MR. COLLINS: In connection with this  11:15:17
16   particular course?             11:15:18
17        MR. BESSETTE: Yes. I thought I made  11:15:18
18   that clear.                  11:15:19
19   BY THE WITNESS:               11:15:19
20   A.   In connection with the course, no.  11:15:21
21   BY MR. BESSETTE:               11:15:21
22   Q.   You also teach I think it is a  11:15:21
23   contracts class, right?         11:15:23
24   A.   Correct.               11:15:24

Page 60

1    Q.   Do you consider yourself an expert in  11:15:25
2    connection with the contracts that you teach?  11:15:29
3    A.   Absolutely.            11:15:30
4    Q.   And again, that's based on your  11:15:31
5    reviewing the course book and whatever other  11:15:33
6    materials that you use to prepare to teach law  11:15:38
7    students?                   11:15:42
8    A.   Yes.                  11:15:42
9    Q.   So, Professor, just I want to be  11:15:42
10   clear. Your expertise in gray marketing as it  11:16:33
11   relates to this case in which you are proffering  11:16:37
12   yourself as an expert in, is based on your being a  11:16:40
13   lawyer and teaching classes that contain gray  11:16:48
14   marketing subject areas and your reading the  11:16:51
15   materials to prepare for the class that you teach.  11:16:54
16   That's the basis for your expertise?   11:16:57
17   A.   The materials that I teach, as well as  11:16:59
18   outside materials, yes.          11:17:02
19   Q.   Now, I think before the break I asked  11:17:02
20   you to take a look at Paragraph 37 of Mr. Frazier's  11:17:10
21   report -- I'm sorry, it may be professor as well.  11:17:16
22   But Exhibit 305, Paragraph 37, it is on page 12.  11:17:16
23   Professor Frazier writes that -- I think it's the  11:17:31
24   second sentence -- that consumers shopping at Costco  11:17:38

Page 61

1    did not particularly care about pre- and post-sales  11:17:41
2    service availability at specialty and pro shops, and  11:17:45
3    sites, the Coughlan piece down there. Do you agree  11:17:51
4    with that statement?           11:17:53
5         MR. COLLINS: Excuse me. You mean  11:17:55
6    that one statement in isolation apart from the  11:17:55
7    paragraph and apart from the section?  11:18:00
8         MR. BESSETTE: Yes.        11:18:02
9    BY MR. BESSETTE:               11:18:02
10   Q.   Do you agree with that statement?  11:18:03
11        MR. COLLINS: I will caution you, go  11:18:04
12   ahead and answer, but if you feel you need to read  11:18:06
13   the paragraph and read the section, you read them.  11:18:11
14        THE WITNESS: Uh-huh. I'll be right  11:18:11
15   with you.                    11:18:13
16   BY THE WITNESS:               11:18:13
17   A.   No, I don't               11:18:16
18   BY MR. BESSETTE:               11:18:17
19   Q.   Why not?               11:18:18
20   A.   I think that what he says there is  11:18:18
21   essentially that nobody shopping -- what I read in  11:18:23
22   that sentence is that nobody shopping at Costco  11:18:26
23   would care about pre and post sales service. And I  11:18:30
24   think that's a stretch. I could imagine -- well, I  11:18:34

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 70

1    (Record read.)    11:27:09
2    MR. COLLINS: Now, Paul asked crisp    11:27:09
3  questions. That was not necessarily the crispest.    11:27:12
4  So make sure you understand the question before you    11:27:17
5  answer. And Paul can say it again or we could have    11:27:19
6  it read back again. If you understand it, go ahead    11:27:23
7  and answer.    11:27:24
8    THE WITNESS: I think I understand the    11:27:24
9  question.    11:27:27
10  BY THE WITNESS:    11:27:27
11    A.  Though my answer -- my answer takes    11:27:28
12  issue with various parts of what you said. And I    11:27:32
13  can either take issue with those in turn or you    11:27:37
14  could break the question into a couple of parts.    11:27:40
15  BY MR. BESSETTE:    11:27:42
16    Q.  Go ahead and answer it however you see    11:27:42
17  fit.    11:27:45
18    (Off the record    11:27:45
19    discussion.)    11:28:17
20    MR. COLLINS: Are you okay or do you    11:28:17
21  need it read back again?    11:28:19
22    MR. BESSETTE: She already said, Todd,    11:28:19
23  that she understood.    11:28:19
24    MR. COLLINS: No. We just had an    11:28:21

Page 71

1  interruption, Paul. She is entitled to hear the    11:28:23
2  question again, which was confusing, if she wants    11:28:25
3  to    
4    MR. BESSETTE: Well, let's just --
5    MR. COLLINS: If you're read, go ahead
6  and answer.
7  BY MR. BESSETTE:
8    Q.  Do you want it again?
9    A.  I'm okay. I'm fine.
10    The first part of your question    11:28:30
11  implied, I read -- I interpreted in what you said    11:28:31
12  that academic literature is divorced from real life    11:28:37
13  or reality. The academic literature that deals    11:28:41
14  specifically with the effects of gray marketing on    11:28:45
15  both on brand image and profitability or sales as a    11:28:48
16  result is, in fact, empirically based. And so it is    11:28:52
17  a summary and extrapolation of what happens in that    11:28:57
18  rear world.    11:29:01
19    In addition when -- so yes, I    11:29:02
20  relied on that academic literature when I was    11:29:03
21  studying the problem that Adams Golf had faced. And    11:29:08
22  I want to make clear that had Adams Golf not had a    11:29:11
23  gray market problem when Adams Golf was experiencing    11:29:15
24  declining sales, I would have no reason to believe    11:29:18

Page 72

1  that the reason that they were experiencing    11:29:21
2  declining sales was gray marketing. However, Adams    11:29:24
3  Golf was experiencing a gray market problem, and    11:29:28
4  that very much informed my analysis.    11:29:30
5    Q.  Again, I think the answer was    11:29:33
6  confusing. Let me try to parse a couple other    11:29:34
7  question    11:29:34
8    Did you undertake any analysis of    11:29:36
9  the causes for Adams Golf's decline in sales in    11:29:40
10  1998, the second half?    11:29:43
11    A.  Can you ask that again?    11:29:45
12    Q.  Did you undertake any analysis to    11:29:47
13  determine what caused Adams Golf's decline in sales    11:29:51
14  in the second half of 1998?    11:29:57
15    A.  Yes.    11:29:58
16    Q.  Tell me what analysis you undertook.    11:29:59
17    A.  I studied its gray market problem and    11:30:02
18  made a determination of whether or not its gray    11:30:06
19  market problem caused some of that decline.    11:30:08
20    Q.  What analysis did you undertake in    11:30:10
21  particular?    11:30:13
22    A.  I applied the academic literature in    11:30:13
23  gray marketing studies, the business strategies that    11:30:18
24  Adams Golf employed, I superimposed that on the    11:30:22

Page 73

1  academic literature on the causes of gray marketing,    11:30:25
2  the various invitations that companies can make to    11:30:28
3  gray marketers, and then saw that, in fact, Adams    11:30:33
4  Golf had experienced a gray market problem and made    11:30:35
5  a determination based on those factors.    11:30:35
6    Q.  And that's what led you to your    11:30:37
7  conclusion that the decline in sales was caused in    11:30:40
8  part by gray marketing?    11:30:43
9    A.  Yes.    11:30:45
10    Q.  Nothing else, just reading the    11:30:45
11  academic literature and superimposing that on to the    11:30:47
12  company's decline in sales?    11:30:52
13    MR. COLLINS: Mischaracterize the    11:30:54
14  testimony.    11:30:56
15  BY THE WITNESS:    11:30:56
16    A.  On to Adams Golf's business model,    11:30:56
17  it's strategies, and yes, the fact that it was    11:31:00
18  actually experiencing a gray market problem and was    11:31:08
19  experiencing a decline in sales.    11:31:10
20  BY MR. BESSETTE:    11:31:13
21    Q.  So okay. In your analysis, did you    11:31:15
22  attribute any other causes to Adams Golf's decline    11:31:17
23  in sales in the second half of 1998 other than gray    11:31:20
24  marketing?    11:31:23

19 (Pages 70 to 73)

Page 74

1    MR. COLLINS: Outside the scope.    11:31:24
2    Go ahead.    11:31:26
3  BY THE WITNESS:    11:31:26
4    A.    In my analysis, no. I was looking at  11:31:26
5  the gray market problem.    11:31:28
6  BY MR. BESSETTE:    11:31:30
7    Q.    Did you quantify what percent of the  11:31:30
8  decline in sales in the second half of 1998 was  11:31:33
9  caused, in your opinion, by gray marketing?    11:31:37
10    A.    I did not.    11:31:39
11    Q.    So you don't have any opinion on that  11:31:40
12  as you sit here today?    11:31:43
13    A.    Not in a quantifiable, numerical    11:31:44
14  sense, no.    11:31:46
15    Q.    In any sense?    11:31:47
16    A.    Yes.    11:31:48
17    Q.    What is your opinion?    11:31:49
18    A.    Significant.    11:31:50
19    Q.    What does that mean?    11:31:51
20    A.    It means enough that it would have  11:31:52
21  been important to Adams Golf and to investors.  11:31:54
22    Q.    When the company experienced gray  11:31:56
23  marketing -- I'm sorry.    11:31:56
24    When the company experienced    11:32:00

Page 75

1  decline in sales -- Strike that.    11:32:02
2    When was it important? When was  11:32:04
3  it significant to investors, as you just mentioned?  11:32:06
4    MR. COLLINS: What is the "it"?    11:32:13
5    MR. BESSETTE: Would you read her last  11:32:13
6  answer, please.    11:32:13
7    (Record read.)    11:32:22
8    MR. COLLINS: Vague and ambiguous,    11:32:22
9  hopelessly vague at this point.    11:32:25
10    MR. BESSETTE: That's her answer.    11:32:28
11    MR. COLLINS: Right. Because -- make  11:32:28
12  it a more crisp question, please, because the "it"  11:32:32
13  in context is very unclear at this point.    11:32:35
14  BY MR. BESSETTE:    11:32:38
15    Q.    Do you understand my question,    11:32:39
16  Professor?    11:32:40
17    A.    Can you please restate it?    11:32:40
18    Q.    What did you mean in your last    11:32:43
19  response that it was significant to potential    11:32:45
20  investors?    11:32:49
21    MR. COLLINS: Vague and ambiguous.    11:32:50
22    Go ahead.    11:32:52
23  BY MR. BESSETTE:    11:32:52
24    Q.    I just want to know what you meant.  11:32:52

Page 76

1  You gave me the response    11:32:52
2    A.    That gray marketing was significant to  11:32:54
3  potential investors to the company and investors  11:32:56
4  don't remember exactly what I said, but.    11:32:59
5    Q.    I believe you were talking about gray  11:33:01
6  marketing    11:33:02
7    A.    Yes, I was referring to gray    11:33:03
8  marketing.    11:33:04
9    Q.    Now, when in your view, was it    11:33:05
10  significant to investors?    11:33:08
11    A.    In my view, gray marketing became  11:33:09
12  significant to investors in thinking back of the  11:33:11
13  history of Adams Golf's gray market problem, there  11:33:14
14  was the initial shipment or the initial appearance  11:33:18
15  of Adams Golf clubs in Costcos in Canada. And then  11:33:21
16  there was a belief that that shipment was an    11:33:27
17  isolated incident. And that once those clubs had  11:33:31
18  been sold through, there would no longer be a    11:33:34
19  problem.    11:33:37
20    That proved not to be the case.    11:33:38
21  In fact, soon thereafter there were additional  11:33:40
22  shipments to Costcos not just in Canada, but    11:33:43
23  appearing all over Canada and every region of the  11:33:46
24  United States. At that point, I think it became  11:33:50

Page 77

1  significantly important to investors    11:33:54
2    Q.    Are you familiar with the common    11:33:55
3  marketing practice of segmenting?    11:33:57
4    A.    If you can tell me a little bit more  11:34:00
5  about what you mean by segmenting I can answer that  11:34:04
6  question.    11:34:08
7    Q.    Well, are you able to sit here and  11:34:08
8  tell me what the major segments in the market for  11:34:10
9  golf clubs would be?    11:34:12
10    A.    I'm not sure if you mean geographical  11:34:13
11  segments or if you mean consumer segments.    11:34:16
12    Q.    Consumers in the industry, so consumer  11:34:18
13  segments.    11:34:22
14    A.    Yes.    11:34:23
15    Q.    What are the consumer segments that  11:34:23
16  you are aware of for golf clubs?    11:34:27
17    A.    In reading the Harvard business school  11:34:29
18  document that was produced in connection with    11:34:35
19  Mr. Frazier's report. in it I learned -- I saw that  11:34:37
20  characterized in that report, and I will just use  11:34:44
21  the same terminology, as avid golf golfers, I think  11:34:47
22  it was beginning -- no. Advanced golfers, maybe it  11:34:52
23  was average golfers and beginning golfers, I think  11:34:56
24  is the terminology they used.    11:35:00

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 78

1    Q    And prior to reading that, you had no    11:35:03
2  understanding or did you, of consumer segmenting in    11:35:06
3  the golf club market?    11:35:09
4         MR. COLLINS: As she just testified,    11:35:13
5  is that what you mean?    11:35:13
6         MR. BESSETTE: No.    11:35:13
7         MR. COLLINS: In connection with --    11:35:14
8  BY MR. BESSETTE:    11:35:14
9    Q    Prior to reading the Harvard business    11:35:16
10  school study, did you have any knowledge of the    11:35:18
11  consumer segmenting in the golf club market?    11:35:18
12         MR. COLLINS: Vague and ambiguous.    11:35:18
13  BY THE WITNESS:    11:35:21
14    A    The information that I would have in    11:35:21
15  that respect would have come from reading documents    11:35:23
16  in connection with this litigation.    11:35:26
17  BY MR. BESSETTE:    11:35:28
18    Q    Okay. Prior to this litigation, did    11:35:28
19  you have any knowledge of consumer segmenting in the    11:35:31
20  golf club market?    11:35:34
21         MR. COLLINS: Vague and ambiguous.    11:35:36
22  BY THE WITNESS:    11:35:36
23    A    I had what I would characterize as a    11:35:38
24  lay understanding of that.    11:35:39

Page 79

1  BY MR. BESSETTE:    11:35:40
2    Q    Certainly not an expert understanding?    11:35:41
3    A    No.    11:35:42
4    Q    And now that you have read litigation    11:35:42
5  and read the Harvard business school study, do you    11:35:47
6  have any view as to what customer segment Adams Golf    11:35:50
7  was targeting with the Tight Lies?    11:35:55
8         MR. COLLINS: Vague and ambiguous    11:35:57
9  BY THE WITNESS:    11:36:00
10    A    Yeah. I'm not sure exactly what you    11:36:01
11  mean by the question.    11:36:01
12  BY MR. BESSETTE:    11:36:02
13    Q    What don't you understand about it?    11:36:02
14    A    I'm not sure -- well, if you can    11:36:02
15  actually just restate the question that will be    11:36:07
16  helpful.    11:36:07
17    Q    Can you say which of the customer    11:36:09
18  segments listed in the Harvard business school study    11:36:11
19  that Adams Golf was targeting?    11:36:15
20         MR. COLLINS: Foundation.    11:36:19
21  BY THE WITNESS:    11:36:20
22    A    It appears to me from the documents    11:36:20
23  that I've read that Adams Golf wanted to maintain    11:36:22
24  high prestige brand, wanted to be able to maintain a    11:36:27

Page 80

1  high profit margin. And those would indicate that    11:36:32
2  Adams Golf was trying to target the high end of the    11:36:35
3  market.    11:36:40
4  BY MR. BESSETTE:    11:36:40
5    Q    Okay. And that high end of the    11:36:40
6  market, where would this segment likely shop for the    11:36:42
7  golf clubs?    11:36:46
8    A    In the places that Adams Golf was    11:36:47
9  hoping they would shop    11:36:51
10    Q    Pro shops, specialty stores, that sort    11:36:51
11  of thing?    11:36:55
12    A    Yes    11:36:55
13    Q    Which of the consumer segments is more    11:36:55
14  likely to shop at Costco or other discount    11:36:58
15  retailers?    11:37:01
16         MR. COLLINS: Which of the two    11:37:01
17  segments you referred to in the article a moment    11:37:02
18  ago, is that what you mean?    11:37:05
19  BY MR. BESSETTE:    11:37:05
20    Q    Which of the customer segments that we    11:37:06
21  are referring to would be most likely to shop in    11:37:08
22  Costco or other discount retailers?    11:37:11
23    A    That's impossible to say.    11:37:15
24    Q    Why?    11:37:16

Page 81

1    A    I think there is not necessarily a    11:37:17
2  direct correlation between avid golfers and lack of    11:37:19
3  price sensitivity.    11:37:24
4    Q    What is that based on?    11:37:25
5    A    Based on living in the world. People    11:37:27
6  like to find a bargain. So even though a person may    11:37:29
7  be an avid golfer, they may not have so much    11:37:32
8  disposable income that they wouldn't seek the deal.    11:37:36
9    Q    So you don't think it is more likely    11:37:36
10  that a certain consumer segment would shop at Costco    11:37:39
11  in terms of the golf market?    11:37:45
12    A    No.    11:37:47
13    Q    How likely is it in your view that a    11:37:47
14  beginning golfer would go to a pro shop and pay full    11:38:02
15  price for a club?    11:38:06
16    A    That they would pay full price for a    11:38:07
17  club?    11:38:10
18    Q    How likely is a customer in the    11:38:10
19  beginning golfer segment to go to a golf shop and    11:38:13
20  pay full price for a club?    11:38:17
21    A    I see two parts in your question, and    11:38:19
22  I will answer them both. I think it is likely that    11:38:21
23  a beginning golfer would like to find as much    11:38:24
24  information as they could about the products that    11:38:28

21 (Pages 78 to 81)

Page 106

```
 1  BY THE WITNESS:                      12:06:24
 2       A.   It was a step that was taken in    12:06:25
 3  reaction to the gray market having already arised at 12:06:26
 4  Adams Golf, and it was a proactive step    12:06:32
 5  BY MR. BESSETTE:                     12:06:35
 6       Q.   And was Adams Golf's efforts to label  12:06:35
 7  its products with serial numbers a proactive supply  12:06:40
 8  side strategy to combat or deal with its existing  12:06:40
 9  gray marketing problem?                12:06:45
10       A.   Yes.                     12:06:46
11           MR. COLLINS: Paul, if you have  12:06:56
12  reached a point to pause.              12:06:57
13           MR. BESSETTE: Oh, this is fine. I  12:07:18
14  forgot. That's fine.                  12:07:18
15               (Off the record   12:07:18
16               discussion.)      12:07:18
17  BY MR. BESSETTE:                     12:07:18
18       Q.   Let's see. Professor Frazier's    12:07:20
19  report, 305, Paragraph 11, first sentence "Gray  12:07:24
20  market activities are commonplace in a wide variety  12:07:42
21  of industries from expensive consumer durables like  12:07:45
22  cars to inexpensive household products like    12:07:50
23  cosmetics." Do you agree with that statement?  12:07:53
24       A.   Yes.                     12:07:55
```

Page 107

```
 1       Q.   In Paragraph 5A of your rebuttal    12:07:56
 2  report, and I think you do it a couple of other   12:09:53
 3  places too, but that's the one I have. I guess it  12:09:56
 4  is the last sentence. You say, "In addition," and  12:10:23
 5  then A. And what you are talking about there is   12:10:23
 6  gray marketing. Saying that gray marketing -- it  12:10:26
 7  was widely known that gray marketing was taking   12:10:29
 8  place in certain sectors of the golf industry. What  12:10:31
 9  did you mean by that?                 12:10:34
10           MR. COLLINS: Read to yourself the   12:10:36
11  whole subparagraph, or if you feel necessary, the   12:10:38
12  whole paragraph, please.              12:10:40
13  BY THE WITNESS:                      12:10:42
14       A.   Okay. As you know, I teach a section  12:10:59
15  on gray marketing and use the golf industry as an   12:11:01
16  example. Specifically, I use Callaway as an example 12:11:05
17  of gray marketing, in addition to others. It is    12:11:08
18  certainly not the case that gray marketing was a   12:11:14
19  uniform problem in the golf industry. It affected  12:11:17
20  different companies differently.          12:11:21
21  BY MR. BESSETTE:                     12:11:22
22       Q.   That's what you meant?          12:11:22
23       A.   Yes.                     12:11:25
24       Q.   What I want to know is what you meant  12:11:26
```

Page 108

```
 1  when you said it was widely known that gray    12:11:28
 2  marketing was taking place in certain sectors of the 12:11:31
 3  industry?                         12:11:35
 4       A.   I meant that gray marketing was    12:11:35
 5  occurring in certain sectors of the industry. I'm  12:11:35
 6  not sure what's unclear.                12:11:37
 7       Q.   How was it widely known?         12:11:37
 8       A.   The world is -- well, let me back up. 12:11:39
 9  Consumers become aware of gray marketing through   12:11:44
10  seeing golf clubs available through gray market    12:11:47
11  chains, big box retailers, etcetera. And also in   12:11:54
12  the golf industry, my understanding is that word   12:11:58
13  spreads quickly and that would be another way.    12:12:02
14       Q.   So your understanding, what is that   12:12:04
15  based on?                         12:12:08
16       A.   What I have read about the golf    12:12:09
17  industry in connection with this litigation.    12:12:11
18       Q.   Okay. Any other knowledge about the  12:12:13
19  golf industry other than what you have read in this  12:12:15
20  litigation?                       12:12:18
21       A.   Do I know anything else about the golf 12:12:20
22  industry other than what I have read in connection  12:12:23
23  with this litigation? Is that the question?    12:12:24
24       Q.   Well, I will ask her to repeat my    12:12:26
```

Page 109

```
 1  question.                         12:12:26
 2               (Record read.)    12:12:26
 3  BY THE WITNESS:                      12:12:26
 4       A.   I guess I just don't understand. Do I  12:12:36
 5  have any other knowledge about the golf industry?  12:12:39
 6  BY MR. BESSETTE:                     12:12:42
 7       Q.   Let me ask you this: What was your   12:12:42
 8  level of knowledge about the golf industry prior to  12:12:43
 9  you teaching a class that had gray marketing in a   12:12:46
10  subset, you know, gray marketing as it related to   12:12:49
11  the golf industry? What was your knowledge?     12:12:51
12       A.   No more than a layperson         12:12:54
13       Q.   And now it is more because of the    12:12:56
14  litigation that we are in and the materials that you 12:12:59
15  have read about it?                  12:13:02
16       A.   Yes                      12:13:04
17       Q.   Paragraph 1 of your rebuttal report,  12:13:05
18  1A actually, you say that you have been asked by   12:14:05
19  plaintiff's counsel to provide your opinions    12:14:14
20  regarding the expert reports of Stephen Grace and   12:14:15
21  Chris James to the extent such reports purport to   12:14:19
22  present the characteristics of gray marketing and   12:14:23
23  the effects the gray market can have on brand name  12:14:26
24  products on the trademark owners or manufacturers   12:14:29
```

28 (Pages 106 to 109)

Page 110

1  thereof. Do you differentiate a brand name from a   12:14:32
2  hot product?                          12:14:37
3     A.   Yes.                          12:14:39
4     Q.   Was the Tight Lies a hot product or a   12:14:39
5  brand name?                          12:14:52
6     A.   It was both.                   12:14:53
7     Q.   And what is your basis for saying   12:14:55
8  that?                               12:14:59
9     A.   It was a brand name that was popular   12:14:59
10  at the time it was a hot product.        12:15:02
11     Q.   I am sorry?                    12:15:04
12     A.   So a hot product would be a modifier.   12:15:06
13  It would be a way of describing the brand name. The   12:15:10
14  brand name was popular. It was in demand. It was a   12:15:14
15  hot product.                         12:15:17
16     Q.   Do any of the articles that you have   12:15:17
17  reviewed that you listed in your report speak to the   12:15:20
18  difference between a brand name -- well, hold on.   12:15:25
19  Strike that. Yeah.                    12:15:39
20         Do any of the articles that you   12:15:40
21  have read speak to the difference between   12:15:42
22  characteristics involved with a brand name versus   12:15:45
23  characteristics involved with a hot product as they   12:15:51
24  relate to gray market?               12:15:54

Page 111

1         MR. COLLINS: I don't think you meant   12:16:01
2  to, but vague and ambiguous.            12:16:03
3         So answer if you can understand   12:16:06
4  the question.                        12:16:09
5  BY THE WITNESS:                      12:16:11
6     A.   Yeah. Actually if you could just   12:16:16
7  rephrase, that would be helpful          12:16:18
8         MR. COLLINS: I can tell you what I   12:16:24
9  think the problem is, if that would be helpful   12:16:25
10         MR. BESSETTE: No, that's okay. But I   12:16:28
11  appreciate it                         12:16:30
12  BY MR. BESSETTE:                     12:16:31
13     Q.   Let me just ask generally. Do you   12:16:33
14  recall any distributions or differences in any of   12:16:36
15  the academic articles you cite in your report about   12:16:39
16  gray marketing as it relates to a brand name product   12:16:43
17  and/or a hot product?                12:16:47
18         MR. COLLINS: Foundation.          12:16:48
19  BY THE WITNESS:                      12:16:49
20     A.   Honestly, I am not remembering whether   12:16:49
21  it is in the materials that I submitted in   12:16:51
22  connection with this litigation or other materials   12:16:53
23  that I have read previously, but, yes, there is a   12:16:55
24  distinction between the brand names that exist in   12:16:59

Page 112

1  the world and those that have the fortune, the good   12:17:03
2  fortune of becoming hot products.        12:17:08
3  BY MR. BESSETTE:                     12:17:12
4     Q.   And what are some of the differences   12:17:12
5  as it relates to gray marketing?        12:17:14
6     A.   Gray marketing, as we have already   12:17:16
7  discussed, can occur in a wide variety of sectors.   12:17:19
8  And it is not the case necessarily that gray   12:17:23
9  marketing only occurs in the case of products that   12:17:26
10  have become hot products, but certainly a brand name   12:17:30
11  as having sort of risen to the level of being a hot   12:17:35
12  product, becoming a popular product, one that   12:17:39
13  consumers widely desire, makes it more attractive to   12:17:42
14  the gray market.                     12:17:46
15     Q.   Okay. And Paragraph 5B of your   12:17:47
16  rebuttal, the next page, next to last sentence. You   12:18:15
17  say, "Prior to the initial public offering, there   12:18:26
18  were indications that gray market sales of Adams   12:18:29
19  Golf clubs were increasing and that the gray market   12:18:33
20  could have a deleterious effect on sales for Adams."   12:18:36
21  First off, did you review any data that indicates   12:18:40
22  that?                               12:18:43
23     A.   Yes.                          12:18:43
24     Q.   What was that?                 12:18:44

Page 113

1     A.   The Costco -- the Costco figures that   12:18:45
2  were -- that have been produced in connection with   12:18:49
3  this litigation.                     12:18:53
4     Q.   So the Costco sales data that they   12:18:54
5  produced?                           12:18:59
6     A.   Okay. As to -- you are asking about   12:18:59
7  figures, and it is a little bit -- well, let me just   12:19:02
8  tell you the world of things that I saw -- the world   12:19:08
9  of things that would be classified as figures.   12:19:10
10     Q.   First off, I didn't ask about figures   12:19:12
11  What I wanted to know was, your statement here that   12:19:14
12  the gray market sales were increasing and the gray   12:19:17
13  market could have a deleterious effect on sales for   12:19:21
14  Adams, what is that based on?           12:19:25
15         MR. COLLINS: And forgive me, that is   12:19:27
16  compound. It sounds like figures to me in the first   12:19:28
17  half of that question. That's the question.   12:19:30
18         Answer it, subject to my              12:19:32
19  objection.                          12:19:33
20  BY THE WITNESS:                      12:19:34
21     A.   Okay. As to the first part of that   12:19:34
22  sentence, there were indications that gray market   12:19:36
23  sales of Adams Golf clubs were increasing. That   12:19:39
24  information came from a few sources, one was the   12:19:42

29 (Pages 110 to 113)

Page 118

1  And so when he stated that profit margins had better 12:23:56
2  stay high and would jump ship if they wouldn't,     12:24:00
3  which is how I remember the answer, but again, I am  12:24:04
4  not exactly sure of the quote. That immediately     12:24:07
5  raised flags for me, given that gray marketing was   12:24:11
6  already occurring at Adams.                12:24:16
7  BY MR. BESSETTE:                  12:24:17
8      Q.   What information or data was available 12:24:17
9  to the company that would identify the causes of     12:24:23
10 this deleterious effect that you think was evident   12:24:28
11 pre IPO?                    12:24:32
12         MR. COLLINS: Foundation.        12:24:33
13         THE WITNESS: Can you restate the    12:24:35
14 question?                    12:24:35
15         MR. BESSETTE: Can you?          12:24:45
16         (Record read.)    12:24:47
17 BY THE WITNESS:                  12:24:47
18     A    Okay. I think I am going to ask you  12:24:49
19 to restate the question, simply because I'm not sure  12:24:54
20 exactly what it is that you are trying to --        12:24:57
21 BY MR. BESSETTE:                  12:24:59
22     Q.   I am trying to get at, Professor, your 12:24:59
23 statement here that prior to the IPO there were     12:25:02
24 indications that gray market sales were increasing   12:25:04

Page 119

1  And we've already talked about that. But that gray  12:25:08
2  market could have a deleterious effect on sales.     12:25:10
3  Tell me the data or information that was available   12:25:13
4  to the company, so what indications would they have  12:25:15
5  seen to show that there could be a deleterious       12:25:19
6  effect on sales pre IPO?             12:25:23
7         MR. COLLINS: Foundation.        12:25:26
8         Go ahead.        12:25:28
9  BY THE WITNESS:                  12:25:28
10     A    Prior to the IPO, the company had, for 12:25:28
11 one, received a number of complaints, including a   12:25:31
12 series of communications from WDC Mackenzie        12:25:34
13 regarding the effects that gray marketing was having 12:25:38
14 on authorized retailers in Canada. Among those,     12:25:41
15 among I think it was internal memo, I think it was  12:25:45
16 an Adams internal memo relating what WDC Mackenzie   12:25:51
17 had stated. The company stood, I think the quote    12:25:57
18 was something like the company stood to lose        12:26:00
19 goodwill and something like 15,000 clubs worth of   12:26:04
20 sales                    12:26:10
21 BY MR. BESSETTE:                  12:26:10
22     Q.   Anything else?        12:26:10
23     A.   Yes. That's sort of a large body of  12:26:11
24 things right there. There was the complaints, there 12:26:17

Page 120

1  was also all the information from WDC Mackenzie, and 12:26:19
2  there was actually declining sales in Canada.       12:26:23
3      Q.   Okay. Anything else?          12:26:26
4      A.   No.            12:26:28
5      Q.   Now, on page -- I am sorry --       12:26:28
6  Paragraph 19 of your initial report.          12:26:37
7         MR. COLLINS: Initial, did you say?    12:26:40
8         MR. BESSETTE: Uh-huh.          12:26:42
9  BY MR. BESSETTE:                  12:26:43
10     Q.   Okay. The first sentence you say,     12:27:01
11 "The company's business model made it particularly  12:27:03
12 vulnerable to gray marketers." In the third         12:27:08
13 sentence, "In the long-term, the gray market is     12:27:10
14 known to be potentially detrimental to consumers and 12:27:13
15 trademark holders and the like."             12:27:18
16         Now, tell me the evidence that        12:27:20
17 supports your conclusion that Adams was particularly 12:27:23
18 vulnerable to gray marketers?             12:27:26
19         MR. COLLINS: Asked and answered.    12:27:28
20         Go ahead.        12:27:29
21 BY THE WITNESS:                  12:27:29
22     A.   I'll just go back to the conversation 12:27:29
23 that we had earlier, which was about how it was that 12:27:31
24 I sort of engaged in my analysis. Given the gray    12:27:36

Page 121

1  market literature and my familiarity with the gray  12:27:41
2  market literature, I looked at the business         12:27:44
3  strategies that Adams employed and superimposed     12:27:47
4  them, sort of looked at the correlation of Adams'    12:27:53
5  business strategies with those that are known to be 12:28:00
6  particularly inviting to gray marketers         12:28:03
7  BY MR. BESSETTE:                  12:28:06
8      Q.   Well, in Paragraph 39 of your         12:28:06
9  rebuttal --            12:28:08
10         MR. COLLINS: Of the rebuttal?       12:28:09
11         MR. BESSETTE: Yes.          12:28:13
12         MR. COLLINS: Give us a second to get 12:28:14
13 there, please.            12:28:15
14         MR. BESSETTE: Todd, you don't need to 12:28:15
15 say that. I routinely wait          12:28:17
16         MR. COLLINS: I appreciate it. We are 12:28:20
17 there.                12:28:25
18 BY MR. BESSETTE:                  12:28:26
19     Q.   You say that Adams had a unique       12:28:28
20 business model. Tell me what you mean by that.      12:28:32
21         MR. COLLINS: Well, with reference to  12:28:34
22 Paragraph 39 or just answer the question? What do   12:28:38
23 you want her to do?            12:28:40
24

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588