OCHOA

PART 2

Page 122

1  BY MR. BESSETTE:                    12:28:40
2     Q.   What was unique about Adams' business  12:28:41
3  model that made it especially vulnerable to gray  12:28:44
4  marketing?                          12:28:48
5     A.   I think I have laid that out.  It is a  12:28:48
6  different question from the first question you  12:28:50
7  asked, for which I also had a response  12:28:54
8          But there were a number of things  12:28:56
9  that were particular about Adams' business plan  12:28:57
10  that made it particularly directed to gray marketers.  12:28:59
11  Its high profit margins, high retailer profit  12:29:04
12  margins were one.  Its desire to restrict sales to  12:29:07
13  its authorized retailers -- I'm sorry.  To restrict,  12:29:18
14  to maintain sales through its authorized retailers  12:29:21
15  and to maintain strong and exclusive relationships  12:29:25
16  with those authorized retailers.  In addition, the  12:29:28
17  company had plans to internationalize.  And there  12:29:32
18  are others that are listed in my report.  12:29:35
19     Q.   Is wanting to offer your retailers,  12:29:43
20  you know, high margins, is that unique in the  12:29:47
21  business world?                     12:29:50
22     A.   Wanting to offer your retailers good  12:29:51
23  profit margins is not unique in the business world,  12:29:56
24  no.                                 12:29:58

Page 123

1     Q.   Is wanting to internationalize unique?  12:29:58
2     A.   It is not unique.  The methods, the  12:30:01
3  particularities of how Adams was going about each of  12:30:04
4  those was unique                    12:30:08
5     Q.   Well, let's go to Paragraph 5A of your  12:30:09
6  rebuttal, where I think you list the elements that  12:30:17
7  make Adams' business model particularly attractive  12:30:20
8  to gray marketers.  You write these included, one,  12:30:26
9  maintaining the strength of the Tight Lies brand;  12:30:32
10  two, strong and exclusive relationships with its  12:30:36
11  distributors and retailers; three, pricing policies  12:30:40
12  which included high built-in retailer profit; four,  12:30:41
13  reliance on its in-house sales force and customer  12:30:45
14  service infrastructure to maintain its competitive  12:30:49
15  strengths; and five, an intention to further  12:30:52
16  internationalize.  So looking at 1, 2 and 3,  12:30:57
17  Professor, aren't these strategies that every golf  12:31:03
18  club manufacture wants?  In other words, are those  12:31:05
19  unique to Adams Golf?                12:31:07
20          MR. COLLINS:  Asked and answered.  12:31:09
21          Go ahead.                  12:31:10
22  BY THE WITNESS:                     12:31:11
23     A.   Yeah.  As I stated, those strategies  12:31:12
24  sort of in a broad sweep are not necessarily  12:31:14

Page 124

1  particular or unique to Adams Golf.  It was how they  12:31:19
2  were engaging in each of those that was.  12:31:24
3  BY MR. BESSETTE:                    12:31:24
4     Q.   How were they engaging in those that  12:31:27
5  made it unique?                     12:31:30
6     A.   For example, the pricing policies and  12:31:31
7  the high built-in retailer profits --  12:31:32
8     Q.   I'm sorry.  Let's stick with 1, 2 and  12:31:35
9  3.                                  12:31:38
10     A.   That was Number 3.             12:31:38
11          MR. COLLINS:  Wait, wait, wait, wait.  12:31:40
12  Let's have a question.  She was answering 3, and you  12:31:41
13  cut her off.                        12:31:44
14          MR. BESSETTE:  That's fine.  I thought  12:31:46
15  it was four, so go ahead.            12:31:46
16          MR. COLLINS:  Not a problem.  12:31:48
17          Do you have the question in mind?  12:31:48
18          THE WITNESS:  Yes.            12:31:50
19          MR. COLLINS:  Go ahead then.  12:31:50
20  BY THE WITNESS:                     12:31:53
21     A.   So for example, as to Number 3, Adams  12:31:53
22  Golf in its road trip presentation stated and made  12:31:57
23  clear that it offered a significantly higher profit  12:32:00
24  margin than its competitors.  That made it unique,  12:32:04

Page 125

1  because it created a wider in gap which gray  12:32:08
2  marketers could play, especially more space for  12:32:13
3  arbitrage to occur.                 12:32:16
4  BY MR. BESSETTE:                    12:32:18
5     Q.   How about one and two?          12:32:19
6     A.   Maintaining the strength of the Tight  12:32:21
7  Lies brand.  Adams Golf was a new company that was  12:32:24
8  trying to enter into the golf consumer mind.  And  12:32:28
9  their desire was to do so in a way that made it a  12:32:33
10  highly desirable, highly sought after, highly  12:32:36
11  prestigious brand.  The fact that Adams was a new  12:32:41
12  company seeking that image made it unique  12:32:46
13     Q.   And Number 2, what is unique about  12:32:49
14  that?                               12:32:53
15     A.   What is unique about that is that --  12:32:53
16  well, first, I don't know -- I don't know in the  12:32:57
17  golf industry as a whole, I haven't studied the  12:33:00
18  business models of every golf company in the golf  12:33:04
19  industry to know the steps that they take to ensure  12:33:08
20  strong and exclusive relationships with their  12:33:11
21  distributors and retailers.  But I can tell you that  12:33:14
22  having strong and exclusive relationships with  12:33:20
23  retailers as a business strategy creates among the  12:33:22
24  reasons to have that strong and exclusive  12:33:31

32 (Pages 122 to 125)

Page 142

1  BY THE WITNESS:                        12:56:04
2      A.   I don't remember exactly what Myers &  12:56:05
3  Griffith -- what Myers & Griffith's analysis of that  12:56:08
4  question is.                           12:56:08
5  BY MR. BESSETTE:                       12:56:11
6      Q.   Okay. Do you recall them saying that  12:56:11
7  over production is one factor within management  12:56:12
8  control that causes gray markets to thrive?  12:56:15
9      A.   Again, I don't recall that Myers &  12:56:19
10 Griffith stated that, but that would certainly be  12:56:22
11 one                                    12:56:24
12     Q.   Do you have any evidence that Adams  12:56:24
13 Golf overproduced clubs?               12:56:29
14     A.   Overproduced, no.             12:56:29
15     Q.   By the way, does Adams by definition  12:56:30
16 have any control over factors that are outside of  12:56:35
17 management's control that cause gray markets to  12:56:38
18 thrive?                                12:56:40
19     A.   By definition, no             12:56:40
20     Q.   In practice, have you seen that? I'm  12:56:42
21 sorry, in academic literature have you seen to the  12:56:47
22 contrary any indications that something  12:56:50
23 characterized as outside of management control  12:56:53
24 management really does have control over?  12:56:56

Page 143

1      A.   Not that I recall, though I can  12:57:04
2  imagine -- sitting here and speculating, I could  12:57:07
3  imagine, for example, that a company might take on  12:57:10
4  lobbying efforts to try to effect sort of larger  12:57:14
5  economic conditions that might make gray marketing  12:57:18
6  viable, but that's speculative  12:57:23
7      Q.   Have you ever been involved in any  12:57:24
8  IPOs?                                  12:57:28
9      A.   Yes.                          12:57:29
10     Q.   How many?                     12:57:33
11     A.   One                           12:57:34
12     Q.   Which one was that?           12:57:35
13     A.   I don't remember the name of the  12:57:36
14 company  It was a Polish copper extraction and  12:57:38
15 production company  I was involved with its IPO  12:57:44
16 when I was a summer associate at Clifford Chance  12:57:51
17     Q.   Was this a company traded on an  12:57:56
18 American exchange?                     12:58:01
19     A.   I think it was a 144(a) offering  12:58:01
20     Q.   And what's that?              12:58:04
21     A.   If I can remember. A 144(a) offering  12:58:05
22 allows for qualified investors to purchase  12:58:12
23 securities without the company -- I'm sorry  12:58:20
24 Qualified investors in the United States to purchase  12:58:25

Page 144

1  securities in the company without the company going  12:58:29
2  through the same rigorous disclosure requirements  12:58:31
3  that are required under the securities laws.  12:58:34
4      Q.   Okay. So the involvement you had in  12:58:37
5  the one you just talked about was as a summer  12:58:44
6  associate. So you were not a lawyer at the time?  12:58:48
7      A.   Correct.                      12:58:50
8      Q.   And it was an offering that didn't  12:58:50
9  have the same disclosure requirements as the  12:58:52
10 securities laws that govern IPOs in the United  12:58:56
11 States. Do I understand that right?    12:59:00
12         MR. COLLINS: Calls for a legal  12:59:01
13 conclusion.                            12:59:03
14 BY MR. BESSETTE:                       12:59:03
15     Q.   To the best of your understanding?  12:59:04
16         MR. COLLINS: Foundation.       12:59:05
17         Go ahead.                      12:59:07
18 BY THE WITNESS:                        12:59:07
19     A.   To the best of my understanding --  12:59:07
20 actually, if you can restate the question, that  12:59:09
21 would be great. Can you read it back?  12:59:11
22         MR. BESSETTE: Can you repeat it,  12:59:11
23 please?                                12:59:11
24         (Record read.)                 12:59:26

Page 145

1  BY THE WITNESS:                        12:59:26
2      A.   Yeah. I am just going to say I'm not  12:59:27
3  entirely sure, because I don't actually remember the  12:59:29
4  law on whether United States companies can offer  12:59:32
5  shares through 144(a) offering by doing it through a  12:59:35
6  foreign subsidiary, for example. So I can't answer  12:59:38
7  with all sureness yes or no.           12:59:45
8          MR. COLLINS: Excuse me. We need to  12:59:48
9  break when it is convenient.           12:59:49
10         MR. BESSETTE: Okay.            12:59:51
11 BY MR. BESSETTE:                       12:59:57
12     Q.   Have you ever counseled companies in  12:59:58
13 any of their -- in disclosure documents? In other  13:00:02
14 words, what companies need to put in various  13:00:05
15 disclosure documents? Do you have that background?  13:00:08
16     A.   In connection with that same  13:00:11
17 transaction, I was not the person in contact with  13:00:13
18 clients, but I was reviewing company documents and  13:00:17
19 trying to make some effort of determining what was  13:00:22
20 and was not relevant and material to investors  13:00:27
21     Q.   And this was as a second year law  13:00:30
22 student?                               13:00:33
23     A.   No. This -- all right. I should have  13:00:33
24 let you finish.                        13:00:33

37 (Pages 142 to 145)

Page 146

1       No, this was as a -- yes, the    13:00:37
2 summer after my second year of law school.    13:00:40
3    Q.   Right.  Okay.  So other than that    13:00:42
4 experience as a summer associate, intern, whatever   13:00:45
5 you want to call it, do you have any other    13:00:49
6 experience counseling companies as to the disclosure  13:00:52
7 requirements of the Securities & Exchange    13:00:56
8 Commission?    13:01:00
9    A.   I am just trying to recollect the body  13:01:00
10 of work that I did when I was working for Chance,   13:01:06
11 because I did other securities work.  And I just am  13:01:09
12 hesitant to say absolutely not, but to the best of   13:01:15
13 my recollection, no.    13:01:19
14       MR. BESSETTE:  I think this is a fine   13:01:33
15 place to stop.    13:01:34
16       (Break taken.)    13:40:50
17 BY MR. BESSETTE:    13:40:50
18    Q.   How many clubs were sold pre IPO at   13:40:51
19 Costco, do you know?    13:40:55
20       MR. COLLINS:  Vague and ambiguous    13:40:57
21 BY THE WITNESS:    13:40:57
22    A.   The numbers are difficult to actually  13:41:01
23 determine.  But I reviewed the Costco figures, and I  13:41:06
24 believe the amount is 3,917.  I have the exact    13:41:08

Page 147

1 number in my report.    13:41:19
2 BY MR. BESSETTE:    13:41:19
3    Q.   I think it's 3,860, but give or take.  13:41:19
4 Somewhere in the 3,900 range.    13:41:19
5       Do you know the breakdown of that   13:41:21
6 number between U.S. and Canada?    13:41:22
7    A.   I believe it was something like    13:41:24
8 82 percent of those clubs were sold in the United   13:41:26
9 States, and the remainder was in Canada.  83, 82   13:41:29
10 something like that.    13:41:34
11    Q.   So 3,200 or so in the U.S. and 600 in  13:41:34
12 Canada is I think the breakdown    13:41:38
13    A.   I am not comfortable with the numbers,  13:41:41
14 because I am not doing the math right now, but yeah,  13:41:44
15 something like that.    13:41:48
16    Q.   And I think you said in your report   13:41:48
17 that that's a relatively small number compared with  13:41:50
18 Adams total pre IPO 1998 sales?    13:41:55
19    A.   Yes.    13:41:57
20    Q.   And do you know what the number of   13:41:58
21 Adams pre 1998 -- I am sorry -- 1998 pre IPO sales  13:42:00
22 were in terms of units?    13:42:07
23    A.   I believe it was somewhere under    13:42:08
24 500,000    13:42:11

Page 148

1    Q.   Now, is it your -- let me ask this:   13:42:12
2 That number, that relatively small number as you   13:42:31
3 admit in your report, by itself, that number of    13:42:35
4 clubs being sold at Costco, was that material in   13:42:41
5 your mind as an expert witness in gray marketing?  13:42:45
6       MR. COLLINS:  Vague and ambiguous.    13:42:48
7 BY THE WITNESS:    13:42:50
8    A.   The number standing alone may or may   13:42:51
9 not be material.    13:42:53
10 BY MR. BESSETTE:    13:42:54
11    Q.   I understand your opinion is that when 13:42:55
12 viewed -- that number, when viewed with the    13:42:59
13 company's business model as we've talked about this  13:43:05
14 morning, in your mind, made the risk of gray    13:43:07
15 marketing material at the time of the IPO?    13:43:12
16    A.   That also in combination with the    13:43:14
17 trend of the gray marketing sales that was occurring 13:43:17
18 at the time, yes.    13:43:21
19    Q.   And let me ask you, do you -- just to  13:43:21
20 be sure.  You have not, as a professional, as an   13:43:37
21 attorney, advised a client as to what was material  13:43:42
22 or what was not material which would go in an    13:43:49
23 offering document, is that -- do I understand that   13:43:53
24 correctly or at least you can't remember doing that? 13:43:55

Page 149

1       MR. COLLINS:  I think it is asked and  13:43:58
2 answered.    13:44:00
3 BY THE WITNESS:    13:44:00
4    A.   Yeah.  I have reviewed company    13:44:00
5 documents trying to look for and flag issues that   13:44:04
6 might be material that I would pull out, but only on  13:44:08
7 occasion and -- yeah.    13:44:16
8 BY MR. BESSETTE:    13:44:20
9    Q.   And you have no experience as a deal   13:44:20
10 attorney, actually, any experience as a deal    13:44:24
11 attorney as opposed to a summer associate making   13:44:27
12 calls of materiality in documents to be filed with  13:44:30
13 the SEC and advising clients of that?    13:44:34
14    A.   Yeah.  I actually would like to go    13:44:37
15 back to my answer to that question previously,    13:44:38
16 because in thinking about it, I remember a dismal   13:44:40
17 day that I think might rather be forgotten that I   13:44:46
18 spent in Buffalo, New York, in a dark conference   13:44:51
19 room sifting through documents for materials -- for  13:44:53
20 documents I thought might be material to investors,  13:44:56
21 but I can't remember anything else about the deal.   13:44:58
22    Q.   Okay.  And I am drawing a distinction,  13:45:00
23 I am not talking about reviewing documents that you  13:45:03
24 personally thought were material.  I am talking    13:45:05

38 (Pages 146 to 149)

Page 150

1  about advising a client as a lawyer what is and what  13:45:08
2  is not material in your opinion that is what should  13:45:12
3  or should not go in an offering document that will  13:45:14
4  be filed with the SEC. You don't have any  13:45:17
5  experience doing that?  13:45:21
6      A.  That's correct.  13:45:22
7      Q.  And your -- the basis of you drawing  13:45:22
8  opinions about materiality of the gray market in  13:45:32
9  this case, I think as we have established, is your  13:45:32
10  teaching the classes for the last three years and  13:45:38
11  reviewing the articles that you have cited and that  13:45:40
12  in additional ones that you used in comparing your  13:45:45
13  class, is that right?  13:45:48
14      MR. COLLINS: Asked and answered.  13:45:48
15  Go ahead  13:45:49
16  BY THE WITNESS:  13:45:50
17      A  Yes. My hesitation is because there  13:45:53
18  was obviously also information that I read in  13:45:58
19  preparation for this -- in connection with this  13:45:59
20  litigation  13:46:03
21  BY MR. BESSETTE:  13:46:04
22      Q.  Sure. All right. Fair enough  13:46:05
23      When did Adams Golf learn --  13:46:19
24      13:46:19

Page 151

1      (Off the record  13:46:19
2      discussion.)  13:46:19
3  BY MR. BESSETTE:  13:46:19
4      Q  Professor, do you know how many Adams  13:50:06
5  Golf distributors or retailers complained to it pre  13:50:10
6  IPO about gray marketing?  13:50:14
7      A.  I think that's impossible to know.  13:50:16
8      Q.  You have seen references in many of  13:50:19
9  your readings in this case?  13:50:21
10      A  I have seen some references, yes.  13:50:22
11      Q.  Why don't you look at Professor  13:50:24
12  Frazier's report, Paragraph 40, where he writes  13:50:27
13  there were a total of eight out of seven 7,000  13:50:44
14  retailers complained, and he cites the Grace report.  13:50:48
15  Do you see that?  13:50:51
16      A.  Uh-huh.  13:50:51
17      Q.  And you have read the Grace report?  13:50:51
18      A.  I have.  13:50:53
19      Q.  Okay. Do you have any knowledge that  13:50:54
20  the number of complaints was higher or lower than  13:50:56
21  this?  13:50:59
22      A.  Concrete knowledge, no.  13:50:59
23      Q.  So I take it from your answer you have  13:51:06
24  a view that it was higher?  13:51:07

Page 152

1      A.  I believe it could have been higher.  13:51:08
2      Q.  I guess it could have been lower, too,  13:51:10
3  but I mean, what's that based on?  13:51:13
4      A.  I'm not sure that it could have been  13:51:15
5  lower. These eight documents are undeniably in  13:51:17
6  existence. The company was organized in a way that  13:51:22
7  had I believe they were called regional account  13:51:25
8  coordinators going out into the field to talk with  13:51:26
9  all of the company's authorized retailers and  13:51:29
10  distributors  And I would imagine that an awful lot  13:51:32
11  of complaints came to the company through  13:51:35
12  conversations between retailers and distributors and  13:51:38
13  those regional account coordinators in a way that  13:51:41
14  may not ever have been documented through formal  13:51:42
15  communication  13:51:45
16      Q.  Okay. Do you factor into your  13:51:46
17  opinions or conclusions in this case any assumptions  13:52:01
18  that there were a higher number of complaints than  13:52:04
19  that indicated here?  13:52:06
20      A.  I didn't rely on it because it is  13:52:08
21  somewhat speculative.  13:52:12
22      Q.  Somewhat or completely?  13:52:13
23      A.  It is speculative.  13:52:15
24      Q.  So you haven't taken that into  13:52:16

Page 153

1  account?  13:52:18
2      A.  No.  13:52:19
3      Q.  All right. So the number of  13:52:19
4  complaints that we have documentary evidence of is  13:52:20
5  the give or take eight out of 7,000 retailers or  13:52:24
6  distributors complaining. Is that a high number in  13:52:31
7  your view?  13:52:34
8      MR. COLLINS: Vague and ambiguous  13:52:34
9  BY THE WITNESS:  13:52:37
10      A.  Again, as a number of issues in this  13:52:37
11  case, it was not the number so much that was  13:52:40
12  concerning to me, as the content of those  13:52:42
13  complaints.  13:52:42
14  BY MR. BESSETTE:  13:52:43
15      Q.  Okay. Does the number of -- let me  13:52:43
16  ask you this. Is that a low number of complaints --  13:52:44
17  well, strike that  13:52:44
18      Actually, going back to 40 where  13:52:48
19  Professor Frazier says in the second sentence that,  13:52:51
20  "This is an incredibly low number of complaints and  13:52:56
21  in no way indicates the existence of degraded  13:53:01
22  relationships with Adams Golf's authorized retail  13:53:01
23  network," do you disagree with that statement?  13:53:12
24      A.  I don't disagree with the first part  13:53:13

39 (Pages 150 to 153)

Page 166

1    A.    It would be speculative to answer that   14:08:59
2    question.                         14:09:02
3    Q.    Did you read the deposition of Darl   14:09:02
4    Hatfield, the former CFO?              14:09:17
5    A.    I don't remember. If I did, it was   14:09:19
6    probably touching on parts of it and not focusing on   14:09:21
7    all of it.                         14:09:26
8    Q.    Okay. Did you read the part where he   14:09:27
9    stated that he didn't think gray market sales had   14:09:30
10   any financial impact at all on Adams Golf?   14:09:34
11   A.    I don't recall.                  14:09:38
12   Q.    Let me give you the -- hand you --   14:09:38
13   well, I'm sorry. Let's mark this        14:10:04
14            (Exhibit No. 307 was   14:10:13
15            marked for         14:10:13
16            identification.)   14:10:14
17   BY MR. BESSETTE:                    14:10:14
18   Q.    Okay. Professor, you have now been   14:10:14
19   handed a document marked Exhibit 307 by the court   14:10:17
20   reporter. I think it is the Eagle study that you   14:10:20
21   cite in your report at Paragraph 21B, I think also   14:10:23
22   Paragraph 7 of your rebuttal.           14:10:34
23            MR. COLLINS: For the record, it is   14:10:36
24   OCH 71 through 88.                  14:10:38

Page 167

1    BY THE WITNESS:                    14:10:38
2    A.    What paragraph of the rebuttal, I am   14:10:45
3    sorry?                         14:10:45
4    BY MR. BESSETTE:                    14:10:45
5    Q.    Now, on Paragraph 7 --           14:10:52
6    A.    Of the rebuttal, right?           14:10:54
7    Q.    Uh-huh. Yes, ma'am.             14:10:57
8          Although the part -- it might be   14:10:57
9    your initial report. Let me just look. Yeah, it's   14:11:29
10   actually -- the quote is in Paragraph 21B of your   14:11:32
11   initial report. He is saying, "In a recent study of   14:11:32
12   the effects of gray marketing on brand image, each   14:11:43
13   of 15 brand owners believe that parallel import   14:11:46
14   activity of their products into discount retail   14:11:49
15   stores was negatively impacting or had the potential   14:11:52
16   to impact on their brands perceptions." And I think   14:11:59
17   you cite the Eagle report on page 1342?   14:11:59
18   A.    Correct.                     14:12:05
19   Q.    Okay. If you turn to page 1335 of   14:12:05
20   that article, and it's obviously going to be one of   14:12:09
21   the underlined lines, because I've underlined that,   14:12:09
22   but I don't remember which one. I believe the   14:12:19
23   article cites a source stating that parallel export   14:12:20
24   channels may assist in penetrating foreign markets   14:12:20

Page 168

1    for an increasing foreign market share."   14:12:28
2    A.    Yes.                         14:12:28
3    Q.    Okay. What is the cite cited for that   14:12:29
4    statement, by the way?               14:12:38
5    A.    It says Mitchell, 1998.           14:12:38
6    Q.    Are you familiar with that article?   14:12:40
7    A.    I don't believe I looked it up, no.   14:12:41
8    Q.    This Eagle article, too, by the way,   14:12:43
9    is published what, some five years after Adam's IPO?   14:12:46
10   A.    Yes. 2003 I believe.             14:12:49
11   Q.    I believe, yeah.                 14:12:50
12         We have touched on this before,   14:13:00
13   but at Paragraph 19 of your initial report, and I   14:13:01
14   will just read it, you can look if you need to. You   14:13:05
15   say, "In the long-term, the gray market is known to   14:13:07
16   be potentially detrimental to consumers and   14:13:10
17   trademark holders alike." Doesn't the Eagle article   14:13:15
18   at page 1335 state that "Protecting parallel   14:13:19
19   importers is perceived as acting in the interest of   14:13:25
20   consumers"?                       14:13:30
21   A.    What it does for consumers is   14:13:30
22   different from what it does to a company.   14:13:34
23   Q.    My question was, doesn't that article   14:13:36
24   state that?                       14:13:40

Page 169

1          MR. COLLINS: Document speaks for   14:13:40
2    itself.                         14:13:42
3    BY THE WITNESS:                    14:13:42
4    A.    It says that it can be -- hang on.   14:13:42
5    What it says is that protecting parallel importers   14:13:50
6    is perceived as providing a check on the near   14:13:53
7    monopoly held by many manufacturers and as acting in   14:13:53
8    the interest of consumers               14:14:05
9    BY MR. BESSETTE:                    14:14:05
10   Q.    Okay. And at page 1339, doesn't Eagle   14:14:06
11   state that there is little research of an empirical   14:14:09
12   nature concerning parallel importing or its effect,   14:14:13
13   positive or negative, on brand equity and values?   14:14:17
14         MR. COLLINS: Speaks for itself.   14:14:20
15         Go ahead.                   14:14:22
16   BY THE WITNESS:                    14:14:22
17   A.    It does say that was the reason for   14:14:22
18   this study.                       14:14:24
19   BY MR. BESSETTE:                    14:14:25
20   Q.    Okay. And there is a marked steer toward   14:14:26
21   conjecture and opinion rather than providing   14:14:26
22   objective, quantitative analysis of the impacts of   14:14:26
23   the practice on brands, markets and individual   14:14:32
24   market segments?                  14:14:34

43 (Pages 166 to 169)

Page 170

1      MR. COLLINS: Same objection.      14:14:35
2    BY THE WITNESS:      14:14:37
3      A.    It does say that, that was the gap she  14:14:38
4    was aiming to fill.      14:14:40
5    BY MR. BESSETTE:      14:14:44
6      Q.    And didn't Eagle tell the reader in    14:14:44
7    the study that parallel importing activities    14:14:44
8    explored only in the consumer goods sector of the  14:14:44
9    New Zealand economy?      14:14:49
10      MR. COLLINS: Speaks for itself    14:14:49
11    Where are you referring to, please? For the record,  14:14:51
12    it's OCH 78.      14:14:51
13    BY THE WITNESS:      14:14:51
14      A.    Yes. She is informing the reader of  14:14:57
15    the place in which she did her study      14:14:59
16    BY MR. BESSETTE:      14:15:01
17      Q.    How similar is New Zealand's gray    14:15:01
18    market economy to Canada's, if you know?      14:15:06
19      A.    I don't know      14:15:08
20      Q.    Do you know whether any of the      14:15:08
21    interviewees of that study sell golf clubs?      14:15:10
22      A.    I don't know      14:15:14
23      Q.    28 C 2 of your report. I think you    14:15:14
24    quote --      14:15:38

Page 171

1      A.    Hang on a second.
2      Q.    Sure.
3      A.    That's page 19, right?
4      Q.    Yes  Uh-huh.
5      A.    Okay
6      Q.    You cite where Eagle writes that many  14:15:49
7    trademark holders have noted substantial losses in  14:15:55
8    sales, and you say up to 30 percent as the direct  14:15:58
9    result of parallel import activity      14:16:01
10      A.    I don't say up to 30 percent. That's  14:16:04
11    part of the quote.      14:16:06
12      Q.    Right. Doesn't the very next sentence  14:16:08
13    state that others generally where there was a high  14:16:10
14    element of rapidly changing technology or fashion  14:16:10
15    reported minimal impact?      14:16:16
16      MR. COLLINS: Just so we have a clear  14:16:16
17    record here, what page of Eagle are you referring to  14:16:19
18    now?      14:16:23
19    BY MR. BESSETTE:      14:16:23
20      Q.    It's 1342 that was cited in your    14:16:24
21    report.      14:16:27
22      MR. COLLINS: That's fine. I just    14:16:27
23    want the record to be clear as to what you are    14:16:28
24    reading.      14:16:30

Page 172

1      MR. BESSETTE: Okay.      14:16:30
2    BY THE WITNESS:      14:16:30
3      A.    I would just like to read it, just for  14:16:31
4    a second      14:16:32
5    BY MR. BESSETTE:      14:16:32
6      Q.    Uh-huh.      14:16:32
7      A.    Yes. That is the next phrase found in  14:17:04
8    the Eagle article.      14:17:06
9      Q.    Wasn't Adam's growth strategy      14:17:08
10    including -- include the developing of new      14:17:12
11    technology in product design?      14:17:14
12      A.    Yes, but I don't know how fast.    14:17:16
13      Q.    Did Adam's Tight Lies club win an    14:17:18
14    award for technical reasons in 1998?      14:17:23
15      A.    I don't know      14:17:26
16      Q.    You can turn, Professor, to your    14:17:27
17    initial report at 28 C 2. I guess, actually, right  14:17:56
18    probably where you are.      14:18:04
19      MR. COLLINS: Page 19?      14:18:04
20    BY THE WITNESS:      14:18:04
21      A.    Yes, that's where I am      14:18:06
22    BY MR. BESSETTE:      14:18:08
23      Q    Let me hand you what has been marked  14:18:14
24    previously as Exhibit 80, which you reference in    14:18:17

Page 173

1    Paragraph 28 C 2 of your expert report, Exhibit 303  14:18:21
2      Now, Paragraph 2 of your report    14:18:37
3    you say, "In addition, the sales in Costco stores    14:18:39
4    had the effect of diminishing the prestige and    14:18:42
5    desirability of its clubs among high end consumers,  14:18:47
6    thus reducing sales though," I think you mean    14:18:47
7    through.      14:18:47
8      A.    It should have been through.      14:18:47
9      Q.    Okay. "The high end retailers. On    14:18:55
10    October 8, 1998, Barney Adams recognized this    14:18:57
11    problem when he estimated that the gray market had a  14:19:01
12    negative sales effect in Q4 of 20 to 25 percent    14:19:05
13    based on a market survey (customers who refused to  14:19:05
14    buy)."      14:19:05
15      Now, to be clear Mr Adams isn't    14:19:12
16    estimating that gray market had a negative sales    14:19:17
17    effect in Q4 in October, is he?      14:19:23
18      MR. COLLINS: The document speaks for  14:19:27
19    itself.      14:19:28
20    BY MR. BESSETTE:      14:19:29
21      Q.    Now, what is your understanding of    14:19:30
22    what he is doing?      14:19:31
23      MR. COLLINS: Calls for speculation.    14:19:32
24

44 (Pages 170 to 173)

Page 198

1  Costco?                                    14:56:47
2      A.    Yes. And again, I will point to that  14:56:47
3  same memo, which I don't think I've seen yet today.  14:56:50
4  And this is how. The company was in a very good  14:56:53
5  position to assess the causes of its own gray market  14:56:58
6  problem once it started to occur. And when it tried  14:57:02
7  to do that, one of the first places that it looked  14:57:04
8  was its pricing policy. I believe the company's own  14:57:07
9  assessment of what was causing its own gray market  14:57:10
10 problem speaks for itself.              14:57:13
11     Q.    So, okay. And in that document, did  14:57:16
12 the company indicate just what you have said, that  14:57:17
13 it looked at the cause and it was trying to deal  14:57:21
14 with the cause of gray marketing and one of the  14:57:24
15 causes was its retail pricing?          14:57:27
16         MR. COLLINS: Vague and ambiguous.  14:57:29
17 BY MR. BESSETTE:                        14:57:29
18     Q.    Is that your recollection?    14:57:29
19         MR. COLLINS: Vague and ambiguous,  14:57:31
20 speaks for itself.                      14:57:31
21         Go ahead.                       14:57:32
22 BY THE WITNESS:                         14:57:32
23     A.    My recollection of that document was  14:57:33
24 not that it spoke about the causes. What it spoke  14:57:36

Page 199

1  about was the proactive steps the company was using  14:57:40
2  in order to try to stem gray marketing in the  14:57:44
3  future. One would assume or hope, at least, that  14:57:47
4  Adams was putting its best foot forward in that  14:57:50
5  respect, and in devising strategies to try to  14:57:55
6  minimize gray marketing in the future, it was trying  14:58:01
7  to get to the causes of its gray market activity.  14:58:01
8  BY MR. BESSETTE:                        14:58:04
9      Q.    But you are just assuming that, are  14:58:04
10 you not?                                14:58:06
11         MR. COLLINS: Asked and answered.  14:58:07
12 BY THE WITNESS:                         14:58:08
13     A.    Again, like I said, I don't know the  14:58:08
14 company's internal process, but I do assume that if  14:58:12
15 the company is taking the time to devise a new  14:58:15
16 pricing policy which is going to adversely effect  14:58:18
17 the company as well, that it wouldn't do so -- it  14:58:22
18 wouldn't do so without cause. So it would do so in  14:58:29
19 honest and earnest attempts to actually be trying to  14:58:33
20 stem its gray market problem, trying to get at a  14:58:36
21 real cause of its gray market problem.  14:58:39
22 BY MR. BESSETTE:                        14:58:40
23     Q.    Wasn't it just as likely that it was  14:58:40
24 just trying to fix the problem and that was one way  14:58:43

Page 200

1  it thought it could at least alleviate the harm to  14:58:44
2  its retailers?                          14:58:48
3      A.    In fact, I think that's exactly what  14:58:48
4  I'm trying to say. It is trying to fix the problem.  14:58:48
5  The way you fix the problem is by spotting its  14:58:50
6  causes and trying to alleviate the causes. And I  14:58:54
7  think that's what the company was trying to do.  14:58:57
8      Q.    So you draw from that memo that one of  14:58:57
9  the causes of the gray marketing was a high retail  14:59:00
10 margin?                                 14:59:03
11     A.    Yes.                          14:59:03
12     Q.    And is there --               14:59:05
13         MR. COLLINS: Excuse me. Are you  14:59:05
14 finished?                               14:59:05
15         THE WITNESS: I didn't finish.  14:59:05
16 BY THE WITNESS:                         14:59:05
17     A.    From that memo, together with other  14:59:08
18 documents.                              14:59:10
19 BY MR. BESSETTE:                        14:59:10
20     Q.    Okay. What are the other documents?  14:59:11
21     A.    Okay. For example, if I had seen that  14:59:12
22 memo and that was the company's strategy, and I knew  14:59:14
23 the company had, just to give a hypothetical, a  14:59:14
24 .05 percent retailer profit margin and it was  14:59:21

Page 201

1  significantly lower than all of its competitors,  14:59:25
2  then I would think it was an odd strategy.  14:59:28
3      Q.    Well, my question was, what other  14:59:30
4  documents beside the pricing policy memo leads you  14:59:33
5  to the conclusion that retail pricing and retail  14:59:36
6  margin was a cause of gray marketing for Adams Golf?  14:59:41
7          MR. COLLINS: Asked and answered.  14:59:45
8  We've had a lot of answers along that line.  14:59:50
9          Go ahead.                       14:59:50
10         MR. BESSETTE: I haven't heard any  14:59:50
11 other documents. I apologize if you've said them.  14:59:50
12 BY MR. BESSETTE:                        14:59:50
13     Q.    Besides that memo, what other  14:59:51
14 documents?                              14:59:53
15     A.    What other documents do I believe -- I  14:59:53
16 am sorry.                               14:59:58
17     Q.    You said that that document, along  14:59:58
18 with others, leads you to the conclusion that the  15:00:00
19 retail margin caused the gray marketing in Adams  15:00:04
20 Golf at least in part. What other documents?  15:00:09
21     A.    Okay, okay. So in addition to that  15:00:11
22 document, there is the road trip document, which we  15:00:12
23 were just talking about, which outlines very clearly  15:00:15
24 Adams' high retail -- the retail profit margin that  15:00:17

51 (Pages 198 to 201)

Page 202

1  Adams presented to its retailers  And in addition,  15:00:21
2  there is an awful lot in the academic literature as  15:00:25
3  well about profit margins being an invitation to  15:00:25
4  gray marketers                                    15:00:32
5      Q.    Okay.  I understand the academic        15:00:32
6  literature  I see the chart and the road show     15:00:37
7  documents showing the retail margin  And then you 15:00:38
8  have got the document you are talking about where  15:00:39
9  the company provided a new policy for Canada, for  15:00:41
10  certain retailers in Canada that were effected where 15:00:46
11  they got a credit, okay                           15:00:49
12          Any other documents that you are          15:00:51
13  referring to that, in your mind, lead to the       15:00:52
14  conclusion that the pricing margin or the retail   15:00:55
15  margin caused some of the gray marketing?          15:00:58
16      A.    At the moment, no  At the moment, I     15:01:01
17  don't recall is what I meant to say               15:01:09
18      Q.    I believe you said somewhere, probably 15:01:11
19  in your rebuttal report, I think you said that 15:01:19
20  that information about retail margins was omitted  15:01:24
21  from the prospectus?                               15:01:27
22      A    Yes.                        15:01:29
23      Q.    Is it your -- do you have any basis to 15:01:29
24  conclude that it should have been in the prospectus? 15:01:33

Page 203

1      A    Yes.                          15:01:36
2      Q.    Really?  What is your basis?        15:01:36
3      A.    I think in order to understand the    15:01:39
4  risks that Adams was facing with respect to the gray 15:01:44
5  market, there was a lot of missing information.     15:01:47
6  There was the information about the gray market    15:01:50
7  problem that was presenting itself at Adams, and   15:01:54
8  there was also, although in the prospectus the     15:01:56
9  company did state that it wanted to maintain -- I'm 15:01:59
10  not actually sure if it said it wanted to maintain 15:02:03
11  profit margins, or whether it said that it couldn't 15:02:03
12  guarantee the profit margins would be maintained.  15:02:08
13  But in order to understand that statement fully, one 15:02:10
14  would have to know -- one would have to know of the 15:02:14
15  potential threats to that profit margin that existed 15:02:18
16  for the company at the time.                       15:02:22
17      Q.    What is that based on, Professor?       15:02:24
18  What is your conclusion that on that information was 15:02:28
19  required to be put in the prospectus?              15:02:32
20      A.    Again, absent any disclosure about the 15:02:37
21  company's gray market problem. Information about -- 15:02:42
22  the information that was contained in the prospectus 15:02:47
23  about the company's profit margins or the retailer 15:02:50
24  profit margins that it offered, were very difficult 15:02:53

Page 204

1  to understand, and certainly very difficult to      15:02:56
2  understand fully, especially if one is trying to see 15:03:00
3  if there is any threats to that profit margin       15:03:03
4      Q.    So you are saying besides saying that    15:03:06
5  the company is going to try to maintain profit      15:03:09
6  margins, but it very well may not, and there is a   15:03:11
7  risk that those margins will decline, something more 15:03:15
8  needed to be disclosed?                             15:03:20
9      A.    Absolutely.                    15:03:21
10      Q.    You are not saying based on some legal 15:03:23
11  requirement or some knowledge you have with respect 15:03:25
12  to SEC disclosure, right?  This is based on your    15:03:27
13  gray marketing expertise?                          15:03:30
14      A.    Yes, yes.                     15:03:32
15      Q.    Okay.  21D of your report.  At the      15:03:32
16  bottom of that page, you say, "The close correlation 15:04:28
17  between increasing gray market sales and decreasing 15:04:34
18  authorized sales, therefore, strongly suggests that 15:04:37
19  the damage to Adams' name of the Tight Lies brand  15:04:40
20  resulting from the gray market was great immediately 15:04:43
21  after the company's IPO," or initial public        15:04:46
22  offering  What do you mean in that sentence by     15:04:49
23  correlation?                         15:04:53
24      A.    Let me read the paragraph.        15:04:53

Page 205

1              There was a negative correlation. 15:05:52
2  The sales were decreasing  Gray market sales were  15:05:54
3  increasing                          15:05:58
4      Q.    So what do you mean by correlation?      15:05:58
5  How do you use the word "correlation" in that       15:06:00
6  sentence?                          15:06:03
7      A.    There was a relationship between the    15:06:04
8  two.                             15:06:05
9      Q.    Do you understand the difference        15:06:05
10  between a correlation and causation?               15:06:07
11      A    Yes.                          15:06:09
12      Q.    Can you explain that to me?             15:06:09
13      A.    Well, for those who use this language, 15:06:11
14  it seems pretty -- so causation is -- there is you  15:06:16
15  have got a factor occurring and it is the cause of 15:06:20
16  another factor that is occurring  That is a causal 15:06:23
17  relationship  A correlation is two things happening 15:06:28
18  at the same time                    15:06:31
19      Q.    Okay.  Because they are correlated,     15:06:32
20  they could be unrelated  I mean, they are not      15:06:38
21  causative?                         15:06:41
22      A.    It's possible that they are unrelated. 15:06:42
23      Q.    All right  Could be causative, could   15:06:42
24  not?                             15:06:42

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 206

1    A.   Sorry. Let me rephrase that.      15:06:47
2         MR. COLLINS: And before you do, I    15:06:47
3    object to causation as outside the scope.    15:06:47
4         Go ahead.              15:06:49
5    BY THE WITNESS:              15:06:49
6    A.   Yeah. It is possible that they are --   15:06:50
7    it is possible that one is not the cause for the    15:06:53
8    other.                 15:06:55
9    BY MR. BESSETTE:              15:06:56
10   Q.   Okay. And what is the basis for your    15:06:57
11   assumption or observation, whichever it is, of    15:06:58
12   decreasing authorized sales?         15:07:02
13   A.   The -- you said what is the basis for    15:07:07
14   my assumption about decreasing authorized sales?   15:07:13
15   Q.   Yes.                 15:07:17
16   A.   The company's sales figures, quarterly   15:07:18
17   sales figures.              15:07:24
18   Q.   So which sales figures are you talking   15:07:25
19   about, which quarters?           15:07:28
20   A.   The second, third and fourth.       15:07:29
21   Q.   So when were sales decreasing?      15:07:31
22   A.   Sales started to decrease in the third   15:07:35
23   quarter and continued in the fourth      15:07:38
24   Q.   So were there decreasing authorized    15:07:41

Page 207

1    sales prior to the IPO?           15:07:43
2    A.   I don't believe so, no. It's hard to   15:07:45
3    say actually, because the IPO happened in the middle   15:07:50
4    of the third quarter -- or during the third quarter   15:07:54
5    So it is actually hard to really separate that out   15:07:56
6    cleanly.                 15:07:58
7    Q.   Well, then why don't we do it as of    15:07:58
8    the end of June. Were there decreased authorized   15:08:00
9    sales in Q2?                15:08:03
10        MR. COLLINS: I think asked and       15:08:05
11   answered, but go ahead           15:08:07
12   BY THE WITNESS:              15:08:08
13   A.   No.                 15:08:08
14   BY MR. BESSETTE:              15:08:10
15   Q.   Are you saying here, just to be clear,   15:08:19
16   I guess that -- well, strike that.      15:08:21
17        You are not saying in this        15:08:26
18   paragraph, are you, Professor, that increasing gray   15:08:28
19   market sales prior to the IPO was causing decreased   15:08:31
20   authorized sales prior to or shortly after the IPO?   15:08:35
21   A.   No. I am not opining as to causation.   15:08:39
22   Q.   When we were talking about that      15:08:45
23   pricing policy change, in fact, I -- well, strike   15:08:59
24   that.                  15:08:59

Page 208

1         Let me strike my reference to an    15:09:04
2    earlier document, but Paragraph 14 of your rebuttal,   15:09:06
3    you say that a Web Street Golf report -- I think   15:09:13
4    it's supposed to be Wall Street. Sorry.    15:09:24
5    A.   It is supposed to be Web Street.     15:09:24
6    Q.   Is it Web Street? Oh, it says Web    15:09:27
7    Street.                 15:09:27
8    A.   Yeah.                15:09:27
9    Q.   Is it different than the Wall Street   15:09:28
10   one in the paragraph above?         15:09:30
11   A.   That should say Web Street.        15:09:31
12   Q.   Oh, oh. I see. All right.         15:09:34
13        So the report dated March 22, 1999   15:09:34
14   reports that Adams had adopted a new retail pricing   15:09:38
15   structure in order to combat the gray market sale of   15:09:42
16   its clubs. Do you know, as you sit here, know for a   15:09:47
17   fact what factors influenced Adams Golf's decision   15:09:47
18   to change its pricing policy at that time?    15:09:50
19   A.   I couldn't tell you that I know all of   15:09:50
20   the factors with complete assurance      15:09:57
21   Q.   Do you know any of them?         15:10:00
22   A.   Yes.                 15:10:03
23   Q.   Which ones?              15:10:04
24   A.   The gray market              15:10:05

Page 209

1    Q.   And how do you know that?        15:10:09
2    A.   I know it from a couple of different   15:10:10
3    sources. One would be the Web Street golfers    15:10:15
4    report, which I cite, which I believe also contained   15:10:18
5    pieces of interviews with Barney Adams And then in   15:10:21
6    addition, there was the pricing strategies the    15:10:29
7    company was undertaking, the internal company    15:10:33
8    documents in which the company talks about pricing   15:10:38
9    strategies I believe also refer to the gray market.   15:10:41
10   Q.   Is it your testimony that Barney Adams   15:10:44
11   testified that the new retail pricing structure had   15:10:47
12   something to do with gray marketing?      15:10:51
13   A.   No.                 15:10:53
14   Q.   Then I misunderstood. You mentioned   15:10:53
15   Mr Adams' testimony What you did mean?      15:10:58
16   A.   I didn't. I said I believe that Web   15:11:00
17   Street Golf report also included interviews with    15:11:04
18   Barney Adams.               15:11:06
19   Q.   Okay. And what about those interviews   15:11:10
20   support your conclusion that the pricing structure   15:11:10
21   change had anything to do with gray market?    15:11:14
22   A.   The Web Street Golf report covered a   15:11:16
23   number of issues. The pricing structure was one of   15:11:19
24   them. And when the Web Street Golf report said that   15:11:22

Page 214

1  anywhere?                                   15:18:00
2        MR. COLLINS: Speak for themselves.    15:18:01
3  BY THE WITNESS:                             15:18:03
4     A.   I don't recall                      15:18:04
5  BY MR. BESSETTE:                            15:18:04
6     Q.   Well, you reviewed it I guess in    15:18:05
7  connection with your work in this case, so is it   15:18:07
8  detailed somewhere in your reports?         15:18:09
9        MR. COLLINS: She just said she        15:18:11
10  doesn't know.                              15:18:14
11  BY THE WITNESS:                            15:18:14
12     A.   I don't recall  I reviewed a lot of   15:18:15
13  documents. I didn't cite them all.         15:18:17
14  BY MR. BESSETTE:                           15:18:19
15     Q.   Why didn't you cite them all, by the   15:18:19
16  way?                                       15:18:21
17     A.   My understanding is that there is some   15:18:21
18  limitation on the page limit of the report. If I   15:18:25
19  were to cite every document that I received, I can't   15:18:31
20  even imagine how long the report would have been.   15:18:34
21     Q.   What is this understanding of some   15:18:36
22  page limit?                               15:18:39
23     A.   It is my own understanding from   15:18:40
24  talking to people who have worked in litigation   15:18:43

Page 215

1  previously about what the standard practice is of   15:18:48
2  expert's reports                           15:18:50
3     Q.   Well, how did you decide which     15:18:51
4  documents to include -- to include in your report   15:18:53
5  detailing which ones they were and which ones you   15:18:58
6  didn't? How did you decide which ones to include?   15:19:01
7     A.   I read them. I looked for all      15:19:03
8  documents that appeared to in any way touch on gray   15:19:05
9  marketing, specifically on the impact that gray   15:19:10
10  marketing was having on the company. I also looked   15:19:13
11  for documents that revealed information about the   15:19:16
12  company's business strategies and business model and   15:19:18
13  strategies for growth in order to be able to   15:19:22
14  determine whether or not the company was poised to   15:19:25
15  become -- to avail itself of the gray market.   15:19:28
16     Q.   Well, no, no. I am sorry  Maybe I   15:19:34
17  wasn't clear on my question                15:19:37
18        My question is, you are required     15:19:38
19  to list the documents that you reviewed, whether you   15:19:40
20  relied on them or not                     15:19:45
21     A.   Uh-huh                            15:19:46
22     Q.   And maybe I am misunderstanding, but   15:19:47
23  what I am hearing is that you reviewed some   15:19:50
24  documents that you have not set forth in your   15:19:53

Page 216

1  report                                     15:19:55
2     A.   No, no                            15:19:56
3     Q.   Okay                             15:19:56
4     A.   No, no, no. I set forth all the   15:19:56
5  documents in my report early on in the report.   15:19:58
6     Q.   Okay                             15:19:58
7     A.   There I stated that I have reviewed   15:20:02
8  all the exhibits that I received at that time. I   15:20:03
9  did not cite every one of those exhibits   15:20:05
10     Q.   So the document is, according to your   15:20:08
11  report, has to be an exhibit in the deposition?   15:20:33
12     A.   Can you say that again?           15:20:37
13     Q.   Yeah. On page 4 of your report, this   15:20:39
14  is where you list the documents that you reviewed   15:20:43
15  and/or relied on, okay. And the first bullet is   15:20:45
16  depositions and transcripts and exhibits of all   15:20:54
17  deponents except plaintiffs  Then there are other   15:20:57
18  declarations in the Costco documents, a Callaway 10K   15:21:00
19  and an expert report from Alan Miller. So there are   15:21:04
20  no individual documents listed.            15:21:08
21        So my question is, since you don't   15:21:11
22  have any individual documents listed, and you don't   15:21:12
23  cite it anywhere individually in your report, I   15:21:16
24  suppose it has to be an exhibit to a deposition   15:21:18

Page 217

1  transcript, because otherwise you haven't listed all   15:21:20
2  the documents you have reviewed or relied on.   15:21:23
3     A.   My understanding of the exhibits that   15:21:25
4  I received was that they were all in connection with   15:21:27
5  deposition transcripts.                    15:21:30
6     Q.   And that's what I asked you         15:21:31
7        MR. COLLINS: That's what she         15:21:33
8  answered                                  15:21:36
9        MR. BESSETTE: I don't think I got an   15:21:36
10  answer before just now.                   15:21:38
11        MR. COLLINS: Well, I am glad to tell   15:21:40
12  you, if this is helpful, that we gave her all the   15:21:41
13  deposition transcripts.                    15:21:43
14        MR. BESSETTE: Okay. I just want     15:21:43
15  to --                                     15:21:43
16        MR. COLLINS: And all of the          15:21:44
17  deposition transcript exhibits. And I don't recall   15:21:45
18  any other document -- I don't know of any documents   15:21:47
19  that we provided that aren't listed here.   15:21:48
20        MR. BESSETTE: Okay.                  15:21:50
21  BY MR. BESSETTE:                           15:21:51
22     Q.   Now, go to page -- I'm sorry --     15:22:02
23  Paragraph 27 of your initial report. You say, low   15:22:04
24  sales force morale is another common effect of gray   15:22:19

55 (Pages 214 to 217)

Page 218

1    market activity, and then you cite Barney Adams's    15:22:24
2    memo of August 14, which is Exhibit 57, where among    15:22:27
3    other comments, he states that the staff had very    15:22:32
4    low morale, including having no faith in their    15:22:37
5    management. Do you have any knowledge whether the    15:22:40
6    low morale that Mr. Adams is referring to in that    15:22:42
7    memo had anything to do with gray marketing?    15:22:45
8        A    I don't. I thought it was interesting    15:22:48
9    that this is one of the common effects of gray    15:22:50
10    market activity, and it was, itself, present within    15:22:53
11    Adams Golf.    15:22:58
12        Q    But you are not giving the opinion or    15:22:59
13    it is not part of your conclusion that there is a    15:23:02
14    cause and effect relationship between gray marketing    15:23:04
15    and a low morale?    15:23:08
16        A    I am not making the opinion that it    15:23:09
17    necessarily caused the low morale    15:23:13
18        Q    Is it your opinion that it had    15:23:16
19    anything to do with the low morale?    15:23:18
20        A    I don't know with certainty, no    15:23:37
21        Q    Do you know at all or are you just    15:23:46
22    speculating?    15:23:50
23        MR COLLINS: Asked and answered    15:23:50
24

Page 219

1    BY THE WITNESS:    15:23:51
2        A    There is a certain amount of    15:23:52
3    speculation, because I'll tell you the process that    15:23:53
4    I went through in seeing them. When I saw some of    15:23:55
5    the negative effects that gray market activity can    15:24:00
6    have on a company, one of them, which I wasn't sure    15:24:03
7    I would find, was low sales force morale. However,    15:24:07
8    in then reviewing the documents that I received, I    15:24:11
9    saw that, in fact, that was another problem that    15:24:14
10    Adams Golf was facing at the time. I thought that    15:24:20
11    was interesting.    15:24:26
12        Q    Okay.    15:24:26
13        A    And worth noting, since that is often    15:24:28
14    caused by the gray market.    15:24:31
15        Q    Right. Okay. But it's speculation on    15:24:33
16    your part whether there is any cause and effect    15:24:35
17    relationship?    15:24:38
18        A    Yes    15:24:38
19        Q    23A, last sentence. "The displeasure    15:24:38
20    Adams' authorized retailers felt with gray market    15:25:13
21    sales is well documented and described in part in    15:25:18
22    Paragraph 15A above." Which authorized retailers    15:25:22
23    were displeased with Adams, Professor?    15:25:26
24        A    I wouldn't be able to tell you the    15:25:28

Page 220

1    world, the universe of authorized retailers that    15:25:35
2    were displeased with Adams. The entire universe    15:25:40
3        Q    Tell me some    15:25:44
4        A    Okay. I can tell you that all the    15:25:45
5    retailers that sent complaints to Adams, in addition    15:25:46
6    to those that were represented by WDC Mackenzie when    15:25:49
7    they corresponded with Adams, and related to Adams    15:25:55
8    that authorized retailers in Canada were quite    15:25:58
9    displeased.    15:26:02
10        Q    Okay. So we have Mackenzie as the    15:26:02
11    Canadian distributor, we have got six or seven    15:26:05
12    retailers that complain. And what else do we have?    15:26:09
13        MR COLLINS: Asked and answered    15:26:12
14    By THE WITNESS:    15:26:12
15        A    We talked about that earlier in the    15:26:13
16    day. As far as written documentation, we have got    15:26:15
17    the communications between authorized retailers and    15:26:19
18    distributors and the company. And that's what we've    15:26:23
19    got    15:26:25
20    BY MR. BESSETTE:    15:26:25
21        Q    Okay.    15:26:25
22        A    If I can just add to that response    15:27:24
23    Just talking back to that earlier conversation, I    15:27:27
24    just want to make sure that it is clear that I am    15:27:28

Page 221

1    referring to also having knowledge of the practice    15:27:32
2    of regional account coordinators going into the    15:27:35
3    field, having strong relationships with the    15:27:38
4    retailers. Especially after the gray market problem    15:27:41
5    arose, they were making trips into the fields to    15:27:43
6    work with authorized retailers. And so like I said,    15:27:46
7    and we talked about the speculative nature of this    15:27:50
8    as well, I could imagine that an awful lot of    15:27:53
9    unofficial complaints were made sort of in those    15:27:56
10    engagements.    15:28:00
11        Q    Sure. Do you have any evidence of    15:28:01
12    any?    15:28:02
13        A    No.    15:28:02
14        Q    Okay. At Paragraph 19 and I think 21    15:28:03
15    of your report, and I don't know that you need to    15:28:09
16    refer to them, but you say, again, one of the other    15:28:14
17    things that make Adams Golf particularly vulnerable    15:28:16
18    to the gray market -- well, no. Strike that.    15:28:21
19        You actually say, citing Myers,    15:28:27
20    you say, problems can arise in the form of    15:28:31
21    ineffective pricing policies, which you talked    15:28:33
22    about, deteriorated distributor relationships, which    15:28:36
23    you talked about, low sales force morale, again,    15:28:40
24    which you've talked about, and poor customer    15:28:41

56 (Pages 218 to 221)

Page 302

1  have been aware of and therefore disclosed?    17:54:08
2        MR. COLLINS: Asked and answered.    17:54:10
3  BY MR. BESSETTE:    17:54:14
4      Q.   Is it just based on assumption that    17:54:15
5  they were aware of the Lehman estimates?    17:54:18
6      A.   There was that. There is also, as    17:54:21
7  you've discussed and I've seen in a number of    17:54:22
8  documents in which Barney Adams is discussing    17:54:24
9  seasonality, and that there is often a downward turn    17:54:28
10 during that time of the year.    17:54:31
11     Q.   Okay. So now you are saying that the    17:54:32
12 seasonality effect in Q3 and Q4 should have put the    17:54:36
13 company on alert that there is a serious risk that    17:54:40
14 the gray marketing, even if it stayed at the same    17:54:43
15 level of activity, would cause -- would cause an    17:54:47
16 increase in the magnitude of the problem for the    17:54:53
17 company?    17:54:57
18     A.   Yes.    17:54:57
19     Q.   And do you know the percentage of    17:54:57
20 decline on average that the company experienced in    17:54:59
21 Q3 or Q4 due to seasonality alone versus Q1 and Q2    17:55:03
22 in any given year?    17:55:12
23        MR. COLLINS: Vague.    17:55:14
24

Page 303

1  BY THE WITNESS:    17:55:15
2      A.   On average, no. In any given year,    17:55:16
3  yes. And I stated those figures in 1998 in my    17:55:17
4  report.    17:55:20
5  BY MR. BESSETTE:    17:55:20
6      Q.   You stated the estimates by Lehman.    17:55:20
7      A.   No, I don't believe so.    17:55:23
8      Q.   Okay. Where are those numbers?    17:55:23
9      A.   Further on in 21, I believe.    17:55:25
10     Q.   Well, those are the actual numbers in    17:55:34
11 Q3 and Q4. Are you saying that all of those are due    17:55:36
12 to seasonality?    17:55:40
13     A.   I don't know which part of that    17:55:41
14 decline was due to seasonality.    17:55:45
15     Q.   Well, that was my question. My    17:55:48
16 question was and is, do you know what the percentage    17:55:51
17 decline in Q3 and Q4 due to seasonality alone in any    17:55:52
18 given year that Adams Golf suffered?    17:55:56
19        MR. COLLINS: Asked and answered, way    17:55:59
20 outside the scope.    17:56:01
21 BY THE WITNESS:    17:56:01
22     A.   No    17:56:02
23 BY MR. BESSETTE:    17:56:02
24     Q.   So how can you sit here and say that    17:56:03

Page 304

1  Adams Golf should have realized a serious risk due    17:56:05
2  alone to a downturn in Q3 and Q4 due to seasonality    17:56:09
3  when you don't know the effect seasonality has in    17:56:10
4  any given year to Adams Golf?    17:56:14
5        MR. COLLINS: Asked and answered.    17:56:16
6        Do you have anything to add to    17:56:17
7  what you already said?    17:56:18
8        THE WITNESS: No, I don't.    17:56:18
9  BY MR. BESSETTE:    17:56:18
10     Q.   Well, can you answer my question,    17:56:21
11 please?    17:56:22
12        MR. COLLINS: Asked and answered.    17:56:45
13 BY THE WITNESS:    17:56:45
14     A.   Can you ask the question again?
15        MR. BESSETTE: Can you read it back,
16 please?
17        (Record read.)
18 BY THE WITNESS:
19     A.   We talked about this already. The    17:56:48
20 Lehman report was out there in the world, and Adams    17:56:50
21 was working closely with Lehman. In addition, Adams    17:56:55
22 had its own experiences with seasonality and knew    17:56:59
23 the effect of that. And I have seen statements by    17:57:04
24 Barney Adams in which he addresses the seasonality    17:57:06

Page 305

1  effects, particularly in that time of the year.    17:57:11
2  BY MR. BESSETTE:    17:57:11
3      Q.   Is it your testimony, Professor, that    17:57:11
4  this internal Lehman commitment committee memo was    17:57:13
5  public or otherwise made available to Adams Golf?    17:57:15
6      A.   Let me restate that.    17:57:18
7        MR. COLLINS: That's also asked and    17:57:20
8  answered.    17:57:20
9        Go ahead.    17:57:20
10 BY THE WITNESS:    17:57:20
11     A.   I don't know whether it was available    17:57:22
12 to Adams Golf.    17:57:23
13 BY MR. BESSETTE:    17:57:24
14     Q.   Well, you said in your testimony out    17:57:25
15 there. I just wanted to know what you meant by out    17:57:27
16 there.    17:57:30
17     A.   It was in existence.    17:57:30
18     Q.   Okay. Did you study the life cycle of    17:57:31
19 the Tight Lies club when doing your work in this    18:00:02
20 case?    18:00:05
21     A.   What do you mean by the life cycle?    18:00:05
22     Q.   Are you aware that golf clubs    18:00:06
23 generally have life cycles?    18:00:10
24     A.   Am I aware now or was I aware then?    18:00:13

77 (Pages 302 to 305)

Page 306

| | | | |
|--|--|--|--|
1    Q.    Well, when you did your report.    18:00:15
2    A.    From reading the documents, I was    18:00:17
3    aware of what the documents say regarding life    18:00:19
4    cycles.    18:00:24
5    Q.    No independent knowledge before you    18:00:25
6    started your work in this case about life cycles of    18:00:32
7    various golf clubs or golf products?    18:00:35
8    A.    No.    18:00:38
9    Q.    Do you know what the lifespan was of    18:00:38
10    the Tight Lies club?    18:00:58
11        MR. COLLINS:  Vague and ambiguous.    18:01:00
12    BY THE WITNESS:    18:01:00
13    A.    I don't know.    18:01:05
14    BY MR. BESSETTE:    18:01:06
15    Q.    You are aware that the company    18:01:06
16    produced a newer one, a Tight Lies 2 I think or    18:01:08
17    whatever they called it, beyond the original, they    18:01:13
18    made a series of clubs?    18:01:16
19    A.    Yes, I am aware that they were -- I    18:01:16
20    believe there was more than just the two.  I believe    18:01:19
21    there were additional    18:01:21
22    Q.    Right.  If Adams Golf had continued to    18:01:24
23    produce only the original Tight Lies, do you have an    18:01:28
24    opinion here what would have happened to sales of    18:01:32

Page 308

1    due diligence investigation by the underwriters in    18:02:26
2    connection with the IPO of Adams Golf was reasonable    18:02:30
3    and adequate?    18:02:34
4    A.    Yes.    18:02:35
5    Q.    And do you have any intention of    18:02:35
6    offering any opinion on that question?    18:02:37
7    A.    No.    18:02:39
8    Q.    Coming back to the drafting process    18:02:39
9    that you used in preparing both your initial report    18:02:46
10    and your rebuttal report.  From the time that you    18:02:49
11    first began working on this matter until we started    18:02:55
12    the deposition this morning, do you have an estimate    18:02:58
13    of how many hours you've spent on this matter?    18:03:01
14    A.    Yeah.  From what was the beginning    18:03:04
15    time, I'm sorry?    18:03:09
16    Q.    Whenever you started.    18:03:10
17    A.    Whenever I started the matter until    18:03:13
18    now?  Approximately, I believe it is something like    18:03:14
19    100 hours.    18:03:17
20    Q.    And has anybody else connected with    18:03:17
21    the law school provided any research or other    18:03:19
22    assistance to you in connection with your work?    18:03:22
23    A.    I have had -- I have been working    18:03:24
24    mostly at home.  I have had difficulty downloading    18:03:27

Page 307

1    the original Tight Lies over time?    18:01:35
2        MR. COLLINS:  Outside the scope.    18:01:37
3    BY THE WITNESS:    18:01:38
4    A.    No.    18:01:38
5    BY MR. BESSETTE:    18:01:39
6    Q.    Do you have any opinion on what would    18:01:41
7    have been the impact of gray marketing on the    18:01:43
8    continued sales of only the original Tight Lies    18:01:48
9    clubs if that's all the clubs Adams Golf had?    18:01:51
10    A.    I would be really in the realm of    18:01:56
11    speculation to answer that question    18:01:59
12        MR. BESSETTE:  We are good.  I am done    18:02:00
13    for now.  Thanks.    18:02:03
14        EXAMINATION    18:02:03
15    BY MR. GLUCKOW:    18:02:03
16    Q.    Professor Ochoa, Paul Gluckow, I'm    18:02:03
17    with Simpson Thacher.  My firm represents the    18:02:09
18    underwriter defendants in this matter.    18:02:11
19    I take it from your report you    18:02:13
20    have had an opportunity to review Mr. Miller's    18:02:17
21    report as well?    18:02:20
22    A.    Correct.    18:02:21
23    Q.    And you understand that Mr. Miller is    18:02:21
24    prepared to offer testimony concerning whether the    18:02:24

Page 309

1    PDF files, my secretary has assisted me in    18:03:30
2    delivering PDF files.    18:03:35
3    Q.    And other than secretarial assistance,    18:03:36
4    have you had anybody doing any actual research to    18:03:39
5    help you?    18:03:41
6    A.    No, no.    18:03:41
7    Q.    Who wrote your initial --    18:03:42
8    A.    Actually, let me back up.    18:03:44
9    Q.    Yeah.    18:03:44
10    A.    I have asked a librarian to pull some    18:03:46
11    documents for me.  But not doing actual research,    18:03:49
12    just pulling documents.    18:03:52
13    Q.    To pull documents that you identified    18:03:52
14    yourself?    18:03:57
15    A.    That I had previously identified, yes.    18:03:57
16    Q.    Who wrote your initial report?    18:03:58
17    A.    I did.    18:03:59
18    Q.    Is every word in that initial report    18:03:59
19    yours?    18:04:02
20    A.    Yes.    18:04:02
21    Q.    And did anyone other than yourself    18:04:02
22    have any input on the initial report?    18:04:05
23    A.    I had discussions with Mr. Collins    18:04:10
24    about the questions that I was being asked.  I also    18:04:13

Page 322

1  reviewing materials, correct?        18:15:43
2      A.   I prepared handwritten notes as I was  18:15:44
3  reviewing the exhibits and other materials in    18:15:47
4  connection with this.            18:15:52
5      Q.   So those are certainly part of the    18:15:52
6  work, the work product that you generated in terms  18:15:54
7  of your consideration of the substantive matters as  18:15:57
8  part of your engagement, correct?        18:16:01
9      A.   I don't think of them as product. I    18:16:04
10  think of them as a way of indexing the information  18:16:06
11  that I reviewed.            18:16:09
12      Q.   They reflect your thought process,    18:16:09
13  right?                18:16:12
14      A.   Process, yes.          18:16:12
15      Q.   And did you refer to those notes as    18:16:13
16  you were preparing your report?        18:16:17
17      A.   Yes.            18:16:18
18      Q.   So you obviously relied on them,    18:16:18
19  correct?                18:16:23
20      A.   I think it's a strange question. The  18:16:23
21  notes were a way of my -- offering me a way to    18:16:28
22  reengage with the exhibits themselves.      18:16:33
23      Q.   Right. And you looked at them as you  18:16:34
24  were working on your report?        18:16:37

Page 323

1      A.   Yes.            18:16:38
2      Q.   Have you ever, while you were a    18:16:39
3  lawyer, had any complaints lodged against you in  18:16:48
4  connection with your professional work?      18:16:52
5      A.   No.            18:16:54
6      Q.   Have you ever been involved in any    18:16:54
7  lawsuits? Have you ever been sued?      18:16:59
8      A.   Not that I know of.        18:17:01
9      Q.   Have you ever been subject to any    18:17:03
10  disciplinary proceedings in connection with being an 18:17:08
11  attorney or otherwise?          18:17:11
12      A.   No.            18:17:12
13      Q.   Any criminal record?      18:17:12
14      A.   No.            18:17:13
15      Q.   Ever been arrested?        18:17:14
16      A.   No.            18:17:18
17      Q.   In preparing your report, did you rely 18:17:18
18  in any way on the references in the documents to    18:17:49
19  possible transshipments going through either King    18:17:55
20  Par or Manatee?            18:17:59
21      A.   In preparing my reports, did I rely on 18:18:00
22  documents that referred to King Par or Manatee Golf? 18:18:03
23  If they were in the documents, I did.      18:18:07
24      Q.   And do you recall those names, King    18:18:09

Page 324

1  Par and Manatee?            18:18:12
2      A.   Yes.            18:18:13
3      Q.   And do you recall that there was    18:18:14
4  discussion in the documents about whether those two  18:18:17
5  authorized retailers had been involved in potential  18:18:20
6  transshipments?            18:18:27
7      A.   Can you ask that question again? I    18:18:28
8  was sort of flipping through the catalog in my head  18:18:32
9  of the documents.            18:18:33
10      Q.   Sure. Do you recall that there was    18:18:33
11  discussion in the documents about possible      18:18:37
12  transshipments going through King Par and Manatee?  18:18:39
13      A.   I don't recall right now.      18:18:42
14      Q.   In what way, if you recall, did you    18:18:46
15  rely on Manatee's or King Par's possibly involvement 18:18:49
16  as transshippers in preparing your report?    18:18:59
17      A.   I don't recall right now.      18:19:02
18      Q.   Do you recall any way in which Manatee 18:19:03
19  or King Par influenced your opinions in this matter? 18:19:07
20      A.   I don't recall right now.      18:19:12
21      Q.   In your report, your initial report    18:19:19
22  that is, on page 21.          18:19:21
23          MR. COLLINS: Now you are referring to 18:19:30
24  Exhibit 303, the final report?        18:19:32

Page 325

1          MR. GLUCKOW: Correct. I'm sorry.    18:19:34
2  BY MR. GLUCKOW:            18:19:34
3      Q.   The final report, 303, page 21,    18:19:36
4  Paragraph 30. The first line of Paragraph 30 says,  18:19:37
5  "At the time of its initial public offering,    18:19:40
6  Callaway had disclosed." I am assuming the "its" is 18:19:44
7  Adams, right?            18:19:44
8      A.   Yes.            18:19:44
9      Q.   Okay. At the time of Adam's public    18:19:45
10  offering, Callaway had disclosed, and then you have 18:19:48
11  a disclosure from a Callaway public offering,    18:19:52
12  correct?
13          MR. COLLINS: No.
14  BY THE WITNESS:
15      A.   I'm sorry.
16  BY MR. GLUCKOW:
17      Q.   The Callaway 10K?        18:19:52
18      A.   Yes            18:19:53
19      Q.   Correct?          18:19:54
20      A.   Yes.            18:19:54
21      Q.   And then after the block quote, you    18:19:57
22  say that, "This is notable, because in determining  18:20:00
23  whether a given disclosure is necessary, it is    18:20:03
24  common to consult the risk factors described by    18:20:18

82 (Pages 322 to 325)

Page 326

1   others in a given market segment when drafting    18:20:21
2   disclosure documents, such as the company's    18:20:24
3   prospectus " Do you see that?    18:20:27
4       A.   Yes.    18:20:28
5       Q.   What was or is the basis for your    18:20:29
6   statement as to what is common in terms of drafting    18:20:33
7   risk factors?    18:20:35
8       A.   My experience at Clifford Chance.    18:20:35
9       Q.   And what was that experience at    18:20:38
10  Clifford Chance?    18:20:40
11          MR. COLLINS:  Asked and answered.    18:20:40
12  BY THE WITNESS:    18:20:40
13      A.   We have talked about my experience at    18:20:41
14  Clifford Chance.    18:20:41
15  BY MR. GLUCKOW:    18:20:41
16      Q.   Oh, so it's what we talked about    18:20:44
17  before when you were a summer associate in London    18:20:45
18  working on the --    18:20:46
19      A.   No.  I also worked at Clifford Chance    18:20:46
20  after that time.    18:20:48
21      Q.   And did you have any involvement in    18:20:49
22  advising clients? I think we have already    18:20:51
23  established, in fact, that you did not have any    18:20:54
24  involvement in advising clients on what should or    18:20:56

Page 327

1   should not go into risk factors when drafting SEC    18:20:59
2   files, correct?    18:21:02
3       A.   I see a distinction between advising    18:21:02
4   clients and observing others advising clients.    18:21:05
5       Q.   And you saw others advising clients?    18:21:08
6       A.   Yes.    18:21:10
7       Q.   And what did you see?    18:21:11
8       A.   What do you mean?    18:21:13
9       Q.   Well, do you consider yourself an    18:21:16
10  expert on advising clients on what should or should    18:21:18
11  not go in an SEC file?    18:21:22
12      A.   No.    18:21:24
13      Q.   Okay.  And do you consider yourself an    18:21:24
14  expert on what risk factors should or should not go    18:21:29
15  in an SEC filing?    18:21:37
16      A.   No.    18:21:40
17      Q.   In fact, you have no knowledge one way    18:21:40
18  or the other whether the company or the underwriters    18:21:47
19  or the company's lawyers or the underwriter's    18:21:50
20  lawyers or anyone else involved in drafting the    18:21:53
21  prospectus actually looked at the Callaway 10K,    18:21:56
22  isn't that true?    18:22:01
23          MR. COLLINS:  I need that question    18:22:01
24  back, please.  Say it again, please.    18:22:01

Page 328

1           MR. GLUCKOW:  Read it back.    18:22:01
2           (Record read )    18:22:01
3   BY THE WITNESS:    18:22:19
4       A.   I don't have actual knowledge, no.    18:22:19
5   BY MR. GLUCKOW:    18:22:23
6       Q.   I am sure you agree that the mention    18:22:23
7   of a risk in one company's disclosure, which may be    18:22:29
8   true for that company, is in no way determinative of    18:22:35
9   whether that same risk should go into another    18:22:38
10  company's disclosure, correct?    18:22:41
11          MR. COLLINS:  Outside the scope.    18:22:43
12          Go ahead.    18:22:44
13  BY THE WITNESS:    18:22:44
14      A.   Not alone  Correct    18:22:45
15  BY MR. GLUCKOW:    18:22:45
16      Q.   Pardon me?    18:22:45
17      A.   Not alone.  Correct.    18:22:45
18      Q.   Because every situation is different,    18:22:47
19  correct?    18:22:50
20      A.   Correct    18:22:50
21      Q.   And what is appropriate for one    18:22:50
22  company may be inappropriate for another company,    18:22:53
23  correct?    18:22:56
24          MR. COLLINS:  Outside the scope.    18:22:56

Page 329

1           Go ahead.    18:22:58
2   BY THE WITNESS:    18:22:58
3       A.   Now we are into an area that I don't    18:22:58
4   feel comfortable commenting on.    18:23:00
5   BY MR. GLUCKOW:    18:23:00
6       Q.   Okay.    18:23:04
7           MR. COLLINS:  Counsel, you have    18:23:04
8   one minute.    18:23:05
9           MR. GLUCKOW:  I have nothing further.    18:23:09
10          MR. COLLINS:  I have one question    18:23:12
11          EXAMINATION    18:23:12
12  BY MR. COLLINS:    18:23:12
13      Q.   Do you recall Exhibit 7 to the Grace    18:23:15
14  report?    18:23:15
15      A.   Yes.    18:23:20
16      Q.   You can pull it out, but you don't    18:23:40
17  need to  If you recall it?    18:23:40
18      A.   I recall it  If we can pull it out,
19  though, so I can have it in my hands, that would be
20  great.
21      Q.   Sure  Does this support your view    18:23:44
22  that gray marketing was increasing and was a serious    18:23:46
23  risk for the IPO?    18:23:51
24      A.   Yes    18:23:55

83 (Pages 326 to 329)