# PATCHIN

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.      :   CONSOLIDATED

SECURITIES LITIGATION        :   C.A. NO. 99-371 KAJ

------------------------------X

ORAL DEPOSITION OF STEPHEN R. PATCHIN

Tuesday, June 13, 2006

The oral deposition of STEPHEN R. PATCHIN was held at the law offices of Akin Gump Strauss Hauer & Feld, LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas, from 9:35 a.m. to 11:53 a.m., before Jamie K. Israelow, a Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter, Certified Realtime Reporter and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000     (888)777-6690

Page 14

| Time | # | Speaker | Text |
|---|---|---|---|
| 09:46:14 | 1 | A | Okay. |
| 09:46:22 | 2 | Q | Can you identify this for me? |
| 09:46:24 | 3 | A | It appears to be a memo from the desk |
| 09:46:26 | 4 | | of Barney Adams to members of the board of |
| 09:46:33 | 5 | | directors on that date. I'm assuming that's all |
| 09:46:36 | 6 | | of the members of the board of directors. I don't |
| 09:46:38 | 7 | | know for sure. And it's a financial report, |
| 09:46:41 | 8 | | purports to be a financial report that Jim Farrell |
| 09:46:44 | 9 | | gave to Lehman Brothers. |
| 09:46:49 | 10 | Q | Do you remember receiving it around |
| 09:46:52 | 11 | | the end of April, April 22nd, 1998? |
| 09:46:55 | 12 | A | We get, unfortunately, thousands of |
| 09:47:00 | 13 | | documents out of Adams Golf. If it says I got it |
| 09:47:03 | 14 | | and it has Barney's initials on it, then I got it. |
| 09:47:06 | 15 | | No, I have no recollection of receiving it in |
| 09:47:14 | 16 | | 1998. |
| 09:47:14 | 17 | Q | Take a look at -- oh, this is -- do |
| 09:47:17 | 18 | | you see the bottom where it says "Adams," and it |
| 09:47:20 | 19 | | has a number? |
| 09:47:21 | 20 | A | Uh-huh. |
| 09:47:21 | 21 | Q | It says: Adams 003992. |
| 09:47:34 | 22 | A | I've got 008283, 84, 89, 90. |
| 09:47:38 | 23 | Q | Just a second. |
| 09:47:41 | 24 | | MS. FOX: Off the record. |

Page 15

| Time | # | Speaker | Text |
|---|---|---|---|
| 09:47:41 | 1 | | (An off-the-record discussion |
| 09:48:51 | 2 | | was held from 9:47 to 9:48.) |
| 09:48:52 | 3 | | MS. BRANNEN: So 3992. |
| 09:48:54 | 4 | Q | (By Ms. Fox) Are you looking at |
| 09:48:57 | 5 | | 3992? |
| 09:48:58 | 6 | A | Yes. |
| 09:48:58 | 7 | Q | That purports to be financial |
| 09:49:00 | 8 | | projections for the years ended '98, '99, 2000, |
| 09:49:05 | 9 | | 2001, 2002. |
| 09:49:08 | 10 | A | Okay. |
| 09:49:08 | 11 | Q | Do you remember looking at that as |
| 09:49:12 | 12 | | the -- as a document that had been given to the |
| 09:49:16 | 13 | | underwriters, projections for Adams Golf? |
| 09:49:18 | 14 | | MR. KANE: Objection -- |
| 09:49:19 | 15 | A | No. I mean -- |
| 09:49:20 | 16 | | MR. KANE: Objection, |
| 09:49:21 | 17 | | foundation. |
| 09:49:27 | 18 | A | Okay. So he -- I've never done this |
| 09:49:29 | 19 | | before. There's obviously no one to rule. |
| 09:49:32 | 20 | Q | (By Ms. Fox) If -- |
| 09:49:32 | 21 | A | Okay. He objects and I answer? |
| 09:49:34 | 22 | Q | Yes. |
| 09:49:35 | 23 | A | I do not recall looking at this in |
| 09:49:41 | 24 | | '98. I'm sure I did. |

Page 16

| Time | # | Speaker | Text |
|---|---|---|---|
| 09:49:42 | 1 | Q | And do you remember any reaction you |
| 09:49:45 | 2 | | may have had to the magnitude of these |
| 09:49:45 | 3 | | projections? |
| 09:49:48 | 4 | | MR. KANE: Same objection. |
| 09:49:55 | 5 | A | I do not recall any reaction I might |
| 09:49:58 | 6 | | have had at the time, no. |
| 09:50:02 | 7 | Q | (By Ms. Fox) Were you -- when did |
| 09:50:03 | 8 | | you become aware that Adams Golf was planning |
| 09:50:06 | 9 | | to -- to go public? Do you know that? |
| 09:50:08 | 10 | A | I don't know that. I don't remember. |
| 09:50:15 | 11 | Q | Do you remember how you found out? |
| 09:50:17 | 12 | A | I would say it was probably through |
| 09:50:19 | 13 | | either a -- it would be a combination of |
| 09:50:21 | 14 | | discussions with Barney and board meetings. |
| 09:50:24 | 15 | Q | Were you in favor of that or against |
| 09:50:28 | 16 | | it, or had -- |
| 09:50:29 | 17 | A | I was in favor of investigating the |
| 09:50:34 | 18 | | possibility of going public. |
| 09:50:35 | 19 | Q | You weren't immediately gung ho, this |
| 09:50:39 | 20 | | is what we ought to do? |
| 09:50:40 | 21 | A | No. |
| 09:50:40 | 22 | Q | And why not? |
| 09:50:42 | 23 | A | I'm a cautious person. |
| 09:50:47 | 24 | Q | And as a cautious person, you don't |

Page 17

| Time | # | Speaker | Text |
|---|---|---|---|
| 09:50:48 | 1 | | remember looking at these projections? |
| 09:50:53 | 2 | | MR. KANE: Objection, asked |
| 09:50:55 | 3 | | and answered. |
| 09:50:55 | 4 | A | Not -- and no, I still don't remember |
| 09:50:57 | 5 | | looking. I don't remember now looking at them |
| 09:51:00 | 6 | | then. |
| 09:51:00 | 7 | Q | (By Ms. Fox) Do you remember any |
| 09:51:03 | 8 | | concern about the level of the projections that |
| 09:51:05 | 9 | | were given to the underwriters? |
| 09:51:08 | 10 | | MR. KANE: Objection, asked |
| 09:51:10 | 11 | | and answered, foundation. |
| 09:51:13 | 12 | A | I -- I recognized -- do I -- I'm |
| 09:51:18 | 13 | | sorry. Can you repeat the question? |
| 09:51:20 | 14 | Q | (By Ms. Fox) Do you remember, apart |
| 09:51:23 | 15 | | from this document, having any concern about the |
| 09:51:25 | 16 | | level of projections that Adams Golf was giving to |
| 09:51:30 | 17 | | the underwriters? |
| 09:51:32 | 18 | A | I have -- no, I don't remember that, |
| 09:51:39 | 19 | | sitting here today. |
| 09:51:39 | 20 | Q | Do you remember who the underwriters |
| 09:51:42 | 21 | | were? |
| 09:51:42 | 22 | A | I believe it was Lehman Brothers. |
| 09:51:44 | 23 | Q | Any -- |
| 09:51:45 | 24 | A | Among others. There was a list of |

**Page 18**

| Time | Line | Text |
|---|---|---|
| 09:51:46 | 1 | them, but that's the only one that strikes me |
| 09:51:49 | 2 | today, simply because there's a representative of |
| 09:51:52 | 3 | Lehman Brothers sitting here today. |
| 09:51:53 | 4 | Q   Well, he represents them all, I |
| 09:51:55 | 5 | think. |
| 09:51:55 | 6 | MR. KANE: I do. |
| 09:51:58 | 7 | A   Okay. |
| 09:51:58 | 8 | Q   (By Ms. Fox) Did you -- did you have |
| 09:51:59 | 9 | any dealings with the underwriters at the time of |
| 09:52:02 | 10 | the IPO or before? |
| 09:52:04 | 11 | A   No. |
| 09:52:04 | 12 | Q   Did you go to any of the drafting |
| 09:52:08 | 13 | sessions for the registration statement, the |
| 09:52:12 | 14 | prospectus? |
| 09:52:14 | 15 | A   No. |
| 09:52:14 | 16 | Q   Do you remember looking at any of the |
| 09:52:17 | 17 | drafts of the wording of the registration |
| 09:52:24 | 18 | statement and prospectus, registration statement |
| 09:52:30 | 19 | which contains the prospectus? |
| 09:52:32 | 20 | A   I have a recollection of looking at |
| 09:52:35 | 21 | what I remember to be the final copy before it |
| 09:52:45 | 22 | went out. It was at a board meeting, just before |
| 09:52:49 | 23 | the board meeting, just before the registration |
| 09:52:51 | 24 | statement or just before the -- whatever you call |

**Page 19**

| Time | Line | Text |
|---|---|---|
| 09:52:53 | 1 | it -- prospectus went out. |
| 09:52:56 | 2 | Q   Did you sign it? |
| 09:52:56 | 3 | A   I signed whatever I was supposed to |
| 09:52:58 | 4 | sign. I don't know if I signed a registration |
| 09:53:02 | 5 | statement and prospectus or documentation related |
| 09:53:05 | 6 | thereto. |
| 09:53:06 | 7 | Q   What did you do to make sure what you |
| 09:53:07 | 8 | were signing was accurate? |
| 09:53:12 | 9 | A   Well, there were a number of meetings |
| 09:53:15 | 10 | leading up to -- a number of board meetings |
| 09:53:18 | 11 | leading up to the actual point in time when the |
| 09:53:21 | 12 | registration statement became active, and I recall |
| 09:53:24 | 13 | a number of sessions where directors asked a |
| 09:53:30 | 14 | number -- a number of quite long sessions to the |
| 09:53:36 | 15 | point it was irritating Barney, but asked a number |
| 09:53:42 | 16 | of pointed questions to management to make sure |
| 09:53:46 | 17 | the -- we were comfortable putting our names on -- |
| 09:53:50 | 18 | on that document, but I don't remember any |
| 09:53:52 | 19 | specific questions that were asked. But I do |
| 09:53:55 | 20 | remember some arduous board meetings. |
| 09:53:58 | 21 | Q   What was irritating Barney? |
| 09:54:00 | 22 | A   Oh, just -- Barney has just got a |
| 09:54:03 | 23 | personality of: Hey, I've taken care of this. |
| 09:54:06 | 24 | Why are you questioning me on this? That's just |

**Page 20**

| Time | Line | Text |
|---|---|---|
| 09:54:08 | 1 | Barney. |
| 09:54:14 | 2 | Q   You don't remember any specific |
| 09:54:15 | 3 | questions that irritated him? |
| 09:54:34 | 4 | A   No. |
| 09:54:50 | 5 | MS. FOX: Can we go off the |
| 09:54:51 | 6 | record a second? |
| 09:54:51 | 7 | (An off-the-record discussion |
| 09:56:09 | 8 | was held from 9:54 to 9:57.) |
| 09:56:09 | 9 | (Deposition Exhibit 283 |
| 09:56:10 | 10 | was marked.) |
| 09:57:25 | 11 | Q   (By Ms. Fox) Mr. Patchin, |
| 09:57:28 | 12 | Exhibit 283 is Bates-stamped UND 02964 -- |
| 09:57:34 | 13 | A   Okay. |
| 09:57:34 | 14 | Q   -- to 2970. |
| 09:57:34 | 15 | A   Okay. |
| 09:57:39 | 16 | MS. FOX: Is that the right -- |
| 09:57:42 | 17 | MR. KANE: (Attorney nods.) |
| 09:57:43 | 18 | Q   (By Ms. Fox) Can you identify it for |
| 09:57:46 | 19 | me? |
| 09:57:46 | 20 | A   It appears to be the minutes of the |
| 09:57:48 | 21 | special meeting of the board of directors of Adams |
| 09:57:50 | 22 | Golf which took place on April 29 of '98. |
| 09:57:53 | 23 | Q   And does it reflect that you were |
| 09:57:57 | 24 | there? |

**Page 21**

| Time | Line | Text |
|---|---|---|
| 09:57:57 | 1 | A   Yes. |
| 09:57:58 | 2 | Q   Do you remember being there? |
| 09:58:11 | 3 | A   Yes. |
| 09:58:31 | 4 | Q   Can you tell me what the major |
| 09:58:33 | 5 | resolutions of the board were on this date? |
| 09:58:36 | 6 | MS. BRANNEN: Objection. The |
| 09:58:37 | 7 | document speaks for itself. |
| 09:58:39 | 8 | MS. FOX: Okay. |
| 09:58:40 | 9 | Q   (By Ms. Fox) Do you remember what |
| 09:58:41 | 10 | was -- what was decided on this date? |
| 09:58:43 | 11 | A   I do not remember. I'd have to look |
| 09:58:45 | 12 | at the -- the minutes of the meeting and -- and |
| 09:58:50 | 13 | basically read back what it says. I -- you know, |
| 09:58:58 | 14 | there have been a lot of meetings. |
| 09:59:06 | 15 | Q   Take a look at the page that says: |
| 09:59:09 | 16 | Minutes of Special Meeting of Board of Directors, |
| 09:59:13 | 17 | Page 4. |
| 09:59:14 | 18 | A   Okay. |
| 09:59:15 | 19 | Q   It's -- |
| 09:59:16 | 20 | MS. BRANNEN: Bates number |
| 09:59:18 | 21 | 2967? |
| 09:59:20 | 22 | MS. FOX: 2967, that's |
| 09:59:22 | 23 | correct. |
| 09:59:23 | 24 | A   Okay. |

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

63c347f2-d7c8-4fe6-beef-b6293a6cef6a

Page 22

```
09:59:23  1     Q    (By Ms Fox) The second-to-the-last
09:59:26  2  paragraph
09:59:26  3     A    Resolved?
09:59:27  4     Q    Yes  Do you remember being put on
09:59:33  5  the compensation plan committee of the board at
09:59:36  6  that point?
09:59:39  7     A    I remember that I am on the
09:59:42  8  compensation committee. I remember that I have
09:59:44  9  been on the compensation committee for quite some
09:59:46 10  time. and I don't think I've ever been off the
09:59:49 11  compensation committee since I was put on
09:59:52 12         Do I remember this is the
09:59:53 13  first time I was put on? No  Sorry
09:59:56 14     Q    Did you think you were on the
09:59:59 15  compensation committee when the company was
10:00:01 16  private?
10:00:01 17     A    No. I'm saying --
10:00:02 18     Q    So ever since the company went
10:00:04 19  public, you've been on the compensation committee?
10:00:07 20     A    Correct
10:00:07 21         MS. BRANNEN: And objection
10:00:08 22  This is slightly before the company went public
10:00:13 23         THE WITNESS: Okay
10:00:31 24     Q    (By Ms Fox) Okay  I'm done with
```

Page 23

```
10:00:31  1  that
10:00:44  2         Do you remember hearing about
10:00:47  3  any problem with gray marketing before the IPO?
10:00:52  4         MS. BRANNEN: Objection,
10:00:56  5  vague.
10:00:56  6     A    You know, a -- when --
10:00:58  7     Q    (By Ms. Fox) Well, before --
10:00:59  8     A    At what point in time?
10:01:01  9     Q    -- the IPO.
10:01:03 10     A    Anytime before the IPO?
10:01:05 11     Q    Well, we're talking really about 1998
10:01:10 12  until July 9th.
10:01:11 13     A    I recall that there was a lawsuit
10:01:20 14  against -- I can't remember the name of the
10:01:21 15  company -- Costco  Whether that was around the
10:01:24 16  time of the IPO, I can't recall.
10:01:27 17     Q    Do you remember the reason for the
10:01:29 18  lawsuit?
10:01:29 19     A    I remember that Costco was
10:01:31 20  actually -- we were trying to discover how Costco
10:01:34 21  was getting out product in that they weren't one
10:01:37 22  of our correct buyers.
10:01:42 23     Q    And were you aware of where Adams
10:01:45 24  Golf clubs were found in Costco?
```

Page 24

```
10:01:47  1         MR. KANE: Vague. Time
10:01:54  2  period.
10:01:54  3     A    Yes, I was aware that at some point
10:01:56  4  in time Costco was -- well, let me put it this
10:02:01  5  way: I was told that. At that point in time, I
10:02:04  6  didn't even know who Costco was. They don't exist
10:02:08  7  in Texas -- or they didn't at the time, so --
10:02:11  8     Q    (By Ms. Fox) So -- but do you
10:02:13  9  remember where?
10:02:16 10     A    No, I don't. I just remember the
10:02:18 11  name Costco. I remember that they were some kind
10:02:20 12  of discount warehouse.
10:02:21 13     Q    Did the board vote on whether or not
10:02:26 14  to file suit, or was that Barney's decision or
10:02:30 15  someone's in the company?
10:02:31 16     A    I don't remember. I would assume
10:02:32 17  that it was brought up to the board, but that
10:02:37 18  might be an overly broad assumption. I -- I -- I
10:02:41 19  know that there was a lawsuit. Beyond that, I
10:02:43 20  don't have a whole lot of recollection about it.
10:02:47 21     Q    How about with regard to press
10:02:50 22  releases? Did the board -- was the board notified
10:02:55 23  when there would be a press release?
10:02:57 24     A    Generally, we would receive a press
```

Page 25

```
10:02:58  1  release about the same time as it was sent to the
10:03:04  2  media.
10:03:04  3     Q    So then you had not voted to -- to
10:03:07  4  issue a press release?
10:03:08  5         MS. BRANNEN: Objection,
10:03:10  6  mischaracterizes testimony
10:03:12  7     A    I don't recall whether or not Adams
10:03:16  8  Golf board ever voted on any press release. We
10:03:18  9  may have voted on some and not on others. I don't
10:03:23 10  recall.
10:03:23 11     Q    (By Ms. Fox) Was there any kind of
10:03:25 12  policy that you were aware of when a press release
10:03:29 13  would be issued?
10:03:30 14     A    Not that I'm aware of.
10:03:32 15     Q    Was -- would you characterize press
10:03:37 16  releases being issued as generally an important
10:03:39 17  issue?
10:03:41 18         MR. KANE: Objection, vague.
10:03:41 19         MS. BRANNEN: Objection,
10:03:44 20  vague.
10:03:44 21     A    Not necessarily
10:03:44 22     Q    (By Ms. Fox) What kind of instances
10:03:45 23  do you know of where Adams Golf issued press
10:03:54 24  releases?
```

## Page 26

10:03:54  1   A   They would issue press releases when
10:03:56  2   they would win some kind of competition among club
10:04:00  3   raters, so that they would generally talk about,
10:04:05  4   you know -- it would be marketing press releases.
10:04:07  5         After the IPO, there would be
10:04:10  6   financial press releases in terms of financial
10:04:13  7   statements or items of interest to the investing
10:04:19  8   community, so I would characterize them as both
10:04:24  9   types of items.
10:04:25 10         While they were private, not
10:04:28 11   so much. I don't think there was any financial
10:04:30 12   releases of information because it was a private
10:04:32 13   company
10:04:33 14         At the time we were going IPO
10:04:35 15   and forward, that's when those kind of started.
10:04:37 16   So generally before, it was about marketing
10:04:43 17   issues. My recollection.
10:04:46 18   Q   Did you have an understanding of
10:04:49 19   why -- why Barney wanted to sue Costco or to file
10:04:54 20   an action against Costco?
10:04:56 21   A   He wanted to figure out how they were
10:04:58 22   getting his clubs.
10:04:59 23   Q   Do you know if he was successful at
10:05:01 24   that?

## Page 27

10:05:01  1   A   I do not know.
10:05:04  2   Q   Let me show you this. This is
10:05:06  3   Exhibit 77.
10:05:20  4   A   It was right about the right time.
10:05:24  5   Q   Exhibit 77 is the press release that
10:05:27  6   was issued at the time Adams Golf filed the bill
10:05:31  7   of discovery against Costco?
10:05:33  8   A   Appears to be.
10:05:35  9   Q   And -- and this was sent to all the
10:05:38 10   board members, I assume?
10:05:39 11   A   I would assume that we received a
10:05:42 12   copy of that, yes.
10:05:44 13   Q   Do you remember any discussion of it
10:05:45 14   on the board or among board members?
10:05:49 15   A   I remember -- no, I really don't. I
10:05:55 16   do remember that Costco was discussed. I don't
10:05:58 17   remember whether we discussed a bill of discovery,
10:06:03 18   specifically. I remember that -- that the issue
10:06:07 19   was discussed, yeah.
10:06:11 20   Q   Do you remember the -- what was said
10:06:13 21   in those discussions?
10:06:16 22   A   I don't remember any specific -- I
10:06:18 23   can't quote anybody. I can say that generally we
10:06:21 24   wanted to find out -- you know, Barney was

## Page 28

10:06:24  1   irritated that a supplier -- that a nonqualified
10:06:33  2   buyer was -- was in -- had inventory of our
10:06:37  3   stock -- you know, of our clubs and wanted to find
10:06:40  4   out about it.
10:06:45  5   Q   Another topic. Did you prepare for
10:06:47  6   this deposition in any way?
10:06:49  7   A   Can you define "prepare"? My
10:06:53  8   attorney and I met yesterday, yeah.
10:06:55  9   Q   Okay.
10:06:55 10   A   And she kind of helped me get through
10:06:59 11   the timeline a little bit, but that's about all.
10:07:04 12   Q   Did you talk to Mr. Brown about his
10:07:06 13   deposition?
10:07:06 14   A   I did not. I specifically did not
10:07:09 15   because I knew that was a no-no, and I didn't want
10:07:13 16   to put him in an uncomfortable position.
10:07:16 17   Q   And I also assume you didn't read his
10:07:18 18   deposition?
10:07:18 19   A   No, I did not.
10:07:25 20   Q   Were you aware while you were on the
10:07:27 21   board that the SEC made comments about the IPO,
10:07:32 22   about the registration statement?
10:07:36 23   A   I don't know.
10:07:37 24         MS. BRANNEN: Objection, vague

## Page 29

10:07:38  1   on time.
10:07:40  2   Q   (By Ms Fox) Okay. As to -- the IPO
10:07:44  3   was in July.
10:07:46  4   A   Okay
10:07:46  5   Q   July 10th.
10:07:48  6   A   Okay
10:07:48  7   Q   The -- the first IPO documents or
10:07:53  8   registration statement documents were filed with
10:07:55  9   the SEC well before that. The SEC made comments.
10:08:00 10   A   Okay.
10:08:00 11   Q   My question is: Do you remember
10:08:02 12   receiving those comments?
10:08:03 13   A   I -- no. I don't remember that, no
10:08:11 14   Not to say I didn't receive them. I don't
10:08:13 15   remember it.
10:08:17 16   Q   Okay.
10:08:17 17         MS. FOX: Off the record
10:08:19 18   again.
10:08:19 19         (An off-the-record discussion
10:08:45 20         was held from 10:08 to 10:08.)
10:08:46 21         MS. FOX: This is Exhibit 164,
10:08:49 22   UND 02708 from Joe Hoffman to the file
10:09:02 23   Q   (By Ms. Fox) Mr. Patchin, have you
10:09:03 24   had a chance to -- to look at that document?

### Page 30

```
10:09:05  1     A    I've read the first sentence. Give
10:09:07  2  me a second.
10:09:40  3     Q    Okay.
10:09:42  4     A    Okay.
10:09:42  5     Q    Do you remember either seeing this
10:09:45  6  document itself or discussing these comments on
10:09:50  7  the board?
10:09:51  8     A    No to both questions.
10:09:55  9     Q    That doesn't refresh your
10:09:57 10  recollection as to any knowledge you had about the
10:10:00 11  SEC's comments?
10:10:05 12     A    No.
10:10:05 13     Q    Do you remember any discussion about
10:10:06 14  whether the file in front of me, the Costco issue,
10:10:14 15  should be mentioned in the prospectus?
10:10:17 16             MS. BRANNEN:  Objection,
10:10:18 17  vague.  Are you asking about board discussions?
10:10:20 18             Can you read the question
10:10:22 19  back.
10:10:22 20     Q    (By Ms. Fox)  I want to know if you
10:10:23 21  had any discussions a lot all with anybody about
10:10:26 22  whether the Costco issue should be mentioned in
10:10:29 23  the prospectus under Number 4.
10:10:32 24     A    I don't have any recollection of that
```

### Page 31

```
10:10:33  1  at all, no.
10:10:36  2     Q    Okay.
10:10:37  3     A    Doesn't mean it didn't happen.  I
10:10:39  4  just don't remember it.
10:10:45  5     Q    Okay.  And if I were to show you
10:10:47  6  letters written back to the SEC, would that
10:10:50  7  refresh your recollection of that?
10:10:51  8     A    Probably not.
10:10:53  9     Q    Okay.
10:10:53 10     A    You know, if there's a letter that
10:10:56 11  indicates that I was copied on them or received
10:10:59 12  copies of them --
10:11:04 13     Q    They do not --
10:11:04 14             MS. BRANNEN:  I'm sorry, Liz.
10:11:08 15     Q    (By Ms. Fox)  They do not reflect
10:11:08 16  that you received copies?
10:11:10 17             MS. BRANNEN:  Can we go off
10:11:10 18  the record for just a second?
10:11:10 19             (A recess was taken from
10:23:33 20              10:11 to 10:23.)
10:23:33 21     Q    (By Ms. Fox)  Mr. Patchin, this is
10:23:37 22  the S-1 that was filed on 7/10/98.
10:23:43 23     A    Okay.
10:23:43 24     Q    Which was the date of the IPO.
```

### Page 32

```
10:23:45  1  Taking a look at it, do you recognize it?
10:23:53  2     A    I recognize it as a -- yes,
10:23:56  3  relative -- my memory of -- I mean, this is --
10:24:00  4     Q    The actual document handed to you is
10:24:02  5  not good, I'm sure.  Do you remember signing it?
10:24:06  6     A    I remember signing a document which
10:24:09  7  allowed us to go public, yes.
10:24:14  8     Q    And what did -- I guess I asked you
10:24:16  9  this before, but now seeing it, are there any
10:24:18 10  parts that you made an investigation about
10:24:28 11  personally?
10:24:28 12     A    I'm sure that as a board, you know --
10:24:32 13  personally?  I have no recollection of that.  I'm
10:24:34 14  sure that as a board we sat and discussed almost
10:24:39 15  all this page by page, but I -- I got no -- no
10:24:42 16  recollection of any specific questions or comments
10:24:44 17  that were made, no.
10:24:45 18     Q    Did you yourself have any questions
10:24:48 19  about it or comments or -- or reservations?
10:24:52 20     A    I actively participate in board
10:24:55 21  meetings, so I'm sure I did, but I don't remember
10:24:59 22  them.
10:25:00 23     Q    Did you have discussions with
10:25:01 24  Mr. Brown about it?
```

### Page 33

```
10:25:03  1     A    Probably.  I don't -- I have no
10:25:06  2  recollection of that either.
10:25:07  3     Q    You don't remember anything.
10:25:13  4     A    No.  It --
10:25:16  5     Q    Okay.
10:25:16  6     A    You know, nothing with any
10:25:18  7  specificity.  I remember that we signed the
10:25:20  8  document.  I remember that we filed a document.  I
10:25:22  9  remember that we went public.  I remember that the
10:25:25 10  board had discussions about it.  I remember that,
10:25:27 11  you know, a number of discussions, you know,
10:25:34 12  and -- a number of meetings.  No, I don't remember
10:25:38 13  anything specifically.
10:25:39 14     Q    And I take it you were not involved
10:25:41 15  in drafting in any way?
10:25:43 16     A    No, I was not.
10:25:49 17     Q    Let's look at --
10:25:51 18             MS. BRANNEN:  Can we go off
10:25:52 19  the record for a second?
10:25:52 20             (An off-the-record discussion
10:25:52 21              was held from 10:25 to 10:28.)
10:28:19 22     Q    (By Ms. Fox)  This document, however,
10:28:20 23  does have page numbers, if you'll look on the
10:28:23 24  bottom.
```

Page 34

```
10:28:23  1      A    Okay.
10:28:25  2      Q    And I want you to take a look at
10:28:27  3  Page 6 --
10:28:32  4      A    Okay.
10:28:32  5      Q    -- Risk Factors.
10:28:35  6           Do you remember any discussion
10:28:36  7  at all about risk factors?
10:28:40  8      A    No, I don't.
10:28:45  9      Q    Had you ever dealt with an IPO before
10:28:48 10  at the time you did this one?
10:28:51 11      A    Define "dealt with." I've invested
10:28:55 12  in a number of them, but in terms of producing
10:28:57 13  them or being on the board of directors that was
10:28:59 14  involved with them, no.
10:29:00 15      Q    Or signing one?
10:29:01 16      A    No.
10:29:01 17      Q    This was the first one you'd ever
10:29:03 18  signed?
10:29:04 19      A    Yes.
10:29:04 20      Q    But as an investor, do you have an
10:29:07 21  understanding or can you tell me what your
10:29:08 22  understanding is of the importance of the risk
10:29:11 23  factors in a prospectus?
10:29:15 24      A    I'd certainly go to the risk factors.
```

Page 35

```
10:29:17  1  I think the primary thing I generally look at is
10:29:21  2  the common stock offered hereby involves a high
10:29:26  3  degree of risk. It says: See risk factors, so I
10:29:29  4  generally go back there. It's also -- you know,
10:29:32  5  initial public offerings are risky, so --
10:29:34  6      Q    So the risk factors are an important
10:29:37  7  part of the prospectus, as far as you're
10:29:40  8  concerned?
10:29:41  9      A    They're apparently important enough
10:29:43 10  that the SEC requires them to be in there, yeah.
10:29:45 11      Q    Do you remember looking at and
10:29:47 12  discussing the risk factors in here?
10:29:50 13      A    I do not have a recollection of that
10:29:53 14  sitting here today. I'm sure we did.
10:29:58 15      Q    Okay. I just wanted to ask you about
10:30:00 16  a couple of them.
10:30:12 17      A    Okay.
10:30:12 18      Q    Just look at Sources of Supply for a
10:30:16 19  moment.
10:30:16 20           MS. BRANNEN: What page?
10:30:17 21           MS. FOX: It's on Page 9.
10:30:25 22      A    Okay.
10:30:25 23      Q    (By Ms. Fox) Is the risk that there
10:30:30 24  may not be available component parts used in the
```

Page 36

```
10:30:33  1  manufacture of golf clubs a risk that would be
10:30:35  2  common to all golf manufacturers?
10:30:39  3      A    Let me -- let me read the whole thing
10:30:41  4  before I comment on that.
10:30:59  5           Okay. I've read it. I
10:31:01  6  believe that's probably accurate, yes, that it's
10:31:05  7  common, not only to this particular IPO, but to
10:31:08  8  other golf companies.
10:31:11  9      Q    And do you know if Adams Golf had
10:31:13 10  ever had a problem with not being able to get --
10:31:20 11  to get the component parts to make its golf clubs
10:31:23 12  in a timely fashion up to this time, from between
10:31:28 13  1990 and 1998 when you were on the board?
10:31:30 14      A    I don't recall that as being a
10:31:32 15  problem prior to the -- prior to this -- this
10:31:40 16  point in time, no.
10:31:41 17      Q    So -- so this was listed as a
10:31:45 18  material risk even though it had not hurt Adams
10:31:47 19  Golf in the past; is that correct?
10:31:52 20      A    Apparently.
10:31:56 21      Q    Is it -- is it your understanding
10:31:58 22  that a risk has to be material before it's listed
10:32:04 23  here?
10:32:06 24           MR. KANE: Objection, form.
```

Page 37

```
10:32:06  1           MS. BRANNEN: Objection, form.
10:32:08  2      A    Could you define the word "material"?
10:32:11  3  I'm not a lawyer.
10:32:11  4      Q    (By Ms. Fox) Well, lawyers --
10:32:12  5      A    Well, is --
10:32:13  6      Q    Lawyers have --
10:32:15  7      A    Let me ask this: Is the -- the
10:32:17  8  word "material," does it have a legal definition
10:32:21  9  that I'm maybe not understanding from my
10:32:23 10  understanding of the English language?
10:32:25 11      Q    I believe it does, although it's very
10:32:27 12  likely your understanding, and that is: Would it
10:32:30 13  matter to an individual shareholder in buying the
10:32:32 14  stock whether or not that thing was true? That's
10:32:36 15  what makes something material.
10:32:38 16      A    I would think that it would -- so --
10:32:41 17  so --
10:32:42 18           MR. KANE: Can we repeat the
10:32:43 19  question. I don't even know there's a question
10:32:43 20  pending.
10:32:46 21           THE WITNESS: There is, but
10:32:47 22  I've forgotten it.
10:32:47 23           MR. KANE: I just wanted to
10:32:48 24  make sure.
```

10 (Pages 34 to 37)

Page 58

| Time | Line | Text |
|---|---|---|
| 11:09:43 | 1 | They'll just get more. |
| 11:09:45 | 2 | Was there any discussion about |
| 11:09:46 | 3 | buying all the clubs out of Costco? |
| 11:09:49 | 4 | A   I don't recall. |
| 11:09:49 | 5 | Q   You don't remember that? |
| 11:09:50 | 6 | Do you remember any discussion |
| 11:09:52 | 7 | about compensating retailers? |
| 11:09:58 | 8 | A   Not in those words. Reading here, I |
| 11:10:00 | 9 | know that we talked about having the stand bag and |
| 11:10:05 | 10 | working with them and trying to give them some -- |
| 11:10:08 | 11 | some pluses to make them happy. |
| 11:10:11 | 12 | Q   Were you aware that there was a |
| 11:10:12 | 13 | price-matching policy in Canada before the IPO? |
| 11:10:17 | 14 | A   No, I wasn't aware of that. Well, |
| 11:10:20 | 15 | sitting here today, I'm not aware of that. I |
| 11:10:23 | 16 | don't remember that at all. |
| 11:10:24 | 17 | Q   Doesn't ring a bell at all? |
| 11:10:26 | 18 | A   Doesn't ring a bell. |
| 11:10:27 | 19 | Q   You can't say for certain that you |
| 11:10:29 | 20 | didn't know? |
| 11:10:30 | 21 | A   Correct. |
| 11:10:30 | 22 | Q   If you had, would that have made a |
| 11:10:36 | 23 | difference to you in -- in your assessment of the |
| 11:10:40 | 24 | risk section of the IPO if you'd had a knowledge |

Page 59

| Time | Line | Text |
|---|---|---|
| 11:10:43 | 1 | of that new policy, the price-matching policy? |
| 11:10:46 | 2 | MS. BRANNEN: Objection, |
| 11:10:48 | 3 | mischaracterizes prior testimony. I think we just |
| 11:10:52 | 4 | established he's not sure he knew at the time. |
| 11:10:58 | 5 | A   So -- I'm sorry. Could you repeat |
| 11:11:00 | 6 | the question? |
| 11:11:00 | 7 | Q   (By Ms. Fox) If you had known at the |
| 11:11:02 | 8 | time, and we don't know whether you knew or not -- |
| 11:11:04 | 9 | A   Right. |
| 11:11:04 | 10 | Q   -- but if you had known -- |
| 11:11:06 | 11 | A   At what time? At the time of the |
| 11:11:11 | 12 | IPO? |
| 11:11:11 | 13 | Q   Before the IPO. |
| 11:11:11 | 14 | A   Okay. |
| 11:11:11 | 15 | Q   -- that Adams had instituted a |
| 11:11:16 | 16 | price-matching policy with its Canadian |
| 11:11:16 | 17 | distributor who distributed all over Canada, would |
| 11:11:18 | 18 | that have made a difference in your assessment of |
| 11:11:24 | 19 | the risk section of the IPO? |
| 11:11:26 | 20 | MR. KANE: Objection, calls |
| 11:11:27 | 21 | for speculation. |
| 11:11:29 | 22 | Q   (By Ms. Fox) Well, do the best you |
| 11:11:31 | 23 | can. If you don't know, you don't know. |
| 11:11:36 | 24 | A   I don't know. You're telling me that |

Page 60

| Time | Line | Text |
|---|---|---|
| 11:11:40 | 1 | the buyback policy was at the same time as the |
| 11:11:45 | 2 | IPO? |
| 11:11:45 | 3 | Q   It was before the IPO. |
| 11:11:48 | 4 | A   I don't remember either one of them. |
| 11:11:49 | 5 | MS. BRANNEN: Objection. |
| 11:11:49 | 6 | I don't think she described it |
| 11:11:51 | 7 | as a buyback policy. |
| 11:11:52 | 8 | Q   (By Ms. Fox) It's a price-matching |
| 11:11:54 | 9 | policy. |
| 11:11:54 | 10 | A   Well, again, obviously, I apparently |
| 11:11:56 | 11 | have a memory issue. I can't remember the last |
| 11:12:06 | 12 | question. |
| 11:12:06 | 13 | Q   Okay. Do you remember discussing |
| 11:12:07 | 14 | this memo or this issue with Mr. Brown? |
| 11:12:14 | 15 | A   I don't remember that. I'm sure I |
| 11:12:15 | 16 | did. I don't remember any specific conversations |
| 11:12:18 | 17 | I had with Paul, no. |
| 11:12:19 | 18 | Q   Did you -- did you generally discuss |
| 11:12:25 | 19 | Adams Golf business? |
| 11:12:25 | 20 | A   That would be the correct word, |
| 11:12:27 | 21 | "generally." |
| 11:12:27 | 22 | MS. BRANNEN: Objection, |
| 11:12:28 | 23 | vague. Are you still referring to with Mr. Brown? |
| 11:12:30 | 24 | MS. FOX: Yeah. |

Page 61

| Time | Line | Text |
|---|---|---|
| 11:12:33 | 1 | A   I'm sorry. Yes, I would say, you |
| 11:12:40 | 2 | know, we'd go to lunch and we were talking about |
| 11:12:43 | 3 | the business of Royal. Okay. What's going on |
| 11:12:45 | 4 | here? What do you know about that? And Adams |
| 11:12:47 | 5 | would definitely percolate to the top of |
| 11:12:50 | 6 | conversations at times. |
| 11:12:53 | 7 | Q   (By Ms. Fox) Do you remember any |
| 11:12:54 | 8 | discussions with him about either gray marketing |
| 11:12:57 | 9 | or the Costco issue? |
| 11:13:01 | 10 | A   You know what, from the standpoint of |
| 11:13:03 | 11 | the fact -- no, I don't remember any specific |
| 11:13:06 | 12 | conversations with him about that. I'm sure they |
| 11:13:07 | 13 | were, and -- and I remember the engraving machine |
| 11:13:16 | 14 | issue and seeing a golf head club with the serial |
| 11:13:20 | 15 | numbers on it and thinking that's going to be a |
| 11:13:22 | 16 | pretty good way of catching these guys. So I seem |
| 11:13:24 | 17 | to remember that kind of a conversation with them. |
| 11:13:26 | 18 | Q   Now, Adams Golf later issued a press |
| 11:13:31 | 19 | release that said it had identified at least one |
| 11:13:33 | 20 | company that was involved in gray marketing. Do |
| 11:13:35 | 21 | you remember who that company was? |
| 11:13:36 | 22 | A   I do not. |
| 11:13:41 | 23 | Q   Did you ever know or -- |
| 11:13:43 | 24 | A   No. |

### Page 62

```
11:13:43  1    Q    You don't even remember if you knew
11:13:45  2    or not?
11:13:46  3    A    Huh-uh.
11:13:52  4    Q    This is Exhibit 56.
11:14:11  5    A    Okay.
11:14:11  6    Q    Exhibit 56 is an October 13th memo
11:14:16  7    from Barney Adams, again about the fourth quarter
11:14:18  8    and addressed to board members, including you.
11:14:23  9    A    Okay.
11:14:24 10    Q    Do you remember this memo?
11:14:25 11    A    No, not particularly. I don't even
11:14:28 12    see his initials on it. Are we sure it was even
11:14:33 13    sent? I mean, generally, when something comes
11:14:35 14    from Barney, he's either signed it or initialed
11:14:39 15    it.
11:14:40 16    Q    Well, he turned it over.
11:14:47 17    A    Oh, Barney turned it over, not: Turn
11:14:50 18    it over.
11:14:51 19    Q    In other words, it has Adams on the
11:14:53 20    bottom, which means it came in the production of
11:14:56 21    the company. Whether it was sent or not, I don't
11:14:58 22    know.
11:15:00 23    A    All right.
11:15:00 24    Q    But you don't remember --
```

### Page 63

```
11:15:02  1    A    No.
11:15:02  2    Q    -- any of this discussion?
11:15:03  3    A    Well --
11:15:05  4    Q    Okay.
11:15:05  5         MS. BRANNEN: Read the
11:15:07  6    document.
11:15:07  7         THE WITNESS: Okay.
11:15:10  8         (Witness perusing document.)
11:15:35  9    A    Okay. I've read it.
11:15:37 10    Q    (By Ms. Fox) In the second
11:15:38 11    paragraph, he says: Why is Q4 so weak?
11:15:41 12    A    Uh-huh.
11:15:42 13    Q    Terrible golf market, Costco, and to
11:15:45 14    a lesser degree competition.
11:15:46 15         And then in parentheses: We
11:15:48 16    planned for the competition. Costco and the
11:15:50 17    terrible market were more of a surprise.
11:15:53 18    A    Okay.
11:15:54 19    Q    Was it a surprise to you that Costco
11:15:58 20    raised its ugly head at this period?
11:16:03 21    A    Again, I don't -- I don't -- you
11:16:08 22    know, putting it in context sitting here today, I
11:16:10 23    don't specifically remember this memo. Did it
11:16:14 24    surprise me that Costco rose its ugly head?
```

### Page 64

```
11:16:17  1         MS. BRANNEN: Objection,
11:16:18  2    vague.
11:16:18  3    A    Yeah. I'm not sure I agree even
11:16:21  4    sitting here today that -- that Barney's ranking
11:16:26  5    of: Terrible golf market, Costco, competition is
11:16:29  6    the entire -- I'm not sure if I agree with his
11:16:33  7    ranking. I'm not sure that I agree that's the
11:16:36  8    entire reason for the problems.
11:16:38  9    Q    (By Ms. Fox) Did -- did you tell
11:16:39 10    Barney that at the time?
11:16:47 11    A    That would be a comment that I would
11:16:49 12    have possibly said at a board meeting. I don't
11:16:51 13    recall saying it. I mean, it's the way my thought
11:16:55 14    processes work.
11:17:38 15    Q    Okay. Okay. This is Exhibit 81.
11:17:59 16         MS. BRANNEN: Thanks. I gave
11:18:00 17    him that one.
11:18:05 18         MS. FOX: Okay. On the
11:18:26 19    record, Exhibit 81 is Adams 4519 through -21.
11:18:36 20    It's the official minutes of the October 19th,
11:18:41 21    1998 special meeting of the board of directors
11:18:46 22    coverage.
11:18:46 23    Q    (By Ms. Fox) Do you remember
11:18:47 24    attending this special meeting?
```

### Page 65

```
11:18:48  1    A    If it says I was there, I was there.
11:18:51  2    Again, we had a lot of meetings. I don't think I
11:18:59  3    really missed too many during my course on the
11:18:59  4    time of the board. But a specific recollection of
11:19:02  5    this particular meeting, no.
11:19:02  6    Q    This was a conference telephone
11:19:06  7    meeting.
11:19:06  8    A    Okay.
11:19:06  9    Q    But again, I gather that happened
11:19:08 10    occasionally as well?
11:19:10 11    A    It happened occasionally then, and it
11:19:14 12    probably happens two out of four now, so it's kind
11:19:18 13    of a common occurrence.
11:19:23 14    Q    Having looked at this --
11:19:24 15         MS. BRANNEN: Read all the way
11:19:24 16    through.
11:19:26 17         THE WITNESS: Well, I'm down
11:19:27 18    to the bottom of Page 1, so --
11:20:45 19    A    Okay.
11:20:45 20    Q    (By Ms. Fox) Okay. Do you remember
11:20:47 21    the Costco discussion as -- now that you've read
11:20:51 22    it, does it refresh your recollection as to --
11:20:54 23    A    Not particularly.
11:20:55 24    Q    -- what was said?
```

### Page 82

```
11:44:39  1            MS. BRANNEN: I know, but
11:44:39  2   you're saying he previously testified to this
11:44:42  3   exact sentence. He testified --
11:44:44  4            MS. FOX: I haven't yet said
11:44:45  5   anything.
11:44:45  6            MS. BRANNEN: You said: I
11:44:46  7   believe you've testified previously that, and then
11:44:48  8   you read that sentence, and I don't think he's
11:44:50  9   testified specifically to that.
11:44:52 10       Q    (By Ms. Fox) You've testified
11:44:54 11   previously that you were aware of the laser
11:44:56 12   engraving issue?
11:44:58 13       A    Yes.
11:44:58 14       Q    My question, then, is about the next
11:45:03 15   issue: In an effort to reduce the negative
11:45:07 16   effects of Costco's discounting, the company is
11:45:07 17   planning to offer a $25-per-club rebate to
11:45:11 18   effective retailers in Costco territories.
11:45:16 19            Did the board vote on that
11:45:18 20   rebate?
11:45:19 21       A    I don't know that that's an item for
11:45:22 22   board approval, and I don't recall whether we
11:45:25 23   voted on it or not. That seems like more of a
11:45:27 24   report of management and their business policy
```

### Page 83

```
11:45:33  1   information back to the board.
11:45:34  2       Q    Do you know how much that rebate
11:45:36  3   actually cost Adams Golf?
11:45:42  4       A    Nope.
11:45:42  5       Q    Do you remember any discussion about
11:45:43  6   the rebate --
11:45:45  7       A    Not sitting here today, I don't.
11:45:46  8       Q    -- and the board?
11:46:05  9            MS. FOX: Can I just have a
11:46:08 10   second to review my notes?
11:46:10 11            MS. BRANNEN: Sure.
11:46:10 12            (A recess was taken from
11:51:31 13            11:46 to 11:51.)
11:51:31 14       Q    (By Ms. Fox) Can you describe what
11:51:33 15   you considered to be your obligation as a signer
11:51:37 16   of the registration statement in terms of due
11:51:43 17   diligence?
11:51:43 18       A    It was my obligation as a member of
11:51:45 19   the board of directors --
11:51:46 20       Q    Yes.
11:51:47 21       A    -- to make myself comfortable that
11:51:51 22   the registration statement was true and correct.
11:51:56 23       Q    Did you consider you had any
11:51:59 24   individual obligation to make an investigation?
```

### Page 84

```
11:52:02  1       A    I believed as -- as a member of the
11:52:05  2   board of directors and through individual
11:52:08  3   questions or comments I might have made at all
11:52:11  4   those meetings which I attended, that -- that I
11:52:18  5   fulfilled that obligation.
11:52:20  6       Q    Other than the investigations of
11:52:23  7   other people, did you make any individual
11:52:27  8   investigation of the completeness or the truth of
11:52:33  9   this registration statement?
11:52:36 10            MS. BRANNEN: Objection, asked
11:52:37 11   and answered and vague.
11:52:38 12            MS. FOX: Okay.
11:52:39 13       A    Other than what I've said in -- in
11:52:41 14   terms of asking questions and making comments at
11:52:48 15   board meetings, I believe that's all I recall
11:52:55 16   doing at the time. I may have actually spoken
11:52:57 17   with our -- with Royal's corporate counsel about
11:53:01 18   some of these issues, but I sure don't remember
11:53:04 19   that. It would have been something I might have
11:53:06 20   done.
11:53:06 21       Q    (By Ms. Fox) Who is Royal's
11:53:08 22   corporate counsel?
11:53:08 23       A    A group called -- Buchanan Ingersoll
11:53:12 24   in Pittsburgh.
```

### Page 85

```
11:53:14  1            MS. FOX: Okay. That's all
11:53:15  2   the questions I have.
11:53:16  3            THE WITNESS: Okay. Thank
11:53:17  4   you.
11:53:18  5            MS. BRANNEN: And I have no
11:53:18  6   questions at this time.
11:53:20  7            MR. KANE: I have no
         8   questions.
         9            (Off the record at 11:53 a.m.)
        10            -----
```

PICCHI

PICCHI

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
- - -

IN RE ADAMS GOLF, INC.   : CONSOLIDATED
                         :
SECURITIES LITIGATION    : C.A. No. 99-371 KAJ

------------------------
Friday, June 9, 2006
------------------------

Oral deposition of BERNARD PICCHI, taken pursuant to notice, was held at the offices of SIMPSON, THACHER, AND BARTLETT, LLP, 425 Lexington Avenue, 29th Floor, New York, New York 10017, commencing at 10:04 a.m., on the above date, before Beth A. Barkocy, Certified Shorthand Reporter and Notary Public.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA   19103
(215) 241-1000     (888) 777-6690

### Page 142

```
13:31:37  1  management of Adams Golf. Do you recall doing a
13:31:46  2  review of those things at November of 1998?
13:31:51  3           MR. McEVOY: Object as vague.
13:31:53  4           You can answer if you can.
13:31:55  5           THE WITNESS: No, I don't recall
13:31:56  6  that.
13:31:56  7  BY MR. LEWIS:
13:31:57  8      Q.  Do you recall anything specific that
13:32:00  9  precipitated your expectation in early November 1998
13:32:08 10  that Adams would achieve lower earnings than you had
13:32:22 11  previously expected?
13:32:23 12           MR. McEVOY: I object to the form of
13:32:24 13  the question.
13:32:25 14           If you understand it, you can
13:32:27 15  answer.
13:32:27 16           THE WITNESS: No, sir, I do not.
13:32:29 17  BY MR. LEWIS:
13:32:29 18      Q.  You understand the question but
13:32:31 19  don't recall the answer; is that right?
13:32:33 20      A.  I understand exactly what you're
13:32:34 21  asking, but I do not recall the sequence of events
13:32:36 22  that led to this particular rating or earnings
13:32:39 23  estimate change or new price target.
13:32:48 24      Q.  As best as you can recall, was the
13:32:52 25  rating change something that you initiated rather than
```

### Page 143

```
13:32:55  1  Mr. Lantier or vice versa?
13:33:06  2      A.  I don't know who initiated this. I
13:33:07  3  don't remember who was the first mover, he or I.
13:33:32  4      Q.  I've placed before you Exhibit-252,
13:33:38  5  a press release entitled Adams Golf Comments on Fourth
13:33:43  6  Quarter Outlook. Do you generally recall this
13:33:46  7  document?
13:33:46  8      A.  Sir, I do not generally recall the
13:33:50  9  document.
13:33:52 10      Q.  Do you recall a time when you cut
13:33:55 11  your ratings on Adams Golf from buy to outperform?
13:34:02 12      A.  I do not remember that, no.
13:34:07 13      Q.  Do you remember any cut in the
13:34:09 14  ratings of Adams Golf?
13:34:13 15      A.  Clarification: You're talking about
13:34:15 16  the coding, the investment rating on the shares, as
13:34:19 17  opposed to earnings estimates and price target?
13:34:22 18      Q.  Right.
13:34:23 19      A.  That's what I thought you meant. I
13:34:26 20  don't recall that; I don't recall having done that,
13:34:26 21  no.
13:34:30 22      Q.  What was the difference at Lehman
13:34:33 23  between an outperform and a 1-buy recommendation?
13:34:43 24      A.  I'm trying to recall that, and I
13:34:46 25  believe an outperform, or a strong buy, a one, was a
```

### Page 144

```
13:34:50  1  stock expected to increase by more than a
13:34:55  2  25-percentage-point differential versus the general
13:34:57  3  market, meaning, of course, the S&P 500, and I think a
13:35:01  4  two rating was a lower numeric increase, say between
13:35:05  5  10 percent and 25 percent. I may be off on the
13:35:09  6  numbers, but that's approximately correct.
13:35:11  7      Q.  The outperform was a two?
13:35:13  8      A.  Correct.
13:35:15  9           MR. LEWIS: Let's take a break for a
13:35:17 10  second.
13:35:17 11           (Recess.)
13:45:52 12  BY MR. LEWIS:
13:46:06 13      Q.  Mr. Picchi, what, if anything, did
13:46:10 14  you do to prepare yourself for the deposition today?
13:46:19 15           THE WITNESS: May I --
13:46:20 16           MR. McEVOY: Off the record.
13:46:26 17           (Discussion held off the record.)
13:46:26 18  BY MR. LEWIS:
13:46:28 19      Q.  Don't tell me anything at the moment
13:46:30 20  that you said to your counsel, if you spoke to
13:46:36 21  counsel. I'm asking for events rather than content,
13:46:41 22  so what did you do to prepare for the deposition
13:46:43 23  today?
13:46:43 24      A.  I did absolutely nothing to prepare
13:46:46 25  for this deposition, absolutely nothing, and damn
```

### Page 145

```
13:46:55  1  proud of it.
13:46:56  2           Please don't put that on.
13:46:58  3      Q.  You're stuck.
13:47:00  4           Without telling me what you said or
13:47:03  5  what was said to you, did you meet with Mr. McEvoy in
13:47:08  6  advance of today to prepare for your deposition?
13:47:10  7      A.  I did.
13:47:10  8      Q.  At what length did you do that?
13:47:12  9      A.  You mean in terms of period of time,
13:47:15 10  approximately?
13:47:15 11      Q.  Yes.
13:47:16 12      A.  About an hour, hour and a half.
13:47:19 13      Q.  When was that?
13:47:20 14      A.  About two weeks ago.
13:47:21 15      Q.  Did you have contact with anyone
13:47:23 16  else in the world about your deposition before it
13:47:27 17  began?
13:47:27 18      A.  I did not.
13:47:29 19      Q.  Have you had contact with Brian
13:47:33 20  Lantier about the fact that you were going to appear
13:47:36 21  for deposition?
13:47:36 22      A.  Yes, I did. I sent him an e-mail.
13:47:39 23      Q.  When was that?
13:47:40 24      A.  About a week ago.
13:47:41 25      Q.  Have you been, generally, in touch
```

BERNARD PICCHI

### Page 146

1  with Mr. Lantier since he left Lehman Brothers?
2     A.   I have, yes.
3     Q.   Are you friends?
4     A.   Yes, socially.
5     Q.   Have you seen a transcript of
6  Mr. Lantier's testimony?
7     A.   I have not.
8     Q.   What were the circumstances, as you
9  understand it, under which Mr. Lantier left Lehman
10 Brothers?
11    A.   I have to think about that. I
12 honestly do not recall the circumstances under which
13 he left Lehman Brothers. I believe that he wanted to
14 move to upstate New York. I think it was a lifestyle
15 decision for Brian.
16    Q.   Do you know that or you just believe
17 that?
18    A.   I believe that to be the case. I
19 don't know, actually, why he left.
20    Q.   Did you review any documents in
21 preparation for your deposition --
22    A.   No, sir, I did not.
23    Q.   -- without telling me what they
24 are?
25    A.   No, I did not.

### Page 147

1     Q.   Did you retain any documents
2  personally from your work regarding Adams Golf at
3  Lehman Brothers?
4     A.   I did not.
5     Q.   Did you save any documents on your
6  home computer relating to Adams Golf?
7     A.   No, I did not.
8     Q.   Did you have a laptop while you were
9  at Lehman?
10    A.   Is your question did I have a
11 Lehman-issued laptop?
12    Q.   Did you have a laptop of any kind
13 while you were at Lehman?
14    A.   I believe I did, yes, so when I went
15 on the road I would be able to take a computer, but I
16 honestly don't recall whether I had a laptop or not.
17    Q.   Did you save any documents on floppy
18 disk relating to Adams while you were at Lehman?
19    A.   No, sir, I did not.
20    Q.   Did you let anyone other than
21 Mr. Lantier know that you were appearing for a
22 deposition?
23    A.   No, I did not.
24    Q.   Your family, coworkers?
25    A.   My wife, coworkers, they had to know

### Page 148

1  where I was, of course; my coworkers and wife and
2  daughter, yes.
3        MR. LEWIS:   I have nothing further
4     at this time.
5        MR. McEVOY:   I have no questions.
6        MS. MORIATY:   I have a few.
7  BY MS. MORIATY:
8     Q.   What were the reasons for the price
9  decline of Adams Golf stock following the IPO?
10       MR. LEWIS:   Objection to foundation
11    and form.
12       THE WITNESS:   The reasons, I
13 believe, for the weakness in the stock price
14 and the decline in the stock price were, I
15 would say, primarily because of the peaking
16 out in market demand for the company's
17 principal product, the Tight Lies fairway
18 wood, combined, importantly, with the second
19 factor, which was the inability of the
20 company to develop any follow-on products. I
21 think those were really the two primary
22 reasons.
23       There was, at the same time, a
24 general weakness, I think, in the golf
25 equipment market, perhaps because of

### Page 149

1  demographic trends, and I would finally cite,
2  although I don't think it was the principal
3  reason, just a general weakness in small
4  capitalization shares at that time.
5  BY MS. MORIATY:
6     Q.   I'm going to turn you to
7  Exhibit-180.
8     A.   Pardon me while I find that.
9        Okay.
10    Q.   We looked at this document earlier.
11 We looked on Page 20, which is Bates labeled Adams
12 4054, we looked at the second paragraph, which is
13 labeled Valuation. The second sentence says negative
14 sentiment has settled around the entire golf industry
15 following a series of press releases from companies
16 like Callaway Golf, Titleist, Arnold Palmer Golf, and
17 Golden Bear Golf. This negative sentiment, is that
18 what you're referring to when you were talking about
19 softness in the golf market?
20    A.   Yes.
21       MR. LEWIS:   Objection to the form.
22       THE WITNESS:   That is correct; that
23    is exactly what I meant.
24 BY MS. MORIATY:
25    Q.   In the sentence following that

BERNARD PICCHI

Page 150

```
13:52:33  1   sentence, you say we do not believe that these
13:52:36  2   negative news items should impact Adams Golf. You
13:52:38  3   have already testified that this document is an
13:52:40  4   accurate recording of what you and Brian Lantier
13:52:43  5   thought at the time, so my question is not that, my
13:52:47  6   question is in retrospect, knowing what you know now
13:52:52  7   and having seen the decline following this of the
13:52:55  8   Adams golf price that you testified to earlier, was
13:52:59  9   this a correct statement?
13:53:01 10        MR. LEWIS: Objection to form and
13:53:02 11   foundation.
13:53:04 12        THE WITNESS: Well, knowing what we
13:53:07 13   know now with the accuracy of hindsight, this
13:53:11 14   was not a correct statement. We believed it
13:53:15 15   to be correct at the time as we thought that
13:53:18 16   this could be the exceptional company, this
13:53:20 17   could be the company whose wonderful new
13:53:25 18   product and whose follow-on products could be
13:53:29 19   the exception to the rule. There had been a
13:53:33 20   lot of emphasis of that in a lot of the
13:53:35 21   industries as well, but it turned out, in
13:53:37 22   fact, that they were taken down with
13:53:39 23   everything else in the rest of the golfing
13:53:40 24   industry, yes
13:53:42 25   BY MS. MORIATY:
```

Page 151

```
13:53:42  1        Q. I'm going to turn your attention to
13:53:44  2   the next paragraph following that in which you
13:53:48  3   caution, in the second sentence; however, we caution
13:53:52  4   there is still only one true publicly traded company
13:53:57  5   comparable to Adams Golf, and that is Callaway Golf.
13:54:00  6   You discussed this earlier with Mr. Lewis. In the
13:54:04  7   second sentence that follows that, however, you write
13:54:07  8   unfortunately, the growth rates and product portfolios
13:54:10  9   are so dramatically different for these companies that
13:54:13 10   even this comparison is not completely accurate.
13:54:16 11   My question is if these companies
13:54:19 12   differed dramatically, as you write, in their growth
13:54:22 13   rates and product portfolios, how were they
13:54:26 14   comparable?
13:54:26 15        MR. LEWIS: Objection to form
13:54:27 16        THE WITNESS: What I meant is they
13:54:29 17   were comparable in the sense of being at that
13:54:33 18   time, I believe, the only two publicly traded
13:54:36 19   pure golf equipment companies, but the point
13:54:39 20   of differentiation is that Callaway seemed to
13:54:42 21   be very mature and on the downside of its
13:54:45 22   life cycle, whereas it appeared at that time
13:54:48 23   that Adams Golf was really just beginning its
13:54:53 24   growth cycle.
13:54:55 25   BY MS. MORIATY:
```

Page 152

```
13:54:55  1        Q. Finally, you testified that as a
13:54:59  2   part of -- let's see if I can refer to it in this
13:55:10  3   document.
13:55:17  4        (Discussion held off the record.)
13:55:28  5   BY MS. MORIATY:
13:55:28  6        Q. Earlier you discussed Page 27, which
13:55:32  7   is labeled Adams 4061, and you talked about how you
13:55:35  8   were doing a poll of Adams retailers periodically as a
13:55:41  9   part of your due diligence and as a part of your
13:55:50 10   ongoing --
13:55:50 11        MR. McEVOY: Off the record.
13:55:50 12        (Discussion held off the record.)
13:55:50 13   BY MS. MORIATY:
13:56:29 14        Q. -- research. You testified that you
13:56:33 15   called these Adams retailers both before and after the
13:56:38 16   IPO
13:56:38 17        A. Right.
13:56:39 18        Q. Were you asking them the same
13:56:41 19   questions, basically, before and after the IPO?
13:56:43 20        MR. LEWIS: Objection to form.
13:56:45 21        THE WITNESS: Yes, we were asking
13:56:47 22   the same questions both before and after the
13:56:49 23   IPO; correct.
13:56:50 24   BY MS. MORIATY:
13:56:50 25        Q. In your opinion, were the questions
```

Page 153

```
13:56:51  1   you and Brian Lantier were asking these retailers
13:56:54  2   formulated so that if the retailers were experiencing
13:56:57  3   gray marketing, they would have brought it up with you
13:57:01  4   during those calls?
13:57:02  5        MR. LEWIS: Objection to form.
13:57:03  6        THE WITNESS: Yes. What we were
13:57:05  7   trying to ask the retailers and other
13:57:08  8   distribution channels at the time were a
13:57:10  9   series of questions that would elicit from
13:57:13 10   the retailers or other channel distributors
13:57:16 11   any negatives at all, or positives, so we
13:57:20 12   certainly were trying to cast a wide net
13:57:22 13   looking for anything we could find that could
13:57:25 14   be negative to the story.
13:57:27 15        MS. MORIATY: I think that's all I
13:57:29 16   have.
13:57:29 17        MR. LEWIS: I have a few more; thank
13:57:31 18   you
13:57:31 19   BY MR. LEWIS:
13:57:32 20        Q. You referred in this recent
13:57:34 21   testimony in response to Ms. Moriaty's questions as an
13:57:40 22   inability of Adams to develop a follow-on product.
13:57:45 23   Can you explain what you meant by that?
13:57:47 24        A. Yes. When we had our due diligence
13:57:55 25   meetings with the company, the company explained to us
```

39 (Pages 150 to 153)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

BERNARD PICCHI

### Page 154

13:58:00  1   its plans for developing a line of drivers as well as
13:58:05  2   sort of follow-on fairway products, not just the Tight
13:58:10  3   Lie but other fairway products they were thinking of
13:58:13  4   developing. They seemed to be pretty far along in the
13:58:16  5   research and development. I think they were just
13:58:19  6   looking for some foundry manufacturers that they could
13:58:23  7   actually outsource the manufacturing of those
13:58:26  8   particular clubs, so that's what I'm talking about.
13:58:29  9   They just never seemed to be able to get any kind of
13:58:32 10   traction in the sense of developing any kind of
13:58:36 11   commercial product beyond this sort of one hit wonder
13:58:39 12   of the Tight Lie.
13:58:40 13       Q.   When had you expected they would
13:58:43 14   have been able to develop it?
13:58:44 15       A.   The answer is very quickly after the
13:58:48 16   time we were talking to them in the spring of '98, so
13:58:52 17   we certainly expected the company to be in actual
13:58:56 18   development, I mean commercial development, of
13:58:59 19   products by, certainly, before the end of the year,
13:59:03 20   certainly in time for, say, the next year's golf
13:59:06 21   season.
13:59:07 22       Q.   When did you learn that that was not
13:59:09 23   to be the case?
13:59:12 24       A.   I don't recall specifically, but my
13:59:16 25   vague recollection is we probably didn't learn that

### Page 155

13:59:19  1   until, I'd say, probably the fall of '98.
13:59:27  2       Q.   Let's go back to Page 20 of
13:59:36  3   Exhibit-180. Do I correctly understand your testimony
14:00:01  4   to be that when you used the phrase weakness in the
14:00:08  5   golf equipment market, you were referring to negative
14:00:12  6   sentiment arising from the press releases described in
14:00:16  7   the second paragraph on that page?
14:00:17  8            MR. McEVOY: I'm just going to
14:00:18  9       object because I'm not sure that correctly
14:00:24 10       characterizes his testimony.
14:00:28 11            You can answer the question.
14:00:29 12            THE WITNESS: Can you tell me what
14:00:31 13       you're referring to; where is that exactly?
14:00:35 14   BY MR. LEWIS:
14:00:35 15       Q.   (Indicating.)
14:00:58 16            MR. McEVOY: Can you read back the
14:00:58 17       question.
14:00:58 18            (The pending question was read
14:01:00 19       back.)
14:01:00 20            THE WITNESS: The answer is yes.
14:01:00 21   BY MR. LEWIS:
14:01:11 22       Q.   Ms. Moriaty asked you about the
14:01:15 23   questionnaires that were used in surveying retailers.
14:01:22 24   Am I correct that when those questionnaires were
14:01:25 25   developed, you were unaware that there was any gray

### Page 156

14:01:27  1   marketing issue with Adams?
14:01:33  2            MR. McEVOY: Object to the form.
14:01:35  3            THE WITNESS: Yeah; well, point of
14:01:39  4       clarification. This isn't the question you
14:01:42  5       were asking. We were sort of aware of
14:01:44  6       another issue that you haven't asked about
14:01:47  7       that's sort of related to gray market, which
14:01:50  8       is more of a black market issue. We were
14:01:53  9       aware that some of the foundry manufacturers
14:01:56 10       of the clubs were making too many of the
14:01:59 11       clubs, basically, and they were pirating the
14:02:02 12       clubs and selling them not really through the
14:02:06 13       gray market but the black market. That's a
14:02:09 14       purely illegal activity. We felt, very
14:02:12 15       certainly, that would be something that would
14:02:14 16       stop because it was so patently illegal, but
14:02:17 17       no, we were not aware of any gray market
14:02:19 18       issues where the company was itself, as I
14:02:23 19       understand gray market, quite legally selling
14:02:26 20       around its normal distribution channels.
14:02:29 21       That was not something that we were aware of,
14:02:33 22       not because we weren't looking for negatives
14:02:36 23       but it's just something that never seemed to
14:02:39 24       come up during the due diligence process.
14:02:43 25   BY MR. LEWIS:

### Page 157

14:02:44  1       Q.   Is it your understanding as you sit
14:02:46  2   here at this moment that Adams, in fact, engaged in
14:02:49  3   gray marketing in 1998?
14:02:52  4            MR. McEVOY: Object to the form.
14:02:52  5   BY MR. LEWIS:
14:02:56  6       Q.   As you have used the terms.
14:02:59  7       A.   In 2006. Frankly, sir, the only
14:03:03  8   reason I am aware of it is because of this deposition.
14:03:07  9   My memory has been refreshed as a result of seeing
14:03:12 10   some of these late-year press releases about the gray
14:03:15 11   market, but it was never an issue that was front and
14:03:20 12   center in any of the discussions that we had had with
14:03:25 13   any of the channels of distribution of the company's
14:03:29 14   clubs.
14:03:29 15       Q.   Or with the company?
14:03:30 16       A.   Or with the company, exactly.
14:03:33 17       Q.   If I asked you about unauthorized
14:03:38 18   distribution of Adams products, would your answer be
14:03:41 19   any different than your answer has been with respect
14:03:43 20   to gray marketing?
14:03:45 21            MR. McEVOY: I just object to the
14:03:46 22       form.
14:03:47 23            You can answer it.
14:03:48 24            THE WITNESS: The answer, sir, is
14:03:50 25       no, it wouldn't be any different.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

5cb8581c-3ba9-4282-9361-a18a34a1eca8