PULIDO-CROWE

OLGA A. PULIDO-CROWE

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

In Re Adams Golf, Inc.        )

Securities Litigation         )   No. 99-37 KAJ

                              )

_____ )

DEPOSITION OF OLGA A. PULIDO-CROWE

WEDNESDAY, MAY 17, 2006

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
(888) 777-6690  (215) 241-1000

023fc33a-412e-4535-b58b-026dd1865d02

## OLGA A. PULIDO-CROWE

**Page 18**

1  its products  Directly supervised my team, guided
2  them in everything -- gathering information that we
3  needed
4      Q  What information did you direct them to
5  gather?
6      A  Well, we have -- if I may refer to our due
7  diligence outline and request list as part of this
8  organizational meeting
9      MR. CHEPIGA:  Would you identify the page
10  you're referring to, or pages?
11      THE WITNESS:  It is Page --
12      MR. CHEPIGA:  The number at the bottom, the
13  Bates number
14      THE WITNESS:  The UND number?
15      MR. CHEPIGA:  Right
16      THE WITNESS:  UND 08741  Due Diligence
17  Outline/Request List put together of information that
18  we need to review and study and collect
19      MR. CHEPIGA:  412 --
20      THE WITNESS:  08741 through 08748
21  BY MS. LELAND:
22      Q  And did you prepare this list?
23      A  Did I prepare it or did I actually write it,
24  that type of thing?  I don't know if I actually wrote
25  it, but I certainly was involved in going through

**Page 19**

1  every line item on this list
2      Q  And you approved the list
3      A  Yes
4      Q  Would that be accurate?
5      At Page 8742, which is 20 of the memo, if --
6  I don't know which is easier
7      A  Okay
8      Q  Under the topic "Business review," Section C
9  identifies major strategic issues facing the company
10      A  Mm-hmm
11      Q  Were you involved in compiling the list of
12  strategic issues facing the company?
13      A  Yes
14      Q  What is meant by -- and just briefly, what's
15  meant by "technological change"?
16      A  Factors that occur in the market that --
17  in this particular case, we would be talking about,
18  are there new materials that are introduced?  Are
19  there new manufacturing processes that are introduced?
20  That kind of thing
21      Q  And "supply and demand for product," what is
22  meant by that?
23      A  Supply and demand for product, can the
24  manufacturer -- in this case, Adams -- get everything
25  that it needs to make the product?  I include that in

**Page 20**

1  it  And can it make the product in substantial
2  numbers to meet demand?  Is it creating demand for the
3  product?  Is it meeting that demand?
4      Q  "Size of market share of competitors."  Seems
5  self-explanatory, but could you go through it quickly?
6      A  We looked at who else is out there in the
7  golf club market, what are their size, what are
8  their -- in terms of how large are they, how much
9  product do they supply, what's their market share,
10  what types of products, that kind of thing
11      Q  And from where did you gather this
12  information?
13      A  From numerous sources  Publicly available
14  information  The major competitors that were publicly
15  traded at the time were Callaway Golf -- and I don't
16  recall if Cobra was still publicly traded or not  But
17  they also have information on market share
18  information
19      And then we look at, you know, others that
20  are in the market, survey lots of different sources in
21  terms of an extensive research capacity to who's out
22  there making golf clubs and other sports equipment,
23  that kind of thing
24      So we would survey that and deem who are the
25  most closely competitive to the company and who's out

**Page 21**

1  there coming up as well, because we look at the growth
2  companies  And we were in touch with a lot of the
3  newer companies that were similar to Adams coming into
4  the market
5      Q  Skipping ahead a couple, included on the list
6  is a category for "other short- and long-term risk";
7  correct?
8      A  Yes
9      Q  What is meant by that?
10      A  It could cover numerous things  It's a
11  catchall category, if you will  Much of it has to do
12  with competition  It could also relate to any of the
13  factors that are listed here as well  We would look
14  at -- let me see just one second
15      Q  That's fine  Take your time
16      A  Okay
17      (Witness examines document )
18      "Other short- and long-term risk "  Most of
19  the items are included here, but it's anything else
20  that might impact  And we -- normally when we ask
21  this question, we could ask the question and think
22  about what else might impact this company and could
23  create risk for this company
24      Q  In the context of Adams Golf specifically,
25  what issues came up under this category, if any?

## OLGA A. PULIDO-CROWE

Page 22

1    A. Under this category specifically, I --
2  I don't recall. I believe most of them are
3  all-encompassing under the major strategic issues.
4  But we would have looked at, you know, can they get
5  enough employees? You know, what does the market look
6  like here in terms of people that they might be able
7  to hire if their demand was increasing? Could they
8  get the labor, the workforce to do so? Would the
9  workforce be trained efficiently enough? Because to
10  handle the call centers, to handle the custom-made
11  golf-type things, what do they have?
12    That would be some of the things that we
13  would look at.
14    Q. Do you recall if the topic of gray marketing
15  came up under this category or in any other context?
16    A. Gray marketing came -- the topic of gray
17  marketing did come up during our discussions. It
18  wasn't a primary term, you know, that we use. But the
19  issues of gray marketing did come up and was looked at
20  under these categories.
21    Q. Who looked at them?
22    A. Our -- myself and our team. It's all part
23  of, you know, what is out there in terms of the --
24  what the company is facing and what's material.
25    And I think, for Adams, the primary risk was

Page 23

1  new product introduction and competition from
2  competitors, competitive lines of golf clubs. That
3  was one of the primary risks and most material.
4    Q. When you say that you and your team looked at
5  gray marketing, what exactly did you do in looking at
6  gray marketing?
7    A. Well, we did a number of things. Gray
8  marketing was not -- we weren't saying, "Let's look at
9  gray marketing." We were saying, "Let's look at the
10  issues surrounding the market for the clubs and how
11  Adams distributes them."
12    And so we did numerous things. We spoke, of
13  course, to the company and their sales force and their
14  salespeople. We did due diligence with their
15  customers, their dealers. We talked to, you know,
16  other -- I guess I have a lot of anecdotal evidence
17  that I would do personally as well and when we look at
18  all of these issues facing Adams.
19    So besides looking at information provided by
20  the company and talking to the company and talking to
21  third parties and verifying what we were learning,
22  there was other anecdotal evidence, I guess you might
23  say, that I know I personally did.
24    Q. Okay. Let me go back to a couple of things.
25    A. Okay.

Page 24

1    Q. You said you spoke with the company and their
2  sales force.
3    A. Mm-hmm.
4    Q. Who did you speak with?
5    A. Well, as part of the due diligence process,
6  you know, we speak with management of the company.
7  And that would have been, I think -- well, I was going
8  to refer to one of the documents we have here, a list
9  of names.
10    Q. Feel free to refer back.
11    A. Okay. Well, if we look at the agenda --
12    Q. Are you looking at Exhibit 143?
13    A. Yeah, Page -- is this 153? Yes. Page 8724.
14    Q. Okay.
15    A. So we spoke with Barney Adams, Jim Farrell,
16  Walt DeVault, Mark Gonsalves -- and I'm just reading
17  from this list -- Dick Murtland, Steve Sanozaro. And
18  those were the formal discussions.
19    We would also speak to people when we --
20  when we were present at the site. You know, as you're
21  there, you would talk to people that you would run
22  into, basically, and ask them, "How do you like" --
23  "What do you think?" "What's going on?" There were
24  random discussions that we would have that were off
25  the official list of people.

Page 25

1    Q. When you spoke with the folks on the official
2  list, did the topic of gray marketing ever come up?
3    A. In the -- in the context of what are the
4  risks facing the company and in the context of what --
5  looking at the dealers and the sales process.
6    Again, it wasn't -- gray marketing itself,
7  we didn't -- it's not something that -- it was part of
8  it. We definitely talked about it, but it wasn't a
9  significant, material issue. There were a lot of
10  other terms used for that in looking at that issue.
11  I -- my term is "stuffing the channels," that kind of
12  thing. What are we doing -- that was one of the ways
13  that we would look at that. And a lot of that would
14  be explored also when we spoke to the -- the retailers
15  and did our due diligence of customers.
16    Am I answering that?
17    Q. I think so, and I -- I know you're trying,
18  and you're doing a great job.
19    A. Okay.
20    Q. When you spoke with the people listed on
21  Page 2 of the memo, 8724, did any of them tell you
22  that gray marketing was affecting Adams Golf or that
23  it wasn't affecting Adams Golf? Just trying to get
24  the idea of the nature of the communications.
25    A. Was affecting? I mean, I wouldn't use that

7 (Pages 22 to 25)

023fc33a-412e-4535-b58b-026dd1865d02

## OLGA A. PULIDO-CROWE

Page 26

1  term, "affecting." Gray marketing is a factor in --
2  in manufacturing and retailing. It's something that
3  everybody faces. How do the products get to
4  unauthorized markets? It's in the newspapers every
5  day. We see it with videos and CDs and, you know,
6  rip-offs here and there -- how did that movie
7  get -- you know, DVD get out there on a movie that
8  hasn't been released yet? It's an issue that just
9  about everybody faces.
10      So, yes, it was discussed and mentioned in
11 that respect.
12      Q. When you were doing your work with Cobra,
13 was gray market an issue back then?
14      A. It's not -- I don't like the term "issue."
15 It's a -- something that's present definitely in the
16 market.
17      So I would say, for Cobra, you know, where
18 the clubs were showing up, yes, that was discussed and
19 how would people get them. It was more in the context
20 of, Are these knockoffs? You know, what is it that's
21 out there? And are there knockoffs being made or
22 fakes? You know, that kind of thing, that -- and
23 who's doing it, and is that a huge problem? How do
24 you protect your name, your brand from these rip-offs,
25 like the Gucci bags that are not real Gucci bags, that

Page 27

1  kind of thing?
2      You know, that was a lot of the context that
3  was -- that we discussed that kind of thing.
4      Q. And at the time that you were working with
5  Cobra, did they actually have product in the gray
6  market?
7      A. I don't -- I don't recall. I would --
8  I guess I don't recall. I would assume, because
9  almost everybody has that issue.
10     Q. Okay. At the time of the Adams IPO -- let me
11 rephrase that.
12     At the time you were working with Adams to do
13 the underwriting, were you aware of any Adams product
14 in the gray market?
15     A. We were -- we discussed the Costco issue,
16 that clubs had appeared at a Costco. I don't remember
17 the location, but someone had seen some -- what were
18 purported to be Adams Golf clubs at a Costco.
19     Q. Do you recall when this discussion occurred?
20     A. I don't recall exactly, but it was during
21 our -- probably one of our drafting sessions or one of
22 our due diligence calls.
23     Q. And these drafting sessions occurred in April
24 of 1998; is that correct?
25     A. I would have to refer back to the schedule to

Page 28

1  confirm that it was April 19 --
2      Q. And I think I've got some documents in here
3  somewhere.
4      A. Okay.
5      Q. Do you recall who it was from Adams who
6  advised you that the clubs were at Costco?
7      A. My recollection of exactly whom it was is
8  unclear. I can't say if it was Barney, if it was
9  Mark, if it was Jim. I don't remember who exactly it
10 was, but I do remember discussing the issue.
11     Q. Can you take a quick look back at
12 Exhibit 152 --
13     A. Okay.
14     Q. -- at Page 3 of the memo, which is
15 Bates-number Page 6028.
16     A. Okay.
17     Q. Paragraph D, "Due diligence."
18     A. Okay.
19     Q. Could you go ahead and read that.
20     (Witness examines document.)
21     A. March 24th. Okay.
22     (Witness examines document.)
23     Okay.
24     Q. Does that paragraph refresh your
25 recollection --

Page 29

1      A. Yes.
2      Q. -- concerning --
3      MR. CHEPIGA: Let her finish the question.
4      THE WITNESS: Oh.
5  BY MS. LELAND:
6      Q. In looking at this, can you now pinpoint a
7  date when the discussion of gray marketing that you
8  just mentioned occurred?
9      A. I can't pinpoint an exact date other than to
10 say it might have been March 24th, April 21st,
11 April 27th.
12     Q. Do you believe it was at one of these
13 meetings identified here?
14     A. Yes.
15     Q. Okay. And what exactly, to the best of your
16 recollection, was discussed concerning the gray
17 marketing?
18     A. There was -- the focus was Costco, that
19 clubs found at -- believed to have been found at
20 Costco. And we asked, "How did they get to Costco?
21 Do you know how they got to Costco?"
22     And the company thought they -- thought they
23 might know how they got there, but they weren't sure
24 and they were going to look into it. It wasn't a
25 large number of clubs. They thought they knew who --

8  (Pages 26 to 29)

OLGA A. PULIDO-CROWE

Page 30

1  how they got there, and they were going to put a stop
2  to that, that dealer/distributor. And we talked about
3  filing some type of motion or suit -- and I apologize
4  I don't know the correct term -- with Costco to -- to
5  stop that or find out where they got it, that kind of
6  thing.
7      Q. Do you recall what dealer/distributor the
8  Adams Golf people thought was selling the clubs to the
9  gray market?
10     A. No, I don't. I don't recall. But it seemed
11 like they suspected it might be one, but I don't
12 remember.
13     Q. Does King Par ring a bell?
14     A. No, I'm sorry. I don't know who.
15     Q. That's perfectly fine. I want you to answer
16 to the best that you can. Don't try to guess.
17     A. Okay.
18     Q. Do you recall what customers were interviewed
19 concerning Adams gray marketing?
20     A. I recall what customers we interviewed when
21 we did -- as part of our due diligence process and
22 discussing with them their entire relationship with
23 Adams Golf.
24     Q. Which -- can you give me the names of any of
25 those customers?

Page 31

1      A. I would have to refer to --
2      Q. That's fine.
3      A. -- actually, our -- actually, I'm not sure
4  where they would be listed here -- other than our
5  notes. But I remember Golfsmith being one, because
6  that was another client that we were -- potential
7  client we were talking to. And there were numerous
8  others, but I have to refer to a list --
9      Q. Okay.
10     A. -- to remember names other than Golfsmith.
11     Q. Okay. That's fine. I'm sure somewhere in
12 here, I've got a list.
13         Quickly, off the top of your head, do you
14 recall ever speaking with anyone at WDC Mackenzie?
15     A. I don't think so.
16     Q. Okay. They were the Canadian distributors of
17 the Adams Golf product.
18     A. Yes. I do not remember talking to them.
19     Q. Okay.
20     A. Canada wasn't a big market. We were looking
21 at Europe and Asia.
22     Q. When you were talking with folks at
23 Adams Golf, did you ever talk with Chris Beebe?
24     A. Chris Beebe? I have to look at the list of
25 names.

Page 32

1      Q. Sure.
2      A. It's back in this; right?
3      Q. I believe so.
4      A. I don't -- I would have to be reminded.
5  I don't -- I don't recall.
6      Q. I believe his official title was director of
7  international sales.
8      A. I don't recall. Most likely we would, but I
9  don't recall.
10     Q. Okay. And for something on that level, was
11 that the type of thing that you had your assistants or
12 people working with you --
13         MR. CHEPIGA: Excuse me. What type of thing?
14         MS. LELAND: In talking with the Adams Golf
15 staff as part of the due diligence.
16         THE WITNESS: It depends. It could be me.
17 It could be my team. It could --
18 BY MS. LELAND:
19     Q. Mr. Walravens, perhaps?
20     A. It could have been.
21     Q. Okay.
22     A. And I might have as well. I just don't
23 recall.
24     Q. That's perfectly fine.
25     A. Okay.

Page 33

1      Q. I'm just trying to get an idea --
2      A. Who's who. If I saw their face, maybe I
3  could remember.
4      Q. I could pretty much guarantee you, I don't
5  think I have photos. Maybe some of Barney, but
6  that's, I think, about it.
7         I guess let me segue a little bit since we're
8  on the topic of the team and the staff.
9      A. Okay.
10     Q. In Exhibit 53, there is a list of the --
11         MR. CHEPIGA: 153?
12         MS. LELAND: 153.
13     Q. -- list of the working group.
14         Can you take a look at that and tell me if
15 that's a correct list of the people in the working
16 group and what the working group entailed?
17         MR. CHEPIGA: Do you want to go through all
18 the pages of that document? Starting where?
19         MS. LELAND: I think that the working group
20 list begins on Page 6 of the document, which is
21 No. 8728. Lists some folks at Adams, then Lehman.
22         MR. CHEPIGA: Okay. And what is the
23 question? I'm sorry.
24 BY MS. LELAND:
25     Q. Is this -- to the best of your knowledge,

9 (Pages 30 to 33)

OLGA A. PULIDO-CROWE

Page 42

1  which would decide -- again, independently -- whether
2  or not he would support the stock. And he would be
3  issuing a research report, potentially, on the stock
4  after the IPO.
5      Q. So what were the differences between the
6  New York and San Francisco analysts' duties with
7  respect to the Adams IPO, the differences between
8  Mr. Picchi and Mr. Mehta?
9      A. Oh, significantly different. Bernie Picchi's
10  job is to educate investors, institutional investors,
11  and provide an independent look at the company based
12  on his models, his knowledge of the market.
13      So Mehta -- Sameet Mehta was a financial
14  analyst, a junior person that did financial analysis
15  in terms of company comparables and lower-level work
16  than what Bernie Picchi would do.
17      Q. Lower-level and more internal? Is that what
18  you're --
19      A. Let's see. Sameet Mehta's job is more as a
20  support role for the banking team.
21      Q. Okay. That's helpful. Still trying to
22  figure out how it all works.
23      A. And the banking team is separate from the
24  equity research team.
25      Q. And what was Brian Lantier's role?

Page 43

1      A. He was kind of like the -- the support for
2  Bernie Picchi. An equity research analyst in
3  training.
4      Q. Okay.
5      A. He would eventually hope to have his own
6  accounts under coverage.
7      Q. And how often did you communicate with either
8  Mr. Picchi or Mr. Lantier in the IPO process?
9      A. Well, we were -- you know, we would --
10  I don't recall if we had -- we had to -- you know,
11  because they are a separate type of group and there is
12  a wall between us, we had to introduce the company to
13  them and they had to do their own analysis and their
14  own independent study. And we could give them what we
15  had, but they made their own judgments on it.
16      But we would talk to them whenever they asked
17  us questions. And I don't remember if at the time,
18  if we had a go-between. We may have, in the form of
19  Brad and Mark. I don't remember.
20      Q. So even though they are on the working group,
21  there was something of a wall between the two groups,
22  with separate and defined roles?
23      A. (Nods head up and down.)
24      Q. Do you recall whether there was ever a
25  discussion with Mr. Picchi or Mr. Lantier about gray

Page 44

1  marketing?
2      A. I don't recall about whether or not we used
3  the term "gray marketing." But we would certainly
4  talk to them -- him about any of our concerns or
5  anything like that. And so most of our focus was on
6  the competition, you know, and what the next product
7  was that was going to be and how the company was doing
8  in that regard.
9      So that's -- that's what I recall.
10      And then he had a separate meeting with the
11  company, which bankers could attend, and then he would
12  explore whatever issues he felt were very relevant.
13  And so I'm sure it was all discussed in the terms of
14  what's important right now to the company in making an
15  assessment of what the most relevant risk factors
16  were.
17      Q. Okay. Just to be clear, when I use the term
18  "gray marketing," I know it's referred to by a variety
19  of terms, and "gray marketing" seems to be what we've
20  just started using in this case.
21      A. Okay.
22      Q. I think "parallel importing," I believe, is a
23  similar term, referring to any unauthorized
24  distribution, distribution to unauthorized retailers.
25      A. Okay.

Page 45

1      Q. And, going back, do you specifically recall
2  having any discussions of gray marketing, under any
3  term, with Mr. Picchi or Mr. Lantier before the Adams
4  IPO?
5      A. Again, I'm getting very literal. I know we
6  discussed it in general. I can't tell you exactly
7  when or how, but I know we discussed any of the issues
8  that we would have.
9      So, again, I would go back to the
10  competition, what it would look like, where the clubs
11  are going, dealers. But the gray marketing was --
12  that wasn't a big issue at all. It happens, you know,
13  that clubs get to be -- you can get a club somewhere,
14  anywhere, no matter what the company does. They could
15  have the strictest contractual things and somebody
16  somewhere can get a club.
17      And so it wasn't -- that wasn't an issue.
18  We were focused on, Are there dealers? Are they
19  getting what they need from the company? Are they
20  happy? Are they upset with the company? Is there
21  anything that they don't like about what the company
22  is doing? And that was our primary focus, because if
23  those dealers no longer wanted to carry Adams Golf,
24  you know, then we would be -- there might be -- that
25  could be an issue.

12 (Pages 42 to 45)

023fc33a-412e-4535-b58b-026dd1865d02

OLGA A. PULIDO-CROWE

Page 46

1    Q. Oh, sure
2    A. So we definitely focused on what -- did the
3    third-party checks. We asked them, we probed them
4    very much. So is there anything at all?
5        And the club was being pulled. Everybody
6    wanted that club. It was more an issue, could Barney
7    get the clubs to the dealers, you know, in the
8    quantity that they wanted, you know, and in a timely
9    manner? And then also, how much Barney was going to
10   keep providing the pull, you know, with the brand
11   awareness and brand recognition out there. Because
12   that all helped the dealers when the name was out
13   there, everybody knew it. It sold the club for them.
14       So that's the kind of thing that we focused
15   on.
16   Q. Okay. So is it fair to say you don't recall
17   having any specific conversations concerning gray
18   market with Mr. Picchi or Mr. Lantier?
19       MR. CHEPIGA: Are you referring -- using the
20   word "gray marketing," conversations in which they
21   used the word, the phrase "gray marketing"?
22       MS. LELAND: Or any -- any sale of products
23   or finding products at an unauthorized retailer.
24       THE WITNESS: Okay. Now, that kind of thing,
25   we would have had. I guess I just -- I have a problem

Page 47

1    with the "gray marketing" concept.
2    BY MS. LELAND:
3    Q. And we can refer to it as whatever you would
4    like to refer to it. But in our complaint and
5    throughout this litigation, "gray marketing" has
6    referred to the unauthorized sale.
7    A. So, unauthorized. Yes, we would have
8    discussed that. And it wasn't -- it wasn't a big
9    issue. It just -- yes, we knew it was there, we
10   discussed it, and it wasn't material, whatever, a
11   relevant issue that was important to this.
12   Q. How were you able to determine whether it was
13   relevant or not?
14   A. Whether --
15   Q. Whether the gray marketing --
16       MR. CHEPIGA: One at a time.
17       THE WITNESS: Okay.
18       MS. LELAND: Sorry.
19   Q. How did you determine whether the gray
20   marketing was material or not?
21   A. We of course first spoke to the company,
22   talked about the distribution channels. The issue
23   of -- the discussion of Costco came up because of
24   discount warehouses. And we asked, was it much of a
25   problem? They said no, there was -- it was an

Page 48

1    isolated incident -- I recall something to that
2    effect. My interpretation was it was an isolated
3    incident and that that person or distributor, whoever
4    it was that got those clubs there, they were going to
5    pursue that and put an end to that.
6    Q. Do you recall who you spoke with at
7    Adams Golf about this issue?
8    A. It would have been Barney or Mark or --
9    I don't recall exactly who, but it was a group of many
10   people that were -- that would have been present.
11   Q. Okay.
12       MR. CHEPIGA: You were asking her what she
13   did to determine it was material. Can we let her
14   finish her answer?
15       MS. LELAND: Sure.
16       THE WITNESS: Then we -- we interviewed third
17   parties, or their customers and retailers, to look --
18   to look at that.
19       Also, you know, I do a lot of anecdotal-type
20   thing. Costco was a client of mine, so I was -- I
21   offered the company, like, "Well, do you want me to
22   talk to Costco about this? I don't know if Costco
23   will tell me, but I can ask them about this." And it
24   wasn't a big issue. They said, "No, we'll take care
25   of it," through their -- their process, which was the

Page 49

1    potential litigation of the filing in Texas. And so
2    we said, okay, we don't have to do that.
3        It wasn't a big issue. Plus, there was
4    discussion, would people actually buy the clubs at
5    Costco? Because if you -- when I was checking with
6    people, they don't buy clubs at Costco, not at that
7    price point. It was a pretty expensive club to buy.
8    If It's suspect, whether it's a second-quality one or
9    rip-off in general.
10       Most people, they won't buy basketballs
11   because they think they bounce funny. They won't buy
12   golf balls because they think they are second-quality
13   That's the impression in general of some of the sports
14   equipment products. And when this is such -- it's a
15   high-ticket item, and someone who's a golfer looking
16   to improve their golf swing and invest in this,
17   they're going to make sure that is the product that
18   has the little technology aspects to it that they
19   believe the product has.
20       So -- so it wasn't -- it wasn't going to be
21   an issue. So many people said, "What? I wouldn't buy
22   it there. How do I know that's it, that that's the
23   right product?"
24       So I wasn't -- you know, if it was showing up
25   there, I didn't think it was -- I thought it would

13 (Pages 46 to 49)

023fc33a-412e-4535-b58b-026dd1865d02

## OLGA A. PULIDO-CROWE

Page 50

1  stop, you know, they would put an end to that.
2  I didn't think there was going to be an issue. It
3  wasn't a great number of clubs that were showing up
4  there. This was a specialty club.
5  BY MS. LELAND:
6      Q. How did you learn how -- the number of clubs
7  that were in Costco?
8      A. I don't recall knowing the exact number, but
9  I remember asking about, you know, where it was. And
10 I just recall it being an isolated incident.
11     Q. Did anybody from Lehman actually go to a
12 Costco and see the clubs in the store?
13     A. We did not see them. I looked. I was,
14 "Where are they? Okay, it must be some store."
15 I actually thought maybe it was up in Seattle or
16 something. Because I didn't see them, so...
17     Q. So you actually went out to Costco and looked
18 to see?
19     A. Oh, yeah.
20     Q. Which Costco did you go to?
21     A. Let's see. I would have gone to the
22 San Francisco one. I -- whenever I was in
23 Los Angeles, I would find -- because Costco and we
24 were -- Lehman Brothers worked on the IPO of Costco --
25 don't quote me; I might be wrong. But, yes, I'm a

Page 51

1  card-carrying member of Costco. And my husband will
2  not buy any sports equipment there.
3      Q. Let me finish going through this list and
4  then maybe, depending on how you feel, it would be a
5  good time to take a break.
6      A. Okay.
7      Q. What was the role of John Weiss in the IPO?
8      I'm sorry, I skipped ahead. Page 9. He
9  appears to be with NationsBank Montgomery.
10     A. Oh. He -- I don't recall, but from his title
11 here, he would have been like the Bernie Picchi of
12 NationsBank.
13     Q. And what was the role of Joe Teklits, if I'm
14 pronouncing that correctly?
15     A. He's an equity research analyst from
16 Ferris Baker. The same as Bernie Picchi, similar role
17 as Bernie Picchi.
18     Q. Okay. And Dave Turner?
19     A. I don't know that name. I don't recall that
20 name, I should say.
21     Q. Okay. He was also at Ferris Baker, I
22 believe, and may have been later in the period.
23     A. Okay.
24     Q. What kind of communications did Lehman and
25 the other writers -- other underwriters have during

Page 52

1  the IPO process?
2      A. Well, they were our co-managers, so they
3  needed to be present at the drafting sessions and at
4  the due diligence sessions. And we would include them
5  in -- they were part of the team. We all worked
6  together.
7      Q. Was there an exchange of the research that
8  was done by the individual underwriters?
9      A. I --
10     MR. CHEPIGA: Object to the form of the
11 question.
12     If you understand it, go ahead. I don't.
13     MS. LELAND: Let me try to rephrase it.
14     Q. You did research at Lehman?
15     A. Okay. Equity research? Because there's
16 equity research, which is the Bernie Picchi,
17 Joe Teklits, that kind of thing. And that's
18 proprietary; they write their own and they are
19 competing with each other. So -- you know, so we have
20 the same source in terms of the companies meetings for
21 equity research, but they write their own reports.
22     Q. Okay.
23     A. They do so independently. They come up with
24 their own models, their own everything, if you're
25 talking about equity research.

Page 53

1      Q. And as far as the type of research you were
2  doing, is there a term for that?
3      A. Well, if you're talking about the due
4  diligence.
5      MR. CHEPIGA: Due diligence?
6      MS. LELAND: Yes, just the due diligence in
7  general.
8      THE WITNESS: Yes, we all do that together.
9  BY MS. LELAND:
10     Q. And the information was exchanged between --
11     A. Mm-hmm. Mm-hmm.
12     Q. Okay.
13     A. Oh, I needed to say "yes."
14     MR. CHEPIGA: Just making sure she got the
15 "yes."
16     Do you want to take a break? We've been
17 going over an hour.
18     MS. LELAND: Sure.
19     (Recess taken.)
20     (Exhibit No. 154 marked for identification.)
21 BY MS. LELAND:
22     Q. Marked as Exhibit 154 is a document Bates UND
23 00134 through -43. Can you take a look at the
24 document and then let me know if you recognize it.
25     (Witness examines document.)

14  (Pages 50 to 53)

023fc33a-412e-4535-b58b-026dd1865d02

## OLGA A. PULIDO-CROWE

Page 66

1  look at the third.
2  BY MS. LELAND:
3      Q.  Exhibit 157?
4      A.  157.
5          (Witness examines document.)
6          So, with Exhibit 157, these items were
7  reviewed, and again, I don't -- I needed more
8  visual aids to help me remember if there was anything
9  specific on these documents.
10     Q.  That's fine.  And --
11     A.  And 158.
12         (Witness examines document.)
13         Okay.  And the same comment here.
14     Q.  Okay.  Do you recall if there were any other
15  shipments of documents from the attorneys?
16     A.  I -- I don't recall.  I would have to rely
17  on -- we keep pretty thorough records of what we get,
18  so I'm relying on that.
19     Q.  So is it fair to say that the documents
20  provided by counsel for the due diligence came in
21  these four shipments?
22     A.  The documents provided by --
23     Q.  -- by Cooley Godward came in these four
24  shipments.
25         MR. CHEPIGA:  She just said she didn't know

Page 67

1  if there were others.  Objection.
2          THE WITNESS:  Yeah, I don't know.  It's
3  whatever you guys have in the files.
4          MS. LELAND:  She also said they keep very
5  good records and if it happened, it should be here.
6          MR. CHEPIGA:  If you pulled everything that's
7  relevant to show her.
8          (Exhibit No. 159 marked for identification.)
9          MS. LELAND:  Marked as Exhibit 159 is the
10  document Bates-numbered UND 00283 to -84.
11         THE WITNESS:  Okay.
12  BY MS. LELAND:
13     Q.  Do you recognize this document?
14     A.  No.
15     Q.  Do you recognize the handwriting in this
16  document?
17     A.  No.  Curious, whose is it?  Sorry.
18     Q.  The document purports to reflect a meeting
19  dated July 9th of 1998 with Daryl and Mark from the
20  company.  I'm looking at the top of Page 284.  It
21  says:  "Bring down due diligence."
22         Do you recall any such meeting occurring?
23     A.  "Bring down due diligence."  Yes.
24     Q.  Was this some -- did you participate in this
25  meeting?

Page 68

1      A.  I believe so, but I can't recall
2  definitively.
3      Q.  Okay.  And by "Daryl and Mark from the
4  company," is that Daryl Hatfield and Mark Gonsalves?
5      A.  Yes.
6      Q.  Do you recall where the meeting was held?
7      A.  July 9th.  No, I do not.
8      Q.  Toward the bottom of Page 284, there is a
9  heading "Litigation front."
10         Do you see that?
11     A.  Mm-hmm.
12     Q.  It says:  "File lawsuit against British
13  distributor to void relationship.  They had declined
14  to sign agreement."
15         Do you see that language?
16     A.  Yes.
17     Q.  Do you know what that refers to?
18     A.  I don't recall.
19     Q.  Okay.  Do you recall whether, during this
20  meeting, any other litigation was discussed?
21     A.  Repeat the question.
22     Q.  Do you recall -- let me rephrase the
23  question.
24         Do you recall whether during this meeting on
25  July 9th, whether the company's litigation with Costco

Page 69

1  was discussed?
2      A.  I don't recall specifically.
3          (Exhibit No. 160 marked for identification.)
4  BY MS. LELAND:
5      Q.  Marked as Exhibit 160 is Bates UND 06019
6  through -22.
7          Do you recognize this document?
8      A.  Yes.
9      Q.  What is this document?
10     A.  It is a summary -- very brief summary of the
11  due diligence that we performed for the Adams Golf
12  IPO.
13     Q.  By "we," do you mean the working team?
14     A.  Yes.
15     Q.  The second item on Page 6020, second heading,
16  is "Customer Calls - summaries circulated to
17  underwriters by caller."
18         Do you recall customer calls?
19     A.  Yes.
20     Q.  Will you explain to me how that worked?
21     A.  We would call the Adams Golf contact at the
22  customer location and speak to them about their
23  relationships with Adams Golf.  And we split up the
24  calls amongst the underwriters.
25     Q.  Which underwriters were the calls divided

18  (Pages 66 to 69)

023fc33a-412e-4535-b58b-026dd1865d02

OLGA A. PULIDO-CROWE

Page 70

1    among?
2        A.  Well, by -- amongst ourselves and
3    Ferris Baker.
4        Q.  Okay.  And do you know who provided the names
5    of the customers?
6        A.  The names of the -- well, we asked for a list
7    of the top customers from the company.  So they
8    provided the list from which to select the -- the
9    customers, and we randomly selected from the list of
10   customers, focusing on the largest.
11       Q.  To your knowledge, during these customer
12   calls, was the issue of gray marketing ever discussed?
13       A.  Was the issue of gray marketing ever
14   discussed?  It was discussed in the context of the
15   customer's satisfaction with their overall
16   relationship with Adams Golf.  So, to clarify, we
17   would talk about if they had any problems or issues
18   with Adams Golf that we should be made aware of.
19           And so we gave them very open-ended,
20   broad questions so that they could tell us anything
21   and everything and gave them pretty much every
22   opportunity to do that.  And so, in that way, it was
23   discussed.
24       Q.  Okay.  Do you have any specific recollection
25   of a customer call during which gray marketing was

Page 71

1    discussed?
2        A.  In terms of, like, if I go through each one
3    of these -- I would say -- well, with each of the
4    accounts that Lehman Brothers handled directly, I know
5    I was involved on those calls.  And it would -- we
6    would discuss any types of issues, again, they would
7    have with Adams, with any -- you know, what they saw
8    in competition.
9           So again, your definition -- your term of
10   "gray marketing," from the broadest sense, using that
11   definition -- in the broadest sense, sure, it was
12   discussed with each of these clients.
13       Q.  Were these --
14       A.  With each of these customers.  Excuse me.
15   Because we're talking about -- "You get your supply
16   from Adams Golf."  You know, "Are you" -- "what are
17   they doing with you?" -- "How happy are you with
18   Adams Golf?"  What are they doing from their
19   perspective for protecting the brand and getting the
20   product to them and servicing them?
21           So that would cover a broad range of issues,
22   including the gray marketing issue.  If they had a
23   problem, they would have said something to us.
24       Q.  And do you recall anyone expressing concern
25   over the sale of clubs in Costco during these calls?

Page 72

1        A.  Not at all.
2           (Exhibit No. 161 marked for identification.)
3    BY MS. LELAND:
4        Q.  Exhibit 161 is Bates UND 00287 through -315.
5    Go ahead and take a look at this and let me know if
6    you recognize it.
7        A.  Yes.  This is a compilation of customer due
8    diligence questionnaires, answers from -- that we
9    received from the company -- from the customers,
10   pardon me -- that we receive from the customers when
11   performing due diligence.
12       Q.  Great.
13           Were you involved in preparing the
14   questionnaire?
15       A.  Yes.
16       Q.  Do you recall who else was involved in
17   preparing the questionnaire?
18       A.  Generally speaking, the team would be
19   involved.
20       Q.  And do these questionnaires correspond to the
21   customer calls listed on the prior exhibit, No. 160?
22           MR. CHEPIGA:  Do you actually want her to go
23   back and compare them?
24           MS. LELAND:  Please.
25           MR. CHEPIGA:  It's a matter of whatever is in

Page 73

1    the document is in the document.
2           MS. LELAND:  Let me rephrase that.
3        Q.  Did you send questionnaires to everyone
4    listed under "Customer calls" in Exhibit 160?
5        A.  I would have to check, but we -- yes, we did.
6    I would have to check to see if they are actually in
7    this packet.
8           MR. CHEPIGA:  Excuse me.  Did you send the
9    questionnaires?
10          THE WITNESS:  Oh, I'm sorry.
11          MR. CHEPIGA:  Listen to the question.
12          THE WITNESS:  I need to listen.  Did we
13   send --
14   BY MS. LELAND:
15       Q.  Did you send or did you provide the
16   questionnaires to the customers listed under "Customer
17   calls" in Exhibit 160?
18       A.  I don't recall.  We asked the questions of
19   the customers.  Whether or not we sent them a copy of
20   this questionnaire in writing, I don't recall.
21       Q.  Okay.  Was this -- just trying to make sure
22   I've got it right.
23           This is the list of questions that you asked
24   the customers?
25       A.  Yes.

19 (Pages 70 to 73)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

023fc33a-412e-4535-b58b-026dd1865d02

OLGA A. PULIDO-CROWE

Page 74

1    Q. Okay. So it very well may have been filled
2  out by someone on the working team as opposed to the
3  customer filling it out and sending it back to you?
4    A. Yes.
5    Q. Okay. Thank you.
6      Are you aware of any customers on the list in
7  Exhibit 160 --
8    A. 160?
9    Q. 160, this one.
10    A. Okay.
11    Q. -- anyone else who you may have asked these
12  questions to?
13    A. Am I aware of anyone else?
14    Q. Let me rephrase it.
15      Do you recall running through the customer
16  due diligence questionnaire with any Adams Golf
17  customers other than those listed on Page 6020 of
18  Exhibit 160?
19    A. I -- all of us spoke to many people in the
20  golf industry during this process. These are our
21  official results for the record. But we also -- I
22  know I did personally, spoke to others when I walked
23  into a golf course, that type of thing. Just
24  checking, checking, looking for market, doing market
25  research, and never incurred any problems.

Page 75

1    Q. And the list of customer calls on
2  Exhibit 160, those were given to you by Adams Golf;
3  correct?
4    A. The list -- no. We --
5    MR. CHEPIGA: Objection.
6    THE WITNESS: Well, the list of customer
7  calls?
8  BY MS. LELAND:
9    Q. How did you decide which customers to call?
10    A. We --
11    MR. CHEPIGA: Objection. Asked and answered.
12  Go ahead.
13    THE WITNESS: We asked for a list of the
14  company's top customers. You know, "Give us a list of
15  your customers." They have over 7,000 customers,
16  but -- "Give us a list of your customers," and then we
17  randomly chose from that list who we wanted to call.
18    MS. LELAND: Okay.
19    (Exhibit No. 162 marked for identification.)
20  BY MS. LELAND:
21    Q. Marked as Exhibit 162 is the document
22  Bates-numbered UND 00387 to -88.
23      Is this a list that you were given?
24    A. I believe so.
25    Q. In the second column, under "1998 through

Page 76

1  February 28th," listed as No. 3 is "WDC Mackenzie
2  Distributing Ltd., Canada"; correct?
3    A. Mm-hmm.
4    Q. Did you ever speak with anyone at
5  WDC Mackenzie as part of the due diligence?
6    MR. CHEPIGA: Objection. Asked and answered.
7  Go ahead.
8    THE WITNESS: Not that I recall. I would
9  have to look back at this list, but I don't think they
10  were on our list of -- of our people --
11    MS. LELAND: Okay.
12    THE WITNESS: -- of the people that we talked
13  to.
14    (Witness examines document.)
15    Correct. No, we did not speak to them.
16    (Exhibit No. 163 marked for identification.)
17  BY MS. LELAND:
18    Q. Marked as Exhibit 163 is the document
19  Bates-numbered Adams 001494.
20      Do you recognize this document?
21    A. It's a press release from Adams, yes.
22    Q. Do you recall having seen it before?
23    A. I believe so.
24    Q. When?
25    A. I don't recall exactly when.

Page 77

1    Q. Do you recall whether you saw it prior to the
2  IPO?
3    A. Yes.
4    Q. You mentioned earlier that you were aware
5  that Adams Golf was commencing litigation against
6  Costco. Is that correct?
7    A. "Commencing litigation," I'm not sure if
8  that's the correct term, again, just because I don't
9  have the legal background. But there was something
10  that was going to be done in a legal manner. That's
11  what I knew.
12    Q. By Adams against Costco?
13    A. Yes.
14    Q. Did you discuss the litigation with anyone at
15  Adams prior to them filing the suit?
16    A. I believe it was prior, yes.
17    Q. Who did you discuss this with?
18    A. I don't recall exactly, but it would have --
19  it was a group of senior management at the company
20  and/or our -- our counsel, underwriters' counsel or
21  their counsel. It was discussed.
22    Q. Did you follow the litigation after it was
23  filed?
24    A. What do you mean by "follow"?
25    Q. Adams Golf filed a bill of discovery against

20  (Pages 74 to 77)

023fc33a-412e-4535-b58b-026dd1865d02

## OLGA A. PULIDO-CROWE

Page 78

1 Costco in June of '98.
2    A. Okay.
3    Q. Did you have any discussions with anyone at
4 Adams concerning the litigation between June 9th
5 of '98 and July 9th of '98?
6    A. I believe I did.
7    Q. Who did you have discussions with?
8    A. I don't recall. I can recall conversations.
9 I don't remember who was actually there, but I recall
10 conversations.
11    Q. And what was said in these conversations?
12    A. My recollection was discussions to determine
13 whether or not this was a significant issue and
14 whether or not it was -- it was a significant issue.
15 And I remember concluding that it wasn't.
16    Q. On what basis did you conclude that this was
17 not a significant issue?
18    A. This type of thing happens all the time with
19 companies. Costco was not -- it wasn't a big problem.
20 There weren't lots of clubs at Costco's; it was an
21 isolated incident, and it was protection that is done
22 in the normal course of business for -- that
23 Adams Golf would do. So other golf clubs
24 manufacturers have -- do the same, protecting their
25 patent, that type of thing. It's not anything

Page 79

1 different that -- so -- it's not anything different.
2    Q. Do you know how the suit turned out?
3    A. Not specifically. I would have to be
4 prompted. I believe it was a nonissue.
5    Q. Would you be surprised to hear the suit was
6 dismissed?
7    MR. CHEPIGA: Object to the form of the
8 question.
9    THE WITNESS: What does that mean?
10    MR. CHEPIGA: It means answer the question,
11 but I think it's a defective question.
12    THE WITNESS: Would I be surprised to find
13 out that --
14    MS. LELAND: -- the suit was dismissed.
15    THE WITNESS: I don't know.
16 BY MS. LELAND:
17    Q. Have you ever heard that the suit was
18 dismissed?
19    A. I don't recall. I just remember it not being
20 a significant issue.
21    Q. Were people at Adams taking the position that
22 this was not a significant issue?
23    A. We discussed it thoroughly. We -- so it
24 was -- it was something that was discussed. Anytime I
25 hear "legal action," it has to be discussed and

Page 80

1 vetted. And so the issue was taken seriously; it
2 wasn't, you know, just dismissed. It was -- but it
3 was fully discussed and vetted with the company and
4 with the underwriters, and we felt it wasn't a
5 significant issue. I do recall that.
6    I -- I mean, when there is a legal issue,
7 I want to know, you know, what's going on? Is it
8 something that could impact the company significantly?
9 And we pursue that. You know, typically they're
10 around patent issues, and this one was not one that
11 was significant. There were other -- many other
12 factors that were significant, or material.
13    Q. And those factors being the ones you
14 identified previously that appear in those first
15 couple of exhibits we talked about?
16    A. Yes, to talk about competition.
17    Q. Exactly.
18    A. What's happening there.
19    Q. Do you recall how you received a copy of that
20 press release?
21    A. No, I don't. No, I don't. But I do remember
22 talking about it and discussing it.
23    Q. Could you have received it directly from
24 Adams Golf?
25    MR. CHEPIGA: Object to the form.

Page 81

1    THE WITNESS: Could I have?
2    MR. CHEPIGA: That's what I'm objecting to.
3 BY MS. LELAND:
4    Q. Just trying to find out if it came through
5 your in-house research or if Barney sent it to you.
6    Do you recall seeing a draft of the press
7 release?
8    A. I don't know if I saw it. I don't know if I
9 saw a draft. But Barney contacted us frequently. You
10 know, he was discussing -- he was one of the most --
11 he talked to us a lot. We had lots of calls from
12 Barney. And so I know we discussed a lot of these
13 issues.
14    Q. What, to your knowledge, was the Adams-Costco
15 litigation intended to accomplish?
16    A. What was it intended to accomplish? Repeat
17 that question again.
18    Q. What was the litigation intended to
19 accomplish?
20    A. To stop the distribution of clubs wherever
21 they might be at Costco.
22    Q. In going through the due diligence process,
23 who had the final say on whether or not the presence
24 of clubs in Costco was material?
25    A. Who had the final say?

21 (Pages 78 to 81)

023fc33a-412e-4535-b58b-026dd1865d02

OLGA A. PULIDO-CROWE

Page 82

1    Q. (Nods head up and down.)
2    A. It would be a collaborative effort amongst
3  the underwriters and the company, and we would all
4  give our opinion on that. And then I'm unsure as to
5  who would say it, but if we wanted -- if we felt that
6  it was material, we would put it in there
7        (Exhibit No. 164 marked for identification.)
8    MS. LELAND: Marked as Exhibit 164 is
9  Document No. UND 02708.
10        THE WITNESS: Okay.
11  BY MS. LELAND:
12    Q. Have you seen this document before?
13    A. Yes.
14    Q. What is this document?
15    A. A summary of the SEC's comments on the
16  prospectus.
17    Q. Who is Joe Hoffman?
18    A. I have to look at the working group list.
19  I believe an attorney.
20    Q. Okay. Do you recall the approximate date
21  when you saw this memo?
22    A. No, I don't recall the approximate date, but
23  as a matter of practice, we see the SEC's comments.
24    Q. Okay. So, as a matter of practice, you would
25  have seen it around the time the memo was issued;

Page 83

1  is that correct?
2    A. Yes.
3    Q. Okay. Take a look, and if you could read on
4  the record Item No. 4.
5    A. Okay.
6        (Witness examines document.)
7        Okay.
8    Q. "The staff wanted the company to consider
9  whether disclosure of the Costco matter was
10  necessary."
11    A. Okay.
12    Q. What happened when you saw this memo?
13    A. When I saw that statement, "The staff wanted
14  the company to consider whether disclosure of the
15  Costco matter was necessary"? Well, your question is,
16  like -- I know -- I don't know what happened when I
17  saw it, but I know what happened with considering
18  whether disclosure of the Costco matter was necessary.
19    Q. What happened in the consideration?
20    A. We discussed whether it was necessary and
21  concluded that it was not a material and relevant
22  factor.
23    Q. Who all was involved in the discussions?
24    A. I can't recall specific names, but I can
25  recall it was underwriters and -- and senior

Page 84

1  management and counsel.
2    Q. Okay. By June 25, 1998, the clubs were in
3  Costco; correct?
4    A. Well, in limited -- what we knew was a
5  limited basis
6    Q. And Adams had filed their suit against
7  Costco; correct?
8    A. Correct, based on -- yes, okay. June 9th,
9  yes.
10    Q. And nevertheless, everyone decided that it
11  wasn't a material issue?
12    A. That's right, because Costco -- it was --
13  you could file suit against every person that you
14  found had a club. You know, people get them in all
15  different manners and different ways. And, you know,
16  this source was -- it was, you know, going to be shut
17  down. It wasn't a significant one, a small number of
18  clubs, isolated incident.
19        And it just wasn't a -- it was not a relevant
20  factor to bring it out and highlight it as a separate
21  risk factor. This was all covered under the risk
22  factors that are in the prospectus, those general
23  terms, competition and what happens, that kind of
24  thing.
25    Q. Once you learned that the litigation had been

Page 85

1  filed against Costco, did you request any litigation
2  updates from Adams Golf?
3    A. As a matter of practice, we would follow up,
4  potentially, what was -- anything that was happening
5  at the company that had a legal or matter -- you know,
6  legal matter, we would follow up on.
7    Q. How would you follow up? In writing?
8    A. We may have, but typically it was in
9  conversations with the company --
10    Q. Okay.
11    A. -- and with their counsel.
12    Q. Do you recall any of these conversations?
13    A. Generally, yes.
14    Q. Can you describe them for me?
15    MR. CHEPIGA: Hold on a second.
16    THE WITNESS: Okay.
17    MR. CHEPIGA: Are we getting into any
18  privileged area for Adams Golf?
19    MS. MORIATY: Yes, we probably are. We're
20  describing conversations between counsel and the
21  company. If we're describing conversations among the
22  group, however, we're okay.
23        Which are we describing?
24    MS. LELAND: Well, I wouldn't think that
25  underwriters --

22 (Pages 82 to 85)

023fc33a-412e-4535-b58b-026dd1865d02

OLGA A. PULIDO-CROWE

Page 86

1      MS. MORIATY: If we're describing things that
2   you heard about as part of a drafting process, then
3   we're okay.
4      MR. CHEPIGA: But she could have talked about
5   her own counsel.
6      THE WITNESS: I don't know. I don't recall.
7      MS. MORIATY: If -- you shouldn't know things
8   that are just happening with their own counsel, so to
9   the extent that you recall specifically or it was
10  within the entire group and part of the drafting
11  process, it's not privileged. But if it's something
12  that Adams is discussing only with their own counsel
13  and you heard hints and don't know the details of,
14  don't talk about that.
15     THE WITNESS: I can't clarify. I don't know,
16  you know, where..
17  BY MS. LELAND:
18     Q. Let me try to go through it step by step,
19  because the last thing I want you to do is disclose
20  privileged information.
21     Do you recall having any conversations within
22  the working group as to the status and progress of the
23  Adams-Costco litigation?
24     A. Again, I'm trying to figure out who was there
25  and when and that kind of thing.

Page 87

1      I would say -- repeat one more time. What
2   did you say? Do I -- I'm sorry.
3      (Record read by the reporter.)
4      THE WITNESS: I -- yes, I recall it being --
5   talking about it being filed and that it was moving
6   along. And then after that, I'm blurry as to, you
7   know, what exactly was said and when.
8   BY MS. LELAND:
9      Q. Okay. What do you mean by "moving along"?
10     A. That the -- whatever the motion was filed and
11  that there was a response, and that -- and that's --
12  that's what I remember.
13     Q. Okay. Do you recall having any conversations
14  with anyone at Adams concerning the progress of the
15  Adams-Costco litigation?
16     A. Do I recall having any conversations with
17  anyone at Adams? Yes, I would have talked to -- well,
18  yes, again in general.
19     Q. Can you describe, to the best of your
20  recollection, what was said in these discussions?
21     A. I apologize, it just -- it was discussed, and
22  I don't remember exactly because it wasn't a --
23  it wasn't a big issue. You know, it was there.
24  I didn't think it was going to turn into a big issue,
25  didn't have any indication it was going to turn into a

Page 88

1   big issue. It was an isolated incident. So, you
2   know, there weren't huge, long -- there were long
3   discussions that I can tell you in detail about other
4   things, but in this one, it was not material by any
5   means.
6      Q. Did anyone at Adams attempt to assure you
7   that this was not a big deal?
8      A. Did anyone attempt to assure me?
9      MR. CHEPIGA: Object to the form.
10     THE WITNESS: Okay.
11     MR. CHEPIGA: Go ahead and answer it.
12     MS. LELAND: Let me try to rephrase it.
13     Q. Did anyone at Adams tell you that the
14  presence of clubs in Costco was immaterial?
15     A. I don't know if they would have used those
16  words. I know that we talked about it as a group and
17  came to that conclusion. But no one was forcing that
18  opinion on us, that kind of thing. I wasn't forcing
19  it on anybody else.
20     (Exhibit No. 165 marked for identification.)
21     (Discussion off the record.)
22     (Recess taken.)
23  BY MS. LELAND:
24     Q. Marked as Exhibit 165 is a Document UND 02701
25  through -03.

Page 89

1      Do you recognize this document?
2      A. By looking at it, it's a letter to the SEC.
3      Q. Do you remember seeing this document
4   previously?
5      A. It's -- well, in this format? Just like
6   this? I guess this is an electronic version of a
7   transmission. I --
8      Q. In any format.
9      A. I mean, just to say we review -- we look at
10  the company's response to the SEC, yeah, we look at
11  them.
12     Q. Did you see a draft of this response before
13  it went to the SEC?
14     A. I don't recall. I know typically we know
15  what the company is going to respond.
16     Q. Were you involved in any discussions on how
17  the company was going to respond?
18     A. On how the company was going to respond?
19  Yes, I knew how -- I knew how the company was going to
20  respond.
21     Q. Did you have any input in the response?
22     A. Did I have any input? Did I have any input?
23  Did I have any input?
24     Well, I was certainly not -- no one told me I
25  couldn't say anything. I could say something; whether

23 (Pages 86 to 89)

023fc33a-412e-4535-b58b-026dd1865d02

OLGA A. PULIDO-CROWE

Page 126

1    "Its ability to deliver high-margin, quality
2  product to golf retailers." Can I get those high
3  margin quality products to the golf retailers? I need
4  to be able to deliver them.
5    Q. So by "margin," you mean the margin that the
6  retailer earns between what they pay Adams for the
7  club and what they sell the club for; is that correct?
8    A. Yes.
9    Q. Okay.
10    A. But more the focus should be on the quality
11  product.
12    (Exhibit No. 174 marked for identification.)
13  BY MS. LELAND:
14    Q. Marked as Exhibit 174 is a document that
15  doesn't have a Bates number.
16    Do you recognize this document?
17    A. It's a new report on Adams Golf earnings
18  release.
19    Q. Do you recall reading the release when it
20  came out?
21    A. Yeah, I remember -- I recall when they issued
22  a press release, I would read it.
23    Q. And just to be clear, the date on this press
24  release is July 22nd of '98, which is after the date
25  of the IPO.

Page 127

1    A. Okay.
2    Q. Did you still follow Adams and read its press
3  releases following the IPO?
4    A. Well, as a course of seeing how the company
5  is doing, yeah.
6    Q. Okay. Do you recall whether you saw a draft
7  of this release before it was issued?
8    A. I don't recall. I don't recall, but Bernie
9  almost checked with us on everything.
10    Q. Even after the IPO?
11    A. To some extent, yes.
12    Q. Following the IPO, did you continue to review
13  Adams sales and income and other similar figures?
14    A. After that, we keep tabs on the company and
15  how they are doing, yes.
16    Q. When you say "we," does that include everyone
17  in the working group?
18    MR. CHEPIGA: Object to the form.
19  BY MS. LELAND:
20    Q. Who do you mean by "we"?
21    A. Well, the banker who covers the client, so
22  that would be me and my team. And the equity research
23  analysts certainly keep tabs on the companies because
24  they publish on the companies.
25    Q. Okay. At this point, following the IPO, was

Page 128

1  Mr. Francis also keeping an eye on the reported
2  performance of Adams Golf?
3    MR. CHEPIGA: Object to the form.
4    THE WITNESS: I don't know. I mean, I would
5  assume so, but --
6    MR. CHEPIGA: Please don't assume --
7    THE WITNESS: Don't assume.
8    MR. CHEPIGA: -- unless you know everything
9  he did.
10    THE WITNESS: That's right. I don't know.
11  BY MS. LELAND:
12    Q. Did you ever have any discussions with him
13  about Adams' performance following the IPO?
14    A. Adams' performance or the performance of the
15  stock?
16    Q. Either.
17    A. Well, I distinctly recall performance on the
18  stock, because there were so many factors outside of
19  the market having nothing to do with Adams having an
20  impact on the stock price. Competitors announcements,
21  untimely, false, wrong reports. It was just amazing
22  what was in the press that was incorrect. The Reuters
23  announcement that Adams had lower earnings was
24  unbelievable. That was just incorrect.
25    But that type of incorrect information in the

Page 129

1  news from an outside source can impact a stock price,
2  and competitors' reports and timings of those releases
3  all impacted Adams' stock price.
4    So I definitely had discussions with Stu
5  about that. It was bad luck for the company that that
6  kind of stuff was happening in the market.
7    Q. Did you have any conversations with
8  Mr. Francis following the IPO concerning that gray
9  market/Costco situation at Adams?
10    A. No. That wasn't an issue. More important
11  were the competitors' products and -- you know, it was
12  bad news on Callaway. Their earnings were declining
13  and so their stock price started declining, and
14  unfortunately that impacted Adams. And it had nothing
15  to do with Adams' performance, but yet, since the
16  market views the whole golf market as one, anything
17  that impacted Cobra or Callaway, or Callaway in
18  particular, was impacting Adams. Even though it
19  shouldn't have, it did.
20    (Exhibit No. 175 marked for identification.)
21  BY MS. LELAND:
22    Q. Exhibit 175 is Bates-numbered Adams 036839
23  through -41.
24    Have you seen this memo before?
25    A. I don't think so. September 28, 1998, to the

33 (Pages 126 to 129)

RAINWATER

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


IN RE: ADAMS GOLF, INC. :    CONSOLIDATED

SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

_____X


ORAL DEPOSITION OF DALLAS RAINWATER

Thursday, August 17, 2006


The oral deposition of DALLAS RAINWATER

was held at the law offices of Akin Gump Strauss

Hauer & Feld, LLP, 1700 Pacific Avenue, Suite

4100, Dallas, Texas, from 9:20 a.m. to 11:57 a.m.,

before Jamie K. Israelow, a Certified Shorthand

Reporter in and for the State of Texas, Registered

Professional Reporter, Certified Realtime Reporter

and Certified LiveNote Reporter.



RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000    (888)777-6690

Page 14

09:32:12 1 that time.

09:32:15 2 Q So in other words, if, say, 300 clubs
09:32:20 3 were returned in December -- that's just a
09:32:28 4 hypothetical number -- then you would say that for
09:32:30 5 the rest of the year you would reserve for 300
09:32:35 6 clubs to be returned each month, for the rest of
09:32:51 7 the year, for next year?

09:33:05 8 A It was somewhat complicated, so we
09:33:11 9 also had to look at those 300 clubs in relation to
09:33:20 10 sales.

09:33:20 11 Q And they could have been sold anytime
09:33:24 12 in 1997, presumably?

09:33:26 13 A Well, as I recall, there was a 90-day
09:33:33 14 policy in place.

09:33:34 15 Q Was that always adhered to?

09:33:38 16 A I really can't testify to that. I
09:33:44 17 don't remember.

09:33:45 18 Q Okay. How did you have to gear it to
09:33:57 19 sales?

09:33:57 20 A We all felt that the reserves should
09:34:01 21 be stated as a percent of sales.

09:34:06 22 Q And how did you arrive at
09:34:10 23 the percent?

09:34:11 24 A We would look at our current actual

Page 15

09:34:14 1 experience.

09:34:17 2 Q So if you had the -- what sales would
09:34:21 3 you look at?

09:34:24 4 A Well, we did break it down between
09:34:28 5 direct response sales and commercial sales.

09:34:36 6 Q Okay.

09:34:36 7 MS. REED: It might be helpful
09:34:37 8 if you just show him the document that shows the
09:34:40 9 reserves.

09:34:40 10 MS. FOX: Yeah. I don't have
09:34:42 11 it

09:34:43 12 MS. REED: I'm having it
09:34:44 13 copied right now, if that might help. Would it
09:34:47 14 help? Should we take a break and I get that?

09:34:50 15 MS. FOX: Sure. If you have
09:34:51 16 that.

09:34:51 17 MS. REED: Okay. Let's take a
09:34:52 18 break.

09:34:52 19 (A recess was taken from
09:38:02 20 9:34 to 9:41.)

09:38:02 21 (Deposition Exhibits 362-365
09:41:12 22 were marked.)

09:41:12 23 Q (By Ms. Fox) The question I asked
09:41:13 24 you is: When you have a given number of returns,

Page 16

09:41:21 1 what sales do you base them on to get
09:41:27 2 your percent?

09:41:27 3 A Right. And if we -- if we look at
09:41:31 4 these work papers, there is a separate section for
09:41:37 5 direct response, a separate section for
09:41:40 6 commercial.

09:41:43 7 Q Okay.

09:41:43 8 A The sales numbers there, for example
09:41:47 9 on Exhibit 363, based on actual returns, we would
09:41:55 10 have said that our expected returns would be the
09:42:00 11 167, the 173, and the 157.

09:42:05 12 Q Where is that?

09:42:06 13 MS. REED: He's looking at
09:42:07 14 Exhibit 363.

09:42:08 15 MS. FOX: Oh, sorry.

09:42:10 16 Q (By Ms. Fox) So in other words,
09:42:12 17 the -- in April the sales were 1,395?

09:42:18 18 A Yes.

09:42:18 19 Q And the returns were 167.4. You only
09:42:22 20 got the club -- the head of the club back?

09:42:25 21 A We -- that would be what we would
09:42:28 22 expect the returns to be on those sales.

09:42:33 23 Q Okay.

09:42:33 24 A That -- yeah. This is --

Page 17

09:42:34 1 Q And how is that figured out? Where
09:42:36 2 did you get that?

09:42:37 3 A We would have based that on previous
09:42:47 4 trends.

09:42:47 5 Q And when you say "previous trends,"
09:42:50 6 how did you figure those out?

09:42:53 7 A Well, we would see our actual
09:42:59 8 returns.

09:42:59 9 Q Previously?

09:43:00 10 A Correct.

09:43:00 11 Q For the same month or --

09:43:02 12 A No. For example, if we look at
09:43:07 13 Exhibit 362, which is the first quarter, we would
09:43:14 14 have looked at our actual returns that we received
09:43:19 15 in January, February, and March, and we would say:
09:43:25 16 Based on those returns, we expect our sales
09:43:31 17 returns for April, May, and June to be at
09:43:37 18 X percent of sales.

09:43:39 19 Q So you didn't take into account at
09:43:40 20 that point that sales differ by month in the golf
09:43:46 21 business? You sell more stuff in the spring for
09:43:48 22 the summer season than you sell in October or
09:43:53 23 November?

09:43:55 24 A That's why we looked at it as

5 (Pages 14 to 17)

---

**Page 18**

09:43:56 1    a percent of sales rather than a flat dollar
09:44:00 2    amount.
09:44:01 3      Q   So your assumption is that returns
09:44:03 4    will always be related to sales in the same -- at
09:44:08 5    the same percent?
09:44:13 6      A   Yes.
09:44:15 7      Q   Okay. And so this January, 1,059 is
09:44:20 8    the actual sales in January?
09:44:22 9        MS. REED: Looking at
09:44:23 10   Exhibit 362?
09:44:24 11        MS. FOX: I'm sorry. 362,
09:44:27 12   yeah.
09:44:28 13      Q   (By Ms. Fox) Those are actual sales,
09:44:30 14   1,059?
09:44:31 15      A   Should have been.
09:44:34 16      Q   And the expected returns is based off
09:44:42 17   December sales and returns or earlier -- or the
09:44:45 18   past January or --
09:44:47 19      A   I -- I really don't recall.
09:44:56 20      Q   Okay. So it's based on some kind of
09:44:59 21   past history, but you don't know what month or
09:45:01 22   whether it was based on the whole year?
09:45:04 23        MS. REED: Liz, I think he's
09:45:06 24   already testified -- he testified that he looked

---

**Page 19**

09:45:10 1    at actual returns for January, February, March --
09:45:13 2    well, he actually did it on Exhibit 363. He
09:45:15 3    looked at actual returns for April, May, June, and
09:45:19 4    on that based the expected returns for July,
09:45:22 5    August, September, because we're at June.
09:45:25 6        MS. FOX: But where did he get
09:45:26 7    the expected returns for January, February, and
09:45:28 8    March? Don't you answer. Let him answer.
09:45:33 9      A   Well, by March, I would have been
09:45:35 10   looking at actual returns for January and
09:45:41 11   February.
09:45:41 12      Q   (By Ms. Fox) So did you for the
09:45:43 13   preceding month or two months?
09:45:49 14      A   Again, I don't remember the specific
09:45:54 15   number of trailing months that we looked at.
09:45:56 16      Q   But you wouldn't have looked at March
09:46:01 17   of 1997? You wouldn't go back that far?
09:46:07 18      A   I -- I really don't recall.
09:46:19 19      Q   Okay. Now, under that -- that line,
09:46:20 20   there's a line that says: January, February, and
09:46:28 21   March, and has percents on it. What do
09:46:28 22   those percents represent?
09:46:28 23      A   Yes. And this is -- this is part of
09:46:30 24   the confusing part, but this represents -- again,

---

**Page 20**

09:46:36 1    we had the 90-day return policy.
09:46:40 2      Q   Uh-huh.
09:46:40 3      A   Okay. So for example, on
09:46:48 4    Exhibit 362, when I look at my January sales and
09:46:54 5    the returns that I expected on those sales -- of
09:47:00 6    the returns that I would have expected on those
09:47:04 7    sales, we were estimating that 25 percent of those
09:47:10 8    returns would come back to us within the same
09:47:19 9    month.
09:47:19 10      Q   What does that mean?
09:47:23 11      A   Okay. Say, for example, that we sold
09:47:23 12   a club on January 5th.
09:47:31 13      Q   Okay.
09:47:31 14      A   Then if it was going to be in this
09:47:34 15   25 percent, I would expect that we would have
09:47:36 16   gotten it back within January.
09:47:42 17      Q   Oh, I see. In other words, these are
09:47:47 18   direct sales. Of the direct sales that you sent
09:47:50 19   out, of the returns that you would get, a quarter
09:47:53 20   of them would come back in the first month?
09:47:55 21      A   By this estimation, right.
09:47:58 22      Q   Right.
09:47:59 23      A   And so the other estimations are the
09:48:01 24   same. So for the January returns that we

---

**Page 21**

09:48:04 1    expected, we would expect to receive 30 percent of
09:48:08 2    those in February, 25 percent in March, and
09:48:14 3    15 percent in April.
09:48:22 4      Q   Now, suppose I buy my club and I
09:48:24 5    don't get it back until May 15th, does it -- what
09:48:30 6    does Adams Golf do about that?
09:48:34 7      A   Again, that was -- that was the other
09:48:37 8    side. I --
09:48:39 9      Q   You don't know?
09:48:41 10      A   No.
09:48:41 11      Q   So if that one -- if -- I mean, I
09:48:46 12   guess they had two choices. They could send it
09:48:49 13   back to the person and bill them and expect them
09:48:51 14   to pay, but maybe they will and maybe they won't;
09:48:53 15   or they can take it as a return and return the
09:48:57 16   money?
09:48:57 17        MS. REED: Objection, calls
09:48:58 18   for speculation, if there's a question in there.
09:49:02 19      Q   (By Ms. Fox) You don't know what
09:49:03 20   they do?
09:49:04 21      A   No.
09:49:04 22      Q   And the same, then, you could take
09:49:07 23   that out to June? Suppose I don't get around to
09:49:10 24   the post office until June. What happens to that

---

6 (Pages 18 to 21)

## Page 78

11:30:51 1    Q    Yet, is there still an accrual for
11:30:55 2    January, February, and March somewhere in Adams
11:30:56 3    Golf's financials?
11:31:02 4        A    Yes. There was an accrual at
11:31:05 5    March 31st.
11:31:15 6        Q    Okay. Exhibits 362 through 365 are
11:31:18 7    broken into direct response and commercial. Are
11:31:23 8    the direct response numbers kept separate from the
11:31:26 9    commercial numbers?
11:31:31 10       A    The numbers --
11:31:32 11       Q    The sales numbers and returns numbers
11:31:34 12   for direct response, are they separated from the
11:31:38 13   sales numbers and returns numbers for commercial?
11:31:42 14       A    Yes.
11:31:42 15       Q    And therefore, if you saw higher
11:31:44 16   returns in direct response, it would have nothing
11:31:49 17   to do with anything that happened in commercial;
11:31:53 18   is that correct?
11:32:02 19       A    Correct.
11:32:02 20       Q    Let's look at Exhibit 362. Based on
11:32:07 21   your analysis here, it says: Accrual necessary --
11:32:12 22   let's actually look at total accrual necessary,
11:32:15 23   which includes direct response and commercial, the
11:32:18 24   560.4, yet the general ledger balance is 572.1; is

## Page 79

11:32:23 1    that right?
11:32:26 2        A    Correct.
11:32:26 3        Q    And so it says you're overaccrued.
11:32:28 4    Is an overaccrual a conservative accounting or
11:32:32 5    aggressive accounting?
11:32:33 6        A    That would be conservative.
11:32:36 7        Q    And why is that?
11:32:39 8        A    Because you have reserved more than
11:32:43 9    what you would need to by the analysis. You have
11:32:49 10   put more expense into the books to create that
11:32:56 11   reserve.
11:32:56 12       Q    And so help me understand. When I'm
11:32:59 13   looking at the financial statements, what impact
11:33:02 14   does an accrual or reserve have on Adams Golf's
11:33:06 15   bottom line?
11:33:07 16       A    If a -- if an accrual or a reserve
11:33:12 17   increases, generally that would cause a decrease
11:33:14 18   to your operating income
11:33:20 19       Q    So, if anything, Adams Golf with each
11:33:26 20   exhibit, 362, 363, 364, and 365, report an
11:33:35 21   overaccrual?
11:33:35 22            MS. FOX: Object to the form
11:33:36 23   It's a leading question.
11:33:38 24       Q    (By Ms. Reed) Okay. Can you look at

## Page 80

11:33:39 1    Exhibits 362 through 365 and tell me if you are
11:33:43 2    overaccrued or underaccrued for each exhibit.
11:33:51 3            Let's start with 362. Are you
11:33:53 4    overaccrued or underaccrued?
11:33:55 5        A    The general ledger balance is higher
11:33:58 6    than accrual necessary.
11:34:00 7        Q    And therefore you are?
11:34:01 8        A    Overaccrued.
11:34:05 9        Q    Exhibit 363, are you overaccrued or
11:34:08 10   underaccrued?
11:34:10 11       A    Again, the balance is higher than
11:34:12 12   necessary, so we're overaccrued.
11:34:14 13       Q    Exhibit 364, same question?
11:34:18 14       A    Again, the same, we're overaccrued.
11:34:20 15       Q    And Exhibit 365, overaccrued or
11:34:24 16   underaccrued?
11:34:24 17       A    Overaccrued.
11:34:26 18       Q    And therefore, looking at these
11:34:28 19   exhibits in combination, did Adams Golf overstate
11:34:32 20   or understate its income based on these
11:34:37 21   overaccruals?
11:34:37 22       A    If we had adjusted the general ledger
11:34:42 23   balance to the accrual necessary shown on the
11:34:46 24   pages, operating income would have increased.

## Page 81

11:34:55 1        Q    Therefore, for Exhibits 362 through
11:34:58 2    365 combined, would you characterize this as
11:35:02 3    conservative or aggressive accounting?
11:35:06 4        A    I would consider it conservative
11:35:11 5        Q    Did you as the controller lean
11:35:14 6    towards conservative accounting?
11:35:16 7        A    Yes.
11:35:16 8        Q    Why?
11:35:25 9        A    I'm just much more comfortable with
11:35:31 10   being conservative
11:35:35 11       Q    What's the downside with being
11:35:37 12   aggressive, if there is any?
11:35:48 13       A    If there are any -- I'm not sure how
11:36:05 14   to -- the downside of being aggressive?
11:36:09 15       Q    Yeah. It's kind of a confusing
11:36:11 16   question and maybe unnecessary.
11:36:15 17            MS. REED: Let me withdraw the
11:36:16 18   question.
11:36:18 19       Q    (By Ms. Reed) Returns from sales
11:36:20 20   made by inside sales, the inside sales team at
11:36:25 21   Adams Golf?
11:36:26 22       A    So for these --
11:36:27 23       Q    Would these --
11:36:27 24       A    You were talking about commercial.

21 (Pages 78 to 81)

24819295-6305-42da-a12b-e7b018cfa52b

SJOQUIST

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
- - -

IN RE: ADAMS GOLF, INC. : CONSOLIDATED
:
SECURITIES LITIGATION  : C.A. No. 99-371 KAJ

---------------------------
Tuesday, August 8, 2006
---------------------------

         Oral deposition of CHARLES A. SJOQUIST, taken

pursuant to notice, was held at the offices of AKIN,

GUMP, STRAUSS, HAUER, AND FELD, 590 Madison Avenue,

18th Floor, New York, New York 10022-2524 commencing

at 10:40 a.m. on the above date before Beth A.

Barkocy, Certified Shorthand Reporter and Notary

Public.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA   19103
(215)241-1000     (888)777-6690

# CHARLES A. SJOQUIST

## Page 54

```
12:04:54  1        THE WITNESS: Could you repeat that
12:04:55  2    again?
12:05:10  3        (The preceding question was read
12:05:13  4    back.)
12:05:13  5        THE WITNESS: And I said it's
12:05:16  6    possible, that's correct.
12:05:17  7    BY MS. FOX:
12:05:17  8        Q.    Is it possible that it was also that
12:05:19  9    they could have been mistaken in their assessment that
12:05:23  10   it was not material?
12:05:25  11       A.    That's possible, too.
12:05:28  12       Q.    You don't know one way or the other?
12:05:31  13       A.    No.
12:05:33  14       MS. FOX: That's all the questions I
12:05:34  15   have.
12:05:36  16       MR. JAMES: Would you read back all
12:05:37  17   the questions and answers since we resumed.
12:05:37  18   I want to see how good you are.
12:05:37  19       (The requested portion of testimony
12:05:37  20   was read back.)
12:08:30  21       MR. JAMES: Thanks.
12:10:06  22       MS. BRANNEN: Excuse us.
12:10:08  23       (Ms. Brannen and Mr. James leave the
12:10:11  24   room.)
12:11:20  25       MS. BRANNEN: I have a couple of
```

## Page 55

```
12:11:22  1        follow-up questions.
12:11:22  2    BY MS. BRANNEN:
12:11:24  3        Q.    Mr. Sjoquist, in your experience,
12:11:25  4    what was the practice of the SEC staff if they thought
12:11:28  5    that more information was needed from the company
12:11:30  6    about an outstanding comment?
12:11:33  7        A.    They would issue follow-up comments
12:11:39  8    asking for more information.
12:11:42  9        Q.    If they didn't get that information,
12:11:45  10   how would that affect the registration statement?
12:11:48  11       A.    If the company didn't respond?
12:11:51  12       Q.    Right.
12:11:51  13       A.    Or respond adequately?
12:11:53  14       Q.    Right.
12:11:54  15       A.    They would just not declare it
12:11:56  16   effective.
12:11:57  17       Q.    And with regard to the SEC's comment
12:12:01  18   about the Costco matter in this case, in your
12:12:04  19   experience, what information, if any, would the staff
12:12:07  20   have wanted about the nature of the litigation?
12:12:10  21       A.    They would have wanted some analysis
12:12:13  22   as to the ramifications to the company's business.
12:12:18  23   Whether it would be material quantitatively or have
12:12:23  24   material impact on the business going forward, some
12:12:26  25   analyst has to -- they would have wanted some analysis
```

## Page 56

```
12:12:40  1    that discussed the potential impact or lack of impact
12:12:46  2    of the matter in their business.
12:12:49  3        Q.    And so would they have inquired into
12:12:55  4    the underlying reasons for the litigation then?
12:12:58  5        A.    Yes.
12:12:58  6        MS. FOX: Object to the form.
12:13:02  7        MS. BRANNEN: That's it; that's all
12:13:04  8    I've got.
12:13:04  9    BY MS. FOX:
12:13:10  10       Q.    You don't know what analysis they
12:13:12  11   asked for in this case, do you?
12:13:14  12       A.    No.
12:13:16  13       MS. FOX: Thank you.
          14
          15            - - -
          16        (Witness excused.)
          17            - - -
          18   (Deposition concluded at 12:14 p.m.)
          19            - - -
          20
          21
          22
          23
          24
          25
```

## Page 57

```
1              C E R T I F I C A T E
2
3        I hereby certify that the witness was
4    duly sworn by me and that the deposition is a true
5    record of the testimony given by the witness.
6
7
8        _____
9        BETH A. BARKOCY, CSR
10       Dated: August 14, 2006
11
12
13       (The foregoing certification of this
14   transcript does not apply to any reproduction of the
15   same by any means, unless under the direct control
16   and/or supervision of the certifying shorthand
17   reporter.)
18
19
20
21
22
23
24
25
```

15  (Pages 54 to 57)

d4ce0589-742c-45fc-89c9-b05f43050a38