TATE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

IN RE: ADAMS GOLF, INC.:

SECURITIES LITIGATION  :

X

ORAL DEPOSITION OF EDDIE G. TATE, III

Tuesday, June 27, 2006

- - -

Oral deposition of EDDIE G. TATE, III,
held at the offices of Fox Rothschild, 1301
Atlantic Avenue, Atlantic City, New Jersey
08401, commencing at 9:41 a.m. reported
by Debra Sapio Lyons, RDR, CRR, CSR and Notary
Public of the States of New Jersey, New York and
Maryland.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA  19103

1   in here that I finish it with as saying --
2   here it goes -- from a retailer's
3   standpoint, it's on the second page, one,
4   two, three, paragraphs up, the last
5   sentence, and this really does sum it up,
6   it says, "All too often, Scott, I heard the
7   words, yeah, it's great, but what's in it
8   for me." So we go through and we're having
9   all these promotions, prices, we're
10   stealing Mastercard's tag line, and the
11   retailers are like we don't give a shit.
12   We want this addressed and fixed and you're
13   giving away frigging golf bags. Adams
14   wound up getting sued for the golf bags
15   because of the little trip arm on the
16   lever, they didn't have the copyright or
17   the patent for it, and they copied that and
18   they got sued for it by the manufacturer.
19   So it was just another problem that they
20   had. They weren't addressing any real
21   issues.
22      Q.  What was going on in the
23   retail market in the golf industry at the
24   time?

1      A.  In what respect?
2      Q.  What was the market like in
3   November, 1998?
4      A.  I think that there was a
5   lot of fluctuation in the market. It
6   wasn't exactly the most stable thing in the
7   world. It wasn't -- I think it's alluded
8   to in here also, that there are a great
9   amount of fluctuations, that to some degree
10   sales might be waning as the market was
11   changing, interest rates were going up, and
12   all these other outside variables perhaps,
13   but, again, perception.
14      Q.  On Page Tate 3 at the very
15   top, you say, "Orlimar has had a tremendous
16   effect on our presence within the golf
17   shops. Much of this can be attributed to
18   their infomercial, just as it was ours last
19   year, as well as their spiffing program.
20   Put all these factors together and you'll
21   see why retailers' support for Adams has
22   been so diminished."
23      Was that a true statement at the
24   time?

1      A.  At the time I would say
2   yes. Again, Adams original Tight Lies was
3   at the tail end of its run. Okay. Orlimar
4   came out with a much more attractive
5   looking product. Personally I always
6   thought Adams' was a better club. Okay?
7   But in this email somewhere -- actually,
8   right below it, it's -- the -- Orlimar was
9   developed more for a low handicap golfer.
10   It was easier to hit for -- for me it would
11   be easy to hit. I don't know your golfing
12   abilities, but it would be more challenging
13   for you to hit. It still had a relatively
14   traditionally shaped head, harder to hit.
15   But they used Ken Venturi who won the 1964
16   U.S. Open. Their infomercial gave a
17   certain amount of credibility because they
18   had a U.S. Open winner presenting it.
19      Their spiff program -- spiffing
20   is when you go inside of a store and say:
21   If you sell X amount of clubs, I'm going to
22   give you $2.00 per club, $3.00 per club,
23   whatever it was. We didn't have a spiffing
24   program. So you put spiffing out there and

1   plus the retailers like the -- the Orlimar
2   product, they liked the way it looked, they
3   liked the way it sold, and they didn't have
4   any gray market issues going on with it,
5   that became their "go to" product for
6   fairway sales. And they bounced us pretty
7   bad.
8      Q.  Tell me about their
9   spiffing program.
10      A.  Adams or Orlimar's?
11      Q.  Orlimar's. I don't
12   understand spiffs. How do they work?
13      A.  Spiffs -- you have Reed
14   Golf Manufacturer, okay, and you're making
15   golf clubs and you put it inside the
16   marketplace. You come to -- you come to me
17   and you want me to sell your golf clubs,
18   but if I sell ten clubs or whatever else,
19   you're going to tell me I'm going to give
20   you $3.00 per club if you sell my clubs, so
21   it's a little incentive program internally.
22      Not uncommon within the industry
23   either.
24      Q.  In 1998 Orlimar had a spiff

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

8f532ab9-7c49-4913-ad28-c9d489710f94

Page 90

```
1    program?
2        A.   Yes.
3        Q.   And did that spiff program
4    cause competition issues for Adams Golf?
5        A.   The spiff program didn't
6    cause competition. The fact was the
7    retailers liked their advertising, they
8    liked the way the product looked, they
9    liked the way the product was received by
10   the buying public, and they didn't have any
11   gray market issues. The club was not going
12   to show up in Costco. They maintained
13   their leverage.
14       Q.   Orlimar clubs did show up
15   in Costco though; isn't that right?
16       A.   It might have. Not at that
17   time, not to my knowledge. Maybe later.
18       Q.   Would it surprise you that
19   it did show up in the fall of 1998?
20       A.   No.
21       MR. MARA: Objection, assumes
22   facts not in evidence.
23       THE WITNESS: It wouldn't
24   surprise me.
```

Page 91

```
1    BY MS. REED:
2        Q.   Why did you leave Adams
3    Golf?
4        A.   I was terminated.
5        Q.   Why?
6        A.   Up until yesterday, I
7    thought one thing, when I read the files,
8    which I had never seen, I was shocked by
9    what I saw. There were 13 original RACs in
10   the country. 12 of us were fired for
11   various reasons of what have you and I
12   found out that mine was performance based.
13   And the paper that you're looking at right
14   there on the top page, the first time I saw
15   it was yesterday, and I almost had a heart
16   attack when I read that. For someone who
17   had no ill feelings toward this company,
18   despite whatever I went through, any anger
19   and hostility I might have had was actually
20   for the first time shown last night when I
21   got that email with that information that
22   was just beyond believability.
23       MR. MARA: Referring to Adam
24   047195 which has not been marked.
```

Page 92

```
1        MS. REED: Let's mark it so we
2    have a clear record.
3        MR. MARA: Sure.
4        (Exhibit 301, document Bate
5    Stamped Adams 47195 to 47229, is marked
6    for identification.)
7    BY MS. REED:
8        Q.   I'm showing you what's been
9    marked Exhibit 301 which is Bate Stamped
10   Adams 47195 to 47229.
11       A.   Uh-huh.
12       Q.   Do you recognize this?
13       A.   Only as of seven o'clock
14   last night.
15       Q.   And when you saw it,
16   what -- what did you believe this to be?
17       A.   A concoction, as I was
18   still one of the twelve who were fired in
19   an RAC position throughout the country, but
20   to -- can I answer your question a little
21   bit more?
22       Q.   Sure.
23       A.   As the sales rep who was
24   entirely responsible for the entire State
```

Page 93

```
1    of Florida, on more than one occasion I had
2    requested from my bosses, I said I need
3    help in the State of Florida if you want to
4    get to the goals where you are. I said
5    let's split up the state down the middle.
6    I'll take S -- or east side, find someone
7    else for the west. So they did hire
8    someone in Tampa ultimately. And then I
9    found out that they hired someone in the
10   Jacksonville area. Then I found out they
11   hired someone in the southeastern part of
12   state, which was Fort Lauderdale, Miami,
13   and everything else. And here I was
14   sitting in Orlando all by myself. And
15   ultimately they gave away my territory, so
16   even though I'd been the one who was
17   running this, they hired three people, and
18   I do know that they paid them twice as much
19   money. I was making 50, 55,000 a year.
20   They paid these people with salary and
21   package close to $100,000.00 a year. And
22   they took me and promoted me into the
23   Marketing Department where I would go out
24   and do demo days for the Marketing
```

24 (Pages 90 to 93)

TEKLITS

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
- - -

IN RE ADAMS GOLF, INC.  : CONSOLIDATED
                         :
SECURITIES LITIGATION    : C.A. No. 99-371 KAJ


------------------------
Wednesday, June 7, 2006
------------------------


Oral deposition of JOSEPH D. TEKLITS, taken

pursuant to notice, was held at the offices of

SIMPSON, THACHER, AND BARTLETT, LLP, 425 Lexington

Avenue, 28th Floor, New York, New York 10017,

commencing at 10:07 a.m. on the above date, before

Beth A. Barkocy, Certified Shorthand Reporter and

Notary Public.




- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA   19103
(215)241-1000     (888)777-6690

JOSEPH D. TEKLITS

## Page 14

```
10:20:03  1    remember?
10:20:04  2         A.    During that time, I don't remember
10:20:15  3    specifically.
10:20:18  4         Q.    You don't remember any of them?
10:20:22  5         A.    During those specific years --
10:20:32  6         Q.    '97 and '98.
10:20:34  7         A.    During those specific years, I don't
10:20:37  8    recall exactly what stocks I was covering at that
10:20:39  9    time.
10:20:39 10         Q.    How long were you at Ferris Baker
10:20:43 11    Watts?
10:20:44 12         A.    Four years.
10:20:44 13         Q.    If you take the whole four years, do
10:20:47 14    you remember any other golf companies other than Adams
10:20:51 15    Golf?
10:20:51 16         A.    Yes.
10:20:51 17         Q.    Which ones?
10:20:52 18         A.    Callaway Golf, Ashworth, Cutter and
10:20:59 19    Buck. Family Golf Centers, Lesco, L-e-s-c-o. That's
10:21:17 20    all I recall.
10:21:18 21         Q.    Some of those you had been analyst
10:21:22 22    for in your job before Ferris Baker; is that right?
10:21:26 23         A.    Yes.
10:21:26 24         Q.    Did you, so to speak, bring those
10:21:30 25    with you?
```

## Page 15

```
10:21:31  1         MR. McEVOY: I'll object to the
10:21:33  2    form.
10:21:34  3         You can answer.
10:21:39  4         THE WITNESS: I'm not clear what
10:21:40  5    that means.
10:21:41  6    BY MS. FOX:
10:21:41  7         Q.    Why was it that if you were an
10:21:43  8    analyst at one company, that you then became an
10:21:47  9    analyst for the same public company when you moved?
10:21:56 10         A.    My expertise. One of the areas that
10:22:01 11    I focused on was the golf industry as an analyst at my
10:22:09 12    previous firm, Ladenburg Thalmann, so when hired at
10:22:13 13    Ferris Baker Watts, one of my duties was to also
10:22:18 14    continue coverage of the golf industry.
10:22:21 15         Q.    At your previous firm, had you had
10:22:25 16    any contact with Adams Golf?
10:22:27 17         A.    I can't recall.
10:22:29 18         Q.    Who is David Turner?
10:22:46 19         A.    My associate at Ferris Baker Watts.
10:22:49 20         Q.    What was his role in this IPO?
10:22:54 21         A.    He worked for me as an associate
10:22:57 22    research analyst, so he supported me.
10:23:00 23         Q.    Doing research?
10:23:01 24         A     Yes
10:23:02 25         Q.    Did he do drafting as well?
```

## Page 16

```
10:23:06  1         A.    Drafting of what?
10:23:08  2         Q.    Drafting of the reports that you
10:23:10  3    did.
10:23:10  4         A.    The research reports?
10:23:11  5         Q.    Yes.
10:23:12  6         A     Yes.
10:23:17  7         Q.    By 1998, were you familiar with the
10:23:24  8    term gray marketing?
10:23:26  9         A.    Yes.
10:23:27 10         Q.    What was your understanding of that?
10:23:37 11         A.    I can't recall at the time what my
10:23:38 12    understanding of it was.
10:23:39 13         Q.    Why were you familiar with it at
10:23:46 14    that point?
10:23:46 15         A.    It's pretty common in covering
10:23:50 16    consumer brands, covered apparel brands, covered golf
10:23:57 17    brands. It's pretty common for that term to be part
10:24:02 18    of any discussion of a company's fundamentals.
10:24:12 19         Q.    Did you know of Costco at that
10:24:15 20    point, beginning of 1998?
10:24:20 21         A.    Yes.
10:24:21 22         Q.    Did you associate Costco with gray
10:24:24 23    marketing?
10:24:25 24         A.    I don't recall exactly.
10:24:30 25         Q.    Is it your understanding of gray
```

## Page 17

```
10:24:36  1    marketing that at the beginning when a company is
10:24:42  2    having its goods in the gray market, that the
10:24:45  3    company's sales will increase?
10:24:48  4         MR. McEVOY: Object to the form.
10:24:49  5         You can answer if you understand the
10:24:52  6    question.
10:24:54  7         THE WITNESS: Can you restate it?
10:24:57  8    BY MS. FOX:
10:24:57  9         Q.    Yes. At the beginning when gray
10:24:59 10    marketing begins, is it your understanding that sales
10:25:06 11    of the company who is being gray-marketed will
10:25:09 12    increase to feed the gray market?
10:25:10 13         MR. McEVOY: I'm just going to
10:25:12 14    object to the form again.
10:25:13 15         You can answer if you can.
10:25:13 16         THE WITNESS: No.
10:25:13 17    BY MS. FOX:
10:25:32 18         Q.    What is your understanding of the
10:25:34 19    effect, the ultimate effect, of gray marketing?
10:25:36 20         MR. McEVOY: Object to the form.
10:25:42 21         THE WITNESS: That somebody is
10:25:51 22    buying a product cheaper than they could find
10:25:54 23    it somewhere in a regular retail format.
10:25:58 24    BY MS. FOX:
10:25:58 25         Q.    What effect will that have on the
```

5 (Pages 14 to 17)

WALRAVENS

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4

 5   IN RE ADAMS GOLF, INC.,        :  CONSOLIDATED
                                    :
 6   SECURITIES LITIGATION          :  C.A. No. 99-371 KAJ

 7

 8                      - - - - -
          Friday, May 26, 2006
 9                      - - - - -

10          Oral deposition of PATRICK D. WALRAVENS, taken

11   pursuant to notice, was held at AKIN, GUMP, STRAUSS,

12   HAUER & FELD, LLP, 580 California Street, San Francisco

13   California 94104, commencing at 8:57 a.m., on the above

14   date, before Kenneth T. Brill, Registered Professional

15   Reporter, and California CSR #12797.

16                      - - - -

17

18

19

20

21

22
   RSA/VERITEXT COURT REPORTING COMPANY
23              1845 Walnut Street, 15th Floor
        Philadelphia, PA 19103
24              (215) 241-1000    (888) 777-6690
```

1

Page 66

Patrick Walraven

1 familiar with. Unauthorized distribution seems pretty

2 clear on the face of it.

3    Q. Is gray – okay. Your MBA was – what was the

4 area of concentration of your MBA?

5    A. I don't know there really was one. Finance.

6    Q. Had the term gray marketing been taught in

7 your MBA courses?

8    A. It may have been. I don't recall that term

9 from –

10    Q. Okay.

11    – business school.

12    Q. Had you done any work for Costco prior to the

13 Adams IPO?

14    A. Not that I recall.

15    Q. Do you know whether Costco had been a client

16 of Cooley Godward?

17    A. Oh, I don't know.

18    Q. Do you know if Lehman Brothers had done any

19 work for Costco prior to the Adams IPO?

20    A. So the question is, do I – can you repeat it

21 for me?

22        - - -
23        (The court reporter read back as
24 requested.)

66

Page 67

Patrick Walraven

1        - - -

2        THE WITNESS: Well, I don't have an

3 independent recollection of it, but in preparing for

4 this process it was suggested that it had been one of

5 Olga's clients.

6 BY MR. LEWIS:

7    Q. Prior to the Adams IPO, had you done work for

8 any client that had experienced unauthorized

9 distribution of its products? To your knowledge, I'm

10 just –

11    A. Yeah, I know. So the question is had I done

12 any work for any client that experienced unauthorized

13 distribution of its clients – of its products?

14    Q. Right.

15    A. That I recall. I did work for Levi's.

16    Q. Okay.

17    A. I don't specifically recall that being an

18 issue for Levi's.

19    Q. But at the actual time you were working on the

20 Adams Golf offering, had you been aware that Levi

21 Strauss had had an unauthorized distribution of its

22 products or was that something you heard later?
23    A. I don't know that I ever actually learned it.
24 It just seems to me that's a brand that's likely to have

67

Page 68

Patrick Walraven

1 this type of issue.

2    Q. Have you, by the way, read the transcript of

3 Olga Pulido's testimony?

4    A. I have not read the transcript. I have –

5    MR. McEVOY: Let me just caution you not to

6 discuss the substance of what we spoke about yesterday.

7    THE WITNESS: Oh, really?

8    MR. McEVOY: Yeah, that is privileged

9 information.

10    THE WITNESS: All right. Well, I haven't read

11 the transcript.

12    MR. McEVOY: Can we go off the record for a

13 second.

14        - - -

15        (Discussion held off the record

16 from 10:47 to 10:49 a.m.)

17        - - -

18    MR. McEVOY: Okay. We can go back on the

19 record.

20 BY MR. LEWIS:

21    Q. When if at all did you first hear of the

22 concept of gray marketing, unauthorized distribution or
23 distribution through Costco mentioned in connection with
24 the Adams Golf offering?

68

Page 69

Patrick Walraven

1    MR. McEVOY: Object to form. Mentioned in

2 connection with the offering?

3 BY MR. LEWIS:

4    Q. All right. Let me try it – let me break it

5 into several pieces.

6    A. Okay

7    Q. When if at all did you first hear the words

8 gray marketing associated with Adams Golf?

9    A. I can't tell you when I first heard that.

10    Q. How did you first hear it?

11    A. I can't tell you that either

12    Q. What did you first hear about it?

13    A. So apart from what I've read, right?

14 Independently I have two recollections of this.

15    Q. Okay

16    A. One is a conversation with Olga at some point

17 when she said that she had seen a high end club in one

18 of these discount warehouses. Second is a conversation

19 with someone regarding a potential solution to the

20 problem being the serialization of golf clubs.

21    Q. Would your answer be any different if I

22 substituted the words "unauthorized distribution" for
23 "gray marketing"?
24    Let me ask it then, and you tell me

69

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

b3eeded1-e8c2-4f9d-8568-102ed18321d5

## Page 70

Patrick Walraven

1  When if at all did you first hear the term

2  unauthorized distribution used in connection with Adams

3  Golf?

4  A.  I -- I don't recall when I heard first that.

5  Q.  Do you recall --

6  A.  I understand that gray marketing and

7  unauthorized distribution are synonymous, so --

8  Q  So you have no independent recollection of

9  anything other than the two instances that you've

10  already told me --

11  A.  Correct.

12  Q.  -- is that fair?  And if I -- all right.

13  When if at all did you first hear that Adams

14  Golf products had ended up in some instances in Costco

15  outlets?

16  A.  My first independent -- well, it's hard to say

17  what the timing is; right?  So independently it's one

18  of those two conversations.

19  Q.  Okay.  Do you have any recollection of either

20  gray marketing, unauthorized distribution, or Costco

21  distribution coming up at the risk factors discussion in

22  the drafting sessions for the Adams Golf offering?

23  A.  I don't recall that.

24  Q.  Do you recall anyone saying in connection with

## Page 71

Patrick Walraven

1  the drafting sessions that gray marketing or

2  unauthorized distribution or Costco distribution was

3  immaterial to Adams Golf?

4  MR. McEVOY:  I'm going to object just to the

5  extent that the witness has testified he doesn't recall

6  the substance of the drafting sessions, but you can

7  answer if you can.

8  MR. BESSETTE:  Let me actually have the

9  question back, please.

10  - - -

11  (The court reporter read back as

12  requested.)

13  - - -

14  MR. BESSETTE:  I'll just object to the extent

15  it calls for a legal conclusion.

16  BY MR. LEWIS:

17  Q.  I'm here asking only if the words used in the

18  draftings sessions relating this subject were -- the

19  word "immaterial"?

20  A.  I mean, I don't recall those conversations.

21  Q.  Do you recall someone saying in the course of

22  the drafting session that distribution of Adams Golf

23  clubs through Costco was -- existed, but was unimportant

24  or sporadic?

## Page 72

Patrick Walraven

1  A.  I don't recall the details of the drafting

2  sessions.

3  Q.  In the course of the drafting sessions do you

4  recall any discussion about theoretical risks of a

5  product getting into the gray market or unauthorized

6  outlets?

7  A.  No.

8  Q.  Are you a golfer yourself?

9  A.  I golf occasionally.

10  Q.  Would you agree with the proposition that when

11  a premium golf club ends up in a department store, it

12  loses its image?

13  MR. LEWIS:  Objection, vague and ambiguous

14  calls for speculation, no foundation.

15  MR. McEVOY:  Object to form.

16  THE WITNESS:  Can you read that back to me?

17  - - -

18  (The court reporter read back as

19  requested.)

20  - - -

21  THE WITNESS:  In a department store?

22  BY MR. LEWIS:

23  Q.  Well, let me broaden the question.  Would you

24  agree that once a premium golf club ends up in either a

## Page 73

Patrick Walraven

1  department store or a discount outlet, that it loses its

2  image?

3  MR. BESSETTE:  Same objection.

4  MR. McEVOY:  Same objection too.

5  THE WITNESS:  I think it depends.

6  BY MR. LEWIS:

7  Q.  Depends on what?

8  A.  We're -- let me put it this way: can you give

9  me a more specific question to answer?

10  Q.  Well, let me move on from that for a moment.

11  A.  Okay

12  Q.  Did you ever hear anyone express the view that

13  once a premium golf club ends up being distributed at a

14  discount price, it tends to lose its image?

15  MR. McEVOY:  Objection.  Are you talking in

16  connection with Adams Golf now?

17  BY MR. LEWIS:

18  Q.  As a general proposition.

19  A.  Well I certainly heard it in preparing for

20  this deposition.

21  Q.  During the due diligence and drafting process

22  for the Adams offering, did you ever hear someone talk

23  about the risks of unauthorized distribution versus the

24  impact of unauthorized distribution?

WALSH

## PATTY WALSH

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.  :    CONSOLIDATED

SECURITIES LITIGATION   :    C.A. NO. 99-371 KAJ

_____X

ORAL DEPOSITION OF PATTY WALSH

Thursday, May 11, 2006

The oral deposition of Patty Walsh was
held at the law offices of Akin Gump Strauss Hauer
& Feld, LLP, 1700 Pacific Avenue, Suite 4100,
Dallas, Texas, from 9:41 a.m. to 4:18 p.m., before
Jamie K. Israelow, a Certified Shorthand Reporter
in and for the State of Texas, Registered
Professional Reporter, Certified Realtime Reporter
and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000    (888)777-6690

PATTY   WALSH

Page 90

13:36:51 1    MS. FOX: Sure.
13:36:51 2    (An off-the-record discussion
14:16:16 3    was held from 1:36 to 2:16.)
14:16:17 4    MS. FOX: Okay. Back on the
14:16:17 5    record.
14:16:19 6    Q    (By Ms. Fox) Exhibit 57 is an
14:16:22 7    August 14th memo from Barney Adams to Mark
14:16:29 8    Gonsalves and Ric Jarrett. And I see you've had a
14:16:32 9    chance to review it.
14:16:33 10    First of all, you've just
14:16:35 11    taken a, what, 15- or 20-minute break with your
14:16:39 12    lawyers. Did you discuss this memo?
14:16:45 13    A    No.
14:16:45 14    Q    And you've had a chance to read it.
14:16:47 15    Did you see this memo at the time it was written?
14:16:50 16    A    No.
14:16:50 17    Q    You've never seen it before?
14:16:56 18    A    No.
14:16:57 19    Q    All right. You're sure?
14:17:01 20    A    Yes. I can keep reading.
14:17:01 21    (Deposition Exhibit 101
14:17:01 22    was marked.)
14:17:49 23    Q    (By Ms. Fox) You don't have to review
14:17:51 24    this all.

Page 91

14:18:08 1    Exhibit 101 is one of these
14:18:16 2    ratings things from Montgomery Securities dated
14:18:22 3    September 25th, 1998. Did you see this when it
14:18:30 4    arrived?
14:18:31 5    A    I'm sure I would have seen it at --
14:18:34 6    at around that time, yes.
14:18:36 7    Q    Where it says on the front:
14:18:41 8    Montgomery Securities, is that your handwriting?
14:18:42 9    Does this come from your file?
14:18:43 10    A    No.
14:18:43 11    Q    Do you know whose handwriting it is,
14:18:46 12    by any chance?
14:18:46 13    A    I don't.
14:19:24 14    Q    All right.
14:19:24 15    MS. FOX: What's the number?
14:19:27 16    THE REPORTER: 102.
14:19:27 17    (Deposition Exhibit 102
14:19:29 18    was marked.)
14:19:29 19    MS. FOX: Exhibit 102 is a
14:19:32 20    news release with Patty Walsh's name on it for
14:19:38 21    September 28th, 1998.
14:19:48 22    Q    (By Ms. Fox) What -- can you
14:19:49 23    identify this?
14:19:53 24    A    It's a news release that we issued

Page 92

14:19:55 1    regarding our earnings outlook.
14:20:01 2    Q    Do you remember discussions of what
14:20:03 3    you would say in this news release?
14:20:06 4    A    I don't remember specific
14:20:08 5    discussions. I know this was another release that
14:20:10 6    went through the committee we talked about before.
14:20:20 7    Q    It says: The company intends to
14:20:22 8    report actual third quarter results on or about
14:20:25 9    October 22nd.
14:20:43 10    But you don't remember
14:20:45 11    anything specific about it?
14:20:47 12    A    No, I don't.
14:20:53 13    Q    By that time, were you aware of the
14:20:57 14    renewal of the gray-market issue, by
14:21:01 15    September 28th?
14:21:01 16    MS. BRANNEN: Objection,
14:21:10 17    vague.
14:21:10 18    A    I don't -- I don't know. I don't
14:21:13 19    know timing.
14:21:20 20    MS. FOX: I do not have three
14:21:22 21    copies of this -- well, maybe I do. Yes, I do.
14:21:30 22    Can we go off the record?
14:21:30 23    (An off-the-record discussion
14:23:30 24    was held from 2:21 to 2:23.)

Page 93

14:23:30 1    (Deposition Exhibit 103
14:23:30 2    was marked.)
14:23:49 3    MS. FOX: Exhibit 103 is a fax
14:23:54 4    to Barney Adams and Darl Hatfield from Pat
14:24:00 5    Walravens. It appears to contain four pages of
14:24:06 6    numbers, 4482 -- Adams 4482 to Adams 4485.
14:24:17 7    Q    (By Ms. Fox) Take a look at the
14:24:18 8    front. It says: For your information, Adams is
14:24:21 9    still strong on course.
14:24:24 10    Do you know what that refers
14:24:36 11    to?
14:24:36 12    A    Yes, this is a market share report
14:24:38 13    from Golf Data Tech that reports on industry
14:24:46 14    sell-through or consumer purchases.
14:25:01 15    Q    And can you, then, explain the
14:25:04 16    numbers -- if we look at Adams, September, 3.1,
14:25:11 17    August, 13.4. What -- what are those?
14:25:14 18    A    That represents our share of those
14:25:18 19    sales as reported by Data Tech versus other
14:25:24 20    competitors.
14:25:24 21    Q    And these are woods. What does woods
14:25:31 22    include?
14:25:31 23    A    It includes fairway woods and
14:25:33 24    drivers.

VERITEXT PA COURT REPORTING COMPANY
(215)  241-1000    (888)  777-6690    (610)  434-8588

2755d861-4bfd-4d7e-9972-92ae4b325e78

PATTY   WALSH

Page 94

```
14:25:33  1      Q    And drivers.
14:25:34  2           So even though Adams at this
14:25:36  3   point didn't have a driver, that would be included
14:25:39  4   with the drivers?
14:25:56  5      A    Correct.
14:25:56  6      Q    And at this point, if we look at
14:25:59  7   Orlimar, it was way, way behind.
14:26:03  8           MS. BRANNEN: Objection --
14:26:06  9           MS. FOX: Hold on. She can
14:26:07 10   look at Orlimar. Is that right?
14:26:09 11           MS. BRANNEN: It calls --
14:26:10 12   you're characterizing a document.
14:26:12 13           MS. FOX: Well, I can
14:26:13 14   characterize it. It's cross-examination.
14:26:16 15           MS. BRANNEN: It calls for
14:26:17 16   expert testimony and assumes facts not in
14:26:19 17   evidence.
14:26:20 18      Q    (By Ms. Fox) Take a look at the
14:26:21 19   Orlimar. Do you see Orlimar?
14:26:29 20      A    Yes. I'm sorry. Yes.
14:26:30 21      Q    And their total as of August here is
14:26:32 22   3.6 percent?
14:26:34 23      A    Correct.
14:26:34 24      Q    And Adams's total for the same period
```

Page 95

```
14:26:38  1   is 13.4?
14:26:43  2      A    Correct.
14:26:44  3      Q    But Adams has gone down slightly from
14:26:47  4   July; Orlimar has gone up a point from July, a
14:26:51  5   point, point 1. Is that what this means?
14:26:58  6      A    Yes.
14:26:58  7      Q    Was that something that was watched
14:27:00  8   carefully by the people at Adams Golf?
14:27:07  9      A    The -- the relationship with
14:27:10 10   Orlimar --
14:27:10 11      Q    Or --
14:27:11 12      A    -- or the market share reports?
14:27:13 13      Q    The market share.
14:27:15 14      A    Yes. However, they would come out
14:27:18 15   much later than the period for which they were
14:27:25 16   reporting.
14:27:25 17      Q    Right. This came out on Friday,
14:27:27 18   October 2nd, and the last period report is August?
14:27:33 19      A    August, right.
14:28:28 20      Q    Okay.
14:28:29 21           MS. FOX: I don't think this
14:28:29 22   has been marked.
14:28:30 23           MS. REED: Uh-huh.
14:28:31 24           MS. BRANNEN: She thinks it
```

Page 96

```
14:28:33  1   has.
14:28:34  2           MS. REED: Exhibit 80.
14:28:35  3           MS. FOX: 80?
14:28:37  4           MS. REED: Exhibit 80.
14:29:20  5           MS. FOX: Exhibit 80 is the
14:29:23  6   October 8th, 1998, re: Fourth quarter. It's a
14:29:28  7   memo from Barney Adams to -- it looks like most of
14:29:33  8   the board members.
14:29:34  9      Q    (By Ms. Fox) Have you seen this
14:29:35 10   before?
14:29:35 11      A    I don't think so. I don't remember
14:29:39 12   it.
14:29:40 13      Q    Do you remember discussions at that
14:29:41 14   particular time, October 8th, about "Costco
14:29:51 15   hurting us badly"?
14:29:51 16      A    I don't remember that.
14:29:59 17      Q    Did you usually get this kind of memo
14:30:02 18   Barney sent to the board?
14:30:09 19      A    No.
14:30:21 20           MS. FOX: This is 56.
14:30:33 21           MS. BRANNEN: Off the record
14:30:33 22   for just a second.
14:30:33 23           (An off-the-record discussion
14:30:49 24           was held from 2:30 to 2:30.)
```

Page 97

```
14:30:49  1           MS. FOX: Exhibit 56 is a memo
14:30:52  2   from Barney Adams, again to the board, October
14:30:55  3   13th, re: Fourth quarter.
14:30:57  4      Q    (By Ms. Fox) Do you remember seeing
14:30:58  5   this one?
14:31:02  6      A    I don't remember it.
14:31:17  7      Q    Okay. Do you remember if --
14:31:19  8   discussion of any of the topics mentioned in it at
14:31:22  9   about that time, October 13th?
14:31:42 10      A    I would have known about A and B.
14:31:51 11      Q    Okay. But you didn't know about the
14:31:53 12   terrible golf market, Costco competition?
14:31:57 13      A    I don't recall what I knew --
14:32:00 14      Q    At that point?
14:32:01 15      A    -- with respect to that.
14:32:11 16           MS. FOX: Oh, I think this has
14:32:12 17   been marked, too, Michelle. This is the special
14:32:16 18   board meeting, October 19th.
14:32:29 19           MS. REED: This is Exhibit 81.
14:32:32 20           MS. FOX: 81. This is a board
14:32:31 21   meeting.
14:32:38 22           Exhibit 81 is the
14:32:41 23   October 19th, 1998 minutes of the special meeting
14:32:43 24   of the board of directors, Adams Golf, and it
```

25 (Pages 94 to 97)

PATTY   WALSH

<table>
<tr><td colspan="2">Page 98</td></tr>
</table>

| | | |
|---|---|---|
| 14:32:46 | 1 | lists Patty Walsh, director investor relations as |
| 14:32:51 | 2 | participating in the meeting at the invitation of |
| 14:32:54 | 3 | the board of directors. |
| 14:32:58 | 4 | Q.   (By Ms. Fox)  Do you remember this |
| 14:33:00 | 5 | meeting? |
| 14:33:00 | 6 | A.   No. |
| 14:33:00 | 7 | Q.   You don't.  You truly do not |
| 14:33:09 | 8 | remember -- |
| 14:33:09 | 9 | A.   Eight years. |
| 14:33:10 | 10 | Q.   I know.  Okay. |
| 14:33:51 | 11 | MS. FOX:  Tell you what -- |
| 14:33:52 | 12 | what's the next exhibit number? |
| 14:33:54 | 13 | THE REPORTER:  104. |
| 14:33:54 | 14 | (Deposition Exhibit 104 |
| 14:34:23 | 15 | was marked.) |
| 14:34:23 | 16 | MS. FOX:  Exhibit 104 is a |
| 14:34:25 | 17 | handwritten document, appears to be notes taken |
| 14:34:28 | 18 | from the special board meeting of October 19th. |
| 14:34:37 | 19 | Q.   (By Ms. Fox)  Patty, is this your |
| 14:34:39 | 20 | handwriting? |
| 14:34:39 | 21 | A.   Yes, it is.  Oh, I should have |
| 14:34:43 | 22 | remembered this meeting. |
| 14:34:53 | 23 | Q.   Okay.  Your handwriting is pretty |
| 14:34:54 | 24 | good.  It's pretty easy to read, but I just have a |

<table>
<tr><td colspan="2">Page 99</td></tr>
</table>

| | | |
|---|---|---|
| 14:34:57 | 1 | few questions. |
| 14:34:58 | 2 | A.   Okay. |
| 14:34:58 | 3 | Q.   LB is Lehman Brothers at the top? |
| 14:35:01 | 4 | A.   Yes. |
| 14:35:01 | 5 | Q.   FBW, Ferris, Baker Watts? |
| 14:35:05 | 6 | A.   Correct. |
| 14:35:05 | 7 | Q.   And those numbers underneath, what |
| 14:35:07 | 8 | are they? |
| 14:35:07 | 9 | A.   They're -- I believe they're |
| 14:35:09 | 10 | estimates for our fourth quarter. |
| 14:35:10 | 11 | Q.   And then the numbers underneath, |
| 14:35:14 | 12 | 19 cents, 14 cents, that would be -- |
| 14:35:17 | 13 | A.   Earnings estimates, I believe. |
| 14:35:18 | 14 | Q.   Earnings per share? |
| 14:35:19 | 15 | A.   Yes. |
| 14:35:24 | 16 | Q.   Okay.  Reduction in sales, 43.1 |
| 14:35:26 | 17 | What would that mean?  Is that actually point 1? |
| 14:35:35 | 18 | A.   No.  It's 43 percent. |
| 14:35:42 | 19 | Q.   Okay.  And selling in royalty expense |
| 14:35:45 | 20 | something 9 percent? |
| 14:35:45 | 21 | A.   Selling in royalty expense up |
| 14:35:55 | 22 | 9 percent. |
| 14:35:55 | 23 | Q.   And so reduction in sales would be -- |
| 14:35:57 | 24 | A.   43 percent. |

<table>
<tr><td colspan="2">Page 100</td></tr>
</table>

| | | |
|---|---|---|
| 14:35:58 | 1 | Q.   Do you remember the discussion about |
| 14:36:01 | 2 | that? |
| 14:36:04 | 3 | A.   No, I don't. |
| 14:36:05 | 4 | Q.   And then it's Q4 costs up.  Is that |
| 14:36:09 | 5 | what that -- |
| 14:36:11 | 6 | A.   Yes. |
| 14:36:12 | 7 | Q.   New TL infomercial.  TL is Tight |
| 14:36:16 | 8 | Lies? |
| 14:36:16 | 9 | A.   Tight Lies. |
| 14:36:17 | 10 | Q.   Creative/ -- what's that next word? |
| 14:36:27 | 11 | A.   Production, I think. |
| 14:36:28 | 12 | Q.   What does that refer to?  Do you |
| 14:36:38 | 13 | know? |
| 14:36:40 | 14 | A.   Advertising information, I think, |
| 14:36:42 | 15 | related to the infomercial. |
| 14:36:45 | 16 | Q.   In other words, it's one of the |
| 14:36:46 | 17 | reasons the -- |
| 14:36:46 | 18 | A.   Creative. |
| 14:36:49 | 19 | Q.   -- costs are up? |
| 14:36:49 | 20 | A.   Yes, the cost to create. |
| 14:36:51 | 21 | Q.   And the bag promotion would be |
| 14:36:53 | 22 | another reason that the costs were up? |
| 14:36:54 | 23 | A.   Right. |
| 14:36:55 | 24 | Q.   And the last one, is it variables? |

<table>
<tr><td colspan="2">Page 101</td></tr>
</table>

| | | |
|---|---|---|
| 14:36:57 | 1 | A.   Variable. |
| 14:36:59 | 2 | Q.   Oh.  Is that a new topic? |
| 14:37:00 | 3 | A.   Correct.  It looks like it, yes. |
| 14:37:08 | 4 | Q.   Okay.  Royalties, pharmacists, |
| 14:37:08 | 5 | commissions. |
| 14:37:13 | 6 | Incentive, what's that? |
| 14:37:15 | 7 | A.   Incentive pay. |
| 14:37:21 | 8 | Q.   And then the next, is that -- |
| 14:37:22 | 9 | MS. REED:  I think -- were you |
| 14:37:23 | 10 | just asking her what that next word -- |
| 14:37:26 | 11 | A.   Oh, manager, from the manager level |
| 14:37:28 | 12 | on up. |
| 14:37:30 | 13 | Q.   (By Ms. Fox)  Okay.  Discretionary. |
| 14:37:30 | 14 | And then what are those two |
| 14:37:33 | 15 | little words?  It looks like basil. |
| 14:37:36 | 16 | A.   Basic -- glass.  Basic |
| 14:37:42 | 17 | Q.   M-E-L? |
| 14:37:43 | 18 | A.   It looks like something members, |
| 14:37:45 | 19 | but -- |
| 14:37:46 | 20 | MS. BRANNEN:  I think it might |
| 14:37:47 | 21 | be cut off. |
| 14:37:48 | 22 | THE WITNESS:  Yeah, I think it |
| 14:37:48 | 23 | might be cut off. |
| 14:37:54 | 24 | MS. BRANNEN:  It's hard to |

26  (Pages 98 to 101)

## Page 146

16:02:36 1   designs, manufacturers premium --

16:02:42 2       Did you -- was there a press

16:02:47 3   release when this case was originally dismissed?

16:02:52 4   Do you remember?

16:02:55 5     A   I suspect there may have been  I

16:02:56 6   don't recall it specifically. I'd have to look in

16:02:58 7   my records.

16:03:00 8     Q   And then after the appeal, when the

16:03:05 9   case was partially reinstated, was there a press

16:03:08 10   release about that?

16:03:10 11     A   I don't recall.

16:03:15 12     Q   Do you remember when that --

16:03:16 13     A   We would -- we would address legal

16:03:19 14   matters in our SEC filings.

16:03:24 15     Q   But you -- but you don't remember a

16:03:27 16   public press release about that?

16:03:36 17     A   I don't -- I don't recall.

16:03:38 18     Q   Can you tell me why you would have a

16:03:42 19   release about a dismissal of a case, but nothing

16:03:44 20   about a --

16:03:45 21       MS. BRANNEN: Objection.  I

16:03:46 22   think that mischaracterizes prior testimony.  I

16:03:49 23   think she said she didn't recall if there was one

16:03:52 24   about the dismissal of the case.

## Page 147

16:03:53 1       MS. FOX: I think she said she

16:03:54 2   thought there were.

16:03:55 3       MS. BRANNEN: Can you read

16:03:55 4   back her testimony?

16:03:56 5       MS. FOX: I believe there was,

16:03:57 6   but I -- I don't have it here.

16:04:02 7     Q   (By Ms. Fox) Do you remember it

16:04:03 8   specifically at all?

16:04:04 9     A   I don't remember it specifically.

16:04:15 10     Q   Okay. Is there any policy within the

16:04:17 11   company of what you would do a press release on

16:04:20 12   and what you wouldn't?

16:04:22 13     A   No.

16:04:23 14     Q   So that would be a judgment that

16:04:24 15   would be made between what?

16:04:26 16     A   The committee.

16:04:28 17     Q   You, Barney, Darl, whatever lawyers

16:04:32 18   were hanging around?

16:04:40 19     A   Yes.

16:04:41 20     Q   Okay.

16:04:41 21       MS. FOX: I think that's all

16:04:42 22   the questions I have.

16:04:43 23       Do you have anything on

16:04:44 24   redirect?

## Page 148

16:04:45 1       MS. BRANNEN: Yes. Just a few

16:04:45 2   questions.

16:04:45 3         EXAMINATION

16:04:45 4   BY MS. BRANNEN:

16:04:46 5     Q   Patty, earlier I believe you

16:04:52 6   testified that Patrick Walravens would have known

16:04:56 7   about gray marketing and the Costco issue because

16:05:03 8   it was discussed before the IPO.

16:05:05 9     A   Yes.

16:05:05 10     Q   Is that right?

16:05:05 11     A   Yes.

16:05:06 12     Q   What do you remember about any

16:05:09 13   discussion that Mr. Walravens or anybody else

16:05:10 14   would have been involved in that -- that you know

16:05:16 15   about?

16:05:16 16     A   I remember in at least one instance

16:05:22 17   at a drafting session discussing that -- the whole

16:05:27 18   group of attendees discussed the gray-market

16:05:36 19   issue, you know, in a fact-finding way.

16:05:39 20     Q   Do you recall who attended that

16:05:42 21   drafting session?

16:05:44 22     A   There were quite a few people from

16:05:49 23   Adams. I guess, Mark Gonsalves, Dallas Rainwater,

16:05:58 24   Darl Hatfield. Then the underwriters, it was

## Page 149

16:06:09 1   Patrick. I don't remember if Olga was there or

16:06:11 2   not that day. I believe she was. And

16:06:17 3   representatives from both of the other two firms.

16:06:20 4   I just can't remember their names.

16:06:22 5     Q   By firms, you mean the law firms?

16:06:24 6     A   I'm sorry. Ferris, Baker Watts and

16:06:28 7   NationsBanc Montgomery, as well as legal counsel

16:06:30 8   for one or both of -- or all three of those.  It

16:06:34 9   was a full room.

16:06:37 10     Q   Okay. Do you remember the substance

16:06:39 11   of those discussions or that discussion, I guess?

16:06:43 12     A   No, not -- I don't remember the

16:06:45 13   specifics. Just --

16:06:47 14     Q   Do you remember when this drafting

16:06:50 15   session occurred?

16:06:53 16     A   There were quite a number of drafting

16:06:56 17   sessions, so I -- I'm not sure about the timing.

16:07:01 18     Q   Were the company's lawyers at this

16:07:04 19   drafting session?

16:07:06 20     A   Yes.

16:07:07 21     Q   Why would gray marketing have come

16:07:09 22   up? Why would it have been discussed?

16:07:12 23     A   Everything else did. We talked about

16:07:16 24   everything with respect to the company, large and

38  (Pages 146 to 149)

2755d861-4bfd-4d7e-9972-92ae4b325e78

PATTY   WALSH

Page 150

```
16:07:19  1   small, so it was just a part of the whole process
16:07:23  2       Q    Okay.
16:07:23  3            MS. BRANNEN: That's all the
16:07:24  4   questions I have at this time.
16:07:27  5            MS. FOX: Just to clarify.
16:07:27  6            FURTHER EXAMINATION
16:07:28  7   BY MS. FOX:
16:07:29  8       Q    This is a drafting session for the
16:07:32  9   prospectus?
16:07:38 10       A    Correct.
16:07:38 11       Q    You didn't know the exact date, but
16:07:40 12   can you give me a month? Was it early, like in
16:07:42 13   April or May, or was it later, in June?
16:07:47 14       A    I would say it was somewhere in the
16:07:51 15   middle. I would. I --
16:07:52 16       Q    Why do you happen to remember that?
16:07:58 17       A    Because I can -- I can just pic -- I
16:08:02 18   can picture that room -- those people in
16:08:06 19   attendance. It may have been the first one I was
16:08:10 20   in. It may have been the second. That's --
16:08:13 21   that's why I'm a little conflicted about the
16:08:17 22   timing.
16:08:18 23       Q    Who was Dallas Rainwater?
16:08:23 24       A    He was -- I believe his title was
```

Page 151

```
16:08:25  1   controller.
16:08:26  2       Q    He was a money person?
16:08:27  3       A    Correct.
16:08:27  4       Q    Who -- he reported to --
16:08:29  5       A    Jim Farrell.
16:08:34  6       Q    Okay. Do you know who brought it up
16:08:38  7   at the meeting?
16:08:39  8       A    I don't remember the specifics.
16:08:45  9       Q    Do you know if it was before or after
16:08:48 10   the press release and the lawsuit against Costco?
16:08:52 11       A    I don't know
16:08:58 12       Q    Are there minutes to those meetings?
16:09:00 13       A    To the drafting sessions? I don't
16:09:02 14   believe so, no.
16:09:07 15       Q    Did anyone write anything down about
16:09:10 16   that? Do you know?
16:09:15 17       A    I don't know. I didn't.
16:09:22 18            MS. FOX: Okay. That's all
16:09:23 19   the questions I have.
16:09:26 20            THE WITNESS: Okay
16:09:27 21            MS. BRANNEN: I think we're
16:09:28 22   done as well
16:09:28 23            (Off the record from
16:09:28 24            4:09 to 4:17.)
```

Page 152

```
16:09:28  1            (Deposition Exhibit 148A
16:17:54  2            was marked.)
16:17:54  3            MS. FOX: Okay. Back on the
16:17:55  4   record.
16:17:56  5            We've discovered that one of
16:18:00  6   the e-mails to investors was missing from the
16:18:05  7   marked pile, and so we have marked it as 148A, a
16:18:16  8   question from Todd Tonore and a response, and this
16:18:19  9   is Adams 003644 and 3645.
         10            (Off the record at 4:18 p.m.)
         11            - - - - -
         12
         13
         14
         15
         16
         17
         18
         19
         20
         21
         22
         23
         24
```

Page 153

```
 1   STATE OF TEXAS   X
 2   COUNTY OF DALLAS X
 3
 4            I, Jamie K. Israelow, a
 5   Certified Shorthand Reporter duly commissioned and
 6   qualified in and for the State of Texas,
 7   Registered Professional Reporter, Certified
 8   Realtime Reporter and Certified LiveNote Reporter,
 9   do hereby certify that there came before me on the
10   11th day of May at Akin Gump Strauss Hauer & Feld,
11   LLP located at 1700 Pacific Avenue, Suite 4100, in
12   the city of Dallas, County of Dallas, State of
13   Texas, the following named person, to-wit: PATTY
14   WALSH, who was duly sworn to testify the truth,
15   the whole truth, and nothing but the truth of
16   knowledge touching and concerning the matters in
17   controversy in this cause; and that she was
18   thereupon examined upon oath and her examination
19   reduced to typewriting under my supervision; that
20   the deposition is a true record of the testimony
21   given by the witness, and signature of the witness
22   is to be before any notary public and returned
23   within 30 days from date of receipt of transcript.
24            I further certify that
```

39  (Pages 150 to 153)

2755d861-4bfd-4d7e-9972-92ae4b325e78

# WASHBURN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


IN RE: ADAMS GOLF, INC.  :    CONSOLIDATED

SECURITIES LITIGATION      :    C.A. NO. 99-371 KAJ

_____X


ORAL DEPOSITION OF J. DAVID WASHBURN

Tuesday, August 16, 2006


The oral deposition of J. DAVID WASHBURN
was held at the law offices of Akin Gump Strauss
Hauer & Feld, LLP, 1700 Pacific Avenue, Suite
4100, Dallas, Texas, from 10:03 a.m. to
12:28 p.m., before Jamie K. Israelow, a Certified
Shorthand Reporter in and for the State of Texas,
Registered Professional Reporter, Certified
Realtime Reporter and Certified LiveNote Reporter.


RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000      (888)777-6690

## Page 50

11:10:10 1 Number 2 for the registration statement signed
11:10:13 2 electronically by Joe Hoffman.
11:10:19 3   Q   With at least a copy to you?
11:10:20 4   A   Yes.
11:10:20 5   Q   And also copies to Hatfield, Ferrell,
11:10:25 6 Guernsey, and Smith. Who were Guernsey and Smith?
11:10:28 7   A   Karyn Smith was an attorney with
11:10:33 8 Cooley. I don't remember Ken Guernsey. He too
11:10:37 9 could have been an attorney with Cooley.
11:10:46 10   Q   Is this the actual letter that went
11:10:47 11 to the SEC?
11:10:48 12   A   There is no actual letter that went
11:10:50 13 to the SEC.
11:10:53 14   Q   Because it was electronic?
11:10:56 15   A   Right.
11:10:56 16   Q   Is this what would have been
11:10:59 17 electronically conveyed to the SEC?
11:10:59 18   A   It seems to be.
11:11:04 19   Q   Along with the amendment?
11:11:06 20   A   It seems to be.
11:11:12 21   Q   And in this letter, there is no
11:11:17 22 Comment 4. Do you know why?
11:11:19 23   A   I have no recollection as to why
11:11:23 24 there is no Comment 4.

## Page 51

11:11:32 1   Q   Ordinarily, if you got a comment from
11:11:35 2 the SEC, would you, in your letter responding to
11:11:39 3 it, list a comment and list an answer to it?
11:11:41 4   A   Not necessarily.
11:11:42 5       To the extent that we received
11:11:44 6 comments from the SEC, either in writing or
11:11:47 7 orally, I think you're our invariable practice to
11:11:50 8 ensure that that comment is cleared one way or the
11:12:00 9 other.
11:12:00 10   Q   And so in this case, apparently the
11:12:05 11 comment was cleared orally with the SEC and never
11:12:08 12 put into writing?
11:12:16 13   A   The comment -- there is no doubt in
11:12:18 14 my mind that the comment was cleared when we
11:12:21 15 submitted the regis- -- the amendment to the
11:12:25 16 registration statement.
11:12:26 17   Q   But you don't remember any of the
11:12:29 18 conversation that cleared it?
11:12:42 19   A   No.
11:12:42 20   Q   And do you remember any discussions
11:12:44 21 at all with any of the other parties, KPMG, the
11:12:48 22 underwriters, underwriters' counsel, Adams about
11:12:52 23 this sequence of -- of comments and --
11:13:00 24   A   No.

## Page 52

11:13:00 1   Q   -- responses to them?
11:13:03 2   A   No specific recollection of any such
11:13:04 3 conversations. I'm confident they occurred, I'm
11:13:09 4 confident that they -- the comments were analyzed
11:13:14 5 and discussed. I'm confident that we articulated
11:13:19 6 the appropriate standard of materiality to the
11:13:21 7 company, and I am confident that they had made
11:13:24 8 their decision.
11:13:25 9   Q   But you can't say who it was at the
11:13:27 10 company that made a decision or --
11:13:29 11   A   I cannot.
11:13:29 12   Q   -- anything of that sort?
11:13:31 13   A   I cannot.
11:13:31 14   Q   Could you make a decision on behalf
11:13:33 15 of the company, or is that something the company
11:13:35 16 had to make a decision on?
11:13:38 17   A   Absolutely not. Law firms, including
11:13:43 18 our own, have no business making materiality
11:13:46 19 assessments.
11:13:47 20   Q   So that would be completely a company
11:13:50 21 assessment?
11:13:50 22   A   Yes. Our role is to articulate the
11:13:53 23 appropriate standard. The company is aware of the
11:13:56 24 universe of facts that must be applied to that

## Page 53

11:13:58 1 standard. So ultimately the decision is theirs,
11:14:08 2 yes.
11:14:08 3   Q   And did -- was this a decision that
11:14:14 4 the lawsuit, that is, the bill of discovery, was
11:14:18 5 not material?
11:14:20 6       MR. RYAN: Objection, form
11:14:26 7   A   I think you're drawing a distinction
11:14:30 8 that I'm incapable of drawing.
11:14:33 9   Q   (By Ms. Fox) The bill of discovery
11:14:37 10 was -- never went anywhere. Eventually Adams Golf
11:14:42 11 dismissed it, so it was not material, it was just
11:14:53 12 a gesture at were.
11:14:53 13       Is that the determination that
11:14:53 14 the company made?
11:14:53 15       MS. BRANNEN: Objection, form
11:14:54 16   A   I would answer it this way: The fact
11:14:57 17 that a lawsuit was filed will necessarily mean
11:15:04 18 that that matter is something that we'll discuss
11:15:10 19 with a client, is necessarily something that we
11:15:15 20 will insist that the client assess, was something
11:15:19 21 that the underwriters and the underwriters'
11:15:23 22 counsel necessarily require that the company
11:15:23 23 assess
11:15:26 24       But it does not mean that the

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

4c6d8769-bf58-4d3e-b9c8-e68453593aac