# EXHIBIT B

# PART I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:  ADAMS GOLF, INC. :

SECURITIES LITIGATION    :

                        X


          The Expert Discovery Deposition of

CHRISTIANA OCHOA, taken in the above-entitled case

before KATHLEEN J. PACULT, a Certified Shorthand

Reporter within and for the County of Cook, State of

Illinois, taken pursuant to the provisions of the

Federal Rules of Civil Procedure and the Rules of

the Supreme Court thereof pertaining to the taking

of depositions for the purpose of discovery, taken

on the 4th day of August 2006, at the hour of

9:30 a.m., at 6100 North River Road, Rosemont,

Illinois.

Page 2

```
1        APPEARANCES
2
3   BERGER & MONTAGUE, P.C.
    BY:  TODD COLLINS, ESQ.
4   1622 Locust Street
    Philadelphia, Pennsylvania 19103
5   (215) 875-3000
    tcollins@bm.net
6
          -and-
7
    LAW OFFICES OF DONALD B. LEWIS
8   BY:  MR. DONALD B. LEWIS
    5 Cynwyd Road
9   Bala Cynwyd, Pennsylvania 19004
    (610) 668-0331
10  morrislewislaw@aol.com
11      appeared on behalf of the Plaintiff;
12
    AKIN GUMP STRAUSS HAUER & FELD, LLP
13  BY:  MR. PAUL R. BESSETTE
    300 West 6th Street
14  Suite 2100
    Austin, Texas 78701-3911
15  (512) 499-6200
    pbessette@akingump.com
16
        appeared on behalf of the Defendant;
17
18  SIMPSON THACHER & BARTLETT, LLP
    BY:  MR. PAUL C. GLUCKOW
19  425 Lexington Avenue
    New York, New York 10017-3954
20  (212) 455-2653
    pgluckow@stblaw.com
21
        appeared on behalf of the Underwriter
22      Defendants.
23
24
```

Page 3

```
1           (Exhibit Nos. 303 - 305
2           were marked for
3           identification.)
4           (Witness duly sworn.)    09:35:27
5       CHRISTIANA OCHOA
6   called as a witness herein, having been first duly
7   sworn on oath, was examined and testified as
8   follows:
9           EXAMINATION
10  BY MR. BESSETTE:
11      Q.   Would you please state your full name  09:35:28
12  and spell your last name for the record, please.  09:35:30
13      A.   My name is Christiana Ochoa. My last  09:35:32
14  name is spelled O-c-h-o-a.  09:35:36
15      Q.   Good morning, Ms. Ochoa. My name is  09:35:37
16  Paul Bessette, I am with the law firm of Akin, Gump,  09:35:40
17  Strauss, Hauer & Feld, and I represent the Adams  09:35:42
18  Golf defendants in this case. Thanks for being here  09:35:44
19  today. In light of your family situation, we  09:35:47
20  appreciate the time you are taking.  09:35:50
21      A.   No problem.  09:35:52
22          MR. COLLINS: If you would, Professor  09:35:52
23  Ochoa.  09:35:55
24
```

Page 4

```
1   BY MR. BESSETTE:  09:35:55
2       Q.   Oh, very good. Professor Ochoa. Is  09:35:56
3   that what you prefer me to call you?  09:35:58
4       A.   Yes, thanks.  09:36:01
5       Q.   Okay. Now, when were you first  09:36:02
6   contacted about providing testimony in this case?  09:36:04
7       A.   I was contacted in the summer of '05.  09:36:07
8       Q.   By whom?  09:36:11
9       A.   By Neil Mara.  09:36:12
10      Q.   Okay. And did you know Mr. Mara  09:36:13
11  before him contacting you?  09:36:16
12      A.   No.  09:36:18
13      Q.   What did he say to you?  09:36:19
14      A.   He asked me whether I would be  09:36:20
15  interested in consulting on this matter, and we  09:36:23
16  talked about -- actually, I believe the first time  09:36:26
17  he contacted me he left a voicemail, and then I  09:36:27
18  called him back. I think I was out of town and I  09:36:31
19  called him back when I got the voicemail. We then  09:36:32
20  spoke, and he told me a little bit about the matter  09:36:34
21  and the kind of help that Todd Collins and Neil Mara  09:36:38
22  were looking for in this case.  09:36:42
23      Q.   Did you ask him how he got your name?  09:36:43
24      A.   I did ask him how he got my name.  09:36:47
```

Page 5

```
1   Though I'm not sure if it was in my conversation  09:36:49
2   with Neil Mara, or whether it was into when I spoke  09:36:51
3   with Mr. Collins, whether I asked that specific  09:36:55
4   question. But I did ask that of either Neil Mara or  09:36:58
5   Todd Collins.  09:37:00
6       Q.   And what did they tell you?  09:37:00
7       A.   They told me that they had found my  09:37:01
8   syllabus from my international business transactions  09:37:05
9   class on the internet. Saw that I teach a section  09:37:08
10  on gray marketing, and that it specifically relates  09:37:12
11  to gray marketing in golf equipment products and  09:37:14
12  were interested as a result.  09:37:16
13      Q.   Now, I apologize. I kind of jumped  09:37:18
14  into that.  09:37:18
15          Have you had your deposition taken  09:37:19
16  before?  09:37:20
17      A.   No.  09:37:20
18      Q.   Okay. Then I apologize a second time.  09:37:21
19  Let me just explain some of the basics.  09:37:24
20          You have been put under oath, you  09:37:26
21  understand that?  09:37:28
22      A.   Yes.  09:37:29
23      Q.   Okay. I am going to ask you a series  09:37:29
24  of questions, and I will do my best to not talk over  09:37:32
```

2  (Pages 2 to 5)

Page 6

1  you. And if you could do the same, then the court 09:37:35
2  reporter will have a clean record for us to review, 09:37:39
3  okay?                          09:37:42
4      A.   Understood.             09:37:42
5      Q.   Please answer in words or phrases, 09:37:43
6  because the court reporter can't take down the 09:37:45
7  uh-huhs and the nods of the head, so we want to make 09:37:48
8  sure we have a clean record.            09:37:50
9      A.   All right.              09:37:50
10     Q.   All right. If you don't understand 09:37:51
11 any of my questions, if they are not clear, then 09:37:52
12 please let me know and I will do my best to reask or 09:37:55
13 rephrase the question. Understood?        09:37:58
14     A.   Thank you.              09:37:59
15     Q.   Okay. If you need a break at any 09:38:00
16 time, as we talked off the record, just please let 09:38:03
17 me know and we will endeavor to meet whatever 09:38:04
18 schedule you need for your family.         09:38:07
19     A.   Great. Thanks.          09:38:08
20     Q.   Any questions about the deposition 09:38:09
21 process?                        09:38:11
22     A.   Not right now.           09:38:11
23     Q.   Is there any reason why you can't give 09:38:12
24 your best testimony today?             09:38:15

Page 7

1      A.   No.                   09:38:16
2      Q.   Explain to me your thought process in 09:38:16
3  deciding to become -- well, strike that.    09:38:25
4           Explain to me your thought process 09:38:28
5  in deciding whether to cooperate and give testimony 09:38:30
6  as an expert in this case.             09:38:34
7           MR. COLLINS: Overbroad.       09:38:35
8           Go ahead.            09:38:37
9  BY THE WITNESS:                   09:38:38
10     A.   If you could be a little bit more 09:38:38
11 specific that would be helpful.          09:38:39
12 BY MR. BESSETTE:                   09:38:41
13     Q.   Okay. You said you got a phone call 09:38:41
14 from Mr. Mara, a message, you called him back. You 09:38:43
15 mentioned how they got to know you and what kind of 09:38:46
16 help they might need. From that point, tell me what 09:38:49
17 your thought process was from then until you decided 09:38:53
18 to go ahead and provide help to the plaintiffs in 09:38:56
19 this case.                      09:38:56
20          MR. COLLINS: Same objection.     09:38:58
21          Go ahead.             09:38:59
22 BY THE WITNESS:                   09:39:00
23     A.   The process was quite long. I had 09:39:01
24 contact with Todd Collins and with Neil Mara last 09:39:03

Page 8

1  summer. It trailed off in the early fall and didn't 09:39:10
2  pick up again until this past summer. The question 09:39:14
3  of whether I was going to commit to helping them was 09:39:20
4  still somewhat open until I spoke with them this 09:39:24
5  summer.                        09:39:27
6  BY MR. BESSETTE:                   09:39:27
7      Q.   And let me stop you there. What was 09:39:27
8  the reason the question was open for that whole year 09:39:29
9  of time or so?                   09:39:32
10     A.   I don't know exactly. We had spoken 09:39:33
11 initially and my impression was that the case had 09:39:36
12 slowed down, there were delays, and my help was not 09:39:40
13 necessary, was not pertinently necessary last year 09:39:44
14 as it became this summer.              09:39:50
15     Q.   So as of last year, did you provide 09:39:52
16 them materials about your course of instruction or 09:39:55
17 any other materials about your background?    09:39:57
18     A.   No, I don't believe so.        09:40:00
19     Q.   How many conversations did you have 09:40:01
20 with anyone on the plaintiff's side, whether 09:40:03
21 Mr. Collins or Mr. Mara before things, as you say, 09:40:06
22 trailed off?                    09:40:10
23     A.   I think three.           09:40:10
24     Q.   Any of those in person?        09:40:11

Page 9

1      A.   No.                   09:40:12
2      Q.   And what level of knowledge did you 09:40:13
3  have about the case or about the issues after those 09:40:15
4  three conversations, do you remember?      09:40:18
5      A.   I can tell you what I remember. I 09:40:19
6  remember that I looked at -- I think I looked up the 09:40:21
7  rulings in the case and learned about the case in 09:40:27
8  that way. I may have seen the consolidated amended 09:40:30
9  complaint at that point as well. And that was it. 09:40:35
10     Q.   And then you say they re-contacted you 09:40:37
11 this summer of 2006?                09:40:42
12     A.   Yes.                  09:40:44
13     Q.   Who contacted you in particular?    09:40:44
14     A.   Todd Collins.            09:40:46
15     Q.   And tell me what he said at that 09:40:47
16 point?                         09:40:50
17     A.   He asked me whether I continued to be 09:40:50
18 interested in assisting them in this matter, and 09:40:53
19 that was the first call. I told him that I was. He 09:40:58
20 told me, more or less, the schedule. Given that it 09:41:01
21 was going to be a relatively compressed schedule, he 09:41:04
22 wanted to make sure that I could accommodate the 09:41:08
23 schedule. And that was I think the majority of the 09:41:11
24 substance of our first conversation. We then had 09:41:13

3  (Pages 6 to 9)

Page 10

```
1    other conversations after that.          09:41:16
2        Q.   In any of those -- well, strike that.  09:41:17
3            When Mr. Collins re-contacted you   09:41:25
4    in the summer of this year and you were entertaining  09:41:28
5    the thought of becoming an expert for the plaintiffs  09:41:31
6    in this case, did you have to seek permission or  09:41:34
7    consult with anybody at the university about whether  09:41:38
8    you could do that or not?                  09:41:41
9        A.   I don't think I actually had to seek  09:41:41
10   permission, but I did check to see whether I had to  09:41:44
11   seek permission. I spoke with my -- with the  09:41:44
12   associate dean at my law school. The dean at my law  09:41:44
13   school was out of town and he made clear to me that  09:41:49
14   it wasn't necessary to speak with her as well. I  09:41:50
15   asked him what the issues -- what the constraints  09:41:53
16   were on my serving as an expert, and he gave me  09:41:57
17   those constraints.                         09:42:00
18       Q.   Now, you had not served as an expert  09:42:02
19   witness in any sort of litigation prior to this  09:42:05
20   engagement, is that right?                 09:42:09
21       A.   That's correct.                   09:42:09
22       Q.   Were you concerned during the process  09:42:10
23   of talking with Mr. Mara or Mr. Collins about  09:42:11
24   whether you would qualify as an expert witness?  09:42:14
```

Page 11

```
1        A.   I wanted to make sure that the   09:42:17
2    qualifications that I do possess were adequate and  09:42:19
3    sufficient for their needs.                09:42:21
4        Q.   How did you do that?              09:42:23
5        A.   I made sure that they were entirely  09:42:24
6    aware of the entirety of my knowledge of the gray  09:42:27
7    market, my expertise in the gray market, and my  09:42:31
8    expertise in other matters as well, and let them  09:42:34
9    make their decision about that.            09:42:37
10       Q.   Did you express concern to the   09:42:39
11   assistant dean or anybody at the university when you  09:42:44
12   were inquiring about the constraints about whether  09:42:47
13   or not you qualified as an expert?         09:42:49
14           MR. COLLINS: Foundation.          09:42:52
15           You may answer.                   09:42:52
16   BY THE WITNESS:                           09:42:53
17       A.   No.                            09:42:54
18   BY MR. BESSETTE:                          09:42:54
19       Q.   Did you consult with anybody -- other  09:42:54
20   than the plaintiffs in this case, Mr. Collins or Mr.  09:42:57
21   Mara, about whether -- well, did you express to  09:42:59
22   anybody, other than Mr. Collins or Mr. Mara,  09:43:01
23   thoughts about whether you qualified as an expert in  09:43:04
24   this case?                                 09:43:07
```

Page 12

```
1            MR. COLLINS: Foundation.          09:43:07
2            Go ahead.                        09:43:08
3    BY THE WITNESS:                           09:43:25
4        A.   I have -- my sister-in-law is -- has  09:43:26
5    some experience in litigation, complex litigation.  09:43:29
6    And I spoke with her about my qualifications -- I  09:43:31
7    spoke with my sister-in-law who has some litigation  09:43:31
8    experience about her knowledge of expert witnesses  09:43:32
9    and the kinds of qualifications they have and need  09:43:36
10   to have, and my qualifications relative to this  09:43:40
11   case.                                      09:43:43
12   BY MR. BESSETTE:                          09:43:43
13       Q.   What is your sister-in-law's   09:43:43
14   experience in litigation?                  09:43:46
15       A.   She was a litigator at I believe at  09:43:46
16   Cooley Godward in Palo Alto and was a litigator  09:43:49
17   there.                                     09:43:56
18       Q.   Is she a litigator now?           09:43:56
19       A.   She is not. She transferred to a  09:43:58
20   different firm and that does -- she sort of retooled  09:44:03
21   herself and now she does trust and estates.  09:44:04
22       Q.   Okay. What is her name?           09:44:04
23       A.   Her name is Julie Lanz.           09:44:05
24       Q.   What were -- what do you understand  09:44:06
```

Page 13

```
1    you were asked to opine on or to be an expert on in  09:44:13
2    this case?                                 09:44:16
3        A.   Characteristics of the gray market and  09:44:17
4    specifically how they applied to Adams Golf.  09:44:21
5        Q.   Anything more specific or is that what  09:44:24
6    you understood your assignment was?        09:44:26
7        A.   That was essentially my assignment.  09:44:28
8        Q.   Okay. Now, let me ask you to -- well,  09:44:30
9    actually, let me give you all of these. The court  09:44:34
10   reporter has marked these exhibits as 303, 304 and  09:44:37
11   305, and I believe they are your expert report in  09:44:44
12   the case, your rebuttal expert report, and then the  09:44:48
13   expert report of Mr. Gary Frazier in order.  09:44:51
14           Does that look to be the case?     09:44:57
15       A.   Yes.                            09:44:58
16       Q.   And I know you are familiar with your  09:44:58
17   expert reports. Are you familiar with Exhibit, I  09:45:01
18   guess, 305, which is Mr. Frazier's?        09:45:06
19       A.   Yes.                            09:45:08
20       Q.   Okay. Turning to -- whether it's page  09:45:09
21   1 of Exhibit 303, your report, or Exhibit A, your  09:45:45
22   resume, whichever you would like, but I want to ask  09:45:51
23   some questions about your qualifications, background  09:45:55
24   and experience.                            09:45:57
```

4  (Pages 10 to 13)

Page 14

1    You are currently an associate  09:45:59
2 professor of law at Indiana University School of  09:46:00
3 Law?  09:46:04
4    A.   That's correct.  09:46:04
5    Q.   And as I understand it, you say in the  09:46:05
6 report or in your resume that your duties are  09:46:07
7 divided into three sort of buckets or categories?  09:46:10
8    A.   Yes.  09:46:13
9    Q.   Okay. Would you tell me what those  09:46:13
10 are, please?  09:46:15
11    A.   Those are teaching, research and  09:46:15
12 service.  09:46:17
13    Q.   Okay. What are your primary duties  09:46:17
14 with respect to the research prong of your duties?  09:46:21
15    A.   To research and publish my work.  09:46:23
16    Q.   And what work?  09:46:33
17    A.   I guess I am curious about what you  09:46:34
18 mean by what work.  09:46:42
19    Q.   I just want to understand what you  09:46:42
20 meant, research and publish your work.  09:46:44
21    A.   Yeah. It is law professors typically  09:46:44
22 write legal scholarship articles, they are published  09:46:47
23 in various law journals, as well as other locations.  09:46:51
24 And we are expected to produce in that way.  09:46:55

Page 15

1    Q.   How many articles have you published?  09:46:57
2    A.   I don't remember right now. It is on  09:47:01
3 my resume. It is five and a book review.  09:47:05
4    Q.   Now, in the teaching category, if I  09:47:10
5 understand this right, you teach international  09:47:20
6 business transactions as one of the courses?  09:47:24
7    A.   Yes.  09:47:26
8    Q.   I guess there is five courses, is that  09:47:26
9 right?  09:47:30
10    A.   That's correct.  09:47:30
11    Q.   And international business  09:47:30
12 transactions, in that course, I understand there is  09:47:35
13 a section devoted to counterfeits and gray market  09:47:38
14 activity, including in the golf industry?  09:47:42
15    A.   Correct, yes.  09:47:45
16    (Off the record  09:47:45
17    discussion.)  09:47:45
18 BY MR. BESSETTE:  09:47:48
19    Q.   International business transactions  09:47:48
20 has a section devoted to counterfeits and gray  09:47:55
21 marketing including in the golf industry, is that  09:47:59
22 right?  09:48:03
23    A.   That's correct.  09:48:03
24    Q.   And you understand that that syllabus  09:48:03

Page 16

1 of that course with that section in it was on the  09:48:06
2 internet and that's how the plaintiff's lawyers  09:48:08
3 found you?  09:48:10
4    A.   That's what I understand.  09:48:11
5    Q.   Okay. Now, explain to me, this course  09:48:12
6 that you teach, international business transactions,  09:48:13
7 is that a course for one semester?  09:48:17
8    A.   Yes.  09:48:20
9    Q.   And this is at the law school?  09:48:20
10    A.   Correct.  09:48:23
11    Q.   Which level of student?  09:48:23
12    A.   Upper level students.  09:48:26
13    Q.   So second and third years?  09:48:28
14    A.   Correct. And also graduate students.  09:48:30
15    Q.   What are the -- I mean, is there a  09:48:33
16 textbook or multiple textbooks that you use to teach  09:48:40
17 that class?  09:48:43
18    A.   I teach from one textbook.  09:48:44
19    Q.   Which one is that?  09:48:49
20    A.   It's Folsom, Gordon and Spanogle  09:48:50
21 International Business Transaction. Folsom is  09:48:59
22 F-o-l-s-o-m, Gordon is Gordon, and Spanogle I  09:48:59
23 believe is S-p-a-n-g -- S-p-a-n-o-g-l-e.  09:49:17
24    Q.   And is there one or more chapters in  09:49:17

Page 17

1 that textbook that deals with gray marketing?  09:49:26
2    A.   There is one chapter that deals with  09:49:29
3 counterfeiting and gray marketing. Let me rephrase.  09:49:33
4 There are chapters in the book, the chapters are  09:49:36
5 divided into what the authors call problems or  09:49:39
6 sections, and one of those is devoted to gray  09:49:41
7 marketing and counterfeiting.  09:49:45
8    Q.   Okay. And how extensive is that  09:49:47
9 section or chapter? In other words, how many pages?  09:49:50
10    MR. COLLINS: The document speaks for  09:49:51
11 itself, and as you know, was produced.  09:49:53
12 BY THE WITNESS:  09:49:56
13    A.   I don't remember exactly the page  09:49:57
14 length.  09:49:58
15 BY MR. BESSETTE:  09:49:59
16    Q.   Did you select that course book for  09:49:59
17 that class?  09:50:01
18    A.   I did.  09:50:01
19    Q.   How did you select that? What was  09:50:02
20 your criteria?  09:50:04
21    A.   I used a few criteria. I selected  09:50:05
22 it -- I taught international business transactions  09:50:09
23 the first year that I taught at the law school, and  09:50:12
24 went through a process that a new professor  09:50:16

5  (Pages 14 to 17)

Page 18

1   typically goes through in selecting a course book    09:50:20
2   and choosing that one.    09:50:23
3       Q.    Okay. And would you just explain for    09:50:25
4   the jury what that process is?    09:50:26
5       A.    Sure. That process includes reviewing    09:50:27
6   the world of possible international business    09:50:30
7   transactions textbooks, looking at them seeing which    09:50:34
8   ones has materials that you think are presented    09:50:39
9   clearly, neatly, in a way that is well organized,    09:50:41
10  easy to understand and will capture the students'    09:50:44
11  attention.    09:50:44
12          In addition, I spoke with other    09:50:51
13  professors who I knew had taught in the area before    09:50:53
14  and asked them about their experiences in teaching    09:50:55
15  international business transactions and the    09:50:59
16  textbooks that they had used and the problems and    09:51:01
17  the benefits that they had encountered with each of    09:51:02
18  them.    09:51:07
19      Q.    Now, only one section in that course    09:51:08
20  book is devoted to gray marketing. Do I have that    09:51:10
21  right?    09:51:15
22      A.    Yes.    09:51:15
23      Q.    And do the materials in that section    09:51:15
24  deal with the golf industry exclusively or just sort    09:51:18

Page 19

1   of mention it?    09:51:24
2          MR. COLLINS: I am sorry. I think you    09:51:25
3   are misunderstanding some of the thrust of the    09:51:27
4   testimony here, but -- so therefore, I object on    09:51:30
5   grounds that you mangled the testimony.    09:51:35
6          Go ahead and answer.    09:51:37
7   BY THE WITNESS:    09:51:39
8       A.    There are, in the textbook itself,    09:51:40
9   there is no -- I believe no mention of the golf    09:51:43
10  industry at all. It is my supplemental materials    09:51:47
11  that include that.    09:51:49
12  BY MR. BESSETTE:    09:51:50
13      Q.    Okay. What supplementary materials    09:51:50
14  are those?    09:51:51
15      A.    Every year in addition to the textbook    09:51:52
16  I assign a course packet of supplemental materials    09:51:55
17  that I believe are particularly useful in    09:51:59
18  illuicating particular topics, and I chose some    09:52:07
19  materials on the gold industry and the golf    09:52:08
20  equipment industry in particular in the presentation    09:52:08
21  of counterfeiting and gray marketing material.    09:52:11
22      Q.    And when did you add those    09:52:12
23  supplementary materials, the particular ones on the    09:52:16
24  golf industry?    09:52:19

Page 20

1       A.    They have been changed over the course    09:52:19
2   of the time that I have taught the class. I have    09:52:21
3   now taught the class three times. Each year I    09:52:24
4   believe they have been slightly different, those    09:52:26
5   materials have been slightly different. So in    09:52:29
6   preparation for teaching each year, I reevaluate    09:52:32
7   and -- I reevaluate the materials I have used before    09:52:35
8   and add or subtract materials that were included.    09:52:39
9       Q.    So the course book itself doesn't have    09:52:42
10  a section on gray materials as it deals with the    09:52:44
11  golf industry, it is the supplemental materials. Do    09:52:47
12  I understand that right?    09:52:50
13      A.    It is has a section on the gray    09:52:50
14  market. It does not have a section on the gray    09:52:53
15  market in relation to the golf industry.    09:52:56
16      Q.    Okay. And when you first started    09:52:58
17  teaching, is it your understanding that in the first    09:53:00
18  year, which I guess we'll get to here, '03 maybe,    09:53:03
19  you provided supplemental materials that focused on    09:53:05
20  gray marketing in the golf industry?    09:53:08
21          MR. COLLINS: Asked and answered.    09:53:10
22          Go ahead.    09:53:12
23  BY THE WITNESS:    09:53:13
24      A.    In the first year that I taught the    09:53:13

Page 21

1   course, I did include those materials, yes.    09:53:16
2   BY MR. BESSETTE:    09:53:18
3       Q.    I'm sorry, you did?    09:53:18
4       A.    I did include those materials, yes.    09:53:18
5       Q.    Okay. Now, where did you find those    09:53:19
6   materials?    09:53:20
7          MR. COLLINS: And we're asking    09:53:23
8   specifically with regard to the first year?    09:53:24
9          MR. BESSETTE: Right.    09:53:26
10  BY THE WITNESS:    09:53:26
11      A.    The first year that I taught the    09:53:27
12  class, again, I followed pretty standard practice    09:53:29
13  for new professors. I used materials that a person    09:53:32
14  who had taught international business transactions    09:53:39
15  introduced me to.    09:53:42
16  BY MR. BESSETTE:    09:53:43
17      Q.    And the supplemental materials that    09:53:43
18  you used starting in '03 and continuing to the    09:53:45
19  present have been produced?    09:53:48
20      A.    Yes. I believe. And materials that I    09:53:49
21  taught the last time that I taught have been    09:53:52
22  produced.    09:53:55
23      Q.    Do you have in your possession those    09:53:56
24  materials starting from the first time you taught to    09:53:59

6 (Pages 18 to 21)

Page 22

1  the present?                           09:54:01
2      A.  I may.  I'm not sure.          09:54:01
3      Q.  All right.  Could you do a search for  09:54:03
4  us and if you have them, would you produce them with  09:54:044
5  counsel's permission?                  09:54:08
6          MR. COLLINS:  Well, we will take it  09:54:08
7  under advisement.  What you are asking for is the  09:54:09
8  materials from the first year and the second year,  09:54:13
9  to the extent they are different from the materials  09:54:15
10  for the third year, which I believe have been  09:54:18
11  produced?                             09:54:21
12          MR. BESSETTE:  Yes.            09:54:21
13  BY MR. BESSETTE:                       09:54:23
14      Q.  And I believe your testimony was you  09:54:23
15  kind of look to change and look to, so if  09:54:25
16  you have materials from '03 or prior years before  09:54:28
17  the ones you produced that are different than the  09:54:31
18  ones you produced, I would like to see those.  09:54:33
19          MR. COLLINS:  We will take it under  09:54:34
20  advisement.                           09:54:36
21  BY MR. BESSETTE:                       09:54:36
22      Q.  Do the materials either in the  09:54:37
23  textbook or the supplemental materials deal with the  09:54:38
24  economic and financial consequences of gray markets  09:54:42

Page 23

1  on manufacturers, do you know?         09:54:46
2          MR. COLLINS:  The documents speak for  09:54:48
3  themselves.                           09:54:50
4          Go ahead.                     09:54:51
5  BY THE WITNESS:                        09:54:51
6      A.  Could you ask the question again?  09:54:52
7  Sorry.                                09:54:53
8  BY MR. BESSETTE:                       09:54:53
9      Q.  Yeah.                        09:54:53
10      Do the supplemental materials --    09:54:54
11  well, actually, strike that.           09:54:54
12      Do the materials on gray           09:54:56
13  marketing, whether in the textbook or the  09:54:57
14  supplemental materials, deal with the economic and  09:54:594
15  financial consequences of the gray market on  09:55:02
16  manufacturers?                        09:55:07
17          MR. COLLINS:  Same objection.   09:55:07
18          Go ahead.                     09:55:08
19  BY THE WITNESS:                        09:55:08
20      A.  I don't actually know whether the  09:55:09
21  materials themselves contain that or whether it is  09:55:10
22  part of the class that I bring out during class  09:55:13
23  discussion.  So to clarify, often in preparing for a  09:55:16
24  class, a professor, or at least in my strategy in a  09:55:23

Page 24

1  classroom, would be to give students enough material  09:55:26
2  that they have a good basis for discussion.  And  09:55:30
3  then I will come to the class with additional  09:55:32
4  information, additional materials to make for  09:55:34
5  interesting classroom experience, as well as  09:55:39
6  interesting reading.                   09:55:42
7          So I'm not really -- I don't      09:55:43
8  remember entirely whether the topics specifically  09:55:45
9  asked about are contained in the written materials  09:55:48
10  or whether they are contained in my head when I walk  09:55:51
11  into the classroom.                   09:55:55
12  BY MR. BESSETTE:                       09:55:57
13      Q.  But as you sit here, it is your  09:55:57
14  understanding that whether in the written materials  09:55:59
15  or in your head, your class deals with the financial  09:56:01
16  and economic consequences of the gray market to  09:56:03
17  manufacturers?                        09:56:07
18      A.  Yes.                         09:56:07
19      Q.  Okay.  And if it is not in the written  09:56:08
20  materials, where did you get the source material for  09:56:11
21  that information?                     09:56:14
22      A.  From a variety of sources.  One place  09:56:15
23  is through -- let me back up.  In preparing for  09:56:17
24  class, in addition to obviously reading the  09:56:21

Page 25

1  materials that I have asked my students to read, I  09:56:24
2  also do additional reading.  And in the course of  09:56:27
3  the time that I have been teaching at IU, I have  09:56:31
4  read countless scholarly articles that supplement  09:56:35
5  the materials that I teach.            09:56:39
6      Q.  Countless scholarly articles, is that  09:56:43
7  what you said?                        09:56:47
8      A.  Yes.                         09:56:47
9      Q.  Do you know any off the top of your  09:56:47
10  head?                                 09:56:51
11          MR. COLLINS:  With regard to gray  09:56:51
12  marketing?                            09:56:52
13          MR. BESSETTE:  Yes.            09:56:53
14  BY THE WITNESS:                        09:56:53
15      A.  Yeah, sure.  Some of them were cited  09:56:54
16  in my reports and are in the records.  09:56:56
17  BY MR. BESSETTE:                       09:56:56
18      Q.  Well, go ahead and turn to page 1  09:56:59
19  guess 3 and 4 of your report where you cite eight  09:57:00
20  articles related to gray marketing that you -- well,  09:57:05
21  strike that.                          09:57:05
22          You cite eight articles related to  09:57:10
23  gray marketing.  I take it you reviewed those  09:57:13
24  articles which -- in the process of your work in  09:57:15

7  (Pages 22 to 25)

Page 26

1  this case?                              09:57:18
2      A.   Yes.                           09:57:18
3      Q.   Did you review any other academic    09:57:19
4  articles on gray marketing in your work in this case 09:57:2?
5  that you have not listed here?          09:57:27
6      A.   No, I don't think so.  Let me actually 09:57:28
7  rephrase.  After receiving Mr. Frazier's report, I 09:57:32
8  also reviewed the articles that he submitted that 09:57:38
9  were not on this list.                  09:57:42
10     Q.   Okay.  So prior to receiving his    09:57:43
11  report, you didn't review anything more than the 09:57:45
12  eight articles in your report?          09:57:48
13         MR. COLLINS:  In connection with this 09:57:49
14  case?                                   09:57:51
15         MR. BESSETTE:  Yes.             09:57:51
16  BY THE WITNESS:                         09:57:52
17     A.   Correct.                        09:57:53
18  BY MR. BESSETTE:                        09:57:53
19     Q.   Okay.  How did you -- what search did 09:57:53
20  you undertake to decide on these eight articles to 09:57:54
21  review?                                 09:57:58
22     A.   I did -- I went through the process 09:57:58
23  that I often go through in performing my research. 09:58:0?
24  I got online, I looked at our library's holdings, I 09:58:05

Page 27

1  used databases that are available to me as a   09:58:11
2  professor, and looked for articles that I thought 09:58:16
3  were useful and pertinent.              09:58:20
4      Q.   Why did you exclude some and include 09:58:23
5  these eight?                            09:58:27
6         MR. COLLINS:  Foundation.        09:58:27
7         Go ahead.                        09:58:28
8  BY THE WITNESS:                         09:58:28
9      A.   I tried to find articles that I    09:58:30
10  thought specifically dealt with the questions that I 09:58:32
11  was asked to address, the types of profiles that 09:58:34
12  make a business particularly susceptible to gray 09:58:39
13  marketing, and also the kinds of impacts that gray 09:58:43
14  marketing can have on a business.       09:58:46
15  BY MR. BESSETTE:                        09:58:48
16     Q.   In your review that produced the eight 09:58:48
17  articles that are listed in your report, do you 09:58:51
18  recall whether you reviewed any of the articles that 09:58:53
19  you saw listed in Mr. Frazier's report, Exhibit 305? 09:58:55
20     A.   No, I don't think I did.        09:59:01
21     Q.   To the best of your knowledge, in your 09:59:03
22  search for articles related to gray marketing, you 09:59:07
23  didn't come across any of the ones Mr. Frazier 09:59:10
24  listed?                                 09:59:13

Page 28

1      A.   That's correct.                 09:59:13
2      Q.   Do you teach courses in marketing?  09:59:14
3      A.   No.                            09:59:16
4      Q.   Have you ever taught a course in   09:59:16
5  marketing?                              09:59:18
6      A.   No.                            09:59:19
7      Q.   Have you ever taken a course in    09:59:19
8  marketing?                              09:59:21
9      A.   That's thinking back a long ways.  I 09:59:22
10  don't think so.                         09:59:27
11     Q.   Have you ever published a paper on  09:59:27
12  gray marketing?                         09:59:30
13     A.   No.                            09:59:31
14     Q.   Have you ever published an article or 09:59:31
15  book on gray marketing?                 09:59:33
16     A.   No.                            09:59:35
17     Q.   Have you ever given a presentation on 09:59:35
18  gray marketing?                         09:59:37
19         MR. COLLINS:  Outside the class work 09:59:38
20  that she has described?                 09:59:41
21         MR. BESSETTE:  Yeah.            09:59:43
22  By MR. BESSETTE:                        09:59:43
23     Q.   I am not viewing teaching law students 09:59:45
24  as a presentation.  That's your profession. 09:59:48

Page 29

1         Have you ever given a presentation 09:59:50
2  outside the law school on gray marketing?   09:59:52
3      A.   No.                            09:59:54
4      Q.   How about on marketing generally?  09:59:56
5  Have you ever give a presentation on marketing 09:59:5?
6  generally?                              10:00:02
7      A.   No.                            10:00:02
8      Q.   Prior to your employment as an    10:00:02
9  assistant -- I am sorry -- as an assistant 10:00:09
10  professor --                            10:00:16
11     A.   Associate professor.            10:00:18
12     Q.   Oh, is it associate?  I am sorry.  10:00:21
13  Okay.                                   10:00:23
14         So prior to your employment as an  10:00:24
15  associate professor, had you ever -- Strike that. 10:00:26
16         Prior to your employment as an     10:00:32
17  associate professor, did you have any involvement 10:00:3?
18  with gray marketing?                    10:00:39
19         MR. COLLINS:  Vague and ambiguous.  10:00:4?
20  BY THE WITNESS:                         10:00:45
21     A.   I would agree.  I'm not sure what you 10:00:45
22  mean.                                   10:00:47
23  BY MR. BESSETTE:                        10:00:47
24     Q.   Well, did you ever get involved with 10:00:48

8  (Pages 26 to 29)

Page 30

1  gray marketing?                                10:00:50
2       MR. COLLINS: Same objection.        10:00:50
3  BY MR. BESSETTE:                              10:00:52
4       Q.   Whether in your life as a lawyer in  10:00:52
5  practice, doing research about it, studying it in  10:00:55
6  school, I mean, anything related to gray marketing.  10:01:00
7  Did you have any concept of what gray marketing was?  10:01:03
8       MR. COLLINS: Compound, vague and     10:01:06
9  ambiguous.                                   10:01:09
10  BY THE WITNESS:                             10:01:10
11      A.   Yeah, there were a lot of questions in  10:01:11
12  what you asked.  The contact that I would say I had  10:01:12
13  most with gray marketing before I became a professor  10:01:16
14  is as a consumer.                           10:01:19
15  BY MR. BESSETTE:                            10:01:20
16      Q.   Okay.  Nothing beyond being a      10:01:20
17  consumer?                                   10:01:23
18      A.   I don't believe so.               10:01:24
19      Q.   Now, prior to joining I guess Indiana  10:01:33
20  University faculty, you were an attorney, is that  10:01:45
21  right?                                      10:01:48
22      A.   Correct.                          10:01:48
23      Q.   Well, strike that.                10:01:57
24           You worked as an attorney?        10:01:58

Page 31

1       A.   Yes.                              10:01:59
2       Q.   All right.  Did you ever represent a  10:02:00
3  party in a matter involving gray marketing as an  10:02:02
4  attorney?                                   10:02:06
5       A.   No.  Actually, can you ask that   10:02:06
6  question again?  I'm not --                  10:02:10
7       Q.   Sure.
8       A.   -- I need to think about it again.
9       MR. BESSETTE:  Go ahead and just
10  repeat it.
11           (Record read.)
12      MR. COLLINS: I'm sorry.  I should      10:02:20
13  have objected on grounds of vague and ambiguous.  10:02:20
14  You might want to clean it up just a touch.  I  10:02:24
15  mean --                                     10:02:24
16      MR. BESSETTE:  Let me ask it again.    10:02:26
17  BY MR. BESSETTE:                            10:02:26
18      Q.   Did you ever represent a party in a  10:02:27
19  matter involving gray marketing?           10:02:30
20      A.   Okay.  No.                        10:02:32
21      Q.   Now, if I am reading your resume  10:02:37
22  right, you last worked at Clifford Chance in  10:02:40
23  April 2001, is that right?                  10:02:44
24      A.   Correct.                          10:02:45

Page 32

1       Q.   And then joined the faculty at Indiana  10:02:46
2  University School of Law in June 2003?      10:02:51
3       A.   Correct.                          10:02:52
4       Q.   Okay.  What did you do between that --  10:02:53
5  or in that time period?                     10:02:55
6       A.   My husband and I who had decided --  10:02:56
7  decided together that we wanted to leave our law  10:03:00
8  firms in New York, and wanted to leave New York as  10:03:04
9  well.  We bought a pickup truck and drove around the  10:03:07
10  country for a year or a little bit over a year.  We  10:03:12
11  got married in the middle of that period.  We drove  10:03:14
12  from the Florida Keys to the Arctic Circle, and  10:03:18
13  everywhere in between.                      10:03:18
14      Q.   Wow.  Sounds interesting.         10:03:18
15      A.   And slept in the back of the pickup  10:03:24
16  truck.                                      10:03:28
17      Q.   That's interesting.               10:03:28
18      A.   In addition, then we settled in San  10:03:30
19  Diego for a year where I was looking for my academic  10:03:34
20  job.                                        10:03:39
21      Q.   Okay.  Now, let's see.  You graduated  10:03:39
22  from law school in June 1998?               10:03:46
23      A.   Correct.                          10:03:49
24      Q.   So as we sit here today, you have been  10:03:49

Page 33

1  a lawyer for I guess eight years?           10:03:52
2       A.   Yeah.                             10:03:54
3       Q.   Are you currently admitted to the New  10:03:55
4  York Bar?                                   10:04:07
5       A.   Yes.                              10:04:07
6       Q.   Okay.  When were you first admitted to  10:04:07
7  the New York Bar?                           10:04:10
8       A.   I was admitted -- oh, boy, I don't  10:04:10
9  remember.  What does it say?  Let me look.  10:04:12
10      Q.   It doesn't say, that's --         10:04:14
11      A.   Oh, yeah?                         10:04:14
12      Q.   Or at least I didn't see it.      10:04:14
13      A.   It was -- so I went to Columbia.  I  10:04:16
14  came back and was then admitted.  So it must have  10:04:20
15  been 2000 by the time the admission ceremony  10:04:26
16  actually took place.                        10:04:32
17      Q.   Okay.  You graduated in June 1998 from  10:04:33
18  Harvard, is that right?                     10:04:36
19      A.   Correct.                          10:04:37
20      Q.   Did you take the bar that summer?  10:04:37
21      A.   I did take the bar that summer.    10:04:39
22      Q.   The New York Bar?                 10:04:41
23      A.   Yes.                              10:04:43
24      Q.   Did you pass it?                  10:04:44

9  (Pages 30 to 33)

## Page 34

1    A.    No.                          10:04:46
2    Q.    And then what did you do?    10:04:46
3    A.    I was planning to go to Columbia    10:04:47
4  already. I went to Columbia. I worked there at a    10:04:51
5  law school and also in a human rights organization    10:04:55
6  in Bogota, Columbia. While I was there, I also came    10:04:59
7  back to take the bar again, passed it and then was    10:05:01
8  admitted.                          10:05:04
9    Q.    Okay. And the second time you took    10:05:05
10 the bar was in 2000?                 10:05:06
11    A.    No, it was in 1999 February.    10:05:08
12    Q.    The next year, 1999, okay.     10:05:12
13    A.    Correct. The next available time.    10:05:13
14    Q.    Again, the New York Bar?       10:05:15
15    A.    Yes.                         10:05:17
16    Q.    And passed it that time?       10:05:18
17    A.    Yes.                         10:05:19
18    Q.    And then what did you do after passing    10:05:20
19 the bar in terms of working?         10:05:26
20    A.    I was already in Columbia, committed    10:05:28
21 to working there for a year. And I fulfilled that    10:05:30
22 obligation, and then came back to the offer that I    10:05:34
23 had open for my law firm, Clifford Chance, and began    10:05:37
24 working as I had agreed with them before I went to    10:05:41

## Page 35

1  Columbia.                          10:05:44
2    Q.    Okay. So through July 1999 at      10:05:46
3  Columbia, and then started back at Clifford Chance    10:05:49
4  in September '99 then, is that right?    10:05:53
5    A.    That's correct.               10:05:54
6    Q.    When did you decide you wanted to, you    10:05:55
7  know, go into teaching, being a law professor?    10:06:01
8    A.    It is hard to remember when I didn't    10:06:03
9  think I might be a teacher. I think I finally    10:06:06
10 ultimately decided that I wanted to go into    10:06:10
11 academia -- well, no. Let me rephrase. That I    10:06:15
12 wanted to be a law professor during the trip that my    10:06:17
13 husband and I took in 2001 and 2002.    10:06:21
14    Q.    Okay. When -- Professor, when do you    10:06:33
15 believe you became knowledgeable about the gray    10:06:44
16 market, gray marketing, I should say?    10:06:47
17    A.    What do you mean by knowledgeable?    10:06:50
18    Q.    Beyond a consumer, beyond somebody    10:06:52
19 just being a consumer, but having specialized    10:06:56
20 knowledge about gray marketing. When do you think    10:07:00
21 you attained that specialized knowledge?    10:07:03
22    A.    My knowledge in the area has been    10:07:03
23 evolving, has been developing over the course of the    10:07:06
24 last three years as I have been teaching at Indiana    10:07:09

## Page 36

1  University.                        10:07:13
2    Q.    Can you explain for me marketing as a    10:07:13
3  discipline in academia and business?    10:07:16
4          MR. COLLINS: Outside the scope of the    10:07:20
5  opinion.                           10:07:22
6  BY THE WITNESS:                     10:07:22
7    A.    It's not my area of expertise.    10:07:23
8  BY MR. BESSETTE:                    10:07:23
9    Q.    What is not?                  10:07:25
10    A.    Marketing.                    10:07:26
11    Q.    Okay. So do you acknowledge you are    10:07:27
12 not an expert in marketing?           10:07:32
13    A.    In marketing generally?        10:07:33
14    Q.    Yes.                         10:07:35
15    A.    Yes.                         10:07:35
16    Q.    So you view gray marketing as    10:07:36
17 something different than marketing generally?    10:07:40
18    A.    Yes.                         10:07:42
19    Q.    Can you explain that to me?    10:07:42
20    A.    Sure. The reason I teach gray    10:07:44
21 marketing in my class, the reason I believe that the    10:07:47
22 authors of my book have included it in a book on    10:07:50
23 international business transactions is because the    10:07:52
24 gray market can have significant impact on a    10:07:56

## Page 37

1  business. And as a result, both I and the authors    10:07:59
2  of the book I would expect, though I don't know    10:08:02
3  their exact reasoning, believe that students who are    10:08:05
4  holding themselves out as particularly knowledgeable    10:08:09
5  about international business transactions ought to    10:08:12
6  have some background in gray marketing.    10:08:16
7          (Off the record    10:08:16
8          discussion.)    10:08:16
9  BY MR. BESSETTE:                    10:08:28
10    Q.    So I take it if I asked you what is    10:08:28
11 commonly known as the four Ps of marketing, you    10:08:45
12 wouldn't know what they were?         10:08:47
13    A.    No.                          10:08:48
14    Q.    Okay. Let me ask you, do you think    10:08:48
15 holding yourself out as an expert in gray marketing    10:08:51
16 without having any background knowledge or    10:08:55
17 specialized experience in marketing generally, you    10:08:59
18 can feel comfortable that you are an expert in gray    10:09:03
19 marketing without having that marketing generally    10:09:06
20 background?                         10:09:10
21          MR. COLLINS: I think you are calling    10:09:11
22 for a legal opinion.                 10:09:12
23          MR. BESSETTE: No, I am not.    10:09:14
24          MR. COLLINS: What do you mean by    10:09:15

10 (Pages 34 to 37)

Page 38

1 expert then?                               10:09:16
2       MR. BESSETTE: All right. Let me      10:09:17
3 withdraw the question.                     10:09:17
4 BY MR. BESSETTE:                           10:09:17
5    Q.  Let me ask you this: You are here   10:09:38
6 today as an expert in gray marketing. Do I 10:09:41
7 understand that right?                     10:09:50
8    A.  Yes.                                10:09:52
9    Q.  And that expertise has been developed 10:09:52
10 over the last three years in connection with your 10:09:55
11 teaching duties at the Indiana University School of 10:09:58
12 Law?                                      10:10:03
13    A.  Correct.                           10:10:03
14    Q.  All right. You have no background, 10:10:04
15 expertise or knowledge in marketing generally? 10:10:05
16    A.  Correct.                           10:10:07
17    Q.  To what extent in your view,        10:10:08
18 Professor, is gray marketing related to marketing 10:10:11
19 generally?                                10:10:18
20    A.  Again, I am not an expert in marketing 10:10:20
21 generally. So how much it relates and in what 10:10:23
22 manners it relates to marketing generally, I 10:10:29
23 wouldn't be qualified to answer.          10:10:32
24    Q.  Okay. And when do you believe you  10:10:35

Page 39

1 became an expert in gray marketing?        10:10:47
2    A.  I'm not sure exactly what you mean by 10:10:49
3 the question.                             10:10:54
4    Q.  Let me ask you this -- let me       10:10:55
5 withdraw.                                 10:10:58
6       MR. COLLINS: I should have objected. 10:10:59
7       Go ahead.                           10:11:00
8 BY MR. BESSETTE:                          10:11:01
9    Q.  Would you consider yourself an expert 10:11:02
10 in gray marketing the first year you taught a class 10:11:04
11 that had one component of it gray marketing? 10:11:09
12    A.  I think my students --             10:11:12
13       MR. COLLINS: I'm sorry. Objection,  10:11:12
14 vague and ambiguous when you use the word "expert," 10:11:13
15 because one doesn't know the context you are using 10:11:17
16 it.                                       10:11:17
17       In any event, go ahead and answer.  10:11:20
18       MR. BESSETTE: Well, let me clarify. 10:11:20
19 She has testified that she is holding herself out as 10:11:20
20 an expert in gray marketing.              10:11:24
21       MR. COLLINS: In connection with this 10:11:25
22 litigation, yes.                          10:11:26
23       MR. BESSETTE: Correct. And that's   10:11:26
24 the definition I am using, so...          10:11:27

Page 40

1 BY MR. BESSETTE:                           10:11:28
2    Q.  To do that, you are sitting here today 10:11:30
3 as an expert in gray marketing in connection with 10:11:32
4 this case. When do you believe you first acquired 10:11:37
5 the requisite knowledge and expertise to sit in this 10:11:39
6 chair today and offer testimony as an expert in gray 10:11:42
7 marketing?                                10:11:49
8       MR. COLLINS: You may answer.         10:11:49
9 BY THE WITNESS:
10    A.  To offer testimony in this case as an
11 expert in gray marketing?
12 BY MR. BESSETTE:
13    Q.  No. Do you understand the question
14 is, when do you believe you acquired the requisite 10:11:50
15 knowledge and expertise to hold yourself out as an 10:11:53
16 expert in gray marketing, such as you are doing 10:11:55
17 today in this case?                       10:11:59
18    A.  Okay. Again, I think I answered this 10:11:59
19 question already. Over the course of the last 10:12:02
20 three years, I have been evolving and developing as 10:12:04
21 an expert in a variety of fields, including the gray 10:12:08
22 market.                                   10:12:11
23    Q.  I understand the evolvement part. Can 10:12:11
24 you tell me when you believe you acquired a certain 10:12:16

Page 41

1 knowledge of level and expertise that you deemed 10:12:19
2 yourself qualified to be an expert such as you are 10:12:22
3 holding yourself out today?               10:12:25
4    A.  It is a hard answer to give you, since 10:12:27
5 I didn't assess myself in that way until after I was 10:12:29
6 asked to serve in this case. However, the first 10:12:32
7 time I walked into a classroom to teach gray market 10:12:35
8 issues, I certainly had to have acquired the 10:12:41
9 knowledge that I believed was necessary in order to 10:12:41
10 educate -- I had to acquire the knowledge that was 10:12:41
11 necessary in order to educate students about issues 10:12:50
12 that they may not have known about, or may have had 10:12:53
13 quite a lot of knowledge about before I walked in 10:12:56
14 the room, and nonetheless, be able to teach them 10:12:59
15 something. And as a result, I think, of the first 10:13:02
16 time I walked into a classroom to teach gray market 10:13:04
17 issues, I was certainly holding myself out as an 10:13:07
18 expert to my students.                    10:13:10
19    Q.  And to acquire the knowledge to hold 10:13:11
20 yourself out as an expert to your student was 10:13:13
21 acquired by what, reading the course book or what 10:13:16
22 did you do to acquire the knowledge that you think 10:13:19
23 was sufficient to hold yourself out as an expert to 10:13:22
24 your students?                            10:13:25

Page 42

1    A.    What I typically do in preparing for    10:13:25
2  class.                                    10:13:28
3    Q.    And tell me what that is, please.    10:13:28
4        MR. COLLINS:  Asked and answered.    10:13:31
5        Go ahead.                          10:13:31
6  BY THE WITNESS:                           10:13:32
7    A.    Again, I read the materials that are    10:13:33
8  necessary -- that I have assigned to my students.  I    10:13:35
9  also read outside materials that are out there for    10:13:38
10 them to read, but I am fairly sure they don't read.    10:13:42
11 BY MR. BESSETTE:                          10:13:46
12   Q.    Fair enough.  So outside of reading    10:13:46
13 materials that other people have published, anything    10:13:48
14 else to gain the knowledge that you think is    10:13:57
15 appropriate to hold yourself out as an expert as you    10:14:00
16 do to your students?                      10:14:04
17   A.    No.                             10:14:05
18   Q.    Okay.  And how many articles would you    10:14:05
19 say you have read in total dealing with the gray    10:14:07
20 market or gray marketing activity?        10:14:09
21   A.    Again, that's -- that would be hard to    10:14:12
22 say.  I don't keep a tally.                10:14:14
23   Q.    I mean, a dozen, two dozen, three    10:14:16
24 dozen?  I mean, can you give me an estimate?    10:14:21

Page 43

1    A.    Again, it is hard to say simply    10:14:23
2  because I don't keep a tally, I don't keep a log.    10:14:26
3  And for each section in each class that I teach, of    10:14:29
4  which now there have been many over the course of    10:14:32
5  the last three years, I do the same.  I engage in    10:14:35
6  the same activities.                      10:14:39
7    Q.    Well, I mean, just give me a sense for    10:14:41
8  how many articles you review, published articles    10:14:44
9  that deal with gray marketing?            10:14:47
10        MR. COLLINS:  May I?  You mean ever?    10:14:52
11        MR. BESSETTE:  In total.            10:14:52
12        MR. COLLINS:  The total number of    10:14:52
13 articles ever reviewed to the extent that Professor    10:14:53
14 Ochoa can give you a number.              10:14:55
15 BY MR. BESSETTE:                          10:14:55
16   Q.    Well, if it is easier to do it by    10:14:55
17 year, maybe.  If you can think of a particular class    10:14:58
18 year and you review materials, as you say, to get    10:15:00
19 ready.  How many -- let's do it that way, if that's    10:15:03
20 easier.                                   10:15:03
21        How many articles or books or    10:15:03
22 publications would you review that deal with gray    10:15:04
23 marketing activity in any given year, say, in the    10:15:07
24 last three years?                         10:15:10

Page 44

1    A.    Again, the number is hard to estimate,    10:15:12
2  simply because the kinds of materials I review may    10:15:14
3  be very lengthy, they may be very short.  So if I --    10:15:18
4  I could easily tell you that I have reviewed 90    10:15:20
5  published pieces in the gray market, that may not be    10:15:24
6  accurate, depending on the length of the pieces that    10:15:28
7  I was reviewing.                          10:15:31
8    Q.    You've never served as an expert    10:15:32
9  witness before in litigation?              10:15:34
10   A.    Correct.                         10:15:35
11   Q.    Never testified in court as an expert    10:15:36
12 witness either?                           10:15:41
13   A.    Correct.                         10:15:41
14   Q.    Somewhere in here, I think Paragraph 8    10:15:41
15 of your report, Exhibit 303, you say you are being    10:15:55
16 compensated for the time spent in this matter at    10:15:59
17 your current hourly rate of 425.  How did you    10:16:04
18 determine what your current hourly rate is?    10:16:07
19   A.    Again, as we just discussed, I had not    10:16:09
20 served as an expert before, had not given expert    10:16:11
21 testimony before.  And as a result, sought advise of    10:16:14
22 colleagues, both in fields of securities litigation    10:16:17
23 and also colleagues who are professors.  And I also    10:16:20
24 believe I spoke to the partners with whom I worked    10:16:28

Page 45

1  at Clifford Chance.                       10:16:31
2    Q.    And how did you settle on 425?    10:16:33
3    A.    Given the information that I received    10:16:36
4  from all the people with whom I spoke, it seemed    10:16:38
5  like a reasonable rate.                   10:16:40
6    Q.    Did Mr. Collins or anyone on the    10:16:42
7  plaintiffs -- plaintiff's lawyers have input into    10:16:45
8  what your rate should be?                  10:16:47
9    A.    They agreed.                     10:16:49
10        MR. COLLINS:  I think what we did was    10:16:49
11 to pay it.                                10:16:51
12 BY MR. BESSETTE:                          10:16:52
13   Q.    But before you settled on the rate,    10:16:52
14 did you inquire of the plaintiff's lawyers whether    10:16:54
15 that was appropriate?  Were they part of the    10:16:57
16 information you took into account in deciding on    10:16:59
17 425?                                      10:17:08
18   A.    No.  I stated my rate, they agreed.    10:17:08
19   Q.    Okay.  On page 3, again of Paragraph 9    10:17:12
20 of your initial report, you say, "I am familiar with    10:18:12
21 the causes and effects of gray market activity."    10:18:19
22        That familiarity with the causes    10:18:23
23 and effects, again, does that come from what you    10:18:25
24 have told us here today, your reading of various    10:18:27

12  (Pages 42 to 45)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

Page 46

1    articles and teaching at the law school?        10:18:30
2        A.   Yes.                        10:18:32
3        Q.   Now, if you would turn to page 15 and   10:18:32
4    16 of your initial report. It is actually the last   10:19:23
5    sentence of Paragraph 24 on page 16, but if you want   10:19:30
6    to see that paragraph in total, you say that, "A    10:19:33
7    significant amount of the literature on gray      10:19:38
8    marketing discusses it in an international context,   10:19:41
9    given the increased opportunities for arbitrage once   10:19:46
10   largely undifferentiated products are sold       10:19:50
11   internationally."                     10:19:54
12         How do you define "significant" in   10:19:55
13   that sentence, Professor?            10:19:57
14       A.   Again, I am not comfortable with     10:19:59
15   giving a percentage. It is a feel more than a     10:20:09
16   quantitative measure.               10:20:13
17       Q.   I mean, is it a super majority, a    10:20:15
18   majority, some?                   10:20:18
19       A.   A good body.               10:20:19
20       Q.   So that would be less than a majority?  10:20:20
21       A.   Again, I'm not sure about the       10:20:24
22   percentages. I would say it is somewhere -- well,   10:20:28
23   I'm just not sure about the percentages. It is a    10:20:31
24   feel. It is a lot of material on gray marketing.   10:20:33

Page 47

1        Q.   Going back I guess to pages 3 and 4,    10:20:42
2    the eight articles, the eight academic articles that   10:20:52
3    you reviewed in connection with your work in this   10:20:54
4    case. I think I already have the answer to this,    10:20:58
5    but that's not the universe of academic literature   10:20:59
6    related to gray marketing, right?            10:21:05
7        A.   Correct.                  10:21:06
8        Q.   Okay. How many academic articles are   10:21:07
9    you aware of that deal with gray marketing?      10:21:10
10         MR. COLLINS:  In the universe?        10:21:13
11         MR. BESSETTE:  Yeah.            10:21:16
12   BY MR. BESSETTE:                  10:21:16
13       Q.   How many exist?             10:21:17
14       A.   I don't know.              10:21:18
15       Q.   No sense at all?            10:21:19
16       A.   It is like any area. If you ask me to   10:21:20
17   give you a sense of how many academic articles exist   10:21:22
18   in the area in which I focus my research, I couldn't   10:21:26
19   even venture a guess. And it would be the same with   10:21:32
20   gray marketing.                   10:21:35
21       Q.   Well, if you don't know how many     10:21:36
22   articles about gray marketing exist, how can you    10:21:43
23   assert that there is a significant amount of the    10:21:47
24   literature, as you do here, dealing with it in an   10:21:49

Page 48

1    international context?               10:21:57
2        A.   In my experience of reading articles   10:21:58
3    on gray marketing and in pulling up articles on gray   10:22:00
4    marketing and seeing articles on gray marketing,    10:22:02
5    those which I have read, those I have seen titled,   10:22:05
6    those which I have scanned, a significant portion of   10:22:09
7    those deal with gray marketing in the international   10:22:11
8    context.                        10:22:14
9        Q.   So what you are saying is Paragraph    10:22:14
10   24, that last sentence should say a significant    10:22:18
11   amount of the literature on gray marketing that you   10:22:19
12   have reviewed discuss it in an international      10:22:22
13   context?                        10:22:26
14       A.   I don't think that would be accurate.   10:22:27
15       Q.   How can you say that a significant    10:22:28
16   amount of the total body of literature, which you   10:22:30
17   are implying to me here today when you don't know   10:22:34
18   how many that is, how can you say a significant    10:22:36
19   amount deals with international? I am just curious.  10:22:41
20         MR. COLLINS:  Misstates the testimony.   10:22:44
21         Go ahead and answer.             10:22:45
22   BY THE WITNESS:                   10:22:46
23       A.   Again, I stated that I wouldn't be     10:22:47
24   able to give you a percentage. And the reason I    10:22:48

Page 49

1    wouldn't be able to give you a percentage is because  10:22:52
2    I haven't tallied up how many articles there are,   10:22:53
3    how many of them deal with international gray      10:22:57
4    marketing. It is my experience in not just in     10:23:01
5    reviewing articles, but also in seeing the titles of   10:23:04
6    articles and doing research that pulls up lists of   10:23:06
7    articles, that a significant percentage of the     10:23:10
8    articles that are out there deal with gray marketing   10:23:14
9    in the international context.             10:23:18
10       Q.   That's your basis for this statement?   10:23:18
11       A.   Let me rephrase. They either deal    10:23:18
12   specifically with gray marketing in the        10:23:18
13   international context, or at least touch on the    10:23:20
14   issue.                         10:23:21
15       Q.   That's the basis for your statement?   10:23:21
16       A.   Yes.                    10:23:23
17       Q.   And if you look at Exhibit 304, your   10:23:23
18   rebuttal report, in Paragraph 4, which is on page 2,   10:23:33
19   second sentence, you say, "The overwhelming      10:23:47
20   attention national/international gray marketing     10:23:51
21   receives in the academic literature."         10:23:56
22         Is that also based on -- what is     10:24:00
23   that sentence based on?               10:24:00
24       A.   The same.                 10:24:01

13   (Pages 46 to 49)

Page 50

1    Q.    Okay. The eight articles you have          10:24:02
2  listed and your research and reviewing any number of  10:24:03
3  articles that you can't tell me how many and pulling  10:24:07
4  things up on the internet?                10:24:10
5         MR. COLLINS: Asked and answered.     10:24:11
6  BY THE WITNESS:                  10:24:12
7    A.    Correct.            10:24:13
8  BY MR. BESSETTE:                  10:24:13
9    Q.    Okay. Let me ask you to look at      10:24:29
10  Exhibit 305, Mr. Frazier's report.        10:24:36
11         MR. COLLINS: Off the record.
12         MR. BESSETTE: Oh, is it time for a
13  break?
14         MR. COLLINS: No, no, I don't know.
15  But you're reaching a point when you can stop, I
16  presume?                  10:24:42
17         MR. BESSETTE: I can stop any time.   10:24:42
18         THE WITNESS: If this is a good      10:24:44
19  breaking point, it might be good.          10:24:46
20         MR. BESSETTE: Sure, that's fine.     10:24:46
21            (Break taken.)    10:24:46
22                  10:24:46
23
24

Page 51

1  BY MR. BESSETTE:                  11:04:43
2    Q.    Professor, what are some of the other  11:04:58
3  topics in the international business transaction    11:05:00
4  course book?                11:05:02
5         MR. COLLINS: Document speaks for    11:05:03
6  itself.                  11:05:05
7         Go ahead.        11:05:05
8  BY MR. BESSETTE:                  11:05:07
9    Q.    And I apologize. We are going to have  11:05:07
10  it soon. We are having copies made.        11:05:10
11         MR. COLLINS: Off the record.      11:05:15
12            (Off the record    11:05:19
13            discussion.)    11:06:32
14            (Exhibit No. 306 was  11:06:32
15            marked for    11:06:32
16            identification.)  11:06:33
17  BY MR. BESSETTE:                  11:06:33
18    Q.    All right. Professor, I'm handing you  11:06:34
19  what the court reporter has marked as Exhibit 306.  11:06:34
20  And for the record, would you just identify that,    11:06:38
21  including the Bates numbers, which are printed at    11:06:41
22  the bottom, from just the first one to the last one?  11:06:44
23    A.    The Bates Numbers OCH 0137 to OCH    11:06:47
24  0199. And it is the front page or the first sort of  11:06:53

Page 52

1  the title page of the international business      11:06:58
2  transactions book from which I teach. And then the  11:07:01
3  section which includes the materials on        11:07:04
4  counterfeiting and gray marketing.        11:07:08
5    Q.    Okay. And that section I think is      11:07:11
6  titled or numbered 9.2?            11:07:14
7    A.    Correct.            11:07:17
8    Q.    And is 9.3 a different section?      11:07:17
9    A.    Yes.            11:07:21
10    Q.    So just 9.2 is the portion of the      11:07:21
11  course book that involves gray marketing?      11:07:27
12    A.    Correct.            11:07:33
13    Q.    And then there are supplemental      11:07:33
14  materials as well, which you talked about earlier,  11:07:36
15  which I understand do you pass out to your students  11:07:38
16  as part of your class or is that just what you teach  11:07:42
17  from?              11:07:45
18    A.    Yeah --            11:07:45
19         MR. COLLINS: Let him finish.
20         THE WITNESS: Right, right, right.
21         MR. COLLINS: Do you have the
22  question?
23         THE WITNESS: Yes, I do.
24

Page 53

1  BY THE WITNESS:
2    A.    The supplemental materials are      11:07:51
3  materials that I assign similarly to how I assign    11:07:52
4  the book. The students are expected to purchase the  11:07:57
5  materials in advance of the class.        11:08:00
6  BY MR. BESSETTE:                  11:08:01
7    Q.    Okay. How many times a year do you    11:08:01
8  teach the international business transactions class?  11:08:05
9    A.    I teach it -- so far it has been once    11:08:07
10  a year. That may change.          11:08:09
11    Q.    So, so far between '03 and the present  11:08:11
12  it has been once a year?            11:08:14
13    A.    Correct.            11:08:16
14    Q.    And that module 9.2 and whatever      11:08:16
15  supplemental materials dealing with gray market, how  11:08:20
16  big a portion of that class that runs a semester is  11:08:24
17  that?              11:08:29
18    A.    Typically we devote between three and  11:08:29
19  four class sessions to these issues.        11:08:32
20    Q.    And then how much preparation work do  11:08:34
21  you do to be able to teach those three or four      11:08:42
22  classes that deal with the subject matter we are    11:08:45
23  talking about, gray marketing?          11:08:47
24    A.    How much in time?          11:08:49

14  (Pages 50 to 53)

Page 54

```
1    Q.   Yes.                          11:08:51
2    A.   I typically allot really between three 11:08:53
3 and five hours preparation time for every hour that 11:08:57
4 I spend in class.                      11:09:01
5    Q.   And when you said three to four  11:09:02
6 sessions, how many hours is a session?    11:09:04
7    A.   One hour.                     11:09:06
8    Q.   So three to five hours preparation on 11:09:07
9 average for one hour of class. And during a   11:09:13
10 semester, you have three or four classes throughout 11:09:17
11 the year that deal with gray marketing issues?  11:09:22
12    A.   Yeah, let me back up, actually. I was 11:09:25
13 speaking about what I do now after having taught all 11:09:27
14 of my classes more than once. In the first year 11:09:31
15 that I was teaching, the amount of prep time that I 11:09:34
16 devote has decreased, mostly because I have read the 11:09:37
17 course materials before, the textbook materials  11:09:41
18 before. And so the majority of my time now is spent 11:09:44
19 reading outside materials.              11:09:47
20        In the first year that I taught   11:09:50
21 the class, I can remember that it was not unusual to 11:09:52
22 spend something more like 10 hours per class session 11:09:58
23 preparing for class. The second year that I taught, 11:10:01
24 it was somewhat less than that. And the last time 11:10:04
```

Page 55

```
1 that I taught it, it was between three and    11:10:09
2 five hours.                            11:10:12
3    Q.   Okay. What are some of the other  11:10:12
4 subject areas in the international business   11:10:13
5 transactions class? So we have gray marketing we 11:10:15
6 have talked about. What are some of the other big 11:10:18
7 topics that are within the class?        11:10:19
8    A.   Okay. There are a number of topics, 11:10:21
9 obviously. We start talking about the prevalence of 11:10:24
10 international business transactions generally, the 11:10:27
11 growth of international business transactions, sort 11:10:30
12 of those wider phenomenons, contextualizing the 11:10:34
13 reasons for the course and the importance of the 11:10:39
14 course.                               11:10:39
15        We move on by talking about really 11:10:41
16 mechanic transactions, how it is that an   11:10:44
17 international business transaction may occur. So we 11:10:47
18 talk about letters of credit, we talk about the 11:10:50
19 relationships that the buyer and a seller would have 11:10:53
20 with a bank, the relationships that they might have 11:10:55
21 with each other, and how it is that individuals and 11:10:58
22 companies engaged in international business   11:11:04
23 transactions gain the confidence that is necessary 11:11:06
24 to transact across borders.            11:11:11
```

Page 56

```
1        We also talk about, again in the  11:11:14
2 introductory part of the class, we talk about some 11:11:20
3 of the difficulties that arise in international 11:11:23
4 transactions, international business transactions 11:11:27
5 typically, which involve issues of language, issues 11:11:31
6 of trust, and issues of varying cultures. We talk 11:11:35
7 about in addition to -- well, that's sort of the 11:11:38
8 very beginning of the class.            11:11:39
9        We also talk about different kinds 11:11:41
10 of international business transactions, different 11:11:48
11 categories of international business transactions. 11:11:51
12 And so we move from --                 11:11:54
13        (Off the record           11:11:54
14        discussion.)               11:11:54
15 BY THE WITNESS:                        11:11:54
16    A.   So we move from international sale of 11:12:04
17 goods to more complex levels of involvement. So we 11:12:05
18 will talk about licensing, franchising, foreign 11:12:10
19 direct investment and the kinds of partnerships that 11:12:16
20 a U.S. entity might have with foreign entities in 11:12:23
21 each of those kinds of transactions. That takes up 11:12:27
22 a great bulk of the class. That was a very quick 11:12:30
23 summary of a lot of the class.         11:12:36
24        And then we also devote a section 11:12:37
```

Page 57

```
1 of the class to what I like to call sort of the 11:12:40
2 underbelly of international business transactions, 11:12:43
3 and the gray marketing and counterfeit materials are 11:12:45
4 sort of a nice transition into that material. I 11:12:48
5 teach this material and then I teach about some of 11:12:53
6 the environmental concerns and human rights concerns 11:12:55
7 that are attendant to international business  11:12:58
8 transactions. I talk about some of the materials or 11:13:01
9 some of the efforts that have been made over the 11:13:04
10 course of the last 35 years or so to alleviate some 11:13:08
11 of those concerns, going all the way -- going into 11:13:13
12 the history of it, as well as covering fairly recent 11:13:17
13 material.                              11:13:22
14        After that section, we talk    11:13:23
15 about -- after that section we talk about -- I am 11:13:25
16 trying to picture my syllabus. The reason I am 11:13:31
17 struggling with the last section is because that 11:13:36
18 section I play with occasionally. And I often play 11:13:39
19 with whether I want to change it. And the last time 11:13:42
20 I taught it, I wasn't entirely happy with it. And 11:13:43
21 there is a lot of material that I exclude that's in 11:13:47
22 the textbook that I don't included in the class. 11:13:49
23    Q.   I think that's good. Unless you want 11:13:53
24 to go on, I won't stop you.             11:13:53
```

15  (Pages 54 to 57)

Page 58

1    A.    No.                          11:13:53
2    Q.    Okay.                        11:13:54
3          MR. COLLINS:  And we don't want you to  11:13:54
4    answer more than he asks, so good answer.      11:13:57
5          THE WITNESS:  Right.          11:14:00
6    BY MR. BESSETTE:                    11:14:00
7    Q.    So let me just ask, on the licensing   11:14:01
8    you talked about licensing as it relates to   11:14:04
9    international business transactions, that's one   11:14:07
10   section or component of the class.  Do you consider   11:14:09
11   yourself an expert in licensing in international   11:14:13
12   business transactions?              11:14:16
13   A.    Sure.                        11:14:17
14   Q.    And that's based on the same criteria   11:14:18
15   that you've used before, you read materials, you   11:14:20
16   presented in your class, so you think you are an   11:14:22
17   expert?                            11:14:24
18   A.    Yes.                         11:14:24
19   Q.    Okay.  Same thing with respect to   11:14:25
20   franchising in connection with the international   11:14:27
21   business transactions.  Because it is in the class   11:14:30
22   and you teach it, do you feel that you are an expert   11:14:32
23   in franchising in connection with international   11:14:36
24   business transactions?              11:14:39

Page 59

1    A.    Yes.                         11:14:40
2    Q.    Same question with respect to foreign   11:14:41
3    direct investment?                  11:14:44
4    A.    Yes.  And I would say there are areas   11:14:44
5    in which I feel more and less comfortable.  For   11:14:46
6    various reasons, I may have other pressing issues   11:14:50
7    that are going on during the time that I am   11:14:52
8    preparing for a class and may have read less or more   11:14:55
9    outside materials as a result.       11:15:00
10   Q.    Is there any area that you can tell me   11:15:02
11   now in connection why the international business   11:15:05
12   transactions and the course book that you teach from   11:15:08
13   and whatever other materials you read to prepare,   11:15:08
14   that you do not consider yourself an expert in?   11:15:17
15         MR. COLLINS:  In connection with this   11:15:17
16   particular course?                  11:15:18
17         MR. BESSETTE:  Yes.  I thought I made   11:15:18
18   that clear.                        11:15:19
19   BY THE WITNESS:                     11:15:19
20   A.    In connection with the course, no.   11:15:20
21   BY MR. BESSETTE:                    11:15:21
22   Q.    You also teach I think it is a   11:15:21
23   contracts class, right?             11:15:23
24   A.    Correct.                     11:15:24

Page 60

1    Q.    Do you consider yourself an expert in   11:15:25
2    connection with the contracts that you teach?   11:15:29
3    A.    Absolutely.                  11:15:30
4    Q.    And again, that's based on your   11:15:31
5    reviewing the course book and whatever other   11:15:33
6    materials that you use to prepare to teach law   11:15:38
7    students?                          11:15:42
8    A.    Yes.                         11:15:42
9    Q.    So, Professor, just I want to be   11:15:42
10   clear.  Your expertise in gray marketing as it   11:16:33
11   relates to this case in which you are proffering   11:16:37
12   yourself as an expert, is based on your being a   11:16:40
13   lawyer and teaching classes that contain gray   11:16:48
14   marketing subject areas and your reading the   11:16:51
15   materials to prepare for the class that you teach.   11:16:54
16   That's the basis for your expertise?   11:16:57
17   A.    The materials that I teach, as well as   11:16:59
18   outside materials, yes.             11:17:02
19   Q.    Now, I think before the break I asked   11:17:02
20   you to take a look at Paragraph 37 of Mr. Frazier's   11:17:10
21   report -- I'm sorry, it may be professor as well.   11:17:16
22   But Exhibit 305, Paragraph 37, it is on page 12.   11:17:16
23   Professor Frazier writes that -- I think it's the   11:17:31
24   second sentence -- that consumers shopping at Costco   11:17:38

Page 61

1    did not particularly care about pre- and post-sales   11:17:41
2    service availability at specialty and pro shops, and   11:17:45
3    sites, the Coughlan piece down there.  Do you agree   11:17:51
4    with that statement?                11:17:53
5          MR. COLLINS:  Excuse me.  You mean   11:17:55
6    that one statement in isolation apart from the   11:17:55
7    paragraph and apart from the section?   11:18:00
8          MR. BESSETTE:  Yes.             11:18:02
9    BY MR. BESSETTE:                    11:18:02
10   Q.    Do you agree with that statement?   11:18:03
11         MR. COLLINS:  I will caution you, go   11:18:04
12   ahead and answer, but if you feel you need to read   11:18:06
13   the paragraph and read the section, you read them.   11:18:11
14         THE WITNESS:  Uh-huh.  I'll be right   11:18:11
15   with you.                          11:18:13
16   BY THE WITNESS:                     11:18:13
17   A.    No, I don't.                  11:18:16
18   BY MR. BESSETTE:                    11:18:17
19   Q.    Why not?                     11:18:18
20   A.    I think that what he says there is   11:18:18
21   essentially that nobody shopping -- what I read in   11:18:23
22   that sentence is that nobody shopping at Costco   11:18:26
23   would care about pre and post sales service.  And I   11:18:30
24   think that's a stretch.  I could imagine -- well, I   11:18:34

16  (Pages 58 to 61)

Page 62

```
1   will stop there.                          11:18:39
2      Q.   Are you familiar with the article or 11:18:40
3   publication that he cites there, which the full cite 11:18:42
4   I think is in Footnote 1 on page 3?       11:18:45
5      A.   That is the one article that I didn't 11:18:48
6   see in the materials that were produced.   11:18:51
7      Q.   Are you familiar with it, though?  11:18:53
8      A.   With that article, no.            11:18:56
9      Q.   Next paragraph. Professor Frazier  11:18:57
10  writes that there is no evidence that Adams Golf 11:19:09
11  brand name lost status, noting that consumers who 11:19:1
12  acquire prestigious brand at a good price are often 11:19:18
13  very satisfied with their purchase. Do you agree 11:19:25
14  with that statement?
15     A.   Do you want me to read the paragraph?
16     Q.   Sure. In all of these, go ahead and
17  read the paragraph.
18     A.   Yeah.
19         MR. COLLINS: All of these meaning
20  Section C on page 12?
21         MR. BESSETTE: No.
22  BY MR. BESSETTE:
23     Q.   All of these meaning my question, if 11:19:35
24  it's in a paragraph, feel free to read the paragraph 11:19:36
```

Page 63

```
1   or whatever you feel is necessary.         11:19:42
2      A.   Now, I'm sorry, which is the statement 11:20:06
3   you're asking me to agree with or disagree with? 11:20:11
4      Q.   It's the one where Professor Frazier 11:20:11
5   writes that there is no evidence that Adams Golf's 11:20:12
6   brand name lost status. _____11:20:15
7      A.   I think that's a mischaracterization 11:20:17
8   of what that paragraph says.              11:20:19
9      Q.   Well, I will read it into the record. 11:20:22
10  "Ms. Ochoa provides no evidence that Adams Golf's 11:20:2
11  brand name lost status with consumers as a result of 11:20:24
12  the low magnitude of gray market sales experienced 11:20:32
13  by Adams Golf."                           11:20:32
14         Do you agree with that sentence?  11:20:34
15     A.   No.                              11:20:35
16     Q.   Why not?                         11:20:36
17     A.   I think there is some evidence that 11:20:36
18  the brand name was losing status. And I also 11:20:38
19  disagree with the characterization of the magnitude 11:20:42
20  of gray market sales experience by Adams as low. 11:20:46
21     Q.   All right. What evidence do you cite 11:20:52
22  where -- that indicates to you that the Adams Golf 11:20:54
23  brand name lost status?                   11:20:57
24         MR. COLLINS: And by cite, are you 11:20:58
```

Page 64

```
1   asking her to tell you the sections of her report or 11:21:00
2   are you asking her to answer --          11:21:00
3         MR. BESSETTE: Can you read the    11:21:00
4   question back, please?                   11:21:00
5         (Record read.)                    11:21:16
6   BY THE WITNESS:                          11:21:16
7      A.   There was, in preparation for my   11:21:16
8   reports, I saw documents that I don't remember now 11:21:19
9   whether they actually made it into my report or not. 11:21:25
10  But, for example, there was, I believe it was Edwin 11:21:28
11  Watts who made a statement about gray marketing 11:21:3
12  lowers the value of the product, and if you lose 11:21:40
13  brand image, you lose everything. The gray 11:21:43
14  marketing was occurring at Adams and was effecting 11:21:4
15  its brand image. If you lose brand image, you lose 11:21:52
16  everything.                              11:21:57
17  BY MR. BESSETTE:                         11:21:57
18     Q.   So your understanding is that Adams 11:21:57
19  Golf lost brand image because Mr. Watts talked about 11:22:0
20  gray marketing generally, and since Adams Golf was 11:22:05
21  experiencing gray marketing it must have lost brand 11:22:09
22  status? Do I understand that right?       11:22:13
23         MR. COLLINS: Mischaracterized the 11:22:13
24  testimony.                               11:22:13
```

Page 65

```
1         Go ahead.                         11:22:13
2   BY THE WITNESS:                          11:22:15
3      A.   Yeah. I don't think Edwin Watts'  11:22:15
4   testimony is what caused Adams Golf's brand name to 11:22:19
5   lose value.                              11:22:19
6   BY MR. BESSETTE:                         11:22:19
7      Q.   And my question is, what is your   11:22:19
8   evidence that the brand name did lose status? 11:22:20
9         MR. COLLINS: And what you're asking 11:22:23
10  her to do --                             11:22:24
11         MR. BESSETTE: Todd, it's pretty    11:22:25
12  plain.                                   11:22:27
13  BY MR. BESSETTE:                         11:22:27
14     Q.   What is your evidence, Professor, that 11:22:27
15  Adams Golf's brand name lost status?      11:22:29
16         MR. COLLINS: Excuse me. I guess what 11:22:32
17  you are asking her to do is to list every piece of 11:22:33
18  evidence. Is that it? Even if it is already in her 11:22:36
19  report?                                  11:22:41
20  BY MR. BESSETTE:                         11:22:41
21     Q.   Point to it, list it, summarize it, 11:22:41
22  but tell me what your evidence is.        11:22:45
23     A.   Okay. All right. So Edwin Watts is 11:22:45
24  an example. In addition, there is a memo written by 11:22:48
```

17 (Pages 62 to 65)

Page 66

1  Barney Adams on October, I believe 13th, in which he  11:22:52
2  says that he is forecasting Q4 sales to decrease 20  11:22:58
3  to 25 percent based on surveys from customers who  11:23:04
4  refused to buy.  That means evidence that customers  11:23:08
5  refused to buy Adams Golf clubs, and as a result --  11:23:14
6  as he stated as a result of gray marketing.  11:23:17
7       Q.  I think that misstates what he said,  11:23:20
8  and we will go into that.  11:23:23
9            That's in October.  When did Adams  11:23:24
10  Golf lose brand status, in your opinion?  11:23:28
11       A.  I believe that Adams Golf started to  11:23:30
12  lose brand status in a sort of escalating fashion,  11:23:31
13  together with the trend of the gray marketing  11:23:38
14  problems that Adams was experiencing.  Certainly by  11:23:40
15  the time that the market generally was aware that  11:23:42
16  gray marketing was occurring, there was some  11:23:45
17  significant impact to Adam's brand name.  11:23:49
18       Q.  And what is your evidence of that?  11:23:52
19       A.  The declining sales.  11:23:54
20       Q.  And when did sales start to decline?  11:23:56
21       A.  Sales started to decline soon after  11:24:01
22  the IPO.  11:24:05
23       Q.  So in your view, declining sales is an  11:24:06
24  indicator of a losing of brand status for Adams  11:24:09

Page 67

1  Golf?  11:24:13
2       A.  That's one of the explanations, yes.  11:24:13
3       Q.  I know it can be.  Is it in your  11:24:15
4  opinion evidence of losing brand status?  11:24:18
5       A.  For Adams?  11:24:20
6       Q.  Yes.  11:24:21
7       A.  Yes.  11:24:22
8       Q.  Why?  11:24:22
9       A.  I am sorry?  11:24:23
10       Q.  Why?  11:24:23
11            MR. COLLINS:  Asked and answered.  11:24:24
12            Go ahead.  11:24:25
13  BY MR. BESSETTE:  11:24:26
14       Q.  In other words, how do you quantify  11:24:26
15  the declining sales -- let me strike that.  11:24:28
16            The declining sales, did it have  11:24:30
17  any other reason besides Adams Golf losing brand  11:24:33
18  status?  11:24:38
19       A.  Could there be another explanations,  11:24:38
20  is that what you're asking?  11:24:40
21       Q.  Yeah.  Are there other causes for the  11:24:40
22  declining sales?  11:24:42
23       A.  There could be.  11:24:42
24       Q.  Well, do you have any opinion?  Do you  11:24:43

Page 68

1  know?  Did you do any research?  11:24:45
2            MR. COLLINS:  What causes are apart  11:24:46
3  from gray marketing are outside the scope.  11:24:48
4  BY MR. BESSETTE:  11:24:51
5       Q.  Well, look.  You cited declining sales  11:24:52
6  as evidence of Adams Golf's losing brand status.  Do  11:24:56
7  I understand that correctly?  11:25:00
8       A.  Yes.  11:25:02
9       Q.  Okay.  What did you do to analyze the  11:25:02
10  cause of declining sales?  11:25:04
11       A.  I analyzed the gray market problem  11:25:05
12  that Adams was experiencing.  11:25:08
13       Q.  Let me ask you, what did you do to  11:25:10
14  analyze the decline in sales to determine that  11:25:13
15  losing brand status was one of the causes for the  11:25:20
16  declining sales?  11:25:24
17       A.  Okay.  I looked at -- obviously I  11:25:25
18  looked at literature on gray marketing, the causes  11:25:28
19  and effects of gray marketing.  The effects are well  11:25:30
20  laid out in a number of documents that I cited, and  11:25:34
21  others.  Those effects can be, among those effects,  11:25:36
22  one of the most prevalent and worrisome effects, can  11:25:41
23  be declining sales, as a result of declining brand  11:25:45
24  image.  11:25:45

Page 69

1            It is well evidenced, well  11:25:48
2  documented that gray marketing can have an impact, a  11:25:49
3  significant impact on brand image, and that  11:25:52
4  devaluation of brand image can have a significant  11:25:56
5  impact on sales.  That information, in my background  11:25:59
6  and in my experience or in my expertise, informed my  11:26:05
7  reading of the problems that Adams experienced and  11:26:09
8  the effects that Adams experienced as well.  11:26:16
9       Q.  So because you read academic  11:26:18
10  literature that indicates that one of the results of  11:26:21
11  gray marketing could be a loss in brand status,  11:26:26
12  which could be reflected in declining sales, because  11:26:28
13  you saw declining sales at Adams Golf, you are  11:26:30
14  concluding that it is, in part, a result of the loss  11:26:35
15  of brand status.  Do I understand that correctly?  11:26:39
16            MR. COLLINS:  Mischaracterizing the  11:26:42
17  testimony.  11:26:44
18            MR. BESSETTE:  Go ahead and read it  11:26:45
19  back, please.  11:26:45
20            THE WITNESS:  The question you  11:26:45
21  asked --  11:26:45
22            MR. COLLINS:  That's fine.  Let him  11:26:45
23  read it back.  11:26:45
24            THE WITNESS:  Sure.  11:26:45

18 (Pages 66 to 69)

Page 70

1    (Record read.)    11:27:09
2    MR. COLLINS: Now, Paul asked crisp    11:27:09
3    questions. That was not necessarily the crispest.    11:27:12
4    So make sure you understand the question before you    11:27:17
5    answer. And Paul can say it again or we could have    11:27:19
6    it read back again. If you understand it, go ahead    11:27:23
7    and answer.    11:27:24
8    THE WITNESS: I think I understand the    11:27:24
9    question.    11:27:27
10    BY THE WITNESS:    11:27:27
11    A.    Though my answer -- my answer takes    11:27:28
12    issue with various parts of what you said. And I    11:27:32
13    can either take issue with those in turn or you    11:27:37
14    could break the question into a couple of parts.    11:27:40
15    BY MR. BESSETTE:    11:27:42
16    Q.    Go ahead and answer it however you see    11:27:42
17    fit.    11:27:45
18    (Off the record    11:27:45
19    discussion.)    11:28:17
20    MR. COLLINS: Are you okay or do you    11:28:17
21    need it read back again?    11:28:19
22    MR. BESSETTE: She already said, Todd,    11:28:19
23    that she understood.    11:28:19
24    MR. COLLINS: No. We just had an    11:28:21

Page 71

1    interruption, Paul. She is entitled to hear the    11:28:23
2    question again, which was confusing, if she wants    11:28:25
3    to.
4    MR. BESSETTE: Well, let's just --
5    MR. COLLINS: If you're read, go ahead
6    and answer.
7    BY MR. BESSETTE:
8    Q.    Do you want it again?
9    A.    I'm okay. I'm fine.
10    The first part of your question    11:28:30
11    implied, I read -- I interpreted in what you said    11:28:31
12    that academic literature is divorced from real life    11:28:37
13    or reality. The academic literature that deals    11:28:41
14    specifically with the effects of gray marketing on    11:28:45
15    both on brand image and profitability or sales as a    11:28:48
16    result is, in fact, empirically based. And so it is    11:28:52
17    a summary and extrapolation of what happens in that    11:28:57
18    rear world.    11:29:01
19    In addition when -- so yes, I    11:29:02
20    relied on that academic literature when I was    11:29:03
21    studying the problem that Adams Golf had faced. And    11:29:08
22    I want to make clear that had Adams Golf not had a    11:29:11
23    gray market problem when Adams Golf was experiencing    11:29:16
24    declining sales, I would have no reason to believe    11:29:18

Page 72

1    that the reason that they were experiencing    11:29:21
2    declining sales was gray marketing. However, Adams    11:29:26
3    Golf was experiencing a gray market problem, and    11:29:28
4    that very much informed my analysis.    11:29:30
5    Q.    Again, I think the answer was    11:29:33
6    confusing. Let me try to parse a couple other    11:29:34
7    question.    11:29:34
8    Did you undertake any analysis of    11:29:36
9    the causes for Adams Golf's decline in sales in    11:29:40
10    1998, the second half?    11:29:43
11    A.    Can you ask that again?    11:29:45
12    Q.    Did you undertake any analysis to    11:29:47
13    determine what caused Adams Golf's decline in sales    11:29:51
14    in the second half of 1998?    11:29:57
15    A.    Yes.    11:29:58
16    Q.    Tell me what analysis you undertook.    11:29:59
17    A.    I studied its gray market problem and    11:30:02
18    made a determination of whether or not its gray    11:30:06
19    market problem caused some of that decline.    11:30:08
20    Q.    What analysis did you undertake in    11:30:10
21    particular?    11:30:13
22    A.    I applied the academic literature on    11:30:13
23    gray marketing studies, the business strategies that    11:30:18
24    Adams Golf employed, I superimposed that on the    11:30:22

Page 73

1    academic literature on the causes of gray marketing,    11:30:25
2    the various invitations that companies can make to    11:30:28
3    gray marketers, and then saw that, in fact, Adams    11:30:33
4    Golf had experienced a gray market problem and made    11:30:35
5    a determination based on those factors.    11:30:35
6    Q.    And that's what led you to your    11:30:37
7    conclusion that the decline in sales was caused in    11:30:40
8    part by gray marketing?    11:30:43
9    A.    Yes.    11:30:45
10    Q.    Nothing else, just reading the    11:30:45
11    academic literature and superimposing that on to the    11:30:47
12    company's decline in sales?    11:30:52
13    MR. COLLINS: Mischaracterize the    11:30:54
14    testimony.    11:30:56
15    BY THE WITNESS:    11:30:56
16    A.    On to Adams Golf's business model,    11:30:56
17    it's strategies, and yes, the fact that it was    11:31:00
18    actually experiencing a gray market problem and was    11:31:08
19    experiencing a decline in sales.    11:31:10
20    BY MR. BESSETTE:    11:31:13
21    Q.    So okay. In your analysis, did you    11:31:15
22    attribute any other causes to Adams Golf's decline    11:31:17
23    in sales in the second half of 1998 other than gray    11:31:20
24    marketing?    11:31:23

19 (Pages 70 to 73)

Page 74

```
1        MR. COLLINS: Outside the scope.    11:31:24
2        Go ahead.                    11:31:26
3   BY THE WITNESS:                    11:31:26
4     A.  In my analysis, no. I was looking at  11:31:26
5   the gray market problem.              11:31:28
6   BY MR. BESSETTE:                    11:31:30
7     Q.  Did you quantify what percent of the  11:31:30
8   decline in sales in the second half of 1998 was  11:31:33
9   caused, in your opinion, by gray marketing?  11:31:37
10    A.  I did not.                    11:31:39
11    Q.  So you don't have any opinion on that  11:31:40
12  as you sit here today?                11:31:43
13    A.  Not in a quantifiable, numerical    11:31:44
14  sense, no.                          11:31:46
15    Q.  In any sense?                  11:31:47
16    A.  Yes.                         11:31:48
17    Q.  What is your opinion?          11:31:49
18    A.  Significant.                  11:31:50
19    Q.  What does that mean?           11:31:51
20    A.  It means enough that it would have  11:31:52
21  been important to Adams Golf and to investors.  11:31:54
22    Q.  When the company experienced gray  11:31:56
23  marketing -- I'm sorry.              11:31:56
24        When the company experienced    11:32:00
```

Page 75

```
1   decline in sales -- Strike that.        11:32:02
2        When was it important? When was  11:32:04
3   it significant to investors, as you just mentioned?  11:32:06
4        MR. COLLINS: What is the "it"?    11:32:13
5        MR. BESSETTE: Would you read her last  11:32:13
6   answer, please.                      11:32:13
7        (Record read.)                11:32:22
8        MR. COLLINS: Vague and ambiguous,  11:32:22
9   hopelessly vague at this point.          11:32:25
10       MR. BESSETTE: That's her answer.  11:32:28
11       MR. COLLINS: Right. Because -- make  11:32:28
12  it a more crisp question, please, because the "it"  11:32:32
13  in context is very unclear at this point.  11:32:35
14  BY MR. BESSETTE:                    11:32:38
15    Q.  Do you understand my question,    11:32:39
16  Professor?                          11:32:40
17    A.  Can you please restate it?      11:32:40
18    Q.  What did you mean in your last    11:32:43
19  response that it was significant to potential  11:32:45
20  investors?                          11:32:49
21       MR. COLLINS: Vague and ambiguous.  11:32:50
22       Go ahead.                    11:32:52
23  BY MR. BESSETTE:                    11:32:52
24    Q.  I just want to know what you meant.  11:32:52
```

Page 76

```
1   You gave me the response.            11:32:52
2     A.  That gray marketing was significant to  11:32:54
3   potential investors to the company and investors. I  11:32:56
4   don't remember exactly what I said, but...  11:32:59
5     Q.  I believe you were talking about gray  11:33:01
6   marketing.                          11:33:02
7     A.  Yes, I was referring to gray        11:33:03
8   marketing.                          11:33:04
9     Q.  Now, when in your view, was it      11:33:05
10  significant to investors?              11:33:08
11    A.  In my view, gray marketing became  11:33:09
12  significant to investors in thinking back of the  11:33:11
13  history of Adams Golf's gray market problem, there  11:33:14
14  was the initial shipment or the initial appearance  11:33:18
15  of Adams Golf clubs in Costcos in Canada. And then  11:33:21
16  there was a belief that shipment was an      11:33:27
17  isolated incident. And that once those clubs had  11:33:31
18  been sold through, there would no longer be a  11:33:34
19  problem.                            11:33:37
20        That proved not to be the case.  11:33:38
21  In fact, soon thereafter there were additional  11:33:40
22  shipments to Costcos not just in Canada, but  11:33:43
23  appearing all over Canada and every region of the  11:33:46
24  United States. At that point, I think it became  11:33:50
```

Page 77

```
1   significantly important to investors.    11:33:54
2     Q.  Are you familiar with the common  11:33:55
3   marketing practice of segmenting?        11:33:57
4     A.  If you can tell me a little bit more  11:34:00
5   about what you mean by segmenting I can answer that  11:34:04
6   question.                           11:34:08
7     Q.  Well, are you able to sit here and  11:34:08
8   tell me what the major segments in the market for  11:34:10
9   golf clubs would be?                  11:34:12
10    A.  I'm not sure if you mean geographical  11:34:13
11  segments or if you mean consumer segments.  11:34:16
12    Q.  Consumers in the industry, so consumer  11:34:18
13  segments.                           11:34:22
14    A.  Yes.                         11:34:23
15    Q.  What are the consumer segments that  11:34:23
16  you are aware of for golf clubs?        11:34:27
17    A.  In reading the Harvard business school  11:34:29
18  document that was produced in connection with  11:34:35
19  Mr. Frazier's report, in it I learned -- I saw that  11:34:37
20  characterized in that report, and I will just use  11:34:44
21  the same terminology, as avid golf golfers, I think  11:34:47
22  it was beginning -- no. Advanced golfers, maybe it  11:34:52
23  was average golfers and beginning golfers, I think  11:34:56
24  is the terminology they used.          11:35:00
```

Page 78

1    Q.   And prior to reading that, you had no  11:35:03
2  understanding or did you, of consumer segmenting in  11:35:06
3  the golf club market?              11:35:09
4        MR. COLLINS: As she just testified,  11:35:13
5  is that what you mean?             11:35:13
6        MR. BESSETTE: No.           11:35:13
7        MR. COLLINS: In connection with --  11:35:14
8  BY MR. BESSETTE:                 11:35:14
9    Q.   Prior to reading the Harvard business  11:35:16
10 school study, did you have any knowledge of the  11:35:18
11 consumer segmenting in the golf club market?  11:35:18
12       MR. COLLINS: Vague and ambiguous.  11:35:18
13 BY THE WITNESS:                  11:35:21
14   A.   The information that I would have in  11:35:21
15 that respect would have come from reading documents  11:35:23
16 in connection with this litigation.       11:35:26
17 BY MR. BESSETTE:                 11:35:28
18   Q.   Okay. Prior to this litigation, did  11:35:28
19 you have any knowledge of consumer segmenting in the  11:35:31
20 golf club market?                11:35:34
21       MR. COLLINS: Vague and ambiguous.  11:35:36
22 BY THE WITNESS:                  11:35:36
23   A.   I had what I would characterize as a  11:35:38
24 lay understanding of that.           11:35:39

Page 79

1  BY MR. BESSETTE:                 11:35:40
2    Q.   Certainly not an expert understanding?  11:35:41
3    A.   No.                   11:35:42
4    Q.   And now that you have read litigation  11:35:42
5  and read the Harvard business school study, do you  11:35:47
6  have any view as to what customer segment Adams Golf  11:35:50
7  was targeting with the Tight Lies?       11:35:55
8        MR. COLLINS: Vague and ambiguous.  11:35:57
9  BY THE WITNESS:                  11:36:00
10   A.   Yeah. I'm not sure exactly what you  11:36:01
11 mean by the question.              11:36:01
12 BY MR. BESSETTE:                 11:36:02
13   Q.   What don't you understand about it?  11:36:02
14   A.   I'm not sure -- well, if you can  11:36:02
15 actually just restate the question that will be  11:36:07
16 helpful.                     11:36:07
17   Q.   Can you say which of the customer  11:36:09
18 segments listed in the Harvard business school study  11:36:11
19 that Adams Golf was targeting?         11:36:15
20       MR. COLLINS: Foundation.        11:36:19
21 BY THE WITNESS:                  11:36:20
22   A.   It appears to me from the documents  11:36:20
23 that I've read that Adams Golf wanted to maintain a  11:36:22
24 high prestige brand, wanted to be able to maintain a  11:36:27

Page 80

1  high profit margin. And those would indicate that  11:36:32
2  Adams Golf was trying to target the high end of the  11:36:35
3  market.                     11:36:40
4  BY MR. BESSETTE:                 11:36:40
5    Q.   Okay. And that high end of the  11:36:40
6  market, where would this segment likely shop for the  11:36:42
7  golf clubs?                   11:36:46
8    A.   In the places that Adams Golf was  11:36:47
9  hoping they would shop.             11:36:51
10   Q.   Pro shops, specialty stores, that sort  11:36:52
11 of thing?                    11:36:55
12   A.   Yes.                   11:36:55
13   Q.   Which of the consumer segments is more  11:36:55
14 likely to shop at Costco or other discount  11:36:58
15 retailers?                    11:37:01
16       MR. COLLINS: Which of the two  11:37:01
17 segments you referred to in the article a moment  11:37:02
18 ago, is that what you mean?           11:37:05
19 BY MR. BESSETTE:                 11:37:05
20   Q.   Which of the customer segments that we  11:37:06
21 are referring to would be most likely to shop in  11:37:08
22 Costco or other discount retailers?      11:37:11
23   A.   That's impossible to say.        11:37:15
24   Q.   Why?                   11:37:16

Page 81

1    A.   I think there is not necessarily a  11:37:17
2  direct correlation between avid golfers and lack of  11:37:19
3  price sensitivity.                11:37:24
4    Q.   What is that based on?          11:37:25
5    A.   Based on living in the world. People  11:37:27
6  like to find a bargain. So even though a person may  11:37:29
7  be an avid golfer, they may not have so much  11:37:32
8  disposable income that they wouldn't seek the deal.  11:37:36
9    Q.   So you don't think it is more likely  11:37:36
10 that a certain consumer segment would shop at Costco  11:37:39
11 in terms of the golf market?          11:37:45
12   A.   No.                   11:37:47
13   Q.   How likely is it in your view that a  11:37:47
14 beginning golfer would go to a pro shop and pay full  11:38:02
15 price for a club?                11:38:06
16   A.   That they would pay full price for a  11:38:07
17 club?                      11:38:10
18   Q.   How likely is a customer in the  11:38:10
19 beginning golfer segment to go to a golf shop and  11:38:13
20 pay full price for a club?           11:38:17
21   A.   I see two parts in your question, and  11:38:19
22 I will answer them both. I think it is likely that  11:38:21
23 a beginning golfer would like to find as much  11:38:24
24 information as they could about the products that  11:38:28

21 (Pages 78 to 81)

Page 82

1   they were about to buy, specifically because they   11:38:31
2   don't have the experience that they might need to   11:38:33
3   make a good decision about what kind of golf clubs   11:38:63
4   to buy, and what kind of golf clubs will help them   11:38:39
5   become better golfers.                   11:38:44
6           That information is obtainable in   11:38:46
7   a variety of locations, one of those locations being   11:38:47
8   a high end or sort of service-orientated retail   11:38:51
9   shop. However, obtaining that information in a shop   11:38:69
10  like that does not preclude a beginning golfer from   11:38:59
11  buying clubs on his way home from obtaining that   11:39:03
12  information at a Costco.                  11:39:06
13      Q.   Okay. Now, Exhibit 305, Professor   11:39:09
14  Frazier's report, Paragraph 16. Professor Frazier   11:39:12
15  writes that the benefits of gray markets can be   11:39:23
16  long-term in nature. You can read the whole   11:39:26
17  paragraph, but essentially that's the thrust. Do   11:39:29
18  you agree with that contention?          11:39:34
19          MR. COLLINS: Please answer, but first   11:39:35
20  read the whole paragraph to yourself.    11:39:36
21  BY THE WITNESS:                          11:39:46
22      A.   Yeah.
23          MR. COLLINS: Excuse me. Please read
24  the whole paragraph to yourself.

Page 83

1           THE WITNESS: Yes. No, I was saying
2   yes that I will.
3           MR. COLLINS: Thank you.
4   BY THE WITNESS:
5       A.   Which part are you asking me to   11:40:13
6   comment on?                              11:40:14
7   BY MR. BESSETTE:                         11:40:15
8       Q.   First, that gray market has long-term   11:40:16
9   benefits.                                11:40:18
10      A.   What Mr. Frazier says is that the gray   11:40:20
11  markets can also -- sorry -- the benefits to a   11:40:25
12  manufacturer as a result of gray marketing can also   11:40:29
13  be long-term in nature.                  11:40:35
14      Q.   Right.                          11:40:35
15      A.   I would agree that they can, with a   11:40:37
16  stress on can, also be long-term in nature.   11:40:39
17      Q.   Okay. And one of the ways could be   11:40:42
18  increased sales volumes to price sensitive customers   11:40:44
19  who would not otherwise be reached. Do you agree   11:40:49
20  with that?                               11:40:51
21      A.   Yes.                           11:40:52
22      Q.   And validation that a brand or product   11:40:52
23  is desirable. Do you agree with that?    11:40:56
24      A.   No.                            11:40:58

Page 84

1       Q.   Why not?                       11:40:58
2       A.   I think that that is -- that's a   11:40:59
3   complicated assertion. It may be a validation that   11:41:07
4   the brand has gained popularity, however, it doesn't   11:41:07
5   account for the effects that the gray marketing can   11:41:12
6   have on the desirability of a brand in other   11:41:15
7   sectors.                                 11:41:18
8       Q.   Let me ask you --                11:41:19
9           MR. COLLINS: Did you finish?        11:41:21
10  BY MR. BESSETTE:                         11:41:21
11      Q.   Oh, I'm sorry. I thought you did. I   11:41:23
12  apologize.                               11:41:23
13      A.   Like I said, it doesn't account for   11:41:31
14  the effects that gray marketing can have in other   11:41:34
15  sectors, the ramifications, the echo effects that it   11:41:37
16  can have in other sectors of the golf equipment   11:41:41
17  purchasing population.                   11:41:45
18      Q.   What is that last part? Can you say   11:41:49
19  that again?                              11:41:51
20      A.   Yeah. That this paragraph or this   11:41:52
21  bullet point doesn't account for the effects that   11:41:54
22  gray marketing can have on the image of the brand   11:41:57
23  and the effects that that can have on the buying   11:42:01
24  practices of other sectors of the golf equipment   11:42:06

Page 85

1   purchasing population.                   11:42:09
2       Q.   Okay. I know we are going to explore   11:42:10
3   that.                                    11:42:14
4           You state in Paragraph 13, I         11:42:14
5   believe, of your initial report that the benefits of   11:42:16
6   gray marketing are only short-term. Is your view   11:42:23
7   now that they can be long-term as well?   11:42:29
8       A.   I --                           11:42:32
9           MR. COLLINS: I want to find this   11:42:32
10  paragraph.                               11:42:34
11          THE WITNESS: Yeah. Page 5.          11:42:34
12          MR. COLLINS: Okay. I'm sorry. Can   11:42:34
13  we have the question again? Forgive me.  11:42:43
14  BY MR. BESSETTE:                         11:42:43
15      Q.   Yeah. You state here that as this   11:42:43
16  report will discuss, in other words, the benefits to   11:42:45
17  a trademark owner from gray markets are generally   11:42:49
18  short-term, and in the long-term, the gray market is   11:42:54
19  often detrimental. Is that your view today?   11:42:57
20      A.   That's what I stated there and that's   11:43:00
21  still my view.                           11:43:02
22      Q.   Okay. You are not saying there that   11:43:03
23  there are no long-term benefits to manufacturers   11:43:05
24  from gray marketing, are you?            11:43:09

22  (Pages 82 to 85)

Page 86

1    A.    I did not say there that there can be    11:43:09
2  no long-term benefits.                    11:43:11
3    Q.    And you don't hold that view?       11:43:12
4    A.    Correct.                    11:43:14
5    Q.    Can you site me a specific example of  11:43:14
6  gray market activity doing long-term damage to a  11:43:22
7  company?                            11:43:26
8    A.    Sure.                    11:43:26
9    Q.    Okay.                    11:43:27
10    A.    I can site Adams Golf.          11:43:28
11    Q.    Well, besides Adams Golf, because we  11:43:30
12  disagree on that.                    11:43:33
13    A.    Right. Yes, I can. I am thinking    11:43:34
14  about one of the documents that I cited in my report  11:43:36
15  in which trademark -- a group of manufacturers or  11:43:39
16  trademark holders were asked about their opinion  11:43:45
17  about the gray market and responded unanimously that  11:43:48
18  they believed the gray market can have long-term  11:43:54
19  detrimental effects.                    11:43:58
20        In addition, there is a statement    11:44:01
21  from Adams Golf's own director of public relations  11:44:02
22  that says that in the short-term the gray market can  11:44:06
23  be beneficial, but in the long-term the gray market  11:44:09
24  can have detrimental effects.            11:44:12

Page 87

1    Q.    My question was, can you cite a    11:44:15
2  specific example other than Adams Golf of gray    11:44:17
3  market activity doing long-term damage to a company?  11:44:23
4    A.    I think I did.                11:44:23
5    Q.    Tell me the company and the example.  11:44:24
6  I must have missed it.                    11:44:26
7    A.    Sorry. The article that I was talking  11:44:28
8  about doesn't disclose the sources that it used, as  11:44:30
9  is typical in empirical research.            11:44:34
10    Q.    I am sorry. Then explain to me what  11:44:38
11  was the long-term damage to the company that you  11:44:40
12  remember in that article?                11:44:42
13    A.    It was a group of 15 companies, all of  11:44:43
14  them had the same reaction, which was that the gray  11:44:45
15  market can have negative effects on brand image and  11:44:50
16  that brand image can detrimentally affect the    11:44:55
17  company. That article goes on to state that in many  11:45:00
18  cases, manufacturers or trademark holders will    11:45:03
19  experience a decline in sales of up to 30 percent.  11:45:07
20    Q.    What article was that?          11:45:10
21    A.    That was the Eagle article.        11:45:11
22    Q.    The one published in 2003?        11:45:12
23    A.    Uh-huh. Actually, I should look to  11:45:14
24  see the publication date. I don't remember exactly  11:45:17

Page 88

1  the publication date.                    11:45:20
2    Q.    All right. We will get there as well.  11:45:21
3        MR. COLLINS: Just so it is clear, it  11:45:24
4  is the Eagle article?                    11:45:25
5        THE WITNESS: It is the Eagle article.  11:45:27
6        MR. COLLINS: Which is listed in your  11:45:28
7  report?                            11:45:30
8        THE WITNESS: Correct.            11:45:31
9        MR. COLLINS: Okay.            11:45:31
10  BY MR. BESSETTE:                    11:45:31
11    Q.    And so what happened with the    11:45:32
12  long-term damage that you remember from the Eagle  11:45:33
13  article with respect to those companies was brand  11:45:36
14  image, that's the long-term damage?          11:45:39
15    A.    In that article, yes.          11:45:41
16    Q.    Is there any other long-term damage  11:45:42
17  that you are aware of from your reading of various  11:45:45
18  articles that you consider a result of gray    11:45:48
19  marketing over the long-term?            11:45:50
20    A.    Yes. And I cited them in my report.  11:45:51
21    Q.    What are they?                11:45:54
22    A.    Are you asking me about the articles  11:45:55
23  or are you asking me about the damage?        11:45:56
24    Q.    The damage.                11:45:57

Page 89

1    A.    Yes. My report states in more than  11:45:57
2  one place that in the long-term, the gray market can  11:46:03
3  have effects on pricing policies, it can have    11:46:08
4  effects on distributor relationships, it can have  11:46:11
5  effects on sales force morale, as well as the    11:46:14
6  decreased prestige associated with the trademark.  11:46:17
7    Q.    Are you familiar with the article from  11:46:21
8  Mike Mullen and C.M. Sashi and Patricia Doney called  11:46:58
9  "Gray Markets: Threat or Opportunity?" published  11:47:03
10  in 2003? It's the case of Herman Miller versus ASAL  11:47:07
11  GmbH providing traditions and research on    11:47:07
12  international market entry?                11:47:15
13    A.    I have some familiarity with that    11:47:15
14  article.                        11:47:17
15    Q.    I don't see it listed in yours. Did  11:47:17
16  you review it in connection with your work in this  11:47:22
17  case?                            11:47:25
18    A.    I did not cite it, no.          11:47:25
19    Q.    Did you review it, nonetheless, in  11:47:27
20  your work in this case?                11:47:30
21    A.    No. Let me back up. I did not review  11:47:31
22  it in preparing my report.                11:47:32
23    Q.    Okay. In what context, if at all, did  11:47:33
24  you review it?                    11:47:39

23  (Pages 86 to 89)

Page 90

```
1     A.  It was submitted together with -- or I     11:47:40
2   received it together with the rebuttal report from   11:47:43
3   Frazier.                                  11:47:43
4     Q.  Did you review the articles and        11:47:58
5   citations to the various articles that Professor     11:47:59
6   Frazier put in his report?                   11:48:03
7     A.  Yes.                                 11:48:04
8         MR. COLLINS:  You mean apart from     11:48:04
9   Coughlan, which you asked about before?        11:48:07
10        MR. BESSETTE:  Right.                 11:48:09
11  BY THE WITNESS:                            11:48:09
12    A.  I am sorry, I interpreted your         11:48:10
13  question to mean, did I review the citations that he  11:48:13
14  made and look at the articles.               11:48:15
15  BY MR. BESSETTE:                           11:48:17
16    Q.  Right.  That's what I wanted to know.   11:48:17
17    A.  That I did.                          11:48:19
18    Q.  You did do that.                      11:48:19
19    A.  Obviously I couldn't read materials   11:48:21
20  that I didn't have.                         11:48:23
21    Q.  Right.  My question is when you got    11:48:26
22  his report and he cited articles that you had up to  11:48:28
23  that point not read or reviewed, did you look at    11:48:31
24  them?                                     11:48:34
```

Page 91

```
1     A.  If they were produced, yes.          11:48:34
2     Q.  Now, in Paragraphs 18 to 26 of       11:48:35
3   Professor Frazier's report, starting on page 7 and  11:48:50
4   running to page 9, that's a section he entitles     11:48:54
5   "Gray Market Activities can be Effectively Managed."  11:49:01
6   And in there, he notes that many manufacturers in   11:49:04
7   many industries do just that, effectively manage    11:49:07
8   gray markets.  Do you agree with that concept, that  11:49:11
9   gray markets -- manufacturers can manage effectively  11:49:14
10  gray marketing?                            11:49:18
11    A.  Yes.                                11:49:19
12    Q.  I think you write in Paragraph 18 of   11:49:20
13  your report, in Exhibit 303, I think it is the      11:49:36
14  fourth sentence.  "To my knowledge, there is no     11:49:52
15  significant evidence that any approach will ensure  11:49:55
16  eradication of a company's gray market problem."    11:49:58
17  You believe that, right?                     11:50:02
18    A.  Yeah.  Yes.                          11:50:03
19    Q.  And then in Paragraph 29B -- I am      11:50:06
20  sorry -- of your initial report, which is on page    11:50:16
21  20, last sentence.  "When Adams did respond," and we  11:50:29
22  are talking about the gray market, "they appeared   11:50:33
23  not to have responded effectively."           11:50:35
24    A.  Oh, 29B sorry.                       11:50:35
```

Page 92

```
1     Q.  Yeah, I'm sorry.  29B on page 20.      11:50:44
2     A.  Yes.                                11:50:46
3     Q.  Okay.  How do you know whether a       11:50:46
4   response was ineffective if gray markets can never   11:50:50
5   be eradicated?                            11:50:54
6     A.  Well, I think you are trying to say    11:50:56
7   that I have said that gray markets can never be      11:51:00
8   eradicated, which is not what I said.          11:51:04
9     Q.  Okay.  Paragraph 18, "To my knowledge,  11:51:07
10  there is no significant evidence that any approach   11:51:10
11  will ensure eradication of a company's gray market   11:51:12
12  problem."  Are you saying that gray markets cannot   11:51:15
13  be eradicated?                            11:51:21
14    A.  No.                                 11:51:22
15    Q.  Okay.  What are you saying?           11:51:22
16    A.  I am saying that when a company adopts  11:51:24
17  an approach, they cannot ensure that their gray      11:51:26
18  market problem will be eradicated by use of that    11:51:30
19  approach.                                 11:51:34
20    Q.  So is there an approach --            11:51:34
21    A.  It's going forward looking at a        11:51:36
22  backward aspect to that.                     11:51:38
23    Q.  Can gray markets be eradicated?        11:51:40
24    A.  Yes.                                11:51:43
```

Page 93

```
1     Q.  And they can be effectively managed as  11:51:43
2   well?                                     11:51:48
3     A.  I actually want to back up.  Can gray   11:51:48
4   markets be eradicated is a much bigger question than  11:51:51
5   can gray marketing at a particular company be       11:51:51
6   eradicated.                               11:51:58
7     Q.  And that's a good distinction.  And    11:51:58
8   the latter is what I meant.                  11:51:58
9         Can gray market activity at a         11:52:00
10  particular company be eradicated?            11:52:02
11    A.  Yes.                                11:52:04
12    Q.  And as you testified, it can also be    11:52:05
13  managed?                                  11:52:08
14    A.  Yes.                                11:52:08
15    Q.  All right.  Now Paragraph 19 of your   11:52:08
16  rebuttal report, which is Exhibit 304, last         11:52:15
17  sentence.  You write, "Without effective proactive  11:52:36
18  and reactive steps on the part of the trademark     11:52:39
19  holder, often the only cure for a gray market       11:52:43
20  problem is a general decline in demand for the      11:52:43
21  product being gray marketed."  Does this imply that  11:52:50
22  with effective steps, a gray market at a particular  11:52:51
23  company be cured?                          11:52:56
24    A.  Yeah.  Though I don't think this would  11:52:57
```

24  (Pages 90 to 93)

Page 94

1  be a cure that most manufacturers would hope for.    11:52:59
2  It would be a cure that would essentially mean that    11:53:02
3  their product is no longer in demand.    11:53:06
4      Q.  Now, what do you mean by "proactive    11:53:08
5  and reactive steps" in that sentence?    11:53:20
6      A.  Gray market literature often refers to    11:53:23
7  steps that manufacturers can take as proactive steps    11:53:25
8  and reactive steps.  Proactive steps would be steps    11:53:29
9  like ensuring that they have business strategies in    11:53:34
10  place that ward off gray marketers.    11:53:37
11          They might also include strategies    11:53:44
12  that Adams later adopted, like serializing golf    11:53:47
13  clubs or serializing products.  They might include    11:53:53
14  ensuring that there is little to no price    11:53:55
15  differentiation, so that the arbitrage that gray    11:53:58
16  marketing depends on can't occur.  They might ensure    11:54:01
17  that they are counting for currency fluctuations,    11:54:06
18  and ensuring that there is little space for    11:54:09
19  arbitrage there, as well.  Those would be typical    11:54:12
20  proactive steps.    11:54:16
21          Reactive steps would include    11:54:17
22  making requests to the customs service to stop    11:54:19
23  products from coming into the country.  They might    11:54:26
24  include issuing -- I am sorry -- litigating against    11:54:29

Page 95

1  the gray marketer or the company that is selling    11:54:32
2  goods through the gray market, or trying, though    11:54:35
3  there are not very many avenues for that at this    11:54:39
4  point.  Those would be some reactive steps.  They    11:54:44
5  might also -- well, those would be some reactive    11:54:47
6  steps.  There are more.    11:54:49
7      Q.  What strategies did Adams use to    11:54:49
8  manage the gray market that it was experiencing?    11:54:53
9          MR. COLLINS:  Are you asking    11:54:55
10  proactive, reactive or both?    11:54:57
11  BY MR. BESSETTE:    11:54:59
12      Q.  I am going to ask you to tell me what    11:55:00
13  the activities are and then classify them as    11:55:02
14  proactive or reactive.    11:55:05
15          MR. COLLINS:  Foundation.    11:55:08
16          Go ahead.    11:55:09
17  BY THE WITNESS:    11:55:10
18      A.  I'm sorry, I think I'm going to ask    11:55:10
19  you to restate the question, just because I'm not    11:55:10
20  sure exactly what you are asking.    11:55:12
21  BY MR. BESSETTE:    11:55:13
22      Q.  What I want to know is what steps did    11:55:13
23  Adams Golf take to manage the gray market it was    11:55:15
24  experiencing, and tell me if you think those were    11:55:20

Page 96

1  proactive or reactive steps.    11:55:23
2          MR. COLLINS:  Foundation, compound.    11:55:25
3          Please answer.    11:55:28
4  BY THE WITNESS:    11:55:28
5      A.  I don't feel comfortable answering the    11:55:29
6  question the way that it was posed, because there is    11:55:30
7  a timeline -- there is a timeline to the steps that    11:55:33
8  Adams Golf decided to take in managing its gray    11:55:38
9  market problem.  So I am not entirely comfortable    11:55:43
10  with answering the question the way it was asked.    11:55:47
11  BY MR. BESSETTE:    11:55:49
12      Q.  I don't understand why.    11:55:49
13      A.  I can explain that.  You are asking me    11:55:50
14  to say whether Adams Golf -- whether the steps they    11:55:54
15  took were proactive or reactive.  And although some    11:55:58
16  of the steps that Adams Golf may have taken may be    11:56:05
17  steps that are characterized often in the literature    11:56:10
18  as proactive steps, all of them were taken in    11:56:13
19  reaction to gray marketing.  I didn't see any    11:56:17
20  evidence that Adams Golf did take any proactive    11:56:20
21  steps in the sense of steps taken before its gray    11:56:24
22  marketing problem commenced.    11:56:28
23      Q.  Okay.  So if a company takes steps to    11:56:30
24  manage gray marketing after gray marketing has    11:56:34

Page 97

1  already appeared, whatever steps it takes are    11:56:37
2  reactive not proactive.  Is that what I understand?    11:56:40
3      A.  Not necessarily.    11:56:44
4      Q.  Then what is the distinction?    11:56:45
5      A.  Those steps are taken in reaction to    11:56:46
6  the gray marketing that has already occurred.  Those    11:56:49
7  steps might be proactive in the sense of trying to    11:56:53
8  prevent future gray market activities from    11:56:56
9  occurring.    11:56:59
10      Q.  So you are saying an activity that a    11:56:59
11  company might employ could be both proactive and    11:57:04
12  reactive?    11:57:07
13      A.  Yes.    11:57:08
14      Q.  And have you analyzed the steps Adams    11:57:08
15  Golf in particular took to manage gray marketing and    11:57:16
16  have you considered whether they were proactive or    11:57:19
17  reactive or both?    11:57:22
18          MR. COLLINS:  Can you give us a time    11:57:23
19  period or do you want a general --    11:57:25
20  BY MR. BESSETTE:    11:57:26
21      Q.  In the whole thing that you looked at.    11:57:26
22          MR. COLLINS:  Overbroad.    11:57:28
23  BY THE WITNESS:    11:57:28
24      A.  Yes.    11:57:31

25  (Pages 94 to 97)

Page 98

1  BY MR. BESSETTE:                         11:57:31
2     Q.   Okay.  Well, then, back to my first  11:57:32
3  question.  Would you tell me the steps that you know  11:57:33
4  Adams Golf took and whether you characterize them as  11:57:36
5  proactive, reactive or maybe both?        11:57:41
6          MR. COLLINS:  Overbroad as there is no  11:57:42
7  time period.                             11:57:45
8          Go ahead.                        11:57:45
9  BY THE WITNESS:                          11:57:45
10    A.   Let me tell you the reason that I am  11:57:46
11 hesitating in answering the question.  It's because  11:57:48
12 I think that there is sort of a step of omission  11:57:49
13 that happened before the gray marketing started to  11:57:52
14 occur, which was a step of designing a business  11:57:56
15 strategy that was particularly attractive to gray  11:58:00
16 marketers without putting in place any sort of  11:58:04
17 prohibitors on gray market activity.      11:58:08
18         Once the gray marketing began at  11:58:12
19 Adams Golf, then the company did begin to react  11:58:16
20 mostly through what would be characterized in the  11:58:22
21 literature as proactive steps.            11:58:26
22 BY MR. BESSETTE:                          11:58:29
23    Q.   Are there demand side strategies and  11:58:29
24 supply side strategies to deal with gray marketing?  11:58:40

Page 99

1     A.   Let me think about that for just one  11:58:44
2  second, because that's not the way that I think  11:58:51
3  about it.                                11:58:52
4          Yes.                             11:58:53
5     Q.   Give me some examples of both, if you  11:58:53
6  would.                                   11:58:56
7     A.   Okay.  On the demand side, educated  11:58:56
8  consumers about the gray market and about the  11:58:59
9  potential hazards of buying goods through gray  11:59:01
10 market channels would be an example of demand side  11:59:05
11 steps to combat gray market activity.     11:59:12
12         The supply side we have already  11:59:15
13 talked about some of them, serializing products,  11:59:17
14 ensuring that price differentiation is kept to a  11:59:20
15 minimum, decreasing profit -- sort of keeping profit  11:59:24
16 margins within reason would be another good example.  11:59:29
17 There are more.                          11:59:34
18    Q.   Are you familiar with the Berman  11:59:35
19 article you list in your materials?       11:59:43
20    A.   Yes.                             11:59:45
21    Q.   It is entitled "Strategies to Combat  11:59:46
22 the Sale of Gray Market Goods"?           11:59:51
23    A.   Correct.                         11:59:53
24    Q.   Okay.  Now, let me ask you, did you  11:59:54

Page 100

1  review that -- were you familiar with that in part  11:59:54
2  of your course work or just in connection with your  11:59:57
3  work on this case?                       11:59:59
4     A.   I had seen the article before.     12:00:00
5     Q.   You used it in your course work?    12:00:02
6     A.   I used it -- I am taking issue with  12:00:05
7  the word "used."  I read it before.       12:00:11
8     Q.   Okay.  Now, I can get the article if  12:00:13
9  you need it, but are you familiar that the author  12:00:34
10 lists offering rebates as a proactive demand side  12:00:37
11 strategy to deal with gray marketing?     12:00:42
12    A.   Yes.                             12:00:45
13    Q.   Did Adams offer rebates to retailers  12:00:45
14 to combat the gray marketing?            12:00:49
15    A.   They put in place a couple of        12:00:52
16 programs, one of them was a fairly complicated  12:00:55
17 program which might be categorized as a rebate.  12:00:59
18    Q.   So in your opinion, is this a reactive  12:01:02
19 or proactive strategy?                    12:01:05
20    A.   It was in reaction to gray marketing  12:01:07
21 that was already occurring.  It was a proactive  12:01:10
22 strategy, if you put it into the classification that  12:01:13
23 are typically found in the literature.    12:01:16
24    Q.   Well, what do you do?  How do you  12:01:18

Page 101

1  classify it?                             12:01:19
2     A.   A reaction that is a proactive step to  12:01:20
3  try to eliminate future gray marketing.   12:01:23
4     Q.   So it is a proactive strategy?      12:01:26
5     A.   Taking in reaction to existing gray  12:01:29
6  marketing.                               12:01:32
7          MR. COLLINS:  When you reach a point,  12:01:33
8  I want to stop for a moment.             12:01:35
9          MR. BESSETTE:  Okay.             12:01:36
10 BY MR. BESSETTE:                          12:01:45
11    Q.   Did you conclude in your report that  12:01:45
12 Adams Golf took no deliberate proactive steps to  12:01:48
13 combat gray marketing?                    12:01:53
14         MR. COLLINS:  Speaks for itself.   12:01:55
15 BY THE WITNESS:                          12:01:56
16    A.   Could you point to that paragraph?   12:01:57
17 BY MR. BESSETTE:                          12:02:00
18    Q.   I think it is Paragraph 29 of your  12:02:01
19 rebuttal report.  Let's just look.  Yes.  Third  12:02:03
20 sentence, Paragraph 29 of the rebuttal report, which  12:02:19
21 is Exhibit 304.  "Despite the prevalence of gray  12:02:23
22 market activity in certain sectors of the golf  12:02:27
23 industry, the company appears to have taken no  12:02:30
24 deliberate proactive steps to prevent a gray  12:02:31

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

Page 102

1  marketing problem from gaining a foothold at Adams." 12:02:39
2      A.   Yes.  The company appears to have    12:02:39
3  taken no proactive steps from preventing a gray    12:02:43
4  market problem from arising at Adams.    12:02:48
5      Q.   Well, that's not what you say.  You    12:02:51
6  say from gaining a foothold.    12:02:51
7      A.   From gaining a foothold.  They took no 12:02:53
8  steps prior to the gray market problem arising at    12:02:55
9  Adams.    12:02:57
10      Q.   Did Adams Golf take any proactive    12:02:57
11  steps to manage the gray marketing that was    12:03:01
12  appearing?    12:03:03
13      MR. COLLINS:  Asked and answered    12:03:03
14  several times.    12:03:03
15  BY THE WITNESS:    12:03:04
16      A.   After the gray marketing occurred,    12:03:04
17  yes.    12:03:06
18  BY MR. BESSETTE:    12:03:06
19      Q.   Now, the author in that same article    12:03:06
20  lists labeling products as a proactive supply side 12:03:16
21  strategy.  Did Adams Golf do that to the best of    12:03:20
22  your knowledge?    12:03:23
23      A.   After the gray market problem arose,    12:03:23
24  yes.    12:03:26

Page 103

1      Q.   Is this an example of reactive or    12:03:26
2  proactive strategy?    12:03:30
3      A.   Typically categorized in the    12:03:30
4  literature as a proactive step.    12:03:31
5      Q.   And how do you characterize it?    12:03:31
6      A.   A reaction to a gray matter problem    12:03:33
7  that had already arisen.  It is a proactive step.    12:03:37
8      Q.   In the literature, do they -- have you 12:03:40
9  ever read anything that characterizes the way you do 12:03:42
10  a proactive step, whether it's before or after gray 12:03:46
11  marketing has occurred?  Is it any different?    12:03:49
12      A.   I couldn't tell you for sure whether I 12:03:50
13  have seen it characterized that way.  It is --    12:03:52
14  certainly the literature that is out there to try to 12:03:55
15  inform manufacturers about how to prevent or stop    12:03:57
16  gray market problems assumes that manufacturers are 12:04:01
17  concerned about a gray market problem.    12:04:04
18      Q.   Well, proactive steps also assume that 12:04:06
19  gray marketing is going on, do they not, in the    12:04:10
20  literature?    12:04:14
21      A.   In the world, yes.    12:04:14
22      Q.   So when the academic literature you    12:04:15
23  read talks about proactive steps to manage gray    12:04:18
24  marketing, by definition gray marketing is already  12:04:21

Page 104

1  happening, right?    12:04:25
2      A.   Gray marketing is already happening in 12:04:26
3  the world, yes.  It does not assume that gray    12:04:27
4  marketing is happening at any one firm, no.    12:04:31
5      Q.   Have you ever seen in the academic    12:04:34
6  literature a category that you are testifying to    12:04:37
7  today which is proactive steps that are a reaction    12:04:41
8  to gray marketing at that company?    12:04:44
9      A.   Yes.  I think any literature that    12:04:46
10  deals with steps the companies can take to stem gray 12:04:49
11  market problems and to keep them at bay deals with  12:04:55
12  both the potential of gray marketing arising for a  12:05:01
13  particular company.  It also deals with the    12:05:05
14  possibility that gray marketing has already arisen  12:05:07
15  at a company, and a company is now looking for a way 12:05:10
16  to diminished that gray market activity over time.  12:05:13
17      Q.   Right.  So proactive steps assume both 12:05:15
18  gray marketing is happening in the world, and in    12:05:18
19  that particular company, do they not?    12:05:20
20      A.   No.    12:05:22
21      MR. COLLINS:  Objection, vague.    12:05:22
22  BY THE WITNESS:    12:05:23
23      A.   No.  Not necessarily.  You can imagine 12:05:24
24  a situation in which a manufacturer who knows that  12:05:26

Page 105

1  they have a product and a business model that is    12:05:29
2  particularly attractive to gray marketers, that they 12:05:32
3  are likely to have a gray marketing problem given    12:05:36
4  their business model and given the nature of their  12:05:39
5  product.  Being aware that gray marketing exists in 12:05:43
6  the world and, therefore, taking proactive steps to 12:05:47
7  ensure that gray marketing never occurs or trying to 12:05:50
8  ensure that gray marketing never occurs within their 12:05:53
9  company.    12:05:57
10  BY MR. BESSETTE:    12:05:58
11      Q.   Was Adams Golf's offering of rebates a 12:05:58
12  deliberate proactive step to manage its gray    12:06:03
13  marketing problem?    12:06:07
14      A.   Can you ask the question again?  I'm    12:06:08
15  sorry.    12:06:08
16      MR. BESSETTE:  Can you read it back,    12:06:08
17  please?    12:06:08
18      (Record read.)    12:06:21
19  BY THE WITNESS:    12:06:21
20      A.   It was --    12:06:22
21      MR. COLLINS:  Excuse me.  Asked and    12:06:22
22  answered.    12:06:22
23      Go ahead.    12:06:24
24

27  (Pages 102 to 105)

Page 106

1  BY THE WITNESS:                    12:06:24
2      A.   It was a step that was taken in    12:06:25
3  reaction to the gray market having already arised at 12:06:26
4  Adams Golf, and it was a proactive step.    12:06:32
5  BY MR. BESSETTE:                    12:06:35
6      Q.   And was Adams Golf's efforts to label  12:06:35
7  its products with serial numbers a proactive supply 12:06:40
8  side strategy to combat or deal with its existing  12:06:40
9  gray marketing problem?              12:06:45
10     A.   Yes.                       12:06:46
11         MR. COLLINS:  Paul, if you have     12:06:56
12 reached a point to pause.              12:06:57
13         MR. BESSETTE:  Oh, this is fine.  I  12:07:18
14 forgot.  That's fine.                12:07:18
15         (Off the record     12:07:18
16         discussion.)       12:07:18
17 BY MR. BESSETTE:                    12:07:18
18     Q.   Let's see.  Professor Frazier's    12:07:20
19 report, 305, Paragraph 11, first sentence.  "Gray  12:07:24
20 market activities are commonplace in a wide variety  12:07:42
21 of industries from expensive consumer durables like 12:07:45
22 cars to inexpensive household products like   12:07:50
23 cosmetics."  Do you agree with that statement?   12:07:53
24     A.   Yes.                       12:07:55

Page 107

1      Q.   In Paragraph 5A of your rebuttal   12:07:56
2  report, and I think you do it a couple of other  12:09:53
3  places too, but that's the one I have.  I guess it  12:09:56
4  is the last sentence.  You say, "In addition," and  12:10:19
5  then A.  And what you are talking about there is  12:10:23
6  gray marketing.  Saying that gray marketing -- it  12:10:26
7  was widely known that gray marketing was taking   12:10:29
8  place in certain sectors of the golf industry.  What 12:10:31
9  did you mean by that?                12:10:34
10        MR. COLLINS:  Read to yourself the  12:10:36
11 whole subparagraph, or if you feel necessary, the  12:10:38
12 whole paragraph, please.             12:10:40
13 BY THE WITNESS:                     12:10:42
14     A.   Okay.  As you know, I teach a section 12:10:59
15 on gray marketing and use the golf industry as an  12:11:01
16 example.  Specifically, I use Callaway as an example 12:11:05
17 of gray marketing, in addition to others.  It is   12:11:08
18 certainly not the case that gray marketing was a  12:11:14
19 uniform problem in the golf industry.  It affected  12:11:17
20 different companies differently.         12:11:21
21 BY MR. BESSETTE:                    12:11:22
22     Q.   That's what you meant?          12:11:22
23     A.   Yes.                       12:11:25
24     Q.   What I want to know is what you meant 12:11:26

Page 108

1  when you said it was widely known that gray   12:11:28
2  marketing was taking place in certain sectors of the 12:11:31
3  industry?                   12:11:35
4      A.   I meant that gray marketing was    12:11:35
5  occurring in certain sectors of the industry.  I'm  12:11:35
6  not sure what's unclear.             12:11:37
7      Q.   How was it widely known?         12:11:37
8      A.   The world is -- well, let me back up.  12:11:39
9  Consumers become aware of gray marketing through   12:11:44
10 seeing golf clubs available through gray market   12:11:47
11 chains, big box retailers, etcetera.  And also in  12:11:54
12 the golf industry, my understanding is that word  12:11:58
13 spreads quickly and that would be another way.   12:12:02
14     Q.   So your understanding, what is that  12:12:04
15 based on?                   12:12:08
16     A.   What I have read about the golf    12:12:09
17 industry in connection with this litigation.   12:12:11
18     Q.   Okay.  Any other knowledge about the 12:12:13
19 golf industry other than what you have read in this 12:12:15
20 litigation?                 12:12:18
21     A.   Do I know anything else about the golf 12:12:20
22 industry other than what I have read in connection  12:12:23
23 with this litigation?  Is that the question?   12:12:24
24     Q.   Well, I will ask her to repeat my   12:12:26

Page 109

1  question.                   12:12:26
2         (Record read.)     12:12:26
3  BY THE WITNESS:                     12:12:26
4      A.   I guess I just don't understand.  Do I 12:12:36
5  have any other knowledge about the golf industry?  12:12:39
6  BY MR. BESSETTE:                    12:12:42
7      Q.   Let me ask you this:  What was your  12:12:42
8  level of knowledge about the golf industry prior to 12:12:43
9  you teaching a class that had gray marketing in a  12:12:46
10 subset, you know, gray marketing as it related to  12:12:49
11 the golf industry?  What was your knowledge?   12:12:51
12     A.   No more than a layperson.         12:12:54
13     Q.   And now it is more because of the   12:12:56
14 litigation that we are in and the materials that you 12:12:59
15 have read about it?                12:13:02
16     A.   Yes.                       12:13:04
17     Q.   Paragraph 1 of your rebuttal report,  12:13:05
18 1A actually, you say that you have been asked by  12:14:05
19 plaintiff's counsel to provide your opinions    12:14:14
20 regarding the expert reports of Stephen Grace and  12:14:15
21 Chris James to the extent such reports purport to  12:14:19
22 present the characteristics of gray marketing and  12:14:23
23 the effects the gray market can have on brand name  12:14:26
24 products on the trademark owners or manufacturers  12:14:29

28 (Pages 106 to 109)

Page 110

1  thereof. Do you differentiate a brand name from a    12:14:32
2  hot product?    12:14:37
3      A.   Yes.    12:14:39
4      Q.   Was the Tight Lies a hot product or a    12:14:39
5  brand name?    12:14:52
6      A.   It was both.    12:14:53
7      Q.   And what is your basis for saying    12:14:55
8  that?    12:14:59
9      A.   It was a brand name that was popular    12:14:59
10  at the time it was a hot product.    12:15:02
11     Q.   I am sorry?    12:15:04
12     A.   So a hot product would be a modifier.    12:15:06
13  It would be a way of describing the brand name. The    12:15:10
14  brand name was popular. It was in demand. It was a    12:15:14
15  hot product.    12:15:17
16     Q.   Do any of the articles that you have    12:15:17
17  reviewed that you listed in your report speak to the    12:15:20
18  difference between a brand name -- well, hold on.    12:15:25
19  Strike that. Yeah.    12:15:39
20          Do any of the articles that you    12:15:40
21  have read speak to the difference between    12:15:42
22  characteristics involved with a brand name versus    12:15:45
23  characteristics involved with a hot product as they    12:15:51
24  relate to gray market?    12:15:54

Page 111

1          MR. COLLINS: I don't think you meant    12:16:01
2  to, but vague and ambiguous.    12:16:03
3          So answer if you can understand    12:16:06
4  the question.    12:16:09
5  BY THE WITNESS:    12:16:11
6      A.   Yeah. Actually if you could just    12:16:16
7  rephrase, that would be helpful.    12:16:18
8          MR. COLLINS: I can tell you what I    12:16:24
9  think the problem is, if that would be helpful.    12:16:25
10         MR. BESSETTE: No, that's okay. But I    12:16:28
11  appreciate it.    12:16:30
12  BY MR. BESSETTE:    12:16:31
13     Q.   Let me just ask generally. Do you    12:16:33
14  recall any distributions or differences in any of    12:16:36
15  the academic articles you cite in your report about    12:16:39
16  gray marketing as it relates to a brand name product    12:16:43
17  and/or a hot product?    12:16:47
18         MR. COLLINS: Foundation.    12:16:48
19  BY THE WITNESS:    12:16:49
20     A.   Honestly, I am not remembering whether    12:16:49
21  it is in the materials that I submitted in    12:16:51
22  connection with this litigation or other materials    12:16:53
23  that I have read previously, but, yes, there is a    12:16:55
24  distinction between the brand names that exist in    12:16:59

Page 112

1  the world and those that have the fortune, the good    12:17:03
2  fortune of becoming hot products.    12:17:08
3  BY MR. BESSETTE:    12:17:12
4      Q.   And what are some of the differences    12:17:12
5  as it relates to gray marketing?    12:17:14
6      A.   Gray marketing, as we have already    12:17:16
7  discussed, can occur in a wide variety of sectors.    12:17:19
8  And it is not the case necessarily that gray    12:17:23
9  marketing only occurs in the case of products that    12:17:26
10  have become hot products, but certainly a brand name    12:17:30
11  as having sort of risen to the level of being a hot    12:17:35
12  product, becoming a popular product, one that    12:17:39
13  consumers widely desire, makes it more attractive to    12:17:42
14  the gray market.    12:17:46
15     Q.   Okay. And Paragraph 5B of your    12:17:47
16  rebuttal, the next page, next to last sentence. You    12:18:15
17  say, "Prior to the initial public offering, there    12:18:26
18  were indications that gray market sales of Adams    12:18:29
19  Golf clubs were increasing and that the gray market    12:18:33
20  could have a deleterious effect on sales for Adams."    12:18:36
21  First off, did you review any data that indicates    12:18:40
22  that?    12:18:43
23     A.   Yes.    12:18:43
24     Q.   What was that?    12:18:44

Page 113

1      A.   The Costco -- the Costco figures that    12:18:45
2  were -- that have been produced in connection with    12:18:49
3  this litigation.    12:18:53
4      Q.   So the Costco sales data that they    12:18:54
5  produced?    12:18:59
6      A.   Okay. As to -- you are asking about    12:18:59
7  figures, and it is a little bit -- well, let me just    12:19:02
8  tell you the world of things that I saw -- the world    12:19:08
9  of things that would be classified as figures.    12:19:10
10     Q.   First off, I didn't ask about figures.    12:19:12
11  What I wanted to know was, your statement here that    12:19:14
12  the gray market sales were increasing and the gray    12:19:17
13  market could have a deleterious effect on sales for    12:19:21
14  Adams, what is that based on?    12:19:25
15         MR. COLLINS: And forgive me, that is    12:19:27
16  compound. It sounds like figures to me in the first    12:19:28
17  half of that question. That's the question.    12:19:30
18         Answer it, subject to my    12:19:32
19  objection.    12:19:33
20  BY THE WITNESS:    12:19:34
21     A.   Okay. As to the first part of that    12:19:34
22  sentence, there were indications that gray market    12:19:36
23  sales of Adams Golf clubs were increasing. That    12:19:39
24  information came from a few sources, one was the    12:19:42

29 (Pages 110 to 113)