# EXHIBIT B

# PART II

Page 114

1 Costco figures that were produced in connection with 12:19:46
2 this litigation. Others were the complaints that 12:19:48
3 the company was receiving in connection with 12:19:52
4 litigation. Others were the internal company 12:19:55
5 documents that we have seen in connection with this 12:19:57
6 litigation. 12:20:00
7 And then addressing the second 12:20:02
8 part, that the gray market could have a deleterious 12:20:05
9 effect on sales for Adams, that would be based 12:20:08
10 primarily on internal company memos regarding the 12:20:12
11 deleterious effects that the company believed the 12:20:16
12 gray market could happen not only on internal 12:20:21
13 company memos, there were other indications as well. 12:20:25
14 Q. What indications are those? 12:20:29
15 A. For example, there was I think it was 12:20:30
16 his name was Eddie Tate, maybe it was Edwin Watts, 12:20:37
17 it was one of the company's customers. When asked 12:20:44
18 in anticipation of the initial public offering about 12:20:49
19 concerns, I believe was the question, that person 12:20:54
20 responded that the company had better maintain high 12:20:58
21 profit margins; if profit margins were affected they 12:21:01
22 would essentially jump ship. 12:21:05
23 And given the characteristics of 12:21:07
24 the gray market, was not a surprising response. And 12:21:10

Page 115

1 if anybody at Adams knew about the effects of the 12:21:13
2 gray market, there were certainly indications that 12:21:17
3 the increasing gray market sales would have a 12:21:19
4 deleterious effect. 12:21:22
5 Q. You are talking about the Edward Watts 12:21:28
6 quote in the Golf Pro magazine of May 1998, is that 12:21:33
7 what you're talking about? 12:21:38
8 A. No. I am talking about a due 12:21:38
9 diligence questionnaire. 12:21:44
10 Q. And was Mr. Watts in that 12:21:45
11 questionnaire talking about margin generally or was 12:21:47
12 he talking about margin in any kind of connection 12:21:49
13 with gray market? 12:21:53
14 MR. COLLINS: Document speaks for 12:21:54
15 itself. Shouldn't be a memory contest. Show her 12:21:57
16 the document. 12:21:58
17 BY MR. BESSETTE: 12:21:58
18 Q. Do you know? 12:21:59
19 A. Actually, I would like to see the 12:22:01
20 document. I don't remember the exact quote. 12:22:02
21 Q. But you are associating it in your 12:22:04
22 mind, you are giving testimony that it was the Edwin 12:22:06
23 Watts confirmation that -- about margin that you are 12:22:09
24 taking as part of your evidence for why there was a 12:22:11

Page 116

1 deleterious effect on the gray marketing activity as 12:22:14
2 Adams prior to the IPO, is that right? 12:22:18
3 MR. COLLINS: Go ahead. I mean, if 12:22:21
4 you want to make it a memory context, go ahead, as 12:22:23
5 best you can recall, that's fine. 12:22:27
6 BY THE WITNESS: 12:22:28
7 A. I would feel more comfortable 12:22:29
8 answering if I saw the document and could read his 12:22:31
9 quote again. 12:22:33
10 BY MR. BESSETTE: 12:22:34
11 Q. That's fine. What I am asking you 12:22:35
12 then goes back to what do you mean in that -- what 12:22:35
13 is your evidence for this statement in your report 12:22:36
14 that there were indications prior to the IPO that 12:22:39
15 gray market activity could have a deleterious effect 12:22:43
16 on sales for Adams? 12:22:46
17 MR. COLLINS: Asked and answered. 12:22:49
18 Go ahead. 12:22:50
19 BY THE WITNESS: 12:22:50
20 A. I did answer that question. Can you 12:22:51
21 read back my answer? Is that -- 12:22:53
22 BY MR. BESSETTE: 12:22:54
23 Q. You gave me in one of the answers a 12:22:55
24 Watts confirmation. Is that your testimony? That 12:22:58

Page 117

1 you are taking that as one of the examples of 12:23:01
2 evidence that gray marketing could have a 12:23:03
3 deleterious effect on sales for Adams because 12:23:07
4 Mr. Watts said in his confirmation that he needs 12:23:10
5 good margin or he will leave? 12:23:14
6 MR. COLLINS: Objection, asked and 12:23:16
7 answered. 12:23:16
8 Go ahead. 12:23:18
9 BY THE WITNESS: 12:23:18
10 A. I'm sorry, maybe confirmation is a 12:23:18
11 term of art that I'm not familiar with. But it was 12:23:19
12 a statement that Edwin Watts made in connection with 12:23:21
13 a due diligence questionnaire that he filled out in 12:23:23
14 anticipation of the initial public offering. If 12:23:28
15 that's a confirmation, then yes. 12:23:30
16 BY MR. BESSETTE: 12:23:34
17 Q. Do you recall as you sit here what 12:23:34
18 about that response had anything to do with gray 12:23:38
19 marketing? 12:23:42
20 MR. COLLINS: Asked and answered. 12:23:43
21 BY THE WITNESS: 12:23:44
22 A. Yes. Profit margins, negative -- 12:23:44
23 effects on pricing policies and profit margins are a 12:23:49
24 commonly cited negative effect of the gray market. 12:23:53

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 118

1 And so when he stated that profit margins had better 12:23:56
2 stay high and would jump ship if they wouldn't, 12:24:00
3 which is how I remember the answer, but again, I am 12:24:04
4 not exactly sure of the quote. That immediately 12:24:07
5 raised flags for me, given that gray marketing was 12:24:11
6 already occurring at Adams. 12:24:16
7 BY MR. BESSETTE: 12:24:17
8 Q. What information or data was available 12:24:17
9 to the company that would identify the causes of 12:24:23
10 this deleterious effect that you think was evident 12:24:28
11 pre IPO? 12:24:32
12 MR. COLLINS: Foundation. 12:24:33
13 THE WITNESS: Can you restate the 12:24:35
14 question? 12:24:35
15 MR. BESSETTE: Can you? 12:24:45
16 (Record read.) 12:24:47
17 BY THE WITNESS: 12:24:47
18 A. Okay. I think I am going to ask you 12:24:49
19 to restate the question, simply because I'm not sure 12:24:54
20 exactly what it is that you are trying to -- 12:24:57
21 BY MR. BESSETTE: 12:24:59
22 Q. I am trying to get at, Professor, your 12:24:59
23 statement here that prior to the IPO there were 12:25:02
24 indications that gray market sales were increasing. 12:25:04

Page 119

1 And we've already talked about that. But that gray 12:25:08
2 market could have a deleterious effect on sales. 12:25:10
3 Tell me the data or information that was available 12:25:13
4 to the company, so what indications would they have 12:25:15
5 seen to show that there could be a deleterious 12:25:19
6 effect on sales pre IPO? 12:25:23
7 MR. COLLINS: Foundation. 12:25:26
8 Go ahead. 12:25:28
9 BY THE WITNESS: 12:25:28
10 A. Prior to the IPO, the company had, for 12:25:28
11 one, received a number of complaints, including a 12:25:31
12 series of communications from WDC Mackenzie 12:25:34
13 regarding the effects that gray marketing was having 12:25:38
14 on authorized retailers in Canada. Among those, 12:25:41
15 among I think it was internal memo, I think it was 12:25:45
16 an Adams internal memo relating what WDC Mackenzie 12:25:51
17 had stated. The company stood, I think the quote 12:25:57
18 was something like the company stood to lose 12:26:00
19 goodwill and something like 15,000 clubs worth of 12:26:04
20 sales. 12:26:10
21 BY MR. BESSETTE: 12:26:10
22 Q. Anything else? 12:26:10
23 A. Yes. That's sort of a large body of 12:26:11
24 things right there. There was the complaints, there 12:26:17

Page 120

1 was also all the information from WDC Mackenzie, and 12:26:19
2 there was actually declining sales in Canada. 12:26:23
3 Q. Okay. Anything else? 12:26:26
4 A. No. 12:26:28
5 Q. Now, on page -- I am sorry -- 12:26:28
6 Paragraph 19 of your initial report. 12:26:37
7 MR. COLLINS: Initial, did you say? 12:26:40
8 MR. BESSETTE: Uh-huh. 12:26:42
9 BY MR. BESSETTE: 12:26:43
10 Q. Okay. The first sentence you say, 12:27:01
11 "The company's business model made it particularly 12:27:03
12 vulnerable to gray marketers." In the third 12:27:09
13 sentence, "In the long-term, the gray market is 12:27:10
14 known to be potentially detrimental to consumers and 12:27:13
15 trademark holders and the like." 12:27:18
16 Now, tell me the evidence that 12:27:20
17 supports your conclusion that Adams was particularly 12:27:23
18 vulnerable to gray marketers? 12:27:26
19 MR. COLLINS: Asked and answered. 12:27:28
20 Go ahead. 12:27:29
21 BY THE WITNESS: 12:27:29
22 A. I'll just go back to the conversation 12:27:30
23 that we had earlier, which was about how it was that 12:27:31
24 I sort of engaged in my analysis. Given the gray 12:27:36

Page 121

1 market literature and my familiarity with the gray 12:27:41
2 market literature, I looked at the business 12:27:44
3 strategies that Adams employed and superimposed 12:27:47
4 them, sort of looked at the correlation of Adams' 12:27:53
5 business strategies with those that are known to be 12:28:00
6 particularly inviting to gray marketers. 12:28:03
7 BY MR. BESSETTE: 12:28:06
8 Q. Well, in Paragraph 39 of your 12:28:06
9 rebuttal -- 12:28:08
10 MR. COLLINS: Of the rebuttal? 12:28:09
11 MR. BESSETTE: Yes. 12:28:13
12 MR. COLLINS: Give us a second to get 12:28:14
13 there, please. 12:28:15
14 MR. BESSETTE: Todd, you don't need to 12:28:15
15 say that. I routinely wait. 12:28:17
16 MR. COLLINS: I appreciate it. We are 12:28:20
17 there. 12:28:25
18 BY MR. BESSETTE: 12:28:26
19 Q. You say that Adams had a unique 12:28:28
20 business model. Tell me what you mean by that. 12:28:32
21 MR. COLLINS: Well, with reference to 12:28:34
22 Paragraph 39 or just answer the question? What do 12:28:38
23 you want her to do? 12:28:40
24

31 (Pages 118 to 121)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 122

1  BY MR. BESSETTE:                              12:28:40
2      Q.   What was unique about Adams' business  12:28:41
3  model that made it especially vulnerable to gray  12:28:44
4  marketing?                                   12:28:48
5      A.   I think I have laid that out. It is a  12:28:48
6  different question from the first question you  12:28:50
7  asked, for which I also had a response.      12:28:54
8          But there were a number of things    12:28:56
9  that were particular about Adams' business plan that  12:28:57
10  made it particularly directed to gray marketers.  12:28:59
11  Its high profit margins, high retailer profit  12:29:04
12  margins were one. Its desire to restrict sales to  12:29:07
13  its authorized retailers -- I'm sorry. To restrict,  12:29:18
14  to maintain sales through its authorized retailers  12:29:21
15  and to maintain strong and exclusive relationships  12:29:25
16  with those authorized retailers. In addition, the  12:29:28
17  company had plans to internationalize. And there  12:29:32
18  are others that are listed in my report.     12:29:35
19      Q.   Is wanting to offer your retailers,   12:29:43
20  you know, high margins, is that unique in the  12:29:47
21  business world?                              12:29:50
22      A.   Wanting to offer your retailers good  12:29:51
23  profit margins is not unique in the business world,  12:29:56
24  no.                                          12:29:58

Page 123

1      Q.   Is wanting to internationalize unique?  12:29:58
2      A.   It is not unique. The methods, the    12:30:01
3  particularities of how Adams was going about each of  12:30:04
4  those was unique.                            12:30:08
5      Q.   Well, let's go to Paragraph 5A of your  12:30:09
6  rebuttal, where I think you list the elements that  12:30:17
7  make Adams' business model particularly attractive  12:30:26
8  to gray marketers. You write these included, one,  12:30:26
9  maintaining the strength of the Tight Lies brand;  12:30:32
10  two, strong and exclusive relationships with its  12:30:36
11  distributors and retailers; three, pricing policies  12:30:40
12  which included high built-in retailer profit; four,  12:30:41
13  reliance on its in-house sales force and customer  12:30:45
14  service infrastructure to maintain its competitive  12:30:49
15  strengths; and five, an intention to further  12:30:52
16  internationalize. So looking at 1, 2 and 3,  12:30:57
17  Professor, aren't these strategies that every golf  12:31:03
18  club manufacture wants? In other words, are these  12:31:05
19  unique to Adams Golf?                        12:31:07
20          MR. COLLINS: Asked and answered.     12:31:09
21          Go ahead.                           12:31:10
22  BY THE WITNESS:                              12:31:11
23      A.   Yeah. As I stated, those strategies  12:31:12
24  sort of in a broad sweep are not necessarily  12:31:14

Page 124

1  particular or unique to Adams Golf. It was how they  12:31:19
2  were engaging in each of those that was.     12:31:24
3  BY MR. BESSETTE:                             12:31:24
4      Q.   How were they engaging in those that  12:31:27
5  made it unique?                             12:31:30
6      A.   For example, the pricing policies and  12:31:31
7  the high built-in retailer profits --       12:31:32
8      Q.   I'm sorry. Let's stick with 1, 2 and  12:31:35
9  3.                                          12:31:38
10      A.   That was Number 3.                  12:31:38
11          MR. COLLINS: Wait, wait, wait, wait.  12:31:40
12  Let's have a question. She was answering 3, and you  12:31:41
13  cut her off.                               12:31:43
14          MR. BESSETTE: That's fine. I thought  12:31:46
15  it was four, so go ahead.                   12:31:46
16          MR. COLLINS: Not a problem.         12:31:48
17          Do you have the question in mind?   12:31:48
18          THE WITNESS: Yes.                   12:31:50
19          MR. COLLINS: Go ahead then.         12:31:50
20  BY THE WITNESS:                             12:31:53
21      A.   So for example, as to Number 3, Adams  12:31:53
22  Golf in its road trip presentation stated and made  12:31:57
23  clear that it offered a significantly higher profit  12:32:00
24  margin than its competitors. That made it unique,  12:32:04

Page 125

1  because it created a wider in gap which gray  12:32:08
2  marketers could play, especially more space for  12:32:13
3  arbitrage to occur.                         12:32:16
4  BY MR. BESSETTE:                            12:32:18
5      Q.   How about one and two?             12:32:19
6      A.   Maintaining the strength of the Tight  12:32:21
7  Lies brand. Adams Golf was a new company that was  12:32:24
8  trying to enter into the golf consumer mind. And  12:32:28
9  their desire was to do so in a way that made it a  12:32:33
10  highly desirable, highly sought after, highly  12:32:36
11  prestigious brand. The fact that Adams was a new  12:32:41
12  company seeking that image made it unique.  12:32:46
13      Q.   And Number 2, what is unique about  12:32:49
14  that?                                      12:32:53
15      A.   What is unique about that is that --  12:32:53
16  well, first, I don't know -- I don't know in the  12:32:57
17  golf industry as a whole, I haven't studied the  12:33:00
18  business models of every golf company in the golf  12:33:04
19  industry to know the steps that they take to ensure  12:33:08
20  strong and exclusive relationships with their  12:33:11
21  distributors and retailers. But I can tell you that  12:33:14
22  having strong and exclusive relationships with  12:33:20
23  retailers as a business strategy creates among the  12:33:22
24  reasons to have that strong and exclusive  12:33:31

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 126

1  relationship is to be able to set set prices.    12:33:34
2        And to I don't want to imply that    12:33:38
3  Adams was engaging in antitrust -- or I'm sorry --    12:33:42
4  in monopoly, that's not what I mean, but to suggest    12:33:47
5  retailer prices that will be observed uniformly.    12:33:49
6  That has the effect of creating sort of a price    12:33:54
7  umbrella under which others can undercut.  Gray    12:34:02
8  marketers can come in and undercut the prices that    12:34:05
9  are set by the authorized retailers.  So even if --    12:34:09
10  so as I said, I don't know what every company was    12:34:09
11  doing, but even if all companies were engaged in    12:34:12
12  this particular activity, having strong and    12:34:15
13  exclusive relationships, it would not preclude Adams    12:34:19
14  from being particularly vulnerable to gray marketing    12:34:23
15  in combination with the other business strategies    12:34:27
16  that it employed.    12:34:31
17        Q.    All right.  So trying to boil that    12:34:33
18  down, 1, 2 and 3 in Paragraph 5A of your rebuttal    12:34:34
19  report, I think as you testified, are not    12:34:39
20  particularly unique to Adams Golf, but the way that    12:34:40
21  they employed them is what made them unique.  And    12:34:44
22  what you described to me is, Number 1, the brand    12:34:48
23  issue, again, not unique to Adams Golf, because it    12:34:51
24  was hot and it was new, they were trying to    12:34:55

Page 127

1  establish their brand, you find that particularly    12:34:58
2  unique to Adams.  And Number 3, the pricing policies    12:35:01
3  you say because of the particularly high profit    12:35:02
4  margin Adams Golf had and wanted to maintain    12:35:05
5  provided additional arbitrage opportunities.  So    12:35:10
6  that's what made essentially 1, 2 and 3 unique to    12:35:14
7  Adams Golf?    12:35:19
8        MR. COLLINS:  Well, the problem is,    12:35:19
9  it's vague and ambiguous, compound, mischaracterizes    12:35:19
10  the testimony.    12:35:23
11        You may answer.    12:35:24
12        Asked and answered.    12:35:26
13        THE WITNESS:  Could you read back the    12:35:29
14  question?    12:35:30
15        (Record read.)    12:35:30
16  BY MR. BESSETTE:    12:35:30
17        Q.    I understand, Professor, what you said    12:36:13
18  is Numbers 1, 2 and 3, I think you testified and    12:36:16
19  admitted that they are not particularly unique to    12:36:18
20  Adams Golf.  Let's stop there.  Is that right?    12:36:26
21        A.    No.    12:36:31
22        Q.    Okay.  Well, I think the record will    12:36:32
23  have that.    12:36:33
24        MR. COLLINS:  We don't have to argue    12:36:33

Page 128

1  about that now.    12:36:35
2  BY MR. BESSETTE:    12:36:37
3        Q.    What you said was 1, 2 and 3 weren't    12:36:37
4  particularly unique to Adams Golf, as opposed to    12:36:41
5  other businesses, but it was the way that they    12:36:44
6  employed them, what they did in particular is what    12:36:46
7  made the business strategy of Adams Golf    12:36:49
8  particularly vulnerable to gray marketers.  Do I    12:36:52
9  have that right?    12:36:56
10        MR. COLLINS:  Record speaks for    12:36:57
11  itself, mischaracterized the testimony.    12:36:59
12        Go ahead and answer.    12:37:01
13  BY THE WITNESS:    12:37:01
14        A.    Yeah.  That each of 1, 2 and 3, that    12:37:01
15  those practices, sort of as a broad sweep, that may    12:37:03
16  have been -- may have been employed by others, but    12:37:07
17  the way in which Adams Golf employed them was    12:37:12
18  unique, yes.    12:37:17
19  BY MR. BESSETTE:    12:37:17
20        Q.    All right.  And Number 1, brand image,    12:37:17
21  what was unique about the way Adams Golf employed    12:37:20
22  that, was because it was a new product and it wanted    12:37:24
23  to maintain that newness, is that right?    12:37:26
24        A.    Yes.  Yes.    12:37:28

Page 129

1        Q.    Okay.  And Number 2, strong and    12:37:28
2  unique -- I'm sorry -- strong and exclusive    12:37:31
3  relationships, what was unique about that?    12:37:34
4        MR. COLLINS:  Asked and answered.    12:37:35
5        Go ahead.    12:37:37
6  BY THE WITNESS:    12:37:37
7        A.    As I stated, because I didn't do an    12:37:38
8  extensive survey of how -- I wouldn't have privilege    12:37:40
9  to know, even if I had tried, what every golf    12:37:43
10  manufacture does in this respect.  It may or may not    12:37:48
11  be that other manufacturers engage in this    12:37:52
12  particular activity, but this particular activity    12:37:55
13  does create the conditions for arbitrage to occur.    12:37:58
14  And certainly in combination with Adams' other    12:38:03
15  business strategies, it created the environment for    12:38:07
16  arbitrage to occur.    12:38:11
17  BY MR. BESSETTE:    12:38:12
18        Q.    So standing alone, Number 2, you don't    12:38:12
19  know that there is anything unique about it with    12:38:15
20  Adams Golf.  That's what you are telling me.    12:38:17
21        A.    Only that it was used in combination    12:38:19
22  with other business strategies.    12:38:22
23        Q.    Right.  But standing alone, there is    12:38:24
24  nothing unique about it that you can sit here and    12:38:26

33  (Pages 126 to 129)

Page 130

1  tell me today?                    12:38:28
2      A.   I am going to split hairs a little    12:38:29
3  bit. Standing alone, if there were no other    12:38:35
4  business strategies that Adams Golf employed, if    12:38:37
5  this was Adams only business strategy, then I would    12:38:40
6  agree with the question you just asked. However,    12:38:42
7  there is a sort of synergy between this business    12:38:45
8  strategy and its others that I believe made it    12:38:47
9  unique.                    12:38:50
10     Q.   Okay. And the uniqueness of Number 3,    12:38:53
11 the pricing policies, was what?            12:38:58
12        MR. COLLINS: Asked and answered.    12:39:00
13     Go ahead.                12:39:01
14 BY THE WITNESS:                12:39:02
15     A.   The uniqueness was that Adams Golf's    12:39:02
16 pricing policies allowed for a retailer profit    12:39:05
17 margin that was significantly higher than its    12:39:10
18 competitors.                12:39:12
19 BY MR. BESSETTE:                12:39:18
20     Q.   Okay. Now, you say strong and    12:39:18
21 exclusive relationships with its distributors    12:39:43
22 several times. You say it in Item 2 there. If you    12:39:47
23 want to check, you say it in Paragraph 15 of your    12:39:51
24 rebuttal report, a few pages later. And, in fact,    12:39:54

Page 131

1  there you say the company states in its prospectus    12:40:00
2  that it relied on strong and exclusive    12:40:07
3  relationships. And you also say it in your initial    12:40:11
4  report at Paragraph 20, Item C, strong and exclusive    12:40:13
5  relationships, and then you cite some documents.    12:40:17
6        MR. COLLINS: You are going too fast    12:40:20
7  for me, sorry. Just give me a second. Okay.    12:40:21
8  BY MR. BESSETTE:                12:40:21
9      Q.   Let me hand you at least one of the    12:40:24
10 documents that you cite there, Exhibit 72, which is    12:40:39
11 the prospectus. And I am going to try to find the    12:40:42
12 others. I would like for you to -- here is 167. Go    12:40:45
13 ahead and point to me where the company said it has    12:40:52
14 exclusive relationships.            12:40:58
15     A.   It's been awhile since I looked at    12:40:58
16 this, so give me a minute.            12:40:58
17     Q.   You have got the cites in Paragraph 20    12:41:13
18 of your initial report. That's where you actually    12:41:16
19 have the cites.                12:41:21
20     A.   Okay, great.
21        (Off the record
22         discussion.)
23 BY THE WITNESS:
24     A.   You should probably give me the

Page 132

1  question one more time.
2  BY MR. BESSETTE:
3      Q.   Can you point to the word "exclusive"    12:42:44
4  on any of the pages you referenced?        12:42:48
5      A.   The word "exclusive" is a way of    12:42:51
6  describing a limitation of a distribution to    12:43:47
7  retailers that market premium quality golf    12:43:47
8  equipment.                12:43:54
9      Q.   That's what you mean by exclusive    12:43:54
10 relationships?                12:43:57
11     A.   Yes.                12:43:57
12     Q.   The word "exclusive" is not in there,    12:43:57
13 is it?                    12:44:03
14        MR. COLLINS: By "there," just tell me    12:44:03
15 what page you are talking about.        12:44:04
16 BY MR. BESSETTE:                12:44:06
17     Q.   Any of the referenced pages that you    12:44:07
18 cite in your report.            12:44:08
19     A.   I didn't just read the entirety of the    12:44:09
20 prospectus, but it wasn't in the words that I read.    12:44:12
21     Q.   You also site Exhibit 167. Is it    12:44:16
22 there?                    12:44:19
23     A.   Right, exactly. I didn't read the    12:44:19
24 entirety of that document either, but it --    12:44:21

Page 133

1      Q.   You cite pages.            12:44:23
2        MR. COLLINS: No, wait. I'm sorry.    12:44:24
3  Let's have a question.            12:44:25
4  BY MR. BESSETTE:                12:44:26
5      Q.   Does it appear on any of the pages you    12:44:26
6  cite in your report?            12:44:29
7        MR. COLLINS: In Paragraph 20?    12:44:30
8        MR. BESSETTE: Yes.            12:44:32
9        MR. COLLINS: I think we just got --    12:44:33
10 BY THE WITNESS:                12:44:34
11     A.   Okay. As to Exhibit 167, I did read    12:44:35
12 the entirety of that language, and no, it does not    12:44:38
13 appear there. As to Exhibit 72, I didn't read the    12:44:41
14 entirety of the language on page 24, but what I    12:44:44
15 read, it does not appear there, but I think I    12:44:48
16 explained what I meant by the word "exclusive."    12:44:50
17 BY MR. BESSETTE:                12:44:53
18     Q.   Okay. Thank you.            12:44:53
19        Exhibit 72, the prospectus, if you    12:45:04
20 could turn the page to 25.            12:45:07
21        MR. COLLINS: Can you wait just one    12:45:14
22 second?                    12:45:15
23        MR. BESSETTE: Sure.            12:45:16
24                    12:45:16

34  (Pages 130 to 133)

Page 134

1     (Off the record    12:45:16
2     discussion.)    12:46:08
3  BY MR. BESSETTE:    12:46:08
4     Q.    On page 25 under the company's    12:46:09
5  business strategy, Adams says its strategy --    12:46:11
6  actually, its first priority is to build its share    12:46:15
7  of the premium fairway woods market. Would that    12:46:19
8  have been adversely impacted by gray market sales,    12:46:22
9  that strategy?    12:46:26
10    A.    I am just reading the whole paragraph.    12:46:28
11    Q.    Sure.    12:46:53
12    MR. COLLINS: I am sorry, this is cut    12:46:53
13  off on this page. It says WTH strategy.    12:46:56
14    THE WITNESS: Growth.    12:47:05
15    MR. COLLINS: Growth? I'm just asking    12:47:05
16  what the word is, growth strategy?    12:47:05
17    MR. BESSETTE: I think so.    12:47:06
18    MR. COLLINS: Okay. Thank you.    12:47:06
19  BY THE WITNESS:    12:47:06
20    A.    Okay. And your question as to    12:47:08
21  the paragraph titled "Building Market Sharing    12:47:09
22  Fairway Woods" is what?    12:47:12
23  BY MR. BESSETTE:    12:47:12
24    Q.    My question is with respect to Adams    12:47:12

Page 135

1  Golf's business strategy to build market share in    12:47:17
2  fairway woods, would that have been adversely    12:47:20
3  impacted by gray market sales?    12:47:23
4     MR. COLLINS: Okay. And just so the    12:47:27
5  record is clear, it says growth strategy. That's    12:47:27
6  the section you are referring to?    12:47:29
7     MR. BESSETTE: Yeah. I think we are    12:47:31
8  on the same page.    12:47:32
9  BY THE WITNESS:    12:47:32
10    A.    Yeah. So the first sentence, the    12:47:34
11  desire to build its share of premium fairway woods,    12:47:36
12  may have been affected by the gray market, yes. And    12:47:40
13  then as you go through the methods that it intends    12:47:43
14  to employ -- yeah, the methods it intends to employ    12:47:46
15  in order to do that, my answer would be yes again.    12:47:51
16    For example, relying on its    12:47:55
17  existing retailers to increase their sales would    12:47:58
18  definitely be impacted negatively by the existence    12:48:01
19  of the gray market. Increasing the number of on and    12:48:03
20  off golf course shop selected to sell Tight Lies    12:48:07
21  would also be impacted, because as we have discussed    12:48:10
22  already, golf retailers apparently believe that    12:48:16
23  profit margin is essential to their decisions about    12:48:21
24  which golf products to carry and promote.    12:48:24

Page 136

1  BY MR. BESSETTE:    12:48:29
2     Q.    The last strategy, developing new    12:48:30
3  technologies and product designs, would that have    12:48:32
4  been impacted adversely by gray market sales?    12:48:36
5     A.    Yes.    12:49:25
6     Q.    How is that?    12:49:25
7     A.    Well, my initial reaction -- my first    12:49:26
8  thought was that developing new technologies and new    12:49:30
9  product designs can be very costly. That means that    12:49:36
10  the company's intentions, A, have to be focused on    12:49:40
11  new technologies and product designs, and not    12:49:44
12  elsewhere focused in areas such as combating gray    12:49:46
13  market activity. In addition, if the gray market    12:49:51
14  has impact on sales and profitability for the    12:49:54
15  company, the company's resources for developing new    12:49:57
16  technologies and product designs will be limited.    12:50:00
17    In addition, this paragraph also    12:50:03
18  says that they expect to -- somewhere it says they    12:50:05
19  rely on -- just a second. Let me see. It says    12:50:09
20  something about relying on -- oh, no. It said, if    12:50:12
21  it is received well by customers. The question of    12:50:15
22  whether or not a new product would be received well    12:50:19
23  by customers I think is likely to be influenced by    12:50:23
24  the perception of consumers of the brand image and    12:50:26

Page 137

1  that can be, as we discussed, impacted negatively by    12:50:30
2  the gray market.    12:50:34
3     Q.    So you are saying essentially if the    12:50:34
4  company is employing resources to deal with the gray    12:50:37
5  market, they are going to have less resources to    12:50:40
6  develop new technologies and designs? Is that what    12:50:43
7  you are saying?    12:50:45
8     MR. COLLINS: Mischaracterizes the    12:50:46
9  testimony.    12:50:48
10    You may answer.    12:50:48
11  BY THE WITNESS:    12:50:48
12    A.    Assuming that the company has limited    12:50:49
13  resources, and those resources have to be allocated    12:50:51
14  to one activity or another. The more resources to    12:50:55
15  devoted to combating gray marketing activities, the    12:50:59
16  less resources available for other activities.    12:51:00
17  BY MR. BESSETTE:    12:51:02
18    Q.    Okay. So that's how you are    12:51:02
19  concluding that gray market sales would impact or    12:51:04
20  could impact the growth strategy of developing new    12:51:08
21  technologies and designs?    12:51:12
22    MR. COLLINS: Mischaracterizes    12:51:13
23  testimony, asked and answered.
24    Go ahead.

Page 138

1  BY THE WITNESS:
2      A.  No.
3  BY MR. BESSETTE:
4      Q.  How does gray market sales effect the  12:51:18
5  company's efforts in this growth strategy of  12:51:21
6  developing new technologies and design?  12:51:23
7          MR. COLLINS:  Asked and answered  12:51:23
8  twice.  12:51:23
9          Go ahead again.  12:51:24
10 BY THE WITNESS:  12:51:25
11     A.  As I stated, it can divert the  12:51:25
12 company's attention.  It can limit the company's  12:51:29
13 profitability.  And it can impact the company's  12:51:32
14 brand image, which can effect whether or not a  12:51:36
15 product is received well by consumers.  12:51:39
16 BY MR. BESSETTE:  12:51:42
17     Q.  Those are all long-term effects of  12:51:42
18 gray marketing?  Brand image suffering, lower  12:51:47
19 profitability I think is what you said.  Are those  12:51:54
20 short or long-term effects of gray marketing?  12:51:57
21     A.  Those, as I have divided them in my  12:51:59
22 reports, are long-term effects.  12:52:03
23     Q.  In 1998, Professor, where was Adams  12:52:32
24 Golf's largest international market?  12:52:42

Page 139

1      A.  I believe Canada.  12:52:44
2      Q.  Canadian sales represented in 1998  12:52:45
3  approximately what percentage of Adams' total sales,  12:52:54
4  do you know?  12:52:57
5      A.  I am not remembering right now.  12:52:58
6      Q.  Does 2 percent sound about right?  12:53:00
7      A.  Again, I am not remembering right now.  12:53:02
8      Q.  Did you take that into account at all  12:53:05
9  in your coming to your conclusions, that is the size  12:53:10
10 of the largest international market for Adams Golf?  12:53:15
11         MR. COLLINS:  Overbroad, vague and  12:53:19
12 ambiguous.  12:53:21
13         Go ahead.  12:53:23
14 BY THE WITNESS:  12:53:23
15     A.  Can I ask you to restate the question?  12:53:27
16 BY MR. BESSETTE:  12:53:29
17     Q.  Yes.  12:53:30
18         Did the size of Adams Golf's  12:53:34
19 largest international market in 1998, did you take  12:53:38
20 that into account at all in reaching any of your  12:53:42
21 opinions and conclusions in this case?  12:53:45
22     MR. COLLINS:  Overbroad.  12:53:46
23         Go ahead.  12:53:47
24

Page 140

1  BY THE WITNESS:  12:53:48
2      A.  I didn't ask myself that particular  12:53:49
3  question, no.  12:53:50
4  BY MR. BESSETTE:  12:53:52
5      Q.  Now, on page -- I am sorry --  12:54:24
6  Paragraph 11 of your initial report --  12:54:26
7          MR. COLLINS:  Did you say page or  12:54:38
8  paragraph?  12:54:40
9          MR. BESSETTE:  Paragraph 11.  12:54:40
10         MR. COLLINS:  Thank you.  12:54:42
11 BY MR. BESSETTE:  12:54:43
12     Q.  You cite Myers & Griffith.  Do you  12:54:47
13 know what they have to say about what causes a gray  12:54:53
14 market to thrive?  12:54:56
15     A.  Well, I think I certainly refer to  12:54:58
16 this article in my report, but I didn't memorize the  12:55:04
17 article.  12:55:12
18     Q.  Okay.  I think they state that there  12:55:12
19 are certain factors within management control and  12:55:14
20 there are certain factors out of management control,  12:55:16
21 both of which could cause a gray market to thrive.  12:55:18
22 Do you agree with that generally?  Does that sound  12:55:22
23 familiar to you?  12:55:24
24         MR. COLLINS:  I am sorry, I don't know  12:55:25

Page 141

1  what question you are asking.  Does it sound  12:55:25
2  familiar or does she agree with the concept?  12:55:29
3  BY MR. BESSETTE:  12:55:32
4      Q.  Do you understand my question?  12:55:32
5          MR. COLLINS:  Vague and ambiguous.  12:55:33
6  BY THE WITNESS:  12:55:33
7      A.  I was actually going to ask you which  12:55:35
8  of those you were asking.  12:55:36
9  BY MR. BESSETTE:  12:55:37
10     Q.  Are you familiar with the concept of  12:55:38
11 factors within management control and some factors  12:55:40
12 outside of management control, both of which help a  12:55:43
13 gray market to thrive --  12:55:46
14     A.  Yes.  12:55:47
15     Q.  -- as stated by Myers & Griffith?  12:55:48
16     A.  Yes.  12:55:51
17     Q.  What are some examples of factors  12:55:51
18 within management control that cause gray markets to  12:55:55
19 thrive, according to Myers & Griffith?  12:55:58
20         MR. COLLINS:  The document speaks for  12:56:00
21 itself.  12:56:01
22         If you remember, go ahead and  12:56:02
23 answer.  12:56:04
24

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 142

1  BY THE WITNESS:                    12:56:04
2      A.  I don't remember exactly what Myers &  12:56:05
3  Griffith -- what Myers & Griffith's analysis of that  12:56:08
4  question is.                       12:56:08
5  BY MR. BESSETTE:                   12:56:11
6      Q.  Okay.  Do you recall them saying that  12:56:11
7  over production is one factor within management  12:56:12
8  control that causes gray markets to thrive?  12:56:15
9      A.  Again, I don't recall that Myers &  12:56:19
10 Griffith stated that, but that would certainly be  12:56:22
11 one.                               12:56:24
12     Q.  Do you have any evidence that Adams  12:56:24
13 Golf overproduced clubs?            12:56:29
14     A.  Overproduced, no.          12:56:29
15     Q.  By the way, does Adams by definition  12:56:30
16 have any control over factors that are outside of  12:56:35
17 management's control that cause gray markets to  12:56:35
18 thrive?                            12:56:40
19     A.  By definition, no.         12:56:40
20     Q.  In practice, have you seen that?  I'm  12:56:42
21 sorry, in academic literature have you seen to the  12:56:47
22 contrary any indications that something  12:56:50
23 characterized as outside of management control  12:56:53
24 management really does have control over?  12:56:56

Page 143

1      A.  Not that I recall, though I can  12:57:04
2  imagine -- sitting here and speculating, I could  12:57:07
3  imagine, for example, that a company might take on  12:57:10
4  lobbying efforts to try to effect sort of larger  12:57:14
5  economic conditions that might make gray marketing  12:57:18
6  viable, but that's speculative.      12:57:23
7      Q.  Have you ever been involved in any  12:57:24
8  IPOs?                              12:57:28
9      A.  Yes.                      12:57:29
10     Q.  How many?                  12:57:33
11     A.  One.                      12:57:34
12     Q.  Which one was that?         12:57:35
13     A.  I don't remember the name of the  12:57:36
14 company.  It was a Polish copper extraction and  12:57:38
15 production company.  I was involved with its IPO  12:57:44
16 when I was a summer associate at Clifford Chance.  12:57:51
17     Q.  Was this a company traded on an  12:57:56
18 American exchange?                  12:58:01
19     A.  I think it was a 144(a) offering.  12:58:01
20     Q.  And what's that?           12:58:04
21     A.  If I can remember.  A 144(a) offering  12:58:05
22 allows for qualified investors to purchase  12:58:12
23 securities without the company -- I'm sorry.  12:58:20
24 Qualified investors in the United States to purchase  12:58:25

Page 144

1  securities in the company without the company going  12:58:29
2  through the same rigorous disclosure requirements  12:58:31
3  that are required under the securities laws.  12:58:34
4      Q.  Okay.  So the involvement you had in  12:58:37
5  the one you just talked about was as a summer  12:58:44
6  associate.  So you were not a lawyer at the time?  12:58:48
7      A.  Correct.                   12:58:50
8      Q.  And it was an offering that didn't  12:58:50
9  have the same disclosure requirements as the  12:58:52
10 securities laws that govern IPOs in the United  12:58:56
11 States.  Do I understand that right?  12:59:00
12     MR. COLLINS:  Calls for a legal  12:59:01
13 conclusion.                        12:59:03
14 BY MR. BESSETTE:                    12:59:03
15     Q.  To the best of your understanding?  12:59:04
16     MR. COLLINS:  Foundation.       12:59:05
17     Go ahead.                     12:59:07
18 BY THE WITNESS:                     12:59:07
19     A.  To the best of my understanding --  12:59:07
20 actually, if you can restate the question, that  12:59:09
21 would be great.  Can you read it back?  12:59:11
22     MR. BESSETTE:  Can you repeat it,  12:59:11
23 please?                            12:59:11
24     (Record read.)                 12:59:26

Page 145

1  BY THE WITNESS:                    12:59:26
2      A.  Yeah.  I am just going to say I'm not  12:59:27
3  entirely sure, because I don't actually remember the  12:59:29
4  law on whether United States companies can offer  12:59:32
5  shares through 144(a) offering by doing it through a  12:59:35
6  foreign subsidiary, for example.  So I can't answer  12:59:38
7  with all sureness yes or no.        12:59:45
8      MR. COLLINS:  Excuse me.  We need to  12:59:48
9  break when it is convenient.        12:59:49
10     MR. BESSETTE:  Okay.           12:59:51
11 BY MR. BESSETTE:                    12:59:57
12     Q.  Have you ever counseled companies in  12:59:58
13 any of their -- in disclosure documents?  In other  13:00:02
14 words, what companies need to put in various  13:00:05
15 disclosure documents?  Do you have that background?  13:00:08
16     A.  In connection with that same  13:00:11
17 transaction, I was not the person in contact with  13:00:13
18 clients, but I was reviewing company documents and  13:00:17
19 trying to make some effort of determining what was  13:00:22
20 and was not relevant and material to investors.  13:00:27
21     Q.  And this was as a second year law  13:00:30
22 student?                           13:00:33
23     A.  No.  This -- all right.  I should have  13:00:33
24 let you finish.                     13:00:33

37 (Pages 142 to 145)

## Page 146

1     No, this was as a -- yes, the    13:00:37
2  summer after my second year of law school.    13:00:40
3     Q.    Right. Okay. So other than that    13:00:42
4  experience as a summer associate, intern, whatever  13:00:45
5  you want to call it, do you have any other    13:00:49
6  experience counseling companies as to the disclosure 13:00:52
7  requirements of the Securities & Exchange    13:00:56
8  Commission?    13:01:00
9     A.    I am just trying to recollect the body  13:01:00
10 of work that I did when I was working for Chance,    13:01:06
11 because I did other securities work. And I just am   13:01:09
12 hesitant to say absolutely not, but to the best of   13:01:15
13 my recollection, no.    13:01:19
14     MR. BESSETTE: I think this is a fine  13:01:33
15 place to stop.    13:01:34
16     (Break taken.)    13:40:50
17 BY MR. BESSETTE:    13:40:50
18     Q.    How many clubs were sold pre IPO at  13:40:51
19 Costco, do you know?    13:40:55
20     MR. COLLINS: Vague and ambiguous.    13:40:57
21 BY THE WITNESS:    13:40:57
22     A.    The numbers are difficult to actually  13:41:01
23 determine. But I reviewed the Costco figures, and I  13:41:06
24 believe the amount is 3,917. I have the exact    13:41:08

## Page 147

1  number in my report.    13:41:19
2  BY MR. BESSETTE:    13:41:19
3     Q.    I think it's 3,860, but give or take.  13:41:19
4  Somewhere in the 3,900 range.    13:41:19
5     Do you know the breakdown of that    13:41:21
6  number between U.S. and Canada?    13:41:22
7     A.    I believe it was something like    13:41:24
8  82 percent of those clubs were sold in the United    13:41:26
9  States, and the remainder was in Canada. 83, 82    13:41:29
10 something like that.    13:41:34
11     Q.    So 3,200 or so in the U.S. and 600 in  13:41:34
12 Canada is I think the breakdown.    13:41:38
13     A.    I am not comfortable with the numbers,  13:41:41
14 because I am not doing the math right now, but yeah,  13:41:44
15 something like that.    13:41:48
16     Q.    And I think you said in your report  13:41:48
17 that that's a relatively small number compared with  13:41:50
18 Adams total pre IPO 1998 sales?    13:41:55
19     A.    Yes.    13:41:57
20     Q.    And do you know what the number of    13:41:58
21 Adams pre 1998 -- I am sorry -- 1998 pre IPO sales  13:42:00
22 were in terms of units?    13:42:07
23     A.    I believe it was somewhere under    13:42:08
24 500,000.    13:42:11

## Page 148

1     Q.    Now, is it your -- let me ask this:  13:42:12
2  That number, that relatively small number as you    13:42:31
3  admit in your report, by itself, that number of    13:42:38
4  clubs being sold at Costco, was that material in    13:42:41
5  your mind as an expert witness in gray marketing?    13:42:45
6     MR. COLLINS: Vague and ambiguous.    13:42:48
7  BY THE WITNESS:    13:42:50
8     A.    The number standing alone may or may  13:42:51
9  not be material.    13:42:53
10 BY MR. BESSETTE:    13:42:54
11     Q.    I understand your opinion is that when  13:42:55
12 viewed -- that number, when viewed with the    13:42:59
13 company's business model as we've talked about this  13:43:05
14 morning, in your mind, made the risk of gray    13:43:07
15 marketing material at the time of the IPO?    13:43:12
16     A.    That also in combination with the    13:43:14
17 trend of the gray marketing sales that was occurring  13:43:17
18 at the time, yes.    13:43:21
19     Q.    And let me ask you, do you -- just to  13:43:21
20 be sure. You have not, as a professional, as an    13:43:37
21 attorney, advised a client as to what was material  13:43:42
22 or what was not material which would go in an    13:43:49
23 offering document, is that -- do I understand that  13:43:53
24 correctly or at least you can't remember doing that?  13:43:55

## Page 149

1     MR. COLLINS: I think it is asked and  13:43:58
2  answered.    13:44:00
3  BY THE WITNESS:    13:44:00
4     A.    Yeah. I have reviewed company    13:44:00
5  documents trying to look for and flag issues that  13:44:04
6  might be material that I would pull out, but only on  13:44:08
7  occasion and -- yeah.    13:44:16
8  BY MR. BESSETTE:    13:44:20
9     Q.    And you have no experience as a deal  13:44:20
10 attorney, actually, any experience as a deal    13:44:24
11 attorney as opposed to a summer associate making    13:44:27
12 calls of materiality in documents to be filed with  13:44:30
13 the SEC and advising clients of that?    13:44:34
14     A.    Yeah. I actually would like to go    13:44:37
15 back to my answer to that question previously,    13:44:38
16 because in thinking about it, I remember a dismal    13:44:40
17 day that I think might rather be forgotten that I    13:44:46
18 spent in Buffalo, New York, in a dark conference    13:44:51
19 room sifting through documents for materials -- for  13:44:53
20 documents I thought might be material to investors,  13:44:56
21 but I can't remember anything else about the deal.    13:45:00
22     Q.    Okay. And I am drawing a distinction.  13:45:00
23 I am not talking about reviewing documents that you  13:45:03
24 personally thought were material. I am talking    13:45:05

38  (Pages 146 to 149)

Page 150

1 about advising a client as a lawyer what is and what 13:45:08
2 is not material in your opinion that is what should 13:45:12
3 or should not go in an offering document that will 13:45:14
4 be filed with the SEC. You don't have any 13:45:17
5 experience doing that? 13:45:21
6     A.    That's correct. 13:45:22
7     Q.    And your -- the basis of you drawing 13:45:22
8 opinions about materiality of the gray market in 13:45:32
9 this case, I think as we have established, is your 13:45:35
10 teaching the classes for the last three years and 13:45:38
11 reviewing the articles that you have cited and that 13:45:40
12 in additional ones that you used in comparing your 13:45:45
13 class, is that right? 13:45:48
14         MR. COLLINS:  Asked and answered. 13:45:48
15         Go ahead. 13:45:49
16 BY THE WITNESS: 13:45:50
17     A.    Yes.  My hesitation is because there 13:45:53
18 was obviously also information that I read in 13:45:58
19 preparation for this -- in connection with this 13:45:59
20 litigation. 13:46:03
21 BY MR. BESSETTE: 13:46:04
22     Q.    Sure.  All right.  Fair enough. 13:46:05
23         When did Adams Golf learn -- 13:46:19
24 13:46:19

Page 151

1         (Off the record 13:46:19
2         discussion.) 13:46:19
3 BY MR. BESSETTE: 13:46:19
4     Q.    Professor, do you know how many Adams 13:50:06
5 Golf distributors or retailers complained to it pre 13:50:10
6 IPO about gray marketing? 13:50:14
7     A.    I think that's impossible to know. 13:50:16
8     Q.    You have seen references in many of 13:50:19
9 your readings in this case? 13:50:21
10     A.    I have seen some references, yes. 13:50:22
11     Q.    Why don't you look at Professor 13:50:24
12 Frazier's report, Paragraph 40, where he writes 13:50:27
13 there were a total of eight out of some 7,000 13:50:44
14 retailers complained, and he cites the Grace report. 13:50:48
15 Do you see that? 13:50:51
16     A.    Uh-huh. 13:50:51
17     Q.    And you have read the Grace report? 13:50:51
18     A.    I have. 13:50:53
19     Q.    Okay.  Do you have any knowledge that 13:50:54
20 the number of complaints was higher or lower than 13:50:56
21 this? 13:50:59
22     A.    Concrete knowledge, no. 13:50:59
23     Q.    So I take it from your answer you have 13:51:06
24 a view that it was higher? 13:51:07

Page 152

1     A.    I believe it could have been higher. 13:51:08
2     Q.    I guess it could have been lower, too, 13:51:10
3 but I mean, what's that based on? 13:51:13
4     A.    I'm not sure that it could have been 13:51:15
5 lower.  These eight documents are undeniably in 13:51:17
6 existence.  The company was organized in a way that 13:51:22
7 had I believe they were called regional account 13:51:25
8 coordinators going out into the field to talk with 13:51:26
9 all of the company's authorized retailers and 13:51:29
10 distributors.  And I would imagine that an awful lot 13:51:32
11 of complaints came to the company through 13:51:35
12 conversations between retailers and distributors and 13:51:38
13 those regional account coordinators in a way that 13:51:41
14 may not ever have been documented through formal 13:51:42
15 communication. 13:51:45
16     Q.    Okay.  Do you factor into your 13:51:46
17 opinions or conclusions in this case any assumptions 13:52:01
18 that there were a higher number of complaints than 13:52:04
19 that indicated here? 13:52:06
20     A.    I didn't rely on it because it is 13:52:08
21 somewhat speculative. 13:52:12
22     Q.    Somewhat or completely? 13:52:13
23     A.    It is speculative. 13:52:15
24     Q.    So you haven't taken that into 13:52:16

Page 153

1 account? 13:52:18
2     A.    No. 13:52:19
3     Q.    All right.  So the number of 13:52:19
4 complaints that we have documentary evidence of is 13:52:20
5 the give or take eight out of 7,000 retailers or 13:52:24
6 distributors complaining.  Is that a high number in 13:52:31
7 your view? 13:52:34
8         MR. COLLINS:  Vague and ambiguous. 13:52:34
9 BY THE WITNESS: 13:52:37
10     A.    Again, as a number of issues in this 13:52:37
11 case, it was not the number so much that was 13:52:40
12 concerning to me, as the content of those 13:52:42
13 complaints. 13:52:42
14 BY MR. BESSETTE: 13:52:43
15     Q.    Okay.  Does the number of -- let me 13:52:43
16 ask you this.  Is that a low number of complaints -- 13:52:44
17 well, strike that. 13:52:44
18         Actually, going back to 40 where 13:52:48
19 Professor Frazier says in the second sentence that, 13:52:51
20 "This is an incredibly low number of complaints and 13:52:56
21 in no way indicates the existence of degraded 13:53:01
22 relationships with Adams Golf's authorized retail 13:53:01
23 network," do you disagree with that statement? 13:53:12
24     A.    I don't disagree with the first part. 13:53:13

39 (Pages 150 to 153)

Page 154

1    It is incredible. I do disagree with the second    13:53:17
2    part, that it indicates -- I'm sorry -- that it in    13:53:20
3    no way indicates the existence of degraded    13:53:26
4    relationships. I definitely disagree with that.    13:53:31
5    Q.    Okay. And how so?    13:53:33
6    A.    The communications themselves    13:53:34
7    indicated the existence of degraded relationships.    13:53:37
8    Q.    With those particular complaining    13:53:40
9    retailers or distributors?    13:53:42
10    A.    For example, the WDC Mackenzie    13:53:43
11    communications represent not just WDC Mackenzie, but    13:53:46
12    a number of authorized retailers. I believe one of    13:53:50
13    the reports from WDC Mackenzie or a recapitulation    13:53:53
14    of communications with WDC Mackenzie indicate that    13:53:59
15    retailers up north, meaning Canada, were highly    13:54:01
16    dissatisfied about the existence of gray marketing.    13:54:05
17    In addition, there is evidence in the record that    13:54:09
18    the retailers were -- the retailers in Canada were    13:54:13
19    significantly concerned and unhappy, such that the    13:54:21
20    company had to take action to try to regain their    13:54:25
21    loyalty.    13:54:29
22    Q.    How many retailers in Canada are you    13:54:33
23    aware of that were dissatisfied?    13:54:35
24    A.    I don't know.    13:54:37

Page 155

1    Q.    Any other reason why you disagree with    13:54:40
2    the second part of that second sentence in Professor    13:54:46
3    Frazier's report?    13:54:51
4    A.    The reason I disagree is that the    13:54:56
5    communications I think did indicate degraded    13:54:59
6    relationships.    13:55:01
7    Q.    And is it the nature or the number of    13:55:03
8    communications or exactly what about the    13:55:11
9    communications, in your mind, evidences a degraded    13:55:14
10    relationship with Adams Golf's authorized retail    13:55:18
11    network?    13:55:22
12    A.    The content of the communications.    13:55:22
13    Q.    What do you mean?    13:55:24
14    A.    What they concerned. So -- and it    13:55:25
15    wasn't -- now we are talking about the content of    13:55:30
16    communications. So it wasn't just the    13:55:33
17    communications from retailers and distributors that    13:55:35
18    Adams was receiving, but also the reactions that    13:55:38
19    that inspired within Adams. The alarm that that    13:55:41
20    inspired within Adams that is evidenced in the    13:55:46
21    company's memos at the time.    13:55:51
22    Q.    By the way, did you ever review the    13:55:52
23    deposition testimony of the authors of any of those    13:55:54
24    memos?    13:55:57

Page 156

1    A.    I did not read all of it word for    13:55:58
2    word, no.    13:56:01
3    Q.    Well, if a particular individual who    13:56:02
4    wrote a memo then gave testimony under oath about    13:56:04
5    what he meant in that memo, did you take the time to    13:56:08
6    read that?    13:56:12
7        MR. COLLINS: Overbroad, vague and    13:56:13
8    ambiguous.    13:56:16
9        Go ahead.    13:56:17
10    BY THE WITNESS:    13:56:17
11    A.    In most instances, yes.    13:56:18
12        Can I just actually add one    13:56:18
13    thing --    13:56:18
14    BY MR. BESSETTE:    13:56:18
15    Q.    Sure.    13:56:18
16    A.    -- about the degraded relationships?    13:56:28
17        One of the -- and I, again, here I    13:56:30
18    am not remembering whether it was an internal    13:56:32
19    company memo or whether it was a communication from    13:56:34
20    WDC Mackenzie or another Canadian -- whether it was    13:56:39
21    from WDC Mackenzie or whether it was an internal    13:56:46
22    memo, but there was in a document significant    13:56:47
23    concern that the company stood to lose its goodwill    13:56:50
24    in Canada. That I think is very good evidence of    13:56:53

Page 157

1    degraded relationships.    13:56:56
2    Q.    Okay. Do you remember reading the    13:57:03
3    testimony of, I think Mr. Beebe was the author of    13:57:05
4    that memo? Do you remember reading his testimony    13:57:08
5    about what he meant when he wrote that?    13:57:11
6    A.    I read parts of his testimony, yes.    13:57:14
7    Q.    Did you read the parts about what he    13:57:15
8    meant when he wrote that that you just talked about?    13:57:19
9    A.    I don't remember exactly what he said    13:57:21
10    in response.    13:57:23
11    Q.    Do you know sitting here whether you    13:57:24
12    took that into account?    13:57:26
13    A.    Yes.    13:57:27
14    Q.    How did you do that?    13:57:28
15    A.    I looked -- I gave significantly more    13:57:29
16    weight to the contemporaneous writings of the author    13:57:32
17    rather than his recollections eight years later,    13:57:37
18    while he was being asked about the document in    13:57:40
19    connection with litigation.    13:57:44
20    Q.    Why is that?    13:57:45
21    A.    Because at the time, the issue was    13:57:46
22    pertinent to the company. At the time, the    13:57:51
23    reaction, both the visceral and the rationale    13:57:54
24    reaction that the company and individuals within the    13:57:58

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

Page 158

1  company were having in reaction to the gray market I 13:58:01
2  thought was very significant, especially when we 13:58:04
3  trying to make a determination of whether or not the 13:58:07
4  gray market was posing a serious problem to the 13:58:09
5  company. 13:58:12
6      Q.   But why take the words somebody wrote 13:58:12
7  and discount what the author of those words 13:58:15
8  testified under oath he meant? 13:58:19
9      A.   Yes. There are a couple of reasons. 13:58:20
10  One is that memory is faulty. Memory is especially 13:58:23
11  faulty when you've got the benefit of hindsight. 13:58:27
12  And I think there -- I don't know Mr. Beebe well 13:58:30
13  enough to know whether there might have been some 13:58:33
14  self interest involved as well, to sort of spin or 13:58:36
15  present his testimony in a particular fashion. 13:58:40
16      Q.   So you made a credibility call that 13:58:42
17  you were going to take the words of the document and 13:58:44
18  discount the testimony under oath of the author of 13:58:47
19  that document? 13:58:51
20      A.   I'm not sure it's really a 13:58:52
21  credibility call. Again, I have never met 13:58:53
22  Mr. Beebe, I don't know anything about his 13:58:58
23  credibility. It is really a matter of wanting to 13:59:00
24  place significant weight on the issues and the 13:59:06

Page 159

1  seriousness with which the company was taking the 13:59:08
2  issue at the time when it was preparing for its 13:59:11
3  initial public offering. 13:59:13
4      MR. BESSETTE: Can you read that back, 13:59:13
5  please? 13:59:13
6      (Record read.) 13:59:13
7  BY MR. BESSETTE: 13:59:36
8      Q.   What do you mean by wanting to place 13:59:36
9  significant weight on? 13:59:42
10      A.   What I mean is that given -- that one 13:59:43
11  of the assessments that I was trying to make was 13:59:45
12  whether or not the company was facing a serious 13:59:47
13  significant gray market problem. I wanted to know 13:59:50
14  how it was the company itself viewed its gray market 13:59:56
15  problem at the time. 14:00:01
16      Q.   Well, I understand that, but why then 14:00:01
17  put more weight on a document than the author of the 14:00:04
18  document explaining under oath what he meant when he 14:00:07
19  wrote it? 14:00:11
20      MR. COLLINS: Asked and answered. 14:00:11
21  BY THE WITNESS: 14:00:11
22      A.   Because what I was looking for was the 14:00:14
23  views of the company at the time, and the company's 14:00:15
24  officials at the time. And again, I think that 14:00:17

Page 160

1  contemporaneous memos are highly relevant in that 14:00:19
2  respect. 14:00:24
3  BY MR. BESSETTE: 14:00:24
4      Q.   Sure. But don't you run the risk of 14:00:24
5  taking something out of context without knowing the 14:00:26
6  actual context in which the author wrote it? 14:00:30
7      A.   There was a lot of context in the 14:00:31
8  document that I received. 14:00:33
9      Q.   I see. So you just -- you made a 14:00:34
10  judgment call to discount what the author of these 14:00:37
11  documents said under oath that he meant when he 14:00:41
12  wrote them, in favor of the plain language in the 14:00:45
13  document? 14:00:48
14      MR. COLLINS: Asked and answered. 14:00:48
15      Go ahead. 14:00:49
16  BY THE WITNESS: 14:00:49
17      A.   Yeah. I think I have answered that. 14:00:50
18  BY MR. BESSETTE: 14:00:51
19      Q.   Well, I need an answer to my question. 14:00:51
20      MR. COLLINS: It's been asked and 14:00:51
21  answered. 14:00:51
22  BY THE WITNESS: 14:00:54
23      A.   Can you restate it for me? 14:00:54
24      (Record read.) 14:00:54

Page 161

1  BY THE WITNESS: 14:00:54
2      A.   Yes. 14:00:54
3  BY MR. BESSETTE: 14:01:24
4      Q.   Let me hand you what has been marked 14:01:24
5  previously in this litigation as Exhibit 85. And 14:01:33
6  you talk about that document in Paragraph 15A of 14:01:38
7  your initial report, and 36 of your rebuttal report, 14:01:41
8  if you want to turn there for context. 14:01:47
9      MR. COLLINS: 15A and 36? 14:01:47
10      MR. BESSETTE: Correct. 14:01:47
11  BY THE WITNESS: 14:02:52
12      A.   Okay. 14:02:52
13  BY MR. BESSETTE: 14:02:52
14      Q.   You note in your report that Mr. Beebe 14:02:52
15  here wrote that the first shipment of Adam's clubs 14:03:04
16  caused a great of trouble for the Canadian 14:03:08
17  distributor and authorized retailers. Mr. Beebe 14:03:13
18  says, I guess in the last sentence of the second 14:03:18
19  paragraph, "The clubs had also through by the end of 14:03:24
20  60 days, so our distributors only had to deal with 14:03:32
21  10 or so returns from angry retailers." Does that 14:03:36
22  issue to you, Professor, that the issue was 14:03:41
23  relatively minor at this point in time? 14:03:42
24      MR. COLLINS: And for reference's 14:03:44

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 162

1  sake, Paul was just referring to Exhibit 85.  14:03:46
2       Go ahead.                        14:03:48
3       MR. BESSETTE: Yeah. Sorry. That's  14:03:48
4  the sentence I read.                   14:03:48
5  BY THE WITNESS:                        14:03:50
6    A.   Let me read that paragraph.     14:03:50
7  BY MR. BESSETTE:                       14:04:26
8    Q.   Mr. Beebe's sentence that the clubs  14:04:27
9  had also through by the end of 60 days, and the  14:04:31
10  distributors only had to deal with 10 or so returns  14:04:32
11  from angry retailers, does that imply to you that at  14:04:32
12  least the problem seemed relatively minor at this  14:04:38
13  point to Mr. Beebe?                    14:04:40
14    A.   No. I think that's taking that  14:04:41
15  sentence out of the context of the entire letter.  14:04:46
16    Q.   Okay. How is that? Well, let me ask  14:04:49
17  you: What does he mean by that?        14:04:52
18       MR. COLLINS: Calls for speculation.  14:04:54
19  BY MR. BESSETTE:                       14:04:56
20    Q.   Did you read his deposition to see  14:04:57
21  what he meant when he wrote that?      14:04:59
22    A.   I read parts of his deposition. I  14:05:02
23  don't remember all of what I read.     14:05:05
24    Q.   Okay. In coming to your conclusions  14:05:07

Page 163

1  and opinions in this case, do you factor in that  14:05:10
2  sentence at all?                       14:05:12
3    A.   Yes.                           14:05:13
4    Q.   How?                           14:05:14
5    A.   It is part of the mix of information  14:05:15
6  that I reviewed and analyzed.          14:05:20
7    Q.   What impact does it have, if at all,  14:05:22
8  on your opinions and conclusions, if you can parse  14:05:26
9  it out?                                14:05:28
10       MR. COLLINS: And the question is that  14:05:29
11  one sentence?                          14:05:31
12       MR. BESSETTE: Yes.               14:05:32
13  BY THE WITNESS:                        14:05:33
14    A.   Are you asking me to take it out of  14:05:39
15  context? Because obviously I am seeing the words  14:05:41
16  that are surrounding it, both above and below, and  14:05:44
17  have opinions and about this one sentence in which it  14:05:47
18  occurred. And this one sentence seems really in and  14:05:51
19  of itself not particularly interesting or useful.  14:05:54
20  BY MR. BESSETTE:                       14:05:57
21    Q.   Okay. Well, let's just leave it  14:05:57
22  there.                                 14:05:59
23       You can turn to paragraph 17 of  14:05:59
24  your initial report and 33 of your rebuttal for  14:06:33

Page 164

1  context if you need to.                14:06:55
2       MR. COLLINS: 17, 33?              14:06:55
3       MR. BESSETTE: Uh-huh.
4  BY THE WITNESS:
5    A.   Okay.
6  BY MR. BESSETTE:
7    Q.   I have handed you what has been marked  14:06:56
8  previously in this litigation as Exhibit 10, a memo  14:06:59
9  from Chris Beebe to WDC Mackenzie dated June 8,  14:07:06
10  1998. You refer to in Paragraph 17 of your initial  14:07:12
11  report, and 33 of your rebuttal report, where you  14:07:16
12  describe the plan that Adams put in place to deter  14:07:20
13  the sale of clubs in Canada. Now, Mr. Beebe here  14:07:24
14  notes in the first -- I don't know if it is a bullet  14:07:28
15  point or a little dash, whatever.      14:07:32
16       MR. COLLINS: On Exhibit 10.        14:07:33
17  BY MR. BESSETTE:                       14:07:35
18    Q.   On Exhibit 10, that the plan being put  14:07:35
19  in place only applies to the retailers that  14:07:37
20  Mackenzie determines are affected by the gray  14:07:42
21  marketing issue based on location, etcetera. Do you  14:07:45
22  see that?                              14:07:49
23    A.   Yes.                           14:07:49
24    Q.   Does that suggest that only a subset  14:07:49

Page 165

1  of retailers in Canada was really being effected by  14:07:52
2  gray marketing?                        14:07:57
3    A.   It might suggest that.           14:07:58
4    Q.   Well, let me ask you this: Do you  14:07:59
5  know what it suggests?                 14:08:03
6       MR. COLLINS: Calls for speculation.  14:08:03
7       Go ahead.                        14:08:03
8  BY THE WITNESS:                        14:08:06
9    A.   It suggests that anywhere from --  14:08:06
10  well, this alone, divorced from all other  14:08:11
11  documentation, suggests that there may have been two  14:08:15
12  groups, those affected and those not affected.  14:08:20
13  BY MR. BESSETTE:                       14:08:24
14    Q.   Did you consider that in all your work  14:08:24
15  in this case?                          14:08:26
16    A.   Yes.                           14:08:26
17    Q.   Do you know how large the subset of  14:08:27
18  retailers affected in Canada -- affected by gray  14:08:39
19  marketing and the subset not, do you know how large  14:08:43
20  each is or was in 1998?                14:08:47
21    A.   No.                            14:08:48
22    Q.   So no sense whether the subset  14:08:49
23  affected by gray marketing was larger or smaller  14:08:53
24  than the subset not affected?          14:08:57

42 (Pages 162 to 165)

1    A.   It would be speculative to answer that 14:08:59
2 question.                              14:09:02
3    Q.   Did you read the deposition of Darl  14:09:02
4 Hatfield, the former CFO?               14:09:17
5    I don't remember. If I did, it was   14:09:19
6 probably touching on parts of it and not focusing on 14:09:21
7 all of it.                              14:09:26
8    Q.   Okay. Did you read the part where he 14:09:27
9 stated that he didn't think gray market sales had  14:09:30
10 any financial impact at all on Adams Golf?  14:09:34
11    A.   I don't recall.                 14:09:38
12    Q.   Let me give you the -- hand you --  14:09:38
13 well, I'm sorry. Let's mark this.       14:10:04
14         (Exhibit No. 307 was  14:10:13
15         marked for          14:10:13
16         identification.)     14:10:14
17 BY MR. BESSETTE:                        14:10:14
18    Q.   Okay. Professor, you have now been  14:10:14
19 handed a document marked Exhibit 307 by the court  14:10:17
20 reporter. I think it is the Eagle report that you  14:10:20
21 cite in your report at Paragraph 21B, I think also  14:10:23
22 Paragraph 7 of your rebuttal.           14:10:34
23         MR. COLLINS: For the record, it is  14:10:36
24 OCH 71 through 88.                      14:10:38

1 BY THE WITNESS:                         14:10:38
2    A.   What paragraph of the rebuttal, I am  14:10:45
3 sorry?                                  14:10:45
4 BY MR. BESSETTE:                        14:10:45
5    Q.   Now, on Paragraph 7 --          14:10:52
6    A.   Of the rebuttal, right?          14:10:54
7    Q.   Uh-huh. Yes, ma'am.             14:10:57
8         Although the part -- it might be  14:10:57
9 your initial report. Let me just look. Yeah, it's  14:11:29
10 actually -- the quote is in Paragraph 21B of your  14:11:29
11 initial report. He is saying, "In a recent study of  14:11:32
12 the effects of gray marketing on brand image, each  14:11:43
13 of 15 brand owners believe that parallel import  14:11:46
14 activity of their products into discount retail  14:11:49
15 stores was negatively impacting or had the potential  14:11:52
16 to impact on their brands perceptions." And I think  14:11:55
17 you cite the Eagle report on page 1342?  14:11:59
18    A.   Correct.                        14:12:05
19    Q.   Okay. If you turn to page 1335 of  14:12:05
20 that article, and it's obviously going to be one of  14:12:09
21 the underlined lines, because I've underlined that,  14:12:09
22 but I don't remember which one. I believe the  14:12:19
23 article cites a source stating that parallel export  14:12:20
24 channels may assist in penetrating foreign markets  14:12:20

1 for an increasing foreign market share."  14:12:28
2    A.   Yes.                            14:12:28
3    Q.   Okay. What is the cite cited for that 14:12:29
4 statement, by the way?                  14:12:38
5    A.   It says Mitchell, 1998.          14:12:38
6    Q.   Are you familiar with that article?  14:12:40
7    A.   I don't believe I looked it up, no.  14:12:41
8    Q.   This Eagle article, too, by the way,  14:12:43
9 is published what, some five years after Adam's IPO?  14:12:46
10    A.   Yes. 2003 I believe.            14:12:49
11    Q.   I believe, yeah.                14:12:50
12         We have touched on this before,  14:13:00
13 but at Paragraph 19 of your initial report, and I  14:13:01
14 will just read it, you can look if you need to. You  14:13:05
15 say, "In the long-term, the gray market is known to  14:13:07
16 be potentially detrimental to consumers and  14:13:10
17 trademark holders alike." Doesn't the Eagle article  14:13:15
18 at page 1335 state that "Protecting parallel  14:13:19
19 importers is perceived as acting in the interest of  14:13:25
20 consumers"?                             14:13:30
21    A.   What it does for consumers is  14:13:30
22 different from what it does to a company.  14:13:34
23    Q.   My question was, doesn't that article  14:13:36
24 state that?                             14:13:40

1         MR. COLLINS: Document speaks for  14:13:40
2 itself.                                 14:13:42
3 BY THE WITNESS:                         14:13:42
4    A.   It says that it can be -- hang on.  14:13:42
5 What it says is that protecting parallel importers  14:13:50
6 is perceived as providing a check on the near  14:13:53
7 monopoly held by many manufacturers and as acting in 14:13:53
8 the interest of consumers.              14:14:05
9 BY MR. BESSETTE:                        14:14:05
10    Q.   Okay. And at page 1339, doesn't Eagle 14:14:06
11 state that there is little research of an empirical  14:14:09
12 nature concerning parallel importing or its effect,  14:14:13
13 positive or negative, on brand equity and values?  14:14:17
14         MR. COLLINS: Speaks for itself.  14:14:20
15         Go ahead.                        14:14:22
16 BY THE WITNESS:                         14:14:22
17    A.   It does say that was the reason for  14:14:22
18 this study.                            14:14:24
19 BY MR. BESSETTE:                        14:14:25
20    Q.   And there is a marked steer toward  14:14:26
21 conjecture and opinion rather than providing  14:14:26
22 objective, quantitative analysis of the impacts of  14:14:26
23 the practice on brands, markets and individual  14:14:32
24 market segments?                        14:14:34

Page 170

1      MR. COLLINS: Same objection.     14:14:35
2  BY THE WITNESS:                      14:14:37
3      A.   It does say that, that was the gap she  14:14:38
4  was aiming to fill.                  14:14:40
5  BY MR. BESSETTE:                     14:14:44
6      Q.   And didn't Eagle tell the reader in  14:14:44
7  the study that parallel importing activities  14:14:44
8  explored only in the consumer goods sector of the  14:14:44
9  New Zealand economy?                 14:14:49
10     MR. COLLINS: Speaks for itself.  14:14:49
11 Where are you referring to, please? For the record,  14:14:51
12 it's OCH 78.                         14:14:51
13 BY THE WITNESS:                      14:14:51
14     A.   Yes. She is informing the reader of  14:14:57
15 the place in which she did her study.  14:14:59
16 BY MR. BESSETTE:                     14:15:01
17     Q.   How similar is New Zealand's gray  14:15:01
18 market economy to Canada's, if you know?  14:15:06
19     A.   I don't know.                14:15:08
20     Q.   Do you know whether any of the  14:15:08
21 interviewees of that study sell golf clubs?  14:15:10
22     A.   I don't know.                14:15:14
23     Q.   28 C 2 of your report. I think you  14:15:14
24 quote --                             14:15:38

Page 171

1      A.   Hang on a second.
2      Q.   Sure.
3      A.   That's page 19, right?
4      Q.   Yes. Uh-huh.
5      A.   Okay.
6      Q.   You cite where Eagle writes that many  14:15:49
7  trademark holders have noted substantial losses in  14:15:55
8  sales, and you say up to 30 percent as the direct  14:15:58
9  result of parallel import activity.  14:16:01
10     A.   I don't say up to 30 percent. That's  14:16:04
11 part of the quote.                   14:16:06
12     Q.   Right. Doesn't the very next sentence  14:16:08
13 state that others generally where there was a high  14:16:10
14 element of rapidly changing technology or fashion  14:16:10
15 reported minimal impact?             14:16:16
16     MR. COLLINS: Just so we have a clear  14:16:16
17 record here, what page of Eagle are you referring to  14:16:19
18 now?                                 14:16:23
19 BY MR. BESSETTE:                     14:16:23
20     Q.   It's 1342 that was cited in your  14:16:24
21 report.                              14:16:27
22     MR. COLLINS: That's fine. I just  14:16:27
23 want the record to be clear as to what you are  14:16:28
24 reading.                             14:16:30

Page 172

1      MR. BESSETTE: Okay.              14:16:30
2  BY THE WITNESS:                      14:16:30
3      A.   I would just like to read it, just for  14:16:31
4  a second.                            14:16:32
5  BY MR. BESSETTE:                     14:16:32
6      Q.   Uh-huh.                     14:16:32
7      A.   Yes. That is the next phrase found in  14:17:04
8  the Eagle article.                   14:17:06
9      Q.   Wasn't Adam's growth strategy  14:17:08
10 including -- include the developing of new  14:17:12
11 technology in product design?        14:17:14
12     A.   Yes, but I don't know how fast.  14:17:16
13     Q.   Did Adam's Tight Lies club win an  14:17:18
14 award for technical reasons in 1998?  14:17:23
15     A.   I don't know.                14:17:26
16     Q.   You can turn, Professor, to your  14:17:27
17 initial report at 28 C 2. I guess, actually, right  14:17:56
18 probably where you are.              14:18:04
19     MR. COLLINS: Page 19?            14:18:04
20 BY THE WITNESS:                      14:18:04
21     A.   Yes, that's where I am.        14:18:06
22 BY MR. BESSETTE:                     14:18:08
23     Q.   Let me hand you what has been marked  14:18:14
24 previously as Exhibit 80, which you reference in  14:18:17

Page 173

1  Paragraph 28 C 2 of your expert report, Exhibit 303.  14:18:21
2      Now, Paragraph 2 of your report  14:18:37
3  you say, "In addition, the sales in Costco stores  14:18:39
4  had the effect of diminishing the prestige and  14:18:42
5  desirability of its clubs among high end consumers,  14:18:47
6  thus reducing sales though," I think you mean  14:18:47
7  through.                             14:18:47
8      A.   It should have been through.  14:18:47
9      Q.   Okay. "The high end retailers. On  14:18:55
10 October 8, 1998, Barney Adams recognized this  14:18:57
11 problem when he estimated that the gray market had a  14:19:01
12 negative sales effect in Q4 of 20 to 25 percent  14:19:05
13 based on a market survey (customers who refused to  14:19:05
14 buy)."                               14:19:05
15     Now, to be clear Mr. Adams isn't  14:19:12
16 estimating that gray market had a negative sales  14:19:17
17 effect in Q4 in October, is he?      14:19:23
18     MR. COLLINS: The document speaks for  14:19:27
19 itself.                              14:19:28
20 BY MR. BESSETTE:                     14:19:29
21     Q.   Now, what is your understanding of  14:19:30
22 what he is doing?                    14:19:31
23     MR. COLLINS: Calls for speculation.  14:19:32
24

44 (Pages 170 to 173)

Page 174

1  BY THE WITNESS:                    14:19:33
2     A.   Yeah. My understanding of what he is  14:19:34
3  doing is talking about the impacts of gray marketing  14:19:35
4  on the company.                    14:19:38
5  BY MR. BESSETTE:                   14:19:39
6     Q.   Well, in terms of his -- well, what is  14:19:40
7  the import of this document, in your opinion?     14:19:47
8        MR. COLLINS: Exhibit 80. Go ahead.  14:19:52
9  BY MR. BESSETTE:                   14:19:56
10    Q.   What relevance does it have to you?  14:19:57
11    A.   It has -- the relevance that it has --  14:19:59
12 actually let me just take a couple of seconds to  14:20:01
13 re-read this document. I have read it before, but I  14:20:06
14 will read it again.                  14:20:09
15    Q.   Sure.               14:20:09
16    A.   It presents -- the gray market problem  14:20:50
17 is it was manifesting itself at Adams.     14:20:51
18    Q.   I'm sorry?            14:20:58
19    A.   The document I believe was written by  14:20:58
20 Barney Adams to summarize the effects of -- sorry.  14:21:02
21 To summarize the gray market problem as it was  14:21:06
22 manifesting itself at Adams.          14:21:10
23    Q.   That's your understanding of what this  14:21:12
24 document is?                    14:21:14

Page 175

1     A.   Yes.               14:21:14
2     Q.   Where did you get that understanding?  14:21:16
3     A.   From reading it.          14:21:17
4     Q.   Your understanding that you just     14:21:18
5  testified to you pull out of this document?     14:21:21
6        MR. COLLINS: You just asked that  14:21:23
7  question. She just answered it.        14:21:26
8        MR. BESSETTE: Just verifying,     14:21:28
9  Counsel.                      14:21:28
10 BY THE WITNESS:                    14:21:28
11    A.   Yes.              · 14:21:28
12 BY MR. BESSETTE:                   14:21:28
13    Q.   Did you read Mr. Adams' testimony  14:21:31
14 about this document?               14:21:33
15    A.   I did.             14:21:33
16    Q.   You understand that Mr. Adams     14:21:35
17 testified under oath that the 20 to 25 percent  14:21:37
18 estimated negative sales effect for Q4 was not  14:21:40
19 solely the result or Costco?          14:21:44
20        MR. COLLINS: The transcript speaks  14:21:47
21 for itself.                    14:21:50
22        Answer.              14:21:51
23 BY THE WITNESS:                    14:21:51
24    A.   I found that part of the transcript  14:21:52

Page 176

1  actually difficult to understand.          14:21:53
2  BY MR. BESSETTE:                   14:21:55
3     Q.   Why?                14:21:55
4     A.   I didn't think it was clear.     14:21:56
5     Q.   What was not clear?         14:21:57
6     A.   I didn't think his testimony was     14:21:59
7  particularly clear.                14:22:02
8     Q.   What was ambiguous then?      14:22:02
9     A.   I thought it was not clear exactly how  14:22:03
10 it was that he was -- I didn't think that his     14:22:06
11 description of his intention in writing this memo  14:22:08
12 was particularly clear.              14:22:12
13    Q.   In what respects? What did you not  14:22:13
14 understand, I guess?               14:22:18
15    A.   Yeah. And now I am trying to     14:22:19
16 remember, obviously. He restated his intention a  14:22:20
17 number of times. And in those restatements, in my  14:22:28
18 recollection of those restatements, sort of changed  14:22:31
19 his presentation slightly. And as a result, I     14:22:34
20 wasn't really entirely clear what it was he was     14:22:38
21 trying to convey during his testimony.     14:22:41
22    Q.   When you read his testimony, did you  14:22:49
23 understand that the 20 to 25 percent negative sales  14:22:52
24 effect that he was estimating was from causes other  14:22:55

Page 177

1  than or in addition to gray marketing?     14:23:00
2     A.   No.                14:23:03
3     Q.   You didn't understand that?     14:23:03
4        MR. COLLINS: Asked and answered.  14:23:06
5  BY THE WITNESS:                    14:23:07
6     A.   No.                14:23:08
7  BY MR. BESSETTE:                   14:23:08
8     Q.   How much weight did you give to     14:23:28
9  Mr. Adams's assessment of the situation as reflected  14:23:31
10 in Exhibit 80?                   14:23:34
11        MR. COLLINS: I'm sorry, could you  14:23:46
12 repeat that? I just missed a word.        14:23:46
13        MR. BESSETTE: That's fine.     14:23:46
14        (Record read.)            14:23:46
15        MR. COLLINS: By assessment, you mean  14:23:47
16 deposition -- assessment in the deposition?     14:23:49
17        MR. BESSETTE: No.            14:23:50
18 BY MR. BESSETTE:                   14:23:50
19    Q.   How much weight did you give -- in  14:23:51
20 coming to your opinions and conclusions, did you  14:23:52
21 give to Mr. Adams' assessment of the situation as  14:23:54
22 reflected in Exhibit 80?            14:23:58
23    A.   It was just one piece of the evidence  14:23:59
24 that I reviewed.                  14:24:02

45 (Pages 174 to 177)

Page 178

1    Q.   Did you find his statements reflected 14:24:03
2 in Exhibit 80 credible? 14:24:05
3    A.   Yes. 14:24:07
4    Q.   How about the last paragraph, wherein 14:24:07
5 Mr. Adams says, "Except for a lesser amount in the 14:24:17
6 pipeline, we will have this under control by Q1 14:24:22
7 '99." Did you find that credible? 14:24:29
8    A.   I thought it was plausible. 14:24:29
9    Q.   You have no reason to believe that he 14:24:31
10 didn't believe that when he wrote that? 14:24:33
11    A.   No. 14:24:36
12    Q.   Paragraph 31 of your initial report 14:24:36
13 and 25 of your rebuttal. 14:25:03
14    A.   Okay. 14:25:25
15    Q.   Let me show you what has been marked 14:25:26
16 as Exhibit 56. I believe that's the October 13, 14:27:02
17 1998 memo that you cite in Paragraph 25 of your 14:27:06
18 rebuttal and 31 of your initial report. 14:27:10
19    A.   Okay. 14:27:10
20    Q.   In your report you cite that Barney 14:27:22
21 Adams stated that Costco sales had a greater impact 14:27:25
22 on Adams -- was going to have a greater impact on 14:27:30
23 Adams Q4 '98 than competition, because I think he 14:27:34
24 says to a lesser degree competition, correct? 14:27:39

Page 179

1    A.   Right. 14:27:41
2    Q.   Mr. Adams also stated that Costco 14:27:42
3 sales at the time of the IPO were no worse than they 14:27:45
4 were in October. And I believe you conclude from 14:27:48
5 this that gray market was a bigger problem in 14:27:50
6 competition at the time of the IPO. Do I have that 14:27:54
7 right? 14:27:57
8    MR. COLLINS:  Vague and ambiguous. 14:27:57
9 You just kind of clumped it all up for an unclear 14:27:59
10 record. I can tell you why or -- 14:28:04
11    MR. BESSETTE:  I don't believe it is 14:28:04
12 unclear. 14:28:05
13    MR. COLLINS:  Not a problem. Vague 14:28:06
14 and ambiguous. 14:28:07
15    If you feel you can, answer the 14:28:09
16 question. 14:28:11
17 BY THE WITNESS: 14:28:11
18    A.   If you could restate it, that would be 14:28:11
19 great. 14:28:13
20 BY MR. BESSETTE: 14:28:13
21    Q.   Okay. You cite Mr. Adams stated that 14:28:13
22 Costco sales would have a greater impact in Q4 than 14:28:21
23 competition. 14:28:21
24    A.   Uh-huh. 14:28:21

Page 180

1    Q.   Mr. Adams also stated that Costco 14:28:21
2 sales at the time of the IPO were no worse than they 14:28:21
3 were in October. I believe in the paragraphs I 14:28:24
4 mentioned in these reports, you conclude from this 14:28:25
5 that gray market was a bigger problem in competition 14:28:28
6 at the time of the IPO. Do I have that right? 14:28:32
7    A.   Yes. 14:28:34
8    Q.   And for you to make that conclusion, 14:28:35
9 does that not assume that competition was at the 14:28:38
10 same level during both periods, that is, at the time 14:28:42
11 of the IPO and Q4? 14:28:45
12    A.   It doesn't really make a particular 14:28:48
13 quantitative assumption about competition. It only 14:28:53
14 makes a relative assumption about competition 14:28:57
15 relative to gray market sales. 14:29:00
16    Q.   Okay. Same thing then. Relative to 14:29:00
17 gray market sales competition was at the same level, 14:29:03
18 that's a natural implication from your conclusion. 14:29:05
19 Do I understand that right? 14:29:09
20    MR. COLLINS:  Vague and ambiguous. 14:29:11
21 BY THE WITNESS: 14:29:13
22    A.   Yeah. My problem is simply that my 14:29:13
23 statement speaks about the time of the document, 14:29:14
24 that gray market sales were a greater problem than 14:29:16

Page 181

1 competition as of the time that Barney Adams wrote 14:29:21
2 the October 13th memo. It doesn't speak to that 14:29:25
3 issue prior to the IPO. 14:29:30
4 BY MR. BESSETTE: 14:29:31
5    Q.   Let me ask you this: If competition 14:29:31
6 was fiercer at the time of the IPO than it was in 14:29:33
7 Q4, then couldn't gray market sales have been less 14:29:38
8 important than competition at the time of the IPO? 14:29:42
9    A.   Not necessarily. 14:29:46
10    Q.   I said couldn't they? 14:29:47
11    A.   Plausibly, yes. 14:29:47
12    Q.   Do you have any view as to whether it 14:29:50
13 was or was not? 14:29:53
14    A.   Yes. 14:29:54
15    Q.   What is your view and then what is it 14:29:54
16 based on? 14:29:58
17    A.   Okay. I am going to take each of them 14:29:59
18 in turn. So competition, I believe at the time of 14:30:04
19 the IPO was something about which the company had a 14:30:06
20 good hold. They had good information about their 14:30:13
21 competitors, they knew who their competitors were, 14:30:17
22 they knew what the competitors' clubs were, and if 14:30:20
23 they were like many manufacturers in a competitive 14:30:24
24 industry, they had some information about what was 14:30:27

46 (Pages 178 to 181)

Page 182

1  likely to be coming down the pike from their          14:30:29
2  competitors.                    14:30:32
3       That was not the case in respect      14:30:32
4  to the gray market. So in respect to the gray      14:30:35
5  market, the company was dealing with a new issue, it  14:30:33
6  was an issue that was increasing in magnitude,      14:30:38
7  increasing in importance, it was an issue that the    14:30:41
8  company was trying to understand and trying to gain  14:30:43
9  hold of. So given that, I think it was a        14:30:45
10  different -- it was a different scenario. Gray      14:30:50
11  marketing was simply different than competition was  14:30:53
12  prior to the IPO. And gray marketing, prior to the  14:30:58
13  IPO, was different than it was in October.        14:31:01
14      Q.  Was competition -- was the competition    14:31:16
15  that faced Adams Golf greater at the time of the IPO  14:31:21
16  than it was in Q4 1998?              14:31:25
17       MR. COLLINS: Outside the scope.      14:31:28
18  BY THE WITNESS:                  14:31:29
19      A.  I don't know.            14:31:29
20  BY MR. BESSETTE:                14:31:29
21      Q.  Okay. And relative to gray marketing,    14:31:33
22  was competition greater at the time of the IPO than  14:31:35
23  it was in Q4 1998?                14:31:44
24       MR. COLLINS: Outside the scope, vague  14:31:47

Page 183

1  and ambiguous.                    14:31:48
2  BY THE WITNESS:                  14:31:49
3      A.  Again, I don't know.          14:31:50
4  BY MR. BESSETTE:                  14:31:51
5      Q.  So as you sit here, you can't tell me    14:31:51
6  whether in relation with gray marketing, whether    14:31:54
7  competition was greater at the time of the IPO or in  14:31:58
8  Q4 1998?                    14:32:02
9       MR. COLLINS: Same objections. Asked    14:32:04
10  and answered.                  14:32:06
11  BY THE WITNESS:                  14:32:06
12      A.  That is not what I was asked to      14:32:07
13  analyze. It's not what I analyzed.          14:32:10
14  BY MR. BESSETTE:                14:32:11
15      Q.  Okay. And how about demand, demand    14:32:11
16  for the Tight Lies and demand for golf clubs      14:32:13
17  generally. As you sit here, do you know whether    14:32:18
18  demand for Adams Golf's Tight Lies was stronger at  14:32:20
19  the time of the IPO or Q4 '98?            14:32:26
20      A.  From reading the documents that I read  14:32:28
21  in connection with this litigation, I know the      14:32:31
22  demand dropped off.                14:32:33
23      Q.  When did it drop off?          14:32:34
24      A.  Again, from reviewing the documents,  14:32:36

Page 184

1  it looks like demand dropped off sometime during the  14:32:38
2  third and moving into the fourth quarter.        14:32:42
3      Q.  And do you know to what degree demand  14:32:44
4  dropped off in that time frame?            14:32:50
5       MR. COLLINS: Outside the scope.      14:32:52
6  BY THE WITNESS:                  14:32:52
7      A.  Not exactly, no.            14:32:54
8  BY MR. BESSETTE:                14:32:55
9      Q.  And it is your view, Professor, that    14:32:55
10  assuming demand did drop off in Q3 moving into Q4,  14:32:59
11  as you said, what impact that would have to Adams    14:33:05
12  Golf in relation to the impact gray marketing was    14:33:12
13  having to Adams Golf?              14:33:16
14       MR. COLLINS: Vague and ambiguous,    14:33:17
15  outside the scope.                14:33:20
16  BY MR. BESSETTE:                14:33:21
17      Q.  Do you understand the question?      14:33:21
18      A.  I think understand it. I will answer  14:33:23
19  what I think -- I will answer what I think I        14:33:25
20  understood the question to be. One of the        14:33:28
21  statements in my report that you have cited to      14:33:29
22  already is the one that occasionally that there are  14:33:31
23  times in which the only, quote, cure for a gray      14:33:36
24  market problem is a fall off in demand for the      14:33:40

Page 185

1  product itself. So there would be a relationship    14:33:44
2  there.                      14:33:46
3       So, for example, if you have got      14:33:46
4  declining demand, that may have an effect on the    14:33:47
5  desirability or the attractiveness of the product to  14:33:52
6  gray marketers.                  14:34:00
7      Q.  Are you aware that Mr. Adams testified  14:34:02
8  that the reason gray marketing had, in his view, for  14:34:13
9  the first time anyway, a material effect on the      14:34:19
10  company was in this October 1998 time frame        14:34:22
11  principally because demand had dropped off so      14:34:27
12  drastically? Do you remember reading that part of  14:34:32
13  his deposition testimony?              14:34:34
14       MR. COLLINS: Transcript speaks for    14:34:35
15  itself.                      14:34:37
16  BY THE WITNESS:                  14:34:37
17      A.  I do remember reading that part of his  14:34:38
18  testimony, yes.                  14:34:40
19  BY MR. BESSETTE:                14:34:41
20      Q.  Okay. Does that sound credible to    14:34:41
21  you?                      14:34:43
22       MR. COLLINS: Outside the scope.      14:34:43
23       Go ahead.              14:34:44
24

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

## Page 186

1  BY THE WITNESS:                    14:34:45
2      A.   Yeah. I mean, you are asking me to  14:34:45
3  assess whether Barney Adams is credible, whether his 14:34:4|
4  testimony is credible and I can't do that. But it  14:34:53
5  does make some degree of sense to me, that as demand 14:34:5|7
6  for the product dropped and as sales of the product  14:35:00
7  dropped, if you have got a gray market problem that  14:35:04
8  is staying stable or even if it is decreasing     14:35:07
9  slightly, the gray market problem could become    14:35:11
10 greater relative to overall sales.            14:35:14
11 BY MR. BESSETTE:                   14:35:18
12     Q.   In performing any of your work in this  14:35:18
13 case, have you made a determination that is    14:35:26
14 what happened in October or Q4 of 1998 at Adams  14:35:2|8
15 Golf?                        14:35:32
16         MR. COLLINS: Outside the scope.      14:35:32
17 BY THE WITNESS:                    14:35:36
18     A.   That what what's happened? Sorry.    14:35:36
19 BY MR. BESSETTE:                   14:35:37
20     Q.   Just what you said, that gray       14:35:37
21 marketing, whether it was constant or decreasing a  14:35:39
22 little, was going to have a bigger effect at Adams  14:35:42
23 Golf in that time frame, because the demand had    14:35:45
24 dropped off. In any of your work, have you looked  14:35:46

## Page 187

1  at that and made any conclusions or findings about  14:35:4|8
2  that?                        14:35:50
3         MR. COLLINS: Outside the scope.      14:35:51
4  BY THE WITNESS:                    14:35:52
5      A.   Yeah. Again, simply because I haven't 14:35:53
6  analyzed the company's sales protectory and I am not 14:35:5|46
7  an expert in that particularly, I wouldn't be     14:35:59
8  qualified to answer that question.           14:36:03
9  BY MR. BESSETTE:                   14:36:04
10     Q.   So I take it you didn't do that?     14:36:05
11     A.   I thought about it, but certainly not 14:36:07
12 to any level that I am willing to testify to here.  14:36:10
13     Q.   And it is not part of your opinion one 14:36:13
14 way or the other?                  14:36:16
15     A.   I don't believe so.             14:36:17
16         (Break taken.)      14:44:38
17 BY MR. BESSETTE:                   14:44:47
18     Q.   Let's see. Of your initial report 29  14:44:48
19 and 29A and 11 of the rebuttal. You have      14:44:53
20 Exhibit 167 in front of you. That's the road show  14:45:53
21 presentation I showed you earlier?           14:45:58
22     A.   Yes.                    14:45:59
23     Q.   And you say in Paragraph 11 of your  14:46:01
24 rebuttal that Adams emphasized the high retailer  14:46:05

## Page 188

1  profit margins built into its pricing policy?    14:46:13
2         MR. COLLINS: Well, mischaracterizes.  14:46:17
3  The document speaks for itself.            14:46:20
4         MR. BESSETTE: I am reading the     14:46:23
5  report.                       14:46:25
6         MR. COLLINS: It doesn't say         14:46:25
7  emphasize. That's the problem.
8         MR. BESSETTE: Sure it does.
9         MR. COLLINS: But there is certainly a
10 reference --
11         MR. BESSETTE: Paragraph 11 of the  14:46:26
12 rebuttal --                     14:46:26
13         MR. COLLINS: -- to boasted retail  14:46:27
14 margins of 31 percent, significantly higher than its 14:46:30
15 competitors.                    14:46:30
16         MR. BESSETTE: First paragraph, the  14:46:31
17 sentence before.                  14:46:32
18         THE WITNESS: The first line.      14:46:33
19         MR. COLLINS: The company's road show 14:46:3|5
20 presentation emphasized the high retailer profit  14:46:38
21 margin built into the pricing policy.         14:46:42
22         MR. BESSETTE: Good. Thank you.    14:46:42
23         MR. COLLINS: My pleasure.         14:46:48
24

## Page 189

1  BY MR. BESSETTE:                   14:46:48
2      Q.   So boasted retail margins of 31      14:46:48
3  percent. Do you have the slide -- can you get 167?  14:46:5|8
4  Let's turn to that slide, which you cite page 29.  14:46:58
5      A.   Okay.                   14:47:10
6      Q.   Isn't that slide simply saying,      14:47:11
7  Professor, that Adams offers higher retail margins  14:47:1|6
8  for its fairway woods than its competitors?     14:47:21
9         MR. COLLINS: Did you say offers?    14:47:27
10         MR. BESSETTE: Uh-huh.          14:47:34
11 BY THE WITNESS:                    14:47:35
12     A.   Can you ask the question again?     14:47:36
13 BY MR. BESSETTE:                   14:47:38
14     Q.   Yeah. Isn't that slide simply saying 14:47:39
15 that Adams offers higher retail margins for its    14:47:41
16 fairway woods than its competitors?          14:47:46
17     A.   Well, it does a number of other things 14:47:48
18 as well. But among the things it does, it states  14:47:49
19 that it offers higher profit margins for its     14:47:52
20 retailers than its competitors, yes.          14:47:55
21     Q.   Do you know what the average retailer 14:47:58
22 margin across all different kinds of clubs was for  14:48:02
23 Adams in each of its competitors?           14:48:06
24     A.   I don't. At least if it's -- let me  14:48:11

48 (Pages 186 to 189)

Page 190

1  sort of come back to the answer. If you are asking  14:48:17
2  me if I know the average retail margin for the  14:48:20
3  entire golf industry, no, I don't know that.  14:48:24
4  Q.  Now, you said earlier, you testified  14:48:27
5  earlier today and I think it is in your report, that  14:48:33
6  one of the unique things about Adams's business  14:48:35
7  model that made it susceptible to gray marketers was  14:48:42
8  this high retail margin.  Do you remember that  14:48:49
9  testimony?  14:48:51
10  A.  Yes.  14:48:51
11  Q.  And is it your view that the high  14:48:51
12  retail margin as evidenced on that page of Exhibit  14:48:56
13  167 is what motivated Costco to get Adams Golf's  14:48:59
14  clubs and sell them in the gray market?  14:49:05
15  A.  There are a couple of things going on  14:49:09
16  in that question.  This is -- first of all, this is  14:49:09
17  not the only document in which the company talks  14:49:10
18  about its high retailer margins.  This is just the  14:49:10
19  only document in which it states exactly how high  14:49:14
20  that margin was.  14:49:16
21  And then to address the second  14:49:17
22  part of your question, whether a high retailer  14:49:18
23  margin is attractive to gray marketers, the answer  14:49:21
24  is yes, but it was not the only business  14:49:26

Page 191

1  characteristic of Adams that made it attractive to  14:49:28
2  gray marketers.  14:49:32
3  Q.  But I am not talking about gray  14:49:33
4  marketing generally, I am talking about Costco  14:49:36
5  getting the Tight Lies.  Okay?  14:49:37
6  A.  Yeah.  14:49:37
7  Q.  Is it your testimony that Costco  14:49:38
8  wanted the Tight Lies because of the higher retail  14:49:41
9  margin?  14:49:45
10  A.  That would not be the reason they  14:49:46
11  would want the clubs.  It would just create an  14:49:47
12  opportunity for them to buy and sell the clubs.  14:49:51
13  Q.  In your opinion, Professor, if the  14:49:53
14  margin was zero, the Tight Lies was as hot as it was  14:49:55
15  in 1998, would Costco still want to get the club and  14:50:01
16  sell it?  14:50:05
17  MR. COLLINS:  Okay.  Go ahead.  14:50:06
18  BY THE WITNESS:  14:50:08
19  A.  I don't think Costco cares how much  14:50:09
20  the authorized retailers profit margin is.  14:50:13
21  BY MR. BESSETTE:  14:50:16
22  Q.  Exactly.  So because Tight Lies was a  14:50:16
23  hot product, Costco wanted to sell it, if for no  14:50:22
24  other reason than to have a loss leader in their  14:50:22

Page 192

1  store?  14:50:22
2  MR. COLLINS:  Calls for speculation.  14:50:22
3  Go ahead.  14:50:22
4  BY THE WITNESS:  14:50:23
5  A.  It is a separate -- that's a separate  14:50:23
6  issue altogether.  So you are asking whether Costco  14:50:25
7  wanted the clubs because they offered a higher  14:50:29
8  profit margin to the retailers, Costco was not --  14:50:34
9  didn't stand to gain any of that margin itself.  So  14:50:38
10  it doesn't care what does or doesn't happen to the  14:50:41
11  authorized retailer.  So that's the answer to that  14:50:45
12  question.  14:50:49
13  And then your second question, can  14:50:50
14  you --  14:50:50
15  BY MR. BESSETTE:  14:50:51
16  Q.  Well, I guess I am trying to  14:50:51
17  understand.  You state in your report that a high  14:50:53
18  retail margin, I guess in a general sense, attracts  14:50:56
19  gray marketers.  I am trying to bring it down to  14:51:00
20  this case and we have got Costco.  14:51:02
21  A.  Sure.  Sure.  14:51:05
22  Q.  Okay.  Was the retail margin any  14:51:05
23  reason why Costco wanted to acquire the clubs and  14:51:07
24  sell them in their stores?  14:51:11

Page 193

1  MR. COLLINS:  Asked and answered, also  14:51:12
2  outside the scope.  Which I can explain to you, if  14:51:13
3  that would be helpful, but otherwise, go ahead and  14:51:16
4  answer.  14:51:19
5  BY THE WITNESS:  14:51:19
6  A.  So just to explain to you how -- what  14:51:19
7  role the higher profit margin plays.  The higher  14:51:21
8  profit margin doesn't make the clubs themselves  14:51:27
9  particularly attractive to Costco, or didn't make  14:51:29
10  the clubs themselves particularly attractive to  14:51:31
11  Costco.  There were other factors that made the  14:51:34
12  clubs themselves particularly attractive, like the  14:51:37
13  fact that they were a hot product.  The pricing  14:51:38
14  strategy, the high retailer margin, simply created  14:51:41
15  an opportunity for arbitrage to occur, allowing  14:51:44
16  Costco to take advantage of that high profit margin,  14:51:48
17  allowing them to accumulate the clubs and sell them.  14:51:50
18  Q.  What arbitrage are you talking about?  14:51:53
19  Who is arbitraging?  14:51:53
20  MR. COLLINS:  Asked and answered.  14:51:53
21  BY THE WITNESS:  14:51:55
22  A.  Costco and whoever was selling to  14:51:55
23  them.  I can explain if you would like.  14:51:59
24  14:51:59

49 (Pages 190 to 193)

Page 194

1  BY MR. BESSETTE:                    14:52:09
2      Q.   Yeah, please.              14:52:09
3      A.   Okay.  So if you have a high profit   14:52:10
4  margin for the retailer, that allows the retailer to  14:52:14
5  accumulate not just the clubs it intends to sell   14:52:18
6  through its own outlet, but also it creates the   14:52:21
7  opportunity for a retailer to purchase clubs that it  14:52:25
8  knows it may not have the capacity to sell on to a   14:52:29
9  particular individuals, but rather to buy so many   14:52:33
10  clubs that they can, A, cover their entire   14:52:37
11  individual consumer base, and also have a mass of   14:52:40
12  clubs to sell to Costco at a lower profit perhaps,   14:52:44
13  but still a relatively high profit.        14:52:49
14      Q.   Well, the degree of the profit margin,   14:52:54
15  how does that have any impact in that scenario?  I   14:52:58
16  mean, if a retailer is going to have a profit margin   14:53:01
17  whether it sells it to its own user base or to   14:53:05
18  Costco, what does it matter?          14:53:11
19      A.   Ask the question again, I'm sorry.   14:53:27
20          MR. BESSETTE:  Can you repeat it,   14:53:27
21  please?                             14:53:27
22          (Record read.)             14:53:27
23  BY THE WITNESS:                     14:53:27
24      A.   The retailer simply wants to have a   14:53:27

Page 195

1  profit margin.  So if it can have a very high, a   14:53:30
2  31 percent profit margin from a sale to an   14:53:34
3  individual, that's wonderful for the retailer.  But   14:53:37
4  if it has to take say, and here I am speculating,   14:53:40
5  but say a 12 percent profit margin, as long as it   14:53:44
6  can cover its cost and still make a profit, the   14:53:47
7  authorized retailer probably doesn't care whether he   14:53:50
8  is getting that profit from individuals, with the   14:53:54
9  exception of the fact that he gets a higher profit   14:53:57
10  margin from selling to individuals, or whether he   14:53:59
11  gets it from Costco, as long as he is still getting   14:54:04
12  a profit margin when he sells to Costco.   14:54:04
13  BY MR. BESSETTE:                    14:54:06
14      Q.   The difference between, who is it   14:54:06
15  TaylorMade the profit margin for Adams Golf, was it   14:54:08
16  TaylorMade 31 or 26, is that significant in your   14:54:13
17  mind creating arbitrage opportunities?  Did it   14:54:16
18  create arbitrage opportunities in this case??   14:54:21
19          MR. COLLINS:  Could you say it again?   14:54:25
20  BY MR. BESSETTE:                    14:54:26
21      Q.   Did the difference between Adams   14:54:27
22  Golf's profit margin and TaylorMade's profit margin   14:54:30
23  create arbitrage opportunities that resulted in gray   14:54:34
24  market sales in this case, do you know?   14:54:38

Page 196

1          MR. COLLINS:  Calls for speculation,   14:54:40
2  outside the scope.                  14:54:40
3          You may answer.            14:54:40
4  BY THE WITNESS:                     14:54:40
5      A.   I don't know about TaylorMade in   14:54:42
6  particular and the gray market problems that   14:54:44
7  TaylorMade was or was not experiencing at the time   14:54:47
8  of the IPO or prior to it or even after it.  And   14:54:49
9  frankly, the only relevance that TaylorMade has in   14:54:51
10  relation to Adams' retailer margins is that it was   14:54:57
11  -- that there was a significant gap between Adams   14:55:02
12  and its competitors in terms of the retail margin   14:55:05
13  that it was offering, in this sense.      14:55:10
14          TaylorMade's profit margins also   14:55:12
15  seems pretty high to me.  It's very possible that   14:55:15
16  that also created enough space for arbitrage to   14:55:19
17  occur, so there was enough space for the gray   14:55:20
18  marketers to cover the additional costs involved   14:55:21
19  with the channeling through unauthorized   14:55:24
20  distribution channels of the product.  But with a   14:55:29
21  5 percent greater retailer margin, there was simply   14:55:31
22  more space for that to occur.          14:55:35
23  BY MR. BESSETTE:                    14:55:38
24      Q.   You are just speculating, are you not,   14:55:38

Page 197

1  that the retail profit margin that was available   14:55:42
2  from the Tight Lies had anything to do with the   14:55:45
3  sales being diverted by authorized retailers to   14:55:48
4  Costco and then clubs being sold in Costco?   14:55:54
5      A.   No, I am not speculating about that.   14:55:54
6      Q.   Do you have proof?          14:55:57
7      A.   Yes.                       14:55:59
8      Q.   What is the proof?          14:55:59
9      A.   I am not remembering the exhibit at   14:56:01
10  the moment, but there was an exhibit, an internal   14:56:02
11  memo in which the company devised a pricing policy   14:56:03
12  for Canada -- in which the company devised a pricing   14:56:13
13  policy for Canada, which was going to decrease   14:56:14
14  profit margins and was to remain in place until -- I   14:56:15
15  think it said something like until the prices are no   14:56:20
16  longer attractive to gray marketers, or something   14:56:21
17  like that.                          14:56:26
18      Q.   Right.  That's in front of you.   14:56:27
19  That's the pricing policy we talked about to deal   14:56:30
20  with the problem.  My question to you was, do you   14:56:32
21  have proof that the retail margin that you talked   14:56:36
22  about which made the company, in your words, so   14:56:39
23  unique that it would be attractive to gray marketers   14:56:42
24  actually caused any of the sales that came from   14:56:42

50  (Pages 194 to 197)

Page 198

```
1   Costco?                          14:56:47
2      A.  Yes.  And again, I will point to that  14:56:47
3   same memo, which I don't think I've seen yet today.  14:56:50
4   And this is how.  The company was in a very good  14:56:53
5   position to assess the causes of its own gray market  14:56:58
6   problem once it started to occur.  And when it tried  14:57:02
7   to do that, one of the first places that it looked  14:57:04
8   was its pricing policy.  I believe the company's own  14:57:07
9   assessment of what was causing its own gray market  14:57:10
10  problem speaks for itself.                14:57:13
11     Q.  So, okay.  And in that document, did  14:57:16
12  the company indicate just what you have said, that  14:57:17
13  it looked at the cause and it was trying to deal  14:57:21
14  with the cause of gray marketing and one of the  14:57:24
15  causes was its retail pricing?            14:57:27
16         MR. COLLINS:  Vague and ambiguous.  14:57:29
17  BY MR. BESSETTE:                          14:57:29
18     Q.  Is that your recollection?        14:57:29
19         MR. COLLINS:  Vague and ambiguous,  14:57:31
20  speaks for itself.                       14:57:31
21         Go ahead.                         14:57:32
22  BY THE WITNESS:                           14:57:32
23     A.  My recollection of that document was  14:57:33
24  not that it spoke about the causes.  What it spoke  14:57:36
```

Page 199

```
1   about was the proactive steps the company was using  14:57:40
2   in order to try to stem gray marketing in the  14:57:44
3   future.  One would assume or hope, at least, that  14:57:47
4   Adams was putting its best foot forward in that  14:57:50
5   respect, and in devising strategies to try to  14:57:55
6   minimize gray marketing in the future, it was trying  14:58:01
7   to get to the causes of its gray market activity.  14:58:01
8   BY MR. BESSETTE:                          14:58:04
9      Q.  But you are just assuming that, are  14:58:04
10  you not?                  14:58:06
11         MR. COLLINS:  Asked and answered.  14:58:07
12  BY THE WITNESS:                           14:58:08
13     A.  Again, like I said, I don't know the  14:58:08
14  company's internal process, but I do assume that if  14:58:12
15  the company is taking the time to devise a new  14:58:15
16  pricing policy which is going to adversely effect  14:58:18
17  the company as well, that it wouldn't do so -- it  14:58:22
18  wouldn't do so without cause.  So it would do so in  14:58:29
19  honest and earnest attempts to actually be trying to  14:58:33
20  stem its gray market problem, trying to get at a  14:58:36
21  real cause of its gray market problem.    14:58:39
22  BY MR. BESSETTE:                          14:58:40
23     Q.  Wasn't it just as likely that it was  14:58:40
24  just trying to fix the problem and that was one way  14:58:43
```

Page 200

```
1   it thought it could at least alleviate the harm to  14:58:44
2   its retailers?                14:58:48
3      A.  In fact, I think that's exactly what  14:58:48
4   I'm trying to say.  It is trying to fix the problem.  14:58:48
5   The way you fix the problem is by spotting its  14:58:50
6   causes and trying to alleviate the causes.  And I  14:58:54
7   think that's what the company was trying to do.  14:58:57
8      Q.  So you draw from that memo that one of  14:58:57
9   the causes of the gray marketing was a high retail  14:59:00
10  margin?                          14:59:03
11     A.  Yes.                     14:59:03
12     Q.  And is there --              14:59:05
13         MR. COLLINS:  Excuse me.  Are you  14:59:05
14  finished?                        14:59:05
15         THE WITNESS:  I didn't finish.  14:59:05
16  BY THE WITNESS:                           14:59:05
17     A.  From that memo, together with other  14:59:08
18  documents.                       14:59:10
19  BY MR. BESSETTE:                          14:59:10
20     Q.  Okay.  What are the other documents?  14:59:11
21     A.  Okay.  For example, if I had seen that  14:59:12
22  memo and that was the company's strategy, and I knew  14:59:14
23  the company had, just to give a hypothetical, a  14:59:17
24  .05 percent retailer profit margin and it was  14:59:21
```

Page 201

```
1   significantly lower than all of its competitors,  14:59:25
2   then I would think it was an odd strategy.  14:59:28
3      Q.  Well, my question was, what other  14:59:30
4   documents beside the pricing policy memo leads you  14:59:33
5   to the conclusion that retail pricing and retail  14:59:36
6   margin was a cause of gray marketing for Adams Golf?  14:59:41
7          MR. COLLINS:  Asked and answered.  14:59:45
8   We've had a lot of answers along that line.  14:59:50
9          Go ahead.                       14:59:50
10         MR. BESSETTE:  I haven't heard any  14:59:50
11  other documents.  I apologize if you've said them.  14:59:50
12  BY MR. BESSETTE:                          14:59:50
13     Q.  Besides that memo, what other  14:59:51
14  documents?                      14:59:53
15     A.  What other documents do I believe -- I  14:59:53
16  am sorry.                 14:59:58
17     Q.  You said that that document, along  14:59:58
18  with others, leads you to the conclusion that the  15:00:00
19  retail margin caused the gray marketing in Adams  15:00:04
20  Golf at least in part.  What other documents?  15:00:09
21     A.  Okay, okay.  So in addition to that  15:00:11
22  document, there is the road trip document, which we  15:00:12
23  were just talking about, which outlines very clearly  15:00:15
24  Adams' high retail -- the retail profit margin that  15:00:17
```

Page 202

1 Adams presented to its retailers. And in addition, 15:00:21
2 there is an awful lot in the academic literature as 15:00:25
3 well about profit margins being an invitation to 15:00:25
4 gray marketers. 15:00:32
5    Q.   Okay. I understand the academic 15:00:32
6 literature. I see the chart and the road show 15:00:37
7 documents showing the retail margin. And then you 15:00:38
8 have got the document you are talking about where 15:00:39
9 the company provided a new policy for Canada, for 15:00:41
10 certain retailers in Canada that were effected where 15:00:46
11 they got a credit, okay. 15:00:49
12       Any other documents that you are 15:00:51
13 referring to that, in your mind, lead to the 15:00:52
14 conclusion that the pricing margin or the retail 15:00:55
15 margin caused some of the gray marketing? 15:00:58
16    A.   At the moment, no. At the moment, I 15:01:01
17 don't recall is what I meant to say. 15:01:09
18    Q.   I believe you said somewhere, probably 15:01:11
19 in your rebuttal report, yeah, I think you said that 15:01:19
20 that information about retail margins was omitted 15:01:24
21 from the prospectus? 15:01:27
22    A.   Yes. 15:01:29
23    Q.   Is it your -- do you have any basis to 15:01:29
24 conclude that it should have been in the prospectus? 15:01:33

Page 203

1    A.   Yes. 15:01:36
2    Q.   Really? What is your basis? 15:01:36
3    A.   I think in order to understand the 15:01:39
4 risks that Adams was facing with respect to the gray 15:01:44
5 market, there was a lot of missing information. 15:01:47
6 There was the information about the gray market 15:01:50
7 problem that was presenting itself at Adams, and 15:01:52
8 there was also, although in the prospectus the 15:01:56
9 company did state that it wanted to maintain -- I'm 15:01:59
10 not actually sure if it said it wanted to maintain 15:02:03
11 profit margins, or whether it said that it couldn't 15:02:03
12 guarantee the profit margins would be maintained. 15:02:08
13 But in order to understand that statement fully, one 15:02:10
14 would have to know -- one would have to know of the 15:02:18
15 potential threats to that profit margin that existed 15:02:18
16 for the company at the time. 15:02:22
17    Q.   What is that based on, Professor? 15:02:24
18 What is your conclusion that that information was 15:02:28
19 required to be put in the prospectus? 15:02:32
20    A.   Again, absent any disclosure about the 15:02:37
21 company's gray market problem. Information about -- 15:02:42
22 the information that was contained in the prospectus 15:02:47
23 about the company's profit margins or the retailer 15:02:50
24 profit margins that it offered, were very difficult 15:02:53

Page 204

1 to understand, and certainly very difficult to 15:02:56
2 understand fully, especially if one is trying to see 15:03:00
3 if there is any threats to that profit margin. 15:03:03
4    Q.   So you are saying besides saying that 15:03:06
5 the company is going to try to maintain profit 15:03:09
6 margins, but it very well may not, and there is a 15:03:11
7 risk that those margins will decline, something more 15:03:15
8 needed to be disclosed? 15:03:20
9    A.   Absolutely. 15:03:21
10    Q.   You are not saying based on some legal 15:03:23
11 requirement or some knowledge you have with respect 15:03:25
12 to SEC disclosure, right? This is based on your 15:03:27
13 gray marketing expertise? 15:03:30
14    A.   Yes, yes. 15:03:32
15    Q.   Okay. 21D of your report. At the 15:03:32
16 bottom of that page, you say, "The close correlation 15:04:28
17 between increasing gray market sales and decreasing 15:04:34
18 authorized sales, therefore, strongly suggests that 15:04:37
19 the damage to Adams' name of the Tight Lies brand 15:04:40
20 resulting from the gray market was great immediately 15:04:43
21 after the company's IPO," or initial public 15:04:46
22 offering. What do you mean in that sentence by 15:04:49
23 correlation? 15:04:53
24    A.   Let me read the paragraph. 15:04:53

Page 205

1       There was a negative correlation. 15:05:52
2 The sales were decreasing. Gray market sales were 15:05:54
3 increasing. 15:05:58
4    Q.   So what do you mean by correlation? 15:05:58
5 How do you use the word "correlation" in that 15:06:00
6 sentence? 15:06:03
7    A.   There was a relationship between the 15:06:04
8 two. 15:06:05
9    Q.   Do you understand the difference 15:06:05
10 between a correlation and causation? 15:06:07
11    A.   Yes. 15:06:09
12    Q.   Can you explain that to me? 15:06:09
13    A.   Well, for those who use this language, 15:06:14
14 it seems pretty -- so causation is -- there is you 15:06:16
15 have got a factor occurring and it is the cause of 15:06:20
16 another factor that is occurring. That is a causal 15:06:23
17 relationship. A correlation is two things happening 15:06:28
18 at the same time. 15:06:31
19    Q.   Okay. Because they are correlated, 15:06:32
20 they could be unrelated. I mean, they are not 15:06:38
21 causative? 15:06:41
22    A.   It's possible that they are unrelated. 15:06:42
23    Q.   All right. Could be causative, could 15:06:42
24 not? 15:06:42

52  (Pages 202 to 205)

Page 206

1    A.  Sorry.  Let me rephrase that.    15:06:47
2        MR. COLLINS:  And before you do, I    15:06:47
3  object to causation as outside the scope.    15:06:47
4        Go ahead.    15:06:49
5  BY THE WITNESS:    15:06:49
6    A.  Yeah.  It is possible that they are --    15:06:50
7  it is possible that one is not the cause for the    15:06:53
8  other.    15:06:55
9  BY MR. BESSETTE:    15:06:56
10   Q.  Okay.  And what is the basis for your    15:06:57
11 assumption or observation, whichever it is, of    15:06:58
12 decreasing authorized sales?    15:07:02
13   A.  The -- you said what is the basis for    15:07:07
14 my assumption about decreasing authorized sales?    15:07:
15   Q.  Yes.    15:07:17
16   A.  The company's sales figures, particularly    15:07:18
17 sales figures.    15:07:24
18   Q.  So which sales figures are you talking    15:07:25
19 about, which quarters?    15:07:28
20   A.  The second, third and fourth.    15:07:29
21   Q.  So when were sales decreasing?    15:07:31
22   A.  Sales started to decrease in the third    15:07:35
23 quarter and continued in the fourth.    15:07:38
24   Q.  So were there decreasing authorized    15:07:41

Page 207

1  sales prior to the IPO?    15:07:43
2    A.  I don't believe so, no.  It's hard to    15:07:45
3  say actually, because the IPO happened in the middle    15:07:50
4  of the third quarter -- or during the third quarter.    15:07:54
5  So it is actually hard to really separate that out    15:07:56
6  cleanly.    15:07:58
7    Q.  Well, then why don't we do it as of    15:07:58
8  the end of June.  Were there decreased authorized    15:08:00
9  sales in Q2?    15:08:03
10       MR. COLLINS:  I think asked and    15:08:05
11 answered, but go ahead.    15:08:07
12 BY THE WITNESS:    15:08:08
13   A.  No.    15:08:08
14 BY MR. BESSETTE:    15:08:10
15   Q.  Are you saying here, just to be clear,    15:08:19
16 I guess that -- well, strike that.    15:08:21
17       You are not saying in this    15:08:26
18 paragraph, are you, Professor, that increasing gray    15:08:28
19 market sales prior to the IPO was causing decreased    15:08:31
20 authorized sales prior to or shortly after the IPO?    15:08:35
21   A.  No.  I am not opining as to causation.    15:08:39
22   Q.  When we were talking about that    15:08:45
23 pricing policy change, in fact, I -- well, strike    15:08:59
24 that.    15:08:59

Page 208

1        Let me strike my reference to an    15:09:04
2  earlier document, but Paragraph 14 of your rebuttal,    15:09:06
3  you say that a Web Street Golf report -- I think    15:09:13
4  it's supposed to be Wall Street.  Sorry.    15:09:24
5    A.  It is supposed to be Web Street.    15:09:24
6    Q.  Is it Web Street?  Oh, it says Web    15:09:27
7  Street.    15:09:27
8    A.  Yeah.    15:09:27
9    Q.  Is it different than the Wall Street    15:09:28
10 one in the paragraph above?    15:09:30
11   A.  That should say Web Street.    15:09:31
12   Q.  Oh, oh.  I see.  All right.    15:09:34
13       So the report dated March 22, 1999    15:09:34
14 reports that Adams had adopted a new retail pricing    15:09:38
15 structure in order to combat the gray market sale of    15:09:42
16 its clubs.  Do you know, as you sit here, know for a    15:09:47
17 fact what factors influenced Adams Golf's decision    15:09:47
18 to change its pricing policy at that time?    15:09:50
19   A.  I couldn't tell you that I know all of    15:09:50
20 the factors with complete assurance.    15:09:57
21   Q.  Do you know any of them?    15:10:00
22   A.  Yes.    15:10:03
23   Q.  Which ones?    15:10:04
24   A.  The gray market.    15:10:05

Page 209

1    Q.  And how do you know that?    15:10:09
2    A.  I know it from a couple of different    15:10:10
3  sources.  One would be the Web Street golfers    15:10:15
4  report, which I cite, which I believe also contained    15:10:18
5  pieces of interviews with Barney Adams.  And then in    15:10:24
6  addition, there was the pricing strategies the    15:10:29
7  company was undertaking, the internal company    15:10:33
8  documents in which the company talks about pricing    15:10:38
9  strategies I believe also refer to the gray market.    15:10:41
10   Q.  Is it your testimony that Barney Adams    15:10:44
11 testified that the new retail pricing structure had    15:10:47
12 something to do with gray marketing?    15:10:51
13   A.  No.    15:10:53
14   Q.  Then I misunderstood.  You mentioned    15:10:53
15 Mr. Adams' testimony.  What you did mean?    15:10:58
16   A.  I didn't.  I said I believe that Web    15:11:00
17 Street Golf report also included interviews with    15:11:04
18 Barney Adams.    15:11:06
19   Q.  Okay.  And what about those interviews    15:11:08
20 support your conclusion that the pricing structure    15:11:10
21 change had anything to do with gray market?    15:11:14
22   A.  The Web Street Golf report covered a    15:11:16
23 number of issues.  The pricing structure was one of    15:11:19
24 them.  And when the Web Street Golf report said that    15:11:22

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

## Page 210

1  it adopted the retail pricing structure in order to  15:11:25
2  combat the gray market. That was, in part, I  15:11:29
3  believe as a result of the conversations the Web  15:11:34
4  Street Golf report reporter had with Barney Adams.  15:11:38
5      Q.   Did they say that or are you just  15:11:40
6  assuming that?  15:11:43
7          MR. COLLINS: Speaks for itself.  15:11:44
8  BY THE WITNESS:  15:11:45
9      A.   I am assuming that in the same way  15:11:45
10 that a reader would assume.  15:11:48
11 BY MR. BESSETTE:  15:11:50
12     Q.   So you assumed that, is that right?  15:11:50
13     A.   Yes.  15:11:52
14     Q.   Did Adams Golf, to your knowledge,  15:11:53
15 take into consideration any decreased consumer  15:12:01
16 demand or increased competitive pressures when it  15:12:06
17 made the decision to have the new retail pricing  15:12:11
18 structure?  15:12:14
19     A.   I don't know.  15:12:14
20     Q.   Did that factor into your opinions in  15:12:15
21 any way?  15:12:18
22     A.   Because I don't know, then no.  15:12:18
23     Q.   Well, you say in that paragraph that  15:12:20
24 this new pricing policy is illustrative of the  15:12:39

## Page 211

1  significant damage a company can suffer from gray  15:12:39
2  market activity. What is your proof that the  15:12:45
3  pricing policy was related to gray marketing?  15:12:46
4          MR. COLLINS: Asked and answered.  15:12:50
5  BY MR. BESSETTE:  15:12:52
6      Q.   Is it simply the report that you cite  15:12:52
7  in that paragraph?  15:12:55
8          MR. COLLINS: Asked and answered.  15:12:55
9  BY THE WITNESS:  15:12:57
10     A.   No. As I stated earlier, it is also  15:12:57
11 the result of reading internal company memos at the  15:12:59
12 time that the company was devising these pricing  15:13:03
13 policies. And in many cases, those memos talk both  15:13:05
14 about pricing policies and gray marketing.  15:13:10
15 BY MR. BESSETTE:  15:13:12
16     Q.   What date? What memos are you talking  15:13:12
17 about?  15:13:15
18     A.   I am not recalling exactly right now.  15:13:15
19 But, for example, one of the documents we have  15:13:17
20 already talked about is a document in which the  15:13:19
21 company was adopting a new pricing policy for Canada  15:13:21
22 in which the company official -- and I don't  15:13:24
23 remember who wrote the memo right now, it might have  15:13:27
24 been Chris Beebe, but I'm not sure -- states that  15:13:31

## Page 212

1  that policy is to remain in place until the gray  15:13:33
2  market problem is alleviated, or something like  15:13:37
3  that. I don't want to misquote it, but it was  15:13:37
4  something like that.  15:13:41
5      Q.   So is it your testimony that the  15:13:41
6  pricing policy instituted in Canada in June of 1998  15:13:44
7  was related in some way to the pricing policy change  15:13:50
8  across the board in January of 1999?  15:13:55
9      A.   Yes.  15:13:58
10         MR. COLLINS: That question  15:13:59
11 mischaracterizes the record.  15:14:00
12         Go ahead.  15:14:02
13 BY THE WITNESS:  15:14:03
14     A.   Yes.  15:14:03
15 BY MR. BESSETTE:  15:14:04
16     Q.   Okay. And what is your basis for that  15:14:04
17 conclusion?  15:14:06
18     A.   Again, there is another internal  15:14:06
19 company memo I believe in which the company  15:14:1
20 describes its short-term and long-term efforts to  15:14:13
21 deal with its gray market problem.  15:14:17
22     Q.   I am sorry? Again, you are falling  15:14:20
23 back on academic literature?  15:14:24
24     A.   No, no, no. Those are internal  15:14:27

## Page 213

1  company memos.  15:14:28
2      Q.   That say what?  15:14:29
3      A.   That say -- in which the company is  15:14:30
4  talking -- I think I believe it was well after the  15:14:32
5  IPO. And I am remembering, and I may be incorrect  15:14:35
6  about what I am remembering, but I believe it was  15:14:40
7  Barney Adams detailing what it was that the company  15:14:43
8  had done in response to gray marketing, and he talks  15:14:46
9  about a short-term effort the company made in  15:14:48
10 devising a pricing policy for Canada. It talks  15:14:50
11 about a longer term policy in which the company  15:14:53
12 revises pricing policy altogether I believe both in  15:14:58
13 Canada and the United States. And that memo was  15:15:0
14 clear that the company was doing so in response to  15:15:06
15 its gray market problem.  15:15:09
16     Q.   Okay. I will have to try to find that  15:15:11
17 one.  15:15:22
18         Let me show you, Professor, what  15:16:36
19 has been marked as Exhibit 17. I am trying just to  15:16:38
20 figure out what you are referring to. Is that  15:16:43
21 letter to Adams' retailers dated January 4, 1999 the  15:16:46
22 document you were referring to?  15:16:53
23     A.   I don't think so.  15:17:51
24     Q.   Did you cite it in your reports  15:17:55

Page 214

```
1   anywhere?                              15:18:00
2        MR. COLLINS: Speak for themselves.  15:18:01
3   BY THE WITNESS:                        15:18:03
4     A.   I don't recall.                 15:18:04
5   BY MR. BESSETTE:                       15:18:04
6     Q.   Well, you reviewed it I guess in  15:18:05
7   connection with your work in this case, so is it  15:18:07
8   detailed somewhere in your reports?    15:18:09
9        MR. COLLINS: She just said she    15:18:11
10  doesn't know.                          15:18:14
11  BY THE WITNESS:                        15:18:14
12    A.   I don't recall. I reviewed a lot of  15:18:15
13  documents. I didn't cite them all.     15:18:17
14  BY MR. BESSETTE:                       15:18:19
15    Q.   Why didn't you cite them all, by the  15:18:19
16  way?                                   15:18:21
17    A.   My understanding is that there is some  15:18:21
18  limitation on the page limit of the report. If I  15:18:25
19  were to cite every document that I received, I can't  15:18:31
20  even imagine how long the report would have been.  15:18:34
21    Q.   What is this understanding of some  15:18:36
22  page limit?                            15:18:39
23    A.   It is my own understanding from  15:18:40
24  talking to people who have worked in litigation  15:18:43
```

Page 215

```
1   previously about what the standard practice is of  15:18:48
2   expert's reports.                      15:18:50
3     Q.   Well, how did you decide which  15:18:51
4   documents to include -- to include in your report  15:18:53
5   detailing which ones they were and which ones you  15:18:58
6   didn't? How did you decide which ones to include?  15:19:01
7     A.   I read them. I looked for all  15:19:03
8   documents that appeared to in any way touch on gray  15:19:05
9   marketing, specifically on the impact that gray  15:19:10
10  marketing was having on the company. I also looked  15:19:13
11  for documents that revealed information about the  15:19:16
12  company's business strategies and business model and  15:19:18
13  strategies for growth in order to be able to  15:19:22
14  determine whether or not the company was poised to  15:19:25
15  become -- to avail itself of the gray market.  15:19:28
16    Q.   Well, no, no. I am sorry. Maybe I  15:19:34
17  wasn't clear on my question.           15:19:37
18        My question is, you are required  15:19:38
19  to list the documents that you reviewed, whether you  15:19:40
20  relied on them or not.                 15:19:45
21    A.   Uh-huh.                         15:19:46
22    Q.   And maybe I am misunderstanding, but  15:19:47
23  what I am hearing is that you reviewed some  15:19:50
24  documents that you have not set forth in your  15:19:53
```

Page 216

```
1   report.                                15:19:55
2     A.   No, no.                         15:19:56
3     Q.   Okay.                           15:19:56
4     A.   No, no, no. I set forth all the  15:19:56
5   documents in my report early on in the report.  15:19:58
6     Q.   Okay.                           15:19:58
7     A.   There I stated that I have reviewed  15:20:02
8   all the exhibits that I received at that time. I  15:20:03
9   did not cite every one of those exhibits.  15:20:05
10    Q.   So the document is, according to your  15:20:08
11  report, has to be an exhibit in the deposition?  15:20:33
12    A.   Can you say that again?         15:20:37
13    Q.   Yeah. On page 4 of your report, this  15:20:39
14  is where you list the documents that you reviewed  15:20:43
15  and/or relied on, okay. And the first bullet is  15:20:45
16  depositions and transcripts and exhibits of all  15:20:54
17  deponents except plaintiffs. Then there are other  15:20:57
18  declarations in the Costco documents, a Callaway 10K  15:21:00
19  and an expert report from Alan Miller. So there are  15:21:04
20  no individual documents listed.        15:21:08
21        So my question is, since you don't  15:21:11
22  have any individual documents listed, and you don't  15:21:12
23  cite it anywhere individually in your report, I  15:21:16
24  suppose it has to be an exhibit to a deposition  15:21:18
```

Page 217

```
1   transcript, because otherwise you haven't listed all  15:21:20
2   the documents you have reviewed or relied on.  15:21:23
3     A.   My understanding of the exhibits that  15:21:25
4   I received was that they were all in connection with  15:21:27
5   deposition transcripts.                15:21:30
6     Q.   And that's what I asked you.      15:21:31
7        MR. COLLINS: That's what she       15:21:33
8   answered.                              15:21:36
9        MR. BESSETTE: I don't think I got an  15:21:36
10  answer before just now.                15:21:38
11       MR. COLLINS: Well, I am glad to tell  15:21:40
12  you, if this is helpful, that we gave her all the  15:21:41
13  deposition transcripts.                15:21:43
14       MR. BESSETTE: Okay. I just want  15:21:43
15  to --                                  15:21:43
16       MR. COLLINS: And all of the        15:21:44
17  deposition transcript exhibits. And I don't recall  15:21:45
18  any other documents -- I don't know of any documents  15:21:47
19  that we provided that aren't listed here.  15:21:48
20       MR. BESSETTE: Okay.               15:21:50
21  BY MR. BESSETTE:                        15:21:51
22    Q.   Now, go to page -- I'm sorry --   15:22:02
23  Paragraph 27 of your initial report. You say, low  15:22:04
24  sales force morale is another common effect of gray  15:22:19
```

55 (Pages 214 to 217)

## Page 218

1  market activity, and then you cite Barney Adams's  15:22:24
2  memo of August 14, which is Exhibit 57, where among  15:22:27
3  other comments, he states that the staff had very  15:22:32
4  low morale, including having no faith in their  15:22:37
5  management. Do you have any knowledge whether the  15:22:40
6  low morale that Mr. Adams is referring to in that  15:22:42
7  memo had anything to do with gray marketing?  15:22:45
8      A.  I don't. I thought it was interesting  15:22:48
9  that this is one of the common effects of gray  15:22:50
10  market activity, and it was, itself, present within  15:22:53
11  Adams Golf.  15:22:58
12      Q.  But you are not giving the opinion or  15:22:59
13  it is not part of your conclusion that there is a  15:23:02
14  cause and effect relationship between gray marketing  15:23:04
15  and a low morale?  15:23:08
16      A.  I am not making the opinion that it  15:23:09
17  necessarily caused the low morale.  15:23:13
18      Q.  Is it your opinion that it had  15:23:16
19  anything to do with the low morale?  15:23:18
20      A.  I don't know with certainty, no.  15:23:37
21      Q.  Do you know at all or are you just  15:23:46
22  speculating?  15:23:50
23          MR. COLLINS: Asked and answered.  15:23:50
24

## Page 219

1  BY THE WITNESS:  15:23:51
2      A.  There is a certain amount of  15:23:52
3  speculation, because I'll tell you the process that  15:23:53
4  I went through in seeing them. When I saw some of  15:23:55
5  the negative effects that gray market activity can  15:24:00
6  have on a company, one of them, which I wasn't sure  15:24:03
7  I would find, was low sales force morale. However,  15:24:07
8  in then reviewing the documents that I received, I  15:24:11
9  saw that, in fact, that was another problem that  15:24:14
10  Adams Golf was facing at the time. I thought that  15:24:20
11  was interesting.  15:24:26
12      Q.  Okay.  15:24:26
13      A.  And worth noting, since that is often  15:24:28
14  caused by the gray market.  15:24:31
15      Q.  Right. Okay. But it's speculation on  15:24:33
16  your part whether there is any cause and effect  15:24:35
17  relationship?  15:24:38
18      A.  Yes.  15:24:38
19      Q.  23A, last sentence. "The displeasure  15:24:38
20  Adams' authorized retailers felt with gray market  15:25:13
21  sales is well documented and described in part in  15:25:18
22  Paragraph 15A above." Which authorized retailers  15:25:22
23  were displeased with Adams, Professor?  15:25:26
24      A.  I wouldn't be able to tell you the  15:25:28

## Page 220

1  world, the universe of authorized retailers that  15:25:35
2  were displeased with Adams. The entire universe.  15:25:40
3      Q.  Tell me some.  15:25:44
4      A.  Okay. I can tell you that all the  15:25:45
5  retailers that sent complaints to Adams, in addition  15:25:46
6  to those that were represented by WDC Mackenzie when  15:25:49
7  they corresponded with Adams, and related to Adams  15:25:55
8  that authorized retailers in Canada were quite  15:25:58
9  displeased.  15:26:02
10      Q.  Okay. So we have Mackenzie as the  15:26:02
11  Canadian distributor, we have got six or seven  15:26:05
12  retailers that complain. And what else do we have?  15:26:09
13          MR. COLLINS: Asked and answered.  15:26:12
14  By THE WITNESS:  15:26:12
15      A.  We talked about that earlier in the  15:26:13
16  day. As far as written documentation, we have got  15:26:15
17  the communications between authorized retailers and  15:26:19
18  distributors and the company. And that's what we've  15:26:23
19  got.  15:26:25
20  BY MR. BESSETTE:  15:26:25
21      Q.  Okay.  15:26:25
22      A.  If I can just add to that response.  15:27:24
23  Just talking back to that earlier conversation, I  15:27:27
24  just want to make sure that it is clear that I am  15:27:28

## Page 221

1  referring to also having knowledge of the practice  15:27:32
2  of regional account coordinators going into the  15:27:35
3  field, having strong relationships with the  15:27:38
4  retailers. Especially after the gray market problem  15:27:41
5  arose, they were making trips into the fields to  15:27:43
6  work with authorized retailers. And so like I said,  15:27:46
7  and we talked about the speculative nature of this  15:27:50
8  as well, I could imagine that an awful lot of  15:27:53
9  unofficial complaints were made sort of in those  15:27:56
10  engagements.  15:28:00
11      Q.  Sure. Do you have any evidence of  15:28:01
12  any?  15:28:02
13      A.  No.  15:28:02
14      Q.  Okay. At Paragraph 19 and I think 21  15:28:03
15  of your report, and I don't know that you need to  15:28:09
16  refer to them, but you say, again, one of the other  15:28:14
17  things that make Adams Golf particularly vulnerable  15:28:16
18  to the gray market -- well, no. Strike that.  15:28:21
19          You actually say, citing Myers,  15:28:27
20  you say, problems can arise in the form of  15:28:31
21  ineffective pricing policies, which you talked  15:28:33
22  about, deteriorated distributor relationships, which  15:28:36
23  you talked about, low sales force morale, again,  15:28:40
24  which you've talked about, and poor customer  15:28:41

Page 222

```
1   service. Did Adams Golf suffer from poor customer   15:28:44
2   service, to your knowledge?                          15:28:49
3        A.   I don't know.                    15:28:49
4        Q.   You haven't seen any evidence of it?   15:28:49
5        A.   I would say the only evidence that I   15:28:52
6   might point to -- or evidence that I might point to   15:29:13
7   is the returned clubs, but no. Basically no.   15:29:17
8        Q.   6B of your rebuttal, last sentence.   15:29:21
9   You say, the company was devoting significant   15:29:52
10  manpower, profits and capital resources to its gray   15:29:56
11  market problem, leading up to and following its IPO.   15:29:59
12  You say initial public offering. Actually, in 29C   15:30:03
13  of your initial report, you say that -- you have the   15:30:20
14  same statement and you cite a four-person Costco   15:30:23
15  buster team as evidence.                   15:30:30
16       A.   Uh-huh.                           15:30:31
17       Q.   Is that right?                    15:30:32
18       A.   Yes.                             15:30:33
19       Q.   Okay. Is there any other support   15:30:33
20  other than that four-person Costco buster team to   15:30:42
21  support your conclusion that the company was   15:30:47
22  devoting significant manpower to its gray market   15:30:50
23  problem?                              15:30:54
24       A.   Certainly Barney Adams activities. I   15:30:54
```

Page 223

```
1   don't believe Barney Adams was part of the   15:30:58
2   four-person Costco buster team. There is evidence   15:31:00
3   in the documents that he was devoting quite a bit of   15:31:04
4   energy to the gray market problem.         15:31:08
5        Q.   When was that?                    15:31:09
6        A.   In memos that he wrote about the gray   15:31:10
7   market, right.                         15:31:14
8        Q.   Post IPO you are talking about? The   15:31:14
9   ones we looked at in October?            15:31:17
10       A.   Those, yes.                       15:31:18
11       Q.   Was he doing anything pre IPO that you   15:31:19
12  are aware of?                          15:31:22
13       A.   I detailed it in my rebuttal report.   15:31:23
14       Q.   Well, I think 6B of your rebuttal   15:31:31
15  report you make this statement with no cite. So   15:31:34
16  tell me the evidence that supports your conclusion   15:31:37
17  that the company was devoting significant -- let's   15:31:41
18  break it out -- significant manpower, profits and   15:31:44
19  capital resources to its gray market problem, let's   15:31:48
20  say leading up to the IPO, and then following the   15:31:51
21  IPO.                                  15:31:54
22       A.   Uh-huh.                           15:31:54
23       Q.   Okay?                            15:31:56
24       A.   Okay. Well, first, there is the   15:31:56
```

Page 224

```
1   evidence that we have already talked about, the   15:31:58
2   Costco buster team, for example, four-person Costco   15:32:03
3   buster team.                          15:32:06
4        Q.   I'm sorry, can I stop you? Because   15:32:06
5   that's post. Let's do it in -- let's go leading up   15:32:07
6   to, if we can start there.               15:32:09
7        A.   Sure. The Grace report I thought was   15:32:11
8   instructive in that respect.             15:32:13
9        Q.   Tell me how.                      15:32:14
10       A.   The Grace report details the        15:32:15
11  activities the company was undertaken in order to   15:32:17
12  combat its gray market problem.           15:32:21
13       Q.   Like what?                        15:32:23
14       A.   Let me look at the Grace report. For   15:32:24
15  example, on page 17 of the Grace report, there is a   15:33:05
16  lot here. We have got Chris Beebe traveling to   15:33:11
17  Canada to meet with WDC Mackenzie. We have got the   15:33:2
18  company monitoring orders from retailers and   15:33:31
19  distributors. We have got Beebe monitoring all   15:33:34
20  large orders. We have got Barney Adams sending   15:33:41
21  letters to suspected transshippers. We have got the   15:33:46
22  company, I don't know who, reviewing the company   15:33:51
23  sales policy to ensure what's called as tight as   15:33:53
24  possible redistribution restrictions. We have got   15:33:59
```

Page 225

```
1   Barney Adams himself writing to Costco demanding to   15:34:01
2   know the sources from which Costco obtained the   15:34:06
3   purported Adams clubs. We have got Barney Adams   15:34:06
4   leading the effort by Adams to further persuade   15:34:12
5   Costco to reveal their sources.          15:34:16
6        Q.   Is that all that you considered in --   15:34:18
7   well, actually, you know what, let me ask you this:   15:34:21
8   You wrote your report initially before seeing the   15:34:24
9   Grace report. What did you have in mind when you   15:34:27
10  said in your initial report the company was devoting   15:34:30
11  significant manpower, profits and capital resources   15:34:35
12  to its gray market problem leading up to the IPO,   15:34:35
13  let's start with?                      15:34:38
14       A.   I reviewed all of the exhibits that   15:34:38
15  Grace also reviewed and cited in drafting this part   15:34:41
16  of his report.                        15:34:46
17       Q.   Okay. And so what you just          15:34:46
18  articulated to me is what you considered to be   15:34:49
19  significant manpower, profits and capital resources   15:34:53
20  employed by Adams Golf to its gray marketing problem   15:34:56
21  leading up to the IPO?                   15:35:00
22       A.   The report goes on, but I stopped,   15:35:02
23  yes.                                  15:35:07
24       Q.   Well, give me everything.          15:35:07
```

57 (Pages 222 to 225)

## Page 226

1  A.  Okay.  In addition, we have got Mark  15:35:08
2  Gonsalves personally investigating the Costco issue  15:35:12
3  and traveling to Boise, Idaho.  And we have got the  15:35:14
4  company, I don't know who, investigating the  15:35:20
5  marketing of clubs as a possible way to enable the  15:35:22
6  identification of the clubs, identification of the  15:35:27
7  transshipper, the person who is gray marketing the  15:35:29
8  clubs.  And this part is unclear, but we have also  15:35:33
9  got the company at some point near the time of the  15:35:41
10  IPO marking its clubs with paint.  15:35:43
11  Q.  And so to cut this short, everything  15:35:50
12  that Mr. Grace has in his report about what the  15:35:54
13  company was doing pre IPO with respect to gray  15:35:56
14  marketing is what you mean when you say the company  15:35:59
15  was devoting significant manpower, profits and  15:36:02
16  capital resources to the gray market problem leading  15:36:05
17  up to the IPO?  15:36:06
18  A.  Significant manpower.  All of that  15:36:06
19  that we just talked about, in the Grace report,  15:36:10
20  details the manpower that was devoted to combating  15:36:12
21  the gray market leading up to the IPO.  15:36:18
22  Q.  Okay.  And then how about the profits  15:36:18
23  and capital resources part of your sentence?  Is  15:36:19
24  that separate?  15:36:22

## Page 227

1  A.  Yes.  15:36:22
2  Q.  Okay.  15:36:23
3  A.  The profits refers to the pricing  15:36:24
4  strategies that the company was employing.  And the  15:36:28
5  pricing strategies the company revised in reaction  15:36:31
6  to the gray market problem that it was facing.  15:36:34
7  The --  15:36:37
8  Q.  Well, let me stop you there.  What  15:36:37
9  dollar amount was that, do you know?  15:36:40
10  A.  I don't know.  15:36:42
11  Q.  How do you know it was significant?  15:36:42
12  A.  It was in place to combat the gray  15:36:44
13  market.  It was significant in that respect.  15:36:49
14  Q.  Oh.  So if it was 10, $20,000, that is  15:36:52
15  still significant to you?  15:36:54
16  A.  It was in respect to the gray market,  15:36:54
17  yes.  15:36:57
18  Q.  Okay.  All right.  Capital resources,  15:36:57
19  is there different capital resources?  15:37:00
20  A.  Yeah.  Capital resources there I was  15:37:03
21  referring specifically to infrastructure that the  15:37:04
22  company was having -- physical infrastructure the  15:37:07
23  company was having to put in place, like the  15:37:08
24  purchasing or the contemplation of purchasing the  15:37:11

## Page 228

1  serializing machine.  I don't know whether they  15:37:16
2  placed the order for the serializing machine before  15:37:18
3  or after the IPO.  15:37:20
4  Q.  Do you know about whether they talked  15:37:21
5  about it before the IPO?  15:37:23
6  A.  Yes.  15:37:24
7  Q.  Well, the serializing machine or just  15:37:25
8  putting numbers on clubs?  Do you know whether there  15:37:28
9  is a difference?  Or putting a marker on a club?  15:37:31
10  A.  Yes, there is a difference.  Right.  15:37:34
11  You can mark clubs in a number of ways.  The company  15:37:34
12  chose ultimately to do that through the purchase of  15:37:38
13  a serializing machine, a marking machine.  I've  15:37:42
14  never seen one of these machines.  I'm not sure how  15:37:42
15  they operate.  15:37:44
16  Q.  No.  I guess my question is, do you  15:37:44
17  know whether the company was talking sincerely about  15:37:48
18  obtaining a machine to serialize the clubs pre IPO?  15:37:50
19  A.  Yes.  15:37:54
20  Q.  What is your source for that?  15:37:54
21  A.  Again, I can tell you.  I don't know  15:37:57
22  the exact number.  There is an exhibit that  15:37:57
23  states -- that demonstrates that.  15:38:01
24  Q.  It's all right.  You don't have to  15:38:02

## Page 229

1  look for it.  15:38:08
2  MR. COLLINS:  We have to break soon.  15:38:08
3  We have got a few more minutes.  15:38:09
4  BY MR. BESSETTE:  15:38:30
5  Q.  Now, at Paragraph 13 of your initial  15:38:31
6  report you say problems can arise in the form of  15:38:34
7  ineffective pricing policies, and we sort of touched  15:39:02
8  on some of this before.  Pre IPO, did Adams suffer  15:39:05
9  from ineffective pricing policies in your view?  15:39:10
10  A.  I believe in Canada, yes.  15:39:11
11  Q.  And so it's the June 8th offering  15:39:13
12  credits to Mackenzie and its retailers who qualified  15:39:19
13  that to you as evidence of infective pricing policy  15:39:24
14  in Canada?  15:39:27
15  MR. COLLINS:  Mischaracterizes.  15:39:28
16  BY THE WITNESS:  15:39:29
17  A.  Yes.  15:39:30
18  BY MR. BESSETTE:  15:39:31
19  Q.  Any other example or any other basis?  15:39:31
20  MR. COLLINS:  Pre IPO?  15:39:33
21  MR. BESSETTE:  Yes.  15:39:33
22  BY THE WITNESS:  15:39:33
23  A.  Not that I am recalling at the moment.  15:39:35
24