# EXHIBIT B

# PART III

Page 230

BY MR. BESSETTE:    15:39:38

Q.    And just so I am clear, the    15:39:41
ineffectiveness of the pricing policy is    15:39:43
demonstrated by them offering a credit to combat    15:39:46
gray marketing to the extent it existed in Canada?    15:39:50

A.    The ineffective pricing policy --    15:39:53
ineffective pricing policy can mean all sorts of    15:39:56
things. Lowering profit margins can be one of    15:40:00
those -- one of those -- can be -- let me back up.    15:40:05
Lowering profit margins can be --    15:40:09
in the context in which a company relies on high    15:40:13
retailer profit margins can be seen as an    15:40:16
ineffective pricing policy, because the company    15:40:20
would hope to have a higher profit margin, if it    15:40:20
could offer one. And yes, the credit acted in    15:40:24
similar ways. Ineffective in the sense that the    15:40:28
company simply wasn't able to profit as much as it    15:40:32
would be able to without the credit.    15:40:34

Q.    Okay. So I am clear, the ineffective    15:40:36
pricing policy that Adams suffered from pre IPO was    15:40:40
the credit program put in place through Mackenzie    15:40:44
for those retailers who were suffering from gray    15:40:48
marketing in Canada? That's the ineffective pricing    15:40:51
policy?    15:40:55

Page 231

A.    That is one, yes.    15:40:55

Q.    What are the other ones, if any?    15:40:57

A.    I may be misrecalling it, but I    15:41:00
believe that in addition to the credit that was    15:41:03
offered, that there was also some conversation    15:41:06
about -- either conversation or actual action taken    15:41:08
to reduce the retailer profit margin in Canada    15:41:11
before the IPO.    15:41:16

Q.    Reduce the retailer profit margin?    15:41:17

A.    Yes.    15:41:22

Q.    You think that's what happened?    15:41:22

A.    I just said I may be misrecalling.    15:41:24

Q.    And if it did happen, that would be an    15:41:26
example of another ineffective pricing policy?    15:41:28

A.    Yes. In the context of the company's    15:41:32
business strategy, yes.    15:41:34

Q.    And on Paragraph 18 of the report, you    15:41:35
say, first sentence, the company had a gray market    15:41:57
problem at the time of the IPO, which had already    15:42:03
begun to threaten its relationships with retailers.    15:42:06
So let's just take that piece. What evidence do you    15:42:10
have to support that?    15:42:12

MR. COLLINS: Beyond what she has    15:42:13
mentioned today?    15:42:15

Page 232

MR. BESSETTE: Right.    15:42:15

MR. COLLINS: Or does she have to go    15:42:15
through more stuff that she has already said?    15:42:18

BY MR. BESSETTE:    15:42:18

Q.    Just -- if that's what it is, tell me    15:42:18
that's what it was. But what I want is a clean    15:42:20
record.    15:42:21
What is the evidence you have to    15:42:21
say that the gray market problem that Adams Golf had    15:42:23
at the time of the IPO had already begun to threaten    15:42:27
its relationships with retailers?    15:42:30

MR. COLLINS: Asked and answered.    15:42:32
Go ahead.    15:42:32

BY THE WITNESS:    15:42:32

A.    Yeah. We have talked about this. We    15:42:33
have a body of things. We have the letters from WDC    15:42:34
Mackenzie relating the communications or the effects    15:42:39
that it saw on retailers in Canada. We have got the    15:42:45
written communications between authorized retailers    15:42:48
and the company. And then also what we have already    15:42:52
talked about is conjecture on my part.    15:42:57

BY MR. BESSETTE:    15:43:00

Q.    I just want evidence. I don't want    15:43:00
speculation.    15:43:02

Page 233

The evidence is, Mackenzie and the    15:43:03
retailers from Canada. And then you said written    15:43:05
communications between other retailers and Adams    15:43:09
Golf?    15:43:11

A.    Communications between other retailers    15:43:11
and Adams Golf, and we also got also -- let me just    15:43:14
see what is here. You are asking me what evidence    15:43:18
that there were deteriorated distributor    15:43:20
relationships?    15:43:28

Q.    No. First sentence of Paragraph 18, I    15:43:29
am asking for the evidence that supports your    15:43:32
statement that --    15:43:34

A.    It threatens its relationships with    15:43:34
retailers?    15:43:36

Q.    Right.    15:43:37

A.    Yeah. In addition, there is also    15:43:38
internal company memos that state with some degree    15:43:38
of concern that the relationships with retailers are    15:43:42
being harmed.    15:43:45

Q.    That's your recollection?    15:43:46

A.    Yes.    15:43:48

Q.    Okay. And then the last part of that    15:43:48
sentence, because I think we have talked about    15:43:59
profit margins, the perception in the marketplace.    15:44:01

Page 234

1   What is the evidence that you have to support the   15:44:04
2   conclusion that at the time of the IPO, it was   15:44:06
3   already a threat -- it had already begun to affect   15:44:10
4   the perception in the marketplace?   15:44:14
5       MR. COLLINS: Asked and answered.   15:44:16
6   BY THE WITNESS:   15:44:19
7       A.   There I rely on the effects that the   15:44:24
8   gray market has on brand name perception, which we   15:44:27
9   have talked about.   15:44:31
10  BY MR. BESSETTE:   15:44:34
11      Q.   Well, we have talked about the   15:44:34
12  academic literature about it that you have read.   15:44:38
13  What is the evidence that Adams Golf's perception in   15:44:42
14  the marketplace had already begun to be affected by   15:44:45
15  gray marketing at the time of the IPO?   15:44:49
16      MR. COLLINS: Asked and answered.   15:44:51
17  BY THE WITNESS:   15:44:52
18      A.   There are other pieces. I don't   15:44:52
19  remember the exhibit number, there is a document --   15:44:55
20  an internal company memo, I believe, that says that   15:44:56
21  Adams' goodwill in Canada stands to be severely   15:44:59
22  affected as a result of the gray market. Goodwill I   15:45:04
23  understand to be, especially for a company like   15:45:09
24  Adams, which relies so much on one brand, goodwill   15:45:11

Page 235

1   was directly connected to its perception.   15:45:15
2   BY MR. BESSETTE:   15:45:18
3       Q.   So besides the Canadian thing,   15:45:18
4   anything else, any evidence that you can point to to   15:45:23
5   support that statement?   15:45:25
6       A.   The Canadian thing. And I know you   15:45:26
7   are trying to discount the academic literature, but   15:45:30
8   the academic literature is grounded in, and   15:45:30
9   empirical research.   15:45:35
10      Q.   Well, any evidence that it affected   15:45:35
11  Adams Golf? That the perception of Adams Golf, not   15:45:37
12  that theoretically it could because the literature   15:45:41
13  says it could. Is there evidence, besides the memo   15:45:45
14  that you referred to, which I think is from Chris   15:45:49
15  Beebe about the goodwill in Canada, is there any   15:45:52
16  other evidence that you've seen in anything that   15:45:55
17  you've reviewed to support the statement that Adams   15:45:56
18  Golf's perception in the marketplace had already   15:45:59
19  begun to be threatened at the time of the IPO?   15:46:02
20      A.   We have all the documents we have   15:46:02
21  already discussed. In addition, and I am just going   15:46:05
22  to say it again. There is, I think it is important   15:46:08
23  to know what the trajectory of the gray market is,   15:46:11
24  and to know the effects of the gray market. And so   15:46:14

Page 236

1   when a company is already experiencing some   15:46:17
2   evidence -- there already is some evidence of   15:46:19
3   degrading perception, degraded perception, then I   15:46:24
4   think it is not a stretch to rely on the academic   15:46:30
5   literature about what happens to companies -- to a   15:46:35
6   company's perception in the marketplace as a result   15:46:37
7   of gray marketing.   15:46:40
8       Q.   Was the Tight Lies brand harmed --   15:46:41
9   Strike that.   15:46:41
10      Did the Tight Lies brand lose its   15:46:49
11  esteem status at the time of the IPO, in your view?   15:46:52
12      MR. COLLINS: Vague and ambiguous.   15:46:56
13  BY THE WITNESS:   15:46:58
14      A.   It is my understanding from the   15:46:58
15  documents I reviewed that at the time of the IPO,   15:47:00
16  the Tight Lies brand was being affected, yes.   15:47:03
17  BY MR. BESSETTE:   15:47:06
18      Q.   Well, that's a slightly different   15:47:06
19  answer to the question. My question is -- let me   15:47:07
20  rephrase it.   15:47:10
21      Was the Tight Lies brand image   15:47:11
22  harmed, in your expert opinion, at the time of the   15:47:14
23  IPO?   15:47:17
24      MR. COLLINS: Asked and answered.   15:47:18

Page 237

1   BY THE WITNESS:   15:47:19
2       A.   If you think about it like an   15:47:20
3   infection. If you think about the gray market like   15:47:22
4   an infection. First, we have got Canada, right?   15:47:26
5   And Canada, I think we have already sort of   15:47:28
6   clarified, that in Canada there was already an   15:47:31
7   acknowledged risk and harm to the goodwill that had   15:47:35
8   been established in Canada. I think we already   15:47:40
9   talked about that.   15:47:42
10      In respect to the United States, I   15:47:43
11  think if you think about the gray market like an   15:47:45
12  infection, the gray market can infiltrate, can get   15:47:48
13  in to a company. It can sort of latch on to a   15:47:51
14  company. And then over time it starts to manifest   15:47:55
15  its harms. So to the extent that -- so although   15:47:59
16  those harms may not have been manifesting yet within   15:48:03
17  the United States, I think the infection was already   15:48:08
18  there, which is evidenced in, for example, the   15:48:10
19  Costco documents that show that the gray market   15:48:12
20  sales were occurring in the United States prior to   15:48:15
21  the IPO.   15:48:17
22      Q.   All right. Professor --   15:48:20
23      MR. COLLINS: We have to stop this.   15:48:20
24   15:48:20

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 238

1  BY MR. BESSETTE:                        15:48:20
2      Q.   Yeah.  Because I don't think we are    15:48:22
3  still clear here.  Besides -- I mean, there is    15:48:23
4  evidence that gray marketing was occurring, that    15:48:25
5  Costco was selling clubs pre IPO.              15:48:29
6      A.   Correct.                       15:48:29
7      Q.   Tell me the evidence that you have    15:48:33
8  seen, not the literature, but the evidence that you  15:48:34
9  have seen, that Adams Golf's Tight Lies brand, that  15:48:37
10  image, was harmed at the time of IPO.         15:48:43
11      MR. COLLINS:  Asked and answered.    15:48:46
12  BY THE WITNESS:                          15:48:47
13      A.   Yeah.  I think you are -- you are    15:48:49
14  asking me the same question over and over again, and  15:48:49
15  I will answer it over and over again.         15:48:49
16  BY MR. BESSETTE:
17      Q.   Well, I am not getting the answer --
18      MR. COLLINS:  Well --
19  BY MR. BESSETTE:
20      Q.   You are talking about -- the answer    15:48:53
21  you gave me before was, yeah, we have talked about  15:48:55
22  the sales and we have talked about the goodwill.    15:48:57
23  What I am asking you, is that all your answer is?    15:48:59
24  Because my question is, what is the evidence that    15:49:03

Page 239

1  you have to support the conclusion that the brand    15:49:05
2  image was harmed, and not just sales were happening,  15:49:07
3  unless you are telling me that the brand image was    15:49:12
4  automatically harmed because sales were happening at  15:49:14
5  Costco.  Is that what you are telling me?  Maybe    15:49:18
6  that is what you are telling me.               15:49:18
7      A.   No, that's not what I'm telling you.    15:49:20
8      Q.   Okay.  So when did the brand image    15:49:21
9  suffer, and was it harmed at the time of the IPO?    15:49:24
10      A.   So you are asking -- what I feel you    15:49:28
11  are asking me for is a definitive date on which    15:49:31
12  the --                                 15:49:34
13      Q.   I don't need a date.  What is your    15:49:34
14  opinion?                              15:49:36
15      A.   I can't give you that, because the    15:49:36
16  gray market doesn't arrive.  So -- but sort    15:49:39
17  of sitting here and thinking about it, there is    15:49:44
18  additional evidence.                     15:49:47
19      For example, we have clubs being    15:49:49
20  returned.  We have got retailers in the United    15:49:52
21  States making complaints to Adams.  Those complaints  15:49:54
22  were partially because sales were -- sales were    15:49:56
23  slowing, you have got consumers who were not buying  15:49:59
24  out of the authorized retailers and were making    15:50:03

Page 240

1  complaints because of the gray market, the gray    15:50:06
2  market sales that were occurring in the United    15:50:09
3  States.  That's additional evidence.  And then I'll    15:50:11
4  just -- harking back to the academic literature,    15:50:15
5  which I actually think is quite relevant.         15:50:21
6      Q.   So if I understand, returns of clubs    15:50:21
7  is evidence to you that the brand image was    15:50:23
8  suffering?                             15:50:26
9      A.   It could be.                    15:50:26
10      Q.   But was it?                     15:50:27
11      A.   It could be.                    15:50:28
12      Q.   So you don't know as you sit here?    15:50:29
13      A.   I don't know.                   15:50:31
14      Q.   Okay.  So how do you know that brand    15:50:32
15  image was actually suffering at all at the time of    15:50:36
16  the IPO, other than could be because the literature    15:50:39
17  suggests it could, or because sales were going on?    15:50:43
18  Can you sit here and tell me that you know or it is    15:50:47
19  your opinion that, based on evidence, that the brand    15:50:49
20  image was suffering at the time of the IPO?    15:50:52
21      MR. COLLINS:  Asked and answered.    15:50:55
22  BY THE WITNESS:                          15:50:56
23      A.   Okay.  So we have got in Canada, we    15:50:59
24  have got WDC Mackenzie complaining that their    15:51:02

Page 241

1  authorized retailers to whom its sold were    15:51:07
2  complaining to it, presumably they were complaining    15:51:10
3  for a reason.  One of those reasons would be that    15:51:12
4  they were not able to sell the Tight Lies through    15:51:15
5  their retail stores.  In addition, you have got    15:51:21
6  documents internal to the company stating that the    15:51:25
7  goodwill that it has built in Canada stands to be at    15:51:28
8  deteriorated.  We have got complaints from    15:51:35
9  authorized retailers in the United States    15:51:36
10  complaining to the company that gray market sales    15:51:39
11  are going on.  And then you have got the academic    15:51:42
12  literature about how the gray market functions.    15:51:45
13      MR. COLLINS:  We have to stop.         15:51:48
14  BY MR. BESSETTE:                          15:51:48
15      Q.   But just to be clear, all of that --    15:51:49
16      MR. COLLINS:  One more question and we    15:51:49
17  have to stop.                         15:51:49
18  BY MR. BESSETTE:                          15:51:49
19      Q.   -- that you have said is your support    15:51:51
20  for the fact that the brand image was suffering.    15:51:54
21  Can you tell me whether all of that means, in your    15:51:58
22  opinion, that the brand image was suffering at the    15:52:01
23  time of the IPO?                        15:52:04
24      MR. COLLINS:  Yes or no.  We have to    15:52:06

61  (Pages 238 to 241)

Page 242

```
1  stop.                          15:52:08
2  BY THE WITNESS:                 15:52:08
3      A.  Yes. Yes.               15:52:09
4          (Break taken.)    16:05:40
5  BY MR. BESSETTE:                16:05:40
6      Q.  To sort of pick up where we left off,  16:06:47
7  Professor, on the brand image of the Tight Lies  16:06:51
8  losing some of the status that it had, and I know  16:06:54
9  you have articulated the reasons why you believe  16:06:58
10 that to be the case at the time of the IPO. And I  16:07:01
11 guess I probably should have been clearer in the  16:07:12
12 questions. The brand image that I am talking about  16:07:15
13 is from the point of view of the consumer. So I  16:07:20
14 don't know if that changes anything in your  16:07:25
15 response. I mean, I think you were giving me the  16:07:27
16 rationale for why you think the brand image of the  16:07:30
17 Tight Lies had suffered at the time of the IPO,  16:07:33
18 because retailers were complaining and Mackenzie was  16:07:38
19 complaining and Beebe made a comment or a statement  16:07:41
20 about the possibility of losing the goodwill in  16:07:45
21 Canada, and all the other reasons, I am not trying  16:07:48
22 to limit them, but all the other reasons you  16:07:49
23 mentioned. Do those still -- are those still the  16:07:51
24 bases in your evidence for why you think the brand  16:07:54
```

Page 243

```
1  image at the time of the IPO suffered in the eyes of  16:07:57
2  the consumer?                   16:08:01
3      A.  Yes.                    16:08:02
4      Q.  Did the brand image in the eyes of the  16:08:02
5  consumer for the Tight Lies suffer because it could  16:08:06
6  be purchased at Costco at reduced prices?      16:08:09
7      A.  Yes.                    16:08:13
8      Q.  Is it your view that any product that  16:08:14
9  has a prestigious brand image, Nike or whatever it  16:08:18
10 might be, if it appears in Costco at reduced prices,  16:08:24
11 its brand image suffers?              16:08:29
12     A.  Not any, no. Sorry. Let me be more  16:08:31
13 clear in my answer. Not every product will    16:08:33
14 suffer -- not every product's brand image will  16:08:36
15 suffer as a result of appearing in a discount retail  16:08:40
16 outlet.                         16:08:44
17     Q.  Are there any guidelines or standards  16:08:44
18 or anything you can point to to sort of say when one  16:08:47
19 prestigious product, its brand image will suffer  16:08:52
20 when it's in Costco at reduced prices and another  16:08:56
21 won't?                          16:09:00
22     A.  Yes. There is some literature that  16:09:01
23 points to the types of products that suffer in that  16:09:03
24 respect and those that may not suffer as much or  16:09:07
```

Page 244

```
1  that don't tend to suffer, those that require  16:09:11
2  technological innovation tend to suffer more than  16:09:14
3  those that don't. For example. That would be one  16:09:21
4  example of a division.              16:09:25
5      Q.  So a product that -- I am sorry, what  16:09:26
6  you say?                        16:09:29
7      A.  Requires technological innovation.  16:09:29
8      Q.  -- requires technological innovation.  16:09:34
9  If it is a prestigious brand product and it requires  16:09:34
10 technological innovation, it's more likely to suffer  16:09:39
11 brand image if it's in a Costco selling at reduced  16:09:41
12 prices than a different product that doesn't require  16:09:42
13 technological innovation?            16:09:45
14     A.  More likely, yes.           16:09:46
15     Q.  And that's based on academic    16:09:47
16 literature?                      16:09:51
17     A.  Yes.                    16:09:52
18     Q.  So does it matter what the product is?  16:09:52
19 So like, for example, Nike. Nike is a brand,  16:10:05
20 prestigious brand image, but it sells a lot of  16:10:10
21 different products. Is Nike not a prestigious brand  16:10:14
22 image in your view?                16:10:19
23     A.  I don't know if it is or not.  16:10:20
24     Q.  How about Callaway for golf clubs, is  16:10:22
```

Page 245

```
1  that a prestigious brand?             16:10:31
2      A.  Yes, I believe so.          16:10:33
3      Q.  Do you know whether they are in  16:10:34
4  Costcos?                        16:10:36
5      A.  I don't know whether they are in  16:10:37
6  Costcos right now.                 16:10:38
7      Q.  You know they were in 1998, because  16:10:38
8  you have got the press releases as part of your  16:10:40
9  study.                          16:10:43
10     A.  I know that they were -- I don't know  16:10:43
11 whether they were in Costcos. I know that they were  16:10:43
12 being gray marketed. I know that they made a  16:10:47
13 disclosure about their gray market activity.  16:10:50
14     Q.  Did Callaway's brand image suffer as a  16:10:50
15 result of its clubs being gray marketed in 1998?  16:10:55
16         MR. COLLINS: Outside the scope.  16:11:00
17 BY THE WITNESS:                    16:11:00
18     A.  I didn't study that.         16:11:01
19 BY MR. BESSETTE:                   16:11:01
20     Q.  How about TaylorMade?         16:11:01
21         MR. COLLINS: Outside the scope.  16:11:02
22 BY THE WITNESS:                    16:11:02
23     A.  I didn't study that.         16:11:04
24                               16:11:04
```

62 (Pages 242 to 245)

Page 246

1  BY MR. BESSETTE:                        16:11:05
2    Q.   So as you sit here, you don't know if  16:11:05
3  any of the other golf manufacturers that had clubs  16:11:08
4  that people would classify as prestigious brands and  16:11:11
5  they were appearing in Costcos, whether their brand  16:11:14
6  image suffered? You didn't look at that as part of  16:11:17
7  your work in this case?                 16:11:21
8    A.   I didn't study that.            16:11:22
9    Q.   Okay. And you don't know          16:11:23
10  independently from this case, just based on your  16:11:24
11  expertise in the gray marketing field for golf  16:11:28
12  industry, is that right?                16:11:29
13         MR. COLLINS: Outside the scope.   16:11:31
14         Go ahead.                       16:11:31
15  BY THE WITNESS:
16    A.   Can you ask the question again? I'm
17  not sure I got the question.
18         MR. BESSETTE: Can you repeat it,
19  please?
20         THE WITNESS: And I don't know --  16:11:38
21         MR. COLLINS: Paul, it's quicker if  16:11:38
22  you just restate it.                    16:11:39
23         MR. BESSETTE: It would be better, I  16:11:39
24  think, if she repeats it.               16:11:39

Page 247

1         (Record read.)                   16:11:52
2  BY MR. BESSETTE:                        16:11:52
3    Q.   You don't know independent from your  16:11:53
4  work in this case whether any of the other golf club  16:11:56
5  manufacturers that have prestigious brands that had  16:12:01
6  gray marketing activity whether their brand  16:12:04
7  suffered?                               16:12:08
8         MR. COLLINS: Outside the scope.   16:12:08
9         Go ahead.                        16:12:09
10  BY THE WITNESS:                         16:12:10
11    A.   Yeah. I am just harking back to the  16:12:11
12  materials that I present in my international  16:12:13
13  business transactions class. It is possible that in  16:12:15
14  that literature there was material talking about  16:12:18
15  Callaway's -- the negative effects that Callaway  16:12:22
16  suffered, but I am not positive.        16:12:26
17  BY MR. BESSETTE:                        16:12:28
18    Q.   So as you sit here, you don't know  16:12:28
19  whether Callaway or any other golf manufacture?  16:12:31
20    A.   I don't recall.                 16:12:33
21    Q.   Let me hand you what has been marked  16:12:34
22  as -- a two-page document that has been marked as  16:13:51
23  Exhibit 51, and have you turn to Paragraph 16 of  16:13:57
24  your rebuttal.                          16:14:20

Page 248

1    A.   Actually, if I could -- before I do  16:14:23
2  that, if I could just -- harking back a little bit  16:14:25
3  to some of the questioning about the brand image.  16:14:29
4  There is another piece that I had forgotten about.  16:14:31
5         In the company's prospectus, there  16:14:35
6  is also a statement in there -- I am not going to  16:14:39
7  get the quote exactly right, but it refers to the  16:14:40
8  reasons that the company limits its retail  16:14:41
9  distribution to authorized distributors as -- one of  16:14:44
10  the reasons for that is to maintain the brand's high  16:14:47
11  profile or high prestige profile or something like  16:14:53
12  that. So that would also inform that conclusion.  16:14:56
13    Q.   Inform what conclusion?          16:14:59
14    A.   The conclusion that the gray market  16:15:00
15  had the effects of degrading the company's brand  16:15:02
16  image.                                  16:15:05
17    Q.   To be precise, do you mean to say that  16:15:06
18  it could or you know for a fact it did?  16:15:09
19    A.   The company had taken -- had taken the  16:15:11
20  time to strategize about how it was going to  16:15:15
21  distribute its product. It decided that in order to  16:15:19
22  maintain the high profile that its products had, it  16:15:21
23  would limit its retail distribution. And  16:15:25
24  presumably, the company was careful in making that  16:15:29

Page 249

1  analysis. When the retail distribution was expanded  16:15:31
2  to include big box retailers like Costco,  16:15:39
3  presumably, that had the effects -- that had the  16:15:44
4  effects that the company was trying to avoid. It  16:15:51
5  had deleterious effects on the company's brand  16:15:55
6  image.                                  16:15:58
7    Q.   Professor, excuse me. Aren't you just  16:15:59
8  speculating? Aren't you just telling me that  16:16:02
9  because the company said we don't want to sell to  16:16:04
10  big box stores -- in order to preserve our brand  16:16:07
11  image, we are not going to sell here, and because  16:16:10
12  they showed up there, you are saying me to me,  16:16:13
13  without any evidence that I can see, that it  16:16:16
14  effected its brand image because it showed up where  16:16:19
15  the company didn't want it to show up.  16:16:23
16    A.   If you take the prospectus in  16:16:25
17  isolation, and I made that conclusion taking into  16:16:25
18  account only the prospectus, that would be highly  16:16:28
19  speculative. However, if you include all of the  16:16:30
20  other documentation that I saw, and that we have  16:16:33
21  already discussed, I just wanted to pointed out that  16:16:35
22  that also informed my conclusion.        16:16:40
23    Q.   So does it make it less speculative  16:16:42
24  for the other reasons? In other words, isn't that  16:16:45

                        63 (Pages 246 to 249)

Page 250

1  still a speculative reason that you are just piling  16:16:46
2  on with the other evidence that you told me about?  16:16:50
3       MR. COLLINS: Asked and answered.    16:16:54
4  BY THE WITNESS:                        16:16:54
5      A.   No.                          16:16:56
6  BY MR. BESSETTE:                       16:16:56
7      Q.   No?                          16:16:56
8      A.   No.                          16:16:56
9      Q.   So what evidence, again, do you have,  16:16:57
10  okay. I mean, let me ask you: Do you have any   16:16:59
11  other evidence, other than what you have told me,  16:17:00
12  that the brand image of Adams Golf Tight Lies   16:17:02
13  suffered because it was in Costco?        16:17:07
14      A.   No.                         16:17:09
15      Q.   All right. Exhibit 51. You say in   16:17:09
16  Paragraph 16 --                        16:17:35
17       MR. COLLINS: Rebuttal?           16:17:38
18       MR. BESSETTE: Rebuttal.          16:17:39
19  BY MR. BESSETTE:                      16:17:41
20      Q.   Let's just start with the bottom of   16:17:42
21  page 8, going over to page 9. Actually, no. Let's  16:17:46
22  read the whole thing. "The gray marketing risks   16:17:54
23  that Adams faced were unlike those faced by the golf  16:17:56
24  industry as a whole, not only because of the reasons  16:18:01

Page 251

1  stated previously herein, such as the comparatively  16:18:03
2  high profit margins enjoyed by Adams' retailers,   16:18:06
3  because also because Adams' retailers were, in some  16:18:11
4  cases, receiving twice the number of clubs they had  16:18:12
5  ordered as a result of double shipping and/or   16:18:14
6  receiving shipments on consignment." And then you  16:18:18
7  cite various documents. Exhibit 51 is one of those.  16:18:21
8       And in 51 Chris Beebe says,        16:18:29
9  "Retailers with too many clubs will cut prices or  16:18:29
10  ship to others in order to relieve the pressures of  16:18:34
11  excess stock," which is I think the quote that you  16:18:36
12  have further down in Paragraph 16.        16:18:39
13      A.   Right.                       16:18:41
14      Q.   Chris Beebe wasn't talking about   16:18:41
15  double shipments for consignment sales. Are you   16:18:47
16  drawing the conclusion that he was in this document?  16:18:51
17      A.   Let me just read that portion of the   16:18:54
18  document.                             16:18:57
19       MR. COLLINS: You know, I have been   16:19:18
20  practically an angel. Can I just make a suggestion  16:19:21
21  and cut through this? Why don't you, in this   16:19:24
22  instance and in other instances, at least consider,  16:19:27
23  and I know you have your own good competent ways.  16:19:30
24  Why don't you consider asking Professor Ochoa   16:19:33

Page 252

1  whether -- what it is in this document that supports  16:19:37
2  her contentions in Paragraph 16.         16:19:41
3       MR. BESSETTE: I could do it that way,  16:19:43
4  Todd, but I prefer not to.              16:19:46
5       MR. COLLINS: Thank you for your     16:19:47
6  consideration.                         16:19:49
7       So what's the question?            16:19:50
8  BY MR. BESSETTE:                       16:19:52
9      Q.   Do you need it re-read to you?    16:19:53
10      A.   If you can restate it, that would be   16:19:53
11  great.                               16:19:53
12       (Record read.)    16:19:53
13  BY THE WITNESS:                        16:19:53
14      A.   Am I drawing the conclusion that Chris  16:20:12
15  Beebe was talking about double shipments and   16:20:14
16  consignments in this document. I am not drawing   16:20:16
17  that conclusion, no.                    16:20:20
18  BY MR. BESSETTE:                       16:20:22
19      Q.   But you cite it as support for your   16:20:27
20  proposition stated in your paragraph?     16:20:31
21      A.   Yes, that's correct.           16:20:33
22      Q.   Why do you do that?            16:20:33
23      A.   Because one of the ways in which   16:20:35
24  retailers could get too many clubs would be through  16:20:39

Page 253

1  double shipments.                      16:20:44
2      Q.   Theoretically I don't disagree.   16:20:45
3       Was Chris Beebe saying that there   16:20:48
4  were double shipments or consignment sales that got  16:20:51
5  excess clubs into the hands of retailers?  16:20:55
6       MR. COLLINS: Asked and answered,    16:20:59
7  document speaks for itself. She just answered that.  16:21:01
8  BY THE WITNESS:                        16:21:01
9      A.   I didn't use this document to support  16:21:02
10  the assertion there were double shipments. I used  16:21:03
11  this document to illustrate the effects it could   16:21:03
12  have on the company.                    16:21:08
13  BY MR. BESSETTE:                       16:21:09
14      Q.   Which documents, then, did you use to  16:21:09
15  support -- well, actually, strike that.   16:21:09
16       Are you making the assertion that   16:21:13
17  double shipments or consignment sales occurred?   16:21:15
18      A.   Yes.                        16:21:18
19      Q.   What is your proof?            16:21:18
20      A.   I cited documents that I looked to in  16:21:19
21  support of that statement.              16:21:24
22      Q.   Are those the ones you cite here?   16:21:25
23      A.   Yes.                        16:21:27
24      Q.   Exhibit 57, I think we have looked at.  16:21:27

64  (Pages 250 to 253)

**Page 254**

1  Oh, maybe we haven't. Let me hand you what has been  16:21:32
2  marked Exhibit 57, which you cite in Paragraph 16 of  16:22:01
3  your report. This is one of the documents, I take  16:22:04
4  it, that you are using to support your assertion  16:22:06
5  that double shipments occurred?  16:22:09
6   A.  I cited it, yes. Let me read the  16:22:13
7  document. Specifically point C of the document.  16:22:42
8   Q.  I am sorry, what? Oh, point C.  16:22:46
9   Did you read Barney Adams'  16:22:47
10 testimony about this document, Professor?  16:22:50
11  A.  I believe I did.  16:22:52
12  Q.  Where he indicated that there were no  16:22:53
13 double shipments, he was characterizing this as a  16:22:56
14 shoot first ask questions later guilty until proven  16:22:59
15 innocent type thing? Did you take that into account  16:23:07
16 in your thought process?  16:23:08
17   MR. COLLINS: You mean his statements,  16:23:08
18 not his indication?  16:23:10
19 BY THE WITNESS:  16:23:11
20  A.  I took it into account, yes.  16:23:11
21 BY MR. BESSETTE:  16:23:15
22  Q.  And disregarded it?  16:23:15
23  A.  I wouldn't say disregarded it, no.  16:23:17
24  Q.  So your proof that double shipments  16:23:19

**Page 255**

1  occurred is Exhibit 57?  16:23:22
2   A.  Among other things.  16:23:24
3   Q.  Okay. Not Exhibit 51. How about  16:23:26
4  Exhibit 186?  16:23:29
5   A.  Exhibit 186?  16:23:36
6   Q.  186. Let me do this. 186 I believe  16:24:13
7  is the Greaney personnel file.  16:24:16
8   A.  Uh-huh.  16:24:21
9   Q.  Did you read the deposition of  16:24:22
10 Mr. Greaney where he denies doing any double  16:24:24
11 shipments?  16:24:27
12  A.  I read parts of his deposition, yes.  16:24:27
13  Q.  So besides a reference by Mr. Adams  16:24:29
14 here about the concept of double shipping, and his  16:24:35
15 statement that he knows it occurs, and his testimony  16:24:38
16 under oath that it hadn't happened, and  16:24:41
17 Mr. Greaney's file where he denies under oath, and  16:24:44
18 there are allegations that he did double ship. And  16:24:49
19 we've already determined 51 is not a cause and  16:24:53
20 effect on double shipping. And then you also cite  16:24:56
21 here a Golf Pro article that one golf pro shop  16:25:01
22 received?  16:25:08
23  A.  Actually, I just want to state that  16:25:08
24 when you are sort of saying the entire document  16:25:12

**Page 256**

1  Exhibit 51 doesn't show that, that's not really what  16:25:15
2  we talked about. We talked about specifically one  16:25:18
3  line in the document.  16:25:21
4   Q.  Is there anything in Exhibit 51 that  16:25:23
5  proves double shipping occurred to you?  16:25:26
6   A.  If I read the whole document, I will  16:25:27
7  let you know.  16:25:30
8   Q.  Okay. Please do.  16:25:31
9   MR. COLLINS: While she is reading,  16:25:46
10 why don't you ask her whether she has any support  16:25:48
11 for that paragraph other than what she cites.  16:25:52
12   MR. BESSETTE: I might get there at  16:25:52
13 the end.  16:25:52
14   MR. COLLINS: We can all get out of  16:25:55
15 here quicker, that's all.  16:25:58
16   MR. BESSETTE: Todd, I must not know  16:26:00
17 what you know.  16:26:03
18 BY MR. BESSETTE:  16:26:28
19  Q.  Is there anything there?  16:26:29
20  A.  No.  16:26:30
21  Q.  So do you know why you cited it?  16:26:30
22  A.  Because I knew that I would be citing  16:26:33
23 it lower in the paragraph.  16:26:37
24  Q.  Okay. So, again, to sort of cut  16:26:38

**Page 257**

1  through some of this, everything you have cited  16:26:43
2  either talks about double shipping generally and  16:26:46
3  deposition testimony refutes that -- so, I mean, my  16:26:50
4  point is, whether -- yeah. There is nothing  16:26:54
5  specific on amounts or places other than one or two  16:26:56
6  retailers that you've cited in this Golf Pro  16:27:00
7  article. So tell me how you draw from the evidence  16:27:04
8  you have cited that there were material amounts of  16:27:06
9  double shipments occurring that would put in the  16:27:09
10 hand of retailers quantities of clubs that they  16:27:12
11 could then sell to Costco?  16:27:17
12   MR. COLLINS: Objection to the  16:27:18
13 rambling testimony that preceded the question.  16:27:20
14   Go ahead.  16:27:23
15 BY THE WITNESS:  16:27:23
16  A.  Do you have the Brewer deposition  16:27:24
17 testimony?  16:27:28
18 BY MR. BESSETTE:  16:27:30
19  Q.  I don't think I have it here, but you  16:27:30
20 think something comes out of there?  16:27:35
21  A.  I wouldn't have cited those pages if  16:27:36
22 not.  16:27:36
23  Q.  Okay. I looked at those pages, and I  16:27:36
24 can tell you that Mr. Brewer says what he says, but  16:27:37

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 258

1   he does say that there were no specific double    16:27:41
2   shipment issues with Jay, there were allegations of    16:27:44
3   it. But even if there were, we have got Jay    16:27:47
4   Greaney's personnel file where there are allegations    16:27:53
5   of several shipments. But my larger question is, at    16:27:57
6   most what we see from the evidence is allegations or    16:28:00
7   each if some occurred, isolated examples of double    16:28:03
8   shipping or extra shipments, whatever you want to    16:28:08
9   call it. Where is the material amounts of double    16:28:10
10  shipping, where is the evidence of that, for you to    16:28:13
11  draw the conclusion that there must have been enough    16:28:16
12  out there in the hands of retailers from double    16:28:19
13  shipping and consignment sales that allowed them to    16:28:23
14  sell to Costco and perpetuate the gray market?    16:28:27
15       MR. COLLINS: Are you asking about    16:28:29
16  some paragraph -- have you read this paragraph    16:28:29
17  carefully? What particular portion of the paragraph    16:28:31
18  are you asking her the basis for? I mean, the basis    16:28:33
19  for the paragraph is cited in the paragraph. You    16:28:38
20  can ask her, as I mentioned, whether there is any    16:28:41
21  other basis. If you have got something in    16:28:43
22  particular --    16:28:46
23       MR. BESSETTE: Can I have an answer to    16:28:46
24  that question, please? And this will be quicker.    16:28:48

Page 259

1        MR. COLLINS: Unanswerable.    16:28:51
2   BY THE WITNESS:    16:28:52
3        A.   What I state in the paragraph is that    16:28:53
4   there were at least some cases of --    16:28:53
5        MR. COLLINS: I'm sorry. Vague and    16:28:55
6   ambiguous, repetitive, unintelligible, asked and    16:28:56
7   answered.    16:28:56
8        Go ahead.    16:29:01
9   BY THE WITNESS:    16:29:02
10       A.   What I state in this paragraph is that    16:29:03
11  there were -- that in some cases, Adams' retailers    16:29:05
12  were receiving twice the number of clubs they had    16:29:07
13  ordered. And what you asked me about was whether    16:29:10
14  there was some material amount. You could imagine    16:29:13
15  one case of double shipment that could have given    16:29:16
16  rise to Adams Golf's entire gray market problem, if    16:29:20
17  it was big enough.    16:29:20
18  BY MR. BESSETTE:    16:29:28
19       Q.   Right. But that's speculation, right?    16:29:28
20       A.   That is, yeah.    16:29:29
21       Q.   And we could have one or two examples    16:29:30
22  that involves five clubs and ten clubs, and would    16:29:33
23  that have given rise to the gray market problem?    16:29:37
24       A.   The double shipment itself alone would    16:29:39

Page 260

1   not have given rise to the entirety of Adams Golf's    16:29:42
2   gray market problem if there were only five or ten    16:29:42
3   clubs sold into the gray market, no.    16:29:48
4        Q.   Okay. So let me just cut through it.    16:29:49
5   Your statement, I guess three from the bottom.    16:29:52
6   "Double shipments and consignments put into the    16:29:56
7   hands of retailers a certain quantity of clubs that    16:29:59
8   they might not have been able to sell for their own    16:30:04
9   customers of standard retail prices." Speculation    16:30:06
10  because you say "might not." So you don't have any    16:30:07
11  direct knowledge, is that right?    16:30:11
12       A.   It is not speculation to say that    16:30:12
13  double shipments and consignment would put into the    16:30:15
14  hands of retailers a certain quantity of clubs.    16:30:19
15  That's not speculation.    16:30:19
16       Q.   But that's based on the evidence you    16:30:21
17  cite above, right?    16:30:21
18       MR. COLLINS: Excuse me. Let her    16:30:21
19  finish.    16:30:21
20  BY MR. BESSETTE:    16:30:21
21       Q.   Just to be clear?    16:30:24
22       MR. COLLINS: Let her finish.    16:30:25
23       Go ahead.    16:30:25
24                              16:30:25

Page 261

1   BY THE WITNESS:    16:30:25
2        A.   That they might not have been able to    16:30:30
3   sell to their own customers? It would be    16:30:32
4   speculation whether they might have been able to    16:30:34
5   sell to their own customers if they held on to them    16:30:36
6   long enough. I don't know whether they -- they    16:30:38
7   might have or might not have been able to sell them    16:30:40
8   on to their own customers if they held on to those    16:30:42
9   clubs long enough.    16:30:45
10  BY MR. BESSETTE:    16:30:46
11       Q.   You don't know as you sit here what    16:30:46
12  number, if any, of clubs got in the hands of    16:30:46
13  retailers through double shipping or consignment    16:30:46
14  sales, do you, Professor?    16:30:52
15       A.   That's correct.    16:30:52
16       Q.   And you don't know what number of    16:30:53
17  clubs, if any, that retailers, assuming they got    16:30:56
18  them through double shipments or consignment sales,    16:31:01
19  sold them to Costco?    16:31:05
20       A.   That's correct.    16:31:07
21       Q.   And your statement here that "This    16:31:07
22  provided a pool of clubs potentially available for    16:31:10
23  the gray market," again, we don't know how big this    16:31:12
24  pool is, you have no direct evidence whatsoever that    16:31:16

Page 262

1  there was a pool, or whether any of these clubs were  16:31:19
2  sold to Costco.                           16:31:22
3         MR. COLLINS: Compound, asked and       16:31:25
4  answered.                                16:31:25
5         Go ahead.                         16:31:27
6  BY THE WITNESS:                           16:31:28
7     A.   Correct.                         16:31:28
8  BY MR. BESSETTE:                           16:31:29
9     Q.   Okay.  In 15 of your report, second   16:31:44
10  sentence, when you get there. "The gray market  16:32:01
11  distribution occurred both in the United States and  16:32:08
12  in Canada when the company's golf clubs appeared in  16:32:09
13  Costco stores throughout both countries." I'm    16:32:13
14  sorry.  Initial report.  Is that where you are?  16:32:16
15     A.   I am in the initial report, the second  16:32:18
16  sentence of 15, "The gray market distribution   16:32:21
17  occurred," okay.                         16:32:26
18     Q.   Yeah.  "When the company's golf clubs  16:32:26
19  appeared in Costco stores throughout both countries  16:32:28
20  and in other unauthorized stores." What do you mean  16:32:33
21  by other unauthorized stores?               16:32:36
22     A.   There is some evidence that there was  16:32:36
23  gray marketing occurring in some parts of the   16:32:39
24  country through stores other than Costco.      16:32:43

Page 263

1     Q.   What is that evidence?            16:32:45
2     A.   I don't recall at the moment.       16:32:46
3     Q.   What other stores?               16:32:47
4     A.   I don't recall at the moment.       16:32:48
5     Q.   Did you document that in your report  16:32:51
6  anywhere?                                16:32:55
7     A.   I don't believe I cited it, no.  I   16:32:55
8  didn't cite it here.  I don't remember if I cited it  16:32:58
9  anywhere else.                           16:32:59
10     Q.   Let me ask you, further down in that   16:33:00
11  paragraph, actually on the next page, page 6, still  16:33:31
12  in that paragraph, I guess it is in Item 4.  "Costco  16:33:31
13  records indicate that at the time of the IPO, Costco  16:33:41
14  had purchased over 8,400 clubs, indicating that gray  16:33:44
15  market sales were likely to continue or intensify."  16:33:50
16  What about the purchase of 8,400 clubs leads you to  16:33:54
17  the conclusion that gray market sales were likely to  16:33:58
18  continue or intensify?                   16:33:59
19     A.   Costco had sold less than half of that  16:33:59
20  number at the time of the IPO.  Costco continued to  16:34:02
21  hold the remainder of those clubs, and that would   16:34:06
22  indicate that they intended to sell them, indicating  16:34:08
23  that the gray market sales were likely to continue.  16:34:11
24     Q.   And that's for the benefit of looking  16:34:13

Page 264

1  at the Costco documents that you reviewed for this  16:34:15
2  litigation?                             16:34:19
3     A.   Yes.                             16:34:19
4     Q.   That information wasn't available to  16:34:20
5  Adams Golf at the time of the IPO, was it?     16:34:23
6         MR. COLLINS: Foundation, speculation.  16:34:27
7  BY THE WITNESS:                           16:34:27
8     A.   Can you restate the question, please?  16:34:30
9  BY MR. BESSETTE:                           16:34:30
10     Q.   Yes.  The evidence you just cited as  16:34:30
11  the reason for why the purchase of 8,400 clubs   16:34:32
12  indicated to you that sales were likely to continue  16:34:36
13  or intensify was because they only actually sold   16:34:39
14  half of what they purchased.  My question is, that  16:34:44
15  information was not available to Adams Golf at the  16:34:48
16  time of the IPO, was it?                  16:34:52
17         MR. COLLINS: Same objection.       16:34:55
18  BY THE WITNESS:                           16:34:56
19     A.   Those numbers were not available to  16:34:57
20  the company at the time of the FPO.  What was   16:34:57
21  available was a view of the trend of gray marketing  16:34:58
22  that the company was experiencing prior to the IPO.  16:35:03
23  BY MR. BESSETTE:                           16:35:03
24     Q.   And what information did the company  16:35:03

Page 265

1  have available to it on the trend?         16:35:06
2         MR. COLLINS: Asked and answered.    16:35:08
3  BY THE WITNESS:                           16:35:09
4     A.   What it had available to it was     16:35:09
5  reports from -- every one who received reports prior  16:35:12
6  to it prior to the IPO, so retailers, authorized   16:35:16
7  retailers, distributors, and from seeing the clubs  16:35:18
8  in stores from sending -- I believe they were   16:35:23
9  sending out the regional account coordinators, I   16:35:27
10  think they were called, into their regions to see   16:35:31
11  whether the clubs were available in Costco stores.  16:35:33
12  There were a number of places and sources of    16:35:36
13  information the company was using in order to try to  16:35:38
14  determine its gray market problem.          16:35:40
15  BY MR. BESSETTE:                           16:35:43
16     Q.   And are you aware of evidence showing  16:35:43
17  that sometime in April that the supply of Adams Golf  16:35:45
18  Tight Lies in Canada had sold through? Do you    16:35:48
19  remember seeing any evidence to that effect?   16:35:51
20     A.   Say that again? Sorry.           16:35:53
21         MR. BESSETTE: Can you repeat that,    16:35:53
22  please?                                 16:35:53
23         (Record read.)                    16:36:07
24         MR. COLLINS: The document speaks for  16:36:07

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 266

1    itself.                          16:36:09
2         Go ahead.                   16:36:09
3    BY THE WITNESS:                  16:36:10
4         A.    I believe there was a document that    16:36:10
5    talks about the first shipment having sold through    16:36:12
6    or anticipating the first shipment would sell    16:36:14
7    through.                         16:36:17
8    BY MR. BESSETTE:                 16:36:17
9         Q.    So what evidence are you relying on to    16:36:17
10   say that the trend -- that Adams Golf should have    16:36:21
11   been aware that sales through Costco were likely to    16:36:24
12   continue or intensify after April 1998?    16:36:28
13        MR. COLLINS:    Asked and answered.    16:36:31
14   BY THE WITNESS:                  16:36:32
15        A.    The frequency with which complaints    16:36:33
16   were being made was increasing. After that first    16:36:35
17   shipment was made, the company was also aware that    16:36:38
18   there were additional shipments made to Costco.    16:36:41
19   BY MR. BESSETTE:                 16:36:44
20        Q.    And is there any evidence that Adams    16:36:44
21   Golf knew what numbers, how much Costco had    16:36:50
22   purchased?                       16:36:54
23        A.    The company was trying to determine    16:36:54
24   those numbers and was unable to.    16:36:56

Page 267

1         Q.    Paragraph 21D, and actually there are    16:36:59
2    several places in this report and your rebuttal,    16:37:14
3    where you reference the Golf Pro magazine?    16:37:25
4         A.    Yes.                  16:37:29
5         Q.    Which has a publish date of August 1,    16:37:29
6    1998. And you say continuously in various places in    16:37:326
7    your report, which was apparently available in the    16:37:37
8    middle of July. So just tell me what you base that    16:37:39
9    on?                              16:37:42
10        A.    I base that on my lay knowledge of how    16:37:42
11   it is that magazines are published. So magazines,    16:37:45
12   if you go to a stand in July, in the middle of July,    16:37:50
13   you will see a number of magazines that are dated    16:37:54
14   August 1st or August or just August plainly.    16:37:56
15        Q.    So no proof?          16:38:00
16        A.    It is a common practice -- my    16:38:01
17   perception is that it is a common practice in the    16:38:03
18   magazine publishing industry.    16:38:07
19        Q.    Any proof?            16:38:09
20        A.    No.                   16:38:10
21        Q.    Just an assumption?    16:38:10
22        A.    Well, no. I mean, in addition to    16:38:12
23   that, there is also, in reading the magazine, there    16:38:13
24   is some -- when you read that magazine, you see that    16:38:21

Page 268

1    the magazine is talking about forward -- things that    16:38:25
2    are happening in the future that happened in July.    16:38:28
3    So things that are happening in the future    16:38:32
4    happened at the end of July. So if it was published    16:38:35
5    after August 1st, you would assume that would be in    16:38:38
6    the past rather than the future, right? The end of    16:38:41
7    July was in the past relative to August 1st.    16:38:43
8         Q.    I don't understand that.    16:38:46
9         A.    Okay. There are references, and I    16:38:48
10   don't remember the exact references I would have to    16:38:50
11   read the magazine again. There are references -- my    16:38:52
12   recollection is that there are references to things    16:38:55
13   that are happening at the tail end of July as if    16:38:58
14   those things were happening in the future.    16:39:03
15   Presumably the end of July, well, not presumably,    16:39:08
16   the end of July is before the beginning of August.    16:39:13
17   So if the magazine wasn't published until the    16:39:15
18   beginning of August, those things that happened at    16:39:18
19   the end of July would have, in fact, been in the    16:39:22
20   past, not the future.            16:39:23
21        Q.    Well, what if the author was    16:39:23
22   writing -- it takes a while to write an article,    16:39:25
23   does it not?                     16:39:27
24        A.    Yes.                  16:39:28

Page 269

1         Q.    I am just trying to understand why    16:39:28
2    that leads you to the conclusion that it was    16:39:31
3    published sometime in the middle of July?    16:39:36
4         A.    The writer would know when its article    16:39:38
5    was going to be published and would write taking    16:39:42
6    that into consideration.         16:39:46
7         Q.    I see. Any other reasons why?    16:39:47
8         A.    No.                   16:39:49
9         Q.    21E, first sentence. "Consumer and    16:39:49
10   investor knowledge of gray marketing likely    16:40:05
11   increased in tandem with the increase of Adams Golf    16:40:08
12   clubs available and/or sold through gray market    16:40:12
13   channels." Did you do any analysis to lead you to    16:40:16
14   that conclusion? Well, actually, is that a    16:40:23
15   conclusion or speculation?       16:40:26
16        A.    The word "likely" I think speaks for    16:40:28
17   itself.                          16:40:30
18        Q.    Just for the record, what is it?    16:40:31
19        A.    It is speculative.    16:40:39
20        MR. COLLINS:    Is there a question    16:40:41
21   pending or is that it?           16:40:43
22        MR. BESSETTE:    No. That's -- I think    16:40:44
23   that answers that one.           16:40:46

68 (Pages 266 to 269)

Page 270

1  BY MR. BESSETTE:                  16:40:47
2    Q.  28B.                        16:40:49
3    A.  Can I actually just come back to 21E  16:40:59
4  for a second?                     16:41:02
5    Q.  Sure.                       16:41:03
6    A.  I just want to take a second to read  16:41:03
7  that paragraph to make sure I gave you a full  16:41:07
8  answer. There is a little bit more that went into  16:41:09
9  that statement. I can tell you what that was.  16:41:45
10   Q.  Sure.                       16:41:47
11   A.  There was some documents, again, I am  16:41:48
12 not going to remember exactly which exhibits they  16:41:53
13 were, that talked about the nature of the golf  16:41:56
14 industry and the rapidity with which information  16:41:59
15 spreads within the golf industry. And that would  16:42:04
16 inform my statement that consumer investor knowledge  16:42:06
17 would increase, together with the availability of  16:42:10
18 Adams' clubs in Costcos. Right, so --   16:42:14
19   Q.  But you have no proof of that  16:42:18
20 statement to back it up?           16:42:20
21   A.  Correct.                     16:42:21
22   Q.  You are making an assumption based on  16:42:22
23 something else you read?           16:42:24
24   A.  Correct.                     16:42:25

Page 271

1    Q.  28B, last sentence. You are talking  16:42:26
2  about the 8,400 clubs that Costco had purchased pre  16:42:34
3  IPO.                             16:42:59
4    A.  I'm sorry, 28B? I was in the wrong  16:42:59
5  place.                           16:42:59
6    Q.  28B, page 18.                 16:42:59
7    A.  Yeah.                        16:42:59
8    Q.  You can read that paragraph. You talk  16:43:00
9  about the clubs. And you say in the last sentence,  16:43:02
10 "These 8,400 plus sales were nonetheless included in  16:43:03
11 the company's total sales volume figures as  16:43:08
12 presented to potential investors." Now, how do you  16:43:11
13 know that?                        16:43:15
14   A.  Because the company sold those clubs,  16:43:15
15 I would assume that they had an accurate accounting  16:43:30
16 of the clubs they sold.            16:43:32
17   Q.  Is it your understanding that the  16:43:33
18 company presented its Q2 numbers to potential  16:43:36
19 investors?                        16:43:41
20   MR. COLLINS: Could you make that more  16:43:41
21 crisp, please? You mean in the IPO? In the IPO  16:43:45
22 prospectus?                       16:43:48
23   MR. BESSETTE: Anywhere.          16:43:49
24   Q.  I mean, you say here, "These 8,400  16:43:50

Page 272

1  plus sales were nonetheless included in the  16:43:52
2  company's total sales volume figures as presented to  16:43:56
3  potential investors." Good point.  16:43:56
4    Let me ask you, as presented to  16:43:58
5  potential investors where and when?  16:44:02
6    A.  In the prospectus.           16:44:04
7    Q.  Are there any sales numbers for the  16:44:05
8  second quarter of 1998 in the prospectus?  16:44:09
9    A.  Let me look at the prospectus again.  16:44:12
10   MR. COLLINS: Can I cut this short?  16:44:14
11   MR. BESSETTE: Yeah.             16:44:14
12   MR. COLLINS: We can stipulate that  16:44:15
13 the second quarter numbers are not in the  16:44:16
14 prospectus.                       16:44:18
15   MR. BESSETTE: Okay.             16:44:18
16   THE WITNESS: Great.             16:44:18
17   MR. COLLINS: And Professor Ochoa is  16:44:19
18 not offering --                   16:44:21
19   THE WITNESS: You're right.       16:44:21
20   MR. COLLINS: -- is not offering an  16:44:22
21 opinion on the second quarter financial statements.  16:44:25
22   MR. BESSETTE: That's fine. That  16:44:30
23 statement is then wrong for the record. That  16:44:32
24 statement is incorrect.            16:44:40

Page 273

1    MR. COLLINS: I think we have a  16:44:47
2  disconnect.                       16:44:48
3  BY MR. BESSETTE:                   16:44:49
4    Q.  If that statement is not incorrect,  16:44:49
5  tell me where and when second quarter sales numbers  16:44:51
6  were presented to potential investors?  16:44:56
7    MR. COLLINS: If you know, please  16:45:01
8  answer.                          16:45:03
9  BY THE WITNESS:                    16:45:03
10   A.  I don't know.               16:45:05
11 BY MR. BESSETTE:                    16:45:07
12   Q.  So you put this statement in here  16:45:08
13 without any evidence or knowledge?  16:45:10
14   MR. COLLINS: About --           16:45:13
15 BY THE WITNESS:                     16:45:13
16   A.  About what?                 16:45:14
17 BY MR. BESSETTE:                    16:45:14
18   Q.  About what you say here.      16:45:16
19 I guess if you can give me a full  16:45:17
20 question, that would be great.     16:45:22
21   Q.  Okay. How about tell me what your  16:45:24
22 basis is for saying that 8,400 clubs sold to Costco  16:45:25
23 in the second quarter were reflected in the numbers  16:45:28
24 of the company as presented to potential investors?  16:45:31

69 (Pages 270 to 273)

Page 274

1       MR. COLLINS: Asked and answered.    16:45:36
2    BY THE WITNESS:                        16:45:37
3       A.   I don't know.                  16:45:37
4    BY MR. BESSETTE:                       16:45:38
5       Q.   Is that statement correct?     16:45:38
6       A.   I believe at least some portion of    16:45:40
7    that statement is correct.             16:45:43
8       Q.   Based on what?                 16:45:44
9       MR. COLLINS: Asked and answered.    16:45:46
10   BY THE WITNESS:                        16:45:46
11      A.   Not all of the 8,400 clubs were sold   16:45:47
12   in the second quarter.                 16:45:50
13   BY MR. BESSETTE:                       16:45:52
14      Q.   Well, you say in this paragraph that   16:45:53
15   it was. Second sentence. "In all, Costco purchased   16:45:54
16   in excess of 8,400 Adams Golf clubs in the second   16:45:59
17   quarter prior to the IPO."             16:46:03
18      A.   Sorry. I will retract that last   16:46:05
19   statement.                             16:46:08
20      Q.   I mean, the truth is, you don't know,   16:46:08
21   right? Whether the second quarter numbers presented   16:46:10
22   to investors or whether they were presented to    16:46:13
23   investors?                             16:46:17
24      MR. COLLINS: Ever, is that the     16:46:18

Page 275

1    question?                              16:46:19
2    BY MR. BESSETTE:                       16:46:19
3       Q.   Potential investors before the IPO?   16:46:20
4       MR. COLLINS: Oh, okay.             16:46:20
5    BY THE WITNESS:                        16:46:23
6       A.   That's right.                  16:46:23
7       MR. COLLINS: Just for the record, I   16:46:28
8    haven't read the whole paragraph, but I don't think   16:46:30
9    anywhere this says that was presented to the    16:46:32
10   potential investors in the prospectus before the   16:46:32
11   IPO.                                   16:46:32
12      MR. BESSETTE: Well, I actually asked   16:46:38
13   how was it presented to potential investors. The   16:46:39
14   one answer you gave me was the prospectus.   16:46:41
15   BY MR. BESSETTE:                       16:46:41
16      Q.   Is there another one?          16:46:42
17      A.   Yes. I made a mistake.         16:46:42
18      Q.   Okay. What is the other basis for   16:46:43
19   saying it was presented to potential investors?   16:46:45
20      MR. COLLINS: Asked and answered. Do   16:46:49
21   you have anything to add to what you said before?   16:46:5
22      THE WITNESS: I don't. No.          16:46:58
23   BY MR. BESSETTE:                       16:46:58
24      Q.   So is there any basis for that   16:46:59

Page 276

1    statement, Professor?                  16:47:01
2       MR. COLLINS: Asked and answered. Do   16:47:02
3    you have anything to add?              16:47:03
4    BY THE WITNESS:                        16:47:03
5       A.   If you look at the middle of the   16:47:03
6    paragraph, it says, "The company repeatedly stated   16:47:06
7    before and after the initial public offering," and   16:47:12
8    there I was considering at the time after the   16:47:15
9    initial public offering, and the company did make   16:47:17
10   disclosure to its investors after its initial public   16:47:17
11   offering that quarter.                 16:47:22
12   BY MR. BESSETTE:                       16:47:22
13      Q.   Okay. So the basis for this statement   16:47:22
14   is presumably it is quarterly filing for the second   16:47:24
15   quarter that sometime after the IPO reflected Q2   16:47:28
16   numbers?                               16:47:32
17      A.   Yes.                          16:47:32
18      Q.   Is that what you had in mind at the   16:47:33
19   time you wrote this?                   16:47:35
20      A.   I don't remember exactly right now.   16:47:36
21      Q.   Your rebuttal report, please.   16:47:40
22   Paragraph 9, page 5, the first part of it, second   16:48:08
23   sentence. "Information about Adams was rapidly   16:48:12
24   spread throughout the market." Tell me what your   16:48:17

Page 277

1    evidence is for that statement, please.   16:48:40
2       A.   Let me read the paragraph, just one   16:48:42
3    second. There was at least one document which I   16:48:44
4    read in which the nature of the golf industry in   16:49:32
5    relation to information was discussed, and it was   16:49:36
6    discussed in a way that made it clear that within   16:49:38
7    the golf industry information about companies and   16:49:42
8    innovations spreads rapidly.           16:49:46
9       Q.   Do you know what document that is?   16:49:50
10      A.   I don't remember right now.     16:49:51
11      Q.   Not something we have touched on   16:49:52
12   today?                                 16:49:55
13      A.   I don't believe so, no. I don't   16:49:55
14   remember right now.                    16:49:58
15      Q.   Is that your belief as you sit here   16:49:58
16   today?                                 16:50:05
17      A.   Yes.                          16:50:05
18      Q.   And do you have evidence that it   16:50:05
19   actually -- that information about Adams was spread   16:50:08
20   rapidly throughout the market?         16:50:12
21      MR. COLLINS: Apart from what she just   16:50:14
22   testified to?                          16:50:16
23   BY MR. BESSETTE:                       16:50:16
24      Q.   Well, I think what you said was that   16:50:17

70 (Pages 274 to 277)

Page 278

1  you read something that in the golf industry    16:50:18
2  information does spread. What I am asking about is,    16:50:20
3  do you have evidence that information about Adams    16:50:22
4  reached the market quickly?    16:50:25
5      A.    Not specific information.    16:50:27
6      Q.    Paragraph 13, staying with the    16:50:36
7  rebuttal. Now, 13 is a long one, well, fairly long,    16:50:38
8  talking about pricing policies before and after the    16:50:47
9  IPO. And it is essentially talking about the    16:50:50
10  erosion of retail or profit margins, where, again,    16:50:54
11  you cite Eddie Tate, making quotes and stuff. And    16:50:58
12  then you say, "In this highly competitive    16:51:04
13  environment, it was possible or likely that sales of    16:51:07
14  Adams Golf clubs would decline as soon as a    16:51:10
15  competitor, such as Orlimar, offered a higher profit    16:51:13
16  margin or the possibility of profit sharing, thus    16:51:17
17  causing the competitor to gain favor with    16:51:17
18  retailers." You cite the Wall Street report.    16:51:20
19      A.    It should have been Web Street report.    16:51:23
20      Q.    You're right. I'm sorry. The Web    16:51:26
21  Street.    16:51:26
22          And so the whole paragraph is    16:51:27
23  dealing with eroding margins and competition. And    16:51:29
24  essentially you state the competition -- the    16:51:35

Page 279

1  competition could cause Adams Golf's sales to    16:51:38
2  decline and margins to erode. Now, you are aware    16:51:42
3  that Adams Golf warned of those specific risks in    16:51:46
4  the prospectus?    16:51:49
5          MR. COLLINS: Excuse me. The    16:51:49
6  paragraph speaks for itself.    16:51:50
7          Go ahead.    16:51:52
8          Vague and ambiguous as well.    16:51:53
9  BY MR. BESSETTE:    16:51:56
10      Q.    Let me ask you this: You are aware,    16:51:57
11  are you not, Professor, that Adams Golf warned in    16:52:00
12  its prospectus that it could suffer, because of    16:52:03
13  competition, and that margins and prices for its    16:52:09
14  products might decline?    16:52:14
15      A.    Yes.    16:52:16
16          (Break taken.)    17:25:08
17  BY MR. BESSETTE:    17:25:11
18      Q.    All right. Professor, staying on the    17:25:45
19  rebuttal, moving on I believe to Paragraph 21. In    17:25:49
20  connection with that, as you get there, you see you    17:25:55
21  cited Exhibit 74 and 98. So I have put those both    17:25:57
22  right here. Do you have Exhibit 21 -- I am sorry    17:26:01
23  Paragraph 21, Paragraph 21 of your rebuttal    17:26:45
24  Exhibit 304?    17:26:49

Page 280

1      A.    Yeah.    17:26:50
2          MR. COLLINS: Do you want to get to    17:26:51
3  the proper paragraph?    17:26:52
4          THE WITNESS: Yeah. I am almost    17:27:04
5  there.    17:27:06
6  BY MR. BESSETTE:    17:27:06
7      Q.    Paragraph 21, first sentence.    17:27:49
8  "According to the Grace report, at the time of the    17:27:52
9  IPO only 2 percent of total sales occurred through    17:27:55
10  Costco stores." To your understanding, is that a    17:27:59
11  true statement?    17:28:04
12          MR. COLLINS: Vague and ambiguous.    17:28:06
13  BY THE WITNESS:    17:28:09
14      A.    My understanding is that that    17:28:09
15  statement is true. The statement that I wrote is    17:28:11
16  true as I wrote it.    17:28:12
17  BY MR. BESSETTE:    17:28:13
18      Q.    Okay. And what did you understand --    17:28:14
19  the 2 percent of total sales occurred through Costco    17:28:17
20  stores, what do you understand that to mean?    17:28:21
21      A.    What I understand that to mean is that    17:28:26
22  2 percent -- exactly what it says. That 2 percent    17:28:29
23  of the company's total sales, there was a figure    17:28:32
24  that was company's total sales. 2 percent of that    17:28:37

Page 281

1  was through Costco stores.    17:28:40
2      Q.    And that 2 percent is the 8,400, not    17:28:42
3  the 3,915. Do you understand that?    17:28:46
4      A.    I am trying to do the math in my head    17:28:48
5  right now, which I simply can't do.    17:28:55
6          MR. COLLINS: It is late. I am sure    17:28:56
7  the two sides can stipulate to that.    17:28:59
8          MR. BESSETTE: Yeah.    17:29:02
9  BY MR. BESSETTE:    17:29:02
10      Q.    I will represent to you that the 8,400    17:29:02
11  that we have now learned through the Costco    17:29:05
12  documents that they had purchased pre IPO in 1998    17:29:10
13  represents about 2 percent or in that range of the    17:29:12
14  total pre IPO 1998 sales of Adams Golf.    17:29:15
15      A.    Okay.    17:29:19
16          MR. COLLINS: Is that in both quarters    17:29:20
17  or just the second quarter?    17:29:22
18          MR. BESSETTE: Both. First and second    17:29:24
19  quarter, so I am saying 1998 pre IPO. So    17:29:25
20  essentially January through the end of June, since    17:29:30
21  we don't know the first nine days of July.    17:29:33
22          MR. COLLINS: One other question. Do    17:29:36
23  you know what percentage it is of the second quarter    17:29:38
24  sales?    17:29:43

71 (Pages 278 to 281)

Page 282

1    MR. BESSETTE: I believe -- off the    17:29:43
2 record.                                  17:29:45
3         (Off the record    17:29:45
4         discussion.)    17:30:13
5 BY MR. BESSETTE:                         17:30:13
6    Q.  So I am trying to understand what you    17:30:14
7 say here. In the second sentence you say, "This    17:30:15
8 misstates the quantitative risk the gray market    17:30:19
9 posed to the company in at least two ways." You    17:30:19
10 say, "First, Mr. Grace bases his figure on Adams    17:30:22
11 Clubs sold through Costco rather than on clubs    17:30:27
12 purchased." And they purchased 8,400. What I am    17:30:29
13 saying now, representing to you is the 8,400 is what    17:30:33
14 is 2 percent of the company's total sales in 1998,    17:30:38
15 the first two quarters. So does that still make    17:30:42
16 sense?                                   17:30:47
17    MR. COLLINS: I don't think we can    17:30:48
18 change that on the basis of your representation.    17:30:49
19 Although we have all due respect for you, Paul. So    17:30:52
20 therefore, it is what it is.             17:30:56
21    MR. BESSETTE: Let her answer that.    17:30:58
22    MR. COLLINS: That's fine.    17:31:00
23 BY THE WITNESS:                          17:31:01
24    A.  Again, I am not doing the math in my    17:31:01

Page 283

1 head.    17:31:03
2 BY MR. BESSETTE:    17:31:03
3    Q.  Let me ask you this then: Your    17:31:04
4 distinction here, your first point you are making is    17:31:07
5 that Mr. Grace must have -- that the 2 percent of    17:31:09
6 sales misstates the quantitative risks because    17:31:13
7 Costco purchased 8,400 not 3,915, and you are    17:31:17
8 assuming in this paragraph that the 2 percent is    17:31:22
9 reflective of the 3,915, is that right?    17:31:25
10    A.  I think the Grace report misstates the    17:31:27
11 quantitative risk because he presents -- I don't    17:31:30
12 even think he uses the 3,915. He uses some number    17:31:32
13 close to that number, and never discusses the 8,400    17:31:35
14 number as I recall, the total clubs purchased rather    17:31:40
15 than -- the total clubs sold by Costco rather than    17:31:45
16 the total clubs purchased.    17:31:47
17    Q.  If the total number of clubs at a    17:31:49
18 Costco purchased in the first half of 1998 was    17:31:54
19 8,400, and that represented 2 percent of Adams Golf    17:31:59
20 sales of clubs in the same time period, by itself,    17:32:05
21 is that an immaterial risk to Adams Golf, that    17:32:12
22 number, just the quantitative risk?    17:32:16
23    MR. COLLINS: Vague and ambiguous.    17:32:19
24    17:32:19

Page 284

1 BY THE WITNESS:    17:32:19
2    A.  Well, the last part of that question    17:32:21
3 was not something I was expecting. If you can give    17:32:23
4 me the question again, that would be great.    17:32:25
5 BY MR. BESSETTE:    17:32:25
6    Q.  Okay. The predicate is, you say in    17:32:26
7 the second sentence that this, meaning the first    17:32:26
8 statement --    17:32:29
9    A.  Yep.    17:32:29
10    Q.  -- okay. 2 percent of sales occurred    17:32:30
11 through Costco. You say that misstates the    17:32:33
12 quantitative risk that the gray market posed for two    17:32:36
13 reasons, okay, and we will get into the second. But    17:32:40
14 right now, your first reason is, you are saying    17:32:42
15 that, you know, they purchased 8,400, not 3,915. So    17:32:44
16 since we don't want to do any math, what I am saying    17:32:49
17 is, if the 8,400 that Costco purchased in the first    17:32:52
18 half of 1998 represents 2 percent of Adams Golf's    17:32:56
19 sales in that same time frame, okay?    17:33:00
20    A.  Okay.    17:33:02
21    Q.  That quantitative risk, in your mind,    17:33:03
22 just the quantitative risk, is that immaterial, 2    17:33:08
23 percent?    17:33:12
24    MR. COLLINS: Vague and ambiguous.    17:33:12

Page 285

1 BY THE WITNESS:    17:33:16
2    A.  Is it immaterial? No.    17:33:17
3 BY MR. BESSETTE:    17:33:17
4    Q.  Why not?    17:33:17
5    A.  For all the reasons that I have stated    17:33:18
6 in my reports. It is not the 2 percent or any other    17:33:20
7 percentages that you might -- that we could talk    17:33:24
8 about speculatively or hypothetically, rather, that    17:33:27
9 I focused on. Rather, I focused on the company's    17:33:32
10 business model and the characteristics of the gray    17:33:35
11 market and how those two coalesced in creating    17:33:38
12 opportunity for the gray market and risks to the    17:33:43
13 company.    17:33:46
14    Q.  And I understand all that. I am    17:33:46
15 putting that in a qualitative risk, okay. I mean,    17:33:49
16 the company being more susceptible to gray    17:33:51
17 marketing, as you've listed in your report, and all    17:33:55
18 those reasons. I am just saying, the number of    17:33:58
19 clubs sold by Costco in the first half of 1998    17:34:01
20 versus the number of clubs Adams Golf sold to the    17:34:04
21 public, you know, its total, is 2 percent a material    17:34:07
22 amount in your mind, just the number?    17:34:11
23    MR. COLLINS: Vague and ambiguous,    17:34:13
24 outside the scope.    17:34:16

72 (Pages 282 to 285)

## Page 286

```
1        Go ahead.                    17:34:17
2   BY THE WITNESS:                   17:34:18
3     A.   Given the context, yes.    17:34:18
4   BY MR. BESSETTE:                  17:34:20
5     Q.   And you base that on all the   17:34:20
6   qualitative factors that you've discussed?   17:34:23
7     A.   Right.                     17:34:26
8     Q.   Okay. You can't answer me without   17:34:26
9   carving out the qualitative factors, is that what   17:34:29
10  you're trying to tell me?         17:34:32
11       MR. COLLINS: And it is outside the   17:34:32
12  scope.                            17:34:32
13       Go ahead.                    17:34:34
14  BY MR. BESSETTE:                  17:34:36
15    Q.   Because I asked you to cut out the   17:34:36
16  qualitative factors.              17:34:36
17       MR. COLLINS: I guess he is asking,   17:34:37
18  have you considered purely on the basis of numbers   17:34:38
19  is it a serious risk. I think that's his question,   17:34:41
20  if you considered that, what's your answer.   17:34:41
21  BY THE WITNESS:                   17:34:44
22    A.   I have thought about it, but I haven't   17:34:44
23  decontextulized it from all the other factors that   17:34:51
24  we have talked about today.       17:34:53
```

## Page 287

```
1   BY MR. BESSETTE:                  17:34:54
2     Q.   All right. Fair enough. So tell me   17:34:54
3   then, what you mean in your first point there, that   17:34:57
4   Mr. Grace has misstated the quantitative risk that   17:35:01
5   the gray market posed. Can you explain to me what   17:35:065
6   you mean then in those two sentences?   17:35:09
7     A.   Let me just read the paragraph.   17:35:11
8   Sorry, can you give me the question one more time?   17:35:528
9     Q.   I would like to know what you mean in   17:35:59
10  those two sentences following the word "First."   17:36:02
11    A.   Mr. Grace, in his report, talked   17:36:04
12  about -- did not talk about the clubs purchased by   17:36:15
13  Costco, rather he talked about the clubs sold   17:36:18
14  through Costco. And I think that's a misstatement   17:36:21
15  of the quantitative risk faced by the company.   17:36:24
16    Q.   And if you are mistaken, has he   17:36:28
17  misstated the quantitative risk?   17:36:31
18    A.   Say that again? If I'm --   17:36:35
19       MR. COLLINS: Vague and ambiguous.   17:36:36
20  BY MR. BESSETTE:                  17:36:38
21    Q.   If you are mistaken on that point, has   17:36:38
22  he then mistaken the quantitative risk?   17:36:40
23    A.   If I am mistaken on which point?   17:36:47
24       MR. BESSETTE: Would you read her   17:36:50
```

## Page 288

```
1   prior answer, please?             17:36:50
2        (Record read.)               17:36:50
3   BY MR. BESSETTE:                  17:37:09
4     Q.   I'm sorry. So let me ask this: Are   17:37:09
5   you referring to Mr. Grace referring to the clubs   17:37:14
6   sold, the 3,900 representing 2 percent, or the 8,400   17:37:18
7   representing 2 percent?           17:37:25
8        MR. COLLINS: This is hopelessly   17:37:26
9   confused at this point. Should we pull out the   17:37:29
10  Grace report? Would that be helpful?   17:37:32
11       MR. BESSETTE: Sure.          17:37:35
12       MR. COLLINS: Can I go off the record   17:37:36
13  and try to cut through this quickly? Or on the   17:37:36
14  record, I don't care. Let me stay on the record.   17:37:39
15       MR. BESSETTE: All right.     17:37:39
16       MR. COLLINS: My recollection is that   17:37:40
17  Grace used the number of 3,915 or 38 and change. I   17:37:42
18  don't think he used the number of 8,400. Now,   17:37:49
19  today, Paul, you have said that the 2 percent of   17:37:52
20  total sales was arrived at using a numerator of   17:37:55
21  8,400, or thereabout, as opposed to 3, 900 or   17:38:02
22  thereabouts. If that's the case, then whatever it   17:38:09
23  is, it is. And we can certainly work it out as a   17:38:12
24  matter of stipulation of agreed facts for trial.   17:38:15
```

## Page 289

```
1   But I think the problem lies in my recollection in   17:38:18
2   imprecision in the Grace report if, in fact, you are   17:38:24
3   right that the 2 percent uses as a numerator 8,400,   17:38:27
4   as opposed to 3,900.              17:38:33
5        MR. BESSETTE: Okay. Let's take a   17:38:33
6   look. Well, Exhibit 7, page 6 reflects total pre   17:38:53
7   IPO numbers for U.S. and Canada in the 8,400 range.   17:38:58
8        MR. COLLINS: Pre IPO total as of   17:39:06
9   7-8-98?                           17:39:09
10       MR. BESSETTE: Right.         17:39:10
11       MR. COLLINS: My recollection is the   17:39:10
12  report uses the 38 and change.    17:39:13
13       THE WITNESS: That's my recollection   17:39:17
14  as well.                          17:39:19
15       MR. GLUCKOW: Off the record.   17:39:22
16       (Off the record             17:39:22
17       discussion.)                 17:39:42
18       MR. COLLINS: Let's keep this on the   17:39:42
19  record now. We are now looking at page 18 of the   17:39:44
20  Grace report, paragraph beginning "Documents   17:39:47
21  produced by Costco," and the witness is reading that   17:39:50
22  paragraph.                        17:39:53
23  BY THE WITNESS:                   17:40:37
24    A.   Okay.                      17:40:37
```

73 (Pages 286 to 289)

Page 290

1  BY MR. BESSETTE:                          17:40:39
2     Q.   When you wrote your rebuttal report,  17:40:47
3  Professor, did you make the assumption that the  17:40:50
4  2 percent of total sales occurring through Costco  17:40:53
5  stores was represented by the 3,200 in U.S. and 660  17:40:56
6  in Canada reflected in Mr. Grace's report?  17:41:06
7     A.   Yes, I think so.                    17:41:10
8     Q.   If the 2 percent being referred to   17:41:11
9  here and in your report is actually based on the  17:41:26
10 units Costco purchased, the 8,400, is it still your  17:41:32
11 testimony that Mr. Grace has misstated the  17:41:34
12 quantitative risk as you've stated it in Paragraph  17:41:38
13 21 of your report?                          17:41:42
14          MR. COLLINS: Objection, vague and   17:41:42
15 ambiguous.                                  17:41:42
16          Go ahead.                          17:41:43
17 BY THE WITNESS:                             17:41:43
18     A.   It would still be my testimony that he  17:41:43
19 misstates the quantitative risk, yes.       17:41:46
20 BY MR. BESSETTE:                            17:41:49
21     Q.   And is that for the reasons that you  17:41:50
22 have already indicated the qualitative factors that  17:41:52
23 you haven't divorced from your mind?         17:41:55
24     A.   Correct.                           17:41:57

Page 291

1     Q.   Okay. And then I guess the second    17:41:57
2  reason, which you say, "In addition, at the time of  17:41:59
3  the company's IPO sales for the third and fourth  17:42:02
4  quarters of 1998 were projected to take a downward  17:42:07
5  turn." And you cite Exhibit 74 and Exhibit 98.  17:42:11
6     A.   Uh-huh.                             17:42:14
7     Q.   Now, Exhibit 74 is a commitment      17:42:15
8  committee memorandum by Lehman Brothers?     17:42:20
9     A.   Yep.                                17:42:25
10    Q.   Which is, I believe dated April 28th.  17:42:25
11 So that was in existence prior to the IPO. The  17:42:29
12 second document is Exhibit 98, which appears to be a  17:42:34
13 Nations Bank Montgomery Securities report. It's  17:42:42
14 dated August 4, 1998. Was that in existence at the  17:42:48
15 time of the IPO?                            17:42:52
16    A.   The date would indicate not.        17:42:54
17    Q.   Now, what is your basis in Exhibit 74  17:42:57
18 for claiming that the projections -- well, for  17:43:01
19 claiming that the company's sales for the third and  17:43:05
20 fourth quarters of 1998 were projected to take a  17:43:09
21 downward turn?                             17:43:13
22          MR. COLLINS: The document speaks for  17:43:14
23 itself.                                    17:43:15
24          Go ahead.                          17:43:17

Page 292

1  BY THE WITNESS:                             17:43:17
2     A.   If you look at Table 4, the first line  17:43:18
3  of the table is net sales. And if you read across  17:43:21
4  that line, you can see that progressing into the  17:43:23
5  future sales were projected to take a downward turn.  17:43:26
6  BY MR. BESSETTE:                            17:43:30
7     Q.   Now, how do you square that with the  17:43:30
8  verbiage above, where Lehman says, "The company is  17:43:34
9  expected to experience top line growth of over 30  17:43:34
10 percent through the year 2002"?              17:43:39
11          MR. COLLINS: Document speaks for    17:43:48
12 itself.                                    17:43:50
13 BY MR. BESSETTE:                            17:43:51
14    Q.   Well, let me ask you: Did you read    17:43:51
15 that sentence before you took the information from  17:43:53
16 Table 4 and used it in your report?          17:43:57
17          MR. COLLINS: I am just going to say,  17:44:02
18 I think we are talking apples and oranges. Since  17:44:05
19 you have very few minutes left, if you want --  17:44:08
20          MR. BESSETTE: I don't believe I am.  17:44:08
21 BY MR. BESSETTE:                            17:44:08
22    Q.   Can you answer my question, please?  17:44:09
23          MR. COLLINS: Go ahead.             17:44:11
24

Page 293

1  BY THE WITNESS:                             17:44:11
2     A.   I was focusing on Table 4, because as  17:44:12
3  the verbiage in the paragraph proceeding it says,  17:44:15
4  "Lehman Brothers quarterly income statement  17:44:19
5  projections for '98 and '99 and annual projections  17:44:19
6  through 2002 are set forth in Table 4." I then  17:44:23
7  focused on Table 4.                         17:44:27
8  BY MR. BESSETTE:                            17:44:29
9     Q.   Okay. And in particular I guess you  17:44:29
10 looked at the third and fourth quarter, those  17:44:30
11 columns?                                   17:44:33
12    A.   Yes.                                17:44:35
13    Q.   Okay. And then how about 1999, those  17:44:46
14 quarters, first and second? Were they higher or  17:44:57
15 lower than estimates -- were they higher or lower  17:45:01
16 than the third and fourth quarters of '98?  17:45:05
17          MR. COLLINS: The document speaks for  17:45:05
18 itself.                                    17:45:06
19 BY THE WITNESS:                             17:45:07
20    A.   The first and second quarters of 1999  17:45:09
21 were both higher than the third and fourth quarters  17:45:14
22 of '98.                                    17:45:17
23 BY MR. BESSETTE:                            17:45:18
24    Q.   So I am just trying to understand.   17:45:18

74 (Pages 290 to 293)

Page 294

1  What is the basis for your thought that the third  17:45:20
2  and fourth quarters were projected to take a  17:45:23
3  downward trend -- Strike that.  17:45:25
4        Did you consider that the third  17:45:28
5  and fourth quarter numbers reflected seasonality?  17:45:29
6  Or did you think that the third and fourth quarter  17:45:32
7  estimates as reflected in Exhibit 74 were due to  17:45:37
8  demand or something else?  Did you give it any  17:45:42
9  thought?  17:45:46
10       MR. COLLINS:  Objection.  Exhibit 74  17:45:46
11  speaks for itself.  And, of course, Paragraph 21 of  17:45:48
12  the rebuttal report speaks for itself.  17:45:51
13 BY THE WITNESS:  17:45:56
14   A.  I considered why that might be. I  17:45:56
15  didn't particularly focus on that, on the reasons  17:46:01
16  for the downward turn.  17:46:03
17 BY MR. BESSETTE:  17:46:05
18   Q.  Well, doesn't that matter in your  17:46:06
19  opinion here, Professor?  17:46:08
20       MR. COLLINS:  In Paragraph 21, is that  17:46:09
21  the question?  17:46:11
22 BY MR. BESSETTE:  17:46:13
23   Q.  Well, aren't you saying that the third  17:46:14
24  and fourth quarter downward projections presented a  17:46:15

Page 295

1  serious risk as it relates to the gray market?  Your  17:46:19
2  whole rationale here is that if the gray market  17:46:23
3  remained constant, with downward projections, it was  17:46:27
4  going to have a bigger effect.  I mean, that's what  17:46:30
5  you are saying in this paragraph, are you not?  17:46:33
6    A.  In this paragraph, I am not talking at  17:46:35
7  all about the cause of the downward turn.  17:46:38
8    Q.  Right.  I am questioning your  17:46:41
9  characterization of the downward turn.  Because the  17:46:52
10 estimates for Q3 and Q4 were lower than Q1 and Q2 in  17:46:56
11 your mind, as you stated in this paragraph, that is  17:47:02
12 a downward turn, is that right?  17:47:04
13   A.  Yes.  17:47:09
14   Q.  Were these the company's projections  17:47:10
15 or the underwriter's projections?  17:47:12
16   A.  This is a Lehman Brothers report.  17:47:14
17   Q.  Do you have any knowledge of whether  17:47:17
18 the company received this report or had any  17:47:18
19 knowledge of what the underwriter's projections for  17:47:22
20 the company were?  17:47:25
21   A.  I am trying to think about whether I  17:47:26
22 have seen it in company documentation.  I don't  17:47:32
23 remember with any definite assurance that the  17:47:40
24 company saw this report before its IPO.  It was  17:47:44

Page 296

1  working very closely with Lehman Brothers, however.  17:47:47
2    Q.  Do you know before the IPO whether the  17:47:50
3  company itself internally projected that Q3 and Q4  17:47:55
4  were going to take a downward turn?  17:47:55
5    A.  I don't know.  17:47:57
6    Q.  Does it make a difference to you  17:47:58
7  whether the company internally projected a downward  17:48:01
8  turn for Q3 and Q4 versus the underwriters?  17:48:04
9        MR. COLLINS:  Is the question related  17:48:09
10 again to Paragraph 21?  17:48:10
11       MR. BESSETTE:  Yes.  Only related to  17:48:13
12 Paragraph 21.  17:48:15
13 BY THE WITNESS:  17:48:16
14   A.  Can you ask the question again?  17:48:17
15       MR. BESSETTE:  Can you read it back,  17:48:17
16 please?  17:48:17
17       (Record read.)  17:48:32
18 BY THE WITNESS:  17:48:32
19   A.  There is a distinction there.  17:48:32
20 BY MR. BESSETTE:  17:48:34
21   Q.  Can you explain what it is?  17:48:34
22   A.  I think it is a fine distinction  17:48:35
23 relative to investors.  The company's internal  17:48:37
24 projections may have been slightly different from  17:48:45

Page 297

1  Lehman Brothers.  I don't know.  If they were, I  17:48:48
2  would have to see where those projections were and  17:48:51
3  compared them to Lehman Brothers projections, and  17:48:54
4  then I might be able to come up with some sort of  17:48:54
5  thoughts about what the differences would be.  17:49:00
6    Q.  What is your basis, Professor, for  17:49:00
7  opining as to what investors would consider  17:49:03
8  significant in terms of whether there were you  17:49:06
9  underwriter's projections or the company's  17:49:09
10 projections?  What basis do you have to even make  17:49:11
11 that assessment?  17:49:14
12       MR. COLLINS:  Outside the scope of the  17:49:15
13 opinion.  17:49:17
14 BY MR. BESSETTE:  17:49:17
15   Q.  Let me ask you:  Do you have any basis  17:49:18
16 at all?  17:49:20
17       MR. COLLINS:  Or do you have any  17:49:21
18 opinion?  17:49:23
19 BY THE WITNESS:  17:49:23
20   A.  Right.  Those are two different  17:49:24
21 things.  17:49:27
22 BY MR. BESSETTE:  17:49:27
23   Q.  Do you have a basis to assess the  17:49:28
24 difference to a potential investor -- Strike that.  17:49:30

75  (Pages 294 to 297)

Page 298

1        Do you have a basis to assess the    17:49:39
2 significance to a potential investor of    17:49:41
3 underwriter's estimates of future earnings or the    17:49:45
4 company's estimates of future earnings?    17:49:48
5        MR. COLLINS: Outside the scope.    17:49:51
6 Please.    17:49:52
7 BY THE WITNESS:    17:49:52
8    A.    That is outside of my realm of    17:49:52
9 expertise in this matter.    17:49:55
10 BY MR. BESSETTE:    17:49:56
11    Q.    Do you have any basis to make that    17:49:57
12 assessment?    17:49:59
13        MR. COLLINS: She just answered.    17:50:00
14 BY THE WITNESS:    17:50:02
15    A.    Again, it is outside the scope of my    17:50:03
16 expertise in this matter.    17:50:05
17 BY MR. BESSETTE:    17:50:05
18    Q.    So you have not made that assessment    17:50:06
19 in this case, have you? Since it is outside your    17:50:06
20 expertise?    17:50:07
21    A.    Right.    17:50:07
22    Q.    Is that the same thing as saying you    17:50:09
23 have no basis to make that assessment?    17:50:12
24    A.    I am not sure exactly what you are    17:50:14

Page 299

1 getting at. I make no assertion about the relative    17:50:15
2 importance of the Lehman Brothers reports and the    17:50:17
3 company's internal assessments.    17:50:21
4    Q.    You say in Paragraph 21, after the    17:50:47
5 cites to Exhibit 74 and 98, that "This," meaning the    17:50:49
6 downward projections for Q3 and Q4, I assume,    17:50:54
7 "presented a serious risk that relative to total    17:51:00
8 sales, even if gray market sales remain stable," as    17:51:04
9 opposed to continuing to escalate, "the magnitude of    17:51:08
10 the gray market problem would increase relative to    17:51:09
11 total sales." And your basis for -- Strike that.    17:51:12
12        That statement assumes, does it    17:51:23
13 not, that third quarter and fourth quarter results    17:51:25
14 were going to be actually lower -- Strike that. Not    17:51:33
15 a good question.    17:51:33
16        The downward turn in Q3 and Q4,    17:51:43
17 how did that relate to the risk of the gray market,    17:51:52
18 the magnitude of the gray market problem?    17:51:58
19        MR. COLLINS: You mean apart from what    17:52:02
20 she wrote there?    17:52:04
21        MR. BESSETTE: Yeah.    17:52:05
22 BY MR. BESSETTE:    17:52:05
23    Q.    I mean, just explain that sentence to    17:52:06
24 me.    17:52:07

Page 300

1    A.    Okay. Wait. Hang on. Explain the    17:52:08
2 sentence in my report?    17:52:10
3    Q.    Yes.    17:52:11
4    A.    Okay. If you've got --    17:52:12
5 hypothetically, if you have got a gray market    17:52:14
6 problem that remains -- in which sales volumes are    17:52:18
7 not moving, gray marketed sales volumes are not    17:52:22
8 shifting upward or downward, it is remaining stable    17:52:26
9 is what I mean to say. And you have got sales    17:52:32
10 volumes that are decreasing. The amount of gray    17:52:33
11 market sales relative to the amount of total sales    17:52:36
12 will be increasing.    17:52:39
13    Q.    Okay. And it is your testimony, I    17:52:41
14 believe, in exhibit -- well, yeah. It is your    17:52:45
15 testimony in this report that because of the    17:52:46
16 downward projections for Q3 and Q4, that the gray    17:52:50
17 market sales then happening, even if they didn't    17:52:54
18 increase, if they just remained constant, presented    17:52:57
19 a serious risk to the company that the company    17:53:00
20 should have disclosed. Is that your view?    17:53:02
21    A.    Yes.    17:53:04
22    Q.    Tell me how the company was supposed    17:53:05
23 to assess that serious risk if their own internal    17:53:08
24 estimates didn't reflect downward projections for Q3    17:53:13

Page 301

1 and Q4?    17:53:16
2    A.    I don't know what the company's    17:53:16
3 internal assessment did or didn't say.    17:53:17
4    Q.    So how is that risk knowable to the    17:53:17
5 company?    17:53:20
6    A.    Well, I assume that the company knew    17:53:20
7 something about Lehman Brothers projected results.    17:53:25
8    Q.    So, again, you are just assuming? You    17:53:30
9 are guessing?    17:53:33
10    A.    I wouldn't say I am guessing.    17:53:34
11    Q.    Do you have any factual basis to opine    17:53:35
12 that the company was aware pre IPO of Lehman's    17:53:39
13 internal earnings estimates?    17:53:45
14        MR. COLLINS: Outside the scope.    17:53:50
15 BY THE WITNESS:    17:53:50
16    A.    You asked me that earlier as well.    17:53:50
17 And I think I told you, I am not remember any    17:53:51
18 documents right now in which the company is    17:53:53
19 internally discussing the Lehman report.    17:53:55
20 BY MR. BESSETTE:    17:53:58
21    Q.    So you have no actual knowledge that    17:53:58
22 the company was aware. Nothing you can point to.    17:53:59
23 So how did you make the statement that there was a    17:54:02
24 serious risk that the company was aware of or should    17:54:05

76 (Pages 298 to 301)

Page 302

1  have been aware of and therefore disclosed?    17:54:08
2          MR. COLLINS: Asked and answered.    17:54:10
3  BY MR. BESSETTE:    17:54:14
4      Q.  Is it just based on assumption that    17:54:15
5  they were aware of the Lehman estimates?    17:54:18
6      A.  There was that. There is also, as    17:54:21
7  you've discussed and I've seen in a number of    17:54:22
8  documents in which Barney Adams is discussing    17:54:24
9  seasonality, and that there is often a downward turn    17:54:28
10 during that time of the year.    17:54:31
11     Q.  Okay. So now you are saying that the    17:54:32
12 seasonality effect in Q3 and Q4 should have put the    17:54:36
13 company on alert that there is a serious risk that    17:54:40
14 the gray marketing, even if it stayed at the same    17:54:43
15 level of activity, would cause -- would cause an    17:54:47
16 increase in the magnitude of the problem for the    17:54:53
17 company?    17:54:57
18     A.  Yes.    17:54:57
19     Q.  And do you know the percentage of    17:54:57
20 decline on average that the company experienced in    17:54:59
21 Q3 or Q4 due to seasonality alone versus Q1 and Q2    17:55:03
22 in any given year?    17:55:12
23         MR. COLLINS: Vague.    17:55:14
24

Page 303

1  BY THE WITNESS:    17:55:15
2      A.  On average, no. In any given year,    17:55:16
3  yes. And I stated those figures in 1998 in my    17:55:17
4  report.    17:55:20
5  BY MR. BESSETTE:    17:55:20
6      Q.  You stated the estimates by Lehman.    17:55:20
7      A.  No, I don't believe so.    17:55:23
8      Q.  Okay. Where are those numbers?    17:55:23
9      A.  Further on in 21, I believe.    17:55:25
10     Q.  Well, those are the actual numbers in    17:55:34
11 Q3 and Q4. Are you saying that all of those are due    17:55:36
12 to seasonality?    17:55:40
13     A.  I don't know which part of that    17:55:41
14 decline was due to seasonality.    17:55:45
15     Q.  Well, that was my question. My    17:55:48
16 question was and is, do you know what the percentage    17:55:50
17 decline in Q3 and Q4 due to seasonality alone in any    17:55:52
18 given year that Adams Golf suffered?    17:55:56
19         MR. COLLINS: Asked and answered, way    17:55:59
20 outside the scope.    17:56:01
21 BY THE WITNESS:    17:56:01
22     A.  No.    17:56:02
23 BY MR. BESSETTE:    17:56:02
24     Q.  So how can you sit here and say that    17:56:03

Page 304

1  Adams Golf should have realized a serious risk due    17:56:05
2  alone to a downturn in Q3 and Q4 due to seasonality    17:56:09
3  when you don't know the effect seasonality has in    17:56:10
4  any given year to Adams Golf?    17:56:14
5          MR. COLLINS: Asked and answered.    17:56:16
6          Do you have anything to add to    17:56:17
7  what you already said?    17:56:18
8          THE WITNESS: No, I don't.    17:56:18
9  BY MR. BESSETTE:    17:56:18
10     Q.  Well, can you answer my question,    17:56:21
11 please?    17:56:22
12         MR. COLLINS: Asked and answered.    17:56:45
13 BY THE WITNESS:    17:56:45
14     A.  Can you ask the question again?
15         MR. BESSETTE: Can you read it back,
16 please?
17         (Record read.)
18 BY THE WITNESS:
19     A.  We talked about this already. The    17:56:48
20 Lehman report was out there in the world, and Adams    17:56:50
21 was working closely with Lehman. In addition, Adams    17:56:55
22 had its own experiences with seasonality and knew    17:56:59
23 the effect of that. And I have seen statements by    17:57:04
24 Barney Adams in which he addresses the seasonality    17:57:06

Page 305

1  effects, particularly in that time of the year.    17:57:11
2  BY MR. BESSETTE:    17:57:11
3      Q.  Is it your testimony, Professor, that    17:57:11
4  this internal Lehman commitment committee memo was    17:57:13
5  public or otherwise made available to Adams Golf?    17:57:15
6      A.  Let me restate that.    17:57:18
7          MR. COLLINS: That's also asked and    17:57:20
8  answered.    17:57:20
9          Go ahead.    17:57:20
10 BY THE WITNESS:    17:57:20
11     A.  I don't know whether it was available    17:57:22
12 to Adams Golf.    17:57:23
13 BY MR. BESSETTE:    17:57:24
14     Q.  Well, you said in your testimony out    17:57:25
15 there. I just wanted to know what you meant by out    17:57:27
16 there.    17:57:30
17     A.  It was in existence.    17:57:30
18     Q.  Okay. Did you study the life cycle of    17:57:31
19 the Tight Lies club when doing your work in this    18:00:02
20 case?    18:00:05
21     A.  What do you mean by the life cycle?    18:00:05
22     Q.  Are you aware that golf clubs    18:00:06
23 generally have life cycles?    18:00:10
24     A.  Am I aware now or was I aware then?    18:00:13

77  (Pages 302 to 305)

1    Q.    Well, when you did your report.    18:00:15
2    A.    From reading the documents, I was    18:00:17
3  aware of what the documents say regarding life    18:00:19
4  cycles.    18:00:24
5    Q.    No independent knowledge before you    18:00:25
6  started your work in this case about life cycles of    18:00:32
7  various golf clubs or golf products?    18:00:35
8    A.    No.    18:00:38
9    Q.    Do you know what the lifespan was of    18:00:38
10  the Tight Lies club?    18:00:58
11        MR. COLLINS: Vague and ambiguous.    18:01:00
12  BY THE WITNESS:    18:01:00
13    A.    I don't know.    18:01:05
14  BY MR. BESSETTE:    18:01:06
15    Q.    You are aware that the company    18:01:06
16  produced a newer one, a Tight Lies 2 I think or    18:01:08
17  whatever they called it, beyond the original, they    18:01:13
18  made a series of clubs?    18:01:16
19    A.    Yes, I am aware that they were -- I    18:01:16
20  believe there was more than just the two. I believe    18:01:19
21  there were additional.    18:01:21
22    Q.    Right. If Adams Golf had continued to    18:01:24
23  produce only the original Tight Lies, do you have an    18:01:28
24  opinion here what would have happened to sales of    18:01:32

1  the original Tight Lies over time?    18:01:35
2        MR. COLLINS: Outside the scope.    18:01:37
3  BY THE WITNESS:    18:01:38
4    A.    No.    18:01:38
5  BY MR. BESSETTE:    18:01:39
6    Q.    Do you have any opinion on what would    18:01:41
7  have been the impact of gray marketing on the    18:01:43
8  continued sales of only the original Tight Lies    18:01:48
9  clubs if that's all the clubs Adams Golf had?    18:01:51
10    A.    I would be really in the realm of    18:01:56
11  speculation to answer that question.    18:01:59
12        MR. BESSETTE: We are good. I am done    18:02:00
13  for now. Thanks.    18:02:03
14        EXAMINATION    18:02:03
15  BY MR. GLUCKOW:    18:02:03
16    Q.    Professor Ochoa, Paul Gluckow, I'm    18:02:03
17  with Simpson Thacher. My firm represents the    18:02:09
18  underwriter defendants in this matter.    18:02:11
19        I take it from your report you    18:02:13
20  have had an opportunity to review Mr. Miller's    18:02:17
21  report as well?    18:02:20
22    A.    Correct.    18:02:21
23    Q.    And you understand that Mr. Miller is    18:02:21
24  prepared to offer testimony concerning whether the    18:02:24

1  due diligence investigation by the underwriters in    18:02:26
2  connection with the IPO of Adams Golf was reasonable    18:02:30
3  and adequate?    18:02:34
4    A.    Yes.    18:02:35
5    Q.    And do you have any intention of    18:02:35
6  offering any opinion on that question?    18:02:37
7    A.    No.    18:02:39
8    Q.    Coming back to the drafting process    18:02:39
9  that you used in preparing both your initial report    18:02:46
10  and your rebuttal report. From the time that you    18:02:49
11  first began working on this matter until we started    18:02:55
12  the deposition this morning, do you have an estimate    18:02:58
13  of how many hours you've spent on this matter?    18:03:01
14    A.    Yeah. From what was the beginning    18:03:04
15  time, I'm sorry?    18:03:09
16    Q.    Whenever you started.    18:03:10
17    A.    Whenever I started the matter until    18:03:13
18  now? Approximately, I believe it is something like    18:03:14
19  100 hours.    18:03:17
20    Q.    And has anybody else connected with    18:03:17
21  the law school provided any research or other    18:03:19
22  assistance to you in connection with your work?    18:03:22
23    A.    I have had -- I have been working    18:03:24
24  mostly at home. I have had difficulty downloading    18:03:27

1  PDF files, my secretary has assisted me in    18:03:30
2  delivering PDF files.    18:03:35
3    Q.    And other than secretarial assistance,    18:03:36
4  have you had anybody doing any actual research to    18:03:39
5  help you?    18:03:41
6    A.    No, no.    18:03:41
7    Q.    Who wrote your initial --    18:03:42
8    Q.    Actually, let me back up.    18:03:44
9    Q.    Yeah.    18:03:44
10    A.    I have asked a librarian to pull some    18:03:46
11  documents for me. But not doing actual research,    18:03:49
12  just pulling documents.    18:03:52
13    Q.    To pull documents that you identified    18:03:52
14  yourself?    18:03:57
15    A.    That I had previously identified, yes.    18:03:57
16    Q.    Who wrote your initial report?    18:03:58
17    A.    I did.    18:03:59
18    Q.    Is every word in that initial report    18:03:59
19  yours?    18:04:02
20    A.    Yes.    18:04:02
21    Q.    And did anyone other than yourself    18:04:02
22  have any input on the initial report?    18:04:05
23    A.    I had discussions with Mr. Collins    18:04:10
24  about the questions that I was being asked. I also    18:04:13

78  (Pages 306 to 309)

Page 310

1 I think inquired about, as a general matter, the 18:04:16
2 format of these types of reports, because I hadn't 18:04:20
3 done them before. 18:04:23
4 Q. Conversations like that with anyone 18:04:24
5 besides Mr. Collins or just Mr. Collins? 18:04:26
6 A. Yes. I think I stated earlier in my 18:04:29
7 testimony that I had a conversation like that with 18:04:32
8 think it was with my sister-in-law, Julie Lanz. 18:04:36
9 Q. Did she review the report? 18:04:38
10 A. No. 18:04:40
11 MR. COLLINS: Excuse me. There may 18:04:42
12 have been other lawyers besides me. I honestly 18:04:44
13 don't remember. 18:04:48
14 BY THE WITNESS: 18:04:49
15 A. Yeah, there may have been. It's true. 18:04:49
16 It's true. I don't remember either. Don Lewis, I 18:04:52
17 may have asked similar questions about the general 18:04:55
18 style and format. I don't remember exactly. 18:04:58
19 BY MR. GLUCKOW: 18:05:03
20 Q. You say in your initial report that 18:05:03
21 you are being compensated at your current hourly 18:05:06
22 rate of $425? 18:05:10
23 A. Yes. 18:05:12
24 Q. And you testified earlier as to how 18:05:12

Page 311

1 you arrived at that figure? 18:05:12
2 A. Correct. 18:05:12
3 Q. Has anyone ever paid you $425 per hour 18:05:12
4 before? 18:05:16
5 A. I have charged either -- I don't 18:05:16
6 remember the exact rate that I was billed at when I 18:05:18
7 was an associate in New York, but it was somewhere 18:05:21
8 close to that. 18:05:24
9 Q. You are saying when you worked at 18:05:24
10 Clifford Chance in New York? 18:05:27
11 A. Yes. 18:05:28
12 Q. You are saying you billed out at a 18:05:29
13 rate of you think around $425? 18:05:33
14 A. I believe so. 18:05:34
15 Q. But you weren't being paid by Clifford 18:05:35
16 Chance $425 an hour for your time? 18:05:39
17 A. No. 18:05:39
18 Q. Have you ever been paid $425 prior to 18:05:40
19 this engagement in your life? 18:05:45
20 MR. COLLINS: $425. 18:05:47
21 BY MR. GLUCKOW: 18:05:47
22 Q. Per hour? 18:05:48
23 A. No. 18:05:48
24 Q. What is the most that you have ever 18:05:49

Page 312

1 been paid per hour prior to this engagement? 18:05:53
2 A. I don't know. I don't know. I would 18:05:55
3 have to do calculations in order to figure that out. 18:05:59
4 Q. Was it ever more than $300 an hour? 18:06:01
5 A. I don't know. It is doubtful. 18:06:05
6 Q. Was it ever more than $200 an hour? 18:06:06
7 A. Again, I don't know. And now we are 18:06:10
8 getting into more shaky ground. 18:06:11
9 Q. But you are confident that it was 18:06:14
10 never more than 300 an hour? 18:06:16
11 A. Again, I said I don't know. I would 18:06:19
12 guess not. 18:06:20
13 MR. COLLINS: You know that Professor 18:06:21
14 Ochoa said this is her first expert assignment. 18:06:26
15 MR. GLUCKOW: Understood. 18:06:27
16 BY MR. GLUCKOW: 18:06:27
17 Q. When did you first form your opinion 18:06:30
18 in this matter? 18:06:31
19 A. My opinion evolved. It didn't happen 18:06:32
20 at any given point. My opinion was formed during 18:06:36
21 the time that I was reviewing documents in 18:06:39
22 preparation for writing my report. 18:06:43
23 Q. And when did you first begin writing 18:06:46
24 the report? 18:06:49

Page 313

1 A. That's a good question. They were due 18:06:49
2 July 14th, is that right? I think I was working on 18:06:56
3 it for approximately two weeks before that. Maybe a 18:06:59
4 little bit longer. 18:07:04
5 Q. You mentioned earlier a process where 18:07:04
6 the plaintiff's lawyers got back in touch with you 18:07:08
7 sometime in 2006, is that correct? 18:07:11
8 A. Yes. 18:07:13
9 Q. Did you remember that, whether it 18:07:14
10 was April, May, June, July? 18:07:18
11 A. I don't remember exactly. I know that 18:07:20
12 it was sometime right before Memorial Day. 18:07:22
13 Q. So if that's correct, then, at some 18:07:24
14 point between Memorial Day and the end of June you 18:07:28
15 began writing your report? 18:07:31
16 A. Correct. I began -- sorry. No, I 18:07:32
17 don't believe I began writing it at that point. I 18:07:36
18 began doing work in preparation of writing the 18:07:40
19 report. 18:07:43
20 Q. And then started writing it in early 18:07:43
21 July? 18:07:46
22 A. I believe so. It may have been the 18:07:46
23 end of June. 18:07:48
24 Q. There are a couple of draft reports 18:07:49

79 (Pages 310 to 313)

Page 314

```
1   that have been produced. I will hand them to the   18:07:55
2   court reporter and ask them to be marked.          18:07:58
3            (Exhibit Nos. 308 &     18:07:58
4            309 were marked for     18:07:58
5            identification.)    18:08:17
6        MR. COLLINS: For the record, 308 is   18:08:17
7   OCH 89 through 115. 309 is 116 through 136.    18:08:19
8   BY MR. GLUCKOW:                 18:08:19
9        Q.   And actually, before I ask you about   18:08:33
10  those, just put those aside for a second.     18:08:36
11           In terms of the rebuttal report   18:08:39
12  that you submitted, was the drafting process for   18:08:41
13  that rebuttal report different in any way from what  18:08:43
14  we discussed with respect to the initial report?   18:08:45
15       A.   Only in that I reviewed additional   18:08:47
16  materials.                 18:08:49
17       Q.   But did you write the rebuttal report   18:08:50
18  yourself?                  18:08:53
19       A.   Yes.               18:08:53
20       Q.   And every word of that rebuttal report  18:08:53
21  is your own?               18:08:56
22       A.   Yes.               18:08:57
23       Q.   And did anybody else have any input   18:08:57
24  into the drafting of that rebuttal report?    18:09:00
```

Page 315

```
1        A.   Again, I had questions about the style   18:09:04
2   and format.               18:09:06
3        Q.   So turning to documents that have now   18:09:07
4   been marked as 308 and 309. To the extent, if at   18:09:09
5   all, that these differ from your final report, are   18:09:13
6   those changes, are those differences edits that you   18:09:15
7   yourself made, or on the other hands, ones that were  18:09:18
8   suggested to you by others?          18:09:21
9        A.   They were edits that I myself made.   18:09:22
10  And in cases like the embarrassing apostrophe S   18:09:26
11  examples, those were suggested by others.    18:09:29
12       Q.   Okay. But you can't recall any    18:09:30
13  substantive changes that were suggested by anyone   18:09:33
14  else?                  18:09:37
15       A.   You know, there were a couple of   18:09:37
16  others. Things that I opined on that were outside   18:09:38
17  of the scope of the questions I was asked. I    18:09:42
18  occasionally went beyond the scope of the questions  18:09:47
19  that were asked and wrote them in my draft, and was  18:09:48
20  asked to delete those portions.        18:09:49
21       Q.   By whom?               18:09:51
22       A.   By Todd Collins, Don Lewis.      18:09:52
23       Q.   Let me just, as an example, in what   18:09:55
24  has been marked as 308, Paragraph 12, there is the   18:10:02
```

Page 316

```
1   first few lines. "Gray market activity can be    18:10:05
2   favorable, as it creates." And the final just says,  18:10:10
3   "Gray market activity creates." Do you recall the   18:10:13
4   process that led to the words "can be favorable"   18:10:16
5   being taken out of the report?         18:10:19
6        A.   Yes. I thought that it made that    18:10:21
7   paragraph unclear.              18:10:23
8        Q.   How so?               18:10:24
9        A.   What I was trying to get at was the   18:10:25
10  effects that the gray marketing had on Adams Golf,   18:10:28
11  and really trying to get at the coalesce of Adams   18:10:33
12  Golf's business model with the gray market. I    18:10:39
13  didn't think it was relevant to talk about the    18:10:42
14  places were gray market activity is favorable for   18:10:44
15  consumers.                 18:10:49
16       Q.   And no one asked you to take out the   18:10:50
17  words "can be favorable"?            18:10:53
18       A.   No.                18:10:54
19       Q.   On the page that's marked OCH 0108,   18:10:54
20  Paragraph 31, I think it is page 20. There is a   18:10:59
21  reference today's exhibits. Do you know about that  18:11:07
22  refers to?                 18:11:10
23       A.   Yes.               18:11:12
24       Q.   What is that?            18:11:12
```

Page 317

```
1        A.   It referred to exhibits that I had   18:11:14
2   received via Fed Ex that day.         18:11:16
3        Q.   And do you recall when this draft was   18:11:20
4   prepared?                 18:11:23
5        A.   Let's see. I believe that was -- this   18:11:23
6   is the expert report, so it was probably -- it was   18:11:29
7   about a week before the final report was due.    18:11:32
8        Q.   And you were still receiving exhibits   18:11:35
9   at that point?              18:11:37
10       A.   I was.               18:11:37
11       Q.   What were you receiving?         18:11:37
12       A.   I think there were exhibits that    18:11:39
13  were -- had recently been produced in connection   18:11:42
14  with depositions that were taken later in the    18:11:45
15  process.                 18:11:47
16       Q.   If you would turn to 309. At OCH   18:11:47
17  O135, toward the back. There is a reference to "See  18:11:59
18  notes on this" in brackets. Do you know what that   18:12:08
19  refers to?                 18:12:13
20       A.   It refers to my own notes.       18:12:13
21       Q.   Did you take notes in connection with  18:12:15
22  your work in the matter?            18:12:18
23       A.   I took some notes while I was going   18:12:19
24  through the exhibits, so that I could have a    18:12:21
```

80 (Pages 314 to 317)

Page 318

```
1   synopsis of the things I read.           18:12:24
2      Q.  Where are those?                   18:12:25
3      A.  Those are in my home.              18:12:26
4      Q.  Have you turned those over to the  18:12:29
5   plaintiff's counsel?                      18:12:31
6      A.  No.                                18:12:31
7      Q.  Any reason why not?                18:12:32
8      A.  I haven't been asked.              18:12:32
9      Q.  Were you asked for all the materials  18:12:32
10  that you had looked at and considered in connection  18:12:34.0
11  with preparing your reports?              18:12:39
12     A.  I was -- that's a good question. I  18:12:40
13  was asked to -- can you rephrase the question  18:12:44
14  actually? Or restate the question, not rephrase it.  18:12:48
15     Q.  What, if anything, did the lawyers for  18:12:51
16  the plaintiffs ask you to give them so that they  18:12:52
17  could produce in the litigation your files?  18:12:56
18     A.  To give you a direct quote would be  18:12:57
19  beyond my ability at this moment. But I know that  18:13:0
20  they did ask me, for example, to produce the  18:13:06
21  articles that I read and reviewed, and any other  18:13:08
22  documents that I read and reviewed in anticipation  18:13:1
23  of writing my report.                     18:13:14
24     Q.  Anything else?                     18:13:15
```

Page 319

```
1      A.  Yes. The materials that I used in  18:13:17
2   preparing -- that I assign to my class, which we  18:13:23
3   have already talked about. And I'm trying to think  18:13:26
4   if there was anything else. I believe I've turned  18:13:28
5   over everything I was asked for.          18:13:31
6      Q.  Is there anything that you have in  18:13:33
7   your possession that relates to your work on this  18:13:35
8   matter other than your notes we have talked about  18:13:37
9   that you haven't given to plaintiff's counsel?  18:13:40
10     A.  No.                                18:13:41
11         MR. COLLINS: And I can comment on  18:13:49
12  that whenever you want me to.             18:13:50
13         MR. GLUCKOW: I would just ask,       18:13:53
14  obviously, that Professor Ochoa provide plaintiff's  18:13:55
15  counsel with her notes as soon as possible, and that  18:13:58
16  those be produced in the case.           18:14:01
17         MR. COLLINS: That is not the         18:14:02
18  agreement in this case as to what we are going to  18:14:03
19  produce. You know that. The documents are going  18:14:0
20  to produce --                             18:14:07
21         MR. GLUCKOW: I don't know that. My  18:14:09
22  recollection is that the exchange that we had in  18:14:09
23  terms of the agreement was that it specifically did  18:14:11
24  include --                                18:14:13
```

Page 320

```
1          MR. COLLINS: Documents relied on, I  18:14:14
2   believe. Documents relied on and documents, I  18:14:17
3   believe, exchanged. I think that's it. But if  18:14:20
4   there is something --                     18:14:22
5          MR. GLUCKOW: There is an e-mail  18:14:22
6   record which we can talk about once we are finished  18:14:24
7   here.                                     18:14:25
8          MR. COLLINS: That's fine. And just  18:14:26
9   one other --                              18:14:26
10         MR. GLUCKOW: Which we have --        18:14:27
11         MR. COLLINS: That's fine. I mean,    18:14:27
12  whatever it is we have agreed to we will produce to  18:14:27
13  you. We believe we have already done that. In  18:14:30
14  addition to that, just to make this quick, you may  18:14:33
15  want to ask what Document 135 is. Maybe that's your  18:14:36
16  next question.                            18:14:42
17         MR. GLUCKOW: You lost me.           18:14:42
18         MR. COLLINS: 135, you might ask  18:14:54
19  Professor Ochoa what that is. That's all.  18:14:54
20         MR. GLUCKOW: Where is that coming  18:14:54
21  from?                                     18:14:54
22         MR. COLLINS: 135, I think she will  18:14:56
23  tell you are notes that she made. It is not part of  18:14:58
24  the draft.                                18:15:01
```

Page 321

```
1          MR. GLUCKOW: I just don't know what  18:15:01
2   you mean when you say Document 135.       18:15:01
3          MR. COLLINS: Bates Stamp OCH 0135 at  18:15:0
4   the end of Exhibit 309.                   18:15:11
5          MR. BESSETTE: Well, you said Exhibit  18:15:11
6   135, so...                                18:15:13
7          MR. GLUCKOW: Oh. You are saying on  18:15:13
8   page 135. No, I understand that.         18:15:14
9   BY MR. GLUCKOW:                            18:15:14
10     Q.  I think what Mr. Collins is saying,  18:15:16
11  Professor, is that those were notes that were  18:15:20
12  keeping for yourself at the back of your draft  18:15:21
13  report that you were considering whether you were  18:15:25
14  going to put them into the report, is that correct?  18:15:25
15     A.  Actually, they may have been a  18:15:26
16  separate document, but yes.               18:15:27
17     Q.  And were those the notes you were  18:15:29
18  referring to earlier when you were talking about  18:15:31
19  "see notes on this"?                      18:15:35
20     A.  No.                                18:15:36
21     Q.  You have handwritten notes?         18:15:36
22     A.  I have some handwritten notes.      18:15:38
23     Q.  Right. And I assume that you prepared  18:15:39
24  those handwritten notes as you were, as you said,  18:15:41
```

81 (Pages 318 to 321)

Page 322

```
1   reviewing materials, correct?              18:15:43
2       A.   I prepared handwritten notes as I was  18:15:44
3   reviewing the exhibits and other materials in    18:15:47
4   connection with this.                      18:15:52
5       Q.   So those are certainly part of the   18:15:52
6   work, the work product that you generated in terms  18:15:54
7   of your consideration of the substantive matters as  18:15:57
8   part of your engagement, correct?          18:16:01
9       A.   I don't think of them as product. I  18:16:04
10  think of them as a way of indexing the information  18:16:06
11  that I reviewed.                           18:16:09
12      Q.   They reflect your thought process,   18:16:09
13  right?                                     18:16:12
14      A.   Process, yes.                      18:16:12
15      Q.   And did you refer to those notes as  18:16:13
16  you were preparing your report?            18:16:17
17      A.   Yes.                               18:16:18
18      Q.   So you obviously relied on them,    18:16:18
19  correct?                                   18:16:23
20      A.   I think it's a strange question. The  18:16:23
21  notes were a way of my -- offering me a way to  18:16:28
22  reengage with the documents themselves.    18:16:33
23      Q.   Right. And you looked at them as you  18:16:34
24  were working on your report?               18:16:37
```

Page 323

```
1       A.   Yes.                               18:16:38
2       Q.   Have you ever, while you were a     18:16:39
3   lawyer, had any complaints lodged against you in  18:16:48
4   connection with your professional work?    18:16:52
5       A.   No.                                18:16:54
6       Q.   Have you ever been involved in any  18:16:54
7   lawsuits? Have you ever been sued?         18:16:59
8       A.   Not that I know of.                18:17:01
9       Q.   Have you ever been subject to any   18:17:03
10  disciplinary proceedings in connection with being an  18:17:08
11  attorney or otherwise?                     18:17:11
12      A.   No.                                18:17:12
13      Q.   Any criminal record?               18:17:12
14      A.   No.                                18:17:13
15      Q.   Ever been arrested?                18:17:14
16      A.   No.                                18:17:18
17      Q.   In preparing your report, did you rely  18:17:18
18  in any way on the references in the documents to  18:17:49
19  possible transshipments going through either King  18:17:55
20  Par or Manatee?                            18:17:59
21      A.   In preparing my reports, did I rely on  18:18:00
22  documents that referred to King Par or Manatee Golf?  18:18:05
23  If they were in the documents, I did.      18:18:07
24      Q.   And do you recall those names, King  18:18:09
```

Page 324

```
1   Par and Manatee?                           18:18:12
2       A.   Yes.                               18:18:13
3       Q.   And do you recall that there was    18:18:14
4   discussion in the documents about whether those two  18:18:17
5   authorized retailers had been involved in potential  18:18:20
6   transshipments?                            18:18:27
7       A.   Can you ask that question again? I  18:18:28
8   was sort of flipping through the catalog in my head  18:18:32
9   of the documents.                          18:18:33
10      Q.   Sure. Do you recall that there was   18:18:33
11  discussion in the documents about possible   18:18:37
12  transshipments going through King Par and Manatee?  18:18:39
13      A.   I don't recall right now.           18:18:42
14      Q.   In what way, if you recall, did you  18:18:46
15  rely on Manatee's or King Par's possibly involvement  18:18:49
16  as transshippers in preparing your report?   18:18:59
17      A.   I don't recall right now.           18:19:02
18      Q.   Do you recall any way in which Manatee  18:19:03
19  or King Par influenced your opinions in this matter?  18:19:07
20      A.   I don't recall right now.           18:19:12
21      Q.   In your report, your initial report  18:19:19
22  that is, on page 21.                       18:19:21
23           MR. COLLINS: Now you are referring to  18:19:30
24  Exhibit 303, the final report?             18:19:32
```

Page 325

```
1            MR. GLUCKOW: Correct. I'm sorry.    18:19:34
2   BY MR. GLUCKOW:                            18:19:34
3       Q.   The final report, 303, page 21,     18:19:36
4   Paragraph 30. The first line of Paragraph 30 says,  18:19:37
5   "At the time of its initial public offering,  18:19:40
6   Callaway had disclosed." I am assuming the "its" is  18:19:44
7   Adams, right?                              18:19:44
8       A.   Yes.                               18:19:44
9       Q.   Okay. At the time of Adam's public  18:19:45
10  offering, Callaway had disclosed, and then you have  18:19:48
11  a disclosure from a Callaway public offering,   18:19:52
12  correct?                                   18:19:52
13           MR. COLLINS: No.                    18:19:52
14  BY THE WITNESS:
15      A.   I'm sorry.                         18:19:52
16  BY MR. GLUCKOW:
17      Q.   The Callaway 10K?                   18:19:52
18      A.   Yes.                               18:19:53
19      Q.   Correct?                           18:19:54
20      A.   Yes.                               18:19:54
21      Q.   And then after the block quote, you  18:19:57
22  say that, "This is notable, because in determining  18:20:00
23  whether a given disclosure is necessary, it is  18:20:03
24  common to consult the risk factors described by  18:20:18
```

others in a given market segment when drafting 18:20:21
disclosure documents, such as the company's 18:20:24
prospectus." Do you see that? 18:20:27
A. Yes. 18:20:28
Q. What was or is the basis for your 18:20:29
statement as to what is common in terms of drafting 18:20:33
risk factors? 18:20:35
A. My experience at Clifford Chance. 18:20:35
Q. And what was that experience at 18:20:38
Clifford Chance? 18:20:40
MR. COLLINS: Asked and answered. 18:20:40
BY THE WITNESS: 18:20:40
A. We have talked about my experience at 18:20:41
Clifford Chance. 18:20:41
BY MR. GLUCKOW: 18:20:41
Q. Oh, so it's what we talked about 18:20:44
before when you were a summer associate in London 18:20:45
working on the -- 18:20:46
A. No. I also worked at Clifford Chance 18:20:46
after that time. 18:20:48
Q. And did you have any involvement in 18:20:49
advising clients? I think we have already 18:20:51
established, in fact, that you did not have any 18:20:54
involvement in advising clients on what should or 18:20:56

should not go into risk factors when drafting SEC 18:20:59
files, correct? 18:21:02
A. I see a distinction between advising 18:21:02
clients and observing others advising clients. 18:21:05
Q. And you saw others advising clients? 18:21:08
A. Yes. 18:21:10
Q. And what did you see? 18:21:11
A. What do you mean? 18:21:13
Q. Well, do you consider yourself an 18:21:16
expert on advising clients on what should or should 18:21:18
not go in an SEC file? 18:21:22
A. No. 18:21:24
Q. Okay. And do you consider yourself an 18:21:24
expert on what risk factors should or should not go 18:21:29
in an SEC filing? 18:21:37
A. No. 18:21:40
Q. In fact, you have no knowledge one way 18:21:40
or the other whether the company or the underwriters 18:21:47
or the company's lawyers or the underwriter's 18:21:50
lawyers or anyone else involved in drafting the 18:21:53
prospectus actually looked at the Callaway 10K, 18:21:56
isn't that true? 18:22:01
MR. COLLINS: I need that question 18:22:01
back, please. Say it again, please. 18:22:01

MR. GLUCKOW: Read it back. 18:22:01
(Record read.) 18:22:01
BY THE WITNESS: 18:22:19
A. I don't have actual knowledge, no. 18:22:19
BY MR. GLUCKOW: 18:22:23
Q. I am sure you agree that the mention 18:22:23
of a risk in one company's disclosure, which may be 18:22:29
true for that company, is in no way determinative of 18:22:35
whether that same risk should go into another 18:22:38
company's disclosure, correct? 18:22:41
MR. COLLINS: Outside the scope. 18:22:43
Go ahead. 18:22:44
BY THE WITNESS: 18:22:44
A. Not alone. Correct. 18:22:45
BY MR. GLUCKOW: 18:22:45
Q. Pardon me? 18:22:45
A. Not alone. Correct. 18:22:45
Q. Because every situation is different, 18:22:47
correct? 18:22:50
A. Correct. 18:22:50
Q. And what is appropriate for one 18:22:50
company may be inappropriate for another company, 18:22:53
correct? 18:22:56
MR. COLLINS: Outside the scope. 18:22:56

Go ahead. 18:22:58
BY THE WITNESS: 18:22:58
A. Now we are into an area that I don't 18:22:58
feel comfortable commenting on. 18:23:00
BY MR. GLUCKOW: 18:23:00
Q. Okay. 18:23:04
MR. COLLINS: Counsel, you have 18:23:04
one minute. 18:23:05
MR. GLUCKOW: I have nothing further. 18:23:09
MR. COLLINS: I have one question. 18:23:12
EXAMINATION 18:23:12
BY MR. COLLINS: 18:23:12
Q. Do you recall Exhibit 7 to the Grace 18:23:15
report? 18:23:15
A. Yes. 18:23:20
Q. You can pull it out, but you don't
need to. If you recall it?
A. I recall it. If we can pull it out,
though, so I can have it in my hands, that would be
great.
Q. Sure. Does this support your view 18:23:44
that gray marketing was increasing and was a serious 18:23:46
risk for the IPO? 18:23:51
A. Yes. 18:23:55

Page 330

1    MR. COLLINS: No more questions, thank 18:23:56
2    you. Gentlemen, thank you.            18:23:58
3    MR. BESSETTE: Okay. Thank you.        18:23:59
4         (FURTHER DEPONENT
5         SAYETH NOT.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 331

1
2
3
4         I hereby certify that I have read the
5    foregoing transcript of my deposition given on , at
6    the time and place aforesaid, and I do again
7    subscribe and make oath that the same is true,
8    correct, and a complete transcript of my deposition
9    so given as aforesaid, as it now appears.
10
11
12
        _____
13    CHRISTIANA OCHOA - WITNESS
      CORRECTION SHEET(S) ATTACHED
14
    SUBSCRIBED AND SWORN TO
15    before me this ____ day
    of _____, A.D., 2006
16    _____
    Notary Public
17
18
19
20
21
22
23
24

Page 332

1    STATE OF ILLINOIS )
                        ) SS:
2    COUNTY OF C O O K )
3         I, KATHLEEN J. PACULT, a Certified
4    Shorthand Reporter within and for the County of
5    Cook, State of Illinois, do hereby certify:
6         That previous to the
7    commencement of the examination of the witness,
8    the witness was duly sworn to testify the whole
9    truth concerning the matters herein;
10        That the foregoing deposition
11    transcript was reported stenographically by me,
12    was thereafter reduced to typewriting under my
13    personal direction and constitutes a true record
14    of the testimony given and the proceedings had;
15        That the said deposition was
16    taken before me at the time and place specified;
17        That I am not a relative or
18    employee or attorney or counsel, nor a relative
19    or employee of such attorney or counsel for any
20    of the parties hereto, nor interested directly
21    or indirectly in the outcome of this action.
22
23
24

Page 333

1         IN WITNESS WHEREOF, I do hereunto
2    set my hand, this 16th day of August, 2006.
3
4
    _____
    Kathleen J. Pacult
5    Certified Shorthand Reporter
6
7    C.S.R. Certificate No. 84-004180.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

84   (Pages 330 to 333)

Page 334

```
 1              I N D E X
 2
 3   WITNESS              EXAMINATION
 4   CHRISTIANA OCHOA
 5   BY MR. BESSETTE          3
 6   BY MR. GLUCKOW              307
 7   BY MR. COLLINS             329
 8
 9
10
11
12            E X H I B I T S
13   NUMBER                PAGE
14   Nos. 303 – 305          3
15   No. 306              51
16   No. 307              166
17   Nos. 308 & 309         314
18
19
20
21
22
23
24
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588