# EXHIBIT C

ADAMS GOLF SECURITIES LITIGATION

REBUTTAL EXPERT REPORT OF CHRISTIANA OCHOA

INDIANA UNIVERSITY SCHOOL OF LAW, 211 SOUTH INDIANA AVENUE, BLOOMINGTON, IN 47405
PHONE: (812) 856-1516/ FAX (812) 855-0555/ EMAIL: cochoa@indiana.edu

ADAMS GOLF SECURITIES LITIGATION

REBUTTAL EXPERT REPORT OF CHRISTIANA OCHOA

I.   INTRODUCTION

1.   I have been asked by plaintiffs' counsel to provide my opinions regarding:

A.   The expert reports of H. Stephen Grace and Christopher M. James (hereinafter the "Grace Report" and the "James Report", respectively), to the extent such reports purport to present the characteristics of gray marketing and the effects the gray market can have on brand name products and the trademark owners or manufacturers thereof.

B.   Those portions of the Grace Report and the James Report that present analyses, opinions and/or conclusions regarding whether at the time of and subsequent to its initial public offering (i) the possibility of gray market distribution of Adams golf clubs was a risk faced by investors in Adams and (ii) whether the extent of gray market distribution of Adams golf clubs was a serious problem for Adams.

C.   The analyses, opinions and/or conclusions presented in the Grace Report and James Report regarding the nature, quality and effectiveness of the Company's actions in addressing the gray market distribution of its clubs.

II.   BACKGROUND AND QUALIFICATIONS

2.   My background and qualifications have been presented in detail in the expert report I submitted on July 14, 2006, in connection with this litigation.

1

3.    In addition to the materials I reviewed in preparing the expert report I
submitted on July 14, 2006, I have now also reviewed the following materials:

- Expert Report of H. Stephen Grace
- Expert Report of Christopher M. James
- Expert Report Edward Necarsulmer III
- Expert Report of Charles A. Sjoquist
- Expert Report of Ed J. Lynch
- Rebuttal Expert Report of R. Alan Miller
- Web Street Golf Report, volume 1, number 27, Sept. 14, 1998
- Web Street Golf Report, volume 2, number 12, Monday, March 22, 1999
- Web Street Golf Report, volume 2, number 2, Monday January 11, 1999

III.    ANALYSIS AND OPINION

**Claims of Defendants' Experts Regarding the Gray Market Generally and the Gray Market as it Pertained to Adams**

4.    The Grace Report states that gray market issues often occur on a localized
basis and admits that the "gray market was also a local issue for Adams." (Grace Report,
p. 18)  However, despite the overwhelming attention national and international gray
marketing receives in the academic literature, Grace fails to recognize or address the
prominence of national and international chains such as Costco in the gray market. This
is particularly notable given that Adams' own gray market problem was not localized.
Adams' gray market problem arose primarily in the form of sales through Costco, which
sold Adams golf clubs in each of its United States sales regions and in Canada prior to
the Company's initial public offering. (Cost 0009-0052)  Adams golf clubs were also sold
through other unauthorized retailers in various regions of the country.

5.    The Grace Report attempts to present the Company's gray market problem
as quantitatively immaterial. This opinion is difficult to sustain if one properly
understands the characteristics of the gray market. There were at least 3,915 golf clubs

2

sold though Costco stores prior to the initial public offering. Of these, 3200 (82%) were sold in the United States and 715 (18%) were sold in Canada. During the period of March 15 to July 5, 1998, Costco stores in every region of the United States and in Canada had received and were selling Adams golf clubs. (Cost 0009-0052). While these numbers may seem relatively small when compared to total sales, there are a number of reasons even these sales posed a significant risk to investors. Moreover, there was reason to be seriously concerned that due to particular factors relevant to Adams, this would be only the beginning of Adams' trouble with the gray market.

A.    The Company's business model included numerous business strategies that are attractive to gray marketers and thus made Adams golf clubs particularly susceptible to the gray market. These included (i) maintaining the strength of the Tight Lies brand, (ii) strong and exclusive relationships with its distributors and retailers, (iii) pricing policies which included high built-in retailer profit (iv) reliance on its in-house sales force and customer service infrastructure to maintain its competitive strengths and (v) an intention to further internationalize. In addition, (a) it was widely known that gray marketing was taking place in certain sectors of the golf industry, (b) gray marketing had already gained a foothold at Adams at the time of the initial public offering and (c) gray marketing problems are notoriously difficult to contain and/or eliminate.

B.    At the time of the initial public offering, the Company was positioned to be harmed by the gray market.  The literature on gray marketing makes clear that the gray market can cause significant harm to a Company in each of the areas listed in (i)-(v) in paragraph 5.A. above. Problems can arise in the form of "ineffective

3

pricing policies, deteriorated distributor relationships, low sales force morale, poor customer service" (Meyers, 1999, p. 106, citing Cespedes, 1988) and decreased prestige associated with a trademark or brand name. (Meyers, 1999, p. 106) Thus a number of the Company's business strategies (called "business strengths" in the Company's Prospectus) which can be strengths in some circumstances, were particularly vulnerable to exploitation by and damage from gray market activity and were consequently risky or potentially weak strategies in an industry (such as the golf equipment industry) in which the gray market was known to be active. Prior to the initial public offering, there were indications that gray market sales of Adams golf clubs were increasing and that the gray market could have a deleterious effect on sales for Adams. In addition, the Company was devoting significant manpower, profits and capital resources to its gray market problem leading up to and following its initial public offering.

**The Gray Market, Brand Names and Reputational Harm**

7.      The Company and its Tight Lies brand were particularly susceptible to damage from gray market activity. Anecdotal and empirical evidence both suggest that prestigious trademarks or brand names can be damaged as a result of the gray market. (Eagle, et. al., 2003) The Company stated in its own Prospectus that the reason it chose to limit "its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and technical expertise" was "[t]o preserve the integrity of its image and reputation." (Ex.72, p.24) In a recent study of the effects of gray marketing on brand image, each of fifteen brand owners "believed that parallel import activity of their products into discount retail stores was negatively impacting, or had the potential to impact the public's perception of their brands. Their major concerns related

4

to the lowering of prestige images by the brands' placement in what the brand controllers perceived to be an incompatible retail environment."(Eagle, et. al., 2003, p. 1342) This same study concludes that in at least some situations, "a decline in brand valuation could presage a fall in shareholder value and thus investor attractiveness." (Eagle, et. al., 2003, p. 1347) Edwin Watts, one of Adams' leading retailers, confirms that this holds true in the golf industry. He states that "clubs that appear at department stores have a long history of losing their image [citing Palmer, Nicklaus and Player]...And if you lose image, you lose everything." (Ex. 228, p.2) When a brand name and its manufacturer are closely identified, as was the case for Adams and its Tight Lies brand, the manufacturer's own image in the marketplace may be eroded together with the market image of its products.

8.      It is important to note that the sighting of Tight Lies golf clubs in a discount retailer has a negative effect that redounds directly to the Tight Lies brand and to Adams. The effects in the market of seeing golf players using competitors' clubs is substantially different, as this type of sighting does not necessarily indicate a negative effect on the Company (i.e. it may indicate overall growth in the golf equipment industry or it could indicate that a third company's market share is being eroded by the rising popularity of another brand of club).

9.      A unique characteristic of the effects of gray marketing on the value of a brand name is the manner by which the market may come to know that a particular product is being gray marketed. Information about Adams was rapidly spread throughout the market.  In this case, those individuals who were engaged in the unauthorized distribution of Adams golf clubs were likely the first to know of the entry of the clubs

5

into the gray market. Soon thereafter, consumers and authorized Adams distributors and retailers became aware of the entry of Tight Lies into the gray market. Their knowledge came not in the form of Company press releases but rather through (i) seeing Adams golf clubs in Costco stores, (ii) hearing of sales of Adams clubs through unauthorized retailers, and (iii) reading about the entry of Adams clubs into the gray market from non-Company sources such as the issue of Golf Pro magazine which was apparently available in the middle of July 1998 and discussed the availability of Adams golf clubs in Costco stores. (Ex. 233, p. 3) Information about Tight Lies entry into the gray market was thus progressively made available to the market through these unofficial sources.

10.    The Grace Report states that the gray market "has a potential positive impact on increased name recognition and consumer base" and speculates generally that this "can be a positive force in the maintenance of the manufacturer's long-term viability." (Grace Report, p. 19) While this statement may be true in some circumstances, it is entirely divorced from the business model and marketing and sales strategies the Company presented to potential investors, which relied on maintaining a high prestige brand and restricting sales through retail outlets such as Costco.

**Gray Market Activity, Profit Margins and Pricing Policies**

11.    The Company's Roadshow presentation emphasized the high retailer profit margins built into its pricing policy. Adams boasted retail margins of 31% (significantly higher than its competitors, such as Callaway, Taylor Made or Cobra, which offered margins of 15%, 26% and 25%, respectively) (Ex. 167, UND00029). This allowed authorized retailers to purchase quantities of Adams clubs which they did not sell through their stores, but instead sold to Costco at a price that presumably fell somewhere

6

between the wholesale price of $138.00 and Costco's retail price. High profit margins allow for each party in a gray market distribution chain to earn a profit even after accounting for the additional shipping, storage and other costs associated with diverted sales. (see, Berman, 2004, p.55; Myers and Griffith, 1999, p. 3, Figure 1) However, once established, Costco sales had the effect of eroding Adams' high retailer profit margin. The Company's own Director of Investor Relations described the effects of the gray market on profit margins as follows: "While it may seem advantageous at first glance, the truth is this type of distribution can erode our retailers' profit margins, i.e. the on- and off-course golf shops which make up our customer base." (Ex.127, ADAMS 003672)

12.    Significantly, information regarding the extent to which Adams retailer profit margins exceeded competitors' retailer profit margins was not included in the Prospectus. The Prospectus also failed to disclose just how detrimental the gray market could be to this Company business strategy.

13.    The Company adopted new short term and long term pricing policies before and after its initial public offering which, among other detrimental effects, eroded the retailer profit margin Adams once boasted. By November 25, 1998, Eddie Tate, one of Adams' Regional Account Coordinators, stated that "once our pricing dropped to $179.00 in many of our markets, our once favorable margin was lost forever." (Ex. 299, TATE 0002) Adams' declining retailer profit margin was very serious in an industry in which "[f]rom the retailer's stand point...margin is king" and "retailers want their better margins...and that is all." (Ex. 299, TATE 0002) In this highly competitive environment, it was possible or likely that sales of Adams golf clubs would decline as soon as a competitor (such as Orlimar) offered a higher profit margin or the possibility of profit

7

sharing, thus causing the competitor to gain favor with retailers. (Wall Street Golf Report, Sept. 14, 1998, Ex. 233, p.4, Golf Pro article citing a golf equipment retailer who implies that a decline in retailer profit margins could affect Adams popularity with retailers.) Prior to the Company's initial public offering, one of the Company's leading retailers noted that Adams needed "to be careful about overdistributing and eroding margins. If the margins erode, we'll get off the bandwagon and start pushing products with higher margins." (Ex. 197, April 21, 1998 Customer Due Diligence Questionaire of Edwin Watts)

14.     Also, a Web Street Golf Report dated March 22, 1999, reports that Adams had adopted a new retail pricing structure in order to combat the gray market sale of its clubs. This included granting a "$4.3 million credit to retailers in connection to this new retail pricing structure in the fourth quarter of 1998." This new pricing policy is illustrative of the significant damage a Company can suffer from gray market activity.

**Gray Market Activity and Relationships with Retailers and Distributors**

15.     The Company states in its Prospectus that it relied on strong and exclusive relationships with on and off-course golf shops and selected sporting good retailers. Gray market sales are known to have a negative impact on a manufacturer's relationship with its distributors and authorized retailers. The displeasure Adams' authorized retailers and its Canadian distributor felt with gray market sales is well documented and partially described in my report of July 14, 2006. (see, e.g. Ex. 85, ADAMS 001497)

16.     The gray marketing risks that Adams faced were unlike those faced by the golf industry as a whole, not only because of the reasons stated previously herein, such as the comparatively high profit margins enjoyed by Adams retailers, but also because

8

Adams retailers were in some cases receiving twice the number of clubs they had ordered as a result of double shipping and/or receiving shipments on consignment. (see, e.g., Ex.57; Ex. 51; Ex. 186, p.2, indicating that double shipments may have been "condoned, even asked for prior to the company going public"; Ex. 233, p.3, a Golf Pro article reporting that a particular golf pro shop received twice the number of clubs it ordered; Brewer deposition testimony, pp. 23-27, 82) Prior to the Company's initial public offering the risk of gray marketing was likely increased by double shipping and consignments. Double shipments and consignments put into the hands of retailers a certain quantity of clubs that they might not have been able to sell to their own customers at standard retail prices. This provided a pool of clubs potentially available for the gray market. For example, a May 6, 1998 memo from Chris Beebe, Adams' head of international sales, states that "retailers with too many clubs will cut prices or ship to others in order to relieve the pressures of excess stock." (Ex. 51 MCK00081)

**Internationalization**

17.    The Company's growth strategy relied in part on further internationalization. My report of July 14, 2006, states that internationalization can increase opportunities for gray market activity. It is worth noting again that the Company's distribution model used a network of thirty-three distributors such as WDC Mackenzie Distributors, Ltd. in its international operations, (Ex. 72, p. 25) and the Company intended to continue to build its international operations. The gray market literature indicates that firms, such as Adams, which outsource the distribution functions in their export operations through the use of commission agents and merchant distributors (as opposed to directing in-house employees to perform these functions), suffer most

9

from gray market sales. (Meyers, 1999, p. 117) Thus, the international distribution model Adams employed made it particularly vulnerable to gray marketing. Not only was gray marketing already occurring and steadily growing at the time of the initial public offering, but the Company's plans to expand international sales would likely create additional opportunities for gray market activity.

**The Trajectory of Gray Market Problems Generally and the Trend for Adams**

18.     At the time of the initial public offering, existing literature on the gray market repeatedly emphasized the tendency of gray market problems to spread and grow. A 1987 study on the long term effects of the gray market states:

> Once established, the gray market tends to exhibit a "snowball effect," forcing traditional marketing channel members to participate in order to compete. Even those firms that would normally be geographically removed from the center of gray-market activity are drawn into direct competition with the gray market...Thus, gray marketing can reach all markets. The disturbing consequence for domestic marketers is that all domestic channels are subject to pressure from the gray market. (Maskulka & Gulas, 1987, p. 26)

19.     The gray market is notorious for being difficult to control and eliminate once it has begun. This is true in part because even small gray market sales volumes can cause significant problems for a manufacturer. In addition, once gray market distribution channels are developed for a given product, it is common for gray market sales to increase and spread. Without effective proactive and reactive steps on the part of the trademark holder, often the only "cure" for a gray market problem is a general decline in demand for the product being gray marketed.

10

20.    At the time of the initial public offering, Costco sales of Adams golf clubs were positioned to continue or increase. The availability and sales of its clubs in Costco stores grew steadily prior to the initial public offering and then rose sharply immediately after its initial public offering. (Cost 0024) Costco records indicate that at the time of Adams' initial public offering Costco had purchased over 8,400 Adams golf clubs. Prior to July 5, 1998, 3,915 Adams golf clubs were sold in Costco stores. The trend of increasing gray market sales leading up to the initial public offering indicated that the gray market problem had taken a strong foothold at Adams. Costco sales rose sharply immediately after the initial public offering. During the eight weeks of July 5 to August 30, 1998, Costco sold 3,330 additional Adams golf clubs.

21.    According to the Grace Report, at the time of the IPO, only 2% of total sales occurred through Costco stores. This misstates the quantitative risk the gray market posed to the Company in at least two ways. First, Mr. Grace bases his figure on Adams clubs sold though Costco stores rather than on clubs purchased by Costco. Prior to Adams' initial public offering, Costco stores had sold 3,915 clubs but had purchased more than twice that amount – over 8,400. In addition, at the time of the Company's initial public offering, sales for the third and fourth quarters of 1998 were projected to take a downward turn. (Ex. 74, UND 06036; Ex. 98, ADAMS 004245) This presented the serious risk that, relative to total sales, even if gray market sales remained stable (as opposed to continuing to escalate), the magnitude of the gray market problem would increase relative to total sales. This risk was realized, as Costco sales increased from approximately 3,391 units in the second quarter to approximately 4,812 units in the third quarter and then amounted to approximately 3,442 for the fourth quarter of 1998. Total

11

Adams net sales for each of these quarters were declining from $33.8 million in the second quarter to $23 million and $7.6 million (after the $4.3 million net down credit) in the third and fourth quarters, respectively. In his deposition testimony, Barney Adams admitted that the Company faced the risk that the same amount of gray marketing constituted a greater risk in the face of lower projected sales. (see, B. Adams deposition testimony, pp. 187-205)

22.    It was also unreasonable to minimize or discount the risk that the gray market presented for Adams by assuming that the gray market for Adams golf clubs could be curbed or abated. To my knowledge there is no significant evidence that any one approach will ensure eradication of a company's gray market problem. In light of (i) the growth trend of gray market sales, (ii) the impossibility of predicting whether such sales could be slowed or eliminated, (iii) the detrimental effects the gray market could have on the Company, and (iv) existing downward sales projections, gray marketing presented a serious problem. The existence of a gray market problem at Adams thus posed important risks to potential investors.

**Canada: A Canary in the Coal Mine**

23.    The Grace Report attempts to demonstrate that the decline in Canadian sales as a result of the gray market was not material. As that report assumes, however, if Costco activities resulted in a 25% decrease in Adams' Canadian sales, this decrease would be very much in keeping with the amount of lost sales experienced by other trademark holders as the direct result of gray market activity. (Eagle, et.al., 2003, p. 1342) The decline in Canadian sales following the appearance of Adams golf clubs in Costco stores should have indicated to the Company that the spread of its gray market

problem into the United States posed significant risks to the Company. The Canadian experience should have been seen as the proverbial canary in the coal mine.

24.    On October 8, 1998, Barney Adams wrote a memo regarding the detrimental effects of gray marketing on the Company. In it he stated that the Company estimated a "negative sales effect in Q4 of 20%-25% based on a market survey (customers who refuse to buy)." (Ex. 80, ADAMS036832) Such losses are consistent with those of several other trademark holders which have "noted substantial losses in sales (up to 30%) as the direct result of parallel import activity." (Eagle, et.al., 2003, p. 1342)

25.    On October 13, 1998, Barney Adams stated that Costco sales had a greater negative impact on the Company's fourth quarter sales than competition had. (Ex. 56, ADAMS 036843) In his deposition he also indicated that the gray market activity Adams was experiencing in the two weeks prior to October 8, 1998 was no worse than it had been at the time of the initial public offering. (see, B. Adams deposition testimony, pp. 187-205) Thus, under the Company's own admission, at the time of its initial public offering the gray market was a greater problem than was competition (and, significantly, competition was described to potential investors as a risk factor in the Prospectus).

26.    The Grace Report and the James Report fail to recognize the above stated attributes of the Company's business model and strategies for growth that made it particularly attractive to gray marketers. They also fail to appreciate that Adams was particularly vulnerable to various harms that can befall a given manufacturer with a gray market problem.  The severity of the risk posed by Adams' gray market problem therefore, is unfairly minimized in the Grace Report and the James Report.

13

**Combating the Gray Market**

27.     The Grace Report devotes significant effort to demonstrating that the Company responded to the gray market risk in a strong and effective manner. There is, however, ample evidence that the Company's response to gray marketing was inadequate.

28.     Barney Adams stated in a January 4, 1999 letter to retailers that the Company had been "slow to react when unauthorized resellers, such as Costco, hurt retail margins." (Ex.17, MCK00026) A January 11, 1999 Web Street Golf Report conveys Barney Adams' acknowledgement that the Company should have begun placing serial numbers on its clubs sooner. Eddie Tate, one of Adam's Regional Account Coordinators, stated in November, 1998, that "[a]s the Costco issue worsened, retailers complained that Adams was both evasive and slow with their response." (Ex. 299, TATE 0002) When Adams did respond they appear not to have responded effectively, as the Company was later surprised that the plan they had established "in case Q4 turned sour" did not adequately counter Costco sales (Ex. 56, ADAMS036843).

29.     A review of the literature on stemming gray market activities describes a number of tools available to manufacturers hoping to eliminate gray market activity. These include both proactive and reactive strategies. Despite the prevalence of gray market activity in certain sectors of the golf industry, the Company appears to have taken no deliberate proactive steps to prevent a gray marketing problem from gaining a foothold at Adams. This was despite the fact that as this report and my report of July 14, 2006, demonstrate, the Company developed a business model which included a number

14

of strategies that were in fact very attractive to gray marketers, effectively inviting them to prey upon Adams golf clubs.

**Gray Market Sales Were a Serious Problem for Adams**

30.    The Grace Report and James Report attempt to present the Company's gray market problem as limited on the one hand and also as a problem which the Company and others, such as Lehman Brothers, believed was an "extremely serious issue that Adams [was] working hard to correct." (James Report, p. 24)

31.    While these reports are inconsistent regarding the seriousness of the gray market, there is ample contemporaneous evidence the Company acknowledged this was a serious problem. For example, in a fax to Mark Gonsalves, Adams' vice president for sales, dated April 15, 1998, Chris Beebe explains that gray market operations detected recently in the United States and Canada could "hurt Adams Golf no matter where they occur, for the outlets that receive these goods 1) have not been approved as an Adams outlet for a variety of reasons, 2) are not required to stand by our pricing policies, which can impact our good accounts and 3) can cost Adams Golf a *great deal* of money and/or sales." (emphasis added, Ex. 258, ADAMS 005045) Mark Gonsalves viewed gray market sales of Adams clubs as a "serious situation" (Ex. 257, ADAMS 002472) which required Adams to "take all necessary action to help prevent this from happening again." (Ex.63 ADAMS 002470) After the initial public offering, the Company's Board of Directors also seems to have requested that it meet "when serious issues such as Costco come up." (Ex. 151 ADAMS 002241)

32.    Importantly, the Grace Report is correct in establishing that significant time and resources were spent by the very highest levels of the Company's management

team in reaction to its gray market problem once it arose, even at a time when Adams'

management was very busy preparing for its initial public offering and developing new

products. As the Grace Report states:

> Barney Adams himself wrote to Costco demanding to know
> the sources from which Costco had obtained the purported
> Adams Golf clubs. Barney Adams led the effort by Adams
> Golf to further persuade Costco to reveal their sources by
> filing a Bill of Discovery in June 1998...Vice President for
> Sales, Mark Gonsalves, personally investigated the Costco
> issue. (Grace Report, p. 17)

Earlier, the Grace Report states: "Chris Beebe, Adams Golf's international sales director,

carefully monitored all large orders... Barney Adams sent warning letters to suspected

transshippers and the Company began reviewing its pricing policy" (Grace Report, p. 17).

33.      Before the initial public offering Adams developed a plan to deal with

gray market sales that would affect the Company's profit margins. In reaction to the

Costco sales, by June 8, 1998, the Company had established a plan to deter the sale of its

clubs to and through Costco stores in Canada. This plan was to "remain in effect until the

stock of Costco products is too low to realistically impact the *Tight Lies* selling price."

(Ex. 10) By the end of July 1998, Adams had installed its "Thank-you America buy two

Tight Lies©, get a free stand bag" program, which was utilized, at least in part, to deal

with the appearance of Adams clubs in Costco stores. (Ex. 80 ADAMS036832 and

Exhibit 56, ADAMS036843) In addition, by October, 1998 the Company had dedicated

a four-person "Costco Buster" team (Ex. 64, ADAMS 001524) charged with studying

and stemming gray market sales. The Company also purchased equipment to place serial

numbers on each of its clubs in an effort to deter gray marketing by allowing each club to

be traceable through its distribution channel (Ex. 61).

16

34.    The attention devoted by the Company's management to the appearance of Adams golf clubs in Costco stores, the contemporaneous internal correspondence regarding gray market sales and the Company's significant expenditure of manpower, profits and capital resources all indicate that the Company believed the gray market was a serious problem for the Company.

35.    Reports from outside the Company also indicate that the gray marketing of Adams golf clubs was a serious issue. For example, an issue of Golf Pro magazine which was apparently available in the middle of July 1998, discussed the availability of Adams golf clubs in Costco stores. It stated in part: "The company joined the ignominious ranks of the big boys in another way this year: Tight Lies started showing up in Costco..." (Ex. 233, p. 3) On July 29, 1998, Lehman Brothers alerted the Company that investors were likely to want to have their concerns addressed about Adams golf clubs appearing in Costco stores (Ex.95, ADAMS 004394). A Lehman Brothers analyst report dated August 28, 1998, also points to Adams gray market problem, calling it an "extremely serious" issue. (Ex. 180, ADAMS 004035)

36.    The Grace Report conveys that one means the Company employed in assessing the seriousness of its gray market problem was studying the breadth and significance of the complaints raised. The reports from Canada prior to the IPO indicated that the Company's relationship with retailers and its sales there were in jeopardy. In a fax to Barney Adams, Mark Gonsalves and Marc Puglielli, dated May 29, 1998, Chris Beebe, Adams' head of international sales, relates that the first shipment of Adams clubs to Costco "caused a great deal of trouble" for Adams' Canadian distributor and for authorized Canadian retailers. Mr. Beebe also expresses his concern that the Company

17

"stands to lose most of the goodwill we [Adams] have built in Canada, and see the 15,000 clubs that McKenzie is forecasting for sales through the end of the year disappear." (Ex. 85, ADAMS 001497) It is important to bear in mind that the gray market problem arose first in Canada. Adams' own experience in Canada should have demonstrated to Adams' management just how potentially detrimental even a relatively small number of gray market sales could be in any given market. (Ex. 51 MCK00081)

  37. Each of the above internal and external assessments of the gray market risk faced by the Company lies in stark contrast to depiction of the gray market provided by Finis Conner, one of the Company's outside directors, which is quoted in the Grace Report and indicates Conner's lack of knowledge about the gray market and the specific risks it posed to Adams. (Grace Report, p.15) One of the common characteristics of the gray market is that the general population is not informed about how it works or about the conditions under which it can flourish (such as the business strategies employed by the Company and discussed herein which made it particularly susceptible to the gray market) and the speed with which it can grow.

**Failure to Disclose Adams' Gray Market Problem**

  38. The Grace Report and James Report opine that the decision to exclude the gray market risk from the Company's disclosures was proper and correct. However, as this report indicates, potential investors could not have known about the particular risks Adams faced in respect to the gray market. Even if a potential investor were deemed to have a very sophisticated knowledge of the causes and effects of gray marketing, there was vital information missing from the Company's disclosures. For example, as stated above, information regarding the extent to which Adams retailer margins exceeded

18

competitors' retailer profit margins was not included in the Prospectus. The Prospectus also failed to disclose just how detrimental the gray market could be to the Company's retailer profit margins.

39.    Missing from both the Grace Report and the James Report is any analysis of the Company's unique business model and growth strategies and their potential and actual interaction with the gray market. Neither the Grace Report nor the James Report explains the factors the Company and its underwriters considered and the decision process they utilized in concluding that a disclosure about its gray market problem was not necessary. This is problematic and strange considering that the James Report acknowledges that the gray market poses risks to investors. (see, e.g., James Report, p.3) and the Grace Report agrees that the Company was devoting significant resources to a gray market problem which it perceived as very detrimental. In addition, (i) the gray market was posing significant risks to the Company's Canadian sales and relationships with retailers, (ii) the Company was witnessing a steady escalation trend in gray marketed clubs in the United States and in Canada at the same time as sales were projected to decline and (iii) the gray market literature suggests that Adams was distinctly positioned to be targeted and harmed by gray marketing.

40.    The James Report points to a June 9, 1998 press release in which Adams announced that it had filed a Bill of Discovery against Costco. Mr. James attempts to characterize this press release as adequate disclosure regarding the Company's gray market problem. This press release could not have been effective notice to potential investors about gray market sales of Adams clubs, nor did it adequately explain the risks associated with investing in Adams. The press release states in part: "The Bill of

19

Discovery was filed in order to determine whether Costco's claims that they had properly acquired Adams' Tight Lies® fairway woods were accurate." (Ex. 20 MCK 01358) This press release does not clearly state that Costco had in fact acquired authentic Adams golf clubs nor does it explain the risks the gray market posed to the Company. In addition, even the potential investor who knew of this press release could reasonably believe that the absence of any mention of gray market sales in the Company's Prospectus indicated that either (i) Costco in fact had not obtained the Company's clubs or (ii) the gray market no longer posed a problem for Adams (if it had ever posed such a problem).

41.     The James Report correctly states that it was widely known that gray marketing was taking place in some sectors of the golf industry. Prior to Adams' initial public offering, Callaway and Titleist had made specific disclosures regarding their own gray market problems. (James Report, p. 13) However, the Company had made no such disclosures despite Adams distinct attractiveness to the gray market and its particular vulnerabilities to the damage the gray market could and did cause the Company.

42.     I have prepared this report before the final completion of fact discovery and before reviewing defendants' rebuttal expert report(s), which may cause me to modify or amplify views expressed herein.

7/28/06
_____
Date

~~~~~~~~~~~~~~~~
Christiana Ochoa
Associate Professor of Law

20