# EXHIBIT A

1   IN THE UNITED STATES DISTRICT COURT

    FOR THE DISTRICT OF DELAWARE

2      - - -

3

IN RE ADAMS GOLF, INC. : CONSOLIDATED

4          :

SECURITIES LITIGATION  : C.A. No. 99-371 KAJ

5

6    --------------------------

     Friday, August 11, 2006

7    --------------------------

8

9    Oral deposition of R. ALAN MILLER, taken

10 pursuant to notice, was held at the offices of AKIN,

11 GUMP, STRAUSS, HAUER AND FELD, LLP, 590 Madison

12 Avenue, 18th Floor, New York, New York 10022-2524

13 commencing at 8:50 a.m. on the above date, before Beth

14 A. Barkocy, Certified Shorthand Reporter and Notary

15 Public.

16

17

18

19

20

21

22      - - -

23   RSA/VERITEXT COURT REPORTING COMPANY

    1845 Walnut Street, 15th Floor

24     Philadelphia, PA  19103

    (215)241-1000  (888)777-6690

25

Page 2

```
 1   A P P E A R A N C E S :
 2      LAW OFFICES OF DONALD B. LEWIS
           BY:  DONALD B. LEWIS, ESQUIRE
 3         Five Cynwyd Road
           Bala Cynwyd, Pennsylvania  19004
 4         (610)668-0331
           Morrislewislaw@aol.com
 5         Representing the Plaintiffs
 6
           BERGER AND MONTAGUE, PC
 7         BY:  TODD S. COLLINS, ESQUIRE
           1622 Locust Street
 8         Philadelphia, Pennsylvania  19103-6365
           (215)875-3040
 9         Tcollins@bm.net
           Representing the Plaintiffs
10
11      SIMPSON, THACHER, AND BARTLETT, LLP
           BY:  PAUL C. GLUCKOW, ESQUIRE and
12         RYAN ANTHONY KANE, ESQUIRE
           425 Lexington Avenue
13         New York, New York  10017
           (212)455-2831
14         Pgluckow@stblaw.com
           Representing the Underwriter Defendants
15
16      AKIN, GUMP, STRAUSS, HAUER, AND FELD, LLP
           BY:  PAUL R. BESSETTE, ESQUIRE
17         300 West Sixth Street
           Suite 2100
18         Austin, Texas  78701-3911
           (512)499-6200
19         Pbessette@akingump.com
           Representing the Nonunderwriter Defendants
20
21
        ALSO PRESENT:
22         Amir Rozen
           Cornerstone Research
23
24
25
```

Page 3

```
 1          I N D E X
              - - -
 2
 3   Testimony of:  R. ALAN MILLER
 4   By Mr. Bessette  ................  6
 5   By Mr. Gluckow  ................  216
 6   By Mr. Lewis  ................  308
 7
              - - -
 8       E X H I B I T S
              - - -
 9
     EXHIBIT NUMBER   DESCRIPTION     PAGE MARKED
10     334   Expert Report of
              R. Alan Miller       5
11
       335   Rebuttal Expert Report
12            of R. Alan Miller     5
13     336   Expert Report of
              Christopher James     5
14
       337   Rebuttal Expert Report
15            of Christopher James  5
16     338   E-Mail from Allyson Terpsma
              dated 08/03/06        5
17
       339   Chart Bates Stamped
18            CMJ 0560              5
19     340   Chart Bates Stamped
              CMJ 0561              5
20
       350   Fax dated 08/04/98    206
21
       351   Mr. Miller's AMF Report  247
22
       352   Document Bates Stamped
23            MIL 00090-00115       266
24     353   Mr. Miller's AMF
              Rebuttal Report       272
25
              - - -
```

Page 4

```
 1
 2          DEPOSITION SUPPORT INDEX
 3
 4   Direction to Witness Not to Answer
 5   Page    Line        Page    Line
 6          (NONE)
 7
 8
 9   Request for Production of Documents
10   Page    Line        Page    Line
11          (NONE)
12
13
14   Stipulations
15   Page    Line        Page    Line
16     5      12
17
18
19   Questions Marked
20   Page    Line        Page    Line
21          (NONE)
22
23
24
25
```

Page 5

```
 1          (Deposition commences with
 2   Mr. Collins not yet present.)
 3          MR. BESSETTE:  Let's mark these,
 4   please.
 5          (Exhibits-334 through 340 were
 6   marked for identification.)
 7          - - -
 8          R. ALAN MILLER, having been first
 9   duly sworn, was examined and testified as
10   follows:
11          - - -
12          EXAMINATION
13          - - -
14          MR. BESSETTE:  Read and sign for the
15   witness.
16          MR. LEWIS:  I'd like to make a very
17   brief statement, and that is that we agreed
18   to this sequencing of the depositions in
19   response to a request by the defendants that
20   depositions either take place in a different
21   order or take place simultaneously.  It's our
22   view that in this case, because of the legal
23   allocation of the burden of proof, that
24   certain burdens are on Mr. James rather than
25   on Mr. Miller, and for that reason we have to
```

2 (Pages 2 to 5)

Page 10

1  in that field.
2      Q.    How many courses, in total, involved
3  statistics, either undergrad or graduate?
4      A.    At least four, I believe. There was
5  one statistics and one operations research undergrad
6  that I can recall, and I believe one of each in
7  graduate school that I can recall. Operations
8  research is, in my view, primarily statistics in
9  content.
10     Q.    Any other statistics classes that
11  you can recall?
12     A.    No.
13     Q.    Let me hand you what has been marked
14  as Exhibits-334 and 335 (indicating). I trust you
15  will recognize those as your report and then your
16  rebuttal report, respectively; is that correct?
17     A.    That's what they appear to be, yes;
18  yes.
19     Q.    I want to talk a couple of minutes
20  about your background. In Exhibit-334, your report,
21  Paragraph 7, Page 4, you list some experience in the
22  investment banking field?
23     A.    Right.
24     Q.    Philadelphia Investment Bank
25  Company, can you describe for me what type of

Page 11

1  investment bank services that company provides?
2      A.    That's been a corporate finance
3  services firm. As a way to define which of --
4  services which may appear in a more full service
5  investment banking firm, we've provided those. We
6  don't have a retail sales or securities sales arm or
7  investment research, as that's commonly known, or
8  those sorts of things. We've been a corporate finance
9  provider, that is, service provider, not actually an
10  investor or lender of capital.
11     Q.    Howard and Company, where you
12  indicate you worked from 1972 to 1976, is it correct
13  you worked on only two offerings registered under the
14  Security Act of 1933 while at Howard and Company?
15         MR. LEWIS: Object to the form and
16  foundation.
17         THE WITNESS: That's a good
18  question. There are two I can recall
19  specifically, one which may not have been
20  completed at the time, if I recall correctly.
21  That might be correct.
22         One of the services we provided was
23  advisory in nature to companies considering
24  going public. In the course of that, I did a
25  lot of research and we had quite a number of

Page 12

1  clients who were investigating that option at
2  the time.
3         What I don't recall specifically,
4  whether any more of those resulted in working
5  on deals that were or would have been filed
6  under the '33 Act, but there are two I can
7  recall specifically that were like that.
8  BY MR. BESSETTE:
9      Q.    Moving to Butcher and Singer, where
10  you were from 1976 to 1980 -- again, I've told you
11  I've read other testimony, I'm just trying to boil
12  things down so we can get to the substance of this
13  case.
14     A.    Right.
15     Q.    Tell me if this squares with your
16  recollection, that you recall working on six to ten
17  public offerings while at Butcher and Singer but can
18  only specifically remember three.
19         MR. LEWIS: Objection to form and
20  foundation.
21  BY MR. BESSETTE:
22     Q.    Does that sound right?
23     A.    It sounds like it might have been
24  right at one point. Let me think a minute.
25         I've got three in mind where we were

Page 13

1  the lead or co-lead managing underwriter, actually,
2  and there were a number of other deals of that type on
3  which I worked where we were not either lead or
4  co-lead or where we were not taking primary role in
5  that function. I think that's probably an accurate
6  number.
7      Q.    Only one of those was an initial
8  public offering of stock; is that your recollection?
9         MR. LEWIS: Objection to the form.
10         THE WITNESS: One of the three was
11  an IPO of -- was actually stock and warrants,
12  which made up a unit at the time.
13  Technically, the offering was of units.
14  BY MR. BESSETTE:
15     Q.    That's the one I'm thinking of.
16     A.    Of the three, yes. Of the others, I
17  do believe there were other IPOs in that list.
18     Q.    Can you recall them as you sit here?
19     A.    No, I just recall vaguely having
20  some conversations within the firm of the type that
21  would have more likely applied to an IPO than another
22  type of an offering; no.
23     Q.    Turning the page of Exhibit-334,
24  your time at Philadelphia Capital Advisors, which was
25  1980 to 1983, you didn't work on any public offerings

4 (Pages 10 to 13)

R. ALAN MILLER

Page 14

1  while at Philadelphia Capital Advisors; is that right?
2       A.      Certainly not as an underwriter, we
3  didn't perform that function there. I think there was
4  an advisory job that I did that involved an IPO where
5  we were basically consulting to a -- I don't know what
6  the right term would be -- to a party that was
7  associated with the issuer in one case.
8            We did do some other consulting work
9  for people considering public offerings at the time.
10  I just don't recall if they actually got to that point
11  while I was there or not.
12      Q.      Is it correct that you have not
13  worked on drafting an IPO prospectus since 1980, give
14  or take, in that time frame?
15      A.      Yeah, I think that's probably
16  correct.
17      Q.      How many IPO transactions has your
18  company, which is -- strike that.
19           Philadelphia Investment Banking
20  Company, that's a company you founded in or about
21  1983?
22      A.      Correct.
23      Q.      Or I should say cofounded, right?
24      A.      That's right.
25      Q.      You're still involved with, I'll

Page 15

1  call it, PIBC?
2       A.      Yes.
3       Q.      How many IPO transactions has PIBC
4  been involved in over the past, say, ten years?
5           MR. LEWIS: Objection to form.
6           THE WITNESS: In the corporate
7       finance role as we view it, probably none.
8  BY MR. BESSETTE:
9       Q.      How many clients does PIBC have
10  currently?
11      A.      That's hard to recall specifically,
12  in a sense, because some are at various levels of
13  activity, but probably -- my best estimate would
14  probably be 20 or 30 at this point. That's kind of a
15  squishy number.
16      Q.      I understand. I'd like to sort of
17  break up in segments real fast just the services that
18  PIBC provides. I know you provide litigation and
19  support services; that's one segment, right?
20      A.      Correct, that's the way we view it;
21  yes.
22      Q.      Investment banking services, is that
23  another segment?
24      A.      Sure. We call it corporate finance
25  services, but yes.

Page 16

1       Q.      What would be the other segments, if
2  any?
3       A.      For PIBC, none. That's basically
4  the way we look at the business.
5       Q.      Of the 20 or 30 clients you can
6  recall as you sit here, and I'm not holding you to
7  that number but that range, how many of those are
8  receiving litigation or support services, that
9  segment?
10      A.      Right; 20 or 25 of the 30, let's
11  say.
12      Q.      How many, if any, are receiving
13  corporate finance services?
14      A.      Five to ten.
15      Q.      Are there some that are receiving
16  both?
17      A.      There are some that have received
18  both at different points in time, but the reason the
19  numbers aren't clearer than that is that is the best I
20  can recall at the moment trying to estimate how many
21  clients we have in those categories.
22      Q.      As you sit here, you believe there
23  are five to ten clients of PIBC that are currently
24  receiving corporate finance services?
25      A.      Right.

Page 17

1       Q.      What was the last M and A
2  transaction in which you were involved, sir?
3           MR. LEWIS: Objection to form.
4           THE WITNESS: The last one, I don't
5       believe I can discuss with you. I don't
6       believe that our retention has been
7       publicly...
8  BY MR. BESSETTE:
9       Q.      I was looking for the timing, not
10  any of the details. Are you saying it's current?
11      A.      Yes, last couple weeks.
12      Q.      Prior to that one, when was your
13  last M and A transaction?
14      A.      Probably ended about two months ago,
15  I think, or I think our work ended about two months
16  ago, maybe three months ago.
17      Q.      The M and A transaction, that would
18  be subsumed in the corporate finance segment of the
19  business?
20      A.      Yes.
21      Q.      The litigation segment of the
22  business, that's currently -- and I think -- tell me
23  if this is correct -- has been true since the
24  late '90s and it's about 90 percent of PIBC's work?
25           MR. LEWIS: Objection to form.



Page 18

BY MR. BESSETTE:
1  Q.    Is that fair?
2  A.    Since the late '90s, I'd say it's at
3  least 80 percent. At any point in time, that number
4  can change pretty substantially in a short period
5  depending on where we're spending our time. There's
6  only a dozen of us, total, six or seven full-time
7  professionals, so if we're working in a concentrated
8  way on a deal for a month or two, that can skew things
9  for that quarter pretty well, but if we're taking from
10 the late '90s to today, I'm pretty confident we're
11 80 percent plus on the litigation side and the balance
12 corporate finance, and during certain periods it would
13 be higher, yeah.
14 Q.    Thanks for that answer, telling me
15 how many staff and professional people you have,
16 because I was going to go there, so I think we've got
17 that.
18        It is correct, is it not, that --
19 strike that.
20        You do not consider yourself to be
21 an expert concerning the legal aspects of SEC's
22 regulations concerning registration statements under
23 the 1933 Act; is that correct?
24        MR. LEWIS: Object to the form.

Page 19

1        THE WITNESS: Sure. I am not a
2  lawyer; I don't give legal opinions. I don't
3  consider myself an expert in the legal
4  aspects of that. Having said that, there are
5  -- certainly the entire context of things
6  under the '33 Act is legal in nature, and I
7  do think I have expertise with respect to
8  understanding the investment community with
9  respect to the meanings of those things as
10 they apply to investment bankers, issuers,
11 the contents of registration statements, and
12 those sorts of things, but that, like I said,
13 is from the point of view of understanding
14 the investment community as opposed to from a
15 legal perspective.
16 BY MR. BESSETTE:
17 Q.    We're going to explore that
18 expertise, the understanding you have about that, but
19 I just wanted to get on the record that the legal
20 aspect, you're not purporting to be an expert in.
21 A.    Except for what I just said.
22 Q.    I just wanted to ask real quick, on
23 Page 7, the research that you have done that you
24 indicate under Howard and Company, doing a detailed
25 comprehensive study of 550 IPOs, what was the purpose

Page 20

1  of that study, by the way?
2        MR. LEWIS: Just for the record,
3  it's Page 4, Paragraph 7.
4        MR. BESSETTE: Did I mix that up?
5        MR. LEWIS: I think you said Page 7.
6        MR. BESSETTE: Thank you.
7        MR. LEWIS: Just so we're looking at
8  the same thing.
9  BY MR. BESSETTE:
10 Q.    Do you remember any details about
11 the study, what the purpose was?
12       MR. LEWIS: Objection to the form,
13 overbroad.
14       THE WITNESS: I remember some things
15 about the study. Probably more of it comes
16 back to me as I think of it. We did that in
17 order to prepare a series of writings which
18 were printed as articles and compiled as a
19 draft of a book and which were being provided
20 at various forms and various stages to
21 clients for informational purposes as they
22 considered being public or going public. We
23 generated what was called a CPM report,
24 chart, of the process for people to use, and
25 all that was in the context of consulting to

Page 21

1  prospective issuers and providing
2  informational services and we conducted
3  seminars on that topic for clients at that
4  time.
5  BY MR. BESSETTE:
6  Q.    These are the newsletters and
7  presentations, the newsletters published by Howard and
8  Company and the presentations from Howard and Company
9  that are referred to in this bullet point?
10       MR. LEWIS: Objection to the form.
11       THE WITNESS: Right.
12 BY MR. BESSETTE:
13 Q.    Have you authored any other
14 publications other than those newsletters published by
15 Howard and Company?
16 A.    We did do the draft of the book. It
17 never got published, at least while I was there, to my
18 knowledge. I wrote some articles back in about that
19 time frame and afterwards, probably up through the
20 early '80s, generally on corporate finance or
21 valuation topics, that appeared in some Pennsylvania
22 CPA and legal publications.
23 Q.    What are those publications; can you
24 remember?
25 A.    One of them was called the

Page 22

1  Pennsylvania CPA Journal. One was a legal trade
2  publication in the Philadelphia area; I don't remember
3  what that was called. I think there was another CPA
4  publication, but I don't remember what that was either
5  other than the Pennsylvania CPA Journal. I think
6  that's it.
7          MR. LEWIS: Excuse me. Had you
8      finished your answer about publications
9      before Mr. Bessette went to the actual
10     journals? I wasn't sure if he cut you off.
11         THE WITNESS: I think I finished.
12 BY MR. BESSETTE:
13     Q.     What time frame are these
14 publications you just referenced?
15     A.     Mid '70s through early '80s at the
16 latest.
17     Q.     Have you published any articles in
18 the last ten years?
19     A.     No.
20     Q.     Twenty years?
21     A.     Twenty years, I don't think so.
22     Q.     Have you published any articles that
23 have been peer reviewed?
24         MR. LEWIS: Object to the form.
25         THE WITNESS: In the sense of

Page 23

1      articles, I actually don't know who read the
2      ones I wrote so I couldn't tell you.
3  BY MR. BESSETTE:
4      Q.     Do you understand what I mean by
5  peer reviewed?
6      A.     I understand it. Peer reviewed is a
7  term that is used sometimes with a narrower meaning in
8  the academic community as describing a process by
9  which articles are submitted for publication and,
10 prior to publication, reviewed by a group of people in
11 the field.
12     Q.     With that understanding of what peer
13 reviewed means, have any of your articles been peer
14 reviewed prior to publication that you're aware of?
15     A.     I think the Howard and Company
16 articles were reviewed by Graham Howard, by and large.
17 The other articles, I don't believe were reviewed by
18 anybody prior to publication that I can recall.
19     Q.     How long have you been holding
20 yourself out as an expert witness in litigation,
21 providing expert services for litigation cases?
22         MR. LEWIS: Object to the form.
23         THE WITNESS: That began sometime in
24     the late '70s.
25 BY MR. BESSETTE:

Page 24

1      Q.     I know as a part of your report,
2  you've got your prior testimony and depositions and
3  retentions and all, so we've got the time frame. In
4  all of your time as an expert witness, has your
5  testimony ever been rejected by a court, that you're
6  aware of?
7          MR. LEWIS: Objection to the form.
8          THE WITNESS: I'm not sure what you
9      mean by the term rejected. I can think of
10     one instance in which a court was distinctly
11     unimpressed with it. I can think of one case
12     in which a portion of an affidavit, I
13     believe, was struck, if I remember the
14     process correctly or the result correctly.
15     Let me think here. I think there was another
16     case in which a portion of an affidavit was
17     struck for reasons of relevance.
18 BY MR. BESSETTE:
19     Q.     Do you recall any of the names of
20 those cases?
21     A.     The first one I referred to was
22 called Van de Walle versus Unimation. The second one
23 is Safeguard Scientifics. The third one was a case in
24 a Texas court involving a prospective class of holders
25 of securities; I cannot remember the name of the case.

Page 25

1      Q.     Krogman, does that sound familiar?
2      A.     That's not it, no. Krogman was the
3  case where the judge selected among factors advanced
4  by two different experts, me and another one, and
5  picked more factors favoring the other fellow's
6  opinion than mine.
7      Q.     That was a market efficiency case?
8      A.     Yes.
9          The other Texas case was not -- I
10 can't remember the name of that.
11     Q.     Aside from sort of --
12     A.     I think that's it.
13     Q.     -- courts criticizing or striking
14 portions, do you recall, as you sit here, whether
15 there has been a legal challenge to you based on your
16 opinion and the court refusing to accept you as an
17 expert witness in a case?
18         MR. LEWIS: Objection to form,
19     overbroad and vague.
20         Go ahead.
21         THE WITNESS: That has not occurred.
22 BY MR. BESSETTE:
23     Q.     Who is your client in this case,
24 sir?
25     A.     The plaintiff class.

7 (Pages 22 to 25)

R. ALAN MILLER



Page 214

1    Q.    Last question from me: Go to your
2  report, Paragraph 22 on Page 13.
3    A.    Right.
4    Q.    You state that it is my opinion that
5  disclosure in the prospectus was inadequate in at
6  least the area of the risks and extent of gray
7  marketing and their potential significantly negative
8  effect on the company. I'm curious about the words at
9  least. Are there other areas where you think and it's
10  your opinion that the prospectus was inadequate in its
11  disclosures?
12        MR. LEWIS: Objection to the form.
13        THE WITNESS: As a topic area, I
14        don't believe so. I think the reason I tend
15        to word things this way is that, particularly
16        prior to rebuttal reports and that sort of
17        thing, is that to the extent that at least a
18        portion of what I'm asked to do is rebuttal,
19        I don't always know what's going to come up
20        in that early stage. I also don't know
21        specifically what questions I might be asked
22        around the area of disclosures which may come
23        out of this whole process, and the area that
24        I'm expecting to be asked about is gray
25        marketing, as we've been discussing today.

Page 215

1        If in the course of describing a
2        process of how the market works and how a
3        company becomes publicly traded, and that
4        sort of thing, questions are asked about what
5        may appear to be different areas but relate
6        back to gray marketing, I suppose that could
7        become a topic of testimony. For example,
8        what impact on pricing the offering might I
9        have had had the gray marketing disclosure
10        been X, just one example I can think of.
11        Then that might evoke an opinion.
12        That's kind of the thinking in
13        having it worded that way, but I don't expect
14        it to go off in new areas of -- well, for
15        example, when you just asked about the --
16  BY MR. BESSETTE:
17    Q.    Questionable sales practices?
18    A.    -- questionable sales practices,
19  accounting related to that, all that kind of stuff.
20    Q.    As you sit here today, having
21  written your report and your rebuttal report and
22  seeing Mr. James' report and his rebuttal report, your
23  opinions concerning whether the prospectus was
24  inadequate are limited to the risks and extent of gray
25  marketing?

Page 216

1        MR. LEWIS: Object to the form.
2        THE WITNESS: And the rest of the
3        sentence in that paragraph.
4  BY MR. BESSETTE:
5    Q.    And, obviously, its potentially
6  significant negative effect, which is why you claim
7  there should have been a risk factor disclosure in the
8  prospectus?
9    A.    Yeah, that's essentially correct,
10  and subject to the last answer about what other
11  questions I may be asked; yeah, that's correct.
12        MR. BESSETTE: I'll pass the
13        witness.
14        Thank you.
15        THE WITNESS: You're welcome.
16        MR. GLUCKOW: I suggest we take five
17        minutes to get reorganized.
18        (Recess.)
19  BY MR. GLUCKOW:
20    Q.    Mr. Miller, good afternoon.
21    A.    Good afternoon.
22    Q.    I'm Paul Gluckow, with Simpson,
23  Thacher, and Bartlett. We represent the underwriter
24  defendants in this matter, so my questions this
25  afternoon will focus on those aspects of your reports

Page 217

1  that have dealt with the underwriters' due diligence
2  issue.
3    A.    Right.
4    Q.    Based on the discussion today with
5  Mr. Bessette and other testimony that I've seen you've
6  given in the past, I think I can just do a little bit
7  more background in terms of your experience with due
8  diligence. My understanding is that in your career
9  you've conducted due diligence in connection with an
10  IPO on one occasion; is that correct?
11        MR. LEWIS: Objection to conducted.
12        Go ahead.
13        THE WITNESS: I don't believe so;
14        that is, there's one on which I recall
15        specifically being involved that was an
16        offering of common stock and warrants or
17        units; there was one involving -- pretty sure
18        it was a convertible preferred; there was
19        another that involved a debt security with
20        some kind of equity kicker. I did due
21        diligence on all those offerings.
22        Then there were a specific -- sorry,
23        there were offerings in which the firm I was
24        with was not a lead or co-lead underwriter or
25        in which we were not taking the lead role in

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

R. ALAN MILLER

Page 222

1    (The pending question was read
2 back.)
3    THE WITNESS: Yeah, except for the
4 one or two, perhaps, in which I did specific
5 due diligence assignments as part of a group
6 but not with a primary responsibility for the
7 whole due diligence function.
8 BY MR. GLUCKOW:
9    Q.    Let's talk about those one or two.
10 Tell me what you recall about those.
11    A.    Just that we as a consequence of
12 being involved in a group of firms that acted together
13 to do offerings upon occasion where someone else may
14 have the primary responsibility for due diligence,
15 they may have asked for assistance or staffing on
16 follow-up on certain items or investigation of certain
17 items, so I'd get a phone call or a memo or something
18 that would say would you please look into the
19 following and identify some area or tasks that we were
20 asked to perform, then I would do that and then report
21 back to whoever was asking me.
22    Q.    That's when you were with Butcher?
23    A.    Yes.
24    Q.    What would have been the time frame
25 for those one or two that you have in mind?

Page 223

1    A.    They would have been -- well,
2 actually, '76 through '79.
3    Q.    Again, your employer -- just to be
4 clear on this, your employer, Butcher, was neither the
5 lead nor the co-lead on those transactions, correct,
6 the lead underwriter or the co-lead underwriter on
7 those two transactions we're talking about?
8    A.    Not that I'm thinking of. If we
9 were one of the leads, we were not taking primary
10 responsibility for due diligence in that sense.
11    Q.    Let me try and boil this down, then.
12    In your career, you've conducted due
13 diligence in connection with an initial public
14 offering where your employer was a lead or co-lead
15 underwriter on one occasion, and that was the Caesar's
16 New Jersey matter in the '78 to '79 time period,
17 correct?
18    A.    Yeah; again, I think that's correct
19 with the possible exception of one or two others in
20 which we were not taking primary role for due
21 diligence but may have appeared as the lead
22 underwriter.
23    Q.    Then it's also fair to say, I
24 believe, that you have not been involved in due
25 diligence in connection with an initial public

Page 224

1 offering where your employer was a lead or co-lead
2 underwriter since at least 1980, correct?
3    A.    Sure; that's correct.
4    Q.    Have you published any articles on
5 the topic of due diligence? I don't see any listed on
6 your CV but I just want to confirm.
7    A.    I don't recall exactly. We
8 published quite a number of articles in the series of
9 newsletters that I referred to earlier back in
10 the '70s which involved a variety of financing
11 techniques, a lot of which involved going public. I
12 would be surprised if there wasn't some articles
13 during that time on due diligence. Some of that might
14 have been from the perspective of the officers and
15 directors as opposed to the underwriters because our
16 clients at that time tended to be prospective issuers
17 as opposed to underwriters. That was a topic that was
18 part of the research I had done on the 550 IPOs from
19 '68 to '72 that I referenced earlier, and that,
20 therefore, appeared in some of our publications around
21 that time.
22    Q.    These newsletters you're talking
23 about would have been written in what time period, the
24 early '70s?
25    A.    '72 through '76.

Page 225

1    Q.    These were not -- were these
2 published to the world at large or were these client
3 newsletters sent to clients and prospective clients of
4 the firm?
5    A.    They were sent to clients,
6 prospective clients, and paid subscribers who tended
7 to be prospective issuers and service providers to
8 prospective issuers.
9    Q.    As you sit here today, can you
10 recall any newsletters that you worked on that
11 specifically dealt with the topic of underwriters' due
12 diligence?
13    A.    No, I can't recall specifically, but
14 as I said, it was part of the study that I did at that
15 time and there was fairly intensive -- we wrote about
16 just about every aspect of that study over a period of
17 years. I'd be surprised if it was not covered in
18 something we did but, again, the focus at that time
19 from our point of view was more on the prospective
20 issuer than on the underwriter, although we did cover
21 all the participants in the process. Again, I can't
22 recall specifically, but I would be surprised if it
23 was not among those articles.
24    Q.    Do you have copies of the articles?
25    A.    No, I don't.

57 (Pages 222 to 225)

R. ALAN MILLER

Page 226

1    Q.    How would you go about finding these
2  articles or newsletters if you wanted to?
3    A.    I haven't been able to. I would
4  have asked the company or its successors but they are
5  now gone except for the group that publishes what's
6  now called, I believe, the IPO Reporter or the IPO
7  Journal, and the owner of that publication apparently
8  doesn't or wouldn't have them, but the group that
9  generates the editorial content, I've checked with and
10 they don't appear to have any of it either. As far as
11 I know, that's the last continuing thread of people.
12   Q.    The study that you referred to, was
13 that study reduced to writing and published?
14   A.    Not as one block of information like
15 that. It was presented in numerous client memos,
16 seminars, constituted a lot of the material for a
17 draft of a book that we didn't publish and that sort
18 of thing, but I don't recall that we ever put the
19 entire study together in one place like that.
20        We did publish at the time a CPM
21 chart of the process with annotated sections that
22 actually would have represented a summary of that, but
23 I don't think we actually ever produced the entire
24 work.
25   Q.    Do you have any versions of the

Page 227

1  study in your possession today?
2    A.    No.
3    Q.    Do you have any idea how to get that
4  document if it exists as a document?
5    A.    No, I'd give you the same answer as
6  the newsletters, same timing, same people.
7    Q.    Putting aside the newsletters, which
8  may or may not have had something specific on
9  underwriters' due diligence, can you think of any
10 other publications that you've authored on the topic
11 of underwriters' due diligence?
12        MR. LEWIS: Objection to form.
13        THE WITNESS: No.
14 BY MR. GLUCKOW:
15   Q.    I just want to confirm: On the
16 newsletters and the study we have talked about, to the
17 extent that there may have been at one time something
18 dealing with underwriters' due diligence, would that
19 have been something that you would have been a
20 principal author of, and if not, what would have been
21 your role?
22        MR. LEWIS: Objection to form.
23        THE WITNESS: I was either author or
24        editor of all of the articles that appeared
25        at that time, and of those, I would have been

Page 228

1        the author because I did the study.
2  BY MR. GLUCKOW:
3    Q.    Have you ever taught any courses
4  that addressed the topic of underwriters' due
5  diligence?
6    A.    Not as a topic in itself, no. I
7  believe that may have been a brief portion of a talk
8  or couple of talks that I gave at the Wharton School
9  back in mid to late '70s or early '80s where some of
10 the topics included various types of financing
11 including going public and the roles of the
12 participants, some of the work that underwriters did
13 and that sort of thing.
14   Q.    How many talks do you recall giving
15 at Wharton in the late '70s or early '80s that might
16 have addressed as a component underwriters' due
17 diligence?
18   A.    There were at least three or four, I
19 believe, such talks.
20   Q.    Any recollection as to what portion,
21 if any, of the talks would have addressed
22 underwriters' due diligence?
23        MR. LEWIS: Objection as to form.
24        THE WITNESS: In one sense, it was a
25        fairly small portion because the talks may

Page 229

1  have been 45 minutes to an hour and generally
2  covered the topics of the state of the public
3  markets for raising capital, the roles of
4  participants in the markets and those sort of
5  things, so as a part of the topic, I would
6  have thought, as part of the outline, it
7  would have been a fairly small portion;
8  however, the obsession of MBA students with
9  getting jobs in investment banking firms
10 tended to generate more questions in that
11 area than I would have expected and I did
12 spend more time on what underwriters do than
13 I probably otherwise would have.
14 BY MR. GLUCKOW:
15   Q.    The audience for these talks were
16 MBA students; is that correct?
17   A.    Yes.
18   Q.    Can you think of any other courses
19 that you've taught or public lectures that you've
20 given of any kind on the topic of underwriter due
21 diligence?
22   A.    I don't believe so.
23   Q.    If you wouldn't mind turning to 334,
24 your initial report, Page 4, Paragraph 6, the last
25 sentence refers to PLI and similar programs and

58 (Pages 226 to 229)

Page 230

1  seminars on topics such as corporate finance and due
2  diligence?
3      A.    Right.
4      Q.    Can you recall any specific PLI or
5  similar programs or seminars that specifically address
6  underwriter due diligence that you've attended in the
7  last ten years?
8      A.    No; in the last ten years, I don't
9  believe I've attended any seminars.  We tend to get,
10  on an occasional basis, I guess I'd say, publications,
11  transcripts, and that sort of thing from those types
12  of seminars, and I get regular -- subscribe to a
13  service called due diligence and securities
14  transactions by Robert Haft.  I don't recall the
15  publisher of that, but it's in a workbook-sized
16  publication, updated about every two years or so, or
17  at least I get the updates about that often.  That
18  would be more the type thing we do in the last ten
19  years.
20          The PLI actual seminars I attended
21  would have been earlier; back in the '70s and
22  early '80s, I think, was when I did that kind of
23  thing.
24      Q.    You don't remember going to any
25  program such as that since the early '80s?

Page 231

1      A.    No, I don't recall attending them
2  since the early '80s.  Since then, I primarily relied
3  on obtaining the transcripts or the workbooks from
4  them or subscribing to other such materials as I've
5  described here.
6      Q.    In the due diligence that you have
7  been involved in in your own career that you've
8  described, have you ever dealt with gray market
9  issues?
10      A.    Not that I can recall.
11      Q.    On Page 3 of your report -- again,
12  we're on 334 -- you state in Paragraph 3 that you've
13  been qualified or accepted as an expert on, among
14  other things, investment banking practices; is that
15  correct?
16      A.    Right.
17      Q.    Have you ever been qualified or
18  accepted as an expert concerning your opinions related
19  to underwriter due diligence specifically?
20      A.    Good question.  The cases that come
21  to mind first are two in which investment banker due
22  diligence was at issue but not in connection with
23  public offerings necessarily.  It would be in
24  connection with other functions investment bankers
25  were performing or purporting to perform.

Page 232

1          I'd have to go through the testimony
2  list here and see what other ones there may have been.
3  Those are the first two I can think of.
4      Q.    Just so I'm clear, I thought you
5  were referring to one matter but were you actually
6  referring to two different matters where investment
7  banker due diligence was at issue but it was not in
8  connection with an offering?
9      A.    Correct.
10      Q.    If you wouldn't mind looking at your
11  list of matters, tell me if you can think of any
12  others and we can go through them.  Thank you.
13      A.    One of the first two I mentioned was
14  No. 14.
15      Q.    Which list are you on?
16      A.    I'm sorry, expert witness testimony
17  in court.
18      Q.    This is McKinley Allsop, Inc.?
19      A.    Right.
20          The second one I was thinking of was
21  No. 25.
22      Q.    Kenny v. Bear Stearns?
23      A.    Right.
24          Another one was 26, which was in
25  connection with an offering.  I just don't recall if

Page 233

1  it was a public offering or a private placement at the
2  moment.
3          On the deposition and arbitration
4  testimony list, No. 1.
5      Q.    Shearson?
6      A.    Yes.
7          No. 8.
8      Q.    American Dental Laser?
9      A.    Right.
10          No. 12, No. 13, No. 15.  I think
11  No. 18, as best I recall.  I think No. 21, as best I
12  recall.  No. 26, No. 50, No. 56.  That's it.
13      Q.    The ones you just gave me most
14  recently off of the deposition and arbitration
15  testimony list starting with the Shearson matter and
16  going down to the CFS matter, which is 56, Shearson
17  was one, those are all matters, I take it, where you
18  either provided a report or were deposed or both but
19  not, which is where we started, where you'd been
20  qualified or accepted as an expert concerning your
21  opinions related to due diligence; is that correct?
22      A.    (No response.)
23      Q.    Because it didn't get to trial, in
24  other words?
25      A.    Correct.

Page 234

1    Q.    Going back to where we started in
2  terms of matters where you've been qualified or
3  accepted as an expert concerning your opinions related
4  to due diligence by underwriters, it would just be the
5  first three we started with, No. 14, No. 25, and
6  No. 26 off the expert witness testimony in court list,
7  correct?
8    A.    Right; that's correct.
9    Q.    No. 14, McKinley Allsop, that was
10 one of the matters you mentioned that involved
11 investment banker due diligence but did not involve
12 any kind of an offering; is that right?
13   A.    Right.
14   Q.    What was the issue in that case?
15   A.    Whether McKinley Allsop had
16 adequately done its work in connection with the
17 issuance of a highly confident letter regarding
18 financing for Jetborne.
19   Q.    No. 25, Kenny, was another one you
20 said where there was no offering involved but the
21 matter otherwise raised issues of due diligence; is
22 that correct?
23   A.    Correct.
24   Q.    What was the issue there?
25   A.    Whether Bear Stearns performed

Page 235

1  properly in its role as financial advisor to Daisy
2  Systems including in connection with issuing a highly
3  confident letter and financing commitment and
4  providing advice about financing to Daisy Systems.
5    Q.    No. 26, Alpha Group, you thought may
6  have involved a private placement but you weren't a
7  hundred percent sure?
8    A.    Yeah, it was either a public
9  offering or private placement of bonds. The more I
10 think about that, it might have been a private
11 placement but the issue was similar.
12   Q.    What was the issue, as you recall
13 it?
14   A.    As to whether or not Bear Stearns
15 had performed adequate due diligence and insured
16 proper disclosure in a prospectus or offering
17 materials in connection with the sale of bonds.
18   Q.    Do you have any materials related to
19 that matter?
20   A.    I don't know.
21   Q.    How would you find out?
22   A.    I would look in the office.
23   Q.    If you did, they would be maintained
24 at PIBC?
25   A.    Right.

Page 236

1    Q.    Now that you've thought about it
2  some more, you think that the matter involved the
3  private placement as opposed to a public offering?
4    A.    I think so. One of the reasons I'm
5  hesitating about that is that there were individual
6  purchasers involved as opposed to institutions, as
7  opposed to solely institutions, and it does raise that
8  question, but as best I can recall, it was a private
9  placement.
10   Q.    As I understand it, you've never
11 offered testimony on behalf of a defendant in a matter
12 involving the issue of whether investment bankers did
13 due diligence properly; is that correct?
14       MR. LEWIS: Objection as to form.
15       THE WITNESS: I think that's
16       correct.
17 BY MR. GLUCKOW:
18   Q.    As I understand it, you've never
19 written an expert report on behalf of a defendant in a
20 case involving the issue of whether the investment
21 bankers did due diligence properly; is that also
22 correct?
23       MR. LEWIS: Objection as to form.
24       THE WITNESS: That, I don't recall.
25       I don't recall testifying about that before.

Page 237

1       I don't recall if I may have written such a
2       report or not.
3  BY MR. GLUCKOW:
4    Q.    Can you recall writing an expert
5  opinion that underwriters performed adequate due
6  diligence?
7    A.    I can't recall whether I have or
8  not.
9    Q.    As you sit here, you can't recall --
10 I'm sure you can recall reports you have written or
11 opinions you've offered that underwriters have not
12 performed adequate due diligence, correct?
13       MR. LEWIS: Objection to form.
14       THE WITNESS: At least the ones that
15       relate to matters printed on these lists, I
16       can jog my memory through the lists. Sitting
17       here, I can't recall others at the moment of
18       that type.
19 BY MR. GLUCKOW:
20   Q.    The ones we talked about earlier off
21 of the trial testimony list, No. 14, 25, and 26, and
22 off of the deposition and arbitration list, one,
23 eight, 12, 13, 15, 18, 21, 26, 50, 56, I take it from
24 your answers that in each of those cases you were
25 offering an expert opinion stating that the

60 (Pages 234 to 237)

Page 246

1    Castle Pines, CliniCorp, US Wireless?
2        A.    No, none of those.
3        Q.    New America securities litigation?
4        A.    No.
5        Q.    Zelcor, American Dental, Shearson?
6        A.    I can't recall.
7        Q.    Alpha Group, Kenny or Mackinley?
8    Those are the other ones we talked about.
9        A.    It wasn't Alpha Group.  No, I don't
10   recall.
11       Q.    But you do recall that AMF Bowling
12   was the other one?
13       A.    Yes.
14       Q.    The AMF report, which we'll mark in
15   a minute, was a model or a template for the section of
16   your report in this matter beginning with Paragraph 19
17   that dealt with the underwriters' due diligence; is
18   that correct?
19            MR. LEWIS: Objection to form and
20            foundation.
21            THE WITNESS: I don't know that I'd
22            put it quite as broadly.  I think with
23            respect to the type of information that was
24            required by prospective underwriters, the
25            type of information relevant to that

Page 247

1        examination, process issues as to how the
2        underwriter should go about the work, what
3        level of detail to obtain, factors that are
4        important in conducting the work.  In those
5        source of factors, I used some of the
6        language which I also used in AMF Bowling as
7        it applied to this case but reviewing it to
8        make sure that it did apply to this case and
9        modifying it if necessary.
10           Again, some of the work here has
11           been generated over the years from reviewing
12           Mr. Haft's series, the due diligence and
13           securities transaction materials, and other
14           publications and materials that we get
15           regularly on due diligence issues.
16           MR. GLUCKOW: Let's mark your
17           initial report of AMF Bowling.
18           (Mr. Miller's AMF Report was marked
19           Exhibit-351 for identification.)
20   BY MR. GLUCKOW:
21       Q.    Mr. Miller, you have 351, which is
22   your initial report in AMF.  Do you recognize that as
23   your initial report in the AMF Bowling matter?
24       A.    Yeah, it appears to be that.
25       Q.    If you would, compare Paragraphs 19

Page 248

1    and 20 from the Adams Golf initial report with
2    Paragraphs 6 and seven of the AMF Bowling report.
3        A.    Right.
4        Q.    They are very similar, correct?
5        A.    Yeah, many of the bullet points are
6    the same.  There are a couple that differ given the
7    differing nature of the two companies involved in
8    these two matters.
9        Q.    The introductory language in 19 in
10   the Adams Golf report is the same as the introductory
11   language in six of the AMF report, correct?
12       A.    Yes.
13       Q.    The first bullet point is the same?
14       A.    Right.
15       Q.    The second bullet point is the same?
16       A.    Yes.
17       Q.    The third bullet point is the same?
18       A.    Yes.
19       Q.    The fourth bullet point is the same?
20       A.    Yes.
21       Q.    The fifth bullet point in Adams Golf
22   is new, correct?
23       A.    Correct.
24       Q.    Do you recall the process that led
25   to the adding of that bullet point and, specifically,

Page 249

1    did you think to add that yourself or was that a
2    suggestion from counsel or someone else?
3        A.    No, that was my input, and it
4    reflects the various -- the differing stages of the
5    two companies; that is, AMF Bowling was a more
6    established, longer term company and Adams was a new,
7    fast-growing company with comparatively inexperienced
8    management, particularly in the public company arena,
9    and with a rapidly evolving business plan, so it was
10   an appropriate one for Adams that didn't apply so much
11   to AMF.
12       Q.    The next bullet point is the same,
13   correct?
14       A.    Correct.
15       Q.    The next one is the same after that?
16       A.    Correct.
17       Q.    Then the -- I think the report of
18   Gerard Adams I read somewhere was a typo in your AMF
19   report, so we'll ignore that one.
20            MR. LEWIS: Objection to form.
21   BY MR. GLUCKOW:
22       Q.    The two paragraphs that follow the
23   list of bullet points --
24       A.    Continuing through the bullet points
25   after you left off there, the next one is different,

Page 250

1   the next one is different.
2        Q.    Which one did you say was different?
3        A.    The one that begins historical
4   financial performance and trends.
5        Q.    The first sentence is the same,
6   correct?
7        A.    The first sentence is the same. In
8   Adams, I've added a sentence that relates to Adams'
9   specific situation versus AMF's. The next bullet
10  point in the AMF does not appear in Adams, the next
11  bullet point is the same, and the report of Gerard
12  Adams we've talked about.
13       Q.    The next paragraph which begins in
14  both reports with respect to each of is the same,
15  correct?
16             MR. LEWIS: Off the record.
17             (Discussion held off the record.)
18             (Recess.)
19             (Mr. Rozen leaves the deposition.)
20  BY MR. GLUCKOW:
21       Q.    Mr. Miller, have you had a chance to
22  look at those paragraphs we were considering before
23  the break?
24       A.    Yes.
25       Q.    As best I can tell, they are the

Page 251

1   same except in the paragraph that begins the proper
2   attitude in Adams Golf, instead of a period after
3   issuer, there's a comma, and then there's a clause
4   particularly with respect to a new company
5   experiencing substantial and rapid growth, which is
6   additional language in Adams Golf that's not in
7   AMF Bowling, correct?
8        A.    Correct.
9        Q.    Otherwise, they are the same,
10  correct?
11       A.    Correct.
12       Q.    In the AMF report, specifically in
13  Paragraph 9, you actually offer an opinion that the
14  due diligence investigation with respect to the public
15  offering was inadequate, correct?
16             MR. LEWIS: Objection to form; it
17        speaks for itself.
18             THE WITNESS: Yeah, in Paragraph 9
19        of AMF, yeah, I give the opinion that the due
20        diligence investigation and pricing analysis
21        conducted by the QIU was inadequate.
22  BY MR. GLUCKOW:
23       Q.    Were you finished?
24       A.    Yes.
25       Q.    As we've discussed in the Adams Golf

Page 252

1   report, in your initial report you did not offer any
2   opinion regarding the adequacy or the inadequacy of
3   the underwriters' due diligence and instead awaited
4   receipt of the defendants' information, correct?
5             MR. LEWIS: Objection to the form.
6             THE WITNESS: Yes, except with
7        respect to the disclosure and the prospectus
8        issue, which I do address in the initial
9        report in Adams Golf.
10  BY MR. GLUCKOW:
11       Q.    You're referring to Paragraph 22 of
12  Adams Golf?
13       A.    Yes.
14       Q.    Just so I'm clear, that
15  Paragraph 22, which I recognize is your opinion, in
16  the initial report does not address the adequacy or
17  the inadequacy of the underwriters' due diligence
18  investigation, correct?
19       A.    It doesn't address it separate from
20  the publication in the prospectus of the information
21  at issue; that's correct. Again, I discussed that
22  topic a few minutes ago before the break. It does not
23  discuss the investigation itself separate from the
24  publication in the Adams Golf Paragraph 22.
25       Q.    I just have to make sure I

Page 253

1   understand this correctly. Twenty-two is saying that
2   it's your opinion that the disclosure in the
3   prospectus was inadequate in the area of gray
4   marketing and the effect that might have on the
5   company, correct?
6        A.    Right; right.
7        Q.    There's nothing in 22 that addresses
8   -- or anywhere else in the initial report that
9   addresses whether the underwriters' due diligence
10  investigation was or was not adequate, correct?
11             MR. LEWIS: Objection to the form
12        and foundation.
13             THE WITNESS: There's nothing else
14        that addresses that; that's correct. Having
15        said that, I don't believe that you can, on a
16        practical basis, have an adequate and
17        reasonable underwriters' due diligence
18        investigation resulting in the nonpublication
19        in the prospectus of the information that's
20        at issue.
21  BY MR. GLUCKOW:
22       Q.    Are you taking away the due
23  diligence defense from the underwriters? I'm not
24  following you.
25             MR. LEWIS: Objection to form.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 254

```
 1            THE WITNESS: I don't think so.
 2   That is, if the underwriter performs a
 3   reasonable and adequate due diligence
 4   investigation and discovers a problem, and it
 5   does not then put in the prospectus, or
 6   insist be put in the prospectus, I don't
 7   believe he has conducted his necessary
 8   reasonable and adequate due diligence
 9   investigation to afford him the defense.  It
10   just doesn't make any sense that that would
11   be the case, so with respect to the
12   publication part of that function, my
13   Paragraph 22 addresses that.  It does not
14   address separately whether or not the
15   investigation part of the function was
16   performed adequately or reasonably in this
17   case.
18   BY MR. GLUCKOW:
19      Q.    Everything you just said is based on
20   what, because you're not a lawyer, right?
21      A.    That's correct.
22      Q.    You have no legal training, haven't
23   gone to law school?
24      A.    I don't have legal training.  I have
25   not gone to law school.  I have obviously read the
```

Page 255

```
 1   Securities Act a number of times, read and reviewed
 2   and attended PLI materials and that sort of thing, but
 3   my expertise in the area is as I discussed before, in
 4   the context of the investment banking and investment
 5   community's understanding of these matters.
 6      Q.    I just want to make sure --
 7      A.    I also -- sorry -- further in that
 8   area have reviewed case law and opinions and that sort
 9   of thing in this area as well.
10      Q.    I'm just going to do this
11   hypothetically to find out whether I can understand
12   what you are saying.
13            Assume that there's a prospectus
14   that's defective, it has a misstatement or an omission
15   in it, a material misstatement or omission, and also
16   assume that the underwriters have conducted a
17   reasonable due diligence investigation where they've
18   identified an issue, and they actually believe and
19   have reasonable grounds to believe that the
20   registration statement and prospectus are complete and
21   accurate, don't have any material misstatements, don't
22   omit any material facts; you do recognize, I take it,
23   that in that circumstance the underwriters are
24   entitled to a due diligence defense even if the
25   prospectus is defective, correct?
```

Page 256

```
 1            MR. LEWIS:  Objection to form,
 2   foundation, incomplete hypothetical,
 3   argumentative.
 4   BY MR. GLUCKOW:
 5      Q.    I'm not trying to be argumentative,
 6   I'm just trying to understand.
 7      A.    I think not necessarily, I guess, is
 8   the answer.  I think that -- let me put it this way if
 9   I can -- if I understand what you're asking, I believe
10   it is possible for underwriters to conduct a
11   reasonable and adequate due diligence investigation
12   and still be misled or defrauded in certain
13   circumstances, but I don't believe those circumstances
14   exist here, and at the time I prepared my initial
15   report I was prepared to say what I did in
16   Paragraph 22 but awaited the report of the defendants'
17   expert to see if they then established that they had
18   performed a reasonable and adequate due diligence
19   investigation, notwithstanding the omission from the
20   prospectus of what I considered to be material
21   information.
22      Q.    Let's assume that the report that
23   you then received from the defendants established a
24   reasonable and adequate due diligence investigation.
25   Okay?
```

Page 257

```
 1      A.    Right.
 2      Q.    You would then agree that the
 3   underwriters could take advantage of their affirmative
 4   defense, correct?
 5            MR. LEWIS:  Objection as to
 6   foundation, incomplete hypothetical, vague
 7   and indeterminate.
 8            THE WITNESS:  Yeah, if I understand
 9   your question correctly, I think that's a
10   possibility.
11   BY MR. GLUCKOW:
12      Q.    They could still be entitled to
13   their due diligence defense, notwithstanding your
14   opinion in 22 that there was a problem with the
15   prospectus, correct?
16            MR. LEWIS:  Objection to form.
17            THE WITNESS:  I think that that is
18   possible, yes.
19   BY MR. GLUCKOW:
20      Q.    We may have to come back to that
21   later but let's leave it there for now.
22      A.    Just to be clear, I view that as a
23   hypothetical question.  Having been through this
24   process so far in this case, I don't believe it
25   occurred.
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 258

1    Q.    You don't believe there was a
2  reasonable investigation by the underwriters?
3    A.    Right. I don't believe there was
4  one and I don't believe the defendants have
5  established that there was one. Maybe I should do
6  that in reverse order. I don't believe -- perhaps
7  more importantly, I don't believe defendants have
8  established they performed such an investigation.
9  From what I have seen, I also believe they have not
10 performed such investigation.
11   Q.    The first point that you just made,
12 which is your point that in your view the underwriters
13 have not established that they conducted a reasonable
14 investigation, as we'll see, that opinion is in your
15 rebuttal report, correct?
16   A.    Right.
17   Q.    The other opinion that you just
18 articulated, which is that you have an opinion that,
19 in fact, the underwriters did not conduct a reasonable
20 investigation, show me where that is in any of your
21 reports in this case.
22   A.    I don't know that I've stated that
23 that way prior to this discussion here.
24   Q.    In fact, you haven't, correct?
25   A.    I don't recall whether I did or not.

Page 259

1    Q.    Take a look at your opening report
2  and your rebuttal report, and if you can find it, show
3  me where it is.
4        MR. LEWIS: Did you have something
5     else to say?
6        THE WITNESS: Yeah. I think in
7     connection with the discussion we've been
8     having is why this arose; that is, you asked
9     these questions and I'm answering them. You
10    asked if I had an opinion about that and I
11    gave it to you.
12        My understanding is the way this
13    works is that the defendants are afforded the
14    opportunity to establish such a defense, and
15    in my view, they have not done so, and that,
16    from a legal perspective, may be where it
17    ends. That's the area in which I was asked
18    to opine and that's the area about which I
19    have opined.
20        In the course of our conversation,
21    then, I believe you asked me if I had an
22    opinion about that and I said I do, but
23    whether or not I offer that is a matter of
24    what counsel decides to pursue.
25 BY MR. GLUCKOW:

Page 260

1    Q.    Have you been asked to form an
2  opinion on that question, that question being whether
3  in your opinion the underwriters conducted a
4  reasonable investigation?
5    A.    I don't think I've been specifically
6  asked so far to form that opinion. I think I've been
7  asked to address the issue of whether the defendants
8  established that. In the course of reviewing the
9  materials that I've reviewed, based on what I've seen
10 to date and as part of my work in determining whether
11 the defendants have met their burden in that regard, I
12 have formed an opinion about that but, again, I don't
13 know if I will be asked about that and have not
14 discussed that in that sense with counsel.
15   Q.    What's your current understanding
16 regarding whether you intend to offer an opinion at
17 trial concerning whether the underwriters conducted a
18 reasonable due diligence investigation?
19        MR. LEWIS: Objection, asked and
20    answered.
21        THE WITNESS: I don't have a current
22    understanding as to whether I would be asked
23    that or not. What I've been asked so far is
24    do I believe the defendants have established
25    that they conducted such an investigation.

Page 261

1    It's -- I don't know whether I would be asked
2    to go to the next step of your question and
3    determine whether I have an opinion on
4    whether the due diligence investigation was
5    adequate or not.
6  BY MR. GLUCKOW:
7    Q.    Just to be clear, you agree with me
8  that in your two written opinions to date, you have
9  not offered an opinion on that latter question,
10 namely, whether in your opinion the underwriters
11 conducted a reasonable due diligence investigation,
12 correct?
13        MR. LEWIS: Objection to form; the
14    documents speak for themselves.
15        THE WITNESS: I think that's
16    correct, but I'll be glad to check them and
17    see if I did say that or not.
18 BY MR. GLUCKOW:
19   Q.    Only if you feel the need to. I'm
20 quite sure you have not given that opinion, but if you
21 want to be comfortable with that, please take your
22 time to do so.
23   A.    No, in the way we've been
24 discussing, I have not offered that so far.
25   Q.    Thank you.

66 (Pages 258 to 261)

Page 262

1        In terms of the materials
2   considered, Mr. Bessette went over this with you a
3   little bit and I won't take much time on it, but if
4   you would turn to Page 6 of your initial report,
5   Paragraph 11, in connection with the underwriters' due
6   diligence, how did you decide what materials you
7   wanted to review?
8        A.    I asked counsel what underwriter
9   materials had been produced, if there was a document
10  production, and what testimony there was on that
11  topic, and they identified that for me as the
12  deposition transcripts and the related exhibits.
13       Q.    Did counsel explain to you that
14  there was, in fact, a separate underwriter production
15  referred to in Mr. Necarsulmer's report which I know
16  you've seen, UND1 through 11,636?
17            MR. LEWIS: Objection to form.
18            THE WITNESS: Yeah, there was -- we
19       had some discussion about that, yes.
20  BY MR. GLUCKOW:
21       Q.    What do you recall about the
22  discussion?
23       A.    I asked what there was in the way of
24  underwriter production. It was described to me there
25  was some amount of it; I don't recall how it was

Page 263

1   characterized to me. I asked what it was and if
2   anybody had gone through it, I believe. I don't
3   recall specifically what we discussed about it beyond
4   that. It was not a terribly long discussion about it.
5   I don't recall who suggested it, but I came to the
6   conclusion that I would see what it was that
7   Mr. Necarsulmer produced from that document production
8   to support his opinion, whatever it was going to be.
9        Q.    As you sit here today, you have
10  never received or reviewed the underwriters' document
11  production in this case; is that correct?
12            MR. LEWIS: Objection to form.
13            THE WITNESS: It's probably correct
14       with respect to all of it. I know there have
15       been some documents with UND numbers on them
16       and other documents referred to in deposition
17       transcripts and that sort of thing, but I
18       don't believe I have anywhere near the volume
19       that I understand exists.
20  BY MR. GLUCKOW:
21       Q.    In fact, at least according to the
22  list on Page 11, the only UND documents you would have
23  received from the underwriters' production would have
24  been those marked as exhibits at depositions, correct?
25       A.    From this list, that's correct, and

Page 264

1   I think that might be correct overall. I have seen
2   some underwriter documents or documents that have UND
3   markings on them that I don't recall necessarily being
4   referenced in transcripts, but I haven't tried to
5   match them up that way, so it may be that they are all
6   deposition transcripts, I don't know that.
7        Q.    In what connection did you see the
8   documents with the UND on them where you think there's
9   at least a possibility that they may not have been
10  deposition transcripts?
11       A.    Just in the normal course of
12  reviewing materials in the litigation.
13       Q.    You're not aware of any category of
14  documents or information received from the
15  underwriters' production, as you sit here now, other
16  than those marked as deposition transcripts, correct?
17            THE WITNESS: Can I have that back?
18            (The pending question was read
19       back.)
20            MR. LEWIS: Objection to form.
21            THE WITNESS: I think that's
22       correct. I'm not aware underwriters'
23       documents have been categorized otherwise.
24  BY MR. GLUCKOW:
25       Q.    For example, I'm looking at your

Page 265

1   bullet point listed on Page 6 and I'm just trying to
2   think is there any way that the underwriters' document
3   production could be captured in any of those other
4   bullet points, and I'm not able to come up with any
5   way and I'm asking you whether you can. These are the
6   materials that you considered, correct, at least as of
7   the time of your initial report?
8            MR. LEWIS: Objection to form.
9            THE WITNESS: No, I think you're
10       correct, and as we discussed earlier.
11  BY MR. GLUCKOW:
12       Q.    What about the underwriters'
13  responses and objections to the plaintiff's sixth set
14  of interrogatories, which were the underwriters'
15  responses to the plaintiff's so-called contention
16  interrogatories? Those are not listed here. Have you
17  ever reviewed those, to your knowledge?
18            MR. LEWIS: Objection to form.
19            THE WITNESS: I don't recall,
20       specifically. There is at least one set of
21       interrogatory answers that I have reviewed.
22       I do not recall off the top of my head if
23       those are underwriters or not.
24  BY MR. GLUCKOW:
25       Q.    Are those interrogatory answers that

Page 266

1  you're thinking of listed in the materials that you've
2  considered in any of your reports?
3      A.    No.
4          MR. GLUCKOW: Can we mark this,
5      please.
6          (Document Bates Stamped
7      MIL 00090-00115 was marked Exhibit-352 for
8      identification.)
9  BY MR. GLUCKOW:
10     Q.    I'm handing you what's been marked
11 as 352; it's from your production in this matter. Is
12 that the set of interrogatory responses you had in
13 mind?
14     A.    Yeah, I believe it is.
15     Q.    Those are the Adams Golf defendants'
16 responses to the plaintiff's fifth set of
17 interrogatories, correct?
18     A.    Correct.
19     Q.    Then to the best of your knowledge,
20 you have not reviewed the underwriters' responses and
21 objections to the plaintiff's sixth set of
22 interrogatories, correct?
23     A.    Yeah, I think that's correct.
24     Q.    Did you review the depositions of
25 the underwriter witnesses?

Page 267

1      A.    I did.
2      Q.    Did you review specifically the
3  deposition transcript of Olga Pulido-Crowe?
4      A.    I did.
5      Q.    Did you read the entire transcript
6  or just selected portions?
7      A.    No, I read it all.
8      Q.    Did you read the exhibits that were
9  referred to during that deposition?
10     A.    Yes.
11     Q.    In your rebuttal report, 335,
12 Pages 22 to 23 address Mr. Necarsulmer's report?
13     A.    Right.
14     Q.    I'm going to ask you the same
15 question I asked you about your initial report, which
16 is your best estimate for the amount of time it took
17 you to draft Paragraphs 23, 24, and 25 of the rebuttal
18 report.
19         MR. LEWIS: Objection to the form.
20         THE WITNESS: In this connection, I
21     read Mr. Necarsulmer's report, I reviewed
22     Ms. Pulido-Crowe's transcript, I reviewed
23     Mr. Walravens' transcript or -- I think prior
24     to writing this report, I skimmed
25     Mr. Walravens' transcript and reviewed the

Page 268

1      exhibits from the reports -- the transcripts,
2      I'm sorry. I think I had a conversation with
3      counsel as to whether there was any factual
4      information I was missing in this context
5      from what I had reviewed and then wrote this
6      language, so that process may have taken five
7      to 15 hours -- I'm trying to give you some
8      decent estimate there -- maybe a little
9      longer than that, somewhere in that
10     neighborhood.
11 BY MR. GLUCKOW:
12     Q.    I think you anticipated my next
13 question because I believe the answer you just gave,
14 five to 15 hours, somewhere in that neighborhood,
15 maybe a little more than that, wasn't just in terms of
16 drafting these paragraphs but also included the time
17 you spent considering the issues discussed in those
18 paragraphs, correct?
19         MR. LEWIS: Objection to form.
20         THE WITNESS: Right.
21 BY MR. GLUCKOW:
22     Q.    In terms of that conversation with
23 counsel you just mentioned, do you recall anything
24 else about that other than what you testified to
25 already?

Page 269

1          MR. LEWIS: Objection to form.
2          THE WITNESS: No, it was a fairly
3      brief conversation of the nature I said. I
4      had summarized what I had observed existed,
5      asked if there was anybody else involved in a
6      significant way in the process, other
7      information that might be missing of that
8      type, and I think that was the nature of the
9      conversation.
10 BY MR. GLUCKOW:
11     Q.    What was the answer to that
12 question?
13     A.    Basically, no.
14     Q.    The information that you had
15 indicated that you had focused on already, if I
16 understood your prior answers correctly, was the Olga
17 Pulido-Crowe deposition transcript and the Walravens'
18 transcript, correct?
19     A.    And the exhibits.
20     Q.    And the exhibits of those
21 depositions?
22     A.    Yeah. I maybe get your question.
23 That is the primary information I looked at related to
24 this topic.
25     Q.    Can you think of any other category

68 (Pages 266 to 269)

Page 274

1  Necarsulmer. I take it you don't recall reviewing any
2  other materials in connection with the preparation of
3  your rebuttal report?
4          MR. LEWIS: Objection to form.
5          THE WITNESS: I think that that's
6      correct. I don't recall any other materials
7      as I sit here.
8  BY MR. GLUCKOW:
9      Q.    I'm going to hand you
10 Mr. Necarsulmer's initial report, which has already
11 been marked as 321 (indicating). Keep your rebuttal
12 report open as well.
13         In the first two sentences of your
14 Paragraph 23 in your rebuttal, you address in a
15 general way the outline of responsibilities that
16 Mr. Necarsulmer has provided. I take it you do not
17 disagree with Mr. Necarsulmer's general outline of
18 what underwriters are supposed to do as part of their
19 due diligence; is that correct?
20         MR. LEWIS: Objection to form,
21     foundation.
22         THE WITNESS: No, I don't think I
23     have a problem with his outline. I think
24     enough areas of it are general enough to
25     cover most of the important areas you'd want

Page 275

1      to get into.
2  BY MR. GLUCKOW:
3      Q.    When you were responding to my
4  question, I'm assuming you were looking at 6A and 6B
5  of Mr. Necarsulmer's initial report where he provides
6  those general contours; is that correct?
7          MR. LEWIS: Objection to form.
8          THE WITNESS: Correct.
9  BY MR. GLUCKOW:
10     Q.    Then on Pages 3 and 4,
11 Mr. Necarsulmer gives a list of 11 areas of activity
12 that he believes the underwriters undertook as part of
13 their due diligence. I take it you don't dispute that
14 the activities reflected in one through 11 actually
15 took place; is that correct?
16         MR. LEWIS: Objection to form and
17     foundation.
18         THE WITNESS: I'm sorry, could I
19     have the question back?
20         (The pending question was read
21     back.)
22         THE WITNESS: There's some judgment
23     calls in here so I'm not sure I can answer
24     it, the way I understand you're asking, that
25     is.

Page 276

1  BY MR. GLUCKOW:
2      Q.    I'm sorry; go ahead.
3      A.    Paragraph 1 on Page 3, it appears to
4  be Mr. Necarsulmer's opinion that the offering process
5  was staffed by a team of sufficient size, experience,
6  and seniority to be appropriate for the project; the
7  offering process was staffed by a team. He then makes
8  the judgment as to the rest of the sentence.
9      Q.    Let's do it that way, then. Do you
10 disagree that the team was of sufficient size,
11 experience, and seniority to be appropriate to the
12 project or do you just not have an opinion one way or
13 the other on that, or do you agree?
14     A.    First off, I think what I've said
15 about this is that his descriptions of these things
16 are extremely general. They don't refer to people,
17 describe their backgrounds, refer to documents
18 reviewed, information discovered, much more
19 importantly independent analysis performed by the
20 underwriters, investigation work, and that sort of
21 thing except in the most general terms, so you can't
22 tell from his presentation what was done to discharge
23 the obligation to conduct a reasonable investigation
24 to come to the conclusions that they came to.
25         That was, at least at the first

Page 277

1  instance, the level of information that I was
2  responding to in my opinions, that is, that
3  specifically with respect to the gray marketing issue,
4  there's no mention of it in here, there's no
5  indication that the issue was uncovered, discussed,
6  analyzed, that independent information was obtained to
7  evaluate it, that the impact of it was considered in
8  any fashion, so I don't see where the generalities
9  that Mr. Necarsulmer describes in these various
10 categories established the adequacy of the
11 investigation conducted by the underwriters in this
12 matter.
13     Q.    Are you finished?
14     A.    Yeah, I think that responds to your
15 question.
16     Q.    Not at all. Move to strike.
17         MR. GLUCKOW: Read back my question.
18         (The preceding question was read
19     back as follows:
20         Question: Let's do it that, way
21     then. Do you disagree that the team was of
22     sufficient size, experience, and seniority to
23     be appropriate to the project or do you just
24     not have an opinion one way or the other on
25     that, or do you agree?)

Page 278

1    THE WITNESS: In terms of presenting
2    a defense theory, it does not discuss the
3    people, their backgrounds, their experience,
4    why he thinks they were qualified, what work
5    they did, how they were supervised, and that
6    sort of thing. There's no information
7    presented except the conclusion that he comes
8    to.
9    BY MR. GLUCKOW:
10    Q.    I'm asking you whether you agree
11    with that conclusion or whether you haven't formed any
12    opinion on it at all.
13    MR. LEWIS: Objection to form,
14    foundation, and scope of opinion.
15    Go ahead.
16    THE WITNESS: Regarding
17    Mr. Necarsulmer's work, I was asked to
18    determine if he established that the
19    underwriters had conducted an adequate
20    investigation as we've been discussing, and
21    what I'm saying is with respect to
22    Paragraph 1 specifically and then more
23    generally the rest of this work, that he has
24    not presented any information on which
25    someone could make that determination. What

Page 279

1    he's presented is his conclusions as to those
2    things.
3    BY MR. GLUCKOW:
4    Q.    I understand that you're not happy
5    with Mr. Necarsulmer's report, and that's fine, we'll
6    deal with that. What I'm asking you is whether you
7    have any opinion of your own regarding whether the
8    offering process was staffed by a team of sufficient
9    size, experience, and seniority to be appropriate for
10    the project, and if you haven't formed an opinion on
11    that, that's fine, just tell me that.
12    MR. LEWIS: Objection to form and
13    foundation.
14    Go ahead.
15    THE WITNESS: I've had thoughts
16    about that. I don't know that I've actually
17    formed a formal opinion on that as you're
18    asking me, as I think you may be asking me
19    here.
20    My thoughts in that area have been
21    that there was no managing director actually
22    involved in the process, as far as I could
23    tell. From the information I've reviewed so
24    far, Mr. Francis was a figurehead whose
25    fingerprints are not on the project, that

Page 280

1    Ms. Pulido-Crowe was hoping to become a
2    managing director and was at the time -- I
3    forget the next title, I think it was vice
4    president -- conducting oversight on the
5    work, much of which was delegated to
6    Mr. Walravens and a financial analyst whose
7    name, unfortunately, I can't recall, and that
8    I'm not sure I saw any evidence of
9    involvement by more senior personnel with
10    perhaps more business experience and
11    background with regard to critical issues
12    such as gray marketing, and if the team had
13    the experience to be appropriate for the
14    project, I saw no evidence of inclination to
15    perform independent analysis with respect to
16    the gray market issue specifically from that
17    team, which suggested either a lack of
18    experience in the area or a simple failure to
19    follow up on information that was obviously
20    deserving of follow-up.
21    BY MR. GLUCKOW:
22    Q.    You don't dispute that the
23    underwriters had discussions with senior management at
24    the company concerning the gray market issue, correct?
25    MR. LEWIS: Objection to form.

Page 281

1    THE WITNESS: No, I don't dispute,
2    from what I've seen, that they had
3    discussions with a couple of management
4    people about the topic.
5    BY MR. GLUCKOW:
6    Q.    You don't dispute that the
7    underwriters conducted telephone interviews with at
8    least seven of Adams' top customers concerning a
9    variety of topics, correct?
10    MR. LEWIS: Objection to form and
11    foundation.
12    THE WITNESS: No, I don't dispute
13    that from what I can see those interviews
14    took place; no.
15    BY MR. GLUCKOW:
16    Q.    Don't you consider those interviews
17    an example of the kind of independent verification
18    that you're referring to?
19    A.    No. That is that the conduct of
20    outside interviews absent management participation is
21    important, but when no specific questioning is made
22    about the gray marketing or the effect of gray
23    marketing, more importantly, no contact was made with
24    any of the people who had complained about gray
25    marketing, no documentation or correspondence was

71 (Pages 278 to 281)

R. ALAN MILLER

Page 282

1  reviewed with respect to the complaints about gray
2  marketing, no independent follow-up was made to
3  determine if it was a problem or what the impact of it
4  was other than the assurance that I believe it was
5  Mr. Adams gave to Ms. Pulido-Crowe with respect to
6  Costco by saying don't pursue your own independent
7  inquiry of Costco, I'll take care of them, or
8  something to that effect, and/or Ms. Pulido-Crowe's
9  assessment that since her husband wouldn't purchase
10 sporting goods items at Costco, that it was not likely
11 to be a threat to Adams Golf.
12        Those are what I remember about the
13 disposition of the issue with management, but that
14 seemed to end the inquiry, from what I can tell.
15     Q.    One of the things you said in that
16 answer was that there was no mention of the gray
17 marketing issue in the customer surveys; is that
18 correct?
19     A.    Right.
20     Q.    There was a specific question that
21 said are there any other issues, legal, contractual,
22 or otherwise, which you feel are important; isn't that
23 correct?
24        MR. LEWIS: Objection to form.
25        THE WITNESS: I understand that was

Page 283

1  a question on the outline.
2  BY MR. GLUCKOW:
3     Q.    You understand that was a question
4  that was asked of the customers who were interviewed
5  by the underwriters, correct?
6     A.    I understood it was a question on
7  the outline to be asked. I don't recall reading
8  enough detail about the actual conversations to know
9  if it was asked or how it was asked or what the
10 inclination of the customer would have been to provide
11 the information over the telephone, what their
12 attitude toward Adams was at that point as a customer
13 trying to acquire a hot club in that market. I don't
14 know a lot of those things about the customer
15 interviews over the telephone.
16     Q.    Did you review the actual record
17 reflecting the 11 interviews that the underwriters
18 conducted which show the responses received?
19     A.    I saw at least some of that
20 information in some exhibits, yes.
21     Q.    Isn't it true that in going through
22 each and every one of those 11 telephone interviews,
23 not a single one of the responses indicated any
24 concern about gray market or Costco?
25        MR. LEWIS: Objection to foundation

Page 284

1  and form; misstates the evidence.
2        THE WITNESS: I don't recall seeing
3  any mention in the responses of Costco or
4  gray marketing.
5  BY MR. GLUCKOW:
6     Q.    Mr. Necarsulmer says, in his
7  rebuttal report which I know you've seen, these kinds
8  of interviews with independent parties are the type of
9  work underwriters should engage in to confirm
10 discussions with company management. Don't you agree
11 with that?
12        MR. LEWIS: Objection to form.
13        THE WITNESS: Again, as a general
14     category, I certainly agree that underwriters
15     should conduct independent interviews with
16     outside parties to confirm information they
17     have received from management. Whether or
18     not the way these were done, the basis of the
19     selection of the parties to interview, and
20     all those sorts of things were adequate are,
21     I think, question marks at this point in that
22     area.
23 BY MR. GLUCKOW:
24     Q.    Again, the only deposition
25 transcripts of underwriters you can recall reading are

Page 285

1  Pulido-Crowe and Walravens', correct?
2        MR. LEWIS: Objection to form.
3        THE WITNESS: I believe that's
4     correct.
5  BY MR. GLUCKOW:
6     Q.    You've never reviewed the
7  underwriters' document production in this case,
8  correct?
9     A.    Other than those we've discussed.
10    Q.    Other than as marked as exhibits at
11 depositions, correct?
12    A.    I think that's correct.
13    Q.    You referred to a conversation
14 between Pulido-Crowe and Mr. Adams regarding gray
15 marketing and Costco. Is it your understanding that
16 the only discussions that the underwriters had
17 concerning the gray market issue took place between
18 Ms. Pulido-Crowe and Mr. Adams?
19        MR. LEWIS: Objection to form.
20        THE WITNESS: No, I don't think
21     that's necessarily right. I think there were
22     conversations with one of the other
23     management people at least, maybe two others,
24     of the salespeople --
25 BY MR. GLUCKOW:

72 (Pages 282 to 285)

R. ALAN MILLER

Page 286

1    Q.    Gonsalves?
2    A.    -- the sales executives, Gonsalves
3  and --
4    Q.    Beebe?
5    A.    -- possibly Beebe, about that topic.
6    Q.    How many conversations are you aware
7  of between the underwriters and Adams' management
8  concerning the gray marketing or Costco issue?
9    A.    As far as I can recall, I don't
10 recall reference to more than a few outside of the
11 Hoffman letter issue, if we can call it that, but with
12 respect to pursuing independent investigation and that
13 sort of thing, essentially none.
14         MR. LEWIS: I want to back up and
15    retroactively object to the question
16    suggesting that there was a conversation with
17    Beebe since the record does not reflect any
18    such conversation. It misstates --
19         MR. GLUCKOW: I disagree with your
20    characterization, but the record will speak
21    for itself.
22 BY MR. GLUCKOW:
23    Q.    What's your basis for saying that
24 Mr. Francis's role was purely as a figurehead?
25    A.    Ms. Pulido-Crowe's testimony to that

Page 287

1  effect.
2    Q.    You take from Ms. Pulido-Crowe's
3  testimony that Francis was nothing more than a
4  figurehead?
5    A.    In very shorthand form, yes --
6    Q.    Do you have any other basis for
7  that?
8         MR. LEWIS: Please don't cut him
9    off.
10 BY MR. GLUCKOW:
11   Q.    I'm sorry.
12   A.    She described, as I recall, his
13 attendance at certain meetings, his fronting the
14 presentations to the commitment committee, and what I
15 would describe as more of a political role in the
16 process than a substantive role in an investigatory
17 way or anything of that nature.
18   Q.    Any other basis for that statement?
19        MR. LEWIS: Objection to form and
20   foundation.
21        THE WITNESS: Only that in
22   discussing the functions that they were
23   performing, in the deposition I don't recall
24   either Pulido-Crowe or Walravens referring to
25   Francis having done anything in the process

Page 288

1  of conducting investigation or interviews or
2  any of those sorts of functions other than,
3  as Pulido-Crowe describes, in what I'll call
4  a more political role.
5  BY MR. GLUCKOW:
6    Q.    Is it your opinion the underwriters
7  should have contacted Costco?
8         MR. LEWIS: Objection to form and
9  foundation.
10        THE WITNESS: I don't know, I hadn't
11   thought about that specifically, but I
12   certainly think, backing up a step, in terms
13   of generality they certainly should have
14   investigated the Costco matter independently,
15   whether that involved contacting Costco,
16   which was certainly one possibility since
17   Lehman Brothers appeared to have some entree
18   to Costco, I don't recall specifically what
19   that was, but contacting Costco directly
20   seemed to be one choice, contacting an
21   industry expert with knowledge of those types
22   of things to conduct an independent analysis
23   is another choice; there may have been
24   different ways to accomplish that. I haven't
25   thought further about how that should have

Page 289

1  been done, but something should have been
2  done along those lines to pursue that issue.
3  BY MR. GLUCKOW:
4    Q.    As you sit here today, what is it
5  that you think needed to be done to have what, in your
6  view, would have been a reasonable investigation?
7         MR. LEWIS: Objection to form and
8  foundation, compound, and we've been over a
9  lot of this already.
10        Go ahead.
11        THE WITNESS: Again, that's an area
12   I have not been asked for specific opinions
13   on to this time. I have produced the opinion
14   so far that Mr. Necarsulmer has not
15   demonstrated that a reasonable and adequate
16   investigation was performed, which is what I
17   was asked to opine to in this area.
18        Having conducted some analysis of
19   this and reviewed the information we
20   discussed so far today, I have reached some
21   opinions about what I know so far appeared to
22   have been done or not done, and that's the
23   basis on which I am answering your questions
24   now.
25        In terms of what should have been

73 (Pages 286 to 289)

Page 290

1   done to conduct a reasonable investigation,
2   at a minimum, the project should have been
3   staffed sufficiently to ensure that somebody
4   would take the responsibility to conduct an
5   independent investigation of potential
6   problem areas as they arose. The one I'm
7   concerned about, obviously, is gray
8   marketing.
9       When that appeared to be an issue,
10  based on the information that clubs were
11  appearing in Costco, the underwriters should
12  have conducted an independent investigation
13  as to what that meant, what effect it was
14  having on the retailers and distributors,
15  what effect it was having on customers, how
16  Costco was obtaining the clubs, whether it
17  was likely to continue, what effect gray
18  marketing had on companies that suffered from
19  it.
20      The red flag, I believe, had been
21  raised once the underwriters obtained
22  knowledge of the clubs' appearance in Costco.
23  The issue had been raised by appearance in
24  Callaway's 10-K and industry knowledge was
25  available, according to Mr. Magnussen, about

Page 291

1   gray marketing, so it doesn't seem as though
2   it should have been all that difficult to get
3   into the industry and get information about
4   that and, thereafter, determine what to do
5   about it.
6   BY MR. GLUCKOW:
7       Q.   Anything else, because we're going
8   to go through each of these, but I want to know if
9   there's anything else before we do?
10      MR. LEWIS: We're at five of six.
11  We started nine hours ago, which is okay.
12  We're all tired. The witness, I'm sure --
13  I'm tired, at least. Maybe everybody else
14  isn't, but I'm very tired. The witness is
15  tired. We're very close, if not past, the
16  seven-hour limit. I want to give you some
17  leeway, but we're going to have to cut off at
18  some point.
19      MR. GLUCKOW: If you're tired, the
20  witness is tired, I'm happy to pick this up
21  on Monday, but here's my point --
22      MR. LEWIS: We're not picking up
23  Monday.
24      MR. GLUCKOW: That's fine, we'll
25  just keep going; I'm not suggesting that we

Page 292

1   need to.
2       All I'm saying is you had as much
3   time as you needed with Mr. Necarsulmer,
4   right, and they had as much time as they
5   needed upstairs today with Mr. James.
6       MR. LEWIS: Right, but nobody has
7   gone past the seven-hour limit, as far as I'm
8   aware of, and that's established by the
9   rules. I'm not trying to be difficult about
10  it, but you don't get to go on until ten
11  o'clock because you have questions until ten
12  o'clock; you have your limit. I'm trying to
13  be flexible on it, but if you're not going to
14  be flexible with me and find a way to meet
15  some reasonable limit at this time of day,
16  then we're going to have to cut it off.
17      MR. GLUCKOW: I certainly intend to
18  be reasonable but I certainly also intend to
19  complete the examination, so hopefully that
20  will be something we can both live with.
21      MR. LEWIS: It's got to be pretty
22  soon.
23  BY MR. GLUCKOW:
24      Q.   I think I was asking you was there
25  anything else before we go back through these items.

Page 293

1       A.   I have not compared the outline of
2   Mr. Necarsulmer in here with the paragraphs that I had
3   submitted outlining an underwriter's responsibilities
4   in the context of due diligence to see how his
5   opinions stack up against those.
6           (Mr. Bessette leaves the
7   deposition.)
8           (Mr. Collins enters the deposition.)
9       THE WITNESS: Without having done
10  that, I think the additional red flag that
11  exists in these materials, to those I've
12  already discussed, would be in Paragraph 6,
13  which --
14  BY MR. GLUCKOW:
15      Q.   I'm sorry, Paragraph 6 of?
16      A.   I'm sorry, Page 3 of
17  Mr. Necarsulmer, which refers to the commitment
18  committee memo, I believe, which did have a line in it
19  referring to the importance of maintaining margins, I
20  believe it was, at Adams and how those could not be
21  allowed to deteriorate or something to that effect,
22  so, again, that identifies someone was aware of the
23  general issue of margin maintenance but not in the
24  specific wording of gray marketing.
25          Having said that, I think the answer

74 (Pages 290 to 293)

R. ALAN MILLER

Page 294

1   I gave you previously probably covers at least the
2   major areas of where I would be today on this issue
3   since you raised it and asked me.
4       Q.    Can you think of any other areas? I
5   don't want to say that they're just the major
6   ones. Can you think of any other areas as of today
7   that you think would have required follow-through --
8           MR. LEWIS: Objection.
9   BY MR. GLUCKOW:
10      Q.    -- in your opinion?
11          MR. LEWIS: Form, foundation, scope
12      of the opinion.
13          THE WITNESS: Again, I haven't been
14      asked to form an opinion on that prior to
15      this time and I've been giving you the prior
16      thoughts I have in this area in response to
17      your questions, and I think I hit on the
18      major area, particularly with respect to gray
19      marketing, and that being the lack of
20      independent investigation by the underwriters
21      of the issue and the willingness to accept
22      Mr. Adams' assertion he would take care of
23      the Costco problem and essentially leaving it
24      at that, so I think that probably covers it
25      with respect to that issue.

Page 295

1           I have not sat here and attempted to
2       go beyond that and think about every other
3       area they may have been deficient in their
4       work, and have not been asked to do that to
5       this point, but I think the major issue with
6       respect to gray marketing would be covered by
7       that topic.
8   BY MR. GLUCKOW:
9       Q.    Putting aside the gray market issue
10  or the Costco issue, however you want to phrase it,
11  you're not offering any opinion that the underwriters'
12  investigation was less than reasonable in any other
13  way, are you? I've never heard you suggest otherwise.
14          MR. LEWIS: Objection to form,
15      foundation, scope.
16  BY MR. GLUCKOW:
17      Q.    Am I correct?
18      A.    I haven't been asked that question.
19  I haven't been asked to focus on areas other than gray
20  marketing, so I couldn't answer that in that sense.
21      Q.    The margins issue you mentioned
22  before with respect to Paragraph 6 is reflected in the
23  prospectus, correct?
24      A.    Again, in a very general way, the
25  issue of maintenance of sales price margin is

Page 296

1   mentioned in the prospectus, but that's all it says in
2   the prospectus, is basically that one line.
3       Q.    Are you aware of Mr. Frazier's
4   opinion, Professor Frazier's opinion, in this case?
5       A.    I don't believe so.
6       Q.    You haven't seen the transcript of
7   his deposition from earlier this week?
8       A.    I have not.
9           MR. LEWIS: In five minutes, I'm
10      going to ask the court reporter to do a
11      calculation of time for us so we can reach
12      some conclusion here.
13  BY MR. GLUCKOW:
14      Q.    I think we've confirmed this, but if
15  you turn to Paragraph 25 on Page 23 of your rebuttal
16  report, in the last sentence you state in your opinion
17  the expert report of Mr. Necarsulmer does not meet the
18  underwriters' burden to demonstrate that the
19  investigation and/or resulting disclosures were
20  reasonable and adequate, correct?
21      A.    Right.
22      Q.    You're not offering an opinion in
23  this report, I think we've established, dealing with
24  whether in your opinion the underwriters'
25  investigation was reasonable, correct; you have not

Page 297

1   offered a written opinion on that question?
2           MR. LEWIS: Objection to form.
3           THE WITNESS: That's correct.
4   BY MR. GLUCKOW:
5       Q.    What are your qualifications to
6   opine on whether Mr. Necarsulmer has met the
7   underwriters' burden?
8           MR. LEWIS: Objection to form,
9       foundation; calls for legal conclusion.
10          THE WITNESS: I think we've
11      discussed those earlier today at some length.
12  BY MR. GLUCKOW:
13      Q.    You have nothing to add to the
14  qualifications that enable you to offer that opinion
15  other than what we talked about earlier?
16          MR. LEWIS: Objection to form,
17      foundation, legal conclusion.
18          THE WITNESS: Yeah, I think that's
19      probably correct in terms of background,
20      education, work experience, and that sort of
21      thing.
22          Having said that and having reviewed
23      the information that I've reviewed that we've
24      discussed, having reviewed Mr. Necarsulmer's
25      report, it's a fairly easy matter in the

75 (Pages 294 to 297)

R. ALAN MILLER

Page 306

1   BY MR. GLUCKOW:
2      Q.   Do you know whether there were any
3   discussions between the underwriters and Adams'
4   management concerning gray marketing or Costco in
5   connection with the Adams' press release in early June
6   concerning the Costco issue?
7      MR. LEWIS: Object to the form.
8      THE WITNESS: Again, I recall that
9      there was some discussion about that in
10     connection with the Costco issue as presented
11     in the press release and limited to that as
12     opposed to the overall problem of gray
13     marketing and sale of clubs through Costco
14     and the implications that that had for the
15     company.
16   BY MR. GLUCKOW:
17      Q.   What's the basis for your last
18   answer?
19      A.   My understanding of the conversation
20   -- the conversations that occurred around the Hoffman
21   letter with respect to addressing the SEC's inquiry
22   about whether the issue discussed in the Hoffman
23   letter had been investigated or examined by the
24   company according to materiality standard.
25      MR. LEWIS: We have to shut it down

Page 307

1   at this point. We're just at the time
2   lengths -- we're way past. This was
3   scheduled in this fashion at your guy's
4   request. There was no anticipation of going
5   after six o'clock on a Friday afternoon. We
6   all have different plans and travel plans.
7      I have one question, possibly the
8   famous one question, for Mr. Miller to get on
9   the record before we terminate.
10      MR. GLUCKOW: I'm going to object to
11   your shutting down the deposition because I
12   have not finished my examination, and I will
13   reserve all my rights.
14      MR. COLLINS: Any idea how much
15   more? We've been through this before and
16   asked you that question.
17      MR. GLUCKOW: Part of the problem is
18   every time I ask more questions, I'm getting
19   new opinions from the witness that are not
20   reflected in his written opinions in the
21   case.
22      MR. LEWIS: Because you're asking
23   him for them, you're asking what opinions that he
24   may have formed aside of the opinions that he
25   has been engaged to express, and so if you

Page 308

1   keep asking someone for views they have, it's
2   not going to be surprising if they have
3   views.
4      MR. GLUCKOW: If you were willing to
5   tell me he isn't going to offer any opinions
6   concerning the underwriters' due diligence
7   beyond that which is contained in his written
8   reports, I told you a long time ago this
9   could have been completed much sooner, but
10   you won't give me that, and because you won't
11   give me that, I need to know what opinions he
12   has formed on that topic.
13      MR. LEWIS: You still haven't
14   answered Todd's question of how much longer
15   do you have to go. We're talking about
16   travel arrangements at this point for people,
17   including the witness.
18      MR. GLUCKOW: Quite honestly, based
19   on this last exchange, I think I have
20   probably another half an hour, at least.
21      MR. COLLINS: Why don't you proceed
22   with your questioning.
23   BY MR. LEWIS:
24      Q.   Mr. Miller, aside from the opinions
25   that have been expressed in your various reports about

Page 309

1   underwriters' due diligence, are there any other
2   opinions that you have formed and believe you may
3   express in the litigation on the subject of due
4   diligence?
5      A.   If asked about the topic of due
6   diligence with respect to other parties besides the
7   underwriters, I would offer the same sort of opinion
8   with respect to the conduct of due diligence by other
9   parties being signatories or defendants in this matter
10   as well.
11      Q.   Can you describe briefly what the
12   basis of that opinion would rest upon?
13      A.   Basically, my understanding that the
14   opportunity afforded for the due diligence defense is
15   the same, or essentially the same, under Section 11,
16   that is, that a party can establish that he performed
17   a reasonable and adequate investigation and thereafter
18   had a reasonable basis to believe that the prospectus
19   was not misleading, and that that would be the primary
20   basis, that is, that the same essential standard
21   applies and the same result occurred here.
22      Q.   Have you formed any views,
23   preliminary or otherwise, as to whether the officer
24   and director defendants in this litigation are
25   entitled to avail themselves of the due diligence

78 (Pages 306 to 309)