IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

—————————————————————x
                                    :
IN RE ADAMS GOLF , INC.,            :    CONSOLIDATED
SECURITIES LITIGATION               :    C.A. NO. 99-371-KAJ
                                    :
—————————————————————x


**PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO
THE ADAMS GOLF DEFENDANTS' MOTION TO EXCLUDE THE
EXPERT TESTIMONY OF R. ALAN  MILLER**


**ROSENTHAL, MONHAIT &
GODDESS, P.A.**

**BERGER & MONTAGUE, P.C.**

Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401

Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
*Lead Counsel for Plaintiffs and the Class*

Citizens Bank Center
Wilmington, DE   19801
(302) 656-4433
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs
and the Class*

OF COUNSEL:

**LAW OFFICES OF DONALD B. LEWIS**

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

**KELLER ROHRBACK, LLP**

Juli E. Farris
Elizabeth A. Leland
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900

Dated: October 9, 2006

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.   Miller's Testimony is Admissible Under Fed. R. Evid. 702 . . . . . . . . . . 6

      C.   Miller has Properly Applied Efficient Market Theory . . . . . . . . . . . . . . 9

      D.   A Statistical Event Study was Unnecessary and May
           Be inappropriate On the Facts of this Case . . . . . . . . . . . . . . . . . . . . 12

      E.   Miller's Use of Event Windows was Correct . . . . . . . . . . . . . . . . . . . 21

      F.   Miller has Opined Appropriately on Materiality . . . . . . . . . . . . . . . . . 22

      G.   Miller has Properly Utilized a Trading Model to
           Calculate Aggregate Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      H.   Defendants' Other Attacks on Miller Are Baseless . . . . . . . . . . . . . . . 27

           1. Miller's Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

           2. Damage Determinations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

           3. Comments Regarding Gray Marketing . . . . . . . . . . . . . . . . . . . . . 29

           4. Characteristics of Adams Golf Investors . . . . . . . . . . . . . . . . . . . . 29

5. GolfPro Magazine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

6. Due Diligence of Adams Golf Officers and Directors . . . . . . . . . . . . 32

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adair v. Kaye Kotts Associates*,
   1998 U.S. Dist. LEXIS 3900 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17

*In re Adams Golf, Inc. Secs. Litig.*,
   381 F.3d 267 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22

*Akerman v. Oryx Commc'ns, Inc.*,
   810 F.2d 336 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 23

*Basic Industries v. Levison*,
   485 U.S. 224 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 22

*Bell v. Ascendant Solutions*,
   2004 U.S. Dist. LEXIS 12321 (N.D. Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bell v. Fore Systems,*
   *Inc.*, 2002 U.S.Dist. LEXIS 27871 (W.D. Pa. 2002) . . . . . . . . . . . . . . . 24, 25, 26

*Cavallo v. Star Enterprise*,
   892 F. Supp. 756 (E.D. Va. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Chris-Craft Industries v. Piper Aircraft*,
   384 F. Supp. 507 (S.D.N.Y. 1974) (E.D. Va. 1995),
   rev'd in part on other grounds, 516 F.2d 172 (2d Cir. 1975),
   rev'd, 430 U.S. 1 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Collins v. Signetics*,
   605 F.2d 110 (3d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Crazy Eddie Secs. Litig.*,
   948 F. Supp. 1154 (E.D. N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 25, 27

*Dura Pharmacueticals, Inc. v. Broudo*,
   544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 28

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Enron Corp. Secs. Litig.*,
   439 F. Supp. 2d 692 (S.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

*Executive Telecard,Ltd. Secs. Litig.*,
   979 F. Supp. 1021 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Goldkrantz v. Griffin*,
   1999 U.S. Dist. LEXIS 4445 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re IKON Office Solutions, Inc. Secs. Litig.*,
   131 F. Supp. 2d 680 (E.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kaufman v. Motorola, Inc.*,
   2000 U.S. Dist. LEXIS 14627 (N.D. Ill. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kumho Tire v. Carmichael*
   526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 25

*Levine v. Skymall, Inc.*,
   2001 U.S. Dist. LEXIS 24705 (D. Ariz. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Merck & Co., Inc. Secs. Litig.*,
   432 F.3d 261 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re NTL, Inc. Secs. Litig.*,
   2006 U.S. Dist. LEXIS 5346 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*In re Oracle Secs. Litig.*,
   829 F. Supp. 1176 (N.D. Cal. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Oxford Health Plans, Inc., Secs. Litig.*,
   244 F. Supp. 2d 247 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 26

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8

*Peil v. Speiser*,
   806 F.2d 1154 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

*RMED International, Inc. v. Sloan's Supermarkets, Inc.*,
   2000 U.S. Dist. LEXIS 3742 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . *passim*

*RMED International, Inc. v. Sloan's Supermarkets, Inc.*,
   2000 U.S. Dist. LEXIS 4892 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16

*Swack v. Credit Suisse First Boston*,
   230 F.R.D. 250 (D. Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*TSC Industrial, Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22

*In re Worldcom, Inc. Secs. Litig.*,
   2005 U.S. Dist. LEXIS 3143 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 26

## FEDERAL STATUTES

Fed. R. Civ. P. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

15 U.S.C. §78u-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## LAW REVIEWS AND JOURNAL ARTICLES

A. Craig MacKinlay, *Event Studies in Economics and Finance*,
   XXXV JOURNAL OF ECONOMIC LITERATURE 37 (March 1997) . . . . . . . . . . 13, 14

Alan Schulman & Nicki Mendoza, *Dura Pharmaceuticals., Inc. v. Broudo*
   -- *The Least of All Evils*, 1505 PLI/Corp. 272, 274 . . . . . . . . . . . . . . . . . . . . . . . 11

Barclay & Torchio, *Complex Litigation at the Millennium: A Comparison Of*
    *Trading Models Used for Calculating Aggregate Damages in Securities,*
    *Litigation,* 64 LAW & CONTEMP. PROB. 105 (2001) . . . . . . . . . . . . . . . . . . . . . . 26

David I. Tabak and Frederick C. Dunbar, *Materiality and Magnitude: Event*
    *Studies in the Courtroom* (National Research Associates Working Paper
    No. 34, 1999) 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Dean Furbush & Jeffrey W. Smith, *Estimating the Number of Damaged*
    *Shares in Securities Fraud Litigation: An Introduction to Stock Trading*
    *Models*, 49 THE BUSINESS LAWYER 527 (Feb. 1994) . . . . . . . . . . . . . . . . . . . . . 26

Kaufman, Vol. 26 SECURITIES LITIGATION: DAMAGES, *Damages Under*
    *the Securities Act of 1933*, §6:31 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Jon Koslow, *Estimating Aggregate Damages in Class Action Litigation under Rule*
    *10b-5 for Purposes of Settlement*, 59 FORDHAM L. REV. 811 (1991) . . . . . . . 16

Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud*
    *Cases: Applications at the Securities and Exchange Commission*,
    49 THE BUSINESS LAWYER 559 (Feb. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

## I.    NATURE AND STAGE OF PROCEEDINGS

Fact and expert discovery has been completed. On July 14, 2006, R. Alan Miller

("Miller") submitted his Expert Report in this litigation. D.I. 258 (hereinafter "Miller Report").

On July 28, 2006, after considering the Expert Reports of Christopher M. James, Edward

Necarsulmer III and others, Miller submitted his Rebuttal Expert Report. D.I. 266 (hereinafter

"Miller Rebuttal"). On August 11, 2006, Miller was deposed by defendants. On September

11, 2006, the Adams Golf defendants filed a Motion (D.I. 285) and supporting brief (D.I. 286)

to Exclude Expert Opinion of R. Alan Miller. ("Def. Br."). Plaintiffs submit this memorandum

in opposition.

## II.    SUMMARY OF ARGUMENT

1.    Miller's testimony clearly satisfies the standards governing the admissibility of

evidence set forth in Kumho Tire v. Carmichael, 526 U.S. 137, 150, 151 (1999) and In re

Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741 (3d Cir. 1994). Fed. R. Evid. 702 does

not require that any expert base his evidence in "scientific" methodology, and quantification of

damages "is hardly an exact science; computation thereof is accomplished basically by

estimation and inference." RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 2000 U.S. Dist.

LEXIS 3742 (S.D.N.Y. 2000), aff'd, 2000 U.S. Dist. LEXIS 4892 (S.D.N.Y. 2000).

Miller's education, training and experience amply satisfy the liberal requirements for

admissibility of expert witness testimony set forth by the relevant case law.

2.    Miller has recognized and applied proper principles of efficient market theory

recognized in the Third Circuit and elsewhere. His proposed testimony is fully consistent with

In re Merck & Co., Inc. Secs. Litig., 432 F.3d 261 (3d Cir. 2005).

3.    In evaluating factors which may have accounted for movements in Adams Golf's stock price, Miller correctly has utilized an analysis informed by principles of information leakage. See In re Enron Corp. Sec. Litig., 439 F. Supp. 2d 692, 701 (S.D. Tex. 2006). Miller has utilized a fully appropriate methodology to reach the opinions he has expressed in this case, performing a kind of events study that carefully examined industry and company specific events and stock price movements. His analysis was fully informed by the economic principles properly governing such a study. A statistically based event study is unnecessary and may be inappropriate on the facts of this case, which involves: (1) information leakage and uncertain disclosure dates; and (2) no meaningful price history from which an expert could control for market and industry factors. See, e.g., RMED, 2000 U.S. Dist. LEXIS 3742, at *22-25 (holding a statistical "event study" is not a predicate to admissibility).

4.    Miller's use of event windows is appropriate on the facts of this case, which involves information leakage. Merck, 432 F.3d at 269-72; Mark L. Mitchell & Jeffry M. Netter, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, 49 THE BUSINESS LAWYER 559 (Feb. 1994).

5.    Miller has properly opined on materiality, and in doing so determined that gray marketing facts and risks were material. TSC Indus., Inc. v. Northway, Inc., 426 US 438, 449 (1976); In re Adams Golf, Inc. Sec. Litig., 381 F. 3d 267 (3d Cir. 2004); Merck, 432 F.3d at 269-72. The record shows that: (1) the omitted facts regarding gray marketing could materially affect the information available to a reasonable investor; and (2) Adams stock reacted significantly, from a price and percentage standpoint, upon a disclosure relating to gray

2

marketing.

6.    It is defendants' burden to prove negative causation. Adair v. Kaye Kotts Associates, 1998 U.S. Dist. LEXIS 3900 (S.D.N.Y. 1998). Miller has properly attributed damages to defendants, since they have failed to shoulder their heavy burden of establishing that plaintiffs' damages were caused by factors other than the non-disclosure of gray marketing.

7.    Miller has correctly applied a proper trading model to estimate class wide damages. Aggregate damages testimony is admissible. In re Oxford Health Plans, Inc., Sec. Litig., 244 F. Supp. 2d 247, 249-52 (S.D.N.Y. 2003); In re Worldcom, Inc. Sec. Litig., 2005 U.S. Dist. LEXIS 3143, at *2-4 (S.D.N.Y. 2005). Miller has applied a reliable methodology.

8.    Miller's report satisfied the requirements of the Federal Rules of Civil Procedure and the Rules of Evidence, in that it was sufficiently specific and based on sufficient facts. Miller should be permitted at an appropriate time to offer testimony regarding the due diligence of the officers and directors of Adams Golf in light of the subject matters identified in his Report and his deposition testimony.

## III.    STATEMENT OF FACTS

Miller is a highly qualified expert, well-versed in the principles that inform the discipline of securities valuation, with a lifetime of experience in securities markets. His economic and financial testimony has been accepted by many Courts, both in affidavit form and at trial.

Miller received a Bachelor of Science degree in Economics at Cornell University in 1970. He earned his Master's of Business Administration degree from the Wharton School of Finance and Commerce of the University of Pennsylvania, where he majored in Financial

accounting, in 1974. Miller Report, p. 4; Miller Dep. Tr., p. 7:9-11, attached hereto as Ex. A. As an undergraduate, he took both economics and finance-oriented courses, and in graduate school he had approximately four finance courses apart from financial accounting courses. Ex. A, pp. 7:22-8:24. He also took at least four courses in statistics. Ex. A, pp. 9-10. Miller is a member of the American Finance Association and other financial organizations and subscribes to finance and economics journals, including the Journal of Finance, the Journal of Financial Economics, and the Review of Financial Studies. Ex. A, pp. 56-57.

From 1972 through 1976, Miller was a Vice President at Howard & Company ("Howard"), a corporate finance research and consulting firm, which provided advisory services to companies going public. While at Howard he worked on two offerings registered under the Securities Act of 1933. There he began his lengthy career of the study and analysis of initial public offerings by undertaking a detailed and comprehensive study of 550 recent initial public offerings. He then prepared a series of writings concerning the determination of information important to investors. The writings, which were printed as articles and compiled as a draft of a book, were provided to companies for informational purposes as they considered going public. In the process, Miller generated a detailed CPM (critical path methodology) chart of the "going public" process and conducted seminars for clients on the subject. Thereafter, through the early 1980's, Miller wrote articles on corporate finance and valuation topics that appeared in some Pennsylvania CPA and legal publications. Miller Report, p. 4; Ex. A., pp. 11-12, 19-22.

From 1976 to 1980, Miller was a Vice President of Corporate Finance at Butcher &

4

Singer, a major regional investment banking firm headquartered in Philadelphia. There he

worked on six to ten more offerings. Miller Report, pp. 4-5; Ex. A, pp. 12-13. Between

1980 and 1983, Miller was a senior vice president at Philadelphia Capital Advisors (the

corporate services group of Philadelphia National Bank). This firm did consulting work for

companies considering public offerings. Miller supervised and instructed other group members

in corporate finance functions for a wide range of clients. Miller Report, p. 5; Ex. A, pp. 13-

14.

In 1983 Miller founded the Philadelphia Investment Banking Company. Five to ten

clients currently receive corporate finance services from the firm, which also provides litigation

and support services. Just a matter of weeks before his August 11th deposition, Miller was

involved in a corporate merger and acquisition transaction, and he was involved in another that

ended two to three months before. Miller Report, p. 9; Ex. A, pp. 14-18. Thus, Miller's

professional work in large part revolves around the materiality of information to investors.

As Miller's Report reflects, he has, over a career spanning more than 30 years, given

deposition testimony in over 60 matters, the majority involving complex litigation. He has been

permitted to render opinions at trial in over 30 cases. Those cases include Peil v. Speiser, 806

F.2d 1154, reh'g denied, (3d Cir. 1986), the seminal Third Circuit case that validated the

"fraud on the market theory" and was cited in Basic Industries v. Levison, 485 U.S. 224

(1986). Miller's testimony has been accepted elsewhere on issues of market efficiency. See

Levine v. Skymall, Inc., 2001 U.S. Dist. LEXIS 24705, at *13-24 (D. Ariz. 2001) (accepting

affidavit of Miller on issues of market efficiency and fraud on the market theory).

## IV.    ARGUMENT

### A.    Introduction.

In seeking to prevent the helpful and informative testimony of R. Alan Miller from

reaching any factfinder, defendants have confused: (1) the facts; (2) the legal principles properly

bearing upon relevant issues, including materiality, loss causation and damages; and (3) the

posture of the case.  Contrary to their strident protestations, Miller -- a well-recognized expert

with broad experience in the applicable principles governing determinations of materiality,

negative loss causation, and damages in securities litigation -- has opined upon the relevant

issues using informed economic and financial analyses fully appropriate to the facts of this case.

There is no basis for excluding any of his testimony.

### B.    Miller's testimony is admissible under Fed. R. Evid. 702.

Miller's Report, Rebuttal Report and deposition testimony show that he is not only

well-qualified, but that he has also provided opinions, informed by the applicable economic,

financial, and legal principles, that will be useful to the jury in understanding the issues in this

case.

Defendants attempt to confuse the issue by asserting that the calculation of damages in

securities litigation is an exact science that can be reduced to purely objective, mechanical

formulae, including a particular form of statistical analysis.  Defendants seek to have the Court

treat Miller's testimony according to "scientific" standards, subject to the specific tests set forth

in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  In doing so, they cite

Elcock v. Kmart Corp., 233 F.3d 734 (3d Cir. 2000), in which the court recited a litany of

factors that it considered appropriate in evaluating the admissibility of expert testimony that

purportedly rested on scientific theory, or Cavallo v. Star Enterprise, 892 F. Supp. 756 (E.D.

Va. 1995) (noting standards governing admissibility of toxicology opinion).

Defendants' argument is without merit. According to the Supreme Court, "the factors

identified in Daubert may or not be pertinent in assessing reliability, depending on the nature of

the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire, 526

U.S. at 150. The Daubert list of factors "was meant to be helpful, not definitive." Id. at 151.

Thus, as Elcock makes clear, the Daubert factors need not be applied in every case, and in

cases involving specialized knowledge which is not "scientific," Daubert factors need only be

applied where they provide reasonable measures of the reliability of the proposed testimony.

233 F.3d at 746. Of course, Fed. R. Evid. 702 does not require that any expert base his

evidence in "scientific" methodology:

> If scientific, technical or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill, experience, training
> or education, may testify thereto in the form of an opinion or otherwise,
> if (1) the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably to the facts of
> the case.

Fed. R. Evid. 702 (emphasis added).

Courts have long recognized in the securities law context that quantification of damages

"is not an exact science; computation thereof is accomplished basically by estimation and

inference." RMED, 2000 U.S. Dist. LEXIS 3742, at *35, aff'd, 2000 U.S. Dist. LEXIS 4892

(2000) (citing Chris-Craft Indus. v. Piper Aircraft, 384 F. Supp. 507, 512 (S.D.N.Y. 1974),

7

rev'd in part on other grounds, 516 F.2d 172 (2d Cir. 1975), rev'd, 430 U.S. 1 (1977). See also In re Crazy Eddie Sec. Litig., 948 F. Supp. 1154, 1171, n. 14 (E.D. N.Y. 1996) ("[a]bsolute certainty is not possible in complex economic determinations such as quantifying the influence of market factors on a stock's price in this or any other case").

The Third Circuit has acknowledged that a "broad range of knowledge, skills and training qualify an expert," and that the requirement that a witness possess specialized knowledge to qualify as an expert must be interpreted broadly. In re Paoli, 35 F.3d at 741. Exclusion is not an appropriate remedy simply because an expert "did not have the degree or training which the district court . . . thought would be most appropriate." Id.

To denigrate Miller's qualifications and opinions, defendants begin by mischaracterizing him as "an accountant," totally ignoring his broad training, experience, knowledge and skills. Def. Br. at 3. Defendants then focus on Miller's not having published "a paper related to financial economics in a peer-reviewed journal" and his purported lack of "professional designations" in the "finance or economic fields." Id. Defendants refuse to credit his recent and ongoing real world experience, claiming that Miller rests his qualifications on "real world experience from more than 26 years ago." Id. They intimate that his only background in financial economics is as "a hired litigation consultant for plaintiffs." Id.

These attacks simply misstate Miller's education, training, knowledge and experience, which were detailed in Miller's report.[1] Miller's education, training and experience amply

---

[1] Defendants also misstate the ruling in Krogman v. Sterritt, 202 F.R.D. 467, 477 n. 14 (N.D. Tex. 2001). There, the Court did not preclude Miller from testifying or exclude any of his testimony on market efficiency. Rather, the Court permitted Miller to testify at a hearing on market efficiency issues (involving an entirely different factual setting) but made some findings of

8

qualify him to testify regarding the principles applicable to the determination of materiality, negative loss causation, and damages in this case.

C.    **Miller has properly applied efficient market theory**.

Defendants' first challenge to the substance of Miller's testimony is that he supposedly "ignores the application of efficient market theory," instead adopting "his own standards" for market efficiency. Def. Br. at 4. They specifically (but incorrectly) assert that Miller's views with respect to market efficiency are at odds with governing Third Circuit authority, particularly Merck, 432 F.3d at 269. Def. Br. at 4-5. This attack is ungrounded. It is particularly ironic, for the Third Circuit's adoption of the "fraud on the market theory" came after Miller's trial testimony regarding market efficiency issues in Peil, 806 F.2d at 1154.

The primary basis for defendants' attack is simple but astounding: defendants challenge the very proposition that information can slowly "leak" into the market, and gradually affect stock prices, as "untested and unreliable." Def. Br. at 4-5. Relying heavily on the reports of their own partisan expert, Christopher James, defendants claim that Merck teaches that information is immediately reflected in the price of a stock. Id. Defendants' reading of Merck is incorrect. The court in fact noted:

> In Basic v. Levinson, the Supreme Court declined to resolve "how quickly and completely publicly available information is reflected in market price." 485 U.S. 224, 248 n.28,108 S. Ct.978,99 L. Ed. 2d 194 (1988). . . . We have decided that this absorption occurs "in the period immediately following disclosure." Oran [v. Stafford, 226 F.3d [275,] at 282 [(3d Cir. 2000)].

---

fact which preferred the market efficiency views of a competing expert on one particular factor, accepting on the facts adduced at a hearing that a stock price should adjust to disclosures contained in news articles in no more than two days.

> This does not mean instantaneously, of course, but in this case there was no adverse effect to Merck's stock price from the disclosure "in the period immediately following disclosure." In fact, Merck's stock continued to rise from its baseline . . . for five trading days . . .

Merck, 432 F. 3d at 269.

The Merck court went on to state that it could not be expected to overlook an increase in Merck's stock price over one month in favor of a five-day decline of slightly over 1%. Id. The Merck court also noted that in Oran v. Stafford, the Third Circuit (in concluding that a misrepresentation had not affected a company's stock price), had looked to movements in the four-day period following issuance of a corporate release that had purportedly fully disclosed the alleged misrepresentation. Id.

Merck and Oran are noteworthy in several ways. First, both cases examined "event windows" extending four to five days after a major disclosure. Second, those cases did not involve any claim of information leakage, but focused on market reaction to a prominent and broadly disseminated piece of news – – in Merck, a Wall Street Journal article detailing questionable accounting practices; in Oran, a corporate press release regarding important adverse drug study results.

Further, contrary to defendants' assertions that theories of market leakage somehow offend efficient market theory, numerous courts have recognized that gradual leakage of information through many forms is a fact of life in certain securities markets.

10

In <u>In re Enron Corp.</u>, 439 F. Supp. 2d 692, the court reviewed the Supreme Court's recent decision in <u>Dura Pharmacueticals, Inc. v. Broudo</u>, 544 U.S. 336, 341-44, 346-47 (2005). The <u>In re Enron Corp.</u> court noted that in <u>Dura</u>, the Supreme Court did <u>not</u> require a plaintiff to allege and ultimately prove that the price dropped because the defendant made a corrective disclosure, adding that <u>Dura</u> did <u>not</u> specify what must be pled regarding the circumstances by which "the truth became known." <u>Id</u>. at 701. The court concluded that the Supreme Court's decision had clear implications for the ultimate burden of proof. It also recognized that, (besides learning of a fraud through a formal corrective disclosure issued by a corporate defendant followed by a steep drop in the price of the stock), the market may learn of possible fraud through a number of sources, including whistleblowers or analyst questioning, and that economic loss may occur as "relevant truth begins to leak out" or "after the truth makes its way into the market place." <u>Id</u>. at 699-701 (citing <u>Dura,</u> 544 U.S. at 341-44, 346-47); Alan Schulman & Nicki Mendoza, <u>Dura Pharm., Inc. v. Broudo -- The Least of All Evils,</u> 1505 PLI/Corp. 272, 274 (Sept. 2005).

In <u>In re NTL, Inc. Secs. Litig.</u>, 2006 U.S. Dist. LEXIS 5346 (S.D.N.Y 2006), the court in certifying a class recognized that plaintiff was typical because his claims were not based on "a single triggering event," but, like all other class members, plaintiff shared "a need to show the drop in NTL's share price during the class period was not attributable to general factors but to <u>'dribbled' disclosures or 'leakage'</u> of truthful information regarding NTL's prior misrepresentations or omissions." <u>Id.</u> at *40 (emphasis added).

Indeed, in Swack v. Credit Suisse First Boston, 230 F.R.D. 250 (D. Mass. 2005), the

court accepted plaintiffs' argument that the fraud on the market theory was applicable to the

facts of the case in part on the basis of an affidavit from Miller explaining that "when assessing

the impact of analysts on market price the concept of 'leakage' -- i.e., information from an

analyst report that reaches the market and impacts prices prior to its official release -- needed

to be taken into account by not strictly limiting the impact inquiry to post-publication changes."

Id. at 270-271.

Even defendants' own professed expert acknowledged at his deposition the theory of

leakage, acknowledging that orally communicated information may move markets. James Dep.

Tr., pp. 93-100 (relevant excerpts attached hereto at Ex. B).[2]

Indeed, plaintiffs are aware of no decisions that have ever held that stock prices cannot

be affected by the gradual seepage from non-issuer sources of relevant information.

## D.  A statistical event study was unnecessary and may be inappropriate on the facts of this case.

Throughout their motion papers, defendants claim that Miller's methodology is flawed

because he did not perform any "event study." Def. Br. at 6-7. This argument disregards the

facts, economic theory and judicial precedent.

---

[2] Defendants suggest that Bell v. Ascendant Solutions, 2004 U.S. Dist. LEXIS 12321 (N.D. Tex. 2004), holds that leakage cannot occur. This is inaccurate. What Bell rejected was the notion that internet rumors can be used "to support a hypothesis that the market quickly reflects unexpected corporate events." Id. at *10. Plaintiffs have not argued that the market reacts immediately to such information, but rather a much different proposition – that certain means of disclosure lend themselves to comparatively slow leakage.

12

In fact, Miller testified that he often uses event studies and performed a type of event study in this case. Ex. A, pp. 50-51, 72-74, Miller Rebuttal at Ex. B. His rebuttal report shows that he collected the relevant events during the class period, examined the price movements of Adams stock, and even charted the price movements of Adams Golf stock against the stocks of Adams' competitors and an index. Miller Rebuttal at Ex. A. It is true that he has not, up until now analyzed the price movements pursuant to the type of supposedly statistically-based analysis defendants' expert applied.

He has not done so for good reason. As stated by A. Craig MacKinlay (an authority upon whom James relied in formulating his opinions), where facts are disclosed to the market by gradual leakage, a statistically based event study regression analysis is unlikely to be successful:

> An important characteristic of a successful events study is the ability to identify precisely the date of the event. In cases where the event date is difficult to identify or the event date is partially anticipated, studies have been less useful. For example, the wealth effects of regulatory changes for affected entities can be difficult to detect using event study methodology. The problem is that regulatory changes are often debated in the political arena over time and any accompanying wealth effects generally will gradually be incorporated into the value of a corporation as the probability of the change being adopted increases.

A. Craig MacKinlay, Event Studies in Economics and Finance, XXXV JOURNAL OF ECONOMIC LITERATURE 37 (March 1997).

Thus, in cases where the facts give rise to an appropriate inference of leakage, the mechanical usage of a statistically based "events study" is simply inadequate. That is because events studies, commonly employed by defense experts in securities cases, have attempted to measure the reaction of a stock price to a disclosure event that is clear and well-defined.

13

Where the actual dates of disclosure are unclear, the employment of statistical events study

methodologies will not work, well or at all, because there is no precise disclosure event fixed in

time from which the researcher can conduct a statistical measurement.

This fact of economic analysis was recognized by the court in RMED, 2000 U.S. Dist.

LEXIS 3742. In that case, plaintiffs' expert did not conduct a statistical event study, but rather

an analysis substantively on all fours with the analysis that Miller has utilized here. Id. That is,

she conducted an analysis of each company-specific event which could have affected the

stock's price, charting those events on a daily basis, and concluding that none of the factors

suggested by defendants explained its movement during the relevant period. Id. Defendants

asserted that this fundamental analysis was unreliable because it did not utilize statistical

methods to evaluate stock movements.

The court rebuffed those assertions. Id. The Magistrate Judge, later affirmed in all

respects by the trial court, recognized that plaintiffs' expert was "presented with a number of

legitimate limitations that hindered her ability to estimate plaintiffs' damages using statistical

methods," namely, that the company's life as an operating company and the period of the

alleged fraud began at approximately the same time; and the manner in which the alleged fraud

was revealed was through "leakage." RMED, 2000 U.S. Dist. LEXIS 3742, at *23-24.

As to the "number of legitimate limitations," the court found that, because the alleged

fraud followed closely an initial public offering, there did not exist a meaningful price history

from which the expert could control for market and industry factors and thereby conduct a

meaningful statistical analysis:

14

> ... there did not exist a meaningful price history for [the] stock that [plaintiff's
> expert] could designate as the control or "clean" period from which to estimate
> its true value using statistical analysis. In order to control for market or industry
> factors using a regression analysis, or to perform a statistical event study,
> [plaintiff's expert] would have to have known the relationship of [the] stock
> price to the market . . . and to the industry . . . before the alleged fraud. ... This
> would have required the availability of [the company's] price history prior to the
> alleged fraud for a period of sufficient length to produce statistically significant
> estimates on . . .[these relationships).

Id. at *24.

Further, concerning the means by which the fraud was revealed, the court found that

where a fraud "either leaks into or becomes apparent to the market slowly over time, use of a

statistical study may underestimate damages, since by the time of full revelation of the fraud, the

market price already reflects some or all of the information contained in the announcement." Id.

at *27.

The RMED court found that, because of the limited value of statistical analysis in a case

involving a fraud revealed by leakage closely following an IPO, the alternate methodology

plaintiff's expert chose was appropriate and admissible. Id. at *27-28. The court noted that

the analysis was informed by a detailed factual analysis and grounded on principles generally

accepted within the relevant field, and was "reasonable and recognized in the relevant scientific

community." Id. at *28.

The district court, in affirming in all respects the recommendation of the magistrate,

stated that "every stock pricing model will be subject to some form of statistical criticism or

unwanted interpretation," and that "aggregate damages in securities fraud cases are generally

incapable of mathematical precision," but that "to the extent defendants' concerns about [the

expert's] analysis are valid, they go to the weight and credibility of her testimony, not its admissibility." RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 2000 U.S. Dist. LEXIS 4892, at *6 (S.D.N.Y. 2000).

RMED applied correct legal principles.[3] In In re Oracle Secs. Litig., 829 F. Supp. 1176 (N.D. Cal. 1993), a Section 10 case in which plaintiffs had the burden of proof as to loss causation, the court found the testimony of the plaintiff's damage expert unreliable, and stated that "[u]se of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to [the Company] which defendants allegedly have distorted."[4] Id. at 1181(emphasis added). In Executive Telecard, Ltd. Secs. Litig., 979 F. Supp. 1021 (S.D.N.Y. 1997), the court cited the same sources and reached the same conclusion as Oracle.

Throughout their brief, defendants of course neglect to remind the court of one essential fact: because this case is brought under Section 11, it is they, and not plaintiffs, who bear the burden of establishing that price declines in Adams stock following the July 9, 1998 initial public offering were due to something other than the non-disclosure of gray marketing. In

_____

[3] RMED demonstrated its complete familiarity with operative precedent, citing Oracle for the proposition that an event study is not necessary or appropriate in all cases, and that it may be supplanted in appropriate cases by "similar analysis." RMED, 2000 U.S. Dist. LEXIS 3742, at *23 (citing Oracle, 829 F. Supp. at 1181).

[4] The Oracle court cited to Jon Koslow, Estimating Aggregate Damages in Class Action Litigation under Rule 10b-5 for Purposes of Settlement, 59 FORDHAM L. REV. 811, 822 (1991). But that very law review article pointed out that there are "subjective or speculative problems" posed even by using an event study approach, only one of which was that when "disclosures seep out over an extended period, it is more difficult to determine when corrective disclosures occur and the impact of such disclosures on the market." Id. at 822-23 (footnote omitted). The ultimate conclusion of the author was one contrary to defendants' position here: that "there is no formulaic approach" to damages "that eliminates all subjective factors. Careful factual analysis and informed judgment must leaven computer-driven models." Id. at 842.

16

fact, the Third Circuit in Merck made very clear the importance of which side bears this burden. 432 F.3d at 245-46. Indeed, no known cases have required Section 11 plaintiffs to prove damages (or refute negative causation arguments) by means of a statistical event study.

To the contrary, in Adair, 1998 U.S. Dist. LEXIS 3900, at *20, the court observed that "[t]he presence or absence of price movement immediately after disclosure is not per se dispositive under Section 11(e)." The court ruled that the measure of damages need not be proven by Section 11 plaintiffs on summary judgment and that plaintiffs are not even required to respond to a summary judgment motion by proferring damage evidence, since the burden is on defendants to prove that other factors caused the decline in the price of plaintiffs' stock. Id. at *24-26. Defendants cannot obtain summary judgment unless they "conclusively establish" that plaintiffs' damages are *de minimis*. Id. at *26. For under Section 11 the "risk of uncertainty" has been statutorily allocated to the defendants. Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 341 (2d Cir. 1987); Collins v. Signetics, 605 F.2d 110 (3d Cir. 1979).

Here, as set forth in plaintiffs' opposition to defendants' motion for summary judgment filed contemporaneously herewith, there is more than sufficient evidence to give rise to an inference of leakage: Adams' stock price declined precipitously before any clearly measurable public disclosure event, at a time period consistent with a surge in gray marketing activity. The price of Adams Golf stock plummeted dramatically before July 29, 1998, despite the absence of any public commentary by Adams Golf that could account for it. The decline conspicuously began before the public could have become aware of factors that defendants claim accounted for it, such as the extent of competition by Orlimar. The Registration Statement cited

17

competition as a material risk, and defendants have shown no disclosure even during July that would have indicated any material heightening of that risk since the IPO.

Industry leader Callaway reported disappointing results after the close on July 22, 1998, and Callaway stock tumbled the next day. This, however, cannot explain the decline in Adams Golf's stock price during July. Adams Golf stock hardly tracked Callaway's stock. As a Lehman analyst explained in an August 28, 1998 research report, Callaway stock was suffering in part as a result of Adams Golf capturing market share from Callaway. Ex. 180, p.2, attached hereto as Ex. C (stating "weak market conditions for firms with broad product profiles . . . open a window of opportunity for Adams").

The only new information reaching the market between the IPO and the end of July 1998 that reasonably could have accounted for the stock price movement in Adams' stock was: (1) the growth of the gray marketing of Adams Golf's "Tight Lies" during the period immediately preceding and following the IPO; (2) the increasing appearance of clubs in Costco outlets; (3) and the gradual leakage of knowledge with respect to these facts into portions of the market. Indeed, Edward Necarsulmer, the underwriters' expert, suggested that Lehman may well have learned of gray marketing as a result of observing what was happening in the market in July when Adams Golf's stock price was declining. Necarsulmer Dep. Tr., pp. 61-63, attached hereto as Ex. D.

Miller's theory does not rest upon defendants' caricature of it: defendants' caricature is that he assumes that Costco warehouse workers purchased and then short-sold Adams stock in sufficient quantities to affect the general market price. Rather, it rests on the common-sense

18

notion that as individuals who have participated in the golf stock market and would be

interested in Adams stock became aware of Costco distribution, the market for the stock

slowly absorbed the information and the stock price correspondingly declined. Indeed,

defendants' own witnesses have acknowledged the likelihood that there was some congruence

between persons interested in golf and Adams stock purchasers. See, e.g., Walravens Dep.

Tr., pp. 179-80; Ex. 190, attached hereto as Exs. E and Ex. F, respectively.

Defendants' assertion that news of gray marketing should have been reflected in the

price of the stock immediately, and once only, does not comport with reality. As Adams Golf's

own customer complaints reflect, news of the gray marketing would have been observed locally

and sporadically. D.I., 262, Expert Report of Stephen Grace, Ex. C at Ex. VII. Prior to

October 22, 1998 (at the earliest), there was never a clear disclosure by Adams Golf or its

underwriters either of the risk of the problem or of the known or possible scope of the problem,

so it is a reasonable inference that knowledge of the magnitude of the issue dribbled out at

different times and places.

James recognized the validity of the theory of "leakage," (Ex. B, pp. 93-100) but

simply disregarded it and made no effort whatsoever to account for it in his price analysis, even

though the burden of proof was upon defendants. By contrast, Miller demonstrated  faithful

application of the relevant economic principles when he performed a different form of events

study, examining the daily price and volume activity for Adams Golf stock as well as collecting

the news regarding Adams Golf and its competitors that were actually in the market, even

charting the extent to which Adams Golf stock moved in tandem with its principal competitors.

19

Armed with that data, and demonstrating complete familiarity with the principles of statistical event studies, he performed an event study that rested in part upon fundamental analysis, rather than pure statistical analysis. This was appropriate.

David I. Tabak and Frederick C. Dunbar of National Economic Research Associates ("NERA"), a consulting and expert firm often retained by defendants' counsel in securities litigation, note that an event study has become a "common method" of attempting to compute damages in such cases, but admit that "[i]t is . . . [n]ot the only way to compute damages. . . . [s]ometimes a fundamental analysis is appropriate. . . ." David I. Tabak and Frederick C. Dunbar, Materiality and Magnitude: Event Studies in the Courtroom 6, 11 (Nat'l Economics Research Associates Working Paper No. 34, 1999). Like RMED, the instant matter is a case where fundamental analysis is appropriate. This case is easily distinguishable from Goldkrantz v. Griffin, 1999 U.S. Dist. LEXIS 4445 (S.D.N.Y. 1999), where analysts' reports demonstrated that the stock price movement was driven by factors other than the alleged fraud, and plaintiffs did not contest that defendants' statistical event study reliably isolated firm-specific movement.

In any event, throughout his deposition testimony, Miller reflected complete familiarity with the methodologies of event studies. Ex. A, pp. 41-72. The test of admissibility is not whether his opinion is the best or whether it is demonstrably correct, but whether his view are based on valid reasoning and a reliable methodology. Oddi v. Ford Motor Co., 234 F.3d 136, 145-46 (3d Cir. 2000). Here, Miller's analysis is valid, reliable and, indeed, clearly superior to the biased and unscientific opinions of defendants' "scientific" expert, James.

20

**E.    Miller's use of event windows was correct.**

Defendants also attack Miller on the grounds that he examines the reaction of Adams

stock to disclosures through examination of longer periods of time -- "event windows"-- than

they wish to utilize. Def. Br. at 6-7. They claim -- based once again largely on the testimony of

their flawed expert, James -- that "[f]inancial economic theory demonstrates that information,

once public, is incorporated very rapidly into the stock price, generally on single days." Def.

Br. at 6.

Again, defendants disregard that it is defendants' burden of proof to show that gray

marketing disclosures do not account for the Adams Golf price drops. They also disregard the

actual analysis of Oran, in which the court considered market reactions over at least a four-day

period following a written corporate press release of an important study; Merck, which

examined a trading period extending at least five days following a nationwide disclosure; and

Dura, which recognized that disclosures do not always affect prices immediately.

Indeed, though he focused on single day event windows, even James used a two-day

event window for some of his work. Ex. B, pp. 115-16. Further, the relevant literature

recognizes that where the disclosure events are subject to leakage, "defining the beginning of

the event window can be problematic." Mitchell and Netter, The Role of Financial Economics

in Securities Fraud Cases, supra. Mitchell and Netter make clear that in the case of a merger in

which the target company is rumored to be in play prior to any announcement, "the event

window should begin prior to the actual merger announcement, perhaps as long as a week or

two." Id. (emphasis added) The authors also make clear that in such an instance "some degree

21

of judgment is required generally based on price and volume movements" before the formal announcement. Id. Defendants have failed to show that any aspect of Miller's event window analysis is inappropriate.

### F.    Miller has opined appropriately on materiality.

Defendants attack Miller's testimony regarding materiality, including his conclusion that there can be no question that the risk and the impact of gray marketing were material. Def. Br. at 7-10.

Defendants ignore the Merck court's comments regarding the tests for materiality. Finding the Court of Appeals ruling in the present case, In re Adams Golf, 381 F. 3d 267, in line with Third Circuit precedent, the Court in Merck held that materiality in the present case was established through two alternative tests. First, the finder of fact could determine, following the principles in TSC, 426 U.S. 438, that the omitted facts could materially affect the information available to a reasonable investor. Second, Adams stock reacted significantly, from a price and percentage standpoint, upon a disclosure relating to gray marketing. See Merck, 432 F.3d at 274-75.

Miller's testimony is fully consistent with these well-established principles of law. To begin with, Miller made it clear that he was familiar with and was applying the definition of materiality established by the Supreme Court in TSC (which was endorsed in Basic Industries as the appropriate measure of materiality). Moreover, he pointed out that, in assessing the materiality of the information, he had examined price movements in Adams stock, not just in "raw" terms as defendants suggest, but also on a percentage basis. Ex. A, pp. 82-85. In

22

examining those changes, Miller gave consideration to news releases and industry movements.

Miller also testified that his approach to materiality is implicitly reflected in economic literature, pointing to basic investment and corporate finance texts that value securities as a substitute for future earnings streams and consider the factors that are likely to influence these streams important. Ex. A, p. 100:10. Defendants contort this testimony, maligning Miller because he could not at the deposition name a specific text that explicitly adopted the valuation approach under the heading of "materiality." But the titles of the texts are unimportant. What matters is Miller's application of standard and well-accepted principles.

## G.   Miller has properly utilized a trading model to calculate aggregate damages.

The measure of damages in this case is of course contained in Section 11 itself, which prescribes its own measure of damages unless defendants are able to sustain their burden of proof that something other than the alleged misrepresentations and omissions caused the drop in the price of the stock.[5]

Miller has not used a trading model to calculate damages per share, which are calculated by the methodology set forth in Section 11. He has used a trading model in an

_____

[5] Thus, defendants' claim that Miller's report and rebuttal report somehow offend the principles of In re IKON Office Solutions Sec. Litig., 131 F. Supp. 2d 680, 690 n.9 (E.D. Pa. 2001), misses the mark entirely. In Ikon, a section 10(b) case, plaintiffs bore the burden of establishing damages, where here defendants have the burden of establishing negative loss causation. Since James has to date failed to establish that the damages result from any factor other than seepage of gray marketing disclosures, Miller is correct in  concluding that plaintiffs are entitled to the statutory measure of damages. The "risk of uncertainty" in this 1933 Act case has been statutorily allocated to defendants. Akerman, 810 F.2d at 341.

23

attempt to calculate the likely aggregate damages of all class members. At deposition,

defendants chose to ask Miller no questions regarding his model, and now they rest their

attacks on the fiat of their expert, James.

There are several fallacies in defendants' arguments. First, the cases in which trading

models were rejected, Kaufman v. Motorola, Inc., 2000 U.S. Dist. LEXIS 14627 (N.D. Ill.

2000), and Bell v. Fore Systems, Inc., 2002 U.S. Dist. LEXIS 27871 (W.D. Pa. Aug. 2,

2002), are clearly distinguishable.

In Kaufman, a securities fraud case under Section 10, the court found that a

"proportional trading model" proffered by an economist other than Miller, was inadmissible

under Daubert. In reaching that conclusion, the court relied heavily on a concession by

plaintiffs' expert. The expert admitted to the applicability of "a test of reliability first articulated

by Nobel Prize winning economist Milton Friedman: the reliability of an economic theory is

tested by comparing it to reality." Kaufman, 2000 U.S. Dist. LEXIS 14627, at *5. The expert

further admitted that his model had never been tested against reality. Id. The record before the

court also suggested that such a model had never been accepted by professional economists.

Id. Accordingly, even while recognizing that a model might be needed to calculate damages to

the class, and that such a model might indeed be developed, the court excluded the model

before it. Id. It was careful to point out, however, that this did not mean that class members

would find their injuries unredressed, since the jury could determine a per share damage loss

and that claims could nonetheless be filed by class members.[6]  Id. at *6.

In Bell, the court rejected use of a trading model on entirely different considerations, none involving Daubert or Kumho.  The court in Bell in fact recognized that "[t]rading models have traditionally been used to estimate damages in shareholder actions."  Bell, 2002 U.S. Dist. LEXIS 27871, at *3.  Without reaching any arguments that were made in that case on methodological or conceptual flaws in the model before it, the court rejected the model because of its conclusion that the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4(e), contained an express limitation on Section 10 damages that could not simply be applied to the class as a whole, but had to be enforced with respect to each class member.  Id. at *3-4.

Even so, the Bell court recognized that its conclusion interpreted a particular statutory provision on which there was no prior case law, and that its conclusion ran counter to current litigation practices.  Id. at *4-10.  The court further acknowledged that numerous courts and commentators have decried the difficulty of calculating damages in class action cases.  The court found substantial ground for differences of opinion as to its conclusions, and certified the issue for interlocutory appeal.  Id. at *16-19.  The case was settled without any appellate decision being reached.

Of course, the concern in Bell that the long-accepted practice of calculating aggregate class damages would offend a limitation established under the PSLRA has no bearing on this case.  Unlike Section 10, section 11 of the 1933 Act sets forth a specific formula for damages,

---

[6]  The trading model rejected in Kaufman was a so-called "single trader" model – a type of model that has been subject to academic criticism.  Miller's, in contrast, is a multiple trader model.  See Affidavit of R. Alan Miller, at p 2., attached hereto as Ex. G.

and contains no limitation of damages provision. The rationale of <u>Bell</u> – which the <u>Bell</u> court itself recognized might be in error – is simply inapplicable here.

Other courts subsequently have held aggregate damages testimony admissible. <u>In re Oxford Health</u>, 244 F. Supp. 2d at 249-52; <u>In re Worldcom,</u>, 2005 U.S. Dist. LEXIS 3143, at *2-4.

Several factors demonstrate the admissibility of Miller's damage model, subject of course to defendants' cross-examination at trial as to its conclusions. First, it is not correct that stock trading models have not been accepted by professional economists. More than ten years ago, a model similar to Miller's was favorably reviewed and endorsed by senior economists with Economists Incorporated. <u>See</u> Dean Furbush & Jeffrey W. Smith, <u>Estimating the Number of Damaged Shares in Securities Fraud Litigation: An Introduction to Stock Trading Models</u>, 49 THE BUSINESS LAWYER 527 (Feb. 1994). Reviewing the increased necessity for developing such models, and the prior literature in the area, the authors recognized the widespread use of such models in securities litigation.

Similarly, even more recently, trading models were reviewed in Barclay & Torchio, <u>Complex Litigation at the Millennium: A Comparison Of Trading Models Used for Calculating Aggregate Damages in Securities, Litigation</u>, 64 LAW & CONTEMP. PROB. 105, 108 (2001). Interestingly, the authors conclude that criticism of assumptions in trading models generally "has emanated from individuals associated with Lexecon or Cornerstone Research, two firms that provide consulting and expert testimony in securities class action cases primarily for defendants." <u>Id.</u> at 108 & n. 14. In the present case, of course, James, defendants' expert,  is

26

associated with Cornerstone Research.

Miller's trading model is admissible under Daubert and its progeny -- similar models been recognized in the literature; Miller's model been used in many securities cases; and the model satisfies Professor Friedman's requirement that it be tested by reality. Miller's model is generated by (and constrained by) real world trading data and has been tested and refined by Miller. He has compared its results against actual, real-world claims experience in dozens of class action cases. Ex. G, p. 2.

### H. Defendants' other attacks on Miller are baseless.

Defendants have launched a miscellany of other challenges to Miller's testimony. None is meritorious.

1. Miller's Reports

Defendants claim that Miller's reports were in some way inadequate under the Federal Rules of Evidence. Def. Br. at 12-15.

However, Miller's opening report and his rebuttal report were full and detailed, especially taking into account that it is defendants who bear the burden of proof on negative loss causation. In a case of this complexity, where an expert will testify on many subjects, a deposition is important because a report cannot deal with every possible nuance, and it is customary to allow for the probing of opinions expressed in the reports. This is why plaintiffs permitted the deposition to start early and to continue until it had considerably exceeded the time limits set forth in Fed. R. Civ. P. 30. This is also why Miller answered every question asked of him by counsel for the Adams Golf defendants.

27

Defendants' charge that the report was not based on "sufficient facts or data" does not

for the most part rest on any alleged lack of particularity or foundation. Def. Br. at 13. Rather,

defendants seem to complain primarily that plaintiffs have not shouldered the burden of proof

regarding negative loss causation that the law imposes on defendants.

Of course, any expert must in the end rest his opinion on the facts that are proved at

trial. It is not generally for experts to establish facts, but to apply relevant principles to facts in

formulating opinions and other testimony. Both Miller and plaintiffs have a reasonable basis for

his opinions.

### 2. Damage Determinations

Defendants suggest that it is incorrect for Miller to attribute all the market loss following

the IPO to the Registration Statement's misrepresentations and non-disclosures regarding gray

marketing. In fact, the damages identified by Miller are those that the statute itself imposes on

defendants unless defendants shoulder the burden of proving that the losses were caused by

other factors.

Defendants' burden in disproving damages is very heavy. In Dura, 544 U.S. at 343,

the Supreme Court concluded that establishing loss causation by plaintiffs under Section 10

requires plaintiffs to show that a defendants's fraud did not merely "touch upon" the plaintiff's

loss, but was its "proximate cause." Thus, for defendants to establish negative causation under

Section 11, defendants must prove that factors other than the claimed misrepresentations and

omissions were "a proximate cause of the actual economic loss suffered by plaintiffs."

Defendants' "must include evidence that the market price was affirmatively affected by an event

other than the defendants' challenged conduct." Kaufman, Vol. 26 SECURITIES LITIGATION: DAMAGES, Damages Under the Securities Act of 1933, §6:31 (2005); see also discussion supra pp. 19-20.

Miller has shown the serious deficiencies that permeate James' supposedly "scientific" analysis. Miller has demonstrated that James cannot establish that the factors favored by defendants (competition and industry coalitions) actually caused the price drop. Accordingly, defendants are subject to the full measure of statutory damages, just as Miller opined.

### 3. Comments Regarding Gray Marketing

Defendants challenge Miller's statement in his report, based on his economic and financial experience, that gray marketing reduces profits by causing manufacturers to take costly steps to protect margins, and that earnings are reduced by the existence of gray marketing. Def. Br. at 13. Defendants challenge Miller's enunciation of these unassailable principles because, they say, he was unable to testify as to the steps taken by Adams before the IPO or the impact of these steps on Adams' financial result. Id. In fact, as his testimony reveals, the only questions Miller was asked on the subject concerned pre-IPO costs of gray marketing. After Miller identified pre-IPO unit costs that Adams had incurred, defendants questioned him no further on the subject.

### 4. Characteristics of Adams Golf Investors

Defendants attack as "unsupported" Miller's statement in his report that it was likely that there was overlap between Costco personnel and customers and Adams distributors and investors. They fail to cite, however, his explanation in the very same paragraph of his report:

29

"it is common practice with a niche company such as Adams Golf, for its stockholders to be people with an interest in such a market or company, such as avid golfers, distributors, retailers, suppliers and others with a likely knowledge of the company and the market." Miller Report, pp. 10-11. Miller's position is hardly speculative, as it echoed the testimony of defense witnesses and others that persons with an interest in golf would likely have been attracted to Adams stock. Ex. E, pp. 179-80, Ex. 190.

Defendants further attack Miller's statement -- about the overlap between Costco personnel and customers and Adams distributors and investors – by distorting it. They cite to a claim by their expert, Christopher James, that Miller did not "identify anything other than speculation as to whether these individuals invested in or sold Adams stock." Def. Br. at 13. But Miller's report did not even purport to opine on that subject, but simply to identify those persons as a potential source of leakage to the market.

5.    GolfPro Magazine

Defendants attack Miller's statement in his expert report that the GolfPro edition with a cover date of August 1998 was actually "apparently available in mid-July." Def. Br. at 13. To do so, they first ignore the explanation in his report, that magazines generally reach subscribers and other recipients days to weeks preceding the cover date. They opportunistically disregard his statement at his deposition (Ex. A, p.127) that his examination of the text of the article suggested that it was published before August, complaining that he could not in response to one question recall the specific text that led him to so conclude. They also disregard that they asked Miller to review the matter on lunch break (Ex. A, p. 128), then never returned to the subject to

30

permit him to offer his explanation.

Defendants also overstate what their expert, James, says he found about when GolfPro editions were available. James had no information regarding when the August 1998 GolfPro edition was generally available to the public. Instead, all he could come up with was an internet search that appeared, James said, to indicate that, in general, GolfPro editions were cited or referenced in other publications in the month appearing on the cover. In other words, an article appearing in the GolfPro edition for, say, January 1997 would be referenced in some other publication issued in January 1997, not before. This hardly satisfies defendants' burden regarding the date the particular GolfPro article reached the public, much less cast any shadow on Miller's qualifications as an expert.

Defendants even suggest that Miller's own chronology of articles in his event study "accepted" August 1 as the date of publication, when this is just not the case. Miller explained to defendants in response to a deposition question on the subject that that was not so, but that the article was listed there because of a convention used with respect to the arrangement of articles not bearing a specific date. Ex. A, p. 136. Defendants also deride Miller because he relied on relevant information received from plaintiffs' counsel that, after investigation, they had some basis to believe that the article was published in July. Ex. A, pp. 125-126.

Obviously, whether Miller's opinions would be helpful to the jury does not rise or fall on when the GolfPro article was published. But the real issue here relates not to Miller's opinions but James'. The GolfPro publication date issue casts severe doubt on the reliability and accuracy of the supposedly "scientific" statistical analysis employed by James, who is

31

required to shoulder the burden of proof. Despite the confusion that surrounds the date on which the GolfPro report was available, James has rested his loss causation analysis on the speculative conclusion that this trade publication was disseminated to the world on August 1, 1998, and that the market immediately reacted to it in a single day. Ex. B, pp. 256-57. Miller has explained that tests to see whether stock price movements were related to the GolfPro article were not possible "if you don't know when it hit the market." Ex. A, p. 133. He further explained that an event window of at least several days would have been necessary with respect to a trade-type publication that "very likely arrived at different people's places of business at different times, that is, over a period of at least several days." Ex. A, pp. 133-34.

At the very least, defendants already have cross-examined Miller with respect to these elements of his opinions. They can cross-examine him further at trial. There is no basis for wholesale exclusion of his opinions.

6.    Due Diligence of Adams Golf Officers and Directors

Finally, defendants attack Miller's statements with respect to the possibility of his testifying at trial concerning the due diligence of the Adams Golf's officers and directors. Def. Br. at 14-15.

This attack is premised upon the Adams Golf defendants' substantial distortion of the operative facts. To begin with, Miller's initial report discussed the underwriting process generally and the possibility that he would testify at trial with respect to the roles of all participants in the underwriting process. Miller Report, p. 1, ¶1(E).

The purpose of the depositions in this case was to clarify and explore the bases for

32

opinions expressed, and defendants themselves felt free throughout the deposition to examine

Miller as to whether he had formed opinions on matters not expressly set forth in his reports.

Plaintiffs' counsel permitted defense counsel to do so freely.

In preparing Miller for and representing him at his deposition, plaintiffs' counsel learned

that Miller had formed opinions regarding the due diligence of officers and directors of Adams

Golf. Plaintiffs' counsel asked Miller to place those opinions on the record before the

deposition was closed for the day, so as to: (1) permit defendants to develop Miller's opinions

through cross-examination; and (2) preserve these opinions for possible use at trial. Miller

clarified that he had not seen evidence that Adams Golf's officers and directors had established

a due diligence defense and that he would be prepared to testify at trial regarding the

shortcomings of officer and director due diligence if asked to do so by plaintiffs. Ex. A, p. 260.

As has been noted, the deposition of Miller proceeded from 9:30 A.M. to almost 6:30

P.M., with total questioning time exceeding the time limits set forth in the Civil Rules. Plaintiffs'

counsel was given no prior warning that the Adams Golf defendants' counsel was leaving for

the day when he left the room shortly before 6:00 P.M., or that he was doing so because of any

family emergency.

After Miller, in response to brief questioning by plaintiffs' counsel, stated his

opinions on the Adams Golf defendants' lack of due diligence, counsel who remained at the

deposition agreed to discuss the possible resumption of the deposition at a later date, subject to

reasonable conditions. It was plaintiffs' expectation that the deposition would continue shortly.

Plaintiffs expressly agreed to further deposition testimony. However, defendants made no

33

efforts to work out a resumption of the deposition, preferring instead to posture that plaintiffs were treating them in an "underhanded" manner and had precluded them from questioning Miller.

## V.     CONCLUSION

For all the reasons set forth above, the Adams Golf defendants' motion to

exclude Mr. Miller's testimony should be denied in all respects.

Dated: October 9, 2006

**ROSENTHAL, MONHAIT &
GODDESS, P.A.**

**BERGER & MONTAGUE, P.C.**

Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
*Lead Counsel for Plaintiffs and the Class*

OF COUNSEL:

By:    /s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, DE   19801
(302) 656-4433
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs
and the Class*

**LAW OFFICES OF DONALD B. LEWIS**

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

**KELLER ROHRBACK, LLP**

Juli E. Farris
Elizabeth A. Leland
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900

Dated: October 9, 2006

35

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 9th day of October, 2006, I caused

**PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO THE ADAMS GOLF DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF R. ALAN MILLER** to be electronically filed with the Clerk of Court using CM/ECF, which will send

notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

In addition, a copy has been served by electronic mail upon the foregoing counsel and the

following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

/s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com