# EXHIBIT A

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE

2                        -   -   -

3

   IN RE ADAMS GOLF, INC.   : CONSOLIDATED

4                           :

   SECURITIES LITIGATION     : C.A. No. 99-371 KAJ

5

6                ------------------------

                  Friday, August 11, 2006

7                ------------------------

8

9              Oral deposition of R. ALAN MILLER, taken

10   pursuant to notice, was held at the offices of AKIN,

11   GUMP, STRAUSS, HAUER AND FELD, LLP, 590 Madison

12   Avenue, 18th Floor, New York, New York 10022-2524

13   commencing at 8:50 a.m. on the above date, before Beth

14   A. Barkocy, Certified Shorthand Reporter and Notary

15   Public.

16

17

18

19

20

21

22                        -   -   -

23         RSA/VERITEXT COURT REPORTING COMPANY
              1845 Walnut Street, 15th Floor

24               Philadelphia, PA    19103
                (215)241-1000      (888)777-6690

25

**Page 2**

```
 1  APPEARANCES:
 2     LAW OFFICES OF DONALD B. LEWIS
       BY:  DONALD B. LEWIS, ESQUIRE
 3     Five Cynwyd Road
       Bala Cynwyd, Pennsylvania  19004
 4     (610)668-0331
       Morrislewislaw@aol.com
 5     Representing the Plaintiffs
 6
       BERGER AND MONTAGUE, PC
 7     BY:  TODD S. COLLINS, ESQUIRE
       1622 Locust Street
 8     Philadelphia, Pennsylvania  19103-6365
       (215)875-3040
 9     Tcollins@bm.net
       Representing the Plaintiffs
10
11     SIMPSON, THACHER, AND BARTLETT, LLP
       BY:  PAUL C. GLUCKOW, ESQUIRE and
12     RYAN ANTHONY KANE, ESQUIRE
       425 Lexington Avenue
13     New York, New York  10017
       (212)455-2831
14     Pgluckow@stblaw.com
       Representing the Underwriter Defendants
15
16     AKIN, GUMP, STRAUSS, HAUER, AND FELD, LLP
       BY:  PAUL R. BESSETTE, ESQUIRE
17     300 West Sixth Street
       Suite 2100
18     Austin, Texas  78701-3911
       (512)499-6200
19     Pbessette@akingump.com
       Representing the Nonunderwriter Defendants
20
21
    ALSO PRESENT:
22     Amir Rozen
       Cornerstone Research
23
24
25
```

**Page 3**

```
 1          INDEX
            - - -
 2
 3  Testimony of:  R. ALAN MILLER
 4  By Mr. Bessette   .................. 6
 5  By Mr. Gluckow  .................... 216
 6  By Mr. Lewis  ...................... 308
 7
            - - -
 8     EXHIBITS
            - - -
 9
    EXHIBIT NUMBER  DESCRIPTION     PAGE MARKED
10     334   Expert Report of
             R. Alan Miller        5
11
12     335   Rebuttal Expert Report
             of R. Alan Miller     5
13     336   Expert Report of
             Christopher James     5
14
       337   Rebuttal Expert Report
15           of Christopher James  5
16     338   E-Mail from Allyson Terpsma
             dated 08/03/06        5
17
       339   Chart Bates Stamped
18           CMJ 0560              5
19     340   Chart Bates Stamped
             CMJ 0561              5
20
       350   Fax dated 08/04/98    206
21
       351   Mr. Miller's AMF Report  247
22
       352   Document Bates Stamped
23           MIL 00090-00115       266
24     353   Mr. Miller's AMF
             Rebuttal Report       272
25
            - - -
```

**Page 4**

```
 1
             DEPOSITION SUPPORT INDEX
 2
 3
 4  Direction to Witness Not to Answer
 5  Page    Line        Page    Line
 6          (NONE)
 7
 8
 9  Request for Production of Documents
10  Page    Line        Page    Line
11          (NONE)
12
13
14  Stipulations
15  Page    Line        Page    Line
16    5     12
17
18
19  Questions Marked
20  Page    Line        Page    Line
21          (NONE)
22
23
24
25
```

**Page 5**

```
 1          (Deposition commences with
 2  Mr. Collins not yet present.)
 3          MR. BESSETTE:  Let's mark these,
 4  please.
 5          (Exhibits-334 through 340 were
 6  marked for identification.)
 7          - - -
 8          R. ALAN MILLER, having been first
 9  duly sworn, was examined and testified as
10  follows:
11          - - -
12          EXAMINATION
13          - - -
14          MR. BESSETTE:  Read and sign for the
15  witness.
16          MR. LEWIS:  I'd like to make a very
17  brief statement, and that is that we agreed
18  to this sequencing of the depositions in
19  response to a request by the defendants that
20  depositions either take place in a different
21  order or take place simultaneously.  It's our
22  view that in this case, because of the legal
23  allocation of the burden of proof, that
24  certain burdens are on Mr. James rather than
25  on Mr. Miller, and for that reason we have to
```

2 (Pages 2 to 5)

R. ALAN MILLER

Page 6

1  reserve our right to -- for Mr. Miller to
2  respond to new information that may come to
3  his attention or to revise his opinion in
4  accordance with testimony that Mr. James may
5  or may not give. We obviously don't want to
6  do it any more than necessary, but we're not
7  operating with the same information that we
8  would at trial.
9          MR. BESSETTE: That's fine. It's
10  the same for us. In our view, plaintiffs
11  have the burden on materiality and damages
12  and we're having the depositions of
13  Mr. Miller and Mr. James simultaneously, and
14  I'm sure Mr. James reserves the same right.
15          We'll proceed on that basis.
16  BY MR. BESSETTE:
17      Q.    Good morning, sir. My name is Paul
18  Bessette; I represent the Adams Golf defendants.
19      Would you please state your name and
20  spell your last name for the record?
21      A.    R. Alan Miller, M-i-l-l-e-r.
22      Q.    I know you've been deposed before;
23  I've read a lot of the transcripts. We can dispense
24  with a lot of the formalities unless you'd like me to
25  walk through them. Obviously, if you need a break,

Page 7

1  let me know. If my questions aren't clear, let me
2  know. We'll proceed that way. Okay?
3      A.    That's fine.
4      Q.    Having read your CV and your prior
5  depositions, I'm going to go quickly through your
6  background. I just want to clarify a few things.
7      You do not have a degree in finance;
8  is that right?
9      A.    That's correct. My undergraduate
10  degree is in economics; my major in graduate school
11  was in financial accounting.
12      Q.    The only finance courses you've
13  taken, I believe you've testified in prior cases, is
14  in connection with PLI and other sort of providers of
15  that nature; do I understand that correctly?
16          MR. LEWIS: Objection to foundation.
17          THE WITNESS: No, that's not
18      correct. I had finance courses in both
19      undergraduate and graduate curriculum at
20      college, grad school.
21  BY MR. BESSETTE:
22      Q.    Let's start with the undergraduate.
23  Can you tell me the finance courses you recall taking?
24      A.    I'm trying to see if I can recall
25  the titles or the major content. There were, I

Page 8

1  believe, at least two economics courses and, I
2  believe, one or two finance or finance-oriented
3  courses in undergrad. I believe the economics were
4  basic micro and macro, or at least as they were
5  referred to at the time, and the finance course was in
6  the nature of business organization and finance in a,
7  what I now consider to be, sort of a generality or
8  general finance curriculum context. In graduate
9  school --
10      Q.    Let me stop you there.
11      How many courses, in total, do you
12  recall that are finance-oriented in undergraduate?
13      A.    I think finance as opposed to
14  economics was one or two undergrad that I can recall.
15  Does not include accounting courses, does not include
16  economics courses.
17      In graduate school, there were --
18  there was a basic corporate finance course, a course
19  in what was called speculative markets, I believe one
20  or two other finance courses, and quite a number of
21  financial accounting courses.
22      Q.    How many at the graduate level,
23  would you say, both economics and finance, how many
24  courses?
25      A.    Economics at the graduate level was,

Page 9

1  I think, two; finance was two I can recall
2  specifically and I think there may have been one or
3  two more. Then there were financial accounting
4  courses on top of that and other -- and what they call
5  managerial accounting courses as well.
6      Q.    Do you hold any professional
7  designations in the finance field?
8      A.    I don't believe so. I think I'm
9  probably a member of the American Finance Association,
10  but that doesn't mean anything.
11      Q.    Any professional designations in the
12  economic field?
13      A.    No. Again, probably something
14  similar. You get those things when you subscribe to
15  the journals. I subscribe to quite a number of
16  finance and economics journals, so I probably have
17  something by that, but that's all it is.
18      Q.    Memberships in organizations is what
19  you're talking about?
20      A.    Yeah. I've seen some people put
21  them on their resumes as something.
22      Q.    Do you have a degree in statistics?
23      A.    I do not. I've had statistics and
24  operations research courses, both undergrad and
25  graduate school, but I do not have a degree or a major

3 (Pages 6 to 9)

R. ALAN MILLER

Page 10

1  in that field.
2      Q.    How many courses, in total, involved
3  statistics, either undergrad or graduate?
4      A.    At least four, I believe. There was
5  one statistics and one operations research undergrad
6  that I can recall, and I believe one of each in
7  graduate school that I can recall. Operations
8  research is, in my view, primarily statistics in
9  content.
10     Q.    Any other statistics classes that
11 you can recall?
12     A.    No.
13     Q.    Let me hand you what has been marked
14 as Exhibits-334 and 335 (indicating). I trust you
15 will recognize those as your report and then your
16 rebuttal report, respectively; is that correct?
17     A.    That's what they appear to be, yes;
18 yes.
19     Q.    I want to talk a couple of minutes
20 about your background. In Exhibit-334, your report,
21 Paragraph 7, Page 4, you list some experience in the
22 investment banking field?
23     A.    Right.
24     Q.    Philadelphia Investment Bank
25 Company, can you describe for me what type of

Page 11

1  investment bank services that company provides?
2      A.    That's been a corporate finance
3  services firm. As a way to define which of --
4  services which may appear in a more full service
5  investment banking firm, we've provided those. We
6  don't have a retail sales or securities sales arm or
7  investment research, as that's commonly known, or
8  those sorts of things. We've been a corporate finance
9  provider, that is, service provider, not actually an
10 investor or lender of capital.
11     Q.    Howard and Company, where you
12 indicate you worked from 1972 to 1976, is it correct
13 you worked on only two offerings registered under the
14 Security Act of 1933 while at Howard and Company?
15           MR. LEWIS: Object to the form and
16 foundation.
17           THE WITNESS: That's a good
18 question. There are two I can recall
19 specifically, one which may not have been
20 completed at the time, if I recall correctly.
21 That might be correct.
22           One of the services we provided was
23 advisory in nature to companies considering
24 going public. In the course of that, I did a
25 lot of research and we had quite a number of

Page 12

1  clients who were investigating that option at
2  the time.
3           What I don't recall specifically,
4  whether any more of those resulted in working
5  on deals that were or would have been filed
6  under the '33 Act, but there are two I can
7  recall specifically that were like that.
8  BY MR. BESSETTE:
9      Q.    Moving to Butcher and Singer, where
10 you were from 1976 to 1980 -- again, I've told you
11 I've read other testimony, I'm just trying to boil
12 things down so we can get to the substance of this
13 case.
14     A.    Right.
15     Q.    Tell me if this squares with your
16 recollection, that you recall working on six to ten
17 public offerings while at Butcher and Singer but can
18 only specifically remember three.
19           MR. LEWIS: Objection to form and
20 foundation.
21 BY MR. BESSETTE:
22     Q.    Does that sound right?
23     A.    It sounds like it might have been
24 right at one point. Let me think a minute.
25           I've got three in mind where we were

Page 13

1  the lead or co-lead managing underwriter, actually,
2  and there were a number of other deals of that type on
3  which I worked where we were not either lead or
4  co-lead or where we were not taking primary role in
5  that function. I think that's probably an accurate
6  number.
7      Q.    Only one of those was an initial
8  public offering of stock; is that your recollection?
9           MR. LEWIS: Objection to the form.
10          THE WITNESS: One of the three was
11 an IPO of -- was actually stock and warrants,
12 which made up a unit at the time.
13 Technically, the offering was of units.
14 BY MR. BESSETTE:
15     Q.    That's the one I'm thinking of.
16     A.    Of the three, yes. Of the others, I
17 do believe there were other IPOs in that list.
18     Q.    Can you recall them as you sit here?
19     A.    No, I just recall vaguely having
20 some conversations within the firm of the type that
21 would have more likely applied to an IPO than another
22 type of an offering; no.
23     Q.    Turning the page of Exhibit-334,
24 your time at Philadelphia Capital Advisors, which was
25 1980 to 1983, you didn't work on any public offerings

4 (Pages 10 to 13)

R. ALAN MILLER

Page 14

```
 1   while at Philadelphia Capital Advisors; is that right?
 2        A.   Certainly not as an underwriter, we
 3   didn't perform that function there. I think there was
 4   an advisory job that I did that involved an IPO where
 5   we were basically consulting to a -- I don't know what
 6   the right term would be -- to a party that was
 7   associated with the issuer in one case.
 8             We did do some other consulting work
 9   for people considering public offerings at the time.
10   I just don't recall if they actually got to that point
11   while I was there or not.
12        Q.   Is it correct that you have not
13   worked on drafting an IPO prospectus since 1980, give
14   or take, in that time frame?
15        A.   Yeah, I think that's probably
16   correct.
17        Q.   How many IPO transactions has your
18   company, which is -- strike that.
19             Philadelphia Investment Banking
20   Company, that's a company you founded in or about
21   1983?
22        A.   Correct.
23        Q.   Or I should say cofounded, right?
24        A.   That's right.
25        Q.   You're still involved with, I'll
```

Page 15

```
 1   call it, PIBC?
 2        A.   Yes.
 3        Q.   How many IPO transactions has PIBC
 4   been involved in over the past, say, ten years?
 5             MR. LEWIS: Objection to form.
 6             THE WITNESS: In the corporate
 7        finance role as we view it, probably none.
 8   BY MR. BESSETTE:
 9        Q.   How many clients does PIBC have
10   currently?
11        A.   That's hard to recall specifically,
12   in a sense, because some are at various levels of
13   activity, but probably -- my best estimate would
14   probably be 20 or 30 at this point. That's kind of a
15   squishy number.
16        Q.   I understand. I'd like to sort of
17   break up in segments real fast just the services that
18   PIBC provides. I know you provide litigation and
19   support services; that's one segment, right?
20        A.   Correct, that's the way we view it;
21   yes.
22        Q.   Investment banking services, is that
23   another segment?
24        A.   Sure. We call it corporate finance
25   services, but yes.
```

Page 16

```
 1        Q.   What would be the other segments, if
 2   any?
 3        A.   For PIBC, none. That's basically
 4   the way we look at the business.
 5        Q.   Of the 20 or 30 clients you can
 6   recall as you sit here, and I'm not holding you to
 7   that number but that range, how many of those are
 8   receiving litigation or support services, that
 9   segment?
10        A.   Right; 20 or 25 of the 30, let's
11   say.
12        Q.   How many, if any, are receiving
13   corporate finance services?
14        A.   Five to ten.
15        Q.   Are there some that are receiving
16   both?
17        A.   There are some that have received
18   both at different points in time, but the reason the
19   numbers aren't clearer than that is that is the best I
20   can recall at the moment trying to estimate how many
21   clients we have in those categories.
22        Q.   As you sit here, you believe there
23   are five to ten clients of PIBC that are currently
24   receiving corporate finance services?
25        A.   Right.
```

Page 17

```
 1        Q.   What was the last M and A
 2   transaction in which you were involved, sir?
 3             MR. LEWIS: Objection to form.
 4             THE WITNESS: The last one, I don't
 5        believe I can discuss with you. I don't
 6        believe that our retention has been
 7        publicly...
 8   BY MR. BESSETTE:
 9        Q.   I was looking for the timing, not
10   any of the details. Are you saying it's current?
11        A.   Yes, last couple weeks.
12        Q.   Prior to that one, when was your
13   last M and A transaction?
14        A.   Probably ended about two months ago,
15   I think, or I think our work ended about two months
16   ago, maybe three months ago.
17        Q.   The M and A transaction, that would
18   be subsumed in the corporate finance segment of the
19   business?
20        A.   Yes.
21        Q.   The litigation segment of the
22   business, that's currently -- and I think -- tell me
23   if this is correct -- has been true since the
24   late '90s and it's about 90 percent of PIBC's work?
25             MR. LEWIS: Objection to form.
```

5 (Pages 14 to 17)



Page 18

BY MR. BESSETTE:
1
2      Q.    Is that fair?
3      A.    Since the late '90s, I'd say it's at
4    least 80 percent. At any point in time, that number
5    can change pretty substantially in a short period
6    depending on where we're spending our time. There's
7    only a dozen of us, total, six or seven full-time
8    professionals, so if we're working in a concentrated
9    way on a deal for a month or two, that can skew things
10   for that quarter pretty well, but if we're taking from
11   the late '90s to today, I'm pretty confident we're
12   80 percent plus on the litigation side and the balance
13   corporate finance, and during certain periods it would
14   be higher, yeah.
15     Q.    Thanks for that answer, telling me
16   how many staff and professional people you have,
17   because I was going to go there, so I think we've got
18   that.
19           It is correct, is it not, that --
20   strike that.
21           You do not consider yourself to be
22   an expert concerning the legal aspects of SEC's
23   regulations concerning registration statements under
24   the 1933 Act; is that correct?
25           MR. LEWIS: Object to the form.

Page 19

1           THE WITNESS: Sure. I am not a
2    lawyer; I don't give legal opinions. I don't
3    consider myself an expert in the legal
4    aspects of that. Having said that, there are
5    -- certainly the entire context of things
6    under the '33 Act is legal in nature, and I
7    do think I have expertise with respect to
8    understanding the investment community with
9    respect to the meanings of those things as
10   they apply to investment bankers, issuers,
11   the contents of registration statements, and
12   those sorts of things, but that, like I said,
13   is from the point of view of understanding
14   the investment community as opposed to from a
15   legal perspective.
16   BY MR. BESSETTE:
17     Q.    We're going to explore that
18   expertise, the understanding you have about that, but
19   I just wanted to get on the record that the legal
20   aspect, you're not purporting to be an expert in.
21     A.    Except for what I just said.
22     Q.    I just wanted to ask real quick, on
23   Page 7, the research that you have done that you
24   indicate under Howard and Company, doing a detailed
25   comprehensive study of 550 IPOs, what was the purpose

Page 20

1    of that study, by the way?
2           MR. LEWIS: Just for the record,
3    it's Page 4, Paragraph 7.
4           MR. BESSETTE: Did I mix that up?
5           MR. LEWIS: I think you said Page 7.
6           MR. BESSETTE: Thank you.
7           MR. LEWIS: Just so we're looking at
8    the same thing.
9    BY MR. BESSETTE:
10     Q.    Do you remember any details about
11   the study, what the purpose was?
12           MR. LEWIS: Objection to the form,
13   overbroad.
14           THE WITNESS: I remember some things
15   about the study. Probably more of it comes
16   back to me as I think of it. We did that in
17   order to prepare a series of writings which
18   were printed as articles and compiled as a
19   draft of a book and which were being provided
20   at various forms and various stages to
21   clients for informational purposes as they
22   considered being public or going public. We
23   generated what was called a CPM report,
24   chart, of the process for people to use, and
25   all that was in the context of consulting to

Page 21

1    prospective issuers and providing
2    informational services and we conducted
3    seminars on that topic for clients at that
4    time.
5    BY MR. BESSETTE:
6      Q.    These are the newsletters and
7    presentations, the newsletters published by Howard and
8    Company and the presentations from Howard and Company
9    that are referred to in this bullet point?
10           MR. LEWIS: Objection to the form.
11           THE WITNESS: Right.
12   BY MR. BESSETTE:
13     Q.    Have you authored any other
14   publications other than those newsletters published by
15   Howard and Company?
16     A.    We did do the draft of the book. It
17   never got published, at least while I was there, to my
18   knowledge. I wrote some articles back in about that
19   time frame and afterwards, probably up through the
20   early '80s, generally on corporate finance or
21   valuation topics, that appeared in some Pennsylvania
22   CPA and legal publications.
23     Q.    What are those publications; can you
24   remember?
25     A.    One of them was called the

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000 (888) 777-6690 (610) 434-8588

Page 22

1 Pennsylvania CPA Journal. One was a legal trade
2 publication in the Philadelphia area; I don't remember
3 what that was called. I think there was another CPA
4 publication, but I don't remember what that was either
5 other than the Pennsylvania CPA Journal. I think
6 that's it.
7          MR. LEWIS: Excuse me. Had you
8     finished your answer about publications
9     before Mr. Bessette went to the actual
10    journals? I wasn't sure if he cut you off.
11         THE WITNESS: I think I finished.
12 BY MR. BESSETTE:
13    Q.    What time frame are these
14 publications you just referenced?
15    A.    Mid '70s through early '80s at the
16 latest.
17    Q.    Have you published any articles in
18 the last ten years?
19    A.    No.
20    Q.    Twenty years?
21    A.    Twenty years, I don't think so.
22    Q.    Have you published any articles that
23 have been peer reviewed?
24         MR. LEWIS: Object to the form.
25         THE WITNESS: In the sense of

Page 23

1     articles, I actually don't know who read the
2     ones I wrote so I couldn't tell you.
3 BY MR. BESSETTE:
4     Q.    Do you understand what I mean by
5 peer reviewed?
6     A.    I understand it. Peer reviewed is a
7 term that is used sometimes with a narrower meaning in
8 the academic community as describing a process by
9 which articles are submitted for publication and,
10 prior to publication, reviewed by a group of people in
11 the field.
12    Q.    With that understanding of what peer
13 reviewed means, have any of your articles been peer
14 reviewed prior to publication that you're aware of?
15    A.    I think the Howard and Company
16 articles were reviewed by Graham Howard, by and large.
17 The other articles, I don't believe were reviewed by
18 anybody prior to publication that I can recall.
19    Q.    How long have you been holding
20 yourself out as an expert witness in litigation,
21 providing expert services for litigation cases?
22         MR. LEWIS: Object to the form.
23         THE WITNESS: That began sometime in
24     the late '70s.
25 BY MR. BESSETTE:

Page 24

1    Q.    I know as a part of your report,
2 you've got your prior testimony and depositions and
3 retentions and all, so we've got the time frame. In
4 all of your time as an expert witness, has your
5 testimony ever been rejected by a court, that you're
6 aware of?
7          MR. LEWIS: Objection to the form.
8          THE WITNESS: I'm not sure what you
9     mean by the term rejected. I can think of
10    one instance in which a court was distinctly
11    unimpressed with it. I can think of one case
12    in which a portion of an affidavit, I
13    believe, was struck, if I remember the
14    process correctly or the result correctly.
15    Let me think here. I think there was another
16    case in which a portion of an affidavit was
17    struck for reasons of relevance.
18 BY MR. BESSETTE:
19    Q.    Do you recall any of the names of
20 those cases?
21    A.    The first one I referred to was
22 called Van de Walle versus Unimation. The second one
23 is Safeguard Scientifics. The third one was a case in
24 a Texas court involving a prospective class of holders
25 of securities; I cannot remember the name of the case.

Page 25

1    Q.    Krogman, does that sound familiar?
2    A.    That's not it, no. Krogman was the
3 case where the judge selected among factors advanced
4 by two different experts, me and another one, and
5 picked more factors favoring the other fellow's
6 opinion than mine.
7    Q.    That was a market efficiency case?
8    A.    Yes.
9          The other Texas case was not -- I
10 can't remember the name of that.
11    Q.    Aside from sort of --
12    A.    I think that's it.
13    Q.    -- courts criticizing or striking
14 portions, do you recall, as you sit here, whether
15 there has been a legal challenge to you based on your
16 opinion and the court refusing to accept you as an
17 expert witness in a case?
18         MR. LEWIS: Objection to form,
19    overbroad and vague.
20         Go ahead.
21         THE WITNESS: That has not occurred.
22 BY MR. BESSETTE:
23    Q.    Who is your client in this case,
24 sir?
25    A.    The plaintiff class.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

Page 38

1      opinions on negative loss causation spring
2      primarily from the review of Mr. James' work
3      and the other information that I provide in
4      my reports on that topic, and the adequacy of
5      due diligence opinions, I actually don't
6      recall what the complaint said about that but
7      those opinions I formed based upon my review
8      of the information that I've seen and that
9      I've listed here. I think that probably
10     covers it.
11 BY MR. BESSETTE:
12     Q.   You're familiar with event studies,
13 correct?
14         MR. LEWIS: Objection to form.
15         THE WITNESS: Yeah, I'll say correct
16     and note that that word is used differently,
17     perhaps, by different people, but I am
18     familiar with that term generally and with at
19     least several uses of it.
20 BY MR. BESSETTE:
21     Q.   What is beta in connection with an
22 event study?
23         MR. LEWIS: I'm sorry?
24         MR. BESSETTE: Beta.
25         THE WITNESS: Beta actually

Page 39

1     sometimes -- a beta measurement typically
2     measures the degree of volatility that a
3     particular stock experiences compared with
4     some base measurement statistic like an index
5     or market index or an industry index or
6     something like that; that is, it measures
7     what percent, for example, a particular stock
8     will move when an index moves 1 percent, is
9     one way to explain it. That sometimes finds
10     its way into event study work and sometimes
11     doesn't.
12 BY MR. BESSETTE:
13     Q.   Are there, in your experience, types
14 of stocks that are more sensitive to market movements
15 than other types of stocks, I guess having a higher
16 beta?
17         MR. LEWIS: Objection, vague and
18     overbroad.
19         THE WITNESS: Sure. There are
20     individual stocks -- let me start over.
21         Individual stocks react differently
22     to market movements as a general matter, and
23     there are probably ways to categorize certain
24     types of stocks that move more volatily than
25     other types of stocks.

Page 40

1 BY MR. BESSETTE:
2     Q.   Let me ask you to look at what's
3 been marked as Exhibit-336 (indicating). This is the
4 expert report of Chris James. I believe you've seen
5 that?
6     A.   Yes.
7     Q.   At Paragraph 17 to 22 of Dr. James'
8 report --
9         MR. LEWIS: Do you have an extra?
10         MR. BESSETTE: Do you have Chris
11     James' report? I'm not going to get detailed
12     on it.
13         MR. LEWIS: Then I will lean over.
14         MR. BESSETTE: I have copies for you
15     of everything else.
16 BY MR. BESSETTE:
17     Q.   In those paragraphs, Dr. James sets
18 out a methodology for an event study. Are you
19 familiar with that general methodology as he has set
20 forth in those paragraphs?
21         MR. LEWIS: Objection to form.
22     You're talking about --
23         MR. BESSETTE: Seventeen to 22 is
24     where he sets out the general methodology.
25         MR. LEWIS: The question is whether

Page 41

1     he is familiar that that's what James did or
2     whether --
3 BY MR. BESSETTE:
4     Q.   I want to know if you're familiar
5 with the general methodology of an event study as
6 Dr. James has laid it out in those paragraphs.
7         MR. LEWIS: Same objection, form,
8     foundation, and vagueness.
9         THE WITNESS: Did you say 17 to 21?
10 BY MR. BESSETTE:
11     Q.   Twenty-two.
12         MR. LEWIS: After he answers this
13     question, would it be a good time for a
14     break?
15         MR. BESSETTE: Sure.
16         THE WITNESS: Could I have the
17     question back?
18 BY MR. BESSETTE:
19     Q.   I'll restate it.
20         Now that you've reviewed
21 Paragraphs 17 to 22 of Dr. James' report, are you
22 familiar with the general methodology of an event
23 study as he has laid it out in those paragraphs?
24         MR. LEWIS: Same objection to form,
25     foundation, vagueness, and overbreadth.

11 (Pages 38 to 41)

Page 42

1    THE WITNESS: I am familiar with
2  event studies and the methodology of
3  conducting event studies, including in, I
4  suppose, the broadest sense, the methodology
5  suggested by Mr. James here in the sense of
6  using a regression analysis based tool in
7  order to measure statistical significance and
8  those sorts of things.
9    Having said that, these paragraphs
10  set forth a general description of that tool
11  or of the use of that tool but leave open
12  gaping sorts of questions as to the
13  application and construction of the tool and
14  analysis, which problems and questions
15  persist, then, as Mr. James proceeds
16  thereafter to apply what he describes here in
17  a general way.
18    MR. BESSETTE: I've got a line of
19  questions here, so we might as well take a
20  break. Thank you.
21    (Recess.)
22  BY MR. BESSETTE:
23    Q.    Mr. Miller, leaving aside your
24  reservations about the application of the event study
25  as described by Mr. James in Paragraphs 17 to 22, you

Page 43

1  agree that's an accurate description of the general
2  methodology of an event study; is that right?
3    MR. LEWIS: Objection to the form
4    and foundation.
5    Excuse me for a moment.
6    (Discussion held off the record.)
7    THE WITNESS: The reason I'm taking
8  so long with this question is that there's a
9  lot of extraneous information in these
10  paragraphs that's like commentary as opposed
11  to simply setting forth how an event study
12  might be structured or established or
13  conducted or something like that, that I
14  don't think are either necessary to the event
15  study or, in fact, may be wrong, were overly
16  assumptive about things that an event study
17  can tell you. That's why I'm thinking more
18  about this than maybe you intended. I'll let
19  it go with that.
20  BY MR. BESSETTE:
21    Q.    As between Paragraphs 17 to 22, what
22  in those paragraphs do you find either extraneous to a
23  description of an event study or, I think you said,
24  maybe even wrong?
25    MR. LEWIS: Compound.

Page 44

1    Go ahead; do the best you can.
2    Also, I think that misstated his
3  testimony a little bit.
4    Answer it anyhow.
5    THE WITNESS: I'm okay on 17, 18,
6  and 19. On 20, the problem I have here is
7  that the second sentence says the relatively
8  smaller movements on other days are typically
9  the result of normal volatile trading
10  activity and do not represent the pricing
11  dash effects of material firm-specific
12  information semicolon such small movements
13  are not statistically distinguishable from
14  zero firm-specific movement.
15    I think that assigns a level of
16  meaning and certainty to the term
17  statistically significant that doesn't
18  comport with the real world; that is, I don't
19  argue that this interpretation is incorrect
20  from a purely academic standpoint and from
21  the interpretation of the meaning of those
22  terms by some pure academicians, at least in
23  recent years. The problem is in applying
24  this methodology for the purposes described
25  in the preceding three paragraphs, it implies

Page 45

1  that it has these real world uses and effects
2  when the bright line nature of the
3  statistically significant factor is
4  artificial and, in fact, smaller movements
5  can occur as a result of information reaching
6  the market which might be weaker sorts of
7  information which might reach the market in
8  ways that are less distinct than a Wall
9  Street Journal announcement or Dow Jones
10  Business Wire announcement, for example, or
11  which might simply have less import than an
12  announcement that causes a reaction to rise
13  above the statistically significant
14  threshold, so I have that sort of problem
15  with that paragraph.
16  BY MR. BESSETTE:
17    Q.    Before you move on to another
18  paragraph, is there anything more you want to say
19  about that sentence in Paragraph 20?
20    MR. LEWIS: Objection to form.
21    THE WITNESS: This also implies a
22  one-day, or less, event window, which is the
23  term that's used in event studies as well,
24  and that is artificial as well. It's also
25  not necessarily standard even in the academic

12 (Pages 42 to 45)

Page 46

1   application of event studies. Event windows
2   typically should be designed to comport to
3   the events being studied, and 9:30 to four
4   o'clock on a particular day is an artificial
5   window which may or may not have any meaning
6   in a particular case.
7          Event window lengths of longer or --
8   well, or arguably shorter periods are
9   appropriate in some cases and there's no
10  reason to think that a consistent event
11  window length applied over a period of time
12  makes any sense; that is, event windows may
13  change in size during a study period to
14  reflect the source of the news, the type of
15  news, how it is transmitted to market
16  participants, and those sorts of factors.
17  All these things are discussed in some fairly
18  standard works on event study construction.
19         There's one by Dunbar and Tabak that
20  refers to these types of factors. There's
21  one by Mackinley; and I think it may be just
22  by Mackinley; he often writes with several
23  other people, but I think it might be just
24  him. There's, I think, another one with
25  Tabak and three other people from National

Page 47

1   Economic Research Associates. These sorts of
2   articles describe in more detail various
3   steps to go about performing event studies
4   but address issues like event window length,
5   threshold for statistical significance, and
6   those kind of factors I've referred to here.
7   I think that might take care of 20.
8   BY MR. BESSETTE:
9       Q.    Before we move on, on 20, just to
10  make sure I understand, to boil, I guess, the first
11  issue down, it's your opinion that relatively small
12  price movements that are not statistically significant
13  in a particular event study analysis could represent
14  the pricing effects of material firm-specific
15  information in your opinion based on the real world,
16  and that's why you take objection to this statement;
17  do I understand that right?
18         MR. LEWIS: Objection to form.
19         THE WITNESS: Yeah, that's part of
20  what I said.
21  BY MR. BESSETTE:
22      Q.    The part after the semicolon, these
23  small -- relatively small, not statistically
24  significant price movements based on a particular
25  event study, are they or are they not distinguishable

Page 48

1   from zero --
2          MR. LEWIS: Objection to form.
3   BY MR. BESSETTE:
4       Q.    -- in an event study?
5          MR. LEWIS: Objection to form and
6   foundation.
7   BY MR. BESSETTE:
8       Q.    Did I not frame that right?
9       A.    I'm wrestling with that.
10         In an event study as academically
11  defined in recent years by many academicians, once you
12  set your threshold for statistical significance, any
13  movement underneath that is viewed as not
14  statistically significant and therefore
15  indistinguishable from zero in its effect.
16         I think in the event study world of
17  pure academia, that is probably correct. In the real
18  world, there's no reason for that to be correct
19  because there are too many subjective assumptions in
20  establishing the threshold, the length of the event
21  window, and then those kinds of things I referenced
22  earlier, to make that true; that is, taking Mr. James'
23  work, he sets a threshold of 95 percent confidence
24  level, ignoring the impact of the relatively low
25  R-squared factor in the first place, says that that

Page 49

1   translates into a 12.3 percent stock price movement
2   and sets that as the threshold for statistical
3   significance, underneath which anything is essentially
4   equal to zero.
5          Simply by looking at his chart, you
6   can see that that doesn't make much sense in the real
7   world suggesting that an 11 percent movement in stock
8   price is indistinguishable from zero, A, on its face,
9   B, not considering the source or type of information,
10  C, assuming that all information affecting market
11  participants' view of a company's earning prospects is
12  equal or is subject to the same minimum threshold, D,
13  ignoring that the 95 percent confidence level is one
14  choice that is made.
15         Ninety percent confidence levels are
16  often used by many practitioners of event study
17  methodology, and at that, there's no reason, 90 or 95
18  or wholly, other numbers or not, except academic
19  convention. It doesn't deal with the possibility of
20  seepage or leakage-type information in which you'd
21  have to have multiple day event windows which are
22  essentially additive arithmetically; they're not quite
23  additive statistically but they are essentially
24  additive in their effect. I think those are some of
25  the issues anyway that relate to this topic.

13 (Pages 46 to 49)

Page 50

1      Q.     If I understand correctly, your
2   issue, I guess, with event studies not being
3   appropriate in the real world is because there are too
4   many subjective factors like what confidence level
5   you're going to use, what event window is going to be
6   used, so is it fair to say that because of those
7   subjective elements, you don't think that an event
8   study methodology accurately captures all
9   firm-specific information translated into price
10  movements?
11             MR. LEWIS: Objection to form.
12  BY MR. BESSETTE:
13     Q.     You're using statistical
14  significance because there are too many variables?
15             MR. LEWIS: Objection to form,
16             overbroad; misstates his answer, lack of
17             foundation.
18  BY MR. BESSETTE:
19     Q.     Do I have that right, generally?
20     A.     Yeah, I think partially so.  I think
21  I'd say this, though: I don't have any problem with
22  the use of event studies and we use them all the time
23  to do our work, and I'm using event study -- I don't
24  know whether that's -- whether to make it uppercase or
25  lower case -- in the broader sense of putting all of

Page 51

1   the information that you think is relevant onto a
2   template or piece of paper, a chart, a format, that
3   contains significant pieces of information to review
4   along with the information to make some sorts of
5   determinations that we're talking about making.
6   That's a process in a much broader sense that I think
7   is fine.
8              Using the event study as narrowly
9   defined in the purely academic world and including the
10  results of a regression analysis with fixed event
11  windows with artificially set thresholds, ignoring,
12  for example, the factor of trading volume, which most
13  academic event studies ignore, ignoring nonprinted
14  electronically data-retrievable sources of information
15  that probably existed at the time, and those sorts of
16  things, are some of the problems I have with the
17  narrower academically-oriented event studies as
18  described here and used by Mr. James.
19             In fact, if the event study in the
20  much broader sense is used properly and does include
21  all of the information that affects pricing, which is,
22  on a practical basis, very difficult to do, but if it
23  does that, includes trading volume data and stock
24  price movement data, the movement of comparable stock
25  prices, comparable indices, market indices and all

Page 52

1   those other factors, and then can be reviewed in a
2   flexible way to allow for multiple event window and
3   flexible event window review with no preset
4   thresholds, I think it can be a very useful tool and
5   we use it all the time for that.
6      Q.     Mackinley, to whom you referred,
7   you're familiar that he uses event studies to test
8   whether stock reactions are different from zero for a
9   particular event window?
10             MR. LEWIS: Objection to form and
11  foundation.
12             THE WITNESS: Yeah, I think part of
13  Mackinley's work -- I'm trying to remember if
14  it's in the same article or not, and I can't.
15             In part of Mackinley's work, he does
16  make that definitional use of the event study
17  setting the academic conditions of threshold
18  and event window length and then makes the
19  statement, I believe, something to the effect
20  that anything under the threshold is
21  statistically the same as zero, or something
22  like that.
23             That's consistent with the academic
24  application of the tool, but Mackinley also,
25  I believe, in discussing how to do the event

Page 53

1   studies, talks about selection of window,
2   talks about selection of base period, which
3   is a major issue I've not discussed yet but
4   which also factors into all this and which is
5   also covered in the Dunbar and Tabak article,
6   and those are important factors that are not
7   covered in this description and which
8   Mr. James deviates from in his application of
9   the event study methodology going forward;
10  that is, all the practitioners say, and
11  Mr. James says, that the first step in
12  creating the Formula A relationship between
13  the variables is to use a clean base period
14  or control period or estimation period, I
15  think are the terms I've seen used to
16  describe it, to establish the relationship
17  between the variables.
18             Based on that, the predicted path of
19  the stock price or the dependent variable is
20  projected into the class period, the actual
21  stock price movement is then subtracted from
22  the predicted movement to determine what's
23  called a residual.  That's tested against the
24  statistically significant threshold and the
25  academic version of the event study to

14 (Pages 50 to 53)

Page 54

1 determine whether you have a meaningful
2 movement or not under that definition.
3      In the case of an IPO, of course,
4 you can't do that because there's no clean
5 base period by definition.
6 BY MR. BESSETTE:
7      Q.   Do you know what a rolling
8 regression is?
9      A.   Yes.
10     Q.   What is that?
11     A.   It basically picks up from each
12 period -- we use day because it's commonly done in
13 days. It picks up from each day going forward and
14 eliminates the results of previous time periods. It's
15 an attempt to eliminate or -- I think it's an attempt,
16 if I remember this correctly, to eliminate
17 autocorrelation.
18          MR. LEWIS: Before you go on, I want
19      to raise something I should have raised at
20      the beginning of the deposition. Could you
21      identify your colleagues here for the record?
22          MR. BESSETTE: Sure. We have Amir
23      Rozen of Cornerstone with us, along with
24      counsel for the underwriters, who should, I
25      guess, identify themselves.

Page 55

1          MR. LEWIS: No, that's fine. I was
2      just wondering whether Mr. Rozen had actually
3      done any of the work on the James' report
4      because I thought part of our --
5          MR. BESSETTE: No.
6          MR. LEWIS: Okay.
7 BY MR. BESSETTE:
8      Q.   The use of a rolling regression, can
9 that be used to sort of make up for a base period as
10 you described it, sort of a substitute?
11         MR. LEWIS: Objection to form.
12         THE WITNESS: That's an interesting
13      factor. If you -- it doesn't get you there
14      and it probably corrects, to some degree, for
15      not having a clean base period. I think
16      because you're at a higher base level than
17      you would otherwise be, assuming a class
18      period that contains fraud and an inflated
19      stock price, so that the application of the
20      threshold gets you too high a trigger point.
21      There's still problems with not having a
22      correct base period. It probably does
23      correct to some degree for it, I think, but
24      I'm sure not completely.
25 BY MR. BESSETTE:

Page 56

1      Q.   Did Dr. James use a rolling
2 regression in his work?
3      A.   I believe he did do a -- one of his
4 alternatives involved a rolling regression. As I
5 recall, his results weren't very different with the
6 rolling regression, if I recall that correctly.
7      Q.   Let's go back to event studies for a
8 second. You made reference several times to the
9 academic version, so why don't we just call the
10 academic version of the event study and then a real
11 world, which you've described as well.
12     A.   Sure.
13     Q.   Certainly, there are legions of
14 published peer-reviewed articles on the academic
15 version of the event study and its use on measuring
16 stock price movement, right?
17         MR. LEWIS: Objection to form.
18         THE WITNESS: There are a lot. It
19      certainly is done. The procedure is done
20      quite a lot in the finance field in academia
21      and, sure, there have been a lot of articles
22      involving the use of it.
23          We subscribe, for example, to at
24      least half a dozen finance-type journals,
25      Journal of Finance, Journal of Financial

Page 57

1 Economics, Review of Financial Studies, those
2 kinds of things that often have articles in
3 them, very often containing academic event
4 study work.
5 BY MR. BESSETTE:
6      Q.   Are there any peer-reviewed articles
7 that you're aware of that use the real world version
8 of the event study as you've described it here today
9 to measure stock price movements?
10         MR. LEWIS: Object to the form and
11      foundation.
12         THE WITNESS: The principles of the
13      real world approach are set forth in the
14      articles I referenced previously.
15 BY MR. BESSETTE:
16     Q.   From NERA?
17     A.   Two from NERA and, to some degree,
18 Mackinley's article, the one article, at least, by
19 Mackinley. Mackinley has written a lot of stuff. At
20 least, I think, the one article that I think he may
21 have been the sole author of discusses having a clean
22 base period, having an appropriate event window
23 length.
24          NERA particularly uses several
25 different levels of threshold for statistical

Page 58

1  significance both in its articles and in its work that
2  I've seen, its work product that I've seen. They
3  discuss the need to include all sources of information
4  that might affect a security's price. I think the
5  principles are discussed in these various articles.
6      As I have seen them, event studies,
7  conducted in academia and written about, they very
8  rarely apply those. Most of the academic articles
9  tend to study simple events or single-type events like
10  earnings announcements or changes in recommendations
11  or dividend announcements with the expectation that
12  the market reaction will be quick and measurable and a
13  constant event window of one day, so the application
14  of the work starts with the principles and almost
15  always gets highly simplified for academic purposes.
16      When these articles used to be
17  started to be written -- terrible sentence -- in
18  the '70s, coincidentally I was in graduate school when
19  a lot of this stuff got started, only because it
20  coincided with the availability of computer time for
21  the first time to faculties at colleges, the articles
22  almost always contained caveats that these techniques
23  should not be applied to the analysis of any one
24  stock, it's useful for evaluating large amounts of
25  data and drawing general conclusions, these sorts of

Page 59

1  things.
2      By and large, those caveats have
3  disappeared over the years and you now see the
4  application of the event study technique much more
5  broadly without the caveats, but I think you have to
6  remember that the academic purposes in most of these
7  articles can be seen to benefit from the
8  simplification of the whole process and the fixing of
9  windows and thresholds and those sorts of things to
10  draw the sorts of general conclusions you're trying to
11  draw. By and large, those peer-reviewed articles are
12  not trying to apply studies to one stock in the way
13  that they are in litigation context, for example, and
14  the way they are here.
15      Q.   Are there any event studies that
16  you've seen published in finance or economic journals
17  that are the real world ones that you've described as
18  opposed to the academic event studies?
19      MR. LEWIS: Objection to form,
20  foundation.
21      THE WITNESS: I can't recall, as I
22  sit here, seeing one allowing for the review
23  of multiple factors, multiple windows, and
24  that sort of thing simultaneously because
25  it's not easily reducible to formulas and,

Page 60

1  certainly, linear formulas. Any formulations
2  that would result from those would be
3  incredibly complex and multidimensional and
4  wouldn't subject themselves to reduction to
5  an academic article. I don't recall that
6  I've seen anybody doing it that way, I think
7  for the reasons I mentioned in the previous
8  answer.
9      Having said that, I think the effect
10  on stock prices from a more fundamental
11  analysis approach is referenced in texts and
12  articles and that sort of thing in a
13  different way; that is, the emphasis on the
14  security price reflecting the expected future
15  -- I'm sorry, the present value at any point
16  in time, that concept is certainly set forth
17  in texts and in articles, whether it be from
18  Graham and Dodd, Brealey and Myers. Any
19  number of corporate finance and investment
20  texts and articles and those types of
21  journals talk about securities valuation
22  resulting from expected future cash flows
23  being reduced to a security price at a point
24  in time. All the factors that affect that
25  are written about in those contexts, and

Page 61

1  those are the type of factors that are often
2  captured in a more real world approach to an
3  event study.
4      One limitation, for example, that
5  pops up in the academic world is very often
6  reliance on a single point distribution in a
7  major source of a piece of simple news,
8  whereas in the real world you often get
9  multiple sources of news, much information
10  being transmitted orally among market
11  participants and those sorts of much messier
12  situations than the academics prefer to
13  study.
14  BY MR. BESSETTE:
15      Q.   I just want to be clear that you
16  cannot, as you sit here, point to any real world event
17  study as you've described today published in a
18  peer-reviewed article in finance or economic journals.
19      MR. LEWIS: Objection to form and
20  foundation; misstates the testimony.
21      THE WITNESS: No, I think what I
22  said was the principles underlying event
23  studies point to what should be a real world
24  event study. The academics then, once
25  establishing the principles, step back from

16 (Pages 58 to 61)

Page 62

1  that for the practical purposes of producing
2  their articles for journals so that they can
3  generate linear formulas that they can reduce
4  variables to the ones that are helpful to
5  them and what they are trying to study.
6      Having said that, I then said that I
7  haven't seen a published article that doesn't
8  step back from the principles and simplify it
9  down to whatever narrow issues the academics
10  are focusing on at the time.
11  BY MR. BESSETTE:
12      Q.    Do you agree that statistical tests
13  are a necessary part of an event study?
14      MR. LEWIS: Objection to form and
15      foundation.
16  BY MR. BESSETTE:
17      Q.    An event study that analyzes stock
18  prices and public information.
19      MR. LEWIS: Same objection.
20  BY MR. BESSETTE:
21      Q.    Let me re-ask the question.
22      Are statistical tests a necessary
23  part of an event study that analyzes stock prices
24  and --
25      MR. LEWIS: Same objection.

Page 63

1  BY MR. BESSETTE:
2      Q.    -- public information?
3      A.    I suppose at some level a
4  statistical test or -- I don't know whether to use the
5  word test or not -- a statistical observation is
6  certainly an important part of event studies. Using
7  that term in a broader sense than what we've been
8  referring to as real world event studies, sure.
9      The notion of price changes,
10  comparison of price changes of the subject company
11  with comparative companies or indexes, for example,
12  the topic of relative volume change, I think all these
13  things are subject to statistical observation as to
14  what they mean or imply with respect to stock price
15  movements and then correlate it with the information
16  that appears to be coming into the market over those
17  periods of time. Whether that reduces to a single
18  test that applies uniformly throughout an analysis
19  period or thresholds or that sort of thing is a
20  different question.
21      I think there is the purpose -- one
22  of the purposes of an event study is to observe the
23  statistical aspects of it, how a stock price changes,
24  how it changes relative to other stock prices,
25  indexes, information, trading volume, and those sorts

Page 64

1  of things, so yes, I think statistical observation is
2  an important part.
3      Q.    My question was a little different,
4  though.
5      A.    But setting defined statistical
6  tests that are artificial or threshold-like or
7  constant, regardless of the appropriate event window
8  or source of information or type of information,
9  ignoring trading volume and that sort of thing, I
10  don't think is necessarily helpful.
11      MR. BESSETTE: Can you repeat my
12      question.
13      (The preceding question was read
14      back.)
15  BY MR. BESSETTE:
16      Q.    You answered it in terms of how it
17  was important and then you had your qualifiers. I
18  want to know if statistical tests or observations are
19  a necessary part of an event study that analyzes stock
20  prices and public information.
21      MR. LEWIS: Objection to form and
22      foundation.
23      THE WITNESS: Sure.
24  BY MR. BESSETTE:
25      Q.    In your opinion, what are the

Page 65

1  necessary statistical tests or observations that need
2  to be made in a properly constructed event study that
3  analyzes stock prices and public information?
4      MR. LEWIS: Objection to foundation,
5      asked and answered, vague and ambiguous.
6      THE WITNESS: I think one should
7  observe the trading volume number and -- I
8  think I'd start with trading volume and
9  suggest that trading volume should be
10  observed for whatever period of times are
11  appropriate, which in the case of a single
12  point major news source such as Dow Jones
13  news wire, Wall Street Journal article, might
14  be a fairly narrow window for simple
15  information. That window could be a day,
16  could be several hours; it could be, perhaps,
17  two days or so.
18  BY MR. BESSETTE:
19      Q.    How is looking at trading volume a
20  statistical test or observation?
21      A.    Because if you have a normal trading
22  volume, for example, on no-news days, let's say, in a
23  simple case, of a hundred thousand shares a day and
24  you have several days of 500,000 share trading volume
25  that coincide with the issuance of news, that's

17 (Pages 62 to 65)

Page 66

1  something that should trigger you to look at the news
2  and look at how the stock price reacted.
3      Q.    That, in your opinion, is a
4  statistical test?
5      A.    Sure, the deviation of trading
6  volume from normal.
7      Q.    How do you measure that
8  statistically?
9      A.    You could measure it any number of
10  ways by setting a normal or average trading volume
11  number and measuring any change in excess of a
12  threshold level, for example, or simply by observing
13  through an event study period how the volume changes
14  in picking up on days with above average trading,
15  leaving not a fixed threshold but allowing for
16  different types of trading volume reactions to
17  different kinds of news and simply looking at all of
18  them that seem to be significant, and there's any
19  number of ways you could structure that review.
20      You could start in a particular
21  class period with the top ten trading volume days with
22  the requirement of a minimum change of 10 percent
23  above average. There's any number of ways you could
24  look at the data.
25      Q.    Right now you're giving me a list of

Page 67

1  the statistical tests that you think are necessary for
2  a properly constructed event study that analyzes stock
3  prices and public information, the first one of which
4  you said was trading volume. Doing a statistical test
5  on trading volume as you've just described it, and it
6  can be done any number of ways, what does that tell
7  you in a properly constructed event study, in your
8  opinion?
9      MR. LEWIS: Objection to form.
10      THE WITNESS: Typically, that will
11  tell you instances where there are more
12  buyers than sellers or more sellers than
13  buyers relative to a particular price and
14  potentially in response to news.
15  BY MR. BESSETTE:
16      Q.    What do you mean, potentially in
17  response to news?
18      A.    Depending on how you set up your
19  study -- this is a bit of a physical matter so I
20  apologize doing this verbally, but if you set up the
21  study with the first column being date, the next
22  column being trading volume, next column being share
23  price, then as you run down the trading volume first,
24  you might see a day when trading volume is
25  significantly above average, and then look to the

Page 68

1  right, if that's the way you set up your table, and
2  see if there's news associated with that, which you've
3  printed in the column allowed for news, either that
4  day or the day before or the day after, for example,
5  to use a one-day window period, to see if there's news
6  associated with the trading volume change.
7      Q.    That statistical test of trading
8  volume, again, shows you what in a properly
9  constructed event study, in your opinion?
10      MR. LEWIS: Objection to form, asked
11  and answered.
12      THE WITNESS: It should be a signal
13  for you to investigate whether something
14  occurred to cause that trading volume change
15  from normal, if it was accompanied by a price
16  change and if it was accompanied by obvious
17  news that you were able to find out at that
18  point in your study.
19  BY MR. BESSETTE:
20      Q.    What other statistical tests are
21  necessary?
22      MR. LEWIS: Objection to form and
23  foundation.
24  BY MR. BESSETTE:
25      Q.    In your opinion.

Page 69

1      A.    I think you would then typically
2  analyze the movement of stock price that you're
3  studying to see how that changes over time on an
4  absolute basis, then on a percentage basis, and,
5  typically, you would compare that with the movement of
6  something else, a general market index and/or a
7  selected industry index and/or comparable companies
8  that would be useful in examining how those factors
9  might affect the company you're studying. I think
10  that would be the next group of information or type of
11  information I'd look at.
12      Q.    I'm sorry, I missed the first part.
13  First statistical test trading volume, we discussed
14  that. What was the second?
15      MR. LEWIS: You're using the word
16  test when he used the word observation. I'm
17  just going to continue to object to the
18  question.
19  BY MR. BESSETTE:
20      Q.    You are listing for me necessary
21  statistical tests or observations that you think, in
22  your opinion, should be part of a properly constructed
23  event study as we've described?
24      A.    Yeah, I've heard the test or
25  observation phrased throughout your questions.

18 (Pages 66 to 69)

Page 70

1    Q.    Right.  The second one was what?
2    A.    Stock price of the company you're
3  studying and -- on an absolute and percentage change
4  basis, and then index data for general market index,
5  industry indexes and/or comparable company stock
6  prices, all on absolute and percentage change bases
7  for the various event windows that might be
8  appropriate as you move through such a study.
9    Q.    What's the purpose of this necessary
10  statistical test or observation, that being absolute
11  and percentage change bases in stock price and
12  absolute and percentage change bases in index data?
13          MR. LEWIS:  Objection to form.
14          THE WITNESS:  The purpose is to see
15      how the stock price moves in relevant time
16      periods compared with the movements in those
17      other factors, general market indexes,
18      industry indexes, and/or comparable company
19      stocks.
20  BY MR. BESSETTE:
21    Q.    In your opinion, is part of the
22  necessary statistical test when you're looking at this
23  stock price data to factor out of absolute and
24  percentage change stock price data for a company the
25  index data, market or industry, for that company?

Page 71

1          MR. LEWIS:  Objection to form.
2          THE WITNESS:  Yeah, as part of the
3      testing or observing of this data, I think
4      you would -- I don't know if you're actually
5      factoring it out or factoring it in.  You're
6      considering that it's moving in a certain
7      fashion.  You're also considering that
8      indexes -- or you're remembering when you're
9      doing this that indexes are made up of stock
10      price movements averaged together, in a very
11      broad sense, after the fact, when you're
12      doing any of these analyses; that is, index
13      movements are created by individual stock
14      movements added and averaged together, so
15      you're keeping that in mind as well as you do
16      these analyses and attempt to determine what
17      was causing these movements of these various
18      components in the study.
19  BY MR. BESSETTE:
20    Q.    What are the other necessary
21  statistical tests or observations?  We've listed two.
22          MR. LEWIS:  Objection to form.
23          THE WITNESS:  Sometimes when it's
24      appropriate, you would do the same -- observe
25      the same types of data for a period prior to

Page 72

1      and after the study period or the class
2      period to observe how those various things
3      performed relative to each other during those
4      periods of time.
5  BY MR. BESSETTE:
6    Q.    In shorthand, we can say the No. 3
7  test is a clean base period?
8          MR. LEWIS:  Objection to form.
9  BY MR. BESSETTE:
10    Q.    Is my understanding correct?
11          MR. LEWIS:  Same objection.
12          THE WITNESS:  Shorthand, using that
13      in the general sense, sure.
14  BY MR. BESSETTE:
15    Q.    Any other necessary statistical
16  tests or observations?
17    A.    I don't think so at the moment.
18    Q.    Did you perform a properly
19  constructed event study in this case?
20          MR. LEWIS:  Objection to form,
21      foundation.
22          MR. BESSETTE:  That's vague.
23  BY MR. BESSETTE:
24    Q.    Did you perform what in your opinion
25  is an event study in this case?

Page 73

1          MR. LEWIS:  Objection to form.
2          Answer it if you can.
3          THE WITNESS:  Yes, I believe that we
4      did.
5  BY MR. BESSETTE:
6    Q.    Did you perform each of these
7  necessary statistical tests or observations as part of
8  your event study?
9    A.    We did.
10    Q.    You've tested for trading volume?
11          MR. LEWIS:  Objection to form.
12          THE WITNESS:  We did.
13  BY MR. BESSETTE:
14    Q.    Can you show me where in your
15  report?
16    A.    If I remember the way this was
17  printed, we had some issues with the printing, and it
18  may not have appeared on the same place as it often
19  does when we do this because there was so much data it
20  overwhelmed the length of the page we had.
21          We didn't put the exhibit numbers on
22  every page.  Exhibit B.
23    Q.    That's the long, big one, 92 pages?
24    A.    That should be.  Yeah, it's pretty
25  long; right.



Page 74

1       Trading volume appears, actually, on
2   both segments. There are two parts to Exhibit B.
3   There's a part that has simply price and percent
4   change data along with Adams' volume for Adams' six
5   other golf companies and what's called a peer group,
6   which is a blended index of those companies. That has
7   Adams' volume data on it and it's also contained in
8   the second part of this exhibit which has Adams'
9   volume price, percent price change, and then a listing
10  of news items in the second part.
11       When we can, we try to put all this
12  on one page but we couldn't get there.
13       Q.    Did you employ any tests to
14  determine whether the volume data was statistically
15  significant --
16       MR. LEWIS: Objection to form.
17  BY MR. BESSETTE:
18       Q.    -- as part of your event study?
19       A.    When we went through this data,
20  yeah, we noted what normal or average trading volume
21  was over a period of -- I think it was weeks at the
22  beginning of the class period, and then used that as a
23  base to observe how trading volume occurred daily
24  throughout the class period and thereafter.
25       Q.    Where do you indicate in Exhibit B,

Page 75

1   if anywhere, the normal trading volume and how you
2   characterize the deviations from normal; is that
3   reflected here in Exhibit B anywhere?
4       A.    No, we were doing that just as we
5   went along reviewing the data and the news information
6   after this was assembled.
7       Q.    Was this sort of a subjective
8   analysis of how much deviation you or your team saw in
9   what you considered -- away from what you considered
10  normal trading volume for Adams Golf?
11       MR. LEWIS: Objection to form.
12       THE WITNESS: No, I wouldn't call it
13  subjective because we didn't have any -- I
14  can't think of what the right word would be
15  -- any purpose or bias to the review; that
16  is, I call it objective because we were
17  simply looking at the data to see what
18  happened to it as we went through it
19  chronologically.
20  BY MR. BESSETTE:
21       Q.    Did trading volume -- deviating from
22  normal trading volume to any degree, how did that
23  impact your opinion that there was news about gray
24  marketing on that day, on any given day?
25       MR. LEWIS: Objection to form and

Page 76

1   foundation.
2       THE WITNESS: (No response.)
3       MR. LEWIS: Do you understand the
4   question?
5       THE WITNESS: I think so. When we
6   first look at the information, we don't know
7   what we're going to find until we look at it,
8   so it's sort of the other way around in a
9   sense; that is, we tend to look at the
10  trading volume information as it develops
11  over time and then look to the right and see
12  is there anything obvious that that was
13  associated with in price change or news that
14  we know about, then we sometimes go backwards
15  when we get information and say, okay, here's
16  some information that may have become known
17  to market participants, was there any
18  noticeable change in the trading volume, so
19  it's sort of iterative in that sense.
20       We start out with knowing nothing
21  and seeing what you learn by looking at it,
22  and then you start going back as you're
23  filling in the news items and learn things
24  and say, you know, what was the effect of
25  this sort of thing. I'm not sure it's quite

Page 77

1   as clean as you're asking me.
2   BY MR. BESSETTE:
3       Q.    You agree that stock prices can move
4   because of general market conditions?
5       MR. LEWIS: Objection, vague and
6   overbroad.
7       THE WITNESS: I think there are --
8   yeah, in general, I think that's true. The
9   stock prices can move because of factors that
10  affect companies similarly which would also
11  affect a particular company's expected future
12  earnings.
13  BY MR. BESSETTE:
14       Q.    A stock price can move because of
15  general industry conditions as well?
16       MR. LEWIS: Objection to form.
17       THE WITNESS: Same answer.
18  BY MR. BESSETTE:
19       Q.    Do you agree that a stock price can
20  move because of company-specific conditions which are
21  unrelated to, for example, in this case, the specific
22  allegations in this case, so in other words, do you
23  agree that Adams Golf's stock price moved during the
24  class period because of company-specific information
25  that was unrelated to any of the allegations in the

20 (Pages 74 to 77)

Page 82

1    the availability to the market of information
2    connected with plaintiff's allegations, we
3    didn't attempt to separate out whether each
4    day's movement related solely to one or the
5    other nor did we think we could based on the
6    types of information dissemination that
7    appeared to be occurring with respect to
8    plaintiff's allegations and the information
9    that related to that. It appeared that the
10   overall new sort of information that was
11   reaching the market during the class period
12   that would likely cause the observed market
13   effect was related to plaintiff's
14   allegations.
15   BY MR. BESSETTE:
16       Q.    What statistical tests did you
17   perform in your event study, sir?
18           MR. LEWIS: Objection, asked and
19   answered, vague and ambiguous.
20           THE WITNESS: Just the ones we've
21   talked about so far where we reviewed the
22   volume changes on an ongoing basis throughout
23   the class period and thereafter, the price
24   changes on an absolute and percentage basis
25   in Adams' stock price, the changes in the

Page 83

1    various index and comparable company
2    movements that we've talked about on an
3    absolute and percentage basis, on each day
4    going through the period and, in a couple of
5    cases, on intraday data as well.
6    BY MR. BESSETTE:
7        Q.    When you say absolute and percentage
8    change, you're talking about the raw dollar draw on
9    any given day translated into a percent, right?
10       A.    Correct.
11       Q.    Are you aware of any case law that
12   says one cannot properly show causation with just raw
13   dollar or raw percentage stock price draws on any
14   given day?
15           MR. LEWIS: Objection to form,
16   overbroad.
17           THE WITNESS: I'm not sure -- I
18   don't think I've seen one that's that clear
19   about that. I've seen a couple of cases that
20   discuss that issue that I can recall to some
21   degree. I'm not sure that I've seen one that
22   takes that position on that firm a basis.
23   BY MR. BESSETTE:
24       Q.    Do you think there's any validity to
25   the criticism of using raw dollar or raw percentage

Page 84

1    stock price drops in trying to show causation or
2    association with specific information; do you see any
3    validity in the criticism of using that?
4            MR. LEWIS: Objection to form,
5    overbroad, lack of foundation.
6            THE WITNESS: Of using raw price
7    data and percentage changes?
8    BY MR. BESSETTE:
9        Q.    Right, to draw conclusions about
10   association or causation with specific information.
11           MR. LEWIS: Objection to form,
12   foundation.
13           THE WITNESS: Trying to think as a
14   general matter, if I can. I don't think so,
15   at least not in the sense that we do, and I'm
16   trying to then extend this as to whether
17   there's a more general case, that is, having
18   the benefit of being able to observe data
19   over flexible event windows or for multiple
20   days prior to, during, and after a study day,
21   for example, and seeing the same data for
22   index and comparable company movements, being
23   able to consider the type of information, the
24   way it reaches the market, its degree of
25   complexity, which is another topic, since you

Page 85

1    jogged my thinking about this, that I would
2    add to the morning's discussion about event
3    studies in general and their limitations;
4    that is, the complexity of information can be
5    a significant factor in the speed of reaction
6    to news. There's a good paper on that that's
7    footnoted in my report or my rebuttal report
8    that deals with that topic.
9            I don't see any problem with using
10   that type of data for your analysis,
11   especially if the comparison is a purely
12   academic version of an event study that sets
13   some sort of a threshold based on nothing but
14   academic convention and based on fixed data,
15   fixed event windows or fixed reaction times,
16   not taking into consideration the types of
17   information or the method of dissemination to
18   market participants and those kinds of
19   factors.
20   BY MR. BESSETTE:
21       Q.    Did market and/or industry factors
22   affect Adams Golf stock price during the class period?
23           MR. LEWIS: Objection to form,
24   foundation, compound.
25           THE WITNESS: I've seen a couple of

22 (Pages 82 to 85)

Page 98

1 material?
2           MR. LEWIS: Objection.
3           THE WITNESS: Yeah, incorporating
4      all of my past answers, I think you got that.
5 BY MR. BESSETTE:
6      Q.    Is that methodology, as we've
7 described it over the last two or three questions,
8 acceptable in the finance or economic fields, in your
9 opinion?
10          MR. LEWIS: Objection to form and
11     foundation.
12          THE WITNESS: Sure, unless I'm
13     missing something in your question or not
14     connecting with it somehow. I don't know how
15     else you'd go about it; that is, you could,
16     as I referred in one of my answers in this
17     line of questioning, in some cases attempt to
18     perform a back test of some sort on stock
19     price movement, which I have seen people do,
20     and discuss as methodology for determining
21     materiality of a particular piece of
22     information.
23          First off, that's not possible to do
24     in connection with an IPO and it ignores the
25     entire practice of corporate finance in

Page 99

1      creating and valuing securities considering
2      what information is material, what needs to
3      be considered in creating and pricing
4      securities out of the gate and what
5      information needs to be included for
6      disclosure in those contexts.
7           Other problems that exist with those
8      kinds of methodologies are in many cases
9      similar to the problems that exist in the
10     academic version of event studies that we
11     discussed earlier today, including specifying
12     all of the universe of information that's
13     affecting prices at any point in time --
14 BY MR. BESSETTE:
15     Q.    That's fine; I don't need criticism
16 of those --
17          MR. LEWIS: Please don't cut him
18     off.
19          MR. BESSETTE: This is not relevant
20     to my --
21          MR. LEWIS: Let him finish and move
22     to strike. You don't know that.
23 BY MR. BESSETTE:
24     Q.    I'm not asking for your criticisms
25 of the back test of materiality and all of that.

Page 100

1 Let's leave that aside.
2           Your methodology for judging
3 materiality that we've described, again leaving aside
4 the tests, the back tests as you described them, is
5 that methodology supported in academic literature
6 anywhere?
7           MR. LEWIS: Objection to form and
8      foundation and vagueness.
9           THE WITNESS: Yeah, I suppose it's
10     at least implicit, if not explicitly
11     discussed in your basic investment and
12     corporate finance text approaches to valuing
13     securities in the sense that they describe
14     the value of a security as representative of
15     the expected future earnings and cash flows
16     to be derived from that security or the
17     company involved, and, therefore, anything
18     that would be important with respect to the
19     generation of expected future cash flows and
20     earnings would be important to an investor
21     relative to the value of that security, so I
22     think that's just a basic kind of grounding
23     point of all that literature.
24          Whether in the context of a
25     discussion of the meaning of the word

Page 101

1      materiality, either approach is really
2      discussed in the academic literature, I don't
3      know that I can sit here and tell you that.
4      I can't recall offhand seeing articles that
5      discuss it that way.
6 BY MR. BESSETTE:
7      Q.    Using your methodology that we
8 talked about for determining materiality of a piece of
9 information, can different people reach different
10 results?
11          MR. LEWIS: Objection to form,
12     foundation.
13 BY MR. BESSETTE:
14     Q.    Obviously, looking at the same set
15 of information, so using your methodology, looking at
16 the same information, can two different people reach
17 different results?
18          MR. LEWIS: Vague, overbroad, and
19     lack of foundation.
20          THE WITNESS: No, I think by
21     definition, probably not, assuming two
22     reasonable and reasonably experienced
23     practitioners, I think probably not, and the
24     reason I say that is based on your assumption
25     you're looking at the same information.

26 (Pages 98 to 101)

1  type of disclosure of the issue of gray
2  marketing.
3      By the way, I would suggest that the
4  entire press release was new information, not
5  just the portion of it you asked me about,
6  and it would be taken by the market in its
7  entirety. That doesn't say that there
8  weren't some people who knew in the spring of
9  '98, and I think it was April and May, that
10  there was some level of gray marketing going
11  on.
12      I'm thinking of some of the
13  references in Mackenzie's work, and some of
14  the complaint letters, I think, referenced in
15  Mr. Grace's work, that there was some level
16  of knowledge about some of it, but I think in
17  terms of public information to the market,
18  that this is the first such piece, but when I
19  say "to the market" here, we have to remember
20  there was no public stock at that time, so
21  even though it was released to the market and
22  to the public, there would have been no
23  community of stockholders or analysts, for
24  example, to follow this at the time.
25  BY MR. BESSETTE:

1      Q.    This press release was
2  contemporaneous with the IPO roadshow, was it not?
3          MR. LEWIS: Objection to form,
4  foundation.
5          THE WITNESS: Yeah, I believe that's
6  right.
7  BY MR. BESSETTE:
8      Q.    Let me show you what's been marked
9  as Exhibit-233 (indicating). This is the Golf Pro
10  article that you reference in your report at
11  Paragraph 13A?
12      A.    Right.
13      Q.    On Page 3 of the article, it states
14  that the company joined the ignominious ranks of the
15  big boys in another way this year; Tight Lies started
16  showing up in Costco, prompting a lawsuit from Adams
17  with two different aims. Do you see that?
18      A.    Yes.
19      Q.    Was this information released on or
20  about August 1, 1998 publish date?
21      A.    I haven't seen any reason to think
22  so.
23      Q.    Is this information in this report
24  new information --
25          MR. LEWIS: Object to the form.

1  BY MR. BESSETTE:
2      Q.    -- or old information?
3          MR. LEWIS: Object to the form.
4  BY MR. BESSETTE:
5      Q.    The part I just read.
6          MR. LEWIS: Same objection.
7          THE WITNESS: I think the --
8  BY MR. BESSETTE:
9      Q.    Let me withdraw it and make the
10  question a little more precise.
11          The information about Tight Lies
12  showing up in Costco, prompting a lawsuit, is that new
13  information or old information?
14          MR. LEWIS: Objection to form and
15  foundation.
16          THE WITNESS: That's a good
17  question. It's technically old information
18  by that point because they refer to
19  information that had occurred sometime
20  previously and had been discussed in the
21  press release sometime previously, but it's
22  the type of information in the form of
23  distribution that would fit into the messier
24  category we talked about earlier as opposed
25  to the clean, simple major national

1  impact-type release or earnings-type
2  information for a large-cap company followed
3  widely by Wall Street or whatever the
4  examples were that we were talking about;
5  that is, you've got this article appearing to
6  the trade, as my understanding goes, in, most
7  likely, mid July, as best I can tell, and
8  that's not -- I don't think there's any
9  certainty as to the dates when this thing
10  actually reached people.
11  BY MR. BESSETTE:
12      Q.    You're just guessing when it reached
13  people, right?
14          MR. LEWIS: Objection to form.
15          THE WITNESS: No. My understanding
16  is there has been work done on that issue
17  that the best information is that it was most
18  likely the middle of July, and if you analyze
19  the text of the article, it appears to make
20  sense that it would be out sometime in the
21  middle of July.
22  BY MR. BESSETTE:
23      Q.    What work has been done?
24      A.    My understanding is contact had been
25  made with -- I think it was the circulation director

32 (Pages 122 to 125)

Page 126

1   of the magazine, who indicated a likely distribution
2   date of mid month before the cover date.
3       Q.    Who is that person?
4       A.    I don't know.
5       Q.    Who made the contact?
6       A.    Counsel.
7       Q.    Which one?
8       A.    I'm sorry, I don't know which one of
9   plaintiff's counsel.
10      Q.    Which one told you?
11      A.    I think it was Mr. Collins.
12            There had been other contact that it
13  might have been the middle of August with another
14  person with some role, I believe, at Fairchild
15  Publications, not positive of that but I think that's
16  right, but the weight of that information seemed to go
17  to the middle of July and our general experience about
18  magazine release dates, and I think most people's, is
19  that they come out before the cover date, not after.
20      Q.    Do you have any actual evidence that
21  it came out in the middle of July?
22            MR. LEWIS: Objection to the form.
23  BY MR. BESSETTE:
24      Q.    That's a yes or no. Do you have any
25  evidence that it came out in the middle of July?

Page 127

1             MR. LEWIS: Same objection.
2             THE WITNESS: I'm not sure what you
3       mean by evidence because in my view if you
4       analyze the text, it looks to be likely that
5       it came out earlier than that, that is, in
6       July as opposed to in August, and we looked
7       at the text pretty closely for that and we
8       looked at the text of an article that
9       appeared in the September issue of Golf Pro,
10      and it appeared as though that most likely
11      was written to come out in August.
12            Having said all that, I am certainly
13      not certain of that distribution date.
14  BY MR. BESSETTE:
15      Q.    What text are you referring to?
16      A.    I'd have to try to go through this
17  and pick it all out, but if there's some reference in
18  here that indicates it was written before the IPO,
19  which occurred around the beginning of January.
20            MR. LEWIS: You said January.
21            THE WITNESS: July, I'm sorry.
22      Thanks.
23  BY MR. BESSETTE:
24      Q.    I'd like to at least see what text
25  you're talking about that leads you to the conclusion

Page 128

1   that it's likely it came out in mid July.
2       A.    This may take a while because I did
3   this a while ago, but I'll go through it and see if I
4   can find it.
5       Q.    Let's do it on the lunch break.
6       A.    That's fine with me.
7       Q.    The information about Tight Lies
8   showing up in Costco, prompting a lawsuit, I think you
9   said that was old information but also -- you started
10  to go through some explanation about how it was messy
11  as well. I'm not sure I understand. Is that
12  information, whether it came out in July or on the
13  publish date, is that old or new information?
14            MR. LEWIS: Objection to form.
15            THE WITNESS: I think what I said
16      about that is that although it's technically
17      old information in the sense that it refers
18      to information that it occurred previously,
19      that is, the lawsuit and the fact of the
20      clubs showing up in Costco, but that it's not
21      of the clean, simple national impact type of
22      information we had discussed earlier when you
23      asked me a general question about this sort
24      of thing, which came out on Monday, repeated
25      on Wednesday, would likely not have an effect

Page 129

1       on Wednesday.
2             This is in the category, to me, of
3       messier information, that is, in a trade
4       publication, to my understanding distributed
5       primarily to the trade, and following an
6       earlier disclosure of the information in the
7       form of a press release into a market in
8       which there was no publicly traded stock for
9       market participants to follow.
10  BY MR. BESSETTE:
11      Q.    Do you think that information as
12  conveyed in this article is material?
13            MR. LEWIS: Objection to form,
14      foundation.
15            THE WITNESS: Yes.
16  BY MR. BESSETTE:
17      Q.    How do you determine that?
18      A.    I think that taking the paragraph
19  you focused on, the use of the words join the
20  ig);ominious ranks of the big boys would suggest that
21  for a small growth company to join the ranks of the
22  big boys would be an important event. The ig;ominious
23  suggests potentially important just by the use of the
24  word. The fact that Tight Lies started showing up in
25  Costco, I think would be important for the reasons we

Page 130

1 discussed earlier. Prompting the lawsuit, in an
2 article, typically implies importance because I think
3 most market participants suspect that most lawsuits
4 are not filed over unimportant matters.
5        The next sentences, I think,
6 emphasize that it's important to Adams because they're
7 trying to find out how Costco is getting the club, so
8 why are they going to that effort if it's not
9 important to them, and then the second aim is to prove
10 to traditional retailers that Adams will not sit
11 around and take it, even if it's an 800-pound gorilla
12 that's dishing it out, would imply that it's important
13 enough to fight an 800-pound gorilla to get the
14 information and show the traditional retailers, as
15 Adams says here, that they're making the effort. I
16 think all the language in there suggests an item
17 that's important to the company.
18      Q.    Is that how you test materiality;
19 you look at something like that and apply your
20 experience and look at it and say it looks like to me
21 it's important to the company by the language they
22 use, so it must be important and therefore it must be
23 material?
24          MR. LEWIS: Objection to the form;
25      misstates his testimony. Asked and answered.

Page 131

1 BY MR. BESSETTE:
2      Q.    Is that how you test materiality?
3      A.    No, I test materiality the way we've
4 discussed at some length this morning, beginning with
5 the context of the expected effect on future earnings
6 and cash flows or the risks to future earnings and
7 cash flows and the likely impact on the security value
8 as a result, so I don't think there's any question
9 that the investment community believes that the most
10 important source of information about a company's
11 likely future earnings and cash flows is the company
12 itself, and the most knowledgeable people about that
13 are typically the company's management, so that any
14 information that they believe to be important in that
15 context are as likely to be important to the
16 investment community for that reason and I think that
17 underlies why this sort of information would be viewed
18 as important by the investment community because it
19 would be in that context.
20      Q.    How did you determine whether that
21 piece of information was material, if you did?
22          MR. LEWIS: Objection to form;
23      objection to foundation, vague and ambiguous.
24      You just asked him to make that determination
25      now and he did. You're not making it clear

Page 132

1        when and whether --
2 BY MR. BESSETTE:
3      Q.    Did you make a determination as part
4 of your work that that information was material to
5 investors?
6      A.    Yes, we made a determination that
7 after reading the entire contents of this article,
8 that that information would be of the type that would
9 be important to reasonable investors.
10      Q.    How did you test -- strike that.
11        What test did you employ to
12 determine that this piece of information in this
13 article was material to investors in your opinion?
14          MR. LEWIS: Objection to form and
15      foundation.
16        THE WITNESS: I'm trying to recall
17      whether I had already made that determination
18      when I read this article. I think that's
19      likely. If I go back to how I came across
20      this and how I did that, I believe that this
21      was not the first piece of information I read
22      in this case, and by the time I got to this,
23      I had already determined that the issue of
24      gray marketing itself was an important one
25      and likely to be material to investors.

Page 133

1        Reading this and given the
2 chronology of what information had been made
3 available to the investment community so far
4 in time prior to this, I didn't see any
5 reason to change that opinion with respect to
6 the gray marketing issue, and as to this
7 specific information, I think I've told you
8 why it would be important in the last couple
9 questions and answers we went through.
10 BY MR. BESSETTE:
11      Q.    Since you don't know exactly when it
12 came into the marketplace, this information, did you
13 perform any tests of the stock price to determine
14 whether stock price movements were related to this
15 piece of information?
16      A.    You really can't if you don't know
17 when it hit the market. You can observe the market
18 data as we've discussed over periods of time when you
19 think it may have reached market participants to see
20 what you think about that, but as I said, you can't --
21 we can't or I couldn't establish with any certainty
22 what the release date would have been. I certainly
23 can't constrain an event window very well based on
24 that because it appears as though, from what I can
25 find out, that it was a trade-type publication that

R. ALAN MILLER

Page 134

1  very likely arrived at different people's places of
2  business at different times, that is, over a period of
3  at least several days, if not a couple of weeks.
4          Once it arrives there and is picked
5  up and read by different people, if it sits around
6  golf pro shops, for example, its impact on the readers
7  may well spread further than the length of time it
8  takes for it to get to the various participants, so
9  even if you knew what date it started to be mailed on,
10  you'd have to take an event window approach to this
11  that is much more than a day or two and try to
12  determine what effect that might have.
13          It also appeared to coincide with
14  the known dates of Costco purchase orders and sales at
15  Costco from other data that we looked at, all of which
16  tended to center around the middle of July, so we
17  looked at it in that context but, no, we could not
18  identify specific dates to measure, and any
19  measurement without knowledge of the specific dates is
20  meaningless.
21      Q.     The information in the Golf Pro
22  article is old information that you believe affected Adams Golf stock price?
23  that you believe affected Adams Golf stock price?
24          MR. LEWIS: Objection to form,
25      foundation; mischaracterizes his testimony.

Page 135

1  BY MR. BESSETTE:
2      Q.     Do I have that right?
3      A.     No, I can't say the end of that
4  sentence with any certainty; I can't say I believe it
5  affected the price on certain days in certain amounts
6  or anything like that. It appears likely that it was
7  a piece of information in the marketplace of
8  interested golf people, probably about the middle of
9  July, consistent with the time frame of Costco
10  purchase orders and Costco sales. I'd refer you back
11  to the last couple answers on this. That's all I can
12  say.
13      Q.     A couple more questions, then we'll
14  take a lunch break.
15          Turn to your rebuttal report,
16  Exhibit-335, the Exhibit B that we looked at.
17      A.     Right.
18      Q.     If you go to Page 61 of 92, that
19  date is August 3, 1998, the date I want you to look
20  at, at the bottom.
21      A.     Okay.
22      Q.     Actually, go to August 1.
23      A.     Right.
24      Q.     Go across to the news item, second
25  one down, GP, Barney Adams -- Barney's Army. GP, is

Page 136

1  that Golf Pro?
2      A.     Yeah.
3      Q.     Why are you dating the Golf Pro
4  article August 1?
5      A.     Because the convention that we
6  sometimes follow, although we're trying to fix this as
7  we go along wherever we can, is to put magazines with
8  cover dates of a month on the first day of the month
9  in which the cover date is. What we've begun doing
10  when we think to do it is to put an undated category
11  for the month at the beginning of the month to show
12  stuff that doesn't have a known publication date on
13  it, but we didn't do that here. It's a tough thing to
14  do when you're putting it in this kind of a display
15  because you don't want to imply something from putting
16  it there that you can't, but it ended up there for
17  that reason.
18      Q.     The first trading day after August 1
19  is August 3, which is the last day you show on Page 61
20  of Exhibit B?
21      A.     Right.
22      Q.     That volume of 251,400, is that
23  above or below the normal volume you say you
24  calculated for Adams Golf during the class period?
25          MR. LEWIS: Objection to form.

Page 137

1          THE WITNESS: As I sit here, I don't
2      remember exactly. I think it's slightly
3      above but I don't recall exactly.
4  BY MR. BESSETTE:
5      Q.     As part of your work in looking at
6  the volume, did you have a normal volume that you
7  calculated and then looked at deviations from that on
8  any given day?
9          MR. LEWIS: Object to the form.
10          THE WITNESS: Yeah, we did. We have
11      sort of a normal volume and we looked at each
12      day's data with that normal volume in mind,
13      so yeah.
14          We also, just for completeness
15      because it may come up at some other point,
16      we do something that looks more quantitative
17      than that in our market simulation
18      methodology for aggregation of damages. I'm
19      not referring to that and I don't think you
20      were referring to that, so if that comes up
21      later, it's not part of this discussion.
22  BY MR. BESSETTE:
23      Q.     Would you, at the lunch break, find
24  any reference that you can or tell me, check your
25  office, but what is the normal volume that you

35 (Pages 134 to 137)

R. ALAN MILLER

Page 258

1    Q.    You don't believe there was a
2  reasonable investigation by the underwriters?
3    A.    Right. I don't believe there was
4  one and I don't believe the defendants have
5  established that there was one. Maybe I should do
6  that in reverse order. I don't believe -- perhaps
7  more importantly, I don't believe defendants have
8  established they performed such an investigation.
9  From what I have seen, I also believe they have not
10 performed such investigation.
11   Q.    The first point that you just made,
12 which is your point that in your view the underwriters
13 have not established that they conducted a reasonable
14 investigation, as we'll see, that opinion is in your
15 rebuttal report, correct?
16   A.    Right.
17   Q.    The other opinion that you just
18 articulated, which is that you have an opinion that,
19 in fact, the underwriters did not conduct a reasonable
20 investigation, show me where that is in any of your
21 reports in this case.
22   A.    I don't know that I've stated that
23 that way prior to this discussion here.
24   Q.    In fact, you haven't, correct?
25   A.    I don't recall whether I did or not.

Page 259

1    Q.    Take a look at your opening report
2  and your rebuttal report, and if you can find it, show
3  me where it is.
4        MR. LEWIS: Did you have something
5        else to say?
6        THE WITNESS: Yeah. I think in
7        connection with the discussion we've been
8        having is why this arose; that is, you asked
9        these questions and I'm answering them. You
10       asked if I had an opinion about that and I
11       gave it to you.
12       My understanding is the way this
13       works is that the defendants are afforded the
14       opportunity to establish such a defense, and
15       in my view, they have not done so, and that,
16       from a legal perspective, may be where it
17       ends. That's the area in which I was asked
18       to opine and that's the area about which I
19       have opined.
20       In the course of our conversation,
21       then, I believe you asked me if I had an
22       opinion about that and I said I do, but
23       whether or not I offer that is a matter of
24       what counsel decides to pursue.
25 BY MR. GLUCKOW:

Page 260

1    Q.    Have you been asked to form an
2  opinion on that question, that question being whether
3  in your opinion the underwriters conducted a
4  reasonable investigation?
5    A.    I don't think I've been specifically
6  asked so far to form that opinion. I think I've been
7  asked to address the issue of whether the defendants
8  established that. In the course of reviewing the
9  materials that I've reviewed, based on what I've seen
10 to date and as part of my work in determining whether
11 the defendants have met their burden in that regard, I
12 have formed an opinion about that but, again, I don't
13 know if I will be asked about that and have not
14 discussed that in that sense with counsel.
15   Q.    What's your current understanding
16 regarding whether you intend to offer an opinion at
17 trial concerning whether the underwriters conducted a
18 reasonable due diligence investigation?
19       MR. LEWIS: Objection, asked and
20       answered.
21       THE WITNESS: I don't have a current
22       understanding as to whether I will be asked
23       that or not. What I've been asked so far is
24       do I believe the defendants have established
25       that they conducted such an investigation.

Page 261

1        It's -- I don't know whether I would be asked
2        to go to the next step of your question and
3        determine whether I have an opinion on
4        whether the due diligence investigation was
5        adequate or not.
6  BY MR. GLUCKOW:
7    Q.    Just to be clear, you agree with me
8  that in your two written opinions to date, you have
9  not offered an opinion on that latter question,
10 namely, whether in your opinion the underwriters
11 conducted a reasonable due diligence investigation,
12 correct?
13       MR. LEWIS: Objection to form; the
14       documents speak for themselves.
15       THE WITNESS: I think that's
16       correct, but I'll be glad to check them and
17       see if I did say that or not.
18 BY MR. GLUCKOW:
19   Q.    Only if you feel the need to. I'm
20 quite sure you have not given that opinion, but if you
21 want to be comfortable with that, please take your
22 time to do so.
23   A.    No, in the way we've been
24 discussing, I have not offered that so far.
25   Q.    Thank you.

66 (Pages 258 to 261)