# EXHIBIT B

```
 1         IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF DELAWARE
 3                        - - -
 4   IN RE: ADAMS GOLF, INC.    :
 5   SECURITIES LITIGATION      :
 6
                                X
 7
                    ORAL DEPOSITION
 8
                          OF
 9
                  CHRISTOPHER M. JAMES
10
                 Friday, August 11, 2006
11
                        - - -
12
         Oral deposition of CHRISTOPHER M.
13
   JAMES, held at the offices of AKIN GUMP
14
   STRAUSS HAUER & FELD, LLP, 590 Madison Avenue,
15
   New York, New York, commencing at 8:30 a.m.,
16
   reported by Pamela Harrison, RMR, CRR, CSR and
17
   Notary Public.
18
                        - - -
19
20
21
22
         RSA/VERITEXT COURT REPORTING COMPANY
23          1845 Walnut Street, 15th Floor
               Philadelphia, PA  19103
24        (215) 241-1000    (888) 777-6690
```

Page 2

1  APPEARANCES:
2
3  TODD S. COLLINS, ESQUIRE
   and ELIZABETH W. FOX, ESQUIRE
4  BERGER & MONTAGUE, P.C.
   1622 Locust Street
5  Philadelphia, Pennsylvania 19103-6305
   215.875.3000
6  tcollins@bm.net
   efox@bm.net
7  For the Plaintiff
8
9
   MICHELLE A. REED, ESQUIRE
10 AKIN GUMP STRAUSS HAUER & FELD, LLP
   300 West 6th Street
11 Suite 2100
   Austin, Texas 78701-3911
12 512.499.6200
   mreed@akingump.com
13 For the Adams Golf Defendants
14
15
   THOEDORE J. McEVOY, ESQUIRE
16 SIMPSON THACHER & BARTLETT, LLP
   425 Lexington Avenue
17 New York, New York 10017-3954
   212-455-2831
18 tmcevoy@stblaw.com
   rkane@stblaw.com
19 For the Underwriter Defendants
20
21
22
23
24

Page 4

1  DEPOSITION SUPPORT INDEX
2
3  Direction to Witness Not to Answer:
4  Page Line
5  (NONE)
6
7
8  Request for Production of Documents:
9  Page Line
10 103/6
11 121/4
12
13
14 Stipulations:
15 Page Line
16 (NONE)
17
18
19 Questions Marked:
20 Page Line
21 (NONE)
22
23
24

Page 3

1  EXAMINATION INDEX
2
   CHRISTOPHER M. JAMES
3
     BY MR. COLLINS . . . . . . . . . . 5
4
5
6
            EXHIBIT INDEX
7
                 PAGE
8
   ** 335              Rebuttal Expert Report
   of R. Alan     **87
9    Miller with attachments
10 336  Expert Report of Christopher M. James  5
      with attachments
11
   337  Rebuttal Expert Report of Christopher  5
12     M. James
13 338  E-mail from Terpsma to James, 8/3/06;   5
      e-mail from Phillips to Goodman
14    8/2/06, Bates stamped CMJ 0562
15 339  Graph analysis, Bates stamped CMJ 0560  5
16 340  Analysis of Peer Performance Around    5
      July Purchase Order Dates, Bates
17    stamped CMJ 0561
18 341  Adams Golf, Inc., Integrated           5
      Chronology, Bates stamped CMJ 0563
19
   342  Memorandum to Collins from Reed dated  72
20    7/20/06 with attachments
21
22
23
24

Page 5

1   (Whereupon, documents were                08:51:07a
2   premarked, for identification purposes,   08:51:07a
3   as Exhibits 336 through 341.)             08:51:07a
4       THE COURT REPORTER: Are there         09:02:05a
5   any stipulations today?                   09:02:05a
6       MS. REED: No, there are not.          09:02:08a
7       THE COURT REPORTER: Are you           09:02:19a
8   having him read and sign?                 09:02:19a
9       MS. REED: Yes. Sorry.                 09:02:22a
10      ---                                   09:02:23a
11      CHRISTOPHER M. JAMES, after           09:02:23a
12  having been duly affirmed, was examined   09:02:23a
13  and testified as follows:                 09:02:23a
14      ---                                   09:02:34a
15      E X A M I N A T I O N                 09:02:34a
16      ---                                   09:02:34a
17  BY MR. COLLINS:                           09:02:34a
18      Q.  Dr. James, thank you very much    09:02:34a
19  for coming.                               09:02:36a
20      A.  My pleasure.                      09:02:38a
21      Q.  Michelle had sent me an e-mail    09:02:41a
22  last night, which I couldn't open, and when I  09:02:43a
23  walked in this morning, I see she was good    09:02:46a
24  enough to give an extra copy of what she     09:02:49a

Page 90

1  Q. Adams declined some, and the S&P  11:19:10a
2  small cap and Callaway declined more -- is that  11:19:14a
3  right so far? -- on or about July 23rd.  11:19:20a
4  A. If you said Callaway and the  11:19:23a
5  peer group?  11:19:26a
6  Q. Yes.  11:19:27a
7  A. I think you may have said --  11:19:27a
8  Q. You know what, let me start  11:19:29a
9  again. You are quite right.  11:19:30a
10  Am I reading this correctly  11:19:31a
11  that on July 23rd both Callaway and the peer  11:19:33a
12  group went down sharply and roughly in tandem?  11:19:36a
13  A. Yes. I think if you go to the  11:19:42a
14  next exhibit, it might be easier.  11:19:45a
15  Q. Okay.  11:19:49a
16  A. 340.  11:19:49a
17  Q. Okay.  11:19:50a
18  A. Which has the dates and the  11:19:51a
19  price decline. So on 7/23/1998, Adams is down  11:19:57a
20  13 percent -- about roughly 13 percent; Callaway  11:20:05a
21  is down 33 percent; and Miller's peer group is  11:20:08a
22  down 28.2 percent.  11:20:12a
23  Q. I see.  11:20:14a
24  Now, Miller's peer group, do  11:20:19a

Page 91

1  you know whether it included Callaway?  11:20:22a
2  A. It did.  11:20:23a
3  Q. And was the peer group -- the  11:20:24a
4  peer group was comprised of how many companies?  11:20:26a
5  A. I believe it was -- it consisted  11:20:37a
6  of Callaway, Teardrop, Aldila --  11:20:42a
7  THE COURT REPORTER: Callaway,  11:20:54a
8  comma Teardrop?  11:20:54a
9  THE WITNESS: It might help,  11:20:54a
10  it's on the top line on the first page of  11:20:54a
11  Mr. Miller's report.  11:21:02a
12  BY MR. COLLINS:  11:21:04a
13  Q. Okay.  11:21:04a
14  A. I can read these off, but it may  11:21:04a
15  be helpful for the court reporter just to look  11:21:08a
16  at them.  11:21:10a
17  It would be Callaway, Teardrop,  11:21:10a
18  Aldila, Coastcast, Arnold Palmer, and Golden  11:21:14a
19  Bear.  11:21:18a
20  Q. Now, as you used the peer group  11:21:27a
21  on Exhibits 339 and 340, was it a weighted group  11:21:41a
22  or was it unweighted, based on the size or the  11:21:51a
23  market caps or some other characteristics of the  11:22:01a
24  companies making up the peer group?  11:22:06a

Page 92

1  A. I used the peer group return as  11:22:08a
2  reported by Mr. Miller in his rebuttal report.  11:22:13a
3  My recollection is I could come  11:22:18a
4  close but not exactly match the peer returns  11:22:21a
5  by taking the -- the peer group return by  11:22:26a
6  taking a value weighted average of the  11:22:31a
7  individuals within the group.  11:22:37a
8  Q. What do you mean by "value  11:22:39a
9  weighted average"?  11:22:42a
10  A. I was responding to the question  11:22:43a
11  you just asked, was it a value weighted average  11:22:44a
12  or an equally weighted average of the returns.  11:22:49a
13  I can come close to, if I use  11:22:54a
14  value weights, come close to the returns that  11:22:56a
15  he had.  11:22:57a
16  Q. That's fine. And I'm just  11:22:58a
17  asking you what you did in using the value  11:23:00a
18  weights, what process did you go through and  11:23:01a
19  what specifically, specifically what value did  11:23:03a
20  you weight.  11:23:07a
21  A. The market value of the common  11:23:09a
22  stock.  11:23:12a
23  THE WITNESS: And I apologize,  11:23:20a
24  but I need to take a short break.  11:23:20a

Page 93

1  MR. COLLINS: Off the record.  11:23:24a
2  (A recess was had from  11:33:46a
3  11:23 a.m. to 11:33 a.m.; and then the  11:33:46a
4  proceedings continued as follows:)  11:33:46a
5  BY MR. COLLINS:  11:33:46a
6  Q. Exhibit 339.  11:33:46a
7  A. Okay.  11:33:48a
8  Q. Why did you do this just for the  11:33:49a
9  month of July?  11:33:56a
10  A. Because Mr. Miller indicated in  11:33:59a
11  his rebuttal report that it is his conjecture  11:34:05a
12  that the price decline, particularly in the  11:34:11a
13  latter part of July, was attributable to, I  11:34:15a
14  think he refers to it as leakage regarding gray  11:34:20a
15  market activities.  11:34:26a
16  Q. Is there something about Exhibit  11:34:27a
17  339 or Exhibit 340 that leads you to question  11:34:28a
18  that conclusion on his part?  11:34:33a
19  A. I think that -- yes, I think  11:34:35a
20  that this analysis demonstrates, using his data,  11:34:41a
21  that the decline in Adams Golf during this  11:34:43a
22  period of time was certainly in line with the  11:34:51a
23  decline experienced by its -- the firms  11:34:55a
24  identified by Mr. Miller as being peers to Adams  11:35:01a

Page 94

1  Golf, and that consistent with the discussion in            11:35:07a
2  my report, the decline appears to be a result               11:35:18a
3  principally of softness in the golf industry as             11:35:25a
4  reflected by the earnings miss and discussion of            11:35:29a
5  difficulties in the market that Callaway                    11:35:36a
6  disclosed, and then the peer group -- I think               11:35:44a
7  Coastcast has a news article during that same               11:35:48a
8  period of time indicating same weakness in                  11:35:53a
9  product demand, which I think is consistent with            11:36:00a
10 the announcement of Callaway, since Coastcast is            11:36:06a
11 a major supplier to Callaway.                               11:36:09a
12     Q.  Did you undertake -- the                            11:36:15a
13 analysis of these various stock prices, did you             11:36:20a
14 do any work taking it out beyond July 31st?                 11:36:25a
15     A.  No. I -- you mean --                                11:36:33a
16     Q.  Did you run the chart beyond                        11:36:37a
17 July 31st?                                                  11:36:39a
18     A.  No, I just focused on the dates                     11:36:41a
19 in -- the dates that he identified as being                 11:36:43a
20 associated with price declines in late July that            11:36:53a
21 he contends may be associated with information              11:36:59a
22 disclosures regarding -- or leakage of                      11:37:03a
23 information regarding, say, purchase orders by              11:37:07a
24 Costco.                                                     11:37:10a

Page 95

1      Q.  And in that regard you are                          11:37:16a
2  referring to the information he has -- perhaps              11:37:17a
3  other places as well, but you are referring to              11:37:21a
4  the information he has in Paragraph 22(A) of his            11:37:23a
5  rebuttal report?                                            11:37:26a
6      A.  22(A), yes.                                         11:37:28a
7      Q.  Now, how long ago did you                           11:37:39a
8  prepare exhibits or did you create the documents            11:37:41a
9  that are now 339 and 340?                                   11:37:43a
10     A.  Within the last week.                               11:37:49a
11     Q.  Did counsel ask you to do so?                       11:37:55a
12     A.  No.                                                 11:37:58a
13     Q.  Did you tell counsel you were                       11:37:58a
14 doing this?                                                 11:38:00a
15     A.  Yes.                                                11:38:00a
16     Q.  Did you run any other charts                        11:38:10a
17 beyond 339 either within the last week or since             11:38:13a
18 the rebuttal report?                                        11:38:18a
19     A.  I don't believe so. I don't                         11:38:24a
20 recall doing any.                                           11:38:26a
21     Q.  And did you undertake an                            11:38:28a
22 analysis of peer performance with respect to                11:38:30a
23 August or September?                                        11:38:35a
24     A.  No, my focus was only on late --                    11:38:39a

Page 96

1  late July, is the period that he focuses in on              11:38:45a
2  his report.                                                 11:38:49a
3        Just to add that he -- and the                        11:38:51a
4  other reason is that he has a chart, I believe              11:38:55a
5  it's -- if you don't mind, I'll take it off.                11:39:00a
6        (The witness takes the clip off                       11:39:08a
7  the document.)                                              11:39:10a
8  BY MR. COLLINS:                                             11:39:10a
9      Q.  Please.                                             11:39:10a
10     A.  That is a -- that has a somewhat                    11:39:15a
11 different pegging in the sense that it's pegged             11:39:23a
12 to 1. It's his Exhibit A. It's entitled ADGO                11:39:28a
13 versus XLC(4), Adams Golf versus Comparable                 11:39:35a
14 Index. He carries it out to -- 12/23/1999 is                11:39:43a
15 the last date.                                              11:39:55a
16     Q.  You are referring to the page                       11:39:57a
17 immediately after the page that says Exhibit A,             11:40:01a
18 or are you referring to a later?                            11:40:07a
19        Which chart are you referring                        11:40:17a
20 to, please?                                                 11:40:18a
21     A.  I know this is -- it doesn't                        11:40:24a
22 make the record look particularly good because              11:40:26a
23 I'm holding something up, but it is this chart              11:40:30a
24 (indicating), and I believe you are looking at              11:40:34a

Page 97

1  it.                                                         11:40:36a
2        MS. FOX: Let me just check                            11:40:37a
3  that. I'll come around and see whether                      11:40:39a
4  it's the same.                                              11:40:42a
5        THE WITNESS: Just so you are                          11:40:45a
6  clear, there appears to be two charts                       11:40:46a
7  in his Exhibit A. One is -- it looks                        11:40:48a
8  like they are the same chart. One is                        11:41:00a
9  simply, in my version, a smaller                            11:41:03a
10 version of the other.                                       11:41:06a
11 BY MR. COLLINS:                                             11:41:09a
12     Q.  Okay. Well, the chart --                            11:41:09a
13     A.  This you can identify --                            11:41:23a
14     Q.  Not a problem.                                      11:41:24a
15     A.  Okay.                                               11:41:26a
16     Q.  Do you see the page that says on                    11:41:26a
17 it Exhibit A? It's probably in your left hand.              11:41:28a
18     A.  Yeah, the problem I'm having is                     11:41:35a
19 that there are a number of pages that say                   11:41:37a
20 Exhibit A on it. Okay? Maybe we can make this               11:41:40a
21 easier.                                                     11:41:43a
22        This is Exhibit A (indicating),                      11:41:44a
23 it only has Exhibit A on it. Then there is a                11:41:46a
24 page that follows it which is a --                          11:41:50a

Page 98

1           MS. FOX: Comparables?                     11:41:57a
2           THE WITNESS: Comparables. But             11:41:58a
3     it's not pegged to 1. It has -- it's            11:42:00a
4     not -- the individual series are not            11:42:05a
5     pegged to a particular number.                  11:42:11a
6   BY MR. COLLINS:                                   11:42:13a
7      Q.   Okay.                                     11:42:13a
8      A.   Okay?                                     11:42:14a
9           That's followed by a smaller              11:42:17a
10    version of the same chart and then data.        11:42:18a
11    Okay?                                           11:42:22a
12     Q.   Okay. I'm with you now.                   11:42:22a
13     A.   Then following that is another            11:42:24a
14    colored chart in my version that is referred to 11:42:30a
15    as Exhibit A and it says Adams Golf versus      11:42:35a
16    Comparables indexed to 1 at 7/10/98. So it's    11:42:40a
17    similar to the chart that I prepared where there 11:42:46a
18    is -- it's pegged at a particular point in      11:42:48a
19    time. He's pegging to 1. I pegged to 16.        11:42:52a
20     Q.   Just so we are clear, the last            11:42:58a
21    document that you referred to is a chart that   11:43:01a
22    says "Exhibit A" on it and it follows a page    11:43:06a
23    which gives information on the last line,       11:43:13a
24    "19991231," for Adams and the small cap index,  11:43:24a

Page 99

1    Callaway, Teardrop, Aldila, and Coastcast?       11:43:33a
2      A.   Yes, but what will be                     11:43:35a
3    distinguishable from the other chart that has    11:43:38a
4    similar information is that it should say up at  11:43:41a
5    the top Adams Golf, Inc., indexed to 1 on        11:43:43a
6    7/9/98, and then there are three asterisks.      11:43:47a
7      Q.   Okay. Great.                              11:43:51a
8           Now, so I now know what                   11:43:53a
9    document you are referring to and I thank you.   11:43:58a
10          Do I understand that this chart           11:44:00a
11   that we are now referring to, which says         11:44:05a
12   indexed to 1, motivated you to prepare Exhibit   11:44:08a
13   339 and 340?                                     11:44:17a
14     A.   What -- not the chart -- not              11:44:21a
15   necessarily the chart itself, but the discussion 11:44:24a
16   in Mr. Miller's report regarding what he         11:44:30a
17   conjectures to be leakage regarding gray         11:44:47a
18   marketing activity, particularly in the mid to   11:44:53a
19   late part of July. I believe he mentions that    11:44:57a
20   in his first report, and then he expands on it   11:45:02a
21   in the current report by contending, as in       11:45:08a
22   Paragraph 22: "In fact, information concerning   11:45:14a
23   gray marketing activity which existed in the     11:45:17a
24   marketplace was available to various parties     11:45:20a

Page 100

1    including the following."                        11:45:22a
2           That's on Paragraph 22 of his             11:45:27a
3    report.                                          11:45:28a
4      Q.   Okay. You are quite right.                11:45:29a
5           Now, if I understand correctly,           11:45:31a
6    Exhibits 339 and 340 include in the Miller's    11:45:39a
7    peer group Teardrop, Aldila, Coastcast, and     11:45:46a
8    Callaway --                                      11:45:54a
9      A.   Right.                                    11:45:56a
10     Q.   -- together with Arnold Palmer            11:45:56a
11   and Golden Bear.                                 11:45:59a
12     A.   That is my understanding.                 11:46:00a
13     Q.   Okay.                                     11:46:01a
14          And it's your understanding               11:46:02a
15   that the Miller's peer group included Arnold     11:46:03a
16   Palmer and Golden Bear?                          11:46:08a
17     A.   I would have to go back and               11:46:10a
18   check that.                                      11:46:12a
19     Q.   Well, it is what it is. You are           11:46:22a
20   not responsible for what he included in Miller's 11:46:24a
21   peer group, I'm just asking what you included in 11:46:29a
22   yours. So let me just ask you.                   11:46:31a
23          In 339 and 340 you included in            11:46:33a
24   what you referred to as Miller's peer group or   11:46:37a

Page 101

1    Miller peer group, you include Arnold Palmer     11:46:41a
2    and Golden Bear; correct?                        11:46:44a
3      A.   No, I think it would be                   11:46:47a
4    incorrect to refer to that as my peer group. My  11:46:48a
5    recollection is that --                          11:46:51a
6      Q.   Let me stop you. Yeah, let me             11:46:52a
7    stop you because I didn't mean to mislead you on 11:46:54a
8    the question.                                    11:46:57a
9           There is a reference on 339 to            11:46:57a
10   Miller's peer group, and then there's a line     11:46:59a
11   that runs across this page, not that I as a      11:47:02a
12   color-blind person can read it, but there's a    11:47:05a
13   line that runs across this page for peer         11:47:08a
14   group.                                           11:47:11a
15     A.   That is Mr. Miller's peer                 11:47:14a
16   group.                                           11:47:16a
17     Q.   Okay. Does that peer group                11:47:16a
18   include or exclude, as set forth on 339, Arnold  11:47:18a
19   Palmer and Golden Bear?                          11:47:23a
20     A.   My recollection is that the peer          11:47:26a
21   group returns that were used in constructing 339 11:47:28a
22   and 340 are the returns as reported in           11:47:36a
23   Mr. Miller's report.                             11:47:43a
24     Q.   You and I can argue about a               11:47:44a

Page 114

```
 1  stock returns.                                    12:06:49p
 2     Q.  Now, you used an event window or           12:06:50p
 3  event windows in this work; correct?              12:06:53p
 4     A.  Yes.                                       12:06:59p
 5     Q.  And the event window you used,             12:07:00p
 6  for all aspects of your work here, was one day?   12:07:01p
 7     A.  No.                                        12:07:08p
 8     Q.  Okay. You used, at least in                12:07:09p
 9  some parts of your work, a one-day event window;  12:07:14p
10  is that --                                        12:07:18p
11     A.  That is correct.                           12:07:18p
12     Q.  Okay. In what part of your work            12:07:19p
13  did you use a one-day event window?               12:07:24p
14     A.  As is indicated in my report,              12:07:26p
15  when I was able to identify when a piece of       12:07:36p
16  information was either published or became        12:07:42p
17  available to market participants, I utilized --   12:07:46p
18  I used the day on which that information was      12:07:53p
19  first available during trading hours.             12:07:55p
20     Q.  Okay.                                      12:07:58p
21     A.  Now, on -- the one I remember in           12:07:59p
22  particular was the April -- I'm sorry, the April  12:08:07p
23  -- the August 28th Lehman Brothers report. It     12:08:09p
24  has a date on it, but not a time stamp, so then   12:08:15p
```

Page 115

```
 1  the question becomes is it a -- was it available  12:08:19p
 2  to market participants during trading hours.      12:08:26p
 3  And, as I indicate in my report, I look at both   12:08:33p
 4  the 28th and the 31st and see whether either one  12:08:37p
 5  of those days is statistically significant.       12:08:41p
 6  Now --                                            12:08:43p
 7     Q.  Can I stop you? Forgive me.                12:08:46p
 8         With regard to that, when you              12:08:48p
 9  did that work regarding the Lehman report and     12:08:49p
10  you looked at the 28th and you looked at the      12:08:52p
11  31st, you looked at each on a one-day event       12:08:54p
12  window basis; correct?                            12:08:57p
13     A.  And I also calculated the                  12:08:59p
14  statistical significance on a two-day basis.      12:09:04p
15     Q.  Okay. With respect to Lehman,              12:09:07p
16  that Lehman August 28th report?                   12:09:12p
17     A.  Yes.                                       12:09:14p
18     Q.  All right. And why with regard             12:09:20p
19  to the Lehman report did you use a two-day event  12:09:23p
20  window?                                           12:09:26p
21     A.  Well, I think it would be a mis            12:09:28p
22  -- it would be a mischaracterization to say that  12:09:31p
23  -- I investigated a two-day event window to       12:09:37p
24  determine whether the conclusions that I was      12:09:40p
```

Page 116

```
 1  reaching regarding the materiality of that        12:09:41p
 2  information would be changed if I used a broader  12:09:44p
 3  window than one day.                              12:09:51p
 4     Q.  Okay. How did you investigate?             12:09:56p
 5     A.  In the manner that I just                  12:09:59p
 6  described, that I looked at each day              12:10:00p
 7  individually in the combination of those two      12:10:02p
 8  days.                                             12:10:06p
 9         In addition, even though the               12:10:06p
10  Lehman report has no time stamp on it, I          12:10:10p
11  believe, both in reading Mr. Lantier's            12:10:14p
12  deposition, and it's my understanding, having     12:10:18p
13  worked with buy and sell side analysts, that      12:10:21p
14  typically the written report will be disclosed    12:10:25p
15  to market participants and the content would      12:10:33p
16  be disclosed to the market participants in the    12:10:36p
17  day -- on the day on which the report is          12:10:39p
18  dated, during trading hours, or before the        12:10:42p
19  start of trading on the day that it is dated.     12:10:51p
20         Consistent with that, I also               12:10:51p
21  looked at what the closing price was referred     12:10:52p
22  to in the August 28th report for Adams Golf to    12:10:55p
23  determine whether the closing price pertained     12:11:01p
24  to the 28th or the day before, and it             12:11:04p
```

Page 117

```
 1  pertained to the day before, which is             12:11:10p
 2  consistent with the report being published on     12:11:13p
 3  the 28th.                                         12:11:16p
 4     Q.  I asked you a question a moment            12:11:19p
 5  ago about what you did to investigate a two-day   12:11:22p
 6  event window and you said you already answered    12:11:26p
 7  that.                                             12:11:28p
 8     A.  Yes.                                       12:11:29p
 9     Q.  Tell me, again, what you did to            12:11:29p
10  investigate a two-day event window consisting of  12:11:32p
11  the 28th and the 31st. Did you run regressions    12:11:37p
12  on it?                                            12:11:41p
13     A.  I aggregated the abnormal                  12:11:44p
14  returns or the residual returns.                  12:11:46p
15     Q.  Okay.                                      12:11:49p
16     A.  And then used -- and then tested           12:11:51p
17  whether they were significant based upon a        12:11:53p
18  standard error that was estimated to be           12:11:57p
19  consistent with a two-day return. So this -- I    12:12:01p
20  have used and others use in published work an     12:12:07p
21  estimate of the two-day standard error is simply  12:12:12p
22  the square root of two times the daily standard   12:12:16p
23  error.                                            12:12:19p
24     Q.  When you did so, what did you              12:12:27p
```

Page 254

```
 1      Q.   Are there models that can be                    05:21:20p
 2  used that test materiality on the basis of               05:21:21p
 3  volume or some combination of volume and price           05:21:25p
 4  movement?                                                05:21:29p
 5      A.   I mean, I have not seen that                    05:21:37p
 6  analysis done in the context of, say, a damage           05:21:40p
 7  analysis. I have seen some academic studies              05:21:43p
 8  that ask the question of whether information has         05:21:49p
 9  an effect on trading volume.                             05:22:01p
10      Q.   And do you have any opinion as                  05:22:11p
11  to the usability or appropriateness of those             05:22:13p
12  models?                                                  05:22:17p
13      A.   I think the appropriateness                    05:22:20p
14  would depend on the purpose of their being              05:22:23p
15  used. I would have to go back and look at some          05:22:31p
16  of those papers. Most of the paper -- the                05:22:36p
17  academic literature in finance is more focused          05:22:40p
18  on how information impacts value as opposed to          05:22:48p
19  trading volume. Although, there are a few                05:22:53p
20  papers out there that look at trading volume. I          05:22:55p
21  just don't recall what the conclusions are.              05:22:58p
22      Q.   The famous Golf Pro article                     05:22:59p
23  allegedly of August or August 1, 1998, when was          05:23:03p
24  that available to the market?                            05:23:08p
```

Page 255

```
 1      A.   As I indicate in my report, it's                05:23:10p
 2  my opinion that it's available to the market on         05:23:16p
 3  August 1st.                                              05:23:19p
 4      Q.   Well, surely you're not offering                05:23:19p
 5  an opinion on that now, Dr. James, are you?              05:23:21p
 6      A.   Yes, I am.                                      05:23:23p
 7      Q.   You might be making an                          05:23:24p
 8  assumption, but you are offering -- are you an           05:23:26p
 9  expert with regard to when Golf Pro appeared in          05:23:29p
10  1998?                                                    05:23:32p
11      A.   I'm not representing myself to                  05:23:33p
12  be an expert in when Golf Pro appeared. I am             05:23:35p
13  representing myself to be an expert in, first of         05:23:40p
14  all, knowing what the publication date and the           05:23:43p
15  convention of using publication dates. I                 05:23:50p
16  believe your own expert uses the publication             05:23:52p
17  date as the date referenced in his chronology.           05:23:55p
18           Second, I undertook an                          05:23:59p
19  investigation to determine whether there was             05:24:01p
20  any evidence that suggests that the Golf Pro             05:24:03p
21  article was available prior to the cover day             05:24:06p
22  and concluded based on that analysis that                05:24:12p
23  there was none.                                          05:24:14p
24      Q.   Okay. Do you know of any                        05:24:15p
```

Page 256

```
 1  evidence, apart from what you've put in your             05:24:16p
 2  reports, to indicate when that Golf Pro article          05:24:21p
 3  was available?                                           05:24:24p
 4      A.   Yes.                                            05:24:26p
 5      Q.   When?                                           05:24:26p
 6      A.   In response to the Miller report                05:24:28p
 7  where he conjectures that it might have been             05:24:32p
 8  available earlier, I performed the following             05:24:37p
 9  test. Based upon communications that I'm aware           05:24:40p
10  of between Cornerstone and the publishers of             05:24:46p
11  Golf Pro, which is now not currently published,          05:24:53p
12  they were unable to answer the question as to            05:25:04p
13  whether it was available before or after the             05:25:05p
14  cover price -- cover date.                               05:25:08p
15           So I conducted a Factiva search                 05:25:11p
16  between 1995 and 2000 in which I used the                05:25:15p
17  keywords "Golf Pro magazine," and then I                 05:25:22p
18  looked at all of the articles that were                  05:25:26p
19  available on Factiva that reference Golf Pro             05:25:29p
20  magazine and asked the question of whether               05:25:34p
21  there was any reference in the public press to           05:25:36p
22  a Golf Pro magazine article prior to the                 05:25:41p
23  stated publication date on the cover, and I              05:25:46p
24  was able to identify several instances in                05:25:50p
```

Page 257

```
 1  which there is a reference to a particular               05:25:53p
 2  issue of Golf Pro magazine, and all of the               05:25:57p
 3  references were after the publication date               05:26:01p
 4  which is consistent with -- which is                     05:26:04p
 5  inconsistent with the conjecture by Mr. Miller           05:26:09p
 6  that the information was available to the                05:26:13p
 7  market prior to the cover date.                          05:26:19p
 8      Q.   Did you save those searches?                    05:26:27p
 9      A.   No.                                             05:26:29p
10      Q.   Did you communicate with your                   05:26:30p
11  office about providing to us information with            05:26:34p
12  regard to the additional regressions you said            05:26:35p
13  you would have?                                          05:26:38p
14      A.   I have -- it's not my office.                   05:26:41p
15      Q.   Cornerstone. Whomever you had                   05:26:43p
16  to communicate with.                                     05:26:44p
17      A.   Yes, and the individual that is                 05:26:46p
18  available -- the individual who undertook that           05:26:53p
19  analysis is not available, he's -- that's Amir           05:26:59p
20  Rosen, and I believe he's attending a deposition         05:27:07p
21  today.                                                   05:27:10p
22      Q.   Not in this case?                               05:27:11p
23      A.   Yes, I believe he's downstairs,                 05:27:12p
24  two stories down.                                        05:27:14p
```