# EXHIBIT D

```
 1
 2            IN THE UNITED STATES DISTRICT COURT
 3               FOR THE DISTRICT OF DELAWARE
 4                         - - -
 5
 6   IN RE: ADAMS GOLF, INC.   :
 7   SECURITIES LITIGATION     :
 8
 9                   ORAL DEPOSITION
10                         OF
11                 EDWARD NECARSULMER, III
12                  Monday, August 7, 2006
13                         - - -
14         Oral deposition of EDWARD NECARSULMER,
15   III, held at the offices of SIMPSON THACHER &
16   BARTLETT, LLP, 425 Lexington Avenue, New York,
17   New York, commencing at 12:08 p.m., reported
18   by Pamela Harrison, RMR, CRR, CSR and Notary
19   Public.
20                         - - -
21
22
23         RSA/VERITEXT COURT REPORTING COMPANY
               1845 Walnut Street, 15th Floor
24                 Philadelphia, PA  19103
              (215) 241-1000  (888) 777-6690
25
```

Page 2

```
 1
 2  APPEARANCES:
 3
 4  DONALD B. LEWIS, ESQUIRE
    5 Cynwyd Road
 5  Bala Cynwyd, Pennsylvania 19004
    610-668-0331
 6  For the Plaintiff
 7
 8  LAURA MORIATY, ESQUIRE
    AKIN GUMP STRAUSS HAUER & FELD, LLP
 9  300 West 6th Street
    Suite 2100
10  Austin, Texas 78701-3911
    512-499-6200
11  lmoriaty@akingump.com
    For the Adams Golf Defendants
12
13
14  PAUL C. GLUCKOW, ESQUIRE
       and
15  RYAN ANTHONY KANE, ESQUIRE
    SIMPSON THACHER & BARTLETT, LLP
16  425 Lexington Avenue
    New York, New York 10017-3954
17  212-455-3056
    pgluckow@stblaw.com
18  rkane@stblaw.com
    For the Underwriter Defendants
19
20
21
22
23
24
```

Page 4

```
 1
 2         DEPOSITION SUPPORT INDEX
 3
 4  Direction to Witness Not to Answer:
 5         Page Line
 6         (NONE)
 7
 8
 9  Request for Production of Documents:
10         Page Line
11         (NONE)
12
13
14  Stipulations:
15         Page Line
16         5/1
17
18
19  Questions Marked:
20         Page Line
21         (NONE)
22
23
24
```

Page 3

```
 1
 2           EXAMINATION INDEX
 3
    WITNESS: EDWARD NECARSULMER, III
 4
         BY MR. LEWIS . . . . . . . . . . .  6, 188
 5       BY MR. GLUCKOW . . . . . . . . . .  177
         BY MS. MORIATY . . . . . . . . . .  184
 6
 7              - - -
 8            EXHIBIT INDEX
 9  320 Cover letter, 7/24/06, to Collins, Esq.,  7
        from McEvoy plus attachments NECARS
10      00001-00029
11  321 Adams Golf Inc. Securities Litigation   10
        Expert Report of Edward Necarsulmer,
12      III
13  322 Adams Golf Securities Litigation   10
        Rebuttal Report of Edward Necarsulmer,
14      III
15  323 E-mail, 4/28/04, to "Ted" from "Paul"   13
16
    324 AMF Bowling Securities Litigation   20
17      Expert Report of Edward Necarsulmer,
        III
18
19  325 Adams Golf, Inc. Customer Due Diligence  144
        Questionnaire
20
    326 Fax dated 8/7/06 plus attachment   144
21
    327 Document entitled Exhibit VII   153
22
    328 Deposition of Olga A. Pulido-Crowe   176
23
24
```

Page 5

```
 1       EDWARD NECARSULMER, III
 2       MR. LEWIS: The stipulations that
 3  we have been proceeding under, as I
 4  understand it, are waiving, sealing,
 5  certification, and filing of the
 6  transcript, and otherwise proceeding
 7  under the federal rules.
 8       MR. GLUCKOW: Give me those
 9  again.
10       MR. LEWIS: Sealing.
11       MR. GLUCKOW: Right.
12       MR. LEWIS: Certification.
13       MR. GLUCKOW: Okay.
14       MR. LEWIS: And filing.
15       MR. GLUCKOW: Okay.
16       MR. LEWIS: Some of which
17  probably are already mooted by the
18  latest federal rules.
19       MR. GLUCKOW: Right.
20       MR. LEWIS: And I suppose you
21  want to reserve read and sign for
22  Mr. Necarsulmer?
23       MR. GLUCKOW: Exactly. Yes.
24       THE WITNESS: Perfect.
25             - - -
```

Page 58

EDWARD NECARSULMER, III

1 variables. Some of the ones you've
2 mentioned are variables -- are valid
3 ones, but there are -- just the
4 existence of the fact that it was a
5 fast growing company or it was a new
6 company would not be enough for me to
7 direct the team to do something
8 different.
9 BY MR. LEWIS:
10   Q.  What variables, if any, would
11 cause you to direct the team to do something
12 different in due diligence?
13     MR. GLUCKOW: I'm going to object
14 to the form and object on the ground
15 that it's vague and ambiguous and quite
16 overbroad.
17     But you can answer.
18     THE WITNESS: I mean it's a
19 situation-by-situation issue. I think
20 that -- and I can only, you know,
21 really respond to it anecdotally if I
22 can think of some appropriate
23 anecdotes. But I guess my point is,
24 without belaboring this, is you look at

Page 59

EDWARD NECARSULMER, III

1 each situation and hopefully -- you
2 know, if you are managing the process,
3 you look at each situation and
4 hopefully you figure out, you know,
5 what you need to do to satisfy your
6 commitment committee, yourself, and the
7 marketplace. And there are really no
8 other rules specific -- you know,
9 templates I can honestly look at you
10 and offer beyond that.
11 BY MR. LEWIS:
12   Q.  Have you ever had the experience
13 of adjusting the due diligence that you were
14 conducting on a company because the company had
15 management that had not had long experience in
16 running a public company?
17   A.  Yes.
18   Q.  And why did you do that?
19   A.  Well, because simply as a matter
20 of mechanics. In many cases if a company had
21 done other offerings or was -- let's say had
22 done other offerings or had significant -- had
23 done private equity financings or other
24 transactions, typically they might be more

Page 60

EDWARD NECARSULMER, III

1 organized in terms of your ability to get
2 documents and things that were on point that
3 would go right to your organizational outline,
4 where if they hadn't, you might have to really
5 help them set up the process.
6   Q.  Would you agree that in an
7 initial public offering there is a strong
8 affirmative duty of disclosure?
9     MR. GLUCKOW: Object to the
10 form. Vague and ambiguous. Calls for
11 a legal conclusion.
12     You can answer.
13     THE WITNESS: Yes.
14 BY MR. LEWIS:
15   Q.  Would you agree that in
16 conducting due diligence it is necessary for the
17 due diligence team to continue its investigation
18 of the issuer up to and including the effective
19 date of the registration statement?
20   A.  Yes.
21   Q.  And a due diligence
22 investigation would be inadequate if the
23 underwriter did not do that?
24     MR. GLUCKOW: Object to the

Page 61

EDWARD NECARSULMER, III

1 form. It calls for a legal conclusion.
2     You can answer.
3     THE WITNESS: I mean, the easy
4 answer is yes, but -- well, okay, let
5 me just leave it at yes.
6 BY MR. LEWIS:
7   Q.  Is it your understanding as a
8 non-lawyer that one of the duties of
9 underwriters is to deal fairly with the
10 investing public?
11     MR. GLUCKOW: Object to the form.
12     You can answer.
13     THE WITNESS: Absolutely.
14 BY MR. LEWIS:
15   Q.  Isn't that sometimes referred to
16 as the shingle theory?
17   A.  I'm not familiar with that.
18   Q.  I take it from your initial
19 report that one of your beliefs is that an
20 underwriter has an obligation to conduct a
21 reasonable investigation in an IPO?
22   A.  Yes.
23   Q.  And there is a long tradition
24 since the securities laws were enacted in the

16 (Pages 58 to 61)

Page 62

EDWARD NECARSULMER, III

1  '30s of underwriters conducting due diligence
2  investigations?
3        MR. GLUCKOW: Object to the
4     form. Vague and ambiguous.
5        You can answer.
6        THE WITNESS: Yes.
7  BY MR. LEWIS:
8     Q.   To your knowledge, how far back
9  in time have due diligence investigations been
10 conducted by underwriters?
11    A.   I think they were formalized by
12 the 33 Act, but I don't go back quite that far,
13 but it's certainly my understanding that
14 particularly, you know, throughout history, you
15 know, you committed your own capital to a
16 greater extent I think than -- now things come
17 full cycle, but in the beginning I think people
18 did due diligence as, you know -- it's my
19 understanding that a lot of due diligence --
20 what due diligence was done was, in fact, you
21 know, a matter of, you know, of self-protection
22 as opposed to any responsibility -- as opposed
23 to exclusively a responsibility to, you know,
24 investors.

Page 63

EDWARD NECARSULMER, III

1     Q.   Did your work in the securities
2  industry begin in 1967 with Hallgarten?
3     A.   Correct.
4     Q.   In the time that you've been in
5  the industry, have you become aware of any
6  changes in practical standards for due diligence
7  investigations?
8        MR. GLUCKOW: Objection. Vague
9     and ambiguous. Overbroad.
10       You can answer.
11 BY MR. LEWIS:
12    Q.   Let me reframe the question.
13       Have you become aware of
14 changes in practice with respect to due
15 diligence investigations over the time since
16 1967 that you've been employed in the
17 industry?
18       MR. GLUCKOW: The same objection.
19       You can answer.
20       THE WITNESS: None to the basic
21    tenets of how the business or the
22    process is done. I think one of the
23    main changes that I've seen is that to
24    the extent that the managing

Page 64

EDWARD NECARSULMER, III

1  underwriter has taken an even larger
2  responsibility or has been delegated --
3  I don't like the word delegated, but
4  has been delegated a responsibility by
5  the other comanagers to a greater
6  extent.
7        And the other -- if I can just
8  illuminate. The process has gotten
9  better to the extent that investment
10 banks began to specialize in either
11 certain industries or had groups that
12 did certain industries; whereas, in my
13 life, everybody was a generalist and so
14 that if you were doing a
15 telecommunications deal, it would be
16 done by the telecommunications group in
17 Lehman Brothers or Goldman Sachs or
18 something, who really became quite
19 expert.
20       I know we had a significant
21 technology practice and management
22 would often tell me that some of the
23 people in that group are as
24 knowledgeable -- not as they were, of

Page 65

EDWARD NECARSULMER, III

1  course, but as their competitors were
2  about the business.
3        MR. GLUCKOW: I think we've been
4     going a little bit over an hour. If
5     there's a point in your outline where
6     we could take a short break.
7        MR. LEWIS: We can take it right
8     now.
9        MR. GLUCKOW: That would be
10    great.
11       (A recess was had from 1:18 p.m.
12    to 1:26 p.m.; and then the proceedings
13    continued as follows:)
14 BY MR. LEWIS:
15    Q.   Mr. Necarsulmer, outside of this
16 litigation, before you did your work in this
17 case, did you ever hear it said that
18 underwriters were required to act as a prudent
19 man would in the management of his own property?
20       MR. GLUCKOW: Those words?
21       MR. LEWIS: Yes.
22       THE WITNESS: I've certainly
23    heard of the prudent man rule, but I
24    thought it referred to trust companies