IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.          )
SECURITIES LITIGATION            )  Civil Action No. 99-371-KAJ
                                 )  (CONSOLIDATED)
                                 )

**APPENDIX TO UNDERWRITER DEFENDANTS' ANSWERING
BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE
AND EXCLUDE TESTIMONY OF EDWARD NECARSULMER III**

**VOLUME I OF III**

**B1-B195**

OF COUNSEL:                         Robert K. Payson (No. 274)
                                    John E. James (No. 996)
Michael J. Chepiga                  POTTER ANDERSON & CORROON LLP
Paul C. Gluckow                     Hercules Plaza – Sixth Floor
Theodore J. McEvoy                  1313 North Market Street
Ryan A. Kane                        Wilmington, DE  19801
SIMPSON THACHER & BARTLETT LLP      Telephone:  (302) 984-6000
425 Lexington Avenue                E-Mail:  rpayson@potteranderson.com
New York, NY 10017-3954             E-Mail:  jjames@potteranderson.com
Tel.  (212) 455-2831
Fax  (212) 455-2502                 *Attorneys for Underwriter Defendants*

Dated:  October 9, 2006
754546/23310

**Table of Contents**

**Volume I of III**

Transcript of the Deposition of Edward Necarsulmer, III, taken August 7, 2006 ................ B1

**Volume II of III**

Expert Report of Edward Necarsulmer III, dated July 12, 2006 ......................................... B196

Rebuttal Report of Edward Necarsulmer III, dated July 26, 2006 ..................................... B204

Expert Report of R. Alan Miller, dated July 12, 2006 ......................................................... B207

Rebuttal Expert Report of R. Alan Miller, dated July 28, 2006 .......................................... B244

**Volume III of III**

Excerpts from the Transcript of the Deposition of R. Alan Miller, Taken August 11,
2006 ....................................................................................................................................... B393

Excerpts from the Transcript of the Deposition of Christiana Ochoa, taken August 4,
2006 ....................................................................................................................................... B491

**Case:**

*Astrazenca LP  v. TAP Pharmaceutical Products, Inc.,*
No. CIV. A.04-1332 KAJ, 2006 WL 2338114 (D. Del. June 23, 2006) ............................. B515

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -



IN RE: ADAMS GOLF, INC. :

SECURITIES LITIGATION    :

ORAL DEPOSITION

OF

EDWARD NECARSULMER, III

Monday, August 7, 2006

- - -

Oral deposition of EDWARD NECARSULMER,

III, held at the offices of SIMPSON THACHER &

BARTLETT, LLP, 425 Lexington Avenue, New York,

New York, commencing at 12:08 p.m., reported

by Pamela Harrison, RMR, CRR, CSR and Notary

Public.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA  19103
(215) 241-1000   (888) 777-6690

```
 1

 2      APPEARANCES:

 3

 4      DONALD B. LEWIS, ESQUIRE
        5 Cynwyd Road
 5      Bala Cynwyd, Pennsylvania   19004
        610-668-0331
 6      For the Plaintiff

 7

 8      LAURA MORIATY, ESQUIRE
        AKIN GUMP STRAUSS HAUER & FELD, LLP
 9      300 West 6th Street
        Suite 2100
10      Austin, Texas   78701-3911
        512-499-6200
11      lmoriaty@akingump.com
        For the Adams Golf Defendants
12

13

14      PAUL C. GLUCKOW, ESQUIRE
                 and
15      RYAN ANTHONY KANE, ESQUIRE
        SIMPSON THACHER & BARTLETT, LLP
16      425 Lexington Avenue
        New York, New York  10017-3954
17      212-455-3056
        pgluckow@stblaw.com
18      rkane@stblaw.com
        For the Underwriter Defendants
19

20

21

22

23

24
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B2

Page 3

1

2                    EXAMINATION INDEX

3

     WITNESS:  EDWARD NECARSULMER, III
4
        BY MR. LEWIS . . . . . . . . . . .  6, 188
5       BY MR. GLUCKOW . . . . . . . . . .  177
        BY MS. MORIATY . . . . . . . . . .  184
6

7                        - - -

8                     EXHIBIT INDEX

9    320  Cover letter, 7/24/06, to Collins, Esq.,        7
          from McEvoy plus attachments NECARS
10        00001-00029

11   321  Adams Golf Inc. Securities Litigation           10
          Expert Report of Edward Necarsulmer,
12        III

13   322  Adams Golf Securities Litigation                10
          Rebuttal Report of Edward Necarsulmer,
14        III

15   323  E-mail, 4/28/04, to "Ted" from "Paul"           13

16
     324  AMF Bowling Securities Litigation               20
17        Expert Report of Edward Necarsulmer,
          III
18

19   325  Adams Golf, Inc. Customer Due Diligence         144
          Questionnaire
20
     326  Fax dated 8/7/06 plus attachment               144
21
     327  Document entitled Exhibit VII                  153
22
     328  Deposition of Olga A. Pulido-Crowe             176
23
24

Page 4

1

2              DEPOSITION SUPPORT INDEX

3

4        Direction to Witness Not to Answer:

5                    Page Line

6                     (NONE)

7

8

9        Request for Production of Documents:

10                   Page Line

11                    (NONE)

12

13

14                 Stipulations:

15                   Page Line

16                     5/1

17

18

19               Questions Marked:

20                   Page Line

21                    (NONE)

22

23

24

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 5

1              EDWARD NECARSULMER, III

2              MR. LEWIS:  The stipulations that

3    we have been proceeding under, as I

4    understand it, are waiving, sealing,

5    certification, and filing of the

6    transcript, and otherwise proceeding

7    under the federal rules.

8              MR. GLUCKOW:  Give me those

9    again.

10             MR. LEWIS:  Sealing.

11             MR. GLUCKOW:  Right.

12             MR. LEWIS:  Certification.

13             MR. GLUCKOW:  Okay.

14             MR. LEWIS:  And filing.

15             MR. GLUCKOW:  Okay.

16             MR. LEWIS:  Some of which

17   probably are already mooted by the

18   latest federal rules.

19             MR. GLUCKOW:  Right.

20             MR. LEWIS:  And I suppose you

21   want to reserve read and sign for

22   Mr. Necarsulmer?

23             MR. GLUCKOW:  Exactly.  Yes.

24             THE WITNESS:  Perfect.

25                  - - -

Page 6

1                    EDWARD NECARSULMER, III

2                    EDWARD NECARSULMER, III, after

3           having been duly sworn, was examined

4           and testified as follows:

5                        - - -

6                    EXAMINATION

7                        - - -

8    BY MR. LEWIS:

9           Q.     Would you state your name and

10   address for the record.

11          A.     Edward Necarsulmer, III, P.O.

12   Box 1173, Quogue, Q-U-O-G-U-E, New York, 11959.

13                 MR. LEWIS:  As a preliminary,

14          since there is a simultaneous

15          deposition going on in this case in

16          Houston today, Mr. Collins suggested to

17          me that I pick up with numbering today

18          at 320, leaving a gap between the end

19          of the last deposition and his, which

20          might result in a few blank numbers but

21          will keep us from having two exhibits

22          with the same number.

23                 So I'm going to pick up at 320,

24          and I'm just going to mark for the

25          record as Exhibit 320 a document -- a

B6

1               EDWARD NECARSULMER, III

2      letter from Ted McEvoy to Todd Collins,

3      enclosing documents NECARS 1 through

4      29.

5           (Whereupon, a document was

6      marked, for identification purposes, as

7      Exhibit 320.)

8           MR. LEWIS:  I guess my question

9      really is to Mr. Gluckow.  Has there

10     been any other production of documents

11     from this witness that you are aware

12     of?

13          MR. GLUCKOW:  Yes, there was a

14     subsequent production I think just on

15     the heels of the rebuttal report.

16          MR. KANE:  Yes.

17          MR. GLUCKOW:  Ryan probably has

18     the Bates numbers.  I think it was just

19     a half dozen more pages.  We can

20     probably get a copy for you, but I

21     think it's NECARS 30 through 33 or 35

22     or 37, or something like that.

23          MR. LEWIS:  Somehow that seems to

24     have slipped through the cracks.  If I

25     could see a copy of that before.

Page 8

EDWARD NECARSULMER, III

1

2          MR. KANE:  I can get it to you

3      during the break.  It was sent to

4      Mr. Collins.

5          MR. LEWIS:  Okay.

6   BY MR. LEWIS:

7          Q.     Mr. Necarsulmer, my name is Don

8   Lewis.  I represent the plaintiffs in this

9   action, and I'm going to be asking you some

10  questions this afternoon.  If I drop my voice,

11  garble my words, let me know and I'll have the

12  question read back to you.  If I ask the

13  question in an incomprehensible way to you, let

14  me know and I'll reframe the question for you.

15          A.     Fine.

16          Q.     How did you come to be retained

17  in this litigation?

18          A.     I have worked -- I have done

19  some prior work with the law firm, Simpson

20  Thacher.

21          Q.     Was that in the AMF Bowling

22  litigation?

23          A.     Correct.

24          Q.     Have you done other work as an

25  expert witness for Simpson Thacher?

1                    EDWARD NECARSULMER, III

2           A.     I did work as a consulting

3    expert in a confidential matter prior to the

4    AMF.

5           Q.     A confidential matter involving

6    due diligence?

7           A.     Correct.  Similar situation,

8    just never -- it was settled.

9           Q.     Is there some reason that you

10   can't disclose the name of the client in that

11   matter?

12              MR. GLUCKOW:  Why don't I take it

13           up with Mr. Necarsulmer.  It may well

14           be that it was a confidential

15           engagement.  My understanding is that

16           there was no report and that it was

17           just a consulting behind the scenes.

18              MR. LEWIS:  All right.

19   BY MR. LEWIS:

20           Q.     Is that your understanding as

21   well?

22           A.     That's correct.

23           Q.     So have you generated expert

24   witness reports for the Simpson Thacher firm

25   before accepting the AMF litigation?

Page 10

1          EDWARD NECARSULMER, III

2          A.     No.

3                 MR. GLUCKOW:  Object -- you've

4          got to give me a chance just to object

5          in general before you give your answer.

6                 Objection to the form of the

7          question.

8                 You can answer.

9                 THE WITNESS:  The answer is no.

10                (Whereupon, documents were

11         marked, for identification purposes, as

12         Exhibit 321 and Exhibit 322.)

13    BY MR. LEWIS:

14         Q.     Let me hand you what I'm marking

15    as Exhibits 321 and 322.  321 is a copy of your

16    expert report, and 322 is a copy of your

17    rebuttal report.

18                Am I correct that Exhibit 321

19    is a copy of the expert report you rendered in

20    this litigation?

21         A.     Yes.

22         Q.     And that 322 is a copy of your

23    rebuttal report?

24         A.     Yes.

25         Q.     When were you retained in this

Page 11

EDWARD NECARSULMER, III

1

2    litigation, approximately?

3        A.    I believe in April.

4        Q.    Were you given any specific

5    instructions with respect to putting together an

6    expert report in this case?

7        A.    No.

8        Q.    What kind of guidance were you

9    given, if any?

10        A.    Basically to review the

11    material, make my own determination as to how I

12    felt about the issue to which I was going to

13    opine.  Really nothing further than that.

14        Q.    When did you start to review the

15    materials and to make your determination as to

16    what you thought about them?

17        A.    I think -- I'm not a hundred

18    percent certain that I remember the dates I

19    received them, but as soon as I began to get the

20    materials, which I believe was probably in

21    April, also.

22        Q.    Did anyone assist you in

23    drafting either of your reports?

24        A.    No.

25        Q.    Between the time of your initial

Page 12

1         EDWARD NECARSULMER, III

2    contact with Simpson Thacher in this litigation

3    and the time you generated your first expert

4    report, did you participate in any meetings with

5    respect to the report?

6                   MR. GLUCKOW:  Objection to the

7              form.

8                   You can answer.

9                   THE WITNESS:  Yes; however, it

10             was really after the report was

11             written.

12   BY MR. LEWIS:

13        Q.    Okay.  And where was the

14   meeting?

15        A.    We did a conference call, a

16   web-based conference call.

17        Q.    Was that a type of call in which

18   you can see each other?

19        A.    No, it was a type of call in

20   which you could see a document.

21        Q.    And had you completed the final

22   touches on your expert report by the time that

23   web-based conference call was held?

24                  MR. GLUCKOW:  Objection to the

25             form.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B12

Page 13

1                   EDWARD NECARSULMER, III

2                   You can answer.

3                   THE WITNESS:  Yes.

4    BY MR. LEWIS:

5         Q.      Who participated in that call?

6         A.      Mr. Gluckow and perhaps one of

7    his associates and a firm called Cornerstone,

8    and I don't actually recall if anyone from Akin

9    Gump was on the call or not.  I think they were

10   not on the call, so I would limit -- rephrase

11   the answer to someone from Cornerstone and from

12   Simpson Thacher.

13                   (Whereupon, a document was

14             marked, for identification purposes, as

15             Exhibit 323.)

16   BY MR. LEWIS:

17        Q.      I'll show you next what has been

18   marked as Exhibit 323, which appears to be an

19   e-mail from Mr. Gluckow to yourself, dated April

20   28, 2006.

21                   Did you receive some version of

22   that e-mail from Mr. Gluckow?

23        A.      I did.

24        Q.      The first line of the e-mail

25   reads:  "It looks like the person from Lehman

Page 14

1                    EDWARD NECARSULMER, III

2      will not be able to make a meeting on May 8th

3      (and in fact will be out that entire week)."

4                    What do you understand the

5      reference to a meeting on May 8th to be?

6           A.      It was a meeting to meet with

7      the ultimate client and just to have them look

8      me over and shake my hand.

9           Q.      Was that meeting to occur before

10     you've completed your expert witness report?

11          A.      Yes.

12          Q.      Would it be fair to say your

13     expert witness report was completed on the date

14     you signed it?

15          A.      Correct.

16          Q.      Did you ever attend a meeting

17     with a person from Lehman to make the

18     determination you referred to?

19          A.      Yes.

20          Q.      And when did that take place?

21          A.      I don't recall the date.

22          Q.      Sometime in the month of May?

23          A.      Yes.

24          Q.      Was the person from Cornerstone

25     who participated in the web-based conference

Page 15

1                    EDWARD NECARSULMER, III

2    call someone named Adel Turki?

3          A.     Yes.

4          Q.     Am I mispronouncing his name?

5                 MR. GLUCKOW:  It's Adel.

6                 MR. LEWIS:  Adel.

7    BY MR. LEWIS:

8          Q.     Who was Mr. Turki?

9          A.     He is the -- I believe he is the

10   manager of the project, the expert project,

11   working with Simpson Thacher.

12         Q.     Did you have an understanding as

13   to why he was participating in a web-based

14   conference call that dealt with your expert

15   witness report?

16         A.     To the best of my knowledge, he

17   was coordinating all the expert material and he

18   also was the facilitator.

19         Q.     Did Mr. Turki provide you with

20   any thoughts regarding your report?

21         A.     I don't believe he did.

22         Q.     Did anyone from Cornerstone

23   supply you with any materials relating to your

24   project before you completed your report?

25         A.     No.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B15

1               EDWARD NECARSULMER, III

2          Q.     At the time the web-based call

3     took place, was your expert report in exactly

4     the same form as it now appears --

5          A.     Yes.

6          Q.     -- as Exhibit 321?

7          A.     Yes.

8          Q.     Including your signature?

9          A.     No.

10         Q.     So when was the report actually

11    finished but for your signature?

12         A.     Either July 10th or July 11th, I

13    entered the date of the signature line.

14         Q.     And the web-based conference

15    call took place a month earlier?

16         A.     No.  Maybe a week earlier, that

17    sort of a time period.

18         Q.     Between the time of your --

19    between the date July 12, on which your first

20    report was signed, and the date of July 26th,

21    2006, on which your rebuttal report was signed,

22    did you have any meetings with anyone concerning

23    your rebuttal report?

24         A.     We had a similar conference call

25    on the rebuttal report.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B16

Page 17

1           EDWARD NECARSULMER, III

2           Q.    Can you recall any of the

3    participants in the similar conference call?

4           A.    I think it was a -- with the

5    exception of the associates from Cornerstone

6    whose name I just don't know, it would have been

7    the same cast of characters as the first

8    conference call.

9           Q.    And do you believe there was

10    someone from Akin Gump on that second call?

11           A.    Yes.

12           Q.    And who was it?

13           A.    I don't know.

14           MR. LEWIS:  Off the record.

15           (A discussion was held off the

16           record.)

17    BY MR. LEWIS:

18           Q.    How long did it take you to

19    write your initial expert report?

20           MR. GLUCKOW:  You mean --

21           MR. LEWIS:  Drafting terms.

22           MR. GLUCKOW:  So you're not

23           including all the time he spent

24           reviewing materials, you are just

25           talking about sitting at the computer

Page 18

                              EDWARD NECARSULMER, III

1
2          drafting?

3                    MR. LEWIS:  Drafting.

4                    THE WITNESS:  I mean, I would

5          estimate between, you know, four and

6          six hours of actual time, but my method

7          of working is I go back at this

8          thing -- you know, I'll write the

9          report, I'll go back at it, I'll think

10         about it, I might move things around a

11         little bit, so it may have been a

12         longer period than that, but, you know.

13    BY MR. LEWIS:

14         Q.    How long had you spent reviewing

15    the materials before you sat down to write the

16    report?

17         A.    I'm going to estimate 40-plus

18    hours.

19         Q.    Can you describe as you recall

20    it the process you went through in reviewing the

21    materials?

22                    MR. GLUCKOW:  Objection to the

23         form.

24                    You can answer.

25                    THE WITNESS:  I usually do it box

Page 19

1          EDWARD NECARSULMER, III

2          by box, and what I'll do is I'll try to

3          order the boxes, actually just in

4          physical stack, as to the things that I

5          want to look at again or want to, you

6          know, give more scrutiny to.  But I

7          just go through things, documents one

8          after another, and I try to do it for

9          as long a period as I can and still

10         remain able to retain the material.

11    BY MR. LEWIS:

12         Q.    As you were doing that, did you

13    make notes?

14         A.    I did not.

15         Q.    Did you make notations on

16    Post-its?

17         A.    No.

18         Q.    You just segregated the

19    materials that you wanted to look back at?

20         A.    Yes.  The only indication I

21    would ever make is I would make a checkmark to

22    show that I've read it, and sometimes I put a

23    date on it to show that I've read it.

24         Q.    Is there some reason that you

25    didn't make notes on materials like that?

Page 20

1              EDWARD NECARSULMER, III

2          A.    It's -- I will always -- I've

3    been under the impression from when I've worked

4    on these cases that that's not -- that drafts

5    and notes are not the best things for expert

6    witnesses to do.

7          Q.    Did you receive instructions to

8    that effect in this case?

9          A.    No, no instructions in this

10   particular case, that's just my understanding of

11   the responsibilities.

12         Q.    When you actually wrote up your

13   report, did you use the AMF Bowling report as a

14   template --

15         A.    Yes.

16         Q.    -- for the report that you were

17   writing?

18         A.    Yes.

19              MR. LEWIS:  Let me just mark that

20         as Exhibit 324.

21              (Whereupon, a document was

22         marked, for identification purposes, as

23         Exhibit 324.)

24   BY MR. LEWIS:

25         Q.    Do you recognize this as a copy

Page 21

                          EDWARD NECARSULMER, III

1

2    of an expert witness report that you generated

3    in the AMF case?

4          A.    Yes.

5          Q.    I'll try to put the questions

6    together for speed, but we'll break them apart

7    if it becomes a problem.

8                In drafting either the expert

9    report or the rebuttal expert report, did you

10   create any drafts?

11         A.    No.

12         Q.    Before you actually -- would it

13   be fair to say that before you actually signed

14   either of the reports, you participated in one

15   of these web-based conference calls in which the

16   text of the report was shown to your -- to the

17   attorneys who retained you before you actually

18   signed the document?

19                MR. GLUCKOW:  Can I just have

20            that one read back?  I missed the

21            beginning.

22                (The court reporter read the

23            record as follows:

24                "QUESTION:  Before you actually

25            -- would it be fair to say that before

Page 22

1      EDWARD NECARSULMER, III

2           you actually signed either of the

3           reports, you participated in one of

4           these web-based conference calls in

5           which the text of the report was shown

6           to your -- to the attorneys who

7           retained you before you actually signed

8           the document?")

9                MR. GLUCKOW:  You can answer.

10               THE WITNESS:  Yes.

11     BY MR. LEWIS:

12          Q.    Were any changes made to either

13     of the reports after the web-based conference

14     calls?

15          A.    The only change -- and it's true

16     of both reports -- were one of punctuation and

17     one of numbering.  I can't tell you on which

18     report was which.

19          Q.    Fair enough.

20                But no substantive changes?

21          A.    Nothing of substance.

22          Q.    So after the punctuation or

23     numbering changes were made, you edited the

24     document in whatever word processing system you

25     had, finalized it, and never had a different

Page 23

1                    EDWARD NECARSULMER, III

2    hard copy draft?

3          A.    No.  I mean, that is correct.

4          Q.    You never -- you had it only on

5    your screen before the final version was printed

6    out?

7          A.    That is correct.

8          Q.    And approximately how many hours

9    in total have you devoted to this litigation so

10   far?

11         A.    I would have to look in my time

12   book, but right up around 60 before today.

13         Q.    In your expert report numbered

14   321 you have listed as Exhibit B Materials

15   Considered.  Can you explain what the heading

16   Materials Considered means to you?

17         A.    Basically all the documents

18   involved in the case that I reviewed.

19         Q.    In rendering your opinion, did

20   you consider any information from sources other

21   than the items that are listed in Exhibit B to

22   your expert report?

23              MR. GLUCKOW:  You mean specific

24         to this litigation?

25              MR. LEWIS:  Specific -- well --

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 24

1                    EDWARD NECARSULMER, III

2                    THE WITNESS:  No.

3                    MR. LEWIS:  -- of any source.

4    BY MR. LEWIS:

5            Q.    Just -- I'm not trying to be

6    vague here.  Did you receive any information

7    from Lehman Brothers --

8            A.    No.

9            Q.    -- regarding its due diligence

10   process other than what you saw in the

11   transcripts, court filings, exhibits?

12           A.    The answer is no.

13           Q.    And did you receive any

14   information from your -- from the counsel who

15   retained you, Simpson Thacher, about the due

16   diligence process or their views as to what had

17   happened in due diligence?

18           A.    No.

19                    MR. GLUCKOW:  Other than what's

20           set forth in the exhibit.

21                    THE WITNESS:  I thought that was

22           the question.

23   BY MR. LEWIS:

24           Q.    I'm sorry, I have a tendency to

25   try to sharpen at the end and it sometimes will

Page 25

1                    EDWARD NECARSULMER, III

2      change the direction of the question, so you

3      will probably be better served if you wait for

4      me, and I'll try to wait for you and try not to

5      overspeak you on these questions.

6                         Did you receive anything in the

7      nature of deposition summaries from anyone

8      related to this litigation?

9              A.      I -- no.

10             Q.      Did you receive any legal

11     analysis from counsel in this litigation other

12     than what may be reflected in Exhibit B?

13             A.      No.

14             Q.      Did anyone from Lehman Brothers

15     discuss the due diligence process with you at

16     all?

17             A.      No.

18             Q.      Have you, as an expert witness,

19     heard the term work product as relating to

20     lawyers?

21             A.      Yes.

22             Q.      Did you receive any work product

23     from your counsel in connection with your work

24     on the Adams Golf engagement?

25             A.      No.

Page 26

1          EDWARD NECARSULMER, III

2          Q.     Let me turn to the report, 321.

3     Just some basic things.  I see that you have

4     listed your hourly rate as $600 per hour.  Is

5     that the current rate?

6          A.     That is accurate.

7          Q.     Am I correct that in 2004 it was

8     $450, back in the AMF case?

9          A.     That's correct.

10         Q.     When did the rate change?

11         A.     In 2005.

12         Q.     What was the circumstance of

13    that?

14         A.     I was discussing being retained

15    in another case and discussed the going rate and

16    was informed that $600 was a fair rate.

17         Q.     In Paragraph 3 of the report, in

18    the category of Prior Testimony, you write:  "I

19    am also currently retained as an expert in a

20    matter before the United States District Court

21    in the Northern District of Texas."

22              What is that matter, in general

23    terms?

24         A.     It is a -- it's a similar type

25    of case.  The company is called Flowserve, and

Page 27

1                    EDWARD NECARSULMER, III

2    it is plaintiffs coming after the company and

3    underwriter defendants based on a number of

4    issues which due diligence is one.

5             Q.    And what underwriters have

6    retained you in that case?

7             A.    The --

8             MR. GLUCKOW:  Objection to the

9             form.  It assumes facts not in

10            evidence.

11            MR. LEWIS:  I'll withdraw the

12            question.

13   BY MR. LEWIS:

14            Q.    Who has retained you in that

15   case?

16            A.    The firm of Jenkens & Gilchrist.

17            Q.    And what underwriters are the

18   defendants in that case whose due diligence,

19   among other things, you are considering?

20            A.    CSFB and Banc of America

21   Securities.

22            Q.    Have you yet rendered any

23   opinions in that case?

24            A.    I have not.

25            Q.    Have you testified in that case?

B27

Page 28

1                    EDWARD NECARSULMER, III

2         A.    I have not.

3         Q.    Have you -- as a technical

4    matter, have you yet been found by any court

5    either qualified or unqualified to render an

6    expert witness opinion on any subject?

7                    MR. GLUCKOW:  Objection to the

8         form.

9                    You can answer.

10                    THE WITNESS:  No.

11    BY MR. LEWIS:

12         Q.    Have you ever been retained as

13    an expert on matters of discloser?

14                    MR. GLUCKOW:  Objection to the

15         form.

16                    You can answer.

17                    THE WITNESS:  Not specifically.

18         The assignment is usually phrased as

19         due diligence; however, you tend to get

20         asked whether the due diligence led to

21         the proper disclosure.

22    BY MR. LEWIS:

23         Q.    Have you ever, other than in

24    this present litigation, included an opinion in

25    one of your reports on the subject of whether

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B28

Page 29

1                          EDWARD NECARSULMER, III

2       something should have been disclosed as a result

3       of due diligence?

4                          MR. GLUCKOW:  Objection to the

5                     form.

6                          I think you've already

7                     established the only other report is

8                     the Exhibit 324.

9                          But you can answer.

10                         THE WITNESS:  No.

11      BY MR. LEWIS:

12           Q.     I note in your description of

13      your experience that both presently and between

14      March of '98 and May of 2000 you have acted as a

15      consultant to the financial services industry.

16      Is that fair?

17                         MR. GLUCKOW:  Just for the record

18                    here, you are looking at what now?

19                         MR. LEWIS:  I'm looking at

20                    Exhibit A to Court Exhibit 321, and

21                    this is the part that includes

22                    Mr. Necarsulmer's CV or biography.

23      BY MR. LEWIS:

24           Q.     Am I correct that between March

25      of 1998 and May 2000 you were a consultant to

Page 30

1                    EDWARD NECARSULMER, III

2        the financial services industry?

3                A.      Yes.

4                Q.      And also between May of 2002 and

5        the present you have been a consultant to that

6        industry --

7                A.      That is correct.

8                Q.      -- is that fair?

9                        In the course of your work as a

10       consultant, have you been asked by any

11       underwriters to render them an opinion outside

12       of court on whether something they did in due

13       diligence was appropriate or inappropriate?

14               A.      No.  The scope of my work, just

15       if it's useful, the scope of my work has

16       traditionally been -- and I don't do much of it

17       anymore -- has been an operating practice,

18       should we -- how do we organize a sales group,

19       how do we organize a research group, will this

20       client's -- things like that.

21               Q.      So in what -- I'll try to ask

22       this fairly.

23                       In the course of your career in

24       the financial industry, leaving aside your

25       expert witness work of the last several years,

Page 31

1                              EDWARD NECARSULMER, III

2      have you been called upon to evaluate due

3      diligence investigations?

4              A.       Absolutely.

5              Q.       And when did that -- when was

6      that first the case in your practice?

7              A.        Through my whole career, I

8      mean.  Either as practitioner or running a deal,

9      but most importantly as a commitment committee

10     chair or member, which I did for a number of

11     years, the heart of the work was evaluating your

12     own investment banker's due diligence or if you

13     were comanager, the due diligence done by

14     whoever was the book-running manager, so that

15     was a significant part of certainly the last 20

16     years of my career in banking.

17             Q.       Just by way of terminology, you

18     used the phrase book-running manager.  Can you

19     explain what you mean by that?

20             A.        In virtually all offerings one

21     manager -- one of the underwriters -- one of the

22     managing underwriters is designated as the book

23     runner and he will be the responsible party.

24     Like Lehman was in this situation versus what a

25     Banc of America -- Nations Banc I guess in this

Page 32

1                          EDWARD NECARSULMER, III

2     case or a Ferris Baker Watts did, they were

3     comanagers.  So the primary responsibility is

4     based on the -- is in the arms of the

5     book-running manager.

6              Q.     So were there times while you

7     were working in the industry, say, on the

8     commitment committee that you had to send your

9     investment banking team back to do more due

10    diligence on a subject?

11             A.     Absolutely.

12             Q.     Have you ever authored any

13    publications with respect to due diligence

14    investigations?

15                    MR. GLUCKOW:  Object to the form.

16                    You can answer.

17                    THE WITNESS:  Not external, not

18                    things for general use.  I certainly

19                    was part of, in firms, making sure that

20                    our standard due diligence procedure,

21                    adding and editing to that, but nothing

22                    for external use.

23    BY MR. LEWIS:

24             Q.     You helped create standard due

25    diligence procedures for one or more firms?

Page 33

1                    EDWARD NECARSULMER, III

2          A.     Yes.

3          Q.     Which firms were they?

4          A.     For CJ Lawrence, which then

5    became Morgan Grenfell and then became Deutsche

6    Bank.

7                 And Wasserstein Perella, I

8    certainly didn't create it, but as head of the

9    equity area I altered it to meet my own

10   practices and standards.

11         Q.     In the course of your work in

12   the financial industry, did you ever receive any

13   legal training?

14         A.     None.

15         Q.     Did you ever teach due diligence?

16         A.     Let me make sure I phrase this

17   properly.

18                Particularly in my Deutsche

19   Bank life, we had a significant number of

20   training classes, whether they were for MBAs

21   or for people from other parts of the world,

22   and I would do -- I would usually run the

23   equity capital markets classes.  Due diligence

24   was certainly a part of that, would be a

25   subject underneath the general heading of

Page 34

1                    EDWARD NECARSULMER, III

2     investment banking or equity capital markets

3     and that would be my responsibility.

4             Q.      As best you can recall it,

5     sitting here today, what in general did you --

6     by way of materials did you present to your

7     instructees about due diligence?

8                    MR. GLUCKOW:  You are asking him

9                to recall the sum and substance of the

10               lectures?

11    BY MR. LEWIS:

12            Q.      Not the sum and substance, but

13    the nature of the materials that were given.

14    Were they case studies in due diligence, were

15    they outlines of or checklists, were they

16    discussions of cases, discussions of industry

17    standards?  What, in general, did you present

18    when you were teaching due diligence?

19                   MR. GLUCKOW:  Objection to the

20               form.

21                   You can answer.

22                   THE WITNESS:  I would usually

23               include the most recent checklist that

24               the firm -- the appropriate firm was

25               using, and I might have some discussion

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

B34

Page 35

```
 1              EDWARD NECARSULMER, III

 2          of how industry standards might have

 3          changed or might be at the moment, but

 4          I'm really not -- can't be any more

 5          specific than that.

 6   BY MR. LEWIS:

 7          Q.    Do you recall whether the

 8   checklist was annotated with legal authorities?

 9                  MR. GLUCKOW:  Objection to the

10          form.

11                  You can answer.

12                  THE WITNESS:  No.

13   BY MR. LEWIS:

14          Q.    Since I didn't ask the question

15   very well, I'm not sure whether you don't recall

16   whether it was, or recall that it wasn't.  To

17   the best of your knowledge, did you provide your

18   instructees with a checklist that was keyed to

19   cases --

20          A.    No.

21          Q.    -- that established

22   requirements?

23                  I ask you to look to Paragraph

24   B on Page 2 of Exhibit 321.  In the middle of

25   the paragraph you use the phrase:  "Although
```

Page 36

1              EDWARD NECARSULMER, III

2     the registration statement is the issuer's,

3     the underwriting team," dash, "including its

4     counsel is also responsible for the

5     completeness, materiality, and veracity of

6     this information."

7              Why do you say that the

8     registration statement is the issuer's?

9          A.    It's a fact.  They file it, they

10    are the only ones who could make changes to it,

11    respond to comments.

12         Q.    Okay.  Have you ever heard

13    anyone express the view that as a matter of law

14    under the 1933 Act that both the underwriters

15    and the issuer are equally legally responsible

16    for the content of the document subject to the

17    due diligence defense?

18              MR. GLUCKOW:  Objection to the

19         form.  Calls for a legal conclusion.

20         You can answer.

21              THE WITNESS:  I do understand

22         that.  I guess my response would be to

23         the first -- back to the first part of

24         what the question is, as a matter of

25         business practice, the registration

Page 37

```
 1              EDWARD NECARSULMER, III
 2         statement, and certainly in the many
 3         deals that I've worked on, is the
 4         issuer's document.  Issuer's counsel,
 5         you know, is the first name on the
 6         agents for service.  It's just the way
 7         things are done.
 8    BY MR. LEWIS:
 9         Q.    If you would just look for a
10    second and maybe keep by you the report from the
11    AMF litigation, Exhibit 324.
12              If you look to the same
13    Paragraph B in that report, you will see there
14    is no -- unless I miss it -- statement in that
15    paragraph to the effect that the registration
16    statement is the issuer's.
17              MR. GLUCKOW:  You mean those
18         words are not in Exhibit 324?
19              MR. LEWIS:  They are not on it.
20         Not that I see.
21              MR. GLUCKOW:  The document speaks
22         for itself.
23              MR. LEWIS:  Correct me if it's
24         somewhere else.
25              MR. GLUCKOW:  Is there a
```

Page 38

1                    EDWARD NECARSULMER, III

2           question?

3    BY MR. LEWIS:

4           Q.      Well, was there some reason that

5    you added that reference -- strike that.

6                   Is there some reason that in

7    writing your report in this litigation you

8    felt it useful to include a reference that the

9    registration statement is the issuer's?

10          A.      There's no particular reason.

11   These are conclusions that I drew from reading

12   the material and thought that they were

13   relevant.

14          Q.      Getting back to 321 at Paragraph

15   6 on Page 3, describing the due diligence

16   process in this case, you write:  "The process

17   was enhanced by the book-running firm's

18   commitment process.  A complete memo was

19   prepared and presented to a group of senior firm

20   members.  This group further reviewed and

21   validated the deal team's due diligence

22   efforts."

23                  MR. GLUCKOW:  Excuse me.  If you

24          wouldn't mind, I think you lost the

25          witness in terms of where you were

Page 39

1           EDWARD NECARSULMER, III

2           reading from.  Would you mind going

3           back and redirecting us to where you

4           are.

5                   MR. LEWIS:  We are on Page 3,

6           Paragraph 6.

7                   MR. GLUCKOW:  And we are on 321;

8           correct?

9                   MR. LEWIS:  Right, 321.

10   BY MR. LEWIS:

11           Q.    "The process was enhanced by the

12   book-running firm's commitment process.  A

13   complete memo was prepared and presented to a

14   group of senior firm members.  This group

15   further reviewed and validated the deal team's

16   due diligence efforts."

17                   When you wrote that, were you

18   referring to the commitment memo that appears

19   at Exhibit 74?

20           A.    Yes.

21                   MR. GLUCKOW:  When you said --

22           just for the record, I'm assuming your

23           question is referring to the complete

24           memo as opposed to the process referred

25           to in Paragraph 6?

Page 40

1           EDWARD NECARSULMER, III

2               MR. LEWIS:  Right.

3   BY MR. LEWIS:

4           Q.    Exhibit 74 is the complete memo

5   that you referred to in Paragraph 6?

6           A.    To the best of my recollection.

7           Q.    Did you receive any information

8   from Lehman about the commitment process other

9   than appears in the documents that are listed in

10  your report?

11          A.    No.

12          Q.    Did you read Exhibit 74 from

13  cover to cover in the process of your work on

14  this case?

15          A.    Yes.

16          Q.    Did you find someplace in

17  Exhibit 74 where there is reference to either

18  potential gray marketing or to potential Costco

19  distribution?

20          A.    Not that I recall.

21          Q.    Do you have any reason to

22  believe that either gray marketing or Costco

23  distribution were mentioned orally to the

24  commitment committee, although those terms don't

25  appear in the memo?

Page 41

1                           EDWARD NECARSULMER, III

2          A.      I wouldn't know.

3          Q.      From your experience working in

4     the industry, would you expect that the

5     commitment committee would be provided with

6     facts at a commitment committee meeting that did

7     not appear in the memorandum that was being

8     presented to them?

9                MR. GLUCKOW:  Objection.  Calls

10               for speculation.

11                    You can answer.

12               THE WITNESS:  I just wasn't

13               there.  Certainly, from a practice

14               matter, you might ask questions -- you

15               do ask questions; you frankly grill the

16               team -- the presenters.  That's the

17               process.

18    BY MR. LEWIS:

19         Q.      What is the purpose of a

20    commitment committee memorandum, as you

21    understand it?

22         A.      It's really to generally

23    familiarize people who are not actively involved

24    with the transaction as to what they are going

25    to hear, the subject, and, maybe, hopefully --

Page 42

1          EDWARD NECARSULMER, III

2    it doesn't always work this way -- they'll think

3    about it before they walk in the door.

4          Q.    The "they" being the commitment

5    committee itself?

6          A.    The commitment committee,

7    correct.

8          Q.    Now, getting to Paragraph 7 of

9    your report, which includes a summary of your

10   opinions -- this is Paragraph 7, Summary, Page

11   4, the next page.  Let me take this in pieces.

12          The first sentence reads:

13   "Based on my long industry experience and the

14   information presented to me, it is my opinion

15   that the underwriters of this offering

16   performed due diligence in line with normal

17   industry standards and practice."

18          Can you explain to me, sir,

19   what you mean by "in line with normal industry

20   standards and practice"?

21          A.    The years of experience that I

22   had actually doing this leads me to believe --

23   leads me to think I understand, you know, what

24   is required and what is expected for the

25   process, and when I opine that it's in line with

Page 43

1              EDWARD NECARSULMER, III

2      that, it means simply that, that I think they

3      complied with what I think is necessary to have

4      complete due diligence.

5              Q.      Are the industry standards that

6      you refer to in your opinion something that is

7      written down in some industry publication or

8      guideline?

9              A.      It's business practice.

10             Q.      An actual business practice that

11     you have observed in your years of working in

12     the financial industry, correct?

13             A.      Yes.

14             Q.      That experience was gained at

15     the firms that are mentioned -- that you've

16     already mentioned in your testimony and also

17     Hallgarten, H-A-L-L-G-A-R-T-E-N, and Company?

18             A.      Yes.

19             Q.      Hallgarten and Company was at

20     one point Moseley and Hallgarten?

21             A.      Actually, the opposite.

22     Hallgarten and Company was a firm of which there

23     were a great number.  It was actually founded in

24     1850 and had a significant business but then

25     became part of Moseley and Hallgarten, and there

Page 44

1                    EDWARD NECARSULMER, III

2      was a period in the '70s when there was a huge

3      conglomeration of firms.

4                    Actually, I did a fair amount

5      of due diligence where I was the guy who

6      actually went and visited the factory at that

7      point in my career.

8              Q.      Opened the boxes?

9              A.      Correct.

10             Q.      Now, the next sentence of your

11     opinion, immediately following the one I read

12     previously, reads:  "Their actions were

13     consistent with a standard of reasonableness as

14     I understand it, and were more than sufficient

15     to satisfy me as to their adequacy and

16     completeness."

17                    Again, words are the heart of all

18     depositions, I guess.  What do you mean by "a

19     standard of reasonableness as I understand it"?

20             A.      As we've already established, I

21     have no legal training, but it's certainly my

22     business understanding or concept that the

23     underwriters are supposed to conduct reasonable

24     due diligence, and, again, in compliance with

25     what I've done in my own career, I've felt and

Page 45

1          EDWARD NECARSULMER, III

2     feel that this meets those standards -- that

3     their efforts meet those standards.  Let me

4     phrase that better.

5          Q.     The standard that you refer to

6     then in that sentence is a standard based on

7     your empirical observation and personal work in

8     the financial industry rather than anything that

9     is written down in text anywhere?

10          MR. GLUCKOW:  Objection to the

11          form.

12          You can answer.

13          THE WITNESS:  Yes.

14     BY MR. LEWIS:

15          Q.     Have you been a member of any

16     industry committees or associations at which

17     representatives of underwriting firms sit down

18     to discuss principles of due diligence?

19          A.     I've participated in numerous

20     industry panels and study groups and the like,

21     commented on rules, changing the department of

22     corporate financing's rules, et cetera.  Due

23     diligence is certainly part of it, but I

24     couldn't cite you a time when I attended a

25     special seminar on due diligence, but I was an

Page 46

```
 1                    EDWARD NECARSULMER, III

 2    active participant in Securities Industry

 3    Association, Investment Bankers Association,

 4    NASD, Group of Corporate Finance, I did a lot of

 5    that kind of thing, yes.

 6            Q.    You believe you've at least

 7    heard people talk at such meetings, in such

 8    context about due diligence?

 9            A.    I do.

10            Q.    Have you read any publications

11    about due diligence?

12                    MR. GLUCKOW:  Ever?

13                    MR. LEWIS:  Ever.

14                    THE WITNESS:  Yes, but I can't

15            really recall -- I can't cite any, but

16            I know that I've done so.

17    BY MR. LEWIS:

18            Q.    Do you recall anything you've

19    seen in writing about due diligence in the last

20    five years?

21                    MR. GLUCKOW:  Object to the form.

22                    You can answer.

23                    THE WITNESS:  No.

24    BY MR. LEWIS:

25            Q.    In the first sentence of this
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B46

Page 47

1        EDWARD NECARSULMER, III

2  summary you refer to the underwriters of this

3  offering having performed due diligence in line

4  with normal industry standards and practice.

5            Are you referring there to

6  Lehman Brothers rather than to Ferris Baker

7  Watts or Nations Banc?

8        A.    I'm referring to all three

9  managers.

10        Q.    Do you believe that the

11  underwriters other than Lehman Brothers

12  satisfied their due diligence by delegating that

13  function to Lehman which, in your view,

14  satisfactorily performed it?

15            MR. GLUCKOW:  Objection to form.

16        Assumes facts not in evidence.

17        Mischaracterizes the testimony.

18            You can answer.

19            THE WITNESS:  I don't believe

20        they -- look, the practical reality is

21        that the managing underwriter is

22        responsible for the process, but I

23        think there's ample reference to the

24        fact that the other firms kept their

25        own files, participated in various

Page 48

```
1               EDWARD NECARSULMER, III

2          parts of this, were present at

3          meetings, so I would not use the word

4          -- I think the word you used was

5          advocated or --

6   BY MR. LEWIS:

7          Q.    Delegated.

8          A.    Delegated, I think to the extent

9   that it's industry standard to clearly delegate

10  the lead to the book-running manager, but I

11  think they performed in line with what I would

12  have expected.

13         Q.    What were you referring to with

14  respect to the other underwriters keeping their

15  own files?

16         A.    I have production from Nations

17  Banc; I've seen some of their work; I've seen

18  the fact that they participated in meetings.

19         Q.    As part of the overall

20  Underwriter Defendants Document Production Pages

21  1 to 11636?

22         A.    That's correct.

23         Q.    Can you recall anything that

24  Nations Banc did with respect to an evaluation

25  of possible gray marketing or Costco
```

Page 49

1                         EDWARD NECARSULMER, III

2      distribution of Adams clubs?

3              A.    No.

4              Q.    Can you recall anything that

5      Ferris Baker Watts did with respect to gray

6      marketing or possible Costco distribution of

7      Adams clubs?

8              A.    No.

9              Q.    Just to be clear in terms of

10     your reading, have you ever read case law

11     regarding the legal standards for due diligence?

12                      MR. GLUCKOW:  Object to the form.

13                      You can answer.

14                      THE WITNESS:  Not that I recall.

15     BY MR. LEWIS:

16             Q.    Have you heard of any cases,

17     legal cases, in the field of due diligence that

18     you consider to be important cases?

19             A.    No.

20             Q.    Have you ever heard of a

21     decision in a case called Escott, E-S-C-O-T-T,

22     versus Bar Chris, B-A-R capital C-H-R-I-S?

23             A.    I've heard of the case, but it

24     was in an earlier time.

25             Q.    Have you heard of a decision in

Page 50

1           EDWARD NECARSULMER, III

2    Feit, F-E-I-T, versus Leasco, L-E-A-S-C-O, by

3    Judge Weinstein?

4           A.    No.

5           Q.    Have you heard that a decision

6    was rendered in the Worldcom litigation by Judge

7    Denise Cote, C-O-T-E, on the subject of due

8    diligence?

9           A.    Yes.

10          Q.    Have you read that decision?

11          A.    I have not.

12          Q.    Have you been told anything

13   about the contents of the decision?

14          A.    Only what I've read.

15          Q.    And what have you read?

16          A.    Just in terms of general press

17   coverage of the matter.

18          Q.    Do you know any principles that

19   she referred to in her opinion?

20          A.    No.

21          Q.    Would you agree with the general

22   proposition -- and, please, if you don't agree,

23   tell me -- that over the years the underwriter

24   has been regarded as a type of gatekeeper to the

25   capital marketplace?

Page 51

```
 1                    EDWARD NECARSULMER, III

 2                    MR. GLUCKOW:  Object to the form.

 3                    You can answer.

 4                    THE WITNESS:  Yes.

 5      BY MR. LEWIS:

 6             Q.     You do agree with that?

 7             A.     I do.

 8             Q.     And would you agree that an

 9      underwriter's reputation has helped small

10      companies gain access to capital markets?

11                    MR. GLUCKOW:  Object to the form.

12                    You can answer.

13                    THE WITNESS:  Yes.

14      BY MR. LEWIS:

15             Q.     Do you believe that it is true

16      that underwriters have been considered

17      responsible for assuring the accuracy of an

18      issuer's offering materials?

19             A.     I don't believe that to be true.

20             Q.     And can you tell me why?

21             A.     I think among -- let me make

22      sure I phrase this properly.  I think among

23      sophisticated investors, it's well-known that

24      the company is, in fact, you know, the better

25      source about its business and that underwriters
```

Page 52

1    EDWARD NECARSULMER, III

2    will certainly do -- are certainly important in

3    the process; but I don't believe that it's -- it

4    completely -- that it's generally recognized

5    that that is part of the underwriters'

6    responsibility.

7         Q.    Do you believe that in initial

8    public offerings underwriters are heavily relied

9    upon by the investing public?

10        A.    I do believe that.

11        Q.    Do you believe that's true

12   especially where the companies doing the IPOs

13   are experiencing rapid growth and change just

14   before the IPO?

15             MR. GLUCKOW:  Object to the form.

16             You can answer.

17             THE WITNESS:  I don't think

18        there's any difference from your last

19        question.  I think your last question

20        is true, I wouldn't modify it.

21   BY MR. LEWIS:

22        Q.    Okay.

23        A.    The first question is true,

24   excuse me.

25        Q.    Do you agree that the

Page 53

1                    EDWARD NECARSULMER, III

2    reasonableness of a due diligence investigation

3    varies with the factual circumstances of each

4    offering?

5            A.    I do.

6            Q.    To what extent do you believe

7    expense is a determinant in how thorough due

8    diligence should be?

9                    MR. GLUCKOW:  Object to the form.

10                   You can answer.

11                   THE WITNESS:  Virtually not at

12           all.

13    BY MR. LEWIS:

14           Q.    And why is that?

15           A.    I think people's reputation and

16    their relationship with their clients -- I'm

17    talking about from an underwriter's point of

18    view now -- is priceless and cost, just for

19    better or worse, was never an issue.

20           Q.    Now, do you believe that in the

21    securities industry the standards for due

22    diligence are more rigorous in an IPO than in a

23    follow-on offer?

24                   MR. GLUCKOW:  Object to the form.

25                   You can answer.

Page 54

EDWARD NECARSULMER, III

1

2          THE WITNESS:  I have a difficult

3          -- I think your concept is correct, but

4          I'm not sure rigorous -- I guess what

5          I'm trying to say is since there is

6          less information in the public domain,

7          more work is traditionally done, but I

8          think the standards are pretty much the

9          same.

10   BY MR. LEWIS:

11          Q.     So the standards are the same

12   but the work is more rigorous in the IPO than in

13   the follow-on offerings?

14          MR. GLUCKOW:  Object to the

15          form.  Mischaracterizes the testimony.

16          You can answer.

17          THE WITNESS:  What I'm trying to

18          say -- maybe I didn't say it properly

19          -- is that if you are working on the

20          second, third, or fourth offering for a

21          company, A, you are knowledgeable,

22          assuming you have the same team in

23          place or parts of the same team in

24          place; and, B, the body of information

25          has been organized and is more easily

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B54

Page 55

1          EDWARD NECARSULMER, III

2               -- easy to digest and to process.  An

3               IPO you tend -- sometimes have to

4               really break new ground to get

5               information.

6    BY MR. LEWIS:

7          Q.     Would you agree that the

8    securities industry as a whole expects more due

9    diligence work in an IPO than in a follow-on

10   offering?

11               MR. GLUCKOW:  Object to the

12          form.  Vague and ambiguous.

13          You can answer.

14               THE WITNESS:  I wouldn't agree to

15          that.

16   BY MR. LEWIS:

17          Q.     I think -- strike that.

18               Is it true in an IPO that

19   because securities have not been previously

20   publicly traded, information about an issuer

21   is often not readily available to the public

22   as a whole?

23               MR. GLUCKOW:  Object to the form.

24          You can answer.

25               THE WITNESS:  It's too hard to

Page 56

1                    EDWARD NECARSULMER, III

2           generalize.  I mean, Google, there were

3           no secrets, yet I'm sure on some small

4           companies there are secrets, or that

5           may be the wrong way to phrase it, but

6           information that is not as available.

7    BY MR. LEWIS:

8           Q.    Would you disagree then that the

9    standards for due diligence are higher than

10   usual where a company going through an IPO is

11   experiencing rapid growth and change?

12          MR. GLUCKOW:  Objection to the

13          form.

14          You can answer.

15          It's vague and ambiguous.

16          THE WITNESS:  I don't think I can

17          answer.  I'm not unwilling to, I just

18          don't think I can answer that.  I don't

19          think the standards -- you are faced

20          with the same issue when you agree to

21          commit your capital and your reputation

22          to underwrite securities and there may

23          be a number of, you know, intensity, or

24          whatever the proper phrase would be,

25          someplace within the same scale and I

Page 57

```
 1              EDWARD NECARSULMER, III
 2          don't think it's just because it's an
 3          initial public offering or just because
 4          it's a company that's a rapidly growing
 5          company.
 6   BY MR. LEWIS:
 7          Q.     So in the past when you -- I
 8   take it you have performed -- you have
 9   participated in some way or other in due
10   diligence investigations both of companies going
11   through IPOs and companies going through
12   follow-on offerings.  Is that correct?
13          A.     That is correct.
14          Q.     And in those situations you did
15   not expect the due diligence team to adjust its
16   level of due diligence to take into account the
17   newness of the one company versus the previous
18   offering of the other?
19              MR. GLUCKOW:  Object to the
20          form.  Mischaracterizes the testimony.
21              You can answer.
22              THE WITNESS:  I don't think
23          that's what I said, or if I did say
24          that, that's not what I meant.  What I
25          meant was there are a whole set of
```

Page 58

EDWARD NECARSULMER, III

1

2          variables.  Some of the ones you've

3          mentioned are variables -- are valid

4          ones, but there are -- just the

5          existence of the fact that it was a

6          fast growing company or it was a new

7          company would not be enough for me to

8          direct the team to do something

9          different.

10   BY MR. LEWIS:

11          Q.    What variables, if any, would

12   cause you to direct the team to do something

13   different in due diligence?

14          MR. GLUCKOW:  I'm going to object

15          to the form and object on the ground

16          that it's vague and ambiguous and quite

17          overbroad.

18          But you can answer.

19          THE WITNESS:  I mean it's a

20          situation-by-situation issue.  I think

21          that -- and I can only, you know,

22          really respond to it anecdotally if I

23          can think of some appropriate

24          anecdotes.  But I guess my point is,

25          without belaboring this, is you look at

Page 59

EDWARD NECARSULMER, III

1

2          each situation and hopefully -- you

3          know, if you are managing the process,

4          you look at each situation and

5          hopefully you figure out, you know,

6          what you need to do to satisfy your

7          commitment committee, yourself, and the

8          marketplace.  And there are really no

9          other rules specific -- you know,

10         templates I can honestly look at you

11         and offer beyond that.

12    BY MR. LEWIS:

13         Q.    Have you ever had the experience

14    of adjusting the due diligence that you were

15    conducting on a company because the company had

16    management that had not had long experience in

17    running a public company?

18         A.    Yes.

19         Q.    And why did you do that?

20         A.    Well, because simply as a matter

21    of mechanics.  In many cases if a company had

22    done other offerings or was -- let's say had

23    done other offerings or had significant -- had

24    done private equity financings or other

25    transactions, typically they might be more

Page 60

1              EDWARD NECARSULMER, III

2      organized in terms of your ability to get

3      documents and things that were on point that

4      would go right to your organizational outline,

5      where if they hadn't, you might have to really

6      help them set up the process.

7              Q.      Would you agree that in an

8      initial public offering there is a strong

9      affirmative duty of disclosure?

10                   MR. GLUCKOW:  Object to the

11              form.  Vague and ambiguous.  Calls for

12              a legal conclusion.

13                   You can answer.

14                   THE WITNESS:  Yes.

15     BY MR. LEWIS:

16              Q.      Would you agree that in

17     conducting due diligence it is necessary for the

18     due diligence team to continue its investigation

19     of the issuer up to and including the effective

20     date of the registration statement?

21              A.      Yes.

22              Q.      And a due diligence

23     investigation would be inadequate if the

24     underwriter did not do that?

25                   MR. GLUCKOW:  Object to the

Page 61

1                    EDWARD NECARSULMER, III

2              form.  It calls for a legal conclusion.

3                    You can answer.

4                    THE WITNESS:  I mean, the easy

5              answer is yes, but -- well, okay, let

6              me just leave it at yes.

7    BY MR. LEWIS:

8              Q.    Is it your understanding as a

9    non-lawyer that one of the duties of

10   underwriters is to deal fairly with the

11   investing public?

12                   MR. GLUCKOW:  Object to the form.

13                   You can answer.

14                   THE WITNESS:  Absolutely.

15   BY MR. LEWIS:

16             Q.    Isn't that sometimes referred to

17   as the shingle theory?

18             A.    I'm not familiar with that.

19             Q.    I take it from your initial

20   report that one of your beliefs is that an

21   underwriter has an obligation to conduct a

22   reasonable investigation in an IPO?

23             A.    Yes.

24             Q.    And there is a long tradition

25   since the securities laws were enacted in the

Page 62

1                    EDWARD NECARSULMER, III

2      '30s of underwriters conducting due diligence

3      investigations?

4                    MR. GLUCKOW:  Object to the

5             form.  Vague and ambiguous.

6                    You can answer.

7                    THE WITNESS:  Yes.

8      BY MR. LEWIS:

9             Q.     To your knowledge, how far back

10     in time have due diligence investigations been

11     conducted by underwriters?

12            A.     I think they were formalized by

13     the 33 Act, but I don't go back quite that far,

14     but it's certainly my understanding that

15     particularly, you know, throughout history, you

16     know, you committed your own capital to a

17     greater extent I think than -- now things come

18     full cycle, but in the beginning I think people

19     did due diligence as, you know -- it's my

20     understanding that a lot of due diligence --

21     what due diligence was done was, in fact, you

22     know, a matter of, you know, of self-protection

23     as opposed to any responsibility -- as opposed

24     to exclusively a responsibility to, you know,

25     investors.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B62

Page 63

1                       EDWARD NECARSULMER, III

2            Q.      Did your work in the securities

3    industry begin in 1967 with Hallgarten?

4            A.      Correct.

5            Q.      In the time that you've been in

6    the industry, have you become aware of any

7    changes in practical standards for due diligence

8    investigations?

9                    MR. GLUCKOW:  Objection.  Vague

10           and ambiguous.  Overbroad.

11                   You can answer.

12   BY MR. LEWIS:

13           Q.      Let me reframe the question.

14                   Have you become aware of

15   changes in practice with respect to due

16   diligence investigations over the time since

17   1967 that you've been employed in the

18   industry?

19                   MR. GLUCKOW:  The same objection.

20                   You can answer.

21                   THE WITNESS:  None to the basic

22           tenets of how the business or the

23           process is done.  I think one of the

24           main changes that I've seen is that to

25           the extent that the managing

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

B63

Page 64

EDWARD NECARSULMER, III

1
2  underwriter has taken an even larger
3  responsibility or has been delegated --
4  I don't like the word delegated, but
5  has been delegated a responsibility by
6  the other comanagers to a greater
7  extent.
8           And the other -- if I can just
9  illuminate.  The process has gotten
10 better to the extent that investment
11 banks began to specialize in either
12 certain industries or had groups that
13 did certain industries; whereas, in my
14 life, everybody was a generalist and so
15 that if you were doing a
16 telecommunications deal, it would be
17 done by the telecommunications group in
18 Lehman Brothers or Goldman Sachs or
19 something, who really became quite
20 expert.
21          I know we had a significant
22 technology practice and management
23 would often tell me that some of the
24 people in that group are as
25 knowledgeable -- not as they were, of

Page 65

```
 1                      EDWARD NECARSULMER, III
 2          course, but as their competitors were
 3          about the business.
 4                      MR. GLUCKOW:  I think we've been
 5          going a little bit over an hour.  If
 6          there's a point in your outline where
 7          we could take a short break.
 8                      MR. LEWIS:  We can take it right
 9          now.
10                      MR. GLUCKOW:  That would be
11          great.
12                      (A recess was had from 1:18 p.m.
13          to 1:26 p.m.; and then the proceedings
14          continued as follows:)
15    BY MR. LEWIS:
16               Q.    Mr. Necarsulmer, outside of this
17    litigation, before you did your work in this
18    case, did you ever hear it said that
19    underwriters were required to act as a prudent
20    man would in the management of his own property?
21                      MR. GLUCKOW:  Those words?
22                      MR. LEWIS:  Yes.
23                      THE WITNESS:  I've certainly
24          heard of the prudent man rule, but I
25          thought it referred to trust companies
```

1           EDWARD NECARSULMER, III

2           and mutual funds.

3   BY MR. LEWIS:

4           Q.    Okay.  Have you heard anything

5   else said about whether underwriters had to act

6   as a prudent man in the management of his own

7   property?

8           A.    I've never heard that.

9           Q.    Do you believe that underwriters

10  are entitled to rely solely on the

11  representations of a company's officers or

12  counsel?

13              MR. GLUCKOW:  Object to the form.

14              You can answer.

15              THE WITNESS:  No.

16  BY MR. LEWIS:

17          Q.    And why do you not believe that

18  they can do so?

19          A.    In my experience, when possible,

20  and when relevant, it always -- it wasn't always

21  the case.  If there are independent checks, you

22  can do formal or informal, it's a useful part of

23  the process.

24          Q.    Do you believe that verification

25  of information is a critical step in the due

Page 67

1                     EDWARD NECARSULMER, III

2    diligence process?

3          A.    Yes.

4          Q.    And do you believe that that is

5    necessary because even honest clients can make

6    mistakes?

7                MR. GLUCKOW:  Objection to the

8          form.

9                You can answer.

10   BY MR. LEWIS:

11         Q.    Do you believe that one reason

12   that verification is necessary is because even

13   honest clients can make mistakes?

14               MR. GLUCKOW:  Same objection.

15               You can answer.

16               THE WITNESS:  Yes.  I don't

17         enthusiastically agree, but I will

18         concede that.

19   BY MR. LEWIS:

20         Q.    Okay.  Do you agree that another

21   reason that it may be necessary is because

22   honest clients can be overenthusiastic or

23   overoptimistic?

24         A.    Yes.

25               MR. GLUCKOW:  The "it" being

Page 68

1                     EDWARD NECARSULMER, III

2            verification?

3                     MR. LEWIS:  Yes.

4    BY MR. LEWIS:

5            Q.     And is it your belief that on

6    rare occasions statements may be made by company

7    officers to induce an underwriter to underwrite

8    an offering where those statements are

9    deliberately false?

10                    MR. GLUCKOW:  Objection to the

11           form.  Vague and ambiguous.

12                    You can answer.

13                    THE WITNESS:  It certainly has

14           happened.

15   BY MR. LEWIS:

16           Q.     Can you think of any situations

17   where it has happened?

18                    MR. GLUCKOW:  In his own

19           experience?

20   BY MR. LEWIS:

21           Q.     Either in your own experience or

22   those you have heard of?

23           A.     I can't give you a specific

24   example.

25           Q.     Do you agree with the

Page 69

```
 1                    EDWARD NECARSULMER, III

 2     proposition that underwriters must be alert to

 3     exaggerations by an issuer?

 4                    MR. GLUCKOW:  Object to the form

 5              and object to the ground that like

 6              these other questions, that it's vague

 7              and ambiguous and overbroad.

 8                    But you can answer.

 9                    THE WITNESS:  Yes.

10     BY MR. LEWIS:

11          Q.     Now, do you believe that there

12     are any industry standards relating to

13     verification of information supplied by an

14     issuer?

15          A.     No.

16                    MR. GLUCKOW:  I offer a belated

17              objection to the form.

18     BY MR. LEWIS:

19          Q.     Have there been instances in

20     your career where to verify information you or

21     people working for you interviewed lower level

22     employees of a corporation?

23          A.     I can't answer that yes or no.

24     I've seen it done, not in a verification sense,

25     but if I may, for example, in a business where
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B69

Page 70

1        EDWARD NECARSULMER, III

2    one particular product line, geographic line,

3    factory is critical or critical to driving

4    growth of sales and revenues, I've seen it done

5    where you've asked to be exposed to the actual

6    hands-on people in that area, but it's not

7    customary, except for, again, you might meet a

8    plant manager if you go look at a facility, that

9    kind of thing, but he would more be a tour guide

10   and you would generally speak to the designated

11   heads of marketing, finance, manufacturing,

12   whatever the traditional department heads of the

13   company are.  That's certainly my experience.

14          Q.    In the instances you gave of

15   dealing with lower level employees, would it be

16   fair to say you were giving examples of

17   situations where the contacts were made for

18   evaluation of those people or examination of

19   facilities?

20              MR. GLUCKOW:  Objection to the

21        form.

22              You can answer.

23              THE WITNESS:  The latter, not the

24        former.

25   BY MR. LEWIS:

B70

Page 71

1                    EDWARD NECARSULMER, III

2          Q.      Okay.  But not as a verification

3    on information that had been supplied by

4    management?

5          A.      Correct.

6          Q.      Have there been instances in

7    your career when either in participating in or

8    conducting a due diligence investigation you

9    asked a company to give you access to files that

10   they had not provided to you?

11         A.      I don't recall ever having done

12   that.

13         Q.      Do you believe that use of

14   industry experts in due diligence is a desirable

15   thing in general terms?

16         A.      Yes, with a qualification.  I

17   think it's important to -- I think it's

18   important when there's something you don't

19   understand -- or, again, I'm a practical

20   character, so I can remember working on an

21   insurance company deal where there's no way we

22   would be able to understand actuarial

23   assumptions, so we would hire our own actuary.

24              But would I encourage the use

25   of an outside expert to look at somebody's

Page 72

1                     EDWARD NECARSULMER, III

2    manufacturing process or something?  Typically

3    not.  So oil and gas is the usual example

4    where you get your independent petroleum

5    engineer to verify reserves, or something like

6    that.

7              Q.    Do you believe that there are

8    instances in which verification may require

9    reviewing internal documents of a company that

10   the company has not voluntarily supplied?

11                   MR. GLUCKOW:  Object to the form.

12                   You can answer.

13                   THE WITNESS:  I'm not really

14                   comfortable with the hypothetical.  I'm

15                   sure there are situations, I just have

16                   never run into one.

17   BY MR. LEWIS:

18             Q.    Do you believe that it's true

19   that during the due diligence process the

20   positions of the underwriters and the company's

21   officers should become somewhat adverse?

22                   MR. GLUCKOW:  Object to the form.

23                   You can answer.

24                   THE WITNESS:  In an ideal world

25                   there ought to be a nice balance

Page 73

1                    EDWARD NECARSULMER, III

2           between friendly or, you know,

3           cooperation, but you still need to have

4           the ability to get the answers, and if

5           that causes adversity, so be it.

6    BY MR. LEWIS:

7           Q.     But would you agree that the due

8    diligence process often fosters a collaborative

9    atmosphere between the issuer and the

10   underwriters?

11          A.     It certainly always starts out

12   that way.  Or I should rephrase, usually starts

13   out that way.

14          Q.     In fact, in your report in the

15   AMF case --

16          A.     Mm-hmm.

17          Q.     -- Exhibit 324, Page 2,

18   Paragraph B --

19          MR. GLUCKOW:  Hold on; just let

20   us get there.

21          Okay.

22   BY MR. LEWIS:

23          Q.     -- the last sentence, you

24   wrote:  "While the process often fosters a

25   collaborative atmosphere between issuer and

Page 74

                              EDWARD NECARSULMER, III

1

2    underwriters, it is essential for due diligence

3    efforts to be thorough and their conclusions

4    factually supportable."

5                    Do you believe that as a

6    general proposition?

7            A.    I think that's just what I just

8    said, but, yes.

9            Q.    Is there a reason that in

10   writing your report in this case you took out

11   the reference to the fostering of a

12   collaborative atmosphere?

13           A.    No.  I said to you before that I

14   used this as a template, but it was more in the

15   process of ordering things and what I wanted to

16   cover, but I frankly rethought what I would want

17   to include in my opinion.

18                 MR. GLUCKOW:  By the way, for the

19           record, you are comparing B of 324 with

20           B of 321?

21                 MR. LEWIS:  Yes.

22                 MR. GLUCKOW:  And comparing

23           collaborative versus cooperation?

24                 MR. LEWIS:  Right.

25                 MR. GLUCKOW:  Okay.

Page 75

1                    EDWARD NECARSULMER, III

2    BY MR. LEWIS:

3          Q.     In your report in 321 you have

4    written:  "While the process requires

5    cooperation between issuer and underwriters, it

6    is essential for due diligence efforts to be

7    thorough and their conclusions factually

8    supportable."

9                    I don't have a question, but if

10   you want to respond, you are free.

11                    MR. GLUCKOW:  Wait for a

12          question.

13   BY MR. LEWIS:

14          Q.     Do you believe that in the due

15   diligence process the underwriters are

16   frequently required to play devil's advocate?

17          A.     Yes.

18          Q.     When, in your opinion, does that

19   become necessary?

20          A.     It's hard to be specific.  I

21   mean, it could be from the first meeting to the

22   bringdown call right before you price.  I mean,

23   it's just part of the ongoing process.

24          Q.     Do you agree in principle that

25   the underwriters must employ a high degree of

1                    EDWARD NECARSULMER, III

2    care in their investigations?

3              A.      I certainly do.

4              Q.      Do you agree that the

5    underwriters must independently verify the

6    company's representations?

7                    MR. GLUCKOW:  Objection to the

8              form.  Asked and answered.

9                    You can answer.

10                   THE WITNESS:  I don't think all

11             of the representations.  I think -- you

12             know, the basic description of their

13             business and their business plan and

14             these kinds of things are -- if you are

15             going to do business with these people,

16             you traditionally accept those at face

17             value.

18    BY MR. LEWIS:

19             Q.      Do you believe that in each case

20    in which an underwriter conducts due diligence

21    it must conduct a meaningful investigation of

22    the company?

23                   MR. GLUCKOW:  Objection to the

24             form.

25                   You can answer.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B76

Page 77

1                     EDWARD NECARSULMER, III

2                     THE WITNESS:  I agree with that.

3      BY MR. LEWIS:

4           Q.     Would you agree that in the due

5      diligence context the term investigation can be

6      defined as conducting a searching inquiry?

7           A.     I don't really have a response

8      to that.  I think that's a matter of semantics.

9      I think you -- whatever procedure and process

10     you use and you feel is adequate and reasonable,

11     you do.

12          Q.     Is there a definition that you

13     have in your own mind for what an investigation,

14     a due diligence investigation, means?

15          A.     Yes, but it can vary from

16     company to company and project to project.

17          Q.     Would you agree that to

18     investigate means to inquire into a subject

19     matter with attention to detail?

20          A.     That's a fair definition.

21          Q.     That's a...?

22          A.     Fair definition.

23          Q.     Fair definition?

24                 MR. GLUCKOW:  Delayed objection

25                 to the form.

Page 78

1            EDWARD NECARSULMER, III

2                  You can answer.  And you have.

3      BY MR. LEWIS:

4            Q.    Is it your view that if an

5      underwriter receives negative information from a

6      company of some sort, it's required -- it

7      becomes necessary to follow up on that

8      information?

9                  MR. GLUCKOW:  Objection to the

10           form.  Vague and ambiguous.

11                 You can answer.

12                 THE WITNESS:  I think it's

13           necessary to follow up on all

14           information - negative, positive, or

15           sideways.

16      BY MR. LEWIS:

17           Q.    And noninformation, also?

18                 MR. GLUCKOW:  Objection to the

19           form.

20                 You can answer.

21                 THE WITNESS:  If something is

22           self-evident or that's just a fact, no,

23           you don't need to follow up on it,

24           but...

25      BY MR. LEWIS:

Page 79

1                   EDWARD NECARSULMER, III

2            Q.      Do you use the term red flags in

3     your work?

4            A.      Yes.

5            Q.      How do you use that term?

6            A.      To define issues that either

7     require further attention or are not -- or

8     perhaps inconsistent with what we -- our, you

9     know, prior impression would be.

10           Q.      Is it your opinion that it is

11    necessary for an underwriter to follow up on any

12    red flag that suggests that a registration

13    statement may not be complete and accurate?

14           A.      I mean, the general answer to

15    the question is yes, but it's very hard just to

16    -- let me leave it there.  Yes.

17           Q.      Would you agree that merely

18    spending a lot of time on an investigation,

19    meeting a lot of times with management, and

20    reviewing a lot of documents is not necessarily

21    sufficient in a due diligence investigation?

22                   MR. GLUCKOW:  Vague and

23           ambiguous.

24                   You can answer.

25                   THE WITNESS:  It doesn't -- it's

Page 80

1                    EDWARD NECARSULMER, III

2          not -- it's not the final answer.

3   BY MR. LEWIS:

4          Q.     Have you been involved in due

5   diligence investigations where a great amount of

6   time and money was spent in the investigation

7   and the investigation was not to your

8   satisfaction?

9          A.     Yes.

10         Q.     And can you give any anecdotal

11  examples of that?

12         A.     Well, all I can tell you is I

13  have been in situations where, either as a

14  commitment committee or as just a man heading up

15  a department, I didn't feel we had adequate

16  information to -- either in one specific area or

17  in general or that we had gone far enough to

18  sign off on underwriting the or presenting it to

19  whoever needed to sign off on it, so the answer

20  is yes.

21         Q.     What did you do in that instance

22  or instances?

23         A.     You go back and you do more

24  work.

25         Q.     Did you ever hold up an offering

Page 81

```
 1                    EDWARD NECARSULMER, III

 2    to do more work?

 3            A.    Yes.

 4            Q.    How recently was that, in

 5    general?

 6            A.    I would say that would have been

 7    pre-1998.

 8            Q.    Do you have an opinion on

 9    whether that portion of the due diligence

10    investigation which the underwriters in this

11    case did with respect to possible gray marketing

12    or Costco distribution of Adams products

13    satisfied industry standards?

14                    MR. GLUCKOW:  Objection to the

15            form.  Vague and ambiguous.  The report

16            speaks for itself.

17                    You can answer.

18                    THE WITNESS:  I believe it does.

19    BY MR. LEWIS:

20            Q.    So you do in fact believe that

21    the underwriters in this case did investigate

22    possible gray marketing or Costco distribution

23    of Adams products?

24            A.    I believe that underwriters were

25    aware of the situation, made a judgment about
```

Page 82

1                    EDWARD NECARSULMER, III

2       how impactful it was upon the company, and acted

3       accordingly.

4              Q.      And the opinion you have on that

5       subject is based, as is your overall opinion, on

6       industry standards rather than legal standards?

7                    MR. GLUCKOW:  Objection to the

8            form.

9                    You can answer.

10                   THE WITNESS:  Yes.

11      BY MR. LEWIS:

12             Q.      You are not relying on any cases

13      with respect to that?

14             A.      Right.

15             Q.      It's your observation of

16      industry norms?

17             A.      Correct.

18             Q.      Do you know of any investigation

19      that the underwriters conducted of gray

20      marketing or Costco issues other than what is

21      reflected in the writings that you have listed

22      in the attachment to your report?

23                   MR. GLUCKOW:  Object to the form.

24                   You are referring to Exhibit A to

25           321?

---

**VERITEXT PA COURT REPORTING COMPANY**
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 83

1                    EDWARD NECARSULMER, III

2                    MR. LEWIS:  321.

3                    MR. GLUCKOW:  Exhibit B?

4                    MR. LEWIS:  Exhibit B.

5                    THE WITNESS:  Those were the

6              materials that I reviewed, solely and

7              completely.

8    BY MR. LEWIS:

9         Q.    Do you believe that the best

10   record of what actions the underwriters take in

11   a due diligence investigation is what they

12   preserve in writing?

13                   MR. GLUCKOW:  Objection to the

14             form.  Vague and ambiguous.

15                   You can answer.

16                   THE WITNESS:  I don't know how to

17             answer the question.

18                   The written record is certainly,

19             you know, significant in the part that

20             lasts, but when you sit in a commitment

21             committee or when you sit with your

22             boss and you say, you know, these are

23             important issues, that could be equally

24             important, but certainly the only thing

25             I can refer to is what I've seen.

```
 1              EDWARD NECARSULMER, III

 2   BY MR. LEWIS:

 3         Q.    Based on your experience in the

 4   industry, is it customary to record in writing

 5   any significant activities you undertake as part

 6   of a due diligence investigation?

 7              MR. GLUCKOW:  Objection to the

 8         form.  Vague and ambiguous.

 9              You can answer.

10              THE WITNESS:  Customary but not

11         exclusive.

12   BY MR. LEWIS:

13         Q.    Can you explain what you mean by

14   that?

15         A.    What I mean by that is that you

16   obviously want to write down and memorialize as

17   much as you possibly can, but this is a process

18   and you go out and you talk to people and you

19   are working with the CFO and you are talking

20   about an issue and you are -- you know, there

21   are things that you hope that the people on your

22   team are getting a feel for and digesting about

23   the company, and whether that all gets written

24   down or not, I can't tell you.

25         Q.    Is it customary in your
```

Page 85

1           EDWARD NECARSULMER, III

2   experience for an underwriter to document

3   discussions regarding determinations of

4   materiality?

5               MR. GLUCKOW:  Objection to the

6       form.  Vague and ambiguous.

7               You can answer.

8               THE WITNESS:  I would say no.

9   BY MR. LEWIS:

10          Q.    Why is that?

11          A.    Because if, you know, again, you

12  are determining something is not material, you

13  probably move on.

14          Q.    In your experience, is it

15  customary to document information which leads to

16  the decision to exclude something from a

17  prospectus?

18              MR. GLUCKOW:  Object to the

19      form.  Vague and ambiguous.

20              You can answer.

21              THE WITNESS:  I'll answer again

22      no.

23  BY MR. LEWIS:

24          Q.    Now, is it customary in the

25  industry to keep notes regarding a due diligence

Page 86

EDWARD NECARSULMER, III

1

2      investigation, in your experience?

3              A.      Again, customary but not

4      exhaustive.  I mean, anecdotally, you -- someone

5      tells you you have currency exposure to some

6      kind of currency, so you investigate and you

7      find out that in fact the contracts are written

8      in dollars -- I mean, I'm making this -- I'm

9      using an example -- so therefore I would never

10     expect for someone to write down, gee, I checked

11     out whether we were exposed to the Zambian

12     kwacha and found out the contracts were written

13     in dollars.  Because we had already reviewed the

14     contracts or we had the contracts as another

15     part of our thing, I wouldn't have expected that

16     to be a separate analysis or separate record.

17             Q.      Is it your opinion that it is

18     desirable for an underwriter to prepare a list

19     of facts to be verified and then to address them

20     in a systematic fashion?

21             A.      Desirable?  Absolutely.

22             Q.      What do you believe, as you sit

23     here and as you can recall, that the

24     underwriters did to investigate possible gray

25     marketing or Costco distribution of Adams

Page 87

1          EDWARD NECARSULMER, III

2     products?

3                    MR. GLUCKOW:  Objection to the

4          form.  Overbroad.

5                    In addition to what's in his

6          reports or in summarized reports?

7     BY MR. LEWIS:

8          Q.    As you sit here, can you recall

9     anything that Adams did to investigate possible

10    gray marketing or Costco distribution of Adams

11    products?  And if you need to refer --

12                   THE WITNESS:  May I ask a

13         question?

14                   MR. GLUCKOW:  Let me object to

15         the form.  I think you said what did

16         Adams do.

17                   THE WITNESS:  Yeah, that's what I

18         was going to ask.

19                   MR. GLUCKOW:  Do you want to have

20         it read back or fix it?

21                   MR. LEWIS:  I'll fix it.

22    BY MR. LEWIS:

23         Q.    As you sit here, can you recall

24    anything that the underwriters did to

25    investigate possible gray market distribution or

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B87

Page 88

1            EDWARD NECARSULMER, III

2    Costco distribution of Adams products?

3                MR. GLUCKOW:  Objection to the

4         form.

5                You can answer.

6                THE WITNESS:  They did a number

7         of things.  They spent time with the

8         marketing people at Adams and the

9         subject was discussed.  They

10        participated in the customer survey

11        process where that was, to the best of

12        my recollection, never mentioned as an

13        issue by a group of their -- a group of

14        customers.

15   BY MR. LEWIS:

16        Q.     Anything else that you can

17   recall?

18        A.     Those would be the two main

19   things that I can recall at this time.

20        Q.     Incidentally, maybe I can

21   short-circuit some paper, you referred in your

22   rebuttal report to a number of specific pages at

23   Pages 1 and 2 of the rebuttal report --

24        A.     Mm-hmm.

25        Q.     -- under underwriting document

Page 89

1              EDWARD NECARSULMER, III

2     pages, Paragraph B, Paragraph C.

3              Am I correct that none of those

4     pages specifically referred to the terms gray

5     marketing or Costco?

6              MR. GLUCKOW:  You mean the UND

7              document production pages as opposed to

8              the deposition transcripts?

9              MR. LEWIS:  Yes, correct.

10             THE WITNESS:  I don't recall.  I

11             can't tell you what said what.  I know

12             they were both used and -- I can

13             certainly tell you in the deposition

14             transcripts it came up often.  I just

15             don't recall.

16             MR. LEWIS:  Okay, if we may go

17             through them.

18    BY MR. LEWIS:

19         Q.    Are you seeking to be qualified

20    in this case as an expert on the subject of what

21    disclosures were legally required?

22             MR. GLUCKOW:  Objection to the

23             form.

24             You can answer.

25             THE WITNESS:  To the extent that

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B89

Page 90

1              EDWARD NECARSULMER, III

2              it's part of the due diligence

3              assignment, I guess the answer is yes,

4              but I wasn't specifically -- to the

5              best of my knowledge, I'm not

6              specifically trying to get there.  I

7              think that it's all basically the same

8              issue to the investigation and I'm sure

9              that it was properly disclosed.

10    BY MR. LEWIS:

11         Q.    But you say in your rebuttal

12    report that the defendants made a reasonable

13    judgment on disclosure?

14              MR. GLUCKOW:  Where are you

15         referring?

16              MR. LEWIS:  The rebuttal report.

17              MR. GLUCKOW:  What page?  What

18         paragraph?

19              MR. LEWIS:  Let's go to Paragraph

20         C.  "After doing proper due diligence,

21         the underwriters made a reasonable

22         judgment related to disclosure of this

23         issue."

24              MR. GLUCKOW:  Maybe we are on

25         different pages.  I'm not finding what

Page 91

1          EDWARD NECARSULMER, III

2          you are referring to.  322, what

3          paragraph?

4                    MR. LEWIS:  3.

5                    MR. GLUCKOW:  Oh, he said C.

6                    THE WITNESS:  I thought you said

7          C, I'm sorry.

8     BY MR. LEWIS:

9          Q.    Let me read it in full:  "To the

10    extent that either expert is opining that the

11    underwriters were unreasonable in concluding

12    that a disclosure regarding gray marketing was

13    not necessary, I disagree with that contention

14    and believe, that after doing proper due

15    diligence, the underwriters made a reasonable

16    judgment related to disclosure of this issue."

17                    You do not contend, do you,

18    that you are an expert in gray markets?

19          A.    Absolutely not.

20          Q.    Did you ever have experience

21    with gray market issues before this litigation?

22          A.    I actually did once.  I worked

23    on a significant case for Daimler-Benz, and it

24    was -- one of the issues they were facing was

25    importation of cars not through their regular

Page 92

```
 1                    EDWARD NECARSULMER, III
 2   channels --
 3            Q.      Okay.
 4            A.      -- and then the dealers would be
 5   responsible for the cars.  And one of the issues
 6   was dealer relations and, you know, the whole --
 7   how the US network hung together.  So I
 8   certainly was, you know, involved in that
 9   particular case, and, you know, we determined
10   that it wasn't material to what we were doing,
11   but it was out there.
12                    I can't think of others, but I
13   suspect there have been others.
14            Q.      When was that Daimler-Benz
15   matter?
16            A.      I guess that was a '93
17   offering.  There were two or three, the rights
18   offering and an equity offering and all around
19   the -- that offering all around the same time.
20   I just remember it being brought up and us
21   discussing it and then doing a little research
22   on it at the time.
23            Q.      Well, is it your testimony that
24   if in this case there was in fact a serious gray
25   marketing issue and the underwriters did not
```

Page 93

```
 1                    EDWARD NECARSULMER, III

 2      detect it, they are excused for overlooking it?

 3                    MR. GLUCKOW:  Objection to the

 4            form.  It assumes facts not in

 5            evidence.  It calls for speculation and

 6            an incomplete hypothetical.  Overbroad.

 7                    THE WITNESS:  I'd be happy to try

 8            to answer your question, I'm just not

 9            sure I can.

10      BY MR. LEWIS:

11            Q.    Well, let's take the

12      hypothetical assumption that -- not so

13      hypothetical -- that there was a serious

14      potential problem that existed, that the

15      underwriters conducted the investigation -- let

16      me reframe it.

17                    Are you saying anything by your

18      opinion other than if the underwriters did a

19      diligent investigation, they were not required

20      to disclose something they didn't find?

21                    MR. GLUCKOW:  The same objections.

22                    THE WITNESS:  I fundamentally

23            agree with that, yes.

24      BY MR. LEWIS:

25            Q.    Your opinion does not rest on
```

Page 94

1                    EDWARD NECARSULMER, III

2    materiality standards or SEC disclosure

3    standards, it's based in the reasonableness of

4    the investigation?

5            A.    Yes.

6            Q.    And nothing else?

7                  MR. GLUCKOW:  Objection to the

8            form.

9                  The report speaks for itself.  I

10           don't know if you want to engage in any

11           dialog on this.

12                 In the conclusion section here,

13           the last section on Page 2, Summary

14           Number 4, it talks about both the

15           reasonableness of the investigation and

16           the reasonableness of the belief.  If

17           you want to lump that all into the

18           reasonableness of the investigation,

19           that's fine.  I just don't want there

20           to be an unclear record; that there's

21           clearly at least two pieces of it in

22           terms of the written opinion.

23    BY MR. LEWIS:

24           Q.    Let me back up a different way.

25                 In a case in which a problem

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 95

EDWARD NECARSULMER, III

1
2    exists, the underwriters conduct a diligent

3    investigation, and notwithstanding having

4    conducted an investigation in full accordance

5    with reasonable industry standards, the

6    problem is still out there and it's not

7    disclosed in the prospectus or registration

8    statement and the problem then thereafter

9    bites the company, are you saying that the

10   underwriters have no disclosure obligation

11   because they conducted a reasonable

12   investigation?

13            MR. GLUCKOW:  The same objections

14         as before.  Incomplete hypothetical.

15         It calls for speculation.  It calls for

16         a legal conclusion.  Incomplete

17         hypothetical.  Assumes facts not in

18         evidence.

19            You can answer.

20            THE WITNESS:  I mean, here's what

21         I would say.  I would say that to the

22         extent that the underwriters made a

23         reasonable and diligent investigation,

24         they discovered -- and in this

25         investigation they discovered whatever

Page 96

EDWARD NECARSULMER, III

1

2       this thing is out there, they decided

3       it wasn't significant to the company's

4       sales and earnings, and then they

5       decided to move on, I would support

6       that, I think that's -- I think that's

7       proper.

8   BY MR. LEWIS:

9       Q.    And if that happened, do you

10  believe that excuses the company from any

11  disclosure obligation?

12           MR. GLUCKOW:  Objection to the

13       form.  Outside the scope of the

14       opinion.  He's not offering any expert

15       testimony as to the company's

16       disclosure obligations; he's offering

17       expert testimony with respect to the

18       underwriters' investigation and the

19       reasonableness of the underwriters'

20       beliefs in light of that investigation.

21  BY MR. LEWIS:

22       Q.    Well, let me back up and ask

23  that question, and that is at the heart of what

24  my question is about.  Does your opinion in any

25  way purport to address the company's disclosure

Page 97

1                    EDWARD NECARSULMER, III

2       obligation, to your knowledge?

3              A.    No, I wasn't asked -- it's not

4       within the scope of my assignment.

5              Q.    And your opinion with respect to

6       disclosure such as it is relates only to the

7       underwriters' disclosure obligations, is that

8       fair?

9                    MR. GLUCKOW:  Objection to the

10                   form.  It's not the underwriters'

11                   disclosure obligations; it's the

12                   underwriters' investigation and the

13                   reasonableness of their belief in the

14                   accuracy and completeness of the

15                   registration statement.

16                   I'm not sure what you're getting

17                   at with your parsing disclosure

18                   obligations of the company --

19                   MR. LEWIS:  I'm sitting here and

20                   letting you filibuster, but you can

21                   object to the questions, and you have,

22                   and you've done it fully, on this whole

23                   subject matter.  You don't have to

24                   supply what his opinion is about.  He

25                   knows what his opinion is about, and he

Page 98

EDWARD NECARSULMER, III

1

2          can tell me that, he can correct me,

3          but --

4                MR. GLUCKOW:  I just think your

5          question is inherently misleading, and

6          I'm trying to make sure that both I and

7          the witness understand what it is you

8          are trying to ask.

9    BY MR. LEWIS:

10          Q.    Let's look at Paragraph F of

11    your rebuttal report, Exhibit 322.

12                You write, starting in the

13    second sentence of Paragraph F: "While

14    Ochoa's report is not clear on this point,

15    although underwriters often review filings of

16    other companies in the same industry, as they

17    did here, the mention of a risk in such

18    filings is not necessarily determinative of

19    whether the risk needs to be included in the

20    issuing company's registration statement."

21                Can you explain what you mean

22    by that?

23          A.    Sure.

24                What I'm saying is basically

25    that it's certainly good practice to look at

Page 99

EDWARD NECARSULMER, III

1

2    what the competition is doing, what they are

3    filing, the most recent, whatever, 10-K,

4    whatever they are filing with the SEC. The

5    fact that you see something doesn't

6    necessarily mean that it's a requirement to be

7    included in either your documents or in your

8    opinion.

9                I guess what I'm trying to say

10   in a broader sense is there's a huge body of

11   information out there, both things you learn

12   from the company and the things you might

13   learn from the industry and whatever else, and

14   when it comes down to it, the underwriter's

15   job is to go through those things and make a

16   decision as to what is material and what is

17   not.

18          Q.     You went on to say:  "Each

19   factual situation is different and the

20   underwriters must evaluate appropriate

21   disclosure on an individual basis," correct?

22          A.     Correct.

23          Q.     Would it be fair to say that

24   your position is that because gray marketing

25   affects different companies in different ways,

Page 100

```
 1              EDWARD NECARSULMER, III
 2    each case has to be separately evaluated?
 3                  MR. GLUCKOW:  Objection to the
 4         form.  Vague and ambiguous.
 5                  You can answer.
 6                  THE WITNESS:  I think that's
 7         fair.
 8    BY MR. LEWIS:
 9         Q.     After the due diligence
10    investigation in the Daimler case that you
11    mentioned, did gray marketing later affect the
12    results of Daimler-Benz?
13         A.     No, or not to my knowledge.
14    I... Not to my knowledge.
15         Q.     What information do you
16    understand the underwriters received from Adams
17    itself about gray marketing or Costco by the
18    time of the effective date of the IPO?
19         A.     They -- they -- you know,
20    there's a number of items.  They knew that an
21    action -- I'm not sure of the name for it and if
22    action is the right word for it, but there had
23    been a legal challenge.  I think they had
24    records from talking to marketing people, you
25    know, that they had discussed it.  Certainly
```

B100