# Appendix
# B101-B195

Page 101

1                    EDWARD NECARSULMER, III

2    Lehman in deposition, I believe from

3    Pulido-Crowe, they discussed whether they should

4    talk to Costco.  Those are the types of things.

5           Q.    Do you think that Lehman should

6    not have talked to Costco because Barney Adams

7    purportedly stated that it was unnecessary to do

8    so?

9                 MR. GLUCKOW:  Objection to the

10                form.  Calls for speculation.

11                Incomplete hypothetical.

12                You can answer.

13                THE WITNESS:  I think probably

14                not necessarily.  I think there's

15                another problem with talking to the

16                Costcos of the world, is you don't

17                normally -- it's pretty hard -- almost

18                by definition of who they are, they are

19                not going to tell you anything, and

20                that is part of their MO which is

21                relatively well-known.  So whether they

22                are right for that reason or right

23                because that's what they heard from

24                Adams, I don't -- I think, it's my

25                opinion, that they were adequate in

Page 102

1                    EDWARD NECARSULMER, III

2          what they did.

3    BY MR. LEWIS:

4          Q.    Do you agree that it would have

5    been better to try calling Costco to see what

6    could be found, if anything?

7          A.    I don't know that hindsight is

8    particularly useful for me in this case.

9          Q.    Well, if you apply it, with the

10   benefit of hindsight, do you think it would have

11   been a better thing to do?

12               MR. GLUCKOW:  Objection.  Asked

13          and answered.

14               You can answer it now.

15               THE WITNESS:  I still don't think

16          they would have found anything

17          significant.

18   BY MR. LEWIS:

19         Q.    Now, you referred in Paragraph C

20   of your rebuttal report to the underwriters

21   having conducted 11 telephonic interviews.

22               Let me show you Exhibit 198.

23               MR. LEWIS:  I'm sorry; this says

24          160, is it not?

25               MR. GLUCKOW:  160.

Page 103

1               EDWARD NECARSULMER, III

2               THE WITNESS:  Mine says 198.

3    BY MR. LEWIS:

4          Q.     They were marked -- the same

5    document was marked several times.  Just so we

6    are all looking at the same thing, you have in

7    front of you one numbered 160?

8          A.     I gave you back 198, which I

9    had.

10         Q.     Okay.

11         A.     Now I have 160.

12         Q.     Were the 11 calls that you

13   referred to in your rebuttal report the 11 calls

14   that are enumerated on the second page of this

15   exhibit under the heading of Customer Calls,

16   summaries circulated to underwriters by caller

17   and supplier calls?

18         A.     That is correct.

19         Q.     Do you know if any of these

20   calls were selected by the underwriters to be

21   made on a geographic basis?

22         A.     I don't.

23         Q.     Do you know how the calls were

24   selected to be made?

25         A.     It -- what -- how this list was

Page 104

                    EDWARD NECARSULMER, III

1

2    compiled; is that the question?

3         Q.    Not how the list was compiled,

4    but how when the customer calls were made by the

5    underwriters, the underwriters figured out who

6    they were going to call?

7                    MR. GLUCKOW:  And which

8              underwriters are going to call which

9              party, or...?

10                   Objection to form.

11                   THE WITNESS:  I'm not sure.

12   BY MR. LEWIS:

13        Q.    Well, Adams had a large universe

14   of suppliers; is that fair to say?

15        A.    Yes.

16        Q.    And it had a large universe of

17   customers also, correct?

18        A.    Correct.

19        Q.    Do you know how the underwriters

20   made the determination of which customers they

21   would call?

22        A.    A list was provided by the

23   company.

24        Q.    Was that based on the size of

25   the customers' business with Adams?

Page 105

1                    EDWARD NECARSULMER, III

2          A.      I don't know for sure, but I

3    assume so.  That is traditionally the way it is

4    done.

5          Q.      Traditionally which -- what

6    level of customers of a company does an

7    underwriter call in due diligence?

8          A.      There's no magic to this, but

9    traditionally, you know, you say, "Give me your

10   top ten customers."  It could be out of the top

11   50, the top five, but the top ten sticks in my

12   memory.

13         Q.      Is that a practice you have used

14   yourself?

15         A.      Yes, it is.

16         Q.      I'll show you what's previously

17   been marked as Exhibit 162.  Was this one of the

18   documents that you reviewed in your work on this

19   case?

20         A.      It was.

21         Q.      Did you see in reviewing it that

22   on the right-hand column of the page for a

23   period of 1998, the firm of WDC Mackenzie,

24   M-A-C-K-E-N-Z-I-E, was listed as the third

25   largest customer of Adams?

Page 106

1                    EDWARD NECARSULMER, III

2          A.     I do.

3          Q.     Do you believe that there was

4    any reason why the underwriter should not have

5    called Mackenzie in the due diligence process?

6                    MR. GLUCKOW:  Objection to the

7              form.  Mischaracterizes the document in

8              the record.

9                    You can answer.

10   BY MR. LEWIS:

11         Q.     Let me back up.  Do you know who

12   Mackenzie is?

13         A.     From reading the documents, I

14   know who they are; yes, I do.

15         Q.     Do you know that they are a

16   retailer who had spoken to Adams about a

17   potential gray market Costco problem in Canada?

18                   MR. GLUCKOW:  Objection to the

19             form.  Mischaracterizes the record.

20                   You can answer.

21                   THE WITNESS:  I know they were

22             the Canadian, I'll say, distributor or

23             retailer of Adams.

24   BY MR. LEWIS:

25         Q.     And what, if any, communications

Page 107

1           EDWARD NECARSULMER, III

2    can you recall between Mackenzie and Adams on

3    the subject of gray market or Costco?

4                    MR. GLUCKOW:  Between Mackenzie

5             and Adams?

6                    MR. LEWIS:  Right, between

7             Mackenzie and Adams.

8                    THE WITNESS:  I saw a series of

9             documentation -- faxes, memos, whatever

10            you want to call them -- going back and

11            forth suggesting that they were having

12            questioning of how these clubs -- were

13            they in Costco and how they got there

14            and what the company is going to do

15            about it.

16   BY MR. LEWIS:

17            Q.    Are you aware of any contact

18   between the underwriters and Mackenzie as part

19   of the due diligence process?

20            A.    None.

21            Q.    Did you have any understanding

22   as to why there was no contact between the

23   underwriters and Mackenzie in the due diligence

24   process?

25            A.    I don't.  I don't.

Page 108

1            EDWARD NECARSULMER, III

2            Q.    Do you believe that there should

3    have been contact between the underwriters and

4    Mackenzie as part of due diligence?

5            A.    No.

6            Q.    And why is that?

7            A.    I'll say that I don't know

8    whether they were given, you know -- the list of

9    customers that they were given simply didn't

10    include them.

11                 I guess I would also add that

12    it's okay -- I wouldn't necessarily think --

13    and, again, it's very hard to put yourself

14    back in their place, but I wouldn't

15    necessarily think if I was trying to uncover

16    or discover or investigate, that Canada would

17    be a place that I would, you know, spend a lot

18    of time looking for issues relative to

19    southern California or Florida or someplace

20    where I would intuitively have thought may

21    have been more important to a golf club

22    company.

23            Q.    You have seen the questionnaire

24    that Adams sent to -- strike that; that the

25    underwriters sent to Adams' retailers as part of

Page 109

1                    EDWARD NECARSULMER, III

2    the due diligence process?

3                    MR. GLUCKOW:  Objection to the

4              form.  It assumes facts not in

5              evidence.

6                    You can answer.

7    BY MR. LEWIS:

8              Q.    Have you seen questionnaires --

9              A.    Yes.

10              Q.    -- that were used in connection

11    with the underwriters' investigation of

12    retailers?

13              A.    I have.

14              Q.    And would it be fair to say that

15    those questionnaires did not include any

16    specific questions relating to gray marketing or

17    Costco?

18                    MR. GLUCKOW:  Objection to the

19              form.  Vague and ambiguous.

20                    You can answer.

21                    THE WITNESS:  The answer is yes,

22              but I would think that the statement,

23              "Are there any other issues (legal,

24              contractual, or otherwise) which you

25              feel are important" would certainly

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B109

Page 110

1                    EDWARD NECARSULMER, III

2           take care of that responsibility.

3                    MR. LEWIS:  I move to strike the

4           latter part of that.  We'll get to the

5           overall -- the larger question within

6           the questionnaires.

7    BY MR. LEWIS:

8           Q.     Have you seen Exhibit 193?

9           A.     Yes, I've seen it.

10           Q.     Is it your understanding that

11    this is a blank copy of a Customer Due Diligence

12    Questionnaire that was used by the underwriters

13    in connection with the due diligence

14    investigation?

15           A.     That's my understanding.

16           Q.     Now, you mentioned, in response

17    to an earlier question, that the underwriters

18    had received information about gray marketing

19    from marketing people at Adams.

20                    Can you tell me when in your

21    understanding that information was received?

22                    MR. GLUCKOW:  Objection to the

23           form.  It mischaracterizes the

24           testimony.

25                    You can answer.

Page 111

EDWARD NECARSULMER, III

1

2          THE WITNESS:  I can't tell you

3      when.  I know there was a press release

4      in June, I believe it was June.

5  BY MR. LEWIS:

6          Q.     June --

7          A.     I assume it was coincident or

8  before that time.  I just can't tell you from

9  not having the documents; my memory isn't that

10  good.

11          Q.     Well, do you recall any

12  testimony by Ms. Pulido-Crowe that the subject

13  of gray marketing came up during drafting

14  sessions?

15          A.     I do recall that testimony.  I

16  actually recall, to be exact, she said she

17  believed that it came up.

18          Q.     In the drafting sessions?

19          A.     Yes.

20          Q.     And the drafting sessions were

21  all held in April?

22          A.     Correct.

23          Q.     Do you know -- strike that.

24          Can you recall, as you sit

25  here, any inquiries made by the underwriters

Page 112

1          EDWARD NECARSULMER, III

2     to Adams concerning Costco or gray marketing

3     after Adams issued the press release that it

4     had filed a proceeding against Costco?

5               MR. GLUCKOW:  Can I have that one

6          back, please.  Thank you.

7               (The court reporter read the

8          record as follows:

9               "QUESTION:  Can you recall, as

10         you sit here, any inquiries made by the

11         underwriters to Adams concerning Costco

12         or gray marketing after Adams issued

13         the press release that it had filed a

14         proceeding against Costco?")

15              MR. GLUCKOW:  Vague and

16         ambiguous.

17              You can answer.

18              THE WITNESS:  I don't recall.

19    BY MR. LEWIS:

20         Q.    Have you, in your long career in

21    the securities industry, been the person who had

22    to ask a customer information that was set forth

23    on a questionnaire?

24         A.    I've done it but not in recent

25    memory or recent history.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 113

EDWARD NECARSULMER, III

1

2    Q.    When you were --

3    A.    Younger.

4    Q.    -- younger and I was younger and

5    we all were browner on top.

6         Can you describe how difficult or

7    easy you found it to get a customer to answer

8    the questions on a due diligence questionnaire?

9         MR. GLUCKOW:  Vague and

10        ambiguous.

11        You can answer.

12        THE WITNESS:  My best

13        recollection is it's sort of both ends

14        of the spectrum.  There are people who

15        like to talk; they are very

16        enthusiastic about XYZ's product; it's

17        important to them.  There are other

18        people who basically tell you that they

19        don't talk much about, you know, their

20        suppliers.  So it's -- people are

21        usually pretty cooperative, they are

22        usually -- but the value of the

23        information varies greatly.

24    BY MR. LEWIS:

25        Q.    And you never know when exactly

B113

Page 114

1                    EDWARD NECARSULMER, III

2      you are getting someone and what kind of mood

3      he's in or she is in at the time you catch them,

4      is that fair?

5                    MR. GLUCKOW:  Vague and

6               ambiguous.

7                    You can answer.

8                    THE WITNESS:  It's fair, with the

9               exception that you hope that, you know,

10              that you are good enough and you

11              understand enough about the subject to

12              qualify the responses.

13     BY MR. LEWIS:

14              Q.    Was it your practice to actually

15     send customers questionnaires before you spoke

16     to them about the contents of them?

17              A.    No.

18              Q.    You used the questionnaire as a

19     guide to your conversation with the client and

20     pulled the information out of them as best you

21     could?

22                   MR. GLUCKOW:  Objection to the

23              form.

24                   You can answer.

25                   THE WITNESS:  That's correct.

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 115

1                    EDWARD NECARSULMER, III

2    BY MR. LEWIS:

3            Q.      Do you know how the

4    questionnaires were completed in this case?

5            A.      They were -- it's my

6    understanding that they were -- there were

7    telephone or other conversations and they were

8    recorded by the questioner, the results were

9    recorded by the questioner.

10           Q.      So that the questionee did not

11   necessarily -- did not have the questionnaire in

12   front of him?

13           A.      I do not know that for a fact,

14   but that's my understanding.

15           Q.      Now, I showed you the blank

16   questionnaire and that questionnaire contains

17   the question that you alluded to in the portion

18   of your testimony that I asked to strike, which

19   is Question 13:  "Are there any other issues

20   (legal, contractual or otherwise) which you feel

21   are important?"

22                   That is Question 13, correct?

23           A.      Correct.

24           Q.      If you wanted to determine in a

25   due diligence investigation whether there was

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 116

1                EDWARD NECARSULMER, III

2      ongoing gray marketing distribution or ongoing

3      Costco distribution, would you agree that

4      Question 13 would not be a very direct way to

5      find that out?

6                MR. GLUCKOW:  Objection to the

7                form.  Incomplete hypothetical.

8                Assumes facts not in evidence.  Vague

9                and ambiguous.

10                You can answer.

11                THE WITNESS:  I would not agree

12                to that.  Often these -- whether they

13                are a list of questions or they are a

14                questionnaire, you sent them out there

15                to set a framework to find out what you

16                can find out, and often it's more

17                useful to ask a question like this one

18                than -- sometimes it is -- than a more

19                direct "Are you doing this?" or "Are

20                you seeing that?"  Because you might

21                get a more helpful response.

22      BY MR. LEWIS:

23                Q.    Well, if the recipient of this

24      questionnaire had heard from Adams previously

25      that Adams was aware of some Costco distribution

Page 117

```
 1                   EDWARD NECARSULMER, III
 2    and was taking steps to address it, the person
 3    answering the questions might not think that
 4    mentioning gray marketing was of any
 5    importance.  Is that fair?
 6                   MR. GLUCKOW:  The same
 7              objections.
 8                   You can answer.
 9                   THE WITNESS:  I'm not trying to
10              be difficult; I just don't know how to
11              answer and the hypothetical is too far
12              out there for me.
13                   It's certainly -- if someone
14              specifically told you, "Don't worry
15              about it; we are taking care of it,"
16              I'm not sure that would deter you from
17              saying there's an issue but the company
18              is taking care of it.  I just don't
19              know.
20    BY MR. LEWIS:
21              Q.    In any event, there was no
22    specific question about Costco or gray marketing
23    on that questionnaire --
24                   MR. GLUCKOW:  Objection.
25    BY MR. LEWIS:
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B117

Page 118

EDWARD NECARSULMER, III

1

2          Q.      -- the document that we just

3    looked at, 193?

4                  MR. GLUCKOW:  The document speaks

5          for itself.

6                  You can answer.

7                  THE WITNESS:  I agree.

8    BY MR. LEWIS:

9          Q.      Do you believe that between the

10   time of the filing of the draft registration

11   statement with the SEC, which was on May the 4th

12   of 1998, and the effective date of the IPO,

13   which was July 10, 1998, the underwriters

14   received any information from Adams that gray

15   marketing was occurring at any location other

16   than in Canada?

17                 MR. GLUCKOW:  Can I get that read

18         back, please.

19                 (The court reporter read the

20         pending question.)

21                 MR. GLUCKOW:  Objection to the

22         form.  It assumes facts not in

23         evidence.

24                 You can answer.

25                 THE WITNESS:  I don't recall the

Page 119

```
 1                EDWARD NECARSULMER, III
 2          dates.  I know there was discussion,
 3          but I can't tell you whether they were
 4          between -- what periods they were or
 5          what the dates were.
 6   BY MR. LEWIS:
 7          Q.    Well, are you aware of any
 8   communication from Adams to the underwriters
 9   that gray marketing was occurring other than at
10   a single location?
11                MR. GLUCKOW:  The same
12          objections.
13                THE WITNESS:  I'm not aware of
14          any communication.
15   BY MR. LEWIS:
16          Q.    Do you believe, as you sit here,
17   that it was true at the effective date that a
18   small set of Tight Lies clubs had reached Costco
19   at only one location?
20                MR. GLUCKOW:  Objection to the
21          form.  Mischaracterizes the record --
22                THE WITNESS:  I really don't
23          know.
24                MR. GLUCKOW:  Let me just finish.
25                -- vague and ambiguous.
```

Page 120

1          EDWARD NECARSULMER, III

2              You can answer.

3   BY MR. LEWIS:

4          Q.     Do you believe, as you sit here,

5   that it was true that at the time of the

6   effective date a group of Adams' clubs had

7   reached the market through Costco as a result of

8   the efforts of a single Adams' retailer?

9              MR. GLUCKOW:  Objection.  Vague

10              and ambiguous.  Incomplete

11              hypothetical.  Mischaracterizes the

12              record.

13              You can answer.

14              THE WITNESS:  In the materials

15              that I reviewed, there were references

16              to a number of potential sources, and I

17              don't know if it was ever determined as

18              to it was one or more than one.

19   BY MR. LEWIS:

20          Q.     Well, isn't it true that by the

21   time of the offering that there had been citings

22   of Adams' clubs at Costco locations in Canada,

23   in California, in Idaho?

24              MR. GLUCKOW:  Objection to the

25              form.  It mischaracterizes the record.

Page 121

1          EDWARD NECARSULMER, III

2                You can answer.

3                THE WITNESS:  I think that's

4       true.

5  BY MR. LEWIS:

6          Q.    How did you learn that?

7          A.    It was in the documentation that

8  I read.

9          Q.    Did you see that in any other

10 place than in the attachments to Mr. Grace's

11 report?

12         A.    Yes.

13         Q.    Where did you see it?

14         A.    I'm not sure I can recall the

15 document.  I'm not -- it may have been in a

16 deposition, either -- I'm not sure.  I don't

17 want to speculate.  I think Beebe's deposition,

18 but I'm not sure.  I'm just not certain.

19         Q.    Would you agree that by the time

20 of the initial public offering Adams had been

21 unable to put a complete stop to gray marketing?

22                MR. GLUCKOW:  Vague and

23       ambiguous.

24                You can answer.

25                THE WITNESS:  I would agree with

Page 122

1                    EDWARD NECARSULMER, III

2           that.

3    BY MR. LEWIS:

4           Q.    Have you seen any evidence that

5    the underwriters were aware of new or increased

6    distribution of Adams' products in Costco

7    locations between the time of Ms. Pulido-Crowe's

8    discussion with Barney Adams and the time of the

9    IPO?

10                    MR. GLUCKOW:  Objection.  Vague

11              and ambiguous.  Incomplete.

12                    THE WITNESS:  Not during that

13              period, no.

14    BY MR. LEWIS:

15           Q.    And do you have any reason to

16    believe, as you sit here, that the underwriters

17    learned anything about the changes in gray

18    market distribution between Ms. Pulido-Crowe's

19    discussion with Barney Adams and the IPO?

20                    MR. GLUCKOW:  Objection to the

21              form.  It mischaracterizes the record

22              particularly with respect to the

23              reference to a discussion.

24                    You can answer.

25                    THE WITNESS:  At some point, the

Page 123

1          EDWARD NECARSULMER, III

2          process of these pro shop surveys began

3          by the equity research analyst.  I

4          believe that did start before the IPO.

5          I'm not certain that information would

6          have been -- in my experience, it was

7          unlikely that that information would

8          have been shared with the banking team.

9     BY MR. LEWIS:

10          Q.     Why do you say it's unlikely it

11    would have been shared?

12          A.     Because in most cases as they --

13    that the research that was done out of the

14    equity department would not likely to be, you

15    know, shared with; it was not normal practice to

16    share it with the people in the investment

17    banking side.

18          Q.     Did that have to do with the

19    existence of the so-called Chinese walls between

20    the investment banking and the research side,

21    the brokerage firms, in those days?

22          A.     Partially; although, there would

23    be nothing specifically prohibited of

24    information going that way.

25          Q.     "That way" meaning...?

Page 124

EDWARD NECARSULMER, III

1

2          A.     The direction from research to

3     banking.  So it wasn't a normal -- to me, it

4     wouldn't have been a normal practice, normal

5     procedure.

6          Q.     There would have been a

7     prohibition on information going the other

8     direction, from banking to research?

9          A.     That is correct.

10               MR. GLUCKOW:  Don, again, we've

11               been going another hour, so whenever

12               there is a convenient break.

13               MR. LEWIS:  We can stop this

14               second.

15               MR. GLUCKOW:  Okay.

16               (A recess was had from 2:31 p.m.

17               to 2:43 p.m.; and then the proceedings

18               continued as follows:)

19     BY MR. LEWIS:

20          Q.     Let me back up to go forward.

21     In your expert report in this case, the first

22     page --

23          A.     So this is also the rebuttal

24     report.

25               MR. GLUCKOW:  Here we are, 321.

Page 125

1        EDWARD NECARSULMER, III

2            THE WITNESS:  First page, yes.

3   BY MR. LEWIS:

4            Q.    The first page, Paragraph 6(A),

5   Summary of Opinions.  You begin by saying:  "In

6   my experience in the process of adequate due

7   diligence, the underwriters should gather and

8   review the following types of information.  The

9   contents and scope of this review may vary

10  greatly depending on the issuer, but in general,

11  these are the categories that should be

12  considered."

13            In your expert report in the AMF

14  case --

15            MR. GLUCKOW:  324?

16            MR. LEWIS:  324.

17  BY MR. LEWIS:

18            Q.    -- you used the same words

19  except that instead of "should be considered,"

20  you had used the words "must be considered."

21            A.    Semantics.

22            Q.    Is there any significance to the

23  change in your report?

24            A.    Semantics.

25            Q.    Did you think it was more

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 126

1                    EDWARD NECARSULMER, III

2      correct to say "should" than "must"?

3              A.      I candidly can't answer that.   I

4      think of -- I thought of the -- I tried to

5      conceive of the thought and I really didn't

6      refer to this much past -- the prior report,

7      much past kind of using it for form, and I knew

8      there was some boilerplate that would be

9      acceptable to be used in the beginning, and then

10     I kind of just went ahead and drafted as I saw

11     fit.

12             Q.      In the same Paragraph 6, the

13     next page --

14             A.      On AMF or Adams?

15             Q.      In Adams.

16                     Well, let's look at -- do you

17     have AMF there?

18                     MR. GLUCKOW:  We have both, 321

19             and 324.

20     BY MR. LEWIS:

21             Q.      In AMF, among the steps you

22     listed was number 6:  "Review of work performed

23     or reports prepared by underwriters' counsel and

24     the issuer's auditors."

25                     Your Paragraph 6 in this case

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 127

1                    EDWARD NECARSULMER, III

2      simply read:  "Meeting with the issuer's counsel

3      and public accountants."

4                    Can you explain whether there was

5      a difference that caused you to change your

6      report?

7                    MR. GLUCKOW:  Object to the

8               characterization.

9      BY MR. LEWIS:

10               Q.    Is there any significance to the

11     change in terminology between the two reports?

12               A.    I thought in -- that the way I

13     said it in 321 was a better representation of

14     what the process really is.

15               Q.    Can you explain that thought?

16               A.    Because it occurred to me -- and

17     again, I didn't think it was a major thing -- it

18     sort of occurred to me that you weren't

19     necessarily just reviewing their work, you were

20     meeting with them, you were talking with them,

21     you were trying to understand, let's say, there

22     was a patent issue or an inventory issue, so it

23     wasn't just the report but you are trying to

24     have a dialog as part of your understanding of

25     the company; that was what I was really trying

Page 128

1              EDWARD NECARSULMER, III

2    to get at.

3              Q.     Okay.  Would you agree with the

4    general proposition that in due diligence an

5    underwriter should be skeptical of rosy outlooks

6    by the issuer's management?

7                    MR. GLUCKOW:  Object to the

8                    form.  Vague and ambiguous.  Asked and

9                    answered.

10                   You can answer.

11                   THE WITNESS:  I don't think --

12                   just because someone is optimistic

13                   doesn't necessitate skepticism.  We've

14                   come to learn to live with rapid growth

15                   in our -- once we got out of the '60s

16                   and '70s, rapid growth was a big part

17                   of our lives.  So I would have to say

18                   even though intuitively I would agree

19                   with you, I think the right answer is

20                   no.

21   BY MR. LEWIS:

22             Q.     Now, in Paragraph 6(C)(2) of

23   your report, you state that "An extensive due

24   diligence outline and materials request list was

25   prepared and presented to company management at

Page 129

1                    EDWARD NECARSULMER, III

2    the organizational meeting."

3                    Just to make sure we are on the

4    same page:  Are you referring there to Exhibit

5    153?  Specifically, to the due diligence -- due

6    diligence outline and request list that begins

7    at Page 8741?

8        A.      Yes, that is to what I was

9    referring.

10        Q.      And would it be fair to say that

11    there was no specific request in the due

12    diligence outline or materials request for data

13    relating to either Costco or gray marketing?

14                    MR. GLUCKOW:  Objection to the

15                    extent the document speaks for itself.

16                    You can answer.

17                    THE WITNESS:  That's correct.  If

18                    I could add, in this type of a list it

19                    doesn't surprise me at all that there

20                    isn't specific caption items.  It's

21                    usually given to let the company know

22                    what the work ahead of them is.

23    BY MR. LEWIS:

24        Q.      Okay.  Is there any item on the

25    due diligence list or materials request list

1          EDWARD NECARSULMER, III

2    that you believe should have caused the company

3    to provide the underwriters with any data

4    regarding either Costco or gray market

5    distribution?

6                    MR. GLUCKOW:  Object to the

7          form.  The document speaks for itself.

8          It calls for speculation.

9                    You can answer.

10                   THE WITNESS:  No.

11   BY MR. LEWIS:

12          Q.    Let me show you Exhibit 154,

13   previously marked, and this is a document with a

14   file folder tab Organization Meeting and some

15   handwritten notes that may be beyond my eyesight

16   or cryptography skills at this point.

17          A.    I'm with you.

18          Q.    Did you review a version of

19   Exhibit 154 in the course of your work?

20          A.    I did see this document.

21          Q.    Did you work your way through it

22   at the time?

23          A.    To the best of my ability.

24          Q.    Did you find any reference in it

25   that you thought was to gray marketing or Costco

Page 131

```
 1              EDWARD NECARSULMER, III
 2      distribution?
 3                    MR. GLUCKOW:  Object to the
 4              extent the document speaks for itself.
 5              You can answer.
 6              THE WITNESS:  No.
 7      BY MR. LEWIS:
 8              Q.    Let me show you what has been
 9      marked as Exhibit 228.  Did you review Exhibit
10      228 in the course of your work?
11              A.    I've seen this article before,
12      so the answer is yes.
13              Q.    If you just look at the last
14      page of the document, you'll see there's a
15      reference to Edwin Watts and some commentary
16      about various subjects.  Did you read that
17      paragraph?
18                    MR. GLUCKOW:  Take your time and
19              make sure you read it before you
20              answer.
21                    (Witness reviewing document.)
22              THE WITNESS:  I don't recall
23              reading that paragraph.
24      BY MR. LEWIS:
25              Q.    Okay.  Do you have any reason to
```

Page 132

```
 1                    EDWARD NECARSULMER, III
 2      believe that the underwriters had a copy of
 3      Exhibit 228 prior to the effective date of the
 4      offering in their due diligence files?
 5                    MR. GLUCKOW:  Objection to the
 6           form.
 7                    You can answer.
 8                    THE WITNESS:  I wouldn't know.
 9      BY MR. LEWIS:
10           Q.     Let me show you Exhibit 197, and
11      this is a copy of what purports to be a Customer
12      Due Diligence Questionnaire completed with
13      respect to Edwin Watts.  Have you reviewed this
14      as part of your expert work in this case?
15           A.     Yes, it was in the material that
16      I was provided.
17           Q.     If you had been conducted --
18      strike that.
19                    Do you have any reason to believe
20      that Mr. Watts was asked any specific questions
21      about Costco in the course of his interview,
22      which was, according to this date, on April 21,
23      1998?
24                    MR. GLUCKOW:  The document speaks
25           for itself.
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B132

Page 133

1              EDWARD NECARSULMER, III

2              You can answer.

3              THE WITNESS:  I have no knowledge

4        of that question or response to it.

5   BY MR. LEWIS:

6        Q.    And you have no knowledge of

7   there being questions asked that are not

8   contained or commented on in this document

9   itself?

10       A.    I could respond that it would be

11  unusual that the conversation would just --

12  would you mind answering the following nine

13  questions; but I certainly couldn't support

14  that, I mean, cite any evidence of that.

15       Q.    Why do you say it would be

16  unusual?

17       A.    Well, the purpose of these type

18  of exercises is to engage the person you are

19  talking to in some sort of a dialog about the

20  company you are checking on.  Sometimes they are

21  expansive; sometimes they are not.  Usually the

22  questionnaire is, you know, an outline, a way to

23  memorialize the conversation, but, hopefully,

24  it's -- you know, there's some dialog, but I

25  don't know because I haven't seen it, and I have

Page 134

EDWARD NECARSULMER, III

1

2 no evidence to prove or no documentation to

3 prove that that's what took place.

4          Q.     In your experience, is it

5 customary for notes to be taken during customer

6 questionnaires?

7          A.     Customary, yes.

8          Q.     Are you aware of any customary

9 practices in the industry with respect to the

10 disposition of drafts and notes that were made

11 prior to an IPO?

12               MR. GLUCKOW:  Objection to the

13          form.  I also object to the extent it's

14          overbroad.

15               Do you mean at any point in his

16          career?  Are you talking about a

17          specific time frame?

18 BY MR. LEWIS:

19          Q.     Let's talk about the period

20 since 1998, do you believe that it is customary

21 in the industry for underwriters to dispose of

22 notes that they made during the due diligence

23 process?

24               MR. GLUCKOW:  The same

25          objections.

Page 135

1    EDWARD NECARSULMER, III

2        Go ahead.

3        THE WITNESS:  I wouldn't say

4    specific to due diligence process.

5    There certainly was a movement among

6    all of our client -- compliance

7    departments to be much more cognizant

8    of what we kept and didn't keep and at

9    what point, you know, like how long you

10   have to keep your tax-return-type

11   standards.  So I think people were more

12   careful to keep what they were supposed

13   to keep and more careful to keep -- not

14   to keep what didn't need to be kept.

15 BY MR. LEWIS:

16       Q.    And when did that begin?

17       A.    I couldn't give you a specific

18   date, but it was an evolving thing throughout --

19   certainly throughout the '90s, it would be a

20   more evolving practice.

21       Q.    So that by 1998 your people were

22   more careful to do what you said --

23       A.    Yes.

24       Q.    -- in your last answer?

25            Since 1998 you worked both at

Page 136

1           EDWARD NECARSULMER, III

2   Wasserstein Perella Securities and Dresdner

3   Kleinwort Wasserstein.  Did either of those

4   firms have a practice of disposing of notes of

5   due diligence after an IPO?

6           A.    Not a specific policy, no.

7           Q.    Let me start with a broad

8   question, and if I need to, I'll go to more

9   specific ones.

10              We've talked several times about

11  the Customer Due Diligence Questionnaires.  Did

12  you find reference to either gray marketing or

13  Costco distribution appearing in any of the

14  customer due diligence questionnaires?

15          A.    I don't believe I did.

16          Q.    Would you like to see them now

17  to check your answer, or --

18              MR. GLUCKOW:  The documents speak

19          for themselves.

20              THE WITNESS:  I don't think I

21          need to check my answer.

22  BY MR. LEWIS:

23          Q.    Okay.

24          A.    I'm not necessarily ready for a

25  memory test, but I believe that's the case; I'm

Page 137

1              EDWARD NECARSULMER, III

2    confident that that's the case.

3              Q.      Okay.  In Paragraph 5 on Page 3

4    of your expert report, Exhibit 321 --

5              A.      I'm sorry, Paragraph...?

6              Q.      5.

7              A.      Which is on Page 3.  Okay.

8              Q.      "The underwriters prepared lists

9    of potential investor questions," dash, "in my

10   experience this was always an effective

11   mechanism for raising and responding to relevant

12   issues."

13             When you wrote that, were you

14   referring to Exhibit 210?

15             A.      That's correct.

16             Q.      Were there any other lists of

17   investor questions that you were referring to in

18   Paragraph 5 of your opinion?

19             A.      This is what I was referring

20   to.

21             Q.      Do you know when this was

22   prepared, "this" being Exhibit 210?

23             A.      I don't know the specific date.

24   I know where in the process, which was prior to

25   the company going on the road to seek potential

Page 138

1                   EDWARD NECARSULMER, III

2    investors.

3          Q.      Sometime by June of 1998?

4          A.      By June, I don't -- we can look

5    at the road show schedule and have an exact

6    date, but I don't recall it.

7          Q.      Would you agree with me that

8    nothing in Exhibit 210 refers either to gray

9    marketing or to Costco?

10                 MR. GLUCKOW:  The document speaks

11          for itself.

12                 You can answer.

13                 THE WITNESS:  That's correct.

14   BY MR. LEWIS:

15          Q.      It is correct that there's no

16   reference?

17          A.      It is correct that there's no

18   reference.

19          Q.      Let me show you what has been

20   marked as Exhibit 204, a memo to the file from

21   Joe Hoffman, dated June 25, 1998.  Do you recall

22   this document?

23          A.      I do.

24          Q.      Do you have any understanding of

25   how this document came to be in the

Page 139

1                    EDWARD NECARSULMER, III

2    underwriters' files as reflected by the page

3    number in the bottom right-hand corner?

4            A.      As a matter of practice, if

5    there is dialog usually between the assigned

6    examiner of the commission and usually issuer's

7    counsel, they'll provide the underwriters a copy

8    of any information that comes of that source.

9            Q.      From your review of documents

10   and testimony, are you aware of any dialog

11   between Adams and the underwriters with respect

12   to this exhibit?

13           A.      I'm not.

14           Q.      Are you aware of any

15   communications between the underwriters and the

16   SEC related to this exhibit, based on your

17   review of the transcripts and exhibits?

18           A.      I don't recall any.

19           Q.      I would next like to show you

20   what has been marked as Exhibit 159, and this is

21   a two-page exhibit, the first page of which is

22   entitled Additional Due Diligence Material.

23                   Do you have any understanding of

24   what this exhibit is?

25           A.      I believe right before -- really

Page 140

1              EDWARD NECARSULMER, III

2     prior to pricing, street practice is to have a

3     so-called bringdown due diligence call where you

4     just make sure there are no -- you try to ensure

5     there are no issues -- I don't know if the word

6     is material, but no significant change between

7     what you know and as you go to become effective

8     the next morning.  And this looks to me --

9     appears to be the notes from that type of

10    meeting.

11          Q.    Now, at the companies that

12    you've worked at, is bringdown due diligence

13    recorded more formally than by a set of notes?

14                MR. GLUCKOW:  Objection to the

15          form.

16                You can answer.

17                THE WITNESS:  No.  I mean, I

18          guess I would have assumed maybe the

19          notes were typed up, but basically this

20          is the form I'd be used to.

21                It is often pro forma, if that's

22          the -- you know.  Unless there's some

23          significant issue that comes up.  In

24          many cases, you know, people are on the

25          road at different places; often the

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B140

Page 141

EDWARD NECARSULMER, III

1

2          management -- you know, the CFO is in

3          San Francisco, the CEO is in London

4          making presentations and sometimes they

5          are not even on the call, and it's

6          usually just an update of where you are

7          in terms the effectiveness, has it

8          gotten NASD approval, that kind of

9          stuff.  So this doesn't surprise me,

10         no.

11    BY MR. LEWIS:

12         Q.    Do you have any understanding as

13    to whose notes these are?

14         A.    I could guess, but I don't know.

15         Q.    As a general proposition, as you

16    were doing your work looking at documents and

17    transcripts, if you had a question about the

18    documents, did you from time to time consult

19    with Simpson Thacher about the significance of a

20    document or the author of a document?

21         A.    I don't believe we ever had -- I

22    mean, we were certainly in touch talking about

23    my progress and where -- you know, but I don't

24    -- it didn't really arise.  I mean, the answer

25    is no, it really did not -- it didn't come up.

Page 142

1          EDWARD NECARSULMER, III

2          Q.      Okay.  Is it your understanding

3     that these are notes of a telephone conversation

4     rather than that of a meeting?

5          A.      That would be my surmise, but

6     it's only that.

7          Q.      And what is that based on?

8          A.      Based on the way it's almost

9     always a so-called bringdown call because the

10    people are not usually in the same place.

11         Q.      Is there, in your experience, a

12    standard format for a bringdown call?

13         A.      No.  In my experience, it's

14    quite informal; it's tick off three or four

15    points, anything we ought to be aware of.  It

16    can be combined with an update of where you are

17    in terms of effectiveness, other forms need to

18    be filed.  So generally it kind of takes this

19    form.

20         Q.      Did you see anything in this

21    document when you reviewed it that you believe

22    referred either to Costco or to gray marketing

23    more broadly?

24              MR. GLUCKOW:  The document speaks

25              for itself.

Page 143

1                    EDWARD NECARSULMER, III

2                    But you can answer.

3                    THE WITNESS:  No.

4    BY MR. LEWIS:

5           Q.      I previously showed you Exhibit

6    160 which was the July 14, 1998, summary of due

7    diligence conducted by the Lehman Brothers Adams

8    Golf team.

9                    Did you see anything in Exhibit

10   198 which referred to either gray marketing or

11   Costco distribution?

12                   MR. GLUCKOW:  You said 198.

13   BY MR. LEWIS:

14          Q.      I'm sorry; that was the one that

15   has been variously numbered as 160 and 198.

16                   So the question is, since you

17   have 160 in front of you, whether you saw

18   anything in the summary of due diligence

19   contained in Exhibit 160 that you believe

20   referred to either Costco or gray marketing

21   issues?

22                   MR. GLUCKOW:  The document speaks

23        for itself.

24                   But you can answer it.

25                   THE WITNESS:  I'm assuming Page 3

Page 144

1        EDWARD NECARSULMER, III

2        that there's nothing that I'm not

3        seeing.  Correct?

4    BY MR. LEWIS:

5        Q.    I think your assumption is

6    absolutely correct.

7        A.    With that assumption, the answer

8    is there's nothing referring to either of those

9    subjects.

10            (Whereupon, documents were

11            marked, for identification purposes, as

12            Exhibit 325 and Exhibit 326.)

13    BY MR. LEWIS:

14        Q.    I'm going to hand you two

15    exhibits together, 325 and 326.

16            MR. LEWIS:  Off the record.

17            (A discussion was held off the

18            record.)

19    BY MR. LEWIS:

20        Q.    325 is a copy of documents that

21    you referred to in your rebuttal report and some

22    of those pages -- there were a few pages not

23    included because some of the Adams advertising

24    materials were double-sided and someone, not

25    doing their due diligence in the copying

Page 145

1          EDWARD NECARSULMER, III

2     process, left those pages out when the document

3     was compiled, so those missing pages are

4     contained in Exhibit 326.

5               You'll see that the documents

6     that are compiled in this exhibit include due

7     diligence questionnaires, sales data,

8     advertising data, and, to the best of my

9     knowledge, these are all the pages that you

10    referred to in your rebuttal report.

11              MR. GLUCKOW:  Just to be clear,

12              we haven't obviously checked to make

13              sure this is the case, but what you are

14              saying is when you combine 325 and 326,

15              all of the documents cited in the

16              rebuttal report should be included in

17              325 and 326.

18              MR. LEWIS:  They should be.  And

19              the ones in 326 are all

20              advertising-type documents which go

21              sort of into the span of documents in

22              the middle that have Adams Tight Lies

23              advertisements and humorous items about

24              Barney and a press release here and

25              there.

Page 146

1                    EDWARD NECARSULMER, III

2    BY MR. LEWIS:

3         Q.    At the risk of beating the horse

4    dead, again, to your knowledge, is there

5    anyplace in any of the pages referred to in your

6    rebuttal report which touched on gray marketing

7    or Costco distribution?

8              MR. GLUCKOW:  And again, you are

9              focused on the UND production which we

10             have in front of us and 325 and 326,

11             not on deposition testimony?

12             MR. LEWIS:  That is correct.

13             THE WITNESS:  Then I would say --

14             I was thinking aloud; excuse me.  Let

15             me just make sure.

16             To the best of my knowledge, that

17             is correct.

18   BY MR. LEWIS:

19        Q.    Moving forward chronologically,

20   I will show you Exhibit 215 which is a Lehman

21   Brothers memorandum, facsimile, suggested

22   outline, and list of concerns.  The transmittal

23   date on the fax is July 29, 1998.

24             Did you review this document?

25        A.    I did see this document.

Page 147

1          EDWARD NECARSULMER, III

2          Q.    And did you see, on the third

3     page of the exhibit, the item "Discounting -

4     Tight Lies have been seen in many Costcos for

5     $146?  How is product getting there?  What is

6     Adams Golf doing about it?"

7          A.    I have seen that.

8          Q.    Have you seen any documents that

9     explain to you how that information came into

10    the possession of the underwriters?

11         A.    I had not seen a document

12    documentary of it, no.

13         Q.    Do you recall any testimonial

14    evidence?

15         A.    It is my recollection that

16    either Picchi or Lantier, who were the two

17    Lehman equity research analysts, did refer to

18    this in their deposition testimony.  I can't

19    tell you which one.  I would say Lantier, if I

20    had to make a determination.

21              L-A-N-T-I-E-R.  P-I-C-C-I, I

22    think.  It may be P-I-C-C-H-I.

23         Q.    So that other than the

24    deposition transcripts of the equity analysts,

25    you are unaware of any means by which one could

Page 148

EDWARD NECARSULMER, III

1    determine how the information came into Lehman's

2    possession that caused someone to write the

3    words that appear on the page I read to you?

4

5                    MR. GLUCKOW:  Objection to the

6                    form.  It mischaracterizes the

7                    testimony.

8                    But you can answer.

9                    THE WITNESS:  I would add that,

10                   you know, since this is post IPO, it's

11                   highly plausible that's -- that this

12                   came through an investor or type of

13                   question to the research analyst.

14   BY MR. LEWIS:

15                   Q.    Can you explain why you say

16   that?

17                   A.    Well, what happens often is that

18   as you are talking about the story or the stock,

19   particularly if the stock is, you know, either

20   going up or down a lot and therefore is the

21   subject, research analysts are constantly

22   talking to their customers who are the --

23   they're counterpart analysts or portfolio

24   managers at usually large financial

25   institutions, or it could be an officer manager

Page 149

1                          EDWARD NECARSULMER, III

2     someplace, and a lot of the process is feedback,

3     and somebody said, you know, what do you think

4     is going on?  I heard, you know, from my golf

5     pro or a guy at Fidelity asked me about...  I

6     mean, in my experience a lot of the information

7     is actually incoming, so it could very well have

8     come through that way as well.

9              Q.      Let me show you what I've marked

10    previously as 217.  This is a teleconference

11    script dated August 5, 1998, sent to Olga

12    Pulido-Crowe and Pat Walravens,

13    W-A-L-R-A-V-E-N-S, from the desk of Patty

14    Walsh.  And at Page 40671, you will see a

15    reference, under the heading of Discounting, to

16    "Tight Lies have been seen in many Costcos for

17    $146.  How is the product getting there?" and an

18    answer is given.

19                      Does anything in this document --

20    strike that.

21                      Do you have any reason to

22    believe that the information that's contained

23    on Page 40670, which is similar to the

24    information we saw in the "concerns" box on

25    Exhibit 215, came as a surprise to the

Page 150

```
 1                    EDWARD NECARSULMER, III
 2     underwriters?
 3                    MR. GLUCKOW:  Objection to the
 4          form.  Just to clean up the record, I
 5          think you said 40670.  I'm assuming you
 6          must have meant 40671.
 7                    MR. LEWIS:  I tried to say
 8          40671.  I probably sputtered it.
 9                    MR. GLUCKOW:  And then you are
10          comparing the language at the bottom of
11          40671 with the language in 215?
12                    MR. LEWIS:  Correct.
13                    MR. GLUCKOW:  And what's the
14          question?
15     BY MR. LEWIS:
16          Q.    Looking at those two documents
17     together, do you recall -- strike that.
18                    Seeing those two documents
19     together, do you have any recollection of any
20     explanation that you learned during your
21     investigation in this case of how the
22     underwriters came to learn of gray marketing
23     distribution through Costco after the IPO?
24                    MR. GLUCKOW:  Vague and
25          ambiguous.
```

Page 151

1          EDWARD NECARSULMER, III

2                But you can answer.

3                Asked and answered as well.

4                Go ahead.

5                THE WITNESS:  Again, I can only

6          surmise that it came through investor

7          feedback or through the surveys that

8          the equity research analyst did.

9    BY MR. LEWIS:

10          Q.    You referred earlier to the

11   surveys.  I'll place before you a copy of

12   Exhibit 180, previously marked, and specifically

13   I'll direct your attention to Page 27.

14                Is the survey that appears on

15   that page the survey you are referring to in

16   your testimony?

17          A.    Yes.

18          Q.    And do you have any reason to

19   believe that Lehman learned of Costco

20   distribution or gray market distribution through

21   the pro shop survey before the IPO date?

22                MR. GLUCKOW:  Objection to the

23          form.  Vague and ambiguous.  Asked and

24          answered.

25                You can answer.

Page 152

1          EDWARD NECARSULMER, III

2              THE WITNESS:  Absolutely not.

3          There's no reference that that happened

4          in any of the material that I reviewed.

5    BY MR. LEWIS:

6          Q.    Do you recall Mr. Lantier being

7    unable to date precisely when his pro shop

8    survey calls were made?

9              MR. GLUCKOW:  Objection.  The

10         deposition record speaks for itself.

11             You can answer.

12             THE WITNESS:  I do recall that in

13         the deposition.

14    BY MR. LEWIS:

15         Q.    Would it be fair to say that to

16    the best of your recollection Mr. Lantier

17    couldn't speak to that subject one way or the

18    other?

19             MR. GLUCKOW:  The same objection.

20             You can answer.

21             THE WITNESS:  I don't have an

22         appropriate response.  I don't know.

23             MR. LEWIS:  Off the record.

24             (A discussion was held off the

25         record.)

Page 153

1                    EDWARD NECARSULMER, III

2                    (Whereupon, a document was

3               marked, for identification purposes, as

4               Exhibit 327.)

5    BY MR. LEWIS:

6               Q.    I've marked as Exhibit 327 a

7    document with the heading Exhibit VII.  Do you

8    recognize this document?

9               A.    I've seen the document.

10              Q.    And where have you seen it?

11              A.    It was within the underwriter

12   production, I believe.  It was within the

13   documents that I referred to in Schedule B.

14              Q.    Of your --

15              A.    Of 321.

16              Q.    Well, to be fair to you, sir,

17   this was an exhibit to the expert report of

18   Mr. Grace.

19              A.    Okay.  I accept that as a fact.

20   As I said in my rebuttal report, I did review

21   that report as well, I just don't remember.

22              Q.    Did you review this -- did you

23   review the entirety of Mr. Grace's report in

24   preparation of your rebuttal report?

25              A.    "Preparation" is not the right

Page 154

```
1                    EDWARD NECARSULMER, III

2      word.  I read it as something related to the

3      case, related to what I -- you know, to what my

4      role was as well.

5                    MR. GLUCKOW:  But in terms of the

6                    entirety, just to be clear, as the

7                    attachment to the rebuttal report

8                    indicates, we sent Mr. Necarsulmer

9                    copies of all the expert reports

10                   including the exhibits so this

11                   (indicating) would have been included

12                   in what we sent Mr. Necarsulmer.

13                   MR. LEWIS:  Right; but he

14                   wouldn't have seen it before it was

15                   issued.

16                   MR. GLUCKOW:  Correct.

17                   MR. LEWIS:  And this was in the

18                   -- oh.

19                   MR. GLUCKOW:  I'm saying in the

20                   rebuttal report.

21                   THE WITNESS:  Right.  That's why

22                   I said in Exhibit B to my rebuttal

23                   report.  Or Exhibit A, I guess it is,

24                   in my rebuttal report.

25      BY MR. LEWIS:
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

B154

Page 155

EDWARD NECARSULMER, III

1

2         Q.      Did you read through this?

3         A.      I did look through this.

4         Q.      Did you specifically look at the

5    first six pages of this?

6               MR. GLUCKOW:   Objection to the

7         form.  He said he's read the entire

8         document, but -- you can answer.

9    BY MR. LEWIS:

10        Q.      Well, when you read the entire

11   document, did you have any reason in your own

12   mind to focus on the first six pages of this?

13        A.      I had no particular reason to do

14   that, no.

15        Q.      Did you read through the

16   complaints to Adams Golf regarding Costco that

17   are listed in the chronological order that

18   Mr. Grace listed them in this report?

19        A.      I did.

20        Q.      And the solutions purportedly

21   implemented by Adams Golf as also listed on

22   this?

23        A.      Correct.

24        Q.      Had you previously seen the

25   complaints, the Adams numbered complaints, that

Page 156

```
 1                    EDWARD NECARSULMER, III

 2      were listed by Mr. Grace in this report?

 3                    MR. GLUCKOW:  You mean had he

 4              seen reference to them in the materials

 5              in Exhibit A -- or Exhibit B, rather,

 6              to his report which included all the

 7              depositions and the exhibits to the

 8              depositions, or has he seen them in

 9              this format (indicating)?  I'm not sure

10              what the question is.

11      BY MR. LEWIS:

12              Q.    Let me try a simple question.

13                    MR. LEWIS:  Off the record.

14              (A discussion was held off the

15              record.)

16      BY MR. LEWIS:

17              Q.    Let me take you to Page 2 of

18      this -- of this report.  You'll see that under

19      the date of May 6, 1998, according to this

20      table, Pro Golf Discount in Fairfax, Virginia,

21      canceled an order because Adams' clubs are in

22      Costco.

23                    Do you recall seeing a reference

24      to that in any of the depositions or exhibits

25      that you had read in your work?
```

Page 157

EDWARD NECARSULMER, III

1

2          A.      I don't.

3          Q.      On May 7, 1998, according to

4    Mr. Grace, Adams Golf clubs were found in Costco

5    in Modesto, California.

6                  Do you recall having seen a

7    reference to that in your work?

8          A.      I can't recall.

9          Q.      May 21, according to Mr. Grace,

10   Pro Golf complains that Costco is selling Adams

11   Golf product.

12                 Do you recall having learned of

13   that in your investigation?

14         A.      I don't recall that either.

15         Q.      On May 29, 1998, according to

16   the table, "WDC Mackenzie reports that a new

17   shipment of Adams Golf clubs have hit Canadian

18   Costcos."

19                 Do you remember seeing

20   reference to that in the --

21         A.      I do remember seeing that in the

22   correspondence between the two.

23         Q.      June 1, 1998, according to

24   Mr. Grace, "Centerville Golf in Centerville,

25   Virginia, complained about Adams clubs in

Page 158

1              EDWARD NECARSULMER, III

2   Costco."

3              Do you recall having learned that

4   in your work in the case prior to seeing

5   Dr. Grace's -- Mr. Grace's report?

6        A.    I don't recall that

7   specifically, no.

8        Q.    All right.  How about the item

9   for June 8, 1998; Merrifield Golf in Fairfax,

10  Virginia, called regarding Adams clubs seen at

11  Costco."

12             Do you recall learning that?

13        A.    I don't recall learning that.

14        Q.    June 11, 1998, Jack Tone,

15  T-O-N-E, Golf in Ripon, R-I-P-O-N, California,

16  called regarding Adams' clubs in Costco.

17             Do you remember seeing that?

18        A.    I don't.

19        Q.    June 24, Green River Golf Club

20  in Corona, California, called to complain about

21  clubs in Costco.  Do you recall learning that?

22        A.    I don't recall learning that

23  either.

24        Q.    June 25, two items, "Pro Golf

25  Discount in Boise, Idaho, called regarding their

Page 159

1                    EDWARD NECARSULMER, III

2    problem selling clubs due to Costco," and

3    "Centerville Golf Center in Centerville,

4    Virginia, called to complain again about

5    Costco."

6          A.    I do recall -- I do recall the

7    one in Idaho.  I don't recall the other one in

8    California.

9          Q.    Just a couple more.

10         A.    Fine.

11         Q.    June 29, Tierneys,

12   T-I-E-R-N-E-Y-S, Golf in Walnut Creek,

13   California, called regarding a customer

14   returning clubs after seeing Adams Golf clubs in

15   Costco.

16         A.    I do recall seeing that.

17         Q.    July 3, '98, "Customer requests

18   Adams Golf hat offer after buying clubs at a

19   Costco in Livonia, Michigan."

20         A.    I don't recall that.

21         Q.    Would you agree that the

22   portions of the summary that we've just gone

23   over contain information that was different with

24   respect to gray marketing and Costco than the

25   information that Mr. Adams had originally

Page 160

```
 1              EDWARD NECARSULMER, III
 2   supplied to Ms. Pulido-Crowe?
 3              MR. GLUCKOW:  Objection to the
 4         form.  It mischaracterizes the record.
 5         It mischaracterizes the testimony.
 6              You can answer.
 7              THE WITNESS:  If I recall from
 8         Pulido-Crowe's deposition, the -- his
 9         characterization of the problem was
10         that there was some problem with
11         Costco, they didn't believe it was
12         significant, and they were handling
13         it.  I mean, that was my summary of
14         what I believe was said.  And I don't
15         know that this is enough to tell me
16         that that's different, but it is a
17         little vague, my memory of same.
18   BY MR. LEWIS:
19         Q.    I'll show you this in a second.
20   At Page 47 of her deposition Ms. Pulido-Crowe
21   was asked the question:  "How did you determine
22   whether the gray marketing was material or not?"
23              "Answer:  We of course first
24   spoke to the company, talked about the
25   distribution channels.  The issue of -- the
```

Page 161

EDWARD NECARSULMER, III

1

2   discussion of Costco came up because of discount

3   warehouses.  And we asked, was it much of a

4   problem?  They said no, there was -- it was an

5   isolated incident -- I recall something to that

6   effect.  My interpretation was it was an

7   isolated incident and that that person or

8   distributor, whoever it was that got those clubs

9   there, they were going to pursue that and put an

10  end to that."

11               MR. GLUCKOW:  Are you

12         representing to the witness that that

13         is the only time that Ms. Pulido-Crowe

14         testified about her discussions with

15         the company concerning Costco and/or

16         gray marketing?

17               I certainly hope not.

18               MR. LEWIS:  I'm not saying it's

19         the only time, but I'm not saying --

20               MR. GLUCKOW:  The inference of

21         your question is that that is the

22         record as to the conversations.

23               MR. LEWIS:  I haven't asked a

24         question, so I can't have an inference

25         to my question.

Page 162

```
 1                    EDWARD NECARSULMER, III
 2    BY MR. LEWIS:
 3            Q.    My question is --
 4                  MR. GLUCKOW:  I suggest
 5          otherwise, but proceed.
 6                  MR. LEWIS:  You suggest I have a
 7          question out there?
 8                  MR. GLUCKOW:  No.  I suggest that
 9          the way you just read that into the
10          record following the exchange that we
11          have had is misleading.  But proceed.
12    BY MR. LEWIS:
13            Q.    The first question is, was that
14    the testimony of Ms. Pulido-Crowe that you were
15    referring to?
16            A.    Partially.
17            Q.    Okay.  Is there something else
18    that you recall?
19                  You have the volume in front of
20    you and an index to it, if there's something
21    else you would like to refer my attention to.
22                  Do you recall her ever telling --
23    strike that.
24                  Do you recall her ever saying
25    that Barney Adams told her that Costco
```

Page 163

1                    EDWARD NECARSULMER, III

2       distribution was other than an isolated

3       incident?

4                         MR. GLUCKOW:  Objection to the

5                    form.

6                         THE WITNESS:  I don't recall him

7                    saying -- her saying anything besides

8                    that, no.

9       BY MR. LEWIS:

10                        Q.    Okay.  Would you agree that the

11      chart to Mr. Grace's report reflects that by the

12      time of the IPO, Costco distribution, whatever

13      it was, was not an isolated incident?

14                        MR. GLUCKOW:  It mischaracterizes

15                   the record.  It mischaracterizes the

16                   testimony.

17                        You can answer.

18                        THE WITNESS:  I mean, I just

19                   don't know --

20                        MR. GLUCKOW:  Asked and answered

21                   as well.

22                        THE WITNESS:  -- I just don't

23                   know.  If these were all coming from

24                   the same source, then I suspect you

25                   could characterize it as one -- you

Page 164

1        EDWARD NECARSULMER, III

2        know, one event.  If they were coming

3        from multiple sources, I think it

4        wouldn't be.

5    BY MR. LEWIS:

6        Q.    All right.  Do you have any

7    reason to believe based on your investigation in

8    this case as part of your expert work -- let me

9    reframe that.

10        Do you have any reason to believe

11   based on your work in this case that the

12   underwriters reviewed the complaints that were

13   listed between the dates of May 6th and I guess

14   I stopped reading at July 3?

15        MR. GLUCKOW:  Objection to the

16        form.

17        You can answer.

18        THE WITNESS:  I know that they

19        certainly -- I shouldn't say

20        certainly.  I believe they knew about

21        the Canadian one.  And I don't know to

22        the extent they knew about the others.

23   BY MR. LEWIS:

24        Q.    Forgive me if I'm asking you

25   something I've already asked you.  Did I read

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B164

Page 165

1            EDWARD NECARSULMER, III

2      you the entry for July 8, 1998:  "Golfdom in

3      McLean, Virginia, called regarding a credit for

4      clubs they had purchased at Costco"?

5                 MR. GLUCKOW:  The question is did

6              you already ask him about that one?

7                 MR. LEWIS:  Right.

8                 MR. GLUCKOW:  The record will

9              speak for itself, but...

10                THE WITNESS:  I don't know; I

11             just don't.

12     BY MR. LEWIS:

13        Q.    Whether or not I read it to you

14     before, the entry here in Mr. Grace's report for

15     July 8, 1998, states that Golfdom in McLean,

16     Virginia, called regarding a credit for clubs

17     they had purchased at Costco.

18                Do you remember learning of that

19     prior to -- as a result of your work in this

20     case prior to the receipt of Dr. Grace's or

21     Mr. Grace's report?

22                MR. GLUCKOW:  He's on Page 6.

23                THE WITNESS:  I'll get to Page

24             6.  I'm sorry, I went back to the

25             beginning.

Page 166

1              EDWARD NECARSULMER, III

2              MR. LEWIS:  Take your time.

3              MR. GLUCKOW:  This one

4         (indicating).

5         A.    I don't -- I don't recall this

6    specific one.

7         Q.    Okay.  Based on your work in

8    this case, do you know of any reason why the

9    complaints -- the written complaints that are

10   listed by Mr. Grace in his report would not have

11   been available to the underwriters as part of

12   their due diligence investigation if they had

13   asked to see them?

14             MR. GLUCKOW:  Objection to the

15        form.  It assumes facts not in

16        evidence.

17             You can answer.

18             THE WITNESS:  I don't know why it

19        wouldn't have been available had they

20        asked to see them.

21   BY MR. LEWIS:

22        Q.    You don't know why it wouldn't

23   have been?

24        A.    Correct.

25        Q.    Do you have any knowledge, as

Page 167

EDWARD NECARSULMER, III

1

2    you sit here, that the underwriters contacted,

3    as part of the due diligence investigation, any

4    of the retailers who made the complaints about

5    Costco that are listed between the dates of

6    March 23, 1998, and July 8, 1998?

7                    MR. GLUCKOW:  Objection to the

8            form.  Are you asking him to compare

9            this list of complaints with the list

10            of customer calls that we've looked at

11            previously?

12                    MR. LEWIS:  Sure, if you want to;

13            but none of them were on the list of

14            customer calls, so I don't think he has

15            to do that.

16    BY MR. LEWIS:

17        Q.    Do you have any knowledge that

18    any of the complaining retailers were contacted

19    by Lehman Brothers or any of the comanagers

20    during due diligence?

21        A.    I have no knowledge of that.

22        Q.    You have opined in your rebuttal

23    report on the subject of the disclosure that was

24    made in this case.  Would you agree that in

25    matters of disclosure that an underwriter should

Page 168

1                     EDWARD NECARSULMER, III

2    err on the side of inclusion of fact rather than

3    exclusion of fact?

4                     MR. GLUCKOW:  Objection to the

5                characterization of the report.

6                     But you can answer.

7                     THE WITNESS:  I'm not sure that's

8                accurate.  I think it's important to

9                have a complete document, but I think

10               part of making it a useful document,

11               and for the benefit of the investors,

12               is making sure that the -- the things

13               that are -- the things that are

14               included are, you know, significant to

15               the company, and I think one of the --

16               having gone through this drafting

17               process a million times, one of the

18               great problems is what do you put in,

19               what do you put out, what do you leave

20               out, and it does start -- you know, can

21               strike likely debate, and I think

22               striking some balance is really the

23               goal.

24    BY MR. LEWIS:

25                     Q.    Would you agree that if by the

Page 169

1                    EDWARD NECARSULMER, III

2    time of the IPO the underwriters were unable to

3    make a studied assessment of the scope of the

4    risk of gray marketing that the risk of gray

5    marketing should have been included as a risk

6    disclosure?

7              MR. GLUCKOW:  Objection to the

8         form.  Incomplete hypothetical.

9         Assumes facts not in evidence.

10             You can answer.

11             THE WITNESS:  I don't agree with

12        that.  I think, again, this is a

13        process, you make a judgment as to

14        those things you think are significant

15        and relevant, and those are the things

16        you include.

17   BY MR. LEWIS:

18        Q.     What if you concluded by the

19   time of the effective date that you just didn't

20   know what the scope of gray marketing was?

21             MR. GLUCKOW:  Objection.  The

22        same objections, and it

23        mischaracterizes the evidence.

24             THE WITNESS:  My interpretation

25        of what I read, what I reviewed, was

Page 170

EDWARD NECARSULMER, III

1

2          that they did make a judgment, and

3          their judgment was that they did know

4          enough and it was not material.

5    BY MR. LEWIS:

6          Q.    When was that judgment made, to

7    the best of your knowledge?

8          A.    Prior to the effective date of

9    the registration statement.  I couldn't tell

10   you -- I couldn't make it any more specific than

11   that.

12         Q.    Prior to the Costco press

13   release?

14               MR. GLUCKOW:  Objection to the

15         form.  It mischaracterizes the record.

16         It mischaracterizes the testimony.

17               You can answer.

18   BY MR. LEWIS:

19         Q.    When I say the Costco press

20   release, I mean the Adams June 9, 1998, press

21   release relating to Costco.

22         A.    I don't know I would make -- you

23   know, the assumption I make from the data that I

24   reviewed is that that was their conclusion.

25         Q.    But are you aware of any meeting

Page 171

1              EDWARD NECARSULMER, III

2    or meetings at which that conclusion was

3    reached?

4              A.     Not specifically, no.

5              Q.     Are you familiar with the term

6    stickering in the context of a prospectus or

7    registration statement?

8              A.     I am.

9              Q.     What does that term mean to you?

10             A.     You can add information via a

11   label, a long label, onto the cover of a

12   prospectus.

13             Q.     And under what circumstances in

14   your opinion does one sticker a registration

15   statement or a prospectus?

16             A.     Some fact coming out subsequent

17   to the printing of that prospectus that, you

18   know, you deem is material.  Sometimes the SEC

19   will ask you to sticker if something comes up.

20   If effectiveness gets delayed for some reason

21   and, you know, a quarter ends or a contract gets

22   canceled or something like that, they'll often

23   allow that as a -- or recommend that as a way to

24   make sure the disclosure is complete.

25             Q.     Have you seen stickering done

Page 172

EDWARD NECARSULMER, III

1

2  after the effective date of a registration

3  statement?

4          A.    I would have -- I would say yes,

5  but it's more usual on the date.  But it could

6  be -- it could be shortly thereafter, not long

7  thereafter.

8          Q.    Are you aware of any limitation

9  to how long after the effective date a

10  prospectus can be stickered?

11          A.    I'm not aware of that, if there

12  is one.

13          Q.    Do you believe that's a legal

14  issue rather than a practice issue?

15          MR. GLUCKOW:  Objection.  It

16          calls for a legal conclusion.

17          But you can answer.

18          THE WITNESS:  I don't know.  I

19          don't know.

20  BY MR. LEWIS:

21          Q.    Do you know if any consideration

22  was given in this case to stickering the

23  registration statement?

24          A.    I don't know.

25          MR. LEWIS:  Let's take a

Page 173

1          EDWARD NECARSULMER, III

2          five-minute break and I may be done.

3                (A recess was had from 3:46 p.m.

4          to 4:00 p.m.; and then the proceedings

5          continued as follows:)

6     BY MR. LEWIS:

7          Q.     A point of clarification.  When

8     we referred to a file memo from Joe Hoffman

9     relating to the SEC, I believe you used the term

10    signing official at the SEC?

11         A.     Examining official.

12         Q.     Examining?

13         A.     Sorry.

14         Q.     I think you actually used the

15    word sign at one point.  Is that a synonym for

16    the examining official?

17              MR. GLUCKOW:  I don't recall

18         those words being used, but the record

19         will speak for itself.

20              THE WITNESS:  Should I respond?

21              MR. GLUCKOW:  Yes, if you --

22              THE WITNESS:  If I said it, I

23         didn't mean to say it.  I meant to say

24         examiner.

25    BY MR. LEWIS:

Page 174

1        EDWARD NECARSULMER, III

2        Q.    A point of clarification.  You

3    have reached no conclusion as a result of your

4    work in this case with respect to issuer

5    disclosure obligations, is that fair?

6        A.    That is fair.

7        Q.    In Exhibit 321 --

8            MR. GLUCKOW:  Hold on; I've got

9        the official copy here.

10           MR. LEWIS:  It's hopefully the

11       last time we'll go back to it.

12   BY MR. LEWIS:

13       Q.    -- in your enumeration of

14   categories of things to be considered, Item 7

15   was:  "Understanding of material outstanding

16   litigation, regulatory or environmental

17   issues."

18            Is it your opinion that the

19   underwriters had any obligation to evaluate the

20   litigation between Adams and Costco --

21           MR. GLUCKOW:  Objection to the

22       form.

23   BY MR. LEWIS:

24       Q.    -- for materiality?

25       A.    No.  Practice is that you ask --

Page 175

1          EDWARD NECARSULMER, III

2    you know, you ask that question of your counsel,

3    and if they give you a clean bill of health on

4    what you've done so far, you typically keep

5    going.

6          Q.    "Your counsel" meaning the

7    issuer's counsel or the underwriter's counsel?

8          A.    The underwriter's counsel.

9          Q.    Going back to Exhibit-7 to

10   Mr. Grace's report, I take it that in the course

11   of your --

12               MR. GLUCKOW:  Hold on, let me

13        just get it.

14               THE WITNESS:  Got it.

15   BY MR. LEWIS:

16          Q.    In the course of your work on

17   this engagement, did you ever try to go through

18   the exhibits to collect complaints related to

19   gray marketing and line them up chronologically?

20          A.    I did not.

21          Q.    Do you have any reason to

22   believe that the underwriters were aware of the

23   identities of the retailers who complained to

24   Adams about Costco's appearing -- Tight Lies

25   appearing at Costco locations?

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 176

1          EDWARD NECARSULMER, III

2          A.      With the exception of WDC

3    Mackenzie, I don't.

4                  MR. LEWIS:  I have no further

5          questions at this time.

6                  MR. GLUCKOW:  Okay.

7          I'm going to have a few

8          questions, but I just need five

9          minutes, so if we can take a

10         five-minute break.  Is that okay?

11                 MR. LEWIS:  Okay.  I'll ask you

12         what you discussed with the witness.

13                 MR. GLUCKOW:  No, I'm going to

14         sit right here.  I'm not going

15         anywhere.

16                 MR. LEWIS:  Okay; fine.  Take

17         your time.

18                 MR. GLUCKOW:  I just need to

19         compare two things quickly.

20                 MR. LEWIS:  Take your time.

21                 (A recess was had from 4:04 a.m.

22         to 4:13 p.m.; and then the proceedings

23         continued as follows:)

24                        -  -  -

Page 177

```
1              EDWARD NECARSULMER, III

2              (Whereupon, a document was

3         marked, for identification purposes, as

4         Exhibit 328.)

5                   - - -

6              EXAMINATION

7                   - - -

8    BY MR. GLUCKOW:

9         Q.      This is a copy of the deposition

10   transcript of Olga Pulido-Crowe.  Mr. Lewis

11   mentioned this deposition during his examination

12   and in fact read from it but didn't mark it,

13   which is why I'm marking it now.

14              Mr. Necarsulmer, let me ask you,

15   first, do you recall reviewing

16   Ms. Pulido-Crowe's deposition as part of your

17   work in this matter?

18        A.      I do.

19        Q.      Did you rely on her testimony?

20        A.      Heavily.

21        Q.      Why?

22        A.      In my experience, the captain of

23   the underwriting team takes particular weight --

24   or deserves particular weight, I should say.

25        Q.      Let me direct your attention to
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B177

Page 178

1                    EDWARD NECARSULMER, III

2      the top of Page 48, Line 6.

3            A.      The top of Page 48, Line 6.

4            Q.      The question is:  "Do you recall

5      who spoke with Adams Golf about this issue?"

6                    And the answer is:  "It would

7      have been Barney or Mark -- or I don't recall

8      exactly who, but it was a group of many people

9      that were -- that would have been present."

10                   Do you recall reading that when

11     you read Ms. Pulido-Crowe's deposition

12     transcript?

13           A.      Yes.

14           Q.      Did you rely on that in any way?

15           A.      I did.

16           Q.      Why?

17           A.      Because I think it was

18     demonstrative of the fact that there was an

19     ongoing process of the underwriters in the

20     company talking about this and other issues.

21           Q.      And I may have misinterpreted

22     some of Mr. Lewis's questions earlier, but I

23     couldn't help get the impression from some of

24     the questions that he was asking that the

25     impression that he was leaving on me anyway was

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 179

1          EDWARD NECARSULMER, III

2     that there was only one discussion between

3     Ms. Pulido-Crowe and Mr. Adams and that that one

4     discussion happened in April or May of '98.

5                  Is that impression that I had

6     in my mind consistent with your review of the

7     materials in this matter?

8                  MR. LEWIS:  Objection to form.

9                  THE WITNESS:  I --

10                 MR. LEWIS:  You can answer.

11                 THE WITNESS:  I don't know who

12              has to tell me this in this case.

13              Absolutely not.  The one thing

14              that is clear to me throughout, and

15              this demonstration -- this deposition

16              is sort of important to that, is that

17              there was, as there normally should be

18              in these cases, a significant number of

19              -- amount of interaction between the

20              company's marketing people and the

21              underwriters.

22    BY MR. GLUCKOW:

23         Q.   Let me turn your attention to

24    Page 78, at the top, Line 3.

25                 MR. LEWIS:  What is this?

Page 180

1          EDWARD NECARSULMER, III

2                    MR. GLUCKOW:  I'm sorry, Page 78,

3          Line 3 through Line 6.

4     BY MR. GLUCKOW:

5          Q.    The question is:  "Did you have

6     any discussions with anyone at Adams concerning

7     the litigation between June 9 of '98 and July 9

8     of '98?"

9                    The answer is:  "I believe we

10    (sic) did."

11                    Line 7:  "Who did you have

12    those discussions with?"

13                    "Answer:  I don't recall.  I

14    can recall conversations.  I don't remember

15    who was actually there, but I recall

16    conversations."

17                    Did you review this?

18          A.    I did.

19          Q.    Did you rely on it?

20                    MR. LEWIS:  Objection to form.

21          Vague.  Overbroad.

22                    THE WITNESS:  I did rely on it.

23    BY MR. GLUCKOW:

24          Q.    Why?

25          A.    Again, it was evidence of this

Page 181

1          EDWARD NECARSULMER, III

2      ongoing discussion between the company and the

3      underwriters as part of the due diligence

4      process.

5          Q.      Let me actually have you turn

6      back to Page 77, the prior page.  I should have

7      started here; I apologize.

8                  On Page 76, Exhibit 163 is marked

9      -- and then there's a question -- which is the

10     press release concerning the Costco action,

11     which Mr. Lewis asked you about, and on top of

12     Page 77, the question is:  "Do you recall

13     whether you saw it," meaning this press release,

14     "prior to the IPO?"

15                 And the answer is:  "Yes."

16                 Skipping down to Line 14, the

17     question is:  "Did you discuss the litigation

18     with anyone at Adams prior to them filing

19     suit?"

20                 The answer is, on Line 16:  "I

21     believe it was prior, yes."

22                 17.  "Who did you discuss this

23     with?"

24                 18.  "Answer:  I don't recall

25     exactly, but it would have -- it was a group

Page 182

1                    EDWARD NECARSULMER, III

2    of senior management at the company and/or our

3    counsel, underwriters' counsel or their

4    counsel.  It was discussed."

5                    Do you see what I've just read

6    there?

7            A.      I do.

8            Q.      Did you read that as part of

9    your evaluation of this matter?

10           A.      I did.

11           Q.      Did you rely on what I've just

12   read?

13                   MR. LEWIS:  Objection.

14                   THE WITNESS:  I did.

15   BY MR. GLUCKOW:

16           Q.      Please explain how and why.

17           A.      I relied on it because, again, I

18   was -- one of the things I was trying to

19   investigate as part of my project was, you know,

20   were the underwriters thorough and consistent in

21   trying to discuss, you know, these -- the

22   marketing issues, the distribution issues, legal

23   issues, with the company, and this is another

24   evidence that they did and that they followed up

25   on it.

Page 183

1          EDWARD NECARSULMER, III

2          Q.      There are a number of documents

3     that Mr. Lewis showed you -- examples would be

4     the Lehman Brothers Commitment Committee

5     memorandum, Exhibit 74; the due diligence

6     memorandum, Exhibit 160, also marked as 198; the

7     notes of the bringdown diligence discussion,

8     Exhibit 159 -- where the questioning pointed out

9     that there was no reference in those documents

10    and other documents to gray marketing or Costco.

11              Do you recall that line of

12    questioning?

13          A.      I do.

14          Q.      Did it surprise you in any way

15    that there was no reference to gray marketing or

16    Costco in those documents?

17              MR. LEWIS:   Objection.  Vague and

18          overbroad.

19              THE WITNESS:   It didn't surprise

20          me at all.

21    BY MR. GLUCKOW:

22          Q.      Why?

23          A.      Because the underwriters had

24    made a determination that this was not

25    significant to the company's sales and earnings;

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000  (888) 777-6690  (610) 434-8588

B183

Page 184

1                    EDWARD NECARSULMER, III

2      therefore, like many other issues, it just

3      wasn't part of the conversation.

4                    MR. GLUCKOW:  I have no further

5             questions at this time.

6                    MS. MORIATY:  I've got just a

7             few.

8                    THE WITNESS:  Sure.

9                         -  -  -

10                        EXAMINATION

11                        -  -  -

12     BY MS. MORIATY:

13            Q.    I want to turn everybody back to

14     Exhibit I think it's 327 which was the exhibit

15     to Mr. Grace's report.

16                    MR. GLUCKOW:  Here it is.

17                    THE WITNESS:  Okay.

18     BY MS. MORIATY:

19            Q.    Well done, okay.

20                   During your research for your

21     report in this case, did you learn how many

22     retailers Adams Golf had in 1998?

23            A.    The number 7,000 sticks in my

24     mind.

25            Q.    Do you know how many phone calls

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B184

Page 185

1                          EDWARD NECARSULMER, III

2      Adams Golf received to its call center in total

3      between about January 1st and July 8 of 1998?

4                          MR. LEWIS:  Objection to form.

5                          THE WITNESS:  A thousand -- I --

6      BY MS. MORIATY:

7              Q.      Did you read this information in

8      the course of your research for this report?

9              A.      Yes.

10                         MR. LEWIS:  Objection to form.

11                         THE WITNESS:  Yes, I did.

12     BY MS. MORIATY:

13             Q.      I'm going to represent to you

14     that -- you just told me it was 7,000

15     retailers.

16             A.      Right.

17             Q.      I'm going to represent to you

18     that they had 12,885 calls to this call center.

19     You can believe that or not.  Based on whatever

20     impression you had during your research, based

21     on that.

22                         So I'm going to look at Exhibit

23     327.  And we discussed earlier the complaints

24     to Adams Golf regarding the Costco column, and

25     in this column by my count there are 12

Page 186

1              EDWARD NECARSULMER, III

2    retailers complaining between the beginning of

3    this chart and the IPO -- the beginning of

4    this chart starts February 16th, '98; and

5    there are nine calls that come into the call

6    center.

7              So with all of your experience

8    working as an underwriter in various IPOs, and

9    in light of the information in Exhibit 327 and

10   the number of retailers -- 7,000 -- and calls

11   to the call center -- upwards of 12,000 -- do

12   you think gray marketing should have been

13   listed as a risk factor in the Adams Golf

14   prospectus?

15              MR. LEWIS:  Objection to form and

16         foundation.

17              MR. GLUCKOW:  I'll just --

18              MR. LEWIS:  Beyond the scope of

19         his purpose in this litigation

20         according to his testimony.

21              THE WITNESS:  Should I answer?

22              MR. LEWIS:  You may answer, if

23         you can.

24              THE WITNESS:  I mean, it seems to

25         me, again, as I just answered

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

1      EDWARD NECARSULMER, III

2           Mr. Gluckow, they made a determination

3           that while they knew of the issue, that

4           it simply wasn't -- didn't rise to the

5           level of, and I would rather use the

6           word significant than material because

7           I think material actually has a legal

8           connotation, also.  So, therefore, like

9           many other issues, they made the

10          determination, the underwriters made

11          the determination, that there was no

12          benefit, no reason, you know, to take

13          it any further.  And that's a judgment

14          you make when you are an underwriter,

15          when you do due diligence.  There are

16          lots of factors to consider; you just

17          -- you make these decisions.

18   BY MS. MORIATY:

19       Q.    If you as an underwriter heard

20   that 12 retailers out of 7,000 complained, would

21   you think that this is a significant issue?

22               MR. LEWIS:  Objection to form.

23               THE WITNESS:  I would think that

24          it would be less than I would have

25          guessed the normal sample would be, so

Page 188

```
 1                    EDWARD NECARSULMER, III

 2              I think it would not be a significant

 3              issue.

 4    BY MS. MORIATY:

 5              Q.     And if you heard that nine calls

 6    out of more than 12,000 were regarding a certain

 7    issue, would you have thought that issue

 8    significant enough to investigate further or put

 9    as a risk factor?

10                    MR. LEWIS:  Objection to form and

11              foundation.

12                    THE WITNESS:  It's hard to, you

13              know -- no, the answer is no, the

14              numbers are simply too small, putting

15              myself in that spot.

16                    MS. MORIATY:  Thanks.  No further

17              questions here.

18                         -  -  -

19                    EXAMINATION

20                         -  -  -

21    BY MR. LEWIS:

22              Q.     Mr. Necarsulmer, can you say

23    that as someone who is overseeing due diligence

24    investigations in the past if you had

25    Mr. Grace's report before you at the time of the
```

Page 189

1          EDWARD NECARSULMER, III

2    IP -- just before the IPO was effective and saw

3    that Adams' clubs were appearing in Costco

4    warehouses in diverse locations in the country,

5    that that was something you wouldn't have asked

6    some questions about?

7              MR. GLUCKOW:  Objection to form.

8         Incomplete hypothetical.

9         Mischaracterizes the record.

10             You can answer.

11             THE WITNESS:  I mean, you know,

12        it's very hard to look back, but I

13        again think that -- I again think that

14        you -- the judgment -- I keep going

15        back -- the totality of this, it is my

16        opinion, and I certainly believe it,

17        that they made an informed -- given all

18        the facts that they knew, they made a

19        reasonable judgment that it was not --

20        did not rise to the level of being a

21        risk factor.

22   BY MR. LEWIS:

23        Q.    The underwriters could have kept

24   the offering from going forward any time up to

25   the effective date, could they not, if they were

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

B189

Page 190

```
 1              EDWARD NECARSULMER, III

 2    not satisfied as to -- that all proper

 3    disclosures were being made?

 4              MR. GLUCKOW:  Incomplete

 5              hypothetical.  Assumes facts not in

 6              evidence.

 7              You can answer.

 8              THE WITNESS:  Sure; you can even

 9              do it after the effective date.

10    BY MR. LEWIS:

11              Q.    How late after the effective

12    date can you do it?

13              MR. GLUCKOW:  It calls for a

14              legal conclusion.

15    BY MR. LEWIS:

16              Q.    In your understanding, to the

17    best of your knowledge, how late after the

18    effective date can you stop an underwriting?

19              MR. GLUCKOW:  The same

20              objections.

21              THE WITNESS:  I don't remember --

22              I don't know if it's 30 or 40.  There's

23              a number, I just don't know what it is,

24              or I don't remember what it is, and it

25              may have changed since I was actively
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

1           EDWARD NECARSULMER, III

2       doing this.  I thought there was some

3       sort of -- I don't remember.  The

4       answer is I don't remember whether it's

5       30 days or 45 days or whether it's even

6       a specific number any longer, but...

7               MR. LEWIS:  Nothing further.

8               MR. GLUCKOW:  Nothing further.

9               MS. MORIATY:  No.  Good.

10              MR. GLUCKOW:  Thank you very

11      much.

12              (Deposition concluded at

13      4:26 p.m.)

14                      -o-

15

16

17

18

19

20

21

22

23

24

**VERITEXT PA COURT REPORTING COMPANY**
**(215) 241-1000   (888) 777-6690   (610) 434-8588**

Page 192

```
1
2                    C E R T I F I C A T E
3              I, Pamela Harrison, a Notary
4   Public, do hereby certify:
5              That EDWARD NECARSULMER, the
6   witness whose testimony is hereinbefore set
7   forth, was duly sworn by me and that such
8   testimony given by the witness was taken down
9   stenographically by me and then transcribed.
10             I further certify that I am not
11  related to any of the parties to this
12  action by blood or marriage, and that I am in
13  no way interested in the outcome of this
14  matter.
15
16             _____
17             Pamela Harrison
               Registered Merit Reporter
18             Certified Realtime Reporter
               CSR-NJ # 30XI00221600
19             Notary Public
               Date: August 8, 2006
20
21             (The foregoing certification of
    this transcript does not apply to any
22  reproduction of the same by any means, unless
    under the direct control and/or supervision of
23  the certifying shorthand
    reporter.)
24
```

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 193

1

2                    INSTRUCTIONS TO WITNESS

3                        Please read your deposition

4      over carefully and make any necessary

5      corrections.  You should state the reason in

6      the appropriate space on the errata sheet for

7      any corrections that are made.

8                        After doing so, please sign the

9      errata sheet and date it.

10                       You are signing same subject to

11     the changes you have noted on the errata sheet,

12     which will be attached to your deposition.

13                       It is imperative that you return

14     the original errata sheet to the deposing

15     attorney within thirty (30) days of receipt of

16     the deposition transcript by you.  If you fail

17     to do so, the deposition transcript may be

18     deemed to be accurate and may be used in court.

19

20

21

22

23

24

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

Page 194

1

2                          - - - - - - -

3                    E R R A T A

4                          - - - - - - -

5        PAGE        LINE        CHANGE

6        8          23   NO,   I WAS RETAINED IN AMF BOWLING CASE BY SULLIVAN AND
                                                            CROMWELL.

7        - - -      - - -    - - - - - - - - - - - -

8        - - -      - - -    - - - - - - - - - - - -

9        - - -      - - -    - - - - - - - - - - - -

10       - - -      - - -    - - - - - - - - - - - -

11       - - -      - - -    - - - - - - - - - - - -

12       - - -      - - -    - - - - - - - - - - - -

13       - - -      - - -    - - - - - - - - - - - -

14       - - -      - - -    - - - - - - - - - - - -

15       - - -      - - -    - - - - - - - - - - - -

16       - - -      - - -    - - - - - - - - - - - -

17       - - -      - - -    - - - - - - - - - - - -

18       - - -      - - -    - - - - - - - - - - - -

19       - - -      - - -    - - - - - - - - - - - -

20       - - -      - - -    - - - - - - - - - - - -

21       - - -      - - -    - - - - - - - - - - - -

22       - - -      - - -    - - - - - - - - - - - -

23       - - -      - - -    - - - - - - - - - - - -

24       - - -      - - -    - - - - - - - - - - - -

25       - - -      - - -    - - - - - - - - - - - -

B194

Page 195

1

2                    ACKNOWLEDGMENT OF DEPONENT

3

4        I, Edward Necarsulmer III hereby certify

5   that I have read the foregoing pages 5

6   to 191 and that the same is a correct

7   transcription of the answers given by me

8   to the questions therein propounded,

9   except for the corrections or changes

10  in form or substance, if any, noted in

11  the attached Errata Sheet.

12   8/17/06        Edward Necarsulmer

13  DATE                    SIGNATURE

14

15

16  Subscribed and sworn to before me this

17   17th day of August               ,

18  2006.

19  My commission expires: 12/31/09

20

21  Marcia Rose Koziarz

22  Notary Public

23  MARCIA ROSE KOZIARZ
    Notary Public, State of New York
    No. 4846969
24  Qualified in Suffolk County
    Commission Expires 12/31/09