# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
_____ x
                              :
IN RE ADAMS GOLF , INC.,      :        CONSOLIDATED
SECURITIES LITIGATION         :        C.A. NO. 99-371-KAJ
_____ x
```

## PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO UNDERWRITER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
*Lead Counsel for Plaintiffs and the Class*

**ROSENTHAL, MONHAIT & GODDESS, P.A.**
Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, DE   19801
(302) 656-4433
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs and the Class*

OF COUNSEL:

**LAW OFFICES OF DONALD B. LEWIS**
Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

**KELLER ROHRBACK, LLP**
Juli E. Farris
Elizabeth A. Leland
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900

Dated: October 9, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................... iii

I.    NATURE AND STAGE OF PROCEEDINGS .......................... 1

II.   SUMMARY OF ARGUMENT ...................................... 1

III.  STATEMENT OF FACTS ....................................... 3

      A.  The Underwriter Defendants Destroyed Important
          Documents After This litigation Began And In Violation
          Of Document Retention Requirements ......................... 3

      B.  The Underwriters conducted an Inadequate Due
          Diligence Investigation ..................................... 7

          1.   The Underwriters Had Reason To Be Concerned ............. 8

          2.   The Underwriters Failed to Respond Appropriately ........... 9

          3.   The Underwriters Breached Their Duty of Verification ....... 10

          4.   Lehman's Customer Surveys Did Not Constitute Verification . . 14

          5.   The Underwriters Conducted Defective "Bring Down"
               Due Diligence ...................................... 16

IV.   ARGUMENT ................................................ 18

      A.  Standard On A Motion For Summary Judgment ................. 18

      B.  Because the Underwriter Defendants Destroyed Key
          Documents They Were Required to Preserve, The Court
          Should Summarily Deny Defendants' Summary Judgment
          Motions ................................................ 20

          1.   Plaintiffs Are Entitled to Sanctions ...................... 21

C.      The Underwriters have Not Met Their Burden of Proof . . . . . . . . . . . . . 26

        1.      The Underwriters' Due Diligence Investigation
               Was Not Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        2.      The Underwriters Relied On, and Failed to Verify,
               Management Assertions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        3.      The Underwriters Failed to "Bring Down" the
               Investigation to the IPO Effective Date and Thereafter . . . . . . . 36

        4.      Defendants Have Failed to Establish a Due Diligence Defense
               With Respect to Double Shipping or Other Questionable Sales
               Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        5.      The Underwriter Defendants Could Not Reasonably
               Have Believed That the Registration Statement
               Was Complete and Accurate . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Anderson v. Production Management Corp.*,
2000 U.S. Dist. LEXIS 5696 (E.D. La. 2000) . . . . . . . . . . . . . . . . . . . . . . . 25

*Byrnie v. Town of Cromwell*,
243 F.3d 93 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25, 26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Chris-Craft Industrial Inc. v. Piper Aircraft Corp.*,
480 F.2d 341 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Competitive Associates, Inc. v. International Health Sciences, Inc.*,
1975 U.S. Dist. LEXIS 14230 (S.D.N.Y. 1975) . . . . . . . . . . . . . . . . . . 32, 33

*Dierson v. Walker*,
2003 U.S. Dist. LEXIS 9538 (N.D. Ill. 2003) . . . . . . . . . . . . . . . . . . . . . . . 25

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 U.S. 451 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Enron Corp. Sec.,Derivative & ERISA Litigation*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 26, 31

*Erie Ins. Exchange v. Applica Consumer Prods., Inc.*,
2005 WL 1165562 (M.D. Pa. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Escott v. Barchris Construction Corp.*,
283 F. Supp. 643 (S.D.N.Y. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Feit v. Leasco Data Processing Equip. Corp.*,
    332 F. Supp. 544 (E.D.N.Y. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re International Rectifier Sec. Litig.*,
    1997 U.S. Dist. LEXIS 23966 (C.D. Cal. 1997) . . . . . . . . . . . . . . . . . 32, 34

*Kim v. Dawn Food Products, Inc.*,
    2006 U.S. Dist. LEXIS 11033 (N.D. Ill. Mar. 17, 2006) . . . . . . . . . . . . . . 25

*Kronish v. United States*,
    150 F.3d 112 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mosaid Techs.,Inc. v. Samsung Electronics Co.*,
    348 F. Supp.2d 332 (D.N.J. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Nationwide Life Insurance Co. v. Bankers Leasing Association, Inc.*,
    182 F.3d 157 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Phillips v. Kidder,Peabody & Co.*
    933 F. Supp. 303 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Picard Chemical, Inc. Profit Sharing Plan v. Perrigo Co.*
    1998 U.S. Dist. LEXIS 11783 (W.D. Mich. 1998) . . . . . . . . . . . . . . . . . 32

*Positran Manufacturing, Inc. v. Diebold Inc.*,
    2003 U.S. Dist. LEXIS 8114 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . 23

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
    306 F.3d 99 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Schmid v. Milwaukee Electric Tool Corp.*,
    13 F.3d 76 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Shaffer v. RWP Group, Inc.*,
    169 F.R.D.19 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Shaw v. Digital Equipment Corp.*,
    82 F.3d 1194 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 27, 36

*In re Software Toolworks Inc. v. Dannenberg*,
    50 F.3d 615 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Bloom*,
    112 F.3d 200 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*University Hill Foundation v. Goldman Sachs & Co.*,
    422 F. Supp. 879 (S.D.N.Y. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 30

*Weinberger v. Jackson*,
    1990 U.S. Dist. LEXIS 18394 (N.D. Cal. 1990) . . . . . . . . . . . . . . . . . 32, 34

*Winters v. Textron, Inc.*,
    187 F.R.D. 519 (M.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re WorldCom, Inc. Sec. Litigation*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . 27, 28, 30, 32

*Zubulake v. UBS Warburg LLC*,
    220 F.R.D. 212 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23, 24

## DOCKETED CASES

*Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co.*, Case No.
    502003CA005045XXOCAI, 2005 WL 679071
    (Cir. Ct. 15th Jud. Dist. Palm Beach Fla. 2005) . . . . . . . . . . . . . . . . . . . . . 21

# FEDERAL STATUTES and RULES

15 U.S.C. § 77k . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 27, 28

15 U.S.C. §77z-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

17 C.F.R. § 230.176 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

17 C.F.R. § 240.17a-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

# MISCELLANEOUS

Comment, <u>BarChris: Due Diligence Refined,</u>
    68 Colum. L. Rev. 1411, 1417 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re the Matter of Morgan Keegan & Co., Inc.,*
    Admin. Proc File No. 3-11600 (Aug. 25, 2004) . . . . . . . . . . . . . . . . . . . . . . .  5

The Obligations of Underwriters, Brokers and Dealers in Distributing and Trading
    Securities, Particularly Those of New High Risk Ventures, SEC Release No.
    33-5275, 2 Fed. Sec. L. Rep. (CC4) 9l4506B (July 26, 1972) . . . . . . . . . . .  35

3D MOORE FEDERAL PRACTICE §37.120 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 21

## I.    NATURE AND STAGE OF PROCEEDINGS

Discovery and expert discovery have been completed. The underwriter defendants submitted their Motion for Summary Judgment (D.I. 289) and Opening Brief (D.I. 290, hereinafter "UW Br.") on September 11, 2006. Plaintiffs submit this memorandum in response.

The underwriter defendants have moved for summary judgment by two separate means: (1) joinder in the Adams Golf defendants' arguments that plaintiffs have failed to establish materiality, and that defendants have established negative loss causation; and (2) their separate motion asserting a "due diligence" defense. This memorandum addresses both aspects of the underwriter defendants' motions for summary judgment.

## II.    SUMMARY OF ARGUMENT

1.    In their response to the Adams Golf defendants' motion for summary judgment, plaintiffs have shown that defendants' motion should be denied on the merits. The Court should also deny that motion on the additional ground that the underwriter defendants who have joined in it have destroyed or failed to preserve and produce important relevant evidence.

2.    In violation of both federal regulations and their own document retention policies, underwriter defendants destroyed or lost highly relevant documents they were required to preserve. Just as an example, the underwriter defendants destroyed or lost -- after this litigation began -- securities analyst notes detailing critical research into gray marketing of Adams Tight Lies at Costco stores. These notes included the "Pro Shop Survey," which revealed gray marketing both before and after the IPO. The destroyed or lost documents, had they been preserved and produced, would have provided important further support to plaintiffs with respect to establishing materiality and rebutting defendants' negative loss causation

argument and also would have provided evidence of what the underwriters could have learned about gray marketing had they conducted a diligent "due diligence" investigation. Because this and other destruction and non-production of evidence has severely prejudiced plaintiffs, the Court should deny the underwriter defendants' motions for summary judgment in all respects.

3.    Defendants' motion for summary judgment on due diligence grounds must be denied on its merits. In order to prevail on a due diligence defense in a motion for summary judgment, defendants must show, as a matter of law, that they conducted a reasonable investigation and that they reasonably believed that the registration statement was accurate. 15 U.S.C. § 77k; *Escott v. Barchris Constr. Corp.*, 283 F. Supp. 643 (S.D.N.Y. 1968); *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 576 (E.D.N.Y. 1971). Unless the Court finds that "no rational jury could conclude that the defendant has not acted reasonably," defendants' motion must fail. *In re Software Toolworks, Inc. v. Dannenberg*, 50 F.3d 615, 621 (9th Cir. 1994).

4.    A reasonable investigation must include specific inquiry regarding negative information, or "storm warnings," about which the underwriters are aware. *Univ. Hill Found. v. Goldman Sachs & Co.*, 422 F. Supp. 879, 902 (S.D.N.Y. 1976). In this instance, the underwriters' investigation was not reasonable because they failed to make a sufficient independent inquiry about the extent of gray marketing, including sales of Adams Golf clubs by Costco, despite warnings that it was occurring. The underwriters relied blindly on assurances from management that the gray marketing issue was not material, following up on management assurances with no more than a haphazard, cursory look at one or two Costco stores, in easy

2

proximity to the underwriters, and a questionnaire of customers that made no effort to delve into the issue.

5.     Underwriters have not performed adequate due diligence when they make no meaningful effort to investigate and verify management's assertions. *Escott*, 283 F. Supp. at 696; *Feit*, 332 F. Supp. at 581-582; *In re Software Toolworks*, 50 F.3d at 625-626. Thus, even if the underwriters believed that the Registration Statement was accurate, "they had no reasonable ground for that belief, within the meaning of the statute." *Escott*, 283 F. Supp. at 697.

6.     The underwriters' investigation was also inadequate because they failed to ask for or examine information that was available to them through the effective date of the Registration Statement, information which would have shown them that their understanding about the extent of gray marketing of Adams Golf products was completely flawed. *Shaw v. Digital Equip. Corp.* 82 F.3d 1194, 1201-1211 (1st Cir. 1996); *see also In re Software Toolworks*, 50 F.3d at 625-626; *Escott*, 283 F. Supp. at 690.

## III.     STATEMENT OF FACTS

### A.     The Underwriter Defendants Destroyed Important Documents After This Litigation Began And In Violation Of Document Retention Requirements.

This litigation began June 11, 1999. Thereafter, the underwriter defendants inexcusably destroyed or lost critical documents. These documents included the notes of analyst Brian Lantier, who departed from Lehman in August or September 1999 and, at that time, left with the company his records and notes reflecting extensive calls that he made to Adams Golf

3

retailers from roughly May 1998 through August 28, 1998. A1, pp. 8, 39-40, 134-38. He

referenced these calls, which he called the "Pro Shop Survey," in his August 28, 1998 Lehman

research report that he drafted for senior Lehman analyst Bernard Picchi. In this research

report, he stated that the Pro Shop Survey had indicated that Costco, the gray marketing

discounter, was "*flooding the market with Adams clubs at $149.*" In the August 28, 1998

report, Lantier stated that this was a "concern" and "an extremely serious issue" for Adams

Golf. A2, p. 27. Lantier's notes, including the "Pro Shop Survey," surely revealed critical facts

about the timing and amount of gray marketing. However, Lehman destroyed or lost them.

Lehman also failed to produce, and presumably destroyed or lost, the notes of Bernard

Picchi, the senior analyst at Lehman who followed Adams Golf stock. According to Mr.

Picchi's testimony, he probably disposed of his notes on Adams Golf when he left Lehman in

September 1999. A3, pp. 23, 31-32. This, again, was after plaintiffs initiated this litigation.

In addition to this evident destruction of documents after this litigation was filed,

document destruction occurred in violation of federal regulation and company document

retention policy. The underwriter defendants were obligated to preserve e-mails and research

materials pursuant to SEC regulations. At all relevant times these regulations, generally

speaking, imposed a legal obligation to preserve, for a period of not less than three years,

"originals of all communications received and copies of all communications sent . . . by the

member, broker or dealer (including inter-office memoranda and communications) "relating to

[the underwriter's] business as such." 17 C.F.R. 240.17a-4. This obligation to preserve

extended not only to hard copy but also to electronic documents, including e-mails. *In the*

4

*Matter of Morgan Keegan & Co., Inc.*, Admin. Proc. File No. 3-11600 (Aug. 25, 2004)

(citing Reporting Requirements for Brokers or Dealers Under the Securities Exchange Act of

1934, Exchange Act Release No. 34-38245 (Feb. 2, 1997)).[1]

Moreover, both defendant Lehman and defendant BancAmerica had in place document

retention policies that required preservation of research materials. Lehman's August 1998

policy required retention of analyst reports and files for six years. A4. BancAmerica's 1999

policy made clear that it was designed so that the company could comply with the records

keeping requirements of the SEC and the National Association of Securities Dealers, and

required the retention of materials for six years. A5.

Notwithstanding these separate and overlapping obligations, the underwriter defendants

utterly failed to preserve and produce many documents. Underwriter defendants Ferris Baker

Watts and BancAmerica did not preserve -- or at least did not produce -- any e-mails,

electronic documents or backup tapes for the discovery period. A6. Underwriter defendant

Lehman has produced some e-mails and other electronic documents, but it did so merely by

reviewing only 32 of the over 200 tapes that Lehman maintained relating to the Class Period.

Lehman admitted that these 200 or more tapes amounted to only a random subset of the tapes

that once existed. A7. Significantly, the list of the bi-weekly and monthly tapes examined

showed that only a few of them were created during the critical period between June and

August, 1998. A7, ¶3.

---

[1] Of course, to the extent that these regulations imposed preservation obligations for a period of three years, by the time three years elapsed this litigation had been long pending. Pendency of such litigation imposed separate preservation obligations.

The underwriters turned over to plaintiffs no written evidence at all regarding

investigation of gray marketing prior to August 28, 1998, excepting an August 4, 1998

BancAmerica report, which associated Adams Golf's price volatility with the appearance of

clubs in Costco. A8. Evidence that the underwriter defendants did not produce included a

script for an August 6, 1998 investor relations teleconference, which recognized that Adams

Golf clubs were frequently turning up in Costco outlets, and that Costco had obtained the clubs

through diverters. A9, p.9. This document was produced by Adams Golf, not by the

underwriters.

In the face of this massive failure to preserve and produce, one can only wonder at

what relevant documents the underwriter defendants once possessed, but have since destroyed

or otherwise failed to turn over to plaintiffs. The underwriter defendants' production did not

even include copies of all of the relevant research reports on Adams Golf generated by the

underwriter defendants, drafts of such reports, or -- as discussed above with respect to

Lehman's August 28, 1998 report -- any backup data upon which the reports were based.

For example, a particularly significant analyst report issued by defendant BancAmerica

on August 4, 1998, referenced above (A8), linked recent volatility in the share price of Adams

Golf stock to similar volatility that existed in the stock of Callaway Golf, the industry leader and

a prime competitor of Adams Golf, in the period immediately following Callaway Golf's initial

public offering. The report evidences that the analyst had found that, with regard to Adams

Golf as well as Callaway, volatility occurred because investors learned that the company's

supposedly premium clubs were on sale at Costco. Obviously, plaintiffs sorely required, in the

6

development of their case, whatever source materials the BancAmerica analyst used in

concluding that Adams Golf stock was affected by the existence of Adams Golf clubs in

Costco. How widespread was the phenomenon? What were the specific days when investors

observed clubs in Costco? What was the source of the analyst information? However, as a

result of the defendants' wholesale failure regarding their obligations to preserve and produce,

this crucial discovery has been denied plaintiffs, gravely prejudicing them.

## B.     The Underwriters Conducted an Inadequate Due Diligence Investigation.

Although the underwriters have attempted to confuse the issue of their due diligence

with a lengthy recitation of essentially irrelevant matter, the relevant facts regarding the

underwriters' "due diligence" investigation of Adams Golf are few and unfortunate.

The relevant facts are that the underwriters recognized that gray marketing could have a

devastating impact on Adams Golf, because they knew that the Company's business strategy

turned on a selective distribution network bulwarked by high retailer margins. The underwriters

knew about the problems that gray marketing could pose for manufacturers in the golf club

industry as a result of their experience with other clients in the industry. The underwriters even

learned that Adams Golf was actually experiencing gray marketing of the Tight Lie club at the

very time the underwriters were conducting their purported due diligence.

And yet the underwriters did virtually nothing to investigate the present or future of gray

marketing at Adams Golf. They meekly accepted the representations of Adams Golf

management. They never asked to examine any documents regarding gray marketing that was

occurring. They refrained from asking the right questions. They failed to probe. They sat on

7

their hands.

1.    The Underwriters Had Reason To Be Concerned.

Certainly, to the underwriters, one thing was clear: Adams Golf was attractive to investors because it offered its retailers margins that were much higher than those offered by Adams Golf's competitors. It was vital that those margins not be allowed to erode. Lehman, the lead underwriter, emphasized this fact in a presentation to Lehman's own Commitment Committee. A10 ("the Company must ensure its products continue to offer retailers high margins and are not discounted"). The underwriters also highlighted this fact in "road show' materials used to pitch Adams Golf stock to investment banking clients. A11 ("Strong Retail Distribution . . . No discount warehouses; High Retailer margins"). And, in a customer questionnaire, one of Adams Golf's top customers, Edwin Watts, informed the underwriters that he would abandon Adams Golf, and switch to clubs sold by Adams Golf's competitors, if retailer margins slipped. A12, p. 3.

As a result of the paramount importance of high retailer margins, whether gray marketing of Adams Golf clubs was occurring or was reasonably likely to occur in the future was a factor of signal importance to the company's success. This was demonstrated, at the very time that IPO due diligence was well underway, in a May 1998 article in Golf Pro magazine. The article was aptly entitled, *"The Costco of Doing Business."* Edwin Watts, one of Adams' largest customers, was quoted as saying that, (once clubs reached the shelves of department stores), they lost their image and thus lost "everything." A13.

This could hardly have been news to Olga Pulido-Crowe, the Lehman Vice President

8

who served as the "point person" for the underwriters' due diligence investigation. A14, p. 56.

Having previously worked on an offering for another golf club manufacturer, Cobra Golf,

Pulido-Crowe was aware of the gray marketing phenomenon, and of its potential importance to

Adams. A14, pp. 26-27.

Finally, gray marketing was more than just of theoretical concern. Pulido-Crowe

learned from Barney Adams that, at the very time the Company was preparing to go public,

Costco was selling Adams Golf clubs. A14, p. 29. Pulido-Crowe claimed that she was told

the gray marketing was not relevant or material, but she cannot recall who told her this. They

best she could say was, "[i]t would *have been* Barney or Mark [Gonsalves] – I don't recall

exactly who, but it was a group of many people that were – that would have been present."

A14, p. 48) (emphasis added).

### 2.    The Underwriters Failed to Respond Appropriately.

In the same manner as Pulido-Crowe's testimony was vague, so, too, was the

underwriters' response to gray marketing – vague, as well as lackadaisical, undirected and

ineffective.

Pulido-Crowe's testimony is completely indeterminate as to time, place and particulars.

Even if her testimony is to be credited, she discussed the issue of gray marketing only casually

with Barney Adams and/or with other Adams Golf representatives. At best, she relied on

someone at Adams Golf pronouncing that the Costco situation was not "relevant," "not

material." There is no indication that she asked any pointed questions about the actual extent of

ongoing gray market distribution. She claims she asked whether gray marketing was "much of

a problem." She claims she was told that "it was an isolated incident and that that person or distributor, whoever it was that got those clubs there, they were going to pursue that and put an end to that." A14, pp. 47-48. There is no evidence that Pulido-Crowe or any of the underwriters discussed how Adams proposed to put an "end to" gray marketing (which it later admitted could not be eliminated), A15, p. 3, or whether the risk of future Costco distribution should be specifically addressed. There is also no indication that she followed up on her question about double shipping.

Indeed, Pulido-Crowe's recollection, vague as it is, is superior to that of her "right arm," Patrick Walravens, who prepared the first drafts of the IPO documents and participated in all phases of due diligence. A14, p. 37. At his deposition, Walravens admitted to no recollection whatsoever with respect to any gray marketing occurring at any time during all of his work on the Adams Golf IPO. He recalled that Pulido-Crowe once told him that she had seen some premium golf club at a discount outlet, but the club might not even have been an Adams Golf club. He also recalled one discussion regarding the serialization of clubs. A16, p. 69. However, manufacturers serialize clubs for various reasons, not just to combat gray marketing. A17, pp. 83-85, 196-97.

### 3. The Underwriters Breached Their Duty of Verification.

There is no evidence of any reasonable attempt by Lehman to verify any assertion that gray market distribution was not material or relevant by assessing or investigating the possible extent or impact of gray marketing or double shipping. Lehman's contemporary written summary of the due diligence it conducted makes no claim that gray marketing or double

10

shipping was the subject of any investigation whatsoever. A18. In fact, no documents

produced by Lehman generated before the IPO contain any reference to double shipping, gray

marketing or Costco's distribution of Adams Golf products. The only document in Lehman's

files touching on the subject at all was a copy of Adams Golf's June 8, 1998 press release, in

which Adams Golf stated that it was initiating a bill of discovery to determine whether it was

true that Costco had obtained Adams Golf clubs.

This lack of relevant documents is not surprising. The underwriters never asked for

any. The due diligence outline and document requests the underwriters directed to Adams Golf

at the organization meeting did not contain any inquiry or request for the production of any

documents relating to possible or actual gray marketing. A19. Edward Necarsulmer III,

defendants' expert, agreed that there was nothing in those requests that he believed should have

caused Adams to provide Lehman with such documents. A20, pp. 129-30.

Pulido-Crowe testified that she had a prior investment banking relationship with

Costco, and that she specifically offered to Barney Adams to call Costco to see what she could

possibly learn. A14, pp 48. However, she did not make any such call because Mr. Adams

asked her not to do so, saying that Adams would handle it. A14, pp. 48. Crediting her

testimony fully, the extent of Pulido-Crowe's efforts to investigate the issue was: (1) to conclude

that customers were unlikely to purchase golf clubs through Costco because her own husband

would not let her purchase sports equipment there; and (2) to check a local Costco store in San

Francisco or Los Angeles -- she was not sure which -- where she was personally unable to

find Adams Golf clubs. A14, pp. 49-51. There is no record evidence of anyone else on

11

Lehman's investment banking team making any other inquiry into gray marketing. Nor is there any evidence of any investigation into double shipping practices at Adams.

After the filing of the May 3, 1998 draft registration statement, and following the filing of Adams Golf's June 9, 1998 press release about its lawsuit against Costco, the SEC made an inquiry to Adams Golf as to whether the Registration Statement should disclose the proceeding against Costco. A21. According to Pulido-Crowe, the underwriters were aware of this inquiry, and no disclosure was made because the Company and its attorneys determined it was immaterial. A14, p. 92. There is no evidence of the underwriters conducting any reasonable investigation to reach this conclusion. Although Pulido-Crowe suggested that at another time she may have discussed whether the proceeding was immaterial, she did so on a completely mistaken basis, believing that the gray marketing had occurred at only one Costco location. A14, pp. 84-87.

There is no basis for Lehman's repeated claim that because 15 persons were nominally assigned to work on the IPO, 15 investment bankers actually conducted due diligence. There is no evidence that any investment bankers other than Lehman's personnel pursued any investment banking due diligence. While Pulido-Crowe and Walravens were principally conducting due diligence, a separate arm of Lehman, its equity analysts, were assigned to the client. It was expected that the analysts would initiate coverage on Adams Golf following the IPO. A junior analyst, Brian Lantier, working for senior analyst Bernard Picchi, began conducting his own separate and independent "due diligence" in May or June 1998. This work culminated in an August 28, 1998 Research Report that promoted Adams stock. A1, p. 17,

12

A2, p.27.

In so doing, Mr. Lantier, as noted above, began conducting a "Pro Shop Survey" in the middle or end of May, after Lehman's investment banking team had largely completed its "due diligence" and already filed a draft registration statement. To conduct the survey, Lantier contacted Adams dealers throughout the country as to their experiences with Adams. Lantier did not call the pro shops to ask them questions about Costco. He had a list of the 50 or 100 largest pro shops in the U.S. and simply called their retail locations and asked about Adams' clubs. A1, pp. 134-35.

Lantier admits that he learned either through the survey or investors that Tight Lies were appearing in Costco outlets, although he did not recall specifically whether they were increasing from "20 stores to 50 stores." A1, p. 137. The August 28th research report itself states that Lehman's knowledge of the Costco distribution arose through the survey. A2, p. 27. Further, Lantier was unable to say at his deposition that he did not learn of Costco distribution of Adams products through pre-IPO pro shop calls. A1, pp. 42-43. In any event, before August 28th he had drafted the research report, which stated that Costco's distribution of the Tight Lies was a "serious issue" for Adams Golf which the Company was working hard to correct. A2, p. 27. Lantier's calls did not include Canada, Michigan, or the Pacific Northwest, where gray marketing was particularly widespread.[2]

_____

[2] As noted above, Lantier kept notes of the interviews he made throughout this three month period, which coincided with the IPO and then marked decreases in the price of Adams Golf stock. He retained these notes through and including the date on which he left Lehman's employment, which occurred in August or September, 1998, and left the notes behind when he departed. A1, pp. 8, 135-37. The documents have never been produced.

13

Lantier's calls pursuant to his Pro Shop Survey may not be credited as part of Lehman's due diligence investigation. Lantier testified that his work was separate and apart from the due diligence of Lehman's investment banking team. A1, p. 17. Defendants' expert Necarsulmer stated that he considered it doubtful that Lantier's information was shared with the investment banking side, because of "Chinese Wall" type considerations and normal banking practices. A20, pp. 123-24. Pulido-Crowe, point person for collecting due diligence, could not recall discussing Costco with Lantier. A14, p. 147. The listing of due diligence conducted by the investment banking team does not refer to Lantier. A18. (Similarly, Ferris Baker Watts' research analyst made clear that his due diligence for his report was not due diligence for his firm's investment bankers. A22, p. 27.) What Lantier's calls to pro shops do reflect is that a reasonable investigation by the investment banking team would have obtained similar information prior to the effective date of the IPO, had only the investment bankers put in the effort.

    4.    Lehman's Customer Surveys Did Not Constitute Verification.

Defendants have suggested that they "confirmed" the unimportance of gray marketing through a general questionnaire directed to several of Adams Golf's top ten customers. A23. This questionnaire was not sent to Adams Golf's customers but instead was read to them over the telephone. A20, p. 115. Moreover, the questionnaire contained no question at all regarding gray marketing or double shipping, and no mention of Costco. It contained just one open-ended question, the thirteenth of fourteen questions on the questionnaire, to which customers might have responded about gray marketing if they had been personally aware and

14

concerned. ("Are there any other issues (legal, contractual or otherwise) which you feel are important?"). A23. It is unlikely, though, that any customer would have mentioned gray marketing, since the calls to customers occurred too early -- mostly in April 1998. A24. Gray marketing, at least through Costco, intensified in May, June and July. Moreover, as defendants' expert Necarsulmer admitted, the callers had no way of knowing how busy the customers were when they were called, or how expansive a customer would be in his responses, and the value of the collected information could vary considerably. A20, pp. 112-14, 133.

Further, the record reflects that the underwriters did not in fact call Adams Golf's top ten customers, and, indeed, did not even know the identity of those top ten customers. The due diligence materials that the Underwriters attach to their present motion includes: (1) a purported list of Adams Golf's top customers from January 1997 through March 1998, A25; and (2) a fax from Mark Gonsalves at Adams Golf to Sameet Mehta at Lehman, dated April 1, 1998. A26.

Even a cursory review demonstrates that Adams Golf's actual top customers at the time of the IPO were different from those on the list that Gonsalves forwarded to Mehta at Lehman. For example, Adams Golf's second largest customer was actually WDC McKenzie, A25, which does not appear anywhere on the list supplied by Gonsalves. Its absence is significant, since WDC McKenzie was the very company from whom Adams Golf had received urgent complaints about Costco and gray marketing in Canada, and with which Adams Golf had conducted extensive correspondence on the subject. A27.

15

Also missing from Gonsalves' list are Sports Authority (number 6 among Adams Golf's top ten customers), George Takai (number 9), Percentage Golf in England, (number 10), Durham Sports in Waterford, Michigan, (number 11), and Gart Sports in Denver (number 12). A25. Instead, Gonsalves included as Adams Golf's "top customers" Pete Carlson's Golf & Tennis, which was actually number 15 in sales; Golf Discount of St. Petersburg, Florida, which was actually number 34 in sales, and World Wide Golf Enterprises, a customer that did not appear on Adams Golf's list of its top customers. A26.

A jury could reasonably conclude that, had Lehman made any attempt independently to verify Adams Golf's top customers, it would have noted the marked differences between the actual top customer list and the one supplied to them by the Company. It would also be reasonable to conclude that had the underwriters contacted WDC McKenzie, the underwriters would have been alerted to the extent of the problems with gray marketing. Thus, it is reasonable to infer that the underwriter defendants' failure to call customers such as WDC was at best negligent and, in all events, inadequate due diligence.

5.    The Underwriters Conducted Defective "Bring Down" Due Diligence.

Between April 27, 1998, when the underwriters completed their basic due diligence and began drafting the Registration Statement, and May 3, 1998, when the first draft registration statement was filed, Adams Golf had received warnings regarding ongoing gray marketing of Adams Golf clubs. A28. Between May 3, 1998, and the effective date, July 9, 1998, additional complaints came in from locations as diverse as Virginia and California. Mr. Necarsulmer himself admitted that California locations were particularly important to a golf

manufacturer. A20, p. 108. Yet there is no evidence that Lehman asked Adams Golf for any update regarding retailer complaints. The underwriters failed to ask for available documents, including: (1) the WDC McKenzie correspondence with Adams; (2) Adams' letters to retailers and internal memoranda regarding gray marketing; or (3) the complaint letters to Adams Golf from retailers. Thus, the underwriters could not and did not verify Adams' claim of immateriality by contacting the very retailers who had had actual experience with, and complained about, gray marketing.

As set forth below, the underwriters were obliged to continue their investigation so that the Registration Statement was accurate when it became effective. However, Lehman made no serious attempt to "bring down" its due diligence to July 9, 1998. The only evidence of that aspect of due diligence is a page and a half of casually scrawled notes that make no reference to gray marketing. A29. The underwriters had not sufficiently informed themselves with respect to the gray marketing problem as even to prepare road show questions that addressed the subject, *see* A30, instead allowing investors to rely on the "road show" slides that stated misleadingly that Adams Golf had a strong distribution network; and "no warehouse distribution." A11. During the same period, while no updating of the Adams investigation was occurring, representatives of Lehman traveled around the country and world with Adams management, visiting such world-class cities as Milan and London selling stock. A31.

As a result, the Registration Statement left Adams stock purchasers blithely unaware not only of the risk of gray marketing, but also the inroads that had already been made in the gray marketing of Adams Golf's Tight Lies. Twenty days after the IPO, on July 28, 1998,

Lehman expressed concern that the subject of gray marketing was likely to come up at an

investor teleconference scheduled for August 6th. A32. Lehman did so in a document that

Walravens testified had likely emanated from the investment banking side of Lehman. A16, pp.

133-39. Lehman shortly thereafter reviewed an Adams script that proposed to answer

questions on the subject, a script in which Adams Golf admitted that Adams Tight Lies had

been seen in many Costcos for $146 and that the Company understood that Costco was using

diverters (authorized Adams Golf dealers who purchased product directly from Adams Golf on

Costco's behalf) to acquire the product. A 9, p. 9. By August 28th, of course, Lehman would

be forced to report in Lantier's Research Report, under the heading "Margins/Pricing," a

"concern" that "Adams' Tight Lies are appearing in Costco Wholesale stores with increasing

regularity," and that one retailer had reported "that 'Costco is flooding the market with Adams

clubs at $149' (versus an average wholesale price of $144)." A2. Lehman also reported that

the problem was "a serious issue that Adams is working hard to correct." A2. By October 22,

1998, Adams Golf was forced to disclose that this serious phenomenon, whose risk and

existence was concealed in the Registration Statement, would impact future sales at Adams

Golf. A33.

## IV.    ARGUMENT

### A.    Standard On A Motion For Summary Judgment.

Summary judgment is appropriate only in those rare instances in which the moving party

can demonstrate that there is "no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination,

courts must consider all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 323 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Because summary judgment is a "drastic device," the moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999). A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 248; *United States v. Bloom*, 112 F.3d 200, 205 (5th Cir. 1997). A factual dispute is "genuine" where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Even where the basic facts are undisputed, if reasonable minds could differ on the inferences to be drawn from those facts, summary judgment should be denied. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Inferences drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992). At the summary judgment stage, the non-movant's version of any disputed issue of fact is presumed correct. *Id*; *Anderson*, 477 U.S. at 255. Where words or conduct may be interpreted in several ways, one supporting the motions and one controverting it, summary judgment must be denied. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520-521 (1991).

Furthermore, due diligence is not an element of plaintiffs' claim, but an affirmative defense on which the underwriters bear the burden of proof. For that reason, summary judgment motions on the grounds of due diligence are rarely raised and even more rarely

19

granted.

## B.    Because the Underwriter Defendants Destroyed Key Documents They Were Required to Preserve, The Court Should Summarily Deny Defendants' Summary Judgment Motions.

Spoliation is "the intentional destruction or alteration of evidence, or the knowing failure

to preserve property for another's use as evidence in pending or reasonably foreseen litigation."

3D MOORE FEDERAL PRACTICE §37.120 (citation omitted). The doctrine exists to protect

litigants against the enormous prejudice that can arise from the opposing parties' wrongful

discarding of paper or electronic records. As Judge Scheindlin observed in *Zubulake v.UBS*

*Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003):

> "Documents create a paper reality we call proof." The absence of such
> documentary proof may stymie the search for the truth. If documents are lost or
> destroyed when they should have been preserved because a litigation was
> pending, a party may be prejudiced.

220 F.R.D. at 214.

Here, the record establishes that the underwriter defendants improperly disposed of or

made unavailable important, relevant documents. These documents consisted of

underwriter analyst notes and research materials, specifically including documents relating to an

underwriter survey of pro golf shops that detected gray marketing activity before and after the

IPO. These underwriter documents would have enabled plaintiffs to more conclusively: (1)

show the materiality of defendants' misrepresentations and omissions in the Registration

Statement; (2) establish the likelihood or fact of "leakage" regarding gray marketing and to

show that defendants cannot bear their burden of establishing negative loss causation; and (3)

demonstrate that a proper due diligence investigation would have detected and disclosed the

spreading phenomenon of gray marketing.

The underwriter defendants engaged in this spoliation in violation of express regulatory requirements and in violation of the document retention policies of two of the underwriter defendants. In addition, the underwriter defendants destroyed some particularly critical documents even after this litigation began.

Because the loss of these documents has significantly impeded plaintiffs' proof, the Court should issue appropriate sanctions, including denying the underwriter defendants' summary judgment motions in their entirety.

     1.     <u>Plaintiffs Are Entitled to Sanctions.</u>

As Professor Moore notes, courts "have imposed a wide range of sanctions for spoliation of evidence," including, (because spoliation may "pose an extreme threat to the integrity of the judicial system,") extreme sanctions of dismissal or default on claims or defenses. 3D MOORE FEDERAL PRACTICE, §37.120; *Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co.*, Case No. 502003CA005045XXOCAI, 2005 WL 679071 (Cir. Ct. 15th Jud. Dist. Palm Beach Fla. 2005). Lesser sanctions have included preclusion orders, orders deeming specified facts to be established, instructions to the jury that it may draw an inference adverse to the party responsible for the absence of the evidence, and monetary awards. 3D MOORE FEDERAL PRACTICE, §37.120.

The doctrine of spoliation applies to "reasonably foreseeable" litigation. 3D MOORE FEDERAL PRACTICE, § 37.120 (duty to preserve material evidence arises not only during litigation but also extends to that period before litigation when a party reasonably should know

21

that the evidence may be relevant to anticipated litigation); *Byrnie v. Town of Cromwell*, 243

F.3d 93, 108 (2d Cir. 2001); *Mosaid Techs., Inc. v. Samsung Electronics Co.*, 348 F.

Supp. 2d 332, 335 (D.N.J. 2004). Courts may impose sanctions under the doctrine of

spoliation on litigants who destroyed documents if they "knew or should have known that the

destroyed evidence was relevant to pending, imminent or reasonably foreseeable litigation."

*Shaffer v. RWP Group, Inc.*, 169 F.R.D.19 (E.D.N.Y. 1996) (emphasis added); *see also*

*Winters v. Textron, Inc.*, 187 F.R.D. 519, 520 (M.D. Pa. 1999).[3]

The decision of what sanction is appropriate where evidence has been lost or destroyed

is entrusted to the sound discretion of the trial court. *See, e.g., Erie Ins. Exchange v. Applica*

*Consumer Prods., Inc.*, 2005 WL 1165562, at *3 (M.D. Pa. 2005) (citing *Schmid v.*

*Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)).

In *Schmid*, the Third Circuit established three factors to be considered when

determining the appropriate sanction to impose for spoliation of evidence: (1) the degree of fault

and personal responsibility of the party that destroyed the evidence; (2) the degree of prejudice

suffered by other parties; and (3) the availability of a lesser sanction that would avoid unfairness

to the innocent party, while serving as a sufficient penalty to deter the same kind of conduct in

---

[3] Even assuming some documents were destroyed before suit was filed, the underwriters should have anticipated litigation by year end 1998. By August 28, 1998 Lehman's analyst had written that gray marketing activity was accelerating and the Costco distribution was a serious issue the Company was working hard to correct. Litigation was clearly foreseeable by October 22, 1998, by which date Adams' stock price had plummeted from $16 to about $4, and the Company revealed by press release that gray marketing – a problem it and the underwriters had never disclosed to investors and had deliberately excluded from the prospectus- would impact future results. And by early November Adam's largest shareholder, Scudder Stevens, had made it known that it was upset with both Adams and Lehman Brothers. A34; A3, pp. 138-41.

the future. *See also Positran Mfg., Inc. v. Diebold Inc.*, 2003 U.S. Dist. LEXIS 8114 (D.
Del. 2003).

The threshold question of the degree of fault attributable to the party that destroyed the
evidence involves a determination of whether that party intended to impair the ability of the
other side to effectively litigate its case. *Schmid*, 13 F.3d at 80. This issue need not be
resolved by testimony concerning the defendants' purported subjective intentions. In *Zubulake*,
220 F.R.D. at 220, the court found that once a duty to preserve documents attaches, any
destruction of those documents would be at least negligent, unless caused by events beyond a
party's control.

Here, the underwriter defendants were at all times under obligations to preserve their
e-mails and research materials under SEC regulation and/or, for certain of the Underwriter
Defendants, pursuant to internal document retention policies. Once this litigation was filed, the
Private Securities Litigation Reform Act required the defendants to preserve their documents
without a formal document preservation order. 15 U.S.C. §77z-1(b)(2)-(3). To have
destroyed or failed to safeguard obviously important and probative documents under those
circumstances bespeaks a very high degree of culpability.

The degree of prejudice suffered by plaintiffs is very high. Many of the fact witnesses in
this case have ritualistically denied having more than scant recollection regarding the relevant
facts of the case, on the basis of the time elapsed since the IPO (although the case was filed in
June 1999, within just eleven months of that offering). It will never be known for certain how
many gray market sales will go undetected as a result of the underwriter defendants' destruction

of Lantier's "Pro Shop Survey" and Picchi's notes. By the same token, it will never be known

for certain the number of occasions the stock price declined -- particularly as the price

plummeted in mid to late July 1998 -- as a result of particular observances of gray marketing by

market participants. Such observances were recorded, presumably, in the backup notes and

materials for the August 4, 1998 BancAmerica analyst report, but these notes and materials are

gone.

On these facts, monetary sanctions for the destruction of evidence would be

insignificant, and, on a cost-benefit analysis, could reward defendants for their elimination of

probative evidence. The only fair and appropriate remedy is to deny summarily the underwriter

defendants' motions for summary judgment in their entirety. (Before trial, plaintiffs intend to

seek an adverse inference instruction to the jury to the effect that the missing documents would

have contained evidence adverse to defendants and helpful to the plaintiffs.)

In *Zubulake*, 220 F.R.D. at 220, Judge Scheindlin addressed the basis for an adverse

inference instruction. The Court found that there were three predicates for such an instruction:

(1) the party having control of the evidence had an obligation to preserve it; (2) the records

were destroyed with a culpable state of mind, which would include negligence; (3) the

destroyed evidence was relevant to a claim or defense. The Court found that where evidence

was destroyed in bad faith -- either intentionally or wilfully -- that fact alone is sufficient to

demonstrate that the destroyed documents were relevant, but that where the destruction was

"merely negligent," the party seeking sanctions had to establish the relevance of the destroyed

evidence. *Zubulake*, 220 F.R.D. at 220.

24

Here, the defendants were under multiple obligations to preserve the lost documents, and the loss of such evidence must rise to gross negligence or intentional conduct. In *Anderson v. Production Mgmt. Corp.*, 2000 U.S. Dist. LEXIS 5696 (E.D. La. 2000), the Court stated that the breach either of a company-wide retention policy or of federal obligations may constitute evidence of bad faith sufficient to support an adverse inference instruction. *See also Dierson v. Walker*, 2003 U.S. Dist. LEXIS 9538 at *24 (N.D. Ill. 2003). Violation of a company's own record retention policy and a similar federal record retention regulation also has been held to create a presumption that the missing evidence was adverse to the spoliator. *Kim v. Dawn Food Products, Inc.*, 2006 U.S. Dist. LEXIS 11033 (N.D. Ill. Mar. 17, 2006).

In *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), the Court similarly found that culpability for purposes of an adverse inference instruction could be satisfied by a showing that the evidence was destroyed knowingly or with negligence, even without a showing of an intent to breach a duty to preserve it. The Court ruled that the party seeking the instruction could establish the relevance of the documents either by showing that they were destroyed in bad faith or with gross negligence or through deposition testimony regarding the missing documents. Here, of course, while it may be that defendants have also destroyed or lost many documents that are irrelevant or whose relevance is marginal, the documents whose loss gives rise to this motion are clearly identified and patently relevant.

In *Byrnie v. Town of Cromwell*, 243 F.3d at 108-110, the Court determined that where a party destroys evidence in violation of a regulation requiring the retention of such documents, an inference of spoliation is permissible even if litigation regarding the documents

25

was not reasonably foreseeable. The Court found that where the plaintiff had established the culpability of the defendant on that basis and the relevance of the documents (bearing in mind that holding the plaintiff to too strict a standard of proof would defeat the prophylactic and punitive purposes of an adverse inference instruction), such an instruction to the jury was a permissible remedy. The Court further noted that where a party puts forward "circumstantial evidence to support the inference that the destroyed [evidence] may have contained documents supporting (or potentially proving) his claim, and that the possibility that a jury would choose to draw such an inference, combined with plaintiff's circumstantial evidence, is enough to entitle plaintiff to a jury trial." *Id.* at 110 (quoting *Kronish v. United States*, 150 F. 3d 112 (2d Cir. 1998)).

Thus, spoliation, such as that here, is sufficient to defeat summary judgment.

### C.    The Underwriters Have Not Met Their Burden of Proof.

On their merits, the underwriter defendants' efforts to obtain summary judgment must fail. Plaintiffs have separately demonstrated that all defendants have failed to establish that they are entitled to summary judgment on issues of materiality or negative loss causation. Similarly, the underwriter defendants have utterly failed to establish their affirmative defense of due diligence beyond dispute.

The legal responsibility of the underwriters in reviewing an initial public offering is real and not to be taken lightly. Indeed, "[n]o greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter." *Chris-Craft Indus. Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973); *In re Enron Corp.*

26

*Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 612 (S. D. Tex. 2002). This duty is particularly important in the context of an initial public offering, where "there is a strong affirmative duty of disclosure." *Shaw*, 82 F.3d at 1202; *see also Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996).

"[C]urrent law continues to place a burden upon an underwriter to conduct a reasonable investigation of non-expertised statements in a registration statement. . . .Recent Section 11 case law . . . shows no signs of abandoning the early courts' demand that underwriters employ 'a high degree of care in investigation and independent verification of the company's representations.'" *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 671, 675-76 (S.D.N.Y. 2004) (quoting *Feit*, 332 F. Supp. at 582). In short, "[t]he underwriters are just as responsible as the company if the prospectus is false. And prospective investors rely upon the reputation of the underwriters in deciding whether to purchase the securities." *Escott* 283 F. Supp. at 696. "Courts must be particularly scrupulous in examining the conduct of underwriters since they are supposed to assume an opposing posture with respect to management." *Feit*, 332 F. Supp. at 581.

Underwriters may escape liability at trial *if* they can establish, by a preponderance of evidence, an affirmative defense of "due diligence." 15 U.S.C. §77k(b)(3)(A). In order to prevail on a due diligence defense, "the defendant must establish: (1) that he conducted a reasonable investigation and (2) that after such investigation he had reasonable grounds to believe and did believe the accuracy of the registration statement." *Feit*, 332 F. Supp. at 576 ("Thus a defendant may fulfill his burden of investigation and still not have reasonable cause to

27

believe in the completeness of the prospectus or he may simply fail in his duty to investigate."). The underwriter is held to "the standard of reasonableness [that is] required of a prudent man in the management of his own property." 15 U.S.C. § 77k(C ); 17 C.F.R. § 230.176; *see, e.g.*, *In re Software Toolworks*, 50 F.3d at 621, (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1975)) ("Thus, due diligence is '[i]n effect, . . . a negligence standard.'")). Moreover, the investigation must be a "thorough" or "searching inquiry," that is, the underwriters must "inquire and examine into with systematic attention to detail and relationship." *In re WorldCom*, 346 F. Supp. 2d at 678.

The underwriter defendants here claim that they are entitled to a due diligence defense as a matter of law. Courts set the bar very high, however, on such claims. "[S]ummary judgment is generally an inappropriate way to decide questions of reasonableness because 'the jury's unique competence in applying the "reasonable" man standard is thought ordinarily to preclude summary judgement.'" *In re Software Toolworks,* 50 F.3d at 621 (*quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 n. 12 (1976)). In the context of the due diligence defense, such matters are properly left for review by the trier of fact at trial unless "no rational jury could conclude that the defendant had not acted reasonably." *Id.* Thus, since the due diligence standard itself requires "reasonable" investigation, courts have not granted summary judgment in the absence of "extensive due diligence efforts" or "only after establishing that the underwriters conducted an 'unquestionably extensive' investigation." *In re Worldcom*, 346 F. Supp. 2d at 676-677 (internal citations omitted).

In making their argument here, the underwriter defendants concede that they knew

28

about the Costco sales and gray marketing in Canada at the time of their investigation, UW Br. at 16, 19-20 (and the record shows they were told about it when they inquired about double shipping); they also concede for the sake of argument that the Costco sales were material. UW Br. at 1. Their argument rests, therefore, on the notion that they conducted a reasonable investigation "as a whole" and that they reasonably believed that the threat of gray marketing and Costco sales were not material and thus could reasonably be omitted from the Registration Statement. UW Br. at 20.

To prevail on that argument at the present juncture, however, the underwriters would have to show that, even viewing the facts and all inferences in the light most favorable to plaintiffs, no genuine issue of fact exists regarding whether their investigation was reasonable and whether they reasonably believed that gray marketing, and the risk it posed, was immaterial. Their defense fails, because ample evidence exists to show that: (1) the investigation failed to examine the "storm warning" issues concerning gray marketing about which the underwriters were aware; (2) the underwriters relied unquestioningly upon management in making the determination that the Costco sales and gray marketing issues were not material and did not perform their duty of verification with a skeptical eye, and (3) the underwriters failed to conduct a reasonable investigation through and including the Effective Date of the IPO. Where, as here, disputed issues of fact exist concerning the quality of the investigation or the independence of the underwriters' investigation of management's self-serving claims, summary judgment must be denied.

1.    The Underwriters' Due Diligence Investigation Was Not Reasonable.

As courts have repeatedly held, "the key to reasonable investigation [is] independent

verification of the registration statement by reference to original written records." *Feit*, 332 F.

Supp. at 576 (citing *Escott*, 283 F. Supp. 643). While the underwriters claim that their

investigation was reasonable "as a whole," (UW Br. at 24), that is not sufficient in the face of

the negative information about which they admit they were aware. Where an underwriter is

aware of negative facts that serve as "red flags" or "storm warnings," a reasonable investigation

requires that the underwriter go above and beyond what might otherwise be reasonable. In

situations such as the one presented here, the underwriters' "normal due diligence procedures

[are] inadequate and . . . require more concrete verification of management representations and

projections." *Univ. Hill Found.*, 422 F. Supp. at 902; *see also In re Worldcom*, 346 F.

Supp. 2d at 672-673.

Even by their own admission, the underwriter defendants were aware of the Costco

sales and the threat of gray marketing, (UW Br. at 15-21), yet they failed specifically to

address any of these issues in their due diligence investigation, preferring to take their clients'

version of the facts on essentially blind faith. As discussed above, they were unaware of the

name of Adams Golf's Canadian distributor, saw no correspondence on gray marketing, and

asked for no documents regarding the issue. They conducted no meaningful inquiry of Adams

Golf's customers, asked no pointed questions of these customers, and did not question

customers who had, by the time of the IPO, complained about gray marketing. By the time of

the IPO, they mistakenly believed that gray marketing had occurred at only one location, and

30

they were unaware of customer complaints showing it had popped up at diverse locations

across the country, as well as in Canada. They initiated no visible investigation of double

shipping, failing to interview Adams middle management on the subject.

2.    The Underwriters Relied On, and Failed to Verify, Management Assertions.

Where underwriters rely upon statements of management, courts have repeatedly held

that they do so at their peril:

> In a sense, the positions of the underwriter and the company's officers are
> adverse. It is not unlikely that statements made by company officers to an
> underwriter to induce him to underwrite may be self-serving. They may be unduly
> enthusiastic. As in this case, they may, on occasion, be deliberately false. . . . The
> purpose of Section 11 is to protect investors. To that end the underwriters are
> made responsible for the truth of the prospectus. If they may escape that
> responsibility by taking at face value representations made to them by the
> company's management, then the inclusion of underwriters among those liable
> under Section 11 affords the investors no additional protection. In order to make
> the underwriters' participation in this enterprise of any value to the investors, the
> underwriters must make some reasonable attempt to verify the data submitted to
> them. They may not rely solely on the company's officers or on the company's
> counsel.

*Escott,* 283 F. Supp. at 696-697; *see also In re Enron*, 235 F. Supp. 2d at 612.

Verification is, as *Escott* instructed, at the very heart of the due diligence process. In

short, underwriters have not performed an adequate due diligence investigation when they

simply rely upon management's assertions, as the defendants admit they did here. UW Br. at

14, 16, 20. "The duty of the underwriter, then, is not merely limited to listening to

management's explanations of the company's affairs. Rather he must make an investigation

reasonably calculated to reveal all of those facts which would be of interest to a reasonably

prudent investor. . . . Tacit reliance on management assertions is unacceptable; the underwriters

31

must play devil's advocate." *Feit*, 332 F. Supp. at 581-582 (quoting Comment, BarChris: Due Diligence Refined, 68 Colum. L. Rev. 1411, 1417 (1968)).

Defendants have compiled a laundry list of items, pieced together from other dissimilar cases, with which they say they have complied, on the basis of which they posit that their due diligence was satisfactory. But their analysis misses the point, and misses the point of each of the cases that they cite. *See* UW Br. at 25-26 (citing *Picard Chemical, Inc. Profit Sharing Plan v. Perrigo Co.*, 1998 U.S. Dist. LEXIS 11783, at \*50 (W.D. Mich. 1998); *In re Int'l Rectifier Sec. Litig.*, 1997 U.S. Dist. LEXIS 23966, at \*16-18 (C.D. Cal. 1997); *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 318-319 (S.D.N.Y. 1996); *Weinberger v. Jackson*, 1990 U.S. Dist. LEXIS 18394, at \*6-7 (N.D. Cal. 1990); *Competitive Assocs., Inc. v. Int'l Health Sciences, Inc.*, 1975 U.S. Dist. LEXIS 14230, at \*45-46 (S.D.N.Y. 1975).

Defendants' citations do not demonstrate that they have conducted proper due diligence. As *Worldcom* teaches, the proper standards for due diligence are set forth in *Escott* and *Feit* and have not changed. In the cases cited by the underwriter defendants, the defendants simply established as a matter of fact that they had concluded reasonable, though imperfect, due diligence investigations.

The question is not whether defendants have exhausted an arbitrary to-do list, however, but whether they have sufficiently investigated the particular issues of which they were aware. *See, e.g., Picard Chemical*, 1998 U.S. Dist. LEXIS 11783, at \*50 (factors identified in other cases are not dispositive on question of whether due diligence was reasonable and believed in

32

case at hand.) As defendants acknowledge, the cases they cite are all distinctly different from

the situation presented here because, in those cases, the defendants' due diligence was sufficient

where, despite their best efforts, the underwriters were unable to uncover any issues that

required additional study. Here, the underwriters admit that they knew about an issue that

required additional investigation—gray marketing—but that they nevertheless chose to ignore it.

Time and again, courts have held that where an issue exists about which additional investigation

might have uncovered additional material information, the underwriters were obliged to pursue

it.

For example, *Competitive Associates* involved a deliberately concealed conspiracy,

one that the court found that reasonable due diligence could not have detected:

> [T]he conspiracy which the Court does find to exist was by its very nature, secret,
> and knowledge of it most unlikely to be available to the non-participating
> underwriters, no matter how much diligence they used. ... The claimed omission
> central to this action is the failure of the Issuer and its underwriters to disclose the
> existence of this conspiracy between Yamada, Vesco and Constantinou to assure
> the success of this offering by unlawful means. This covert and illicit situation
> would not have come to light had a greater number of underwriters been present,
> or if notes of the meeting had been recorded.

1975 U.S. Dist. LEXIS 14230, at *51. These facts are readily distinguishable from those

presented here where, had the underwriters followed up on the available information—by

questioning the Canadian customers, inquiring directly of Costco (as the underwriters

acknowledged they could have done), or following up on existing complaints, the situation

*would* have come to light. This is not a case remotely like *Competitive Associates*, in which

even reasonable due diligence could not have uncovered what others chose to conceal. Instead

here, as the underwriters admit, the issue of gray marketing was known to them, they simply

33

chose to ignore it while preparing their due diligence inquiry. While they could not be faulted for failing to inquire about issues that were hidden from them, where, as here, the issue itself was known and information suggesting its materiality was readily available — had they asked for it — the due diligence inquiry that failed to even attempt to find the truth is insufficient.

This is not a case in which the underwriters cannot be faulted "for failing to examine data which were simply unavailable" at the time. *Int'l Rectifier*, 1997 U.S. Dist. LEXIS 23966, at *25. The record shows that Adams Golf had in its files documented complaints about pre-IPO gray marketing, A28, and the underwriters' expert testified that he had no reason to believe that these documents (or other Adams documents regarding gray marketing) would not have been made available to the underwriters if they had simply asked for them. A20, p. 166.

Nor is it a situation, such as in *Weinberger*, in which the underwriters "contacted many of [the company's] suppliers, customers, and distributers where were asked specific questions about the company's operations." 1990 U.S. Dist. LEXIS 18394, at *6-7. Rather, in this instance plaintiffs fault the underwriters for choosing to ignore data that was available and about which the underwriters admit that they were aware at the time, and for failing to ask direct questions about gray marketing to anyone, or to even contact the entities most knowledgeable about it.

Plaintiffs here do <u>not</u> contend that the underwriters' investigation had to be perfect, but rather that the investigation here was unreasonable given the surrounding facts. As defendants recognize, this case differs from all those they cite, because here the underwriter defendants

actually became aware of the gray marketing issue. However, once they learned of it, they

brushed off the issue by conducting a pro forma investigation that, with respect to a known

issue, violated basic principles of due diligence, failing to verify the facts they assumed and later

failing entirely to examine whether facts given them by management had changed.

In addition, there is no evidence that any of the other underwriter defendants, apart

from Lehman, either: (a) conducted a proper investigation or (b) investigated the scope of

Lehman's investigation. As the SEC has instructed, Ferris Baker and BancAmerica had an

obligation to monitor Lehman's efforts to ensure that Lehman as lead underwriter, met due

diligence requirements. As the SEC stated:

> [Although] the [non-managing underwriter] may relieve himself of the task
> of actually verifying the representations in the registration statement . . . he must
> satisfy himself that the managing underwriter makes the kind of investigation the
> participant would have performed if he were the manager. He should assure
> himself that the manager's program of investigation and actual investigative
> performance are adequate. The participant's checks on the manager are vital since
> they may provide additional assurance of the verification of the statements in the
> registration statement.

The Obligations of Underwriters, Brokers and Dealers in Distributing and Trading Securities,

Particularly Those of New High Risk Ventures, SEC Release No. 33-5275, 2 Fed. Sec. L.

Rep. (CC4) 9l4506B, at 4058 (July 26, 1972) (emphasis added).

In sum, there is nothing in the record -- including Necarsulmer's flawed expert opinion,

which plaintiffs have moved to preclude -- that establishes the underwriter defendants' due

diligence defense.

35

3.    The Underwriters Failed to "Bring Down" the Investigation to the
        IPO Effective Date and Thereafter.

Even assuming that the underwriters were correct when they argue that the extent of

Costco sales and their impact on Adams Golf retail margins and the existence of double

shipping was not apparent until after they had completed their initial investigations -- and the

facts on this issue are in direct dispute -- this would not absolve them of liability.  An

underwriter's due diligence responsibilities continue after the initial investigation and even after

the prospectus is filed with the SEC, right up to and including the effective date of the offering.

*See, e.g., Shaw,* 82 F.3d at 1201-1211.  When additional information becomes available, "the

question is whether the nondisclosure of interim facts rendered the prospectus materially

incomplete."  *Id*. at 1210; *see also In re Software Toolworks*, 50 F.3d at 625-626 (reversing

grant of summary judgment where plaintiff claimed that underwriter failed to investigate relevant

business developments); *Escott*, 283 F. Supp. at 690 (attorney defendant did not make a

reasonable investigation where he failed to discover that statements made in January were

inaccurate by the May effective date of the registration.)  Defendants' own expert testified that

the underwriters could have stickered the Registration Statement, or even stopped the IPO

even after the Effective Date.  A20, pp. 171-72; 189-90.

Here, there is no more than a page and a half of scrawled "bring down" notes that are

silent as to gray marketing and double shipping.  A29 That is simply not enough.

36

4.    Defendants Have Failed to Establish a Due Diligence Defense With Respect
To Double Shipping or Other Questionable Sales Practices.

The underwriter defendants do not, because they cannot, claim that they conducted a

reasonable investigation with respect to double shipping or other questionable sales practices at

Adams Golf. Instead, they argue that Adams Golf's financial statements were the responsibility

of the public auditors, KPMG, and that the underwriters cannot be held responsible for revenue

recognition issues in the financial statements unless they had affirmative reason to believe that

such issues existed. UW Br., 28-29.

This argument constricts and distorts plaintiffs' position. The fact is that at the time of

Adams Golf's IPO, the Company was engaging in double shipping. This was important

because double shipping made excess clubs available for gray marketers. Indeed, Barney

Adams let Olga Pulido-Crowe know that gray market distribution was occurring when she

asked about channel stuffing. Plaintiffs' expert Professor Christiana Ochoa has made clear that

double shipping can give rise to gray marketing. D.I. 267, p. 8-9; ¶ 16.

Plaintiffs have not challenged the accuracy of the Company's financial statements, but

rather they challenge all defendants' failure to disclose material facts of which the class should

have been apprised. Had Lehman properly investigated gray marketing, it would have become

aware of Adams' double shipping practices. Conversely, had they investigated double

shipping, they would have learned about gray marketing.

In any event, due diligence is an affirmative defense. Lehman and its co-underwriters

have simply failed to show that they conducted a reasonable investigation of double shipping

and other questionable sales practices.

37

5.    The Underwriter Defendants Could Not Reasonably Have Believed That the
Registration Statement Was Complete And Accurate.

In light of their defective due diligence investigation, there is no need to consider

defendants' argument that they, after such an investigation, reasonably believed that the

registration statement was not misleading.  Absent a reasonable investigation, there was no

basis for such a belief.

## IV.    **CONCLUSION**

Due diligence requires underwriters to perform their investigations with a healthy dose

of skepticism.  Instead, Lehman and its cohorts did little more than follow a one size fits all

checklist, while turning a blind eye to obvious warnings and relying unquestioningly upon

management's self-serving statements.  It is no surprise that neither the customers nor any of the

other third parties whom the underwriters interviewed "even hinted at gray market problem, a

Costco problem."  UW Br. at 32.  Not only were the interview subjects hand picked by the

Company, they were never even asked about the gray market problem or Costco problem.

The due diligence defense is not available to an ostrich. Given the known problems

regarding Costco and gray marketing, the underwriters failed to provide an adequate

investigation when they undertook no substantial or serious probe of a potentially serious

problem about which they had been made aware. At the very least, plaintiffs have adduced

sufficient evidence to create a disputed issue of fact concerning the adequacy of the

underwriters' investigation and the plausibility of their claims that they reasonably believed the

Registration Statement was accurate.   This Court should deny the underwriters' motion for

summary judgment in all respects.


**ROSENTHAL, MONHAIT &**
**GODDESS, P.A.**

**BERGER & MONTAGUE, P.C.**

Todd Collins

Elizabeth Fox

Neil Mara

1622 Locust Street

Philadelphia, PA. 19103

(215) 875-3000

*Lead Counsel for Plaintiffs and the Class*


OF COUNSEL:

By:    /s/ Carmella P. Keener

Carmella P. Keener (DSBA No. 2810)

919 Market Street, Suite 1401

Citizens Bank Center

Wilmington, DE   19801

(302) 656-4433

ckeener@rmgglaw.com

*Liaison Counsel for Plaintiffs*
*and the Class*

**LAW OFFICES OF DONALD B. LEWIS**

Donald B. Lewis

5 Cynwyd Road

Bala Cynwyd, PA 19004

(610) 668-0331

**KELLER ROHRBACK, LLP**

Juli E. Farris

Elizabeth A. Leland

1201 Third Avenue, Suite 3200

Seattle, Washington 98101

(206) 623-1900


Dated: October 9, 2006

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 9th day of October, 2006, I caused

**PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO UNDERWRITER**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be electronically filed with

the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

In addition, a copy has been served by electronic mail upon the foregoing counsel and the

following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

/s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com