**A. 1**

1         IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

4   -------------------------------------------------

5

6  IN RE: ADAMS GOLF, INC.   :     CONSOLIDATED

7

8  SECURITIES LITIGATION     :    C.A. NO. 99-371-KAJ

9

10

11  ------------------------------------------------

12

13

14          ORAL DEPOSITION OF BRIAN LANTIER

15

16            Monday, June 5, 2006

17

18         The oral deposition of BRIAN LANTIER

19       was held at the Wyndham Syracuse Hotel,

20       6301 Route 298, East Syracuse, New York,

21       from 12:00 noon to 4:59 p.m., before

22       Cynthia A. Sanders, a Certified Shorthand

23       Reporter in and for the State of New York

24       and Registered Professional Reporter.

25

Page 6

6

IT IS HEREBY STIPULATED by and between
counsel for the respective parties that
this Examination Under Oath be held
pursuant to the provisions of the Federal
Rules of Civil Procedure Rules; that the
presence of a Referee is waived; that the
filing of the minutes is waived; that the
witness may be sworn by Cynthia A. Sanders,
Notary Public of the State of New York; and
that all objections, except as to form, are
reserved until the time of trial.

*      *      *

MR. LEWIS:  We are waiving the sealing
of the transcript, certification of the
transcript and waiving filing of the
transcript because we can't file in
Delaware.  Other than that, we are
proceeding under the Rules of Civil
Procedure.
MR. McEVOY:  The witness will read and

Page 7

sign the transcript, otherwise the Federal

7

Rules.

*      *      *

B R I A N      L A N T I E R, called as a
witness, after having been first duly
sworn, testified as follows:

EXAMINATION BY MR. LEWIS:
Q    Would you state your full name for the
record, please?
A    Brian James Lantier.
Q    Mr. Lantier, my name is Don Lewis.  I'm one
of the attorneys for the Plaintiffs, and I have the
lowest and weakest voices of anybody on the
Plaintiff's side, so you may hear me drop my voice.
If you don't hear the question, either I or the court
reporter will get one back to you.  If I garble my
words or get caught up in convolution and you don't
understand a question, let me know and I'll reframe
the question.
A    Okay.
Q    What's your residence address?

Page 8

A    It's 15419 Lyellton Drive, Clayton,

8

New York.
Q    And what do you currently do for a living?
A    I'm unemployed.
Q    Was there a time that you worked for a firm
named Lehman Brothers?
A    Yes, there was.
Q    And when did you work for Lehman?
A    June 19 -- I'm sorry, let me take that
back.
November 1996 to August or September of
'99; I can't really remember what the exact
resignation day was.
Q    And after you resigned your employment at
Lehman Brothers, what did you do?
A    I would work for a venture capital firm.
Q    And which one was that?
A    Commonwealth Associates.
Q    And where were they located?
A    Manhattan.
Q    How long did you stay with Commonwealth?
A    '99 through June of 2001.
Q    And did you stay in the same field after
that?

Page 9

A    Yes -- Well, similar, I went to work for a

9

hedge fund.
Q    Okay.  Which hedge fund?
A    Fulcrum.
Q    And how long did you stay at Fulcrum?
A    From 2001 -- June of 2001 to -- I have to
think about it now -- October of 2002.
Q    And from Fulcrum where did you go?
A    I worked at duties Deutsche Bank in January
of 2003 to March of 2003.
Q    And after Deutsche Bank?
A    I haven't worked since.
Q    During your employment after Lehman
Brothers, did you work as an analyst?
A    Yes.
Q    What had been your education prior to
working for Lehman Brothers?
A    I had received a bachelors from Pace
University.
Q    Where is that?
A    Manhattan.
Q    And did you have any post-graduate
education?
A    I had taken a class.  But while at Lehman,

1    A    He would have been my most direct contact
                            14
3  with the new issues team that worked with the sales
4  force.
5    Q    For what types of purposes did you have
6  contact with him?
7    A    When it came time to contact -- to discuss
8  allocation of shares, who would get -- you know, what
9  type of buyer would be the -- or who would be buying
10  how many shares, things like that, in the IPO.
11    Q    If you will flip back to page I-4. Under
12  the heading trading support showing our commitment to
13  your capital. The first bulleted item is No. 1:
14  Trader of our IPOs and secondaries.
15        Do you have an understanding of what that
16  means?
17    A    Yes.
18    Q    And what does it mean to you?
19    A    That our trading desk would have handled
20  the bulk of the shares traded and IPOs where we were
21  the lead manager, or a secondary offering where we
22  were the lead manager.
23    Q    And, for the record, what was the leading
24  trading desk?
25    A    What was the trading desk?

1    Q    Yes.
                            15
3    A    It's a collection of people on phones that
4  sit on a specific floor and they trade down to the
5  actual market.
6    Q    And were they part of the equity new issues
7  department?
8    A    I'm not sure of the titles. I'm not sure
9  who would -- I don't want to speculate.
10    Q    To your knowledge, was there someone in
11  charge of the trading desk in 1998?
12    A    I'm sure there was.
13    Q    Do you remember who?
14    A    I don't recall the names, no.
15    Q    And on page I-5, under the first bulleted
16  point, which is: Lehman is the right choice to
17  lead-manage Adams Golf IPO due to Lehman's, colon, one
18  of the items is dedicated after-market support of IPO
19  clients.
20        Do you have an understanding of what that
21  means?
22    A    I'm not exactly clear on what you're trying
23  to ask.
24        Do I have an understanding of supporting
25  our clients?

1    Q    Let's just focus on the phrase after-market
                            16
3  support.
4        In what ways did, to your knowledge, Lehman
5  Brothers provide after-market support to its IPO
6  clients?
7    A    I'm not sure. I would not have been in a
8  research capacity, so I'm not sure in which regard
9  they were offering -- we were offering support.
10    Q    Now, let me try to get a preview to scope
11  things down at the beginning.
12    A    Um-hmm.
13    Q    Would it be accurate to say that up until
14  the time that the IPO became effective in July of
15  1998, that your primary work was in the area of
16  valuation?
17    A    It's a function of the research analyst
18  role, yes; but not necessarily in valuations as they
19  are assigning value to an IPO price, it was valuations
20  versus the existing market trading price.
21        So there weren't a lot of -- It was not
22  here is 50 IPOs, let's talk about what their prices
23  valuation should be, that would be more of a banking
24  role. My role was more: There is a stock trading at
25  $15, should it be trading at 12 or 18, in your

1  opinion.
                            17
3    Q    Okay. During the phase of Lehman's work
4  for Adams Golf, up to the time the offering became
5  effective, what other areas of work did you do other
6  than the type of valuation work that you just
7  described with respect to Adams Golf?
8    A    With respect to Adams Golf, there would
9  have been due diligence. We did some preliminary due
10  diligence on our side, which was separate, but going
11  on at the same time as investment banking due
12  diligence.
13    Q    Okay. While you were working on the Adams
14  Golf offering, what was the general nature of your
15  personal interaction, if any, with the investment
16  banking team?
17    A    We spoke fairly regularly about the
18  marketplace; what due diligence I had done, various
19  things that were going on with the company.
20    Q    And all of those people were generally in
21  San Francisco at the time?
22    A    Yes.
23    Q    And where was your office located?
24    A    Manhattan.
25    Q    How did you communicate with the investment

Page 38

1    Q    -- by you?
2                              38
3    A    These would have been my calls.
4         MR. McEVOY:  Wait for him to finish
5         the question.
6    Q    And did you have a standard format that you
7    used when you made your due diligence calls?
8    A    It was pretty informal.
9    Q    But you kept records of the calls?
10   A    I don't have the records, but I assume
11   there was -- there would be -- there would have been a
12   form of some sort that I would have written things
13   down on.
14   Q    And did there ever come a time when you
15   disposed of those notes?
16   A    No.
17   Q    Were they, to the best of your knowledge,
18   in the files when you left Lehman Brothers?
19   A    They should have been.  When I resigned,
20   you just hand in your card key and you just leave, you
21   just walk out; you don't get to pack up or anything.
22   Q    Can you recall any other due diligence that
23   you did, that you wrote down in some form, other than
24   the calls to Edwin Watts and similar calls that you
25   just referred to?

Page 39

1    A    There were a number of calls.  I mentioned
2                              39
3    that was the retailer that stuck out in my head, but I
4    do recall there being a list of 50 to 100 retailers,
5    and we called a lot of them; we called the majority of
6    them.  That was the primary due diligence, because it
7    was a retail product, you could see it going into one
8    side and coming out the other side.  So that was the
9    primary due diligence that we did.
10   Q    Now, I don't want to skip too far ahead,
11   but do you recall your research report that you
12   generated on Adams in August of 1998?
13   A    Yes; I've seen a copy, yes.
14   Q    And it refers to, at some point, a pro shop
15   survey?
16   A    Yes.
17   Q    Were the calls to Edwin Watts and other
18   retailers that you just referred to part of what you
19   later described as a pro shop survey?
20   A    I believe so, yes.
21   Q    So when did the pro shop survey begin?
22   A    It was ongoing, it was something that we
23   did -- that I did pre-IPO, post-IPO into 1999.  We
24   would call as the club cycle began, mid-cycle when
25   it's January, February and everyone is buying their

Page 40

1    clubs for the year, and then it continued on until
2                              40
3    when the actual season starts in the northeast, into
4    May.
5    Q    But at what point before the IPO had you
6    begun the pro shop survey?
7    A    I can't give you a specific date, but it
8    was before the IPO started.
9    Q    Sometime between the management meeting and
10   the IPO?
11   A    The April meeting?
12   Q    Yes.
13   A    I would assume it would be after the April
14   meeting.
15        (Whereupon, Exhibit No. 226 was marked
16        for identification.)
17   BY MR. LEWIS:
18   Q    I have marked as 226 a document numbered
19   UND-8587 through 8590 from Brian J. Lantier to
20   Bernard J. Picchi on the subject of Adams summary.
21        (Document handed.)
22        (Witness reviewed document.)
23   Q    Do you recognize this document?
24   A    Yes.
25   Q    What is it?

Page 41

1    A    This is an internal document created for
2                              41
3    the sales department -- actually created for the
4    research analyst to communicate with the sales
5    department.
6    Q    And when you say sales department, are you
7    referring to the department that dealt with sales
8    institutions, or are you using the term more broadly?
9    A    They were principally institutional
10   salespeople.
11   Q    Was this a draft that you created?
12   A    I'm not sure if this is the final or draft
13   version.
14   Q    And what was the purpose of it?
15   A    It creates a series of talking points for
16   the research analyst when discussing a potential IPO
17   with the institutional sales department.
18   Q    And when a document of this type was
19   finalized, to whom was it distributed?
20   A    I'm trying to think what the policy was,
21   but, if I remember correctly, we would allow the
22   salespeople to see these documents when they are
23   finalized.  But clearly it says for internal use; it
24   never left the building, it never was to go out to
25   customers.

Page 42

1  Q   By the time you sent this document to
2                    42
3  Mr. Picchi at the end of April of 1998, had you heard
4  the term gray marketing in connection with Adams Golf?
5     A   April of '98? I'm not sure when I first
6  heard the term the gray market. I've seen that in a
7  lot of documents, the term gray marketing, and I'm not
8  sure that's an actual true definition, but it might be
9  some terminology that I can correct at some point.
10    Q   Well, I would like to get to some
11 terminology that might save us some time.
12    A   Um-hmm.
13    Q   By the time the commitment committee at
14 Lehman had approved going forward with the Adams
15 offering, do you remember having heard of alleged
16 illegal distribution of Adams products?
17    A   I believe it may have come up -- I don't
18 know when it came up. I remember hearing about it
19 prior to the IPO, and the determination was it was
20 such a small insignificant number of clubs, at the
21 time limited to one retailer, that it wasn't a --
22 going to have a material financial impact.
23    Q   How did you hear of this illegal
24 distribution issue, as best you can recall?
25    A   I can't recall whether it was -- how it

Page 43

1  came up; I don't know whether it was through pro shop
2                    43
3  calls -- We had heard from conversations with pro
4  shops that there were some clubs showing up in big box
5  retailers, but if that was post-IPO or pre-IPO, I
6  can't recall.
7     Q   From what pro shops did you hear that from?
8     A   I can't recall. I mean, we spoke to
9  dozens, I don't know which pro shop that was.
10    Q   Is it -- Just so we're on solid ground to
11 start with at least: Is it your recollection that the
12 first way that you heard of an illegal distribution
13 issue was through a pro shop rather than some other
14 source?
15    A   I don't know how we -- how it may have come
16 up first.
17    Q   Do you remember ever discussing the issue
18 of illegal distribution of Adams clubs with the
19 investment banking team prior to the IPO?
20    A   I'm sure we may have discussed it at some
21 point, but I can't recall the -- It was not a high
22 priority, again because of the size. It was not --
23 There were far more pressing issues.
24    Q   What were they?
25    A   The potential outlook for competition, new

Page 44

1  clubs being buzzed by Callaway or Title Lies and
2                    44
3  Orlimar's filing; all those were things which we
4  focused a lot more attention on.
5     Q   What did you learn about the number of
6  clubs that made -- Strike that.
7         You said that a determination was made that
8  the number of clubs was small and insignificant. Who
9  made the determination that the number of clubs was
10 small and insignificant?
11    A   I don't recall who may have made that
12 specific determination, but I remember calling around
13 to Costco's when the issue first came up, and I
14 couldn't find the clubs on the east coast; so we had
15 some understanding that they were not in the east
16 coast. And as, you know, we went along, we could not
17 locate any of these clubs. So we assumed that if it
18 was going on, it was not, you know -- In a company
19 that was selling 600,000 clubs a year, a few thousand
20 clubs wasn't going to make or break their year.
21    Q   And was it your conclusion, prior to the
22 IPO, that there were a few thousand clubs out there
23 that had gotten into Costco's?
24    A   No, we didn't have a firm number. The
25 first time I ever saw a number was in your complaint,

Page 45

1  I had not seen a number prior to that.
2                    45
3     Q   Were you ever a participant in a meeting at
4  Lehman Brothers that involved the discussion of the
5  size of the possible Costco distribution of Adams
6  products?
7     A   I don't believe prior to the -- I don't
8  know that I had a meeting prior to the IPO to discuss
9  that.
10    Q   Do you know of a meeting having taken place
11 prior to the IPO?
12    A   That discussed --
13    Q   To discuss the subject --
14    A   To discuss the clubs and Costco?
15    Q   Yes.
16    A   No; no, I don't recall any meeting.
17    Q   Did you participate, prior to the IPO, in
18 any discussion of the risk that distribution of Adams
19 products in Costco stores might pose in the future to
20 the company?
21    A   That, I don't -- I don't recall a specific
22 conversation. Clearly, as I was doing the research,
23 it came up in our research report, that the clubs were
24 there. At that point, I would have addressed it with
25 the company, but that was post-IPO. So pre-IPO, I

12 (Pages 42 to 45)

Page 126

1  happening with the new products, and the potential
2  126
3  impact that it was going to have -- At that time the
4  market segment leaders Adams, with Orlimar attempting
5  to complete their IPO at the same time, and the new
6  Callaway club achieving some success on the PGA Tour,
7  that became something we had to follow monthly, as
8  well; as far as how many Adams clubs or Callaway clubs
9  or TaylorMade clubs are being carried by specific pro
10  players.
11      Q   Was there a specific purpose of keeping
12  them abreast on these subjects?
13      A   Other than being part of a team -- As an
14  investment banker post-IPO, your relationship with a
15  company does not go away. So the investment bankers
16  continuing to have a relationship with the -- with
17  Adams Golf, and I felt arming them with the most
18  information on the market would be the best thing
19  possible. It would make them more educated in their
20  discussions with Adams on what was happening in the
21  marketplace.
22      Q   Was it your understanding, in August of
23  1998, that Lehman was considering doing a further
24  offering with Adams at some later date?
25      A   I was not aware of that or at least -- No,

Page 127

1  I was not aware of that.
2  127
3      Q   Was -- Did you come to the conclusion, at
4  any time in 1998, that Adams had adopted a stock
5  buy-back program because of the decline in its stock
6  price?
7          MR. McEVOY: Object to the form.
8      A   I don't recall what the -- I do recall
9  something about the stock buy-back program, but I
10  don't remember when it was instituted or who suggested
11  the program.
12      Q   Do you recall having any involvement in the
13  decision by Adams to adopt a stock buy-back program in
14  the sense that you had provided information that was
15  acted upon?
16          MR. McEVOY: I'm just going to object
17      to the form again. Go ahead.
18      A   I don't recall being party to those
19  decisions.
20      Q   On that Exhibit 218, the specific words
21  used next to status August 1998 were, quote: Finis
22  wanted help understanding why ADGO stock price still
23  low and investor sentiment in preparation for board
24  meeting.
25          What sources did you have, in August of

Page 128

1  1998, for assessing investor sentiment in Adams stock?
2  128
3      A   I can't recall any specific investors, but
4  it would have been just a general gauge of those
5  people that were still calling in, checking on the
6  stock to gauge what that sentiment was. But I can't
7  recall who those investors were or what that sentiment
8  was.
9      Q   These were primarily institutional
10  investors --
11      A   Yes.
12      Q   -- or by that point, were you also getting
13  retail investors?
14      A   For the most part institutional investors.
15  I don't recall really speaking to any individual
16  investors.
17      Q   Let me show you now what we have talked
18  about before, Exhibit 180. This is a research report
19  on Adams Golf, Inc., dated August 28, 1998.
20          (Document handed.)
21          (Witness reviewed document.)
22      Q   Do you recognize this document?
23      A   Yes.
24      Q   And were you the primary draftsman of it?
25      A   Yes.

Page 129

1      Q   Can you explain to me how heavily
2  129
3  Mr. Picchi was involved in writing it?
4      A   I probably gave him a document 90 percent
5  completed. And Mr. Picchi is a skilled wordsmith, and
6  he would -- he had been writing research reports, at
7  this time, for 25 years, so he clearly was able to
8  tweak it and make the document flow better than the
9  one I had offered to him.
10      Q   As to page 27, which is the appendix
11  regarding the pro shop survey. Did Mr. Picchi have
12  any role in that particular page, that you can recall?
13      A   He may have -- He may have participated in
14  the pro shop survey to some degree, but in terms of
15  the preparation of the document, for the most part, it
16  was a page that I had written.
17      Q   As specifically as you can, please tell me
18  what the pro shop survey was?
19      A   It consisted of picking up the phone and
20  dialing. We had a list of the -- either the 50 or 100
21  largest pro shops across the U.S., and basically it
22  was just calling their retail locations and asking
23  them a few questions about the drivers. Some people
24  were very good in providing information, others not so
25  much, and we were able to garner a lot of good

Page 134

134

1  28th?
2
3  A   I don't believe at this time we were doing
4  electronic distributions, but I could be completely
5  wrong on that.
6  Q   Was -- In addition to the report, itself,
7  was something put on a first-call note or summary
8  electronic form on that date?
9  A   I don't believe so. The first-call note
10 would have been the down-sized version of this, the
11 August 4th note, because that was our initiation of
12 coverage, and this is just the extended version with
13 models.
14 Q   Now, on the survey, itself, did anyone
15 other than you and Mr. Picchi make calls?
16 A   In our research department; no, not that I
17 can recall. I don't know if the investment banking
18 group was still doing any due diligence at that point,
19 but in the research department -- And for the most
20 part, it would have been me making the calls. Bernie
21 may have attended -- listened in on some of the calls,
22 but for the most part, I was doing the pro shop
23 survey.
24 Q   And you called between 50 and 100 --
25 A   Yes --

Page 135

135

1  Q   -- stores?
2
3  A   Sorry.
4      Yes, I don't know how many responses we
5  would have gotten, but there were 50 to 100, and we
6  called them.
7  Q   And did you call some of them more than
8  once over the three-month period that the survey was
9  conducted?
10 A   I believe so, yes.
11 Q   How did you keep the records straight?
12 A   A lot of it was because they are subjective
13 answers; this is selling well, this isn't. It wasn't
14 something that you could say: Okay, you sold 38 Title
15 Lies, so we'll put that into a chart, and you sold 15
16 Warbirds; it was what's demand, what's good, bad,
17 different. Are people liking Orlimar? Is that
18 driving traffic? Do you like Orlimar? Do you like
19 the profit you're making off it? So it was a lot of
20 subjective questions and answers.
21     And I think you see that on our commentary
22 on the survey. That's what we used Golf Data Tech
23 for, because they had the physical numbers; ours was
24 more subjective in terms of what was working.
25 Q   Did you make notes of your telephone calls?

Page 136

136

1  A   I would assume that we had notes of some
2
3  sort, but I don't have the files, I don't know if
4  Lehman has the files.
5  Q   Okay. When you made notes in those days,
6  did you do it on a computer or on a yellow pad or
7  something?
8  A   For the most part it was handwritten.
9  Q   And by the time you were finished with the
10 pro shop survey, what kind of collection of notes did
11 you have?
12 A   I don't know. Every firm, every shop gave
13 you different amounts of information. Some might be
14 as simple as we're selling a lot of Orlimar, and you
15 might have made 50 calls and ended up with a page a
16 day, and some others might give you some valuable
17 information.
18 Q   I'm just talking about the physical paper,
19 if you got a quick response from someone.
20 A   Um-hmm.
21 Q   I assume you would use a piece of paper to
22 jot it down?
23 A   Yeah. I think that's safe to assume, but
24 there was no folder of pro shop survey results, that
25 was an inch thick or anything. There were probably a

Page 137

137

1  few pages somewhere. But where they ever went, I have
2
3  no idea.
4  Q   Did you consciously ever throw them out?
5  A   No. Like I said, when we resign it was
6  very much -- they packed up all my stuff that was
7  physically mine and mailed it to my new job, and that
8  was that.
9  Q   Now, on page 27 -- And I just want to
10 focus on the paragraph, for the moment,
11 margins/pricing.
12 A   Um-hmm.
13 Q   You write: One concern that we should
14 report is that Adams, Title Lies are appearing in
15 Costco wholesale stores with increasing regularity.
16     What was the increasing regularity, in
17 general terms, that you're referring to there?
18 A   I don't have a specific number to say they
19 were increasing from 20 stores to 50 stores; I don't
20 know what the numbers were, but we were hearing -- or
21 I was hearing of it more frequently. I don't know
22 what the increased frequency would be, but --
23 Q   And how were you hearing of it?
24 A   Again, through -- possibly from an investor
25 or from the pro shop survey.

35 (Pages 134 to 137)

Page 138

1    Q    Had you surveyed pro shops in the pacific
2                    138
3    northwest in this survey?
4    A    There were not -- I would have to say I
5    can't recall. The bulk of the pro shops in the U.S.
6    and the bulk of the sales are in the south and the
7    southeast, so Callaway and the northwest were not
8    particularly well covered.
9    Q    Did you cover Canada?
10   A    I thought about that; I don't believe we
11   did call Canada.
12   Q    Do you remember a location in Livonia,
13   Michigan?
14   A    No, I don't remember that.
15   Q    You also wrote: Adams has filed a suit of
16   discovery against Costco to determine how Costco,
17   dash, an unauthorized retailer, dash, has secured this
18   inventory.
19        Did you have any knowledge of the status of
20   that litigation at the time you wrote this particular
21   report?
22   A    No, I don't believe there had been any new
23   public commentary on the status.
24   Q    Did you ever learn that Adams had
25   voluntarily dismissed its own suit against Costco?

Page 139

1    A    Not that I recall.
2                    139
3            (Whereupon, Exhibit No. 240 was marked
4        for identification.)
5    BY MR. LEWIS:
6    Q    I have marked as Exhibit 240 a document
7    numbered AH-40 through AH-46, with a transmittal
8    letter and a motion by Plaintiff's, Adams Golf, LLP,
9    limited to dismiss pursuant to Rule 41(a)(2) and brief
10   in support thereof.
11           (Document handed.)
12           (Witness reviewed document.)
13   Q    I take it you have never seen all or any
14   part of this document before --
15   A    No.
16   Q    -- is that correct?
17   A    No, I have not.
18   Q    Did you ever hear, from any source, that
19   Adams was encountering any kind of jurisdictional
20   problems in that litigation in Texas?
21           MR. McEVOY: Objection, vague. You
22       can answer it, if you understand.
23           MR. LEWIS: I'll reframe it.
24   BY MR. LEWIS:
25   Q    Did anyone at Adams inform you that Costco

Page 140

1    had taken the position in the Texas litigation that it
2                    140
3    didn't do business in Texas and was not subject to
4    suit there?
5    A    No, I haven't heard that before.
6    Q    You wrote: One retailer in particular
7    indicated that, quote, Costco is flooding the market
8    with Adams clubs at $149, parens, versus an average
9    wholesale price of $144, dash, a trend that we have
10   seen in a few markets.
11        Can you identify the retailer who stated
12   that Costco was flooding the market?
13   A    No, I can't recall who that was.
14   Q    And what was the trend that you had seen in
15   a few markets?
16   A    That Costco was willing to sell; and that
17   is something that they have continued to do to this
18   day, they will sell products at wholesale in order to
19   drive foot traffic through their store.
20   Q    By the way, did you ever hear anyone at
21   Adams refer to Costco as the 800-pound gorilla?
22   A    I think I have seen that somewhere in
23   today's presentation, but I have heard the term used
24   before.
25   Q    You wrote: Although this is an extremely

Page 141

1    serious issue, that Adams is working hard to correct,
2                    141
3    we think investors should note that Costco is also
4    selling popular clubs from Callaway and TaylorMade.
5        First of all, what happened by August that
6    caused you to conclude that Adams was working hard to
7    correct the issue?
8    A    I think the assumption that the lawsuit was
9    still pending, which clearly was not correct, but --
10   and the assumption that they were working -- I can't
11   remember if we had already talked at this point about
12   their doing some sort of serial numbering on the
13   shafts, as well as working through their retail system
14   trying to find out how the clubs were getting into
15   Costco. So I deem that to be working hard to fix
16   it -- fix whatever the problem was.
17   Q    Okay. And that final sentence: Callaway
18   and TaylorMade are already in there and has materially
19   altered their outlooks.
20        Why did you put the discussion, that
21   appears under the heading of margins and pricing,
22   under that particular caption?
23   A    The -- The pricing of the clubs at the
24   retail level had historically been at $199 or so. For
25   Costco to sell them at $149, clearly could have

36 (Pages 138 to 141)

**A. 2**

D. HATFIELD

# LEHMAN BROTHERS

August 28, 1998

**Growth Stocks**

**Brian Lantier**
1 212 526-5977
*blantier@lehman.com*

**Bernard J. Picchi, CFA**
1 212 526-5344
*bpicchi@lehman.com*



# ADAMS GOLF, INC.

## FORE!  A GOLF EQUIPMENT GIANT IS HEADED YOUR WAY

**1 Buy**

| ADGO 6 5/8 | | 52-Wk Range 19-6 | | | FY 12/31 | | S&P 500 1042.57 | |
|---|---|---|---|---|---|---|---|---|
| | 1Q | 2Q | 3Q | 4Q | Year | P/E | Div. | |
| 1997A | - | - | - | - | -0.37 | NM | Nil | |
| 1998E | 0.31a | 0.35a | 0.23e | 0.19e | 1.05e | 6.3 | Nil | |
| 1999E | 0.29 | 0.36 | 0.32 | 0.29 | 1.26 | 5.3 | Nil | |
| Shares Outstanding   23.1 Million | | | | | | | DJIA 8165.99 | |

### Growth Drivers: New Products, International Sales and Market Share

- ❑ We have initiated research coverage of Adams Golf, Inc., with a 1 Buy recommendation.  Adams Golf has grown into one of the top five manufacturers of premium golf equipment in the U.S. and has its sights set on becoming the top domestic equipment manufacturer before long.

- ❑ The success of the company's fairway woods – marketed under the "Tight Lies" brand – have made Adams Golf the market leader in this segment.  As all successful golf companies before it have done, Adams has established a position of dominance in its chosen sector (fairway woods) upon which it can build a larger company.

- ❑ Adams should experience solid top- and bottom-line growth fueled by new product introductions (a new driver introduced in 1999) and a meaningful expansion of international sales.  All growth will be anchored by the company's position as the leading manufacturer of fairway woods in the U.S.

- ❑ We believe that despite some areas of weakness in the domestic market for golf equipment (weakness that, in our opinion, is driven by a lack of new innovations in the equipment market) there are specific areas of strength.  For example, we believe that firms specializing in fairway woods are enjoying a fairly healthy operating environment.

- ❑ We have a 12-month price target for Adams Golf of $23 (18 times our 1999 estimate of $1.26)  and recommend purchase of the shares with a 1 Buy.



EXHIBIT
180
5/17/06

ADAMS 004035

**LEHMAN BROTHERS**

"My neighbor carries an Adams Tight Lies and if it wasn't for his wife, I believe he would marry his."

*- Taken from iGOLF's (www.iGOLF.com) product review forum*

**COMPANY DESCRIPTION**

Adams Golf, Inc. manufactures premium golf clubs based on innovative designs to provide enhanced performance for the average golfer. The success of the company's fairway woods – marketed under the "Tight Lies" brand – has made Adams Golf the market leader in fairway woods. As all successful golf companies before it, Adams has established a position of dominance in its chosen sector (fairway woods) upon which it can build a larger company. (See Appendix 2 for golf-related terms.)

**INVESTMENT THESIS**

Adams Golf should be viewed as a new breed of company in the golf business with a unique sales and distribution model, rather than simply a company with a hot product. The success of Adams Golf to date has, in large part, been due to the high quality clubs that it manufactures, but we believe that the company's unique marketing model and its ability to deliver margin to its retailers have been equally important. It is important to note that the Adams story has the legs to travel beyond the Tight Lies fairway woods. The key is its relationship with retailers and its innovative marketing techniques that should make the introduction of new products easier.

Adams Golf has entered the top tier of golf companies at an opportune time. Traditional industry powerhouses did not focus on the fairway wood market prior to the success of Adams Golf (most clubs developed were simply scaled down versions of the company's driver). In addition, recent weak market conditions for firms with broad product profiles have combined with a changing industry landscape (major players such as Cobra and Taylor Made were acquired by larger conglomerates) to open a window of opportunity for Adams. We expect Adams to introduce new product lines, enter new markets and enhance its retail sell-through to achieve our growth expectations.

Behind each of our emerging growth stock recommendations must be a true growth company. Few companies can pass the six-level "growth litmus test" that we apply to all comers. In Figure 1 we list these criteria and show how Adams measures against this profile.

2

ADAMS 004036

**LEHMAN BROTHERS**

Figure 1: Adams Golf, Inc.
**Adams Golf as Growth Company – How It Measures Up (Inside and Outside the Box)**

| Growth Characteristics | | Adams Golf – How It Measures Up |
|---|---|---|
| Unique Business Model | X | The company's marketing model was unique at the time of its introduction (imitators have followed) and we expect Adams to continually innovate marketing and product delivery in the world of golf. |
| Improves Client Productivity | | Although a good round of golf may improve one's spirits, we don't think this translates to productivity gains. |
| Suite of Services (No "One Trick Pony") | x | Adams has successfully expanded its line of fairway woods from one club to a family of fairway woods. More product line extensions (like a driver, irons, putters and wedges) should boost Adam's long-term returns. |
| Internal Revenue Growing at ≥ 20% Yearly | X | Our current projections are for annual revenue growth of roughly 20% for the foreseeable future. |
| Barriers to Entry | x | Adams continues to build its brand equity, which could ultimately be a barrier for new entrants, but today the barriers are few. |
| Recession Resistant | | High end premium golf clubs do not sell well in a recession. |

Source: Lehman Brothers.

This exercise would rate Adams Golf as a 3 out of 6 on our growth scale, not a terribly strong rating. However, we have reserved the right to *think outside the box* and Adams is positioned to be an "outside the box" kind of growth company. If a company is early in its life cycle, delivers tangible or psychological benefits to its customers, is in a growing industry, and is gaining market share, we consider the company an "outside the box" growth stock. Consider companies such as Timberland or The Gap that do not fit the traditional mold of a growth company, but have nonetheless performed extremely well.

Below we review what we believe to be the key investment points of Adams Golf.

### 1. The Strength of the Tight Lies Brand

Adams Golf has successfully and recently established its Tight Lies brand as one of the major premium brands in the golf equipment industry. We expect Adams to end 1998 among the four or five golf equipment manufacturers in the United States with sales in excess of $100 million (others: Callaway, Taylor Made, Titleist/Cobra and possibly Karsten Manufacturing). To achieve this level of success while offering *only one* product line -- Adams is not a meaningful competitor in any other golf club categories (irons, drivers, wedges or putters) -- is testament to the strength of the company's business model and the quality of its clubs.

### 2. Unique Marketing Approach

Adams Golf has redefined the marketing model for golf companies through its unique sales and marketing methods, as we show below:

| **Adams Golf** | **Traditional Golf Equipment Co.** |
|---|---|
| In-House Salesforce | Independent Agent Salesforce |
| Direct Response Advertising | N/A (None) |
| Targeted Image Advertising | General Image Advertising |

3

ADAMS 004037

### 3. New Products Will Offer Long-Term Growth

As we noted above, we expect Adams Golf to be among the top five manufacturers of golf clubs in the U.S. in 1998 with just a single line of clubs (seven fairway woods offered in both graphite and steel shafts). Adams looks to leverage its brand strength and strong retail relationships to enter the premium driver and iron markets over the next three years.

### 4. Strong Design Team = Meaningful New Products

Senior management of Adams Golf complements its own knowledge of club design with industry experts — like Bob Bush (30 years of experience, including Director of Technical Services for True Temper, a leading shaft manufacturer) — who are focused on delivering high quality new products to the market.

### 5. Nick Faldo Endorsement

The lifetime endorsement agreement with Mr. Faldo should benefit Adams Golf in a number of ways. *First*, international sales, which are not now a major portion of sales, should benefit from the endorsement of one of golf's most accomplished players. Mr. Faldo's successful European career should help sales to that continent in particular. *Second*, Mr. Faldo's input on club design (especially for specialty products like wedges) should improve the final product. *Finally*, Mr. Faldo should improve the company's exposure on the major professional golf tours.

### 6. Favorable Trends for Golf

Golf continues to attract a wider audience as a result of increased media coverage of young stars like Tiger Woods, Annika Sorenstam, Se Ri Pak and Ernie Els. In 1997, three million new golfers tried the sport for the first time (a 50% increase over 1996 figures). Although the typical Adams customer is still a middle-aged, avid golfer, expansion of the golf industry will benefit Adams in the long run.

**VALUATION**

Adams shares currently trade at a 1999 P/E of just 5.3 times and just 21% of its long-term EPS growth rate of 25%. The company's purest comparable, Callaway Golf, has a 30-day average multiple of 11.4 times 1999 consensus estimates or 74% of its long-term growth rate. We argue that the growth prospects for Adams Golf are far superior to those of Callaway Golf and as such Adams' shares should trade more in line with its long-term growth rate. At 74% of its growth rate (the current PEG for Callaway) Adams Golf should trade at 18 times our 1999 estimate of $1.26, yielding a 12-month price target of $23 per share.

**BACKGROUND AND OPERATING ANALYSIS**

### Current Products Offer Solid Growth Prospects

Adams Golf's recent success has been tied directly to the phenomenal market response to its fairway woods.

### Fairway Woods: What They Are and What Defines the Market

Fairway woods have typically been the stepchild of the golf industry, often overlooked by the major manufacturers in favor of more high profile products like drivers and irons. A fairway wood is defined by the loft angle of the clubhead, which typically ranges from 12 degrees to 32 degrees (See Figure 2). The increase in the loft angle means that the club is further from perpendicular (a 0 degree loft would be perpendicular to the horizon, a 16 degree loft would be 16 degrees back from the perpendicular). As the number of the wood increases, the loft increases as well and the distance that the golf ball will travel falls.

4

ADAMS 004038

LEHMAN BROTHERS

Figure 2: Adams Golf, Inc.
**The Tight Lies Family of Clubs**

| Club | Loft | Distance |
|------|------|----------|
| Strong 2 Tour Brassie | 12° | 225-250 yds |
| Strong 3 Wood | 13° | 210-225 yds |
| The Original 16 | 16° | 190-210 yds |
| Strong 5 Wood | 19° | 175-190 yds |
| Strong 7 Wood | 24° | 165-175 yds |
| Strong 9 Wood | 28° | 155-165 yds |
| Strong 11 Wood | 32° | 140-155 yds |

Source: Lehman Brothers and company reports.

The early 1990s were dominated by manufacturers producing oversized metal club heads that promoted improved accuracy off the tee, especially for less-than-ideal swings. When a ball is not hit in the best spot on the clubface of a persimmon club (the so-called "sweet spot"), the results will be more erratic than those shots taken with the more forgiving metalwood. Because the average golfer (and professionals, for that matter) prefer to limit the downside of a poorly struck ball, large head metal (steel, titanium, etc.) drivers have enjoyed great success in the 1990s and have made the game more enjoyable for all golfers.

Against this backdrop the market for fairway woods languished over the past 10 years. Most major manufacturers offered scaled down versions of their drivers for the fairway wood market. Unfortunately, what makes the large head clubs work well off the tee — a deep face (taller clubhead) and an oversized head — prevents them from easily getting the ball in the air from the fairway, rough or divots. Golfers facing the daunting task of hitting a second shot 220 yards to a green with a deep-faced metalwood or a long iron were left without an easy solution.

**The Answer to Long Second Shots to the Green: The Tight Lies From Adams Golf**

Barney Adams realized through years of interacting with average golfers as a custom fitter that long irons and fairway woods were the hardest clubs to master. The challenge was to improve the ball flight for the average golfer on the second shot to the green, so that the ball would land more softly than if it were struck with a traditional club (i.e., make the ball travel the distance of a long iron, with the high, soft arc of a short iron).

With a given ball flight in mind, Barney Adams set off to design a golf clubhead that would deliver the ball flight pattern shown in Figure 3. The resulting design was the inverted trapezoid shown in Figure 4, which was designed to lower the center of gravity on the clubhead below the equator of the golf ball. By lowering the center of gravity, a manufacturer can increase the ease with which a golfer can hit a fairway wood. Adams Golf accomplished this with the introduction of the Tight Lies Fairway Woods.

5

ADAMS 004039

Figure 3: Adams Golf, Inc.
**Ball Flight Trajectory**



Source: Lehman Brothers.

### A Marketing Epiphany

In 1995 and Adams Golf began testing its Tight Lies Fairway Woods at local driving ranges. The club performed as promised, delivering high, long shots for average golfers from a variety of lies. With a club in hand that delivered the results that were eluding other golf companies, Adams Golf was at a crossroads. Because product introduction costs in the U.S. golf market can be astoundingly high (note the 1996 advertising budgets of leading firms in Figure 5) and this spending in no way guarantees meaningful market penetration, any advertising by Adams had to deliver bottom line results. Understanding that the company was without the financial means to compete (via traditional means) with firms like Callaway, Cobra, Titleist and Taylor Made, the marketing and sales team at Adams elected to use non-traditional forms of advertising such as infomercials and direct response advertising. The key benefits of direct response advertising include the fact that it is at least "earnings neutral," as revenues from the commercial or print ad offset the cost of advertising, it improves market awareness and retail sell-through, and it establishes a national price point for the product.

Figure 4: Adams Golf, Inc.
**Clubhead Comparisons**

**The Adams Tight Lies**



**A "Traditional" Fairway Wood**



Source: Adams Golf.

ADAMS 004040

LEHMAN BROTHERS

Figure 5: Adams Golf, Inc.
**Advertising Spending by Major Golf Manufacturers**

| Manufacturer | Advertising Dollars | % Magazine Spending | % Television Spending |
|---|---|---|---|
| Callaway Golf | $14.5 | 24% | 74% |
| Cobra Golf | $13.7 | 38% | 62% |
| Taylor Made | $12.7 | 40% | 59% |
| Ping Golf | $8.7 | 56% | 44% |
| Tommy Armour | $8.5 | 45% | 49% |
| Titleist Golf Clubs | $7.3 | 41% | 58% |
| Lynx Golf | $7.1 | 14% | 86% |
| Top-Flite Golf Clubs | $6.3 | 32% | 65% |

\* Percentages may not equal 100% due to other advertising costs.
Source: LNA Multi-Media Report 1996.

### The Adams Marketing Model Is a Hybrid...

The direct response base from which Adams Golf was truly born is based on using an infomercial to establish initial sales and brand awareness that will drive customers to retail locations. Although final sales predominantly occur in the retail locations (88% of second quarter 1998 sales occurred at on- and off-course golf shops), the company's method for gaining initial floor space (direct response advertising) was unique at the time of its introduction.

Traditionally, golf club manufacturers have used image-based advertising and sponsoring individual golf professionals through endorsement contracts to increase the visibility of their clubs and gain retail floor space. We believe that the current golf industry is capable of supporting both the traditional marketing model and the hybrid model developed by Adams Golf. However, we believe that the Adams model will be much more flexible and more responsive to changes in consumer tastes than the traditional marketing model. Consider how Dell Computer receives instant feedback on consumer demand via its website sales — this is like the feedback Adams Golf receives from its infomercials that will prove to be a leading indicator for end consumer demand.

### ...That Parallels Another Industry

"When the company first opened its doors, many in the industry had a good laugh at how the company distributed and marketed its products."(*Informix Magazine*, Winter 1998). The company referred to in this article is not Adams Golf, but rather Dell Computer. Dell redefined the marketing and distribution model for the PC business by selling directly to the end user. Similarly, Adams Golf has redefined the marketing and distribution systems of the golf industry.

### Retail Partners

Adams Golf currently has relationships with roughly 8,000 retail accounts ranging from on-course golf pro shops to off-course golf specialty stores (Edwin Watts, GolfDay) to large sporting goods stores with a commitment to price integrity (Sports Authority). Our thesis on the golf industry is centered on the concept of retail sell-throughs. Those equipment manufacturers that deliver customers and a sustainable operating margin to the retailers will be the most successful in the competitive world of golf equipment.

7

ADAMS 004041

Adams Golf has rapidly become a major player in the golf industry by delivering solid operating margins to its retail customers. The company is able to deliver strong margins because of its low cost of goods and strong brand image. Its increasingly popular brand has taken hold and Adams is now delivering the second half of the success formula: customers to the retailer. Retailers need to drive customers into their stores because once they are inside they tend to buy more high margin products such as golf balls, gloves or apparel.

### The Outlook for the Fairway Woods Market

As we indicated earlier, the fairway wood has long been the stepchild of all clubs in a player's bag. A traditional golf bag with 14 clubs (the maximum allowed by USGA rules) would normally include irons numbered 3 to 9 (seven clubs), a driver, a putter, and two wedges (pitching and sand). This leaves three available slots for a 3 wood, other fairway woods, wedges or long irons (like a 1 or 2 iron). The current trend for professionals and amateurs alike is to replace the 2, 3 and 4 irons with two fairway woods (like the Original 16 degree and a Strong 5). This switch benefits players in two ways: First, the player can now add up to three more clubs to his or her bag (usually extra wedges) and still be within the guidelines and, second, the fairway woods will typically be easier to hit than long irons if they are shallow-faced.

A recent survey by Golfonline (www.golfonline.com) revealed the increasing popularity of fairway woods as shown by the number of woods carried by average players (Figure 6).

Figure 6: Adams Golf, Inc.
**How Many Woods Do You Carry?**

| # of Woods Carried | % of Respondents |
|---|---|
| 0 | 0.6% |
| 1 | 3.2% |
| 2 | 23.5% |
| 3 | 47.4% |
| 4 or More | 25.3% |

Source: Golfonline Survey.

### Avid Golfers – An Avenue for Growth

The growth of fairway woods' popularity in the last 18 months has also been driven by the desire of avid golfers (those playing more than 25 times per year and averaging 66 rounds per year) to try any and all new equipment on the market. It is estimated by the National Golf Foundation (NGF) that roughly 5.6 million of the 26.5 million golfers in the U.S. are "avid." These golfers are predominately male, older, have more disposable income than the mean and are much more dedicated to game improvement through equipment advancements than less frequent players. The number of avid golfers in the U.S. has not changed meaningfully since 1991 (the six-year compounded annual growth rate was just +0.8%). However, we believe that there is an important trend developing in the golfing statistics for 1997 that indicates the number of avid golfers could soon begin to increase significantly. In Figure 7, we review the current trends in the number of golfers by category.

We believe that the increase in core golfers reported in 1997 could be the beginning of a trend toward a greater level of commitment to the game of golf by the leading edge of the "Baby Boom" generation. This is best evidenced by the increase in the

8

**LEHMAN BROTHERS**

number of core golfers relative to occasional golfers. The ratio of core golfers to occasional golfers ranged between 0.62 and 0.66 to 1 between 1991 and 1996 but in 1997, this ratio jumped to 1 to 1.

Figure 7: Adams Golf, Inc.
**Player Categories**

| | Avid Golfer (25+ Rounds) | % of Total Golfers | Core Golfer (8-24 Rounds) | % of Total Golfers | Occasional (1-7 Rounds) | % of Total Golfers | Beginner First Round | % of Total Golfers | Juniors 12-17 yrs old | % of Total Golfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 1991 | 5,348 | 21.6% | 6,152 | 24.8% | 9,244 | 37.3% | 2,256 | 9.1% | 1,800 | 7.3% |
| 1992 | 5,376 | 21.7% | 6,224 | 25.1% | 9,468 | 38.2% | 2,032 | 8.2% | 1,700 | 6.9% |
| 1993 | 5,518 | 22.5% | 5,782 | 23.6% | 9,286 | 37.9% | 2,014 | 8.2% | 1,900 | 7.8% |
| 1994 | 5,113 | 21.0% | 6,087 | 25.0% | 9,818 | 40.4% | 1,582 | 6.5% | 1,700 | 7.0% |
| 1995 | 5,512 | 22.0% | 6,088 | 24.4% | 9,569 | 38.3% | 1,831 | 7.3% | 2,000 | 8.0% |
| 1996 | 5,266 | 21.2% | 6,134 | 24.7% | 9,641 | 38.9% | 1,959 | 7.9% | 1,800 | 7.3% |
| 1997 | 5,600 | 20.9% | 7,900 | 29.5% | 7,900 | 29.5% | 3,000 | 11.2% | 2,400 | 9.0% |

> 1997's meaningful jump in the number of core golfers could forecast an eventual jump in the number of avid golfers.

Source: National Golf Foundation and Lehman Brothers.

We believe that by the end of 1998 Adams Golf will have sold over 1.0 million Tight Lies in the U.S. This leaves significant upside potential for the company over the next two to three years in the high end fairway wood market given that its target market includes the expanding avid golfer segment (5.6 million golfers) and a portion (the more committed golfers) of the core golfer market (7.9 million in 1997).

### Competition Heats Up

#### Callaway – An 800-lb Gorilla Stubs Its Toe

Callaway golf emerged from relative obscurity in the late 1980s with the introduction of the S2H2 (Short Straight Hollow Hosel) metalwoods. But when the company introduced its first Big Bertha metalwood in 1991, its growth rate shifted into overdrive. Callaway rapidly grew into a dominant position in the consumer driver market that it still holds. The company successfully extended its product lines to irons, putters, wedges and accessories and followed the success of the Big Bertha driver with the even more successful introduction of The Great Big Bertha titanium driver.

Callaway Golf remains king of the mountain (despite setbacks discussed later) and the model for true success for a golf company. On August 12, Callaway Golf introduced a new line of drivers and fairway woods called the Big Bertha Steelhead. Despite early reports to the contrary, the new Steelhead *is not* a shallow-faced wood like the Adams Tight Lies. To achieve the ball flight desired, Callaway combined a fairly standard clubhead, a light crown plate, and steel weight chip (from 2 to 20 grams) inserted in the base of the club to lower the center of gravity. Callaway's marketing angle is based on the premise that with a larger clubhead, the Steelhead will have a larger effective hitting area than shallow-faced woods like the Adams Tight Lies. The Big Bertha Steelhead carries a suggested retail price of $295 for a graphite shafted club but is retailing for $35 below this price — $260. At this price point the new Callaway club will be priced slightly below Orlimar's Tri-Metal fairway wood ($270) and well above the average Tight Lies price of $199.

9

ADAMS 004043

A key point for investors to consider is that Callaway is entering the current boom in fairway woods mid cycle with a product that does not have the characteristics of the most popular clubs – a low profile design. We liken this to introducing a new steel headed driver in the middle of the 1996/97 titanium craze or (continuing with our earlier computer analogy) introducing a new computer in 1996 without a modem because "How many people really want to use the Internet?"

Callaway Golf will phase out its Big Bertha Warbird fairway woods and drivers and replace them with its new Steelhead line. Our channel checks have indicated that the demand for this new club is high (on a par with the introduction of The Great Big Bertha in 1995) and most stores sold out of their allotted stock in only a few days. If this trend continues through the end of September we will reconsider the impact of the Callaway Big Bertha Steelhead on our earnings estimates for Adams Golf.

### Callaway's Growing Pains

Callaway Golf has experienced a rough 1998. The Street's earnings estimates for the company have gone from $2.35 per share and $2.67 per share at the beginning of 1998 to just $0.46 per share (down 80%) and $1.14 per share (down 57%) for 1998 and 1999, respectively, in just over seven months.

Callaway began 1998 with expectations that it would achieve revenues of $1.0 billion during the year. The company built its operating infrastructure to support a billion-dollar firm. On its second quarter conference call, the company conceded that it would not realize $1.0 billion in revenues and that the more realistic target would be $750-$800 million. The shortfall has been blamed on a number of influences including El Niño, the Asian crisis and the USGA rules committee, but we believe the single biggest factor has been the performance of Adams Golf. Callaway has been unsuccessful in defending its lucrative metalwoods franchise and as a result both top- and bottom-line results have suffered.

### Orlimar Golf: The Tri-Metal Plays Follow the Leader

Orlimar Golf introduced a premium fairway wood in January 1998 and has followed the Adams Golf marketing model (principally direct response marketing) to grow sales from under $1.5 million in 1997 to a projected level in excess of $75 million in 1998. Orlimar's golf club utilizes a shallow-faced design like the Adams Tight Lies combined with exotic metals (maraging steel, copper/tungsten alloys) for an additional marketing angle. The company has positioned its products as an advance in technology rather than an advance in design. Orlimar Golf has built a loyal following of players eagerly awaiting its next product introduction.

Orlimar's Tri-Metal fairway wood appears to be particularly popular among better amateur players and professionals. Indeed, on July 5, of the 769 woods in play on the professional golf tours, Orlimar held a surprising second behind Callaway Golf, with a 14.9% share (see Figure 8). Orlimar has blitzed the media with this information and it appears to be improving the company's position in the consumer market.

10

LEHMAN BROTHERS

Figure 8: Adams Golf, Inc.
**Number of Woods In Play on the Professional Tours**

| Manufacturer | Clubs in Play | % of Total |
|---|---|---|
| Callaway | 369 | 48.8% |
| *Orlimar* | *113* | *14.9%* |
| Taylor Made | 86 | 11.4% |
| Titleist | 33 | 4.4% |
| Top-Flite | 25 | 3.3% |
| Cobra | 23 | 3.0% |
| Ping | 22 | 2.9% |
| *Adams* | *17* | *2.2%* |
| Mizuno | 8 | 1.1% |
| Others | 60 | 7.9% |

Source: Darrell Survey.

It should be noted that usage by professional golfers does not guarantee success in the consumer market. Firms such as Mizuno (the #1 iron on tour), Cleveland (the #1 wedge on tour), Lynx and Ram have long been staples on the major professional tours, yet the *combined* revenues of these firms in 1997 was just $117 million (estimated by *Golf Pro* magazine). Traditionally, clubs designed for the professional golfer are built to offer better feedback to the golfer and tend to be very unforgiving on miss hits. Any amateur golfer who has hit a Mizuno MP-14 3 iron (Tiger Woods' iron of choice before signing with Titleist) quickly understands that although the clubs perform wonderfully for a professional, the amateur is likely to have much greater success with a forgiving, cavity-backed iron.

Our channel checks with retailers indicated that some stores continue to see Orlimar clubs (particularly the lower lofts – 9 degree and 11 degree) returned at a double digit rate. Speculation from retailers we spoke to was that the return rates for Orlimar were dramatically higher than for Adams because of the Orlimar 90-day money back guarantee, because certain clubs proved to be less accurate than expected (particularly in the lower lofts), and because the ability to hit out of certain lies was limited (again mainly for lower lofts).

As we highlight in our retailer survey, Orlimar offers a meaningful rebate program to its most significant customers. This convoluted plan is open only to certain customers and thus may damage Orlimar's relationship with some of its other customers (see Appendix 1).

### Orlimar's Product Extensions — Is It Too Much, Too Fast?

The most successful emerging golf equipment companies have made it a point to dominate their core business first and only then extend the product line. Callaway Golf was a classic example: Callaway's 1991 introduction of the Big Bertha woods led to rapid gains in market share. Callaway extended its line with the new Big Bertha irons in January 1996, wedges in September 1996, and putters in September 1996. As we noted earlier, Adams does not expect to extend its product line until 1999. Orlimar Golf has introduced a new driver, a stainless steel shell with an "Alpha Maraging" steel face and a line of Tri-Metal irons. We believe the company runs the risk of spreading its resources fairly thin at a critical stage of its development. Investors should know that early production problems at Orlimar appear to have been corrected and we will closely watch for future developments.

As we were writing this report, Orlimar Golf issued a press release that indicated it is exploring the possibility of filing a registration statement with the SEC for an IPO, which we expect to come to the market in the fourth quarter.

11

ADAMS 004045

LEHMAN BROTHERS

**Others**

Taylor Made and Titleist, both top tier golf equipment manufacturers in the U.S., have both either announced plans to introduce a new fairway wood or are rumored to be working on a new fairway wood.

Taylor Made has successfully expanded its share of the total woods market in 1998 through an aggressive price reduction campaign and the success of its professional endorsers. By meaningfully lowering the wholesale price for its drivers, Taylor Made has increased its consumer use. If consumers are pleased with the Taylor Made driver, this potential base of Adams customers could consider a new Taylor Made product if it offered comparable performance benefits.

Titleist continues to ride a wave successful product launches, including its new drivers (the 975D and 976R) and its Scotty Cameron putters, both of which have impacted the market share of Callaway Golf. During a mid-July conference call for Fortune Brands (owner of Titleist, Cobra and Foot Joy), management indicated that Titleist would soon be introducing its response to the Adams Tight Lies. We view Titleist as an excellent manufacturer and innovator in the golf equipment industry and believe that its new product could be a meaningful competitor for Adams. However, if recent history is a guide, Titleist will likely price its product at the high end of the range for fairway woods, and thus we do not believe its club will attract significant unit volumes.

**GROWTH WILL BE "DRIVEN" BY NEW PRODUCTS**

Adams Golf will look to expand its product offerings in 1999 and we expect the company's first product extension to be a new driver (a.k.a. "1 wood").

### Definition of a Driver and the Driver Market

A driver is the club most frequently used off the tee by professionals and amateurs. It is typically designed with a deep face and low loft angle (typically less than 10 degrees). A driver is designed to hit a golf ball for maximum distance — 250 yards+ — with limited loft. Recent advancement in materials have lead to lighter overall drivers and specifically more forgiving clubheads (i.e., a shot will deliver the desired results when struck on a wider area of the clubface, or the "sweet spot" has been enlarged).

Despite the high degree of difficulty associated with consistently hitting a driver, the limited number of times a driver is used in a round of golf (maybe 10-12 times out of 80 to 100 shots) and the extremely high price points of premium drivers, most amateurs own at least one of the market's leading drivers, i.e., a Callaway, Taylor Made, Titleist or Cobra. The typical life cycle for drivers is four years — meaning that every four years the early adopters will enter the marketplace looking for the latest technology to improve their game.

The driver market, roughly $1.0 billion annually, has been deluged by clubs featuring titanium heads during the three and one half years since the introduction of The Great Big Bertha from Callaway Golf in 1995. We believe that we are currently in a lull between driver innovations and as a result we've seen sales for the major titanium golf manufactures tail off.

### The Adams Driver

Adams should introduce a new driver in the beginning of 1999, hitting the four-year sweet spot since the last meaningful innovation in driver technology. Although we can not forecast the success of a product that we have not yet seen, we believe that the market is properly conditioned for a major new product and the history of innovative designs at Adams could forecast an excellent new product offering.

12

ADAMS 004046

LEHMAN BROTHERS

We believe that Adams Golf is dedicated to a philosophy of improving club designs rather than using improved materials. Having said this, we believe that Adams' new driver:

- Will be designed to optimize the carry (distance in the air) of a tee shot and

- Will use a variety of shafts to optimize individual results.

As Adams works to develop a new driver, we believe management will aim to deliver a product that will retail for roughly $300-$350 per club. In addition, Adams will likely design the new driver with features that will be difficult to copy.

The company's design team is headed by Barney Adams, CEO and Chairman of Adams Golf, whose 12+ years of experience in the custom fitting business and the success of his Tight Lies design increase our confidence that Adams Golf will deliver a meaningful new product. The design team at Adams includes Bob Bush, the former Director of Technical Services at True Temper (a major golf shaft company); Richard Murtland, VP of R&D; Dr. Michael Carroll, the former Dean of Engineering at Rice University; and professionals such as Carol Mann, Hank Haney and Nick Faldo. A final and key component of the new product development process at Adams Golf will be the role of custom fitters. The company has a network of over 100 authorized custom fitters (professionals who personally fit a set of golf clubs to an individual like a tailor) who will be able to provide high quality feedback on new products from their customers.

When Adams moved to its new location in Plano, Texas, it secured enough manufacturing space to produce three to four million clubs annually. We are currently forecasting total unit sales of just 1.17 million clubs in 1999 (1,031,500 fairway woods and 144,500 drivers). Thus manufacturing capacity will not be strained by the introduction of new products.

### Marketing Model

We expect the company to continue to use its direct response marketing model to introduce its new driver to the public. Adams will likely use a high quality infomercial and direct response print advertising to provide high profile, earnings neutral advertising.

Furthermore, the company has compiled a sizable database of existing customers to whom it may direct market its new product. If a customer has purchased a Tight Lies through an infomercial or print ad or if he or she has completed a warranty card, Adams Golf will have the information necessary to direct market its new products. If just 15% of the company's fairway wood customers purchase the new driver, the company will easily meet our expectations for the driver's 1999 sales.

### Current Trends in the Driver Market

#### 1. Market Saturation
As we've noted, many of the more established golf manufacturers have cited market weakness in the U.S. as a factor in their current weak operating performance. We believe that it is less a question of market demand than of weak demand for specific products. For example, Titleist's new 975D driver is experiencing very strong demand, as are products in new categories like the Adams Tight Lies and Orlimar's Tri-Metal fairway woods. Certain products (the Callaway Great Big Bertha, for example) have enjoyed a position of market strength for almost four years and the potential customer base continues to shrink with every new club sold. In Figure 9 we highlight the market (avid golfers) for premium golf clubs relative to the annual

13

ADAMS 004047

LEHMAN BROTHERS

club sales of one of the most popular clubs of the 1990s, the Callaway Great Big Bertha driver.

Figure 9: Adams Golf, Inc.
**Great Big Bertha Sales – Is the Market for Titanium Drivers Becoming Saturated?**

|        | Est. Great Big Bertha Sales (in units)[1] | # of Avid Golfers Less Total GBB's Sold[2] | Cumulative % of Avid Golfers |
|--------|-------------------------------------------|--------------------------------------------|------------------------------|
| 1995E  | 300,000                                   | 5,212,000                                  | 5.4%                         |
| 1996E  | 994,182                                   | 3,971,818                                  | 24.6%                        |
| 1997E  | 1,068,000                                 | 3,237,818                                  | 42.2%                        |

[1] Estimated from Callaway Golf financial statements.
[2] Total Avid Golfers for 1995, 1996, and 1997 equals 5.5 mil, 5.3 mil and 5.6 mil, respectively.

Source: Callaway Golf and industry reports.

As Figure 9 shows, a hugely popular golf club like the Callaway Great Big Bertha can reach a point of market saturation fairly quickly when its market is somewhat restricted by its high price. We believe that the $350-$400 average retail price for Callaway's Great Big Bertha limited its target market to avid golfers – 5.3 million in 1997 – and probably 50% of core golfers (it is estimated that there were 6.0 million moderate golfers in 1997 in the U.S. who average 8 to 24 rounds annually). Thus, the total addressable market for The Great Big Bertha and its successor, 1997's Biggest Big Bertha, was roughly 8.3 million golfers in the U.S.

We believe that Adams Golf will follow a pricing standard established with the Tight Lies – pricing its new driver in the middle of the market for premium drivers. We believe that the days of the $500 driver are gone (for now) and that any new successful driver must retail for $300-$350 to achieve the mass market success that will ensure an extended life cycle. At this price point a product offering meaningful performance benefits has the opportunity to achieve success across all key categories — avid golfers, moderate golfers, and occasional golfers.

**2. Competition**
Competition in the driver market should be viewed on two fronts: competition from existing products and competition from products yet to be introduced.

**Existing Products:**

The current market for drivers is dominated by the major players in the golf equipment industry. Specifically, Callaway Golf, Taylor Made, and Titleist/Cobra (a Fortune Brands company) far outdistance their competitors in terms of units and dollar sales. The second tier players in drivers include companies like Ping, Top-Flite, Wilson, Goldwin and Lynx; these are well behind the elite manufacturers in both unit and dollar volume.

As we've discussed, there has not been a meaningful innovation in the driver industry since the introduction of titanium clubheads in 1995. There has been a slight shift of market share in 1997/1998 among the industry leaders as Titleist and Taylor Made have taken some market share from Callaway with new products (Titleist's 975D and 976R have been well received) and price discounting (Taylor Made has lowered its wholesale price).

14

ADAMS 004048

**LEHMAN BROTHERS**

**New Products:**

Most companies in the industry are continually developing new products, but we believe that most companies will avoid introducing any meaningful new designs or materials until after a September meeting between manufacturers and the USGA on new club testing requirements. The USGA's concerns are centered on the issue of the "spring-effect" — a question of whether certain thin-faced metalwoods are affecting the flight of a golf ball.

As we noted earlier, Callaway has introduced a new driver and fairway wood called the Big Bertha Steelhead. We believe that this is not the only driver in Callaway's pipeline and that a new titanium driver could be introduced in January 1999.

Given the mixed market response to Callaway's new products (mass acceptance of its latest iron – the X-12, and limited acceptance of the Biggest Big Bertha) we believe handicapping the success of any potential product is a fool's game.

### Growth Fueled by the International Expansion of the Tight Lies Brand

It is estimated that for every golfer in the U.S., there is another golfer located somewhere else on the planet. There are roughly 26 million golfers in the U.S. and another 26 million spread around the world, with particular concentrations in Canada and Asia. Adams has elected to cautiously enter international markets to ensure that it establishes relationships with the premier distributors in each of its chosen markets. To date the company has signed relationships with 33 distributors in 39 countries.

The company's initial focus in international sales will be Western Europe and Canada, where word-of-mouth marketing is making the Tight Lies introduction go very smoothly. Although we have not included meaningful sales to Asia in our models, it should be noted that in the most recent quarter Adams Golf recorded nearly $1.25 million of sales to the Asian region (principally Japan). We believe that despite the weak Asian economies, the buzz around the Adams Tight Lies has allowed the company to realize a limited amount of success in this region without a significant marketing effort. In the second quarter of 1998, Adams Golf's total international sales (principally, Canada, U.K. and Japan) equaled 12% of total revenues. In Figure 10 we review the estimated number of golfers around the globe. We believe that Adams will concentrate on entering the largest non-Asian markets first.

15

ADAMS 004049

LEHMAN BROTHERS

Figure 10: Adams Golf, Inc.
**Global Golfer Profile**

| Country | Total Golfers | Adams Distributor |
|---------|---------------|-------------------|
| United States | 26,500,000 | Yes |
| Japan | 15,000,000 | Yes |
| Canada | 4,785,000 | Yes |
| South Korea | 1,000,000 | Yes |
| England | 827,129 | Yes |
| Sweden | 373,430 | Yes |
| Germany | 272,830 | Yes |
| France | 253,800 | Yes |
| Scotland | 222,000 | Yes |
| Taiwan | 200,000 | Yes |
| Ireland | 190,000 | Yes |
| Indonesia | 110,000 | Yes |
| Spain | 108,204 | Yes |
| Netherlands | 101,000 | Yes |
| Thailand | 100,000 | |
| Other | 555,792 | Partial Coverage |
| **Total** | **50,599,185** | |

Source: National Golf Foundation, Canadian Golf Foundation, European Golf Association 1997.

### The International Marketing Model

Despite the success of Adams Golf in the U.S., with its unique brand of marketing heavily weighted toward direct response advertising, we believe that this model will have to be altered to achieve success in the international marketplace.

The international markets are not well suited to Adams' direct response marketing model because of reluctance to accept infomercials as a legitimate form of advertising, fewer television viewers, limited access to air time and generally weaker distribution networks than the U.S. Historically, American consumer products that have flourished in the overseas markets have done so through the use of more traditional image-based advertising.

### Nick Faldo and Adams Golf

To enhance the company's international marketing efforts, Adams Golf entered into a lifetime agreement with Nick Faldo. Mr. Faldo, one of golf's most accomplished players over the last 10 years with six major victories to his credit, agreed to the lifetime endorsement agreement in exchange for roughly 3.9% of the post-offering equity and a royalty fee of up to 5% of all international sales of Adams clubs. The agreement with Nick Faldo is more involved than that of the typical tour professional with a sponsoring golf equipment manufacturer. Mr. Faldo will be involved in the design, testing and development of new products, as well as a key figure in positioning the Tight Lies brand among international golfers. Much of the company's international image advertising will feature Mr. Faldo, a golfer long associated with high quality products.

The compensation agreement with Mr. Faldo, while generous, is in line with other endorsement contracts for top tier golfers and is unique in that it is tied to the performance of international operations. In Figure 11 we review a list of the 10 golfers with the highest endorsement incomes in 1997.

16

ADAMS 004050

LEHMAN BROTHERS

Figure 11: Adams Golf, Inc.
**Golf's Leading Endorsers**

| Player | Total Endorsement Income (in $Mil.) |
|--------|-------------------------------------|
| Tiger Woods | $28 |
| Arnold Palmer | $20 |
| Greg Norman | $14 |
| Jack Nicklaus | $11 |
| Fred Couples | $10 |
| Ernie Els | $9 |
| *Nick Faldo* | *$8* |
| Davis Love III | $8 |
| Corey Pavin | $7 |

Source: *SportsBusiness Journal*, May 1998.

The company also plans to open a line of "Faldo/Adams Golf" golf schools in conjunction with Marriott International. Currently Mr. Faldo has one golf school located in Orlando, Florida at the Marriott Grande Vista, but the number of golf schools could grow to as many as 20 in the coming years. We view these schools as an excellent example of "earnings neutral" advertising because the Adams Golf name will be prominently featured throughout the location and revenues from pro shop sales should more than offset the cost of establishing these locations.

### The $64,000 Question: Is the Golf Equipment Market Strong or Weak?

A number of the larger equipment manufacturers have recently described the golf equipment market as weak. With roughly half of the world's golfers residing in the U.S., any domestic weakness would compound the extremely weak operating environment in Asia and would have a meaningful impact on the industry as a whole. Our belief is that these companies have simply run out of customers to sell products to in the U.S. Over the past three years Callaway Golf and its competitors such as Cobra/Titleist and Taylor Made have sold nearly 6.0 million titanium drivers by some estimates. A high end club like a titanium driver or an Adams Tight Lies will appeal most to the 5.6 million avid golfers in the U.S. Callaway might sell some Titanium drivers to core golfers (8 to 24 rounds per year), but with a limited number of avid golfers, product saturation was bound to become an issue.

As shown in Figures 12 and 13, golf continues to grow in popularity. However, we believe that lack of innovation in the equipment market has combined with poor early season weather to produce a weak operating environment for golf equipment companies with broad diversified product lines.

Golf course construction, long noted as a sign of end demand, continues to spiral upward. At the end of 1997 a record number of new courses were under development — 932 at December 31, 1997 — of which 485 are expected to be completed in 1998. Amazingly, 3,573 new courses have been added to the U.S. supply over the last 10 years (roughly 1 new course/day) bringing the total supply of golf courses to just over 16,000. Figure 12 reviews recent trends in new course construction.

17

ADAMS 004051

LEHMAN BROTHERS

Figure 12: Adams Golf, Inc.
**Domestic Golf Course Construction**



Source: National Golf Foundation "Golf Facilities in the U.S./1998 Edition."

Measuring the total golfers in the U.S., especially beginning golfers and the avid golfing segment, is another critical measure of golf's increasing popularity. In 1997 participation rates soared, crossing the 25,000,000 mark for the first time in seven years. As we've said, there is an interesting trend developing as occasional golfers convert to core golfers. This bodes well for the long-term health of the equipment industry, as avid and core golfers spend a disproportionately high amount of money on equipment.

18

ADAMS 004052

LEHMAN BROTHERS

Figure 13: Adams Golf, Inc.
**Composition of U.S. Golfers by Category**



Source: Golf Participation in the U.S./1998 Edition.

Although the data for 1997 are compelling and could forecast another upturn in the golf cycle, we caution that weather (particularly in strong golfing states like California and Florida) wreaked havoc on the golf market in the first quarter of 1998 and the positive participation trends in 1997 could reverse in 1998-1999. In addition, 1997 could prove to be a "head fake" like 1990, when the total number of U.S. golfers grew by 7% and then fell off by a like amount in 1991 and remained around 24.5 million until 1997.

Recent data on 1998 equipment sales seem to indicate that 1997's strong participation and new course construction have not converted into stronger equipment sales (both in dollar and unit volume). In the first four months of 1998 equipment sales were dramatically weaker than in the same period in 1997 as a result of a series of factors that we list in Figure 14.

Figure 14: Adams Golf, Inc.
**Recent Equipment Sales Trends and Analysis**

| | | Jan-Apr '98 | Jan-Apr '97 | % Change | Reason |
|---|---|---|---|---|---|
| Woods | Dollar Sales (in Millions) | $144.3 | $163.1 | -11.5% | Weak unit sales, lower proportion of titanium clubs |
| | Unit Sales | 656,000 | 727,000 | -9.8% | Lack of new products, weather |
| Irons | Dollar Sales (in Millions) | $136.4 | $151.4 | -9.9% | Discounting as Callaway/Taylor Made replaced existing irons |
| | Unit Sales | 1,920,520 | 1,968,230 | -2.4% | New products and lower pricing |
| Balls | Dollar Sales (in Millions) | $102.9 | $101.8 | 1.1% | Mix shift toward premium priced balls |
| | Unit Sales (Dozens Sold) | 4,500,000 | 4,570,000 | -1.5% | Weather |

Source: Golf Datatech and Lehman Brothers.

19

ADAMS 004053

So is the domestic golf equipment market weak or strong? Our opinion is that the general market for golf equipment is relatively weak as a result of limited new products to stir consumer interest. This weakness has the greatest impact on companies that offer a diverse product base of woods, irons, putters and/or golf balls. However, we believe that there are specific areas of strength within the market — fairway woods for example — and companies focused on these areas will have a fairly healthy operating environment for the foreseeable future.

**VALUATION**

As shown in Figure 19 (a post-IPO price chart for Adams Golf), Adams' shares have been extremely weak since its IPO. Negative sentiment has settled around the entire golf industry following a series of press releases from companies like Callaway Golf, Titleist, Arnold Palmer Golf, and Golden Bear Golf. We do not believe that these negative news items should impact Adams Golf; in fact, we believe that on the contrary, the weak results of the other companies in the industry could actually improve the competitive scene for Adams Golf.

We have compiled a list of firms "comparable" to Adams Golf in Figure 20. However, we caution that there is still only one true publicly traded company comparable to Adams Golf and that is Callaway Golf. Unfortunately, the growth rates and product portfolios are so dramatically different for these companies that even this comparison is not completely accurate.

We have established a 12-month price target on the shares of Adams Golf of $23 per share.

We summarize our methodology as follows:

The current consensus estimate for Callaway Golf's earnings in 1999 is $1.14 per share (with a high estimate of $1.45 per share and a low estimate of $0.76 per share). Callaway has traded at an average multiple of 11.4 times the 1999 consensus estimate of $1.14 per share over the past 30 days. By simply applying this multiple to our Adams Golf 1999 estimate of $1.26 per share our target would be $14.36 per share or 117% upside.

The consensus long-term growth rate assumption for Callaway Golf is still a fairly aggressive 15% per annum. By applying Callaway's current 1999 P/E to its long-term growth rate, a 1999 PEG ratio can be calculated of 0.74. This compares with the current PEG ratio for Adams Golf of just 0.21 for 1999. If Adams Golf is simply assigned the same PEG ratio as its slow growth competitor (0.74 * 25% = 18 P/E on 1999 earnings) our target becomes – 18 * $1.26 per share or $23 per share (232% upside).

We believe that an argument can be made that Adams Golf should trade in line with other early stage golf companies like Cobra Golf and Callaway Golf in the first year after their IPOs, which averaged 22 times the forward earnings estimates of these companies. On this basis Adams Golf could trade as high as $28 per share in the next 12 months. However, given the increasingly competitive market for golf equipment, we believe that these multiples may never again be attainable and consequently we have elected to use the more conservative target of $23 per share.

20

ADAMS 004054

LEHMAN BROTHERS

Figure 15: Adams Golf, Inc.
**Income Statement, 1998E ($ Thousands)**

| | 3rd.Qtr | 4th.Qtr | 1998 |
|---|---|---|---|
| Product Sales | | | |
| Existing Products | $25,503 | $21,993 | $105,824 |
| New Products | 0 | 0 | $0 |
| Total Revenues | $25,503 | $21,993 | $105,824 |
| Costs of Goods Sold | | | |
| Existing Products | 7,377 | 6,452 | 27,533 |
| New Products | 0 | 0 | 0 |
| Gross Profit | $18,126 | $15,541 | $78,291 |
| Gross Margin | 71.1% | 70.7% | 74.0% |
| Research and Development | 408 | 308 | 1,380 |
| Selling Expense | 6,631 | 5,718 | 29,736 |
| General and Administrative | 3,315 | 3,079 | 13,417 |
| Operating Income (Loss) | $7,772 | $6,436 | $33,758 |
| Operating Margin | 30.5% | 29.3% | 31.9% |
| Interest Income/(Expense) | 708 | 648 | 1,357 |
| Other | 0 | 0 | (112) |
| Earnings Before Tax | $8,480 | $7,084 | $35,004 |
| Income Taxes | 3,231 | 2,699 | 13,124 |
| Tax Rate | 38.1% | 38.1% | 37.5% |
| Net Income (Loss) | $5,249 | $4,385 | $21,880 |
| Net Margin | 20.6% | 19.9% | 20.7% |
| Earnings (Loss) Per Share | $ 0.23 | $ 0.19 | $ 1.05 |
| Shares Outstanding (millions) | 22,849 | 23,364 | $20,906 |
| F'way Wood-US Wholesale | 140,240 | 121,038 | 603,080 |
| F'way Wood-US Direct Res | 15,794 | 14,215 | 63,328 |
| Fairway Wood Units - Int'l | 34,786 | 31,308 | 116,556 |

| | | | | |
|---|---|---|---|---|
| F'way Wood ASP - US Whol | $134.00 | $134.00 | $132.00 | $130.00 |
| F'way Wood ASP - US DR | $190.00 | $190.00 | $190.00 | $190.00 |
| Fairway Wood ASP - Int'l | $105.00 | $104.99 | $104.99 | $104.99 |

**1998 Model:** Our estimate for 1998 EPS is $1.05/share, which assumes that the second half of 1998 will be the company's first period of sequentially declining earnings since the introduction of the Tight Lies. We have assumed that the company experiences some limited pricing pressure in the back half of 1998 and that margins stabilize around 30% (on an operating basis).

**Domestic Wholesale Fairway Woods:** Revenues from this division will experience the most seasonality of any of the company's businesses. The weaker third and fourth quarters should combine with a tougher domestic pricing environment.

**Domestic Direct Response Fairway Woods:** Revenues from direct response should be little changed throughout the remainder of 1998. The impact of seasonal factors is less profound on this line of business.

**International Fairway Woods:** As the company is slowly rolling out its international distribution and because of the high levels of international demand, we do not expect international sales to show meaningful seasonality in the second half of 1998.

Source: Lehman Brothers and company reports.

21

ADAMS 004055

LEHMAN BROTHERS

Figure 16: Adams Golf, Inc.
Income Statement, 1999E ($ Thousands)

| Product Sales | 1st-Qtr | 2nd-Qtr | 3rd-Qtr | 4th-Qtr | 1999 |
|---|---|---|---|---|---|
| Existing Products | $32,274 | $39,309 | $32,881 | $28,830 | $133,294 |
| New Products | 5,033 | 6,823 | 9,955 | 10,514 | $32,325 |
| Total Revenues | $37,307 | $46,132 | $42,836 | $39,344 | $165,618 |
| Costs of Goods Sold | | | | | |
| Existing Products | 9,605 | 11,488 | 9,875 | 8,719 | 39,687 |
| New Products | 1,575 | 2,135 | 3,116 | 3,291 | 10,117 |
| Gross Profit | $26,126 | $32,508 | $29,846 | $27,334 | $115,815 |
| Gross Margin | 70.0% | 70.5% | 69.7% | 69.5% | 69.9% |
| Research and Development | 746 | 923 | 878 | 787 | 3,333 |
| Selling Expense | 9,793 | 12,340 | 11,566 | 10,780 | 44,479 |
| General and Administrative | 5,036 | 5,813 | 5,612 | 5,193 | 21,654 |
| Operating Income (Loss) | $10,551 | $13,433 | $11,791 | $10,573 | $46,348 |
| Operating Margin | 28.3% | 29.1% | 27.5% | 26.9% | 28.0% |
| Interest Income/(Expense) | 549 | 436 | 410 | 396 | 1,791 |
| Other | 0 | 0 | 0 | 0 | 0 |
| Earnings Before Tax | $11,099 | $13,869 | $12,201 | $10,970 | $48,139 |
| Income Taxes | 4,218 | 5,270 | 4,636 | 4,169 | 18,293 |
| Tax Rate | 38.0% | 38.0% | 38.0% | 38.0% | 38.0% |
| Net Income (Loss) | $6,882 | $8,599 | $7,564 | $6,801 | $29,846 |
| Net Margin | 18.4% | 18.6% | 17.7% | 17.3% | 18.0% |
| Earnings (Loss) Per Share | $ 0.29 | $ 0.36 | $ 0.32 | $ 0.29 | $ 1.26 |
| Shares Outstanding (millions) | 23,480 | 23,596 | 23,713 | 23,831 | 23,655 |
| F'way Wood-US Wholesale | 176,136 | 213,001 | 174,707 | 149,680 | 713,524 |
| F'way Wood-US Direct Res | 17,684 | 20,337 | 18,303 | 16,473 | 72,797 |
| Fairway Wood Units - Int'l | 51,962 | 70,149 | 63,134 | 59,977 | 245,221 |
| Driver Units | 22,500 | 30,500 | 44,500 | 47,000 | 144,500 |
| F'way Wood ASP - US Whol | $130.00 | $129.00 | $127.00 | $126.00 | |
| F'way Wood ASP - US DR | $190.00 | $190.00 | $190.00 | $190.00 | |
| Fairway Wood ASP - Int'l | $105.00 | $105.00 | $105.00 | $105.00 | |
| Driver ASP | $223.70 | $223.70 | $223.70 | $223.70 | |

1999 Model: Our estimate for 1999 EPS is $1.26/share, which would represent 20% EPS growth over 1998's results. The improvement will be driven by maintenance of a stable share of the expanding domestic fairway wood market, expansion of international sales and the introduction of a driver in 1999.

Domestic Wholesale Fairway Woods: Revenues from this division will be driven by an 18% increase in unit sales, offset partially by the 3.5% decline of average selling prices. We have forecast that the fairway wood market will grow at 15% for the next 2-3 years and that Adams will secure a larger piece of this market.

Domestic Direct Response Fairway Woods: Revenues from direct response advertising should track the growth of the market at 15% in 1999.

International Fairway Woods: Revenues from international operations are expected to double in 1999 as a result of the company's push into European and North American markets.

Driver: Revenues from the company's driver (expected to be introduced in early 1999) are expected to ramp steadily throughout the year as demand spikes for this new product.

Source: Lehman Brothers.

22

ADAMS 004056

LEHMAN BROTHERS

Figure 17: Adams Golf, Inc.
**Income Statement, 1995-2001E ($ Thousands)**

| | 1995 | 1996 | 1997 | | | | | | 98 - 02 4 YR CAGR |
|---|---|---|---|---|---|---|---|---|---|
| *Share of Fairway Woods* | | | | 12.1% | 13.8% | 15.0% | 16.6% | 18.8% | |
| (Global) Fairway Woods Mkt | $758.333 | $875.000 | $962.500 | $1.034.688 | $1.086.422 | $1.113.582 | | | |
| | | | | | | | | | |
| *Share of Drivers* | | | | 0.0% | 7.9% | 6.1% | 9.9% | 13.9% | |
| Domestic Driver Mkt | | | $915.981 | $961.780 | $1.106.047 | $1.271.954 | $1.367.350 | $1.401.534 | |
| **Product Sales** | | | | | | | | | |
| Existing Products | $1.125 | $3.522 | $36.690 | | | | | | 19% |
| New Products | 0 | 0 | 0 | | | | | | NA |
| **Total Revenues** | $1.125 | $3.522 | $36.690 | | | | | | 44% |
| *Costs of Goods Sold* | | | | | | | | | |
| Existing Products | 756 | 1.590 | 9.992 | | | | | | |
| New Products | 0 | 0 | 0 | | | | | | |
| **Gross Profit** | $369 | $1.932 | $26.698 | | | | | | 40% |
| *Gross Margin* | 32.8% | 54.9% | 72.8% | | | | | | |
| | | | | | | | | | |
| Research and Development | 19 | 51 | 558 | | | | | | |
| Selling Expense | 313 | 626 | 13.093 | | | | | | |
| General and Administrative | 281 | 1.246 | 17.017 | | | | | | |
| **Operating Income (Loss)** | ($244) | $9 | ($3.969) | | | | | | 34% |
| *Operating Margin* | -21.7% | 0.3% | -10.8% | | | | | | |
| Interest Income/(Expense) | $1 | $4 | ($54) | | | | | | |
| Other | 0 | 0 | ($48) | | | | | | |
| | | | | | | | | | |
| **Earnings Before Tax** | ($243) | $13 | ($4.071) | | | | | | 33% |
| Income Taxes | 0 | 0 | 583 | | | | | | |
| *Tax Rate* | 0.0% | 0.0% | -14.3% | | | | | | |
| **Net Income (Loss)** | ($243) | $13 | ($4.655) | | | | | | 33% |
| *Net Margin* | 0.0% | 0.0% | -12.7% | | | | | | |
| | | | | | | | | | |
| **Earnings (Loss) Per Share** | ($0.05) | $0.00 | ($0.37) | | | | | | 27% |
| Shares Outstanding (millions) | 4.423 | 11.238 | 12.519 | | | | | | |
| | | | | | | | | | |
| Research and Development | 1.6% | 1.5% | 1.5% | | | | | | |
| Selling Expense | 27.8% | 17.8% | 35.7% | | | | | | |
| General and Administrative | 25.0% | 35.4% | 46.4% | | | | | | |
| | | | | | | | | | |
| F'way Wood-US Wholesale | | | 603.080 | 713.524 | 798.131 | 892.105 | 1.014.026 | | |
| F'way Wood-US Direct Res | | | 63.328 | 72.797 | 76.437 | 80.259 | 78.252 | | |
| Fairway Wood Units - Int'l | | | 116.556 | 245.221 | 355.571 | 490.688 | 672.242 | | |
| Driver Units | | | 0 | 144.500 | 361.250 | 632.188 | 948.281 | | |
| Iron Sets | | | 0 | 0 | 18.000 | 45.000 | 75.600 | | |
| | | | | | | | | | |
| F'way Wood ASP - US Whol | | | $132.73 | $128.13 | $126.00 | $124.00 | $120.60 | | |
| F'way Wood ASP - US DR | | | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 | | |
| Fairway Wood ASP - Int'l | | | $104.59 | $105.00 | $105.00 | $105.00 | $105.00 | | |
| Driver ASP | | | | $223.70 | $214.20 | $214.20 | $204.70 | | |
| Irons ASP | | | | $704.56 | $675.67 | $656.78 | | | |

Source: Lehman Brothers and company reports.

23

ADAMS 004057

# LEHMAN BROTHERS

**Figure 18: Adams Golf, Inc.**
**Balance Sheet**

| | 1996 | 1997 | 1998E | 1999E | 2000E | 2001E | 2002E |
|---|---|---|---|---|---|---|---|
| Current Assets: | | | | | | | |
| Cash and Equivalents | $855 | $1,956 | $54,000 | $53,330 | $49,530 | $45,730 | $41,930 |
| Trade Receivables | 524 | 8,369 | 28,123 | 43,106 | 61,726 | 85,251 | 111,836 |
| Less: Allow. for Doubtful Accts | 26 | 698 | 1,678 | 2,506 | 3,730 | 5,113 | 6,701 |
| Trade Receivables, net | 498 | 7,671 | 26,445 | 40,600 | 57,995 | 80,137 | 105,135 |
| Inventories | 675 | 4,487 | 9,052 | 16,101 | 24,672 | 36,006 | 48,128 |
| Other | 28 | 1,832 | 2,216 | 2,756 | 2,798 | 2,840 | 2,882 |
| Total Current Assets | $2,055 | $15,950 | $92,213 | $112,788 | $134,995 | $164,713 | $198,075 |
| | | | | | | | |
| Property and Equipment | $124 | $604 | $9,935 | $16,340 | $16,941 | $16,966 | $16,172 |
| Deferred Taxes | 0 | 183 | 0 | 0 | 18,000 | 46,000 | 87,200 |
| Intangible Assets | 268 | 233 | 8,961 | 7,966 | 6,971 | 5,976 | 4,981 |
| Other Assets | 112 | 390 | 777 | 785 | 793 | 801 | 809 |
| Total Assets | $2,559 | $17,360 | $111,887 | $137,879 | $177,701 | $234,457 | $307,238 |
| | | | | | | | |
| Current Liabilities | | | | | | | |
| Notes Payable | $230 | $0 | $0 | $0 | $0 | $0 | $0 |
| Accounts Payable | 18 | 378 | 4,903 | 7,095 | 10,727 | 14,716 | 18,833 |
| Taxes Payable | 0 | 1,021 | 1,041 | 1,062 | 1,083 | 1,105 | 1,127 |
| Accrued Expenses | 332 | 7,636 | 9,630 | 3,563 | 620 | 104 | - 115 |
| Total Current Liabilities | $580 | $9,035 | $15,575 | $11,720 | $12,431 | $15,925 | $20,075 |
| | | | | | | | |
| Stockholder's Equity | | | | | | | |
| Common Stock | 12 | 16 | 23 | 24 | 24 | 24 | 25 |
| Additional Paid-In Capital | 3,126 | 14,123 | 80,223 | 80,223 | 80,223 | 80,223 | 80,223 |
| Retained Earnings | (1,160) | (5,814) | 16,066 | 45,912 | 85,023 | 138,284 | 206,915 |
| Total Stockholders' Equity | $1,978 | $8,325 | $96,312 | $126,159 | $165,270 | $218,531 | $287,163 |
| | | | | | | | |
| Total Liabilities & Stockholders' Equity | $2,559 | $17,360 | $111,887 | $137,879 | $177,701 | $234,457 | $307,238 |
| | | | | | | | |
| Financial Returns | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net Profit Margin | 0.0% | -12.7% | 20.7% | 18.0% | 16.0% | 15.4% | 15.1% |
| x Avg. Asset Turnover | 1.4 | 3.7 | 1.3 | 1.3 | 1.6 | 1.7 | 1.7 |
| x Avg. Financial Leverage | 1.3 | 1.9 | 1.2 | 1.1 | 1.1 | 1.1 | 1.1 |
| = Return on Equity | 0.00% | NM | 41.82% | 26.83% | 26.84% | 27.75% | 27.14% |

Source: Lehman Brothers and company reports.

24

ADAMS 004058

LEHMAN BROTHERS

**Figure 19: Adams Golf, Inc.**
**Club Units and Pricing**

| | | 1st Qtr 1998 | 2nd Qtr 1998 | 3rd Qtr 1998 | 4th Qtr 1998 | Year-End 1998 | 1st Qtr 1999 | 2nd Qtr 1999 | 3rd Qtr 1999 | 4th Qtr 1999 | Year-End 1999 | Year-End 2000 | Year-End 2001 | Year-End 2002 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fairway Woods | Units - US Wholesale | 148,590 | 193,212 | 140,240 | 121,038 | 600,080 | 176,136 | 213,001 | 174,707 | 149,680 | 713,524 | 798,131 | 892,105 | 1,014,016 |
| | Units - US Direct Response | 14,737 | 18,582 | 15,794 | 14,215 | 63,328 | 17,684 | 20,337 | 18,303 | 16,473 | 72,797 | 87,356 | 100,460 | 115,529 |
| | Units - International | 11,810 | 38,653 | 34,786 | 31,308 | 116,556 | 51,062 | 70,149 | 63,134 | 59,977 | 245,221 | 355,571 | 490,088 | 672,242 |
| | Units - US Wholesale ASP | $134.00 | $134.00 | $132.00 | $130.00 | $132.73 | $130.00 | $129.00 | $127.00 | $126.00 | $128.13 | $126.00 | $124.00 | $120.00 |
| | Units - US Direct Re: ASP | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 | $190.00 |
| | Units - International ASP | $105.00 | $104.99 | $104.99 | $104.99 | $104.99 | $105.00 | $105.00 | $105.00 | $105.00 | $105.00 | $105.00 | $105.00 | $105.00 |
| Drivers | Units | N/A | N/A | N/A | N/A | N/A | 22,500 | 30,500 | 44,500 | 47,000 | 144,590 | 361,250 | 631,188 | 948,281 |
| | ASP | N/A | N/A | N/A | N/A | N/A | $223.70 | $223.70 | $223.70 | $223.70 | $223.70 | $223.70 | $214.20 | $204.70 |

Source: Lehman Brothers.

**Figure 20: Adams Golf, Inc.**
**Price Chart**



Source: Baseline Financial Services and Lehman Brothers.

25

ADAMS 004059

# LEHMAN BROTHERS

Figure 21: Adams Golf, Inc.
Comparable Companies

| Company | Niche | Market Capitalization | Price 8/24/98 | 1-Yr Price Change | EPS 1998E | EPS 1999E | P/E 1998E | P/E 1999E | LT-Growth Rate | 1998 P/E to Gr. Rate | 1999 P/E to Gr. Rate | Firm Value/ EBITDA | Gross Margin | Operating Margin | Net Margin |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Valuation | | | | Profitability | |
| Galloway Golf Company | Premium Golf Equipment Mfg. | $922 | 12 5/16 | -54.3% | $0.46 | $1.14 | 26.8 | 10.8 | 14.5% | 185% | 74% | 4.6 | 53.2% | 28.8% | 19.5% |
| **Firms with Golf Subsidiaries** | | | | | | | | | | | | | | | |
| Adidas-Salomon AG | Owns Taylor Made Golf, Ski Eq., Apparel | $5,646 | 62 1/4 | -1.4% | $3.02 | $3.63 | 20.6 | 16.3 | 26.8% | 77% | 81% | NA | NA | NA | NA |
| Fortune Brands | Consumer Goods, Titleist/Cobra/FootJoy | $8,677 | 32 13/16 | -6.3% | $1.68 | $1.91 | 19.5 | 17.2 | 14.0% | 140% | 123% | 5.7 | 47.9% | 13.5% | 7.2% |
| Average | | $3,774 | | -4.2% | | | 20.1 | 16.7 | 20.4% | 108% | 92% | | | | |
| **Hard and Soft-Goods Makers** | | | | | | | | | | | | | | | |
| Ashworth, Inc. | Premium Golf Apparel | $104 | 8 15/16 | -31.1% | $0.58 | NA | 12.4 | NA | 35.0% | 35% | NM | 6.5 | 42.5% | 19.7% | 11.5% |
| Cutter & Buck, Inc. | Premium Golf Apparel | $139 | 26 3/4 | 42.8% | $1.15 | $1.64 | 20.3 | NA | 30.0% | 78% | NM | 14.2 | 45.0% | 19.1% | 13.0% |
| K2, Inc. | Ski Equipment, Recreational Eqvp. | $308 | 19 1/8 | -40.1% | $1.44 | $1.64 | 12.6 | 11.1 | 12.0% | 100% | 92% | 7.1 | 30.8% | 8.4% | 4.5% |
| Nike, Inc. | Recreational Equipment, Athletic Apparel | $11,322 | 39 5/16 | -29.2% | $1.03 | NA | 38.2 | NA | 15.0% | 254% | NM | 12.7 | 32.5% | 1.1% | -2.9% |
| The Northface Company, Inc. ** | Athletic Apparel | $173 | 14 7/16 | -33.2% | $1.13 | $1.50 | 12.8 | 9.6 | 25.0% | 51% | NM | 6.3 | 42.0% | -5.8% | -8.5% |
| Columbia Sportswear ** | Athletic Apparel | $388 | 15 1/2 | -13.5% | $1.13 | $1.33 | 13.7 | 11.7 | 18.0% | 78% | 65% | NM | 43.5% | -1.7% | -2.6% |
| Average | | $2,072 | | -17.8% | | | 18.8 | 10.8 | 22.5% | 100% | 85% | 65% | | | |

* Lehman Estimates
** The percentage price change for Adams Golf and Columbia Sportswear are since their 1998 IPO's
Source: Lehman Brothers and Baseline Financial Services.

26

ADAMS 004060

LEHMAN BROTHERS

**APPENDIX 1: PRO SHOP SURVEY**

We have spoken with a number of leading on- and off-course golf shops in the U.S. over the past three months and have arrived at some conclusions about the fairway woods marketplace.

### Adams Golf

Sales of the Tight Lies this summer have been characterized as "steady" and "strong." We are encouraged by the strong retail sell-through that the company continues to achieve. Our checks with retailers have indicated that the Tight Lies continue to be a top selling product. Although returns are historically lower at the retail level than through direct response, we would note that many retailers we spoke with indicated that returns for Adams clubs tend to be much lower than average.

#### Margins/Pricing

One concern that we should report is that Adams Tight Lies are appearing in Costco Wholesale stores with increasing regularity. Adams has filed a suit of discovery against Costco to determine how Costco — an unauthorized retailer — has secured this inventory. One retailer in particular indicated that "*Costco is flooding the market with Adams clubs at $149*" (versus an average wholesale price of $144) — a trend that we have seen in a few markets. Although, this is an extremely serious issue that Adams is working hard to correct, we think investors should note that Costco is also selling popular clubs from Callaway and Taylor Made.

### Orlimar Golf

Orlimar Golf's Tri-Metal woods continue to sell through the retail market well. Retailers indicated that the marketplace is becoming more aware of the relative benefits of the Orlimar clubs (principally designed for better golfers) and thus returns have slowed (down from high double digits to roughly 10%). An interesting note for investors is the issue of retailer margins provided by the Orlimar clubs. Orlimar's Tri-Metal woods currently retail for roughly $269 per club and the standard wholesale rate for an Orlimar club, we estimate, is roughly $230 per club or a $40 profit (15% margin) on the clubs. Below we compare retail prices, wholesale prices and margins for Orlimar and Adams products.

Figure 22: Adams Golf, Inc.
**Average Retail, Wholesale and Margin Comparison**

| Company | Avg. Retail Price | Avg. Wholesale Price | Margin |
|---|---|---|---|
| Adams Golf – *Tight Lies* | $199 | $144 | 27.6% |
| Orlimar Golf – *Tri-Metal* | $269 | $230 | 14.9% |

Source: Lehman Brothers.

However, certain larger customers of Orlimar Golf indicated to us that they are offered a quarterly "rebate" by Orlimar that can lower the average cost per club by as much $100 per club. At a "modified" wholesale price (after rebate) of $130 per club a large customer's margin can grow to $149 per club or 53% — which is dramatically higher than its competitors. We view the Orlimar margin difference as a critical point for investors. We believe that rebates are offered to only the largest customers of Orlimar and as such, many average retailers do not realize a meaningful margin benefit with the Orlimar product.

27

ADAMS 004061

LEHMAN BROTHERS

### *Callaway Golf*

Finally, on Callaway's new fairway wood product, the Big Bertha Steelhead, our retailer checks indicate that these clubs have been selling very briskly in the weeks since its August 12 introduction. We believe that it is too early in the sales cycle of this new product to make definitive observations on the long-term success of the Big Bertha Steelhead, but we will watch the market's long-term response to this product closely.

ADAMS 004062

LEHMAN BROTHERS

**APPENDIX 2:**
**GLOSSARY OF GOLF**
**TERMS**

| | |
|---|---|
| **Address** | The process a player goes through in positioning his/her body and the club prior to taking a stroke. |
| **Center of Gravity** | The point on a club where the upper mass, lower mass, right and left sides all balance. |
| **Divot** | A piece of turf displaced by a golf club. Reflects a correctly descending swing when taken in front of the ball and is the effect of most good iron shots. |
| **Fairway Wood** | A club designed for hitting a golf ball off the fairway. Distance varies according to the swing speed of the golfer and the club design but, in general, fairway woods fly 170-225 yards in the air. |
| **Fluffy Lie** | A ball resting on top of long grass presenting the potential for the clubface to slide under the ball, resulting in little impact and reduced distance. |
| **Graphite** | A synthetic material that is used to make carbon/graphite filaments. Graphite shafts are much lighter than steel and can thus be swung faster to create more clubhead velocity and, in turn, greater distance. |
| **Hosel** | The neck of a club into which the shaft fits. |
| **Lie (of the Ball)** | The position of the ball after it has come to rest. |
| **Lie (of the Club)** | The angle the shaft makes with the clubhead as measured from the center of the shaft to a line extending tangentially from the lowest point on the sole. |
| **Loft** | The degree of the pitch angle built into the clubface. Short irons (numbers 7-9) have more loft than long irons (numbers 3-5). |
| **Sky/Balloon** | To hit under the ball on the upper part of the clubface, sending the ball high and a short distance. |

Sources: Lehman Brothers, The PGA, and iGOLF's "Glossary of Equipment Terms."

29

ADAMS 004063

LEHMAN BROTHERS

30

ADAMS 004064

LEHMAN BROTHERS

31

ADAMS 004065

# GLOBAL EQUITY RESEARCH

New York (1) 212 526-3070    London (44) 171 601-0011-5524    Tokyo (81) 3 5571-7462    Hong Kong (852) 2869-3189

## CONGLOMERATES & DIVERSIFIED

### AMERICAS

**BUSINESS SERVICES**
Jeffrey T. Kessler          (1) 212 526-5162

**MULTI-INDUSTRY**
Phua K. Young              (1) 212 526-2805

**SELECTED GROWTH STOCKS**
Bernard J. Picchi          (1) 212 526-5344
Monica Logani              (1) 212 526-5996
Sean Kraus                 (1) 212 526-3896

### EUROPE

**SELECTED GROWTH STOCKS**
Ann Popelka                (44) 171 260-3027
Markus Reichle             (44) 171 260-2849

### ASIA

**CONGLOMERATES**
Christopher Alexander      (852) 2869-3100
Philip Tulk                (852) 2869-3890

**TRADING COMPANIES**
Nozomu Kunishige           (81) 3 5571-7482

For additional copies of Lehman Brothers research reports, call (201) 963-0572 or fax (201) 216-0705.

Lehman Brothers, Inc. has managed or co-managed within the past three years a public offering of the securities of Adams Golf, Inc.

Lehman Brothers, Inc. makes a market in the securities of Adams Golf, Inc.

Any OTC security mentioned herein may not be blue skied in all states; brokers should check the FCI system or call the Blue Sky department before placing any order.

Key to Investment Rankings:  This is a guide to expected total return (price performance plus dividend) relative to the total return of the stock's local market over the next 12 months.  *1 = Buy* (expected to outperform the market by 15 or more percentage points); *2 = Outperform* (expected to outperform the market by 5-15 percentage points); *3 = Neutral* (expected to perform in line with the market, plus or minus 5 percentage points); *4 = Underperform* (expected to underperform the market by 5-15 percentage points); *5 = Sell* (expected to underperform the market by 15 or more percentage points); *V = Venture* (return over multiyear time frame consistent with venture capital; should only be held in a well-diversified portfolio).

No part of this report may be reproduced in any manner without the written permission of Lehman Brothers Inc.  We do not represent that this information is complete or accurate and it should not be relied upon as such.  All opinions expressed herein are subject to change without notice.  Lehman Brothers Inc., its affiliated companies, or their respective shareholders, directors, officers and/or employees, may have long or short positions in the securities discussed herein.  The securities mentioned in this document may not be eligible for sale in some states or countries, nor suitable for all types of investors; their value and the income they produce may fluctuate and/or be adversely affected by exchange rates, interest rates or other factors. ©1998 Lehman Brothers Inc.  All rights reserved. Member SIPC.

US98-1369

ADAMS 004066