A. 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

IN RE ADAMS GOLF, INC. : CONSOLIDATED
:
SECURITIES LITIGATION : C.A. No. 99-371 KAJ

------------------------
Friday, June 9, 2006
------------------------

Oral deposition of BERNARD PICCHI, taken pursuant to notice, was held at the offices of SIMPSON, THACHER, AND BARTLETT, LLP, 425 Lexington Avenue, 29th Floor, New York, New York 10017, commencing at 10:04 a.m., on the above date, before Beth A. Barkocy, Certified Shorthand Reporter and Notary Public.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
(215)241-1000 (888)777-6690

Q. Was it your practice to make notes at organizational meetings?

MR. McEVOY: I object to the form. You can answer.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. To the best of your knowledge, did you make notes at the Adams Golf organizational meeting?

A. To the best of my recollection, I did, yes, as I do, usually, at almost every meeting I attend with management, whether it's related to financing or just a straight research meeting.

Q. What did you typically do with your notes of organizational meetings?

A. I typically would retain the notes for a period of time and then occasionally, as we all do, once every two years, three years, do a little housecleaning and simply purge things that seem to be no longer needed on a day-to-day basis. I have nothing; I have no notes from those meetings.

Q. To the best of your recollection, how long would your notes from the organizational meeting have been retained?

MR. McEVOY: Are we talking

generally now or in relation to Adams Golf?

BY MR. LEWIS:

Q. In relation to Adams Golf, to the best of your knowledge, how long would it have been before you purged your notes from the March 1998 organizational meeting of Adams?

A. I really don't recall; I really don't know when I would have purged those notes. I don't know.

Q. To the best of your knowledge, did they still exist by the year -- by the time you left Lehman Brothers?

A. No, they did not, to the best of my knowledge. When I left Lehman Brothers, I discarded virtually all of my files, all of my old reports.

Q. When in '99 did you leave Lehman?

A. I left in -- I want to say it was either late August or early September of 1999.

Q. To the best of your knowledge, did your notes regarding the Adams organizational meeting exist through June of 1999?

A. I don't recall.

Q. Were you personally involved in the drafting of the registration statement for the Adams offering?

A. Personally involved?

Q. Yes.

A. I reviewed it, I looked at it, but I didn't personally draft it, no.

Q. Did you attend drafting sessions?

A. No, never attended drafting sessions.

Q. At what point in the process did you look at the registration statement?

A. (No response.)

Q. Let me make it easier. There came a time that an initial registration statement was filed with the Securities and Exchange Commission. Did you review the registration statement before it was filed with the Securities and Exchange Commission?

A. I don't recall; I don't remember.

Q. Did you typically do that in your work at Lehman, that is, look at registration statements before they were filed with the SEC?

A. I don't believe I did, no. There may have -- maybe just to help you and clarify even my thinking on the issue, I think if there were any business description issues, for example, not the financials or anything of a technical nature, I might have occasionally been involved in the review of

something before it was submitted, but that would have been very rare. That wasn't very typical. Analysts usually are not involved in drafting sessions or reviews of the filings of the S-ones.

Q. You don't recall departing from that practice in the Adams offering?

A. I don't.

Q. Between the time of the organizational meeting and the time that the registration statement was first filed with the SEC, what, if any, contacts did you personally have with Adams management?

A. I don't recall that; I don't recall.

Q. You don't recall any or you don't recall whether you had any? There's a slight difference.

MR. McEVOY: To the best of your recollection, do you recall meeting, if you can answer.

THE WITNESS: It was ten years ago. I honestly don't recall. I may have or I may not have. I just honestly don't remember.

BY MR. LEWIS:

Q. In your typical practice, between the time that there was an organizational meeting and

Page 30

not. I can't recall that.
Q. You know Stuart Francis?
A. Yes, I know Stu Francis.
Q. You know Olga Pulido-Crowe?
A. I know who she is; I know the name. I don't think I'd recognize her if she walked in the room.
Q. Did you have any personal dealings with them with respect to the Adams offering?
MR. McEVOY: I'm sorry. Personal dealings?
THE WITNESS: Yes, what does that mean?
BY MR. LEWIS:
Q. Phone calls, correspondence, meetings, any personal interaction.
A. To my knowledge, I honestly don't recall; I really don't remember.
Q. Do you recall ever discussing gray marketing or unauthorized distribution of Adams products with either of them?
A. No; no, I do not.
Q. Prior to the IPO becoming final, did you keep a file on Adams?
A. I believe I did, but I don't know

Page 31

that for a fact. I think so.
Q. What, typically, did you place in a file on a company that was about to be underwritten by Lehman?
MR. McEVOY: We're talking generally now?
MR. LEWIS: Right.
THE WITNESS: Generally, I would think just about anything I would think was particularly relevant to the valuation of the security, as well as any sort of historical documents. Things of this sort and so forth would go into that file, certainly (indicating).
BY MR. LEWIS:
Q. In those days, did you use a computer for your work?
A. Yes.
Q. Did you keep notes in computer format?
A. Can you clarify what you mean by notes exactly?
Q. If you had a telephone call and obtained a piece of information that you thought was of significance, would you enter it on a yellow

Page 32

scratch pad like I do or would you dictate it to a secretary or would you enter it into a computer database or something else?
A. Probably would write it out longhand. I usually use the computer for just two things, usually, and that's for doing Excel spreadsheets and also for company reports, reports I'll actually publish, so I'll use the word documents. I don't use the computer for notes, usually.
Q. As you took notes on Adams, did you keep them in a master file that you kept at your desk or accessible?
MR. McEVOY: To the extent you recall taking notes, to make sure we know what we're talking about.
THE WITNESS: Probably. I don't know that I would have actually put it in the Adams Golf file. Typically what I do, have been doing for decades, is taking notes and putting them into a ledger-like book, but when I left Lehman Brothers, I threw out all my ledgers.
Even if I had the ledgers, quite frankly -- I offer this gratuitously -- you wouldn't be able to read them. I don't think

Page 33

I'd be able to read them. I'm not exactly the neatest writer.
Usually, at the time, at least up to, say, several days after I write my notes, I'm able to recall, and if they are particularly important, I'll go back and rewrite the notes, take something illegible and make it legible. I don't recall in the case of Adams having done that. The notes are not there.
BY MR. LEWIS:
Q. To the best of your knowledge, at some point, you had such a ledger for Adams?
MR. McEVOY: If you recall.
THE WITNESS: I don't recall; I really don't recall.
BY MR. LEWIS:
Q. It was your usual practice to have such a notebook?
A. Typical practice, yeah.
Q. At or about the time you left Lehman, did you get rid of a bunch of notebooks at the same time?
MR. McEVOY: Object to a bunch of.
BY MR. LEWIS:

A. Not to my recollection, no.
Q. Let me show you what has previously been marked as 248 (indicating).
MR. McEVOY: Is there a question?
THE WITNESS: I want to finish reading it.
Okay.
BY MR. LEWIS:
Q. Mr. Picchi, did you send the e-mail to Tim Gamso that appears on Page 8507?
A. Yes, I believe I did.
Q. You sent that on November 2nd of 1998?
A. Yes, sir.
Q. Who was Tim Gamso?
A. I don't know Tim Gamso. I was struggling to try to remember who Tim Gamso was, or is, and I don't even know who he is. I don't know that -- it looks like an internal memo, but I honestly don't even recall the name Tim Gamso, let alone what his function and responsibility was at Lehman.
MR. McEVOY: Do you want to make a representation who Tim was in the hope it will refresh his memory?
MR. LEWIS: I'm forgetting the exact title and I don't want to put a bad title on it.

BY MR. LEWIS:
Q. Do you recall a Mr. Gamso who was located in Texas for Lehman who was involved in relations with the client, client services?
A. Sir, I do not; no.
Q. Do you recall the subject matter of your e-mail to Mr. Gamso?
A. Very vaguely.
Q. What do you recall about it?
A. What I recollect in looking this over is that some of the large buyers and holders of the stock were very upset with the performance of the stock and felt that they really wanted to hear directly from the company on a one-on-one basis as to the reasons for the weakness and what the company's program was for fixing that. That's what it was all about, I think.
Q. What happened in response to the expressed desire of these entities to meet one-on-one with the company?
A. I don't recall what happened; I don't remember what happened.
Q. Do you recall that Scudder Stevens was among the institutions that was upset at the price performance?

A. Yes, I do remember that.
Q. Did you have discussions with Roy McKay about that?
A. I didn't personally have any discussions with Roy McKay about it.
Q. Did you learn of the upset of Scudder Stevens through Mr. Smith or Mr. Paley?
A. Yes, I believe that that's correct. I think I did hear about Scudder Stevens' upset through them, I think.
Q. Both of them or was it one or the other?
A. I don't remember.
Q. Did you hear from them that Scudder Stevens was upset with not only Adams but with Lehman?
A. My recollection is that that's correct, yes.
Q. What, as best you recall, were they upset with Lehman about?
A. Well, the specific reason is just the poor performance of the stock price. I don't know that it's really any more complicated than that.
Q. By the time you learned of Scudder Stevens being upset, had you discussed with anyone other than an attorney the possibility that someone might sue about the Adams Golf?

A. No, sir, I did not.
Q. Did Scudder Stevens say anything about litigation, to your knowledge?
A. I never talked to Scudder Stevens directly.
Q. Did you hear anything said about the possibility of litigation from Scudder Stevens?
A. I don't recall that, sir.
Q. Let me show you what I've marked as Exhibit-249 (indicating). Mr. Picchi, does this document contain a First Call recommendation that you made lowering the price target on Adams Golf on November 6, 1998?
A. Yes.
Q. What caused you to issue this lowering of the 1999 estimates?
A. Sir, I don't recall what precipitated this.
Q. The first starred item on the second page of the exhibit refers to our latest review of the golf equipment market and our discussion with -- discussions with retailers, manufacturers, and

A. 4

# LEHMAN BROTHERS

## RECORDS MANAGEMENT PROGRAM

August 1998

LEHMAN BROTHERS
RECORDS MANAGEMENT SERVICES

| | |
|---|---|
| Frank Girello, Records Specialist | 212-526-4228 |
| Tracey Dolinski, Records Specialist | 212-526-3301 |
| Stanley Holmes, Records Specialist | 212-526-2595 |
| Peter Tsigakos, Records Specialist | 212-526-2684 |
| Kathleen Muldowney, Records Specialist | 212-526-2682 |
| Jim Holderman, Records Manager | 212-526-4614 |
| Fax (15th floor) | 212-528-7480 |
| Legal File Room | 212-526-2682 |

TABLE OF CONTENTS

| | |
|---|---|
| Records Management Program | 1 |
| Records Retention Committee | 1 |
| Policy Statement | 1 |
| Managers & Representatives | 2 |
| Records Retention Schedules | 3 |
| Shearson Schedules & Lehman Brothers Records | 4 |
| New Or Revised Lehman Brothers Schedules | 5 |
| What You Need To Remember About Schedules | 5 |
| Control Over Access To Records | 5 |
| Smith Barney Shearson Access To Lehman Brothers Records | 6 |
| Lehman Brothers Access To Smith Barney Shearson Records | 6 |
| Destruction Of Records | 7 |
| How To Ship Records To Storage | 7 |
| Review Your Retention Schedule | 8 |
| Obtain Boxes | 8 |
| Pack The Boxes | 8 |
| Obtain Bar-code Labels | 8 |
| Mark The Boxes | 9 |
| Records Transfer Memorandum (RTM) | 9 |
| Send RTM To Records Manager | 9 |
| How To Borrow Records From Storage | 11 |
| How To Return Borrowed Records | 12 |
| | 13 |

DISPLAYS

| | |
|---|---|
| Records Management Program | |
| Policy Statement | A |
| Managers & Representatives | B |
| Records Retention Schedule | C |
| Shipping Records To Storage | D |
| Records Transfer Memorandum (RTM) Coded for Explanation | E |
| Records Transfer Memorandum (RTM) Example for New Boxes | F |
| Request For Stored Records Example | G |
| Records Refile Form Example For Returned Boxes | H |
| | I |

## RECORDS MANAGEMENT PROGRAM

The Lehman Brothers Records Management Program has the following mission and functions.

- Our mission is to build and maintain the corporate memory of Lehman Brothers.
- We prepare records retention schedules for approval by the Lehman Records Management Committee (LRMC).
- We maintain a database of records in storage, including Shearson records.
- We monitor shipments of records to storage and retrievals of records from storage.
- We assist compliance and legal and all staff in record searches.
- We provide records management consulting services for Lehman Brothers departments.

## RECORDS RETENTION COMMITTEE

This committee provides guidance and direction to ensure that the records retained in our corporate memory satisfy business, compliance, legal and tax needs.

| | |
|---|---|
| Rich Willner | Chair |
| Kathryn Reimann | Compliance Member |
| Michael Hogan | Legal Member |
| Tom Hommel | Legal Member |
| Joe Polizotto | Legal Member |
| Bob Kunz | Tax Member |
| Anthony Taranto | Tax Member |
| Jim Holderman | Secretary |

The committee has issued the following statement of policy.

# POLICY STATEMENT

**1. Program Objectives.** Records shall be retained for as long as needed for Lehman Brothers business, or longer if needed for compliance, legal, tax or historical reasons. When these needs have been met, the records shall be promptly and properly destroyed.

**2. Definition Of Records.** Records include all paper, microfilm and microfiche, computer files or other information media created or received by Lehman Brothers or any of its parts.

**3. Ownership Of Records.** All records are the property of Lehman Brothers and do not belong to departments or individuals.

**4. Retention Of Records.** Lehman Brothers decides how long to retain its records, where to retain them and when to destroy them.

**5. Records Retention Committee.** Lehman Brothers has appointed this Committee to make final decisions on records retention policy & procedures. Staff work of the Committee is done by Records Management Services.

**6. Records Retention Schedules.** The Committee publishes its decisions as Records Retention Schedules. These schedules are part of a Records Retention Manual that also contains policies and procedures approved by the Committee.

**7. Retention Schedule For Each Department.** Each department has its own retention schedule for records received or created by it. A Department Schedule, after approval by the Committee, is the sole authority to retain, store and destroy such records.

**8. Department Managers' Responsibilities.** Each Department Manager is responsible for: (1) assisting the Records Manager in drafting the department's schedule, (2) submitting the schedule to the Committee for approval, (3) sending specified records to storage, and (4) retaining other records until their retention periods expire and then destroying them. The Department Manager may be assisted in this work by one or more Record Representatives whom he appoints and for whom he is responsible.

**9. Controlled Access.** Access to each department's records is permitted only through authorization on a list of Authorized Department Managers and Representatives. The list is maintained by the Records Manager. When the accessed records are in storage, the Records Manager shall monitor all borrowings and retrievals.

**10. Compliance Audits.** With the help of Lehman Corporate Audit, Records Management Services will audit Departments to insure compliance with the firm's record retention policy.

**11. Suspension Of Destruction.** Under emergency conditions, the Records Manager may authorize suspension of destruction for specified records. Such suspensions shall approved by the Committee at its next meeting, shall be in force for six months thereafter, and may be extended for further six month periods by the Committee. Department Managers may also produce reasons for suspending destruction.

## MANAGERS & REPRESENTATIVES

Each schedule has at least one Manager and one Representative responsible for its implementation.

**The manager is responsible for:**

1. Working with the Lehman Brothers Records Manager in drafting or revising the schedule.
2. Submitting the schedule to the Lehman Brothers Retention Committee for approval.
3. Authorizing access to records covered by the schedule.
4. Overseeing the work of the representative.
5. Interfacing with compliance audits of records retention.

**The representative is responsible for:**

1. Retaining copies of Retention Schedules, Records Transfer Memorandums and other documentation showing the identity and location of stored records.
2. Sending records to storage as required by the schedule.
3. Retaining records not sent to storage until their retention periods expire.
4. Retrieving and returning borrowed records through the Lehman Brothers Records Manager.

## RECORDS RETENTION SCHEDULES

Approved Lehman Brothers Records Retention Schedules are the sole and final authority for the retention of Lehman Brothers records. There is one schedule for each department or work group. A schedule is drafted or revised by the Records Manager working with the department manager, and is then approved by the Records Retention Committee.

Display D shows an example of a Lehman Brothers Records Retention Schedule. It lists the records of the Investment Banking Operations Department, and tells how long and where to retain them. Here is an explanation of the fields on the form.

| | |
|---|---|
| DEPARTMENT | Name of the department or group where the records originate. |
| SECTION NO. | This number identifies the department or group where the records originate, and permits sequencing in the Lehman Brothers Records Retention Manual. |
| EFFECTIVE DATE | Date when the schedule was approved by the Records Retention Committee, as recorded in its minutes. |
| CODE | This 2-digit number identifies individual records. All Lehman Brothers records in the Retention Manual may be identified by Section + Code. |
| RECORDS | Title and file structure of the records. Under 37-4 for example, the title is Client Project Prospect Files and the file structure is Alphabetical by Prospect. |
| APPROVED PERIODS | Retention periods approved by the Lehman Records Management Committee. |
| • OFFICE | How long to retain in the office. |
| • STORAGE | How long to retain in off-site storage at the Records Center. |
| • TOTAL | Total retention period. |

## SHEARSON SCHEDULES & LEHMAN BROTHERS RECORDS

Existing retention schedules were prepared by Shearson Lehman Brothers and approved by the Shearson Lehman Brothers Records Retention Committee. By agreement between Lehman Brothers and Smith Barney Shearson, these schedules are to stay in force to cover all records shown thereon that are dated up to and including July 30,1993. That is, Lehman Brothers departments as well as Smith Barney Shearson departments holding these records will retain them as shown on the schedules.

The Shearson schedules shall remain in effect until all records listed on them are destroyed. The most common retention period on the schedules is 6Y+C or six years plus the current year, which in practice may be rendered as seven years. Accordingly, the typical Shearson schedule will remain in effect as a control over retained records until the middle of the year 2000.

## NEW OR REVISED LEHMAN BROTHERS SCHEDULES

Because of reorganizations and for other reasons, it will be necessary to revise or replace the schedules to cover records dating from August 1, 1993 forward. This will be the responsibility of the Lehman Brothers Records Manager, under the authority and approval of the Lehman Brothers Records Retention Committee.

## WHAT YOU NEED TO REMEMBER ABOUT SCHEDULES

1. Continue to ship and retain records dated up to July 30, 1993 as instructed by the existing Shearson retention schedules. Do this for as long as the records exist.
2. Ship and retain records dated from August 1, 1993 forward under the same existing schedules until they are revised or replaced.
3. For assistance in revising or replacing your schedule call the Lehman Brothers Records Manager.

## CONTROL OVER ACCESS TO RECORDS

Anyone requesting access to records must contact the manager for permission. The manager or representative prepares a Request For Stored Records form and sends it to Lehman Records Management Services (RMS). RMS then contacts the Records Center where the records are stored and has the records sent to the requester. Here is the sequence:

Requester ⇒ Manager or Rep. ⇒ LB Records Mgmt Svcs ⇒ Records Center

Records requested on authorized request forms received by RMS before 3 PM will be delivered the following business day. Records requested without proper authorization will not be retrieved.

RMS maintains an Access Authorization List showing the names of Managers and Representatives permitted access.

RMS maintains a complete database of all stored records to assist in their location and control. They also maintain a database of all records borrowed and follows-up to ensure early return of borrowed records.

## SMITH BARNEY SHEARSON ACCESS TO LEHMAN BROTHERS RECORDS

Smith Barney Shearson has the right to access certain Lehman Brothers records that are dated up to and including July 30, 1993. That access shall be made through these channels:

SBS Requester ⇒ SBS Records Manager ⇒ LB Records Manager ⇒ Records Center

When the records are located in Lehman Brothers offices, the flow will be:

SBS Requester ⇒ SBS Records Manager ⇒ LB Records Manager ⇒ LB Office

## LEHMAN BROTHERS ACCESS TO SMITH BARNEY SHEARSON RECORDS

Lehman Brothers also has the right to access certain Smith Barney Shearson records that date up to and including July 30, 1993. That access shall be made through the same channels as shown above, namely:

LB Requester ⇒ LB Records Manager ⇒ SBS Records Manager ⇒ Records Center

## DESTRUCTION OF RECORDS

The Lehman Brothers Records Manager controls the destruction of Lehman Brothers records in the following manner.

1. The Records Manager prepares or has prepared a list of records whose retention periods have expired and that are ready to be destroyed.

2. He distributes three copies of the list as a 30-day destruction notice to the Department Manager, the Legal Department and the Tax Department.

3. At the end of the 30 days, the records are destroyed and a Certificate of Destruction is prepared.

4. If Smith Barney Shearson does not agree to the destruction, the records and their associated costs pass to Smith Barney Shearson.

MAR 29 2006 18:07 FR SIMPSON THACHER TO #10531100185B121 P.28/28

Records Retention Schedule

Department: EQT: Equity Research

Section Number: 75

Approved Date: April 13 1994

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|
| 75.02 | DISC. - Oil & Gas Files. | 0 | 6 Year(s) | 6 Years | 6Y+C | INACTIVE 3/8/94. |
| 75.04 | Research Reports-Signed. | 1 Years | 5 Years | 6 Years | 6Y+C | C by Date |
| 75.06 | DISC Wire Files. | 1 Years | 2 Years | 3 Years | 3Y+C | C by Date |
| 75.08 | General Correspondence. | 1 Years | 5 Years | 6 Years | 6Y+C | C by Date |
| 75.10 | Research Reports & Comments | 1 Years | 7 Years | 8 Years | 8Y+C | C by Date |
| 75.12 | Subject Files. | 1 Years | 0 | 1 Years | 1Y+C | C by Date |
| 75.14 | DISC. - Plans of Solicitation. | 0 | 6 Year(s) | 6 Years | 6Y+C | INACTIVE 3/8/94. |
| 75.16 | Morning Meeting Notes. | 0 | 8 Years | 8 Years | 8Y+C | C by Date |
| 75.18 | DISC. - F.C.I. Opinion Updates. | 3 Year(s) | 0 | 3 Years | 3Y+C | INACTIVE 3/8/94. |

UND 08865

03/29/06 WED 18:00 [TX/RX NO 7771]

A. 5

Section Name: 1. Firm Wide Policies & Procedures
Section Number: 1.17

# Record Retention

## A. Introduction

The SEC, NYSE, NASD and MSRB have established minimum record-keeping requirements applicable to broker-dealers. To satisfy these requirements, Supervisory Principals must have procedures in place that will ensure that required records are prepared and maintained for the applicable time frame (see below). Certain business-specific record retention requirements are noted in other sections of this Manual.

## B. Requirements

The BAS Chief Operations Officer and Chief Financial Officer, as well as Supervisory Principals, shall be responsible for compliance with SEC, NYSE, NASD and MSRB books and records requirements. Originals of all communications received and copies of all communications sent (including interoffice memoranda and communications) relating to BAS business must be retained for three years, the first two in an easily accessible place. Records are in an "easily accessible place" if they are retrievable within 48 hours.

## C. Accessibility and Availability of Records

Records to be preserved may be retained on microfilm or microfiche, or any similar medium, or by means of electronic storage media (any digital storage medium or system, provided the information is available for ready retrieval and is easily readable).

All books and records required to be preserved shall be available for ready inspection by each regulatory authority having jurisdiction to inspect such records. They shall be maintained and preserved in an easily accessible place for a period of at least two years and thereafter stored in such a manner as to be accessible within a reasonable period of time, taking into consideration the nature of the record and the amount of time expired since the record was made.

## D. Preservation of Records via Electronic Storage Media

If BAS employs electronic storage media for record retention the BAS Chief Operations Officer must notify the NYSE prior to employing such media. If the method chosen is one other than optical disk technology (including CD-ROM), the NYSE must be notified at least 90 days prior to employing such storage media. In either case the electronic storage media must:

- Preserve the records exclusively in a non-rewriteable, non-erasable format;
- Verify automatically the quality and accuracy of the storage media recording process;
- Serialize the original and, if applicable, duplicate units of storage media, and time-date for the required period of retention the information placed on such electronic storage media; and
- Have the capacity to readily download indexes and records preserved on the electronic storage media to any medium acceptable under SEC Rule 17a-4(f) as required by the Commission or self regulatory organizations of which BAS is a member.

Additional requirements for use of electronic storage media apply. Contact the Compliance or Operations Department for such requirements.

## Record Retention Matrix-General Firm Wide

| Books and Records | Retention Requirement | Maintained By |
|---|---|---|
| Articles Of Incorporation, Minute Books, All Corporate Records | Life of Firm | BAS Corp Secretary |
| Fingerprint Record Notification 17f-2(e) & Exemption | Life of Firm | BAS Compliance |
| Blotters (or other records of original entry) containing an itemized daily record of all:<br>- purchases and sales of securities<br>- receipts and deliveries of securities<br>- receipts and disbursements of cash<br>- other debits and credits | 6 years/2 years easily accessible | Operations |
| Financial Statements | 6 years/2 years easily accessible | BAS Accounting |
| Account Statements and all other ledger account records itemizing separately each cash and margin account. | 6 years/2 years easily accessible | Operations |
| Stock Record | 6 years/2 years easily accessible | Operations |
| Customer Account Documentation | 6 years after the close of the account/2 years easily accessible | Operations |
| Securities in Transfer | 3 years/2 years easily accessible | Operations |
| Dividends and Interest Received | 3 years/2 years easily accessible | Operations |
| Securities Borrowed and Loaned | 3 years/2 years easily accessible | Stock Loan/Operations |
| Monies Borrowed and Loaned (together with a record of the collateral therefor any substitutions in collateral) | 3 years/2 years easily accessible | Operations |
| Securities Failed to Receive and Deliver | 3 years/2 years easily accessible | Operations |
| Long and Short Securities Record Differences | 3 years/2 years easily accessible | Operations |
| Repurchase/Reverse Repurchase Agreements | 3 years/2 years easily accessible | Operations |
| Customer Order/Trade Tickets | 3 years/2 years easily accessible | Operations |
| Broker/Dealer Order/Trade Tickets | 3 years/2 years easily accessible | Operations |
| Copies of Confirmations | 3 years/2 years easily accessible | Operations |
| Records Reflecting the Beneficial Owners of Accounts | 3 years/2 years easily accessible | Operations |

| | | |
|---|---|---|
| Options Contracts and Guarantees | 3 years/2 years easily accessible | Operations |
| Proof of Money Balances in Firm Ledger Accounts (pursuant to Rule 15c3-1) | 3 years/2 years easily accessible | BAS Accounting |
| Checkbooks, Canceled Checks, Bank Statements/Reconciliations | 3 years/2 years easily accessible | BAS Accounting |
| All Bills Receivable or Payable (paid or unpaid) | 3 years/2 years easily accessible | BAS Accounting |
| Originals of Communications Received and Copies of Communications Sent Relating to BAS Business | 3 years/2 years easily accessible | Supervisory Principals |
| All Trial Balances, Computations of Aggregate Indebtedness and Net Capital (and related working papers), Financial Statements, Branch Office Reconciliations, and Internal Audit Working Papers | 3 years/2 years easily accessible | BAS Accounting |
| All Guarantees of Accounts and Powers of Attorney and Other Evidence of the Granting of Discretionary Authority. | 3 years/2 years easily accessible | Operations & Supervisory Principals |
| Any Written Agreements Pertaining to BAS | 3 years/2 years easily accessible | BAS Administration and Applicable Business Unit |
| Records which support the amounts included in the FOCUS Reports and Annual Statements-details listed in 17a-4(b)(8) | 3 years/2 years easily accessible | BAS Accounting |
| Procedures and Records on Reducing Securities to Possession or Control - reference detail in 15c3-3(d) | 3 years/2 years easily accessible | Operations |
| Missing, Lost, Counterfeit and Stolen Securities (Form X-17F-1A) | 3 years/2 years easily accessible | Operations |
| Employment Applications and Questionnaires (Form U-4/U-5) | 3 years after termination of employee/2 years easily accessible | BAS Compliance |
| Fingerprint Cards (17f-2) | 3 years after termination of employee/2 years easily accessible | BAS Compliance |
| Publication or Submission of Quotes - Information Required by 15c2-11 | 3 years/2 years easily accessible | Trade Desk Supervisory Principals |
| Underwriting Syndicate Recordkeeping and Stabilizing Activities (17a-2) | 3 years/2 years easily accessible | Syndicate Desks |
| Record of Quarterly Securities Counts (17a-13) | 6 years/2 years easily accessible | Operations |
| Research Material | 6 years/2 years easily accessible | Supervisory Analysts |
| Advertising and Sales Material | 6 years/2 years easily accessible | Compliance Department & Supervisory Principals |
| Customer Complaints | 6 years/2 years easily accessible | Supervisory Principals & |

| | | |
|---|---|---|
| Compensation, Gifts and Gratuities | 6 years/2 years easily accessible | BAS Compliance BofA Expense Control & Supervisory Principals |
| Employee Trade Confirmations | 3 years/2 years easily accessible | BAS Control Room |
| "Papilsky" Records-Reference NASD Rules 2730, 2740 & 2750 | 3 years/2 years easily accessible | Origination Supervisory Principals Operations |
| Margin Records | 6 years/2 years easily accessible | |
| Restricted/Watch Lists | 6 years/2 years easily accessible | BAS Control Room |
| Supervision Procedures & Supervisory Principal Designations | 3 years/2 years easily accessible | BAS Compliance |
| Written Option Procedures and Updates | 3 years/2 years easily accessible | BAS CROP |
| Annual Compliance Meeting & Continuing Education Records | 3 years/2 years easily accessible | BAS Compliance |
| Records of official statement delivery | 3 years/2 years easily accessible | Operations |
| Annual compliance review report and workpapers | 3 years/2 years easily accessible | BAS Compliance |
| Regulatory Examination Reports | 6 years/2 years easily accessible | BAS Compliance |
| 17a-8 Reports-Currency and Foreign Transactions Reporting Act | 6 years/2 years easily accessible | Operations |
| Additional MSRB Rule G-8/9 Record Retention Requirements | See below and Refer to Section 6 - Municipal Securities Origination and Trading Manual | See below and Refer to Section 6 - Municipal Securities Origination and Trading Manual |

**MSRB Rule G-8/9 Record Retention Matrix-In addition to the aforementioned requirements**

| Books and Records | Retention Requirement | Maintained By |
|---|---|---|
| Subsidiary Records | 3 years/2 years easily accessible | Operations |
| Put Options and Repurchase Agreements | 3 years/2 years easily accessible | Operations |
| Records of Syndicate Transactions | 6 years/2 years easily accessible | Municipal Trading Supervisory Principals |
| Records Concerning Deliveries of Official Statements Pursuant to Rule G-32 | 3 years/2 years easily accessible | Operations |
| Records Concerning Delivery of Official Statements, Advance Refunding Documents and Forms G-36(OS) and G-36(ARD) | 3 years/2 years easily accessible | Operations |
| Records Concerning Political Contributions and Prohibitions on Municipal Securities Business Pursuant to Rule G-37 – including | 6 years/2 years easily accessible | BAS Compliance |

| | | |
|---|---|---|
| Form G-37/G-38 | | |
| Records Concerning Consultants Pursuant to Rule G-38 | 5 years/2 years easily accessible | BAS Compliance |
| Records Concerning Compliance with Rule G-20-Gifts and Gratuities | 6 years/2 years easily accessible | BAS Compliance |
| Rules 17a-3/17a-4 records | See Above | See Above |

August 1999

A. 6

SIMPSON THACHER & BARTLETT LLP
425 LEXINGTON AVENUE
NEW YORK, N.Y. 10017-3954
(212) 455-2000

FACSIMILE (212) 455-2502

DIRECT DIAL NUMBER
212 455 2831

E-MAIL ADDRESS
TMCEVOY@STBLAW.COM

August 5, 2005

Re: *In re Adams Golf Inc. Securities Litigation*

Elizabeth W. Fox, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania
19103

Dear Liz:

I write in response to your letter of July 27, 2005, regarding Plaintiffs' request for e-mail documents from calendar year 1998. We have consulted with each of the Underwriters in order to clarify whether any e-mail documents from 1998 still exist or can be recovered from backup tapes or any other sources.

Neither Bank of America nor Ferris Baker Watts are in possession of e-mails from calendar year 1998. Neither Underwriter's e-mail archives contain any pre-1999 e-mails.

Certain backup tapes for Lehman e-mails from 1998 still exist in two formats, "cc mail" and "exchange." Lehman no longer has the hardware or software necessary to recover e-mail documents in the cc mail format. Furthermore, even if we could locate the appropriate hardware and software to attempt to recover cc mail format e-mails, a number of the cc mail tapes are known to be corrupted and missing essential data necessary to recover individual e-mails.

However, Lehman is in possession of approximately 200 random backup tapes in the "exchange" format for calendar year 1998. These "exchange" backup tapes do not contain a complete record of every e-mail sent or received during 1998; rather, they are "snapshots" taken on random days during calendar year 1998. Lehman is in the process of attempting to recover e-mails from these "exchange" tapes, but the process will take approximately six months to complete and there is no guarantee that any of the e-mails recovered will be relevant to this action.

Sincerely,

Ted McEvoy

Theodore J. McEvoy

cc: Carmella P. Keener, Esq.
Jennifer R. Brannen, Esq.

SIMPSON THACHER & BARTLETT LLP

425 LEXINGTON AVENUE
NEW YORK, N.Y. 10017-3954
(212) 455-2000

FACSIMILE (212) 455-2502

DIRECT DIAL NUMBER

212-455-2831

E-MAIL ADDRESS

tmcevoy@stblaw.com

June 27, 2006

Re:     Adams Golf

Donald B. Lewis, Esq.
Law Offices of Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA  19004

Dear Don:

I write in response to your letter of June 23, 2006. Contrary to the allegations in your latest letter, the Underwriter Defendants have fulfilled and continue to fulfill their agreements with regard to all discovery issues, including electronic discovery issues.

First, Lehman Brothers has provided an affidavit, at your request, regarding the completion of their search of e-mail server disaster recovery tapes, including the names of the individuals searched for, the search terms used and confirmation that the documents have been produced. We have also provided, as you requested, the dates on which each of the e-mail disaster recovery tapes was created. Lehman Brothers' additional search of file server disaster recovery tapes is continuing. It will be completed this week and any remaining documents will be produced prior to the close of discovery.

Second, as agreed, Banc of America has provided a declaration concerning the document retention policies in place at BOA in 1998 and 1999. As we have made clear to plaintiffs since this issue first arose last year, Banc of America has no responsive

electronic documents in its possession, custody or control. All other responsive Banc of America documents were produced over a year ago.

Third, as noted above, we have provided you with the dates on which the Lehman e-mail server disaster recovery tapes were created.

Finally, the Underwriters have provided Plaintiffs with all of the information regarding the relevant document retention policies that is still available after eight years by producing documents, a 30(b)(6) witness and now, at Plaintiffs' request, providing affidavits and declarations from each Underwriter. Despite the fact that the Underwriter Defendants have provided substantive responses to all of Plaintiffs' many requests, it seems that you are now taking issue with the form of the documents provided in response to your own requests in an effort to prolong a dispute over an issue that has nothing whatsoever to do with the merits of this case.

As noted above, the Underwriter Defendants will complete their production of documents, including electronic documents, by the close of discovery this Friday. If, upon reviewing the completed production, you believe there are any unresolved issues that need to be discussed please do not hesitate to contact me.

Sincerely,

Ted McEvoy

**A. 7**

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE ADAMS GOLF, INC. SECURITIES LITIGATION | : CONSOLIDATED C.A. : No. 99-371 KAJ |

# AFFIDAVIT OF JAMES HOLDERMAN

STATE OF NEW YORK) : ss.:
COUNTY OF NEW YORK)

James Holderman, being duly sworn, deposes and says:

1. I am employed by Lehman Brothers, Inc. as a Senior Vice President. At the time the reviews detailed below were conducted, I was responsible for the Information and Records Management Department. This affidavit supersedes my affidavit of June 14, 2006, in this matter.

2. In response to Plaintiffs' discovery requests, Lehman Brothers Inc. has searched all monthly and bi-weekly e-mail disaster recovery tapes in its possession created during calendar year 1998 for any and all e-mail documents received or sent by the following current and former Lehman Brothers employees: J. Stuart Francis; Olga A. Pulido-Crowe; Patrick Walravens; Sameet S. Mehta; Marc Paley; Tim Gould; M. Bradley Smith; Bernard J. Picchi; Brian J. Lantier; Unni Mahany; Steven L. Berkenfeld; Kevin R. Genirs; Arlene Salmonson; Andrea T. Ramlakan; Tim Gamso; Steve McManus.

3. A true and correct list of the monthly and bi-weekly e-mail disaster recovery tapes searched is attached hereto as Exhibit A.

4. Once Lehman located the emails recovered for each of the individuals listed above, it searched the emails using the terms "Adams Golf," "Adams" or "Golf" to locate potentially relevant documents.

5. All of the e-mail documents identified as a result of the search described in Paragraph 4 above were provided to counsel for Lehman Brothers Inc. and have been produced.

6. Lehman Brothers has also searched all file server disaster recovery tapes in its possession created during calendar year 1998 for electronic documents other than e-mail created or maintained by the following individuals: J. Stuart Francis; Olga A. Pulido-Crowe; Patrick Walravens; Sameet S. Mehta; Marc Paley; Tim Gould; M. Bradley Smith; Bernard J. Picchi; Brian J. Lantier; Unni Mahany; Steven L. Berkenfeld; Kevin R. Genirs; Arlene Salmonson; Andrea T. Ramlakan; Tim Gamso; Steve McManus.

7. All electronic documents recovered for each of the individuals listed above were reviewed using the terms "Adams Golf," "Adams" or "Golf" to locate potentially relevant documents.

8. All of the electronic documents identified as a result of the search described in paragraph 7 above were provided to counsel for Lehman Brothers Inc. and have been produced.

James Holderman
Senior Vice President for Information and Records Management

Sworn to before me this
2nd day of August 2006

Notary Public

CHRISTINE P. SEARL
Notary Public, State of New York
No. 02SE5083795
Qualified in New York County
Commission Expires ~~August 25, 1999~~ 10/19/2009
Certificate Filed in New York County

| Server Loaded | Date Loaded | Retention Category |
| --- | --- | --- |
| EXATL01 | 10/14/1998 | Bi-Weekly |
| EXLA01 | 9/17/1998 | Bi-Weekly |
| EXLA01 | 9/30/1998 | Sep-98 |
| EXLA01 | 10/14/1998 | Bi-Weekly |
| EXNYC02 | 4/30/1998 | Apr-98 |
| EXNYC02 | 5/29/1998 | May-98 |
| EXNYC02 | 6/30/1998 | May-98 |
| EXNYC02 | 7/31/1998 | Jul-98 |
| EXNYC02 | 9/14/1998 | Bi-Weekly |
| EXNYC02 | 10/14/1998 | Bi-Weekly |
| EXNYC02 | 10/31/1998 | Oct-98 |
| EXNYC03 | 4/30/1998 | Apr-98 |
| EXNYC04 | 5/29/1998 | May-98 |
| EXNYC04 | 7/31/1998 | Jul-98 |
| EXNYC04 | 10/1/1998 | Sep-98 |
| EXNYC04 | 10/14/1998 | Bi-Weekly |
| EXNYC04 | 10/31/1998 | Oct-98 |
| EXNYC06 | 3/31/1998 | Mar-98 |
| EXNYC06 | 4/15/1998 | Bi-Weekly |
| EXNYC06 | 4/30/1998 | Apr-98 |
| EXNYC06 | 5/29/1998 | May-98 |
| EXNYC06 | 9/16/1998 | Bi-Weekly |
| EXNYC06 | 9/17/1998 | Bi-Weekly |
| EXNYC06 | 10/15/1998 | Bi-Weekly |
| EXNYC06 | 10/16/1998 | Bi-Weekly |
| EXNYC06 | 11/2/1998 | Oct-98 |
| EXNYC08 | 11/2/1998 | Oct-98 |
| EXNYC10 | 11/2/1998 | Oct-98 |
| EXNYC12 | 10/1/1998 | Sep-98 |
| EXNYC12 | 10/14/1998 | Bi-Weekly |
| EXNYC12 | 11/2/1998 | Oct-98 |
| EXSF01 | 10/30/1998 | Oct-98 |

**A. 8**



John W. Weiss
*Senior Managing Director*

Mark- I will be out of town when Adams' quiet period ends on August 4. Attached is the First Call report (which is the Summary for the Basic Report) which will be issued that day alongwith the models. Please review and ask me any questions that you anticipate receiving or that you have. I will not be available after July 30. Please note the reasons for EPS declines in 3Q and 4Q 1998.

Thanks John

NationsBanc Montgomery Securities LLC
600 Montgomery Street San Francisco, California 94111 (415) 627-2000

NationsBank

CONFIDENTIAL

# ADAMS GOLF, INC.

**RATING: BUY**

| August 4, 1998 | CONSUMER PRODUCTS | NASDAQ: ADGO |
|---|---|---|

*John W. Weiss (415) 627-2240*

*Bracken J. White (415) 913-3528*

Basic Report

DJIA: ____
S&P 500: ____
NMSGI: ____

| | | FY ENDS 12/31 | 1997 | 1998E | 1999E |
|---|---|---|---|---|---|
| PRICE: | $____ | | | | |
| 52-WEEK RANGE: | $____ | | | | |
| FULLY DILUTED SHARES O/S: | 28.4 | Q1 (MAR) | $0.00 | $0.31A | $ |
| MARKET CAPITALIZATION: | $____ MM | Q2 (JUN) | 0.00 | 0.35A | |
| AVG. DAILY VOL. (3 MOS.): | ____ | Q3 (SEP) | 0.24 | 0.22 (3) | |
| SECULAR EPS GROWTH: | 25% | Q4 (DEC) | 0.31 (2) | 0.20 (4) | |
| 1998E REVENUES: | $106 MM | FISCAL YEAR | $0.57 (2) | $1.05 | $1.25 |
| MARKET CAP./REVENUES (1): | ____% | P/E | | | |
| 3/98 TOTAL DEBT (1): | $1.1 MM | P/E/G | % | % | % |
| 3/98 LTD/TOTAL CAP. (1): | 1% | | | | |
| 1998 ROAE: | 45% | | | | |
| 3/98 SHAREHOLDERS EQ.(1): | $72.9 MM | | | | |
| 3/98 BOOK VALUE/SHARE (1): | $3.11 | | | | |
| DIVIDEND/YIELD: | NONE | | | | |

(1) Adjusted for IPO in July 1998.
(2) Excludes stock compensation and bonus award.
(3) Net income is projected to increase 86%.
(4) Net income is projected to advance 15%.

Same

$ Arbiw to higher

CONFIDENTIAL

Callaway 224 st flat
* Adams 8th flat

**Summary and Investment Conclusion**

Adams Golf is currently experiencing extremely rapid growth as a result of strong customer acceptance of its Tight Lies fairway woods which enhance golfers' ability to hit from a variety of poor lies and still achieve good distance. Sales rose from $3.5 million in 1996 to $36.7 million in 1997, and in the first half of 1998 jumped from $5.4 million to $58.3 million. We expect annual sales to rise from $36.7 million in 1997 to $106 million in 1998 and to $162.5 million in 1999. EPS are anticipated to increase from $0.57 in 1997 to $1.05 in 1998 and to $1.25 (+19% with 11% more shares outstanding) in 1999.

The critical issues are the following: ( Same )

1. What are the prospects for growth in Adams' sales of fairway woods in the U. S. in 1999, which will be the fourth year of the original Tight Lies 4-wood and the third year for most of the other lofts? We assume that Adams' sales decline sequentially but still increase dramatically year-to-year) in the third and fourth quarter of 1998, primarily due to normal seasonality of demand. The declines we project in EPS in the third and fourth quarters of 1998 on a year-over-year basis reflect an 86% increase in shares outstanding. In addition, we project that growth of Adams' fairway wood sales in the U. S. slows to 7% in 1999 as a result of the age of the product, recent increased availability of Orlimar fairway woods at retail and the introduction by Callaway of a new and presumably improved fairway wood. There are no signs currently of a decline in demand for Adams' products based on comments by retailers and the maintenance of retail prices at $199 per club at almost all outlets. Our 1999 EPS estimate assumes that Adams lowers its wholesale price by $10 per club in 1999, which should allow retailers to continue to achieve attractive gross profits on Adams' fairway woods even if retail prices slip somewhat.

2. Will Adams be successful in selling its fairway woods in foreign markets, which accounted for only 2% of Adams' sales but 50% of industry sales in 1997? Adams has already named 33 distributors in 39 countries, and the initial sell-in to most of these distributors in the second quarter of 1998 was above plan. Early indications are that consumer demand for Adams'

CONFIDENTIAL

Nick Falbo

products is strong in many foreign countries at retail prices that are equivalent to $300-400. These retail prices are likely to decline as distribution is broadened, and this should further stimulate consumer demand.

Our 1999 EPS estimate assumes that foreign markets represent 23% of Adams' fairway wood sales. Foreign sales accounted for 33% of Callaway's sales in the third year of the original Big Bertha line.

3. Will Adams be successful in introducing new products? The company expects to introduce a driver incorporating a new but unspecified technology in early 1999. Our 1999 EPS estimate assumes that sales of this product approximate $27 million next year, which seems achievable if a market share of only 4% is attained in the U. S. We estimate Adams' dollar share of fairway woods in the U. S. at 16% in 1998. We believe that about 1.1 million golfers will own one or more Adams fairway woods by mid-1999. Our projection of driver sales of $27 million in 1999 could be achieved if only 12% of the owners of Adams fairway woods purchased a driver. For the industry and for Callaway, driver sales approximate fairway wood sales.

While projections for a new product are inherently speculative, it should be remembered that Callaway's stock increased 1100% in the 1992-1996 period when there was never much "visibility" into the next year in terms of new products or EPS. Some investors will also remember that during the period of 60% compound annual growth in Callaway's stock price, the shares were often volatile in response to concerns such as "I saw a Big Bertha in Costco" or "some retailer offered a Big Bertha at $10 below an earlier price" that proved to be irrelevant. We expect Adams stock to also be temporarily volatile.

In view of Adams' currently very low sales in foreign markets and the absence of a driver, success in either or both of these untapped segments has the potential to dramatically expand Adams' sales assuming sales of existing products are maintained. Because of the company's unusually high gross margin of 74%, small changes in market share or sales can have a significant effect on EPS. A 5% point change in market share in fairway woods or drivers either in the U. S. or in foreign markets can influence EPS by $0.30-0.35.

CONFIDENTIAL

We believe the current P/E's of 12x projected 1998 EPS and 10x estimated 1999 profits discount the uncertainties associated with any rapidly growing company that is dependent on successful new products. As suggested, our key assumptions appear to provide opportunities for favorable surprises. It should also be noted that Adams has cash of $3 per share and no debt.

We are initiating coverage of Adams Golf with a **BUY** and purchase is recommended.

CONFIDENTIAL

A. 9



183B

2801 East Plano Parkway
Plano, TX 75074
www.adamsgolf.com
e-mail: pattywalsh@adamsgolf.com
Fax: (972) 673-9590
(800) 622-0609
Tel: (972) 673-9595

# CONFIDENTIAL FAX

*From the desk of*
**Patty Walsh**
**Ext.# 9595**
Patty

To: Olga Pulido-Crowe/Lehman Brothers
Pat Walravens/Lehman Brothers

Fax #: (415) 274-5381

Date: August 5, 1998

Re: 8/6/98 Teleconference Script

FYI, to follow is a draft of the above referenced script.

A Overall sales increased 38% in Q2 1998 from Q1 1998. 72% of this increase or $6.7MM was attributable to domestic sales and 28% or $2.6MM was attributable to international sales. As we are just beginning to see meaningful revenues from international markets, our domestic sales are still the major revenue producers.

International Sales

**Q What is your projection for international sales going forward and how much is dependent on sales in Asia?**

A (?) We plan to continue increasing our international efforts. We currently have 33 distributors in 39 countries and we intend to focus on developing these relationships to their full potential. (Check #'s with Chris/Marc.) In addition, as you know, we entered into a partnership agreement with Nick Faldo in May of this year and intend to capitalize on his international reputation to further our marketing efforts worldwide. In addition, we recently announced that John Simpson of the UK has joined our Board of Directors. John has 20 years of international golf experience and we expect him to be a significant asset to us as we increase our international marketing efforts.

Nick Faldo

**Q You signed Nick Faldo in May but he hasn't been having such a great time in competition lately. Any comments?**

A We are extremely proud of our association with Nick Faldo. His reputation for excellence is well known and we do not feel this can be diminished in any way by his recent playing performance. We brought Nick into the Adams R&D group so that we could tap into his vast experience and equipment knowledge as well as to align ourselves with someone having an international reputation as one of the greatest golfers the world has ever seen. Nick's input on new Adams products has been very valuable and will continue to increase as we progress.

Discounting

**Q Tight Lies have been seen in many Costcos for $146. How is the product getting there?**

A Costco is not an authorized dealer of Adams Golf products. It is our understanding that Costco has used diverters to acquire our products. We are not alone in this as it is our understanding that Costco has followed the same practice with successful products of our competitors as well.

A. 10

Comm. tment Committee

Δ π EXHIBIT 152
Deponent
Date 5/17/06 Rptr. 1l
WWW.DEPOBOOK.COM

Tight Lies brands by retailers and golfers, (iii) a strong customer service organization and (iv) an R&D pipeline of potential new products.

- *Lifetime Relationship with Nick Faldo.* Adams has recently entered into a lifetime agreement with Nick Faldo, who uses the Tight Lies fairway woods. Mr. Faldo will be inducted into the World Golf Hall of Fame in May 1998 and has won more major championships in the 1990s than any other golfer. The Company intends to leverage Mr. Faldo's international reputation for technical excellence to expand Adams' international sales. The Company also expects to work closely with Mr. Faldo to develop new products and technologies.

*CONS*

- *Dependence on New Products Introductions; Uncertain Consumer Acceptance.* Over 95.3% of the Company's 1997 revenues were derived from sales of the Tight Lies fairway woods. Golf clubs tend to have a limited life cycle and at some point the Company can expect that sales of its clubs will diminish and that average selling prices will decline. Accordingly, the Company's continued growth and success depend on its ability to successfully develop and introduce new products that meet with consumer and retailer acceptance. With respect to retailers, the Company must ensure its products continue to offer retailers high margins and are not discounted. The Company plans to introduce new technologies in the design of future golf clubs. In particular, the Company is currently developing a new energy transfer technology, which, if it proves to be commercially viable, will form the basis for a new line of drivers, and, further in the future, a second generation of Tight Lies fairway woods. There can be no assurance that such technologies will not be rejected by consumers or that the Company will be able to complete its product development activities in a timely manner. Moreover, successful technologies and designs created by the Company, including the Tight Lies fairway woods, are likely to be copied by competitors. For example, the Company is already aware of several companies that have produced clubs designed in a manner very similar to the Tight Lies ("knock-offs"). The design of new golf clubs is also greatly affected by the rules and interpretations of the United States Golf Association ("USGA"). No assurances can be given that new products will receive USGA approval.
- *Ability to Manage Growth.* The Company has recently experienced a period of extraordinary growth that has resulted in new and increased responsibilities for management and continues to place a strain on the Company's management, operating and financial systems and resources. To accommodate this recent growth and to manage future growth, the Company will need to improve its operational, financial and management information systems and controls on a timely basis and recruit and train employees, including members of management. The failure to do so would adversely impact the Company.
- *Highly Competitive Industry.* The market for golf clubs is highly competitive. The Company's primary competition comes from Callaway Golf Company, Taylor-Made Golf Company, Titleist (Cobra) and Karsten Manufacturing Corporation (Ping). Callaway is the dominant player in the industry with a 42% market share as a result of strength in both irons

A. 11

# Strong Retail Distribution

- Over 7,000 accounts
- Increasing penetration of U.S. golf retailers
- Selective distribution to
  - On and off course golf shops
  - Selected sporting goods retailers
  - No discount warehouses

ADAMS

# Pricing Strategy

## High Retailer Margins

| | Average Wholesale Price | Average Retail Price | Average Retailer Margin |
|---|---|---|---|
| Adams | $138 | $199 | 31% |
| Callaway | 170 | 189 | 15 |
| Taylor Made | 150 | 189 | 26 |
| Cobra | 120 | 159 | 25 |

* Based on graphite shafts, stainless steel heads

ADAMS

A. 12

EXHIBIT
192

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

| Customer Name | Contact Name | Interviewer Name | Date |
|---|---|---|---|
| Edwin Watts | Edwin Watts<br>President<br>(800) 874-0146x103 | Patrick Walravens | 4/21/98 |

1) For how long have you been doing business with Adams Golf? *Over the last 4 years. Lots in the last 2 years since the Tight Lies came out.*

2) What is your role and title at your company? *CEO. We have 40 stores in 8 or 9 states.*

3) Which golf clubs does your company purchase from Adams Golf? At what price do you sell them? *We sell all models of Tight Lies. Including left handed versions. $199 graphite and $149 steel. We hold prices and don't discount. Don't know the cost. But margins are good.*

4) Approximate your annual dollar volume of Adams Golf club sales. Do you expect business to increase during the next one and two years? *Yes at least during 1998*

- What percent of your equipment sales in a given month are Adams clubs? *Hard to say. Less than 5% of our total woods sales.*

5) Based on your industry knowledge, how does the growth of Adams Golf compare to that of other golf companies you've seen? *Growth is in the 5 or 6 all time fastest.*

6) Are customers pre-disposed to purchasing the Adams Golf clubs or do you find yourself having to introduce and describe the club to customers? *Customers are pre-disposed. We also push the product because margins are better than other brands like Callaway.*

- Do Adams clubs increase customer traffic in your store? *Probably. But they are also becoming competition for us with their direct sales.*

# Adams Golf, Inc.
# Customer Due Diligence Questionnaire

7) Are Fairway Woods a growing part of your business? Is Adams Golf selling the most units of Fairway Woods? *Definitely a growing part. Not sure who sells the most.*

- What percent of your equipment sales are Fairway Woods today vs. 5 years ago? *Not sure.*
- Who else are the major players in this space? *Callaway and Orlimar.*

8) Do you think Adams Golf will have the ability to develop new products which customers will be pre-disposed to consider buying? *That's a difficult question. I don't know. You have to realize that they are a niche product. Also, the smaller size head works perfect for fairway woods and it was something Callaway and others had trouble selling because of their focus on oversized products. This was a void, a good space for Adams to fill. I'm not sure they'll be able to find another space this good.*

- Would you consider carrying new product lines from Adams? *Sure. We'll carry anything that helps out golfers. Adams has become a good brand that people are familiar with.*
- What would your preference be for a new club? *I'd keep going after the fairway woods market for a while. Add clubs specifically for seniors and ladies. Although I guess they kind of do that now. My next thing would be irons.*

9) What are your impressions of Adams Golf's direct response channel (1-800-number)? Do you see the 1-800-number as a source of competition? *Yes it is competition. It's a major hurdle. Adams can't afford to make its retailers mad. Adams needs to move away from direct sales. I feel Adams is overdoing their infomercials and print ads in areas where we have stores. Adams is stealing customers away from our stores. Also, customers think they might get a better deal direct because the ads tout the steel at the lower price and don't make it clear that that price is for steel only. It's bait and switch.*

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

10) How do you rank the Adams Golf clubs versus its competitors - better, worse or the same? *Adams is pretty good. Some of the larger players are over-distributed. As a result, their margins are low. Adams has higher margins, which makes our stores want to push their products. Adams has succeeded because they have a niche product, good marketing and good retailer margins. I worry that if they go public they will feel pressure to increase their sales and will overdistribute.*

11) Are you satisfied with the service Adams Golf provides to you? How might it improve? *Adams service is good. Callaway is the best. The delivery that Adams get us is fine. We think we may get better service because we are a large customer. Adams has inside sales and a face to face person for each store. Inside sales work fine. Overall, customer service is not a problem.*

12) Do you expect to continue doing business with Adams Golf? *Yes. But they need to be careful about overdistributing and eroding margins. If the margins erode, we'll get off the bandwagon and start pushing other products with higher margins.*

13) Are there any other issues (legal, contractual or otherwise) which you feel are important?

14) What are your thoughts on knock-offs/clones/copies? *Not really an issue. We don't sell knock-offs. In fact, we market against such products. Don't think it's a big problem because most people want the real thing.*

A. 13

2 of 3 DOCUMENTS

Copyright 1998 Information Access Company,
a Thomson Corporation Company
IAC (SM) PROMT (R)
Copyright 1998 Fairchild Publications Inc.
Golf Pro

May, 1998

SECTION: Pg. 6; ISSN: 1072-1274

IAC-ACC-NO: 50143023

LENGTH: 727 words

HEADLINE: The Costco Of Doing Business

BYLINE: Kramer, Scott

THIS IS THE FULL TEXT

BODY:

SCOTT KRAMER

What a difference a year makes. Twelve months ago, Taylor Made told everyone who would listen that it was buying back all ofits clubs from Costco stores that had secured diverted product from disloyal Taylor Made customers. Now, the company has officially opened the discount mega-chain, selling to a distributor that repackages the clubs in a Costco-friendly manner before reselling them. Why the change of heart?

'We can better protect our brand,' says Mike Whan, v.p. of marketing at Taylor Made. 'We've worked with Costco directly, training their in-store salespeople. They've agreed to a minimum advertising policy and we've agreed with how our brand will be merchandised.'

Nonetheless, the decision has left many retailers feeling betrayed. 'They've taken what their top accounts have tried to do to help them and wiped it in their faces,' says Brian Cole of The Golf Shop in Portland, Ore., which does close to $200,000 annually with Taylor Made. His anger stems from the obsolesence of the Burner Bubble Oversizeiron.

'We helped them close out, we thought, the Oversize iron by agreeing to bring in a whole bunch of sets at our slowest time of year.And we moved them. Then they told us they had no more, that they'd stopped making them,' says Cole. 'Then we find out from our rep that not only do the clubs exist, but they're being sold exclusively at Costco.'

Whan admits Costco has much of the remaining Oversize irons, and that there are none left, but says that's a matter of timing, not exclusivity. 'If anyone considers it an exclusive, that's because we gave Costco an agreement as to how many we'd give them,' he says. 'We did an allocation on the Oversize irons last December , and Costco got a chunk, as well. Costco didn't take its shipment at the time.' Costco finally opened as an official account at the end of March, and Whan says that's when it received its allocation.

Whan points out thatmost accounts are asking for the new LCG irons, which he says are ina severe back-order situation, and that the Oversize iron was a matter of paying dues. 'We wanted to make sure that when we started working with big accounts like Costco and The Sports Authority, they had to do their part in selling the old stuff before getting to the new. You can imagine if we opened these guys and all they had was LCG from front to back. That wouldn't send the right message to our existing custome[illegible].'

Retailers fear Costco will sell the Oversize irons at lowball prices, deterring their own customers from buying the LCG. But ithasn't played out that way at the Costco in Carlsbad, which sells a set of eight irons with graphite shafts at $699.99 - the same price as Edwin Watts Golf Shops catalog.

'I don't think it's affecting LCG sell-in or sell-through,' says Whan. 'The pricing Costco will do on the Oversize is no different than what we're seeing already in the market. I'm not concerned because we've seen Oversize at that price for three months and all of our advertising is in the LCG.'

Shop owners, however, are concerned by the direction Taylor Made is headed. 'It pisses off everyone that they opened Costco,' says one San Diego retailer who requested anonymity. 'For years, they've denied it, but we knowthey've been shipping them behind our collective back. You can't control pricing anymore because they whore it out. And Callaway's just as bad.' Callaway officials, who declined to be quoted for this story,say that Costco is not their customer.

Edwin Watts, miffed that Taylor Made hadn't informed him of the Costco move, claims the decision could have dire results. 'Clubs that appear at department stores have a long history of losing their image,' says Watts, citing Palmer, Nicklaus and Player. 'And if you lose image, you lose everything.' To Watts, the move is also indicative of larger troubles. 'In no other industry would manufacturers ever think of treating their good retailersthe way golf retailers are treated now,' he says. 'If the retailers or dealers don't do well, eventually, the manufacturers won't do well. But in the golf industry, in most cases, they don't care. They're crossing their best customers and they don't care.'

And Cole's reaction? 'We're going to pare down our business with Taylor Made. What had been a trusting business relationship hasn't a lot of trust anymore.'

**IAC-CREATE-DATE:** July 10, 1998

**LOAD-DATE:** July 11, 1998

A. 14

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

In Re Adams Golf, Inc. )
Securities Litigation ) No. 99-37 KAJ
)
______________________________)

DEPOSITION OF OLGA A. PULIDO-CROWE

WEDNESDAY, MAY 17, 2006

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
(888) 777-6690 (215) 241-1000

A. Under this category specifically, I -- I don't recall. I believe most of them are all-encompassing under the major strategic issues. But we would have looked at, you know, can they get enough employees? You know, what does the market look like here in terms of people that they might be able to hire if their demand was increasing? Could they get the labor, the workforce to do so? Would the workforce be trained efficiently enough? Because to handle the call centers, to handle the custom-made golf-type things, what do they have?

That would be some of the things that we would look at.

Q. Do you recall if the topic of gray marketing came up under this category or in any other context?

A. Gray marketing came -- the topic of gray marketing did come up during our discussions. It wasn't a primary term, you know, that we use. But the issues of gray marketing did come up and was looked at under these categories.

Q. Who looked at them?

A. Our -- myself and our team. It's all part of, you know, what is out there in terms of the -- what the company is facing and what's material.

And I think, for Adams, the primary risk was

new product introduction and competition from competitors, competitive lines of golf clubs. That was one of the primary risks and most material.

Q. When you say that you and your team looked at gray marketing, what exactly did you do in looking at gray marketing?

A. Well, we did a number of things. Gray marketing was not -- we weren't saying, "Let's look at gray marketing." We were saying, "Let's look at the issues surrounding the market for the clubs and how Adams distributes them."

And so we did numerous things. We spoke, of course, to the company and their sales force and their salespeople. We did due diligence with their customers, their dealers. We talked to, you know, other -- I guess I have a lot of anecdotal evidence that I would do personally as well and when we look at all of these issues facing Adams.

So besides looking at information provided by the company and talking to the company and talking to third parties and verifying what we were learning, there was other anecdotal evidence, I guess you might say, that I know I personally did.

Q. Okay. Let me go back to a couple of things.

A. Okay.

Q. You said you spoke with the company and their sales force.

A. Mm-hmm.

Q. Who did you speak with?

A. Well, as part of the due diligence process, you know, we speak with management of the company. And that would have been, I think -- well, I was going to refer to one of the documents we have here, a list of names.

Q. Feel free to refer back.

A. Okay. Well, if we look at the agenda --

Q. Are you looking at Exhibit 143?

A. Yeah, Page -- is this 153? Yes. Page 8724.

Q. Okay.

A. So we spoke with Barney Adams, Jim Farrell, Walt DeVault, Mark Gonsalves -- and I'm just reading from this list -- Dick Murtland, Steve Sanozaro. And those were the formal discussions.

We would also speak to people when we -- when we were present at the site. You know, as you're there, you would talk to people that you would run into, basically, and ask them, "How do you like" -- "What do you think?" "What's going on?" There were random discussions that we would have that were off the official list of people.

Q. When you spoke with the folks on the official list, did the topic of gray marketing ever come up?

A. In the -- in the context of what are the risks facing the company and in the context of what -- looking at the dealers and the sales process.

Again, it wasn't -- gray marketing itself, we didn't -- it's not something that -- it was part of it. We definitely talked about it, but it wasn't a significant, material issue. There were a lot of other terms used for that in looking at that issue. I -- my term is "stuffing the channels," that kind of thing. What are we doing -- that was one of the ways that we would look at that. And a lot of that would be explored also when we spoke to the -- the retailers and did our due diligence of customers.

Am I answering that?

Q. I think so, and I -- I know you're trying, and you're doing a great job.

A. Okay.

Q. When you spoke with the people listed on Page 2 of the memo, 8724, did any of them tell you that gray marketing was affecting Adams Golf or that it wasn't affecting Adams Golf? Just trying to get the idea of the nature of the communications.

A. Was affecting? I mean, I wouldn't use that

term, "affecting." Gray marketing is a factor in -- in manufacturing and retailing. It's something that everybody faces. How do the products get to unauthorized markets? It's in the newspapers every day. We see it with videos and CDs and, you know, rip-offs here and there of -- how did that movie get -- you know, DVD get out there on a movie that hasn't been released yet? It's an issue that just about everybody faces.

So, yes, it was discussed and mentioned in that respect.

Q. When you were doing your work with Cobra, was gray market an issue back then?

A. It's not -- I don't like the term "issue." It's a -- something that's present definitely in the market.

So I would say, for Cobra, you know, where the clubs were showing up, yes, that was discussed and how would people get them. It was more in the context of, Are these knockoffs? You know, what is it that's out there? And are there knockoffs being made or fakes? You know, that kind of thing, that -- and who's doing it, and is that a huge problem? How do you protect your name, your brand from these rip-offs, like the Gucci bags that are not real Gucci bags, that

kind of thing?

You know, that was a lot of the context that was -- that we discussed that kind of thing.

Q. And at the time that you were working with Cobra, did they actually have product in the gray market?

A. I don't -- I don't recall. I would -- I guess I don't recall. I would assume, because almost everybody has that issue.

Q. Okay. At the time of the Adams IPO -- let me rephrase that.

At the time you were working with Adams to do the underwriting, were you aware of any Adams product in the gray market?

A. We were -- we discussed the Costco issue, that clubs had appeared at a Costco. I don't remember the location, but someone had seen some -- what were purported to be Adams Golf clubs at a Costco.

Q. Do you recall when this discussion occurred?

A. I don't recall exactly, but it was during our -- probably one of our drafting sessions or one of our due diligence calls.

Q. And these drafting sessions occurred in April of 1998; is that correct?

A. I would have to refer back to the schedule to

confirm that it was April 19 --

Q. And I think I've got some documents in here somewhere.

A. Okay.

Q. Do you recall who it was from Adams who advised you that the clubs were at Costco?

A. My recollection of exactly whom it was is unclear. I can't say if it was Barney, if it was Mark, if it was Jim. I don't remember who exactly it was, but I do remember discussing the issue.

Q. Can you take a quick look back at Exhibit 152 --

A. Okay.

Q. -- at Page 3 of the memo, which is Bates-number Page 6028.

A. Okay.

Q. Paragraph D, "Due diligence."

A. Okay.

Q. Could you go ahead and read that.

(Witness examines document.)

A. March 24th. Okay.

(Witness examines document.)

Okay.

Q. Does that paragraph refresh your recollection --

A. Yes.

Q. -- concerning --

MR. CHEPIGA: Let her finish the question.

THE WITNESS: Oh.

BY MS. LELAND:

Q. In looking at this, can you now pinpoint a date when the discussion of gray marketing that you just mentioned occurred?

A. I can't pinpoint an exact date other than to say it might have been March 24th, April 21st, April 27th.

Q. Do you believe it was at one of these meetings identified here?

A. Yes.

Q. Okay. And what exactly, to the best of your recollection, was discussed concerning the gray marketing?

A. There was -- the focus was Costco, that the clubs found at -- believed to have been found at Costco. And we asked, "How did they get to Costco? Do you know how they got to Costco?"

And the company thought they -- thought they might know how they got there, but they weren't sure and they were going to look into it. It wasn't a large number of clubs. They thought they knew who --

is this a complete list of who was in the working group?
MR. CHEPIGA: As of the date of this document?
MS. LELAND: Sure.
THE WITNESS: I would say as of the date of this document, because we sometimes add names and change information as it gets updated as we go along.
BY MS. LELAND:
Q. And that will be my next question, is if you know if this has changed in any way during the IPO process.
A. I -- during the IPO process, I'm sure it was probably updated. I mean, I don't have them in front of me, but we would always update it. We start off with has anything changed in the working group, phone numbers, addresses, people being added, that type of thing.
Q. Looking at Page 7, which is Bates-numbered 8729, the first person on the list is J. Stuart Francis. His title here is managing director.
What was his role in the IPO?
A. He is the head of the office -- and the contact for Finis Conner, also. He also knew Finis Conner. And so he is the most senior person on

the team.
Q. What was his role in the IPO? What specific duties did he have?
A. Well, he would review the information, was available for advice and guidance on this. And he also happened to be a scratch golfer, almost scratch golfer.
Q. Was he involved on a day-to-day basis or a little bit more removed from the whole process?
A. A little bit more removed, you know. I think he met in the initial meeting of the company and the initial pitch for the company, certainly on the commitment committee process and being prepared for the commitment committee, which is an important internal process. He was very involved with that.
Q. As part of the commitment committee process, in what ways was he involved, to the extent you can recall the details?
A. Well, we have to have a managing director at the -- you know, in charge of -- not in charge, but there needs to be a managing director on the team. I wasn't a managing director yet. And so he's there.
And he had the board -- I guess the board-level contact, if you will. I did, too, but he knew -- much longer relationship with Finis, and also

knew Barney from this process.
Q. So did he attend meetings?
A. Yes, he would attend some meetings, not all.
Q. Not all?
A. Mm-hmm.
Q. Would it be fair to say he attended the higher-level meetings, not the lower-level meetings?
A. Higher-level meetings?
Q. Just trying to get an idea.
A. He -- that might be a fair characterization.
Q. Did he draft documents? Was he involved in the drafting and preparation of any of the IPO materials?
A. I don't recall if he was actually at the drafting sessions, but, you know, I would -- he would receive copies and I would ask him to check something or read over something if I felt uncomfortable. He made a practice -- he reads everything he gets.
Q. Okay. And you're listed next on this page, followed by Patrick Walravens, who is described as an associate.
A. Mm-hmm.
Q. Was that his position throughout the IPO?
A. I can't recall. I believe so. I don't think he was VP yet.

Q. Okay. What was his role in the IPO?
A. He was my right arm, if you will, working on the transaction.
Q. Okay. And I have to ask, can you give me some details? What do you mean by "right arm"?
A. Well, he was the person I would look to, to make sure, you know, these types of -- help me make sure these types of things were executed, "these type of things" meaning, you know, the drafting sessions and the due diligence request list. He was part of the team. It was my primary responsibility, and he would prepare first drafts. And then I would take it from there or he would -- then he would spell-check and that kind of thing.
Q. And did he ever go out to Adams Golf and meet with the salespeople?
A. He went to Adams Golf, yes. He was at Adams Golf as part of the due diligence process.
Q. And you were there as well; correct?
A. Yes.
Q. Was he involved in communicating with Adams customers?
A. Yes, as part of our due diligence process.
Q. And you mentioned you spoke with customers as well?

Q. Oh, sure.
A. So we definitely focused on what -- did the third-party checks. We asked them, we probed them very much. So is there anything at all?
And the club was being pulled. Everybody wanted that club. It was more an issue, could Barney get the clubs to the dealers, you know, in the quantity that they wanted, you know, and in a timely manner? And then also, how much Barney was going to keep providing the pull, you know, with the brand awareness and brand recognition out there. Because that all helped the dealers when the name was out there, everybody knew it. It sold the club for them.
So that's the kind of thing that we focused on.
Q. Okay. So is it fair to say you don't recall having any specific conversations concerning gray market with Mr. Picchi or Mr. Lantier?
MR. CHEPIGA: Are you referring -- using the word "gray marketing," conversations in which they used the word, the phrase "gray marketing"?
MS. LELAND: Or any -- any sale of products or finding products at an unauthorized retailer.
THE WITNESS: Okay. Now, that kind of thing, we would have had. I guess I just -- I have a problem

with the "gray marketing" concept.
BY MS. LELAND:
Q. And we can refer to it as whatever you would like to refer to it. But in our complaint and throughout this litigation, "gray marketing" has referred to the unauthorized sale.
A. So, unauthorized. Yes, we would have discussed that. And it wasn't -- it wasn't a big issue. It just -- yes, we knew it was there, we discussed it, and it wasn't material, whatever, a relevant issue that was important to this.
Q. How were you able to determine whether it was relevant or not?
A. Whether --
Q. Whether the gray marketing --
MR. CHEPIGA: One at a time.
THE WITNESS: Okay.
MS. LELAND: Sorry.
Q. How did you determine whether the gray marketing was material or not?
A. We of course first spoke to the company, talked about the distribution channels. The issue of -- the discussion of Costco came up because of discount warehouses. And we asked, was it much of a problem? They said no, there was -- it was an

isolated incident -- I recall something to that effect. My interpretation was it was an isolated incident and that that person or distributor, whoever it was that got those clubs there, they were going to pursue that and put an end to that.
Q. Do you recall who you spoke with at Adams Golf about this issue?
A. It would have been Barney or Mark or -- I don't recall exactly who, but it was a group of many people that were -- that would have been present.
Q. Okay.
MR. CHEPIGA: You were asking her what she did to determine it was material. Can we let her finish her answer?
MS. LELAND: Sure.
THE WITNESS: Then we -- we interviewed third parties, or their customers and retailers, to look -- to look at that.
Also, you know, I do a lot of anecdotal-type thing. Costco was a client of mine, so I was -- I offered the company, like, "Well, do you want me to talk to Costco about this? I don't know if Costco will tell me, but I can ask them about this." And it wasn't a big issue. They said, "No, we'll take care of it," through their -- their process, which was the

potential litigation of the filing in Texas. And so we said, okay, we don't have to do that.
It wasn't a big issue. Plus, there was discussion, would people actually buy the clubs at Costco? Because if you -- when I was checking with people, they don't buy clubs at Costco, not at that price point. It was a pretty expensive club to buy. If It's suspect, whether it's a second-quality one or rip-off in general.
Most people, they won't buy basketballs because they think they bounce funny. They won't buy golf balls because they think they are second-quality. That's the impression in general of some of the sports equipment products. And when this is such -- it's a high-ticket item, and someone who's a golfer looking to improve their golf swing and invest in this, they're going to make sure that is the product that has the little technology aspects to it that they believe the product has.
So -- so it wasn't -- it wasn't going to be an issue. So many people said, "What? I wouldn't buy it there. How do I know that's it, that that's the right product?"
So I wasn't -- you know, if it was showing up there, I didn't think it was -- I thought it would

stop, you know, they would put an end to that. I didn't think there was going to be an issue. It wasn't a great number of clubs that were showing up there. This was a specialty club.

BY MS. LELAND:

Q. How did you learn how -- the number of clubs that were in Costco?

A. I don't recall knowing the exact number, but I remember asking about, you know, where it was. And I just recall it being an isolated incident.

Q. Did anybody from Lehman actually go to a Costco and see the clubs in the store?

A. We did not see them. I looked. I was, "Where are they? Okay, it must be some store." I actually thought maybe it was up in Seattle or something. Because I didn't see them, so...

Q. So you actually went out to Costco and looked to see?

A. Oh, yeah.

Q. Which Costco did you go to?

A. Let's see. I would have gone to the San Francisco one. I -- whenever I was in Los Angeles, I would find -- because Costco and we were -- Lehman Brothers worked on the IPO of Costco -- don't quote me; I might be wrong. But, yes, I'm a

card-carrying member of Costco. And my husband will not buy any sports equipment there.

Q. Let me finish going through this list and then maybe, depending on how you feel, it would be a good time to take a break.

A. Okay.

Q. What was the role of John Weiss in the IPO?

I'm sorry, I skipped ahead. Page 9. He appears to be with NationsBank Montgomery.

A. Oh. He -- I don't recall, but from his title here, he would have been like the Bernie Picchi of NationsBank.

Q. And what was the role of Joe Teklits, if I'm pronouncing that correctly?

A. He's an equity research analyst from Ferris Baker. The same as Bernie Picchi, similar role as Bernie Picchi.

Q. Okay. And Dave Turner?

A. I don't know that name. I don't recall that name, I should say.

Q. Okay. He was also at Ferris Baker, I believe, and may have been later in the period.

A. Okay.

Q. What kind of communications did Lehman and the other writers -- other underwriters have during

the IPO process?

A. Well, they were our co-managers, so they needed to be present at the drafting sessions and at the due diligence sessions. And we would include them in -- they were part of the team. We all worked together.

Q. Was there an exchange of the research that was done by the individual underwriters?

A. I --

MR. CHEPIGA: Object to the form of the question.

If you understand it, go ahead. I don't.

MS. LELAND: Let me try to rephrase it.

Q. You did research at Lehman?

A. Okay. Equity research? Because there's equity research, which is the Bernie Picchi, Joe Teklits, that kind of thing. And that's proprietary; they write their own and they are competing with each other. So -- you know, so we have the same source in terms of the companies meetings for equity research, but they write their own reports.

Q. Okay.

A. They do so independently. They come up with their own models, their own everything, if you're talking about equity research.

Q. And as far as the type of research you were doing, is there a term for that?

A. Well, if you're talking about the due diligence.

MR. CHEPIGA: Due diligence?

MS. LELAND: Yes, just the due diligence in general.

THE WITNESS: Yes, we all do that together.

BY MS. LELAND:

Q. And the information was exchanged between --

A. Mm-hmm. Mm-hmm.

Q. Okay.

A. Oh, I needed to say "yes."

MR. CHEPIGA: Just making sure she got the "yes."

Do you want to take a break? We've been going over an hour.

MS. LELAND: Sure.

(Recess taken.)

(Exhibit No. 154 marked for identification.)

BY MS. LELAND:

Q. Marked as Exhibit 154 is a document Bates UND 00134 through -43. Can you take a look at the document and then let me know if you recognize it.

(Witness examines document.)

A. I don't recognize it, but someone --
MR. CHEPIGA: All right. The question was: Do you recognize it?
THE WITNESS: Okay.
BY MS. LELAND:
Q. These appear to be notes from the organizational meeting, based on the label on the first page and the heading on Page 135.
A. Okay.
Q. They look to be dated March 24, '98.
By chance, do you recognize whose handwriting this is?
A. No.
Q. Do you recall attending a meeting on March 24, '98?
A. Can I look back at the date on there?
Q. Of course, or do you recall attending a meeting that was referred to as the organizational meeting?
A. Yes, I do.
Q. If you look through these notes, does this seem to track the matters that were discussed at the organizational meeting?
MR. CHEPIGA: I object to the question.
You can answer if you can.

THE WITNESS: How close do you want me to look at this?
MS. LELAND: Just very generally.
THE WITNESS: Looking at some of the headings, it -- it somewhat tracks, but I'm not sure what this is.
BY MS. LELAND:
Q. It's hard if it's not your handwriting and you don't know whose --
A. That's right.
Q. On Page 135, approximately the third line down, it says: "Drafting on Tuesdays beginning on April 7, 14, 21, 28, and 29."
A. Okay.
Q. Are these -- do these appear to be the dates that you had the drafting meetings you referred to earlier?
A. I don't know if those are the exact dates.
Q. Were there -- how many drafting meetings were there that you recall?
A. I don't recall. I would have to refer to our schedule. We would attempt to do weekly drafting sessions, but that's -- that type of schedule changes depending on what we get done on one day or if it expanded to two, that kind of stuff.

Q. Oh, sure.
To the best of your recollection, approximately how many drafting sessions were there? Five? Ten? Fifty? Just trying to get a general feel.
A. I -- other than to say several, I don't -- I don't know.
Q. "Several" is fine.
Can you flip ahead to Page 137.
A. Okay.
Q. About halfway down, right above management presentations, it says: "Olga is point person on due diligence info for underwritings. "
A. Okay.
Q. Do you recall that topic being discussed at any of the meetings that --
A. "Olga is point person" -- I don't recall it, but I would have said I'm the person collecting -- I'm the lead underwriter there. So I'm the person that collects things.
Q. So that statement is correct?
A. Yeah. Myself. And I would delegate that potentially to Patrick, but -- if I'm not there. Either way, we're one and the same, kind of.
(Exhibit No. 155 through 158 marked for identification.)

MS. LELAND: Marked as Exhibit 155 is Document UND 6283 through 6287; marked as Exhibit 156 is the document Bates-numbered UND 4380 through -84; as Exhibit 157 is the document Bates-numbered UND 06946 through -49; and as Exhibit 158 is the document UND 8076 through -77.
Q. Do you recognize these documents?
A. Yes.
Q. Will you tell me what these documents are?
A. These are the cover letters of information being sent from the company or from Arter, Hadden -- I'm not sure how it came, from the company or from Arter, Hadden, but to our attorneys, who then delivered them to us.
Q. And these were prepared in the ordinary course of the underwriting?
A. Mm-hmm, yes.
Q. And these were all part of the due diligence process?
A. Yes.
Q. With respect to Exhibit 155, probably a good place to start, do you recall receiving the documents listed on Page 6284 through -87?
A. Yes.

Q. (Nods head up and down.)
A. It would be a collaborative effort amongst the underwriters and the company, and we would all give our opinion on that. And then I'm unsure as to who would say it, but if we wanted -- if we felt that it was material, we would put it in there.
(Exhibit No. 164 marked for identification.)
MS. LELAND: Marked as Exhibit 164 is Document No. UND 02708.
THE WITNESS: Okay.
BY MS. LELAND:
Q. Have you seen this document before?
A. Yes.
Q. What is this document?
A. A summary of the SEC's comments on the prospectus.
Q. Who is Joe Hoffman?
A. I have to look at the working group list. I believe an attorney.
Q. Okay. Do you recall the approximate date when you saw this memo?
A. No, I don't recall the approximate date, but as a matter of practice, we see the SEC's comments.
Q. Okay. So, as a matter of practice, you would have seen it around the time the memo was issued;

is that correct?
A. Yes.
Q. Okay. Take a look, and if you could read on the record Item No. 4.
A. Okay.
(Witness examines document.)
Okay.
Q. "The staff wanted the company to consider whether disclosure of the Costco matter was necessary."
A. Okay.
Q. What happened when you saw this memo?
A. When I saw that statement, "The staff wanted the company to consider whether disclosure of the Costco matter was necessary"? Well, your question is, like -- I know -- I don't know what happened when I saw it, but I know what happened with considering whether disclosure of the Costco matter was necessary.
Q. What happened in the consideration?
A. We discussed whether it was necessary and concluded that it was not a material and relevant factor.
Q. Who all was involved in the discussions?
A. I can't recall specific names, but I can recall it was underwriters and -- and senior

management and counsel.
Q. Okay. By June 25, 1998, the clubs were in Costco; correct?
A. Well, in limited -- what we knew was a limited basis.
Q. And Adams had filed their suit against Costco; correct?
A. Correct, based on -- yes, okay. June 9th, yes.
Q. And nevertheless, everyone decided that it wasn't a material issue?
A. That's right, because Costco -- it was -- you could file suit against every person that you found had a club. You know, people get them in all different manners and different ways. And, you know, this source was -- it was, you know, going to be shut down. It wasn't a significant one, a small number of clubs, isolated incident.
And it just wasn't a -- it was not a relevant factor to bring it out and highlight it as a separate risk factor. This was all covered under the risk factors that are in the prospectus, those general terms, competition and what happens, that kind of thing.
Q. Once you learned that the litigation had been

filed against Costco, did you request any litigation updates from Adams Golf?
A. As a matter of practice, we would follow up, potentially, what was -- anything that was happening at the company that had a legal or matter -- you know, legal matter, we would follow up on.
Q. How would you follow up? In writing?
A. We may have, but typically it was in conversations with the company --
Q. Okay.
A. -- and with their counsel.
Q. Do you recall any of these conversations?
A. Generally, yes.
Q. Can you describe them for me?
MR. CHEPIGA: Hold on a second.
THE WITNESS: Okay.
MR. CHEPIGA: Are we getting into any privileged area for Adams Golf?
MS. MORIATY: Yes, we probably are. We're describing conversations between counsel and the company. If we're describing conversations among the group, however, we're okay.
Which are we describing?
MS. LELAND: Well, I wouldn't think that underwriters --

MS. MORIATY: If we're describing things that you heard about as part of a drafting process, then we're okay.

MR. CHEPIGA: But she could have talked about her own counsel.

THE WITNESS: I don't know. I don't recall.

MS. MORIATY: If -- you shouldn't know things that are just happening with their own counsel, so to the extent that you recall specifically or it was within the entire group and part of the drafting process, it's not privileged. But if it's something that Adams is discussing only with their own counsel and you heard hints and don't know the details of, don't talk about that.

THE WITNESS: I can't clarify. I don't know, you know, where...

BY MS. LELAND:

Q. Let me try to go through it step by step, because the last thing I want you to do is disclose privileged information.

Do you recall having any conversations within the working group as to the status and progress of the Adams-Costco litigation?

A. Again, I'm trying to figure out who was there and when and that kind of thing.

I would say -- repeat one more time. What did you say? Do I -- I'm sorry.

(Record read by the reporter.)

THE WITNESS: I -- yes, I recall it being -- talking about it being filed and that it was moving along. And then after that, I'm blurry as to, you know, what exactly was said and when.

BY MS. LELAND:

Q. Okay. What do you mean by "moving along"?

A. That the -- whatever the motion was filed and that there was a response, and that -- and that's -- that's what I remember.

Q. Okay. Do you recall having any conversations with anyone at Adams concerning the progress of the Adams-Costco litigation?

A. Do I recall having any conversations with anyone at Adams? Yes, I would have talked to -- well, yes, again in general.

Q. Can you describe, to the best of your recollection, what was said in these discussions?

A. I apologize, it just -- it was discussed, and I don't remember exactly because it wasn't a -- it wasn't a big issue. You know, it was there. I didn't think it was going to turn into a big issue, didn't have any indication it was going to turn into a

big issue. It was an isolated incident. So, you know, there weren't huge, long -- there were long discussions that I can tell you in detail about other things, but in this one, it was not material by any means.

Q. Did anyone at Adams attempt to assure you that this was not a big deal?

A. Did anyone attempt to assure me?

MR. CHEPIGA: Object to the form.

THE WITNESS: Okay.

MR. CHEPIGA: Go ahead and answer it.

MS. LELAND: Let me try to rephrase it.

Q. Did anyone at Adams tell you that the presence of clubs in Costco was immaterial?

A. I don't know if they would have used those words. I know that we talked about it as a group and came to that conclusion. But no one was forcing that opinion on us, that kind of thing. I wasn't forcing it on anybody else.

(Exhibit No. 165 marked for identification.)

(Discussion off the record.)

(Recess taken.)

BY MS. LELAND:

Q. Marked as Exhibit 165 is a Document UND 02701 through -03.

Do you recognize this document?

A. By looking at it, it's a letter to the SEC.

Q. Do you remember seeing this document previously?

A. It's -- well, in this format? Just like this? I guess this is an electronic version of a transmission. I --

Q. In any format.

A. I mean, just to say we review -- we look at the company's response to the SEC, yeah, we look at them.

Q. Did you see a draft of this response before it went to the SEC?

A. I don't recall. I know typically we know what the company is going to respond.

Q. Were you involved in any discussions on how the company was going to respond?

A. On how the company was going to respond? Yes, I knew how -- I knew how the company was going to respond.

Q. Did you have any input in the response?

A. Did I have any input? Did I have any input? Did I have any input?

Well, I was certainly not -- no one told me I couldn't say anything. I could say something; whether

or not the company took my advice was up to the company. But I could certainly comment.

Q. Was the SEC comment issue something that was discussed among the working group?

MR. CHEPIGA: Can you clarify what you mean by "working group"?

THE WITNESS: The working group listed on --

MR. CHEPIGA: I mean the Lehman -- the bankers working group or the working group in the company?

MS. LELAND: Let's start with the Lehman working group.

THE WITNESS: We would talk to the company about it.

MS. LELAND: Okay.

THE WITNESS: Yeah.

BY MS. LELAND:

Q. And going back to Exhibit 164, the memorandum relays the SEC call that discusses four issues; correct?

A. Mm-hmm.

Q. And the fourth issue being whether disclosure of the Costco matter is necessary?

A. Going to consider, yeah, whether -- the company would consider whether the disclosure of the

Costco matter was necessary, yes.

Q. In Exhibit 165, there's no discussion of the Costco matter?

A. Okay. In this one. Okay.

MR. CHEPIGA: Is that a question or a statement?

MS. LELAND: Either way. Okay.

MR. CHEPIGA: If it's a question, she's supposed to respond. If it's a statement, she can ignore it.

BY MS. LELAND:

Q. Go ahead and keep looking through the letter.

Do you see any discussion of the Costco matter in the letter?

A. Okay.

(Witness examines document.)

No, Costco isn't -- I don't see Costco's name mentioned in this letter. But I see the reference to press releases and other publicity regarding the company.

Q. Do you know why discussion of the Costco matter is not included in this letter?

A. Specifically, I would -- I mean, I would -- it's because it's not -- the company was asked to consider whether it was -- should be disclosed, and

the company considered it and decided not to because it wasn't relevant.

I could interpret this to mean that -- conduct a review of press releases and other publicity regarding the company that, you know -- I don't know why it wasn't in here other than that it was -- I'm not sure. I don't know. Again, I don't know the form in which the questions came. That was a summary of the comments. So this -- there may have been some discussions between the SEC and the company on that to specifically address it.

I would say it wasn't an issue.

Q. Okay. Are you aware of any additional discussions between the company and the SEC on any of these issues listed in Exhibit 164?

A. Am I aware of --

MR. CHEPIGA: You mean additional other than the ones referred to in 165?

MS. LELAND: The way the documents go together, this memorandum relays a call from the SEC, which we've discussed.

THE WITNESS: Right, and this is the --

MR. CHEPIGA: The four points. And then we have the July 6th letter, Exhibit 165, which is a written response.

BY MS. LELAND:

Q. Are you aware of any --

MR. CHEPIGA: I'm just trying to hear the question.

Go ahead.

BY MS. LELAND:

Q. Are you aware of any other communications between Adams and the SEC on these issues?

A. The phone calls.

Q. Okay. Can you identify for me the phone calls?

A. No.

Q. Okay. How do you know the phone calls took place?

A. Well, it's typical in an IPO that there's communication between the counsel and the SEC, so -- then she refers to them -- I mean he refers to Carolyn Kurr calling.

MR. CHEPIGA: In 164?

THE WITNESS: In 164.

BY MS. LELAND:

Q. And 164 is dated June 25th --

A. Mm-hmm.

Q. -- and 165, the response to the SEC, is dated July 6th.

because they don't tell us. They don't share with us their exact things; they share with us their concerns.

Q. Okay. Was the concern expressed regarding Tight Lies' appearance in Costco expressed to you by the analysts at any time prior to August 28th?

A. No, I do not believe so.

Q. And were Mr. Lantier and Mr. Picchi on the working group team?

A. They are research analysts for Lehman and part of the -- part of the -- it's separate, banking and research. So they're there, but they have their own independent reviews.

Q. Okay. So as of August 28th, they know the Costco issue is a problem in their research report; correct?

MR. CHEPIGA: Object to the form.

THE WITNESS: Correct.

BY MS. LELAND:

Q. And this -- the Costco issue is based upon what the memo says here, something they learned of after speaking with golf shops over three months?

A. Correct.

MR. CHEPIGA: Objection. The document speaks for itself.

MS. LELAND: I'm just trying to figure out --

MR. CHEPIGA: This is a document she's not involved in the creation of. I don't know -- I don't know what you're trying to establish through her with this document.

BY MS. LELAND:

Q. So although the equity -- the equity analysts were aware of certain information, it wouldn't necessarily flow to the investment banking side?

A. If it were a major concern, it would.

Q. Okay.

A. If it were a major concern, we wouldn't have done the deal.

Q. And at any time prior to doing the deal, did you discuss with either Mr. Lantier or Mr. Picchi the issue of clubs in Costco?

A. I don't recall the clubs in Costco, exactly, but we discussed margins and pricing.

Q. Okay. How frequently did you communicate with the Lehman analysts?

MR. CHEPIGA: At what period of time?

MS. LELAND: Prior to the IPO. Let's start there.

THE WITNESS: How frequently? It's hard to say how frequently. It's when -- when necessary. But -- that's how I can answer it. It's when

necessary.

BY MS. LELAND:

Q. When you guys -- you and the analysts did communicate, how did you communicate? By phone? e-mail? written document?

A. How did we communicate? A lot in -- I believe it was a lot in writing, because we would have to clear everything we talk about.

(Exhibit No. 181 marked for identification.)

MS. LELAND: Exhibit 181 is Bates-numbered Adams 004460 through -4463.

THE WITNESS: Okay.

BY MS. LELAND:

Q. Do you recognize this document?

A. Other than the Lehman Brothers fax page, no.

Q. I'm sorry. Do you recognize the fax cover page?

A. The heading.

Q. Okay.

A. But I haven't seen --

MR. CHEPIGA: Stationery?

MS. LELAND: Stationery, yes.

BY MS. LELAND:

Q. But not the specific fax dated September 29th to Mark Gonsalves?

A. Right.

Q. So, Timothy Gamso?

A. I believe he was a retail/high-network broker in Texas for Lehman Brothers.

Q. Do you recognize the document beginning on the second page here, which is No. 4461 through 4463?

A. Yes.

Q. What is this document?

A. This is a printout of an equity research analyst's report on Adams Golf.

Q. And it's dated September 29th; is that correct?

A. I'm looking for the date on here.

Today's date, 9/29/98. Yes.

Q. Okay. And authored by Mr. Lantier and Mr. Picchi?

A. Yes.

Q. And in this report, they lower the price target for Adams Golf; is that correct?

A. Yes.

Q. Did you have any involvement in the preparation of this report?

A. No.

Q. Were you aware, prior to the report's issuance, that they were going to lower the price

A. 15

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1998

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITES EXCHANGE ACT OF 1934

Commission File Number: 0-24583

COPY

## ADAMS GOLF, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| DELAWARE<br>(State or other jurisdiction of incorporation or organization) | 75-2320087<br>(I.R.S. Employer Identification No.) |
| 300 Delaware Avenue, Suite 572, Wilmington, Delaware<br>(Address of principal executive offices) | 19801<br>(Zip Code) |

(302) 427-5892
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**
None

**Securities registered pursuant to Section 12(g) of the Act:**
Title of Class
Common Stock $.001 Par Value

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

At March 15, 1999, the aggregate market value of the Registrant's Common Stock held by nonaffiliates of the Registrant was $38,941,431 based on the closing sales price of $3 11/16 per share of the Registrant's Common Stock on the Nasdaq Stock Market's National Market.

The number of outstanding shares of the Registrant's Common Stock, par value $.001 per share, was 22,479,282 on March 15, 1999.

### DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates certain information by reference from the Registrant's definitive proxy statement for the annual meeting of stockholders to be held on May 5, 1999, which proxy statement was filed with the Securities and Exchange Commission on April 7, 1999.

involved, generally requires between 3 to 18 months to complete, however, this stage of product development typically occurs in conjunction with one or more of the other steps.

*PRODUCT DESIGN AND ENGINEERING REVIEW*—If a product concept continues past the patent review stage, the Company translates design parameters into working designs. When appropriate, these designs are developed using computer aided design software and modeled using in-house rapid prototyping systems. Once modeled the prototype is subjected to rigorous engineering review to validate the effectiveness of the technology or design. The Company estimates that it takes between 4 to 6 months to successfully complete product design and engineering review.

*TESTING*—Once a specific design has been decided upon, the Company creates and tests one or more prototypes. The Company has a product testing facility at the Hank Haney Golf Ranch in McKinney, Texas and utilizes an independent mechanical test facility in Fort Worth, Texas for comparative performance testing. In addition, prototypes are also tested for performance and player preferences by Nick Faldo. As part of the testing process, the Company records, analyzes and interprets data associated with each prototype including ball flight, distance, spin and accuracy. Using feedback from these tests, the Company modifies its designs to achieve its performance objective. Additionally, the Company applies for official USGA approval of the resulting club at this time. Upon approval of a new product from the USGA, it becomes considered for commercial release. The Company believes that in order to properly field test a new product, it must expect between 4 to 6 months of additional development time.

The Company's research and development expenses were approximately $51,000, $557,000 and $1,532,000 during 1996, 1997 and 1998, respectively.

**MARKETS AND METHODS OF DISTRIBUTION**

The Company sells its products through on- and off-course golf shops and selected sporting goods retailers, direct sales to consumers, international distributors and the Company's custom fitting accounts.

*SALES TO RETAILERS*—The Company sells a majority of its products to selected retailers. To maintain its high quality reputation and generate retailer loyalty, the Company currently does not sell its products through price sensitive general discount warehouses, department stores or membership clubs. The Company believes its selective retail distribution strategy helps its retailers maintain profitable margins and maximize sales of the Company's products. For the year ended December 31, 1998, sales to retailers accounted for approximately 73% of the Company's total sales.

Despite the Company's efforts to limit its distribution to selected retailers, Adams Golf products have been found in a certain membership warehouse club, which the Company believes has obtained the products through the use of unauthorized distribution channels. Adams Golf has taken steps to limit this unauthorized distribution through the serialization of all Adams Golf club heads but does not believe the gray marketing of its products can be totally eliminated.

Adams Golf maintains an inside sales department that at March 15, 1999 consisted of 23 employees who are in regular contact with the Company's retail accounts (over 7,000 retailers). These sales representatives are supported by 18 field-based regional account coordinators who maintain personal contact with the Company's retailers nationwide. The Company generally has been successful in delivering product to its retailers within one week of a placed order. The Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers.

*CUSTOMER SUPPORT AND DIRECT SALES*—Adams Golf believes that superior customer service can significantly enhance its marketing efforts. Accordingly, the Company maintains an in-house

A. 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE ADAMS GOLF, INC., : CONSOLIDATED
:
SECURITIES LITIGATION : C.A. No. 99-371 KAJ

- - - - -

Friday, May 26, 2006

- - - - -

Oral deposition of PATRICK D. WALRAVENS, taken pursuant to notice, was held at AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, 580 California Street, San Francisco California 94104, commencing at 8:57 a.m., on the above date, before Kenneth T. Brill, Registered Professional Reporter, and California CSR #12797.

- - - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
(215) 241-1000 (888) 777-6690

familiar with. Unauthorized distribution seems pretty clear on the face of it.

Q. Is gray -- okay. Your MBA was -- what was the area of concentration of your MBA?

A. I don't know there really was one. Finance.

Q. Had the term gray marketing been taught in your MBA courses?

A. It may have been. I don't recall that term from --

Q. Okay.

A. -- business school.

Q. Had you done any work for Costco prior to the Adams IPO?

A. Not that I recall.

Q. Do you know whether Costco had been a client of Cooley Godward?

A. Oh, I don't know.

Q. Do you know if Lehman Brothers had done any work for Costco prior to the Adams IPO?

A. So the question is, do I -- can you repeat it for me?

\- - -

(The court reporter read back as requested.)

\- - -

THE WITNESS: Well, I don't have an independent recollection of it, but in preparing for this process it was suggested that it had been one of Olga's clients.

BY MR. LEWIS:

Q. Prior to the Adams IPO, had you done work for any client that had experienced unauthorized distribution of its products? To your knowledge, I'm just --

A. Yeah, I know. So the question is had I done any work for any client that experienced unauthorized distribution of its clients -- of its products?

Q. Right.

A. That I recall, I did work for Levi's.

Q. Okay.

A. I don't specifically recall that being an issue for Levi's.

Q. But at the actual time you were working on the Adams Golf offering, had you been aware that Levi Strauss had had an unauthorized distribution of its products, or was that something you heard later?

A. I don't know that I ever actually learned it. It just seems to me that's a brand that's likely to have

this type of issue.

Q. Have you, by the way, read the transcript of Olga Pulido's testimony?

A. I have not read the transcript. I have --

MR. McEVOY: Let me just caution you not to discuss the substance of what we spoke about yesterday.

THE WITNESS: Oh, really?

MR. McEVOY: Yeah, that is privileged information.

THE WITNESS: All right. Well, I haven't read the transcript.

MR. McEVOY: Can we go off the record for a second.

\- - -

(Discussion held off the record from 10:47 to 10:49 a.m.)

\- - -

MR. McEVOY: Okay. We can go back on the record.

BY MR. LEWIS:

Q. When if at all did you first hear of the concept of gray marketing, unauthorized distribution or distribution through Costco mentioned in connection with the Adams Golf offering?

MR. McEVOY: Object to form. Mentioned in connection with the offering?

BY MR. LEWIS:

Q. All right. Let me try it -- let me break it into several pieces.

A. Okay.

Q. When if at all did you first hear the words gray marketing associated with Adams Golf?

A. I can't tell you when I first heard that.

Q. How did you first hear it?

A. I can't tell you that either.

Q. What did you first hear about it?

A. So apart from what I've read, right? Independently I have two recollections of this.

Q. Okay.

A. One is a conversation with Olga at some point when she said that she had seen a high end club in one of these discount warehouses. Second is a conversation with someone regarding a potential solution to the problem being the serialization of golf clubs.

Q. Would your answer be any different if I substituted the words "unauthorized distribution" for "gray marketing"?

Let me ask it then, and you tell me.

Patrick Walravens

A. I believe it means that Lehman was the number one trader in stocks that it had taken public or done a secondary offering for.

Q. Okay. The number one trader in the after market?

MR. McEVOY: Objection, vague.

THE WITNESS: I don't think the after market -- well, what does the after market mean?

BY MR. LEWIS:

Q. Following the completion of the IPO, is it your understanding this document states that Lehman was the number one trader of the IPOs and secondaries?

A. That's how I interpret that.

Q. Okay.

A. I don't have any independent knowledge that it's true, right.

Q. To the best of your knowledge, who at Lehman was responsible for decisions to buy or sell Adams' stock after the offering became effective; is that the equity syndicate department?

A. After the IPO?

Q. After the IPO.

A. I believe it would be either equity capital or trading.

Patrick Walravens

Q. And were either Mr. Paley or Mr. Smith in the equity capital section?

A. I believe so.

Q. And who was head of trading?

A. I don't know.

MR. LEWIS: Okay.

MR. McEVOY: Take break.

MR. LEWIS: Take a break? Yeah.

----

(Luncheon recess from 12:48 to 1:33 p.m.)

----

BY MR. LEWIS:

Q. Mr. Walravens, when you were answering my last question about the equity capital people, am I correct you were referring to, when you answered it, in looking -- am I correct that when you answered you were looking to a chart on the back of page -- Exhibit 187?

A. Yeah.

Q. On that, on Page 09116 of Exhibit 187, there is a page called Introduction to Lehman Brothers, Adams Golf/Lehman Brothers Team.

And then there is a chart that shows the team. One group is investment banking. One group is equity research. A third group is equity new issues. The

Patrick Walravens

fourth is mergers and acquisitions. And the fifth is tax and structuring.

What was the equity new issues portion of the Adams Golf team, in terms of function?

A. Mark Paley, I believe, is the head of equity capital markets. Tim Gould, I believe at the time was the head of syndicate. Brad Smith, I believe at the time was a vice president in equity capital markets. Yuni Mahani (ph) helped coordinate the roadshow.

Q. So Messirs Paley, Gould and Smith were all involved in decisions from time to time to buy or sell stock in the IPO after market?

MR. LEWIS: Can I have that back?

---

(The court reporter read back as requested.)

---

MR. BESSETTE: Thanks.

THE WITNESS: I don't know exactly what their jobs were, but they were certainly closer to those decisions than we were in investment banking.

BY MR. LEWIS:

Q. To your knowledge, was there anyone closer to those decisions than the three gentlemen I named --

Patrick Walravens

A. Well, presumably, there would be a trader.

Q. -- who actually executed the orders --

A. Mm-hmm.

Q. -- on someone's direction?

A. Yeah.

Q. Let me show you what I've marked as Exhibit 215.

---

(Whereupon the document was marked, for identification purposes, as Exhibit Number Two Hundred and Fifteen.)

---

MR. BESSETTE: Thank you.

BY MR. LEWIS:

Q. 215 is a Lehman Brothers facsimile dated July 29, 1998, numbered Adams 4394 through 4396. It's to Barney Adams and Darl Hatfield from Patrick Walravens, Lehman Brothers, and it's one paragraph: "Barney and Darl, attached are a summary outline and a summary of likely investor concerns for the Adams Golf conference call next week. Pat."

Did you send this to Mr. Adams and Mr. Hatfield at or about the date indicated?

A. I don't recall it, but I have no reason to

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000 (888) 777-6690 (610) 434-8588

Patrick Walravens

believe I didn't.

Q. Okay. Well, just before the break in testimony we were referring to a conference call that took place on July 28, 1998 -- reportedly took place on that date that you didn't recall participating in.

Does this document in any way refresh your recollection as to whether you participated in that conference call?

A. No, I still don't remember whether I participated in the conference call.

Q. The second two pages of this exhibit are a suggested summary outline and concerns to expect from investors. Did you draft any or all of the printed matter on these two pages?

A. I don't recall these documents, and I don't recall who drafted them.

Q. Do you have any reason to doubt that you did not participate in some way in the drafting of the documents?

MR. McEVOY: I'm sorry, can you read that back?

\- - -

(The court reporter read back as requested.)

Patrick Walravens

\- - -

THE WITNESS: So, again, I don't have a specific recollection of it. I was part of a team, so I don't have any reason to doubt it.

BY MR. LEWIS:

Q. To the best of your knowledge, what members of the team other than yourself may have participated in the drafting of this document?

A. So who -- are you asking me who could have participated in that?

Q. Right.

MR. McEVOY: I'm going to object that it calls for speculation, but if you have some knowledge.

THE WITNESS: Well, the investment banking team could have. Equity capital markets, and I don't know whether or not research would have.

BY MR. LEWIS:

Q. This document on its face shows distribution from you to Barney Adams and Darl Hatfield. Is it possible, based on your knowledge of how you worked at Lehman during 1998 that this suggested summary outline was distributed to persons within Lehman?

A. Is it possible that this was distributed to persons within Lehman?

Patrick Walravens

Q. Yes.

A. Yes, it's possible.

Q. Was there any reason you would not have sent it to the equity capital department?

A. I don't remember sending it to the equity capital department, but this is the type of thing that you would solicit their feedback on.

Q. And why is that?

A. Because their role is to be the link between public markets and -- well, they have a better understanding of public markets than investment bankers.

Q. I mean, can you explain what you mean by that?

A. Investment bankers don't talk to institutional shareholders, generally. Sales people in equity capital markets do.

Q. Okay. Now, based on how you worked on the investment banking team for Adams Golf in the summer of 1998, did this memorandum require the approval of Ms. Pulido-Crowe?

A. So you mean generally speaking, a memorandum like this require the approval of --

Q. Start there.

A. -- the vice president? I would think so.

Q. And do you have any specific recollection

Patrick Walravens

about this document as to whether there was anything difference between this and other documents that required her approval?

A. No.

Q. You'll see that on the third page of the exhibit under the listing of concerns, the last bulleted item is discounting, and the items that follow it state: Tight Lies have been seen in many Costcos for $146, question mark. How is product getting there, question mark. What is Adams Golf doing about it, question mark.

Did you raise the issue of discounting at the end of July 1998 of your own initiative?

MR. McEVOY: Object to the form.

MR. LEWIS: Let me rephrase it.

BY MR. LEWIS:

Q. Did you reach the conclusion that one of the concerns to expect from investors were issues relating to the discounting of Tight Lies products?

A. I don't remember this document, so I can't answer that question.

Q. Do you remember being a person who raised the issue that discounting was an investor concern?

A. I don't remember raising that issue.

Q. Does this document refresh your recollection

Patrick Walravens

about when Ms. Pulido-Crowe told you that she had seen a premium club in a discount warehouse?

A. No.

Q. Did you have any discussions with Mr. Smith or Mr. Paley about Tight Lies appearing in Costco club -- Costco stores?

A. Not that I recall.

Q. Did you have any discussions at the end of July of 1998 with Mr. Lantier about Tight Lies appearing in Costco stores?

MR. McEVOY: You can go ahead and answer but, you know, the witness has testified about his recollection generally. We've asked some very broad questions. You're welcome to ask it, but I don't want to go around this track the whole rest of the afternoon. So you can go ahead and answer.

THE WITNESS: No.

BY MR. LEWIS:

Q. Do you believe that Mr. Lantier had any input into the exhibit I placed before you?

A. I don't know.

MR. McEVOY: Object to the form.

THE WITNESS: I don't know whether he would have had any input into it or not.

Patrick Walravens

BY MR. LEWIS:

Q. As a matter of routine at Lehman Brothers, was this the kind of document that he would have been expected to have input into?

MR. McEVOY: Object to the form, expected by whom? It's vague, but you can answer if you can.

THE WITNESS: I think I answered this already. So I -- I -- I don't know whether the research department would have had input to this document. I think investment banking and equity capital markets would typically have input into something like this.

BY MR. LEWIS:

Q. Do you believe this was an area where there would have been a prohibition on Lehman's research people having -- research analysts having input into the document?

MR. McEVOY: Object to the form.

THE WITNESS: I don't know, it's a very complex area.

BY MR. LEWIS:

Q. Can you tell me as you sit here any information other than that which you've mentioned before that you received by July of 1998 regarding the appearance of Tight Lies in Costco stores?

Patrick Walravens

A. Other than the conversations that we've already talked about?

Q. The one conversation with --

A. With Olga, and something regarding serialization.

Q. Tell me about the conversation regarding serialization. What do you remember about that?

A. I remember hearing that one potential solution was putting serial numbers on the golf club heads so that you could identify the source of the product.

Q. And from whom did you hear that that was a potential solution? Somebody at Adams, or somebody at Lehman?

A. I don't recall where I -- who I had that conversation with.

Q. And do you recall what led to that conversation?

A. No.

Q. The third page of the exhibit states in part as I read before, that Tight Lies have been seen in many Costcos for $146. Do you have any knowledge as to what that refers to?

A. You mean, other than what it says?

Q. Do you know where the Costco stores were that

Patrick Walravens

Tight Lies were found?

A. Oh, no, I don't.

Q. Did you ever hear that there was unauthorized distribution of Tight Lies products in Costcos in the Pacific Northwest?

MR. BESSETTE: Vague as to time.

BY MR. LEWIS:

Q. All right. I can only start with any time to try to focus your recollection.

A. I don't have a recollection of that.

Q. Do I understand your testimony correctly that the suggested summary outline and document concerning concerns to expect from investors was a product of the investment banking team as a whole?

MR. McEVOY: I'm going to object. He says -- the testimony is that he doesn't recall the document, but to the extent you have any knowledge.

THE WITNESS: So I don't -- I don't recall this particular document. It seems like the sort of thing that would be done by investment banking and the equity capital group, and I don't know whether or not research would have a role in it.

BY MR. LEWIS:

Q. And why do you say it seems to be something

A. 17

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC. : CONSOLIDATED
SECURITIES LITIGATION : C.A. NO. 99-371 KAJ
______________________________X

ORAL AND VIDEOTAPED DEPOSITION

OF BARNEY ADAMS

Thursday, June 22, 2006

The oral deposition of BARNEY ADAMS was held at the law offices of Akin Gump Strauss Hauer & Feld, LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas, from 9:32 a.m. to 4:53 p.m., before Jamie K. Israelow, a Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter, Certified Realtime Reporter and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
(215)241-1000 (888)777-6690

Q (By Mr. Collins) Yes.
A Oh, boy. I can't answer that question because we had a new organization at the time, and I don't remember who reported to who.
Q Okay. It is a long time ago.
I'd like you to look at a document marked as Exhibit 14, also concerning Canada. You can take your time, but tell me if you've seen this document, please.
A Okay.
Q Do you remember this document?
A Not specifically.
Q Do you remember communicating with Greg Pratt with respect to how Mackenzie was doing?
MR. BESSETTE: In August 1998, or just whenever time?
Q (By Mr. Collins) End of August '98 or thereabouts.
A I don't have any specific recollection.
Q Do you recall generally in -- in 1998 that Mackenzie complained to Adams Golf about gray marketing?

A Specifically in 1998? I mean, anytime during the year?
Q Yes.
(Mr. Parker entered the deposition proceedings.)
A I think they complained sometime, sure.
Q (By Mr. Collins) And do you recall discussions with Mackenzie about whether to code the clubs in an attempt to cut down on gray marketing?
A I don't recall any specific discussions.
Q Now, is coding of clubs or marking them in some fashion one possible response to gray marketing?
A It's something that could be used in a -- as a methodology of tracking your product in the field. So that would be an application, yes.
Q Okay. And -- and Adams eventually adopted that process?
A I think we did by early '99 or something.
Q Why did you do so?

A Why did we do so? Why did we code? Is that your question? I'm sorry.
Q Yes, sir.
A I think we felt it was a good business practice. If you can identify your product before it -- or let's say if you could identify your product in the field as to when it was made, it's a -- it helps you identify quality problems, for example, like if you have a shaft breakage or something like that, you know, with a shaft that was made on, you know how many clubs that were made. It's -- you know, the more you know, the better job you can do.
Q It also allows you to identify transshippers, doesn't it?
A It certainly helps. I mean, let's put it this way: It could help, yes. I mean, it's not -- it's not as direct as -- as you might think it is, but it could help.
Q Why not?
A Well, let's suppose -- now, again, I'm being hypothetical here, and this is end of 1999.
But let's suppose you've got a

batch of clubs with a code on them. And according to procedure, those clubs were supposed to go to this particular operation, and then in turn, they ended up where they didn't belong.
You don't know for sure that they went there. There's no system that says that once the clubs got to this particular operation they were checked in or logged or anything like that. This is something that you do way after the fact.
So it -- it's something that you can use, but it is absolutely not something that's foolproof.
Q If Adams keeps accurate records of shipments by the code on the club, why isn't it foolproof?
A In a perfect world, if we keep records of shipments and when the product left the manufacturing floor and went to the right bin to be shipped to the right customer, et cetera, et cetera, and all of the paperwork or computer documents are correct, then it could be used.
Q Now, was there -- forgive me, Mr. Adams, because I may have asked this before.

Page 194

Q Well, the board knew that the fourth quarter was coming up before you wrote this memo, correct?
A Yeah.
Q The board knew because you had disclosed it in public reports, as well as other places I'm sure, that the fourth quarter is a weak quarter on a seasonal basis for the company, correct? This wasn't the first time you had informed the board that the fourth quarter is a seasonally weak time of the year, correct?
A I don't know if I informed them, but let's say they knew.
Q Okay. So my question is the same: What's the new thing that happened that prompted you to write this memo?
MR. BESSETTE: Okay. This is the third time, I think, but --
THE WITNESS: It's okay.
MR. BESSETTE: Let's do --
THE WITNESS: Maybe I'll get it clearer if I keep going.
A You had a different marketplace. You had a completely different marketplace. Once the

Page 195

Callaway memo came out and -- or I'm sorry -- the Callaway commentary with the quarterly report, that had a serious negative effect on the marketplace.
And it's -- you know, again, just being honest, it's not stated in here. I don't -- I don't talk about it -- enough about our competition, Orlimar. Maybe I was embarrassed. But they were -- they were beating -- they were beating us up in some areas.
Q (By Mr. Collins) Well, now, you -- you -- you entitled the memo --
A Here, I'll save your --
Q Thank you.
A -- save your -- I have a copy now.
Q I don't have a microphone yet, though.
MR. COLLINS: Thank you.
Q (By Mr. Collins) You entitled the memo Fourth Quarter. The first paragraph refers to Costco, not to Orlimar, not to Callaway.
Am I reading that correctly?
A Yes.
Q And then A deals with Costco.

Page 196

B deals with Costco.
Am I reading that correctly?
A Yes.
Q And then C deals with an engraving machine that is necessary to deal with Costco, not with market downturn or Orlimar.
Is that accurate?
MR. BESSETTE: That's a misstate, his prior testimony.
Q (By Mr. Collins) Well, what was the purpose of the engraving machine?
A To be able to track product into the field.
Q And that was necessary because of competition with Orlimar?
A Could have been. Could have been a million reasons. I mean, I -- if you would like me to give you some, I certainly can, but it's -- it's -- there are a lot of reasons for being able to track your product into the field.
Q Sure. Well, now, Paragraph 4 also deals with Costco and not with Orlimar or general market conditions, right?
A That's correct.

Page 197

Q And then the next paragraph after that, talking about how Costco makes its money, also deals with Costco and not Orlimar or general market conditions or seasonal problems in the fourth quarter, right?
A That's -- right, yes.
Q And so are you really arguing that Paragraph C about committing $125,000 to an engraving machine is something that you were discussing in this context because of that million reasons, or you were discussing it in this context because of the serious problem posed by Costco?
A I was discussing it in that context as a way of tracking product into the field, that if applicable to Costco, certainly we could use.
Now, this says we have committed $125,000 to an engraving machine. I suspect that thing wasn't up and running until about the following, I don't know, March or April. It --
Q But of course --
A -- certainly wasn't imminent.
Q Forgive me.
But, of course, the reason you