**A. 18**

Due Diligence Memo

Δ π EXHIBIT 16D

Deponent _____

Date 5/17/06 Rptr. _____

WWW.DEPOBOOK.COM

CONFIDENTIAL

UND 06019

# LEHMAN BROTHERS

### MEMORANDUM

| | |
|---|---|
| To: | File |
| From: | Lehman Brothers Adams Golf Team |
| Date: | July 14, 1998 |
| Subject: | Summary of Due Diligence |

Selected highlights of the due diligence process included the following:

Management Interviews:

1. Barney Adams - CEO

2. Dick Murtand – VP, Operations

3. Jim Farrell – VP, Finance

4. Walt Devault – Director, Direct Sales

5. Mark Gonsalves – VP, Sales

Customer Calls -- Summaries circulated to underwriters by caller

1. Golfsmith International -- Craig Johnson (LEH)
2. Edwin Watts -- Edwin Watts (LEH)
3. Golf Day – John McGregor (LEH)
4. Family Golf Center – Gene McMasters (LEH)
5. Dick's Sporting Goods – Joe Beauseigneur (Ferris, Baker, Watts)
6. Pete Carlson's Golf & Tennis – Pete Carlson (Ferris, Baker, Watts)
7. Somerton Springs – Harry Lange (Ferris, Baker Watts)
8. Chun Sin Corporation – Jung Ha ( Ferris, Baker, Watts

Supplier Calls
1. True Temper – Jim Felty (LEH)
2. Lamkin Grips – Mark Snopkowski (LEH)
3. Fu Sheng – Patrick Tai (Montgomery)

CONFIDENTIAL

UND 06020

- 2 -

Materials Reviewed

1. See due diligence items in file

2. See legal due diligence by underwriters counsel

3. Golf DataTech Market Surveys

4. Golf Market Research Institute Surveys

5. Other golf industry data sources

Background Checks

6. Barney Adams - CEO

7. Dick Murtand – VP, Operations

8. Jim Farrell – VP, Finance

9. Walt Devault – Director, Direct Sales

10. Mark Gonsalves – VP, Sales

Financial Due Diligence

1. Reviewed historical audited financials for 1994 –1997 and Q1 1998

2. Reviewed monthly sales results and projections for 1998

3. Company projections (4/29/98)

4. Interviewed Manny Fernandez and Rick Erhman, KPMG audit partner and senior manager

Legal Issues

1. Interviewed Adams outside patent counsel, Nick Acquillino

2. Interviewed Jacquie Valenzuela, Arter & Hadden's patent litigator

Other

1. Interviewed Nickolaus A. Faldo, professional golfer

2. Visited Hank Haney Golf Ranch and interviewed Mark Berry, professional Adams custom club fitter

3. Conducted other standard due diligence

CONFIDENTIAL

UND 06021

[rambna17\groups] -- \sanfran\walraven\clients\adams\ipo\closing\ddmemo.doc - Patrick Walravens - 07/13/98 5:29 PM - Page 3 of 3

- 3 -

CONFIDENTIAL

UND 06022

**A. 19**

ram:bria02\groups\sanfran\wakaven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 1 of 27

# ADAMS GOLF, INC.



## INITIAL PUBLIC OFFERING

## ORGANIZATIONAL MEETING

## MARCH 24, 1998

# LEHMAN BROTHERS

rambna02\groups\sanfran\watravenlclients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 1 of 27

## Table Of Contents

I.      AGENDA

II.     INITIAL PUBLIC OFFERING ("IPO") DISCUSSION ITEMS

III.    WORKING GROUP LIST

IV.     SUMMARY AND DETAILED IPO TIME TIMETABLES

V.      DUE DILIGENCE OUTLINE/REQUEST LIST

rambna02\groups\sanfran\walraven\clients\adams\ipo\crgmtg\org2.doc - Carol Maddid - 2/17/2006 2:31:43 PM - Page 2 of 27

## *Agenda*

### Tuesday, March 24

| Time | Activity |
|---|---|
| 10:00 a.m. - 10:15 a.m. | Introductions |
| 10:15 a.m. - 12:00 p.m. | Review of the offering |

- Time schedule
- Proposed offering
- Financial and accounting matters
- Publicity issues
- Legal and other issues

| Time | Activity |
|---|---|
| 12:00 p.m. - 12:30 p.m. | Lunch |
| 12:30 p.m. - 4:00 p.m. | Due diligence |

Company presentations:

Barney Adams
*Chief Executive Officer*

Jim Farrell
*Chief Financial Officer*

Walt DeVault
*Director of Sales, Call Center*

Mark Gonsalves
*Vice President, Sales & Marketing*

Steve Sanozaro
*Vice President, Information Technology*

Dick Murtland
*Vice President, Operations*

2

UND 08724

r:\mbne02\groups\sanfran\walraven\clients\adams\ipo\orpmg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 3 of 27

## *IPO Discussion Items*

I.    Review Working Group List

II.   Time Schedule

    (A)  Drafting/due diligence sessions
    (B)  Availability of Q1 financials and projections
    (C)  Status of Representation Agreements
    (D)  Lead times for prospectus photographs, charts, graphics
    (E)  Filing date/filing press release
    (F)  SEC review period
    (G)  Roadshow/Internal management presentations
    (H)  Institutional meetings/roadshow meetings
    (I)   Pricing and offering
    (J)   Closing

III.  **Proposed Offering**

    (A)  Size of offering
    (B)  Primary/secondary shares
    (C)  Review existing shareholder list
        (1) Registration rights
        (2) Rule 144 stock
    (E)  Lock-up agreements with principal shareholders
        (1) Amount of time
        (2) Cut off (% ownership)
    (F)  Stock split/shares outstanding
    (G)  Use of proceeds
    (H)  Syndicate structure
    (I)   Green shoe option
    (J)   Distribution objectives
    (K)  Directed shares
    (L)  Inclusion in National Market System (NMS)
    (M)  Proposed Ticker Symbol "_____"

UND 08725

rambna02\groups\sanfran\walraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2005 2:31:03 PM - Page 4 of 27

## *IPO Discussion Items*

IV. Review Legal Issues

  (A) Outstanding claims
  (B) Intellectual property issues/patent enforcement
  (C) Environmental Review
  (D) Blue Sky issues
      (1) Shareholder notes
      (2) Cheap stock
      (3) Stock options
  (E) Board meetings
      (1) Appropriate board authorizations
      (2) Filing registration statement
      (3) Other
  (F) Third-party consents
      (1) Bank agreements
      (2) Landlord
      (3) Waiver of registration rights, if applicable
  (G) Related party, certain transactions and confidential document disclosure
  (H) Other legal issues

V. Financial and Accounting Matters

  (A) Availability of unaudited and audited financials
  (B) Presentation in prospectus
  (C) Comfort letter
  (D) Tax/FASB
  (E) Cheap stock issues/compensation charges
      (1) Employees
      (2) Representation Agreements
      (3) Other
  (F) Management letters/responses
  (G) Historical audited financials, pro forma financials
  (H) Historical and projected EPS calculations
      (1) Shares, options, warrants outstanding
      (2) Weighted average shares outstanding
  (I) Review of accounting principles/changes
  (J) Review of projections

VI. Publicity Issues

  (A) Pre-filing, post-filing/pre-effective periods
  (B) Internal communication with employees
  (C) Press releases
  (D) Meetings with securities analysts

4

UND 08726

rambna02\groups\sanfran\walraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:49 PM - Page 5 of 27

*IPO Discussion Items*

VII.    Printing of Documents

      (A)    Selection of printer and bank note company
      (B)    Use of color, pictures

VIII.   Legal Due Diligence/Review of Corporate Records

      (A)    Information request list

UND 08727

## *Working Group List*

ADAMS GOLF, INC.
2901 Summit Avenue
Suite 100
Plano, TX  75074
Tel:    *(972) 546-9600*
Fax:    *(972) 546-9682*

| Name/Title | Office | | Home | |
|---|---|---|---|---|
| Barney H. Adams<br>*Chief Executive Officer* | Tel:<br>Alt:<br>Fax: | (972) 422-7060 Ext. 105<br>(800) 622-0609<br>(972) 424-0721 | | |
| James E. Farrell<br>*Chief Financial Officer* | Tel:<br>Alt:<br>Fax: | (972) 422-7060 Ext. 153<br>(800) 622-0609<br>(972) 424-0721 | Cellular: | (972) 365-7060 |

6

UND 08729

## *Working Group List*

LEHMAN BROTHERS
555 California Street, 30th Floor
San Francisco, CA 94104
Tel:   *(415) 274-5200*

| Name/Title | Office | Home |
|---|---|---|
| INVESTMENT BANKING, SAN FRANCISCO: | | |
| J. Stuart Francis<br>*Managing Director* | Tel:    (415) 274-5220<br>Fax:    (415) 274-5269<br>E-mail: *Stuart_Francis@usccmail.lehman.com* | 242 Clark Drive<br>San Mateo, CA 94402<br>Tel:      (650) 343-8090<br>Car:     (415) 279-3150<br>Cellular:  (415) 608-6667<br>Fax:     (650) 347-1100 |
| *Assistant:   Rachel Rodrigues* | Tel:   (415) 274-5298 | |
| Olga A. Pulido-Crowe<br>*Senior Vice President* | Tel:    (415) 274-5227<br>Fax:    (415) 274-5381<br>E-mail: *Olga_Pulido@usccmail.lehman.com* | 3137 Gough Street<br>San Francisco, CA 94123<br>Tel:      (415) 929-0334<br>Cellular:  (415) 602-0868<br>Fax:      (415) 922-3933<br>Pager:    (800) 225-0256<br>Pin #: 598-3801 |
| *Assistant:   Eileen Maldonado* | Tel:   (415) 274-5274 | |
| Patrick Walravens<br>*Associate* | Tel:    (415) 274-5285<br>Fax:    (415) 274-5381<br>E-mail: *pwalrave@lehman.com* | 151 Stanyan Street<br>San Francisco, CA 94118<br>Tel:      (415) 752-3359<br>Cellular:  (415) 609-4268 |
| *Assistant:   Louis Banks* | Tel    (415) 274-5346 | |
| Sameet S. Mehta<br>*Analyst* | Tel:    (415) 274-5389<br>Tel:    (415) 837-5679<br>E-mail: *Sameet_Mehta@usccmail.lehman.com* | 401 El Cerrito Avenue<br>Hillsborough, CA 94010<br>Tel:      (650) 348-2716 |
| *Assistant: Eileen Maldonado* | Tel:   (415) 274-5274 | |

7

LIND 00700

rsimbna02\groups\sanfran\walraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 8 of 27

## Working Group List

**LEHMAN BROTHERS**
3 World Financial Center
200 Vesey Street
New York, NY 10285
Tel:    (212) 526-7000
Fax:    (212) 526-3738

| Name/Title | Office | Home |
|---|---|---|
| **EQUITY CAPITAL MARKETS:** | | |
| Marc Paley* *Managing Director and Global Group Head* | Tel:    (212) 526-9420<br>Fax:    (212) 528-6301<br>E-Mail: *mpaley@lehman.com* | 41 Cayuga Way<br>Short Hills, NJ 07078<br>Tel:    (201) 379-2069<br>Fax:    (201) 379-5707 |
| M. Bradley Smith *Vice President* | Tel:    (212) 526-0115<br>Fax:    (212) 528-6973<br>E-mail: *Brad_Smith@usccmail.lehman.com* | 277 West 10th Street<br>Apt. 9C<br>New York, NY 10014<br>Tel:    (212) 242-0684 |
| *Assistant:*   Cynthia Minter | Tel:   (212) 526-8828 | |
| **EQUITY RESEARCH:** | | |
| Bernard J. Picchi* *Managing Director* | Tel:    (212) 526-5344<br>Fax:    (212) 526-5399<br>E-mail: *Bernard_Picchi@usccmail.lehman.com* | 131 Mine Mount Road<br>Bernardsville, NJ 07924<br>Tel:    (908) 221-9186<br>Fax:    (908) 221-9082 |
| Brian J. Lantier *Research Analyst* | Tel:    (212) 526-5977<br>Fax:    (212) 526-5399<br>E-mail: *Brian_Lantier@usccmail.lehman.com* | 5126 Washington Boulevard<br>Jersey City, NJ 07310<br>Tel:    (201) 610-9650 |
| **ROADSHOW SERVICES:** Unni Mahany* *Vice President* | Tel:    (212) 526-7860<br>E-Mail: *Unni_Mahany@usccmail.lehman.com* | 8 Essex Drive<br>Little Silver, NJ 07739<br>Tel:    (908) 933-4789 |
| **LEGAL:** Steven L. Berkenfeld* *Managing Director* | Tel:    (212) 526-2557<br>Fax:    (212) 526-2198<br>E-Mail: *Steven_Berkenfeld@usccmail.lehman.com* | 8 Norman Court<br>Dix Hills, NY 11746<br>Tel:    (516) 547-8048<br>Fax:    (516) 385-7918 |
| Kevin R. Genirs* *Vice President* | Tel:    (212) 526-2614<br>Fax:    (212) 526-2198<br>E-Mail: *Kevin_Genirs@usccmail.lehman.com* | 411 West End Avenue<br>Apt. 7A<br>New York, NY 10024<br>Tel:    (212) 875-1729 |
| **REGISTRATION:** Arlene Salmonson* *Vice President* | Tel:    (212) 526-6140<br>E-Mail: *Arlene_Salmonson@usccmail.lehman.com* | |

*No Documents

8

LIND 08730

rombna02\groups\sanfran\watraven\clients\adams\ipo\orgmtg\crg2.doc - Caro' Madrid - 2/17/2006 2:31:43 PM - Page 9 of 27

## *Working Group List*

NATIONSBANK MONTGOMERY SECURITIES LLC
600 Montgomery Street
San Francisco, CA 94111
Tel: *(415) 627-2000*

| Name/Title | Office | | Home |
|---|---|---|---|
| **INVESTMENT BANKING:** | | | |
| John Berg *Senior Managing Director* | Tel: Fax: E-Mail: | (415) 627-2111 (415) 913-5802 *jberg@montgomery.com* | 2642 Broadway San Francisco, CA 94115 Tel: (415) 922-2374 Cellular: (415) 279-3991 |
| *Assistant: Bibi Green* | Tel: | (415 ) 627-2523 | |
| Jeff Mills *Associate* | Tel: Fax: E-Mail: | (415) 913-6213 (415) 913-5802 *jmills@montgomery.com* | 3219 Gough Street San Francisco, CA 94123 Tel: (415) 440-5886 Cellular: (415) 606-1214 |
| *Assistant: Lauren O'Neil* | Tel: | (415) 913-5915 | |
| **RESEARCH** John Weiss* *Senior Managing Director* | Tel: | (415) 627-2240 | |
| Richard L. Leza* *Associate* | Tel: | (415) 913-5734 | |
| **SYNDICATE** Dick Smith* *Senior Managing Director* | Tel: | (415) 627-2264 | |
| Mark Saltzgaber *Principal* | Tel: | (415) 627-2788 | |
| **LEGAL** David Baylor* *Associate Counsel* | Tel: | (415) 627-2384 | |

*No Documents

UND 08731

# *Working Group List*

NATIONSBANK MONTGOMERY SECURITIES LLC
9 West 57th Street
New York, NY 10019
Tel:  *(212) 583-8000*

| Name/Title | Office | Home |
|---|---|---|
| INVESTMENT BANKING: | | |
| Courtney Tuttle<br>*Associate* | Tel:  (212) 583-8079<br>Fax:  (212) 583-8589<br>E-Mail: *ctuttle@montgomery.com* | 257 West 86th Street , Apt.7C<br>New York, NY 10024<br>Tel:  (212) 721-7117<br>Cellular:  (917) 865-0525 |
| *Assistant: Laurie Velluzzi* | Tel:  (212) 583-8085 | |
| David Chanley<br>*Analyst* | Tel:  (212) 583-8073<br>Fax:  (212) 583-8273<br>E-Mail: *debanley@montgomery.com* | 300 East 34th Street, Apt.8C<br>New York, NY 10016,<br>Tel:  (212) 545-7252<br>Cellular:  (917) 769-5243 |
| *Assistant: Juliana Chen* | Tel:  (212) 583-8541 | |

10

UND 08732

rambra02\groups\sanfran\walraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2005 2:21:43 PM - Page 11 of 27

## *Working Group List*

FERRIS, BAKER WATTS, INC.
100 Light Street
Baltimore, MD 21202
Tel:  *(410) 685-2600*

| Name/Title | Office | | Home |
|---|---|---|---|
| **INVESTMENT BANKING** | | | |
| Steven L. Shea<br>*Senior Vice President* | Tel:<br>Fax:<br>E-mail: | (410) 659-4639<br>(410) 659-4632<br>*sshea@fbw.com* | 101 Pleasant Hill Road<br>Owings Mills, MD 21117<br>Tel:      (410) 363-4058<br>Cellular:  (410) 371-3536 |
| Charles W. Place<br>*Vice President* | Tel:<br>Fax:<br>E-mail: | (410) 659-4657<br>(410) 659-4632<br>*cplace@fbw.com* | 127 W. Montgomery<br>Baltimore, MD 21230<br>Tel:      (410) 752-2429<br>Cellular:  (410) 375-0575 |
| **RESEARCH** | | | |
| Joe Teklits*<br>*Equity Analyst* | Tel:<br><br><br>E-Mail: | (410) 659-4605<br>(410) 382-4347<br>(410) 659-4395<br>*jteklits@fbw.com* | 3736 College Avenue<br>Ellicot City, MD 21043<br>Tel:      (410) 480-1604 |
| **SYNDICATE** | | | |
| Kim Clendenin*<br>*Senior Vice President* | Tel:<br>Fax: | (202) 429-3608<br>(202) 429-5606 | |

*No Documents

11

UND 08733

rambna02\groups\sanfran\walraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 12 of 37

## *Working Group List*

**ARTER & HADDEN**
1717 Main Street
Suite 4100
Dallas, Texas 75201-4605
Tel:    *(214) 761-2100*
Fax:    *(214) 741-7139*

| Name/Title | Office | | Home |
|---|---|---|---|
| Joseph A. Hoffman | Tel:    (214) 761-4779<br>Fax:    (214) 741-7139<br>E-mail: *jhoffma2@arterhadden.com* | | 5420 Pebblebrook<br>Dallas, TX 75229<br>Tel:    (214) 265-8953 |
| Robin Bradford | Tel:    (214) 761-4328<br>Fax:    (214) 741-7139<br>E-Mail: *rbradfor@arterhadden.com* | | 5320 Surrey Circle<br>Dallas, TX 75209<br>Tel:    (214) 956-9919 |
| J. David Washburn | Tel:    (214) 761-4309<br>Fax:    (214) 741-7139<br>E-Mail: *dwashbur@arterhadden.com* | | 2107 Meadowview<br>Corinth, TX 76205<br>Tel:    (817) 497-2348 |

12

rambna02\groups\sanfran\wol\raven\clients\edema\ipo\orgmtg\org2.doc · Carol Madrid · 2/17/2006 2:31:43 PM · Page 13 of 27

## *Working Group List*

COOLEY GODWARD LLP
One Maritime Plaza
20th Floor
San Francisco, CA 94111
Tel:    *(415) 693-2000*
Fax:    *(415) 951-3699*

| Name/Title | Office | Home |
|---|---|---|
| Kenneth L. Guernsey<br>*Partner* | Tel:    (415) 693-2091<br>Fax:    (415) 951-3699<br>E-mail: guernseykl@cooley.com | 1506 Forestview Avenue<br>Burlingame, CA 94010<br>Tel:    (650) 347-1021<br>Fax:    (650) 347-3843<br>Cell:    (415) 860-4582<br>Pager:    (415) 207-9647<br><br>Second Home:<br>570 Beale Street<br>Suite 202<br>San Francisco, CA 94105<br>Tel:    (415) 512-1595<br>Fax:    (415) 512-1972 |
| *Assistant: Gloria Taylor* | Tel:    (415) 693-2421 | |
| Karyn R. Smith<br>*Associate* | Tel:    (415) 693-2053<br>Fax:    (415) 951-3699<br>E-mail: smithkr@cooley.com | 2516 Franklin Street<br>San Francisco, CA 94123<br>Tel:    (415) 923-1507<br>Fax:    (415) 923-1508<br>Cell:    (415) 722-4166 |
| *Assistant: Cathy Diaz* | Tel:    (415) 693-2316 | |
| Richard S. Jasen<br>*Associate* | Tel:    (415) 693-2013<br>Fax:    (415) 951-3699<br>E-mail: jasenrs@cooley.com | 1855 Pine Street<br>San Francisco, CA 94109<br>Tel/Fax:    (415) 441-5451 |

UND 08735

r2mbns02\groups\sanfran\waitaven\clients\adams\ipo\crgmlg\org2.doc - Carol Madrid - 2/17/2006 2:31:42 PM - Page 14 of 27

## *Working Group List*

KPMG PEAT MARWICK
200 Crescent Court
Suite 300
Dallas, TX 75201-1885
Tel:    *(214) 754-2000*
Fax:    *(214) 754-2297*

| Name/Title | Office | Home |
|---|---|---|
| Darl P. Hatfield, Jr.<br>*Partner* | Tel:    (214) 754-2480<br>Fax:    (214) 754-2264<br>E-mail: *dhatfield@kpmg.com* | 601 Liechty Court<br>Heath, TX 75087 |
| *Assistant:* Roselyn Howard | Tel:    (214) 754-2531 | — |
| Rick Ehrman<br>*Senior Manager* | Tel:    (214) 754-2145<br>Fax:    (214) 754-2485<br>E-mail: *rehrman@kpmg.com* | 3523 Whitehall<br>Dallas, TX 75229 |

14

rambna02\groups\sanfran\walraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 15 of 27

## Summary Timetable (Filing with Q1 1998 Financials)

| March 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| April 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| May 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| Date | Activity |
|---|---|
| March 24 | Organizational and Preliminary Due Diligence meeting |
| April 7 to April 21 | Due diligence meetings; Preparation of S-1 Registration Statement and underwriting documents |
| April 21 | Financial due diligence meeting |
| April 27 and 28 | Meetings at Printer to complete S-1 Registration Statement |
| April 29 | File S-1 Registration statement with SEC; Silent filing |
| Week of June 1 | Receive SEC Comments on S-1 Registration Statement; Respond to SEC Comments; Print and circulate red herring; management presentations at Underwriters |
| Week of June 8 and June 15 | Roadshow meetings in selected cities with investors |
| June 22 to June 29 | Price offering; closing |

15

ramona02\groups\sanfran\wakave\nc\ients\adams\ipo\crgmtg\org2.doc - Carol Madrid - 2/17/2006 2:21:43 PM - Page 16 of 27

## Detailed IPO Timetable (Filing with Q1 1998 Financials)

| March 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| April 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| May 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| Participants | Legend |
|---|---|
| Adams Golf, Inc. (Company) | C |
| Lehman Brothers, Nationsbank Montgomery Securities and Ferris Bakers Watts (Underwriters) | UW |
| Arter & Hadden (Company Counsel) | CC |
| Cooley Godward LLP (Underwriters' Counsel) | UC |
| KPMG Peat Marwick (Accountants) | A |

| Time Period | Activity | |
|---|---|---|
| March 24 | (a) Organizational meeting to discuss:<br>    (1) Time schedule<br>    (2) Offering<br>    (3) Document preparation responsibilities | All Parties |
| | (b) Commence review of all corporate records, materials, contracts, financial statements and documentation with regard to outstanding securities | C, UW, CC, UC |
| | (c) Preparation of Officers' and Directors' Questionnaire and Lock-up Agreements | CC, UC |
| | (d) Commence preparation of the Underwriting Agreement, Agreement Among Underwriters, Underwriters' Questionnaire, Underwriters' Power of Attorney and Preliminary Blue Sky Memorandum | CC, UC |
| March 30 to April 24 | (a) Discuss Comfort Letter procedures | A, UW |
| | (b) Officers' and Directors' Questionnaires mailed | CC |
| | (c) Lock-up Agreement finalized | CC, UW |
| | (d) Discussion of syndicate composition and desired distribution | C, UW |
| | (e) Contact bank note company to arrange for preparation of certificates | C |
| April 3 | Distribute first draft of S-1 Registration Statement | CC |
| April 7 | Drafting session; due diligence | All Parties |
| April 10 | Distribute second draft of S-1 Registration Statement | CC |
| April 14 | Second drafting session; due diligence | All Parties |
| April 17 | Distribute third draft of S-1 Registration Statement | CC |

15

## Detailed IPO Timetable (Filing with Q1 1998 Financials)

**March 1998**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

**April 1998**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

**May 1998**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**June 1998**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| Time Period | Activity | |
|---|---|---|
| April 21 | Third drafting session | All Parties |
| | Financial due diligence session | All Parties |
| April 23 | S-1 Registration Statement sent to Printer | CC |
| April 24 | Printer proofs of all documents distributed to all parties | Printer |
| April 27 and 28 | Meetings at printer to review all documents and prepare filing package | Printer |
| April 29 | S-1 Registration Statement filed with SEC - Silent filing | CC, UC |
| April 29 to May 29 | (a) Roadshow presentation preparation and practice sessions with Company | C, UW |
| | (b) Dates and locations of roadshow meetings finalized | UW |
| Week of June 1 | (a) Comments received from SEC | C, UW |
| | (b) Review SEC comments and prepare responses | All Parties |
| | (c) Preliminary Prospectus sent to offices of Lehman Brothers and other managers | UW, Printer |
| | (d) Copies of S-1 Registration Statement and Preliminary Prospectus, proofs of Underwriting Agreement and Agreement Among Underwriters, Underwriters' Power of Attorney, Underwriters' Questionnaire and Preliminary Blue Sky Memorandum distributed to proposed syndicate members | UW |
| | (e) Mailing to institutional investors and financial publications | UW |
| | (f) Prepare press release regarding Offering | C, CC |
| | (g) Review draft tombstone advertisement | LB |
| | (h) Supplemental Blue Sky Memorandum prepaid | UW |
| June 4 and 5 | Company presentation to Underwriters' sales forces | C, UW |
| June 8 to June 19 | Roadshow meetings in selected domestic and European (to be determined) cities | C, UW |

17

rambna02\groups\sanfran\walraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 18 of 27

## *Detailed IPO Timetable (Filing with Q1 1998 Financials)*

| March 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| April 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| May 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June 1998 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| Time Period | Activity | |
|---|---|---|
| June 23 | (a) Meeting between the Company and Underwriters to determine offering terms | C, UW |
| | (b) Final Prospectus filing package prepared | All parties |
| | (c) Agreement Among Underwriters signed | UW |
| | (d) Underwriting Agreement signed | C, UW |
| | (e) Comfort Letter delivered | A |
| | (f) Pricing. S-1 Registration Statement declared effective | C, UW |
| | (g) Press release regarding Offering issued | C, CC |
| Week of June 29 | Closing | C, UW, CC, UC |

18

## *Due Diligence Outline/Request List*

I.   General Document Requests

  A.  Historical and Current Data
    −  Three Year Historical Financial and Operating Data

        (a) Audited Annual and Quarterly Financials (for FY 1995, 1996 and 1997)
            for Adams Golf, including income statements, balance sheets and cash
            flow statements
        (b) Breakdown of components of revenues and expenses by product
        (c) Revenue breakdown by sales channel/geography
        (d) List of major customers showing total sales in FY1995, 1996 and 1997
        (e) Backlog data

    −  Auditor's Management Letters
    −  Tax Audit Status Reports
    −  Updated Shareholder Holdings Profile
    −  Articles of Incorporation and Bylaws
    −  Bank Loan Agreements
    −  Organization Chart and Departmental Headcounts
    −  Key Management Resumes
    −  Labor Contracts and Employee Agreements with Key Officers
    −  Benefit Plan Summaries
    −  Product Brochures and/or Marketing Material
    −  Facilities Layouts, Descriptions and Photographs

  B.  Business or Strategic Plan

  C.  Financial Projections
    −  Financial projections (quarterly for FY 1998 and 1999 and annually for 1998 to 2002,
        including income statements, balance sheets and cash flow statements

        (a) Breakdown by major product areas of revenues and margins
        (b) All product introduction, key milestones, market penetration, pricing,
            capital expenditures and other assumptions involved in projections
        (c) Breakdown of revenue by distribution channel
        (d) Revenue breakdown by geographic area

UND 08741

## Due Diligence Outline/Request List

C. Financial Projections (cont'd)

        (e) Projected major capital expenditures and R&D expenses
        (f) Major customers projected each year from 1998-2000, key customer wins

  &ndash; Five Year Capital Budget
  &ndash; Review of stockholders and equity ownership
  &ndash; History of equity ownership
  &ndash; History of options grants

II. Business Review

A. Products
  &ndash; Review of Major Product Lines
  &ndash; Comparative Product Analysis
     (Advantages and Disadvantages)

B. Markets and Market Position
  &ndash; Market Size and Share by Product
  &ndash; Industry Capacity
  &ndash; Principle Competitors by Product
     (Estimated Market Shares)
  &ndash; Comparative Pricing Strategy
  &ndash; Top 15 Customers
     (Penetration by Customers and Major Product Line)
  &ndash; List of Companies which Represent 80% of Total Business
  &ndash; Revenue Composition Analysis
     Direct response, International, Custom Fitting, Inside Sales, etc.
     Proportion of Renewal Business (Recurring Revenues)
     Customer Attrition Record
     Long-Term Core Business vs Transitional Business

C. Major Strategic Issues Facing the Company
  &ndash; Technological Change
  &ndash; Supply/Demand for Product
  &ndash; Size and Market Share of Competitors
  &ndash; Competitors' New Product Introductions
  &ndash; Dependence Cyclical Markets
  &ndash; Other Short- and Long-Term Risks
  &ndash; Age/Health of Management or Other Key Personnel
  &ndash; Regulatory Issues

20

UND 08742

## Due Diligence Outline/Request List

III.   Research and New Product Development

A. Product Development Strategy
   – Summary of R&D Activity Over Past Three Years
   – Product Life Cycle
   – Project Origination, Planning and Control Process
   – Products Under Development
   – Product Acquisition Opportunities
   – Remarketing Arrangements
   – Quality Assurance and Testing
   – Technical Service and Support
   – Sourcing of Next Generation of Products
   – Requirements For Additional Facilities
   – Comparison with Competitors' R&D Efforts

IV.   Marketing and Sales

A. Sales Organization
   – Description of the Sales Process
   – Organization of Selling Effort
         Product vs Geographic
         Vertical Markets (Government, International, Other)
   – Sales Channels
         Percent of Sales Through Sales Force vs Reps. and Distributors
         Number and Names of Distributors and Billings per Distributors
         Distributors Contract Terms
            (Copy of a Representative Distribution Contract)
   – Sales Terms and Conditions
         Pricing Terms
         Discount and Allowance Policy

B. Sales Force
   – Number and Location of Sales Offices and Sales Force
   – Strengths and Weakness of Sales Force
   – Productivity Statistics
         (i.e. Revenues per Salesperson)
   – Compensation Structure
   – Account Coverage
   – Experience and Training Profile
   – Support Requirements

21

UND 08743

rambr\a02\groups\sanfran\walraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 22 of 27

## *Due Diligence Outline/Request List*

    C.  Advertising and Promotion
- Advertising Philosophy
- Expenditures By Channel

**V.**    Finance

    A. Reporting Cycles
- Financial Controls and MIS Systems Review
- Monthly Financial Reports

    B. Financial Review (Historical and Projected)
  - Income Statement
  - Identify Non-Recurring Items
  - Identify Discontinued Businesses
- Balance Sheet
- Statement of Changes in Financial Position
- Capital Expenditures
- Goodwill Amortization, and Other

    C. Revenue Review
- Revenue Recognition Policies
- Revenue Trends
- Unit Sales Volume and Pricing Data
- Sales Breakdown by Product

    D. Cost Analysis
- Direct vs Indirect Costs
- Variable vs Fixed costs
- Standalone Costs (if applicable)
- Product-Specific costs

    E. Inventory Analysis
- Raw Materials by Type
- Work in Process and Finished Goods
- Allowance for Obsolescence
- Policies

UND 08744

rambna02\groups\sanfran\walraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 23 of 27

## Due Diligence Outline/Request List

F. Receivables Analysis
- Account Concentration
- Aging Analysis
- Receivables Policy
- List of Overdue Accounts, Reserves and Write-Offs
- Adequacy of Allowances
- Collection Periods (Turns Assumptions)

G. Fixed Assets Analysis
- Investment and Accumulated Depreciation By:
  - Asset Type
  - Location
  - Date or Month of Acquisition
- Replacement Cost
- Amortization and Depreciation Policies

H. Other Balance Sheet Issues
- All Short and Long-Term Debt Agreements and Conditions
- Deferred Income Taxes
- R&D Tax Credits
- ITC Tax Credits
- Foreign Tax Status
- Detail of Prepaid and Accrued Accounts
- Deferred Liabilities
- Tax vs GAAP Book Value of Assets
- Pension Plan Funding Status

I. Cash Flow Issues
- Depreciation
- Capital Expenditures
- Physical Plant Capacity Issues
- Net Working Capital Issues
- Invested Capital/Reserve Issues
- Other Major External Sources/Uses of Cash

J. Other Financial Issues
- Pension Funds Structure and Rules
- Implicit Tax Rate and Tax Liability Exposure Assumptions
- Foreign Currency Translation Policies/Exposure
- Upcoming Extraordinary/Non-Recurring Items
- Patents/Licenses/Trademarks/Royalties/Etc...
- Associated/Affiliated Companies

UND 08745

rambna02\groups\sanfran\walfraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 24 of 27

## *Due Diligence Outline/Request List*

VI.   Production

   A.  Description of Facilities and Future Facilities Needs
   - Owned vs Leased vs Contracting
   - Domestic vs Offshore
   - Lease Terms, Depreciation Policy
   - Significant Production Equipment

   B.  Description of Production Process
   - Steps in Production Process
   - Major Material and Labor Components
   - List of Key Suppliers and any Material Supply Agreements
   - List of Second or Alternative Vendors
   - Potential Supply Bottlenecks
   - Review of Capacity and Capacity Utilization

   C.  Environmental Review
   - Current Status
   - EPA Review
   - Outstanding Violations
   - Other Potential Contingencies


VII.  Administration and Management

   A.  Organization Structure
   - Reporting Relationships
   - Geographic vs Product vs Market Management Responsibilities
   - Corporate Support

   B.  Management
   - Description of Responsibilities
   - Management Quality Assessments
   - Bonuses Plans, Stock Options, Etc...

   C.  Systems
   - Major EDP Systems
   - EDP Systems Plan
   - Telecommunications/Call Center Plans

UND 08746

rambna02\groups\sanfran\watraver\clients\adams\ipo\orgmig\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 25 of 27

## *Due Diligence Outline/Request List*

VIII.  Workforce

   A.  Hourly and Salaried Employees
   - Headcounts By Department, Location and Facility
   - Productivity Measurements
   - Turnover Statistics
   - Compensation and Incentive Plans
   - Health Care and Retirement Plans
   - Other Fringe Benefits

   B.  Labor Relations
   - Union Representation
   - Strike History
   - Industry Norms
   - Labor Contract Review

   C.  Regulatory Issues
   - EEOC Compliance
   - OSHA Compliance
   - Other Potential Regulatory Issues

IX.   International

   - Subsidiary Structure
   - Products Sold Internationally
   - International Sales Force and Marketing Arrangement
   - Distributor Arrangements
   - Nature of Foreign Competition
   - International Development Facilities
   - Foreign Currency Exposure and Accounting Treatment
   - Foreign Tax Position

25

UND 08747

ramona02\groups\sanfran\walraven\clients\adams\ipo\orgmtg\org2.doc - Carol Madrid - 2/17/2006 2:31:43 PM - Page 26 of 27

## Due Diligence Outline/Request List

XI.    Other

- Other Significant Contractual Relationships
- Acquisition and Divestiture Summary
- All Stock Purchase Agreements, Voting Trust Agreements, Buy/Sell Agreements
- Copies of All Stock Option Plans
- Press Releases since January 1, 1997
- Joint Venture, Partnership and Distribution Agreements
- List of Patents and Patent Applications
- Marketing and Product Literature
- List of any Outstanding Legal Claims/Issues Regarding Intellectual Property and Environmental (not listed above)
- Any Appropriate Industry Articles, Market Research, Industry Newsletters and Competitive Analyses etc.
- Any External or Internal Analysis Regarding Competitors' Products, Pricing Trends
- Review of Federal, State and Local Tax Status
- Professional Relationships
  - Attorney
  - Accounting Firm
  - Public Relations Firm
  - Advertising Firm
  - Other

26

UND 08748

**A. 20**

Page 1

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
 3                 FOR THE DISTRICT OF DELAWARE
 4                          - - -
 5
 6    IN RE: ADAMS GOLF, INC. :
 7    SECURITIES LITIGATION    :
 8
 9                    ORAL DEPOSITION
10                          OF
11               EDWARD NECARSULMER, III
12               Monday, August 7, 2006
13                          - - -
14        Oral deposition of EDWARD NECARSULMER,
15    III, held at the offices of SIMPSON THACHER &
16    BARTLETT, LLP, 425 Lexington Avenue, New York,
17    New York, commencing at 12:08 p.m., reported
18    by Pamela Harrison, RMR, CRR, CSR and Notary
19    Public.
20                          - - -
21
22
23            RSA/VERITEXT COURT REPORTING COMPANY
               1845 Walnut Street, 15th Floor
24                  Philadelphia, PA  19103
               (215) 241-1000  (888) 777-6690
25
```

Page 106

EDWARD NECARSULMER, III

1    EDWARD NECARSULMER, III
2    A.    I do.
3    Q.    Do you believe that there was
4  any reason why the underwriter should not have
5  called Mackenzie in the due diligence process?
6        MR. GLUCKOW: Objection to the
7        form. Mischaracterizes the document in
8        the record.
9        You can answer.
10 BY MR. LEWIS:
11   Q.    Let me back up. Do you know who
12 Mackenzie is?
13   A.    From reading the documents, I
14 know who they are; yes, I do.
15   Q.    Do you know that they are a
16 retailer who had spoken to Adams about a
17 potential gray market Costco problem in Canada?
18        MR. GLUCKOW: Objection to the
19        form. Mischaracterizes the record.
20        You can answer.
21        THE WITNESS: I know they were
22        the Canadian, I'll say, distributor or
23        retailer of Adams.
24 BY MR. LEWIS:
25   Q.    And what, if any, communications

Page 107

1    EDWARD NECARSULMER, III
2  can you recall between Mackenzie and Adams on
3  the subject of gray market or Costco?
4        MR. GLUCKOW: Between Mackenzie
5        and Adams?
6        MR. LEWIS: Right, between
7        Mackenzie and Adams.
8        THE WITNESS: I saw a series of
9        documentation -- faxes, memos, whatever
10       you want to call them -- going back and
11       forth suggesting that they were having
12       questioning of how these clubs -- were
13       they in Costco and how they got there
14       and what the company is going to do
15       about it.
16 BY MR. LEWIS:
17   Q.    Are you aware of any contact
18 between the underwriters and Mackenzie as part
19 of the due diligence process?
20   A.    None.
21   Q.    Did you have any understanding
22 as to why there was no contact between the
23 underwriters and Mackenzie in the due diligence
24 process?
25   A.    I don't. I don't.

Page 108

1    EDWARD NECARSULMER, III
2    Q.    Do you believe that there should
3  have been contact between the underwriters and
4  Mackenzie as part of due diligence?
5    A.    No.
6    Q.    And why is that?
7    A.    I'll say that I don't know
8  whether they were given, you know -- the list of
9  customers that they were given simply didn't
10 include them.
11       I guess I would also add that
12 it's okay -- I wouldn't necessarily think --
13 and, again, it's very hard to put yourself
14 back in their place, but I wouldn't
15 necessarily think if I was trying to uncover
16 or discover or investigate, that Canada would
17 be a place that I would, you know, spend a lot
18 of time looking for issues relative to
19 southern California or Florida or someplace
20 where I would intuitively have thought may
21 have been more important to a golf club
22 company.
23   Q.    You have seen the questionnaire
24 that Adams sent to -- strike that; that the
25 underwriters sent to Adams' retailers as part of

Page 109

1    EDWARD NECARSULMER, III
2  the due diligence process?
3        MR. GLUCKOW: Objection to the
4        form. It assumes facts not in
5        evidence.
6        You can answer.
7  BY MR. LEWIS:
8    Q.    Have you seen questionnaires --
9    A.    Yes.
10   Q.    -- that were used in connection
11 with the underwriters' investigation of
12 retailers?
13   A.    I have.
14   Q.    And would it be fair to say that
15 those questionnaires did not include any
16 specific questions relating to gray marketing or
17 Costco?
18       MR. GLUCKOW: Objection to the
19       form. Vague and ambiguous.
20       You can answer.
21       THE WITNESS: The answer is yes,
22       but I would think that the statement,
23       "Are there any other issues (legal,
24       contractual, or otherwise) which you
25       feel are important" would certainly

28 (Pages 106 to 109)

Page 110

EDWARD NECARSULMER, III
1  EDWARD NECARSULMER, III
2  take care of that responsibility.
3      MR. LEWIS: I move to strike the
4  latter part of that. We'll get to the
5  overall -- the larger question within
6  the questionnaires.
7  BY MR. LEWIS:
8      Q.  Have you seen Exhibit 193?
9      A.  Yes, I've seen it.
10     Q.  Is it your understanding that
11  this is a blank copy of a Customer Due Diligence
12  Questionnaire that was used by the underwriters
13  in connection with the due diligence
14  investigation?
15     A.  That's my understanding.
16     Q.  Now, you mentioned, in response
17  to an earlier question, that the underwriters
18  had received information about gray marketing
19  from marketing people at Adams.
20         Can you tell me when in your
21  understanding that information was received?
22         MR. GLUCKOW: Objection to the
23  form. It mischaracterizes the
24  testimony.
25         You can answer.

Page 111

1  EDWARD NECARSULMER, III
2      THE WITNESS: I can't tell you
3  when. I know there was a press release
4  in June, I believe it was June.
5  BY MR. LEWIS:
6      Q.  June --
7      A.  I assume it was coincident or
8  before that time. I just can't tell you from
9  not having the documents; my memory isn't that
10  good.
11     Q.  Well, do you recall any
12  testimony by Ms. Pulido-Crowe that the subject
13  of gray marketing came up during drafting
14  sessions?
15     A.  I do recall that testimony. I
16  actually recall, to be exact, she said she
17  believed that it came up.
18     Q.  In the drafting sessions?
19     A.  Yes.
20     Q.  And the drafting sessions were
21  all held in April?
22     A.  Correct.
23     Q.  Do you know -- strike that.
24         Can you recall, as you sit
25  here, any inquiries made by the underwriters

Page 112

1  EDWARD NECARSULMER, III
2  to Adams concerning Costco or gray marketing
3  after Adams issued the press release that it
4  had filed a proceeding against Costco?
5      MR. GLUCKOW: Can I have that one
6  back, please. Thank you.
7      (The court reporter read the
8  record as follows:
9      "QUESTION: Can you recall, as
10  you sit here, any inquiries made by the
11  underwriters to Adams concerning Costco
12  or gray marketing after Adams issued
13  the press release that it had filed a
14  proceeding against Costco?")
15     MR. GLUCKOW: Vague and
16  ambiguous.
17         You can answer.
18         THE WITNESS: I don't recall.
19  BY MR. LEWIS:
20     Q.  Have you, in your long career in
21  the securities industry, been the person who had
22  to ask a customer information that was set forth
23  on a questionnaire?
24     A.  I've done it but not in recent
25  memory or recent history.

Page 113

1  EDWARD NECARSULMER, III
2      Q.  When you were --
3      A.  Younger.
4      Q.  -- younger and I was younger and
5  we all were browner on top.
6         Can you describe how difficult or
7  easy you found it to get a customer to answer
8  the questions on a due diligence questionnaire?
9      MR. GLUCKOW: Vague and
10  ambiguous.
11         You can answer.
12         THE WITNESS: My best
13  recollection is it's sort of both ends
14  of the spectrum. There are people who
15  like to talk; they are very
16  enthusiastic about XYZ's product; it's
17  important to them. There are other
18  people who basically tell you that they
19  don't talk much about, you know, their
20  suppliers. So it's -- people are
21  usually pretty cooperative, they are
22  usually -- but the value of the
23  information varies greatly.
24  BY MR. LEWIS:
25     Q.  And you never know when exactly

29 (Pages 110 to 113)

EDWARD NECARSULMER, III

1
2  you are getting someone and what kind of mood
3  he's in or she is in at the time you catch them,
4  is that fair?
5         MR. GLUCKOW: Vague and
6         ambiguous.
7             You can answer.
8         THE WITNESS: It's fair, with the
9         exception that you hope that, you know,
10        that you are good enough and you
11        understand enough about the subject to
12        qualify the responses.
13  BY MR. LEWIS:
14       Q.    Was it your practice to actually
15  send customers questionnaires before you spoke
16  to them about the contents of them?
17       A.    No.
18       Q.    You used the questionnaire as a
19  guide to your conversation with the client and
20  pulled the information out of them as best you
21  could?
22       MR. GLUCKOW: Objection to the
23       form.
24           You can answer.
25       THE WITNESS: That's correct.

EDWARD NECARSULMER, III

1
2  BY MR. LEWIS:
3       Q.    Do you know how the
4  questionnaires were completed in this case?
5       A.    They were -- it's my
6  understanding that they were -- there were
7  telephone or other conversations and they were
8  recorded by the questioner, the results were
9  recorded by the questioner.
10      Q.    So that the questionee did not
11  necessarily -- did not have the questionnaire in
12  front of him?
13      A.    I do not know that for a fact,
14  but that's my understanding.
15      Q.    Now, I showed you the blank
16  questionnaire and that questionnaire contains
17  the question that you alluded to in the portion
18  of your testimony that I asked to strike, which
19  is Question 13: "Are there any other issues
20  (legal, contractual or otherwise) which you feel
21  are important?"
22           That is Question 13, correct?
23      A.    Correct.
24      Q.    If you wanted to determine in a
25  due diligence investigation whether there was

EDWARD NECARSULMER, III

1
2  ongoing gray marketing distribution or ongoing
3  Costco distribution, would you agree that
4  Question 13 would not be a very direct way to
5  find that out?
6         MR. GLUCKOW: Objection to the
7         form. Incomplete hypothetical.
8         Assumes facts not in evidence. Vague
9         and ambiguous.
10            You can answer.
11        THE WITNESS: I would not agree
12        to that. Often these -- whether they
13        are a list of questions or they are a
14        questionnaire, you sent them out there
15        to set a framework to find out what you
16        can find out, and often it's more
17        useful to ask a question like this one
18        than -- sometimes it is -- than a more
19        direct "Are you doing this?" or "Are
20        you seeing that?" Because you might
21        get a more helpful response.
22  BY MR. LEWIS:
23      Q.    Well, if the recipient of this
24  questionnaire had heard from Adams previously
25  that Adams was aware of some Costco distribution

EDWARD NECARSULMER, III

1
2  and was taking steps to address it, the person
3  answering the questions might not think that
4  mentioning gray marketing was of any
5  importance. Is that fair?
6         MR. GLUCKOW: The same
7         objections.
8             You can answer.
9         THE WITNESS: I'm not trying to
10        be difficult; I just don't know how to
11        answer and the hypothetical is too far
12        out there for me.
13            It's certainly -- if someone
14        specifically told you, "Don't worry
15        about it; we are taking care of it,"
16        I'm not sure that would deter you from
17        saying there's an issue but the company
18        is taking care of it. I just don't
19        know.
20  BY MR. LEWIS:
21      Q.    In any event, there was no
22  specific question about Costco or gray marketing
23  on that questionnaire --
24      MR. GLUCKOW: Objection.
25  BY MR. LEWIS:

30 (Pages 114 to 117)

Page 122

EDWARD NECARSULMER, III

1    that.
2    that.
3    BY MR. LEWIS:
4        Q.    Have you seen any evidence that
5    the underwriters were aware of new or increased
6    distribution of Adams's products in Costco
7    locations between the time of Ms. Pulido-Crowe's
8    discussion with Barney Adams and the time of the
9    IPO?
10        MR. GLUCKOW: Objection. Vague
11    and ambiguous. Incomplete.
12        THE WITNESS: Not during that
13    period, no.
14    BY MR. LEWIS:
15        Q.    And do you have any reason to
16    believe, as you sit here, that the underwriters
17    learned anything about the changes in gray
18    market distribution between Ms. Pulido-Crowe's
19    discussion with Barney Adams and the IPO?
20        MR. GLUCKOW: Objection to the
21    form. It mischaracterizes the record
22    particularly with respect to the
23    reference to a discussion.
24        You can answer.
25        THE WITNESS: At some point, the

Page 123

EDWARD NECARSULMER, III

1    
2    process of these pro shop surveys began
3    by the equity research analyst. I
4    believe that did start before the IPO.
5    I'm not certain that information would
6    have been -- in my experience, it was
7    unlikely that that information would
8    have been shared with the banking team.
9    BY MR. LEWIS:
10        Q.    Why do you say it's unlikely it
11    would have been shared?
12        A.    Because in most cases as they --
13    that the research that was done out of the
14    equity department would not likely to be, you
15    know, shared with; it was not normal practice to
16    share it with the people in the investment
17    banking side.
18        Q.    Did that have to do with the
19    existence of the so-called Chinese walls between
20    the investment banking and the research side,
21    the brokerage firms, in those days?
22        A.    Partially; although, there would
23    be nothing specifically prohibited of
24    information going that way.
25        Q.    "That way" meaning...?

Page 124

EDWARD NECARSULMER, III

1    
2        A.    The direction from research to
3    banking. So it wasn't a normal -- to me, it
4    wouldn't have been a normal practice, normal
5    procedure.
6        Q.    There would have been a
7    prohibition on information going the other
8    direction, from banking to research?
9        A.    That is correct.
10        MR. GLUCKOW: Don, again, we've
11    been going another hour, so whenever
12    there is a convenient break.
13        MR. LEWIS: We can stop this
14    second.
15        MR. GLUCKOW: Okay.
16        (A recess was had from 2:31 p.m.
17    to 2:43 p.m.; and then the proceedings
18    continued as follows:)
19    BY MR. LEWIS:
20        Q.    Let me back up to go forward.
21    In your expert report in this case, the first
22    page --
23        A.    So this is also the rebuttal
24    report.
25        MR. GLUCKOW: Here we are, 321.

Page 125

EDWARD NECARSULMER, III

1    
2        THE WITNESS: First page, yes.
3    BY MR. LEWIS:
4        Q.    The first page, Paragraph 6(A),
5    Summary of Opinions. You begin by saying: "In
6    my experience in the process of adequate due
7    diligence, the underwriters should gather and
8    review the following types of information. The
9    contents and scope of this review may vary
10    greatly depending on the issuer, but in general,
11    these are the categories that should be
12    considered."
13        In your expert report in the AMF
14    case --
15        MR. GLUCKOW: 324?
16        MR. LEWIS: 324.
17    BY MR. LEWIS:
18        Q.    -- you used the same words
19    except that instead of "should be considered,"
20    you had used the words "must be considered."
21        A.    Semantics.
22        Q.    Is there any significance to the
23    change in your report?
24        A.    Semantics.
25        Q.    Did you think it was more

32 (Pages 122 to 125)

EDWARD NECARSULMER, III

1
2  correct to say "should" than "must"?
3      A.    I candidly can't answer that. I
4  think of -- I thought of the -- I tried to
5  conceive of the thought and I really didn't
6  refer to this much past -- the prior report,
7  much past kind of using it for form, and I knew
8  there was some boilerplate that would be
9  acceptable to be used in the beginning, and then
10  I kind of just went ahead and drafted as I saw
11  fit.
12      Q.    In the same Paragraph 6, the
13  next page --
14      A.    On AMF or Adams?
15      Q.    In Adams.
16            Well, let's look at -- do you
17  have AMF there?
18            MR. GLUCKOW:  We have both, 321
19      and 324.
20  BY MR. LEWIS:
21      Q.    In AMF, among the steps you
22  listed was number 6:  "Review of work performed
23  or reports prepared by underwriters' counsel and
24  the issuer's auditors."
25            Your Paragraph 6 in this case

EDWARD NECARSULMER, III

1
2  simply read:  "Meeting with the issuer's counsel
3  and public accountants."
4            Can you explain whether there was
5  a difference that caused you to change your
6  report?
7            MR. GLUCKOW:  Object to the
8      characterization.
9  BY MR. LEWIS:
10      Q.    Is there any significance to the
11  change in terminology between the two reports?
12      A.    I thought in -- that the way I
13  said it in 321 was a better representation of
14  what the process really is.
15      Q.    Can you explain that thought?
16      A.    Because it occurred to me -- and
17  again, I didn't think it was a major thing -- it
18  sort of occurred to me that you weren't
19  necessarily just reviewing their work, you were
20  meeting with them, you were talking with them,
21  you were trying to understand, let's say, there
22  was a patent issue or an inventory issue, so it
23  wasn't just the report but you are trying to
24  have a dialog as part of your understanding of
25  the company; that was what I was really trying

EDWARD NECARSULMER, III

1
2  to get at.
3      Q.    Okay.  Would you agree with the
4  general proposition that in due diligence an
5  underwriter should be skeptical of rosy outlooks
6  by the issuer's management?
7            MR. GLUCKOW:  Object to the
8      form.  Vague and ambiguous.  Asked and
9      answered.
10            You can answer.
11            THE WITNESS:  I don't think --
12      just because someone is optimistic
13      doesn't necessitate skepticism.  We've
14      come to learn to live with rapid growth
15      in our -- once we got out of the '60s
16      and '70s, rapid growth was a big part
17      of our lives.  So I would have to say
18      even though intuitively I would agree
19      with you, I think the right answer is
20      no.
21  BY MR. LEWIS:
22      Q.    Now, in Paragraph 6(C)(2) of
23  your report, you state that "An extensive due
24  diligence outline and materials request list was
25  prepared and presented to company management at

EDWARD NECARSULMER, III

1
2  the organizational meeting."
3            Just to make sure we are on the
4  same page:  Are you referring there to Exhibit
5  153?  Specifically, to the due diligence -- due
6  diligence outline and request list that begins
7  at Page 8741?
8      A.    Yes, that is to what I was
9  referring.
10      Q.    And would it be fair to say that
11  there was no specific request in the due
12  diligence outline or materials request for data
13  relating to either Costco or gray marketing?
14            MR. GLUCKOW:  Objection to the
15      extent the document speaks for itself.
16            You can answer.
17            THE WITNESS:  That's correct.  If
18      I could add, in this type of a list it
19      doesn't surprise me at all that there
20      isn't specific caption items.  It's
21      usually given to let the company know
22      what the work ahead of them is.
23  BY MR. LEWIS:
24      Q.    Okay.  Is there any item on the
25  due diligence list or materials request list

EDWARD NECARSULMER, III

1  that you believe should have caused the company
2  to provide the underwriters with any data
3  regarding either Costco or gray market
4  distribution?
5          MR. GLUCKOW: Object to the
6      form. The document speaks for itself.
7      It calls for speculation.
8          You can answer.
9          THE WITNESS: No.
10 BY MR. LEWIS:
11      Q.    Let me show you Exhibit 154,
12 previously marked, and this is a document with a
13 file folder tab Organization Meeting and some
14 handwritten notes that may be beyond my eyesight
15 or cryptography skills at this point.
16      A.    I'm with you.
17      Q.    Did you review a version of
18 Exhibit 154 in the course of your work?
19      A.    I did see this document.
20      Q.    Did you work your way through it
21 at the time?
22      A.    To the best of my ability.
23      Q.    Did you find any reference in it
24 that you thought was to gray marketing or Costco

EDWARD NECARSULMER, III

1  distribution?
2          MR. GLUCKOW: Object to the
3      extent the document speaks for itself.
4          You can answer.
5          THE WITNESS: No.
6  BY MR. LEWIS:
7      Q.    Let me show you what has been
8  marked as Exhibit 228. Did you review Exhibit
9  228 in the course of your work?
10      A.    I've seen this article before,
11 so the answer is yes.
12      Q.    If you just look at the last
13 page of the document, you'll see there's a
14 reference to Edwin Watts and some commentary
15 about various subjects. Did you read that
16 paragraph?
17          MR. GLUCKOW: Take your time and
18      make sure you read it before you
19      answer.
20          (Witness reviewing document.)
21          THE WITNESS: I don't recall
22      reading that paragraph.
23 BY MR. LEWIS:
24      Q.    Okay. Do you have any reason to

EDWARD NECARSULMER, III

1  believe that the underwriters had a copy of
2  Exhibit 228 prior to the effective date of the
3  offering in their due diligence files?
4          MR. GLUCKOW: Objection to the
5      form.
6          You can answer.
7          THE WITNESS: I wouldn't know.
8  BY MR. LEWIS:
9      Q.    Let me show you Exhibit 197, and
10 this is a copy of what purports to be a Customer
11 Due Diligence Questionnaire completed with
12 respect to Edwin Watts. Have you reviewed this
13 as part of your expert work in this case?
14      A.    Yes, it was in the material that
15 I was provided.
16      Q.    If you had been conducted --
17 strike that.
18          Do you have any reason to believe
19 that Mr. Watts was asked any specific questions
20 about Costco in the course of his interview,
21 which was, according to this date, on April 21,
22 1998?
23          MR. GLUCKOW: The document speaks
24      for itself.

EDWARD NECARSULMER, III

1          You can answer.
2          THE WITNESS: I have no knowledge
3      of that question or response to it.
4  BY MR. LEWIS:
5      Q.    And you have no knowledge of
6  there being questions asked that are not
7  contained or commented on in this document
8  itself?
9      A.    I could respond that it would be
10 unusual that the conversation would just --
11 would you mind answering the following nine
12 questions; but I certainly couldn't support
13 that, I mean, cite any evidence of that.
14      Q.    Why do you say it would be
15 unusual?
16      A.    Well, the purpose of these type
17 of exercises is to engage the person you are
18 talking to in some sort of a dialog about the
19 company you are checking on. Sometimes they are
20 expansive; sometimes they are not. Usually the
21 questionnaire is, you know, an outline, a way to
22 memorialize the conversation, but, hopefully,
23 it's -- you know, there's some dialog, but I
24 don't know because I haven't seen it, and I have

Page 166

1          EDWARD NECARSULMER, III
2          MR. LEWIS:  Take your time.
3          MR. GLUCKOW:  This one
4     (indicating).
5          A.    I don't -- I don't recall this
6     specific one.
7          Q.    Okay.  Based on your work in
8     this case, do you know of any reason why the
9     complaints -- the written complaints that are
10    listed by Mr. Grace in his report would not have
11    been available to the underwriters as part of
12    their due diligence investigation if they had
13    asked to see them?
14         MR. GLUCKOW:  Objection to the
15         form.  It assumes facts not in
16         evidence.
17         You can answer.
18         THE WITNESS:  I don't know why it
19         wouldn't have been available had they
20         asked to see them.
21    BY MR. LEWIS:
22         Q.    You don't know why it wouldn't
23    have been?
24         A.    Correct.
25         Q.    Do you have any knowledge, as

Page 167

1          EDWARD NECARSULMER, III
2     you sit here, that the underwriters contacted,
3     as part of the due diligence investigation, any
4     of the retailers who made the complaints about
5     Costco that are listed between the dates of
6     March 23, 1998, and July 8, 1998?
7          MR. GLUCKOW:  Objection to the
8          form.  Are you asking him to compare
9          this list of complaints with the list
10         of customer calls that we've looked at
11         previously?
12         MR. LEWIS:  Sure, if you want to;
13         but none of them were on the list of
14         customer calls, so I don't think he has
15         to do that.
16    BY MR. LEWIS:
17         Q.    Do you have any knowledge that
18    any of the complaining retailers were contacted
19    by Lehman Brothers or any of the comanagers
20    during due diligence?
21         A.    I have no knowledge of that.
22         Q.    You have opined in your rebuttal
23    report on the subject of the disclosure that was
24    made in this case.  Would you agree that in
25    matters of disclosure that an underwriter should

Page 168

1          EDWARD NECARSULMER, III
2     err on the side of inclusion of fact rather than
3     exclusion of fact?
4          MR. GLUCKOW:  Objection to the
5          characterization of the report.
6          But you can answer.
7          THE WITNESS:  I'm not sure that's
8          accurate.  I think it's important to
9          have a complete document, but I think
10         part of making it a useful document,
11         and for the benefit of the investors,
12         is making sure that the -- the things
13         that are -- the things that are
14         included are, you know, significant to
15         the company, and I think one of the --
16         having gone through this drafting
17         process a million times, one of the
18         great problems is what do you put in,
19         what do you put out, what do you leave
20         out, and it does start -- you know, can
21         strike likely debate, and I think
22         striking some balance is really the
23         goal.
24    BY MR. LEWIS:
25         Q.    Would you agree that if by the

Page 169

1          EDWARD NECARSULMER, III
2     time of the IPO the underwriters were unable to
3     make a studied assessment of the scope of the
4     risk of gray marketing that the risk of gray
5     marketing should have been included as a risk
6     disclosure?
7          MR. GLUCKOW:  Objection to the
8          form.  Incomplete hypothetical.
9          Assumes facts not in evidence.
10         You can answer.
11         THE WITNESS:  I don't agree with
12         that.  I think, again, this is a
13         process, you make a judgment as to
14         those things you think are significant
15         and relevant, and those are the things
16         you include.
17    BY MR. LEWIS:
18         Q.    What if you concluded by the
19    time of the effective date that you just didn't
20    know what the scope of gray marketing was?
21         MR. GLUCKOW:  Objection.  The
22         same objections, and it
23         mischaracterizes the evidence.
24         THE WITNESS:  My interpretation
25         of what I read, what I reviewed, was

43 (Pages 166 to 169)

EDWARD NECARSULMER, III

1
2          that they did make a judgment, and
3          their judgment was that they did know
4          enough and it was not material.
5 BY MR. LEWIS:
6      Q.    When was that judgment made, to
7 the best of your knowledge?
8      A.    Prior to the effective date of
9 the registration statement. I couldn't tell
10 you -- I couldn't make it any more specific than
11 that.
12      Q.    Prior to the Costco press
13 release?
14          MR. GLUCKOW: Objection to the
15      form. It mischaracterizes the record.
16      It mischaracterizes the testimony.
17      You can answer.
18 BY MR. LEWIS:
19      Q.    When I say the Costco press
20 release, I mean the Adams June 9, 1998, press
21 release relating to Costco.
22      A.    I don't know I would make -- you
23 know, the assumption I make from the data that I
24 reviewed is that that was their conclusion.
25      Q.    But are you aware of any meeting

EDWARD NECARSULMER, III

1
2 or meetings at which that conclusion was
3 reached?
4      A.    Not specifically, no.
5      Q.    Are you familiar with the term
6 stickering in the context of a prospectus or
7 registration statement?
8      A.    I am.
9      Q.    What does that term mean to you?
10      A.    You can add information via a
11 label, a long label, onto the cover of a
12 prospectus.
13      Q.    And under what circumstances in
14 your opinion does one sticker a registration
15 statement or a prospectus?
16      A.    Some fact coming out subsequent
17 to the printing of that prospectus that, you
18 know, you deem is material. Sometimes the SEC
19 will ask you to sticker if something comes up.
20 If effectiveness gets delayed for some reason
21 and, you know, a quarter ends or a contract gets
22 canceled or something like that, they'll often
23 allow that as a -- or recommend that as a way to
24 make sure the disclosure is complete.
25      Q.    Have you seen stickering done

EDWARD NECARSULMER, III

1
2 after the effective date of a registration
3 statement?
4      A.    I would have -- I would say yes,
5 but it's more usual on the date. But it could
6 be -- it could be shortly thereafter, not long
7 thereafter.
8      Q.    Are you aware of any limitation
9 to how long after the effective date a
10 prospectus can be stickered?
11      A.    I'm not aware of that, if there
12 is one.
13      Q.    Do you believe that's a legal
14 issue rather than a practice issue?
15          MR. GLUCKOW: Objection. It
16      calls for a legal conclusion.
17      But you can answer.
18      THE WITNESS: I don't know. I
19      don't know.
20 BY MR. LEWIS:
21      Q.    Do you know if any consideration
22 was given in this case to stickering the
23 registration statement?
24      A.    I don't know.
25      MR. LEWIS: Let's take a

EDWARD NECARSULMER, III

1
2 five-minute break and I may be done.
3      (A recess was had from 3:46 p.m.
4 to 4:00 p.m.; and then the proceedings
5 continued as follows:)
6 BY MR. LEWIS:
7      Q.    A point of clarification. When
8 we referred to a file memo from Joe Hoffman
9 relating to the SEC, I believe you used the term
10 signing official at the SEC?
11      A.    Examining official.
12      Q.    Examining?
13      A.    Sorry.
14      Q.    I think you actually used the
15 word sign at one point. Is that a synonym for
16 the examining official?
17          MR. GLUCKOW: I don't recall
18      those words being used, but the record
19      will speak for itself.
20      THE WITNESS: Should I respond?
21      MR. GLUCKOW: Yes, if you --
22      THE WITNESS: If I said it, I
23      didn't mean to say it. I meant to say
24      examiner.
25 BY MR. LEWIS:

Page 186

EDWARD NECARSULMER, III

1  retailers complaining between the beginning of
2  this chart and the IPO -- the beginning of
3  this chart starts February 16th, '98; and
4  there are nine calls that come into the call
5  center.
6      So with all of your experience
7  working as an underwriter in various IPOs, and
8  in light of the information in Exhibit 327 and
9  the number of retailers -- 7,000 -- and calls
10 to the call center -- upwards of 12,000 -- do
11 you think gray marketing should have been
12 listed as a risk factor in the Adams Golf
13 prospectus?
14     MR. LEWIS: Objection to form and
15 foundation.
16     MR. GLUCKOW: I'll just --
17     MR. LEWIS: Beyond the scope of
18 his purpose in this litigation
19 according to his testimony.
20     THE WITNESS: Should I answer?
21     MR. LEWIS: You may answer, if
22 you can.
23     THE WITNESS: I mean, it seems to
24 me, again, as I just answered
25

Page 187

EDWARD NECARSULMER, III

1  Mr. Gluckow, they made a determination
2  that while they knew of the issue, that
3  it simply wasn't -- didn't rise to the
4  level of, and I would rather use the
5  word significant than material because
6  I think material actually has a legal
7  connotation, also. So, therefore, like
8  many other issues, they made the
9  determination, the underwriters made
10 the determination, that there was no
11 benefit, no reason, you know, to take
12 it any further. And that's a judgment
13 you make when you are an underwriter,
14 when you do due diligence. There are
15 lots of factors to consider; you just
16 -- you make these decisions.
17 BY MS. MORIATY:
18     Q.   If you as an underwriter heard
19 that 12 retailers out of 7,000 complained, would
20 you think that this is a significant issue?
21     MR. LEWIS: Objection to form.
22     THE WITNESS: I would think that
23 it would be less than I would have
24 guessed the normal sample would be, so
25

Page 188

EDWARD NECARSULMER, III

1  I think it would not be a significant
2  issue.
3 BY MS. MORIATY:
4      Q.   And if you heard that nine calls
5  out of more than 12,000 were regarding a certain
6  issue, would you have thought that issue
7  significant enough to investigate further or put
8  as a risk factor?
9      MR. LEWIS: Objection to form and
10 foundation.
11     THE WITNESS: It's hard to, you
12 know -- no, the answer is no, the
13 numbers are simply too small, putting
14 myself in that spot.
15     MS. MORIATY: Thanks. No further
16 questions here.
17         - - -
18         EXAMINATION
19         - - -
20 BY MR. LEWIS:
21     Q.   Mr. Necarsulmer, can you say
22 that as someone who is overseeing due diligence
23 investigations in the past if you had
24 Mr. Grace's report before you at the time of the
25

Page 189

EDWARD NECARSULMER, III

1  IP -- just before the IPO was effective and saw
2  that Adams' clubs were appearing in Costco
3  warehouses in diverse locations in the country,
4  that that was something you wouldn't have asked
5  some questions about?
6      MR. GLUCKOW: Objection to form.
7  Incomplete hypothetical.
8  Mischaracterizes the record.
9      You can answer.
10     THE WITNESS: I mean, you know,
11 it's very hard to look back, but I
12 again think that -- I again think that
13 you -- the judgment -- I keep going
14 back -- the totality of this, it is my
15 opinion, and I certainly believe it,
16 that they made an informed -- given all
17 the facts that they knew, they made a
18 reasonable judgment that it was not --
19 did not rise to the level of being a
20 risk factor.
21 BY MR. LEWIS:
22     Q.   The underwriters could have kept
23 the offering from going forward any time up to
24 the effective date, could they not, if they were
25

48 (Pages 186 to 189)

Page 190

EDWARD NECARSULMER, III

1  EDWARD NECARSULMER, III
2  not satisfied as to -- that all proper
3  disclosures were being made?
4          MR. GLUCKOW: Incomplete
5  hypothetical. Assumes facts not in
6  evidence.
7          You can answer.
8          THE WITNESS: Sure; you can even
9  do it after the effective date.
10 BY MR. LEWIS:
11         Q.     How late after the effective
12 date can you do it?
13         MR. GLUCKOW: It calls for a
14 legal conclusion.
15 BY MR. LEWIS:
16         Q.     In your understanding, to the
17 best of your knowledge, how late after the
18 effective date can you stop an underwriting?
19         MR. GLUCKOW: The same
20 objections.
21         THE WITNESS: I don't remember --
22 I don't know if it's 30 or 40. There's
23 a number, I just don't know what it is,
24 or I don't remember what it is, and it
25 may have changed since I was actively

Page 191

1  EDWARD NECARSULMER, III
2  doing this. I thought there was some
3  sort of -- I don't remember. The
4  answer is I don't remember whether it's
5  30 days or 45 days or whether it's even
6  a specific number any longer, but...
7          MR. LEWIS: Nothing further.
8          MR. GLUCKOW: Nothing further.
9          MS. MORIATY: No. Good.
10         MR. GLUCKOW: Thank you very
11 much.
12         (Deposition concluded at
13 4:26 p.m.)
14                -O-
15
16
17
18
19
20
21
22
23
24

Page 192

1
2          C E R T I F I C A T E
3          I, Pamela Harrison, a Notary
4  Public, do hereby certify:
5          That EDWARD NECARSULMER, the
6  witness whose testimony is hereinbefore set
7  forth, was duly sworn by me and that such
8  testimony given by the witness was taken down
9  stenographically by me and then transcribed.
10         I further certify that I am not
11 related to any of the parties to this
12 action by blood or marriage, and that I am in
13 no way interested in the outcome of this
14 matter.
15
16
17         _____
           Pamela Harrison
           Registered Merit Reporter
18         Certified Realtime Reporter
           CSR-NJ # 30X100221600
19         Notary Public
           Date: August 8, 2006
20
21         (The foregoing certification of
   this transcript does not apply to any
22 reproduction of the same by any means, unless
   under the direct control and/or supervision of
23 the certifying shorthand
   reporter.)
24

Page 193

1
2          INSTRUCTIONS TO WITNESS
3          Please read your deposition
4  over carefully and make any necessary
5  corrections. You should state the reason in
6  the appropriate space on the errata sheet for
7  any corrections that are made.
8          After doing so, please sign the
9  errata sheet and date it.
10         You are signing same subject to
11 the changes you have noted on the errata sheet,
12 which will be attached to your deposition.
13         It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within thirty (30) days of receipt of
16 the deposition transcript by you. If you fail
17 to do so, the deposition transcript may be
18 deemed to be accurate and may be used in court.
19
20
21
22
23
24

49 (Pages 190 to 193)

**A. 21**

SENT BY:ARTER & HADDEN-DALLAS : 7- 1-98 : 9:54PM :    ARTER & HADDEN    2650245:= 7/ 8

# M E M O R A N D U M

TO:       File                                            June 25, 1998

FROM:    Joe Hoffman

RE:       Adams Golf SEC Comments


     Carolyn Kurr of the SEC called to relay to me the SEC's comments on the Adams Golf S-1 Registration Statement Amendment No. 1 filing.

     The following is a summary of the Staff's comments:

1.  The Staff has conducted a review of press releases and other publicity regarding the Company and noted that Mr. Adams, the Chairman of the Company, was quoted in a number of articles.  Please make a good faith effort to review recent publicity and to square the information therein with the Prospectus.

2.  The Staff has noticed that the Company has an interactive site with Mr. Adams on its web page.  Please discontinue the use of this feature until the Registration Statement has become effective.

3.  Consider updating disclosure in the Prospects regarding USGA approval of golf equipment.

4.  The Staff wanted the Company to consider whether disclosure of the Costco matter was necessary.


104367.1



UND 02708

**A. 22**

1              IN  THE  UNITED  STATES  DISTRICT  COURT
                 FOR  THE  DISTRICT  OF  DELAWARE
2                         -    -    -
3

IN RE ADAMS GOLF, INC.   : CONSOLIDATED
4                        :

SECURITIES LITIGATION    : C.A. No. 99-371 KAJ
5
6              ------------------------
                 Wednesday, June 7, 2006
7              ------------------------
8
9          Oral deposition of JOSEPH D. TEKLITS, taken
10    pursuant to notice, was held at the offices of
11    SIMPSON, THACHER, AND BARTLETT, LLP, 425 Lexington
12    Avenue, 28th Floor, New York, New York 10017,
13    commencing at 10:07 a.m. on the above date, before
14    Beth A. Barkocy, Certified Shorthand Reporter and
15    Notary Public.
16
17
18
19
20                        -    -    -
21         RSA/VERITEXT COURT REPORTING COMPANY
                 1845 Walnut Street, 15th Floor
22                 Philadelphia, PA    19103
                 (215)241-1000      (888)777-6690
23
24
25

JOSEPH D. TEKLITS

Page 26

1 　Q. 　What happened at that meeting, if
2 you remember?
3 　A. 　I remember being at the headquarters
4 building in Plano. I remember being in a conference
5 room with a group of people. I remember that some of
6 the management team from Adams Golf spoke to us in
7 that conference room. I remember taking a tour of the
8 building, which included a call center, I recall
9 specifically, incoming calls, taking orders. I
10 remember going out to a driving range nearby and
11 hitting golf balls. I remember reading letters on a
12 wall that were framed from famous people addressed to
13 Barney Adams. At this time, that's what I recall.
14 　Q. 　How long did the meeting last,
15 several days or --
16 　A. 　I was there for a day. It was all
17 in one day.
18 　Q. 　I take it Barney Adams spoke to you,
19 spoke with the group?
20 　A. 　Yes.
21 　Q. 　Do you remember any of the things
22 that Adams said?
23 　A. 　No.
24 　Q. 　I take it that you were given Adams
25 Golf clubs to go to the driving range?

Page 27

1 　A. 　I don't recall specifically, but I
2 surely would hope we were using his clubs, yes.
3 　Q. 　At that time, did you have any idea
4 what was going to be in the registration statement?
5 　A. 　I don't recall the timing.
6 　Q. 　You don't recall the timing at all?
7 　A. 　No.
8 　Q. 　April the 1st.
9 　A. 　No.
10 　Q. 　Had you written anything about Adams
11 Golf as of this time?
12 　A. 　I don't recall. The only place I
13 would have written something was in a research report
14 about the golf industry or about one of Adams Golf's
15 competitors, so if I had written anything about Adams
16 Golf, it would have been in a research report.
17 　Q. 　Did you take any notes during this
18 day?
19 　A. 　I can't recall.
20 　Q. 　What did you do when you took notes
21 at a meeting; how did you preserve those notes?
22 　MR. McEVOY: Object to the form.
23 We're not talking about the April 13 meeting
24 anymore, we're just talking in general?
25 　MS. FOX: We're talking in general,

Page 28

1 because he doesn't remember if he took notes
2 at the April 1 meeting.
3 　THE WITNESS: I had files in a
4 cabinet in my office on companies that I
5 researched and I would file notes
6 chronologically, hopefully, in those folders.
7 BY MS. FOX:
8 　Q. 　Did you have an Adams Golf folder?
9 　A. 　Yes.
10 　Q. 　These would be handwritten notes or
11 notes on a computer?
12 　MR. McEVOY: Object to the form.
13 If you recall taking notes, that's
14 fine; if we're talking about speculation,
15 that's a different story.
16 　THE WITNESS: Yeah, generally, that
17 folder would include anything that was
18 relevant to my research in the company. It
19 could be an annual report, could be something
20 I printed off my computer, could be something
21 I wrote by hand.
22 BY MS. FOX:
23 　Q. 　Were you carrying a computer around
24 with you at that time, if you remember?
25 　A. 　To this meeting, I don't recall. In

Page 29

1 general, a laptop, actually, I don't really recall
2 when that was made available to me.
3 　Q. 　What did you do with those notes at
4 the time you left Ferris Baker?
5 　MR. McEVOY: I'm going to object to
6 the form because I'm not sure that we've
7 established that notes were taken at this
8 meeting or at any other point about Adams.
9 BY MS. FOX:
10 　Q. 　Any notes you took or any contents
11 of your folder about Adams Golf, what did you do with
12 that at the time you left Ferris Baker?
13 　A. 　I recall taking some of my files out
14 of my office at Ferris Baker with me to go to my next
15 job.
16 　Q. 　What was your next job?
17 　A. 　First Union Securities.
18 　Q. 　Are those files still extant; do you
19 still have them or does someone still have them?
20 　A. 　Today, no, because I don't work
21 there either anymore, so I don't have any of those old
22 research notes. They were either left at Ferris Baker
23 Watts or at Wachovia Securities, which is what First
24 Union turned into.
25 　Q. 　How long were you at First

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000　(888) 777-6690　(610) 434-8588

**A. 23**

ramona02\groups\sanfran\walraven\clients\adams\ipo\due diligence\customer questionnaire.doc - Eileen Maldonado - ~AUTODATE~AUTODATE - Page 1 of 4

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

| **Customer Name** | **Contact Name** | **Interviewer Name** | **Date** |
|---|---|---|---|

1) For how long have you been doing business with Adams Golf?

**EXHIBIT**

*193*

2) What is your role and title at your company?

3) Which golf clubs does your company purchase from Adams Golf?  At what price do you sell them?

| | Price | |
|---|---|---|
| | **Steel Shaft** | **Graphite Shaft** |
| ☐ Tight Lies | _____ | _____ |
| ☐ Tight Lies #3 | _____ | _____ |
| ☐ Tight Lies #5 | _____ | _____ |
| ☐ Tight Lies #7 | _____ | _____ |
| ☐ Tight Lies #9 | _____ | _____ |
| ☐ Air Assault Drivers | _____ | _____ |
| ☐ Assault$^{VMI}$ Irons | _____ | _____ |
| ☐ Assault$^{VMI}$ Putters | _____ | _____ |

- 1 -

CONFIDENTIAL

UND 010634

ram-bna02\groups\sanfran\walraven\clients\adams\ipo\due diligence\customer questionnaire.doc - Eileen Maldonado - ~AUTODATE~AUTODATE - Page 2 of 4

# *Adams Golf, Inc.*
# *Customer Due Diligence Questionnaire*

4) Approximate your annual dollar volume of Adams Golf club sales. Do you expect business to increase during the next one and two years?

- What percent of your equipment sales in a given month are Adams clubs?

5) Based on your industry knowledge, how does the growth of Adams Golf compare to that of other golf companies you've seen?

6) Are customers pre-disposed to purchasing the Adams Golf clubs or do you find yourself having to introduce and describe the club to customers?

- Do Adams clubs increase customer traffic in your store?

- 2 -

CONFIDENTIAL

UND 010635

rsmbns02\groups\sanfran\walraven\cxents\adams\ipo\due diligence\customer questionnaire.doc - Eileen Maldonado - ~AUTODATE~AUTODATE - Page 3 of 4

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

7) Are Fairway Woods a growing part of your business? Is Adams Golf selling the most units of Fairway Woods?

- What percent of your equipment sales are Fairway Woods today vs. 5 years ago?

- Who else are the major players in this space?

8) Do you think Adams Golf will have the ability to develop new products which customers will be pre-disposed to consider buying?

- Would you consider carrying new product lines from Adams?

- What would your preference be for a new club?

9) What are your impressions of Adams Golf's direct response channel (1-800-number)? Do you see the 1-800-number as a source of competition?

- 3 -

CONFIDENTIAL                                        UND 010636

rambnaC2\groups\sanfran\warraven\clients\adams\ipo\due diligence\customer questionnaire.doc - Eileen Maldonado - ~AUTODATE~AUTODATE - Page 4 of 4

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

10) How do you rank the Adams Golf clubs versus its competitors - better, worse or the same?

11) Are you satisfied with the service Adams Golf provides to you? How might it improve?

12) Do you expect to continue doing business with Adams Golf?

13) Are there any other issues (legal, contractual or otherwise) which you feel are important?

14) What are your thoughts on knock-offs/clones/copies?

- 4 -

CONFIDENTIAL

UND 010637

**A. 24**

ram0n402\groups\sanfran\walraven\clients\adams\ipo\due diligence\customer questionnaire.doc - Eileen Maldonado - ~AUTODATE ~AUTODA

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

**EXHIBIT** /9 5

| **Customer Name** | **Contact Name** | **Interviewer Name** | **Date** |
|---|---|---|---|
| Golfsmith International | Craig Johnson, VP of Merchandising | Patrick Walravens and Sameet Mehta | April 9, 1998 |

1. For how long have you been doing business with Adams Golf?

Business of any substance since Oct-Nov of 1997. Golfsmith sells Adams clubs through retail and catalogue channels. Sales of Adams clubs are equally balanced between these channels.

2. What is your role and title at your company?

VP of Merchandising, responsible for product selection, acquisition and inventory management.

3. Which golf clubs does your company purchase from Adams Golf? At what price do you sell them?

| | **Price** | |
|---|---|---|
| | **Steel Shaft** | **Graphite Shaft** |
| √ Tight Lies | $149.95 | $199.95 |
| √ Tight Lies #3 | $149.95 | $199.95 |
| √ Tight Lies #5 | $149.95 | $199.95 |
| √ Tight Lies #7 | $149.95 | $199.95 |
| √ Tight Lies #9 | $149.95 | $199.95 |
| ☐ Air Assault Drivers | _____ | _____ |
| ☐ Assault$^{VMI}$ Irons | _____ | _____ |
| ☐ Assault$^{VMI}$ Putters | _____ | _____ |

The wholesale price is $102 for Steel Shaft and $135 for Graphite Shaft

- 1 -

CONFIDENTIAL

UND 010435

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

4. Approximate your annual dollar volume of Adams Golf club sales. Do you expect business to increase during the next one and two years?

For the first 15% of 1998, Golfsmith has sold $502,000 between its retail and catalogue operations, and they are still in the growth stage of the curve. Craig conservatively estimates total 1998 sales of Adams clubs to be $3.5 to $4.0 million. Business should increase over the next one and two years because 1) Craig expects same-store sales to increase and 2) Golfsmith is undergoing a retail expansion, adding 6 or 7 stores by the end of the year.

What percent of your equipment sales in a given month are Adams clubs?

For the first 15% of 1998, Adams clubs represented $0.5 million of $15.0 million in total woods and irons sales, or about 3.3%. Craig expects this percentage to increase based on consumers' enthusiasm for Adams clubs.

5. Based on your industry knowledge, how does the growth of Adams Golf compare to that of other golf companies you've seen?

The growth from no sales to $0.5 million in sales in three months, not in the prime golf season, is phenomenal from Golfsmith's standpoint. The comparable story is that of Callaway.

6. Are customers pre-disposed to purchasing the Adams Golf clubs or do you find yourself having to introduce and describe the club to customers?

Customers are pre-disposed to purchasing the Adams clubs. In fact Golfsmith has received calls from customers about the Adams clubs prior to having carried these clubs in the store.

Do Adams clubs increase customer traffic in your store?

Yes.

CONFIDENTIAL

UND 010436

# *Adams Golf, Inc.*
## *Customer Due Diligence Questionnaire*

7. Are Fairway Woods a growing part of your business? Is Adams Golf selling the most units of Fairway Woods?

Yes, and Adams is selling the most units of Fairway Woods.

What percent of your equipment sales are Fairway Woods today vs. 5 years ago? Today, Fairway Woods represent 10-15% of equipment sales, versus 0% 5 years ago. Fairway Woods represent about 33% of all woods sales.

Who else are the major players in this space?

Callaway, Taylor Made and Cobra. Demand in this space is expanding the market, and Craig would not take competition, especially from Callaway, lightly.

8. Do you think Adams Golf will have the ability to develop new products which customers will be pre-disposed to consider buying?

Doesn't know – from his experience with working with Adams, he is impressed with their new product advertising. The sales staff responds and executes very well, and Craig believes that the can sell whatever new product Adams comes up with.

Would you consider carrying new product lines from Adams?

Yes. Although Golfsmith is careful about choosing its relationships, once a vendor is established, like Adams Golf, Golfsmith will go deep into its vendor's product lines.

What would your preference be for a new club?

Unless an entirely new category develops, a driver would be a good choice.

9. What are your impressions of Adams Golf's direct response channel (1-800-number)? Do you see the 1-800-number as a source of competition?

It is a source of competition, but the advertising builds the customer base which more than offsets any negative competitive effect.

-3-

CONFIDENTIAL

UND 010437

rambra02\groups\sanfran\walraven\clients\adamsupo\due diligence\customer questionnaire.doc - Eileen Maldonado - ~AUTODATE ~AUTODATE~ Page 4 of 4

# *Adams Golf, Inc.*
# *Customer Due Diligence Questionnaire*

10. How do you rank the Adams Golf clubs versus its competitors - better, worse or the same?

From a sales perspective, it is much easier to sell Adams clubs, and the product is driving customers into the stores. Therefore he would rate them highly relative to competitors.

11. Are you satisfied with the service Adams Golf provides to you? How might it improve?

Yes. There are no negatives at all with Adams' service level. They never create demand which they can't back up.

12. Do you expect to continue doing business with Adams Golf?

Yes.

13. Are there any other issues (legal, contractual or otherwise) which you feel are important?

No.

14. What are your thoughts on knock-offs/clones/copies?

Craig doesn't see this as much of a threat; he feels that Adams does a good job of policing it.

- 4 -

CONFIDENTIAL

UND 010438

[rambna02\groups\ -- \sanfran\walraven\clients\adams\upo\due diligence\customer\golfday.doc - Carol Madrid - -AUTODATE -AUTODATE-

EXHIBIT

156

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

| Customer Name | Contact Name | Interviewer Name | Date |
|---|---|---|---|
| Golf Day | John McGregor | Patrick Walravens | 4/20/98 |
| | VP Golf Merchand. | | |
| | (781) 853-0900x2318 | | |

1) For how long have you been doing business with Adams Golf? *6 month.*

2) What is your role and title at your company? *Vice President. Golf Day is a division of Trends Lines Incorporated. I do mail order, overseas stuff and some merchandising for our 80 stores.*

3) Which golf clubs does your company purchase from Adams Golf?

*Sell steel for $149 & graphite for Tight Lives $199. Don't want to tell you our cost. No problem getting product delivered. Turnaround no worse than anyone else. In top half in terms of delivery.*

4) Approximate your annual dollar volume of Adams Golf club sales. Do you expect business to increase during the next one and two years?

*Mail order – item not in catalog at Adams request. So no sales occurring there.*

*In store. I really can't say.*

- What percent of your equipment sales in a given month are Adams clubs?

*Over 50% of our pro line fairway woods are Adams clubs. Fairway woods represent less than 10% of total sales.*

- 1 -

CONFIDENTIAL

UND 010443

{ramona02\groups\ -- \sanfran\walraven\clients\adams\po\due diligence\customer\golfday.doc - Carol Madrid - ~AUTODATE ~AUTODATE- Page 2 of 6

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

5) Based on your industry knowledge, how does the growth of Adams Golf compare to that of other golf companies you've seen?

*The big issues is will they be able to sustain their growth? This is unclear especially for an infomercial driven company. Golf is very cyclical. Look at the Ginty (Stan Thompson) fairway woods company that went out of business. The rapid growth will level and then dip unless they come up with new products. No dip so far however. Thinks 1998 will be a big year for Adams Golf. More sales in 98 than 97 expected. Good word of mouth. People come in the store asking for it. The issue will be sales in 1999.*

6) Are customers pre-disposed to purchasing the Adams Golf clubs or do you find yourself having to introduce and describe the club to customers?

*They are predisposed to buying it.*

- Do Adams clubs increase customer traffic in your store?

*Yes. Some people come in because they see our flyers which we mail to 750,000 people and which will have Tight Lies in them. This helps get people to come in the store and look at the product. Tight Lies create some traffic. They are a hot item.*

- 2 -

CONFIDENTIAL

UND 010444

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

7) Are Fairway Woods a growing part of your business? Is Adams Golf selling the most units of Fairway Woods?

*Yes it's definitely a growing part of our business. And it will continue to be as the population gets older. Older people use fairway woods more often. Adams dominates the pro line fairway woods.*

- What percent of your equipment sales are Fairway Woods today vs. 5 years ago?

*Less than 10% on dollar basis, today.*

- Who else are the major players in this space?

*Isn't any niche player like Adams. Cobra is reintroducing the Baffler with a steel head. Callaway has the Heaven 7 and Divine 9 – but these are more more expensive. We are talking to Orlimar but not carrying them yet. We want to wait and see if customers ask for Orlimar.*

8) Do you think Adams Golf will have the ability to develop new products which customers will be pre-disposed to consider buying?

*Don't know them well enough to say. Only met Mark Gonsalves for about ten minutes. Don't know the rest of the management team.*

- Would you consider carrying new product lines from Adams?

*Would be receptive to putting new products in stores - start in small amounts and see how they do.*

- What would your preference be for a new club?

*Hard to say. I would try to stay away from big guys. Why go head to head with Callaway by coming out with a driver? Maybe a wedge. But then again the driver is where the money is. Tough question. The issue for Adams is how do you transition to different niche. That's the challenge.*

- 3 -

CONFIDENTIAL

UND 010445

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

9) What are your impressions of Adams Golf's direct response channel (1-800-number)? Do you see the 1-800-number as a source of competition?

No. Doesn't bother him. Lot of people won't buy over the phone or on tv. Thinks of direct response as additional advertising. Would like Adams to tag commercials to say that Tight Lies are available at Golf Day. Working with Adams about doing just that.

10) How do you rank the Adams Golf clubs versus its competitors - better, worse or the same?

*Can't say. I haven't hit the club.*

Are you satisfied with the service Adams Golf provides to you? How might it improve?

*Thinks Adams is making a lot of profit on its clubs now. Compared to Callaway and Taylor Made, Adams provides better margins to Golf Day and does a better job of controlling distribution. Three ways to sell clubs: media advertising, word of mouth and making people in retail stores want to sell the product. Adams have decent displays and have brand recognition from advertising. GolfDay sales people don't steer customers towards Adams though. Adams people aren't calling on the stores and training the sales people. Adams should come in and give the assistant managers a hat or a t-shirt or something to get them on the Adams team. Also Adams isn't spiffing. Some other mfg do SPIFF and that provides an incentive to steer customers toward products.*

*11)* Do you expect to continue doing business with Adams Golf? *Yes.*

*12)* Are there any other issues (legal, contractual or otherwise) which you feel are important? *No.*

14) What are your thoughts on knock-offs/clones/copies?

*Knock offs are coming. Companies with look-a-like clubs want to be in the catalogs. Adams won't let us sell Tight Lies in catalogs so we'll put the clones in. These are not patent infringers. Also, we get better margins off the knock offs. Can buy a club similar to a Tight Lies for $29 and sell it for $69.*

-4-

CONFIDENTIAL

UND 010446

rambna02\groups\sanfran\walraven\clients\adams\po\due diligence\customer questionnaire.doc - Eileen Maldonado - ~AUTODATE ~AUTODATE- Page 1 of 3

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

**EXHIBIT**
/92

| Customer Name | Contact Name | Interviewer Name | Date |
|---|---|---|---|
| Edwin Watts | Edwin Watts | Patrick Walravens | 4/21/98 |
| | President | | |
| | (800) 874-0146x103 | | |

1) For how long have you been doing business with Adams Golf? *Over the last 4 years. Lots in the last 2 years since the Tight Lies came out.*

2) What is your role and title at your company? *CEO. We have 40 stores in 8 or 9 states.*

3) Which golf clubs does your company purchase from Adams Golf? At what price do you sell them? *We sell all models of Tight Lies. Including left handed versions. $199 graphite and $149 steel. We hold prices and don't discount. Don't know the cost. But margins are good.*

4) Approximate your annual dollar volume of Adams Golf club sales. Do you expect business to increase during the next one and two years? *Yes at least during 1998*

• What percent of your equipment sales in a given month are Adams clubs? *Hard to say. Less than 5% of our total woods sales.*

5) Based on your industry knowledge, how does the growth of Adams Golf compare to that of other golf companies you've seen? *Growth is in the 5 or 6 all time fastest.*

6) Are customers pre-disposed to purchasing the Adams Golf clubs or do you find yourself having to introduce and describe the club to customers? *Customers are pre-disposed. We also push the product because margins are better than other brands like Callaway.*

• Do Adams clubs increase customer traffic in your store? *Probably. But they are also becoming competition for us with their direct sales.*

- 1 -

CONFIDENTIAL

UND 010644

rambna02\groups\santranwaraven\clients\adams\ipo\due diligence\customer questionnaire.doc - Eileen Maldonado - ~AUTODATE ~AUTODATE- Page 2 of 3

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

7) Are Fairway Woods a growing part of your business? Is Adams Golf selling the most units of Fairway Woods? *Definitely a growing part. Not sure who sells the most.*

- What percent of your equipment sales are Fairway Woods today vs. 5 years ago? *Not sure.*

- Who else are the major players in this space? *Callaway and Orlimar.*

8) Do you think Adams Golf will have the ability to develop new products which customers will be pre-disposed to consider buying? *That's a difficult question. I don't know. You have to realize that they are a niche product. Also, the smaller size head works perfect for fairway woods and it was something Callaway and others had trouble selling because of their focus on oversized products. This was a void, a good space for Adams to fill. I'm not sure they'll be able to find another space this good.*

- Would you consider carrying new product lines from Adams? *Sure. We'll carry anything that helps out golfers. Adams has become a good brand that people are familiar with.*

- What would your preference be for a new club? *I'd keep going after the fairway woods market for a while. Add clubs specifically for seniors and ladies. Although I guess they kind of do that now. My next thing would be irons.*

9) What are your impressions of Adams Golf's direct response channel (1-800-number)? Do you see the 1-800-number as a source of competition? *Yes it is competition. It's a major hurdle. Adams can't afford to make its retailers mad. Adams needs to move away from direct sales. I feel Adams is overdoing their infomercials and print ads in areas where we have stores. Adams is stealing customers away from our stores. Also, customers think they might get a better deal direct because the ads tout the steel at the lower price and don't make it clear that that price is for steel only. It's bait and switch.*

- 2 -

CONFIDENTIAL

UND 010645

# Adams Golf, Inc.
## Customer Due Diligence Questionnaire

*10)* How do you rank the Adams Golf clubs versus its competitors - better, worse or the same? *Adams is pretty good. Some of the larger players are over-distributed. As a result, their margins are low. Adams has higher margins, which makes our stores want to push their products. Adams has succeeded because they have a niche product, good marketing and good retailer margins. I worry that if they go public they will feel pressure to increase their sales and will overdistribute.*

*11)* Are you satisfied with the service Adams Golf provides to you? How might it improve? *Adams service is good. Callaway is the best. The delivery that Adams get us is fine. We think we may get better service because we are a large customer. Adams has inside sales and a face to face person for each store. Inside sales work fine. Overall, customer service is not a problem.*

12) Do you expect to continue doing business with Adams Golf? *Yes. But they need to be careful about overdistributing and eroding margins. If the margins erode, we'll get off the bandwagon and start pushing other products with higher margins.*

13) Are there any other issues (legal, contractual or otherwise) which you feel are important?

*14)* What are your thoughts on knock-offs/clones/copies? *Not really an issue. We don't sell knock-offs. In fact, we market against such products. Don't think it's a big problem because most people want the real thing.*

CONFIDENTIAL

UND 010646