A. 29

— Additional Due Diligence Materials —

Δ π EXHIBIT __159__

Deponent _____

Date __5/17/06__ Rptr: __ll__
WWW.DEPOBOOK.COM

CONFIDENTIAL

UND 00283

7/9/98    Davy? & Mark from Company  — Bring down due diligence
        NASD — OK
        SEC — Be effective 4:30 PM today

2nd Q have not seen numbers yet
    Sales of $33.8mm for 2Q
        — Does not know of any material change in expenses
        — will have some amortization from Faldo deal        } about $300,000
            and Davy's options

    July shipments — unknown
    Returns — Thinks there is no change
    Revenue breakdown — retail vs. direct — no material change in
                sales mix
            — International sales better than anticipated
    Comfortable with estimates for '98

Increasing size of deal to 6.0mm shares
            — Olga does not think they are increasing size deal?

Litigation front
    — Filed lawsuit against British distributor
        to void relationship
            — They had declined to sign agreement

No issues with sources of supply


# CONFIDENTIAL

**A. 30**

EXHIBIT

2/0

### Adams Golf, Inc.
### Example Roadshow Questions

1. What do you think will be the product lifecycle of the Tight Lies? How much longer do you expect to have increasing sales of Tight Lies?

2. How do you compare to Orlimar and the Trimetal? What do you make of their claims to have better Darrell survey results than Adams?

3. What is your understanding regarding Callaway's new product introductions in the fairway woods field? How much of a threat do you expect these new products to be? How will you respond to these products?

4. Why are Barney, Dick Murtland and Finis selling so much of their stock? Don't you think the value of the shares will increase over the next year or so?

5. Is it true you paid Nick Faldo $25 million for his endorsement? Isn't that an awful lot of money for a small company to pay to a professional golfer?

6. Why is such large percentage of the offering going to the directed share program? Wouldn't it be better to place those shares with institutional investors?

7. How do you think Nick Faldo's recent performance reflects on the Company? Why not chose another spokesman who is winning more consistently?

8. Does Mr. Faldo have the right to exit his relationship with Adams Golf? What if he just wasn't involved the way you expect him to be?

9. When will your new driver be in stores? How will it compare to existing products? Why would someone want to buy the new Adams driver as opposed to the Great Big Bertha, Biggest Big Bertha or the Titleist 975D?

10. What is the story behind Nickent's lawsuit against Adams?

11. What will you do with the proceeds of the offering? You don't really expect to make any acquisitions do you?

12. Will the decision to go public eventually mean lower margins for retailers? Why do people think that will happen?

13. How much will you continue to rely on infomercials going forward?

14. Don't your retailers view the direct response business as competition? Why or why not?

15. How do the margins retailers get from your product compare to those of the other major manufacturers? Why do these differences exist?

16. Where do you expect your market share of the woods market to be in the next year?

17. What is your average selling price on the Tight Lies fairway woods? How has that changed over the past six months?

18. How do your sales look for the quarter so far? I see Lehman Brothers projects sales of $27.8 million for Q2? Will you make that?

**LEHMAN BROTHERS**

~AUTODATE

CONFIDENTIAL

UND 08890

19. How comfortable are you with Lehman Brothers projection of about $100 million in sales in 1998 and EPS of $.88?

20. Will Adams have any problems with manufacturing to meet demand for its clubs? What is the capacity of your manufacturing facilities and supply channels?

21. What is your target gross margin?

22. What is your long-term target SG&A as a percentage of revenues?

LEHMAN BROTHERS                                         ~AUTODATE

CONFIDENTIAL                                            UND 08891

**A. 31**

# Adams Golf, Inc.

### Initial Public Offering
### Lehman Brothers (Books)
### NationsBanc Montgomery Securities and Ferris, Baker Watts

Barney H. Adams, Chief Executive Officer
Darl Hatfield, Senior Vice President Finance and Administration
Mark D. Gonsalves, Vice President Sales & Marketing

### Summary Roadshow Schedule as of July 13, 1998 05:31 PM

| Date | City | Function | Time | Location |
|------|------|----------|------|----------|
| Tuesday<br>June 16 | Baltimore<br>New York | Management to Ferris, Baker Watts Sales<br>Management to Lehman Sales | 9:00 am<br>4:30 pm | FBW/100 Light Street<br>LB/200 Vesey St., 6th floor – NW Conf Room |
| Wednesday<br><br>June 17 | San Francisco | Management to NationsBanc Montgomery Sales | 1:30 pm | NBMS/600 Montgomery St., 13th floor |
| Thursday<br>June 18 | San Francisco | US Open | | The Olympic Club |
| Monday<br>June 22 | Plainsboro<br>New York | Private Breakfast (Casey +)<br>Luncheon<br>1/1 (Smith or Nacheff +)<br>1/1 (Sung +)<br>Golfing and Cocktail Reception | 8:00 am<br>12:00 pm<br>2:00 pm<br>3:15 pm<br>4:30–7:00 pm | MLAM/Ken Chaing, PM<br>The '21 Club/Remington Room<br>Alliance/Randy Haase, PM<br>Scudder/Roy McKay, PM<br>Chelsea Piers/Pier 59 – 23rd St./Hudson River (Cocktails in Ryder Cup Room & Brewery) |
| Tuesday<br>June 23 | Chadds Ford<br>Greenville<br>Wayne<br>Philadelphia<br><br>Berwyn<br>Washington DC | 1/1 (Pflieger +)<br>1/1 (Marisa +)<br>1/1 (Nacheff +)<br>1/1 (Pflieger +)<br>1/1 (Pflieger +)<br>1/1 (Dollenberg +)<br>Private Dinner (Dollenberg +) | 8:00 am<br>9:15 am<br>10:45 am<br>12:30 pm<br>1:45 pm<br>3:30 pm<br>7:15 pm | Gardner Lewis/Tim Maxwell, Analyst<br>Freiss/Trip Rudisill, PM<br>Pilgrim Baxter/Quint Slattery, Analyst<br>Delaware/Steve Lampe, Analyst<br>Blackrock/Sam Kim, Analyst<br>Turner/Bill McVale, Pm<br>Robert E. Torray/Doug Eby, PM |
| Wednesday<br>June 24 | Boston | 1/1 (Goldsmith +)<br>1/1 (Papp +)<br>1/1 (Taygan +)<br>1/1 (Taygan +)<br>Luncheon<br>1/1 (Rodeno +)<br>1/1 (Blond +)<br>1/1 (Blond +)<br>1/1 (Rodeno +) | 7:45 am<br>9:00 am<br>10:00 am<br>11:00 am<br>12:15 pm<br>2:00 pm<br>3:00 pm<br>4:00 pm<br>5:00 pm | Fidelity/Jennifer Nettersheim, Analyst<br>State St. Research/JC Cabrera, PM<br>Mass Financial/Chip Crowther, Analyst<br>Wellington/Ken Abrams, PM<br>The Four Seasons/Wendell Phillips Room<br>Hancock/Laura Allen, PM<br>Putnam/Craig Lewis, Analyst<br>Kobrick Cendant/Todd Brooks, Analyst<br>DFS/Mike DiCarlo, PM |
| Thursday<br>June 25 | New York | Private Breakfast (Casey +)<br>1/1 (Harris +)<br>1/1 (Smith +)<br>Luncheon<br>1/1 (Spear +)<br>1/1 (Kurtz +) | 8:15 am<br>9:30 am<br>10:45 am<br>12:15 pm<br>2:15 pm<br>3:30 pm | Bankers Trust/Mary Dugan, PM<br>Dean Witter/Lawrence Darrow, Analyst<br>WPG/Adam Starr, PM<br>The '21 Club/Harbor Room<br>Dawson Samberg/Katrin Yaghuobi, Analyst<br>Seligman/Hilary Shane, Analyst |
| Friday<br>June 26 | San Antonio<br>Dallas<br><br>Ft. Worth | Private Breakfast (Moriarity +)<br>1/1 (Lancaster +)<br>Luncheon<br>1/1 (Lancaster +) | 7:00 am<br>10:45 am<br>12:00 pm<br>2:30/2:45 pm | USAA/Eric Efron, PM; Mickey Brivac, Analyst<br>Regal/John Winslow, PM; Bill Ward, PM<br>The Petroleum Club/Keystone Room<br>Bass Brothers/Brian McManus, Analyst |

continued …


EXHIBIT
166
5/17/06

UND 05135

# Adams Golf, Inc.

### Initial Public Offering
### Lehman Brothers (Books)
### NationsBanc Montgomery Securities and Ferris, Baker Watts

**Barney H. Adams, Chief Executive Officer**
**Darl Hatfield, Senior Vice President Finance and Administration**
**Mark D. Gonsalves, Vice President Sales & Marketing**

### Summary Roadshow Schedule as of July 13, 1998 05:31 PM

| Date | City | Function | Time | Location |
|------|------|----------|------|----------|
| Monday June 29 | San Francisco | 1/1 (Uzelac +) | 7:00 am | Seneca/Mick White, Analyst |
| | | 1/1 (McDermott +) | 9:10-9:50 am | Robertson Stephens/Dan Dunn, Analyst |
| | | 1/1 (Uzelac +) | 8:00 am | Gruber McBain/John Gruber, PM |
| | | 1/1 (Newman +) | 10:00 am | Emerging Growth/Matt Spotswood, Analyst |
| | | Luncheon (Gailes +) | 12:50 pm | The Park Hyatt/Consortium II, Level 2 |
| | | 1/1 (Newman +) | 2:00 pm | Wells Capital/Ken Lee, Analyst |
| Tuesday June 30 | San Diego | 1/1 (Newman +) | 7:00 am | Wall St. Associates/Alexis Waadt, PM; Ken McCain, PM |
| | | 1/1 (Newman +) | 8:00 am | Duncan Hurst/Randy Hanley, Analyst |
| | | 1/1 (Newman +) | 10:00 am | Nicholas Applegate/Tom Bicakeley, Analyst |
| | | 1/1 (Newman +) | 11:30 am | Bricoleur/Dan Wimsatt, PM |
| | Los Angeles | 1/1 | 2:30 pm | Roger Engemann/Scott Swansen, Analyst |
| | | 1/1 | 4:00 pm | Strome/Brian Cheek, Analyst |
| | | 1/1 – CANCELED | CANCELED | Capital Guardian/Todd James, Analyst |
| Wednesday July 1 | Denver | Private Breakfast (Casey -) (Bartley +) | 7:45 am | Invesco/Mark Greenberg, PM |
| | | 1/1 (Bartley +) | 9:15 am | Montgomery/Brad Kidwell, PM |
| | | 1/1 (Bartley +) | 10:30 am | Berger/John Jares, PM |
| | | 1/1 (Owen +) | 12:00 pm | United Capital/Jim Lustig, PM *joined by:* Capstar/Chris Rule, PM |
| | | 1/1 (Smith -) (Bartley +) | 1:30 pm | PERA/JD Padgett, Analyst |
| | | 1/1 (Bartley +) | 2:45 pm | Marsico/Kent Moore, Analyst |
| Thursday July 2 | Cleveland Columbus | Breakfast (Billish +) | 7:00 am | The Club at Society Center/Plaza North Room |
| | | 1/1 (Billish +) | 10:30 am | Banc One Columbus Trust/Brad Erwin |
| | | Management Conference Call to Accounts | 11:30 am | Domestic dial in: (888) 566—6573 International dial in: (773) 756-4632 passcode: "Adams Golf" *Domestic replay:  (888) 554-3816 (no passcode) Int'l replay:  (402) 998-0106 (no passcode)* |
| Friday July 3 | N/A | (Fourth of July Weekend – Holiday) | | (Fourth of July Weekend – Holiday) |
| Monday July 6 | Birmingham Milwaukee | Private Breakfast (Alcorn +) | 7:30 am | Munder Capital/Carl Wilk, PM |
| | | 1/1 (Alcorn +) | 10:30 am | Firmco/Todd Krieg, PM |
| | | Luncheon (Alcorn +) | 12:00 pm | Pfister Hotel/Executive Conference Room |
| | Madison | 1/1 (Alcorn +) | 3:00 pm | SWIB/Chad Neumann, Analyst |
| Tuesday July 7 | Minneapolis | Breakfast | 7:30 am | Radisson Plaza/New Sweden East |
| | | 1/1 | 9:00 am | IDS/Marty Hurwitz, PM |
| | Chicago | Group Meeting | 1:30 pm | LB/190 S. LaSalle, 26th floor |

continued . . .

UND 05136

# Adams Golf, Inc.

### Initial Public Offering
### Lehman Brothers (Books)
### NationsBanc Montgomery Securities and Ferris, Baker Watts

Barney H. Adams, Chief Executive Officer
Darl Hatfield, Senior Vice President Finance and Administration
Mark D. Gonsalves, Vice President Sales & Marketing

### Summary Roadshow Schedule as of July 13, 1998 05:31 PM

| Date | City | Function | Time | Location |
|------|------|----------|------|----------|
| Wednesday July 8 | London | 1/1 (Trafford +) | 10:45 am | Schroder Investment/Ben Starling |
| | | Luncheon | 12:00 pm | LB/One Broadgate, 7th floor – Boardroom |
| | | Demonstration | 1:30 pm | Nevada Bob's |
| | | 1/1 | 2:15 pm | GLG/Atif Khan |
| | | 1/1 (Kloppenborg +) | 3:30 pm | Framlington Investment Mgmt/Susan O'Brien |
| Thursday July 9 | Milan | 1/1 (Quagliotti or della Valle) | 9:00 am | ABN Amro/Mr. Midolo |
| | | 1/1 – TO BE CONFIRMED | 10:00 am | ARCA |
| | | 1/1 (Quagliotti or della Valle) | 11:00 am | BCI/Mr. Pierini |
| | | Demonstration | 12:30 pm | The Palace Hotel/Room: to be posted |
| | | Luncheon | 1:15 pm | The Palace Hotel/Room: to be posted |
| | | 1/1 (Quagliotti or della Valle) | 3:00 pm | Fondigest/Contact: TBA |
| | | Follow up Conference Call | | Kingdon/Matt Karchmer (212) 333-0125 |

UND 05137

**A. 32**

07/29/98     14:24     LEHMAN BROTHERS → 972 398  8818                    NO.620     001

# LEHMAN BROTHERS

### FACSIMILE



**EXHIBIT**

215

**DATE:**   July 29, 1998                          **PAGES (INCLUDING COVER):** 3

**TO:**

    Barney Adams
    Darl Hatfield
    Adams Golf, Inc.
    (972) 673-9000
    (972) 398-8818  (Fax Number)

**FROM:**

    Patrick Walravens
    Lehman Brothers
    (415) 274-5285
    (415) 274-5381  (Fax Number)

**MESSAGE:**



Barney and Darl,

Attached are a summary outline and a summary of likely investor concerns for the Adams Golf conference call next week.

Pat

ADAMS 004394

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

TELEPHONE 415-274-5285

# ADAMS GOLF CONFERENCE CALL
## SUGGESTED SUMMARY OUTLINE

- Welcome investors to first Adams Golf conference call + introduce who is there from the Company
- Read safe harbor language (get this from Arter & Hadden)
- **Barney Adams**
  - Pleased to announce introduction of our 2 wood and 11 wood
  - Now that quiet period has ended pleased to discuss Q2 results
  - Our business model is intact
    - On target for projections
    - New product development (driver) is on track
    - Very pleased with results to date
    - ADGO is one largest revenue companies in the industry
    - One of the fast growing companies in golf
    - It's a $4 billion market worldwide
    - We continue to feel good about the business and to feel comfortable with the estimates the analysts have put forward
- **Darl Hatfield**
  - Q2 was a great quarter for Adams Golf
  - Revenues
    - We are comfortable with the analyst projections for the quarter and the year
    - Breakdown by Product
    - Breakdown by direct, non-direct, international
  - Gross margin (cost of goods sold)
  - Operating margin (operating expenses)
- Questions & Answer

ADAMS 004395

LEHMAN BROTHERS

07/23/98      14:24      LEHMAN BROTHERS → 972 398  8818                    NO.622    D03

# ADAMS GOLF CONFERENCE CALL
## CONCERNS TO EXPECT FROM INVESTORS
### JULY 29, 1998

| CONCERN | RESPONSE |
|---|---|
| • Orlimar<br>— Are retailers swapping Adams floor space for Orlimar?<br>— Everyone is seeing the Orlimar commercials over the weekends.<br>— Why does Orlimar dominate Darrell Survey rankings?<br>— Does Orlimar beat you at your own game by offering retailers higher margins | |
| • Recent performance<br>— How is this quarter shaping up?<br>— Are you confident that you are in line for Q3?<br>— What were the Golf Data Tech numbers for June?<br>— How is retail sell through going? | |
| • Callaway<br>— What is the story behind the new Callaway club?<br>— What impact will it have on Adams Golf's sales and projections? | |
| • New products<br>— Is driver development on track? | |
| • Domestic sales<br>— What were your domestic vs. international sales in Q2?<br>— Did international sales make up for weak domestic sales in Q2? | |
| • Discounting<br>— Tight Lies have been seen in many Costcos for $146?<br>— How is product getting there?<br>— What is Adams Golf doing about it? | |

LEHMAN BROTHERS                                    ADAMS 004396

**A. 33**

ADAMS Golf Center                                                    Page 1 of 2



## Adams Golf Reports Third Quarter Operating Results



--10/22/98

PLANO, Texas, October 22, 1998 -- Adams Golf (Nasdaq:ADGO) today announced operating results for the third quarter ended September 30, 1998. Net sales increased 61.5 percent to $22,986,702 as compared to net sales of $14,236,078 during the third quarter of 1997. Net income increased to $4,346,389 for the three months ended September 30, 1998 from $3,143,967 for the comparable period in 1997. Net income per common share decreased to $0.19 for the three months ended September 30, 1998 from $0.26 per share for the comparable period of 1997 based on weighted average diluted common shares outstanding of 22,748,523 and 12,156,878, respectively.

For the nine months ended September 30, 1998, net sales were $81,314,895, an increase of 313 percent from $19,684,813 for the comparable period in 1997. Net income for the nine months ended September 30, 1998 was $16,645,897 versus $3,184,807 for the first nine months of 1997. Net income per common share increased to $0.83 for the nine months ended September 30, 1998 from $0.27 per share for the comparable period of 1997 based on weighted average diluted common shares outstanding of 20,011,800 and 11,968,472, respectively.

"We are pleased with our third quarter results, especially considering the general softening we have seen in the golf equipment market," stated Barney Adams, Chairman, CEO and President of Adams Golf.

Commenting on the Company's outlook for the fourth quarter, Mr. Adams stated, "At this time, we expect our fourth quarter sales will be affected by continuing weakness in the golf equipment market. In addition, we anticipate our sales will be further impacted by the recent gray market distribution of our products to a membership warehouse club. While we are working diligently to identify and stop the unauthorized distribution of our products to this retailer, we anticipate this process will take at least through the end of the year. As a result of these market conditions, we anticipate that our net income for the fourth quarter will be at or slightly above a break even level. We remain optimistic, however, about our ability to increase our sales and earnings in 1999 through the introduction of new products and the continued expansion of our marketing efforts both domestically and internationally."

Further Mr. Adams stated, "In response to current market conditions, we have recently rolled out a new marketing campaign offering a high quality golf bag free to consumers who purchase any two Tight Lies® fairway woods. Based on preliminary reaction from our retailers, we believe this promotion will help stimulate sales and reduce the gray market distribution as the free bag is available only to customers who purchase Tight Lies clubs through authorized Adams Golf retailers. In addition, we will begin

-119-

ADAMS Golf Center                                                    Page 2 of 2

airing a new Tight Lies infomercial within the next week which focuses on the expanded line of Tight Lies products and highlights the benefits of the Tight Lies fairway wood over clubs currently offered by our competitors. Meanwhile, we are continuing our research and development efforts and the new driver remains on track for introduction in the first quarter of the new year," concluded Barney Adams.

On October 1, 1998, Adams Golf announced that its Board of Directors had authorized the repurchase of up to two million shares of the Company's common stock. With respect to this share repurchase program, Adams Golf has purchased 657,500 shares of the Company's common stock to date.

Adams Golf designs, manufactures and markets premium quality, technologically innovative golf clubs including the Tight Lies fairway woods. Further information on the Company can be found on its Internet site, www.adamsgolf.com.

*This release, other than historical information, includes forward-looking statements with respect to industry trends and certain other matters. These statements are made under the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995 and involve risks and uncertainties which could cause actual results to differ materially from those in the forward-looking statements, including but not limited to the following: product development; product introductions; market demand and acceptance of products; the impact of changing economic conditions; business conditions in the golf industry; reliance on third parties including suppliers; the impact of market peers and their products; the actions of competitors, including pricing; risks concerning future technology; and one time events and other factors detailed in the Company's prospectus, and other Securities and Exchange Commission filings. These filings can be obtained by contacting Adams Golf Investor Relations.*

[Please note: The original copy of this news release included two additional pages, consisting of the Company's Condensed Consolidated Statements of Operations and Balance Sheets. If you would like to receive a copy of the full news release, please call (972) 673-9850 and leave your fax telephone number. A copy of the release will be faxed to you as soon as possible.]

To view Adams financial news releases, click here

http://www.adamsgolf.com/clubhouse/press_release.asp?ID=49&year=1998          6/30/00

**A. 34**

From:           Picchi, Bernard J
Sent:           Monday, November 02, 1998 6:11 PM
To:             Gamso, Tim
Subject:        RE: Adams Golf

This is not good. Barney told me on Friday that he COULD do it, and we've already told the largest holder that – Scudder, Stevens. It's not a matter of going on the road to "tell their story" it's a matter of keeping faith with one of the largest holders (who's extremely upset with Lehman and Adams, by the way). Please try to rethink this with Barney and Darl. Barney's secretary mentioned Nov. 12 and 13 looked OK.

Bernie

> -----Original Message-----
> From:       Gamso, Tim
> Sent:       Monday, November 02, 1998 3:33 PM
> To:         Picchi, Bernard J
> Subject:    Adams Golf
>
> Bernie,
>
> In speaking to Darl Hatfield today about his personal affairs he mentioned your idea of Adams Golf management going on the road to visit clients. He and Barney Adams are not keen on the idea of going on the road to tell a story they just told last week. They did not feel there is anything new to say at this point that is "public" information.
>
> Darl did suggest that they host a tour at their headquarters one day for interested or concerned investors. They could show us their facility, introduce new management personnel like Chip Brewer and show their new ad campaign. He did say that Barney was much more in favor of this idea as opposed to another roadshow. I might suggest one-on-ones with Barney on this particular days for your more concerned investors.
>
> I have mentioned this idea to Stu Francis and he may call you about it.
>
> Please let Darl know if this would be a good alternative.
>
> Regards,
>
> Tim Gamso

From:           Gamso, Tim
Sent:           Monday, November 02, 1998 3:33 PM
To:             Picchi, Bernard J
Subject:        Adams Golf

Bernie,

In speaking to Darl Hatfield today about his personal affairs he mentioned your idea of Adams Golf management going on the road to visit clients. He and Barney Adams are not keen on the idea of going on the road to tell a story they just told last week. They did not feel there is anything new to say at this point that is "public" information.

Darl did suggest that they host a tour at their headquarters one day for interested or concerned investors. They could show us their facility, introduce new management personnel like Chip Brewer and show their new ad campaign. He did say that Barney was much more in favor of this idea as opposed to another roadshow. I might suggest one-on-ones with Barney on this particular days for your more concerned investors.

I have mentioned this idea to Stu Francis and he may call you about it.

UND 08507

**A. 35**

LEXSEE 2000 US DIST LEXIS 5696

## WILLIAM ERNEST ANDERSON, ET AL. VERSUS PRODUCTION MANAGEMENT CORP., ET AL.

### CIVIL ACTION NO. 98-2234 SECTION "N"

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

*2000 U.S. Dist. LEXIS 5696*

**April 25, 2000, Decided**
**April 25, 2000, Filed; April 26, 2000, Entered**

**DISPOSITION:** [*1] Plaintiffs William and Christian Anderson's Motion in Limine Seeking Adverse Presumption DENIED.

**COUNSEL:** For WILLIAM ERNEST ANDERSON, CHRISTIAN MICHELE ANDERSON, plaintiffs: Tommy Dulin, Dulin & Dulin, Gulfport, MS.

For WILLIAM ERNEST ANDERSON, CHRISTIAN MICHELE ANDERSON, plaintiffs: Harvey Jay Lewis, Lewis, Kullman & Sterbcow, New Orleans, LA.

For PRODUCTION MANAGEMENT CORPORATION, PRODUCTION MANAGEMENT INDUSTRIES, INC., defendants: Russell Martin Cornelius, Cornelius, Sartin & Murphy, New Orleans, LA.

**JUDGES:** EDITH BROWN CLEMENT, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** EDITH BROWN CLEMENT

**OPINION:**

### ORDER AND REASONS

Before the Court is plaintiffs William and Christian Anderson's Motion in Limine Seeking Adverse Presumption. For the following reasons, plaintiffs' Motion in Limine is DENIED.

BACKGROUND

This suit arises out of an accident aboard a spud barge located in navigable waters off the coast of Louisiana. Plaintiffs William and Christian Anderson filed a Complaint on July 29, 1998, seeking to recover for damages sustained by William Anderson on February 11, 1998. William Anderson was employed by PMI as a roustabout, and was injured during an exercise to move a spud barge [*2] when a crane used to lift and move the barge's spuds dropped a spud, causing the spud's keeper pin to dislodge and strike Anderson in the head. n1 Originally, plaintiffs premised jurisdiction on diversity of citizenship and provisions of 33. U.S.C. § 905(b), naming as defendants Production Management Corporation and PMI, owners of the spud barge on which Anderson was injured, and Newman Crane Service, Inc. ("Newman"), the presumed owner of the crane involved in the accident. On August 20, 1998, plaintiffs filed an Amended Complaint, substituting Thigpen Construction Co., Inc. ("Thigpen") for defendant Newman after plaintiffs learned that Thigpen was the actual owner of the crane involved in Anderson's accident. In November, 1998, plaintiffs dismissed Thigpen because discovery failed to demonstrate liability on its part. Defendant PMI then filed a third-party complaint against Thigpen in August, 1999, under both *Fed. R. Civ. P. 9(h)* and *14(c)*, tendering Thigpen to plaintiffs. In its Answer, Thigpen brought a counterclaim against PMI. In March, 2000, plaintiffs filed a Supplemental and Amended Complaint, changing their jurisdictional allegations to premise jurisdiction on the Jones [*3] Act and in the alternative, on diversity of citizenship and provisions of *33 U.S.C. § 905*(b). Finally, in April, 2000, this Court was advised that PMI's third-party claims against Thigpen were resolved through

settlement. The Court was also advised that plaintiffs released PMI's Rule 14(c) tender of Thigpen to plaintiffs. Before settlement of all third-party claims, however, Thigpen had filed a Motion in Limine Seeking Adverse Presumption. Plaintiff joined in this request on April 5, 2000, by submitting their own motion. Plaintiffs adopted and incorporated Thigpen's Motion in Limine. While this Court denied Thigpen's Motion as moot upon learning of the parties' settlement of all third-party claims, plaintiffs' Motion in Limine remains before the Court.

> n1 This exercise took place while PMI was performing a job for Callon Petroleum Company and/or Callon Offshore, Inc. (the Callon Project").

## LAW AND ANALYSIS

Plaintiffs move this Court for an Order sanctioning defendant PMI for spoliation [*4] of evidence on the ground that defendant's failure to preserve and hence produce requested job and work records prepared and maintained by PMI in connection with the Callon Project and this casualty prevents plaintiffs and the trier of fact from ascertaining certain factual truths at the heart of this dispute. Plaintiffs claim that PMI maintained control over certain records contained in a job file on the work performed in furtherance of the Callon Project, which file may have included documentation regarding inspections, work records, logs, invoices, daily crane safety checklists, time sheets, rental records, records in investigation of plaintiffs' injury and accident, and other general records pertaining to the project. Plaintiffs recognize that PMI maintains that the file in question was destroyed by a PMI employee after the Callon Project Manager, Charles Mistich, left the company, but while the current lawsuit was pending. Plaintiffs argue that PMI's failure to preserve the file gives rise to a presumption that the evidence would have been adverse to PMI's position. In sum, plaintiffs seek an adverse inference instruction to the jury that it may infer from the destruction of or [*5] failure to produce certain documents that they would have been detrimental to PMI's case.

At the time this Motion in Limine was filed, PMI alleged that Thigpen leased a defective crane. Deposition testimony had revealed that daily crane safety inspection reports were provided to the crane operators to be used in

connection with the crane's inspection. Plaintiffs continue to argue that the crane's brakes may not have been adjusted properly. Plaintiffs now assert that because it is undisputed that the work records in question were last in PMI's possession and PMI has failed to produce such records, the Court should draw an adverse inference presumption that, were this evidence available, it would be unfavorable to PMI's position. Plaintiffs rely on the deposition testimony of Mistich, in which he states that PMI had a file on the Callon project that included documentation regarding the crane rental, daily work records, invoices, time sheets, and "anything and everything pertaining to that job."

In response, PMI asserts that the file in question was lost inadvertently, and that there was no intent on the part of anyone to destroy evidence or to conceal the fact that the file in question [*6] no longer exists. PMI also points out that there was no outstanding discovery due to plaintiffs at the time of loss. Further, PMI's counsel asserts that he has no knowledge of relevant documentation that was "in or likely to have been in" the file at issue, relying on deposition testimony of Karl Olson, PMI crane operator, in which Olson states that he never turned anything over to his boss that indicated there was something wrong with the crane. Olson stated that he kept a daily record inspection book, but that he did not have to turn in a checklist each day. Thus, PMI's counsel reasons that no crane operator records would have been found in the file, as none were "turned in." PMI also argues that the case law of this circuit requires a finding of bad faith or bad conduct associated with the loss of evidence in order to permit an adverse inference to be drawn. PMI argues that there is no evidence of bad faith before the Court, and future argues that the question of whether PMI knew of "house cleaning" that may have led to the file's loss and whether such knowledge is of any relevant or probative value should be evaluated when such evidence is sought to be offered at trial.

PMI submits [*7] affidavit testimony of PMI's Risk Manager, Michael Seymour, who states that when he discovered that the Callon Project file was missing, during preparation to respond to discovery in 1999, he undertook an investigation and learned that the file in question had been moved from PMI's office in Venice to its office in Harvey around March, 1999. He understands that the files were transferred due to billing disputes. Seymour further states that after Mistich was released from PMI's employment in July, 1999, PMI hired a new

2000 U.S. Dist. LEXIS 5696, *7

General Manager, Robert Meith, in August, 1999, and that Meith, on his own initiative, ordered a "house cleaning" of PMI's Harvey offices, believing all papers to be old paperwork that was no longer needed. Seymour further states that Meith had no knowledge of Anderson's injury or the pending litigation.

It is well established that a court may use the sanction of an adverse evidentiary inference when a party suppresses evidence through spoliation. See Maria A. Losavio, Comment, Synthesis of Louisiana Law on Spoliation of Evidence, 58 La. L.R. 837, 862 (1998). Spoliation includes the loss, destruction, concealment or material alteration of evidence. [*8] See Black's Law Dictionary 1409 (7th ed. 1999); see also Karen Wells Roby & Pamela W. Carter, Spoliation: The Case of the Missing Evidence, 47 La. B.J. 222, 222 (1999). The underlying principle is best stated as follows: "when the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the facts of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him." Nation-Wide Check Corp. v. Forest Hill Distribs., Inc., 692 F.2d 214, 217 (1st Cir. 1982). While the circuits are split on the issue of whether a showing of bad faith or willfulness is required, the Fifth Circuit holds that in order to permit the fact-finder to draw an inference adverse to the destroying party, there must be a showing of bad faith or bad conduct. See Caparotta v. Entergy Corp., 168 F.3d 754, 756-57 (5th Cir. 1999) (stating that "an adverse inference drawn from the destruction of records is predicated on bad conduct by the defendant."); Vick v. Texas Employment Comm'n, 514 F.2d 734 (5th Cir. 1975). [*9] See also Self v. Illinois Central R.R., 1999 U.S. Dist. LEXIS 19671, 1999 WL 1212177, at *2-3 (E.D. La. Dec. 15, 1999) (citing Vick for the proposition that the Fifth Circuit requires a finding of bad faith in order to draw an adverse evidentiary inference for spoliation); In re Hopson Marine Transp., Inc., 168 F.R.D. 560, 567 (E.D. La. 1996) (holding adverse inference requires a wrongful denial of discovery necessary to establish a fact in dispute); Tieken v. Clearing Niagara, Inc., 1997 U.S. Dist. LEXIS 9854, 1997 WL 88180, at *3 (N.D. Miss, Jan. 7, 1997) (holding that bad faith is required to apply the adverse inference rule); Williams v. CSX Transp., Inc., 925 F. Supp. 447, 452 (S.D. Miss. 1996) (stating that for a party to draw an adverse inference, "destruction must be such as to indicate 'bad conduct of the defendant'"), aff'd, 139 F.3d

899 (5th Cir. 1998); Wright v. Illinois Central R.R., 868 F. Supp. 183, 188 (S.D. Miss. 1994) (holding adverse inference may be drawn "only where documents have been destroyed in bad faith"); Kammerer v. Sewerage & Water Bd. of New Orleans, 633 So. 2d 1357, 1358 (La. Ct. App. 4th Cir. 1994) [*10] (holding that adverse inference not applicable because "there was no intentional destruction of evidence for the purpose of depriving the plaintiff of its use."). See also Pressey v. Patterson, 898 F.2d 1018, 1022 (5th Cir. 1990) (considering whether decision to destroy evidence to prevent use of certain information was a rational act in order to determine whether destruction was in bad faith or willful). The Fifth Circuit reasons:

> [The argument for an adverse inference where records are destroyed under routine procedures without bad faith] is unpersuasive. The *adverse inference to be drawn from destruction of records is predicted on bad conduct of the defendant. Moreover, the circumstances of the act must manifest bad faith. Mere negligence is not enough,* for it does not sustain an inference of consciousness of a weak case.

Vick, 514 F.2d at 737 (emphasis added) (quotations and citations omitted). In addition, the destroying party must have been on notice of the relevance of the evidence to potential liability, and thus subject to a duty to preserve such evidence. See Nation-Wide Check, 692 F.2d at 218. In other [*11] words, the Court's inquiry is not limited solely to an examination of whether the evidence was destroyed, but rather the crucial inquiry requires consideration of the reason for destruction.

It is important to note, however, that a court may allow the fact of inadvertent destruction of evidence to be presented to the jury even when a finding of bad faith is not supported by the facts of a case. See Caparotta, 168 F.3d at 756-57. The Fifth Circuit states expressly that Vick "does not apply to the issue of whether the district court could nonetheless admit the fact of the destruction of documents for the jury to weigh with the other evidence in the case because such evidence was relevant." Id. at 757. Thus, where evidence of the fact of destruction is relevant with respect to the credibility and reliability of the destroying party, such evidence is properly within the province of the fact-finder for

2000 U.S. Dist. LEXIS 5696, *11

consideration. See *id. at 758.*

This Court finds that the evidence before it lacks a showing of bad conduct on behalf of the defendant, and thus the Court denies plaintiffs' request for an adverse inference. The file in question is missing [*12] due to a "house cleaning" ordered by an employee on PMI who lacked notice of the relevance of the evidence in question to potential liability. PMI supports these facts with affidavit testimony, although it is a curiosity as to why PMI did not submit an affidavit by Meith, himself. While PMI in no way asserts that such cleaning was a routine activity, nonetheless, plaintiffs produce no evidence that Meith was aware of the pending lawsuit when he destroyed the file at issue or that he acted in bad faith. Further, the Court does not have evidence of violation of a company-wide document retention policy; nor do the parties reference any state or federal regulations imposing obligations of which PMI is in breach. The evidence before the Court indicates that the file in question was destroyed after August, 1999, approximately one year after this litigation was commenced, but the Court is not advised whether this was before or after discovery requests were made. Although the Court finds PMI's conduct troublesome, as it violates the obligation to maintain records that are reasonably perceived by a corporation as potentially relevant, it cannot make a finding of intentional conduct on PMI's [*13] part in the destruction of evidence, and thus the sanction of an adverse evidentiary inference is unwarranted.

Further, there must be some showing that the content of the evidence in question bears some nexus to the inference sought. Here, there remains a question of fact as to whether the file in dispute in fact contained daily inspection logs or safety checklists, as Olson's testimony indicates that no such logs were turned in to a supervisor while he was the crane's operator. Thus, there is no significant evidence that the file would have shown that the crane's brakes were not adjusted properly by PMI. At most, the records may have revealed ambiguous information. The Court is not convinced that the file was reasonably likely to contain information from which a fact in dispute could be proven. Still, because evidence of the fact of destruction is relevant with respect to PMI's credibility and reliability, plaintiffs will have the opportunity to present the fact of inadvertent destruction of the Callon Project file to the jury even in the absence of a finding of bad faith or bad conduct. Accordingly,

IT IS ORDERED that plaintiffs William and Christian Anderson's Motion in Limine [*14] Seeking Adverse Presumption is DENIED.

New Orleans, Louisiana, this 25 day of April, 2000.

EDITH BROWN CLEMENT

UNITED STATES DISTRICT JUDGE