**A. 36**

LEXSEE 1975 US DIST LEXIS 14230

**Competitive Associates, Inc. v. International Health Sciences, Inc. et al.**

**72 Civ. 1848-CLB.**

**United States District Court for the Southern District of New York.**

*1975 U.S. Dist. LEXIS 14230; Fed. Sec. L. Rep. (CCH) P94,966*

**January 22, 1975.**

**OPINION BY:** [*1]

BRIEANT

**OPINION:**

BRIEANT, Judge: Competitive Associates, Inc. (the "Fund") is a Delaware corporation having its principal place of business in California. It is an open-end investment company registered with the Securities and Exchange Commission ("SEC") pursuant to Section 8 of the Investment Company Act of 1940, as amended. Plaintiff is no stranger to this Court. n1

n1 In addition to this action, plaintiff initiated the following cases in this Court, all arising directly or indirectly out of the depredations of Akiyoshi Yamada:

Competitive Associates, Inc., et ano. v. Visual Sciences, Inc., et al. - 72 Civ. 1844

Competitive Associates, Inc., et ano. v. Fantastic Fudge, Inc., et al. - 72 Civ. 1845

Competitive Associates, Inc., et ano. v. Children's World, Inc., et al. - 72 Civ. 1846

Competitive Associates, Inc., et ano. v. Firefly Enterprises, Inc., et al. - 72 Civ. 1847

Competitive Associates, Inc., et ano. v. Yamada, et al. - 72 Civ. 1986

The complaint was filed on May 4, 1972. The claims of Competitive Capital Corporation, originally joined as a plaintiff, were dismissed by memorandum decision and order dated October 10, 1972.

Competitive, as its name implies, [*2] permits the investment policies of its fund to be determined differently with respect to separate segments, each of which is supervised by a different investment adviser. These advisers "compete" with each other to achieve the best adaptation to the particular exigencies of the securities markets during given periods of time. In addition to serving as an incentive to greater success, this method permits a diversification of opinions; it is theoretically impossible for all of several portfolio managers to be wrong at the same time. Since the complaint was filed, plaintiff has changed its name to Seaboard Leverage Fund.

For the period from October 12, 1970 through May 14, 1971, Akiyoshi Yamada, acting either individually, or through his controlled corporation, Takara Asset Management Corp., was the investment manager of a segment of plaintiff's portfolio.

Defendant International Health Sciences, Inc. is a Delaware corporation having its principal place of business in New Jersey. It is now known as Gilman Service, Inc., and is sometimes referred to hereinafter for convenience as "the Issuer", or "IHS". Defendants P. K. Hickey, Wolff & Co., Provident Securities, Inc., Delphi [*3] Capital Corporation, Scheinman, Hochstin & Trotta,

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 3 of 38

Page 2

1975 U.S. Dist. LEXIS 14230, *3; Fed. Sec. L. Rep. (CCH) P94,966

Incorporated, Hartzmark & Co., Inc., L. C. Wegard & Co., Inc., S. J. Salmon & Co., Inc. and Ross, Low, Bull & Co. are all broker-dealers, registered pursuant to Section 15 of the Securities Exchange Act of 1934. Together they were underwriters or distributors of common stock claimed omission or the misleading aspect on or about November 30 and December 1, 1970, pursuant to a Registration Statement, public offering and prospectus. Defendant Scheinman, Hochstin & Trotta, Incorporated was served and appeared by counsel, but defaulted in its appearance prior to trial. It is a subsidiary of Weis Securities, Inc., and is defunct, although no official proceedings have apparently been taken with respect to it. Defendants Salmon and Provident are in liquidation under the supervision of the Securities Investor Protection Corporation ("SIPC"). The action was stayed as to them. The plaintiff stipulated to discontinue as to Salmon. The action against Provident can serve no purpose and is severed and dismissed without without prejudice to renew should any assets of that corporation turn up at some future date.

Defendants Kalman Shmueli, [*4] Howard F. Cerny, Carl W. Anderson and Ralph P. Dodd are or were officers or directors of the Issuer, and defendant Pericles Constantinou was an officer or director of Provident Securities, Inc., a member of the underwriting group. Defendants Cerny, Anderson and Dodd were not served. There is no excuse for the failure to effect service, and accordingly, the action is dismissed as against them for failure to prosecute. Such dismissal shall be with prejudice. *Rule 41(b), F.R. Civ. P.*

The Fund seeks to recover damages arising out of the purchase by it of 40,000 shares of the Issuer on December 1st and 2,000 additional shares on December 23, 1970. It is claimed that the prospectus failed to state material facts required and necessary to make the prospectus not misleading in violation of Sections 11, 12(2) and 17(a)(2) of the Securities Act of 1933. Specifically, it is alleged that the prospectus failed to describe accurately the plan of distribution and "failed to state that the Defendants intended, in concert with a certain adviser of Competitive Associates, to use Competitive Associates to support the market in these securities". (Complaint, P6). Plaintiff alleges further that [*5] the use of this faulty prospectus was the use of a deceptive device in violation of Sections 17(a)(1) and 17(a)(3) of the 1933 Act and Sections 10(b) and 15(c) of the Securities Exchange Act of 1934. Plaintiffs plead use

of a means of interstate commerce, or the mail, and that it acted in reliance upon the prospectus, and had no actual knowledge of the claimed omission or the misleading aspect thereof.

Answers, filed on behalf of defendants generally deny any wrongdoing, and plead various affirmative defenses, including the one year statute of limitations set forth in § 13 of the 1933 Act, and the underwriters assert the defense of due diligence under § 11 thereof.

Factual Background

In early 1970, the Issuer was privately owned by a group of individuals, including the defendant Shmueli. One of the group, and its leader, was Robert Vesco, who held 17.9% thereof and much later, was to become notorious. n2

> n2 Vesco, a sort of latter-day Samuel Insull, is a much travelled man. He journeyed first to Nassau and from thence to Costa Rica, where he has been found to be a substantial addition to the economy, and is well regarded by local officials. He is a fugitive defendant in at least four indictments pending in this District, charging him with criminal conduct in unrelated matters.

[*6]

Although the Issuer had no business operations, and had experienced losses on a consolidated basis for 1968 and 1969, it did own a subsidiary, Clinical Analysis Service, Inc., which operated a medical laboratory in Connecticut. The laboratory had significant potential because it offered approximately 60 individual medical tests, including blood chemistry, hematology, urinalysis, serology, endocrinology and microbiology and thirteen selected combinations of such tests, called profiles. It was able to perform at least twenty of the individual tests by automation, and all of the profiles, except the inflamatory profile and pre-natal work-up profile, were substantially automated. It could render its services by mail and transmit test results by mail, telephone or telegraph to the patient's physician within 24 to 48 hours after receipt of the specimen.

IHS's proposed offering of 200,000 shares of stock was intended to secure $887,500.00 for the Company,

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 4 of 38

Page 3
1975 U.S. Dist. LEXIS 14230, *6; Fed. Sec. L. Rep. (CCH) P94,966

which it intended to use "to acquire one or more companies in the medical/health field." n3

> n3 The Company intended to use $56,700.00 for working capital, and to pay current debts, and had no immediate plans for acquisitions.

[*7]

While the Issuer had no history of profitability, had operated its clinical testing subsidiary at a loss since acquisition, and may be characterized as insolvent without regard to the proceeds of the public offering, it could not be said that offering was wholly without merit as a speculative or "growth" situation. IHS's officers and directors were experienced men of business, and Vesco, together with Shmueli, Dodd, Anderson and others, had paid substantial funds to acquire the subsidiary and promote the enterprise.

The defendant underwriters led by P. K. Hickey, Wolff & Co. made a substantially firm commitment (Ex. 10) to distribute 200,000 shares. There was no mention in the prospectus (Ex. 11) of any of the activities of Yamada detailed below.

Plaintiff made the following purchases of IHS stock:

| Trade Date | No. of Shares | Price per Share | Total Paid | Seller |
|---|---|---|---|---|
| Dec. 1, 1970 | 20,000 | $5.25 | $106,500.00 | John J. Meyers & Co. |
| Dec. 3, 1970 as of Nov. 30, 1970 (Ex. 4) | 20,000 | $5.00 | $100,000.00 | Eastman Dillon, Union Securities & Co. |
| Dec. 23, 1970 | 2,000 | $5.00 | $ 10,000.00 | John R. Maher |

It sold 2,000 shares at $6.00 on April 26, 1971 for $12,000.00 [*8] through Jefferies & Company, Inc. Further sales were made on and after August 29, 1972 at prices of $2.00 per share and lower - see Exhibit 16.

The Conspiracy - Yamada and Vesco

The Court finds that a conspiracy existed in which Yamada and Vesco were the central figures. We will discuss below, separately, our analysis of the extent and nature of the participation of others in this conspiracy, and whether they did so knowingly.

In this civil action, plaintiff will satisfy its burden of proof to show the conspiracy, by presenting credible evidence which proves the facts in issue by a mere preponderance, and accordingly, cases involving the federal crime of conspiracy, where the standard of proof is higher, are of little assistance. In determining the nature and extent of the conspiracy and delineating the members thereof, the Court may have reliance on the circumstantial evidence showing its existence, the admissions of conspirators, and consideration of what others have done, including "verbal acts" insofar as such acts show the conspiracy's existence and scope, whereupon hearsay statements become admissible as to a person so connected to the conspiracy. The Court will make [*9] the ultimate finding on the basis of all evidence in the case. Cf. *United States v. Nuccio* , *373 F.2d 168, 173* (2d Cir.), cert. denied , *387 U.S. 906 (1967).*

The object of the conspiracy was, in violation of the rights of plaintiff, to make the underwriting and public offering of IHS shares a success beyond its normal expectations. Success, from the conspirators' point of view was based on a two part test; it was necessary first that all of the stock be sold, and secondly, that it be sold and held, in such a fashion as to create a stable post-offering public market in the security, at a price

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 5 of 38

Page 4

1975 U.S. Dist. LEXIS 14230, *9; Fed. Sec. L. Rep. (CCH) P94,966

level no less than the offering price, and hopefully, somewhat more. These results were essential to the successful operations of IHS, and a failure of IHS to achieve these results would have had an adverse effect on Vesco with respect to his other business undertakings, many of which were of far greater scope than IHS.

To the extent that the conspirators knew that Yamada had a fiduciary obligation as registered investment adviser to Competitive and other clients, and that his participation in the conspiracy required him to violate that obligation, a crime was committed. n4 See §§ 180.05 [*10] and 180.00 of the New York Penal Law, and *15 U.S.C. §§ 80b-6* and 80b-17. Implementation of the conspiracy constituted employment of a "device, scheme, or artifice to defraud." It violated *17 C.F.R. § 240.10b-5(a)*.

> n4 Akiyoshi Yamada pleaded guilty to two indictments charging him with conspiring to file false statements and conspiracy to manipulate the market for securities. 73 Cr. 426, 427. Yamada received a sentence of two years in prison and $20,000.00 in fines. Yamada also pleaded guilty to six counts of a sixteen count indictment charging him with conspiracy, mail fraud, obstruction of justice and the filing of false statements. 74 Cr. 100. He was sentenced to one year in prison, later reduced to six months, to run concurrently with his two year sentence. Yamada also pleaded guilty to a charge of conspiring to use a false and misleading offering circular. 72 Cr. 363. He was sentenced to five years probation with special conditions restricting his investment involvements and a $10,000.00 fine. An additional indictment, charging him with conspiracy and fraud in the offering and sale of securities, is pending in this District. 72 Cr. 528.

We begin the chain of [*11] circumstantial proof which establishes the existence of the conspiracy, by analyzing the bizarre and inexplicable conduct of Yamada in connection with placing Competitive's orders for IHS shares. The witness McSwain was plaintiff's "trader". As such, his function was to handle and record the execution of trades in securities, directed to him by

the various portfolio managers of this and related mutual funds. Ordinarily McSwain enjoyed discretion with respect to selecting the source for his purchases, and also, ordinarily was permitted to secure the best possible price. Exhibit 1 and the testimony of McSwain show that at 7:40 o'clock (California time) on December 1, 1970, the morning after the effective date of the offering, Yamada gave an order to McSwain to purchase 3,000 shares of International Health Sciences, Inc. at 5 1/4, (Tr. p. 32). Yamada used the telephone between New York and California to do so. At this time, the offering, which was priced at 5, was not fully sold out. While McSwain wrote the name of the firm "M. H. Meyerson" on his blotter (Exhibit 1), I find that McSwain was in fact directed by Yamada to place the trade with another firm, John J. Meyers & Co. of [*12] New York. Although the purchase was a directed trade at a specified price, it was not so unusual that acquisition of 3,000 shares under those circumstances, even at a price slightly higher than the offering price, should excite suspicion. However, about an hour or two later in the day, and before the trade had been executed, Yamada telephoned McSwain again, and increased his order to 20,000 shares. This was 10% of the public offering. It was substantially equal to the amount of shares which the in-and-out trading operation of Dr. Greditor and Rosemary Gumper (see infra , p. 29) had arranged to purchase that day in the public offering. The direction by Yamada of the purchase to John J. Meyers, which was in a position to acquire the Greditor-Gumper shares, is regarded by the Court as more than a mere coincidence. As was testified by Anthony Meyers of that firm, Greditor and Gumper were his valued customers (Tr. p. 321). The Court infers that when Yamada increased the order from 3,000 to 20,000 shares at a price 1/4 point higher than the offering price, and directed the trader to Meyers, Yamada knew that he was buying Greditor-Gumper shares, and knew that those shares were overhanging [*13] the market and imperiling the success of the issue insofar as its post-offering trading price was concerned, and that he intended thereby to purchase substantially all of the Greditor-Gumper shares. This indicates purposeful activity on Yamada's part, which could not possibly have been motivated by his fiduciary duty to get the best of it for Competitive, and indeed, his conduct is inconsistent with any such intention, or any other reasonable hypothesis.

The situation was compounded by a further action on Yamada's part later in the afternoon on the same day when he directed McSwain to purchase an additional

1975 U.S. Dist. LEXIS 14230, *13; Fed. Sec. L. Rep. (CCH) P94,966

20,000 shares from Eastman Dillion, Union Securities & Co. These shares were a part of the public offering. Eastman was a member of the "selected dealer" or selling group referred to at p. 20 of the prospectus. It obtained these shares from P. H. Hickey, Wolff & Co., the lead underwriter. Sale of these shares, again 10% of the offering, was essential in order to complete the distribution of the entire amount of shares.

It would appear most unusual in connection with an honestly conceived and executed trade, for a fund employing an expert trader for a fund employing an [*14] morning at 5 1/4 a block resold by Greditor-Gumper through Meyers, and to have purchased a like amount later in the same day from a member of the selling syndicate at the offering price, $.25 per share less. n5

　　　　n5 Exhibit 3, McSwain's blotter, or record of trades, shows the Eastman trade as placed at 7:04 A.M. on December 1st, and the time of execution is reported as 9:09 A.M. Clearly, the "time placed" has been written over on Exhibit 3, and appears originally to have been entered as 9:00 A.M., or later. The Meyers' order is written in as 9:15 A.M. on the line above the Eastman order. Its time of execution is listed as 10:47 A.M. Exhibit 1 shows that the original Meyers order, placed initially for 3,000 shares only, has been corrected and changed after the initial entry to show 20,000 shares. This order is there listed as received by McSwain from Yamada at 7:40 A.M.

　　　　The length of time which was needed in order to fill the Meyers order is accounted for in Anthony Meyers' testimony. He explained that he had to make inquiries, and talk to various possible sources before effecting an agency trade in behalf of his customers, Greditor and Gumper. On Exhibit 3 the hour of execution of the revised directed trade for 20,000 shares from Meyers is stated as 10:47 A.M.

　　　　Notwithstanding the apparent confusion and contradiction in these records, the Court finds that the Meyers

purchase was both directed by Yamada and transmitted by McSwain to Meyers prior to the Eastman order. The confirmation of sale from Eastman Dillon, Union Securities & Co. (Exhibit 4) refers to the trade date as "December 3, 1970 as of November 30, 1970". The sales ticket at Eastman (Exhibit 18) is stamped as "Reported" on December 1st at 3:55 P.M. New York time, or 12:55 P.M. in California, rather than 9:09 A.M., as listed on Exhibit 3.

　　　　Stott of Eastman testified that McSwain had called him on the 28th or 29th of November in behalf of Competitive and asked about the IHS shares. He says that within 20 minutes after the inquiry he called McSwain on the 29th and had circled the amount of 20,000 shares. He testifies further that only after this expression of interest by Competitive did Eastman call defendant Hickey and ascertain that it could get 20,000 shares as a member of the selling group.

　　　　The difference between this testimony and the documents mentioned is not explained, nor was Hickey asked. The Court credits McSwain and Exhibits 1, 3, 4 and 18 as being more likely correct with respect to the time sequence. Although McSwain testified before Stott he was not asked about any telephone conversation on November 28th or 29th with Eastman, Exhibit 24 sheds little light on the issue because the date of it is not shown by the trial record. However, Ferkauf's allocation of 21,500 shares, sold to Greditor-Gumper appears on that exhibit, together with Eastman's allocation of 20,000 shares. We have Greditor's testimony that the number of shares Ferkauf could obtain from him was first known in the morning of December 1st, just before he sold to Meyers, who did not sell to plaintiff until it had obtained Greditor's authority. This took place before 10:47 California time on December 1st (1:47 P.M. in New York). Unless stockjobbers in New York are

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 7 of 38

Page 6
1975 U.S. Dist. LEXIS 14230, *14; Fed. Sec. L. Rep. (CCH) P94,966

keeping farmer's hours, the allocation to Ferkauf, as well as the allocation to Eastman were made to them on November 30th, before McSwain received his buy orders of December 1st regularly recorded on Exhibits 1 and 3.

[*15]

The result of Yamada's activities on December 1st was to place this mutual fund in the position of owning 20% of the outstanding public offering of 200,000 shares, and more than 5.1% of the total outstanding shares of the Issuer, which then amounted to 789,290 shares. Of the shares not registered, all but approximately 20,000 were at all relevant times, restricted as to transferability as investment letter, or as founders' or promoters' shares (Tr. pp. 229-30). Accordingly, the market was thin, and the float available for trading was extremely limited.

Competitive's investment effected on December 1, 1970, had the effect of making IHS an "affiliate" as defined in the Investment Company Act of 1940 of Competitive, because Competitive owned over 5% of the outstanding voting securities of IHS. This created an additional responsibility for Competitive's management, and it was necessary to disclose this fact in any prospectus furnished to new purchasers of shares in the Fund. *15 U.S.C. § 80z-8*(b)(4). This represented a situation which the typical Fund portfolio manager ordinarily would avoid, although there were other securities held by Competitive during the relevant period [*16] in which its interest exceeded 5% of the voting shares.

John Galanis n6 was a general partner by estoppel in Takara Partners, a creature of Yamada. At some time prior to the public offering of IHS, Yamada asked Galanis to assist in placing IHS shares under the initial offering. Galanis declined. Yamada told Galanis that Robert Vesco controlled IHS and was apparently going to be taking control of Investors Overseas Services, a large financial corporation. Yamada expressed a desire to ingratiate himself with Vesco, and told Galanis that he had committed himself to Vesco to see that the IHS offering was completed successfully (Tr. pp. 77-78). Galanis had been introduced to Vesco by Anthony Pilaro (see infra p. 19).

n6 John Peter Galanis was indicted three times for violations of the securities laws. Galanis was indicted along with Akiyoshi Yamada in a thirteen count indictment charging a conspiracy and substantive securities law violations. The Government ultimately determined not to prosecute under this indictment, 72 Cr. 520. Galanis pleaded guilty to an indictment in which Robert Hagopian was also charged, which accused him with participating in a conspiracy by an investment adviser to defraud by use of the mails and instrumentalities of interstate commerce, 72 Cr. 884. He was sentenced to five years in prison, but only served six months. The balance of the sentence was satisfied by a term of probation with the special condition that he could not serve in a fiduciary capacity regarding the investments of others and that he cannot deal in publicly traded securities without the written consent of his probation officer. Finally, Galanis pleaded guilty to a charge of conspiracy to file a false statement with the Securities and Exchange Commission for which he was placed under similar probation terms, 73 Cr. 52.

[*17]

Vesco, at a conference attended by Galanis, Yamada and Pilaro prior to the underwriting, told Galanis and Yamada that International Controls, or an affiliate, controlled by Vesco, had pension funds, then being managed by a bank, and that Vesco would consider shifting investment control of these funds to Yamada, and/or Yamada and Galanis jointly, (Tr. pp. 84-85).

Pilaro, before the introduction, had told Galanis and Yamada that there was "a reasonable chance that we could assume management control of the pension fund of International Controls, because Mr. Vesco and Mr. Pilaro had had a working relationship, and ... [Pilaro's]company had assisted Mr. Vesco, and in fact Mr. Vesco very often followed his advice in certain matters." (Tr. p. 84). During the meeting Vesco expressed doubt as to whether the pension funds could be removed from the management of a bank or trust company.

Yamada told Galanis prior to the offering that he had sought or was going to seek the assistance of defendant

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 8 of 38

Page 7

1975 U.S. Dist. LEXIS 14230, *17; Fed. Sec. L. Rep. (CCH) P94,966

Constantinou and his firm, Provident Securities, (Tr. p. 89), a concern not previously known to the lead underwriter.

After the offering of IHS shares was completed successfully with the [*18] aid of Yamada and Constantinou, Vesco made a valiant effort to get pension advisory business shifted to Yamada. This is discussed infra , pp. 24 and 26. The intensity of his efforts bespeaks greater motivation than would have been provided merely by respect for Yamada's professional competence, and Vesco's conduct confirms the existence of a substantial obligation under a prior agreement. This suspicious circumstance, together with Constantinou's efforts (noted below) to get a banking accommodation from Shmueli confirms the existence of greater obligations than would flow merely from good honest service in a successful underwriting.

### Constantinou

Pericles Constantinou n7 was the principal of Provident Securities, Inc. His firm, now defunct, was brought into the Hickey underwriting group through the efforts of Pilaro, whose roving commission from Vesco included the search for additional persons for underwriters or members of the selling group.

> n7 Pericles Constantinou pleaded guilty to one count of a nine count indictment. The guilty plea was to a charge of extending unlawful credit in a securities transaction, 73 Cr. 260.Constantinou received a sentence of two years probation and a $1,000.00 fine.

[*19]

In a conversation after the completion of the offering, during 1972, which testimony is taken solely as against Constantinou, Yamada and Constantinou made various representations or admissions to Galanis that they had helped in placing the initial offering of IHS (Tr. pp. 97-98). The bare facts stated in the admission are matters of record, and do not in themselves impel the inference of any wrong-doing.

Constantinou considered that IHS and its principals were obligated to him. In January 1971 he telephoned Shmueli, President of IHS, whom he had never met, introduced himself over the telephone, and asked Shmueli

to make a deposit of IHS funds in a Texas bank in order to satisfy Constntinou's need to do a favor for the Texas banker. Shmueli did not reject the request, but stalled Constantinou by asking for financial statements of the bank.

As previously noted, Provident was brought into the underwriting syndicate close to the effective date through the efforts of Vesco, acting through Pilaro. Constantinou agreed for Provident to take 10,000 additional shares of the underwriting, and made an arrangement with Robert Hagopian n8 whereby Carole Corporation, controlled by Hagopian, [*20] would purchase these shares by a check drawn on insufficient funds in the amount of $50,000.00. Hagopian testified that Constantinou had agreed in behalf of Provident that the check would not be deposited, and that Hagopian would have a profit on a resale (Tr. pp. 415, 418).

> n8 Robert R. Hagopian pleaded guilty to two counts of an indictment which charged that while acting as an investment adviser, he employed schemes to defraud by the use of the mails and instrumentalities of interstate commerce, and also that he embezzled moneys from an investment company, 72 Cr. 884. On the two counts, he was given a total sentence of one year in prison, a five year suspended sentence with probation, and a $10,000.00 fine. The terms of his probation restricted his future dealings in securities.

The Court does not rely on the indictment of Constantinou for the Regulation T violation in this and related matters to which he pleaded guilty. His plea was equivocal, since other claims were contained within the same indictment and the record is unclear as to precisely what admissions of guilty conduct Constantinou made or intended to make when he pleaded guilty. Furthermore, the Court declines [*21] to draw any inference adverse to Constantinou with respect to his plea on this trial of the privilege of self-incrimination, (see infra , p. 38). The Court, however, credits Hagopian's testimony with respect to the wooden ticket and places no weight or reliance on the conflicting testimony of Constantinou to the effect that he had no such agreement to hold Carole Corporation's check undeposited, and that there was no Regulation T violation, because had there been, "back

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 9 of 38

1975 U.S. Dist. LEXIS 14230, *21; Fed. Sec. L. Rep. (CCH) P94,966                    Page 8

office personnel" of Provident would have notified him as the registered representative who made the sale to Carole. Hagopian's recollection as to the profit he made, however, appears to be unfounded. The quoted pink sheet prices during December, 1970, when Hagopian's wooden ticket was covered do not rise to a price which would permit a $20,000.00 profit to Hagopian.

Constantinou's particular activity constitutes a knowing and wilful attempt to participate in, and become a part of the conspiracy to violate Rule 10b-5 of which Yamada and Vesco were the pivotal members. Although Hagopian misstated the amount of his profit, the Court does credit as truthful his testimony that Hagopian was permitted by Constantinou [*22] to make a wooden ticket purchase of 10,000 shares without any loss or risk of loss. Clearly, this advanced the cause insofar as the conspiracy was concerned, and Constantinou did so in behalf of Provident, knowingly.

Constantinou's act in placing 50 shares of IHS in Galanis' account without payment and without his authority is considered to be de minimis and this particular episode had no material effect on the underwriting or on the market price of IHS stock. It was not an essential act committed in furtherance of the conspiracy. The Court believes that whatever Constantinou did for Galanis in this connection was unrelated to this litigation.

### Pilaro

On the record before me I am unable to find that Anthyony Pilaro was a conspirator or that he was engaged in any unlawful conduct. Considerable suspicion attaches to Pilaro, but the evidence does not rise to the level of showing any wrongdoing on Pilaro's part in this case. Hickey first met Pilaro through Vesco in the Fall of 1970. Vesco told Hickey that Pilaro had a lot of experience and that it would underwriters are not required to account)." Pilaro had colorable qualifications in the medical area and in financial and [*23] banking activities, and several days thereafter, Hickey met with him again, discussing generalities affecting the proposed underwriting of IHS and the company's "concept." It was agreed between Hickey and Pilaro that Pilaro would be employed by the underwriters to assist and would be paid a reasonable fee. This payment was disclosed by the following at p. 20 of the prospectus:

"In addition to the payment of the underwriting discount of $.50 for each of the shares which are purchased by the Underwriters, the Company has agreed to pay $12,500.00 of the Underwriters' legal and other expenses (for which the Underwriters are not required to account)."

Pilaro told Hickey that he would introduce him to other security investment people and dealers in stocks, with a view towards becoming underwriters or selling group participants with respect to IHS, and that he would work on due diligence on the medical aspects and the background of the industry in which IHS was involved.

The record shows that Pilaro did do some ligitimate work for the underwriters. His work was precisely in the area contemplated by Hickey when he was retained, and included introducing defendant Constantinou and Provident [*24] Securities as a member of the underwriting group. The firm of A. M. Pilaro & Son, Inc. was paid the sum of $10,300.00 by the underwriters. by virtue of this payment, the non-accountable expenses of the underwriters exceeded the budgeted amount by approximately $6,000.00, and this difference was absorbed by the underwriters out of the sum of $.50 a share paid to them in connection with their services, as profit.

Notwithstanding the subsequent activities of Constantinou and Provident, detailed herein, the Court finds no basis in this record for making any finding that Pilaro was a part of the corrupt and unlawful scheme or plan in which Vesco, Yamada and others were engaged or were to become engaged with respect to the distribution of IHS stock. The Court attaches no significance to the fact that one copy of the expense record of the underwriting lists the Pilaro concern by name as receiving $10,300.00 as a consultant, whereas the other merely mention "Consultants" in that amount. Under the circumstances of this case it was highly unlikely that all the underwriters other than Hickey would have acquiesced, as they did, in a payment to Pilaro by Hickey, which had the effect of carrying [*25] the budget expense of the underwriters beyond the agreed amount by $6,000.00, unless they recognized the validity of his claim for legitimate services. The Court believes that Pilaro rendered colorably valuable services to the underwriting syndicate, which appeared to its members to be bona fide , and that this appearance of regularity with respect to Pilaro's activities was such as to cause them to acquiesce in the overpayment of expenses. There is no

1975 U.S. Dist. LEXIS 14230, *25; Fed. Sec. L. Rep. (CCH) P94,966

credible evidence in this case to warrant a finding that Pilaro did anything other or different than what he was supposed to do, or that his services were useless, or connected in any way with corrupt conduct on the part of Vesco, Yamada or Constantinou. We are unable in the case of Pilaro to indulge in unwarranted inferences of guilt by association. Similarly, the Court attaches no significance to the fact that Pilaro was considered as a future nominee to the Board of Directors of IHS, or that he apparently was also on the payroll of International Controls, or IHS at some time during the period in which his corporation was purporting to earn the consultant's fee from the underwriting group. Plaintiff's contentions with respect [*26] to Pilaro's activities are in all respects rejected, and I decline to find any wrongdoing in connection with his activities.

Shmueli

Defendant Shmueli was an experienced businessman who had come into the orbit of Vesco as a result of the merger in 1966 of Cryogenics, Inc. with a Vesco controlled company. He had been acquainted with Vesco since about 1960, and became Vice President of Corporate Development and Acquisition, with respect to the merged company. Through his wife, he became, together with Vesco and others, one of the initial investors in IHS, and the prospectus indicates that in addition, he purchased, between March 14th and April 14, 1970, 35,756 shares of IHS at $.50 per share. Prior to the offering, he and his wife, individually, and as custodian for minor children, owned 13.3% of the equity of IHS, compared to 17.9% belonging to Vesco, individually, and as custodian for his minor children. Along with Vesco, Shmueli was a "promoter" and a "parent" of IHS as such terms are generally used under the 1933 Act and rules and regulations promulgated thereunder, and, unlike Vesco, was an officer and director. These facts are all conceded, and set forth with sufficient [*27] clarity in the prospectus.

At Vesco's request, Shmueli had an initial introduction and meeting with Yamada where the future of IHS and its potential as an investment were discussed. On the next day or a few days later, Vesco asked for a report as to the meeting with Yamada. Shmueli testified (Ex. 23, p. 70):

"... He asked me how did it go, and I said fine. And he said, 'Good,' and that was the end of the conversation."

Plaintiff's charges against Shmueli are summarized at p. 39 of its Post-Trial Memorandum:

"Shmueli had actual knowledge of certain of the critical prospectus non-disclosures: namely that Pilaro and Yamada were underwriters, that, yamada was seeking to have International Controls pension or profit-sharing funds invested with him (Yamada) (or advised by him), that Pilaro was to become a paid consultant to and Director of IHS, and that Hickey was negotiating a deal between a Vesco related company and Radiation Machinery."

We have previously noted that there is no evidence of wrongdoing with respect to Pilaro or his conduct with respect to this underwriting. Yamada was no underwriter, he was at most the pivotal figure in a fraudulent scheme. Notice to Shmueli [*28] that Yamada was seeking to have International Controls pension or profit-sharing funds invested with him or advised by him was not in itself sufficient to make Shmueli a participant in the fraud, or put him on notice of the existence of a fraud, nor was it the sort of matter which standing alone reasonably should have been revealed in the prospectus.

Beatty's testimony shows that Shmueli attempted on several occasions to urge Beatty to accept Yamada as a pension trust adviser after the underwriting was concluded. We have previously noted with respect to Vesco the fact that Vesco was anxious to effect this result, although apparently not sufficiently anxious to bring down the house of International Controls about his shoulders. The decision whether or not to hire Yamada for the pension funds rested with Beatty and Richardson. They apparently exercised their discretion against such hiring and did so for bona fide reasons, arising out of their fiduciary obligations to the pension funds, and a preference on their part to do business with Prudential Insurance Company, whose integrity was unquestioned, and which was also owed a favor by the Vesco group.

Theoretically, Vesco was not [*29] in a position to order the other two committee members or trustees, Beatty and Richardson, but Beatty admits that "faced with [the fact that] Mr. Vesco was Chairman of the Board or President at that time, naturally, [I] being an Executive Vice President, I am certainly going to take serious consideration of directions and orders he might give me." (Tr. p. 640). Shmueli had no direction over Beatty or Richardson, but Vesco, if he desired to pay the price in the form of organizational disruption, could have forced

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 11 of 38

Page 10
1975 U.S. Dist. LEXIS 14230, *29; Fed. Sec. L. Rep. (CCH) P94,966

these two individuals to obey his wishes, or give up their employment. Shmueli's persistent efforts to swing Beatty's vote is consistent with Shmueli's closeness to Vesco, and is equally consistent with an innocent purpose, that is, to get Beatty to do what Vesco wanted, as it is consistent with knowing participation in the underlying fraud by Shmueli.

Shmueli's version of the meeting at International Controls after the underwriting was successfully completed, in which Yamada attempted to collect the reward for his activity, parallels the testimony of Beatty, except with respect to the phone calls made by Shmueli on Yamada's behalf.

He testified (Tr. p. 702) that [*30] no investment management contract for Yamada was discussed with respect to the pension fund, but does recall that Yamada was proposing, prior to the effective date of the prospectus, the possible investment of a portion of this fund in one or more investment partnership funds controlled by Yamada. Shmueli denies that he came to any contract or agreement with regard to Yamada purchasing stock of IHS for himself or anyone else. Thereafter, Hickey reported to Shmueli that he had been in contact with Yamada, and that he believed Yamada "was interested in possibly having his funds or directly himself or in some way participating." (Tr. p. 705). Shmueli denies that he agreed to give an investment contract to Yamada or do anything else for him, but I do not credit this testimony as true.

Early in 1971, Shmueli was visiting International Controls, and Beatty indicated to him by conversation that ICA was not going to make any investment of any type, either directly or indirectly with or through any of Yamada's entities. The Court credits Beatty's testimony at p. 641 as truthful:

"Q Did there come a time when you spoke with Mr. Vesco and in some way or another finally identified [*31] the decision as a formal matter, namely, the decision not to hire Mr. Yamada.

"A No, I think the matter simply died. I simply stalled it to death. I would not proceed with Mr. Yamada, and just stalled, and I don't recall subsequent discussions with Mr. Vesco about it."

This method is, of course, standard in all bureaucracies, including the Vesco controlled group of

corporations.The record warrants a finding that Vesco had a strong wish that Yamada be compensated, but he was unable to effectuate that wish because of opposition within his own bureaucracy.Although anxious to compensate Yamada for his activities in connection with IHS stock, apparently Vesco was unwilling to disrupt his organization by putting sufficient pressue upon the co-trustees of the pension fund, Richardson and Beatty, to achieve that result.

Shmueli's expressed interest in compensating Yamada through the pension fund was as great as Vesco's but this fact, standing alone or together with other facts concerning Vesco's conduct, does not warrant an inference of guilty knowledge or participation in the fraud by Shmueli. It is equally likely that Shmueli thought he was advancing Vesco's interests by trying [*32] to get Richardson and Beatty to pull together, and keep Vesco's word given to Yamada. Without additional evidence not present here, the Court must and does find that the plaintiff failed to prove any wrongful participation in the scheme or artifice, or violation of Rule 10b-5 on Shmueli's part.

The Activities of Greditor-Gumper

Dr. Greditor was a practicing chiropractor in November and December, 1970, and was an in-and-out trader in new issues. Rosemary Gumper enjoyed the use of Dr. Greditor's office, where at that time there was a direct private telephone line to the stockbrokerage firm of Herzfeld & Stern. n10 Miss Gumper was in a position to follow Dr. Greditor's judgment in matters, and they ordinarily acted together in making trades. They were principally day traders. Dr. Greditor had the practice of reviewing the prospectus on most new offerings, and purchased those which appeared attractive. His purchases were bona fide , and insofar as this record appears, he paid for the stock he bought, and had the financial capacity to do so without regard to whether an immediate sale was effected.

n10 Later, the private wire was connected with John J. Meyers & Co.

His [*33] dealings in the stock of IHS are typical of his standard method of proceeding. He purchased 17,500 shares of IHS at $5.00 on December 1, 1970 from Ferkauf, Rogan, Grisman & Classen, a member of the selling group, but not an underwriter. The salesman at the

1975 U.S. Dist. LEXIS 14230, *33; Fed. Sec. L. Rep. (CCH) P94,966

Ferkauf firm had called him, and he believes that he had read the prospectus of IHS before the date of purchase. The morning that the stock became available, and at a time when the quoted price in the after issue market was slightly above the issue price, he purchased 17,500 shares from Ferkauf, and Miss Gumper at the same time, purchased 4,000 shares from the same source.

The Greditor-Gumper operation had a standard practice with respect to these issues; they sold promptly.

The operations of Greditor-Gumper were described at p. 430, et seq. :

"THE COURT: Are we to understand that if you had not been able to sell it at a profit you would have sold it within the ensuing week or two in any event?

THE WITNESS: My records would show that I played the secondary new issue market on the basis that if they break the offering price, I immediately sell.

THE COURT: If they do not?

THE WITNESS: If they rise up, I will either [*34] take a profit or sit with them, or perhaps remove part of the position which I now own at free cost, and sell the balance.

THE COURT: If they remain the same or drop?

THE WITNESS: I immediately sell the stock. I would say my records would show 90 to 95% of my trades are in that category.

THE COURT: What do you mean by immediately?

THE WITNESS: It could be within moments after the offering has come ...."

Anthony Meyers of John J. Meyers & Co. spoke with Dr. Greditor on December 1st and informed him that he, Meyers, was making a market in IHS stock that particular morning. As the price was up, and Meyers indicated to Greditor that he had a potential buyer for 20,000 shares [which was plaintiff, although Greditor did not know it], he and Miss Gumper sold through the Meyers firm. Greditor's and Gumper's shares comprised a total of 21,500. Meyers, as noted previously, made a trade as broker of 20,000 shares to Competitive, and took the balance of the Greditor-Gumper stock into the house for its own account.

The particular form of Poker, or more accurately Red Dog, which Greditor, Gumper and others were playing in the new issue market in 1970 was not in itself illegal. [*35] These individuals had no communication with Yamada or with any defendant in this case, but their operations with respect to new issues were well known, and while Hickey testified that he would have preferred to keep the stock out of such hands, this was, as a practical matter, almost impossible. The record wararnts an inference that Yamada, Vesco and Constantinou were familiar with these practices and that at some point in the morning of December 1st, learned that the Greditor-Gumper block of stock was overhanging the market, that it was going to be sold regardless, and that unless purchasing strength were provided, the issue would fail tom et the necessities facing Vesco previously discussed, namely, that the underwriting be successful, and that the postoffering price of the stock not fall below the offering price.

Even if they did not know that Greditor or other day-traders were overhanging the market, or did not know the precise number of shares held by such traders, they knew the likelihood existed. By making the directed bid of 5 1/4, pointed to Meyers, at the time he did so, Yamada was able to test the market quickly for the presence of such overhanging shares. If there [*36] were none, and if the underwriting had been successful, and all shares were in strong hands intending to hold for investment, then no sale would close for a mere quarter point, and Meyers would report back to McSwain his inability in whole or in part to fill the order at the price fixed by Yamada. It was foreseeable that if the day-traders held slightly more than the 20,000 bid by Yamada, Meyers, a market maker, would pick off their entire block, as in fact happended. If no such shares, or less than 20,000 shares were overhanging, Yamada would have known that fact by Meyer's response, and could have directed McSwain to increase the bid, or more likely, to reduce the size. All this points up Yamada's activities for just what they are; use of plaintiff's funds, credit, and facilities, not for its own benefit, but to aid Vesco in making the IHS offering an outstanding success.

Hickey, and P. K. Hickey, Wolff & Co.

There is no evidence in the record to justify a finding that Hickey or his firm were parties to the illicit arrangement between Yamada, Vesco and Constantinou, or that they should have known of it. Hickey, in the

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 13 of 38

Page 12
1975 U.S. Dist. LEXIS 14230, *36; Fed. Sec. L. Rep. (CCH) P94,966

Spring of 1970, was an officer and director of Radiation [*37] Machinery Corporation ("Radiation"), and his firm, P. K. Hickey & Company, a predecessor of P. K. Hickey, Wolff & Co., was its investment banker. Radiation was in financial difficulties. Hickey engaged in extensive negotiations with Vesco, acting for International Controls, to see if Radiation could be merged with a Vesco entity. There was nothing improper about this conduct, which ultimately came to fruition in a merger or acquisition of Radiation by a Vesco controlled entity after the effective date of the IHS underwriting. At that time, Hickey had no reason to believe that Vesco was a crook. It was natural that Vesco, who was dissatisfied with "best efforts" underwritings being proposed for IHS by others, would ask Hickey to take an interest in IHS and he did so. The Court believes that this is an ordinary manner in which investment bankers obtain business, and while plaintiff has characterized it as "back-scratching," there is nothing wrong or unlawful about such relationships in the context of this lawsuit. At the effective date of the prospectus, no agreements had been reached between Radiation and any Vesco entity, and the existence or nature of the ongoing confidential [*38] negotiations between Radiation and International Controls were not material facts insofar as concerns this underwriting. The prospectus showed that Shmueli had a history of prior connections with International Controls, that Anderson a director of IHS, had served as a director of International Controls, that Dodd, another director, had ben an officer of International Controls, and that the issuer planned to elect Paul J. Hickey, characterized therein as a general partner of P. K. Hickey, Wolff & Co., to its board of directors. Vesco's position with International Controls was revealed (Prospecus, p. 17) and the prospectus suggested that Vesco was or might be a promoter or parent of IHS.

Hickey proceeded in behalf of his firm in an entirely normal and routine fashion with respect to the underwriting. While Vesco told Hickey that he would be of assistance in seeing that IHS offering would be fully sold, this statement by itself does not imply any intention to use wrongful means. While Vesco put Hickey in touch with Pilaro, the Court has found no evidence of wrongdoing on Pilaro's part. It is true that Pilaro brought in Provident and Constantinou, and introduced them into the underwriting [*39] syndicate, but Hickey made a good faith effort as a part of his due diligence procedures to check the honesty and reputation of Provident, and found nothing adverse. The Court cannot imply liability

from these facts, taken alone, or together with anything else in the case.

We have noted previously in our discussion of Pilaro's efforts, that underwriters, including Hickey as lead underwriter, paid a substantial fee to Pilaro in part from their own funds. Had they known that there was a conspiracy afoot, engineered by Vesco, and had they believed that Pilaro was in any way related to it, it is doubtful they would have paid his fee from their own pockets. Furthermore, shortly before the offering, Hickey's firm decreased the amount of its commitment. A part of this reduced allotment to Hickey resulted in an increase of 10,000 shares of the allotment to Provident, which as we observed supra . p. 17 was "sold" to Hagopian. Were Hickey a participant in the fraud, there would have been no reason for him to reduce the allotment of his firm.We find no wrongdoing in Hickey's dealings with Yamada. Plaintiff asserts it was gulled by Yamada, and believed him to be honest and upright. So [*40] did Hickey.

Evidence Questions

The Court declines to take Yamada's hearsay statements as testified to by Galanis and others as admissible under the exception to the hearsay rule relating to statements against Yamada's pecuniary, penal or proprietary interests at the time made. Of course, the statements are admissible against those persons, found on the entire evidence in the case to be members of the conspiracy with Yamada, but the statements are so vague taken by themselves, and inconclusive, that they do not constitute a clear admission against penal or related interests. A statement so admitted must be such that the person making it reasonably would believe himself to be making a statement against his interests.

The concept of "helping" Vesco place an underwriting, or complete an offering successfully, are not by themselves statements that clearly stand against Yamada's penal or other substantial interests. As of the time they were made, and before Vesco was known to be an international crook Yamada could not have so considered them. The statement of fact must be "distinctly" against the interests of the declarant and so "positive that it would naturally have been present [*41] in the declarant's mind." Wigmore § 1461. The Court declines to take any of the hearsay statements attributed to Yamada or Vesco, except as against those persons herein found to be conspirators and accepts it as to them

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 14 of 38

Page 13

1975 U.S. Dist. LEXIS 14230, *41; Fed. Sec. L. Rep. (CCH) P94,966

on agency principles to the extent made during the course of the conspiracy and prior to its discovery or completion.

Furthermore, the Court declines to draw any inference under the circumstances of this case against any party by reason of the refusal of Yamada and Constantinou to answer questions on the ground of self-incrimination. Yamada was not a party, nor was he under the control of any of the party defendants, so that his refusal to testify would be imputed to them. There is ample evidence concerning Constantinou's role in the matter, without recourse to any inference based upon the taking of the Fifth, and the Court believes that defendants should not be placed in jeopardy even in a civil case, for exercising a right of constitutional dimensions. See *Gardner v. Broderick* , *392 U.S. 273 (1967)* and cases cited therein; cf. 8 Wigmore § 2272, (McNaughton Rev.).

Liability Under § 12 of the Securities Act of 1933

Competitive asserts that the defendant [*42] Issuer and underwriters and their principals are liable under Sec. 12 of the 1933 Act. Liability is premised on material omissions and misleading statements in the prospectus. Plaintiff misconstrues the scope of liability that this section casts. The statute provides that "[any] person who ... (2) offers or sells a security" by means of a faulty prospectus "shall be liable to the person purchasing such security from him...." *15 U.S.C. Sec. 77l.* Although the statute has not been construed as limiting liability to those in strict privity with the plaintiff, "[undoubtedly], the language of Sec. 12(2) envisions the presence of some 'element of privity.'" *In re Caesars Palace Securities Litigation* , *360 F.Supp. 366, 379 (S.D.N.Y. 1937).*

Competitive did not purchase its shares from any of the defendants. Of the 42,000 shares which Competitive purchased, 20,000 were bought from Greditor-Gumper through John J. Meyers & Co.; 20,000 were bought from Eastman, Dillon Union Securities & Co.; and 2,000 were bought from John R. Maher Associates. None of the sellers were made defendants in this action. None of the sellers nor their principals, in the case of Meyers, were members of the [*43] underwriting group. The members of the underwriting group cannot be held liable under Sec. 12 under these circumstances were they were not plaintiff's immediate sellers. *Unicorn Field, Inc. v. Cannon Group, Incorporated* , *60 F.R.D. 217 (S.D.N.Y. 1973).*

IHS may not be held liable under this section. The distribution was a firm commitment underwriting. Under this arrangement, there is no basis for tracing liability to the Issuer as the ultimate seller of these securities. See *DeMarco v. Edens* , *390 F.2d 836 (2d Cir. 1968);* 3 L. Loss, Securities

Regulation , 1719-20.

Liability Under § 11 of the Securities Act of 1933

Plaintiff relies upon the failure to disclose certain transactions or facts in IHS's registration statement and prospectus as the omission of material facts upon which § 11 liability may be premised. Specifically, the alleged material omissions are the claimed "parking" arrangement engineered through Galanis' account, the purchase of the shares from the so-called "free riders" Greditor and Gumper, and the wooden ticket purchase by Hagopian through Provident Securities, one of the underwriters.

A fact is proved to be material, for purposes of Sec. 11 of the [*44] 1933 Act, "when it is more probable than not that a significant number of traders would have wanted to know it before deciding to deal in the security at the time and price in question." *Feit v. Leasco Data Processing Equipment Corporation* , *332 F.Supp. 544, 571 (E.D.N.Y. 1971).* As has been previously noted (supra , p. 19), the Court views the Galanis transaction as de minimus and believes it certainly does not rise to this, or any magnitude of materiality. n11 The Greditor-Gumper transaction was not a fact that would influence the investment decisions of potential traders. In the era of the "hot issues", "free riders" were a factor to contend with, but it would not be possible for the prospectus to anticipate which issues would attract their attention, nor for the underwriters to prevent purchases by them.

> n11 As to an omission, the issue is now phrased in terms of "might have" rather than "would". See Welch Foods, Inc. v. Goldman Sachs & Co. , [*] F.Supp. [*] , Docket No. 70 Civ. 4811 (dated September 30, 1974).

The Hagopian "wooden ticket" purchase from Provident Securities, one of the underwriting firms in this distribution, ranks in a different order. Although [*45] plaintiff did not purchase its shares from Provident, it

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 15 of 38

Page 14

1975 U.S. Dist. LEXIS 14230, *45; Fed. Sec. L. Rep. (CCH) P94,966

would be a concern of the plaintiff, as it would be of any reasonably prudent investor, that one of a select circle of underwriters had sold 10,000 shares, or 5% of the public issue, to a favored customer in violation of credit restrictions. Such dealing of a principal of a member of the underwriting syndicate in violation of these restrictions, to achieve the initial success of the offering was a material fact which required disclosure. As it was not disclosed, this material omission is a basis for imposing § 11 liability on defendant IHS. As noted infra , p. 46, the underwriters other than Provident have sustained their burden in showing due diligence. Constantinou, as the controlling person of Provident, is liable for this omission since the credible evidence in this case indicates that the wooden ticket purchase was consummated with his knowledge. *15 U.S.C. Sec. 77o.*

It is unrealistic to characterize Yamada as an underwriter, whose presence should have been disclosed in the prospectus. The record shows that Yamada purchased all of the shares he ordered as an investment for Competitive; the only difficulty with his [*46] conduct is that he was motivated not by his fiduciary duty to plaintiff, but by his desire to ingratiate himself with Vesco and give Vesco consideration which would induce Vesco to have pension trust advisory business awarded to Yamada. There is no material omission with respect to Yamada. We have dated the effectuation of the fraud as having occurred in the morning of December 1, 1970, when Yamada altered his directions to McSwain and increased his initial order of IHS stock from 3,000 to 20,000 shares. Yamada continued his activity by purchasing the additional 20,000 shares from Eastman later in the day.

The prospectus contains a general statement (p. 20) that:

"P. K. Hickey, Wolff & Co. has been authorized, for the accounts of the several Underwriters, to sell any or all of the Capital Common Stock to selected dealers who are members of the National Association of Securities Dealers, Inc. at the public offering price, less a concession of not more than $.25 per share. ..."

The Court attaches no significance whatsoever to the fact that there were such reallowances to members of a selling group, and that a firm refered to as BWA purchased shares thereunder. BWA was not [*47] a principal underwriter, assuming, as is apparently the case, that Vesco controlled BWA, or had an interest in it.

We have previously discussed Pilaro's role as a consultant, and believe that this was adequately disclosed in the prospectus. Defendant Issuer argues the point well concerning Pilaro (Brief, p. 41):

"to assert that disclosure is required of the services of a consultant in the context of this record is as absurd as to assert that the name of an underwriter's registered representative or back office employees, accountants or chauffeurs must be disclosed. It just is not material. No authority is cited for the peculiar and untenable position asserted by plaintiff that a consultant, employed to help an underwriter find co-underwriters becomes an underwriter, if successful. There is no evidence that Pilaro's compansation depended upon his finding co-underwriters, or that he purchased the stock, or that he sold any of the stock to anyone."

Furthermore, there is no evidence that the discussion concerning employment of Pilaro by IHS as a consultant or a Director had reached the point of firm reality to the extent that it should have been discussed in the prospectus. [*48] Indeed, if it had been mentioned under the facts of this case, it would be a false representation unless Pilaro had agreed to accept some particular employment. Furthermore, the prospectus does disclose an intention by the underwriters to engage in after market transactions.

The "Due Diligence" Defenses

Section 11(b) of the Securities Act of 1933 provides that "no person, other than the issuer, shall be liable" under § 11(a) "who shall sustain the burden of proof".

"(3) that (A) as regards any part of the registrationstatement not purporting to be made on the authority of an expert ... he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement not purporting to that the statemens therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading; ...."

For purposes of determining what constitutes reasonable investigation and reasonable ground for belief, Sec. 11(c) sets the standard of reasonableness as "that required of a prudent man in the management of his own property."

Page 15

1975 U.S. Dist. LEXIS 14230, *48; Fed. Sec. L. Rep. (CCH) P94,966

The defense of due diligence [*49] would be available to all the defendants, with the exception of the Issuer, IHS. Section 11 imposes nearly absolute liability on the issuer. *Feit v. Leasco Data Processing Equipment Corporation , 332 F.Supp. 544, 575 (E.D.N.Y. 1971).*

The performance of due diligence "is a question of degree, a matter of judgment in each case." *Escott v. Barchris Construction Corporation , 283 F.Supp. 643, 697 (S.D.N.Y. 1968).*

The underwriting group was headed by P. K. Hickey, Wolff & Co., of which Paul K. Hickey was a partner. Hickey testified that his due diligence inquiry included a complete analysis of the company, its finances, management and future plans, as well as an analysis of the state of the industry (Tr. p. 259). Pilaro, as adviser to the underwriting syndicate, made an extensive study of the medical and health care fields (Tr. pp. 491-92). Investigations were made of opportunities for acquisitions which was the stated use to which the proceeds of the offering would be applied, (Tr. p. 494). Hickey and counsel visited IHS's clinical laboratory and acquainted themselves with its operation (Tr. pp. 484-87). Hickey, Wolff, as the lead underwriter, assembled the underwriting group.Hickey [*50] was acquainted with each firm that became a member of this group, with the exception of Provident. To assure that Provident would undertake a true public offering, Hickey investigated the reputation of Provident and Constantinou, since he did not have prior experience with that firm. Hickey testified that in all respects his due diligence efforts in this underwriting were similar to his normal practice in other underwritings (Tr. p. 511).

Immediately prior to the effective date, a due diligence meeting was held. At that meeting, Shmueli made a presentation on behalf of IHS, discussing the company's current status and its plans for the future, including potential acquisitions (Tr. p. 552). Dick Donner, an attorney who was present at the meeting due to the efforts within the Hickey firm, represented that, apart from the described "affiliate" status, there was no connection between IHS and International Controls (Tr. pp. 552-55). Copies of the prospectus were distributed to those in attendance (Tr. pp. 552, 556). Shmueli and Donner responded to questions. Additional questions were directed to Hickey regarding the mechanics of the underwriting (Tr. p. 507).

While an element [*51] of levity was injected in the trial record concerning the due diligence meeting, to the effect that it took place in a private club where appetizers and liquor were served, and an effort was made to portray the due diligence meeting as a mere cocktail party, the Court does not accept this characterization, and believes that Hickey, his attorneys, Pilaro, and the underwriters other than Provident, went through all of the necessary procedures to justify a finding of due diligence on their part. Furthermore, the conspiracy which the Court does find to exist was by its very nature, secret, and knowledge of it most unlikely to be available to the non-participating underwriters, no matter how much diligence they used. A smaller investment in it would not have been unreasonable for plaintiff's funds. The initial order made by Yamada was for a mere 3,000 shares; this is in itself some evidence that the conspiracy did not flower until mid-morning on December 1st, and for that reason alone could not have been known to the non-participants.

The plaintiff has attempted to place significance on the claimed failure of certain defendants to have representatives in attendance at the due diligence [*52] meeting (Tr. pp. 549-52). Plaintiff also attaches significance to Hickey, Wolff's failure to have the due diligence meeting transcribed and its failure to prepare a post-meeting summary (Tr. pp. 547-48). Although the attendance of all the participating underwriters and the maintenance of these records may have been advisable, the significance of any failures on the part of the underwriting group must be viewed in the context of the issues raised by this lawsuit.

The claimed omission central to this action is the failure of the Issuer and its underwriters to disclose the existence of this conspiracy between Yamada, Vesco and Constantinou to assure the success of this offering by unlawful means. This covert and illicit situation would not have come to light had a greater number of the underwriters been present, or if notes of the meeting had been recorded. Diligent investigation by Hickey of the character and reputation of Provident failed to disclose intent to effect the Hagopian transaction.

To escape liability under Sec. 11, "[the] defendant must establish (1) that he conducted a reasonable investigation and (2) that after such investigation he had reasonable ground to [*53] believe and did believe the accuracy of the registration statement." *Feit v. Leasco, supra , at p. 576.*I find that Hickey, Wolff, on its own behalf and in behalf of the other underwriters, made a

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 17 of 38

Page 16

1975 U.S. Dist. LEXIS 14230, *53; Fed. Sec. L. Rep. (CCH) P94,966

reasonable investigation; that the degree of investigation required to have unveiled the conspiracy was far greater than "that required of a prudent man in the management of his own property." *15 U.S.C. Sec. 77k*(c). Although each of the underwriters had a responsibility of due diligence, upon this record, I do not find that the other members of the underwriting group conducted their affairs in an unreasonable manner. The activities of Hickey, which inured to the benefit of all of the underwriters, indicate an exercise of due diligence throughout the offering. Hickey testified, and I find, he did so truthfully, that Vesco had never informed him of any specific connection or understanding between Vesco and Yamada, and Hickey knew nothing of any attempts by Yamada to acquire investment advisory business from Vesco controlled entities, nor did he have any knowledge of Hagopian's activities.

Plaintiff has failed to prove any wrongdoing on the part of Hickey or his firm, P. K. Hickey, Wolff [*54] & Co. As lead underwriter, it exercised due diligence, an adequate defense under § 11 of the 1933 Act.

All underwriters, except Provident are entitled to prevail upon the affirmative defense of due diligence used.

The Court finds no negligence. Mere negligence, if present, would not constitute a basis for liability on the part of the underwriters for the Sec. 10b claims which plaintiff has proved against others. The underwriters had no actual knowledge, and there is no basis upon which the Court could find that they should have known or would have known of these improper activites.

Even if negligence were proved, it will not rise to the degree of culpability necessary to impose liability under Rule 10b-5. *Republic Technology Fund, Inc. v. Lionel Corp. , 483 F.2d 540 (2d Cir. 1973)*.

The Statute of Limitations Defense

Defendants assert that plaintiff falied to bring this action within one year after "discovery should have been made by the exercise of reasonable diligence," with the result that any claim under Sec. 11 or Sec. 12(2) is bared. *15 U.S.C. Sec. 77m*.

It is true that as soon as the confirmations were received, perhaps earlier, plaintiff, through its employees [*55] not connected with the fraud, knew that the Fund

had absorbed 20% of the new offering.Defendants urge that even rumor or vague charges are sufficient to put plaintiff on notice, and thereby start the limitations period running, if they were such as to arouse suspicion in a reasonable man. *Klein v. Shields & Co. , 470 F.2d 1344, 1347 (2d Cir. 1972); Clement A. Evans & Co. v. McAlpine , 434 F.2d 100, 104 (5th Cir. 1970),* cert. denied *402 U.S. 988 (1971)*.

Even before Yamada was hired by plaintiff to manage a segment of its portfolio, there were rumors concerning his character, and it was understood by plaintiff's officers that the Securities and Exchange Commission was investigating him. Yamada's practice of directing trades to particular brokers had come to the attention of Randolph, plaintiff's principal officer, and had been cause for concern. McSwain's records clearly showed plaintiffs that this was a directed trade.

As early as January 13, 1971, Mr. James B. Baron, a Director of plaintiff, reached the conclusion that Yamada was a fraud, a cheat, and a person of bad character. He recomended that Yamada be discharged as a liar. Mr. Baron had no hard evidence on which to form [*56] this conclusion; he was a retired banker who had had many years experience dealing with borrowers and persons in the financial community, and reached his conclusion with respect to Yamada operating solely by intuition. The majority of the Board of Directors, and the balance of Competitive's management rejected this conclusion, and they were entitled to do so, even though by hindsight, the unsupported intuition of the former banker proved correct.

Even when, finally, Yamada was discharged by the Board of Directors for lying, this fact did not immediately place the Directors on notice of the claimed scheme in this case. It would be foolhardy to suggest that, having established Yamada was a crook, and that he had fleeced the Fund in connection with Fantastic Fudge or Firefly Enterprises, as he apparently did, a reasonable Director must immediately infer that all investments of the trust funds made by Yamada were fraudulent. What is clear today was not necessarily clear in early 1971. The Fund discharged Yamada on May 14, 1971, and in the Court's view under the circumstances of this case, was entitled to at least a 30 day period thereafter as a reasonable time within which to investigate [*57] and ascertain the facts concerning the IHS issue, some of which remain unclear even to this day. This action was brought on May 4

1972. To require knowledge at a prior date necessitates judging the actions of the Directors "in the light of such subsequent events as could not, through compliance with their duty, have been anticipated. A wisdom developed after an event, and having it and its consequences as a source, is a standard no man should be judged by." *Costello v. Costello , 209 N.Y. 252, 262 (1913).*

Defendants contend plaintiff's managers knew no later than January 13, 1971 that they had been damaged and "hid their heads in the sand because they were embarrassed." That inference or conclusion is unjustified.

In October 1971, Randolph, plaintiff's then President, and Markizon, its Secretary, weer given the assignment by plaintiff's Board to determine the true market value of the securities in Yamada's segment of the portfolio and determine whether or not they should be sold, and whether they could be sold, and shortly thereafter, on November 9, 1971, plaintiff's directors apparently authorized its attorneys to bring this litigation and other lawsuits. This action is timely. [*58]

The Court does not consider that plaintiff waived any rights against defendants, or became estopped in any fashion by the fact that subsequently, it apparently reported the IHS stock in its financial reports as having a value greater than that which it now contends.

Section 17a Claim

This Court has dealt previously with this issue in *Welch Foods, Inc. v. Goldman Sachs & Co. ,* [*] F.Supp. [*] Docket No. 70 Civ. 4811-CLB (dated Sept. 30, 1974), relying on the opinion of Judge Gignoux in *Dyer v. Eastern Trust and Banking Company , 336 F.Supp. 890 (D. Me. 1971).* Since liability is found under Secs. 10b and 11, no purpose will be served in prolonging this opinion unduly by discussion of a Sec. 17a claim, which would parallel our consideration in the Welch case.

Imputed Liability of IHS Under § 10b for Acts of Vesco and Yamada While the statute provides a basis for imputing liability of the issuer to its promoters, we find little reported authority concerning imputed or vicarious liability of an issuer because of the misconduct of its promoters or controlling persons. Under the circumstances of this case, and concededly in the prospectus, Vesco was a "promoter" of IHS. I [*59] find that he was more than that, and regard him as a de facto officer and director of IHS. He controlled 17.9% of the

voting stock. An additional 13.3% was owned by Shmueli, who, as previously observed, was so involved with Vesco as to be under his domination and control. One Ballin, an unrelated person, who had a three year contract of employment at $20,000.00 with Issuer's wholly owned subsidiary, owned 9.1%. Of the directors and officers not mentioned, one was an attorney whose firm was expected to render legal services to the Company, and another hada prior history of close affiliation with International Controls.

At the time of the underwriting, the Issuer was Vesco's creature in all respects, and under his domination and control. His efforts in its behalf in connection with the sale of the stock inured to the benefit of the corporation as they were intended to do. We consider the corporation liable for the acts of Vesco previously mentioned on principles of agency, on the theory that Vesco was a de facto officer and director, wholly apart from his status as a promoter and controlling person.

There are alternate theories available to plaintiff. One of these is, assuming [*60] the liability for Vesco's activities is not imputed to the Issuer, at least the Issuer received the proceeds of the underwriting, and as an innocent beneficiary of the tort, should be compelled to make restitution. Furthermore, even if the promoter were not a de facto officer and director, we see no sound basis by which the beneficiary of a promoter's wrongdoing should not have that wrongdoing imputed to it under general principles of agency, even absent any position as officer or director. Cf. *Hill York Corp. v. American International Franchises, Inc. , 448 F.2d 680 (5th Cir. 1971).*

Damages

Plaintiff is entitled to compensatory damages for the losses suffered as a result of the fraud and statutory violations. It remains subject to a duty to mitigate its damages and should have sold the IHS stock within a reasonable period of time after ascertaining the fraud. Plaintiff contends that it could not realize the prices quoted in the "pink sheets" by over-the-counter market makers, because it held almost 20% of the outstanding salable float, a figure computed by taking the total amount of the issue of 200,000 shares and adding approximately 20,000 unregistered shares which had been [*61] freed of restrictions by reason of the death of a shareholder or similar circumstances.

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 19 of 38

Page 18

1975 U.S. Dist. LEXIS 14230, *61; Fed. Sec. L. Rep. (CCH) P94,966

Plaintiff attempted to prove by the expert witness Drucker that its block was so large that it could not be sold for more than 50% of the pink sheet bid quotations. While Drucker was fully qualified to give such expert testimony, the hypotheses which were submitted to him for his consideration were so limited that it was impossible for him, or anybody, to have given a meaningful opinion based solely thereon. The Court attaches no weight whatsoever to his testimony. Specifically, all that Mr. Drucker relied upon was the float figure. Drucker testified that he could form an opinion and determine the market price which could have been obtained for this substantial block of shares during 1972 based solely upon consideration of the pink sheets, the prospectus issued in 1970 by IHS and the Annual Report of plaintiff, which certainly had no bearing on the market value of IHS stock. (Tr. pp. 281-82).

Specifically, when Drucker testified as to such market price, he did not know what unfulfilled customer orders were then on hand, at what specified price, with what dealers, and had no information [*62] whatsoever concerning the financial condition of IHS at the time of the proposed sale, or its profit and loss experience since 1970. He did not know the supply and demand ratio of stock of IHS existing in the market, the market climate, nor the short position of houses maintaining primary markets, all of which he conceded were relevant factors in connection with the opinion he was asked to give (Tr. p. 286.) His testimony is worthless.

Plaintiff advances the reasonable suggestion that dumping this 40,000 share block on the market at or near the time of the discharge of Yamada would have depressed the price further. Galanis testified that he wanted to find out about the holdings of plaintiff because he believed that he could sell short with respect to issues which Yamada had purchased. He inferred, not unreasonably, and the Court believes any trader would conclude, that plaintiff was most likely to dispose of unseasoned stocks which Yamada had purchased. It would be expected to do so in order to realize all losses and potential losses, and permit the next portfolio manager to start with a clean record.But this fact depressing the market is not germane to the issue,

because the [*63] Court finds that the reasonable period within which plaintiff should have sold began in mid-June, 1971. (See supra , p. 54).

More nearly in point on the issue of damages is the result of a clandestine attempt by plaintiff in September or October 1971 to sell its IHS stock.Plaintiff placed a tentative sell offer through one Spencer, a trader. That trader solicited Hickey as a possible purchaser. Hickey attempted to find out who the seller was, and to make certain that the block, originally offered at between fifteen and twenty-five thousand shares, did not have additional shares behind it, which would come on the market and depress the price, impeding Hickey's resale efforts. The trader acting for plaintiff admitted to Hickey that he had 35,000 shares, and Hickey quoted a bid price of $3.25 for these shares. I find Hickey would have purchased them himself for his firm. Hickey was able to ascertain by reference to the Issuer's stock records that "Gitfund", an alter ego or street name for plaintiff, owned 40,000 shares. He knew this when he made the bid, and though he was bidding for this specific block. Hickey did not know that Gitfund was an alter ego of Competitive Associates, [*64] but knew that it was the only holder of a salable block of stock in that number of shares. He made a bid for the "approximate amount of 35,000 shares" at a price of $3.25, and I find that he would have bid the same amount for the full 40,000 shares had it been tendered to him, and that his bid was a good faith bid. It was not accepted.

While Competitive disclaims knowledge that any such offer was authorized, I am convinced that Hickey testified truthfully in regard thereto, and that he did in fact receive such a request, and correctly deduced that the block involved was Gitfund's. Mr. Spencer, of Herzog & Co., the stockbroker claimed to have offered these shares to Hickey in behalf of plaintiff was not called as a witness. There is no other evidence that plaintiff could have liquidated its sizable block at the prices quoted in the pnik sheets or at any price higher than the Hickey offer, during the aforementioned period.

The Court computes plaintiff's damages as follows:

| 20,0 00 shar | $105,000.00 |
|---|---|

1975 U.S. Dist. LEXIS 14230, *64; Fed. Sec. L. Rep. (CCH) P94,966

es at 5 1/4 (pur chas ed from Mey ers)

20,0 00 shar es at $5.0 0 per shar e (pur chas ed from East man )

100,000.00

| | Total Investment | $205,000.00 |
|---|---|---|

Less profi t on 2,00 0 shar es sold on Apri l 26, 197 1

$ 2,000.00

Less 40,0 00 shar es at 3 1/4 (pric e at whic

$130,000.00

Page 20

1975 U.S. Dist. LEXIS 14230, *64; Fed. Sec. L. Rep. (CCH) P94,966

h
Git-
fund
coul
d
have
sold
to
Hick
ey in
the
Fall
of
197
1
and
shou
ld
have
done
so in
mit-
iga-
tion
of
dam
ages
)

|                          |            |
|--------------------------|------------|
|                          | 132,000.00 |
| Plaintiff's Total Damages | $ 73,000.00 |

[*65]

As compensatory damages for the wrongful withholding of the money after demand, plaintiff shall recover interest at 6% from May 4, 1972 to date of entry of the judgment. The judgment shall be entered against Gilman Service, Inc., and Pericles Constantinou, jointly and serverally, and shall provide that the action is dismissed without prejudice as to defendant Provident Securities, Inc., and with prejudice insofar as concerns defendants P. K. Hickey, Wolff & Co., Delphi Capital Corporation, Scheinman, Hochstin & Trotta, Inc., Hartzmark & Co., Inc., L. C. Wegard & Co., Inc., Ross, Low, Bull & Co., Kalman Shmueli, Howard F. Cerny, Carl W. Anderson and Ralph P. Dodd.

Plaintiff's attorneys in their post-trial memorandum requested this Court, for the first time, to award plaintiff counsel fees, although the complaint, requested compensatory damages, "together with costs and disbursements ... and such other relief as to which the Plaintiffs may be entitled." No evidence of the extent of the efforts by each of the law firms which has represented Competitive in this action was submitted. Defendants in their briefs chose not to deal with the awarding of counsel fees. On this record, [*66] the Court has no basis upon which to make an award.

The foregoing constitutes findings and conclusions pursuant to *Rule 52, F. R. Civ. P.* Settle a final Judgment on five (5) days notice.

**A. 37**

LEXSEE 2003 US DIST LEXIS 9538

**DAVID JOHN DIERSEN, Plaintiff, v. DAVID M. WALKER, Comptroller General of the United States of America, Defendant.**

**No. 00 C 2437**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2003 U.S. Dist. LEXIS 9538*

**June 5, 2003, Decided**
**June 6, 2003, Docketed**

**SUBSEQUENT HISTORY:** Summary judgment granted by *Diersen v. Walker, 2003 U.S. Dist. LEXIS 19794 (N.D. Ill., Nov. 3, 2003)*

**DISPOSITION:** [*1] Recommended that Plaintiff's Motion for Sanctions for Spoliation of Relevant Documents be denied.

**COUNSEL:** DAVID J DIERSEN, plaintiff, Pro se, Wheaton, IL.

For DAVID M WALKER: AUSA, United States Attorney's Office, Chicago, IL.

**JUDGES:** Nan R. Nolan, United States Magistrate Judge. The Honorable Amy J. St. Eve, United States District Court Judge.

**OPINION BY:** Nan R. Nolan

**OPINION:**

**REPORT AND RECOMMENDATION**

Nan R. Nolan, United States Magistrate Judge

Plaintiff David John Diersen ("Diersen"), a former employee of the General Accounting Office (the "GAO"), brings this *pro se* action against David M. Walker in his capacity as Comptroller General of the GAO. Diersen alleges, among other things, that he was denied various promotions and forced into early retirement because of age, race, and gender discrimination and retaliation. The

GAO denies these claims. This matter is now before the Court on Diersen's Motion for Sanctions for Spoliation of Relevant Documents. For the reasons explained below, the Court recommends that Diersen's motion be denied.

**BACKGROUND**

On October 31, 2002, this Court granted Diersen's unopposed motion to compel and ordered GAO to produce "copies of [*2] all written affirmative action (AA), equal employment (EEO), and diversity expectations since 1986 that GAO gave three former managers of its Chicago Field Office, Joseph E. Totten (Totten), Luke, and Leslie G. Aronovitz (Aronovitz) and the reports that Totten, Luke, and Aronovitz submitted detailing the actions they took to meet those expectations." n1 On November 11, 2002, GAO was ordered a second time to produce these documents.

> n1 According to Diersen, Totten managed GAO's Chicago office between 1986 and 1989, Luke managed GAO's Chicago office between 1990 and 1994, and Aronovitz has managed GAO's Chicago office since 1995. Totten retired from GAO approximately fifteen years ago and Luke retired in 1999.

By letter dated November 18, 2002, defense counsel informed Diersen that the only material responsive to Diersen's request and the Court's orders was "performance expectations of Senior Executive Service

2003 U.S. Dist. LEXIS 9538, *2

("SES") Members that were sent to SES employees, including Totten, Luke and Aronovitz, as well as the [*3] individual responding SES Performance Contract/Assessments from Totten, Luke, and Aronovitz." Exh. 1 to Def's Resp. to Pl's Motion to Compel Discovery (dated February 10, 2003). GAO then provided Diersen with memoranda entitled GAO Performance Expectations of Senior Executive Service ("SES") Members from 1997 through the present. Id. Defense counsel also located directly from Aronovitz her SES Performance Contract/Assessments from fiscal years 1992-1993, 1995-1996, 1996-1997, 1997-1998, 1999-2000, and 2000-2001 and copies were furnished to Diersen. Aronovitz located some copies of the GAO Performance Expectations of Senior Executive Service ("SES") Members that were furnished directly to her and copies of these documents were provided to Diersen. Defense counsel also informed Diersen that GAO had not been able to locate any SES Performance Contract/Assessments from Luke or Totten since they had been retired for a number of years and GAO was in the process of determining whether their personnel files were still warehoused or had been destroyed.

On November 19, 2002, this Court again ordered GAO to produce the documents sought by Diersen in his unopposed motion to compel. By letter [*4] dated December 13, 2002, defense counsel informed Diersen that GAO located two SES Performance Contract/Assessments for Luke, one for the rating period of October 1, 1997 through September 30, 1998 and one for the rating period of October 1, 1998 through September 30, 1999. Defense counsel further reported that GAO was unable to locate any additional performance appraisals for either Luke or Totten and that any additional performance appraisals had been destroyed in accordance with GAO regulations. Exh. 3 to Def's Resp. to Pl's Motion to Compel Discovery (dated February 10, 2003).

On January 21, 2003, Diersen filed a second motion to compel seeking production of these same documents. GAO's response included the Declaration of Laura A. Chase, a Human Capital Assistant for GAO. Exh. 4 to Def's Resp. to Pl's Motion to Compel Discovery (dated February 10, 2003). Chase's responsibilities as a Human Capital Assistant include maintenance of Senior Executive Service (SES) program performance contracts/assessments and performance expectations memoranda. Id. at P 1. In her declaration dated February

6, 2003, Chase explained that "pursuant to GAO Order 0413.1, GAO Comprehensive Records Schedule [*5] (June 30, 1998), SES performance appraisals, including the job elements and the standards upon which they are based, are destroyed five years after the date of the appraisal. Accordingly, SES performance contracts/assessments and expectations memoranda dated prior to FY 1998 are not available." Id. at P 2. Chase further stated: "To the best of my knowledge and belief, I have retrieved all available SES performance contracts/assessments for Mr. John Luke and Ms. Leslie Aronovitz, along with all available and corresponding performance expectations. To the best of my knowledge and belief, there are no such records available for Mr. Joseph Totten." Id. at P 3.

After reviewing the parties' submissions, this Court found that Diersen was entitled to conduct discovery concerning the circumstances surrounding the destruction of the Totten and Luke SES performance appraisals. The Court directed Diersen to file a written statement detailing the specific discovery he wished to conduct on the limited issue of the circumstances surrounding the destruction of the Totten and Luke SES performance appraisals. See Order dated March 27, 2003. On April 25, 2003, the Court ordered GAO to provide [*6] Diersen with the following discovery:

1. GAO shall provide Diersen with the following information concerning the Totten and Luke SES performance appraisals: (a) any and all documents which specify the identity of the persons who requested the destruction of these documents, authorized the destruction, and destroyed the documents; (b) the purported authorities under which the documents were destroyed; (c) when the documents were destroyed; and (d) where the documents were destroyed.

2. GAO shall contact Totten and Luke and request that Totten and Luke explain the searches they made to attempt to locate the missing SES performance appraisals. GAO shall then provide Diersen with a written explanation of the searches made by Totten and Luke for the missing SES performance appraisals.

3. GAO shall determine whether it is possible to reconstruct any AA, EEO, and diversity expectations contained in the missing Totten and Luke SES performance appraisals. GAO shall inform Diersen in writing of whether it is possible to reconstruct this

information.

4. GAO shall provide the Court and Diersen with a written statement detailing the specific searches that have been conducted [*7] to attempt to locate the missing Totten and Luke SES performance appraisals. The statement shall include the names of the GAO personnel conducting the searches.

5. GAO shall provide Diersen with the following documents: (a) all versions of GAO Order 0413.1 since 1980; (b) all versions of GAO Order 0410.1 since 1980; (c) all DOJ and GAO documents that contain polices, practices, or procedures relating to the identification and preservation of documents containing information related to potential or actual litigation against GAO; (d) all documents issued by DOJ to GAO concerning the identification or retention of documents concerning claims made in the Chennareddy case and this case; and (e) all documents issued by GAO concerning the identification or retention of documents concerning claims made in the Chennareddy case and this case.

The Court ordered GAO to provide the above discovery by May 5, 2003. On May 5, 2003, GAO provided the Court and Diersen with its Response in Compliance with April 25, 2003 Magistrate's Order. n2 On May 21, 2003, Diersen filed his current "motion for sanctions for spoliation of relevant documents." The parties have fully briefed the matter, [*8] and the motion is now ripe for ruling.

n2 In his current motion, Diersen argues that GAO's Response was inadequate for numerous reasons and he now seeks additional information from GAO. Diersen's request for any further discovery is denied. The parties appeared before the Court on May 6, 2003 for a status and to set a briefing schedule on the spoliation motion. At that time, Diersen did not state that he believed any deficiencies existed in GAO's Response and he did not ask for additional discovery. It is too late to conduct further discovery. Discovery is closed. Diersen's spoliation motion is fully briefed and dispositive motions are due by June 13, 2003.

## DISCUSSION

"The Court's authority to sanction a party for the failure to preserve and/or produce documents is both inherent and statutory." *Danis v. USN Communications, Inc., 2000 U.S. Dist. LEXIS 16900, 2000 WL 1694325, *30* (N.D.Ill. Oct. 23, 2000). Diersen appears to be proceeding under *Rule 37 of the Federal Rules of Civil Procedure* and the Court's inherent [*9] power to punish conduct that abuses the judicial process. The "analysis is essentially the same" whether proceeding under *Rule 37* or under a court's inherent powers. Id. Diersen moves for a default judgment against GAO for its destruction of expectations memoranda and Totten and Luke SES performance appraisals. n3 In the alternative, Diersen asks the Court to draw the inference from the document destruction that the destroyed documents would have provided evidence unfavorable to GAO. n4

n3 Diersen requests various additional sanctions (i.e. a finding that GAO's affirmative action goals were illegal quotas, exclusion of all evidence in opposition to Diersen's claims that GAO's goals were illegal quotas, and an order striking GAO's denials concerning Diersen's claims that GAO's goals were illegal quotas).

n4 Diersen also seeks an order finding that "former Comptroller General Elmer Staats (Staats), former Comptroller General Charles Bowsher (Bowsher), former Acting Comptroller General James Hinchman (Hinchman), and Comptroller General David Walker (Walker) are personally responsible for GAO's illegal quotas during their terms in office and responsible for the spoliation of documents relevant to GAO's illegal quotas that took place during their terms in office." Diersen has not established that a finding of "illegal quotas" is appropriate or that Staats, Bowsher, Hinchman, and Walker should be held personally responsible for the destruction of the expectations memoranda and Totten and Luke SES performance appraisals. As a

further alternative, Diersen requests an order finding GAO in contempt of court for refusing to provide administrative documents that evidence which GAO employees requested and authorized the destruction, which specific documents were destroyed, and the specific dates the documents were destroyed; for refusing to make adequate efforts to locate copies of the documents it destroyed; for refusing to provide Diersen with declarations from all responsible former and current GAO employees concerning their searches for the documents; and for refusing to reconstruct from other sources the information it destroyed. Diersen has not shown that GAO refused to provide any documents evidencing which GAO employees requested and authorized the destruction of the missing documents, which specific documents were destroyed, and the specific dates the documents were destroyed. GAO represented that no such documents exist. Diersen has also not shown that GAO failed to make adequate efforts to locate the missing documents or to attempt to reconstruct the destroyed information. Diersen has not cited any authority under which GAO can require former employees to provide declarations. Moreover, Diersen has been provided a declaration by Laura Chase, a current employee responsible for searching for the missing documents, and a statement from Michael E. Hatch, a Senior GAO Attorney, involved in searching for the missing documents. Finally, Diersen seeks to conduct additional, but undefined discovery "concerning GAO's AA goals" and to extend discovery "concerning GAO's AA goals." Diersen's request to conduct additional discovery and to extend the discovery deadline is denied. This Court has previously provided numerous discovery extensions, and Diersen has not provided any valid reason for reopening discovery at this late date in the litigation.

[*10]

"Because a default judgment deprives a party of a hearing on the merits, the harsh nature of this sanction should usually be employed in extreme situations where there is evidence of wilfulness, bad faith, or fault by the noncomplying party." *Danis, 2000 U.S. Dist. LEXIS 16900, 2000 WL 1694325* at *33. "Bad faith" means destruction "for the purpose of hiding adverse information." *Mathis v. John Morden Buick, Inc., 136 F.3d 1153, 1155 (7th Cir. 1998).* "Wilfulness and bad faith are associated with conduct that is intentional or reckless . . . ." *Long v. Steepro, 213 F.3d 983, 987 (7th Cir. 2000).* "Fault" is unconcerned with the non-complying party's subjective motivation, but rather describes the reasonableness of the conduct. *Langley v. Union Electric Co., 107 F.3d 510, 514 (7th Cir. 1997).* Fault may include "gross negligence" or "a flagrant disregard" of the duty to "preserve and monitor the condition" of material evidence. *Marrocco v. Gen. Motors, 966 F.2d 220, 224 (7th Cir. 1996).*

The Seventh Circuit has held that a finding of prejudice is not required before a court dismisses or enters judgment as a sanction under its inherent [*11] power but has also recognized that "dismissal or judgment is such a serious sanction that it should not be invoked without first considering what effect--if any--the challenged conduct has had on the course of the litigation." *Barnhill v. U.S., 11 F.3d 1360, 1368 (7th Cir. 1993).* The Court is given broad discretion to choose the appropriate sanction for discovery violations given the unique factual circumstances of the case. *National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 642-43, 49 L. Ed. 2d 747, 96 S. Ct. 2778 (1976); Long, 213 F.3d at 988* (stating "courts have considerable discretion in imposing sanctions to control their dockets."). However, a court's discretion to sanction litigants is not unfettered. "An award of sanctions must be proportionate to the circumstances surrounding the failure to comply with discovery." *Crown Life Ins. Co. v. Craig, 995 F.2d 1376, 1382 (7th Cir. 1993).*

"A prerequisite to the imposition of sanctions for spoliation is a determination that the party, which destroyed the documents, had an obligation to preserve them." *Cohn v. Taco Bell Corp., 1995 U.S. Dist. LEXIS 12645, 1995 WL 519968, *5 (Aug. 30, 1995)* [*12] . Parties in litigation have a duty to preserve relevant evidence "over which the non-preserving party had control and reasonably knew or could reasonably foresee was material to a potential legal action." *China Ocean*

*Shipping (Group) Co., v. Simone Metals, Inc.,* 1999 U.S. Dist. LEXIS 16264, 1999 WL 966443, *3 (N.D. Ill. Sep. 30, 1999).

GAO states that the Totten and Luke performance appraisals as well as the job elements and standards upon which they were based were destroyed pursuant to the document retention policy of GAO embodied in GAO Order 0413.1. GAO Order 0431.1 provides for the destruction of SES performance appraisals, as well as the job elements and standards upon which they were based, five years after the date of the appraisals. Thus, SES performance appraisals and expectations memoranda dated prior to fiscal year 1998 are not available. n5 These circumstances suggest that the documents were destroyed under routine procedures and not in bad faith. *Coates v. Johnson & Johnson,* 756 F.2d 524, 551 (7th Cir. 1985) (holding if documents were destroyed under routine procedures, and not in bad faith, the circumstances cannot sustain an inference that the [*13] defendant's agents were "conscious of a weak case.").

n5 GAO has in fact produced GAO Performance Expectations of Senior Executive Service Members for 1997.

Diersen points out that GAO has admitted that it has no written policy or procedures regarding the retention of documents containing information related to potential or actual litigation against GAO. See Def's Resp. in Compliance with April 25, 2003 Magistrate's Order. While GAO need not have an official written policy regarding the preservation of documents related to litigation to avoid sanctions, GAO must comply with its duty to preserve relevant evidence regardless of its document retention policy contained in GAO Order 0413.1. Thus, GAO's reliance on GAO Order 0413.1 does not end the inquiry concerning whether GAO had a duty to preserve the destroyed documents and if so, its level of culpability for that breach.

GAO argues that given the limited scope of his administrative claim, "there was no way for GAO to deduce that any possible EEO communications [*14] between Senior Executive Service supervisors (like Totten, Luke and Aronovitz) and their supervisors had any bearing on Diersen's assignment in the Chicago office or his subsequent retirement." Federal Def's Sur-Response to Pl's Motion to Compel Discovery, p.3

(dated March 10, 2003). GAO states that Diersen's administrative complaint identified his claims as being based upon events in 1997. GAO claims that Diersen's administrative complaint was properly confined to events occurring in the 45-day period before his retirement on September 30, 1997. GAO states that Diersen's complaint in this lawsuit has improperly transformed his claim into a whole-scale attack upon GAO's EEO and affirmative action policies dating back to the 1980's. GAO argues that on the basis of this new claim, Diersen has claimed entitlement to "all sorts of information that may have anything to do with GAO's EEO or affirmative action plans." Id., p. 4. GAO contends that in expanding his claim, Diersen has violated the principle that a Title VII plaintiff may only bring those claims which fall within the scope of his original EEO charge. GAO further contends that Diersen cannot rely on the continuing violation [*15] doctrine to reach back from his 1997 EEO complaint to events occurring in the 1980s. GAO concludes that the relevance of the destroyed information cannot be determined until the court determines whether or not Diersen's current claims have been properly and timely presented, exhausted, and preserved for litigation in the current lawsuit.

The Court disagrees with GAO's argument that it cannot determine whether GAO had a duty to preserve the missing documents until the scope of Diersen's complaint is determined. A complaint provides notice to a party of what information is relevant and likely to be sought in discovery. *Cohn,* 1995 U.S. Dist. LEXIS 12645, 1995 WL 519958 at * 5. A party cannot destroy documents based solely on its own version of the proper scope of the complaint. GAO has not obtained a judicial ruling that the complaint in this matter should be limited to events occurring in 1997. Absent such a ruling, GAO had a duty to preserve evidence relevant to the claims in Diersen's complaints. Given the extremely broad and extensive allegations contained in Diersen's various complaints, the Court is not convinced that GAO did not have a duty to preserve the destroyed pre-1997 performance expectations [*16] memoranda and Totten and Luke performance appraisals.

GAO has admitted that it has no documents concerning the identification or retention of documents concerning the claims made in this lawsuit. Def's Resp. in Compliance with April 25, 2003 Magistrate's Order, p. 4. Moreover, GAO has not provided any evidence indicating that it instructed any employees to preserve

documents relevant to this litigation. GAO's apparent failure to warn its employees to preserve documents potentially relevant to this litigation evidences fault by acting with negligence or flagrant disregard of the duty to preserve potentially relevant evidence.

Although the Court has found that GAO failed to preserve certain potentially relevant evidence, the Court is not persuaded that any of the sanctions sought by Diersen are appropriate. Given the current record, the Court finds that the destruction of the pre-1997 performance expectations memoranda and the Totten and Luke performance appraisals does not raise an inference of bad faith or wilfulness. Diersen has not also established that the degree of prejudice, if any, from non-production of the Totten and Luke performance appraisals and the pre-1997 expectations [*17] memoranda is great enough to warrant sanctions.

Diersen claims that the destroyed documents were "crucial" to his ability to prove his claims because the destroyed documents "evidenced the quotas it gave Diersen's superiors to hire and promote minorities and females as well as documents that evidenced the actions that Diersen's supervisors took to meet those quotas." Diersen's motion, p. 12. n6 The Court emphasizes that the only missing documents are: 1) pre-1997 performance expectations for SES Members; 2) performance appraisals for Totten who retired approximately fifteen years ago; and 3) pre-1997 performance appraisals for Luke. n7 Diersen has failed to sufficiently explain how he is prejudiced by the non-production of these documents.

n6 Diersen has not indicated his definition of a "quota." The Court assumes he means a fixed number or percentage which must be met regardless of the quality of the applicants.

n7 GAO has also indicated that certain records from GAO's Office of Opportunity and Inclusiveness were destroyed in 1997. GAO presented the Declaration of Allen R. Elliott, the Deputy Director of GAO's Office of Affirmative Action Plans between 1986 and 1994. Elliott states that the GAO's Office of Affirmative Action Plans was disestablished in early 1994. Elliott further states that to the best of his knowledge and belief, pursuant to GAO Order 04131.1, GAO Comprehensive Records Schedule (June 30, 1998), files consisting of overall EEO/Affirmative Action/Civil Rights guidance and program administration records, including correspondence, reports, memoranda, and other records pertaining to overall program office administration, policies and procedures were destroyed three years after closure. Elliott concludes that records of GAO's Office of Affirmative Action Plans are not officially available. Nevertheless, Elliott retained personal copies of correspondence and related reports, dated between 1986 and 1993, which communicated affirmative action job assignment, hiring, and promotion processes to and from GAO field offices and units. Diersen has been provided with this information.

Diersen has not shown that any material from the Office of Affirmative Actions Plans was destroyed for the purpose of hiding adverse information in this lawsuit. GAO represents that at the time Diersen filed his administrative complaint of discrimination with GAO on September 30, 1997, the records from the Office of Affirmative Action Plans were already destroyed or in the process of being destroyed pursuant to GAO regulation. Based on Diersen's complaint of discrimination dated September 30, 1997, GAO perceived Diersen's claim as alleging discrimination based on race, sex, and age when he was appraised, not assigned to an OSI assignment, and forced to take early retirement. Diersen has not convinced this Court that this allegation put GAO on notice that it needed to preserve records pertaining to affirmative action goals dating back to 1980. Diersen also claims that records from the Office of Affirmative Action Plans should have been preserved in light of the Chennarreddy litigation filed in 1987 in the district court for the District of Columbia. Diersen has not provided the

Court with any pleadings or rulings of the trial judge which would allow this Court to determine the nature of the issues in that case and whether records from the Office of Affirmative Action Plans should have been preserved by GAO for that lawsuit. The Court does not find the Declaration of Walter T. Charlton, the plaintiffs' lawyer in Chennareddy, persuasive on the issue of the scope and nature of that litigation.

[*18]

The Court has reviewed the available performance expectations memoranda for fiscal years 1997, 1998, and 2000. Notably, none of these memoranda contain any specific numeric expectations or goals regarding minority and/or female hiring and promotions. Defendant's Response to Plaintiff's Motion to Compel Discovery, Exh. 5. In fact, each memorandum reviewed by the Court explicitly states that SES members are expected to adhere to equal opportunity and merit system principles in making decisions regarding hiring, promoting, training, and rewarding staff.

With respect to performance appraisals for SES Members, GAO states that to the best of its knowledge and belief, SES performance appraisals did not contain specific, quantifiable expectations regarding affirmative action, equal employment opportunity and diversity and did not include information about targets, goals, or quotas. The Court's review of existing performance appraisals confirms GAO's assertion. GAO has produced performance appraisals which are similar to the missing performance appraisals. Diersen has Aronovitz's performance appraisals for the rating periods of 1992-1993, 1995-1996, 1996-1997, 1997-1998, 1999-2000, and 2000-2001 and [*19] Luke's performance appraisals for the rating periods of 1997-1998 and 1998-1999. A review of the produced SES performance appraisals shows that some appraisals contain minority hiring information but not specific numeric hiring expectations. See Aronovitz appraisal, Rating period 10/01/98-9/30/99 (stating "successful hiring included ... an Asian staff member with extraordinary credentials in the health field."); Aronovitz appraisal, Rating period 10/1/99-9/30/00 (stating "successful hiring included ... an African-American staff member with extraordinary credentials in public policy research.").

Diersen has also not shown that the destroyed performance appraisals contained any crucial or irreplaceable information. To the extent that Diersen seeks to use this type of hiring information to claim generally that GAO maintained minority and female hiring goals, he has not explained why existing performance appraisals are not sufficient. If Diersen seeks to use minority and female hiring information to support a claim that he was unlawfully denied a specific position which he sought, then Diersen likely has some personal knowledge of the race or sex of the successful applicant(s). [*20]

This is not a case where the destroyed evidence is the only proof available on an issue in the case. See e.g., Marrocco, 966 F.2d at 225 (finding loss of tire's side ring prevented plaintiffs from establishing prima facie case of negligent manufacturing). Diersen has admitted that GAO provided him with numeric information on GAO's hiring and promoting of minorities and females between 1987 and 1990 for GAO's Chicago office. Diersen Reply, p. 8. Diersen further admits that GAO provided him with some memoranda that disclose some of the actions Totten took to meet GAO's affirmative action goals for its Chicago office. Id. Moreover, the loss of certain evidence of minority/female hirings contained in the performance appraisals is not irreplaceable because Totten and Luke are available to testify generally concerning GAO's affirmative action goals and expectations for SES members.

Diersen's claim that the destroyed documents were "crucial" to his ability to prove his claims is further undermined by his own prior statements concerning the existence of other evidence which he believes supports his claims of illegal quotas. In his original complaint, Diersen represented [*21] that "[in] a series of official documents and testimony before Congress and in statistics stipulated in related litigation, GAO had admitted and it has been proven that GAO is biased in favor of young persons, women, and minorities and that these groups have been during the relevant period, recipients of benefits resulting from GAO's affirmative action programs." Cmplt., p. 28. Diersen further stated: "GAO has admitted by memoranda and on the public record in testimony before Congress that, in making effective the necessary RIF, it intended to favor persons subject to GAO's mandatory quota driven Affirmative Action Plans ...." Id., pp. 29-30. Diersen also represented that "GAO has admitted these illegal and improper

Case 1:99-cv-00371-GMS    Document 321-7    Filed 10/09/2006    Page 30 of 38

Page 8
2003 U.S. Dist. LEXIS 9538, *21

preferences as alleged herein." Id., p. 30.

Moreover, GAO has produced numerous other documents regarding GAO's affirmative action goals. For example, GAO provided Diersen with its office-wide affirmative action plans from fiscal years 1992-1997. GAO informed Diersen that it was not aware of the existence of any other affirmative action plans, that it had operated for several years prior to 1992 without any affirmative action plans at all, and that is has operated [*22] since 1997 without any such plan. GAO further provided Diersen with a 1996 EPRP GAO-wide Summary, a 1997 EPRP Summary, and a report entitled Spring 2000 MSP Cycle Results which is a FY 2001 statistical report concerning the age, race and gender of employees vis-a-vis their performance appraisals. GAO gave Diersen memoranda entitled GAO Performance Expectations of Senior Executive Service ("SES") Members dating from 1997 through the present. Finally, with respect to specific performance appraisals, GAO gave Diersen Aronovitz's performance appraisals for the rating periods of 1992-1993, 1995-1996, 1996-1997, 1997-1998, 1999-2000, and 2000-2001 and Luke's performance appraisals for the rating periods of 1997-1998 and 1998-1999.

Diersen also argues that he is entitled to an inference that the documents destroyed by GAO in this case would have provided evidence unfavorable to GAO. "An employer's destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse to the employer's case." Park v. City of Chicago, 297 F.3d 606, 615 (7th Cir. 2002). Rather, the destruction [*23] of evidence presumption has two elements: (1) the totality of the circumstances must show that the destruction was in bad faith and (2) if prong (1) is met the court "may . . . infer from this state of mind that the contents of the evidence would be unfavorable to the party if introduced in court." S.C. Johnson & Son, Inc. v. Louisville & Nashville Railroad Co., 695 F.2d 253, 258 (7th Cir. 1983). "The crucial element is not that the evidence was destroyed but rather the reason, for the destruction." Id.

Although GAO failed to preserve certain limited documents, the facts surrounding their destruction do not support an inference that the destroyed documents would have been unfavorable to GAO. The Court notes the

absence of any evidence indicating that GAO discarded the documents in bad faith for the purpose of hiding discriminatory information. No inference that the documents destroyed by GAO would have favored Diersen is appropriate because the evidence established that the records were destroyed in the ordinary course of business. Absent evidence of bad faith destruction, the Court will not presume that the content of the destroyed documents was unfavorable to [*24] GAO. S.C. Johnson & Son, Inc., 695 F.2d at 258-59 (7th Cir. 1982). Finally, there is no indication here that GAO selectively destroyed documents or violated a record retention policy in destroying the documents. Brown & Williamson Tobacco Corp. v. Jacobson & CBS, 827 F.2d 1119, 1134-36 (7th Cir. 1987) (applying presumption where employee engaged in selective destruction of documents he knew were relevant to the litigation against defendant, where employee violated employer's retention policy, and where he offered noncredible justification for destruction); Latimore v. Citibank Federal Savings Bank, 151 F.3d 712, 716 (stating rebuttable presumption of bad faith destruction of evidence arises where party violated record retention regulation and refusing to apply presumption where party creditably "showed that the disappearance of [the documents] was inadvertent.").

**CONCLUSION**

For the reasons stated above, the Court concludes that none of sanctions sought by Diersen, including default, evidence preclusion, and adverse inferences, are warranted here. Plaintiff's Motion for Sanctions for Spoliation of Relevant Documents should [*25] be denied. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. See Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. Lorentzen v. Anderson Pest Control, 64 F.3d 327, 330 (7th Cir. 1995).

**ENTER:**

**Nan R. Nolan**

**United States Magistrate Judge**

Dated: 6-5-03

**A. 38**



Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Erie Ins. Exchange ex rel. McCracken v. Applica
Consumer Products, Inc.M.D.Pa.,2005.
    United States District Court,M.D. Pennsylvania.
    ERIE INSURANCE EXCHANGE, as Subrogee of
            Donald McCracken Plaintiff
                        v.
    APPLICA CONSUMER PRODUCTS, INC.,
    Formerly Known as Windmere Corp., Defendant
                **No. 3:CV-02-1040.**

                    May 17, 2005.

Edward S. Neyhart, Byrne & Neyhart, Scranton, PA,
for Plaintiff.
Rochelle M. Fedullo, Wilson, Elser, Moskowitz,
Edelman & Dicker, Philadelphia, PA, for Defendant.

                    *MEMORANDUM*
VANASKIE, Chief J.
**\*1** Defendant Applica Consumer Products, Inc.
("Applica") has moved for summary judgment based
upon Plaintiff's failure to preserve the fire scene for
inspection and failure to preserve relevant evidence
from the fire scene. Plaintiff Erie Insurance Exchange
("Erie"), as a suborgee of Donald McCracken, the
former owner of the property where the fire occurred,
asserts that the fire was caused by a malfunction in a
coffee maker that was manufactured and placed into
the stream of commerce by Applica under the trade
name of "Black & Decker." In its motion Applica
claims that Erie's failure to timely notify it of a pos-
sible subrogation claim prevented Applica's repres-
entatives from conducting their own investigation of
the fire scene, and Erie's failure to preserve an elec-
tric range located in the kitchen of the McCracken
home prevented it from investigating other potential
causes of the fire.

Applica claims that Erie's failure has impaired its
ability to put forth an adequate defense and, there-
fore, judgment should be entered in its favor. Applica
has also filed a companion motion requesting the
Court to exclude the testimony of Erie's electrical en-
gineering expert, Randolph Marshall, on the basis

that it lacks reliability. Applica maintains that judg-
ment must be entered in its favor if Mr. Marshall's
testimony is excluded. For the reasons set forth be-
low, the Motion for Summary Judgment and the Mo-
tion to Preclude the Testimony of Randolph Marshall
will be denied.

                    *I. BACKGROUND*

On November 14, 2000, a fire occurred at 86 Leisure
Lands, East Stroudsburg, Pennsylvania, the home of
Donald McCracken ("McCracken"). The fire caused
extensive damage to Mr. McCracken's home. He in-
curred repair costs of $85,808.78, and personal prop-
erty damage of $74,400. (*Id.*) The McCracken home
was insured under a policy issued by Erie. Upon re-
ceiving notice of the fire by McCracken, Erie imme-
diately retained Michael J. Hartley ("Hartley") of
HSH Investigations, to investigate the cause and ori-
gin of the fire. Hartley conducted his investigation
the day following the fire and determined that the
cause of the fire was a coffee maker that was located
on the kitchen countertop in the McCracken home.
(Hartley's report of 11/16/00 at 3.) The coffee maker
was a Black & Decker, Versa Brew Series DCM
1250. During his investigation of the fire scene,
Hartley was accompanied by a Pennsylvania State
Police Fire Marshal, who concurred with his determ-
ination. (*Id.*) At the conclusion of his investigation,
Hartley removed the Black & Decker coffee maker, a
toaster oven, a waffle iron, and an electrical outlet
from the scene of the fire as possible ignition sources.
Hartley did not remove an electric range that was loc-
ated in the kitchen because he had ruled it out as a
possible source of the fire. Photographs as well as a
videotape were taken of the scene of the fire. Erie
also retained the expert services of Randolph Mar-
shall ("Marshall") of Dawson Engineering, Inc. Mar-
shall is an electrical engineer who was hired to in-
vestigate the cause of the fire and to perform tests on
the coffee maker to determine whether it was defect-
ive. Erie insisted that the coffee maker be fully ex-
amined by Marshall prior to notifying any potential
subrogation targets. Marshall's examination of the
coffee maker was completed approximately four (4)
months after the fire occurred. (Id. at 2) Upon receiv-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
(Cite as: Not Reported in F.Supp.2d)

Page 2

ing Marshall's report, notice was given to Applica of a possible subrogation claim. At that time, the fire scene was no longer available for Applica to conduct its own inspection.

*2 Marshall prepared three reports pertaining to the cause of the fire. In each report, he expressed his professional opinion that the fire at the McCracken residence was caused by a malfunction of the Black & Decker coffee maker. (E.g., Marshall's Engineering Report of 1/7/04 at 6.) Applica had the opportunity to review Marshall's reports as well as review Erie's investigation file, photographs, and videotape of the fire scene. Applica also hired its own electrical engineering expert, Lawrence Sacco ("Sacco"), to evaluate and examine the coffee maker. In his report, Sacco opined that the coffee maker was not the cause or origin of the fire. (Sacco's Engineering Report of 12/23/03 at 4.) He believed that the coffee maker was exposed to an external fire attacking it from the left, the exact location of McCracken's electric range, and as such, he felt that the electric range could not be eliminated as the source of the fire. (Id. at 2, 4.) Applica claims that Erie's conduct in failing to preserve the fire scene so that Applica could perform its own investigation, and failure to preserve the electric range in order that appropriate tests could be performed on it to determine if it was the source of the fire, has prejudiced it in presenting a complete defense.

## II. THE SUMMARY JUDGMENT MOTION

Summary judgment should be granted when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir.1982). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 256-57. Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment. Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir.1990). Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*3 The basis of Applica's motion for summary judgment is that Erie's failure to preserve relevant evidence from the scene of the fire and provide Applica with an opportunity to conduct its own inspection of McCracken's kitchen constitutes a spoliation of evidence, which should result in a dismissal of Plaintiff's claims. Applica's motion for summary judgment is a request for the ultimate sanction of dismissal for Erie's alleged spoliation of evidence. See Donohoe v. American Isuzu Motors, Inc., 155 F.R.D. 515, 519 (M.D.Pa.1994). There is no rigid rule mandating a particular sanction upon a finding of improper destruction or loss of evidence. See Id.[FN1] It is a discretionary decision by the district court and this discretion should be exercised with a view toward choosing the "least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir.1994) "A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort', to be imposed only 'if no alternative remedy by way of a lesser, but equally efficient sanction is available." ' Baliotis v. McNeil, 870 F.Supp. 1285, 1289 (M.D.Pa.1994) (citing Capellupo v. FMC Corp., 126

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 3
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
**(Cite as: Not Reported in F.Supp.2d)**

F.R.D. 545, 552 (D.Minn.1989)).

> FN1. Sanctions that may be appropriate for
> the destruction of evidence include; (1) out-
> right dismissal of claims; (2) exclusion of
> countervailing evidence; or (3) a jury in-
> struction on the spoliation inference, which
> permits the jury to assume that destroyed
> evidence would have been unfavorable to
> the position of the offending party. *Howell
> v. Maytag,* 168 F.R.D. 502, 505
> (M.D.Pa.1996) (citing *Schmid v. Milwaukee
> Elec. Tool Corp.,* 13 F.3d 76, 78 (3d
> Cir.1994)).

The authority to impose sanctions for the destruction
of relevant evidence is recognized under state
products liability law, *e.g., Lee v. Boyle-Midway
Household Products, Inc.,* 792 F.Supp. 1001, 1005
(W.D.Pa.1992), and the inherent power of district
courts to utilize sanctions in order to "manage their
own affairs so as to achieve the orderly and expedi-
tious disposition of cases." *Chambers v. NASCO,
Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27
(1991). As explained in *Baliotis,* "sanctions for loss
of evidence is part of a district court's inherent
powers ... to make discovery and evidentiary rulings
conducive to the conduct of a fair and orderly trial."
*Baliotis,* 870 F.Supp. at 1289.

The Third Circuit established the analytical frame-
work for examining spoliation claims in *Schmid v.
Milwaukee Elec. Tool Corp. .,* 13 F.3d 76, 79 (3d
Cir.1994). In *Schmid,* the Court stated that when con-
sidering the imposition of a sanction against a party
for spoliation of the evidence, three factors must be
considered:

(1) the degree of fault of the party who altered or des-
troyed the evidence;
(2) the degree of prejudice suffered by the opposing
party; and
(3) whether there is a lesser sanction [compared to
the complete exclusion of evidence] that will avoid
substantial unfairness to the opposing party and,
where the offending party is seriously at fault, will
serve to deter such conduct by others in the future.

*Id.; Schroeder v. Commw. Dep't of Transp.,* 551 Pa.

243, 710 A.2d 23, 26-27 (Pa.1998) (the Pennsylvania
Supreme Court expressly adopted the three-prong test
set forth in *Schmid* ). "In determining the applicabil-
ity of the spoliation doctrine, a court cannot focus en-
tirely on only one prong of the test, but must balance
the facts of the case involved as to each prong."
*Tenaglia v. Proctor & Gamble Inc.,* 737 A.2d 306,
308 (Pa.Super.Ct.1999).

*A. Fault*

*4 Applying the first prong of the *Schmid* test to
Erie's actions, it appears that Erie, either through in-
advertence or neglect, bears a large degree of fault
for the loss of relevant evidence. The electric range
that was located in McCracken's kitchen at the time
of the fire was inspected by Erie's investigator and
ruled out as a possible source of ignition or as a cause
of the fire. The mere fact that Hartley had to rule out
the electric range as a possible source of the fire
makes it apparent that the appliance was important to
his investigation. Yet, Erie specifically chose not to
preserve the electric range as evidence even though it
did preserve a toaster oven, a waffle iron, and an
electric outlet. It is also apparent that one of the reas-
ons why Erie conducted its cause and origin investig-
ation was to determine if a subrogation claim existed.

"A litigant is under a duty to preserve evidence which
it knows or reasonably should know is relevant to the
action." *Baliotis,* 870 F.Supp. at 1290. This duty
arises as soon as a potential claim is identified. Erie
knew as early as November 16, 2000, less than 48
hours after the fire occurred, that the Black & Decker
coffer maker was a potential cause of the fire, thereby
making Black & Decker a potential target for subrog-
ation.[FN2] Despite this knowledge, Erie waited al-
most four months before contacting Black & Decker
and by that time the site of the fire was no longer
available for inspection. Erie claims that it had not
decided to pursue a subrogation claim until approx-
imately four months after the fire when it received
the initial expert engineering report of Marshall.[FN3]

> FN2. "[T]he knowledge of a potential sub-
> rogation claim is deemed sufficient to im-
> pose a duty to preserve evidence." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 4
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
(Cite as: Not Reported in F.Supp.2d)

FN3. Erie required that the coffee maker be x-rayed by Dawson Engineering in order to determine whether a defect existed in the machine prior to notifying Black & Decker of a potential subrogation claim. Erie attributes the delay in notification to Dawson Engineering because it did not complete the testing on the coffee maker until February 28, 2001. After receiving the testing results from Dawson Engineering, Erie placed Black & Decker on notice of a potential subrogation claim on March 6, 2001.

It is apparent that Erie was aware of a potential subrogation claim immediately following the fire after receiving the cause and origin report of Hartley, which concluded that the Black & Decker coffee maker was a potential cause of the fire. At that point a duty was imposed upon Erie to preserve the relevant evidence for inspection. Accordingly, Erie owed a duty to preserve evidence relevant to the origin and cause of the fire, including the electric range.

"The scope of the duty to preserve evidence is not boundless. At a minimum, however, an opportunity for inspection should be afforded to a potentially responsible party before relevant evidence is destroyed." *Baliotis,* 870 F.Supp. at 1290-91. Thus, Erie should have provided Applica with the opportunity to inspect the electric range.

Erie's motive for failure to preserve the electric range is relevant in determining what sanctions, if any, should be imposed. *Schmid* makes it clear that "the degree of fault" is the issue. The evidence as presented does not support a determination that Erie acted in bad faith. There was no evidence presented that Erie sought to destroy the fire scene or the electric range in order to prevent Applica from performing its investigation, or to divert liability away from its insured, McCracken.

### B. Prejudice

*5 Having established that Erie breached its duty to preserve relevant evidence from the fire, this Court must now determine what prejudice, if any, resulted to Applica from this breach. Under the second prong

of the *Schmid* analysis a manufacturer of a product that is allegedly responsible for causing a fire is prejudiced if it cannot have its own cause and origin expert inspect the fire scene for other potential causes. *Schmid,* 13 F.3d at 80 ("defendant will want as much evidence as possible [that is] relevant to the issue of causation"). However, the Black & Decker coffee maker, which Erie believes to be the cause of the fire, as well as the waffle iron, toaster oven, and the electrical outlet were preserved. Applica has had the ability to defend its product by having its expert examine the coffee maker to refute Erie's assertion that it was the cause of the fire. Plaintiff's expert, Sacco, has examined the coffee maker as well as the other appliances and has provided his opinion that the coffee maker was not the cause of the fire and that it was not defective. Furthermore, Applica has not presented any affidavits in this case that it is unable to present expert witness evidence on the cause and origin of the fire because of the inability to inspect the fire scene or the electric range. In fact, Sacco has testified that the information and evidence provided to him, which included photographs of the McCracken kitchen, videotape of the McCracken residence, Hartley's cause and origin report, and Marshall's reports were sufficient to allow him to formulate his expert opinion. Accordingly, a defense of this action has not been rendered impossible by Erie's failure to allow Applica to investigate the fire scene or its failure to preserve the electric range.

Applica's defense, however has been hampered by the destruction of the electric range. As pointed out by Applica, Erie is proceeding on a product malfunction theory. Under this approach, a plaintiff must present, *inter alia,* evidence eliminating other reasonable secondary causes for the fire. *See e.g., Walters ex rel. Walters v. General Motors Corp.,* 209 F.Supp.2d 481, 486-87 (W.D.Pa.2002). Here, Erie has presented evidence from its cause and origin expert eliminating the electric range as an ignition source, but Applica has been deprived of the means to test this assertion. Thus, Erie has prejudiced the defense of this action by failing to preserve the electric range.

The Third Circuit has indicated that "in the absence of bad faith by the breaching party and where the res-

Not Reported in F.Supp.2d                                                              Page 5
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
**(Cite as: Not Reported in F.Supp.2d)**

ulting prejudice is not severe, a sanction of witness preclusion or entry of judgment is unwarranted." *Schmid,* 13 F.3d at 81.[FN4] The Third Circuit specifically rejected a blanket preclusion rule based on the proposition that an expert witness "has an affirmative duty not to conduct an investigation without affording all potential defendants an opportunity to have an expert present." *Id.* In *Baliotis,* this Court determined that this rule applies to a fire scene. It would be impractical to require an insurance company to maintain the scene of a fire until all potential defendants are notified and afforded the opportunity to conduct independent inspections. To do so would create a safety hazard, and be wasteful and inefficient.

> FN4. Dismissal of a complaint or preclusion of evidence regarding an allegedly defective product is an extreme sanction reserved only for those instances where an entire product or the allegedly defective portion of a product is lost, spoiled or destroyed. *See Mensch v. BIC Corp.,* No. Civ.A. 90-6002, 1992 WL 236965 at *2 (E.D.Pa. Sept.17, 1992).

**\*6** This Court in *Baliotis* determined that a lesser sanction of a "spoliation inference" was warranted under facts similar to the facts of this case. An instruction to a jury that it may consider that the lost evidence would be unfavorable to Erie is consistent with the evidentiary rationale underlying the spoliation inference. As explained in *Baliotis,* "permitting the jury to draw such an inference furthers the prophylactic and punitive purposes of the 'spoliation inference.' " *Baliotis,* 870 F.Supp. at 1292. Knowledge that sanctions may be imposed for loss of relevant evidence attending destruction of a fire scene and a possible cause of the fire, resulting in prejudice to subrogation targets, may induce insurers or property owners to provide notice to those targets and an opportunity to inspect. Accordingly, this Court will impose a sanction of a "spoliation inference" instruction to the jury at the time of trial.

### III. THE ADMISSIBILITY OF MARSHALL'S TESTIMONY

Applica has filed a motion to exclude the testimony

of Randolph Marshall, Erie's electrical engineering expert. Applica asserts that Marshall's conclusion lacks indicia of reliability because of the purportedly improper methodology he used in arriving at his opinions.

The admissibility of expert testimony in federal court is governed by Federal Rule of Evidence 702, which provides:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that Rule 702 imposes a special obligation on the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." The purpose of this gatekeeping role is to establish a standard of evidentiary reliability. *Id.* at 590; *Kannankeril v. Terminix Int'l Inc.,* 128 F.3d 802, 806 (3d Cir.1997).

In assessing whether the proffered scientific expert testimony is reliable, the Third Circuit has explained that the trial court should admit expert testimony "if there are 'good grounds' for the expert's conclusions," notwithstanding "the judge's belief that there are better grounds for some alternative conclusion." *Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 152-53 (3d Cir.1999). "Novel" conclusions should not be excluded where the methodology and its application are reliable. *Id.* at 153. "[A]n expert opinion must be based on reliable methodology and must reliably flow from that methodology and the facts at issue-but it need not be so persuasive as to meet the party's burden of proof or even necessarily its burden of production." *Id.* at 152. Furthermore, the Supreme Court in *Daubert* emphasized that the Rule 702 inquiry was a "flexible one." *Daubert,* 509 U.S. at 594.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
(Cite as: Not Reported in F.Supp.2d)

*7 In order to determine whether to admit the expert testimony of Marshall the Court must begin by reviewing the methodology used by Marshall in formulating his opinions. Marshall's evaluation included:
1. Exposure of a small sample of the plastic housing from the exemplar coffee maker to an open flame
2. Evaluating x-rays of the remains of the coffee maker
3. Examining the burn pattern on the coffee maker
4. Examining the damaged power cord connected to the coffee maker and an evaluation of the internal wiring of the coffee maker
5. Reviewing the videotape and photographs from the scene of the fire and a review of Hartley's cause and origin report.

The x-rays of the coffee maker revealed that the shroud of the capacitor was detached and propelled five inches away into the plastic housing, and metal splatter was found in the area of the capacitor. The only explanation, according to Marshall, for both the projection of the shroud and the splattering of metal is an explosion due to internal electrical energy. (Marshall's Engineering Report of 1/7/04 at 4.) Marshall also explains that the burn patterns on the remains of the coffee maker were consistent with an internal fire, and in addition, the damage to the circuit board could not have occurred unless the fire developed internally because the circuit board is shielded behind a plastic housing, made of heat resilient materials. (*Id.* at 5.) Thus, Marshall was able to rule out the electric range as a source of the fire since he determined that the fire was ignited internally in the coffee maker.

Applica's argument attacking Marshall's opinion is based on his failure to perform further testing to determine whether the internal components in the location of the coffee maker where Marshall claims the fire originated were capable of generating sufficient heat to ignite the fire. Applica asserts that it is this failure to perform additional testing that renders Marshall's testimony unreliable and, therefore, inadmissible.[FN5]

> FN5. Unlike the electrical engineer whose testimony was excluded in *Pappas v. Sony Electronics, Inc.,* 136 F.Supp.2d 413

(W.D.Pa.2000), Marshall did inspect the power cord for the suspect appliance, finding that this "very important evidence needed to determine whether the [appliance] was energized at the time of the fire," *id.* at 419 n. 9, indicated that the coffee maker had been energized. Also unlike *Pappas,* Defendant in this case has failed to produce affidavits of an expert asserting that Marshall's methodology of "determining cause based on the physical evidence ran afoul of those techniques generally accepted by fire investigators." *Id.* at 423. Finally, unlike *Pappas,* other experts who examined the device in question concluded that the coffee maker was the likely origin of the fire.

Marshall's opinion is not rendered unreliable and inadmissible simply because he failed to determine the exact component of the coffee maker that caused the ignition of the internal fire. He based his conclusions on observations from x-rays and detailed examinations of the damaged product. These observations afford "good grounds" for a person with requisite expertise in electrical devices to base an opinion that an electrical source inside an appliance caused the fire. Marshall has articulated explanations premised upon electrical engineering principles that rule out a flame source external to the coffee maker. Specifically, examination of the burn patterns on the remains of the coffee maker and the results of the x-rays allowed Marshall to rule out the range as a source of ignition and conclude that an electrical malfunction inside the coffee maker triggered the fire. He pinpointed the origin of the fire to a two-inch square area housing electrical components. It is not for this Court to determine whether the opinion offered by Marshall is correct or incorrect. "The analysis of the conclusions themselves is for the trier of fact when the expert is subject to cross-examination." *In re: TMI Litigation,* 193 F.3d 613, 665 (3d Cir.1999). "The admissibility inquiry thus focuses on the principles and methodology, not the conclusions generated by the principles and methodology." *Id.* "The goal is reliability not certainty." *Id.* Despite its focus on reliability, the Court "must examine the expert's conclusions in order to determine whether they could reliably follow

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
**(Cite as: Not Reported in F.Supp.2d)**

from the facts known to the expert and methodology used." *Heller,* 167 F.3d at 153.

*8 This Court does not find that there is a significant gap between the information used by Marshall and the opinion he has proffered. His conclusions logically follow from the results of the information available to him. The fact that further testing could have been conducted by Marshall in forming his opinion is not determinative of the reliability of his testimony. The test for "admitting his expert testimony is not a question of whether his methods were perfect or whether a possibility exists that [he] might have done a better job." *Eclipse Electronics v. Chubb Corp.,* 176 F.Supp.2d 406, 412 (3d Cir.2001). Erie has presented sufficient evidence to establish the reliability of Marshall's testimony in accordance with the principles set forth in *Daubert* and Rule 702. His failure to conduct voltage or temperature testing may serve to undermine his opinions, but it does not render them inadmissible. Accordingly, Marshall's testimony will not be excluded.

### IV. CONCLUSION

For the reasons set forth above, and after consideration of the degree of prejudice suffered by the Defendant, this Court concludes that "an adverse inference instruction" is appropriate as the least onerous sanction, which corresponds to the harm that resulted from Plaintiff's breach of the duty to preserve evidence. Accordingly, Defendant's motion for summary judgment will be denied. Because Randolph Marshall articulated "good grounds" for his conclusions, the motion to exclude his testimony will also be denied. An appropriate Order follows.

### ORDER

NOW, THIS 16th DAY OF MAY, 2005, for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant's "Motion for Summary Judgment" (Dkt. Entry 43) is DENIED.

2. At the time of trial, the trier-of-fact will be permitted to draw an inference adverse to the position asserted by Plaintiff, that inference being that the evidence lost as a result of Plaintiff's failure to preserve the fire scene and electric range for inspection by Defendant would have been unfavorable to the position asserted by Plaintiff.

3. Defendant's "Motion to Exclude the Testimony of Randolph Marshall" (Dkt. Entry 44) is DENIED.

4. A telephonic scheduling conference will be held on June 3, 2005, at 11:00 a.m. Counsel for the plaintiff shall be responsible for placing the call to 570-207-5720 and all parties shall be ready to proceed before the undersigned is contacted.

M.D.Pa.,2005.
Erie Ins. Exchange ex rel. McCracken v. Applica Consumer Products, Inc.
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313

Briefs and Other Related Documents (Back to top)

• 3:02cv01040 (Docket) (Jun. 17, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.