**A. 39**

LEXSEE 1997 U.S. DIST. LEXIS 23966

**IN RE INTERNATIONAL RECTIFIER SECURITIES LITIGATION**

**CASE NO. CV91-3357-RMT(BQRx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF
CALIFORNIA**

*1997 U.S. Dist. LEXIS 23966; Fed. Sec. L. Rep. (CCH) P99,469*

**March 31, 1997, Decided
March 31, 1997, Filed; April 2, 1997, Entered**

**DISPOSITION:** [*1] Underwriters are entitled to
summary judgment with respect to all the claims asserted
against them, and IR and the Individual Defendants are
entitled to partial summary judgment as to the claims
under Sections 11 and 12(2) of the 1933 Act and as to the
common law fraud and negligent misrepresentation
claims to the extent they are based on representations
contained in the prospectuses.

**COUNSEL:** For INITIO INC, plaintiff: William S
Lerach, Milberg Weiss Bershad Hynes & Lerach, San
Diego, CA. Robert P Frutkin, Savett Frutkin Podell &
Ryan, Philadelphia, PA. Kevin J Yourman, Weiss &
Yourman, Los Angeles, CA.

For ROBERT J MUELLER, INTERNATIONAL
RECTIFIER CORP, defendants: John A Crose Jr, Isaacs
& Clouse, Santa Monica, CA.

For GEORGE KRSEK, JACK O VANCE, ROCHUS E
VOGT, defendants: Raymond C Fisher, Heller Ehrman
White & McAuliffe, Los Angeles, CA. Daniel K
Slaughter, Heller Ehrman White & McAuliffe, San
Francisco, CA.

For ALAN LIDOW, defendant: Raymond C Fisher,
Heller Ehrman White & McAuliffe, Los Angeles, CA.
Daniel K Slaughter, Heller Ehrman White & McAuliffe,
San Francisco, CA. John A Crose Jr, Isaacs & Clouse,
Santa Monica, CA.

**JUDGES:** ROBERT M. TAKASUGI, United States [*2]
District Judge.

**OPINION BY:** ROBERT M. TAKASUGI

**OPINION:**

MEMORANDUM

This matter has come before the court on the motion
for summary judgment by the underwriter defendants
Kidder Peabody & Co. ("Kidder") and Montgomery
Securities ("Montgomery") and the motion for summary
judgment by defendants International Rectifier ("IR" or
"the Company") and Eric Lidow, Robert Mueller, Jack
Vance, Rochus Vogt, Alan Lidow and George Krsek
(collectively "the Individual Defendants"). Having
considered the pleadings and other documents filed
herein, the court issues this memorandum in lieu of
findings of fact and conclusions of law.

**I. INTRODUCTION**

This is a class action lawsuit alleging securities fraud
under Sections 11 and 12(2) of the Securities Act of 1933
("1933 Act") and Section 10(b) of the Securities
Exchange Act of 1934 ("1934 Act"). The plaintiff class
consists of all persons who purchased or otherwise
acquired the publicly traded securities of International
Rectifier ("IR" or "the Company") between March 7,
1991 and October 18, 1991 -- the time period
encompassing (a) IR's filing of its Registration Statement
with the Securities Exchange Commission ("SEC")
(March 7, 1991); (b) IR's stock offering [*3] (April 17,
1991); and (c) the conversion of IR's debentures into
stock (May 15 - June 14, 1991).

**II. FACTS**

Case 1:99-cv-00371-GMS    Document 321-8    Filed 10/09/2006    Page 3 of 42

Page 2
1997 U.S. Dist. LEXIS 23966, *3; Fed. Sec. L. Rep. (CCH) P99,469

## A. The Company

The Company, founded in El Segundo, California in 1947, is a company devoted to the manufacture and sale of semiconductors. In 1991, IR was divided into two divisions: (1) the power products division ("PPD"), responsible for manufacturing IR's traditional power semiconductor devices, and (2) the electronics products division ("EPD"), responsible for the development and manufacture of IR's newer and more technologically advanced products. EPD was responsible for the manufacture of "HEXFETs," IR's trademark power MOSFET design, n1 which account for over 65% of IR's revenues.

> n1 "MOSFET" stands for metal oxide semiconductor field effect transistor. A "power MOSFET" is a power transistor used in applications that call for electrical power to be turned on and off (such as a power switch) or otherwise controlled (such as the control for a motor used in the power windows of a car).

[*4]

Anticipating increased demand for HEXFETs, IR constructed a $ 100 million manufacturing plant called "Hexfet America" or "HexAm" in Temecula, California, which became operational in 1987. The significant construction and operational costs associated with the HexAm plant, among other things, caused IR to lose money from 1986-1989.

## B. IR's Operations

The manufacture of semiconductors is highly technical and involves two distinct operations, wafer fabrication and assembly. In terms of IR's overall semiconductor output, the assembly rate determined the levels of wafer fabrication -- i.e. the HexAm plant only fabricated as many wafers as could, in turn, be assembled into the finished product.

In order to meet rapidly rising demand, IR needed to expand its assembly capacity by purchasing and installing new assembly equipment at the HexAm plant.

Around this time, the defendant investment banks,

Kidder and Montgomery (collectively "the Underwriters"), began their "courtship" of IR. The key players and events of this courtship are as follows:

## C. Kidder's Role (Cuhney, Whittington)

In 1990, Adam Cuhney, a Vice-President in Kidder's corporate finance department, who [*5] already possessed knowledge about the semiconductor industry and IR, made several presentations, on behalf of Kidder, to help IR obtain financial capital. In August of that year, Cuhney approached IR's management about the possibility of a stock offering. The idea, however, was ultimately rejected because IR's stock was valued too low for a stock offering to raise the capital IR needed.

Between August 1990 and January 1991, however, the price of IR's stock rose significantly. The Underwriters credit this higher valuation to a combination of growing HEXFET sales, increased plant utilization, and a major patent infringement victory involving the HEXFET. Plaintiffs, by contrast, view IR's market gains in a more sinister light, attributing the increased stock prices "to the numerous misrepresentations made by the defendants to the market." In any event, by January of 1991, Cuhney considered a stock offering as a developmental strategy and organized a presentation to IR's management about the services Kidder could potentially offer.

In attendance at this presentation was Richard Whittington, a Kidder stock analyst who covered IR and, more broadly, the semiconductor industry. Whittington, [*6] who had previously rated IR's stock as a "hold" in December 1990 and January 1991, changed his rating the following month (February) to a "buy." IR retained Kidder that same month as lead underwriter for the stock offering. n2

> n2 Although not explicitly stated, the inference Plaintiffs intend for the Court to draw here is clear: Whittington changed his recommendation from "hold" to "buy" as part of Kidder's "courtship" of IR. However, Plaintiffs offer no evidence to support this inference.

1997 U.S. Dist. LEXIS 23966, *6; Fed. Sec. L. Rep. (CCH) P99,469

### D. Montgomery's Role (Gerhardt, Joseph, Thornhill)

In January of 1991, Clark Gerhardt, the Managing Director of Montgomery's corporate finance department, solicited IR's management to allow Montgomery to participate in the stock offering. As a prerequisite to hiring Montgomery, IR's CEO insisted that Thomas Thornhill, an experienced semiconductor analyst, be assigned to follow IR. Along with Jonathan Joseph, another Montgomery semiconductor analyst, Thornhill issued a research report on February 14, 1991 with [*7] a "buy" rating for IR's stock. Montgomery was hired on February 19 as a co-manager with Kidder for the public offering.

### E. The Due Diligence

As required by the SEC, the Underwriters commenced formal due diligence into IR's operations. The Underwriters first held an organizational meeting which was attended by Kidder, Montgomery, Latham & Watkins (the law firm representing the Underwriters), O'Melveny & Meyers (IR's attorneys), and Coopers & Lybrand (IR's outside accountants) -- collectively "the Working Group." Building upon the Underwriters' already existing base of knowledge about IR and the semiconductor industry, the diligence conducted in preparation for the stock offering was unquestionably extensive.

At the outset, the Underwriters interviewed eleven senior and middle management employees on a variety of subjects including IR's management, operations, customer-base, technology, expenditures, and growth potential. The Underwriters interviewed IR's major customers, IR's outside quality consultants (Andersen Consulting), IR's outside accountants (Coopers & Lybrand), IR's patent attorney, and IR's outside environmental counsel. The Underwriters inspected IR's major [*8] factories and reviewed IR's internal financial forecasts and other important documents. Latham & Watkins examined IR's key contracts and its compliance with applicable laws.

The entire Working Group reviewed IR's preliminary prospectus line-by-line, maintaining contact with IR's management as revisions were made. The Underwriters conducted their own independent analysis of IR's business plan and created their own model of IR's expected earnings, which demonstrated that IR's internal forecasts were actually conservative. The Underwriters

continued their diligence throughout the preoffering period, receiving an oral confirmation from IR's management that they believed the prospectus to be correct, a written confirmation from IR's management stating the same, and a "cold comfort" letter from Coopers & Lybrand representing that it knew of no material changes in IR's financial position since its last audit.

### F. The Stock Offering

On March 7, 1991, IR filed a Registration Statement with the SEC for the offering of 4.2 million shares of stock, with an over-allotment option of 525,000 additional shares. IR's stock was then trading at approximately $ 17 per share. The Registration [*9] Statement was declared effective on April 16, 1991, and the stock offering became effective on April 17, 1991 at an offering price of $ 22 per share. One week later, IR reported third quarter earnings of $ .29 per share, exceeding all analysts' expectations.

### G. The Debenture Conversion

Pursuant to the successful stock offering, Adam Cuhney (the Kidder Vice-President) recommended that IR conduct a "debenture conversion." IR's debenture holders were given the option of converting their debentures into common stock at $ 16.375 per share or redeeming the debentures at $ 1,045 per each $ 1,000 of face value.

Kidder was the sole underwriter for the debenture conversion, and assisted IR in the preparation of a prospectus for those debenture holders who opted to receive stock. In addition to conducting further interviews of IR's management and at least two of IR's major customers, Kidder received oral and written confirmation from management that there had been no adverse material changes in IR's business since the stock offering. IR then "called" the convertible debentures on May 14, 1991, which could be irrevocably surrendered between May 15 and June 14, 1991. IR publicly announced [*10] the completion of the debenture conversion on June 19, 1991.

### H. The Whittington Report

On June 19, 1991, the same day IR publicly announced the completion of its debenture conversion, Richard Whittington (the Kidder analyst) issued a report in which he lowered his earning estimates for IR's June

Case 1:99-cv-00371-GMS    Document 321-8    Filed 10/09/2006    Page 5 of 42

Page 4

1997 U.S. Dist. LEXIS 23966, *10; Fed. Sec. L. Rep. (CCH) P99,469

1991 quarter and changed his short-term recommendation on IR's stock from a "buy" to a "hold." Whittington's report caused a precipitous drop in IR's stock price, n3 and Plaintiffs filed this action the next day. Eight days after he issued his report, Whittington reinstated his "buy" recommendation. As discussed below, the Whittington report and temporary devaluation of IR's stock thereafter is the crux of this entire lawsuit.

> n3  On June 19, 1991, IR's stock dropped $ 5.625 per share (from a June 18 closing price of $ 22.125) and closed at $ 16.50.

In his report, Whittington, while maintaining that IR's stock remained an excellent long-term investment, provided the following three reasons for downgrading [*11] his short-term recommendation and earnings estimates for IR's stock:

> First, back-end test and assembly at IR's Power MOSFET facility is being added slower than we had thought. This problem results from the strapped financial position in which the company has operated until recently and should fairly quickly be resolved. Until it is, however, sales of their most profitable products, which account for 60% - plus of sales, are constrained.

> Second, demand for older technology and relatively low margin Power Products Division output is weakened by the slow European economy, particularly in white goods and other consumer durables.

> Third, a mix shift in Power MOSFETs favoring the lower margin automobile market at the expense of the more profitable disk drive product could dampen an overall strong demand trend for IR's Electronics Products Division.

In his deposition, however, Whittington stated that the three reasons, listed above, were not the "main reasons" for downgrading IR's stock on June 19, 1991. Rather, his principal reason for the downgrading was his perception, acquired during his trip to the Far East, of a

"general industry decline." Whittington stated:

> As I wound [*12] my way from Japan to . . . Taiwan and then to Singapore, it became clear that orders were dropping across the front, and that my premise of a rebounding economy were, you know, evaporating. And not just for disk drives, but for everything in the electronics industry. . . . Again, I never heard anything about IR specifically, but . . . the preponderance of inputs was overwhelming, which led me to downgrade a number of stocks I was covering at that time.

Whittington's earnings estimate for IR proved, in fact, to be too low. Whittington even stated that his June 19 recommendation was "very poor performance, which I acknowledge." This is reinforced by the fact that eight days later, Whittington reinstated his "buy" recommendation for IR. Whittington's assertion that IR represented an excellent long term investment proved quite true. As of November of 1995, IR's stock was trading at approximately $ 46 per share, more than twice the secondary offering price and close to three times the debenture conversion price.

Plaintiffs contend that the information contained in Whittington's report was new, material, known to IR, and not disclosed to the market. Plaintiffs claim that IR's alleged [*13] concealment of this information violated Sections 11 and 12 of the 1933 Act. As discussed below, however, Plaintiffs are wrong. Each of the three factors discussed in Whittington's report were disclosed in IR's prospectuses. Defendants correctly assert (as demonstrated by the clear language of the prospectuses) that "the only thing new in that report . . . was Mr. Whittington's opinion -- no new facts were reported." Plaintiffs have failed to produce any evidence that Whittington withheld negative information before the completion of the debenture conversion.

## III. DISCUSSION

### A. Sections 11 & 12(2) Claims Against All Defendants

Plaintiffs bring claims against all of the defendants under Sections 11 and 12(2) of the 1933 Act, *15 U.S.C. §§ 77k* and *77l*. Section 11 imposes liability "in case any part of [a] registration statement . . . contains an untrue

Case 1:99-cv-00371-GMS    Document 321-8    Filed 10/09/2006    Page 6 of 42

Page 5

1997 U.S. Dist. LEXIS 23966, *13; Fed. Sec. L. Rep. (CCH) P99,469

statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *15 U.S.C. § 77k(a); In re Software Toolworks Inc., 50 F.3d 615, 621 (9th Cir. 1994)*("Toolworks [*14] II"), cert. denied, *116 S. Ct. 274 (1995)*. Section 12(2) imposes additional liability for using a prospectus "which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." *15 U.S.C. § 77l(2); Toolworks II, 50 F.3d at 621.*

### 1. IR's Prospectuses Were Not False Or Misleading

Plaintiffs contend that IR concealed material, new information contained in Whittington's report. Whittington reported that IR's production capacity was constrained by a lack of back-end test and assembly at the HexAm. This was fully disclosed in the prospectus. (Prospectus Statements 70 and 71). Whittington stated that the demand for low margin Power Products Division output was weakened by the slow European economy. Again, this was fully disclosed in the prospectus. (Prospectus Statements 55, 56, and 57). Finally, Whittington stated that "a mix shift in Power MOSFETs favoring lower margin automobile market at the expense of more profitable disk drive product could dampen overall strong demand trend for IR's Electronic [*15] Products Division (EPD)." This is an opinion not a fact. There is no evidence that anyone at IR was aware of this opinion and no liability can be premised thereon.

The Whittington Report did not disclose facts that were concealed or misrepresented in the registration statements or prospectuses; nor is there any evidence that the registration statements or prospectuses otherwise contained misrepresentations or concealed information. As a result, all defendants are entitled to summary judgment on the claims brought pursuant to Sections 11 and 12(2) of the 1933 Act.

Because it appears that the common law fraud and negligent misrepresentation claims asserted against the Underwriters are based solely on representations contained in the prospectuses, the Underwriters are also entitled to summary judgment on said claims. To the extent plaintiffs' claims for common law fraud and negligent misrepresentation as against IR and the Individual Defendants are based on alleged misrepresentations and/or concealment in the prospectuses, they too are entitled to summary judgment thereon.

### 2. The Underwriters' Due Diligence Defense

The underwriters have an additional basis upon which to avoid [*16] liability under Sections 11 and 12(2) of the 1933 Act: by establishing a "due diligence" defense. Section 11 (b)(3) requires the underwriters to demonstrate that they "had, after reasonable investigation, reasonable ground to believe and did believe . . . that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *15 U.S.C. § 77k(b)(3); Toolworks II, 50 F.3d at 621.* Under Section 12(2), the underwriters must establish that they "did not know, and in the exercise of reasonable care, could not have known, of [the] untruth or omission." *15 U.S.C. § 77l(2); Toolworks II, 50 F.3d at 621.*

#### a. Reasonable Investigation/Reasonable Care Defined

In Toolworks II, the Ninth Circuit observed that the "reasonable investigation" standard set forth in Section 11 (b)(3) and the "reasonable care" standard of Section 12(2) were "similar, if not identical." *50 F.3d at 621.* Regarding summary judgment, the Court held that the appropriate due diligence analysis under either section [*17] would, accordingly, be the same: "'the standard of reasonableness shall be that required of a prudent man in the management of his own property.'" Id. (quoting *15 U.S.C. § 77k(c)*). Stated otherwise, the due diligence standard is, "'in effect, . . . a negligence standard.'" Id. (quoting *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 208, 96 S. Ct. 1,375; 47 L. Ed. 2d 668 (1975)*).

Whether "due diligence" has been adequately performed "is a question of degree, a matter of judgment in each case." *Escott v. BarChris Constr. Corn., 283 F. Supp. 643, 697 (S.D.N.Y. 1968)*; see also *Feit v. Leasco Data Processing Equipment Corp., 332 F. Supp. 544, 577 (E.D.N.Y. 1971)*(noting that underwriters play a crucial role in protecting the public against false or "unduly enthusiastic" information and "must make an investigation reasonably calculated to reveal all of those facts which would be of interest to a reasonably prudent investor").

1997 U.S. Dist. LEXIS 23966, *17; Fed. Sec. L. Rep. (CCH) P99,469

It is clear, then, that the diligence conducted must be reasonable, not perfect. *In re Software Toolworks, 789 F. Supp. 1489, 1496-98* (N.D.Cal, 1992)("Toolworks [*18] I"), aff'd in part and rev'd in part, *38 F.3d 1078 (9th Cir. 1994),* amended *50 F.3d at 615 (9th Cir. 1995).* Without the benefit of hindsight, the Court must determine whether "the overall investigation . . . was reasonable under the circumstances at the time of the investigation." *789 F. Supp. at 1498 n. 14.* To the extent that the underlying facts are undisputed, the adequacy of the diligence may be appropriately decided on summary judgment.

**b. Factors for Determining Reasonableness**

Courts have examined a variety of factors for the purpose of determining "reasonableness." See *Toolworks II, 50 F.3d at 622-23* (defense established where underwriters obtained written representations from company and outside auditors that prospectus was accurate, confirmed certain facts with company's customers, and surveyed retailers to ensure that the company had not lowered its prices); *Weinberger v. Jackson, 1990 U.S. Dist. LEXIS 18394, Fed. Sec. L. Rep. (CCH) P95,693, 1990 WL 260676* at *3 (N.D.Cal. Oct. 11, 1990)(defense established where underwriters reviewed industry publications and company documents, conducted meetings, interviewed personnel [*19] and customers, inspected facilities, and obtained written representations that the prepared prospectus was accurate); *Competitive Associates, Inc. v. International Health Sciences, Inc., 1975 U.S. Dist. LEXIS 14230, Fed. Sec. L. Rep. (CCH) P94,966, 1975 WL 349* at *18 (S.D.N.Y. Jan. 22; 1975)(defense established where underwriters' "inquiry included a complete analysis of the company, its finances, management and future plans, as well as an analysis of the state of the industry"); *Leasco Data Processing, 332 F. Supp. at 582-83* (defense established where underwriters conducted a "thorough review of all available financial data").

Based on the foregoing, the following are factors this court considered in determining the "reasonableness" of the Underwriters' diligence:

(1) whether the Underwriters were familiar with IR's finances, management, and operations (see Weinberger, 1990 WL at *3; Competitive Associations, 1975 WL at *18; *Leasco Data Processing, 332 F.*

*Supp. at 582);*

(2) whether the Underwriters possessed knowledge of the industry in which IR is involved (see Weinberger, 1990 WL at *3; Competitive Associations, 1975 WL at [*20] *18);

(3) whether the Underwriters conducted interviews of IR's employees (see *Toolworks II, 50 F.3d at 622;* Weinberger, 1990 WL at *3);

(4) whether the Underwriters conducted interviews of and/or confirmed data with IR's customers or other third parties (see *Toolworks II, 50 F.3d at 623;* Weinberger, 1990 WL at *3);

(5) whether the Underwriters obtained written verification from IR and/or outside accountants that the information contained in the prospectus was accurate (see *Toolworks II, 50 F.3d at 623-25;* Weinberger, 1990 WL at *3).

Applying the above factors to the present case establishes that the Underwriters' diligence was reasonable as a matter of law. Prior to the April 17th offering, the Underwriters and/or other members of the Working Group:

(1) reviewed IR's internal financial forecasts, contracts, and other important documents, and inspected IR's major facilities;

(2) employed analysts who were knowledgeable of the semiconductor industry;

(3) conducted interviews with eleven of IR's senior and middle management employees, inquiring about numerous aspects of IR's operations; [*21]

(4) conducted interviews with IR's major customers, IR's outside quality consultants, the public accounting firm responsible for auditing IR, IR's patent

1997 U.S. Dist. LEXIS 23966, *21; Fed. Sec. L. Rep. (CCH) P99,469

attorney, and IR's outside environmental counsel;

(5) obtained written verification from IR's management that the information in the prospectus was correct and a "cold comfort" letter from IR's outside accountants indicating that there had been no material changes in IR's financial position since its last audit.

### c. Smith Declaration

In an effort to discredit the Underwriters' due diligence defense, Plaintiffs rely heavily on the declaration of Dr. Richard Smith, a finance professor at the Graduate Management Center of the Claremont Graduate School. Dr. Smith opines, for several reasons, that the diligence performed by the Underwriters in this case was "inadequate." Plaintiffs argue that the Smith Declaration, alone, precludes this Court from granting summary judgment on the due diligence defense. For reasons discussed below, this is not necessarily true.

### (1) Dr. Smith's "Expertise" Examined

First of all, Dr. Smith's "expertise" is more than questionable. The Underwriters contend, and this court [*22] agrees, that pursuant to *Rule 702 of the Federal Rules of Evidence*, Dr. Smith is not an expert in the area of underwriter due diligence and "is not qualified to opine on either practices and customs in the industry or the Underwriters' adherence to the legal requirements."

And indeed, the most troubling aspect of Dr. Smith's declaration, as noted by the Underwriters, is that "nothing in his background indicates that he has any first-hand knowledge of industry custom and practice pertaining to underwriters' due diligence, or that he has personally participated in the due diligence for a public offering." The Underwriters further point out that: (1) Dr. Smith has no background in securities law or due diligence case law; (2) Dr. Smith has never appeared as an expert on underwriters' due diligence; and (3) Dr. Smith has not written any articles about underwriters' due diligence. In other words, while Dr. Smith may be an erudite individual in matters of finance and economics, he is not an expert on the subject of underwriter due diligence.

### (2) Reasonableness of Dr. Smith's

### Declaration

Even if, *arguendo*, Dr. Smith were an expert on due diligence, his declaration does [*23] not necessarily preclude this Court from granting summary judgment. As the Ninth Circuit held in *Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir. 1995)*:

Assertions in expert affidavits do not automatically create a genuine issue of material fact, . . . We are obliged to look at the record to determine whether, in light of any undisputed facts, the inferences to be drawn from the expert's affidavits are reasonable. [Citation]. "When the expert opinion is not supported by sufficient facts to validate it in the eyes of the law or when indisputable record facts contradict or otherwise render the opinion unreasonable," summary judgment is appropriate. [Citation].

*51 F.3d at 1440.* See also *Toolworks II, 50 F.3d at 628; In re Wonder of the Worlds Sec. Litig., 35 F.3d 1407, 1426-27 (9th Cir. 1994)* ("WOW"); *In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir. 1988)*("Where the evidence is as clear as that in this record, the court is not required to defer to the contrary opinion of plaintiffs' expert.'").

Dr. Smith takes issue with the Underwriters' diligence [*24] on four points:

(a) The Underwriters failed to examine quarterly as opposed to annual production and sales data. Such data, opines Dr. Smith, would have revealed IR's declining market share and decreasing output from the HexAm plant.

(b) The Underwriters failed to read reports from Andersen Consulting, IR's outside consultants, concerning issues such as plant capacity, growth potential and customer satisfaction. Dr. Smith asserts that these reports would have been a "red flag" to the Underwriters that the market had been misled about IR's ability to expand output. Acknowledging that a member of the underwriting team spoke

1997 U.S. Dist. LEXIS 23966, *24; Fed. Sec. L. Rep. (CCH) P99,469

by telephone with an Andersen consultant, presumably about the reports, Dr. Smith contends that "a conversation is not an adequate substitute for first-hand examination of the reports."

(c) The Underwriters, upon interviewing IR's employees, neglected to speak to plant employees, focusing instead on upper-level management. Dr. Smith asserts that "it is not sufficient simply to speak with senior management since it is the representations of senior management that need to be tested."

(d) The Underwriters interviewed only IR's largest customers, [*25] rather than selecting customers at random or by a stratified sampling. Dr. Smith contends that "given the size of IR backlog and the fact that IR output was being rationed, it would have been important to determine whether these customers were receiving priority treatment or were representative of the other customers."

At first blush, Dr. Smith's declaration appears to raise valid concerns about the diligence performed by the Underwriters. Under closer scrutiny, most of his criticisms lack merit. First, Dr. Smith criticizes the Underwriters for failing to examine quarterly as Opposed to annual production and sales data. However, it appears that the Underwriters had no other choice. Quarterly data for the months of January through March did not become available until June (three months later), after the prospectuses for the secondary offering and debenture conversion were filed. Dr. Smith appears to be faulting the Underwriters for failing to examine data which were simply unavailable.

Second, Dr. Smith criticizes the Underwriters for failing to read the Andersen Consulting reports. Well-exceeding the bounds of his alleged "expertise," Dr. Smith asserts:

Andersen Consulting [*26] is in the business of selling consulting services to corporations such as IR. In a conversation, the underwriter would have to expect that Andersen Consulting would not volunteer

negative information and would tend to portray IR in a generally positive light.

This statement, as characterized by the Underwriters, amounts to nothing more than "rampant speculation." There is no evidence to suggest that the Andersen consultant misrepresented, in any sense, the state of affairs at IR. In fact, making such a false representation would have been foolish because the Underwriters would ultimately have been able to check the validity of the consultant's statements against the information in the written reports. It appears illogical to assert that the Anderson consultant would be less-than-forthcoming about IR on the telephone, but totally honest in the written report. Furthermore, if the consultant actually withheld negative information from the Underwriter on the telephone in the hope of ingratiating himself/Andersen Consulting with IR's management, as Dr. Smith speculates, then it would seem that the written reports would also be faulty for the same reason. Under such circumstances, review [*27] of the Andersen reports would be wholly unnecessary.

Thus, while it may have been preferable for the Underwriters to have read the Andersen reports as opposed to receiving an oral summation, the latter may have simply represented a better use of the Underwriters' limited time and resources. There is no authority cited by either party to support Dr. Smith's contention that a failure to examine, first-hand, the reports of a private consulting firm, commissioned by and prepared for the benefit of the defendant, was unreasonable.

Third, Dr. Smith takes issue with the Underwriters' failure to interview lower-level employees at the HexAm plant, arguing that the "Underwriters need to speak with employees who have first-hand knowledge of production problems." Dr. Smith's position is that senior management either lacked knowledge of the true state of affairs at the HexAm plant or had an incentive to misrepresent the same. Again there is no evidence to support Dr. Smith's position. Nor is any authority cited to suggest that, given the time constraints under which the Underwriters operated, their decision to interview only senior and middle management (the employees who would presumably possess [*28] the broadest knowledge about IR's operations, finances etc.), as opposed to lower level employees, was unreasonable.

Finally, Dr. Smith asserts that the Underwriters were negligent in interviewing only IR's largest customers as

Case 1:99-cv-00371-GMS    Document 321-8    Filed 10/09/2006    Page 10 of 42

Page 9

1997 U.S. Dist. LEXIS 23966, *28; Fed. Sec. L. Rep. (CCH) P99,469

opposed to selecting customers at random or according to a stratified sampling. The Underwriters respond that "it would hardly make sense to waste time and money calling customers that do not have a material impact on revenues in preference to those that do." The Underwriters' response is not entirely satisfactory on this point. Smaller customers do have a material impact on revenues, individually and, most certainly, in a collective sense. Perhaps the Underwriters should have interviewed IR's smaller customers to determine whether their needs were adequately met. However, one judgmental error on the part of the Underwriters, in light of the otherwise thorough due diligence investigation performed, should not, alone, negative the reasonableness of their investigation. And again, the Underwriters may have determined (perhaps in conformance with industry custom) that interviewing only IR's larger customers represented the best use of their limited time and resources. [*29]

In sum, the standard under which this Court must measure the Underwriters' due diligence is one of reasonableness, not perfection. Based on the authority cited above, the Underwriters have amply conformed with, if not exceeded, the industry standards in this area. Dr. Smith is an academic; he does not have first-hand knowledge of due diligence practice and custom; nor should he be allowed to assist this Court in understanding the same.

Even if Dr. Smith were an expert, identifying only one possible shortcoming in the Underwriter's due diligence (i.e. the failure to interview smaller customers), it would be truly surprising, given the advantage of hindsight, if he could not do so. Dr. Smith's ability to poke holes in the diligence conducted is not dispositive of the above. Cf. *Toolworks II, 50 F.3d at 628* and *WOW, 35 F.3d at 1427* (rejecting "self-righteous" statements of expert who appeared, in the court's eyes, to argue that because outside auditor did not perform audit as he would have, fraud could be found).

The undisputed facts of this case demonstrate that the Underwriters conducted thorough diligence into IR's affairs. The authorities discussed [*30] above demonstrate that the Underwriters' diligence is sufficient to establish a due diligence defense, as a matter of law, under Sections 11 and 12(2) of the 1933 Act.

**B. Section 10(b) and Rule 10b-5 Claims Against the**

## Underwriters

Plaintiffs also bring claims against the Underwriters pursuant to Section 10(b) of the 1934 Act and SEC Rule 10b-5 thereunder. Rule 10b-5 provides that it is unlawful "to make any untrue statement of fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading." Rule 10b-5; *In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989),* cert. denied, *496 U.S. 943, 110 S. Ct. 3229 (1990).* Liability for damages will not lie under Section 10(b) and Rule 10b-5 in the absence of scienter. *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).*

Under Rule 10b-5, scienter is defined as "a mental state embracing the intent to deceive, manipulate, or defraud." *Ernst & Ernst, 425 U.S. at 193-94 n. 12 (1976); Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568 (9th Cir. 1990)* [*31] (en banc), cert. denied, *499 U.S. 976, 113 L. Ed. 2d 719, 111 S. Ct. 1621 (1991).* For summary judgment purposes, Plaintiffs are required to produce "significant probative evidence" (see *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))* that the Underwriters had either (a) actual knowledge of the material misstatements or (b) acted with "recklessness" -- i.e. not merely simple, or inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger, 914 F.2d at 1569* (citations omitted); *Toolworks II, 50 F.3d at 626.* See also *Weinberger, 1990 WL 260676* at *3 ("'Should have been aware' is not the standard, and the underwriters can be liable under section 10(b) only if their misconduct rose to a level of recklessness.").

In light of the preceding discussion of the Underwriters' due diligence, the analysis of Plaintiffs' Section 10(b) claim is simple: if the Underwriters reasonably [*32] believed in the veracity of the prospectuses by virtue of the extensive due diligence they conducted, they cannot be said to have acted "recklessly," making an "extreme departure from the standards of ordinary care," with respect to the same assertions under Rule 10b-5. Simply stated, the Underwriters' establishment of a due diligence defense under Sections 11 and 12(2) of the 1933 Act negates the existence of scienter under Section 10(b) of the 1934 Act. See

Case 1:99-cv-00371-GMS    Document 321-8    Filed 10/09/2006    Page 11 of 42

Page 10
1997 U.S. Dist. LEXIS 23966, *32; Fed. Sec. L. Rep. (CCH) P99,469

*Weinberger, 1990 WL 260676* at *3 ("The underwriters . . . made diligent inquiries, and evaluated the information they received. Their actions could not be held to be 'reckless.'").

### C. Section 10(b) and Rule 10b-5 Claims Against IR and the Individual Defendants

Plaintiffs also bring claims against IR and the Individual Defendants pursuant to Section 10(b) of the 1934 Act and SEC Rule 10b-5. However, genuine issues of material fact remain as to such claims.

### IV. CONCLUSION

For all of the foregoing reasons, the Underwriters are entitled to summary judgment with respect to all the claims asserted against them, and IR and the Individual Defendants are entitled to partial summary judgment as to the [*33] claims under Sections 11 and 12(2) of the 1933 Act and as to the common law fraud and negligent misrepresentation claims to the extent they are based on representations contained in the prospectuses.

DATED:

ROBERT M. TAKASUGI

United States District Judge

### ORDER

This matter having come before the court on the motion for summary judgment by the underwriter defendants Kidder Peabody & Co. and Montgomery Securities and the motion for summary judgment by defendants International Rectifier and Eric Lidow, Robert Mueller, Jack Vance, Rochus Vogt, Alan Lidow and George Krsek, and the court having issued a memorandum concurrently herewith,

IT IS ORDERED that the motion for summary judgment by the underwriter defendants Kidder Peabody & Co. and Montgomery Securities is granted.

IT IS FURTHER ORDERED that with respect to the motion for summary judgment by defendants International Rectifier and Eric Lidow, Robert Mueller, Jack Vance, Rochus Vogt, Alan Lidow and George Krsek:

1. The motion is granted as to the claims brought under Sections 11 and 12(2) of the 1933 Act.

2. The motion is denied as to the claims brought under Section 10(b) of the 1934 Act and SEC Rule 10b-5. [*34]

3. The motion is granted as to the common law claims for fraud and negligent misrepresentation to the extent said claims are based on representations contained in the prospectuses and denied in all other respects.

DATED: 3/31/97

ROBERT M. TAKASUGI

United States District Judge

**A. 40**

LEXSEE 2006 US DIST LEXIS 11033

**YOON JA KIM, Plaintiff, v. DAWN FOOD PRODUCTS, INC., Defendant.**

**No. 04 C 8141**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 11033*

**March 17, 2006, Decided**

**COUNSEL:** [*1] For Yoon Ja Kim, Plaintiff: Dean Andrew Pelletier, James P. Murphy, Jonathan M Rushman, McAndrews, Held & Malloy, P.C., Chicago, IL.

For Dawn Foods Products, Inc., an Indiana Corporation, Defendant: Jason C. White, Christopher Allen Harkins, Brinks, Hofer, Gilson & Lione, Chicago, IL; Michelle L Knight, Young & Basile, P.C., Rochester, MI.

**JUDGES:** AMY J. ST. EVE, United States District Court Judge.

**OPINION BY:** AMY J. ST. EVE

**OPINION:**

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Yoon Ja Kim filed a two-count Complaint in the Circuit Court of Cook County, Illinois, that Defendant Dawn Food Products, Inc. ("Dawn Food Products") removed to federal court pursuant to *28 U.S.C. § 1441(a)*. In her Complaint, Kim alleges a common law breach of contract claim and a trade secret misappropriation claim under the Illinois Trade Secrets Act, *765 ILCS 1065/1 et seq.* Before the Court is Dawn Food Products' Motion for Summary Judgment pursuant to *Federal Rule of Civil Procedure 56(c)*. For the following reasons, the Court denies Defendant's Motion for Summary Judgment [*2] as to Defendant's Wheat Bread Concentrate, Formula No. 34330. The Court grants Defendant's motion as to the other 39 challenged formulas.

### BACKGROUND

### I. Prior Lawsuit

In the parties' initial lawsuit in front of this Court, Kim alleged that Dawn Food Products, a manufacturer of bakery mixes for retail sale, infringed on *United States Patent No. Re. 36,355* (the *"'355 patent"*) entitled "Potassium Bromate Replacer Composition." *See Kim v. Dawn Food Prods., 2004 U.S. Dist. LEXIS 20837, No. 01 C 1906, 2004 WL 2658068 (N.D. Ill. Oct. 13, 2004).* The bread making industry once widely used potassium bromate as an oxidizing agent for bread dough. Its use became less common, however, after the Food and Drug Administration discovered that it caused cancer in laboratory animals. The invention of the *'355 patent* served as a substitute for potassium bromate. The *'355 patent* discloses a potassium bromate replacer comprising an ascorbic acid composition that acts as a slow acting oxidant in bread making. Kim is the named inventor and holder of the *'355 patent*, which the United States Patent and Trademark Office ("PTO") issued on October 26, 1999 as a reissue of *United States Patent No.* [*3] *5,510,129* (the "*129 patent*").

In this prior litigation, the Court granted Dawn Food Products' Motion for Summary Judgment and Declaratory Judgment on the issue of non-infringement. The Court declined to exercise its supplemental jurisdiction over Kim's state law claims for breach of contract and trade secret misappropriation because Kim had failed to allege any basis for the Court's subject matter jurisdiction over such claims. Because Defendant removed Kim's state court complaint based on diversity jurisdiction, these claims are presently before the Court.

Case 1:99-cv-00371-GMS    Document 321-8    Filed 10/09/2006    Page 14 of 42

Page 2
2006 U.S. Dist. LEXIS 11033, *3

## II. Relevant Facts to the Present Motion for Summary Judgment

On November 5, 1993, Kim filed her first application for a patent, U.S. Patent Application No. 08/147,995 (the "'995 application"). (R. 19-1, Def.'s *Rule 56.1* Stmt. Facts P4.) Kim abandoned the '995 application upon filing the continuation-in-part U.S. Patent Application No. 08/308,617 (the "'617 application"). (*Id.* P5.) While the '617 application was pending, Dawn Food Products' Chief Operating Officer, Miles E. Jones, contacted Kim about Kim's potassium bromate replacer composition after which Kim sent a Proprietary Materials Agreement (the "Agreement") [*4] to Jones. (R. 32-1, Pl.'s *Rule 56.1* Stmt. Facts PP1, 2.) Pursuant to the Agreement, Kim mailed Jones the '617 application entitled "Method Of Preparing Potassium Bromate Replacer" on April 10, 1995. (*Id.* P3.) For purposes of this motion only, Defendant admits that the '617 application contained twenty-eight of Kim's trade secrets. (*Id.* PP4, 5.) Each one of Kim's trade secrets, which are recipes for potassium bromate replacer, contain varying amounts of food acid. (*Id.* P5.)

On April 21, 1995, Jones reviewed Kim's patent application. (*Id.* P6.) Thereafter, Jones wrote Kim to inform her that Dawn Food Products already had a potassium bromate replacer similar to Kim's, but that Dawn Food Products' bromate replacers used food acid (tartaric), ascorbic acid, and phosphate, as well as other ingredients. (*Id.* P8.) Jones also explained to Kim that one of Dawn Food Products' customers had previously requested a bromate-free yeast raised mix and as of May 18, 1992, Dawn Food Products had supplied this customer and others with this particular formulation. (*Id.*, Pl.'s Ex. 6.) Finally, Jones informed Kim that Dawn Food Products did not want to assert ownership of Kim's formula [*5] and also wanted Kim to be aware of Dawn Food Products' use and ownership of a similar formula. (*Id.*, Pl.'s Ex. 6.)

On January 17, 1996, Kim wrote a letter to Jones alleging that Dawn Food Products was infringing on her patent rights. (*Id.* P10.) Shortly thereafter, on April 23, 1996, the '617 application issued as *U.S. Patent No. 5,510,129* (the "*129 patent*"). (*Id.* P12; Def.'s Stmt. Facts P5.) On May 2, 1996, Dawn Food Products sent a letter to Kim informing her why its potassium bromate replacer did not infringe on her *129 patent*. (*Id.*, Pl.'s Ex. 19.) Less than two weeks later, Kim filed an application to fix the

defects in the *129 patent*. (Def.'s Stmt. Facts P16.) The PTO issued the reissue application as the *'355 patent*, which was the subject of the parties' patent litigation. (*Id.*) For purposes of this motion, the parties agree that the relevant time period for Kim's pending trade secret and breach of contract claims are from April 10, 1995 through April 23, 1996. (Pl.'s Stmt. Facts. P16.)

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, [*6] if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)*. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)*. In determining whether a genuine issue of material fact exists, the Court construes the facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc., 477 U.S. at 255*. The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004)*; [*7] *see also Fed. R. Civ. P. 56(e)* (adverse party must set forth specific facts showing that there is genuine issue for trial).

### ANALYSIS

### I. Misappropriation of Trade Secrets

Kim first contends that Defendant misappropriated her trade secrets contained in the '617 application. To prevail on a trade secret claim under the Illinois Trade Secrets Act ("Act"), *765 ILCS 1065/1 et seq.*, a plaintiff must demonstrate that (1) the information was a trade secret, (2) defendant misappropriated it, and (3) defendant used the information in its business. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc., 342 F.3d 714, 721 (7th Cir. 2003)*; *Associated Underwriters of Am. Agency, Inc. v. McCarthy, 356 Ill.App.3d 1010, 1019, 292*

*Ill.Dec. 724, 826 N.E.2d 1160 (Ill.App.Ct. 2005).* Under the second element, misappropriation means stolen "rather than developed independently or obtained from a third source." *Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1266 (7th Cir. 1992).*

### A. Schultz Affidavit and Attached Batch Cards

Defendant focuses [*8] on the second and third elements of Kim's trade secret claim contending that of the 40 bakery mixes that Kim is challenging, Dawn Food Products independently developed and owned 20 of these mixes. n1 Defendant also contends that it never commercially produced seven of the formulas and that it produced the remaining 13 formulas after Kim's recipes were publicly disclosed when the PTO issued the *'129 patent. See Rototron Corp. v. Lake Shore Burial Vault Co., 712 F.2d 1214, 1215 (7th Cir. 1983)* (because grant of patent constitutes full disclosure of patented process, that process cannot be trade secret). Accordingly, Defendant asserts that it never misappropriated or used Kim's trade secrets contained in the '617 application.

> n1 Kim narrowed the relevant mixes to 40 in her Motion to Compel, Ex. A, entitled "Accused Products." (R. 5-1, Pl.'s Mot. to Compel, Ex. A.)

In support of its argument, Defendant has submitted the affidavit of Mary Jo Schultz, the Vice President of Food Regulatory Affairs at [*9] Dawn Food Products. Schultz bases her affidavit on her personal knowledge and upon her review of the files maintained in the normal course of business at Dawn Food Products as required under *Federal Rule of Civil Procedure 56(e). See Markel v. Board of Regents of the Univ. of Wisconsin, 276 F.3d 906, 912 (7th Cir. 2002).* n2 Attached to Schultz's affidavit are the batch cards for each of the bakery mixes at issue. The batch cards contain the formula used by Dawn Food Products in the production of each bakery product. (R. 17-1, Def.'s Summ. J. Mem., Ex. E, Schultz Decl. P4.) Further, the batch cards indicate when Dawn Food Products first used the formulas and any changes made to the formulas. (*Id.* PP6, 7.)

> n2 *Federal Rule of Civil Procedure 56(e)* requires that parties must attach to their affidavits all certified copies of

documents referred to in the affidavits. *See Fed.R.Civ.P. 56(e).* Further, to be admissible as evidence, the affiant must be a person through whom the exhibits could be admitted into evidence. *Scott v. Edinburg, 346 F.3d 752, 759-60 n. 7 (7th Cir. 2003)* (citation omitted); *Woods v. City of Chicago, 234 F.3d 979, 987 (7th Cir. 2000).*

[*10]

Kim contends that Mary Jo Schultz's affidavit and supporting documentation are not "objective evidence," such as documents describing constituent ingredients or product samples. Furthermore, Kim argues that the batch cards do not conclusively prove that Dawn Food Products did not use her trade secrets because the batch cards are dated after the relevant time period. Finally, Kim asserts that Dawn Food Products discarded relevant evidence, and thus she is entitled to a strong inference that any destroyed evidence would have been unfavorable to Dawn.

Due to the serious ramifications of Kim's spoliation argument, the Court first addresses this issue. The "destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse" to Dawn Food Products. *Park v. City of Chicago, 297 F.3d 606, 615 (7th Cir. 2002).* Instead, Dawn Food Products must have destroyed the evidence in bad faith. *Id.* In other words, the "bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable [*11] to the party responsible for its destruction." *Crabtree v. National Steel Corp., 261 F.3d 715, 721 (7th Cir. 2001).* The violation of a record retention policy "creates a presumption that the missing record[s] contained evidence adverse to the violator." *Park, 297 F.3d at 615* (citation omitted).

Kim first argues that Dawn Food Products had a continuing duty to preserve all evidence that was reasonably known or foreseen to be material to any litigation involving Kim and her intellectual property, contractual rights, and related rights starting as of January 17, 1996, the date of Kim's letter alleging patent infringement. (R. 32-1, Pl.s' Brief in Opp. at 14.) Kim's

Case 1:99-cv-00371-GMS    Document 321-8    Filed 10/09/2006    Page 16 of 42

Page 4
2006 U.S. Dist. LEXIS 11033, *11

letter to Dawn Food Products stated: "This is to inform you that your company is infringing on my Patent Rights." (Pl.'s Stmt. Facts P10, Pl.'s Ex. 17.) Kim did not mention any contractual or trade secret rights in her letter. In fact, Kim herself did not discover the alleged "theft" of the trade secrets until 2000, as she alleged in her Amended Complaint in the patent litigation, presumably to meet the five year statute of limitations under the Illinois Trade Secrets Act. (*See* 01 C [*12] 1906 R. 23-1, Am. Compl. PP24, 25.) As such, the Court would be hard-pressed to conclude that Kim's January 17, 1996 letter put Dawn Food Products on notice of Kim's trade secrets claim, especially because she herself was unaware of any such claim at that time.

In any event, Kim has not supported her argument -- that Dawn Food Products selectively discarded pertinent evidence from the relevant time period in violation of its normal practices -- with sufficient evidence in the record. For example, Kim suggests that product samples, namely, perishable food products, would be sufficient "objective evidence" to support Defendant's claims, yet the record indicates that Dawn Food Products discarded such products after a short period of time in its normal course of business. (Def.'s Ex. 51, M. Schultz Dep. at 61.) Although the Court must construe the facts and all reasonable inferences in a light most favorable to Kim at this procedural posture, Kim has failed to present definite, competent evidence to rebut Defendant's evidence that it destroyed the perishable food products in its normal course of business. *See Butts, 387 F.3d at 924.*

Further, Dawn Food Products admits [*13] that the formulas for the products at issue were updated formulas, and that it destroyed the old batch cards. Nevertheless, the updated batch cards reflect the changes to the formulas over the years, therefore, the destruction of the old batch cards did not destroy the history of the formulas. (R. 17-1, Def.'s Summ. J. Mem., Ex. E, Schultz Decl. P6, 7.) Accordingly, Kim's argument that there is no way to determine whether any of the products were altered to use her trade secrets during the relevant time period is unavailing. As such, Kim has failed to set forth sufficient evidence that Dawn Food Products acted in bad faith, and thus Kim is not entitled to the presumption that the missing evidence would have been favorable to her. *See Crabtree, 261 F.3d at 721.* n3

n3 Kim also argues that the batch cards are invalid because the cards contain handwritten notes. Kim fails to develop this claim or cite pertinent legal authority to support her argument. Thus, Kim has waived this arguments. *See Estate of Moreland v. Dieter, 395 F.3d 747, 759 (7th Cir. 2005)* ("Perfunctory or undeveloped arguments are waived").

[*14]

**B. Misappropriation and Use of Kim's Trade Secrets**

**1. Scope of Kim's Trade Secrets**

The Court thus turns to Dawn Food Products' argument that Kim cannot establish the second or third element of an Illinois Trade Secrets Act claim. To do so, the Court must first look to the scope of Kim's trade secrets. Dawn Food Products contends that Kim's trade secrets are limited to: (1) Potassium Bromate Replacer I, comprising about 0.001 to 0.03 parts ascorbic acid per 100 parts flour and about 0.015 to 0.2 parts food acid per 100 parts flour; and (2) Potassium Bromate Replacer II, which is comprised of the above two ingredients and the added ingredient of about 0.1 to 0.5 parts phosphate per 100 parts flour, along with the optional ingredient of about 0.5 parts yeast food per 100 parts flour. (Def.'s Stmt. Facts P6.) For purposes of this motion, however, Dawn Food Products admitted that Kim's '617 application included 28 trade secrets, including her broadest trade secret -- a potassium bromate replacer comprising ascorbic acid and food acid for use in yeast-leavened products. (R. 48-1, Def.'s Resp. to Pl.'s Stmt. Facts P5.) Thus, the Court must determine whether Dawn Food Products [*15] misappropriated and used Kim's broadest trade secret regarding the 40 bakery mixes during the relevant time period. n4

n4 Defendant contends that it has already proved that it independently developed some of the bakery mixes based on the parties' patent litigation. There, the Court concluded that Dawn Food Products' "Yeast Raised Donut Mix" and "Danish Mix" did not meet the food acid limitation and the yeast food limitation in the *'355 patent. See Kim v. Dawn Food Prods., 2004 U.S. Dist. LEXIS 20837, No. 01 C 1906, 2004 WL 2658068, at *6 (N.D.*

Case 1:99-cv-00371-GMS    Document 321-8    Filed 10/09/2006    Page 17 of 42

Page 5
2006 U.S. Dist. LEXIS 11033, *15

*Ill. Oct. 13, 2004).* Thus, the Court concluded that these mixes did not literally infringe on the asserted claims in the *'355 patent. Id.* Here, there are 38 other mixes at issue and for purposes of this motion, Defendant admitted that Kim's trade secrets are broader than the patent limitations. (*See* R. 48-1, Def.'s Resp. to Pl.'s Stmt. Facts P5.) Therefore, Defendant's argument fails.

## 2. Misappropriation and Use During Relevant Time Period

As the batch cards [*16] and Dawn Food Products' admissions reveal, 31 of the 40 mixes have both ascorbic acid and some level of food acid as ingredients, but do not have potassium bromate, and thus fall within Kim's broadest trade secret. (*See* Pl.'s Ex. 4.) Of those 31 mixes, Dawn Food Products never commercially produced the Raised Donut Base-Chocolate, Yeast Raised Donut Mix-Frozen Dough, Sweet Dough Base, and New York Bagel Base mixes. (Def.'s Stmt. Facts PP77, 78, 80, 81; Def.'s Batch Card Exs. 42, 43, 45, 46.) Moreover, of the remaining formulas, Dawn Food Products produced 12 of these mixes after the *129 patent* issued on April 23, 1996, and thus these formulas fall outside of the relevant time period. (Def.'s Stmt. Facts PP63-66, 69-75; Def.'s Batch Card Exs. 28-31, 34-40.) In order to determine whether there is a genuine issue of material fact for trial, the Court must examine whether Defendant produced the remaining formulas prior to April 10, 1995 and if so, whether Defendant changed the formulas to the mixes during the relevant time period.

Defendant has produced its Bun Base products from at least June 19, 1993. (Def.'s Stmt. Facts PP23, 24, Def.'s Batch Card Ex. 9.) Although changes were [*17] made during 1993 and 1994, Dawn Food Products did not change the formula during the relevant time period. (*Id.*) Dawn Food Products started producing its New Richer Bun Base mix as early as December 12, 1993 and changes were made to the ingredients in 1994. (Def.'s Stmt. Facts P25, Def.'s Batch Card Ex. 10.) Nevertheless, Defendant did not change the formula during the relevant time period. In fact, the batch card does not indicate any activity or further changes until March of 1997. (Def.'s Stmt. Facts P26; Def.'s Batch Card Ex. 10.) Defendant started producing the Super Dough Base prior to April

19, 1994 and Super Dough Mix since at least January 6, 1995 and did not change these formulas during the relevant time period. (Def.'s Stmt. Facts PP27, 28, 30, 31; Def.'s Batch Card Exs. 11, 12.) Further, Dawn Food Products started producing its Yeast Raised Donut Mix products from at least January 12, 1994 and did not make any changes to this mix during the time period in question. (Def.'s Stmt. Facts PP32, 33; Def.'s Batch Card Ex. 13.)

Next, the record reveals that Defendant started producing the Liberty Yeast Raised Base mix from at least December 20, 1993 and made no changes to [*18] the mix during the relevant time period. (Def.'s Stmt. Facts PP34, 35; Def.'s Batch Card Ex. 14.) Dawn Food Products started producing its Originator Variety Bread prior to December 10, 1993 and made no changes of any kind to the formula during the relevant time period, although it issued a new eight digit code on December 11, 1996. (Def.'s Stmt. Facts PP40, 41; Def.'s Batch Card Ex. 17.) In addition, Defendant started producing its Italian Bread Base mix prior to December 22, 1992 and its Bun Concentrate products as early as July 22, 1992 and did not make any changes to these products during the relevant time period. (Def.'s Stmt. Facts PP45, 46, 49, 50; Def.'s Batch Card Ex. 19, 21.) The evidence further reveals that Dawn Food Products has made the Danish Mix products from at least January 3, 1991 and made no changes during the relevant time period except that Defendant assigned the mix a new formula number on December 5, 1995. (Def.'s Stmt. Facts PP51, 52; Def.'s Batch Card Ex. 22.)

Also, Defendant has produced its Danish Base and Seven Grain Bread Mix since prior to December 13, 1993 and made no changes to these formulas during the relevant period. (Def.'s Stmt. Facts PP47, 48, [*19] 53, 54; Def.'s Batch Card Exs. 20, 23.) Similarly, Dawn Food Products started producing its Multi-Purpose Yeast Raised Mix before January 17, 1992 and made no changes of any kind to these mix products during the relevant time period. (Def.'s Stmt. Facts PP57, 58; Def.'s Batch Card Ex. 25.) Next, the record indicates that Dawn Food Products has produced the U.P. Chocolate Yeast Raised Base products as early as January 6, 1994 and made no changes to these products during the relevant time period. (Def.'s Stmt. Facts PP59, 60; Def.'s Batch Card Ex. 26.) Finally, Defendant has made its Yeast Raised Mix since before October 6, 1992 and did not make changes to the formula during the relevant time

period. (Def.'s Stmt. Facts PP61, 62; Def.'s Batch Card Ex. 27.)

In sum, as to the above formulas, Kim's contention that Dawn Food Products changed its earlier produced formulas to incorporate her trade secrets is not supported by the record. Further, Kim has failed to present definite, competent evidence to rebut Defendant's summary judgment motion. n5 *See Butts, 387 F.3d at 924.* Thus, there are no genuine issues of material fact as to Dawn Food Products misappropriating Kim's [*20] trade secrets as to these formulas.

> n5 Kim has failed to set forth any evidence supporting her claim that Dawn Food Products may have produced the challenged bakery mixes under a different name or formula number during the relevant time period. As such, Kim cannot create a genuine issue of material fact by merely raising this speculative argument. *See Payne v. Pauley, 337 F.3d 767, 772-73 (7th Cir. 2003)* (conclusory statements unsupported by the record are insufficient to avoid summary judgment).

There is one remaining formula -- Dawn Food Products' Wheat Bread Concentrate, Formula No. 34330, former Formula No. 55 TT 8929. Defendant contends that it produced this formula prior to December 21, 1995, but it does specify if "prior December 21, 1995" is before April 10, 1995, and thus outside the relevant time period. (Def.'s Stmt. Facts P43, Def.'s Batch Card Ex. 18.) Meanwhile, Defendant ignores the well-established standard at this procedural posture, namely, that the party seeking summary judgment [*21] has the burden of establishing the lack of any genuine issue of material fact, *see Celotex Corp., 477 U.S. at 323,* when it argues that Kim has failed to establish Defendant's misappropriation of her trade secrets as to this formula. In short, viewing the evidence and all reasonable inferences in favor of Kim, there is a genuine issue of material fact as to whether Dawn Food Products misappropriated Kim's broadest trade secret in its Wheat Bread Concentrate formula.

## II. Breach of Contract Claim

Next, Kim alleges that Dawn Food Products breached the parties' Proprietary Materials Agreement by engaging in the unauthorized use of one or more of her trade secrets. To prevail on a breach of contract claim under Illinois law, a plaintiff must establish: (1) the existence of a valid and enforceable contract, (2) her own performance under the terms of the contract, (3) defendant breached the contract, and (4) she suffered an injury as a result of the defendant's breach. *Burrell v. City of Mattoon, 378 F.3d 642, 651 (7th Cir. 2004); Zirp-Burnham, LLC v. E. Terrell Assocs., 356 Ill.App.3d 590, 600, 292 Ill.Dec. 289, 826 N.E.2d 430 (Ill.App.Ct. 2005).* [*22]

Here, the parties agree that the relevant issue is whether Defendant breached the parties' agreement. Dawn Food Products' sole argument is that because Kim's breach of contract claim is predicated on the alleged theft or misappropriation of Kim's trade secrets, it cannot be liable for breaching the parties' contract. As discussed, however, there is a genuine issue of material fact concerning the misappropriation of Kim's broadest trade secret in connection with Defendant's Wheat Bread Concentrate, Formula No. 34330. Thus, the Court cannot dismiss this claim as a matter of law as Defendant suggests because a factual issue exists concerning the Wheat Bread Concentrate mix.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendant's Motion for Summary Judgment.

Dated: March 17, 2006

**ENTERED**

**AMY J. ST. EVE**

**United States District Court Judge**

**A. 41**

LEXSEE 1998 U.S. DIST. LEXIS 11783

**PICARD CHEMICAL INC. PROFIT SHARING PLAN, et al., on behalf of themselves and all others similarly situated, Plaintiffs, v. PERRIGO COMPANY, et al., Defendants.**

**Case Nos. 1:95-CV-141, 1:95-CV-290**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*1998 U.S. Dist. LEXIS 11783*

**June 15, 1998, Decided**

**SUBSEQUENT HISTORY:** As Modified June 25, 1998.

**DISPOSITION:** [*1] Summary judgment granted to both Perrigo Defendants and Underwriter Defendants on six alleged omissions which survived dismissal in Court's July 1996 Opinion.

**COUNSEL:** For PICARD CHEMICAL INC. PROFIT SHARING PLAN, ELIZABETH B. PILLING, EDWARD R. PEPPER, DAVID H. LEVY, plaintiffs (95-CV-141): Stephen C. Bransdorfer, Bransdorfer & Bransdorfer, PC, Grand Rapids, MI.

For ELSIE S. FELDMAN, ELSIE S. FELDMAN TRUST, TED S. GOLDBERG, plaintiffs (95-CV-141, 95-CV-290): Stephen C. Bransdorfer, Bransdorfer & Bransdorfer, PC, Grand Rapids, MI.

For PICARD CHEMICAL INC. PROFIT SHARING PLAN, ELIZABETH B. PILLING, EDWARD R. PEPPER, DAVID H. LEVY, plaintiffs (95-CV-141): Reed Richard Kathrein, Milberg, Weiss, Bershad, Hynes, LLP, San Francisco, CA.

For ELSIE S. FELDMAN, ELSIE S. FELDMAN TRUST, TED S. GOLDBERG, plaintiffs (95-CV-141, 95-CV-290): Reed Richard Kathrein, Milberg, Weiss, Bershad, Hynes, LLP, San Francisco, CA.

For PICARD CHEMICAL INC. PROFIT SHARING PLAN, ELIZABETH B. PILLING, EDWARD R. PEPPER, DAVID H. LEVY, ELSIE S. FELDMAN,

ELSIE S. FELDMAN TRUST, TED S. GOLDBERG, plaintiffs (95-CV-141): Ellen A. Gusikoff, Spector & Roseman, P.C., San Diego, CA.

For PERRIGO COMPANY, [*2] MICHAEL J. JANDERNOA, LONNIE L. SMITH, M. JAMES GUNBERG, STEVEN N. HUTCHINSON, ROBERT P. LASNER, MARK OLESNAVAGE, F. FOLSOM BELL, WILLIAM C. SWANEY, RALPH E. KLINGENMEYER, MICHAEL J. JANDERNOA TRUST, SWANEY ASSOCIATES, RALPH E. KLINGENMEYER TRUST, JOSEPH KLINGENMEYER MANAGEMENT TRUST, JOHN KLINGENMEYER MANAGEMENT TRUST, AMY KLINGENMEYER MANAGEMENT TRUST, SANDRA E. HANSEN TRUST, RICHARD G. HANSEN, RICHARD G. HANSEN TRUST, RICHARD R. HANSEN TRUST, ELIZABETH A. HANSEN TRUST, HENRY L. HILLMAN TRUST, defendants (95-CV-141): Stephen D. Turner, Law, Weathers & Richardson, Grand Rapids, MI.

For PERRIGO COMPANY, MICHAEL J. JANDERNOA, LONNIE L. SMITH, M. JAMES GUNBERG, STEVEN N. HUTCHINSON, ROBERT P. LASNER, MARK OLESNAVAGE, F. FOLSOM BELL, WILLIAM C. SWANEY, RALPH E. KLINGENMEYER, MICHAEL J. JANDERNOA TRUST, SWANEY ASSOCIATES, RALPH E. KLINGENMEYER TRUST, JOSEPH KLINGENMEYER MANAGEMENT TRUST, JOHN KLINGENMEYER MANAGEMENT TRUST, AMY KLINGENMEYER MANAGEMENT TRUST,

1998 U.S. Dist. LEXIS 11783, *2

SANDRA E. HANSEN TRUST, RICHARD G. HANSEN, RICHARD G. HANSEN TRUST, RICHARD R. HANSEN TRUST, ELIZABETH A. HANSEN TRUST, HENRY L. HILLMAN TRUST, defendants (95-CV-141): Joe A. Sutherland, Gardner, Carton & Douglas, Chicago, IL.

For [*3] HENRY L. HILLMAN, HILLMAN FAMILY TRUSTS, THE, EDWARD A. CRAIG, III, defendants (95-CV-141): Bruce W. Neckers, Rhoades, McKee, Boer, Goodrich, et al, Grand Rapids, MI.

For HENRY L. HILLMAN, HILLMAN FAMILY TRUSTS, THE, EDWARD A. CRAIG, III, defendants (95-CV-141): Michael B. Reuben, Gordon, Altman, Butowsky, Weitzen, et al, New York, NY.

For J.P. MORGAN SECURITIES, LTD., MORGAN STANLEY INTERNATIONAL, SMITH BARNEY SHEARSON, INC., DEAN WITTER REYNOLDS, INC., defendants (95-CV-141): William K. Holmes, Warner, Norcross & Judd, LLP, Grand Rapids, MI.

For J.P. MORGAN SECURITIES, LTD., MORGAN STANLEY INTERNATIONAL, SMITH BARNEY SHEARSON, INC., DEAN WITTER REYNOLDS, INC., defendants (95-CV-141): Dennis E. Glazer, Davis, Polk & Wardwell, New York, NY.

GROVER H. DAVIS, claimant (95-CV-141), Pro se, Three Rivers, MI.

**JUDGES:** GORDON J. QUIST, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** GORDON J. QUIST

**OPINION:**

**OPINION**

**Table of Contents**

Background Facts

The Defendants

Standard for Summary Judgment

Analysis

A. Analysis of Six Alleged Material Omissions

1. "The Company had learned that certain of its main retail chain customers . . . and certain [*4] major wholesale customers . . . were materially reducing or stopping their purchases from the Company." (Compl. P 51(g).)

2. "Perrigo's switch from the LIFO to the FIFO method of valuing inventory was to hide increasing cost-of-goods-sold in the fourth quarter of fiscal 1993 and subsequently, thereby allowing Perrigo to continue to announce increased earnings growth immediately prior to and following the October 1993 Offering." (Compl. P 51(j).)

3. "The Company had been unusually aggressive in its 'early-ship' program and had convinced many of its retail companies . . . to stockpile inventory prior to and immediately after the October 1993 Offering to make its sales growth appear better than it actually was." (Compl. P 51(e).)

4. "Perrigo did not, in fact, have real plans to 'invest even more in fiscal 1994' as, in fact, a lesser amount was invested -- and no explanation has ever been forthcoming from Perrigo." (Compl. P 47(b).)

5. "Perrigo's results for the first two quarters of 1994 had been artificially inflated due to increased revenues generated by sales promotions which had borrowed large amounts of sales from the last two quarters of fiscal 1994 and would [*5] result in Perrigo's profit growth in the second half of fiscal 1994 slowing materially." (Compl. P 74(a).)

6. "Perrigo would not achieve any substantial profit growth due to increased sales in international markets, at least in the near term, as defendants knew that the major company with which they had stated they would enter those markets --

1998 U.S. Dist. LEXIS 11783, *5

Wal-Mart -- had informed them that it preferred regional suppliers." (Compl. P 74(b).)

7. Admission of Immateriality

8. Lack of a Causation Allegation

B. Analysis of Underwriters' Separate Motions for Summary Judgment on Separate Grounds

    1. Facts Regarding Underwriters

    2. Discussion of Due Diligence Defense

        a. Due Diligence Standards

        b.     Due     Diligence Investigation

        c. Red Flags

Conclusion

This is a class action alleging securities fraud.

**Background Facts**

When publicly traded stock drops as quickly and as far as did the stock of Perrigo Company ("Perrigo"), one reasonably thinks that there is something wrong - probably fraud. In this case, Perrigo had a secondary public offering of 13 million shares at $ 31 per share in October 1993. In March 1994, the share price dropped [*6] from $ 28.25 to 22.375 over two days, and in May 1994, the price dropped suddenly again to $ 12.25. To date, the share price has not risen above $ 20 and has generally fluctuated between $ 10 and $ 15. The October 1993 offering (the "1993 Offering") was the largest offering up to that time on the National Association of Securities Dealers exchange. The corporate insiders of Perrigo and the alleged largest shareholder of Perrigo reaped profits of tens of millions of dollars.

In March 1995, persons who purchased Perrigo stock between May 11, 1993, and May 10, 1994, sued Perrigo, its officers and directors, and Henry L. Hillman, who was allegedly the largest shareholder and primary beneficiary of the secondary offering through trusts and other entities which he allegedly controlled. The Complaint alleges that the secondary public offering in October 1993 was

fraudulent and in violation of federal securities laws. The Complaint does not allege that Perrigo created false books or that the Defendants made specific false statements. Rather, the Complaint alleges that Defendants failed to disclose facts that were material to helping a reasonable investor make an informed decision about whether [*7] to purchase Perrigo stock.

This Court granted Plaintiffs status as class representatives on September 27, 1996. This Court dismissed Henry L. Hillman and his trusts and associates on July 25, 1996, on the ground that these defendants were not "controlling persons" and Plaintiffs failed to allege as required by *Fed. R. Civ. P. 9(b)* specific facts showing their involvement in the alleged fraudulent scheme. See *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co., 940 F. Supp. 1101, 1129-30, 1135-36 (W.D. Mich. 1996)*.

The defendants in the case are Perrigo, its officers, its directors, and the Underwriters who participated in the secondary offering. In 1996, these defendants moved to dismiss the case on the grounds that Plaintiffs failed to state a claim upon which relief could be granted. In a lengthy opinion dated July 25, 1996, this Court granted the motions in part and denied the motions in part. See *Picard, 940 F. Supp. at 1137-38*. That ruling eliminated many of Plaintiffs' allegations of fraud but permitted the case to go forward on six of the alleged material omissions. n1

> n1 The Court relies on its July 1996 Opinion for a more comprehension discussion of applicable securities law.

[*8]

After that ruling, the parties engaged in an enormous amount of discovery involving scores of depositions, the production of hundreds of thousands of documents, numerous interrogatories, constant motions regarding discovery, and appeals of many of the Magistrate Judge's Orders regarding discovery. At the conclusion of discovery, Defendants moved for summary judgment. The motions for summary judgment were supported by numerous briefs which exceeded this Court's standard page limitations. The documents supporting and opposing the motions for summary judgment constituted the largest filing in the history of the Western District of Michigan, according to employees in the Clerk of Court's Office.

In response to Defendants' motions for summary judgment, Plaintiffs have changed the thrust of their claims, but have not formally abandoned all of their original theories and claims of fraud. Plaintiffs summed up their current position during the oral argument that this Court heard for several hours on April 24, 1998. Plaintiffs' counsel Paul Howes said:

> What the Court heard this morning, what the plaintiffs have brought forward in our papers is this: From that manageable framework [in [*9] the July 25, 1996 Opinion] to an amended complaint [as currently proposed], . . . this case now is quite simple. This case is about sales and growth and projections.

(4/24/98 Hr'g Tr. at 123.) Plaintiffs' counsel Pamela Parker, in support of Plaintiffs' request to amend their complaint, stated:

> Your Honor, what we are saying the evidence shows is that the projections that the defendants made publicly -- of which there is much evidence, [20%/30%] projections -- were undermined by facts known to the defendants, including information about declining sales growth, information about the need for acquisitions.

(Id. at 95.) Plaintiffs' counsel Reed Kathrein added that Defendants' "internal projections, their best-case projections, were completely contrary to" the 20%/30% projections that Defendants allegedly gave the market. (Id.)

These oral statements were consistent with Plaintiffs' written arguments and other oral presentations in which they spent little time arguing about the six omissions and spent most of their space and time encouraging this Court to permit them to expand their claims and to amend their Complaint one more time to show that Defendants [*10] perpetrated a fraud by projecting high growth rate figures with knowledge of undisclosed facts that made a belief in those figures unreasonable. (See, e.g., Pls.' Resp. Br. at 1-51.) n2

> n2 Plaintiffs' counsel Mr. Kathrein argued that Plaintiffs' current theory is

what they have "said from day one, that the projections were false and not believed." (4/24/98 Hr'g Tr. at 95.) This claim is true only in a very general sense, in that the specific fraud with which Defendants are charged in this case, the six alleged omissions, arguably resulted in an overstatement of Perrigo's growth rate. Nothing in the Complaint could possibly have informed Defendants that Plaintiffs' theory was that specific statements regarding rate of growth were false and misleading. See *Fed. R. Civ. P. 9(b)*. As the parties and the Court have repeatedly stated, up until the Defendants filed their motion for summary judgment, this case has not been one of cooked books or positive misstatements. It has always been a case of alleged material omissions. Although they claim that the misstatements which they recently discovered "are entirely consistent with the nature of plaintiffs' claims and the theory of their case," Plaintiffs acknowledge that they did not allege the misstatements in their Complaint. (Pls.' Resp. Br. at 58, 59 n.48.) Furthermore, by requesting more discovery regarding declining rates of sales and profit growth, Plaintiffs impliedly acknowledge that false representations regarding rates of growth are not in their original Complaint.

[*11]

Because Plaintiffs have not formally abandoned all of their arguments regarding the six omissions, this Court will analyze each omission in turn. n3

> n3 For clarity of analysis, the facts relevant to the separate motions of the Underwriters will be described later in this Opinion.

**The Defendants**

There are essentially two groups of Defendants left in this case.

1998 U.S. Dist. LEXIS 11783, *11

The Perrigo Defendants include Perrigo Company, a Michigan corporation, Chairman and CEO Michael Jandernoa ("Jandernoa"), Board member William Swaney ("Swaney"), Swaney Associates, the partnership through which Swaney sold Perrigo stock, former Executive Vice President and Board member Ralph Klingenmeyer ("Klingenmeyer"), President and COO Richard Hansen ("Hansen"), Executive Vice President and CFO James Gunberg ("Gunberg"), Executive Vice President Mark Olesnavage ("Olesnavage"), Executive Vice President and Board member Lonnie Smith ("Smith"), Board member Folsom Bell ("Bell"), Board member Robert Lasner ("Lasner"), and Board member Steven [*12] Hutchinson ("Hutchinson").

The Underwriter Defendants include J.P. Morgan Securities Ltd., Morgan Stanley International, Smith Barney Shearson, Inc. ("Smith Barney"), and Dean Witter Reynolds ("Dean Witter" and collectively with J.P. Morgan Securities Ltd., Morgan Stanley International, and Smith Barney the "Underwriter Defendants"). As will be noted below, the 1993 Offering was managed by Underwriter Defendants Smith Barney, Dean Witter, and non-parties J.P. Morgan Securities, Inc. ("J.P. Morgan") and Morgan Stanley & Co. Incorporated ("Morgan Stanley"). Plaintiffs sued Underwriter Defendants Morgan Stanley International and J.P. Morgan Securities Ltd., who did not participate in the 1993 Offering, by mistake.

This Court will first analyze both the Perrigo Defendants' and Underwriter Defendants' motions for summary judgment with regard to the six alleged material omissions which Plaintiffs claim constitute fraud. Then, because the Underwriters have asserted alternative grounds for their motions, the Court will analyze the Underwriters' separate arguments. The Plaintiffs request to amend their Complaint to allege false and misleading statements regarding rate of growth is still under [*13] consideration.

**Standard for Summary Judgment**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the movie party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56.* The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).* A dispute

over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Id. at 248, 106 S. Ct. at 2510.* The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. Id. This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *Id. at 251, 106 S. Ct. at 2511* (citing *Improvement Co. v. Munson, 81 U.S. 442, 14 Wall. 442, 448, 20 L. Ed. 867 (1872)).*

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that [*14] there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 324-25, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).* If the motion is so supported, the party opposing the motion must then demonstrate with concrete evidence" that there is a genuine issue of material fact for trial. Id.; *Frank v. D'Ambrosi, 4 F.3d 1378, 1384 (6th Cir. 1993).* The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle, 967 F.2d 233, 236 (6th Cir. 1992)* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).*

**Analysis**

**A. Analysis of Six Alleged Material Omissions**

It is not for this Court to speculate upon why the Perrigo stock dropped so swiftly starting in March 1994. Plaintiffs, of course, argue that starting in March 1994, the fraud of Defendants upon the market became apparent and the market then started to reflect the stock's true value. [*15] Perrigo Defendants have argued that an unexpectedly short cold-flu season in 1993-94 depressed Perrigo's earnings and the depression was reflected in Perrigo's market value. n4 This Court can only analyze whether there is more than a scintilla of evidence to support Plaintiffs' claims regarding the six alleged material omissions.

> n4 See "Big News on Stock? Hold on to your Hat," The Wall Street Journal, Apr. 27, 1998, at C1 (describing fast and

1998 U.S. Dist. LEXIS 11783, *15

major market reaction when a stock misses analyst projections).

**1. "The Company had learned that certain of its main retail chain customers . . . and certain major wholesale customers . . . were materially reducing or stopping their purchases from the Company." (Compl. P 51(g).)**

Plaintiffs support this allegation with evidence that the August 1993, September 993, and October 1993 Status Reports showed declines in sales to several major customers compared with the same period in fiscal year 1993. n5 (SOE PP 348, 350, 352.) n6 However, as the Court summarizes [*16] in the chart below, those same reports show that both top account and overall sales for those months and for the 1994 fiscal year-to-date increased over fiscal year 1993, in both units and dollars:

| Ex. No. n7 | Percent increase over fiscal year 1993 |
|---|---|
| Key accounts | |
| 215 | 17.8% increase (dozens), FYTD as of August |
| | 30.2% increase (], FYTD as of August |
| | 18% increase (dozens) for month of August |
| | 26.4% increase (] for month of August |
| | |
| All accounts | |
| 482 | 21% increase (dozens), FYTD as of August |
| 216 | 30.8% increase (], FYTD as of August |
| | 20% increase (dozens) for month of August |
| | __% (] for month of August n8 |
| | |
| Key accounts | |
| 212 | 26.4% increase (dozens), FYTD as of September |
| | 33.9% increase (], FYTD as of September |
| | 39% increase (dozens) for month of September |
| | 43.6% increase (] for month of September |
| | |
| All accounts | |
| 226 | 25% increase (dozens), FYTD as of September |
| | 33% increase (], FYTD as of September |
| | 33% increase (dozens) for month of September |
| | 36.6% increase (] for month of September |
| | |
| Key accounts | |
| 217 | 23.8% increase (dozens), FYTD as of October |
| | 34.1% increase (], FYTD as of October |

1998 U.S. Dist. LEXIS 11783, *16

| Ex. No. n7 | Percent increase over fiscal year 1993 |
| | 18% increase (dozens) for month of October |
| | 33.1% increase [] for month of October |

| All accounts | |
| 217 | 24% increase (dozens), FYTD as of October |
| 343 | 33.4% increase [], FYTD as of October |
| 217 | 20% increase (dozens) for month of October |
| 343 | 34.3% increase [] for month of October |

[*17]

n5 Perrigo's fiscal year runs from July 1 to June 30.

n6 "SOE" refers to Plaintiffs' Statement of Evidence and the exhibits cited therein.

n7 Exhibit numbers, unless otherwise specified, correspond to Kathrein Declaration exhibit numbers.

n8 The Status Reports submitted by Plaintiff were not complete for every month and the Court as unable to locate this figure in the August report.

Plaintiffs do not dispute the fact that sales increased in absolute numbers in fiscal year 1994, (see Pls.' Resp. Br. at 63), but they argue that Defendants' failure to disclose the declining growth trend in sales made Defendants' 20%/30% growth projections misleading. In further support of this theory, Plaintiffs produced evidence of a 7.6% drop in dollar sales between fiscal year 1992 and fiscal year 1993. (See Ex. 209; SOE P 342.) Defendants argue that the document Plaintiffs cite is "demonstrably incorrect" because the total fiscal year 1992 sales figure it lists for L. Perrigo exceeds the total fiscal year [*18] 1992 sales for both parts of the entire company reported in other documents. (See Form, 10-K for fiscal year 1993, Gunberg Aff. Ex. D at 22, UF n9 Document App. vol. I, tab 6.) Defendants also produced evidence that sales actually increased between fiscal year 1992 and fiscal year 1993. (Id. at 22, 26.) Plaintiffs have

already conceded that they "'do not allege that historic statements . . . are inaccurate.'" (Defs.' Resp. to SOE P 342 (quoting 3/13/96 Hr'g Tr. at 79).)

n9 "UF" refers to Defendants' Statement of Undisputed Facts.

Moreover, despite Plaintiffs' attempts to link their current theory to their original allegation, the Court finds that the Complaint, quoted above, does not satisfy the requirements of *Fed. R. Civ. P. 9(b)* with regard to a declining growth trend omission. The plain language of the Complaint refers to a decline in absolute numbers, which contemplates a different set of "circumstances constituting fraud" than a decline in the growth trend. *Fed. R. Civ. P. 9(b).* As stated earlier [*19] in this Opinion, the Court will separately address the merits of granting Plaintiffs leave to amend the Complaint to add the growth trend theory.

In light of the undisputed fact that overall sales increased during the periods which Plaintiffs allege showed declines in sales to major customers, the Court finds that failure to disclose declines in sales to a few individual customers were not materially misleading omissions. See *Jakobe v. Rawlings Sporting Goods Co., 943 F. Supp. 1143, 1155-56 (E.D. Mo. 1996)* (holding that defendants had no duty to disclose "whether each customer increased or decreased its orders, [because otherwise,] shareholders would be buried in an 'avalanche of trivial information--a result that is hardly conducive to informed decisionmaking'") (quoting *TSC Indus. v. Northway, Inc., 426 U.S. 438, 448-49, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976)).

1998 U.S. Dist. LEXIS 11783, *19

**2. "Perrigo's switch from the LIFO to the FIFO method of valuing inventory was to hide increasing cost-of-goods-sold in the fourth quarter of fiscal 1993 and subsequently, thereby allowing Perrigo to continue to announce increased earnings growth immediately prior to and following the October 1993 [*20] Offering." (Compl. P 51(j).)**

In their brief, Plaintiffs concede that they "do not believe they have obtained sufficient evidence during discovery to withstand a motion for summary judgment" on this allegation. (Pls.' Resp. Br. at 71 n.57.)

**3. "The Company had been unusually aggressive in its 'early-ship' program and had convinced many of its retail companies . . . to stockpile inventory prior to and immediately after the October 1993 Offering to make its sales growth appear better than it actually was." (Compl. P 51(e).)**

Plaintiffs' only argument remotely related to this allegation is as follows:

> Perrigo's sales strategy and aggressive promotions "overdrove" its business to the point where several of its key customers became overstocked and thus purchased less in later quarters. K-Mart is one such customer. SOE P534. At the time of the October 1993 Offering, Walgreens also was having "soft" sales due to high inventories. SOE P538.

(Pls.' Resp. Br. at 43.) To the extent this argument addresses the stockpiling allegation, as opposed to the over-promotion allegation discussed below in Section A.5., Plaintiffs have raised only circumstantial evidence that two [*21] of Defendants' customers were overstocked during the relevant time period, without any direct evidence that Defendants used incentives to cause this inventory situation. (See SOE PP 534-38.)

Defendants, on the other hand, presented evidence that they ran an "early ship" program every year in order to prevent backlogs of orders during busy seasons and maintain smoother production schedules. (UF P 128.) They argue that Plaintiffs presented no evidence that their 1994 program was more aggressive than that of prior years. They also offered the testimony of numerous large customers that Defendants did not attempt to push products on customers which they otherwise would not have ordered or stimulate demand artificially. (See, e.g., Harris Dep. at 55-56, UF Document App. vol. IV, tab 30; Wagner Dep. at 31, id. vol. VI, tab 60; Prentice Dep. at 28-29, id. vol. V, tab 49; Marciniak Dep. at 64, id. vol. IV, tab 37; Carlson Dep. at 37, id. vol. III, tab 23; Sullivan Dep. at 85, id. vol. VI, tab 55; cf. UF PP 145-200.)

Plaintiffs rebut only by citing the testimony of Wagner, Wal-Mart's merchandising manager, that although he could not remember any details, he [*22] was "sure" that at some time a sales person or vendor had asked him "to buy more product to enhance a rebate." (Wagner Dep. at 60-61, UF Document App. vol. VI, tab 60.) However, Wagner testified that he count not recall any such incident with Perrigo. (Id. at 61.) In the absence of any evidence of an unusually aggressive "early ship" program or any other form of incentives to customers to stockpile inventory, this rebuttal "evidence" is immaterial.

Defendants further argue that they have disclosed their "early ship" program several times in public filings and press releases since the company went public. (See UF PP 201-06.) Plaintiffs' only response is that the general disclosure of the existence of the "early ship" program was insufficient to alert the market that Defendants were pursuing an unusually aggressive program in the first quarter of fiscal year 1994. (Pls.' Resp. to UF PP 201, 204.) As discussed above, Plaintiffs have failed to present any evidence of an unusually aggressive program in fiscal year 1994.

Therefore, any allegation with regard to these omissions is not supported by the record.

**4. "Perrigo did not, in fact, have real plans to 'invest even [*23] more in fiscal 1994' as, in fact, a lesser amount was invested - and no explanation has ever been forthcoming from Perrigo." (Compl. P 47(b).)**

The parties have two major disputes relating to the scope of this allegation as it survived dismissal. First, Plaintiffs claim that the allegation reaches both the $ 75 million projection for capital expenditures in the 1993 Annual Report ("Report") as well as the statement quoted in the Complaint from the "Fellow Shareholder" Letter ("Letter") that Perrigo expected to invest more in fiscal year 1994 than the $ 68 million it spent in fiscal year 1993. (See Ex. 125 at P 01-0004-004190, P 01-0004-004207.) Perrigo ultimately reported spending

of $ 62.251 million. (SOE P 585.) This disagreement as to scope is important because Plaintiffs have presented evidence that at the time of the Report and Letter, Defendants' internal planning documents reflected a projection of $ 72. 792 million, which is less than $ 75 million but still more than $ 68 million. In addition to disputing Plaintiffs' evidence, Defendants argue that the prediction was not misleading because their plans were always in excess of $ 68 million, indirectly arguing that the [*24] allegation is limited to the Letter.

In discussing this allegation in its earlier Opinion, this Court employed the more restrictive phrase of "lack of plans to invest more money in fiscal 1994." *Picard, 940 F. Supp. at 1113, 1138*. The Court dismissed the first half of Plaintiffs' claim, paragraph 47(a), but did not strike the whole paragraph. *Id. at 1124, 1139*. The preamble section of paragraph 47 alleges that both the Report and the Letter were misleading because they failed to reveal the lack of plans to spend more money. Therefore, reading paragraph 47(b) in context, the Court finds that Plaintiffs are correct as to the scope of this allegation.

Plaintiffs' evidence that the $ 75 million projection was unreasonable at the time Defendants announced it is as follows:

(1) Defendants admit that their "total capital expenditure plan was the sum of the plans for Perrigo's OTC, vitamins and CSI's personal-care divisions." (Defs.' Resp. to SOE P 562, vol. IV at 455.)

(2) Planning documents from March 1993 show estimated CSI spending of $ 20.292 million. (Ex. 349 at P 02-0002-005340.)

Neither party presented evidence that CSI spending plans increased before the Annual Report [*25] in September. Also, Defendants dispute the relevance of documents from March, but they assert a similar $ 20.5 million figure as of late September/early October 1993. (UF P 356.)

(3) By the September planning meeting, capital spending plans for the OTC and vitamins divisions decreased from $ 57 million to $ 52.5 million. (Ex. 308 at P 01-0012-006186; Ex. 328 at P 01-0012-006127.)

(4) Therefore, as of the date of the Annual Report's $ 75 million projection, internal documents showed total

planned capital spending of only $ 72.792 million.

Defendants argue that their projection also included a category of "Additional Requests" apart from the OTC/vitamin or CSI categories. They cite an October 1, 1993, CSI planning document showing several additional requests, including $ 2.05 million for child-resistant closures and $ 16 million for a LaVergne Distribution Center. (Smith Dep. Ex. 53 at P 02-0002-005372, UF Doc. App. vol. VI, tab 53.) However, the document post-dates the Annual Report and lists the $ 20.5 million figure discussed above under the heading "Current Plan," in distinction from these "Additional Requests." (Id.) Defendants submit no evidence that the "Additional Requests" [*26] were part of their projection in the Annual Report and no explanation for the lack of documentation of the "Additional Requests" prior to October. Plaintiffs argue that the child-resistant closures and the LaVergne facility were both unfunded projects which were not certain enough to be included in the Annual Report's projection. (See Pls.' Resp. to UF P 357.)

Even drawing all reasonable inferences in favor of Plaintiffs, however, the Court finds that a discrepancy of $ 2.208 million, a 3% overstatement of investment plans, would have been immaterial to the reasonable investor as a matter of law. See *In re Westinghouse Sec. Litig., 90 F.3d 696, 714-15 (3d Cir. 1996)*(holding that understatement of loan loss reserves amounting to 0.54% of defendant's net income was quantitatively immaterial to decision making of reasonable investor); *Ferber v. Travelers Corp., 802 F. Supp. 698, 708 (D. Conn. 1992)*(holding that defendants' failure to disclose that mortgage portfolio contained second mortgages comprising 3% of total mortgage-loan and real estate portfolio was not material omission); *In re First Chicago Corp. Sec. Litig., 769 F. Supp. 1444, 1454 (N.D. Ill. 1991)*(mem. op.)(implying [*27] that allegation of defendants' initiation of risky real estate loan that constituted 5.59% of total real estate loan portfolio was immaterial for purposes of rendering defendant's optimistic statements about portfolio misleading).

Plaintiffs also argue that the projection was unreasonable because of the constant admonitions to reduce capital outlays which demonstrate Defendants' knowledge that they would have to reduce expenditures at some point. (See SOE PP 564, 569, 574, 595.) Defendants rebut with evidence that they had the directive to reduce capital spending every year and argue

that the existence of the same directive in fiscal year 1994 is irrelevant to the reasonableness of the capital expenditure projection. (See Defs.' Resp. to SOE P 595, vol. IV at 472-74.) The Court agrees that the bare fact that Perrigo, like most companies, strove to reduce capital expenditures does not support an inference that Defendants' belief in their $ 75 million projection was unreasonable.

The second scope-related dispute between the parties concerns Defendants' duty to update their capital expenditure predictions once they had reason to believe that they would have to reduce the $ 75 [*28] million figure. See *Bomarko, Inc. v. Hemodynamics, Inc., 848 F. Supp. 1335, 1341 (W.D. Mich. 1993)*(mem. op.)(acknowledging "that a public statement, correct when issued, may become materially misleading in light of subsequent events, which effect may create a duty to update" and finding issue of fact regarding breach of duty to clarify prior statement that company approved repurchase of "'up to 500,000 of its outstanding common shares'"). Defendants argue that the duty to update, to the extent it applies in this circuit, attaches only to historical statements which a company later discovers to have been incorrect. See *Pittiglio v. Michigan Nat'l Corp., 906 F. Supp. 1145, 1153-54 (E.D. Mich. 1995)*(mem. op.)(holding that defendants had no duty to correct pre-merger statement that Board was committed to maintaining company's independence because statement "expressed [defendants'] presumed opinion at the time that independence was in the best interest of MNC shareholders" and quoting *Stransky v. Cummins Engine Co., 51 F.3d 1329, 1333 n.9 (7th Cir. 1995)* for proposition that "'a company has no duty to update forward-looking statements merely because changing circumstances [*29] have proven them wrong'"). Neither party cited, nor did the Court find, any Sixth Circuit precedent directly on point.

Defendants further argue, and the Court agrees, that the Complaint does not allege any breach of a duty to update. The plain language of the allegation refers only to Defendants' lack of plans to increase spending as of the time of the Report and Letter. However, the Court will consider the merits of the claim for purposes of deciding whether an amendment would be futile.

In recognizing the duty to update, the Bomarko court relied on *Kirby v. Cullinet Software, Inc., 721 F. Supp. 1444 (D. Mass. 1989)*(mem. op.), which applied the duty

to update to the defendants' public growth rate projections *id. at 1450-51. See Bomarko, 848 F. Supp. at 1341.* Based on Bomarko, a decision from this district, this Court rejects Defendants' argument that the duty to update in the Sixth Circuit applies only to historical statements which a company later discovers to have been incorrect. n10

    n10 Several other courts have also recognized a duty to update forward-looking statements which were not misleading when made but which became misleading in light of subsequent events. See *In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1245 (3d Cir. 1989)*(holding that "a subsequent change of intention will not, by itself, give rise to a cause of action under Section 10(b) or Rule 10b-5," but "that in these circumstances [] one can fairly require [] that notice of a change of intent be disseminated in a timely fashion"); *Backman v. Polaroid Corp., 910 F.2d 10, 17 (1st Cir. 1990)*(agreeing "that, in special circumstances, a statement, correct at the time, may have a forward intent and connotation upon which parties may be expected to rely. If this is a clear meaning, and there is a change, correction, more exactly, further disclosure, may be called for"); *In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)*(agreeing "that a duty to update opinions and projections may arise if the original opinions or projections have become misleading as the result of intervening events" but holding that statements without "definite positive projections," such as predicted completion dates or the probability of a successful deal, did not require later correction).

[*30]

Plaintiffs allege several misrepresentations post-dating the 1993 Annual Report as evidence of Defendants' failure to correct their prior projections. (See, e.g., Ex. 361 at P 01-0006-002326, P 01-0006-002350 (showing in Board meeting documents "Current

Projected FY 1994" capital spending at $ 45 million for OTC/Vitamins and $ 21.975 for CSI as of 2/2/94, plus a transfer of $ 2.686 million in spending on personal care lines from the OTC/Vitamins capital plan to CSI's); Ex. 344 at P 01-0005-000542 (stating in Perrigo's Form 10-Q, dated 2/7/94, that "the Company's planned capital expenditures will require approximately $ 75,000[,000] during fiscal year 1994"); cf. UF P 369 (noting transfer between OTC/Vitamins and CSI plans); Schmiege Dep. Ex. 90 at P 01-0012-006070, UF Document App. vol. VI, tab 51 (listing downward planning adjustments Perrigo made in December 1993 and May 1994).)

Although Plaintiffs' capital expenditure allegation survived dismissal, this Court never held that such an omission, even if proven, would be material standing alone. This Court held only that "certain omissions alleged in the Complaint may be found to be material omissions--some singly and some [*31] only in combination with others listed." *Picard, 940 F. Supp. at 1124.* In light of the lack of evidence regarding any of the other alleged omissions that survived summary judgment, and in light of the general principle that lower capital expenditures increase earnings per share, the Court finds that Defendants' alleged failure to disclose the gradual decrease in planned expenditures from $ 72.792 million to $ 62.251 million was not material. "Where the disclosure duty arises from the combination of a prior statement and a subsequent event, which, if not disclosed, renders the prior statement false or misleading, the inquiries as to duty and materiality coalesce." *Time Warner, 9 F.3d 259 at 267.* Therefore, Defendants had no duty to update their projection, and amendment would be futile.

**5. "Perrigo's results for the first two quarters of 1994 had been artificially inflated due to increased revenues generated by sales promotions which had borrowed large amounts of sales from the last two quarters of fiscal 1994 and would result in Perrigo's profit growth in the second half of fiscal 1994 slowing materially." (Compl. P 74(a).)**

In support of this allegation, Plaintiffs rely [*32] primarily on evidence that promotion sales increased dramatically just before the secondary public offering, especially in comparison to fiscal year 1993, (SOE P 490; Ex. 212 at P 01-0008-008296), and that Defendants had spent 60%, or $ 8.215 million, of their promotions budget of $ 14 million by the middle of fiscal year 1994

(December 31, 1993), (SOE P 487).

Defendants rebut with evidence that they spent $ 1.7 million more on promotions in the second half of fiscal year 1994 (January 1-June 30, 1994) than during the first half. (Elgersma Aff. P 6, UF Document App. vol. I, tab 4; cf. UF PP 213-14.) Since Defendants were over-budget for the whole year, and since their spending was higher in the second half of the fiscal year than in the first, Plaintiffs' evidence is irrelevant. Plaintiffs have failed to create a genuine issue of material fact as to Defendants' "borrowing" of sales from the last half of fiscal year 1994 to inflate Perrigo's numbers for the offering.

**6. "Perrigo would not achieve any substantial profit growth due to increased sales in international markets, at least in the near term, as defendants knew that the major company with which they had stated they [*33] would enter those markets -- Wal-Mart -- had informed them that it preferred regional suppliers." (Compl. P 74(b).)**

Defendants argue that Plaintiffs abandoned this allegation by failing to discuss it in their response brief. (Defs.' Reply Br. at 39.) However, Plaintiffs' response brief submits "that the lack of any near-term international sales opportunities is an actionable omission to the extent described in § II.K.2." (Pls.' Resp. Br. at 71 n.57.) n11 Section II.K.2 cites the following evidence relating to international sales prospects.

> n11 At oral argument, Plaintiffs' attorney Mr. Kathrein made the following statement:
>
>> Let me address international, because I don't want you to think we're playing smoke with international. We agree that looking at everything they said about international, international was a long-term prospect. So we don't believe that international was an omission from the standpoint that they lied about international.

(4/24/98 Hr'g Tr. at 46.) Nevertheless, in the interest of clarity, the Court will address the evidence Plaintiffs presented in their briefs.

[*34]

In slide presentations to investors, Defendants listed international expansion under "Longer term emerging opportunities," separately from the more immediate growth opportunities of existing customers, traditional new products, and Rx to OTC switches. (See Ex. 138 at P 01-0006-002897.) The text of the presentation states that "We are starting today with research, we don't know which markets or how to address the individual markets in other parts of the world today. We need to do some research, get some background to understand how we should strategically approach those markets." (Id.) These statements rebut, rather than support, Plaintiffs' position because they show that Defendants explicitly disavowed any final plans to "achieve any substantial profit growth due to increased sales in international markets," (Compl. P 74(b)), rather than that Defendants failed to disclose a lack of prospects.

Plaintiffs also cite an analyst's report stating that expansion opportunities in international markets "are not reflected" in the report's EPS projections. (Ex. 181 at 4.) Again, rather than supporting Plaintiffs' allegation, this evidence shows that the market knew that Defendants [*35] had no definite international expansion plans.

Plaintiffs further offered evidence that Defendants knew that international sales would not contribute to the achievement of a 20%/30% growth rate. (See SOE PP 314-18.) However, in the absence of any evidence of affirmative misrepresentations as to international opportunities, and in light of the unrebutted evidence that Defendants actually disclosed a lack of international opportunities, this evidence is irrelevant.

### 7. Admission of Immateriality

Defendants further argue that through the testimony of Plaintiffs' expert, John Torkelson ("Torkelson"), Plaintiffs have admitted that:

> 1. None of the six alleged omissions, by itself, could be material.
>
> 2. At a bare minimum, plaintiffs must

prove both (1) that sales to main retail customers were declining ( # 15), and (2) that Perrigo had successfully encouraged customers to stockpile more inventory than they wanted ( # 13), in order to meet the materiality requirement of the federal securities laws.

> 3. Even if plaintiffs could prove all four of the remaining other alleged omissions, it would not be material unless plaintiffs can also prove both declining sales [*36] to main customers ( # 15) and stockpiling ( # 13).

(Defs.' Reply Br. at 20-21 (emphasis in original)(footnote omitted); see also Torkelson Dep. at 23, 25-26, Consolidated Document App. to Defs.' Reply Br. & Defs.' Resp. to SOE vol. II, tab 36.)

Defendants conflate statements of sufficiency with statements of necessity. Torkelson testified that he was opining on the six alleged omissions "only as a group together," not that his opinion was that the omissions could not be material if taken separately. (Torkelson Dep. at 23.) Likewise, Torkelson testified that, taken together, the declining sales and stockpiling omissions "would clearly be material," not that any combination lacking those two omissions would necessarily be material. (Id. at 26.) Lastly, Torkelson testified that "since some of the other statements are difficult to quantify at this time, I couldn't give you any other combinations other than those two and then the six taken together," not that no one could ever prove the materiality of other combinations. (Id.) Therefore, the Court would not grant summary judgment to Defendants on the alternative ground of Plaintiffs' alleged admission as to immateriality.

### [*37] 8. Lack of a Causation Allegation

Defendants also argue that the allegations of causation in paragraphs 93 to 96 of the Complaint are exclusive of the six remaining omissions in this case. They argue that those allegations thereby constitute a judicial admission that the six omissions did not cause Plaintiffs' loss. (See Defs.' Br. Supp. at 63-68; Defs.' Reply Br. at 15-19.) The Court disposed of this matter in its earlier opinion, where it held that "the Complaint clearly alleges that defendants' fraud caused plaintiffs' economic injury in its very first page." *Picard, 940 F.*

*Supp. at 1126.* Therefore, the Court would not grant summary judgment to Defendants on the alternative ground of Plaintiffs' admission as to causation.

**B. Analysis of Underwriters' Separate Motions for Summary Judgment on Separate Grounds**

Because Plaintiffs' claims against the Underwriter Defendants are premised upon some or all of the six omissions, the Underwriter Defendants are also entitled to summary judgment. However, the Underwriter Defendants have asserted grounds in support of their motions apart from the six omissions. Because of the current posture of this case, the Underwriters' [*38] "due diligence" defense to the § 11 and § 12(2) claims deserves separate consideration.

**1. Facts Regarding Underwriters**

Perrigo common stock was first offered for sale to the public in an initial public offering ("IPO") of eight million shares on December 16, 1991. An additional five million shares of Perrigo stock owned by certain shareholders were sold in a secondary offering on September 30, 1992 (the "1992 Offering"). Morgan Stanley and J.P. Morgan, both non-parties to this action, served as the lead underwriters in both the IPO and the 1992 Offering. On July 14, 1993, Perrigo announced a two-for-one stock split. On October 20, 1993, thirteen million shares of Perrigo stock owned by certain shareholders were offered for sale in the secondary offering which is the subject of this case.

The 1993 Offering was managed by J.P. Morgan, the lead manager, Morgan Stanley, and Defendants Smith Barney and Dean Witter. n12 In connection with the 1993 Offering, the Underwriters conducted a due diligence investigation of Perrigo. The Underwriters began their investigation with a base of knowledge about Perrigo and its operations which they had obtained through prior due diligence [*39] investigations for the IPO, the 1992 Offering, and other various matters. n13 The due diligence investigation was led by investment bankers Sarah Nash ("Nash") and Sharon Jacquet ("Jacquet") of J.P. Morgan. Nash had conducted due diligence investigations of Perrigo in connection with various projects since 1991. (Nash Dep. at 41, Ballard Aff. Ex. 21.) Jacquet had organized the due diligence investigation for the IPO as a team leader at Morgan Stanley and, after leaving Morgan Stanley to join J.P. Morgan, participated

extensively in the due diligence investigation for the 1992 Offering. (Jacquet Dep. at 19-22, Ballard Aff. Ex. 14.) n14 Ruth Porat ("Porat"), who left Morgan Stanley in June 1993 to join Smith Barney, also participated in the due diligence for the 1993 Offering. While at Morgan Stanley, Porat was involved in the due diligence investigation for both the IPO and the 1992 Offering. (See Porat Dep. at 26-27, Ballard Aff. Ex. 25.)

n12 In total, thirty-one United States underwriters and thirteen international underwriters participated in the 1993 Offering.

n13 Ruth Porat, an investment banker with Smith Barney who participated in the due diligence for the IPO, the 1992 Offering, and the 1993 Offering, described the use of information obtained from prior due diligence investigations as "piggybacking." (Porat Dep. at 26, Ballard Aff. Ex. 25.) In other words, information obtained from the IPO and the 1992 Offering was built on and updated in the due diligence process for the 1993 Offering to avoid duplication of efforts.

[*40]

n14 Jacquet testified that in the 1992 Offering, she

attended all the meetings[,] [] participated in the visits to the plants[,] [] participated in conference calls with customers[,] [] participated in conference calls and meetings with respect to drafting the registration statement, [] read significant quantities of documents, [] with respect to Perrigo, with respect to the market for their products, with respect to their customers and everything imaginable.

1998 U.S. Dist. LEXIS 11783, *40

(Jacquet Dep. at 22, Ballard Aff. Ex. 14.)

On September 15, 1993, the Underwriters held an "all hands" due diligence meeting to review "the operating and financial soundness of" Perrigo. (Nash Dep. at 42, Ballard Aff. Ex. 21.) The participants included representatives from each of the Underwriters, Perrigo management, Perrigo's outside counsel, Perrigo's outside accountants, and the Underwriters' counsel. The full-day meeting was conducted pursuant to an outline of questions prepared by J.P. Morgan that were addressed to specific members of Perrigo management. See Nash Dep. at 287-88; Due Diligence Meeting [*41] Agenda; Due Diligence - Topics for Discussion, Ballard Aff. Exs. 21, 54, 55.) Morgan Stanley also prepared its own list of questions for Perrigo management which was intended to supplement the issues raised by J.P. Morgan. (See Adams Dep. at 193-95; Morgan Stanley Sept. 13, 1993, Interoffice Mem., Ballard Aff. Exs. 1, 50.)

During the meeting, Perrigo's management addressed a variety of issues, including the effect of the cost of plastic on Perrigo's cost of goods sold, the change in accounting methods from LIFO to FIFO, switches from prescription to over-the-counter medications as a component of revenue growth, international market opportunities, levels of sales to key customers, and capital expenditure plans. (See Nash Dep. at 291-99; Jacquet Dep. at 57, 113-14, Ballard Aff. Exs. 21, 14.) The Underwriter participants also questioned Perrigo's management, its outside attorneys, and its outside auditors on a variety of other issues.

After the "all hands" meeting, the Underwriters continued their investigation by obtaining additional information and following up on issues that had not been fully addressed. For example, major customers were contacted, (see Nash Dep. at 289-90; [*42] Jacquet Dep. at 115-17, Ballard Aff. Exs. 21, 14) n15; information was obtained on an environmental issue, (Nash Dep. at 289, Ballard Aff. Ex. 21); and Perrigo provided more detailed information on its plans for capital expenditures for fiscal year 1994, (see Jacquet Dep. at 121, Ballard Aff. Ex. 14). The Underwriters continued to conduct their investigation through closing. (Adams Dep. at 359, Ballard Aff. Ex. 1.) Shortly before the closing, the Underwriters conducted a "bring down" due diligence conference call to confirm that no changes had occurred in Perrigo's financial or operating condition that affected the information obtained

during due diligence. By that time, all of the outstanding issues from the "all hands" due diligence meeting had been resolved. (Nash Dep. at 288, Ballard Aff. Ex. 21.) The Underwriters obtained written representations and warranties from Perrigo's management confirming that there had been no material changes in the company's financial condition as of the date of the closing, as well as comfort letters from Perrigo's outside counsel and auditors and from their own counsel.

> n15 Jacquet and Porat both testified that Perrigo customers were contacted in connection with the IPO and the 1992 Offering, which gave the Underwriters an existing base of knowledge about Perrigo's customers. (Jacquet Dep. at 23-24; Porat Dep. at 259-60, Ballard Aff. Exs. 14, 25.)

[*43]

During the months leading up to the 1993 Offering and for several months thereafter, the Underwriters published various reports covering Perrigo's stock. Morgan Stanley analyst Debra Levin ("Levin") covered Perrigo throughout most of 1993. In her coverage during the first half of 1993, Levin predicted that Perrigo's earnings per share ("EPS") for fiscal year 1994 would be $ 1.42, with earnings growth rate estimated at 30%. In August 1993, Levin revised her 1994 EPS prediction upward to $ 1.43 per share but reduced her earnings growth rate estimate to 25%. Levin increased her 1994 EPS estimate to $ 1.44 on August 23, 1993. n16 On November 12, 1993, after the commencement of 1993 Offering, Levin increased her 1994 EPS post-split estimate to $ 0.76 and her earnings growth rate estimate to 26% to reflect Perrigo's positive first quarter earnings announcement. Levin's predictions did not change until March 15, 1994, when she reduced her 1994 EPS estimate to $ 0.74 and her third quarter EPS estimate to $ 0.17 after Perrigo announced that third quarter sales and earnings estimates would not be met due to the abrupt ending of the cough and cold season. (Ex. 401.) Levin reduced her predictions [*44] again on May 10, 1994, when she cut her 1994 EPS number to $ 0.72 and her earnings growth rate estimate to 21%, after Perrigo announced less-than-expected third quarter results and slower growth rate prospects. Levin maintained a "buy" rating on Perrigo's stock throughout this period. (Ex. 493.) n17

1998 U.S. Dist. LEXIS 11783, *44

n16 These estimates were based on the pre-stock split number of shares. EPS estimates issued by analysts after August 23, 1993, reflected the post-stock split number of shares.

n17 The notes or reports by Levin at issue in this case are her August 23, 1993, report, March 15, 1994, research notes, and May 9, 1994, research note. See *Picard, 940 F. Supp. at 1128.*

J.P. Morgan analyst Carol Pope ("Pope") began her coverage of Perrigo stock during the first half of 1993. In a report dated May 12, 1993, Pope predicted that Perrigo would achieve 1994 EPS of $ 1.42. Pope did not revise her 1994 EPS forecast until November 12, 1993, when she issued a report following Perrigo's announcement of positive first quarter [*45] results, in which she increased her post-split 1994 EPS two cents to $ 0.75 and maintained her earlier 1995 prediction of $ 0.92. Pope subsequently revised her 1994 EPS predictions up from $ 0.75 to $ 0.76 on February 9, 1994, to reflect that Perrigo's second quarter results had exceeded her predictions by $ 0.01. She revised her third quarter EPS down from $ 0.19 to $ 0.17 and her 1994 EPS estimate down from $ 0.76 to $ 0.72 on March 15, 1994, after Perrigo's announcement regarding the abbreviated cough and cold season. Except for reports issued on January 6, 1994, and March 15, 1994, Pope's reports did not include sales and earnings growth rate predictions. n18 In those reports, Pope predicted sales and earnings growth rates of 20%/25% and 17.5%/25%, respectively. Pope also maintained a consistent "buy" rating on the stock.

n18 The notes or reports by Pope at issue in this case are her January 31, 1994, research note, March 15, 1994, research note, and April 29, 1994, research note. See *Picard, 940 F. Supp. at 1128.*

[*46]

Smith Barney analyst Joe Kozloff ("Kozloff") initiated coverage of Perrigo in a research note issued on August 26, 1993. In that note, Kozloff gave Perrigo's stock an "outperform" rating, predicted 1994 EPS at $ 0.73, and predicted future earnings growth rate of 25-30%. Kozloff increased his 1994 EPS predictions to $

0.75 in a published research note issued on January 31, 1994, in response to an article which questioned the value of Perrigo stock as well as the company's prospects for future growth. (See Ballard Aff. Ex. 100.) Kozloff reduced his 1994 EPS estimate to $ 0.73 in a March 14, 1994, note. Kozloff made his final revision to his 1994 EPS estimate in a May 10, 1994, research note to reflect negative third quarter earnings and muted future growth prospects announced by Perrigo. n19 Kozloff projected earnings growth rate of 25-30% in each of these reports.

n19 The Kozloff notes and reports at issue in this case are his August 26, 1993, research note. September 1, 1993, research report, January 31, 1994, research note, March 15, 1994, research note, and May 2, 1994, research note. See *Picard, 940 F. Supp. at 1128.*

[*47]

Dean Witter analyst Bill Steele ("Steele") did not initiate coverage of Perrigo until after the 1993 Offering commenced. In his first research note issued on November 9, 1993, Steele projected 1994 EPS to be $ 0.73 and estimated earnings growth rate of 26%. Steele subsequently revised his 1994 EPS prediction to $ 0.74 on November 18, 1994. Steele, like the other analysts, cut his 1994 EPS estimate by two cents in response to the March 1993 news from Perrigo about the abbreviated cough and cold season. n20 (See Steele Mar. 16, 1994, Research Note, Ballard Aff. Ex. 113.) Steele projected earnings growth rate of 26% in each of his reports.

n20 The Steele notes and reports at issue are his November 9, 1993, research report, November 18, 1993, research note, November 23, 1993, "Company Brief," and March 16, 1994, research note. See *Picard, 940 F. Supp. at 1128.*

## 2. Discussion of Due Diligence Defense

Plaintiffs allege claims against the Underwriter Defendants under § 11 and § 12(2), as amended, [*48] of the 1933 Act. Section 11 allows a person to sue certain

parties if a registration statement "contain[s] an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *15 U.S.C. § 77k(a)*. Section 12 imposes liability upon a person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." *15 U.S.C. § 77l(a)(2)*.

The Underwriter Defendants argue that they are entitled to summary judgment on Plaintiffs' § 11 and § 12(2) claims because they have established the due diligence defense as to both claims provided under §§ 77k(b)(3) and 77l(d)(2). The Underwriter Defendants contend that the undisputed evidence shows that their due diligence investigation met the standard required to establish the defense to both claims, that of the "reasonableness . . . required of a prudent man in the management of his own property." *15 U.S.C. § 77k(c)*.

[*49] **a. Due Diligence Standards**

The Underwriter Defendants may avoid liability under § 11 and § 12(2) by showing that they conducted a reasonable investigation and met the standards of due diligence. See *Phillips v. Kidder, Peabody & Co., 933 F. Supp. 303, 323 (S.D.N.Y. 1996)*(mem. op.), aff'd, *108 F.3d 1370 (2d Cir. 1997)*. A defendant who relies on the due diligence defense to a claim under § 11 must show that "after reasonable investigation, [he had] reasonable ground to believe and did believe . . . that the statements [] were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements [] not misleading." *15 U.S.C. § 77k(b)(3)*; see also *Dannenberg v. PaineWebber Inc. (In re Software Toolworks Inc. Sec. Litig.), 50 F.3d 615, 621 (9th Cir. 1994)*; cf. *Picard, 940 F. Supp. at 1131*. The standard of due diligence under § 12(2) requires a defendant to show "he did not know, and in the exercise of reasonable care could not have known, of [the] truth or omission." *15 U.S.C. § 77l(a)(2)*. Both standards are "similar, if not identical." *Toolworks, 50 F.3d at 621*. The standard is essentially [*50] one of negligence. *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 208, 96 S. Ct. 1375, 1388, 47 L. Ed. 2d 668 (1976)*. The issue of reasonableness may, in appropriate cases, be resolved on summary judgment. *Toolworks, 50 F.3d at 621*.

Plaintiffs argued at length in their written and oral presentations that the Court must measure the reasonableness of the Underwriter Defendants' investigation against the five factors set forth by the Sixth Circuit in *Davis v. Avco Financial Services, Inc., 739 F.2d 1057 (6th Cir. 1984)*. n21 Based upon its review of *Davis*, the Court concludes that the factors identified in that case, n22 while potentially relevant to the consideration of whether a defendant has established the due diligence defense in a given case, are not by themselves determinative of the issue. Rather, the ultimate question is whether the defendant performed a reasonable investigation and had a reasonable belief that the information regarding the offering was true and accurate. See *Toolworks, 50 F.3d at 621; Eichenholtz v. Brennan, 52 F.3d 478, 485 (3d Cir. 1995)*. This standard requires examination of the steps taken by the Underwriters to ensure that the offering [*51] documents contained no material misrepresentations or omissions. See, e.g., *Phillips, 933 F. Supp. at 318-19* (reviewing due diligence steps taken by underwriter); In re Int'l Rectifier Sec. Litig., No. CV91-3357-RMT(BQRX), *1997 WL 529600*, at *8 (C.D. Cal. Mar. 31, 1997)(identifying and applying factors determining "reasonableness" of investigation).

n21 The Underwriter Defendants argue that Davis was completely overruled by the Supreme Court's decision in *Pinter v. Dahl, 486 U.S. 622, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988)*. Plaintiffs acknowledge that Pinter overruled Davis to the extent that it rejected the "substantial factor" test employed by the Sixth Circuit in Davis to determine whether a defendant is an "offeror" or "seller" potentially liable under § 12(1) and § 12(2), see *Pinter, 486 U.S. at 654, 108 S. Ct. at 2082*, but contend that Pinter left intact the due diligence standard set forth in Davis. For purposes of this motion, the Court will assume that Pinter did not overrule the portion of Davis regarding due diligence factors.

n22 The court identified the following factors as "pertinent to an analysis" of whether a defendant has established the "due diligence" defense:

(1) the quantum of decisional (planning) and facilitative (promotional) participation, such as designing the deal and contacting and attempting to persuade potential purchasers, (2) access to source data against which the truth or falsity of representations can be tested, (3) relative skill in ferreting out the truth . . . , (4) pecuniary interest in the completion of the transaction, and (5) the existence of a relationship of trust and confidence between the plaintiff and the alleged "seller."

*739 F.2d at 1068.*

[*52]

**b. Due Diligence Investigation**

The Underwriter Defendants have presented substantial evidence demonstrating the extent of the investigation which they performed in connection with the 1993 Offering. The starting point of the investigation was the substantial base of knowledge about Perrigo's financial and operating condition that the Underwriter Defendants' personnel had acquired through their involvement in the due diligence investigations for the IPO, the 1992 Offering, and other financing projects. Personnel from the Underwriter Defendants who did not have prior experience with Perrigo familiarized themselves with the company by reviewing various SEC documents, annual reports, and research pieces written by analysts. (See Adams Dep. at 28-30, Ballard Aff. Ex. 1.) The Underwriters held a day-long "all hands" due diligence meeting at which they questioned Perrigo management about a number of topics, including levels of sales to customers, capital expenditure plans, switches from Rx to OTC, and international market opportunities. During the meeting, the Underwriters also questioned Perrigo's outside accountants about various financial matters, including the effect of [*53] Perrigo's switch from the LIFO to FIFO system of accounting on Perrigo's financial statements.

In the course of their investigation, the Underwriters also reviewed Perrigo's internal growth plan, (see Jandernoa Dep. at 319-24, Ballard Aff. Ex. 15), as well as Perrigo's internal sales and earnings projections. (Jacquet Dep. at 133-35, Ballard Aff. Ex. 14.) The Underwriters also contacted Perrigo's major customers, inspected Perrigo's facilities, and reviewed various sources of information regarding Perrigo and its industry. They reviewed drafts of the Prospectus for accuracy and relayed any suggested changes or revisions to management. Finally, the Underwriters obtained written representations from Perrigo that neither the Prospectus nor the Registration Statement contained any misstatements or omissions as of the date of the closing and obtained comfort letters from Perrigo's outside counsel and outside auditors and from the Underwriters' counsel. Based upon this evidence, the Court concludes that the Underwriters conducted a reasonable investigation and had a reasonable basis to believe, and did believe, that neither the Registration Statement nor the prospectus contained any [*54] material misstatement or failed to state a material fact.

Plaintiffs contend that the inability of certain witnesses to recall specific details of the due diligence investigation undercuts the Underwriter Defendants' evidence supporting their due diligence defense and creates an issue for the jury. Plaintiffs have cited numerous instances in which the Underwriter Defendants' investment bankers testified in their depositions that they could not recall specific discussions or events that occurred during the due diligence investigation. (See, e.g., Nash Dep. at 289-90 (failing to recall who contacted Wal-Mart and who at Wal-Mart was contacted); Jacquet Dep. at 114-15 (failing to recall being advised that sales to Eckerd had been declining, that sales to Kroger had been declining, and whether Perrigo's top ten customers during the 1992 Offering were also the top ten customers during the 1993 Offering), Pls.' App. Dep. Tr.)

Plaintiffs contend that while the Underwriter Defendants have presented evidence of what they intended to do and the questions they intended to ask during their "all hands" meeting or other tasks they intended to perform, the investment bankers' inability to recall [*55] specific questions that were asked or

1998 U.S. Dist. LEXIS 11783, *55

answers that were given renders their defense insufficient. This Court believes, however, that common everyday experience teaches us that very few persons, if any, can, after three or four years, recall the details of lengthy meetings. This judge has difficulty remembering the details of trials that occurred some months ago and must refer to transcripts. Attorneys order transcripts because they cannot, and are not expected to, recall the details of every argument and every bit of testimony. Based upon their individual differences in life, jurors often recall and forget different aspects of a trial that has just concluded. People with J.D.'s and M.D.'s, and maybe even Ph.D.'s, forget where they have parked their cars when returning from even fairly short trips by airplane. Despite these common shortcomings, the Underwriter Defendants have presented substantial evidence showing that they conducted an extensive inquiry into Perrigo's affairs. (See, e.g., Nash Dep. at 41-43, 353-54 (discussing her role in leading "all hands" meeting and indicating that all questions on outline were covered, including items that came up as a result of management's [*56] answers); Adams Dep. at 214-15 (testifying that Jandernoa addressed all of the issues presented "and more" and that some topics were covered in management's presentation and others were covered through questions asked by participants); Adams Sept. 15, 1993, meeting notes, Ballard Aff. Exs. 1, 21, 56.) This evidence, which is uncontradicted, adequately supports the Underwriter Defendants' assertion that they conducted a thorough investigation in connection with the 1993 Offering. Thus, Plaintiffs' argument that the investment bankers' inability to recall every detail of their investigation precludes summary judgment is without merit.

### c. Red Flags

Plaintiffs have also presented evidence which they allege should have alerted the Underwriters to the need for a further investigation. The Court has already found with respect to the Perrigo Defendants' Motions that Plaintiffs have failed to present any evidence to support the existence or materiality of the six omissions. Because Plaintiffs have failed to present evidence on the six omissions, the Plaintiffs' contention that the Underwriters should have discovered the existence of those omissions is without merit.

### Conclusion [*57]

For the foregoing reasons, the Court will grant summary judgment to both the Perrigo Defendants and the Underwriter Defendants on the six alleged omissions which survived dismissal in this Court's July 1996 Opinion. The Court will address by separate Opinion and Order Plaintiffs' request for leave to file a Second Amended Complaint alleging that Defendants' knowledge of internal projections, the need for acquisitions, and declining sales and profit growth rates made their belief in publicly projected growth rate figures unreasonable and undermined the factual basis for those projections.

An Order consistent with this Opinion will be entered.

Dated: JUN 15 1998

GORDON J. QUIST

UNITED STATES DISTRICT JUDGE

**A. 42**

LEXSEE 2003 U.S. DIST. LEXIS 8114

**POSITRAN MANUFACTURING, INC., Plaintiff/Counter-Defendant, v. DIEBOLD, INC., Defendant/Counter-Claimant.**

**C.A. No. 02-466 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 8114*

**May 15, 2003, Decided**

**DISPOSITION:** [*1] Diebold's Motion for Relief from Intentional Destruction of Evidence GRANTED; Positran's Motion to Exceed Its Answering Brief Page Limit declared MOOT.

**COUNSEL:** For Positran Manufacturing Inc, PLAINTIFF: William D Sullivan, Elzufon Austin Reardon Tarlov & Mondell, PA, Wilmington, DE USA.

For Diebold Inc, DEFENDANT: Frederick L Cottrell, III, Thomas Henry Kovach, Richards, Layton & Finger, Wilmington, DE USA.

For Diebold Inc, COUNTER-CLAIMANT: Frederick L Cottrell, III, Thomas Henry Kovach, Richards, Layton & Finger, Wilmington, DE USA.

For Positran Manufacturing Inc, COUNTER-DEFENDANT: William D Sullivan, Elzufon Austin Reardon Tarlov & Mondell, PA, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On May 31, 2002, the plaintiff, Positran Manufacturing Inc. ("Positran"), filed the above-captioned action asserting claims for breach of contract. In response, the defendant, Diebold, Inc. ("Diebold") has asserted counterclaims for breach of contract, fraud, and unjust enrichment. A two-day bench trial is scheduled to begin on June 16, 2003.

Presently before [*2] the court is Diebold's motion for relief from Positran's allegedly intentional destruction of evidence. For the following reasons, the court will grant Diebold relief, albeit not in the requested form.

### II. BACKGROUND

In the first count of its counterclaim, Diebold asserts that Positran failed to make payments to Mosler as they became due for goods tendered by Mosler under its agreement with Positran. n1 Positran, however, argues that this obligation was "canceled out" under a supposed oral agreement between it and Mosler to "net" that obligation against amounts Mosler allegedly owed to Positran.

> n1 Diebold subsequently purchased Mosler's assets and accounts-receivable, including the roughly $ 1.3 million account-receivable against Positran.

Diebold now contends that, while its discovery requests were pending, and just days before his deposition, Positran's Vice-President, Joseph Uhl ("Uhl"), intentionally destroyed relevant evidence. Specifically, Diebold alleges that Uhl destroyed his handwritten [*3] notes which set forth his contemporaneous account of events that are the subject of both Positran's claim and

2003 U.S. Dist. LEXIS 8114, *3

Diebold's counterclaim. This fact is not in contention because, at his July 11, 2002 deposition, Uhl admitted that, just before his deposition, he did, in fact, throw away his handwritten notes.

Diebold alleges that the destroyed notes reflected communications between Positran and Mosler regarding Mosler's product orders to Positran. According to Diebold, these communications are crucial to the issue of the scope of the implied license to make Mosler goods. Diebold further alleges that the destroyed notes contained information on the Positran-Diebold negotiations that led to the agreement upon which Positran bases its "netting" claim.

Additionally, Diebold maintains that, not only did Uhl destroy documents, he fabricated a typewritten document which was subsequently produced to Diebold in discovery. Uhl then falsely testified that the document was a verbatim, typed version of the destroyed handwritten notes. In support of its contention that this document is fraudulent, Diebold points to the following testimony taken from Uhl at his July 11, 2002 deposition. At that deposition, [*4] Uhl stated that the only documents to which he referred in creating the typed document were the handwritten notes that he destroyed. He further testified that the only difference between the documents is that, whereas the destroyed documents were handwritten, the produced document is typewritten.

Upon closer inspection of the produced document, however, Diebold noticed that it duplicates, often verbatim, excerpts from Positran's complaint. Additionally, while Uhl stated that his handwritten notes did not refer to exhibits, the typed document does refer to exhibits. Those exhibit references in turn exactly match the exhibit references in Positran's complaint.

## III. DISCUSSION

A party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit. *See, e.g., Howell v. Maytag, 168 F.R.D. 502, 505 (M.D. Pa. 1996)* (citing *Baliotis v. McNeil, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994)); accord Shamis v. Ambassador Factors Corp., 34 F. Supp.2d 879, 888-89 (S.D.N.Y. 1999)* (asking whether the party "knew or should have known that the destroyed evidence was relevant [*5] to pending, imminent, or reasonably foreseeable litigation"); *Bass v. GMC, 929 F. Supp. 1287, 1288 (W.D. Mo. 1996)* (same). A party who

breaches this duty by destroying relevant evidence or by allowing relevant evidence to be destroyed may be sanctioned by the court. *See, e.g., Howell, 168 F.R.D. at 505; accord TeleCom Intn'l Am. Ltd. v. AT&T Corp., 189 F.R.D. 76, 81 (S.D.N.Y. 1999)*. When this destruction is willful or in bad faith and intended to prevent the other side from examining the evidence, the court may impose the most severe sanction of them all--the outright dismissal of a claim or the entry of a default judgment. *See Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 74 (S.D.N.Y. 1991)* ("The even harsher sanction of default [or dismissal] may be imposed as a sanction for the intentional destruction of evidence if the party seeking the evidence has been severely prejudiced and no lesser sanction is adequate."); *accord TeleCom, 189 F.R.D. at 81* (noting that the sanction of dismissal is a "drastic remedy" which should be imposed only in "extreme circumstances," such as [*6] when a party wilfully destroys evidence or otherwise acts in bad faith) (relying on *West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)); Baliotis, 870 F. Supp. at 1289* ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only 'if no alternative remedy by way of a lesser, but equally efficient, sanction is available.'") (citations omitted).

When determining whether to impose sanctions for the spoliation of evidence, the court must consider the following three factors:

> (1) the degree of fault and personal responsibility of the party who destroyed the evidence;
>
> (2) the degree of prejudice suffered by the other party; and
>
> (3) the availability of lesser sanctions which would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the same type of conduct in the future.

*See Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994); accord Indemnity Ins. Co. of N. Am. v. Liebert Corp., 1998 U.S. Dist. LEXIS 9475, 1998 WL*

*363834, at * 3 (S.D.N.Y. June 29, 1998)* [*7] .

As the *Schmid* court emphasized, when determining the degree of fault and personal responsibility attributable to the party that destroyed the evidence, the court must consider whether that party intended to impair the ability of the other side to effectively litigate its case. *13 F.3d at 80; see also Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995)* ("It must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."); *accord Collins v. Throckmorton, 425 A.2d 146, 150 (Del. 1980)* ("Where a litigant intentionally suppresses or destroys pertinent evidence, an inference arises that such evidence would be unfavorable to his case.").

In addition, when considering the degree of prejudice suffered by the party that did not destroy the evidence, the court should take into account whether that party had a meaningful opportunity to examine the evidence [*8] in question before it was destroyed. *See Thiele v. Oddy's Auto & Marine, Inc., 906 F. Supp. 158, 162 (W.D.N.Y. 1995)*. As the *Thiele* court explained, when one side is completely deprived of the opportunity to inspect the evidence because it was destroyed after the other side had a chance to examine it, sanctions for spoliation are generally appropriate. *Id. at 162-63* ("Without any ability to examine the boat, [the third-party defendant] will be greatly frustrated in its ability to defend its case. Since [the plaintiff] is plainly at fault for allowing the boat to be placed in a landfill, any claims against [the third-party defendant] must be dismissed."); *see also Baliotis, 870 F. Supp. at 1290-91* ("At a minimum ... an opportunity for inspection should be afforded ... before relevant evidence is destroyed.").

In the present case, it is clear that Uhl's destruction of his notes reflects an extreme degree of fault and personal responsibility. Indeed, he admits that he personally destroyed his contemporaneous account of events that are, at a minimum, relevant to the central issues in this case. Further, he destroyed the evidence, [*9] not before litigation ensued, but rather, months after Diebold served document requests in a related case, a month after Positran filed its complaint in the present case, and mere days before his own deposition. On these

facts, Positran cannot credibly claim that Uhl was unaware of his obligations.

More disturbing still, Positran now attempts to explain the similarities between Uhl's typewritten document and its complaint by arguing that the typewritten document is verbatim only to the extent that portions of the information were taken from Uhl's handwritten notes. Positran further explains that Uhl may have also referred to other documents in preparing his typewritten notes. Thus, Positran's explanation is basically that some of the typewritten document is a verbatim transcript of Uhl's handwritten notes, but not necessarily all of it reflects his notes. Moreover, although Uhl himself denied having referred to outside documents at his April 16, 2003 deposition, Positran takes the position that he was "intimidated" during the questioning, and was thus incorrect on this point.

While the problems with Positran's explanation are manifold, the court need only address one to make its [*10] point. Assuming that Positran's version is correct, this position merely exacerbates the problem because it makes it even less clear whether the typed document bears any resemblance to Uhl's handwritten notes. Neither the court, nor Diebold, can know what Uhl culled from his notes, what he pulled from other sources, and what may have been destroyed in notes he ultimately omitted from the typewritten document.

Likewise, because Diebold has no means of determining what Uhl's contemporaneous notes described, the prejudice to Diebold is not insignificant. There is no question that Diebold did not have the opportunity to examine Uhl's notes prior to their destruction. Additionally, Diebold has presented evidence that the information in Uhl's handwritten document would have been relevant to its case. For instance, focusing just on the May 7, 2001 entry in Uhl's typed document, the meeting that day allegedly related to a "credit hold," Positran's refusal to ship products, a production cut-back, quality issues, and a possible account "netting" arrangement. These are all issues in the present case and in its related companion case. Instead of Uhl's contemporaneous notes of this meeting, however, [*11] Diebold is left with Positran's assurance that Uhl completely and accurately transcribed all of his notes from that meeting. Moreover, Uhl's actions have deprived Diebold of the opportunity to use a contemporaneous record to cross-examine Positran's representative to

Case 1:99-cv-00371-GMS    Document 321-8    Filed 10/09/2006    Page 42 of 42

Page 4
2003 U.S. Dist. LEXIS 8114, *11

determine what really occurred. Thus, given Positran's own inability to coherently and consistently explain what the typewritten document actually consists of, the court is compelled to conclude that Diebold has suffered prejudice through the loss of the handwritten document.

In light of the circumstances surrounding Uhl's destruction of his notes, the unavoidable inference is that the notes would have been helpful to Diebold's case. The court does not, however, believe that Diebold's requested sanction of dismissal is warranted in this case. Diebold has not argued that Uhl's handwritten notes are the only evidence available to prove its claims and adequately defend itself. Thus, while a sanction is clearly warranted, dismissal would be unjustly harsh. The court will, therefore, impose a "spoliation inference" in this case. This inference will allow the trier of fact, in this case, the court, to assume the destroyed evidence [*12] would have been unfavorable to the offending party. Such a sanction is sufficient to avoid substantial unfairness to Diebold, while at the same time serving as a deterrent to

Positran, as well as other future litigants who may consider engaging in similar dilatory tactics.

## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Diebold's Motion for Relief from Intentional Destruction of Evidence (D.I. 25) is GRANTED.

2. Positran's Motion to Exceed Its Answering Brief Page Limit (D.I. 44) is declared MOOT.

Dated: May 15, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE