A. 43

Case 1:99-cv-00371-GMS    Document 321-9    Filed 10/09/2006    Page 1 of 15

LEXSEE 1990 US DIST LEXIS 18394

**WILLIAM B. WEINBERGER, on behalf of himself and all others similarly situated, Plaintiff, v. DAVID JACKSON, et al., individually and as representative of a defendant underwriter class, Defendants**

No. C-89-2301-CAL

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*1990 U.S. Dist. LEXIS 18394; Fed. Sec. L. Rep. (CCH) P95,693*

October 11, 1990, Decided
October 12, 1990, Filed

**JUDGES:** [*1]

Charles A. Legge, United States District Judge.

**OPINION BY:**

LEGGE

**OPINION:**

ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Defendants have moved for summary judgment or partial summary judgment. The motions and oppositions were supported by extensive fact records, and were argued and submitted for decision. The court has reviewed the record of the case, the moving and opposing papers, the fact records, and the applicable authorities.

The court concludes that summary judgment on some claims should be granted and some denied. This order will discuss those claims as to which this court believes there is no genuine issue of material fact and summary judgment or partial summary judgment should be entered. The motions for summary or partial summary judgment on all other claims are denied.

I.

Upon reviewing the earlier rulings on motions to dismiss and motions for summary judgment made by Judges Ingram and Aguilar, this court concludes that the following are the causes of action remaining in the case before the rulings made below: (1) Section 11 of the Securities Act; (2) Section 12(2) of the Securities Act. The Section 11 and Section 12(2) claims are based upon alleged false statements or omissions in the offering [*2] materials. (3) Section 10(b) of the Exchange Act and Rule 10(b)5, concerning alleged false statements or omissions in the offering materials, press releases, and "road shows." (4) California Corporations Code Section 25400.

The alleged false statements or omissions concern three subject matters: (1) Whether the 586 series and the 6800 series of products were shipped in quantity in November 1982. (2) Whether the statement in the prospectus that software was currently available for Altos' products was correct. (3) Whether defendants projected sales, particularly for fiscal year 1983, were actionably misleading.

II.

It is undisputed that defendants represented to the brokerage community that Altos would have projected gross revenue of eighty-five to ninety million dollars for fiscal year 1983. Plaintiffs contend that shortly before and shortly after the public offering, defendants were aware that Altos would not make that earnings projection. In fact, the company's gross revenue for fiscal year 1983

1990 U.S. Dist. LEXIS 18394, *2; Fed. Sec. L. Rep. (CCH) P95,693

Page 2

was seventy-five million dollars.

Plaintiffs also complain that at the "road show" presentations defendants showed a chart of Altos' past net sales for fiscal years 1978 through 1982, demonstrating [*3] that earnings had more than doubled each year. However, that presentation was an accurate statement of historical information. There was no representation that the doubling of revenue each year would continue. And the investment community was advised that anticipated 1983 revenues would be in the seventy-five to ninety million dollar range, less than a doubling of the fifty-one million dollars of net sales for the prior fiscal year.

The projection of gross revenue for fiscal year 1983 was not a part of the prospectus or otherwise distributed to the investing public. Whether such projections are actionable misrepresentations is to be judged under the standard of 10(b). The Ninth Circuit's latest consideration of this issue is in *In re Apple Computer Securities Litigation, 886 F.2d 1109 (9th Cir. 1989)*. The Ninth Circuit said that a projection or expression of optimism is not actionable if (1) the statement was genuinely believed, (2) there was a reasonable basis for the belief, and (3) that the speaker was not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement (p. 1113).

This court believes that there is no genuine issue of material fact [*4] on the application of that standard to this case. The eight-five to ninety million dollar projection was reasonable and was genuinely believed. The company was constantly engaged in preparing and revising budgets, including sales estimates. In June 1982, the company projected revenue for fiscal year 1983 of 98.5 million. Company personnel examined that budget and believed that it was reasonable after assessing it against various factors. At the end of each quarter, the company reviewed the accuracy of the revenue estimates and revised its projections for future quarters. The company revised its 1983 fiscal year estimate downward to the eighty-five to ninety million range later in 1982, after considering the financial results for the quarter ending September 1982, and the production and sales plans of management. The company re-estimated in early January 1983 that its revenues would be in the seventy-two to seventy-eight million dollar range, after some difficulties with shipments in November and December and a power outage in December of 1982 --- all after the issuance of the prospectus.

Plaintiffs attempt to demonstrate a genuine issue of material fact by pointing to certain memos [*5] and testimony concerning a possible future slow down in gross sales in relation to budgets. However, the court does not believe that they show a genuine issue of material fact, or that they "seriously undermine the accuracy" of the projections. Such conservative statements internally, and to Altos' bank, were simply an ongoing part of the company's continuing analysis of its sales and budgets. That process is necessarily flexible, constantly changing, and an attempt by many persons to predict the future. Opinions about the future necessarily vary as various elements come into focus, fade from importance, and are replaced by other considerations. Management, particularly those in positions of financial control, would not be doing their job if they did not caution the company's senior management and board about the possibility of results being less favorable than some anticipated. But such statements and opinions are merely factors in the company's management evaluating its position and making projections on behalf of the company.

This court therefore concludes that the earnings projection was genuinely believed, that there was a reasonable basis for the belief, and that the company [*6] was not aware of any undisclosed facts tending to undermine the accuracy of the projection. The court also notes that the actual result of seventy-five million dollars of gross revenue was not far from the projection.

Summary judgment is therefore granted in favor of defendants and against plaintiffs on the claim of alleged misrepresentations with respect to sales projections.

III.

The underwriter defendants seek summary judgment on all claims against them.

A.

They contend that under section 11 they conducted a reasonable investigation and met the required standard of due diligence. Under section 12(2), they assert that they had no knowledge of any misrepresentations or omissions and exercised reasonable care. The standards under sections 11 and 12(2) are essentially the same in the context of this case. *Sanders v. John Nuven & Co., 619 F.2d 1222 (7th Cir. 1980)*.

Case 1:99-cv-00371-GMS   Document 321-9   Filed 10/09/2006   Page 4 of 15

1990 U.S. Dist. LEXIS 18394, *6; Fed. Sec. L. Rep. (CCH) P95,693

Page 3

After reviewing the record, this court concludes that there is no genuine issue of material fact that the underwriters did meet the standards required of them by section 11 and section 12(2). Their investigation of Altos was conducted primarily by the managing underwriters. It was conducted by experienced people, who [*7] were assisted by attorneys and accountants. The underwriters reviewed the industry, the company, the company's management, and the company's past and projected manufacturing, sales and financial performance. The underwriters had over twenty meetings with various management personnel, covering all aspects of the company's business. Company personnel were specifically questioned about the development and scheduled availability of products, related operating systems and applications software. The underwriters also contacted many of Altos' suppliers, customers, and distributors, who were asked extensive questions about the company's operations. The underwriters reviewed company documents including operating plans, product literature, corporate records, financial statements, contracts, and lists of distributors and customers. They examined trade journals and other industry-related publications to ascertain industry trends, market trends and competitive information. They also made physical inspections of the company's facilities. When any negative or questionable information was developed as a result of their investigation, the underwriters discussed it with the appropriate persons and arrived [*8] at informed decisions and opinions. The underwriters also obtained written representations from the selling stockholders and the company that as of the closing date of the public offering, there were no misstatements or omissions.

As a result of that investigation and due diligence, the underwriters reasonably believed the accuracy of the information contained in the prospectus, including the information alleged to be misrepresented or omitted here. The underwriters had no knowledge of any misrepresentations or omissions, and their work met the standards of due diligence and reasonable investigation required by sections 11 and 12(2). Summary judgment is therefore granted to the underwriter defendants and against plaintiffs on the section 11 and section 12(2) claims.

B.

The underwriters also seek summary judgment on the 10(b) claims because of the absence of scienter as to the alleged misrepresentations about product shipments in November 1982 and the availability of software. As stated, the underwriters did a diligent investigation on all aspects of the company's business, including those subjects alleged to be misrepresented or omitted.

The underwriters focused on the scheduled [*9] shipment dates of the company's products. Plaintiffs argue that the underwriters saw certain weekly status summary reports from which they should have been aware that the scheduled shipments for November and December were going to be slow. However, "should have been aware" is not the standard, and the underwriters can be liable under section 10(b) only if their misconduct rose to a level of recklessness; Apple, p.1117; Hollings v. Titan, F.2d (9th Cir. 1990). The underwriters did focus on the issue, made diligent inquiries, and evaluated the information which they received. Their actions could not be held to be "reckless."

The underwriters did receive some information which indicated that the company's products might have some difficulties with respect to software. However, again the underwriters did make inquiries on that negative subject, discussed it with the appropriate people, and arrived at reasonable judgments. That level of inquiry cannot be called "reckless."

Summary judgment will therefore be granted in favor of the underwriters on the motion 10(b) claims.

IV.

Defendant Valentine was an outside director. The only cause of action now pending against him is under [*10] section 11.

Section 11(b)(3) provides the so called "due diligence" defense. That is an affirmation defense which requires that a defendant show that "he had, after reasonable investigation, reasonable ground to believe and did believe" that there were no material misstatements or omissions. Section 11(c) imposes the measure of "reasonableness" as that of a reasonably prudent person managing his own property. Valentine's motion for summary judgment contends that there is no genuine issue of material fact but that he met those standards. This court agrees.

Since Valentine was an outside director, he was not obliged to conduct an independent investigation into the

Case 1:99-cv-00371-GMS    Document 321-9    Filed 10/09/2006    Page 5 of 15

1990 U.S. Dist. LEXIS 18394, *10; Fed. Sec. L. Rep. (CCH) P95,693

Page 4

accuracy of all the statements contained in the registration statement. He could rely upon the reasonable representations of management, if his own conduct and level of inquiry were reasonable under the circumstances. He was reasonably familiar with the company's business and operations. He regularly attended board meetings at which the board discussed every aspect of the company's business. And he reviewed the company's financial statements. He was familiar with the company's development of its new product lines. He was involved [*11] with various company decisions. He reviewed six drafts of the registration statement and saw nothing suspicious or inconsistent with the knowledge that he had acquired as a director. And he discussed certain aspects of the registration statement with management.

With respect to the alleged misrepresentations about shipment of the lines of products, he could not reasonably have noticed any ambiguity in the phrase "in quantity" in light of his understanding of the company's business and its practice of increasing production from the time a new model is first introduced. With respect to alleged misrepresentations regarding the availability of software, Valentine knew what the prospectus stated, that is, that software was provided by outside vendors, and that application software might not be available for new models when they are first introduced.

Plaintiffs argue that Valentine did not make specific inquiries of the company's management with respect to the representations contained in the prospectus. But he had no duty to do so as long as the prospectus statements were consistent with the knowledge of the company which he had reasonably acquired in his position as director. He was also [*12] given comfort by the fact that the prospectus and the information in it were reviewed by underwriters, counsel and accountants. This met the standards of due diligence and reasonable inquiry. See *Laven v. Flanagan*, 695 F. Supp. 800 (D.C. N.J. 1988); *Goldstein v. Alodex Corp.*, 409 F. Supp. 1201 (E.D. Pa. 1976); compared with *Escott v. Bar Chris*, 283 F. Supp. 643 (S.D. N.Y. 1968).

Judgment should therefore be granted in favor of defendant Valentine and against plaintiffs.

V.

Defendants also seek partial summary judgment to the effect that no class member who sold his Altos shares at a price of $ 21 or above may recover damages under section 11(e). This court does believe from the briefs that plaintiffs seriously contest this. And indeed that result is consistent with the language of section 11(e). Partial summary judgment is therefore granted in favor of defendants and against those class members who sold their Altos shares at a price of $ 21 or above, for purposes of their claims under section 11.

VI.

Defendants have also moved for summary judgment on the following issues: The prospectus statements about the November shipments of the 586 and the 6800 lines were not misrepresentations; [*13] the prospectus statements regarding the availability of software were not misstatements; the materiality of the alleged misstatements; causation resulting from the alleged misstatements; damages resulting from the alleged misstatements; and scienter under section 10(b). This court has examined the fact record on each of these issues and concludes that plaintiffs have established sufficient evidence to show genuine issues of material fact. Summary judgment on those issues is therefore denied.

The court notes, however, that there does not appear to be any direct evidence in the present record of "leakage" in December 1982 and January 1983. If plaintiffs are unable to offer any further evidence on this claim, the court may deny admissibility of plaintiffs' present evidence on that issue.

The court does not understand that defendants have moved for summary judgment on the claims under the California Corporations Code.

VII.

The case is presently set for trial on February 25, 1991. A status conference will be held on October 26, 1990, at 11:00 a.m. to consider whether the trial date might be accelerated (which presently appears unlikely from this court's calendar), and to set a date [*14] for the pretrial conference and whatever other dates the parties believe are necessary.

IT IS SO ORDERED.

A. 44



Not Reported in So.2d
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

Page 1

Briefs and Other Related Documents
Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co., Inc.Fla.Cir.Ct.,2005.Only the Westlaw citation is currently available.
Florida Circuit Court, Fifteenth Judicial Circuit, Palm Beach County..
COLEMAN (PARENT) HOLDINGS, INC.,
Plaintiff,
v.
MORGAN STANLEY & CO., INC., Defendant.
No. 502003CA005045XXOCAI.

March 1, 2005.

*ORDER ON COLEMAN (PARENT) HOLDINGS, INC.'S MOTION FOR ADVERSE INFERENCE INSTRUCTION DUE TO MORGAN STANLEY'S DESTRUCTIONS OF E-MAILS AND MORGAN STANLEY'S NONCOMPLIANCE WITH THE COURT'S APRIL 16, 2004 AGREED ORDER, AND MOTION FOR ADDITIONAL RELIEF AND ORDER ON PLAINTIFF'S MOTION TO COMPEL FURTHER DISCOVERY REGARDING MORGAN STANLEY'S DESTRUCTION AND NON-PRODUCTION OF E-MAILS*

MAASS, J.

**\*1** THIS CAUSE came before the Court on February 14, 2005 on Coleman (Parent) Holdings, Inc.'s ("CPH's") Motion for Adverse Inference Instruction Due to Morgan Stanley's Destruction of E-Mails and Morgan Stanley's Noncompliance with the Court's April 16, 2004 Agreed Order, as modified by CPH's February 14, 2005 *ore tenus* motion for additional relief, and on February 28, 2005 on Plaintiff's Motion to Compel Further Discovery Regarding Morgan Stanley's Destruction and Non-Production of E-Mails, with both counsel present. Based on evidence introduced, the Court finds:

1. CPH has sued Defendant, Morgan Stanley & Co., Inc. ("MS & Co."), for fraud in connection with CPH's sale of its stock in Coleman, Inc., to Sunbeam Corporation in return for Sunbeam stock. Whether MS & Co. had knowledge of the fraudulent scheme undertaken by Sunbeam in 1997 and early 1998 and, if so, the extent of that knowledge, is central to the case. CPH has sought access to MS & Co.'s internal files, including e-mails, since the case was filed.

2. Though MS & Co. instructed its investment bankers to preserve paper documents in their possession in connection with the Sunbeam transaction in February, 1999, it continued its practice of overwriting e-mails after 12 months, despite an SEC regulation requiring all e-mails be retained in readily accessible form for two years. *See* 17 C.F.R. § 240.17a-4 (1997).

3. On April 16, 2004, the Court entered its Agreed Order requiring MS & Co. to (1) search the oldest full backup tape for each of 36 MS & Co. employees involved in the Sunbeam transaction; (2) review e-mails dated from February 15, 1998 through April 15, 1998 and e-mails containing any of 29 specified search terms such as "Sunbeam" and "Coleman", regardless of their date; (3) produce by May 14, 2004 all nonprivileged e-mails responsive to CPH's document requests; (4) give CPH a privilege log; and (5) certify its full compliance with the Agreed Order.

4. On May 14, 2004, MS & Co. produced approximately 1,300 pages of e-mails but failed to provide the required certification. Finally, on June 23, 2004, after inquiries by CPH, MS & Co. provided CPH with a certificate of full compliance with the April 16 Agreed Order signed by Arthur Riel, the MS & Co. manager assigned this task.

5. As organized by MS & Co., the effort to recover e-mails from any remaining backup tapes had several stages. First, the relevant backup tapes (in various formats, such as "DLT" tapes and eight-millimeter tapes) had to be located by searching the potential storage locations. Second, the tapes were sent to an outside vendor, National Data Conversion, Inc. ("NDC"), to be processed, and the data returned to MS & Co. in the form of "SDLT" tapes. Third, MS & Co. had to find a way to upload the contents of these SDLT tapes into its new e-mail archive. Fourth, MS & Co. would run "scripts" to transform this data into a searchable form, so that it could later be searched

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for responsive e-mails. MS & Co. personnel used the term "staging area" to describe the stage of the process when SDLT tapes remained in limbo, waiting to be uploaded to the archive.

*2 6. At some point prior to May 6, 2004, Arthur Riel and his team became aware that more than 1,000 backup tapes had been found at a MS & Co. facility in Brooklyn, New York. These 1,423 DLT tapes had not been processed by NDCI and thus had not been included in the archive or searched when MS & Co. made its supposedly complete production on May 14, 2004, and when Mr. Riel certified full compliance with the Agreed Order on June 23, 2004. Aware of the tapes' discovery, Mr. Riel knew when he executed the certification that it was false. He and others on MS & Co.'s e-mail archive team knew by July 2, 2004 that these "Brooklyn tapes" contained e-mail dating back at least to the late 1990's. MS & Co. neither withdrew its certification nor informed CPH about the potential for additional production of e-mails, however. During the summer of 2004, the Brooklyn tapes were processed and sent to the staging area, but they were not uploaded to the e-mail archive so as to be available to be searched until January 2004, at least eight months after they were found.

7. MS & Co. also failed to timely produce e-mails from 738 8-millimeter backup tapes found at a MS & Co. facility in Manhattan, in 2002. These 738 8-mm tapes, like the 1,423 Brooklyn tapes, had not been processed by NDCI and thus had not been included in the archive and searched when MS & Co. made its supposedly complete production on May 14, 2004, and when Mr. Riel certified full compliance with the Agreed Order on June 23, 2004. Mr. Riel and others were told by their vendor, NDCI, by July 2, 2004 that the 8-mm tapes contained e-mail dating back at least to 1998. MS & Co. neither withdrew its certification nor informed CPH about the potential for additional production of e-mails, though. During the summer of 2004, the 8-mm tapes were processed and sent to the staging area. Like the Brooklyn tapes, though, they also were not uploaded to MS & Co.'s e-mail archive.

8. In August 2004, Mr. Riel was relieved of his employment responsibilities. He and his team were replaced by a new team headed by Allison Gorman Nachtigal.

9. Ms. Gorman testified that she was instructed to describe the circumstances of Mr. Riel's replacement as his having been "placed on administrative leave." That same term appears by interlineation over the original typed description in MS & Co.'s memorandum addressing these issues. The typed language stated: "[Mr. Riel was] dismissed for integrity issues." MS & Co. presented no evidence to explain why Mr. Riel would have been placed on administrative leave rather than terminated. CPH argued that it may have been to deprive CPH of the ability to contact him directly.

10. Upon taking over Mr. Riel's responsibilities, Ms. Gorman did not initially make significant efforts to address the backlog of data in the staging area; indeed, she was not informed of the existence of this litigation until five months later, in January 2005. In October 2004, Ms. Gorman met with a group of MS & Co. attorneys. Following that meeting, Ms. Gorman gave the project somewhat greater priority, although even then it clearly did not move as expeditiously as possible. For example, MS & Co. gave no thought to using an outside contractor to expedite the process of completing the discovery, though it had certified completion months earlier; it lacked the technological capacity to upload and search the data at that time, and would not attain that capacity for months; and it knew trial was scheduled to begin in February, 2005. Even at this point, no one from MS & Co. or its outside counsel, Kirkland & Ellis LLP, gave CPH or this Court any hint that the June certification was false.

*3 11. On November 17, 2004, more than six months after the May 14, 2004 deadline for producing e-mails in response to the Agreed Order, MS & Co. sent CPH a letter revealing that its June 23 certificate of compliance was incorrect. The letter stated:
Morgan Stanley has discovered additional e-mail backup tapes since our e-mail production in May 2004. The data on some of [the] newly discovered tapes has been restored and, to ensure continued compliance with the agreed order, we have re-run the searches described in the order. Some responsive e-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mails have been located as a result of that process. We will produce the responsive documents to you as soon as the production is finalized.

The letter also foreshadowed further delays: "(s)ome of the backup tapes are still being restored. To ensure continued compliance with the agreed order, we intend to re-run the searches again when the restoration process is complete and will produce any responsive documents that result."

12. The next day, November 18, 2004, MS & Co. produced an additional 8,000 pages of e-mails and attachments. MS & Co.'s November 2004 letter stated that the 8,000 pages came from "newly discovered" tapes; but the testimony now makes clear that this statement was false because Ms. Gorman's team did not figure out how to upload and make searchable the materials from the staging area until January, 2005.

13. MS & Co. has failed to offer any explanation to reconcile the obvious conflict between its assertions at the time of production that the 8,000 pages came from "newly discovered" tapes (*i.e.,* the "Brooklyn tapes") and the testimony of its own witness, Ms. Gorman, that data from those newly discovered tapes were not capable of being searched until two months later, in January.

14. After a follow-up inquiry by CPH, on December 17, 2004, MS & Co. produced a privilege log and told CPH that "[n]o additional responsive e-mails have been located since our November production." MS & Co. refused to answer CPH's questions about whether MS & Co. had restored all the backup tapes described in its November 17 letter and why the tapes had not been located earlier, however.

15. On December 30, 2004, CPH sought confirmation that MS & Co. had reviewed all e-mail backup tapes and produced all responsive e-mails and, if not, asked when the review would be completed. On January 11, 2005, MS & Co. informed CPH that the "restoration of e-mail back tapes is ongoing. Restoration of the next set of backup tapes is estimated to be completed at the end of January. We intend to re-run the searches described in the agreed order at that time."

16. On January 19, 2004, CPH wrote asking MS & Co. to explain the circumstances under which MS & Co. located the "newly discovered" backup tapes and to disclose when the tapes were located. CPH also asked MS & Co. to explain why the backup tapes could not be restored sooner.

17. On January 21, 2005, MS & Co. sent CPH a letter that failed to answer CPH's questions. Instead, MS & Co. described its efforts to restore the backup tapes as "ongoing"; informed CPH that "there is no way for MS & Co. to know or accurately predict the type or time period of data that might be recovered"; and stated that MS & Co. "cannot accurately estimate when all of the tapes will be restored or whether any recoverable data will be found on the remaining tapes."

*4 18. On January 26, 2005, CPH filed the Motion at issue here, asking the Court to instruct the jury that MS & Co.'s destruction of e-mails and other electronic documents and MS. & Co.'s noncompliance with the April 16, 2004 Agreed Order can give rise to an adverse inference that the contents of the missing e-mails would be harmful to MS & Co.'s defense in this case.

19. Meanwhile, MS & Co. found another 169 DLT tapes in January, 2005, that allegedly had been misplaced by its New Jersey storage vendor, Recall. Again, MS & Co., chose to provide no specifics to CPH or to the Court.

20. At a February 2, 2005 hearing on CPH's Motion, Thomas A. Clare of Kirkland & Ellis, LLP, representing MS & Co., stated that "late October of 2004 ... [is] the date I represent to Court is the first time that anyone knew that there was recoverable e-mail data" on the Brooklyn tapes. Hr'g Tr. (2/2/05) at 133-34. The actual date, however, was at least three months earlier, by July 2, 2004. Furthermore, MS & Co. refused to provide the Court with definitive answers about when its e-mail production would be complete, merely stating that it would proceed with "all deliberate speed." *Id.* at 139. Also at the February 2 hearing, Mr. Clare neglected to inform the Court about the 8-mm tapes that had been located in 2002, and told the Court that the 1,423 DLT tapes had been found in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Brooklyn "sometime during the summer" of 2004. The truth of this assertion is belied by the evidence showing that the tapes were found before May 6, 2004.

21. On February 3, 2005, the Court ordered further discovery and set an evidentiary hearing for February 14, 2005. The discovery took place on February 9 and 10, when CPH deposed the three e-mail witnesses identified by MS. & Co.

22. On Saturday afternoon, February 12, 2005, MS & Co. informed the Court that it had, in the previous 24 hours, discovered additional tapes. Also, MS & Co. stated that its recent production omitted certain "attachments" to e-mails. MS & Co. did not attempt to clarify or substantiate either of these statements to CPH or to the Court until the Monday, February 14, 2005 hearing.

23. At the February 14 hearing, none of the witnesses MS & Co. presented was involved in or familiar with the actual electronic searches conducted using the parameters specified in this Court's April 16, 2004 Agreed Order, and none explained where the 8,000 pages produced in November, 2004 had come from. MS & Co.'s witnesses did, however, describe three new developments. First, Robert Saunders, a Morgan Stanley executive director in the Information Technology Division, testified that he returned to New York after his February 10 deposition and, concerned about his unqualified assertion that the was "confident" that a complete search for backup tapes had been conducted, decided finally to undertake a personal search of MS & Co.'s "communication rooms," going to the areas he thought most obvious first. By doing so, he and two contractors discovered more than 200 additional backup tapes openly stored in locations known to be used for tape storage. Those discoveries were made on Friday and Saturday, February 11 and 12, 2005. As of the February 14 hearing, NDCI had not yet determined which, if any, of these newly discovered backup tapes contained e-mails. Second, Ms. Gorman reported that on Friday, February 11, 2005 she and her team had discovered that a flaw in the software they had written had prevented MS & Co. from locating all responsive e-mail attachments. Third, Ms. Gorman reported that MS & Co. dis-covered on Sunday evening, February 13, 2005, that the date-range searches for e-mail users who had a Lotus Notes platform were flawed, so there were at least 7,000 additional e-mail messages that appeared to fall within the scope of the Agreed Order had yet to be fully reviewed by MS. & Co.'s outside counsel for responsiveness and privilege. As counsel for MS & Co. admitted, this problem "dwarf[s]" their previous problems. Hr'g Tr. (2/14/05) at 13. Ms. Gorman indicated she was "90 percent sure" that the problem infected MS & Co.'s original searches in May, which means that even they failed to timely produce relevant materials that had been uploaded into the archive by that point. *Id.* at 82-83. The bulk of the employees using the Lotus Notes platform in the relevant time period came from the Investment Banking Division, the division responsible for the transaction under review here.

*5 24. On February 19, 2005 MS & Co. informed counsel for CPH that "additional boxes of back up tapes" have been located "in a security room" and that, "(a)s of this morning, Morgan Stanley has identified four (unlabled) DLT tapes among the collection. Those four tapes will be sent to NDCI for further analysis." The disclosure did not state when the discovery was made. MS & Co.'s counsel represented to the Court that it was his understanding that about 73 bankers' boxes of tapes were discovered. No explanation for the late discovery was offered.

25. Throughout this entire process, MS & Co. and its counsels' lack of candor has frustrated the Court and opposing counsel's ability to be fully and timely informed.

26. MS & Co.'s failure during the summer and fall of 2004 to timely process a substantial amount of data that was languishing in the "staging area," rather than being put into searchable form and then searched, was willful and a gross abuse of its discovery obligations.

27. MS & Co.'s failure to time notify CPH of the existence of the DLT and 8-mm tapes, which it had located as early as 2002 and certainly prior to the June 23, 2004 certification, and its failure to timely process those raw backup tapes was willful and a gross

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

abuse of its discovery obligations.

28. MS & Co.'s failure to produce all e-mail attachments was negligent, and it was discovered and revealed only as a result of CPH's hiring a third-party vendor, pursuant to the Court's February 4, 2005 Order, to double-check MS & Co.'s compliance with the April 16, 2004 Agreed Order.

29. MS & Co.'s failure to produce all of the Lotus Notes e-mails was negligent, and it was discovered and revealed only as result of CPH's hiring a third-party vendor, pursuant to the Court's February 4, 2005 Order, to double-check MS & Co.'s compliance with the April 16, 2004 Agreed Order.

30. MS & Co.'s failure to locate other potentially responsive backup tapes before Saturday, February 12, 2005 was grossly negligent.

31. Given the history of the discovery, there is no way to know if all potentially responsive backup tapes have been located.

32. In sum, despite MS & Co.'s affirmative duty arising out of the litigation to produce its e-mails, and contrary to federal law requiring it to preserve the e-mails, MS & Co. failed to preserve many e-mails and failed to produce all e-mails required by the Agreed Order. The failings include overwriting e-mails after 12 months; failing to conduct proper searches for tapes that may contain e-mails; providing a certificate of compliance known to be false when made and only recently withdrawn; failing to timely notify CPH when additional tapes were located; failing to use reasonable efforts to search the newly discovered tapes; failing to timely process and search data held in the staging area or notify CPH of the deficiency; failing to write software scripts consistent with the Agreed Order; and discovering the deficiencies only after CPH was given the opportunity to check MS & Co.'s work and the MS & Co.'s attorneys were required to certify the completeness of the prior searches. Many of these failings were done knowingly, deliberately, and in bad faith.

*6 It is clear that e-mails existed which were requested by CPH that have not been produced because of the deficiencies discussed above. Electronic data are the modern-day equivalent of the paper trail. Indeed, because of the informalities of e-mail, correspondents may be less guarded than with paper correspondence. In this case, the paper trail is critical to CPH's ability to make out its prima facie case. Thus, MS & Co.'s acts have severely hindered CPH's ability to proceed. The only way to test the potentially self-serving testimony of MS & Co. personnel is with the written record of the events.

The failures outlined in this Order are of two types. First, by overwriting e-mails contrary to its legal obligation to maintain them in readily accessible form for two years and with knowledge that legal action was threatened, MS & Co. has spoiled evidence, justifying sanctions. *See Martino v. Wal-Mart Stores, Inc.*, 835 So.2d 1251 (Fla. 4th DCA 2003). "The appropriateness of sanctions for failing to preserve evidence depends on: (1) willfulness or bad faith of the responsible party, (2) the extent of prejudice suffered by the other party, and (3) what is required to cure the prejudice." *Nationwide Lift Trucks, Inc. v. Smith*, 832 So.2d 824, 826 (Fla. 4th DCA 2002). Second, MS & Co.'s willfull disobedience of the Agreed Order justifies sanctions. *See* Rule 1.380(b)(2), Fla. R. Civ. P. The conclusion is inescapable that MS & Co. sought to thwart discovery *in this specific case*.

Sanctions in this context are not meant to be punitive. They are intended, though, to level the playing field.

A reasonable juror could conclude that evidence of MS & Co.'s misconduct demonstrates its consciousness of guilty. It is relevant to the issues before the jury. Further, CPH should not be penalized by being forced to divert the jurors' attention away from the merits of its claim to focus on highly technical facts going to MS & Co.'s failures here, facts that are not reasonably disputed. Evidence of that failure, though, alone does not make CPH whole. Indeed, it can be said it is not a "sanction" at all, but merely a statement of unrefuted facts that the jury may find relevant. Shifting the burden of proof, though, forces MS & Co. to accept the practical consequence of its failures-that some information will never be known. Obviously, this sanction is of consequence only in the marginal case. If there is overwhelming proof of MS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

& Co.'s knowledge of the fraud and collusion with Sunbeam, CPH would have prevailed on those elements in any event. And, to the contrary, if there is overwhelming evidence MS & Co. did not know of the fraud or conspire with or aid Sunbeam in its commission, it would have prevailed in any event. If the case is close on those issues, though, MS & Co., not CPH, should bear the burden of persuasion. Further, shifting the burden on the fraud issue does not relieve CPH of its obligation to establish the other elements of its claims, most notably reliance, proof of which is independent of the MS & Co. e-mails. Thus, the sanctions chosen are the most conservative available to the Court to address the spoilation of evidence and willfull violation of the Agreed Order.<sup>FN1FN2</sup>

> FN1. MS & Co.'s bad acts and pocket book may not be used to gain the continuance it has sought from the beginning. Further, the Court has no confidence that, even if a continuance were granted, MS & Co. would fully comply with discovery in this case.

> FN2. The undersigned notes that the sanctions imposed are not enumerated in Rule 1.380(b)(2), and is aware of the concern expressed in the 2000 Handbook on Discovery Practice, Joint Committee of the Trial Lawyers Section of the Florida Bar and Conferences of Circuit and County Court Judges ("(f)or the trial court to be on solid footing, it is wise to stay within the enumerated orders" [*Handbook* at p. 4] ). However, MS & Co.'s violations involve both the violation of a discovery order and the intentional spoiliation of evidence. The sanction imposed is *less* severe than that provided in Rule 1.380(b)(2)(B), under which the Court could preclude MS & Co. from presenting evidence of its lack of knowledge of or collusion with the Sunbeam fraud, which the Court finds is the least severe enumerated sanction appropriate to place the parties on a level playing field.

*7 Finally, the Court notes that CPH has requested the e-mails since May of 2003. MS & Co. was supposed to comply with the April 16, 2004 Order by May 14, 2004. Fact discovery in this case closed November 24, 2004. MS & Co.'s actions have resulted in the diversion of enormous amounts of resources, by both the parties and the Court, into a fact discovery dispute that should have never arisen and which would have long ago been put to bed had MS & Co. timely recognized its obligations to CPH and this Court. Opening argument in this complex case is set for March 21, 2005. Preliminary jury selection has begun. MS & Co. has controlled the timetable of this portion of the litigation long enough. Consequently, CPH should have the ability to continue to require MS & Co. to attempt to comply with the Agreed Order and the February 4, 2005 Order on Coleman (Parent) Holdings Inc.'s *ore tenus* Motion to Participate in Search of Additional E-Mail Back Up Tapes or Appoint Third Party to Conduct Search, or to elect to terminate the e-mail discovery and concentrate on trial preparation.

Based on the foregoing, it is

ORDERED AND ADJUDGED that:

1. Plaintiff's Motion for Adverse Interference Instruction Due to Morgan Stanley's Destructions of E-Mails and Morgan Stanley's Non-Compliance with the Court's April 16, 2004 Agreed Order and Motion for Additional Relief is GRANTED.

2. MS & Co. shall continue to use its best efforts to comply with the April 16, 2004 Agreed Order and shall continue to comply with the February 4, 2005 Order on Coleman (Parent) Holdings Inc.'s *ore tenus* Motion to Participate in Search of Additional E-Mail Back Up Tapes or Appoint Third Party to Conduct Search until March 21, 2005 or written notice from CPH, which ever first occurs. Either party shall notify the other in writing of its intention to offer into evidence e-mails actually produced to CPH prior to termination of e-mail discovery in conformity with this Order, within 72 hours of the e-mail's production to CPH. The Court shall hear and determine any objections to use of the e-mails.

3. The Court shall read to the jury the statement of facts attached as Exhibit A during whatever evidentiary phase of CPH's case that it requests. These find-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ings of fact shall be conclusive. *See* Rule 1.380(b)(2)(A). No instruction shall be given to the jury regarding inferences to be drawn from these facts. However, counsel may make such argument to the jury in favor of whatever inferences that evidence may support. No other evidence concerning the production of e-mails, or lack thereof, shall be presented absent further Court order.

4. CPH will be allowed to argue that MS & Co.'s concealment of its role in the Sunbeam transaction is evidence of its malice or evil intent, going to the issue of punitive damages. *See, e.g., General Motors Corp. v. McGee,* 837 So.2d 10120.

5. MS & Co. shall bear the burden of proving to the jury, by the greater weight of the evidence, that it lacked knowledge of the Sunbeam fraud and did not aid and abet or conspire with Sunbeam to defraud MS & Co. The traditional order of proof shall remain unaffected, however.

\*8 6. MS & Co. shall compensate CPH for costs and fees associated with the Motion. The amount shall be determined at an evidentiary hearing to be held after the completion of the trial.

7. Plaintiff's Motion to Compel Further Discovery Regarding Morgan Stanley's Destruction and Non-Production of E-Mails is Denied.

DONE AND ORDERED.

### EXHIBIT A

A federal regulation in effect in 1997 and all times since required Morgan Stanley to preserve e-mails for three years and to preserve them in a readily accessible place for two years. Beginning in no later than 1997, Morgan Stanley had a practice of overwriting e-mails after 12 months. E-mails could no longer be retrieved once they were overwritten. This practice was discontinued in January, 2001. CPH has sought access to Morgan Stanley's e-mails relating to this transaction since the case was filed in May, 2003.

Prior to 2003, Morgan Stanley recorded e-mails and other electronic data on back up tapes. On April 16, 2004, the Court ordered Morgan Stanley to (1) search the oldest full backup tape for each of 36 Morgan Stanley employees involved in the Sunbeam transaction; (2) review e-mails dated from February 15, 1998 through April 15, 1998 and e-mails containing any of 29 specified search terms such as "Sunbeam" and "Coleman", regardless of their date; (3) produce by May 14, 2004 all e-mails relating to this case found by the search I have just described; and (4) certify its full compliance with the Court's order.

On May 14, 2004, Morgan Stanley produced approximately 1,300 pages of e-mails. It did not produce the required certification. On June 23, 2004, after inquiries by CPH, Morgan Stanley provided CPH with a certificate of full compliance with the April 16 Order signed by Arthur Riel, the Morgan Stanley manager assigned this task.

As organized by Morgan Stanley, the effort to recover e-mails from the backup tapes had several stages. First, the relevant backup tapes had to be located by searching the potential storage locations. Second, the tapes were sent to an outside vendor, National Data Conversion, Inc., which I will call "NDCI", to be processed, and the data returned to Morgan Stanley. Third, Morgan Stanley had to upload the processed data into its e-mail archive. Fourth, Morgan Stanley had to run scripts, or pieces of computer code, to transform this data into a searchable form. Finally, Morgan Stanley had to search the data for e-mails related to this case. Morgan Stanley personnel used the term "staging area" to describe the stage of the process when the processed data returned by NDCI remained in limbo, waiting to be uploaded to Morgan Stanley's archive.

At some point prior to May 6, 2004, Arthur Riel and his team became aware that 1,423 backup tapes had been found at a Morgan Stanley facility in Brooklyn, New York. These 1,423 tapes had not been processed by NDCI and thus had not been included in the archive or searched when Morgan Stanley made its production to CPH on May 14, 2004. Aware of the tapes' discovery, Mr. Riel knew when he executed the certification of full compliance with the Court's April 16, 2004 Order that it was false. He and others on Morgan Stanley's e-mail archive team knew by July 2, 2004 that these "Brooklyn tapes" contained e-mail

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dating back at least to the late 1990's. During the summer of 2004, the Brooklyn tapes were processed and the data sent to the staging area. The scripts were not written and tested to permit the search for e-mails relating to this case to begin until the middle of January, 2004. Such a search, even if perfectly done, can take weeks.

\*9 Morgan Stanley also failed to timely produce e-mails from 738 backup tapes found at a Morgan Stanley facility in Manhattan in 2002. These 738 tapes, like the 1,423 Brooklyn tapes, had not been processed by NDCI and thus had not been included in the archive and searched by either on May 14, 2004 or June 23, 2004. Mr. Riel and others were told by NDCI by July 2, 2004 that these tapes contained e-mail dating back at least to 1998. During the summer of 2004, the these tapes were processed and sent to the staging area. Like the Brooklyn tapes, though, they also were not searched.

In August 2004, Mr. Riel was relieved of his employment responsibilities. He and his team were replaced by a new team headed by Allison Gorman Nachtigal. At that time, the staging area contained about 600 gigabytes of e-mail data that had not yet been uploaded into the Morgan Stanley archive and had not been searched for e-mails relating to this case.

Upon taking over Mr. Riel's responsibilities, Ms. Gorman did not initially make significant efforts to address the backlog of data in the staging area. Indeed, she was not informed of the existence of this litigation until five months later, in January 2005. In October 2004, Ms. Gorman gave the project somewhat greater priority, although even then it did not move as expeditiously as possible. Morgan Stanley did not consider using an outside contractor to expedite the process.

Morgan Stanley found another 169 DLT tapes in January, 2005, that had been misplaced by its New Jersey storage vendor. Morgan Stanley discovered more than 200 additional backup tapes openly stored in locations known to be used for tape storage on February 11 and 12, 2005. On February 11, 2005 Morgan Stanley discovered that a flaw in the software it had written had prevented Morgan Stanley from locating all e-mail attachments about the Sunbeam transaction. Morgan Stanley discovered on February 13, 2005, that the date-range searches for e-mail users who had a Lotus Notes platform were flawed, so that additional e-mail messages that appeared to fall within the scope of the April 16, 2004 Order had not been given to CPH. Further, it appears that the problem infected Morgan Stanley's original searches in May of 2004. The bulk of the employees using the Lotus Notes platform in the relevant time period came from the Investment Banking Division, the division responsible for the transaction under review here. On February 16, 2005, Morgan Stanley withdrew its certificate of compliance with the April 16, 2004 Order. On February 19, 2005 Morgan Stanley notified CPH that it had found boxes of additional tapes that have not been uploaded into its archive or searched for responsive e-mails. Morgan Stanley did not tell CPH it had found any tapes that it had not searched until November 17, 2004. Even then, it did not tell CPH how many tapes were found, when they were found, or when they would be searched. MS & Co. did not provide all of this information to CPH until February of 2005. The searches had not yet been completed when this trial was begun, when they were terminated without completion.

Fla.Cir.Ct.,2005.
Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co., Inc.
Not Reported in So.2d, 2005 WL 679071 (Fla.Cir.Ct.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 4755541 (Trial Motion, Memorandum and Affidavit) Morgan Stanley & Co. Incorporated's Motion to Strike Coleman (Parent) Holdings Inc.'s Response to Morgan Stanley & Co. Incorporated's Proposed Findings of Fact and Conclusions of Law in Support of Its Motion for Summary Judgment (Jan. 12, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 3957747 () Videotape Deposition of Mark Grinblatt (Jan. 7, 2005) Original Image of this Document (PDF)
• 2004 WL 4979332 (Trial Motion, Memorandum and Affidavit) Coleman (Parent) Holdings Inc.'s Mo-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion to Strike Morgan Stanley & co. Incorporated's Proposed Findings of Fact and Conclusions of Law in Support of Its Motion for Summary Judgment (Dec. 21, 2004) Original Image of this Document (PDF)
• 2004 WL 4979331 (Trial Motion, Memorandum and Affidavit) Morgan Stanley & Co. Incorporated's Motion for Summary Judgment (Dec. 10, 2004) Original Image of this Document (PDF)
• 2003 WL 24303790 () (Transcript) (2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.