IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ADAMS GOLF, INC., SECURITIES LITIGATION | § § § § | CIVIL ACTION NO. 99-371-KAJ (CONSOLIDATED) |

**DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF CHRISTOPHER JAMES**

OF COUNSEL:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas 78701

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

On Behalf of All Defendants

Dated: October 9, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................1

I. DR. JAMES'S EVENT-STUDY METHODOLOGY IS CONSISTENT WITH PROFESSIONAL STANDARDS IN FINANCIAL ECONOMICS ...................................1

    A. Plaintiffs' criticism that Dr. James ignores potential "leakage" is baseless—there is no evidence of leakage and the theory itself lacks general acceptance in financial economics ..........................................................2

        1. Plaintiffs' particular speculation about leakage lacks empirical support ...........................................................................................................3

        2. Plaintiffs' contention that event studies are improper when information has "leaked" to the market is incorrect ..................................4

    B. Dr. James's expert report uses proper event windows ............................................5

    C. The fact that there are no statistically significant stock price declines during the class period suggests that Adams Golf's stock price decline was caused by an industry-wide slow down and normal stock volatility, not that Dr. James's methodology is flawed ......................................................................6

    D. Dr. James's index is appropriate and Miller's index does not change the results ........................................................................................................................7

    E. Rolling regressions are a correct way to analyze stock price movements when no proper control period exists ..........................................................................8

II. DR. JAMES'S USE OF MONTHLY DATA IN ANALYZING MARKET SHARE IS AN ACCEPTED WAY OF ANALYZING MACRO-LEVEL DATA ............9

III. DR. JAMES'S TIME PERIODS ARE APPROPRIATE—HE IS ANALYZING A RELATIONSHIP BETWEEN TWO VARIABLES AND IT IS IRRELEVANT THAT IT EXTENDS BEYOND THE CLASS PERIOD .................................................11

IV. PLAINTIFFS' ASSERTION THAT DR. JAMES "LACKS OBJECTIVITY" IS ABSURD: HE OPINES BASED ON STATISTICS, NOT PERSONAL OPINION LIKE MILLER ..............................................................................................12

    CONCLUSION ..........................................................................................................15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Blue Dane Simmental Corp. v. Amer. Simmental Assoc.*,
  178 F.3d 1035 (8th Cir. 1999) ...................................................................................14

*Carpe v. Aquila, Inc.*,
  2005 WL 1138833 (W.D. Mo. Mar. 23, 2005) ........................................................2, 14

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ................................................................................................2, 11

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000) ...............................................................................1, 2, 13

## OTHER AUTHORITY

Binder, *On the Use of the Multivariate Regression Model in Event Studies*, 23 J. OF
  ACCOUNTING RESEARCH 1 (Spring 1985) ...................................................................9

Busse and Greene, *Market Efficiency in Real Time*, 65 J. OF FIN. ECONOMICS 415 (2002) ............5

Greene and Watts, *Price Discovery on the NYSE and the Nasdaq: The Case of Overnight
  and Daytime News Releases*, 25 FIN. MGMT. 19 (Spring 1996) ..........................................5

MacKinlay, *Event Studies in Economics & Finance*, 35 J. OF ECONOMIC LITERATURE 13
  (March 1997) ...............................................................................................................4

# INTRODUCTION

~~Plaintiffs' motion to exclude Dr. James's testimony is based on the following fallacious~~ premise: the Court should reject Dr. James's objectively verifiable statistical analysis because his results differ from the subjective personal opinion of plaintiffs' expert. The undisputed evidence demonstrates, however, that Dr. James's expert opinion is the only opinion that satisfies the Third Circuit's criteria for admissibility:

| Criteria set forth in *Elcock v. Kmart Corp.*, 233 F.3d 734, 745-46 (3d Cir. 2000) | Christopher James | Alan Miller |
|---|---|---|
| Testable hypothesis | Yes | No |
| Subject to peer review | Yes | No |
| Known or potential rate of error | Yes | No |
| Standards controlling technique's operations | Yes | No |
| Generally accepted | Yes | No |
| Relationship to reliable methods | Yes | No |
| Qualifications | Yes | No |
| Non-judicial uses for the method | Yes | No |

Plaintiffs criticize Dr. James in three principal areas: (1) event-study methodology; (2) monthly analysis of market share data; (3) and overall objectivity. Tellingly, the very scholar who plaintiffs misleadingly cite to impeach Dr. James has clarified by affidavit that Dr. James's analysis was reliable and generally accepted. The summary judgment record demonstrates that Dr. James's testimony satisfies the admissibility requirements of the Federal Rules of Evidence and therefore must be admitted. (MacKinlay Aff. ¶¶ 2, 18-20.)

# ARGUMENT

## I. DR. JAMES'S EVENT-STUDY METHODOLOGY IS CONSISTENT WITH PROFESSIONAL STANDARDS IN FINANCIAL ECONOMICS

The event study is generally accepted in the field of financial economics. It is widely employed in academic research to examine the behavior of security prices and to assess the

1

materiality of new information. (Ex. 337 at 5 ¶ 14). Such event studies are the judicially-endorsed method of distinguishing between allegation-related and non-allegation-related changes in a stock's behavior. *Carpe v. Aquila, Inc.*, 2005 WL 1138833, *3 (W.D. Mo. Mar. 23, 2005). Indeed, courts routinely exclude expert opinions when they fail to conduct an event study comparing the stock's price to the market as a whole or to a selected index of similar companies. *Id.* at *4.

Despite the overwhelming academic and judicial authority endorsing event studies as the proper method for examining stock-price behavior, plaintiffs claim that an event study is inappropriate in this case. Instead, plaintiffs contend that Dr. James should have considered their evidence, including the following: non-public purchase orders from Costco that could not possibly have reached a significant number of market participants, and an unscientific and unreliable "leakage" theory that does not meet any of the reliability factors outlined by either the Supreme Court in *Daubert* or the Third Circuit in *Elcock*. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Elcock*, 233 F.3d at 745-46. Dr. James, however, did exactly what he was supposed to do. He considered all the relevant evidence and then applied the generally accepted scientific methodology.

A. **Plaintiffs' criticism that Dr. James ignores potential "leakage" is baseless—there is no evidence of leakage and the theory itself lacks general acceptance in financial economics**

Plaintiffs assert that information about gray marketing leaked into the market over time and that there was no precise date when this leakage began. Their "leakage" theory is based entirely on speculative allegations that: (1) rumors existed that Adams Golf clubs were available in Costcos; (2) Costco warehouse workers and Adams Golf sales personnel must have sold Adams Golf stock in response to these rumors; and (3) these inside trades must have occurred in sufficient volume to cause Adams Golf's stock price to decline. (James Dep. Tr. 93:8-94:24.)

2

Such speculation is the sole basis of Miller's expert report and the main reason his report should be excluded.[1] (See also MacKinlay Decl. ¶ 9.) Plaintiffs' leakage theory must be rejected as unreliable, and Dr. James's testimony must be admitted as the only testimony grounded in financial economics.

### 1. Plaintiffs' particular speculation about leakage lacks empirical support

As an example of leakage, plaintiffs point to Costco purchase orders for Adams Golf clubs on July 21-22, 1998 and the 27% drop in Adams Golf stock price over a six-day period around these dates. (Mot. at 5.) The undisputed evidence indicates, however, that the entire industry declined during this time. Callaway—which plaintiffs assert was Adams Golf's closest competitor—experienced a stock price decline of 30.6% during the same period. (James Aff. ¶ 3 & James Ex. 14.) Similarly, Miller's Peer Group experienced a decline greater than Adams Golf, dropping 28.7% over the same six-day period. (James Aff. ¶ 3 & James Ex. 14; *see also* Exs. 339-40 (analyzing a five-day period).)

Dr. James performed a statistical test to determine objectively and scientifically whether the stock price decline over the six-day period was statistically significant. The results indicate that it was not, and that the decline actually paralleled the entire market and industry decline during this time. (James Aff. ¶ 4.)

Plaintiffs also reference a ***non-public*** July 29, 1998 Lehman Brothers internal memo written in preparation for an earnings conference call, which discusses gray market discounting, as support for their "leakage" theory. (Mot. at 5.) This provides no support whatsoever, as

---

[1] Miller's entire opinion is based on anecdotal speculation with no basis is any recognized discipline. His definition of market efficiency is inconsistent with financial economics and judicial precedent and he uses unscientific standards in assessing materiality and damages. For these reasons, Miller's opinion should be excluded. *See* Adams Golf Defendants' Memorandum in Support of Motion to Exclude the Expert Testimony of R. Alan Miller (D.I. 286).

3

plaintiffs neglect to mention—and Miller reluctantly acknowledged in his deposition—is that no analyst or investor raised gray marketing as a concern on the conference call. (Miller Dep. Tr. 159:17-160:6.) Plaintiffs cannot simply associate the stock price drop with speculation that somehow information about Costco's non-public purchase orders "leaked" into the market. (MacKinlay Decl. ¶ 9.)

None of the purported leakage periods that Miller identified are statistically significant, underscoring that his "theory" lacks any verifiable, empirical support.[2] There is simply no credible evidence of any leakage of information about the gray market causing a stock price drop. (James Aff. ¶ 4.)

### 2. Plaintiffs' contention that event studies are improper when information has "leaked" to the market is incorrect

Plaintiffs cite to an article by Professor Craig MacKinlay to support their claim that an event study is inappropriate in this case. (Mot. at 6-7.) According to MacKinlay, "The problem is that regulatory changes are often debates in the political arena over time and any accompanying wealth effects generally will gradually be incorporated into the value of a corporation as the probability of the change being adopted increases."[3] It is unclear why plaintiffs are relying on this statement, particularly where the statement is so out of context.

---

[2] As noted in both of Dr. James's reports, the October 23, 1998 close of the class period was statistically significant, but this stock drop was not attributable to "leakage" or disclosure of information about the gray market. Information about gray marketing was part of the total mix of information both before and after the IPO. Therefore, none of the October 23, 1998 stock-price decline could have been caused by this information. (Ex. 336 at 25-26 ¶¶ 60-62; Ex. 337 at 17-22 ¶¶ 50-59.) The decline was likely caused by the new material information released on that date, namely that Adams Golf expected fourth quarter sales to be affected by weakness in the golf equipment industry, that net income for the fourth quarter would be at or just slightly above break-even, and by analysts' revision of fourth quarter consensus earnings estimates from $0.11 per share to $0.05 per share. (Ex. 336 at 25-26 ¶¶ 60-62; Ex. 337 at 17-22 ¶¶ 50-59.)

[3] MacKinlay, *Event Studies in Economics & Finance*, 35 J. OF ECONOMIC LITERATURE 13, 37 (March 1997) (Pls.' Ex. 6).

4

Adams Golf is *not* analogous to this situation at all: the probability of gray marketing did not increase during the class period because it had already occurred pre-IPO.

The June 9, 1998 press release established that Costco was distributing Adams Golf clubs without authorization. Indeed, as MacKinlay himself acknowledges in his affidavit, the difference between MacKinlay's example and Adams Golf's gray marketing issue is that the gray marketing was occurring before the IPO, which is analogous to a regulatory change that has already occurred. (MacKinlay Decl. ¶¶ 4-9.) Where an event has already occurred, there is no reason for it to be gradually incorporated into the stock price during the class period. (MacKinlay Decl. ¶ 9.) The decline in Adams Golf's stock price, as stated previously, actually reflects the evolution of the company's market share, the golf industry's general slowdown over the course of the class period and beyond, and the general market decline. (Ex. 336 at James Exs. 10-13.)

### B.   Dr. James's expert report uses proper event windows

Plaintiffs assert that Dr. James's use of one and two-day event windows somehow makes his analysis unreliable. As described below, a one-day event window is generally accepted under principles of financial economics and expanding the window to two days makes no difference in the statistical results.[4]

In an efficient market, an event study using a one day event window is a correct and accepted practice in the field of financial economics. (Ex. 336 at 15 ¶ 34.) Dr. James established, and plaintiffs do not dispute, that Adams Golf stock traded in an efficient market. (Exs. 334-35;

---

[4] *See, e.g.*, Greene and Watts, *Price Discovery on the NYSE and the Nasdaq: The Case of Overnight and Daytime News Releases*, 25 FIN. MGMT. 19-42 (Spring 1996) (noting that "on the Nasdaq, the price adjustment to trading-hours earnings announcements is concentrated in the first post-announcement trade") (Brannen Decl. II Ex. 427 at 20); Busse and Greene, *Market Efficiency in Real Time*, 65 J. OF FIN. ECONOMICS 415-37 (2002) (observing that "prices respond to reports within seconds of initial mention, with positive reports fully incorporated within one minute") (Brannen Decl. II Ex. 428).

*see also* Ex. 336 at 17-23 ¶¶ 38-55; James Dep. Tr. 231:9-14 .) Therefore the market is assumed to incorporate publicly available information immediately. (MacKinlay Decl. ¶ 6.)

Dr. James's use of a one-day event window is not only reliable but also is the accepted practice. Nevertheless, in response to Mr. Miller's suggestion that a larger window should have been used, Dr. James conducted an analysis using a two-day event window and found that the results concerning statistical significance were the same. (James Dep. Tr. 221:13-222:18.)

The event windows are easily defined in this case: there are three discernable public disclosures about the gray market during the class period (June 9, 1998, August 1, 1998, and August 28, 1998). Plaintiffs contend that it is difficult to identify when the information was released, but that is simply not the case. The disclosure dates are easily identified. (*See* James Dep. Tr. 254:22-257:7; Ex. 336 at 24 ¶ 56; Ex. 336 at 24 ¶¶ 58-59; Ex. 336 at 25 ¶ 60.) The price effects on these disclosure dates must be analyzed to assess whether the allegations concerning gray market impacted the stock price.

C. **The fact that there are no statistically significant stock price declines during the class period suggests that Adams Golf's stock price decline was caused by an industry-wide slow down and normal stock volatility, not that Dr. James's methodology is flawed**

Plaintiffs assert that Dr. James's analysis is flawed because there was a substantial stock-price decline over the class period and Dr. James attributed none of this decline to disclosures about the gray market. There is no question that Adams Golf stock declined substantially, but Dr. James's analysis demonstrates that this decline was caused by factors *other than* disclosures about the gray market. (Ex. 336 at 27-32 ¶¶ 65-71; James Dep. Tr. 232:10-233:10.) The entire market and golf industry declined over the class period: the Nasdaq declined 12.3%, Callaway declined 38.9%, and Miller's Peer Group declined 42%. (James Aff. ¶ 5 & James Ex. 15.) In addition, Adams Golf suffered an extraordinary loss of market share to its non-publicly traded

6

competitor, Orlimar. (Ex. 336 at 30-32 ¶¶ 68-71 & James Exs. 11-13.) These factors and normal stock volatility were the causes of Adams Golf's stock-price decline. Miller's report stands in stark contrast: he *ignores* these factors and their associated declines, and instead conveniently attributes the entire decline to the gray market, despite statistical proof that other factors caused the decline.

### D. Dr. James's index is appropriate and Miller's index does not change the results

Plaintiffs assert that Dr. James "used a flawed comparative or 'control' index in his event study, citing Tabak and Dunbar's statement that "an index is suspect when the choice of companies in the index is made by the expert without recourse to objective criteria." (Mot. at 10.) Dr. James's choice of indices, however, is supported by objective criteria.

Dr. James ran three regressions: a one-factor market regression, a one-factor industry regression, and a two-factor market and industry regression. (Ex. 336 at 21 ¶ 51 & n. 21.) The results of these three regression analyses dictated which model best explained the movement of Adams Golf's stock during the class period. These statistical results are objective criteria for selecting an index. Dr. James used the Nasdaq index to represent market movements because Adams Golf's stock traded on the Nasdaq. (Ex. 336 at 21 ¶ 51 & n. 21.) When looking at general market movements, it is appropriate to use an index with companies trading on a similar exchange because that is where one can expect to see a relationship. (James Dep. Tr. 111:4-12.) Dr. James also examined Adams Golf's daily stock return as a function of a modified Bloomberg Golf Index and as a function of individual major competitors in the golf industry. (Ex. 336 at 21 ¶ 51, n.21.) The modified Bloomberg Golf Index included Callaway, the company plaintiffs point to as an "industry leader" and "the only stock comparable to Adams Golf stock." (Mot. at 10.) Since the one-factor industry regression and the two-factor market and industry regression

7

models were statistically inferior to the model using the NASDAQ index, Dr. James appropriately used the NASDAQ index to conduct his analysis. (James Aff. ¶¶ 6-7 & James Ex. 16.)

The Miller Peer Group is an inferior model to the Nasdaq model, as evidenced by the fact that the Nasdaq model has a better fit (*i.e.,* the Nasdaq model has a higher adjusted R-squared than the Miller Peer Group model). Notably, even if plaintiffs' proposed alternative index is used, the result does *not* change: there are no additional statistically significant stock-price declines associated with the gray market disclosure dates.[5]

### E.  Rolling regressions are a correct way to analyze stock price movements when no proper control period exists

Plaintiffs claim that Dr. James used "an arbitrary and unscientific estimation or base period." (Mot. at 10.) Again, plaintiffs are wrong: Dr. James's control period is supported by financial economic theory. As an initial control period, Dr. James used a period contemporaneous with the class period. To ensure the robustness of his model, however, he ran a rolling regression whereby each day's stock-price return is excluded from the model, making each day's return more likely to be significant. (MacKinlay Decl. ¶¶ 10-12.)

The academic scholars who plaintiffs cite recognize the legitimacy of an in-class estimation period in certain situations such as that of Adams Golf:

> When the analysis studies multiple events, the estimation window may cover the periods around the event windows, including the period[s] between event windows. The estimation window is often placed at one of these locations rather than before the event window because of a lack of relevant prior trading history (for example because the event window comes shortly after an IPO.

---

[5] *See supra* note 2.

Tabak and Dunbar, Chapter 19, *in* WEIL, WAGNER, AND FRANK, LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT (3d ed. 2001.)[6] (Brannen Decl. II Ex. 429 at 19; MacKinlay Decl. ¶¶ 10-12.) In an attempt to avoid the reality that factors *other than* the gray market caused the stock-price decline, plaintiffs are trying to argue that a regression analysis cannot be done because this is an IPO case. That is wrong as a matter both of science and of policy. Congress specifically provided a negative causation defense for initial public offerings and plaintiffs' unsupported challenges to its use must be rejected.

## II.    DR. JAMES'S USE OF MONTHLY DATA IN ANALYZING MARKET SHARE IS AN ACCEPTED WAY OF ANALYZING MACRO-LEVEL DATA

Interestingly, plaintiffs argue on one hand that Dr. James's regressions using daily returns are invalid because his event windows are too short, but then they claim that his monthly regressions are invalid because they are too long. They cite MacKinlay, who they assert "sternly warns against use of monthly data." (Mot. at 12.) Plaintiffs again misrepresent what MacKinlay says. As MacKinlay explains in his affidavit, he encourages use of daily returns as more likely to detect significant relationships but where monthly data is available, it must be used. (MacKinlay Decl. ¶¶ 13-16.)

Dr. James compared monthly market share data to month-end stock prices to determine the price effect of Adams Golf's declining market share. Plaintiffs criticize this as unreliable because Dr. James used monthly data (rather than daily returns) in his regression analysis. Plaintiffs' criticism is a red herring because they ignore a critical fact: market share data is aggregated and released only monthly, not daily. Golf Datatech, which releases the market share data in the golf industry, does so only monthly. This data describes market share for a particular

---

[6] *See also* Binder, *On the Use of the Multivariate Regression Model in Event Studies*, 23 J. OF ACCOUNTING RESEARCH 1 (Spring 1985). (Brannen Decl. II Ex. 430).

9

month (*e.g.*, market share for the month of August, the month of September, etc.). It does not provide a daily breakdown. (James Dep. Tr. 35:2-7.) As Dr. James repeatedly explained to plaintiffs' counsel in his deposition, "it's a very simple and intuitive concept that the frequency with which data becomes available will determine the minimum frequency with which you can undertake the analysis."[7] (James Dep. Tr. 25:10-14; 30:4-11.)

There are numerous academic articles that support the use of monthly data to analyze issues similar to the ones in this case. An example is from Ball and Brown's work:

> The impact of market-wide information on the monthly rate of return from investing one dollar in the stock of firm *j* may be estimated by its predicted value from the linear regression of the monthly price relatives of *j*'s common stock on a market index of returns. . . .[8]

The only support plaintiffs can muster for their criticism of the use of monthly data is an excerpt from Dr. MacKinlay that discusses considerations between the uses of data at various intervals. (Mot. at 11.) Of course, they take MacKinlay's excerpt completely out of context and twist it so it is unrecognizable. As Dr. MacKinlay explains, Dr. James used monthly data properly when he analyzed the relationship between Adams Golf's market share and its stock price. (MacKinlay Decl. ¶¶ 13-17, 19.) The risk of using monthly data is that it is *less* likely to find a statistically significant relationship in the aggregate. This makes Dr. James's regression results even more powerful: here, Dr. James found a highly statistically significant relationship between Adams Golf's stock price performance and both industry conditions and market share despite the fact that the model itself likely *understates* the relationship. (James Aff. ¶ 9.) This

---

[7] Monthly market share data is very useful to identify structural relationships, such as those analyzed here. (James Dep. Tr. 35:8-36:10.) Monthly data also helps filter out random variations or "noise" and helps overcome technical problems caused by non-synchronous trading of securities. (James Dep. Tr. 35:8-36:10; Ex. 336 at 30 ¶ 67 n.29.) Plaintiffs have absolutely no answer to this, nor could they.

[8] Ball and Brown, *An Empirical Evaluation of Accounting Income Numbers*, J. OF ACCOUNTING RESEARCH, Autumn 1968. (Brannen Decl. II Ex. 431.)

underscores just how strong the relationship is. There is no question that monthly data are regularly used in financial economics literature and are a generally accepted methodology for analyzing monthly data and macro-level data.

### III. DR. JAMES'S TIME PERIODS ARE APPROPRIATE—HE IS ANALYZING A RELATIONSHIP BETWEEN TWO VARIABLES AND IT IS IRRELEVANT THAT IT EXTENDS BEYOND THE CLASS PERIOD

Plaintiffs also incorrectly assert that Dr. James's analysis is somehow flawed because it extends beyond the class period. His regression spans eighteen months, which includes the class period. (James Dep. Tr. 141:8-12.) As Dr. James explained, using an eighteen month time period enabled him to use eighteen observations as opposed to only three. (James Dep. Tr. 141:8-142:15.) When estimating the relationship between a dependent variable and explanatory variables, using more observations produces a more reliable result. (James. Dep. Tr. 142:6-15.) Using data both during and after the class period allowed Dr. James to establish a direct relationship between Adams Golf's stock price and its relative market share over time. (James Dep. Tr. 143:6-144:8.) Dr. MacKinlay explains that this is a generally accepted practice in financial economics. (MacKinlay Decl. ¶ 17.)

Plaintiffs assert that Dr. James's use of data points outside the class period amount to an improper use of "irrelevant data." It is hard to fathom how Adams Golf stock price data could be considered "irrelevant" in this lawsuit. Limiting the analysis to the class period, as plaintiffs suggest, would in fact produce results that are far less reliable than those Dr. James produced. (James. Dep. Tr. 141:8-18; MacKinlay Decl. ¶ 17.) Plaintiffs apparently have no problem using less than reliable and tested scientific methodology as long as the result is favorable to their case. Luckily, the law does not permit this type of "advocacy." The court must focus "solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.

11

Plaintiffs provide no academic authority suggesting that a regression analysis must be limited to the class period. They quote Tabak and Dunbar for the unremarkable proposition that "[i]n securities fraud cases, the events of interest usually include all the alleged disclosures of fraud and/or the dates when fraudulent statements were made." (Mot. at 12.) But Tabak and Dunbar do not speak to the use of data outside of a class period; they simply state the obvious fact that disclosures and dates of fraudulent statements are relevant in securities fraud cases.[9] And plaintiffs themselves acknowledge that post-class-period data is relevant when they discuss use of control periods from dates before or after the class period. (Mot. at 10-11.) The bottom line is that plaintiffs' use of random quotes and conjecture cannot undermine the proven, tested and reliable scientific methodology used by Dr. James.

IV.  **PLAINTIFFS' ASSERTION THAT DR. JAMES "LACKS OBJECTIVITY" IS ABSURD: HE OPINES BASED ON STATISTICS, NOT PERSONAL OPINION LIKE MILLER**

Plaintiffs contend that Dr. James lacks objectivity, although they acknowledge Tabak and Dunbar's point that "[t]he most important reason to consider the use of an event study is that it is likely to provide a highly objective methodology for calculating the magnitude of damages and the materiality of the event that may have caused damages." (Mot. at 13.) An event study is the precise statistical analysis that Dr. James performed. Plaintiffs' expert, on the other hand, did not perform any event studies to reach his conclusions and offered only personal opinion. It is apparent that plaintiff's expert, not Dr. James, lacks objectivity.

The parties agree that the Third Circuit requires courts to evaluate the following eight standards when analyzing scientific expert opinions: testable hypothesis, peer review, known or potential rate of error, standards controlling the technique's operations, generally accepted,

---

[9] TABAK & DUNBAR, MATERIALITY & MAGNITUDE: EVENT STUDIES IN THE COURTROOM, April 1999 (Pls.' Ex. 7).

12

relationship to reliable methods, qualifications, and non-judicial uses for the methodology. ~~*Elcock*, 233 F.3d at 745-46. Dr. James's statistical analysis is testable and he tested it: the~~ results were statistically significant and demonstrated that Adams Golf's stock price was caused by factors *other than* the gray market. (Ex. 336 at 27-32 ¶¶ 65-71; James Dep. Tr. 232:10-233:10.) His event study and regression analysis were subject to peer review. His exhibits report the known or potential rate of error. There are clear standards controlling his statistical analysis. (MacKinlay Decl. ¶¶ 18-20.) Plaintiffs admit that the event study approach is a generally accepted, reliable method. (Mot. at 13.) And, for good reason, plaintiffs do not dispute Dr. James's qualifications—he is a well-published and well-respected scholar in financial economics. (Ex. 336 at James Ex. 1.) Finally, Dr. James's statistical analysis is widely used in academic, research, and other non-judicial settings. (MacKinlay Decl. ¶¶ 18-20.)

Dr. James's analysis stands in stark contrast to Miller's opinion. Miller does not suggest a way that his opinion can be tested—he simply asserts that anyone else looking at the data would come to the same conclusion. Miller cannot identify any peer-reviewed article that uses his ad hoc methodology. Because his opinions cannot be tested, there is no known or potential rate of error. Miller does not appear to articulate any particular standard controlling his analysis and cannot demonstrate that his personal speculation is generally accepted in *any* field. And while Miller had some experience with public offerings more than twenty years ago, he has no experience in statistical analysis other than as a hired witness for plaintiffs. Finally, Miller does not appear to cite to any non-judicial setting in which his do-it-yourself speculation has been used.

Plaintiffs state that Dr. James's report ignores alleged stock-price declines in response to gray marketing activity. This is a nonsequitur as there were no such declines.[10] Dr. James's report analyzed the news about gray marketing, and he concluded, based on reliable, scientific analysis, that news of gray marketing did *not* cause a statistically significant change in Adams Golf's stock price. (Ex. 336 at 4-5 ¶¶ 6(c), 6(d).) Since this conclusion does not comport with plaintiffs' theory of the case, they have chosen—in apparent desperation—to mischaracterize Dr. James's analysis as lacking objectivity.

Miller attributes the entire decline in Adams' Golf stock price solely to gray marketing under an unrecognized "leakage" theory. (Ex. 335.) He does so despite the fact that the industry showed a general downward trend during the class period, there were new competitive products in the market, and Adams Golf announced that its expected fourth quarter sales would be affected by general weakness in the golf equipment market. (Ex. 336 at 5 ¶ 6(d), 6(f).) If Dr. James put blinders on to these other factors, as Miller did, then his opinion would be considered unreliable. *See Blue Dane Simmental Corp. v. Amer. Simmental Assoc.*, 178 F.3d 1035, 1040-41 (8th Cir. 1999) (affirming exclusion of expert's testimony that entire difference in market price was due to allegations when various other factors contributed to loss of market value); *Carpe*, 2005 WL 1138833, at *4 (disqualifying expert when he failed to take into account other factors that could have affected the stock price). Because Dr. James's report properly considers all the factors affecting Adams Golf's stock price, it is both reliable and objective.

---

[10] *See supra* note 2 for a discussion of the October 23, 1998 decline.

## CONCLUSION

For all these reasons, plaintiffs' motion to exclude should be denied and Dr. James's testimony should be admitted as reliable.

OF COUNSEL:
Paul R. Bessette
Jennifer R. Brannen
Michelle A. Reed
Laura Moriaty
Akin Gump Strauss Hauer & Feld LLP
300 West 6th Street, Suite 2100
Austin, Texas 78701

/s/ Jeffrey L. Moyer
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

On Behalf of All Defendants

Dated: October 9, 2006

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2006, I have caused the foregoing to be served by Hand Delivery which has also been filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Carmella P. Keener
Rosenthal, Monhait & Goddess
919 Market Street, Suite 1401
Wilmington, DE 19801

Robert K. Payson
John E. James
Potter Anderson & Corroon LLP
1313 North Market Street, Hercules Plaza
Wilmington, DE 19801

I hereby certify that on October 9, 2006, I have sent by electronic mail the foregoing document(s) to the following non-registered participants:

Neil Mara
Todd S. Collins
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA 19103

Michael J. Chepiga
Theodore J. McEvoy
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Jeffrey L. Moyer (#3309)

RLF1-2851933-2