EXHIBIT 314

Rebuttal to Expert Report of Christiana Ochoa
H. Stephen Grace, Jr., Ph.D.



## I. SCOPE OF REBUTTAL REPORT

Counsel for Adams Golf, Inc. and the Individual Defendants in this case have retained me to opine on the reasonableness of the investigation they conducted in connection with Adams Golf, Inc.'s IPO. I am being compensated at an hourly rate of $550 per hour. On July 14, 2006, I submitted an expert report in this case. I am submitting this Rebuttal Report to rebut certain opinions and claims contained in the Expert Report of Christiana Ochoa, submitted by plaintiffs on July 14, 2006 (the "Ochoa Report").

My qualifications, prior testimony, and publications were set forth in my initial report. I have already opined that the Individual Defendants conducted a reasonable investigation in connection with the IPO and that this process resulted in a Registration Statement and related Prospectus that they had reasonable grounds to believe and did believe was complete and true. To formulate the opinions contained in this Rebuttal Report, I have reviewed the materials listed in my initial report and in the Document Index produced to plaintiffs on July 25, 2006, as well as additional materials, including the Ochoa Report, listed in Exhibit A to this Rebuttal Report. The additional opinions I express in this Rebuttal Report are based on my experience and the knowledge of customary and normal business practices developed over my 35 + years of senior management and consulting experience, as well as my review of documents and other materials listed in my initial report, my Document Index and Exhibit A.

## II. SUMMARY OF REBUTTAL OPINIONS

Ochoa opines that, at the time of the Adams Golf IPO, gray market distribution was an important risk faced by investors in Adams Golf and that the gray market distribution and sale of Adams Golf's clubs was of such a nature as to be a material consideration to persons considering investing in Adams Golf's securities. Ochoa's attempt to support this position fails. Not only are her underlying assumptions and assertions about the gray market wrong (as will be addressed in the report of Gary Frazier), but as will be shown below, she relies on data that does not support her position and wrongly asserts the steps taken by Adams Golf management to investigate and manage Costco's gray marketing of this product were inadequate. Further, much of the information she relies on did not become available until after the IPO.

The Individual Defendants of Adams Golf addressed their responsibilities appropriately, and within customary and normal business guidelines, in connection with the initial public offering of Adams Golf. Adams Golf's management monitored the marketplace and responded to data flowing from the marketplace. They did so on a timely basis and in a thoughtful, thorough manner as was shown in Exhibit VII of my report.

From the outset, Adams Golf's management sought to determine the nature of the purported Adams Golf clubs acquired by Costco. When the Company first became aware

2

that purported Adams Golf clubs had been seen in Costco, management was uncertain whether the Company was facing a situation of counterfeit clubs (a black market problem) or a situation of an unauthorized distributor obtaining clubs from an authorized distributor (a gray market problem). Adams Golf's management worked diligently to manage this business issue. The steps that they took to investigate and address the issue were reasonable and demonstrated appropriate business judgment in light of the limited number of complaints they were receiving and the indication from WDC Mackenzie that Costco had a limited number of clubs.

Adams Golf and the Individual Defendants worked with experienced professionals in preparing for the Company's IPO. They interacted appropriately in the preparation of the Registration Statement and Prospectus. Those involved with the IPO understood that gray market issues had been present for a long period of time in the golf industry. They knew about the purported Adams Golf clubs appearing in Costco, and their respective analyses of the issue did not support including the gray market as a risk factor in the offering documents.

Adams Golf and the Individual Defendants understood gray market issues in the golf industry and their attendant effects, and they were diligent and timely in monitoring and addressing the gray market issues. The Individual Defendants followed customary and normal business guidelines in their management and oversight of Adams Golf and the gray market issue. And based on the information that existed at the time, they believed and had reasonable grounds to believe that the Registration Statement and Prospectus were true, complete and accurate without the inclusion of gray marketing as a specific risk factor.

### III. ADAMS GOLF'S OFFICERS AND DIRECTORS TOOK APPROPRIATE STEPS TO INVESTIGATE AND ADDRESS THE COSTCO ISSUE

Ochoa fails to put the Costco issue into the appropriate context. First, although she defines the black market and the gray market, she fails to note that when the problem with Costco in Canada first arose, both WDC Mackenzie and Adams Golf were trying to determine the nature of the problem at Costco in Canada, that is, whether it was a black market problem or a gray market problem. This is reflected in the correspondence between WDC Mackenzie and Costco, and the subsequent follow-up between Adams Golf and Costco. (Ex. 6, 7, 19, MCK 00087-00089, ADAMS 1505, ADAMS 1501-1503, ADAMS 1499, ADAMS 1498-1500) Importantly, despite the limited information available as to the magnitude of the problem and knowing the Canadian market in total represented a very small portion of Adams Golf's marketplace, Adams Golf was both diligent and timely in its efforts to determine what had happened. Exhibit VII of my report sets out the events and actions taken by Adams Golf.

Exhibit VII is useful in placing the Costco issue in the proper context. Adams Golf, as reflected in Exhibit VII, sold 188,898 clubs in the quarter ending March 31, 1998. (ADAMS 028669) Adams Golf sold 268,598 clubs in the quarter ending June 30, 1998, for a total of approximately 457,500 clubs in the first half of 1998. (ADAMS 028669) Exhibit VII also reveals that data obtained from Costco long after the IPO

3

indicates Costco obtained approximately 8,400 clubs in the US and Canada in total during this same six month period ending June 30, 1998. As such, the Costco clubs available for sale (a smaller number was actually sold) represented less than 2% of Adams Golf's sales in that six month period. (ADAMS 028669.)

Further, Exhibit VII sets out the complaints received by Adams Golf from its authorized distributors. Only nine retailers/distributors (including WDC Mackenzie, the Canadian distributor) complained during the period prior to the July 1998 IPO. (ADAMS 040794-042910)

Exhibit VII sets out the interaction between WDC Mackenzie and Adams Golf in response to the appearance of Adams Golf clubs in Canadian Costcos. WDC Mackenzie had a continuous series of communications and meetings with Adams Golf personnel, as is reflected in the Exhibit. (ADAMS 9325, MCK 00093-00096, ADAMS 9325-9328, MCK 00087-00089, ADAMS 9405-9410, ADAMS 1497) In spite of the concerns WDC Mackenzie expressed to Adams Golf, the memo from Greg Pratt to Barney Adams dated August 19, 1998 sets out that Mackenzie expected to sell 23,800 Adams Golf clubs in 1998 as compared with the 5,000 clubs sold in 1997. (MCK 00072-00074) While Pratt states the 23,800 was less than WDC Mackenzie's originally projected sales of 26,000 clubs, he sets out several obstacles which he believed had impacted the sales of Adams Golf clubs. These included the fall of the Canadian dollar (over 15%), the emergence of the Orlimar club as a competitor to Adams Tight Lies, and the competition offered from the new Callaway Fairway Woods, in addition to the Costco problem. (MCK 00072-00074) Pratt actually failed to mention the general decline facing the golf equipment industry which had been identified by this time.

That background is useful for examining the actions of Adams Golf set out in Exhibit VII. Adams Golf moved directly and aggressively to address the Costco problem, and continually monitored the marketplace for other gray market distribution issues. Adams Golf began to monitor large orders for potential gray market problems. (ADAMS 1323) Adams Golf stopped a large order from going to King Par in Flint, Michigan for fear of potential gray marketing. (ADAMS 1323) Internal discussions at Adams Golf emphasized the diligence with which Adams Golf addressed gray market issues of all types, reflecting Adams Golf's understanding that gray market issues could not be totally eradicated but had to be properly controlled. (Ex. 109, ADAMS 003825) Adams Golf was timely and thorough in the actions taken to manage gray market issues.

Adams Golf had approximately 7,000 authorized U.S. retailers and a number of international distributors, and received complaints from only 9 of these in the pre-IPO period. Yet Adams Golf communicated with all of their distributors and threatened to terminate any who participated in gray marketing. (MCK 00081-00082) Adams Golf worked to make clear that they were going to take every step possible to properly control gray marketing and keep it from becoming a problem.

The CEO of Adams Golf, Barney Adams began to communicate directly with Costco to determine whether the clubs had actually been manufactured by Adams Golf

4

and, if so, the source from which Costco was obtaining the clubs. (ADAMS 1505, ADAMS 1501-1503, ADAMS 1499, ADAMS 1498-1500) After several communications with Costco proved unsatisfactory to Barney Adams, Adams Golf took legal action against Costco by filing a Bill of Discovery in Texas State Court. (ADAMS 1474-1493) Even though WDC Mackenzie and Adams Golf believed that the supply of clubs at Costco was drying up, Adams Golf remained determined to gain an understanding of the source of the problem. (ADAMS 001548-001549)

Adams Golf's business plan was to preserve its relationships with its authorized retailers and distributors and to protect the profit margins of these authorized sellers. Adams Golf implemented a price matching policy in Canada in a highly targeted fashion to address what WDC Mackenzie saw as a need for protection. (MCK 1053-1055)

Post-IPO, the intensity of Adams Golf's efforts to address gray market distribution issues continued. They remained dedicated to pursuing the issues on a timely and thorough basis. Adams Golf continued to consider alternative approaches to addressing the gray market distribution issue, ultimately making the decision to serialize their clubs. (ADAMS 9088-9091, ADAMS 27732-27735) Adams Golf believed that these gray market issues would be satisfactorily addressed by the end of 1998. (ADAMS 001548-001549)

The officers and directors of Adams Golf were familiar with the gray marketing issues in the golf equipment industry. The professionals assisting Adams Golf in preparing for their IPO were also familiar with these gray market issues. Adams Golf and the Individual Defendants took appropriate steps to investigate and address the Costco issue, and they concluded that gray marketing did not pose a material risk at the time of the IPO.

## IV. THE OCHOA REPORT

Ochoa bypasses all of this information as she attempts to support the Plaintiffs' position set out earlier in this rebuttal. Here I comment on certain sections of Ochoa's report, understanding that other sections are being addressed by others.

Ochoa, in paragraph 15.A, attempts to cite 108 clubs being returned to WDC Mackenzie as a major problem, but this number pales compared to WDC Mackenzie's estimated 1998 sales of 23,800 clubs, in spite of the obstacles Greg Pratt pointed to in his August 19 memo to Barney Adams cited earlier. Ochoa's efforts to point to Chris Beebe's communications as a recognition of a major problem is misleading. Beebe's communications evidenced Adams Golf's efforts to be vigilant. As stated previously, Adams Golf treated gray market issues directly because they understood the importance of controlling these issues.

Ochoa, in paragraph 15.A, cites Chris Beebe's memo of May 6, 1998, but takes words out of context. Beebe is reviewing a number of matters and, in all of the cases, makes clear Adams Golf's dedication to protecting its authorized distributors and the profit margins they are earning. (Ex. 51) He is indicating the vigilance with which

5

Adams Golf will pursue these matters and sets them out as a warning in his memo which went to all of Adams Golf's distributors. (Ex. 51)

Ochoa, in paragraph 15.B and 15.C, cites sales data which was not available at the time of the IPO. As set out earlier in this rebuttal, when the data subsequently became known, it was reflective of the minor nature of the problem, less than 2% of Adams Golf's sales in the first half of 1998. (ADAMS 028669) Ochoa overlooks the immaterial size of the problem and more importantly overlooks the fact that Adams Golf was addressing the problem in a timely and thorough manner.

Again, in paragraph 16, Ochoa stretches in her attempt to say that Adams Golf, at the time of the initial public offering, "believed this was a serious problem." (Ochoa ¶ 15.A., 16) Ochoa failed to consider that Adams Golf knew it was important to address gray marketing matters in a timely and diligent manner to keep the gray marketing under control. The Beebe and Gonsalves memos reflect the diligence of Adams Golf's approach. The memos reflect the fact that the Company took the issues seriously, but they do not support a conclusion that there was any reason for management to believe that they could not monitor and minimize gray marketing of the Company's clubs. Ochoa's reference to the Company's Board of Directors seeming to have requested that it meet when serious issues such as Costco come up, is an extrapolation from a single line item in six handwritten pages of one of the attendee's notes from the October 1998 Board Meeting. (Ochoa ¶ 16) Gray marketing was felt to be a material issue in October 1998 (Ex 151 at ADAMS 2238-2243), and Adams Golf promptly disclosed it at that time. The notes from the Board Meeting, whatever their meaning at that time, do not reflect that gray marketing was a serious issue facing the Company pre-IPO.

Ochoa, in paragraph 17, fails to point out that the June 8th plan she references actually supports the fact that Adams Golf was taking appropriate actions to address the issue. The alternatives under consideration carried a small cost and were directed toward dealing with a temporary problem (as is reflected in that memo) and reflects Adams Golf's aggressive consideration of alternatives to control the well known gray market issues which face the golf equipment industry.

Ochoa, in paragraph 21.D, continues to take the position that the gray market sales were very damaging to Adams Golf, citing what occurred in Canada. Again, the facts do not support Ochoa, as records obtained much later reveal. Costco obtained only approximately 8,000 clubs in the pre-IPO period and only approximately 6,000 clubs in the post-IPO period. While Ochoa cites the Magnussen Declaration, she overlooks the memo from Greg Pratt of WDC Mackenzie to Barney Adams dated August 19, 1998 (cited earlier here in this rebuttal as well as in my report). To restate, Pratt sets out that WDC Mackenzie's current projection for 1998 sales were 23,800 units verses 5,000 units sold in 1997 and 335 units sold in 1996.

Ochoa, in paragraph 21.E, raises Adams Golf filing of a Bill of Discovery against Costco on June 9, 1998. (ADAMS 1474-1493) Once more, Ochoa fails to mention that Adams Golf was attempting to determine whether the clubs at Costco were from the gray market or the black market, as that had not been determined. There were no numbers of

6

how many clubs were in Costco's hands, nor were there facts relating to the source(s) of these clubs. What was apparent, and what Ochoa fails to mention, is that Adams Golf was taking action to determine the source of the problem, even though the sense of the situation at that point in time was that the problem was small, and this was validated by data that became available later.

There was no way for Adams Golf to determine at the time of the IPO how many clubs Costco had purchased before the IPO, contrary to Ochoa's implication that Adams Golf inflated its sales figures through these sales. (Ochoa ¶ 28.B.) Nor is there any evidence that these sales would not have been made to authorized sellers if the Company could have prevented its clubs from being diverted to Costco. These were not inflated sales—they were real sales to authorized retailers and distributors and ultimately to end users—the golfers purchasing them.

In summary, Ochoa's attempt to support the Plaintiffs' position fails. Adams Golf and the Individual Defendants were diligent, thorough and timely in addressing their responsibilities regarding the issues Ochoa raises. Notwithstanding that the Canadian marketplace in total comprised less than 2% of their sales, and notwithstanding that their Canadian distributor's sales were close to projected levels in the face of multiple obstacles unrelated to Costco, Adams Golf and the Individual Defendants worked timely and diligently to protect their authorized sellers and to control gray market issues. Adams Golf and the Individual Defendants understood gray market issues in the golf industry, understood the need to control gray market issues, and properly considered these points in arriving at the conclusion that the Prospectus and Registration Statement were true, complete, and accurate.

July 28, 2006

_____
H. Stephen Grace, Jr., Ph.D.

7