EXHIBIT 432



Adams Golf, Inc.
Accounts Receivable Testwork
12/31/98

**Purpose:**
To document the procedures performed on accounts receivable as of 11/30/98.

**Procedures:**

- To test the existance and accuracy of A/R, KPMG obtained the 11/30/98 Aged Receivables Report from Dallas Rainwater, Controller, and judgementally selected a sample of 20 customer balances to confirm. KPMG selected 16 customer balances based on key item criteria (large dollar balances) and selected 4 customer balances randomly. See confirms sent at L-30 and the results of the confirmation process at L-14.

- To test the accuracy of the A/R aging, KPMG randomly selected an additional 7 customers (based on large dollar balances) from the Aged Receivables Report. KPMG obtained a detail listing of the invoices that make up the customer balances and selected one invoice from each customer's detail listing. KPMG chose high dollar invoices from all aging categories. The following invoices were selected: *(greater than $10,000)*

    | Invoice # | Customer | Due Date | Amount |
    |---|---|---|---|
    | 10092600 | Bavarian Village | 10/18/98 | $32,339 |
    | 10086327 | Carls Golfland | 12/26/98 | 77,815 |
    | 10093040 | Frys Sports | 12/20/98 | 93,662 |
    | 10097130 | Nevada Bob's | 01/05/99 | 2,383 |
    | 10106754 | Polar Golf | 12/20/98 | 9,058 |
    | 10083514 | Special Tee Golf | 10/04/98 | 8,764 |
    | 10080498 | Wheat Road Golf | 09/12/98 | 8,530 |

- KPMG tested the aging categories by calculating the days outstanding from the invoice due date through 11/30/98. KPMG then reviewed each customer's detailed aging report noting that the invoice amount was in the appropriate aging category. No exceptions were noted.

- *KPMG agreed the A/R balance per the aging to the GL A/R balance w/c/c /@ 11/30/98.*

**Conclusion**
Based on the procedures performed above, it appears that A/R is properly stated, and the A/R aging system is working properly. KPMG will rely on the results of this testwork at 12/31/98.

KPMG 2095

# GRACE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

..............................................
                                  :
IN RE: ADAMS GOLF, INC.           : CIVIL ACTION NO.
SECURITIES LITIGATION             : 99-371-KAJ
                                  :
..............................................


ORAL TELEPHONIC DEPOSITION OF

H. STEPHEN GRACE, JR., Ph.D.

AUGUST 7, 2006


..............................................


ORAL TELEPHONIC DEPOSITION OF H. STEPHEN GRACE, JR., Ph.D., produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on Monday, August 7, 2006, from 10:08 a.m. to 4:42 p.m., via telephone before Mary C. Dopico, Certified Shorthand Reporter No. 463 and Notary Public in and for the State of Texas, reported by machine shorthand at the offices of Akin Gump Strauss Hauer & Feld, LLP, 1111 Louisiana Street, 42nd Floor, Houston, Texas, pursuant to Notice and the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 46

1  market's there. It's something you work to control,  10:51:56
2  but it's always going to be there.  10:51:58
3  ~~You realize that the manufacturers~~  10:51:58
4  incentivize the pros to transship. Do you realize  10:52:04
5  that?  10:52:06
6    Q. Please tell me.  10:52:06
7    A. Yeah. Yeah. The manufacturers, many of  10:52:08
8  them, and they are listed in the PGA magazine, that  10:52:12
9  support the PGA pros by -- When you buy from them,  10:52:16
10 depending upon the quantity you buy, they contribute  10:52:20
11 to your individual retirement plan.  10:52:22
12    So if you talk to PGA pros and are  10:52:26
13 familiar with that, many of them -- You have the  10:52:28
14 clubs and you're on one side of Florida, I'm your  10:52:30
15 friend, I don't have any. You pick up -- You get a  10:52:32
16 few more clubs than you need. You ship them to me so  10:52:34
17 I can sell them out of my pro shop.  10:52:36
18    That's been something that's  10:52:38
19 characterized golf for a long time. So in fact  10:52:42
20 incentivized by the manufacturers. And the last list  10:52:44
21 I looked at, Adams is not one of those. But so  10:52:48
22 what? It's this process has been there for a long  10:52:52
23 time.  10:52:52
24    Just like the Costco process. They  10:52:54

Page 47

1  clearly had a chain set up by which they got the  10:52:58
2  Callaways, the Pings and the Taylor Mades. So all  10:53:02
3  they had to do was call in those people for Adams. I  10:53:06
4  mean, I don't know precisely what happened, but it's  10:53:08
5  not a big stretch.  10:53:10
6    But when a product's life comes to an  10:53:12
7  end and the thing's over, the new product comes out.  10:53:16
8  So there are ways -- there are ways that you can --  10:53:18
9  excuse me, that you can control this problem, and so  10:53:20
10 control is -- it is something you continually deal  10:53:24
11 with in different forms over time.  10:53:26
12    But that's -- All that's to the point  10:53:28
13 of your question about why I don't believe it's  10:53:30
14 represented material omission.  10:53:36
15    Q. Uh-huh. Your last answer was quite  10:53:38
16 interesting. One of the things you said was when the  10:53:44
17 product cycle is complete -- tell me if I got this  10:53:48
18 wrong -- the problem -- problem is over? Did I hear  10:53:50
19 that correctly? When the product isn't hot any more,  10:53:52
20 then the gray marketing issue goes way?  10:53:56
21    A. Or you come out with a new product.  10:53:58
22    Q. I see.  10:53:58
23    A. Then there is less demand. Those people  10:54:00
24 are stuck with an old product, but the world's  10:54:02

Page 48

1  looking for the new product.  10:54:04
2    Q. I see. So then there is less -- If it's  10:54:06
3  not a hot product, there's less gray marketing going  10:54:10
4  on; is that it?  10:54:10
5    A. People want goods. Basically, I think we  10:54:12
6  all know the degree that they can sell. You know,  10:54:16
7  they don't want to buy something and hold it in  10:54:18
8  inventory. So they are looking for those products  10:54:20
9  that are hot which they don't have.  10:54:22
10   Q. Okay. Now, in your last two answers, the  10:54:24
11 basis of that information was your experience as a  10:54:26
12 golfer over the last 60 years or something else?  10:54:30
13   A. No. I think it's more than that. I mean,  10:54:32
14 I think -- this is -- this is why -- this is why  10:54:34
15 neither Lehman nor Nations/Montgomery Securities then  10:54:38
16 are concerned about, in our mind. This is why the  10:54:42
17 directors knew it was there. Barney Adams knew it  10:54:46
18 was there. But it was not significant.  10:54:48
19   Q. Right. But what I'm asking you, sir, is  10:54:50
20 what's the basis of your testimony over the last few  10:54:54
21 minutes about the gray market? How do you have the  10:54:56
22 fund of knowledge that allows you to opine on that  10:55:00
23 question?  10:55:02
24   A. Well, remember -- remember that what we're  10:55:06

Page 49

1  looking at here is a document -- People other than  10:55:12
2  us wrote the document, okay, and they chose to leave  10:55:14
3  that out. All right?  10:55:16
4    Q. By "the document," forgive me, you mean the  10:55:20
5  Registration Statement?  10:55:22
6    A. The Registration Statement, yes.  10:55:24
7    Q. Continue, please.  10:55:26
8    A. And so we're evaluating the fact that it's  10:55:28
9  been left out, okay, and why it was being left out.  10:55:30
10 Okay? Part of that, when we look back at how these  10:55:34
11 people arrived at that decision, can build on our own  10:55:38
12 experience; but it's not building exclusively on our  10:55:42
13 own experience. It's building on the players that  10:55:44
14 was there and the processes they undertook, the  10:55:48
15 knowledge that they had as they moved toward this  10:55:50
16 decision not to include it.  10:55:52
17   Q. I see. Have -- Now, you've been working  10:55:54
18 on this assignment for several months apparently;  10:55:56
19 right?  10:55:56
20   A. I guess about four months.  10:55:58
21   Q. Okay. And I notice that several other  10:56:00
22 people from your firm have worked with you on this  10:56:04
23 and --  10:56:06
24   A. Yes.  10:56:06

Page 130

1 is that we were named in the documents presented to 12:37:28
2 the Court.
3 Q. Sure. 12:37:28
4 A. It settled before we ever got to, you know, 12:37:30
5 deposition. 12:37:30
6 Q. And in all of those cases Akin Gump hired 12:37:34
7 you. 12:37:34
8 A. Correct. Yes. 12:37:36
9 Q. Okay. Now, in this case, I'm back to page 12:37:38
10 5, the third paragraph, you say that you've been 12:37:52
11 retained here "to provide an opinion regarding the 12:37:54
12 nature of the roles, responsibilities and actions 12:37:56
13 taken or omitted by the individual defendants." 12:38:00
14     What specifically were you asked to 12:38:10
15 do? Now, I'm not asking what you did, obviously, 12:38:16
16 because you have a nice long report here. But I'm 12:38:18
17 asking what were you asked to do at the beginning? 12:38:22
18 A. Well, when you have the discussions 12:38:24
19 initially, as you would know, oftentimes there is 12:38:26
20 some generalized discussions; and you begin to come 12:38:30
21 in on what the customer, the client, yourselves -- be 12:38:34
22 it you or Paul -- want us to do. We talk about 12:38:36
23 things, what our background, where it might be 12:38:40
24 helpful, who else you're using on the team and so 12:38:42

Page 131

1 forth.
2     And as I sit here right now and try to 12:38:44
3 boil it down, I think it comes down to number one was 12:38:48
4 the governance process, the management and governance 12:38:52
5 of this was this process that led to the IPO. Was it 12:38:56
6 conducted properly? Was it thorough? Timely? 12:38:58
7 Diligent? That type of thing like that. Inside that 12:39:00
8 we had to address other issues. 12:39:02
9 Q. Now, I'm intrigued by the distinction 12:39:04
10 between a due diligence opinion and an opinion 12:39:14
11 relating to what actions were taken in response to 12:39:16
12 indications of gray marketing. And it seems here 12:39:20
13 that you provided both. And I'm wondering what the 12:39:22
14 second part of that has to do with the due diligence 12:39:26
15 opinion. 12:39:28
16 A. Well -- 12:39:28
17     MR. BESSETTE: That's vague to me, so 12:39:30
18 I'm not sure if you understand it. 12:39:32
19 BY MR. COLLINS:
20 Q. I think -- 12:39:32
21     MR. BESSETTE: Go ahead. 12:39:34
22 Q. -- many lawyers have asked better questions 12:39:36
23 than that one was. Let me try again. 12:39:40
24     I'm struck by your opinions here that 12:39:42

Page 132

1 they seem to be focused not just on whether -- on the 12:39:46
2 issue of whether the individual defendants exercise 12:39:48
3 due diligence in investigating the disclosures 12:39:54
4 required for the Registration Statement; but you also 12:39:58
5 go on it at considerable length with regard to what 12:40:02
6 the responses to the gray market situation were at 12:40:08
7 Adams Golf before the IPO; and I'm wondering why you 12:40:12
8 thought it appropriate to get into the second issue 12:40:14
9 in view of the fact, as you well know, this is a '33 12:40:18
10 Act case. 12:40:20
11 A. The -- Because of the linkage to the due 12:40:24
12 diligence of the process, what the two parties are 12:40:28
13 saying -- defendants are saying we did it okay and 12:40:30
14 the plaintiffs are saying you didn't do it okay -- 12:40:32
15 centered around this gray market issue. 12:40:36
16     So we're going to look at gray market, 12:40:38
17 look at what was going on out there with regard to 12:40:40
18 gray market, much to what I said earlier. Was there 12:40:44
19 something out there either then or even later that 12:40:48
20 would have been indicative that the process did not 12:40:50
21 work as you might hope for. That's how the gray 12:40:52
22 market gets wrapped into it here. 12:40:56
23 Q. Okay. 12:40:56
24 A. I think that's a fair -- I mean, it may 12:40:58

Page 133

1 be --
2 Q. No, no, no. 12:40:58
3 A. I think that's a fair statement as I sit 12:41:04
4 here. 12:41:04
5 Q. No, no. That's helpful. But how does it 12:41:04
6 relate to the issues in this case, as you understand 12:41:08
7 them, as to how Adams Golf responded to gray 12:41:16
8 marketing? How does that relate to this case? 12:41:18
9 A. I think I would say it this way. If we 12:41:24
10 looked at the process, the governance management 12:41:26
11 process and said they did everything we think they 12:41:30
12 should have, and just -- We found that. All right? 12:41:32
13 There are two other situ -- there are two other 12:41:36
14 outcomes that would be interesting. One is a problem 12:41:40
15 and the question is: Did they do everything they 12:41:42
16 should have? And we said: We think the process was 12:41:44
17 fine; but by the way, they either missed it or they 12:41:48
18 got it right. You know, because if they missed it, 12:41:50
19 if they missed it, that's one sort of problem. All 12:41:54
20 right. You've got a great process, but you missed 12:41:56
21 the situation. 12:41:56
22     If you had a great process but you 12:41:58
23 didn't miss the situation, then to us there is no 12:42:02
24 business liability issues there in terms of what we 12:42:06

34 (Pages 130 to 133)

Page 134

1  examined.                                  12:42:06
2  Q. All right. That's helpful. And I        12:42:08
3  apologize. I'm not quite getting it yet.   12:42:10
4     Is it fair to characterize your work    12:42:14
5  in this case as being divisible in two parts? One is  12:42:18
6  looking at how Adams Golf responded to the gray  12:42:24
7  market problem; and the second is whether the failure  12:42:28
8  to disclose gray marketing as a risk was material.  12:42:32
9  Is that -- Is that a fair characterization of what  12:42:36
10 you were looking at?                       12:42:36
11    MR. BESSETTE: That misstates --         12:42:36
12 BY MR. COLLINS:
13 Q. Okay.                                   12:42:38
14 A. Yeah.                                   12:42:38
15 Q. Let me try it again, because I'm not trying  12:42:42
16 to put words in your mouth. I am -- Let me ask it  12:42:44
17 in a hypothetical way.                     12:42:46
18    As I understand it, one of the things   12:42:48
19 you looked at was how -- how Adams Golf responded to  12:42:54
20 the gray market problem pre-IPO. Am I right so far?  12:42:58
21 A. In the context of the -- of the governance  12:43:02
22 process, of the IPO preparation process, yes.  12:43:06
23 Q. Okay. That's fine. That's fine.         12:43:08
24 A. And then I looked at -- we looked at the  12:43:10

Page 135

1  gray market. I want to be careful about -- I may  12:43:14
2  not have heard that question as you said it exactly.  12:43:16
3  I wandered off slightly.                   12:43:18
4  Q. Well, my questions often wander off.    12:43:22
5  A. No. I said I wandered off. I didn't say  12:43:26
6  you wandered off, just to clarify.         12:43:28
7  Q. I'll ask you a hypothetical. Let's say  12:43:38
8  Adams Golf did not -- You believe Adams Golf  12:43:40
9  responded properly to what I believe you   12:43:42
10 characterized as the gray market problem pre-IPO; is  12:43:46
11 that right?
12 A. We think it was -- We think it was       12:43:48
13 appropriate -- It was understandable to us as to why  12:43:52
14 it was not included in the IPO documents.  12:43:56
15 Q. And that's where I may -- Perhaps it's my  12:43:58
16 confusing, Dr. Grace. What I am trying to do is to  12:44:00
17 step back here, because it looks to me that you did  12:44:04
18 two different things. And one of the things that you  12:44:06
19 did was to analyze -- Apart from the IPO. I  12:44:08
20 understand there was an IPO coming. But it looks to  12:44:10
21 me like part of your opinion here -- goes on page  12:44:14
22 after page -- is whether there was an IPO coming or  12:44:16
23 not, Adams Golf did certain things in response to the  12:44:20
24 gray market.                               12:44:20

Page 136

1     And it seems to me that your opinion   12:44:24
2  contains in a number of different spots your  12:44:28
3  conclusion that Adams Golf responded appropriately --  12:44:32
4  not to the disclosure issue, you put it in the -- in  12:44:38
5  the Registration Statement -- but instead it seems to  12:44:40
6  me that you're actually going out and opining that  12:44:44
7  Adams Golf responded appropriately to the business  12:44:46
8  issue of: You've got gray market, a gray market, a  12:44:50
9  gray market issue. Now, how are you going to respond  12:44:54
10 to it?                                     12:44:54
11    So let me try to translate that into    12:44:56
12 English. Do I understand your opinion in this case  12:45:00
13 to include, separate and apart from the IPO, a  12:45:06
14 conclusion that from a business standpoint the  12:45:08
15 individual defendants discharged their business  12:45:12
16 responsibilities to respond and -- to respond to and  12:45:18
17 address the gray market problem pre-IPO?   12:45:22
18    MR. BESSETTE: I need to just object     12:45:26
19 that it's vague and ambiguous because I can't even  12:45:26
20 tell which -- what -- what to object to.   12:45:30
21 BY MR. COLLINS:
22 Q. You know what then, let me try again.   12:45:32
23    MR. BESSETTE: All right.                12:45:36
24 BY MR. COLLINS:

Page 137

1  Q. You -- I think you said there was a gray  12:45:40
2  market problem pre-IPO. I think it's your opinion it  12:45:42
3  was not material. Are we right so far?    12:45:44
4  A. I think that's fair. I think --         12:45:46
5  Q. Okay. That's fine.                      12:45:46
6  A. I think -- I don't think I was chose --  12:45:48
7     MR. BESSETTE: That's fine. Yeah.        12:45:50
8  A. I wasn't asked to be a materiality expert  12:45:52
9  on the gray market issue. I want to make sure that  12:45:56
10 that's clear.                              12:45:56
11 BY MR. COLLINS:
12 Q. Okay.
13 A. But the fact that it was not mentioned did  12:45:58
14 not seem to be a wrong step to us.         12:46:00
15 Q. Okay.                                   12:46:00
16 A. Yeah.                                   12:46:00
17 Q. But I'm trying to divide the two parts and  12:46:04
18 I'm not being very eloquent.               12:46:06
19    You did work in this case on whether    12:46:08
20 pre-IPO Adams Golf and the individual defendants  12:46:16
21 responded appropriately to the gray market problem.  12:46:18
22 Is that fair?                              12:46:20
23    MR. BESSETTE: Okay.                     12:46:22
24 A. I think that we did work on examining the  12:46:24

35 (Pages 134 to 137)

Page 138

1  entire -- you know, trying to get a sense of        12:46:28
2  management, the board and the professionals, on how  12:46:30
3  they worked together or didn't work together, moving 12:46:32
4  towards this IPO.                                    12:46:34
5  BY MR. COLLINS:
6     Q. Ah, okay.                                      12:46:34
7        MR. BESSETTE: A reasonable                     12:46:36
8  investigation.                                       12:46:36
9        MR. COLLINS: Yes.                              12:46:38
10       MR. BESSETTE: That's where you guys            12:46:38
11 are getting hung up.                                 12:46:40
12 BY MR. COLLINS:
13    Q. And I think it may be just my confusion.       12:46:46
14 Because hypothetically it would seem to me that you  12:46:50
15 could have come to the conclusion that the individual 12:46:52
16 defendants didn't discharge properly their duties to 12:46:56
17 the shareholders to investigate and follow-up on the 12:47:00
18 gray market problem. But nonetheless, you could have 12:47:04
19 concluded the gray market problem wasn't something   12:47:06
20 that should have been disclosed as a risk in this    12:47:08
21 Prospectus. Is that --                               12:47:10
22    A. That --                                        12:47:12
23    Q. Is that --                                     12:47:12
24    A. You could have situations like that. I        12:47:14

Page 139

1  mean, you could have situations, you know, where    12:47:16
2  they're sort of what we would call liability -- and 12:47:18
3  whether that had damages to it or not. You know,   12:47:22
4  some document doesn't get delivered at a -- at a    12:47:26
5  financing closing; and, okay, somebody's got        12:47:28
6  liability for not delivering that document. But was 12:47:30
7  it consequential to losses --                        12:47:34
8     Q. Right.                                         12:47:34
9     A. -- you know, we all know that, those          12:47:36
10 arguments, yeah.                                     12:47:38
11    Q. Right. Thank you. That is helpful.            12:47:38
12 Because what I am getting at is I don't know why you 12:47:42
13 stuck your neck out and why you thought it was       12:47:44
14 appropriate or necessary in this case not only to    12:47:46
15 look at whether the risk should have been disclosed  12:47:50
16 or the potential risk should have been disclosed in  12:47:52
17 the Registration Statement, but you also provided a  12:47:58
18 good bit of work on an opinion that seems to say that 12:48:04
19 Adams Golf responded appropriately from a corporate  12:48:08
20 standpoint to a problem. And I don't understand why  12:48:12
21 those two are linked.                                12:48:14
22    A. What's the question?                           12:48:16
23    Q. Thank you.                                     12:48:16
24       MR. BESSETTE: Why -- Oh, okay.                 12:48:18

Page 140

1  BY MR. COLLINS:
2     Q. Why are they linked?                           12:48:20
3     A. Well, I think as I said earlier, you come      12:48:22
4  in here and we're looking at the: Was a reasonable   12:48:28
5  process followed, reasonable investigation, whatever 12:48:30
6  you would want to call it -- refer to it.            12:48:34
7        And in the course of that, the                 12:48:36
8  reasonableness, the thoroughness, diligence of the   12:48:40
9  process, seemed to center on the two parties'        12:48:44
10 disagreement about this one item. All right?         12:48:46
11       And so we look at the process. Part            12:48:50
12 of it is we look at that item and how these          12:48:54
13 parties -- again whether we're on the plaintiff's    12:48:56
14 side or defendant's side -- attempted to or appeared 12:49:00
15 to have addressed this along the way that they       12:49:02
16 made -- along their decision-making process or       12:49:06
17 trail.                                               12:49:08
18    Q. Uh-huh.                                        12:49:10
19    A. And so, you know, that's where we -- if --    12:49:12
20 if we had found something differently, we'd have to  12:49:18
21 say something differently. And we -- In the course   12:49:20
22 of that work and the evaluation of the process, I    12:49:26
23 think my feeling was it was most useful to do it     12:49:30
24 within a time frame pre-IPO, post-IPO that swung     12:49:36

Page 141

1  around the gray market.                              12:49:38
2        Were there issues in the gray market          12:49:40
3  that were not being properly addressed in this       12:49:44
4  process that management, the board, and the          12:49:46
5  professionals had in place? And that's where we keep 12:49:48
6  looking at that other area.                          12:49:50
7        But there -- It connects -- It                 12:49:52
8  connects to a number of areas. In other words, you  12:49:54
9  had to -- You know, you're making a determination    12:49:56
10 about: What type of person is Barney Adams? What's   12:50:00
11 his style? What's the relationship of these          12:50:02
12 directors early-on before this thing goes public?    12:50:06
13 What's their relationship with what they perceived to 12:50:08
14 be their distribution base, their customer base? How 12:50:10
15 did they -- You know, you're attempting to assess    12:50:14
16 how they looked at all this, because they all come   12:50:16
17 back, they all come up -- most of them come up       12:50:20
18 centered, at the end of the day, about: Did this     12:50:22
19 impact gray market? Does this mean something should  12:50:24
20 have been said or not been said about gray market?   12:50:28
21    Q. Okay.                                          12:50:30
22       MR. BESSETTE: Lunch whenever you're            12:50:34
23 thinking about it, because I'm getting hungry.       12:50:36
24    A. Oh, it's five to 1:00. Time has gone by.      12:50:38

## Page 142

1  BY MR. COLLINS:
2     Q. Heavens. We're having a good time.  12:50:40
3     ~~A. Indeed.~~  ~~12:50:40~~
4     Q. Just a couple more if I may --  12:50:44
5     MR. BESSETTE: Sure.  12:50:48
6  BY MR. COLLINS:
7     Q. -- because it is time for lunch.
8     Look, if you would, at page 5,  12:50:52
9  paragraph 5.  12:50:52
10    A. Yes.  12:50:52
11    Q. Paragraph starting out, "As is set out in  12:50:56
12 detail..."  12:50:56
13    A. Yes.  12:50:58
14    Q. This paragraph goes on to say "my  12:51:00
15 conclusion is that the company, its officers and its  12:51:02
16 directors satisfactorily addressed and fulfilled  12:51:04
17 their responsibilities and conducted a reasonable  12:51:08
18 investigation...immediately preceding and following  12:51:16
19 the initial public offering..."  12:51:18
20    That's fine. When you talk about  12:51:22
21 "their responsibilities" in this sentence, are you  12:51:26
22 referring to their responsibilities to investors in  12:51:30
23 the IPO or are you talking about some other set of  12:51:34
24 responsibilities?  12:51:34

## Page 143

1     A. I'm talking about the process that they had  12:51:38
2  in place. I mean, you were going toward an IPO. The  12:51:42
3  IPO might or might not happen. We -- You know, we  12:51:46
4  know that can be the situation.  12:51:48
5     So what was the magic process they had  12:51:52
6  in place? How did they interrelate? Were they  12:51:54
7  transparent? Were documents moving back and forth  12:51:58
8  between management and the board that they had? All  12:52:00
9  these type -- these types of things is what I'm  12:52:02
10 addressing.  12:52:04
11    Q. Okay. And then this paragraph goes on and  12:52:14
12 you say that "The officers and directors exercised  12:52:18
13 proper due diligence," and you continue "followed  12:52:22
14 customary and normal business practices in addressing  12:52:26
15 and fulfilling their responsibilities..." The  12:52:30
16 sentence continues.  12:52:32
17    A. Uh-huh.  12:52:32
18    Q. In this sentence when you referred to  12:52:34
19 "their responsibilities," does that mean in  12:52:38
20 connection with the IPO or does that mean a broader  12:52:40
21 set of responsibilities?  12:52:40
22    A. In the overall sense, as we were examining,  12:52:42
23 we did not look, for example, at the quality of their  12:52:46
24 assembly process, such as an example, or their real  12:52:48

## Page 144

1  estate process as they went from one situation to  12:52:52
2  another.  12:52:52
3     ~~We were looking -- What we saw in~~  12:52:54
4  this evaluation of this -- of this -- of the workings  12:52:58
5  of the company as it moved toward the IPO we saw  12:53:04
6  processes that we thought were defective.  12:53:08
7     Q. So you mean processes in connection with  12:53:10
8  the IPO.  12:53:12
9     A. Primarily, that was true; although, if  12:53:14
10 there was something else that came to our attention,  12:53:16
11 it could -- You know, for example, it also came to  12:53:18
12 our attention what they -- how they perceived their  12:53:20
13 relationship with their -- with their distributors  12:53:22
14 and their retailers. That was something that came --  12:53:24
15 somewhere as any relationships they had with  12:53:26
16 component suppliers, we had no idea of what was going  12:53:30
17 on there.  12:53:32
18    Q. Okay. And what still confuses me is what  12:53:36
19 their -- the individual defendants' -- relationship  12:53:42
20 with distributors or authorized retailers has to do  12:53:44
21 with your opinion. That's -- That's what I don't  12:53:48
22 understand.  12:53:48
23    A. Well, it does, because it comes into --  12:53:50
24 again, it comes into an issue of the gray market and  12:53:56

## Page 145

1  the -- and the relevancy of this gray market and how,  12:54:00
2  you know, whether our people -- albeit they may have  12:54:04
3  been trying to be doing the right thing -- missed it  12:54:08
4  as far as the gray market goes or didn't miss it.  12:54:10
5  And certainly there's things that are cited about  12:54:14
6  certain memos and other things like that that are  12:54:16
7  spoken to that the plaintiffs see one way, the  12:54:18
8  defendants see other way.  12:54:20
9     Q. Okay. And then the sentence goes on, "and  12:54:26
10 after their reasonable investigation, had reasonable  12:54:28
11 grounds to believe and did believe at the time the  12:54:34
12 Registration Statement became effective that it did  12:54:36
13 not contain any material misstatements or omit any  12:54:40
14 material facts."  12:54:40
15    Now, are you honestly opining on what  12:54:44
16 the individual defendants did believe?  12:54:46
17    A. I think that would come from the -- their  12:54:48
18 depositions; in other words, as they've all said that  12:54:52
19 they believed then and believe now.  12:54:54
20    I -- I wasn't inside of them as  12:54:56
21 you're -- as I think you're leading to, back at the  12:54:58
22 time that they signed this at the end of June, first  12:55:00
23 of July, so --  12:55:02
24    Q. You administered no lie detector tests.  12:55:06

### Page 146

1    A. At that time nor later.                    12:55:06
2    Q. Okay. So I gather when you opine as to     12:55:10
3 what the individual defendants did believe, you don't 12:55:12
4 really know what they did believe at the time they  12:55:16
5 signed the Registration Statement. You are not so   12:55:18
6 opining.                                        12:55:20
7    A. No. I'm not opining about that.           12:55:22
8    Q. Okay. Let us break for lunch and thank    12:55:24
9 you.                                            12:55:24
10       (Off the record from 12:55 - 1:40.)      13:40:26
11 BY MR. COLLINS:
12   Q. Okay. Let's resume. Let me go briefly     13:40:28
13 back to something I touched upon this morning. In  13:40:32
14 those situations where you -- you and your firm --  13:40:34
15 are retained to analyze loss causation or the lack of 13:40:42
16 it, can you tell me in general what your method of  13:40:44
17 analysis is? How do you go about doing it?      13:40:48
18   A. I think that's -- that's a good question. 13:40:50
19       I think in each case the best way I      13:40:54
20 can explain it is we try to get to the facts about  13:40:56
21 what -- what really took place. Who did what, where, 13:41:00
22 when and why, and what emerges, an analysis of those 13:41:04
23 items, what does that tell us based on the evidence 13:41:08
24 based on our experience?                        13:41:10

### Page 147

1    Q. Then on any particular day when there is a 13:41:24
2 stock price movement, what factors do you employ to 13:41:30
3 determine how on that particular day the stock price 13:41:34
4 movement can be explained?                      13:41:36
5    A. Well, as I --                             13:41:38
6       MR. BESSETTE: Again --                    13:41:38
7    A. -- mentioned earlier --
8       MR. BESSETTE: -- asked and answered.     13:41:40
9    A. I'm sorry.                                13:41:40
10      MR. BESSETTE: Go ahead.                   13:41:42
11   A. As I mentioned earlier, in most cases I  13:41:46
12 think you'd say you need to look at two -- two parts 13:41:48
13 of that. We look at one part of it. There is the 13:41:52
14 external part, as I've mentioned the economists and 13:41:56
15 so forth, people who do that type of -- as you  13:41:58
16 referred to it earlier -- statistical analysis or  13:42:02
17 combination of financial and statistical analysis and 13:42:06
18 look at what I'd call macroeconomic forces that are 13:42:10
19 moving in the marketplace.                      13:42:10
20 BY MR. COLLINS:
21   Q. Right.
22   A. And what's happening. You know, if all   13:42:12
23 these companies of whoever type that is drop 10 13:42:14
24 percent and you drop 5, you know, that's -- or you 13:42:18

### Page 148

1 drop 15 and maybe 10 of it's explained by the market 13:42:20
2 and another 5 that's got to be explained by what we 13:42:22
3 find.                                           13:42:22
4    Q. Right.                                    13:42:24
5    A. Inside the company. I think I would just 13:42:26
6 cut it up that way.                             13:42:26
7    Q. You said two parts though. So one is the 13:42:30
8 external --
9    A. Internal.                                 13:42:30
10   Q. -- and the other is the internal.         13:42:34
11   A. Let's just say the stock dropped 15      13:42:38
12 percent.                                        13:42:38
13   Q. Right.                                    13:42:38
14   A. And macroeconomist said: Look, all of    13:42:40
15 those types of stock dropped 10.                13:42:42
16   Q. Okay.                                     13:42:42
17   A. Okay? So that -- And upon looking at that 13:42:44
18 analysis, people agree the reasonable analysis, that 13:42:48
19 accounts for 10. What accounted for the other 5?  13:42:50
20 What inside the company on that particular day or 13:42:54
21 that became known or was moving around, they could 13:42:56
22 have -- that could -- doesn't necessarily have to 13:43:00
23 be -- that could explain the 5 percent drop.    13:43:02
24   Q. Okay.                                     13:43:02

### Page 149

1    A. You could have one seller that goes and  13:43:04
2 dumps on the marketplace. You know, again, your 13:43:06
3 macro person may have caught that. The market may 13:43:10
4 have perceived some turn in the company's operation. 13:43:12
5 That could be another thing.                    13:43:14
6    Q. Okay. And then -- And then what process  13:43:22
7 do you use in general to determine whether the  13:43:24
8 company-specific movement on a particular day is a 13:43:32
9 significant movement or instead if it's just noise or 13:43:36
10 random movement that doesn't reflect company-specific 13:43:38
11 factors?                                        13:43:40
12   A. Well --                                   13:43:40
13      MR. BESSETTE: Objection. I think         13:43:42
14 that's outside his area of expertise, which he's told 13:43:44
15 you several times.                              13:43:46
16   A. Yeah.                                     13:43:46
17 BY MR. COLLINS:
18   Q. Well, go ahead.                           13:43:48
19   A. I was going to say that a lot of that    13:43:48
20 type of information will be picked up by the    13:43:50
21 macroeconomist. All we're going to be looking at 13:43:54
22 is inside that company and the environment in which 13:43:56
23 they operate, what was going on there. You know, are 13:43:58
24 there any explanatory factors in there that tell us 13:44:02

Page 150

1  this negatively or positively was happening to the   13:44:04
2  company?   13:44:04
3  Q. Okay. And then you did testify to this   13:44:08
4  before, forgive me, but in doing that work, looking   13:44:12
5  inside the company, that you just described, do you   13:44:14
6  normally, as a customary matter, prepare an event   13:44:18
7  study?   13:44:18
8  A. We would prepare an event study in the   13:44:20
9  sense of a time line of what happened in terms of the   13:44:22
10 areas that we were addressing.   13:44:24
11 Q. I see.   13:44:24
12 A. That -- That type of event, and then go   13:44:28
13 look at those, the elements of that event study.   13:44:30
14 Q. Okay. Very good. Thank you.   13:44:32
15    Now, you opined in this case that the   13:44:36
16 officers and directors exercised proper due diligence   13:44:38
17 with regard to the omission of any disclosure about   13:44:46
18 risk -- gray marketing; correct?   13:44:48
19 A. Proper due diligence regarding to the   13:44:50
20 process that they put in place --   13:44:52
21 Q. Okay.   13:44:52
22 A. -- to arrive at those IPO statements.   13:44:56
23 Q. Now, some of the individual defendants were   13:44:56
24 management and some of them were outside directors;   13:45:00

Page 151

1  correct?   13:45:00
2  A. Correct.   13:45:00
3  Q. Are the standards the same?   13:45:02
4  A. No, I think that's where you're properly   13:45:06
5  dividing governance from management.   13:45:08
6  Q. Okay.   13:45:08
7  A. And it can take many, many different   13:45:10
8  forms. I mean, one of the basic parts -- and you can   13:45:14
9  find this in the -- what we would all call one on one   13:45:18
10 management text is the division of labor specific to   13:45:22
11 a firm at a point in time, literally.   13:45:24
12    So you have to go in and look -- Who   13:45:28
13 comprised the board? Who comprised the management?   13:45:32
14 The skill sets they had, how they tended to operate,   13:45:34
15 how they tended to interact, all that being directed   13:45:38
16 toward whatever the issue is that's being addressed,   13:45:42
17 the analytical issue that's on the table.   13:45:44
18 Q. One of the things you discussed in your   13:45:46
19 report is that the individual defendants -- it's   13:45:50
20 appropriate for them in the due diligence process   13:45:52
21 sometimes to rely on experts -- auditors, lawyers,   13:45:56
22 others; correct?   13:45:58
23 A. Yes.   13:45:58
24 Q. Does it sometimes happen that the outside   13:46:04

Page 152

1  directors rely on management?   13:46:06
2  A. (Nods head affirmatively.) In the -- In   13:46:12
3  the interaction between the two, they're going to be   13:46:18
4  receiving information from management that management   13:46:20
5  has that they wouldn't necessarily have access to.   13:46:22
6  Q. Okay.   13:46:24
7  A. So there is a -- There is a reli -- there   13:46:28
8  is an interaction between them, between -- as to what   13:46:30
9  each of them is doing, and so there is in a sense a   13:46:32
10 reliance.   13:46:34
11 Q. Reliance by the outside directors on   13:46:38
12 management; correct?   13:46:38
13 A. Yes. And I'm trying to think if that sword   13:46:42
14 cuts both ways. It may to an extent, but   13:46:44
15 certainly -- and we're talking about the outside   13:46:46
16 directors are looking to management.   13:46:48
17    And again they're -- Where they are   13:46:52
18 at a point in time has been built up hopefully from   13:46:56
19 their dealings with management over time --   13:47:00
20 Q. Now --   13:47:00
21 A. -- that you come to -- You know, you come   13:47:02
22 to -- You don't like people until after you can   13:47:06
23 trust them and they've earned your respect, that type   13:47:08
24 of thing from the nature of the relationship.   13:47:10

Page 153

1  Q. Okay. Now, management doesn't rely on the   13:47:12
2  outside directors; does it?   13:47:14
3  A. As -- I was saying about the sword cutting   13:47:16
4  both ways. There might be in some cases be a   13:47:20
5  situation where a director was so deep in a certain   13:47:22
6  skill set, whatever that was, that the firm might   13:47:26
7  call on that director. It's the microcosm of this.   13:47:30
8  I think Conner had the relationship with Lehman   13:47:34
9  Brothers and suggested that Lehman be the lead or one   13:47:36
10 of the lead underwriters on the offering. He had   13:47:40
11 done a couple of other -- as I understand it a couple   13:47:42
12 of another IPO's; and, you know, so you're utilizing   13:47:46
13 a director's talents there. I would -- I would   13:47:48
14 consider that a pretty limited use.   13:47:50
15 Q. Now, I notice Mr. Mand was one of the   13:47:56
16 people who worked with you on this assignment;   13:48:00
17 correct?   13:48:00
18 A. Correct.   13:48:00
19 Q. How recently was he with Nortel?   13:48:02
20 A. He retired in '94, when it was still called   13:48:06
21 Northern Telecom. He has missed all the interesting   13:48:10
22 things of late.   13:48:10
23 Q. Well, that was one of my questions. Was --   13:48:12
24 Was he sued --   13:48:14

39 (Pages 150 to 153)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

6b5f3d69-00cc-4377-95f0-577c6715d7be

Page 158

1  A. Investors who went into Adams, I would 13:53:10
2  suspect -- I haven't tried to do an analysis -- 13:53:14
3  Q. Okay. 13:53:14
4  A. -- had -- were caught up with this break- 13:53:16
5  through technology with these raging sales of these 13:53:22
6  Tight Lies clubs. So they had -- I would suspect 13:53:24
7  that's what drew them to the offering, but I don't 13:53:26
8  know. 
9  Q. If they were drawn to the offering because 13:53:30
10 of the break-through technology that you have 13:53:32
11 described, that doesn't mean they necessarily had any 13:53:34
12 information about industry-wide gray marketing 13:53:38
13 problems; does it? 13:53:38
14 A. It would depend upon if you went, you know, 13:53:42
15 person by person; because usually these people are 13:53:44
16 visiting the different places, they're aware of 13:53:46
17 equipment and things like that. And I would -- I 13:53:48
18 would think that they're -- a fair number of them 13:53:52
19 would be aware of this struggle that you can only buy 13:53:54
20 Wilson Staff Irons at the pro shops, that you can 13:53:58
21 only buy MacGregor Tournament Woods all the way 13:54:02
22 back -- You know, that if you want a certain model, 13:54:02
23 you have to go to a certain place to get it; and yet 13:54:06
24 sometimes it turns up where you didn't think it 13:54:08

Page 159

1  would.
2     So I would think there is a reasonable 13:54:10
3  chance that they were familiar with these 13:54:12
4  distribution issues that arose. 13:54:14
5  Q. And by "they," you mean a fair number of 13:54:18
6  the investors and analysts that would be -- 13:54:20
7  A. Yeah. And, again, in no way have we done 13:54:22
8  any sort of assessment one by one any of these 13:54:24
9  investors involved. 13:54:28
10 Q. Sure. Now, you are not testifying in this 13:54:30
11 case as a golf industry expert I gather. 13:54:34
12 A. No. 13:54:34
13 Q. But you have been a golfer for 60 years, 13:54:38
14 you told me. 13:54:40
15 A. Only 52. 13:54:42
16    MR. BESSETTE: 50. 13:54:42
17 A. I don't want to overstate the situation 13:54:44
18 here.
19 BY MR. COLLINS:
20 Q. I was going to say probably only 20 or 25, 13:54:46
21 from the looks of you. 13:54:48
22 A. Well, I like that number, but I've got to 13:54:50
23 be truthful to the court reporter. 13:54:52
24 Q. And I gather you do know something about 13:54:54

Page 160

1  how word spreads through the golf industry, just from 13:54:58
2  your own experience as a golfer. 13:55:00
3  A. I think that the PGA pros and those things, 13:55:04
4  there are closely knit groups in there. I think that 13:55:08
5  that's true. 13:55:08
6  Q. And do you know or did you do any analysis 13:55:12
7  to determine whether people who invest in golf 13:55:14
8  company stocks tend to be golfers? 13:55:18
9  A. I think that what would -- the people that 13:55:22
10 would be drawn to this, this is just thinking on my 13:55:24
11 part, would be people who had a sense of what was 13:55:26
12 happening, had an understanding, were golfers in some 13:55:30
13 sort, either they played golf and enjoyed it, or they 13:55:32
14 followed the golf industry and invested in it. 13:55:34
15 That's what -- That would just -- But that's, 13:55:38
16 again, that makes sense. 13:55:38
17 Q. That's common sense. That's common sense; 13:55:42
18 is that right? 13:55:42
19 A. I think that's fair to say. 13:55:44
20 Q. Now, when you -- In this same paragraph 13:55:58
21 you go on to say, "Moreover, the SEC did not require 13:56:04
22 any discussion of gray marketing in the Registration 13:56:06
23 Statement or Prospectus." What is the source of your 13:56:10
24 information on that, please? 13:56:12

Page 161

1  A. Well, we looked at some documents about the 13:56:18
2  inquiry that was made regarding the ability to 13:56:20
3  discovery, the litigation, the SEC; and our 13:56:26
4  experience with the SEC is that they are very 13:56:28
5  thorough. They attempt to be very careful. They 13:56:30
6  work to watch out for the public. 13:56:32
7     Are they perfect? You know, no. None 13:56:36
8  of us are. But they're pretty diligent in that my 13:56:40
9  only -- or I think our group's -- our team's 13:56:44
10 experience is that if they have an issue, they're 13:56:46
11 going to let you know about it; and you're not going 13:56:48
12 to move ahead until you get that issue. You're going 13:56:52
13 to have to make them happy. 13:56:54
14    Just fighting over the comment letters 13:56:54
15 just on 10-Qs, people could cite -- Jim Ott or Marty 13:57:00
16 Mand could cite more than I could about the issues on 13:57:04
17 the forms they raise. 13:57:06
18 Q. You didn't talk to the SEC in connection 13:57:06
19 with Adams Golf; did you? 13:57:08
20 A. No. 13:57:08
21 Q. Do you know what information was provided 13:57:10
22 to the SEC with regard to the Costco or gray 13:57:16
23 marketing issue? 13:57:16
24 A. I -- In following the letters that went 13:57:20

41 (Pages 158 to 161)

Page 162

1  between Arter & Hadden, if I remember correctly, with   13:57:28
2  the SEC discussing various issues, the issue that   13:57:30
3  came us was raised -- let's just -- approximately in   13:57:34
4  June some time, maybe toward the end of June. In a   13:57:38
5  comment letter that Arter & Hadden wrote, excuse me,   13:57:44
6  if I remember -- remember correctly, sometime right   13:57:46
7  about -- getting close to the statement, the   13:57:50
8  registration going effective. It was not addressed   13:57:54
9  in there. There was no -- As I recall, there was no   13:57:58
10 explicit thing that said: By the way, you asked   13:58:02
11 about the bill of discovery and this is what we told   13:58:04
12 you about.   13:58:06
13         All I can indicate -- All that I can   13:58:08
14 draw from that is that this was resolved. That's   13:58:12
15 what I can draw from that.   13:58:14
16    Q. Okay. And you're not offering an opinion   13:58:16
17 in this case with regard to what it means or what it   13:58:20
18 doesn't mean when the SEC allows a Registration   13:58:24
19 Statement to go effective; are you?   13:58:26
20    A. I'm not offering an opinion upon that, just   13:58:28
21 an observation that they didn't require it to be   13:58:32
22 disclosed after in fact they observed it directly or   13:58:36
23 indirectly.   13:58:38
24    Q. Okay. And you don't know what it was, if   13:58:40

Page 163

1  anything, that the SEC was told with regard to Costco   13:58:44
2  gray marketing; do you?   13:58:46
3     A. I don't think as I sit here I can recall   13:58:48
4  anything that I know of, no.   13:58:50
5     Q. Okay. And SEC as far as you know didn't   13:58:54
6  approve or endorse the Registration Statement in   13:58:58
7  that; do they?   13:59:00
8     A. I don't think they approve anything. They   13:59:02
9  don't reject. They don't let you go forward. We're   13:59:08
10 going through that process right now in a mutual fund   13:59:18
11 related deal.   13:59:18
12    Q. Okay. Now, page 10, paragraph 4, the first   13:59:28
13 sentence, "The officers and directors are expected to   13:59:32
14 exercise reasonable business judgment in addressing   13:59:34
15 their responsibilities." What does the exercise of   13:59:40
16 reasonable business judgment have to do with this   13:59:42
17 case?   13:59:44
18    A. Well, in how this process flowed, in how   13:59:48
19 the governance and management structures were put   13:59:52
20 together and how this process flowed of moving toward   13:59:54
21 the IPO.   13:59:56
22    Q. But you acknowledge, don't you, that --   13:59:58
23 that the officers and directors could have in fact   14:00:04
24 exercised reasonable business judgment and still,   14:00:06

Page 164

1  however, there could have been material   14:00:08
2  misrepresentations or omissions in the Registration   14:00:10
3  Statement?   14:00:12
4     A. On -- We're talking about things in   14:00:14
5  general, of course.   14:00:16
6     Q. Sure.   14:00:16
7     A. And that people could follow the correct   14:00:18
8  whatever and a bad result at the end of the day   14:00:22
9  because something slipped through the cracks could   14:00:24
10 refer to it in that kind of slang. Somehow, even   14:00:28
11 though the process was as good as you could hope for   14:00:32
12 it to be, you know, there is no perfect processes.   14:00:34
13 But something got through there and you go in there   14:00:36
14 and you look at it, make a decision: Did it get   14:00:40
15 through there because the process was flawed or did   14:00:42
16 it work its way through for any other reasons?   14:00:46
17    Q. But when you discuss in this report the   14:00:48
18 directors' and officers' exercise of business   14:00:52
19 judgment, I gather now you're talking about business   14:00:54
20 judgment both in addressing the gray market problem   14:00:58
21 and in determining not to disclose it in the   14:01:02
22 Registration Statement; is that accurate?   14:01:06
23    A. We were --   14:01:06
24       MR. BESSETTE: Objection. That   14:01:08

Page 165

1  misstates -- misstates the record.   14:01:10
2  BY MR. COLLINS:
3     Q. Please.   14:01:12
4     A. What we're talking about is reasonable   14:01:14
5  business judgment in terms of the process that was   14:01:16
6  performed. Now, you can cross that over into the   14:01:20
7  other areas because I've concluded that it, in my   14:01:24
8  opinion, I believe that they were accurate in the way   14:01:28
9  they treated the gray market issue. But where I was   14:01:30
10 coming from was their conduct in terms of the -- the   14:01:34
11 governance and management of the company in   14:01:36
12 connection with this IPO.   14:01:38
13    Q. And I know you've referred to this before,   14:01:40
14 sir, so I just want to make sure I've got it down.   14:01:44
15 When you refer to "governance and management of the   14:01:46
16 company" in this context, you're referring to both   14:01:50
17 how to address the gray market problem and the due   14:01:56
18 diligence with regard to the IPO? Am I -- Do I   14:01:58
19 understand you correctly?   14:02:00
20    A. I think the -- It started from the   14:02:04
21 standpoint, as I've said before, about the due   14:02:08
22 diligence with regard to the process itself. From   14:02:10
23 that, I examine the gray market situation to see if   14:02:16
24 the knowledge that I obtain there -- what that   14:02:22

Page 166

1  knowledge had to say about the appropriateness of its   14:02:24
2  process; and in doing that, I reached the conclusion   14:02:28
3  that it was appropriate to omit the gray market.   14:02:34
4      MR. COLLINS: Could you read that   14:02:36
5  back, please.   14:02:36
6      (The requested testimony was read back
7  by the reporter, as follows:
8      ANSWER: "I think the -- It started
9  from the standpoint, as I've said before, about the
10 due diligence with regard to the process itself.
11 From that, I examine the gray market situation to see
12 if the knowledge that I obtain there -- what that
13 knowledge had to say about the appropriateness of its
14 process; and in doing that, I reached the conclusion
15 that it was appropriate to omit the gray market.")   14:03:08
16 BY MR. COLLINS:
17    Q. Okay. In your determining that it was   14:03:10
18 appropriate to omit the gray market problem as a risk   14:03:16
19 on the Registration Statement, you're drawing upon no   14:03:26
20 special expertise with regard to SEC disclosure   14:03:30
21 requirements; is that accurate?   14:03:32
22    A. I'm trying to draw on everything that I saw   14:03:38
23 in connection with this thing.   14:03:38
24    Q. Okay.   14:03:40

Page 167

1     A. And that would not be specialized SEC   14:03:44
2  expertise. That would be one of the things I   14:03:46
3  observed. They knew about it, they didn't stop it.   14:03:50
4  Different -- Just like I talked about the   14:03:50
5  underwriter memos.   14:03:52
6     Q. But you're not here as an expert on gray   14:03:56
7  market. You're not here as an expert on marketing.   14:03:58
8  You're not at least here in this case as an expert on   14:04:00
9  loss causation. So in none of those areas did you   14:04:04
10 draw upon in coming to the conclusion that it was   14:04:06
11 appropriate to omit the disclosure; that's correct?   14:04:08
12    A. No. I -- Yeah, I was not named as an   14:04:12
13 expert in those different areas; but in terms of the   14:04:14
14 area in which I focused, again, we would want to look   14:04:18
15 at certain events and see if those events told us   14:04:22
16 anything about the process.   14:04:22
17    Q. I see.   14:04:24
18    A. That's how I'd relate it.   14:04:26
19    Q. And the area on which you focused again was   14:04:28
20 process and governance?   14:04:30
21    A. Right.   14:04:30
22    Q. Okay.   14:04:32
23    A. As it's set out there in the report.   14:04:36
24    Q. I see. Okay. Now, in the fourth paragraph   14:04:56

Page 168

1  on page 11, under "Business Investment Decisions   14:05:00
2  Involve Risks," why do you consider it in your   14:05:08
3  opinion to be significant to discuss your assertion   14:05:14
4  that the development of new or improved products   14:05:20
5  involves risk? Why is that relevant to your   14:05:22
6  opinion?   14:05:22
7     A. Because, as I say later on in that   14:05:26
8  paragraph, "New product development is the area into   14:05:30
9  which Adams Golf entered with the development of   14:05:32
10 'Tight Lies' club." Does that answer your   14:05:36
11 question? I'm not sure I got the question right.   14:05:36
12    Q. Well, I just may be a little bit confused.   14:05:40
13 Was there -- How was -- Was there something about   14:05:46
14 the Tight Lies being a new product that affected the   14:05:56
15 gray market risk?   14:05:56
16    A. Well, that's pretty -- pretty broad in the   14:06:04
17 sense that -- I think one reason it became a target   14:06:08
18 in the gray market was because of the immense   14:06:10
19 popularity that it had. It made it desirable for   14:06:14
20 those who were not authorized to try to get their   14:06:16
21 hands on to sell it.   14:06:18
22    Q. Uh-huh.   14:06:18
23    A. So that -- that would be one of the things   14:06:20
24 there.   14:06:22

Page 169

1     Q. Okay.   14:06:22
2     A. But you've got to -- You know, as I said   14:06:24
3  before a couple of times, technology is -- technology   14:06:28
4  offering here the break-through technology, which is   14:06:30
5  set out there in the -- in the Prospectus.   14:06:32
6     Q. Okay. I guess one of the things that I am   14:06:36
7  asking you here is there is some parts of your report   14:06:40
8  that I don't understand the significance to your   14:06:42
9  opinion about the process and the governance, so   14:06:46
10 that's -- that's motivating some of my questions.   14:06:52
11    A. That's a good question. It's one of the   14:06:54
12 factors that Adams Golf was facing that we would   14:07:00
13 consider in evaluating the process. This was one of   14:07:04
14 those items that this was a company that potentially   14:07:06
15 offered break-through technology. It was a company   14:07:10
16 whose sales were soaring. Whatever -- You're   14:07:12
17 collecting those facts and framing up the situation.   14:07:14
18    Q. I see.   14:07:14
19    A. That's why --   14:07:16
20    Q. So it's background, primarily.   14:07:18
21    A. That's a fair word.   14:07:20
22    Q. Do you recall whether there was a risk   14:07:22
23 disclosure with regard to product development or the   14:07:26
24 risks of product development in the Registration   14:07:30

43 (Pages 166 to 169)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690   (610) 434-8588

6b5f3d69-00cc-4377-95f0-577c6715d7be

Page 202

1  in perceiving that it was a material problem in       14:44:04
2  October of '98?                                        14:44:06
3      A. I -- I think that was his perception. He       14:44:08
4  was certainly trying to be right. It was his          14:44:12
5  perception that it was a serious problem and he got   14:44:14
6  it out to the world right away. I think that was his  14:44:16
7  style. I personally like that style.                  14:44:18
8      Q. Well then, was there -- Did there come a       14:44:22
9  point in time that Barney Adams, in your opinion,     14:44:26
10 concluded that Barney Adams had been wrong in October 14:44:30
11 and in fact gray marketing was not a problem and      14:44:32
12 never had been?                                        14:44:34
13     A. I think there was something in his             14:44:36
14 deposition -- I'd have to go back and look at it --   14:44:38
15 where he makes a statement, and I'd have to really    14:44:40
16 have to look at it, about the problem in October was  14:44:44
17 no worse than the problem back pre-IPO. And if I      14:44:48
18 look at the 8,000 number and the 6,000 number, I say  14:44:52
19 yeah, that's right.                                    14:44:54
20         In neither case were they a material          14:44:56
21 situation, you know, in terms of the significance of  14:44:58
22 these clubs and the distribution and the fact you     14:45:02
23 could bring the problem under control as he was doing 14:45:04
24 then. They could have done it earlier, when they      14:45:08

Page 203

1  were under tremendous pressure to get these clubs     14:45:10
2  out. Trying to serialize is not an easy               14:45:16
3  manufacturing problem. As he said and was said along  14:45:18
4  the way, they went to it.                             14:45:20
5      Q. Well, you just said that -- get "the           14:45:24
6  problem under control." You believed that in July of  14:45:28
7  '98, October of '98, Adams Golf had the ability to    14:45:32
8  get the gray marketing problem under control?         14:45:34
9      A. Well, remember, I said always is always        14:45:36
10 going to be a gray market problem of one sort of      14:45:40
11 another. But in the sense of this Costco situation,   14:45:46
12 if you serialize clubs, you have two things going for 14:45:48
13 you. One they show up there in Costco and you know    14:45:52
14 where they can came from. Number two, if they file    14:45:54
15 the numbers off, then you're going to sue Costco for  14:45:58
16 selling counterfeit clubs. And so you had a way to    14:46:00
17 cut into Costco's market position there and to        14:46:04
18 threaten their supply lines. There may have been      14:46:10
19 something else to that question.                      14:46:10
20     Q. No, no. That's fine.                           14:46:12
21     A. Yeah.                                          14:46:12
22     Q. So, therefore, the Costco problem was          14:46:14
23 something that could always be addressed simply by    14:46:18
24 serialization; am I understanding you correctly?      14:46:22

Page 204

1      A. Well, there are different ways. And I         14:46:24
2  think they were hoping early-on, as you would expect, 14:46:26
3  that they don't have to do something that interrupts  14:46:28
4  their whole assembly process.                         14:46:30
5          Here's this little company. It's             14:46:30
6  growing, as we talked about earlier, moving from      14:46:34
7  space to space, trying to handle this tremendous flow 14:46:36
8  of products. Now, we throw in on top of that another  14:46:40
9  element that's going to change the assembly process,  14:46:42
10 in computerizing these clubs.                         14:46:44
11     Q. Right.                                        14:46:44
12     A. And so they -- Is there a way -- You          14:46:48
13 know, we've got this problem. And, again, in terms   14:46:50
14 of scale, from what I saw, the scale was quite        14:46:52
15 small. You had only nine complaints come in, nine    14:46:58
16 different entities that were complaining pre-IPO, the 14:47:02
17 record that I've seen. So the scale's pretty --      14:47:04
18 pretty small and you're trying to figure other ways   14:47:06
19 to, so to speak, resolve it. And one of them was the 14:47:10
20 price-matching program. Let's see if we can cut the  14:47:14
21 supply off. Let's see if we can figure out who's     14:47:16
22 selling it to Costco, and we can do it some other way 14:47:18
23 than really disrupting our entire assembly process.  14:47:22
24     Q. And because disrupting the assembly process  14:47:26

Page 205

1  could have -- could be detrimental to the financial   14:47:28
2  results of --                                         14:47:30
3      A. On at least on, you know, on a temporary      14:47:32
4  basis it would be; and if you have got -- If you     14:47:34
5  have product going out the door, you're trying to    14:47:36
6  create a platform, as they were. You're a            14:47:38
7  one-product club. You're trying to build that        14:47:42
8  platform of consumer usage and consumer relations.   14:47:44
9  So when you go forward from there, you don't want to 14:47:48
10 slow down that production when there is a demand for 14:47:50
11 your product and let the competition get a jump on   14:47:52
12 you or things like that.                             14:47:54
13     Q. And as long as serialization was              14:47:58
14 implemented, you faced the risk of that sort of      14:48:04
15 disruption that could have a detrimental financial   14:48:08
16 impact, I gather.                                    14:48:10
17         MR. BESSETTE: I'm sorry. Can I get          14:48:12
18 that back?                                           14:48:12
19         (The requested testimony was read back
20 by the reporter, as follows:
21         QUESTION: "And as long as
22 serialization was implemented, you faced the risk of
23 that sort of disruption that could have a detrimental
24 financial impact, I gather.")

52 (Pages 202 to 205)

VERITEXT PA COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690    (610) 434-8588

6b5f3d69-00cc-4377-95f0-577c6715d7be

Page 214

1   Q. Well, as part of Exhibit 186, there is a   15:06:32
2   September 29th letter, 1998, from an authorized   15:06:38
3   retailer who said that, in that letter, that before   15:06:42
4   the IPO there had been Costco -- that the Adams clubs   15:06:50
5   had been available at Costco. Do you recall that   15:06:54
6   vaguely?   15:06:54
7   A. This was -- Okay. Some late September   15:06:58
8   memo.   15:06:58
9   Q. No, no.   15:06:58
10  A. From an authorized --   15:07:00
11  Q. A September letter --   15:07:02
12  A. Yeah.   15:07:02
13  Q. -- from an authorized retailer in New   15:07:06
14  Jersey --
15  A. To.   15:07:06
16  Q. -- to Adams Golf saying that in June --   15:07:08
17  A. Okay.   15:07:08
18  Q. -- there had been Costco's -- the Costco   15:07:12
19  warehouses having Adams clubs.   15:07:18
20  A. Okay. So to some --   15:07:18
21  Q. After the event, after the IPO, this   15:07:22
22  retailer was complaining about that.   15:07:24
23  A. Okay.   15:07:24
24  Q. So all I'm saying is you don't preclude the   15:07:26

Page 215

1   possibility that there were other authorized   15:07:30
2   retailers besides the eight or nine that you've   15:07:32
3   described --   15:07:32
4   A. Who --   15:07:32
5   Q. -- who were concerned about -- about gray   15:07:36
6   marketing but that you don't include them in your   15:07:38
7   eight or nine.   15:07:40
8   A. That's -- That's a good example of   15:07:42
9   something that popped up later on that spoke to an   15:07:46
10  earlier period.   15:07:46
11  Q. Okay. And in your experience, where   15:07:52
12  authorized retailers have concerns, they don't always   15:07:58
13  complain. They sometimes stop doing business. Is   15:08:02
14  that accurate?   15:08:02
15  A. Let me just put it this way. It's   15:08:06
16  speculation on my part. I haven't made a study of   15:08:10
17  that in any sense, but it wouldn't surprise me if you   15:08:12
18  had a large number of retailers and somebody became   15:08:16
19  angry. They could leave for a lot of reasons.   15:08:18
20  Q. And not complain before they went out the   15:08:20
21  door.   15:08:20
22  A. (Nods head affirmatively.) That's true.   15:08:22
23  Q. Now, on page 15, in the second paragraph,   15:08:28
24  there is a reference to "The Company's lawyers, Arter   15:08:38

Page 216

1   & Hadden," having "extensive contact with the SEC to   15:08:38
2   ensure complete compliance."   15:08:40
3   Well, you don't know anything more   15:08:42
4   about that what you call "extensive contact" beyond   15:08:46
5   what you've already testified to today; do you?   15:08:48
6   A. Right. There are various letters -- I   15:08:50
7   mean, what -- what you do know is that you're going   15:08:54
8   to be working closely with the SEC because you have   15:08:58
9   to on an IPO, and your communications and so forth;   15:09:02
10  so you have every re -- And the attorneys are the   15:09:06
11  ones that you would normally expect to be carrying   15:09:08
12  that ball.   15:09:08
13  Q. Oh, sure.   15:09:10
14  A. So, you know --   15:09:10
15  Q. But the extent of the contact with the SEC,   15:09:14
16  you were not really somebody who's privy to it.   15:09:16
17  A. There were, what, three or four different   15:09:18
18  S-1s that were issued before the final came out; so   15:09:22
19  maybe the adjective "extensive" is more than it needs   15:09:26
20  to be; but there was certainly dialogue going on and   15:09:28
21  they were refiling the S-1.   15:09:30
22  Q. And that sentence goes on "Arter & Hadden,   15:09:36
23  had significant contact with the SEC to ensure   15:09:38
24  complete compliance with the federal securities law   15:09:40

Page 217

1   and full disclosures of any risks..."   15:09:42
2   Well, whatever contact the company's   15:09:46
3   lawyers had with the SEC didn't ensure any compliance   15:09:50
4   with the federal securities law; did it? You can't   15:09:54
5   ensure compliance by contacting the SEC, however   15:09:56
6   extensively.   15:09:58
7   A. Well, that may be a -- That may be a legal   15:09:58
8   question. I may have -- I may have overwritten that   15:10:02
9   thing from an angle that -- What I was trying to say   15:10:04
10  is that the SEC, they're going to move slowly, as I   15:10:10
11  said earlier, before they give you clearance to go   15:10:14
12  forward; and that certainly gives you some comfort,   15:10:16
13  that you have complied with those regulations with --   15:10:18
14  with which you have to comply. That's what --   15:10:22
15  That's where I was coming from.   15:10:24
16  Q. And you say that as somebody who is not an   15:10:26
17  expert with regard to SEC procedures or approval   15:10:34
18  processes; correct?   15:10:36
19  A. Who is familiar with them, but I'm not   15:10:40
20  putting myself forward as an expert, that's correct,   15:10:42
21  yes.   15:10:42
22  Q. Now, in the next paragraph, do you -- You   15:10:48
23  know you have Exhibit 7 to -- You're familiar with   15:10:52
24  your --   15:10:52

55 (Pages 214 to 217)

Page 234

1  and what difference does it make to this case?    15:30:42
2    A. It speaks to the dedication that they had    15:30:46
3  to their authorized retailers, that they -- that they    15:30:48
4  didn't linger back in the pre-IPO periods when this    15:30:52
5  first came up, even though Canada was a very small    15:30:54
6  part of their overall sales. It indicated to me they    15:31:00
7  took the well-being of their distributors and their    15:31:04
8  retailers very seriously.    15:31:06
9    Q. Well, what does that have to do with this    15:31:08
10  case?    15:31:10
11    A. Well, because it speaks to -- It flows    15:31:12
12  right into the fact that they had -- they dealt with    15:31:16
13  the problem. They went after it because it was    15:31:18
14  important to them, but it was not material as far as    15:31:22
15  being put in the company's statement -- in the IPO    15:31:28
16  documents.    15:31:28
17    Q. I -- I guess we are getting metaphysical    15:31:32
18  these days, or I am, or Paul and I are; but you say    15:31:36
19  it's important but not material. Surely you see that    15:31:38
20  as a fairly fine distinction, sir.    15:31:40
21    A. No. No.    15:31:42
22    MR. BESSETTE: Yeah, explain.    15:31:42
23    A. And the reason -- Yeah. The reason why is    15:31:48
24  because this goes back to the employee, the customer    15:31:52

Page 235

1  what we're going to do as a company to take care of    15:31:54
2  things. This company, as I see it, had a deep    15:31:58
3  concern for their customers. They believed that that    15:32:00
4  was an important element of their success. That was    15:32:02
5  important to them. And so they had a -- one    15:32:06
6  authorized distributor or retailer who had a    15:32:08
7  problem. They were going to address that problem.    15:32:10
8    And when they heard it was something    15:32:12
9  that could affect their standing with their retailers    15:32:20
10  and their distributors, just use retailer as a    15:32:22
11  general, you know, they went after it. They went    15:32:28
12  after it. And that was -- They were dedicated to    15:32:30
13  doing that.
14    That's why Gonsalves says this is a    15:32:34
15  serious problem, whatever. It could be a serious    15:32:36
16  problem to him if one distributor complained, one    15:32:38
17  retailer complained. That was within -- That was    15:32:42
18  within their psyche or modest operandi. And it was    15:32:46
19  completely legitimate. It was simply saying: Treat    15:32:48
20  your customers right. Develop those relationships.    15:32:50
21  They'll take care of you if you take care of them.    15:32:52
22  All that type of stuff, whether it's relevant or not    15:32:56
23  relevant of the situation if the company thinks about    15:33:00
24  it. And that's what was going on here, no matter    15:33:00

Page 236

1  how small that problem is.    15:33:02
2    Barney Adams said somewhere, in one of    15:33:06
3  the articles that he was quoted as saying about this    15:33:08
4  time, about -- He didn't want his customers unhappy.    15:33:12
5  That it was a pain in the back said. I'm not sure    15:33:14
6  those are the words he used -- a pain in the back    15:33:16
7  side to deal with these kinds of things. He wanted    15:33:20
8  his -- He wanted his retailers and his distributors    15:33:22
9  to be happy.    15:33:24
10  BY MR. COLLINS:
11    Q. And his desire for the retailers to be    15:33:26
12  happy was partly tied to the business strategy of    15:33:30
13  Adams Golf; correct?    15:33:32
14    A. I believe that it was. Yes.    15:33:34
15    Q. Because if your -- if your customers are    15:33:38
16  high end or reasonably high end golf course shops or    15:33:46
17  off course shops, as opposed to discount houses,    15:33:56
18  whether they are well treated, whether they have high    15:33:58
19  margins, matters more than would be the case if you    15:34:04
20  sold your golf clubs at gas stations and drug stores;    15:34:08
21  right?    15:34:08
22    A. You know, again, each situation has to be    15:34:10
23  valued -- evaluated separately. I mentioned about    15:34:14
24  Taylor Made along about this time made some sort of    15:34:18

Page 237

1  deal with Costco, where they were going to sell older    15:34:20
2  clubs, and I think even some of their new clubs they    15:34:24
3  got if they sold enough of the old clubs. I don't    15:34:26
4  know what the deal was. But each party is trying to    15:34:28
5  optimize as you said earlier for their shareholders,    15:34:32
6  take it and take into consideration what they think    15:34:34
7  those factors are, they have to address.    15:34:36
8    Q. Okay. And that's, what, Barney Adams,    15:34:40
9  Gonsalves --    15:34:42
10    A. And Beebe.    15:34:44
11    Q. -- and Beebe were doing when they    15:34:46
12  considered this issue important, although you say not    15:34:48
13  material.    15:34:48
14    A. Yeah. Financially, financially it was not    15:34:52
15  that significant. I show that in the report, even in    15:34:56
16  something of some magnitude in Canada happened, it    15:35:00
17  wouldn't have much of a financial effect on Adams.    15:35:04
18    But -- and that's the effect now, in    15:35:06
19  this quarter. They obviously -- "they" being the    15:35:10
20  management team -- were looking it appears to be much    15:35:14
21  further than that. They wanted to keep these    15:35:16
22  relationships because they valued them.    15:35:18
23    Q. And they valued them not out of the    15:35:20
24  goodness of their hearts, but because that was part    15:35:24

60 (Pages 234 to 237)