LYNCH

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: ADAMS GOLF, INC.        :     CONSOLIDATED

SECURITIES LITIGATION          :     C.A. NO. 99-371 KAJ

————————————————X

ORAL DEPOSITION OF ED J. LYNCH, CPA

Tuesday, August 1, 2006

The oral deposition of ED J. LYNCH, CPA, was held at the law offices of Akin Gump Strauss Hauer & Feld, LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas, from 9:37 a.m. to 12:41 p.m., before Jamie K. Israelow, a Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter, Certified Realtime Reporter, and Certified LiveNote Reporter.

RSA/VERITEXT COURT REPORTING COMPANY

1845 Walnut Street, 15th Floor

Philadelphia, PA  19103

(215)241-1000       (888)777-6690

Page 2

```
 1  APPEARANCES:
 2    NEIL F. MARA, ESQUIRE
      BERGER & MONTAGUE, PC
 3      1622 Locust Street
        Philadelphia, Pennsylvania 19103
 4      (215.875.3000)
 5    -- Representing the Plaintiffs
 6
      PAUL R. BESSETTE, ESQUIRE
 7    AKIN GUMP STRAUSS HAUER & FELD, LLP
        300 West 6th Street, Suite 2100
 8      Austin, Texas 78701-3911
        (512.499.6200)
 9
      -- Representing Adams Golf, Inc.
10
11    THEODORE J. McEVOY, ESQUIRE
      SIMPSON THACHER & BARTLETT, LLP
12      425 Lexington Avenue
        New York, New York 10017-3954
13      (212.455.2831)
14    -- Representing the Underwriter Defendants
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2  Appearances                    2
    Stipulations                   --
 3
    ED J. LYNCH
 4     Examination by Mr. Mara     4
 5  Corrigendum                  116
    Reporter's Certificate       117
 6
 7            E X H I B I T S
    NUMBER   DESCRIPTION          PAGE
 8
    302   Expert Report of Ed J. Lynch, CPA
 9         July 14, 2006            8
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              PROCEEDINGS
 2         (On the record at 9:37 a.m.)
 3             ED J. LYNCH, CPA,
 4  the witness hereinbefore named, being of lawful
 5  age and being first duly cautioned and sworn in
 6  the above cause, testified on his oath as follows:
 7             EXAMINATION
 8  BY MR. MARA:
 9      Q   Good morning, Mr. Lynch.  My name is
10  Neil Mara.  I am an attorney with Berger &
11  Montague in Philadelphia.  I am one of the
12  attorneys representing the plaintiffs in the Adams
13  Golf Securities Litigation.  Thank you for coming
14  in this morning.  We appreciate your time.
15             I know from reviewing the
16  materials that you submitted that you've been
17  deposed on numerous occasions before this?
18      A   Yes.
19      Q   Okay.  So you're well familiar with
20  the format of a deposition.  If you need a break,
21  let me know.
22      A   Okay.
23      Q   We'll stop.  I'm more than happy to
24  do that.
```

Page 5

```
 1             And you know that you need to
 2  respond verbally and not with nods of your head
 3  because what you're saying is being recorded.
 4             Is there any reason why you
 5  can't testify to the best of your ability this
 6  morning?
 7      A   I cannot think of any.
 8      Q   Okay.  No medications that would
 9  impede your reasoning?
10      A   No.
11      Q   Okay.  As I said prior to going on
12  the record, we'll attempt to take the least amount
13  of your time that we can today.  And in light of
14  that, having reviewed your resume, my questions on
15  your qualifications are very few.
16             Have you ever been
17  disqualified as an expert witness?
18      A   No.
19      Q   Okay.  Have you offered testimony in
20  the past on behalf of Akin Gump?
21      A   I have been hired by Akin Gump and a
22  client in the past, yes.
23      Q   My question was inartful.
24             Have you been retained -- how
```

2 (Pages 2 to 5)

Page 6

1  many times have you been retained by Akin Gump to
2  provide expert testimony or consulting expert
3  advice?
4      A    Three or -- three or four or five,
5  somewhere in there.
6      Q    And those have been -- have those
7  been recent retentions, or has this been a
8  long-standing relationship you've had with the
9  firm?
10     A    It's been over a number of years.  I
11 think the first time was in '95 or '6.
12     Q    And it's continued, obviously, to the
13 present day?
14     A    Sporadically, obviously, if only
15 three to five times in 10 years, 11 years.
16     Q    Sure.  Sure.
17          Have you provided expert
18 testimony in securities class actions --
19     A    Yes.
20     Q    -- in the past?
21          How many times have you done
22 that, if you're able to recall?
23     A    I think three or four or five times,
24 somewhere in there.

Page 7

1      Q    Have you testified on behalf of both
2  defendants and plaintiffs when providing expert
3  testimony?
4      A    Yes.
5      Q    Have you testified for plaintiffs in
6  securities class actions?
7      A    I can't remember one in a securities
8  class-action case.
9      Q    What percentage of your expert
10 testimony or consultation as a whole has been on
11 behalf of plaintiffs?
12     A    I don't know a precise number, as
13 I've not kept track from the first time I've ever
14 testified till today, so I just -- I don't know an
15 exact percentage.
16     Q    Can you estimate?  Is it -- is it a
17 50/50 thing, or is it tilted heavily in one
18 direction or another?
19     A    I don't think it's 50/50.  I think if
20 I were to guesstimate a number, it would be a
21 third plaintiffs, two-thirds defendants; however,
22 you know, if you went back and looked at every
23 one, it could be as low as 25 percent for
24 plaintiffs.  I just -- I haven't done that

Page 8

1  analysis.
2      Q    Sure.  I know you're providing
3  ballpark estimates.  I'm not -- I'm not looking to
4  hold you to an exact figure.  Thanks.
5          You've also -- have you
6  testified at trial?
7          MR. BESSETTE:  As an expert?
8      Q    (By Mr. Mara)  Yes, as an expert.
9  Excuse me.
10     A    Yes.
11     Q    And you've testified in arbitration
12 hearings as an expert?
13     A    Yes.
14     Q    Well, moving to your report, then,
15 which I will mark as Exhibit 302 in an effort to
16 jump beyond the fact witness exhibits.
17          (Deposition Exhibit 302
18          was marked.)
19     Q    (By Mr. Mara)  And I see you have
20 your report in front of you, Mr. Lynch.  I'm just
21 going to very simply walk you through the report.
22 I have a number of questions, and I'll pretty much
23 jump from paragraph to paragraph.
24          So if I may, I will invite

Page 9

1  your attention to Paragraph 16.
2      A    Okay.
3      Q    It's under the heading Facts and
4  Circumstances Underlying My Opinions, and I just
5  have some general questions.
6          MR. MARA:  Ted, are you with
7  us?
8          MR. McEVOY:  Yes, I am.
9          MR. MARA:  Okay.
10     Q    (By Mr. Mara)  If you look at the
11 last sentence of that paragraph, it says -- I'd
12 invite you to re-read the whole paragraph, but my
13 question is just on the last sentence, quote:
14 Such estimates have approximated actual costs
15 incurred.
16          What's the meaning of the
17 term "approximated" in that sentence?
18     A    Well, I -- I didn't write the
19 sentence.  I quoted the sentence from someone
20 else.
21     Q    Sure.
22     A    So the way I read the
23 sentence, "approximated," in my mind is like the
24 word "estimated" to an accountant.

3 (Pages 6 to 9)

Page 102

1  goof-up, that he was terminated not because of an
2  honest goof-up, does that change your testimony
3  that no final determination was made regarding the
4  allegations? That's my question.
5      A   Well, what I'm referencing in the "no
6  final determination" is I believe the memo in
7  Mr. Greaney's personnel file. And so if you say
8  that there is testimony that contradicts that,
9  obviously I would look at that and -- and
10 determine if one document controverted by
11 testimony should cause me not to have an opinion
12 as to no final determination, especially since I
13 even recall seeing a resignation letter when, in
14 fact, you're saying he was terminated.
15         When I have terminated people,
16 they did not give me a resignation letter. I
17 terminated them. So there are several
18 contravening facts here on the table.
19     Q   We can agree that personnel files are
20 often sanitized?
21         MR. McEVOY: Object to form.
22     A   I -- I am not aware of any personnel
23 files I've ever been associated with being
24 sanitized, so you know, it's a little hard for me

Page 103

1  to agree that in general personnel files are
2  sanitized when I personally have never been
3  involved in sanitizing a personnel file.
4          MR. MARA: Just one second, if
5  I may.
6      Q   (By Mr. Mara) I've represented in my
7  questions previously that your report seems to me,
8  as the reader, to favor the deposition testimony
9  over the memo written in August of 1998, and I --
10 you can accept that or reject it.
11         But my question is: If you
12 favored the memo written in 1998, which, as you'll
13 recall, listed several issues that Mr. Adams had
14 with the inside sales department, what obligation
15 or duty would that place on the company to
16 investigate those problems?
17     A   If one assumed that there were, for
18 instance, consignment sales being accounted for as
19 sales, then one should generally get to the bottom
20 of which sales were real sales and which sales
21 should be accounted for as consignment sales.
22         When you look at the issue of
23 double shipments as they were described in the
24 memo, one would expect a double shipment to

Page 104

1  boomerang on you rather quickly as a return, and
2  the company was tracking returns in a diligent
3  manner.
4          So of those things mentioned
5  in Mr. Adams' memo, as an accountant, I think the
6  one that I would be advising the company to drill
7  down on is the consignment sales because that is a
8  relatively difficult area to investigate and
9  connect.
10     Q   And drilling down, is it fair to say,
11 that can take whatever form it needs to take for
12 that company to do a proper investigation, or is
13 there some standard investigatory -- investigatory
14 practice that a company would execute to, quote,
15 drill down?
16     A   I don't think that there is a
17 standard -- well-defined standard for looking for
18 consigned sales -- consignment sales. What one
19 does is interview a number of people and look at
20 facts and circumstances around sales. And in
21 essence, a number of, quote, interviews have been
22 done through deposition testimony in this case, of
23 people in the sales department, as well as of
24 Mr. Adams himself.

Page 105

1          MR. BESSETTE: I found the
2  testimony. I can put it in the record.
3          MR. MARA: You know, save it
4  for cross, and we'll just deal --
5          MR. BESSETTE: Sure.
6          MR. MARA: -- with it that
7  way.
8      Q   (By Mr. Mara) Do you know, are you
9  familiar with -- we're really getting to the end.
10         Are you familiar with WDC
11 Mackenzie? Have you ever heard that name before
12 this morning, before I just said it?
13     A   It does not ring a bell.
14     Q   They -- for the sake of clarity, they
15 were a Canadian distributor for the Adams Golf
16 products. They had exclusive distribution rights
17 in Canada, which is simply background.
18         Do you know if you saw any
19 KPMG confirmations from WDC Mackenzie? Not "do
20 you know." Did you see any confirmations?
21     A   I don't recall that name, but I
22 looked at a number of confirmations. I just can't
23 tell you all of the confirmations I looked at.
24     Q   And are you able to recall how many

27 (Pages 102 to 105)

MILLER

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
- - -

IN RE ADAMS GOLF, INC.      : CONSOLIDATED
                            :
SECURITIES LITIGATION       : C.A. No. 99-371 KAJ

---------------------------
Friday, August 11, 2006
---------------------------

Oral deposition of R. ALAN MILLER, taken pursuant to notice, was held at the offices of AKIN, GUMP, STRAUSS, HAUER AND FELD, LLP, 590 Madison Avenue, 18th Floor, New York, New York 10022-2524 commencing at 8:50 a.m. on the above date, before Beth A. Barkocy, Certified Shorthand Reporter and Notary Public.

- - -

RSA/VERITEXT COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA   19103
(215)241-1000       (888)777-6690

Page 158

1   A.   There was a memoranda prepared
2  either by corporate finance or equity capital market
3  person at Lehman. I'm not sure it was clearly
4  identified who it was. I think it was one of those
5  two groups, communicating to Adams to prepare for an
6  investor conference call indicating concerns being
7  expressed by customers about gray marketing and
8  expecting to have to answer questions about that topic
9  on the conference call.
10   Q.   Is it your recollection that that
11  document was reflecting actual concerns by investors?
12   A.   I don't remember the wording of the
13  document specifically enough, but I remember having
14  the impression that the author expected the topic to
15  come up at the conference call and that, for some
16  reason, I remember thinking that was based on investor
17  contact, and it may have, to some degree, reflected my
18  understanding of the equity capital market person's
19  function at Lehman with respect to monitoring the
20  price of underwritings and customer activity after the
21  IPO and that kind of stuff.
22   Q.   (Indicating.)
23       I just handed you Exhibit-177. Is
24  that the document you're referring to?
25   A.   Yeah, I believe this is.

Page 159

1   Q.   This document is from Patrick
2  Walravens at Lehman. Do you know who that is?
3   A.   Yeah, he was a corporate finance
4  person.
5   Q.   Was he involved in the underwriting?
6   A.   Yes, he was the -- trying to
7  remember his title. I think he was the associate on
8  the underwriting, if I remember correctly.
9   Q.   The third page says concerns to
10  expect from investors. Is there something on this
11  page that leads you to believe that these are concerns
12  actually expressed by investors to Lehman?
13   A.   Not other than the heading
14  suggesting that investors are likely to have these
15  concerns, at least with respect to this document. I
16  think this document clearly says what it says.
17   Q.   Do you know whether investors --
18  actually, this is for the Adams Golf conference call.
19  This is dated July 29. Do you know the date of the
20  conference call being referred to?
21   A.   I think it was early August. I
22  don't remember exactly.
23   Q.   Do you know whether there were any
24  concerns expressed on the conference call from
25  investors about discounting or gray marketing or

Page 160

1  Costco?
2   A.   No, I don't; I don't recall that.
3   Q.   You don't recall whether they did or
4  did not or you just don't recall at all?
5   A.   I don't recall whether they did or
6  didn't.
7   Q.   These concerns are in boxes,
8  Orlimar, recent performance, Callaway, new products,
9  domestic sales, and discounting. Would it surprise
10  you to learn that of all of those concerns, the only
11  one not expressed on the conference call was gray
12  marketing or Costco or discounting?
13       MR. LEWIS: Objection to form and
14       foundation.
15       THE WITNESS: No, it wouldn't
16       surprise me one way or the other. I just
17       don't recall whether it occurred or not.
18  BY MR. BESSETTE:
19   Q.   Did you review the conference call
20  transcript as part of your work in this case to see if
21  investors had expressed concern in August on the
22  conference call about discounting or gray marketing?
23   A.   I don't believe I reviewed the
24  conference call transcript.
25   Q.   Did you not think it was important

Page 161

1  to do that?
2   A.   No, I didn't.
3   Q.   Why?
4   A.   Because given all the other
5  indicators we're talking about and given the
6  identification of the issue in this memo, it indicated
7  knowledge of the issue, certainly at Lehman, and it
8  was identified by Lehman as a concern to expect from
9  investors. I don't know why they would have had some
10  thought it was a concern to expect from investors
11  unless they thought exactly that.
12   Q.   What's more important to your
13  analysis, what Lehman thought or what, actually,
14  investors thought?
15       MR. LEWIS: Objection to form and
16       foundation. Which analysis of what?
17       THE WITNESS: (No response.)
18       MR. BESSETTE: I'll withdraw that.
19  BY MR. BESSETTE:
20   Q.   Turn to Paragraph 22 of your
21  rebuttal report, if you would, please.
22   A.   (Witness complies.)
23   Q.   In Paragraph 22A, you discuss Costco
24  national purchase orders for the purchase of Adams
25  Golf clubs, right?