## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

——————————————————————X
                                          :
IN RE ADAMS GOLF , INC.,          :        CONSOLIDATED
SECURITIES LITIGATION             :        C.A. NO. 99-371-KAJ
                                          :
——————————————————————X

## PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO
## ADAMS GOLF DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

**BERGER & MONTAGUE, P.C.**
Todd Collins
Elizabeth Fox
Neil Mara
1622 Locust Street
Philadelphia, PA. 19103
(215) 875-3000
*Lead Counsel for Plaintiffs and the Class*

**ROSENTHAL, MONHAIT &**
**GODDESS, P.A.**
Carmella P. Keener (DSBA No. 2810)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com
*Liaison Counsel for Plaintiffs*
*and the Class*

OF COUNSEL:

**LAW OFFICES OF DONALD B. LEWIS**
Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

**KELLER ROHRBACK, LLP**
Juli E. Farris
Elizabeth A. Leland
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900

Dated: October 9, 2006

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.    NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    The Misleading Statements and Omissions in the Registration
            Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      B.    Problems with Gray Marketing in Canada . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      C.    Problems with Gray Marketing in the United States . . . . . . . . . . . . . . . . . . . . 8
      D.    The Costco Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      E.    The SEC Staff Allowed The Registration Statement to Become
            Effective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      F.    Gray Marketing Was a Significant Cause of the Stock Drop . . . . . . . . . . . . 14
      G.    The Adams Golf Defendants Failed to Make an Adequate Inquiry
            into Gray Marketing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      H.    Double Shipping and Other Questionable Sales Practices . . . . . . . . . . . . . . 22
      I.    Additional Facts Concerning Spoliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      A.    SUMMARY JUDGMENT STANDARD OF REVIEW . . . . . . . . . . . . . . . . 25

      B.    BECAUSE THE ADAMS GOLF DEFENDANTS DESTROYED KEY
            DOCUMENTS EVEN AFTER THEY ANTICIPATED LITIGATION,
            THE COURT SHOULD STRIKE OR SUMMARILY REJECT THEIR
            MATERIALITY AND NEGATIVE LOSS CAUSATION
            ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
            1.    The Adams Golf Defendants Destroyed Important Documents At a
                  Time When They Anticipated Litigation . . . . . . . . . . . . . . . . . . . . . . 26
                  a.    The Adams Golf defendants disposed of key documents in
                        January 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
                  b.    Before January 1999, the Adams Golf defendants reasonably
                        expected litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
            2.    Plaintiffs Are Entitled to Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      C.    DEFENDANTS CANNOT SATISFY THEIR BURDEN ON
            NEGATIVE CAUSATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

            1.    Defendants Cannot Show That The Risk Of Gray Marketing Was
                  Incorporated Into The Offering Price . . . . . . . . . . . . . . . . . . . . . . . . . . 33

i

|     | 2.  | Defendants Cannot Bear Their Burden That Price Movements On The First Day of Trading Preclude Damages . . . . . . . . . . . . . . . . 34 |
| --- | --- | --- |
|     | 3.  | Defendants Minimize Or Ignore The Disclosures that Occurred Post-IPO Regarding The Gray Market And Thus Cannot Bear Their Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36 |
|     | 4.  | Defendants Fail to Satisfy Their Burden of Showing That The Gray Market Disclosures Were "Speculative" . . . . . . . . . . . . . . . . . . . . . . . 37 |
|     | 5.  | Defendants Fail to Satisfy Their Burden of Specifying the Dates Disclosures Reached the Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38 |
|     | 6.  | The Jury Could Reasonably Conclude That James' *Daily* Regression Analyses Do Not Satisfy Defendants' Burden . . . . . . . . . . . . . . . . . . 40 |
|     | 7.  | The Jury Could Reasonably Conclude That James' Monthly Regression Analyses Do Not Satisfy Defendants' Burden . . . . . . . . . . . . . . . . . . 42 |
|     | 8.  | Defendants Cannot Bear Their Burden Regarding the October 23, 1998 Price Decline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43 |
|     | 9.  | Defendants Cannot Bear Their Burden in Challenging the Opinions of Plaintiffs' Expert, Miller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45 |
|     | 10. | Defendants Cannot Establish As A Matter of Law That Double Shipping is Unrelated To The Gray Market Risk . . . . . . . . . . . . . . . . 46 |
|     | 11. | Regression Analysis, Properly Performed, Reveals Statistically Significant Price Declines in July 1998 . . . . . . . . . . . . . . . . . . . . . . . . 46 |
| D.  |     | ADAMS GOLF HAD A DUTY TO DISCLOSE THEIR RISK OF GRAY MARKETING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49 |
|     | 1.  | Item 503(c) of SEC Regulation S-K Imposed A Duty To Disclose The Risk of Gray Marketing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49 |
|     | 2.  | Item 303 of SEC Regulation S-K Imposed a Duty to Disclose The Risk of Gray Marketing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49 |
|     | 3.  | Defendants Bore A Duty To Disclose The Risk of Gray Marketing In The Registration Statement Because The Absence Of The Risk Factor Rendered Statements In the Registration Statement Misleading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51 |
| E.  |     | GRAY MARKETING AS A MATERIAL RISK FOR ADAMS GOLF AT THE TIME OF THE IPO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52 |
|     | 1.  | Plaintiffs' Gray Marketing Expert Opined That Gray Marketing Was Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52 |
|     |     | a. The Company's business model and the desirability of the Tight Lies brand made Adams Golf clubs attractive to gray marketers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54 |
|     |     | b. The Company's business model made it vulnerable to damages from gray marketing . . . . . . . . . . . . . . . . . . . . . . . . 55 |
|     |     | c. The Tight Lies Were in Costcos All Across the U.S. and Canada . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55 |

                d.     Gray marketing would accelerate and it would be difficult to
eradicate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

                e.     Even a Small Number of Clubs
Could Do Material Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

        2.    Plaintiffs Otherwise Created a Jury Question Regarding Materiality . 57

                a.     Number of complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

                b.     Management's Ability to Know . . . . . . . . . . . . . . . . . . . . . . . 58

                c.     Management's Response to Gray Marketing . . . . . . . . . . . . 58

                d.     Gray marketing did not help Adams Golf . . . . . . . . . . . . . . . 59

                e.     The stock price declined in response to information about
gray marketing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

                f.      Gray marketing was not industry-wide but varied from
company to company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

                g.     Adams Golf 's piecemeal warnings are inadequate . . . . . . . . 60

                h.     The June 9th press release about the Bill of Discovery
does not relieve Adams Golf of its duty to disclose the
risk of gray marketing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

   F.     INDIVIDUAL ADAMS GOLF DEFENDANTS CANNOT ESTABLISH
AN AFFIRMATIVE DEFENSE OF DUE DILIGENCE . . . . . . . . . . . . . . . . . 61

        1.    Defendants Must Be "Reasonably Prudent" . . . . . . . . . . . . . . . . . . . . 61

        2.    Determinations Of "Reasonableness" Are For The Jury . . . . . . . . . . . 61

        3.    Inside Directors And Management Have Not Met Their Burden . . . . 62

        4.    Outside Directors Have Not Met Their Burden . . . . . . . . . . . . . . . . . . 63

V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## TABLE OF AUTHORITIES

### CASES

*Acme Propane, Inc. v. Tenexco, Inc.*,
844 F.2d 1317 (7th Cir. 1988) ............................................................................................. 34

*Adair v. Kaye Kotts Associates*,
1998 U.S. Dist. LEXIS 3900 (S.D.N.Y. 1998) ..................................................................... 25

*In Re Adams Golf Sec. Litigation*
381 F.3d 267 (3d Cir. 2004) ......................................................................................... *passim*

*Akerman v. Oryx Communications, Inc.*,
810 F.2d 336 (2d Cir. 1987) ................................................................................................ 25

*Boyle v. County of Allegheny, Pa.*,
139 F.3d 386 (3d Cir. 1998) ................................................................................................ 25

*Byrnie v. Town of Cromwell*,
243 F.3d 93 (2d Cir. 2001) ............................................................................................ 30, 33

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................................ 25

*Collins v. Signetics*,
605 F.2d 110 (3d Cir. 1979) ................................................................................................ 25

*Duming v. First Boston Corp.*,
815 F.2d 1265 (9th Cir. 1987) ............................................................................................. 51

*In re Enron Corp.*,
439 F. Supp. 2d 692 (S.D. Tex. 2006) ................................................................................. 37

*Erie Ins. Exchange v. Applica Consumer Prods., Inc.*,
2005 WL 1165562 (M.D. Pa., May 17, 2005) ..................................................................... 30

*Escott v. BarChris Construction Corp.*,
283 F. Supp. 544 (E.D.N.Y. 1971) ..................................................................................... 62

*Feit v. Leasco Data Processing Equipment Corporation*,
332 F. Supp. 544 (E.D.N.Y. 1971) ..................................................................................... 62

*Hugh v. Butler County Family YMCA*,
418 F.3d 265 (3d Cir. 2005) ................................................................................................ 25

*MOSAID Techs. Inc. v. Samsung Elecs Co.*,
348 F. Supp. 2d 332 (D.N.J. 2004) ..................................................................................... 30

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d. Cir. 2002) ............................................................................................. 52

*In re NTL Sec. Litig.*,
  2006 U.S. Dist. LEXIS 5346 (S.D.N.Y., Feb. 14, 2006) ...................................................... 38

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ................................................................................................. 50

*Oxford Asset Mgmt., v. Jaharis*,
  297 F.3d 1182 (11th Cir. 2002) ............................................................................................ 50

*Pa. Coal Ass'n v. Babbitt*,
  63 F.3d 231 (3d Cir. 1995) ................................................................................................... 25

*Positran Mfg. Inc. v. Diebold Inc.*,
  2003 WL 21104954 (D.Del., May 15, 2003) ....................................................................... 31

*RMED Int'l, Inc. v. Sloan's Supermarkets*,
  2000 U.S. Dist. LEXIS 3742 (S. D. N.Y. 2000) ........................................................... 42, 45

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
  306 F.3d 99 (2d Cir. 2002) ................................................................................................... 32

*Rodman v. Grant Foundation.*,
  608 F.2d 64 (2d Cir. 1979) ................................................................................................... 34

*Schmid v. Milwaukee Elec. Tool Corp.*,
  13 F.3d 76 (3d Cir. 1994) ............................................................................................... 30, 31

*Securities Offering Reform, SEC Release No. 8591*,
  2005 WL 1692642 (Aug. 3, 2005) ....................................................................................... 49

*Seibert v. Sperry Rand Corp.*,
  586 F.2d 949 (2d Cir. 1978) ................................................................................................. 34

*Shaffer v. RWP Group, Inc.*,
  169 F.R.D. 19 (E.D.N.Y. 1996) ........................................................................................... 30

*In re Software Toolworks, Inc. v. Dannenberg*,
  50 F.3d 615 (9th Cir., 1994) ................................................................................................. 61

*Steckman v. Hart Brewing*,
  143 F.3d 1293 (9th Cir. 1998) .............................................................................................. 50

*In re Surebeam Corp. Secs. Litig.*,
  2004 U.S. Dist. LEXIS 26951 (S.D. Cal. 2004) .................................................................. 50

*Swack v. Credit Suisse First Boston*,
230 F.R.D. 250 (D. Mass. 2005) ........................................................................................... 38

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ..................................................................................................... 52, 62

*Weinberger v. Jackson*,
1990 U.S. Dist. LEXIS 18394 (N.D. Ca. 1990) ...................................................................... 61

*Wielgos v. Commonwealth Edison Co.*,
892 F.2d 509 (7th Cir. 1989) ................................................................................................ 60

*Winters v. Textron, Inc.*,
187 F.R.D. 518 (M.D. Pa. 1999) .......................................................................................... 30

*In re Worldcom, Inc. Sec. Litig.*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004) ............................................................................. 49, 62

*Zubulake v. UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003) ............................................................................ 26, 31, 32

## STATUTES

15 U.S.C.A. 77g(a) ........................................................................................................... 49

17 C.F.R. § 229.503(c) ..................................................................................................... 50

Fed. R. Civ. P. 56(c) ......................................................................................................... 25

SEC Regulation S-K, 17 C.F.R. 229.303 .......................................................................... 49, 50

## OTHER AUTHORITIES

3D MOORE, FEDERAL PRACTICE §37.120   .................................................................... 26, 30

Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations,
Securities Act Release No. 33-6835,1989 WL 1092885 (May 24, 1989) ................................... 50

The Role of Financial Economics and Securities Fraud Cases: Applications at the Securities and
Exchange Commission, The Business Lawyer, p. 559 (February 1994) ..................................... 38

A. Craig MacKinlay, Event Studies in Economics and Finance, Journal of Economic Literature (March
1997) ................................................................................................................................. 41

## I.    NATURE AND STAGE OF PROCEEDINGS

Fact and expert discovery has been completed. On September 11, 2006, the Adams Golf defendants submitted their Motion for summary Judgment (D.I. 289) with accompanying brief in support. (D.I. 290) (hereinafter "Def. Br."). Plaintiffs submit this brief in response.

## II.    SUMMARY OF ARGUMENT

1.    The Adams Golf Defendants' Motion for Summary Judgment must be denied because there are material issues of fact in dispute concerning negative loss causation, duty to disclose, materiality and due diligence.

2.    Defendants engaged in spoliation of critical documents. Their negative loss causation and materiality arguments should be stricken or summarily denied, because defendants have allowed vital documents to be destroyed when they reasonably expected to be sued. The destroyed documents, including Adams Golf's sales register, would have been vital to plaintiffs in further establishing materiality and refuting negative loss causation.

3.    The Registration Statement materially misrepresented, and also omitted, the risk and the fact of ongoing gray marketing. This gray marketing gravely threatened the selective retail distribution network that formed the backbone of Adams Golf's business plan. The misrepresentations and omissions concerning gray marketing were material, and defendants bore a duty to disclose. The truth gradually seeped into the market following the IPO, driving down the price of the stock.

4.    Defendants have failed to satisfy their burden to prove **negative loss causation**. Defendants urge the Court to accept that "two subsequent class-period disclosures about the gray marketing did *not* result in *any* discernible stock-price drop," but neither defendants nor their expert have the slightest idea of the precise dates on which these two disclosures reached or were absorbed by the market. Accordingly, they have no means to measure the price reactions.

5.      Defendants emphasize that "Adams Golf told the public in a press release one
month before the IPO that Costco was gray marketing its clubs." But the Court of Appeals
dispensed with this point two years ago, rejecting the argument that the *"pre-*IPO press release
sufficed to inform the public of Costco's unauthorized inventory of Tight Lies clubs." *In re
Adams Golf* (emphasis in original).

6.      Defendants ignore the "leakage" about gray marketing that occurred right after
the IPO – a spike in Costco's Tight Lies sales to the public; large orders placed by Costco that
occurred at times that correlate with large drops in the price of the stock; the warnings of two
analysts that market participants were aware of and concerned about gray marketing.

7.      Defendants admit that "[t]he October 22 press release contained . . . new,
material information about the gray market" and that the resulting price drop on the next trading
day was statistically significant. A reasonable jury could easily conclude that the risk of gray
marketing omitted from the Registration Statement was the same as what was revealed in
October.

8.      Part of the reason defendants cannot meet their negative causation burden lies
with their negative causation expert, James.  James misuses regression analysis, which is the
foundation of his opinions, and makes unrealistic, baseless assumptions. By contrast, plaintiffs'
negative causation expert, Miller, uses a fundamental approach that has been judicially endorsed
in a case involving an IPO, particularly in light of limitations with respect to the use of statistical
tools in such a case. *RMED Int'l, Inc. v. Sloan's Supermarkets*. Indeed, this type of
fundamental analysis appears to have been adopted by defendants themselves in July 1998, as
they made their own analysis – *not* for purposes of litigation – of why the price of the stock was
dropping.

2

9.     The jury *could* accept Miller's expert approach, which means the Court *cannot* enter summary judgment on negative loss causation grounds, because defendants do not "conclusively establish" that plaintiffs' damages are de mimimis. *Adair v. Kaye Kotts Associates.*

10.    Defendants bore the **duty to disclose**. This duty arises from Item 503(c) of Regulation S-K, which requires that the Registration Statement list risk factors. Defendants admit that the Company faced  risk factors, even though the Registration Statement did not include gray marketing among them. Defendants also bore a duty to disclose under Section 303 of Regulation S-K, which requires disclosure of known trends and uncertainties. Finally, defendants were required to disclose gray marketing under the requirement to set forth statements necessary to make the statements made not misleading. The jury could reasonably conclude that gray marketing rendered false and misleading the Registration Statement's representations about Adams Golf's selective distribution network, and that the listing of some risk factors imposed the duty of listing all.

11.    It is an issue of fact whether the gray marketing risk was **material**. Plaintiffs' gray marketing expert, Ochoa, opined that the risk was severe on the basis of the nearly 4,000 clubs that Costco sold at retail pre-IPO; the 9,000 clubs in transit to Costco stores or on the Costco store shelves at the time of the IPO; the gray marketers in addition to Costco; the grave concern expressed by top Adams Golf management and major customers; the particular harm gray marketing can inflict on a company, such as Adams Golf, that focuses on exclusive distribution protected by high retailer margins; and the history of gray marketing at other companies in the industry. Defendants' own gray marketing expert, Frazier, admitted that gray marketing varied from company to company in the golf equipment industry.

3

12.    The Adams Golf defendants fail in carrying their burden on their **due diligence**

**defense**. All of these defendants, including both management and outside directors, knew about

gray marketing yet failed to investigate its scope and impact.

## III.    STATEMENT OF FACTS

### A.    The Misleading Statements and Omissions in the Registration Statement

Adams Golf is a manufacturer of golf clubs, under the brand name "Tight Lies." It

became a public company in an initial public offering ("IPO") on July 10, 1998. The Registration

Statement and Prospectus for the IPO ("Registration Statement") A. 1, omitted any mention of

"gray marketing" in its risk section, or elsewhere, even though gray marketing was a material risk

for Adams Golf at the time of the IPO. Gray marketing is the unauthorized distribution of the

Company's products to discount retailers. The Registration Statement also failed to disclose that

Adams Golf was engaging in questionable sales practices, including shipping more clubs than the

customer had ordered, a practice which increased sales before the IPO and made extra clubs

available for the gray marketers to purchase.

The Registration Statement assured prospective buyers that "to preserve the integrity of

its image and reputation, the Company currently <u>limits its distribution to retailers that market</u>

<u>premium quality golf equipment</u> and provide a high level of customer service and technical

expertise. The Company currently sells its products to on and off course golf shops and selected

sporting goods retailers." A.1, p. 3 (emphasis added). The Registration Statement also stated:

"To maintain its high quality reputation and generate retailer loyalty, <u>the Company does not sell its</u>

<u>products through price sensitive general discount warehouses, department stores or membership</u>

<u>clubs</u>. A.1, p. 24 (emphasis added). The Registration Statement recited the language highlighted

in the sentence immediately above at least twice. <u>See</u> A. 1, p. 29. The Registration Statement

recited the following sentence at least three times: " The Company believes its selective retail

4

distribution helps its retailers to maintain profitable margins and maximize sales of Adams

products." A. 1, pp. 3, 24, 29.[1]

These statements were materially misleading because, at the time of the IPO, Tight Lies

were in fact being sold "through price sensitive general discount warehouses," including but not

limited to Costco, a warehouse club with many retail outlets in the United States and Canada.

These gray market sales were making it impossible for retailers "to maintain profitable margins

and maximize sales," destroying "the integrity of [Adams Golf's] image and reputation" as well

as "retailer loyalty." Adams Golf clubs' "retail distribution," was increasingly less "selective."

Likewise, when retailers received double shipments of clubs they could not sell, those

excess supplies negatively impacted retailer loyalty, and made excess clubs available to gray

marketers.

### B.    Problems with Gray Marketing in Canada

In late March 1998, Adams Tight Lies first appeared in Costco warehouses (stores)

throughout Canada. Adams Golf's exclusive Canadian distributor, W.D.C. Mackenzie

("Mackenzie"), up to that time had been Adams Golf's second biggest selling customer. A. 2.

Mackenzie notified Adams Golf that Costco was selling Tight Lies at low prices, undercutting

Mackenzie's customers.

At about that time Adams had hired an international sales director, Chris Beebe, because

Adams Golf saw international sales as one of the engines of future growth. A. 1, p. 4. Gregg

Pratt, Sales Manager of Mackenzie, wrote to Beebe on April 13, 1998, stating, "our accounts

have been calling us steady ever since the Tight Lies showed up in Costco stores, about three

weeks ago. We handle about ten to twenty calls daily. . . [Costco] admit[s] to sourcing the

---

[1]In one such instance, the Registration Statement referred to ". . . its selective retail
distribution strategy helps its retailers. . . ." A. 1, p. 29 (emphasis added).

Adams clubs on the 'gray market' and are not apologizing for it." A. 3. *see* A. 4. At that time,

Costco was selling graphite Tight Lies for $249.99 (Canadian). Mackenzie's wholesale price was

$235 (Canadian) and the retail price was $299 to $349 (Canadian), so a buyer could save $50 to

$100 (Canadian) by buying at Costco. A. 5, ¶ 6. Pratt said that even though Costco "did not

have many clubs, their pricing has done some short term damage to the perception in the market."

A. 3. Retail stores were having to sell the clubs at $249. A. 6 p. 15. Costco drove the retail

margins down A. 6, pp. 48, 56.

Several days later Mackenzie sent Adams Golf the transshipment policy of Titleist,

another golf company. A. 7. At that time, Adams had no written contracts with its customers

that limited resale of clubs and no written transshipment policy. A. 8, p. 11. On April 15, 1998,

Mackenzie sent Adams Golf a list of the areas of Canada affected by this first wave of Costco

sales. The areas included British Columbia, Alberta, Ontario, Quebec, Manitoba/Saskatchewan,

and the Maritime Provinces. A. 9. In less than a month after the clubs had first appeared,

Mackenzie's customers had returned or cancelled orders for 108 clubs. *Id*.        Beebe visited

Mackenzie on April 28 and 29, 1998, taking careful notes which he sent back to Barney Adams

and Mark Gonsalves, Adams Golf's Vice President of Sales. Beebe's notes reflect that it "has

been a very big thorn in their side, that 600 woods have made it into Costco stores across Canada

...." Beebe's notes asserted that since Costco had already sold most of these 600 clubs, there

was no need for Adams Golf to act immediately, but, "we need to put a plan in place in case this

occurs again . . .." A. 10.

When he got back from his trip to Canada, Beebe made further inquiries. A. 11. One

Adams Golf retailer, Keith Thomas of Dynamic Golf, operated 16 stores. Thomas told Beebe,

according to Beebe's notes, "dealing with Orlimar now, promises it won't get into Costco stores."

A. 12.   Likewise, on July 8, Beebe noted: "Nevada Bob's move to Orlimar has hurt and what

6

part of this was caused by Costco?" A. 13, ADAMS 009409. In other words, Adams Golf's gray market problem was helping Orlimar grab market share from Adams Golf.[2]

Early in June, 1998, Beebe wrote to Barney Adams and Gonsalves that Pratt, of Mackenzie, had left a voice mail that "Costco Stores have just received a second shipment of Tight Lies, this time in master packets of 30 clubs each." A.15.

Beebe told Barney Adams and Gonsalves that in the past, when affected by gray marketing, Adams Golf's competitors had "ended up giving the retailer the right to match Costco prices . . . . ." Beebe added that "opinion across Canada is that any major golf manufacturer would have to put in place similar programs or they would have massive returns . . .." Beebe worried that if no program was introduced, "Adams Golf stands to lose most of the goodwill we have built in Canada . . .." *Id*. In response, Barney Adams said "we should do what has to be done to keep our sales strong and our reputation." A. 16.

In June 1998, Adams Golf put in place in Canada a price matching program, but the program proved unwieldy and ineffective. A. 5, ¶ 11. Pratt described the program as "putting a band-aid on an open wound." A. 6 p. 29. Canadian retailers complained extensively to Pratt and Ryan Magnussen, the President of Mackenzie, that the price matching program was not working to reduce the number of clubs Costco sold. A. 5, ¶ 11. Indeed, even with the price matching program in place, Mackenzie sold only $259,000 worth of clubs in July. A. 5, ¶ 1. According to Beebe, this should have been Mackenzie's biggest selling month. A. 10. Mackenzie had to cancel an order from Adams because of Costco. A. 6, p.33. By contrast, in June, Mackenzie had sold $537,000 worth of clubs, over twice as much as they sold in July. A. 5, ¶ 11.

---

[2]This serious problem was reflected in the comments of other retailers. As Edwin Watts, one of Adams Golf top customers, put it, he would stop selling Adams Golf clubs if retail margins dropped. A. 14.

Despite the price matching program, the Tight Lies were still selling at Costco for all to see and buy.

## C.    Problems with Gray Marketing in the United States

In the United States as well as Canada, Adams Golf experienced extensive problems with gray marketing before the IPO.  On March 27, 1998, Gonsalves, VP for sales, informed defendant Richard Murtland, who was Adams Golf's Vice President for Research and Development, that King Par had transshipped Tight Lies to a discount retailer in Massachusetts. A.17.  King Par was an Adams Golf authorized retailer located in Michigan.  A. 6.  Soon thereafter, in early April, Beebe, the international sales director, urged Gonsalves to stop a shipment of 1,500 clubs ordered by King Par.[3]  A. 3.  Gonsalves was reprimanded by Murtland, because the shipment had been packaged and ready to go when Beebe told Gonsalves to stop the shipment.[4] A.17.

Other early complaints about Costco came from Washington State.  An Adams Golf senior sales representative, Sandra Brooks, testified about one of her big clients, who was located an in Seattle.  "He was pretty mad."  The client wanted to know why the clubs were for sale in Costco.  A. 20, pp. 13-14.  Brooks told Gonsalves about the Tight Lies in Seattle Costcos, but Gonsalves "blew her off."  After that, Brooks repeatedly told Gonsalves when other Washington State accounts called to complain about being undersold by Costco.  *Id.*, p. 15.  Gonsalves responded by telling Brooks, "keep working on it" or "I don't know."  *Id.*, pp. 18-19, 27.  She dated these complaints from her clients in Washington State as before Adams Golf moved its

---

[3]Costco's sources for Adams Golf clubs included neither King Par nor another suspected gray marketer, Manatee Golf, a Florida authorized retailer.  Def. Br. 10.  A. 18, ¶13.

[4]As Beebe commented, much later, after many more clubs had ended up in the gray market, Gonsalves was "numbers oriented."  A. 19.

8

headquarters, which, according to Adams Golf's counsel, was March 1998. *Id., pp.* 38-39.
Brooks testified that her Washington State accounts affected by Costco stopped ordering Adams
Golf clubs, because they no longer trusted her or Adams Golf. *Id.*, pp16-17. They thought she
had "stabbed them in the back" by allowing the clubs to get into Costco at low prices. *Id.*, pp. 18,
19, 22. Brooks also testified that Katherine East, another inside sales person, discussed
complaints about Costco competition that East had received from customers in the Southwest,
possibly Arizona. *Id*. p. 20.

On May 6, 1998, Beebe wrote to all international distributors, "I have also heard of
several cases of transshipment, (also called parallel importing or gray marketing) occurring in the
United States as well as overseas." Beebe said that distributors had told him that they had been
asked by Costco to sell Tight Lies directly to Costco's U.S. stores. A. 21.

Also, on May 6, 1998, Pro Golf Discount in Fairfax, Virginia cancelled an order because
of the presence of Adams clubs in Costco.[5] A. 22. Pro Golf Discount was a large Adams Golf
customer with stores or franchises in Norcross, Georgia; Bellevue, Washington; Charlotte, North
Carolina; Houston, Texas; Norwalk, Connecticut and Boise, Idaho. A. 2. On May 7, Tight Lies
were found in a Modesto, California Costco, according to one of Adams Golf's customers. A. 24,
p. 12. On May 21, 1998, Mark Gonsalves wrote to Pro Golf: "Our clubs have ended up at a
number of Costco and Price Clubs . . ." A. 25.

By early May -- two months before the IPO -- Barney Adams was concerned enough

---

[5]Defendants claim this was the first U.S. complaint about Costco. Def. Br. p. 10.
However, the record shows that Sandra Brooks and Katherine East, at least, had received
complaints a month or more earlier. This May 6 complaint from Pro Golf Discount was reflected
on a list apparently kept by Adams Golf accounts receivable staff, who made calls to customers
to attempt to persuade them to pay their bills. The list was *not* a list of customer complaints, and it
does not set forth all complaints about Costco or gray marketing. A. 23. Complaints, directed to
sales personnel, apparently do not show up on the accounts receivable staff's list.

9

about gray marketing to ask Gonsalves for the name of Costco's buyer for Adams Golf clubs, the Costco item number for Tight Lies, and Costco's corporate phone numbers. The information that Barney Adams sought concerned Costco activity in the United States, not Canada. A. 26. Then, on May 26, 1998, Barney Adams sent a memo, "RE: COSTCO", to Gonsalves. Barney Adams asked whether there was language in Adams Golf's purchase orders precluding selling to other retailers. Barney Adams wrote, "As we proceed, understand that we're taking on the 800# gorilla [Costco] and they've done this 1,000 times." A. 27.

The complaints continued to roll in. In early June there were complaints from Centerville Golf in Centerville, Virginia and Merrifield Golf in Fairfax, Virginia. A. 24, p. 4.

On June 2, 1998, Gonsalves sent a memo to a number of senior people at Adams, including Murtland, stating: "... we are experiencing transshipment of our Tight Lies Clubs into Costco and Price Club (same parent company). This is a serious situation because Costco is selling our clubs at deep discounts -- $149.99 in graphite, $109.99 in steel. This is just a few dollars over our wholesale price. Our retailers who have locations in areas where Costco has our clubs are being seriously effected [sic] as is our brand integrity." A. 28. (emphasis added). This was a month before the IPO.

A week later, on June 9,1998, Adams Golf filed a "Bill of Discovery" against Costco in Texas state court.[6] *See* A. 29. Adams Golf also issued a press release, which stated in part: "The Bill of Discovery was filed in order to determine whether Costco's claims that they had properly acquired Adams's Tight Lies fairway woods, for resale were accurate. . ." The press release further stated, quoting Barney Adams, that the Company wanted "'to ensure that our valuable relationship with our retailers is maintained and remains fully intact.'" A. 31.

---

[6]Ultimately, Adams Golf moved to dismiss its own suit without prejudice. A.30.

Sandra Brooks, of the Adams Golf inside sales department, testified that the Costco

lawsuit was "too little, too late. . . . They were already mad." A. 20, pp. 68-69. She was

referring to Adams Golf's authorized dealers in Florida, including Edwin Watts in Miami and Fort

Lauderdale, who complained angrily about the low-priced Adams Golf clubs in Costco as early as

April. *Id.* Brooks said the gray marketing caused retailers' sales to decline and "messed up"

their margins. Brooks said that her clients told her that Costco had a hundred clubs sitting in the

store, which were continually freshly stocked. *Id., p.* 82.

In mid-June, customers in Ripon, California, Cerona, California, Walnut Creek, California

and Boise, Idaho, complained about Tight Lies in local Costcos. A. 24. Further, Hobby's Golf

Works, Inc. in Manalapan, New Jersey subsequently wrote to Barney Adams: "as early as June

[1998] your clubs were for sale in Costco for less than my wholesale price." A. 32.

Also in June 1998, according to Eddie Tate, an Adams Golf Regional Account

Coordinator ("RAC"), Manatee Golf of Florida bought $498,774 worth of Tight Lies. The amount

of this sale was far in excess of what Manatee could sell to its retail customers.[7] A. 33, pp 70-

71.

On June 26, 1998, even though he was on the Road Show, Barney wrote letters to King

Par Golf and Manatee Golf, that "we have been advised that one or more of our distributors has

been selling Adams Golf products to wholesalers, such as Costco Wholesale." A. 34; A. 35.

The extent of Adams Golf's gray marketing difficulty in the U.S. on the eve of the IPO

was summed up by a Livonia, Michigan Costco receipt, dated July 3, 1998, that Barney Adams

_____

[7]Tate expressed concern, but Scott Blevins, his supervisor, told him not to worry about it.
A. 33, pp. 20-21. It seemed to Tate that it was "hushed up" by Blevins. The sale took place in
the period when Tate felt "a huge push" to increase sales before the July 10 IPO. Tate
understood that Adams Golf wanted to increase its sales so that Adams Golf could raise the IPO
price of the stock to $16 per share. Tate believed that the clubs Manatee did not sell to end users
would be sold on the gray market. A.33, p. 44.

11

received from Walt DeVault, director of customer service at Adams Golf. The receipt showed

the purchase for $149.00 of an "Adams Wood". As DeVault explained in a note to Adams:

"Barney . . . just wanted to make sure you knew Costco is still selling our clubs below retail."

A.36.

Thus, by the time of the IPO Adams Golf was or should have been aware that Costco or

other discounters were selling Tight Lies in at least Washington State, Massachusetts, New

Jersey, Virginia, Arizona, Florida, California, Idaho and Michigan, as well as in at least eight

provinces in Canada.

### D.    The Costco Documents

During the present litigation, plaintiffs subpoenaed Costco's records concerning

purchases and sales of Adams Golf's clubs during the relevant period. The documents produced

by Costco and the Declaration of Mark Woodrich reflect Costco's purchases and sales to the

extent they can be retrieved from Costco's current database. A. 18. Costco's purchases of

Adams clubs and sales of clubs to retail customers were as follows:

| Costco Sales Periods[8] | Costo Purchases From Gray market In Numbers Of Clubs )U.S. And Canada) | Costo Sales To Public In Numbers Of Clubs (U.S. And Canada) |
|---|---|---|
| 2/16 - 3/13 | 700 | 1 |
| 3/16 - 4/12 | 3,645 | 223 |
| 4/13 - 5/10 | 0 | 809 |
| 5/11 - 6/7 | 4,025 | 1,783 |
| 6/8 - 7/5 | 1,100 | 1,099 |
| 7/6 - 7/9 | 269 | 0 |
| **Pre IPO Totals** | **9,739** | **3,915** |
| 7/10 - 8/2 | 3,611 | 2,104 |
| 8/3 - 8/30 | 2,928 | 1,426 |
| 8/31 - 9/27 | 250 | 1,282 |
| 9/28 - 10/25 | 0 | 1,126 |
| **Class Period Total** | **6,789** | **5,938** |
| **Totals Pre-IPO Through Class Period End** | **16,528** | **9,853** |

The period July 6, 1998 - August 2, 1998, which straddled the IPO, is particularly

important. During this period, Costco sold 2,104 Adams Golf clubs. This was the largest amount

of sales for any four week period. In addition, this was the third largest period for purchases of

Adams Clubs.

---

[8]Costco operates on a 13-period year, each consisting of approximately four weeks. A. 18, p.3. One particular Costco period, 7/6-8/2, straddles the IPO, for which the Registration Statement was declared effective July 9, 1998. On this chart - - for Costco purchases - - this period was broken into sub-periods (7/6-7/9 and 7/10-8/2) to reflect pre- and post-IPO Costco purchases. It is not possible to break down Costco sales by these two sub-periods. Accordingly, all Costco sales during this Costco period of 7/6 - 8/2 were included in this chart as falling in the sub-period 7/10-8/2. *Id*.

By the time of the IPO, Costco had purchased 9,739 clubs, and sold 3,915 clubs.

Accordingly, at the time of the IPO, almost 6,000 clubs were on the shelves in Costco stores for sale to the retail public or on their way to Costco stores.

**E.    The SEC Staff Allowed The Registration Statement To Become Effective**.

Adams made its first S-1 filing with the SEC in May 1998. A. 37, p. 16.  On June 25, 1998,  the SEC staff asked Adams Golf to comment on or resolve several issues, including "advise the staff of the significance of this action [against Costco]."  A. 38.  Evidently, Adams Golf's counsel responded to the SEC staff orally with respect to the staff's questions about the Costco litigation. There is no evidence that the SEC staff made any investigation or knew anything about gray marketing at Adams, other than the contents of the press release about the Costco litigation. Nor is there evidence that defendants provided any such information to the SEC.  A. 37, pp. 44-48.

**F.    Gray Marketing Was a Significant Cause of the Stock Drop.**

The IPO price was $16.00 per share.  The price went above $18 immediately following the IPO, then fell sharply through the rest of July, and continued to decline in  August, September and October.  A. 39.  During July, there was no Company announcement that possibly explained or caused the stock price decline.[9]

Numerous factors indicated that Adams Golf stock declined in July 1998 and thereafter on investors' concerns regarding gray marketing. On July 29, Lehman warned Barney Adams that, at an upcoming conference call with securities analysts and investors, Barney Adams should

---

[9]On July 22, 1998, Adams Golf announced "record second quarter sales and earnings." A. 40. Later the same day, Callaway announced lower sales and profits, due to "softening of U.S. demand," and "loss of . . . market share to competitors."  A. 41.  Callaway stock declined sharply following its July 22 announcement.  One factor in the price decline was Callaway's loss of market share to Adams Golf.  A. 42.

14

expect to be questioned about the appearance of Adams Golf clubs in Costco. A. 43. At this time

Lehman had been active in trading Adams Golf stock. A few days later, in an August 4, 1998

research report, Nationsbank indicated that volatility in Adams Golf's stock price resulted from

market awareness of gray marketing.[10] A. 45.

On July 29, 1998, Barney Adams and other board members conducted a conference call

with Lehman "to determine what has affected the price of the Company's stock." Lehman

provided an analysis based on observation of general market conditions, the stock performance of

other golf manufacturers, and the effects of competition form Orlimar. Lehman apparently

conducted no regression or similar analysis in coming to these conclusions regarding why Adams

Golf's stock price declined. A. 46. Similarly, again apparently without the benefit of regression

analysis, Adams Golf's investor relations personnel offered opinions in or about July 1998 for the

decline in the stock price. A. 42.

At this stage, immediately before and after the IPO, Tight Lies abounded in Costcos in

the United States and Canada. A. 18. See chart on p. 12 *supra*. Anyone who walked into a

Costco could see them. It became increasingly evident to Adams Golf distributers and retailers,

Adams Golf salesmen, golf pros, and all persons who worked in the golf industry that Adams

clubs were proliferating at Costco stores. Moreover, golfers, golf dealers, executives at golf

companies, distributors, retail sales persons, and golf pros were frequently investors in Adams

stock. A. 5, ¶12, D.I. 266, p. 20, Miller Rebuttal Report, (hereinafter "Miller Rebuttal"). Word

gets around the golf industry. A. 5 ¶ 12; A. 6, p. 50. The seepage of information regarding gray

marketing activity is shown by the pattern of price declines around the time of Costco purchases:

---

[10]The Nationsbank report stated: "Callaway shares were often volatile in response to concerns such as 'I saw a Big Bertha in Costco,' or 'some retailer offered a Big Bertha at $10 below an earlier price' that proved to be irrelevant. We expect Adams' stock to also be volatile." A. 45.

| Date of Costco P.O. | # of Clubs | Adams Stock Price Decline |
|---|---|---|
| 7/21 & 22/98 | 3,111 | 27% |
| 7/29/98 | 500 | 13% |
| 8/19/98 | 2,918 | 14% |
| 9/10/98 | 250 | 21% |

Miller Rebuttal, ¶22A, (price decline measured over period beginning two days before and ending

two days after the purchase order dates).

News of the negative impact continued to dribble into the market. The August issue of

Golf Pro, a magazine sent free to the golf trade and apparently not available on newsstands,[11]

contained an article entitled "Barney's Army". A. 48. At the end of the second page, the article

contained the following:

> The company joined the ignominious ranks of the big boys in another way this year: Tight Lies started showing up in Costco. . . .

> Barney Adams deals with this latest challenge with his same unique outlook. "Yeah, this means Adams has joined the big boys, but if Costco and 16 or 17 knockoffs are the payoff, I'd almost have rather started small. It's really a giant pain in the ass," Adams says.

Id., GP022.

Although the Golf Pro article did not explain how Costco was affecting Adams Golf, and

---

[11]Defendants claim Golf Pro was available to the market on August 1st, and that Adams Golf's stock price did not, according to their expert James, react in a statistically significant manner. However, the magazine was mailed and thus arrived at golf stores at different times. The on-line version of the article cited by defendants was available on-line on August 18, 1998 -- not August 1 -- as can be seen from the exhibit cited by Defendants. A.47. Moreover, it is a common experience that magazines are available before the date on their covers.

As plaintiffs' expert Alan Miller pointed out, the text of the article suggested that it was published before August. (For instance, the article refers only to the first quarter results, when the second quarter results were available on July 22, 1998. A. 48, p. GP021.

In any event, defendants' expert James admitted at deposition that he could not pinpoint the date on which the Golf Pro article was available to the market. A. 61, pp. 256, 257. This is despite the fact that he conducted a regression analysis assuming - - without basis - - that the date was August 1.

16

generally the article was favorable with respect to the Company's prospects, it was the first

publication after the IPO to reveal that Costco was selling Tight Lies.  Golf Pro was "a niche"

magazine -- seen only by the golf trade and by golfers.  It could not impact the market to the

same degree or as quickly as a Company release or filing, or even to the same degree as

comment by a securities analyst.  However, the period during which the article probably became

available, sometime between July 15 and August 15, corresponds with a sharp decline in the price

of Adams Golf stock.  Miller Rebuttal, ¶ 22E.

A second published reference to Adams Golf's Costco problem became available  at

least to some people on or after August 28, 1998.  This was a Lehman research report urging

investors to buy Adams Golf stock. On the front it said, "we . . . recommend purchase of the

shares."  A. 49.  On the 27th page of the 28-page report praising Adams Golf, it stated as

follows:

> One concern that we should report is that Adams Tight Lies are appearing in
> Costco Wholesale Stores with increasing regularity.  Adams has filed a suit of
> discovery against Costco to determine how Costco -- an unauthorized retailer--
> has secured this inventory.  One retailer in particular indicated that "*Costco is
> flooding the market with Adams clubs at $149*" (versus an average wholesale
> price of $144_ -- a trend that we have seen in a few markets.  Although, this is
> an extremely serious issue that Adams is working hard to correct, we think
> investors should note that Costco is also selling popular clubs from Callaway and
> Taylor Made.

*Id.*, p. 27 (emphasis in original).

It is not clear either how widely or how quickly this Lehman research report was

circulated. Lantier, the Lehman analyst, testified that August 28th was the date the report went to

the printer, and it may have been mailed to Lehman's customers after that date (which was a

Friday). A 50, pp. 128-129.  Before the day of a special meeting of the Adams Golf Board of

Directors on October 19, 1998, members of the Adams Golf  board of directors  had not even

seen the research report. A. 51.

17

At the beginning of October, Adams Golf formed the "Costco Buster Team," made up mostly of regional account coordinators and headed by Scott Blevins. A. 52. Chip Brewer, new head of sales, told Blevins he wanted "to find out where the clubs [in Costco] were coming from." A. 53, p. 15. Under Blevins's direction, the team counted clubs in Costcos across the country in an attempt to determine the scope of the g ray market problem. By October 20, Blevins was referring to the problem as "the Costco fiasco". A. 54.

On October 8, 1998, Barney Adams sent a memo to the Board explaining why Adams Golf would barely break even in the fourth quarter. A. 55. The memo began, "[o]ne thing that is hurting us badly is Costco." Barney Adams estimated "a negative sales effect in Q4 of 20%-25% . . .." *Id.* He explained that Costco sells at $149, and when they cannot compete, "retailers get mad and stop buying." In the memo, Barney Adams admitted that the Bill of Discovery lawsuit against Costco had been unsuccessful. *Id.*

On October 13, Barney Adams again wrote to the Board. Regarding the poor outlook for the fourth quarter, he listed the issues, "terrible market, Costco, and to a lesser degree, competition." He said they had "anticipated the problem with competition, but the market and Costco were more of a surprise." A. 57.

On October 19, at a special meeting of the Board, Barney Adams and Chip Brewer explained that Adams Golf's authorized retailers "are under pressure either to (1) match Costco's price resulting in substantially reduced margins or (2) maintain a $199 price and risk consumer backlash. The result has been a slowdown in sales to retailers... which is expected to continue throughout the 4th quarter." A. 51.

This October 19 special meeting came soon after Adams Golf had launched a stock buy-back program. A. 58. Board members expressed concern about the buy-back in view of "10/8 memo - revenue 20-25% due to Costco." The notes of this special meeting continued:

18

Were you aware of Costco problem when stock buy back was decided?

Wants board to meet when serious issues such as Costco come up

Finis [Conner, a director] - - thinks we should not buy back until street has info.

Paul [Casati, a director] – what did Joe [Hoffman, corporate counsel] say? If we had knowledge that [the buy-back] would cause it [the stock price] to go up,

**    **    ***

message on conference call Friday – market is very soft; Costo makes it more difficult.

Pg. 27 Ref. 8/28 LB analyst's report outlining Costco issue

All analyst reports should go to Board.

Increasing D&O insurance – $7.5 mm currently. Met with carriers on Friday, waiting for quotes on $15, 20, 30, 40 mm.

A. 59, pp. ADAMS 2241- 42.

On October 22, 1998, Adams Golf issued its third quarter results. With regard to

the outlook for the fourth quarter, the release said

we expect our fourth quarter sales will be affected by continuing weakness in the golf equipment market. In addition, we anticipate our sales will be further impacted by the recent gray market distribution of our products to a membership warehouse club. While we are working diligently to identify and stop the unauthorized distribution of our products to this retailer, we anticipate this process will take at least through the end of the year. As a result of these market conditions, we anticipate that our net income for the fourth quarter will be at or slightly above a break even level. A. 60. (emphasis added).

As a result of this announcement, Adams Golf stock fell from 4.62 to 3.87, a decline of

16.23%. A. 39. This decline, according to defendants' expert James, was "statistically

significant." A. 61, pp. 167-170.

On October 22 or 23, in a form letter to many Adams Golf dealers who had complained

about Costco, Barney Adams wrote:

First is Costco. We do not sell to them. One or more of our customers does, and this has become a serious problem for both Adams Golf and our customers. In

19

> our prospectus and on our road show we stated that we don't sell to Costco type
> operations and we have not. If we sold to them and did not make an
> announcement <u>we would be subject to litigation.</u>

A. 62 (emphasis added).

On October 23, 1998, Adams held a telephone conference call with investors. The first

investor question was, "if you could specifically comment to some of the ways you're going to

address the sales in the gray market . . .." A. 63, ADAMS 004365. The next questioner also

asked, first of all, about gray marketing. <u>Id</u>. at 4366.

On October 28, the Adams Board met again. One of the power point exhibits was

entitled "Adams Critical Issues." The first critical issue was "Costco", which was listed as a

"cause." The "effect" was "eroding selling price and retail margins." A. 64.

At the beginning of 1999, Adams Golf reduced the wholesale price of Tight Lies. Adams

Golf's customers who still had clubs in stock from 1998 were given a credit for the difference in

price between what they paid for the clubs and what the clubs were selling for after the price

reduction, a process called "price protection." This resulted in a $4.3 million charge against gross

revenues in the fourth quarter of 1998. Management told the board of directors that the price

reduction and the $4.3 million charge were necessary "[i]n order to adequately address pricing

issues resulting from gray market sales of the Tight Lies club. . . ." A. 65.

The stock kept dropping. On January 7, 1999, the Company announced that it anticipated

disappointing fourth quarter results, ascribing continuing poor results to the "gray marketing

distribution of its products to a membership warehouse club." <u>Adams Golf</u>, 381 F.3d 267, 272 (3d

Cir. 2004); <i>Id.</i> at 277 n. 11. The stock price fell 17 percent on heavy volume. Thereafter, in

March 1999, the Company publicly admitted that a warehouse club was selling its golf clubs and

that the Company "does not believe that the gray marketing of its product can be totally

eliminated." <i>Id.</i> p. 272.

### G.    The Adams Golf Defendants Failed to Make an Adequate Inquiry into Gray Marketing

As officers of the Company, the inside directors Barney Adams, Darl Hatfield, and Richard Murtland were intimately familiar with the operations of Adams Golf.  Company management, including the inside directors, were well aware of the existence of, and growing material threat posed by, gray marketing of the Tight Lies before the IPO. Murtland and Barney Adams, were aware, as early as March 1998, that gray marketing of Tight Lies was occurring in the United States as well as Canada, and that it was not limited to Costco stores. A. 66.  Barney Adams knew that by May 1998,  the gray marketing of Tight Lies in Costco stores in Canada involved at least 600 clubs and had become "a very big thorn in [Mackenzie's] side." A. 10.  By June, the Company's vice president of sales, Mark Gonsalves, in a memorandum to defendant Murtland and others, identified Costco and gray marketing as a "serious issue" that "seriously effected [sic]... brand integrity." A. 28.  Finally, the gray marketing problem was sufficiently vexing that, on  June 9, 1998,  Adams Golf filed a Bill of Discovery against Costco,  A. 29, which all the directors knew about.  (A. 67, pp. 31-32; D.I.281¶ 7, A. 8, pp. 63-69).

However, despite being in possession of these facts, these "red flags," the inside director defendants undertook virtually no investigation regarding the extent and seriousness of gray marketing.  Barney Adams testified that, at the time of the IPO, "[T]he only incident [of gray marketing] I was aware of, or purported incident, was a very small quantity in Canada." A 8, p. 16.  He did not know if retailers were selling to Costco before the IPO. *Id.*, p. 50.  He had "no knowledge or history of [pre-IPO gray marketing] going on" so he "can't come up with any numbers" of clubs for sale on the gray market; A. *Id.*, p. 18.  Even after learning of the pre-IPO gray marketing of Tight Lies in Canada, he made no effort to investigate Costco stores in the United States for gray marketing. A. *Id.*, pp. 122-123.  He did not know if any United States

retailers had complained about gray marketing before the IPO. *Id*., p. 62.

Defendant Hatfield took no action of any sort, not even discussing gray marketing again prior to the IPO after he heard about it in June 1998. Defendant Murtland admits to having visited only *one* Costco "at some point" to ascertain whether or not the Tight Lies on display were counterfeit. D.I. 281.

The outside directors concede that they attended at least one meeting at which the Registration Statement was discussed. There is no evidence that any of the outside directors discussed or asked about the risk of gray marketing or Costco at any pre- IPO board meeting. A. 68, p. 25; A. 69, p. 31; A. 70, p. 30; D.I. 282, ¶ 16. Regarding the Company's June 9, 1998 press release announcing the filing of the Bill of Discovery against Costco, the outside directors failed to inquire about the significance of the Bill of Discovery, or even to check on the status of the litigation. A. 68, pp. 63-64; A. 69, pp. 31, 33; A 70, pp. 26-27; D. I. 282, ¶3.

### H.   Double Shipping and Other Questionable Sales Practices

Adams Golf also failed to inform investors about double shipping and other questionable sales practices. Double shipping made more clubs available to gray marketers. D. I. 259, ¶ 16.

On August 14, 1998, only a month after the IPO, Barney Adams wrote, in an internal memo under the heading "Sales, Current Condition":  "I cannot accurately describe the degree of upset that accompanies this memo. My concern is how deep do our problems go, and have we been presenting a false image?" A. 71. Evaluating the Company's sales practices, Barney Adams had come in for "a shock . . . . What I learned is so upsetting that it has made me physically ill, a discouragement equal to any time since the start of Adams Golf." *Id*.

According to Barney Adams, the Company's Inside Sales staff " know cheating (at least in the form of double shipments) occurs and are concerned that such action is quietly endorsed. . . Apparently we've made a lot of sales that have been falsely reported (as sales) and are little

22

more than consignments." *Id.* He concluded: "I don't think I need to write any more; the issue is squarely on the table and I'll clarify what is making me sick. Are we living the big lie? Did we present Road Show numbers for '98, '99 that we have no idea we can attain? Is the big lie catching up with us and the reason our people are upset is that they know it?" *Id.*

In coming to these conclusions and posing these questions, Barney Adams had undertaken "an in depth evaluation." He added: "I've researched this to the point where I know that [the above issues] have become reality."[12] *Id.*

Sandra Brooks, an inside sales representative, confirmed at her deposition that "all of that double-shipping business was going on with Jay . . . I'm pretty sure Mark Gonsalves knew about that." A. 20, p. 34. She was referring to Jay Greanay, who was the top performing inside salesperson at Adams Golf. He "was a good salesperson, and he also padded his orders." *Id.* p. 77. Brooks said "the whole inside sales team, including Mark ... knew about [Jay double shipping]. We talked about it openly. ... Some people, when you -- you say: okay, I'll take six clubs. Send them a dozen. He would do that." *Id.*, p. 80-81.

Chip Brewer, the replacement for Mark Gonsalves as head of Sales, testified: "I became aware of some aggressive sales tactics . . .." A. 73, pp. 23-24, ". . . There were some concerns about Jay's business practice, which included double shipment." *Id.*, p. 27. Brewer asked Greanay to leave the Company because of his aggressive tactics. *Id.*, p. 40.[13]

_____

[12]Barney Adams addressed the memo to Mark Gonsalves, VP for Sales, and Ric Jarrett, an outside consultant. In the memo, Barney Adams stated: "this analysis is the worst performance assessment I've ever written and that includes all my pre-Adams corporate days." A 72. Six weeks later, on September 25, 1998, Barney Adams informed the Board of Directors: "When I came off the road show, I started spending much of my time in sales, not reviewing numbers, but working with the sales people. Serious problems were found and changes were made . . . . Mark Gonsalves left the company."*Id.*

[13]Greanay reportedly asserted "that these practices were condoned, even asked for, prior to the Company going public." A.74, ADAMS 046810. A handwritten note, scrawled on a

23

## I.    **Additional Facts Concerning Spoliation**

At a time when Adams Golf anticipated litigation, the Company allowed its sales register

and other computerized sales records to be destroyed.  These documents would have made it

possible to identify possible gray marketers and persons who received double shipments.  The

sales register was a list of all Adams Golf sales, including the customer, date and amount of sale.

Using these documents, plaintiffs could have established the full extent of pre-IPO gray

marketing.  The documents would also have provided evidence on the loss causation issue,

because plaintiffs could have correlated declines in the stock price with sales to the gray market,

as well as discounter sales to the public.

In a letter dated June 30, 2005, counsel for the Adams Golf defendants admitted that

Adams Golf's sales register and reconciliation reports no longer existed.  A. 76.  Counsel claimed

that, on January 31, 1999, Adams Golf had changed from the "Platinum System" of record

keeping to "Peoplesoft," and that Adams Golf had transferred only the "high level summary

financial data."  Adams Golf had not transferred or retained monthly sales information by

distribution and retailer, including the sales register.  *Id.*

---

customer's complaint letter concerning Greanay's aggressive tactics, appeared in Greanay's
personnel file: "Mr. Greanay has been written up for 'phantom orders'.  Interesting situation - top
seller <u>BUT</u> some shady deals?" *Id.,* p. 46812 (emphasis in original).

    Other evidence of double shipping shows the practice of double shipping was widespread.
For instance, *Golf Pro Magazine* quoted a golf pro who received twice the Tight Lies he had
ordered  A. 48.  Mackenzie received a double shipment from Adams Golf in spring 1998.  A. 75,
p. 32.  Yamamoto Golf in Honolulu received clubs it had  not ordered and insisted on returning
them to Adams Golf.  A. 23.  A customer complained that the clubs he had ordered were
supposed to be shipped over a course of time, but were shipped and billed to the customer
immediately.  A. 74.

## IV.    ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD OF REVIEW

A court shall grant summary judgment *only if* "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

To raise a genuine issue of material fact, "the summary judgment opponent need not match, item for item, each piece of evidence proffered by the movant, but simply must exceed the 'mere scintilla' standard." Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (internal citations omitted). In ruling on a motion for summary judgment, the court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Hugh v. Butler County Family YMCA, 418 F.3d 265 (3d Cir. 2005); Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

Further, in Adair v. Kaye Kotts Associates, 1998 U.S. Dist. LEXIS 3900, at *20 (S.D.N.Y. 1998), the court observed that "[t]he presence or absence of price movement immediately after disclosure is not per se dispositive under Section 11(e)" and that the measure of damages need not be proven by Section 11 plaintiffs on summary judgment. Plaintiffs are not even required to respond to a summary judgment motion by proffering damage evidence, since the burden is on defendants to prove that other factors caused the decline in the price of plaintiffs' stock. Id. at *24-26. Defendants cannot obtain summary judgment unless they "conclusively establish" that plaintiffs' damages are *de minimis*. Id. at *26. For under Section 11, the "risk of uncertainty" has been statutorily allocated to the defendants. Akerman v. Oryx Communications, Inc., 810 F.2d 336, 341 (2d Cir. 1987); Collins v. Signetics, 605 F.2d 110 (3d

25

Cir. 1979).

**B.     BECAUSE THE ADAMS GOLF DEFENDANTS DESTROYED KEY
        DOCUMENTS EVEN AFTER THEY ANTICIPATED LITIGATION, THE
        COURT SHOULD STRIKE OR SUMMARILY REJECT THEIR
        MATERIALITY AND NEGATIVE LOSS CAUSATION ARGUMENTS**

Spoliation is "the intentional destruction or alteration of evidence, or the knowing failure to

preserve property for another's use as evidence in pending or reasonably foreseen litigation." 3D

MOORE, FEDERAL PRACTICE §37.120 (citation omitted). The doctrine exists to protect

litigants against the enormous prejudice that can arise from the opposing parties' wrongful

discarding of paper or electronic records. *See* Zubulake v. UBS Warburg LLC, 220 F.R.D. 212

(S.D.N.Y. 2003)("If documents are lost or destroyed when they should have been preserved

because a litigation was threatened or pending, a party may be prejudiced").

Here, the record establishes that the Adams Golf defendants improperly disposed of or

made unavailable important, relevant documents, and they did so at a time when they anticipated

litigation. Because the loss of these documents has significantly impeded plaintiffs' proof, the

Court should issue appropriate sanctions, including striking or refusing to consider those portions

of the Adams Golf defendants' summary judgment motion that bear directly on the lost or

destroyed documents - - specifically, those portions of the motion that seek entry of judgment on

grounds of materiality and negative loss causation.

**1.     The Adams Golf Defendants Destroyed Important Documents
        At A Time When They Anticipated Litigation**

**a.     The Adams Golf defendants disposed of key documents in
        January 1999.**

It is undeniable that Adams Golf destroyed its most basic sales records, including but not

limited to the sales register that detailed every sale, by customer, date and amount. A. 76. The

rationalization given was that Adams Golf changed from the "Platinum system" of record keeping

26

to a "PeopleSoft" computer system, and that, in the process of transferring data, only "high-level summary financial data" was transferred. Monthly sales information by distributor and retailer was not transferred, and the sales register was lost. According to counsel, this change from Platinum to PeopleSoft occurred on January 31, 1999. *Id*.

These records, had they been preserved and produced, would have revealed critical information regarding the scope and effect of gray marketing. In particular, through the use of the sales register from the weeks leading up to the IPO, plaintiffs could have established every instance of gray marketing that occurred, refuting defendants' claim that gray marketing was sporadic or insignificant. In addition, plaintiffs could have matched up instances of gray marketing with declines in Adams Golf's stock price, in the period following the IPO, thereby establishing the existence of probable "leakage" of information and negating defendants' negative loss causation claim.

The utility that the sales register would have offered plaintiffs in ferreting out gray market sales, both pre- and post-IPO, was admitted by the Adams Golf defendants in their brief. In June 1998, Manatee Golf and King Par were "suspected of gray market activity based on their sales figures." Def. Br., 10. Using the same method, if plaintiffs had had access to the sales register, they would have been in a position to detect unusually large sales to certain retailers or distributors and then pursued further discovery, directed to both the retailer/distributors and Adams Golf, in order to establish that the sales resulted in distribution through gray market channels to discounters or others.

Plaintiffs discovered that Costco had purchased a total of 9,739 clubs from gray marketers before the IPO. (see chart, p. 12, *supra*). None of these clubs was supplied by either King Par or Manatee Golf. A. 18, ¶¶13. Thus, production of the sales register would have led plaintiffs, by tracking every purchase by King Par, Manatee and certain other authorized

27

distributors and retailers, to establish a materially greater amount of gray market sales than
plaintiffs were able to uncover through the discovery that was made available to them.

        **b.**       **Before January 1999, the Adams Golf defendants
                  reasonably expected litigation.**

      The record shows that, by January 31, 1999 - when Adams Golf destroyed the sales

register and related sales documents - the Adams Golf defendants reasonably expected that they

would be sued. Soon after the IPO, Barney Adams, CEO, examined sales practices within the

Company and expressed "shock", stating in a memorandum to management personnel that

"we've made a lot of sales that have been falsely reported"; that the road show projections

provided to the investment community in connection with the IPO might be baseless; that Adams

Golf possibly was "presenting a false image"; and that the company could be "living the big lie" A

71. Thereafter, litigation was certainly on Adams's mind on October 22, 1998, when, writing to 7

customers, Adams stated defensively that if Adams Golf had been selling directly to the

discounter Costco, it would have been "subject to litigation". A 62.

      Events at a special meeting of the Board of Directors of Adams Golf, convened on

October 19, 1998, further demonstrated the Adams Golf defendants' recognition of the strong

possibility that they would be sued. Just before the October 19 meeting, there had been two

important developments. First, on October 1, 1998, Adams Golf had announced that the Board of

Directors had authorized the repurchase of up to 2,000,000 shares of the Company's common

stock. A 58. Second, on October 8, 1998, in a confidential memo to board members, Mr. Adams

had stated that Costco gray marketing was "hurting us badly. . .Our normal channels can't

compete, retailers get mad and stop buying. . . . We estimate a negative sales effect in Q4

[ending December 1998] of 20%-25% . . . ." A.55. In light of these developments, the directors

expressed severe concern about litigation, according to notes of the October 19 meeting.[14]

The only logical conclusion to draw from the board members' expressions of concern at the October 19, 1998 special meeting is that they believed the Company faced a law suit for failing to disclose the Costco or gray marketing problem, particularly in light of the recently announced stock buyback program. "Were you aware of Costco problem when stock buyback was decided" could only mean the following: an investor considering purchase on the good news of the Company's decision to buy back its own stock might have believed it important to know about the impact of gray marketing. To precisely the same effect was Finis Conner's instruction: "we should not buy back until street has info."

In this light, it is perfectly understandable - and indicative of the concern about forthcoming litigation - that the directors took one further relevant action at their October 19th meeting. They determined to increase directors and officers insurance coverage from $7.5 million to as much as $40 million. A 51.

By early November, Adams Golf's largest shareholder, the institutional investor Scudder Stevens, let it be known that it was upset with both Adams Golf and Lehman, lead underwriter for the IPO, further raising concerns about forthcoming litigation. A 77. Adams Golf destroyed its sales register less than three months later.

## 2.    Plaintiffs Are Entitled To Sanctions

As Professor Moore notes, courts "have imposed a wide range of sanctions for spoliation

---

[14] As noted by the Statement of Facts, these notes included the following comments: (1) "10/8 memo - revenue 20-25% due to Costco"; (2) "Were you aware of Costco problem when stock buyback was decided?"; (3)"Wants board to meet when serious issues such as Costco come up"; (4) "Finis [Connor, one of the directors] - thinks we should not buy back until street has info."; (5) "Paul [Brown, another director] - what did Joe [Hoffman, company counsel] say? If we had knowledge that [the stock buy back] would go cause it [the stock price] to go up, . . . A 59 (emphasis added).

29

of evidence," including, because spoliation may "pose an extreme threat to the integrity of the judicial system," extreme sanctions of dismissal or default on claims or defenses. 3D MOORE FEDERAL PRACTICE, supra, §37.120; see Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co., Case No. 502003CA005045XXOCAI (Cir. Ct. 15th Jud. Dist. Palm Beach Fla. 2005). Lesser sanctions have included preclusion orders, orders deeming specified facts to be established, and instructions to the jury that it may draw an inference adverse to the party responsible for the absence of the evidence, and monetary awards. 3D MOORE, FEDERAL PRACTICE, §37.120.

The doctrine of spoliation applies to "reasonably foreseeable" litigation. 3D MOORE, FEDERAL PRACTICE § 37.120 (duty to preserve material evidence arises not only during litigation but also extends to that period before litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation); Byrnie v. Town of Cromwell, 243 F.3d 93, 108 (2d Cir. 2001); Mosaid Technologies, Inc. v. Samsung Elecs Co., 348 F. Supp. 2d 332, 335 (D.N.J. 2004). Courts may impose sanctions under the doctrine of spoliation on litigants who destroyed documents if they "knew or should have known that the destroyed evidence was relevant to pending, imminent or reasonably foreseeable litigation." Shaffer v. RWP Group, Inc., 169 F.R.D. 19 (E.D.N.Y. 1996) (emphasis added); see also Winters v. Textron, Inc., 187 F.R.D. 518, 520 (M.D. Pa. 1999).

The decision of what sanction is appropriate where evidence has been lost or destroyed is entrusted to the sound discretion of the trial court. E.g., Erie Ins. Exchange v. Applica Consumer Prods., Inc., 2005 WL 1165562, at *3 (M.D. Pa., May 17, 2005)(citing, Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).

In Schmid, the Third Circuit established three factors to be considered when determining the appropriate sanction to impose for spoliation of evidence: (1) the degree of fault and personal

30

responsibility of the party that destroyed the evidence; (2) the degree of prejudice suffered by other parties; and (3) the availability of a lesser sanction that would avoid unfairness to the innocent party, while serving as a sufficient penalty to deter the same kind of conduct in the future. See also, Positran Mfg. Inc. v. Diebold Inc., 2003 WL 21104954 (D.Del., May 15, 2003).

The threshold question of the degree of fault attributable to the party that destroyed the evidence involves a determination of whether that party intended to impair the ability of the other side to litigate effectively its case. Schmid,13 F.3d at 80. This issue need not be resolved by testimony concerning the defendants' purported subjective intentions. In Zubulake, 220 F.R.D. 212, the court found that once a duty to preserve documents attaches, any destruction of those documents would be at least negligent, unless caused by events beyond a party's control.

Here, the Adams Golf defendants anticipated or should have anticipated litigation by October 1998, four months before the destruction of the sales register and related sales documents. To have destroyed or failed to safeguard obviously important and probative documents under those circumstances bespeaks a very high degree of culpability. This was hardly a matter of events beyond the Adams Golf defendants' control. There was no need to destroy all but "high-level summary financial data" at the time of the January 1999 changeover from Platinum to PeopleSoft or, indeed, to engage in the changeover at all if it entailed destruction of important documents that the Adams Golf defendants were obligated to preserve.

The degree of prejudice suffered by plaintiffs is very high. Many of the fact witnesses in this case have ritualistically denied having more than scant recollection regarding the relevant facts of the case, on the basis of the time elapsed since the IPO (although the case was filed in June 1999, within just eleven months of that offering). It will never be known for certain how many gray market sales will go undetected as a result of the Adams Golf defendants' destruction of the sales register.

31

By the same token, it will never be known for certain on how many occasions the stock

price declined -- particularly as the price plummeted in mid to late July 1998 -- as a result of

particular observances of gray marketing by market participants. In this 1933 Act case, it is

defendants' burden to establish that the omissions in the Registration Statement did not cause loss

to plaintiffs and the Class. However, plaintiffs are obliged to rebut defendants' effort to meet that

burden. One way by which plaintiffs will do so is to explain that defendants cannot establish that

the severe drop in the price of Adams stock during the month of July and thereafter was

unrelated to gradual "leakage" into the market of information regarding the gray marketing of

Adams products. The unavailability of key records evidencing the extent of gray marketing at

Adams Golf has handicapped plaintiffs' efforts to demonstrate the extent of gray marketing and

related information "leakage".

On these facts, monetary sanctions for the destruction of evidence would be insignificant,

and, on a cost-benefit analysis, could reward defendants for their elimination of probative

evidence. The only fair and appropriate remedy is to strike those portions of the Adams Golf

defendants' motion for summary judgment that seek judgment on materiality or negative loss

causation grounds. (As trial approaches, plaintiffs intend to seek an adverse inference instruction

to the jury to the effect that the missing documents would have contained evidence adverse to

defendants and helpful to the plaintiffs.)

In Zubulake, 220 F.R.D. 212, Judge Scheindlin addressed the basis for an adverse

inference instruction. The Court found that there were three predicates for such an instruction:

(1) the party having control of the evidence had an obligation to preserve it; (2) the records were

destroyed with a culpable state of mind, which would include negligence; (3) the destroyed

evidence was relevant to a claim or defense. 220 F.R.D at 220. Similarly, in Residential Funding

Corp. v. DeGeorge Financial Corp., 306 F.3d 99 (2d Cir. 2002), the Court found that culpability

32