for purposes of an adverse inference instruction could be satisfied by a showing that the evidence

was destroyed knowingly or with negligence, even without a showing of an intent to breach a

duty to preserve it. *See also* Byrnie v. Cromwell, 243 F.3d at 110 (where a party produces

"enough circumstantial evidence to support the inference that the destroyed [evidence] may have

contained documents supporting (or potentially proving) his claim, and that the possibility that a

jury would choose to draw such an inference, combined with plaintiff's circumstantial evidence, is

enough to entitle plaintiff to a jury trial.") (quoting Kronish v. United States, 150 F. 3d 112, (2d

Cir. 1998))

Thus, spoliation, such as that here, is sufficient to defeat summary judgment.

## C.    DEFENDANTS CANNOT SATISFY THEIR BURDEN ON NEGATIVE LOSS CAUSATION

### 1.    Defendants Cannot Show That The Risk Of Gray Marketing Was Incorporated Into The Offering Price

Relying heavily on their expert, James, defendants assert that the gray marketing risk was

incorporated into the IPO price simply, and solely, on the basis of Adams Golf's pre-IPO press

release regarding a "Bill of Discovery" filed against Costco.

The Court of Appeals has already dispensed with this argument: "The defendants also

argue that the June 9, 1998 *pre*-IPO press release sufficed to inform the public of Costco's

unauthorized inventory of Tight Lies clubs. They argue that if information regarding any gray

market problem was placed in the public domain through the pre-IPO press release, the Company

would have had no obligation to mention it in their offering materials." In re Adams Golf Sec.

Litig., 381 F.3d at 277 n.10 (emphasis in original). The Court rejected defendants' argument,

noting that such disclosure, "announced in single press release before the company went public,

33

was simply unlike the publicly known or available facts" in the cases defendants cited. *Id.*[15]

Thus, as the Court of Appeals observed, at the time of the June 9, 1998 press release, Adams Golf remained a private company. The IPO was still a month away. Accordingly, there was no efficient market, no "rapidly incorporated new information about the company and its business", D.I. 258, ¶48, and, hence, no possibility that "[m]arket participants . . . . knew of the risk of the gray market due to" the June 9, 1998 release. *Id.* at ¶ 6(b).

The June 9 press release, issued as it was at a time that Adams Golf was not trading in an efficient market, could hardly have been very important to any IPO investors who might have happened to have run across it. This is because, one month later, the Registration Statement contained no risk disclosure concerning Costco or the extent of other gray market distribution or the risk thereof. *See* Miller Rebuttal, ¶13, p. 12 (market participants understand that a Registration Statement and Prospectus for a public offering are "required to contain all material information relevant to the issuer").

Nor did any limited awareness regarding gray marketing on the part of the underwriter defendants somehow insure that the "risk of gray marketing was incorporated" into the IPO price. As discussed at length in plaintiffs' opposition to the underwriter defendants' motion for summary judgment, the underwriters' "due diligence" with respect to gray marketing was haphazard, incomplete, and almost entirely dependent upon unverified management assertions.

## 2. Defendants Cannot Bear Their Burden That Price Movements On The First Day Of Trading Preclude Damages

According to defendants and their expert James, the fact that the price of the stock rose

---

[15]Defendants cited to Acme Propane, Inc. v. Tenexco, Inc., 844 F.2d 1317, 1323 (7th Cir. 1988) (state statutes are in public domain); Rodman v. Grant Foundation., 608 F.2d 64, 70 (2d Cir. 1979) (corporate officers' motivation to maintain corporate control is "universal"); Seibert v. Sperry Rand Corp., 586 F.2d 949, 952 (2d Cir. 1978) (widely known and reported labor difficulties).

on the first day of trading precludes attribution of damages to disclosure of gray marketing. This is because, according to the expert James, the market would have reflected the gray marketing information as soon as the shares began to trade. Def. Br. at 24.

The difficulty with this argument, as noted above, is that the June 9 press release was not issued in an efficient market. Thereafter, the Registration Statement said nothing about gray marketing or Costco, leading reasonable investors to believe that whatever material risks existed, gray marketing was not among them. *See* Miller Rebuttal, ¶13, p. 12. Finally, defendants show no post-IPO disclosure, on the first day of trading, that could possibly be characterized as providing important information with regard to gray marketing. If, as James asserts, "the stock rapidly incorporated *new* information about the company and its business", James Report, ¶48, (emphasis added), there was no *new* information available on the first day of trading apart from the Registration Statement. As noted, the Registration Statement deleted the gray marketing risk.[16]

---

[16]As plaintiffs' expert Miller put it: "The concept that market participants would 'sit on' information released into a market in which the stock was not trading and then wait for an IPO to occur, then sell or short back the stock based on information not disclosed in a prospectus, and ignore all other information, is simply not realistic." Miller Rebuttal ¶13, p. 12.

As Miller, plaintiffs' expert, observed:

> It would be very surprising if there were not some significant overlap between these various parties [who were involved in Costco gray marketing] and investors in Adams Golf stock, as it is common practice with a niche company such as Adams Golf, for its stockholders to be people with an interest in such a market or company, such as avid golfers, distributors, retailers, suppliers, and others with a likely knowledge of the company and the market.

Miller Rebuttal, ¶22A.

3.    **Defendants Minimize Or Ignore The Disclosures That Occurred Post-IPO Regarding The Gray Market And Thus Cannot Bear Their Burden**

Defendants admit that "[m]any factors affected the stock price in July 1998." Adams Br., p. 12. Defendants seem to credit every possible factor except gray marketing.

The stock price plummeted in July 1998, within days of the IPO. During this period information about gray marketing at Costco and elsewhere seeped into the market. The four week period beginning just a few days before the IPO and running through July saw Costco's largest sales ever, before or since the IPO, of Adams Golf clubs – some 2,100 clubs. See chart, p. 12 , *supra.* At the same time, to feed its customers' demands, Costco placed large follow-on orders for more clubs. Costco ordered 3,111 clubs on July 21 and 22. The stock price fell 27 percent over the six-day trading period beginning two days before and ending two days after Costco placed those orders. Miller Rebuttal, ¶22A.

A reasonable jury could conclude that some or all of the stock decline in July occurred as a result of market participants observing or learning about this gray market activity and concluding that gray marketing was hurting Adams Golf's future prospects, because it was threatening the high dealer margins on which Adams Golf depended for its success. The golf industry is close knit. Persons who golf, and persons who work in the industry, tend to invest in golf stocks. A. 5; A. 79.

The underwriter defendants confirmed that investors were concerned. On July 29, 1998, prepping Barney Adams so that he could field questions at an upcoming investor conference, Lehman warned that he should expect questions about Costco sales of Tight Lies. A. 43. A few days later a NationsBanc analyst indicated that Adams Golf stock price volatility reflected concerns about ongoing gray marketing at Costco. A. 45.

The stock price continued to go down as the market learned more about gray marketing.

36

In July or August, Golf Pro Magazine warned about gray marketing. A.48. On August 28, 1998, a Lehman research report described the gray marketing problem as "an extremely serious issue". A. 49. On October 22, 1998, in its first public announcement regarding the impact of gray marketing, the Company admitted that gray marketing was dragging down current, ongoing results. A. 60. The stock reacted so negatively to Adams Golf's October 22 announcement that even defendants' expert, James, admits that the price reaction was statistically significant. James Report, ¶6(d).

The jury could conclude that, in the light of this growing chorus of bad news for Adams Golf as a result of gray marketing, defendants do not satisfy their burden of establishing that investors simply shut their ears to gray marketing as they unloaded the stock. Indeed, the record shows that at a time when Lehman's analysts and capital markets personnel had been learning about the increasing gray marketing of Adams Golf products, Lehman was active in trading Adams Golf stock.

### 4.    Defendants Fail To Satisfy Their Burden Of Showing That The Gray Market Disclosures Were "Speculative"

In response to these disclosures regarding gray marketing, defendants say that most of these were not really disclosures at all. According to defendants, plaintiffs only "speculate that the information 'leaked' into the market over time in unspecified, nonpublic ways." Defs. Br. at 31.

Defendants' characterization of "leaked" information as "nonpublic" is simply wrong. What defendants presumably mean by "nonpublic" is "nonpublished". However, the authorities establish that market prices move on "leaked" information even if that information is not reduced to writing and even if that information cannot be identified as having been disseminated on a particular date. See In re Enron Corp., 439 F. Supp. 2d 692, 698-701 (S.D. Tex. 2006) (market

37

may learn of fraud through numerous sources, including whistleblowers or analyst questioning, and economic loss may occur as "relevant truth begins to leak out"); In re NTL Sec. Litig., 2006 U.S. Dist. LEXIS 5346 (S.D.N.Y., Feb. 14, 2006) (truth may reach market through "'dribbled' disclosures or 'leakage'"); Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 270-271 (D. Mass. 2005).[17]  Indeed, even defendants' expert James agreed that material information could "leak" into the market, whether by rumor or oral communication or observation, and thereby materially affect stock prices.  A.  61, pp. 116, 121-22, 126-31.

### 5.    Defendants Fail To Satisfy Their Burden of Specifying the Dates Disclosures Reached the Market

There are two gray marketing disclosures that defendants refrain from dismissing as "leaked", "nonpublished" information. These are the *Golf Pro* article bearing the cover date of August 1998 and the August 28, 1998 Lehman research report.  According to defendants, "any stock-price decline that occurs more than a day after the information was publicly available cannot be attributed to that omission." Defs. Br., p. 27.  Accordingly, the failure of the stock price to decline in what defendants' expert James deems to be "statistically significant" fashion on the particular dates that defendants assert the *Golf Pro* article and the Lehman research

---

[17]        As Mark L. Mitchell and Jeffrey M. Netter have written:

> For those events that are subject to leakage, defining the beginning of the event window can be problematic. *Consider the case of a merger in which the target company is rumored to be "in play" prior to the announcement.  For such a case, the event window should begin prior to the actual merger announcement, perhaps* as *long as a week or two* . . . .In practice, this date is difficult to define and some degree of judgment is required generally based on price and volume movements prior to the merger announcement. (emphasis added)

The Role of Financial Economics and Securities Fraud Cases:  Applications at the Securities and Exchange Commission, The Business Lawyer, p. 559 (February 1994)(footnote deleted; emphasis added).

report became available to the public, defendants assert, precludes any possibility that the disclosures caused loss.

However, defendants cannot bear their burden of establishing when either the *Golf Pro* article or the Lehman report became available to the market. With respect to the *Golf Pro* article, defendants and their expert James have no relevant information. All that James could come up with was an internet search that appeared, James said, to indicate that, in general, some unspecified number of *Golf Pro* articles, over some unspecified time span, were cited or referenced in other publications in the month appearing on the cover. In other words, an article appearing in the *Golf Pro* edition for a particular month supposedly would be referenced in some other publication (if at all) that same month, not before. This hardly satisfies defendants' burden regarding the *particular* date the *Golf Pro* article reached the public.[18] A. 61, p. 256-57. Accordingly, since defendants cannot establish the day (much less the month) when the *Golf Pro* article was available to the public, their expert James can hardly divine whether there was a significant stock-price decline not more than one day after that Golf Pro release date occurred.

With respect to the August 28 Lehman research report, a different problem arises. Analysts' research reports may not immediately be fully absorbed in the market price.[19] Further,

---

[18]James admits as much. He testified: "Based upon communications that I'm aware of between Cornerstone [with whom James is associated] and the publishers of Golf Pro, which is now not currently published, they were unable to answer the question as to whether it was available before or after the cover price - cover date." A. 61, pp. 256-57.

[19]As plaintiffs' Miller points out:

Mr. James is assuming (or opining?) that the *Golf Pro* article and the August 28 analyst report represent full, clear, timely, and undiluted "disclosure" of what plaintiffs allege was omitted from the prospectus - disclosure of the risk, existence, extent and impact of gray marketing. Clearly they do not, as they are partial, "seeping" comments by non-Company sources which are in no way equivalent to a proper company disclosure in an SEC-filed prospectus.

it is far from clear when the August 28 research report was issued. Lantier, the Lehman analyst, testified that August 28 was the date the report went to the printer, and it may have been mailed to Lehman clients after that date (which was a Friday). A. 50, pp. 128-129.

At the October 19, 1998 board meeting, board members, evidently learning for the first time about the August 28 research report, admonished management: "All analysts' reports should go to Board." A. 51. (emphasis in original). If the board of directors itself was unaware for nearly two months about the reference in the August 28 research report to gray marketing, the jury could reasonably refuse to assume that the information contained in that research report was instantaneously and fully absorbed into the market price on August 28.

## 6. The Jury Could Reasonably Conclude That James's *Daily* Regression Analyses Do Not Satisfy Defendants' Burden

The Adams Golf defendants rely heavily on James's daily regressions, asserting that these establish that "apart from October 23, 1998, there were no trading days with statistically significant negative stock returns that could be linked to plaintiffs' allegations." Defs. Br., p. 29.

The jury might plausibly place no weight on James's event study regression analysis on grounds that it is not appropriate for this case. In his work on this litigation, James relied upon A. Craig MacKinlay, who is a leading authority in the field. James Report, fn. 9. According to Dr. MacKinlay, there are more successful and less successful applications of event study regression analyses:

*An important characteristic of a successful event study is the ability to identify precisely the date of the event.* In cases where the event date is

_____

Miller Rebuttal, ¶9, p.7.

Miller points out that the reference to the "extremely serious" gray marketing at Adams Golf appeared on page 27 of an otherwise wholly positive 28-page research report. He also observed that, notwithstanding the overall highly positive content of the research report, Adams Golf's stock price declined 5% on August 28 and 16% on the next trading day. Miller Rebuttal, *id*.

40

difficult to identify or the event date is partially anticipated, studies have been less useful.

A. Craig MacKinlay, Event Studies in Economics and Finance, <u>Journal of Economic Literature</u> (March 1997), p. 37 (emphasis added)

The present case is exactly as Dr. MacKinlay describes: one in which "the event date is difficult to identify". It is impossible for James to identify the precise date when the *Golf Pro* article with the cover date of August 1998 reached its readers, as James himself admits, or to determine when the August 28 Lehman research report was fully absorbed into the market. And James does not even attempt, since he largely ignores plaintiffs' "leakage" allegations, to determine when during July 1998 the market began gradually to gain awareness of gray marketing issues through Costco and other gray marketing activity.[20]

There are other reasons the jury could conclude that James' regression approach simply makes no sense. Adams Golf stock fell more than 75% prior to the October 22, 1998 Company disclosure. A. 39. However, according to James, there was no day (or "event") prior to October 23 when the stock price returns were statistically significant *and* negative. That is, Dr. James's analysis cannot find a single date before October 23 when "new, material firm-specific [negative] information about the firm's future earnings prospects reach the market that trading day." James Report, p. 11.

Moreover, the jury might be puzzled by the fact that James came up with three or (depending upon the regression) four statistically significant days -- August 12, September 1, October 2, and October 23, 1998. The day with the largest return (residual price change) on a

---

[20]MacKinlay warns of the likely result if, as here, a researcher such as James attempts to make the uneasy fit of a "leakage" case into the mold of event study regression analysis. According to Dr. MacKinlay, such researchers "find largely insignificant results leaving open the absence of distinct event dates as the explanation of" the lack of any finding of statistical significance. *Id*. at pp. 37-38.

41

percentage basis was September 1. James Report, tab 6. Yet, as to the return on this day, James apparently has no explanation. He does not attempt to explain why, according to his analysis, the return was statistically significant. All James offers on the subject is the following: "There was no news released on September 1, 1998 or the day before." James Report, ¶54(c).

Further, the jury could find that James's daily regressions are flawed by his use of an arbitrary and unscientific estimation or base period, which he runs contemporaneously with the class period. There is no meaningful price history that the researcher can use, under these circumstances, as the estimation or base period from which to estimate the stock's predicted returns during the class period. As MacKinlay wrote, "Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance parameter estimates." MacKinlay, Event Studies, p. 15. *see* <u>RMED Int'l, Inc. v. Sloan's Supermarkets</u>, 2000 U.S. Dist. LEXIS 3742 (S. D. N.Y. 2000) (the estimation or base period must not affect the normal relationship between the stock under study and the index that the investigator uses).

### 7. The Jury Could Reasonably Conclude That James's Monthly Regression Analyses Do Not Satisfy Defendants' Burden

As part of his analysis, James attempted to show a correlation between Adams Golf's stock price (measured at the end of each month) and the market share of a competitor, Orlimar (as reported for the preceding month or the month before that). In this connection, James used monthly regressions for periods that extend months or even a year or more beyond the end date of the three and one-half month class period. Why did James do so? According to James: "Since the revised class period contains only three months of data, *I did not have a sufficient number of monthly data points to conduct a reliable statistical analysis.*" James Report, n. 29 (p. 30) (emphasis added). The jury could conclude that what mattered was analysis of factors

affecting the stock price during the class period. What did not matter was a year or more after the class period. The jury could conclude that if James lacked sufficient points "to conduct a reliable statistical analysis", James should have refrained from conducting it.

It would be reasonable to conclude that the monthly analysis should not have been conducted – and is utterly unpersuasive – for an even more basic reason. Dr. MacKinlay points out that stock return data, such as the data that James used regarding Adams Golf stock, can be obtained at different sampling levels, including both daily and monthly intervals. Dr. MacKinlay sternly warned against use of monthly data: "Given the availability of various intervals, the question of the gains of using more frequent sampling arises. To address this question one needs to consider the power gains from shorter intervals. . . . *[T]he decrease in power going from a daily interval to a monthly interval is severe.* . . . The clear message is that there is a substantial payoff in terms of increased power from reducing the sampling interval." MacKinlay, Event Studies, pp. 34-35 (emphasis added).

### 8. Defendants Cannot Bear Their Burden Regarding The October 23, 1998 Price Decline

Defendants acknowledge that on October 23, 1998, the stock price declined a statistically significant amount as a result of gray marketing disclosures. They admit that this price decline occurred because, "The October 22 press release contained . . . new, material information about the gray market -- that it was expected to impact Q4 results in combination with the sharp drop in demand." Defs. Br., p.26. Defendants insist that the price decline "was *not* caused by material information allegedly omitted from the Prospectus." *Id.* (emphasis added). This statement, however, ignores the fact that it is exactly this -- the risk that gray marketing would materially affect results -- that plaintiffs assert the Registration Statement should have disclosed.

Defendants' position with respect to the October 23 price drop is at odds with, and thus

not supported by, defendants' expert James. James opined that the statistically significant stock price decline on October 23 had *nothing* to do with gray marketing. This was despite the fact that the October 22 press release specifically stated that the company anticipated sales would be "further impacted by the recent gray market distribution". According to James, the market reacted on October 23 to *other* disclosures, not gray marketing-related, including "new information regarding market conditions and future performance" that led analysts to revise downward their consensus earnings estimates.[21] James Report, ¶¶ 6(e), 60-62.

Defendants' assertion that gray market disclosure caused the October 23 decline puts defendants at odds not only with their expert James, but also with themselves. On the very next page of their brief, defendants assert that "Plaintiffs admit that investors knew about the gray market as early as mid-July 1998. . . . By plaintiffs' own admission, then, to the extent they suffered damages at all, such damages ended in mid-July 1998." Defs. Br. at 27.

This is inconsistent with the admission that gray marketing disclosure caused the October 23 decline. It cannot be ruled as a matter of law that gray market disclosure significantly moved the market price in October but not in late July or thereafter. The stock price decline in July was substantial. A. 39. The jury could reasonably conclude that the risk reflected in the increased tempo of gray marketing activity in July, perceived by various market participants, Miller Rebuttal ¶22 A-C, was related to or the same as the gray market risk disclosure that defendants concede drove the market price down in October. The jury could also reasonably conclude that this gray market risk was the same risk defendants failed to disclose in the Registration Statement.

_____

[21]In this connection, James simply disregards the fact that, soon before the October 22 press release, Barney Adams, Adams Golf's CEO, informed the board of directors that he expected a 20-25 percent negative sales impact from gray marketing during the fourth quarter. A. 55. James asserts that gray marketing had nothing to do with the analysts' revised estimates, even though he admitted that Barney Adams communicated with the analysts in connection with fourth quarter expectations. A. 61, p. 238.

9.    **Defendants Cannot Bear Their Burden In Challenging The
      Opinions Of Plaintiffs' Expert, Miller**

The jury could reasonably credit the expert opinion of plaintiffs' expert, Miller. Miller

opined that defendants failed to establish that any of the price decline was caused by factors

other than gray marketing disclosures. Miller Rebuttal, *passim*.

Miller's testimony was based on a study of the events that pertained to Adams Golf and

its competitors and the movements of their stock prices and the movements of relevant indexes.

Miller's analysis was informed by relevant economic principles. The jury could credit Miller's

fundamental analysis, which generally avoids the event study regression approach that James

claims to use. Miller's fundamental analysis is particularly appropriate where, as here, there is no

"meaningful price history for [the] stock that [the researcher] could designate as the control or

'clean' period from which to estimate its true value using statistical analysis." RMED, 2000 U.S.

Dist. LEXIS 3742 *24.

The jury could further credit Miller's fundamental analysis, because that is the very same

analysis defendants themselves used during July 1998 to analyze why Adams Golf stock was

going down. Neither Lehman nor Adams Golf appear to have performed any regression studies

as part of their analysis. *See* A. 72; A. 42.[22]

---

[22]The RMED court found that statistical analysis is of limited value where, as here,
misrepresentation or omission is revealed by "leakage" closely following an IPO. *Id*. at *27-28.
*See also* MacKinlay, Event Studies, p. 37; Estimating Aggregate Damages in Class Action
Litigation under Rule 10b-5 for Purposes of Settlement, 59 FORDHAM L. REV 811, 822-3, 842
(1991) (where "disclosures seep out over an extended period, it is more difficult to determine
when corrective disclosures occur"; and "there is no formulaic approach" to damages "that
eliminates all subjective factors. Careful factual analysis and informed judgment must leaven
computer-driven models."); David I. Tabak and Frederick C. Dunbar, "Materiality and
Magnitude: Event Studies in the Courtroom (April 1999), p. 6 and n. 11 (an event study is a
common method, but "[i]t is, however, not the only way to compute damages. Sometimes a
fundamental analysis is appropriate. . . .").

10. **Defendants Cannot Establish As A Matter Of Law That Double Shipping Is Unrelated To The Gray Market Risk**

Defendants assert that there was no disclosure of questionable sales practices during the class period, and for this reason they sustain their negative loss causation burden as to this issue as a matter of law.

Defendants are wrong. Defendants' questionable sales practices, especially their practice of double shipping, were closely tied to the gray market risk. As Professor Christiana Ochoa , plaintiffs' gray marketing expert opined:

> Prior to the Company's initial public offering the risk of gray marketing was likely increased by double shipping and consignments. Double shipments and consignments put into the hands of retailers a certain quantity of clubs that they might not have been able to sell to their own customers at standard retail prices. This provided a pool of clubs potentially available for the gray market. For example, a May 6, 1998 memo from Chris Beebe, Adams' head of international sales, states that "retailers with too many clubs will cut prices or ship to others in order to relieve the pressures of excess stock."

Ochoa Rebuttal, p. 9

11. **Regression Analysis, Properly Performed, Reveals Statistically Significant Price Declines in July 1998**

At his deposition on August 11, 2006, following the submission of both opening and rebuttal expert reports, defendants' expert James asserted three new or amplified positions. First, he allowed for the possibility that material information could "leak" into the market, affecting the market price. A. 61, pp. 116, 121-22, 126-31. Second, he stated that under some circumstances it is permissible to use event windows, for purposes of regression analysis, of more than one day. *Id.*, pp. 221-22. Third, he agreed that the industry index that plaintiffs' expert Miller used in his analysis (the "Miller index") as well as the Standard & Poors ("S&P") Small Cap index may be considered in connection with performing daily regressions in this case. *Id.,* pp. 85-94.

Also at deposition, James asserted for the first time that the decline in the price of Adams

Golf stock during July 1998 was consistent with the declines in the Miller index and the S&P Small Cap index during July 1998. *Id.,* pp. 93-94. James also testified that "the conclusions regarding days of statistical significance would be unaffected by utilizing the S&P small cap and the Miller peer group as part of a market model." *Id.*, pp. 105-06.

In their brief, citing to two exhibits that James produced at or just prior to his August 11 deposition, defendants asserted: "Indeed, during late July 1998 when plaintiffs claim that Adams Golf's stock was declining because of 'leaked' gray market information -- Adams Golf's stock price virtually tracked the stock price of its competitors identified by plaintiffs' expert, Alan Miller." Defs. Br., p. 30.

In light of the new or amplified positions taken by James at his deposition, plaintiffs' counsel asked their expert, Alan Miller, to test James's assertions that -- assuming "leakage" can move stock prices, and assuming event windows may exceed one day in length -- the decline in the price of Adams Golf stock during July 1998  tracked the decline in the NASDAQ index, which James used in daily regressions. Miller did so, and he concluded, using statistical analysis, that the decline in the Adams Golf stock price was statistically significant in July 1998. For purposes of this analysis, Miller used a 12-day event window, beginning July 10, 1998, when trading began, and continuing through July 28, 1998.

Miller's affidavit setting forth and explaining this statistical analysis is attached. A. 80. According to Miller:

5.    As I expressed in my rebuttal report, I have serious reservations regarding the usability and appropriateness of event study regression analyses in a case such as this. In particular, this case involves an IPO, 1933 Act claims, and the absence of a clean "estimation" period prior to the class period.

6.    Nonetheless, assuming arguendo, that event study regression analysis can be appropriate in a case such as this, I have concluded, in view of the positions that I understand James to have asserted at his deposition, as described above, that it would be instructive to attempt to replicate portions of James's regression

47

analysis, substituting variables or assumptions as appropriate. Specifically, I refer to James's agreement at his deposition with a position to which I subscribe -- in appropriate cases, particularly where information reaches the market by way of "leakage" -- an event or measurement window in excess of a single day may be appropriate.

7.    Accordingly, I caused there to be run a regression using as many assumptions as possible from the various daily regressions that James ran, except I lengthened the window or measurement period. My regression used or assumed a window of measurement period of 12 days after examination of the Adams Golf stock price data. I believe that a window period of this length is appropriate in view of the fact that, during the window period, the stock price was reacting to rumor, "leaked" information, or other forms or non-published disclosure. In such a situation, it is difficult to ascertain exactly when new material information enters the market. Indeed, it appears that in this case the information entered the market gradually, over a period of time, as increasing numbers of market participants gained access to the information. This exercise allowed testing of plaintiffs' assertion that the Adams Golf stock price moved in a significant fashion in July 1998 as a result of "leakage" that gray marketing was seriously affecting Adams Golf.

8.    The results of this regression are set forth on Tab B to this Affidavit. We analyzed the movement of Adams Golf returns versus, or adjusted for, the returns to the NASDAQ index (used by James) for each of the 12 consecutive day periods in the Class Period and discovered that there was only a 3% chance of any other 12-day period having as significant a deviation of Adams Golf returns from NASDAQ returns as the first 12 days' returns. To further test the difference between Adams Golf returns in the first 12 days and the remaining days of the Class Period-- adjusted for the NASDAQ returns in the same periods -- we did the following. We created a slope (trend) line analysis, first, to compare the trend in Adams Golf's price in the period July 10 through July 28, 1998 to its trend in the remaining days from July 29 on; and, second, to take into account the changes in NASDAQ returns over these same two periods, to compare the difference between the first 12 day period movement in Adams stock price and the rest of the Class Period to the difference between the first 12-day period movement in the NASDAQ index and its movement in the rest of the Class Period. First, the slopes of Adams Golf prices over the first period (July 10-28, 1998) is strongly significantly different from the same slope in the remainder of the Class Period from July 29 on. Second, the difference between the differences of the Adams Golf slopes and the NASDAQ slopes over the two periods is strongly and statistically significantly different, showing that the movement in the NASDAQ index does not explain the movement in Adams Golf during July 1998. The above results confirm that Adams Golf stock moved in a statistically significant manner during the period July 10, 1998 - July 28, 1998.

A. 80, ¶ 5-8 (footnotes omitted).

Miller's statistical analysis, as described above and in Miller's Affidavit, could lead a

reasonable jury to conclude that defendants cannot satisfy their burden on negative loss causation.

## D.    ADAMS GOLF HAD A DUTY TO DISCLOSE THE RISK OF GRAY MARKETING

### 1.    Item 503(c) Of SEC Regulation S-K Imposed A Duty To Disclose The Risk of Gray Marketing

The Registration Statement must disclose all information required under the SEC rules.[23]

Item 503(c) of Regulation S-K ("Item 503(c)") requires that a registration statement contain a

risk factors section. This section "must" include "a discussion of the most significant factors that

make the offering speculative or risky." 17 C.F.R. § 229.503(c). "The risk factor section is

intended to provide investors with a clear and concise summary of the material risks to an

investment in the issuer's securities." Securities Offering Reform, SEC Release No. 8591, 2005

WL 1692642, at *107 (Aug. 3, 2005). According to the SEC, "a risk factor discussion is a

necessity." In re Worldcom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 691 (S.D.N.Y. 2004).

Therefore, because the risk of gray marketing was a significant factor that made the IPO

"speculative or risky," Item 503(c) obligated defendants to disclose it in their Registration

Statement.

### 2.    Item 303 Of SEC Regulation S-K Imposed A Duty To Disclose The Risk of Gray Marketing

The Registration Statement failed to disclose information required under Item 303 of SEC

---

[23]Section 7(a) of the Securities Act of 1933 states, the "registration statement shall contain such other information, and be accompanied by such other documents, as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C.A. 77g(a). Under this broad power granted to it by Congress, the SEC created Form S-3, which companies must complete to register securities. Form S-3 requires the registrants to furnish information listed in Regulation S-K. *See* Part II(B) of the General Instructions of Form S-3, "Application of General Rules and Regulations" ("Attention is directed to Regulation S-K for the requirements applicable to the content of the non-financial statements portions of registration statements under the Securities Act.").

Regulation S-K ("Item 303"). Item 303 requires disclosure of any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. Oran v. Stafford, 226 F.3d 275, 287 (3d Cir. 2000) (citing Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303). If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed. Oxford Asset Mgmt., v. Jaharis, 297 F.3d 1182, 1190-91 (11th Cir. 2002) (citing Item 303 of SEC Regulation S-K).

Because §11 of the Securities Act of 1933 imposes liability if a registrant omits to state a material fact required to be stated in the registration statement, any omission of facts required to be stated under Item 303 will produce liability under §11. *See* In re Surebeam Corp. Secs. Litig., 2004 U.S. Dist. LEXIS 26951, at *39 (S.D. Cal. 2004) (citing Steckman v. Hart Brewing, 143 F.3d 1293, 1296 (9th Cir. 1998)).

The first element of the Item 303 disclosure test set forth in Securities Act Release 6835 requires management to assess whether the "known trend, demand, commitment, event or uncertainty [is] likely to come to fruition." Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations, Securities Act Release No. 33-6835, 1989 WL 1092885, at *6 (May 24, 1989). The test then states, "[i]f management cannot make that determination, it must evaluate the consequences of the known trend . . . or uncertainty, on the assumption that it will come to fruition." *Id.* Disclosure is required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur. *Id.* Management's assessment "must be objectively reasonable, viewed at the time the determination was made." *Id.*

Here, as explained below, the gray marketing risk should have been disclosed because, at the time of the IPO, it was objectively reasonable to determine that gray marketing would have a material effect on the financial condition of Adams Golf. Defendants argue that all the information Adams Golf management received at the time of the IPO showed that, as a matter of law, gray marketing was immaterial. Def. Br. at 36-37. Defendants base their materiality argument solely on the amount of clubs present in the Costco stores at the time of the IPO and the allegedly small number of complaints the Company allegedly received from its retailers and distributors. Def. Br. at 36-37.

However, as plaintiffs' gray marketing expert, Professor Ochoa, stated in her report, "[w]hile the number of Adams golf clubs sold through Costco stores may seem relatively small when compared to total sales, there are a number of reasons even these sales posed a significant risk to investors." D.I. 267 (hereinafter "Ochoa Report") at ¶15. The Third Circuit stated in its ruling on the Motion to Dismiss that, "[b]y itself . . . this figure [number of clubs possessed by Costco at the time of the IPO] does not persuade us that the fact [gray marketing] was plainly immaterial" and "the possession of [the small number of Adams golf clubs] in the hands of a nationwide, discount retailer may have been material." *In re Adams Golf,* 381 F.3d at 275.

Furthermore, adequacy of disclosure under Item 303 is a factual question. *See* Surebeam, 2004 U.S. Dist. LEXIS 26951, at *40 (citing Durning v. First Boston Corp., 815 F.2d 1265, 1268 (9th Cir. 1987)). ("adequacy of disclosure is normally a jury question.")

3.    **Defendants Bore A Duty To Disclose The Risk And Effect Of Gray Marketing In The Registration Statement Because The Absence Of The Risk Factor Rendered Statements In The Registration Statement Misleading**

A duty to disclose exists because the omission of the gray marketing risk rendered the Registration Statement materially misleading. Section 11 renders an omission actionable not only

51

if the material fact omitted is "required to be stated therein," but also if it is "necessary to make the statements therein not misleading." *See* In re Adams Golf, 381 F.3d at 277 ("In order to make out prima facie violations of sections 11 and 12(a)(2), plaintiffs must allege that an omitted material fact was required to be included by the securities laws or that its absence rendered statements in the prospectus misleading.").

As explained below, the failure to disclose the risk and ongoing problem of gray marketing rendered misleading statements in the Registration Statement touting Adams Golf's supposedly exclusive retail network and asserting that the Company "does not sell its products through price sensitive general discount warehouses." As the Court of Appeals stated: "But while technically true, those statements may have nevertheless led a reasonable "investor to conclude that selective distribution model was functioning properly, i.e., that this method was exclusive and therefore that unauthorized retailers were not selling significant quantities of its Adams Golf merchandise." In re Adams Golf, 381 F.3d at 278.

## E.     GRAY MARKETING WAS A MATERIAL RISK FOR ADAMS GOLF AT THE TIME OF THE IPO

The Third Circuit, in this case, reiterated that "[m]ateriality is ordinarily an issue left to the fact-finder . . ." In re Adams Golf, 381 F.3d at 274. The test to determine the materiality of an omission is "whether there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly affected the 'total mix' of information made available." *Id.* at 275 (citing In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d. Cir. 2002) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

### 1.     Plaintiffs' Gray Marketing Expert Opined That Gray Marketing Was Material

Plaintiff's gray marketing, expert, Professor Christiana Ochoa, opined  that at the time of the Adams Golf IPO, gray market distribution was an important risk faced by Adams Golf, and

52

that the risk was material. Ochoa Report, ¶ 15.

At the time of the IPO, Adams Golf's clubs were being sold through Costco and other discount stores throughout both the United States and Canada. *Id*. ¶15. These sales posed a significant risk to investors for a number of reasons: First, the Company's business model, which provided for high margins for retailers, and the desirability of the Tight Lies brand made Adams Golf clubs attractive to gray marketers, *Id* at 5. Second, the business model and the fact that the Tight Lies were a "hot" brand also made Adams Golf susceptible to damage from gray marketing. *Id*., at 5 and 6. Third, since the clubs were for sale in Costcos throughout the United States and Canada, many Adams Golf executives, salesmen and retailers had to direct their attention away from selling and running the Company to attempt to control gray marketing. Moreover, combating gray marketing required the Company to expend money and resources. Fourth, because Costco had purchased, at the time of the IPO, almost 6,000 more clubs than it had yet sold, gray market activity would continue for a long time, even if Adams Golf were successful in locating and shutting down gray marketers (which it was never able to do). Fifth, once a gray marketing channel had been established, the volume of sales could increase quickly. Sixth, it is extremely difficult to control or reduce gray market activity, and the effort to do so requires vigilance and resources.

As is reflected in more detail in the Statement of Facts, above, clubs first appeared in Costcos in Canada in March 1988. Chris Beebe, Adams Golf's head of international sales, wrote to Barney Adams and Mark Gonsalves that because of the clubs in Costco, the Company "stands to lose most of the goodwill we have built in Canada and see the 15,000 clubs that Mackenzie is forecasting for sales through the end of the year disappear." A. 15. Beebe convinced Barney Adams to institute a "price matching" program, prior to the IPO, which proved ineffective. A. 5, ¶ 11.

By March 1998, gray marketing had also been reported with clubs sold to a different discounter in the Boston area. Gradually at first, but then in greater numbers, authorized retailers across the U.S. began to complain about Costco selling Tight Lies at prices barely above wholesale. See Statement of Facts, pp. 7-11, *supra.*

The jury could reasonably conclude that the Company considered the presence of Tight Lies in Costco and gray marketing generally a serious problem. For example, on April 15, Chris Beebe said gray market outlets could "hurt Adams Golf no matter where they occur . . . and can cost Adams Golf a great deal of money and/or sales." A. 81. Likewise, Mark Gonsalves said the gray market sales were a "serious situation", which required Adams to "take all necessary action to help prevent this from happening again." A. 28; A. 25.

### a. The Company's business model and the desirability of the Tight Lies brand made Adams Golf clubs attractive to gray marketers.

Professor Ochoa points out that Adams Golf's business model made it vulnerable to gray marketing. Adams Golf stressed in the Registration Statement that it sells only to retailers who "market premium quality equipment." Adams Golf sought to maintain a high quality reputation and to give its retailers high profit margins A. 1, p. 3. Further, Adams Golf sought to increase its international sales.

The Tight Lies were a "hot" product. That made them desirable to gray marketers, because they would need no advertising, and would sell quickly. Adams retailers enjoyed high margins, and high margins are very important to gray marketers. Gray marketers could buy at just above the wholesale price and still sell well below the retail price that Adams Golf's authorized retailers charged. Finally, because of differences in currency, and duties, gray marketers often target products sold internationally. Ochoa Report, 9124. Thus, Adams Golf's plan to increase its sales to overseas markets made it vulnerable. *Id., ¶ 29.*

54

### b.    The Company's business model made it vulnerable to damages from gray marketing.

Professor Ochoa opines that once Adams's clubs got to Costco or other discounters, they soon ceased to be a hot product, and margins for authorized retailers tightened as they tried to compete with Costco prices. The end result was that retailers cancelled orders because they could not make a profit. Adams Golf's business model - - sell clubs to dealers who "market premium quality equipment" - - was thwarted, and Adams Golf's brand reputation suffered. Gray marketing can also cause ineffective pricing policies, deteriorated relations with distributors, and low sales force morale. These consequences of gray markets were obvious to Adams Golf management by the time of the IPO. *Id.*, ¶ 16.

### c.    The Tight Lies Were in Costcos All Across the U.S. and Canada.

The unauthorized discounters in Adams Golf clubs stretched from coast to coast in two countries. The effect was that price competition engendered by gray marketing spread faster and faster, with a snowball effect. *Id.*, ¶ 15A. Each Costco competes with authorized retailers all around it. In Ochoa's opinion, even though there were relatively few clubs for sale compared to total sales, a few clubs in a Costco would affect authorized dealers all around the Costco. Having the clubs spread to Costcos all over both the United States and Canada also posed an administrative burden on those trying to deal with gray marketing. Counting clubs, checking on displays, dealing with retailer complaints, and related activities diverted the attention of a number of sales and management employees.

### d.    Gray marketing would accelerate and it would be difficult to eradicate.

At the time of the IPO, these were almost 6,000 clubs in Costcos or on their way to Costcos. *See* chart at p. 12 *supra.* In Professor Ochoa's opinion, if any investigation had been made, it would have been evident that even if Adams Golf had been able to stop all its authorized

55

retailers from selling to Costco, the Costco problem would still get worse, because of the several thousand clubs on Costco store shelves or in transit to Costco stores. Indeed, at the time of the IPO, the scholarly literature available on gray marketing explained that once gray marketing got a foothold, it could increase rapidly.

Moreover, gray marketing was very difficult to eradicate or even control. *Id.*, ¶ 18. Almost all the known strategies to deal with gray marketing are expensive and have little chance of success. *Id.* In Adams Golf's case, at the time of the IPO, Adams had been unable to identify or control the authorized retailers who were selling to Costco, despite letters to Costco, a lawsuit against Costco, warnings to all suspect authorized retailers, and price matching in Canada. Nor had Adams been able to prevent its own sales persons from overselling or double shipping. (See Statement of Facts at    .) The practice of over-shipping caused more clubs to be available for sale in the gray market, because retailers would be sent clubs they could not sell, but were willing to unload at a small profit.

### e.    Even A Small Number of Clubs Could Do Material Harm.

Defendants claim that there were relatively few clubs involved with gray marketing at the time of the IPO. However, in Professor Ochoa's opinion, the geographical spread can make the negative effects of even a small number of clubs significant. Gray marketing can hurt a company because the authorized retailers get angry and refuse to carry the clubs. When gray marketing is widespread with clubs at a number of gray market outlets, it is more expensive and disruptive to the Company to control it. Moreover, the volume of clubs can increase rapidly once the channel is established. By the time of the IPO, the channel was firmly established. *Id.*, ¶15.

In this regard, Barney Adams's testimony is enlightening. On October 8, 1998, Barney Adams wrote to the board: "One thing that is hurting us badly is Costco." A. 55. At deposition, Barney Adams admitted that as of the time he wrote this memo in October, the amount of gray

56

market activity was no greater than it had been at the time of the IPO. A. 8, pp. 187-203.

Accordingly, if the number of gray market clubs was relatively small at the time of the IPO,

Barney Adams, nonetheless agreed that the same amount of gray marketed clubs was "hurting as

badly" by October 1998.

In any event, as the Third Circuit stated, discussing the 5,000 clubs alleged in the original

Complaint, whether or not the number of clubs sold by Costco is material "is for a fact finder to

discover." In re Adams Golf, 381 F.3d at 277.

Pre-IPO, the experience in Canada showed how a relatively modest numbers of clubs in

Costco caused havoc. During the first wave of sales in Canada, from the end of March through

April 1998, Costco sold only about 384 clubs. A. 18, Ex. B, See chart at 12 supra; A. 82. The

presence of those clubs in Costco caused Mackenzie's customers to make ten to twelve calls

daily, complaining about Costco. During this period, Mackenzie's customers returned or

cancelled orders for 108 clubs and threatened to cease carrying Tight Lies. A. 10. At least one

customer switched to selling Orlimar,. A. 13, and retail stores had to reduce their price from

$349-299 (Canadian) to $149 (Canadian) A. 6, p. 15.

### 2.    Plaintiffs Otherwise Created A Jury Question Regarding Materiality

#### a.    Number of complaints.

Defendants claim that there were few reports or complaints about the Tight Lies in

Costco. (Def. Br. at 36-37). In fact, defendants fail to count or acknowledge many complaints

that the Company actually received and fail to recognize that Gonsalves, head of sales, heard

many complaints that he ignored. A.20, pp. 13-18. Defendants rely on Exhibit 406 to their

summary judgment brief, part of a huge untitled list of calls to or from specific customers, which

appears to contain principally calls about payment and credit issues. ADAMS 040794-04153. A

complaint about Costco would be included in this list only if the customer cited Costco as a reason

he refused to pay or was late in his payment. Thus, it is not surprising defendants claim that this list allegedly contains only a limited number of complaints about Costco. Complaints made to sales representatives, regional account coordinators or even Mark Gonsalves would not be on the list.

### b.    Management's Ability to Know.

Defendants further claim that Adams Golf management had no basis to believe that gray marketing posed a risk at the time of the IPO. This is an issue of fact. Professor Ochoa's report shows that the facts indicated that gray marketing was material at the time of the IPO and had enough information to know it would get worse and be difficult to eradicate. A. 13.

### c.    Management's Response to Gray Marketing.

Defendants argue that Adams Golf took appropriate action against gray marketing, rendering the problem manageable and eliminating any need to disclose it. This is incorrect, because every one of the Company's strategies was ineffective. Defendants' efforts at managing gray marketing, pre-IPO, included monitoring large shipments, "reminding" retailers and distributors not to transship, confronting Costco regarding its unauthorized sale of golf clubs, suing Costco to no avail, counting clubs in Canadian Costcos, and conducting an ineffective price-matching program in Canada. Adams Golf did not "manage" the risk of gray marketing. Def. Br. at 37-38. Ochoa explains, and numerous articles written on gray market activity confirm, that methods companies can use in attempting to eradicate gray market activity once it has begun are complex and costly, and "there is no significant evidence that any approach will ensure eradication of a company's gray market problem." Ochoa Report, ¶ 18.

Moreover, as the Third Circuit explained, "Adams may have been working resolutely, in conformance with its stated policy, to solve its unauthorized inventory situation. But, a company's effort to manage a problem does not by itself discharge its obligation to inform investors of that

problem; if an event is material, the securities laws may require disclosure . . ." <u>In re Adams</u>
<u>Golf</u>, 381 F.3d at 276.  Indeed, the efforts Adams Golf made to try to end gray marketing, though
ineffective, are themselves evidence that Adams Golf recognized that gray marketing posed a
material risk.

> **d.      Gray marketing did not help Adams Golf.**

Regarding Defendants' claim that gray marketing might have helped and not hurt Adams
Golf.  This ignores the wealth of evidence of extreme concern on the part of management and
authorized dealers.  In any event Ochoa opined that, even though Adams Golf initially profited
from gray market sales - because the clubs were sold first by Adams Golf to a retailer before the
retailer sold to Costco - eventually the destruction of retailer margins and the loss of retailers
would be sure to hurt Adams Golf.  <u>Id</u>., ¶ 28.

> **e.      The stock price declined in response to information about gray**
> **marketing.**

Defendants argue that misrepresentations and omissions regarding gray marketing was
not material because they claim, the stock price did not go down on the date of disclosure.  In
fact, as explained above, the price declined materially as information concerning gray marketing
"leaked" out.

> **f.      Gray marketing was not industry-wide but varied from company to**
> **company.**

Defendants argue that Adams Golf did not need to disclose the gray market problem
because it was an industry-wide phenomenon.  But it was not.  Gray marketing caused different
problems for different members of the industry. A. 83, pp. 280-281.  Indeed, when gray
marketing was serious for particular companies, those companies disclosed it.  Ochoa Report, ¶
30.  Industry-wide risks that hurt different manufacturers at different times and in different ways
and levels of intensity must be disclosed by companies that have specific knowledge of the

ongoing material risk happening at their company.  See Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 517 (7th Cir. 1989) ("Issues or securities must reveal firm-specific information.").

Of course, even if gray marketing had been a uniform industry-wide risk, Adams Golf would have had to disclose the risk it faced. Adams Golf's Registration Statement misled investors into believing that Adams Golf's business plan -- to sell to selected authorized retailers, who would sell to end users at high margins - - would protect Adams from having its clubs sold in such discount stores. Having raised that expectation, Adams Golf was duty bound to reveal its gray marketing problems to make its statements not misleading.  As the Third Circuit stated, "[r]easonable minds could disagree as to whether the omitted fact of Costco's unauthorized possession, in addition to the alleged 'sales by other unauthorized discount retailers and international gray market distributors,' were necessary to make the statements regarding the Company's limited distribution not misleading." *In re Adams Golf*, 381 F.3d at 278.

g.    **Adams Golf's piecemeal warnings were inadequate**.

Defendants argue that the Registration Statement warned about the risk of "significant price erosion", competition causing lower selling prices, or "material deterioration of customer loyalty and the Company's image", and thus warned about the claimed effects of gray marketing. Def. Br., pp. 39-40.  The Registration Statement did not so warn about gray marketing. "Significant price erosion" could mean Adams Golf's prices might erode as a result of, say, technological advances of a competitor, as opposed to  retailers suffering price erosion as a result of gray marketing.  Competition causing lower selling prices, too, says nothing about gray marketing and the particular threats it posed for Adams Golf's business plan.  Disclosure of prospective, non-specific, irrelevant risks is inadequate when actual risks of gray marketing were present at the Company, and threatening to get worse, at the time of the IPO.

h.      **The June 9th press release about the Bill of Discovery does  not relieve Adams Golf of its duty to disclose the risk of gray marketing.**

Plaintiffs address their argument above, with respect to negative loss causation. As noted, the Court of Appeals disposed of this argument two years ago. *See* In re Adams Golf, 381 F.3d at 277 n.10.

## F.      INDIVIDUAL ADAMS GOLF DEFENDANTS CANNOT ESTABLISH AN AFFIRMATIVE DEFENSE OF DUE DILIGENCE

### 1.      Defendants Must Be "Reasonably Prudent"

All of the individual defendants have asserted 'due diligence' affirmative defenses.  This is an affirmative defense "which requires that a defendant show that 'he had, after reasonable investigation, reasonable ground to believe and did believe that there were no material misstatements or omissions" in the registration statement.  Weinberger v. Jackson, 1990 U.S. Dist. LEXIS 18394, *10 (N.D. Ca. 1990).  Section 11(c) "imposes the level of 'reasonableness' as that of a reasonably prudent person managing his own property." *Id*., at *10.

The individual Adams Golf defendants are liable under Section 11 as they, both outside directors and inside directors and officers: (1) failed to conduct a reasonable investigation into gray marketing occurring at the Company prior to the IPO; and (2) lacked reasonable grounds to believe there were no material omissions in the Registration Statement.

### 2.      Determinations Of "Reasonableness" Are For The Jury

The individual defendants claim they are entitled to a due diligence defense as a matter of law.  Courts set the bar very high, however, on such claims, because "summary judgment is generally an inappropriate way to decide questions of reasonableness because "the jury's unique competence in applying the reasonable man standard is thought ordinarily to preclude summary judgment." In re Software Toolworks, Inc. v. Dannenberg, 50 F.3d 615, 621 (9th Cir.,

1994)(quoting <u>TSC Industries v. Northway, Inc.</u>, 426 U.S. 438, 450 n. 12 (1976)). Thus, while the due diligence standard itself requires "reasonable" investigation, when applied at summary judgment, rather than at trial, courts have not granted summary judgment unless defendants launched truly "extensive due diligence efforts." <u>In re Worldcom</u>, 346 F.Supp. 2d at 676-677 (internal citations omitted). No evidence of this type of effort exists here.

### 3.    **Inside Directors And Management Have Not Met Their Burden**

"Inside directors with intimate knowledge of corporate affairs and of the particular transactions will be expected to make a more complete investigation and have more extensive knowledge of facts supporting or contradicting inclusions in the registration statements than outside directors, although each must undertake that investigation which a reasonably prudent man in that position would conduct." <u>Feit v. Leasco Data Processing Equipment Corporation</u>, 332 F. Supp. 544, 578 (E.D.N.Y. 1971). A reasonable investigation by an inside director requires the independent verification of the registration statement, which is more than the mere questioning of management and reliance on their representations. <u>Escott v. BarChris Construction Corp.</u>, 283 F.Supp. 544, 578 (E.D.N.Y. 1971). The inside director defendants cannot meet this standard.

Company management, including the inside directors, were well aware of the existence of, and growing material threat posed by, gray marketing of the Tight Lies before the IPO. Nonetheless, they failed to investigate.

Barney Adams testified that: (1) at the time of the IPO "The only incident [of gray marketing] I was aware of, or purported incident, was a very small quantity in Canada." A. 8, p. 16; (2) he did not know if retailers were selling to Costco before the IPO. <i>Id</i>., p. 50; (3) he had "no knowledge or history of [pre-IPO gray marketing] going on" so he "can't come up with any numbers" of clubs for sale on the gray market; <i>Id</i>., p. 18; (4) even after learning of the pre-IPO gray marketing of Tight Lies in Canada, he made no effort to investigate Costco stores in the

United States for gray marketing. *Id.*, pp. 122-123; and (5) he did not know if any United States retailers had complained about gray marketing before the IPO. *Id.*, p. 62.

Similarly, defendant Hatfield testified that he was made aware of gray marketing during the Company's road show in late May or June of 1998, and that he was aware of (but had no involvement with) the Company's legal action against Costco. A. 61, pp. 27-32. He took no action of any sort before the IPO, not even discussing gray marketing again until October. Defendant Murtland was aware of the growing gray market issue well before the IPO, yet claims to have visited only *one* Costco "at some point" to ascertain whether or not the Tight Lies on display were counterfeit. D.I. 281 , ¶ 4.

### 4.    Outside Directors Have Not Met Their Burden

The outside directors claim that they attended at least one meeting at which the Registration Statement was discussed. There is no evidence, however, that anyone discussed the risk of gray marketing or Costco at any pre-IPO board meeting. In fact, the materiality of gray marketing as a risk factor was not discussed by the outside directors before the IPO. A. 68, p. 25; A. 69, p. 31; A. 70, p. 30; D.I. 282, ¶ 6.

At a minimum, the outside directors were aware of the Company's June 9, 1998 press release announcing the filing of the bill of discovery against Costco. And yet, despite this awareness, the outside directors failed to inquire about the significance of the Bill of Discovery, the extent of gray marketing, or even to check on the status of the litigation. A. 70, pp. 26-27; A. 68, pp. 63-64; A. 69, pp. 31, 34; D.I. 282, ¶3. No investigation is unreasonable. Defendants have not met their burden.

63

## V.    CONCLUSION

For the reasons explained above this Court should deny the Adams Golf Defendants'

Motion for Summary Judgment.

ROSENTHAL, MONHAIT &
GODDESS, P.A.

BERGER & MONTAGUE, P.C.          By: /s/ Carmella P. Keener
Todd Collins                     Carmella P. Keener (DSBA No. 2810)
Elizabeth Fox                    919 Market Street, Suite 1401
Neil Mara                        Citizens Bank Center
1622 Locust Street               Wilmington, DE   19801
Philadelphia, PA. 19103          (302) 656-4433
(215) 875-3000                   ckeener@rmgglaw.com
*Lead Counsel for Plaintiffs and the Class*    *Liaison Counsel for Plaintiffs*
                                 *and the Class*

OF COUNSEL:
**LAW OFFICES OF DONALD B.
LEWIS**
Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004
(610) 668-0331

**KELLER ROHRBACK, LLP**
Juli E. Farris
Elizabeth A. Leland
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on this 9th day of October, 2006, I caused

**PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO ADAMS GOLF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be electronically filed with

the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

Jeffrey L. Moyer, Esquire
Alyssa M. Schwartz, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

John E. James, Esquire
Brian C. Ralston, Esquire
Potter, Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801

In addition, a copy has been served by electronic mail upon the foregoing counsel and the

following:

Theodore J. McEvoy, Esquire
Michael J. Chepiga, Esquire
Elaine Divelbliss, Esquire
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Email: tmcevoy@stblaw.com
Email: mchepiga@stblaw.com
Email: edivelbliss@stblaw.com

Paul R. Bessette, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
Three Embarcadero Center, Suite 2800
San Francisco, CA 94111-4066
Email: pbessette@akingump.com

Jennifer R. Brannen, Esquire
Akin, Gump, Strauss, Hauer & Feld, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-2916
Email: jbrannen@akingump.com

/s/ Carmella P. Keener
Carmella P. Keener (DSBA No. 2810)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
ckeener@rmgglaw.com