# A.1

# PART 1 of 2

# ADAMS GOLF INC

### FORM S-1MEF
(Registration of Additional Securities (up to 20%))

### Filed 7/10/1998

| | |
|---|---|
| Address | 2801 EAST PLANO PARKWAY |
| | PLANO, Texas 75074 |
| Telephone | 972-673-9000 |
| CIK | 0001059763 |
| Industry | Recreational Products |
| Sector | Consumer Cyclical |
| Fiscal Year | 12/31 |



Δ π EXHIBIT 72
Deponent F. Conner
Date 5/9/06 Rptr. AmH
WWW.DEPOBOOK.COM

Generated by EDGAR Online Pro
http://pro.edgar-online.com



Contact EDGAR Online
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

FILED PURSUANT TO RULE 424(b)(4)
REG. NOS. 333-51715, 333-58917

PROSPECTUS

6,000,000 SHARES

[LOGO]

COMMON STOCK

Of the 6,000,000 shares of common stock, par value $.001 per share (the "Common Stock"), being offered hereby 4,000,000 shares are being offered by Adams Golf, Inc. (the "Company") and 2,000,000 shares are being offered by certain stockholders of the Company (the "Selling Stockholders"). The Company will not receive any of the proceeds from the sale of shares by the Selling Stockholders. See "Principal and Selling Stockholders."

Prior to the offering made hereby (the "Offering"), there has been no public market for the Common Stock of the Company. See "Underwriting" for a discussion of the factors to be considered in determining the initial public offering price of the Common Stock. The Common Stock has been approved for listing on the Nasdaq National Market under the symbol "ADGO."

THE COMMON STOCK OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK.
SEE "RISK FACTORS" BEGINNING ON PAGE 6.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

|  | PRICE TO PUBLIC | UNDERWRITING DISCOUNTS AND COMMISSIONS(1) | PROCEEDS TO COMPANY(2) | PROCEEDS TO SELLING STOCKHOLDERS |
|---|---|---|---|---|
| Per Share............... | $16.00 | $1.12 | $14.88 | $14.88 |
| Total(3)................ | $96,000,000 | $6,720,000 | $59,520,000 | $29,760,000 |

(1) The Company and the Selling Stockholders have agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended. See "Underwriting."

(2) Before deducting estimated expenses of the Offering payable by the Company of $1,250,000.

(3) The Company and certain of the Selling Stockholders have granted the Underwriters a 30-day option to purchase up to an aggregate of 900,000 additional shares of Common Stock on the same terms and conditions as set forth above, solely to cover over-allotments, if any. If such option is exercised in full, the total Price to Public, Underwriting Discounts and Commissions, Proceeds to Company and Proceeds to Selling Stockholders will be $110,400,000, $7,728,000, $60,078,000 and $42,594,000, respectively. See "Underwriting."

The shares of Common Stock offered by this Prospectus are offered severally by the Underwriters, subject to prior sale, to withdrawal, cancellation or modification of the offer without notice, to delivery to and acceptance by the Underwriters and to certain further conditions. It is expected that delivery of the certificates for the shares of Common Stock will be made at the offices of Lehman Brothers Inc., New York, New York, on or about July 15, 1998.

LEHMAN BROTHERS

NATIONSBANC MONTGOMERY SECURITIES LLC

FERRIS, BAKER WATTS

INCORPORATED

July 9, 1998

[ON THIS PAGE APPEAR SEVERAL PHOTOGRAPHS OF THE COMPANY'S PRODUCTS AND CERTAIN PERSONS AFFILIATED WITH THE COMPANY INCLUDING B. H. (BARNEY) ADAMS, NICK FALDO AND HANK HANEY. CERTAIN OF THE PHOTOGRAPHS CONTAIN CAPTIONS INDICATING THE CONTENTS THEREOF.]

The Company intends to furnish to its stockholders annual reports containing audited consolidated financial statements and quarterly reports containing unaudited consolidated financial information for each of the first three quarters of each fiscal year.

CERTAIN PERSONS PARTICIPATING IN THE OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK. SUCH TRANSACTIONS MAY INCLUDE THE PURCHASE OF SHARES OF COMMON STOCK FOLLOWING THE PRICING OF THE OFFERING TO COVER A SYNDICATE SHORT POSITION IN THE COMMON STOCK OR FOR THE PURPOSE OF MAINTAINING THE PRICE OF THE COMMON STOCK AND THE IMPOSITION OF PENALTY BIDS. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."

The Company has registered the trademarks Adams-Registered Trademark- (with triangle design), Tight Lies-Registered Trademark- and Assault-Registered Trademark-, and currently has pending trademark applications for registration of a configuration of the heel portion of a golf club head, and an overall configuration of a golf club head. This Prospectus also includes trademarks of companies other than the Company.

PROSPECTUS SUMMARY

THE FOLLOWING SUMMARY INFORMATION IS QUALIFIED IN ITS ENTIRETY BY AND SHOULD BE READ IN CONJUNCTION WITH THE MORE DETAILED INFORMATION AND THE COMPANY'S

CONSOLIDATED FINANCIAL STATEMENTS (INCLUDING THE NOTES THERETO) APPEARING ELSEWHERE IN THIS PROSPECTUS. UNLESS OTHERWISE INDICATED, ALL SHARE AMOUNTS, PER SHARE AMOUNTS AND OTHER INFORMATION IN THIS PROSPECTUS HAVE BEEN ADJUSTED TO GIVE RETROACTIVE EFFECT TO A 2-FOR-1 STOCK SPLIT OF THE COMMON STOCK AND ASSUME

NO EXERCISE OF THE UNDERWRITERS' OVER-ALLOTMENT OPTION. REFERENCES IN THIS PROSPECTUS TO THE "COMPANY" OR "ADAMS" ARE, UNLESS THE CONTEXT OTHERWISE REQUIRES, TO ADAMS GOLF, INC., A DELAWARE CORPORATION, AND ITS SUBSIDIARIES.

THE COMPANY

Adams designs, manufactures and markets premium quality, technologically innovative golf clubs. The Company's design objective is to produce golf clubs that deliver meaningful performance benefits and inspire player confidence. The Company believes that its most successful product line to date, the Tight Lies fairway woods, meets this objective by providing golfers with the ability to hit the ball from virtually any lie while maximizing distance. The patented Tight Lies fairway woods feature an upright trapezoidal head, a shallow face and a lower center of gravity as compared to conventional fairway woods. The complete Tight Lies line of products includes the original, Strong 3, Strong 5, Strong 7 and Strong 9 fairway woods. According to the Golf Market Research Institute, the Tight Lies fairway woods were the top-selling single fairway woods in the U.S. on a unit volume basis during the three months ended March 31, 1998. During this period, the Company achieved a 27% market share of the single fairway woods category.

Adams has developed a marketing model that integrates direct response and traditional image-based advertising to generate brand awareness and drive retail sales. The Company's advertising includes a 30-minute informative television commercial ("infomercial") and print advertising in publications such as GOLF DIGEST, USA TODAY and THE WALL STREET JOURNAL. For the three months ended March 31, 1998, approximately 79% of the Company's sales occurred at the retail level. To preserve the integrity of its image and reputation, the Company currently limits its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and technical expertise. The Company currently sells its products to on- and off-course golf shops and selected sporting goods retailers. The Company believes its selective retail distribution helps its retailers to maintain profitable margins and maximize sales of Adams' products.

Another important element of the Company's success to date has been its sales and customer service infrastructure. Rather than relying on independent sales representatives, as do many other golf equipment companies, Adams maintains an inside sales department that currently consists of 25 employees who are in regular telephone contact with the Company's over 7,000 retailers. These sales representatives are supported by 13 field-based Regional Account Coordinators who maintain personal contact with the Company's retailers nationwide. The Company believes that using and carefully managing its own sales force enables it to significantly reduce selling expenses. Adams also has a separate 30-seat customer call center that provides customer service to retailers and consumers. The majority of the Company's sales and customer service personnel are experienced golfers. The Company believes interaction with its knowledgeable representatives promotes customer satisfaction and helps to strengthen the Adams brand.

In 1997, wholesale sales of golf equipment in the U.S. reached an estimated $2.4 billion. Wholesale sales of golf clubs increased at an estimated compound annual growth rate of approximately 13% over the 5-year period from 1992 to 1997. The Company believes that a number of trends are likely to further increase the demand for Adams' products. These trends include: (i) significant growth in the number of golf courses; (ii) increasing interest in golf from women, junior and minority golfers; (iii) the large numbers of golfers entering their 40s and 50s, the age when most golfers begin to play more often and increase their spending on the sport; (iv) the correspondingly large population of "Echo Boomers," who are beginning to

3

enter their 20s, the age when golfers generally take up the sport; and (v) the rapid evolution of golf club designs and materials.

The Company recently established a relationship with internationally recognized, professional golfer Nicholas A. Faldo, who currently uses the Tight Lies fairway woods. Mr. Faldo was inducted into the World Golf Hall of Fame in May 1998 and has won more major championships in the 1990s than any other golfer. Pursuant to the terms of the agreement, Mr. Faldo has agreed to, among other things, (i) exclusively endorse the Company's golf clubs and undertake certain other promotional activities on behalf of the Company and (ii) assist in the design and field testing of a new line of golf clubs. In exchange for his services, Mr. Faldo was granted 900,000 shares of Common Stock and is entitled to receive certain minimum royalties. Absent an early termination event, the agreement with Mr. Faldo continues throughout his lifetime. The Company believes that Mr. Faldo's comprehensive knowledge of the game of golf and reputation for technical excellence complement the Company's capabilities and strong brand identity. See "Certain Transactions."

The Company intends to develop proprietary new technologies and product designs that provide golfers with meaningful performance benefits. Capitalizing on the technical knowledge and expertise gained through the Tight Lies fairway woods, the Company is currently testing prototypes of a potential new driver. This new product is expected to combine the distance of a driver with the playability of a fairway wood. The Company currently expects the new driver to be introduced after the end of fiscal year 1998. The Company is working with Mr. Faldo to design and test this new driver as well as other potential new products.

The Company's goal is to establish itself as a leading developer of technologically innovative, performance-oriented golf clubs. To achieve this goal the Company intends to (i) build its share of the premium fairway woods market; (ii) leverage the success, performance and reputation of the Tight Lies fairway woods; (iii) expand international sales; and (iv) develop new technologies and product designs.

The address of the Company's principal executive office is 300 Delaware Avenue, Suite 548, Wilmington, Delaware 19801. The Company's telephone number at this address is (302) 427-5892. Adams' principal manufacturing and management headquarters are located at 2801 East Plano Parkway, Plano, Texas 75074 and its telephone number at this location is (972) 673-9000. The Company's World Wide Web site is located at www.adamsgolf.com. The contents of the Company's Web site shall not be deemed to be part of this Prospectus.

## THE OFFERING

| | |
|---|---|
| Common Stock offered by: | |
| The Company........................................... | 4,000,000 shares |
| The Selling Stockholders............................. | 2,000,000 shares |
| Total Common Stock Offered......................... | 6,000,000 shares |
| Common Stock to be outstanding after the Offering(1)... | 23,099,282 shares |
| Use of net proceeds to the Company................... | Working capital and general corporate purposes |
| Nasdaq National Market Symbol........................ | ADGO |

(1) Excludes 423,666 shares of Common Stock issuable upon the exercise of outstanding stock options at May 31, 1998.

4

## SUMMARY CONSOLIDATED FINANCIAL INFORMATION
### (IN THOUSANDS, EXCEPT PER SHARE DATA)

The following table sets forth summary consolidated financial data of the Company and should be read in conjunction with the Consolidated Financial Statements and related Notes thereto included elsewhere in this Prospectus.

| | YEAR ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| **CONSOLIDATED STATEMENTS OF OPERATIONS DATA(1):** | | | | | |
| Net sales | $  1,125 | $  3,522 | $  36,690 | $  1,475 | $  24,511 |
| Gross profit | 369 | 1,932 | 26,699 | 888 | 18,649 |
| Operating expenses (excluding stock compensation and bonus award) | 613 | 1,709 | 15,826 | 823 | 9,777 |
| Stock compensation and bonus award(2) | -- | 214 | 14,842 | -- | -- |
| Operating income (loss) | (244) | 9 | (3,969) | 65 | 8,872 |
| Net income (loss) | $   (243) | $    13 | $  (4,654) | $    45 | $   5,642 |
| **Income (loss) per common share(3):** | | | | | |
| Basic | $  (0.05) | $    -- | $   (0.37) | $    -- | $    0.32 |
| Diluted | $  (0.05) | $    -- | $   (0.37) | $    -- | $    0.31 |
| **Weighted average common shares(3):** | | | | | |
| Basic | 4,423 | 11,238 | 12,519 | 11,873 | 17,662 |
| Diluted | 4,423 | 11,238 | 12,519 | 11,873 | 18,340 |

| | AT MARCH 31, 1998 | |
|---|---|---|
| | ACTUAL | AS ADJUSTED(4) |
| **CONSOLIDATED BALANCE SHEET DATA:** | | |
| Cash and cash equivalents | $    602 | $  58,872 |
| Working capital | 12,299 | 70,569 |
| Total assets | 25,793 | 84,063 |
| Total debt (including current maturities) | 1,135 | 1,135 |
| Stockholders' equity | 14,667 | 72,937 |

(1) This table excludes summary financial information for the fiscal years ended December 31, 1993 and 1994 because operations in those years were not comparable in size or scope to current operations.

(2) Consists primarily of a stock award to the Company's founder, Chief Executive Officer and President. See "Certain Transactions" and Note 9 of Notes to Consolidated Financial Statements.

(3) See Note 1 of Notes to Consolidated Financial Statements for information concerning the calculation of income (loss) per common share and weighted average common shares outstanding.

(4) Gives effect to the sale of 4,000,000 shares of Common Stock offered by the Company hereby and the application of the estimated net proceeds therefrom (based on an initial public offering price of $16.00 per share). See "Use of Proceeds" and "Capitalization."

## RISK FACTORS

AN INVESTMENT IN THE COMMON STOCK OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK. PROSPECTIVE PURCHASERS OF COMMON STOCK OFFERED HEREBY SHOULD CONSIDER CAREFULLY THE FOLLOWING FACTORS IN ADDITION TO OTHER INFORMATION IN THIS PROSPECTUS. THIS PROSPECTUS CONTAINS FORWARD-LOOKING STATEMENTS WHICH INVOLVE RISKS AND UNCERTAINTIES. THE COMPANY'S ACTUAL RESULTS AND THE TIMING OF CERTAIN EVENTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED BY SUCH FORWARD-LOOKING STATEMENTS AS A RESULT OF CERTAIN FACTORS DISCUSSED IN THIS PROSPECTUS, INCLUDING THE FACTORS SET FORTH BELOW AND IN "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS" AND "BUSINESS." SEE "DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS."

## DEPENDENCE ON NEW PRODUCT INTRODUCTIONS; UNCERTAIN CONSUMER ACCEPTANCE

During the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998, approximately 47.2%, 94.3% and 97.3%, respectively, of the Company's net sales were derived from the sale of Tight Lies fairway woods. Sales of this product line are expected to account for a substantial portion of the Company's net sales for some time. A decline in demand for, or average selling prices of, the Tight Lies line of products would have a material adverse effect on the Company's business, operating results and financial condition. Accordingly, the Company's continued growth and success depend, in large part, on its ability to successfully develop and introduce new products accepted in the marketplace. Historically, a large portion of new golf club technologies and product designs have been met with consumer rejection. No assurance can be given that the new driver currently under development will meet with market acceptance or that the Company will be able to continue to design, manufacture and introduce new products that will meet with market acceptance. Failure by the Company to identify and develop innovative new products that achieve widespread market acceptance would adversely affect the Company's future growth and profitability. Additionally, successful technologies, designs and product concepts are likely to be copied by competitors. Accordingly, the Company's operating results could fluctuate as a result of the amount, timing and market acceptance of new product introductions by the Company or its competitors. The design of new golf clubs is also greatly influenced by the rules and interpretations of the U.S. Golf Association ("USGA"). Although the golf equipment standards established by the USGA generally apply only to competitive events sanctioned by that organization, the Company believes that it is critical for its future success that new clubs introduced by the Company comply with USGA standards. In an effort to anticipate emerging technology while maintaining the fundamental challenge of the game of golf, the USGA has recently announced that it will create a new standard for golf equipment by the year 2000. While this new standard would be set at a level that makes all currently approved clubs legal under the Rules of Golf, the testing methods being used to establish the standard are uncertain, therefore, it may take considerable time to define and promote the standard, which could delay research and development and the subsequent introduction of new products by the Company. No assurance can be given that any new products will receive USGA approval or that existing USGA standards will not be altered in ways that adversely affect the sales of the Company's products. See "--Historical Dependence on Television Advertising."

## LIMITED HISTORY OF PROFITABILITY

The Company has a limited history of profitability. Although the Company generated net income during the year ended December 31, 1996 and the three months ended March 31, 1998, it has historically experienced net losses from operations. There can be no assurance that the Company will be able to sustain profitability on a quarterly or annual basis in the future. The Company's prospects must be considered in light of the significant risks, challenges and difficulties frequently encountered by companies experiencing rapid growth. To address these risks, the Company must, among other things, successfully increase the scope of its operations, respond to competitive and technological developments, continue to attract, retain and motivate qualified personnel and continue to develop and obtain market acceptance of its products. There can be no assurance that the Company will be successful in addressing these risks and challenges. See "--Dependence on New Product Introductions; Uncertain Consumer Acceptance,"

6

"--Ability to Manage Growth," "--Highly Competitive Industry," and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

## PATENTS AND PROTECTION OF PROPRIETARY TECHNOLOGY

The Company's ability to compete effectively in the golf club market will depend, in large part, on its ability to maintain the proprietary nature of its technologies and products. The Company currently holds six U.S. patents relating to certain of its products and proprietary technologies and has two patent applications pending. Assuming timely payment of maintenance fees, if any, the Company expects that the six currently issued patents will expire on various dates between 2009 and 2013. There can be no assurance, however, as to the degree of protection afforded by these patents or as to the likelihood that patents will be issued from the pending patent applications. Moreover, these patents may have limited commercial value or may lack sufficient breadth to adequately protect the aspects of the Company's products to which the patents relate. The Company does not hold any foreign patents and no foreign patent applications are pending. The U.S. patents held by the Company do not preclude competitors from developing or marketing products similar to the Company's products in international markets.

There can be no assurance that competitors, many of which have substantially greater resources than the Company and have made substantial investments in competing products, will not apply for and obtain patents that will prevent, limit or interfere with the Company's ability to make and sell its products. The Company is aware of numerous patents held by third parties that relate to products competitive to the Company's, including products competitive with the Tight Lies fairway woods. There is no assurance that these patents would not be used as a basis to challenge the validity of one or more of the Company's patent rights, to limit the scope of the Company's patent rights or to limit the Company's ability to obtain additional or broader patent rights. A successful challenge to the validity of the Company's patents may adversely affect the Company's competitive position. Moreover, there can be no assurance that such patent holders or other third parties will not claim infringement by the Company with respect to current and future products. Because U.S. patent applications are held and examined in secrecy, it is also possible that presently pending U.S. applications will eventually issue with claims that will be infringed by the Company's products or technologies. The defense and prosecution of patent suits is costly and time-consuming, even if the outcome is favorable. This is particularly true in foreign countries where the expenses associated with such proceedings can be prohibitive. An adverse outcome in the defense of a patent suit could subject the Company to significant liabilities to third parties, require the Company to cease selling products or require disputed rights to be licensed from third parties. Such licenses may not be available on satisfactory terms, or at all. The Company also relies on unpatented proprietary technology. Third parties could develop the same or similar technology or otherwise obtain access to the Company's proprietary technology.

Despite the Company's efforts to protect its patent and other intellectual property rights, unauthorized parties have attempted and are expected to continue to attempt to copy all, or certain aspects of, the Company's products. Policing unauthorized use of the Company's intellectual property rights can be difficult and expensive, and while the Company takes appropriate action whenever it discovers any of its products or designs have been copied, knock-offs and counterfeit products are a persistent problem in the performance-oriented golf club industry. There can be no assurance that the Company's means of protecting its patent and other intellectual property rights will be adequate. See "Business-- Patents."

## ABILITY TO MANAGE GROWTH

The Company has recently experienced a period of rapid growth that has resulted in new and increased responsibilities for existing management personnel. Further, the Company has recently employed a number of additional senior management personnel and, accordingly, numerous members of the management team have worked together for only a short time. The Company's growth has placed, and is expected to continue to place, a significant strain on the Company's management and operating and financial systems. To accommodate this recent growth and to compete effectively and manage future

7

growth, if any, the Company will be required to continue to implement and improve its operational, financial and management information systems, procedures and controls on a timely basis and to expand, train, motivate and manage its workforce. The Company's growth has required increasing amounts of working capital that, to date, have been funded from current operations and available borrowing sources. There can be no assurance that the Company's personnel, systems, procedures, controls and working capital will be adequate to support its existing or future operations. Any failure to implement and improve the Company's operational, financial and management systems, to expand, train, motivate or manage employees or to maintain adequate working capital could have a material adverse effect on the Company's business, operating results or financial condition. See "Management's Discussion and Analysis of Financial Condition and Results of Operations-- Liquidity and Capital Resources," "Business--Information Systems" and "Management."

## DEPENDENCE ON KEY PERSONNEL AND ENDORSEMENTS

The Company's success depends to a significant extent upon the performance of its senior management team, particularly the Company's founder, Chief Executive Officer and President, B. H. (Barney) Adams. In addition to his direction and supervision of the day-to-day affairs of the Company, Mr. Adams spearheads the Company's product development efforts. The loss or unavailability of Mr. Adams would adversely affect the Company's business and prospects. None of the Company's officers or employees, including Mr. Adams, is bound by an employment agreement and the relationships of such officers and employees are, therefore, at will. The Company has a $2.0 million key man life insurance policy on the life of Mr. Adams; however, there can be no assurance that the proceeds of such policy could adequately compensate the Company for the loss of his services. In addition, there is strong competition for qualified personnel in the golf club industry, and the inability to continue to attract, retain and motivate other key personnel could adversely affect the Company's business, operating results or financial condition.

The Company has recently entered into an agreement with Nick Faldo, an internationally recognized professional golfer and winner of numerous U.S. and international championships. The agreement provides that Mr. Faldo will provide a variety of services to the Company including endorse certain of the Company's products. This agreement requires the Company to make certain significant payments to Mr. Faldo, whether or not his endorsement results in increased sales of the Company's products. Specifically, Mr. Faldo is entitled to receive a royalty of 5% of the net sales price of all Adams golf clubs (other than certain specialty items for which the royalty equals 10% of the net sales price) sold outside the U.S. throughout the term of the agreement. The agreement provides for a minimum royalty of $1.5 million in 1999 escalating to $4.0 million for the years 2004 through 2008. From 2009 through 2014, the minimum royalty is $1.5 million, as adjusted for changes in the consumer price index. After 2014, the agreement does not provide for a minimum royalty. Commencing with 2009, however, the agreement provides for a maximum royalty of $4.0 million, as adjusted for changes in the consumer price index. Absent an early termination event, the agreement with Mr. Faldo continues throughout his lifetime. The Company believes that the future success of its marketing strategy may be affected by the continued professional success of Mr. Faldo. The inability of the Company to maintain its relationship with Mr. Faldo or the inability of Mr. Faldo to maintain an acceptable level of professional success, could have a material adverse effect on the Company's business, operating results or financial condition. See "Business--Business Strengths," "-- Growth Strategy," "--Marketing" and "Certain Transactions."

## HIGHLY COMPETITIVE INDUSTRY

The market for golf clubs is highly competitive. The Company's competitors include a number of established companies, many of which have greater financial and other resources than the Company. The purchasing decisions of many golfers are often the result of highly subjective preferences, which can be influenced by many factors, including, among others, advertising, media, promotions and product endorsements. The Company could therefore face substantial competition from existing or new competitors that introduce and successfully promote golf clubs that achieve market acceptance. Such competition could

8

result in significant price erosion or increased promotional expenditures, either of which could have a material adverse effect on the Company's business, operating results and financial condition. There can be no assurance that Adams will be able to compete successfully against current and future sources of competition or that its business, operating results or financial condition will not be adversely affected by increased competition in the markets in which it operates. See "Business--Competition."

## HISTORICAL DEPENDENCE ON TELEVISION ADVERTISING

In April 1997 the Company debuted a 30-minute infomercial concerning the original Tight Lies fairway wood, and, immediately thereafter, sales of this product grew significantly. Although, consistent with the Company's marketing model, the Company has subsequently increased its use of traditional image-based advertising, sales of the Company's products at both the retail and direct response levels have been, and may continue to be, highly dependent on the success of the Company's infomercial. The Company believes that its current television advertising strategy, like other advertising campaigns, will reach a point of diminishing return and will therefore need to be replaced or abandoned. No assurance can be given that an alternative infomercial or other equally effective advertising strategy can be timely developed or that, if developed, such infomercial or alternative strategy will achieve the same level of success as that previously enjoyed by the Company's original infomercial. Further, certain companies have attempted to emulate the Company's marketing strategy. To the extent the Company believes that these additional infomercials may have the effect of diluting the Company's message, the Company may be forced to adopt a new marketing strategy. A decline in effectiveness of the Company's marketing strategy could have a material adverse effect on the Company's business, operating results or financial condition.

## SOURCES OF SUPPLY

The Company relies on a limited number of suppliers for a significant portion of the component parts used in the manufacture of its golf clubs, including the manufacture of its Tight Lies line of fairway woods. The Company could in the future experience shortages of components or periods of increased price pressures, which could have a material adverse effect on the Company's business, operating results or financial condition. In addition, failure to obtain adequate supplies or fulfill customer orders on a timely basis could have a material adverse effect on the Company's business, operating results or financial condition. See "Business--Manufacturing and Assembly."

## UNSPECIFIED USE OF PROCEEDS

Although the Company intends to use the net proceeds of this Offering for working capital and general corporate purposes, including capital expenditures, expansion of the Company's product development efforts, additional advertising and expansion of the Company's international sales efforts, the Company currently has no definite plan for the use of the net proceeds. In addition, the Company may use all or a portion of the net proceeds derived from the Offering for possible acquisitions. Accordingly, management will have broad discretion with respect to the expenditure of such proceeds. Purchasers of shares of Common Stock in the Offering will be entrusting their funds to the Company's management, upon whose judgment they must depend, with limited information concerning the specific purposes to which the funds will ultimately be applied. See "--Risks Associated with Acquisitions" and "Use of Proceeds."

## RISKS ASSOCIATED WITH ACQUISITIONS

While the Company has no current agreements or negotiations underway with respect to any acquisition, the Company may make acquisitions of complementary services, technologies, product designs or businesses in the future. There can be no assurance that any future acquisition will be completed or that, if completed, any such acquisition will be effectively assimilated into the Company's business. Acquisitions involve numerous risks, including, among others, loss of key personnel of the acquired company, the difficulty associated with assimilating the personnel and operations of the acquired company, the potential disruption of the Company's ongoing business, the maintenance of uniform standards, controls, procedures

9

and policies, and the impairment of the Company's reputation and relationships with employees and customers. In addition, any future acquisitions could result in the issuance of dilutive equity securities, the incurrence of debt or contingent liabilities, and amortization expenses related to goodwill and other intangible assets, any of which could have a material adverse effect on the Company's business, operating results or financial condition.

## SEASONALITY AND QUARTERLY FLUCTUATIONS; DISCRETIONARY CONSUMER SPENDING

Golf generally is regarded as a warm weather sport and sales of golf equipment historically have been strongest during the second and third quarters, with the weakest sales occurring during the fourth quarter. In addition, sales of golf clubs are dependent on discretionary consumer spending, which may be affected by general economic conditions. A decrease in consumer spending generally could result in decreased spending on golf equipment, which could have a material adverse effect on the Company's business, operating results and financial condition. In addition, the Company's future results of operations could be affected by a number of other factors, such as unseasonal weather patterns; demand for and market acceptance of the Company's existing and future products; new product introductions by the Company's competitors; competitive pressures resulting in lower than expected average selling prices; and the volume of orders that are received and that can be fulfilled in a quarter. Any one or more of these factors could result in the Company failing to achieve its expectations as to future sales or net income.

Because most operating expenses are relatively fixed in the short term, the Company may be unable to adjust spending sufficiently in a timely manner to compensate for any unexpected sales shortfall, which could materially adversely affect quarterly results of operations. If technological advances by competitors or other competitive factors require the Company to invest significantly greater resources than anticipated in research and development or sales and marketing efforts, the Company's business, operating results or financial condition could be materially adversely affected. Accordingly, the Company believes that period- to-period comparisons of its results of operations should not be relied upon as an indication of future performance. In addition, the results of any quarter are not indicative of results to be expected for a full fiscal year. As a result of fluctuating operating results or other factors discussed above and below, in certain future quarters the Company's results of operations may be below the expectations of public market analysts or investors. In such event, the market price of the Company's Common Stock would be materially adversely affected. See "--Absence of Public Market for Common Stock and Volatility" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

## CERTAIN RISKS OF CONDUCTING BUSINESS ABROAD

The Company imports a significant portion of its component parts, including heads, shafts, headcovers and grips, from companies in Taiwan, China and Mexico. In addition, the Company is rapidly increasing its international sales efforts. The Company's international business is currently centered in Canada, Japan and the United Kingdom. The Company intends to focus its international expansion efforts in Japan and the United Kingdom and, to a lesser extent, in South Africa and Australia. The Company's business is subject to the risks generally associated with doing business abroad, such as foreign government regulations, foreign consumer preferences, import and export control, political unrest, disruptions or delays in shipments and changes in economic conditions and exchange rates in countries in which the Company purchases components or sells its products.

## CONTROL BY PRINCIPAL STOCKHOLDERS

Following the closing of the Offering, the Company's existing stockholders, certain of whom are directors, officers or employees of the Company, will own approximately 74.0% of the outstanding Common Stock without giving effect to any purchases of Common Stock in the Offering by such persons. As a result, the existing stockholders will be in a position to exercise control of matters submitted to the Company's stockholders, including the election of directors. In addition, the Company's founder, Chief Executive Officer and President, B.H. (Barney) Adams, and Royal Holding Company, Inc. ("Royal"), the

10

Company's largest single stockholder, will own approximately 15.4% and 30.1%, respectively of the outstanding Common Stock immediately following the Offering and through their respective stock ownership and positions or representations on the Board of Directors may be able to exercise a controlling influence over the Company. See "Management," "Certain Transactions" and "Principal and Selling Stockholders."

## SHARES ELIGIBLE FOR FUTURE SALE; ISSUANCE OF ADDITIONAL SHARES

Future sales of shares of Common Stock by the Company and its stockholders could adversely affect the prevailing market price of the Common Stock. The Company's directors, officers and certain stockholders, including the Selling Stockholders, holding an aggregate of 18,025,835 shares of Common Stock as of the date of this Prospectus have agreed not to sell, offer, contract to sell, grant any option or right for the sale of or otherwise dispose of any Common Stock or any securities convertible, exercisable or exchangeable into shares of Common Stock, nor any options or right to acquire any shares of Common Stock, including any sale pursuant to Rule 144 or Rule 144A promulgated under the Securities Act of 1933, as amended (the "Securities Act"), for a period of 180 days after the date of this Prospectus without the prior written consent of Lehman Brothers Inc. (the "Lock-up Agreement"). After such time, based upon stock ownership at the date of this Prospectus, approximately 16,199,282 shares of Common Stock will be eligible for sale pursuant to Rule 144 promulgated under the Securities Act.

In addition, the Company has granted registration rights that will be effective after the Offering to stockholders holding as of the date of this Prospectus an aggregate of 17,797,087 shares of Common Stock. These stockholders have the right, subject to certain conditions, to demand that their stock be registered under the Securities Act on any three occasions commencing generally one year after the date of this Prospectus. The stockholders also have certain additional piggyback registration rights, and subject to certain conditions, may participate in future registrations by the Company of shares of Common Stock under the Securities Act.

Pursuant to its Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation"), the Company has the authority to issue additional shares of Common Stock. The issuance of such shares could result in the dilution of the voting power of Common Stock purchased in the Offering. Sales of substantial amounts of Common Stock in the public market, or the perception that such sales may occur, could have a material adverse effect on the market price of the Common Stock. See "Shares Eligible for Future Sale," "Underwriting" and "Description of Capital Stock."

## ANTI-TAKEOVER PROVISIONS

The Company's Certificate of Incorporation and Amended and Restated Bylaws (the "Bylaws") contain, among other things, provisions establishing a classified Board of Directors, authorizing shares of preferred stock with respect to which the Board of Directors of the Company as the power to fix the rights, preferences, privileges and restrictions without any further vote or action by the stockholders, requiring that all ockholder action be taken at a stockholders' meeting and establishing certain advance notice requirements in order for stockholder proposals or director nominations to be considered at such meetings. In addition, the Company is subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law (the "DGCL"). In general, this statute prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner. Such provisions could delay, deter or prevent a merger, consolidation, tender offer, or other business combination or change of control involving the Company that some or a majority of the Company's stockholders might consider to be in its best interest, including offers or attempted takeovers that might otherwise result in such stockholders receiving a premium over the market price for the Common Stock. The potential issuance of preferred stock may have the effect of delaying, deferring or preventing a change of control of the Company, may discourage bids for the Common Stock at a premium over the market price of the Common

11

Stock and may adversely affect the market price of and the voting and other rights of the holders of the Common Stock. The Company has not issued, and currently has no plans to issue, shares of preferred stock. See "Description of Capital Stock--Preferred Stock" and "--Delaware Law and Certain Charter and Bylaw Provisions."

## ABSENCE OF PUBLIC MARKET FOR COMMON STOCK AND VOLATILITY

Prior to the Offering there has been no public market for the Common Stock, and there can be no assurance that an active trading market will develop or be sustained after the Offering. The initial public offering price of the Common Stock offered hereby will be determined through negotiations among the Company, the Selling Stockholders and the Underwriters, and may not be indicative of the market price for the Common Stock after the Offering. The market price for shares of the Common Stock may be volatile depending on a number of factors, including business performance, industry dynamics, news announcements or changes in general market conditions. See "Underwriting."

## DILUTION

The initial public offering price is substantially higher than the book value per share of Common Stock. Investors purchasing shares of Common Stock in the Offering will therefore incur immediate and substantial dilution in net tangible book value per share of $12.71. To the extent outstanding options to purchase the Company's Common Stock are exercised, there will be further dilution. See "Dilution."

### DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Prospectus includes "forward-looking statements" including statements containing the words "believes," "anticipates," "expects" and words of similar import. All statements other than statements of historical fact included in this Prospectus, including without limitation, such statements under "Prospectus Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business" and located elsewhere herein, regarding the Company or any of the transactions described herein, including the timing, financing, strategies and effects of such transactions, are forward-looking statements. Although the Company believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from expectations are disclosed in this Prospectus, including, without limitation, in conjunction with the forward-looking statements in this Prospectus and/or under "Risk Factors." The Company does not intend to update these forward-looking statements.

12

## USE OF PROCEEDS

The net proceeds to the Company from the sale of the 4,000,000 shares of Common Stock offered by the Company hereby, after deducting estimated Offering expenses payable by the Company and the underwriting discounts and commissions, are estimated to be approximately $58.3 million. The principal purposes of the Offering are to provide working capital to fund the Company's long-term growth strategy, to facilitate future access by the Company to the public equity markets, to enhance the Company's ability to use the Common Stock as a means of attracting, retaining and motivating senior managers and professionals and to provide liquidity to its stockholders. The Company intends to use the net proceeds for working capital and general corporate purposes, including capital expenditures, expansion of the Company's product development efforts, additional advertising and expansion of the Company's international sales efforts. In addition, the Company may use all or a portion of the net proceeds from the Offering for possible acquisitions. The Company has no current agreements or specific plans with respect to any acquisition, but will consider acquisition opportunities as they arise. Company management will have broad discretion with respect to the proceeds of this Offering. Pending such uses, the Company intends to invest the net proceeds of this Offering in short-term, interest-bearing, investment-grade securities. The Company will not receive any of the proceeds from the sale of Common Stock by the Selling Stockholders. See "Risk Factors--Unspecified Use of Proceeds," "--Risks Associated with Acquisitions" and "Principal and Selling Stockholders."

## DIVIDEND POLICY

The Company has not paid cash dividends in the past and has no present intention of declaring or paying any dividends in the foreseeable future. The Company anticipates that any earnings will be retained for the foreseeable future for use in the operations of the business. Any future determinations as to the payment of dividends will be at the discretion of the Company's Board of Directors and will depend on the Company's results of operations, financial condition, contractual restrictions and other factors deemed relevant by the Board of Directors. The Company's ability to pay dividends is restricted by certain covenants set forth in its Revolving Credit Agreement with NationsBank of Texas, N.A. See "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources."

13

## DILUTION

At March 31, 1998, the Company's net tangible book value was $14,659,000 or $0.81 per share. Net tangible book value per share represents the amount of the Company's total tangible assets less the Company's total liabilities, divided by the number of shares of Common Stock outstanding. Without taking into account any other changes in such net tangible book value after March 31, 1998, other than to give effect to the sale of 4,000,000 shares of Common Stock offered by the Company hereby (after deduction of estimated expenses payable by the Company and underwriting discounts and commissions), the net tangible book value of the Company on March 31, 1998 would have been $72,929,000 or $3.29 per share. This represents an immediate increase in net tangible book value of approximately $2.48 per share to the Company's existing stockholders and an immediate dilution in net tangible book value of $12.71 per share to new investors in the Offering. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Initial public offering price per share.................................... | | $ 16.00 |
| Net tangible book value per share before the Offering...................... | $ 0.81 | |
| Increase in net tangible book value per share attributable to new investors................................................................ | 2.48 | |
| Net tangible book value per share after the Offering........................ | | 3.29 |
| Dilution per share to new investors......................................... | | $ 12.71 |

The following table sets forth, at May 31, 1998, the difference between existing stockholders and the new investors in the Offering with respect to the number of shares purchased from the Company, the total consideration paid and the average price per share paid.

| | SHARES PURCHASED FROM THE COMPANY | | TOTAL CONSIDERATION | | AVERAGE PRICE PER SHARE |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | AMOUNT | PERCENT | |
| Existing stockholders............................... | 19,099,282 | 82.7% | $ 4,838,636 | 7.0% | $ 0.25 |
| New investors....................................... | 4,000,000 | 17.3 | 64,000,000 | 93.0 | $ 16.00 |
| Total.............................................. | 23,099,282 | 100.0% | 68,838,636 | 100.0% | |

The above computations exclude 423,666 shares of Common Stock issuable upon exercise of stock options outstanding at May 31, 1998. At May 31, 1998, an additional 518,000 shares of Common Stock are reserved for issuance under the Company's 1998 Stock Incentive Plan (the "Incentive Plan"). To the extent that any outstanding options are exercised, or additional options are issued, there will be further dilution to new investors in the Offering. See "Management--Benefit Plans," "Description of Capital Stock," "Shares Eligible for Future Sale" and "Underwriting."

14

## CAPITALIZATION

The following table sets forth the capitalization of the Company at March 31, 1998 and as adjusted as of that date to give effect to the sale of 4,000,000 shares of Common Stock by the Company in the Offering and the application of the estimated net proceeds therefrom. See "Use of Proceeds." This table should be read in conjunction with the Company's Consolidated Financial Statements and Notes thereto appearing elsewhere in this Prospectus.

|  | AT MARCH 31, 1998 | |
|  | ACTUAL | AS ADJUSTED |
|  | (IN THOUSANDS) | |
| Cash and cash equivalents.............................................................. | $    602 | $ 58,872 |
| Note payable--current.................................................................. | $    913 | $    913 |
| Note payable--non-current.............................................................. | 222 | 222 |
| Stockholders' equity: | | |
| Preferred stock, $.01 par value, 5,000,000 shares authorized; none outstanding.......... | -- | -- |
| Common stock, $.001 par value, 50,000,000 shares authorized; 18,199,282 shares (actual) and 22,199,282 shares (as adjusted) issued(1)........................................ | 18 | 22 |
| Additional paid-in capital............................................................. | 16,032 | 74,298 |
| Common stock subscription.............................................................. | (231) | (231) |
| Deferred compensation.................................................................. | (981) | (981) |
| Accumulated deficit.................................................................... | (171) | (171) |
| Total stockholders' equity............................................................. | 14,667 | 72,937 |
| Total capitalization.................................................................. | $ 14,889 | $ 73,159 |

(1) Excludes 313,666 shares subject to outstanding options at March 31, 1998.

15

### SELECTED CONSOLIDATED FINANCIAL INFORMATION

The following selected financial data at and for the fiscal years ended December 31, 1995, 1996 and 1997 are derived from the Consolidated Financial Statements of the Company, which have been audited by KPMG Peat Marwick LLP, independent certified public accountants. The selected financial information for the three months ended March 31, 1997 and 1998 are derived from unaudited Consolidated Financial Statements of the Company. In the opinion of management, all adjustments consisting only of normal recurring adjustments, necessary for a fair presentation of the financial position and results of operations, have been included in such unaudited Consolidated Financial Statements. Results for the three months ended March 31, 1998 may not be indicative of the results expected for the year ended December 31, 1998. The Consolidated Financial Statements at December 31, 1996 and 1997 and for each of the years in the three-year period ended December 31, 1997, and the independent auditors' report are included elsewhere in this Prospectus. The selected financial data should be read in conjunction with the Consolidated Financial Statements, the related Notes thereto, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the other financial information included elsewhere herein.

| | YEAR ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | | |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA(1): | | | | | |
| Net sales................................ | $ 1,125 | $ 3,522 | $ 36,690 | $ 1,475 | $ 24,511 |
| Cost of goods sold....................... | 756 | 1,590 | 9,991 | 587 | 5,862 |
| Gross profit............................. | 369 | 1,932 | 26,699 | 888 | 18,649 |
| Operating expenses (excluding stock compensation and bonus award)........... | 613 | 1,709 | 15,826 | 823 | 9,777 |
| Stock compensation and bonus award(2).... | -- | 214 | 14,842 | -- | -- |
| Operating income (loss)................. | (244) | 9 | (3,969) | 65 | 8,872 |
| Income (loss) before taxes.............. | (243) | 13 | (4,071) | 61 | 8,773 |
| Net income (loss)....................... | $ (243) | $ 13 | $ (4,654) | $ 45 | $ 5,642 |
| Income (loss) per common share(3): | | | | | |
| Basic................................. | $ (.05) | $ -- | $ (.37) | $ -- | $ .32 |
| Diluted............................... | $ (.05) | $ -- | $ (.37) | $ -- | $ .31 |
| Weighted average common shares(3): | | | | | |
| Basic................................. | 4,423 | 11,238 | 12,519 | 11,873 | 17,662 |
| Diluted............................... | 4,423 | 11,238 | 12,519 | 11,873 | 18,340 |

| | AT DECEMBER 31, | | | AT MARCH 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | (IN THOUSANDS) | | | | |
| CONSOLIDATED BALANCE SHEET DATA: | | | | | |
| Cash and cash equivalents................ | $ 243 | $ 855 | $ 1,956 | $ 760 | $ 602 |
| Working capital.......................... | 575 | 1,475 | 6,915 | 1,558 | 12,299 |
| Total assets............................. | 658 | 2,559 | 17,360 | 3,116 | 25,793 |
| Total debt (including current maturities).. | -- | 230 | -- | 479 | 1,135 |
| Stockholders' equity..................... | 615 | 1,978 | 8,325 | 2,024 | 14,667 |

(1) This table excludes financial information for the fiscal years ended December 31, 1993 and 1994 because operations in those years were not comparable in size or scope to current operations.

(2) Consists primarily of a stock award to the Company's founder, Chief Executive Officer and President. See "Certain Transactions" and Note 9 of Notes to Consolidated Financial Statements.

(3) See Note 1 of Notes to Consolidated Financial Statements for information concerning the calculation of income (loss) per common share and weighted average common shares outstanding.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following management's discussion and analysis of financial condition and results of operations addresses the performance of the Company for the three months ended March 31, 1997 and 1998, and the years ended December 31, 1995, 1996 and 1997, and should be read in conjunction with the Company's Consolidated Financial Statements and Notes thereto appearing elsewhere in this Prospectus.

### OVERVIEW

Adams designs, manufactures and markets premium quality, technologically innovative golf clubs. Founded in 1987, the Company operated initially as a components supplier and contract manufacturer. Thereafter, the Company established its custom fitting operation which currently services a network of over 100 certified custom fitting accounts. In the fall of 1995, the Company introduced the original Tight Lies fairway wood and, in December 1996, the Company extended the Tight Lies line to include the Tight Lies Strong 3, Strong 5 and Strong 7, with the Tight Lies Strong 9 being introduced in January 1998. Sales of the Tight Lies line of products increased significantly subsequent to the second quarter of 1997 when the Company launched an infomercial relating to the original Tight Lies fairway wood.

The Company's net sales are primarily derived from sales to on- and off-course golf shops and selected sporting goods retailers and, to a much lesser extent, direct sales to consumers, international distributors and the Company's custom fitting accounts. The Company defines net sales as gross sales less returns. The Company recognizes sales and an allowance for returns is estimated at the time products are shipped. The Company's net sales increased to $36.7 million for 1997 from $1.1 million for 1995 and to $24.5 million for the three months ended March 31, 1998 from $1.5 million for the three months ended March 31, 1997. The Company's net sales are based on orders for immediate delivery and backlog is not, therefore, necessarily indicative of future net sales.

The Company does not currently manufacture the components required to assemble its golf clubs, relying instead on component suppliers. Costs of the Company's Tight Lies fairway woods consist primarily of component parts, including the head, shaft and grip. To a lesser extent, the Company's cost of goods sold includes labor and occupancy costs in connection with the inspection, testing and assembly of component parts at its facility in Plano, Texas.

Operating expenses are composed primarily of selling and royalty expenses, general and administrative expenses, and to a lesser extent, research and development expenses. Selling and royalty expenses include advertising and marketing expenses, salaries and commissions, royalties related to the Company's infomercial and independent consulting fees. During the year ended December 31, 1997 and the first three months of 1998, royalties were approximately 6% of net sales of the Company's original Tight Lies fairway wood, excluding international and custom fitting sales. The Company expects royalties to increase as a percentage of net sales as a result of the agreement reached with Nick Faldo. The Company's royalty expenses were $0 and $944,451 for 1996 and 1997, respectively. Beginning May 1, 1998, Mr. Faldo is entitled to receive a royalty equal to 5% of the Company's net sales of golf clubs (other than certain specialty items for which the royalty is 10%) sold outside the U.S. Although, there is no minimum royalty for 1998, Mr. Faldo will be entitled to a minimum royalty in subsequent years. See "Certain Transactions." General and administrative expense includes salaries and benefits for corporate management, accounting, administrative support staff, bad debts, independent consulting and professional services, and office rent and utilities. Expenses associated with research and development efforts include salaries and independent consulting fees.

The Company was incorporated in Texas in 1987 and reincorporated in Delaware in 1990. The Company completed an internal reorganization in 1997 and now conducts its operations through several direct and indirect wholly-owned subsidiaries, including (i) Adams Golf Holding Corp., a Delaware corporation, which holds limited partnership interests of certain indirect subsidiaries of the Company; (ii) Adams Golf GP Corp., a Delaware corporation, which holds capital stock or limited partnership

17

interests, as applicable, of certain indirect subsidiaries of the Company; (iii) Adams Golf Direct Response, Ltd., a Texas limited partnership, which operates the call-center and advertising activities; (iv) Adams Golf, Ltd., a Texas limited partnership, which operates the golf club design, assembly and sales business; (v) Adams Golf IP, L.P., a Delaware limited partnership, which holds the intellectual property rights of the Company; and (vi) Adams Golf Management Corp., a Delaware corporation, which provides management and consulting services to certain of the Company's indirect subsidiaries.

## RESULTS OF OPERATIONS

The following table sets forth operating results expressed as a percentage of net sales for the periods indicated. Results for any one or more periods are not necessarily indicative of annual results or continuing trends. See "--Quarterly Results and Seasonality," below.

| CONSOLIDATED STATEMENTS OF OPERATIONS DATA | YEAR ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 67.2 | 45.1 | 27.2 | 39.8 | 23.9 |
| Gross profit | 32.8 | 54.9 | 72.8 | 60.2 | 76.1 |
| Operating expenses | 54.5 | 54.6 | 83.6 | 55.8 | 39.9 |
| Operating income (loss) | (21.7) | 0.3 | (10.8) | 4.4 | 36.2 |
| Interest expense | -- | -- | 0.2 | 0.9 | -- |
| Other income (expense) | 0.1 | 0.1 | (0.1) | 0.6 | (0.4) |
| Income (loss) before income taxes | (21.6) | 0.4 | (11.1) | 4.1 | 35.8 |
| Income tax expense | -- | -- | 1.6 | 1.1 | 12.8 |
| Net income (loss) | (21.6)% | 0.4% | (12.7)% | 3.0% | 23.0% |

## THREE MONTHS ENDED MARCH 31, 1997 COMPARED TO THREE MONTHS ENDED MARCH 31, 1998

Net sales increased to $24.5 million for the three months ended March 31, 1998 from $1.5 million for the comparable period of 1997, primarily due to the continued market acceptance of the Company's Tight Lies line of fairway woods, and, to a lesser extent, a price increase effective January 1, 1998. Net sales of the Tight Lies line of fairway woods increased to $23.8 million from $1.1 million for the comparable period of 1997, and increased as a percentage of net sales to 97.3% from 75.8%, respectively. Sales of the Tight Lies fairway woods increased subsequent to the Company's introduction of an infomercial marketing its original Tight Lies fairway wood in the second quarter of 1997. Net sales of other product lines for the three months ended March 31, 1998 increased to $0.7 million from $0.4 million for the comparable period of 1997, but decreased as a percentage of net sales to 2.7% from 24.2%, respectively. Net sales of the Company's products outside the U.S. increased to $1.4 million for the three months ended March 31, 1998 from $0.2 million for the three months ended March 31, 1997, but decreased as a percentage of net sales to 5.7% from 11.0%, respectively. The increase in international sales in absolute dollars was due to increased market acceptance of the Tight Lies fairway woods and expanded international marketing efforts in the last half of 1997.

Gross profit increased to $18.6 million for the three months ended March 31, 1998 from $0.9 million for the comparable period of 1997, and increased as a percentage of net sales to 76.1% from 60.2%, respectively. Gross profit for the three months ended March 31, 1998 was favorably affected by an increased percentage of sales attributable to the higher margin Tight Lies fairway woods and the inherent cost savings associated with buying components in large volumes and assembling them on a substantially increased scale.

18

Operating income increased to $8.9 million for the three months ended March 31, 1998 from $65,000 for the comparable period of 1997 due to increased sales. Total operating expenses increased to $9.8 million for the three months ended March 31, 1998 from $0.8 million for the comparable period of 1997, principally as a result of increased selling and advertising costs related to the promotion of the Tight Lies fairway woods and increased administrative costs resulting primarily from the hiring of additional employees and slightly higher occupancy costs. As a percentage of net sales, operating expenses decreased for the three months ended March 31, 1998 to 39.9% from 55.8% for the comparable period of 1997.

## YEAR ENDED DECEMBER 31, 1996 COMPARED TO YEAR ENDED DECEMBER 31, 1997

Net sales increased to $36.7 million for 1997 from $3.5 million for 1996, primarily due to increased market acceptance of the Company's Tight Lies fairway woods. Net sales of the Tight Lies fairway woods increased to $34.6 million for 1997, from $1.7 million for 1996, and increased as a percentage of net sales to 94.3% from 47.2%, respectively. Net sales of other product lines increased to $2.1 million for 1997 compared to $1.8 million for 1996, but decreased as a percentage of net sales to 5.7% for 1997 from 52.8% for 1996.

Gross profit increased to $26.7 million for 1997 from $1.9 million for 1996, and increased as a percentage of net sales to 72.8% from 54.9%, respectively. Gross profit for 1997 was favorably affected by an increased percentage of sales attributable to the higher margin Tight Lies fairway woods and the inherent cost savings associated with buying components in large volumes and assembling them on a substantially increased scale.

The Company experienced operating loss of $4.0 million for 1997 as compared to operating income of $9,000 for 1996. Total operating expenses increased to $30.7 million for 1997 from $1.9 million for 1996. Of the $30.7 million of operating expenses for 1997, $14.8 million, or 48.4%, of expenses related to stock compensation and bonus awards to the Company's founder, Chief Executive Officer and President. See "Certain Transactions" and Note 9 of Notes to Consolidated Financial Statements. The expense recognized in 1996 in conjunction with these awards was $0.2 million, or 11.1% of operating expenses. In 1997, the Company also incurred higher expenses for selling and royalties and provision for bad debts, in each case due principally to increased sales of the Tight Lies fairway woods. General and administrative expenses also increased in 1997 due to the hiring of additional employees, and research and development expenses.

## YEAR ENDED DECEMBER 31, 1995 COMPARED TO YEAR ENDED DECEMBER 31, 1996

Net sales increased to $3.5 million for 1996 from $1.1 million for 1995, primarily due to the introduction of the original Tight Lies fairway wood in the fall of 1995. Net sales of the original Tight Lies fairway wood increased to $1.7 million for 1996 from $0.1 million for 1995, and increased as a percentage of net sales to 47.2% from 9.6%, respectively. Net sales of other products increased to $1.8 million for 1996 from $1.0 million for 1995, but decreased as a percentage of net sales to 52.8% from 90.4%, respectively. The increase in sales of other products in absolute dollars was due to increased sales of custom fitted golf clubs resulting from an increased number of teaching professionals who became certified Adams Golf club fitters during 1996.

Gross profit increased to $1.9 million for 1996 from $0.4 million for 1995, and increased as a percentage of net sales to 54.9% from 32.8%, respectively. The increase in gross profit was due to higher sales of the Company's products in 1996, specifically the higher margin original Tight Lies fairway wood.

Operating income was $9,000 for 1996 compared to an operating loss of $0.2 million for 1995. Total operating expenses increased to $1.9 million for 1996 from $0.6 million for 1995 and remained relatively flat as a percentage of net sales. Of the $1.9 million of operating expenses in 1996, $0.2 million, or 11.1%, of expenses were related to a bonus award to the Company's founder, Chief Executive Officer and President. The Company also incurred additional selling and general and administrative expenses in 1996 as a result of increased sales and hiring additional employees.

19

## QUARTERLY RESULTS AND SEASONALITY

The following table sets forth certain unaudited quarterly financial operational data for the five most recent quarters. A review in accordance with Statement on Auditing Standards No. 71 has not been performed by the Company's independent certified public accountants on the unaudited information in the table below.

| | | | | QUARTER ENDED | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | MARCH 31, 1997 | | JUNE 30, 1997 | | SEPT. 30, 1997 | | DEC. 31, 1997 | | MARCH 31, 1998 |
| Net sales............................ | $ | 1,475 | $ | 3,974 | $ | 14,236 | $ | 17,005 | $ | 24,511 |
| Gross profit......................... | | 888 | | 2,418 | | 10,633 | | 12,759 | | 18,649 |
| Operating income (loss)............. | | 65 | | 4 | | 4,212 | | (8,250) | | 8,872 |
| Net income (loss)................... | | 45 | | (4) | | 3,144 | | (7,839) | | 5,642 |

Golf generally is regarded as a warm weather sport and sales of golf equipment historically have been strongest during the second and third quarters, with the weakest sales occurring during the fourth quarter. Although the Company's rapid growth has offset this trend in recent periods, no assurances can be given that the Company's growth will continue to offset the impact of seasonality, and therefore results for any one or more quarters are not necessarily indicative of annual results or continuing trends. In addition, sales of golf clubs are dependent on discretionary consumer spending, which may be affected by general economic conditions. A decrease in consumer spending generally could result in decreased spending on golf equipment, which could have a material adverse effect on the Company's business, operating results and financial condition. In addition, the Company's future results of operations could be affected by a number of other factors, such as unseasonal weather patterns; demand for and market acceptance of the Company's existing and future products; new product introductions by the Company's competitors; competitive pressures resulting in lower than expected average selling prices; and the volume of orders that are received and that can be fulfilled in a quarter. Any one or more of these factors could result in the Company failing to achieve its expectations as to future sales or net income.

Because most operating expenses are relatively fixed in the short term, the Company may be unable to adjust spending sufficiently in a timely manner to compensate for any unexpected sales shortfall, which could materially adversely affect quarterly results of operations. If technological advances by competitors or other competitive factors require the Company to invest significantly greater resources than anticipated in research and development or sales and marketing efforts, the Company's business, operating results or financial condition could be materially adversely affected. Accordingly, the Company believes that period- to-period comparisons of its results of operations should not be relied upon as an indication of future performance. In addition, the results of any quarter are not indicative of results to be expected for a full fiscal year. As a result of fluctuating operating results or other factors discussed above and below, in certain future quarters the Company's results of operations may be below the expectations of public market analysts or investors. In such event, the market price of the Company's Common Stock would be materially adversely affected.

## STOCK-BASED COMPENSATION

In December 1997, the Board of Directors of the Company approved a stock compensation award of 2,000,000 shares of Common Stock to the Company's founder, Chief Executive Officer and President. The Company agreed to pay all income taxes due by the officer relating to such stock award and related tax bonus. As a result, compensation expense of approximately $12.5 million was charged to operations in 1997. In addition, this officer notified the Company of his intent to exercise stock options and an additional compensation expense of approximately $2.3 million was recorded in 1997. With respect to certain stock options granted to employees, the Company recorded deferred compensation of $981,000 and $788,000, respectively, in the first and second quarters of 1998. The Company will begin amortizing deferred compensation in the second quarter of 1998 over the vesting period, generally four years. In addition, in connection with its stock grant to Nick Faldo, the Company recorded deferred compensation of $10.1 million in the second quarter of 1998. This amount will be amortized to expense ratably over 10 years

20

beginning in the second quarter of 1998. See "Certain Transactions" and Note 9 of Notes to Consolidated Financial Statements.

## YEAR 2000 COMPLIANCE

Many existing computer systems and applications and other control devices use only two digits to identify a year in the date field, without considering the impact of the upcoming change in the century. As a result, as year 2000 approaches, computer systems and applications used by many companies may need to be upgraded to comply with "Year 2000" requirements. The Company relies on its systems in operating and monitoring many significant aspects of its business, including financial systems (such as general ledger, accounts payable, accounts receivable, inventory and order management), customer services, infrastructure and network and telecommunications equipment. The Company also relies directly and indirectly on the systems of external business enterprises such as customers, suppliers, creditors, financial organizations and domestic and international governments. The Company currently estimates that its costs associated with Year 2000 compliance, including any costs associated with the consequences of incomplete or untimely resolution of Year 2000 compliance issues, will not have a material adverse effect on the Company's business, financial condition or results of operations. However, the Company has not exhaustively investigated and does not believe it has fully identified the impact of Year 2000 compliance and has not concluded that it can resolve any issues that may arise in complying with Year 2000 without disruption of its business or without incurring significant expense. In addition, even if the Company's internal systems are not materially affected by Year 2000 compliance issues, the Company could be affected through disruption in the operation of the enterprises with which the Company interacts.

## LIQUIDITY AND CAPITAL RESOURCES

The Company historically has financed its operations principally through internally generated funds and funds from the private placement of equity securities. Such funds have been supplemented from time to time with short-term borrowings under the Company borrowing facilities. Primarily as a result of tax payments made by the Company in the first quarter of 1998, for the three months ended March 31, 1998 net cash used in operating activities is $1.5 million. Net cash provided by operating activities was $1.1 million for the year ended December 31, 1997.

Working capital totaled $12.3 million at March 31, 1998 compared to $6.9 million at December 31, 1997. Net trade accounts receivable amounted to $14.7 million at March 31, 1998 compared to $7.7 million at December 31, 1997. The increase was primarily due to increased net sales in the first three months of 1998. Inventory totaled $5.6 million at March 31, 1998 and $4.5 million at December 31, 1997.

The Company has a $10.0 million revolving credit facility, which expires on December 31, 1998. At May 31, 1998, the Company had no outstanding borrowings under this facility. Borrowings under the Company's revolving credit facility agreement are at interest rates based on the lending bank's general refinance rate of interest or certain LIBOR rates of interest. Obligations under the revolving credit facility loan agreement are collateralized by substantially all of the accounts receivable, inventory and equipment of the Company. See Note 7 of Notes to Consolidated Financial Statements. During the first quarter of 1998, the Company borrowed approximately $1.1 million in the form of a note payable to the Company's founder, Chief Executive Officer and President to be used for working capital purposes. The remaining principal amount of the note ($534,899 at April 30, 1998) is payable in two installments on December 15, 1998 and April 14, 1999 at an interest rate of 5.39%.

The Company's capital expenditures amounted to $1.7 million, $0.8 million and $0.1 million for the three months ended March 31, 1998 and the years ended December 31, 1997 and 1996, respectively. The Company anticipates making capital expenditures in the ordinary course of business of approximately $6.0 million in the balance of 1998, which includes implementing a customer management information system at an estimated cost of $1.9 million.

The Company believes that the cash flow from operations, the net proceeds of the Offering and the Company's $10.0 million credit facility will be sufficient to meet operating needs and capital expenditures for at least the next 12 months.

21

BUSINESS

## GENERAL

Adams designs, manufactures and markets premium quality, technologically innovative golf clubs. The Company's design objective is to produce golf clubs that deliver meaningful performance benefits and inspire player confidence. The Company believes that its most successful product line to date, the Tight Lies fairway woods, meets this objective by providing golfers with the ability to hit the ball from virtually any lie while maximizing distance. The patented Tight Lies fairway woods feature an upright trapezoidal head, a shallow face and a lower center of gravity as compared to conventional fairway woods. Adams has developed a marketing model that integrates direct response and traditional image-based advertising to generate brand awareness and drive retail sales. The complete Tight Lies line of products includes the original, Strong 3, Strong 5, Strong 7 and Strong 9 fairway woods. According to the Golf Market Research Institute, the Tight Lies fairway woods were the top-selling single fairway woods in the U.S. on a unit volume basis during the three months ended March 31, 1998. During this period, the Company achieved a 27% market share of the single fairway woods category.

The Company's growth strategy is to continue to increase its share of the fairway woods market, leverage consumer acceptance of the Tight Lies brand, expand international sales and develop new technologies and product designs.

## GOLF INDUSTRY OVERVIEW

According to the National Golf Foundation ("NGF"), there are approximately 49 million golfers worldwide, including approximately 25 million in the U.S. In 1997, golfers in the U.S. played an estimated 547 million rounds of golf and, according to the National Sporting Goods Association, are estimated to have spent $5.8 billion on golf equipment, apparel and accessories. Of the 25 million U.S. golfers, about 5.2 million, characterized by the NGF as "avid golfers," play over 25 rounds of golf per year. The Company believes that avid golfers are the first to seek out performance-oriented golf equipment and generally drive golf club product trends.

In 1997, wholesale sales of golf equipment in the U.S. reached an estimated $2.4 billion. Wholesale sales of golf clubs increased at a compound annual growth rate of approximately 13% over the 5-year period from 1992 to 1997. The Company believes that sales of golf clubs will continue to grow in the future due to a number of factors including:

INCREASING AVAILABILITY OF GOLF FACILITIES. According to the NGF, approximately 900 new golf courses, the vast majority of which will be available to the public, are expected to open in the U.S. by the year 2000. The Company believes that these additional facilities will make golf more accessible and convenient, leading to a further increase in golf participation rates.

INCREASING INTEREST FROM NON-TRADITIONAL GOLFERS. The game of golf has become increasingly attractive to segments of the population that have not historically been well-represented among golfers. Most notably, Tiger Woods has made golf more appealing to junior and minority golfers. According to the NGF, the total number of beginning and junior golfers increased by over 40% in 1997 compared to the previous year. In addition, the success of the Ladies Professional Golf Association (the "LPGA") Tour and such female golfers as Annika Sorenstam of Sweden have increased the appeal of the sport to women.

FAVORABLE POPULATION TRENDS. The Company believes that two population trends are likely to benefit the golf industry over the next several years: (i) the aging of Baby Boomers (those born between 1946 and 1964) and (ii) the emergence of the Echo Boom generation (those born between 1977 and 1995). As golfers age, they tend to play golf more often and spend more money on the sport, particularly in the over-50 age group. Accordingly, because a majority of Baby Boomers are entering their 40s and 50s, the Company expects interest in and spending on golf to increase. Further, because Echo Boomers are

22

beginning to enter their 20s, the age most golfers begin to play the sport, the Company believes they will further increase their participation in and spending on golf.

NEW PRODUCT INNOVATIONS. In recent years, the golf equipment industry has made significant advances in product designs and technologies to enhance golfers' performance and overall enjoyment of the game. The Company believes that this rapid evolution of golf clubs accelerates the rate at which golfers purchase new or additional clubs.

GROWTH IN FAIRWAY WOODS. The Company believes that sales of fairway woods are growing for a number of reasons. Fairway woods have proven to be more versatile and dependable than long irons (specifically, the 1-4 irons), which many golfers find inherently difficult to hit. In addition, an increasing number of professional golfers on each of the Professional Golf Association ("PGA"), LPGA, Senior PGA and Nike Tours are carrying multiple fairway woods in competition, thereby validating the use of fairway woods as an accepted substitute for long irons. Finally, changes in course architectures and turf maintenance techniques are placing a premium on shots that fly higher and land softer (I.E., the types of shots typically produced by fairway woods).

## COMPANY HISTORY

Barney Adams founded the Company in 1987. After an initial period of supplying components and performing contract manufacturing, the Company established a custom fitting operation at the Hank Haney Golf Ranch in McKinney, Texas, a well-known teaching and practice facility. As a result of the knowledge and experience gained through custom fitting, Mr. Adams concluded that the greatest difference in skill between a professional golfer and an amateur golfer is the ability to successfully hit the long second shot to the green. Similarly, Alastair Cochran and John Stobbs previously concluded in their book "THE SEARCH FOR THE PERFECT SWING" that the long approach shot affects a player's score more than any other. After a period of further research, development and testing, the Company introduced a patented club head design to assist golfers with this shot. The resulting product, the original Tight Lies fairway wood, incorporates an upright trapezoidal head, a shallow face, a low center of gravity and 16 DEG. of loft to assist the golfer in getting the ball airborne quickly and efficiently from a variety of lies while maximizing distance. In late 1996, Adams extended the Tight Lies line of fairway woods to include the Strong 3, Strong 5 and Strong 7 and, one year later, the Strong 9.

In an effort to generate maximum exposure and retail sell-through of the original Tight Lies fairway wood, the Company debuted its professionally produced infomercial in April 1997. This 30-minute informational commercial is hosted by veteran golf announcer Jack Whitaker and features former PGA Teacher of the Year Hank Haney, former British Open Champion Bill Rogers and LPGA Hall of Famer Carol Mann. Demand for the Tight Lies fairway woods increased significantly after the introduction of the infomercial. To meet this demand, the Company increased its distribution capacity by expanding its network of on- and off-course golf shops and selected sporting goods retailers.

The International Network of Golf, an 800-member organization of leading media and golf industry executives, named the original Tight Lies fairway wood the "Breakthrough Product of the Year" in 1996. In addition, the Tight Lies fairway wood received the 1997/98 Certificate of Excellence from the Golf Industry Association. Since the introduction of the original Tight Lies fairway wood in late 1995, more than 50 professionals on the PGA, LPGA and Senior PGA Tours have carried one or more Tight Lies fairway woods in competition, none of whom were then under contract with or paid by the Company.

23

## BUSINESS STRENGTHS

The Company has developed the following business strengths that it believes provide it with a competitive advantage over many other golf club manufacturers:

STRENGTH OF THE TIGHT LIES BRAND. The Company believes that it has established a significant presence in the fairway woods market category. According to the Golf Market Research Institute, the Tight Lies fairway woods were the top selling single fairway woods in the U.S. on a unit volume basis during the three months ended March 31, 1998. During this period, the Company achieved a 27% market share of the single fairway woods category. The Company believes that the strength of its brand is further demonstrated by the rapid acceptance of the expanded line of Tight Lies fairway woods. Although at the time the Company only advertised the original Tight Lies fairway wood, sales of the expanded line represented 48.8% of net sales for the three months ended March 31, 1998.

INNOVATIVE MARKETING MODEL AND STRONG RETAIL DISTRIBUTION. Adams has developed a marketing model that integrates direct response and traditional image-based advertising to generate brand awareness and drive retail sales. For the three months ended March 31, 1998, approximately 79% of the Company's sales occurred at the retail level. To preserve the integrity of its image and reputation, the Company currently limits its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and technical expertise. The Company currently sells its products to on- and off-course golf shops and selected sporting goods retailers. The Company does not sell its products through price sensitive general discount warehouses, department stores or membership clubs. The Company believes its selective retail distribution helps its retailers to maintain profitable margins and maximize sales of Adams products. The Company further believes it is well-positioned to utilize its marketing model and retail distribution for future products.

RELATIONSHIP WITH NICK FALDO. The Company has recently entered into a relationship with Nick Faldo. Mr. Faldo was inducted into the World Golf Hall of Fame in May 1998 and has won more major championships in the 1990s than any other golfer. In addition to numerous other domestic and international championships, Mr. Faldo has won the Masters three times (1989, 1990 and 1996) and the British Open three times (1987, 1990 and 1992). Mr. Faldo uses the Tight Lies fairway woods in competition and has agreed to work closely with the Company to assist in the design and testing of future golf clubs and other equipment. The Company believes that Mr. Faldo's comprehensive knowledge of the game of golf and reputation for technical excellence complements the Company's capabilities and strong brand identity.

SALES AND CUSTOMER SERVICE INFRASTRUCTURE. Adams has committed significant resources to developing its sales and customer service infrastructure. Rather than relying on independent sales representatives, as do many other golf equipment companies, Adams maintains an inside sales department that currently consists of 25 employees who are in regular telephone contact with the Company's over 7,000 retailers. These sales representatives are supported by 13 field-based Regional Account Coordinators who maintain personal contact with the Company's retailers nationwide. The Company believes that using and carefully managing its own sales force enables it to significantly reduce selling expenses. Adams also has a separate 30-seat customer call center that provides customer service to retailers and consumers. The majority of the Company's sales and customer service personnel are experienced golfers. The Company believes interaction with its knowledgeable representatives promotes customer satisfaction and helps to strengthen the Adams brand.

EMPHASIS ON QUALITY. Due in large part to its heritage in custom club fitting, Adams emphasizes quality control and precise adherence to design specifications. The Company has redundant sources of supply for each of the component parts used in the manufacture of its golf clubs and has established a quality assurance program at those manufacturing facilities located in Taiwan and China that are collectively responsible for producing substantially all of the Company's performance club heads. Upon arrival at the Company's manufacturing facilities in Plano, Texas, each component used in the Company's clubs is

24

again checked to ensure consistency with strict design specifications. Components are then sorted to identify variations in characteristics, such as head weight and shaft flexibility, that, although within the specified manufacturing tolerances, may affect club performance. The Company uses its patented variable moment of inertia ("VMI") formula to combine compatible components to produce a consistent swing feel across an entire set of clubs.

## GROWTH STRATEGY

The Company's goal is to establish itself as a leading developer of technologically innovative, performance-oriented golf clubs. The Company's strategy to achieve this goal includes the following elements:

BUILDING MARKET SHARE IN FAIRWAY WOODS. The Company's first priority is to build its share of the premium fairway woods market. The Company believes it can increase its market share by (i) continuing to build demand using the Company's marketing model; (ii) assisting existing retailers to increase their sales of the Tight Lies fairway woods by maintaining the relatively high margins currently enjoyed by such retailers; and (iii) increasing the number of on- and off-course golf shops and selected sporting goods retailers that distribute the Tight Lies fairway woods.

LEVERAGING CONSUMER ACCEPTANCE OF TIGHT LIES BRAND. The Company intends to leverage acceptance of the Tight Lies brand to develop and sell additional products, a strategy that has proven effective in marketing the Company's expanded line of Tight Lies fairway woods. For the three months ended March 31, 1998, sales of the expanded line of Tight Lies fairway woods exceeded sales of the original club. The Company believes that the success and performance of its Tight Lies fairway woods have earned Adams a reputation as a manufacturer of technologically innovative, performance-oriented golf clubs among its customers and avid golfers. The Company further believes that it will be able to efficiently introduce new products to this customer base through its recent investments in infrastructure, thereby generating sales and receiving valuable product feedback.

EXPANDING INTERNATIONAL SALES. Until recently, the Company has focused on developing sales domestically. For the year ended December 31, 1997 and the three months ended March 31, 1998, approximately 2% and 6%, respectively, of the Company's net sales were derived from international sales. Accordingly, the Company's sales to date have been achieved without significant contribution from international markets. Beginning in late 1997, the Company began leveraging its domestic strength to attract qualified international distributors. The Company currently has a network of 33 distributors located in 39 countries including Canada, Japan and the United Kingdom and expects to continue to build its international distribution. Toward this end, the Company has recently hired a Director of International Sales who has significant international golf equipment sales experience. Additionally, the Company believes that Nick Faldo's worldwide reputation will help drive international demand for the Company's products.

DEVELOPING NEW TECHNOLOGIES AND PRODUCT DESIGNS. The Company engages continuously in the process of developing new technologies and product designs that, when incorporated into golf clubs, are expected to provide golfers with meaningful performance benefits. Capitalizing on the technical knowledge and expertise gained through the Tight Lies fairway woods, the Company is currently testing prototypes of a potential new driver. This new product is expected to combine the distance of a driver with the playability of a fairway wood. The Company currently expects the new driver to be introduced after the end of fiscal year 1998. The Company is working with Mr. Faldo to design and test this new driver as well as other potential new products. To the extent that any new technology or product design can be developed to the point of commercial viability, the Company intends to introduce such technology or design into a single product and, if the product is well received by consumers, develop a broader product line around the core club category. The Company believes that the affiliation, endorsement and support of Nick Faldo will provide important credibility in the development and marketing of new technologies and product designs.

25

The Company's continued growth and success depend, in large part, on its ability to successfully develop and introduce new products that achieve widespread market acceptance. Failure by the Company to identify and develop innovative new technologies and product designs could adversely affect the Company's future growth and profitability. See "Risk Factors--Dependence on New Product Introductions; Uncertain Consumer Acceptance."

## PRODUCTS

The Company currently offers the following products:

ORIGINAL TIGHT LIES FAIRWAY WOOD. The original Tight Lies fairway wood has an innovative upright trapezoidal or "upside down" head shape that incorporates a distinctive shallow face, a low center of gravity and 16 DEG. of loft. The Company believes that this club is ideal for getting the ball airborne quickly and efficiently with optimum spin to maximize distance from the critical scoring area of 185 to 225 yards from the green. The Company further believes that the Tight Lies fairway woods are particularly effective from virtually any lie on the course including the rough, hard pan, fairway bunkers and divots.

EXPANDED LINE OF TIGHT LIES FAIRWAY WOODS. In late 1996, based on initial consumer acceptance of the original Tight Lies fairway wood, the Company expanded its line to include the Tight Lies Strong 3 (13 DEG. loft), the Tight Lies Strong 5 (19 DEG. loft) and the Tight Lies Strong 7 (24 DEG. loft). In January 1998, the Company expanded the line again to include the Tight Lies Strong 9 (28 DEG. loft). The expanded line of Tight Lies fairway woods incorporates the same design innovations as the original club while providing golfers with increased flexibility to play these clubs from different distances on the course. For the three months ended March 31, 1998, sales of the expanded line of Tight Lies fairway woods exceeded sales of the original club.

OTHER CLUB LINES. The Company's other clubs include the Air Assault Driver and the Assault-VMI irons. The Air Assault Driver was the Company's first product to incorporate the patented upright trapezoidal head. The Company's Assault-VMI irons are perimeter-weighted, cavity-backed, slightly offset irons which incorporate the Company's patented VMI design formula producing consistent swing feel across an entire set of clubs. The Company markets the Assault-VMI irons to professional and avid golfers exclusively through its network of over 100 certified custom fitting accounts. The Company believes that its custom fitting activities provide Adams with an in-depth understanding of golf club design and credibility in the golf industry.

Each golf club manufactured by the Company is available in a variety of shaft lengths and flexes to accommodate both men and women golfers of all ages and ability levels. In addition, once a club has received a certain degree of market acceptance, the Company has historically introduced a left-handed model. Currently, the Company offers each of its golf clubs in a left-handed model, with the exception of the recently introduced Tight Lies Strong 9.

26

The following table indicates the percentage of net sales in each major product group for the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998. Historical percentages may not be indicative of the Company's future product mix.

## PERCENTAGE OF NET SALES BY PRODUCT GROUP

| | YEAR ENDED DECEMBER 31, | | THREE MONTHS ENDED MARCH 31, |
| PRODUCT GROUP | 1996 | 1997 | 1998 |
| --- | --- | --- | --- |
| Original Tight Lies | 45.6% | 55.9% | 48.5% |
| 3, 5, 7 and 9 Tight Lies | 1.6 | 38.4 | 48.8 |
| Other Club Lines | 52.8 | 5.7 | 2.7 |
| Total | 100.0% | 100.0% | 100.0% |

The Company supports each of its products with a two-year warranty. The warranty provides for repair or replacement of the golf club, except in the case of abuse. The Company has not experienced material amounts of breakage with respect to its golf clubs.

## DESIGN AND DEVELOPMENT

The Company's design and development team is responsible for developing, testing and introducing new technologies and product designs. This team is currently spearheaded by Barney Adams, the founder of the Company and inventor of the Tight Lies fairway wood; Richard H. Murtland, Vice President-- Research and Development; Mr. Nick Faldo and, independent consultants, Robert R. Bush and Dr. Michael M. Carroll. Mr. Bush has over 30 years of experience in golf club development, most notably, as Director of Technical Services for True Temper Sports, a leading shaft manufacturer, where from 1966 to 1993, he was responsible for testing all golf club shafts. Mr. Bush was instrumental in the development of "Iron Byron," the industry standard for the mechanical testing of golf clubs and balls. Mr. Bush is currently a member of the Technical Advisory Panel for GOLF DIGEST. Dr. Michael M. Carroll is Dean of the George R. Brown School of Engineering at Rice University in Houston, Texas. Dr. Carroll holds doctorate degrees in both physics and mathematics and is an avid golfer. Dr. Carroll has worked with the Adams design and development team since April 1, 1998 and is responsible for the scientific analysis of each new product under development by the Company.

The design and development team engages in a five-step process to create new products.

CONCEPT DEVELOPMENT. During concept development, Adams' design and development team identifies specific desirable ball flight objectives. In addition, the Company considers new ideas from professional golfers, inventors, distributors and others. The Company expects that Nick Faldo will play a significant role in future concept development.

DESIGN SPECIFICATIONS. The Company's product design and development team determines design specifications for the club, including shaft length, flex and weight, head design, loft and overall club weight. Throughout the design specifications process, the Company refers to and incorporates the golf equipment standards developed by the USGA. Although the standards set by the USGA only apply to competitive events sanctioned by that organization, the Company believes it is critical for new clubs to comply with these standards. At this time, the product design and development team also determines the optimal materials to use in the club. The Company will not use higher cost materials, such as titanium or other alloys, unless such expensive materials provide meaningful performance benefits. This stage of product development typically takes 6 to 8 weeks after a concept has been clearly identified.

PATENT REVIEW. The Company considers patent protection for its technologies and product designs to be an important part of its development strategy. The Company and its patent attorneys conduct a search

27

of prior art and existing products to determine whether a new product idea may be covered by an existing patent. Patent review, depending upon the complexity and novelty of the design involved, generally requires between 3 to 18 months to complete, however, this stage of product development typically occurs in conjunction with one or more of the other steps.

PRODUCT DESIGN AND ENGINEERING REVIEW. If a product concept continues past the patent review stage, the Company translates design parameters into working designs. When appropriate, these designs are modeled and developed using computer aided design technologies and subjected to rigorous engineering review to validate the effectiveness of the technology or design. Dr. Carroll is expected to play a key role in this stage of product development. The Company estimates that it will take between 4 to 6 months to successfully complete product design and engineering review.

TESTING. Once a specific design has been decided upon, the Company creates and tests one or more prototypes. The Company has a testing facility at the Hank Haney Golf Ranch in McKinney, Texas. As part of the testing process, the Company records, analyzes and interprets data associated with each prototype including ball flight, distance, spin and accuracy. Using feedback from these tests, the Company modifies its designs to achieve its performance objective. Additionally, the Company applies for official USGA approval of the resulting club at this time. Upon approval of a new product from the USGA, it becomes considered for commercial release. The Company believes that in order to properly field test a new product, it must expect between 4 to 6 months of additional development time.

The Company's research and development expenses were $18,516, $51,101 and $557,513 during 1995, 1996 and 1997, respectively.

## MARKETING

The goals of the Company's marketing efforts are to build its brand identity and drive sales through its retail distribution channel. To accomplish these goals, Adams utilizes direct response and traditional image-based advertising, engages in promotional activities and capitalizes on its relationship with Nick Faldo and other well known golf figures.

ADVERTISING. The Company uses a combination of direct response and traditional image-based advertising.

- DIRECT RESPONSE ADVERTISING. The Company intends to continue to build brand awareness and stimulate product demand through its direct response advertising, which includes a variety of mediums including television, radio, print and direct mail. Direct response advertising, in which consumers may order products directly from the Company by calling a toll-free telephone number, provides a cost-effective vehicle enabling Adams to communicate a compelling product story and build brand recognition. The Company's direct response advertising serves to introduce the Company's products to consumers, many of whom will subsequently purchase Adams clubs directly from the Company's retailers. In April 1997, Adams debuted a 30-minute Tight Lies infomercial, which has contributed significantly to the Company's recent growth. This infomercial received the award for "Best Infomercial Demonstration Show" from the National Infomercial Marketing Association in September 1997. The Tight Lies infomercial routinely runs on The Golf Channel, regional sports stations, national networks and local, market-specific broadcast stations. In addition, the Company utilizes 30- and 60-second direct response television commercials as well as radio advertising. The Company advertises regularly in major golf and industry publications, general consumer magazines and local newspapers nationwide. These include GOLF DIGEST, GOLF MAGAZINE, SPORTS ILLUSTRATED, THE WALL STREET JOURNAL and USA TODAY. Finally, the Company engages in regularly scheduled direct mail advertising campaigns.

- TRADITIONAL IMAGE-BASED ADVERTISING. The Company's direct response sales revenue has enabled Adams to broaden its advertising efforts to include traditional image-based advertising. This

28

advertising includes a series of 30-second commercials which run during major golf tournaments and golf related programs; newspaper, magazine and radio ad campaigns; sponsorship of selected golf tournaments; exclusive sponsorship of The Golf Channel's weekly instructional program, "LIVING ROOM LESSONS" and a recently updated and professionally redesigned web site located at www.adamsgolf.com.

The Company has received extensive editorial coverage in golf, consumer and trade publications as well as general consumer magazines and newspapers worldwide.

PROMOTIONAL ACTIVITIES. The Company engages in a variety of promotional activities to sell and market its products. Such activities include (i) consumer sweepstakes like the Company's "Ramble in the Bramble," where the winner will receive an all expense paid, luxury tour for two of Scotland's most legendary golf courses; (ii) promotional giveaways with certain purchases, including items such as instructional videos and audio tapes; and (iii) promotional campaigns like the "90-Day Challenge," in which the Company advertises its 90-day return policy.

RELATIONSHIP WITH NICK FALDO AND OTHERS. The Company has recently formed a lifetime relationship with Nick Faldo, an internationally recognized professional golfer and winner of numerous U.S. and international championships, including three Masters (1989, 1990 and 1996) and three British Opens (1987, 1990 and 1992). Mr. Faldo led the Official World Golf Ranking for 81 weeks during 1993 and 1994. Mr. Faldo also has made the most Ryder Cup appearances in the history of golf. Adams expects Nick Faldo to be actively and directly involved in the design, testing and development of new technologies and products. Mr. Faldo is noted for his precise play as a golfer and his reputation as a perfectionist. The Company believes that by aligning itself with Mr. Faldo, it can further promote the Adams brand, while at the same time demonstrating the Company's ability to deliver golf clubs that satisfy the specific and demanding requirements of tour professionals.

The Company has also obtained endorsements from Hank Haney, Bill Rogers and Carol Mann. Mr. Haney was named the 1993 PGA Teacher of the Year and is a five-time recipient of the Northern Texas Section PGA Teacher of the Year Award. Mr. Haney has instructed over 100 touring professionals from the PGA, LPGA, European, Japanese and Asian Tours along with several top rated junior golfers. Mr. Haney is a member of the advisory staff for GOLF DIGEST. Mr. Rogers won the British Open championship in 1981 and was the 1981 PGA Player of the Year. Ms. Mann is a member of the LPGA Hall of Fame.

SALES AND CUSTOMER SUPPORT

The Company sells its products through on- and off-course golf shops and selected sporting goods retailers, direct sales to consumers, international distributors and the Company's custom fitting accounts.

SALES TO RETAILERS. The Company sells a significant majority of its products to selected retailers. To maintain its high quality reputation and generate retailer loyalty, the Company does not sell its products through price sensitive general discount warehouses, department stores or membership clubs. The Company believes its selective retail distribution strategy helps its retailers to maintain profitable margins and maximize sales of Adams products. In the three months ended March 31, 1998, sales to retailers accounted for approximately 79% of the Company's total sales.

Adams maintains an inside sales department that currently consists of 25 employees who are in regular contact with the Company's over 7,000 retailers. These sales representatives are supported by 13 field-based Regional Account Coordinators who maintain personal contact with the Company's retailers nationwide. The Company generally has been successful in delivering product to its retailers within one week of a placed order. The Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers.

CUSTOMER SUPPORT AND DIRECT SALES. Adams believes that superior customer service can significantly enhance its marketing efforts. Accordingly, the Company maintains an in-house customer call center whose representatives provide technical assistance to Adams' customers and field calls resulting from the Company's direct response advertising. The Company also outsources a portion of its call center activities. The Company provides its staff with computerized access to its retailer database enabling call center representatives to guide consumers to their nearest Adams retailer.

INTERNATIONAL SALES. International sales are made in 39 countries (including Japan, Canada and the United Kingdom) through approximately 33 independent distributors. The international distributors sell to retailers for end sale to the consumer. International sales have increased from $0.6 million for 1996 to $0.9 million for 1997 and $0.2 million for the first three months of 1997 to $1.4 million for the first three months of 1998. The Company recently expanded its international sales staff to include a Director of International Sales to identify, develop, engage and support the Company's worldwide distributor base.

CUSTOM FITTING SALES. The Company employs six sales representatives who manage the Company's custom fitting sales and support division and administer Adams' custom fitting training program for golf professionals. Adams' custom fitting training program has received PGA certification and provides continuing education credits for PGA Member Professionals. Since 1992, the Company has certified in excess of 300 golf professionals to custom fit its Assault-VMI irons, which are sold exclusively through its over 100 custom fitting accounts. Custom fitters measure data relating to swing and ball flight characteristics. Based on the interpretation of the data, a set of clubs is manufactured that is specifically tailored to that golfer.

The majority of the Company's sales and customer service personnel are experienced golfers, including a number of former collegiate and professional golfers. Further, each of the Company's new employees attends an 8-hour, in-house seminar which provides training on club specifications, performance, design and manufacturing. Adams believes interaction with its knowledgeable representatives promotes customer satisfaction and helps to strengthen the Adams brand image.

## MANUFACTURING AND ASSEMBLY

The Company manages all stages of manufacturing, from sourcing to assembly, in order to maintain a high level of product quality and consistency. The Company establishes product specifications, selects the materials used to produce the components and tests the specifications of all components received by the Company. In addition, the Company has redundant sources of supply for each of the component parts used in the manufacture of its golf clubs and has established a quality assurance program at those manufacturing facilities located in Taiwan and China that are collectively responsible for producing substantially all of the Company's performance club heads. Upon arrival at the Company's manufacturing facilities in Plano, Texas, each component used in the Company's clubs is again checked to ensure consistency with strict design specifications. Components are then sorted to identify variations in characteristics, such as head weight and shaft flexibility, that, although within the specified range, may affect club performance. Golf clubs are then built by the Company's manufacturing personnel using the appropriate component parts and the Company's patented VMI technology. See "Risk Factors—Sources of Supply."

## PATENTS

The Company's ability to compete effectively in the golf club market will depend, in large part, on the ability of the Company to maintain the proprietary nature of its technologies and products. The Company currently holds six U.S. patents relating to certain of its products and proprietary technologies and has two patent applications pending. Assuming timely payment of maintenance fees, if any, the Company expects that the six currently issued patents will expire on various dates between 2009 and 2013. The Company has been awarded patents with respect to the design of the Tight Lies fairway wood and the VMI design formula. There can be no assurance, however, as to the degree of protection afforded by these or any other

patents held by the Company or as to the likelihood that patents will be issued from the pending patent applications. Moreover, these patents may have limited commercial value or may lack sufficient breadth to adequately protect the aspects of the Company's products to which the patents relate. The Company does not hold any foreign patents and no foreign patent applications are pending. The U.S. patents held by the Company do not preclude competitors from developing or marketing products similar to the Company's products in international markets.

There can be no assurance that competitors, many of which have substantially greater resources than the Company and have made substantial investments in competing products, will not apply for and obtain patents that will prevent, limit or interfere with the Company's ability to make and sell its products. The Company is aware of numerous patents held by third parties that relate to products competitive to the Company's, including products competitive with the Tight Lies fairway woods. There is no assurance that these patents would not be used as a basis to challenge the validity of the Company's patent rights, to limit the scope of the Company's patent rights or to limit the Company's ability to obtain additional or broader patent rights. A successful challenge to the validity of the Company's patents may adversely affect the Company's competitive position. Moreover, there can be no assurance that such patent holders or other third parties will not claim infringement by the Company with respect to current and future products. Because U.S. patent applications are held and examined in secrecy, it is also possible that presently pending U.S. applications will eventually issue with claims that will be infringed by the Company's products or technologies. The defense and prosecution of patent suits is costly and time-consuming, even if the outcome is favorable. This is particularly true in foreign countries where the expenses associated with such proceedings can be prohibitive. An adverse outcome in the defense of a patent suit could subject the Company to significant liabilities to third parties, require the Company and others to cease selling products or require disputed rights to be licensed from third parties. Such licenses may not be available on satisfactory terms, or at all.

Despite the Company's efforts to protect its patent and other intellectual property rights, unauthorized parties have attempted and are expected to continue to attempt to copy all, or certain aspects of, the Company's products. Policing unauthorized use of the Company's intellectual property rights can be difficult and expensive, and while the Company takes appropriate action whenever it discovers any of its products or designs have been copied, knock-offs and counterfeit products are a persistent problem in the performance-oriented golf club industry. There can be no assurance that the Company's means of protecting its patent and other intellectual property rights will be adequate.

## INFORMATION SYSTEMS

The Company believes that a comprehensive and integrated infrastructure of information technology, systems and services is a significant factor in maintaining and improving its competitive position. Systems in place, including order fulfillment and distribution, financial and decision support and operational planning, have supported the growth of the Company to date. The Company is aggressively enhancing its current capabilities to meet the demands of the Company's growth. Special emphasis is being placed on systems for customer management, supply chain management and business analysis and planning. The Company believes that its current and enhanced computer systems, along with normal upgrades and extensions, will be sufficient to accommodate the Company's anticipated growth of sales and planned expansion for the foreseeable future. There can be no assurance that any upgrades of its information systems will be completed in a timely manner, that any such upgrades will be adequate to meet the needs of the Company or that these upgrades will not strain the Company's financial resources.

## COMPETITION

The Company competes with a number of established golf club manufacturers, many of which have greater financial and other resources than the Company. Adams' competitors include Callaway Golf Company, adidas-Salomon AG (Taylor Made) and Fortune Brands, Inc. (Titleist and Cobra). The

31

Company competes primarily on the basis of performance, brand name recognition, quality and price. The Company believes that its ability to market its products through multiple distribution channels, including on- and off-course golf shops, selected sporting goods retailers and through direct response advertising, is important to its ability to compete.

The golf club industry is generally characterized by rapid and widespread imitation of popular technologies, designs and product concepts. Due to the success of the Tight Lies fairway woods, the Company expects that one or more competitors may introduce products similar to the Tight Lies fairway woods. The buying decisions of many purchasers of golf clubs are often the result of highly subjective preferences which can be influenced by many factors, including, among others, advertising media, promotions and product endorsements. The Company may face competition from manufacturers introducing other new or innovative products or successfully promoting golf clubs that achieve market acceptance. The failure to compete successfully in the future could result in a material deterioration of customer loyalty and the Company's image and could have a material adverse effect on the Company's business, operating results or financial condition. See "Risk Factors--Dependence on New Product Introductions; Uncertain Consumer Acceptance" "--Highly Competitive Industry" and "--Historical Dependence on Television Advertising."

## EMPLOYEES

At May 31, 1998, the Company had 264 full-time employees, including 113 engaged in manufacturing and assembly, 26 in research and development and quality control, 86 in sales support and 39 in management and administration. Adams' employees are not unionized. Management believes its relations with its employees are good.

## PROPERTIES

The Company's administrative offices and manufacturing facilities currently occupy approximately 65,000 square feet of space in Plano, Texas. This facility is leased by the Company pursuant to a lease agreement expiring in 2004 and may be extended for an additional five years. The Company maintains the right to terminate the lease if it moves to a larger facility owned by the current lessor. The Company has also leased an additional 33,000 square feet of space and expects to take possession of the additional space before July 31, 1998 pursuant to the terms of a lease also expiring in 2004. The Company believes that these facilities will be sufficient through at least the end of 1999.

## LEGAL PROCEEDINGS

The Company is not involved in any material legal proceedings.

32

# MANAGEMENT

## DIRECTORS AND EXECUTIVE OFFICERS

The following table sets forth certain information with respect to the directors and executive officers of the Company, as of May 31, 1998:

| NAME | AGE | POSITION(S) HELD |
|------|-----|------------------|
| B. H. (Barney) Adams | 59 | Chairman of the Board, Chief Executive Officer and President |
| Darl P. Hatfield | 51 | Senior Vice President--Finance and Administration and Chief Financial Officer |
| Richard H. Murtland | 57 | Vice President--Research and Development, Secretary, Treasurer and Director |
| James E. Farrell | 39 | Vice President--Finance |
| Mark D. Gonsalves | 38 | Vice President--Sales and Marketing, Retail |
| Steven P. Sanazaro | 50 | Vice President--Information Technology |
| Paul F. Brown, Jr. | 51 | Director |
| Roland E. Casati | 67 | Director |
| Finis F. Conner | 54 | Director |
| Mark R. Mulvoy | 56 | Director |
| Stephen R. Patchin | 39 | Director |

The Company's Certificate of Incorporation was amended and restated effective May 1, 1998 to provide, among other things, that the Board of Directors be divided into three classes, each of whose members serve for staggered three-year terms. Commencing with the 1999 Annual Meeting of Stockholders, one class of directors will be elected each year for a three-year term. Messrs. Conner and Patchin are members of Class I, the term of which expires at the 1999 Annual Meeting of Stockholders, Messrs. Murtland and Casati are members of Class II, the term of which expires at the 2000 Annual Meeting of Stockholders and Messrs. Adams, Brown and Mulvoy are members of Class III, the term of which expires at the 2001 Annual Meeting of Stockholders. See "Description of Capital Stock--Delaware Law and Certain Charter and Bylaw Provisions."

The number of members of the Board of Directors of the Company is currently fixed at nine and, as a result, the Board presently has two vacancies. The Company intends to fill these vacancies as soon as practicable after the completion of the Offering. Under the terms of the agreement between the Company and Nick Faldo, the Company has agreed that, for so long as royalties remain payable to Mr. Faldo, it will use commercially reasonable efforts to cause a designee of Mr. Faldo to be nominated for, and elected to, the Board. As of the date of this Prospectus, Mr. Faldo has not notified the Company of his designee to the Board.

Certain additional information concerning the directors and executive officers is set forth below.

B. H. (BARNEY) ADAMS. Mr. Adams founded the Company in 1987 and has served as Chairman of the Board, Chief Executive Officer and President since that time. Mr. Adams is the inventor of the Tight Lies fairway wood. Prior to founding the Company, Mr. Adams served as President of Intertest, Inc. (a manufacturer of semiconductor testing equipment), Senior Vice President of Margaux Controls, Inc. (a manufacturer of energy control systems) and Executive Vice President of Maytex Manufacturing Co., Inc. (a manufacturer of store fixtures). Mr. Adams has authored several magazine articles concerning the technical aspects of golf equipment and is a frequent PGA section speaker.

DARL P. HATFIELD. Mr. Hatfield joined the Company as Senior Vice President--Finance and Administration and Chief Financial Officer in May 1998. Prior to joining the Company, Mr. Hatfield was a partner

33

with KPMG Peat Marwick LLP ("KPMG") from July 1977 to April 1998. Mr. Hatfield has 30 years of experience in accounting and auditing and is a Certified Public Accountant.

RICHARD H. MURTLAND. Mr. Murtland joined the Company in 1994 as Vice President--Operations and has been a director of the Company since August 1995. He became Vice President--Research and Development in April 1998. Mr. Murtland has approximately 30 years of experience in operations and engineering, most recently serving as Project Manager with ARCO International Oil and Gas Company (an international oil exploration and production company) from June 1976 to March 1994.

JAMES E. FARRELL. Mr. Farrell joined the Company as Vice President--Finance in September 1997. From June 1995 to September 1997, Mr. Farrell served as a Manager for The Pittson Company (a diversified holding company), where he was responsible for financial review and re-engineering in the security services and air freight divisions. From May 1994 to June 1995, Mr. Farrell was employed by ADT Security Systems, Inc. as a Manager of Planning and Marketing. Prior thereto, he served as Director of Accounting for Brinks Home Security, Inc. from September 1986 to December 1993. Mr. Farrell has over 15 years of business experience and is a Certified Public Accountant.

MARK D. GONSALVES. Mr. Gonsalves joined the Company in July 1995 as Vice President--Sales and Marketing and now serves as Vice President--Sales and Marketing, Retail. Prior to joining the Company, Mr. Gonsalves was President and Chief Executive Officer of In-Sync Sport International, Inc. (a sports psychology company founded by Mr. Gonsalves) from January 1992 to July 1995. He was a professional golfer from 1990 to 1992. Mr. Gonsalves has 16 years of sales and marketing experience.

STEVEN P. SANAZARO. Mr. Sanazaro joined the Company as Vice President--Information Technology in January 1998. Prior to joining Adams, Mr. Sanazaro served as Director, Information Technology for Sprint Corporation from June 1987 to November 1992, as Vice President, Information Technology for Pepsico, Inc. from May 1996 to January 1998 and as Vice President, Research and Development and Chief Technology Officer for Harbinger Corporation (a supplier of electronic commerce software and network services) from August 1993 to May 1996. Mr. Sanazaro has approximately 30 years of business technology experience.

PAUL F. BROWN, JR. Mr. Brown became a director of the Company in August 1995. Mr. Brown has been Vice President--Finance and Chief Financial Officer of Royal (a holding company with diversified interests) since 1990. Mr. Brown has 29 years of experience in accounting, auditing, and finance and is a Certified Public Accountant.

ROLAND E. CASATI. Mr. Casati became a director of the Company in November 1995. Mr. Casati has been Chairman of the Board of Continental Offices, Ltd. for over five years. Continental Offices, Ltd. is engaged in the development of residential and commercial real estate and diversified personal investments. Mr. Casati is a director of Zeigler Coal Holding Co. (one of the largest coal producers in the U.S.) and Virtual Visits, Inc. (a company engaged in the design of Internet web sites for the promotion of golf products).

FINIS F. CONNER. Mr. Conner became a director of the Company in October 1996. From 1985 to February 1996, Mr. Conner was Chairman of the Board and Chief Executive Officer of Conner Peripherals, Inc. (a manufacturer of disk drives for personal computers founded by Mr. Conner in 1986) which, in February 1996, merged with Seagate Technology, Inc. ("Seagate") (a publicly traded manufacturer of computer components co-founded by Mr. Conner in 1979). Mr. Conner served as Vice-Chairman of Seagate from 1979 to 1985. Since February 1996, Mr. Conner has been a principal of the Conner Group, an independent consulting organization, and Chairman of the Board of Virtual Visits, Inc. Mr. Conner is also a director of Box Hill Systems Corp., a manufacturer of high performance data storage systems.

MARK R. MULVOY. Mr. Mulvoy became a director of the Company in April 1998. Mr. Mulvoy is a retired executive of Sports Illustrated magazine, where he was employed from 1965 to 1998. Mr. Mulvoy was Managing Editor of Sports Illustrated from 1984 through 1996 and Publisher from 1990 to 1992.

Mr. Mulvoy has written 12 books including "GOLF - THE PASSION AND THE CHALLENGE." He is also a director of Tosco Corporation (the largest independent refiner and marketer of petroleum products in the U.S.).

STEPHEN R. PATCHIN. Mr. Patchin became a director in October 1993. He has been President and Chief Executive Officer of Royal Oil and Gas Corp., an oil and gas exploration and production company and wholly owned subsidiary of Royal, since June 1985 and President and Chief Executive Officer of Royal since February 1990.

Executive officers of the Company are elected by and serve at the discretion of the Board of Directors.

## KEY MANAGEMENT EMPLOYEES

The following table sets forth certain information with respect to certain additional key management employees of the Company.

| NAME | AGE | POSITION(S) HELD |
| --- | --- | --- |
| Walter G. DeVault | 47 | Director of Customer Service and Consumer Sales |
| Cindy A. Herington | 36 | Director of Advertising and Direct Response Marketing |
| Christopher K. Beebe IV | 41 | Director of International Sales |

Certain additional information concerning these individuals is set forth below.

WALTER G. DEVAULT. Mr. DeVault joined the Company as Director of Customer Service and Consumer Sales in February 1998. He has worked in the home security industry for the last eight years. Mr. DeVault served as Director of Sales for X-Truder, Inc. (a home security company) from February 1992 to July 1994 and as National Sales Director for Brink's Home Security, Inc. from August 1994 to February 1998. Mr. DeVault has over 25 years of sales and sales management experience.

CINDY A. HERINGTON. Ms. Herington joined the Company as Director of Special Projects in May 1997. Ms. Herington became Director of Advertising and Direct Response Marketing in April 1998. Prior to joining the Company, Ms. Herington had been employed from August 1987 to May 1997 by The Neiman Marcus Group, Inc. in a variety of sales management positions. Ms. Herington is the daughter of Mr. Adams, the Company's Chairman of the Board, Chief Executive Officer and President.

CHRISTOPHER K. BEEBE IV. Mr. Beebe joined the Company as Director of International Sales in March 1998. He has been involved with international sales for the past 10 years. From June 1989 through July 1994, Mr. Beebe held various international sales positions with Ram Golf Corporation (a golf equipment manufacturer), and from August 1994 through April 1997 he was Vice President--Asia/Pacific with Lynx Golf, Inc. (a golf equipment manufacturer).

## COMMITTEES OF THE BOARD OF DIRECTORS

The Board of Directors currently has two standing committees: the Compensation/Plan Committee and the Audit Committee. The Compensation/Plan Committee is responsible for the recommendation to the Board of Directors of annual salaries for senior management as well as the administration and grant of awards under the Company's Incentive Plan and the Company's Bonus Plan (the "Bonus Plan"). The Compensation/Plan Committee is comprised of Messrs. Casati, Mulvoy and Patchin.

The Audit Committee is responsible for meeting periodically with representatives of the Company's independent public accountants to review the general scope of audit coverage, including consideration of the Company's accounting practices and procedures and system of internal accounting controls, and to report to the Board of Directors with respect thereto. The Audit Committee also makes recommendations to the Board of Directors with respect to appointment of the Committee's independent auditors. The Audit Committee is comprised of Messrs. Brown and Conner.

## EXECUTIVE COMPENSATION

The following table sets forth all compensation received by the Company's Chief Executive Officer and the executive officers whose total annual salary and bonus exceeded $100,000 during the fiscal year ended December 31, 1997 (collectively, the "Named Executive Officers").

### SUMMARY COMPENSATION TABLE

| NAME AND PRINCIPAL POSITION | YEAR | ANNUAL COMPENSATION | | OTHER ANNUAL COMPENSATION | ALL OTHER COMPENSATION |
|---|---|---|---|---|---|
| | | SALARY | BONUS | | |
| B. H. Adams | | | | | |
| Chairman of the Board, Chief Executive Officer and President | 1997 | $ 162,940 | $ 10,015,000(1) | $ 2,541,688(2) | $ 4,185(3) |
| Richard H. Murtland | | | | | |
| Vice President-Research and Development, Secretary and Treasurer | 1997 | 72,548 | 40,000 | -- | -- |
| Mark D. Gonsalves | | | | | |
| Vice President--Sales and Marketing, Retail... | 1997 | 62,400 | 352,144(4) | -- | -- |

(1) Represents (a) $15,000 cash bonus and (b) value of 2,000,000 shares of Common Stock granted on December 31, 1997 having a fair market value, as determined by the Board of Directors, of $5.00 per share on the date of grant. See "Certain Transactions."

(2) Represents reimbursement of federal income taxes and Medicare tax liability associated with the grant of certain restricted shares of Common Stock. See "Certain Transactions."

(3) Comprised of premiums for a life insurance policy for which members of Mr. Adams' family are the beneficiaries.

(4) Represents bonus earned in 1997 pursuant to the terms of a sales commission agreement which expired by its terms on December 31, 1997.

### FISCAL YEAR-END OPTION VALUES

| NAME | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR-END(#) | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END($)(1) | |
|---|---|---|---|---|
| | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| B. H. Adams | 1,520,766 | 0 | $ 7,033,552 | -- |
| Richard H. Murtland | 222,214 | 0 | 1,027,739 | -- |
| Mark D. Gonsalves | 333,320 | 0 | 1,541,605 | -- |

(1) Calculated by determining the difference between the fair market value of the Common Stock underlying the options at December 31, 1997 ($5.00 per share), as determined by the Board of Directors, and the exercise price of such options. See "Certain Transactions." Each of the options referred to herein was exercised by the respective option holder during January 1998.

### BENEFIT PLANS

1998 STOCK INCENTIVE PLAN. In February 1998, the Company adopted the 1998 Stock Incentive Plan. The purpose of the Incentive Plan is to provide incentives and rewards for participating employees and consultants of the Company (i) to support the execution of the Company's business strategies and the achievement of its goals and (ii) to associate the interests of such persons with those of the Company's stockholders. In furtherance of this purpose, the Incentive Plan authorizes the granting of stock options, including incentive stock options (within the meaning of Section 422 of the Internal Revenue Code of

1986, as amended) (the "Code"), stock appreciation rights, restricted and performance shares, restricted and performance share units, performance stock awards, dividend or equivalent rights, or other awards that are valued in whole or in part by reference to, or otherwise based on, the Common Stock of the Company (each, an "Award"). A total of 1,800,000 shares of Common Stock have been reserved for issuance upon the exercise of Awards granted under the Incentive Plan, subject to adjustment in accordance with the terms of the Incentive Plan.

Upon consummation of the Offering, the Incentive Plan will be administered by the Compensation/ Plan Committee comprised of Messrs. Casati, Mulvoy and Patchin. The Compensation/Plan Committee has discretion to select the persons to whom Awards will be granted (each, a "Participant"), to determine the type, size and terms and conditions applicable to each Award and the authority to interpret, construe and implement the provisions of the Incentive Plan. Each Award under the Incentive Plan shall be evidenced by an Award Agreement.

Under the Incentive Plan, the Company may grant, in addition to other Awards, incentive or nonqualified stock options. The exercise price of any option granted under the Incentive Plan must be at least equal to the fair market value of the Common Stock on the date of the grant, and in the case of a grant of an incentive stock option to any Participant who owns stock representing more than 10% of the Common Stock, the exercise price shall at least equal 110% of the fair market value of the shares at the time the incentive stock option is granted. In addition, no incentive stock option is exercisable more than 10 years from the date of grant (5 years if such option is granted to a Participant who owns in excess of 10% of the Common Stock) and the aggregate fair market value, determined on the date of grant, of the Common Stock as to which such incentive stock options are exercisable for the first time by any Participant in the Incentive Plan shall be limited to $100,000 per calendar year. The Incentive Plan also permits the grant of stock appreciation rights (rights to receive the excess of the fair market value of a share of Common Stock on the date the Award is exercised over the fair market value of a share of Common Stock on the date of grant for such period as the Compensation/Plan Committee may determine); restricted and performance shares (a transfer of shares of Common Stock to a Participant, subject to such restrictions on transfer or other incidents of ownership, or subject to specified performance standards as the Compensation/Plan Committee may determine); restricted or performance share units (fixed or variable share or dollar-denominated units subject to conditions of vesting, performance and time of payment as the Compensation/Plan Committee may determine, which may be paid in shares of Common Stock, cash or a combination of both); dividend or equivalent rights (rights to receive dividends or their equivalent in value in shares of Common Stock, cash or in a combination of both with respect to any new or previously existing Award); performance stock awards (rights to receive restricted shares that will not be issued until after the end of the applicable performance period, subject to the satisfaction of specified performance goals); and other Common Stock-based Awards, in each case, as set forth in the Incentive Plan.

At May 31, 1998, the Company had granted Awards under the Incentive Plan consisting of (i) options to purchase an aggregate of 382,000 shares of Common Stock, none of which were exercisable at such date and (ii) 900,000 shares of restricted Common Stock. It is anticipated that all of the Company's employees will be considered for participation in the Incentive Plan.

If a Participant terminates his or her service for reasons other than retirement, permanent and total disability or death, the Participant may exercise, no later than the date of termination, only those stock options vested as of the date of termination. Upon retirement, a Participant's options immediately vest and such Participant may exercise nonqualified stock options within one year of retirement and incentive stock options within three months of such retirement. In order to retire under the Incentive Plan, a Participant must have attained the age of 62 and have had 10 years of continuous employment with the Company. In the case of termination as a result of permanent and total disability, a Participant's options will immediately vest and such Participant will have one year from termination to exercise any outstanding options. If a Participant who was granted stock options dies while employed by the Company, or during the period which options may be exercised following termination of employment due to retirement or permanent and

37