# A.1

# PART 2 of 2

total disability, all stock options granted under the Incentive Plan immediately vest and must be exercised by the Participant's estate no later than the termination date of such option. Except to the extent permitted by the Code and the rules and regulations promulgated under Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (i) no Award under the Incentive Plan is assignable or transferable except by will, by the laws of descent and distribution or pursuant to a qualified domestic relations order and (ii) during the lifetime of a Participant, the Award will be exercisable only by such Participant or such Participant's guardian, legal representative or assignee pursuant to a qualified domestic relations order.

The Incentive Plan provides that, in the event of a "change of control" (as defined below), the following may, in the sole discretion of the Compensation/Plan Committee, occur with respect to any and all Awards outstanding as of such change of control:

(i) automatic maximization of performance standards, lapse of all restrictions and acceleration of any time periods relating to the exercise, realization or vesting of such Awards so that such Awards may be immediately exercised, realized or vested in full on or before the relevant date fixed in the applicable Award Agreement;

(ii) performance shares or performance units shall be paid entirely in cash;

(iii) upon the exercise of a stock option during the 60-day period from and after the date of the change of control, the Participant exercising the option may in lieu of the receipt of Common Stock upon exercise, elect by written notice to the Company to receive an amount in cash equal to the excess of the aggregate Value (as hereinafter defined) of the shares of Common Stock covered by the option or portion thereof surrendered, determined on the date the option is exercised, over the aggregate exercise price of the option (the "Aggregate Spread"). However, if the end of such 60 day period is within six months of the date of grant of the option held by a Participant subject to the reporting requirements of Section 16 of the Exchange Act, such option shall be canceled in exchange for a cash payment to the participant equal to the Aggregate Spread on the day which is six months and one day after the date of grant of such option. "Value," as more fully defined in the Incentive Plan, means the higher of (i) the highest fair market value during the 60-day period after the date of a change of control and (ii) if the change of control is the result of a transaction described in paragraphs (i) or (iii) under the definition of a change of control, the highest price per share of the Common Stock paid in such transaction.

(iv) if a Participant's employment or engagement terminates for any reason other than retirement or death following a change of control, any options held by such Participant may be exercised by such Participant until the earlier of three months after the termination of employment or engagement or the expiration date of such options; and

(v) all Awards become non-cancellable.

For purposes of the Incentive Plan, "change of control" is defined, in general, to mean the occurrence of any of the following events: (i) the acquisition, other than from the Company, by an individual, entity or group (other than Royal or B. H. Adams) of beneficial ownership of thirty percent (30%) or more of either the then outstanding shares of Common Stock or the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in election of directors, (ii) the ceasing, for any reason, of individuals who, as of January 1, 1998, constitute the Board of Directors to constitute at least a majority of the Board, provided that any individual becoming a director subsequent to such date whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the incumbent Board shall be considered as though such individual were a member of the incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the directors of the Company; (iii) approval by the stockholders of the Company of a

38

reorganization, merger or consolidation of the Company, in each case, whereby the individuals who were the respective beneficial owners of the Common Stock and voting securities of the Company immediately prior to such reorganization, merger or consolidation do not, following such reorganization, merger or consolidation, beneficially own, directly or indirectly, more than sixty percent (60%) of the then outstanding shares of Common Stock and the combined voting power of the then outstanding voting securities entitled to vote generally in election of directors, as the case may be, of the corporation resulting from such reorganization, merger or consolidation, or complete liquidation or dissolution of the Company or the sale or other disposition of all or substantially all of the assets of the Company. The Incentive Plan terminates on February 25, 2008.

1996 STOCK OPTION PLAN. In April 1996, the Company adopted a stock option plan (the "1996 Plan") providing for the issuance to certain officers, directors, employees and advisors of the Company of incentive stock options within the meaning of Section 422 of the Code and stock options that are nonqualified for federal income tax purposes. A total of 800,000 shares of Common Stock have been reserved for issuance upon the exercise of options granted under the 1996 Plan, subject to adjustment in accordance with such plan. At May 31, 1998, options to purchase an aggregate of 659,694 shares of Common Stock had been granted under the 1996 Plan, of which 618,030 had been exercised. All such stock options were granted at an exercise price that was, at the time of grant, equal to the fair market value of a share of Common Stock, as determined by the Board of Directors. The Company currently does not anticipate making additional grants under the 1996 Plan.

401(K) PLAN. In February 1998, the Company adopted its 401(k) Retirement Plan (the "Retirement Plan"). Generally, all employees who are 18 years of age and who have completed a three-month consecutive period of service are eligible for participation in the Retirement Plan.

The Retirement Plan is a defined contribution plan intended to qualify under
Section 401 of the Code, such that participants generally may elect to contribute to the Retirement Plan, on a pretax basis, up to 15% of their compensation per pay period in the form of voluntary payroll deductions (for which the statutorily prescribed annual limit in 1998 is $10,000 per participant) ("Voluntary Contributions"). The Company makes matching contributions equal to 50% of the first 6% of a participant's compensation contributed to the Retirement Plan during such pay period ("Mandatory Matching Contributions"). From time to time, the Company may make additional discretionary contributions to the Retirement Plan ("Discretionary Contributions," and together with Mandatory Matching Contributions, "Company Contributions").

Participants who were employed by the Company at May 1, 1998 are immediately vested in all Company Contributions. Participants who were not employed by the Company on May 1, 1998 are gradually vested in all Company Contributions over a period of three years of credited service, vesting 33 1/3% a year for each full year of service beginning with the participant's first anniversary, and becoming fully vested after three years of service or upon death, total and permanent disability, retirement under the Retirement Plan or Retirement Plan termination. Participants are always fully vested in their Voluntary Contributions.

COMPANY BONUS PLAN. In February 1998, the Company adopted the Bonus Plan to become effective for the fiscal quarter commencing January 1, 1998. The Bonus Plan is administered by the Compensation/ Plan Committee. Participation is based upon individual selection by the Compensation/Plan Committee from among key employees who, in the judgment of the Compensation/Plan Committee, make significant contributions to the performance of the Company and whose decisions and actions most significantly affect the growth, profitability and efficient operations of the Company. It is anticipated that approximately 22 individuals will initially participate in the Bonus Plan. The aggregate amount of any awards paid with respect to calendar year 1998 to any participant under the Bonus Plan shall not exceed 8% of the Company's net pre-tax operating profits.

Awards are based upon the extent to which the Company's financial performance (measured in terms of financial goals or objectives as may be determined by the Compensation/Plan Committee) during the appropriate measurement period for each award (e.g., the calendar year, calendar quarter, etc.) has met or exceeded certain performance goals specified by the Compensation/Plan Committee. Some performance goals applicable to participants in the Bonus Plan may include elements which specify individual achievement objectives directly related to such individual's area of responsibility. The Compensation/Plan Committee may, in its discretion, decrease, but not increase, the amount of any award granted under the Bonus Plan. Additionally, the Compensation/Plan Committee may alternatively grant discretionary bonuses.

Because the performance goals under the Bonus Plan are determined by the Compensation/Plan Committee in its discretion, it is not possible to determine the benefits and amounts that will be received by any individual participant or group of participants in the future. The Board of Directors may terminate, modify or suspend the Bonus Plan, in whole or in part, at any time; provided that no such termination or modification may impair any rights which may have accrued under such Bonus Plan.

## COMPENSATION OF DIRECTORS

Prior to the Offering, directors did not receive compensation to serve as directors of the Company but did receive reimbursement for expenses traveling to and from meetings of the Board of Directors. The Company intends to continue to reimburse directors for their reasonable expenses associated with attending meetings. The Company is also considering the adoption of a Director Plan to further incentivize the directors and align their interests with those of the stockholders.

## LIMITATION OF LIABILITY AND INDEMNIFICATION MATTERS

The Company's Certificate of Incorporation limits the liability of directors to the maximum extent permitted by Delaware law. Delaware provides that a corporation's certificate of incorporation may contain a provision eliminating or limiting the personal liability of directors for monetary damages for breach of their fiduciary duties as directors, except for liability (i) for any breach of their duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) for unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the DGCL or (iv) for any transaction from which a director derives an improper personal benefit.

The Company's Certificate of Incorporation and Bylaws provide that the Company will indemnify, to the fullest extent permitted by applicable law as from time to time may be in effect, any person against all liability and expense (including attorneys' fees and settlement costs) incurred by reason of the fact that he is or was a director or officer of the Company. Expenses (including reasonable attorneys' fees) incurred in defending any proceeding or prosecution will be paid by the Company in advance of the final disposition of such proceeding or suit upon receipt of a written affirmation by the director or officer of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification and a written undertaking by such person to repay such amount if it is ultimately determined that he or she is not entitled to indemnification. The Company may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, or agent of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against any liability asserted against and incurred by such person in any such capacity or arising out of such person's position, whether or not the Company would have the power to indemnify against such liability under the provisions of the Certificate of Incorporation or Bylaws of the Company.

40

The indemnification provided by the Certificate of Incorporation is not deemed to be exclusive of any other rights to which those indemnified may be entitled under any Bylaw, agreement or vote of stockholders or disinterested directors, or otherwise, and inures to the benefit of their heirs, executors and administrators. Further, such indemnification shall continue as to a person who has ceased to be a director or officer. The provisions of the Bylaws specifically permit the Company to indemnify other persons from similar or other expenses and liabilities as the Board of Directors may determine. Insofar as indemnification for liabilities under the Securities Act may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, the Company has been informed that, in the opinion of the Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

The Company is not aware of any pending litigation or proceeding involving any director, officer, employee or agent of the Company where indemnification will be required or permitted, nor any threatened litigation or proceeding that might result in a claim for such indemnification.

The foregoing description of certain provisions of the Company's Certificate of Incorporation and Bylaws is qualified in its entirety by the actual Certificate of Incorporation and Bylaws filed as exhibits to the Registration Statement of which this Prospectus is a part.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

Prior to April 29, 1998, the Company did not have a Compensation Committee or other committee of the Board of Directors performing similar functions. Decisions concerning compensation of executive officers have generally been made by Mr. Adams in consultation with the other members of the Board of Directors. None of the executive officers of the Company currently serves on the Compensation Committee of another entity or on any other committee of the Board of Directors of another entity performing similar functions.

41

## CERTAIN TRANSACTIONS

In September 1995, the Company effected a reorganization (the "Reorganization") pursuant to which it (i) distributed to its stockholders the shares of common stock of Supershafts, Inc., a Texas corporation ("Supershafts"), held by the Company and constituting a minority interest in Supershafts, (ii) issued four shares of Common Stock in exchange for each share of Supershafts common stock then outstanding and (iii) reclassified, on a 1 for 1 basis, all of the outstanding Series A Preferred Stock and Series B Preferred Stock of the Company as Common Stock. As a result of the Reorganization, the Company issued an aggregate of 5,827,406 shares of Common Stock, Supershafts became a wholly-owned subsidiary of the Company and the Common Stock became the only class of capital stock of the Company outstanding. Mr. Adams and Royal Holding Company, Inc. received 820,000 and 3,706,382 shares of Common Stock, respectively, in the Reorganization.

In 1996 and 1997, the Company borrowed an aggregate of $450,000 from Royal of which $250,000 was advanced in 1997, to finance the production of the Company's infomercial. Such advances bore interest at the prime rate. In September 1997, the Company paid accrued interest of $29,233 on this debt and issued 900,000 shares of Common Stock (at a rate of $.50 of principal indebtedness per share) to Royal in cancellation of the principal amount.

In December 1997, the Board of Directors of the Company granted to Mr. Adams, the Company's Chairman of the Board, Chief Executive Officer and President, 2,000,000 shares of Common Stock. The Board of Directors also provided Mr. Adams with a cash payment of $2,541,688, an amount equal to the federal income tax and Medicare tax liability associated with such grant and bonus. In the first quarter of 1998, Mr. Adams loaned $1.1 million of such funds back to the Company pursuant to an unsecured promissory note at an interest rate of 5.39% per annum. The Company repaid $600,142 of the note on April 14, 1998 and the remaining principal amount of the note ($534,899) is payable in installments of $312,500 and $222,399 on December 15, 1998 and April 14, 1999, respectively. In determining that the stock grant and bonus to Mr. Adams were appropriate and in the best interests of the Company and its stockholders, the Board of Directors considered, among other factors, the Company's revenue and operating income growth and improved competitive position under Mr. Adams' leadership, Mr. Adams' historical cash compensation and the Board of Directors' desire to increase Mr. Adams' equity interest in the Company to a level commensurate with his contributions to and role with the Company. The Board of Directors determined that the value of Mr. Adams' services to the Company exceeded the fair market value of the stock ($10,000,000) and bonus. The Company does not consider these payments to be indicative of future levels of compensation to Mr. Adams or other executives of the Company.

The agreement between the Company and Nick Faldo (the "Faldo Agreement") became effective May 1, 1998 and provides that Mr. Faldo will exclusively endorse the Company's clubs and undertake certain other promotional activities on behalf of the Company. Pursuant to the Faldo Agreement, the Company and Mr. Faldo will design a line of clubs to be used by Mr. Faldo in tournaments and other events, provided such clubs are suitable for Mr. Faldo's use. Under the Faldo Agreement, the Company has licensed the worldwide rights to the Nick Faldo trademark for use in connection with the distribution of its golf clubs, head covers, golf bags, travel covers, golf towels and umbrellas which it designs or manufactures.

As compensation for the licensing and endorsement arrangement set forth in the Faldo Agreement, the Company has granted 900,000 shares of Common Stock to Mr. Faldo. Subject to certain exceptions including transfers to Mr. Faldo's agent, Mr. Faldo may not transfer, dispose of or otherwise assign any rights in more than 100,000 shares of Common Stock in any calendar year prior to 2002. In addition, Mr. Faldo is entitled to receive a royalty of 5% of the net sales price of all Adams golf clubs (other than certain specialty items for which the royalty equals 10% of the net sales price) sold outside the U.S. throughout the term of the Faldo Agreement. The Faldo Agreement provides for a minimum royalty of $1.5 million in 1999 escalating to $4.0 million for years 2004 through 2008. From 2009 through 2014, the minimum royalty is $1.5 million, as adjusted for changes in the consumer price index. After 2014, the Faldo

42

Agreement does not provide for a minimum royalty. Commencing with 2009, however, the Faldo Agreement provides for a maximum royalty of $4.0 million, as adjusted for changes in the consumer price index. In the event Mr. Faldo does not compete in a minimum number of worldwide golf events each year, such royalty payments shall be reduced on a pro-rata basis, unless such events are missed as a result of illness or injury. The Company has also agreed that through the year 2008, it will support the "Faldo Junior Series" in the United Kingdom by making an annual contribution to the sponsoring organization of not less than $45,000 for each year the tournament is played under that name. The Faldo Agreement further provides that, so long as royalties remain payable thereunder, the Company will use commercially reasonable efforts to cause a designee of Mr. Faldo to be nominated for, and elected to, the Board of Directors of the Company. As of the date of this Prospectus, Mr. Faldo has not notified the Company of his designation to the Board.

The Faldo Agreement extends through Mr. Faldo's lifetime; however, the Company has the right to terminate the Faldo Agreement earlier if Mr. Faldo (a) is unable to perform the duties required by the Faldo Agreement for a period of 12 consecutive months, (b) retires or becomes officially ineligible to compete on the PGA and/or Senior PGA tour, or (c) has engaged in illegal or immoral conduct resulting in a felony conviction, or has otherwise conducted himself in a manner not in keeping with the standards of professional conduct set forth in the Faldo Agreement. In the event of the death of Mr. Faldo prior to May 1, 2030, the Company may, at its option, continue the terms of the Faldo Agreement until May 1, 2030, in which case, Mr. Faldo's heirs or estate shall be entitled to any royalties due.

KPMG, a public accounting firm in which Mr. Hatfield was a partner until April 30, 1998, has provided accounting and auditing services to the Company during 1997 and 1998. The amounts paid to KPMG for services rendered during 1997 and 1998 were $112,887 and $403,520, respectively. Mr. Hatfield is currently Senior Vice President--Finance and Administration and Chief Financial Officer of the Company. The Company has an agreement with Mr. Hatfield providing that, upon Mr. Hatfield's termination without cause following certain change of control events, Mr. Hatfield's stock options will become fully vested and Mr. Hatfield will be paid an amount equal to one year of his base salary.

From January 1, 1998 through May 31, 1998, the Company paid Virtual Visits, Inc. ("Virtual Visits"), a company engaged in the design of Internet Web sites for the promotion of golf products, approximately $60,000. The Company expects to pay at least an additional $10,000 to Virtual Visits during 1998. Mr. Conner and Mr. Casati, directors of the Company, are also directors and significant stockholders of Virtual Visits.

In January 1998, the Company made loans of $83,330 and $125,000 to Mr. Murtland and Mr. Gonsalves, respectively, to finance the aggregate exercise price of stock options then exercised by such individuals. The loans bore interest at the rate of 5% per annum and were due January 14, 2001. The loan to Mr. Murtland was repaid in April 1998. Messrs. Murtland and Gonsalves are each executive officers of the Company.

The Company has granted options to purchase the Company's Common Stock to certain of its officers and directors. See "Management--Benefit Plans" and "Principal and Selling Stockholders."

The Company believes that all of the transactions set forth above were made on terms no less favorable to the Company than could have been obtained from unaffiliated third parties. All future transactions between the Company and its officers, directors, principal stockholders and their affiliates will be approved by a majority of the Board of Directors, including a majority of the independent and disinterested outside directors.

43

## PRINCIPAL AND SELLING STOCKHOLDERS

The following table and the notes thereto set forth certain information regarding the beneficial ownership of the Common Stock as of May 31, 1998, by  (i) each person known by the Company to own beneficially more than 5% of the outstanding shares of the Common Stock, (ii) each director of the Company, (iii) each Named Executive Officer, (iv) all directors and executive officers of the Company as a group, and (v) each Selling Stockholder. Unless otherwise noted in the notes to the table, the Company believes the executive officers and directors can be contacted at the principal offices of the Company.

| NAME OF BENEFICIAL OWNERS | BENEFICIAL OWNERSHIP OF COMMON STOCK PRIOR TO THE OFFERING(1) | | NUMBER OF SHARES OF COMMON STOCK TO BE SOLD(2) | BENEFICIAL OWNERSHIP OF COMMON STOCK AFTER THE OFFERING(1)(2) | |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | NUMBER | PERCENT |
| DIRECTORS AND NAMED EXECUTIVE OFFICERS | | | | | |
| B. H. Adams.................................. | 4,482,321 | 23.5% | 928,000 | 3,554,321 | 15.4% |
| Richard H. Murtland.......................... | 333,952 | 1.7 | 66,750 | 267,202 | 1.2 |
| Mark D. Gonsalves............................ | 333,320 | 1.7 | 0 | 333,320 | 1.4 |
| Paul F. Brown, Jr.(3)(4)..................... | 7,405,438 | 38.8 | 454,745(5) | 6,950,693 | 30.1 |
| Roland B. Casati............................. | 1,838,600 | 9.6 | 0 | 1,838,600 | 8.0 |
| Finis F. Conner.............................. | 1,942,776 | 10.2 | 388,555 | 1,554,221 | 6.7 |
| Mark R. Mulvoy............................... | 0 | 0.0 | 0 | 0 | 0.0 |
| Stephen R. Patchin(3)(4)..................... | 7,405,438 | 38.8 | 454,745(5) | 6,950,693 | 30.1 |
| ALL EXECUTIVE OFFICERS AND DIRECTORS AS A GROUP (11 PERSONS)(4)(6)............................ | 16,381,407 | 85.6 | 1,838,050 | 14,543,537 | 62.8 |
| BENEFICIAL OWNERS OF 5% OR MORE OF THE COMPANY'S COMMON STOCK | | | | | |
| Royal Holding Company, Inc.(3)(4)............. | 7,405,438 | 38.8 | 454,745 | 6,950,693 | 30.1 |
| OTHER SELLING STOCKHOLDERS | | | | | |
| Lincoln Trust Company Custodian f/b/o Richard Urdahl............... | 116,592 | * | 77,000 | 39,592 | * |
| Richard Urdahl(7)............................ | 119,392 | * | 79,800(8) | 39,592 | * |
| Faris McMullin............................... | 111,738 | * | 73,750 | 37,988 | * |
| Peter Cassady................................ | 8,400 | * | 8,400 | 0 | 0.0 |

* Less than one percent.

(1) Applicable percentage of ownership is based on 19,099,282 shares of Common Stock outstanding on May 31, 1998, and 23,099,282 shares of Common Stock to be outstanding upon completion of the Offering. Common Stock is the only class of equity securities outstanding. Beneficial ownership is determined in accordance with the rules of the Commission and generally includes voting or investment power with respect to securities. Shares of Common Stock subject to options that are presently exercisable or exercisable within 60 days of May 31, 1998 are deemed to be beneficially owned by the person holding such options for the purpose of computing the beneficial ownership of such person, but are not treated as outstanding for the purpose of computing the beneficial ownership of any other person.

(2) Does not give effect to the exercise of the Underwriters' over-allotment option or to purchases in the Offering, if any. If the Underwriters over-allotment option is exercised in full, Messrs. Adams, Murtland, Gonsalves, Conner, Urdahl, McMullin and Cassady would beneficially own 3,362,321 (14.6%), 250,464 (1.1%), 303,320 (1.3%), 1,554,221 (6.7%), 30,000 (less than 1%) (representing 30,000 shares held of record by Lincoln Trust Company as custodian for Mr. Urdahl), -0- and -0- shares of Common Stock, respectively, and Royal Holding Company, Inc. and Lincoln Trust Company would own 6,374,511 (27.6%) and 30,000 (less than 1%) shares, respectively, after the Offering. See "Underwriting."

(3) The address for Messrs. Patchin and Brown and for Royal is c/o Royal Holding Company, Inc., 300 Delaware Avenue, Suite 306, Wilmington, Delaware 19801.

(4) Includes 7,405,438 shares of Common Stock owned directly by Royal. Messrs. Patchin and Brown, directors of the Company, are the (i) Chief Executive Officer and President and (ii) Chief Financial Officer and Vice President-- Finance, respectively, of Royal and, by virtue of their positions with Royal, may be deemed to share the power to vote or direct the vote of, and to share the power to dispose or direct the disposition of, these shares of Common Stock. Each of Messrs. Patchin and Brown disclaim beneficial ownership of the shares of Common Stock held by Royal.

(5) Represents shares sold for the account of Royal Holding Company, Inc.

(6) Includes 45,000 shares of Common Stock subject to options exercisable by Darl P. Hatfield, an executive officer of the Company, within 60 days of May 31, 1998.

(7) Includes 116,592 shares of Common Stock held of record by Lincoln Trust Company as custodian for Mr. Urdahl and 2,800 shares of Common Stock held of record by Mr. Urdahl.

(8) Represents 77,000 shares sold for the account of Lincoln Trust Company as custodian for Mr. Urdahl and 2,800 shares sold for the account of Mr. Urdahl.

44

## DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company consists of 50,000,000 shares of Common Stock, $.001 par value per share, and 5,000,000 shares of Preferred Stock, $.01 par value per share (the "Preferred Stock"). The following description of certain characteristics of the capital stock of the Company does not purport to be complete and is subject to, and qualified in its entirety by, the provisions of the Certificate of Incorporation, Bylaws and the Registration Rights Agreement, as defined below, each of which is included as an exhibit to the Registration Statement of which this Prospectus is a part, and by the provisions of applicable law.

### COMMON STOCK

As of May 31, 1998, there were 19,099,282 shares of Common Stock outstanding held of record by 101 stockholders. The holders of Common Stock are entitled to share pro rata in dividends and distributions, if any, with respect to the Common Stock when, as and if declared by the Board of Directors, from funds legally available therefor. See "Dividend Policy". Holders of Common Stock are entitled to one vote per share, are not entitled to cumulative voting in the election of directors and have no preemptive, subscription, redemption or conversion rights. Upon the liquidation, dissolution or winding up of the Company, the assets of the Company remaining after payment of or provision for liabilities and payment to the holders of Preferred Stock of such preferential amounts that they are entitled to receive will be distributed pro rata on a share-for-share basis among the holders of Common Stock. All outstanding shares of Common Stock are, and the shares to be issued and sold in the Offering will be, duly authorized, validly issued, fully paid and non-assessable. The rights, preferences and privileges of holders of Common Stock are subject to any series of Preferred Stock that the Company may issue in the future.

The Company effected a two-for-one stock split on May 1, 1998 in contemplation of this Offering. The Company had 9,549,641 shares of Common Stock issued and outstanding immediately prior to the stock split.

### PREFERRED STOCK

The Company's Board of Directors is authorized, without further action by the stockholders, to divide the Preferred Stock into series and, with respect to each series, to determine the preferences and rights, and the qualifications, limitations or restrictions thereof, including the dividend rights, conversion rights, voting rights, redemption rights and terms, liquidation preferences, sinking fund provisions, the number of shares constituting the series and the designation of such series. The Board of Directors could, without stockholder approval, issue Preferred Stock with voting and other rights that could adversely affect the voting power of the holders of Common Stock and could have certain anti-takeover effects. The Company has no present plans to issue any shares of Preferred Stock.

The authority possessed by the Board of Directors to issue Preferred Stock could potentially be used to discourage attempts by others to obtain control of the Company through merger, tender offer, proxy contest or otherwise by making such attempts more costly or difficult to achieve.

### REGISTRATION RIGHTS

Pursuant to the terms of that Registration Rights Agreement dated April 30, 1998 (the "Registration Rights Agreement") by and among the Company and certain stockholders of the Company holding an aggregate of 17,797,087 shares of Common Stock as of May 31, 1998, the Company has granted certain registration rights to such stockholders. Specifically, under the terms of the Registration Rights Agreement, the stockholders holding in excess of 40% of the Common Stock covered by such agreement have a right commencing at any time not earlier than the latter of (i) the expiration of any of the "lock-up" period prescribed by the Lock-up Agreement and (ii) the date on which the Company shall become eligible to use the Form S-3 Registration Statement (or any successor to such form) for the purpose of registering outstanding securities for the account of any person other than the Company, to demand that the shares of the Common Stock held by them be registered under the Securities Act. However, if the Board of Directors determines, in its good faith, that such registration would be detrimental to the Company and, as a result, that it is necessary to defer the filing of such registration statement at such time, the Company may defer such registration for a period not to exceed 180 days. The Company has agreed to pay all costs and expenses necessary to effect the registration of the shares of Common Stock to be sold by the stockholders in this first registration statement (other than underwriting and brokerage commissions, if

any, and legal fees incurred by the selling holders). If, after the Company has effected the first such registration statement, it shall receive a request for registration from the stockholders holding a majority of the shares of Common Stock subject to the Registration Rights Agreement not previously registered, the Company shall file a second or third registration statement for the purpose of registering such shares under the Securities Act; however, the Company and such stockholders have agreed to defer the filing of such registration statements in the same manner and on the same basis as the first registration. The stockholders having shares registered in such subsequent registration statements have agreed to pay all costs and expenses related thereto including the Company's fees and expenses relating to counsel, accountants and filing under the Securities Act.

The Registration Rights Agreement also grants certain piggy-back registration rights to the stockholders. Accordingly, whenever the Company proposes to register any shares of Common Stock under the Securities Act (other than registrations on Form S-4 or S-8), certain of the stockholders have the right to include the shares of Common Stock held by them in any such registration. However, if the managing underwriter of such registration advises the Company in writing that, in its opinion, the total number or dollar amounts of securities requested to be included in such registration exceeds the number or dollar amount of shares of Common Stock that can be sold in such offering, the Company may exclude certain shares from the offering. In such a case, the order of priority in which shares are to be included in the proposed offering will be as follows: first, all shares of Common Stock that the Company proposes to sell; and second, up to the full number or dollar amount of shares of Common Stock requested by the stockholders to be included in such registration in excess of the number or dollar amount of shares of the Common Stock the Company proposes to sell which, in the opinion of such underwriter, can be sold, allocated pro rata among the participating stockholders on the basis of the number of shares of Common Stock requested to be included therein by each. The Company generally is obligated to bear the expenses, other than underwriting discounts and sales commissions, of the registration of such shares. Any exercise by the holders of such incidental registration rights may hinder efforts by the Company to arrange future financings and may have an adverse impact on the market price of the Common Stock.

## DELAWARE LAW AND CERTAIN CHARTER AND BYLAW PROVISIONS

Following the consummation of the Offering, the Company will be subject to Section 203 of the DGCL, the "business combinations" statute. In general, such statute prohibits a publicly held Delaware corporation from engaging in various "business combinations" with any "interested stockholder" for a period of three years after the time that such stockholder became an "interested stockholder," unless (i) the business combination or the transaction by which such stockholder became an "interested stockholder" was approved by the Board of Directors prior to such time, (ii) upon consummation of the transaction which resulted in the stockholder becoming an "interested stockholder," the "interested stockholder" owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced (excluding for purposes of determining the number of shares outstanding those shares owned by (a) persons who are directors and also officers and (b) certain employee stock ownership plans) or (iii) on or subsequent to such time the "business combination" is approved by the Board of Directors and authorized at an annual or special meeting of stockholders by the affirmative vote of at least 66 2/3% of the outstanding voting stock which is not owned by the "interested stockholder." A "business combination" includes mergers, asset sales and other transactions resulting in financial benefit to a stockholder. In general, an "interested stockholder" is a person who, together with affiliates and associates, owns (or within three years, did own) 15% or more of a corporation's outstanding voting stock. The statute could prohibit or delay mergers or other takeover or change in control attempts with respect to the Company and, accordingly, may discourage attempts to acquire the Company.

In addition, certain provisions of the Company's Certificate of Incorporation and Bylaws summarized in the following paragraphs may be deemed to have an anti-takeover effect and may delay, defer or prevent an attempt to obtain control of the Company by means of a proxy contest, tender offer, merger or other transaction that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares held by stockholders.

CLASSIFIED BOARD OF DIRECTORS. The Company's Certificate of Incorporation provides for the Board of Directors to be divided into three classes of directors serving staggered three-year terms. As a result, approximately one-third of the Board of Directors will be elected each year. Moreover, under the DGCL, in the case of a corporation having a classified board, stockholders may remove a director only for cause.

This provision, when coupled with the provision of the Bylaws authorizing the Board of Directors to fill vacant directorships, may preclude a stockholder from removing incumbent directors without cause and simultaneously gaining control of the Board of Directors by filling the vacancies created by such removal with its own nominees.

SPECIAL MEETING OF STOCKHOLDERS. The Company's Bylaws provide that special meetings of stockholders of the Company may be called only by the Board of Directors, or the Executive Committee of the Board of Directors, if any, or the President. This provision will make it more difficult for stockholders to take actions opposed by the Board of Directors.

STOCKHOLDER ACTION BY WRITTEN CONSENT. The Company's Certificate of Incorporation provides that no action required or permitted to be taken at any annual or special meeting of the stockholders of the Company may be taken without a meeting, and the power of stockholders of the Company's to consent in writing, without a meeting, for the taking of any action is specifically denied.

ADVANCE NOTICE REQUIREMENTS FOR STOCKHOLDER PROPOSALS AND DIRECTOR NOMINATIONS. The Bylaws provide that stockholders seeking to bring business before an annual meeting of stockholders, or to nominate candidates for election as directors at an annual or special meeting of stockholders, must provide timely notice thereof in writing. In order to be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Company no later than 90 days prior to the meeting; provided, however, that in the event that less than 100 days notice or prior public disclosure of the date of the meeting is given and made to stockholders, notice by the stockholder must be received no later than the close of business on the tenth day following the earlier of the day on which such notice of the date of the meeting was mailed or such public disclosure was made in order to be timely. The Bylaws specify certain requirements for a stockholder's notice to be in proper form. These provisions may preclude some stockholders from bringing matters before the stockholders at an annual or special meeting or from making nominations for directors at an annual or special meeting.

The Company believes the foregoing provisions are necessary to attract and retain qualified persons as directors and officers.

## MARKET INFORMATION

Prior to the Offering, there has been no established public trading market for the Common Stock. The Common Stock has been approved for listing on the Nasdaq National Market under the symbol "ADGO."

## TRANSFER AGENT AND REGISTRAR

The Company has appointed The Bank of New York as the transfer agent and registrar for the Common Stock.

47

## SHARES ELIGIBLE FOR FUTURE SALE

Upon the closing of the Offering, the Company will have 23,099,282 shares of Common Stock outstanding. Of these shares, the 4,000,000 shares sold by the Company and the 2,000,000 shares sold by the Selling Stockholders in the Offering will be freely tradeable without restriction or further registration under the Securities Act unless held by an "affiliate" of the Company (as that term is defined below). Any such affiliate will be subject to the resale limitations of Rule 144 adopted under the Securities Act. The remaining 17,099,282 shares of Common Stock currently outstanding are "restricted securities" for purposes of Rule 144 ("Restricted Shares"). Restricted Shares may be sold in the public market only if registered or if they qualify for an exemption from registration under Rule 144 or Rule 701 promulgated under the Securities Act. As a result of contractual restrictions and the provisions of Rule 144 and Rule 701, additional shares will be available for sale in the public market as follows: (i) no Restricted Shares will be eligible for immediate sale on the date of this Prospectus; (ii) no additional Restricted Shares will be eligible for sale 90 days after the date of this Prospectus; and (iii) an additional 16,184,282 Restricted Shares will be eligible for sale upon expiration of the Lock-up Agreements, 180 days after the date of this Prospectus.

After the expiration of the Lock-up Agreements, the Company may file a Registration Statement on Form S-8 under the Securities Act to register the shares of Common Stock reserved for issuance to its employees, officers, directors and consultants under its employee benefit plans. Upon the effective date of such Registration Statement, shares of Common Stock issued upon exercise of options granted under the plans generally will be available for sale in the open market. As of the date of this Prospectus, the Company has granted outstanding options to purchase up to 423,666 shares of Common Stock to certain employees, officers, directors and consultants under the 1996 Plan and the Incentive Plan, none of which were then exercisable. In addition, Mr. Faldo has been granted 900,000 shares of Common Stock pursuant to the terms of the Incentive Plan, however, subject to certain exceptions including transfers to Mr. Faldo's agent, he may not transfer, dispose of or otherwise assign any rights in any more than 100,000 shares of Common Stock in any calendar year prior to 2002.

In general under Rule 144 as currently in effect, a person (or persons whose shares are aggregated), including a person who may be deemed to be an "affiliate" of the Company as that term is defined under the Securities Act, is entitled to sell within any three-month period a number of shares beneficially owned for at least one year that does not exceed the greater of (i) 1% of the then outstanding shares of Common Stock (approximately 230,993 shares immediately after the Offering) or (ii) the average weekly trading volume of the outstanding shares of Common Stock during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain requirements as to the manner of sale, notice and the availability of current public information about the Company. A person (or persons whose shares are aggregated) who is not an "affiliate" of the Company during the 90 days immediately preceding a proposed sale by such person and who has beneficially owned "restricted securities" for at least two years is entitled to sell such shares under Rule 144(k) without regard to the volume, manner of sale, public information or notice requirements. As defined in Rule 144, an "affiliate" of an issuer is a person that directly or indirectly controls, or is controlled by, or is under common control with such issuer. In general, under Rule 701 under the Securities Act as currently in effect, any employee, consultant or advisor of the Company who purchases shares from the Company in connection with a compensatory stock or option plan or other written agreement related to compensation is eligible to resell such shares 90 days after the effective date of the offering in reliance on Rule 144, but without compliance with certain restrictions contained in Rule 144.

Prior to this Offering, there has been no public market for the Common Stock of the Company and no predictions can be made of the effect, if any, that future sales of shares of Common Stock, and options to acquire shares of Common Stock, or the availability of shares for future sale, will have on the market price prevailing from time to time. Sales of substantial amounts of Common Stock in the public market, or the perception that such sales could occur, could adversely affect prevailing market prices of the Common Stock.

48

## UNDERWRITING

Subject to certain terms and conditions contained in the Underwriting Agreement, Lehman Brothers Inc., NationsBanc Montgomery Securities LLC and Ferris, Baker Watts, Incorporated (the "Underwriters") have severally agreed to purchase from the Company and the Selling Stockholders, and the Company and the Selling Stockholders have agreed to sell to each of the Underwriters, the number of shares of Common Stock set forth opposite their respective names below:

| UNDERWRITER | NUMBER OF SHARES |
|---|---|
| Lehman Brothers Inc. | 1,602,000 |
| NationsBanc Montgomery Securities LLC. | 1,601,000 |
| Ferris, Baker Watts, Incorporated | 1,601,000 |
| CIBC Oppenheimer Corp. | 104,000 |
| Donaldson, Lufkin & Jenrette Securities Corporation | 104,000 |
| A.G. Edwards & Sons, Inc. | 104,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 104,000 |
| Morgan Stanley & Co. Incorporated | 104,000 |
| PaineWebber Incorporated | 104,000 |
| Prudential Securities Incorporated | 104,000 |
| Wheat First Securities, Inc. | 104,000 |
| First Southwest Company | 52,000 |
| Hoak Breedlove Wesneski & Co. | 52,000 |
| Janney Montgomery Scott Inc. | 52,000 |
| Ragen MacKenzie Incorporated | 52,000 |
| Raymond James & Associates, Inc. | 52,000 |
| Sands Brothers & Co., Ltd. | 52,000 |
| J.E. Sheehan & Co., Inc. | 52,000 |
| Total | 6,000,000 |

The Underwriting Agreement provides that the obligations of the Underwriters thereunder are subject to various conditions. The nature of the Underwriters' obligations are such that they are committed to take and pay for all of the shares offered hereby if any are purchased.

The Company and the Selling Stockholders have been advised by the Underwriters that they propose to offer the shares of Common Stock to the public at the public offering price set forth on the cover page hereof and to certain selected dealers (who may include the Underwriters) at such price less a concession not in excess of $.65 per share. The Underwriters may allow, and such dealers may reallow, a concession not in excess of $.10 per share to certain other dealers. After the initial offering, the public offering price, the concession to selected dealers and the reallowance to other dealers may be changed by the Underwriters.

The Company and certain of the Selling Stockholders have granted to the Underwriters an option to purchase up to an additional 900,000 shares of Common Stock, at the public offering price less the underwriting discounts and commissions shown on the cover page of this Prospectus, solely to cover over-allotments, if any. Such option may be exercised at any time up to 30 days after the date of this Prospectus. To the extent that the Underwriters exercise such option, each of the Underwriters will be committed, subject to certain conditions, to purchase a number of additional shares that is proportional to such Underwriter's initial commitment.

The Company's directors, officers and certain stockholders of the Company including the Selling Stockholders have agreed that they will not, without the prior written consent of Lehman Brothers Inc., during the 180 days following the date of this Prospectus, directly or indirectly, (1) offer for sale, sell, pledge or otherwise dispose of (or enter into any transaction or device which is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any shares of Common Stock (including, without limitation, in the case of Selling Stockholders, shares of Common Stock that may

49

be deemed to be beneficially owned in accordance with the rules and regulations of the Securities and Exchange Commission and shares of Common Stock that may be issued upon exercise of any option or warrant) or securities convertible into or exchangeable for Common Stock (other than the shares of Common Stock to be sold in the Offering), or (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of such shares of Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise (other than, in the case of the Company, the grant of options pursuant to option plans existing on the date hereof).

Until the distribution of the shares of Common Stock is completed, rules of the Commission may limit the ability of the Underwriters and certain selling group members to bid for and purchase shares of Common Stock. As an exception to these rules, the Underwriters are permitted to engage in certain transactions that stabilize the price of the Common Stock. Such transactions may consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of the Common Stock.

In addition, if the Underwriters over-allot (I.E., if they sell more shares of Common Stock than are set forth on the cover page of this Prospectus), and thereby create a short position in the Common Stock in connection with the Offering, the Underwriters may reduce that short position by purchasing Common Stock in the open market. The Underwriters also may elect to reduce any short position by exercising all or part of the over-allotment option described herein.

The Underwriters also may impose a penalty bid on certain dealers and certain selling group members. This means that if the Underwriters purchase shares of Common Stock in the open market to reduce the Underwriter short position to stabilize the price of the Common Stock, they may reclaim the amount of selling concession from such dealers and the selling group who sold shares as part of the Offering.

In general, purchases of a security for the purpose of stabilization or to reduce a syndicate short position could cause the price of the security to be higher than it might otherwise be in the absence of such purchases. The imposition of a penalty bid might have an effect on the price of a security, to the extent that it were to discourage resales of the security by purchasers in the Offering.

Neither the Company nor any of the Underwriters makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the Common Stock. In addition, neither the Company nor any of the Underwriters makes any representation that the Underwriters will engage in such transactions or that such transactions, once commenced, will not be discontinued without notice.

The Company and each of the Selling Stockholders have agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act, and to contribute to payments the Underwriters may be required to make in respect thereof.

Prior to the sale of shares in the Offering, there has been no active public market for the Common Stock of the Company. The initial public offering price of the shares of Common Stock will be determined by negotiation among the Company, the Selling Stockholders and the Underwriters. Among the factors that will be considered in determining the initial public offering price will be the prospects of the Company and its industry in general, the Company's past and present operations, the Company's position in the industry, an assessment of the Company's management, the general condition of securities markets at the time of the Offering and the demand for similar securities.

At the request of the Company, the Underwriters have reserved up to 575,000 shares of Common Stock offered hereby for sale to certain officers, directors, employees, business associates and related parties of the Company at the initial public offering price set forth on the cover page of this Prospectus. Such persons must commit to purchase no later than the close of business on the day following the date hereof. The number of shares available for sale to the general public will be reduced to the extent such persons purchase such reserved shares.

## LEGAL MATTERS

The validity of the shares of Common Stock offered hereby will be passed upon for the Company by Arter & Hadden LLP, Dallas, Texas. Certain legal matters in connection with the Offering will be passed upon for the Underwriters by Cooley Godward LLP, San Francisco, California.

## EXPERTS

The consolidated financial statements and financial statement schedule of the Company as of December 31, 1996 and 1997, and for each of the years in the three-year period ended December 31, 1997, have been included herein and elsewhere in the Registration Statement in reliance upon the report of KPMG Peat Marwick LLP, independent certified public accountants, appearing elsewhere herein and in the Registration Statement, and upon the authority of such firm as experts in accounting and auditing.

The statements in this Prospectus set forth under "Risk Factors--Patents and Protection of Proprietary Technology," "Business--Design and Development--Patent Review" and "Business--Patents," together with the last paragraph of the inside front cover of this Prospectus, have been reviewed and approved by Aquilino & Welsh, Arlington, Virginia, as experts in patent and trademark law, and are included herein in reliance upon that review and approval. A partner in Aquilino & Welsh owns 59,106 shares of Common Stock of the Company. Purchasers of the securities offered hereby should not rely on Aquilino & Welsh with respect to any matters other than as set forth above.

## ADDITIONAL INFORMATION

The Company has filed with the Commission a Registration Statement on Form S-1 under the Securities Act with respect to the Common Stock offered hereby. This Prospectus constitutes a part of the Registration Statement and does not contain all of the information set forth therein and in the exhibits thereto, certain portions of which have been omitted as permitted by the rules and regulations of the Commission. For further information with respect to the Company and the Common Stock offered hereby, reference is hereby made to such Registration Statement and exhibits. Statements contained in this Prospectus as to the contents of any document are not necessarily complete and in each instance are qualified in their entirety by reference to the copy of the appropriate document filed with the Commission. The Registration Statement, including the exhibits thereto, may be examined without charge at the Commission's public reference facility at Room 1024, Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C. 20549, and at the following regional offices of the Commission: 7 World Trade Center, New York, NY 10048, and Northwestern Atrium Center, 500 West Madison Street, Suite 1400, Chicago, IL 60601. Copies of such material may be obtained from the Public Reference Section of the Commission at its principal office at 450 Fifth Street, N.W., Washington, D.C. 20549, upon payment of the fees prescribed by the Commission. Copies of such material are also available through the Commission's website located at http:// www.sec.gov.

51

[This Page Intentionally Left Blank]

## INDEX TO FINANCIAL STATEMENTS

Independent Auditors' Report................................................................. F-2

Consolidated Balance Sheets as of December 31, 1996 and 1997 and March 31, 1998
   (unaudited)................................................................................ F-3

Consolidated Statements of Operations for the years ended December 31, 1995, 1996 and
   1997 and the three months ended March 31, 1997 and 1998 (unaudited)............... F-4

Consolidated Statements of Stockholders' Equity for the years ended December 31,
   1995, 1996 and 1997 and the three months ended March 31, 1998 (unaudited).......... F-5

Consolidated Statements of Cash Flows for the years ended December 31, 1995, 1996 and
   1997 and the three months ended March 31, 1997 and 1998 (unaudited)................ F-6

Notes to Consolidated Financial Statements........................................... F-7

Financial Statement Schedule:
   II--Valuation and Qualifying Accounts for the years ended December 31, 1995, 1996
   and 1997 and the three months ended March 31, 1998 (unaudited)................... F-16

All other schedules are omitted since the required information is not present or is not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements and notes thereto.

F-1

## INDEPENDENT AUDITORS' REPORT

The Board of Directors and Stockholders
Adams Golf, Inc. and subsidiaries:

We have audited the consolidated financial statements of Adams Golf, Inc. and subsidiaries as listed in the accompanying index. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule as listed in the accompanying index. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Adams Golf, Inc. and subsidiaries as of December 31, 1996 and 1997, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1997, in conformity with generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

### KPMG PEAT MARWICK LLP

Dallas, Texas
April 29, 1998

F-2

## ADAMS GOLF, INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

### ASSETS

| | DECEMBER 31, | | MARCH 31, |
| | 1996 | 1997 | 1998 |
|---|---|---|---|
| | | | (UNAUDITED) |
| **Current assets:** | | | |
| Cash and cash equivalents.................................... | $ 854,543 | $ 1,955,563 | $ 602,290 |
| Trade receivables net of allowance for doubtful accounts of $26,199, $698,341 and $1,126,831 (unaudited) in 1996, 1997 and 1998, respectively (note 7)................................ | 497,787 | 7,670,960 | 14,708,636 |
| State income taxes refundable................................ | -- | 221,637 | 221,637 |
| Inventories (notes 2 and 7)................................... | 674,737 | 4,486,563 | 5,559,699 |
| Prepaid expenses............................................. | 28,007 | 509,350 | 1,106,635 |
| Deferred income tax assets (note 8).......................... | -- | 390,164 | 650,626 |
| Other current assets......................................... | -- | 715,670 | 352,795 |
| Total current assets..................................... | 2,055,074 | 15,949,907 | 23,202,318 |
| Property and equipment, net (note 3)......................... | 123,950 | 603,823 | 2,094,794 |
| Deferred income tax assets (note 8).......................... | -- | 182,621 | 209,942 |
| Other assets, net (note 4)................................... | 379,697 | 623,728 | 285,705 |
| Total assets............................................. | $ 2,558,721 | $ 17,360,079 | $ 25,792,759 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | 1996 | 1997 | 1998 |
|---|---|---|---|
| **Current liabilities:** | | | |
| Notes payable............................................... | $ 230,406 | $ -- | $ -- |
| Note payable to shareholder (note 7)........................ | -- | -- | 912,642 |
| Accounts payable............................................ | 17,526 | 377,622 | 2,732,215 |
| Federal income taxes payable................................ | -- | 1,020,980 | 2,940,390 |
| Accrued expenses (note 5)................................... | 332,423 | 7,636,157 | 4,317,926 |
| Total current liabilities................................ | 580,355 | 9,034,759 | 10,903,173 |
| Notes payable to shareholder, less current portion (note 7)......... | -- | -- | 222,399 |
| Total liabilities....................................... | 580,355 | 9,034,759 | 11,125,572 |
| **Stockholders' equity (note 9):** | | | |
| Common stock, $.001 par value. Authorized 50,000,000 shares; 11,873,234, 15,719,338 and 18,199,282 (unaudited) shares issued and outstanding at December 31, 1996 and 1997 and March 31, 1998, respectively............................................ | 11,873 | 15,719 | 18,199 |
| Additional paid-in capital................................... | 3,126,073 | 14,123,398 | 16,031,896 |
| Common stock subscription................................... | -- | -- | (230,459) |
| Deferred compensation....................................... | -- | -- | (981,000) |
| Accumulated deficit......................................... | (1,159,580) | (5,813,797) | (171,449) |
| Total stockholders' equity.............................. | 1,978,366 | 8,325,320 | 14,667,187 |
| Commitments (note 6)........................................ | | | |
| | $ 2,558,721 | $ 17,360,079 | $ 25,792,759 |

See accompanying notes to consolidated financial statements.

F-3

ADAMS GOLF, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS

| | YEARS ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
| --- | --- | --- | --- | --- | --- |
| | 1995 | 1996 | 1997 | 1997 | 1998 |
| | | | | (UNAUDITED) | |
| Net sales | $ 1,125,115 | $ 3,521,788 | $ 36,690,090 | $ 1,474,940 | $ 24,510,808 |
| Cost of goods sold | 756,400 | 1,589,696 | 9,991,132 | 586,538 | 5,862,255 |
| Gross profit | 368,715 | 1,932,092 | 26,698,958 | 888,402 | 18,648,553 |
| Operating expenses: | | | | | |
| Research and development expenses | 18,516 | 51,101 | 557,513 | -- | 196,997 |
| Selling and royalty expenses | 312,785 | 625,897 | 13,093,174 | 418,737 | 6,248,196 |
| General and administrative expenses: | | | | | |
| Stock compensation and bonus award (note 9) | -- | 213,760 | 14,841,711 | -- | -- |
| Provision for bad debts | 12,791 | 51,306 | 738,805 | 75,768 | 466,213 |
| Other | 268,518 | 981,219 | 1,436,995 | 328,727 | 2,865,198 |
| Total operating expenses | 612,610 | 1,923,283 | 30,668,198 | 823,232 | 9,776,604 |
| Operating income (loss) | (243,895) | 8,809 | (3,969,240) | 65,170 | 8,871,949 |
| Other income (expense): | | | | | |
| Interest income | 1,226 | 3,938 | 15,325 | 4,451 | 10,550 |
| Interest expense | -- | -- | (69,731) | (13,090) | (9,362) |
| Other | -- | -- | (47,808) | 4,350 | (100,621) |
| Income (loss) before income taxes | (242,669) | 12,747 | (4,071,454) | 60,881 | 8,772,516 |
| Income tax expense (note 8) | -- | -- | 582,763 | 15,586 | 3,130,168 |
| Net income (loss) | $ (242,669) | $ 12,747 | $ (4,654,217) | $ 45,295 | $ 5,642,348 |
| Income (loss) per common share: | | | | | |
| Basic | $ (.05) | $ .00 | $ (.37) | $ .00 | $ .32 |
| Diluted | $ (.05) | $ .00 | $ (.37) | $ .00 | $ .31 |

See accompanying notes to consolidated financial statements.

F-4

## ADAMS GOLF, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### YEARS ENDED DECEMBER 31, 1995, 1996 AND 1997 AND THE
### THREE MONTHS ENDED MARCH 31, 1998 (UNAUDITED)

| | SHARES OF PREFERRED STOCK | PREFERRED STOCK | SHARES OF COMMON STOCK | COMMON STOCK | ADDITIONAL PAID-IN CAPITAL | COMMON STOCK SUBSCRIPTION | DEFERRED COMPENSATION |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 1994 (unaudited).............. | 772,551 | $    773 | 1,066,514 | $   1,067 | $ 1,327,799 | $    -- | $    -- |
| Conversion of preferred stock to common stock (note 9).... | (772,551) | (775) | 1,545,102 | 1,545 | (772) | -- | -- |
| Sale of stock.............. | -- | -- | 4,168,988 | 4,169 | 453,507 | -- | -- |
| Stock distribution (note 9)........................ | -- | -- | 4,282,304 | 4,282 | (4,282) | -- | -- |
| Net loss.................. | -- | -- | -- | -- | -- | -- | -- |
| Balance, December 31, 1995.................... | -- | $   -- | 11,062,908 | 11,063 | 1,776,252 | -- | -- |
| Sale of stock.............. | | | 1,581,126 | 1,581 | 1,594,362 | -- | -- |
| Common stock repurchased and retired (note 9)..... | | | (770,800) | (771) | (244,541) | -- | -- |
| Net income................ | | | -- | -- | -- | -- | -- |
| Balance, December 31, 1996.................... | | | 11,873,234 | 11,873 | 3,126,073 | -- | -- |
| Stock compensation award (note 9)................ | | | 2,000,000 | 2,000 | 9,998,000 | -- | -- |
| Exercise of stock options.. | | | 946,104 | 946 | 550,225 | -- | -- |
| Exchange of debt for common stock (note 9)................ | | | 900,000 | 900 | 449,100 | -- | -- |
| Net loss.................. | | | -- | -- | -- | -- | -- |
| Balance, December 31, 1997.................... | | | 15,719,338 | 15,719 | 14,123,398 | -- | -- |
| Issuance of stock options.. | | | -- | -- | 981,000 | -- | (981,000) |
| Exercise of stock options.. | | | 2,479,944 | 2,480 | 927,498 | (230,459) | -- |
| Net income................ | | | -- | -- | -- | -- | -- |
| Balance, March 31, 1998 (unaudited).............. | | | 18,199,282 | $ 18,199 | $ 16,031,896 | $ (230,459) | $ (981,000) |

| | ACCUMULATED DEFICIT | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|
| Balance, December 31, 1994 (unaudited).............. | $ (929,658) | $   399,981 |
| Conversion of preferred stock to common stock (note 9).... | -- | -- |
| Sale of stock.............. | -- | 457,676 |
| Stock distribution (note 9)........................ | -- | -- |
| Net loss.................. | (242,669) | (242,669) |
| Balance, December 31, 1995.................... | (1,172,327) | 614,988 |
| Sale of stock.............. | -- | 1,595,943 |
| Common stock repurchased and retired (note 9)..... | -- | (245,312) |
| Net income................ | 12,747 | 12,747 |
| Balance, December 31, 1996.................... | (1,159,580) | 1,978,366 |
| Stock compensation award (note 9)................ | -- | 10,000,000 |
| Exercise of stock options.. | -- | 551,171 |
| Exchange of debt for common stock (note 9)................ | -- | 450,000 |
| Net loss.................. | (4,654,217) | (4,654,217) |
| Balance, December 31, 1997.................... | (5,813,797) | 8,325,320 |
| Issuance of stock options.. | -- | -- |
| Exercise of stock options.. | -- | 699,519 |
| Net income................ | 5,642,348 | 5,642,348 |

```
Balance, March 31, 1998
    (unaudited)...............    $   (171,449)   $ 14,667,187
```

See accompanying notes to consolidated financial statements.

F-5

ADAMS GOLF, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | YEARS ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
| | 1995 | 1996 | 1997 | 1997 | 1998 |
|---|---|---|---|---|---|
| | | | | (UNAUDITED) | |
| **Cash flows from operating activities:** | | | | | |
| Net income (loss) | $ (242,669) | $ 12,747 | $(4,654,217) | $ 45,295 | $ 5,642,348 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | 8,291 | 19,278 | 302,589 | 16,374 | 218,959 |
| Loss on retirement of fixed assets | -- | -- | 134,009 | -- | 100,617 |
| Stock compensation and bonus award | -- | -- | 10,000,000 | -- | -- |
| Deferred income taxes | -- | -- | (572,785) | -- | (137,657) |
| Allowance for doubtful accounts | -- | 26,199 | 672,142 | 71,207 | 1,126,831 |
| Changes in assets and liabilities: | | | | | |
| Trade and other receivables | (93,649) | (374,228) | (8,066,952) | (399,963) | (8,164,507) |
| Inventories | (81,470) | (476,467) | (3,811,826) | (103,962) | (1,073,136) |
| Prepaid assets | (27,589) | (418) | (481,343) | 406 | (597,285) |
| Other current assets | 2,860 | -- | (715,670) | (257,186) | 362,875 |
| Other assets | (4,873) | (361,916) | (390,442) | 67,478 | 248,822 |
| Accounts payable | 40,252 | (22,726) | 360,096 | 60,688 | 991,832 |
| Accrued expenses | 2,728 | 329,302 | 7,303,734 | 187,607 | (2,105,596) |
| Federal income taxes payable | -- | -- | 1,020,980 | 15,586 | 1,919,410 |
| Net cash provided by (used in) operating activities | (396,119) | (848,229) | 1,100,315 | (296,470) | (1,466,487) |
| **Cash flow from investing activities--purchase of equipment** | (9,287) | (121,444) | (770,060) | (46,277) | (1,721,347) |
| **Cash flows from financing activities:** | | | | | |
| Proceeds from notes payable and line of credit | -- | 230,406 | 1,050,000 | 250,000 | 4,635,041 |
| Repayment of line of credit borrowings | -- | -- | (800,000) | -- | (3,500,000) |
| Repayment of notes payable | -- | -- | (30,406) | (1,494) | -- |
| Issuance of common stock | 457,676 | 1,350,631 | 551,171 | -- | 699,520 |
| Net cash provided by financing activities | 457,676 | 1,581,037 | 770,765 | 248,506 | 1,834,561 |
| **Net increase (decrease) in cash and cash equivalents** | 52,270 | 611,364 | 1,101,020 | (94,241) | (1,353,273) |
| Cash and cash equivalents at beginning of period | 190,909 | 243,179 | 854,543 | 854,543 | 1,955,563 |
| Cash and cash equivalents at end of period | $ 243,179 | $ 854,543 | $ 1,955,563 | $ 760,302 | $ 602,290 |
| **Supplemental disclosure of cash flow information:** | | | | | |
| Interest paid | $ -- | $ -- | $ 69,731 | $ 13,090 | $ 9,362 |
| Income taxes paid | $ -- | $ -- | $ 356,204 | $ -- | $ 1,293,820 |
| **Supplemental disclosure of financing activity-- exchange of debt for common stock** | $ -- | $ -- | $ 450,000 | $ -- | $ -- |

See accompanying notes to consolidated financial statements.

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(a) GENERAL

Adams Golf, Inc. (the "Company") was founded in 1987. The Company designs, manufactures, markets and distributes golf clubs and provides custom golf club fitting technology. The Company's primary products are fairway woods that are marketed under the trademark "Tight Lies."

The Company has both domestic and international sales. International sales were $647,325, $878,666, and $1,387,325 for the years ended December 31, 1996 and 1997 and the three months ended March 31, 1998, respectively. There were no international sales in 1995.

The consolidated financial statements include the accounts of Adams Golf, Inc. and its wholly-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation.

The consolidated financial statements of the Company as of March 31, 1998 and for the three months ended March 31, 1997 and 1998 are unaudited, but in the opinion of management reflect all adjustments (consisting only of normal recurring accruals) which are necessary for a fair statement of the results of the interim periods presented. Results for interim periods are not necessarily indicative of the results to be expected for a full year due in part to the Company's growth.

(b) INVENTORIES

Inventories are valued at the lower of cost or market and primarily consists of completed golf clubs and component parts. Cost is determined using the first-in, first-out method.

(c) PROPERTY AND EQUIPMENT

Property and equipment are stated at cost. Depreciation is calculated using the straight-line method over the estimated useful lives of the respective assets, which range from three to seven years.

(d) REVENUE RECOGNITION

The Company records revenue as earned, which occurs when the product is shipped.

(e) OTHER ASSETS AND RELATED AMORTIZATION EXPENSE

Other assets consist primarily of the cost of obtaining patents, development costs of an infomercial and various deposits. Patent amortization is computed on the straight-line method over the estimated useful lives of the assets, which range from 5 to 15 years.

(f) RESEARCH AND DEVELOPMENT

Research and development costs consist of all costs incurred in planning, designing and testing of golf equipment, including salary costs related to research and development, and are expensed as incurred.

(g) ADVERTISING COSTS

Advertising media costs, other than infomercial costs, are expensed as incurred. Production costs are charged to expense ratably in relation to sales over the year in which incurred. Advertising costs other than infomercials were $35,300, $33,503 and $8,651,420 for the years ended December 31, 1995, 1996 and 1997, respectively, and $59,049 (unaudited) and $2,333,406 (unaudited) for the three months ended March 31, 1997 and 1998, respectively.

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED) Infomercial costs are amortized based on revenues generated compared to total estimated revenues expected to result from the airing of such infomercial generally over an 18 month period. Amortization expense for the years ended December 31, 1995, 1996 and 1997 was $3,161, $3,738 and $146,411, respectively, and $89,200 (unaudited) for the three months ended March 31, 1998.

(h) PRODUCT WARRANTY AND SALES RETURNS

The Company's golf equipment is sold under warranty against defects in material and workmanship for a period of two years. In addition, the Company has a 90 day "no questions asked" return policy. An allowance for estimated future warranty and sales return costs is recorded in the period products are sold. Such estimates have approximated actual costs incurred.

(i) INCOME TAXES

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforwards. Deferred tax assets and liabilities are measured using enacted rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

(j) INCOME (LOSS) PER SHARE

The weighted average common shares used for determining basic net income (loss) per common share was 4,423,146, 11,237,794 and 12,519,392, for the years ended December 31, 1995, 1996 and 1997, respectively, and 11,873,234 (unaudited) and 17,662,189 (unaudited) for the three months ended March 31, 1997 and 1998, respectively. The effect of dilutive stock options added 678,263 (unaudited) shares for the three months ended March 31, 1998 for the computation of diluted income (loss) per common share. Stock options outstanding for the years ended December 31, 1995, 1996 and 1997 and the three months ended March 31, 1997 were not considered in the computation of net income (loss) per common share since their effect is immaterial or antidilutive.

(k) USE OF ESTIMATES

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(l) FINANCIAL INSTRUMENTS

The carrying amount of cash and cash equivalents, accounts receivable, accounts payable, and accrued expenses and note payable to stockholder approximates fair value due to the short maturity of these instruments.

F-8

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(1) SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
(m) IMPAIRMENT OF LONG-LIVED ASSETS AND LONG-LIVED ASSETS TO BE DISPOSED OF

The Company adopted the provisions of Statement of Financial Accounting Standards (SFAS) No. 121, ACCOUNTING FOR THE IMPAIRMENT OF LONG-LIVED ASSETS AND FOR LONG-LIVED ASSETS TO BE DISPOSED OF, on January 1, 1996. This Statement requires that long-lived assets and certain identifiable intangibles be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceed the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell. Adoption of this Statement did not impact the Company's financial position, results of operations, or liquidity.

(n) STATEMENTS OF CASH FLOWS

The Company considers all short-term highly liquid instruments, with an original maturity of three months or less, to be cash equivalents.

(o) NEWLY ADOPTED ACCOUNTING PRONOUNCEMENTS

The Company adopted the reporting and disclosure requirements of SFAS No. 130, REPORTING COMPREHENSIVE INCOME, on January 1, 1998. This Statement requires the display of comprehensive income and its components in a financial statement that is displayed in equal prominence with other financial statements. As the Company has not had any comprehensive income components, the reporting and disclosure requirements of this statement have not altered the consolidated financial statements presented herein.

Effective January 1, 1998, the Company adopted Statement of Position (SOP) 98-1, ACCOUNTING FOR THE COSTS OF COMPUTER SOFTWARE DEVELOPED OR OBTAINED FOR INTERNAL USE, which was issued in March 1998. The SOP requires that certain costs related to the development or purchase of internal-use software be capitalized and amortized over the estimated useful life of the software. The SOP also requires that costs related to the preliminary project stage and the post-implementation/operations stage of an internal-use computer software development project be expensed as incurred.

(2) INVENTORIES

Inventories consist of the following:

|  | DECEMBER 31 | | MARCH 31, 1998 |
|---|---|---|---|
|  | 1996 | 1997 | (UNAUDITED) |
| Finished goods | $ 41,323 | $ 2,063,803 | $ 2,526,767 |
| Component parts | 633,414 | 2,422,760 | 3,032,932 |
|  | $ 674,737 | $ 4,486,563 | $ 5,559,699 |

F-9

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(3) PROPERTY AND EQUIPMENT, NET

Property and equipment consists of the following:

| | DECEMBER 31, | | MARCH 31, 1998 |
|---|---|---|---|
| | 1996 | 1997 | (UNAUDITED) |
| Manufacturing equipment | $ 70,728 | $ 142,137 | $ 151,979 |
| Office and computer equipment | 100,368 | 660,145 | 2,237,891 |
| Accumulated depreciation | (47,146) | (198,459) | (295,076) |
| | $ 123,950 | $ 603,823 | $ 2,094,794 |

(4) OTHER ASSETS, NET

Other assets, net, consist of the following:

| | DECEMBER 31, | |
|---|---|---|
| | 1996 | 1997 |
| Deposits, including amounts for fixed assets purchased | $ 97,498 | $ 380,836 |
| Infomercial costs | 267,677 | 233,365 |
| Patents | 14,522 | 9,527 |
| | $ 379,697 | $ 623,728 |

(5) ACCRUED EXPENSES

Accrued expenses consist of the following:

| | DECEMBER 31, | | MARCH 31, 1998 |
|---|---|---|---|
| | 1996 | 1997 | (UNAUDITED) |
| Payroll, bonuses and commissions (see note 9) | $ 277,810 | $ 5,576,134 | $ 1,115,699 |
| Sales, property and state income taxes | 4,604 | 271,225 | 204,501 |
| Royalties | -- | 392,541 | 477,163 |
| Advertising | -- | 470,500 | 795,260 |
| Product warranty and sales returns | -- | 449,200 | 732,100 |
| Professional services | 9,807 | 340,389 | 220,491 |
| Other | 40,202 | 136,168 | 772,712 |
| | $ 332,423 | $ 7,636,157 | $ 4,317,926 |

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

### (6) COMMITMENTS

The Company is obligated under certain noncancelable leases for office space. A summary of the minimum rental commitments under noncancelable leases is as follows:

| YEARS ENDING DECEMBER 31, | |
|---|---|
| 1998 | $ 368,700 |
| 1999 | 456,000 |
| 2000 | 480,400 |
| 2001 | 488,500 |
| 2002 | 512,900 |
| Thereafter | 651,400 |

Rent expense was $32,540, $45,603, $104,480 $26,694 (unaudited) and $64,075 (unaudited) for the years ended December 31, 1995, 1996 and 1997, and the three months ended March 31, 1997 and 1998, respectively.

The Company had outstanding commitments (denominated in U.S. dollars ) on letters of credit of $459,167 at December 31, 1997, and $989,419 (unaudited) at March 31, 1998 for the purchase of inventory from foreign vendors.

### (7) DEBT

The Company entered into a $1,500,000 revolving line of credit agreement with a bank on May 30, 1997. The line of credit is secured by trade receivables and inventories, matures on May 15, 1998 and bears interest, payable quarterly, at the bank's prime rate (8.5% at December 31, 1997). At December 31, 1997, there was no balance outstanding on this line of credit. The Company pays an annual commitment fee of 0.5% on the unused portion of the line of credit.

On February 27, 1998, the Company entered into a new $10,000,000 revolving credit facility with a bank which replaced the existing $1,500,000 line of credit. The facility is secured by eligible trade receivables, inventories and equipment, matures on December 31, 1998 and bears interest, payable monthly, at the bank's prime rate of interest minus 25 basis points (8.25% at March 31, 1998) or LIBOR rates plus 1.75% interest. At March 31, 1998, there was no balance outstanding on this credit facility. The Company pays an annual commitment fee of 0.25% on the unused portion of the credit facility.

During the first quarter of 1998, the Company borrowed $1,135,041 in the form of an unsecured note payable to the Chief Executive Officer. The principal balance is payable in three installments, matures on April 14, 1999, and bears interest at 5.39%.

F-11

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(8) INCOME TAXES

Income tax expense (benefit) for the year ended December 31, 1997 consists of the following:

| | YEAR ENDED DECEMBER 31, 1997 | | |
|---|---|---|---|
| | CURRENT | DEFERRED | TOTAL |
| Federal | $ 1,020,980 | $ (572,785) | $ 448,195 |
| State | 134,568 | -- | 134,568 |
| | $ 1,155,548 | $ (572,785) | $ 582,763 |

Actual income tax expense differs from the "expected" income tax expense (benefit) (computed by applying the U.S. federal corporate tax rate of 34% to income (loss) before income taxes for the years ended December 31, 1995, 1996 and 1997 as follows:

| | YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| Computed "expected" tax expense (benefit) | $ (82,507) | $ 4,334 | $ (1,384,294) |
| State income taxes, net of federal tax benefit | -- | -- | 88,815 |
| Stock compensation and bonus award | -- | -- | 2,159,000 |
| Change in valuation allowance for deferred tax assets | 81,352 | (4,334) | (337,558) |
| Other | 1,155 | -- | 56,800 |
| | $ -- | $ -- | $ 582,763 |

The tax effects of temporary differences that give rise to deferred tax assets and deferred tax liabilities are presented below:

| | DECEMBER 31, | | MARCH 31, 1998 |
|---|---|---|---|
| | 1996 | 1997 | (UNAUDITED) |
| Deferred tax assets: | | | |
| Allowance for bad debts | $ 8,908 | $ 237,436 | $ 394,391 |
| Research and development costs | 7,563 | 974 | -- |
| Bonus compensation | 72,678 | -- | -- |
| Product warranty and sales returns | -- | 152,728 | 256,235 |
| Net operating tax loss carryforwards | 389,528 | 311,100 | 320,250 |
| Total gross deferred tax assets | 478,677 | 702,238 | 970,876 |
| Less valuation allowance | (387,667) | (50,109) | (59,259) |
| Net deferred tax assets | 91,010 | 652,129 | 911,617 |
| Deferred tax liabilities--infomercial costs | (91,010) | (79,344) | (51,049) |
| Net | $ -- | $ 572,785 | $ 860,568 |

In assessing the realizability of deferred income tax assets, management considers whether it is more likely than not that some portion or all of the deferred income tax assets will not be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during

F-12

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(8) INCOME TAXES (CONTINUED) the periods in which those temporary differences become deductible. Based upon projections for future taxable income over the periods which the deferred tax assets are deductible, management believes it is more likely than not that the Company will realize the benefits of these deductible differences, net of the existing valuation allowance at December 31, 1997.

The valuation allowance for deferred tax assets at December 31, 1996 and 1997 was $387,667 and $50,109, respectively. The net change in the total valuation allowance for the years ended December 31, 1996 and 1997 were decreases of $4,334 and $337,558, respectively.

At December 31, 1997, the Company has net operating tax loss carryforwards for federal income tax purposes of approximately $915,000 which are available to offset future federal taxable income through 2010. The availability of the net operating loss carryforwards to reduce future taxable income is subject to certain limitations. As a result of a change in ownership, the Company believes utilization of its net operating tax loss carryforwards is limited to approximately $62,000 per year for the remaining life of the net operating losses.

(9) STOCKHOLDERS' EQUITY

(a) STOCK OPTION PLANS

In April 1996, the Company adopted the 1996 Stock Option Incentive Plan ("the Stock Option Plan"), pursuant to which stock options covering an aggregate of 800,000 shares of the Company's common stock may be granted. Options awarded under the Stock Option Plan (i) are generally granted at prices that equate to or are above fair market value on the date of the grant; (ii) generally become exercisable over a period of one to four years; and (iii) generally expire five years subsequent to award.

At December 31, 1997 and March 31, 1998, there were 140,310 shares available for grant under the Plan. The per share weighted-average fair value of stock options granted during 1995 and 1996 was $0.25 and $0.06, respectively, on the date of grant using the Black Scholes option-pricing model with the following weighted-average assumptions: Risk-free interest rate, 6%; expected life, two-five years and expected dividend yield, 0%.

In connection with an employment agreement entered into in September 1995 with the Company's chief executive officer and founder, the Company granted the chief executive officer options to acquire 1,520,766 shares of common stock at $.375 per share, the market price at date of grant. Vesting of the stock options was conditioned upon meeting certain revenue and earnings requirements, which were met during 1996 and 1997. Also, the agreement provided for a bonus to be paid to the officer in an amount equal to the exercise price of the options plus any related income tax due by the officer upon exercise of the options. The officer notified the Company of his intent to exercise the options in December 1997 and the shares were issued in January 1998. Compensation expense of $213,760 and $2,300,023 was charged to operations in 1996 and 1997, respectively, to recognize the bonus due to the officer.

In conjunction with a 1996 stock purchase agreement, the Company granted options to a shareholder to acquire an aggregate of 942,632 shares of common stock at option exercise prices ranging from $0.375, the market price at date of grant, to $0.625 per share. During 1997, the shareholder exercised the options for an aggregate exercise price of $549,869.

F-13

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(9) STOCKHOLDERS' EQUITY (CONTINUED) In February 1998, the Company adopted the 1998 Stock Incentive Plan ("the 1998 Stock Option Plan"), pursuant to which stock options covering an aggregate of 1,800,000 shares of the Company's common stock may be granted. The Company granted 218,000 options to employees on February 26, 1998 at $2.50 per share. For financial statement reporting purposes, the grant was deemed to have a fair market value of $7.00 per share at the date of grant. Accordingly, the Company has recorded deferred compensation of $981,000 at March 31, 1998.

The Company applies Accounting Principles Board Opinion 25 in accounting for its stock plans and, accordingly, no compensation cost has been recognized for its stock options in the financial statements. Had the Company determined compensation cost based on the fair value at the grant date for its stock options under SFAS No. 123, the Company's net income (loss) would have been adjusted to the pro forma amounts indicated below:

|  | YEARS ENDED DECEMBER 31 | | |
|---|---|---|---|
|  | 1995 | 1996 | 1997 |
| Net income (loss): | | | |
| As reported............................................... | $ (242,669) | $ 12,747 | $ (4,654,217) |
| Pro forma................................................. | (242,669) | (13,361) | (4,743,744) |
| Diluted income (loss) per common share: | | | |
| As reported............................................... | $ (0.05) | $ 0.00 | $ (0.37) |
| Pro forma................................................. | (0.05) | (0.00) | (0.38) |

Pro forma net loss reflects only options granted in 1995, 1996 and 1997. Therefore, the full impact of calculating compensation cost for stock options under SFAS No. 123 is not reflected in the pro forma net loss amounts presented above because compensation cost is reflected over the respective options vesting periods of up to four years.

A summary of stock option activity follows:

|  | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|
| Options outstanding at December 31, 1994........................ | -- | $ -- |
| Options granted................................................. | 1,520,766 | 0.375 |
| Options outstanding at December 31, 1995........................ | 1,520,766 | 0.375 |
| Options granted................................................. | 1,946,948 | 0.50 |
| Options outstanding at December 31, 1996........................ | 3,467,714 | 0.44 |
| Options exercised.............................................. | (946,104) | 0.583 |
| Options outstanding at December 31, 1997........................ | 2,521,610 | 0.375 |
| Options granted................................................. | 272,000 | 2.50 |
| Options exercised.............................................. | (2,479,944) | 0.375 |
| Options outstanding at March 31, 1998 (unaudited)............... | 313,666 | $ 2.22 |

At December 31, 1997, the exercise price and weighted-average remaining contractual life of outstanding options was $0.375 and 3.5 years, respectively.

At December 31, 1996 and 1997, the number of options exercisable was 467,970 and 2,114,492, respectively, and the weighted-average exercise price of those options was $0.375.

F-14

ADAMS GOLF, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

DECEMBER 31, 1996 AND 1997 AND MARCH 31, 1998 (UNAUDITED)

(9) STOCKHOLDERS' EQUITY (CONTINUED)
(b) STOCK DISTRIBUTION

In connection with the acquisition of a related entity, the Company distributed 4,282,304 shares of common stock to its shareholders during the year ended December 31, 1995. As a result of the common control existing between the Company and the related entity, the transaction was accounted for in a manner similar to a pooling of interests. Accordingly, the transaction resulted in no increase to stockholders' equity since the recorded net asset value of the related entity was not material. The resulting subsidiary has been inactive during the three years ended December 31, 1997 and has no assets or liabilities.

(c) STOCK COMPENSATION AWARD

In December 1997, the Board of Directors of the Company approved a stock compensation award of 2,000,000 shares of common stock to its chief executive officer and founder of the Company. In addition, the Company agreed to pay all income taxes payable by the officer relating to such stock award and related tax bonus. Aggregate compensation of $12,541,688 (including $2,541,688 for estimated taxes) was recorded by the Company during the year ended December 31, 1997 based on the fair market value of the stock.

(d) NOTE WITH STOCKHOLDER CONVERTED TO STOCK

The Company borrowed $200,000 from a stockholder in October 1996 and an additional $250,000 from the same stockholder in 1997. The aggregate notes payable balance of $450,000 was converted into 900,000 shares of the Company's stock in September 1997.

(e) STOCK CONVERSION

During 1995, the Company amended its Certificate of Incorporation to provide the authority to issue up to 25,000,000 shares of $.001 per share par value stock. All such shares were to be designated as common stock and, accordingly, all stockholders of preferred stock surrendered such shares for an equivalent number of shares of common stock.

(f) STOCK SPLIT AND AUTHORIZED CLASSES OF STOCK

Effective April 29, 1998, the stockholders of the Company authorized a two-for-one stock split for holders of record on May 1, 1998. The stock split has been reflected in the accompanying consolidated financial statements and, accordingly, all applicable dollar, share and per share amounts have been restated to reflect the stock split. In addition, the stockholders of the Company also approved an increase in the number of authorized shares of Common Stock to 50,000,000 and established a class of preferred stock with a par value of $.01 per share and authorized shares of 5,000,000.

(10) SUBSEQUENT EVENTS (UNAUDITED)

Effective May 1, 1998, the Company entered into an agreement with Nicholas A. Faldo, a professional golfer (the "Agreement"). The Agreement with Faldo, provides the Company with Faldo's endorsement and use of Adams products, as well as the design, development and testing of new technologies and products. As consideration for such services, Faldo will receive 900,000 shares of the Company's common stock which will be recorded and amortized over the estimated period benefited. In addition, Mr. Faldo will receive royalty payments representing 5% of net sales outside the U.S., with a minimum annual amount of $1,500,000 beginning in 1999 and increasing ratably to $4,000,000 in 2004. Under certain conditions, including the failure by the Company to effect an initial public offering by December 31, 1998, Faldo has the right to require the Company to repurchase the shares for $5,000,000 at which point the Company would have the right to terminate the agreement.

F-15

SCHEDULE II

ADAMS GOLF, INC. AND SUBSIDIARIES
YEARS ENDED DECEMBER 31, 1995, 1996
AND 1997 AND THREE MONTHS ENDED MARCH 31, 1998 (UNAUDITED)
VALUATION AND QUALIFYING ACCOUNTS

| DESCRIPTION | BALANCE AT BEGINNING OF PERIOD | ADDITIONS CHARGED TO: | | DEDUCTIONS(1) | BALANCE AT END OF PERIOD |
| | | COSTS AND EXPENSES | OTHER | | |
| --- | --- | --- | --- | --- | --- |
| Allowance for doubtful accounts: | | | | | |
| Year ended December 31, 1995............... | $   -- | $   12,791 | $   -- | $   12,791 | $   -- |
| Year ended December 31, 1996............... | $   -- | $   51,306 | $   -- | $   25,107 | $   26,199 |
| Year ended December 31, 1997............... | $   26,199 | $   738,805 | $   -- | $   66,663 | $   698,341 |
| Three months ended March 31, 1998 (unaudited)............................ | $   698,341 | $   466,213 | $   -- | $   37,723 | $ 1,126,831 |
| Product Warranty and Sales Returns: | | | | | |
| Year ended December 31, 1995............... | $   -- | $   -- | $   -- | $   -- | $   -- |
| Year ended December 31, 1996............... | $   -- | $   1,733 | $   -- | $   1,733 | $   -- |
| Year ended December 31, 1997............... | $   -- | $ 1,808,154 | $   -- | $ 1,358,954 | $   449,200 |
| Three months ended March 31, 1998 (unaudited)............................ | $   449,200 | $ 1,078,407 | $   -- | $   795,507 | $   732,100 |

(1) Represents uncollectible accounts charged against the allowance for doubtful accounts and actual costs incurred for warranty repairs and sales returns.

F-16

[This Page Intentionally Left Blank]

[This Page Intentionally Left Blank]

NO DEALER, SALESPERSON OR OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED ON AS HAVING BEEN AUTHORIZED BY THE COMPANY, THE SELLING STOCKHOLDERS OR THE UNDERWRITERS. THIS PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OTHER THAN THE REGISTERED SECURITIES TO WHICH IT RELATES IN ANY STATE TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION IN SUCH STATE. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE.

## TABLE OF CONTENTS

|                                                          | Page |
|----------------------------------------------------------|------|
| Prospectus Summary                                       | 3    |
| Risk Factors                                             | 6    |
| Disclosure Regarding Forward-Looking Statements          | 12   |
| Use of Proceeds                                          | 13   |
| Dividend Policy                                          | 13   |
| Dilution                                                 | 14   |
| Capitalization                                           | 15   |
| Selected Consolidated Financial Information              | 16   |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Business                                                 | 22   |
| Management                                               | 33   |
| Certain Transactions                                     | 42   |
| Principal and Selling Stockholders                       | 44   |
| Description of Capital Stock                             | 45   |
| Shares Eligible for Future Sale                          | 48   |
| Underwriting                                             | 49   |
| Legal Matters                                            | 51   |
| Experts                                                  | 51   |
| Additional Information                                   | 51   |
| Index to Financial Statements                            | F-1  |

UNTIL AUGUST 4, 1998 (25 DAYS AFTER THE DATE OF THIS PROSPECTUS), ALL DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

**6,000,000 SHARES**

[LOGO]

**COMMON STOCK**

**PROSPECTUS**

July 9, 1998

**LEHMAN BROTHERS**

**NATIONSBANC MONTGOMERY SECURITIES LLC**

**FERRIS, BAKER WATTS**

**INCORPORATED**

End of Filing

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.