**A. 19**



*2801 East Plano Parkway*
*Plano, Texas 75074*
*beebeck@adamsgolf.com*
*FAX: 972-398-8818*
*800-622-0609*
*Tel: 972-673-9000*

*From the desk of*
**Chris Beebe**



To: **Mr. William Heinecke – The Minor Group**

RE: **Thailand Representation**

Date: **January 18, 1999**                    **Total Pages - 1**

Dear Mr. Heinecke,

Thank you for your fax of today. I understand your concerns regarding the situation in the Thai market.

1) Regarding the parallel importer Tight Lies, there are two reasons that these clubs are in your market. The first is that the Tight Lies were a very hot product last year, and as there was no distributor in Thailand, several parallel importers contacted parallel exporters in the States and brought the clubs in to meet the demand.

   The second reason is that our former domestic sales manager was very numbers oriented, and as a result several outlets were able to purchase our clubs that we normally would not sell to. As a result, Tight Lies appeared in a few areas that caused us some concern, and one of them is Thailand. Our new domestic sales manager has a better grasp of the situation, and is putting more controls in place to minimize such disturbances.

   With proper representation in your market, and with distributor pricing and sensible margins, the parallel importers should not find many customers in Thailand (as of the first of the year, Adams has new and very aggressive pricing internationally which should make it easy to undercut the parallel importers). Unfortunately, parallel importation can never be stopped, but it can certainly be controlled and minimized.

2) Reasons for the slow sales would be two. One is that the prices the outlets are charging are too high. The second is that they are selling US specification clubs. We do offer an Asian specification club with a smaller grip, more flexible shaft and lighter weight that is much better suited to the Asian markets. As it has a different shaft, it can easily be distinguished from the US specification club.

3) I believe that you should speak with John Souza (or whomever you work with) at Ping regarding the possibility of representing Adams in Thailand (or I can, as John and I know each other very well). Adams and Ping are at different price points, pursue different distribution strategies and have different strengths, so conflict should be not be a problem. I believe that you are also representing another golf company at this time, and

**ADAMS 017172**

if you have not signed an exclusive agreement with Ping they should not object.   If there are concerns on their part, you can also add some different salesmen to handle one or more of the lines, and that should alleviate their worries.

You have a fine organization and I would welcome the opportunity to work with your people. Please let me know if you have any other questions, or if I can help to eliminate any other concerns that you may have.

Best regards,

Chris Beebe

ADAMS 017173

**A. 20**

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3

4  IN RE:  ADAMS GOLF, INC.  :    CONSOLIDATED

5  SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

6  _____X

7

8          ORAL DEPOSITION OF SANDRA BROOKS

9              Friday, June 30, 2006

10

11        The oral deposition of SANDRA BROOKS was

12  held at the law offices of Akin Gump Strauss Hauer

13  & Feld, LLP, 1700 Pacific Avenue, Suite 4100,

14  Dallas, Texas, from 10:38 a.m. to 12:09 p.m.,

15  before Jamie K. Israelow, a Certified Shorthand

16  Reporter in and for the State of Texas, Registered

17  Professional Reporter, Certified Realtime Reporter

18  and Certified LiveNote Reporter.

19

20

21        RSA/VERITEXT COURT REPORTING COMPANY

22          1845 Walnut Street, 15th Floor

23            Philadelphia, PA  19103

24          (215)241-1000    (888)777-6690

Page 10

1   Parrish was like, I think, under him and I would
2   report to him. He took over for a while, but Mark
3   was ultimately the --
4       Q    Okay. And how often did you -- say,
5   in '96 and '97, how often did you see Mark
6   Gonsalves? Was it --
7       A    Every day. Every day. We had a
8   morning meeting every day.
9       Q    Okay.
10      A    From the beginning of time, we had a
11  meeting -- the whole inside sales group and Mark,
12  we'd have a meeting and talk about goals and --
13  what did we call them? -- objections and how to
14  get around objections.
15      Q    Okay.
16      A    Yeah. So every day we had a meeting,
17  and it was a way to start off our day.
18      Q    And did that practice continue
19  throughout your employment at Adams Golf?
20      A    Yes.
21      Q    Okay. You testified that in the
22  beginning of your employment, and correct me if
23  I'm wrong, I don't want to misquote the record,
24  there were six members of the inside sales staff.

Page 11

1   Is that --
2       A    When I started, correct.
3       Q    And then -- so I assume your regions,
4   then, were -- were greater than the ones you've
5   described here, Seattle, Miami, Arkansas,
6   New Orleans, Connecticut --
7       A    Right. For instance, I had the
8   entire state of Washington.
9       Q    I see.
10      A    Then when we added more people, we
11  were asked: What territories do you want to get
12  rid of? And I was like: Well, you can have
13  Arkansas, and you can also have the east half of
14  Washington.
15      Q    Yep. Yep. Spokane?
16           MR. BESSETTE: Lucky folks.
17      Q    (By Mr. Mara) Okay. So and are you
18  able to recall when -- but you retained -- I'm
19  sorry. Strike that.
20           So you retained Seattle,
21  Miami, throughout your tenure at Adams Golf?
22      A    Yeah.
23      Q    Are you aware of the concept of gray
24  marketing?

Page 12

1       A    I am now.
2       Q    And what do you understand it to
3   mean? What does it mean to you?
4       A    I guess when people get ahold of a
5   product, like a golf club, and I guess they're not
6   really supposed to have it, like an
7   unauthorized -- like they get the golf club --
8   somebody gets the golf club and sells it to
9   somebody else who isn't really supposed to be
10  selling it.
11      Q    I see. Okay. Now, during 1997, did
12  you have an occasion to experience anything like
13  that in your sales regions?
14      A    Yes.
15      Q    And can you describe what that was?
16      A    It started off in Seattle where a big
17  client of mine called me up complaining that he
18  was at Costco and saw Adams Golf clubs at Costco.
19  And I wasn't really sure about Costco because we
20  didn't have Costcos there, but he explained to me,
21  a big warehouse wholesale-type place like Sam's.
22  I know what Sam's is, so he explained that to me.
23  That's how I first found out about it.
24      Q    And are you able to recall who the

Page 13

1   account was?
2       A    I think -- I think it was Pro Am
3   Golf. Is that it? It's -- it's -- big, giant --
4   it's like the biggest one in Seattle.
5       Q    Okay. They're in Seattle?
6       A    Uh-huh.
7       Q    And are you able to recall what, if
8   anything -- if it was Pro Am Golf, I know you're
9   trying to remember. What did they say to you?
10  Are you able to recall what they --
11      A    Well, he was pretty mad. He was
12  pretty mad, like: Why are these clubs showing up
13  in Costco? Why are you -- why are you-all giving
14  these clubs to Costco? That was pretty much
15  his --
16      Q    Okay.
17      A    -- take on it.
18      Q    And did he describe what quantity or
19  how many clubs he --
20      A    He said there were a bunch. I mean,
21  I don't think he actually gave me a number or
22  anything, but he said there was a bunch in there,
23  and that was his concern. I think if he saw like
24  one or two, he probably wouldn't care, but there

Page 14

1 were a bunch in there.
2     Q     And what, if anything, did you do
3 after you had this conversation --
4     A     I told -- I told Mark.
5     Q     And can you describe what happened
6 there?  What did you say to Mark and --
7     A     I went in and I told him my concerns
8 and he just kind of blew me off, so to speak.
9     Q     And --
10     A     He just said that was another
11 objection that I had to get over and figure out
12 how to work around that.
13     Q     Did you say anything else to Mark
14 Gonsalves at that time or --
15     A     Well, I went to him more than once.
16 It wasn't just one time I let go.  It kept
17 happening and my people kept calling me.  They
18 were -- they were mad at me for somehow having
19 fault at the clubs getting into Costco.
20     Q     I see.
21     A     They were mad, just:  Why are you --
22 why are these people having golf clubs?
23     Q     And are you able to recall -- now,
24 when you say they were mad and my people were

Page 15

1 calling me, was that from Washington?
2     A     Uh-huh.  That's where it started.  It
3 wasn't just the one big retailer, some green-grass
4 accounts would call and they'd say the same thing
5 and they'd get upset.
6     Q     I see.  And by green-grass accounts,
7 do you mean --
8     A     Like country clubs.
9     Q     -- like pro shops and --
10     A     Yeah, pro shops and country clubs,
11 stuff like that.
12     Q     And now -- and that was occurring --
13 are you able to recall when that was occurring in
14 1997?
15     A     It was -- it was early in the year,
16 because we were in the first building in Plano.
17     Q     Uh-huh.  Are you able to estimate, or
18 if you can recall, how many times do you think you
19 went to Mark Gonsalves relaying these complaints
20 about clubs in Costco?
21     A     I'm what is known as a squeaky wheel,
22 so I went often.  I can't remember -- I can't tell
23 you how many times, but I do know I went multiple
24 times to him.

Page 16

1     Q     And did -- was his reaction
2 consistent each time or --
3     A     Pretty much.
4     Q     -- or did he just keep saying:  Work
5 on it?
6     A     Yeah, work on it.  You'll get over
7 it, or you know, he really just kind of blew me
8 off.
9     Q     And when you went to him, did --
10 well, can you describe the level -- was the level
11 of frustration growing from the accounts?
12     A     Yes.
13     Q     Okay.  And can you describe what that
14 was like?  What -- how do you know the level of
15 frustration was growing?
16     A     They would stop ordering clubs.  They
17 didn't trust me anymore.  Because when you're
18 calling people on the telephone, they've never
19 seen you, they've never met you, just some woman
20 from Texas is calling me trying to sell me a whole
21 bunch of golf clubs.  It took a long time.  You
22 build the trust, you have a rapport, you have a
23 relationship with these people, and they trust
24 you.

Page 17

1         And this is their business, so
2 they're trusting you to help them grow their
3 business, and all of a sudden, they feel as though
4 you stabbed them in the back, so there's a lot of
5 trust that -- they didn't trust us anymore.  Us,
6 I'm saying us as a whole, as a company.  It wasn't
7 just me.
8     Q     Right.
9     A     Because they saw the clubs and they
10 quit ordering them.  The country clubs and stuff
11 got to the point where they wouldn't -- it's not
12 like they ordered a million clubs.  They would
13 order maybe a dozen or a half a dozen to keep them
14 on hand.  They wouldn't do that anymore.  They
15 would just order like one special order or some
16 guy came in and wanted a specific Adams club, they
17 would order that and just kind of didn't want
18 anything else.
19     Q     I see.  And -- okay.  And did they
20 tell you it was because of the clubs in Costco --
21     A     Yeah.
22     Q     -- that this trust had been breached?
23     A     Uh-huh.
24     Q     What you just testified to, did you

5 (Pages 14 to 17)

Page 18

```
 1   relay that to Mark Gonsalves in '97?
 2       A    Yes. Yes.
 3       Q    Okay. And he said: Keep working on
 4   it?
 5       A    Yeah, they eventually had like some
 6   little task force that they got going, but that
 7   had -- it had been going on a long time. It
 8   affected me first before it started affecting
 9   other salespeople, and it wasn't until it started
10   affecting other salespeople that, you know, they
11   kind of like looked into it a little bit.
12            And they had this task force,
13   but the task force didn't happen until the damage
14   was done, if you ask me, and that's when -- I
15   think it was Scott Blevins, they had some serial
16   numbers they would write on them or something like
17   that, but I mean --
18       Q    Now, are you aware -- are you aware
19   that Adams Golf had an initial public offering --
20       A    Uh-huh, yeah.
21       Q    -- and went public?
22       A    Yes.
23       Q    And just for clarity, you're aware
24   that it was July 9th of 1998?
```

Page 19

```
 1       A    Right.
 2       Q    The decline in sales that you were
 3   complaining about, was that occurring in 1997?
 4       A    Yes.
 5       Q    And was that occurring in -- the
 6   first half of 1998?
 7       A    Uh-huh.
 8       Q    And did you -- did you tell Mark
 9   Gonsalves specifically that you were experiencing
10   a decline in sales --
11       A    Yes.
12       Q    -- as a result of these complaints?
13       A    Yes.
14       Q    And what, if anything, did he say to
15   that?
16       A    He didn't really say much. He just
17   kind of blew me off. He never really had a whole
18   lot to say about it. He was just kind of: I
19   don't know.
20       Q    Other than Mark Gonsalves, did you --
21   did you talk about this Costco -- clubs in Costco
22   with other people at Adams Golf?
23       A    Oh, yeah. We -- everybody at Adams
24   Golf was really pretty close. We hung out. We
```

Page 20

```
 1   went to lunch together. We chitchatted. We saw
 2   each other on the weekends. We were all pretty
 3   close. Yeah, we'd talk about it. I mean, one of
 4   the things, we would kind of try to help each
 5   other, how to get over the objections that we
 6   always had. You know, we would stand around and
 7   we would write our numbers on the boards. I know
 8   like Katherine and I would talk about it,
 9   Katherine East and I would talk about it. So
10   yeah, we all talked about it.
11       Q    Were you the only one who was
12   experiencing a problem with clubs in Costco?
13       A    No. No. I believe Katherine was the
14   second salesperson affected by it.
15       Q    Are you able to recall what
16   regions -- Katherine is Katherine East?
17       A    Right.
18       Q    Are you able to recall what regions
19   of the country she had?
20       A    I think it was in the Southwest, like
21   around Arizona. I think that was the area that
22   was affected for her.
23       Q    And again, these discussions among --
24   correct me if I'm -- I don't want to characterize.
```

Page 21

```
 1   These discussions were generally among the inside
 2   sales staff?
 3       A    Yeah. Yeah. Pretty much.
 4       Q    And were those discussions occurring
 5   in 1997 and the first part of 1998?
 6       A    Uh-huh, yes.
 7       Q    Are you able to recall if anyone else
 8   on the inside sales staff complained about a
 9   breach of what -- what we've characterized as a
10   breach of trust this morning with their accounts?
11       A    I mean, if you're referring to the
12   double shipping and all that kind of crazy stuff,
13   yeah.
14       Q    Well, no, I --
15       A    I mean --
16       Q    I mean --
17       A    I mean the whole trust issues about
18   like the clients calling up --
19       Q    Yeah.
20       A    -- and complaining to us. Yeah,
21   everybody had that problem.
22       Q    I see. Did you -- were you ever able
23   to ascertain the amount of clubs that were
24   involved in showing up in Costco?
```

6 (Pages 18 to 21)

Page 22

1     A     I couldn't give you a number, but I
2   know that there were a lot, just for the fact
3   that, well, the people in the Seattle area were
4   telling me that there were hundreds in there. And
5   then they made their way all the way down to
6   Florida, and they made their way all the way to
7   Arizona. That's a lot of clubs.
8     Q     Are you able to recall -- let's see.
9   We'll take Pro Am Golf. I don't know anything
10  about it, but was Pro Am Golf -- where was that in
11  the hierarchy of your accounts? Was that the
12  biggest or --
13    A     Probably top five. And I had some
14  big ones.
15    Q     Well, we'll take Pro Am Golf in 1997
16  and the first half of 1998.
17           Can you describe what effect
18  this clubs-in-Costco complaint had on -- on your
19  sales to Pro Am Golf in 1997 and the first part of
20  1998?
21    A     They didn't buy nearly as many clubs.
22  They would just buy less, a lot less.
23    Q     Are you able to estimate, rough
24  estimate?

Page 23

1     A     I'm not good with estimates.
2     Q     I mean, if you can't, you can't.
3     A     I don't know. It was significant.
4   It was a significant decrease in what they would
5   buy.
6     Q     And were you on a commission --
7     A     Yes.
8     Q     -- basis at that --
9           Okay. So that was hurting
10  your pocketbook personally?
11    A     Yeah.
12    Q     Did anyone from Pro Am Golf cite any
13  other reasons for a reduction in their orders?
14    A     No.
15    Q     Did any of your green-grass accounts
16  suggest any other reason for a reduction in their
17  orders?
18    A     No. I mean, that was -- that was it.
19    Q     The Costco problem?
20    A     Uh-huh.
21    Q     Was there any discussion about where
22  the clubs were coming from that were showing up in
23  Costco?
24    A     Do you mean with Mark?

Page 24

1     Q     Sure. Yeah. Did you ever --
2     A     I know we --
3     Q     Yeah, did --
4     A     We all wondered, but I still don't
5   know exactly how they got there.
6     Q     Yeah.
7     A     I've got my assumptions and what I --
8   how I think they got there, but no, no one ever --
9   no one ever pinpointed that.
10    Q     What -- what's your assumption?
11    A     My assumption is when Jay, another
12  salesperson, he shipped a lot of clubs --
13    Q     I'm sorry. For the record --
14    A     Jay Greaney. He's a salesperson.
15           He would ship clubs -- I do
16  remember there was a place in California that he
17  would ship gobs and gobs of clubs to, but there
18  was no store. Gee, I wonder where they're going.
19  And that -- I don't remember the name of the
20  accounts. It wasn't my account base. But we do
21  travel. It's not like we're stuck in Texas, and
22  you go to places and there is no such and such
23  store.
24           And also, when he -- he

Page 25

1   shipped out of a lot of clubs that he really
2   probably shouldn't have been shipping out, and
3   that's where I assume they went.
4     Q     I see. And when you said: We
5   weren't stuck in Texas, again, are you referring
6   to the inside sales staff?
7     A     Yeah. I travel -- even when I
8   traveled for pleasure -- my brother -- at the
9   time, my brother lived in Southern California, and
10  I would go and: Hey, I work for Adams Golf. So
11  I'd go to Edwin Watts or whatever golf stores were
12  out there. We're not isolated. We get out.
13    Q     Well, and what -- okay. Strike that.
14  Sorry.
15           Your region -- let's say in
16  1997 and the first half of 1998, did -- you had
17  the Miami region in Florida, or did -- how was
18  your region bordered in Florida?
19    A     I had Fort Lauderdale and I had
20  Miami.
21    Q     And in the hierarchy of the Adams
22  Golf sales department, were those important
23  markets or --
24    A     Yes.

Page 26

1    Q    -- average markets?
2    A    No. No. That's -- there's a lot of
3  money in Southern Florida. And the way the --
4  it's -- the way the inside sales was mapped out is
5  that you would have -- because in the winter,
6  you're in Seattle or Philadelphia or whatever,
7  you're not playing golf because it's cold. You go
8  down to Miami and play golf.
9        So you'd have an amount of
10  summer accounts and an amount of winter accounts.
11  And so that was -- I mean, if I didn't have Miami,
12  I probably wouldn't have made any money in the
13  winter months.
14    Q    Right. Nobody is playing golf in the
15  snow.
16    A    Yeah.
17    Q    You've testified to the reaction of
18  your accounts in Washington to clubs in Costco.
19  Can you tell us about the reaction of your
20  accounts in Fort Lauderdale or Miami area?
21    A    Yeah. I'm pretty sure it was Edwin
22  Watts that called me, and I'm sure you know Edwin
23  Watts is a big chain.
24    Q    Oh, yeah.

Page 27

1    A    And also some smaller places too.
2  They would call and complain, kind of the same
3  thing, just a different area.
4    Q    And was -- can you characterize what,
5  if any, impact that had on sales in --
6    A    Yeah, it -- dramatic decline. They
7  were angry. I mean, their first thing is they're
8  angry because they think we bamboozled them. That
9  was their first thought: Hey, I'm managing this
10  pro shop or I own this pro shop and you're selling
11  me these clubs at X dollars, and I can go down the
12  street and any Joe Blow can buy them for way
13  cheaper.
14        It was just -- it messes up
15  the numbers, because we would tell them they have
16  so much of a margin because you have to sell it
17  for so many dollars. They go down the street and
18  what I just told my pro doesn't apply to that guy,
19  and they would get mad.
20    Q    Right.
21    A    It affected their bottom dollar too,
22  and if you're a pro shop manager or you manage an
23  Edwin Watts or whatever and your numbers aren't
24  what they're supposed to be, they're getting in

Page 28

1  trouble. So yes.
2    Q    So then in your -- your portfolio of
3  accounts, Miami and Fort Lauderdale was your most
4  important region or most profitable, however you
5  would define that? Is that true or --
6    A    Of my whole region, no; but in the
7  winter, yes.
8    Q    All right. Okay. Was there
9  competition among inside sales staff members to --
10  to get different regions, to be the salesperson
11  for that region?
12    A    No, that wasn't really an option.
13    Q    It was just kind of whacked up --
14    A    You -- your territory is your
15  territory and tough luck if you want something
16  else. I mean, unless someone was wanting -- I
17  mean, you could trade, but that didn't really
18  happen.
19    Q    Just one second, if I may.
20        So other than -- and again,
21  the record will -- and please, I don't want to put
22  words in your mouth.
23        Other than speaking with Mark
24  Gonsalves about the clubs in Costco and customer

Page 29

1  complaints and other members of the inside sales
2  staff, did you discuss it with anybody else?
3    A    I mean, no. There's no real need to.
4  No.
5    Q    There's no -- why did you feel no
6  real need to?
7    A    Well, Mark was my boss, so --
8    Q    Okay.
9        MR. MARA: I don't think I
10  have anything else.
11        EXAMINATION
12  BY MR. BESSETTE:
13    Q    Ms. Brooks, my name is Paul Bessette.
14  I'm with Adams -- I'm sorry. I'm with Akin Gump.
15  I think when you and I first talked a long time
16  ago, I was with Brobeck. I don't know if you
17  remember our phone conversation.
18    A    I do, but it's been a while, yeah.
19    Q    But we haven't been able to talk with
20  you in a long time. I say "we" meaning Adams
21  Golf's counsel. But I understand you've talked
22  with the plaintiffs' counsel before today?
23    A    Uh-huh.
24    Q    How many times, would you say?

8 (Pages 26 to 29)

1  who used to work there. So I have no problem with
2  Adams Golf.
3      Q   Do you know what the plaintiffs'
4  claim in this litigation is?
5      A   Not really sure. No, I really don't
6  know the ins and outs of the case, I just -- I
7  really don't.
8      Q   Did the plaintiffs ever tell you what
9  their claims were?
10     A   I -- I don't know if I ever asked.
11     Q   Do you have any sense, as you sit
12 here, whether Adams Golf as a company did anything
13 wrong with respect to -- when they went public in
14 their IPO?
15     A   Yeah. I think there was some -- a
16 couple of misguided people at the company.
17     Q   What do you mean?
18     A   Well, when all that double-shipping
19 business was going on with Jay, and I'm sure
20 you-all talked to Jay Greaney and everything,
21 about the whole double shipping, I'm pretty sure
22 Mark Gonsalves knew about that. That's not right,
23 you know.
24     Q   Did you know that the company

1  investigated whether there was actual double
2  shipping or not?
3      A   I'm not really sure -- I know
4  there's -- you don't need to investigate it. I
5  know there was double shipping. I don't need to
6  investigate. I am quite confident there was
7  double shipping going on.
8      Q   I'm sure you are --
9      A   Yeah.
10     Q   -- but do you know whether the
11 company investigated it?
12     A   I don't know.
13     Q   Do you know what Jay talked about
14 with respect to double shipping?
15     A   No.
16     Q   Okay.
17     A   I mean, Jay was a nice guy and
18 everything, but we weren't like -- we didn't like
19 hang out and chat or anything.
20     Q   You don't have any reason to believe
21 that Jay Greaney would lie under oath, do you?
22     A   No.
23     Q   You wouldn't lie under oath?
24     A   No.

1      Q   Let's talk about you joining Adams
2  Golf in August '96. What did you do before that?
3      A   I was a sale rep for "The Green
4  Sheet." And before that, I had just moved here
5  from El Paso.
6      Q   And before joining Adams Golf, did
7  you have any experience in the golf industry?
8          MR. MARA: I'm sorry. I
9  didn't mean to -- did you say '98, joining Adams
10 Golf in '98?
11         MR. BESSETTE: August of '96.
12         THE WITNESS: I thought he
13 said '96.
14         MR. MARA: Sorry.
15     A   Golf industry, no. I played golf,
16 but that was it.
17     Q   (By Mr. Bessette) Okay. And you
18 said you reported to Mark Gonsalves. How was he
19 as a -- as a boss, generally speaking?
20     A   He was -- he had certain standards he
21 would like us to live up to. He drove us pretty
22 hard, but he was a good salesperson. He was a
23 good sales manager.
24     Q   He was a good motivator?

1      A   Yeah.
2      Q   Was he a good mentor?
3      A   Yeah.
4      Q   And he held, I think you said, daily
5  sales meetings with the staff to help motivate and
6  help drive more sales?
7      A   Right.
8      Q   You -- I wrote this down. I thought
9  it was kind of funny. You called yourself a
10 squeaky wheel?
11     A   Yeah.
12     Q   Were you sort of the complainer in
13 the group?
14     A   When something was brought to my
15 attention, yeah. But I'm like that now, still.
16 If something I see is wrong or happening wrong,
17 I'm going to talk about it until I don't think
18 it's wrong anymore or it's been fixed or repaired
19 or has gone away or whatever, so yeah.
20     Q   And is it your recollection you kind
21 of went and talked to Mark quite a bit and
22 complained quite a bit about things, didn't you?
23     A   Not just things. I mean, that makes
24 it sound pretty trivial. But if there was

10 (Pages 34 to 37)

Page 66

1  about it.
2        So I was like: No, we are not
3  selling to Costco. It's -- it's not going to
4  happen. That's not what we're doing. And it just
5  kind of built up over a series of a couple of
6  months where they got more angry and kept seeing
7  the clubs, and I kept telling them, no, no, no,
8  and then they just kind of finally had enough and
9  just -- slowly just stopped buying.
10       Q    I see. So it took -- I mean, it took
11 several months because you were obviously being
12 very persuasive that the company is not selling
13 clubs to Costco?
14       A    Right.
15       Q    They must be getting them somewhere
16 else?
17       A    Right.
18       Q    And we're going to figure out where
19 they're getting them?
20       A    Right.
21       Q    And you were being told by Mark and
22 others in the company that the company was trying
23 to figure out how Costco was getting these clubs?
24       A    Towards the end, yeah, when everybody

Page 67

1  was affected by it, yeah.
2        Q    And you're aware that the company
3  sued Costco, right?
4        A    No, I didn't know that.
5        Q    You didn't know that. Okay.
6             So you didn't know that they
7  sued Costco to figure out how Costco was getting
8  the clubs. They put out a press release to tell
9  retailers and people in the marketplace that they
10 were suing Costco because Costco was an
11 unauthorized retailer.
12            You don't remember that at
13 all?
14       A    Vaguely. I remember something about
15 the Costco thing, but I don't remember there being
16 a lawsuit, but --
17       Q    I think it was actually called a bill
18 of discovery, but unless you're a lawyer, you're
19 probably --
20       A    I'm like, no, so that's -- yeah,
21 so -- I do remember something along those lines,
22 yeah.
23       Q    Because wasn't Mark telling you:
24 Look, here's the story. We're not selling to

Page 68

1  Costco. Tell your folks that. We're going to sue
2  Costco or we're suing Costco, and that's a message
3  you can send to the retailers?
4        A    Long time -- I mean, in my opinion,
5  the damage had already been done. My clients
6  didn't care at that point. They were like: Too
7  little, too late.
8        Q    Okay.
9        A    Because it wasn't just like: Oh,
10 really, let's run out and do something about it.
11 It took a long time of lots of clients and people
12 calling in before anything was ever really done
13 about it.
14       Q    So in the -- and what you're saying
15 as anything really done about it is sort of that
16 Scott Blevins team to go check --
17       A    Yeah, and that thing of discovery
18 that you just talked about. I do remember that,
19 but --
20       Q    When do you remember that?
21       A    I don't -- I don't remember a time,
22 but you -- I'd completely forgotten about that
23 until you -- I was like, oh, yeah, they did do
24 some little press release or whatever you called

Page 69

1  it.
2        Q    Uh-huh.
3        A    But that was too little too late.
4        Q    Okay. So when do you recall --
5        A    I don't remember when it happened. I
6  do remember it happening, but I don't remember
7  what it was. I do remember my accounts had
8  already -- by the time that happened, I do
9  remember my accounts being disgruntled already.
10       Q    Oh, okay.
11       A    Does that --
12       Q    Sure. Because if that happened in --
13 say, the press release was in June, you move into
14 the new building in April, so between April --
15 March, April and June, you've been working them a
16 long time telling them: It's not us, and not to
17 worry.
18            Does that sort of sound right?
19       A    I think so, yeah, but -- actions
20 speak louder than words sort of thing.
21       Q    Sure.
22       A    That was their --
23       Q    So there's no doubt they were
24 disgruntled and they were complaining to you.

18 (Pages 66 to 69)

Page 74

1    Q    And they started complaining, and as
2  you say, they got more and more disgruntled, and
3  it took months, and then at some point they slowed
4  their orders and it stopped altogether?
5    A    Yeah.
6    Q    And the records of the company and
7  the sales records would reflect all the sales that
8  were made?
9    A    Yeah.
10    Q    So we could see, presumably, whether
11  anybody actually slowed or stopped?
12    A    Yeah, I would guess.
13         MR. MARA:  Is now a good time?
14         MR. BESSETTE:  Yeah.  Let's
15  break.
16         (A recess was taken from
17         11:46 to 11:56.)
18         MR. BESSETTE:  Okay.  Back on.
19    Q    (By Mr. Bessette)  In the --
20  Ms. Brooks, in the -- again, same time frame we've
21  been talking about, moving into the new building
22  on Plano Parkway, March/April, till the IPO, how
23  many inside salespeople do you think the company
24  had at that time, that you recall?

Page 75

1    A    12, maybe.  I don't remember.  I'm
2  trying to think of who all was there.  I know it
3  was more than the initial six.
4    Q    Uh-huh.
5    A    10, 10, 12, somewhere around there.
6    Q    That's your recollection?
7    A    I think -- I don't really remember.
8  I'm just trying to think of who the salespeople
9  were, because they were the original six, and then
10  there was like Darin and Andrea and all those
11  people got hired, and the little guy that drove
12  the Jeep.  I can't remember his name.  I don't
13  remember.  I know it was more.
14    Q    Okay.  And do you remember -- do you
15  remember about the -- of the IPO again, so we're
16  in the summer of '98, about how many retail
17  accounts were there overall that the company had?
18    A    I don't know.
19    Q    No idea?
20    A    Huh-uh.
21    Q    You don't know if it was 5,000 or
22  10,000 or anything like that?
23    A    No.
24    Q    With lots of accounts and lots of

Page 76

1  salespeople, did you -- how well did you know
2  other people's accounts?  Did you have time to
3  know other salespeople's accounts?
4    A    Some of the bigger ones that maybe
5  affect your territory, maybe you would know.
6    Q    Uh-huh.
7    A    That way.
8    Q    Okay.  I can see that.  Any other
9  way?
10    A    Just chatting.  Like I'll give you an
11  example that kind of -- like the -- there's a golf
12  club in Pennsylvania called Squires Club.  It's a
13  pretty high-end -- when I say high-end, men-only
14  club, and I got to be such good friends with the
15  pro there that he actually sent me a wedding
16  present, and he thanked me when I sent Dr. Jay to
17  his club to buy a golf club.
18         So I told everybody the
19  Dr. Jay story a hundred times.  So you know
20  things, if have like a story or something.  We
21  knew things about maybe special accounts.
22    Q    Okay.  All right.  Good.
23         Now, Jay Greaney was the top
24  salesperson at the time?

Page 77

1    A    Correct.
2         MR. MARA:  The time being?
3    Q    (By Mr. Bessette)  The time being,
4  again, it's March/April to --
5    A    While Jay was there, best of my
6  recollection, he was usually the top salesperson,
7  so --
8    Q    And why was that, in your view?
9    A    He was a good salesperson, and he
10  also padded his orders.
11    Q    Yeah.  So let me explore that a
12  little.
13         Why do you think he padded his
14  orders?
15    A    To make more money.
16    Q    Let me ask you a better question:
17  How do you know?  How do you have the opinion that
18  he padded his orders?
19    A    Because my -- I know he had a lot of
20  returns and -- and it was kind of common
21  knowledge.
22    Q    Okay.  So besides water cooler talk
23  and people not liking Jay for whatever reason --
24    A    I never said I didn't like Jay.  I do

20 (Pages 74 to 77)

Page 78

1  like Jay.
2      Q    Okay. Let me ask you this in one
3  pointed question: Do you have any personal
4  knowledge that he actually, as you said, padded
5  his numbers?
6      A    I can't think of anything specific.
7  Eight years ago, I probably could have cited
8  something pretty specific, but right now, no, I
9  can't.
10     Q    So as you sit here, no personal
11 knowledge?
12     A    That I can remember.
13     Q    That's all I want to know, is what
14 you remember.
15     A    Yeah. I can't think of anything
16 right now. If someone were to jog my memory or
17 give me some specific examples, maybe I'd remember
18 something, maybe I wouldn't. I don't know.
19     Q    Okay. You also testified earlier
20 about this California store that Jay shipped to.
21     A    Uh-huh.
22     Q    So let me understand, are you saying
23 that you were out in California and you knew the
24 specific address?

Page 79

1      A    No. No. No. Other people, such as
2  myself -- I was giving you an example of when I
3  went to California and I would go look at other
4  people, but I do remember him having an account in
5  California that did not have a storefront.
6      Q    Okay.
7      A    I believe -- I believe maybe he's the
8  one who told us. I don't recall. I don't
9  remember, but it -- the inside sales team knew
10 that Jay had a customer, client, whatever you want
11 to call them, in California that did not have a
12 storefront.
13          I think maybe one of his other
14 clients found that out. I'm not really sure
15 exactly how it came to light, but that did come to
16 light.
17     Q    Okay. And what did that mean to you?
18 Because I don't know what that means.
19     A    Well, that meant to me: He is
20 selling clubs at the wholesale price to some guy
21 who doesn't have a store for people to come and
22 buy them in.
23     Q    Okay. So besides that, you don't
24 know -- is there any other meaning to that?

Page 80

1      A    I take it is that he is selling them
2  to this guy and this guy is probably, I'm
3  thinking, Mr. Gray Market guy.
4      Q    But again, no personal knowledge?
5      A    No. But it was -- the whole inside
6  sales team, including Mark and Craig and everybody
7  else, knew about this. We talked about it openly.
8  It wasn't some big secret.
9      Q    So wouldn't that suggest it was
10 appropriate and aboveboard, just a little unusual
11 and not something sinister?
12     A    No --
13          MR. MARA: Objection to the
14 form of the question.
15          But answer it. Sorry.
16     A    No, because didn't Jay get fired?
17     Q    (By Mr. Bessette) Is that your
18 recollection?
19     A    Yeah, I think he got fired
20 eventually. I mean, Jay had a unique way of
21 selling clubs, I'll say, and I personally don't
22 find it it to have been an ethical way to sell clubs.
23     Q    What do you mean by that?
24     A    Some people, when you -- you say:

Page 81

1  Okay. I'll take six clubs.
2          Send them a dozen. He would
3  do that. That was his method. I don't believe
4  there's any secret. A person tells me: Send me
5  six clubs, I sent them six clubs. So that's what
6  I'm talking about.
7      Q    All right. So let's explore that
8  again. Besides the knowledge that you say was
9  around the water cooler --
10     A    Do I have something pinpoint specific
11 to document or anything, no, I don't.
12     Q    So no personal knowledge, no seeing
13 an order, knowing that somebody ordered six and --
14     A    No.
15     Q    -- seeing that Jay actually shipped
16 12?
17     A    No.
18     Q    Nothing like that?
19     A    No.
20     Q    Just talk around the halls?
21     A    Yeah.
22     Q    Okay. Now, you testified earlier
23 that -- I think you said Costco, you know, it was
24 a big problem for your -- the accounts we've

21 (Pages 78 to 81)

1  already talked about --
2      A     Right.
3      Q     -- who they were.  And that
4  eventually, over time, they got so disgruntled
5  that they slowed or stopped orders?
6      A     Right.
7      Q     Sitting here, looking back on it now,
8  so this time frame in '98 --
9      A     Uh-huh.
10     Q     -- let's say all of -- let's say that
11 same time frame, the April -- March/April, going
12 to the new building, to say, the IPO, how -- how
13 many clubs -- how many -- how many clubs did
14 Costco sell in your territory?  Do you have any
15 sense?
16     A     No.  I mean, I couldn't tell you.  I
17 mean, I never went there.  I don't know how many
18 they had, but according to my clients who told me
19 that they had, you know, in the -- a hundred clubs
20 or so sitting right there.  It was always full and
21 it was all freshly stocked, so I'm going to say a
22 lot.
23     Q     A lot.
24     A     Yeah.  I don't have a number to put

1  on it because I wasn't there.  I didn't count
2  them.  I'm just going by what my people told me.
3      Q     Okay.  And you have no reason to
4  dispute that whatever the Costco records show what
5  their sales were in particular regions, you don't
6  have any reason to believe that that wouldn't be
7  accurate?
8      A     No.
9      Q     Okay.  And if -- for example, if
10 Costco had showed that in the second quarter of
11 1998 -- and again, that's right at the time frame
12 we're talking about, April, May, June 1998.
13     A     Uh-huh.
14     Q     -- in the states of Alaska and Idaho
15 and Montana and Oregon and Utah and Washington,
16 there were just over 700 clubs sold, does that
17 sort of sound accurate to you?
18            MR. MARA:  Objection, assumes
19 facts not in evidence.
20            But go ahead.
21     A     I figured it would be a lot more than
22 that, but I -- I have never been to any of those
23 places, so I have no idea.  I mean --
24     Q     (By Mr. Bessette)  And that's a good

1  point.  You would have thought it was more because
2  it seemed more to you because your customers
3  were -- were complaining to you?
4      A     Uh-huh.
5      Q     But you don't, as you sit here, know
6  how many actual sales were being made in Costco
7  and how it was affecting the company overall,
8  meaning Adams Golf?
9      A     Right.
10     Q     Okay.  And would it surprise you to
11 learn -- and again, in the same time frame, April,
12 May, June of 1998 -- in what Costco calls the
13 Southeast region, but it's the states of Alabama
14 and Florida, Georgia, Maryland, North Carolina,
15 portions of New Jersey -- I don't know why that's
16 Southeast, but -- Puerto Rico, South Carolina,
17 Tennessee, and portions of Virginia, there were
18 only 150 clubs sold by Costco in that time frame?
19            MR. MARA:  Same objection.
20     Q     (By Mr. Bessette)  Is that surprising
21 to you as well?
22     A     Yeah.
23     Q     Again, you would have thought it
24 would be more?

1      A     Yeah.  Maybe they're all sold out of
2  Miami, I don't know, but --
3      Q     Maybe you know, maybe not.  We don't
4  know.
5            When did you -- let's see.
6  You said you got married in April?
7      A     Uh-huh.
8      Q     1998?
9      A     Uh-huh.
10     Q     You got married to Michael Brooks?
11     A     Right.
12     Q     He was an employee of Adams Golf?
13     A     Right.
14     Q     And you met him at Adams Golf?
15     A     Right.
16     Q     He was in what department?
17     A     He started off in customer service,
18 and then he moved up, and he was like the
19 purchasing manager or something like that.  He --
20 he was in charge of purchasing the components.
21     Q     We won't be too much longer.
22            Purchasing.  Who was his boss
23 in 1998/1999 time frame?  Do you know?
24     A     Well, Dick Murtland was his boss, and

22 (Pages 82 to 85)

**A. 21**

MAY-06-1998 17:42    ADAMS GOLF    972 424 0721    P.01/02

*2801 East Plano Parkway*
*Plano, Texas 75074*
*www.adamsgolf.com*
*FAX: 972-398-8818*
*800-622-0609*
*Tel: 972-673-9000*



*From the desk of*
**Chris Beebe**



To:  **All Distributors**

RE:  **Pirated Clubs, Grey Markets and Other Unpleasant Subjects**

Date: **May 6, 1998**                                    **Total Pages - 1**

Dear Distributors,

After the positive tone of my last fax to all of you, it is time to mention a few topics that are not as pleasant as the Faldo signing. However, these are part of doing business in the golf industry, and I thought it best to put them all together in one fax.

1) As Adams Golf has had the very good fortune to be selling a club that is in high demand, we understand that there will be those who want to create product similar to ours so that they can ride the momentum that has been created.  Companies such as Olimar and Cobra have clubs that employ the same concept, but are readily different from the *Tight Lies*.  These we take as complements.

   However, we are also seeing a number of direct copies, or very close reproductions of the *Tight Lies*. Adams Golf is taking action against these firms whenever we discover their products.  If any of you happen to come across such products, please fax me with as many details about the club as possible (name, who produces it, where it is being carried, pricing, etc.).  If Adams is not already aware of this club, we will ask you to purchase one and send it to Adams Golf via express mail.  Adams Golf will of course compensate you for any expenses incurred on our behalf.

2) I have also heard of several cases of trans-shipments (also called parallel importing or gray marketing) occurring in the United States as well as overseas. Adams Golf will not stand for such actions, and companies anywhere in the world that are caught selling our product outside their designated territories will be terminated.

   We are fortunate to be selling a club that many golfers want. However, we must be careful not to sell too many clubs to a single customer at one time, or to sell to known or suspected parallel exporters. Retailers with too many clubs will cut prices or ship to others in order to relive the pressures of excess stock. Either action hurts your future sales or those of a neighboring country. We are all in this together. Through sensible allocation of our product, strict policing of retail pricing and the knowledge that our actions will have an impact on others in the Adams Golf family, we can keep the demand for the *Tight Lies* growing.

**MCK00081**

MAY-06-1998  17:43        ADAMS GOLF                    972 424 0721    P.02/02

3) Several distributors have told me that they have been approached by Price Club and/or Costco regarding sales of *Tight Lies* directly to their US stores. If these stores, or any other approaches you, I would appreciate receiving as much information on which store called, who the contact person was, price they were offering, etc. We must all do our part to stop parallel imports (transshipments), and I appreciate any assistance that you can provide. If you are considering selling to these stores, please give me a chance to beat their pricing!

As the world becomes smaller, these problems affect each and every one of us. I want all of us to benefit from the popularity of the *Tight Lies*, but the only way that we can do this is by working together.

Best regards,

Chris Beebe

MCK00082

**A. 22**

| Date | Customer | Description | Operator | Name |
|---|---|---|---|---|
| 5/6/1998 | 18424 | Buddy wts me to call next Wed for PTP payment and why..JQ | VP1 | Lexington Country Club-Lexington, KY |
| 5/6/1998 | 18544 | Spoke w/Brian and gave info concerning Inv#10022160-he will research & call me back--explained order #1027666 on hold...kv | VP1 | Smithfields Country Club-Easley, SC |
| 5/6/1998 | 18711 | CR MEM FOR ALL INV'S CHARGED TAX | VP1 | Mira Vista Country Club-Ft Worth, TX |
| 5/6/1998 | 18711 | ON ACCT CR MEM FOR #80/14 IS FOR ALL INV'S PAID INCLUDING THE TAX-EC-PULL CR MEM FOR LIST OF THESE INV'S-EC | VP1 | Mira Vista Country Club-Ft Worth, TX |
| 5/6/1998 | 18800 | contacted golf shop...but was told to contact Barry at 828-0431--attempted to contact--not in-- imtc..kv | VP1 | Professional Golf Shop-Madison AL |
| 5/6/1998 | 18890 | Barry ci & stated that he would mail ck for Inv#10019068 by Friday--explained order #1026930 on hold..kv | VP1 | Professional Golf Shop-Madison AL |
| 5/6/1998 | 19062 | trans ck 13562 to cust 20036 | VP1 | |
| 5/6/1998 | 19132 | PER NANCY CK TO BE MAILED THURS. #10748 FOR INV. #10019654. CR. | VP1 | Cliffs Golf & Country Club-Landrum, SC |
| 5/6/1998 | 19145 | Get this Andrew called to cancel his order since our clubs are in Costco (not by our choice) in the Virginia area. I told Andrew that would be fine since he is on credit hold anyway and his now a COD account | VP1 | Pro Golf Discount-Fairfax, VA |
| 5/6/1998 | 19146 | II Laura: the ck 7855 never pd in an appearance on her account, I will research, Customer is actually up to date. | VP1 | Pro Golf Discount-Memphis, TN |
| 5/6/1998 | 19183 | SPOKE TO LEONA-SHE WILL OVER NIGHT CK TODAY FOR 38328.00 AND 534. NEXT WEEK. SAID SHE SHOULD HAVE AROUND 5000 DUE IN CREDITS FROM A PRICE CHANGE. | VP1 | Oshmans Sporting Goods, Inc.-Houston, TX |
| 5/6/1998 | 19183 | Called Leona-LM on physical address-will call her again today I for PTP sent sent.Glenda -SR-brought to all that on Inv#10011690/22022 wr gr only for 175 steel TL#122 per club,should be $102Q,Cr Memo to be written up by SR through A-Cr and turned in to | VP1 | Oshmans Sporting Goods, Inc.-Houston, TX |
| 5/6/1998 | 19163 | Sherry-When talking to Leona I will relay matter..JO | VP1 | Oshmans Sporting Goods, Inc.-Houston, TX |
| 5/6/1998 | 19736 | SW | VP1 | Alan Yamamoto Golf, Inc.-Honolulu, HI |
| 5/6/1998 | 19736 | SW MARK...CLAUS HAS BEEN SW JAY ABOUT 3 OR 4 TIMES ASKING THAT WE GIVE HIM R#4 AS DIDNT ORDER AND WANTS TO RETURN...HE HAS REFUSED TO PAY ON THE OTHER AS HE CLAIMS DOESNT TRUST US...I TRIED TO EXPLAIN THAT IS? I NEED TO KNOW WHICH INVOICE HE WAS SPEAKING | VP1 | Alan Yamamoto Golf, Inc.-Honolulu, HI |
| 5/6/1998 | 19736 | ABOUT...HE WILL GET INFO AND I WICR...THIS GUY IS VERY UPSET AND IS NOT AT ALL BELIEVING WHAT SR JAY IS SAYING..CLAIS BEEN IN BOX AND WAITING FOR APPROX 6 MONTHS..PS | VP1 | Alan Yamamoto Golf, Inc.-Honolulu, HI |
| 5/6/1998 | 19736 | ALSO WHEN HE RETURNS HE REFUSES TO PAY FREIGHT SINCE HE DIDNT ORDER..PS | VP1 | Alan Yamamoto Golf, Inc.-Honolulu, HI |
| 5/6/1998 | 19805 | Melta does not wk here-sk#3529945,line busy..JO | VP1 | Meadowbrook Golf Club-Gainesville, FL |
| 5/6/1998 | 19894 | Spoke w/Mark--requested fax of Inv#10021666 and he will mail ck today--faxed Inv...kv | VP1 | West Lake Country Club-Augusta, GA |

ADAMS041074

**A. 23**

| Date | Customer | Description | Operator | Name |
|---|---|---|---|---|
| 5/6/1998 | 18424 | Buddy wts me to call next Wed for PTP payment and why..JQ | | Lexington Country Club-Lexington, KY |
| 5/6/1998 | 18544 | Spoke w/Brian and gave info concerning inv#1022216O-he will research & call me back--explained order #1027668 on hold..kv | VP1 | Smithfields Country Club-Easley, SC |
| 5/6/1998 | 18711 | CR MEM FOR ALL INV'S CHARGED TAX | VP1 | Mira Vista Country Club-Ft.Worth, TX |
| 5/6/1998 | 18711 | ON ACCT CR MEM FOR 430.14 IS FOR ALL INV'S PAID INCLUDING THE TAX.EC-PULL CR MEM FOR LIST OF THESE INV'S.EC | VP1 | Mira Vista Country Club-Ft.Worth, TX |
| 5/6/1998 | 18990 | contacted golf shop, but was told to contact Barry at 828-0431--attempted--not inv-- intic..kv | VP1 | Professional Golf Shop-Madison AL |
| 5/6/1998 | 18990 | Barry ck & stated that he would mail ck for inv#10019368 by Friday--explained order #1026830 on hold..kv | VP1 | Professional Golf Shop-Madison AL |
| 5/6/1998 | 19062 | trans ck 1852 to cust 20306 | VP1 | |
| 5/6/1998 | 19132 | PER NANCY CK. TO BE MAILED THURS. #10746 FOR INV. #10019654. CR. | VP1 | Cliffs Golf & Country Club-Landrum, SC |
| 5/6/1998 | 19145 | Get this Andrew called to cancel his order since our clubs are in Costco (not by our choice) in the Virginia area.. I told Andrew that would be fine since he is on credit hold anyway and his now a COD account! | VP1 | Pro Golf Discount-Fairfax, VA |
| 5/6/1998 | 19146 | tt Laura: the ck 7835 never put in an appearance on her account, I will research. Customer is actually up to date. | VP1 | Pro Golf Discount-Memphis, TN |
| 5/6/1998 | 19163 | SPOKE TO LEONA-SHE WILL OVER NIGHT CK TODAY FOR 38328.00 AND 534. NEXT WEEK. SAID SHE SHOULD HAVE AROUND 5000 DUE IN CREDITS FROM A PRICE CHANGE. | VP1 | Oshmans Sporting Goods, Inc.-Houston, TX |
| 5/6/1998 | 19163 | Called Leona-LM on physical address-will call her again today for PTP amt.Glenda -SR- brought to att that on inv#10011590 02/02 wr chrg for 175 steel TL($132 per club.should be $102).Cr Memo to be written up by SR through JQ-cr and turned in to | VP1 | Oshmans Sporting Goods, Inc.-Houston, TX |
| 5/6/1998 | 19163 | Sherry:When talking to Leona I will relay matter.JQ | VP1 | Oshmans Sporting Goods, Inc.-Houston, TX |
| 5/6/1998 | 19736 | S/W | VP1 | Alan Yamamoto Golf, Inc.-Honolulu, HI |
| 5/6/1998 | 19736 | S/W MARK. CLMS HAS BEEN S/W JAY ABOUT 3 OR 4 TIMES ASKING THAT WE GIVE HIM RA# AS DIDNT ORDER AND WANTS TO RETURN..HE HAS REFUSED TO-PAY ON THE OTHER AS HE CLMS DOESNT TRUST US..I TRIED TO EXPLAIN THAT IST I NEED TO KNOW WHICH INVOICE HE WAS SPEAKING | VP1 | Alan Yamamoto Golf, Inc.-Honolulu, HI |
| 5/6/1998 | 19736 | ABOUT..HE WILL GET INFO AND I W/C/B..THIS GUY IS VERY UPSET AND IS NOT AT ALL BELIEVING WHAT S/R JAY IS SAYING..CLMS CLUBS BEEN IN BOX AND WAITING FOR APPROX 6 MONTHS...PS | VP1 | Alan Yamamoto Golf, Inc.-Honolulu, HI |
| 5/6/1998 | 19736 | ALSO WHEN HE RETURNES HE REFUSES TO PAY FREIGHT SINCE HE DIDNT ORDER..PS | VP1 | Alan Yamamoto Golf, Inc.-Honolulu, HI |
| 5/6/1998 | 19905 | Melba does not wk here-fax#3323345,line busy,JQ | VP1 | Meadowbrook Golf Club-Gainesville, FL |
| 5/6/1998 | 19894 | Spoke w/Mark--requested fax of inv#10021666 and he will mail ck today--faxed inv...kv | VP1 | West Lake Country Club-Augusta, GA |

ADAMS041074

| Date | Customer | Description | Operator | Name |
|---|---|---|---|---|
| 6/16/1998 | 8921 | LMTC for Wanda about results twice.Jq call tomo | VP1 | Great Visitors Golf Shop |
| 6/16/1998 | 9157 | ON INV.#10055266 WE CHARGED $4 TOO MUCH ON SHIPPING & $15 TOO MUCH ON THE PRICE OF THE CLUB. I WROTE UP A CREDIT MEMO FOR $19. | VP1 | Pro Golf Discount-Erie, PA |
| 6/16/1998 | 10039 | NACM RAN TODAY FOR REQ BY VW FORWARDED | VP1 | Chesapeake Bay Golf Shop-North East, MD |
| 6/16/1998 | 10046 | LMTC FOR KEN...PS | VP1 | Coopers Golf Outlet-Burlington, WA |
| 6/16/1998 | 10337 | Spoke w/David--he now states that I must contact Allan at 703-761-1444--kv | VP1 | Stoneleigh Golf Club-Round Hill, VA |
| 6/16/1998 | 10342 | S/W SHAWN..MIKE PLAYING GOLF...LMTC..PS | VP1 | Johnson City CC-Johnson City, TN |
| 6/16/1998 | 10351 | MELINDA PHD..CLMS INV 54279 WAS QUOTED 107.00 INSTEAD OF 108.00..ALSO FRT OF 11.00..SAYS SHE DOESNT PAY MORE THAT 6.00 FOR ONE CLUB...TOLD HER TO SEND OK LESS 5.00 FRT AND 1.00 OVER-PRICED AND WE WILL WO...PS | VP1 | Special Tee Golf-Altamonte Springs, FL |
| 6/16/1998 | 10352 | GAVE TO SHERRY FOR LETTER AS HAS ANOTHER ACCT ALSO # 12349..PS | VP1 | |
| 6/16/1998 | 12017 | Rtn-PTP-CC-Visa for #10010485-$4464.00.JQ | VP1 | McGuire Golf Course-McGuire AFB, NJ |
| 6/16/1998 | 12113 | Spoke w/Frank--he will research inv#10030077 and call me back..kv | VP1 | Race Brook Country Club-Orange, CT |
| 6/16/1998 | 12220 | REC 200.00 MO..PS | VP1 | Kamaina Golf Shop-Honolulu, HI |
| 6/16/1998 | 12266 | Teresa cl to have Inv#10025451 and Inv#10017753 from dup acct c#17039 faxed to her-faxed Inv's...kv | VP1 | New York Golf Ctr-LEE-Hicksville, NY |
| 6/16/1998 | 12266 | Teresa cl to have inv#10017753 & 10025451(from dup acct C#17039) charged to cc--submitted paperwork to Rowena to have $5,753.17 chrged...kv | VP1 | New York Golf Ctr-LEE-Hicksville, NY |
| 6/16/1998 | 12296 | submitted credit memo for inv#10052662 amt$144.00--per pulled original order--this was a repair at no chrg...kv | VP1 | New York Golf Ctr-LEE-Hicksville, NY |
| 6/16/1998 | 12309 | S/W KEN..SAYS WILL SEE ROBERT WHEN HE SEES HIM..TOLD HIM URGENT MUST HAVE PH CALL..PS | VP1 | Colonial Country Club-Jackson, MS |
| 6/16/1998 | 12349 | TRIED B/A..N/A...TO SHERRY FOR LETTER..PS | VP1 | |
| 6/16/1998 | 12418 | Frank-PTP-will try thru 04/27-53272.25 and $1192.21/n June if possible.FLU in July.JQ | VP1 | Golf USA-Saginaw, MI |
| 6/16/1998 | 12418 | Had problem in rec faxes -finally rec them;FLU w/Frank next wk.JQ | VP1 | Golf USA-Saginaw, MI |
| 6/16/1998 | 12806 | CALLED B/A..CLMS RECEIVER TAKEN OVER...PERSON TO CONTACT IS C.E. BOYD AT 770-509-8632..TRIED PH# LMTC ON A/S..PS | VP1 | Lanier Golf Center-Cumming, GA |
| 6/16/1998 | 12823 | 06/16/98 JACOP CLD PUT INV 47714 ON INV FOR 1011.50. PMR | | Roger Dunn Golf-Arroyo Grande, CA |
| 6/16/1998 | 13037 | 06/16/98 CLD T.T PETER SAID FAX INV 24146 SAID FAXED INV B/4 WENT HIS REFAXING TODAY AND SAYS 'EMPIRE GOLF' ON THIS INV. FAXING TDA - REL ORDERS TILL MATTER CLRD GOOD ACCT. PMR | | Golf Town-Bayside, NY |

ADAMS041360

| Date | Customer | Description | Operator | Name |
|---|---|---|---|---|
| 6/16/1998 | 13037 | 06/16/98 FAX NMBR SAME PH# NOT TURNED TO FAX I AM MNG PD INV 241:46 TDA AND ON INV SAID EMPIRE GOLF SO IDONT KNOW WHAT HE MEANT BY NOT HIS INV. PMR | VP1 | Golf Town-Bayside, NY |
| 6/16/1998 | 14095 | RETURN CALL TO GORDY TO CK UP ON INV INFO...N/A...BWH | VP1 | Bocair Country Club-Boca Raton, FL |
| 6/16/1998 | 15069 | submitted credit memo for inv#10017736 amt $9.00--concerning cod chrgs for inv#10012354 & 10017736...also submitted paperwork to have on acct applied to inv#10017736...kv | VP1 | Nevada Bobs-Tustin, CA |
| 6/16/1998 | 16341 | LMTC FOR DAVID...OLD NOTES SHOWS THAT HE WAS RTNG 4 CLUBS AND WOULD SEND CK FOR DIFFERENCE.PS | VP1 | Glenrochie Country Club-Abington, VA |
| 6/16/1998 | 16362 | Charlie ol--he will mail half of bal. today and the other half to get to b bal. in 30days..kv | VP1 | Warehouse Golf-Pigeon Forge, TN |
| 6/16/1998 | 17041 | spoke w/Brent concerning inv#1002874:1 & 10035013--he has junior golf right now--he will call back w/cc info later this afternoon to have inv's chrged...kv | VP1 | Williams Country Club-Weirton, WV |
| 6/16/1998 | 17041 | Brent cl to have inv#10029741 chrged to co--submitted paperwork to Rowena to have 1,241.95 chrged...also he requested to have 'on acct' applied to inv#10035013--submitted paperwork to have on acct applied...also he stated that he will be a little late | VP1 | Williams Country Club-Weirton, WV |
| 6/16/1998 | 17041 | paying inv#10044309 due to bad weather--just needs a little extra time...kv | VP1 | Williams Country Club-Weirton, WV |
| 6/16/1998 | 17117 | LMTC FOR JERRY...PS | VP1 | Nevada Bobs-Bloomington, IN |
| 6/16/1998 | 17131 | FAX INFO TO KATHY...BWH | VP1 | BIGHORN-Palm Desert, CA |
| 6/16/1998 | 17326 | order on 5/6 being picked up/ 5/1 order in request for 60 days | VP1 | Pyramid Discount Golf-Horn Lake, MS |
| 6/16/1998 | 17330 | WE OVERCHARGED ON SHIPPING ON INV.#10050228 BY $3.25. I WROTE UP A CREDIT MEMO FOR THAT AMOUNT & INFORMED SUZIE, THE SHOP MANAGER. | VP1 | Toms Golf Shop-Floyds Knobs, IN |
| 6/16/1998 | 17360 | LMTC FOR LAURA..PS | VP1 | |
| 6/16/1998 | 17690 | LMTC for Bobbie sd rec invoices but no statement;PTP-$286.03 in June-gave me address-will ck on it..JQ | VP1 | Hidden Valley Golf Facility-Wind Gap, PA |
| 6/16/1998 | 18251 | Kathleen not there-need to call on Friday for Kathy..JQ | VP1 | Golf Trader-Tamarac, FL |
| 6/16/1998 | 18329 | CHARGED TAX ON INV # 45794...BWH | VP1 | Pebble Creek-CC-College Station,TX |
| 6/16/1998 | 18329 | sent cust tax cert w/letter | VP1 | Pebble Creek-CC-College Station,TX |
| 6/16/1998 | 18439 | SPOKE TO ROB AND TOLD HIM PRE-PAY. HE WILL OVERNIGHT CK | VP1 | Golf Country-Staten Island, NY |
| 6/16/1998 | 18467 | REC'D NEW ADDRESS CHANGE FROM KEVIN BRYANT...NEW ADD/2949 CANTON HWY STE 400 MARIETTA,GA 30066... OLD ADD/ 2800 CANTON HWY STE K140O...BWH | VP1 | Bryant Boys Golf-Marietta, GA |
| 6/16/1998 | 18589 | Wir #-phone messed up.Call tomorrow..JQ | VP1 | Golf USA-Olathe, KS |
| 6/16/1998 | 18736 | Jill-PTP-all invoices in March-$3609.12 on 06/22.JQ | VP1 | Golf USA-Twin Falls, ID |

ADAMS041361

**A. 24**

Exhibit VII

| DATE | NUMBER OF CLUBS IN COSTCO WAREHOUSE[1] | NUMBER OF CLUBS SOLD BY COSTCO[2] | COMPLAINTS TO ADAMS GOLF REGARDING COSTCO | SOLUTIONS IMPLEMENTED BY ADAMS GOLF | NUMBER OF CLUBS SOLD BY ADAMS GOLF[3] |
|---|---|---|---|---|---|
| 2/16/98 | 200 (US) 440 (Canada) | | | | |
| 3/6/98 | 60 (Canada) | | | | |
| 3/15/98 [for 2/16/98-3/15/98] | | 1 (Canada) | | | |
| 3/17/98 | | | | | |
| 3/23/98 | | | | | |
| 3/25/98 | 2,883 (US) | | | | |
| 3/26/98 | 492 (Canada) | | WDC Mackenzie first reports the appearance of Adams Golf clubs in Canadian Costcos (ADAMS 9125) | | |
| 3/27/98 | | | | Adams Golf monitors large orders for potential gray marketing (ADAMS 1323) | |
| 3/31/98 | | 223 (Canada) | | | |
| 4/12/98 [for 3/16/98-4/12/98] | | | | Adams Golf stopped a large order from going to King Par in Flint, MI for fear of potential gray marketing (ADAMS 1323) | 188,898 |

[1] The count in this column are from the document Costco produced, showing when its warehouses received Adams Golf Tight Lies clubs. COST 0001-0008
[2] The count in this column are from Costco's records showing Costco sales of Adams Golf Tight Lies Clubs. COST 0024, 0041, 0050-0052
[3] ADAMS 28669.

1

| DATE | NUMBER OF CLUBS ARRIVING IN COSTCO WAREHOUSE? | NUMBER OF CLUBS SOLD BY COSTCO? | COMPLAINTS TO ADAMS GOLF REGARDING COSTCO | SOLUTIONS IMPLEMENTED BY ADAMS GOLF | NUMBER OF CLUBS SOLD BY ADAMS GOLF |
|---|---|---|---|---|---|
| 4/1/98 | | | WDC Mackenzie complains to Adams Golf's new director of International sales, Chris Beebe, about the presence of Adams Golf clubs in Canadian Costco (MCK 93 – MCK 96) | | |
| 4/1/98 | | | WDC Mackenzie sends a follow-up fax to Chris Beebe, reminding him that the Adams clubs were first seen in Costco around March 23 (ADAMS 9325 – ADAMS 9328) | | |
| 4/1/98 | | | WDC Mackenzie sends memo to Chris Beebe regarding the impact of Costco on Mackenzie's sales of Adams Golf clubs (MCK 87 – MCK 89) | Chris Beebe sends a memo to Mark Gonsalves, discussing the dangers of gray marketing and the solutions that other golf retailers have employed to combat the problem (ADAMS 5043) | |
| 4/28/98 | | | WDC Mackenzie tells Chris Beebe on a visit to Canada that about 600 woods made it into Canadian Costco, although most Costcos had run out of stock by that point. (ADAMS 9405 – ADAMS 9410) | | |
| 5/6/98 | | | Pro Golf Discount in Fairfax, VA cancelled order because Adams clubs are in Costco (ADAMS 041074) | Chris Beebe sends a letter to all international distributors, threatening to terminate any who participate in gray marketing, and offering to match Costco price for any thinking of selling to Costco (MCK 81 - MCK 82) | |
| 5/7/98 | | | Adams Golf clubs found in Costco in Modesto, CA (ADAMS 1504) | | |

2

| DATE | NUMBER OF CLUBS APPROVED IN COSTCO WAREHOUSE | NUMBER OF CLUBS SOLD BY COSTCO | COMPLAINTS TO ADAMS GOLF REGARDING COSTCO | SOLUTIONS IMPLEMENTED BY ADAMS GOLF | NUMBER OF CLUBS SOLD BY ADAMS GOLF |
|---|---|---|---|---|---|
| 5/10/98 [for 4/12/98-5/10/98] | 1,500 (US) | 160 (Canada) | | | |
| 5/8/98 | 300 (US) | 649 (U.S.) | | Barney Adams writes to Jim Sinegal of Costco, demanding that Costco cease selling Adams clubs, and asking to know where Costco is acquiring the clubs (ADAMS 1505) | |
| 5/11/98 | | | | | |
| 5/20/98 | | | Pro Golf complains that Costco is selling Adams Golf product (ADAMS 247J) | Mark Gonsalves sends a letter to Paul McDonald at Pro Golf, explaining that Adams Golf does not sell to Costco, and that Adams Golf is looking for ways to stop its product from being in Costco (ADAMS 247J). Gonsalves also writes to Adams Golf's sales department, asking them to pass on this same message to any customers complaining about Costco (ADAMS 247G) | |
| 5/21/98 | 225 (US) | | | Costco's Patrick Callans responds to Barney Adams's letter, saying that Costco will not reveal its source, other than to say that it is a US company (ADAMS 1501 – ADAMS 1503) | |
| 5/22/98 | | | | Barney Adams sends a letter to Patrick Callans, demanding that Costco identify the retailer that had sold Adams Golf clubs to it (ADAMS 1499) | |

3

| DATE | NUMBER OF CLUBS ARRIVING IN COSTCO WAREHOUSE | NUMBER OF CLUBS SOLD BY COSTCO | COMPLAINTS TO ADAMS GOLF REGARDING COSTCO | SOLUTIONS IMPLEMENTED BY ADAMS GOLF | NUMBER OF CLUBS SOLD BY ADAMS GOLF |
|---|---|---|---|---|---|
| 5/26/98 | | | | | |
| 5/29/98 | 2,000 (US) | | | Patrick Cullen of Costco responds to Barney Adams's letter, providing Adams with the certificate of authenticity signed by the retailer that supplied Costco, but still refusing to reveal the retailer's identity (ADAMS 1498) – ADAMS 1500 | |
| 5/29/98 | | | WDC Mackenzie reports that a new shipment of Adams Golf clubs have hit Canadian Costco (ADAMS 1497) | | |
| 6/1/98 | | | Centerville Golf in Centerville, VA complained about Adams clubs in Costco (ADAMS 04 1242) | Barney Adams writes another letter to Patrick Cullen of Costco, demanding that Costco identify the retailer providing Costco with Adams Golf clubs (ADAMS 1495) | |
| 6/5/98 | | 1625 (U.S.) 158 (Canada) | Merrifield Golf in Fairfax, VA called regarding Adams clubs seen at Costco (ADAMS 04 1296) | Adams Golf implements a price-matching policy in Canada that allows the retailers to match Costco's price without giving up their margin for any customer that mentions that Adams clubs are available at Costco (MCK 1033 – MCK 1035) | |
| 6/9/98 [for 5/11/98-6/9/98] | | | | Adams Golf issues a press release announcing that the Company has taken legal action against Costco (ADAMS 1477) | |

4

| DATE | NUMBER OF CLUBS ARRIVING IN COSTCO WAREHOUSE | NUMBER OF CLUBS SOLD BY COSTCO | COMPLAINTS TO ADAMS GOLF REGARDING COSTCO | SOLUTIONS IMPLEMENTED BY ADAMS GOLF | NUMBER OF CLUBS SOLD BY |
|---|---|---|---|---|---|
| 6/11/98 | | | Jack Toon Golf in Ripon, CA called regarding Adams clubs in Costco (ADAMS 041334) | Adams Golf files a Bill of Discovery in Texas state court against Costco (ADAMS 1474 – ADAMS 1493) | |
| 6/24/98 | | | Green River Golf Club in Corona, CA called to complain about clubs in Costco (ADAMS 041435) | | |
| 6/25/98 | | | Pro Golf Discount in Boise, ID called regarding their problems selling clubs due to Costco (ADAMS 041441) | | |
| 6/25/98 | | | Centerville Golf Center in Centerville, VA called to complain again about Costco (ADAMS 041443) | | |
| 6/26/98 | | | | Barney Adams writes letters to Larry Terry of Manatee Golf and Don Starks of King Par Golf, reminding them of their resale agreements with the Company and the fact that it only allows him to sell to end-users. Adams asks Terry and Starks to sign and return copies of this distribution policy to the Company. (ADAMS 1457; ADAMS 1473) | |
| 6/29/98 | | | | Adams Golf internal minutes indicate tracing of shipments to Manatee (ADAMS 9071) | |
| 6/31/98 | | | Terracy Golf in Walnut Creek, CA called regarding a customer returning clubs after seeing Adams Golf clubs in Costco (ADAMS 041454) | | 268,598 |

5

| DATE | NUMBER OF CLUBS ARRIVING IN COSTCO WAREHOUSE | NUMBER OF CLUBS SOLD BY COSTCO | COMPLAINTS TO ADAMS GOLF REGARDING COSTCO | SOLUTIONS IMPLEMENTED BY ADAMS GOLF | NUMBER OF CLUBS SOLD BY ADAMS GOLF |
|---|---|---|---|---|---|
| Pre-IPO total as of 6/5/98 | | | | | 457,496 |
| 7/3/98 | | | Customer requests after buying clubs at a Costco in Livonia, MI (ADAMS 1447) | | |
| 7/5/98 [in 6/6/98-7/5/98] | | 926 (US)<br>173 (Canada) | | | |
| Pre-IPO total as of 7/5/98 | | 3200 (US)<br>715 (Canada) | | | |
| 7/6/98 | 269 (US) | | Golfsom in McLean, VA called regarding a credit for clubs they had purchased at Costco (ADAMS 041514) | | |
| Pre-IPO total as of 7/8/98 | 992 (US)<br>7377 (Canada) | | | | |
| 7/16/98 | | | | As a staff meeting, the Company discusses potentially implementing a serialization program for Adams Golf clubs (ADAMS 9088 - ADAMS 9091) | |
| 7/21/98 | | 1,266 (US) | | | |
| 7/23/98 | | 1,795 (US) | | | |
| 7/27/98 | | | Fisher's Discount Golf in Bellingham, WA called to complain about problems with self-through sale to Adams clubs in Costco (ADAMS 041654) | | |
| 7/29/98 | 447 (US) | | | | |
| 8/2/98 [for 7/6/98-8/2/98] | | 2059 (US)<br>75 (Canada) | | | |

6

**A. 25**

2801 East Plano Parkway
Plano, Texas 75074
Phone: 972-673-9000 Fax: 972-398-7970

**Adams Golf, Inc.**

# Fax

| **To:** | Paul McCormick | **From:** | Mark D. Gonsalves |
|---|---|---|---|
| **Fax:** | 248-737-9077 | **Pages:** | 1, including this one. |
| **Phone:** | 248-737-0553 | **Date:** | 05/21/98 |
| **Re:** | Costco | **CC:** | Adams Inside Sales and RAC Staff |

Dear Paul,

As discussed, I wanted you, your staff and your franchisees to know Adams has not sold, and will not sell, our Tight Lies clubs to Costco. Our clubs have ended up at a number of Costco and Price Club's (both the same parent company) without our authorization.

We are working very hard to identify the source who is supplying Costco our product. We are also looking into the legal remedies we have with Costco for selling our product and disrupting our retail trade, such as yourself.

Pro Golf customers should be aware Costco is not an authorized dealer of Adams product, and as such, have no implied warranty coverage should a club be defective. Your customers should also note that although Costco is selling the clubs now, we will stop them. It will just take some time. Having said this, many of the Costco stores do not have the right loft or flex in stock for a customer, nor do they have trained personnel who can help fit the player to the right club.

I would hope with all my heart Pro Golf customers, and all golfers, consider the ramifications of buying product from an unauthorized dealer. You and your stores have worked hard to develop your expertise in golf and in golf equipment. Your stores work hard to invest in products your customers can benefit from and are there to support them when a product may not be performing as anticipated. I feel strongly they consider what it means to support their Pro Golf store. With better support, the stores can even do more for customers to enjoy this great game.

I am truly sorry for any disruption to your business the Costco incident may have caused. Thank you for your understanding and know we are doing everything to correct the problem.

Very best regards,



Mark D. Gonsalves
Vice President
Sales & Marketing

ADAMS 002471

**A. 26**

**Adams Golf, Inc.**

# Memo

To:     Ann Neff

From:   Mark D. Gonsalves

CC:

Date:   05/08/98

Re:     Costco

Ann,

Barney asked me to provide you the following information on Costco:

Buyer for Costco for Adams clubs: Mark Fenick, buyer #174, phone # 425-313-8100

Costco's Adams Tight Lies item # 025926

Clubs are sold to Costco through National Clothing who receives the clubs from US Merchants out of Thousand Oaks, CA (310-855-1946, Jeff Pierce).

Costco's Corporate Address is: 999 Lake Drive, Issaquah, WA 98027
CEO is Jim Sinegal
Costco's corporate phone number is 425-313-8100.

Let me know if I can help gather any additional information.



EXHIBIT
256

ADAMS 001506

**A. 27**

JUL-06-2005  13:22          BERGER & MONTAGUE P.C.                              P.04

2801 East Plano Parkway
Plano, Texas 75074
www.AdamsGolf.com
FAX: 972-398-8818
800-622-0609
Tel: 972-673-9673

# ADAMS
*We make golf clubs.*

*From the desk of*
**B.H. (Barney) Adams**

## Memo

To:  Mark Gonsalves

Date:  May 26, 1998

RE:  COSTCO

As we proceed, understand that we're taking on the 800# gorilla and they've done this 1,000 times. In their response to my letter they say they buy clubs form a duly authorized Adams distributor who has represented that he has the right to resell anything he buys to whomever he chooses at any price.

A.    Is there any language in our purchase orders that precludes selling to other retailers?
B.    I know we encourage observing the retail price and I think we request but can't demand (correct).
C.    I realize we have a strong business agreement; I'm looking for anything that isn't verbal or natural course of business.

At the end of the day we expose X source (or sources) and they say, "I buy Adams, I pay my bills. They never said I couldn't sell to Costco or anyone else, it's my decision." Given all the logic, do we have any technical grounds? (What if it were WDC Mackenzie – does their contract read Canada only, etc.?)

AND:  Let's say there are 1 – 2,000 clubs in the Costco system (who knows?). We win – they send them back to their source who wants to send them back to us (in various forms of "newness"). What do we do if the source:
A.    Has paid their bill;
B.    Hasn't.

No matter what happens, this product is going to get dumped and I'm not too anxious to get back $250K worth of clubs!

BHA:afn

Δ π EXHIBIT 293
Deponent *Adams*
Date 6/22/04 Rptr. *JL*
WWW.DEPOBOOK.COM

ADAMS028450

TOTAL P.04

**A. 28**

**Adams Golf, Inc.**

# Memo

| | |
|---|---|
| **To:** | Sherry Braby, Jim Farrell, Kayla Mitchell, Max Puglielli, Chris Beebe, Cindy Herrington, Dick Murtland, Walt DeVelt |
| **From:** | Mark D. Gonsalves   *MDG* |
| **CC:** | |
| **Date:** | 08/02/98 |
| **Re:** | Costco |

In an attempt to keep everyone posted, we are experiencing transshipment of our Tight Lies clubs into Costco and Price Club (same parent company). This is a serious situation because Costco is selling our clubs at deep discounts- $149.99 in graphite, $109.99 in steel. This is just a few dollars over our wholesale price.

Our retailers who have locations in areas where Costco has our clubs are being seriously effected, as is our brand integrity. We DO NOT sell to Costco. They are an unauthorized account. Any customer who asks should be told we are working hard on the problem. We are attempting to identify the source of the clubs to Costco. We are looking into our legal rights with Costco as well. In the interim, we are scrutinizing each large order that is written.

Our customers need to know the following:

- We do not sell to Costco

- We are investigating how Costco is receiving clubs

- The clubs at Costco carry no implied warranty because Costco is an unauthorized account

- Costco staff is not trained to help golfers identify the correct clubs (loft, flex, shaft material)

- Costco has very limited inventory in most locations

- We are looking at ways to identify our clubs to track them (i.e. serial numbers)

Please direct any customer who want to discuss this situation to me. I will explain more fully our position if needed.

Any ideas you may have on how we can solve this riddle are appreciated. Let your staff know what is taking place at Costco as well.

ADAMS 002479

EXHIBIT
251

**A. 29**

;ived Jul 15 02:36PM (06:02) on FAX_HOU line [8] for 'GW0400'   WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 * Pg 4/17
      JUL 15 '98 12:33 FR COSTCO LEGAL        425 313 8114 TO 917137582346        P.04/17

CAUSE NO. 219-92298

| | |
|---|---|
| ADAMS GOLF, LP LIMITED, A TEXAS LIMITED PARTNERSHIP,<br>    Plaintiff, | §    IN THE DISTRICT COURT<br>§<br>§ |
| v. | §<br>§    ____ JUDICIAL DISTRICT<br>§ |
| COSTCO COMPANIES, INC. d/b/a COSTCO WHOLESALE,<br>    Defendant. | §<br>§<br>§    COLLIN COUNTY, TEXAS |

## BILL OF DISCOVERY

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Adams Golf, LP, Limited ("Adams" or "Plaintiff"), Plaintiff in the above-styled and numbered cause and brings this Bill of Discovery pursuant to Rule 737 of the Texas Rules of Civil Procedure against Defendant Costco Companies, Inc. d/b/a Costco Wholesale ("Costco" or "Defendant"), and would show the Court the following:

### PARTIES

1.      Plaintiff Adams is a limited partnership, organized and existing under the laws of the State of Texas, having its principal place of business at 2901 Summit Avenue, Suite 100, Plano, Texas 75074.

2.      Adams alleges upon information and belief that Costco is a Washington corporation with its principal place of business at 999 Lake Drive, Issoquah, Washington 98027. Adams further alleges upon information and belief that Costco does business in this judicial district and in interstate commerce, and makes solicitations to customers in the County of Collin, State of Texas. Costco is engaged in business in Texas and does not maintain a regular place of business in Texas and does not have a registered agent in Texas. This lawsuit arises out of Costco's business in Texas. Thus, Costco may be served pursuant to the Long

FILED

'99 JUN 11 PM 3: 31

COUNTY CLERK
COUNTY, TEXAS

FILED
COUNTY COURT AT LAW

_____ Clerk

By _____ Deputy

1

AH 000105

:ived Jul 15·02:36PM (06:02) on FAX HOU line (8) for 'GW0400'    WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 * Pg 5/17
     JUL 15 '98 12:34 FR COSTCO LEGAL              425 313 8114 TO 917137582346    P.05/17

Arm Statute CPRC §17.041 *et seq.*, with substitute service on the Secretary of State for the

State of Texas, Statutory Documents Section, 1019 Brazos Street, Rudder Building, Room

214, Austin, Texas 78701, P.O. Box 12887, Austin, Texas 78711-2889.

## FACTS

3.     Adams designs, develops, markets and distributes high quality, innovative golf

clubs. Adams' primary product currently is its Tight Lies® all metal woods. (the "Clubs").

4.     Adams sells all of its Clubs either directly to the public through its representatives

or to retailers who are under contract.

5.     Adams has an advertised pricing policy which is part of all of its contracts with

retailers (the "Policy"). That Policy governs its relations with all of its distributors and retailers.

This Policy spells out at what prices sellers of Adams products may sell the Clubs. The Policy

also states that Adams will only do business with sellers that comply with the guidelines.

Additionally, the Policy restricts sales of golf clubs by retailers to end-user customers only. In

the Policy, Adams Golf also reserves the right to choose whom it will do business with, and the

right to accept or reject any order.

6.     Adams has recently discovered that Costco, a bargain retail company with which

Adams has not agreed to sell its Clubs, is selling the Clubs at some of its Costco stores.

Because Adams is not selling directly to Costco, and because the Policy prohibits sales to other

retail entities, it is evident that Costco has purchased the Clubs from a company in violation of

the Policy.

7.     Adams has been unable to determine the identity of the company who is

supplying the Clubs to Costco and who is therefore, violating the Policy. Costco has refused to

divulge the identity of that company. The identity of the company cannot be determined from

102346.1                                    2.

AH 000106

any other source. Therefore, Adams' only recourse is to ask this Court to permit discovery to

determine the company's identity so that Adams can pursue its legal rights against that company

in order to protect itself.

### RELIEF REQUESTED

B.      Pursuant to Rules 737 and 215 of the Texas Rules of Civil Procedure, Plaintiffs

request that this Court issue an order as follows:

(a)      Compelling Defendant to produce documents requested in the Notice of

Deposition of Costco's Corporate Representative and Subpoena Duces Tecum, attached hereto as

Exhibit "A";

(b)      Compelling Defendant to answer the interrogatories attached hereto as

Exhibit "B";

(c)      Compelling Defendant's Corporate Representative to appear for deposition

in order to clarity and verify its responses to the Request for Production and Interrogatories;

(d)      For such other and further relief, both general and special, at law and in

equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

JACQUELINE I. VALENZUELA
State Bar No. 00790114
LARA REENAN
State Bar No. 24002814
ARTER & HADDEN LLP
1717 Main Street, Suite 4100
Dallas, Texas 75201-4605
Telephone: (214) 761-2100
Facsimile: (214) 741-7139

ATTORNEYS FOR PLAINTIFF

102346.1                                          3.

AH 000107

:ived Jul 15 02:36PM (06:02) on FAX HOU line (8) for 'GW0400'    WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 * Pg 7/17
    JUL 15 '98 12:34 FR COSTCO LEGAL        425 313 8114 TO 917137582346    P.07/17

CAUSE NO. _____

| | | |
|---|---|---|
| ADAMS GOLF, LP LIMITED, A TEXAS LIMITED PARTNERSHIP, **Plaintiff,** | §<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| **v.** | §<br>§ | _____ JUDICIAL DISTRICT |
| COSTCO COMPANIES, INC. d/b/a COSTCO WHOLESALE, **Defendant.** | §<br>§<br>§ | COLLIN COUNTY, TEXAS |

### PLAINTIFF'S NOTICE OF DEPOSITION DUCES TECUM
### TO COSTCO WHOLESALE

**TO:**   Defendant Costco Companies, Inc. d/b/a Costco Wholesale, 999 Lake Drive, Issoquah, Washington, 98027.

Defendant is hereby notified pursuant to the Texas Rules of Civil Procedure that Plaintiff will take the deposition of Defendant in connection with the above numbered and entitled cause. Defendant is hereby directed to designate a person or persons who will testify concerning the following matters: (1) the documents requested in the duces tecum attached hereto; and (2) the purchase by Defendant of any items manufactured or thought to be manufactured by Plaintiff.

Defendant is further instructed to produce the documents requested in Exhibit "A" attached hereto, on which examination will be conducted. The deposition will occur at a mutually agreeable time and place, not to exceed 45 days from this notice at the offices of Arter & Hadden, LLP, 1717 Main Street, Suite 4100, Dallas, Texas 75201.

As used herein, the following words, terms, and phrases shall have the meaning indicated below:

1.   "Plaintiff" or "Adams." "Plaintiff" or "Adams" as used herein refers to Adams Golf LP, Limited, and all persons acting and purporting to act upon its behalf.

102368.1                                    1.

EXHIBIT
A

AH 000108

:ived Jul 15 02:36PM (06:02) on FAX HOU Line [8] for 'GW0400'    WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 * Pg 8/17
    JUL 15 '98 12:34 FR COSTCO LEGAL              425 313 8114 TO 917137582346       P.08/17

2.    "Defendant," "Costco," "you," "your" or "yours." "Defendant," "Costco," "you," "your"
      or "yours," as used herein refers to Defendant Costco Companies, Inc. d/b/a Costco
      Wholesale, and all persons acting and purporting to act upon its behalf, including, but not
      limited to, all past and present employees, officers, directors, attorneys, consultants,
      agents, adjusters or any other representatives.

3.    "Document" or "documents." "Document" or "documents" as used herein refers to all
      written, printed or graphic matters, drafts, originals, copies, non-conforming copies which
      contain deletions, insertions, hand-written notes or comments, however produced or
      reproduced and to any other means of retention of information, including without
      limitation all letters, correspondence, records of conferences, memoranda, telegrams,
      stenographic or hand-written notes, summaries, telephone logs and records, teletypes,
      bank checks, bank deposits and withdrawal slips, bank credit and debit memoranda, bank
      drafts, bank statements, telexes, private wire messages, communications, desk calendars,
      diaries, appointment books, agendas, meetings, conversations, schedules, reports, studies,
      appraisals, analysis lists, surveys, budgets, financial statements, financial projections,
      financial calculations, contracts, agreements or proposed agreements, notice of wired
      transfer of funds or other notices, canceled checks, periodicals, charts, graphs, interviews,
      speeches, transcripts, depositions, press releases, brochures, books of account, affidavits,
      communications of government bodies, invoices, notices of minutes of meetings of board
      of directors, and audit committees, and financial committees, and executive committees,
      interoffice communications, results of investigations, working reports, newspaper or
      magazine articles, records of payment, releases, receipts, computer data, maps, tax
      returns, vouchers, microfilm, videotapes, photographs, phone records, tape recordings,
      wire recordings, diagrams, computer tapes, projections, microfiche and other data
      computations and papers similar to any of the foregoing and other writings of every kind
      and description (whether or not actually used) and other data computations from which
      information can be obtained.

      Additionally, "document" and "documents" shall include documents considered to be
      privileged by you, which shall be identified, in order to assist Plaintiff and the Court in
      determining whether privilege may be properly claimed, by stating the subject matter of
      each such document, the names of all persons preparing and receiving the document, the
      names of all persons to whom the document was distributed and the privilege claimed,
      and the reasons which justify the assertion of privilege by you should be included in your
      answer herein.

4.    "Identify." "Identify" or any form of that word, shall have the following meanings and
      include the following instructions: (a) "identify" when used in reference to a natural
      person, means to state (i) the full name, (ii) present or last known complete residential
      and business address and phone numbers, and (iii) the name of the current or last known
      employer; (b) "identify" when used in reference to an entity, means to state (i) the current
      name for the entity, (ii) its principal home office address and telephone number, (iii) the
      state of legal formation, (iv) identify all officers, directors, partners and/or principals, and

AH 000109

eived Jul 15·02:36PM (06:02) on FAX HOU line (8) for 'GW0400'    WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 · Pg 9/17
       JUL 15 '98 12:35 FR COSTCO LEGAL    425 313 8114 TO 917137582346    P.09/17

(v) state the name of the natural person with whom most of the communications with such entity are made or the name of the natural person whom the party responding to these interrogatories believes would have personal knowledge regarding the information requested in the interrogatory; and (c) "identify," when used in reference to a document, means to state (i) the name, date and subject of the document, (ii) the type of document (e.g., letter, memorandum, note, report), (iii) the identity of the author and all recipients of the document, (iv) the identity of the custodian or possessor of the document or a copy thereof, and (v) the location of the document or a copy thereof.

5.    "Person" or "persons." "Person" or "persons" as used herein shall include natural persons, male or female, in any capacity whatsoever, and all types and kinds of businesses or other entities, including, but not limited to, public or private corporations, partnerships, joint ventures, firms, voluntary or unincorporated associations, trusts, estates, proprietorships or government agencies.

6.    "Relate to" or "relating to." "Relate to" or "relating to" as used herein shall include referring to, alluding to, responding to, concerning, connected with, commenting on, in respect of, in respect to, about, regarding, discussing, describing, measuring, reflecting, supporting, analyzing, explaining, constituting, evidencing, or pertaining to.

7.    "Evidence" or "evidencing." "Evidence" or "evidencing" as used herein means tending to show, in any probative manner, the existence or nonexistence of any matter.

8.    "Concerning" or "concern." "Concerning" or "concern" as used herein shall include relating to, pertaining to, describing, evidencing, involving or constituting.

9.    "Describe." "Describe," or any form of that word, as used herein shall have the following meanings and include the following instructions: (a) "describe" shall generally mean to describe, explain, illustrate, represent or characterize; (b) "describe" when used in reference to a transaction, event or activity means to state (i) the identity of each person who participated in or was present during the transaction, event or activity, (ii) the location of the transaction, event or activity, and (iii) the date of the transaction, event or activity; and (c) "describe" when used in reference to a communication means to state (i) the identity of each person who participated in or was present when the communication was made, (ii) the date of the communication, (iii) the substance and subject matter of the communication, and (iv) identify all documents relating to or evidencing the communication.

10.    "Communication" or "communications." "Communication" or "communications" as used herein means any contract or act by which information or knowledge is transmitted or conveyed between two or more persons and includes, without limitation: (a) written contacts (whether by letter, memoranda, telegram, telex or other documents); (b) oral contacts (whether by face-to-face meetings, telephone conversations or otherwise); and

1023641.1

3.

AH 000110

ived Jul 15 02:36PM (06:02) on FAX_HOU line [8] for 'GW0400'    WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 * Pg 10/17
        JUL 15 '98 12:36 FR COSTCO LEGAL ·             425 313 8114 TO 917137582346        P.10/17

(c) nonverbal acts intended to communicate or convey any meaning, understanding or other message.

11.    The word "or" means and/or and the word "and" means and/or.

12.    Each of the words "each," "any" and "all" mean each, any and all.

13.    "Fact." "Fact" as used herein refers to and includes all circumstances, events, and evidence pertaining to or touching upon the items in question.

14.    "Clubs" Clubs as used herein means Adams Golf Tight Lies® products.

103368.1                                    4.

A H   0 0 0 1 1 1

<u>Exhibit A</u>

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT

**REQUEST NO. 1:**  Any written, verbal or any other kind of statement made to you by the Company that provides Costco with the Clubs. For purposes of this request, a statement previously made is (a) a written statement signed or otherwise adopted or approved by the person making it, or (b) a stenographic, mechanical, electrical or other type of recording, or any transcription thereof which is a substantially verbatim recital of a statement made by the person and contemporaneously recorded.

**REQUEST NO. 2:**  Any and all documents concerning, demonstrating, reflecting, relating to how Costco obtains or obtained the Clubs.

**REQUEST NO. 3:**  Any and all contracts or agreements between any two of the following: a) Adams; b) Costco; and c) any company who provides or provided Costco.

**REQUEST NO. 4:**  Any and all documents which reference, pertain or relate to Adams.

**REQUEST NO. 5:**  Any and all documents which reference, pertain or relate to the Clubs.

**REQUEST NO. 6:**  Any and all documents which reference, pertain or relate to the name of any company who provides or ever provided Costco with the Clubs.

Respectfully submitted,

_____

JACQUELINE I. VALENZUELA
State Bar No. 00790114
LARA REENAN
State Bar No. 24002814
ARTER & HADDEN LLP
1717 Main Street, Suite 4100
Dallas, Texas 75201-4605
Telephone: (214) 761-2100
Facsimile: (214) 741-7139

ATTORNEYS FOR PLAINTIFF

102368.1                    5.

AH 000112

CAUSE NO. _____

| | | |
|---|---|---|
| ADAMS GOLF, LP LIMITED, A TEXAS LIMITED PARTNERSHIP,<br>　　Plaintiff, | §<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | _____ JUDICIAL DISTRICT |
| COSTCO COMPANIES, INC. d/b/a COSTCO WHOLESALE,<br>　　Defendant. | §<br>§<br>§<br>§ | COLLIN COUNTY, TEXAS |

### PLAINTIFF'S FIRST SET OF INTERROGATORIES TO COSTCO WHOLESALE

TO:　Defendant Costco Companies, Inc. d/b/a Costco Wholesale, 999 Lake Drive, Issoquah, Washington, 98027.

### I.　GENERAL INSTRUCTIONS

**STATUTORY AUTHORITY**

The party represented by the undersigned attorneys are sending the attached questions to you under the provisions of Rule 168 of the Texas Rules of Civil Procedure.

**TIME FOR ANSWERING INTERROGATORIES**

Pursuant to TEX. R. CIV. P. 168, Plaintiff, Adams Golf, LP Limited, requests that complete and responsive answers to these questions be received within 30 days after hand delivery service, or within 33 days after U.S. Mail delivery service, of these questions.

**INSTRUCTIONS FOR ANSWERING**

In answering these questions, please furnish all of the information available to you, including information in the possession of your attorneys or their investigators, and all persons acting on your behalf, and not merely such information known of your own personal knowledge.

PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT - Page 1

**EXHIBIT**

**B**

AH 000113

:ived Jul 15 02:36PM (06:02) on FAX HOU line [8] for 'GW0400'    WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 * Pg 13/17
      JUL 15 '98 12:36 FR COSTCO LEGAL        425 313 8114 TO 917137582346    P.13/17

If you cannot answer the question in full after exercising due diligence to secure the information, say so in your answer, and to the extent possible, answer stating whatever information or knowledge you have.

If any interrogatory is not answered through the claim of privilege, including the work product doctrine, state the claim of privilege or other reason for answering with specificity and provide all information necessary to evaluate the claim of privilege, including, without limitation, the date of the communications and the subject matter therein, and the identity of all persons to whom any portion of the contents of the communications have been disclosed. Such information should be provided in a manner sufficient to allow it to be described to the court for ruling on the privilege or other reason asserted.

## II.    DEFINITIONS

As used herein, the following words, terms, and phrases shall have the meaning indicated below:

1.  "Plaintiff" or "Adams." "Plaintiff" or "Adams" as used herein refers to Adams Golf, LP Limited, and all persons acting and purporting to act upon its behalf.

2.  "Defendant," "Costco," "you," "your" or "yours." "Defendant," "Costco," "you," "your" or "yours," as used herein refers to Defendant Costco Companies, Inc. d/b/a Costco Wholesale and all persons acting and purporting to act upon its behalf, including, but not limited to, all past and present employees, officers, directors, attorneys, consultants, agents, adjusters or any other representatives.

3.  "Document" or "documents." "Document" or "documents" as used herein refers to all written, printed or graphic matters, drafts, originals, copies, non-conforming copies which contain deletions, insertions, hand-written notes or comments, however produced or reproduced and to any other means of retention of information, including without limitation all letters, correspondence, records of conferences, memoranda, telegrams, stenographic or hand-written notes, summaries, telephone logs and records, teletypes, bank checks, bank deposits and withdrawal slips, bank credit and debit memoranda, bank drafts, bank statements, telexes, private wire messages, communications, desk calendars,

AH 000114

:ived Jul 15 02:36PM (06:02) on FAX HOU line [8] for 'GW0400'     WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 * Pg 14/17
       JUL 15 '98 12:37 FR COSTCO LEGAL          425 313 8114 TO 917137582346     P.14/17

diaries, appointment books, agendas, meetings, conversations, schedules, reports, studies, appraisals, analysis lists, surveys, budgets, financial statements, financial projections, financial calculations, contracts, agreements or proposed agreements, notice of wired transfer of funds or other notices, canceled checks, periodicals, charts, graphs, interviews, speeches, transcripts, depositions, press releases, brochures, books of account, affidavits, communications of government bodies, invoices, notices of minutes of meetings of board of directors, and audit committees, and financial committees, and executive committees, interoffice communications, results of investigations, working reports, newspaper or magazine articles, records of payment, releases, receipts, computer data, maps, tax returns, vouchers, microfilm, videotapes, photographs, phone records, tape recordings, wire recordings, diagrams, computer tapes, projections, microfiche and other data computations and papers similar to any of the foregoing and other writings of every kind and description (whether or not actually used) and other data computations from which information can be obtained.

Additionally, "document" and "documents" shall include documents considered to be privileged by you, which shall be identified, in order to assist Plaintiff and the Court in determining whether privilege may be properly claimed, by stating the subject matter of each such document, the names of all persons preparing and receiving the document, the names of all persons to whom the document was distributed and the privilege claimed, and the reasons which justify the assertion of privilege by you should be included in your answer herein.

4.   "Identify."   "Identify" or any form of that word, shall have the following meanings and include the following instructions: (a) "identify" when used in reference to a natural person, means to state (i) the full name, (ii) present or last known complete residential and business address and phone numbers, and (iii) the name of the current or last known employer; (b) "identify" when used in reference to an entity, means to state (i) the current name for the entity, (ii) its principal home office address and telephone number, (iii) the state of legal formation, (iv) identify all officers, directors, partners and/or principals, and (v) state the name of the natural person with whom most of the communications with such entity are made or the name of the natural person whom the party responding to these interrogatories believes would have personal knowledge regarding the information requested in the interrogatory; and (c) "identify," when used in reference to a document, means to state (i) the name, date and subject of the document, (ii) the type of document (e.g., letter, memorandum, note, report), (iii) the identity of the author and all recipients of the document, (iv) the identity of the custodian or possessor of the document or a copy thereof, and (v) the location of the document or a copy thereof.

5.   "Person" or "persons."   "Person" or "persons" as used herein shall include natural persons, male or female, in any capacity whatsoever, and all types and kinds of businesses or other entities, including, but not limited to, public or private corporations, partnerships, joint ventures, firms, voluntary or unincorporated associations, trusts, estates, proprietorships or government agencies.

AH 000115

eived Jul 15' 02:36PM (06:02) on FAX_HOU line [8] for 'GWO4DO'    WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 * Pg 15/17
        JUL 15 '98 12:37 FR COSTCO LEGAL        425 313 8114 TO 917137582346        P.15/17

6.    "Relate to" or "relating to." "Relate to" or "relating to" as used herein shall include referring to, alluding to, responding to, concerning, connected with, commenting on, in respect of, in respect to, about, regarding, discussing, describing, measuring, reflecting, supporting, analyzing, explaining, constituting, evidencing, or pertaining to.

7.    "Evidence" or "evidencing." "Evidence" or "evidencing" as used herein means tending to show, in any probative manner, the existence or nonexistence of any matter.

8.    "Concerning" or "concern." "Concerning" or "concern" as used herein shall include relating to, pertaining to, describing, evidencing, involving or constituting.

9.    "Describe." "Describe," or any form of that word, as used herein shall have the following meanings and include the following instructions: (a) "describe" shall generally mean to describe, explain, illustrate, represent or characterize; (b) "describe" when used in reference to a transaction, event or activity means to state (i) the identity of each person who participated in or was present during the transaction, event or activity, (ii) the location of the transaction, event or activity, and (iii) the date of the transaction, event or activity; and (c) "describe" when used in reference to a communication means to state (i) the identity of each person who participated in or was present when the communication was made, (ii) the date of the communication, (iii) the substance and subject matter of the communication, and (iv) identify all documents relating to or evidencing the communication.

10.    "Communication" or "communications." "Communication" or "communications" as used herein means any contract or act by which information or knowledge is transmitted or conveyed between two or more persons and includes, without limitation: (a) written contacts (whether by letter, memoranda, telegram, telex or other documents); (b) oral contacts (whether by face-to-face meetings, telephone conversations or otherwise); and (c) nonverbal acts intended to communicate or convey any meaning, understanding or other message.

11.    The word "or" means and/or and the word "and" means and/or.

12.    Each of the words "each," "any" and "all" mean each, any and all.

13.    "Fact." "Fact" as used herein refers to and includes all circumstances, events, and evidence pertaining to or touching upon the items in question.

14.    "Clubs." Clubs as used herein means Adams Golf Tight Lies® products.

AH 000116

eived Jul 15 02:36PM (06:02) on FAX_HOU line [8] for 'GW0400'    WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 * Pg 16/17
          JUL 15 '98 12:38 FR COSTCO LEGAL           425 313 8114 TO 917137582346      P.16/17

### · III.    PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT

**INTERROGATORY NO. 1:**    Identify each person having knowledge or involvement in Costco's purchase of the Clubs.

    **ANSWER:**

**INTERROGATORY NO. 2:** Describe all conversations or communications you have had with Adams concerning the Clubs.

    **ANSWER:**

**INTERROGATORY NO. 3:**   Identify the person who sold you the Clubs or any other product for which you have reason to believe was manufactured by Adams.

    **ANSWER:**

**INTERROGATORY NO. 4:**  Describe all conversations or communications you have had with any and all of the persons identified in Interrogatory No. 3.

    **ANSWER:**

AH 000117

eived Jul 15 02:36PM (06:02) on FAX HOU line (8) for 'GW0400'    WORKSRV3 printed FAX35ACBFFB1AF6 on Jul 15 02:46PM 1998 * Pg 17/17
        JUL 15 '98 12:38 FR COSTCO LEGAL        425 313 8114 TO 917137582346    P.17/17

__INTERROGATORY NO. 5:__   Describe in detail how you obtained the Clubs or any other products for which you have reason to believe was produced by Adams.

ANSWER:

__INTERROGATORY NO. 6:__   State in detail the amount of money and/or any other form of compensation you originally contracted to receive from any and all parties identified in Interrogatory No. 3 and the amount of money and/or any other form of compensation you actually received or plan to receive for the same.

ANSWER:

__INTERROGATORY NO. 6:__   State in detail each and every contention or reason by which you believe you have a lawful right to sell the Clubs.

ANSWER:

Respectfully Submitted

ARTER & HADDEN LLP

By: _____

JACQUELINE L. VALENZUELA
State Bar No. 00790114
LARA REENAN
State Bar No. 24002814
ARTER & HADDEN LLP
1717 Main Street, Suite 4100
Dallas, Texas 75201-4605
Telephone: (214) 761-2100
Facsimile: (214) 741-7139

ATTORNEYS FOR PLAINTIFF

AH 000118

**A. 30**

EOD 9/8/98

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

P 3 - [OC:]

DA...J. MALAND, CLERK
BY
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

ADAMS GOLF LP, LIMITED,                  §
                                         §
        Plaintiff,                       §
                                         §
v.                                       §     CIVIL ACTION NO. 4:98-CV-217
                                         §
COSTCO COMPANIES, INC. d/b/a             §
COSTCO WHOLESALE,                        §
                                         §
        Defendant.                       §

## ORDER GRANTING ADAMS GOLF LP, LIMITED'S
## MOTION TO DISMISS PURSUANT TO RULE 41(a)(2)

On September 3___, 1998, this Court considered the Motion to Dismiss Pursuant to Rule 41(a)(2) filed by Plaintiff Adams Golf LP, Limited ("Adams Golf") in the above-styled and numbered cause. The Court, having considered said Motion to Dismiss Pursuant to Rule 41(a)(2) and the arguments and authorities set forth therein, finds that said Motion to Dismiss is well-taken and should be granted in all respects.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that all claims asserted by Plaintiff Adams Golf against Defendant in the above-styled and numbered cause are hereby dismissed without prejudice.

IT IS FURTHER THEREFORE ORDERED, ADJUDGED AND DECREED that each side should be responsible for their own respective attorneys' fees and costs incurred in the above-styled and numbered cause.

ADAMS 001448

DATED September 3, 1998.

_____
United States District Judge

ORDER GRANTING ADAMS GOLF LP, LIMITED'S
MOTION TO DISMISS PURSUANT TO RULE 41(a)(2) - Page 1
Civ. Order Book
.. .97 p... 51                              106907

**A. 31**

Adams Golf                                                          Page 1 of 1

  



**Press Releases**

**Adams Takes Legal Action Against Costco**
**Plano, Texas – June 9, 1998**

Adams Golf filed a Bill of Discovery against Costco on June 9, 1998.

The Bill of Discovery was filed in order to determine whether Costco's claims that they had properly acquired Adams' Tight Lies® fairway woods for resale were accurate.

Adams Golf became concerned when it learned that Costco was selling their Tight Lies® fairway woods because Costco is not an authorized distributor.



"We are committed to our program of partnership with our retail accounts," stated Barney Adams, Chief Executive Officer of Adams Golf. We are prepared to take every legal action required to ensure that our valuable relationship with our retailers is maintained and remains fully intact," Adams added.

Back to the List of Press Releases

Copyright © 1998 – Adams Golf
All Rights Reserved

This website created by
**Virtual Visits, Inc.**



**ADAMS 001494**

**A. 32**

Hoby's Golfworks Inc.
120 Route 33
Manalapan, NJ 07726

September 29, 1998

*[handwritten: this is Jay's account]*

Barney Adams
Adams Golf
2801 East Plano Parkway
Plano, Texas 75074

Dear Mr. Adams,

**Subject: Return of Clubs and past Dealings**

I am sorry that I am forced to write this letter but your actions in the past year are forcing me to do so. Here is a summary of what has occurred in the last year.

- In early January your company sent me an order that was supposed to be shipped over a course of time and billed net 90 days and put on my American Express card.

- In February you charged the entire amount to my American Express Card making my monthly obligation to them over 12,000.00 dollars.

- As early as June your clubs were for sale in Cosco for less than my wholesale price. I was guaranteed that you were a one-price shop and that this wouldn't happen. Well it did much to my disappointment and forced me to sell most of the rest of my inventory at or below cost and to sell the demo clubs that I loaned out for half price.

- I am returning the rest of the inventory that I could not unload for credit on my bill. RA16541c

I have suffered damage to my credit, have fallen behind in payments to other companies, had to take money from my retirement account to keep my business afloat, worked normal 70 hour weeks to save on payroll to maintain what I have worked for the last ten years.

Your unscrupulous use of my credit card, your premature shipping, and your selling your product to others at lower prices have contributed greatly to my present state of business. I hope you take this into consideration and call our account square as of today and will inform me as such in the near future

Respectfully yours,

*George H. List Jr.*

George H. List Jr.
President
Hoby's Golfworks Inc.

MSOffice

*[handwritten: 10/20/98 Per Jay this could have been a system problem. I agreed it could have been but expressed concern that .. seems to be associated with this type of problem in overwhelmingly disproportionate frequency.]*

ADAMS 046813

**A. 33**

Page 1

1       IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE

2

               - - -

3

  IN RE: ADAMS GOLF, INC.:

4

  SECURITIES LITIGATION  :

5

               X

6

7     ORAL DEPOSITION OF EDDIE G. TATE, III

8        Tuesday, June 27, 2006

9          - - -

10     Oral deposition of EDDIE G. TATE, III,

11 held at the offices of Fox Rothschild, 1301

12 Atlantic Avenue, Atlantic City, New Jersey

13 08401, commencing at 9:41 a.m. reported

14  by Debra Sapio Lyons, RDR, CRR, CSR and Notary

15 Public of the States of New Jersey, New York and

16 Maryland.

17

18

19          - - -

20

     RSA/VERITEXT COURT REPORTING COMPANY

21      1845 Walnut Street, 15th Floor
        Philadelphia, PA  19103

22

23

24

Page 18

1    Florida RAC, did -- were -- were you
2    reading or monitoring sales transactions
3    involving Manatee Golf?
4         A.    Yes.
5         Q.    Did -- was there ever a
6    time that transactions involving Manatee
7    Golf raised your curiosity?
8         A.    Yes.
9         Q.    And can you describe what
10   that was?
11        A.    Again, when the monthly
12   sales report would come through, I'm in
13   Florida, I don't have anyone there, a fax
14   would come through -- through my fax
15   machine in my office, which was in my
16   house, and I would always, you know, pull
17   out this fax, look at the back page, see
18   where my sales numbers were. And this one
19   day in June of 1998 I had a $600,000.00 --
20   600 plus thousand dollar order. And --
21        Q.    I'm sorry. And who was
22   that order to?
23        A.    It was to Manatee Golf.
24        Q.    Okay.

Page 19

1         A.    It was to Manatee Golf.
2    And as a salesperson, one being the end of
3    my quarter. And realizing that a lot of my
4    extended pay came out of sales, I was
5    curious whether I was going to get a bonus
6    off of this because it was still within my
7    state, and it wasn't Edwin Watts. I was
8    supposed to get a kick off of every account
9    that was not Edwin Watts. So I called my
10   boss, who was Scott Blevins. And I asked
11   him first what's this about, you know, am I
12   going to get credit for this?
13        Q.    And did you get credit for
14   it?
15        A.    No.
16        Q.    And why -- what was it
17   about a $600,000.00 sale to Manatee Golf
18   that prompted you to pick up the phone?
19   Why was it unusual?
20        A.    Because in sales we follow
21   histories. You know, if you have a golf
22   shop and you're doing $2,000.00 a month, my
23   goal might be to increase you 50 percent,
24   up to 3,000 a month. Within six months I

Page 20

1    might want to get you to 6,000 a month.
2    You know, their entire credit limit was no
3    more than 60 or $90,000.00. So to get an
4    order of that magnitude, which was second
5    only to an Edwin Watts for a store that's a
6    couple thousand square feet, was just way
7    out of line, way out of order.
8         Q.    And this was in June of
9    1998?
10        A.    Yes.
11        Q.    When you -- you said you
12   picked up the phone and you called Scott
13   Blevins?
14        A.    Yes.
15        Q.    You were in Florida.
16   Blevins would have been in?
17        A.    Plano.
18        Q.    And that was at Adams Golf
19   headquarters?
20        A.    Yes.
21        Q.    Okay. Can you describe
22   what, if anything, was said at that time?
23   What --
24        A.    I asked Scott what this

Page 21

1    order was, and he told me not to worry
2    about it. And I just let it go.
3         And when I asked him if I was
4    going to get a credit or a commission off of
5    it, he said no. So I pretty much let the
6    whole transaction go at that point.
7         Q.    Was anything else said in
8    that conversation, or is that pretty much
9    the sum total?
10        A.    Not to my recollection.
11        Q.    Okay. Are you able to
12   recall what was the sales environment at
13   Adams Golf like at that time?
14        You started in May, and I guess
15   you testified this transaction occurred in
16   June.
17        A.    Uh-huh.
18        Q.    Can you describe what the
19   sales environment at Adams Golf was at that
20   time?
21        A.    Adams Golf was on the tail
22   end of the success of the original Adams
23   Tight Lies. So it was very upbeat and
24   everything else, but at the same time,

1  salespeople actually moving our products,
2  we had to give the retailers a decent
3  margin.
4      So when you start looking at a
5  179 is what it fell to -- when I first got
6  with Adams, if I'm not mistaken, our retail
7  price for the original Adams Tight Lies was
8  $199.00. And I had bought one before I
9  worked for the company, I know I paid 199
10 at Edwin Watts for it. So with $119.00
11 wholesale price, you're looking at $80.00,
12 $90.00 right there. Once that went away
13 and the margin was lost and their trust was
14 lost, the motivation for them to sell was
15 very, very, very low.
16     Q.   Gotcha. And the retailers
17 were pointing at gray marketing as the
18 problem --
19     A.   Absolutely.
20     Q.   -- with the margin?
21     A.   Absolutely. That was the
22 root cause in the eyes of the retailers.
23     Q.   And I guess what you've
24 just testified to is sort of summed up in

1  the next paragraph, the first sentence, "In
2  short," I'm quoting you, "In short,
3  retailers want their better margins, and
4  that's all."
5      A.   Yes.
6      Q.   The margins are king?
7      A.   Absolutely.
8      Q.   All right. Just a moment,
9  if I may.
10     (Pause.)
11     I just -- do you know -- I'm
12 sorry, back on.
13     Manatee Golf, do you know was it
14 a multi -- maybe you testified to this, was
15 it a multi-store operation?
16     A.   No, it was a one-unit
17 store.
18     Q.   Okay.
19     A.   Just -- that was the only
20 one.
21     Q.   And were you aware, were
22 they a -- a distributor of Adams Golf
23 clubs?
24     A.   Not to my knowledge.

1      Q.   Okay. What, if anything,
2  became of the clubs that were shipped to
3  Manatee Golf, if you know?
4      A.   We never were able to
5  ascertain exactly what ever happened to
6  those clubs.
7      Q.   Did you -- did your
8  retailers have suspicions about what was
9  going on?
10     A.   Yes, they did.
11     Q.   And what were those?
12     A.   That a lot of the clubs
13 were either shipped and delivered to Costco
14 and other unauthorized dealers, and some
15 clubs were also delivered overseas into
16 China and Asia.
17     Q.   I see. Just another second
18 if I may. I'm just...
19     (Pause.)
20     Q.   Okay. So it's your
21 conclusion then that the -- oh, no, strike
22 that.
23     MR. MARA: I have nothing
24 further. Thanks for your time.

1      - - -
2  E X A M I N A T I O N
3      - - -
4  BY MS. REED:
5      Q.   I have a few questions.
6  Actually, probably more than a few.
7      I'm Michele Reed and I represent
8  the Adams Golf defendants in this
9  securities litigation.
10     A.   Excuse me. Are you the one
11 who called me the first time in September?
12     Q.   I am. I am.
13     A.   Okay.
14     Q.   Tell me a little bit about
15 your position as a Regional Account
16 Coordinator, when you first --
17     MR. MARA: I'm sorry to
18 interrupt. My apologies. Can I take a
19 short break?
20     MS. REED: Yeah, sure.
21     MR. MARA: Just a 30 second
22 break. I'm sitting here thinking.
23 Thanks. Okay.
24     (A recess is held.)

1 significantly?
2     A.    Oh, just, again, it was
3 still a growing product. If you went back
4 to 1996 you'd see that it was, you know,
5 like 18 clubs, but by 1997 it was this, by
6 1998 it was this. But it was still in its
7 second year of a product cycle run, so it
8 was, no matter what, on the tail end of its
9 success.
10     Q.    When did you first visit
11 Manatee Golf?
12     A.    If I started in May, I
13 would probably say almost immediately or no
14 later than mid June.
15     Q.    And who was the owner of
16 Manatee Golf?
17     A.    His name was Larry.
18     Q.    You testified today that
19 there was a $600,000.00 order in June?
20     A.    Yes.
21     Q.    When we had -- we had
22 talked in September, I think it was --
23     A.    Uh-huh.
24     Q.    -- or something like

1 that --
2     A.    September, October.
3     Q.    -- you had left me a
4 message and said that you had found some
5 documentation that showed that it was a
6 $498,000.00 order?
7     A.    No, it was more than that.
8     Q.    Do you have that
9 documentation?
10     A.    I do not.
11     Q.    Do you have that
12 documentation with you at home?
13     A.    No, I do not.
14     Q.    Let me see.
15     Why do you think that it's
16 $600,000.00 and not $498,000.00 now?
17     A.    My recollection, again, if
18 I'm not mistaken, I just believed it to be
19 greater than 600,000.
20     Q.    Do you know how much it
21 was, the order?
22     A.    I always want to say either
23 642 or 682. Now, when I called your office
24 after we spoke, I read --

1     (Telephone interruption.)
2     THE WITNESS: You might want to
3 grab that just in case.
4     MR. MARA: Yeah, hang on.
5     MS. REED: Off the record.
6     (Discussion is held off the
7 record.
8     MS. REED: Back on the record.
9 BY MS. REED:
10     Q.    When you called me, I guess
11 this was in October, you said that you were
12 moving and that you'd probably come across
13 documentation, and you did, and you said
14 "Manatee Golf, Bradenton, Florida,
15 $498,774.38. That's what it was, so I was
16 a little high in what I told you."
17     A.    Okay.
18     Q.    Does that sound right,
19 498,000?
20     A.    So what I would like to say
21 then is when I originally talked to you, I
22 probably said the same exact number and
23 made the amendment when I spoke with you
24 over the telephone because that was read

1 specifically and exactly off of that fax.
2     Q.    And you don't still have
3 that fax?
4     A.    When I moved, literally,
5 and this goes back to my termination
6 anyway, and there's some communication I
7 had with the Human Resources, I really did
8 want to move on with myself. When you
9 called me, it was one thing, and I just
10 communicated back with you. A couple
11 months or, you know, just a couple months
12 ago I was contacted again by another
13 lawyer, I guess it's Ms. Moriaty, I really
14 had gotten to the point where I didn't want
15 to really be involved and I discarded
16 pretty much everything I had with Adams.
17 This I found 'cause it's on the computer --
18 not even on my computer, it's on a disk.
19 So it was found by accident more than
20 anything else.
21     MR. MARA: Referring -- I'm
22 sorry. Referring to Exhibit 299.
23     THE WITNESS: Yes.
24 BY MS. REED:

1   Q.   So $600,000.00 isn't --
2   A.   No.
3   Q.   -- the right number?
4   A.   The number that you just
5   read would be the exact and correct amount
6   read specifically from that documentation.
7        MS. REED: Mark this as Exhibit
8   300.
9        (Exhibit 300, Adams Golf Monthly
10       Management Summary June 1998, Bate
11       Stamped Adams 1879 to Adams 1908, is
12       marked for identification.)
13  BY MS. REED:
14       Q.   I'm showing you what's been
15  marked as Exhibit 300. It's Bate Stamped
16  Adams 1879 to Adams 1908, and it's the
17  Adams Golf Monthly Management Summary for
18  June, 1998.
19       If you turn to Page Adams 1894 --
20       A.   I'm sorry. What number?
21       Q.   1894.
22       A.   Okay.
23       Q.   It shows sales to the top
24  ten customers for the current month, which

1   is June, 1998; and listed as number four is
2   Manatee Golf at $289,611.00?
3        A.   Okay.
4        Q.   Would it surprise you that
5   that was the amount that was actually
6   shipped to Manatee Golf in June, 1998?
7        A.   Shipped or was that --
8   well, let me read what it says first.
9        So are you telling me that the
10  sales for that month would be $289,000.00?
11       Q.   Yes.
12       A.   Then I would say I would be
13  surprised by that.
14       Q.   Why?
15       A.   Their inventory levels,
16  their sales histories did not support that
17  type of volume. They had a credit limit
18  that wasn't even $90,000.00, even at that
19  time.
20       Q.   Well, they sold
21  $289,000.00, and so their credit limit
22  obviously went up; is that right?
23       A.   No.
24       Q.   How would you know what

1   their credit limit was?
2        A.   'Cause I had access to
3   their Excel spreadsheets. I knew what
4   their credit limits were. I knew what
5   their buying histories were.
6        Q.   So how would Manatee Golf
7   pay for this particular order then?
8        MR. MARA: Objection. That
9   calls for speculation.
10  BY MS. REED:
11       Q.   So you don't really know
12  exactly what their credit limit was or --
13       A.   No.
14       Q.   -- how they would pay for
15  something?
16       A.   I do know what their credit
17  limit was.
18       Q.   Okay.
19       MR. MARA: I mean, you can
20  answer the question. I just objected.
21       THE WITNESS: Yeah, absolutely.
22  Their credit limit is clearly specified
23  in the Florida Excel spreadsheet for
24  all sales. And their -- their credit

1   limit is not over $100,000.00. It's
2   not, at any point. And that goes --
3   Mr. Mara, can you say off the record
4   for a second?
5        I just want to ask him one
6   question.
7        MS. REED: Sure, that's fine.
8        MR. MARA: Off the record.
9        (Discussion is held off the
10  record.)
11  BY MS. REED:
12       Q.   So while we were off the
13  record, you talked about an email and an
14  Excel spreadsheet. What is that?
15       A.   It was a listing of all
16  accounts for the entire State of Florida,
17  what their purchase powers would be, which
18  would be authorized credit limits, and
19  Manatee Golf did not have a credit limit
20  that was in excess of $100,000.00.
21       Q.   Could you email that to me
22  if I -- oh, I gave you my card.
23       A.   Yes.
24       Q.   Could you email that to me

19 (Pages 70 to 73)

**A. 34**

June 26, 1998

Dan Straka                                    VIA FACSIMILE
King Par Golf                                 816-732-6662
G-5140 Flushing Road
Flushing, MI  48433

Dear Mr. Straka:

As you know, our Distribution Agreement and the business arrangements that follow
therefrom and are provided to you periodically in writing, permit you to sell Adams Golf
products to end-user consumers. We have been advised that one or more of our
distributors has been selling Adams Golf products to wholesalers, such as Costco
Wholesale. As we are investigating this information, we write to remind you of your
agreement and the limitation within the Agreement as stated above.

Please acknowledge your understanding and receipt of this notification by signing below
where indicated.

For the benefit of all of our customers, Adams Golf will continue to ensure that each
distributor abides by the terms of its Distribution Agreement and business arrangements.

Thank you for your cooperation.

Yours truly,


B.H. (Barney) Adams


ACKNOWLEDGED AND RECEIVED:


_____


BHA:afn

cc:    J. Valenzuela



ADAMS028492

**A. 35**

June 26, 1998

Larry Tatro                                           VIA FACSIMILE
Manatee Golf                                         941-745-1693
3908 Manatee Avenue West
Bradenton, FL  34205

Dear Mr. Tatro:

As you know, our Distribution Agreement and the business arrangements that follow
therefrom and are provided to you periodically in writing, permit you to sell Adams Golf
products to end-user consumers.  We have been advised that one or more of our
distributors has been selling Adams Golf products to wholesalers, such as Costco
Wholesale.  As we are investigating this information, we write to remind you of your
agreement and the limitation within the Agreement as stated above.

Please acknowledge your understanding and receipt of this notification by signing below
where indicated.

For the benefit of all of our customers, Adams Golf will continue to ensure that each
distributor abides by the terms of its Distribution Agreement and business arrangements.

Thank you for your cooperation.

Yours truly,

B.H. (Barney) Adams

ACKNOWLEDGED AND RECEIVED:

_____

BHA:afn

cc:    J. Valenzuela

Δ π EXHIBIT 292
Deponent _Adams_
Date _10/27/06_ Rptr: _Ji_
WWW.DEPOBOOK.COM

ADAMS028486

**A. 36**

COSTCO WHOLESALE
*LIVONIA II #391*

GOLDSTAR MEMBER #833096886000        7

25926 ADAMS WOOD        149.99  T

*Barney, This receipt came through with a last request. Just wanted to make sure you knew Costco is still selling our clubs below retail.*

*Walt*

| | | | |
|---|---|---|---|
| 200622 | 100' HOSE | 12.99 | T |
| 46956 | DNR NAPKIN | 5.99 | T |
| 803233 | PAPER PLATES | 4.69 | T |
| 99354 | CUTLERY | 5.99 | T |
| 54287 | NUTRI-GRAIN | 6.99 | |
| 89669 | RED PLST CUP | 5.99 | T |
| 1597 | PAPER PLATES | 9.99 | T |
| 27049 | NACHO DORITO | 3.79 | |
| 27090 | FRITO SCOOPS | 3.19 | |

**** 6% TAX RATE        11.74

*file*
*Costco*

VF        TOTAL        221.34

PRICECOSTCO Credit        221.34

------------------------------------------------

XXXXXXXXXXXXXXXX6000  2412  SWIPED
Seq #: 000635 Ref #: 12624300
PRICECOSTCO Credit  Resp: 00A

    00APPROVED
        AMOUNT: $221.34
    0391 011 0000000063 0296
------------------------------------------------

CHANGE        .00

TOTAL NUMBER OF ITEMS SOLD = 10
CASHIER:VALERIE G        REG31:
7/03/98 20:32 0391 11 0296 45

1-800-774-2678 Member Service
    THANK YOU
PLEASE COME AGAIN

ADAMS 001447

**A. 37**

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3

4    IN RE:  ADAMS GOLF, INC.   :    CONSOLIDATED

5    SECURITIES LITIGATION      :    C.A. NO. 99-371 KAJ

6    _____X

7

8         ORAL DEPOSITION OF J. DAVID WASHBURN

9              Tuesday, August 16, 2006

10

11         The oral deposition of J. DAVID WASHBURN

12    was held at the law offices of Akin Gump Strauss

13    Hauer & Feld, LLP, 1700 Pacific Avenue, Suite

14    4100, Dallas, Texas, from 10:03 a.m. to

15    12:28 p.m., before Jamie K. Israelow, a Certified

16    Shorthand Reporter in and for the State of Texas,

17    Registered Professional Reporter, Certified

18    Realtime Reporter and Certified LiveNote Reporter.

19

20

21         RSA/VERITEXT COURT REPORTING COMPANY

22             1845 Walnut Street, 15th Floor

23              Philadelphia, PA  19103

24           (215)241-1000    (888)777-6690

Page 42

1 then the group decides on how to respond, and we
2 add paragraph by paragraph the responses that we
3 intend to submit to the SEC.
4         So I don't know the genesis of
5 this document, but I suspect it began the same
6 way.
7     Q     (By Ms. Fox)  In other words, you
8 would have taken the four comments from Hoffman's
9 memo and started with those?
10    A     Somehow, some way, the comments would
11 need to be articulated in the response letter,
12 yes.
13    Q     And in some cases they are virtually
14 word for word.  I think the first one is virtually
15 word for word from comment from staff?
16         MS. BRANNEN:  Objection, form.
17    Q     (By Ms. Fox)  Is it?
18    A     I don't know.  I can match them up if
19 you'd like.
20    Q     The second one is virtually word for
21 word.  Would you agree?
22    A     It appears to be, yes.
23    Q     The third one appears to be word for
24 word?

Page 43

1    A     I agree.
2    Q     And the fourth one is different.  Do
3 you know why the fourth one is different?
4    A     No.
5    Q     Would Mr. Hoffman have been involved
6 in doing this draft, as well as you?
7    A     Potentially.
8    Q     Do you have an opinion on which is
9 more accurate, just using the words "Costco
10 matter," or using the words "an action in Texas
11 against Costco companies," blah, blah, blah?
12    A     Accurate when compared to the verbal
13 comment received from the SEC?
14    Q     Yes.  In other words, my interest is:
15 Was the SEC looking at all the problems that Adams
16 Golf may have had with Costco, or were they just
17 looking at the lawsuit and the press release?
18         MS. BRANNEN:  Objection, form.
19    A     I don't know.
20    Q     (By Ms. Fox)  So you can't -- you
21 have no idea why that was changed from "Costco
22 matter" to the "action in Texas"?
23    A     No.
24    Q     And then there's a response which

Page 44

1 ends with:  The company does not believe that this
2 proceeding is material.
3    A     May I see that?
4    Q     What was the basis, if you know, of
5 that proposed response to the SEC comment?
6    A     I'm not sure I understand the
7 question.
8    Q     What was your basis for saying:  The
9 company does not believe that this proceeding is
10 material?
11         MR. RYAN:  Objection, form.
12    A     Yeah.  I don't know what the universe
13 of facts were that were considered at the time
14 that the draft response was prepared, so I don't
15 know the bases of that draft response.
16    Q     (By Ms. Fox)  Okay.  At the beginning
17 of this response, second paragraph:  This letter
18 summarizes the company's responses to staff's oral
19 comments received June 25th, 1998.  The
20 undersigned, which would have been Joe Hoffman and
21 David Washburn of this company, previously
22 discussed the company's responses at greater
23 length with Ms. Carolyn Kurr of the staff on
24 July 1st, 1998.

Page 45

1         Do you have any memory of that
2 discussion with Carolyn Kurr?
3    A     None.
4    Q     And as far as you know, there are no
5 notes extant of that discussion?
6    A     Correct.
7    Q     If there had been notes, would they
8 have been put into the file?
9         MS. BRANNEN:  Objection, form.
10    A     You -- I don't know.  You're asking
11 me to speculate.  I don't even recall if there
12 were notes.
13    Q     (By Ms. Fox)  Okay.  Was it your
14 habit, when on the phone with somebody like the
15 SEC, to -- to make notes, as you were on the
16 telephone?
17    A     I wouldn't say it was a habit, no.
18    Q     How about Mr. Hoffman, was he a
19 notetaker?  Does he write down everything?
20    A     I couldn't comment on Joe's habits.
21    Q     You only worked for him for 25 years.
22    A     Not that many, but I suspect it will
23 be 25 years.
24    Q     So we're left with really no clue of

12 (Pages 42 to 45)

Page 46

1  what went on with you and the SEC?
2         MR. RYAN: Objection, form.
3         MS. BRANNEN: Objection, form.
4  Q    (By Ms. Fox) Is that right?
5  A    Yeah. I don't know what you're left
6  with.
7  Q    Do you remember any discussions with
8  the company during that period between July 25th
9  and -- I'm sorry -- June 25th, when they called,
10 and July 6th, when apparently the letter was --
11 was -- and the August file -- and Amendment 2 was
12 filed with the SEC?
13 A    I don't have any specific
14 recollection of any such conversations. I'm
15 confident that we had more than one such
16 conversation in order to evaluate and consider the
17 SEC's comments and decide how best to respond.
18 Q    Who would you have spoken with at the
19 company?
20 A    The company representatives. There
21 were a number of them, so I can't tell you with --
22 I can't tell you who those conversations would
23 have been with.
24 Q    This was during the road show, so

Page 47

1  Mr. Adams, Mr. Gonsalves, and Mr. Hatfield were
2  otherwise occupied. I can show you the -- I don't
3  know that we need to make -- this is already an
4  exhibit. Exhibit 166, you can see the -- other
5  than that 4th of July weekend.
6         MS. BRANNEN: Objection, form.
7  Did you ask a question?
8  Q    (By Ms. Fox) My question is: Who
9  other than those three would you have spoken to?
10 Would they have been ordinarily the people that
11 you would speak to with respect to an SEC comment?
12        MR. RYAN: Objection, form.
13        Go ahead.
14 A    We spoke to a number of people at the
15 time who were critical in making these decisions.
16 That group included Barney. That group included
17 Darl. It included Patty. Indeed, there was an
18 unusual number of officers involved in this
19 particular IPO.
20        Which subgroup we spoke to
21 about this and whether Barney in particular called
22 in while on the road, I don't recall.
23 Q    (By Ms. Fox) This was over the 4th
24 of July weekend. Do you remember working the 4th

Page 48

1  of July weekend?
2  A    I would need to ask my wife. It
3  wouldn't surprise me.
4  Q    Other than those three names and
5  Patty Walsh, do you remember any other names of
6  people you spoke to at the company who were
7  helpful?
8  A    Again, there were a number of --
9         MS. BRANNEN: Objection, form.
10 A    -- folks involved: Jim Ferrell, Dick
11 Murtland, Mark Gonsalves. No doubt, others.
12 Q    (By Ms. Fox) Those are all the
13 people that come to mind as you mull over --
14 A    Yeah.
15        MS. BRANNEN: Objection, form.
16        MS. FOX: What's wrong with
17 that form?
18        MS. BRANNEN: It's unclear to
19 me. Are you asking him in general, or are you
20 asking him with regard to this comment in
21 particular?
22 Q    (By Ms. Fox) With regard to the
23 people that you used as information givers from
24 the company at this period of time, which would

Page 49

1  have been, say, the last month before the IPO,
2  would that be a comprehensive list of the people
3  you can remember now?
4  A    Indeed, it is not a comprehensive
5  list of the people we talked to. You're getting
6  the benefit of the people I can remember as I sit
7  here.
8  Q    Right.
9         MS. FOX: This is Exhibit 165.
10 I only seem to have two of these. Does anyone
11 have another? 165 is --
12        MR. McEVOY: Show it to me,
13 please.
14        MS. FOX: Do you need it,
15 Jenny?
16        MS. BRANNEN: I have it.
17 Q    (By Ms. Fox) This is one of the
18 letters I sent you.
19 A    Okay.
20 Q    Can you identify this letter?
21 A    This is a letter dated July 6th,
22 1998, on Arter & Hadden letterhead, which
23 functioned as the transmittal letter to the US
24 Securities and Exchange Commission to Amendment

13 (Pages 46 to 49)

**A. 38**

SENT BY:ARTER & HADDEN-DALLAS : 7- 1-98 : 9:54PM :     ARTER & HADD⁻⁻·     2650245:= 7/ 8

# M E M O R A N D U M

**TO:**     File                                           June 25, 1998

**FROM:**     Joe Hoffman

**RE:**     Adams Golf SEC Comments

    Carolyn Kurr of the SEC called to relay to me the SEC's comments on the Adams Golf S-1 Registration Statement Amendment No. 1 filing.

    The following is a summary of the Staff's comments:

1. The Staff has conducted a review of press releases and other publicity regarding the Company and noted that Mr. Adams, the Chairman of the Company, was quoted in a number of articles. Please make a good faith effort to review recent publicity and to square the information therein with the Prospectus.

2. The Staff has noticed that the Company has an interactive site with Mr. Adams on its web page. Please discontinue the use of this feature until the Registration Statement has become effective.

3. Consider updating disclosure in the Prospectus regarding USGA approval of golf equipment.

4. The Staff wanted the Company to consider whether disclosure of the Costco matter was necessary.

304367.1



**A. 39**



ADGO US $    ↑ 1.35 -.05 U  U1.35/1.41U   5x5                    Equity GP
DELAY        Vol 1,000 Op 1.35 U  Hi 1.35 U  Lo 1.35 U  ValTrd 1350

Trade Line  ADGO US Equity                    1/4

Range        7/ 9/98 - 12/31/98        Period  D Daily        Base Currency:  USD
Upper Chart: 3 Trade Line              Moving Averages
Lower Chart: V Volume Histogram        Moving Average      15      1) News

Comp/Close/Trade/USD
Last          4.09375
High 07/10/98 18.375
Average       6.50559
Low  12/14/98 3.1875

Volume            0.248m
SMAVG on Volume(15)  0.157m

09  16  23   03  10  17  24   01  08  15  22   01  08  15  22   02  09  16  23   01  08  15  22
  1998 Jul       1998 Aug       1998 Sep       1998 Oct       1998 Nov       1998 Dec

Australia 61 2 9777 8600       Brazil 5511 3048 4500       Europe 44 20 7330 7500       Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
                                                                        G384-261-0 09-Oct-2006 12:20:03

&lt;HELP&gt; for explanation.

N090 **Equity HP**

# Comp/CLOSE/PRICE

Page  2 / 3

ADAMS GOLF INC            (ADGO    US)        PRICE 1.35            U    $    DELAYED

HI 18.375    ON    7/10/98

Range **7/ 9/98** to **12/31/98**    Period **D** Daily    AVE **6.5056**    VL    313667
**USD**    Market **U** Trade    LOW **3.1875**    ON 12/14/98

| | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 10/30 | 4.625 | 198800 | F | 10/ 9 | 4.75 | 257900 | F | 9/18 | 5.0625 | 69500 |
| T | 10/29 | 4.625 | 295900 | T | 10/ 8 | 4.625 | 251200 | T | 9/17 | 4.875 | 77800 |
| W | 10/28 | 4.00 | 151500 | W | 10/ 7 | 4.6875 | 214700 | W | 9/16 | 4.9375 | 246800 |
| T | 10/27 | 3.96875 | 177800 | T | 10/ 6 | 4.875 | 147600 | T | 9/15 | 4.9375 | 153200 |
| M | 10/26 | 3.6875 | 508800 | M | 10/ 5 | 4.5625 | 83500 | M | 9/14 | 4.8125 | 358000 |
| | | | | | | | | | | | |
| F | 10/23 | 3.875 | 1196900 | F | 10/ 2 | 4.4375 | 581800 | F | 9/11 | 4.75 | 193500 |
| T | 10/22 | 4.625 | 58000 | T | 10/ 1 | 4.00 | 396800 | T | 9/10 | 4.8125 | 279000 |
| W | 10/21 | 4.625 | 70100 | W | 9/30 | 4.125 | 96900 | W | 9/ 9 | 5.50 | 98000 |
| T | 10/20 | 4.875 | 39500 | T | 9/29 | 4.00 | 1976900 | T | 9/ 8 | 6.125 | 115500 |
| M | 10/19 | 5.00 | 37600 | M | 9/28 | 4.625 | 139700 | M | 9/ 7 | | |
| | | | | | | | | | | | |
| F | 10/16 | 4.71875 | 38300 | F | 9/25 | 4.50 | 91700 | F | 9/ 4 | 6.125 | 25800 |
| T | 10/15 | 5.00 | 64300 | T | 9/24 | 4.50 | 115600 | T | 9/ 3 | 6.5625 | 70000 |
| W | 10/14 | 4.96875 | 99400 | W | 9/23 | 4.6875 | 128800 | W | 9/ 2 | 6.9375 | 210500 |
| T | 10/13 | 4.8125 | 307800 | T | 9/22 | 4.4375 | 112300 | T | 9/ 1 | 6.375 | 337700 |
| M | 10/12 | 5.00 | 204500 | M | 9/21 | 4.50 | 190700 | M | 8/31 | 5.1875 | 222400 |

<HELP> for explanation.                                          N090 Equity HP

# Comp/CLOSE/PRICE                                          Page  3 / 3
ADAMS GOLF INC                 (ADGO    US)        PRICE 1.35        U    $    DELAYED
                                                              HI 18.375    ON   7/10/98
Range  7/ 9/98   to 12/31/98       Period D Daily         AVE 6.5056    VL    313667
                              USD      Market U Trade      LOW 3.1875    ON 12/14/98

|   | DATE | PRICE | VOLUME |   | DATE | PRICE | VOLUME |   | DATE | PRICE | VOLUME |
|---|------|-------|--------|---|------|-------|--------|---|------|-------|--------|
| F | 8/28 | 6.25    | 244200 | F | 8/ 7 | 9.75    | 240700 | F | 7/17 | 17.625  | 596300 |
| T | 8/27 | 6.625   | 175800 | T | 8/ 6 | 9.8125  | 174600 | T | 7/16 | 16.625  | 806600 |
| W | 8/26 | 6.9375  | 134600 | W | 8/ 5 | 9.75    | 137600 | W | 7/15 | 18.1875 | 383900 |
| T | 8/25 | 6.875   | 173100 | T | 8/ 4 | 9.8125  | 753900 | T | 7/14 | 18.25   | 553700 |
| M | 8/24 | 6.9375  | 547600 | M | 8/ 3 | 9.25    | 251400 | M | 7/13 | 17.875  | 1473800 |
| F | 8/21 | 7.875   | 283700 | F | 7/31 | 9.9375  | 241400 | F | 7/10 | H18.375 | 7437400 |
| T | 8/20 | 8.25    | 102700 | T | 7/30 | 10.0313 | 210100 | T | 7/ 9 | 16.00   |         |
| W | 8/19 | 8.875   | 67800  | W | 7/29 | 9.9375  | 330600 |   |      |         |         |
| T | 8/18 | 8.6875  | 96200  | T | 7/28 | 9.9375  | 972000 |   |      |         |         |
| M | 8/17 | 9.125   | 106000 | M | 7/27 | 11.4375 | 376800 |   |      |         |         |
| F | 8/14 | 9.875   | 75100  | F | 7/24 | 12.875  | 428500 |   |      |         |         |
| T | 8/13 | 10.00   | 244600 | T | 7/23 | 13.3125 | 684300 |   |      |         |         |
| W | 8/12 | 10.0625 | 435300 | W | 7/22 | 15.25   | 630900 |   |      |         |         |
| T | 8/11 | 8.50    | 285300 | T | 7/21 | 14.9375 | 1031500 |   |      |         |         |
| M | 8/10 | 9.625   | 919400 | M | 7/20 | 16.6875 | 633600 |   |      |         |         |

Australia 61 2 9777 8600       Brazil 5511 3048 4500       Europe 44 20 7330 7500       Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
                                                                        G384-261-0 09-Oct-2006 12:23:02