**A. 50**

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3

4     ----------------------------------------------

5

6   IN RE:  ADAMS GOLF, INC.     :      CONSOLIDATED

7

8   SECURITIES LITIGATION        :    C.A. NO. 99-371-KAJ

9

10

11    ----------------------------------------------

12

13

14           ORAL DEPOSITION OF BRIAN LANTIER

15

16                Monday, June 5, 2006

17

18          The oral deposition of BRIAN LANTIER

19        was held at the Wyndham Syracuse Hotel,

20        6301 Route 298, East Syracuse, New York,

21        from 12:00 noon to 4:59 p.m., before

22        Cynthia A. Sanders, a Certified Shorthand

23        Reporter in and for the State of New York

24        and Registered Professional Reporter.

25

**Page 126**

```
1                    126
2   impact that it was going to have -- At that time the
3   market segment leaders Adams, with Orlimar attempting
4   to complete their IPO at the same time, and the new
5   Callaway club achieving some success on the PGA Tour,
6   that became something we had to follow monthly, as
7   well; as far as how many Adams clubs or Callaway clubs
8   or TaylorMade clubs are being carried by specific pro
9   players.
10      Q    Was there a specific purpose of keeping
11  them abreast on these subjects?
12      A    Other than being part of a team -- As an
13  investment banker post-IPO, your relationship with a
14  company does not go away.  So the investment bankers
15  continuing to have a relationship with the -- with
16  Adams Golf, and I felt arming them with the most
17  information on the market would be the best thing
18  possible.  It would make them more educated in their
19  discussions with Adams on what was happening in the
20  marketplace.
21      Q    Was it your understanding, in August of
22  1998, that Lehman was considering doing a further
23  offering with Adams at some later date?
24      A    I was not aware of that or at least -- No,
25  I was not aware of that.
```

**Page 127**

```
1                    127
2       Q    Was -- Did you come to the conclusion, at
3   any time in 1998, that Adams had adopted a stock
4   buy-back program because of the decline in its stock
5   price?
6           MR. McEVOY:  Object to the form.
7       A    I don't recall what the -- I do recall
8   something about the stock buy-back program, but I
9   don't remember when it was instituted or who suggested
10  the program.
11      Q    Do you recall having any involvement in the
12  decision by Adams to adopt a stock buy-back program in
13  the sense that you had provided information that was
14  acted upon?
15          MR. McEVOY:  I'm just going to object
16      to the form again.  Go ahead.
17      A    I don't recall being party to those
18  decisions.
19      Q    On that Exhibit 218, the specific words
20  used next to status August 1998 were, quote:  Finis
21  wanted help understanding why ADGO stock price still
22  low and investor sentiment in preparation for board
23  meeting.
24          What sources did you have, in August of
25  1998, for assessing investor sentiment in Adams stock?
```

**Page 128**

```
1                    128
2       A    I can't recall any specific investors, but
3   it would have been just a general gauge of those
4   people that were still calling in, checking on the
5   stock to gauge what that sentiment was.  But I can't
6   recall who those investors were or what that sentiment
7   was.
8       Q    These were primarily institutional
9   investors --
10      A    Yes.
11      Q    -- or by that point, were you also getting
12  retail investors?
13      A    For the most part institutional investors.
14  I don't recall really speaking to any individual
15  investors.
16      Q    Let me show you now what we have talked
17  about before, Exhibit 180.  This is a research report
18  on Adams Golf, Inc., dated August 28, 1998.
19          (Document handed.)
20          (Witness reviewed document.)
21      Q    Do you recognize this document?
22      A    Yes.
23      Q    And were you the primary draftsman of it?
24      A    Yes.
25      Q    Can you explain to me how heavily
```

**Page 129**

```
1                    129
2   Mr. Picchi was involved in writing it?
3       A    I probably gave him a document 90 percent
4   completed.  And Mr. Picchi is a skilled wordsmith, and
5   he would -- he had been writing research reports, at
6   this time, for 25 years, so he clearly was able to
7   tweak it and make the document flow better than the
8   one I had offered to him.
9       Q    As to page 27, which is the appendix
10  regarding the pro shop survey.  Did Mr. Picchi have
11  any role in that particular page, that you can recall?
12      A    He may have -- He may have participated in
13  the pro shop survey to some degree, but in terms of
14  the preparation of the document, for the most part, it
15  was a page that I had written.
16      Q    As specifically as you can, please tell me
17  what the pro shop survey was?
18      A    It consisted of picking up the phone and
19  dialing.  We had a list of the -- either the 50 or 100
20  largest pro shops across the U.S., and basically it
21  was just calling their retail locations and asking
22  them a few questions about the drivers.  Some people
23  were very good in providing information, others not so
24  much, and we were able to garner a lot of good
25  information about what was happening in the
```

**A. 51**

MINUTES OF A SPECIAL MEETING OF
THE BOARD OF DIRECTORS OF

ADAMS GOLF, INC.

October 19, 1998

A Special meeting of the Board of Directors of ADAMS GOLF, INC., a Delaware corporation (the "Corporation"), was held by conference telephone call whereby all participants could hear each other. The meeting was held in accordance with the provisions of Article 141 of the General Corporation Law of the State of Delaware on the 19th day of October, 1998 beginning at the hour of 9:30 a.m. central time.

The following directors constituting a quorum participated in the conference telephone meeting:

B.H. Adams
Paul F. Brown, Jr.
Roland Casati
Finis Conner
Mark Mulvoy
Richard Murtland
Stephen R. Patchin
John Simpson

Darl Hatfield, Senior Vice President, Finance and Administration, Chip Brewer, Senior Vice President Sales & Marketing, and Patty Walsh, Director, Investor Relations, participated in the meeting at the invitation of the Board of Directors.

An information packet concerning the Company's 3rd quarter 1998 results, 4th quarter 1998 and fiscal year 1999 forecasts were provided to all Directors in advance of the meeting. After the Chairman called the meeting to order, a general discussion of these documents took place and is recapped below.

Costco
In response to questions concerning Costco's effect on projected 4th quarter 1998 sales, Barney Adams and Chip Brewer reported that Costco has significantly increased its inventory of Tight Lies, using unauthorized diverters, and is selling the graphite club for $149. Adams authorized retailers in Costco's territories are under pressure either to (1) match Costco's price resulting in substantially decreased margins, or (2) maintain a $199 price and risk consumer backlash. The result has been a slowdown in sales to retailers in these areas which is expected to continue throughout the 4th quarter. Management is working to identify the retailers who are supplying Costco. In addition, management is



Δ π EXHIBIT 81
Deponent F. Conner
Date 5/9/x

ADAMS 004519

working with legal counsel to determine what actions may be taken to prevent authorized retailers from diverting product to Costco.

Orlimar's clubs have begun to appear at Costco at $199 graphite. Suggested retail is approximately $269 providing up to a 50% margin to their top retailers. Callaway's new Steelhead clubs have not been seen in Costco. The Steelhead, in graphite, retails for approximately $249 with a 30% to 35% retail margin.

### 1998/1999 Financials
The Board requested copies of the Company's previous 1998 and 1999 projections for comparison with current estimates. Darl Hatfield will provide these at the 10/28/98 Board of Directors meeting.

### 4th Quarter 1998 Projection
Selling and Royalty expense for the 4th quarter reflects an increase over the 3rd quarter 1998 with a significant reduction in sales estimates. Darl Hatfield noted that part of the increase in expenses can be attributed to production costs for the new Tight Lies infomercial, creative and production costs for the new driver infomercial and costs associated with the bag promotion. Additional discussion took place regarding variable expenses and professional services.

The Board recommended that management review the 4th quarter 1998 budget to determine if reductions in expenses could be made in order to improve operating results.

Details of the 4th Quarter 1998 and the 1999 Annual Forecasts were requested to be provided at the October 28, 1998 Board of Directors meeting.

### General Market Conditions
In response to questions concerning the golf equipment market in general, Chip Brewer reported that Adams and its competition all appear to be experiencing a slowdown in the market. Sales during the 3rd quarter filled the retail channel. Retailers have reported to Adams management they think Orlimar will begin to suffer due to their high rate of returns, pricing policies and the appearance of their products at Costco.

### Share Repurchase Program
Darl Hatfield reported, due to concerns expressed by the Board, the share repurchase program has been temporarily discontinued until after the conference call with investors and analysts.

### Third Quarter 1998 Conference Call
In response to questions concerning the October 23, 1998 analyst teleconference, Barney Adams stated the message to be communicated is that the golf market is very soft and Costco makes the situation more difficult. It was added that the continued investment in R&D should be highlighted as well, pointing out that the Company is on track to introduce the new driver in early 1999. In addition, the Board indicated the Company should clearly acknowledge the gray market which has developed in the Company's

distribution channel and that management is working to resolve this issue which is expected to take through the end of 1998. The Board further recommended that Joe Hoffman, outside counsel with the law firm of Arter & Hadden LLP, be included in the teleconference scripting/rehearsal.

Analyst Reports
The Board requested a copy of all future analysts' reports.

Directors & Officers Insurance
Darl Hatfield reported he has requested estimates to increase D&O insurance from $7.5 million to $15 million, $20 million, $30 million, and $40 million.

Driver Update
Dick Murtland reported driver development is on track with a target introduction date of January 1999. Barney Adams noted that Nick Faldo has been involved in the driver development process and will participate in the advertising as well. The driver is expected to retail between $350 and $400. Teaser ads are expected to be used prior to the introduction.

Next Board Meeting
The next Adams Golf Board of Directors meeting is scheduled for Wednesday, 10/28/98 with dinner on the preceding evening.

There being no further business to come before the meeting, upon motion duly made, seconded and carried, the meeting was adjourned at 10:40 a.m. central time.

CHAIRMAN OF THE MEETING:

_____
B.H. Adams

SECRETARY OF THE MEETING:

_____
B.H. Adams

ADAMS 004521

A. 52

2601 E. Plano Pkwy.
Plano, Texas 75074
(800) 606-7660
FAX (972) 398-7970

www.adamsgolf.com
e-mail: info@adamsgolf.com



# Fax

| To: | Sally | From: | Scott |
|---|---|---|---|
| **Fax:** | 253-661-4558 | **Pages: 6** | |
| **Phone:** | | **Date:** | October 15, 1998 |
| **Re :** | COSTCO | | |

Sally,

Good morning!!

I have included you on the COSTCO BUSTER team. Its me, you, Matt, and Jeff.

They got these inventories for me yesterday. The blank stores are on the spreadsheet are yours. We are going to do inventory checks every 2nd Wed. with the next one on Wed. Oct. 28,1998.

They simply called a location - said that they were having a company golf tournament and that they wanted to buy clubs for everyone.

Our product code in Costco is 25926.

Please make this priority number one. I am due to fax Chip information today on the Costco situation and I want to include inventory reports.

Thanks,

Scott



EXHIBIT

64

Blevins

ADAMS 001524

**A. 53**

SCOTT BLEVINS

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3

4    IN RE: ADAMS GOLF, INC.  :    CONSOLIDATED

5    SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

6    _____X

7

8          ORAL DEPOSITION OF SCOTT BLEVINS

9              Wednesday, May 3, 2006

10

11          The oral deposition of Scott Blevins was

12   held at the law offices of Akin Gump Strauss Hauer

13   & Feld, LLP, 1700 Pacific Avenue, Suite 4100,

14   Dallas, Texas, from 9:36 a.m. to 2:26 p.m., before

15   Jamie K. Israelow, a Certified Shorthand Reporter

16   in and for the State of Texas, Registered

17   Professional Reporter, Certified Realtime Reporter

18   and Certified LiveNote Reporter.

19

20

21          RSA/VERITEXT COURT REPORTING COMPANY

22            1845 Walnut Street, 15th Floor

23              Philadelphia, PA  19103

24            (215)241-1000    (888)777-6690

SCOTT BLEVINS

Page 14

1  when he asked you to do that?
2      A    It was fairly close to when I moved
3  into that new role in October --
4  October/Novemberish sometime time frame, if I
5  recall.
6      Q    And I assume you met with Chip Brewer
7  about what he was trying to accomplish with this
8  group, obviously?
9      A    Well, the -- this group was the
10  existing people that we had out in the field
11  already, so there wasn't a specific group put
12  together that -- to --
13      Q    Oh, okay.
14      A    -- to figure out any issues. This
15  was just the group of people that I already
16  managed as regional account coordinator
17  supervisor.
18      Q    I see. Okay. And that was 13?
19      A    The 13.
20      Q    Okay. That's too many people. I'm
21  not going to ask you their names.
22      A    Yeah.
23      Q    Okay. So you met with Chip Brewer.
24  What did Chip explain to you he wanted done? How

Page 15

1  did Chip explain it to you?
2      A    He basically wanted to see if I could
3  find out where clubs were coming from. There were
4  some clubs in Costco, see if I could track it
5  down.
6      Q    Was that a natural fit for your
7  position in the company at the time?
8      A    I don't know. I was the only one
9  that had contact with the outside folks, so if we
10  had investigated on the outside, it seemed like it
11  would be a natural fit. No one else had
12  interaction with the outside regional account
13  coordinators.
14      Q    Did -- well, didn't members of the
15  inside sales staff have -- I'm just trying to
16  understand.
17           The inside sales staff would
18  call to outside retailers or green-grass accounts
19  or vendors trying to make sales?
20      A    Correct.
21      Q    Did they have contact with these
22  outside accounts beyond that? Were they
23  marketing --
24      A    Who is they?

Page 16

1      Q    Inside sales group people.
2      A    Okay. Yes. One time a year.
3  Probably one time a year at the PGA show, when
4  everyone would go to the show and meet with them.
5      Q    So again, I'm just trying to
6  understand the structure.
7           So as far as -- using the
8  shorthand, as far as schmoozing or going to meet
9  with the outside, that was your group's
10  responsibility?
11      A    We didn't -- I wouldn't say schmooze
12  with the customers.
13      Q    Right.
14      A    The only thing --
15      Q    Customer relations?
16      A    The only thing we were concerned with
17  at that point, again, since we weren't sales --
18      Q    Right.
19      A    -- was where our clubs were
20  positioned in the store and if we had good
21  presence and position in the stores so someone
22  would walk in and see it and hopefully buy the
23  club.
24      Q    I see. Okay. Were you surprised

Page 17

1  when Chip Brewer approached you about the -- what
2  we're calling the Costco issue?
3      A    Not necessarily.
4      Q    Had you heard about any problems with
5  clubs appearing in Costco prior to Chip Brewer
6  approaching you about it in October of 1998?
7      A    Yes. I believe I knew -- I had heard
8  rumblings about it, and I believe even a few of --
9  my regional account coordinators had mentioned
10  something about it prior to him talking to me in
11  October.
12      Q    When did you first hear about clubs
13  showing up in Costco?
14      A    I don't recall the exact date.
15      Q    Spring? Summer? Fall?
16      A    I couldn't even guess.
17      Q    Again, and we're talking 1998 for --
18  spring, summer, or fall of '98.
19      A    Yeah, I'd hate to guess at the exact
20  date, but it was probably prior to when he talked
21  to me about it.
22      Q    Okay. What were the rumblings? You
23  said you had heard rumblings about it. What were
24  the rumblings?

5 (Pages 14 to 17)

**A. 54**

Debra L. Lopez
_____

**From:**        Scott T. Blevins
**Sent:**         Tuesday, October 20, 1998 3:48 PM
**To:**           Sales
**Subject:**      Selling Around the Costco issue

Hello everyone. As you may know, I have been appointed to tackle the Costco fiasco. I am sure you are receiving calls on this subject, and while no customer will be satisfied until we are out of these stores, we need to make sure that concerned customers understand the magnitude of the problem for us and what we are doing to correct it.

I have used this in the field on numerous occasions and it works.

Customer: "Why are you selling to Costco?"

Response:
       1. Listen to the customer complain. Do not interrupt them, let them spill everything ( they will feel better even if you don't      have a good answer for them!)
       2. Assure the customer that you understand it has a negative impact on their business. Assure the customer that it is our     number 1 area of concern and that we are working the problem.

Customer: "How are you working the problem? When will it be fixed?"
       1. Long Term- We filed a Bill of Discovery against Costco on June 9, 1998. We filed it in order to determine whether       Costco's claims that they have properly acquired our Tight Lies woods for resale were accurate. The official press release is       available to send to our customers. We do not want to arbitrarily send this to everyone ( why wake a sleeping customer??)        but we want to use it to make sure the customer understands that Costco is an unauthorized account.
       Note: The legal process is hardly ever a short term answer to a problem - so see #2 and #3.
       2. Mid Term- We are in the process of acquiring a very expensive piece of equipment to label our golf clubs. New products       will be marked and we will be able to track product. This process should be in place by Jan. 1, 1999.
       3. Short Term- The bag promotion. We are focusing all of our resources on a "Costco Buster" program. We are giving the       retailer a chance to sell Tight Lies (and maintain a margin) by providing consumers a value added piece that Costco cannot      offer.

Note: We are not the only company in Costco. Callaway, Taylor Made, Orlimar, Odyssey, and Maxfli do not sell to Costco, but are in the stores as well. Callaway and Odyssey are feeling the heat from retailers and are also looking into marking their products.

Again, use this to answer objections and be assured that I have put the process in place to identify accounts reselling our clubs. I am sure that we will solve the issue, but it will take some time.

I hope this helps.

Thanks,

*Scott Blevins*
*Manager - Regional Account Coordinators*



**EXHIBIT**
_09_
Blevins

**ADAMS 001562**

1

**A. 55**

2801 East Plano Parkway
Plano, Texas 75074
www.AdamsGolf.com
FAX: 972-398-8918
800-622-0609
Tel: 972-673-9673

 **ADAMS**

*From the desk of*
**B.H. (Barney) Adams**

## Memo

To: Paul Brown, Roland Casati, Finis Conner, Mark Mulvoy, Dick Murtland,
Steve Patchin, John Simpson

Date: October 8, 1998

RE: 4TH QUARTER

One thing that is hurting us badly is Costco. It was a problem before, but has greatly escalated in the last two weeks and will be very difficult in Q4 (Christmas).

A. We don't sell Costco.
B. They have previously bought our product through some of our customers looking to make a quick buck. This is a modus operandi for Costco. We were never able to trace sources, we attempted to file suit but were unsuccessful.
C. We committed $125K to an engraving machine which will engrave a serial number on the hosel of every club head. It's a long lead time product and requires sophisticated installation with our computer system providing tracing ability. The machine should be up and running by end Q4.
D. In the meantime, the product volume at Costco has increased dramatically (as of the last two weeks), and to our great surprise we are relatively sure their source is one of our largest retail accounts. (A process of elimination with this new volume, not a paper trail.)

Costco makes its money from memberships. They buy a hot product like ours and sell it at a low price ($149.00 for graphite). Our normal channels can't compete, retailers get mad and stop buying. We can:

A. Buy the product out of Costco. (They'll just get more).
B. Compensate our retailers.

We estimate a negative sales effect in Q4 of 20%-25% based on a market survey (customers who refuse to buy). We are countering with our Thank You America program where you get a free $150.00 stand bag with the purchase of two Tight Lies®, and Costco does not participate.

Except for a lesser amount in the pipeline we'll have this under control by Q1 '99, but it's a problem that has become a major issue in the last two weeks.

BHA:afn



Δ π EXHIBIT 80
Deponent F. Conner
Date 5/9/06 Rptr. AmH
WWW.DEPOBOOK.COM

ADAMS036832

**A. 56**

◄ PGA TOUR PROS   ASK BARNEY   NEWSLETTER   DEMO DAYS   CRAFTSMANSHIP   PRESS RELEASES   CONTACT US

◄ BACK

# ADAMS IN THE NEWS



## Adams Golf Comments on Fourth Quarter Outlook

—1/7/99

PLANO, TEXAS, JANUARY 7, 1999—Adams Golf (NASDAQ:ADGO) announced today that due to lower than anticipated sales and certain charges to operations, the Company expects to report a loss of between $.17 and $.19 per share for the quarter ended December 31, 1998. The Company intends to report actual fourth quarter results during the week of February 1, 1999.

Adams Golf attributes the lower than expected sales to continuing weakness in the golf equipment market and the gray market distribution of its products to a membership warehouse club. Operating results for the fourth quarter were further impacted by credits offered to retailers in connection with a new suggested retail pricing structure and settlement of future royalty obligations that would have been payable to (1) an outside sales and marketing consultant and (2) infomercial talent. The Company expects the aggregate after tax expense associated with the above charges will approximate $3.2 million, or $.14 per common share.

"We are clearly disappointed by the results of our fourth quarter in which sales were affected more than originally anticipated by the factors discussed above," stated Barney Adams, Chairman, CEO and President of Adams Golf. "Effective immediately, we are implementing a new pricing structure. In conjunction with the new pricing, retailers will be eligible to receive credit on unsold Adams inventories at the time of the price change, which may be applied to future orders of existing products."

Mr. Adams further stated, "We believe the strategic steps taken the last quarter of 1998, combined with scheduled new product introductions in 1999, improves our competitive posture and will benefit our shareholders going forward. Furthermore, our balance sheet remains strong with approximately $58 million in cash, cash equivalents and marketable securities with virtually no debt as of December 31, 1998."

Adams Golf designs, manufactures and markets premium quality, technologically innovative golf clubs including the Tight Lies® fairway woods. Further information on the Company can be found on its Internet site, www.adamsgolf.com.

This release, other than historical information, includes forward-looking statements with respect to industry trends and certain other matters. These statements are made under the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995 and involve risks and uncertainties which could cause actual results to differ materially from those in the forward-looking statements, including but not limited to the following: product development; product introductions; market demand and acceptance of products; the impact of changing economic conditions;

-121-

business conditions in the golf industry; reliance on third parties including suppliers; the impact of market peers and their products; the actions of competitors, including pricing; risks concerning future technology; and one time events and other factors detailed in the Company's prospectus, and other Securities and Exchange Commission filings. These filings can be obtained by contacting Adams Golf Investor Relations.

◄ BACK

To view Adams financial news releases, click here

**A. 57**

*2801 East Plano Parkway*
*Plano, Texas 75074*
*www.AdamsGolf.com*
*FAX: 972-398-8818*
*800-622-0609*
*Tel: 972-673-9673*

 **ADAMS**

*From the desk of*
**B.H. (Barney) Adams**

## Memo

**To:** Paul Brown, Roland Casati, Finis Conner, Mark Mulvoy, Dick Murtland,
Steve Patchin, John Simpson

**Date:** October 13, 1998

**Re:** 4TH QUARTER

The 3rd quarter numbers came out on the high side, the Q4 forecast is awful. I've spent countless hours with sales and (subsequently) finance, and I agree with them that it's better to have a poor forecast we think we can make (and beat) than to put out better sounding numbers and not make them.

Why is Q4 so weak? Terrible golf market, Costco, and to a lesser degree, competition. (We planned for the competition; Costco and the terrible market were more of a surprise.) I say more of a surprise because about 90 days ago we decided to install an aggressive program in case Q4 turned sour.

A.    Our Thank You America, buy two Tight Lies®, get a free stand bag.
B.    A completely new marketing plan, new infomercial, TV ads, print ads.
C.    One on one visits with major customers to optimize A and B above.

There is another reason for Q4 problems. As I've written earlier, after the road show I immersed myself in the sales department. Suffice to say that Chip Brewer inherited situations of a deep and serious nature. We're still affecting solutions and will be doing so through Q4 '98. This is about facts, and if changes hadn't been made Adams Golf would have suffered irreparable damage.

I've written before about '99. A major part of our forecast is the new driver ($35M). We will have a technically superior product, great looking, great player results <u>and</u> it's a very complex story to tell. We know the issues, we discuss in detail, employ consultants. Notwithstanding anything we try, the fact is our '99 forecast depends on a successful new production introduction in what now is a very down market.

On the other hand, the market is definitely looking for something new and we'll be there. Callaway is at its weakest in the last 5+ years and there is a tremendous opportunity. We feel very good about our future, but we'll never have the luxury of advance orders that meet our forecast.



EXHIBIT
56
Brewer

ADAMS036843

BHA:afn

ADAMS036844

**A. 58**

|

1 of 1 DOCUMENT

Copyright 1998 PR Newswire Association, Inc.
PR Newswire

October 1, 1998, Thursday

**SECTION:** Financial News

**DISTRIBUTION:** TO BUSINESS EDITOR

**LENGTH:** 404 words

**HEADLINE:** Adams Golf Plans to Repurchase Up to 2 Million Shares of the Company's Common  Stock**LEXIS-NEXIS Related Topicsno targeted Topics.**

**DATELINE:** PLANO, Texas, Oct. 1

**BODY:**

Adams Golf (Nasdaq: ADGO) announced today that its Board of Directors has authorized the repurchase of up to two million shares of the Company's Common Stock.  A purchase of the total number of shares authorized would equal approximately 8.6% of the 23,136,782 shares outstanding.

Adams Golf will repurchase its Common Stock using periodic open market purchases and by block purchases at prevailing prices and based on market conditions.  The Company intends to use surplus cash to fund the repurchase program and expects the program to begin immediately.

Barney Adams, Chairman, CEO and President of Adams Golf stated, "We believe our shares are significantly undervalued at this time and believe the share repurchase program communicates our confidence in the future of Adams Golf as a leader in the golf equipment industry.  Given our Company's strong cash and financial position, the Board determined that purchasing our own stock represents an excellent investment for the Company and is in the best interest of our shareholders."

Adams Golf designs, manufactures and markets premium quality, technologically innovative golf clubs including the Tight Lies(R) fairway woods.  Further information on the Company can be found on its Internet site, www.adamsgolf.com.

This release, other than historical information, includes forward-looking statements with respect to industry trends and certain other matters.  These statements are made under the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995 and involve risks and uncertainties which could cause actual results to differ materially from those in the forward-looking statements, including but not limited to the following: product development; product introductions; market demand and acceptance of products; the impact of changing economic conditions; business conditions in the golf industry; reliance on third parties including suppliers; the impact of market peers and their products; the actions of competitors, including pricing; risks concerning future technology; and one time events and other factors detailed in the Company's prospectus, and other Securities and Exchange Commission filings.  These filings can be obtained by contacting Adams Golf Investor Relations.
SOURCE  Adams Golf

CONTACT: Patty Walsh, Director, Investor Relations of Adams Golf, 972-673-9850

**LOAD-DATE:** October 2, 1998

**A. 59**

10/19/98
Board Meeting Notes

Patchin, Casati, Murtland, Simpson, P& Brewer
Conner, Brown, Mulroy

Costco – why problem? Demand issue.
1. Team of diverters, will not disclose sources
no legal redress to identify
Have strong indications – 50 clubs, 30 clubs
think it's series of small buyers. May be one
of our largest customers
$149 Letter from Edwin Watts – removes
retailers' margin or holding margin consume
pays more.
What % of sales? Don't know – subjective on
magnitude
Callaway & Orlimar – w/ Callaway greater margin
on Adams ($259 Steelhead, Orlimar $200)
   30-35% margin    $130-$135 after full rebate
   ~$150 pts.       50 pts.
                 / Orlimar in Costco for $199

Mag of shortfall in Q4 – probably 30% purely
                              subjective

22 mm sales
revised to 18-19 mm w/ 12¢ per share       ADAMS 002238

Want numbers given prior to/during roadshow – RA thinks
they went out. May have had @ last board mtg.


EXHIBIT
151
Brown

LB          FBW          previous
.21,993     20.7         Q4 estimates
19¢         14¢

Q3 report
Reduction in sales 43.1
Selling & Royalty exp. + 9.1

Q4/up costs
   new TL infomercial
   creative/prod. driven info.
   Bag promotion
Variables
Royalties
Bonuses & commissions
Incentive - mgs. level on up - discretionary, based mkt #'s
Travel expense - mktg. int'l.

Castle Budget seems very conservative - per Ba this
budget will take a lot of work even @ this
level.
Actions will have to be taken publicly
to explain losses.
Budget does not reflect adjustments or conscious
action to make up for decrease in sales

1999 - prof'l. svcs under $1mm but $600K for
Q4 98? Significant IT expenses. Midwest
Consultants - E-mo. employment

ADAMS 002239

18% add on for benefits.

Casati - @ board mtg wants details

Is Q4 budget fixed? - Everyone in a key position

Selling & Royalty up 9% on 43% decrease
in sales
Increase in int'l sales costs add'l 5% jFaldo

Morale is an issue
Are incentives paid if loss of 2¢/share? No exec
maybe at lowest level where $ are very
low.

Costco 20%
Where is 80%?
    Poor market conditions (same for compe-
    Ortiman not as much            tition)
    Callaway will show
    Sales @ end of Q3 overloaded distributors
How much in sales @ 180-day terms? 3 per Bd
Will it continue? If Callaway continues
How are you
Chip working on letter to customers

ADAMS 002240

Orlimas still on upswing?
Retailers say in 6-9 mos. they think
Orlimas will crash big time.
Returns are high, pricing policy is catching
up, Costco is hurting them
Predict by mid- to end 1999 Orlimas will
be non issue. Did xxxx job for about 90
days.
Callaway - think there are problems

10/8 memo - revenue 20-25% due to Costco
Were you aware of Costco problem when stock
buy back was decided?
Wants board to meet when serious issues
such as Costco come up
Finis - thinks we should not buy back until
street has info.
Paul - what did we say? If we had knowledge
that would go up,  cause it to go
4/29 - LB Q4 decreased from 23¢ to 13¢
$13mm will be a disaster

conf. call Friday - market is very soft; Costco makes it
more difficult.     message on

pg.27 Ref. 8/28 LB analysts report outlining Costco
issue

ADAMS 002241

In Q3 were in selected Costcos

Q4 increased dramatically
(Find out how many Costcos)
Heard July/Aug - Pacific northwest
did not know it was material
Long promotion also counteracts Costco
In last few weeks - were in many stores

19¢ results - what will you say?
Q3 came out on very high end of adjusted
expectations
As there any way to show even 1¢ profit?
Increase sales, decrease expenses
Rework #'s

Paul - Q4 budget - costs don't run w/ expected
level of sales

A All analyst reports should go to Board

Increasing D&O insurance — $75mm currently
Met w/ carriers on Friday, waiting for
quotes on
$15, 20, 30, 40 mm.

ADAMS 002242

① Bullish ① strong adv. program on TL
②
③ new drives (most technically superior but
tough story to sell)

Non conversation?
Continuing to invest in R&D; we're on track to intro. in early 1999
When ready?
Teaser campaign in January.

Clear ack. of dist. channel
has created gray mkt. On track to resolving
&
will take thru end of year.
Make sure Joe hears prior to

Nick's name on new drives? & will partic.
in advertising?

10/27 Tues - dinner
10/28 Wed. meeting

New adv. - can Board see Wed.?
Dinner mtg in closed room?
How is Brush progressing w/ R&D? Very hands on
currently. Will he move to Tx? Probably not.

$350 - $400:
Preview program that's about margin + working w/
retailer

Darl- fax conf. call # for Friday

ADAMS 002243

**A. 60**

CONFIDENTIAL - DRAFT ONLY



# NEWS RELEASE

*For more information, please contact:*
Patty Walsh
Director, Investor Relations
(972) 673-9850

FOR IMMEDIATE RELEASE

### ADAMS GOLF REPORTS THIRD QUARTER OPERATING RESULTS

PLANO, TEXAS, October 22, 1998. Adams Golf (NASDAQ:ADGO) today announced operating results for the third quarter ended September 30, 1998. Net sales increased 61.5 percent to $22,986,702 as compared to net sales of $14,236,078 during the third quarter of 1997. Net income increased to $4,346,389 for the three months ended September 30, 1998 from $3,143,967 for the comparable period in 1997. Net income per common share decreased to $0.19 for the three months ended September 30, 1998 from $0.26 per share for the comparable period of 1997 based on weighted average diluted common shares outstanding of 22,748,523 and 12,156,878, respectively.

For the nine months ended September 30, 1998, net sales were $81,314,895, an increase of 313 percent from $19,684,813 for the comparable period in 1997. Net income for the nine months ended September 30, 1998 was $16,645,897 versus $3,184,807 for the first nine months of 1997. Net income per common share increased to $0.83 for the nine months ended September 30, 1998 from $0.27 per share for the comparable period of 1997 based on weighted average diluted common shares outstanding of 20,011,800 and 11,968,472, respectively.

"We are pleased with our third quarter results, especially considering the increasing competition in the fairway woods category and the general softening we have seen in the golf equipment market," stated Barney Adams, Chairman, CEO and President of Adams Golf.

Commenting on the Company's outlook for the fourth quarter, Mr. Adams stated, "At this time, we expect our fourth quarter sales will be affected by continuing weakness in the golf equipment market. In addition, we anticipate our sales will be further impacted by the recent gray market distribution of our products to a membership warehouse club. While we are working diligently to identify and stop the unauthorized distribution of our products to this retailer, we anticipate this process will take at least through the end of the year. As a result of these market conditions, we anticipate that our net income for the fourth quarter will be at or slightly above a break even level. We remain optimistic, however, about our ability to increase our sales and earnings in 1999 through the introduction of new products and the continued expansion of our marketing efforts both domestically and internationally."

UND 08818

CONFIDENTIAL - DRAFT ONLY

Further Mr. Adams stated, "In response to current market conditions, we have recently rolled out a new marketing campaign offering a high quality golf bag free to consumers who purchase any two Tight Lies® fairway woods. Based on preliminary reaction from our retailers, we believe this promotion will help stimulate sales and reduce the gray market distribution as the free bag is available only to customers who purchase Tight Lies clubs through authorized Adams Golf retailers. In addition, we will begin airing a new Tight Lies infomercial within the next week which focuses on the expanded line of Tight Lies products and highlights the benefits of the Tight Lies fairway wood over clubs currently offered by our competitors. Meanwhile, we are continuing our research and development efforts and the new driver remains on track for introduction in the first quarter of the new year," concluded Barney Adams.

On October 1, 1998, Adams Golf announced that its Board of Directors had authorized the repurchase of up to two million shares of the Company's common stock. With respect to this share repurchase program, Adams Golf has purchased 657,500 shares of the Company's common stock to date.

Adams Golf designs, manufactures and markets premium quality, technologically innovative golf clubs including the Tight Lies fairway woods. Further information on the Company can be found on its Internet site, www.adamsgolf.com.

*This release, other than historical information, includes forward-looking statements with respect to industry trends and certain other matters. These statements are made under the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995 and involve risks and uncertainties which could cause actual results to differ materially from those in the forward-looking statements, including but not limited to the following: product development; product introductions; market demand and acceptance of products; the impact of changing economic conditions; business conditions in the golf industry; reliance on third parties including suppliers; the impact of market peers and their products; the actions of competitors, including pricing; risks concerning future technology; and one time events and other factors detailed in the Company's prospectus, and other Securities and Exchange Commission filings. These filings can be obtained by contacting Adams Golf Investor Relations.*

UND 08819

## CONFIDENTIAL - DRAFT ONLY

Adams Golf, Inc. and Subsidiaries
Condensed Consolidated Balance Sheets
(in thousands)

### Assets

| | December 31, 1997 | September 30, 1998 |
|---|---|---|
| | | (unaudited) |
| Current Assets: | | |
| Cash and cash equivalents | $    1,956 | 29,196 |
| Marketable securities | - | 8,120 |
| Trade receivables, net | 7,671 | 12,899 |
| Inventories | 4,487 | 10,879 |
| Deferred income tax assets | 390 | 866 |
| Other current assets | 1,446 | 3,413 |
| Total current assets | 15,950 | 65,373 |
| Property and equipment, net | 604 | 3,524 |
| Marketable securities | - | 26,263 |
| Deferred income tax assets | 183 | - |
| Professional services agreement | - | 9,703 |
| Other assets, net | 623 | 1,800 |
| | $    17,360 | 106,663 |

### Liabilities and Stockholders' Equity

| | | |
|---|---|---|
| Current liabilites: | | |
| Note payable to stockholder | $    - | 535 |
| Accounts payable | 378 | 438 |
| Income taxes payable | 1,021 | - |
| Accrued expenses | 7,636 | 7,000 |
| Total current liabilities | 9,035 | 7,973 |
| Deferred income tax liabilities | - | 3,182 |
| Total liabilities | 9,035 | 11,155 |
| Stockholders' equity: | | |
| Common stock | 16 | 23 |
| Additional paid in capital | 14,123 | 85,891 |
| Common stock subscription | - | (22) |
| Deferred compensation | - | (1,303) |
| Retained earnings (accumulated deficit) | (5,814) | 10,832 |
| Accumulated other comprehensive income | - | 87 |
| Total stockholders' equity | 8,325 | 95,508 |
| | $    17,360 | 106,663 |

UND 08820

## CONFIDENTIAL - DRAFT ONLY

Adams Golf, Inc. and Subsidiaries
Condensed Consolidated Statements of Operations
(in thousands, except for share and per share data)
(unaudited)

| | Three Months Ended September 30. | | Nine Months Ended September 30. | |
|---|---|---|---|---|
| | 1997 | 1998 | 1997 | 1998 |
| Net sales | $ 14,236 | 22,987 | 19,685 | 81,315 |
| Cost of goods sold | 3,603 | 6,001 | 5,745 | 19,626 |
| Gross profit | 10,635 | 16,986 | 13,940 | 61,689 |
| Operating expenses: | | | | |
| Selling and royalty expenses | 5,568 | 7,296 | 7,854 | 24,683 |
| General and administrative expenses | 593 | 3,011 | 1,507 | 10,034 |
| Research and development expenses | 260 | 454 | 298 | 1,118 |
| Total operating expenses | 6,421 | 10,761 | 9,659 | 35,835 |
| Operating profit | 4,212 | 6,225 | 4,281 | 25,854 |
| Other income (expense): | | | | |
| Interest income | 37 | 666 | 46 | 598 |
| Interest expense | (25) | (15) | (48) | (58) |
| Income before income taxes | 4,224 | 6,876 | 4,279 | 26,394 |
| Income tax expense | 1,080 | 2,530 | 1,094 | 9,748 |
| Net income | $ 3,144 | 4,436 | 3,185 | 16,646 |
| Net income per common share: | | | | |
| Basic | $ 0.26 | 0.19 | 0.27 | 0.84 |
| Diluted | 0.26 | 0.19 | 0.27 | 0.83 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 12,156,878 | 22,695,478 | 11,968,472 | 19,714,997 |
| Diluted | 12,156,878 | 22,748,523 | 11,968,472 | 20,011,800 |

\# \# \#

UND 08821

A. 61

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF DELAWARE
3                   - - -
4    IN RE: ADAMS GOLF, INC. :
5    SECURITIES LITIGATION   :
6
                           X
7
                   ORAL DEPOSITION
8
                         OF
9
               CHRISTOPHER M. JAMES
10
               Friday, August 11, 2006
11
                      - - -
12
13        Oral deposition of CHRISTOPHER M.

14   JAMES, held at the offices of AKIN GUMP

15   STRAUSS HAUER & FELD, LLP, 590 Madison Avenue,

16   New York, New York, commencing at 8:30 a.m.,

17   reported by Pamela Harrison, RMR, CRR, CSR and

18   Notary Public.

                      - - -
19
20
21
22
         RSA/VERITEXT COURT REPORTING COMPANY
23          1845 Walnut Street, 15th Floor
              Philadelphia, PA  19103
24          (215) 241-1000  (888) 777-6690

Page 82

1    A.    Yes.    11:06:41a
2    Q.    Any other indices that you used    11:06:42a
3  in this case?    11:06:44a
4    A.    Yes. In response to the report    11:06:44a
5  of Mr. Miller, I believe his rebuttal report, I    11:06:51a
6  also undertook the analysis utilizing the S&P    11:06:57a
7  small cap and the S&P small cap together with    11:07:02a
8  the -- his peer group.    11:07:10a
9    Q.    Am I missing something or is    11:07:19a
10  this something I haven't seen yet?    11:07:21a
11    A.    I don't know whether it's been    11:07:25a
12  produced to you, but it was something that I did    11:07:26a
13  subsequent to my rebuttal report because it was    11:07:29a
14  in response to Mr. Miller's.    11:07:34a
15    MR. COLLINS:  Okay.    11:07:39a
16    MS. REED:  I haven't seen it.    11:07:40a
17  BY MR. COLLINS:    11:07:46a
18    Q.    Okay. So that work you did in    11:07:46a
19  response to Mr. Miller's rebuttal; correct?    11:07:50a
20    A.    That's right.    11:07:54a
21    Q.    Any other work you did in    11:07:54a
22  response to Mr. Miller's rebuttal?    11:07:57a
23    A.    Yes. When I reviewed his    11:08:01a
24  rebuttal report, I investigated and prepared    11:08:08a

Page 83

1  responses to -- I thought about -- and that's    11:08:19a
2  what I meant by prepared -- I thought about    11:08:25a
3  responses to and tried to assess the validity of    11:08:30a
4  some of the issues that he raised.    11:08:36a
5    I also undertook an analysis,    11:08:39a
6  which I believe is in -- which has been marked    11:08:44a
7  as Exhibit 339 and 340, which addresses an    11:08:47a
8  issue that Mr. Miller raised in his report    11:08:53a
9  regarding his contention that the price    11:08:56a
10  decline principally in late July was    11:09:00a
11  attributable to issues concerning the gray    11:09:05a
12  market.    11:09:11a
13    Q.    Anything else?    11:09:13a
14    A.    I think that's -- as I sit here,    11:09:15a
15  that's a summary of the things that I did.    11:09:19a
16    Q.    Okay. Now, the work that you    11:09:21a
17  did in response to or in connection with the    11:09:23a
18  Miller rebuttal report, that work is reflected    11:09:27a
19  in part by Exhibits 339 and 340, if I heard you    11:09:34a
20  correctly.    11:09:39a
21    A.    Yes, some of it -- some of the    11:09:39a
22  analysis that I just referred to is contained in    11:09:42a
23  339, 340.    11:09:46a
24    Q.    Okay. Any other pieces of paper    11:09:50a

Page 84

1  or computer programs or documents of any nature    11:09:54a
2  reflect the work you did in response or    11:10:03a
3  in connection with the rebuttal report of    11:10:06a
4  Mr. Miller?    11:10:08a
5    A.    I don't have any other --  I    11:10:15a
6  don't have any other paper or -- I reviewed the    11:10:22a
7  output of a market model analysis using the S&P    11:10:29a
8  small cap and the peer group from the data that    11:10:38a
9  Mr. Miller provided --    11:10:44a
10    Q.    Okay.    11:10:46a
11    A.    -- that I reviewed that output    11:10:48a
12  on a computer screen. I don't believe -- I    11:10:51a
13  don't think I printed it out.    11:10:54a
14    Q.    Okay. Could you do so for us,    11:10:55a
15  please.    11:10:57a
16    A.    I believe I can recreate it.    11:11:03a
17    Q.    If you would, please.    11:11:05a
18    How long would it take you to    11:11:09a
19  recreate it?    11:11:10a
20    A.    The estimation wouldn't take    11:11:19a
21  long.    11:11:21a
22    Q.    Could you ask someone to do    11:11:21a
23  that, say, at the next break or lunch and have    11:11:22a
24  it sent to us so we can take a look at it before    11:11:25a

Page 85

1  you go home?    11:11:29a
2    A.    I'll take it under advisement.    11:11:29a
3  I would have to ask the attorneys what the    11:11:31a
4  protocol is, and if those people are available.    11:11:34a
5  I'll certainly try to look into it.    11:11:38a
6    Q.    Good. Thank you.    11:11:40a
7    And what is the nature of that    11:11:50a
8  material that's on the computer that you just    11:11:51a
9  described?    11:11:55a
10    A.    Just so you are clear, one issue    11:11:55a
11  that I wanted to address was whether the    11:12:00a
12  conclusions that I reached with respect to the    11:12:03a
13  statistical significance of the days that I    11:12:08a
14  identify, those conclusions would differ if I    11:12:14a
15  used an S&P small cap as opposed to the NASDAQ,    11:12:20a
16  or if I used the peer group as opposed to the    11:12:26a
17  industry index in combination with the NASDAQ or    11:12:30a
18  S&P small cap.    11:12:35a
19    Q.    Okay. And by the peer group,    11:12:36a
20  you are referring to what?    11:12:42a
21    A.    Mr. Miller's peer group.    11:12:44a
22    Q.    And what Mr. Miller was using    11:12:49a
23  was the peer group that appeared in the company    11:12:51a
24  proxy statement?    11:12:55a

22 (Pages 82 to 85)

CHRISTOPHER M. JAMES

Page 86

1    A.    I don't believe that -- I would    11:12:56a
2  have to go back and check whether that peer    11:13:01a
3  group is the -- whether it's referred -- whether    11:13:05a
4  those groups of firms are referred to as the    11:13:10a
5  peer group in the proxy statement. I simply    11:13:13a
6  don't recall. I utilized the peer group as    11:13:16a
7  identified in his report, appendix, I believe    11:13:19a
8  it's -- if you have a copy of his report, I    11:13:22a
9  could...    11:13:24a
10    Q.    This is the rebuttal report; eh?    11:13:42a
11    A.    Rebuttal Report A?    11:13:46a
12        MS. REED: Oh, rebuttal report    11:13:47a
13  question mark.    11:13:49a
14        THE WITNESS: Oh.    11:13:51a
15        MS. REED: It's Canadian.    11:13:52a
16        MR. COLLINS: E-H.    11:13:54a
17        THE WITNESS: Cast as a rebuttal    11:13:58a
18  report B?    11:13:59a
19        (Laughter.)    11:13:59a
20        MS. REED: Not another one.    11:13:59a
21  BY MR. COLLINS:    11:14:00a
22    Q.    Is it the rebuttal report?    11:14:00a
23    A.    Yes.    11:14:02a
24        MR. COLLINS: Has this been    11:14:04a

Page 87

1  marked previously, Michelle?    11:14:06a
2        MS. REED: It will be Exhibit    11:14:07a
3  335.    11:14:09a
4        (Whereupon, a document was    11:14:11a
5  marked, for identification purposes, as    11:14:11a
6  Exhibit 335.)    11:14:11a
7  BY MR. COLLINS:    11:14:14a
8    Q.    Take a look at it, please.    11:14:14a
9    A.    The peer group -- the peer group    11:14:51a
10  that I'm referring to is the peer group that is    11:14:53a
11  referred to in his report.    11:14:57a
12    Q.    Where, please?    11:15:00a
13    A.    I'm not sure I know of all of    11:15:02a
14  the references, but there is a reference to it    11:15:04a
15  on Page 1 of Exhibit B, the last column.    11:15:10a
16    Q.    Okay. And so you ran, I    11:15:19a
17  presume, Exhibit 339 using the same peer group    11:15:22a
18  as indicated on Page 1, Exhibit B of the Miller    11:15:25a
19  rebuttal?    11:15:31a
20    A.    Just so we are clear, yes, when    11:15:33a
21  you mean run, the blue line is the -- is it    11:15:39a
22  blue?    11:15:46a
23        MS. REED: Yes.    11:15:49a
24        THE WITNESS: I believe it's    11:15:52a

Page 88

1  blue.    11:15:53a
2  BY MR. COLLINS:    11:15:53a
3    Q.    You're not color-blind, are you?    11:15:53a
4    A.    Yeah, so --    11:15:55a
5    Q.    How can you be in this business    11:15:57a
6  and be color-blind?    11:15:58a
7    A.    I'm pretty good at    11:16:00a
8  distinguishing colors, but --    11:16:01a
9    Q.    Now, wait, we have a problem    11:16:03a
10  here, Professor, because I'm color-blind. So    11:16:05a
11  when you refer to the blue line...?    11:16:09a
12    A.    I believe the blue line is the    11:16:12a
13  peer group.    11:16:16a
14    Q.    The dark blue line, anyway?    11:16:16a
15    A.    The peer group is the third    11:16:19a
16  entry --    11:16:22a
17    Q.    Okay.    11:16:23a
18    A.    -- on the index. All right?    11:16:24a
19    Q.    Okay. Good.    11:16:27a
20    A.    And that corresponds to the --    11:16:30a
21  and I'm simply having trouble distinguishing    11:16:35a
22  what is blue and green here, but the blue line I    11:16:39a
23  believe is -- tracks the green line with the    11:16:43a
24  exception of the line below the green line from,    11:16:49a

Page 89

1  it looks like, 7/15/1998 to 7/21/1998.    11:16:53a
2  Does that help?    11:17:04a
3    Q.    It does. Thank you.    11:17:05a
4        And how did you construct this    11:17:08a
5  chart? Is this daily closing price?    11:17:09a
6    A.    How this chart was constructed    11:17:17a
7  is to peg, as it indicates in the note, both the    11:17:20a
8  S&P small cap, the peer, and the -- and Callaway    11:17:29a
9  to $16.00 at 7/09/98. And then once pegged in    11:17:37a
10  that manner, to compute the changes -- or plot    11:17:44a
11  the prices based on the returns on Callaway, S&P    11:17:50a
12  small cap, peer group, and then the red line is    11:17:55a
13  Adams Golf.    11:18:03a
14    Q.    Now, did you undertake any    11:18:14a
15  analysis as to what caused the decline in    11:18:16a
16  Callaway, peer group, and S&P on or about July    11:18:24a
17  23rd?    11:18:38a
18    A.    I don't believe the S&P is --    11:18:49a
19    Q.    The S&P didn't decline.    11:18:56a
20    A.    If it did decline, it declined a    11:18:59a
21  very small amount.    11:19:03a
22    Q.    So the S&P declined a very small    11:19:03a
23  amount or didn't decline on or about July 23?    11:19:07a
24    A.    Right.    11:19:10a

23 (Pages 86 to 89)

CHRISTOPHER M. JAMES

Page 90

```
1        Q.    Adams declined some, and the S&P    11:19:10a
2   small cap and Callaway declined more -- is that    11:19:14a
3   right so far? -- on or about July 23rd.    11:19:20a
4        A.    If you said Callaway and the    11:19:23a
5   peer group?    11:19:26a
6        Q.    Yes.    11:19:27a
7        A.    I think you may have said --    11:19:27a
8        Q.    You know what, let me start    11:19:29a
9   again. You are quite right.    11:19:30a
10       Am I reading this correctly    11:19:31a
11  that on July 23rd both Callaway and the peer    11:19:33a
12  group went down sharply and roughly in tandem?    11:19:36a
13       A.    Yes. I think if you go to the    11:19:42a
14  next exhibit, it might be easier.    11:19:45a
15       Q.    Okay.    11:19:49a
16       A.    340.    11:19:49a
17       Q.    Okay.    11:19:50a
18       A.    Which has the dates and the    11:19:51a
19  price decline. So on 7/23/1998, Adams is down    11:19:57a
20  13 percent -- about roughly 13 percent; Callaway    11:20:05a
21  is down 33 percent; and Miller's peer group is    11:20:08a
22  down 28.2 percent.    11:20:12a
23       Q.    I see.    11:20:14a
24       Now, Miller's peer group, do    11:20:19a
```

Page 91

```
1   you know whether it included Callaway?    11:20:22a
2        A.    It did.    11:20:23a
3        Q.    And was the peer group -- the    11:20:24a
4   peer group was comprised of how many companies?    11:20:26a
5        A.    I believe it was -- it consisted    11:20:37a
6   of Callaway, Teardrop, Aldila --    11:20:42a
7        THE COURT REPORTER: Callaway,    11:20:54a
8   comma Teardrop?    11:20:54a
9        THE WITNESS: It might help,    11:20:54a
10  it's on the top line on the first page of    11:20:54a
11  Mr. Miller's report.    11:21:02a
12  BY MR. COLLINS:    11:21:04a
13       Q.    Okay.    11:21:04a
14       A.    I can read these off, but it may    11:21:04a
15  be helpful for the court reporter just to look    11:21:08a
16  at them.    11:21:10a
17       It would be Callaway, Teardrop,    11:21:10a
18  Aldila, Coastcast, Arnold Palmer, and Golden    11:21:14a
19  Bear.    11:21:18a
20       Q.    Now, as you used the peer group    11:21:27a
21  on Exhibits 339 and 340, was it a weighted group    11:21:41a
22  or was it unweighted, based on the size or the    11:21:51a
23  market caps or some other characteristics of the    11:22:01a
24  companies making up the peer group?    11:22:06a
```

Page 92

```
1        A.    I used the peer group return as    11:22:08a
2   reported by Mr. Miller in his rebuttal report.    11:22:13a
3        My recollection is I could come    11:22:18a
4   close but not exactly match the peer returns    11:22:21a
5   by taking the -- the peer group return by    11:22:26a
6   taking a value weighted average of the    11:22:31a
7   individuals within the group.    11:22:37a
8        Q.    What do you mean by "value    11:22:39a
9   weighted average"?    11:22:42a
10       A.    I was responding to the question    11:22:43a
11  you just asked, was it a value weighted average    11:22:44a
12  or an equally weighted average of the returns.    11:22:49a
13       I can come close to, if I use    11:22:54a
14  value weights, come close to the returns that    11:22:56a
15  he had.    11:22:57a
16       Q.    That's fine. And I'm just    11:22:58a
17  asking you what you did in using the value    11:23:00a
18  weights, what process did you go through and    11:23:01a
19  what specifically, specifically what value did    11:23:03a
20  you weight.    11:23:07a
21       A.    The market value of the common    11:23:09a
22  stock.    11:23:12a
23       THE WITNESS: And I apologize,    11:23:20a
24  but I need to take a short break.    11:23:20a
```

Page 93

```
1        MR. COLLINS: Off the record.    11:23:24a
2        (A recess was had from    11:33:46a
3   11:23 a.m. to 11:33 a.m.; and then the    11:33:46a
4   proceedings continued as follows:)    11:33:46a
5   BY MR. COLLINS:    11:33:46a
6        Q.    Exhibit 339.    11:33:46a
7        A.    Okay.    11:33:48a
8        Q.    Why did you do this just for the    11:33:49a
9   month of July?    11:33:56a
10       A.    Because Mr. Miller indicated in    11:33:59a
11  his rebuttal report that it is his conjecture    11:34:05a
12  that the price decline, particularly in the    11:34:11a
13  latter part of July, was attributable to, I    11:34:15a
14  think he refers to it as leakage regarding gray    11:34:20a
15  market activities.    11:34:26a
16       Q.    Is there something about Exhibit    11:34:27a
17  339 or Exhibit 340 that leads you to question    11:34:28a
18  that conclusion on his part?    11:34:33a
19       A.    I think that -- yes, I think    11:34:35a
20  that this analysis demonstrates, using his data,    11:34:41a
21  that the decline in Adams Golf during this    11:34:43a
22  period of time was certainly in line with the    11:34:51a
23  decline experienced by its -- the firms    11:34:55a
24  identified by Mr. Miller as being peers to Adams    11:35:01a
```

24 (Pages 90 to 93)

CHRISTOPHER M. JAMES

Page 94

1   Golf, and that consistent with the discussion in        11:35:07a
2   my report, the decline appears to be a result           11:35:18a
3   principally of softness in the golf industry as         11:35:25a
4   reflected by the earnings miss and discussion of        11:35:29a
5   difficulties in the market that Callaway                11:35:36a
6   disclosed, and then the peer group -- I think           11:35:44a
7   Coastcast has a news article during that same           11:35:48a
8   period of time indicating same weakness in              11:35:53a
9   product demand, which I think is consistent with        11:36:00a
10  the announcement of Callaway, since Coastcast is        11:36:06a
11  a major supplier to Callaway.                           11:36:09a
12      Q.   Did you undertake -- the                        11:36:15a
13  analysis of these various stock prices, did you         11:36:20a
14  do any work taking it out beyond July 31st?             11:36:25a
15      A.   No. I -- you mean --                            11:36:33a
16      Q.   Did you run the chart beyond                    11:36:37a
17  July 31st?                                               11:36:39a
18      A.   No, I just focused on the dates                 11:36:41a
19  in -- the dates that he identified as being             11:36:43a
20  associated with price declines in late July that        11:36:53a
21  he contends may be associated with information          11:36:59a
22  disclosures regarding -- or leakage of                  11:37:03a
23  information regarding, say, purchase orders by          11:37:07a
24  Costco.                                                  11:37:10a

Page 95

1       Q.   And in that regard you are                      11:37:16a
2   referring to the information he has -- perhaps          11:37:17a
3   other places as well, but you are referring to         11:37:21a
4   the information he has in Paragraph 22(A) of his        11:37:23a
5   rebuttal report?                                         11:37:26a
6       A.   22(A), yes.                                     11:37:28a
7       Q.   Now, how long ago did you                       11:37:39a
8   prepare exhibits or did you create the documents        11:37:41a
9   that are now 339 and 340?                                11:37:43a
10      A.   Within the last week.                           11:37:49a
11      Q.   Did counsel ask you to do so?                   11:37:55a
12      A.   No.                                             11:37:58a
13      Q.   Did you tell counsel you were                   11:37:58a
14  doing this?                                              11:38:00a
15      A.   Yes.                                            11:38:00a
16      Q.   Did you run any other charts                    11:38:10a
17  beyond 339 either within the last week or since        11:38:13a
18  the rebuttal report?                                     11:38:18a
19      A.   I don't believe so. I don't                     11:38:24a
20  recall doing any.                                        11:38:26a
21      Q.   And did you undertake an                        11:38:28a
22  analysis of peer performance with respect to           11:38:30a
23  August or September?                                     11:38:35a
24      A.   No, my focus was only on late --               11:38:39a

Page 96

1   late July, is the period that he focuses in on          11:38:45a
2   his report.                                              11:38:49a
3            Just to add that he -- and the                  11:38:51a
4   other reason is that he has a chart, I believe          11:38:55a
5   it's -- if you don't mind, I'll take it off.            11:39:00a
6            (The witness takes the clip off                 11:39:08a
7   the document.)                                           11:39:10a
8   BY MR. COLLINS:                                          11:39:10a
9       Q.   Please.                                         11:39:10a
10      A.   That is a -- that has a somewhat                11:39:15a
11  different pegging in the sense that it's pegged         11:39:23a
12  to 1. It's his Exhibit A. It's entitled ADGO            11:39:28a
13  versus XLC(4), Adams Golf versus Comparable             11:39:35a
14  Index. He carries it out to -- 12/23/1999 is            11:39:43a
15  the last date.                                           11:39:55a
16      Q.   You are referring to the page                  11:39:57a
17  immediately after the page that says Exhibit A,         11:40:01a
18  or are you referring to a later?                        11:40:07a
19           Which chart are you referring                   11:40:17a
20  to, please?                                              11:40:18a
21      A.   I know this is -- it doesn't                    11:40:24a
22  make the record look particularly good because         11:40:26a
23  I'm holding something up, but it is this chart          11:40:30a
24  (indicating), and I believe you are looking at         11:40:34a

Page 97

1   it.                                                      11:40:36a
2            MS. FOX:  Let me just check                     11:40:37a
3   that. I'll come around and see whether                  11:40:39a
4   it's the same.                                           11:40:42a
5            THE WITNESS:  Just so you are                   11:40:45a
6   clear, there appears to be two charts                   11:40:46a
7   in his Exhibit A. One is -- it looks                    11:40:48a
8   like they are the same chart. One is                    11:41:00a
9   simply, in my version, a smaller                        11:41:03a
10  version of the other.                                    11:41:06a
11  BY MR. COLLINS:                                          11:41:09a
12      Q.   Okay. Well, the chart --                       11:41:09a
13      A.   This you can identify --                       11:41:23a
14      Q.   Not a problem.                                 11:41:24a
15      A.   Okay.                                          11:41:26a
16      Q.   Do you see the page that says on              11:41:26a
17  it Exhibit A? It's probably in your left hand.          11:41:28a
18      A.   Yeah, the problem I'm having is                11:41:35a
19  that there are a number of pages that say               11:41:37a
20  Exhibit A on it. Okay? Maybe we can make this           11:41:40a
21  easier.                                                  11:41:43a
22           This is Exhibit A (indicating),                11:41:44a
23  it only has Exhibit A on it. Then there is a            11:41:46a
24  page that follows it which is a --                      11:41:50a

Page 102

1   lot. Let's not argue about this. This is very        11:47:47a
2   simple.                                              11:47:49a
3         Whether it came from James,                    11:47:50a
4   Miller, McEvoy, Fox, Page 339, peer group,           11:47:54a
5   does it include or does it exclude Arnold            11:48:00a
6   Palmer and Golden Bear?                              11:48:03a
7       A.   And the answer to that question             11:48:06a
8   is I was unable to replicate exactly the returns     11:48:08a
9   on his peer group by taking a value weighted         11:48:11a
10  average of the returns of the companies that he      11:48:15a
11  reports as part of the peer. As a result, and        11:48:18a
12  to be able to use his own data, I did not            11:48:22a
13  construct a peer group for purposes of preparing     11:48:27a
14  339, 340. The best recollection -- my best           11:48:31a
15  recollection is the peer group returns are as        11:48:36a
16  reported in Mr. Miller's report. Okay?               11:48:39a
17      Q.   Okay.                                       11:48:43a
18      A.   So if he included or excluded               11:48:43a
19  Palmer and Golden Bear, then they would be           11:48:49a
20  included or excluded in the peer group return as     11:48:54a
21  reported in 340 and 339, as best -- is my best       11:48:58a
22  recollection.                                        11:49:04a
23      Q.   Okay. Now, before the break I               11:49:04a
24  had asked you, if you would, to get delivered to     11:49:06a

Page 103

1   us during the course of the deposition the          11:49:09a
2   material that's on your computer. Can I ask,         11:49:15a
3   has that been accomplished?                          11:49:18a
4       A.   It has not been accomplished as             11:49:19a
5   of this point in time.                               11:49:21a
6       Q.   Okay. I presume you've                      11:49:22a
7   consulted with counsel and you will be good          11:49:26a
8   enough to supply that. Correct?                      11:49:29a
9       A.   I will endeavor to try to supply            11:49:32a
10  that.                                                11:49:34a
11      Q.   Okay. Thank you.                            11:49:35a
12      In time for us to talk about it                  11:49:38a
13  today; correct, sir?                                 11:49:39a
14      A.   Again, I will try to do that. I             11:49:44a
15  -- first of all, I don't have my computer with       11:49:50a
16  me; and second, the person then whom I would         11:49:52a
17  call to obtain the data on which I did the           11:49:58a
18  analysis is currently not available. So I am         11:50:04a
19  endeavoring to undertake that.                       11:50:08a
20      Q.   Thank you.                                  11:50:11a
21      Well, I'll tell you what I'm                     11:50:31a
22  confused about because it's a pretty simple          11:50:32a
23  matter.                                              11:50:34a
24      A.   Okay.                                       11:50:35a

Page 104

1       Q.   I understand that you don't know            11:50:35a
2   whether 339 and 340 include Arnold Palmer and        11:50:38a
3   Golden Bear. Am I right so far? As you sit           11:50:43a
4   here now, you don't remember whether those two       11:50:46a
5   companies are included in peer group?                11:50:48a
6       A.   Right.                                      11:50:50a
7       Q.   But I thought I also heard you              11:50:51a
8   say that peer group, as used in 339 and 340,         11:50:54a
9   consist of whatever it is that Miller referred       11:50:59a
10  to as peer group at some point in his report.        11:51:01a
11      A.   No, I think that's -- I                     11:51:04a
12  understand your confusion now.                       11:51:06a
13      My recollection is that I used                   11:51:08a
14  the return for the peer group as reported in         11:51:13a
15  Mr. Miller.                                          11:51:17a
16      Q.   Fine.                                       11:51:18a
17      A.   In other words, he has a column             11:51:19a
18  in his report that has the returns for the peer      11:51:23a
19  group. Okay? However he calculated them. And         11:51:26a
20  my recollection is that's what I utilized.           11:51:32a
21      Q.   Okay. Can you show me that                  11:51:34a
22  column you are referring to?                         11:51:36a
23      A.   Yes. It's in his Exhibit --                 11:51:39a
24      MS. REED: "A."                                   11:51:44a

Page 105

1       THE WITNESS: "A."                                11:51:45a
2   BY MR. COLLINS:                                      11:51:47a
3       Q.   Right.                                      11:51:47a
4       A.   Actually, Exhibit B --                      11:51:51a
5       Q.   Right.                                      11:51:58a
6       A.   -- you see peer group?                      11:52:00a
7       Q.   I do.                                       11:52:04a
8       A.   My recollection is that's what I            11:52:05a
9   utilized.                                            11:52:08a
10      Q.   Okay. Okay. Good.                           11:52:09a
11      Now, I think you said that                       11:52:42a
12  following the receipt of Mr. Miller's rebuttal       11:52:45a
13  report, you used the S&P small cap together          11:52:47a
14  with Miller's peer group and examined whether        11:52:54a
15  your conclusions regarding statistical               11:53:01a
16  significance with respect to particular days         11:53:03a
17  was changed if those were the indices you used       11:53:08a
18  as opposed to the indices that you had used          11:53:12a
19  previously. Correct so far?                          11:53:15a
20      A.   Yes.                                        11:53:17a
21      Q.   And when you did so, what did               11:53:20a
22  you find?                                            11:53:23a
23      A.   My recollection is that the                 11:53:24a
24  conclusions regarding days of statistical           11:53:29a

27 (Pages 102 to 105)

CHRISTOPHER M. JAMES

Page 106

1  significance would be unaffected by utilizing        11:53:32a
2  the S&P small cap and the Miller peer group as        11:53:38a
3  part of a market model.        11:53:50a
4    Q.    With regard to NASDAQ, for        11:54:04a
5  example, the 17 percent was the explanatory        11:54:05a
6  power of NASDAQ?  Is that what the 17 percent        11:54:08a
7  was, with regard to daily returns?        11:54:14a
8    A.    The daily -- the amount of the        11:54:17a
9  daily variability explainable by changes in the        11:54:19a
10  NASDAQ was I believe 17 or 18 percent.        11:54:23a
11    Q.    Sure.  Well, whatever, but can        11:54:27a
12  we call that the -- how do you refer to that in        11:54:29a
13  shorthand?  Explanatory power?        11:54:34a
14    A.    Let's use what -- the precise        11:54:38a
15  terms, the R-squared.        11:54:40a
16    Q.    Okay.  Good.        11:54:42a
17    A.    Adjusted R-squareds were, I        11:54:43a
18  believe, 17 or 18 percent.        11:54:48a
19    Q.    Perfect.        11:54:50a
20        What were the adjusted        11:54:50a
21  R-squareds of the S&P small cap?        11:54:52a
22    A.    What I recall is the S&P small        11:54:56a
23  cap and the industry peers, the explanatory        11:54:57a
24  power was virtually identical to the explanatory        11:55:05a

Page 107

1  power of the -- or the R-squareds of the model        11:55:08a
2  that I used.        11:55:13a
3        Sorry.  The R-squareds were        11:55:14a
4  virtually the same.        11:55:25a
5    Q.    Now, you just changed terms on        11:55:27a
6  me and I was so careful to get them down so we        11:55:30a
7  were talking about the same thing.        11:55:32a
8        Do I understand that the        11:55:33a
9  adjusted R-squareds are virtually the same        11:55:34a
10  whether you use your NASDAQ index or whether        11:55:47a
11  you use the S&P small cap index or whether you use the        11:55:51a
12  Miller peer index?        11:55:56a
13    A.    The R-squareds are -- if I        11:55:59a
14  replicate the regressions that I discuss in my        11:56:06a
15  report -- remember, I discuss a single-factor        11:56:13a
16  and a two-factor model.  If I replicate the        11:56:18a
17  single- and two-factor models, utilizing,        11:56:25a
18  instead of the NASDAQ and the Bloomberg modified        11:56:30a
19  index, the S&P small cap and the peer group as        11:56:35a
20  identified by Mr. Miller, the R-squareds are        11:56:43a
21  virtually the same.        11:56:48a
22    Q.    Perfect.        11:56:49a
23        Does it matter whether we talk        11:56:52a
24  about R-squareds or adjusted R-squareds?        11:56:54a

Page 108

1    A.    For these purposes -- the        11:56:58a
2  purposes of these proceedings, I don't think it        11:57:01a
3  will make a difference.        11:57:03a
4    Q.    Okay.  Good.        11:57:03a
5        You ran --        11:57:10a
6    A.    Just so you know, an R-squared        11:57:10a
7  will always increase as you add explanatory        11:57:15a
8  variables.  An adjusted R-squared is an        11:57:21a
9  R-squared that is adjusted for the number of        11:57:26a
10  explanatory variables and it will not always        11:57:29a
11  increase, so it's -- it utilizes a measure of        11:57:32a
12  the additional explanatory power, if you will,        11:57:38a
13  of adding explanatory variables.        11:57:41a
14    Q.    The adjusted R-squared of NASDAQ        11:57:59a
15  combined with the golf index you used was        11:58:09a
16  approximately equal to the adjusted R-squared of        11:58:16a
17  using small cap plus Miller's peer group;        11:58:19a
18  correct?        11:58:25a
19    A.    Could she read it back to me,        11:58:28a
20  please --        11:58:30a
21    Q.    You know what, I just want to        11:58:31a
22  get over it, so let me just ask it again.        11:58:33a
23        You compared the adjusted        11:58:35a
24  R-squareds of NASDAQ plus golf to the adjusted        11:58:37a

Page 109

1  R-squareds of Miller peer plus S&P small cap;        11:58:45a
2  correct?        11:58:51a
3    A.    Yes.        11:58:51a
4    Q.    Okay.  Did you compare the        11:58:52a
5  adjusted R-squareds of NASDAQ to Miller peer        11:58:54a
6  group?        11:59:03a
7    A.    I don't recall.        11:59:05a
8    Q.    Did you compare the adjusted        11:59:07a
9  R-squareds of NASDAQ to S&P small cap?        11:59:10a
10    A.    I believe I did.        11:59:21a
11    Q.    What did you find when you did        11:59:23a
12  that?        11:59:25a
13    A.    My recollection is that they        11:59:25a
14  were virtually identical.        11:59:26a
15    Q.    Did you compare the adjusted        11:59:32a
16  R-squared of your modified Bloomberg golf index        11:59:43a
17  to the adjusted R-squared of Miller's peer        11:59:50a
18  group?        11:59:54a
19    A.    I don't recall -- I don't        11:59:59a
20  believe I did.  I just did -- just -- I did        12:00:00p
21  exactly what I indicated in the answer a couple        12:00:05p
22  of questions ago, which is, the analyses that I        12:00:09p
23  report in my report of NASDAQ and NASDAQ plus        12:00:17p
24  industry, the one- and two-factor models which I        12:00:26p

28 (Pages 106 to 109)

Page 114

1  stock returns.                                    12:06:49p
2      Q.   Now, you used an event window or          12:06:50p
3  event windows in this work; correct?             12:06:53p
4      A.   Yes.                                      12:06:59p
5      Q.   And the event window you used,            12:07:00p
6  for all aspects of your work here, was one day?  12:07:01p
7      A.   No.                                       12:07:08p
8      Q.   Okay.  You used, at least in             12:07:09p
9  some parts of your work, a one-day event window;  12:07:14p
10 is that --                                        12:07:18p
11     A.   That is correct.                          12:07:18p
12     Q.   Okay.  In what part of your work         12:07:19p
13 did you use a one-day event window?              12:07:24p
14     A.   As is indicated in my report,            12:07:26p
15 when I was able to identify when a piece of       12:07:36p
16 information was either published or became       12:07:42p
17 available to market participants, I utilized --   12:07:46p
18 I used the day on which that information was      12:07:53p
19 first available during trading hours.            12:07:55p
20     Q.   Okay.                                     12:07:58p
21     A.   Now, on -- the one I remember in         12:07:59p
22 particular was the April -- I'm sorry, the April 12:08:07p
23 -- the August 28th Lehman Brothers report.  It   12:08:09p
24 has a date on it, but not a time stamp, so then   12:08:15p

Page 115

1  the question becomes is it a -- was it available  12:08:19p
2  to market participants during trading hours.     12:08:26p
3  And, as I indicate in my report, I look at both  12:08:33p
4  the 28th and the 31st and see whether either one 12:08:37p
5  of those days is statistically significant.      12:08:41p
6  Now --                                           12:08:43p
7      Q.   Can I stop you?  Forgive me.             12:08:46p
8          With regard to that, when you            12:08:48p
9  did that work regarding the Lehman report and    12:08:49p
10 you looked at the 28th and you looked at the     12:08:52p
11 31st, you looked at each on a one-day event      12:08:54p
12 window basis; correct?                           12:08:57p
13     A.   And I also calculated the               12:08:59p
14 statistical significance on a two-day basis.     12:09:04p
15     Q.   Okay.  With respect to Lehman,          12:09:07p
16 that Lehman August 28th report?                  12:09:12p
17     A.   Yes.                                     12:09:14p
18     Q.   All right.  And why with regard         12:09:20p
19 to the Lehman report did you use a two-day event 12:09:23p
20 window?                                           12:09:26p
21     A.   Well, I think it would be a mis         12:09:28p
22 -- it would be a mischaracterization to say that 12:09:31p
23 -- I investigated a two-day event window to       12:09:37p
24 determine whether the conclusions that I was     12:09:40p

Page 116

1  reaching regarding the materiality of that        12:09:41p
2  information would be changed if I used a broader   12:09:44p
3  window than one day.                              12:09:51p
4      Q.   Okay.  How did you investigate?          12:09:56p
5      A.   In the manner that I just               12:09:59p
6  described, that I looked at each day             12:10:00p
7  individually in the combination of those two     12:10:02p
8  days.                                            12:10:06p
9          In addition, even though the             12:10:06p
10 Lehman report has no time stamp on it, I         12:10:10p
11 believe, both in reading Mr. Lantier's           12:10:14p
12 deposition, and it's my understanding, having    12:10:18p
13 worked with buy and sell side analysts, that     12:10:21p
14 typically the written report will be disclosed   12:10:25p
15 to market participants and the content would     12:10:33p
16 be disclosed to the market participants in the   12:10:36p
17 day -- on the day on which the report is         12:10:39p
18 dated, during trading hours, or before the       12:10:42p
19 start of trading on the day that it is dated.    12:10:51p
20         Consistent with that, I also            12:10:51p
21 looked at what the closing price was referred    12:10:52p
22 to in the August 28th report for Adams Golf to   12:10:55p
23 determine whether the closing price pertained    12:11:01p
24 to the 28th or the day before, and it            12:11:04p

Page 117

1  pertained to the day before, which is            12:11:10p
2  consistent with the report being published on    12:11:13p
3  the 28th.                                        12:11:16p
4      Q.   I asked you a question a moment         12:11:19p
5  ago about what you did to investigate a two-day  12:11:22p
6  event window and you said you already answered   12:11:26p
7  that.                                            12:11:28p
8      A.   Yes.                                     12:11:29p
9      Q.   Tell me, again, what you did to         12:11:29p
10 investigate a two-day event window consisting of 12:11:32p
11 the 28th and the 31st.  Did you run regressions  12:11:37p
12 on it?                                           12:11:41p
13     A.   I aggregated the abnormal              12:11:44p
14 returns or the residual returns.                 12:11:46p
15     Q.   Okay.                                    12:11:49p
16     A.   And then used -- and then tested        12:11:51p
17 whether they were significant based upon a       12:11:53p
18 standard error that was estimated to be          12:11:57p
19 consistent with a two-day return.  So this -- I  12:12:01p
20 have used and others use in published work an    12:12:07p
21 estimate of the two-day standard error is simply 12:12:12p
22 the square root of two times the daily standard  12:12:16p
23 error.                                           12:12:19p
24     Q.   When you did so, what did you           12:12:27p

30 (Pages 114 to 117)

CHRISTOPHER M. JAMES

Page 118

1    come up with; a lack of statistical significance    12:12:29p
2    on the two-day basis?    12:12:32p
3         A.    Yes.    12:12:33p
4         Q.    That work with regard to the    12:12:34p
5    two-day event window analysis or investigation,    12:12:37p
6    does that appear somewhere in your report or    12:12:42p
7    your rebuttal report, with respect to the Lehman    12:12:44p
8    August 28th report?    12:12:46p
9         A.    I don't -- as I sit here, I    12:12:57p
10    don't recall. I believe in the report I discuss    12:13:00p
11    both the return on the 28th and the 31st.    12:13:04p
12         Q.    Can you retrieve, please, the    12:13:20p
13    investigation you did of the two-day event    12:13:23p
14    window with respect to the Lehman August 28    12:13:26p
15    report?    12:13:31p
16         A.    I don't know whether I still    12:13:41p
17    have it. I think that you could get very close    12:13:42p
18    to that result by -- actually, by going to my    12:13:50p
19    report.    12:14:03p
20              I believe on Paragraph 59, as I    12:14:28p
21    outline, the residual return was less than one    12:14:43p
22    percent on the 28th and the residual return on    12:14:53p
23    the 31st was minus 5.2, so the cumulative    12:14:59p
24    residual would be somewhere around 6.2. The    12:15:05p

Page 119

1    one-day -- so that -- that's -- that would be    12:15:12p
2    the two-day abnormal return, would be 6.2    12:15:18p
3    percent.    12:15:22p
4              Since neither return is    12:15:23p
5    statistically significant on a one-day basis,    12:15:25p
6    combining the two, given that the standard    12:15:29p
7    error for a two-day return is bigger than the    12:15:31p
8    one-day return, is not going to result in the    12:15:37p
9    6.2 percent return or something less than 6.2    12:15:39p
10    percent return to be statistically    12:15:47p
11    significant.    12:15:49p
12         Q.    Okay. Tell me about the    12:15:50p
13    standard error with regard to how the standard    12:15:51p
14    error changes depending upon the event -- the    12:15:54p
15    length of the event window. Would you describe    12:15:57p
16    to me how that works.    12:16:01p
17         A.    Generally the longer the event    12:16:03p
18    window, the larger the standard error because    12:16:06p
19    the volatility of two-day returns is generally    12:16:18p
20    higher than one-day returns under the assumption    12:16:25p
21    of independence in the returns.    12:16:27p
22              Now, some analysts, when    12:16:30p
23    looking at two or -- two-day abnormal returns    12:16:32p
24    or three-day abnormal returns will also    12:16:38p

Page 120

1    compute, based on the data, the    12:16:41p
2    autocorrelation in the return series and try    12:16:44p
3    to include that in the calculation of the    12:16:47p
4    standard error.    12:16:50p
5         Q.    What does autocorrelation mean?    12:16:52p
6         A.    It refers to -- if you think    12:16:55p
7    about correlation as being how two series move    12:16:59p
8    together, autocorrelation refers to how a series    12:17:06p
9    is related to the series lagged one day or one    12:17:14p
10    month.    12:17:20p
11         Q.    What's the effect of    12:17:26p
12    autocorrelation that some analysts use in this    12:17:28p
13    context?    12:17:33p
14         A.    It depends on the size of the    12:17:34p
15    autocorrelation. If the autocorrelation is    12:17:36p
16    positive, it tends to make the standard error    12:17:40p
17    somewhat bigger than the standard error that you    12:17:44p
18    would get, assuming independence.    12:17:47p
19         Q.    And what do you mean by    12:17:51p
20    "assuming independence"?    12:17:53p
21         A.    Assuming independence means that    12:17:54p
22    you are assuming that the autocorrelation is    12:17:58p
23    zero on a one-day lag period.    12:18:01p
24         Q.    Okay. So, now, the regression    12:18:05p

Page 121

1    you ran, if any, with regard to the two-day    12:18:08p
2    period, I hope I have the presence of mind to    12:18:13p
3    ask you to be good enough to produce that to us    12:18:17p
4    if you can so retrieve it.    12:18:19p
5         A.    I'll take it under    12:18:23p
6    consideration.    12:18:24p
7         Q.    I appreciate it.    12:18:24p
8              Now, other than that, that is,    12:18:27p
9    other than with respect to the August -- wait    12:18:30p
10    a minute, one other thing. You mentioned a    12:18:34p
11    few minutes ago that it's your experience that    12:18:37p
12    sometimes where there is a written report by    12:18:40p
13    an analyst -- did I hear you correctly, that    12:18:44p
14    it's your experience that sometimes the    12:18:48p
15    contents of that written report are    12:18:50p
16    disseminated orally prior to the issuance?    12:18:54p
17         A.    In the morning conference call    12:18:58p
18    on the day that the report is issued.    12:19:00p
19         Q.    Okay. Is it your experience    12:19:03p
20    that the contents are sometimes disseminated    12:19:05p
21    prior to that on an oral basis?    12:19:09p
22         A.    I'm not sure what you mean by    12:19:14p
23    "the contents disseminated."    12:19:19p
24         Q.    An analyst calls up a good    12:19:21p

31 (Pages 118 to 121)

**Page 122**

1  client and says, "I'm going to issue an analyst    12:19:24p
2  report tomorrow that is going to have an impact    12:19:26p
3  on the stock price. I just wanted you to know    12:19:28p
4  what I'm going to say."    12:19:31p
5      A.    That -- I'm not familiar with    12:19:33p
6  that practice.    12:19:35p
7      Q.    You are familiar with the    12:19:36p
8  occurrence that stock prices move sometimes on    12:19:40p
9  the basis of oral information being disseminated    12:19:45p
10  into the marketplace?    12:19:51p
11      A.    Are you saying --    12:19:55p
12      Q.    Rumors move stock prices    12:19:58p
13  sometimes, don't they?    12:20:00p
14      A.    If they are material and -- if    12:20:02p
15  they are material, they certainly can move stock    12:20:13p
16  prices, and there are scientific methods for the    12:20:15p
17  determination of whether a specific rumor or    12:20:21p
18  conjecture is disseminated to the market.    12:20:31p
19      Q.    What are those scientific    12:20:36p
20  methods?    12:20:37p
21      A.    Let me give a couple of    12:20:42p
22  examples.    12:20:44p
23          There is academic literature    12:20:45p
24  that looks at the impact of, say, chat room    12:20:50p

**Page 123**

1  information. and that literature asks the    12:21:02p
2  question of whether chat room information is    12:21:10p
3  viewed as material to investors.    12:21:12p
4          Now, what that literature    12:21:19p
5  recognizes is that a reference in a chat room    12:21:21p
6  to a particular company, whether that is    12:21:25p
7  favorable or unfavorable, is likely to be a    12:21:32p
8  subjective evaluation. So those studies    12:21:39p
9  provide objective measures of the extent to    12:21:41p
10  which there is discussion within a chat room    12:21:46p
11  and objective measures as to whether that --    12:21:51p
12  those discussions are favorable or unfavorable    12:21:54p
13  and then attempts to test whether that    12:21:59p
14  information is viewed by market participants    12:22:04p
15  as being material.    12:22:07p
16      Q.    What are these objective    12:22:11p
17  measures determining whether the information is    12:22:18p
18  favorable or unfavorable?    12:22:20p
19      A.    The -- and I'm going by    12:22:26p
20  recollection, this is an article published in    12:22:27p
21  the Journal of Finance maybe five years ago --    12:22:29p
22  the researchers set up a text-based search of    12:22:36p
23  chat room information and identify certain words    12:22:42p
24  that would be considered to be unambiguous with    12:22:5

**Page 124**

1  favorable such as "buy" --    12:22:59p
2      Q.    "Hot"?    12:23:01p
3      A.    Something like that.    12:23:03p
4          -- and "negative," and then    12:23:09p
5  try to come up with a quantitative measure of    12:23:09p
6  the frequency on a particular day in which    12:23:12p
7  those words appear, and then to use that    12:23:14p
8  quantitative measure to examine whether on    12:23:20p
9  that day there is a significant stock price    12:23:24p
10  movement, and so what the researcher is doing    12:23:29p
11  is setting up a -- an experiment that can be    12:23:34p
12  replicated by a third party that is testing,    12:23:37p
13  using objective scientific measures, the    12:23:43p
14  significance of a piece of information.    12:23:49p
15      Q.    And you said Journal of Finance    12:23:55p
16  five years ago or thereabouts?    12:23:58p
17      A.    Or thereabouts, yes.    12:24:00p
18      Q.    Who wrote it?    12:24:01p
19      A.    My recollection is a guy -- at    12:24:04p
20  least one of the authors was at the University    12:24:06p
21  of British Columbia. I don't recall, as I sit    12:24:09p
22  here, who the authors are.    12:24:13p
23      Q.    That article dealt with chat    12:24:14p
24  room --    12:24:16p

**Page 125**

1      A.    Right.    12:24:17p
2      Q.    -- communication.    12:24:18p
3          Did it deal with oral rumors?    12:24:19p
4      A.    I don't recall.    12:24:25p
5      Q.    Rumor or other forms of oral    12:24:28p
6  communication can, if material, affect stock    12:24:34p
7  price; correct?    12:24:37p
8      A.    If that information is material    12:24:40p
9  and becomes available to market participants.    12:24:43p
10      Q.    And how in that case does one    12:24:46p
11  objectively measure, if at all, as to whether    12:24:48p
12  the information has materially affected the    12:24:53p
13  market?    12:24:56p
14      A.    The procedure that I think I've    12:24:57p
15  used and would use is to first provide    12:25:01p
16  information -- to ascertain whether the    12:25:05p
17  information that is characterized as -- you are    12:25:09p
18  characterizing as rumor or opinion is publicly    12:25:15p
19  available. So there is a news report, an    12:25:21p
20  analyst report, a company disclosure, a    12:25:27p
21  disclosure, say, of a government regulatory    12:25:33p
22  agency, some objective way of determining    12:25:37p
23  whether the information is publicly available.    12:25:39p
24          And then the second step would    12:25:45p

32 (Pages 122 to 125)

CHRISTOPHER M. JAMES

Page 126

```
 1   be, in terms of identifying the materiality of        12:25:46p
 2   that information, to examine the stock price          12:25:49p
 3   movements on the day that or days in which the        12:25:56p
 4   analyst has been able to determine the                12:26:01p
 5   information was publicly available.                   12:26:06p
 6        Q.    And in your last answer, when              12:26:09p
 7   you referred to the date on which the                 12:26:11p
 8   information was publicly available, do you mean        12:26:13p
 9   by means of some writing or do you mean,              12:26:16p
10   instead, by means of the rumor process?               12:26:21p
11        A.    I think one needs to determine             12:26:25p
12   that it was available to market participants.         12:26:30p
13   Let me see if I can make a distinction, and I         12:26:39p
14   think it's an important one.                          12:26:41p
15             If -- would I consider as I                 12:26:43p
16   walk back to my hotel tonight or this                 12:26:50p
17   afternoon --                                          12:26:52p
18        MR. COLLINS:  Off the record.                    12:26:54p
19        (Discussion off the record.)                     12:26:54p
20        THE WITNESS:  As I walk back                     12:26:57p
21   early this afternoon to my hotel, and I               12:26:59p
22   were to pass someone that said, "Gosh,                12:27:03p
23   I think Google is overvalued," okay,                  12:27:09p
24   that would be a rumor.  Okay?                         12:27:14p
```

Page 127

```
 1        Now, how would I as a scientist             12:27:16p
 2   determine whether that rumor was                  12:27:21p
 3   material and was available -- was               12:27:25p
 4   reflected in the information that the            12:27:28p
 5   market was using to value the stock?            12:27:35p
 6   Well, I first would have to say, is             12:27:41p
 7   there any indication that market                12:27:45p
 8   participants are aware of that opinion          12:27:48p
 9   and view it as new information?  What           12:27:56p
10   would I do?                                     12:28:01p
11        I would not rely necessarily               12:28:02p
12   completely on written documents, but            12:28:05p
13   certainly I would look for press                12:28:06p
14   releases, I would like for company              12:28:09p
15   releases, I would look for analyst              12:28:11p
16   discussion, I would go to the -- I              12:28:14p
17   would review perhaps the e-mails that           12:28:17p
18   come to the investor relations                  12:28:22p
19   department of a company, I would review         12:28:27p
20   the conference calls that the company           12:28:28p
21   holds with investors and analysts to            12:28:30p
22   determine whether the information that          12:28:33p
23   I, quote, heard on the street was               12:28:35p
24   information that market participants            12:28:38p
```

Page 128

```
 1   were considering in valuing the stock.          12:28:41p
 2        And then I would look to the time          12:28:49p
 3   at which that were available to market          12:28:50p
 4   participants, and then I would do the           12:28:54p
 5   next step, which would be assess its            12:28:57p
 6   materiality by examining whether it             12:29:00p
 7   changed the total mix of information as         12:29:02p
 8   measured by did it move the stock in a          12:29:06p
 9   significant way.                                12:29:12p
10   BY MR. COLLINS:                                 12:29:13p
11        Q.    Okay, that is very interesting.      12:29:13p
12        So let's assume you are walking            12:29:14p
13   to your cab this afternoon to get a ride to     12:29:16p
14   the airport and the person who tells you        12:29:19p
15   Google is overvalued is the CEO of Google.      12:29:23p
16        Let's further assume that you              12:29:29p
17   can find no writing, analyst report, press      12:29:32p
18   report, news story suggesting or stating that   12:29:37p
19   the CEO of Google believes Google to be         12:29:45p
20   overstated.                                     12:29:48p
21        And let's further assume, going            12:29:49p
22   to your next step as you called it a moment     12:29:50p
23   ago, there is a statistically significant       12:29:53p
24   movement on the day that the CEO of Google      12:29:55p
```

Page 129

```
 1   shared with you this information.               12:30:02p
 2        Under those circumstances,                 12:30:04p
 3   would you conclude that it was impossible that  12:30:06p
 4   -- or highly unlikely that oral communication,  12:30:13p
 5   in this case in the form of rumor, materially   12:30:19p
 6   affected the market price?                      12:30:23p
 7        A.    Well, I mean, I think that if,       12:30:28p
 8   under your hypothetical, if the CEO of Google   12:30:32p
 9   conveyed that information of overvaluation to me 12:30:41p
10   in the cab and on the same day there was a      12:30:45p
11   change in the stock price, I would -- first of  12:30:49p
12   all, under the hypothetical, if I were the one  12:30:51p
13   that received that information -- and I was the  12:30:57p
14   only one -- and I didn't trade on it, then      12:30:58p
15   there's no reason to expect that that           12:31:00p
16   conversation would have -- that that would be   12:31:03p
17   causally linked to the stock price movement.    12:31:06p
18        Now, if, in fact, the CEO of               12:31:09p
19   Google were -- that we undertook an             12:31:15p
20   investigation and concluded that in fact on     12:31:20p
21   the day that I got into the cab and heard that  12:31:25p
22   Google was overvalued, the CEO had also         12:31:32p
23   communicated to Black Rock and other            12:31:37p
24   institutional investors that it was his view    12:31:41p
```

33 (Pages 126 to 129)

CHRISTOPHER M. JAMES

Page 130

1 that the stock was overvalued, would I expect 12:31:45p
2 then there to be a price reaction? Yes, I 12:31:51p
3 would. 12:31:53p
4 Would I expect also that there 12:31:53p
5 would be some discussion, public information, 12:31:56p
6 that would be indicative of the CEO's comments 12:32:02p
7 to that effect? I certainly would think so. 12:32:08p
8 Because it would be viewed by market 12:32:10p
9 participants and powers of the stock as being 12:32:15p
10 something that was material and significant to 12:32:19p
11 them. 12:32:22p
12 MS. REED: I don't want to stop 12:32:23p
13 things, but I was just looking at the 12:32:25p
14 clock and we are at about 12:36, so 12:32:26p
15 whenever this line -- 12:32:29p
16 MR. COLLINS: Just a couple more 12:32:30p
17 minutes. 12:32:31p
18 MS. REED: Okay. 12:32:32p
19 BY MR. COLLINS: 12:32:32p
20 Q. Very interesting. Time for 12:32:32p
21 lunch. 12:32:34p
22 It is not necessary in every 12:32:36p
23 case for there to be a writing in order for 12:32:39p
24 the stock price to move materially; correct? 12:32:43p

Page 131

1 A. I think that's correct. For 12:32:45p
2 example, stock prices might move because of 12:32:47p
3 information conveyed during a conference call 12:32:54p
4 with the company. Their stock prices could 12:32:56p
5 move, and I would expect there to be discussion 12:33:05p
6 of the -- linking the stock price movement to 12:33:08p
7 information that, say, an analyst gathers from 12:33:12p
8 discussing a particular stock with the brokerage 12:33:18p
9 network. 12:33:22p
10 MR. COLLINS: Let's break for 12:33:23p
11 lunch at the moment. 12:33:24p
12 THE WITNESS: Okay. 12:33:25p
13 (A luncheon recess was had from 12:33:26p
14 12:33 p.m. to 1:40 p.m.; and then the 12:33:26p
15 proceedings continued as follows:) 12:33:26p
16 BY MR. COLLINS: 01:40:47p
17 Q. Dr. James, if you do a rolling 01:40:47p
18 regression, are you going to get the same result 01:40:49p
19 you will get if your examination period begins 01:40:52p
20 prior to the class period? 01:40:59p
21 A. I'm not sure what you mean by 01:41:05p
22 "same result." 01:41:07p
23 Q. Same R-squared. 01:41:08p
24 A. There's no reason to expect that 01:41:13p

Page 132

1 they would be the same. One could be higher or 01:41:17p
2 lower, there's no reason to expect -- there's no 01:41:22p
3 reason necessarily to expect them to differ, but 01:41:29p
4 there's nothing that would lead me to believe 01:41:32p
5 that they would be the same either. I mean, 01:41:38p
6 there's no -- 01:41:41p
7 Q. Because they are two different 01:41:42p
8 analyses? 01:41:44p
9 A. No. It would -- I think the 01:41:47p
10 issue would be -- sort of a more general issue 01:41:54p
11 would be, if I -- I would expect them to be very 01:41:59p
12 similar if the underlying characteristics of the 01:42:02p
13 company were similar. I would expect them to 01:42:09p
14 differ if, say, the fundamentals of the company 01:42:13p
15 differed or there was reason to believe that 01:42:19p
16 market conditions were materially different 01:42:24p
17 during a contemporaneous period versus, say, a 01:42:27p
18 period prior to an analysis. 01:42:33p
19 Q. Did you consider in your work in 01:42:35p
20 this case whether there was a marked change in 01:42:36p
21 market conditions affecting Adams Golf during 01:42:39p
22 the class period; that is, when you created your 01:42:46p
23 rolling regression in this case and you went 01:42:51p
24 about this assignment using a rolling 01:42:54p

Page 133

1 regression -- 01:42:56p
2 A. Right. 01:42:57p
3 Q. -- did you take into the fact, 01:42:57p
4 into consideration, the possibility that there 01:43:00p
5 was a marked change in market conditions during 01:43:02p
6 the class period? 01:43:04p
7 A. During the class period? 01:43:05p
8 Certainly the model will capture the extent to 01:43:07p
9 which that occurs. But I used the 01:43:11p
10 contemporaneous period, as I indicated before, 01:43:21p
11 because I didn't have a period that preceded the 01:43:24p
12 class period in which the company was publicly 01:43:27p
13 traded because it is an initial public offering. 01:43:30p
14 Q. So, this was the best you 01:43:34p
15 could do? 01:43:36p
16 A. I think that this is -- that 01:43:36p
17 what I've done is a reasonable approach and I 01:43:39p
18 think it is, under the circumstances, the best 01:43:44p
19 approach to take, yes. 01:43:49p
20 Q. Were there other approaches 01:43:50p
21 considering the fact that it was an IPO? 01:43:51p
22 A. I'm not sure what you mean by 01:43:54p
23 "other approaches." 01:43:56p
24 Q. Well, could you have used as the 01:43:57p

34 (Pages 130 to 133)

Page 166

1    A.    9/29.                          02:31:56p
2    Q.    9/29, thank you.               02:31:57p
3    A.    9/29/98.                       02:32:02p
4    Q.    Now, tell me what it is that you    02:32:10p
5  are pointing out here.  This shows that you    02:32:12p
6  applied the 90 percent level?         02:32:16p
7    A.    No, I'm just saying that it    02:32:18p
8  reflects the price change and the return on    02:32:19p
9  9/29/98.                               02:32:27p
10   Q.    Okay.                          02:32:38p
11   A.    And it's an earnings           02:32:39p
12 announcement in which the company is    02:32:41p
13 indicating -- the company attributes the lower    02:32:45p
14 than expected sales to new product introductions    02:32:50p
15 by the company's competitors in the fairway wood    02:32:54p
16 category -- which is Orlimar -- and to a lesser    02:32:57p
17 extent and to a lesser degree the general    02:33:02p
18 softening in the golf equipment sales.    02:33:05p
19   Q.    Okay.  So what does that tell    02:33:09p
20 you?                                   02:33:10p
21   A.    That -- it tells me that the    02:33:13p
22 company is experiencing lower than expected    02:33:21p
23 sales as a result of new product introductions    02:33:25p
24 and competition from the company's competitors    02:33:31p

Page 167

1  in the fairway wood market.            02:33:34p
2    Q.    And that was new information as    02:33:36p
3  of that time?                          02:33:38p
4    A.    The impact of that competition    02:33:40p
5  on the company's earnings appears to be new    02:33:44p
6  information at that point in time.     02:33:50p
7    Q.    And when you say "on the    02:33:54p
8  company's earnings," you mean specifically with    02:33:55p
9  regard to the ongoing third quarter?    02:33:57p
10   A.    This is a prerelease of the    02:34:02p
11 third quarter results.  Excuse me.    02:34:08p
12   Q.    But of course this was not the    02:34:32p
13 first release of information, not the first time    02:34:34p
14 the market was aware that Orlimar was offering    02:34:39p
15 competition?                           02:34:46p
16   A.    Oh, no, this wasn't the first    02:34:46p
17 time, but for information to be material, it    02:34:48p
18 needs to be -- and impact the stock price, it    02:34:51p
19 needs to be new information.  Certainly the    02:34:56p
20 information regarding Orlimar as a competitor    02:34:59p
21 was not new information.  Information regarding    02:35:02p
22 the effectiveness of Orlimar as a competitor and    02:35:05p
23 Orlimar's activities in the market and their    02:35:09p
24 impact on Adams would appear to be, at least at    02:35:14p

Page 168

1  the 90 percent level, new information.    02:35:17p
2    Q.    If that's true, then why wasn't    02:35:20p
3  it new information with regard to gray marketing    02:35:23p
4  on October 22nd when the company announced that    02:35:25p
5  gray marketing was expected to have an impact on    02:35:29p
6  fourth quarter results?               02:35:32p
7    A.    They knew -- well, for several    02:35:36p
8  reasons.  The first is with respect to gray    02:35:39p
9  marketing activity, there was certainly    02:35:45p
10 information in the market regarding gray market    02:35:48p
11 activity.  Before that -- and it was assessed to    02:35:52p
12 be not material or significant.       02:35:56p
13         With respect to the -- and I    02:36:03p
14 certainly agree that the market reacted to the    02:36:07p
15 fourth quarter change in expectations which    02:36:15p
16 was a result of a number of factors, one of    02:36:21p
17 which the company cites is recent, within the    02:36:27p
18 last two weeks, gray market activity.    02:36:31p
19   Q.    Let me stop you there.  I'm    02:36:33p
20 looking at your chronology.  Where does it say    02:36:35p
21 last two weeks?                        02:36:38p
22   A.    It's -- in the chronology?  It    02:36:39p
23 says --                                02:36:44p
24   Q.    When you talk about the last two    02:36:45p

Page 169

1  weeks, you're talking about something else other    02:36:46p
2  than the press release of October 22nd.  I don't    02:36:48p
3  mean to take advantage of you because you don't    02:36:51p
4  have the record like the rest of us do, but you    02:36:53p
5  know -- think about it for a minute, you'll    02:36:55p
6  realize that the reference to the last two weeks    02:36:57p
7  isn't it in that press release.       02:36:58p
8    A.    Well, I would have to review the    02:37:00p
9  press release.  I believe the press release says    02:37:03p
10 something to the effect of recent gray market    02:37:04p
11 activity.                              02:37:07p
12   Q.    Take your time, look at your    02:37:08p
13 chronology.                            02:37:09p
14   A.    Okay.  (Witness reviewing    02:37:10p
15 document.)                             02:37:12p
16         I believe it says -- the press    02:38:02p
17 release says, impacted by recent gray market    02:38:03p
18 activity.                              02:38:11p
19   Q.    Okay.  And?                    02:38:16p
20   A.    I believe -- I believe that --    02:38:17p
21 and I would have to go back and check, but    02:38:18p
22 associated with this release was a conference    02:38:24p
23 call with investors, and I believe in that    02:38:26p
24 conference call the reference is to within the    02:38:31p

43 (Pages 166 to 169)

Page 170

1  last two weeks.                              02:38:33p
2      Q.    That's fine.                       02:38:34p
3          So before October 22nd there        02:38:41p
4  was information in the market that was about 02:38:44p
5  gray marketing that the market considered not 02:38:49p
6  material, that's what you just said?         02:38:52p
7      A.    The evidence suggests that it      02:38:54p
8  was either not new information or not viewed as 02:38:55p
9  material information.                        02:38:58p
10     Q.    But when the company announces     02:39:02p
11 its expectation of disappointing results in the 02:39:06p
12 fourth quarter and one of the reasons they cite 02:39:10p
13 is gray marketing and the stock price goes down 02:39:13p
14 in a statistically significant way, you were  02:39:18p
15 prepared to say that none of that decline had to 02:39:22p
16 do with the market's realization now that it was 02:39:25p
17 a material problem?                          02:39:31p
18     A.    Yes, as it pertains to the        02:39:35p
19 allegations in the Complaint for purposes of 02:39:42p
20 assessing damages; in other words, the -- even 02:39:48p
21 if the market viewed the gray market as being a 02:39:55p
22 contributing factor to -- the recent gray market 02:40:03p
23 activity as a contributing factor to lower sales 02:40:10p
24 in the fourth quarter, my understanding is that 02:40:16p

Page 171

1  the Complaint alleges that there were        02:40:23p
2  misrepresentations and omissions regarding gray 02:40:30p
3  marketing activity and its risks at the time of 02:40:33p
4  the IPO. And I certainly don't think that the 02:40:36p
5  10/22/98 disclosure regarding future earnings 02:40:42p
6  and the revision that accompanied that of     02:40:51p
7  analyst expectations about future earnings, as I 02:40:53p
8  indicated in my rebuttal report, was         02:40:58p
9  something that was known or knowable or I would 02:40:59p
10 expect to be placed in -- and because of that I 02:41:04p
11 wouldn't expect it to be placed in a prospectus 02:41:10p
12 or offering material.                        02:41:17p
13     Q.    Right.                            02:41:18p
14     A.    I'm not aware of any examples in   02:41:19p
15 which companies as part of the registration or 02:41:21p
16 prospectus material provide earnings estimates. 02:41:26p
17     Q.    Nor am I. Nor am I aware of any    02:41:32p
18 pleading in this case making that allegation  02:41:32p
19 here, so maybe we can ask you to look at the  02:41:33p
20 Complaint again.                             02:41:38p
21         But you are familiar with the       02:41:40p
22 nature of the allegations in the Complaint?  02:41:41p
23     A.    Yes.                              02:41:44p
24     Q.    And you are familiar with the     02:41:44p

Page 172

1  contents of the June 9th press release?      02:41:45p
2      A.    Yes, I am.                         02:41:48p
3      Q.    And in terms of the quality of    02:41:49p
4  the disclosure regarding the impact on Adams 02:41:55p
5  Golf resulting from gray market, do you believe 02:42:00p
6  that the June 9th press release was as important 02:42:04p
7  or meaningful a disclosure as October 22?     02:42:12p
8      A.    I, first of all, haven't been     02:42:22p
9  asked to assess that. I think, as I sit here, 02:42:23p
10 those are two different disclosures: One has to 02:42:26p
11 do with a disclosure about actions the company 02:42:29p
12 is taking in response to sales of its clubs at 02:42:38p
13 Costco. October 22nd is a discussion of the   02:42:48p
14 company's forward-looking earnings estimates and 02:42:55p
15 how they are impacted by the current market   02:43:00p
16 conditions that the company faces.           02:43:04p
17     Q.    Different -- different press       02:43:08p
18 releases, different substance then?          02:43:12p
19     A.    Well, I certainly think they are  02:43:16p
20 different. I don't see -- and I don't see how 02:43:19p
21 the October press release regarding fourth    02:43:22p
22 quarter earnings is -- future earnings is     02:43:26p
23 related to a June 9th press release regarding 02:43:34p
24 the bill of discovery concerning the sales of 02:43:46p

Page 173

1  clubs at Costco.                             02:43:51p
2      Q.    The June 9th press release        02:43:52p
3  didn't say that there was gray marketing going 02:43:55p
4  on, did it?                                  02:43:57p
5      A.    It says -- it says it was filed   02:43:59p
6  in order to determine whether Costco's claims 02:44:08p
7  that they had properly acquired Tight Lies   02:44:11p
8  fairway woods for resale were accurate.       02:44:14p
9      Q.    Okay. Do you read that to say     02:44:22p
10 that the June 9th press release was a disclosure 02:44:24p
11 that gray marketing was going on?            02:44:28p
12     A.    It certainly implies to me that   02:44:32p
13 if one defines gray marketing as the sale by 02:44:36p
14 Costco or unauthorized distributors or their 02:44:42p
15 having the clubs available to sell, this would 02:44:48p
16 certainly indicate that Costco has the clubs. 02:44:52p
17     Q.    Okay. Well, my reading, I         02:44:55p
18 suppose, isn't relevant at this point, but we 02:44:57p
19 can deal with that, again, later.            02:44:59p
20     A.    Can we take a -- we've been       02:45:04p
21 going for about an hour.                     02:45:06p
22     Q.    Of course we can. Just let me     02:45:08p
23 finish a couple of questions along the same   02:45:09p
24 line.                                        02:45:12p

44 (Pages 170 to 173)

CHRISTOPHER M. JAMES

Page 218

1    Q.    Stock return.    04:09:25p
2         And how do you choose what    04:09:26p
3    stock return you use?    04:09:29p
4    A.    Over the month?    04:09:32p
5    Q.    For each month.    04:09:33p
6    A.    It's from the close of the prior    04:09:37p
7    month to the close of the current month, so it    04:09:40p
8    would be the cumulative return over the month,    04:09:44p
9    so all of the returns in the month are used.    04:09:49p
10   All the daily returns are incorporated into the    04:09:53p
11   monthly return.    04:09:57p
12   Q.    And for the monthly observation    04:09:57p
13   for the industry index, how did you determine    04:10:00p
14   that?    04:10:02p
15   A.    The same, the same way. So you    04:10:02p
16   take each component of the industry -- I think    04:10:05p
17   the index -- the Bloomberg index is on -- you    04:10:08p
18   can -- I think -- I think I recall seeing it on    04:10:12p
19   a level basis, you just take level prior month    04:10:15p
20   -- level at the end of the month plus level at    04:10:22p
21   the prior month divided by level at the prior    04:10:25p
22   month will give you the return over that month,    04:10:28p
23   the same way you calculate a return over the    04:10:30p
24   month.    04:10:32p

Page 219

1    Q.    Why did you perform the    04:10:33p
2    regression in Exhibit 10; what did that add to    04:10:35p
3    the work you were doing otherwise?    04:10:37p
4    A.    I think we touched on this topic    04:10:40p
5    this morning when we had a discussion of why    04:10:43p
6    market participants and researchers utilize,    04:10:52p
7    say, monthly returns. Remember I said if you    04:10:56p
8    look at Ibbitson or Barra or other vendors of    04:11:01p
9    what are called betas, how stock moves with the    04:11:08p
10   market, those vendors may also have how stock    04:11:11p
11   moves with industry comparables; that generally    04:11:15p
12   that analysis -- not always, but typically that    04:11:19p
13   analysis is done to figure out the influence of    04:11:22p
14   general industry factors, is done on a monthly    04:11:26p
15   basis as opposed to a daily basis for the    04:11:28p
16   reasons I gave you before, which is that on a    04:11:34p
17   monthly basis you are basically taking out a lot    04:11:35p
18   of noise that occurs, what a statistician would    04:11:40p
19   refer to as noise, on the daily returns due to    04:11:45p
20   randomness.    04:11:48p
21   Q.    So, again, with regard to    04:11:51p
22   Exhibit 10, if there were volatility in either    04:11:52p
23   the index on an intramonth basis or in Adams    04:11:56p
24   Golf stock on an intramonth basis, that would    04:11:59p

Page 220

1    not be reflected; that would be washed out by    04:12:03p
2    your monthly observation?    04:12:07p
3    A.    Yes, but it would be only    04:12:10p
4    looking at how one could explain monthly    04:12:12p
5    variations in the stock return relative to    04:12:17p
6    monthly variations in the industry index.    04:12:22p
7    Q.    Why was the period under study    04:12:28p
8    in Exhibit 10, why did that cut off at June 11?    04:12:31p
9    A.    You know, I looked at Exhibit 10    04:12:34p
10   and I knew you were going to ask that question,    04:12:36p
11   and I don't recall. I think it, frankly, might    04:12:38p
12   be an oversight.    04:12:42p
13   Q.    "An oversight" meaning what?    04:12:43p
14   A.    On my part. So I need to go    04:12:46p
15   back -- in just assembling this, as I sit here,    04:12:48p
16   I don't recall why it ended in June of 1999.    04:12:55p
17   Q.    Did you consider -- and I    04:12:58p
18   understand, I respect people that forget things,    04:13:02p
19   I do that, too. But did you consider, if you    04:13:04p
20   know, running the regression at Exhibit 10    04:13:06p
21   through December '99 as you ran the regressions    04:13:09p
22   in Exhibit 12?    04:13:18p
23   A.    I don't recall making a    04:13:24p
24   distinction between June of 1999 and December of    04:13:27p

Page 221

1    1999, so as I sit here I don't recall making any    04:13:35p
2    conscious decision to cut one analysis at 6/99    04:13:44p
3    and the other analysis at year-end 1999.    04:13:48p
4    Q.    I want to go back to a couple of    04:13:58p
5    points you raised earlier. First, you said that    04:14:00p
6    you did consider a two-day event window in    04:14:03p
7    response to the August 28, 1998, Lehman analyst    04:14:07p
8    report; correct?    04:14:14p
9    A.    Right.    04:14:15p
10   Q.    Did you consider a three-day    04:14:15p
11   event window?    04:14:17p
12   A.    No.    04:14:18p
13   Q.    Did you consider a two-day event    04:14:18p
14   window with regard to any other periods of the    04:14:21p
15   class period?    04:14:25p
16   A.    I don't recall that I did.    04:14:29p
17        I do recall, as we mentioned    04:14:34p
18   earlier today, doing an analysis in response    04:14:37p
19   to something which was in Mr. Miller's report,    04:14:43p
20   and that was he indicated -- he made two    04:14:50p
21   points: First, that, you know, while I looked    04:14:55p
22   at statistical significance at a 95 percent    04:15:00p
23   level, I didn't look at the significance at    04:15:04p
24   other levels. And, as I indicated in my    04:15:06p

56 (Pages 218 to 221)

1 report, the 95 percent level is the 04:15:08p
2 conventional level; although, some researchers 04:15:11p
3 will report significance at a 10 percent 04:15:17p
4 level. And so I examined whether there were 04:15:21p
5 days that were significant at a 90 percent 04:15:31p
6 level and what information was coming to the 04:15:36p
7 market on those days. 04:15:47p
8      Second is in response to a 04:15:49p
9 comment in his report concerning looking at the 04:15:51p
10 returns over multiple days. I asked the 04:16:01p
11 question of whether if the results and my 04:16:03p
12 conclusions regarding statistical significance 04:16:11p
13 and the information coming to the market on 04:16:16p
14 those days would be altered if I used a two-day 04:16:18p
15 window, and concluded that -- my conclusions 04:16:25p
16 were the same whether I used a two-day window or 04:16:33p
17 a one-day window for each of the events that I 04:16:36p
18 analyzed. 04:16:43p
19      So if you take the Golf Pro 04:16:44p
20 August 1st article and say, well, look at a 04:16:47p
21 two-day window around that, would that alter 04:16:50p
22 your conclusion regarding the statistical 04:16:53p
23 significance, would using a 90 percent 04:16:58p
24 confidence interval as opposed to a 95 percent 04:17:05p

1 confidence interval impact the conclusion, and 04:17:08p
2 the answer to both of those questions is no. 04:17:11p
3      Q.   Which events or which time 04:17:19p
4 periods during the class period did you consider 04:17:21p
5 using a multiple-day event window for? 04:17:25p
6      A.   Every day. 04:17:29p
7      Q.   Okay. And which events did you 04:17:31p
8 consider using the 90 percent confidence level 04:17:33p
9 for? 04:17:37p
10      A.   Every day. 04:17:38p
11      Q.   And how did you apply that using 04:17:40p
12 every day? For example, if I can turn you to 04:17:42p
13 Page Exhibit 5? 04:17:46p
14      A.   Mm-hmm. 04:17:54p
15      Q.   With regard to using a 04:17:55p
16 multiple-day event window, what did you mean by 04:18:00p
17 that; three days or five days? 04:18:03p
18      A.   Two days. 04:18:04p
19      Q.   Okay. You didn't look at 04:18:05p
20 anything more than two days, did you? 04:18:06p
21      A.   No, I had no information that 04:18:08p
22 would indicate to me that the market would not 04:18:10p
23 operate in an efficient way and I had no 04:18:15p
24 information to me that indicated any uncertainty 04:18:18p

1 regarding -- there would be no reason to use a 04:18:22p
2 multiple-day window more than two days for this 04:18:28p
3 analysis because you would use that if you were 04:18:34p
4 uncertain as -- you have a news announcement -- 04:18:37p
5 we talked about this earlier today; if you had a 04:18:40p
6 news announcement and you weren't sure whether 04:18:44p
7 that news announcement was made -- you know what 04:18:46p
8 day it was made on, but you don't know whether 04:18:48p
9 it was during trading hours or not. 04:18:54p
10      Q.   Sure. 04:18:54p
11      But you might also have new 04:18:54p
12 information enter in the market or allegedly 04:18:55p
13 new information enter in the market that might 04:18:58p
14 be in the form of rumor or oral communication 04:19:01p
15 which would be another situation in which you 04:19:03p
16 were uncertain as to what the disclosure date 04:19:06p
17 is. Correct? 04:19:08p
18      A.   No, I would certainly think that 04:19:09p
19 if there was an allegation that a rumor or oral 04:19:11p
20 communication were material, that you would be 04:19:18p
21 able to identify the date at which that 04:19:25p
22 information became available to the market. I 04:19:30p
23 would also say that -- and be able to relate it, 04:19:33p
24 as I talked about earlier today, in an objective 04:19:37p

1 scientific manner, to the price reaction. 04:19:44p
2      As I have indicated, oral 04:19:48p
3 communication, as it would be in the context 04:19:51p
4 of a conference call with investors, you would 04:19:52p
5 look at the day on which that conference call 04:19:57p
6 occurred, that oral communication, for 04:19:59p
7 purposes of determining whether that 04:20:03p
8 communication was material. 04:20:07p
9      Q.   If it were a rumor, however, you 04:20:09p
10 might not know when the rumor first started 04:20:11p
11 circulating; correct? 04:20:15p
12      A.   I think that's -- I mean, again, 04:20:19p
13 it's -- and we went through this before -- I 04:20:22p
14 would -- if I were asked to assess the 04:20:25p
15 materiality of an alleged rumor, the first step 04:20:28p
16 I would take is to try to determine when that 04:20:33p
17 rumor was being utilized by market participants 04:20:35p
18 for purposes of pricing or valuing the stock. 04:20:45p
19      I would also think that -- 04:20:48p
20 there's certainly -- and I would -- I would 04:20:54p
21 expect to see, if it was a rumor that was 04:20:59p
22 material and significant to investors, that -- 04:21:02p
23 as I indicated before, that there would be 04:21:06p
24 some commentary on it, in some source. 04:21:08p

57 (Pages 222 to 225)

CHRISTOPHER M. JAMES

Page 238

1  the hypothetical situation that Barney Adams    04:55:33p
2  harbored such a belief, would that constitute    04:55:35p
3  some evidence?    04:55:39p
4      A.    That -- of what?    04:55:42p
5      Q.    Some evidence that the gray    04:55:45p
6  market represented part of the reason for the    04:55:47p
7  decline in analyst expectations.    04:55:51p
8      A.    Without a -- what I would    04:55:55p
9  require for that is a link between his    04:55:59p
10  hypothetical belief and a communication with    04:56:05p
11  analysts regarding that belief to be able to    04:56:12p
12  assess whether their forward-looking earnings    04:56:16p
13  estimates were revised based upon Barney Adams'    04:56:24p
14  belief about gray marketing.    04:56:31p
15      Q.    Did Barney Adams communicate    04:56:34p
16  with the analysts in connection with fourth    04:56:37p
17  quarter expectations?    04:56:40p
18      A.    I think you asked me that    04:56:42p
19  question and I answered he did.    04:56:44p
20      Q.    Okay.  That's fine.    04:56:45p
21      Now, at least under the    04:56:47p
22  analysis -- well, thank you.    04:56:50p
23      How does the market in general    04:57:05p
24  react to new information that contains both    04:57:07p

Page 239

1  positive and negative elements?    04:57:10p
2      A.    It would depend on the facts and    04:57:15p
3  circumstances.    04:57:17p
4      Q.    Well, let's look at the August    04:57:18p
5  28th Lehman analyst report.  Did that contain    04:57:20p
6  new information?    04:57:24p
7      A.    In my view, there's very little    04:57:28p
8  new information in that analyst report.  If you    04:57:32p
9  take a look at and compare the investment thesis    04:57:35p
10  that is outlined in the August 4th analyst    04:57:39p
11  report on the initiation of coverage to the    04:57:43p
12  analyst report that is August 28th, you will see    04:57:47p
13  that they are virtually identical.    04:57:51p
14      You will also see, if you    04:57:57p
15  compare the two reports, that the target    04:57:57p
16  prices established by the analyst, the    04:57:59p
17  recommendation and the rationale for the    04:58:01p
18  recommendations, are all the same.    04:58:05p
19      So there does not appear to me    04:58:09p
20  to be, between the August 4th and the August    04:58:11p
21  28th, new information regarding what the    04:58:14p
22  analyst views as the key factors behind the    04:58:21p
23  recommendation of the target price.    04:58:30p
24      Q.    Except, of course, gray    04:58:32p

Page 240

1  marketing, because in your last answer you    04:58:33p
2  referred to the analyst view, and the analyst    04:58:36p
3  view as of August 4th did not include gray    04:58:39p
4  marketing but it did include gray marketing as    04:58:42p
5  what I think was referred to as a, quote,    04:58:46p
6  serious, closed quote, issue on August 28th?    04:58:48p
7      A.    I don't know that it was    04:58:51p
8  referred to as, quote, a serious issue or not.    04:58:53p
9  It is -- it was not mentioned on August 4th and    04:58:56p
10  it was mentioned and discussed on August 28th,    04:59:00p
11  and I think -- and that is obviously one reason    04:59:04p
12  why I examined the price reaction on August    04:59:07p
13  28th.  And given the fact that that -- and this    04:59:13p
14  is really -- as Mr. Miller indicates, that the    04:59:18p
15  August 28th was a -- the disclosure of gray    04:59:22p
16  market risks was in conjunction with other    04:59:29p
17  favorable information in the report.    04:59:32p
18      And I looked at the information    04:59:35p
19  in the report regarding the investment thesis    04:59:37p
20  and the rationale for the recommendation and    04:59:39p
21  target price, and found that they were    04:59:42p
22  identical to the items listed in the August    04:59:44p
23  4th recommendation and initiation of coverage    04:59:49p
24  which led me to believe that that was not new    04:59:57p

Page 241

1  information.    04:59:58p
2      Q.    Let's approach it this way.    04:59:58p
3  Let's look at a hypothetical situation where    05:00:00p
4  there is new information both good and bad    05:00:01p
5  presented simultaneously to market participants.    05:00:06p
6  In a situation like that, does it sometimes take    05:00:11p
7  longer for the market to digest the information    05:00:14p
8  and for the market to react than would be the    05:00:18p
9  case in the event that the information were all    05:00:21p
10  good or all bad?    05:00:24p
11      A.    No, I don't think that the    05:00:25p
12  information -- that the time it takes the market    05:00:26p
13  to incorporate new information into the price is    05:00:29p
14  dependent upon whether the information is in    05:00:35p
15  conjunction with other information.  I mean, I    05:00:42p
16  think that the evidence indicates, from numerous    05:00:47p
17  academic studies and it's been my experience,    05:00:52p
18  that -- and this illustrated here in this case    05:00:55p
19  with respect to the speed with which Adams Golf    05:00:59p
20  responds to new information, but new information    05:01:02p
21  gets embedded in prices almost immediately.    05:01:05p
22      Q.    I'm jumping around a little, but    05:01:11p
23  that's good news because that means I'm going to    05:01:14p
24  let you out of here soon.    05:01:16p

61 (Pages 238 to 241)

Page 254

1  Q.  Are there models that can be                    05:21:20p
2  used that test materiality on the basis of          05:21:21p
3  volume or some combination of volume and price      05:21:25p
4  movement?                                           05:21:29p
5  A.  I mean, I have not seen that                     05:21:37p
6  analysis done in the context of, say, a damage      05:21:40p
7  analysis. I have seen some academic studies         05:21:43p
8  that ask the question of whether information has     05:21:49p
9  an effect on trading volume.                        05:22:01p
10  Q.  And do you have any opinion as                  05:22:11p
11  to the usability or appropriateness of those        05:22:13p
12  models?                                             05:22:17p
13  A.  I think the appropriateness                     05:22:20p
14  would depend on the purpose of their being          05:22:23p
15  used. I would have to go back and look at some       05:22:31p
16  of those papers. Most of the paper -- the           05:22:36p
17  academic literature in finance is more focused      05:22:40p
18  on how information impacts value as opposed to      05:22:48p
19  trading volume. Although, there are a few           05:22:53p
20  papers out there that look at trading volume. I     05:22:55p
21  just don't recall what the conclusions are.         05:22:58p
22  Q.  The famous Golf Pro article                     05:22:59p
23  allegedly of August or August 1, 1998, when was     05:23:03p
24  that available to the market?                       05:23:08p

Page 255

1  A.  As I indicate in my report, it's                05:23:10p
2  my opinion that it's available to the market on     05:23:16p
3  August 1st.                                         05:23:19p
4  Q.  Well, surely you're not offering                05:23:19p
5  an opinion on that now, Dr. James, are you?         05:23:21p
6  A.  Yes, I am.                                       05:23:23p
7  Q.  You might be making an                           05:23:24p
8  assumption, but you are offering -- are you an       05:23:26p
9  expert with regard to when Golf Pro appeared in     05:23:29p
10  1998?                                               05:23:32p
11  A.  I'm not representing myself to                  05:23:33p
12  be an expert in when Golf Pro appeared. I am        05:23:35p
13  representing myself to be an expert, in first of    05:23:40p
14  all, knowing what the publication date and the     05:23:43p
15  convention of using publication dates. I            05:23:50p
16  believe your own expert uses the publication        05:23:52p
17  date as the date referenced in his chronology.      05:23:55p
18  Second, I undertook an                              05:23:59p
19  investigation to determine whether there was       05:24:01p
20  any evidence that suggests that the Golf Pro        05:24:03p
21  article was available prior to the cover day        05:24:06p
22  and concluded based on that analysis that           05:24:12p
23  there was none.                                     05:24:14p
24  Q.  Okay. Do you know of any                        05:24:15p

Page 256

1  evidence, apart from what you've put in your        05:24:16p
2  reports, to indicate when that Golf Pro article     05:24:21p
3  was available?                                       05:24:24p
4  A.  Yes.                                             05:24:26p
5  Q.  When?                                            05:24:26p
6  A.  In response to the Miller report                05:24:28p
7  where he conjectures that it might have been        05:24:32p
8  available earlier, I performed the following        05:24:37p
9  test. Based upon communications that I'm aware       05:24:40p
10  of between Cornerstone and the publishers of        05:24:46p
11  Golf Pro, which is now not currently published,     05:24:53p
12  they were unable to answer the question as to       05:25:04p
13  whether it was available before or after the        05:25:05p
14  cover price -- cover date.                          05:25:08p
15  So I conducted a Factiva search                     05:25:11p
16  between 1995 and 2000 in which I used the           05:25:15p
17  keywords "Golf Pro magazine," and then I           05:25:22p
18  looked at all of the articles that were            05:25:26p
19  available on Factiva that reference Golf Pro       05:25:29p
20  magazine and asked the question of whether          05:25:34p
21  there was any reference in the public press to      05:25:36p
22  a Golf Pro magazine article prior to the           05:25:41p
23  stated publication date on the cover, and I         05:25:46p
24  was able to identify several instances in           05:25:50p

Page 257

1  which there is a reference to a particular          05:25:53p
2  issue of Golf Pro magazine, and all of the         05:25:57p
3  references were after the publication date          05:26:01p
4  which is consistent with -- which is                05:26:04p
5  inconsistent with the conjecture by Mr. Miller     05:26:09p
6  that the information was available to the           05:26:13p
7  market prior to the cover date.                     05:26:19p
8  Q.  Did you save those searches?                    05:26:27p
9  A.  No.                                             05:26:29p
10  Q.  Did you communicate with your                  05:26:30p
11  office about providing to us information with       05:26:34p
12  regard to the additional regressions you said       05:26:35p
13  you would have?                                     05:26:38p
14  A.  I have -- it's not my office.                   05:26:41p
15  Q.  Cornerstone. Whomever you had                  05:26:43p
16  to communicate with.                               05:26:44p
17  A.  Yes, and the individual that is                05:26:46p
18  available -- the individual who undertook that     05:26:53p
19  analysis is not available, he's -- that's Amir     05:26:59p
20  Rosen, and I believe he's attending a deposition   05:27:07p
21  today.                                             05:27:10p
22  Q.  Not in this case?                              05:27:11p
23  A.  Yes, I believe he's downstairs,               05:27:12p
24  two stories down.                                  05:27:14p

65 (Pages 254 to 257)

**A. 62**

▲ **ADAMS**

October 22, 1998

Mr. Phil Hawes
East Coast Golf & Tennis
10428 Autopark Ave.
Bethesda, MD 20817



Dear Phil,

What follows is a series of pretty direct thoughts. If you know me, you will recognize the approach, it's the only way I know how.

First is Costco. We do not sell to them. One or more of our customers does and this has become a serious problem for both Adams Golf and our customers. In our prospectus and on our road show we stated that we don't sell to Costco type operations and we have not. If we sold to them and did not make an announcement we would be subject to litigation. I know it's been said, "Barney is selling Costco to make his numbers, it's the public company story." That is 100% wrong. We could, they'd love to have us, but we don't.

Given that we don't, what is Adams doing to protect its accounts from Costco and their pricing?

A.  Starting 10/15/98 we announce a national promotion -- buy two Tight Lies® and get a $150.00 value stand bag free. Participating retailers, Costco not included. This is no cheap bag, it's as good as any on the market. I use it myself. This program will be advertised nationally along with a new theme in our advertising showing the greater hitting area in the patented Tight Lies design (and a new infomercial).

B.  By year-end we'll have the ability to serialize (numerically) every head. We'll always know what goes where. We are also evaluating other methods to determine the source of these transshipments.

C.  We are reworking our purchase order document. Working with attorney's we want the maximum ability to take legal action against retailers shipping to other channels instead of selling to consumers.

D.  We have initiated legal action against Costco in an effort to force them to disclose their sources. This will probably fail, Costco is a master at this but we'll try.

E.  We will do everything we can to protect the relationships (and margins) with our good customers. (And I might add, we're open to suggestions.)

Second is our new driver. We promised a new driver for Q1 '99 and we will deliver. It will be a new technology and superior to competition. It will be supported by a multi-million dollar advertising program and that's only the beginning of the story.

The driver program doesn't work unless you make money. The formula is clear but complex.

ADAMS 001527

**A. 63**

# ADAMS GOLF

## Moderator: Patty Walsh
## October 23, 1998
## 1:00 p.m. CT

Operator:    Good day and welcome to this Adams Golf third quarter results conference call.

Today's call is being recorded. At this time for opening remarks and introductions I would

like to turn the call over to the Director of Investor Relations, Ms. Patty Walsh, please go

ahead ma'am.

Patty Walsh:    Good afternoon ladies and gentlemen and welcome to the Adams Golf third

quarter earnings release teleconference. With me today are Mr. Barney Adams,

Chairman, Chief Executive Officer and President and Mr. Darl Hatfield, Senior Vice

President, Finance and Administration and Chief Financial Officer of Adams. As a

formality, before we begin I need to point out that any comments made about future

performance reflect our best judgement today based on current market trends and

conditions. Any such comments or forward looking statements should be understood in

the context of our publicly available report filed with the SEC including our prospectus

which contains a discussion of various factors we believe may affect our business.

Certain factors, which could be expected to affect future performance, include market

demand and acceptance of products and business conditions in the golf equipment

industry generally. These factors could cause actual future performance to differ

materially from current expectations. At this time I'd like to turn the meeting over to

Barney Adams.



EXHIBIT

106

Walsh

ADAMS 004361

Barney Adams:    Hello everyone.  Yesterday afternoon we announced our third quarter results

which Darl will elaborate out in a minute.  I'd like to make one comment before Darl gets

started and that is in light of the general softening of the golf market we are very positive

about those results and I'm going to elaborate on them later but I want to turn it over to

Darl just now.

Darl Hatfield:    Thanks Barney.  Although the third quarter was disappointing in terms of not

meeting analyst's original estimates it did however represent a significant increase over

the comparable period in 1997.  Sales for the third quarter were twenty-three million

compared to fourteen point two million in the third quarter of 1997.  Sales for the first nine

months were eighty-one point three million versus nineteen point seven million in the

comparable period of 1997.  Aggregate units sold in the third quarter were approximately

two hundred and ten thousand. A breakdown of sales by product category for the three

and nine months ended September 30th, 1998 is as follows, for the three months, the

original sixteen degree lofted tight ((inaudible)) club represented thirty-six point five

percent of our revenues.  Other lofted fairway woods represented fifty-nine point eight

percent and other products which are primarily represented by our custom fitting

operations, represented three point seven percent of our revenues.  Year to date the

original sixteen degree lofted club is forty-two point nine percent of revenues, other lofts

are fifty-three point nine and the other product category of three point two percent.  The

increase in the percentage of net sales represented by other lofted clubs category

continues the trend that has occurred over the last three quarters and has been

accelerated by the addition of the two wood and to a lessor degree, the eleven wood,

both of which were introduced in late August of this year.  A breakdown of our sales by

geographic territory on a broad basis is as follows, for the three months ended

September 30th, 1998, domestic sales represented eighty-five point seven percent of our

revenues.  International represented fourteen point three percent.  For the nine month

ADAMS 004362

period, domestic represented eighty-nine point two percent and international represented ten point eight percent. Of our domestic sales in the third quarter, direct response sales accounted for seven point eight percent of those revenues with the remainder primarily represented by sales to our retail customers. A further breakdown of our international sales shows that for the three months, Asia represented fifty point five percent, Europe, twenty-eight percent and the rest of the world represented primarily by Canada was twenty-one point five percent. For the nine month period, Asia represented thirty-four point eight percent, Europe was thirty-one point one and the rest of the world was thirty-four point one percent. Gross profit as a percentage of sales for the third quarter decreased to seventy-three point nine percent from seventy-four point seven in the comparable period in 1997 and seventy-seven percent in the second quarter of 1998. The decrease in gross profit is due primarily through a reduction in the average sales price of the tight (wise) club at the wholesale level due to increasing competition in the fairway wood segment and to the liquidation of our demo club inventory in the third quarter. Operating expenses as a percentage of sales equaled forty-six point eight percent and is composed of selling and royalty expense, general and administrative expenses and to a lessor extent, research and development. Selling and royalty expense equaled thirty-one point seven percent of sales for the third quarter of 1998 compared to thirty-nine point one percent in the comparable period in 1997. The biggest component of this expense is advertising which we break down into image based advertising and direct response advertising. Both types of advertising were somewhat higher then expected when expressed as a percentage of sales because of the lower then expected sales volume. In addition, the company incurred start up costs associated with the production of new commercials. General and administrative expenses equaled thirteen point one percent of sales for quarter three as compared to four point two percent for the comparable period in 1997 and ten point nine percent for the first six months of 1998. The increase in G&A expenses as a percentage of sales is primarily due to the lower level of sales in quarter three as compared to the first and second quarter of 1998

ADAMS 004363

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998 1:00 p.m. CT
Confirmation # 560194
Page 4

considering the fixed nature of these expenses. Finally, R&D expense equaled two percent of sales for the third quarter. As a result, net income we eighteen point nine percent of sales or four point three million and year to date, for the first nine months was twenty point five percent of sales or sixteen point six million. That concludes my prepared remarks so I'll turn the call back over to Barney.

Barney Adams:    Thanks Darl. You know as I stated previously, if you took our third quarter results and forgetting the comparison of us to us, just took our third quarter results and looked at them in light of the industry my gamble is that an awful lot of companies would trade places with us. This does not mean that we're proud of missing our number but it does mean that we're still a very, very strong company. Now having said that, in our recent press release we talked about the fourth quarter that this market softness is going to continue, there's just a lot of factors out there. But the bottom line is that we'll probably come in at or slightly below break even. Now we knew months ago that we were going to sell our millionth (tight lie) sometime during Q4 of 98. And I think what's remarkable about that is the marketing for this club started less then eighteen months ago. We wanted to figure out a way to say thank you to the American golfers at the same time say thank you to our good retail accounts. So we've come up with a program, started October 15th, it runs for a month, anyone who purchases two (tight lies) during that period gets a one hundred and fifty dollar stand bag absolutely free. As I said, this not only allows us to thank the consumer but it allows us to work with our retail accounts and help them move merchandise off their shelves. At the same time, our new infomercial will view next week and it is going to be accompanied by a new ad campaign. And that's important because at the beginning, when we first did all of our ads, and you have to remember the ads you see for the most part and certainly the infomercial were done back in day one, eighteen months ago. And in those days the issue was big club versus small club. Well little did we know that we were going to change the way fairway woods were designed in the golf industry and that of course is what's happened. So now our issue is

ADAMS 004364

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page  5

to differentiate ourselves from other manufacturers who come up with low profile fairway woods. And we've been able to do that on a technical basis that shows that we have a distinctive technical advantage with our design over anybody else on golf. You combine that with the fact that we are also more aggressively showing that we make seven different (lofts). We found out in some of our focus groups that people didn't realize we made all those (lofts) so we're being much more aggressive with the marketing of all of our (lofts). And we have a very strong marketing program going into Q4 of this year and of course will also go into the first quarter and so on of next year for just the (tight lies). Now the other obvious question is 1999, where are we, where are we going, etceteras. And as I've said back in the road show and continue, we're going to introduce a new driver early in 1999. Regardless of how soft the golf market gets the overall market for drivers is still, in the United States, approximately five hundred million dollars. So from our prospective that's what we're focusing on. We see a market opportunity for us, it's significant whether the market is up or down it's still a very significant number and that's what we're concentrating on to help us improve our sales and margin performance in 1999. That's the end of my remarks and we'll be glad to open the call to questions.

Operator:    Thank you sir. The question and answer session will be conducted electronically. If you would like to ask a question you may signal by firmly pressing the star key followed by the digit one on your touch tone telephone. We'll proceed in the order that you signal us and we'll take as many questions as time permits. Once again if you do have a question please press the star key followed by the digit one. And we'll take our first question from Brian Lantier of Lehman Brothers.

Brian Lantier:    Good afternoon gentlemen, Brian Lantier with Lehman Brothers. I was wondering if Barney if you could specifically comment to some of the ways you're going to address the sales in the gray market going through to the wholesale clubs which you mentioned in your press release?

ADAMS 004365

Barney Adams:    Yeah, we're going to do two things, we are going to have the ability shortly to

serialize clubs and the bottom line to that is that we're going to be able to track them any

place they go. The second thing is that we are, you know we have legal restrictions, I

mean there's only a certain things we can do but within the guidelines and let's say,

pushing the guidelines of what we can do legally, we are rewriting all of our sales

contracts with our wholesalers to do whatever we can to discourage that action.

Brian Lantier:    Great. Do you have any feedback so far on the consumer response to the two

wood?

Barney Adams:    Yeah it's been a, I have to be honest, I tell you it's been a pleasant surprise.

People are, people like their (tied lies) so much that they like to tee off with it and they're

raising this club as kind of a club I can hit off the fairway, a club I can hit off the tee. So

it's been stronger then I expected.

Brian Lantier:    Great. Quick question for Darl, day's sales outstanding, they seem to be inching

up a little bit is this in line with what you expected?

Darl Hatfield:    They are, have gone up a little bit but as of September 30th it's about forty-four

days so yes, we think that's right in line where we would expect.

Brian Lantier:    Okay, great. Thank you.

Operator:    We'll take our next question from John Weiss at NationsBanc.

John Weiss:    Had a couple of questions if I may. First who is the retailer that seems to be

obtaining your club in the gray market? What retail price is that retailer offering it at?

ADAMS 004366

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998 1:00 p.m. CT
Confirmation # 560194
Page 7

And why is that having such a significant affect on your sales? This is obviously a problem for a lot of golf club manufacturers. And I was also wondering if you could serialize the clubs in a way that those who diverted in the future aren't able to easily obliterate the serial number.

Barney Adams:    I'll answer your question in reverse. We think the answer to part B to your question is yes we can do that. We'll have pretty good control over that. Going back to the first part of your question, we have been, there's no secret here but we have been advised by our attorney that we shouldn't mention any names. So I can only say it begins with C and ends with O and it's a membership corporation that comes out of the West Coast United States. Middle initial is T if it helps you any.

John Weiss:    Yeah I think I can narrow it down to one or two.

Barney Adams:    Well you know, it's like jeopardy John. Here's what happened. I mean these guys have been calls from deviators for several months. This is not new information. But in the last couple of months it increased, not even the last couple of months, I'd say the in the last couple three weeks it increased dramatically. And it just upset a lot of our retail market. We got calls from retail markets saying hey we can't compete, they're selling this thing for, I think they're selling the thing on a graphite shaft for a hundred and forty-nine dollars. We can't make any money selling at that price. And you know, I'll tell you what the accusation was. The accusation really was, and I got this in writing from one of my customers, Oh you guys are a public company. You'll do anything to make your numbers and you guys are really selling to them. And there's a great irony here because we've actually turned down business in that marketplace because we said we weren't going to sell there. But they actually accuse us of it. So now we, now we're kind of in a when do you stop beating your wife situation here. We have to go back and convince our own retailers that even though our clubs are in those stores we didn't sell them to them.

ADAMS 004367

John Weiss:     Thank you.

Barney Adams:     You're welcome.

Operator:     And we'll take our next question from Dave Turner at Ferris Baker, Watts.

Joe Tecklets:     Hi guys, actually Joe (Tecklets) here.  Question first on gross margin, Darl can you quantify what the liquidation of the demo clubs did to your gross margin in the quarter?  Or how many clubs, I think you said there are two hundred and, how many units in the quarter, two hundred and ten thousand?

Darl Hatfield:     Yeah we sold two hundred and ten thousand units in the quarter.  Demo clubs represented about thirteen thousand units and they were sold at gross profit obviously that's significantly below what we normally would sell our new clubs for.

Joe Tecklets:     But you can't quantify that in terms of basis points off of the, maybe the normalized gross margin?

Darl Hatfield:     It would be about twenty points under normal gross margin.

Joe Tecklets:     Okay and you said there was a reduction in the average sale price at wholesale, when did that go into affect and maybe how big of a reduction was there?

Darl Hatfield:     There was no formal date as to when any kind of a pricing policy went into affect but our average price was somewhat lower this quarter then it has been in previous quarters.

ADAMS 004368

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page  9

Joe Tecklets:    Is that an ongoing strategy or has that leveled out?  Do you have a set price
             now?

Darl Hatfield:    No we think that that probably has leveled out and we don't think that that will be
             further reduced in the fourth quarter.

Joe Techlets:    And also is this a, was this more a direct response or a retail issue and is it
             across the board?  Are you giving discounts to certain retailers for quantity or?

Darl Hatfield:    Yes it's on a very selective specific basis.

Joe Techlets:    Okay.  And lastly Barney, when you say a driver in 1999 are you talking about
             January?  You said early 1999.

Barney Adams:    Right our goal is, was and continues to be to have it by January of 1999.  The
             only reason that I will not come out and say ((inaudible)) is because this product, again
             as I've said all along, is going to be a technically different and superior product.  And it
             has to meet certain standards before we're going to release it.  We're very optimistic but
             we aren't making any definitive comments.

Joe Tecklets:    Can you say if there's any titanium in it?

Barney Adams:    It's entirely possible Joe.

Joe Tecklets:    Okay.  Last question Darl, any extended terms out there in the channel as well or
             have you extended your terms at all?

ADAMS 004369

Darl Hatfield:    No as a general rule we have not ended our terms. There are some situations

where, when you view the overall transaction in terms of number of clubs and other terms

involved where we did extend the terms somewhat but that's in a very, very small portion

of our sales. And those cases it was simply to meet competitive situations.


Joe Techlets:    Okay thank you.


Operator:    We'll go next to Mitchell Spiegel at DLJ.


Mitchell Spiegel:    Yeah a couple quick questions just regarding the industry, could you

comment what you're seeing in terms of retail inventory levels and when you think, if

there is any sort of build up that should correct itself? And then on the competitive front,

in terms of pricing you've made some general comments and we've heard some other

golf club manufactures comment about a very difficult environment in terms of pricing.

Can you just give me a sense on where you see that, you know, when and whether you

see it stabilizing in the next six months?


Barney Adams:    Mitchell I wish I had a better crystal ball to be honest with you but I don't. You

know a lot of the data about the golf industry, in fact almost all the data about the golf

industry comes from people who sell woods, irons, wedges, putters, you know even golf

balls, etceteras. So the comments tend to be inclusive of all products. We only

concentrate on fairway woods. What we know about fairway woods as far as the market

is concerned is that at the very least all other manufactures have decided that our

methodology for making a fairway must be right because they're all doing the same thing

that we are. And that's caused a little confusion in the marketplace and it's caused a little

confusion with our retailers. And we, we anticipated this but I suppose the most honest

answer I can give you is I don't think we thought that every single company that makes

clubs was going to jump on our bandwagon. We knew some of them were but that's

ADAMS 004370

what's happened. Now from the same, but the answer to that, I mean the settling out for us, we're not so much looking for the settling out. And this is what I eluded to earlier is that we've put together a very clear and concise advertising program that shows that we don't care what they do we have a distinctive advantage in our design. And that's really our approach to the thing is that we have to differentiate and sell what we can do.

Mitchell Spiegel:    Okay and then I guess, while a small portion of your revenue has come from Europe, do you have any sense of there's been some comment as to there's a slow down in the golf market across Europe, some of it related to El Nino and just other general malaise. Can you comment on that?

Barney Adams:    I'm afraid it's the same answer. I'm afraid because we're so isolated that another company that would sell woods, irons, wedges, putters, etceteras would probably have a better feel for it then we would. We are just getting started in Europe and Asia as you can see by the significant increase in international sales. So again, it's more of our goals visavis what percentage of sales we want to accomplish in the next year.

Mitchell Spiegel:    Great, thank you very much.

Operator:    We'll go next to Fred Kull of Fred Kull Financial Advisors.

Fred Kull:    Yes sir, if you could tell me what your free cash flow was in the quarter just ended, what your guess pre-cash flow will be in Q4 assuming it's flat? And number three, the rational for using your precious cash as a young company fighting larger competitors in an uncertain future to buy in shares where there's simply no support what ever for virtually any of the smaller companies.

ADAMS 004371

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page 12

Darl Hatfield:    Concerning the cash flow we generated about two million dollars to cash flow from operations this quarter. Next quarter, again we don't comment on specifics but as we indicated we'll be at or slightly above the breakeven level on earnings. And as you might suspect our cash flow should be a positive amount based on that but will not be significant.

Barney Adams:    Fred I'll answer part three, this is Barney Adams. I understand your question. I don't think there's a good answer for it. I can only tell you that from our prospective based on hundreds of phone calls from investors, from investment bankers, etceteras we were probably damned if we did and damned if we didn't. And I wish I had a more intelligent answer for you then that but that's it. I suppose that the best news is that thus far we're able to use a very small percentage of our cash in this objective. But I mean, I still understand the, one of my very good friends who's a financial advisor expressed what you just expressed to me in much stronger terms. So I understand your question.

Fred Kull:    I felt constrained. What will the attitude going forward? Is this an open question going forward or sort of what's the feeling, the next step on this issue?

Barney Adams:    It's still alive but our concentration is and always has been on doing a better job running the company. And I guess, again giving the constraints I'm under and so on that the buy back program is still in affect but I suppose like all programs it's under constant scrutiny.

Fred Kull:    Thank you.

Operator:    We'll take our next question from Matthew Ziehl of Salomon Brothers Asset Management.

ADAMS 004372

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998 1:00 p.m. CT
Confirmation # 560194
Page 13

Matthew Ziehl:    Yes, hi.  Just a following up a question about the share repurchase program, it's, obviously it's quite accretive to earnings per share to, or somewhat accretive to complete the program.  Is that your intent to complete the program especially with the stock around four dollars?

Darl Hatfield:    We still have an authorization in place by our board to repurchase up to two million shares.  We've purchased as we indicated six hundred and fifty-seven thousand to date and we'll re-evaluate that based on market conditions.  But that repurchase authorization does remain open and we will continue to consider it.

Matthew Ziehl:    Okay thanks.

Operator:    We'll go next to follow up question from John Weiss at NationsBanc.

John Weiss:    I had a couple of questions about the bag promotion, first what is the cost to you of providing a bag?  Second, how do you make sure the retailer really has sold two clubs to a customer?  And third, an ad you had I believe in the *Wall Street Journal* yesterday or two days ago encouraged the consumer to call you directly, how do the retailers respond to that suggestion as opposed to the alternative of the customer obtaining the bag through a retail purchase?

Barney Adams:    John suffice to say that when we did this program we did a serious amount of homework to obtain a very, very high quality bag at a very good price.  Secondly, as far as directing consumer inquiries into here, as in all of our efforts, what we try and do is deflect the sale to the retail level.  This is not, we don't want to do this in house but we have increased our capability significantly in the last six months with our investment in infrastructure to handle these calls to divert them to the right retail accounts, the participating retail accounts and so on.  So there is some value to directing calls in here.

ADAMS 004373

ADAMS·GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page 14

And then as far as making sure the retail actually sells the two bags, you know we do have a system in place, I mean we rehearsed this, I guess for a lack of a better word. I suppose if anybody really wanted to cheat us they could. I mean you can always cheat any system. But again, we're working with participating retailers and we have agreements with them.

John Weiss:    So Barney when a call comes in you automatically refer the caller to a retailer? What if the customer just wants to buy it over the phone?

Barney Adams:    Yeah if he's up in (DeBuke) and the nearest retailer is, you know, a hundred miles away we'll deal with them directly. But we try, our objective is to try and divert them to a retailer.

John Weiss:    Thank you.

Operator:    We'll go next to Roy McKay with Scudder Kemper.

Roy McKay:    Yeah I'm just a little bit concerned Barney to hear you back away from, what I hear you saying is that sure you've got a two million share repurchase in place but you don't have any intention in doing it. Then you dodge the question of whether or not you're going to complete that program. You know, you've seen the market value of your corporation, which the public invested in, drop a hundred and thirty million dollars. The stock is between three and four, I can't imagine why you wouldn't double the repurchase program, if you really had the interest of the shareholders in mind.

Barney Adams:    Well you know here I am, I'm damned if I do and I'm damned if I don't. We have a repurchase program in place. I don't think I heard anybody say we were going to

ADAMS 004374

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page 15

stop it. I think what you heard us say is that if I called up twenty financial advisors, ten would tell me it's a good idea and ten would tell me it's a dumb idea.

Roy McKay:    Well that's why you're the CEO, you have to decide what's the best interest of the shareholders.

Barney Adams:    That's correct and I understand the emphasis of the word shareholders and there is a stock repurchase program in place and it has not been changed from when we first announced it.

Roy McKay:    You want to see the (shortness) just go to two million shares just cancel your program.

Barney Adams:    I appreciate your input.

Operator:    Once again if you would like to ask a question you may signal by pressing the star key followed by the digit one. We'll go next to Jeff Klein, a private investor.

Jeff Klein:    Good afternoon. I'm just interested to know if there's any discussion or investment in iron technology that might mirror what you've done with the fairway woods?

Barney Adams:    Yeah, yeah there is Jeff. It's an ongoing project but our game plan has always been to introduce one category at a time so we can focus on it and focus on gaining market share. So you're absolutely right, there is a program internally on irons. In fact we've actually did prototypes as to when they're going to be running and when they're going to introduce I can't tell you because right now the first marketing emphasis is going to be on the driver.

ADAMS 004375

ADAMS GOLF
Moderator: Patty Walsh
October 23, 1998  1:00 p.m. CT
Confirmation # 560194
Page 16

Jeff Klein:    Are these prototypes or the possibilities, are these going to be completely different looking or different reacting type of irons?

Barney Adams:    Yeah anything we introduce will be with a technically, technical, excuse me, with a technical story that's a benefit to the golfer.

Jeff Klein:    Okay very good, thanks.

Barney Adams:    Sure.

Patty Walsh:    Ladies and gentlemen we have time for just one more call, question before we end the call.

Operator:    Ms. Walsh it appears there are no further questions at this time. I'd like to turn the program back over to you.

Patty Walsh:    Okay. Thank you. On behalf of Barney Adams, Darl Hatfield and myself I'd like to thank all of you for participating in our teleconference today. We plan to continue to hold quarterly teleconferences following each earnings release and you'll be notified by fax a few days prior to the call. Thank you again and good afternoon.

Operator:    That concludes today's conference call, thank you everyone for your participation.

END

ADAMS 004376

**A. 64**

# Adams' Critical Issues

## Cause

- Costco

- Increasing Competition
  (Product Offering and Ad Messages)

- Slowing Market Conditions

- "High Road" Marketing
  and Overly Aggressive Sales/Distribution

## Effect

- Eroding selling price and retail margins

- Decreasing Market Share

- Lack of sell through and high retail inventories

- Insufficient Product Differentiation
  ("Why buy Tight Lies?")

ADAMS 002331