**A. 65**

**ADAMS**

# ADAMS GOLF, INC.

## BOARD OF DIRECTORS MEETING

### February 3, 1999

CONFIDENTIAL

ADAMS 008623



2801 East Plano Parkway
Plano, TX 75074
www.adamsgolf.com
e-mail: pattywalsh@adamsgolf.com
Fax: (972) 673-9590
(800) 622-0609
Tel: (972) 673-9850



*From the desk of*
**Patty Walsh**
**Director,**
**Investor Relations**

To:     Board of Directors

Re:     February Board Meeting Materials

Date:  January 21, 1999

In preparation for the February 3, 1999 Board of Directors meeting, enclosed are the following materials:

| Tab # | Description |
|-------|-------------|
| 1 | Preliminary Financial Results for the 4th Quarter and Year Ended 12/31/98 |
| 2 | Memo from Barney Adams/Revised 1999 Forecast/Rankmark 1998-1999 Test Results |
| 3 | Preliminary Projections for 2000 |
| 4 | Memo from Barney Adams/Proposal to establish U.K. subsidiary |

Additional materials, including the agenda for the meeting and the minutes of the October 1998 Board of Directors meeting, will be sent to you under separate cover.

ADAMS 008624

ADAMS 008625

ADAMS GOLF, INC.
4th Quarter Results vs. Forecast

| | 4th Quarter Forecast | 4th Quarter Actual | $ Variance | % Variance |
|---|---|---|---|---|
| Gross Revenues: | | | | |
| Inside sales | $ 9,600,000 | $ 4,379,785 | $ (5,220,215) | -54.4% A |
| International sales | 2,130,000 | 2,230,141 | 100,141 | 4.7% B |
| Direct response sales | 2,000,000 | 1,365,348 | (634,652) | -31.7% C |
| Custom fitting sales | 270,000 | 164,011 | (105,989) | -39.3% A |
| Margin Protection | - | (4,300,000) | (4,300,000) | 100.0% E |
| | 14,000,000 | 3,839,285 | (10,160,715) | -72.6% |
| Sales returns | 819,000 | 734,012 | (84,988) | -10.4% D |
| Net revenues | 13,181,000 | 3,105,273 | (10,075,727) | -76.4% |
| | | | | |
| Cost of goods sold | 3,690,680 | 2,165,364 | (1,525,316) | -41.3% F |
| Gross profit | 9,490,320 | 939,909 | (8,550,411) | -90.1% |
| | | | | |
| Selling and Royalty: | | | | |
| | | | | |
| Salaries and benefits | 1,013,620 | 929,691 | (83,929) | -8.3% G |
| Travel | 180,000 | 240,308 | 60,308 | 33.5% H |
| Vehicle | 3,000 | 2,125 | (875) | -29.2% |
| Outside services | 360,000 | 598,659 | 238,659 | 66.3% I |
| Postage | (40,000) | 205,662 | 245,662 | -614.2% J |
| Telephone | 85,000 | 96,953 | 11,953 | 14.1% |
| Royalties | 400,000 | 213,799 | (186,201) | -46.6% K |
| Advertising | 3,800,000 | 3,128,610 | (671,390) | -17.7% L |
| Advertising - bag promotion | 809,071 | 259,435 | (549,636) | -67.9% M |
| Depreciation and amortization | 507,000 | 600,882 | 93,882 | 18.5% N |
| Total Selling and Royalty | 7,117,691 | 6,276,124 | (841,567) | -11.8% |
| | | | | |
| General and Administrative: | | | | |
| | | | | |
| Salaries and benefits | 840,000 | 457,745 | (382,255) | -45.5% O |
| Travel | 45,000 | 53,410 | 8,410 | 18.7% |
| Vehicle | 9,000 | 5,804 | (3,196) | -35.5% |
| Postage and freight | 240,000 | 106,234 | (133,766) | -55.7% P |
| Telephone | 15,000 | 13,075 | (1,925) | -12.8% |
| Depreciation and amortization | 280,000 | 265,636 | (14,364) | -5.1% |
| Dues and subscriptions | 9,000 | 35,883 | 26,883 | 298.7% Q |
| Insurance expense | 105,000 | 76,874 | (28,126) | -26.8% |
| Office supplies | 90,000 | 42,031 | (47,969) | -53.3% |
| Office PC software | 45,000 | 26,109 | (18,891) | -42.0% |
| Printing expense | 4,500 | 8,941 | 4,441 | 98.7% |
| Professional services | 450,000 | 765,168 | 315,168 | 70.0% R |
| Professional development | 9,000 | 14,661 | 5,681 | 62.9% |
| Bank service charges and credit card processing | 80,000 | 111,866 | 31,866 | 39.8% |
| Rent and common area maintenance | 214,000 | 202,916 | (11,084) | -5.2% |
| Miscellaneous supplies - operations | 450,000 | 327,375 | (122,625) | -27.3% |
| Miscellaneous office | 93,000 | 57,706 | (35,294) | -38.0% |
| Operations - clearing account | (1,340,000) | (956,297) | 383,703 | -28.6% S |
| | 1,638,500 | 1,615,137 | (23,363) | -1.4% |
| Bad debt expense | 500,000 | 250,000 | (250,000) | -50.0% T |
| Total General and Administrative | 2,138,500 | 1,865,137 | (273,363) | -12.8% |
| | | | | |
| Research and development | 357,625 | 413,781 | 56,156 | 15.7% U |
| Interest income, net | 689,000 | 653,295 | (35,705) | -5.2% |
| Net income (loss) before tax | 565,504 | (6,961,838) | (7,527,342) | -1331.1% |
| Income tax expense (benefit) | 214,891 | (2,469,525) | (2,684,416) | -1249.2% V |
| Net income (loss) | $ 350,613 | $ (4,492,313) | $ (4,842,926) | -1381.3% |

ADAMS 008626

**ADAMS GOLF, INC.**
Analytical Analysis – Income Statement
For the Quarter Ended December 31, 1998

Revenues and Cost of Goods Sold

A    **Inside Sales and Custom Fitting Sales**

During the quarter, actual results for Inside Sales and Custom Fitting were $5.2 million and $106 thousand less than the forecasted amounts of $9.6 million and $270 thousand, respectively. The decreased level of Inside Sales for the quarter is primarily the result of two factors. First, sales have been negatively impacted by the sale of the Company's golf clubs at significant discounts from retail by a discount membership warehouse (Costco) leading to higher inventory levels at the retail locations. Second, although it appears that the advertising efforts made by the Company produced sales at the retail level, additional orders for more product have not been generated due to retailers being in overstocked positions. Other factors that have affected sales levels have been the general softening of the golf industry and the Tight Lies line of clubs becoming a mature product.

B    **International Sales**

During the quarter, International Sales were above forecasted amounts by $100 thousand for a total of $2.2 million for the month. International Sales has continued to perform near expectations due to the increased market acceptance of the Tight Lies product overseas. In addition, several countries are now beginning their golf seasons whereas, the season has ended domestically.

C    **Direct Response Sales**

For the quarter, Direct Response sales were below forecasted sales by $635 thousand. This is due in part to the new "effective hitting area" infomercial being geared to drive the consumer to request information about the Company's products rather than to purchase merchandise direct from the Company. As a result, sales are being driven to retail customers, instead of through the Direct Response Department.

D    **Sales Returns**

During the quarter, sales returns were 9.0% of gross revenues as compared to forecasted sales returns of 5.9%. The increased sales return percentage is primarily related to additional amounts accrued in October and November for anticipated incremental sales returns associated with the holiday season and the low volume of gross sales.

E    **Margin Protection**

In order to adequately address pricing issues resulting from gray market sales of the Tight Lies club, it was necessary to reduce suggested retail prices and provide price protection for existing inventories on hand with the Company's retail customers. This price protection will allow the retailers to liquidate their existing inventories at competitive prices and help the Company re-establish relationships damaged throughout 1998 because of the Costco situation.

ADAMS 008627

**F**     **Cost of Goods Sold**

For the quarter, cost of goods sold was less than the forecasted amount by $1.5 million. The decreased cost of goods sold is primarily the result of the decreased level of sales for the quarter due to factors previously mentioned. With regard to actual results, cost of goods sold as a percentage of sales for the quarter was 29.2% as compared to the forecasted amount of 28%. The increase over the forecasted amount was primarily associated with an increase in overhead component of the standard cost.

<u>Selling and Royalty</u>

**G**     **Salaries and Benefits**

Actual salaries and benefits for the quarter were below the forecasted amount by approximately $84 thousand. The positive variance is primarily the result of the Company not accruing any additional amounts for incentive pay due to the Company not meeting specified goals. In addition, to true-up benefit accruals, the Company released an accrual of approximately $30 thousand relating to employee benefits during the month of November.

**H**     **Travel**

During the quarter, Travel Expense exceeded the forecasted amount by $60 thousand. The excess expense is primarily associated with additional travel by the Regional Area Coordinators to each of the major customers to assess inventory levels on-hand in accordance with the Company's price protection program discussed at E.

**I**     **Outside Services**

Outside services relate primarily to costs associated with outsourcing overflow call volume at the call center to third parties. The call volume of direct response inquiries associated with the new "effective hitting area" infomercial was significantly lower than expected leading to a smaller percentage of calls being routed to third parties. In addition, the Company released an accrual of $30 thousand relating to anticipated services that were to be provided by Telegolf. These positive variances were offset by a $500 thousand negative variance associated with the buyout of the Ric Jarrett consulting agreement.

**J**     **Postage and Freight**

During the quarter the Company reported a negative variance of $246 thousand as compared to the forecasted amount for Postage and Freight. Generally, the Company reports credit balances (revenue) relating to Postage and Freight since amounts charged to customers exceed actual costs. The debit balance is the result of the Company incurring freight charges for the shipment of advertising displays to the retail locations relating to the "Tight Lies Great Bag Giveaway".

**K**     **Royalties**

During the quarter, Royalties were below the forecasted amount by $186 thousand. The positive variance is primarily the result of two factors, the Company adjusting royalty accruals to appropriate year end levels and decreased royalties owed as a result of the reduced level of sales during the quarter.

ADAMS 008628

**L     Advertising**

Advertising for quarter is below the forecasted amount by $671 thousand. The positive variance as compared to the forecasted amount is due to a lower level of media time than was originally forecasted coupled with the reduction of advertising accruals during the quarter to reflect the appropriate year end amounts.

**M     Advertising -- Bag Promotion**

The amounts forecasted for Advertising -- Bag Promotion relate primarily to the costs associated with redemption of certificates for the new Adams stand bag under the Company's new "Tight Lies Great Bag Giveaway" promotion. The positive variance as compared to budget is primarily the result of the Company anticipating full liquidation of the bag inventory by year end. As of December 31, 1998, the Company had redeemed and shipped 8,900 bags with a total of 16,000 coupons having been received as of January 20, 1999.

**N     Depreciation and Amortization**

During the quarter Depreciation and Amortization was in excess of the forecasted amount by $94 thousand. The negative variance is primarily associated with the Company accelerating amortization of "effective hitting area" infomercial.

**General and Administrative**

**O     Salaries and Benefits**

Actual salaries and benefits for the quarter were below the forecasted amount by approximately $382 thousand. The positive variance is primarily the result of the Company not accruing for incentive pay due to the Company not meeting specified goals.

**P     Postage and Freight**

Actual Postage and Freight was below the forecasted amount by $134 thousand primarily due to a significant reduction in amount of inventory received during the quarter. As the forecasted amount was based on the assumption that inventory would continue to be received at a level rate, it is expected that a large positive variance would result.

**Q     Dues and Subscriptions**

During the quarter, Dues and Subscriptions were in excess of forecasted amounts by $27 thousand. The negative variance is primarily the result of the Company paying annual fees associated with Sports Market Research Institute to receive information used in marketing campaigns.

**R     Professional Services**

During the quarter, Professional Services were in excess of the forecasted amount by $315 thousand. The additional expense over the forecasted amount is primarily attributable to conversion costs associated with the PeopleSoft migration. In accordance with generally accepted accounting principles, conversion costs cannot be capitalized, but rather, must be expensed as incurred.

ADAMS 008629

S    **Operations – Clearing Account**

The Operations – Clearing Account represents the costs that are capitalized into inventory during the quarter. During the quarter, a negative variance of $384 thousand as compared to forecast was reflected. The negative variance is primarily the result of the Company continuing to record negative labor and overhead variances due to the significantly reduced production levels. It was originally anticipated that the costs capitalized into inventory would approximate 10.2% as compared to actual capitalized of 12.9% of net sales.

R    **Bad Debt Expense**

Bad Debt Expense for the quarter was less than the forecasted amount by $250 thousand due to decreased levels of sales during the quarter.

**Other**

S    **Research and Development**

During the quarter, research and development expenses were in excess of the forecasted amount by $56 thousand. The Research and Development expense is primarily related to costs associated with development of the driver expected to be introduced in January 1999.

T    **Income Tax Benefit**

During the quarter, based on the level of operations, the Company recorded an income tax benefit of $2.5 million. The tax benefit is the result of a large portion of the Company's interest income being generated by non-taxable securities coupled with a net loss from operations.

ADAMS 008630

**ADAMS GOLF, INC.**
**Comparative Balance Sheets**
**December 31, 1998**

| | Balance @ 11/30/98 | Balance @ 12/31/98 | | $ Variance | % Variance |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| **Current Assets** | | | | | |
| Cash and Cash Equivalents | $ 27,189,786 | $ 23,687,826 | A $ | (3,501,960) | -12.9% |
| Marketable Securities | 9,953,593 | 13,084,218 | B | 3,130,625 | 31.5% |
| Accounts Receivable, net | 8,703,313 | 1,918,559 | C | (6,784,754) | -78.0% |
| Inventory | 12,873,354 | 13,211,784 | D | 338,430 | 2.6% |
| State Income Taxes Receivable | - | 62,840 | E | 62,840 | 100.0% |
| Federal Income Taxes Receivable | 1,660,359 | 2,199,739 | F | 539,380 | 32.5% |
| Prepaid Expenses | 1,774,359 | 884,708 | G | (889,651) | -50.1% |
| Deferred Income Tax Assets | 831,607 | 2,296,622 | H | 1,465,015 | 176.2% |
| Other Current Assets | 952,859 | 1,590,458 | I | 637,599 | 66.9% |
| Total Current Assets | 63,939,230 | 58,936,754 | | (5,002,476) | -7.8% |
| | | | | | |
| Property, Plant and Equipment: | | | | | |
| Equipment, net | 189,243 | 185,017 | | (4,226) | -2.2% |
| Computers and Software, net | 2,230,960 | 2,130,942 | | (100,018) | -4.5% |
| Telecommunications, net | 543,148 | 536,883 | | (6,265) | -1.2% |
| Furniture and Fixtures, net | 476,935 | 474,970 | | (1,965) | -0.4% |
| Leaseholds, net | 134,369 | 140,670 | | 6,301 | 4.7% |
| Total P,P & E, Net | 3,574,655 | 3,468,482 | | (106,173) | -3.0% |
| | | | | | |
| Investments in Marketable Securities | 21,695,006 | 21,290,956 | B | (404,050) | -1.9% |
| Professional Services Agreement | 9,534,375 | 9,450,000 | J | (84,375) | -0.9% |
| Other Assets | 2,408,139 | 3,945,585 | K | 1,537,446 | 63.8% |
| | | | | | |
| Total Assets | $ 101,151,405 | $ 97,091,777 | $ | (4,059,628) | -4.0% |
| | | | | | |
| **Liabilities and Stockholder's Equity** | | | | | |
| **Current Liabilites** | | | | | |
| Notes Payable to Shareholder | $ 534,899 | $ 174,899 | L $ | (360,000) | -67.3% |
| Accounts Payable | 659,432 | 1,402,317 | M | 742,885 | 112.7% |
| Accrued Expenses | 5,066,889 | 4,600,639 | N | (466,250) | -9.2% |
| Total Current Liabilities | 6,261,220 | 6,177,855 | | (83,365) | -1.3% |
| | | | | | |
| Deferred Tax Liabilities - Noncurrent | 3,024,571 | 3,081,309 | | 56,738 | 1.9% |
| | | | | | |
| Total Liabilities | 9,285,791 | 9,259,164 | | (26,627) | -0.3% |
| | | | | | |
| **Stockholder's Equity** | | | | | |
| Common Stock | 23,137 | 23,137 | | - | 0.0% |
| Additional Paid In Capital | 85,549,076 | 85,421,881 | O | (127,195) | -0.1% |
| Common Stock Subscription | (22,134) | (22,134) | | - | 0.0% |
| Deferred Compensation | (1,229,570) | (942,202) | P | 287,368 | -23.4% |
| Unrealized Gain on Investment In Marketable Securities | 119,875 | 149,503 | Q | 29,628 | 24.7% |
| Treasury Stock | (3,136,613) | (3,136,613) | | - | 0.0% |
| Retained Earnings/(Deficit) | (5,813,797) | (5,813,797) | | - | 0.0% |
| Current Earnings/(Deficit) | 16,375,640 | 12,152,838 | | (4,222,802) | -25.8% |
| Total Stockholder's Equity | 91,865,614 | 87,832,613 | | (4,033,001) | -4.4% |
| | | | | | |
| Total Liabilities and Stockholder's Equity | $ 101,151,405 | $ 97,091,777 | $ | (4,059,628) | -4.0% |

ADAMS 008631

ADAMS GOLF, INC.
Company Wide Operating Analysis -- Balance Sheets
November 30 and December 31, 1998

A    **Cash and Cash Equivalents**

Cash and Cash Equivalents have decreased $3.5 million as compared to the balance at November 30, 1998. The decrease is primarily due to the Company utilizing $800 thousand in cash to fund capital expenditures in addition to a reclass from cash and cash equivalents to marketable securities – noncurrent of $2.7 million. The reclass from cash was re-invested in instruments that mature in greater than 365 days.

B    **Marketable Securities – Current and Marketable Securities - Noncurrent**

The balance relates to the Company's investment in marketable debt securities that mature at various dates in excess of 90 days. The increase in the current portion of $3.1 million is primarily due to $3.1 million of marketable securities – long term reaching maturity dates that fall within the 91 to 365 day period. The decrease in marketable securities – noncurrent of $404 thousand is primarily attributable to $3.1 million being reclassed to current offset by $2.7 million of cash being re-invested in instruments which mature in greater than 365 days.

C    **Accounts Receivable, net**

Accounts Receivable has decreased from $8.7 million at November 30, 1998 to $1.9 million at December 31, 1998. The decrease is primarily attributable to the Company initiating a margin protection program in December for existing levels of inventory with wholesale customers resulting in a credit to Accounts Receivable of $4.3 million. In addition, the decrease in accounts receivable is directly correlated to the decreased level of sales recorded during the current month and the continued collection efforts on aged accounts.

D    **Inventory**

During the current month, Inventory increased approximately $338 thousand to a balance of $13.2 million at December 31, 1998. The increase in inventory is primarily due to the Company receiving inventory which was committed to earlier in the year and secured by letters of credit. The Company attempts to control the cost of the components required to manufacture its products through purchasing significant quantities of inventory from overseas manufacturers. As the vast majority of the inventory is transported to the Company via ship, it is necessary to purchase the inventory with several months lead time.

E    **State Income Tax Receivable**

The State Income Tax Receivable is the result of the Company recording a net loss for the 4th quarter as estimated tax payments for 1998 were computed on a higher level of sales and consequently, net income for 1998.

F    **Federal Income Tax Receivable**

The Federal Income Tax Receivable results from overpayment of quarterly estimated tax payments during the first and second quarters of 1998. The overpayment resulted from the estimated tax payments being computed on a higher level of annual sales and consequently, net income for 1998. Due to the Company recording a net loss for the month of December the Company recorded an addition to the receivable during December.

ADAMS 008632

**G    Prepaid Expenses**

During the month Prepaid Expenses decreased $885 thousand as compared to the balance at $1.7 million at November 30, 1998. Approximately $711 thousand of the decrease is attributable to the reclassing the cost associated with bags for the "Tight Lies Great Bag Giveaway" to Other Assets. The remainder of the decrease is attributable to a reduction in prepaid advertising.

**H    Deferred Income Tax Assets and Liabilities**

During December, the Company received guidance on the tax ramifications of the margin protection program. It was determined that the Company will be able to take a tax deduction in 1999 for the total amount of expense resulting from the transaction. For "book" purposes the expense will be recognized in 1998 resulting in a deferred tax asset from the difference in the timing of expense for tax and "book" purposes.

**I    Other Current Assets**

The increase in Other Current Assets is attributable to several partially offsetting factors which aggregate to the net increase of $638 thousand. The factors are as follows:

|  | Increase / (Decrease) |
|---|---|
| Reclass of Bags | $ 711,000 |
| Returned Components | (60,000) |
| Other | (13,401) |
| Net Increase | $ 637,599 |

The majority of the increase, $711 thousand, relates to the cost of bags for the "Tight Lies Great Bag Giveaway" which, in previous months, were classified as a component of Prepaid Expenses. The remainder of the increase relates to $60 thousand of inventory that was received from the manufacturer after it had been sent back to be refurbished in previous months. Upon receipt the $60 thousand was appropriately reclassed to the inventory line item.

**J    Professional Services Agreement**

This account represents the assigned value of the stock (900,000 shares at $11.25 per share) awarded to Nick Faldo. The amount will be amortized to operations over a ten year period.

**K    Other Assets**

During the current month Other Assets increased $1.5 million as compared to the balance at November 30, 1998. The increase is primarily attributable to additional invoices received relating to the Seibel and PeopleSoft implementation which have been capitalized. In addition, the Company also capitalized $100 thousand of costs relating to the purchase of the new trade show booth which will be amortized to expense over a three year period.

**L    Note Payable to Shareholder**

During the current month, the Company made a payment of $360 thousand relating to a note agreement between the Company and Barney Adams. The remainder of the balance will be paid in April when the note matures.

ADAMS 008633

**M**    **Accounts Payable**

At December 31, 1998, the balance in Accounts Payable increased $743 thousand as compared to the balance November 30, 1998. The increase is primarily due to the receipt of invoices from KPMG and Midwest Consulting relating to the PeopleSoft implementation coupled with invoices received for advertising expenditures for holiday promotions that were previously classified as accrued expenses.

**N**    **Accrued Expenses**

Accrued expenses have decreased $466 thousand as compared to the balance at November 30, 1998. Based on more current information, the decrease in accrued expenses is associated with the adjustment of existing accruals and reduction of accruals for benefits, property taxes, and incentive pay to estimated required year end balances.

**O**    **Additional Paid in Capital**

The decrease in Additional Paid in Capital is primarily due to employees leaving the Company during the current month thereby forfeiting unvested stock options which had a compensation element associated with the original grant. In addition, a portion of the decrease was due to increased coverage and corresponding expense associated with directors and officers insurance.

**P**    **Deferred Compensation**

During December, Deferred Compensation decreased $287 thousand as compared to the balance November 30. Approximately $114 thousand of the decrease is associated with the forfeiture of stock options as discussed above. The remainder of the decrease is due to the Company paying off a royalty agreement with an outside consultant.

**Q**    **Unrealized Gain/(Loss) on Investment in Marketable Securities**

In accordance with generally accepted accounting principles, the Company is required to record investments in Marketable Securities at fair value at the date of reporting. Differences between the fair value and historical cost must be recorded as an "unrealized" gain or loss, net of tax, in the equity section of the balance sheet. All realized gains and losses have appropriately been recorded as a component of the income statement as of December 31, 1998.

ADAMS 008634



# 1998 YTD Operating Results vs. Analyst Expectations
(In thousands except for per share amounts)

|  | Adams | Analysts Expectations |  |  |
|---|---|---|---|---|
|  |  | Ferris, Baker, Watts | Montgomery | Lehman Brothers |
| Net Sales | $ 84,420 | $ 97,804 | $ 95,300 | $ 95,385 |
| Cost of goods sold | 21,791 | 24,212 | 23,700 | 23,615 |
| Gross profit | 62,629 | 73,592 | 71,600 | 71,770 |
| Operating expenses: |  |  |  |  |
| Selling and royalty | 30,959 | 32,603 | 32,500 | 31,859 |
| General and administrative | 11,899 | 13,581 | 12,000 | 13,199 |
| Research and development | 1,531 | 1,596 | 1,600 | 1,681 |
|  | 44,389 | 47,780 | 46,100 | 46,739 |
| Operating income | 18,240 | 25,812 | 25,500 | 25,031 |
| Other income, net | 1,193 | 1,190 | 1,000 | 1,149 |
| Income before taxes | 19,433 | 27,002 | 26,500 | 26,180 |
| Income tax expense | 7,278 | 10,089 | 9,800 | 9,673 |
| Net Income | $ 12,155 | $ 16,913 | $ 16,700 | $ 16,507 |
| Earnings per share - Diluted basis | $ 0.60 | $ 0.82 | $ 0.81 | $ 0.80 |

ADAMS 008635

2

ADAMS 008636



2801 East Plano Parkway
Plano, TX 75074
www.adamsgolf.com
Fax: (972) 398-8818
(800) 622-0609
Tel: (972) 673-9673



*From the desk of*
**B.H. (Barney) Adams**

To:     Board of Directors

Re:     1999 Revised Forecast

Date:   January 20, 1999

---

The industry predictions for golf equipment sales in '99 are not positive. Forecasts include Callaway selling 10%-15% less in '99 than '98 and a general prediction that there will be significant OEM inventory clearance throughout the year. Given the reality of those predictions, our analysis is that the year is still one of great opportunity to further our position in the market.

A.     We're entering a new market (drivers) that is estimated at $500M U.S. and $500M international.

B.     We have a dramatic new technology in our SC series driver.

C.     This technology is not a one-club situation. We have a long-range plan, which includes fairway woods, a driver in a different material and drivers and fairway woods in new designs. It's a minimum 5-year plan of new product introduction.

D.     Our market survey of 200 customers turns up one constant. The industry is suffering from a lack of technology. Consumer buying power is still existent. They need a reason to buy.

E.     Callaway's leadership position is considerably weaker than it was two years ago. Once considered invincible, they are losing momentum.

F.     A successful introduction of SC Technology identifies Adams Golf as much more than a "one club company." A positive reaction will facilitate new introductions into categories like irons.

Given the conditions outlined, it is essential that we follow a detailed procedure in establishing revenue and expense budgets. We pool a select list of 200 retail accounts. (Golf pro shops are insignificant to this data). We analyze two separate industry market reports, Golf Datatech and Golf Market Research Institute. We get forecasts from our internal and external sales people and we talk to outsiders who have good exposure to

ADAMS 008637

industry trends (like a shaft or grip manufacturer who covers OEM's). All of this data is consolidated into three revenue forecasts: low, medium, high.

We present these three forecasts along with our mid- and long range goals to each operating department. Consistent with our philosophy for growth, expense budgets are presented at each of the three sales levels. Darl Hatfield's group compiles all the information into a format that allows myself, him and Chip to conduct a review. Each department submitting numbers must be able to justify expenses as we review by line item. We decide on a finished product and it is presented to the Board.

The process does not end with assembling the information. While the basis of management bonus compensation is tied to corporate goals, we have further criteria specific by department. Examples would be commissions for sales people or market share goals for marketing personnel.

Administration is the last phase. The tremendous uncertainty in our database requires constant scrutiny and the ability to make adjustments as deemed necessary. Our constant is the combination of aggressive sales and short-term revenue influenced by mid- and long-range corporate objectives.

While most of the comparative numbers are straight forward, the obvious investment is sales and marketing and on closer inspection, it's marketing and advertising. Golf is a marketing driven business if the plan is to be a major supplier. Product is important, but reference the attached report from an independent test company. Take the driver category and the cumulative 100's of millions in advertising and marketing, and what do you see? There is no technical product winner. It's a marketing effort to win the heart of the consumer.

Adams has grown to the point where we can no longer rely solely on an infomercial, its reach is not broad enough. In 1999 our advertising exposure increases 42%, but the consumer exposure increases 300%. We understand our challenge and we've taken the first step, a dramatic new technology. Before it sells successfully, it must be marketed and it is that area of our company that has undergone the greatest change in the last four months and it receives the highest proportions of Chip's and my time.

BHA:sh
Attach.
\246.Board

ADAMS 008638

**ADAMS**

# 1999 Revised Forecasted Results

(In thousands except for per share amounts)

| | Revised Forecast | Original Forecast | Difference |
|---|---|---|---|
| Net Sales | $ 106,209 | $ 126,869 | $ (20,660) |
| Cost of goods sold | 36,215 | 40,687 | (4,472) |
| Gross profit | 69,994 | 86,182 | (16,188) |
| Operating expenses: | | | |
| Selling and royalty | 43,814 | 46,989 | (3,175) |
| General and administrative | 13,088 | 12,743 | 345 |
| Research and development | 2,455 | 2,733 | (278) |
| | 59,357 | 62,465 | (3,108) |
| Operating income | 10,637 | 23,717 | (13,080) |
| Other Income, net | 2,945 | 2,662 | 283 |
| Income before taxes | 13,582 | 26,379 | (12,797) |
| Income tax expense | 4,930 | 9,563 | (4,633) |
| Net Income | $ 8,652 | $ 16,816 | $ (8,164) |
| Earnings per share - Diluted basis | $ 0.38 | $ 0.75 | $ (0.37) |

* See following page for explanation of revisions.

ADAMS 008639

**ADAMS**

## Net Sales

- Decrease is due to a reduction in the average selling price for Tight Lies I from $117 to $90 and $89 to $65 for graphite and steel (wholesale), respectively.

- Decrease is also due to revision of the introduction date of the Tight Lies II from May to October thereby, reducing the number of Tight Lies II units by 69%

- Decreases mentioned above are partially offset by the following:

  - 33% increase in Tight Lies I units.

  - Increase in the selling price for the Driver from $200 to $210 wholesale.

ADAMS 008640

# ADAMS

## Cost of Goods Sold

- Dollar decrease in Cost of Goods Sold is associated with the migration of sales from the higher cost Tight Lies II product line to the Tight Lies I product line.

- Increase in Cost of Goods Sold as a percentage of Sales from 32% to 34% is due to the reduced selling prices for Tight Lies I.

## Selling and Royalty Expense

- Decrease is due to a reduction in expenses allocated for sponsorship of touring professionals.

## Income Taxes

- Decrease is due to the reduced amount of taxable income income taxes have remained constant at 36.3% of Income before taxes.

ADAMS 008641



# 1999 Quarterly Forecasted Results

(In thousands except for per share amounts)

|  | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter | Total |
|---|---|---|---|---|---|
| Net Sales | $ 20,732 | $ 37,905 | $ 23,284 | $ 24,288 | $ 106,209 |
| Cost of goods sold | 7,239 | 13,040 | 8,053 | 7,883 | 36,215 |
| Gross profit | 13,493 | 24,865 | 15,231 | 16,405 | 69,994 |
| Operating expenses: |  |  |  |  |  |
| Selling and royalty | 9,852 | 14,017 | 9,888 | 10,057 | 43,814 |
| General and administrative | 3,177 | 3,618 | 3,147 | 3,146 | 13,088 |
| Research and development | 615 | 615 | 613 | 612 | 2,455 |
|  | 13,644 | 18,250 | 13,648 | 13,815 | 59,357 |
| Operating income | (151) | 6,615 | 1,583 | 2,590 | 10,637 |
| Other income, net | 715 | 739 | 739 | 752 | 2,945 |
| Income before taxes | 564 | 7,354 | 2,322 | 3,342 | 13,582 |
| Income tax expense | 204 | 2,677 | 840 | 1,209 | 4,930 |
| Net Income | $ 360 | $ 4,677 | $ 1,482 | $ 2,133 | $ 8,652 |
| Earnings per share - Diluted basis | $ 0.02 | $ 0.21 | $ 0.07 | $ 0.09 | $ 0.38 |

ADAMS 008642

**ADAMS**

# 1998 Actual vs. 1999 Forecasted Results

(In thousands except for per share amounts)

| | 1998 | | | 1999 | $ | % |
| --- | --- | --- | --- | --- | --- | --- |
| | 1st Half | 2nd Half | Total | Forecast | Difference | Difference |
| Net Sales | $ 58,328 | $ 26,092 | $ 84,420 | $ 106,209 | $ 21,789 | 25.8% |
| Cost of goods sold | 13,625 | 8,166 | 21,791 | 36,215 | 14,424 | 66.2% |
| Gross profit | 44,703 | 17,926 | 62,629 | 69,994 | 7,365 | 11.8% |
| Operating expenses: | | | | | | |
| Selling and royalty | 17,387 | 13,572 | 30,959 | 43,814 | 12,855 | 41.5% |
| General and administrative | 7,023 | 4,876 | 11,899 | 13,088 | 1,189 | 10.0% |
| Research and development | 664 | 867 | 1,531 | 2,455 | 924 | 60.4% |
| | 25,074 | 19,315 | 44,389 | 59,357 | 14,968 | 33.7% |
| Operating income | 19,629 | (1,389) | 18,240 | 10,637 | (7,603) | -41.7% |
| Other income, net | (110) | 1,303 | 1,193 | 2,945 | 1,752 | 146.9% |
| Income before taxes | 19,519 | (86) | 19,433 | 13,582 | (5,851) | -30.1% |
| Income tax expense | 7,219 | 59 | 7,278 | 4,930 | (2,348) | -32.3% |
| Net Income | $ 12,300 | $ (145) | $ 12,155 | $ 8,652 | $ (3,503) | -28.8% |
| Earnings per share - Diluted basis | $ 0.66 | $ (0.01) | $ 0.60 | $ 0.38 | $ (0.22) | -36.7% |

ADAMS 008643

**A. 66**

**Adams Golf, Inc.**

# Memo

**To:** Dick Murland

**From:** Mark D. Gonsalves

**CC:**

**Date:** 3/27/98

**Re:** Customer Returns

---

Thank you for bringing the recent returned order of King Par and Dunham's canceled order to my attention. Here are my thoughts on the subject.

First, with King Par, they refused their order even though we have signed PO's on their order forms. The reason, I believe, is that we called them to task this week for trans-shipping to a retailer in Massachusetts named MVP Sports who are selling our club for $179 and advertising that price in the newspaper. We cannot allow trans-shipment of our clubs. We should be credited with taking a long-term Adams view on the trans-shipment issue.

Second, Dunham's had a solid order with us, but at the last minute, through us a curve ball by requiring us to sign a consignment agreement. This was to be their first order or consequence and I think they tried to make us fold on terms with the clubs on the shipping dock. We, as a sales department, stepped up and said no way. Dick, that's good stuff on our part, not bad. Again, we put the company first.

As for future orders, here is my plan. You come up with a order size you would like to see us have more documentation on besides the normal company PO. Let's say it's 500 clubs- you pick the amount. For any order over this amount of clubs, we will send to that customer, up front, a document that reconfirms the following: Order Quantities, Price, Terms, Delivery Date and Method. We will include sections on our trans-shipment policy, pricing policy and return policy. They will be REQUIRED to sign the document and return it, BEFORE we process their order. You should be aware that in our industry return policies are ignored- I don't see that changing any time soon. I've have been over this once before with Barney.

Remember, to implement this will require extra steps which can have an effect on slowing down the machine. I would be fiscally irresponsible if I did not point this out. The document needs to be drafted by an attorney. Would you like to suggest one or take ownership of getting this done? Either way is OK with me.

Lastly, I will address Jay and all of our sales staff on the effect of returned or changed orders. You make a very valid point on the problems it causes. Please know how you would like me to proceed.



EXHIBIT

255

ADAMS 007805

**A. 67**

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4   IN RE:  ADAMS GOLF, INC.  :    CONSOLIDATED

5   SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

6   _____X

7

8         ORAL DEPOSITION OF DARL HATFIELD

9              Thursday, June 8, 2006

10

11         The oral deposition of DARL HATFIELD was

12   held at the law offices of Akin Gump Strauss Hauer

13   & Feld, LLP, 1700 Pacific Avenue, Suite 4100,

14   Dallas, Texas, from 9:34 a.m. to 12:52 p.m.,

15   before Jamie K. Israelow, a Certified Shorthand

16   Reporter in and for the State of Texas, Registered

17   Professional Reporter, Certified Realtime Reporter

18   and Certified LiveNote Reporter.

19

20

21         RSA/VERITEXT COURT REPORTING COMPANY

22            1845 Walnut Street, 15th Floor

23              Philadelphia, PA  19103

24            (215)241-1000    (888)777-6690

Page 30

1    Q    Okay.  In going back to the
2  conversation in the car, did -- whether it was --
3  I guess it was Gonsalves who said something to
4  Barney.  It's not that important, but I'm just --
5  now, was that discussed at that time because the
6  information had just been learned, or was it
7  discussed because it was a concern during the road
8  show?
9    A    It was not a concern.  The only
10  concern that anyone voiced was the fact that it
11  was -- the clubs were being sold by somebody that
12  was not an authorized dealer, that didn't have
13  people that could show the end user how to -- how
14  to use the club in terms of what type of shafts
15  they needed or lofts, et cetera.
16    Q    Right.  In -- if you're able to
17  recall, was -- during this conversation in the car
18  on the road show, was Barney surprised by the
19  information?  Did he exhibit -- was he surprised?
20    A    He seemed surprised, and he was upset
21  because he had told the authorized retailer group
22  that we would not sell to discount warehouses and
23  such.
24    Q    And are you able to recall how long

Page 31

1  the conversation was in the car?
2    A    It was very short.
3    Q    Okay.  A couple of minutes?
4    A    Yes.
5    Q    This next document, which dovetails
6  right with your testimony, is previously marked
7  Exhibit 77.
8        MR. BESSETTE:  Thanks.
9        MR. MARA:  We're all familiar
10  with it.
11    Q    (By Mr. Mara)  Please take a moment
12  to familiarize yourself.
13        MR. MARA:  While you're doing
14  that, for the record, it's Adams 001494, as I said
15  previously, marked Exhibit 77.
16    Q    (By Mr. Mara)  Have you seen
17  Exhibit 77 prior to this morning?
18    A    Yes.
19    Q    And when -- when did you see
20  Exhibit 77?
21    A    To the best of my knowledge, it was
22  sometime after I returned from the road show.
23    Q    Okay.  Just the general question:
24  Did you -- what role, if any, did you play in

Page 32

1  taking legal action against Costco?
2    A    None.
3    Q    Were you present for strategy
4  discussions or --
5    A    No.
6    Q    Okay.  No informal discussions with
7  Barney Adams saying:  This is one option that we
8  could pursue?
9    A    No.
10    Q    Okay.  To the best of your knowledge,
11  who was involved in any discussions of that type,
12  if they occurred?
13    A    I have no idea.
14    Q    Okay.  So in other words, the first
15  time you heard about any legal action against
16  Costco was when you saw this press release?
17    A    No.  In the car --
18    Q    Oh.
19    A    -- when we were -- I overheard the
20  discussion, Barney talked about taking some kind
21  of action --
22    Q    Okay.
23    A    -- to determine who was selling to
24  the unauthorized dealer.

Page 33

1    Q    Okay.  And it would appear this is
2  the action that was taken, or one of the actions,
3  very possibly?
4    A    Yes.
5    Q    Okay.  Just a moment, if I may.
6        Have you -- during your 30 --
7  I believe you testified a 30-year tenure at KPMG.
8  Had you ever heard of gray marketing, as we've
9  defined it this morning?
10    A    No.
11    Q    So you -- it -- it was not a concept
12  that you were familiar with from your tenure at
13  KPMG?
14    A    No, it was not.
15    Q    What is your -- I think it's
16  reasonable for me to say, looking -- given the
17  various exhibits and testimony, that gray
18  marketing is not a desirable event for a company?
19        MR. BESSETTE:  Objection.  I
20  think that misstates the record.
21    Q    (By Mr. Mara)  Is that -- a company
22  doesn't want its products in the gray market.  Is
23  that a general -- as a general proposition, fair
24  to say?

**A. 68**

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4    IN RE:  ADAMS GOLF, INC.  :    CONSOLIDATED

5    SECURITIES LITIGATION    :    C.A. NO. 99-371 KAJ

6    _____X

7

8          ORAL DEPOSITION OF PAUL BROWN, JR.

9             Tuesday, May 16th, 2006

10

11          The oral deposition of PAUL BROWN, JR.,

12    was held at the law offices of Akin Gump Strauss

13    Hauer & Feld, LLP, 1700 Pacific Avenue, Suite

14    4100, Dallas, Texas, from 9:41 a.m. to 12:57 p.m.,

15    before Jamie K. Israelow, a Certified Shorthand

16    Reporter in and for the State of Texas, Registered

17    Professional Reporter, Certified Realtime Reporter

18    and Certified LiveNote Reporter.

19

20

21          RSA/VERITEXT COURT REPORTING COMPANY

22             1845 Walnut Street, 15th Floor

23                Philadelphia, PA   19103

24          (215)241-1000     (888)777-6690

PAUL BROWN, JR.

Page 22

1 signature to this registration statement.
2            So based upon what you knew at
3 the time of the IPO, what is it that made you
4 think it was a risk for other companies, but not a
5 material risk, if I heard you correctly?
6            MS. REED: Objection,
7 misstates prior testimony.
8    Q    (By Mr. Collins) Let's start again.
9            Why didn't you believe at the
10 time of the Adams IPO that gray marketing was a
11 material risk for other companies in the industry?
12    A    I didn't believe it was a material
13 risk at any time.
14    Q    Okay. Tell me why.
15    A    I would believe there were two
16 reasons, maybe more. The most significant reason,
17 from the company's perspective, those clubs being
18 sold on the gray market represented sales from the
19 company, so they were selling their clubs. They
20 were not -- as opposed to being stolen, they were
21 being paid for those golf clubs.
22    Q    I see.
23    A    The second thing is that the number
24 of clubs involved for Adams, or any other company,

Page 23

1 I do not feel was significant relative to the --
2 the overall totals.
3    Q    Now, in your last answer, when you
4 talked about the number of clubs being sold to the
5 gray market not being significant, were you
6 referring to Adams or other companies?
7    A    Actually, any -- any of the
8 companies, but I don't think -- I don't think they
9 were significant to Adams either.
10    Q    Let's go back to Adams.
11           At the time of the IPO, had
12 any gray marketing occurred with regard to Adams'
13 clubs?
14    A    There -- there may have been some.
15 There was some.
16    Q    What was the basis of your
17 information about that at the time of the IPO?
18    A    Basis? I was advised as -- I was
19 advised that by the people in the company, in
20 Adams, that some -- some gray market activity.
21    Q    And who told you that?
22    A    I -- exactly who, I'm not sure.
23    Q    Barney Adams?
24    A    It could have been.

Page 24

1    Q    Were you advised orally or in writing
2 or both?
3    A    I'd say probably orally. I just
4 don't remember.
5    Q    It's a long time ago.
6            You're aware that a press
7 release was issued by Adams in June with regard to
8 the appearance of Adams Golf clubs at Costco?
9 You're aware of that?
10    A    Yes.
11    Q    And you were aware of that fact at
12 the time of the IPO?
13    A    Yes.
14    Q    Did you ever say to anybody, Barney
15 Adams, a lawyer, anybody: Do we need to disclose
16 this Costco action in the IPO, in the prospectus?
17    A    I don't -- I don't believe so.
18    Q    Anybody besides yourself raise that
19 question, who was signatory to the registration
20 there?
21            MS. REED: Are you saying to
22 the extent he knows or he had the conversation?
23            MR. COLLINS: Oh, yes. Yes,
24 of course.

Page 25

1    A    Yes.
2    Q    (By Mr. Collins) Anybody who
3 participated -- there were a number of people, I
4 presume, with this registration statement who
5 participated in the drafting, lawyers, company
6 personnel, others, correct? Is that accurate,
7 sir?
8    A    I guess I don't know for certain.
9    Q    To your knowledge, did anybody who
10 participated in the preparation of the
11 registration statement question whether there
12 should be a reference to the gray market activity
13 or the Costco litigation in the prospectus?
14    A    I'm not aware of anyone.
15    Q    Okay. Okay. Now, I want to ask you
16 a couple of questions now relating to the period
17 after the IPO, and I'll probably drag you back to
18 the IPO later.
19            As you understand it, you're
20 saying that at the time of the IPO, you personally
21 believed gray marketing was not a material risk to
22 Adams, correct?
23    A    Yes.
24    Q    Did there come a time subsequent to

7 (Pages 22 to 25)

PAUL BROWN, JR.

Page 62

1  $40 or whatever that number is to join so that I
2  can save $40 on a golf club? I might, I might
3  not, unless I thought I was going to use Costco
4  beyond that.
5     Q    Why did Adams issue that press
6  release in June about the bill of discovery filed
7  in connection with Costco, if you know?
8     A    I suspect it was to demonstrate to
9  retailers that we were, in fact, pursuing it
10  because we felt that somehow Costco got the clubs,
11  and we wanted to know how they did that.
12    Q    Okay. Well, was it that you wanted
13  to get information, if you know? Was -- was it
14  that Adams wanted to get information from Costco,
15  or was it that Adams wanted to show its retailers
16  Adams would defend the retailers' interest?
17          MS. REED: Objection, vague.
18          MR. COLLINS: Rephrase it --
19  no, no. Rephrase it.
20    Q    (By Mr. Collins)  Did Adams Golf, to
21  your knowledge, file the bill of discovery in
22  order to obtain information from Costco, or
23  instead, did Adams Golf file the bill of discovery
24  to send a message to Adams' own retailers.

Page 63

1     A    I guess I don't know precisely why
2  they did that. It could be both.
3     Q    Were you informed before the press
4  release went out that there was going to be a
5  press release?
6     A    Yes, I believe so.
7     Q    And were you informed before the
8  lawsuit went out that there was going to be this
9  bill of discovery?
10    A    Before which --
11    Q    I'm sorry. Forgive me.
12          The press release, which I can
13  show you, the press release says: A bill of
14  discovery has been filed.
15          My question is: Before the
16  bill of discovery was filed, were you consulted?
17    A    We were told that we were going to
18  pursue that --
19    Q    And "we" meaning the board of
20  directors was told?
21    A    Yes. I don't think collectively,
22  individually, because we were all together in one
23  place.
24    Q    What became of that bill of

Page 64

1  discovery?
2     A    Specifically, I'm not sure, other
3  than we probably didn't discover anything. I
4  think we -- we didn't get any information from
5  Costco.
6     Q    What's the basis of your information
7  for that answer?
8     A    I think we've discussed it, over-time
9  buyback.
10    Q    And "we" meant --
11    A    We, the board members, Barney and
12  management --
13    Q    Now, going back to this particular
14  sentence: The company believes that selective
15  retail distribution helps its retailers to
16  maintain profitable margins and maximize sales of
17  Adams product.
18          At the time of the IPO, was it
19  possible for Adams Golf to maximize sales of Adams
20  products in the event that its retailers did not
21  maintain profitable margins?
22          MS. REED: Objection, improper
23  hypothetical, calls for speculation.
24    Q    (By Mr. Collins) Do you want me to

Page 65

1  rephrase it?
2     A    Well, you know, again, it comes down
3  to are we talking about all of our retailers or
4  are we talking about two or five?
5     Q    What I'm really trying to ask is a
6  business plan, the approach. What's the approach
7  or the business plan of Adams Golf as of the time
8  of the IPO? We are going to maximize sales and
9  the way we are going to do it is by maintaining
10  profitable margins for our retailers? Was that
11  what the business plan was?
12    A    I believe that was part of it, sure.
13  The industry is competitive, so if you can provide
14  a margin equal to or greater than your competition
15  that's going to help in selling your clubs.
16    Q    Okay.
17    A    All other things being equal.
18    Q    Sure. And by the same token, if your
19  retailers are going to make a lower margin selling
20  an Adams club than, say, an Orlimar club, that
21  presents at least an issue for Adams to consider;
22  is that accurate?
23    A    Yes.
24    Q    Did Adams, from time to time,

**A. 69**

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3                       * * *

4

5

6

    IN RE ADAMS GOLF, INC.           :    CONSOLIDATED

7                                     :

    SECURITIES LITIGATION             :    C.A. No. 99-371 KAJ

8

9

10          DEPOSITION OF FINIS F. CONNER

11

12          The following deposition was given on the 9th

13   day of May, 2006, commencing at the hour of 9:24 a.m.,

14   before Anne M. Hall, a Certified Shorthand Reporter,

15   License Number 4942.

16          The witness personally appeared at The

17   Monterey Marriott, 350 Calle Principal, Santa Barbara

18   Conference Room, Monterey, California.

19                       * * *

20

21          RSA/VERITEXT COURT REPORTING COMPANY

22            1845 Walnut Street, 15th Floor

23               Philadelphia, PA 19103

24          (215) 241-1000    (888) 777-6690

FINIS F. CONNER

Page 30

1 meeting?
2    A. Yes.
3    Q. Is there anything that happened that you
4 recall that's not in the minutes?
5    A. I don't understand the question.
6    Q. Okay. Other than what -- you said that the
7 minutes accurately reflect the meeting. I'm just
8 wondering if you remember anything that's not reflected
9 in the minutes that happened at the meeting?
10    A. No.
11    Q. Okay.
12       MR. BESSETTE: Let's take a quick break. Just
13 a quick one.
14       MS. DESPER: Sure.
15          (Recess taken from 10:06 a.m. to
16          10:10 a.m.)
17          (Deposition Exhibit Number 76 marked
18          for identification.)
19 BY MS. DESPER:
20    Q. I'm going to hand you what's been marked as
21 exhibit number 76.
22    A. Before we do this, can I go back on something?
23 Because I'm afraid that I didn't either hear correctly
24 one of your discussions in talking about the risk

Page 31

1 factors.
2    Q. Sure.
3    A. I want to clarify a point, what I was trying
4 to institute.
5       I did not participate in the creation of these
6 risk factors, but clearly I reviewed those.
7    Q. Right.
8    A. And my background of doing at least two prior
9 public offerings, that's a very important part for me as
10 an officer and as a participant.
11    Q. Right.
12    A. So the creation of these, I didn't sit down
13 and say put that in and put this in.
14       We reviewed them as a team and I did
15 personally as an individual and contributed, and
16 particularly on being on the pricing committee, I wanted
17 to make sure that we had sufficient enough information
18 on here to make sure everything that we knew about the
19 company at that point in time had to be in here and
20 covered by these factors.
21       And when you brought up this issue of the gray
22 market, that was never an issue discussed at this point
23 in time when this was being created about the gray
24 markets.

Page 32

1    Q. Okay. What -- now that you've clarified, what
2 is it that you do recall about those discussions? With
3 whom did you discuss it and what factors did you
4 discuss?
5    A. I can only speak for myself as to how I manage
6 this or reviewed this. Risk factors to me are extremely
7 important.
8       And the benefit of having leading bankers who
9 have done multiple public offerings, they have been
10 through this many, many times before.
11       My own personal experience in at least two
12 public offerings, a lot of time was spent on discussing
13 risk factors and are we disclosing fully.
14       So when I reviewed them personally, I found
15 them to be more than adequate to describe to the best of
16 my knowledge what represents the company at the time of
17 an IPO. Okay?
18       And so, these factors more than cover what I
19 thought was needed to disclose to the potential buyer.
20    Q. Based on the information that you had at that
21 time?
22    A. Correct.
23    Q. Okay. You mentioned just now meeting some of
24 the team. To whom were you referring when you said

Page 33

1 that?
2    A. All board members.
3    Q. Okay. Were there any other -- any others
4 besides the board members who were involved in those
5 discussions with you when you were reviewing these risk
6 factors that were so important?
7    A. No.
8    Q. Okay. Was there any discussion with you or
9 that you're aware of about whether to include gray
10 market in -- as part of these risk factors?
11       MR. BESSETTE: At what time? I'm sorry.
12 BY MS. DESPER:
13    Q. At any time before this document was issued.
14    A. There is no discussion of that because it was
15 not an issue to us at that time as far as we were
16 concerned.
17    Q. Okay. But what I'm trying to clarify is was
18 there a discussion about it and then a decision was made
19 to leave it out or there was no discussion about it at
20 all?
21    A. I don't recall.
22    Q. Okay. Did you have any discussion with anyone
23 at that time about any comments from the SEC about
24 whether risk factors -- whether gray marketing should be

**A. 70**

1            IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4    IN RE:  ADAMS GOLF, INC.  :    CONSOLIDATED

5    SECURITIES LITIGATION     :    C.A. NO. 99-371 KAJ

6    _____X

7

8         ORAL DEPOSITION OF STEPHEN R. PATCHIN

9                Tuesday, June 13, 2006

10

11         The oral deposition of STEPHEN R. PATCHIN

12   was held at the law offices of Akin Gump Strauss

13   Hauer & Feld, LLP, 1700 Pacific Avenue, Suite

14   4100, Dallas, Texas, from 9:35 a.m. to 11:53 a.m.,

15   before Jamie K. Israelow, a Certified Shorthand

16   Reporter in and for the State of Texas, Registered

17   Professional Reporter, Certified Realtime Reporter

18   and Certified LiveNote Reporter.

19

20

21       RSA/VERITEXT COURT REPORTING COMPANY

22           1845 Walnut Street, 15th Floor

23               Philadelphia, PA  19103

24            (215)241-1000   (888)777-6690

Page 26

1     A    They would issue press releases when
2  they would win some kind of competition among club
3  raters, so that they would generally talk about,
4  you know -- it would be marketing press releases.
5     After the IPO, there would be
6  financial press releases in terms of financial
7  statements or items of interest to the investing
8  community, so I would characterize them as both
9  types of items.
10    While they were private, not
11  so much. I don't think there was any financial
12  releases of information because it was a private
13  company.
14    At the time we were going IPO
15  and forward, that's when those kind of started.
16  So generally before, it was about marketing
17  issues. My recollection.
18    Q    Did you have an understanding of
19  why -- why Barney wanted to sue Costco or to file
20  an action against Costco?
21    A    He wanted to figure out how they were
22  getting his clubs.
23    Q    Do you know if he was successful at
24  that?

Page 27

1     A    I do not know.
2     Q    Let me show you this. This is
3  Exhibit 77.
4     A    It was right about the right time.
5     Q    Exhibit 77 is the press release that
6  was issued at the time Adams Golf filed the bill
7  of discovery against Costco?
8     A    Appears to be.
9     Q    And -- and this was sent to all the
10  board members, I assume?
11    A    I would assume that we received a
12  copy of that, yes.
13    Q    Do you remember any discussion of it
14  on the board or among board members?
15    A    I remember -- no, I really don't. I
16  do remember that Costco was discussed. I don't
17  remember whether we discussed a bill of discovery,
18  specifically. I remember that -- that the issue
19  was discussed, yeah.
20    Q    Do you remember the -- what was said
21  in those discussions?
22    A    I don't remember any specific -- I
23  can't quote anybody. I can say that generally we
24  wanted to find out -- you know, Barney was

Page 28

1  irritated that a supplier -- that a nonqualified
2  buyer was -- was in -- had inventory of our
3  stock -- you know, of our clubs and wanted to find
4  out about it.
5     Q    Another topic. Did you prepare for
6  this deposition in any way?
7     A    Can you define "prepare"? My
8  attorney and I met yesterday, yeah.
9     Q    Okay.
10    A    And she kind of helped me get through
11  the timeline a little bit, but that's about all.
12    Q    Did you talk to Mr. Brown about his
13  deposition?
14    A    I did not. I specifically did not
15  because I knew that was a no-no, and I didn't want
16  to put him in an uncomfortable position.
17    Q    And I also assume you didn't read his
18  deposition?
19    A    No, I did not.
20    Q    Were you aware while you were on the
21  board that the SEC made comments about the IPO,
22  about the registration statement?
23    A    I don't know.
24    MS. BRANNEN: Objection, vague

Page 29

1  on time.
2     Q    (By Ms. Fox) Okay. As to -- the IPO
3  was in July.
4     A    Okay.
5     Q    July 19th.
6     A    Okay.
7     Q    The -- the first IPO documents or
8  registration statement documents were filed with
9  the SEC well before that. The SEC made comments.
10    A    Okay.
11    Q    My question is: Do you remember
12  receiving those comments?
13    A    I -- no, I don't remember that, no.
14  Not to say I didn't receive them. I don't
15  remember it.
16    Q    Okay.
17    MS. FOX: Off the record
18  again.
19    (An off-the-record discussion
20  was held from 10:08 to 10:08.)
21    MS. FOX: This is Exhibit 164,
22  UND 02708 from Joe Hoffman to the file.
23    Q    (By Ms. Fox) Mr. Patchin, have you
24  had a chance to -- to look at that document?

Page 30

1      A      I've read the first sentence. Give
2  me a second.
3      Q      Okay.
4      A      Okay.
5      Q      Do you remember either seeing this
6  document itself or discussing these comments on
7  the board?
8      A      No to both questions.
9      Q      That doesn't refresh your
10  recollection as to any knowledge you had about the
11  SEC's comments?
12      A      No.
13      Q      Do you remember any discussion about
14  whether the file in front of me, the Costco issue,
15  should be mentioned in the prospectus?
16          MS. BRANNEN: Objection,
17  vague. Are you asking about board discussions?
18          Can you read the question
19  back.
20      Q      (By Ms. Fox) I want to know if you
21  had any discussions a lot all with anybody about
22  whether the Costco issue should be mentioned in
23  the prospectus under Number 4.
24      A      I don't have any recollection of that

Page 31

1  at all, no.
2      Q      Okay.
3      A      Doesn't mean it didn't happen. I
4  just don't remember it.
5      Q      Okay. And if I were to show you
6  letters written back to the SEC, would that
7  refresh your recollection of that?
8      A      Probably not.
9      Q      Okay.
10      A      You know, if there's a letter that
11  indicates that I was copied on them or received
12  copies of them --
13      Q      They do not --
14          MS. BRANNEN: I'm sorry, Liz.
15      Q      (By Ms. Fox) They do not reflect
16  that you received copies?
17          MS. BRANNEN: Can we go off
18  the record for just a second?
19          (A recess was taken from
20          10:11 to 10:23.)
21      Q      (By Ms. Fox) Mr. Patchin, this is
22  the S-1 that was filed on 7/10/98.
23      A      Okay.
24      Q      Which was the date of the IPO.

Page 32

1  Taking a look at it, do you recognize it?
2      A      I recognize it as a -- yes,
3  relative -- m   memory of -- I mean, this is --
4      Q      The actual document handed to you is
5  not good, I'm sure. Do you remember signing it?
6      A      I remember signing a document which
7  allowed us to go public, yes.
8      Q      And what did -- I guess I asked you
9  this before, but now seeing it, are there any
10  parts that you made an investigation about
11  personally?
12      A      I'm sure that as a board, you know --
13  personally? I have no recollection of that. I'm
14  sure that as a board we sat and discussed almost
15  all this page by page, but I -- I got no -- no
16  recollection of any specific questions or comments
17  that were made, no.
18      Q      Did you yourself have any questions
19  about it or comments or -- or reservations?
20      A      I actively participate in board
21  meetings, so I'm sure I did, but I don't remember
22  them.
23      Q      Did you have discussions with
24  Mr. Brown about it?

Page 33

1      A      Probably. I don't -- I have no
2  recollection of that either.
3      Q      You don't remember anything.
4      A      No. It --
5      Q      Okay.
6      A      You know, nothing with any
7  specificity. I remember that we signed the
8  document. I remember that we filed a document. I
9  remember that we went public. I remember that the
10  board had discussions about it. I remember that,
11  you know, a number of discussions, you know,
12  and -- a number of meetings. No, I don't remember
13  anything specifically.
14      Q      And I take it you were not involved
15  in drafting in any way?
16      A      No, I was not.
17      Q      Let's look at --
18          MS. BRANNEN: Can we go off
19  the record for a second?
20          An off-the-record discussion
21          was held from 10:25 to 10:28.)
22      Q      (By Ms. Fox) This document, however,
23  does have page numbers, if you'll look on the
24  bottom.

9 (Pages 30 to 33)

**A. 71**



2801 East Plano Parkway
Plano, Texas 75074
www.AdamsGolf.com
FAX: 972-398-8818
800-622-0609
Tel: 972-673-9673



*From the desk of*
**B.H. (Barney) Adams**

## *Memo*

To: Mark Gonsalves, Ric Jarrett

Date: August 14, 1998

RE: SALES, CURRENT CONDITION

I cannot accurately describe the degree of upset that accompanies this memo. My concern is how deep do our problems go and have we been presenting a false image?

I always pointed to the inside sales group as the "bright star" at Adams. The best people, best management, the attitude, the driver, the core to our future.

In a chance undertaking I'm learning how wrong I was. George Klaus (my friend at Platinum) was asking me some questions on telesales parameters. I called Ric Jarrett for information and after receipt I started investigation of our numbers fully expecting to be able to tell George how much better than standard we performed.

What I got instead was a shock. Recognizing that there is generally more to a story I started an in depth evaluation of Inside Sales. What I learned is so upsetting that it has made me physically ill, discouragement equal to any time since the start of Adams Golf. In no particular order:

A.   The department staff has very low morale.
B.   They have no faith in their management and, in fact, there is serious concern (over 50%) that their management is self serving.
C.   They know cheating (at least in the form of double shipments) occurs and are concerned that such action is quietly endorsed.
D.   They feel that the income potential for the job was (politely) overstated.
E.   It is a unanimous feeling that departmental management is weak, undirected, especially as practiced by Craig Parrish.
F.   There is no sense of "we", they aren't part of the decisions, they are told what to do.
G.   Given all the worries about low income, the average phone time is 1 hour 20 minutes. I cannot interpret this unless it's a form of low morale and giving up.
H.   They feel that if there is superior financial performance the commissions will be cut anyway.



ADAMS028451

I.      They feel that they are too isolated, put in conflict with other departments.  As a result there is a defensive attitude that isn't healthy.

Here's what I know.  I've researched this to the point where I know there is enough truth that A – I have become reality.  As a result this analysis is the worst performance assessment I've ever written and that includes all my pre-Adams corporate days.

Our short term goals are to make the Q3, Q4 numbers.  What is the plan to resurrect this department, return it to what I thought it was and how it was presented in the Road Show.  I realize there are decisions we can make (like diverters) but we must rely on these people.

Apparently we've made a lot of sales that have been falsely reported (as sales) and are little more than consignments.  Check July returns and tell me what they'll be during the rest of the year.

I'm in agreement with the splitting of the department but only if it contains some deeper use of management tools.  Example:  I want to see weekly/monthly forecasts by group that the group agrees to as doable.  I know we've done similar things before, but the real question is are they management's numbers or sales numbers?  If they're sales numbers we should be able to get into detail – clubs/by variation/ by account.  What can we get from our people that will make us/them better.  How do we effectively solve the 1½ hours on the phone.  Mark G. says the new criteria should be 2, Ric said closer to 2½, even 3.

Given an hour off what specifically happens, the other 4½ to 5½ hours/day.  It's not service calls which go elsewhere.  If it's pre-call planning, how do we help make that time more efficient?

I don't think I need to write any more; the issue is squarely on the table and I'll clarify what is making me sick.  Are we living the big lie?  Did we present Road Show numbers for '98, '99 that we have no idea we can attain?  Is the big lie catching up with us and the reason our people are upset is that they know it?

Given the issue of the next two quarters I'll listen to suggestions; these are mine.

A.      Personal visits to the top 50 retail accounts where we get them to support us (and what's coming).
B.      Terms.  I don't favor a price decrease, I'll accept terms but no consignments.
C.      Our millionth club promotion.
    1.      Buy one Tight Lies®, get stand bag @ $50.00.
    2.      Buy a second Tight Lies and get stand bag free.


BHA:afn


ADAMS028452

A. 72

2801 East Plano Parkway
Plano, Texas 75074
www.AdamsGolf.com
FAX: 972-398-8818
800-622-0609
Tel: 972-673-9673

 **ADAMS**

*From the desk of*
**B.H. (Barney) Adams**

# Memo

To:   Board of Directors

Date:   September 25, 1998

RE:   Third Quarter Results

Receiving the attached report should have been cause for celebration. Unfortunately, it was not. (I will explain the unfortunately part later.) We are not going to meet the analysts' numbers for the third quarter. We have had some $2,000,000 in sales move out (not cancel) and no offer will move them back into the third quarter (one for $900,000 in South Florida where the issue is the current hurricane).

What will happen?

A.   Most likely September sales of $7,500,000 - $7,700,000, a total of $23,000,000 for the quarter, and earnings of $0.19 per share versus analysts numbers of $25,500,000 and $0.20-$0.23 per share.

B.   There are two significant orders in the mix, if either hits, we will be at $24,000,000 for the quarter and $0.21 per share. I give either of these a 10% probability, but we are trying.

Why do I say unfortunately; our performance is outstanding. Still, we missed our forecast; we failed.

A.   What follows is information only, the responsibility is mine. The major contributors to our forecast were Mark Gonsalves in sales and Jim Farrell assembling all of the numbers. When I came off the road show, I started spending much of my time in sales, not reviewing numbers, but working with the sales people. Serious problems were found and changes were made (more are coming):

1.   Mark Gonsales left the company.
2.   The inside sales organization has been changed.
3.   Dan conducted a detailed analysis on the financial side; Jim Farrell has left the company.



Δ π EXHIBIT 79
Deponent F. Conner
Date 5/9/06 Rptr AMH
www.nlpoxsdot.com

ADAMS036839

**A. 73**

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4    IN RE:  ADAMS GOLF, INC.   :    CONSOLIDATED

5    SECURITIES LITIGATION      :    C.A. NO. 99-371 KAJ

6    _____X

7

8              ORAL DEPOSITION OF CHIP BREWER

9                   Tuesday, May 2, 2006

10

11           The oral deposition of Chip Brewer was

12    held at the law offices of Akin Gump Strauss Hauer

13    & Feld, LLP, 1700 Pacific Avenue, Suite 4100,

14    Dallas, Texas, from 11:03 a.m. to 2:44 p.m.,

15    before Jamie K. Israelow, a Certified Shorthand

16    Reporter in and for the State of Texas, Registered

17    Professional Reporter, Certified Realtime Reporter

18    and Certified LiveNote Reporter.

19

20

21           RSA/VERITEXT COURT REPORTING COMPANY

22              1845 Walnut Street, 15th Floor

23                 Philadelphia, PA  19103

24              (215)241-1000     (888)777-6690

CHIP BREWER

Page 22

1    Q    Are you able to recall who the strong
2  performers were?
3    A    Yes.
4    Q    Who were they?
5    A    Two strong performers are Debbie
6  Chandler and Jay Greaney.
7    Q    Now, how were sales responsibilities
8  divided among members of the inside sales staff?
9  Was it geographically or by customer or --
10    A    I don't recall, Neil. I think -- I
11  don't recall whether it was -- I don't recall
12  exactly how it was divided at that point.
13    Q    And are you able to recall what
14  customers or -- or regions or divisions Debbie
15  Chandler or Jay Greaney were selling to at that
16  time?
17    A    I know Debbie Chandler sold Family
18  Golf, and I do not recall any specifics of who
19  Jay's customers were.
20    Q    And is Debbie Chandler still with the
21  company?
22    A    No.
23    Q    Do -- are you able to recall when she
24  left the company?

Page 23

1    A    I believe Debbie left in '99 or 2000.
2    Q    And do you know why Debbie Chandler
3  left?
4    A    I know she lives in Austin now with
5  her husband down there. I believe she left
6  because he -- his business moved there.
7    Q    And Jay Greaney is no longer with the
8  company?
9    A    That's correct.
10    Q    Are you able to recall when he left
11  the company?
12    A    I believe Jay left in the fall of
13  1998.
14    Q    And why did Jay Greaney leave?
15    A    He resigned.
16    Q    And do you know what was the reason
17  for his resignation?
18    A    We asked for Jay's resignation.
19    Q    Why did you ask for Jay Greaney's
20  resignation?
21    A    I was -- at the time, when I joined
22  the company, I became aware of some aggressive
23  sales tactics that I wasn't comfortable with.
24    Q    When did you become aware of the

Page 24

1  aggressive sales tactics?
2    A    I don't recall specifically, but you
3  know, whether it was -- I don't recall the
4  specifics of when I had that conversation or those
5  conversations with Jay.
6    Q    Was it prior to Gonsalves's departure
7  from the company or subsequent to Gonzalves's
8  departure from the company?
9    A    It would have been after Gonzalves's
10  departure with the company.
11    Q    I'm just trying to keep up.
12        What were the aggressive sales
13  tactics?
14    A    We received complaints from customers
15  regarding Jay. If I recall, the customer would
16  not have ordered the same quantity product or
17  would not have ordered product, and then the
18  orders would somehow be entered into the system.
19    Q    Who did you receive those customer
20  complaints from?
21    A    I don't recall the specifics.
22    Q    How many did you receive?
23    A    I don't recall. It would -- you
24  know, it was a -- a few. One or two is my guess.

Page 25

1    Q    Did you personally receive those
2  complaints from customers?
3    A    I don't think I did.
4    Q    Who, if anyone -- if it wasn't you,
5  who, if anyone, would have received those
6  complaints?
7    A    I don't know. It -- it somehow would
8  have come up to me from the -- somewhere in the
9  organization, but where it would have come through
10  is not clear. It could have come from several
11  paths. Eventually I would have heard about it.
12    Q    What did you do when you first heard
13  of these customer complaints, that this was going
14  on?
15    A    I spoke with, you know, Jay regarding
16  the issue.
17    Q    And what did you say to Jay Greaney?
18    A    I don't recall the specifics of the
19  conversation.
20    Q    Where was the meeting?
21    A    I don't recall that.
22    Q    Was it on campus at Adams Golf, or
23  did it take place outside the physical --
24    A    I assume it was on campus only

7 (Pages 22 to 25)

CHIP BREWER

Page 26

1  because I do not recall having any off-campus
2  meetings.
3      Q     Who else was present at the meeting?
4      A     I don't recall the meeting.
5      Q     How many meetings took place --
6      A     Don't recall.
7      Q     -- between you and Jay Greaney?
8            Are you familiar with the term
9  "double shipping"?
10     A     I've heard the term before.
11     Q     And what do you understand that term
12  to mean?
13     A     I don't -- I've heard it being used
14  in different contexts, so it has potentially
15  different meanings.
16     Q     What's the first meaning you
17  understand it to be?
18     A     One of the meanings could be that
19  you -- an order would in some way, shape, or form,
20  be entered into the system two times, an actual
21  order, and therefore, the customer receives twice
22  the desired amount of product.  That happens from
23  time to time in -- in a lot of businesses.
24     Q     Was that happening here with Jay

Page 27

1  Greaney's aggressive sales tactics?
2            MR. BESSETTE:  The way you
3  just defined it?
4            MR. MARA:  Yeah.  Yeah.
5      A     The -- you know, I don't know for a
6  fact whether that happened with -- with Jay or
7  not.  You know, there were some concerns about
8  Jay's business practice, which included double
9  shipment.
10           The -- you know, this happened
11  a long time ago.  I remember the context of why
12  Jay was asked to resign, was regarding, you know,
13  sales practices, but whether there were specific
14  double-shipment issues or not, I can't recall.
15     Q     (By Mr. Mara)  I believe you
16  testified that you understand double shipping to
17  mean different things in different contexts, and
18  you just described --
19     A     One.
20     Q     -- your first understanding.
21           What is another context of
22  double shipping?
23     A     I've heard people using double
24  shipment for -- also for entering orders that are

Page 28

1  not valid customer orders, and the --
2      Q     Can you explain what you mean by
3  that?
4      A     Well, if the customer hasn't
5  confirmed the order, and so there may be an
6  indication that the order may become live, and the
7  salesman might jump the gun and enter the order
8  without a -- a confirmation or a final
9  confirmation from the customer.
10     Q     Can you explain the confirmation
11  process?  What -- in a -- in a proper sale, how --
12  how does that process work?
13     A     It varies by the setting, you know,
14  what that confirmation process would be, I think.
15     Q     Well, if I were just to say:  Inside
16  sales succeeds --
17     A     Right.
18     Q     -- in contacting a green-grass
19  account or a retailer, and succeeds in arranging
20  for the sale of 40 clubs --
21     A     It would simply be --
22           MR. BESSETTE:  Hold on.  This
23  is still in '98?
24           MR. MARA:  Yeah.  I'm sorry.

Page 29

1  Everything is 1998.
2      A     September/October '98 specifically,
3  because when I was with the company, my
4  understanding is if the customer, you know,
5  verbally confirmed that they wanted to place that
6  order, it was --
7      Q     (By Mr. Mara)  That was sufficient?
8      A     That's my understanding.
9      Q     Okay.  So then, in your second
10  understanding of double shipping, perhaps sales
11  are logged without that type of either verbal or
12  written confirmation from the customer?
13     A     Yes.
14     Q     In September or the fall of 1998, was
15  it predominantly verbal confirmations or was there
16  a system for written confirmations?  I don't know.
17     A     I believe, it was predominantly
18  verbal.
19     Q     Was Jay Greaney engaging in this
20  second type of double shipping at the time?
21     A     We had heard of one -- at least one
22  customer complaint regarding that.
23     Q     Who was that customer?
24     A     I don't recall.

8 (Pages 26 to 29)

CHIP BREWER

Page 38

1    Q    Were -- did any other members of the
2  inside sales staff or inside sales staff
3  management depart the company in September or
4  October of 1998?
5    A    I don't recall.
6    Q    I'll extend that question out.  In
7  the second half of 1998.  I know you didn't get
8  there until September.
9    A    Yeah.
10    Q    I understand that.
11        Did any -- did any other
12  members of the inside sales staff depart,
13  including management?
14    A    I don't recall anybody departing.
15    Q    I may have asked this.  If I did, I
16  apologize.
17        Craig Parrish is no longer
18  with the company?
19    A    Correct.
20    Q    Do you know when he left the company?
21    A    I'm going to guess it's that '99/2000
22  time period, but I don't recall specifically.
23    Q    And again I apologize if I asked:  Do
24  you know why he left the company?

Page 39

1    A    He went to a software company to do a
2  similar role, I believe.
3    Q    At the time of the discussion about
4  Greaney's aggressive sale tactics, were there any
5  concerns about Craig Parrish being involved in the
6  same type of behavior?
7    A    Craig didn't actually, to the best of
8  my knowledge, solicit or do any specific selling.
9    Q    When did anyone in the company --
10  I'll say:  When did the company first become aware
11  of what was going on with Jay Greaney?  And by
12  that I mean what you've defined as aggressive
13  sales tactics.
14    A    I don't know when the company first
15  became aware of it.  I joined the company in
16  September of 1998.
17    Q    Right.  But it was before that or --
18    A    I joined the company in September of
19  1998.
20    Q    Okay.  How long after you joined the
21  company did you ask Greaney for his resignation?
22    A    I don't recall when I asked it.  I
23  believe it was somewhere between October and
24  December, but I -- I don't recall the specific

Page 40

1  date.
2    Q    When you learned of these aggressive
3  sales tactics, was Greaney removed from the inside
4  sales staff?
5    A    He was -- we asked for his
6  resignation, so that effectively removed him.
7    Q    In other words, it was pretty
8  immediate?
9    A    I think so.
10    Q    We're not talking a long,
11  drawn-out --
12    A    I don't recall it as such.
13    Q    When you -- okay.  So I guess it's
14  fair to say, then, the Greaney situation came up
15  fairly promptly after you joined the company?
16    A    I -- okay.
17    Q    Okay.  When you joined the company,
18  were you confronting any other problems in the
19  inside sales staff or in the sales department at
20  Adams Golf that needed your immediate attention?
21    A    Yeah.  There were all kinds of
22  opportunities and issues and -- you know, in the
23  company in terms of, you know, running the
24  business and hitting our sales goals and such,

Page 41

1  and -- and it was a big learning period and
2  getting-up-to-speed period for myself.  So, you
3  know, Jay was an issue, but he wasn't a dominant
4  issue.
5    Q    Were there any concerns about Mark
6  Gonzalves's performance when you joined the
7  company?
8    A    In September of 1998, was there
9  concerns about his performance?
10    Q    Correct.
11    A    My concerns?
12    Q    Well, sure.  Did you have any
13  concerns?
14    A    I didn't have any concerns.  I joined
15  the company, he was already resigned and
16  leaving --
17    Q    Right.
18    A    -- so I didn't -- you know, my role
19  was simply to learn as much as I could from Mark
20  and make as orderly a transition as possible.
21    Q    Did Barney Adams have any concerns
22  about Mark Gonzalves's concerns when you joined
23  the company?
24        MR. BESSETTE:  You mean that

**A. 74**

**ADAMS**

To John Harriss

From CR

Subject   Personal Issue

Attached are the notes from
my conversation w/ Jay.


EXHIBIT
186

ADAMS 046808

10/20/98

This note documents a conversation ~~between~~ Jay Greeney, Roger Wilde and I held today. During this conversation I told Jay I was concerned about his business practices in that I had heard from several sources he had double shipped orders, padded orders or otherwise conducted business in manners that were inconsistent with my, and Adams, values and principles. I noted that I had received letters inditing him both for ~~such practices~~ directly and indirectly. (Also I mentioned that it was my understanding that Mark Gonsalves and Craig Parish had spoken to him about this issue in the past.

~~Jay acknowledged~~

I strongly and clearly stated that these practices were not consistent with my and Adams rules and could not be tolerated.

ADAMS 046809

Jay said this was understood. He said that these practices were condoned, even asked for, prior to the company going public. Since this event, and since being advised by Mark Gonsalves and Craig of their stance on the issue, ~~Jay~~ Jay believes this business has been "clean".

Jay also refuted the two letters that I showed him (see attached) and implied that the recent evidence against him is not founded (either circumstantial or based on events prior to a "policy" change).

I told ~~Jay~~ I still had concerns and used the quote "often where there is smoke there is fire". I specifically told him that I remain uncomfortable regarding this issue.

Jay ~~expressed~~ ~~concern~~ ~~regarding~~ his ~~salary~~ level and sought out direction on ~~what I wanted from him~~ ~~his role is~~ ~~the change~~. I explained I wanted business that is in the long term best interest of Adams Golf and its customers. Jay and I struggled to reach a common understanding on this point.

ADAMS 046810

**◢ ADAMS**

10/20

Jay's comments

○ upintil we went public
his practices were condoned
even supported

since then he was spoken to
and we has changed his practices

• Per Jay

r.e. Sunset Golf letter

This was established and
promoted bva practice
(at shows)

( Notes made during conversation )

ADAMS 046811

*[handwritten top left: Jim letter I couldn't find chip - I couldn't find.]*

# SUNSET GOLF, INC.

326 N. Water Street • P.O. Box 89 • Loudonville, Ohio 44842
☎ 419-994-5563 • FAX 419-994-3078 • 1-800-472-7432

August 27, 1998

Mr. Byron H. Adams, President
ADAMS GOLF, INC.
2901 Summit Ave., Ste. 100
Plano, TX  75074

Dear Mr. Adams,

I attended the Las Vegas golf show as a buyer for our two factory outlet stores.
While walking by the Adams booth, I was accosted by your sales representative
Jay Greaney. I use "accosted" because he physically tried to pull me into your
booth. When I resisted, he stuck a 2-iron in my face and said I could take it
with me if I placed an order for 30 show promotion 2-irons. When I refused, he
asked if he could write up an order in the event I changed my mind. He said I
didn't have to sign the order and it would not be valid without my signature. I
again refused and he asked for my business card for his records. I gave him the
business card. I have witnesses who will attest to the fact that I was very
emphatic in my refusal to place or authorize any order.

This morning our Adams representative, Mike Lyon, called to confirm the order
that Jay Greaney had the nerve to place on my behalf.

I have been in the golf business for 35 years. I am responsible for our compa-
nies booth at the Orlando PGA show. I would never tolerate a person who acted
in such a reprehensible manner. If his actions were endorsed by management as
part of a show strategy, I feel your companies conduct leaves a lot to be de-
sired. I don't feel this is true or Mr. Lyon would not have called to confirm
the validity of this order.

I am sure that you have spent a great deal of money and effort to build the
Adams company image. People like Mr. Greaney can destroy it in a minute. I
felt you should be made aware of the situation.

Sincerely yours,

*[signature]*

James J. Lyons, Sr.
V.P. Sales/Operations

JJL/sa

*[handwritten right margin, top to bottom:]*
*Per Jay he did not send order and can't re-call this customer.*
*Mike Lyon confirmed he sent order.*
*Jay said he didn't say or tell to or took order*
*Jay said he took letter + threw it out.*

*[handwritten bottom:]* Mr. Greaney has been written up for "phantom orders". Interesting situation — top seller BUT some shady deals !

ADAMS 046812

**MANUFACTURER OF U.S.G.A. APPROVED PROFESSIONAL QUALITY GOLF BALLS**
OEM PROGRAMS • CUSTOM LOGO PRINTING • RANGE BALLS • MINIATURE GOLF PUTTING BALLS

Hoby's Golfworks Inc.
120 Route 33
Manalapan, NJ 07726

September 29, 1998

*for is Jay's account*

Barney Adams
Adams Golf
2801 East Plano Parkway
Plano, Texas 75074

Dear Mr. Adams,

**Subject: Return of Clubs and past Dealings**

I am sorry that I am forced to write this letter but your actions in the past year are forcing me to do so. Here is a summary of what has occurred in the last year:

- In early January your company sent me an order that was supposed to be shipped over a course of time and billed net 90 days and put on my American Express card.

- In February you charged the entire amount to my American Express Card making my monthly obligation to them over 12,000.00 dollars.

- As early as June your clubs were for sale in Cosco for less than my wholesale price. I was guaranteed that you were a one-price shop and that this wouldn't happen. Well it did much to my disappointment and forced me to sell most of the rest of my inventory at or below cost and to sell the demo clubs that I loaned out for half price.

- I am returning the rest of the inventory that I could not unload for credit on my bill. RA16541c

I have suffered damage to my credit, have fallen behind in payments to other companies, had to take money from my retirement account to keep my business afloat, worked normal 70 hour weeks to save on payroll to maintain what I have worked for the last ten years.

Your unscrupulous use of my credit card, your premature shipping, and your selling your product to others at lower prices have contributed greatly to my present state of business. I hope you take this into consideration and call our account square as of today and will inform me as such in the near future

Respectfully yours,

George H. List Jr.
President
Hoby's Golfworks Inc.

MSOffice

ADAMS 046813

*10/20/98*

*Per Jay this could have been a system problem. I agreed it could have been but expressed concern that ... seems to be associated with this type of problem in overwhelmingly disproportate frequency.*

To John Harris,

This is to advise of my resignation from Adams Golf effective November 5, 1998 to seek other interests. I have enjoyed my time at Adams and wish the best for the company.

If there is any way I may help in transition please advise me.

Very Truly Yours,

Jay S Greaney

JAY S. Greaney.

ADAMS 046814

## TERMINATION AND RELEASE AGREEMENT

This Termination and Release Agreement ("Agreement") is entered into this 5th day of November, 1998 between Jay S. Greaney ("Employee") and Adams Golf Inc.

WHEREAS, I desire to settle fully and finally any differences that may have arisen or might arise out of my employment and termination of service with Adams Golf Inc. or any of its affiliated companies (hereinafter collectively referred to as "Company") and my separation therefrom, including my entitlement to severance benefits.

NOW, THEREFORE, in consideration of the mutual benefits described below, the Company and Employee agree as follows:

1.    After November 5, 1998, Employee shall not be entitled to any benefits under any benefit plans except as provided in paragraph 2 herein.

2.    The Company and Employee agree that Employee shall be entitled to the following benefits:

    (a)    Employee will receive salary continuance through January 5, 1999 at a rate of $6,000 per month.

    (b)    Employee will receive health care benefits through January 5, 1999 at current benefit levels and deductions.

    (c)    If full time, permanent employment is not secured by the Employee by January 5, 1999, he may make application for an extension of one additional month's salary and benefits as noted in 2(a) and 2(b) noted above. The Company shall be the sole decision-maker in any extension request, and the Employee must demonstrate he has actively sought employment.

    (d)    Long term and short term disability, 401K plan, life insurance and accidental death and dismemberment benefits shall cease effective November 5, 1998.

    (e)    Employee will receive two weeks of vacation compensation at his regular rate of pay, payable upon termination.

    (f)    Employee agrees not to disclose to or discuss with any person (except as permitted in the next sentence) the

ADAMS 046815

substance of this Agreement.  The preceding sentence shall not be applicable to disclosure and/or discussion with representatives of the Internal Revenue Service, with immediate family members and with professionals from whom legal and/or financial advice is sought, provided they are instructed to keep the information confidential.  Any breach of this requirement will subject Employee to forfeiture of any benefits payable hereunder.

3.    Except as specifically provided in section 2 above, Employee hereby expressly releases and relinquishes unto the Company, all his rights as an employee, effective close of business on November 5, 1998.  This relinquishment of all employment rights includes, but is not limited to, coverage under any and all employee benefit plans which Employee was eligible to participate in heretofore.  Employee hereby releases and discharges the Company, its affiliated corporations, their successors and assigns, and these companies' directors, officers, agents, servants, and their successors and assigns, from any and all liability, causes of action, claims or rights, known or unknown, arising from his employment or his separation for employment with the Company, which employee, his heirs or assigns, might otherwise claim or assert.  Claims which employee relinquishes under this Termination and Release Agreement, include but are not limited to personal injury claims, contract claims, employment claims, labor and labor protection claims, claims arising under federal, state or local common law or statue, including without limitation Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621 et seq., the Worker Adjustment and Retraining Notification Act or any collective bargaining agreement, the Americans with Disabilities Act, 42 U.S.C. §12101 et seq., the Family and Medical Leave Act, 29 U.S.C. §2601 et seq., the Employment Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq., and claims arising out of any legal restrictions on the Company's right to terminate its employees, except for claims arising out of acts or omissions occurring after the date hereof.

4.    Employee understands and agrees that after his employment with the Company has terminated, he will not apply for or otherwise seek re-employment with the Company, its affiliates, subsidiaries or its successors, at any time.  The Company shall have the absolute right, without incurring liability of any kind, to refuse Employee consideration for employment and he agrees that he shall not authorize any person or agency to pursue any claim for such refusal of employment.

5.    Employee also promises neither to contest the validity of this Agreement, nor sue concerning any claim he may have relating to his employment with or the termination of that employment.  If Employee,

ADAMS  046816

nonetheless, should pursue litigation against regarding the validity of this Agreement or any other matter covered herein, he agrees that he will, before filing any suit, return to the full value of all consideration he has received under this Agreement, including any taxes withheld on his behalf with interest at the post-judgement rate of interest for the state in which his suit was filed. Employee further agrees that he shall pay all costs and reasonable attorneys' fees incurred in defending against his litigation.

6.      As further consideration for the covenants set forth above, Employee hereby agrees to reasonably cooperate with the Company's Law Department and/or any lawyer, law firm, or consultant that the Company designates with respect to any litigation, deposition, hearing, arbitration, or other proceeding where the Company's legal or financial interests are at issue. Employee shall not seek any compensation or fee in excess of the actual and necessary expenses incurred with respect to such testimony or appearance. Employee further covenants that he will contact the Company's Law Department in the event that there is any subpoena, notice or other instruction directing the Employee to appear in any legal proceeding involving the Company.

7.      EMPLOYEE ALSO ACKNOWLEDGES THAT HE HAS BEEN GIVEN AT LEAST TWENTY ONE (21) DAYS, TO REVIEW THIS RESIGNATION AND RELEASE AGREEMENT OR EMPLOYEE HAS KNOWINGLY AND VOLUNTARILY AGREED TO WAIVE HIS RIGHT TO THE FULL TWENTY ONE (21) DAYS. EMPLOYEE HAS CAREFULLY READ AND FULLY UNDERSTANDS ALL THE PROVISION OF THIS RELEASE INCLUDING THE RELEASE OF ALL CLAIMS AND HAS HAD SUFFICIENT TIME AND OPPORTUNITY TO CONSULT WITH HIS PERSONAL FINANCIAL, TAX, AND LEGAL ADVISORS PRIOR TO EXECUTING THIS AGREEMENT. EMPLOYEE UNDERSTANDS THAT HE MAY REVOKE THIS AGREEMENT WITHIN SEVEN (7) DAYS OF EXECUTION AND THAT SUCH REVOCATION MUST BE IN WRITING AND ACCOMPANIED BY ALL SUMS RECEIVED HEREUNDER AND RECEIVED BY THE DIRECTOR, HUMAN RESOURCES BY THE END OF THE SEVEN (7) DAY PERIOD.

8.      Employee agrees not to disparage, or make any disparaging remark or send any disparaging communications concerning the Company, its existing or future products, its reputation, its business, its financial condition or its officers, directors or employees to any person unless Employee is specifically required to disclose information concerning the Company by applicable law.

9.      Employee hereby agrees to surrender immediately to the Company all information, papers, documents, writings, computer diskettes, software, customer lists and information, and all other property of or pertaining to the

ADAMS 046817

Company (including, without limitation, credit cards, building access cards, keys, computers, computer components, sales materials, etc.) in your possession or control. All such information, papers, documents, writings, and property shall at all times remain the property of the Company.

10.    If any portion or aspect to any promise, covenant or understanding contained in this Agreement, is or shall become invalid or unenforceable by operation of law, such enforceability shall not in any limit or otherwise affect the validity and enforceability of any promise, covenant, understanding, or any aspect thereof, in this Agreement which would otherwise be valid and enforceable by itself.

11.    Employee has read and understands all of the foregoing, and agrees to all the provisions contained herein. I am executing this Agreement out of my own free will and without coercion.

12.    THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD OR REFERENCE TO CHOICE OF LAW RULES.

_____    11/11/98
Jay S. Greaney,    REDACTED    Date

_____    11-11-98
Witness    Date

_____    11-11-98
Director, Human Resources    Date

ADAMS  046818

**A. 75**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

—————————————————x
                                          .

IN RE ADAMS GOLF, INC.    .    Consolidated
                          :    C.A. No. 99-371 KAJ
SECURITIES LITIGATION     :    Class Action
                          .    Jury Trial Demanded
                          .
—————————————————x



                          APRIL 28, 2006
                          9:00 O'CLOCK A.M.



        The Deposition of <u>RYAN MAGNUSSEN</u>,
taken before Ernest Kuemmel, CSR(A), Examiner,
pursuant to Rules 203, 728, 204(1) of the Court of
Queen's Bench of Alberta at the offices of Michael
C. Dunkley, Calgary, Alberta, on the 28th day of
April, A.D. 2006.

———————————————————————————



1    of clubs?

2         A.    No, the stores have ordered the seven

3    wood or the nine wood, the left-hand regular or

4    right-hand stiff.  You know, there's hundreds of

5    different clubs for one club.  And to fill in a

6    customer's request, we had to place an order in

7    August.

8         Q.    Okay.  You mentioned, I believe,

9    something to the effect of overshipment from Adams?

9:49:32    10         A.    They would --

11         Q.    Yes or no?

12         A.    We had one double shipment and --

13         Q.    When did that --

14         A.    Approximately May -- early in the

15    spring.

16         Q.    Can you explain to me what you mean by

17    double shipment?

18         A.    They shipped the PO once and then they

19    shipped it again.

9:49:56    20         Q.    Once you received the second shipment,

21    what did you do with those clubs?

22         A.    We hung on to them.

23         Q.    You didn't send them back?

24         A.    No.  Sales at that time were very brisk

25    so we wouldn't want to send them back.



**A. 76**

# AKIN GUMP
# STRAUSS HAUER & FELD LLP

━━━━━━━━━━━━  Attorneys at Law

JENNIFER R. BRANNEN
512.499.6258/fax: 512.499.6290
jbrannen@akingump.com

June 30, 2005

VIA FACSIMILE & OVERNIGHT

Ms. Liz Fox
Berger & Montague
1622 Locust Street
Philadelphia, PA 19103

   Re: Adams Golf Securities Litigation

Dear Liz:

   I write in response to your letter dated June 24, 2005. As you know, we have completed our production and have sent under separate cover defendants' privilege log and Arter & Hadden's privilege log. I respond to each of the concerns outlined in your June 24, 2005 letter in turn.

   As an initial matter, more than five months ago in our first meet-and-confer teleconference, defendants informed plaintiffs that any date and scope restrictions on plaintiffs' discovery requests should be addressed before production begins so as to minimize discovery burden and cost and to decrease the likelihood of unnecessary motion practice. *See* Brannen letter dated 2/7/2005 (summarizing meet-and-confer call). Defendants have reviewed hundreds of boxes of documents based on plaintiffs' own stated parameters and should not be obligated to re-review these documents based on an calculatedly vague assertion. Plaintiffs had more than six years to investigate their claims before discovery began and have only now—after the document production is complete—asserted the existence of an unidentified witness with unspecified claims of supposed gray marketing in 1997. Plaintiffs did not object or respond to any of the parameters outlined in my letter dated February 7, 2005, and therefore, defendants object to plaintiffs' belated attempt to extend the relevant time period.

   Without more information about the purported 1997 gray marketing, defendants' agreement to review the board of director minutes from the last six months of 1997 is not a "first step" but rather a final compromise. Defendants have produced all 1998 board minutes that fall under the broad definition of gray marketing agreed to by the parties. Defendants have also produced all 1998 board minutes that support their defenses and will do the same for the board minutes from the last six months of 1997.

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━ Attorneys at Law

Ms. Liz Fox
June 30, 2005
Page 2

As explained in our June 14, 2005 letter, defendants have already produced all responsive and relevant investor communications, road show materials, and analyst reports. Adams Golf does not possess any "Midtown Research Report."

Moreover, as explained in my June 27, 2005 message to Mr. Mara, the "sales register" and reconciliation report do not exist. On January 31, 1999, Adams Golf migrated from the Platinum system to PeopleSoft. In this data transfer, only high-level summary financial data was ported to PeopleSoft—monthly sales by distributor were not ported over. Plaintiffs' lawsuit was not filed until June 11, 1999, and thus defendants had no obligation to preserve the detailed sales records at the time of the data transfer. As you know, parties are not obligated to produce or create documents that do not exist.

Plaintiffs' claim that defendants' production of customer call records demonstrates that Adams Golf's "computer records from 1998 do exist" is illogical. Adams Golf ported over some but not all data into PeopleSoft. Defendants' production of the records that do exist simply underscores defendants' good-faith compliance with the Federal Rules.

Defendants have produced all correspondence broadly relevant to gray marketing. To the extent retailer agreements from 1998 existed at the time the suit was filed, defendants will produce such agreements for the retailers identified by plaintiffs.

Finally, defendants will respond to plaintiffs' latest discovery request under separate cover on the deadline mandated by the Federal Rules of Civil Procedure.

Sincerely,

*Jennifer R. Brannen / MRK with permission*

Jennifer R. Brannen

cc:     Theodore McEvoy, Esq.

**A. 77**

From:       Picchi, Bernard J
Sent:       Monday, November 02, 1998 6:11 PM
To:         Gamso, Tim
Subject:    RE: Adams Golf

This is not good.  Barney told me on Friday that he COULD do it, and we've already told the largest holder that – Scudder, Stevens.  It's not a matter of going on the road to "tell their story" it's a matter of keeping faith with one of the largest holders (who's extremely upset with Lehman and Adams, by the way).  Please try to rethink this with Barney and Darl. Barney's secretary mentioned Nov. 12 and 13 looked OK.

Bernie

> -----Original Message-----
> From:       Gamso, Tim
> Sent:       Monday, November 02, 1998 3:33 PM
> To:         Picchi, Bernard J
> Subject:    Adams Golf
>
> Bernie,
>
> In speaking to Darl Hatfield today about his personal affairs he mentioned your idea of Adams Golf management going on the road to visit clients.  He and Barney Adams are not keen on the idea of going on the road to tell a story they just told last week.  They did not feel there is anything new to say at this point that is "public" information.
>
> Darl did suggest that they host a tour at their headquarters one day for interested or concerned investors.  They could show us their facility, introduce new management personnel like Chip Brewer and show their new ad campaign.  He did say that Barney was much more in favor of this idea as opposed to another roadshow.  I might suggest one-on-ones with Barney on this particular days for your more concerned investors.
>
> I have mentioned this idea to Stu Francis and he may call you about it.
>
> Please let Darl know if this would be a good alternative.
>
> Regards,
>
> Tim Gamso

From:       Gamso, Tim
Sent:       Monday, November 02, 1998 3:33 PM
To:         Picchi, Bernard J
Subject:    Adams Golf

Bernie,

In speaking to Darl Hatfield today about his personal affairs he mentioned your idea of Adams Golf management going on the road to visit clients.  He and Barney Adams are not keen on the idea of going on the road to tell a story they just told last week.  They did not feel there is anything new to say at this point that is "public" information.

Darl did suggest that they host a tour at their headquarters one day for interested or concerned investors.  They could show us their facility, introduce new management personnel like Chip Brewer and show their new ad campaign.  He did say that Barney was much more in favor of this idea as opposed to another roadshow.  I might suggest one-on-ones with Barney on this particular days for your more concerned investors.

I have mentioned this idea to Stu Francis and he may call you about it.

UND 08507

**A. 78**

Jay Greaney 5/24/2006 12:00:00 PM

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4      IN RE: ADAMS GOLF, INC. :   CONSOLIDATED

5      SECURITIES LITIGATION   :·  C.A. NO. 99-371 KAJ

6      _____X

7

8            ORAL DEPOSITION OF JAY GREANEY

9              Thursday, May 18, 2006

10

11        The oral deposition of JAY GREANEY was

12    held at the law offices of Locke Liddell & Sapp,

13    LLP, 1700 Pacific Avenue, Suite 2200, Dallas,

14    Texas, from 10:08 a.m. to 12:45 p.m., before Jamie

15    K. Israelow, a Certified Shorthand Reporter in and

16    for the State of Texas, Registered Professional

17    Reporter, Certified Realtime Reporter and

18    Certified LiveNote Reporter.

19

20

21        RSA/VERITEXT COURT REPORTING COMPANY

22          1845 Walnut Street, 15th Floor

23            Philadelphia, PA  19103

24          (215)241-1000    (888)777-6690

1        Q.  Let's talk about King Par.  What was                    AM

2    it?                                          AM

3        A.  A retail operation in the upper                    AM

4    midwest, I think, Michigan.                          AM

5        Q.  Was King Par an authorized retailer of                    AM

6    Adams Golf?                                      AM

7        A.  Initially, they were an authorized                    AM

8    retailer.                                        AM

9        Q.  Did it come a time when they ceased                    AM

10   being an authorized user?                          AM

11       A.  I can't remember the specifics.                    AM

12          MR. BESSETTE:  That's a yes or no.                    AM

13       A.  I don't know.                          AM

14       Q.  Although you can't remember the                    AM

15   specifics, you do remember what about King Par?                    AM

16       A.  I remember what's illustrated in this                    AM

17   memo, that we had an order that came back to us                    AM

18   from them.                                      AM

19       Q.  What was the reason why the order came                    AM

20   back?                                          AM

21          MR. BESSETTE:  Objection, vague.  You                    AM

22       mean, as expressed in the memo?                    AM

23       Q.  (By Mr. Collins) In your last answer,                    AM

24   you said there was an order that came back.  I'm                    AM

25   asking you why, to your understanding, did it                    AM

**A. 79**

**Patty K. Walsh**

| | |
|---|---|
| **To:** | lablack@sclp.com |
| **Subject:** | RE: What is happening? |

Dear Mr. Black:

Thank you for inquiring about Adams Golf.

As to an explanation regarding our recent stock price activity, apparently the combined effects of being a newly public company; some bad news coming out of our competitors and others in the golf industry; and overall stock market conditions, especially with respect to small cap stocks have taken their toll.

On the other side of the coin, the fundamentals of the Company have not changed since the initial public offering. Following the offering, Adams Golf announced record sales and earnings for the second quarter of 1998, and has also introduced two new products – the Tight Lies® Strong 2 and Strong 11 woods. In addition, the Company intends to introduce a new driver after the end of this year. The Company's outlook, therefore, continues to be very positive.

The goal of the Company's management is to continue to set and meet the expectations of the financial community while guiding a company with a secure future. No one can guarantee this, and, as in all competitive businesses, it isn't easy. What management does promise is full dedication to establishing the presence of Adams Golf so our stock price will ~~truly~~ reflect our performance.

If I can be of further assistance, please do not hesitate to contact me.

Yours truly,

Patty Walsh
Director, Investor Relations
Adams Golf
pattywalsh@adamsgolf.com
Phone: (972) 673-9850
Fax: (972) 673-9590

> ----Original Message----
>
> | | |
> |---|---|
> | **From:** | Larry Black [SMTP:lablack@sclp.com] |
> | **Sent:** | Thursday, September 10, 1998 9:40 PM |
> | **To:** | info@adamsgolf.com |
> | **Subject:** | What is happening? |
>
> Hi,
>
> Are you folks doing allright? Your stock is dropping in price like a lead sinker.
>
> I own the clubs and love them. I tell everyone to buy them. Every foursome I play in has two to three Adams Tight Lies in it. Yet, the stock I bought at 18.5 closed today at 5.8.
>
> Does Adams Golf have any plans to increase its stock value? Should I jump in and buy more now that it is so low? Any tips you care to send me would be greatly appreciated.
>
> Thanks,



EXHIBIT
117
Walsh

ADAMS 003659

**Patty K. Walsh**
**To:**       LPUTT2@aol.com
**Subject:**  RE: (no subject)

Thank you for inquiring about Adams Golf.

As to an explanation regarding our recent stock price activity, apparently the combined effects of being a newly public company; some bad news coming out of our competitors and others in the golf industry; and overall stock market conditions, especially with respect to small cap stocks have taken their toll.

On the positive side, the fundamentals of the Company have not changed since the initial public offering. Following the offering, Adams Golf announced record sales and earnings for the second quarter of 1998, and has also introduced two new products – the Tight Lies® Strong 2 and Strong 11 woods. In addition, the Company announced, according to the Golf Market Research Institute, that it held the #1 market share position for single unit sales of fairway woods for the first quarter of 1998.

The goal of the Company's management is to continue to set and meet the expectations of the financial community while guiding a company with a secure future. No one can guarantee this, and, as in all competitive businesses, it isn't easy. What management does promise is full dedication to establishing the presence of Adams Golf so our stock will reflect our performance.

If I can be of further assistance, please do not hesitate to contact me.

Yours truly,

Patty Walsh
Director, Investor Relations
Adams Golf
pattywalsh@adamsgolf.com
Phone:  (972) 673-9850
Fax:  (972) 673-9590

P.S.  I'm happy to hear the Tight Lies clubs are working so well for you and hope you will enjoy our future products just as much.

----Original Message----
**From:**     LPUTT2@aol.com [SMTP:LPUTT2@aol.com]
**Sent:**     Thursday, August 27, 1998 5:06 PM
**To:**       info@adamsgolf.com
**Subject:**  (no subject)

HAVING RECENTLY PURCHSE YOUR STOCK, I'M CONCERNED ABOUT THE RECENT VALUE OF
THE STOCK.DO YOU HAVE ANY INSIGHT AS TO WHY THE STOCK HAS LOST SO MUCH VALUE
IN A RELATIVE SHORT TIME? I DO BELIEVE IN YOUR PRODUCT SINCE I CURRENTLY OWN
THE ORIGINAL & THE STRONG 3 AND I WAS HOPING THE STOCK WOULD MATCH THE
PERFORMANCE THAT YOUR CLUBS DELIVER



EXHIBIT
121
Walsh

ADAMS 003665

*8/20 9:00a*

**Patty K. Walsh**

To:        B.Oliver@t-online.de
Subject:   RE: Share price

Dear Ben:

Thank you for inquiring about Adams Golf.

As to an explanation regarding our recent stock price activity, apparently the combined effects of being a newly public company; some bad news coming out of our competitors and others in the golf industry; and overall stock market conditions, especially with respect to small cap stocks have taken their toll.

On the positive side, the fundamentals of the Company have not changed since the initial public offering. Following the offering, Adams Golf announced record sales and earnings for the second quarter of 1998, and has also introduced two new products – the Tight Lies® Strong 2 and Strong 11 woods. In addition, the Company announced, according to the Golf Market Research Institute, that it held the #1 market share position for single unit sales of fairway woods for the first quarter of 1998.

In regard to your question concerning negative news, the Company has announced only positive news to date. If there is any material news of a negative (or positive) nature, or if we become aware of rumors which need to be corrected or addressed, we will certainly do so with a news release.

The goal of the Company's management is to continue to set and meet the expectations of the financial community while guiding a company with a secure future. No one can guarantee this, and, as in all competitive businesses, it isn't easy. What management does promise is full dedication to establishing the presence of Adams Golf so our stock will reflect our performance.

If I can be of further assistance, please do not hesitate to contact me.

Yours truly,

Patty Walsh
Director, Investor Relations
Adams Golf
pattywalsh@adamsgolf.com
Phone: (972) 673-9850
Fax: (972) 673-9590

-----Original Message-----
From:      B.Oliver@t-online.de [SMTP:B.Oliver@t-online.de]
Sent:      Wednesday, August 19, 1998 12:22 AM
To:        info@adamsgolf.com
Subject:   Share price

As a golf professional and a recent investor in your company, please could you inform me of any reason to the performance of the share price. Are sales expecting to or are slowing, are there any production problems?
I am looking to increase my investment in your company as I have confidence in the product, however I would like to know if there is anything negative happening.

Kind regards,



EXHIBIT
1 23
Walsh

ADAMS 003667

Ben Oliver.

ADAMS 003668

**Patty K. Walsh**
**To:**        @specent.com
**Subject:**   RE: RETAIL SALES

Dear Ed,

Thank you for your letter regarding Adams Golf. While selling to "big box" retailers such as Wal-Mart may seem advantageous at first glance, the truth is this type of distribution can erode our retailers' profit margins, i.e. the on- and off-course golf shops which make up our customer base. The advantage of selling through pro shops is (1) this is where the majority of pro line clubs are purchased at retail and (2) our retailing customers provide the knowledge and expertise that we consider to be essential to providing high quality customer service.

Regarding Golfsmith, Adams Golf equipment is currently sold through this retailer and has been for approximately ___ years.

If I can be of further assistance, please don't hesitate to contact me.

Yours truly,

Patty Walsh
Director, Investor Relations
Adams Golf
(972) 673-9850

-----Original Message-----
**From:**    Ed Wells [SMTP:ed@specent.com]
**Sent:**    Friday, August 07, 1998 6:41 AM
**To:**      pattywalsh@adamsgolf.com
**Subject:** RETAIL SALES

RECENTLY I HAVE NOTICED THE WAL-MART SUPERCENTER HERE IN BENTONVILLE, AR HAS ODESSY PUTTERS AND TAYLOR MADE DRIVERS ON DISPLAY. THE TAYLOR MADE DRIVERS SOLD VERY QUICKLY.

IF YOUR SALES AND MARKETING DIVISIONS WANT TO INCREASE SALES THEY SHOULD CONSIDER A MARKETING AGREEMENT WITH WAL-MART STORES.

EVERYONE I PLAY GOLF WITH IS IMPRESSED WITH THE TIGHT LIES CLUBS. HOWEVER, IN THIS AREA THEY ARE AVAILABLE ONLY IN A LIMITED NUMBER OF OUTLETS.

ANOTHER OUTLET THAT IS WIDELY SUPPORTED IS GOLFSMITH IN AUSTIN, TEXAS.

I REALIZE THAT DEALING WITH WAL-MART MAY REDUCE YOUR PROFIT MARGIN BUT THE INCREASED VOLUME WILL MORE THAN COMPENSATE FOR WHAT LITTLE LOSS IN MARGIN YOU WOULD INCUR.

I RECENTLY BOUGHT AND HOLD ADAMS STOCK AND WOULD LIKE TO SEE THE EARNINGS INCREASE AS MUCH AS POSSIBLE.

SINCERELY, ED WELLS



EXHIBIT
127
Walsh

ADAMS 003672

**Patty K. Walsh**

| | |
|---|---|
| **To:** | lablack@sclp.com |
| **Subject:** | RE: What is happening? |

Dear Mr. Black:

Thank you for inquiring about Adams Golf.

As to an explanation regarding our recent stock price activity, apparently the combined effects of being a newly public company; some bad news coming out of our competitors and others in the golf industry; and overall stock market conditions, especially with respect to small cap stocks have taken their toll.

On the other side of the coin, the fundamentals of the Company have not changed since the initial public offering. Following the offering, Adams Golf announced record sales and earnings for the second quarter of 1998, and has also introduced two new products – the Tight Lies® Strong 2 and Strong 11 woods. In addition, the Company intends to introduce a new driver after the end of this year. The Company's outlook, therefore, continues to be very positive.

The goal of the Company's management is to continue to set and meet the expectations of the financial community while guiding a company with a secure future. No one can guarantee this, and, as in all competitive businesses, it isn't easy. What management does promise is full dedication to establishing the presence of Adams Golf so our stock price will ~~truly~~ reflect our performance.

If I can be of further assistance, please do not hesitate to contact me.

Yours truly,

Patty Walsh
Director, Investor Relations
Adams Golf
pattywalsh@adamsgolf.com
Phone: (972) 673-9850
Fax: (972) 673-9590

---

----Original Message----

| | |
|---|---|
| **From:** | Larry Black [SMTP:lablack@sclp.com] |
| **Sent:** | Thursday, September 10, 1998 9:40 PM |
| **To:** | info@adamsgolf.com |
| **Subject:** | What is happening? |

Hi,

Are you folks doing allright? Your stock is dropping in price like a lead sinker.

I own the clubs and love them. I tell everyone to buy them. Every foursome I play in has two to three Adams Tight Lies in it. Yet, the stock I bought at 18.5 closed today at 5.8.

Does Adams Golf have any plans to increase its stock value? Should I jump in and buy more now that it is so low? Any tips you care to send me would be greatly appreciated.

Thanks,



EXHIBIT
140
Walsh

ADAMS 003659

Larry Black
Web Page: http://www.mindspring.com/~lablack

ADAMS 003660