**A. 84**

LEXSEE 1998 U.S. DIST. LEXIS 3900

**LINCOLN ADAIR, on behalf of himself and all others similarly situated, Plaintiff, - against - KAYE KOTTS ASSOCIATES, INC.; J.W. BARCLAY & CO. INC.; FIRST CAMBRIDGE SECURITIES CORP.; FELDMAN RADIN FEINSOD & CO., P.C.; DAVID KAYE; LINDA KAYE; MICHAEL M. KESNER; SUSAN E. PHILLIPS; ROBERT M. RUBIN; and LAWRENCE COHEN, Defendants.**

**97 Civ. 3375 (SS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 3900; Fed. Sec. L. Rep. (CCH) P90,192*

**March 24, 1998, Decided**
**March 27, 1998, Filed**

**DISPOSITION:** [*1] Defendant Feldman Radin's Fed. R. Civ. P. 12(b)(6) motion granted and the individual defendants' Rule 56 motion denied.

**COUNSEL:** I. Stephen Rabin, Allan K. Peckel, Brian Murray, RABIN & PECKEL LLP, New York, NY, for Plaintiff.

Dan L. Goldwasser, VEDDER, PRICE, KAUFMAN, KAMMHOLZ & DAY, New York, NY, for Feldman Radin & Co., P.C., Defendant.

David E. Nachman, Robert S. Frenchman, SOLOMON, ZAUDERER, ELLENHORN FRISCHER & SHARP, New York, New York, for Linda Kaye; Michael M. Kesner; Susan E. Phillips; Robert M. Rubin; and Lawrence Cohen, Defendants.

**JUDGES:** Sonia Sotomayor, U.S.D.J.

**OPINION BY:** Sonia Sotomayor

**OPINION:**

### OPINION AND ORDER

**Sonia Sotomayor, U.S.D.J.**

This is a putative class action n1 against Kaye Kotts Associates, Inc. ("Kaye Kotts" or the "Company"), its

officers, directors and controlling shareholders (collectively, the "individual defendants"), J.W. Barclay & Co. Inc. ("J.W. Barclay") and First National Securities Corp. ("First National") (together, "the Underwriters"), and Feldman Radin Feinsod & Co., P.C. ("Feldman Radin"). n2 In this action, plaintiffs allege that the defendants disseminated materially misleading information in the registration statement and prospectus [*2] (the "Registration Statement and Prospectus") issued by Kaye Kotts in its initial public offering (the "Offering") on February 22, 1996, in violation of Sections 11, 12(2) and 15 of the Securities Act of 1933 (the "Securities Act"), *15 U.S.C. § 77k, 77l(2)* and 77o, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), *15 U.S.C. § 78j(b)* and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, *17 C.F.R. § 240.10b-5*. Defendant Feldman Radin now moves for an order pursuant to *Fed. R. Civ. P. 12(b)(6)* and *9(b)* dismissing, as against it, plaintiffs' Class Action Complaint (the "Complaint"), and alternatively, for partial summary judgment pursuant to *Fed. R. Civ. P. 56* and *15 U.S.C. § 77k(e)*. The individual defendants, by notice of motion dated August 8, 1997, join in Feldman Radin's motion for summary judgment. For the reasons discussed below, I grant only Feldman Radin's motion to dismiss the Complaint against it. n3

n1 By Order dated September 23, 1997, the Court granted plaintiff Adair's motion seeking permission to serve as lead

1998 U.S. Dist. LEXIS 3900, *2; Fed. Sec. L. Rep. (CCH) P90,192

plaintiff for the putative class.

[*3]

> n2 Feldman Radin Feinsod & Co., P.C. became Feldman Radin & Co. in July 1991. Feldman Radin's Mem. in Supp. of Mot. for Summ. J. at 1 n.1 ("FR's Mem."). For purposes of this Opinion, "Feldman Radin" refers to Feldman Radin & Co., P.C., successor to Feldman Radin Feinsod & Co., P.C.

> n3 Because I dismiss the Complaint with respect to Feldman Radin pursuant to *Fed. R. Civ. P. 12(b)(6)*, I do not consider its Rule 9(b) motion.

## BACKGROUND

The pertinent facts alleged are as follows. Kaye Kotts is a Delaware corporation based in Sherman Oaks, California that provides tax advice to delinquent taxpayers who face enforcement proceedings by federal and state tax authorities. Cplt. PP 7, 26; Pls.' Mem. in Opp'n to Mot. for Summ. J. at 3 ("Pls.' Mem."). Beginning February 22, 1996, Kaye Kotts offered for sale to the public 1,000,000 shares of common stock at $ 5 per share and 1,100,00 class A common stock warrants ("warrants") at $ 0.15 per warrant. n4 Cplt. P 2. Prior to the Offering, Kaye Kotts was a closely-held company. Cplt. P 27. Plaintiffs purchased or otherwise acquired Kaye Kotts common [*4] stock and warrants between February 22, 1996 and April 15, 1997 (the "Class Period"), pursuant to the Registration Statement and Prospectus. Cplt. PP 2, 20. Each of the individual defendants are principals of Kaye Kotts, as members of the Company's Board of Directors and/or management. Defendants J.W. Barclay and First National were underwriters for the Offering. Cplt. PP 16, 17.

> n4 Each warrant entitled the holder to purchase one share of common stock for $ 6. Cplt. P 27. The Complaint alleges that the warrants sold for as much as $ 4 per warrant during the Class Period. Cplt. P 2. As of December 31, 1996, the Company had 2,398,900 shares of stock and

2,575,000 warrants issued and outstanding. Cplt. P 8. The securities are listed and actively traded on the NASDAQ Small Cap Market. Cplt. P 21.

The Prospectus included in the Registration Statement contained audited financial statements for fiscal years 1993 and 1994, and unaudited figures for both the first nine months ended September 30, 1994 and the first nine [*5] months ended September 30, 1995. Cplt. PP 28, 29. The Prospectus did not include the Company's operating results for the final quarter and year ending 1995. Cplt. P 29. Defendant Feldman Radin issued an audit report dated May 4, 1995, certifying the financial statements for fiscal years 1993 and 1994 which were included in the Prospectus. Cplt. P 31; Defs.' Ex. B at F-2. Feldman Radin supplemented its report on August 31 and November 27, 1995. Defs.' Ex. B at F-2. The report revealed that while the Company had sustained losses of $ 218,392 in 1994, its losses had dropped to $ 171,248 for the nine months ended September 30, 1995.

In the Winter of 1995, Kaye Kotts took a turn for the worse. Cplt. P 34. On its form 10-K filed April 15, 1997, the Company reported a loss of $ 224,454 for the final quarter of 1995 alone. Cplt. P 33. Kaye Kotts' stock lost $ 0.17 per share in the final quarter and $ 0.14 per share in fiscal 1995. The Company never recovered. By April 15, 1997, the Company's stock sold for $ 0.625 per share and its warrants for $ 0.16 per warrant. Cplt. P 35. In July 1997, Kaye Kotts filed for bankruptcy. Pls.' Mem. at 1.

The crux of plaintiffs' claim against defendants [*6] is that the financial figures, as revealed in Feldman Radin's audit report and elsewhere in the Prospectus, made the Company look profitable when it was in fact losing money. Plaintiffs allege that defendants knew or should have known of the 1995 results at the time of the Offering and that their failure to disclose these results made the Registration Statement and Prospectus materially misleading. Cplt. PP 33, 34, 35. n5 Plaintiffs also charge that defendants' failure to disclose the final quarter 1995 losses artificially inflated the price of Kaye Kotts' stock during the Class Period, and that plaintiffs incurred damages, because they purchased the shares for more than they were worth. Cplt. PP 6, 59.

> n5 Specifically, plaintiffs allege that "the Prospectus set forth that Kaye Kotts,

Case 1:99-cv-00371-GMS    Document 329-11    Filed 10/10/2006    Page 4 of 20

Page 3

1998 U.S. Dist. LEXIS 3900, *6; Fed. Sec. L. Rep. (CCH) P90,192

while unprofitable in 1993, had turned the corner, making a profit in 1994 and the first nine months of 1995. This was misleading because the Company had suffered a massive loss in the fourth quarter and full year 1995, which ended *seven weeks before the Offering*." Cplt. P 32 (emphasis in original). Feldman Radin contends that it could not have committed securities fraud, because such a statement does not appear in its audit report. FR's Mem. at 21. However, reading plaintiffs' allegation broadly, the Court concludes that plaintiffs allege that the financial figures disclosed in the Prospectus suggest that the Company was profitable when in fact it was not. See Pl.'s Mem. at 19.

[*7]

## DISCUSSION

### I. Standard of Review

Feldman Radin moves to dismiss the Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim upon which relief may be granted, or alternatively, for summary judgment on plaintiffs' Section 11 claim. The individual defendants join in Feldman Radin's motion for summary judgment. Because the grounds for dismissal asserted by Feldman Radin in its 12(b)(6) motion are inapposite to the individual defendants, the Court discusses the merits of each motion separately.

### A. Motion to Dismiss

Dismissal under Rule 12(b)(6) is proper only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. The Court's function on a 12(b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)*. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" [*8] *Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995)* (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974)*, cert. denied, ___ U.S. ___ , 117

*S. Ct. 50 (1996))*. Accordingly, on a motion to dismiss, the Court must accept as true all factual allegations in the Complaint and draw all reasonable inferences in favor of the plaintiff. *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993)*. However, the Court may disregard "conclusions of law or unwarranted deductions of fact." *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994)*.

When a complaint is dismissed under Rule 12(b)(6), "the usual practice" is to allow leave to amend. *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)*. "Although leave to [amend] is within the discretion of the district court, refusal to grant it without any justifying reason is an abuse of discretion." Id. Such a justifying reason exists if a plaintiff "is unable to allege any fact sufficient to support its claim," id., or where "amendment[] would not serve any purpose." *Kaster v. Modification Systems, Inc.,* [*9] *731 F.2d 1014, 1018 (2d Cir. 1984)*. If a plaintiff has "at least colorable grounds for relief, justice does . . . require leave to amend." Id. (internal quotation omitted). However, where no justifying reason or colorable ground for relief exists, dismissal with prejudice is warranted. *Cortec Indus., 949 F.2d at 48*.

In reviewing the pleadings on a 12(b)(6) motion, the Court must limit its analysis to the four corners of the complaint and evaluate the legal viability of the allegations contained therein. *Fed. R. Civ. P. 12(b)(6); Kopec v. Coughlin, 922 F.2d 152, 154-55 (2d Cir. 1991)*. However, "when a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim." *Cortec Indus., 949 F.2d at 47*. Because the Complaint here alleges materially misleading statements made in the Registration Statement and Prospectus issued February 22, 1996, and Feldman Radin has annexed a copy of the Prospectus to its Notice of Motion, the Court considers it in its review of the pleadings.

### B. [*10] Summary Judgment

Summary judgment is permissible only where the parties have been afforded adequate discovery and "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S.*

Page 4

1998 U.S. Dist. LEXIS 3900, *10; Fed. Sec. L. Rep. (CCH) P90,192

*Ct. 2505 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* "The pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(d).* On a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in its favor." *Liberty Lobby, 477 U.S. at 255.*

A party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323.* Only if the movant satisfies that burden does the onus shift to the nonmoving [*11] party "to set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby, 477 U.S. at 250.* This is a "heavy burden" when the motion is made pursuant to *15 U.S.C. § 77k(e). Akerman v. Oryx Communications, Inc., 810 F.2d 336, 341 (2d Cir. 1987).*

II. Liability under Section 11 of the Securities Act

At issue in plaintiffs' Section 11 claim is whether Feldman Radin was required to update its audit report with financial results it had not certified and whether the individual defendants have proffered sufficient evidence to dismiss plaintiffs' Section 11 claim pursuant to Section 11(e). For the reasons to be discussed, I hold that Feldman Radin was not required to update its audit report and that the individual defendants have not met their burden under Section 11(e). Accordingly, I grant Feldman Radin's motion to dismiss the Section 11 claim as against it, but deny the individual defendants' motion for summary judgment.

A. Sections 11(a) and (b)

My analysis necessarily begins with the language of Section 11(a). See *Landreth Timber Co. v. Landreth, 471 U.S. 681, 685, 85 L. Ed. 2d 692, 105 S. Ct. 2297 (1985).* Section 11(a) provides a [*12] cause of action for "any person" who "acquired" a security in reliance on a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading," as against, among others,

(1) every person who signed the registration statement; n6

(4) every accountant . . . who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him [.]

*15 U.S.C. § 77k(a)(4)* (emphasis added).

n6 The Complaint alleges that each of the individual defendants signed the Registration Statement. Cplt. PP 9-15. However, the individual defendants have not moved to dismiss plaintiffs' Section 11 claim for failure to state a claim upon which relief may be granted. Thus, the Court does not consider whether plaintiffs sufficiently allege liability on the part of the individual defendants under *15 U.S.C. § 77k(a)(1).* However, the Court will consider whether plaintiffs can prove damages against the individual defendants under Section 11, because the individual defendants have joined in Feldman Radin's motion for summary judgment. See discussion infra Part II.B.

[*13]

Moreover, Section 11 provides an affirmative defense to any person, other than the issuer, who by "reasonable investigation" had "reasonable ground to believe and did believe at the time such registration statement became effective" that no statement made in connection with a registration statement was materially false or misleading. Id., § 77k(b)(3).

Here, plaintiffs assert a Section 11 claim against Feldman Radin based upon its failure to conduct a "proper and complete S-1 Review" of Kaye Kotts and to update their audit report with the Company's final quarter

1998 U.S. Dist. LEXIS 3900, *13; Fed. Sec. L. Rep. (CCH) P90,192

and year end 1995 financial results. n7 See Cplt. PP 31, 42; Pl.'s Mem. at 5. Plaintiffs claim that if Feldman Radin had conducted such a review, it "would have discovered that Kaye Kotts had a material loss for the fourth quarter and full year 1995."

> n7 An S-1 Review is a review of "events subsequent to the date of a certified balance sheet [appearing in a registration statement] . . . to ascertain whether any material change has occurred in the company's financial position that should be disclosed to prevent the balance sheet figures from being misleading." Comment, Barchris: Due Diligence Refined, 21 Stan. L. Review 171, 178 n.16 (1968) (quoting *Escott v. BarChris, 283 F. Supp. 643, 701 (S.D.N.Y. 1968)*). Such review includes comparing recent financial statements to earlier ones, reading minutes of stockholders' and directors' meetings, and investigating changes in material contracts, bad debts and newly discovered liabilities. *BarChris, 283 F. Supp. at 701-03.*

[*14]

Plaintiffs have entirely misconstrued the basis for accountant liability under Section 11. In order to state a claim against an accountant under this provision, the accountant must have prepared or certified a statement in connection with a registration statement that was false or misleading. See *Herman & MacLean v. Huddleston, 459 U.S. 375, 382 n.13, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983); Grimm v. Whitney-Fidalgo Seafoods, Inc., 1973 U.S. Dist. LEXIS 10803, No. 73 Civ. 1304, 1973 WL 495*, at *2-3 (S.D.N.Y. Dec. 4, 1973). In other words, the accountant may only be liable for statements that "purport . . . to have been prepared or certified by him." *15 U.S.C. § 77(k)(a)(4).* See also *Huddleston, 459 U.S. at 386 n.22* (accountants "cannot be reached by a Section 11 action . . . . with respect to parts of a registration statement which they are not named as having prepared or certified"). n8 Plaintiffs do not allege that Feldman Radin, or anyone else, made or caused a misstatement or omission to be made in the audit report. Nor do plaintiffs allege that Feldman Radin prepared or certified any part of the registration statement other than the audit report.

> n8 Unless, of course, the accountant has signed the registration statement, was a director or partner of the issuer, or was about to become a director or partner. See *15 U.S.C. § 77k(a).* Cf. *Shapiro v. Cantor, 123 F.3d 717, 721 (2d Cir. 1997)* ("an accountant shares in an insider's duty to disclose [under Rule 10(b)] if the accountant exchanges his or her role for an insider who vends the company's securities"). Plaintiffs have made no such allegation here.

[*15]

Rather, plaintiffs suggest that the mere presence of Feldman Radin's report in the Prospectus was misleading, when considered in light of the Company's final 1995 financial results. This argument, however, is unavailing. An accurate report simply does not become misleading because an issuer suffers a material loss subsequent to the period covered by the report. There must exist materially false or misleading information in the report itself. See, e.g., *Ingenito, 441 F. Supp. 525 at 549.* Here, Feldman Radin expressly limited its opinion to "the financial position of Kaye Kotts . . . as of December 31, 1994." Because plaintiffs have failed to allege that the certified statements were misleading in and of themselves, they cannot maintain a Section 11 claim against Feldman Radin.

Indeed, by merely alleging that Feldman Radin should have updated its report with the Company's 1995 results, plaintiffs suggest that Section 11(b) is an independent basis for liability under the Securities Act. However, as enacted, Section 11(b) is an affirmative defense to liability under Section 11(a). A fortiori, in order for Section 11(b) to apply in any given case, a plaintiff must first allege a violation [*16] of Section 11(a). Here, plaintiffs do not assert that Feldman Radin omitted or falsified any material information in the 1993 or 1994 financial statements. Therefore, plaintiffs' sole claim that a subsequent review of the Company would have revealed a material loss for the final quarter and full year 1995 is irrelevant, because plaintiffs have no basis for maintaining a Section 11(a) claim against Feldman Radin. See, e.g., *Robin v. Doctors Officenters Corp., 686 F. Supp. 199, 208 (N.D. Ill. 1988)* ("although accountants are required to take reasonable steps to correct misstatements discovered in previous financial

1998 U.S. Dist. LEXIS 3900, *16; Fed. Sec. L. Rep. (CCH) P90,192

statements," they need not "disclose events that occur subsequent to the period that they purport to certify") (citing *BarChris, 283 F. Supp. at 684 (S.D.N.Y. 1968)*) (emphasis added); *Ingenito v. Bermec Corp., 441 F. Supp. 525, 549 (S.D.N.Y. 1977)* (purpose of post-audit inquiry is to ensure integrity of certified statements); *Grimm, 1973 U.S. Dist. LEXIS 10803, 1973 WL 495, at *2* ("independent accountant's liability is limited to those figures which he certifies . . . . just what has been certified [must] be determined [from] the four corners of the prospectus") (emphasis [*17] added); *BarChris, 283 F. Supp. at 701* (purpose of S-1 review "is to prevent . . . balance sheet figures" from being false or misleading). See also *United States v. Arthur Young & Co., 465 U.S. 805, 811, 104 S. Ct. 1495, 1500, 79 L. Ed. 2d 826 (1984)* (purpose of audit report is to opine "whether the financial statements, taken as a whole, fairly present the financial position and operations of the corporation for the relevant period"). Cf. *In re Leslie Fay Companies, Inc. Sec. Lit., 835 F. Supp. 167, 174-75 (S.D.N.Y. 1993)* (declining to dismiss complaint against auditor where auditor certified report but failed to discover annual income was 60% of that actually reported); *Ahern v. Gaussoin, 611 F. Supp. 1465, 1484 (D. Ore. 1985)* (finding cause of action under Section 11(a) where accountant had certified statement that had become inaccurate by the time that investors had purchased notes).

I decline plaintiffs' invitation to read a duty into Section 11(a) to "update" a certified report beyond the period that the report purports to certify. To do so would contravene the plain language of the statute, which limits the liability of accountants to "statement[s] in a registration [*18] statement, report, or valuation, which purport[] to have been prepared or certified by [them]." *15 U.S.C. § 77(k)(a)(4)*. See also *Grimm, 1973 U.S. Dist. LEXIS 10803, 1973 WL 495, at *3* (dismissing Section 11(a) claim against defendant auditor where plaintiff had not alleged that certified financial statements contained material omission or misstatement); *BarChris, 283 F. Supp. at 684* (declining to hold accountants liable for interim, unaudited financial results). n9 Cf. *Ingenito, 441 F. Supp. at 549* ("accountant may be held liable for . . . financial statements which portray an inaccurate picture for the period covered by the report").

n9 In BarChris, a case which is not, as plaintiffs suggest, "dispositive," a court imposed Section 11 liability on defendant

auditor Peat, Marwick because it failed to discover misstatements in its certified audit report. See *283 F. Supp. at 682*. This Court declines to interpret BarChris in such a way that would impose a duty on accountants beyond what is prescribed by Section 11(a). To the extent that dictum in BarChris may suggest otherwise, I decline to follow it.

[*19]

In short, for any post-audit investigation to have been relevant to the instant motion, there must first have existed a basis for liability against Feldman Radin under Section 11(a). The Court has carefully considered the Complaint and has found none. Accordingly, plaintiffs' Section 11 claim is dismissed as against Feldman Radin.

B. Plaintiffs' Damages under Section 11(e)

Feldman Radin also urges that plaintiffs' Section 11 claim be dismissed, because plaintiffs can not prove damages under this provision. The individual defendants have joined, and briefed, this motion. Because Feldman Radins' 12(b)(6) motion does not apply to the individual defendants, the Court will consider the defendants' Rule 56 motion.

Section 11(e) provides that damages are not recoverable under Section 11,

> if the defendant proves that any portion or all of the damages represents other than the depreciation in the value of such security resulting from such part of the registration statement, with respect to which liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

*15 U.S.C.* [*20] *§ 77k*(e). Defendants assert that because Kaye Kotts disclosed a $ 176,621 loss for fiscal 1995 in a "Special Financial Report" or "SP-15" filed with the SEC on or about May 17, 1996, and the Company's stock price rose immediately after disclosure, plaintiffs cannot prove damages under Section 11. Indiv. Defs.' Reply Mem. at 3. I disagree.

The presence or absence of price movement

1998 U.S. Dist. LEXIS 3900, *20; Fed. Sec. L. Rep. (CCH) P90,192

immediately after disclosure is not per se dispositive under Section 11(e). n10 Accord *Beecher v. Able*, 435 F. Supp. 397, 404 (S.D.N.Y. 1977) ("Case law [and] commentators . . . agree that a stock's 'realistic value' may be something other than market price, where the public is either misinformed or uninformed about important facts relating to the defendant's well being."). This is particularly true where it is undisputed that the stock price did in fact decline at some point after the disclosure of the Company's financial results. n11 Because no expert analysis of the price issue has been provided, the Court cannot discern from the evidence what part, if any, the 1995 information might have had on the stock price. See, e.g., *Westinghouse Elect. Corp. v. '21' Int'l Holdings, Inc.*, 821 F. Supp. [*21] 212, 215 (S.D.N.Y. 1993) ("while the Court agrees with [defendants that] the better part of the drop in the market price of its stock cannot be said to have resulted from the alleged misrepresentations, [defendants have] not shown that the drop in market price after the [second] announcement . . . was not the result of the alleged misrepresentations"); *In re Saxon Sec. Lit., 1985 U.S. Dist. LEXIS 14305, *28, No. 82 Civ. 3103, 1985 WL 48177,* at *9 (S.D.N.Y. Oct. 31, 1985) ("to separate the effect of the fraud from the effect of non-actionable forces . . . . require[s] expert testimony" where stock price declined upon announcement of company's bankruptcy but had fluctuated periodically prior to announcement). If such analysis were not required, the Court would seldom be in the position to "eliminate that portion of a price decline that [was] the result of forces unrelated to the wrong." *In re Executive Telecard, Ltd. Sec. Lit., 979 F. Supp. 1021, 1025* (S.D.N.Y. 1997) (citing *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 65 F.3d 1044, 1048 (2d Cir. 1995), cert. denied, 517 U.S. 1190, 116 S. Ct. 1678, 134 L. Ed. 2d 781 (1996)).

n10 Defendants rely exclusively on *Akerman,* 810 F.2d 336 at 342-43, to support their position. In *Akerman,* plaintiffs sought damages based upon a depreciation in stock price prior to public disclosure of erroneous information, on the theory that insider trading had deflated the securities' true value. *609 F. Supp. 363, 371 (S.D.N.Y. 1984).* Defendants had shown that the depreciation in value between the time of disclosure and the time of suit was "zero," and that in fact,

the price at the time of suit was twenty-five cents higher than at the time of the offering. *810 F.2d at 342.* This is certainly not the case here, where plaintiffs have claimed -- and the facts suggest -- that Kaye Kotts stock is now "virtually worthless." See Pl.'s Br. at 1. Cf *Kurzweil v. Philip Morris Companies, Inc., 1997 U.S. Dist. LEXIS 4451, No. 94 Civ. 2373, 1997 WL 167043,* at *9 (S.D.N.Y. April 9, 1997) (implying that where stock price nearly doubled when lawsuit was pending, defendants could bring successful motion for summary judgment). Moreover, in *Akerman,* the plaintiffs had been permitted extensive discovery and expert testimony had been submitted on the motion for summary judgment. See *810 F.2d at 343.* Here, neither party has submitted expert testimony, and in April 1997, Kaye Kotts' stock sold at $ 0.25 per share, $ 4.75 less than at the time of the Offering and approximately $ 3.25 less than at the filing date of the SP-15 report. See Def.s' Ex. E; Pls.' Mem. at 1; Cplt. P 2. These cases are therefore distinguishable.

[*22]

n11 While the depreciation in value of Kaye Kotts' stock has not been more than a few dollars since the time of the Offering, the Court notes that the price of the stock has dropped approximately 97% from the time of the initial disclosure, and approximately 92% from the time of the second disclosure, to the time of suit. The Court cannot hold as a matter of law that this decrease is insignificant. See, e.g., *United States v. Russo, 74 F.3d 1383, 1389 (2d Cir. 1996)* (finding significant 68% drop in stock price from $ 1.25 to $ 0.40), cert. denied, *519 U.S. 927 117 S. Ct. 293, 136 L. Ed. 2d 213 (1996).*

Furthermore, it should be noted that in the cases where defendants have successfully established an 11(e)

Case 1:99-cv-00371-GMS    Document 329-11    Filed 10/10/2006    Page 9 of 20

Page 8

1998 U.S. Dist. LEXIS 3900, *22; Fed. Sec. L. Rep. (CCH) P90,192

defense on summary judgment, they have not only submitted expert testimony, but have provided and discussed evidence attributing the decline to factors other than their own disclosure of financial results. n12 Eg., *In re Fortune Systems Sec. Lit., 680 F. Supp. 1360, 1365-68 (N.D. Ca. 1987)* (attributing price drop to poor management of Offering in addition to showing that stock had outperformed [*23] competitors during same period); *Akerman, 609 F. Supp. 363 at 371* (finding "many independent factors [had] contributed to the stock's decline"); *Beecher, 435 F. Supp. at 407* (drop in value due to economy). Cf. *Feit v. Leasco Data Processing Equip. Corp., 332 F. Supp. 544, 586 (E.D.N.Y. 1971)* (taking "market decline" into account during valuation); *Fox v. Glickman Corp., 253 F. Supp. 1005, 1010 (S.D.N.Y. 1966)* (same, with respect to "market conditions"). Defendants have not provided the Court with any authority that cannot be distinguished on these grounds. n13

n12 The Court notes that the record suggests that factors other than the disclosure of the 1995 and 1996 financial results may have contributed to the depreciation in Kaye Kotts' stock price. First, the Prospectus suggests that Kaye Kotts may have lost money in 1995, because it was further expanding its market. See Defs.' Ex. B at 5 ("There is no assurance that the Company will successfully market its services outside of California . . . . It is possible that during its expansion efforts the Company will sustain losses."). Second, a press release states that Kaye Kotts and other tax assistance firms were being investigated by the Internal Revenue Service in 1996. Pls.' Ex. 1. The Court does not consider this evidence, however, because the parties do not discuss, nor even mention, it in their briefs and the Court has no basis in the evidence upon which to evaluate the significance of these events upon the stock price.

[*24]

n13 In *Akerman*, the court dismissed plaintiffs' Section 11 claim on summary

judgment, only after defendants had "proven by expert, statistical analysis that the alleged discrepancy had insufficient significance to create a genuine issue of material fact." *609 F. Supp. at 371*. The court suggested that plaintiffs' claim would not have been dismissed based solely upon the submission of stock quotes: "Although defendants failed in their more general attack on the significance of the alleged discrepancy in performance of the . . . stock, the court offered them an opportunity to [submit] expert [testimony on that point]." Id.

Finally, the Court rejects defendants' attempt to shift their Section 11(e) burden to plaintiffs, by claiming that plaintiffs have failed to show loss causation. Loss causation is not an element of a Section 11 claim. *Lyne v. Arthur Andersen & Co., 772 F. Supp. 1064, 1067 (N.D. Ill. 1991); Miller v. New America High Income Fund, 755 F. Supp. 1099, 1106-09 (D. Mass 1991)*, aff'd sub nom. *Lucia v. Prospect Street High Income Portfolio, Inc., 36 F.3d 170 (1st [*25] Cir. 1994); Billet v. Storage Tech. Corp., 72 F.R.D. 583, 586 n.6 (S.D.N.Y. 1976); Emmi v. First Manufacturers Nat'l Bank, 336 F. Supp. 629, 635 (D. Me. 1971)*. Rather, in enacting Section 11(e), Congress unmistakably made "negative causation" an affirmative defense. *Akerman, 810 F.2d at 341*. See also *Hayes v. Arthur Young & Co., 34 F.3d 1072, 1994 WL 463493*, at *10 (9th Cir. 1994) (unpublished table decision) ("while in the § 10(b) context it is the plaintiff who must prove loss causation, in the § 11 context it is the defendant who has the burden"); *Bastian v. Petren Resources Corp., 892 F.2d 680, 685 (7th Cir. 1990)* (Posner, J.) ("absence of loss causation is an explicit defense"); *Nielsen v. Greenwood, 849 F. Supp. 1233, 1247 (N.D. Ill. 1994)* ("[it is] well-settled that loss causation is not a requirement . . . under § 11"); *In re Fortune Systems Sec. Lit., 680 F. Supp. 1360, 1364 (N.D. Ca. 1987)* (once plaintiffs allege omission under Section 11, "causation is presumed and the burden is then on defendants to show that 'factors other than' the omissions caused the decline in the value of the stock for which plaintiffs seek to recover"). [*26] Cf. *Huddleston, 459 U.S. at 382* ("Section 11 places a . . . minimal burden on a plaintiff."). Thus, the measure of damages is not "an essential element of [plaintiffs'] case" that must be proven by plaintiffs on summary judgment. See *Celotex, 477*

Page 9

1998 U.S. Dist. LEXIS 3900, *26; Fed. Sec. L. Rep. (CCH) P90,192

*U.S. at 325*. Plaintiffs are certainly not required, as defendants suggest, to "'go beyond the pleadings and by [their] own affidavits, or by . . . [expert] deposition . . .' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex, 477 U.S. at 324* (quoting *Fed. R. Civ. P. 56(e)*). See also *Isquith v. Middle South Utilities, Inc., 847 F.2d 186, 198 (5th Cir. 1988)* ("We disagree with defendants that [the nonmovant is] required to respond to a motion for summary judgment by proffering its own evidence."). Rather, the burden remains on defendants to prove that other factors caused the decline in price of plaintiffs' stock. See *Akerman, 810 F.2d at 341-343*.

For plaintiffs' Section 11 claim to be dismissed under Section 11(e) at this stage in the proceedings, defendants must conclusively establish that plaintiffs' damages are de minimus. *Akerman, 609 F. Supp. at 371*. Based on the evidence submitted, [*27] defendants have not met this burden. Accordingly, I decline to dismiss plaintiffs' Section 11 claim as against the individual defendants.

## II. Liability under Section 10(b) and Rule 10b-5

Plaintiffs also seek to hold the defendants liable under Section 10(b) of the Exchange Act and SEC Rule 10b-5 for failing to disclose the 1995 financial results. Feldman Radin moves to dismiss this claim under *Fed. R. Civ. P. 12(b)(6)*. Because these provisions serve different remedial purposes than does Section 11, see, e.g., *Huddleston, 459 U.S. at 383-86*, I analyze these claims separately.

Section 10(b) makes it "unlawful for any person . . . to use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as necessary or appropriate . . . for the protection of investors." *15 U.S.C. § 78j(b)*. Rule 10b-5, a general anti-fraud provision promulgated under Section 10(b), makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, [*28] not misleading . . . ." *17 C.F.R. § 240.10b-5(2)*.

To state a claim under Rule 10b-5, a plaintiff must plead that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on

defendant's action caused him injury." *Bloor v. Carro, 754 F.2d 57, 61 (2d Cir. 1985)*.

As previously stated, plaintiffs allege that Feldman Radin's audit report was misleading, not because it misstated any of the financial results, but rather because it failed to disclose the results for the final quarter and full year 1995. Therefore, the sole basis for plaintiffs' 10(b) and 10b-5 claims is that defendants made a material omission. When a 10(b) claim "is based upon non-disclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States, 445 U.S. 222, 234, 63 L. Ed. 2d 348, 100 S. Ct. 1108 (1980)*. See also *Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)* ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992)* ("a 'duty [*29] to speak' must exist before the disclosure of material facts is required") (internal quotations omitted). Accordingly, as a preliminary matter, to sustain their claims under 10(b) and 10b-5, plaintiffs must allege that Feldman Radin had a duty to disclose Kaye Kotts' final quarter and full year 1995 results.

Plaintiffs cannot meet this burden. Though they are correct that an accountant creates "a special relationship of trust with the public" when it provides certified statements in a prospectus, *Gold v. D.C.L. Inc., 399 F. Supp. 1123, 1127 (S.D.N.Y. 1973)*, this duty is narrowly circumscribed. When an accountant certifies financial statements, it "holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable." *Gold, 399 F. Supp. at 1127*. However, the relationship which starts with a review of the issuer's financial statements necessarily ends with the accurate disclosure of those statements on the effective date of the prospectus. "No basis exists in principle or authority . . . [to] extend[] an auditor's duty to disclose beyond . . . [his] representation or certification." *Barker v. [*30] Lee County Bank, 1985 U.S. Dist. LEXIS 15986, No. 79 Civ. 2047, 1985 WL 2529, at *13 (N.D. Ill. Sept. 13, 1985), aff'd, 797 F.2d 490 (7th Cir. 1986)*. See also *Robin, 686 F. Supp. at 208* ("no duty to the public to disclose events that occur subsequent to the period that they purport to certify"); *Ingenito, 441 F. Supp. at 549* (possession of adverse information does not require disclosure where certified figures are accurate when issued).

The duty that plaintiffs would have the Court impose

Case 1:99-cv-00371-GMS    Document 329-11    Filed 10/10/2006    Page 11 of 20

Page 10

1998 U.S. Dist. LEXIS 3900, *30; Fed. Sec. L. Rep. (CCH) P90,192

on Feldman Radin is simply too broad. In *IIT v. Cornfeld, 619 F.2d 909, 927 (2d Cir. 1980)*, the Court restricted an auditor's duty to disclose accurate information under Section 10(b) to those statements it had certified as accurate:

> Accountants do have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements . . . . However . . . . [defendant Arthur Anderson & Co.] had no independent duty to see to the correction of portions of the prospectus other than the financial statement it prepared.

Even more recently, the Court limited an auditor's duty in connection with information that had not been disclosed anywhere in the offering memorandum. [*31] In Shapiro v. Cantor, the Court affirmed the dismissal of a 10(b) claim against defendant Touche Ross & Co. for having declined to reveal in its financial projections that "investment proceeds were to be placed at the mercy of a person who had been convicted and imprisoned for fraud." *123 F.3d at 721* (quoting Pls.' Mem. in Opp'n to Mot. to Dismiss). The Court held that Touche Ross had no duty to disclose such information, because an accountant could not be liable for misrepresentations or omissions which he or she did not certify. Id. The Court reasoned that to hold otherwise would impermissibly impose aider and abettor liability under Section 10(b). n14

> n14 In Central Bank v. First Interstate Bank," *511 U.S. 164, 191 (1994)*, the Supreme Court determined that Section 10(b) "does not prohibit aiding and abetting" fraud. See also *Dinsmore v. Squadron, 135 F.3d 837, 1998 U.S. App. LEXIS 1448, 1998 WL 49315*, at *6 (2d Cir. 1998) (declining "to imply a cause of action for conspiracy to violate § 10(b) and Rule 10b-5").

[*32]

Plaintiffs claim that the Prospectus gave the impression that Kaye Kotts had "turned the corner," by suggesting that the Company was "profitable" at the time of the Offering, when in fact it was not. Cplt. P 32.

Neither of these statements appear in Feldman Radin's audit report. n15 Therefore, in light of Shapiro, plaintiffs cannot state a 10(b) or 10b-5 claim against Feldman Radin. Accord *Wright v. Ernst & Young, 1997 U.S. Dist. LEXIS 13630, No. 97 Civ. 2189, 1997 WL 563782*, at *1-3 (S.D.N.Y. Sept. 10, 1997) (dismissing complaint on "aider and abettor" grounds where plaintiff alleged that auditor certifying financial statements in prospectus had implicitly "signed off" on later results in company press release); *AUSA Life Ins. Co. v. Dwyer, 928 F. Supp. 1239, 1256 (S.D.N.Y. 1996)* (following Central Bank to dismiss Section 10(b) claims where audit committee did not make alleged misrepresentations). Accordingly, I dismiss plaintiffs' Section 10(b) and Rule 10b-5 claims with respect to Feldman Radin. n16

> n15 As far as the Court can tell, they also do not appear anywhere else in the Prospectus. See Defs.' Ex. B.

[*33]

> n16 Plaintiffs' Section 10(b) and Rule 10b-5 claims may also be dismissed for failure to allege "loss causation." See *First Nationwide, 27 F.3d at 769; Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1991); Fisk v. Superannuities, Inc., 927 F. Supp. 718, 729 (S.D.N.Y. 1996)*. However, because defendants have not raised this issue, the Court does not consider it.

## CONCLUSION

For the foregoing reasons, the Court grants defendant Feldman Radin's *Fed. R. Civ. P. 12(b)(6)* motion and denies the individual defendants' Rule 56 motion. The Clerk of the Court is directed to enter judgment dismissing the Complaint against Feldman Radin.

**SO ORDERED.**

Dated: New York, New York

March 24, 1998

**Sonia Sotomayor**

1998 U.S. Dist. LEXIS 3900, *33; Fed. Sec. L. Rep. (CCH) P90,192

**U.S.D.J.**

**A. 85**



Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Erie Ins. Exchange ex rel. McCracken v. Applica
Consumer Products, Inc.M.D.Pa.,2005.
United States District Court,M.D. Pennsylvania.
ERIE INSURANCE EXCHANGE, as Subrogee of
Donald McCracken Plaintiff
v.
APPLICA CONSUMER PRODUCTS, INC.,
Formerly Known as Windmere Corp., Defendant
**No. 3:CV-02-1040.**

May 17, 2005.

Edward S. Neyhart, Byrne & Neyhart, Scranton, PA,
for Plaintiff.
Rochelle M. Fedullo, Wilson, Elser, Moskowitz,
Edelman & Dicker, Philadelphia, PA, for Defendant.

*MEMORANDUM*
VANASKIE, Chief J.
*1 Defendant Applica Consumer Products, Inc.
("Applica") has moved for summary judgment based
upon Plaintiff's failure to preserve the fire scene for
inspection and failure to preserve relevant evidence
from the fire scene. Plaintiff Erie Insurance Exchange
("Erie"), as a suborgee of Donald McCracken, the
former owner of the property where the fire occurred,
asserts that the fire was caused by a malfunction in a
coffee maker that was manufactured and placed into
the stream of commerce by Applica under the trade
name of "Black & Decker." In its motion Applica
claims that Erie's failure to timely notify it of a pos-
sible subrogation claim prevented Applica's repres-
entatives from conducting their own investigation of
the fire scene, and Erie's failure to preserve an elec-
tric range located in the kitchen of the McCracken
home prevented it from investigating other potential
causes of the fire.

Applica claims that Erie's failure has impaired its
ability to put forth an adequate defense and, there-
fore, judgment should be entered in its favor. Applica
has also filed a companion motion requesting the
Court to exclude the testimony of Erie's electrical en-
gineering expert, Randolph Marshall, on the basis

that it lacks reliability. Applica maintains that judg-
ment must be entered in its favor if Mr. Marshall's
testimony is excluded. For the reasons set forth be-
low, the Motion for Summary Judgment and the Mo-
tion to Preclude the Testimony of Randolph Marshall
will be denied.

*I. BACKGROUND*

On November 14, 2000, a fire occurred at 86 Leisure
Lands, East Stroudsburg, Pennsylvania, the home of
Donald McCracken ("McCracken"). The fire caused
extensive damage to Mr. McCracken's home. He in-
curred repair costs of $85,808.78, and personal prop-
erty damage of $74,400. (*Id.*) The McCracken home
was insured under a policy issued by Erie. Upon re-
ceiving notice of the fire by McCracken, Erie imme-
diately retained Michael J. Hartley ("Hartley") of
HSH Investigations, to investigate the cause and ori-
gin of the fire. Hartley conducted his investigation
the day following the fire and determined that the
cause of the fire was a coffee maker that was located
on the kitchen countertop in the McCracken home.
(Hartley's report of 11/16/00 at 3.) The coffee maker
was a Black & Decker, Versa Brew Series DCM
1250. During his investigation of the fire scene,
Hartley was accompanied by a Pennsylvania State
Police Fire Marshal, who concurred with his determ-
ination. (*Id.*) At the conclusion of his investigation,
Hartley removed the Black & Decker coffee maker, a
toaster oven, a waffle iron, and an electrical outlet
from the scene of the fire as possible ignition sources.
Hartley did not remove an electric range that was loc-
ated in the kitchen because he had ruled it out as a
possible source of the fire. Photographs as well as a
videotape were taken of the scene of the fire. Erie
also retained the expert services of Randolph Mar-
shall ("Marshall") of Dawson Engineering, Inc. Mar-
shall is an electrical engineer who was hired to in-
vestigate the cause of the fire and to perform tests on
the coffee maker to determine whether it was defect-
ive. Erie insisted that the coffee maker be fully ex-
amined by Marshall prior to notifying any potential
subrogation targets. Marshall's examination of the
coffee maker was completed approximately four (4)
months after the fire occurred. (Id. at 2) Upon receiv-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 2
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
(Cite as: Not Reported in F.Supp.2d)

ing Marshall's report, notice was given to Applica of a possible subrogation claim. At that time, the fire scene was no longer available for Applica to conduct its own inspection.

*2 Marshall prepared three reports pertaining to the cause of the fire. In each report, he expressed his professional opinion that the fire at the McCracken residence was caused by a malfunction of the Black & Decker coffee maker. (E.g., Marshall's Engineering Report of 1/7/04 at 6.) Applica had the opportunity to review Marshall's reports as well as review Erie's investigation file, photographs, and videotape of the fire scene. Applica also hired its own electrical engineering expert, Lawrence Sacco ("Sacco"), to evaluate and examine the coffee maker. In his report, Sacco opined that the coffee maker was not the cause or origin of the fire. (Sacco's Engineering Report of 12/23/03 at 4.) He believed that the coffee maker was exposed to an external fire attacking it from the left, the exact location of McCracken's electric range, and as such, he felt that the electric range could not be eliminated as the source of the fire. (*Id.* at 2, 4.) Applica claims that Erie's conduct in failing to preserve the fire scene so that Applica could perform its own investigation, and failure to preserve the electric range in order that appropriate tests could be performed on it to determine if it was the source of the fire, has prejudiced it in presenting a complete defense.

## II. THE SUMMARY JUDGMENT MOTION

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

All doubts as to the existence of a genuine issue of

material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *Cont'l Ins. Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. *Anderson,* 477 U.S. at 256-57. Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment. *Schoch v. First Fid. Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*3 The basis of Applica's motion for summary judgment is that Erie's failure to preserve relevant evidence from the scene of the fire and provide Applica with an opportunity to conduct its own inspection of McCracken's kitchen constitutes a spoliation of evidence, which should result in a dismissal of Plaintiff's claims. Applica's motion for summary judgment is a request for the ultimate sanction of dismissal for Erie's alleged spoliation of evidence. *See Donohoe v. American Isuzu Motors, Inc.,* 155 F.R.D. 515, 519 (M.D.Pa.1994). There is no rigid rule mandating a particular sanction upon a finding of improper destruction or loss of evidence. *See Id.*[FN1] It is a discretionary decision by the district court and this discretion should be exercised with a view toward choosing the "least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir.1994) "A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only 'if no alternative remedy by way of a lesser, but equally efficient sanction is available.' " *Baliotis v. McNeil,* 870 F.Supp. 1285, 1289 (M.D.Pa.1994) (citing *Capellupo v. FMC Corp.,* 126

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
(Cite as: Not Reported in F.Supp.2d)

F.R.D. 545, 552 (D.Minn.1989)).

> FN1. Sanctions that may be appropriate for the destruction of evidence include; (1) outright dismissal of claims; (2) exclusion of countervailing evidence; or (3) a jury instruction on the spoliation inference, which permits the jury to assume that destroyed evidence would have been unfavorable to the position of the offending party. *Howell v. Maytag,* 168 F.R.D. 502, 505 (M.D.Pa.1996) (citing *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 78 (3d Cir.1994)).

The authority to impose sanctions for the destruction of relevant evidence is recognized under state products liability law, *e.g., Lee v. Boyle-Midway Household Products, Inc.,* 792 F.Supp. 1001, 1005 (W.D.Pa.1992), and the inherent power of district courts to utilize sanctions in order to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). As explained in *Baliotis,* "sanctions for loss of evidence is part of a district court's inherent powers ... to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial." *Baliotis,* 870 F.Supp. at 1289.

The Third Circuit established the analytical framework for examining spoliation claims in *Schmid v. Milwaukee Elec. Tool Corp. .,* 13 F.3d 76, 79 (3d Cir.1994). In *Schmid,* the Court stated that when considering the imposition of a sanction against a party for spoliation of the evidence, three factors must be considered:
(1) the degree of fault of the party who altered or destroyed the evidence;
(2) the degree of prejudice suffered by the opposing party; and
(3) whether there is a lesser sanction [compared to the complete exclusion of evidence] that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*Id.; Schroeder v. Commw. Dep't of Transp.,* 551 Pa.

243, 710 A.2d 23, 26-27 (Pa.1998) (the Pennsylvania Supreme Court expressly adopted the three-prong test set forth in *Schmid* ). "In determining the applicability of the spoliation doctrine, a court cannot focus entirely on only one prong of the test, but must balance the facts of the case involved as to each prong." *Tenaglia v. Proctor & Gamble Inc.,* 737 A.2d 306, 308 (Pa.Super.Ct.1999).

### A. Fault

*4 Applying the first prong of the *Schmid* test to Erie's actions, it appears that Erie, either through inadvertence or neglect, bears a large degree of fault for the loss of relevant evidence. The electric range that was located in McCracken's kitchen at the time of the fire was inspected by Erie's investigator and ruled out as a possible source of ignition or as a cause of the fire. The mere fact that Hartley had to rule out the electric range as a possible source of the fire makes it apparent that the appliance was important to his investigation. Yet, Erie specifically chose not to preserve the electric range as evidence even though it did preserve a toaster oven, a waffle iron, and an electric outlet. It is also apparent that one of the reasons why Erie conducted its cause and origin investigation was to determine if a subrogation claim existed.

"A litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *Baliotis,* 870 F.Supp. at 1290. This duty arises as soon as a potential claim is identified. Erie knew as early as November 16, 2000, less than 48 hours after the fire occurred, that the Black & Decker coffer maker was a potential cause of the fire, thereby making Black & Decker a potential target for subrogation.[FN2] Despite this knowledge, Erie waited almost four months before contacting Black & Decker and by that time the site of the fire was no longer available for inspection. Erie claims that it had not decided to pursue a subrogation claim until approximately four months after the fire when it received the initial expert engineering report of Marshall.[FN3]

> FN2. "[T]he knowledge of a potential subrogation claim is deemed sufficient to impose a duty to preserve evidence." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
(Cite as: Not Reported in F.Supp.2d)

> FN3. Erie required that the coffee maker be x-rayed by Dawson Engineering in order to determine whether a defect existed in the machine prior to notifying Black & Decker of a potential subrogation claim. Erie attributes the delay in notification to Dawson Engineering because it did not complete the testing on the coffee maker until February 28, 2001. After receiving the testing results from Dawson Engineering, Erie placed Black & Decker on notice of a potential subrogation claim on March 6, 2001.

It is apparent that Erie was aware of a potential subrogation claim immediately following the fire after receiving the cause and origin report of Hartley, which concluded that the Black & Decker coffee maker was a potential cause of the fire. At that point a duty was imposed upon Erie to preserve the relevant evidence for inspection. Accordingly, Erie owed a duty to preserve evidence relevant to the origin and cause of the fire, including the electric range.

"The scope of the duty to preserve evidence is not boundless. At a minimum, however, an opportunity for inspection should be afforded to a potentially responsible party before relevant evidence is destroyed." *Baliotis,* 870 F.Supp. at 1290-91. Thus, Erie should have provided Applica with the opportunity to inspect the electric range.

Erie's motive for failure to preserve the electric range is relevant in determining what sanctions, if any, should be imposed. *Schmid* makes it clear that "the degree of fault" is the issue. The evidence as presented does not support a determination that Erie acted in bad faith. There was no evidence presented that Erie sought to destroy the fire scene or the electric range in order to prevent Applica from performing its investigation, or to divert liability away from its insured, McCracken.

### B. Prejudice

*5 Having established that Erie breached its duty to preserve relevant evidence from the fire, this Court must now determine what prejudice, if any, resulted to Applica from this breach. Under the second prong

of the *Schmid* analysis a manufacturer of a product that is allegedly responsible for causing a fire is prejudiced if it cannot have its own cause and origin expert inspect the fire scene for other potential causes. *Schmid,* 13 F.3d at 80 ("defendant will want as much evidence as possible [that is] relevant to the issue of causation"). However, the Black & Decker coffee maker, which Erie believes to be the cause of the fire, as well as the waffle iron, toaster oven, and the electrical outlet were preserved. Applica has had the ability to defend its product by having its expert examine the coffee maker to refute Erie's assertion that it was the cause of the fire. Plaintiff's expert, Sacco, has examined the coffee maker as well as the other appliances and has provided his opinion that the coffee maker was not the cause of the fire and that it was not defective. Furthermore, Applica has not presented any affidavits in this case that it is unable to present expert witness evidence on the cause and origin of the fire because of the inability to inspect the fire scene or the electric range. In fact, Sacco has testified that the information and evidence provided to him, which included photographs of the McCracken kitchen, videotape of the McCracken residence, Hartley's cause and origin report, and Marshall's reports were sufficient to allow him to formulate his expert opinion. Accordingly, a defense of this action has not been rendered impossible by Erie's failure to allow Applica to investigate the fire scene or its failure to preserve the electric range.

Applica's defense, however has been hampered by the destruction of the electric range. As pointed out by Applica, Erie is proceeding on a product malfunction theory. Under this approach, a plaintiff must present, *inter alia,* evidence eliminating other reasonable secondary causes for the fire. *See e.g., Walters ex rel. Walters v. General Motors Corp.,* 209 F.Supp.2d 481, 486-87 (W.D.Pa.2002). Here, Erie has presented evidence from its cause and origin expert eliminating the electric range as an ignition source, but Applica has been deprived of the means to test this assertion. Thus, Erie has prejudiced the defense of this action by failing to preserve the electric range.

The Third Circuit has indicated that "in the absence of bad faith by the breaching party and where the res-

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313

**(Cite as: Not Reported in F.Supp.2d)**

ulting prejudice is not severe, a sanction of witness preclusion or entry of judgment is unwarranted." *Schmid,* 13 F.3d at 81.[FN4] The Third Circuit specifically rejected a blanket preclusion rule based on the proposition that an expert witness "has an affirmative duty not to conduct an investigation without affording all potential defendants an opportunity to have an expert present." *Id.* In *Baliotis,* this Court determined that this rule applies to a fire scene. It would be impractical to require an insurance company to maintain the scene of a fire until all potential defendants are notified and afforded the opportunity to conduct independent inspections. To do so would create a safety hazard, and be wasteful and inefficient.

> FN4. Dismissal of a complaint or preclusion of evidence regarding an allegedly defective product is an extreme sanction reserved only for those instances where an entire product or the allegedly defective portion of a product is lost, spoiled or destroyed. *See Mensch v. BIC Corp.,* No. Civ.A. 90-6002, 1992 WL 236965 at *2 (E.D.Pa. Sept.17, 1992).

**\*6** This Court in *Baliotis* determined that a lesser sanction of a "spoliation inference" was warranted under facts similar to the facts of this case. An instruction to a jury that it may consider that the lost evidence would be unfavorable to Erie is consistent with the evidentiary rationale underlying the spoliation inference. As explained in *Baliotis,* "permitting the jury to draw such an inference furthers the prophylactic and punitive purposes of the 'spoliation inference.' " *Baliotis,* 870 F.Supp. at 1292. Knowledge that sanctions may be imposed for loss of relevant evidence attending destruction of a fire scene and a possible cause of the fire, resulting in prejudice to subrogation targets, may induce insurers or property owners to provide notice to those targets and an opportunity to inspect. Accordingly, this Court will impose a sanction of a "spoliation inference" instruction to the jury at the time of trial.

### III. THE ADMISSIBILITY OF MARSHALL'S TESTIMONY

Applica has filed a motion to exclude the testimony

of Randolph Marshall, Erie's electrical engineering expert. Applica asserts that Marshall's conclusion lacks indicia of reliability because of the purportedly improper methodology he used in arriving at his opinions.

The admissibility of expert testimony in federal court is governed by Federal Rule of Evidence 702, which provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that Rule 702 imposes a special obligation on the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." The purpose of this gatekeeping role is to establish a standard of evidentiary reliability. *Id.* at 590; *Kannankeril v. Terminix Int'l Inc.,* 128 F.3d 802, 806 (3d Cir.1997).

In assessing whether the proffered scientific expert testimony is reliable, the Third Circuit has explained that the trial court should admit expert testimony "if there are 'good grounds' for the expert's conclusions," notwithstanding "the judge's belief that there are better grounds for some alternative conclusion." *Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 152-53 (3d Cir.1999). "Novel" conclusions should not be excluded where the methodology and its application are reliable. *Id.* at 153. "[A]n expert opinion must be based on reliable methodology and must reliably flow from that methodology and the facts at issue-but it need not be so persuasive as to meet the party's burden of proof or even necessarily its burden of production." *Id.* at 152. Furthermore, the Supreme Court in *Daubert* emphasized that the Rule 702 inquiry was a "flexible one." *Daubert,* 509 U.S. at 594.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 6
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
(Cite as: Not Reported in F.Supp.2d)

*7 In order to determine whether to admit the expert testimony of Marshall the Court must begin by reviewing the methodology used by Marshall in formulating his opinions. Marshall's evaluation included:
1. Exposure of a small sample of the plastic housing from the exemplar coffee maker to an open flame
2. Evaluating x-rays of the remains of the coffee maker
3. Examining the burn pattern on the coffee maker
4. Examining the damaged power cord connected to the coffee maker and an evaluation of the internal wiring of the coffee maker
5. Reviewing the videotape and photographs from the scene of the fire and a review of Hartley's cause and origin report.

The x-rays of the coffee maker revealed that the shroud of the capacitor was detached and propelled five inches away into the plastic housing, and metal splatter was found in the area of the capacitor. The only explanation, according to Marshall, for both the projection of the shroud and the splattering of metal is an explosion due to internal electrical energy. (Marshall's Engineering Report of 1/7/04 at 4.) Marshall also explains that the burn patterns on the remains of the coffee maker were consistent with an internal fire, and in addition, the damage to the circuit board could not have occurred unless the fire developed internally because the circuit board is shielded behind a plastic housing, made of heat resilient materials. (Id. at 5.) Thus, Marshall was able to rule out the electric range as a source of the fire since he determined that the fire was ignited internally in the coffee maker.

Applica's argument attacking Marshall's opinion is based on his failure to perform further testing to determine whether the internal components in the location of the coffee maker where Marshall claims the fire originated were capable of generating sufficient heat to ignite the fire. Applica asserts that it is this failure to perform additional testing that renders Marshall's testimony unreliable and, therefore, inadmissible.[FN5]

> FN5. Unlike the electrical engineer whose testimony was excluded in *Pappas v. Sony Electronics, Inc.,* 136 F.Supp.2d 413

(W.D.Pa.2000), Marshall did inspect the power cord for the suspect appliance, finding that this "very important evidence needed to determine whether the [appliance] was energized at the time of the fire," *id.* at 419 n. 9, indicated that the coffee maker had been energized. Also unlike *Pappas,* Defendant in this case has failed to produce affidavits of an expert asserting that Marshall's methodology of "determining cause based on the physical evidence ran afoul of those techniques generally accepted by fire investigators." *Id.* at 423. Finally, unlike *Pappas,* other experts who examined the device in question concluded that the coffee maker was the likely origin of the fire.

Marshall's opinion is not rendered unreliable and inadmissible simply because he failed to determine the exact component of the coffee maker that caused the ignition of the internal fire. He based his conclusions on observations from x-rays and detailed examinations of the damaged product. These observations afford "good grounds" for a person with requisite expertise in electrical devices to base an opinion that an electrical source inside an appliance caused the fire. Marshall has articulated explanations premised upon electrical engineering principles that rule out a flame source external to the coffee maker. Specifically, examination of the burn patterns on the remains of the coffee maker and the results of the x-rays allowed Marshall to rule out the range as a source of ignition and conclude that an electrical malfunction inside the coffee maker triggered the fire. He pinpointed the origin of the fire to a two-inch square area housing electrical components. It is not for this Court to determine whether the opinion offered by Marshall is correct or incorrect. "The analysis of the conclusions themselves is for the trier of fact when the expert is subject to cross-examination." *In re: TMI Litigation,* 193 F.3d 613, 665 (3d Cir.1999). "The admissibility inquiry thus focuses on the principles and methodology, not the conclusions generated by the principles and methodology." *Id.* "The goal is reliability not certainty." *Id.* Despite its focus on reliability, the Court "must examine the expert's conclusions in order to determine whether they could reliably follow

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

from the facts known to the expert and methodology used." *Heller,* 167 F.3d at 153.

*8 This Court does not find that there is a significant gap between the information used by Marshall and the opinion he has proffered. His conclusions logically follow from the results of the information available to him. The fact that further testing could have been conducted by Marshall in forming his opinion is not determinative of the reliability of his testimony. The test for "admitting his expert testimony is not a question of whether his methods were perfect or whether a possibility exists that [he] might have done a better job." *Eclipse Electronics v. Chubb Corp.,* 176 F.Supp.2d 406, 412 (3d Cir.2001). Erie has presented sufficient evidence to establish the reliability of Marshall's testimony in accordance with the principles set forth in *Daubert* and Rule 702. His failure to conduct voltage or temperature testing may serve to undermine his opinions, but it does not render them inadmissible. Accordingly, Marshall's testimony will not be excluded.

### IV. CONCLUSION

For the reasons set forth above, and after consideration of the degree of prejudice suffered by the Defendant, this Court concludes that "an adverse inference instruction" is appropriate as the least onerous sanction, which corresponds to the harm that resulted from Plaintiff's breach of the duty to preserve evidence. Accordingly, Defendant's motion for summary judgment will be denied. Because Randolph Marshall articulated "good grounds" for his conclusions, the motion to exclude his testimony will also be denied. An appropriate Order follows.

### ORDER

NOW, THIS 16th DAY OF MAY, 2005, for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant's "Motion for Summary Judgment" (Dkt. Entry 43) is DENIED.

2. At the time of trial, the trier-of-fact will be permitted to draw an inference adverse to the position asserted by Plaintiff, that inference being that the evidence lost as a result of Plaintiff's failure to preserve the fire scene and electric range for inspection by Defendant would have been unfavorable to the position asserted by Plaintiff.

3. Defendant's "Motion to Exclude the Testimony of Randolph Marshall" (Dkt. Entry 44) is DENIED.

4. A telephonic scheduling conference will be held on June 3, 2005, at 11:00 a.m. Counsel for the plaintiff shall be responsible for placing the call to 570-207-5720 and all parties shall be ready to proceed before the undersigned is contacted.

M.D.Pa.,2005.
Erie Ins. Exchange ex rel. McCracken v. Applica Consumer Products, Inc.
Not Reported in F.Supp.2d, 2005 WL 1165562 (M.D.Pa.), 67 Fed. R. Evid. Serv. 313

Briefs and Other Related Documents (Back to top)

• 3:02cv01040 (Docket) (Jun. 17, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.